## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CITIZENS FOR CONSUMER JUSTICE,
COLORADO PROGRESSIVE COALITION,
CONGRESS OF CALIFORNIA SENIORS,
FLORIDA ALLIANCE FOR RETIRED
AMERICANS, HEALTH CARE FOR ALL, INC.,
MASSACHUSETTS SENIOR ACTION COUNCIL,
MASSPIRG, MINNESOTA SENIOR
FEDERATION, NEW JERSEY CITIZEN ACTION,
NEW YORK STATE WIDE SENIOR ACTION
COUNCIL, PENNSYLVANIA ALLIANCE FOR
RETIRED AMERICANS, VERMONT PUBLIC
INTEREST RESEARCH GROUP, WEST
VIRGINIA CITIZEN ACTION, and WISCONSIN
CITIZEN ACTION,

                Plaintiffs,

                v.

ABBOTT LABORATORIES, INC., ALLERGAN
WORLDWIDE, ALPHA THERAPEUTIC CORP.,
AMERICAN BIOSCIENCE, INC., AMERICAN
HOME PRODUCTS, AMGEN INC.,
ASTRAZENECA US, AVENTIS PHARMA,
BAYER AG, BAXTER INTERNATIONAL, INC.,
BRISTOL-MYERS SQUIBB CO., CHIRON,
FUGISAWA HEALTHCARE, INC.,
GLAXOSMITHKLINE, PLC, GENSIA SICOR
PHARMACEUTICALS, INC. GLAXO
WELLCOME, INC., GLAXO WELLCOME, PLC,
IMMUNEX CORP., ICN PHARMACEUTICALS,
INC., HOESCHT MARION ROUSSEL, INC., ELI
LILLY AND COMPANY, ONCOLOGY
THERAPEUTICS NETWORK CORP.,
PHARMACIA CORP., SCHERING-PLOUGH,
CORP., SICOR, INC., SMITHKLINE BEECHAM
CORPORATION, TAKEDA CHEMICAL
INDUSTRIES LTD., TAP PHARMACEUTICAL
PRODUCTS, INC., AND JOHN DOES 1 – 200,
                Defendants.

Case No.

**CLASS ACTION COMPLAINT**

Jury Trial Demanded

# 01-12257 PBS

RECEIPT # _____ 35961
AMOUNT $ _____ 150.00
SUMMONS ISS. _____ N
LOCAL RU _____
WAIVER _____
MCF ISSUED _____
AO 120 OR 121 _____
BY DPTY CLK _____ ES
DATE _____ 12/19/01

## COMPLAINT

Plaintiffs, on behalf of themselves and all others similarly situated, demanding a trial by jury, upon information and belief, except for information paragraphs five through sixteen which are based on personal knowledge, complain as follows:

### I.
### INTRODUCTION

This is a class action brought under the § 16 of the Clayton Act, the Sherman Act, 15 U.S.C. § 1 and § 2, and the Racketeer Influenced and Corrupt Organizations Act (RICO),18 U.S.C. §1961 *et seq.,* by Plaintiffs Citizens for Consumer Justice, Colorado Progressive Coalition, Congress of California Seniors, Florida Alliance For Retired Americans, Health Care for All, Inc., Massachusetts Senior Action Council, MassPIRG, Minnesota Senior Federation, New York StateWide Senior Action Council, Pennsylvania Alliance for Retired Americans, Vermont Public Interest Research Group, West Virginia Citizen Action, and Wisconsin Citizen Action (Plaintiffs) seeking relief on behalf of themselves and as representatives of the class which is defined herein.

1.     The fraudulent scheme devised and initiated by defendants and implemented by their co-conspirators was effectuated by: (i) overstating the average wholesale price (AWP) for Medicare Covered Drugs, the basis for the determination of the Medicare reimbursement rate and the co-payment amount; (ii) promoting the sale of Medicare Covered Drugs through health care providers by selling the Covered Drugs to them at a price substantially less than the health care providers charged Medicare and Medicare Beneficiaries; and (iii) encouraging health care providers to claim Medicare reimbursement for free samples. As a result, the Defendants

developed, managed and maintained a regular and consistent scheme that resulted in billions of

dollars of losses to Medicare and Medicare beneficiaries.

## II.
## JURISDICTION AND VENUE

2.     Plaintiff brings this class action pursuant to § 16 of the Clayton Act, 15 U.S.C.

§ 26, to prevent Defendants Abbott Laboratories, Inc., Allergan Worldwide, Alpha Therapeutic

Corp., American Bioscience, Inc., American Home Products Corporation, Amgen Inc.,

AstraZeneca US, Aventis Pharma, Bayer AG, Baxter International, Inc., Bristol-Myers Squibb

Co., Chiron, Fugisawa Healthcare, Inc., GlaxoSmithKline, PLC, Gensia Sicor Pharmaceuticals,

Inc. Glaxo Wellcome, Inc., Glaxo Wellcome, PLC, Immunex Corp., ICN Pharmaceuticals, Inc.,

Hoescht Marion Roussel, Inc., Eli Lilly and Company, Oncology Therapeutics Network Corp.,

Pharmacia Corp., Schering-Plough, Corp., Sicor, Inc., Smithkline Beecham Corporation, Takeda

Chemical Industries, LTD, TAP Pharmaceutical Products, Inc., and JOHN DOES 1 – 200, from

continuing to engage in exclusionary, monopolistic anticompetitive conduct in violation of §1

and § 2 of the Sherman Act that has harmed and continues to harm Plaintiffs and the Class.

3.     This Court has subject matter jurisdiction over this matter pursuant to the

Racketeer Influenced and Corrupt Organizations Act (RICO), 28 U.S.C. § 1331, and the Sherman

Act, 15 U.S.C. § 26.  This Court has supplemental jurisdiction over Plaintiffs' state law claims

pursuant to 28 U.S.C. § 1367.

4.     The Court has jurisdiction to fashion equitable relief pursuant to the Declaratory

Judgment Act, 28 U.S.C. § 2201.

Venue is proper within this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)

and (c) because defendants do business in this District, certain acts giving rise to the claims

asserted in this Complaint occurred within this District; and Plaintiffs or members of the Class

sustained injury within this District as a result of Defendants' illegal actions.

## III.
## PARTIES

5.     Plaintiff Citizens for Consumer Justice ("CCJ") is Pennsylvania's leading

nonprofit umbrella organization for the promotion of affordable, quality health care.  It is located

at Architects Building, 117 South 17th Street, Ste. 311, Philadelphia, Pennsylvania.  During the

class period, Plaintiff's members purchased prescription pharmaceuticals manufactured and/or

distributed by Defendants and were injured by the illegal conduct alleged herein.  As an

unincorporated association, CCJ has standing to pursue this action under Federal Rule of Civil

Procedure 17(b)(1).

6.     Plaintiff Colorado Progressive Coalition ("CPC") is a statewide nonprofit,

multiracial network of groups and individuals united for racial and economic justice since 1996.

It is located at 1420 Ogden Street, 1st Floor, Denver, Colorado.  During the class period,

Plaintiff's members purchased prescription pharmaceuticals manufactured and/or distributed by

Defendants and were injured by the illegal conduct alleged herein.   As an unincorporated

association, CPC has standing to pursue this action under Federal Rule of Civil Procedure

17(b)(1).

7.     Plaintiff Congress of California Seniors ("CCS") is a nonprofit organization

representing over 650,000 Californian senior citizens and their families.  It is located at 1228 N

Street, Suite 29, Sacramento, California.  During the class period, Plaintiff's members purchased

prescription pharmaceuticals manufactured and/or distributed by Defendants and were injured by

the illegal conduct alleged herein.   As an unincorporated association, CCS has standing to

pursue this action under Federal Rule of Civil Procedure 17(b)(1).

8.   Plaintiff Florida Alliance for Retired Americans ("FLARA") is a nonprofit umbrella organization formed in 1963 representing over 80 groups of retired Floridians with a cumulative membership of over 80,000 individuals. It is located at 12773 West Forest Hill Blvd., Ste. 1213, Wellington, Florida. During the class period, Plaintiff's members purchased prescription pharmaceuticals manufactured and/or distributed by Defendants and were injured by the illegal conduct alleged herein. As an unincorporated association, FLARA has standing to pursue this action under Federal Rule of Civil Procedure 17(b)(1).

9.   Plaintiff Health Care For All, Inc. ("HCA") is a non-profit organization devoted to making health care a right of all people. It is located at 30 Winter Street, 10th Floor, Boston, Massachusetts. During the class period, Plaintiff's members purchased prescription pharmaceuticals manufactured and/or distributed by Defendants and were injured by the illegal conduct alleged herein.  As an unincorporated association, HCA has standing to pursue this action under Federal Rule of Civil Procedure 17(b)(1).

10.   Plaintiff Massachusetts Senior Action Council ("MSAC") is a nonprofit advocacy group for senior issues and especially champions health care issues. It has 3,000 individual members and over 60 affiliate organizations. It is located at 565 Warren Street, Dorchester, Massachusetts. During the class period, Plaintiff's members purchased prescription pharmaceuticals manufactured and/or distributed by Defendants and were injured by the illegal conduct alleged herein. As an unincorporated association, ("MSAC") has standing to pursue this action under Federal Rule of Civil Procedure 17(b)(1).

11.     Plaintiff MassPIRG is Massachusetts' largest consumer advocacy group. It is located at 29 Temple Place, Boston, Massachusetts. During the class period, Plaintiff's members purchased prescription pharmaceuticals manufactured and/or distributed by Defendants and were injured by the illegal conduct alleged herein. As an unincorporated association, MassPIRG has standing to pursue this action under Federal Rule of Civil Procedure 17(b)(1).

12.     Plaintiff Minnesota Senior Federation ("MSF") is a statewide, nonprofit and nonpartisan organization with 25,000 active members and 400 affiliated organizations, representing 100,000 individuals in all 87 counties. it is located at 555 Park St., Ste 110, St. Paul, Minnesota. During the class period, Plaintiff's members purchased prescription pharmaceuticals manufactured and/or distributed by Defendants and were injured by the illegal conduct alleged herein. As an unincorporated association, MSF has standing to pursue this action under Federal Rule of Civil Procedure 17(b)(1).

13.     Plaintiff New Jersey Citizen Action ("NJCA") is the state's largest independent citizen watchdog. It is located at 85 Raritan Ave., #100, Highland Park, New Jersey. During the class period, Plaintiff's members purchased prescription pharmaceuticals manufactured and/or distributed by Defendants and were injured by the illegal conduct alleged herein. As an unincorporated association, NJCA has standing to pursue this action under Federal Rule of Civil Procedure 17(b)(1).

14.     Plaintiff New York StateWide Senior Action Council ("StateWide") is a grassroots membership organization made up of individual senior citizens and senior citizen clubs from all parts of New York State. It is located at 275 State Street, Albany, New York. During the class period, Plaintiff's members purchased prescription pharmaceuticals

manufactured and/or distributed by Defendants and were injured by the illegal conduct alleged herein. As an unincorporated association, StateWide has standing to pursue this action under Federal Rule of Civil Procedure 17(b)(1).

15.     Plaintiff Pennsylvania Alliance for Retired Americans ("PARA") is a nonprofit, advocacy group committed to promoting affordable healthcare. It is located at 2116 Chestnut St., Philadelphia, Pennsylvania. During the class period, Plaintiff's members purchased prescription pharmaceuticals manufactured and/or distributed by Defendants and were injured by the illegal conduct alleged herein. As an unincorporated association, PARA has standing to pursue this action under Federal Rule of Civil Procedure 17(b)(1).

16.     Plaintiff Vermont Public Interest Research Group ("VPIRG")has been Vermont's leading watchdog and advocacy group since 1972. It is located at 141 Main Street, Ste 6, Montpelier, Vermont. During the class period, Plaintiff's members purchased prescription pharmaceuticals manufactured and/or distributed by Defendants and were injured by the illegal conduct alleged herein. As an unincorporated association, VPIRG has standing to pursue this action under Federal Rule of Civil Procedure 17(b)(1).

17.     Plaintiff West Virginia Citizen Action ("WVCA") is a nonprofit organization devoted to increase the voice of the average citizen in public affairs with an emphasis on health care reform. It is located at 1500 Dixie Street, Charlestown, West Virginia. During the class period, Plaintiff's members purchased prescription pharmaceuticals manufactured and/or distributed by Defendants and were injured by the illegal conduct alleged herein. As an unincorporated association, WVCA has standing to pursue this action under Federal Rule of Civil Procedure 17(b)(1).

18.     Plaintiff Wisconsin Citizen Action ("WCA") is the state's premiere public interest organization with 53,000 individual members and 250 affiliate organizations.  It is located at 1202 Williamson St., Ste B, Madison, Wisconsin.  During the class period, Plaintiff's members purchased prescription pharmaceuticals manufactured and/or distributed by Defendants and were injured by the illegal conduct alleged herein.  As an unincorporated association, WCA has standing to pursue this action under Federal Rule of Civil Procedure 17(b)(1).

19.     Defendant Abbott Laboratories, Inc. ("Abbott") is a corporation organized and existing under the laws of the state of California.  Abbott, one of the world's largest pharmaceutical companies, is in the business of manufacturing prescription medications, including Calcijex® (treatment for kidney failure and rickets) and Methapred® (a corticosteroid), for clinical distribution by Medicare providers nationwide.  Abbott's revenues for the first half of 2001 were over $7.6 billion.

20.     Defendant Allergan , Inc. is a corporation organized and existing under the laws of the state of California.  It is headquartered at 2525 Dupont Drive, Irvine, California.  Allergan is in the business of providing eye care and specialty pharmaceutical products, including Genoptic®, for clinical distribution by Medicare providers nationwide.

21.     Defendant Alpha Therapeutic Corporation (Alpha) is a corporation headquartered at 555 Valley Blvd., Los Angeles, California.  Alpha is a subsidiary of Mitsubishi Pharma Corporation operating under California law.  Alpha is in the business of providing home infusion products and services for clinical distribution by Medicare providers nationwide.

22.     Defendant American Bioscience, Inc. (ABI) is a corporation headquartered in Santa Monica, California.  ABI is a subsidiary of IVEX Corp. and Bristol-Myers Squibb, Co.,

existing and operating under California law. ABI is in the business of manufacturing and

prescription drugs, including chemotherapy drugs, for clinical distribution by Medicare providers

nationwide.

23.   Defendant American Home Products Corporation ("AHP") is the parent company

of Wyeth Worldwide. It is organized and exists under the laws of the state of New Jersey.

American Home Products is one of the largest pharmaceutical and health care product companies

in the world. Its annual sales in 2000 exceeded $13.3 billion. Through its subsidiaries, AHP

manufactures and distributes prescription drugs, including Ativan® (convulsive disorder

medication), for clinical distribution by Medicare providers nationwide.

24.   Defendant Amgen Inc. is a corporation organized and existing under the laws of

the state of California. Amgen is in the business of manufacturing and distributing prescription

pharmaceuticals, including Epogen/Procrit® (for treatment of anemia) and Neupogen® (bone

marrow transplant infection prevention), for clinical distribution by Medicare providers

nationwide. In 2000, Amgen's revenues exceeded $3.6 billion.

25.   Defendant AstraZeneca US is a corporation organized and existing under the laws

of the state of Delaware. AstraZeneca is in the business of manufacturing and distributing

prescription pharmaceuticals, including Zoladex®, for clinical distribution by Medicare

providers nationwide.

26.   Defendant Aventis Pharma ("Aventis") is a corporation organized and existing

under the laws of the state of New Jersey and operating in more than 120 countries in the world.

Aventis is in the business of manufacturing and distributing prescription pharmaceuticals,

including Pentacarinat® (pneumonia treatment), for clinical distribution by Medicare providers

nationwide. In 1999, Aventis's pro forma sales for its pharmaceuticals were $3.3 billion.

27.     Defendant Bayer AG is a corporation organized and existing under the laws of the Federal Republic of Germany, and maintains its principal place of business at 5090 Leverkusen, Bayerwerk, Federal Republic of Germany. Bayer AG is the parent company of Bayer Corporation, the subsidiary in the United States that sells and markets Medicare covered prescription drugs to clinical outsourcers. In 1999, Bayer AG derived approximately 30% of its $30.6 billion of worldwide revenues from sales in the United States.

28.     Defendant Baxter International Inc.("Baxter") is a corporation organized and existing under the laws of Illinois. It maintains its principal place of business at One Baxter Parkway, Deerfield, Illinois. Baxter manufactures and distributes, Gammagard®, among other prescription drugs, to clinical outsourcers. Baxter's annual sales from January 1, 2000 through December 31, 2000 were $6,896,000,000.

29.     Defendant Bristol-Myers Squibb Co. ("Bristol-Myers") is a corporation organized in Delaware with a principal place of business located at 345 Park Avenue, New York, New York. Bristol-Myers manufactures and distributes prescription drugs, including Blenoxane® and Taxol® and other injectible cancer treatment drugs, that are clinically distributed by Medicare providers nationwide. Bristol-Myers' sales for the year 2000 were more than $21 billion worldwide.

30.     Defendant Chiron is a corporation organized and existing under the laws of the state of California. Chiron is in the business of manufacturing pharmaceuticals, including Depocyt® (anticancer drug), among other prescription drugs, to Medicare clinical outsourcers. Revenues for 2000 were $972 million.

31.    Defendant Fujisawa Healthcare, Inc. is a corporation organized and existing under the laws of the state of Illinois, with its principal place of business located at Parkway North Center, Three Parkway North, Deerfield, Illinois.  Fujisawa Healthcare, Inc. ("Fugisawa") is a subsidiary of Fujisawa Pharmaceutical Co., Ltd, headquartered in Osaka, Japan.  Fugisawa develops and manufactures prescription drugs, including the immunosuppressant Prograf® (used in liver and kidney transplants) and Pentam® (used for treatment of pneumonia associated with AIDS), clinically distributed by Medicare providers nationwide.

32.    Defendant GensiaSicor Pharmaceuticals, Inc. ("GSP") is a corporation organized and existing under the laws of the state of Delaware with a principal place of business located in Irvine, California.  GSP is a wholly-owned subsidiary of SICOR, Inc.  GSP manufactures prescription drugs for clinical distribution by Medicare providers nationwide.

33.    Defendant GlaxoSmithKline PLC ("GSK") is a public limited company incorporated under the laws of England and Wales with corporate headquarters at Glaxo Wellcome House, Berkeley Avenue, Greenford, Middlesex, United Kingdom UB6 0NN.  GSK's operational headquarters are located at One Franklin Plaza, Philadelphia, Pennsylvania.  GSK manufactures prescription drugs, including Zovirax® and other cancer and HIV drugs, clinically distributed by Medicare providers nationwide.  GSK's annual pharmaceutical sales for the year 2000 were more than $23.5 billion.  Every second, more than 30 doses of vaccines are distributed by GSK.

34.    Defendant Glaxo Wellcome PLC ("GW") was a public limited company incorporated under the laws of England and Wales, with corporate headquarters at Glaxo Wellcome House, Berkeley Avenue, Greenford, Middlesex, United Kingdom UB6 0NN prior to

its merger with Defendant SmithKline Beecham PLC. GW manufactured prescription drugs including Ventolin® and Volmax® used for treating breathing disorders for clinical distribution by Medicare providers throughout the United States. In 1999, GW's sales totaled $13.75 billion.

35.     Defendant Glaxo Wellcome, Inc. (GWI) is a wholly-owned U.S. subsidiary of GlaxoSmithKline PLC organized and existing under the laws of the state of North Carolina. Its principal place of business is located at 5 Moore Drive, Research Triangle Park, North Carolina. GWI manufactures prescription drugs, including Zofran® (treats chemotherapy induced nausea), for clinical distribution by Medicare providers nationwide.

36.     Defendant Hoechst Marion Roussel, Inc. ("HMR") is a wholly-owned subsidiary of Aventis S.A. (formerly Hoechst AG). HMR is a corporation organized and existing under the laws of the State of Delaware, and has its headquarters located at 10236 Marion Park Drive, Kansas City, Missouri. HMR develops and manufactures prescription drugs including Lasix® (high blood pressure treatment) for clinical distribution by Medicare providers nationwide.

37.     Defendant ICN Pharmaceuticals, Inc. (ICN) is a corporation organized and existing under the laws of California. ICN is in the business of manufacturing prescription drugs, including Efudex® (precancerous skin disorder treatment) for clinical distribution by Medicare providers nationwide. ICN's revenues for the first quarter of 2001 were $167 million.

38.     Defendant Immunex Corporation is a corporation organized and existing under the laws of the state of Washington. Its principal place of business is located at 51 University Street, Seattle, Washington. Immunex manufactures immune system disorder and cancer treatment prescription drugs, including Novantrone® for clinical distribution by Medicare providers nationwide. Immunex's total revenues for 1999 were $542 million.

39.    Defendant Eli Lilly and Company ("Lilly") is a corporation organized and existing under the laws of Indiana. Lilly is in the business of manufacturing prescription drugs, such as Nebcin® (for bacterial eye infection treatment), Vancocin® (bacterial infection treatment), and Oncovin® (for the treatment of some cancerous conditions) for clinical distribution by Medicare providers nationwide.

40.    Defendant Oncology Therapeutics Network Corporation ("OTN") is a wholly owned subsidiary of Bristol-Myers Squibb organized and existing under the laws of Delaware with its principal place of business in South San Francisco, California.   OTN offers health care services to oncology practices. OTN's revenues for the year 2000 exceeded $1 billion.  OTN manufactures prescription drugs for clinical distribution by Medicare providers nationwide.

41.    Defendant Pharmacia Corp. is a corporation organized and existing under the laws of the state of New Jersey. Pharmacia's corporate headquarters are located at 100 Route 206 North, Peapack, New Jersey.  Pharmacia manufactures prescription drugs, including HIV and cancer treatment drugs (Amikin®, Neosar®, Toposar®, and Andrucil®), for clinical distribution by Medicare and Medicaid providers nationwide. Sales for the colorectal treatment drug, Camptosar®, and the breast cancer treatment drug, Ellence®, were $441 million for the year 2000.

42.    Defendant Schering-Plough, Corp. is a corporation organized and existing under the laws of the state of New Jersey.  Its headquarters are located at 2000 Galloping Hill Rd., Kenilworth, New Jersey.  Schering-Plough manufactures prescription drugs, including Garamycin® (eye infection treatment), for distribution by Medicare providers nationwide.

43. Defendant SICOR, Inc. is a Delaware corporation organized and existing under the laws of California. Its principal place of business is located at 19 Hughes, Irvine, California. SICOR manufactures difficult-to-manufacture injectable pharmaceutical products for distribution by Medicare providers nationwide.

44. Defendant SmithKline Beecham PLC ("SKB") was a public limited company incorporated under the laws of England and Wales with corporate headquarters at New Horizons Court, Brentford, Middlesex, United Kingdom TW8 9BD. Prior to its merger with GW (to form GlaxoSmithKline PLC), SKB manufactured prescription drugs for clinical distribution by Medicare providers nationwide. SKB's total sales during 1999 were $8.49 billion.

45. Defendant Smithkline Beecham Corporation ("SKBC") is a corporation organized and existing under the laws of the state of Pennsylvania. It is a wholly-owned subsidiary of GlaxoSmithKline PLC with a principle place of business located at One Franklin Plaza, Philadelphia, Pennsylvania. SKBC manufactures prescription drugs for clinical distribution by Medicare providers nationwide.

46. Defendant Takeda Chemical Industries LTD ("Takeda") is headquarter in Osaka, Japan with U.S. headquarters in Lincolnshire, Illinois. Takeda is one of the world's largest pharmaceutical manufacturers. Its 1999 net sales exceeded $8.7 billion. Takeda develops and manufactures prescription drugs for clinical distribution by Medicare providers throughout the United States.

47. Defendant TAP Pharmaceutical Products, Inc. (TAP) is a corporation organized and existing under the laws of the state of Illinois. Its principal place of business is 675 Northfield Drive, Lake Forest, Illinois. TAP resulted from a merger between two of the world's

largest health care companies, Takeda Chemical Industries, Ltd. of Japan and Abbott

Laboratories based in the United States.  TAP manufactures prescription drugs for clinical

distribution by Medicare providers nationwide.

48.    The acts charged in this Complaint as having been done by the Defendants were

authorized, ordered, or done by its officers, agents, employees, or representatives while actively

engaged in the management of the Defendants' business or affairs.

## IV.
## CO-CONSPIRATORS AND DOE DEFENDANTS

49.    Various other individuals, partnerships, sole proprietors, business entities,

companies, and corporations, presently unknown to Plaintiffs and not named as defendants in

this Complaint, participated as co-conspirators in the violations alleged in this Complaint and

performed acts and made statements in furtherance thereof.  Such unknown persons or entities

acted as co-conspirators and aided, abetted, or participated with Defendants in the commission of

the wrongful acts alleged herein or otherwise caused the damages suffered by Plaintiff and the

other class members.

50.    DOES 1-100 are corporations, companies, partnerships, or other business entities

that participated in the illegal course of conduct that is the subject of this action as alleged herein.

51.    DOES 101-125 are residents of the state of Massachusetts and are officers,

employees, or agents of the defendants and/or entities owned or controlled by the defendants.

DOES 101-125 participated in the illegal course of conduct that is the subject of this action as

alleged herein.

52.    DOES 126-150 are residents of states other than the state of Massachusetts and

are officers, employees, or agents of the defendants and/or entities owned or controlled by the

defendants. DOES 126-150 participated in the illegal course of conduct that is the subject of this action as alleged herein.

53.    DOES 151-200 are residents of countries other than the United Sates and are officers, employees, or agents of the defendants and/or entities owned or controlled by the defendants. DOES 151-200 participated in the illegal course of conduct that is the subject of this action as alleged herein.

54.    Except as described herein, plaintiffs are, as yet, ignorant of the true names, capacities, nature and extent of the participation in the course of conduct alleged herein of the persons sued as DOES 1-200 inclusive and, therefore, sues these defendants by such fictitious names. Plaintiffs will amend this Complaint to allege the true names and capacities of the Doe Defendants when ascertained.

55.    In addition, defendants unknown at this time may include independent physicians and other medical providers who prescribed Covered Drugs and engaged in fraudulent billing practices, as well as various other persons, partnerships, sole proprietors, firms, corporations and individuals that may have participated as co-conspirators with defendants in the offenses alleged in this Complaint and may have performed acts and made statements in furtherance of the alleged illegal conduct.

## IV.
## FACTS

A.    The Medicare Insurance Program

56.    In 1965, Congress enacted Title XVIII of the Social Security Act (the "Act") to pay for the cost of certain medical services and care. The Act was passed for the specific purpose of providing a coordinated and comprehensive approach to federal health insurance and medical

care for the aged and disabled.  The Act and its associated programs, usually called "Medicare,"

is codified at 42 U.S.C. §1395, *et seq*

57.    As a general rule, the Medicare Program does not pay for the cost of most

prescription pharmaceuticals, such as drugs which a Medicare beneficiary self-administers by

swallowing in liquid or pill form when originally enacted into law, pharmaceuticals played a less

prominent role than the widespread reliance upon pharmaceuticals in health administration today.

Nevertheless, Medicare Part B, allows for payment of certain "Covered Drugs."  Covered Drugs

include only the following: (i) those that must be administered by a health care provider; (ii)

drugs needed to facilitate the use of covered durable medical equipment; (iii) certain

immunizations; and (iv) some self-administered drugs usually relating to cancer or

immunosuppressant therapy.

58.    Congress crafted Medicare Part B to provide supplementary medical insurance for

those aged and disabled individuals who elect to enroll under the program.

59.    The U.S. Department of Health and Human Services ("HHS") is responsible for

the funding, administration and supervision of the Medicare program.  Congress specifically

created  a program to administer Medicare through contracts with organizations that already

served as payers of health care services.  In doing so, it chose to pay on the basis of the

contractors' allowable costs so the contractors would neither be penalized nor would they unduly

profit for administering the program.  A division of the HHS, the Health Care Financing

Administration ("HCFA"), is responsible for ensuring that contractors administer the program

efficiently and accurately.

60.    HCFA relies on the contractors themselves to certify that their controls over the accuracy and security of their payment and data systems are sound.

61.    The provider's nomination provision in the Medicare Act allows the professional associations of hospitals and certain other institutional providers to choose claims processing intermediaries on behalf of their members.   Accordingly, HCFA does not have authority to freely choose the companies with which it may contract as Medicare intermediaries.

62.    The allowed amount to be paid for a drug under Medicare is determined under the payment methodology set forth in 42 C.F.R. § 405.517, which was published in the Federal Register on November 25, 1991 and became effective on or about January 1, 1992 as amended at 63 FR 58849.

63.    Under 42 C.F.R. § 405.517, drugs and biologicals not paid on a cost or prospective basis are paid based on the lower of the billed charge or 95 percent of the AWP as posted in sources such as the Red Book or Medispan.

64.    Prior to January 1, 1998, the amount Medicare would allow health care providers to charge for Covered Drugs under Medicare Part B was the lower of either: (i) the "estimated acquisition cost" or (ii) ninety-five percent (95%) of the "national average wholesale price" (AWP) for the particular drug.   At that time, the estimated acquisition cost for a drug could be determined by the Medicare program "based on surveys of the actual invoice prices paid for the drug."   In determining the estimated acquisition cost, the Medicare Program considered "factors such as inventory, waste and spoilage."

65.    Since January 1, 1998, the AWP has been calculated as follows: (1) for a single source drug or biological, the AWP equals the AWP of the single product; (2) for a multi-source

drug or biological, the AWP is equal to the lesser of the median AWP of all of the generic forms

of the drug or biological or the lowest brand name product AWP; and (3) after determining the

AWP, the allowance limit is calculated by multiplying the AWP by 0.95.

66.     Medicare relies on the AWP published in pharmaceutical industry publications,

such as the Red Book and Medispan, to ascertain the Medicare reimbursement amount.  Payment

allowances for drugs and biologicals are described in HHS Program Memorandum AB-99-63

which states that drugs and biologicals are to be reimbursed by the Medicare Program based on

the lower of the actual billed charge or 95 percent of the AWP reflected in pharmaceutical

industry publication sources such as the Red Book or Medispan.

67.     Medicare Part B reimburses medical providers 80% of the allowable amount.  The

Medicare beneficiary, or his or her insurer, pays the additional 20% (usually called the "co-

payment").  In addition, beneficiaries under Part B are required to pay an annual deductible

amount before Part B coverage is available.

68.     Ostensibly the industry publications provide objectively verifiable AWP figures

for Medicare Covered Drugs. The Department of Justice ("DOJ"), the National Association of

Medicaid Fraud Control Units ("Medicaid Fraud Units") and Group Purchasing Organizations

("GPOs") have compiled data from wholesalers' catalogs on 400 national drug codes

representing about 50 different chemical compounds.  The wholesaler catalogs, listing wholesale

prices, are, according to the DOJ, a more accurate representation of the true wholesale cost than

prices published by the Defendants in either the Red Book or Medispan.

69.     The wholesale catalog prices reveal that the Defendants have grossly inflated the

true average wholesale price for Medicare Covered Drugs.  For instance, the catalog wholesale

price for one drug was $22. The same drug listed for $73 in the Red Book. GPOs offered the same drug at $15.

70.    The published AWPs currently used by Medicare-contracted carriers to determine reimbursement bear little or no resemblance to actual wholesale prices available to the health care providers who bill for these drugs.

71.    Because the Defendants directly control the AWP listed in the industry publications and relied upon by the Medicare Program for reimbursement rates, the Defendants regularly and unjustifiably raised the AWP in order to capture, control and eviscerate the relevant market.

72.    As a direct and proximate result of defendants' pattern of artificially and fraudulently inflating the AWP for Covered Drugs above the average wholesale price actually reflective of the relevant market, Plaintiffs and members of the Class substantially overpaid, in whole or in part, for the drugs and biologicals covered under Medicare Part B.

B.    The Ongoing Government Investigation

73.    In early 1999, the Congressional Committee on Commerce ("Commerce Committee") began to investigate the prices Medicare pays for Covered Drugs. Over the course of the Investigation, the committee staff reviewed almost 100,000 pages of internal drug manufacturers' documents relating to pricing. In May 2000, the Commerce Committee stated that:

> [its] investigative work has produced evidence indicating that some
> drug companies may be reporting artificially inflated reimburse-
> ment rates . . . and may be manipulating such prices in order to
> assist their sales and marketing efforts aimed at healthcare
> providers.

(Letter dated May 4, 2000 from the Chairman of the Commerce Committee to SmithKline Beecham.).

74.    At least as early as 1997, the DOJ, the United States General Accounting Office ("GAO"), the Office of the Inspector General at HHS ("OIG"), and certain Congressional subcommittees began investigating the defendants and other pharmaceutical manufacturers for questionable practices regarding the industry's calculation of the AWP and offering illegal incentives to health care providers.

75.    In 1997, the OIG, comparing Medicare reimbursement in 1996 for twenty-two of defendants' Plan B prescription drugs with the cost of acquiring the same drugs through sources other than the defendants and concluded that Medicare reimbursement, for these twenty-two drugs *alone*, exceeded the actual wholesale prices by $447 million.  Exhibit A.

76.    In the same study, the OIG concluded that Medicare would have saved $445 million on the same twenty-two drugs in 1995.  Of these twenty-two drugs, the OIG found that Medicare had paid twice the AWP for about one-third of them.  It also found no consistency between carriers in establishing and updating the AWPs listed in the industry publications. Exhibit A.

77.    In 1998, the OIG reviewed drug costs in the Department of Veteran Affairs ("VA") as compared to Medicare costs for the same drugs.  The OIG chose to focus on the 34 drugs that had each resulted in at least $10 million in Medicare allowed charges in 1996.  The review revealed that if Medicare had purchased these drugs at the same rates paid by the VA, Medicare and its beneficiaries would have saved $1.03 *billion* in 1998 on these 34 drugs *alone*.

78.     In 1999, the GAO, recognizing and recapping the various investigations, concluded that the it was clear that Medicare was vulnerable to erroneous and fraudulent billing practices by healthcare providers.

79.     The Chairman of the House Commerce Committee, Representative Tom Bliley, relying on the OIG's reports, in a letter to then Secretary of Health and Human Services, Donna Shalala, noted that "Medicare could have saved at least 40 percent of the current allowance for almost half the 22 drugs, and 93 percent for one particular drug, by limiting reimbursement to the available private sector prices for those drugs."

80.     In Secretary Shalala's response, she proposed lowering the reimbursement rate to the health care provider's actual acquisition rate.

81.     The DOJ accumulated price data from a number of wholesale drug catalogs and provided the data to First DataBank to compile for use by the pharmaceutical industry in calculating its AWP.

82.     On May 21, 2000, as a result of the DOJ's investigation, HCFA announced plans for Medicare to use AWP's developed by Medicare.

83.     In September 2000, HCFA authorized Medicare carriers to use the prices compiled by First DataBank in reimbursing Plan B claims.

84.     In November 2000, HCFA rescinded the order to the carriers due to concerns raised by providers.

85.     In December 2000, Congress passed legislation requiring the GAO to complete a more comprehensive study before permitting HCFA to put in place the lower reimbursement rates. The GAO published the study in September 2001.

86.     After HCFA required its carriers to establish new reimbursable amounts, the OIG

ran a study comparing the Medicare allowable amount for 24 drugs to the amount reimbursable

under Medicaid and the VA.  These drugs represented 79% (or $3.1 billion) of the $3.9 billion in

total Medicare drugs for 1999.

87.     OIG concluded that Medicare and Medicare beneficiaries would have saved $1.6

billion in 1999 if they had paid the same price for the 24 drugs that the VA paid.  Medicare

reimbursement rates were fifteen to ninety-one percent greater than the prices paid by the VA.

88.     The OIG's analysis of the AWP list lead to the conclusion that in the year 2000,

Medicare had paid at least $887 million more than the actual wholesale prices it had paid based

on the pharmaceutical industry's listed average wholesale prices.

89.     In September, 2001, the GAO reported to the Commerce Committee that

Medicare had been paying much more than the health care providers' true acquisition costs.

HHS's Centers for Medicare and Medicaid services confirmed the GAO's report, noting that

Medicare's payments for drugs were substantially higher than the actual cost to those who

administered the drugs.  The GAO concluded that as a result of payments by Medicare based on

the "AWP, a price that may be neither an average nor what wholesalers charge, Medicare has

been paying much more than providers' likely acquisition costs."

90.     On September 21, 2001, Thomas A. Scully, Administrator for HHS' Centers for

Medicare and Medicaid Services testified before the Subcommittees on Health, and Oversight

and Investigations of the Congressional Committee on Energy and Commerce, that the:

> Numerous studies have indicated that the industry's reported
> wholesale prices, the data on which Medicare payments are based,
> are vastly higher than the amounts that drug manufacturers and
> wholesalers actually charge providers.  That means Medicare

beneficiaries, through their premiums and cost sharing, and U.S. taxpayers are spending far more than the "average" price that we believe the law intended them to pay.

Scully also noted that Medicare now pays more than many other purchasers for the drugs Medicare covers due to the way drug manufacturers and wholesalers report their prices and due to Medicare's payment policies.

B.    Scope of Medicare Benefits

91.    Congress created Medicare supplemental insurance coverage for some pharmaceuticals and services for aged and disabled individuals electing to enroll and financed the plan from premium funds paid by the enrollees and tax payer contributions.

92.    Medicare Part B entitles enrollees to have payment for medical and other health services, including payment for Covered Drugs and biologicals.

93.    Each enrollee incurring expenses for benefits and services covered under Medicare Part B is entitled to recover from the program, or have the program pay directly to the health care provider, 80 percent of the reasonable charges for the covered services.

94.    Where a health care provider elects to accept payment directly from the program, it may not charge the individual enrollee more than 20 percent of the reasonable cost of the Covered Drug or biological. See 42 U.S.C. § § 1395(j) -- 1395(w-4).

C.    Defendants' Fraudulent Marketing Scheme

95.    As part of Defendants scheme to induce health care providers to prescribe the drugs they manufacture, Defendants grossly inflated the average wholesale price for Covered Drugs, sold the drugs to the providers at a far lower price, encouraged health care providers to fraudulently charge Medicare and Medicare Beneficiaries at the AWP amount and also

encouraged providers to bill for so-called "free" samples.

96.     Relying on the artificially inflated prices that defendants intentionally posted in pharmaceutical industry publications, defendants charged the treating health care provider substantially less than the health care providers could charge under the AWP fee calculation. The higher the AWP and the lower the actual cost, the greater the "spread" and therefore, the greater the incentive to prescribe defendants' Covered Drugs. Health care providers prescribing Covered Drugs thus generated large, unlawful profits at the expense of the Medicare Program, Medicare Co-Payors, and Third Party Payors, including Plaintiffs and the Class.

97.     Defendants created this scheme in order to capture and manipulate a market. Defendants did so intentionally and with impunity because defendants knew Congress and the Medicare reimbursement system trusted them to accurately and justly compute the AWP relied on to calculate reimbursement for Covered Drugs.

98.     The execution of this scheme of fraudulent incentives was an interstate endeavor intentionally carried out by defendants' employees. Widespread, interstate cooperation of health care providers was also a necessary component of defendants' fraudulent incentive scheme.

99.     Defendants also have provided and/or arranged for many other financial inducements to stimulate sales of Covered Drugs at the expense of plaintiffs and the Class. Such inducements included volume discounts, rebates, off-invoice pricing, and free goods, including gifts of cash and other items of value directly to health care providers. The defendants used these incentives to increase the net profits for the prescribing doctor in order to capture, manipulate, and monopolize the relevant market.

D.     Defendants' Use of the Mails and Wires in Furtherance of the Scheme

100.   Defendants' illegal conduct and practice was carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfer of information and funds by mail and wire.

101.   The nature and pervasiveness of defendants' fraudulent marketing scheme, orchestrated from defendants' corporate headquarters , necessarily required those defendant headquarters to communicate directly and frequently by United States mail and by facsimile over wire with the various local district managers overseeing the sales force and the numerous pharmaceutical sales representatives who, in turn, directly communicated with the prescribing doctors.

102.   Defendants' conduct included mailing and transmitting via interstate wires numerous marketing and sales materials relating to Covered Drugs, Medicare reimbursement rates and profit margins to be earned by prescribing the drug.  Defendants also used the mail and wires to set-out the AWP listings in industry publications, as well as to arrange illegal financial inducements discussed herein.  Defendants also shipped free samples of the products that were used as inducements to physicians to induce them to prescribe Covered Drugs.

E.     Effects of Defendants' Scheme on The Relevant Market and the Class

103.   Defendants' illegal marketing scheme has substantially increased Covered Drugs market share and total sales figures.

104.   A substantial portion of the grossly inflated revenues defendants derived from Medicare Beneficiaries through payment of the twenty percent co-payment, payment of the deductible, or when the beneficiary owned no insurance coverage, through complete payment of

the cost of the Covered Drug.

## CLASS ACTION ALLEGATIONS

105.   Plaintiffs bring this Declaratory Judgment, antitrust class and RICO action

pursuant to Rule 23 of the Federal Rules of Civil Procedure, subsections 23(a) and 23(b)(2)

and/or (b)(3), on behalf of a class defined as follows:

> All individuals or entities who paid any portion of the 20% co-
> payment and/or deductible amount for themselves or for their
> beneficiaries under Medicare Part B for Covered Drugs
> manufactured and/or distributed by defendants during the period
> 1993 through the present (class period).

106.   Excluded from the Class are all defendants, their respective subsidiaries and

affiliates, all governmental entities, and all judges and justices assigned to hear any portion of

this case.

107.   The members of the Class are so numerous (Medicare beneficiaries number over

40 million nationally) that joinder of all members is impracticable.  Plaintiffs claims are typical

of the claims of the Class Members.  Defendants' illegal, anticompetitive and inequitable

methods, acts and trade practices have targeted and affected all members of the Class in a similar

manner, *i.e.*, they have been deprived of a competitive market to ensure accurate and fair drug

pricing due to the deceitful practices of the Defendants.

108.   Plaintiffs will fairly and adequately protect the interests of the Class. The interests

of the plaintiffs coincide with, and are not antagonistic to those of, the Class.  Plaintiffs are

represented by counsel who are experienced and competent in the prosecution of complex Class

action litigation, including, for example, in the areas of mass tort, healthcare, consumer and

antitrust class actions.

109.   Questions of law and fact common to the Class include, but are not limited to:

(a)   Whether defendants engaged in a fraudulent scheme of improperly setting and/or adjusting the AWP for Covered Drugs;

(b)   Whether defendants artificially inflated the AWP for Covered Drugs in order to increase their market share, sales figures, and revenues;

(c)   Whether defendants prepared marketing and sales materials containing comparisons of the Red Book AWP for the Covered Drugs and the actual average wholesale price for these same drugs;

(d)   Whether defendants provided free samples of Covered Drugs to doctors and other health care professionals so as to induce them to prescribe Covered Drugs to their patients;

(e)   Whether defendants instructed doctors and other health care professionals to seek Medicare reimbursement and consumer co-payment for free samples of Covered Drugs;

(f)   Whether defendants encouraged doctors and other health care providers to prescribe defendants' Covered Drugs to patients in lieu of competing drugs;

(g)   Whether defendants engaged in a pattern and practice of selling Covered Drugs to health care providers at a price well-below the Red Book listed AWP that the health care providers could recoup from Medicare (the "spread" price) so as to induce them to prescribe Covered Drugs to their patients;

(h)   Whether defendants have monopolized and/or attempted to monopolize the relevant markets;

(i)   Whether defendants engaged in a pattern of racketeering activity as defined under RICO;

(j)   Whether defendants participated in the operation and management of the association-in-fact conspiracy.

(k)   Whether defendants received income derived from a pattern of racketeering activity and used or invested such income in the establishment and operation of the conspiracy;

(l)   Whether defendants used or invested the income derived from a pattern of

racketeering activity in the operation or management of the conspiracy;

(m)    Whether plaintiffs and members of the Class were injured within the meaning of §1964(c) of RICO as a direct and proximate result of defendants' investment or other use of illegally-obtained income into the conspiracy;

(n)    Whether the defendants' unlawful activities affected interstate commerce;

(o)    Whether defendants engaged in a pattern of racketeering activity intended to defraud the Class;

(p)    Whether plaintiffs and members of the Class were injured within the meaning of §1964(c) of RICO, as a direct and proximate result of defendants' racketeering activities and predicate acts consisting of a wrongful scheme intended to defraud plaintiffs and the Class;

(q)    Whether defendants' fraudulent scheme was carried out and furthered by the use of the United States mail and interstate wire services; and

(r)    Whether defendants are liable to plaintiffs and the Class for treble damages for conduct actionable under the civil provisions of the RICO statute.

(s)    Whether the alleged conduct herein constitutes a violation of § 1 of the Sherman Act;

(t)    Whether the alleged conduct herein constitutes a violation of § 2 of the Sherman Act;

(u)    Whether the alleged conduct herein has harmed plaintiffs and other members of the Class;

(v)    Whether injunctive relief is necessary to prohibit defendant from engaging in unlawful conduct in the future; and

(w)    Whether defendants violated state antitrust and deceptive trade practice statutes identified herein.

110.    The above-identified common questions predominate over individual questions, if any, that may affect the Class.

111.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy because it permits large numbers of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, cost effectively in a manner that would be impossible if each individual filed separate actions.  Furthermore, prosecution of separate actions by individual Class members would create an inherent risk of inconsistent and varying adjudications, with the concomitant risk of establishing incompatible and conflicting standards of conduct for defendants.

112.   Adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of the interests of others not party to the adjudications or substantially impair or impede their ability to protect their interests.

## THE RELEVANT MARKET

113.   The sale of pharmaceuticals is a multi-billion dollar a year industry.  Each Covered Drug constitutes a relevant product market.

114.   The relevant geographic market is the United States.

115.   Defendants possess the dominant and persistent market share for each Covered Drug in the United States.

## FRAUDULENT CONCEALMENT

116.   The running of any statute of limitations has been tolled by reason of defendants' fraudulent concealment.  Defendants and their co-conspirators actively concealed their fraudulent scheme to grossly inflate the prices charged for Covered Drugs by reporting AWPs that bore no relationship to the actual market cost of the Covered Drugs.

117.   Defendants throughout the period of their unlawful conduct, secretly and covertly met, discussed and agreed with each other and their co-conspirators to artificially elevate the price charged for Covered Drugs.  Many, if not most, of those meetings, discussions and agreements took place, in whole or in part, in private.  Plaintiffs and members of the Class were unaware of and could not through diligence have discovered these meetings and the unlawful conspiracy.

## IV.
## COUNT I
### (For Declaratory and Injunctive Relief Pursuant to 28 U.S.C. § § 2201 and 2202)

118.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint and further allege against defendants, and each of them, as follows:

119.   Defendants have engaged in fraudulent, anticompetitive and conspiratorial conduct undermining the benefits Congress intended Medicare recipients to enjoy.

120.   Defendants have interfered with and/or deprived plaintiffs' and the Class members' of their statutory rights, privileges and entitlements.

121.   By virtue of defendants' illegal conduct, defendants are obligated to remedy the harm they have caused plaintiffs.

## COUNT II
### (Violation of § 1 of the Sherman Act, 15 U.S.C. § 1)

122.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against defendants, and each of them, as follows:

123.   Since 1993 and continuing into the present, the defendants have conspired to unreasonably restrain trade and commerce by manipulating the prices of Covered Drugs paid by Medicare and Medicare beneficiaries.

124.   Defendants' combinations and conspiracy has resulted from concerted efforts by defendants to capture the Medicare Covered Drug market and fix, raise and maintain control over exorbitant prices and the relevant market.

125.   As a direct and proximate result of defendants' illegal conduct as described above, plaintiffs and members of the Class paid grossly inflated prices for Covered Drugs.

126.   As a direct and proximate result of defendants' illegal violation of the antitrust laws, defendants have threatened loss or caused real damage to plaintiffs and members of the Class.  The prices charged by defendants for Covered Drugs are substantially greater than the prices Medicare beneficiaries would have paid absent the illegal conduct.  As a result of defendants' conduct, Medicare beneficiaries continue to sustain substantial losses and damages to their business and property.

## COUNT III
### Violation of § 2 of the Sherman Act, 15 U.S.C. § 2)

127.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Defendants, and each of them, as follows:

128.   Defendants conspired to monopolize, and successfully monopolized, the market and production of Medicare Plan B Covered Drugs.  The incentives and inducements provided to health care providers and Defendants' resulting relevant market control are evidence of Defendants' monopoly and they are, therefore, a per se violation of § 2 of the Sherman Act and

are otherwise a violation of § 2 of the Sherman Act.

129.   Defendants engaged in a vertical monopolization of the Medicare Covered Drug market in violation of § 2 of the Sherman Act under a rule of reason analysis.

130.   As a direct and proximate result of the illegal conduct of defendants as described above, plaintiffs and members of the Class paid artificially inflated prices for Medicare Plan B Covered Drugs were deprived of the ability to purchase these drugs at the true average wholesale price.  As a direct and proximate cause of defendants' illegal violation of the antitrust laws, defendants have threatened loss or damage to plaintiffs and members of the class.  The prices charged by defendants for Medicare Plan B Covered drugs are substantially greater than the prices consumers would have paid absent the illegal conduct.   As a result of defendants' conduct alleged herein, consumers continue to sustain substantial losses and damage to their business and property.

### COUNT IV
### (Violation of 18 U.S.C. §1962(c))

131.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows.

132.   Defendants are "persons" within the meaning of §1961(3) who conducted the affairs of both an enterprise and an association-in-fact enterprise affecting through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

133.   The enterprise at issue is an association-in-fact within the meaning of 18 U.S.C. §1961(4) because it consists of a group of persons associated together for the common purpose of selling, purchasing and providing Covered Drugs to the Class and earning profits from the provision of those services.  The enterprise consists of the various and independent physicians

and other medical providers who prescribed Covered Drugs and engaged in fraudulent billing practices and the defendants, including their directors, employees, and agents who conspired with the medical providers to monopolize the relevant market. The defendants' enterprise is an on-going and continuing business organization consisting of both corporations and individuals associated for the common purposes of selling, purchasing, prescribing, and administering Covered Drugs to Plaintiffs and members of the Class and deriving profits from these activities that functions as a continuing unit.

134. The enterprise engages in and affects interstate commerce because it engages in the following activities across state boundaries: the sale and/or purchase of Covered Drugs, the transmission of sales and marketing literature, and the transmission and/or receipt of invoices and payments related to the use of Covered Drugs. In addition, the enterprise prescribes and/or administers Covered Drugs to thousands of Medicare beneficiaries throughout the United States.

135. Defendants have exerted control over the enterprise and have directly or indirectly conducted or participated in the conduct of the affairs of the enterprise, in the following ways:

(i)     Defendants have directly controlled the price at which physicians and other medical providers purchase Covered Drugs;

(ii)    Defendants have directly controlled the AWP reported in industry publications;

(iii)   Defendants have directly controlled the price at which physicians and other medical providers are reimbursed by the Medicare Program;

(iv)    Defendants have directly controlled the creation and distribution of marketing, sales, and other materials used to inform physicians and other medical providers nationwide of the profit potential of Covered Drugs;

(v)     Defendants have directly controlled the marketing and sales scheme to use the artificially and unlawfully inflate the Medicare reimbursement rate (and co-payment rate) to induce physicians and other medical providers to prescribe Covered Drugs to their patients;

(vi)    Defendants have directly controlled the use and distribution of free samples of Covered Drugs to physicians and other medical providers;

(vii)   Defendants have directly or indirectly counseled and induced physicians and other medical providers to unlawfully seek reimbursement from the Medicare Program for free samples;

(viii)  Each Defendant has relied upon its employees and agents to promote the fraudulent marketing schemes herein alleged through the mail, through the wires, and through direct contacts with physicians and other medical providers; and

(ix)    Each Defendant has controlled and participated in the conspiracy by using a fraudulent scheme to manufacture, market and sell Covered Drugs through the use of unlawful inducements to physicians and other medical providers.

136.    Defendants have conducted and participated in the affairs of the conspiracy through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §1341, relating to mail fraud, and 18 U.S.C. §1343, relating to wire fraud. Defendants' pattern of racketeering likely involved hundreds, even thousands, of separate instances of use of the United States mail or the interstate wires in furtherance of their fraudulent and unlawful marketing scheme. Each of these fraudulent mailings and interstate wire transmissions separately constitutes a "racketeering activity" within the meaning of 18 U.S.C. §1961(1). Collectively,

these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5) in which the defendants intended to defraud plaintiffs and members of the Class.

137.    Defendants' fraudulent and unlawful marketing scheme consisted first of deliberately overstating the AWP for Covered Drugs, creating a "spread" based on the inflated figure to induce physicians and other medical providers to prescribe Covered Drugs to their patients, thereby causing the Medicare Program to pay an artificially-inflated rate of reimbursement for Covered Drugs.  Defendants' fraudulent and unlawful marketing scheme also consisted of providing free samples of Covered Drugs to physicians and other medical providers instructing these professionals to bill the Medicare Program for these free samples and providing other unlawful financial incentives, including kickbacks and bribes to induce use of Covered Drugs.

138.    These schemes were calculated and intentionally crafted to ensure that Medicare and Medicare beneficiaries would overpay for Covered Drugs.  In designing and implementing these fraudulent schemes, defendants were at all times cognizant of the fact that the entire Medicare Program and all patients for whom Covered Drugs are prescribed, rely upon the honesty of defendants in setting the AWP as crafted and disseminated by the defendants.

139.    By intentionally and artificially inflating the AWP and by pervasively providing physicians and other medical providers with unlawful financial inducements to use Covered Drugs, and by subsequently failing to disclose such practices to the patients from whom reimbursement was sought through the United States mail or interstate wire transmission, defendants engaged in a repeated, fraudulent, and unlawful course of conduct constituting a pattern of racketeering.

140.   These racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive plaintiffs and members of the class.  Each separate instance of a racketeering activity perpetrated by the defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including plaintiffs and members of the Class.  Defendants have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Prescription Enterprise.

141.   Defendants' violations and pattern of racketeering activity have directly and proximately caused plaintiffs and members of the Class to be injured in their property insofar as plaintiffs and members of the Class have paid millions of dollars in inflated reimbursements or other payments for Covered Drugs.

142.   Plaintiffs and members of the Class have relied to their detriment on billing statements based on information reported directly or indirectly by Defendants sent through the United States mail.  As a result of Defendants' fraudulent acts, the billing statements so distributed have resulted in unjust overpayment from Plaintiffs and members of the Class.

143.   By virtue of these violations of 18 U.S.C. §1962(c), Defendants are jointly and severally liable to plaintiffs and members of the Class .

## COUNT V
### (For Violation of 18 U.S.C. §1962(a))

144.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows.

145.   Throughout the Class Period, defendants have violated the federal RICO statute by using and investing income that was derived from a pattern of racketeering activity as herein

discussed to acquire, establish and/or operate a variety of enterprises engaged in and affecting interstate commerce.

146.   The enterprise is an association-in-fact within the meaning of 18 U.S.C. §1961(4) that were created and/or used as tools to effectuate defendants' pattern of racketeering activity. The defendants' enterprise, an ongoing organization functioning as a continuing unit, falls within the meaning of 18 U.S.C. §1961(4) insofar as it consists of a group of "persons" associated together for the common purposes of buying, selling, prescribing, and administering Covered Drugs to the Class and their individual participants and deriving profits from these activities.

147.   Defendants engaged in a pattern of racketeering activity as set out herein.

148.   Plaintiffs and members of the Class have been directly and proximately injured in their property by the defendants' use and investment of the racketeering income into the acquisition, establishment and operation of the defendants' enterprise. The injury to plaintiffs' and the Class members' business or property stemming from these violations has been realized in the form of millions of dollars in over-payments they expended for Covered Drugs.

149.   The use and investment of racketeering income by the defendants directly and proximately injured the plaintiffs and members of the Class in a manner that was distinct from the injury caused by the pattern of racketeering activity described herein.

150.   Plaintiffs and members of the Class relied, to their detriment, on the fraudulent billing statements sent to them through the United States mails.

151.   By virtue of these violations of 18 U.S.C. §1962(a), defendants are jointly and severally liable to plaintiffs and members of the Class.

## COUNT VI
### (For Violation of 18 U.S.C. §1962(d))

152.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows.

153.   Pursuant to 18 U.S.C. §1962(d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

154.   Defendants violated §1962(d) by conspiring to violate 18 U.S.C. §1962(a) and (c).

155.   Defendants together conspired and agreed to derive, and ultimately did derive, substantial income and proceeds from the above-described pattern of racketeering activity. Defendants further conspired and agreed to use or invest, and did use or invest, directly or indirectly, a significant portion of such income or proceeds in the operation or management of the enterprise, described above, in violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(a).

156.   The use or investment of such monies directly and proximately injured plaintiffs and members of the Class, in a manner that was distinct from the injury caused by the pattern of racketeering activity described herein, because it enabled, furthered, and perpetuated the ongoing scheme of over-billing Medicare, Medicare beneficiaries and members of the Class for Covered Drugs.

157.   Defendants also violated section 1962(d) by conspiring and agreeing to violate 18 U.S.C. §1962(c). The object of the conspiracy and agreement was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Defendants' enterprise through a pattern of racketeering activity. Defendants' pattern of racketeering activity directly and proximately caused plaintiffs and the Class to be injured in their business and property.

158.   As a direct and proximate result of Defendants' direct and indirect acts in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § §1962(a) and (c), Plaintiffs and members of the Class were injured in their business or property.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs and absent Class members pray judgment against the defendants and seek relief as may be allowed by law, including interest and costs of court as follows:

1.   Under Count I, an entry by the Court adjudging the defendants conduct to be an illegal violation of plaintiffs' rights pursuant to the Social Security Act;

2.   On all Counts, an award to plaintiffs and the Class of any and all other appropriate equitable relief;

3.   On all Counts, an award of such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

Date: _December 19, 2001_          By: _____

Thomas M. Sobol (TMS 471770)
Nicole Y. Brumsted (NYB 3557)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
175 Federal Street, 7th Floor
Boston, MA 02110
Telephone: (617) 720-5000
Facsimile: (617) 729-5015

Michael J. Flannery
**CAREY & DANIS, LLC**
676 North Michigan Avenue
Suite 3110
Chicago, IL   60611
Telephone:   (312) 649-0100
Facsimile:   (312) 649-0603

David J. Bershad
J. Douglas Richards
Michael M. Buchman
**MILBERG WEISS BERSHAD HYNES &
LERACH, LLP**
One Pennsylvania PlazaNew York, NY
10119-0165
Telephone: (212) 594-5300
Facsimile:           (212)           868-1229

Robert G. Eisler
**LIEFF   CABRASER   HEIMANN   &
BERNSTEIN, LLP**
780 Third Avenue, 48th FloorNew York, NY
10017-2024Telephone:        (212)        355-
9500Facsimile: (212) 355-9592