UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO ALL ACTIONS | CIVIL ACTION NO. 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

### MEMORANDUM OF BRISTOL MYERS SQUIBB DEFENDANTS IN SUPPORT OF THEIR MOTION TO DISMISS

Defendants Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp. and Apothecon, Inc. ("BMS")[1] join in the Consolidated Memorandum in Support of Defendants' Motion to Dismiss the Master Consolidated Class Action Complaint ("Consolidated Memorandum" or "Consol. Mem."), as well as the memoranda of other defendants raising common issues, and file this memorandum in order to make a number of additional points.

### Preliminary Statement

Congress and the Executive Branch have not only known about the "spread" between average wholesale prices ("AWPs") and actual physician costs for many years, they have actually set the reimbursement rates about which plaintiffs complain. This Court cannot award plaintiffs relief on their Class 1 claims without determining that the reimbursement rates established by the government should have been different. For that reason, this action is barred by the filed rate doctrine, the state action doctrine and the doctrines of field and conflict preemption.

---

[1] Oncology Therapeutics Network Corp. and Apothecon, Inc. are wholly-owned subsidiaries of Bristol-Myers Squibb Co.

212

Moreover, not only have Congress and the Executive Branch known about the "spread" between AWPs and actual physician costs for many years, that fact has been widely reported in a variety of publicly available sources. For that reason, plaintiffs' Class 2 claims as well as their Class 1 claims are barred because there can be no intent to defraud when the alleged victim has ready access to the truth. In addition, the enterprises alleged by plaintiffs are defective because plaintiffs have alleged nothing more than a variety of conspiracies, which is insufficient as a matter of law.

Finally, plaintiffs' Class 1 and Class 2 claims with respect to improper use of free samples by BMS are defective because they do not even come close to satisfying the requirements of Fed. R. Civ. P. 9(b). There is no identification of <u>who</u> gave <u>what</u> free sample to <u>whom</u> and <u>when</u>, much less an explanation of <u>why</u> giving the free sample was fraudulent. Plaintiffs' Class 2 claims also fail to satisfy Fed. R. Civ. P. 9(b) because they do not identify the "brand name" drugs that were allegedly part of that scheme.

## Statement of Facts

As set forth in the Master Consolidated Class Action Complaint ("Complaint" or "Compl."), the well-pleaded allegations of which must be taken as true for purposes of this motion, plaintiffs purport to represent two classes: (1) Class 1 -- persons who made co-payments for Covered Drugs under Medicare Part B; and (2) Class 2 -- third-party payors, such as health plans, who contracted with pharmacy benefit managers ("PBMs") or other intermediaries to pay for brand name prescription drugs purchased by plan participants. (Compl. ¶ 333.) Plaintiffs contend that the defendant manufacturers, including BMS, violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as various state consumer protection statutes, by providing "inflated" and "fictitious" AWPs to trade publications such as the Red Book, Blue

Book and Medi-Span. (Id. ¶¶ 3, 158-60.) Plaintiffs contend that they have been damaged because "health care providers . . . are reimbursed by Medicare based on the inflated AWP" (id. ¶ 4) and intermediaries such as PBMs receive payments from third party payors based on "inflated" AWPs (id. ¶¶ 5, 166-72).

Plaintiffs affirmatively allege that "Medicare calculates the 'allowed' amount for the drug". (Compl. ¶ 144.) They also allege: "The Medicare Program has publicly announced that it would use the AWP published in pharmaceutical industry magazines as the basis for reimbursement." (Id. ¶ 147.) Plaintiffs seek damages based on the 20% co-payment that is mathematically derived from the "allowable amount" established by the government for reimbursement purposes. (Id. ¶ 149; see also ¶¶ 368, 395, 422.)

As set forth in the Consolidated Memorandum, there has been extensive public disclosure of the "spread" between AWPs and actual provider costs about which plaintiffs complain. For example, in Louisiana v. Dep't of Health & Human Servs., 905 F.2d 877, 880 (5th Cir. 1990), the court quoted the observation of government sources that "'AWP data are frequently inflated'". In a 1996 "Dow Jones" article to which plaintiffs refer in their Complaint (Compl. ¶ 135), AWP is described as "Ain't What's Paid". Bill Alpert, Hooked On Drugs: Why Do Insurers Pay Such Outrageous Prices For Pharmaceuticals?, Barron's, June 10, 1996, at 16 (appended hereto as Exhibit 1). In a 1997 report, the Office of Inspector General of HHS reported: "The published AWPs that are currently being used by Medicare-contracted carriers to determine reimbursement bear little or no resemblance to actual wholesale prices that are available to the physician and supplier communities that bill for these drugs." Excessive Medicare Payments for Prescription Drugs, Office of Inspector General, Department of Health and Human Services, at ii (Dec. 1997) (appended hereto as Exhibit 2).

Argument

I.

THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THE CLASS 1 CLAIMS BECAUSE THERE IS NO JUSTICIABLE CONTROVERSY.

A. <u>Plaintiffs' Class 1 Claims Are Barred By The Filed Rate Doctrine</u>

The filed rate doctrine provides that "any 'filed rate' -- that is, one approved by the governing agency -- is per se reasonable and unassailable in judicial proceedings [against non-governmental entities] brought by rate-payers." <u>Wegoland Ltd. v. NYNEX Corp.</u>, 27 F.3d 17, 18 (2d Cir. 1994). The filed rate doctrine is based on the concept that "(1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack the competence to set . . . rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime." <u>Sun City Taxpayers' Ass'n v. Citizens Utils. Co.</u>, 45 F.3d 58, 62 (2d Cir. 1995).[2] While the filed rate doctrine originally arose in the context of antitrust cases against railroads and utilities, <u>see</u>, <u>e.g.</u>, <u>Keogh v. Chicago & N.W. Rwy. Co.</u>, 260 U.S. 156, 163 (1922), it is clear that it applies to RICO cases, <u>see</u>, <u>e.g.</u>, <u>Taffet v. The Southern Co.</u>, 967 F.2d 1483, 1488-90 (11th Cir. 1992), and to industries other than railroads and utilities. <u>See</u>, <u>e.g.</u>, <u>Square D Co. v. Niagara Frontier Tariff Bureau, Inc.</u>, 476 U.S. 409 (1986) (freight transportation); <u>Fersco v. Empire Blue Cross/Blue Shield of New York</u>, 93 Civ. 4226 (JFK), 1994 WL 445730 (S.D.N.Y. Aug. 17, 1994) (health insurance); <u>Servais v. Kraft Foods, Inc.</u>, 631 N.W.2d 629 (Wis. Ct. App. 2001), <u>aff'd</u>, 643 N.W.2d 92 (Wis. 2002) (milk prices). <u>See</u> generally <u>Korte v. Allstate Ins. Co.</u>, 48 F. Supp. 2d

---

[2] Courts defer to regulatory bodies in this context, in part, because the regulatory body is not a party to the action. Plaintiffs always have the option of asserting a claim against the rate-setting body directly, in which case the degree of deference would be different.

647, 651 (E.D. Tex. 1999) ("While the filed rate doctrine had its origins in the area of the common carrier, it has subsequently been extended to a number of regulated industries").

There can be no doubt that the filed rate doctrine applies to this case. The rates in question -- the "allowed amounts" for reimbursement under Medicare -- were determined by the government. While plaintiffs allege that the government based its reimbursement rates on AWPs that were fraudulent, "every court that has considered the . . . argument has rejected the notion that there is a fraud exception to the filed rate doctrine." Wegoland, 27 F.3d at 20.

This Court's decision in Town of Norwood v. New England Power Co., 23 F. Supp. 2d 109 (D. Mass. 1998) is instructive. In Norwood, a town that owned and operated an electric distribution system sued its wholesale power supplier complaining that the supplier was charging the town substantially higher rates than it was charging its own affiliates. Noting that "a federal district court cannot make its own determination of what rate is 'just and reasonable,'" the Court dismissed the town's antitrust claim on the ground that it was barred by the filed rate doctrine. Id. at 116. The Court observed that "[t]he filed rate doctrine is applied 'out of deference to a congressional scheme of uniform regulation' in order to avoid 'impermissibly usurp[ing] a function that Congress has assigned to a federal regulatory body.'" Id. Quoting from the Eighth Circuit's decision in H.J. Inc. v. Northwestern Bell Tel. Co., 954 F.2d 485, 488 (8th Cir. 1992), the Court added: "Even if plaintiff's complaint refers to some underlying or distinct conduct, '[t]he filed rate doctrine prohibits a party from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct in issue.'" Id. at 116-17.

On appeal, the First Circuit affirmed this branch of the Court's decision[3] because the rates in question were subject to agency regulation. 202 F.3d 408, 418 (1st Cir. 2000). In response to the argument that the agency had not even considered certain cost data, the First Circuit stated: "It is the filing of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine." Id. at 419 (emphasis omitted).[4] The court went on to rule that claims for declaratory and injunctive relief, as well as damages, were barred because "any meaningful relief . . . would require the alteration of tarrifs . . . ." Id. at 420.

This case is even stronger than Norwood because, here, the reimbursement rates at issue were not merely submitted to the government, they were set by the government.[5] There is no way the Court can grant plaintiffs relief without deciding that the "allowed amounts" should have been different. Where "damages can only be measured by comparing the difference between the rates the [government] originally approved and the rates the [government] should have approved absent the conduct of which the class complains," there is no justiciable controversy. H.J. Inc., 954 F.2d at 494.

---

[3] The First Circuit reversed and remanded that portion of this Court's decision which held that the plaintiff's Clayton Act § 7 claim (challenging a merger) was barred by the filed rate doctrine, ruling that the filed rate doctrine did not apply to that claim since the claim did not require the Court to sit in judgment of an administratively approved price. 202 F.3d 408, 422 (1st Cir. 2000).

[4] This language from the First Circuit's opinion does not imply that the rate must be lodged with a government office for the filed rate doctrine to apply. The court was making the point that acceptance of the rate without disapproval was sufficient. See also Kline and Co. v. MCI Communications Corp., 98 F. Supp. 2d 69, 73 (D. Mass. 2000) (agency need not conduct "meaningful review" of rates for filed rate doctrine to apply). It is also clear that where a rate is "approved by the governing regulatory agency", that is sufficient as well. Wegoland, 27 F.3d at 18. As the Supreme Court has held, it is of no significance to the doctrine whether the rate in question is (i) filed by a private party and merely "accepted" by the regulator or (ii) "determine[d]" or "fixed" by the regulator itself. Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 251-52 (1951).

[5] In Norwood, the defendant proposed a rate that was accepted by the agency. Here, after considerable scrutiny, the agency charged with establishing the rate affirmatively adopted AWP, as reported in publications such as the Red Book, in establishing the "allowed amount" for Medicare drugs.

B.     Plaintiffs' Class 1 Claims Are Barred By The "State Action" Doctrine

Under Parker v. Brown, 317 U.S. 341 (1943) and Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961), where a plaintiff's injury is the direct result of governmental action, there can be no claim against private parties who caused or influenced the government to take that action. See also Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n, 107 F.3d 1026, 1036-37 (3d Cir. 1997) (ABA's law school accreditation rules, even if anticompetitive, are not actionable because it is the States, not the ABA, that incorporate the accreditation rules into bar admission requirements); Sandy River Nursing Care v. Aetna Casualty, 985 F.2d 1138, 1146 (1st Cir. 1993) (employers paying higher workers compensation insurance rates will not be heard to complain that insurers influenced state to "move[] away from the state's previous pro-competitive policy toward rate setting.").[6]

Accordingly, Medicare Part B co-payors cannot sue drug manufacturers for providing to publications allegedly false AWPs because it was the government that affirmatively decided (with full knowledge of the public record) to make those AWPs the basis for government reimbursement and the co-payment. Indeed, even if one assumes (incorrectly) that defendants have defrauded the government program, Medicare, thereby harming private co-payors, numerous cases have held that such a fraud claim is barred under the principles of Parker and Noerr.[7] See, e.g., Armstrong Surgical Cen. v. Armstrong Cty. Mem. Hosp., 185 F.3d 154,

---

[6] While Noerr immunity claims typically arise in the context of antitrust actions, the state action doctrine is applicable to RICO actions and to state-law claims. International Bhd. of Teamsters v. Philip Morris, Inc. 196 F.3d 818, 826 (7th Cir. 1999); Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P., 129 F. Supp. 2d 578, 593-97 (W.D.N.Y.), aff'd, 229 F.3d 1135 (2d Cir. 2000).

[7] The government's knowledge about AWP and its policy reasons for using it for Medicare purposes (i.e. allowing medical providers' profits on drugs to "cross-subsidize" inadequate payments for providers' related services) implicate another related antitrust standing argument based on the Supreme Court's decision in California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97 (1980). In brief, Midcal and its progeny hold that

160-63 (3d Cir. 1999) (plaintiff does not have standing to sue defendants for false filings before state health officials that allegedly cause officials' denial of plaintiff's application); Bristol-Myers Squibb Co. v. Immunex Corp., 84 F. Supp. 2d 574, 577 (D.N.J. 2000) (rejecting drug company's allegation that competitor obtained exclusive drug rights through false statements made to regulators; holding there is "[no] liability on Bristol for acts undertaken by the government. Here, the [NCI] and the [FDA] directly caused [the complained-of] injuries."); see also Midland Export Ltd. v. Elkem Holding, Inc., 947 F. Supp. 163, 166 (E.D. Pa. 1996) ("Even though the ITC reached [its] conclusion allegedly in reliance on market information distorted by Defendants' conspiracy . . . the ITC's action was still the direct cause of the harm here."). The direct cause of plaintiffs' harm is the government, not any action of defendants.

C.      Plaintiffs' Class 1 Claims Are Barred By The Doctrine of Preemption

Although the "preemption" doctrine is most often associated with federal supremacy over state statutes and judicial proceedings, it can also apply within the federal system to bar actions under general federal statutes. Amalgamated Ass'n of Street, Elec. Rwy. And Motor Coach Employees v. Lockridge, 403 U.S. 274, 285-288 (1971); Tamburello v. Comm-Tract Corp., 67 F.3d 973, 976 n.2 (1st Cir. 1995). Thus, courts have found that RICO claims have been preempted by federal regulatory schemes in a number of areas. See, e.g., Kenty v. Bank One, 92 F.3d 384, 391-393 (6th Cir. 1996) (McCarran-Furguson Act preempts RICO claims based on alleged fraud relating to insurance); Bodimetric Health Servs., Inc. v.

---

private parties are immune from federal antitrust liability if (a) an appropriate legislative or regulatory body has "clearly articulated" a "permissive policy" toward the conduct at issue and (b) the policy is "actively supervised" by the legislature/regulator. See generally II ABA Section of Antitrust Law, Antitrust Law Developments, 1074-1083 (4th ed. 1997). Here, the literally decades of legislation, regulation, studies and debate on AWP's role in Medicare more than satisfy the tests.

Aetna Life & Casualty, 903 F.2d 480, 486-87 (7th Cir. 1990) (RICO claims preempted by administrative benefits determination procedure under the Social Security Act); Jarman v. United Indus. Corp., 98 F. Supp. 2d 757, 765-66 (S.D. Miss. 2000) (claim that pesticide manufacturers had intentionally mislabeled products in violation of RICO preempted as inconsistent with regulatory structure for pesticides created by Congress and jurisdiction of EPA); Norman v. M.S. Carriers, Inc., 741 F. Supp. 148, 149-50 (W.D. Tenn. 1990) (Surface Transportation Assistance Act bars RICO claims based on defendants' alleged violations of federal motor safety regulations). Courts have also found that the Medicare Act can preempt other federal statutes. See St. Vincent's Medical Center v. United States, 32 F.3d 548, 549-50 (Fed. Cir. 1994) (Medicare Act preempts Tucker Act). Furthermore, a specific statutory/administrative construct can preempt federal private lawsuits under a generic statute like RICO "even when the [preemptive] statute provides no alternative remedy," Orsay v. United States, 289 F.3d 1125, 1128-29 (9th Cir. 2002), although in this case there is an administrative remedy. See 42 C.F.R. §§ 405.801-77.

    1.    Field Preemption

With respect to field preemption, Congress of California Seniors v. Catholic Healthcare West, 87 Cal. App. 4th 491 (Cal. Ct. App. 2001) is on point. In that case, the plaintiff brought a fraud claim on behalf of consumers alleging that a hospital had improperly inflated reimbursement requests under Medicare Part A by including anti-union expenses in its cost reports. Noting that "there is no express preemption in the Medicare statute", the court nevertheless held that the claim was barred by the doctrine of field preemption because (1) Congress had granted broad discretion to the Secretary of HHS to determine reasonable costs; (2) there were various mechanisms available for appealing reimbursement disputes; and (3) the

plaintiff, in effect, was asking the court to review decisions made by the Secretary or his agents. 87 Cal. App. 4th at 499, 502, 509-10.

The only difference between <u>California Seniors</u> and this case is that the former involved claims under Medicare Part A (in-hospital services) while the latter involves claims under Medicare Part B (outpatient services). In this case, as in <u>California Seniors</u>, (1) Congress has authorized an administrative agency to determine reimbursement rates (although it has restricted the agency's discretion); (2) as noted by the court in <u>California Seniors</u>, "Part B disputes may be administratively appealed by the beneficiary or his assignee", 87 Cal. App. 4th at 502; and (3) plaintiffs are asking this Court to review decisions made by the agency and its agents. In this context, any distinction between Part A and Part B is a distinction without a difference; therefore, plaintiffs' federal and state claims on behalf of the Medicare class should be dismissed.

2.      <u>Conflict Preemption</u>

With respect to conflict preemption, <u>Buckman Co. v. Plaintiffs' Legal Comm.</u>, 531 U.S. 341 (2001) is also applicable here. In <u>Buckman</u>, the plaintiffs claimed that they were injured as a result of a fraud on the FDA. The Supreme Court ruled that the claim was barred by the doctrine of conflict preemption because "the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and . . . this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives". 531 U.S. at 348.

Here, too, the Executive Branch has the power to deal with allegedly fraudulent AWPs if it chooses to do so. Indeed, plaintiffs have sought production of documents relating to various government investigations. Plaintiffs should not be permitted to pursue their Class 1

claims as surrogates of the government, making claims and policy judgments that the Executive Branch is perfectly capable of making for itself.

II.

## PLAINTIFFS' CLASS 1 AND CLASS 2 RICO CLAIMS ARE SUBSTANTIVELY DEFECTIVE AND FAIL TO SATISFY RULE 9(b).

A. <u>Public Knowledge Of The "Spread" Negates Fraudulent Intent</u>

As the Consolidated Memorandum makes clear, there can be no wire fraud or mail fraud to support a RICO claim without a credible allegation that defendants "intended to deceive" those responsible for administering the Medicare system and private health plans in reporting prices to the publications. Even though the First Circuit has stated that reliance is not a necessary element of a mail fraud claim, <u>Systems Mgmt., Inc. v. Loiselle</u>, 303 F.3d 100, 104 (1st Cir. 2002), "a demonstrated intent to deceive is required". <u>United States v. Sawyer</u>, 85 F.3d 713, 732 (1st Cir. 1996).[8] Here, plaintiffs cannot demonstrate the requisite intent because it is undisputed that the "spread" between AWPs and actual provider costs was widely reported in government publications, judicial decisions and media reports which any pharmaceutical manufacturer would have assumed that the plaintiffs in this case -- who include sophisticated health care plans -- would have seen.

As a matter of law, there can be no fraud where the defendant reasonably believes that the alleged victim knows the truth. See, e.g., <u>United States v. Pendergraft</u>, 297 F.3d 1198, 1209 (11th Cir. 2002) ("If [defendants] knew that they could not deceive [the alleged victim], then they could not have had an intent to deceive."); <u>Norton v. United States</u>, 92 F.2d 753, 755

---

[8] This argument does not focus on whether the <u>victim</u> of the alleged fraud changed position based on the statements made, but rather whether the <u>defendant-speaker</u> can be said to have the requisite state of mind for fraud in the context of information in the public domain.

11

(9th Cir. 1937) ("There can be no intent to deceive where it is known to the party making representation that no deception can result."). While a defendant's intent is ordinarily a question of fact, where, as here, it is undisputed that the "true" facts were readily available, a plaintiff cannot demonstrate fraudulent intent. See, e.g., United States v. Brown, 79 F.3d 1550, 1556-59 (11th Cir. 1996) ("A 'scheme to defraud' under the pertinent criminal statutes has not been proved where a reasonable juror would have to conclude that the representation is about something which the customer should, and could, easily confirm -- if they wished to do so -- from readily available external sources [real estate brokers or newspaper advertisements]."); Alexander v. The Turner Corp., 00 Civ. 4677, 2001 WL 225049, at *5 (S.D.N.Y. Mar. 2, 2001) ("Plaintiff cannot show misrepresentation or intent to misrepresent when the alleged fraudulently concealed information was contained in a publicly available document [a proxy statement]."). Furthermore, it does not matter whether the plaintiff actually saw the publicly available information; the existence of the information negates any inference of bad faith. Cf. United States v. Josleyn, 99 F.3d 1182, 1194 (1st Cir. 1996) (defendant had no obligation to prove that alleged victim actually condoned the activities in question; the burden is on the government to prove "fraudulent intent and the consequent lack of good faith").[9]

This analysis in the context of a motion to dismiss is similar to the analysis that courts frequently use in determining whether to grant a motion to dismiss on statute of limitations grounds. See, e.g., Donahue v. Federal Bureau of Investigation, 204 F. Supp. 2d 169,

---

[9] As materials that plaintiffs have filed with the Court make clear, competition among pharmaceutical manufacturers based on the "spread" is not the product of any fraudulent intent; once the government decides to base reimbursement rates on AWPs as opposed to actual provider costs, the pharmaceutical companies have no choice but to compete on the basis of the spread. If they do not, they will not get any business. See Kalb, Bass & Fabrikant, The Average Wholesale Price: It Ain't What The Government Wants To Pay, BNA Health Law Reporter, Vol. 10, No. 9 (March 1, 2001), annexed to the Affidavit of Thomas Sobol, sworn to October 16, 2002, as Exhibit 4.

177 (D. Mass. 2002) ("[S]ome cases hold that media reports, in some circumstances, provide the plaintiffs with constructive notice of their claims".). Where a newspaper article or other publicly available information would alert a reasonable person to the possibility of fraud, the court may dismiss the action even if the plaintiff claims that it did not see the information. See, e.g., In re Sterling Foster & Co. Sec. Lit., --- F. Supp. 2d ---, 2002 WL 1395448, at *7 (E.D.N.Y. June 27, 2002) (lawsuits and newspaper articles); In re Ultrafem Inc. Sec. Lit., 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000) (Bloomberg news article); Blue Cross of California v. SmithKline Beecham Clinical Labs., Inc., 108 F. Supp. 2d 116, 123-24 (D. Conn. 2000) (media stories and government reports). The court may decide the issue on the basis of the undisputed facts. See Hodas v. Sherburne, Powers & Needham, P.C., 938 F. Supp. 60, 64-65 (D. Mass. 1996) aff'd per curiam 114 F.3d 1169 (1st Cir. 1997) (RICO claim dismissed where undisputed facts demonstrated that plaintiff was on notice of the possibility of fraud).

There are numerous Court of Appeals cases interpreting the False Claims Act, 31 U.S.C. § 3729 et seq., which hold that "prior government knowledge of an allegedly false claim can negate the scienter required for an FCA violation." United States ex rel. Becker v. Westinghouse Savannah River Co., 303 F.3d 284, 289 (4th Cir. 2002) (cataloging cases).[10] Since the "scienter requirement [under the FCA] is something less than that set out in the common law" (and therefore is also less than the scienter requirement for statutory mail and wire fraud), Wang v. FMC Corp., 975 F.2d 1412, 1420 (9th Cir. 1992) (emphasis added), it follows that

---

[10] In Becker, the defendant government contractor, Westinghouse, was alleged to have knowingly disregarded Congressional appropriations rules for an energy project. The court noted that the Department of Energy "had at least as much knowledge as [the contractor] Westinghouse regarding Congressional authority", id. at 288, and that "DOE's full knowledge of the material facts . . . negates any knowledge that Westinghouse had regarding the truth or falsity of those representations." Id. at 289.

plaintiffs in this case cannot possibly show that defendants acted with the requisite "intent to deceive" to support their claim under RICO. Indeed, while the existence of publicly available information negates fraudulent intent for both the Class 1 and Class 2 claims, it would be completely anomalous for the Class 1 plaintiffs to be able to pursue a claim based on their 20% co-payment under circumstances in which the government, which pays 80% of the reimbursement, could not pursue a claim itself.

B.   An Enterprise Must Be Something More Than A Conspiracy

With respect to plaintiffs' provider, publisher and PBM enterprises, plaintiffs repeat the mantra that they are "ongoing and continuing business organizations consisting of both corporations and individuals that are and have been associated for the common purposes of selling, purchasing, prescribing, and administering" drugs. (E.g., Compl. ¶¶ 346, 375, 402, 429.) While courts have struggled with the proper definition of an enterprise, it is clear that an enterprise must be something more than a conspiracy -- i.e. its members must exhibit some form of organization in addition to a "common purpose". See, e.g., Stachon v. United Consumers Club, Inc., 229 F.3d 673, 675-76 (7th Cir. 2000) ("To withstand Appellees' motion to dismiss, however, Appellants must present something more than . . . assertions of conspiracy; otherwise, 'every conspiracy to commit fraud that requires more than one person to commit is a RICO organization and consequently every fraud that requires more than one person to commit is a RICO violation.'"); Chang v. Chen, 80 F.3d 1293, 1300 (9th Cir. 1996) ("A conspiracy . . . is not an enterprise for purposes of RICO."); see also United States v. Patrick, 248 F.3d 11, 17 (1st Cir.) (plaintiff must prove "that the alleged enterprise had an ongoing organization, formal or informal, and that its various associates functioned as a continuing unit for a common purpose"), cert.

14

denied sub nom. Arthur v. United States, 122 S. Ct. 620 (2001) and cert. denied, Patrick v. United States, 122 S. Ct. 1215 (2002) (emphasis added).

C.     The Complaint Fails to Satisfy Rule 9(b) With Respect To BMS

Plaintiffs allege that BMS "used free drugs and other goods to encourage participation by physicians." (Compl. ¶ 244.) Other than (a) one example of BMS allegedly providing a free drug to induce two oncologists to purchase other BMS drugs and (b) the practice of giving doctors "Cytoguards", a device used to prevent spilling of the drugs given intravenously to patients, there are no facts pled to support this allegation; nor is there any explanation of what physicians are being encouraged to "participate" in (other than purchasing BMS products). In short, nothing in the complaint is pled to suggest why these two acts might be deemed wrong, let alone fraudulent.[11]

RICO allegations that do not specify what conduct was fraudulent, why the conduct was fraudulent, how the fraudulent conduct was carried out and when and where the fraudulent conduct took place must be dismissed. M&I Heat Transfer Products, Ltd. v. Willke, 131 F. Supp. 2d 256, 261 (D. Mass. 2001). As the Schering-Plough/Warrick defendants make clear in their motion to strike paragraphs 155-56 of the complaint, this is not a case like Lupron where manufacturers are alleged to have encouraged doctors to bill the government for free samples.[12] Indeed, BMS stands accused of nothing more than good salesmanship.

---

[11] Nor is there any allegation of how the mails or wires were used in connection with these free samples. North Bridge Associates, Inc. v. Boldt, 274 F.3d 38, 44 (1st Cir. 2001) (dismissing RICO claims because complaint did not allege facts that implicated the use of the mails or wires).

[12] BMS joins in the Schering-Plough/Warrick defendants' motion to strike and for a more definite statement. BMS also joins the other defendants' motions to dismiss claims for lack of standing, where no named plaintiff has paid for a defendant's drug. No Class 1 plaintiff is alleged to have paid for a BMS drug.

15

Plaintiffs also fail to identify the "brand name" prescription drugs that are the subject of their Class 2 claims. There are literally hundreds of drugs that could fit that description, depending on how the term "brand name" is defined. BMS cannot begin to prepare a defense until it knows what plaintiffs are talking about.

### Conclusion

For the foregoing reasons, the Complaint should be dismissed.

Respectfully submitted,

BRISTOL-MEYERS SQUIBB COMPANY,
ONCOLOGY THERAPEUTICS
 NETWORK CORP. and
APOTHECON, INCORPORATED

By their attorneys,

Steven M. Edwards (SE 2773)
Lyndon M. Tretter (LT 4031)
Admitted *pro hac vice*
**HOGAN & HARTSON L.L.P.**
875 Third Avenue
26th Floor
New York, NY  10022
(212) 918-3000

Thomas E. Dwyer, Jr. (BBO No. 139660)
Daniel J. Cloherty (BBO No. 565772)
**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, MA  02210
(212) 371-1000

Dated:  November 4, 2002

## CERTIFICATE OF SERVICE

I, Lyndon M. Tretter, certify that a true and correct copy of the foregoing motion and memorandum of law was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on Nov. 4, 2002, a copy to Verilaw Technologies for posting and notification to all parties.

_____
Lyndon M. Tretter

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456<br><br>CIVIL ACTION NO. 01-CV-12257-PBS<br><br>Judge Patti B. Saris |
| THIS DOCUMENTS RELATES TO ALL ACTIONS | |

## DEFENDANT BRISTOL-MYERS SQUIBB COMPANY'S
## LOCAL RULE 7.3 DISCLOSURE STATEMENT

Pursuant to Local Rule 7.8, the undersigned attorney of record for defendants Bristol-Myers Squibb Company ("BMS"), Oncology Therapeutics Network Corporation ("OTN") and Apothecon, Inc. hereby certifies that BMS is a publicly-held corporation with no parent companies and that no publicly held corporation owns 10% or more of BMS' outstanding stock. The undersigned attorney also certifies that OTN and Apothecon, Inc. are wholly owned subsidiaries of BMS.

New York, New York
November 4, 2002

HOGAN & HARTSON L.L.P.

By: _____
Lyndon M. Tretter

875 Third Avenue
New York, New York 10022
(212) 918-3000

Attorneys for Defendants
Bristol-Myers Squibb Company, Oncology
Therapeutics Network Corporation and
Apothecon, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITIZENS FOR CONSUMER JUSTICE ET AL., ) <br> Plaintiffs, ) <br> v. ) <br> ABBOTT LABORATORIES, INC. ET AL., ) <br> Defendants. ) <br> ) <br> AND ALL RELATED CASES ) | Civil Action No. <br> 01-12257-PBS <br> MDL No. 1456 |

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

Pursuant to Local Rule 7.1 (A)(2), I hereby certify that counsel for Defendant Bristol-Myers Squibb has conferred in good faith with counsel for Citizens for Consumer Justice, Edward Notargiacomo of Hagens Berman LLP, by telephone on November 4, 2002 for the purposes of attempting to resolve the issues addressed in the Motion to Dismiss. The efforts were unsuccessful.

Respectfully submitted,

_/s/ Lyndon M. Tretter_

Lyndon M. Tretter
Steven M. Edwards
Admitted *pro hac vice*
**HOGAN & HARTSON, LLP**
875 Third Avenue
New York, NY 10022
(212) 918-3000

Thomas E. Dwyer, Jr. (BBO No. 139660)
Daniel J. Cloherty (BBO No. 565772)
**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, MA 02210
(617) 371-1000

Dated: November 4, 2002

## CERTIFICATE OF SERVICE

I, Lyndon M. Tretter, certify that a true and correct copy of the following was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on Nov. 4, 2002, a copy to Verilaw Technologies for posting and notification to all parties:

Defendant Bristol-Myers Squibb Company's Rule 7.3 Corporate Disclosure;

Notice of Appearance for Defendant Bristol-Myers Squibb Company; and

Motion for Admission Pro Hac Vice.

_____
Lyndon M. Tretter