## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
|  | CIVIL ACTION:  01-CV-12257-PBS |
|  | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS |  |

## PLAINTIFFS' CONSOLIDATED OPPOSITION TO
## DEFENDANTS' MOTIONS TO DISMISS



## TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ...................................................................................................1

II.     PRIOR PROCEEDINGS ........................................................................................1

III.    THE ALLEGATIONS OF THE COMPLAINT.....................................................2

    A.      General Allegations of AWP Fraud.............................................................2

    B.      The Government Investigations Into Defendants' AWP Scheme .................4

    C.      Defendant Specific Unlawful Conduct.........................................................6

    D.      The Pervasive Damage Caused By Defendants' AWP Scheme....................7

    E.      Plaintiffs' Causes Of Action ........................................................................8

IV.     THE APPLICABLE STANDARD FOR DISMISSAL...........................................8

    A.      The Allegations Of The Complaint Control .................................................8

    B.      Defendants' 54 Exhibits Only Raise Disputed Fact Issues .........................9

V.      THIS CASE DOES NOT REQUIRE THE COURT TO REJECT OR REWRITE
    MEDICARE POLICY ...........................................................................................11

    A.      Plaintiffs Do Not Allege, And Need Not Establish, That AWP Approximates
        Actual Acquisition Cost:  Alleging That Defendants Reported Fictitious AWPs
        Suffices .......................................................................................................11

    B.      The Term "AWP" Is Capable of Definition ...............................................13

    C.      The Political Question Doctrine Does Not Apply In This Case ..................15

        1.      The Political Question Doctrine Is Narrowly Proscribed And Does Not
            Apply Here.......................................................................................15

        2.      No Persuasive "Political Question" Case Law Is Cited...................16

VI.     COUNTS I-IV OF THE COMPLAINT PROPERLY PLEAD RICO VIOLATIONS ...........19

    A.      An Overview Of Plaintiffs' Civil RICO Claims And Their Necessary Elements.......19

    B.      The Complaint Properly Identifies The RICO Enterprises..........................20

        1.      The RICO "Enterprise" Concept .....................................................20

        2.      The "AWP Enterprises".....................................................................21

|   |   |   | a. | The First Circuit expressly authorizes alternative enterprises | 21 |
|   |   |   | b. | The First Circuit has rejected an "ascertainable structure" enterprise requirement | 22 |
|   |   |   | c. | Plaintiffs allege that the members of each enterprise had a common purpose | 24 |
|   |   | 3. | The Publisher Enterprises | | 26 |
|   |   | 4. | The PBM Enterprises | | 26 |
|   |   | 5. | The Third-Party Payor Enterprises | | 27 |
|   | C. | | The Complaint Properly Alleges That Defendants "Conducted" The Affairs Of The Third-Party Payor AWP Enterprises | | 27 |
|   | D. | | The Complaint Properly Alleges That Defendants Conducted The Enterprises' Affairs Through A Pattern Of Racketeering Activity | | 29 |
|   | E. | | Plaintiffs Properly Allege Acts Constituting Mail And Wire Fraud | | 29 |
|   | F. | | Plaintiffs Plead Fraud With The Particularity Required By Rule 9(b) | | 30 |
|   |   | 1. | Rule 9(b) Pleading Standards | | 30 |
|   |   | 2. | Plaintiffs Allege Mail And Wire Fraud With The Particularity Required By Rule 9(b) | | 31 |
|   |   |   | a. | Plaintiffs Allege The AWP Scheme With Requisite Particularity | 31 |
|   |   |   | b. | Plaintiffs Allege With Particularity Defendants' Knowing Participation In The AWP Scheme | 34 |
|   |   |   | c. | Plaintiffs allege with particularity Defendants' use of U.S. mail and interstate wire facilities in furtherance of the scheme | 35 |
|   | G. | | Plaintiffs Have Standing To Sue Defendants For RICO Violations | | 37 |
|   | H. | | Plaintiffs Properly Assert RICO Conspiracy Claims Against Defendants | | 40 |
| VII. | | | PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED | | 41 |
|   | A. | | The Medicare Act Does Not Preempt Plaintiffs' Claims | | 41 |
|   |   | 1. | The Medicare Act Does Not Preempt The Field | | 42 |
|   |   | 2. | Plaintiffs' Claims Do Not Conflict with the Medicare Act | | 44 |
|   | B. | | ERISA Does Not Preempt Plaintiffs' State Law Claims | | 44 |

VIII.   THE REMAINING ARGUMENTS MADE BY INDIVIDUAL DEFENDANTS DO
        NOT WARRANT DISMISSAL ....................................................................................47

        A.      Plaintiffs Have Standing To Sue All Defendants .......................................................47

                1.      The Constitutional Standard for Standing........................................................47

                2.      The Allegations Meet the Pleading Standards for Standing ............................48

                3.      Defendants' Argument for More Specifics on Standing Lacks Merit ............49

        B.      ERISA Plans Are Proper Plaintiffs ............................................................................51

        C.      The Filed Rate Doctrine Does Not Apply Here...........................................................52

        D.      The State Action And Noerr-Pennington Doctrines Do Not Apply ............................55

        E.      Abbott's Assertions Concerning Reimbursement For Its Vancomycin Drug Are
                Misleading.....................................................................................................................56

        F.      Amgen's Assertions Concerning Reimbursement For Its Epogen Drug Are
                Misleading.....................................................................................................................56

        G.      Plaintiffs Make Sufficient Allegations Of BMS's Intent To Defraud .........................57

        H.      Plaintiffs Make Sufficient Allegations Against Defendant Hoffman-La Roche .........58

IX.     CONCLUSION...........................................................................................................................59

## TABLE OF AUTHORITIES

### CASES

*Aetna Cas. & Sur. Co. v. P & B Autobody*, 43 F.3d 1546 (1st Cir. 1994) ............................. passim

*Alves v. Harvard Pilgrim Health Care, Inc.*, 204 F. Supp. 2d 198 (D. Mass. 2002) ................... 50

*American Postal Workers Union v. Frank*, 968 F.2d 1373 (1st Cir. 1992) ................................. 48

*Arkansas La. Gas Co. v. Hall*, 453 U.S. 571 (1981) ..................................................................... 52

*Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp.*, 185 F.3d 158 (3d Cir. 1999),
  *cert. denied*, 530 U.S. 1261 (2000) ......................................................................................... 55

*Augat, Inc. v. Collier*, 1996 U.S. Dist. Lexis 2702 (D. Mass., Jan. 22, 1996) ............................. 13

*Avirgan v. Hull*, 932 F.2d 1572 (11th Cir. 1991) ......................................................................... 23

*Baker v. Carr*, 369 U.S. 186 (1962) ............................................................................................. 15

*Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*, 129 F. Supp. 2d 578 (W.D.N.Y.),
  *aff'd*, 229 F.3d 1135 (2d Cir. 2000) ......................................................................................... 55

*BCCI Holdings (Lux.), S.A. v. Khalil*, 214 F.3d 168 (D.C. Cir. 2000) ......................................... 38

*Beacon Prod. Corp. v. Reagan*, 633 F. Supp. 1191 (D. Mass. 1986), *aff'd*, 814 F.2d 1 (1st Cir.
  1987) ....................................................................................................................................... 17

*Benjamin v. Aroostook Med. Ctr., Inc.*, 57 F.3rd 101 (1st Cir. 1995) ......................................... 50

*Blue Cross v. SmithKline Beecham Clinical Labs., Inc.*, 62 F. Supp. 2d 544 (D. Conn. 1998) ... 25

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ......................................................... 40

*Bolduc v. United States*, 2002 U.S. Dist. Lexis 13830 (D. Mass. July 30, 2002) .......................... 8

*Boston & Me. Corp. v. Hampton*, 987 F.2d 855 (1st Cir. 1993) .................................................. 30

*Bowdoin Constr. Corp. v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 869 F. Supp. 1004 (D.
  Mass. 1994) ............................................................................................................................. 29

*Cahnmann v. Sprint Corp.*, 961 F. Supp. 1229 (N.D. Ill. 1997), *aff'd*, 133 F.3d 484 (7th Cir.
  1998). ....................................................................................................................................... 54

*California Div. of Labor Stds. Enforcement v. Dillingham Constr.*, 519 U.S. 316 (1997) .......... 45

*California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272 (1987) ........................................... 41

*Camelio v. American Fed'n*, 137 F.3d 666 (1st Cir. 1998) ......................................................... 37

*Can v. United States*, 14 F.3d 160 (2d Cir. 1994)..................................................................... 16

*Carpenters & Millwrights Health Benefit Trust Fund v. Domestic Insulation Co.*, 387 F. Supp.
144 (D. Colo. 1975) ...................................................................................................... 45, 46, 52

*Carpenters Local Union No. 26 v. United States Fid. & Guar. Co.*, 215 F.3d 136  (1st Cir. 2000).
.................................................................................................................................................. 45, 46

*Center Cadillac v. Bank Leumi Trust Co.*, 808 F. Supp. 213 (S.D.N.Y. 1992)............................ 36

*Chevron, U.S.A. Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837 (1984)........... 14

*City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365 (1991) ................................... 54, 55

*Combustion Eng'g, Inc. v. Miller Hyrro Group*, 13 F.3d 437 (1st Cir. 1993)............................... 19

*Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374 (2d Cir. 2001) ....... 38

*Comsource Indep. Foodservice Co. v. Union Pacific R.R..*, 102 F.3d 438 (9th Cir. 1996).......... 53

*Congress of Cal. Seniors v. Catholic Healthcare West*, 87 Cal. App. 4th 491 (2d Dist. 2001) ... 43

*Corporacion Insular De Seguros v. Munoz*, 826 F. Supp. 599 (D.P.R. 1993) ............................. 34

*County of Stanislaus v. Pacific Gas & Elec. Co.*, 114 F.3d 858 (9th Cir. 1997).......................... 54

*Coyne v. City of Somerville*, 972 F.2d 440, 442-43 (1st Cir. 1992)................................................ 8

*Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272 (6th Cir. 1991)............................... 46

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) ............................................... 44

*District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125 (1992)........................ 45

*Doyle v. Hasbro, Inc.*, 103 F.3d 186 (1st Cir. 1996) ................................................................... 21

*Earles v. State Bd. of Certified Pub. Accountants*, 139 F.3d 1033 (5th Cir. 1998) ...................... 55

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961)............ 55

*Fallick v. Nation Wide Mutual Insurance Co.* 162 F.3d 410 (6th Cir. 1998) ............................... 50

*Feinstein v. Resolution Trust Corp.*, 942 F.2d 34 (1st Cir. 1991) ............................................... 26

*First Nat'l Bank of Cincinnati v. Flershem*, 290 U.S. 504 (1934).......................................... 14, 16

*First Nat'l Bank v. Flershem*, 290 U.S. 504 (1934)..................................................................... 18

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999)......................................................... 8

*Grossman v. Waste Mgmt., Inc.*, 589 F. Supp. 395 (N.D. Ill. 1984)............................................. 13

*Guckenberger v. Boston Univ.*, 957 F. Supp. 306 (D. Mass.1997)............................................... 48

*Hamm v. Rhone-Poulenc Rorer Pharms.*, 187 F.3d 941 (8th Cir. 1999), *cert. denied*, 528 U.S. 1117 (2000 ........................................................................................................................... 38

*Harrington v. Chao*, 280 F.3d 50 (1st Cir., 2000) ........................................................................ 14

*Harris v. Harvard Pilgrim Health Care, Inc.*, 208 F.3d 274 (1st Cir. 2000) ............................... 47

*Hastings v. Fidelity Mortg. Decisions Corp.*, 984 F. Supp. 600 (N.D. Ill. 1997)............. 31, 34, 38

*Hewlett-Packard Co. v. Boston Sci. Corp.*, 77 F. Supp. 2d 189 (D. Mass. 1999) .......................... 9

*Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985)................................... 43

*Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258 (1992)......................... 37, 38, 39, 43, 44

*Hospice of Metro Denver, Inc. v. Group Health Ins.*, 944 F.2d 752 (10th Cir. 1991)................... 46

*Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178 (1st Cir. 1999) ........................... 49

*In Home Health v. Prudential Ins. Co. of Am.*, 101 F.3d 600 (8th Cir. 1996).............................. 46

*In re Managed Care Litigation*, 185 F. Supp. 2d 1310 (S.D. Fla. 2002)................................. 23,24

*In re Number Nine Visual Tech.*, 51 F. Supp. 2d  1 (D. Mass. 1999)........................................... 13

*In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395 (3d Cir. 2000)............................................ 9

*Int'l Union of Bricklayers & Allied Craftsmen, Local #1 v. Menard & Co. Masonry Bldg. Contractors*, 619 F. Supp. 1457 (D.R.I. 1985) ..................................................................... 52, 60

*Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris, Inc.*, 29 F. Supp. 2d 801 (N.D. Ohio 1998) .................................................................................................................. 40

*Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221 (1986) ................................... 17

*Kannavos v. Annino*, 356 Mass. 42, 48, 247 N.E. 2d 708 (1969).................................................. 13

*Kline & Co. v. MCI Communications Corp.*, 98 F. Supp. 2d 69 (D. Mass. 2000) ....................... 54

*Kuney Int'l, S.A. v. DiIanni*, 746 F. Supp. 234 (D. Mass. 1990) .................... 30, 31, 33, 34, 35, 39

*LeBlanc v. Cahill*, 153 F.3d 134 (4th Cir. 1998) .......................................................................... 53

*Lenon v. St. Paul Mercury Ins. Co.*, 136 F. 3d 1365 (10th Cir. 1998).......................................... 52

*Liberty Mut. Ins. Co. v. Diamante*, 138 F. Supp. 2d 47 (D. Mass. 2001) ......................... 22, 27, 29

*Local 159 v. Nor-Cal Plumbing, Inc.*, 185 F.3d 978 (9th Cir. 1999)............................................ 51

*Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F. Supp. 1188 (D. Mass. 1990)......................... 14

*Loma Linda Univ. Med. Ctr. v. Farmers Group*, 1995 U.S. Dist. Lexis 9668 (E.D. Cal. May 15, 1995) ............................................................................................................................................ 26

*Lordmann Enters., Inc. v. Equicor, Inc.*, 32 F.3d 1529 (11th Cir. 1994) ..................................... 53

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ..................................................... 48, 50

*Maryland v. Louisiana*, 451 U.S. 725 (1981) ............................................................................... 41

*Massachusetts Ass'n of HMOs v. Ruthardt*, 194 F.3d 176 (1st Cir. 1999).................................... 41

*Massachusetts Med. Soc'y v. Dukakis*, 815 F.2d 790, 791 (1st Cir. 1987)....................... 41, 43, 43

*McEvoy Travel*, 904 F.2d 786 (1st Cir. 1990) .............................................................................. 29

*Medical Soc'y of New York v. Cuomo*, 976 F.2d 812  (2d Cir. 1992) ............................... 41, 42, 43

*Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236 (5th Cir. 1990)......................... 46

*Mid Atl. Telecom, Inc. v. Long Distance Servs.*, 18 F.3d 260 (4th Cir. 1994)............................... 38

*Moore v. Comfed Sav. Bank*, 908 F.2d 834 (11th Cir. 1990)....................................................... 51

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995) 45

*Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986) ............................................... 54

*New England Data Servs., Inc. v. Becker*, 829 F.2d 286 (1st Cir. 1987) ...................................... 36

*New Hampshire Right to Life PAC v. Gardner*, 99 F.3d 8 (1st Cir. 1996). .................................. 50

*Nixon v. Herndon*, 273 U.S. 536 (1927) ..................................................................................... 16

*North Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38 (1st Cir. 2001) .................................................. 19

*Parker v. Brown*, 317 U.S. 341 (1943) .................................................................................. 55, 64

*Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002) .............................................................. 50

*Peckham v. Continental Cas. Ins. Co.*, 895 F.2d 830 (1st Cir. 1990)............................................ 44

*Pennsylvania Med. Soc'y v. Marconis*, 942 F.2d 842 (3d Cir. 1991)............................... 41, 42, 43

*Pharmacare v. Caremark*, 965 F. Supp. 1411, 1421-23 (D. Haw. 1996)................................ 23, 24

*Pressroom Unions-Printers League Income Sec. Fund v. Continental Assurance Co.*, 700 F.2d 889 (2d Cir. 1983)........................................................................................................................... 52

*Prudential Ins. Co. v. United States Gypsum*, 711 F. Supp. 1244 (D.N.J. 1989) ................... 36, 41

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)......................................................................... 28, 29

*Rice v. Norman Williams Co.*, 458 U.S. 654 (1982)...................................................................... 44

*River City Markets, Inc. v. Fleming Foods West, Inc.*, 960 F.2d 1458 (9th Cir. 1992)................ 26

*Roeder v. Alpha Indus., Inc.*, 814 F.2d 22 (1st Cir. 1987)......................................... 8, 9, 12, 13, 14

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ........................................................................................ 8

*Sea Shore Corp. v. Sullivan*, 158 F.3rd 51, (1st Cir. 1998) ......................................................... 50

*Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70  (D. Mass. 1998) ............................ 36, 38, 39

*Servais v. Kraft Foods, Inc.*, 631 N.W.2d 629 (Wis. Ct. App. 2001), *aff'd*, 643 N.W.2d 92 (2002) ................................................................................................................................................. 54, 63

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984)................................................................... 42

*Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976) ......................................... 47

*Solorvano v. Superior Court*, 10 Cal. App. 4th 1135 (2d Dist. 1992) ........................................... 42

*State of Minnesota v. Pharmacia Corporation*, C.A. No. 02-1779 (D. Minn., Sept. 27, 2002) ... 17

*Stephenson v. Shalala*, 87 F.3rd 350 (9th Cir. 1996) ....................................................... 16, 17, 19

*Stetson v. PFL Ins. Co.*, 16 F. Supp. 2d 28 (D. Me. 1998) ........................................................... 47

*Swift v. United States*, 866 F.2d 507 (1st Cir. 1989) .................................................................... 44

*TAP Pharms. v. U.S. Dept. of Health & Human Services*  163 F.3d 199 (4th Cir. 1998). ........... 44

*The Meadows v. Employers Health Ins.*, 47 F.3d 1006 (9th Cir. 1995) ....................................... 46

*Town of Norwood v. New England Power Co.*, 23 F. Supp. 2d 109 (D. Mass. 1998) *rev'd in part on other grounds*, 202 F.3d 408 (1st Cir. 2000). .................................................................. 52, 53

*Trustees of the AFTRA Health Fund v. Biondi*, 303 F.3d 765 (7th Cir. 2002) ............................. 46

*Turner v. Johnson & Johnson*, 809 F.2d 90 (1st Cir. 1986) ......................................................... 13

*Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574 (5th Cir. 2001) ................... 13

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965) .......................................................... 64

*United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39 (D. Mass. 2001)......... 9, 30, 34

*United States ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d 141 (D. Mass. 2000)........... 31

*United States v. 525 Co.*, 342 F.2d 759 (5th Cir. 1965).............................................................. 14

*United States v. AVX Corp.*, 962 F.2d 108 (1st Cir. 1992) ........................................................... 47

*United States v. Boylan*, 898 F.2d 230 (1st Cir. 1990) ................................................................ 40

*United States v. Brown*, 79 F.3d 1550 (11th Cir. 1996)............................................................... 58

*United States v. Cianci*, 210 F. Supp. 2d 71 (D.R.I. 2002).......................................................... 24

*United States v. London*, 66 F.3d 1227, 1243 (1st Cir. 1995) ...................................... 20, 22, 24, 26

*United States v. Marino*, 277 F.3d 11 (1st Cir. 2002)................................................................... 19

*United States v. Owens*, 167 F.3d 739 (1st Cir. 1999)..................................................................... 23

*United States v. Patrick*, 248 F.3d 11 (1st Cir. 2001)..................................................................... 22

*United States v. Shifman*, 124 F.3d 31 (1st Cir. 1997).................................................................. 19

*United States v. TAP Pharmaceutical Products, Inc.*, No. CR-01-10354-WGY (D. Mass., Dec. 6, 2001). ........................................................................................................................................ 6

*United States v. Turkette*, 452 U.S. 576 (1981) ............................................................... 20, 21, 22

*US ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284 (4th Cir. 2002) .............. 57

*V.H.S. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411 (1st Cir. 1985)........................................... 12, 13

*Venzor v. Gonzalez*, 936 F. Supp. 445 (N.D. Ill. 1996) .................................................................. 38

*VNA Plus, Inc. v. Apria Healthcare Group, Inc.*, 29 F. Supp. 2d 1253 (D. Kan. 1998)............... 26

*Warth v. Seldin*, 422 U.S. 490 (1975) .......................................................................................... 18

*Watterson v. Paige*, 987 F.2d 1 (1st Cir. 1993) ............................................................................. 9

*Webster v. Omnitron Int'l*, 79 F.3d 776 (9th Cir. 1996) ................................................................ 24

*Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir. 1994) ......................................................... 54

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................................................ 47

*Wooten v. Loshbough*, 951 F.2d 768 (7th Cir. 1991)..................................................................... 40

*Yale Fin. Servs. Trust v. Palmetto Tomato Packers, Inc.*, 1987 U.S. Dist. Lexis 10886 (N.D. Ill. Nov. 18, 1987), ......................................................................................................................... 52

**STATUTES**

18 U.S.C. § 1961(1)(B)................................................................................................................... 29

18 U.S.C. § 1961(3) ....................................................................................................................... 19

18 U.S.C. § 1961(4) ....................................................................................................................... 28

18 U.S.C. § 1962(c) ............................................................................................................. 1, 19, 29

28 U.S.C. §§ 2201, 2002................................................................................................................ 08

29 U.S.C. § 1144(a) ......................................................................................... 52

29 U.S.C. §1132(d)(1) ...................................................................................... 51

42 U.S.C. § 1395 rr (b)(11)(B)(i)....................................................................... 56

42 U.S.C. § 1395 rr (b)(11)(B)(ii)...................................................................... 56

42 U.S.C. § 1395 w-2......................................................................................... 42

42 U.S.C. § 1395 u(o)(1) .................................................................................. 13

42 U.S.C. § 1962(d) .......................................................................................... 40

## REGULATIONS

42 C.F.R. § 405.517........................................................................................... 16

61 Fed. Reg. 66676, 66684 (Dec 18, 1996) ..................................................... 64

### TREATISES

Douglas E. Abrams, THE LAW OF CIVIL RICO § 4.3.1, at 186 (1991).......................................... 35

W. Prosser & W. Keeton, Prosser and Keeton on Torts 321 (5th ed. 1984) ................................ 47

### OTHER AUTHORITIES

AMERICAN HERITAGE DICTIONARY(2d ed. 1991) ........................................................ 14

BLACK'S LAW DICTIONARY (6th ed) .................................................................. 14

## I.    INTRODUCTION

Defendants seek dismissal pursuant to Fed. R. Civ. P. 9(b), 12(b)(1) and 12(b)(6).  No basis for dismissal exists.  The allegations of the Master Consolidated Class Action Complaint allege widespread fraudulent manipulation of the published average wholesale price, or "AWP," causing damage to Plaintiffs and the classes they seek to represent.  This conduct has been neither sanctioned by Congress nor condoned by regulators; in fact, Defendants have been investigated, and at times prosecuted, for this misconduct.  The MCC properly alleges claims for relief under federal law, 18 U.S.C. § 1962(c)–(d), as well as state consumer protection laws. Whether cast as preemption or jurisdictional attacks, Defendants' efforts to invoke the political question doctrine, ERISA preemption, field and conflict preemption, or the filed-rate doctrine, all fail.

## II.    PRIOR PROCEEDINGS

On September 6, 2002 – and following the entry of a case management order that provided for the consolidation of all actions pending before this Court in MDL No. 1456 – the Plaintiffs filed a 164 page, 465 paragraph Master Consolidated Class Action Complaint (the "Complaint" or "MCC").  The MCC amends the claims and allegations in all complaints then pending before the Court and coordinated as part of MDL No. 1456, as well as any class actions subsequently transferred to the Court.  Case Management Order No. 2, ¶ A ("CMO 2").  The MCC adds some new Defendants not previously sued in AWP litigation, omits other Defendants,[1] and clarifies that the MCC seeks relief for overcharges in the private insurer market as well as overcharges incurred by private end-payors in the form of co-payments made under Medicare Part B.

---

[1] During July and August of 2002, Plaintiffs' counsel reviewed the claims against all existing and potential Defendants.  Some of the Defendants who were previously named in one or more of the consolidated actions were omitted from the MCC.  Since that time, Plaintiffs' counsel have dismissed without prejudice some of those Defendants from the underlying actions.  Defendant Boehringer moves for dismissal based on a purported failure to comply with Local Rule 15.1.  Boehringer Mem. at 3.  This rule applies in instances where a party seeks leave of Court to add an additional defendant, requiring any motion for leave to amend be served upon the potential new parties 10 days in advance of the filing of any motion for leave to amend.  In the instant case, CMO 2, endorsed by the Court on July 23, 2002, expressly provides for the filing of a Master Consolidated Complaint amending all of the individual complaints consolidated into MDL No. 1456.  Thus, no motion by Plaintiffs for leave to amend was necessary.

In November 2002, all Defendants moved to dismiss. In three separate orders entered in November, the Court ordered Defendants to limit the length of their common memorandum to 40 pages despite multiple requests by Defendants for a more lengthy common brief. On November 25, 2002, all but four of the Defendants joined in a revised Consolidated Memorandum In Support Of Defendants' Motion To Dismiss The Master Consolidated Class Action Complaint ("Defs.' Mem."), and they filed 17 separate Defendant-specific memoranda. Defendants Bristol-Myers Squibb, Oncology Therapeutics Network Corp. and Apothecon, Inc. (collectively "BMS") as well as Defendant, B. Braun Medical, Inc. ("Braun"), filed two additional memoranda purporting to join the consolidated memorandum and raising additional arguments.[2] This Memorandum addresses all Defendants' arguments.

### III.   THE ALLEGATIONS OF THE COMPLAINT

The MCC is brought by nine individual plaintiffs, four third party payor plaintiffs and twenty-one associational plaintiffs, all acting on behalf of themselves and a proposed nationwide class of consumers, self-insured employers, health and welfare plans, health insurers and other end payors of prescription drugs (the "Class"). The MCC has three general parts: the general allegations (¶¶[3] 131-182, 329-342); the Defendant-specific allegations (¶¶ 183-328); and a statement of the claims for relief set forth in seven counts (¶¶ 343-465).

### A.   General Allegations Of AWP Fraud

Prescription drugs are dispensed to patients by or through different types of medical providers, including physicians, retail pharmacies, home infusion companies, hospitals and other medical providers. ¶ 132. Providers regularly submit claims for reimbursement through private channels such as insurers, self-insured employers, other third-party payors or consumers, or through public channels such as Medicare and Medicaid. During the Class Period, Defendants were aware that private insurers and public payors rely on the published average wholesale price

---

[2] The separate filings by BMS and Braun do not comply with this Court's Order of November 6, 2002.

[3] Unless otherwise indicated, "¶" references paragraphs in the MCC.

to reimburse providers for drugs.  Indeed, use of published AWPs to establish reimbursement rates for drugs is an industry-wide practice in both the private insurance sector and in Medicare and Medicaid.  ¶ 133.

Several pharmaceutical industry compendia, including the *Red Book*, periodically publish the AWPs for various dosage forms of prescription drugs (the "Publishers").  ¶ 134.  The AWP is supplied to the publishers by Defendants for their respective drugs, and the Publishers do not conduct an independent review of the AWPs to ensure their accuracy.  ¶ 135.  The MCC alleges that Defendants "deliberately set [the average wholesale price] far above the prices that their drugs are available in the marketplace."  ¶ 3.  The manufacturers "inflate AWP reimbursement rates to enable providers and others to make secret profits through overcharges to patients and their insurers.  This, in turn, incentivizes the providers to sell and administer the drugs with the most inflated AWPs, resulting in increased market share and profit" for a particular Defendant. ¶ 3; *et passim.*

The MCC explains how public or private reimbursement schemes are manipulated by Defendants' conduct.  As to the private payor side, the inflated AWP works to the benefit of "an intermediary (for example, a pharmacy benefit manager[4] or others) [who can] pocket[] the 'spread' between the AWP and the actual cost that the intermediaries pay for the brand name drugs." ¶ 5.[5]  As Plaintiffs explain:

> [I]n a perversion of the type of competitive behavior expected in a market not subject to illegal restraints of trade, the Defendant[s] often promote their drugs not simply with lower prices, but with reimbursement rates based on a fictitious AWP that allows

---

[4]   Pharmacy benefit managers – or "PBMs" – are fiscal intermediaries that specialize in the administration and management of prescription benefit programs.  PBM clients include HMOs, employers, preferred provider organizations and other health insurers.

[5]   The MCC also alleges in the private payor arena that Defendants know that there are significant discrepancies between (i) the AWP reported by them and therefore the Publishers, and (ii) the prices actually paid by providers and PBMs for those same drugs.  ¶ 169.  Thus, Defendants incentivize PBMs to place the brand name drugs with the highest-inflated AWPs on the PBMs' formularies.  They do this by marketing the spread between the discounted AWP that the PBM agrees to pay retail pharmacies, and the AWP at which the health plans reimburse the PBM. Consequently, Defendants incentivize the PBMs to include in their formularies the drugs with the highest AWPs in order to benefit from the artificial spread.  Moreover, the PBMs negotiate rebates with Defendants at a percentage of the drug's list price or AWP.  Thus, Defendants further inflate AWPs in order to create additional proceeds that are then passed back to the PBMs as "rebates."  ¶¶ 170-71.

> purchasers and intermediaries (including providers and PBMs) to
> make inflated profits - - and the Defendant[s] to increase their
> market share at the expense of Plaintiffs and the Class.  [¶ 6.]

On the public payor side, Medicare reimbursements are based on the same published AWPs used industry-wide. Thus, for "drugs reimbursed by Medicare Part B . . . providers benefit by pocketing the 'spread' between the AWP and the actual cost that they pay for the drugs[,]" and the manufacturers also "provide chargebacks, rebates, hidden price discounts and/or unlawful financial inducements, including free samples to further increase the provider's spread and, therefore, their incentive to prescribe a particular" Defendant's product. ¶ 4.[6]

The MCC further alleges that Defendants "actively conceal, and caused others to conceal, information about the true pricing structure for the prescription drugs, including the fact that the AWPs for the drugs are deliberately overstated." ¶ 7. In short, the MCC alleges that Defendants have manipulated the AWP systems in an unlawful manner by fraudulently and deceptively reporting inflated average wholesale prices. The AWPs for the drugs at issue were simply fabricated in furtherance of Defendants' scheme to generate profit spreads to providers, PBMs and others and to increase Defendants' profits at the expense of Plaintiffs and the Class members. ¶ 137. (This conduct is sometimes called Defendants' "AWP Scheme".)

## B.    The Government Investigations Into Defendants' AWP Scheme

The MCC alleges that the fraudulent reimbursement scheme engaged in by Defendants is prohibited under federal and state law and is the subject of aggressive federal and state investigations and prosecutions. The MCC alleges that Congress and regulators of federally-

---

[6] The Complaint further alleges that Defendants intentionally published AWPs for Covered Drugs solely to cause Plaintiffs and the Class members to overpay the co-pay for their drugs. Defendants created and perpetuated this scheme so that the medical providers who purchased these drugs at a low cost would bill patients and their insurers at the inflated AWPs and earn a substantial profit from the "spread" between the real cost and the various AWP-related reimbursement rates. Because Defendants controlled the published AWPs, Defendants knew and understood that they could manipulate the providers' profits from Plaintiffs and the Class. The purpose of artificially inflating the providers' profits was to create an illegal kickback to the providers, funded by Plaintiffs' and the Class members' overpayments. ¶¶ 158-61.

Defendants also used free samples as a means of lowering the price, ¶¶ 162-64, and provided and/or arranged for many other non-public financial inducements such as volume discounts, rebates, off-invoice pricing, free goods, credit memos, consulting fees, debt forgiveness and grants. All of these incentives were designed to lower the providers' net cost of purchasing Defendants' Covered Drugs and were not included in the AWPs reported by Defendants. ¶ 165.

funded health care programs have expressed shock at the recent revelations resulting from investigations into drug manufacturer manipulation of stated average wholesale prices, as well as outrage at the vast degree of the inflation, its purposeful use to market spreads in order to change prescription behavior and usage, and its use to disguise unlawful kickbacks and hidden payments.

In this regard, Plaintiffs allege that the United States Department of Justice ("DOJ"), the United States General Accounting Office ("GAO"), the Office of the Inspector General at the United States Department of HHS ("OIG"), and other Congressional subcommittees have been investigating Defendants and other pharmaceutical manufacturers for questionable practices regarding the industry's calculation of AWPs and for offering illegal incentives to providers. ¶ 151.  One example of Congress' outrage is found in a letter from Congressman Pete Stark.  The Stark letter referred to the AWP manipulation described in the MCC as a "corruptive scheme [that] is perverting [the] financial integrity of the Medicare program and harming beneficiaries who are required to pay 20% of Medicare's current limited drug benefit."  ¶ 152.  Five "shocking conclusions" were identified in Stark's letter:

> First – Certain drug manufacturers have abused their position of privilege in the United States by reporting falsely inflated drug prices in order to create a de facto improper kickback for their customers.
>
> Second – Certain drug manufacturers have routinely acted with impunity in arranging improper financial inducements for their physicians and other healthcare provider customers.
>
> Third – Certain drug manufacturers engage in the fraudulent price manipulation for the express purpose of causing federally funded health care programs to expend scarce tax dollars in order to arrange de facto kickbacks for the drug manufacturers' customers at a cost of billions of dollars.
>
> Fourth – Certain drug manufacturers arrange kickbacks to improperly influence physicians' medical decisions and judgments notwithstanding the severely destructive effect upon the physician/patient relationship and the exercise of independent medical judgment.

> Fifth – Certain drug manufacturers engage in illegal price
> manipulation in order to increase utilization of their drugs beyond
> that which is necessary and appropriate based on the exercise of
> independent medical judgment not affected by improper financial
> incentives. [¶ 153.]

That Congress has not sanctioned this practice is also revealed by the actions of Abbott

Laboratories, a defendant here, when its related entity TAP Pharmaceuticals agreed to pay

$875 million to resolve criminal charges and civil liabilities in connection with its fraudulent

pricing and marketing practices for the drug named Lupron,® which included AWP inflation.  At

a hearing in the criminal matter, United States District Court Judge William G. Young found:

> This has been a gross abuse of the Medicare/Medicaid repayment
> system, knowing, intelligent.  You have demonstrated, and it's all
> been confirmed in open court, and I don't want anyone forgetting
> about the fact that this company, not under its present
> management, knowingly abused the public trust in a most, and I
> use my words carefully, despicable way.

*United States v. TAP Pharmaceutical Products, Inc.*, No. CR-01-10354-WGY (D. Mass., Dec. 6,

2001).[7]  ¶ 156.

Similarly, in stark contrast to Defendants' claims that Congress has in effect immunized

their behavior, Defendant Bayer Corporation agreed to settle claims asserted by the U.S.

government and 47 states arising from its fraudulent pricing and marketing practices involving

AWP manipulation.  ¶ 221.

## C.    Defendant Specific Unlawful Conduct

The MCC sets forth many examples of AWP inflation engaged in by specific Defendants

for particular drugs.  These allegations, which span 42 pages, are not repeated here.  *See* MCC at

pp. 44-86.  However, the following examples again show congressional condemnation, not

condonation:

-- *Regarding Abbott*: "The evidence . . . clearly shows that Abbott has intentionally reported
inflated prices and has engaged in other improper business practices in order to cause its
customers to receive windfall profits from Medicare and Medicaid when submitting claims for
certain drugs.  The evidence further reveals that Abbott manipulated prices for the express

---

[7]  The TAP defendants have been sued in a separate class action in connection with their fraudulent pricing and
marketing practices for Lupron®.  ¶ 155.

purpose of expanding sales and increasing market share for certain drugs." (10/31/00 Letter, Stark to White), ¶ 184.

-- *Regarding Aventis Group*: "The following chart represents a comparison of Hoechst's fraudulent price representations for its injectable form of the drug versus the truthful prices paid by the industry insider . . . . And this underscores the frustration that federal and state regulators have experienced in their attempts to estimate the truthful prices being paid by providers in the marketplace for prescription drugs . . . ." (9/28/00 Letter, Stark to Holmer), ¶ 206.

-- *Regarding Baxter*: "The deliberate manipulation of AWP or WAC prices is a problem that we need to address. The spread between acquisition cost and AWP/WAC is direct profit for customers, and is being used to increase product positioning in the market by certain manufacturers." (Internal Baxter document), ¶ 214.

-- *Regarding Bayer*: "The government's investigation of the allegations . . . revealed that [Bayer] beginning in the early 1990s falsely inflated the reported drug prices – referred to by the industry as the Average Wholesale Price (AWP) . . . ." (1/23/01 Press Release, DOJ), ¶ 221.

-- *Regarding Dey*: "Medicare's reimbursement amount for albuterol was nearly six times higher than the median catalog price" and that "Medicare and its beneficiaries would save between $226 million and $245 million a year if albuterol were reimbursed at prices available to suppliers." (OEI-03-01-00410, March 2002), ¶ 247.

-- *Regarding GlaxoSmithKline*: "If we choose to explain the price increase by explaining the pricing strategy, which we have not done before, then we risk further charges that we are cost shifting to government in an attempt to retain market share . . . . What arguments can we make to explain to congressional watchdogs that we are cost-shifting at the expense of the government?" (Glaxo memorandum, 10/25/94), ¶ 270.

-- *Regarding Immunex*: "The documents further expose the fact that certain of your members deliberately concealed and misrepresented the source of AWPs . . . . However, Immunex's own internal documents indisputably establish the knowledge of the origin of their AWPs and their active concealment." (09/23/01 Letter, Stark to Holmer), ¶ 189.

-- *Regarding Pharmacia*: "The evidence . . . shows that Pharmacia & Upjohn has knowingly and deliberately inflated their representations of the average wholesale price ("AWP") . . . ." (Extension of Remarks of U.S. Representative Pete Stark in the House of Representatives, October 3, 2000), ¶ 299.

**D.      The Pervasive Damage Caused By Defendants' AWP Scheme**

Government payors have not been the only targets of Defendants' AWP Scheme. Private individuals and businesses have also suffered damage as a direct result of Defendants' AWP Scheme. Damage has been directly inflicted on, among others: (i) Plaintiffs and other third-party payor class members who reimburse health care providers or make payments to PBMs for

prescription drugs based upon the AWP; (ii) Plaintiffs and Class members who make

prescription drug co-payments under their health insurance plans; (iii) Plaintiffs and Class

members who make Medicare Part-B prescription drug co-payments; and (iv) Plaintiffs and

Class members who pay in full for prescription drugs.  ¶¶ 138-39, 329-32.

### E.      Plaintiffs' Causes Of Action

Plaintiffs' Complaint contains seven Counts:  Counts I-IV for violation of the federal

Racketeering Influenced and Corrupt Organizations Act, organized by separate RICO enterprises

(*see* ¶¶ 343-450); Count V for Violations of the Consumer Protection statutes of eleven states

(*see* ¶¶ 451-457); and Counts VI-VII for declaratory and other relief pursuant to 28 U.S.C.

§§ 2201, 2002 (*see* ¶¶ 458-465).

## IV.     THE APPLICABLE STANDARD FOR DISMISSAL

### A.      The Allegations Of The Complaint Control

A Rule 12(b)(6) motion should be granted "only if 'it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"

*Bolduc v. United States*, 2002 U.S. Dist. Lexis 13830, *3 (D. Mass. July 30, 2002) (quoting

*Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987)).  "[The] Court takes as true 'the

well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable

inference in his favor.'"  *Id.* (quoting *Coyne v. City of Somerville*, 972 F.2d 440, 442-43 (1st Cir.

1992)); *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 200 (1st Cir. 1999).  As a result, a

"[m]otions to dismiss are subject to limited inquiry, focusing not on 'whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'"

*Bolduc*, 2002 U.S. Dist. Lexis 13830 at *3 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236

(1974)).

This Court recently observed that in cases like this "where the proof is largely in the

hands of the [defendant], dismissals prior to giving the plaintiff ample opportunity for discovery

should be granted sparingly."  *Hewlett-Packard Co. v. Boston Sci. Corp.*, 77 F. Supp. 2d 189,

195 (D. Mass. 1999).  *See also United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 47 (D. Mass. 2001) (strict pleading requirements are relaxed where facts underlying the fraud are particularly within the defendant's control) (Saris, J.).

**B.    Defendants' 54 Exhibits Only Raise Disputed Fact Issues**

Apparently not content to rest their motion on the allegations of the Complaint as required by Rule 12(b)(6), Defendants submit 54 exhibits comprising hundreds of pages of extraneous material in an effort to recast Plaintiffs' allegations to their satisfaction.  However, "any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56."  *Watterson v. Paige*, 987 F.2d 1, 3 (1st Cir. 1993); *see also* Fed. R. Civ. P. 12(b)(6).  Although exceptions to this rule exist, there is no exception for documents that either lead to, or themselves contain, conflicting factual inferences, for a court may not take judicial notice of a fact that is "subject to reasonable dispute."  *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 398 (3d Cir. 2000); *see also Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987) ("In ruling on a motion to dismiss, . . . a court should not decide questions of fact.").[8]

Defendants' effort to re-write the MCC through the introduction of 54 exhibits simply highlights the fact that factual conflicts and inferences abound.  Some examples:

- Defendants construe their exhibits as showing that the federal government has "known for many years that the published AWPs frequently are much higher than the prices at which providers actually purchase drugs." Defs.' Mem. at 3.  Even if this assertion is true, not *one* of Defendants' exhibits "proves" that the federal government, let alone Plaintiffs here, were aware of Defendants fraudulent AWP scheming.  Indeed, as the Complaint illustrates, the federal government *only recently* investigated the drug manufacturers and expressed both *surprise and outrage* at the AWP fraud, *see, e.g.,* ¶¶ 89-91, disproving Defendants' suggestion

---

[8]    Indeed, many of the proffered exhibits can hardly meet Rule 201's requirement of being a "fact" that "is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Based upon the holding in *Watterson, supra,* and the requirements of Rule 201, this Court has authority to strike Defendants' exhibits.

that Congress has for many years condoned their gaming and manipulation of AWPs, or at least creating a factual issue.

- Defendants quote CMS Administrator Thomas Scully's March 14, 2002 testimony advocating reform of the system. Defs.' Mem. at 14. However, the quotation is selective, as Defendants fail to note other portions of Mr. Scully's testimony where he states that "*AWP is intended to represent the average price at which wholesalers sell drugs to their customers, which include pharmacies and physicians*." Defendants' Exhibit 27 at 5 (emphasis added).

- Defendants cite to a November 6, 1992 report for the proposition that "AWP is not intended to reflect physician's costs." Def. Mem. at 9. The citation is misleading. In fact, HCFA specifically disagreed with many of the findings in this report, concluding with the observation that "[w]e are not prepared to agree that HCFA should reimburse physicians at the lowest price available in the marketplace without evidence that a substantial number of physicians have access to that price." *Id.* at 3.

Moreover, Plaintiffs vigorously dispute Defendants' interpretation of Congress' alleged refusal to take additional action as an acquiescence to allow Defendants to set the AWP at any level they chose as part of a fraudulent scheme to market its drugs. An alternative, and far more likely, interpretation of Congressional intent is that Congress could not determine whether the AWP was inflated for all drugs or by how much, and requested regulators to undertake more complete study of the matter.

These are just several examples highlighting that Defendants' extraneous exhibits merely raise factual conflicts that cannot be resolved at this time.[9] The controlling allegations of the Complaint contradict Defendants' claims and establish that neither Plaintiffs nor the Class knew that the published AWPs were deliberately inflated in order to drive market share and prescription behavior.

---

[9] The factual conflicts raised by these exhibits are further illustrated in the chart that appears as Exhibit 1 attached to the Affidavit of Thomas M. Sobol Regarding Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motion to Dismiss submitted herewith.

## V.   THIS CASE DOES NOT REQUIRE THE COURT TO REJECT OR REWRITE MEDICARE POLICY

Defendants argue that the MCC "depend[s] entirely" on a specific interpretation of the term average wholesale price as "the actual cost at which providers acquire drugs, or some close variant of that." Defs.' Mem. 17. They claim that this interpretation would "override years of federal policy-making" and "trump the current, ongoing political debate" on Medicare drug pricing. Remarkably, Defendants argue that no court has jurisdiction to interpret the requirements of Medicare drug pricing because no definitions, no limitations and no interpretable statute or regulations exist on how much Defendants may charge the government or Medicare beneficiaries. Equally remarkable, Defendants argue that the absence of interpretable federal statutes or regulations precludes this Court from adjudicating claims for relief for fraudulent reimbursement disclosures entirely in the private sector. These arguments lack merit and completely ignore the claim at issue – that Defendants have published false AWPs as part of a scheme to bilk those paying for their drugs.

### A.   Plaintiffs Do Not Allege, And Need Not Establish, That AWP Approximates Actual Acquisition Cost:  Alleging That Defendants Reported Fictitious AWPs Suffices

Defendants' characterizations of the MCC are simply wrong. Putting aside for the moment the fact that the Complaint challenges unlawful activity striking far beyond co-payments in the Medicare realm, even those aspects of the case related to Medicare do not seek to "override years of federal policy-making." Among other things, the MCC alleges Defendants' purposeful manipulation of stated average wholesale prices to increase profits to providers, PBMs and others in the drug distribution chain. The alleged wrongful conduct violates federal and state law, and Defendants are currently the subject of widespread investigation for these unlawful acts. The allegations in the Complaint are not sanctioned by Congress. If they were, neither Bayer nor TAP would have settled claims brought by the government challenging the practice. Further, there is no support for the association that disguised, unlawful kickbacks, rebates or other secret payments designed to manipulate provider or PBM behavior, as alleged in the MCC, would be conduct condoned by Congress.

Defendants erroneously suggest that "Plaintiffs' entire case is predicated on the basic contention that defendants were legally required to report AWPs at the providers' actual acquisition cost, or something close to that." Defs.' Mem. at 17.  To the contrary, and as expressed throughout the Complaint, Plaintiffs' core legal theory, claims and damages focus on Defendants' reporting of *false and inflated* AWPs in order to manipulate prescription drug prices.  But a few examples include the following:

- [T]he Defendant Drug Manufacturers report to trade publications a drug price – the Average Wholesale Price (or 'AWP') – that is deliberately set far above the prices that their drugs are available in the marketplace.  The AWPs for these drugs are deliberately false and fictitious and created solely to cause Plaintiffs and the Class members to overpay for drugs.  [¶ 3]

- Defendant[s] often promote their drugs not simply with lower prices, but with reimbursement rates based on a fictitious AWP that allows purchasers and intermediaries (including providers and PBMs) to make inflated profits . . . at the expense of Plaintiffs and the Class.  [¶ 6]

- All Defendants actively conceal, and caused others to conceal, information about the true pricing structure for the prescription drugs, including the fact that the AWPs for the drugs are deliberately overstated.  [¶ 7]

- The AWPs for the drugs at issue here bore no relationship to the drugs' pricing in the marketplace.  They were simply fabricated in furtherance of Defendants' scheme to generate the profit spread to providers, PBMs and others and to increase Defendants' profits at the expense of Plaintiffs and the Class members. [¶ 137]

- Certain drug manufacturers have abused their position of privilege in the United States by reporting falsely inflated drug prices in order to create a de facto improper kickback for their customers.  [¶ 153 (quoting Congressman Stark)]

- During the Class Period, [Defendants] deliberately and intentionally published AWPs for Covered Drugs that did not reflect the actual pricing structure of the drugs, but was created solely to cause Plaintiffs and the Class members to overpay for the Covered Drugs.  [¶ 159]

By Defendants' deliberate decision to report AWPs to national pharmaceutical industry publications – *knowing that these published AWPs would form the basis of an industry-wide reimbursement system* – Defendants were obligated by law to ensure that these pricing benchmarks were *not* misleading.  It is axiomatic under RICO and other statutes prohibiting misrepresentations that "a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party."  *V.H.S. Realty,*

*Inc. v. Texaco, Inc.*, 757 F.2d 411, 414 (1st Cir. 1985) (Mass. unfair and deceptive acts statute); *see also Roeder*, 814 F.2d at 26 (RICO and securities claims); *Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F. Supp. 1188, 1200 (D. Mass. 1990) (common law misrepresentation claims).

Indeed, in a case involving RICO claims, the First Circuit has specifically held that "[w]here a corporation does make a disclosure – ***whether it be voluntary or required*** – there is a duty to make it complete and accurate." *Roeder*, 814 F.2d at 26 (emphasis added). "'Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies . . . .'" *V.H.S. Realty*, 757 F.2d at 414-15 (quoting *Kannavos v. Annino*, 356 Mass. 42, 48, 247 N.E. 2d 708 (1969)). Thus, if a drug manufacturer "chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth." *Roeder*, 814 F.2d at 26 (quoting *Grossman v. Waste Mgmt., Inc.*, 589 F. Supp. 395, 409 (N.D. Ill. 1984)).[10]

Plaintiffs' Complaint adequately alleges that Defendants engaged in a sophisticated and deliberately concealed scheme to artificially inflate AWPs. *See Roeder*, 814 F.2d at 26; *In re Number Nine Visual Tech.*, 51 F. Supp. 2d at 18. No measure of obfuscation by Defendants can re-write Plaintiffs' Complaint.

**B.     The Term "AWP" Is Capable of Definition**

In 1997 Congress amended the Medicare statute to provide that the reimbursement "amount payable for [a coverable] drug or biological is equal to 95 percent of the average wholesale price." 42 U.S.C. § 1395u(o)(1). This statutory requirement – a statutory requirement which is germane to this case to the extent the claims are based on Medicare co-payments from 1998 forward – presents a routine matter of statutory construction.[11]

---

[10]   *See also Turner v. Johnson & Johnson*, 809 F.2d 90, 100 (1st Cir. 1986) (finding that "an incomplete or partial statement may be the basis for fraud when only full disclosure would avoid deception . . . ."); *Augat, Inc. v. Collier*, 1996 U.S. Dist. Lexis 2702 at *47 (D. Mass., Jan. 22, 1996) (noting that disclosure of partial information may be fraudulent); *Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 586 (5th Cir. 2001) (finding disclosure of "some but less than all material facts" may be actionable where "partial disclosure convey[s] a false impression.").

[11]   After passage of § 1395u(o), HHS promulgated regulations to explain implementation of this statute, stating that the methodology for payment is "the lower of the actual charge on the Medicare claim for benefits for 95