It is a well-established canon of statutory construction that by "using terms undefined in the statute, Congress intended the words to have their natural, ordinary and familiar meaning." *United States v. 525 Co.*, 342 F.2d 759, 761 (5thCir. 1965) (citing *First Nat'l Bank of Cincinnati v. Flershem*, 290 U.S. 504 (1934)). The word "average" can mean "a mean proportion, medial sum or quantity, made out of unequal sums or quantities," BLACK'S LAW DICTIONARY at 135 (6th ed) (hereinafter "Black's"), or simply "typical" or "usual." AMERICAN HERITAGE DICTIONARY at 144 (2d ed. 1991). Black's defines "wholesale price" as "that which retailer pays in expectation of obtaining higher price by way of profit from resale to ultimate consumer." *Id.* at 1597. Read together and applied in this context, the natural, ordinary and familiar meaning of "average wholesale price" is a mean proportion or medial, or a typical or usual, amount that intermediaries pay before resale to the ultimate consumers.

While one need not go beyond the plain language of the statute, the administrator of the Centers for Medicare & Medicaid Services nonetheless provides a further answer: "the AWP is intended to represent the average price at which wholesalers sell drugs to their customers, which include physicians and pharmacies." *See* Defendants' Exhibit 27 at 5.[12]

Normal statutory construction of the term AWP cannot result in the conclusion Defendants' strive for: that AWP can mean phony prices that are much higher than those paid by any commercial entity. Logic and sensible statutory construction commands that AWP be a real average of real prices.

Conspicuously absent from Defendants' papers is their own definition or interpretation of AWP. Defendants make no attempt to educate Plaintiffs or this Court on how they determine

---

percent of the *national* average wholesale price of the drug or biological." 42 C.F.R. § 405.517(b) (emphasis supplied).

[12] *Testimony of Thomas A. Scully, Administrator of Centers for Medicare & Medicaid Services, on Reimbursement & Access to Prescription Drugs under Medicare Part B, Senate Finance Committee, Subcommittee on Health* at 5. This testimony appears in Defendants' Appendix of Exhibits at Exhibit 27. Again, Plaintiffs believe that the Court should not consider Defendants' exhibits in deciding the instant motion. But if the Court decides to review such exhibits, the Court should well consider Administrator Sculley's definition of AWP. *Harrington v. Chao*, 280 F.3d 50, 59 (1st Cir., 2000). (Judicial deference to agency interpretations is premised in part on the notion that agencies have greater expertise in their area of specialty than do courts) (citing *Chevron, U.S.A. Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 836-66 (1984).

AWPs – a strange omission considering only they are privy to the process. Instead, Defendants offer volumes of "legislative history" in an effort to prove what AWP is not. Defendants argue that AWP should bear no relationship to their actual acquisition costs and go so far as to suggest that this Court "cannot find that AWP means *anything close* to provider acquisition cost," Defs.' Mem. at 27 (emphasis added), yet Defendants provide no legal authority for their proposition and it is contrary to common sense and statutory construction.

## C.     The Political Question Doctrine Does Not Apply In This Case

Invoking the political question doctrine, Defendants contend that because Congress has decided "to leave the AWP-based reimbursement system in place," this Court "cannot grant relief on any of the Plaintiffs' claims unless it rewrites a reimbursement rule. . . ." Defs.' Mem. at 19-21. These assertions are without merit.

### 1.     The Political Question Doctrine Is Narrowly Proscribed And Does Not Apply Here

The political question doctrine prevents a federal court with jurisdiction over a dispute from adjudicating questions that should be addressed by the political branches of government. *Baker v. Carr*, 369 U.S. 186, 210 (1962) (holding justiciable an equal protection claim based on state legislative appointment that allowed substantial disparities in number of voters represented by each state representative). To determine whether a matter raises non-justiciable political questions, courts examine whether any of the following factors exist: (i) a demonstrable constitutional commitment of the issue to a coordinate political department; (ii) the lack of judicially discoverable and manageable standards for resolving it; (iii) the impossibility of making a decision without first making a policy determination of the type clearly outside judicial discretion; (iv) the court's inability to resolve the issue without expressing lack of respect to the coordinate branches of government; (v) an unusual need for unquestioning adherence to a political decision already made; or (vi) the potential for embarrassment from multifarious pronouncements by various departments on one question. *Id.* at 217. The doctrine must be cautiously invoked, and the mere fact that a case touches on the political process does not

-15-

necessarily create a political question beyond court jurisdiction. *See Nixon v. Herndon*, 273 U.S.
536, 540 (1927); *Can v. United States*, 14 F.3d 160, 163 (2d Cir. 1994).

None of the *Baker* factors apply to the claims here. Plaintiffs' case does not in any way
challenge Medicare's use of AWP as a basis for reimbursement, and the Court will not be called
upon to rewrite reimbursement rules.[13] The only challenged conduct is Defendants' gaming of
that reimbursement system through the fraudulent reporting of AWPs. ***Even though the
Medicare reimbursement system is based on the use of AWPs, this reimbursement structure
does not provide Defendants with a free license to fraudulently game the system by deliberately
publishing inflated and misleading price data that directly results in excessive payments by
Plaintiffs and the Class. Such conduct is unlawful and may be remedied by a court employing
well-established federal and state law.*** Plaintiffs' dispute is with Defendants – not the Medicare
reimbursement system or government officials. Defendants "have abused their position of
privilege in the United States by reporting falsely inflated drug prices[.]" ¶ 153. Simply stated,
Plaintiffs' claims arise from Defendants' manipulation, inflation, and misuse of AWP – not
because Medicare's drug reimbursement system ***provided them the opportunity*** to commit
fraud.[14] Claims of this sort are uniquely appropriate for judicial resolution.

### 2.  No Persuasive "Political Question" Case Law Is Cited

Defendants' political question argument rests almost entirely on *Stephenson v. Shalala*,
87 F.3rd 350 (9th Cir. 1996), but this reliance is completely misplaced. *Stephenson* is not even a
political question case – it cites no political question case law and it does not invoke the concept
or words "political question" in any way. Indeed, *Stephenson* is an example of precisely what

---

[13] Notably, the political question doctrine did not impede civil and criminal settlements between certain
Defendants and government officials (such as Abbott, Bayer and Pfizer) relative to their role in the manipulation,
inflation and misuse of AWP.

[14] Moreover, there is no support for Defendants' suggestion that – by interpreting the plain meaning of AWP in
the Medicare regulations, 42 C.F.R. § 405.517 – this Court would somehow be impermissibly treading on the
province of Congress. Statutory interpretation is routinely performed by courts, and the fact that a term is undefined
in a statute does not render it void of meaning. To the contrary, it is a well-established canon of statutory
construction that by using terms undefined in the statute, Congress intended the words to have their natural, ordinary
and familiar meaning, *see, e.g., First Nat'l Bank v. Flershem*, 290 U.S. 504 (1934), and that courts are perfectly
capable of discerning that meaning. Indeed, courts do this throughout the country every day.

the Defendants here seek to avoid, a case of judicial construction and interpretation of federal statutes and regulations.

Moreover, the *Stephenson* court's interpretation of the Medicare laws is not apposite to this case. There, the plaintiffs challenged HHS' interpretation of a Medicare law that permitted hospitals to charge "customary" rates rather than, as the plaintiffs there would have it, "reasonable" rates which HHS would affix through a national rate and specified cap structure. In *Stephenson*, because Congress and HHS had long adopted and maintained the "customary" rate regime (and had expressly decided not to require HHS to establish a national rate structure), the court was disinclined to interpret the Medicare statute as requiring anything more. *Stephenson*, 87 F.3rd at 355-56. This case thus bears no real resemblance to *Stephenson*. This case does not seek to revamp the AWP system; it seeks to enforce existing law and applicable agency interpretation of that law.[15]

One federal court has already recognized that an attack on fraudulently overstating AWPs does not equate to an attack on the Medicare reimbursement system itself. In *State of Minnesota v. Pharmacia Corporation*, C.A. No. 02-1779 (D. Minn., Sept. 27, 2002), Minnesota claimed that Pharmacia "unlawfully inflated the average wholesale price ('AWP') of certain of its chemotherapy drugs." Report and Recommendation, Chief U.S. Magistrate Judge Jonathan

---

[15] Defendants' two political question cases are of no help to them. In *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 229-30 (1986), the Court rejected an effort to bar conservation groups from seeking a writ of mandamus to compel the U.S. Secretary of Commerce to certify Japanese whaling activities as violative under the Pelly and Packwood-Magnuson Amendments. Even though the issue raised highly charged foreign relations policy questions, the Supreme Court *rejected* the argument that the case was beyond judicial resolution due to the political question doctrine, stating that "not every matter touching on politics is a political question," and that "it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts." *Id.* at 230.

*Beacon Prod. Corp. v. Reagan*, 633 F. Supp. 1191 (D. Mass. 1986), *aff'd*, 814 F.2d 1 (1st Cir. 1987), the other political question case cited by Defendants, also demonstrates the narrow reach of the political question doctrine. In *Beacon Prod.*, the plaintiffs sued the President of the United States claiming he had exceeded his statutory and constitutional authority by imposing an embargo on trade with the Republic of Nicaragua. The Plaintiffs also claimed that the Department of State had acted unconstitutionally by notifying Nicaragua of a treaty termination without congressional approval. The *Beacon* court addressed two questions. As to the question of whether Nicaragua posed an "unusual or extraordinary threat" to trigger certain actions, such a determination would, of course, be a political one. However, the question of whether the President had exercised powers pursuant to an unconstitutional statute, a claim that would not require the Court to second-guess the President's foreign policy judgment, was determined not to be a political one. The Court rejected the political question doctrine as a bar to this claim and addressed the plaintiffs' claims on the merits. *Id.* at 1194-96.

Lebedoff, September 27, 2002 ("Report") at 1-2.[16]  Bringing claims for consumer fraud, fraud on

senior citizens and handicapped persons, Medicaid fraud, common law fraud, false advertising,

and unjust enrichment, Minnesota alleged that "[Pharmacia's] fraud has caused the Minnesota

Medicaid program and individual Minnesota Medicare beneficiaries to pay 'grossly excessive'

prices for [Pharmacia's] drugs." *Id.* at 2.  In recommending remand and rejecting Defendants'

assertions of federal question jurisdiction, Chief Magistrate Judge Lebedoff wrote that

"[Minnesota] is not attacking the federal program.  [Minnesota] does not even challenge the use

of AWP as the basis for drug pricing, reimbursement, and co-pay schemes." *Id.* at 9.  His Report

emphasized that Pharmacia had mischaracterized Minnesota's claims:

> [Minnesota] is not seeking to have AWP reporting requirements
> changed.  [Minnesota] is merely asking that [Pharmacia] *be
> required to report honestly* so as to not violate Minnesota law. . . .
> The Hennepin County District Court *will not be called upon to
> evaluate the validity or sufficiency of federal Medicare or
> Medicaid law*.  [Minnesota] is not attacking Medicare's and
> Medicaid's policies of using AWP as a basis for reimbursement.
> Rather, [Minnesota] *is only attacking [Pharmacia's] alleged
> untruthful reporting of AWP*.  Providing this relief would not
> prohibit Medicare from using AWP as its basis for reimbursement.

*Id.* at 11-12 (citations omitted) (emphasis added).

Similarly, in the present action, Plaintiffs do not take issue with Medicare's drug pricing,

reimbursement or co-pay schemes, and they do not seek to have AWP reporting requirements

changed.  As the Magistrate found in *Pharmacia*, this Court will not be called upon to evaluate

the validity or sufficiency of Medicare law.[17]

---

[16]  The Report is attached to the Affidavit of Thomas M. Sobol as Exhibit 2.  This opinion was not cited by
Defendants though some were parties to the litigation.  An objection to the report was also filed by Defendants and
the Plaintiffs are not aware of any further action taken with respect to the Report.

[17]  Defendants make a passing reference to the "[p]rudential limitations on the exercise of Article III
jurisdiction" with a citation to *Warth v. Seldin*, 422 U.S. 490, 499-500 (1975). Defs.' Mem. 19.  It is unclear from
this passing reference whether Defendants intend to argue some or all claims should be dismissed on the strength of
*Warth*; if they do, this oblique reference may not rise to a level of argument that warrants court review.  In any
event, the *Warth* Court addressed issues of standing and did not, as the Defendants seem to suggest, articulate a
broad "doctrine of prudential abstention."

## VI.    COUNTS I-IV OF THE COMPLAINT PROPERLY PLEAD RICO VIOLATIONS

### A.    An Overview Of Plaintiffs' Civil RICO Claims And Their Necessary Elements

Counts I, II, III and IV assert four separate substantive claims against Defendants for

violations of Section 1962(c) of RICO.  Each count properly alleges all elements required by the

statute, First Circuit precedent, Rule 8(a) and, where applicable, Rule 9(b).  The scope of each

civil RICO claim is summarized as follows:

- Counts I (¶¶ 343-369) and II (¶¶ 370-396) assert claims on behalf of Class 1 members against Defendants for unlawful conduct associated with Medicare Part B Covered Drugs.

- Counts III (¶¶ 397-423) and IV (¶¶ 424-450) are brought on behalf of Class 2 members against Defendants (excluding the Boehringer Group, Braun, Dey, Fujisawa and Watson Defendants) for unlawful conduct associated with brand name prescription drugs.

Section 1962(c) of RICO makes it "unlawful for any person[18] employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

a pattern of racketeering activity. . . ." 18 U.S.C. § 1962(c).  Thus, plaintiffs or the government

must prove the same elements:  (i) an enterprise existed; (ii) the enterprise participated in, or its

activities affected, interstate commerce; (iii) the defendant was employed by or was associated

with the enterprise; (iv) the defendant conducted or participated in the conduct of the enterprise;

(v) through a pattern of racketeering activity.  *United States v. Marino*, 277 F.3d 11, 33 (1st Cir.

2002) (citing *United States v. Shifman*, 124 F.3d 31, 35 (1st Cir. 1997)); *see also North Bridge*

*Assocs., Inc. v. Boldt*, 274 F.3d 38, 42 (1st Cir. 2001).[19]

---

[18] Paragraphs 345 (Count I), 372-373 (Count II), 399-400 (Count III) and 426-427 (Count IV) properly allege that each of the Plaintiffs and each Defendant is a "person." *See* 18 U.S.C. § 1961(3) ("'person' includes any individual or entity capable of holding a legal or beneficial interest in property").  Defendants apparently do not contest these allegations.

[19] In their brief, Defendants inexplicably ignore First Circuit *criminal* RICO precedents demonstrating that Plaintiffs' *civil* RICO claims are properly pled.  The First Circuit has repeatedly stated that "it is appropriate to rely on civil RICO precedent when analyzing criminal RICO liability.  The standard is the same for both criminal and civil RICO violations." *Marino*, 277 F.3d at 33 n.6 (quoting *Shifman*, 124 F.3d at 35 n.1).  Of course, civil RICO claims must only be proved "by a preponderance of the evidence." *Aetna Cas. & Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1560 (1st Cir. 1994) (citing *Combustion Eng'g, Inc. v. Miller Hyrro Group*, 13 F.3d 437, 446 (1st Cir. 1993)).

The following chart summarizes the requisite elements of Plaintiffs' civil RICO claims and where each element is alleged:

| Elements of Civil RICO Claims: | Count I (¶¶ 343-369) | Count II (¶¶ 370-396) | Count III (¶¶ 397-423) | Count IV (¶¶ 424-450) |
|---|---|---|---|---|
| "Persons" | ¶ 345 | ¶¶ 372-373 | ¶¶ 399-400 | ¶¶ 426-427 |
| "Enterprise(s)" | ¶¶ 346-350 (AWP Enterprises); ¶ 351 (Payor Enterprises) | ¶¶ 375-377 (Publisher Enterprises); ¶ 378 (Payor Enterprises) | ¶¶ 402-404 (Publisher Enterprises); ¶ 405 (Payor Enterprises) | ¶¶ 429-431 (PBM Enterprises); ¶ 432 (Payor Enterprises) |
| "Racketeering Activity" | ¶¶ 352-356 (Mail/Wire Fraud) | ¶¶ 379-383 (Mail/Wire Fraud) | ¶¶ 406-410 (Mail/Wire Fraud) | ¶¶ 433-437 (Mail Fraud/Wire Fraud) |
| "Pattern of Racketeering Activity" | ¶¶ 360-364 | ¶¶ 387-391 | ¶¶ 414-418 | ¶¶ 441-445 |
| "Conduct" of Enterprise(s) | ¶¶ 345, 357-359 | ¶¶ 374, 384-386 | ¶¶ 401, 411-413 | ¶¶ 428, 438-440 |
| "Defendants' Motive" | ¶¶ 365-366 | ¶¶ 392-393 | ¶¶ 419-420 | ¶¶ 446-447 |
| "Plaintiffs' Injury" | ¶¶ 367-369 | ¶¶ 394-396 | ¶¶ 421-423 | ¶¶ 448-450 |

**B.   The Complaint Properly Identifies The RICO Enterprises**

**1.   The RICO "Enterprise" Concept**

"Enterprise" is defined broadly to include "any individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  Thus, to satisfy the "enterprise" element, Plaintiffs must allege "either the existence of a legal entity, such as a corporation, or that a group of individuals were associated-in-fact." *Aetna*, 43 F.3d at 1557.  An association-in-fact enterprise is an "ongoing organization," whether "formal or informal," with members "function as a continuing unit," which is "separate and apart from the pattern of activity in which it engages." *United States v. Turkette*, 452 U.S. 576, 583 (1981).  An association-in-fact RICO

enterprise may consist of "two or more legal entities," or "two legal entities and two individuals." *United States v. London*, 66 F.3d 1227, 1243 (1st Cir. 1995).

### 2.    The "AWP Enterprises"

In Count I, Plaintiffs allege that each Defendant formed an association-in-fact enterprise with the medical providers who prescribed Covered Drugs for which that Defendant reported an AWP (the "AWP Enterprises"). ¶ 346. For example, the "Abbott Provider Enterprise" is described as an "association-in-fact consisting of the various and independent medical providers who prescribed Covered Drugs for which Abbott reported an AWP, and Defendant Abbott, including its directors, employees and agents." ¶ 350(a).[20] Plaintiffs allege that each of the "AWP Enterprises" is "an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common purpose of selling, purchasing, prescribing, and administering Covered Drugs to individual Plaintiffs and Class 1 members, and to participants in those Plaintiffs and Class 1 members that comprise health and welfare plans, and deriving profits from these activities." ¶ 350(a)-(u).

Paragraphs 346-349 and 350(a)-(u) describe in requisite detail the "ongoing organization" of each alleged association-in-fact enterprise, and those paragraphs also explain how each association-in-fact "function[ed] as a continuing unit." *Aetna*, 43 F.3d at 1557 (quoting *Turkette*, 452 U.S. at 583). Nothing more is required. *See id.*; *see also Doyle v. Hasbro, Inc.*, 103 F.3d 186, 19 (1st Cir. 1996)). Yet, ignoring First Circuit precedent, Defendants raise a variety of pleading challenges to the AWP Enterprises. Each challenge fails.

### a.    The First Circuit expressly authorizes alternative enterprises

Defendants complain that the Complaint identifies too many RICO "enterprises," and they decry Plaintiffs' use of "alternative" allegations. *See* Defs.' Mem. at 25-26. However, in *Aetna*, 43 F.3d at 1553-57, the First Circuit upheld a jury verdict for the plaintiff insurer in a civil RICO action arising from the submission of false auto insurance claims in which Aetna alleged

---

[20] The respective AWP Enterprises for the other Defendants are defined in ¶¶ 350(b)-(u).

in the alternative a variety of different enterprises in which defendants participated.  Similarly, in
*Liberty Mut. Ins. Co. v. Diamante*, 138 F. Supp. 2d 47 (D. Mass. 2001), where the plaintiff
insurer asserted civil RICO claims against 20 individual and corporate defendants who were
alleged to have submitted phony medical insurance claims, Chief Magistrate Judge Collings
upheld RICO claims involving a half-dozen alternative enterprises.  *Id.* at 55-61.[21]

<b>b.    The First Circuit has rejected an "ascertainable structure" enterprise<br>requirement</b>

Defendants assert – without citing any precedent – that "an association in fact enterprise
must be a tightly organized unit with a defined hierarchy in which all members work in concert
to achieve a common objective."  Defs.' Mem. at 27.  Defendants' position, however, is
untenable under First Circuit RICO precedent.  In *United States v. Patrick*, 248 F.3d 11 (1st Cir.
2001), the defendant "street gang" members appealed their criminal RICO convictions,
contending that Judge Keeton erred in refusing to instruct the jury that "at a minimum, the
enterprise must exhibit ***some sort of structure for the making of decisions, whether it be
hierarchical or consensual.***"  *Id.* at 18 (emphasis added).  The RICO indictment charged that
defendants were associated in fact to form a "street gang" that conducted drug transactions.  *Id.*
at 17.  Affirming their RICO convictions, the First Circuit rejected defendants' contention that it
should adopt an "ascertainable structure" definition of a RICO "enterprise," observing that the
district court had properly derived the jury instruction defining "enterprise" from the Supreme
Court's decision in *Turkette*, and that "no more was needed to define the term 'enterprise' for the
jury."  *Id.* at 18.  "Since Congress intended the term 'enterprise' to include both legal and
criminal enterprises, . . . and because the latter may not observe the niceties of legitimate
organizational structures, we refuse to import an 'ascertainable structure' requirement into jury
instructions."[22]  *Id.* at 19.

---

[21]  In *Liberty Mutual*, Judge Lindsay accepted the magistrate judge's recommendations concerning defendants'
motions to dismiss the civil RICO claims.

[22]  Indeed, in previous RICO cases the First Circuit had never adopted the "ascertainable structure" definition for
association-in-fact enterprises.  *Patrick*, 248 F.3d at 18 (citing *United States v. London*, 66 F.3d at 1244 (association-
in-fact enterprise consisted of corporation and sole proprietorship engaged in bookmaking and extortion), and
*United States v. Owens*, 167 F.3d 739, 752 n.6 (1st Cir. 1999) (large-scale cocaine distribution enterprise)).

In another recent case, *In re Managed Care Litigation*, 185 F. Supp. 2d 1310 (S.D. Fla. 2002), the plaintiffs, who were insureds or subscribers to various health care insurance plans, brought a civil RICO action against managed care insurance companies alleging misrepresentations relating to various aspects of their health insurance coverage. Plaintiffs alleged that each of the defendant insurance companies associated with a RICO enterprise consisting of (i) the insurance company; (ii) the insurance company's health plans; and (iii) the primary physicians, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies, and home health agencies that contract with the defendant insurance company. *Id.* at 1322. The district court upheld the RICO enterprise allegations, observing that the Eleventh Circuit (like the First Circuit) has "no strict 'structure' requirement." *Id.* at 1323 (citing, *inter alia*, *Avirgan v. Hull*, 932 F.2d 1572, 1578 (11th Cir. 1991) ("[A] RICO enterprise may be an 'amoeba-like' structure of a loose informal association.")). The defendants argued that "a RICO enterprise requires a structure beyond that commonly found in ongoing contractual relationships." *Id.* But even so, plaintiffs' allegations more than sufficed:

> Even if the Court adopted this heightened standard, each National
> Enterprise pled by the Plaintiffs would likely prevail. All of the
> relevant published cases cited by the Defendants describe a
> putative enterprise consisting of either a random collection of
> contracting entities, independent actors committing criminal acts
> within a particular industry, or a manufacturer selling a product
> through independent distributors. The Plaintiffs in the present case
> have not alleged a series of random contractual exchanges, but a
> network of physicians, hospitals, pharmacies and health care
> professionals through which the Defendants deliver health care to
> the subscribers.

185 F. Supp. 2d at 1323-24 (footnote omitted). The specific allegations of Paragraphs 346-350 of the Complaint demonstrate that the same conclusion should apply in this case. *See also Pharmacare v. Caremark*, 965 F. Supp. 1411, 1421-23 (D. Haw. 1996) (in civil RICO action brought by competitors of corporation providing alternate site infusion therapy, plaintiffs properly defined "enterprise" as association-in-fact between defendant corporate entities "and the

doctors who received bribes" from defendants so that they would prescribe defendants' products rather than plaintiffs' competing products).[23]

###### c. Plaintiffs allege that the members of each enterprise had a common purpose

Defendants contend that the members of the "AWP Enterprises" do not have a "common purpose merely by participating in a particular industry or through a connection to a particular party or defendant." Defs.' Mem. at 29. However, Plaintiffs allege that Defendants and the providers had a "common purpose" to **make money** by engaging in the "AWP Scheme" relating to the Covered Drugs. ¶¶ 349-50. Under the First Circuit's decision in *United States v. London*, these allegations suffice. In *London*, the criminal RICO defendant operated a bar (Heller's) and a check-cashing service (M & L). 66 F.3d at 1230. The alleged RICO enterprise was an association-in-fact between Heller's (a corporation) and M & L (a sole proprietorship). *Id.* at 1243. The government charged that London conducted the affairs of the enterprise through a pattern of racketeering activity that included illegal bookmaking and extortion. *Id.* at 1230. Notwithstanding the seemingly unrelated nature of the bar and check-cashing businesses, in affirming London's RICO conviction the First Circuit stated that "[t]he jury could have found that there was a common or shared purpose animating both the enterprise and London:  doing commerce with (and thereby profiting from) bookmakers engaged in illegal gambling." *Id.* at 1244; *see also United States v. Cianci*, 210 F. Supp. 2d 71, 74-75 (D.R.I. 2002) (a legal entity need not share the criminal purposes of the individuals controlling it in order to be part of an association-in-fact enterprise).[24]

---

[23]  The district court in *Pharmacare* reached this conclusion even though the Ninth Circuit requires that a RICO enterprise have an "ascertainable structure." 965 F. Supp. at 1422. Chief Judge Kay  wrote that "this requirement may be fulfilled by the simple inclusion of a corporation as a participant in the enterprise." 965 F. Supp. at 1423; *see also Webster v. Omnitron Int'l*, 79 F.3d 776, 786 (9th Cir. 1996). Defendants cannot dispute that Plaintiffs' Complaint alleges that corporate entities are alleged to be participants in the "AWP Enterprises." ¶ 350(a)-(u).

[24]  *Cianci* arose from the criminal RICO prosecution of the mayor of Providence, Rhode Island, a city official and the operator of a private business. The alleged enterprise was an association-in-fact consisting of the individual defendants, Mayor Cianci's political fundraising organization, and various city departments and agencies that defendants used to award contracts and jobs in exchange for bribes and political contributions. *Id.* at 73. Chief Judge Torres refused to dismiss the RICO indictment, even though defendants argued that the alleged association-in-fact enterprise did not have a "common purpose" because "the City and its departments were legitimate entities that did not subscribe to the defendants' alleged criminal objectives." *Id.*

Defendants' reliance upon *Blue Cross v. SmithKline Beecham Clinical Labs., Inc.*, 62 F. Supp. 2d 544 (D. Conn. 1998), is misplaced.  Defs.' Mem. at 29.  In that case, the plaintiff insurance companies and patients who paid for clinical laboratory tests conducted by SmithKline asserted civil RICO claims, contending that SmithKline had engaged in fraudulent billing practices.  *Id.* at 547, 549.  Plaintiffs contended that the RICO enterprise was a nationwide "billing network" consisting of SmithKline, its personnel and the hospitals, physicians, physician practice groups, and laboratories to which the fraudulent bills had been sent.  *Id.* at 550.  The district court found that the physicians, hospitals and laboratories that had allegedly been fooled by SmithKline's fraudulent billing scheme did not share a "common purpose" with the defendants.  *Id.* at 552.  The court wrote that plaintiffs' complaint was "devoid of any specific allegation that any physician, hospital, or laboratory shared [defendants'] alleged common purpose to defraud public and private health care payers." *Id.* at 553.  Indeed, the plaintiffs in that case alleged that defendants' "scheme exploited the trust of both patients and payers in the physicians, as well as the trust of the physicians in [defendants]." *Id.* at 552.

In contrast, in this case Plaintiffs specifically allege that the medical providers who prescribed Covered Drugs[25] were willing, "integral participants" in the AWP Scheme.  "Indeed, the providers were the parties who actually sought reimbursement from Plaintiffs and members of Class 1." ¶ 347.  The providers were "knowing and willing" participants in the AWP Scheme, ¶ 348, and they shared Defendants' commitment to the scheme in the various ways detailed in ¶ 349(a)-(e).  Thus, unlike the association-in-fact enterprise at issue in *SmithKline Beecham*, the members of the "AWP Enterprises" here clearly shared a "common purpose."

### 3.    The Publisher Enterprises

Counts II and III allege the existence of "Publisher Enterprises," namely, associations-in-fact of Defendants and the publishers that reported AWPs for Covered Drugs.  Like the "AWP

---

[25] A "Covered Drug" is a drug that is covered by Medicare Part B and are primarily limited to injectables administered directly by a doctor, certain oral anti-cancer drugs, and drugs furnished under a durable medical equipment benefit.  Approximately 450 drugs are covered by Medicare Part B.

Enterprises," the "Publisher Enterprises" are described in detail in ¶¶ 375, 376, 377(a)-(u), 402-403, and 404(a)-(p) of the Complaint.

Challenging the "Publisher Enterprises," Defendants contend that an enterprise cannot consist of "two separate entities engaged in a common business venture." Defs.' Mem. at 29. In *London*, the First Circuit explicitly rejected Defendants' contention that two or more "legal entities" cannot form an association-in-fact enterprise. As Senior Judge Bownes noted, such a restrictive reading of RICO's "enterprise" element "would lead to the bizarre result that only criminals who failed to form corporate shells to aid their illicit schemes could be reached by RICO." *Id.* at 1244. Moreover, notwithstanding Defendants' assertions, RICO enterprises are frequently based on common business ventures. *See, e.g., River City Markets, Inc. v. Fleming Foods West, Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992) ("Virtually every business contract can be called an 'association in fact [enterprise].'"); *VNA Plus, Inc. v. Apria Healthcare Group, Inc.*, 29 F. Supp. 2d 1253, 1259 (D. Kan. 1998) (commercial contract can serve as the basis of a RICO enterprise); *Loma Linda Univ. Med. Ctr. v. Farmers Group*, 1995 U.S. Dist. Lexis 9668, at *4 (E.D. Cal. May 15, 1995) (noting that "contractual relationships can establish a RICO enterprise"). Thus, once again, Defendants are wrong.[26]

### 4.    The PBM Enterprises

Count IV, which is asserted against Defendants on behalf of Class 2, alleges the existence of "PBM Enterprises," which are associations-in-fact between Defendants and pharmacy benefit managers ("PBMs") that administered purchases of brand name drugs and billed their members on the basis of the reported AWPs. The PBM Enterprises are identified in ¶¶ 429-430 and 431(a)-(p). For the reasons stated in the preceding sections, and contrary to Defendants'

---

[26] Defendants rely on a footnote in the First Circuit's decision in *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34 (1st Cir. 1991), which dismissed a civil RICO claim because plaintiffs' complaint merely "made a ritualistic averment, in wholly conclusory terms" that defendants formed an association-in-fact enterprise. *Id.* at 42. Such allegations were insufficient because plaintiffs' complaint "contained no allegations articulating how any of the [defendants] may have comprised part of an 'ongoing organization' or 'functioned as a continuing unit.'" *Id.* (quoting *Turkette*, 452 U.S. at 583). *Feinstein* is readily distinguished from this case by comparing the paltry allegations at issue in that case with the detailed allegations found in ¶¶ 375-377 and 402-404.

assertions, *see* Defs.' Mem. at 30, Plaintiffs adequately allege the existence of the PBM
Enterprises.

**5.     The Third-Party Payor Enterprises**

Count I also alleges that each of the Third-Party Payors identified as Plaintiffs in ¶¶ 23-
26 of the Complaint constitute separate RICO "enterprises." ¶ 351. These are referred to as the
"Third-Party Payor AWP Enterprises" and as "victim enterprises." *Id.* Similar enterprise
allegations are made in Counts II (¶ 378), III (¶ 405) and IV (¶ 432). Defendants do not
challenge the sufficiency of these allegations, *see* Defs.' Mem. at 30-32, nor could they because
it is well settled that a plaintiff itself may be a RICO enterprise. *Aetna*, 43 F.3d at 1558; *Liberty
Mutual*, 138 F. Supp. 2d at 58-61; Douglas E. Abrams, THE LAW OF CIVIL RICO § 4.3.1, at 186
(1991).

**C.     The Complaint Properly Alleges That Defendants "Conducted" The Affairs Of The
Third-Party Payor AWP Enterprises**

Counts I, II, III and IV allege that Defendants violated § 1962(c) by conducting the
affairs of the Third-Party Payor AWP Enterprises through a pattern of racketeering activity.
¶¶ 345, 374, 401, 428. Plaintiffs allege that Defendants and the providers "conducted the affairs
of each of the Third-Party Payor AWP Enterprises with which they dealt by reporting
fraudulently inflated AWPs for Covered Drugs and by submitting false and misleading invoices
to Plaintiffs, thereby inducing Plaintiffs to pay inflated amounts for Covered Drugs." ¶ 359.

Grossly misstating the First Circuit's holding in *Aetna*, 43 F.3d at 1559-60, and
inexplicably relegating that controlling precedent to a mere footnote, *see* Defs.' Mem. at 32 n.27,
Defendants contend that they did not "conduct" the affairs of the Third-Party Payor AWP
Enterprises. *See id.* at 32-33. In *Aetna*, as noted above, the plaintiff insurance company brought
a civil RICO action alleging that defendants had participated in the affairs of Aetna (the
enterprise) through a pattern of racketeering activity. 43 F.3d at 1558. The defendants were an
automobile body shop, the owner and employees of the body shop, and relatives and friends of
the owners and employees of the body shop who submitted false claims to Aetna for supposed

repairs done by the body shop on certain vehicles.  Also named as defendants were two Aetna appraisers who, *inter alia*, "submitted false appraisals to help [the other defendants] defraud Aetna."  *Id.* at 1552.

In evaluating whether the defendants (other than the two Aetna appraisers) participated in the conduct of Aetna's affairs, the court applied the "operation or management" test set forth in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), which requires that defendants take "some part in directing the enterprise's affairs."  43 F.3d at 1559.  The First Circuit emphasized that the requisite participation "could be 'indirect' in the sense that persons with no formal position in the enterprise can be held liable."  In upholding the plaintiff's enterprise theory, the court explained:

> Appraising allegedly damaged vehicles and investigating, processing, and paying automobile insurance claims are vital parts of Aetna's business.  By acting with purpose *to cause Aetna to make payments* on false claims, appellants were participating in the "operation" of Aetna. . . .  The evidence was sufficient to support a finding that the individual Aetna defendants' activities affected, in a material degree, the direction of Aetna's affairs by employees of Aetna.  Appellants' activities *caused* Aetna employees having authority to do so to direct that other employees *make payments Aetna otherwise would not have made*. . . .  When viewed in the light most favorable to the plaintiff, in support of the verdict in this case, the evidence supports a finding that appellants caused the Aetna appraisers to approve false claims and conduct their appraisals in a manner contrary to Aetna's business practices and *caused Aetna to pay out large sums of money on false claims*.  The evidence was sufficient to support a finding that appellants exerted control over the enterprise, if not by bribery (the example given by the Court in *Reves*), then at least by other methods of *inducement*.  Since a reasonable jury could find that the appellants exerted some control over Aetna and took part in directing some aspect of the enterprise's affairs, the appellants' actions could be found to have satisfied the "operation or management" test.

*Id.* at 1559-60 (emphasis added; citations omitted).

Citing *Reves* and *Aetna*, Chief Magistrate Judge Collings of this District refused to dismiss civil RICO claims brought by insurance companies against attorneys (and others) who submitted false claims that the insurers paid, stating that the "operation or management" test for § 1962(c) liability posited by *Reves* "may be met by proof that the defendants participated in the operation of the insurance companies [the RICO enterprises] by acting in such a manner as to

cause them to pay false claims which would not have otherwise been paid were it not for the defendants' acts." *Liberty Mutual*, 138 F. Supp. 2d at 61.

The same is true here. Under First Circuit precedent, Plaintiffs properly allege that Defendants conducted the affairs of the Third-Party Payor AWP Enterprises through a pattern of racketeering activity, in violation of § 1962(c).[27]

## D.   The Complaint Properly Alleges That Defendants Conducted The Enterprises' Affairs Through A Pattern Of Racketeering Activity

Plaintiffs allege that Defendants conducted the specified RICO enterprises through a "pattern of racketeering activity." ¶¶ 360-364, 387-391, 414-418, 441-445. Defendants concede that Plaintiffs' allegations satisfy the "pattern" element.

## E.   Plaintiffs Properly Allege Acts Constituting Mail And Wire Fraud

"Racketeering activity" is defined as "any act . . . indictable under" enumerated sections of Title 18 of the U.S. Code, including mail and wire fraud. 18 U.S.C. § 1961(1)(B). The elements of a mail fraud violation "are a scheme to defraud and the use of the mails to execute or further this scheme." *Aetna*, 43 F.3d at 1560; *see also McEvoy Travel*, 904 F.2d at 791 n.8 ("Because the relevant language of the mail and wire fraud statutes is the same, we apply the same analysis to the allegations under both statutes."). Significantly, predicate RICO acts can include aiding and abetting mail or wire fraud. *Id.* at 72 n.6 (citing *Aetna*, 43 F.3d at 1560).

Defendants' acts of mail and wire fraud are alleged in ¶¶ 353-355, 356(a)-(i), 380-382, 383(a)-(h), 414-418 and 441-445. The Complaint is replete with allegations detailing Defendants' AWP Scheme, *see* ¶¶ 132-140, 141-182, and each Defendant's willing participation therein. ¶¶ 184-328. As these detailed allegations make clear, Plaintiffs' allegations of mail and

---

[27] Contrary to Defendants' assertions, *see* Defs.' Mem. at 31, this Court's decision in *Bowdoin Constr. Corp. v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 869 F. Supp. 1004 (D. Mass. 1994), does not compel a different result. In that case, a civil RICO action arising out of the financing of renovations at a resort and conference center, the plaintiff general contractor sued the lenders and lawyers who represented the lenders and the developer. *Id.* at 1006. Although this Court refused to dismiss the § 1962(c) claims against the developer, its executives, and the "lead" lender, *id.* at 1009, it dismissed the contractor's claim against a lawyer who "did [nothing more] than provide legal advice and legal services" to the developer. *Id.* at 1010. The theory of liability in that case was completely different than that upheld by the First Circuit in *Aetna*, 43 F.3d at 1559-60, which was decided six weeks after this Court decided *Bowdoin*.

wire fraud are not limited to Defendants' submission of false and misleading AWPs to "independent publishers" as Defendants contend. *See* Defs.' Mem. at 22. The elements of mail and wire fraud are properly alleged.

Nonetheless, and once again mischaracterizing Plaintiffs' claims, Defendants assert that it is not fraud to report AWPs higher than actual acquisition costs and that, therefore, Plaintiffs have not pled a fraud claim upon which a RICO violation can be based. Defs.' Mem. at 21-22. As discussed in greater detail in Section V.A. *supra*, Plaintiffs claims are ***not*** predicated on a finding that AWP equates to actual acquisition cost. Rather, the fraud challenged here is Defendants' reporting of ***false and inflated*** AWPs in order to manipulate reimbursements of prescription a drug. *See, e.g.*, ¶¶ 3, 6-7, 137, 153, 159. Defendants should not be permitted to mischaracterize Plaintiffs' description of the AWP Scheme.

## F.   Plaintiffs Plead Fraud With The Particularity Required By Rule 9(b)

### 1.   Rule 9(b) Pleading Standards

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." An exception to the particularity requirements of Rule 9(b) exists where plaintiffs are not directly involved in the alleged fraudulent scheme and, thus, cannot be expected to have personal knowledge of the facts constituting the fraud. *See Kuney Int'l, S.A. v. DiIanni*, 746 F. Supp. 234, 237 (D. Mass. 1990) (civil RICO claim was pled with sufficient particularity). In such cases, plaintiffs may satisfy Rule 9(b) by including those facts upon which their beliefs are found. *Id*; *see also United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 47 (D. Mass. 2001) ("[W]here facts underlying the fraud are 'peculiarly within the defendants' control,' a plaintiff may be excused from pleading the circumstances of the fraud with a high degree of precision.") (Saris, J.) (quoting *Boston & Me. Corp. v. Hampton*, 987 F.2d 855, 866 (1st Cir. 1993)).

This Court has previously referred to Rule 9(b)'s requirements as setting forth the "'who, what, when where, and how' of the alleged fraud." *Parke-Davis*, 147 F. Supp. 2d at 46 (quoting

*United States ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d 141, 147 (D. Mass. 2000)).
The Complaint does exactly that.

### 2. Plaintiffs Allege Mail And Wire Fraud With The Particularity Required By Rule 9(b)

#### a. Plaintiffs Allege The AWP Scheme With Requisite Particularity

Plaintiffs satisfy Rule 9(b) where "[t]he general outline of the general scheme to defraud
. . . provides the defendant with notice of the grounds on which the plaintiff's claim is based."
*Kuney Int'l*, 746 F. Supp. at 237; *see also Hastings v. Fidelity Mortg. Decisions Corp.*, 984 F.
Supp. 600, 607 (N.D. Ill. 1997) ("The [RICO] allegations must be specific enough to provide the
defendants with a general outline of how the alleged fraud scheme operated and of their
purported role in the scheme.").

Plaintiffs allege that Defendants inflate AWPs for drugs reimbursed under Medicare Part
B and then market the spread between the Medicare reimbursement rate and the providers'
acquisition cost.  Through the AWP Scheme, Defendants incentivize providers to administer the
drugs for which Defendants have created the biggest spread and, thereby, increase sales for the
drugs and their market share.  ¶¶ 4, 157-65.  For brand name drugs administered outside the
Medicare Part B context, Plaintiffs allege that Defendants specifically marketed the inflated
AWP, the price on which Plaintiffs' payments are based, to PBMs and other intermediaries in
order to induce them to place those drugs on their formularies.  The AWP Scheme incentivizes
intermediaries to place drugs on formularies based not on their professional judgment but,
instead, on their desire to increase their profitability.  Plaintiffs allege that PBMs and other
intermediaries pocketed the "spread" between AWP and the actual cost paid for those brand
name drugs.  ¶¶ 5, 166-72.

Conceding that Plaintiffs plead the AWP Scheme with particularity as to Class 1,
Defendants challenge Plaintiffs' allegations pertaining to Class 2, to wit, Defendants' actions
directed at the private, third-party payor sector.  Defs.' Mem. at 32-35.  First, while many of the
examples of AWP inflation provided in the Complaint have been documented for Medicare Part

B drugs, those same drugs are also sold in the private payor market and, consequently, the impact of the fraud is the same. Further, while Defendants list the purported scheme-related allegations that Plaintiffs have allegedly failed to provide, a cursory review of the Complaint reveals the "missing" allegations. For example, Defendants claim that Plaintiffs have failed to identify "the identity of a single 'brand name drug' manufactured by a single one of the multiple defendants that are subject to these allegations." Defs.' Mem. at 33. To the contrary, at the beginning of Section V of the Master Complaint, entitled "Examples of Specific Unlawful Conduct," Plaintiffs describe the specific unlawful conduct of each named Defendant in great detail. ¶¶ 183-328. Further, at the end of almost every Defendant-specific section, Plaintiffs provide specific examples of inflated AWPs for prescription drugs *identified by name*. *See, e.g.*, ¶¶ 190 (Abbott); 209 (Aventis); 217 (Baxter); 223 (Bayer); 238 (BMS); 260 (GSK); 291 (Immunex); 306 (Pharmacia); and 323 (Sicor).

Defendants also claim that Plaintiffs have failed to identify "a single specific allegation about how a single health insurance plan or third party payor, including any of the named plaintiffs, was allegedly affected, let alone damaged, by the [AWP Scheme]," Defs.' Mem. at 33, yet many paragraphs do, *see, e.g.,* ¶¶ 329-32, putting Defendants on sufficient notice of Plaintiffs damage claims.

Defendants further assert that only ¶ 162 addresses Defendants' improper distribution of drug samples and other inducements and price reductions. Defs.' Mem. at 34.[28] But, on the contrary, the Complaint alleges, *inter alia*, that Defendants AstraZeneca, Baxter, Bayer, the BMS Group and Pharmacia each engaged in a form of this scheme to defraud. *See* ¶¶ 201, 218, 225, 244 and 302(e).

Defendants also claim that Plaintiffs have not provided "**a single specific allegation about how any defendant allegedly 'inflated' a brand name drug's 'AWP,'** or how a defendant allegedly 'marketed the spread' to a PBM." Defs.' Mem. at 33. Yet, not only do

---

[28] This is the only particularity challenge relevant to the Medicare Part B class allegations.

Plaintiffs set forth specific examples of inflated AWPs (*see, e.g.,* ¶¶ 190, 209, 217, 223, 238, 260, 291, 306, and 323), the Complaint alleges, *inter alia*, that:

- "AstraZeneca documents reveal that AstraZeneca was directly marketing the spread to physicians." ¶ 196; *see also* ¶ 197 ("[A]t the same time AstraZeneca was raising the AWP for Zoladex, it was lowering the real price to providers (by giving bigger discounts), which served to widen the spread.").

- An internal Baxter document admitted that "[i]ncreasing AWPs was a large part of our negotiations with large homecare companies." ¶ 213.

- Baxter circulated marketing and sales documents comparing the costs of their drugs to the costs of their competitors to induce physicians to use Baxter drugs to get larger "return-to-practice" amounts. ¶ 215.

- An internal Bayer document showed that Bayer believed it had to raise its AWP in order to obtain business from homecare companies and that doing so could be "done overnight." ¶ 220.

- An internal BMS Group document showed that BMS encouraged doctors to take advantage of the spread between the AWP and acquisition costs for its product Vepesid. ¶ 242.

- Internal documents show Glaxo's decisions to repeatedly increase AWP for its drug Zofran to compete with Kytril. ¶¶ 262-75. SKB did the same for Kytril. ¶¶ 277-81. Correspondence between the two companies show that both companies were aware that the other was competing on the basis of a significantly inflated AWP. ¶¶ 284-87.

- "The J&J Group created promotional materials and worksheets to allow them to market the spread between the published AWP and the actual selling price to doctors." ¶ 297.

- Internal documents show that Sicor Group had a marketing strategy to market its price spread to the top 40 AIDS hospitals. ¶ 320.

Moreover, the law does *not* require that Plaintiffs include *every* AWP for *every* drug for *every* Defendant. *See* Defs.' Mem. at 35. As the court stated in *Kuney Int'l*, "[t]he additional particularity desired by the defendant, regarding the exact role [he] played in the scheme to defraud . . . should be left for discovery and is not required to be alleged in the complaint under Rules 8 and 9(b)." 746 F. Supp. at 238; *see also Hastings v. Fidelity Mortg.*, 984 F. Supp. at 608 ("It is true that '*the scheme* must involve some sort of fraudulent misrepresentations or

omissions . . .' but it is not necessary for every participant in the scheme to make them.")
(citation omitted); *Venzor v. Gonzalez*, 936 F. Supp. 445, 449 (N.D. Ill. 1996) (denying motion
to dismiss RICO claim; "[a]lthough the complaint does not always distinguish between
defendants as precisely as it could have, ... we think that the allegations sufficiently spell out the
fraud.") (citation omitted). Indeed, Defendants would require a level of detail not previously
required by this Court under Rule 9(b), for this Court has previously rejected defense pleas that a
plaintiff must allege every facet of a complex fraud:

> Defendant contends that the pleading of the basic scheme of fraud
> or the identification of certain instances of fraudulent conduct does
> not satisfy Rule 9(b). Indeed, Defendant goes so far as to argue
> that Rule 9(b) requires no less than the identification of every
> ineligible prescription submitted to the government for payment.
> This view of Relator's pleading obligation may fit a scenario
> where the alleged fraud is confined to a small number of
> transactions about which Relator had knowledge. However, where
> the alleged scheme of fraud is complex and far-reaching, pleading
> every instance of fraud would be extremely ungainly, if not
> impossible.

*Parke-Davis*, 147 F. Supp. 2d at 49.

Plaintiffs have more than satisfied their obligation under Rule 9(b) to "setting out a
general scheme of fraud" and put Defendants on "notice of the grounds" on which Plaintiffs'
claims are based. *Kuney Int'l*, 746 F. Supp. at 238. Defendants' cry that they "have no idea
what the 'Class 2' 'brand name' PBM claims are all about" (Defs.' Mem. at 33) rings hollow.

### b. Plaintiffs Allege With Particularity Defendants' Knowing Participation In The AWP Scheme

Plaintiffs are not required to allege that Defendants "knowingly" engaged in the fraud if it
is obvious from the facts alleged that the acts were committed ***knowingly***. *See Corporacion
Insular De Seguros v. Munoz*, 826 F. Supp. 599, 610 (D.P.R. 1993) (denying motion to dismiss
RICO claim because "the Court fails to perceive how participation in the . . . enterprise alleged . .
. could be anything but 'knowing.'"). Here, Plaintiffs allege Defendants' actual knowledge and
also allege facts demonstrating that Defendants could not have engaged in the acts alleged
without knowledge of doing so. Specifically:

- Defendants control the prices listed as the AWPs for each drug. ¶ 135. Defendants "knew and understood" that Plaintiffs and the Class used the *Red Book* and other publications to determine AWPs for drugs. ¶ 160. Because Defendants had such control over setting AWPs, they were able to set AWPs "that did not reflect the actual pricing structure of the drugs." *Id.*, ¶ 159.

- Defendants actively marketed the "spread" between AWP and a health care provider's actual cost in order to obtain market share. ¶ 171.

- Defendants instructed health care providers to bill for free samples, although they failed to calculate the provision of those free samples in their calculation of AWP. ¶¶ 162-64.

- Defendants provided other inducements to health care providers so that those providers would purchase Defendants' products based on the desire for those inducements, rather than based on their professional judgment. ¶ 165.

In addition, Defendants fraudulently concealed their actions which, of course, suggests that Defendants knowingly engaged in the acts that they concealed. *See* ¶¶ 173-76.

### c.   Plaintiffs allege with particularity Defendants' use of U.S. mail and interstate wire facilities in furtherance of the scheme

While courts in this Circuit require plaintiffs to allege the circumstances of the mail or wire fraud alleged, the requirement does not, as Defendants suggest, require Plaintiffs to describe every single act of mail or wire fraud that the wrongdoers allegedly committed. In the words of the First Circuit:

> Where there are multiple defendants, as here, and where the plaintiff was not directly involved in the alleged transaction, the burden on the plaintiff to know exactly when the defendants called each other or corresponded with each other, and the contents thereof, is not realistic. *Plaintiff here provided an outline of the general scheme to defraud and established an inference that the mail or wires was used to transact this scheme*; requiring plaintiff to plead the time, place and contents of communications between the defendants, without allowing some discovery, in addition to interrogatories, seems unreasonable.

*New England Data Servs., Inc. v. Becker*, 829 F.2d 286, 291 (1st Cir. 1987) (emphasis added);

*see also Prudential Ins. Co. v. United States Gypsum*, 711 F. Supp. 1244, 1263 (D.N.J. 1989)

(civil RICO plaintiffs need not plead the 'date, place or time' of the fraud, so long as they inject

precision and some measure of substantiation into their allegations of fraud); *Center Cadillac v.*

*Bank Leumi Trust Co.*, 808 F. Supp. 213, 229 (S.D.N.Y. 1992) ("[T]he complaint need not

specify the time, place and content of each mail communication *where the nature and mechanics of the underlying scheme is sufficiently detailed*, and it is enough to plead the general content of the misrepresentation without stating the exact words used.") (emphasis added)).

Plaintiffs' Complaint describes in requisite detail the mechanisms of Defendants' AWP Scheme and describes how it was accomplished by acts constituting federal mail and wire fraud. Notably, the Complaint enumerates at least nine ways in which Defendants used the U.S. mails or interstate wire facilities to accomplish their scheme, including, *inter alia*, dissemination of marketing materials regarding the AWPs for drugs to providers; dissemination of AWPs and changes thereto to publishers; dissemination of checks for rebates, kickbacks and other financial inducements; and communication of fraudulent AWPs to the U.S. Government, insurers and consumers. ¶¶ 356, 383, 410, and 437. These allegations note the general contents of Defendants' communications and to whom they were sent and why. *Id.*

Moreover, where Plaintiffs allege that the fraudulent use of the mails and wires involved Defendants' own sales, research and marketing materials, courts find that many of the details are peculiarly within the knowledge of the defendants. *Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70, 80 (D. Mass. 1998) (finding that civil RICO plaintiff who alleged that defendant published two research reports distributed through mail had sufficiently pled mail fraud predicate acts); *Prudential Ins.*, 711 F. Supp. at 1263 (plaintiffs pled their RICO claims with sufficient particularity by alleging that defendants had "made representations in advertisements, sales literature, and trade publications that [the products at issue] were safe, nontoxic, fully tested, suitable for use in commercial buildings and desirable"). Here, Plaintiffs make similar allegations that Defendants marketed their products via similar means and have described the mechanisms of the AWP Scheme with sufficient particularity. *See, e.g.*, ¶¶ 356, 383, 410, and 437.

**G.    Plaintiffs Have Standing To Sue Defendants For RICO Violations**

As required, Counts I, II, III and IV allege that Defendants' violations of federal law and their pattern of racketeering activity caused them and the members of Class 1 and Class 2 "to be injured in their business or property" because Plaintiffs and Class members "have paid many millions, if not hundreds-of-millions, of dollars in inflated reimbursements or other payments for Covered Drugs." ¶ 367; *see also* ¶¶ 394, 421, 448.

To establish standing to sue under RICO, Plaintiffs must allege some direct relationship between the injury sustained and the alleged racketeering activity (mail and wire fraud). *See Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268-70 (1992); *Camelio v. American Fed'n*, 137 F.3d 666, 669 (1st Cir. 1998) ("When a plaintiff attempts to base a civil RICO claim on § 1962(c), that claim cannot succeed unless the injuries of which the plaintiff complains were caused by one or more of the specified acts of racketeering.") (footnote and citation omitted).

Under this analysis, and notwithstanding Defendants' arguments to the contrary (Defs.' Mem. at 22-25), the allegations of the Complaint are more than sufficient because Plaintiffs allege a direct connection between Defendants' AWP Scheme, their alleged acts of mail and wire fraud, and the multi-million dollar overpayments made by Plaintiffs and Class members. ¶¶ 367-369, 394-396, 421-423, 448-450. The Complaint alleges that Plaintiffs and Class members are the targets of Defendants' AWP Scheme. ¶ 3. The sole purpose of Defendants' pattern of racketeering activity (the alleged acts of mail and wire fraud) was to "deliberately overstat[e] the AWPs for their Covered Drugs, thereby creating a 'spread' based on the inflated figure in order to induce providers to prescribe their Covered Drugs to their patients and causing the Medicare program to pay an artificially-inflated rate of reimbursement for the Covered Drugs." ¶ 361. These allegations are more than sufficient to allege standing to sue under Section 1964(c) of RICO and satisfy the causation tests established by the Supreme Court in *Holmes*, 503 U.S. at 268-70. *See, e.g., Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 384 (2d Cir. 2001) (collecting cases); *Mid Atl. Telecom, Inc. v. Long Distance Servs.*, 18 F.3d 260, 263 (4th Cir. 1994). *Cf. Hamm v. Rhone-Poulenc Rorer Pharms.*, 187 F.3d 941, 952-53

(8th Cir. 1999), *cert. denied*, 528 U.S. 1117 (2000).[29]  Moreover, there is no issue here of apportioning damages among Plaintiffs and Class members who have been harmed by the same injury.  Plaintiffs allege injury to each of them and to each Class member:  The amount of money that that person or entity paid out of pocket as a direct consequence of the AWP Scheme. ¶¶ 367-369, 394-396, 421-423, 448-450.

Given the facts and circumstances of this case, the RICO causation analysis offered by Judge Wolf of this District in *Sebago*, 18 F. Supp. 2d at 83-85, is particularly applicable.  In that case, the plaintiff building owner and shopping center owner filed a class action against defendants, a distributor and fiberglass component supplier for the roof insulation that had been installed on the owners' roofs.  The owners asserted civil RICO claims, contending that the roof insulation caused the owners' roofing systems to corrode, thereby causing injury to their "business or property."  In response to defendants' motions to dismiss, the owners contended that they satisfied RICO's standing requirements because they alleged that defendants' misrepresentations and omissions constituted the proximate and factual cause of their injuries. *Id.* at 81.  Rejecting defendants' claim that plaintiffs' RICO claims should be dismissed because the owners did not allege "reliance" upon the alleged predicate acts of mail and wire fraud, the alleged misrepresentations concerning the fiberglass insulation having been made to the plaintiff owners' predecessors, *id.* at 81-83, Judge Wolf stated that each element of RICO causation had been properly alleged:

> In the context of this case, these concerns weigh in favor of finding that the plaintiffs have standing to assert their RICO claim. Allowing [the plaintiff owners] to advance their RICO claims against these defendants will not create administratively inconvenient or unmanageable litigation.  Nor will these plaintiffs' claims lead to duplicative recoveries.  Finally, recognizing that these plaintiffs have standing will further RICO's statutory goal of encouraging directly injured victims to act as private attorneys general to vindicate the law.  Here, the plaintiffs are owners of buildings allegedly damaged by latent defects of PFRI.  Because of

---

[29] It should be noted that *Holmes* does not require that civil RICO plaintiffs must allege that they were the "targets" of defendants' scheme to defraud; however, that is one way to satisfy the standing requirements of Section 1964(c). *See BCCI Holdings (Lux.), S.A. v. Khalil*, 214 F.3d 168, 174 (D.C. Cir. 2000).