# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | MDL No. 1456<br><br>CIVIL ACTION:  01-CV-12257-PBS<br><br>Judge Patti B. Saris |

## PLAINTIFFS' SUR-REPLY TO DEFENDANTS' CONSOLIDATED MOTION TO DISMISS



1534.16 0016 MTN.DOC

# TABLE OF CONTENTS

**PAGE**

I.   The Meaning of AWP is a Question of Fact that Can be Resolved by this Court but Not on a Motion to Dismiss..........................................................................................1

II.  The Complaint Properly Alleges RICO Violations .............................................................3

    A.   Plaintiffs' Allegations Describing The Association-In-Fact Enterprises Satisfy Supreme Court And First Circuit Precedent...................................................3

    B.   Plaintiffs Properly Allege That Defendants "Operated Or Managed" The Third-Party Payor AWP Enterprises .................................................................5

    C.   Plaintiffs Properly Allege RICO Causation .............................................................8

    D.   Plaintiffs Plead Fraud With The Particularity Required By Rule 9(b) ...................12

III. Plaintiffs' State-Law Claims are not Preempted..............................................................18

    A.   There Is No Medicare Act Preemption ..................................................................18

    B.   There Is No ERISA Preemption ...........................................................................20

IV.  The Filed Rate Doctrine Does not Bar Plaintiffs' Claims .................................................21

V.   Plaintiffs' Response to Discreet Issues Raised In Defendants' Individual Reply Brief.............................................................................................24

    A.   Defendants' Manipulation Of The AWP For Multi-Source Drugs..................24

    B.   The Juridicial Link Between Defendants...……………………..……………….28

    C.   Plaintiffs' Individual Standing..……………………………..……………30

VI.  Conclusion .....................................................................................................................28

## I. THE MEANING OF AWP IS A QUESTION OF FACT THAT *CAN* BE RESOLVED BY THIS COURT BUT *NOT* ON A MOTION TO DISMISS

Defendants continue to insist that, notwithstanding the fact that Congress used the phrase "average wholesale price" in 42 U.S.C. § 1395u(o)(1), the Court *cannot* interpret the phrase and, moreover, the phrase is simply *impossible* to define. Defs. Reply Mem. at 3-7. This is contrary to over a century of United States Supreme Court jurisprudence originating with the seminal phrase penned by Chief Justice Marshall that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 178 (1803). Indeed, when Congress leaves a term in a statute undefined, it is the duty of the federal courts to construe the term "in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (referring to BLACK'S LAW DICTIONARY to define the word "cognizable," which Congress left undefined in 28 U.S.C. § 1346(b)); *see also Smith v. United States*, 508 U.S. 223, 228 (1993) (referring to both BLACK'S LAW DICTIONARY and WEBSTER'S NEW INTERNATIONAL DICTIONARY to define the word "use," which Congress left undefined in 18 U.S.C. § 924(c)(1).).

It thus borders on frivolity for Defendants to perpetuate the myth that this Court is *powerless* to engage in statutory construction – using the many tools at the Court's disposal – to determine the true meaning of AWP. Defendants would have the Court believe that the meaning of AWP is a policy decision that should be left to Congress for future determination, but the point is that Congress has *already* chosen *not* to define "average wholesale price," thereby indicating an intent for the ordinary and natural meaning of the words to apply.

Defendants continue to rely on the inapposite case of *Stephenson v. Shalala*, 87 F.3d 350 (9th Cir. 1996), where the plaintiffs challenged HHS' interpretation of a Medicare law that permitted hospitals to charge "customary" rates even though Congress and HHS had long adopted and maintained the "customary" rate regime (and had expressly decided not to require HHS to establish a national rate structure advocated by plaintiffs). *Id.* at 355-56. In contrast,

- 1 -

Plaintiffs here do not challenge any Congressional decision and merely ask that the Court engage in a simple act of statutory construction.  Plaintiffs simply do not challenge Congress's adoption of AWP as the base upon which Medicare reimbursements are made.

Defendants also recycle a series of conflicting statements about the meaning of AWP, which of course merely confirms that a factual dispute exists that cannot be resolved on a motion to dismiss.  For example, Defendants claim that Congress knew that AWPs were often well above provider acquisition costs, Defs. Reply Mem. at 4, yet Defendants inform the Court that the Administrator of the Centers for Medicare & Medicaid recently defined AWP as "the average price at which wholesalers sell drugs to their customers, which include physicians and pharmacies." Defs. Mem., Ex. 27 at 5; *see also* Defs. Mem., Ex. 31 ("within the pharmaceutical industry, AWP means non-discounted list price") (HHS-IG Report).  Defendants' 53 other extraneous exhibits, which purport to reflect three decades of legislative and regulatory history, also create more fact issues than they resolve.[1]

At the appropriate time, and after considering all of the relevant evidence, the Court will interpret the meaning of AWP.  But this is not the appropriate time given Defendants' parade of conflicting documents.  For now, Plaintiffs' MCC controls, and the MCC squarely alleges that AWP does ***not*** mean fictitious AWPs reported by Defendants in a deliberate scheme to cause Plaintiffs and the Class members to overpay for drugs. *E.g.,* ¶¶ 3, 6-7,137, 153, 159.[2]

---

[1] Contrary to Defendants' assertion, Plaintiffs never asserted that the Court could not review legislative materials. *See* Defs. Reply Mem. at 2-3.  Plaintiffs simply asserted that the Court should not take judicial notice of documents that either lead to, or themselves contain, conflicting factual inferences, for "a court may not take judicial notice of a fact that is "subject to reasonable dispute." *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 398 (3d Cir. 2000); *see also Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987) ("In ruling on a motion to dismiss, . . . a court should not decide questions of fact.").  Defendants do not even attempt to dispute this well-accepted rule.

[2] Plaintiffs are confident that when the Court ultimately interprets the meaning of AWP, it will do so in a manner that makes quite clear that Congress intended AWP to be a real average of real prices. As Plaintiffs outlined in their opposition brief, the word "average" can mean "a mean proportion, medial sum or quantity, made out of unequal sums or quantities." BLACK'S LAW DICTIONARY at 135 (6th ed.) (hereinafter "Black's"), or simply "typical" or "usual." AMERICAN HERITAGE DICTIONARY at 144 (2d ed. 1991). Black's defines "wholesale price" as "that which retailer pays in expectation of obtaining higher price by way of profit from resale to ultimate consumer." Black's at 1597. Read together and applied to this context, the natural, ordinary and familiar meaning of "average wholesale price" is a mean proportion or medial, or a typical or usual, amount that intermediaries pay before resale to the ultimate consumers.  This conclusion matches Administrator Scully's testimony that "the AWP is intended to represent the average price at which wholesalers sell drugs to their customers, which include physicians and pharmacies." *See* Defs. Mem., Exh. 27 at 5.

- 2 -

Finally, and notwithstanding Plaintiffs' challenge to Defendants to submit their own definition of AWP, Defendants steadfastly refuse to do so, resoundingly demonstrating that Defendants do, indeed, have much to hide.

## II.  THE COMPLAINT PROPERLY ALLEGES RICO VIOLATIONS

**A.    Plaintiffs' Allegations Describing The Association-In-Fact Enterprises Satisfy Supreme Court And First Circuit Precedent**

In reply, Defendants once again attack Plaintiffs' RICO "enterprise" allegations, claiming that the association-in-fact enterprises described in ¶¶ 346-350 (Count I), ¶¶ 375-377 (Count II), ¶¶ 402-404 (Count III), and ¶¶ 429-431 (Count IV) do not meet the requirements for ***proving*** an enterprise set forth by the Supreme Court in *United States v. Turkette,* 452 U.S. 576, 583 (1981). Defs. Reply Memo. at 7-11.  Once again, Defendants are wrong.

In *Turkette,* a criminal RICO prosecution, the alleged enterprise was described in the indictment as "a group of individuals associated in fact for the purpose of illegally trafficking in narcotics and other dangerous drugs, committing arsons, utilizing the United States mails to defraud insurance companies, bribing and attempting to bribe local police officers, and corruptly influencing and attempting to corruptly influence the outcome of state court proceedings. . . ." 452 U.S. at 579.  Reversing the decision of the First Circuit, the Supreme Court held that the "enterprise" concept encompasses ***both*** legitimate ***and*** illegitimate enterprises.  *Id.* at 581-87.  In the portion of the opinion cited by Defendants (*see* Defs. Reply Mem. at 7), Justice White wrote that "[t]he enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct."  *Id.* at 583.  This element is "proved by evidence of an ongoing organization, ***formal or informal***, and by evidence that the various associates ***function as a continuing unit***."  *Id.* (emphasis added).

The First Circuit has stated that what "suffice[s] to show that an [association-in-fact] enterprise exists" is evidence of "systemic linkage, ***such as overlapping leadership, structural or financial ties, or continuing coordination***."  *Libertad v. Welch,* 53 F.3d 428, 443 (1st Cir.

- 3 -

1995) (emphasis added).  On pages 7-11 of their reply, Defendants quote this language at least

five times, without acknowledging that plaintiffs enterprise allegations entirely satisfy this

standard.  Paragraphs 346-350, 375-377, 402-404 and 429-431 are replete with allegations that

the members of the alleged association-in-fact enterprises have "financial ties" and that their

profit-oriented activities are subject to "continuing coordination" and communication.  *See, e.g.*,

¶¶ 349(a)-(3).[3]

In *Libertad*, the First Circuit affirmed the district court's ruling granting **summary**

**judgment** as to certain anti-abortion protesters (both organizations and individuals) in a civil

RICO action.  The appellate court found that the defendant organizations Rescue America,

Sacrificial Lambs of Christ and Pro-Life Rescue Team ("PLRT") had only participated together

in one anti-abortion protest, which Chief Judge Torruella described as a "well-coordinated but

one-time activity of several similar but otherwise unconnected parties. . . ."  *Id.* at 442.[4]  As to

Rescue America, PLRT and two affiliated individual defendants, however, the First Circuit

reached the opposite conclusion, holding that there was sufficient evidence that they "constitute

or are part of an 'association-in-fact'" because they "'shared information' . . . on a regular basis,

by faxing and mailing [materials] to one another," *id.*, "share[d] common leaders or organizers . .

. [and] function[ed] as a continuing unit."  *Id.* at 444.[5]  Once again, plaintiffs' enterprise

---

[3] Without reference to First Circuit authority, Defendants assert that the "members" of an association-in-fact RICO enterprise must "know one another."  Defs. Reply Mem. at 8; *see also id.* at 9 (complaining that the alleged members of the AWP and PBM Enterprises "don't know one another").  No Supreme Court or First Circuit case so holds and, as Senior Judge Pollack has stated, "a [RICO] defendant may be found liable *even if he does not have specific knowledge of every member and component of the enterprise.*"  *In re Sumitomo Copper Litig.,* 104 F. Supp. 2d 314, 318 (S.D.N.Y. 2000) (emphasis added; citation omitted).

Defendants also decry Plaintiffs' reliance on the First Circuit's decision in *United States v. London,* 66 F.3d 1227 (1st Cir. 1995), *see* Defs. Reply Mem. at 10, which upheld defendant's RICO conviction, holding that London and the businesses he operated had a "common or shared purpose," namely, "doing commerce with (and thereby profiting from)" bookmakers. 66 F.3d at 1244.  Whether or not *London* is a "run-of-the-mill criminal case," Defs. Reply Mem. at 10, it is squarely on point, and Defendants cannot excuse their willful ignorance of it.

[4] Of course, in this case it cannot be gainsaid that Plaintiffs accuse Defendants of engaging in "one-time activit[ies]."

[5] *Accord United States v. Owens,* 167 F.3d 739, 751 (1st Cir.) (affirming defendants' RICO convictions arising out of their operation of a large-scale cocaine distribution enterprise; the government produced sufficient evidence of "systemic linkages" between two separate groups that "depended on one another both financially and structurally"; "[t]hey regularly exchanged money for cocaine [and] coordinated in the transporting of cocaine to Boston. . . ."), *cert. denied,* 528 U.S. 894 (1999).

- 4 -

allegations are replete with allegations that the members of the association-in-fact enterprises had what the First Circuit terms an "ongoing relationship," *id.,* that is characterized by ongoing business dealings, attendance at meetings at professional organizations, and standardized communications that are disseminated by Defendants. *See, e.g.,* ¶¶ 349(a)-(b), 353-354, 356(a)-(i).[6]

**B.     Plaintiffs Properly Allege That Defendants "Operated Or Managed" The Third-Party Payor AWP Enterprises**

Defendants also contend that Plaintiffs' Section 1962(c) claims do not satisfy the "operation or management" test elucidated by the Supreme Court in *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993), with regard to the Third-Party Payor AWP Enterprises described in ¶ 351 (Count I), ¶ 378 (Count II), ¶ 405 (Count III) and ¶ 432 (Count IV).  Defendants dispute Plaintiffs' reading of the First Circuit's decision in *Aetna Cas. Sur. Co. v. P&B Autobody,* 43 F.3d 1546 (1st Cir. 1994), claiming that *Aetna* holds that the only way that an "outsider" can operate or manage the affairs of a RICO enterprise "is through bribery or other internal infiltration."  Defs. Reply Mem. at 11.[7]  But that was not the First Circuit's holding in that case.

---

[6] Defendants inexplicably seek support in *United States v. Patrick,* 248 F.3d 11 (1st Cir. 2001), *cert. denied,* 534 U.S. 1043 (2002), a criminal RICO prosecution involving the members of a street gang.  In that case, the First Circuit affirmed defendants' convictions, expressly rejecting their argument that Judge Keeton of this District committed reversible error by refusing a requested jury instruction that "the enterprise must exhibit some sort of structure for the making of decisions, whether it be hierarchical or consensual." *Id.* at 18.  One cannot reasonably read the relevant portion of that opinion, and Judge Lynch's relevant conclusion, *see id.* at 18-19, and draw from it Defendants' desired conclusion that "structure is required" for association-in-fact RICO enterprises.  Defs. Reply Mem. at 8.  But if, as Defendants assert, *see id.* at 9, there must be allegations that the members of an association-in-fact enterprise have "sessions" or meetings where "decisions" are made, they need only refer to ¶ 349(b) to find the supposedly requisite allegation(s).

[7] Defendants now acknowledge (which they did not do before) that there are "two types of enterprises: legal entities and associations-in-fact." *Libertad,* 53 F.3d at 441 (citing *Turkette,* 452 U.S. at 580-81).  Plaintiffs allege ***both*** types of RICO enterprises.  In applying the "operation or management" test for § 1962(c) liability stated by the Supreme Court in *Reves,* 507 U.S. at 185, this Court must take into account the "nature" of the enterprise alleged by Plaintiffs. *MCM Partners v. Andrews-Bartlett & Assocs.,* 62 F.3d 967, 979 (7th Cir. 1995).  As the First Circuit has explained:

> *Reves* is a case about the liability of ***outsiders*** who may assist the enterprise's affairs. Special care is required in translating *Reves'* concern with "horizontal" connections--focusing on the liability of an outside adviser--into the "vertical" question of how far RICO liability may extend within the enterprise but down the organizational ladder.  In our view, the reason the accountants were not liable in *Reves* is that, while they were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out; in other words, the accountants were outside the chain of command through which the enterprise's affairs were conducted.

*United States v. Oreto,* 37 F.3d 739, 759 (1st Cir. 1994) (emphasis in original). *See also United States v. Shifman,* 124 F.3d 31, 36 (1st Cir. 1997).  Thus, the First Circuit has narrowed the application of *Reves* by holding that the

- 5 -

Addressing the sufficiency of the evidence supporting a jury verdict for the plaintiff insurer

(Aetna), the court stated in relevant part:

> Contrary to the appellants' assertion, there was sufficient evidence
> for a reasonable jury to find that the defendants' activities met the
> definition of "participation" adopted by the Supreme Court in
> *Reves,* which is known as the "operation or management" test.
> Appraising allegedly damaged vehicles and investigating,
> processing, and paying automobile insurance claims are vital parts
> of Aetna's business.  By acting with purpose to cause Aetna to
> make payments on false claims, appellants were participating in
> the "operation" of Aetna.
>
> The Supreme Court in *Reves* interpreted the phrase "conduct of the
> enterprise's affairs" to indicate a "degree of direction," which the
> court described as taking "some part in directing the enterprise's
> affairs."  The evidence was sufficient to support a finding that the
> individual Arsenal defendants' activities affected, in a material
> degree, the direction of Aetna's affairs by employees of Aetna.
> Appellants' activities caused Aetna employees having authority to
> do so to direct that other employees make payments Aetna
> otherwise would not have made. The Court in *Reves* emphasized
> that, as in this case, the defendants' "participation" could be
> "indirect" in the sense that persons with no formal position in the
> enterprise can be held liable under § 1962(c) for "participating in
> the conduct of the enterprise's affairs."  *Id.*  The evidence was
> sufficient to support a finding that each of the appellants
> participated in the conduct of Aetna's affairs in this way.

43 F.3d at 1559-60 (citations omitted).

In a ***separate*** portion of its analysis, the First Circuit *also* said that the *Reves* standard for

Section 1962(c) liability may be satisfied where plaintiff alleges that defendant(s) "exerted

control over the enterprise, if not by bribery . . ., then at least by other methods of inducement."

43 F.3d at 1560.  But contrary to Defendants' assertion, the First Circuit did not state or imply

that this was the ***only*** way to satisfy *Reves,* and the portion of First Circuit's opinion reproduced

---

"operation or management" test applies *only* to RICO defendants who are "outsiders."  *See United States v. Owens,*
167 F.3d 739, 754 (1st Cir. 1999) ("*Reves's* analysis does not apply where a party is determined to be inside a RICO
enterprise."), and cases cited therein. Where (as here) the Complaint alleges that the Defendants were *members* of
the alleged association-in-fact enterprises, the *Reves* standard for Section 1962(c) simply does not apply.  *See
George Lussier Enters. v. Subaru of New Eng., Inc.,* 2000 U.S. Dist. Lexis 1080, at *12 n.6 (D.N.H. Jan. 13, 2000);
*see also MCM Partners,* 62 F.3d at 979 (defendants were alleged to be "part of the enterprise itself"); *accord
Emcore Corp. v. PricewaterhouseCoopers LLP,* 102 F. Supp. 2d 237, 263 (D.N.J. 2000).  *See generally* G. Robert
Blakey & Kevin P. Roddy, *Reflections on Reves v. Ernst & Young:  Its Meaning and Impact on Substantive,
Accessory, Aiding and Abetting and Conspiracy Liability Under RICO,* 33 AMER. CRIM. L. REV. 1345, 1481-83
(1996).

- 6 -

above makes this clear.  *Compare Reves,* 43 F.3d at 1559-60 *with* Defs. Reply Mem. at 11-12.

Thus, in *Liberty Mut. Ins. Co. v. Diamante,* 138 F. Supp. 2d 47 (D. Mass. 2000), a reported case

from this District cited by Plaintiffs but ignored by Defendants, Chief Magistrate Judge Collings

refused to dismiss civil RICO claims brought by insurance companies against attorneys (and

others) who submitted false claims that the plaintiff insurance companies paid.[8]  Relying on his

earlier unpublished decision in *Metropolitan Prop. & Cas. Ins. Co. v. Uong,* Civil Action No. 98-

11185-RCL (D. Mass. Feb. 26, 1999),[9] Chief Magistrate Judge Collings refused to dismiss the

insurers' claims, even though there was no allegation that their employees had been

compromised by defendants' payment of bribes or other inducements:

> It is not a *sine qua non* of liability that an employee of the innocent
> enterprise be a knowing participant in the racketeering activity.  It
> appears that the Court of Appeals for the Eleventh Circuit has so
> read the *Aetna* case by summarizing its holding as follows:
>
> Outsiders may exert control over an enterprise's affairs through
> illegal means sufficient to satisfy *Reves'* requirements.  [citing
> *Aetna* and] *United States v. Castro,* 89 F.3d 1443, 1452, n. 5 (11
> Cir., 1996).
>
> To repeat, although I admit the matter is not free from doubt, it
> does not appear "...beyond doubt that the plaintiff[s] can prove not
> set of facts in support of [its innocent enterprise] claims," that the
> defendants, including Cutler, participated in the operation or
> management of the plaintiffs through a pattern of racketeering
> activity by submitting fraudulent claims which the plaintiffs would
> not have paid were it not for the activity. Evidence that corrupted
> employees of the plaintiffs were involved is not required.

*Liberty Mutual,* 138 F. Supp. 2d at 61 (citation omitted).  Thus, Plaintiffs respectfully submit that

Defendants are deliberately misreading the First Circuit's decision in *Aetna,* 43 F.3d at 1559-60,

and that Plaintiffs' allegations are more than sufficient to satisfy *Reves.*

---

[8] Chief Magistrate Judge Collings' Report and Recommendation was accepted by Judge Lindsay on March 1, 2001.  *See Liberty Mut. Ins. Co. v. Diamante,* 138 F. Supp. 2d 47 (D. Mass. 2001).

[9] As Chief Magistrate Judge Collings noted, his Report and Recommendation in *Metropolitan Property* was approved by Judge Lindsay on March 25, 1999.  *See Liberty Mutual,* 138 F. Supp. 2d at 60 n.18.

**C.    Plaintiffs Properly Allege RICO Causation**

Section 1964(c) of RICO imposes a standing requirement under which plaintiffs seeking

remedies for violations of Section 1962(c) must allege that defendants' racketeering activities

caused injury to plaintiffs' business or property. *See* 18 U.S.C. § 1964(c); *Sedima, S.P.R.L. v.*

*Imrex Co.,* 473 U.S. 479, 495-97 (1985); *Camelio v. American Fed'n,* 137 F.3d 666, 669-70 (1st

Cir. 1998).  Plaintiffs' standing to sue depends on a finding that at least one of defendants'

predicate acts of racketeering activity was the proximate cause, as well as the but-for (or factual)

cause of plaintiffs' injuries. *See Holmes v. Securities Investor Prot. Corp.,* 503 U.S. 258, 268

(1992). "At the pleading stage, however, general factual allegations that the plaintiff suffered

injury as a result of the defendant's conduct are sufficient to satisfy [RICO's] standing

requirement." *George Lussier Enters.,* 2000 U.S. Dist. Lexis 1080, at \*33 (citing *National Org.*

*for Women, Inc. v. Scheidler,* 510 U.S. 249, 256 (1994)).

Defendants, however, take great issue with Plaintiffs' allegations of RICO standing,

contending that Plaintiffs have failed to properly plead causation. *Compare* Defs. Reply Mem. at

12-14 *with* Plaintiffs' Opp. Mem. at 37-39.  Defendants particularly castigate Plaintiffs for

reliance upon Judge Wolf's thorough discussion of the RICO causation issue in *Sebago, Inc. v.*

*Beazer East, Inc.,* 18 F. Supp. 2d 70, 81-85 (D. Mass. 1998).[10]  As previously stated, in *Sebago*

the plaintiffs were commercial property owners in Maine and Massachusetts that alleged that

their predecessor-in-interest and/or building contractor had relied upon defendants'

representations when installing defective insulation in the buildings' roofs.  In that class action,

plaintiffs sought to represent a nationwide class of building owners with similar claims against

defendants. *Id.* at 77-78.

On defendants' motions to dismiss the civil RICO claims, Judge Wolf held that (i) the

plaintiff building owners had properly alleged RICO causation, even though the plaintiffs had

---

[10] Defendants assert that this portion of Judge Wolf's opinion in *Sebago* is not about RICO causation, *see* Defs.
Reply Mem. at 14 n.12, even though the relevant heading in the district court's opinion reads: "The Plaintiffs
Adequately Allege ***Causation***." 18 F. Supp. 2d at 81 (emphasis added).

not "relied" on defendants' alleged misrepresentations (*i.e.*, the alleged predicate acts of mail fraud), *see id.* at 81-82; (ii) the plaintiffs, not their predecessors-in-interest or their building contractors, were "directly injured" by defendants' scheme to defraud because they were the ones that had sustained financial damage, *see id.* at 83-84;[11] and (iii) "it is for a jury [to] apply the law of proximate causation and decide whether the plaintiffs were in the zone of foreseeable plaintiffs and whether the defendants' actions were a substantial factor in causing the plaintiffs' harm." *Id.* at 85.

Contrary to Defendants' contentions, Judge Wolf's analysis and conclusions regarding RICO causation in *Sebago* are squarely on point and should be adopted by this Court. Just like the plaintiff property owners in *Sebago*, who were "indirect purchasers" of the allegedly defective siding from the defendant manufacturers, Plaintiffs here do not "directly" purchase Covered Drugs from Defendants. In *Sebago*, the alleged false and misleading representations were not made directly to the plaintiff property owners; rather, such misrepresentations were made by the insulation manufacturers and distributors to plaintiffs' predecessors-in-interest and/or building contractors. The same thing is true here. Under the facts presented in *Sebago*, one could say that the property owners' predecessors-in-interest or building contractors who had installed the defective insulation materials were "intervening" causes. In *Sebago*, Judge Wolf addressed each of the issues raised by Defendants here and resolved them in Plaintiffs' favor.

---

[11] Defendants claim that it is insufficient for Plaintiffs to allege that they "were a target or even the intended victim of the alleged scheme." Defs. Reply Mem. at 12 (footnote omitted). But in *Sebago*, 18 F. Supp. 2d at 84 & n.6, Judge Wolf reached the opposite conclusion, relying on Judge Posner's decision in *In re EDC, Inc.*, 930 F.2d 1275 (7th Cir. 1991). In that case, the Seventh Circuit stated that "[t]he general rule in fraud cases . . . is that you are liable only to an intended victim." However, "[o]ne can be an intended victim without being the primary victim." *Id.* at 1279. Judge Posner illustrated this principle with the following hypothetical:

> Suppose you blow up a plane carrying X and Y in order to kill X. If both die in the explosion, you are just as much Y's murderer as X's, not because of the fiction of transferred intent but because you knew that Y (or any other person who might be a passenger on the plane) would die if your plot against X succeeded. It is not a transferred-intent case because nothing went wrong with your plan; it is a case of extreme recklessness, equated to deliberateness. You killed Y for an ulterior motive, it is true, but most murders have ulterior motives.

*EDC*, 930 F.2d at 1279 (citations omitted). After quoting this portion of the Seventh Circuit's decision, Judge Wolf stated that "assuming the truth of the plaintiffs' allegations for the purposes of the motions to dismiss, the plaintiffs are among the intended victims of the defendants' alleged fraudulent scheme because the plaintiffs are the owners of the buildings that the [defective insulation] has allegedly damaged." *Sebago*, 18 F. Supp. 2d at 84 (citing *EDC*).

Under Section 1964(c) of RICO, it is the Plaintiffs in this case that have been injured in their

business or property and, as Judge Wolf recognized in that case, *see* 18 F. Supp. 2d at 83-84, it is

Plaintiffs who can "act as private attorneys general to vindicate the law." *Id.* at 83.

To the same effect is *George Lussier Enterprises,* 2000 U.S. Dist. Lexis 1080 at *35. In

that case, the plaintiff Subaru dealers alleged that they relied upon fraudulent representations that

the defendant distributor (SNE) and its sole shareholder (Boch) made about the vehicle

allocation system when they decided to enter into dealership agreements. They further alleged

that the distributor's fraudulent scheme caused them to suffer lost profits and a diminishment in

the value of their dealerships. *Id.* at *34. Refusing to dismiss one of the plaintiff dealers' civil

RICO claims on standing grounds, Chief Judge Barbadoro stated in relevant part:

> Based on these allegations, I conclude that the dealers have
> pleaded sufficient facts to establish the causal connection required
> for standing. The complaint, read in the light most favorable to the
> dealers, alleges that the dealers' property and/or businesses were
> injured, and that Boch's racketeering activities were both the
> proximate and factual cause of those injuries. Nothing more is
> required at this stage of the litigation.

*Id.* at *35. Given the detailed allegations of the MCC, this Court should reach the same

conclusion in this case and should reject Defendants' challenges to plaintiffs' RICO standing

allegations.

Moreover, Defendants overlook many decisions where courts have found that

racketeering conduct can be directed at more than one person or entity. *See, e.g., NOW v.*

*Scheidler*, 510 U.S. 249, 255-56 (1994) (clinics have standing to sue for force directed toward

clinic staff and patients; court noted that "at the pleading stage, general factual allegations of

injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume

that general allegations embrace those specific facts that are necessary to support the claim.")

(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 119 L. Ed. 2d 351, 112 S. Ct. 2130

(1992)); *In re EDC, Inc.*, 930 F.2d 1275, 1279 (7th Cir. 1991) (fraud on Pension Benefit

Guarantee Corporation, the primary target, cognizable in suit by creditor, if secondary target); *J*

- 10 -

& M Turner, Inc. v. Applied Bolting Tech. Prods, 1997 U.S. Dist. LEXIS 1835, *24-37 (E.D. Pa.

1997) (RICO) (corporation possesses standing to sue for false statements made to customers and

prospective customers); *Teamsters Local 372 v. Detroit Newspapers*, 956 F. Supp. 753, 765

(E.D. Mich. 1997) (corporation had standing under RICO to sue for violence directed to third

parties during strike); *Jerry Kubecka, Inc. v. Avellino*, 898 F. Supp. 963, 968-969 (E.D.N.Y.

1995) (corporation has standing under RICO to sue for homicide of executives of corporation).

Under such circumstances, an injured entity may sue under RICO so long as it was a target of

defendants' actions.

Here, throughout the MCC, Plaintiffs have alleged that they and the Class members were

targeted by Defendants' fraudulent scheme. *See, e.g.,* ¶ 3 ("The AWPs for these drugs are

deliberately false and fictitious and created solely to cause Plaintiffs and the Class members to

overpay for drugs."); ¶ 138 ("Plaintiffs and the members of the Class paid for the drugs based on

an in reliance on the inflated AWPs reported by the Defendant Drug Manufacturers."); ¶ 139

("The Defendant Drug Manufacturers' pattern of fraudulent conduct in artificially inflating the

AWPs for their drugs (sometimes referred to herein as the 'AWP Scheme') directly caused

Plaintiffs and the members of the Class to substantially overpay for those drugs."); ¶ 329

("Plaintiffs are directly damaged by Defendants' fraudulent AWP pricing schemes because

Plaintiffs frequently are required to make a co-payment for a Covered Drug or a brand name

drug, or because such Plaintiffs occasionally make payment in full, and their payments are based

on inflated AWPs."); ¶¶ 330-32; ¶¶ 367-69, 394-96, 421-23, 448-50.  Because Plaintiffs and the

members of the Class were the target of Defendants' racketeering activities, Defendants cannot

now complain that the injuries were "indirect."

Indeed, even Defendants' leading case, *Holmes v. Securities Investor Protection*

*Corporation*, does not bar Plaintiffs' claim here.  In *Holmes*, 503 U.S. at 265-68, the plaintiff

Securities Investor Protection Corporation (SIPC) alleged that defendants had conspired in a

fraudulent stock manipulation scheme that disabled brokers from meeting obligations to their

- 11 -

customers.  As a result, SIPC was forced under its statutory duty to reimburse the broker's customers.  The *Holmes* court found that the broker-dealers, and not the SIPC, suffered "direct" injury and therefore had standing to sue under 18 U.S.C. § 1964(c); the injuries suffered by the SIPC was too remote because damage to it was purely contingent on the harm suffered by the broker-dealers.  *Id.* at 271-72.  (In contrast here, Plaintiffs' injuries are not contingent on the harm suffered by another party; they have been directly injured.)

Significantly, the *Holmes* court recognized that the result would be different if the allegations were that the defendants had engaged in a "parking scam" that targeted both the broker-dealers and their insurer; under those circumstances, "the broker-dealers' customers might be proximately injured by these offenses," and the SIPC would be able to sue.  *Id.* at 272, n. 19 (*citing Taffet v. Southern Co.*, 930 F.2d 847, 856-57 (11th Cir. 1991); *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1311-12 (2nd Cir. 1990).  Both of these cases cited by the Supreme Court held that customers of defrauded utilities had standing to sue for the overcharges that were passed on to them ***even though those customers were not the "direct" victims of the fraud***.  The Supreme Court thus recognized that its "direct" causation requirement was not to be inflexibly applied.  *See also Holmes*, 503 U.S. at 274 at n. 20 ("the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case.") (*citation omitted*).

There can be no question that Defendants targeted Plaintiffs and the Class every bit as much as Defendants targeted the federal government because Defendants knew that Plaintiffs and the members of the Class would be primary payors of the inflated drug charges (whether paying all of the costs or a portion thereof); after all, Defendants would not have engaged in the activity alleged in the MCC if they did not believe that their scams would succeed.

**D.**     **Plaintiffs Plead Fraud With The Particularity Required By Rule 9(b)**

Defendants continue to refuse to acknowledge the need to read Rule 9(b) in conjunction with Rule 8(a).  This Court recognized in *United States ex rel. Franklin v. Parke-Davis*, 147 F.

- 12 -

Supp. 2d 39, 46 (D. Mass. 2001), that Rule 9(b) serves to enable defendants to fully prepare a defense to charges of fraud, and to gate-keep against "conclusory allegations" and "fishing expeditions."  Importantly, this Court reasoned that "[t]he requirements of Rule 9(b) . . . must be read in conjunction with Fed. R. Civ. P. 8(a)," which requires only a "short and plain statement of the claim." *Id.* at 46.  This Court noted that while a plaintiff "must allege the circumstances of the fraud, he is not required to plead all of the evidence or facts supporting it." *Id.* at 46-47.

In a more recent decision, Judge Zobel stated: "if the complaint provides a 'general description of the personal sources of plaintiffs' beliefs,' the pleading requirement is met." *In re Xcelera.com Sec. Litig.*, 2002 U.S. Dist. Lexis 7400 at *8 (D. Mass. Mar. 8, 2002)  (citing *Fitzer v. Security Dynamics Techs.*, 119 F. Supp. 2d 12, 22 (D. Mass. 2000)).  Finding that the complaint was "not merely based on 'bald assertions' and 'general illusions,'" the court denied the motion to dismiss, *id.* the court held that the Complaint met the Rule 9(b) standard, because, *inter alia*, the Complaint cited to nine investigative sources and identified and quoted from "supporting documentation to buttress their allegations." *Id.* at *8.

Here, Plaintiffs more than amply meet the requirements of Rule 9(b) as discussed in *Xcelera.com Securities.*  Plaintiffs cite to, identify and quote from more than 60 sources, many of which are internal documents prepared by defendants touting AWP manipulation.  Thus, the MCC is in large part a direct recitation of defendants' implementation of the AWP scheme. *See, e.g.*, ¶¶ 135-312.

Defendants complain that plaintiffs have failed to meet Rule 9(b) with respect to the Class 2 PBM allegations, citing three "problems" with the PBM-related allegations:  (i) lack of particulars of how the "alleged duping of Medicare extended to include non-Medicare drugs;" (ii) the alleged failure to identify any non-Medicare drugs; and (iii) failure to identify any PBM or other intermediary.  Defs. Reply Mem. at 15-16.  Each of these arguments is wholly without merit.

First, the MCC clearly explains how defendants' AWP manipulation directly affects *anyone* that pays for prescription drugs based on inflated AWPs.  ¶¶ 5-7, 166-172.  The MCC describes how, for brand name drugs administered outside the Medicare Part B context, Defendants specifically marketed the inflated AWP, the price on which Plaintiffs' payments are based, to PBMs and other intermediaries in order to induce them to place those drugs on their formularies.  The MCC alleges that this scheme incentivizes intermediaries to place drugs on formularies based on their desire to increase their profitability.  Plaintiffs allege that PBMs and other intermediaries through which drugs were transferred to Plaintiffs and the Class thus pocketed the spread between AWP and the actual cost that they paid for those brand name drugs.  ¶¶ 5, 166-172.

Second, Defendants try to draw a distinction between Medicare and non-Medicare drugs.  There is no such thing.  In fact, for each drug cited in the MCC as having an inflated AWP, of which there are over 100,[12] Defendants not only conned the government but also caused the members of Class 2 to overpay.

Finally, Defendants claim that plaintiffs failed to specifically identify any PBMS or other intermediaries that were incentivized by the AWP scheme.  Defendants cannot seriously claim that this alleged "deficiency" prevents them from fully preparing their defense to the charges of fraud. *See Parke-Davis*, 147 F. Supp. 2d at 46.  In fact, much of the internal correspondence quoted in the Defendant-specific allegations demonstrates that it is peculiarly within the Defendants' knowledge which intermediaries they worked to incentivize by inflating AWPs.  *See, e.g.*, ¶¶ 213, 215, 220, 242, 262-275, 277-81, 297, 320.

Several individual defendants, including Abbott, Amgen, Baxter, Johnson & Johnson, SICOR, Warrick, and Immunex, *inter alia*, also filed individual briefs, asserting that Plaintiffs failed to meet Rule 9(b)'s particularity requirements.  These arguments are also misplaced.

---

[12] These 100 were included as examples of the 479 drugs, for which the DOJ found inflated AWPs.

- 14 -

Abbott erroneously suggests that *United States ex rel. Gublo v. Novacare, Inc.*, 62 F. Supp. 2d 347 (D. Mass. 1999), is directly on point. Abbott Mtn. at 3. In *Novacare*, this Court dismissed the complaint due to plaintiff's failure to cite a regulation that required the defendant, a provider of orthotics and prosthetics, to "factor discounts given to private insurers into the determination of its 'actual charges' for government billing purposes." *Novacare, Inc.*, 62 F. Supp. 2d at 354. The *Novacare* defendant allegedly engaged in an offsetting pricing practice by charging providers 25% less than the Medicare reimbursement amount. *Id.* Ultimately, the Court concluded that the allegations of overbilling Medicare for prosthetics did not meet Rule 9(b) pleading standards, particularly where the plaintiffs failed to cite "a single instance of a false claim." *Id.*

In contrast, the fraud challenged here is Defendants' ***reporting of false and grossly inflated AWPs*** to pharmaceutical compendia in order to manipulate reimbursements of prescription drugs. ¶¶ 184-90. The plaintiffs in *NovaCare* merely claimed that the "actual charge" used for government reimbursement served to compensate providers for the 20% Medicare discount, whereas here Defendants' inflation scheme goes far beyond simple "offsetting" issues.

As exhibited in the MCC, most instances of AWP inflation resulted in grossly wide spreads between the published AWPs and the actual AWPs. ¶ 190. For example, Abbott's 2001 *Red Book* AWP for vancomycin hydrochloride was $382.14, and the DOJ determined the actual AWP for that same product to be $4.98. ¶ 190. The 7,574% spread, used to incentivize providers to administer the drugs and thereby increase sales and market share, clearly exceeds the *NovaCare* defendant's offsetting practices. Moreover, the vancomycin spread is only one of several examples of AWP inflation by Abbott included in the MCC, thereby satisfying the particularity requirements of Rule 9(b). ¶ 190. Thus, though this Court found that the *NovaCare* plaintiffs failed to cite to a single false claim, Plaintiffs here have cited dozens with respect to all Defendants, and at least sixteen with respect to Abbott. *See* ¶¶ 190-328.

- 15 -

With respect to Amgen, Plaintiffs allege that Amgen, as the sole manufacturer of filgrastram and one of two sources for epoetin alpha, reported fraudulently inflated AWPs for both drugs to the *Red Book*. ¶ 192. Plaintiffs further point out that the GAO reported that epoetin alfa accounted for the second highest percentage of Medicare expenditures on drugs in 1999, which clearly resulted in excessive overpayments. ¶ 193. These allegations are straightforward and particular, meet the requirements of Rule 9(b) and sufficiently enable Amgen to prepare a defense pursuant to *Parke-Davis*.

Baxter claims that neither the Opposition nor the MCC distinguish the roles of the defendants in the alleged wrongdoing. Baxter Mtn. at 2. On the contrary, the MCC sets out Baxter's specific fraudulent conduct, as distinguished from each of the other defendants. *See* ¶¶ 212-19. Not only does the MCC include a chart of specific drugs for which Baxter artificially inflated AWPs, it (i) includes the exact percentage spread between Baxter's AWPs and the DOJ determined actual AWPs; (ii) describes a report published by the DHHS documenting the DOJ's findings that Baxter's AWPs for certain drugs were substantially higher than actual prices listed by wholesalers, and (iii) transcribes internal Baxter documents that reference Baxter's AWP manipulation. ¶¶ 212-19. Thus, Baxter's argument that the MCC fails to particularize its role in the fraud is without merit, and easily refuted by the allegations of the MCC.

As to the Johnson & Johnson Group ("J&J"), the MCC includes specific allegations, as document by federal investigations, of J&J's fraudulently reported AWPs for epoetin alfa. *See* ¶ 294. Moreover, J&J is one of only two manufacturers of this drug, which accounts for 9.5% of overall Medicare prescription drug spending. ¶ 295.[13] The MCC also alleges that J&J continued to overstate the AWP for Remicade while simultaneously marketing to providers the availability of inflated payments by Medicare. ¶ 296. The MCC contains a specific explanation of how J&J markets the scheme by demonstrating that providers who prescribe the drug will gain significant profits from the Medicare overpayment. ¶¶ 296-97. In short, it is impossible to conceive of how

---

[13] This conduct is even more egregious, as noted in the MCC, given that the federal government originally underwrote research and development of epoetin alfa. *Id.*

- 16 -