Mass. 2001) ("It is not a sine qua non of liability that an employee of the innocent enterprise be a knowing participant in the racketeering activity.").

This analysis applies to the alleged third-party payor publisher enterprises as well.  (Compl. ¶¶ 378, 405.)  While the defendants contracted with the publishing companies and paid money to the publishing companies for their services, such transactions are inadequate to show that defendants exercised "control" over the third party payor enterprises as that term is used in the RICO statute.  Moreover, in no sense could the publishing companies be considered victim enterprises as they were not harmed by the fraud.

## V.   PREEMPTION OF STATE LAW CLAIMS

Plaintiffs also bring state law claims under the consumer protection statutes of California, Delaware, Florida, Illinois, Louisiana, Minnesota, New Jersey, New York, Pennsylvania, Texas, and Washington.  (¶ 452.)  Defendants argue that these claims are preempted by both the Medicare statute and by ERISA.

### A.  Medicare

The federal Medicare Act preempts the state consumer fraud causes of action "if and only if Congress intended it to do so." Mass. Med. Soc'y v. Dukakis, 815 F.2d 790, 791 (1st Cir. 1987) (Breyer, J.).  Reviewing preemption doctrine, the First Circuit set forth the following framework:

> Congress might show that it intends to
> preempt state law by _explicitly_ withdrawing
> the power of states to regulate within
> certain fields. Or, Congress might _implicitly_
> withdraw the states' power to regulate by
> creating a regulatory system so pervasive and
> complex that it leaves 'no room' for the
> states to regulate.  Congress might also
> enact a law such that 'compliance with both
> federal and state regulations is a physical
> impossibility,' in which case the state
> statute must yield.  Finally, the Supreme
> Court has noted that, even in the absence of
> a direct conflict, a state law violates the
> supremacy clause when it 'stands as an
> obstacle to the accomplishment and execution
> of the full purposes and objectives of
> Congress.'

_Id._ (citations omitted).  The guiding principle throughout the
preemption analysis is Congressional intent.  _See_ _Cal. Fed. Sav._
_& Loan Ass'n v. Guerra_, 479 U.S. 272, 280, 107 S.Ct. 683, 689
(1987).

Defendants acknowledge that the Medicare statute does not
explicitly preempt the state consumer protection statutes.  _See,_
_e.g._, _Mass. Ass'n. of Health Maint. Org. v. Ruthhardt_, 194 F.3d
176, 179 (1st Cir. 1999) (involving an express preemption
provision).  Nonetheless, defendants argue that the Medicare
system is so extensive and complex that it preempts the entire
field of consumer protection laws as they relate to billing for
medical treatment related to Medicare.  Defendants further
contend that allowing state consumer fraud claims to go forward
would stand as an obstacle to the accomplishment of the Medicare
system envisioned by Congress.

When Congress legislates in a field which the States have traditionally occupied, like medical fee regulation, "courts must presume that Congress has not preempted state power to act unless that was Congress's 'clear and manifest purpose.'"  Mass. Med. Soc'y, 815 F.2d at 791 (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152 (1947)); see also generally Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 719, 105 S.Ct. 2371, 2378 (1985) ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern.").

The issue in Mass. Med. Soc'y was whether the Medicare Act preempted a state law that banned health providers from charging patients for the balance of their fee not covered by Medicare. The First Circuit rejected a Supremacy Clause challenge even though there was evidence that Congress intended to permit the practice of balance billing.  The language is helpful:

> To prevail, MMS must show that Congress intended to create an "option" in the strong sense of that word: that Congress intended to create a legal *right* to balance bill, a right immune from significant state interference. MMS cannot win by showing only that Congress failed to disturb a preexisting legal status quo that happened to permit doctors to balance bill.  We cannot infer from Congress's simple failure to disturb an existing practice that Congress meant to grant that practice the status of a right, immune from state regulation.

Mass. Med. Soc'y, 815 F.2d at 792.  Other circuits have agreed.

See Penn. Med. Soc'y v. Marconis, 942 F.2d 842, 849 (3d Cir. 1991) (holding that the Medicare Act did not preempt state legislation regulating billing practices); Med. Soc'y of the State of N.Y. v. Cuomo, 976 F.2d 812, 816 (2d Cir. 1992) (holding that "regulation of public health and the cost of medical care are virtual paradigms of matters traditionally within the police powers of the state."). See also Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 256, 104 S.Ct. 615, 626 (1984) (finding no preemption of state tort suit for damages stemming from leakage of nuclear power plant, despite exclusive federal regulation of nuclear safety).

Here, the fact that Congress has failed to disturb the widespread practice on the part of pharmaceutical companies of grossly overstating their AWPs cannot be read as a clear and manifest intention to grant immunity from state regulation of such fraudulent practices. Because there is no evidence of a clear and manifest intent to preempt the entire field of state regulation of fraudulent medical billing practices, claims based on state consumer protection statutes that allege such practices are not preempted. Cf. Hofler v. Aetna US Healthcare of California, Inc., 296 F.3d 764, 768 (9th Cir. 2002) ("Because Congress did not clearly manifest any intention to convert all state tort claims arising from the administration of Medicare benefits into federal questions, we hold that the Medicare

program does not completely preempt state tort law claims."). Further, the Medicare statute supports plaintiffs' position that there was no legislative intent to preempt supervision of the compensation of a person providing health services.  See 42 U.S.C. § 1395.[10]

Defendants also argue that the state law claims conflict with or are an obstacle to the Medicare program, and thus must be preempted. "A conflict exists when it is impossible to comply with both state and federal law, or if the state law is an obstacle to the accomplishment of the full purposes and objectives of Congress in enacting the federal legislation." Penn. Med. Soc'y, 942 F.2d at 848 (citing Schneidewind v. ANR Pipeline Co., 485 U.S. at 300, 108 S.Ct. at 1150-51).

The maintenance of these consumer protection claims against defendants will not actually conflict with the operation of the federal program.  Compare Cox v. Shalala, 112 F.3d 151, 154 (4th

---

[10]     The opening provision of the Act states that:

> Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

42 U.S.C. § 1395.

Cir. 1997) (holding that North Carolina's Wrongful Death Act
conflicted with the Medicare Act to the extent that it capped the
amount of money that Medicare could recover for medical expenses
it paid in connection with the provision of medical services to a
Medicare beneficiary who died as a result of malpractice; because
the Medicare statute entitled the program to complete
compensation, the state law presented an actual conflict and was
therefore preempted).  Neither will the action require state
courts to construe complex federal regulations.  Compare Congress
of Cal. Seniors v. Catholic Healthcare West, 87 Cal. App. 4th
491, 508, 104 Cal. Rptr.2d 665, 667 (2001) (holding that
extensive and complex federal law governing cost reporting by
hospitals precluded a claim that hospital's including certain
anti-union expenses in annual Medicare cost reports constituted
an unfair business practice under state law).

Defendants protest that to allow state consumer fraud claims
in this context will permit state courts, one-by-one, to construe
the meaning of "national average wholesale prices" as it is used
in the statute, and that that will defeat the goal of uniform
application of federal laws.  To be sure, the need for uniformity
in enforcement is an important goal which should be considered in
determining preemption.  As the Supreme Court has pointed out in
a different context, complying with a federal "regulatory regime
in the shadow of 50 states' tort regimes will dramatically

increase the burdens facing regulated entities." <u>Buckman Co. v. Plaintiffs' Legal Comm.</u>, 531 U.S. 341, 349-350, 121 S.Ct. 1012, 1018 (2001).

However, state courts frequently construe terms in federal laws in order to adjudicate causes of action based in state law, and the Supreme Court has pointed out that it is the ultimate decision-maker on federal questions arising out of state court. <u>See</u> <u>Merrell Dow Pharms., Inc. v. Thompson</u>, 478 U.S. 804, 810, 106 S.Ct. 3229, 3233 (1986) (recognizing that state court will be required to construe federal law to determine viability of state negligence claim, and that uniformity might be compromised, but holding that remand was nonetheless required because of lack of jurisdiction); <u>see also</u> <u>J.A. Jones Constr. Co. v. City of New York</u>, 753 F.Supp. 497, 505 (S.D.N.Y. 1990) ("A state court will have to determine the scope of the EPA Procurement Regulations in order to decide this [contract] case, but there is no doubt that that court will fulfill its 'constitutional obligation . . . to uphold federal law.'").

The circuit courts have routinely held that state prohibitions on balance billing did not conflict with or create an obstacle to the accomplishment of the federal Medicare program. <u>See, e.g.</u>, <u>Mass. Med. Soc'y</u>, 815 F.2d at 796 ("We . . . conclude that the Massachusetts balance billing ban does not pose a significant 'obstacle,' constitutionally speaking, to any

- 31 -

congressional 'purpose' or 'objective' in the Medicare Act.").
They so held despite the fact that their decision meant that
different state laws might produce significant differences across
states in terms of how much doctors could be compensated for
their treatment of Medicare-covered patients.  See id. at 794-95
(noting that states would be unlikely to provide supplemental
regulation that would harm their own citizens' ability to
participate in the Medicare program).

Defendants argue that preemption is required by the Supreme
Court's holding in Buckman.  In that case, plaintiffs brought a
state fraud-on-the-agency tort claim against a consulting firm
that made fraudulent statements to the FDA to obtain regulatory
approval for the marketing of a medical device that injured
plaintiffs.  The Court held that "plaintiff's state-law fraud-on-
the-FDA claims conflict with, and are therefore impliedly
preempted by, federal law."  Buckman, 531 U.S. at 348, 121 S.Ct.
at 1017.  Allowing the state-law based "fraud-on-the-FDA" theory
to go forward, the Court held, would unduly interfere with the
FDA's "statutorily required judgment" concerning the approval of
devices and would "inevitably conflict with the FDA's
responsibility to police fraud consistent with the
Administration's judgment and objectives."  Id. at 349-350, 121
S.Ct. 1017-1018.  Unlike the FDA in Buckman, CMS does not make a
discretionary judgment with respect to the statutorily defined

Medicare Part B reimbursement rates, and does not approve the
AWPs.  Therefore, the decision of the pharmaceutical companies,
not an agency action, is alleged to cause plaintiffs' harm.  Cf.
Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 223 n. 7 (3rd Cir.
2001) (holding plaintiffs' claims not preempted because,
"[u]nlike the plaintiffs in Buckman, the plaintiffs in the case
at bar allege not fraud against a federal agency, but rather
violations of state and federal securities laws"); see also
Caraker v. Sandoz Pharms. Corp., 172 F.Supp.2d 1018, 1039 n. 17
(S.D. Ill. 2001) ("Courts have generally read Buckman's specific
holding rather narrowly.") (citing Green).

Accordingly, I find that the Medicare statute does not
preempt the state causes of action.

**B.  ERISA Preemption**

Class Two, the third-party payor class, is comprised of
employee health benefit plans that assert state law claims
against the defendant pharmaceutical companies.  Defendants argue
that the state claims are preempted by ERISA under the Supremacy
Clause.  U.S. Const. art. VI.

ERISA is a comprehensive statutory scheme that governs
private employee benefit plans, including both pension and
welfare plans.  Section 514(a) of the statute, ERISA's general
preemption provision, states that ERISA "shall supersede any and
all state laws insofar as they . . . relate to any employee

- 33 -

benefit plan" covered by the statute, 29 U.S.C. § 1144(a),
although preemption stops short of "any law of any state which
regulates insurance." § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A).
"When state-law claims 'relate to' ERISA plans, those claims are
transmuted into ERISA claims." <u>Carpenters Local Union No. 26 v.
United States Fid. & Guar. Co.</u>, 215 F.3d 136, 139 (1st Cir. 2000)
(citing 29 U.S.C. §1144(a)).

A law relates to a covered employee benefit plan for
purposes of §514(a) "if it has a connection with or a reference
to such a plan." <u>Shaw v. Delta Air Lines, Inc.</u>, 463 U.S. 85, 97,
103 S.Ct. 2890, 2900 (1983); <u>Cal. Div. of Labor Standards
Enforcement v. Dillingham Constr. N.A., Inc.</u>, 519 U.S. 316, 324,
117 S.Ct. 832, 837 (1997). Preemption does not occur, however,
"if the state law has only a tenuous, remote, or peripheral
connection with covered plans, as is the case with many laws of
general applicability." <u>New York State Conf. of Blue Cross &
Blue Shield Plans v. Travelers Ins. Co.</u>, 514 U.S. 645, 661, 115
S.Ct. 1671, 1680 (1995) (citing <u>District of Columbia v. Greater
Washington Bd. of Trade</u>, 506 U.S. 125, 130 n. 1, 113 S.Ct. 580,
583 n. 1 (1992)). The "starting presumption" is "that Congress
does not intend to supplant state law." <u>Id.</u> at 654, 115 S.Ct. at
1676.

In <u>Carpenters</u>, the First Circuit analyzed the scope of ERISA
preemption under § 514(a) in the context of a suit brought by an

- 34 -

ERISA plan against a third party.  Holding that ERISA did not

preempt the trustees of an ERISA plan from bringing a claim

against a surety for payments owed the fund under a state statute

generally authorizing such suits, the Carpenters Court reasoned:

> ERISA preemption proscribes the type of
> alternative enforcement mechanism that
> purposes to provide a remedy for the
> violation of a right expressly guaranteed and
> exclusively enforced by the ERISA statute.
> Those state laws which touch upon enforcement
> but have no real bearing on the intricate web
> of relationships among the principal players
> in the ERISA scenario (e.g., the plan, the
> administrators, the fiduciaries, the
> beneficiaries, and the employer) are not
> subject to preemption on this basis. . . .
> The Massachusetts bond statute does not
> constitute a proscribed alternate enforcement
> mechanism.  By the same token, it has no
> other meaningful nexus with ERISA; it does
> not, for example, interfere with the
> administration of covered employee benefit
> plans, purport to regulate plan benefits, or
> impose additional reporting requirements.
> Last -- but far from least -- it regulates an
> area of the law traditionally thought to be
> the states' preserve: enforcing contracts
> under state law for the citizenry's
> protection.

215 F.3d at 141 (citations omitted).

Other circuits have also held that an ERISA plan may bring a

claim as plaintiff against a third party, where the cause of

action is based on statutory or common law of general

applicability.  See LeBlanc v. Cahill, 153 F.3d 134, 138 (4th

Cir. 1998) (holding that ERISA does not preempt "a state common

law cause of action for fraud, pressed by a pension plan subject

to ERISA, against a third party who is neither a fiduciary nor a
party in interest with respect to the plan . . . ."); <u>Airparts
Co., Inc. v. Custom Benefit Servs. of Austin</u>, 28 F.3d 1062, 1065
(10th Cir. 1994) (holding that ERISA plan trustees' common law
fraud claims against consultant to plan was not preempted: "[I]f
there is no effect on the relations among the principal ERISA
entities – the employer, the plan, the plan fiduciaries, and the
beneficiaries – there is no preemption. . . . [A]ctions that
affect the relations between one or more of these plan entities
and an outside party similarly escape preemption."); <u>Operating
Eng'rs Health and Welfare Trust Fund v. JWJ Contracting Co.</u>, 135
F.3d 671, 678-79 (9th Cir. 1998) (holding that ERISA plan
trustees are not preempted from bringing a claim under state
statute authorizing action against surety who failed to pay money
owed to plan); <u>Trs. for Michigan Laborers' Health Care Fund v.
Seaboard Sur. Co.</u>, 137 F.3d 427, 429 (6th Cir. 1998) (holding
that a claim brought by ERISA plan trustees' under state law
against employer's surety was not preempted); <u>Geller v. County
Line Auto Sales, Inc.</u>, 86 F.3d 18, 22-23 (2d Cir. 1996) (finding
no preemption for ERISA plan trustees' common law fraud claim
against employer, a non-fiduciary of the plan, who misreported a
non-employee as eligible for plan coverage); <u>Trs. of the AFTRA
Health Fund v. Biondi</u>, 303 F.3d 765, 781 (7th Cir. 2002) (holding
that ERISA plan trustees' common law fraud action against

- 36 -

participant who misrepresented marital status in order to maintain ex-wife's health coverage was not preempted).

The issue in the case at bar is whether a fraud claim, pressed by an ERISA plan against a third party pharmaceutical company under state consumer protection statutes involving payments the plan made to its pharmacy benefit manager, is preempted.  According to the complaint, health plans typically contract with PBMs so that the plan's participants can obtain brand name drugs from the PBMs.  In these contracts, the drugs are typically priced at the AWP less a percentage discount. Under the above case law, the plaintiffs' claim is not preempted. Plaintiffs here do not seek an alternative state-law mechanism for the enforcement of their rights with respect to the terms of their ERISA plans. Nor does this dispute require the Court to determine whether plan fiduciaries behaved fraudulently with respect to the plans.  The consumer protection statutes at issue here are laws of general application and do not single out ERISA plans by reference or for special treatment.

Defendants argue that the state law claims are preempted because the Court will have to evaluate and interpret the terms of the ERISA plans to determine defendant's liability under the state law claims, as well as the amount of damages.  Only by referring to these plans, they argue, can the Court determine whether reimbursement for prescription drugs for a particular

- 37 -

employer was based on AWP and the amount of reimbursement that was required.  A state law claim is preempted when "the Court's inquiry must be directed to the plan" to resolve the claim. Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 139-40, 111 S.Ct. 478, 485 (1990); Hampers v. W.R. Grace & Co., Inc., 202 F.3d 44, 52 (1st Cir. 2000) (holding that "a cause of action 'relates to' an ERISA plan when a court must evaluate or interpret the terms of the ERISA-regulated plan to determine liability under a state law cause of action.")

Plaintiffs argue that the Court need not evaluate or interpret the terms of the ERISA plans to determine liability, and that the Court need only interpret the terms of the contract between the plan and the PBM.  The complaint seeks damages for the spread between the drug price charged by the PBM and the fair AWP, and does not appear to be asking for amounts that can only be reimbursed by interpreting the plan documents.  While there may be some damage theories that are preempted (for example, whether the plans cover co-payments), the Court need not determine that issue at this early stage of the proceedings.

Because the consumer protection statutes do not have a sufficient "connection to" the employee benefit plans and do not refer to ERISA plans, there is no ERISA preemption.

## VI. MISCELLANEOUS

### A.   Filed Rate Doctrine

Two defendants argue that the complaint must be dismissed under the filed rate doctrine, which limits attacks outside the regulatory process on rates filed with federal regulatory agencies.  See Town of Norwood v. New England Power Co., 202 F.3d 408, 415 (1st Cir. 2000).  "It is the filing of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine."  Id. at 419 (emphasis in original); see also Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 417, 106 S.Ct. 1922, 1927 (1986) (upholding the "stringent rule" of the filed rate doctrine pertaining to rates that had not been vetted at a formal hearing because they had been "duly submitted" and "filed" under the terms of the Interstate Commerce Act); Fla. Mun. Power Agency v. Fla. Power & Light Co., 64 F.3d 614, 616 (11th Cir. 1995) (noting that the Supreme Court "has emphasized the limited scope of the filed rate doctrine to preclude damage claims only where there are validly filed rates.").

Pharmaceutical companies do not "file" their AWPs with any federal regulatory agency.  Rather, the pharmaceutical companies publish their wholesale pricing information in independent, publicly available trade publications that are used by the government and others to implement the statutorily defined

- 39 -

reimbursement rates.  The "filed rate" doctrine is thus
inapplicable here.

### B.  Government Action Doctrine

Borrowing from antitrust caselaw, two defendants argue that
plaintiffs' claims that they were injured must be dismissed under
the so-called "government action" doctrine.  Under that doctrine,
the courts have barred plaintiffs from collecting damages that
resulted from government action, such as legislation, that was
induced by the organized effort of defendants.  See Sandy River
Nursing Care v. Aetna Cas., 985 F.2d 1138, 1147 (1st Cir. 1993)
(holding that plaintiffs were barred from recovering damages that
resulted from legislation raising workers compensation insurance
rates, which plaintiffs claimed were passed in response to an
illegal economic boycott and price-fixing by defendants); see
also Eastern R.R. Presidents Conference v. Noerr Motor Freight
Inc., 365 U.S. 127, 145, 81 S.Ct. 523, 533 (1961) (holding that
trucking industry plaintiffs were barred from recovering damages
from railroad industry defendants who had orchestrated widespread
anti-trucking campaign resulting in anti-trucking legislation).

This doctrine is inapplicable to the case at bar because
plaintiffs do not claim that the harm they suffer stems from the
AWP system as Congress has established it, but rather from the

- 40 -

defendants' fraudulent statements about their average wholesale prices.

### C.  Standing

Several, but not all, of the individual defendant motions raise standing issues.  Defendants do not dispute that all of the individual named plaintiffs have standing because each plaintiff claims to have purchased at least one covered drug.  However, several pharmaceutical companies correctly argue that the individually named plaintiffs do not have standing to bring suit against them because no plaintiff claims to have purchased their drug.  See Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324 ("The requirement of standing . . . has a core component derived directly from the Constitution.  A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.").

Plaintiffs contend that a named plaintiff who has purchased one drug from one of the defendants can serve as a class representative, pursuant to Fed. R. Civ. P. 23, in a class of all persons who made purchases of covered drugs from any defendant, even those companies against which no named plaintiff claims to have made a purchase.  However, under long standing caselaw, "[a] named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have

afforded them standing had they been named plaintiffs . . . .
Standing cannot be acquired through the backdoor of a class
action." <u>Allee v. Medrano</u>, 416 U.S. 802, 828-29, 94 S.Ct. 2191,
2207 (1974); <u>see also</u> <u>O'Shea v. Littleton</u>, 414 U.S. 488, 494, 94
S.Ct. 669, 675 (1974) (same).

Some courts have carved out an exception to the standing
requirement in cases in which all defendants are juridically
related in a manner that suggests that a single resolution of the
dispute would be expeditious. <u>See</u> <u>La Mar v. H&B Novelty & Loan</u>
<u>Co.</u>, 489 F.2d 461, 466 (9th Cir. 1973) (discussing juridical
linkage doctrine). "Post-<u>La Mar</u> cases from other courts have
suggested that if all the defendants took part in a similar
scheme that was sustained either by a contract or conspiracy, or
was mandated by a uniform state rule, it is appropriate to join
as defendants even parties with whom the <u>named</u> class
representative did not have direct contact." <u>Payton v. County of</u>
<u>Kane</u>, 308 F.3d 673, 679 (7th Cir. 2002) (collecting cases); <u>cf.</u>
<u>Alves v. Harvard Pilgrim Health Care, Inc.</u>, 204 F.Supp.2d 198,
205 (holding that named plaintiff who had a claim against one
ERISA plan could represent class of plaintiffs against other
ERISA plans that he did not have a claim against, where the plans
were all administered by the same employer and the gravamen of
the challenge was to general practices of the employer that
affected the plans). "[A] common commercial practice," however,

is not enough to establish juridical linkage. La Mar, 489 F.2d at 470.

Defendants argue that in the present case there is no allegation of corporate, contractual, conspiratorial, or other legal connection to establish juridical linkage between all the defendants. I agree that the allegations in the complaint are insufficient to support a claim of standing under the doctrine of juridical linkage with respect to defendants from which no plaintiff has purchased a drug. Indeed, the primary thrust of plaintiffs' theory is that the companies competed with one another by offering inflated AWPs. The doctrine of juridical linkage is not indefinitely elastic so as to permit an industry-wide challenge on the basis of the conduct of select companies.

For present purposes, however, I decline defendants' invitation to determine whether a plaintiff who purchased one drug from a given company has standing to represent a class of others who purchased a different drug or drugs from the same company. Those allegations fit better into the juridical linkage claim, and the issue will be decided at a later stage in the litigation. See Ortiz v. Fibreboard Corp., 527 U.S. 815, 831, 119 S.Ct. 2295, 2307 (1999) ("[C]lass certification issues are . . . 'logically antecedent' to Article III concerns . . . . Thus the issue about Rule 23 certification should be treated first, 'mindful that [the Rule's] requirements must be interpreted in

keeping with Article III constraints . . . .") (citations
omitted).

Finally, defendants also assert that none of the association
plaintiffs has alleged sufficient facts to establish standing
under Article III.   See United States v. AVX Corp., 962 F.2d 108,
116 (1st Cir. 1992) (holding that an association must establish
that "at least one of [its] members possesses standing to sue in
his or her own right."); Guckenburger v. Boston Univ., 957 F.
Supp. 306, 320-21 (D. Mass. 1997) (same).   None of the
associations alleges specific members who purchased a specific
drug from a specific company.   Instead, the allegations in the
complaint and accompanying affidavits contain only bare bones
assertions and empirically non-verifiable conclusions unsupported
by specific facts concerning any injury-in-fact on the part of
one of its members.   See AVX Corp., 962 F.2d at 117 (holding that
association did not have standing to press suit on behalf of its
members where "the members are unidentified; their places of
abode are not stated; the extent and frequency of . . . [their
injury] is left open to surmise.   In short, the asserted injury
is not anchored in any relevant particulars.").   Thus, all the
associations are **DISMISSED** as party plaintiffs.

### D.   Fed. R. Civ. P. 8 and 9(b)

Defendants argue that the complaint fails to meet either the
heightened pleading standards for fraud set forth in Fed. R. Civ.

P. 9(b) or even the notice pleading standards of Fed. R. Civ. P.
8, because it makes fraud claims based on some Medicare covered
drugs, brand name drugs and generic multi-source drugs without
identifying the drug and specifying the fraudulent published AWP.

The Court **DENIES** defendants' motion to dismiss with respect
to any drug identified in the complaint together with the
allegedly fraudulent AWP published by a named defendant for that
drug.  However, to the extent the complaint seeks to encompass
all "brand name drugs" (¶¶ 166, 333), named drugs without a
specific fraudulent AWP, or generic multi-source drugs[11], the
motion to dismiss is **ALLOWED**.  In the event any such amendment is
filed, plaintiffs shall clearly and concisely allege with respect
to each defendant: (1) the specific drug or drugs that were
purchased from defendant, (2) the allegedly fraudulent AWP for
each drug, and (3) the name of the specific plaintiff(s) that
purchased the drug.

### E.   Fraudulent Concealment

Defendants argue that plaintiffs failed to allege fraudulent
concealment with specificity.  See J. Giels Band Empl. Ben. Plan
v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1255 (1st Cir.
1996) (holding that plaintiffs have the burden under Rule 9(b) to

---

[11]      In their sur-reply (Docket No. 33), plaintiffs provide
particular allegations with respect to generic multi-source
drugs.  However, these allegations are not in the complaint, and
as defendants point out, multiple source drugs do not fit the
paradigm described in the complaint.

plead with particularity the facts giving rise to fraudulent concealment).  As that issue only affects the amount of damages, I do not address it now.

### F.  Multi-Source/Generic Drugs

I allow the motion to dismiss all multi-source generic drugs from the complaint, because plaintiffs have not framed their claims to include such drugs.  However, it is unclear from the complaint and briefing which drugs are in fact multi-source or generic, and therefore which claims or defendants are affected by this ruling.  If plaintiffs wish to encompass a theory that captures multi-source generic drugs, they should move to amend.

### G.  Detritus

I decline to address the other arguments for dismissal either because they are without merit or because a ruling has been rendered unnecessary in light of the above conclusions of law.

### ORDER

For the foregoing reasons, I order as follows:

1.  The omnibus motion to dismiss is **ALLOWED** with respect to the RICO claims (Counts I, II, III, and IV), **DENIED** with respect to the claims for declaratory and other relief pursuant to 28 U.S.C. §§ 2201, 2002 (Counts VI and VII), and **DENIED** with respect to claims brought under the state consumer protection statutes (Count V).  The Court **ALLOWS** the motion to dismiss with respect

- 46 -

to any drugs that the complaint fails to identify both with respect to name of the drug and the allegedly fraudulent published AWP for the drug.  (Docket Nos. 215, 185, 188, 203, 205, 211.)

2.   The motions to strike certain paragraphs from the complaint (Docket No. 184) are **DENIED**.

3.   The motion for a more definite statement (Docket No. 185) is **DENIED**.

4.   I dismiss all associations as plaintiffs.

5.   I dismiss Abbott, Baxter, Boehringer, BMS, Braun, Smithkline, Immunex, Johnson & Johnson, Pharmacia, Schering-Plough, and Warrick with respect to the Class One claims only.

6.   I dismiss Amgen, Bayer, Hoffmann LaRoche, Merck, Pfizer, Sicor, and Johnson and Johnson with respect to both the Class One and Class Two claims.

7.   The dismissals are without prejudice to a motion to amend to cure any defects.

8.   The dismissals in this Order will go into effect in 30 days unless a motion to amend is filed.

9.   Discovery shall begin forthwith on the pending non-dismissed claims.

10.  A scheduling conference shall be held for all non-dismissed claims at 3 p.m. on June 18, 2003.

PATTI B. SARIS
United States District Judge