may not be limited to: acetylcysteine, acyclovir, amikacin sulfate, calcitriol, cimetidine hydrochloride, clindamycin phosphate, dextrose, dextrose sodium chloride, diazepam, furosemide, gentamicin sulfate, heparin lock flush, metholprednisolone sodium succinate, sodium chloride, tobramycin sulfate, vancomycin, and zemplar.

41.     Abbott is also sued herein in its capacity as a participant in the Together Rx conspiracy.

**2.     Amgen**

42.     Defendant Amgen Inc. ("Amgen") is a Delaware corporation with its principal place of business at One Amgen Drive, Thousand Oaks, California. Amgen is a biotechnology corporation that focuses its research and development efforts on drugs related to nephrology, cancer, inflammation, neurology and metabolism. In 2000, Amgen's revenues exceeded $3.6 billion.

43.     Amgen is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide. Pharmaceuticals that are manufactured by Amgen and covered by Medicare Part B include, but may not be limited to: Epogen® (epoetin alfa) and Neupogen® (filgrastim).

**3.     AstraZeneca**

44.     Defendant Zeneca, Inc. ("Zeneca") is a Delaware corporation with its principal place of business at Malvern, Pennsylvania. Zeneca is a wholly owned subsidiary of AstraZeneca, PLC, a limited liability company domiciled in the United Kingdom.

45.     Defendant AstraZeneca US is a Delaware corporation with its principal place of business at 1800 Concord Pike, Wilmington, Delaware.

46.     Defendant AstraZeneca Pharmaceuticals L.P. is a Delaware corporation, with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware. AstraZeneca

AMENDED MASTER CONSOLIDATED          - 14 -
CLASS ACTION COMPLAINT

Pharmaceuticals L.P. is owned and controlled by AstraZeneca PLC, a public limited liability company domiciled in the United Kingdom.

47.     AstraZeneca, PLC, Zeneca, Inc., AstraZeneca Pharmaceuticals L.P. and AstraZeneca U.S. are collectively referred to as "AstraZeneca."

48.     AstraZeneca maintains research and development and manufacturing facilities worldwide, including in the United States.  AstraZeneca reported annual sales of $16.5 billion in 2001, with an operating profit of $4.2 billion.

49.     AstraZeneca manufactures and markets several drugs covered by Medicare Part B including, but not limited to:  Zoladex® (goserilin acetate implant), Nolvadex® (tamoxifen citrate), Tomudex® (raltitrexed), and Diprivan® (propofol).

50.     AstraZeneca is also sued herein in its capacity as a participant in the Together Rx conspiracy.

**4.     The Aventis Group (Aventis, Pharma, Hoechst and Behring)**

51.     Defendant Aventis Pharmaceuticals, Inc. ("Pharma") is a Delaware corporation with its principal place of business located at 300-400 Somerset Corporate Blvd., Bridgewater, New Jersey.  Pharma is a wholly owned subsidiary of Aventis, S.A., a company domiciled in France.  Pharma is comprised of the U.S. commercial operations of predecessor companies Rhone-Poulenc Rorer, S.A. and Defendant Hoechst Marion Roussel, Inc. ("Hoechst").  Prior to its acquisition by Pharma, Hoechst was a Delaware corporation with its principal place of business located at 10236 Marion Park Drive, Kansas City, Missouri.

52.     Pharma's principal business activities are the discovery, development, manufacture and sale of prescription pharmaceuticals in the areas of cardiology, oncology, infectious diseases, arthritis, allergies and respiratory disorders, diabetes and central nervous system disorders.  Pharma reported U.S. net sales of approximately $5.8 billion in 2001.

53.     Defendant Aventis Behring L.L.C. ("Behring"), located at 1020 First Avenue, King of Prussia, Pennsylvania, formerly did business as Centeon L.L.C., a 50/50 joint venture between Hoechst and Rhone-Poulenc Rorer, S.A. When Centeon L.L.C.'s parent companies merged to create Aventis in 1996, Behring became its wholly-owned subsidiary.

54.     Behring is the plasma protein business of Pharma, producing a line of therapies including coagulation therapies for the treatment of hemophilia, wound healing agents used during major surgical procedures, inhibitor treatments that inhibit the formation of blood clots, immunoglobulins for the prevention and treatment of immune disorders, and plasma expanders for the treatment of a variety of conditions such as shock, burns and circulatory disorders. In 2000, Behring held assets estimated at $1.5 billion.

55.     The drugs manufactured by Pharma, Hoechst and Behring (collectively referred to as "The Aventis Group") and covered by Medicare Part B include, but may not be limited to: Anzemet® (dolasteron mesylate), Bioclate® (antihemo factor viii), Gammar® (immune globulin), Helixate® (antihemo factor viii), Humate-P® (antihemo factor viii), Mononine® (antihemo factor ix complex), Monoclate-P® (antihemo factor viii), and Taxotere® (docetaxel).

56.     Aventis is also sued in its capacity as a participant in the Together Card Rx conspiracy.

**5.     Baxter**

57.     Defendant Baxter International Inc. ("Baxter") is a Delaware corporation with its principal place of business at One Baxter Parkway, Deerfield, Illinois. Baxter manufactures and distributes prescription drugs to clinical administrators. Baxter's annual sales from January 1, 2000 through December 31, 2000 were over $6.8 billion.

58.     Defendant Baxter Healthcare Corporation is the principal domestic operating subsidiary of Baxter International. Baxter International and Baxter Healthcare Corporation are collectively referred to as "Baxter."

59.     Baxter is a global medical products company that, *inter alia*, develops, manufactures, markets and/or distributes drugs to treat cancer, trauma, hemophilia, immune deficiencies, infectious diseases, kidney disease and other disorders. Baxter reported a year 2000 sales of $6.9 billion.

60.     The drugs developed, manufactured, marketed, sold and/or distributed by Baxter that are covered by Medicare Part B include, but may not be not limited to: albumin, Bebulin® (factor ix complex), Buminat® (human albumin), dextrose, dextrose sodium chloride, Gammagard® (immune globulin), Iveegam® (immune globulin), Holoxan® (ifosfanide), Uromitexan® (mesna), Endoxan® (cyclophosphamide), Hemofil M® (antihemo factor viii), Proplex T® (factor ix complex), Recombinate® (antihemo factor viii), cisplatin, sodium chloride, and diazepam.

**6.     Bayer**

61.     Defendant Bayer Corporation ("Bayer") is an Indiana corporation with its principal place of business located at 100 Bayer Road, Pittsburgh, Pennsylvania. Bayer is a wholly owned United States subsidiary of a German corporation, Bayer AG. Bayer's pharmaceutical division is located at 400 Morgan Lane, West Haven, Connecticut.

62.     Bayer is a highly diversified health care company whose principal business includes the development, manufacture, marketing, sale and/or distribution of healthcare products and services, including pharmaceuticals. Bayer reported sales in the United States of $10.1 billion in 2001 and $8.9 billion in 1999.

63.     Bayer is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide. The pharmaceutical drugs manufactured by Bayer and covered by Medicare Part B include, but may not be limited to: Kogenate® (antihemo factor viii), FS/Kogenate® (antihemo factor viii), and Koate-DVI®

(antihemo factor viii) and Gamimune® (immune globulin), all used to treat hemophilia, and Gamimune® which is used in the treatment of immunodeficiency and autoimmune disorders.

### 7. The Boehringer Group (Boehringer, Ben Venue, Bedford)

64. Defendant Boehringer Ingelheim Corp. ("Boehringer") is a Nevada corporation with its principal place of business located at 900 Ridgefield Road, Ridgefield, Connecticut. Boehringer is a United States subsidiary of Pharma Investment Ltd., of Burlington, Canada, which in turn is a division of C.H. Boehringer Sohn Gurdstucksverwaltung GmbH & Co. KG of Ingelheim, Germany. Boehringer designs, manufactures and markets pharmaceuticals. Boehringer is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

65. Defendant Ben Venue Laboratories Inc. ("Ben Venue") is a Delaware corporation with its principal place of business located at 300 Northfield Road, Bedford, Ohio. Ben Venue is a wholly owned subsidiary of Defendant Boehringer. Ben Venue is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

66. Defendant Bedford Laboratories ("Bedford") is a division of Ben Venue with its principal place of business located at 300 Northfield Road, Bedford, Ohio. Bedford manufactures and markets injectable pharmaceuticals. Bedford is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide. (Boehringer, Ben Venue, and Bedford are collectively referred to herein as the "Boehringer Group.")

67. The pharmaceuticals manufactured by the Boehringer Group and covered by Medicare Part B include, but may not be limited to injectable forms of: acyclovir, bleomycin, cisplatin, cyclosporine, cytarabine, doxorubicin hydrochloride, doxorubicin hydrochloride,

AMENDED MASTER CONSOLIDATED     - 18 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

doxycycline, etoposide, leucovorin calcium, leucovorin calcium, methotrexate, mitomycin, paclitaxel, pamidronate disodium, and vinblastine sulfate.

### 8.    Braun

68.    Defendant B. Braun of America, Inc. is a Pennsylvania corporation with its principal place of business located at 824 Twelfth Avenue, Bethlehem, Pennsylvania. B. Braun of America is a wholly-owned subsidiary of B. Braun Melsunger Aktiengesellschaft.

69.    In 1997, B. Braun of America acquired McGaw, Inc. ("McGaw"), a Delaware corporation with a principal place of business in Irvine, California. B. Braun McGaw ("Braun"), which produces pharmaceutical products, is a wholly-owned subsidiary of B. Braun of America, Inc. Upon information and belief, McGaw ceased to maintain a separate corporate entity upon the acquisition of McGaw by B. Braun of America. Until its acquisition by B. Braun of America, McGaw was in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide. (B. Braun of America, McGaw and B. Braun McGaw are collectively referred to herein as "Braun.") Braun designs, manufactures and markets medical devices and certain intravenous solutions. Braun is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

70.    The pharmaceuticals manufactured by Braun and covered by Medicare Part B include, but may not be limited to intravenous solutions of dextrose, dextrose sodium chloride, and sodium chloride.

### 9.    The BMS Group (Oncology Therapeutics; Apothecon)

71.    Defendant Bristol-Myers Squibb Co. ("Bristol-Myers") is a Delaware corporation with its principal place of business located at 345 Park Avenue, New York, New York. Bristol-Myers is a multi-national health care company specializing in the manufacturing, marketing and

sale of pharmaceuticals and medical devices. For the year 2000, Bristol-Meyers reported revenues of approximately $20 billion and net earnings of $4.7 billion.

72. Defendant Oncology Therapeutics Network Corp. ("OTN") is a Delaware corporation with its principal place of business located at 395 Oyster Point Boulevard, Suite 405, South San Francisco, California. OTN has been a wholly-owned subsidiary of Bristol-Myers since its acquisition in 1996. Prior to 1996, OTN was an independent company. In 2001, OTN reported revenues of over $1.4 billion.

73. OTN is a healthcare services and distribution firm that directly sells Bristol-Myers' infusion oncology drugs and related products to approximately 2,300 office-based oncology practices in the United States. At the time of its acquisition by Bristol-Myers, OTN was the leading distributor of chemotherapeutic drugs and related products for the treatment of cancer. Bristol-Myers paid OTN a commission for marketing and selling its drugs. Both prior to and after Bristol-Myers acquired OTN, Bristol-Myers marketed and sold its drugs directly to medical providers across the country, and thus Bristol-Myers and OTN employed and maintained extensive marketing and sales departments.

74. Defendant Apothecon, Inc. ("Apothecon") is a Delaware corporation with its principal place of business located in Princeton, New Jersey. It is a subsidiary of Bristol-Myers specializing in small to mid-size niche brand and generic products.

75. Bristol-Myers, OTN and Apothecon are collectively referred to herein as the "BMS Group."

76. The BMS Group manufactures and distributes prescription drugs that are clinically distributed by Medicare Plan B providers nationwide. The drugs manufactured by the BMS Group and covered by Medicare Part B include, but may not be not limited to: Blenoxane® (bleomycin sulfate), Paraplatin® (carboplatin), Cytoxan® (cyclophospamide),

Rubex® (doxorubicin hydrochloride), Etopophos® (etoposide), Vepesid® (etoposide), TaxolV (paclitaxel), and Fungizone® (amphotericin B).

77. Bristol-Myers is also sued herein in its capacity as a participant in the Together Rx conspiracy.

78. The BMS Group engages in an organization-wide and deliberate scheme to inflate AWPs. The BMS Group has stated fraudulent AWPs for all or almost all of its drugs including Amikacin Sulfate, Amphotercin B, Bleomycin Sulfate, Cyclophospamide, Vespid (Etoposide), Carboplatin (Paraplatin), Taxol (paclitaxel), and Blenoxane. The specific drugs of the BMS Group for which relief is sought in this case are set forth in Appendix A.

**10. Dey, Inc.**

79. Defendant Dey, Inc. ("Dey") is a Delaware corporation with its principal place of business at 2751 Napa Valley Corporate Drive, Napa, California. Dey is a unit of Merck KGaA, a German pharmaceutical conglomerate.

80. Dey is a specialty pharmaceutical company that primarily develops, manufactures and markets generic drugs used in the treatment of selected respiratory diseases and allergies. Dey, one of the largest U.S. manufacturers of such pharmaceuticals, had net sales of $266 million in 1998.

81. The drugs manufactured by Dey and covered by Medicare Part B include, but may not be not limited to: albuterol sulfate, acetylcysteine, cromolyn sodium, ipratropium bromide, and metproterenol sulfate.

82. Defendant Dey, Inc. f/k/a Dey Laboratories, Inc. ("Dey") is a corporation organized under the laws of Delaware with its principal offices in Napa, California.

83. Dey is a specialty pharmaceutical company focusing on drug products for respiratory diseased and related allergies. The products it manufactures and publishes AWPs on include: Ipratropium, Bromide; Metapeoterenol Sulfate, and Accuneb.

## 11.    The Fujisawa Group (Fujisawa Healthcare, Fujisawa USA)

84.    Defendant Fujisawa Healthcare, Inc. ("Fujisawa Healthcare") is a Delaware corporation with its principal place of business located at Three Parkway North, Deerfield, Illinois, 60015. Fujisawa Healthcare is a wholly-owned subsidiary of Fujisawa Pharmaceutical Co. Ltd., a Japanese corporation. Fujisawa Healthcare focuses its efforts in the therapeutic areas of immuno-suppression and transplantation, cardiovascular care, skin care, oncology, and antifungal and anti-infective treatment.

85.    Defendant Fujisawa USA, Inc. ("Fujisawa USA") is a Delaware corporation with its principal place of business located at Three Parkway North, Deerfield, Illinois. Fujisawa USA was a wholly-owned subsidiary of Fujisawa Pharmaceutical Co. Ltd. In 1998, Fujisawa Healthcare assumed responsibility for Fujisawa USA's portfolio of proprietary products

86.    The drugs manufactured by Fujisawa Healthcare and Fujisawa USA (collectively referred to as "The Fujisawa Group") and covered by Medicare Part B include, but may not be limited to: Acyclovir Sodium, Dexamethasone Sodium Phosphate, Doxorubicin Hydrochloride, Fluorouracil, Gentamicin Sulfate, Pentamidine Isethionate, and Vancomycin Hydrochloride.

## 12.    The GSK Group (GlaxoSmithKline, SmithKline Beecham, Glaxo Wellcome)

87.    Defendant GlaxoSmithKline, P.L.C. ("GlaxoSmithKline") is a public limited company incorporated under the laws of England and Wales, with its corporate headquarters located at 980 Great West Road, Brentford, Middlesex, United Kingdom TW8 9GS. GlaxoSmithKline was created through the December 27, 2000, merger of GlaxoWellcome, P.L.C. and SmithKline Beecham, P.L.C. GlaxoSmithKline's operational headquarters are located at One Franklin Plaza, 16th and Race Streets, Philadelphia, Pennsylvania.

88.    Defendant SmithKline Beecham Corporation ("SKB"), a wholly-owned U.S. subsidiary of the former SmithKline Beecham P.L.C., is a Pennsylvania corporation with its principal place of business at One Franklin Plaza, 16th and Race Streets, Philadelphia, Pennsylvania.

89.     Defendant GlaxoWellcome, Inc. ("Glaxo"), a wholly-owned subsidiary of GlaxoSmithKline, is a North Carolina corporation with its principal place of business at 5 Moore Drive, P.O. Box 13398, Research Triangle Park, North Carolina.  Cerenex Pharmaceuticals ("Cerenex"), a division of Glaxo prior to the merger, was responsible for Glaxo's central nervous system drugs, including Zofran.

90.     Defendants GlaxoSmithKline, SKB and Glaxo are referred to collectively as the "GSK Group."

91.     The GSK Group is a diversified pharmaceutical company which controls an estimated 7 percent of the world's pharmaceutical market.  In 2001, the GSK Group reported pharmaceutical sales of $24.8 billion.

92.     The drugs manufactured by the GSK Group and covered by Medicare Part B include, but may not be limited to:  Hycamtin® (topotecan hydrochloride), Ventolin® (albuterol) and Zofran® (ondansetron hydrochloride).  Pierre Fabré Médicament licenses another Medicare Part B drug, Navelbine® (vinorelbine tartrate), to the GSK Group.  SmithKline Beecham P.L.C. manufactured and sold Kytril® (granisteron hydrochloride), another drug covered by Medicare Part B (and a competitor to Zofran®), prior to the merger.  To secure regulatory approval for the merger, SmithKline Beecham P.L.C. sold Kytril®'s global rights to the Roche Group in December of 2000.

93.     GSK is also sued herein as a member of the Together Rx conspiracy.

**13.    Hoffman-LaRoche, Inc.**

94.     Defendant Hoffman-LaRoche, Inc. ("Roche") is a New Jersey corporation with its principal place of business at 340 Kingsland Street, Nutley, New Jersey.  Roche is a research-based company that develops, manufacturers and markets numerous prescription and non-prescription drugs.

95.     Roche is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.  Pharmaceuticals that are manufactured by Roche and covered by Medicare Part B include, but may not be limited to: Cellcept® (mycophenolate mofetil), Cytovene® (ganciclovir), Demadex® (torsemide), Kytril® (granisetron HCL), Rolcatrol® (calcitriol), Rocephin® (ceftriaxone), Roferon-A® (Interferon 2-alfa), Toradol® (ketorolac tromethamine), Valium® (diazepam), Versed® (midazolam), Xeloda® (capecitabine), Zenapx® (daclizumab), Rituxan® (rituximab), Herceptin® (trastuzumab), and Xeloda® (capecitabine).

96.     In addition to manufacturing and marketing drugs that are reimbursed by Medicare Plan B, Roche also manufactures and distributes other named brand drugs for which it publishes, or causes to be published, an AWP in various industry compendia.

**14.     Immunex**

97.     Defendant Immunex Corporation ("Immunex"), a wholly owned subsidiary of Defendant Amgen, Inc., is a Washington corporation with its principal place of business at 51 University Street, Seattle, Washington.  Immunex is a company that develops products for the treatment of cancer, asthma, rheumatoid arthritis, inflammatory diseases, infectious diseases, and cardiovascular diseases.  In 1999, its total revenues were $542 million.

98.     Immunex is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.  Pharmaceutical drugs that are manufactured by Immunex and covered by Medicare Part B include, but may not be limited to:  Leucovorin Calcium, Enbrel® (etanercept), Novantrone® (mitoxane hydrochloride), Leukine® (sargramostim), and Thioplex®(thiotepa).

99.     Defendant Immunex has been a wholly owned subsidiary of Defendant Amgen, since Immunex' acquisition in July 2002.

15.     **The Johnson & Johnson Group (J&J, Centocor, Janssen, McNeil, Ortho)**

100.     Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey. In 2001, pharmaceutical sales represented 45% of J&J's worldwide sales and 19% of its operational growth. J&J is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

101.     Defendant Centocor, Inc. ("Centocor") is a Pennsylvania corporation and has been a wholly owned subsidiary of Defendant J&J since its acquisition by J&J in October 1999. Centocor's principal place of business is located at 200 Great Valley Parkway, Malvern, Pennsylvania. Centocor manufactures, markets and distributes prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

102.     Defendant Janssen Pharmaceutica Products, L.P. ("Janssen") is a New Jersey limited partnership with a principal place of business located at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560. Janssen is a subsidiary of Johnson & Johnson. Janssen is sued for its role in the Together Rx conspiracy.

103.     Defendant McNeil-PPC, Inc., is a New Jersey corporation. McNeil-PPC, Inc. is a subsidiary of Johnson & Johnson. McNeil Consumer & Specialty Pharmaceuticals is a division of McNeil-PPC, Inc. and has a principal place of business located at 7050 Camp Hill Road, Fort Washington, Pennsylvania 19034. McNeil-PPC is sued for its role in the Together Rx conspiracy.

104.     Defendant Ortho Biotech ("Ortho") is New Jersey corporation and has been a wholly owned subsidiary of Defendant J&J since its formation by J&J in 1990. Ortho's principal place of business is located at 700 U.S. Highway 202, Raritan, New Jersey. Ortho manufactures and distributes prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

AMENDED MASTER CONSOLIDATED          - 25 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

105.    The drugs manufactured by J&J, Centocor, Ortho, McNeil-PPC and Janssen (collectively referred to as "J&J Group") and covered by Medicare Part B include, but may not be limited to: ReoPro® (abciximab), an anti-blood clotting medication, Retavase® (reteplase), an anti blood clotting agent, Procrit® (epoetin alfa), for the treatment of anemia, Leustatin® (cladribine), for the treatment of leukemia, Orthoclone® (muromonab-CD3), used to prevent organ transplant rejection, Sporanox® (itraconazole), used in the treatment of fungal infections, and Remicade® (infliximab), an anti-inflammatory drug.

106.    J&J, Ortho, McNeil and Janssen are also sued herein as members of the Together Rx conspiracy.

**16.     Novartis**

107.    Defendant Novartis Pharmaceuticals Corporation ("Novartis") is a New Jersey corporation with its principal place of business at One Health Plaza, East Hanover, New Jersey. Novartis, a U.S. affiliate of Swiss-based Novartis AG, has core businesses in pharmaceuticals, consumer health, generics, eye care and animal health.  Novartis AG reported a net income of $4.2 billion on sales of $19.1 billion in 2001.

108.    The drugs manufactured by Novartis and distributed through the Together Rx Card Program include, but may not be limited to:  Clozaril, CombiPatch, Comtan, Diovan, Diovan HCT, Elidel, Estraderm, Exelon, Famvir, Femara, Focalin, Lamisil, Lescol/Lescol XL, Lotensin, Lotensin HCT, Miacalcin Injection & Nasal Spray, Parlodel, Rescula, Ritalin Hydrochloride, Ritalin LA, Starlix, Tegretol, Tegretol-XR, Trileptal, Vivelle/Vivelle-Dot, Voltaren Opthalmic, Zaditor, and Zelnorm.

**17.     Pfizer, Inc.**

109.    Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, New York.  Pfizer is one of the largest

pharmaceutical companies in the United States, whether measured by number of prescriptions written, revenues, or market capitalization.

110. Pfizer is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide. Pharmaceuticals that are manufactured by the Pfizer Group and covered by Medicare Part B include, but may not be limited to: Cerebyx® (fosphenytoin sodium injection), Dilatin® (phenytoin), Diflucan® (fluconazole), Zithromax® (azithromycin), Trovan® (trovafloxacin mesylate), and Unasyn® (ampicillin sodium/sulbactam sodium).

111. In addition to manufacturing and marketing drugs that are reimbursed by Medicare Plan B, the Pfizer Group also manufactures and distributes other named brand drugs for which it publishes, or causes to be published, an AWP in various industry compendia.

**18.    The Pharmacia Group (Pharmacia and Pharmacia & Upjohn)**

112. Defendant Pharmacia Corporation ("Pharmacia") is a Delaware corporation with its principal place of business located at 100 Route 206, North Peapack, New Jersey. Pharmacia was created through the merger of Defendant Pharmacia and Upjohn, Inc. and Monsanto Company on March 31, 2000.

113. Defendant Pharmacia & Upjohn, Inc. ("P&U") is a subsidiary of Pharmacia Corp. In 1995, P&U was formed through the merger of Pharmacia AB and The Upjohn Company. P&U became a global provider of human healthcare products, animal health products, diagnostics and specialty products. In 1998, Pharmacia & Upjohn relocated its global headquarters from the United Kingdom to New Jersey. In September 1999, the company established its global headquarters on a 70-acre campus in Peapack, New Jersey. This site is now the management and pharmaceutical headquarters for Pharmacia.

114. Pharmacia is a highly diversified health care company whose business focuses on the discovery, development, manufacture and sale of a broad and diversified line of health care

AMENDED MASTER CONSOLIDATED          - 27 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

products and services, including pharmaceuticals, diagnostics and hospital products.
Pharmacia's Prescription Pharmaceuticals business segment is involved in researching,
developing, registering, manufacturing and selling prescription pharmaceutical products,
including general therapeutics, ophthalmology, and hospital products, which include oncology
products and diversified therapeutics.  Pharmacia reported sales of $18.1 billion for the fiscal
year ended December 31, 2000.  Pharmacia also reported $12.0 billion in prescription
pharmaceuticals sales for the year 2001, and $10.8 billion in prescription pharmaceuticals sales
for the year 2000.  Prescription pharmaceuticals sales account for over 85 percent of Pharmacia's
overall pharmaceutical sales.  According to its Annual Report, Pharmacia's oncology drugs
generated more than $1 billion in sales in 2001.

     115.    The drugs manufactured by Pharmacia and P&U (collectively referred to as "The
Pharmacia Group") and covered by Medicare Part B include, but may not be limited to:
Adriamycin PFS® (doxorubicin hydrochloride), Adrucil® (fluorouracil), Amphocin®
(amphotericin), Aromasin® (bleomycin), Camptosar® (irinotecan hydrochloride), Cleocin
Phosphate® (clindamycin phosphate), Neosar ® (cyclophosphamide), Cytosar-U (cytarabine),
Depo-Testosterone® (testosterone cypionate), Adriamycin PFS® (doxorubicin HCL), Ellence®
(epirubicin HCL), Toposar® (etoposide), Adrucil® (fluorouracil),  Solu-Cortef®
(hydrocortisone sodium succinate), Idamycin® (idarubicin hydrochloride), Medrol®
(methylprednisolone), and Vincasar® (vincristine sulfate).

     **19.    The Schering-Plough Group (Schering Plough & Warrick)**

     116.    Defendant Schering-Plough Corporation ("Schering-Plough") is a New Jersey
corporation with its principal place of business located at 2000 Galloping Hill Road, Kenilworth,
New Jersey.

     117.    Schering-Plough's primary business involves prescription products in core
product categories, including allergy and respiratory, anti-infective and anticancer,

AMENDED MASTER CONSOLIDATED      - 28 -
CLASS ACTION COMPLAINT

cardiovasculars, dermatologicals and central nervous systems and other disorders.  Schering-Plough's revenues in 2001 totaled $9.8 billion.

118.   Defendant Warrick Pharmaceuticals Corporation ("Warrick"), is a Delaware corporation with its principal place of business at 12125 Moya Boulevard, Reno, Nevada. Warrick is a wholly-owned subsidiary of Defendant Schering-Plough and has been since its formation in 1993.  Warrick manufactures generic pharmaceuticals.

119.   The drugs manufactured by Schering-Plough and Warrick (collectively at times referred to as "The Schering-Plough Group") and covered by Medicare Part B include, but may not be limited to:  Proventil® (albuterol sulfate), Integrelin® (eptifibatide), Intron A® (interferon alfa-2b recombinant), and Temodar® (temozolomide).  The Schering-Plough Group's Albuterol sulfate sales alone totaled $154 million in 2000.

### 20.   The Sicor Group (Sicor and Gensia)

120.   Defendant Sicor, Inc. ("Sicor") is a Delaware corporation with its principal place of business located at 19 Hughes, Irvine, California.  Sicor was the result of the 1997 merger between Defendant Gensia, Inc. ("Gensia"), a finished dosage manufacturer, and Rakepoll Holding, a Europe-based supplier of active pharmaceutical ingredients.

121.   Sicor markets itself as a vertically-integrated specialty pharmaceutical company with expertise in the development, manufacturing and marketing of injectable pharmaceutical products, primarily used worldwide by hospitals.  Sicor's finished dosage products manufacturing operations account for 32% of its total revenue, and is comprised of a portfolio of products that includes oncology, anesthesiology, and critical care.  Sicor's 2001 revenues totaled nearly $370 million.  According to its website, Sicor operates its business through several subsidiaries.

122.   Defendant Gensia Sicor Pharmaceuticals, Inc. ("Gensia Sicor"), a Delaware corporation, is a wholly-owned subsidiary of Sicor with its principal place of business located at

17 Hughes, Irvine, California.  Gensia Sicor focuses on acute-care multisource products in the fields of oncology, cardiology, and anesthesiology.  Gensia Sicor's injectable drug business includes more than 60 products.

123.    In 1999, Gensia Sicor entered into a sales distribution agreement with Abbott Laboratories under which the two companies formed a strategic alliance for the marketing and distribution of oncology products in the U.S.  The agreement was restructured in March 2002.  In 1999, Gensia Sicor also amended an earlier agreement with Baxter Pharmaceutical Products, Inc. Notably, Abbott (6%) and Baxter (34%) accounted for nearly 40% of Sicor's total product sales in 2001.

124.    The drugs manufactured by Sicor, Gensia, and Gensia Sicor (collectively referred to as "The Sicor Group") and covered by Medicare Part B include, but may not be not limited to: amikacin sulfate and tobramycin sulfate.

### 21.    TAP

125.    Defendant TAP Pharmaceutical Products, Inc. ("TAP") is a corporation that arose in 1977 from a partnership between Takeda Chemical Industries, Ltd. and Defendant Abbott, under which each company owns 50 percent of TAP's stock.  Abbott and Takeda jointly control TAP's operations and rotate control of TAP's presidency.

126.    Prior to April 2000, TAP was known as TAP Holdings, Inc.  TAP, together with its subsidiary, TAP Pharmaceuticals, Inc., develops and markets pharmaceutical products for the United States and Canada.  TAP's headquarters is located in Waukegan, Illinois.

127.    The pharmaceuticals manufactured by TAP include Lupron and Prevacid.

128.    TAP is also sued herein for its role in the Together Rx Card Program.

### 22.    Watson

129.    Defendant Watson Pharmaceuticals, Inc. ("Watson") is a Delaware corporation with its principal place of business at 311 Bonnie Circle, Corona, California.  Watson develops,

AMENDED MASTER CONSOLIDATED          - 30 -
CLASS ACTION COMPLAINT

manufactures and markets brand and generic pharmaceuticals.  Watson is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

130.   The pharmaceuticals manufactured by Watson and covered by Medicare Part B include, but may not be limited to:  albuterol sulfate, dexamethasone acetate, diazepam, gentamicin sulfate, iron dextran, testosterone enanthate, vancomycin hydrochloride, and cytarabine.

**23.   Together Rx**

131.   Defendant Together Rx LLC is a Delaware limited liability company, formed and controlled by its founding partners:  Abbott; AstraZeneca; Aventis; Bristol; GSK, Janssen; Novartis; and Ortho-McNeil, and later TAP.

## IV.   GENERAL ALLEGATIONS APPLICABLE TO ALL DEFENDANTS

132.   The allegations contained herein apply generally to all Defendants.

**A.   The AWP System**

133.   There are approximately 65,000 different drug products in the United States market, including different dosages of the same drug.  Prescription drugs are dispensed to patients by or through different types of medical providers, including but not limited to: (a) physicians who administer the drug in an office, (b) retail pharmacies, (c) home infusion pharmacies, and (d) other medical providers.

134.   Providers regularly submit claims for reimbursement, seeking payment for the drugs from Medicare, insurers and patients.  During the Class Period, the Defendants were aware that the Medicare program and virtually all end payors (the latter are included as members of the Class) use published AWPs to reimburse providers for drugs.  Use of the published AWPs to establish reimbursement rates for drugs is an industry-wide practice and exists with respect to all classes of drugs, brand name and generic and is used for Part B drugs and non-Part B drugs.

AMENDED MASTER CONSOLIDATED                - 31 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

135.     There are several pharmaceutical industry compendia that periodically publish, in printed and electronic media, the AWPs for the tens of thousands of drugs on the market, including the *Drug Topics Red Book* (the "*Red Book*"), *American Druggist First Databank Annual Director of Pharmaceuticals* and *Essential Director of Pharmaceuticals* (the "*Blue Book*") and Medi-Span's *Master Drug Database* (collectively referred to herein as the "Publishers"). These Publishers publish AWPs for the various dosage forms for drugs. And the AWPs are published for Part B, non-Part B, brand name and generic drugs.

136.     In periodically announcing the AWP for each drug, during the time period relevant to this Complaint the Publishers publish the prices that are supplied to them by the Defendant Drug Manufacturers for their respective drugs. For instance, the forward to the 1999 edition of the *Red Book* states that "all pricing information is supplied and verified by the products' manufacturers, and it should be noted that no independent review of those prices for accuracy is conducted." In addition, a June 1996 Dow Jones news article reported that Phil Southerd, an associate product manager of the *Red Book*, stated that it only publishes prices that are faxed directly from the manufacturer. Thus, the Defendant Drug Manufacturers control the prices listed as the AWPs for each drug listed by the Publisher.

137.     A system that bases its reimbursement rates for drugs on the published AWP is thus dependent on the honesty of the drug manufacturers. The Defendant Drug Manufacturers knew they could directly control and fabricate the AWP for their drugs at any time by forwarding to the Publishers a phony AWP. The Defendant Drug Manufacturers also knew that actual transaction price data – the amounts charged to providers and others for their drugs – was not publicly available, and they kept this information (on which AWPs should have been calculated) highly confidential and secret.

138.     As detailed, the AWPs for the drugs at issue here bore little relationship to the drugs' pricing in the marketplace. They were simply fabricated and overstated in furtherance of

AMENDED MASTER CONSOLIDATED          - 32 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

Defendants' scheme to generate the profit spread to providers, PBMs and others and to increase Defendants' profits at the expense of Plaintiffs and the Class members.

139.    Plaintiffs and the members of the Class paid for the drugs based on the inflated AWPs reported by the Defendant Drug Manufacturers.

140.    The Defendant Drug Manufacturers' pattern of fraudulent conduct in artificially inflating the AWPs for their drugs (sometimes referred to herein as the "AWP Scheme") directly caused Plaintiffs and the members of the Class to substantially overpay for those drugs.

141.    As detailed below, this overpayment manifested itself in two contexts, both of which were well known and understood by the Defendant Drug Manufacturers: (i) all drugs administered under Medicare Part B and (ii) drugs administered outside of the Medicare context whose reimbursement was established by use of AWP as a benchmark.

**B.      The Defendant Drug Manufacturers Commit AWP Fraud to Increase Market Share For Their Drugs Covered by Medicare Part B**

      **1.      The Medicare Insurance Program**

142.    In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care.

143.    The United States Department of Health & Human Services ("HHS") is responsible for the funding, administration and supervision of the Medicare Program. The Centers for Medicare and Medicaid Services ("CMMS"), formerly known as the Health Care Financing Administration ("HCFA"), is a division of HHS and is directly responsible for the administration of the Medicare Program.

144.    The Medicare Program generally does not cover the cost of prescription drugs that a Medicare beneficiary self administers (*e.g.*, by swallowing the drug in liquid or pill form). However, Medicare Part B does cover some drugs, including injectables administered directly by a doctor, certain oral anti-cancer drugs, and drugs furnished under a durable medical equipment benefit. Approximately 450 drugs are covered by Medicare Part B.

AMENDED MASTER CONSOLIDATED                    - 33 -
CLASS ACTION COMPLAINT

145.    In determining the amount it will pay, Medicare calculates the "allowed" amount for the drug.  During the period 1992 through 1997, Medicare's reimbursement for Covered Drugs was set at the lesser of the estimated acquisition cost or national average wholesale price. For generic drugs (where more than one company sells a certain drug, sometimes called multiple-source drugs), payment was based on the lower of the estimated acquisition cost or the wholesale price that was defined as the median price for all sources of the generic form of the drug.  This payment methodology was set forth in 42 C.F.R. § 405.517, a regulation first published in the Federal Register on November 25, 1991 and which became effective on or about January 1, 1992.

146.    The estimated acquisition cost for a drug could be determined by the Medicare Program "based on surveys of the actual invoice prices paid for the drug" taking into consideration the estimated acquisition cost, including "factors such as inventory, waste and spoilage."  However, historically it has been the AWP published in the *Red Book* or other compendia that has been used as a ceiling for Medicare reimbursement.

147.    On January 1, 1998, 42 C.F.R. § 405.517 was amended to provide that the allowed amount would be based upon the lower of the billed charge on the Medicare claim form or 95 percent of AWP.

148.    The Medicare Program has publicly announced that it would use the AWP published in pharmaceutical industry magazines as the basis for reimbursement.  Specifically, Program Memorandum AB-99-63 (dated September 1999 but re-issuing PM AB-98-76 dated in December 1998), a publicly available Medicare Program bulletin, confirmed that reimbursement for certain Medicare Part B drugs and biologicals "are paid based on the lower of the billed charge or 95 percent of the AWP as reflected in sources such as the *Red Book, Blue Book,* or Medi-Span."

AMENDED MASTER CONSOLIDATED                    - 34 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

benefit offered on purchases of multiple products should be fairly apportioned among the products (and could potentially raise anti-kickback issues).  Underlying assumptions used in connection with reported prices should be reasoned, consistent, and appropriately documented, and pharmaceutical manufacturers should retain all relevant records reflecting reported prices and efforts to comply with federal health care program requirements.

154.   And, the OIG rejected the notion that purposeful AWP manipulation was a lawful

practice:

The "spread" is the difference between the amount a customer pays for a product and the amount the customer receives upon resale of the product to the patient or other payer.  In many situations under the federal programs, pharmaceutical manufacturers control not only the amount at which they sell a product to their customers, but also the amount those customers who purchase the product for their own accounts and thereafter bill the federal health care programs will be reimbursed.  To the extent that a manufacturer controls the "spread," it controls its customer's profit.

Average Wholesale Price (AWP) is the benchmark often used to set reimbursement for prescription drugs under the Medicare Part B program.  For covered drugs and biologicals, Medicare Part B generally reimburses at "95 percent of average wholesale price." 42 U.S.C. 1395u(o).  Similarly many state Medicaid programs and other payers base reimbursement for drugs and biologicals on AWP.  Generally, AWP or pricing information used by commercial price reporting services to determine AWP is reported by pharmaceutical manufacturers.

If a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated.  Unlike *bona fide* discounts, which transfer remuneration from a seller to a buyer, manipulation of the AWP transfers remuneration to a seller's immediate customer from a subsequent purchaser (the federal or state government).  Under the anti-kickback statute, offering remuneration to a purchaser or referral source is improper if one purpose is to induce the purchase or referral of program business.  In other words, it is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the "spread" to induce customers to purchase its product.

In the light of this risk, we recommend that manufacturers review their AWP reporting practices and methodology to confirm that marketing considerations do not influence the process.  Furthermore, manufacturers should review their marketing practices.  *The conjunction of manipulation of the AWP to*

AMENDED MASTER CONSOLIDATED                    - 36 -
CLASS ACTION COMPLAINT

> *induce customers to purchase a product with active marketing of*
> *the spread is strong evidence of the unlawful intent necessary to*
> *trigger the anti-kickback statute.* Active marketing of the spread
> includes, for example, sales representatives promoting the spread
> as a reason to purchase the product or guaranteeing a certain profit
> or spread in exchange for the purchase of a product. [Emphasis
> added.]

### 2.   Congressional and Other Federal Investigations and Actions

155.   The United States Department of Justice ("DOJ"), the United States General

Accounting Office ("GAO"), the Office of the Inspector General at the United States Department

of HHS ("OIG"), and certain Congressional subcommittees have been investigating the

Defendant Drug Manufacturers and other pharmaceutical manufacturers for questionable

practices regarding the industry's calculation of AWPs and for offering illegal incentives to

providers.

156.   In a letter dated September 28, 2000, sent from the House of Representatives

Committee on Ways and Means, Subcommittee on Health to the President of the trade

organization known as the Pharmaceutical Research and Manufacturers of America (most of the

Defendant Drug Manufacturers are members of this association), Congressman Stark identified

the improper scheme of manipulating AWPs and noted:

> This corruptive scheme is perverting financial integrity of the
> Medicare program and harming beneficiaries who are required to
> pay 20% of Medicare's current limited drug benefit.

157.   In his September 28 letter, Congressman Stark made the following five "shocking

conclusions":

> First – Certain drug manufacturers have abused their position of
> privilege in the United States by reporting falsely inflated drug
> prices in order to create a de facto improper kickback for their
> customers.
>
> Second – Certain drug manufacturers have routinely acted with
> impunity in arranging improper financial inducements for their
> physicians and other healthcare provider customers.
>
> Third – Certain drug manufacturers engage in the fraudulent price
> manipulation for the express purpose of causing federally funded

AMENDED MASTER CONSOLIDATED                    - 37 -
CLASS ACTION COMPLAINT

health care programs to expend scarce tax dollars in order to arrange de facto kickbacks for the drug manufacturers' customers at a cost of billions of dollars.

Fourth – Certain drug manufacturers arrange kickbacks to improperly influence physicians' medical decisions and judgments notwithstanding the severely destructive effect upon the physician/patient relationship and the exercise of independent medical judgment.

Fifth – Certain drug manufacturers engage in illegal price manipulation in order to increase utilization of their drugs beyond that which is necessary and appropriate based on the exercise of independent medical judgment not affected by improper financial incentives.

158.    The DOJ and Congressional investigations are ongoing.

### 3.    Certain of the Defendants Drug Manufacturers' Fraudulent Conduct Within the Medicare Part B Program

159.    As set forth below, certain of the Defendants Drug Manufacturers each perpetrated the alleged fraudulent scheme by using some and/or all of the following practices:

#### a.    Artificially Inflating AWPs

160.    Each Defendant Drug Manufacturer provided AWPs for each of its drugs to the *Red Book*, the *Blue Book*, Medi-Span and other pharmaceutical compendia for Covered Drugs and non-Part B drugs, both brand name and generic.

161.    During the Class Period, the Defendant Drug Manufacturers deliberately and intentionally published AWPs for Covered Drugs that did not reflect the actual pricing structure of the drugs, but was created solely to cause Plaintiffs and the Class members to overpay for the Covered Drugs. The Defendant Drug Manufacturers created and perpetuated this scheme so that the medical providers who purchased these drugs at a low cost would bill patients and their insurers at the inflated AWPs and earn a substantial profit from the "spread" between the real cost and the various AWP-related reimbursement rates.

162.    The Defendant Drug Manufacturers knew and understood that Medicare and Plaintiffs and the Class members used the *Red Book* and other publications to determine the

AMENDED MASTER CONSOLIDATED                 - 38 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

AWPs of the drugs. Because the Defendant Drug Manufacturers controlled the AWPs published in the *Red Book* and other compendia, the Defendant Drug Manufacturers knew and understood that they could manipulate the providers' profits from Plaintiffs and the Class. The purpose of artificially inflating the providers' profits was to create an illegal kickback to the providers, funded by Plaintiffs' and the Class members' overpayments.

163.    As part of their scheme, the Defendant Drug Manufacturers specifically instructed and expected the providers to charge the inflated AWPs for Covered Drugs to Medicare, Plaintiffs and the Class members.

### b.    Improper Use of Free Samples

164.    The Defendant Drug Manufacturers, through their sales personnel and marketing representatives, also provided free samples of their drugs to providers as a means of lowering the price. The free samples were used to offset the total cost associated with the purchases of the drugs, thereby increasing the "spread." Moreover, the Defendant Drug Manufacturers specifically told providers to bill Plaintiffs and the members of the Class for the free samples, which Defendants knew was unlawful.

165.    Every free sample of a drug for which a provider bills a patient or insurer effectively reduces that provider's overall cost for that drug. However, the full cost of the Covered Drug was charged to the Plaintiffs and the Class members, and the free sample is not used by the drug company in calculating the AWP, which in turn inflates the AWP.

166.    Although the Defendant Drug Manufacturers provided free samples and marketed them as a way to lower the providers' actual cost of the Covered Drugs, they did not include the value of the free samples in calculating the AWPs for those drugs. Thus, the Defendant Drug Manufacturers effectively and improperly passed on the cost of the free samples directly to Plaintiffs and the members of the Class.

AMENDED MASTER CONSOLIDATED          - 39 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC