c.     **Other Hidden and Improper Inducements and Price Reductions**

167.    The Defendant Drug Manufacturers also have provided and/or arranged for many other non-public financial inducements to stimulate sales of their Covered Drugs at the expense of Plaintiffs and the members of the Class. Such inducements included volume discounts, rebates, off-invoice pricing, free goods, credit memos, consulting fees, debt forgiveness and educational and promotional grants. All of these incentives were designed to lower the providers' net cost of purchasing the Defendant Drug Manufacturers' Covered Drugs. And again, the value of these services was kept "off the book," so as to not be reflected in the AWP, which in turn inflates the AWP.

**C.    The Defendant Drug Manufacturers' Use of AWP Fraud to Increase and Maintain the Price of Drugs Outside of the Medicare Part B Context**

168.    The Defendant Drug Manufacturers' AWP fraud strikes well beyond Medicare Part B, adversely impacting health plans and their participants with respect to reimbursements for scores of other drugs. As described below, one such area is the use of AWPs by PBMs.

169.    Health plans typically contract with intermediaries called pharmacy benefit managers ("PBMs") so that a health plan's participants can obtain brand name drugs from pharmacies or, via mail order, directly from the PBMs. In these contracts, the brand name drugs are priced at the AWP less a certain percentage "discount."

170.    Pharmacy benefit managers – or "PBMs" – are fiscal intermediaries that specialize in the administration and management of prescription benefit programs. PBM clients include HMOs, employers, preferred provider organizations and other health insurers. Collectively, four PBMs comprise the significant market share of the PBM market. They are: AdvancePCS; Caremark; Express Scripts; and Medco Health. These four companies handle the drug benefits of 210 million people in the United States, or 70 percent of the nation's population.

171.    For brand name drugs, PBMs use inflated "Average Wholesale Price" – or "AWP" – set by drug manufacturers as the basis for reimbursement (i) made by health plans to

AMENDED MASTER CONSOLIDATED      – 40 –
CLASS ACTION COMPLAINT

the PBMs for their members' drug purchases; and (ii) from the PBMs to the pharmacies for the purchases made by health plans' members. The PBMs typically contract with retail pharmacies to reimburse an amount equal to each drug's AWP, less a specified discount, plus a dispensing fee. Because the PBMs consider the contracting relationship with retail pharmacies to be confidential, health plans are never informed of the reimbursement amount to pharmacies. However, the PBM frequently pockets a "spread" or differential between charges paid to pharmacies and collected from clients. So, for example, clients may be charged the AWP minus 13 percent, but the retail pharmacy may only receive the AWP minus 15 percent, generating an undisclosed 2 percent spread for the PBM. Furthermore, as the example presented demonstrates, PBMs are motivated to, and do place on their formulary those drugs with inflated AWPs: the greater the AWP inflation, the greater the profit to the PBM based on the 2 percent spread. A similar situation occurs for generic drug pricing based on Maximum Acquisition Cost ("MAC") lists, as the PBM uses one MAC list to charge clients and another MAC list to reimburse pharmacies. Further, with respect to mail order prescriptions, PBMs do business with companies that have the right to repackage drugs; they are called repackagers. These repackagers assign a new NDC number to a drug and publish a higher AWP. The PBM then negotiates with the repackager a discount off the AWP and tells the health plan it has saved a certain percentage off the AWP. But because the repackager's AWP is higher, the health plan pays more and the PBM pockets the spread between the AWP and the price paid to the repackager. PBMs also have mail order services in which case they act as the pharmacy. In this situation, the PBM keeps the spread between the AWP and the list price as there is no intermediary, like a pharmacy dispensing the drug. The PBMs keep this spread knowing that the AWPs are inflated and not the true AWP.

172.    The Defendant Drug Manufacturers knew and understood that the PBM Defendants used the *Red Book* and other publications to determine the AWPs of the drugs.

AMENDED MASTER CONSOLIDATED          - 41 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

Because the drug manufacturers controlled the AWPs published in the *Red Book* and other compendia, the drug manufacturers knew and understood that they could help manipulate the PBMs' profits from Plaintiffs and the classes. The purpose of artificially inflating the PBMs' profits was to create an illegal kickback to the PBMs, funded by health plan and subscriber overpayments.

173.     PBMs use the inflated AWPs set by drug manufacturers as the basis for the payments (i) made by health plans to the PBMs for their members' drug purchases, and (ii) from the PBMs to the pharmacies for the purchases made by health plans' members.

174.     The PBMs typically contract with retail pharmacies to reimburse in an amount equal to each drug's AWP, less a specified discount, plus a dispensing fee. Because the PBMs consider the contracting relationship with retail pharmacies to be confidential, health plans are never informed of the reimbursement amount to pharmacies.

175.     However, the PBMs frequently pockets a secret "spread" or differential between charges paid to pharmacies and collected from clients. So, for example, clients may be charged the AWP minus 13 percent, but the retail pharmacy may only receive the AWP minus 15 percent, generating an undisclosed 2 percent spread for the PBMs.

176.     Furthermore, as the example presented demonstrates, PBMs are motivated to place on their formulary those drugs with inflated AWPs: the greater the AWP inflation, the greater the profit to the PBM based on the 2 percent spread.

177.     A similar situation occurs for generic drug pricing based on MAC lists, as the PBM uses one MAC list to charge clients and another MAC list to reimburse pharmacies.

178.     The PBMs deliberately utilize the inflated AWP to overcharge health plans for brand name drugs purchased by their participants and beneficiaries at retail pharmacies. An example of this practice was recently reported in the WALL STREET JOURNAL on March 30, 2003. According to the JOURNAL article, the AWP for fluoxetine is $2.66 a pill. With a 60 percent

AMENDED MASTER CONSOLIDATED                    - 42 -
CLASS ACTION COMPLAINT

discount off the AWP, that brings the price to $1.06 a pill the PBM collects from the plan. Express Scripts pays the pharmacy 25 cents a pill and keeps the rest as profit. Express Scripts claims that currently its client pays 60 cents a pill, but since Express Scripts pays a pharmacy 25 cents per pill, it receives almost a 100 percent profit. And at the same time it was making this profit, Express Scripts was notifying its clients it was saving them money by having switched to fluoxetine, instead of Prozac.

**D.     The Defendant Drug Manufacturers' Use of AWP Fraud to Increase and Maintain Volume and Market Share For Generic and Multi-Source Drugs**

179.    The Defendant Drug Manufacturers' AWP fraud is most exacerbated for generic drugs or for brand name drugs for which there are biological or therapeutic equivalents.

180.    Health plans and other sponsors of drug benefits contract with PBMs both so that the plan's participants can obtain *brand name* drugs from pharmacies or mail order distribution, but also so that they might receive *multi-source*, or *generic, drugs*. As with brand name drugs, reimbursement for multi-source, or generic, drugs is also related to a published average wholesale price for each generic drug manufactured and/or distributed by a generic drug company.

181.    In the private payor arena, generic drug reimbursement is determined either in the same manner for brand name drugs (*i.e.*, a certain percentage "discount" off of the AWP), or is based on the amount specified as the maximum allowable cost or "MAC." MAC prices or reimbursements rates are a schedule of pricing for generically equivalent drugs based upon the listed average wholesale prices (AWPs) of competing generic drug manufacturers. The federal government originally introduced the concept of MAC reimbursement for generic medications. The CMS issues a MAC price list for generic products that have three or more manufacturers or distributors on the market. Because of this limitation, not all generics have a corresponding CMS MAC price.

AMENDED MASTER CONSOLIDATED                    - 43 -
CLASS ACTION COMPLAINT

182.    PBMs often utilize this government-issued MAC reimbursement publication as a basis for their proprietary MAC list and supplement the list with other generic products or modify it for a variety of purposes.  Sometimes, to stabilize the cost variance of different generic products of the same compound, pharmacy benefit administrators calculate a maximum allowable cost based on the list average wholesale prices of competing generic drug manufacturers (indeed, this is termed in the industry as the average average wholesale price or "AAWP").  The resulting proprietary MAC generic drug reimbursement lists are typically based on the AAWP and, in turn, the AWP.

183.    Accordingly, in the private payor arena generic drug reimbursement is closely tied to the published AWP for a generic drug.  Generic drug makers are able to push market share for their generic drugs by intentionally increasing the published AWP for a generic drug with the intention to create a profit margin for others in the distribution chain.  That profit margin is taken advantage of either directly (through reimbursement based upon the AWP for some plans and in some channels) or indirectly on the AWP based upon the establishment of a MAC tied to the AWP.

184.    In the public payor arena under Medicare Part B, multi-source drugs or biologicals are also reimbursed on the basis of AWP.  For multi-source drugs or biologicals, under Medicare Part B the AWP is equal to the lessor of the median AWP of all of the generic forms of the drug or biological, or the lowest brand name product AWP.  Because reimbursement is pegged to the AWP, drug makers act in unison by elevating the AWP for all generic drugs, thereby inflating the amount of the reimbursement that occurs through Medicare Part B, including the Medicare co-payment through Part B.

185.    As stated by one industry consultant:

> . . . This situation is more pronounced with generic drugs.  Many generic companies have taken advantage of this use of AWP by substantially inflating their published AWPs.. . . [T]he system allows a retailer to acquire a drug at a low cost $2.50 per 100

tablets, for example) while relying on a published AWP ($20.00 or more) for its own pricing.  It is not uncommon that the $25.00 retail price for a generic drug renders a gross profit well above $20.00 for the retailer.  It is also common for the AWP of a generic product to remain stable while the actual selling price declines. . . .It is obvious that AWP is not an accurate measure of the prices manufactures charge.  It must also be noted that not all generic products will be priced similarly.  Some, in fact, use the more traditional method of a 20% markup to reach an AWP.  This can be a handicap for generic companies choosing this method because retailers often use the AWP as the starting point for many pricing decisions and an artificially high AWP provides the retailer with greater profits.

186.    The raising of an individual Defendant's reported AWP for a multi-source drug raises the median AWP at which the generic drug is reimbursed.  As a result, the publication and reporting of fraudulent AWPs by Defendants for generic drugs squarely fits generic drugs in which the cure of unlawful AWP inflation within the activity complained of in the MCC. Moreover, while any one generic manufacturer can only effect the median generic reimbursement AWP for a product, Defendants can and do create a spread between the median AWP and the actual prices paid by reporting AWPs that are far in excess of the actual wholesale prices while simultaneously maintaining or lowering actual wholesale prices.

187.    Documents produced by Defendant generic manufacturers show that they are aware of the AWPs reported by their competitors and of the actual sales price of their generic competitors and that they manipulate their own AWPs in order to gain or maintain a competitive advantage in the market for their generic products.  Each Defendant generic maker or distributor competes by inflating its AWP and thereby inflating the median AWP.  The natural and expected result of this "leap frogging" of increasing AWPs is that multi-source drugs have some of the highest spreads of any drugs, sometimes resulting in an AWP over 50,000% over actual costs.  A few examples are set forth below:

| Defendant | Multisource Drug | RedBook AWP | DOJ Determined Actual AWP | Percentage Spread |
|-----------|------------------|-------------|---------------------------|-------------------|
| Abbott | Sodium Chloride | $670.89 | $3.22 | 20,735% |

AMENDED MASTER CONSOLIDATED                          - 45 -
CLASS ACTION COMPLAINT

| Defendant | Multisource Drug | RedBook AWP | DOJ Determined Actual AWP | Percentage Spread |
|---|---|---|---|---|
| Baxter | Dextrose | $928.51 | $2.25 | 41,167% |
| Baxter | Sodium Chloride | $928.51 | $1.71 | 54,199% |
| Boehringer Group | Leucovorin Calcium | $184.40 | $2.76 | 6,581% |
| B. Braun | Sodium Chloride | $11.33 | $1.49 | 660% |
| BMS Group | Etoposide (Vepesid) | $136.49 | $34.30 | 298% |
| Dey | Albuterol Sulfate | $30.25 | $9.17 | 230% |
| Immunex | Leucovorin Calcium | $137.94 | $14.58 | 846% |
| Pharmacia | Etoposide | $157.65 | $9.47 | 1,565% |
| Sicor Group | Tobramycin Sulfate | $342.19 | $6.98 | 4,802% |
| Watson | Vancomycin HCL | $70.00 | $3.84 | 1,567% |

188.    In summary, generic or multi-source drugs are subject to fraudulent AWP manipulation as set forth in this Amended MCC.

189.    The importance of AWPs to generic drugs was recently revealed in a lawsuit filed by Dey and two of the Publishers.  In this lawsuit, Dey's allegations can be summarized as follows:

(a)    Dey is a generic manufacturer, and generic manufacturers largely compete on price because they market products that contain the same active ingredients and are predominantly therapeutically interchangeable.  (¶ 9 of Dey Complaint.)

(b)    A large segment of the generic marketplace for respiratory drugs is comprised of a relatively small number of entities controlling purchase decisions.  (¶ 12 of Dey Complaint.)

(c)    The vast majority of prescription drug transactions – as much as 85% – are covered, in whole or in part, by third-party payor reimbursement arrangements such as managed care plans and Medicaid.  (¶ 13 of Dey Complaint.)  Both Medicaid and the private insurance system rely on reimbursement formulas that utilize the AWP.  (¶¶ 14-16 of Dey Complaint.)

*This allegation confirms Plaintiffs' allegations in this Complaint that the AWP fraud impacts private markets, not just Medicaid.*

(d)     Dey has an agreement with First DataBank and Medi-Span to provide the reporting services with AWP pricing information.  Pursuant to this agreement (and in order to make Dey's products eligible for reimbursement through Medicaid Programs), Dey has reported WACs and AWPs.  (¶¶ 26-32 of Dey Complaint.)

> In each case, until the events that have resulted in the present crisis, First DataBank has (except for some inadvertent errors) selected for listing in its published reports the AWP as suggested by Dey.  For over ten years, until April 2003, no prices other than those submitted by Dey have been listed by First DataBank as AWP for Dey products in its databases [even though Dey also reported declining WACs for the products]."

(¶ 32 of Dey Complaint; *see also* ¶ 36 of Dey Complaint for similar allegation against Medi-Span.)  This has also been the course of dealings between the Publishers and Dey's competitors:

> Virtually every drug manufacturer who participates in these reimbursement programs, and against whom Dey competes also communicates their suggested AWP prices to the reporting services.  To the best of Dey's knowledge, with few, if any exceptions, First DataBank and Medi-Span have selected and reported the AWP pricing exactly as suggested by these competing manufacturers.

(¶ 37 of Dey Complaint.)  *See also* ¶ 47 of Dey Complaint (recounting testimony of First DataBank representative who admits that First DataBank had always accepted the AWPs suggested by the manufacturers).

(e)     Providers who dispense generic drugs "are cognizant of, and are highly attentive to, AWPs as reported by the recognized industry compendia published by First DataBank and Medi-Span because of the direct relationship between the level of reimbursement anticipated for the drugs selected and the reported AWPs of those drugs." (¶ 38 of Dey Complaint.)  Indeed, Dey admits that it has relied on the publishers' practice of treating all manufacturers equally by simply reporting whatever AWP a manufacturer submitted.

AMENDED MASTER CONSOLIDATED          - 47 -
CLASS ACTION COMPLAINT

Consequently, First DataBank and Medi-Span have frustrated Dey's "reasonable expectations"

by *independently reporting* an AWP different than that submitted by Dey. (¶ 39 of Dey

Complaint.) These allegations become even more emphatic in a section of the Complaint titled

"The Immediate Consequences of the Arbitrary Changes:"

> Since reimbursement to Dey's customers is, in Medicaid program
> in many states and in and [sic] insurance programs, most
> frequently based on the AWP as reported by the reporting services,
> this arbitrary and capricious reduction by First DataBank and
> Medi-Span in AWP would result in a drastic reduction in the
> reimbursement to drug providers who choose to dispense Dey's
> product. Since there has not been a comparable reduction in the
> AWP for Dey's competitors, there would be no comparable
> reduction in the reimbursement the purchasers of competitive
> products receive.

> Because reimbursement for Dey products would be significantly
> reduced, but reimbursement for those competing products would
> remain as they have been, Dey is prevented, by First DataBank's
> and Medi-Span's arbitrary and capricious acts, from effectively
> competing in the marketplace.

> In fact, within one day of learning that First DataBank and Medi-
> Span had arbitrarily changed Dey's AWP, Dey has already been
> contacted by at least nine of its customers complaining about the
> drastic changes and indicating that, because of those changes, the
> customers would not be able to purchase Dey products since they
> could not earn a reasonable profit from the sale of such products.

> Further, at least one customer has already indicated that he had
> canceled all of his purchases presently on order from Dey and was,
> instead, buying those products from Dey's direct competitors.

> ..... These providers will cease to purchase and dispense Dey's
> drugs if the reimbursement for those drugs is a fraction of those
> obtained from competing companies. Because purchasing
> decisions are highly concentrated in this industry among
> wholesalers and group purchasing organizations, this scenario is
> playing out across the country and threatens to eliminate sales of
> Dey's products that are covered by Medicaid and insurance
> reimbursement programs.

(¶¶ 50-54 of Dey Complaint.)

190.    *These allegations confirm the allegations herein that medical providers rely on*

*spreads in dispensing (and, consequently, so do the manufacturers in order to move market*

AMENDED MASTER CONSOLIDATED                    - 48 -
CLASS ACTION COMPLAINT

*share).* Further, these allegations are akin to saying: "We all committed fraud on an even basis, but now only my competitors can commit fraud; consequently, I have now suffered damage."

### E.   Defendants' Concealment of the Truth

191.   Each Defendant concealed its fraudulent conduct from the Plaintiffs and the Class by controlling the process by which the AWPs for Covered Drugs and brand name drugs were set. Defendants prevented Plaintiffs and the Class Members from knowing what the actual pricing structures for these drugs were, and failed to inform them of the usage of free samples and the provision of other financial incentives to providers and other intermediaries to lower their respective costs for the drugs. Moreover, Defendants' fraudulent conduct was of such a nature as to be self-concealing.

192.   Each Defendant closely guarded its pricing structures and sales figures for their Covered Drugs and brand name drugs. CMS Health Care Industry Market Update (dated January 10, 2003) stated that drug "price discounts are closely guarded as competitive information." *See* p. 39.

193.   Each Defendant also concealed its fraudulent conduct by instructing providers and others not to report the prices they paid for the Covered Drugs and brand name drugs, respectively.

194.   Each Defendant also worked with and motivated provider and intermediary trade associations to halt any investigations or change in the AWP system.

195.   Each Defendant's efforts to conceal its pricing structures for Covered Drugs and brand name drugs is evidence that it knew that its conduct was fraudulent.

196.   Thus, each Defendant concealed that (i) its AWPs were highly-inflated (and were inflated solely to cause Plaintiffs and the Class to overpay for the AWPIDs), (ii) it was manipulating the AWPs of the AWPIDs, and (iii) the AWPs bore no relationship to the prices paid for, or the pricing structure of, the AWPIDs as they were sold to providers and others.

AMENDED MASTER CONSOLIDATED                    - 49 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

197.    Plaintiffs were diligent in pursuing an investigation of the claims asserted in this
Complaint. Through no fault of their own, they did not receive inquiry notice nor learn of the
factual basis for their claims in this Complaint and the injuries suffered therefrom until recently.

**F.      Tolling of Applicable Statutes of Limitation**

198.    Any applicable statutes of limitations have been tolled by Defendants' knowing
and active concealment and denial of the facts alleged herein. Plaintiffs and members of the
Class have been kept in ignorance of vital information essential to knowledge of and the pursuit
of these claims, without any fault or lack of diligence on their part. Plaintiffs and members of
the Class could not reasonably have discovered the fraudulent nature of the published AWPs.

199.    Defendants were and continue to be under a continuing duty to disclose to
Plaintiffs and the Class the fact that the published AWPs bore and continue to bear no
relationship to the prices or pricing structures for Covered Drugs and brand name drugs.
Because of their knowing, affirmative, and/or active concealment of the fraudulent nature of the
published AWPs, Defendants are estopped from relying on any statutes of limitations.

## V.      EXAMPLES OF SPECIFIC UNLAWFUL CONDUCT

200.    Due to acts of concealment by each Defendant, the following examples of the
specific unlawful conduct engaged in by each particular Defendant are merely illustrative. They
are not intended to be an exhaustive account of all of the unlawful activity engaged in by each
Defendant. Instead, these allegations allege the circumstances of the wrongdoing with some
detail. Additional detail is peculiarly within the Defendants' control and warrants that further
discovery should proceed as to each drug identified in this Complaint as well as other drugs
whose AWP is published by any Defendant.

**A.      Abbott**

201.    Abbott engages in an organization-wide and deliberate scheme to inflate AWPs.
Abbott has stated fraudulent AWPs for all or almost all of its drugs, including those set forth

below.  The specific drugs of Abbott for which relief is currently sought in this case are set forth

in Appendix A, and are identified below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| ABBOTT | A-Methapred | methylprednisolone sodium succinate | Anti-Inflammatory Agent<br>Used to provide relief for inflamed areas of the body.  Also used for control of allergic processes |
| | Aminosyn | amino acid | Nitrogen Product<br>Used as a nutritional supplement |
| | Biaxin | clarithromycin | Macrolide (Anti-Infective Agent)<br>Used to treat mild to moderate infections |
| | Calcijex | calcitrol | Hormone<br>Used in the treatment of hypocalcemia |
| | Depakote | divalproex sodium | Anticonvulsant<br>Used in the treatment of complex partial seizures |
| | Ery-tab | erythromycin, enteric-coated | Antibiotic Agent (Anti-Infective Agent)<br>Used in the treatment of various infections |
| | Erythromycin | erythromycin base | Antiacne Agent; Anti-Infective Agent<br>Used in the treatment of various infections |
| | Liposyn II | fat emulsion | Caloric Agent; Nutritional Supplement<br>Used as a nutritional supplement |
| | Prevacid | lansoprazole | Proton Pump Inhibitor (Gastrointestinal Agent)<br>Used in the treatment of duodenal ulcer and erosive esophagitis |
| | | acetylcysteine | Mucolytic (Respiratory Agent: Diagnostic Aid)<br>Used for certain lung conditions when increased amounts of mucus make breathing difficult |
| | | acyclovir sodium | Anti-Infective Agent<br>Used in the treatment of herpes infections |
| | | amikacin sulfate | Antibiotic Agent (Anti-Infective Agent)<br>Used to treat respiratory tract, urinary tract, bone, skin and soft tissue infections |
| | | cimetidine hydrochloride | Gastrointestinal Agent<br>Used in the treatment of duodenal ulcer and prevention of ulcer recurrence |
| | | clindamycin phosphate | Anti-Infective Agent<br>Used in the treatment of vaginal infections |
| | | dextrose | Caloric Agent<br>Used to increase intake of calories and fluids |

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT

- 51 -

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | | dextrose sodium chloride | Caloric Agent; Electrolyte Replenisher<br>Used to increase intake of calories and fluids |
| | | diazepam | Central Nervous System Agent<br>Used to treat status epilepticus and anxiety disorders. Also used as an amnesic prior to surgical procedures |
| | | fentanyl citrate | Central Nervous System Agent<br>Used for anesthetic purposes |
| | | furosemide | Diuretic<br>Used in the treatment of edema associated with cirrhosis and kidney disease. Also used to manage hypertension |
| | | gentamicin sulfate | Anti-Infective Agent<br>Used as a general antibiotic to treat serious gastrointestinal, respiratory, bone, skin and soft tissue infections |
| | | heparin sodium or heparin lock flush | Blood Modifier<br>Used to prevent and treat thrombosis and pulmonary embolism. Also used as an anticoagulant in blood transfusions and dialysis procedures |
| | | leucovorin calcium | Antianemic Agent (Blood Modifier)<br>Used in the treatment of anemia |
| | | lorazepam | Central Nervous System Agent<br>Used in the treatment of anxiety disorders |
| | | sodium chloride | Flush; Abortifacient<br>Used to remove medicine and blockage from intravenous (IV) catheter. Also used to induce abortion |
| | | tobramycin sulfate | Antibiotic Agent (Anti-Infective Agent)<br>Used to treat severe infection |
| | | vancomycin hydrochloride | Antibiotic Agent (Anti-Infective Agent)<br>Used as a general antibiotic |

### 1.   Abbott Has Been The Target of Government Investigations

202.   In connection with its scheme to inflate AWPs, Abbott has been investigated by the United States Department of Justice, Commonwealth of Massachusetts, the Office of Inspector General of the Department of Health and Human Services, the Attorney General for the State of Texas, the Attorney General for the State of California, and the State of California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse.

AMENDED MASTER CONSOLIDATED   – 52 –
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

203.    These investigations confirm that Abbott has engaged in a deliberate scheme to inflate the published AWPs for many of its drugs. According to Representative Pete Stark, the ranking member of the Congressional Ways and Means Committee:

> The price manipulation scheme is executed through Abbott's inflated representations of average wholesale price ("AWP") and direct price ("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers. The difference between the inflated representations of AWP and DP versus the true price providers are paying, is regularly referred to . . . as "the spread." The evidence . . . clearly shows that Abbott has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs. The evidence further reveals that Abbott manipulated prices for the express purpose of expanding sales and increasing market share of certain drugs. This was achieved by arranging financial benefits or inducements that influenced the decisions of health care providers submitting Medicare and Medicaid claims.

*See* October 31, 2000 letter from U.S. Representative Pete Stark to Miles White, Chief Executive Officer of Abbott. (P007647-78.)

**2.    Abbott Controls the Published AWP for Its Products**

204.    Abbott has controlled and set the AWPs for its pharmaceutical products through direct communications with industry compendia during the Class Period.

**3.**

205.                                    **REDACTED**

a.

                                    **REDACTED**

REDACTED

REDACTED

b.      **REDACTED**

206.

**REDACTED**

207.

REDACTED

**4.     Specific Abbott AWPs Documented by the DOJ**

208.    In a report published by the DHHS (the "DHHS Report"; PM Rev. AB-00-86,

"An Additional Source of Average Wholesale Price Data In Pricing Drugs and Biologicals

Covered by the Medicare Program," Sept. 8, 2000), the DOJ documented at least 81 instances

where the published AWPs for various dosages of 16 drugs manufactured by Abbott were

AMENDED MASTER CONSOLIDATED          - 54 -
CLASS ACTION COMPLAINT

substantially higher than the actual prices listed by wholesalers. The chart below sets forth the 16 drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by Abbott in the 2001 *Red Book.*

| Drug | Abbott's 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|------|------------------------------|---------------------------|------------|-------------------|
| Acetylcysteine | $35.87 | $21.90 | $13.97 | 64% |
| Acyclovir | $1047.38 | $349.05 | $698.33 | 200% |
| Amikacin Sulfate | $995.84 | $125.00 | $870.84 | 697% |
| Calcitriol (Calcijex) | $1,390.66 | $1079.00 | $311.66 | 29% |
| Cimetidine Hydrochloride | $214.34 | $35.00 | $179.34 | 512% |
| Clindamycin Phosphate | $340.52 | $75.35 | $265.17 | 352% |
| Dextrose | $239.97 | $3.91 | $236.06 | 6,037% |
| Dextrose Sodium Chloride | $304.38 | $1.93 | $302.45 | 15,671% |
| Diazepam | $28.50 | $2.03 | $26.47 | 1,304% |
| Furosemide | $74.52 | $14.38 | $60.14 | 418% |
| Gentamicin Sulfate | $64.42 | $.51 | $63.91 | 12,531% |
| Heparin Lock Flush | $38.30 | $13.60 | $24.70 | 182% |
| Metholprednisolone Sodium Succinate | $34.08 | $2.30 | $31.78 | 1,382% |
| Sodium Chloride | $670.89 | $3.22 | $667.67 | 20,735% |
| Tobramycin Sulfate | $150.52 | $2.94 | $147.58 | 5,020% |
| Vancomycin Hydrochloride | $382.14 | $4.98 | $377.16 | 7,574% |

(P006299-316.)

5.    **Additional Evidence Concerning Vancomycin**

209.    At least one Publisher, Medi-Span, challenged the manner in which Abbott set its AWPs for vancomycin. The following statement appeared in a February 9, 1996 faxed letter to Abbott from a representative of Medi-Span:

> It appears that the only difference between these two products listed is the vial it comes in. If it is, please let us know why the $400 plus difference in AWPs?... [T]his customer claims he can get Vancomycin for $6 or $7 per vial DP as opposed to the $52.94 and $19.50 the Abbott Vancomycin cost.

(ABT AWP/MDL 001215.)

AMENDED MASTER CONSOLIDATED          - 55 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

210.   The government investigation into Abbott's AWP for vancomycin identified:

> prices that are routinely made available to many providers, but are
> far below Medicare reimbursement rates. They include 1999
> prices for vancomycin, the Abbott Labs-manufactured antibiotic,
> which a health care provider could buy for $76.00 but for which
> the AWP upon which Medicare's reimbursement was based on
> was $261.84.

*See* September 25, 2000 letter from U.S. Rep. Tom Bliley to the Honorable Nancy-Ann Min

DeParle, Administrator of the Health Care Financing Administration. (P007015-490.)

211.   For other doses of vancomycin, Abbott reported an AWP of $68.77 as of April

2000. The DOJ adjusted it to $8.14.

### 6.   Additional Evidence for Amikacin

212.   One published report states: "Amikacin, used to treat an infection that HIV+

people get and manufactured by Abbott, had an AWP of $54.56.  DOJ said the actual price was

$6.75." *See States Mull Suit Against Drug Companies*, www.stateline.org (April 2, 2001)

(P011268-70).

### 7.   Inflated AWPs From Abbott Price Lists

213.   In response to government subpoenas, Abbott produced numerous price lists

setting forth spreads between AWPs and prices offered to wholesalers, providers and other

intermediaries.  A review of those price lists reveals that Abbott has consistently offered

hundreds of its drugs and other solutions to its customers at prices significantly below the

published AWP and that the spread was of great importance to its customers.  To repeat every

one of those drugs and the spread offered to each specific customer here is not practical.

However, set forth below in Tables 1 and 2 are a number of those drugs (not already referenced

above) with spreads in excess of 100% from two specific Abbott customers.

214.

## REDACTED

1534.16 0046 BSC.DOC

**Table 1**

# REDACTED

215.

**REDACTED**


**Table 2**


**REDACTED**


216.    As set forth above, Abbott's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Plaintiffs and the Class.

**B.      Amgen**

217.    Amgen engages in an organization-wide and deliberate scheme to inflate AWPs. Amgen has stated fraudulent AWPs for all or almost all of its drugs, including:  Epogen (eportin alfa for ESRD use),[1] Neupogen (filgrastim), Aransep (darbepoetin alfa), Enbrel, Kineret (anakrina), and Neulasta (pegfilgrastim). The specific drugs of Amgen for which relief is sought in this case are set forth in Appendix A and are set forth below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| AMGEN | Aranesp | darbepoetin alfa albumi | Antianemic Agent; Blood Modifier Used in the treatment of anemia associated with chronic renal failure and/or chemotherapy |
| | Enbrel | etanercept | Antirheumatic Agent Used to reduce signs and symptoms of rheumatoid arthritis |
| | Epogen | epoetin alfa | Antianemic Agent; Blood Modifier Used in the treatment of anemia associated with chronic renal failure, chemotherapy and/or HIV-infected patients |

---

[1]   In the Medicare Part B context, reimbursement for Epogen is not based on the AWP, but rather on a specific dollar amount set by statute.  However non-Medicare Part B reimbursement for Epogen is based on AWP for many Class members.

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | Kineret | anakinra | Antirheumatic Agent<br>Used in the treatment of moderate to severe rheumatoid arthiritis |
| | Neulasta | pegfilgrastim | Antineoplastic; Blood Modifier<br>Used to decrease incidence of infection (neutropenia) in some cancer patients |
| | Neupogen | filgrastim | Antineoplastic; Blood Modifier<br>Used to decrease incidence of infection (neutropenia) in some cancer and leukemia patients |

### 1.    Amgen's Definition and Understanding of AWP

218.    Internally, Amgen defines AWP as "the common basis for reimbursement by payors.  AWP may not necessarily reflect the actual purchase price" (Press Release, "Data from Study Shows Aranesp ...", Dec. 9. 2002 (www.amgen.com)) or "one of the factors used by Medicare to determine payment for drug charges."

### 2.    Amgen Controls the Published AWP for Its Products

219.    Amgen has controlled and set the AWPs for its pharmaceutical products through direct communications with industry compendia during the Class Period.

### 3.    Amgen's AWP Manipulation Benefited Providers at the Expense of the Class

220.    Amgen was well aware that its customers' profits depended on reimbursement rates for drugs, and that Amgen's own sales and profits in turn depended on its customers' reimbursement payments and profits:

> Our sales depend on payment and reimbursement from third-party payors, and a reduction in the payment rate or reimbursement rate could result in decreased sales of our products.
>
> In both domestic and foreign markets, sales of our products are dependent, in part, on the availability of reimbursement from third-party payors ...we believe that sales of Aranesp and Neulasta are and will be affected by government and private payor reimbursement policies. ...If reimbursement for our marketed products changes adversely or if we fail to obtain adequate reimbursement for our other current or future products, health care providers may limit how much or under what circumstances they

AMENDED MASTER CONSOLIDATED          - 59 -
CLASS ACTION COMPLAINT

> will administer them, which could reduce the use of our products
> or cause us to reduce the price of our products. This could result in
> lower product sales or revenues ...

(Amgen 2002 Form 10-K at 43-44).

221.   Amgen also knows that several of its drugs compete with other manufacturers'
drugs. In some cases, as detailed herein, the competing manufacturers' manipulate the AWP to
create a reimbursement advantage for their drugs. Specifically, Amgen's Kineret competes with
J&J's Remicade and Immunex's Enbrel; Neupogen competed against Immunex's Leukine; and
Aranesp competes against Procrit, J&J's epoetin alfa product. *See* Amgen's 2001 Form 10-K
(P002327-002397). All of these competing drugs are alleged herein to be subject to AWP
manipulation. The logical inference is that Amgen also engaged in AWP manipulation for those
drugs where the competitors were manipulating and marketing the AWP spread.

222.   Amgen also made sure its sales representatives were focused on reimbursement
and customer profit motives. A senior Amgen sales manager has publicly stated:

> Reps need to understand the insurance system flawlessly. They
> need to understand the money trail in terms of how a drug gets
> reimbursed, who reimburses it, and coverage or policy limitations
> – those are fundamental questions."

223.   Amgen has also established a website (www.reimbursementconnection.com) to help
providers with reimbursement issues, including information on how to calculate reimbursement
for Amgen drugs and Sample Reimbursement Sheets detailing how much Medicare will pay for
Amgen drugs. In addition, Amgen maintains a telephone Reimbursement Hotline for providers
or their office staffs to call to get help with reimbursement questions.

**4.   Amgen Provided Free Goods and Other Incentives**

224.   In addition to marketing the spread, Amgen has utilized other impermissible
inducements to stimulate sales of its drugs. These inducements were designed to result in a
lower net cost to the provider while concealing the actual wholesale price beneath a high invoice
price.

AMENDED MASTER CONSOLIDATED                 - 60 -
CLASS ACTION COMPLAINT

225.    A 1993 OIG Report detailed how Amgen gave substantial year-end rebates to its customers based on their purchases of Epogen.  The report noted that Medicare and Medicare beneficiaries did not receive the benefit of any rebates; all monies remained with the provider. There was no way to provide for any rebates on Medicare claim forms, and Amgen's rebates were not provided until year-end:

> [T]he effect of the rebates is that it reduces the actual cost of EPO to a dialysis facility, thus increasing their gross profit.  Presently, the rebates represent price reductions which benefit the facilities exclusively.

("Review of Epogen Reimbursement," (OIG A-01-02-00506 at 7-8)).

226.    By utilizing hidden inducements, Amgen provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

227.    Amgen's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of hidden rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

### 5.    Amgen Concealed Its AWP Manipulation

228.    Amgen deliberately acted to conceal its fraudulent reporting and marketing of the AWP spread.  For example, as noted above, Amgen gave rebates to its Epogen customers which effectively lowered the true price charged.  When OIG asked Amgen for data on its total sales or the total amount of Epogen rebates, Amgen refused to provide such data. ("Review of Epogen Reimbursement," (OIG A-01-02-00506 at 7-8)).

229.    In September 2001, the GAO reported that epoetin alfa accounted for the second highest percentage of Medicare expenditures on drugs in 1999, accounting for 9.5% of spending for prescription drugs by Medicare in 1999 and for 3.4% of all Medicare allowed services.

230.    As set forth above, Amgen's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Plaintiffs and the Class.

AMENDED MASTER CONSOLIDATED                    - 61 -
CLASS ACTION COMPLAINT

**C.**    **AstraZeneca**

231.    AstraZeneca has engaged in an ongoing deliberate scheme to inflate AWPs.  The drugs at issue for this defendant are identified in Appendix A and summarized below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| ASTRAZENECA | Accolate | zafirlukast | Leukotriene Antagonist (Respiratory Agent) Used in the treatment of asthma |
| | Armidex | anastrozole | Antiestrogen (Antineoplastic: Hormonal Agonist/Antagonist) Used in the treatment of breast cancer in postmenopausal women |
| | Atacand | candesartan cilexetil | Angiotension II Receptor Antagonist (Cardiovascular Agent) Used in the treatment of hypertension |
| | Atacand HCT | candesartan cilexetil-hydrocholorothiazide | Angiotension II Receptor Antagonist With Diuretic (Cardiovascular Agent) Used in the treatment of hypertension |
| | Casodex | bicalutamide | Antineoplastic Used in the treatment of prostate cancer |
| | Diprivan | propofol | General Anesthetic Used in the induction or maintenance of anesthesia as part of balanced anesthetic technique |
| | Entocort | budesonide | Glucocorticoid Used in the treatment of Crohn's disease |
| | Nexium | esomeprazole magnesium | Proton Pump Inhibitor (Gastrointestinal Agent) Used in the treatment of heartburn and erosive esophagitis |
| | Nolvadex | tamoxifen citrate | Antiestrogen (Antineoplastic: Hormonal Agonist/Antagonist) Used in the treatment or prevention of breast cancer |
| | Prilosec | omeprazole | Proton Pump Inhibitor (Gastrointestinal Agent) Used in the treatment of gastric and duodenal ulcers, gastroesophageal reflux disease and erosive esophagitis |
| | Pulmicort | budesonide (inh) | Glucocorticoid Used for maintenance treatment of asthma |
| | Rhinocort | budesonide (nasal) | Glucocorticoid Used in the treatment of allergic rhinitis |

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | Seroquel | quetiapine fumarate | Antipsychotic Agent (Psychotherapeutic Agent)<br>Used in the treatment of schizophrenia |
| | Toprol | metoprolol succinate | Beta Adrenergic Blocking Agent (Cardiovascular Agent)<br>Used in the treatment of hypertension, angina pectoris and heart failure |
| | Zestril | lisinopril | Angiotension Converting Enzyme Inhibitor (Cardiovascular Agent)<br>Used in the treatment of hypertension and heart failure |
| | Zoladex | goserelin acetate | Gonadotropin Releasing Hormone Analogue (Antineoplastic: Hormonal Agonist/Antagonist)<br>Used in the treatment of prostate and advanced breast cancer |
| | Zomig | zolmitriptan | Serotonin Receptor Agonist (Migraine Preparation)<br>Used in the treatment of migraines |

## 1. AstraZeneca Has Been the Target of a Government Investigation

232.    In connection with its scheme to inflate AWPs, AstraZeneca has been investigated by the United States Department of Justice.  In January 2002, a federal grand jury in Wilmington, Delaware returned an indictment accusing a New Jersey doctor of conspiring with AstraZeneca to resell free samples of Zoladex® that AstraZeneca sales representatives had given the doctor.  The indictment alleges that AstraZeneca (i) sold Zoladex® to the New Jersey doctor and others at prices substantially below the AWP reported by AstraZeneca, and (ii) provided the New Jersey doctor with materials showing how much more profit he could make by using Zoladex® instead of its competitor, Lupron®.

233.    In response to the government's subpoena, AstraZeneca appears to have produced documents related to Zoladex only.

## 2.

234.    **REDACTED**

REDACTED

3.

235.

# REDACTED

4.

236.

a.                              # REDACTED

b.

# REDACTED

c.

## REDACTED

237.

## REDACTED

238.

## REDACTED

REDACTED

239.

REDACTED

240.

REDACTED

AMENDED MASTER CONSOLIDATED                – 66 –
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

**REDACTED**

**REDACTED**

**REDACTED**

AMENDED MASTER CONSOLIDATED          - 67 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

241.

**REDACTED**

**REDACTED**

**REDACTED**

242.    Thus, at the same time AstraZeneca was raising the AWP for Zoladex, it was lowering the real price to providers (by giving bigger discounts), which served to widen the spread.

243.    Another document sets forth the difference between the purchase price and the AWP at various volume levels.  Note that even with no volume discount, a provider is still making at least a $71.00 profit per unit on Zoladex ($358.55 - 286.84 = 71.71):

NEW LOWER CASE QUANTITY DISCOUNT
ZOLADEX PRICING

| UNITS | AWP | COST | DISCOUNT | LESS 2% |
|-------|-----|------|----------|---------|
| 1-5   | $358.55 | $286.84 | 0%  | $281.10 |
| 6-11  | $358.55 | $269.63 | 6%  | $264.24 |
| 12-23 | $358.55 | $261.02 | 9%  | $255.80 |
| 24-47 | $358.55 | $252.42 | 12% | $247.37 |
| 48-59 | $358.55 | $243.81 | 15% | $238.93 |
| 60-71 | $358.55 | $235.21 | 18% | $230.50 |
| 72+   | $358.55 | $229.47 | 20% | $224.88 |

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT

- 68 -

1534.16 0046 BSC.DOC

(P003060.)

244.    The same document goes on to tout the practice's ability to make more profit, or

return on investment, by exploiting the AWP scheme:

> Thank you for your time and listening ear on Monday, April 17.
> As discussed, I am offering a proposal to switch Lupron patients to
> Zoladex. Zeneca Pharmaceuticals now has new volume pricing,
> with a 20% maximum discount, for Zoladex. What this will offer
> the practice is an opportunity to save money, realize a better return
> on investment, achieve the same profit you currently have with our
> competitor and free up a substantial amount of working capital.
> Zoladex will also save the patient money and the system money.
>
> Based on a comparison of Zoladex and Lupron, if 480 depots are
> used annually Zoladex will save the practice $57,177.60 a year.
> Your dollar return to the practice is now slightly higher with
> Zoladex. This rate of return for Zoladex is now 59% compared to
> Lupron's 39%

(P003058.)

245.    Another AstraZeneca document even more explicitly demonstrates to providers

how they can profit from the AWP scheme, in excess of $64,000 per year:

### ZOLADEX

| Direct Pricing | Medicare AWP | $$Return / % Return | |
|---|---|---|---|
| 72+ $224.88 | $358.55 | $133.67 | 59% |
| 72x$224.88=$16,191.38 | 72x$358.55=$25,815.60 | $9,624.24 | 59% |

*based on your use of 480 depots annually, with our 2% discount these
are the comparisons*

| | | | |
|---|---|---|---|
| $107,942.40 | $172,104.00 | $64,161.60 | 59% |

(P003058.)

246.    According to a September 2001 GAO report, the discount from AWP for medical

providers who purchased AstraZeneca's Zoladex and billed Medicare was between 21.9% and

22.3%. ("Payments for Covered Outpatient Drugs Exceed Providers' Cost, Sept. 2001"

(P005546-78).)

AMENDED MASTER CONSOLIDATED          - 69 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

247.   AstraZeneca, through its employees and agents, also provided millions of dollars worth of free samples of its drugs to providers.  The free samples would be used to offset the total cost associated with purchases of its drugs, thereby increasing the spread, while also concealing the actual cost of the drug from Plaintiffs and the Class.  Moreover, at least as to Zoladex®, AstraZeneca sales representatives specifically told providers that they could and should bill for the free samples.

248.   A written proposal from AstraZeneca Sales representative Randy Payne dated July 17, 1995 encourages a urology practice to switch all of their patients to Zoladex and states: "AS AN ADDED INCENTIVE, ZENECA WILL PROVIDE YOU WITH 50 FREE DEPOTS (over $11,900 worth of product) FOR THE INITIAL CONVERSION TO ZOLADEX." (P003059.)

249.   As set forth above, AstraZeneca's scheme to inflate its reported AWPs for Zoladex, market the resulting spread, and channel to providers "free" goods – all in order to increase the market share of its drugs – has resulted in excessive overpayments by Plaintiffs and the Class.

**D.   The Aventis Group (Aventis, Pharma, Hoechst and Behring)**

250.   Aventis engages in an organization-wide and deliberate scheme to inflate AWPs. Aventis has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below.  The specific drugs of Aventis for which relief is sought in this case are set forth in Appendix A and are as follows:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| AVENTIS GROUP (Aventis, Pharma, Hoechst and Behring) | Allegra | fexofenadine | Antihistamine Used for the relief of symptoms of seasonal allergic rhinitis |
| | Allegra-D | fexofenadine pseudoephedrine | Antihistamine Used for the relief of symptoms of seasonal allergic rhinitis |

AMENDED MASTER CONSOLIDATED          - 70 -
CLASS ACTION COMPLAINT

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | Amaryl | glimepiride | Antidiabetic<br>Used to lower blood glucose in Type II diabetes patients |
| | Anzemet | dolasetron mesylate | Antineoplastic<br>Used to prevent nausea and vomiting after chemotherapy or operation |
| | Arava | leflunomide | Antirheumatic<br>Used in the treatment of active rheumatoid arthritis |
| | Azmacort | triamcinolone aceonide (inh) | Steroidal Anti-Inflammatory Agent (Respiratory Agent)<br>Used for maintenance treatment of asthma |
| | Calcimar | calcitonin salmon | Parathyroid Agent<br>Used in the treatment of blood calcium levels and to increase the level of calcium in the bones |
| | Carafate | sucralfate | Duodenal Ulcer Adherent Complex (Gastrointestinal Agent)<br>Used in the treatment and maintenance therapy of duodenal ulcer |
| | Cardizem | diltiazem | Calcium Channel Blocker (Cardiovascular Agent)<br>Used in the treatment of angina and hypertension |
| | Gammar PI.V. | immune globulin | Immunizing Agent<br>Used as a maintenance therapy in patients with compromised immune systems |
| | Intal | cromolyn sodium | Antiasthmatic<br>Used to treat allergic rhinitis and severe perennial bronchial asthma |
| | Nasacort | triamcinolone acetonide (nasal) | Steriodal Anti-Inflammatory Agent (Nasal Preparation)<br>Used for nasal treatment of allergic rhinitis symptoms |
| | Taxotere | docetaxel | Antineoplastic<br>Used in the treatment of breast or lung cancer after failed chemotherapy |
| | Trental | pentoxifylline | Blood Viscosity-Reducing Agent (Blood Modifier)<br>Used to improve the flow of blood through blood vessels |

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

**1.     Aventis Has Been the Target of Government Investigations**

251.    In connection with its scheme to inflate AWPs, Aventis has been investigated by the United States Department of Justice, the Office of Inspector General of the Department of Health and Human Services, the Commerce Committee of the U.S. House of Representatives, the Attorney General for the State of Texas, the Attorney General for the State of California, and the State of California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse.

**2.**

252.

# REDACTED

253.

**REDACTED**

**REDACTED**

AMENDED MASTER CONSOLIDATED          - 72 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

3.

**REDACTED**

254.

    a.

**REDACTED**

    b.

**REDACTED**

4.    **Aventis' AWP Manipulation Benefited Providers at the Expense of the Class**

255.    The purpose of Aventis' manipulation was to increase the spread in order to maximize the profit to providers and other intermediaries at the expense of Plaintiffs and the Class.

256.

**REDACTED**

# REDACTED

257.

# REDACTED

258.

REDACTED

**REDACTED**

259.                        **REDACTED**

5.      **Specific Aventis AWPs Documented by the DOJ**

260.    In a report published by the DHHS (AB-00-86), the DOJ documented at least 15

instances where the published AWPs for various dosages of 4 drugs manufactured by Aventis

were substantially higher than the actual prices listed by wholesalers.  The chart below sets forth

the 4 drugs identified by the DOJ and the spread associated with one particular dosage of each

drug.  These figures compare the DOJ's determination of an accurate AWP for that particular

dosage, based upon wholesalers' price lists, with the AWP reported by Aventis in the 2001 *Red*

*Book*.

| Drug | 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| Anzemet Injectable (dolasetron mesylate) | $166.50 | $74.08 | $92.42 | 125% |
| Factor VIII/ Bioclate | $1.25 | $.91 | $.34 | 37% |
| Factor VIII/ Helixate | $1.18 | $.78 | $.40 | 51% |
| Gammar (immune globulin) | $400.00 | $296.67 | $103.33 | 35% |

(P006299-P006316).

261.    An OIG report (*see* "Medicare Reimbursement of Prescription Drugs," OEI-03-

00-00310, Jan. 2001) further revealed that: (i) the AWP for all immune globulin 5 mg doses

listed in the 1997 *Red Book* were inflated by an average spread of 32.21%; (ii) a 10 mg dose of

Anzemet had a Medicare Median of $14.82 and a Catalog Median of $8.29, resulting in a spread

AMENDED MASTER CONSOLIDATED                    - 75 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

of 78.76%; and (iii) a 20 mg dose of Taxotere had a Medicare Median of $283.65 and a Catalog Median of $8.29, resulting in a spread of 18.75%. (P006398-006424).

    **6.**

    262.

REDACTED

    263.

# REDACTED

264.    A government investigation revealed similar inflated pricing implemented by Aventis with respect to the injectable form of Anzemet. In a September 28, 2000 letter to Alan F. Holmer, President of the Pharmaceutical Research and Manufacturers of America, U.S. Rep. Pete Stark provided a synopsis of the scheme implemented by Aventis (Hoechst):

> The following chart represents a comparison of Hoechst's fraudulent price representations for its injectable form of the drug versus the truthful prices paid by the industry insider. It is [sic] also compares Hoechst's price representations for the tablet form of Anzemet and the insider's true prices. It is extremely interesting that Hoechst did not create a spread for its tablet form of Anzemet but only the injectable form. This is because Medicare reimburses Doctors for the injectable form of this drug and by giving them a profit, can influence prescribing. The tablet form is dispensed by pharmacists, who accept the Doctor's order. And this underscores the frustration that federal and state regulators have experienced in their attempts to estimate the truthful prices being paid by providers in the marketplace for prescription drugs and underscores the fact that, if we cannot rely upon the drug companies to make honest and truthful representations of their prices, Congress will be left with no alternative other than to legislate price controls.

| NDC No: | Unit Size/ Type | Quantity | Net Price as Represented to Florida Medicaid | True Wholesale Price | Variance |
|---|---|---|---|---|---|
| 0088-1206-32 | 100 mg/5 ml Injectable | 1 | $124.90 | $70.00 | Represented price 78% higher than true wholesale price. |

(P007548-007588).

7.

265.


**REDACTED**

REDACTED

266.

# REDACTED

267.   U.S. Rep. Thomas J. Bliley, in a May 4, 2000 letter to the CEO of Aventis

(Behring), also stated concerns regarding Aventis' pricing of Gammar:

> The Office of Inspector General (OIG) at the Department of Health
> and Human Services determined that the Medicare-allowed
> amount for immune globulin, a pharmaceutical product sold by
> your company under the name Gammar, in Fiscal Year 1996 was
> $42.21.  The OIG further estimated that the actual wholesale price
> of this drug was $16.12 and the highest available wholesale price
> that the OIG was able to identify was $32.11.

(P006962-P006966).

## 8.   Inflated AWPs From Aventis' Price Lists

268.   In response to government subpoenas, Aventis produced numerous price lists

setting forth spreads between AWPs and prices offered to wholesalers, providers and other

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT

- 78 -

1534.16 0046 BSC.DOC

intermediaries.  A review of those price lists reveals that Aventis has consistently offered drugs and other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers.  To repeat every one of those drugs and the spread offered to each specific customer here is not practical.

269.

# REDACTED

270.    As set forth above, Aventis' scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Plaintiffs and the Class.

9.

271.

# REDACTED

E.    **Baxter**

272.    Baxter engages in an organization-wide and deliberate scheme to inflate AWPs. Baxter has stated fraudulent AWPs for all or almost all of its drugs those set forth below.  The specific drugs of Baxter for which relief is sought in this case are set forth in Appendix A and are summarized below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| BAXTER | Aggrastat | tirofiban hydrochloride | Glycoprotein Receptor Inhibitor (Blood Modifier)<br><br>Used in the treatment of acute coronary symptoms |
| | Ativan | lorazepam | Antianxiety Agent (Psychotherapeutic Agent); Anticonvulsant<br><br>Used to relieve anxiety and treat insomnia |
| | Bebulin VH | factor ix (systemic) | Antihemorrhagic Agent<br>Used to treat hemophilia B |
| | Brevibloc | esmolol hcl | Autonomic Nervous System Agent<br><br>Used in the treatment of tachyarrhythmias in critical situations |
| | Buminate | albumin (human) | Plasma Fraction (Blood Modifier)<br><br>Used in the treatment of hypovolemia and hypoalbuminemia |
| | Claforan | cephalosporin (systemic) | Antibacterial Agent (Anti-Infective Agent)<br><br>Used in the treatment of infections caused by bacteria |
| | Gammagard S/D | immune globulin solution | Antibacterial Agent (Anti-Infective Agent)<br>Used to prevent or treat some illnesses. |
| | Gentran | dextran | Blood Derivative; Blood Modifier<br>Used in the emergency treatment of shock |
| | Holoxan/Ifex | ifosfamide | Antineoplastic<br><br>Used in the treatment of various forms of cancer |
| | Iveegam EN | immune globulin iv | Antibacterial Agent (Anti-Infective Agent)<br><br>Used as replacement therapy in patients with primary immunodeficiency syndromes |
| | Osmitrol | mannitol | Osmotic Diuretic<br><br>Used to promote diureses during treatment of acute kidney failure. Also used to reduce intraocular and intracranial pressure |
| | Recombinate | factor viii | Antihemophilic Factor<br>Used to induce blood clotting |
| | Travasol | amino acid | Dietary Supplement<br>Used for nutritional support in cancer patients |
| | Vancocin HCl | vancomycin hydrochloride | Antibacterial Agent (Anti-Infective Agent)<br><br>Used in the treatment of infections caused by bacteria |
| | | cisplatin | Antineoplastic<br><br>Used to treat cancer of the bladder, ovaries, and testicles |
| | | dextrose | Caloric Agent; Electrolyte Replenisher<br>Used to increase intake of calories and fluids |

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC