> other generic forms of Adriamycin, not to shift the customer to
> direct shipments. The higher we can keep the price of Adriamycin,
> the easier it is for you to meet your sales goals for Adriamycin.

(PH 024315).

475.    As set forth above, The Pharmacia Group's scheme to inflate its reported AWPs

and market the resulting spread to increase the market share of its drugs and its use of other "off

invoice" rebates and financial inducements to its customers has resulted in excessive

overpayments by Plaintiffs and the Class.

**S.    The Schering-Plough Group (Schering-Plough and Warrick)**

476.    The Schering Plough Group engages in an organization-wide and deliberate

scheme to inflate AWPs. The Schering Plough Group has stated fraudulent AWPs for all or

almost all of its drugs, including those set forth below. The specific drugs of The Schering

Plough Group for which relief is sought in this case are set forth in Appendix A, and are set forth

below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| SCHERING-PLOUGH GROUP | Clarinex | desloratadine | Antihistamine<br>Used to relieve the symptoms of hay fever and hives of the skin |
| (Schering-Plough and Warrick) | Claritin | loratadine | Antihistamine<br>Used to relieve or prevent the symptoms of asthma |
|  | Claritin-D | loratadine & pseudoephedrine | Antihistamine<br>Used to treat the nasal congestion, sneezing, and runny nose caused by colds and hay fever |
|  | Diprolene | aug betamethasone dipropionate | Antipruritic (Skin & Mucous Membrane Agent)<br>Used to help relieve redness, swelling, itching, and discomfort of many skin problems |
|  | Diprosone | betamethasone dipropionate | Antipruritic (Skin & Mucous Membrane Agent)<br>Used to help relieve redness, swelling, itching, and discomfort of many skin problems |
|  | Elocon | mometasone furoate | Antipruritic (Skin & Mucous Membrane Agent)<br>Used to help relieve redness, swelling, itching, and discomfort of many skin problems |
|  | Eulexin | flutamide | Antineoplastic<br>Used to treat cancer of the prostate gland |

AMENDED MASTER CONSOLIDATED                    - 161 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | Integrilin | eptifibatide | Cardiovascular Agent<br>Used in the treatment of patients with acute coronary syndrome |
| | Intron-A | interferon alfa-2b | Immunomodulator<br>Used in the treatment of hairy cell leukemia and chronic hepatitis B or C. |
| | Lotrisone | clotrimazole w/ betamethasone | Antifungal Agent (Anti-Infective Agent)<br>Used to treat fungus infections |
| | Nasonex | mometasone furoate (nasal) | Anti-Inflammatory Agent (Nasal Preparation)<br>Relieve the stuffy nose, irritation, and discomfort of hay fever and other allergies |
| | Peg-Intron | peginterferon alfa-2b | Biological Response Modifier<br>Used to treat chronic hepatitis C |
| | Proventil | albuterol sulfate | Bronchodilator (Respiratory Agent)<br>Used to treat the symptoms of asthma, chronic bronchitis, emphysema, and other lung diseases |
| | Rebetol | ribavirin | Biological Response Modifier<br>Used to treat hepatitis C |
| | Sebizon | sulfacetamide sodium | Anti-Infective Agent<br>Used in the treatment of conjunctivitis and other ocular infections |
| | Temodar | temozolomide | Antineoplastic<br>Used to treat a specific type of cancer of the brain in adults whose tumors have returned |
| | Trinalin Rep | azatadine & pseudoephedrine | Antihistamine<br>Used to treat the nasal congestion, sneezing, and runny nose caused by colds and hay fever. |
| | Vanceril | beclomethosone (nasal) | Anti-Inflammatory Agent; Antiasthmatic<br>Used to help prevent the symptoms of asthma |
| | | albuterol | Bronchodilator (Respiratory Agent)<br>Used for relief of bronchospasm in asthma sufferers |
| | | clotrimazole | Antifungal Agent (Anti-Infective Agent)<br>Used to treat yeast (fungus) infections of the vagina |
| | | griseofulvin ultramicrocrystalline | Antifungal Agent (Anti-Infective Agent)<br>Used to treat fungus infections of the skin, hair, fingernails, and toenails |
| | | oxaprozin | Central Nervous System Agent; Antipyretic (Analgesic)<br>Used in the treatment of osteoarthritis and rheumatoid arthritis |

1534.16 0046 BSC.DOC

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | | perphenazine | Antiemetic (Gastrointestinal Agent); Antipsychotic Agent (Psychotherapeutic Agent) Used to treat serious mental and emotional disorders. Also used to relieve moderate to severe pain in some hospitalized patients |
| | | potassium chloride | Electrolytic Agent Used to prevent and treat potasium deficit secondary to diuretic or cortiocosteroid therapy |
| | | sodium chloride | Flush; Abortifacient Used to remove medicine and blockage from intravenous (IV) catheter. Also used to induce abortion |
| | | sulcrafate | Gastrointestinal agent Used for short term treatment of duodenal ulcer |
| | | theophylline er | Bronchodilator (Respiratory Agent) Used to treat and/or prevent the symptoms of bronchial asthma, chronic bronchitis, and emphysema |

### 1. The Schering Plough Group Has Been the Target of Government Investigations

477.   In connection with its scheme to inflate AWPs, The Schering Plough Group has been investigated by the Department of Justice, Texas Attorney General, West Virginia Attorney General, California Attorney General, California Bureau of Medi-Cal Fraud and Elder Abuse, and the Department of Health and Human Services Office of Inspector General, and the U.S. Attorney for the District of Massachusetts.

478.   On May 30, 2003, Schering Plough announced that the U.S. Attorney for the District of Massachusetts had advised that its subsidiary, Schering Corporation, is the subject of a federal grand jury investigation.  Schering Plough is the target of a criminal investigation involving: (i) providing remuneration, such as drug samples, to providers to induce the purchase of Schering products for which payment was made through federal health care programs; (ii) selling misbranded or unapproved drugs; (iii) submitting false wholesale pricing information for its pharmaceutical products to the government; and (iv) destroying evidence and obstructing

AMENDED MASTER CONSOLIDATED      - 163 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

justice relating to the government's investigation.  *See* Schering Plough Press Release dated

May 30, 2003, located at http://www.sch-plough.com/news/2003/business/20030530.html;

"Schering Plough expects indictment," The Philadelphia Inquirer, at C3 (May 31, 2003).

Moreover, according to Schering Plough's Form 10-K for the year 2000, this investigation has

focused on "whether the AWP set by pharmaceutical companies for certain drugs improperly

exceeds the average prices paid by dispensers . . . and other pricing and/or marketing practices."

479.    A Medicaid investigation by the Texas Attorney General revealed that The

Schering-Plough Group defrauded the State of Texas $14.5 million.  Investigators determined

that The Schering-Plough Group provided the greatest "spread" amongst the drug companies

selling albuterol in Texas, and thereby obtained the largest market share for albuterol.  The

Schering-Plough Group sold a box of albuterol to pharmacies for $13.50, while it charged the

Texas Medicaid program $40.30, a 200% increase.  *See Cornyn Sues Three Drug Companies for*

*Medicaid Fraud*, Press Release by the Office of the Attorney General, State of Texas, Sept. 7,

2000.  (www.oag.state.tx.us.gov)

480.    On October 11, 2001, the West Virginia Attorney General filed suit against

Warrick, alleging that Warrick defrauded state agencies and citizens by deliberately overstating

the AWP for certain drugs, including albuterol, from approximately 1995 until December 2000.

2.

481.                              **REDACTED**

**REDACTED**

3.

482.

**REDACTED**

483.

**REDACTED**

Thus, Warrick touted a 529% spread on its albuterol inhalation aerosol and a 482% spread on the refill.

484.    In a report to Congress, the GAO reported that albuterol sulfate was one of a small number of products that accounted for the majority of Medicare spending and volume. Albuterol sulfate accounted for 6.3% of total Medicare spending, ranking fifth out of more than 400 covered drugs.  Albuterol sulfate ranked first for volume of units covered, accounting for 65.8% of total units reimbursed.  *See* GAO Report to Congressional Committees, "Payments for

AMENDED MASTER CONSOLIDATED                    - 165 -
CLASS ACTION COMPLAINT

Covered Outpatient Drugs Exceed Providers' Cost," Tables 1 and 2, pp. 7-8 (GAO-01-0118
(P005546-005578)).  The Schering Plough Group is one of three companies noted by the DOJ as
manufacturing albuterol.  *See* DHHS report, AB-00-86 (P006299-006316).

    485.    According to The Schering Plough Group's own documents, the published AWPs
for most of its drugs were higher than the actual prices provided to wholesalers.

    486.

# REDACTED

## TABLE 1

## REDACTED

## TABLE 2

## REDACTED

AMENDED MASTER CONSOLIDATED      - 166 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

REDACTED

TABLE 3

REDACTED

### 4.   The DOJ Specifically Documented AWP Inflation for Albuterol Sulfate

487.   In a report published by the DHHS (AB-00-86 (P006299-006316)), the DOJ

documented at least one instance where the published AWPs for various dosages of albuterol

sulfate manufactured by The Schering Plough Group were substantially higher than the actual

prices listed by wholesalers.  The following figures compare the DOJ's determination of an

accurate AWP for one particular dosage, based upon wholesalers' price lists, with the AWP

reported by The Schering Plough Group in the 2001 *Red Book*:  The Schering-Plough Group

reported to *Red Book* an AWP of $30.25 for albuterol sulfate, yet the DOJ determined the actual

AWP to be $9.16, or $21.09 less.

488.   As stated in a May 4, 2000, letter from U.S. Rep. Tom Bliley, Chairman of the

Congressional Committee on Commerce, to Raman Kapur, President of Warrick:

> I am writing to you because one of the drugs reflecting a
> significant variation between the AWP-based prices paid by
> Medicare and the prices generally charged to private sector
> purchasers is albuterol sulfate, a drug manufactured by Warrick
> Pharmaceuticals.

(P006938-006941).

AMENDED MASTER CONSOLIDATED                  - 167 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

489.     In his May 4, 2000, letter, Bliley outlined The Schering Plough Group's scheme with respect to the prescription drug albuterol sulfate. The government's investigation uncovered a significant spread between the amount Medicare reimbursed for albuterol sulfate and the amount the Schering-Plough Group actually charged. U.S. Rep. Bliley stated:

> The OIG [Office of the Inspector General] has determined that the Medicare-allowed amount for albuterol sulfate, a pharmaceutical product sold by your company, in the Fiscal Year 1996 was $.42. The OIG further estimated that the actual wholesale price of this drug was $.15 and the highest available wholesale price that the OIG was able to identify was $.21.

*Id.*

### 5.     The Schering Plough Group Provided Free Goods and Other Incentives

490.     In addition to marketing the spread, The Schering Plough Group has utilized other impermissible inducements to stimulate sales of its drugs. These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price. By utilizing "off-invoice" inducements, The Schering Plough Group provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

491.     As set forth above, The Schering Plough Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

### T.     The Sicor Group (Sicor, Gensia and Gensia Sicor)

492.     The Sicor Group engages in an organization-wide and deliberate scheme to inflate AWPs. The Sicor Group has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below. The specific drugs of The Sicor Group for which relief is sought in this case are set forth in Appendix A, and are identified below:

AMENDED MASTER CONSOLIDATED             - 168 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| SICOR GROUP (Sicor, Gensia and Gensia-Sicor) | | acyclovir sodium | Anti-Infective Agent<br>Used in the treatment of herpes infections |
| | | amikacin sulfate | Antibiotic Agent (Anti-Infective Agent)<br>Used to treat respiratory tract, urinary tract, bone, skin and soft tissue infections |
| | | amphotercin b | Antifungal Agent (Anti-Infective Agent)<br>Used to help the body overcome serious fungus infections |
| | | doxorubicin hydrochloride | Antineoplastic<br>Used in the treatment of ovarian cancer and AIDS-related Kaposi's sarcoma |
| | | etoposide | Mitotic Inhibitor (Antineoplastic)<br>Used in the treatment of testicular neoplasm and small cell cancer of the lung |
| | | leucovorin calcium | Antianemic Agent (Blood Modifier)<br>Used in the treatment of anemia |
| | | pentamidine isethionate | Anti-Infective Agent<br>Used in the treatment of pneumonia |
| | | tobramycin sulfate | Antibiotic Agent (Anti-Infective Agent)<br>Used to treat severe infection |

### 1.     The Sicor Group Has Been the Target of Government Investigations

493.    In connection with its scheme to inflate AWPs, The Sicor Group has been investigated by the Department of Justice, Department of Health and Human Services Office of Inspector General, the Texas Department of Health, and the California Attorney General.

### 2.

494.

**REDACTED**

**REDACTED**

AMENDED MASTER CONSOLIDATED          - 169 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

REDACTED

495.

# REDACTED

3.    **The Sicor Group's AWP Manipulation Benefited Providers at the Expense of the Class**

496.    The Sicor Group has engaged in an ongoing deliberate scheme to inflate AWPs. For example, by letter dated September 25, 2000 to the HCFA administrator, the Chairman of the Commerce Committee revealed that: "[I]n 1998, a health care provider could buy Gensia's Etoposide for $14.00, while the AWP used to determine Medicare reimbursement was $141.97." (P007015-P007490).

497.    The Sicor Group's marketing strategies further demonstrate its fraudulent practices. In a marketing document prepared by Gensia and obtained by the government in its investigation, Gensia stated:

> Concentrate field reps on the top 40 AIDS hospitals using a $54.00 price in conjunction with a 10% free goods program to mask the final price. Provides the account with an effective price of $48.60 per vial.

AMENDED MASTER CONSOLIDATED            - 170 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

*See* letter dated September 28, 2000 from U.S. Rep. Pete Stark to Alan F. Holmer, President of the Pharmaceutical Research and Manufacturers of America. (P007512).

498.    Certain handwritten notations appear on this same marketing document comparing the AWP with other prices used for the same drug:

        FSS     $44.95

        Whls    $71.00

        Distr.    $51.50

        AWP    $109.20

(P007532).

499.

# REDACTED

500.

### REDACTED

AMENDED MASTER CONSOLIDATED      - 171 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

REDACTED

4.      **Specific Sicor Group AWPs Documented by the DOJ**

501.     In a report published by the DHHS, the DOJ documented at least 17 instances where the published AWPs for various dosages of drugs manufactured by The Sicor Group were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by The Sicor Group in the 2001 *Red Book*.

| Drug | The Sicor Group's 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Spread |
|------|----------------------------------------|----------------------------|------------|--------|
| Acyclovir Sodium | $125.00[9] | $100.00 | $25.00 | 25% |
| Amikacin Sulfate | $87.50 | $72.68 | $14.82 | 20% |
| Tobramycin Sulfate | $342.19 | $6.98 | $335.21 | 4,802% |

(P006299-006316).

5.

502.

REDACTED

---

[9] Calculation based on the AWP listed in the 2000 *Red Book*.

REDACTED

**Table 1**

**REDACTED**

503.

**REDACTED**

**Table 2**

**REDACTED**

6.

504.

**REDACTED**

**REDACTED**

505.    As set forth above, The Sicor Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

**U.    TAP**

506.    TAP engages in an organization-wide and deliberate scheme to inflate AWPs. TAP has stated fraudulent AWPs for Prevacid, as set forth in Appendix A, and identified below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| TAP | Prevacid | lansoprazole | Proton Pump Inhibitor (Gastrointestinal Agent) Used in the short-term treatment of duodenal ulcer, erosive esophagitis and gastroesophageal reflux disease |

**1.    TAP Has Been the Target of Government Investigations**

507.    In connection with its scheme to inflate AWPs, TAP has been investigated by the Department of Justice.

508.    On October 13, 2001, the United States Attorney in Boston, Massachusetts announced that TAP had agreed to pay $875 million to resolve criminal charges and civil liabilities in connection with its fraudulent pricing and marketing practices for the drug named Lupron®. As part of the agreement:

> a        TAP agreed to plead guilty to a conspiracy to violate the Prescription Drug Marketing Act, 21 U.S.C. §§ 331(t) and 333(b), and to pay a $290 million criminal fine, the largest criminal fine ever in a health care fraud prosecution. The plea agreement between the United States and TAP specifically stated that TAP's criminal conduct caused the Government losses of $145,000,000;

AMENDED MASTER CONSOLIDATED              - 174 -
CLASS ACTION COMPLAINT

b.    TAP agreed to pay the United States Government $559,483,560 for filing false and fraudulent claims with the Medicare and Medicaid programs as a result of TAP's fraudulent drug pricing schemes and sales and marketing misconduct;

c.    TAP agreed to pay the fifty states and the District of Columbia $25,516,440 for filing false and fraudulent claims with the States, as a result of TAP's drug pricing and marketing misconduct, and for TAP's failure to provide state Medicaid programs TAP's best price for Lupron®, as required by law;

d.    TAP agreed to comply with the terms of a sweeping Corporate Integrity Agreement that, among other things, significantly changes the manner in which TAP supervises its marketing and sales staff and ensures that TAP will report to the Medicare and Medicaid programs the true average sale price for drugs reimbursed by those programs;

e.    Abbott and Takeda agreed to cooperate fully with the ongoing government investigation of TAP and its former officers and employees in exchange for the United States declining prosecution of Abbott and Takeda for conduct relating to Lupron®; and

f.    An Indictment was unsealed in the District of Massachusetts against six current or former TAP employees (including an account executive, three District Managers, a National Accounts Manager and the former Vice President of Sales), and a urologist, alleging that they conspired to (i) bill Medicare for free samples of Lupron® and (ii) market Lupron® using the "spread" and the "return to practice" program.

The TAP defendants have been sued in a separate class action in connection with their fraudulent pricing and marketing practices for Lupron®.

509.    At a hearing in the criminal matter, which has an extensive record, United States District Court Judge William G. Young found:

> This has been a gross abuse of the Medicare/Medicaid repayment system, knowing, intelligent. You have demonstrated, and it's all

> been confirmed in open court, and I don't want anyone forgetting
> about the fact that this company, not under its present
> management, knowingly abused the public trust in a most, and I
> use my words carefully, despicable way.

*United States v. TAP Pharm. Prods., Inc.*, No. CR-01-10354-WGY (D. Mass. Dec. 6, 2001).

### 2.    TAP Controls the Published AWP for Its Products

510.    TAP has controlled and set the AWPs for its pharmaceutical products through direct communications with industry compendia during the Class Period.

### 3.    TAP's AWP Manipulation Benefited Providers at the Expense of the Class

511.    According to Criminal Information filed against several doctors and the Indictment filed against six former TAP employees and a urologist, TAP referred its practice of inflating the AWP for Lupron and the corresponding inducement to the physicians as its "Return to Practice" program.

512.    At various times, TAP employees would conduct a "Business Review Meeting" with individual doctors or their staff to explain in detail how a doctor could make money by buying Lupron® and exploiting the spread.

513.    TAP created sophisticated computer programs, including spreadsheets for use with physicians, to further explain how "Return to Practice" worked and how much money a physician could make from the spread. These computer programs were loaded onto laptop computers used by sales representatives and taken directly into physician's offices.

514.    TAP knew and understood that, because Medicare and other insurers relied upon the Publishers to establish AWPs, and because TAP could precisely control the published AWP, TAP could increase whenever they so desired the profit obtained by physicians from Plaintiffs and the Class.

### 4.    TAP Provided Free Goods and Other Incentives

515.    In addition to marketing the spread, Watson has utilized other impermissible inducements to stimulate sales of its drugs. These inducements were designed to result in a

AMENDED MASTER CONSOLIDATED          - 176 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.

516.    For example, TAP has pled guilty to illegally conspiring with medical providers to provide free samples which would then be billed to Medicare. In an October 3, 2001, press release that referenced the guilty plea, TAP's president, Thomas Watkins, stated:

> We admit that TAP provided free samples of Lupron to a number of physicians, primarily in the early to mid-1990s, with the knowledge that those physicians would seek and receive reimbursement. The billing for free samples is wrong, and it should never have happened.

517.    TAP has also provided and/or arranged for many other non-public financial inducements to stimulate the sales of its drugs at the expense of Plaintiffs and the Class. Such inducements included volume discounts, rebates, off-invoice pricing, free goods, credit memos, consulting fees, debt forgiveness and grants. All of these incentives are designed to lower the cost of the drug to the medical provider while concealing the actual cost from Plaintiffs and the Class.

518.    For example, the Indictment alleges three specific instances when TAP employees offered an HMO, a urology practice and a hospital unrestricted "educational grants" of more than $75,000 to continue their use of Lupron. It offered Tufts HMO $65,000 in grants.

519.    Another way that TAP funneled illicit payments to physicians was through the "TAP into the Future" program, which consisted of providing physicians with all-expense paid weekends at luxurious resorts. These junkets were disguised as educational or consulting programs, with all of the doctors in attendance designated as "consultants" even though the doctors who attended did not do anything that could reasonably be deemed consulting services.

520.    As set forth above, TAP scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates

and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs

and the Class.

### 5.   TAP Concealed Its AWP Manipulation

521.   TAP deliberately acted to conceal its fraudulent reporting and marketing of the

AWP spread.

522.   For example, TAP instructed physicians not to report the true price they paid for

Lupron. According to the Indictment, a TAP Senior Marketing executive, Alan MacKenzie,

advised TAP's sales force to:

> tell physicians that if doctors disclosed their invoice costs to the
> Medicare Program, that Program would take steps to reduce the
> maximum payment allowed for Lupron and thus reduce the
> physician's profit for Return to Practice.

523.   MacKenzie also told the sales force to caution doctors not to discuss their price

discounts with other physicians and instructed TAP employees to tell urologists that:

> by discussing your costs of Lupron with other physicians, you run
> the risk of that information getting back to HCFA. If HCFA then
> realizes that AWP is not a true reflection of the price, the AWP
> could be affected, thus lowering the amounts you may charge.

524.   A presentation to TAP's sales representatives included the same statements listed

above, as well as directions for the leader of the presentation, which stated:

> The main point to make to physicians is that confidentiality clause
> is a protection for them. If word is leaked back to HCF/Medicare
> that the cost of Lupron is going down, they very well may take
> steps in reducing allowable. This tactic should help prevent
> physicians talking amongst themselves.

## V.   Warrick

525.   Warrick has acted to inflate AWPs pursuant to the scheme identified above. The

specific drugs are identified in Appendix A.

W.    Watson

526.    Watson engages in an organization-wide and deliberate scheme to inflate AWPs.

Watson has stated fraudulent AWPs for all or almost all of its drugs, including: Ferrlecit,

Verapamil HCL, Vinblastine Sulfate, Vincristine Sulfate, Dexamethasone, Diazepam,

Gentamicin, Testosterone Ethanate, Vancomycin, Fluphenazine, Gemfibrozil, Imipramine,

Nadolol, and Perphenazine. The specific drugs of Watson for which relief is sought in this case

are set forth in Appendix A, and as identified below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| WATSON (Watson and Schein) | Ferrlecit | sodium ferric gluconate complex in sucrose injection | Iron Preparation (Blood modifier) Used for treatment of anemia in patients undergoing hemodialysis |
| | InfeD | iron dextran | Iron Preparation (Blood modifier); Nutritional Supplement Used for treatment of iron deficiency |
| | | dexamethasone acetate | Hormone; Glucocorticoid Used to treat inflammatory conditions, hematologic disorders and cerebral adema |
| | | dexamethasone sodium phosphate | Hormone; Glucocorticoid Used to treat inflammatory conditions, hematologic disorders and cerebral adema |
| | | diazepam | Central Nervous System Agent Used to treat status eplipeticus and anxiety disorders. Also used as an amnesic prior to surgical procedures |
| | | estradiol | Estrogen (Hormone) Used for treatment of menopausal symptoms and postmenopausal osteoporosis |
| | | fluphenazine hcl | Central Nervous System Agent; Psychotherapeutic Agent Used to manage psychotic disorders |
| | | gemfibrozil | Antilipemic Agent (Cardiovascular Agent) Used to lower cholesterol |
| | | gentamicin sulfate | Anti-Infective Agent Used as a general antibiotic to treat serious gastrointestinal, respiratory, bone, skin and soft tissue infections |
| | | imipramine hcl | Central Nervous System Agent; Psychotherapeutic Agent Used in the treatment of depression |

AMENDED MASTER CONSOLIDATED          - 179 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | | lorazepam | Central Nervous System Agent<br>Used for treatment of anxiety disorders |
| | | nadolol | Antihypertensive (Cardiovascular Agent)<br>Used in the treatment of hypertension and management of angina |
| | | perphenazine | Central Nervous System Agent;<br>Psychotherapeutic Agent<br>Used to manage psychotic disorders |
| | | propanolol hcl | Beta Adrenergic Blocking Agent (Cardiovascular Agent)<br>Used to treat hypertension |
| | | ranitidine hcl | Histamine Receptor Antagonist (Gastrointestinal Agent)<br>Used for treatment of duodenal ulcer, gastric ulcer, gastroesophageal disease and heartburn |
| | | vancomycin hcl | Antibiotic Agent (Anti-Infective Agent)<br>Used as a general antibiotic |
| | | verapamil hcl | Calcium Channel Blocker (Cardiovascular Agent)<br>Used in the treatment of tachyarrhythmia, angina and hypertension |

1.      **Watson Has Been the Target of Government Investigations**

527.    In connection with its scheme to inflate AWPs, Watson has been investigated by the Department of Justice, Department of Health and Human Services Office of Inspector General, and the State of California.

2.

528.

**REDACTED**

3.

529.

**REDACTED**

1534.16 0046 BSC.DOC

. REDACTED

530.    A *Red Book* Product Listing Verification form asks for approval of changes to the stated AWP for Schein's (which was later acquired by Watson) Verapamil HCL, Vinblastine Sulfate and Vincristine Sulfate.  A Schein executive okayed the changes and signed the *Red Book* form.  (MDLW00887).

4.

531.

REDACTED

532.

REDACTED

533.

REDACTED

5.    **Specific Watson AWPs Documented by the DOJ**

534.    In a report published by the DHHS (AB-00-86), the DOJ documented at least 12 instances where the published AWPs for various dosages drugs manufactured by Watson were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each drug.

AMENDED MASTER CONSOLIDATED                    - 181 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by Watson in the *Red Book*.

| Drug | Watson's 1998–2001 *Red Book* AWPs | DOJ Determined Actual AWP | Difference | Spread |
|---|---|---|---|---|
| Dexamethasone Acetate | $46.45 (1998) | $11.50 | $34.95 | 304% |
| Dexamethasone Sodium Phosphate | $93.04 (2001) | $1.08 | $91.96 | 851% |
| Diazepam | $18.15 (2000) | $2.50 | $15.65 | 626% |
| Gentamicin Sulfate | $114.10 (1999) | $1.18 | $112.92 | 957% |
| Iron Dextran | $377.04 (2001) | $24.69 | $352.35 | 1,427% |
| Testosterone Ethanate | $42.10 (2001) | $13.39 | $28.71 | 214% |
| Vancomycin HCL | $70.00 (1998) | $3.84 | $60.16 | 1,567% |

(P006299-P006316).

### 6.    Inflated Watson AWPs From Watson's Price Lists

535.    In response to government subpoenas, Watson produced numerous price lists setting forth spreads between AWP and prices offered to wholesalers, providers and other intermediaries.  A review of those lists indicates that Watson has consistently offered drugs to its customers at prices significantly below the published AWP, and that the spread was of great importance to Watson's customers.   It is not practical to repeat every one of those drugs and the spread offered to specific customers.  However, set forth below in Table 1 are a number of those drugs (not already referenced above) and the substantial spread offered to Watson customers.

536.    Table 1 is an analysis of certain dosages of Schein drugs from a chart titled Schein Product Status Report, February 1996.  (MDLW01237).

### Table 1

| Drug | AWP | WAC | % Spread |
|---|---|---|---|
| Fluphenazine HCL 1mg | $46.08 | $15.71 | 193% |
| Gemfibrozil 600mg | $55.65 | $7.95 | 600% |
| Imipramine HCL 10mg | $4.45 | $1.32 | 237% |
| Nadolol 20mg | $85.32 | $42.95 | 98% |
| Perphenazine 2mg | $42.53 | $19.76 | 115% |

537.    As set forth above, Watson's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Plaintiffs and the Class.

### 7.    Watson Provided Free Goods and Other Incentives

538.    In addition to marketing the spread, Watson has utilized other inducements to stimulate sales of its drugs. These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price. In one instance in May 2000, Schein offered "Priority Customers" an additional 5% discount on Ferrlecit "off invoice" for all purchases made that month. (MDLW15896.) By utilizing "off-invoice" inducements, Watson provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

539.    As set forth above, Watson's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

### 8.

540.                        **REDACTED**

### VI.    DIRECT DAMAGE SUSTAINED BY PLAINTIFFS AND THE MEMBERS OF THE AWP CLASS

541.    Plaintiffs and other Third-Party Payors also typically make reimbursement to health care providers for pharmaceuticals based upon the AWP. Accordingly, Third-Party

AMENDED MASTER CONSOLIDATED                    - 183 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

Payors are directly damaged by fraudulent AWP pricing schemes for drugs covered by employee health and benefit plans or by private insurance because reimbursement is also typically based on the AWP, as in the case of Medicare and Medicaid reimbursement.

### VII.    CERTAIN DEFENDANTS USE AWP TO ENGAGE IN A SCHEME TO FIX PRICES – THE TOGETHER CARD SCHEME

**A.    The Formation of the Together Card Conspiracy**

542.    Beginning in 2001 or 2002, the exact date of which is not yet known but is discoverable, certain of the Defendants also began to use AWPs and the growing concern over the cost of care to seniors, for another purpose – to artificially fix and/or increase the spread between their posted AWPs and their posted wholesale acquisition cost, or WAC, in connection with the commencement of the Together Card Program.

543.    Defendants Abbott, AstraZeneca, Aventis, BMS, GSK, Novartis and J&J, through its subsidiaries Janssen and Ortho-McNeil ("the Founding Together Card Defendants"), later Defendant TAP, and an alliance they formed, Defendant Together Rx LLC (the "Together Card Defendants"), have engaged in a conspiracy to fix the AWP spread of drug prices in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, 18 U.S.C. § 1962(c), and certain state antitrust laws.

544.    This conspiracy was accomplished with the use of the Together Rx Card Program ("Together Card Program"), which was supposedly designed as a prescription drug savings program for older, uninsured and poor Americans. The Together Card Defendants, in conjunction with their establishment and ongoing management of the Together Card Program, have agreed and conspired among themselves to raise, fix, maintain and/or stabilize the AWP spread of over 170 widely prescribed brand name drugs (the "Together Card Drugs") purchased through, and outside of, the Together Card Program.

545.    The Together Card Defendants' agreement and conspiracy have caused Plaintiffs and the Nationwide End Payor Together Card Class during the class period to pay more for the

AMENDED MASTER CONSOLIDATED          - 184 -
CLASS ACTION COMPLAINT

Together Card Drugs than they would have if the Together Card Defendants had not engaged in their unlawful practices. Plaintiffs and the Nationwide End Payor Together Card Class have therefore been damaged due to the Together Card Defendants' conspiracy to raise, fix, maintain and/or stabilize the AWP spread of the Together Card Drugs.

546.    Defendant Together Rx LLC, a Delaware limited liability company, was formed by the Founding Together Card Defendants as an alliance to effectuate this conspiracy. Indeed, these Founding Together Card Defendants refer to themselves as the "Founding Partners" of the alliance and the Together Card Program. The alliance and Together Card Program facilitated the sharing of price information, and the information and maintenance of the Together Card Defendants' conspiracy.

**B.    The Drug Discount Card Response to the Lack of Medicare Drug Coverage and the Underpinnings of the Together Card Scheme**

547.    In 2001, Americans spent over $172 billion on prescription drugs. The total is expected to more than double in a few years. Elderly Americans bear a disproportionate burden. While accounting for only 13 percent of the U.S. population, seniors pay for more than one-third of all prescription drugs. The average senior spent $1,756 for prescription drugs in 2001, with nearly half of that ($858) coming out of pocket.

548.    Congress has long debated whether to add a prescription drug benefit to the Medicare program. Currently, however, the Medicare Program generally does not cover the cost of self-administered prescription drugs. Accordingly, it is estimated that nearly one-third of the 40 million Medicare beneficiaries in the U.S. have no prescription drug coverage.

549.    Recently, Congress began considering a number of other measures designed to lower the cost of prescription drugs for U.S. seniors, including price controls and the importing of cheaper drugs from countries with price controls. For example, on April 4, 2001, U.S. Rep. Tom Allen (D-Maine) reintroduced the Prescription Drug Fairness for Seniors Act to protect senior citizens from drug price discrimination and make prescription drugs available to Medicare

AMENDED MASTER CONSOLIDATED          - 185 -
CLASS ACTION COMPLAINT

beneficiaries at substantially reduced prices. According to Rep. Allen, the legislation is intended to allow pharmacies that serve Medicare beneficiaries to purchase prescription drugs at the average price that the drugs are sold in other developed nations. Rep. Allen estimated that his legislation would reduce prices for brand name prescription drugs, on average, by 40 percent.

550.    Faced with growing Congressional and public scrutiny, and recognizing that true drug pricing reform would likely involve price controls or other unwelcome government regulation, certain Defendants introduced a number of pharmaceutical "discount" cards to Medicare beneficiaries.

### 1.    GSK Orange Card

551.    On October 3, 2001, GSK launched its Orange Card. According to a GSK press release, the Orange Card – an innovative prescription medicine savings program for seniors in need – was created to "help address a critical gap in prescription drug coverage." The Orange Card, an extension of GSK's patient assistance program, was purportedly designed so participants "will realize average savings of 30% off the usual price they pay for all outpatient GSK medicines. In some cases, savings may be 40% or greater." The Orange Card, effective January 1, 2002, is completely free to participants.

552.    GSK claimed that Orange Card participants would receive direct savings on their purchase of GSK outpatient prescription drugs equal to 25% of its list price to wholesalers – AWP – as reported by *First DataBank*. GSK indicated that participating pharmacies will charge Orange Card holders no more than a negotiated price for outpatient GSK prescription drugs. Because of variations in pharmacy prices, according to GSK, actual savings to Orange Card participants on each prescription will vary. However, GSK expected participants to realize average savings of 30% off the price individuals without prescription drug coverage would usually pay for GSK medicines at their pharmacy. In some cases, GSK claimed that savings

could be 40% or greater depending on their pharmacy's usual and customary price for the prescribed GSK medicine.

     553.    The same press release quoted GSK CEO Jean-Pierre Garnier:

> The GlaxoSmithKline Orange Card program assists low-income seniors who have no prescription coverage. We support a Medicare prescription drug benefit, but while the issue is still being debated in Congress, GSK wants to provide relief now for America's most needy seniors.

****

> We spend a great deal of time and effort in developing effective medicines. With the Orange Card, we hope to help participants be able to afford to follow their doctors' prescribed treatment and realize the full value of those medicines through a longer healthier life.

     554.    According to the October 3, 2002 press release, eleven million seniors are eligible for the Orange Card. Those eligible are senior citizens age 65 and older, and the disabled, who are enrolled in Medicare and: (1) have annual incomes at or below 300% of the federal poverty level (annual incomes at or below $26,000 single or $35,000 for a couple) and (2) lack public or private insurance programs or other pharmaceutical benefit programs, such as Medicaid.

     555.    GSK reported that seniors and other Medicare beneficiaries could apply for the Orange Card through healthcare providers or by calling a toll-free number. The Orange Card application process began immediately, and participants could begin using it on January 1, 2002. According to GSK, seniors could simply present the Orange Card with their prescription to their pharmacist to receive the savings on GSK outpatient prescriptions. GSK retained Express Scripts Specialty Distribution Services to administer the Orange Card program.

     556.    By October 2002, just one year after the launch of the Orange Card, GSK had enrolled over 100,000 seniors and other Medicare beneficiaries. GSK's participation in the Together Card alliance did not affect its Orange Card program. Orange Card and Together Card participants receive identical discounts on all GSK outpatient prescriptions.

AMENDED MASTER CONSOLIDATED     - 187 -
CLASS ACTION COMPLAINT

2.    **Novartis Care Card**

557.    In November of 2001, just one month after GSK announced the Orange Card,
Novartis launched its Care Plan. Novartis claims that the Novartis Care Plan "is a
comprehensive and flexible prescription savings plan that offers help to a broad range of lower
income patients enrolled in Medicare without prescription drug coverage." The Care Plan,
effective January 1, 2002, purports to be completely free to participants.

558.    The Care Plan claims to offer "participating prescription medicines to patients
with annual income up to $18,000 ($24,000 per couple) for a $12 flat fee per prescription.
Individuals whose annual income is between $18,000-28,000 ($24,000-38,000 per couple) will
receive 25-40% savings off their usual [AWP] price, on selected Novartis products." Novartis
estimated that eleven million Medicare recipients might be eligible for its Care Plan.

559.    According to Novartis, eligible applicants would receive a Care Card from either
Novartis or their participating pharmacy. Participants would present their Care Card and
prescription to a participating pharmacy. The pharmacist would automatically reduce the
participant's cost based on his or her eligibility. In turn, Novartis paid participating pharmacies
$5 per enrollee. Novartis retained McKesson Health Solutions to administer its Care Card.

560.    Although existing cardholders could still use the Novartis Care Card, after the
launch of the Together Card in April of 2002, Novartis directed all of its new Care Plan
applicants to the Together Card.

561.    Novartis, on its company website, offered an explanation as to why it forged an
alliance with six competing pharmaceutical manufacturers:

> When the Novartis Care Card was launched, *Novartis issued a*
> *call-to-action asking other pharmaceutical companies to help*
> *create an interim solution to help Medicare recipients who lack*
> *drug coverage.* Novartis joined the Together Rx card to help this
> population gain access to medicines with a single, easy-to-use
> card. The Together Rx card represents a voluntary industry
> contribution to an immediate interim solution for millions of
> Medicare enrollees without prescription drug coverage. Each of the

AMENDED MASTER CONSOLIDATED              - 188 -
CLASS ACTION COMPLAINT

participating companies supports long-term solutions by federal
and/or state governments.  [Emphasis added.]

**C.      Implementation of the Together Rx Card Program**

562.    On April 10, 2002, the Together Card Defendants announced their new

pharmaceutical alliance, Defendant Together Rx, LLC.  According to the Together Card

Defendants' joint press release:

> For the first time, millions of people enrolled in Medicare will
> have access to savings on more than 150 widely prescribed
> medicines through one free, easy-to-use card unveiled by seven
> major pharmaceutical companies.  By offering one-card access to
> savings on more medicines than any existing pharmaceutical
> company savings program, the Together Rx Card makes it easier
> for 8 to 11 million Medicare enrollees who have no prescription
> drug coverage to get the medicines they need to help them
> maintain active and independent lifestyles.

****

> The lack of prescription drug coverage among Medicare
> beneficiaries is a serious national problem that no individual
> company can solve.

****

> Together Rx encourages other pharmaceutical companies to join
> the coalition in this significant step forward.

563.    BMS states on its website that it "has teamed up" with the other Together Card

Defendants to form the Together Card Program, which BMS describes as "the most

comprehensive savings program ever offered by the pharmaceutical industry."  It further states:

"One free card + seven pharmaceutical companies = significant savings."

564.    The alliance of Together Card Defendants states that it has communicated with

"about a dozen manufacturers" to join the alliance.  The Chief Executive Officer of at least one

major pharmaceutical company that created its own discount card program publicly rejected a

joint discount program among competing pharmaceutical companies because it violated

"antitrust regulations."  *See* Niala Boodhoo, "Lilly Joins Discount Drug Card Bandwagon,"

*Reuters*, Mar. 12, 2002.

AMERICAN MASTER CONSOLIDATED          - 189 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

565.   Although not a Founding Together Card Defendant, TAP's website presently indicates that it participates in the Together Card Program through its blockbuster drug, Prevacid (along with Abbott). Prevacid's U.S. sales in 2002 totaled $3.7 billion.

566.   The Together Card Defendants claim that the Together Card Program, effective in early June of 2002, provides savings to eligible Medicare enrollees on more than 170 widely prescribed brand name medicines, including 26 different medicines used to treat diabetes, hypertension, high cholesterol, cancer, allergy, asthma, arthritis and depression, which are among the most common conditions affecting older Americans.

567.   The Together Card Defendants prominently proclaim that members will "save on these brand-name medicines with Together Rx." The medicines are: Accolate, Aciphex, Advair Diskus, Agenerase, Albenza, Allegra, Allegra-D Extended Release Tablets, Amaryl, Amerge, Amoxil, Anxemet Tablets, Arava Tablets, Arimidex, Atacand, Atacand HCT, Augmentin, Avandamet, Avandia, Avodart, Axert, Azmacort Inhalation Aerosol, Bactroban Cream, Beconase, Biaxin Filmtab, Biaxin XL Filmtab, Biaxin Granules, Bicitra, BuSpar, Carafate Tablets and Suspension, Casodex, Ceftin Tablets and Power for Oral Suspension, Cefzil, Clozaril, CombiPatch, Combivir, Compazine, Comtan, Concerta, Coreg, Coumadin, Daraprim Tablets, Depakote, Depakote Sprinkle Capsules, Depakote ER, Dexedrine, DiaBeta, Diovan, Diovan HCT, Ditropan, Duragesic, Dyazide, Elidel, Elmiron, Emla Anesthetic Disc, Emla Cream, Entocort EC, Epivir, Epivir-HBV, Erycette, Eskalith CR, Estraderm, Exelon, Famvir, Femara, Flexeril, Flonase, Flovent, Floxin, Focalin, Glucophage, Glucophage XR, Glucovance, Grifulviin V, Imitrex, Kaletra, Lamictal, Lamisil, Lanoxicaps, Lanoxin, Lantus, Lasix, Lescol/Lescol XL, Leukeran Tablets, Levaquin, Lotensin, Lotensin HCT, Lotrel, Malarone, Mavik, Mepron, Metaglip, Miacalcin Injection & Nasal Spray, Monistat-Derm, Monopril, Monopril-HCT, Mycelex, Myleran, Nasacort, Nasacort AQ Nasal Spray, Neutraphos, Nexium, Nolvadex, Norvir, Omnicef Capsules/Oral Suspension, Pancrease, Parafon Forte DSC, Parlodel,

Parnate, Paxil, Plendil, Polycitra, Pravachol, Prevacid, PrevPac, Prilosec, Pulmicort Turbuhaler,

Purinethol, Regranex, Relafen, Relenza, Reminyl, Renova, Requip, Rescula, Retin-A, Retrovir,

Rhinocort Aqua Nasal Spray, Risperdal, Risperdal M-Tab, Ritalin hydrochloride, Ritalin LA,

Serevent, Seroquel, Serzone, Sinemet, Sinemet CR, Spectazole, Sporanox, Starlix, Stelazine,

Synthroid, Tabloid brand Thiguanine, Tagamet, Tarka, Tegretol, Tegretol XR, Tequin, Terazol,

Thorazine, Tolectin, Topamax, Toprol-XL, Trental, TriCor, Trileptal, Trizivir, Tylenol with

Codeine, Tylox, Ultracet, Ultram, Urispas, Valtrex, Vascor, Ventolin, Vermos, Vivelle/Vivelle-

Dot, Voltaren Ophthalmic, Wellburtin SR, Zaditor, Zantac, Zelnorm, Ziagen, Zofran, Zomig,

Zomig-ZMT, Zovirax, and Zyban.

568.   The drugs manufactured by Abbott and distributed through the Together Card
Program, include but may not be limited to:  Biaxin Filmtab, Biaxin XL Filmtab, Depakote,
Depakote Sprinkle Capsules, Depakote ER, Kaletra, Mavik, Norvir, Omnicef Capsules/Oral
Suspension, Prevacid, PrevPac, Synthroid, Tarka, and TriCor.

569.   The drugs manufactured by AstraZeneca and distributed through the Together
Card Program include, but may not be limited to: Accolate, Arimidex, Atacand, Atacand HCT,
Casodex, Emla Anesthetic Disc, Emla Cream, Entocort, Nexium, Nolvadex, Plendil, Prilosec.
Pulmicort Turbuhaler, Rhinocort Aqua, Seroquel, Toprol, Zomig, and Zomig-ZMT.

570.   The drugs manufactured by Aventis and distributed through the Together Card
Program include, but may not be limited to: Allegra, Allegra-D, Amaryl, Anzemet Tablets,
Arava Tablets, Azmacort, Carafate Tablets and Suspension, DiaBeta, Intal, Lantus, Lasix,
Nasacort, Nasacort AQ, Tilade, and Trental.

571.   The drugs manufactured by BMS and distributed through the Together Card
Program include, but may not be limited to: BuSpar, Cefzil, Coumadin, Glucophage,
Glucophage XR, Glucovance, Metaglip, Monopril, Monopril HCT, Pravachol, Serzone, Sinemet,
Sinemet CR, and Tequin.

AMENDED MASTER CONSOLIDATED          - 191 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

572.    The drugs manufactured by GSK and distributed through the Together Card Program include, but may not be limited to: Agenerase, Albenza, Alkeran Tablets, Amerge, Amoxil, Augmentin, Avandamet, Avandia, Avodart, Bactroban Cream, Beconase, Ceftin Tablets and Powder for Oral Suspension, Combivir, Compazine, Coreg, Daraprim Tablets, Dyazide, Epivir, Epivir-HBV, Eskalith CR, Flonase, Flovent, Imitrex, Lamictal, Lanoxicaps, Lanoxin, Leukeran Tablets, Malarone, Mepron, Myleran, Parnate, Paxil, Purinethol, Relafen, Relenza, Requip, Retrovir, Serevent, Stelazine, Tagamet, Tabloid brand Thioguanine, Thorazine, Trizivir, Urispas, Valtrex, Ventolin, Wellbutrin, Zantac, Ziagen, Zofian, Zovirax and Zyban.

573.    The drugs manufactured by J&J and distributed through the Together Card Program include, but may not be limited to:  Aciphex, Bicitra, Concerta, Ditropan XL, Duragesic, Ehmiron, Erycette, Flexeril, Floxin, Grifulvin V, Haldol, Levaquin, Monistat-Derm, Mycelex, Neutraphos, Pancrease, Parafon Forte DSC, Polycitra, Regranex, Reminyl, Renova, Retin-A Micro, Risperdal, Spectrazole, Sporanox, Terazol, Tolectin, Topamax, Tylenol with Codeine, Tylox, Ultracet, Ultram, Vascor and Vermox.

574.    The drugs manufactured by Novartis and distributed through the Together Card Program include, but may not be limited to:  Clozaril, CombiPatch, Comtan, Diovan, Diovan HCT, Elidel, Estraderm, Exelon, Famvir, Femara, Focalin, Lamisil, Lescol/Lescol XL, Lotensin, Lotensin HCT, Miacalcin Injection & Nasal Spray, Parlodel, Rescula, Ritalin Hydrochloride, Ritalin LA, Starlix, Tegretol, Tegretol-XR, Trileptal, Vivelle/Vivelle-Dot, Voltaren Opthalmic, Zaditor, and Zelnorm.

575.    The drugs manufactured by TAP and distributed through the Together Card Program, include but may not be limited to: Prevacid.

**D.    Marketing of the Together Card Program**

576.    The Founding Together Card Defendants encouraged immediate and widespread enrollment in the Together Card Program:

1534.16 0046 BSC.DOC

> The individual companies' sales forces, which total more than
> 30,000 representatives, will assist in making enrollment materials
> available through participating pharmacies, physicians' offices and
> community centers.

****

> The members of Together Rx are committed to maximizing
> enrollment in the Together Rx Card and at the same time to
> identifying patients who may qualify for their independent [patient
> assistance programs].

577.    According to the Founding Together Card Defendants, "[p]harmacies across the

country . . . have shown strong support for the [Together Card]. In addition to accepting the card

at their retail outlets in communities across America, participating pharmacies have made the

commitment to pass through direct to the patient 100% of the savings being offered by the

pharmaceutical companies."

578.    The website of the alliance, www.together-rx.com, addresses enrollment,

eligibility and use issues pertaining to the Together Card:

> Enrollment in Together Rx is free. There is no fee to apply for or
> to receive the Card. Enrollees apply for the Together Rx Card by
> completing and mailing a postage-paid application available from
> Together Rx.

****

> Together Rx Card users present the Card, along with their doctor's
> prescription (or when obtaining a refill), at a participating
> pharmacy. Card users are to receive savings right at the pharmacy
> counter. The Card could be used at participating retail pharmacies
> beginning June 2002.

****

> Approximately 11 million Medicare enrollees may be eligible for
> Together Rx. Enrollees must: (1) be a Medicare enrollee; (2) have
> an annual income of less than $28,000 (individuals) or $38,000
> (couples); and (3) not have public or private prescription drug
> coverage. In Alaska, enrollees must have an annual income of less
> than $35,000 (single) or $48,000 (couple). In Hawaii, enrollees
> must have an annual income less than $33,000 (single) or $44,000
> (couple). Households of three or more are to contact Together Rx
> for eligibility information.

AMENDED MASTER CONSOLIDATED                    - 193 -
CLASS ACTION COMPLAINT

579.    The Founding Together Card Defendants, in their April 10, 2002 press release and at www.together-rx.com, claim participants in the Together Card Program will save "approximately 20-40% off the amount [they] usually pay for prescriptions and, in many cases, substantially more." The Founding Together Card Defendants also note:

> This range of savings reflects the mix of savings programs presently offered by each company and is subject to change. Each company sets its own levels of savings independently, with a minimum savings of 15% off its list price to wholesalers [AWP]. Actual consumer savings may vary depending on a pharmacy's customary pricing for a specific medicine and each company's saving program requirements, including any minimum quantity requirements. Each company independently determines which products are included in the savings program. Products covered are subject to change. [Emphasis added].

580.    The Founding Together Card Defendants' promotional efforts yielded an immediate and tremendous response from seniors. According to another press release, by July 29, 2002, enrollment in the Together Card Program had reached 118,000. The Founding Together Card Defendants encouraged "other pharmaceutical companies to join this effort and help broaden the number of products offered." By November of 2002, enrollment was estimated at nearly 400,000. Just weeks earlier, on October 3, 2002, a spokesman for BMS claimed that the Together Card had already saved seniors $6.4 million on prescription drugs since June of 2002.

581.    On their Together Rx website, the Together Card Defendants offered the following response to the question "Why are all these pharmaceutical companies doing this?":

> The participating companies are committed to providing seniors and other eligible Medicare patients with broader access to savings on many medications with convenience of one card. Together Rx is designed to fill a gap in the system for the short term. The real solution is implementation of Medicare reform, including a prescription drug benefit.

582.    The current website continues to promise savings:

> **Savings and medicines. Together.**

AMELDED MASTER CONSOLIDATED                  - 194 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

> **Save big on many commonly prescribed medicines.**
> Together RX is a prescription savings program that offers a free,
> easy way to save approximately 20% to 40% on brand-name
> medicines and, in many cases, much more (depending on your
> prescription and pharmacy).  You can save on more than 170
> medicines (click here to see the entire list).  And some pharmacies
> even offer savings on generics.

583.   On February 3, 2003, Together Rx informed pharmaceutical industry publication

*The Pink Sheet* that Together Card enrollment had recently surpassed 570,000 members.

Together Rx also indicated that it had targeted 2003 enrollment at 1.5 million members.

**E.     The Together Card Defendants' Conspiracy to Fix the AWP Spread of the Together
         Card Drugs**

584.   Although claiming its purpose was to help provide Medicare beneficiaries with

"broader access to savings" on prescription pharmaceuticals, the Together Card Defendants used

their alliance and the Together Card Program to raise, fix, maintain and/or stabilize the AWP

spread for their prescription drugs and maximize profits.

585.   When the Together Card Defendants aligned themselves in order to offer a

combined drug discount card for elderly Americans, they perceived a significant problem with a

discount card effort — elderly and poor Americans *might actually end up paying less* for their

prescription drugs.  Although the Together Card Defendants did not necessarily object to elderly

and poor Americans paying less for drugs, they did not want to bear that expense themselves.

The quandary continued, however, because others in the distribution chain — major retail

pharmacy chains, PBMs, wholesalers — similarly did not wish to bear the cost of reduced

expenditures by elderly and poor Americans.  Put differently, the discounts could not be borne

by retail pharmacists or wholesalers (given their claim to already being squeezed on margin).

586.   Moreover, administration of the Together Card Program would itself carry some

cost.  While the Together Card Defendants wished the publicity attendant on providing a "free"

discount drug card, they did not wish to bear the financial administrative costs for the program,

and they needed to persuade retail pharmacists to participate without incurring product or administrative costs.

587.    As a result of their desire to avoid the financial burden of the Together Rx Program, the Together Card Defendants conspired and agreed to simply impose the burden of the Together Card Drugs right back upon consumers by raising reimbursement or end payor prices (typically based on AWPs) in relation to actual cost to wholesalers, pharmacies and mail order companies (typically tied in some way to WAC, although subject to discounting and rebates).

588.    Specifically, in conjunction with the establishment and management of their Together Card Program, the Together Card Defendants agreed to raise, fix, maintain and/or stabilize the AWP "spread" on nearly every one of the 170+ drugs included in the Together Card Program. The Together Card Defendants increased the AWP spread on most of their Together Card Drugs – across many therapeutic classes and product lines. The 170+ Together Card Drugs account for approximately 900 pharmaceutical line-items (the line-items reflecting the 170+ drugs in different forms, sizes and dosages). The AWP spread for over 80% of these line-items were increased.

589.    Put simply, by increasing the difference between posted AWPs and posted WAC, the Together Card Defendants created spread dollars available to others in the distribution chain as an incentive to participate in the program — all to the detriment, and only to the detriment, of end payros (and enrollees).

590.    Prior to the formation of the Together Rx alliance, the AWPs for the Together Card Drugs reflected an AWP pricing spread of roughly 20% (AWP – WAC/WAC). Following formation of the alliance, the Together Card Defendants increased the AWP spreads for these same drugs to a range of 21-26%, whether sold through or outside of the Together Card Program. As reflected by the chart below, the percentage of all Together Card Drugs manufactured by the Together Card Defendants with an AWP spread level greater than 24% increased from 25.5 % in

AMENDED MASTER CONSOLIDATED               - 196 -
CLASS ACTION COMPLAINT

J534.16 0046 BSC.DOC

2000 – prior to the development and implementation of the Together Card Program – to 92% by

2002, as depicted by the following chart.



Percentage of Together Card Drugs with
AWP Spread Level > 24% from Dec. 1997 to Dec. 2002

591.    An increase in the AWP spread was often achieved through an increase in the
AWP of a Together Card Drug. An increase in AWP directly results in higher prices to Plaintiffs
and the Nationwide End Payor Together Card Class. For example, in the case of AstraZeneca's
Prilosec (as reflected in the chart below), the AWP spread increase raised the AWP for that drug
by $295.72. The following chart reflects, for a single drug manufactured by each Founding
Together Card Defendant, the AWP spread increase and related AWP increase which occurred as
a result of the Together Card Program.

| Together Card Defendant | Together Card Drug | AWP Before Alliance | WAC Before Alliance | AWP Spread Before Alliance | AWP After Alliance | WAC After Alliance | AWP Spread After Alliance |
|---|---|---|---|---|---|---|---|
| Abbott | Biaxin 500 mg #60 | $396.72 | $334.08 | 18.8% | $437.98 | $350.38 | 25% |
| AstraZeneca | Prilosec 40 mg #1000 | $6,171.66 | $5,143.05 | 20% | $6,621.67 | $5,297.34 | 25% |
| Aventis | Allegra 60 mg #100 | $118.36 | $98.63 | 20% | $123.29 | $98.63 | 25% |
| BMS | Tequin 400 mg #100 | $818.86 | $682.27 | 20% | $895.48 | $716.38 | 25% |
| GSK | Combivir #100 | $1,241.26 | $1,034.38 | 20% | $1,370.55 | $1,096.44 | 25% |
| J&J (Janssen) | Risperdal 2 mg #500 | $2,320.10 | $1,933.42 | 20% | $2,535.20 | $2,028.16 | 25% |
| Novartis | Exelon 2 mg/ml | $246.96 | $205.80 | 20% | $267.29 | $213.83 | 25% |

Almost all of the Together Card Drugs experienced similar AWP spread increases and related
AWP increases.

592.    The Together Card Defendants' increases in AWP spreads occurred in 2001 and
2002. The effectively simultaneous timing of the Together Card Defendants' increases in AWP
spreads is unprecedented in terms of scope (i.e. number of products per manufacturer and
number of manufacturers within the pharmaceutical industry). The Together Card Defendants'
increases in AWP spread for the Together Card Drugs are not consistent with competitive
conduct.

593.   The Together Card Defendants' conduct is also inconsistent with their alleged motive to make prescription drugs more affordable to Medicare recipients by offering discounts on prescription prices.  Indeed, the Together Card Defendants' immediate increase of the AWP spread on their Together Card Drugs diluted any meaningful discount for the relatively small number of eligible consumers and raised the price for other consumers significantly beyond what was charged prior to the Together Card Defendants' formation of the alliance.

594.   The Together Card Defendants' conspiracy — agreeing to raise, fix, maintain and/or stabilize the AWP spread of their Together Card Drugs under the guise of a discount program – directly caused Plaintiffs to pay substantially more for those drugs than they would have paid if the Together Card Defendants had not engaged in their illegal conduct.

## VIII.   CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME

595.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and two Classes comprised of:

> *AWP Payor Class:*
>
> All persons or entities who, for purposes other than resale and during the Class Period, paid any portion of the purchase for a prescription drug manufactured by a Defendant Drug Manufacturer (as identified in Appendix A) at a price calculated by reference to the published AWP during the Class Period.[10]
>
> *Sub-Class:  The PBM Third-Party Payor Class:*
>
> All Third-Party Payors that, during the Class Period, contracted with a PBM to provide to its participants a prescription drug manufactured by a Defendant Drug Manufacturer and identified in Appendix A.

Excluded from the Classes are (a) each Defendant and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors;

---

[10] Plaintiffs reserve the right to modify the Class Definition based on class related discovery and/or merits discovery.

AMENDED MASTER CONSOLIDATED                    - 200 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC