**The Manufacturer-PBM RICO Enterprises**

651.    For purposes of this claim, the RICO "enterprises" are associations-in-fact consisting of (a) one of the PBMs that administered purchases of a Defendant Drug Manufacturer's brand name drugs and billed its members on the basis of the Defendant Drug Manufacturer's reported AWPs, and (b) a Defendant Drug Manufacturer, including its directors, employees and agents. These associations-in-fact are collectively referred to herein as the "Manufacturer-PBM Enterprises."

652.    Each of the Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Classes that comprise health and welfare plans, and deriving profits from these activities.

653.    Each of the Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the Defendant Drug Manufacturer and the specific PBM that are associates. As to each of the Manufacturer-PBM Enterprises, there is a common communication network by which the Defendant Drug Manufacturer and the specific PBM share information on a regular basis. As to each of the Manufacturer-PBM Enterprises, the Defendant Drug Manufacturer and the specific PBM functioned as a continuing unit. At all relevant times, each of the Manufacturer-PBM Enterprises was operated by the specific Defendant Drug Manufacturer for criminal purposes, namely, carrying out the AWP Scheme.

654.    Each manufacturer-PBM enterprise had a common purpose of perpetuating use of AWPs as a benchmark for reimbursement in the pharmaceutical industry. The manufacturing defendants had this as a purpose, because without the use of inflated AWPs as an industry price setting benchmark, they would not be able to push the spread to those in the distribution chain.

The PBMs share this common purpose, because they are subject to a great deal of control from the manufacturers. PBMs are now turning to drug manufacturers for hidden profit-making schemes, because PBM clients are no longer allowing PBMs to collect as much for claims administration. Thus, as a result, PBMs have, with the knowing and willful participation and assistance of the drug manufacturers, engaged in hidden profit-making schemes falling into three general categories: (i) garnering rebates and other "soft dollars" from drug manufacturers that the PBM Defendants, to a large extent, keep without disclosing to their health plans the true amounts of the rebates; (ii) pocketing secret spreads between actual drug costs and the prices charged to health plans and their members; and (iii) keeping secret discounts provided by the drug manufacturers in association with the PBMs' mail order operations.

655. The existence and magnitude of PBM rebates and accompanying profits at the expense of PBM clients is acknowledged within the PBM industry. For example, a recent industry report observed:

> [R]ebates paid to the PBMs by pharmaceutical companies continue to increase, as evidenced by the increasing PBM profits . . . . [T]his should hold true so long as the PBMs add value [apparently to the drug makers] by moving market share within drug classes.

656. Thus, PBMs were willing participants in the enterprise, and each participant in the enterprise shared many common purposes.

657. Further, as a result of their reliance on the manufacturers, PBMs took instructions and commands from the manufacturers regarding the use of AWP, not only so that they could keep part of the spread, but also so as to continue to earn from the manufacturers: (i) *Access rebates* for placement of products on the PBMs' formulary; (ii) *Market share rebates* for garnering higher market share than established targets; (iii) *Administrative fees* for assembling data to verify market share results; and (iv) *Other fees and grants* in an effort to promote products.

AMENDED MASTER CONSOLIDATED            - 241 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

658.    In order to garner all of these fees from the drug manufacturers, the PBMs each meet on a frequent basis to discuss drug prices, spreads, marketing opportunities and coordination of all of the above.

659.    There is a common communication network between each PBM and each manufacturer for the purpose of implementing the AWP spread scheme and for the exchange of financial rewards for the PBMs activities that benefit the drug company manufacturers.

660.    At all relevant times, each one of the PBMs was aware of the Defendants Drug Manufacturers' AWP Scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.

661.    For purposes of this count, the Manufacturer-PBM Enterprises are identified as follows:

(a)    *The Abbott Manufacturer-PBM Enterprises:*  The Abbott Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Abbott's AWPIDs and billed its members on the basis of Abbott's reported AWPs, and Abbott, including its directors, employees and agents: (1) the Abbott-AdvancePCS Enterprise; (2) the Abbott-Caremark Rx Enterprise; (3) the Abbott-Express Scripts Enterprise; and (4) the Abbott-Medco Health Enterprise.  Each of the Abbott Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Abbott Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and Abbott and Medco Health.  As to each of these Abbott

Manufacturer-PBM Enterprises, there is a common communication network by which
Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and
Abbott and Medco Health share information on a regular basis.  As to each of these
Abbott-Manufacturer-PBM Enterprises, Abbott and AdvancePCS, Abbott and Caremark
Rx, Abbott and Express Scripts, and Abbott and Medco Health functioned as continuing
but separate units.  At all relevant times, each of the Abbott Manufacturer-PBM
Enterprises was operated and conducted by Abbott for criminal purposes, namely,
carrying out the AWP Scheme.

   (b)  *The Amgen Manufacturer-PBM Enterprises:*  The Amgen Manufacturer-
PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs
that administered purchases of Amgen's AWPIDs and billed its members on the basis of
Amgen's reported AWPs, and Amgen, including its directors, employees and agents:
(1) the Amgen-AdvancePCS Enterprise; (2) the Amgen-Caremark Rx Enterprise; (3) the
Amgen-Express Scripts Enterprise; and (4) the Amgen-Medco Health Enterprise.  Each
of the Amgen Manufacturer-PBM Enterprises is an ongoing and continuing business
organization consisting of both corporations and individuals that are and have been
associated for the common or shared purposes of selling, purchasing, prescribing and
administering AWPIDs to Plaintiffs and Class members, and deriving profits from these
activities.  Each of the Amgen Manufacturer-PBM Enterprises has a systemic linkage
because there are contractual relationships, financial ties, and continuing coordination of
activities between Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and
Express Scripts, and Amgen and Medco Health.  As to each of these Amgen
Manufacturer-PBM Enterprises, there is a common communication network by which
Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and Express Scripts, and
Amgen and Medco Health share information on a regular basis.  As to each of these

Amgen-Manufacturer-PBM Enterprises, Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and Express Scripts, and Amgen and Medco Health functioned as continuing but separate units. At all relevant times, each of the Amgen Manufacturer-PBM Enterprises was operated and conducted by Amgen for criminal purposes, namely, carrying out the AWP Scheme.

      (c)    *The AstraZeneca Manufacturer-PBM Enterprises:* The AstraZeneca Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of AstraZeneca's AWPIDs and billed its members on the basis of AstraZeneca's reported AWPs, and AstraZeneca, including its directors, employees and agents: (1) the AstraZeneca-AdvancePCS Enterprise; (2) the AstraZeneca-Caremark Rx Enterprise; (3) the AstraZeneca-Express Scripts Enterprise; and (4) the AstraZeneca-Medco Health Enterprise. Each of the AstraZeneca Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the AstraZeneca Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca and Express Scripts, and AstraZeneca and Medco Health. As to each of these AstraZeneca Manufacturer-PBM Enterprises, there is a common communication network by which AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca and Express Scripts, and AstraZeneca and Medco Health share information on a regular basis. As to each of these AstraZeneca-Manufacturer-PBM Enterprises, AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca and Express Scripts, and

AstraZeneca and Medco Health functioned as continuing but separate units. At all relevant times, each of the AstraZeneca Manufacturer-PBM Enterprises was operated and conducted by AstraZeneca for criminal purposes, namely, carrying out the AWP Scheme.

      (d)    *The Aventis Group Manufacturer-PBM Enterprise:* The Aventis Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Aventis Group's AWPIDs and billed its members on the basis of Aventis Group's reported AWPs, and Aventis Group, including its directors, employees and agents: (1) the Aventis Group-AdvancePCS Enterprise; (2) the Aventis Group-Caremark Rx Enterprise; (3) the Aventis Group-Express Scripts Enterprise; and (4) the Aventis Group-Medco Health Enterprise. Each of the Aventis Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Aventis Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health. As to each of these Aventis Group Manufacturer-PBM Enterprises, there is a common communication network by which Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health share information on a regular basis. As to each of these Aventis Group-Manufacturer-PBM Enterprises, Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Aventis Group

Manufacturer-PBM Enterprises was operated and conducted by Aventis Group for criminal purposes, namely, carrying out the AWP Scheme.

(e)     *The Baxter Manufacturer-PBM Enterprises:*  The Baxter Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Amgen's AWPIDs and billed its members on the basis of Baxter's reported AWPs, and Baxter, including its directors, employees and agents: (1) the Baxter-AdvancePCS Enterprise; (2) the Baxter-Caremark Rx Enterprise; (3) the Baxter-Express Scripts Enterprise; and (4) the Baxter-Medco Health Enterprise.  Each of the Baxter Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Baxter Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health.  As to each of these Baxter Manufacturer-PBM Enterprises, there is a common communication network by which Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health share information on a regular basis.  As to each of these Baxter-Manufacturer-PBM Enterprises, Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Baxter Manufacturer-PBM Enterprises was operated and conducted by Baxter for criminal purposes, namely, carrying out the AWP Scheme.

AMENDED MASTER CONSOLIDATED                  - 246 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

(f)     *The Bayer Manufacturer-PBM Enterprises:*  The Bayer Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Bayer's AWPIDs and billed its members on the basis of Bayer's reported AWPs, and Bayer, including its directors, employees and agents: (1) the Bayer-AdvancePCS Enterprise; (2) the Bayer-Caremark Rx Enterprise; (3) the Bayer-Express Scripts Enterprise; and (4) the Bayer-Medco Health Enterprise.  Each of the Bayer Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Bayer Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health.  As to each of these Bayer Manufacturer-PBM Enterprises, there is a common communication network by which Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health share information on a regular basis.  As to each of these Bayer-Manufacturer-PBM Enterprises, Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Bayer Manufacturer-PBM Enterprises was operated and conducted by Bayer for criminal purposes, namely, carrying out the AWP Scheme.

(g)     *The Boehringer Group Manufacturer-PBM Enterprise:*  The Boehringer Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Boehringer Group's AWPIDs and billed its members on the basis of Boehringer Group's reported AWPs, and Boehringer Group,

including its directors, employees and agents: (1) the Boehringer Group-AdvancePCS Enterprise; (2) the Boehringer Group-Caremark Rx Enterprise; (3) the Boehringer Group-Express Scripts Enterprise; and (4) the Boehringer Group-Medco Health Enterprise. Each of the Boehringer Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Boehringer Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Boehringer Group and AdvancePCS, Boehringer Group and Caremark Rx, Boehringer Group and Express Scripts, and Boehringer Group and Medco Health. As to each of these Boehringer Group Manufacturer-PBM Enterprises, there is a common communication network by which Boehringer Group and AdvancePCS, Boehringer Group and Caremark Rx, Boehringer Group and Express Scripts, and Boehringer Group and Medco Health share information on a regular basis. As to each of these Boehringer Group-Manufacturer-PBM Enterprises, Boehringer Group and AdvancePCS, Boehringer Group and Caremark Rx, Boehringer Group and Express Scripts, and Boehringer Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Boehringer Group Manufacturer-PBM Enterprises was operated and conducted by Boehringer Group for criminal purposes, namely, carrying out the AWP Scheme.

(h)     *The Braun Manufacturer-PBM Enterprise:* The Braun Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Braun's AWPIDs and billed its members on the basis of Braun's reported AWPs, and Braun, including its directors, employees and agents: (1)

the Braun-AdvancePCS Enterprise; (2) the Braun-Caremark Rx Enterprise; (3) the
Braun-Express Scripts Enterprise; and (4) the Braun-Medco Health Enterprise. Each of
the Braun Manufacturer-PBM Enterprises is an ongoing and continuing business
organization consisting of both corporations and individuals that are and have been
associated for the common or shared purposes of selling, purchasing, prescribing and
administering AWPIDs to Plaintiffs and Class members, and deriving profits from these
activities. Each of the Braun Manufacturer-PBM Enterprises has a systemic linkage
because there are contractual relationships, financial ties, and continuing coordination of
activities between Braun and AdvancePCS, Braun and Caremark Rx, Braun and Express
Scripts, and Braun and Medco Health. As to each of these Braun Manufacturer-PBM
Enterprises, there is a common communication network by which Braun and
AdvancePCS, Braun and Caremark Rx, Braun and Express Scripts, and Braun and
Medco Health share information on a regular basis. As to each of these Braun-
Manufacturer-PBM Enterprises, Braun and AdvancePCS, Braun and Caremark Rx,
Braun and Express Scripts, and Braun and Medco Health functioned as continuing but
separate units. At all relevant times, each of the Braun Manufacturer-PBM Enterprises
was operated and conducted by Braun for criminal purposes, namely, carrying out the
AWP Scheme.

   (i)  *The BMS Group Manufacturer-PBM Enterprises:* The BMS Group
Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each
of the PBMs that administered purchases of BMS Group's AWPIDs and billed its
members on the basis of BMS Group's reported AWPs, and BMS Group, including its
directors, employees and agents: (1) the BMS Group-AdvancePCS Enterprise; (2) the
BMS Group-Caremark Rx Enterprise; (3) the BMS Group-Express Scripts Enterprise;
and (4) the BMS Group-Medco Health Enterprise. Each of the BMS Group

Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the BMS Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health. As to each of these BMS Group Manufacturer-PBM Enterprises, there is a common communication network by which BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health share information on a regular basis. As to each of these BMS Group-Manufacturer-PBM Enterprises, BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the BMS Group Manufacturer-PBM Enterprises was operated and conducted by BMS Group for criminal purposes, namely, carrying out the AWP Scheme.

(j)      *The Fujisawa Group Manufacturer-PBM Enterprise:* The Fujisawa Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Fujisawa Group's AWPIDs and billed its members on the basis of Fujisawa Group's reported AWPs, and Fujisawa Group, including its directors, employees and agents: (1) the Fujisawa Group-AdvancePCS Enterprise; (2) the Fujisawa Group-Caremark Rx Enterprise; (3) the Fujisawa Group-Express Scripts Enterprise; and (4) the Fujisawa Group-Medco Health Enterprise. Each of the Fujisawa Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have

been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Fujisawa Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health. As to each of these Fujisawa Group Manufacturer-PBM Enterprises, there is a common communication network by which Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health share information on a regular basis. As to each of these Fujisawa Group-Manufacturer-PBM Enterprises, Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Fujisawa Group Manufacturer-PBM Enterprises was operated and conducted by Fujisawa Group for criminal purposes, namely, carrying out the AWP Scheme.

(k)     *The GSK Group Manufacturer-PBM Enterprises:* The GSK Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of GSK Group's AWPIDs and billed its members on the basis of GSK Group's reported AWPs, and GSK Group, including its directors, employees and agents: (1) the GSK Group-AdvancePCS Enterprise; (2) the GSK Group-Caremark Rx Enterprise; (3) the GSK Group-Express Scripts Enterprise; and (4) the GSK Group-Medco Health Enterprise. Each of the GSK Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and

AMENDED MASTER CONSOLIDATED          - 251 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

Class members, and deriving profits from these activities.  Each of the GSK Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between GSK Group and AdvancePCS, GSK Group and Caremark Rx, GSK Group and Express Scripts, and GSK Group and Medco Health.  As to each of these GSK Group Manufacturer-PBM Enterprises, there is a common communication network by which GSK Group and AdvancePCS, GSK Group and Caremark Rx, GSK Group and Express Scripts, and GSK Group and Medco Health share information on a regular basis.  As to each of these GSK Group-Manufacturer-PBM Enterprises, GSK Group and AdvancePCS, GSK Group and Caremark Rx, GSK Group and Express Scripts, and GSK Group and Medco Health functioned as continuing but separate units.  At all relevant times, each of the GSK Group Manufacturer-PBM Enterprises was operated and conducted by GSK Group for criminal purposes, namely, carrying out the AWP Scheme.

(*l*)     *The Hoffman-La Roche Manufacturer-PBM Enterprises:*  The Hoffman-La Roche Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Hoffman-La Roche's AWPIDs and billed its members on the basis of Hoffman-La Roche's reported AWPs, and Hoffman-La Roche, including its directors, employees and agents: (1) the Hoffman-La Roche-AdvancePCS Enterprise; (2) the Hoffman-La Roche-Caremark Rx Enterprise; (3) the Hoffman-La Roche-Express Scripts Enterprise; and (4) the Hoffman-La Roche-Medco Health Enterprise.  Each of the Hoffman-La Roche Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Hoffman-La Roche

Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Hoffman-La Roche and AdvancePCS, Hoffman-La Roche and Caremark Rx, Hoffman-La Roche and Express Scripts, and Hoffman-La Roche and Medco Health. As to each of these Hoffman-La Roche Manufacturer-PBM Enterprises, there is a common communication network by which Hoffman-La Roche and AdvancePCS, Hoffman-La Roche and Caremark Rx, Hoffman-La Roche and Express Scripts, and Hoffman-La Roche and Medco Health share information on a regular basis. As to each of these Hoffman-La Roche Manufacturer-PBM Enterprises, Hoffman-La Roche and AdvancePCS, Hoffman-La Roche and Caremark Rx, Hoffman-La Roche and Express Scripts, and Hoffman-La Roche and Medco Health functioned as continuing but separate units. At all relevant times, each of the Hoffman-La Roche Manufacturer-PBM Enterprises was operated and conducted by Hoffman-La Roche for criminal purposes, namely, carrying out the AWP Scheme.

(m)    *The Immunex Manufacturer-PBM Enterprises:*  The Immunex Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Immunex's AWPIDs and billed its members on the basis of Immunex's reported AWPs, and Immunex, including its directors, employees and agents:  (1) the Immunex-AdvancePCS Enterprise; (2) the Immunex-Caremark Rx Enterprise; (3) the Immunex-Express Scripts Enterprise; and (4) the Immunex-Medco Health Enterprise. Each of the Immunex Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Immunex

Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Immunex and AdvancePCS, Immunex and Caremark Rx, Immunex and Express Scripts, and Immunex and Medco Health. As to each of these Immunex Manufacturer-PBM Enterprises, there is a common communication network by which Immunex and AdvancePCS, Immunex and Caremark Rx, Immunex and Express Scripts, and Immunex and Medco Health share information on a regular basis. As to each of these Immunex Manufacturer-PBM Enterprises, Immunex and AdvancePCS, Immunex and Caremark Rx, Immunex and Express Scripts, and Immunex and Medco Health functioned as continuing but separate units. At all relevant times, each of the Immunex Manufacturer-PBM Enterprises was operated and conducted by Immunex for criminal purposes, namely, carrying out the AWP Scheme.

(n)     *The Johnson & Johnson Group Manufacturer-PBM Enterprise:* The Johnson & Johnson Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Johnson & Johnson Group's AWPIDs and billed its members on the basis of Johnson & Johnson Group's reported AWPs, and Johnson & Johnson Group, including its directors, employees and agents: (1) the Johnson & Johnson Group-AdvancePCS Enterprise; (2) the Johnson & Johnson Group-Caremark Rx Enterprise; (3) the Johnson & Johnson Group-Express Scripts Enterprise; and (4) the Johnson & Johnson Group-Medco Health Enterprise. Each of the Johnson & Johnson Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Johnson & Johnson Group Manufacturer-PBM

Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Johnson & Johnson Group and AdvancePCS, Johnson & Johnson Group and Caremark Rx, Johnson & Johnson Group and Express Scripts, and Johnson & Johnson Group and Medco Health. As to each of these Johnson & Johnson Group Manufacturer-PBM Enterprises, there is a common communication network by which Johnson & Johnson Group and AdvancePCS, Johnson & Johnson Group and Caremark Rx, Johnson & Johnson Group and Express Scripts, and Johnson & Johnson Group and Medco Health share information on a regular basis. As to each of these Johnson & Johnson Group-Manufacturer-PBM Enterprises, Johnson & Johnson Group and AdvancePCS, Johnson & Johnson Group and Caremark Rx, Johnson & Johnson Group and Express Scripts, and Johnson & Johnson Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Johnson & Johnson Group Manufacturer-PBM Enterprises was operated and conducted by Johnson & Johnson Group for criminal purposes, namely, carrying out the AWP Scheme.

(o)     *The Pfizer Manufacturer-PBM Enterprises:* The Pfizer Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Pfizer's AWPIDs and billed its members on the basis of Pfizer's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Pfizer-AdvancePCS Enterprise; (2) the Pfizer-Caremark Rx Enterprise; (3) the Pfizer-Express Scripts Enterprise; and (4) the Pfizer-Medco Health Enterprise. Each of the Pfizer Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Pfizer Manufacturer-PBM Enterprises has a systemic linkage

because there are contractual relationships, financial ties, and continuing coordination of activities between Pfizer and AdvancePCS, Pfizer and Caremark Rx, Pfizer and Express Scripts, and Pfizer and Medco Health. As to each of these Pfizer Manufacturer-PBM Enterprises, there is a common communication network by which Pfizer and AdvancePCS, Pfizer and Caremark Rx, Pfizer and Express Scripts, and Pfizer and Medco Health share information on a regular basis. As to each of these Pfizer Manufacturer-PBM Enterprises, Pfizer and AdvancePCS, Pfizer and Caremark Rx, Pfizer and Express Scripts, and Pfizer and Medco Health functioned as continuing but separate units. At all relevant times, each of the Pfizer Manufacturer-PBM Enterprises was operated and conducted by Pfizer for criminal purposes, namely, carrying out the AWP Scheme.

(p)     *The Pharmacia Group Manufacturer-PBM Enterprises:* The Pharmacia Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Pharmacia Group's AWPIDs and billed its members on the basis of Pharmacia Group's reported AWPs, and Pharmacia Group, including its directors, employees and agents: (1) the Pharmacia Group-AdvancePCS Enterprise; (2) the Pharmacia Group-Caremark Rx Enterprise; (3) the Pharmacia Group-Express Scripts Enterprise; and (4) the Pharmacia Group-Medco Health Enterprise. Each of the Pharmacia Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Pharmacia Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pharmacia Group and AdvancePCS, Pharmacia Group and Caremark Rx, Pharmacia Group and Express Scripts, and Pharmacia Group and

Medco Health. As to each of these Pharmacia Group Manufacturer-PBM Enterprises, there is a common communication network by which Pharmacia Group and AdvancePCS, Pharmacia Group and Caremark Rx, Pharmacia Group and Express Scripts, and Pharmacia Group and Medco Health share information on a regular basis. As to each of these Pharmacia Group-Manufacturer-PBM Enterprises, Pharmacia Group and AdvancePCS, Pharmacia Group and Caremark Rx, Pharmacia Group and Express Scripts, and Pharmacia Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Pharmacia Group Manufacturer-PBM Enterprises was operated and conducted by Pharmacia Group for criminal purposes, namely, carrying out the AWP Scheme.

(q)    *The Schering-Plough Group Manufacturer-PBM Enterprises:* The Schering-Plough Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Schering-Plough Group's AWPIDs and billed its members on the basis of Schering-Plough Group's reported AWPs, and Schering-Plough Group, including its directors, employees and agents: (1) the Schering-Plough Group-AdvancePCS Enterprise; (2) the Schering-Plough Group-Caremark Rx Enterprise; (3) the Schering-Plough Group-Express Scripts Enterprise; and (4) the Schering-Plough Group-Medco Health Enterprise. Each of the Schering-Plough Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Schering-Plough Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Schering-Plough Group and AdvancePCS,

Schering-Plough Group and Caremark Rx, Schering-Plough Group and Express Scripts, and Schering-Plough Group and Medco Health.  As to each of these Schering-Plough Group Manufacturer-PBM Enterprises, there is a common communication network by which Schering-Plough Group and AdvancePCS, Schering-Plough Group and Caremark Rx, Schering-Plough Group and Express Scripts, and Schering-Plough Group and Medco Health share information on a regular basis.  As to each of these Schering-Plough Group-Manufacturer-PBM Enterprises, Schering-Plough Group and AdvancePCS, Schering-Plough Group and Caremark Rx, Schering-Plough Group and Express Scripts, and Schering-Plough Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Schering-Plough Group Manufacturer-PBM Enterprises was operated and conducted by Schering-Plough Group for criminal purposes, namely, carrying out the AWP Scheme.

(r)     *The Sicor Group Manufacturer-PBM Enterprises:*  The Sicor Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Sicor Group's AWPIDs and billed its members on the basis of Sicor Group's reported AWPs, and Sicor Group, including its directors, employees and agents:  (1) the Sicor Group-AdvancePCS Enterprise; (2) the Sicor Group-Caremark Rx Enterprise; (3) the Sicor Group-Express Scripts Enterprise; and (4) the Sicor Group-Medco Health Enterprise.  Each of the Sicor Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Sicor Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities

AMENDED MASTER CONSOLIDATED          - 258 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

between Sicor Group and AdvancePCS, Sicor Group and Caremark Rx, Sicor Group and Express Scripts, and Sicor Group and Medco Health. As to each of these Sicor Group Manufacturer-PBM Enterprises, there is a common communication network by which Sicor Group and AdvancePCS, Sicor Group and Caremark Rx, Sicor Group and Express Scripts, and Sicor Group and Medco Health share information on a regular basis. As to each of these Sicor Group-Manufacturer-PBM Enterprises, Sicor Group and AdvancePCS, Sicor Group and Caremark Rx, Sicor Group and Express Scripts, and Sicor Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Sicor Group Manufacturer-PBM Enterprises was operated and conducted by Sicor Group for criminal purposes, namely, carrying out the AWP Scheme.

(s)     *The Watson Manufacturer-PBM Enterprises:* The Watson Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Watson's AWPIDs and billed its members on the basis of Watson's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Watson-AdvancePCS Enterprise; (2) the Watson-Caremark Rx Enterprise; (3) the Watson-Express Scripts Enterprise; and (4) the Watson-Medco Health Enterprise. Each of the Watson Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Watson Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Watson and AdvancePCS, Watson and Caremark Rx, Watson and Express Scripts, and Watson and Medco Health. As to each of these Watson Manufacturer-PBM Enterprises, there is a common communication network by which

Watson and AdvancePCS, Watson and Caremark Rx, Watson and Express Scripts, and Watson and Medco Health share information on a regular basis. As to each of these Watson Manufacturer-PBM Enterprises, Watson and AdvancePCS, Watson and Caremark Rx, Watson and Express Scripts, and Watson and Medco Health functioned as continuing but separate units. At all relevant times, each of the Watson Manufacturer-PBM Enterprises was operated and conducted by Watson for criminal purposes, namely, carrying out the AWP Scheme.

(t)    *The TAP Manufacturer-PBM Enterprises:* The TAP Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of TAP's AWPIDs and billed its members on the basis of TAP's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the TAP-AdvancePCS Enterprise; (2) the TAP-Caremark Rx Enterprise; (3) the TAP-Express Scripts Enterprise; and (4) the TAP-Medco Health Enterprise. Each of the TAP Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the TAP Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between TAP and AdvancePCS, TAP and Caremark Rx, TAP and Express Scripts, and TAP and Medco Health. As to each of these TAP Manufacturer-PBM Enterprises, there is a common communication network by which TAP and AdvancePCS, TAP and Caremark Rx, TAP and Express Scripts, and TAP and Medco Health share information on a regular basis. As to each of these TAP Manufacturer-PBM Enterprises, TAP and AdvancePCS, TAP and Caremark Rx, TAP and Express Scripts, and TAP and Medco Health functioned

as continuing but separate units. At all relevant times, each of the TAP Manufacturer-PBM Enterprises was operated and conducted by TAP for criminal purposes, namely, carrying out the AWP Scheme.

(u)     *The Warrick Manufacturer-PBM Enterprises:* The Warrick Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Warrick's AWPIDs and billed its members on the basis of Warrick's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Warrick-AdvancePCS Enterprise; (2) the Warrick-Caremark Rx Enterprise; (3) the Warrick-Express Scripts Enterprise; and (4) the Warrick-Medco Health Enterprise. Each of the Warrick Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Warrick Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Warrick and AdvancePCS, Warrick and Caremark Rx, Warrick and Express Scripts, and Warrick and Medco Health. As to each of these Warrick Manufacturer-PBM Enterprises, there is a common communication network by which Warrick and AdvancePCS, Warrick and Caremark Rx, Warrick and Express Scripts, and Warrick and Medco Health share information on a regular basis. As to each of these Warrick Manufacturer-PBM Enterprises, Warrick and AdvancePCS, Warrick and Caremark Rx, Warrick and Express Scripts, and Warrick and Medco Health functioned as continuing but separate units. At all relevant times, each of the Warrick Manufacturer-PBM Enterprises was operated and conducted by Warrick for criminal purposes, namely, carrying out the AWP Scheme.

(v)     *The Dey Manufacturer-PBM Enterprises:*  The Dey Manufacturer-PBM
Enterprises are four separate associations-in-fact consisting of each of the PBMs that
administered purchases of Dey's AWPIDs and billed its members on the basis of Dey's
reported AWPs, and Pfizer, including its directors, employees and agents:  (1) the Dey-
AdvancePCS Enterprise; (2) the Dey-Caremark Rx Enterprise; (3) the Dey-Express
Scripts Enterprise; and (4) the Dey-Medco Health Enterprise.  Each of the Dey
Manufacturer-PBM Enterprises is an ongoing and continuing business organization
consisting of both corporations and individuals that are and have been associated for the
common or shared purposes of selling, purchasing, prescribing and administering
AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.
Each of the Dey Manufacturer-PBM Enterprises has a systemic linkage because there are
contractual relationships, financial ties, and continuing coordination of activities between
Dey and AdvancePCS, Dey and Caremark Rx, Dey and Express Scripts, and Dey and
Medco Health.  As to each of these Dey Manufacturer-PBM Enterprises, there is a
common communication network by which Dey and AdvancePCS, Dey and Caremark
Rx, Dey and Express Scripts, and Dey and Medco Health share information on a regular
basis.  As to each of these Dey Manufacturer-PBM Enterprises, Dey and AdvancePCS,
Dey and Caremark Rx, Dey and Express Scripts, and Dey and Medco Health functioned
as continuing but separate units.  At all relevant times, each of the Dey Manufacturer-
PBM Enterprises was operated and conducted by Dey for criminal purposes, namely,
carrying out the AWP Scheme.

**The Defendant Drug Manufacturers' Use of the U.S. Mails and Interstate
Wire Facilities**

662.    Each of the Manufacturer-PBM Enterprises and Medco Health engaged in and
affected interstate commerce because they engage in the following activities across state
boundaries:  The sale, purchase and/or administration of drugs; and/or the transmission and/or

AMENDED MASTER CONSOLIDATED          - 262 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

receipt of sales and marketing literature; and/or the transmission to patients of individual prescriptions for drugs by mail-order pharmacies; and/or the transmission and/or receipt of invoices, statements and payments related to the use or administration of drugs. During the Class Period, the Manufacturer-PBM Enterprises and Medco Health participated in the administration of prescription drugs to millions of individuals located throughout the United States.

663.    During the Class Period, the Defendants Drug Manufacturers' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

664.    The nature and pervasiveness of the Defendant Drug Manufacturers' AWP Scheme, which was orchestrated out of the corporate headquarters of the Defendant Drug Manufacturers, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the various local district managers overseeing the sales force(s), the numerous pharmaceutical sales representatives who, in turn, directly communicated with providers and employees who communicated with the PBMs, including Medco Health.

665.    Many of the precise dates of Defendant Drug Manufacturers' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records. Indeed, an essential part of the successful operation of the AWP Scheme alleged herein depended upon secrecy, and as alleged above, the Defendant Drug Manufacturers took deliberate steps to conceal their wrongdoing. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the AWP Scheme and do so below.

AMENDED MASTER CONSOLIDATED           - 263 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

666.    The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities to perpetrate the AWP Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

(a)    Marketing materials about the AWPs for brand name drugs and the available spread, which were sent by the Defendant Drug Manufacturers to PBMs (including Medco Health) located across the country;

(b)    Written representations of the AWPs made by the Defendant Drug Manufacturers to the Publishers, which were made at least annually and in many cases several times during a single year;

(c)    Thousands of written and oral communications discussing, negotiating and confirming the placement of a Defendant Drug Manufacturer's drugs on a particular PBM's formulary;

(d)    Documents providing information or incentives designed to lessen the prices that each of the PBMs paid for drugs, and/or to conceal those prices or the AWP Scheme;

(e)    Written communications, including checks, relating to rebates, kickbacks or other financial inducements paid to each of the PBMs to persuade them to advocate one Defendant Drug Manufacturers' drug over a drug manufactured by a competitor;

(f)    Written and oral communications with U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

(g)    Written and oral communications with health insurers and patients;

(h)     Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Defendant Drug Manufacturers' AWP Scheme; and

(i)     In addition to the above-referenced RICO predicate acts, Defendants' corporate headquarters have communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the AWP Scheme. These mails include some of the documents referenced in this Amended Complaint.

**Conduct of the RICO Enterprises' Affairs**

667.   During the Class Period, each of the Defendant Drug Manufacturers have exerted control over the Manufacturer-PBM Enterprises with which they were associated and, in violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers have conducted or participated in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly.  Such participation was carried out in the following ways:

(a)     Each of the Defendant Drug Manufacturers has directly controlled the price for its AWPIDs, which determines the amount of each of the PBMs' compensation;

(b)     Each of the Defendant Drug Manufacturers has directly controlled the AWPs that are reported by the Publishers;

(d)     Each of the Defendant Drug Manufacturers has directly controlled the creation and distribution of marketing, sales, and other materials used to inform each of the PBMs of the profit potential of its AWPIDs;

(e)     Each of the Defendant Drug Manufacturers has relied upon its employees and agents to promote the AWP Scheme through the U.S. mails, through interstate wire facilities, and through direct contacts with providers and the PBMs; and

(f)     Each of the Defendant Drug Manufacturers has controlled and participated in the affairs of the Manufacturer-PBM Enterprises with which they are associated by providing or receiving rebates (as detailed above) or other inducements to place a certain Defendant Drug Manufacturer's AWPIDs on a PBM formulary or advocate the use of a certain AWPID. These inducements include drug manufacturers' payment to PBMs of: (i) access rebates for placement of products on the PBMs' formulary; (ii) market share rebates for garnering higher market share than established targets; (iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants. Although PBMs typically agree to share rebates in some form with clients, they link the rebates to formulary savings in such a manner that the PBM often is able to secretly retain all of the rebates. Furthermore, PBMs refuse to disclose specific rebate amounts to clients in any fashion other than in the aggregate compared to performance standards, thereby preventing the client from learning the true amount of rebates that the PBM has received in connection with the health plan client.

668.    Each of the Manufacturer-PBM Enterprises identified above had a hierarchical decision-making structure headed by the respective Defendant Drug Manufacturer.

669.    In violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers has conducted the affairs of each of the Manufacturer-PBM Enterprises with which they associated by reporting fraudulently inflated AWPs for AWPIDs and by submitting false and misleading invoices to Plaintiffs and members of the Classes, thereby inducing Plaintiffs and Class members to pay inflated amounts for AWPIDs.

**The Defendant Drug Manufacturers' Pattern of Racketeering Activity**

670.    Each of the Defendant Drug Manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18

U.S.C. § 1343, relating to wire fraud.  The Defendant Drug Manufacturers' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their AWP Scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) (B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Defendant Drug Manufacturers intended to defraud Plaintiffs, members of the Classes and other intended victims of the AWP Scheme.

671.    The Defendant Drug Manufacturers' fraudulent and unlawful AWP Scheme consisted, in part, of deliberately overstating the AWPs for their AWPIDs, thereby creating a "spread" based on the inflated figure in order to induce each of the PBMs to advocate and favor that particular Defendant Drug Manufacturer's drugs to the members of that PBM's clients. Further, each of the PBMs billed their clients for the particular Defendant Drug Manufacturers' AWPIDs based on the inflated AWPs, which did not reflect the true price paid by the PBMs for the AWPIDs.

672.    The AWP Scheme was calculated and intentionally crafted to ensure that Plaintiffs and members of the Classes would be over-billed for AWPIDs.  In designing and implementing the AWP Scheme, at all times the Defendant Drug Manufacturers were cognizant of the fact those in the distribution chain that were not part of the enterprise relied upon the integrity of the Defendant Drug Manufacturers in setting the AWPs, as reported by the Publishers.

673.    By intentionally and artificially inflating the AWPs, and by subsequently failing to disclose such practices to the individual patients and their insurers, each of the Defendant Drug Manufacturers engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

674.    The Defendant Drug Manufacturers' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and members of the Classes.  Each separate use of the U.S. mails and/or interstate wire facilities employed by each of the Defendant Drug Manufacturers was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Classes.  Each of the Defendant Drug Manufacturers has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Enterprises with which each of them is and was associated-in-fact.

**The Defendant Drug Manufacturers' Motive**

675.    The Defendant Drug Manufacturers' motive in creating and operating the AWP Scheme and conducting the affairs of the Manufacturer-PBM Enterprises described herein was to fraudulently obtain sales of and profits from their AWPIDs.

676.    The AWP Scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the Defendant Drug Manufacturers' AWPIDs.  Thus, each of the Defendant Drug Manufacturers used the AWP Scheme to sell more of its drugs, thereby fraudulently gaining sales and market share and profits.

**Damages Caused by the Defendant Drug Manufacturers' AWP Scheme**

677.    The Defendant Drug Manufacturers' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Classes to be injured in their business or property because Plaintiffs and Class members have paid many hundreds of millions of dollars in inflated reimbursements for AWPIDs.

678.    The Defendant Drug Manufacturers sent billing statements through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in

furtherance of their AWP Scheme. Plaintiffs and members of the Classes have made inflated payments for AWPIDs based on and/or in reliance on reported and false AWPs.

679.    Under the provisions of Section 1964(c) of RICO, the Defendant Drug Manufacturers are jointly and severally liable to Plaintiffs and members of the Classes for three times the damages that Plaintiffs and Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**COUNT III**

**DECLARATORY AND OTHER RELIEF PURSUANT TO 28 U.S.C. §§ 2201, 2002**

**(AGAINST DEFENDANT DRUG MANUFACTURERS FOR UNLAWFUL CONDUCT ASSOCIATED WITH MEDICARE PART B COVERED DRUGS)**

680.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

681.    An actual case and controversy exists between the Plaintiffs and each of the Defendant Drug Manufacturers with respect to the Defendant Drug Manufacturers' conduct of inflating the published reimbursement rates for AWPIDs. The Plaintiffs contend that setting stated reimbursement prices above the actual average wholesale price for AWPIDs is unlawful, and that each Defendant Drug Manufacturer does so in violation of applicable law, knowing that Medicare beneficiaries and other end payors will incur similarly inflated co-payments and payments for AWPIDs.

682.    Each Defendant Drug Manufacturer contends to the contrary. Each of the Defendant Drug Manufacturers, either by itself or through groups or its trade association, contend that they may exploit the Medicare reimbursement system without limit, and regardless of its effect on Medicare beneficiaries and their insurers.

683.    The Plaintiffs, on behalf of themselves, their constituent members and all others similarly situated, are entitled to a judgment declaring that the practice of the Defendant Drug

AMENDED MASTER CONSOLIDATED                - 269 -
CLASS ACTION COMPLAINT

Manufacturers of inflating stated reimbursement rates for AWPIDs is unlawful, and are entitled to further relief pursuant to 28 U.S.C. § 2202.

## COUNT IV

## VIOLATIONS OF CONSUMER PROTECTION STATUTES

684.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

685.    This Count is asserted by the AWP End Payor Class by each class representative.

686.    Defendants are incorporated, or maintain their principal places of business, in either California, Delaware, Illinois, New Jersey, Pennsylvania or Washington.  In addition, individual Patient and Third-Party Payor Plaintiffs reside in either California, Florida, New York, Minnesota, Louisiana, Pennsylvania or Texas.  Each of these states has enacted statutes to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising.  The statutes of these states, legally and substantively common, provide consumers with a private right of action, as follows:

| | |
|---|---|
| *California:* | Cal. Civ. Code §§ 1750, Bus. & Prof. Code § 17200, *et seq.* and 17500, *et seq.* |
| *Delaware:* | 6 Del. Code §§ 2511-2537 |
| *Florida:* | Fla. Stat. Stat. §§ 501.201-501.213 |
| *Illinois:* | 815 ILCS § 505/1, *et seq.* |
| *Louisiana:* | La. Rev. Stat. Ann. § 51:1405 |
| *Minnesota:* | Minn. Stat. Ann. §§ 325D.09 - 325D.16, § 325F.67 - 69 |
| *New Jersey:* | N.J. Stat. Ann. §§ 56:8-1 - 56:8-24 |
| *New York:* | N.Y. Gen. Bus. L. §§ 349-350 |
| *Pennsylvania:* | 73 Pa. Stat. § 201-1 *et seq.* |
| *Texas:* | Tex. Bus. & Com. Code §§ 17.41 B 17.63 |

AMENDED MASTER CONSOLIDATED                - 270 -
CLASS ACTION COMPLAINT

*Washington:*                        RCW 19.86.010, *et seq.*

These statutes do not require a showing of either scienter or individual reliance.

687.    Defendants' conduct, as alleged in this Complaint, constitutes unfair and

deceptive acts or practices, unconscionable practices, fraud, false pretense, false promise,

misrepresentation, concealment, suppression or omission of material fact in violation of these

statutes.  Defendants' continuing violations include:

> (a)    Failing to disclose material facts in the conduct of trade or commerce in that they have not disclosed that the AWP does not reflect the true average wholesale price of the drugs they sell, and that the published AWPs are instead deliberately inflated in order to (1) increase the prices paid by Plaintiffs and the members of the Classes; (2) increase the profitability of the Defendant Drug Manufacturer's drugs to the providers who prescribe or dispense them, and to the other intermediaries that promote them; and thereby (3) increase Defendants' market shares and profits;

> (b)    Making false or misleading statements of fact concerning the price of goods in that they have not reported the true AWP paid for their medications in order to accomplish the goals described above;

> (c)    Knowingly making false representations in a transaction by representing that the AWP is an accurate reflection of the average wholesale price paid for their drugs when AWP is, in reality, a fictitious and inflated amount;

> (d)    Publishing fictitious and inflated AWPs in the *Red Book* and other publications;

> (e)    Encouraging Medicare Part B providers to use drugs based upon the "spread" as opposed to medicines being prescribed based on medical reasons; and

> (f)    Providing PBMs with a cut on the spread in return for the PBMs' participation in the AWP scheme.

688.    Defendants willfully engaged in such practices knowing them to be deceptive and

with the intent that Plaintiffs and the Class would rely thereon.

AMENDED MASTER CONSOLIDATED                    - 271 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

689.    The wrongful conduct alleged in this Complaint occurs, and continues to occur, in the ordinary course of Defendants' business or occupation and has caused great harm to Plaintiffs and the Class, who were foreseeable and direct victims.

690.    Defendants have injured the public interest, and Defendants' actions continue to pose a threat to the public.

691.    As a direct and legal result of Defendants' misleading, deceptive, unfair, false and fraudulent trade practices, Plaintiffs and the Class have sustained damages.

## COUNT V

### CLAIM FOR INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT ARISING FROM THE TOGETHER CARD CONSPIRACY

692.    Plaintiffs, on behalf of themselves and the Nationwide End Payor Together Card Class, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

693.    The acts of the Together Card Defendants which violated federal and state antitrust laws were authorized, ordered, or done by the Together Card Defendants' officers, agents, employees, or representatives while actively engaged in the management of the Together Card Defendants' business or affairs.

694.    Various other individuals, partnerships, sole proprietors, business entities, companies and corporations, presently unknown to Plaintiffs and not named as Together Card Defendants in this complaint, participated as co-conspirators in the violations of federal and state antitrust laws alleged herein and performed acts and made statements in furtherance thereof. Such unknown persons or entities acted as co-conspirators and aided, abetted or participated with the Together Card Defendants in the commission of the wrongful acts alleged in this complaint.

695.    During the Class Period, the Together Card Defendants sold, or facilitated the sale of, Together Card Drugs in a continuous and uninterrupted flow of interstate commerce to customers located in countries and states other than the countries or states in which Defendants

AMENDED MASTER CONSOLIDATED                - 272 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

produced the Together Card Drugs. The business activities of the Together Card Defendants were thus within the flow of, and substantially affected, interstate trade and commerce.

696.     The combination or conspiracy alleged in this Complaint consisted of a continuing agreement, understanding or concert of action by Defendants, and their other co-conspirators, the substantial terms of which were to raise, fix and maintain the AWP spreads of the Together Card Drugs.

697.     As the result of the Together Card Defendants' wrongful conduct, Plaintiffs and the Nationwide End Payor Together Card Class paid higher prices for the Together Card Drugs than they would have paid but for the Together Card Defendants' anticompetitive conduct, and have been injured in their business or property.

698.     The Together Card Defendants should be enjoined under federal law, including Section 16 of the Clayton Act, from continuing their anticompetitive conduct. Absent an injunction, the effects of this anticompetitive conduct will continue. In a country where tens of thousands of citizens cannot afford prescription drugs, or where the expense of such drugs is a great burden on millions, any continuing anticompetitive conduct is a serious matter that needs injunctive relief as a remedy.

## COUNT VI

### CLAIM FOR VIOLATION OF SHERMAN ACT, 15 U.S.C. § 1
### ON BEHALF OF NATIONWIDE END PAYOR TOGETHER CARD CLASS

699.     Plaintiffs, on behalf of themselves and the Nationwide End Payor Together Card Class, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

700.     The combination or conspiracy alleged in this complaint consisted of a continuing agreement, understanding or concert of action by the Together Card Defendants, and their other co-conspirators, the substantial terms of which were to raise, fix and maintain the AWP spreads of the Together Card Drugs.

AMENDED MASTER CONSOLIDATED           - 273 -
CLASS ACTION COMPLAINT

701.    The Together Rx Card conspiracy was intended to affect directly, and to affect the end payors of the pharmaceutical products covered by the Together Card program, *i.e.*, the National End Payor Together Card Class and Together Card enrollees.  The intent, purpose and effect of the Together Rx Card conspiracy was to cause over-reimbursement for certain drugs, and thereby increase available "spread" dollars for other participants in the distribution channel (*i.e.*, wholesalers, distributors, pharmacies and/or PBMs) to the detriment of the National End Payor Together Card Class.

702.    Through the Together Rx Card conspiracy, the Together Card Defendants have in fact caused an increase in end payor reimbursement or payments for many of the drugs that are covered by the Together Rx Card program, and at the same time the conspiracy had the intent, purpose and effect of not affecting (either directly or indirectly) transaction costs and/or prices to all other participants in the distribution chain (*i.e.*, wholesalers, distributors, pharmacies and PBMs).

703.    As the result of the Together Card Defendants' wrongful conduct, Plaintiffs and the Nationwide End Payor Together Card Class paid higher prices for the Together Card Drugs than they would have paid but for Defendants' anticompetitive conduct, have been injured in their business or property, and have suffered damages in an amount to be determined at trial.

704.    Plaintiffs and the Nationwide End Payor Together Card Class are entitled to recover all damages and treble damages allowed under § 1 of the Sherman Act against Together Card Defendants, jointly and severally, together with their costs of suit, including reasonable attorneys' fees.

AMENDED MASTER CONSOLIDATED                    - 274 -
CLASS ACTION COMPLAINT

## COUNT VII

### CLAIM FOR VIOLATION OF THE ANTITRUST STATUTES OF THE INDIRECT PURCHASER STATES ON BEHALF OF INDIRECT PURCHASER STATES END PAYOR TOGETHER CARD CLASS

705.    Plaintiffs, on behalf of themselves and the Indirect Purchaser States End Payor

Together Card Class, reallege and incorporate herein by reference each of the allegations

contained in the preceding paragraphs of this complaint.  Plaintiffs allege and assert that

Plaintiffs and members of the Nationwide End Payor Together Card Class are direct purchasers

in that they are the first and only ones in the distribution chain that actually pay and are harmed

as a result of the agreement to fix reimbursement rates and the AWP spreads.  Everyone else in

the distribution chain benefits from the AWP, *i.e.*, they receive a portion of the spread, but they

do not pay or reimburse based on AWP.  However, to the extent any are deemed indirect

purchasers, this Count is asserted alternatively.

706.    The Together Card Defendants' conduct described herein constitutes unlawful

acts under the antitrust laws of the Indirect Purchaser States as follows:

a.    <u>Arizona</u>: The aforementioned practices by the Together Card Defendants

were and are in violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-

1401, *et seq.*, the Arizona Consumer Fraud Act, Ariz. Rev. Stat §§ 44-1521, *et seq.*, and the

Constitution of the State of Arizona, Article 14, § 15;

b.    <u>California</u>: The aforementioned practices by the Together Card

Defendants were and are in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et*

*seq.* and the California Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

c.    <u>District of Columbia</u>: The aforementioned practices by the Together Card

Defendants were and are in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-

4501, *et seq.*;

     d.    <u>Florida</u>: The aforementioned practices by the Together Card Defendants were and are in violation of the Florida Antitrust Act, Fla. Stat. Ann. §§ 542.15, *et seq.*, and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.*;

     e.    <u>Kansas</u>:  The aforementioned practices by the Together Card Defendants were and are in violation of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.*, and the Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50-623, *et seq.*;

     f.    <u>Kentucky</u>: The aforementioned practices by the Together Card Defendants were and are in violation of the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.*;

     g.    <u>Louisiana</u>: The aforementioned practices by the Together Card Defendants were and are in violation of the Louisiana Monopolies Law, La. Rev. Stat. Ann. §§ 51:121, *et seq.,* and the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*;

     h.    <u>Maine</u>: The aforementioned practices by the Together Card Defendants were and are in violation of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, and the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, §§ 205-A, *et seq.*;

     i.    <u>Massachusetts</u>: The aforementioned practices by the Together Card Defendants were and are in violation of the Massachusetts Antitrust Act, Mass. Gen. Laws, ch. 93, and the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A;

     j.    <u>Michigan</u>: The aforementioned practices by the Together Card Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §§ 445.771, *et seq.*, and the Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

k.      Minnesota: The aforementioned practices by the Together Card

Defendants were and are in violation of the Minnesota Antitrust Law of 1971, Minn. Stat.

§§ 325D.49, *et seq.*, and the Minnesota Consumer Fraud Act, Minn. Stat §§ 325F.67, *et seq.*;

l.      Nevada: The aforementioned practices by the Together Card Defendants

were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat.

§§ 598A.010, *et seq.*, and the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat.

§§ 598.0903, *et seq.*;

m.      New Jersey: The aforementioned practices by the Together Card

Defendants were and are in violation of the New Jersey Antitrust Act, N.J. Stat. Ann. §§ 56:9-1,

*et seq.*, and the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.*;

n.      New Mexico: The aforementioned practices by the Together Card

Defendants were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-

1, *et seq.*, and the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

o.      New York: The aforementioned practices by the Together Card

Defendants were and are in violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*,

and the New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.*;

p.      North Carolina: The aforementioned practices by the Together Card

Defendants were and are in violation of North Carolina's antitrust and unfair competition law,

N.C. Gen. Stat. §§ 75-1, *et seq.*;

q.      North Dakota: The aforementioned practices by the Together Card

Defendants were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code §§ 51-

08.1-01, *et seq.*, and the North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51-15-01, *et

seq.*;

r.      South Dakota: The aforementioned practices of the Together Card

Defendants were and are in violation of South Dakota's antitrust law, S.D. Codified Laws §§ 37-

1-3, *et seq.,* and deceptive trade practices and consumer protection law, S.D. Codified Laws §§ 37-24-1, *et seq.*;

        s.      <u>Tennessee</u>:  The aforementioned practices of the Together Card Defendants were and are in violation the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, and the Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.*;

        t.      <u>Vermont</u>:  The aforementioned practices of the Together Card Defendants were and are in violation of the Vermont Consumer Fraud Act, Vt. Stat. tit. 9. §§ 2451, *et seq.*;

        u.      <u>West Virginia</u>:  The aforementioned practices by the Together Card Defendants were and are in violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.*, and the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-6-101, *et seq.*; and

        v.      <u>Wisconsin</u>:  The aforementioned practices by the Together Card Defendants were and are in violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*, and the Wisconsin Unfair Trade Practices Act, Wis. Stat. §§ 100.20, *et seq.*

    707.    As the result of the Together Card Defendants' wrongful conduct, Plaintiffs and the Indirect Purchaser States End Payor Together Card Class paid higher prices for the Together Card Drugs than they would have paid but for the Together Card Defendants' anticompetitive conduct, have been injured in their business or property, and have suffered damages in an amount to be determined at trial.

    708.    Plaintiffs and the Indirect Purchaser States End Payor Together Card Class are entitled to recover all damages and treble damages, as permitted by law under these antitrust statutes against the Together Card Defendants, together with their costs of suit, including reasonable attorneys' fees.

AMENDED MASTER CONSOLIDATED      - 278 -
CLASS ACTION COMPLAINT

## COUNT VIII

### VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)

#### (AGAINST THE TOGETHER CARD DEFENDANTS
FOR UNLAWFUL CONDUCT ASSOCIATED WITH TOGETHER RX)

709.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

710.    This Count, which alleges violations of Section 1962(c) and (d) of RICO, 18 U.S.C. § 1962(c)-(d), is asserted against the Together Card Defendants on behalf of the Nationwide End Payor Together Card Class.

711.    Plaintiffs, the members of the Nationwide End Payor Together Card Class, and the Together Card Defendants identified in the previous paragraphs of this complaint are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

712.    Together Rx, LLC, which administers the Together Rx Card Program, is the product of an alliance formed by Abbot, AstraZeneca, Aventis, BMS Group, GSK Group, Johnson & Johnson Group, Novartis, and TAP.  For purposes of this claim, Together Rx is and was an "enterprise" (the "Together Rx Enterprise"), as that term is defined in 18 U.S.C. § 1961(4).  During the Class Period, the Together Card Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Together Rx Enterprise through a pattern of racketeering activity and/or conspired to do so, in violation of Section 1962(c) and (d) of RICO, 18 U.S.C. § 1962(c)-(d) (the "Together Rx Card Scheme").

#### The Together Card Defendants' Use of the U.S. Mails and Interstate Wire Facilities

713.    The Together Rx Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries:  The dissemination of Together Rx Cards to hundreds of thousands of consumers located nationwide; the use of Together Rx Cards in consumers' purchases of brand name drugs; the transmission and/or receipt of sales and

AMENDED MASTER CONSOLIDATED              - 279 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC

marketing literature; the transmission to patients of individual prescriptions for brand name drugs by mail-order pharmacies; and the transmission and/or receipt of invoices, statements and payments related to the use or administration of brand name drugs.

714.    During the Together Rx Class Period, the Together Card Defendants' illegal conduct and wrongful practices regarding the Together Rx Card Scheme were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

715.    The nature and pervasiveness of the Together Card Defendants' scheme or artifice to defraud consumers via the Together Rx Card Scheme, which was orchestrated out of the corporate headquarters of the Together Card Defendants, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with each other, with Together Rx, and with consumers located nationwide who signed up for the Together Rx Card Program.

716.    Many of the precise dates of Together Card Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records. Indeed, an essential part of the successful operation of the Together Rx Card Scheme depended upon secrecy, and as alleged above, these defendants took deliberate steps to conceal their wrongdoing. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme and do so below.

717.    The Together Card Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the Together Rx Card Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

AMENDED MASTER CONSOLIDATED          - 280 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC