# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) |
|  | ) |
| THIS DOCUMENTS RELATES TO ALL ACTIONS | ) ) ) ) |

MDL NO. 1456

Master File No. 01-CV-12257-PBS

Judge Patti B. Saris

## THE TOGETHER RX DEFENDANTS'
## BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
## COUNTS V, VI, VII, VIII, AND X OF THE AMENDED COMPLAINT

## TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Factual Allegations ............................................................................................................... 2

Summary of Argument .......................................................................................................... 4

Argument ............................................................................................................................... 5

I.    Conspiracy Allegations That Make No Economic Sense Should Be
      Dismissed ...................................................................................................................... 6

II.   The Together Rx Defendants Have No Economic Incentive to
      Collude to Increase AWPs or the "AWP Spread" on Together Rx
      Transactions ................................................................................................................. 9

      A.    The Allegations Related to Together Rx Transactions Make
            No Economic Sense ............................................................................................ 9

      B.    Plaintiffs Lack Standing to Assert Claims Regarding
            Together Rx Transactions. ................................................................................ 12

III.  The Together Rx Defendants Have No Economic Incentive to
      Collude to Increase AWPs or the "AWP Spread" on Non-Together
      Rx Transactions. ........................................................................................................ 12

IV.   The State Law Antitrust and Unfair Competition Claims Should
      Also Be Dismissed. .................................................................................................... 16

V.    The Together Rx RICO Claim Should be Dismissed ................................................. 16

Conclusion ........................................................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Allee v. Medrano*, 416 U.S. 802 (1974) .................................................................................12

*Associated General  Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ........................................................................................6

*Brunson Communications, Inc. v. Arbitron*, 239 F. Supp. 2d 550 (E.D. Pa. 2002).....................................................................................................7, 8

*Car Carriers v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984) ..........................8, 10, 11

*Chongris v. Board of Appeals*, 811 F.2d 36 (1st Cir. 1987) .................................................6

*DM Research, Inc. v. College of American Pathologists*, 170 F.3d 53 (1st Cir. 1999) ....................................................................................................6, 7, 8, 11, 14

*Diamantis v. Milton Bradley Co.*, 772 F.2d 3 (1st Cir. 1985) ...........................................12

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992)....................7

*Gooley v. Mobil Oil Corp.*, 851 F.2d 513 (1st Cir. 1988).....................................................6

*Hirsch v. Arthur Anderson & Co.*, 72 F.3d 1085 (2d Cir. 1995) .......................................6

*Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258 (1992).....................................17

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)....................................................13, 16

*Interface Group, Inc. v. Massachusetts Port Authority*, 816 F.2d 9 (1st Cir. 1987)....................................................................................................8

*Laird v. Tatum*, 408 U.S. 1 (1972)........................................................................................12

*Lerma v. Univision Communications, Inc.*, 52 F. Supp. 2d 1011 (E.D. Wis. 1999) ....................................................................................................8

*Lipson v.  Socony-Vacuum Corp.*, 7 F. Supp. 961 (D. Mass. 1934), *amended by* 76 F.2d 213 (1st Cir. 1935) ........................................................................7

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)........................................................................................................7

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172 (D. Mass. 2003) ...........................................................................12

*Re/Max International v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999) ........................15

*Salts v. Moore*, 107 F. Supp. 2d 732 (N.D. Miss. 2000).......................................................8

*United Magazine Co. v. Murdoch Mag. Distributing*, 146 F. Supp. 2d 385 (S.D.N.Y. 2001)............................................................................8

*Watterson v. Page*, 987 F.2d 1 (1st Cir. 1993) .....................................................................6

## Statutes & Rules

15 U.S.C. § 1..............................................................................................................................16

18 U.S.C. § 1964(c) ..................................................................................................................17

Fed. R. Civ. P. 12(b)(6)..............................................................................................................1

Defendant Together Rx LLC ("Together Rx") and its member companies (collectively, the "Together Rx Defendants") respectfully submit this brief in support of their motion to dismiss Counts V, VI, VII, VIII, and X of the Amended Master Consolidated Class Action Complaint ("AMCC"), *i.e.*, all counts directed against the Together Rx program, pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## Introduction

The Amended Complaint transforms this case from one brought, at least in part, on behalf of consumers into one brought solely to benefit insurance companies and health plans. Worse yet, plaintiffs now launch a scurrilous attack on a program that directly benefits the most vulnerable consumers of prescription drugs -- the uninsured, low-income elderly. In just 14 months of operation, the Together Rx program has grown to 900,000 cardholders who have received more than $125,000,000 of direct subsidies at the pharmacy counter from the member companies of Together Rx. It is thus not surprising that no one enrolled in Together Rx has joined this case, in which plaintiffs advance the entirely implausible claim that this salutary effort to provide direct subsidies to the low-income elderly is in fact an unlawful antitrust conspiracy -- a conspiracy claim that makes no economic sense for the purported participants.

Plaintiffs' allegations against Together Rx and its seven member companies are legally insufficient to state a claim and therefore should be dismissed under Rule 12(b)(6).

---

[1]     This brief is submitted on behalf of the member companies of Together Rx: Abbott Laboratories; AstraZeneca Pharmaceuticals LP; Aventis Pharmaceuticals Inc.; Bristol-Myers Squibb Company; SmithKline Beecham Corporation d/b/a GlaxoSmithKline; Janssen Pharmaceutical Products, L.P. and McNeil-OPC, Inc. (both affiliates of Johnson & Johnson); and Novartis Pharmaceuticals Corporation. The AMCC also makes allegations regarding TAP Pharmaceutical Products, Inc. ("TAP") in connection with Together Rx, but TAP is not a member of Together Rx. TAP's arguments regarding these claims are contained in its separate, defendant-specific brief.

## **Factual Allegations**

Together Rx is a Delaware limited liability corporation founded by its seven member companies (AMCC ¶ 131) for the purpose of providing "access to savings on more than 150 widely prescribed medicines through one free, easy-to-use card" to elderly, low-income consumers who lack prescription drug insurance. (AMCC ¶¶ 544, 562) (quoting www.together-rx.com). The Together Rx program is "a prescription savings program that offers a free easy way to save approximately 20% to 40% on brand-name medicines and, in many cases, much more." (AMCC ¶ 582) (quoting www.together-rx.com).

Cardholder Eligibility Requirements. Between 8 and 11 million consumers are eligible for the Together Rx program. (AMCC ¶ 562.) An applicant must meet three eligibility requirements in order to receive a Together Rx card: (1) the applicant must be a Medicare enrollee; (2) the applicant must have an annual income of less than $28,000 (individuals) or $38,000 (couples); and (3) the applicant *must not have* public or private prescription drug insurance. (AMCC ¶ 578.) The application process costs the consumer nothing, nor is there any monthly or annual fee. (AMCC ¶ 578.)

The third eligibility requirement is critical to an analysis of the Amended Complaint. The Together Rx program is directed to low-income, *uninsured* elderly individuals -- those who pay cash for their prescriptions at the pharmacy counter. No third-party payors are involved in a Together Rx transaction.

Cardholder Access to Savings. Together Rx cardholders "receive savings right at the pharmacy counter."[2] (AMCC ¶ 578) (quoting www.together-rx.com). The amount of the

---

[2]   The Together Rx program is structured to ensure that the pharmacy does not skim off for itself the subsidy intended for the uninsured consumer's benefit. Therefore, "participating pharmacies have made the commitment to pass through direct to the patient 100% of the savings being offered by the pharmaceutical companies." (AMCC ¶ 577.)

subsidy that cardholders receive on particular drugs varies because each member company "independently determines which products are included in the savings program," and each company "sets its own levels of savings independently," subject to a minimum subsidy level required by Together Rx for participation in the program.[3]  (AMCC ¶ 579) (quoting www.together-rx.com).  Thus, the amount of the subsidy can vary by member company; by the identity of the drug purchased; and, at least in the case of some member companies' offerings, by the income level of the cardholder, so that the poorest cardholders receive the largest benefit.  In the only specific example provided by the Amended Complaint, Novartis offers its drugs for a "$12 flat fee per prescription" to "patients with annual income up to $18,000 ($24,000 per couple)," but in the case of "[i]ndividuals whose annual income is between $18,000 - $28,000 ($24,000 - $38,000 per couple)," Novartis provides a specific-dollar subsidy that results in a "25-40% savings off their usual . . . price."  (AMCC ¶ 558) (quoting www.careplan.novartis.com).

Plaintiffs' Allegations against Together Rx.  Plaintiffs allege that the Together Rx Defendants conspired to "increase[e] the difference between posted AWPs and posted WAC" on the drugs included in the Together Rx program.  (AMCC ¶ 589.)  The Amended Complaint defines "AWP" as a "drug price" that manufacturers assertedly "report to trade publications" and "that for many drugs is deliberately set far above the prices that these drugs are available in the

---

[3]     Paragraph 579 of the Amended Complaint, purporting to quote a Together Rx press release, describes the minimum subsidy required from each manufacturer as "15% off its list price to wholesalers [AWP]."  The bracketed reference to "[AWP]" does not appear in the press release, and its insertion erroneously suggests that "list price to wholesalers" means "AWP."  Paragraph 9 of the Amended Complaint, however, acknowledges that "AWP" does not mean "list price to wholesalers."  The list price to wholesalers is referred to as "Wholesale Acquisition Cost" or "WAC."  (AMCC ¶ 9.)

3

marketplace." (AMCC ¶ 3.)  And the Amended Complaint defines "WAC" as "the posted wholesale acquisition cost." (AMCC ¶ 9; *see* note 3, *supra*.)[4]

Plaintiffs do ***not*** allege that defendants collusively set WACs or that they increased the "AWP spread" by ***decreasing*** WAC.  Rather, they allege that the Together Rx Defendants collusively increased the "spread" by increasing posted AWPs for the drugs included in the Together Rx program.  (AMCC ¶ 591.)  According to plaintiffs, this alleged increase in posted AWPs harmed not only Together Rx cardholders (none of whom is a plaintiff), but also insurance companies and health plans.  (AMCC ¶ 589.)  That is, drugs covered by the Together Rx program are sold not only to Together Rx members, but also to insured patients.  (AMCC ¶ 10.)  Plaintiffs claim that, outside the Together Rx program, entities like the plaintiff employee health plans that paid for Together Rx drugs based, in part, on AWPs were harmed by the purported conspiracy.  (AMCC ¶¶ 10, 589.)

## Summary of Argument

The motion to dismiss is based on three principal points:

1.  Allegations of antitrust conspiracy cannot survive a motion to dismiss where the allegations make no economic sense and are inherently implausible.  Here, plaintiffs' allegation of a conspiracy to increase the "spread" between WAC and AWP make no economic sense because such a conspiracy would have no benefit to the Together Rx Defendants.  To the contrary, the sole example cited in the complaint reflects that Novartis would pay ***more*** in direct subsidies to Together Rx cardholders if it had conspired in the manner alleged.  Plaintiffs, who

---

[4]      Although the Court must accept the allegations of the Amended Complaint as true on a motion to dismiss, we are constrained to point out that plaintiffs have avoided acknowledging what is common knowledge in the industry:  Generally, the publications -- not the manufacturers -- report AWPs, and the publishers determine AWP by multiplying WAC by a factor of their choosing.

are not participants in the Together Rx program, also lack standing to assert these claims of supposed harm based on purchases through the program.

2.   Plaintiffs make the further argument that the Together Rx Defendants conspired to inflate the "spread" between WAC and AWP for sales outside the Together Rx program. But this also makes no economic sense. The alleged conspiratorial increase in this "spread" would have no benefit for the manufacturers. The entire thrust of the balance of the Amended Complaint is that each defendant individually manipulates AWP levels to compete for market share. There is no rational basis for the Together Rx Defendants to agree on a public, uniform AWP "spread" when plaintiffs otherwise claim that the defendants seek competitive advantage by achieving secret differences in those spreads. Further, given plaintiffs' core allegations that each defendant has the ability on its own to raise AWPs, it is implausible that the Together Rx Defendants would have at the same time launched a highly visible, widely publicized campaign to "conspire" to achieve an objective plaintiffs allege that each can achieve entirely on its own.

3.   Plaintiffs' state law antitrust and unfair competition claims should be dismissed for similar reasons, and in any event are asserted only in the alternative. And plaintiffs' RICO claims lack merit for the reasons addressed in detail in the separate motion to dismiss filed by all defendants.

## Argument

Counts V, VI, VII, and X of the Amended Complaint, the antitrust and civil conspiracy counts directed against the Together Rx Defendants, should be dismissed because the factual allegations make no economic sense and therefore fail to state a claim under the antitrust laws.

I.     **Conspiracy Allegations That Make No Economic Sense Should Be Dismissed.**

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must take the complaint's well-pled allegations as true, viewing them in the light most favorable to the plaintiff. *See DM Research, Inc. v. College of American Pathologists,* 170 F.3d 53, 54 (1st Cir. 1999); *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993). But, as *DM Research* recognizes, that general rule is subject to important qualifications.

First, a court may not credit conclusory allegations or legal conclusions. *See, e.g., Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515 (1st Cir. 1988) (a complaint may not rely upon "naked conclusion[s], unanchored in any meaningful set of factual averments."). Thus, frequent incantations in the complaint about a "conspiracy to fix, stabilize, and maintain" prices will not suffice. Indeed, commenting specifically in the antitrust context, the Supreme Court stated that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 528 n. 17 (1983); *see also DM Research, Inc.,* 170 F.3d at 56 ("[T]he discovery process is not available where, at the complaint stage, a plaintiff has nothing more than unlikely speculations. While this may mean that a civil plaintiff must do more detective work in advance, the reason is to protect society from the costs of highly unpromising litigation."); *Chongris v. Board of Appeals,* 811 F.2d 36, 37 (1st Cir. 1987) (court must "eschew any reliance on bald assertions, unsupportable conclusions, and 'opprobrious epithets'") (citations omitted).

Second, generalized allegations should not be credited "when they are belied by more specific allegations." *Hirsch v. Arthur Anderson & Co.,* 72 F.3d 1085, 1092 (2d Cir. 1995). *See also Chongris,* 811 F.2d at 37 (the court must "exempt, of course, those 'facts' which have since been conclusively contradicted by plaintiffs' concessions or otherwise") (citations

6

omitted); *Lipson v. Socony-Vacuum Corp.*, 7 F. Supp. 961, 964 (D. Mass. 1934), *amended by* 76

F.2d 213 (1st Cir. 1935) ("plaintiff gains nothing by alleging [illegal conduct] in general . . .

when the facts alleged in support of the general allegations show conclusively [conduct that] was

not unlawful").

   <u>Third</u> -- and most pertinent to this case -- when an antitrust conspiracy complaint

alleges conduct that is implausible and makes no economic sense, the complaint must be

dismissed.  The Supreme Court enunciated this doctrine in *Matsushita Elec. Indus. Co., Ltd. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986):

> [I]f the factual context renders respondent's claim implausible --
> if the claim is one that simply makes no economic sense --
> respondents must come forward with more persuasive evidence to
> support their claim than would otherwise be necessary.

*See also Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468-69 (1992) ("if

the plaintiff's theory is economically senseless, no reasonable jury could find in its favor").

   "Though *Matsushita* was decided in the context of a motion for summary

judgment, its reasoning, nevertheless, has been used to decide motions to dismiss." *Brunson*

*Communications, Inc. v. Arbitron*, 239 F. Supp. 2d 550, 563 (E.D. Pa. 2002).  Indeed, the First

Circuit has expressly held that, in order to survive a Rule 12(b)(6) motion, a claim that

defendants conspired in violation of Section 1 of the Sherman Act must make economic sense.

In *DM Research, Inc.*, the plaintiff claimed that industry standards governing laboratory use of

"reagent grade water" were the result of an unlawful conspiracy among two accrediting

organizations and their members.  170 F.3d at 55.  The First Circuit upheld the dismissal of the

complaint, on the basis that the alleged conspiracy made no economic sense:

> [I]t is highly implausible to suppose that the [accrediting
> organization defendant] or its members have any reason to "agree"
> with [its co-defendant] to adopt a faulty standard whose main
> effect would be to raise costs for laboratories that found it cheaper
> to buy bottled reagent water than to make it on site.

*Id.* at 56. *See also Interface Group, Inc. v. Massachusetts Port Authority*, 816 F.2d 9, 12 (1st Cir. 1987) (Breyer, J.) (absence of any economic incentive for defendant to profit from alleged antitrust violation supports affirming dismissal of complaint).

DM Research relied on *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984), for its economic plausibility analysis. In *Car Carriers*, a transportation company alleged that a competitor had unlawfully conspired with Ford to eliminate competition in the transportation of automobiles, with the result that the competitor would raise its prices to Ford above competitive levels. The Seventh Circuit affirmed dismissal of the complaint, finding it "inherently implausible that Ford, as a buyer that could 'dictat[e] and contro[l]' the tariffs of its suppliers of transportation services, would conspire in order to allow its new carrier . . . to charge noncompetitive prices; *the plaintiffs are alleging, in essence, that Ford conspired to injure itself*." *Id.* at 1109 (emphasis added).

Numerous federal district courts thus have recognized that a plaintiff must allege an economically plausible theory to survive a motion to dismiss an antitrust claim. *See, e.g., Lerma v. Univision Communications, Inc.*, 52 F. Supp. 2d 1011, 1025 (E.D. Wis. 1999) ("[I]n regard to determining whether an antitrust claim is stated, 'the Court is not required to don blinders and to ignore commercial reality.' . . . To survive a motion to dismiss, a claim must make economic and factual sense.") (quoting *Car Carriers*, 745 F.2d at 1110); *Brunson Communications*, 239 F. Supp. 2d at 564 (dismissing antitrust conspiracy claims because "the conspiracy theorized by Plaintiff is, for several reasons, economically implausible"); *United Magazine Co. v. Murdoch Mag. Distrib.*, 146 F. Supp. 2d 385, 402 (S.D.N.Y. 2001) (because "plaintiffs' alleged conspiracy to engage in predatory pricing is entirely unnecessary and makes no economic sense, plaintiffs fail to state a claim under section 1"); *Salts v. Moore*, 107

8

F. Supp. 2d 732, 742-43 (N.D. Miss. 2000) (granting Rule 12(c) motion where plaintiffs failed to establish inference of conspiracy, in part due to lack of rational economic motive to conspire).

In this case, plaintiffs have not alleged an economically plausible theory with respect to their claims against the Together Rx Defendants. As noted above, plaintiffs' claims against the Together Rx Defendants divide into two parts. First, plaintiffs assert that as a result of the alleged conspiracy, Together Rx cardholders pay more for drugs than they otherwise would (although no plaintiff claims to be a cardholder). (AMCC ¶ 10.) Second, plaintiffs claim that entities paying for Together Rx drugs outside of the Together Rx program are also harmed by the allegedly collusive increases in AWPs. (AMCC ¶ ¶ 10, 589.) As demonstrated in the following sections, neither theory makes economic sense because plaintiffs have not, and cannot, explain what economic incentive the Together Rx Defendants would have to enter into such an alleged conspiracy.

## II.     The Together Rx Defendants Have No Economic Incentive to Collude to Increase AWPs or the "AWP Spread" on Together Rx Transactions.

The principal thrust of the conspiracy allegations is the improbable argument that this discount drug program is in fact a mechanism to inflate drug prices to the low-income elderly who participate in the Together Rx program (even though no plaintiff participates in the program). The Together Rx Defendants would have no economic incentive to participate in the hypothesized "conspiracy" to inflate AWPs in connection with Together Rx transactions.

### A.     The Allegations Related to Together Rx Transactions Make No Economic Sense.

The Amended Complaint contains virtually no allegations about the specific subsidies given to cardholders by the Together Rx member companies. The only example offered shows that for cardholders with incomes less than $24,000, Novartis offered its drugs for a flat fee of $12 per prescription. (AMCC ¶ 558.) The difference between $12 and whatever

9

price the pharmacy charges for that drug is the amount of the subsidy provided by Novartis. That is, the Amended Complaint acknowledges that the Together Rx "discounts could not be borne by retail pharmacists or wholesalers" (*id.* ¶585); there are no third-party payors involved in a Together Rx transaction; and so the only possible source of what plaintiffs characterize as "reimbursement" to the pharmacy for the difference between $12 and the pharmacy's sales price is *Novartis itself*. Consequently, even if it were true that the Together Rx Defendants had somehow "conspired" to increase retail pricing by increasing the "AWP spread" -- an allegation which itself is illogical for reasons explained later -- the effect would be that Novartis would pay *more* in subsidies, with no offsetting increase in revenues. Thus, the Amended Complaint makes the nonsensical allegation that, like Ford in *Car Carriers*, Novartis "conspired to injure itself."

Nor does the alleged conspiracy make economic sense with respect to a Together Rx transaction that offers a specific dollar subsidy, *i.e.*, where the Together Rx cardholder pays the difference between the subsidy and the pharmacy's sales price. Increasing the "spread" between WAC and AWP does not increase the revenue a manufacturer receives when a prescription is filled with its drug. The "spread" can increase in only two ways. First, WAC could be reduced. But there is no allegation that the Together Rx Defendants conspired to reduce WACs. Second, AWP can be raised. But an increase in a drug's AWP does not increase the per-prescription revenue that the manufacturer receives for its drug; indeed, the entire thrust of the rest of the Amended Complaint is that increases in AWP do not flow to manufacturers but rather allow doctors and PBMs to recoup more from third parties that reimburse them based on AWP. There are, of course, no doctors, PBMs, or other third parties involved in a Together Rx transaction.

In sum, the Amended Complaint describes two types of Together Rx transactions: (1) where the cardholder pays a flat fee, and the manufacturer pays a subsidy equal to the

10

difference between the flat fee and the pharmacy's selling price; and (2) where the manufacturer pays a dollar-specific subsidy, and the cardholder pays the difference between that subsidy and the pharmacy's selling price.  In the first type of transaction, the Together Rx member company would be affirmatively hurt by the alleged conspiracy, and in the second, it would not benefit from it.  Thus, there is no economic incentive to participate in the supposed conspiracy.

While that is sufficient to support dismissal under *DM Research, Car Carriers*, and the controlling rule of law they represent, it is important also to point out that the specific allegations belie plaintiffs' accusation that the "conspiracy" made Together Rx cardholders worse off.  It is, of course, true that *if* increases in the AWP of a drug in fact determined retail pharmacies' prices to cash-paying customers, then an increase in AWP could increase the amount that the Together Rx cardholder paid, after receiving the subsidy from the Together Rx member company.[5]  But, there is no allegation in the Amended Complaint that retail pharmacies uniformly, routinely, or even ever set their prices to cash-paying customers on the basis of AWP.  Moreover, any increase in AWP would *not* benefit the manufacturer -- which, according to the Amended Complaint, receives WAC, not AWP, for the drugs (*see* AMCC ¶¶ 196, 587) -- and so the manufacturer has no economic incentive to "artificially inflate" AWP in a Together Rx transaction.

In short, with respect to Together Rx transactions -- *i.e.*, transactions in which the Together Rx member companies provide a direct subsidy to cardholders at the pharmacy counter -- plaintiffs' allegations cannot withstand any real analysis, make no economic sense, and should therefore be dismissed.

---

[5]     Unless, of course, the subsidy came in the form of a fixed fee to the patient, as is true for the Novartis program for individuals with incomes of less than $24,000 per year.  (AMCC ¶ 558.)

11

### B.  Plaintiffs Lack Standing to Assert Claims Regarding Together Rx Transactions.

The Amended Complaint includes no allegation that any plaintiff (or even any member of any plaintiff association) is enrolled in the Together Rx program.  For this reason, none of the plaintiffs has standing to assert claims based on harm allegedly sustained by individuals enrolled in the program. *Laird v. Tatum*, 408 U.S. 1, 13 (1972) (plaintiff who had not been subject to U.S. Army surveillance lacked standing to assert claims challenging that surveillance). *See also Diamantis v. Milton Bradley Co.*, 772 F.2d 3, 5 (1st Cir. 1985) ("An individual must assert his own legal rights and cannot rest his claim to relief on the legal rights and interests of third parties.").

As this Court noted in its Memorandum and Order of May 13, 2003 granting (in part) defendants' motion to dismiss the original complaint:

> A named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs. . . . Standing cannot be acquired through the back door of a class action.

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 193 (D. Mass. 2003) (*quoting Allee v. Medrano*, 416 U.S. 802, 828 (1974)).

### III.  The Together Rx Defendants Have No Economic Incentive to Collude to Increase AWPs or the "AWP Spread" on Non-Together Rx Transactions.

Plaintiffs also allege that by agreeing to "increas[e] the difference between posted AWPs and posted WACs," the Together Rx Defendants have conspired to hurt "the broader public of prescription drug end payors (such as self-insured employers, health plans and consumers who reimburse or pay for their drugs based upon the average wholesale price) and who were purchasing drugs covered by the Together Rx Card outside of that program." (AMCC ¶¶ 10, 589.)  That is, plaintiffs hedge their bets by suggesting that even if the Together Rx

12

Defendants had nothing to gain from collusively raising AWPs in the context of Together Rx transactions, they stood to gain from collusively raising AWPs in the context of non-Together Rx, third-party payor transactions.

This allegation, which runs directly counter to the entire thrust of the rest of the Amended Complaint, makes no economic sense, either.

1.      As discussed above, increasing the "spread" between WAC and AWP does not increase the per-prescription revenue that a Together Rx member manufacturer receives for its drug.  If the "spread" is increased by lowering WAC, then by definition the per-prescription revenue received by the manufacturer *declines*.  Conversely, if the "spread" increases through an increase in AWP, that has no effect on the per-prescription revenue received by the manufacturer because, as the Amended Complaint alleges elsewhere (*see* AMCC ¶¶ 196, 587), the manufacturer receives WAC, *not* AWP, for its drugs.  Simply put, increasing AWP may increase the per-prescription revenue received by someone else, as plaintiffs allege, but the parties agree that it does not increase the per-prescription revenue received by the manufacturer.  (*See* AMCC ¶¶ 196, 587.)[6]

2.      Because increasing the "spread" between WAC and AWP does not increase per-prescription revenue to the manufacturer, a manufacturer can profit from increasing the spread *only if* doing so increases the volume of its sales.  Indeed, the principal thrust of the balance of plaintiffs' 297-page Amended Complaint alleges precisely this point.  Thus, in the introductory and summary paragraph 3, plaintiffs allege that by increasing the spread between

---

[6]      If plaintiffs were to claim that manufacturers receive increased per-prescription revenues from increased AWPs, they would necessarily be asserting that the Together Rx Defendants conspired to increase prices and passed on those price increases through providers and ultimately to plaintiffs (as third-party payors).  If that were their claim, plaintiffs would be indirect purchasers, and their antitrust damages claim would be barred under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

13

the prices at which providers acquire drugs and the prices at which they can sell them, defendants "motivate[d] the providers to sell and administer the drugs with *the most inflated* AWPs, resulting in increased *market share* and profits for the defendant manufacturers" (emphasis supplied).[7]  As made clear in this passage and the rest of the Amended Complaint, plaintiffs allege that a manufacturer can benefit from increasing the "spread" between WAC and AWP only if (a) its "spread" is greater than its competitors' spread (*i.e.*, if it has one of "the most inflated AWPs") which (b) results in increasing its sales relative to the sales of its competitors selling drugs in the same therapeutic category (*i.e.*, "resulting in increased market share").

The allegations of collusion among the Together Rx Defendants are directly contrary to this fundamental theory of the Amended Complaint.  While the Amended Complaint rests on the allegation that drug manufacturers individually benefit through increased market share by offering WAC-to-AWP spreads that are larger than their competitors, the Together Rx Defendants are alleged to have increased their "AWP-to-WAC spreads" to the *same* 25%. (AMCC ¶ 591.)  But if the Together Rx Defendants agreed to have the *same* WAC-to-AWP spread, then none of them would have a basis on which to seek increased market share, the only basis by which they could allegedly profit by increasing the spread.  Reading this allegation in light of the remainder of the Amended Complaint, "no antitrust lawyer could help but ask almost immediately why [defendants] would conspire" to do this. *DM Research*, 170 F.3d at 56.

Further, the entirety of the Amended Complaint is premised on the allegation that each defendant individually can manipulate AWP levels as it sees fit.  Yet here plaintiffs allege that the defendants launched a highly visible effort to "conspire" to achieve an objective that

---

[7]     The rhetorical term "inflated AWPs" clearly does not mean simply a "high" AWP. Rather, it is clear that plaintiffs use the term "inflated" to mean that in their view, the AWP is high *relative to* what the provider paid to acquire the drug in question.

each defendant allegedly could have accomplished entirely on its own, without any need for Together Rx. *See Re/Max Int'l v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999) (considering whether "defendants have a common motive to conspire" in assessing whether a conspiracy existed). Given the core allegations that each defendant has full control over AWP, it is nonsensical to suggest at the same time that the Together Rx Defendants launched a highly visible, widely publicized joint effort to conspire to increase AWP levels.

The public nature of Together Rx further demonstrates the illogic of plaintiffs' conspiracy allegations. Plaintiffs' specific allegation is that the Together Rx Defendants colluded to "increas[e] the difference between *posted* AWPs and *posted* WAC" on the drugs that are included in the Together Rx program. (AMCC ¶ 589 (emphases added).) Elsewhere in the Amended Complaint, however, plaintiffs allege that a manufacturer can benefit from increasing the "spread" between the price at which a provider buys a drug and the price at which it sells the drug only if those prices are concealed. (AMCC ¶ 7 (the "success of the high profit scheme will be jeopardized" without concealment); *see also* AMCC ¶¶ 109, 192, 193.) That is clearly correct. Accordingly, it would make no sense to collude on publicly-posted "spreads." To the extent third-party payors such as the plaintiffs here believe that the posted AWPs exceed the posted WACs by an inappropriate "spread," they could simply change their reimbursement formulae.

In short, plaintiffs allege collective action by competitors -- each of whom seeks greater market share -- to increase "AWP spreads" in a manner obvious to each other. How this helps any defendant is never explained because it cannot be explained. The Amended Complaint provides no logical explanation of why it would be in the economic interests of the Together Rx Defendants to engage in the alleged collusion.

15

## IV.    The State Law Antitrust and Unfair Competition Claims Should Also Be Dismissed.

In addition to their claims of a conspiracy in violation of the Sherman Act, 15 U.S.C. § 1, Plaintiffs also allege, in Count VII, violations of various state antitrust statutes. As an initial matter, Count VII is moot.  Paragraph 705 of the Amended Complaint states that Count VII is meant to be asserted only if the federal antitrust counts are dismissed on the basis of *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), which bars price-fixing claims by indirect purchasers:

> Plaintiffs allege and assert that Plaintiffs and members of the Nationwide End Payor Together Card Class are direct purchasers. . . . ***However, to the extent they are deemed indirect purchasers, this Count [VII] is asserted alternatively.***

(AMCC ¶ 705 (emphasis added).)  Because defendants have not moved to dismiss the complaint on *Illinois Brick* grounds, Count VII by its own terms is not asserted.

Moreover, even if these state law claims are deemed part of the Amended Complaint, they are deficient for the same reasons addressed above in relation to the federal antitrust claim.  If the allegations of conspiracy are implausible and lack a rational economic basis, that defeats any conspiracy theories under state as well as federal law.

## V.    The Together Rx RICO Claim Should be Dismissed.

The health plan plaintiffs also assert a RICO claim against the Together Rx Defendants in Count VIII.  They allege that Together Rx LLC is an enterprise, and that the member companies conducted or participated in the affairs of this enterprise through a pattern of racketeering activity.  As established above, the so-called conspiracy or scheme allegedly furthered by the enterprise makes no economic sense.  The fact that the U.S. mail was used to administer the Together Rx program does not convert plaintiffs' wholly implausible claim into a RICO violation.

16

But even putting aside the implausibility of plaintiffs' claimed conspiracy, plaintiffs lack standing under the RICO statute, 18 U.S.C. § 1964(c), because defendants' alleged conduct was not the direct, proximate cause of any claimed injuries. *See Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 265-66, 268 (1992). As demonstrated in Point II of the motion of all defendants to dismiss (which is incorporated here by reference), several intervening factors break the causal chain between defendants' alleged inflation of AWPs and the prices plaintiffs paid for defendants' products -- regardless whether that "inflation" occurred as a result of a "conspiracy," or individual action by individual defendants, or actions by third parties. This defeats plaintiffs' standing to assert this RICO claim as a matter of law. To recap:

- Plaintiff health plans do not allege that defendants made any misrepresentations to them, but rather to the publishers.

- Plaintiff health plans do not allege that they purchased drugs from the defendants, but rather from the PBMs. (*See* AMCC § 169.)

- Plaintiff health plans have discretion to base their payments to PBMs on any benchmark of their choosing, but *they* chose AWP without any involvement of the defendants in that decision.

Under the allegations of the Amended Complaint, any injury plaintiffs claim to have suffered from their payments to the PBMs on the basis of AWP therefore would not be proximately caused by Together Rx or its members. Accordingly, the RICO claim should be dismissed.

17

## CONCLUSION

For the reasons stated above, the claims based on Together Rx should be dismissed.

Respectfully Submitted,

By: _____

Joseph L. Kociubes, BBO # 276360
Charles L. Solomont, BBO #557190
Mary B. Murrane, BBO # 644448
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110
(617) 951-8000

Dated:  August 1, 2003

18

## CERTIFICATE OF SERVICE

I certify that on August 1, 2003, a true and correct copy of the foregoing Memorandum in Support of the Together Rx Defendants' Motion to Dismiss Counts V, VI, VII, VIII and X of the Amended Complaint was served on all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to Verilaw Technologies for posting and notification to all parties.

Mary B. Murrane