maintain an AWP-based reimbursement system in the private payor context.[14] Plaintiffs contend that the members of each of these 88 conspiracies had the common purpose of "perpetuating a reimbursement scheme based on AWP" because they each benefited from the scheme. AMCC ¶ 729. The PBMs allegedly seek to maintain the AWP system because they benefit by billing their clients for prescription drugs based on AWPs that do not reflect the prices they actually pay for the drugs. Each manufacturer allegedly benefits from the purported scheme by using the "spread" between acquisition cost and AWP to induce each PBM to "advocate and favor" that particular defendant's drugs to the customers of the PBM's clients. *Id.*

Plaintiffs' conspiracy claims should be dismissed for several reasons. First, the allegations of conspiracy do not satisfy the requirements of Rule 9(b). Second, plaintiffs fail to state a claim for either a "concerted action conspiracy" or a "coercive conspiracy" – the two types of civil conspiracy recognized under Massachusetts state law. *See Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 244 (D. Mass. 1999). Third, because plaintiffs' conspiracy claims are duplicative of their RICO and consumer fraud claims, Massachusetts law requires that they be dismissed.

### A.     Plaintiffs' Conspiracy Claims Fail To Satisfy the Pleading Requirements of Rule 9(b).

As this Court held in *Van Schaick v. Church of Scientology of Cal., Inc.*, 535 F. Supp. 1125 (D. Mass. 1982), when pleading a civil conspiracy to defraud, a plaintiff must "plead fraudulent conspiracy with enough specificity to inform multiple defendants of facts forming the basis of the conspiracy charge." *Id.* at 1141. Indeed, "such allegations must 'delineate among

---

[14] Plaintiffs allege diversity jurisdiction with respect to Count IX. *See* AMCC ¶ 22. Accordingly, this Court must apply the substantive law of Massachusetts, the forum state, to plaintiffs' conspiracy claim. *See Moss v. Camp Pemigewassett, Inc.*, 312 F.3d 503, 507 (1st Cir. 2002).

24

the defendants as to their participation or responsibilities' in making the statements which are the subject of the suit." And, "[c]onspiracies described in sweeping and general terms cannot serve as the basis for a cause of action, and may be dismissed." *Id.* Furthermore, a complaint alleging a conspiracy based on fraud must specify the time, place, and content of the alleged fraud. *See Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985); *Heinrich v. Sweet*, 49 F. Supp. 2d 27, 46 (D. Mass. 1999).

At the outset, plaintiffs' conspiracy claims are inherently illogical: First, plaintiffs fail to explain how defendants' reporting of AWP can further a fraud when the relevant contracts are negotiated at arm's length by PBMs and the third-party payor plaintiffs and provide for substantial discounts off AWP. *See* AMCC ¶ 169 ("In these contracts, the brand name drugs are priced at the AWP less a certain percentage 'discount.'"). Second, plaintiffs fail to explain how each of 22 defendants could induce each of the PBMs to agree to favor that particular defendant's products over those of 21 other defendants, with whom the PBMs are also conspiring. Plaintiffs' allegations on this point simply make no sense.

Furthermore, the AMCC contains only the most conclusory assertions of multiple conspiracies – 88 to be exact – between individual defendants and the four major PBMs. Indeed, each paragraph describing an individual defendant's participation in alleged conspiracies with each of the four major PBMs, *see* AMCC ¶ 728 (a) – (v), is identical to those describing the conduct of every other defendant, with the sole difference being the defendant's identity.

Plaintiffs make rote and conclusory allegations about an entire industry without providing any specific details about what individual acts any particular defendant purportedly took to further the alleged conspiracies with the PBMs. Rule 9(b) is intended to safeguard a defendant's

25

ability to defend itself against serious allegations of fraud by imposing heightened pleading standards for such claims. Plaintiffs clearly fail to meet those standards. *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) (affirming dismissal of conspiracy allegations under Rule 9(b) where plaintiff merely alleged that defendants "'worked closely together and were aware of the others' conduct'" and that defendants "'conspired . . . for . . . their own personal financial gain'"); *Herring v. Vadala,* 670 F. Supp. 1082, 1087 (D. Mass. 1987) (dismissing civil conspiracy claim that was "simply a vague and conclusory sweep of all of the defendants into one conspiracy without specifying what action each defendant took").

### B.     Plaintiffs Fail To Allege A Concerted Action Civil Conspiracy.

In Massachusetts, a claim for a "concerted action" civil conspiracy requires a showing that two or more people acted in concert to commit an unlawful act or to commit a lawful act by unlawful means. *See Grant v. John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344, 359 (D. Mass. 2002). Because plaintiffs have failed to allege specific facts that, if proved, would establish (1) that each defendant entered into an agreement with each PBM to commit an unlawful act, and (2) that each defendant committed a tortious act in furtherance of such an agreement, plaintiffs have failed to allege a "concerted action conspiracy" under Massachusetts law. *See Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994) ("For liability to attach on this basis, there must be, first, a common design or an agreement . . . and, second, proof of some tortious act in furtherance of the agreement.") (citation omitted).

The AMCC contains only the conclusory allegation that "[d]efendants consciously conspired and deliberately pursued a common plan or design to commit tortious acts, with each PBM that was part of its conspiracy." AMCC ¶ 729. There are no defendant-specific allegations

26

about any communications between any individual defendant and a PBM, let alone specific allegations of an agreement between a defendant and any PBM that the PBM should base its reimbursement rates on AWP, or that the defendant should report fraudulent AWPs. *See id.* ¶¶ 726-33.

Even assuming that the PBMs engaged in misleading or deceptive conduct in the course of their negotiations with the private payor plaintiffs, there are no particularized allegations suggesting that any of the defendants was aware of such conduct. *See Grant*, 183 F. Supp. 2d at 364 ("Because a conspiracy requires an agreement to commit a wrongful act, none can exist where an alleged participant lacks knowledge that a wrongful act is being perpetrated.") (citation omitted). Because plaintiffs fail to allege with particularity that each defendant and each PBM agreed to engage in unlawful conduct, the civil conspiracy claim must be dismissed.

### C.     Plaintiffs Fail To Allege A Coercive Conspiracy.

Plaintiffs also fail to allege facts supporting a "coercive conspiracy" claim under Massachusetts law. Coercive conspiracy is a "rare," *Fleming v. Dane*, 22 N.E.2d 609, 611 (Mass. 1939), and "very limited" cause of action, *Aetna*, 43 F.3d at 1563. To prevail on such a claim, a plaintiff must demonstrate that the defendants, acting in unison, exerted a "peculiar power of coercion" over plaintiffs, which any individual standing in like relation to plaintiffs would not have had. *See Massachusetts Laborers*, 62 F. Supp. 2d at 244 (citing *Fleming*, 22 N.E.2d at 611).

*Massachusetts Laborers* is particularly instructive. There, an employee health benefit plan sued a tobacco manufacturer for civil conspiracy based on the manufacturer's manipulation of scientific research and concealment of unfavorable facts regarding the effects of smoking.

27

The court held that the plaintiff could not state a claim for "coercive conspiracy" because the defendants' activities were not peculiarly focused on the plaintiffs. *See id.* at 245. Rather, the alleged conduct was directed at the general public. *See id.* (holding "an allegation of a generally exerted and generally felt power of coercion is not sufficient to plead the independent tort of ["coercive"] conspiracy as recognized in Massachusetts"). The alleged conduct at issue here – defendants' reporting of AWPs – is similarly "generally exerted" and "generally felt."[15] Accordingly, plaintiffs have failed to state a claim for coercive conspiracy.

### D. Plaintiffs' Conspiracy Claims Are Duplicative Of Their Other Claims.

It is settled law that there is no separate action for damages for a civil conspiracy where the conspiracy claim is based on the same underlying conduct as the plaintiff's other claims. *See Grant*, 183 F. Supp. 2d at 364 (quoting *Putnam v. Adams Comm. Corp.*, Civ. A. No. 84-0355-S, 1987 WL 13262, at *9 (D. Mass. June 15, 1987) ("'Where the allegations of conspiracy add nothing to the underlying tort allegations, the courts have repeatedly held that "the gist of such action is not the conspiracy alleged, but the tort committed against the plaintiff."'"). Because plaintiffs' civil conspiracy claims are based on the same allegations underlying plaintiffs' RICO and consumer fraud claims, *see* AMCC ¶¶ 619-91, the conspiracy claims in Count IX should be dismissed.

---

[15] Moreover, plaintiffs have not alleged that the defendants acted in unison with the PBMs. The AMCC only alleges that the defendants and PBMs had a similar interest in perpetuating the AWP-based reimbursement system because it was to their benefit. *See* AMCC ¶ 729. Mere evidence of joint activity is insufficient to sustain a claim of coercive conspiracy. *See Tennaro v. Ryder Sys., Inc.*, 832 F. Supp. 494, 499 (D. Mass. 1993) (citation omitted).

28

## IV. PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE STATE CONSUMER FRAUD STATUTES.

Plaintiffs assert claims under eleven state consumer fraud laws.[16] As discussed above, *see supra* pp. 6-10, plaintiffs fail to allege their claims under these statutes, which sound in fraud, with the particularity required by Rule 9(b).[17] Plaintiffs also fail to state claims under the controlling law of all of these states. First, plaintiffs fail to adequately plead that defendants' conduct proximately caused them to overpay for defendants' drugs. Second, plaintiffs cannot successfully allege that defendants engaged in a "deceptive" or "misleading" practice by reporting AWPs. Third, plaintiffs' claims fall outside the scope of certain of the state consumer protection laws for a variety of reasons that are described below.

### A. Plaintiffs Cannot Show That Defendants Directly Caused Them To Pay Higher Prices.

Eight of the eleven state consumer protection laws[18] under which plaintiffs seek to recover require a showing that the allegedly fraudulent statements or conduct at issue directly and proximately caused plaintiffs' injuries.[19] Plaintiffs cannot allege that their purported injuries

---

[16] California, Delaware, Florida, Illinois, Louisiana, Minnesota, New Jersey, New York, Pennsylvania, Texas, and Washington.

[17] *Hayduk*, 775 F.2d at 443 ("[A]lthough state law governs the burden of proving fraud at trial, the procedure for pleading fraud in federal courts in all diversity suits is governed by the special pleading requirements of Federal Rule of Civil Procedure 9(b).").

[18] Florida, Illinois, Louisiana, New Jersey, New York, Pennsylvania, Texas, and Washington.

[19] *See, e.g., Association of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc.*, 241 F.3d 696, 706 (9th Cir. 2001) (concluding that proximate cause standards under RICO govern claims under Washington's consumer protection statute and dismissing claim because there was no "direct link" between plaintiffs' damages and defendants' conduct); *Oliviera v. Amoco Oil Co., Inc.*, 776 N.E.2d 151, 155-6, 164 (Ill. 2002) ("market theory" of causation is not sufficient under Illinois Consumer Fraud Act; plaintiff must allege that he saw, heard, or read the allegedly deceptive advertisements and was deceived by them); *Weinberg v. Sun Co.*, 777 A.2d 442, 444 (Pa. 2001) (to state a claim under Pennsylvania consumer protection statute, plaintiff must suffer loss as a result of defendants' conduct); *Feinberg v. Red Bank Volvo, Inc.*, 752 A.2d 720, 723 (N.J. Super. Ct. App. Div. 2000) ("In order to be entitled to damages under the [New Jersey] Consumer Fraud Act, a plaintiff must 'prove that the unlawful consumer fraud caused his loss.'") (citation omitted); *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000) (to state a claim

29

were directly caused by defendants' reporting of AWPs. Rather, they allege, at best, only an attenuated causal chain, involving many intervening actors. *See* pp. 21-23 *supra.* Such allegations are insufficient to support claims under the consumer fraud statutes of these eight states.

The Illinois Supreme Court's decision in *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151 (Ill. 2002), provides a useful comparison. In that case, the plaintiff filed a class action complaint alleging that Amoco Oil Company falsely represented in a series of advertisements that the use of its premium gasoline would improve engine performance and benefit the environment. *Id.* at 154. Plaintiff further alleged that these misrepresentations, along with the increased demand for Amoco's premium gasoline they engendered, allowed Amoco to charge inflated prices for its gasoline, thereby causing damage to purchasers, regardless of whether the purchasers were aware of the advertisements. *Id.* Plaintiff, however, failed to allege that the advertisements induced him to purchase Amoco's gasoline, or even that he saw, heard, or read any of the allegedly deceptive advertisements. *Id.* at 155. Accordingly, the court dismissed plaintiff's consumer fraud claim for failure to plead proximate causation adequately. *See id.* at 164.

Here, the allegations of the AMCC make clear that plaintiffs were not induced by the published AWPs to purchase defendants' products. Indeed, the AMCC does not even allege that any plaintiff read the national pharmaceutical pricing compendia that list AWPs.

---

under N.Y. Gen. Bus. L.§ 349, plaintiff must suffer injury "as a result" of defendants' deceptive act); *McGill v. General Motors Corp.*, 231 A.D.2d 449, 450 (N.Y. App. Div. 1996) (plaintiffs must show they knew of and relied upon the allegedly false advertisements to state a claim under N.Y. Gen. Bus. L. § 350); *Chicken Unlimited, Inc. v. Bockover*, 374 So. 2d 96, 97 (Fla. Dist. Ct. App. 1987) (no causation under Fla. Stat.Ann. §501.204 where plaintiff knew of the potential falsity of the alleged misrepresentations); Tex. Bus.& Com. Code 17.45(13) (requiring "specific intent that the consumer act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness"); La. Rev. Stat. Ann. § 51:1409 (creating a private right of action for the loss suffered "as a result of an unfair or deceptive method, act or practice . . .").

Plaintiffs here fail to plead proximate causation in other ways as well. As discussed above, *see* pp. 21-23 *supra*, their allegations make clear that there were multiple intervening actors in the causal chain between defendants' alleged conduct and plaintiffs' alleged injuries. These intervening actors include: (i) doctors, who ultimately determine which drugs to prescribe to their patients; (ii) private health insurance plans and funds, which contract with PBMs and frequently establish formularies that influence the drugs their customers use; (iii) Congress, which enacted the legislation providing that non-multi-source Medicare Part B covered drugs would be reimbursed at the lower of the providers' actual charge or 95% of AWP; and (iv) CMS, which administers the federal Medicare program. Given these intervening causes of plaintiffs' alleged injuries, the causal chain alleged in the AMCC is simply too attenuated to support a claim of consumer fraud.[20] Because the AMCC fails to plead adequately that defendants' conduct directly caused plaintiffs' alleged injuries, plaintiffs' claims under the consumer fraud statutes of Florida, Illinois, Louisiana, New Jersey, New York, Pennsylvania, Texas, and Washington must be dismissed.

### B. Plaintiffs Cannot Demonstrate That Defendants' Conduct Was "Deceptive" Or "Misleading."

State consumer fraud statutes are intended to protect consumers against "sharp practices and dealings in the marketing of merchandise and real estate." *Daaleman v. Elizabethtown Gas Co.*, 390 A.2d 566, 569 (N.J. 1978). These consumer-oriented laws typically apply in circumstances where consumers have been targeted by unscrupulous advertisers or retail

---

[20] *See, e.g., Prudential Ins. Co. of Am. v. Jefferson Assoc., Ltd.*, 896 S.W.2d 156, 161-62 (Tex. 1995) (citing, with approval, *Dubow v. Dragon*, 746 S.W.2d 857, 860 (Tex. Ct. App. 1988), which dismissed plaintiff's claim where a "new and independent basis for [plaintiff's] purchase" existed which "intervened and superseded" defendant's alleged wrongful act); *Bartlett v. Schmidt*, 33 S.W.3d 35, 38-41 (Tex. Ct. App. 2000) (dismissing plaintiff's claim because plaintiff failed to demonstrate an "unbroken causal connection between the allegedly deceptive act and the actual damages suffered").

salespersons. *See, e.g., ARC Networks, Inc. v. Gold Phone Card Co.*, 756 A.2d 636, 638 (N.J. Super. Ct. Law Div. 2000) (identifying automotive repairs, delivery of household furniture, and home improvement practices as paradigmatic application of the New Jersey Consumer Fraud Act).

Accordingly, the state statutes invoked by plaintiffs require a showing that the public was, or could have been, deceived by defendants' conduct.[21] Where, as in this case, the alleged misrepresentations were not made to plaintiffs, these state laws simply do not apply. Indeed, plaintiffs here do not – and cannot – allege that the end-payors they seek to represent were "lured into a purchase through fraudulent, deceptive or other similar kinds of selling or advertising practices" by defendants. *Daaleman*, 390 A.2d at 569.

Furthermore, the allegations contained in the AMCC demonstrate that plaintiffs were not misled to believe that published AWPs reflect actual average acquisition costs. To the contrary, the AMCC alleges that plaintiffs negotiate with PBMs to pay for drugs at prices that reflect discounts off AWP, thus demonstrating that the members of the proposed class are aware that AWPs reflect undiscounted prices. Accordingly, because plaintiffs have failed to allege

---

[21] See *Oliveira*, 776 N.E.2d at 160 (defendant not liable unless act was "deceptive"); *Davis v. Powertel, Inc.*, 776 So.2d 971, 974 (Fla. Dist. Ct. App. 2000) (defendant's act must be "likely to deceive a consumer acting reasonably" under the circumstances); 6 Del. Code § 2513(a) (2001) (prohibiting use of any "deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression or omission . . . in connection with the sale, lease or advertisement of any merchandise"); *State ex rel. Humphrey v. Directory Publ'ng Servs., Inc.*, No. Cl-95-1470, 1996 Minn. App. LEXIS 62, at *12 (Minn. Jan. 9, 1996) (act must have capacity to mislead); *Cox v. Sears, Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) ("The capacity to mislead is the prime ingredient of all types of consumer fraud."); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744-45 (N.Y. 1995) (no cause of action under New York's consumer protection statute where defendants' conduct was not "likely to mislead a reasonable consumer acting reasonably under the circumstances"); *Marshall v. Citicorp Mortg., Inc.*, 601 So.2d 669, 670 (La. Ct. App. 1992) ("plaintiff must prove some element of fraud, misrepresentation, deception, or other unethical conduct" by defendant); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 479-80 (Tex. 1995) (defendant's act must have "capacity to deceive"); *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 535 (Wash. 1986) (plaintiff must show "that the alleged act had the capacity to deceive a substantial portion of the public") (citation omitted).

adequately that the challenged practice – defendants' reporting of AWPs – could deceive plaintiffs, the consumer fraud claims must be dismissed.

### C. Plaintiffs' Claims Falls Outside The Scope Of Certain Of The State Consumer Protection Laws.

#### 1. Standing

Plaintiffs lack standing to bring a claim under certain of the statutes alleged, including those of Delaware, Florida, Louisiana, New Jersey, Pennsylvania, and Washington.

Under the Deceptive Trade Practices Act ("DTPA") of Delaware only the Attorney General may bring suit on behalf of consumers, *see* 6 Del. Code § 2533, and private suits under this section can only be brought by competitors of the defendant, *S&R Assocs., L.P., III v. Shell Oil Co.*, 725 A.2d 431, 440 (Del. Super. Ct. 1998).

Only residents of Florida have standing to bring a cause of action under the Florida Deceptive Trade and Unfair Practices Act ("FDTUPA"). *See OCE Printing Sys. USA, Inc. v. Mailers Data Servs., Inc.*, 760 So.2d 1037, 1042 (Fla. Dist. Ct. App. 2000). Because none of the named plaintiffs is alleged to be a resident of Florida, plaintiffs' claims under FDTUPA must be dismissed.

A number of Louisiana courts have held that only direct consumers and business competitors have standing to sue under the state's Unfair Trade Practices Act ("LUTPA"), La. Rev. Stat. Ann. § 1405. *See Cashman Equip. Corp. v. Acadian Shipyard, Inc.*, 2002 U.S. Dist. LEXIS 12243, at *4-5 (E.D. La. 2002) (discussing cases and noting split among Louisiana courts), *aff'd*, 2003 U.S. App. LEXIS 8927 (5th Cir. Apr. 11, 2003). In *Cashman*, a federal court applying Louisiana law dismissed a LUTPA claim brought by an insurer for lack of standing, reasoning that the insurer was neither a consumer nor a competitor.

Under New Jersey's consumer fraud statute, N.J. Stat. Ann. 56:8-1 *et seq.*, a consumer is "one who uses (economic) goods, and so diminishes or destroys their utilities." *City Check Cashing, Inc. v. The Nat'l State Bank*, 583 A.2d 809, 811 (N.J. Super. Ct. 1990) (quotation omitted). The named plaintiffs here are not consumers within the meaning of the New Jersey statute because they do not "diminish or destroy the utility" of the prescription drugs identified in the AMCC. Accordingly, they lack standing to sue under New Jersey's Consumer Fraud Act.[22]

Likewise, because no plaintiff alleges that it purchased any of defendants' products "primarily for personal, family or household purposes," plaintiffs do not have standing to bring a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law. 73 Pa. Stat. § 201-9.2; *see also Waldo v. North Am. Van Lines, Inc.*, 669 F. Supp. 722, 725-26 (W.D. Pa. 1987) (granting summary judgment where plaintiff "did not buy [goods at issue] to consume personally or with his family").

Finally, plaintiffs lack standing under Washington law to assert a claim under its consumer protection statute because they have not purchased drugs directly from the defendants. *Cf. Blewett v. Abbott Labs.*, 938 P.2d 842, 844 (Wash. Ct. App. 1997) (holding that a consumer who purchased a drug from a retail pharmacy, rather than directly from a manufacturer, does not have standing to bring a claim for inflated pricing under Washington's Consumer Protection Act).

---

[22] A recent case, *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 349-50 (2d Cir. 2003), misconstrued New Jersey law, permitting insurers to bring suit against drug manufacturers for alleged fraud in violation of the CFA. In that case, the Second Circuit failed to consider the New Jersey cases, *supra*, that limit the right of action under the Consumer Fraud Act to consumers (failed, indeed, to consider any New Jersey cases), and instead based its decision on general causation principles.

34

### 2. Reliance

Contrary to plaintiffs' allegation, *see* AMCC ¶ 686, N.Y. Gen. Bus. Law § 350 (one of the two New York statutes plaintiffs invoke) and Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-9.2, require a showing of reliance. *See McGill*, 231 A.D.2d at 450; *Weinberg*, 777 A.2d at 446; *Debbs v. Chrysler Corp.*, 810 A.2d 137, 158 (Pa. Super. Ct. 2002) (stating "fraud under UTPCPL require[s] an individualized showing of reliance on a fraudulent statement"); *see also Sponaugle v. First Union Mortg. Corp.*, No. 01-3325, 2002 WL 1723894, at *3 (3d Cir. July 25, 2002) (citations omitted). Because plaintiffs fail to allege that they relied on defendants' allegedly fraudulent statements, their claims under these statutes must be dismissed.

### 3. No Consumer-Oriented Conduct

New York's consumer fraud statute, N.Y. Gen. Bus. Law § 349, requires, as a threshold matter, that the challenged conduct be consumer-oriented. *See New York Univ. v. Continental Ins. Co.*, 662 N.E.2d 763, 770 (N.Y. 1995) (citation omitted). The defendants' reporting of AWPs to the publishers of pharmaceutical pricing compendia can hardly be described as consumer-oriented. Furthermore, the New York Court of Appeals has held that a bilateral contract negotiated in an arm's-length transaction is not within the purview of the statute. *See id.* Here, plaintiffs seek to represent hundreds, if not thousands, of private health funds and insurance plans with respect to contracts those entities entered into with PBMs. As the *New York University* case makes clear, such conduct is not "consumer-oriented" and, therefore, is not actionable.

35

## V. ALL CLAIMS RELATING TO MULTIPLE-SOURCE DRUGS SHOULD AGAIN BE DISMISSED.

Plaintiffs again attempt improperly to extend this case to multiple-source drugs. As this Court held in dismissing the MCC, "multiple source drugs do not fit the paradigm described in the complaint." *AWP Litigation*, 263 F. Supp. 2d at 194 n.11. Plaintiffs' claims with respect to multiple-source drugs are inconsistent with the laws of mathematics and conflict with the plaintiffs' liability theory. Accordingly, this Court should dismiss all claims with respect to those drugs. *See* Exhibit B hereto (listing multiple-source drugs named in the AMCC).

### A. Medicare Part B Claims Should Again Be Dismissed AsTto Multiple-Source Drugs.

Medicare Part B pays for multiple-source drugs and biologicals at a flat rate calculated as "the lesser of the median average wholesale price for all sources of the generic forms of the drug or biological or the lowest average wholesale price of the brand name forms of the drug or biological." 42 C.F.R. § 405.517; *see also* AMCC ¶ 184. Under this methodology, one manufacturer cannot obtain a competitive advantage over another by increasing the AWP for its drug. Any effect that such an increase would have on Medicare payments would apply equally to all forms of the drug. As this Court recognized, the effect of this common payment rate is fundamentally inconsistent with the AMCC's notion that defendants "motivate[d] the providers to sell and administer the drugs with the most inflated AWPs." AMCC ¶ 3.

Plaintiffs again fail to explain how manufacturers of multiple-source drugs gain a competitive advantage with respect to Medicare Part B covered multiple-source drugs by raising the AWPs for their drugs. Plaintiffs still allege that defendants competed "not based on lower prices" but by inflating their AWPs in a "perversion of the type of competitive behavior expected

36

in a market not subject to illegal manipulation." AMCC ¶ 6. This is identical to the language used in the MCC to describe plaintiffs' theory. *See* MCC ¶ 6.

In their attempt to shoehorn multiple-source drugs into this case, plaintiffs contort the rules of mathematics. According to plaintiffs, "raising of an individual Defendant's reported AWP for a multiple-source drug raises the median AWP at which the generic drug is reimbursed." AMCC ¶ 186. Plaintiffs contend that a single manufacturer can "effect [*sic*] the median generic reimbursement AWP" for a multiple-source drug. *Id.* But, plaintiffs confuse the median with the mean. The median is "that quantity which is so related to the quantities occurring in a given set of instances that exactly as many of them exceed it as fall short of it." *The Oxford English Dictionary* 543 (2d Edition 1989). The mean, by contrast, is the mathematical average. *See id.* at 519.[23]

Most importantly, all formulations of a multiple-source drug are reimbursed at the same rate, regardless whether one manufacturer can raise that rate. This prevents competition based upon a single drug's AWP. No provider can be "motivated" to purchase one drug as opposed to another by virtue of an inflated AWP.

### B.     Plaintiffs' Conspiracy Allegation Is Insufficient.

Perhaps to address this fact, plaintiffs add to the AMCC a one-sentence allegation of a horizontal conspiracy among the competing manufacturers of multiple-source drugs:

> Because reimbursement is pegged to the AWP, drug makers act in unison by elevating the AWP for all generic drugs, thereby inflating the amount of the reimbursement that occurs through Medicare Part B, including the Medicare co-payment through Part B.

---

[23] This difference can be critical. Assume that the AWPs for five formulations of a multiple-source drug are $3, $5, $7, $8 and $50. The median AWP is $7. If the manufacturer with the $50 drug raises its AWP to $60, the median AWP remains $7.

37

AMCC ¶ 184. This conclusory allegation of conspiracy is inconsistent with the remainder of the theories in the AMCC, and it is insufficient under Rule 9(b). Plaintiffs do not describe who entered these agreements, where they were consummated, or what their goals were. Thus, plaintiffs have not plead their conspiracy claims "with enough specificity to inform multiple defendants of facts forming the basis of the conspiracy charge." *Van Schaick*, 535 F. Supp. at 1141. Nor does the AMCC "'delineate among the defendants [as to] their participation or responsibilities' in making the statements which are the subject of the suit." *Id.* (citation omitted).

In fact, plaintiffs' conspiracy allegations make no sense. Plaintiffs never explain how defendants *competed* by raising AWPs in one context, but *cooperated* to set these same AWPs in unison in another context. Thus, plaintiffs provide none of the detail that is demanded by Rule 9(b). *See Doyle*, 103 F.3d at 194; *Hayduk*, 775 F.2d at 44; *Herring*, 670 F. Supp. at 1087.

### C. The Non-Medicare Allegations Regarding Multiple-Source Drugs Likewise Should Be Dismissed.

Plaintiffs also allege that payment for multiple-source drugs by certain unnamed private entities is based upon unspecified formulae "sometimes" connected to AWP. AMCC ¶ 182. For example, plaintiffs contend that private payor reimbursement for multiple-source drugs may be determined as "a certain percentage 'discount' off of the AWP," and, at other times, it may be based on a uniform "maximum allowable cost" or "MAC." AMCC ¶ 181. According to plaintiffs, a pharmacy benefit manager "sometimes" will calculate a MAC "based on list average wholesale prices of competing multiple-source drug manufacturers." AMCC ¶ 182. As with the PBM allegations discussed *supra* at ___, these vague generalizations cannot support a claim that

38

defendants competed on the "spread" as to multiple-source drugs in the private market.[24]

## CONCLUSION

For the reasons stated above, the Amended Master Consolidated Class Action Complaint should be dismissed.

Respectfully Submitted,
ON BEHALF OF ALL DEFENDANTS

By: _/s/ Nicholas C. Theodorou_

Nicholas C. Theodorou, Esq. (BBO# 496730)
Juliet S. Sorensen, Esq. (BBO# 647255)
FOLEY HOAG, LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

D. Scott Wise, Esq.
Kimberley D. Harris, Esq.
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

---

[24] Plaintiffs also quote at length from a lawsuit which challenged the arbitrary decision by First Data Bank ("FDB") to calculate the AWP for one manufacturer differently than its competitors. *See* AMCC ¶¶ 189-90. These allegations are irrelevant to the manner in which multiple-source drugs are reimbursed; simply put, it remains mathematically impossible for manufacturers of multiple-source drugs to compete on the AWP "spread" in the Medicare Part B context. Indeed, the lawsuit never even mentions Medicare. A more detailed discussion of this FDB lawsuit is contained in the individual brief filed by defendant Dey.

39