UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL No. 1456 ) Master File No. 01-12257-PBS ) ) Hearing Date: September 18, 2003 ) Time: 3:00 p.m. |
| THIS DOCUMENT RELATES TO: State of California, et al v. Abbott Laboratories et al CASE #: 1:03-cv-11226-PBS | ) ) ) Judge Patti B. Saris ) ) |

## THE STATE OF CALIFORNIA'S AND RELATOR'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REMAND

### INTRODUCTION

The State of California and the Relator Ven-A-Care of the Florida Keys, submit this Amended Memorandum of Law in Support of Their Motion to Remand in State of California, et al. v. Abbott Laboratories et al. This additional briefing supports Plaintiffs' initial Points and Authorities in Support of Motion to Remand filed April 4, 2003 in the United States District Court for the Central District of California, Case No. 03-cv-2238, (CR 22-23 therein). Since the initial brief in Support of the Motion to Remand was filed, the Court herein, on June 11, 2003, issued a ruling regarding motions to remand by other states (MDL 1456 CR 379). This brief constitutes Plaintiffs' brief in support of Plaintiff's Motion to Remand this matter back to State Court.

1

## Procedural History

1.     In 1998, the  Relator, Ven-A-Care, filed  its original complaint, under seal, entitled State of California ex rel. Ven-A-Care of the Florida Keys, Inc., et al. vs. Abbott Laboratories, et al., San Diego Superior Court Case No. 722855 against twenty-three (23) pharmaceutical manufacturers.  Claims were asserted pursuant to the California False Claims Act alleging those manufacturers defrauded the State of California Medi-Cal program. (See, Exhibit "B"- Cal. Gov't Code § 12652 et seq.).  The case was later transferred to Los Angeles and assigned to the Hon. Judge Peter D. Lichtman.

2.     In August 2002, Relator's First Amended Complaint was filed under seal expanding the number of pharmaceutical company defendants to forty-six (46).  The relator's complaint remains under seal and has not been served on any defendant – neither Abbott and Wyeth nor the remaining sealed defendants.  The Relator's First Amended Complaint added claims pertaining to Medicaid rebate fraud as to certain defendants, including Abbott.

3.     In January 2003, the California Attorney General filed an Intervention Complaint as to certain claims against only Defendants Abbott, Wyeth, Inc. and Wyeth Pharmaceuticals (collectively, "Wyeth").  (See, Exhibit "A").  The Intervention Complaint was based on the California False Claims Act.  The Attorney General's action was assigned a separate case letter designation from the Relator's action.  Only defendants Abbott and Wyeth were served with the Intervention Complaint or any subsequent pleadings in that action.  The relator's Amended Complaint as to the other forty-four (44) defendants remains under seal.  The Intervention Complaint did not allege any Medicaid rebate count or any other federal claim.

2

4.      Abbott and Wyeth moved to dismiss the Intervention Complaint pursuant to a state rule of procedure governing service. On March 25, 2003 an order denying the Motion to Dismiss filed by Abbott and Wyeth issued from Los Angeles Superior Court, Hon. Judge Peter D. Lichtman, in the underlying state case.

5.      Limited discovery had commenced in the case, together with limited production of the sealed court file to defendants Abbott and Wyeth. In the course of that production, redacted copies of Relator's sealed Complaint and sealed Amended Complaint were provided to defendants Abbott and Wyeth.[1]  The Relator's complaints were not served on defendants Abbott and Wyeth, however. None of the formalities of service were performed and a letter accompanying the production expressly stated that the pleadings were not being served.

6.      On March, 31 2003, Abbott filed its Notice of Removal to Federal Court and the action was assigned to the Hon. Dean D. Pregerson with Case No. 03-2238 D.P. (PLAx)(CR 1 therein). As a result of motions filed by Defendants, this case was transferred to this Court through the JPML as part of MDL 1456.

7.      The caption of Abbott's Notice of Removal (Id.) expressly indicated that Abbott was removing both the Abbott - Wyeth case (the Intervention Complaint, Case No. BC287198A) and the still - sealed relator's action (Case No. BC287198.)

8.      The basis for Abbott's removal is that the sealed relator's case contains federal claims, specifically Medicaid rebate claims. Abbott does not contend that the Attorney General's case satisfies federal jurisdiction either on the face of the complaint or by virtue of additional

---

[1]      Because of the seal, the court file was produced in redacted form. The identity of other defendants, for example, was redacted.

3

information that renders that case alone removable. Abbott's argument is that the sealed complaint in the relator's case contains federal claims and those claims confer federal jurisdiction on both the sealed relator's case and the Attorney General's case against Abbott and Wyeth.

9.     The State and the Relator timely filed a motion to remand in the Central District of California (CR 22-23 therein). That court did not rule on the remand motion, opting instead to stay the action to allow Abbott and Wyeth's Motion for Transfer to the MDL to be decided.

10.     On June 23, 2003 the JPML transferred both the sealed relator's case and the Attorney General's case to this Court (MDL 1456 CR 410).

11.     On July 23, 2003, the State filed a separate Motion to Remand Sealed Defendants in this Court (MDL 1456 CR 437-438). On August 6, 2003, Defendant Abbott opposed that motion, arguing in part that this Court should not entertain that motion since the sealed defendants were not served with the motion and will not be heard by the Court (MDL 1456 CR 462). The instant motion to remand also seeks remand of the action against the sealed defendants as well as the complaint against Abbott and Wyeth.

## ARGUMENT

## INTRODUCTION

Federal jurisdiction is lacking in this case since there are no federal issues presented by the Complaint in Intervention, which is the only complaint that has been activated by an intervention decision by the California Attorney General and subsequent service of a complaint. Following the denial of their Motion to Dismiss in state court, Abbott and Wyeth removed the combined Relator's case and Attorney General's case to federal court, asserting the existence of Medicaid

4

rebate claims within the sealed Relator's complaint.[2]  As evidenced by its Intervention

Complaint, however, the State of California is not pursuing any rebate claims tied to the Medicaid

program against Abbott and Wyeth. The Intervention Complaint only alleges violations by

Abbott and Wyeth of the California False Claims Act based on fraudulent reporting of direct

prices. As this Court has already held in similar circumstances, state fraud complaints regarding

Medicaid price reporting do not satisfy federal jurisdiction requirements for removal. State of

Montana v. Abbott Laboratories, et al. , Memorandum and Order dated June 11, 2003 (In re

Pharmaceutical Industry, Mass. Dist. Ct. Case No. 01-12257, CR 379, pp. 11-15); State of Minn.

v. Pharmacia, Memorandum and Order dated August 20, 2003 (Mass. Dist. Ct. Case No. 03-

10069, CR 4, pp. 2-5). It is mere speculation in the instant case that the State of California may

seek to allege in the future federal claims regarding Medicaid rebates. At this time there was a

deliberate decision not to include federal claims. The case law on removal requires recognition of

the State's intent as expressed in the outstanding complaint not to pursue claims that give the

federal court jurisdiction.

The existence of sealed claims arises due to the unique procedural structure applicable to a

qui tam action, where a relator's complaint is filed under seal and service of the complaint and the

application of procedural obligations do not occur until the Attorney General makes a

determination about whether or not to intervene in the case. At that time, the action is unsealed

and the normal procedural process commences. Abbott's request to seek removal based on

---

[2]     As this Court has recently ruled, Medicaid rebate claims present federal questions
and warrant the exercise of federal jurisdiction.   State of Montana v. Abbott Laboratories, et al. ,
Memorandum and Order dated June 11, 2003 (In re. Pharmaceutical Industry, Mass. Dist. Ct.
Case No. 01-12257, CR 379, pp. 16-19)

allegations in a sealed, unserved and unactivated Relator's complaint is without precedent and is unsupported in the law. The statutory scheme under the California False Claims Act parallels the federal statute and permits the State to choose which portions, if any, of the sealed Relator's complaint the State wishes to pursue. The mere existence in the sealed complaint of federal claims is not evidence that those claims will ever be included by the State in the false claims lawsuit; certainly, at the moment, those claims are not at issue in the existing case and do not require any defense to be put forth. And because the sealed claims have not been activated, they are not grounds for removal.

## I

## THE INTERVENTION COMPLAINT EXCLUSIVELY ALLEGES CALIFORNIA CLAIMS AND VIOLATIONS OF CALIFORNIA LAW

The California False Claims Act, California Government Code § 12652(c)(2), requires Relators to file the initial complaint under seal to permit the State of California to conduct an investigation to determine whether it will intervene in the action. Because the initial complaint was under seal pending the Attorney General's investigation, all claims therein were confidential and dormant from the initial filing date of July 28, 1998 until the Attorney General determined it would intervene. See, Cal. Gov't Code 12652(c)(2)-(5). In this *qui tam* action, the Attorney General's office was and continues to be responsible for investigating and scrutinizing the allegations before deciding to intervene, and only the Attorney General's decision regarding intervention and subsequent unsealing and service of the complaint triggers any procedural obligations or options on the part of defendants. California Government Code § 12652(c)(9) expressly provides that "the defendant shall not be required to respond to any complaint filed under this section until 30 days after the complaint is unsealed and served upon the defendant

6

pursuant to section 583.210 of the Code of Civil Procedure."

In this case, the State of California extensively investigated in confidence whether it should intervene in the *qui tam* claims at issue. The Relator filed its initial sealed complaint in July 1998 and its sealed First Amended Complaint in August 2002 ("Relator's Complaints"), allowing the State of California to (1) evaluate the lawsuit and the facts underlying the suit; (2) determine whether the case is related to an ongoing criminal investigation; and (3) evaluate the effect of intervening in the suit. The provisions are similar to the federal False Claims Act. See, U.S. *ex rel.* Mikes v. Straus, 931 F. Supp. 248, 259-61 (S.D.N.Y. 1996).

While the sealed Amended Relator's Complaint contains claims arising under federal law, the State of California purposely chose to intervene exclusively on the state claims. (See, Exhibit "A"). In January 2003, the State of California determined that it acquired sufficient data and information about Defendants Abbott and Wyeth to institute an enforcement action against them only as to the false price claims under the False Claims Act. The State of California intentionally omitted any and all Medicaid rebate fraud claims or any other claims that would necessarily implicate federal law. It is certainly within Plaintiff's prerogative to decide which claims to put forth and case law on removal recognizes that prerogative and defers to issues raised in the outstanding complaint in deciding whether there is federal jurisdiction permitting removal. Particularly in the *qui tam* context, where the State becomes the controlling Plaintiff upon intervention, it is the prerogative of the State to determine the course of the litigation.

7

## II

## DORMANT FEDERAL CLAIMS IN THE SEALED RELATOR'S COMPLAINT ARE NOT GROUNDS FOR REMOVAL

Abbott's Notice of Removal is based entirely on allegations that are sealed and not contained in the only operative complaint for this case, the Intervention Complaint. There is no contention that the federal court has jurisdiction over the exclusively state claims in the Intervention Complaint. "[F]ederal courts have jurisdiction to hear, originally or by removal, only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action, or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 27-28, 103 S.C. 2842, 2855-2856 (1983). "Federal question" cases are those cases "arising under the Constitution, laws, or treaties of the United States." Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 107 S. Ct. 1542, 1546, 95 L. Ed. 2d 55 (1987); 28 U.S.C § 1331. The definition must be narrow because a broad definition of "arising under" would create the possibility for "a number of potentially serious federal-state conflicts." Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. at 10; Metropolitan Life, 107 S. Ct. at 1546.

Removal statutes are strictly construed against removal. Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 61 S. Ct. 868, 85 L. Ed. 1214 (1941); Able v. Upjohn Co., 829 F.2d 1330, 1332 (4th Cir. 1987). Doubts as to the propriety of the removal are resolved in favor of remand. State of Montana v. Abbott, 266 F. Supp. 2d 250 (D. Mass. 2003); Rodriguez v. FNMA, 2003 U.S. Dist. LEXIS 10877 (D. Mass. 2003). While a defendant may remove a state court case if a federal district court would have had original federal question jurisdiction, the federal court must remand that action to the state court if it appears it lacks jurisdiction over the case. 28 U.S.C. §

1441(a)-(c); Caterpillar, Inc. v. Williams, 482 U.S. 386, 96 L. Ed. 2d 318, 107 S. Ct. 2425, 2429

(1987).   Defendant has the "burden of showing the federal court's jurisdiction." BIW Deceived

v. Local 56, Indus. Union of Marine & Shipbuilding Workers, 132 F.3d 824, 831 (1st Cir. 1997);

Danca v. Private Health Care Systems, Inc., 185 F.3d 1 (1st Cir. 1999).  When a plaintiff moves to

remand "the burden of proving the propriety of removal (remains) on the party who removed."

Societa Anonima Lucchese Olii E. Vini v. Catania Spagna Corp., 440 F. SUPP. 461, 464 (D.

Mass. 1977).  Relying on allegations in an unsealed complaint does not meet defendant's burden

in demonstrating grounds for removal.

It is clear on the face of the unsealed and only operative complaint in this case, the

Intervention Complaint, that Plaintiffs are solely pursuing state claims against Defendants.

Complaint ¶¶ 25-45 (See, Exhibit "A").  When considering a motion to remand, federal courts

apply the well pleaded complaint rule to ascertain whether the removal was appropriate.

> The presence or absence of federal-question jurisdiction is governed by the "well-pleaded" complaint rule, which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint . . . .  The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law.

Caterpillar, 482 U.S. at 392 (citing Gully v. First National Bank, 299 U.S. 109, 112-113 (1936)).

(*emphasis added*).   The "well-pleaded complaint" rule prevents removal to federal court if a

plaintiff chooses to present only state claims.

> But the presence of a federal question, even a § 301 question, in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule -- that the plaintiff is the master of the complaint, that a federal question must appear on the face of the complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court.

Caterpillar, 482 U.S. at 398-99.

In fact, this exact issue was addressed by the United States Supreme Court in a decision published only two[2] months ago. In Beneficial National Bank v. Anderson , ___ U.S. ___, 123 S. Ct. 2058; 156 L. Ed. 2d 1, 2003 U.S. LEXIS 4277 (June 2, 2003), the Justices specifically focused on removal and reaffirmed that the plaintiff is indeed the "master of the complaint." Justice Stevens, writing for the majority, stated,

> To determine whether the claim arises under federal law, we examine the "well pleaded" allegations in the complaint and ignore potential defenses...As a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim.

Beneficial, 123 S. Ct. at 2062.

Abbott has asserted that claims from a sealed complaint regarding Medicaid rebates on drugs suffice to permit removal of this action. But the state has not adopted those claims in its Intervention Complaint. "Jurisdiction may not be sustained on a theory that the plaintiff has not advanced." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804,809, n.6,92 L. Ed. 2d 650, 106 S. Ct. 3229 (1986); Lewis v. Abbott Laboratories, 189 F. Supp. 2d 590, 592-93 (S.D. Miss. 2001). (Plaintiff may choose to sue for less than $75,000 to avoid removal to federal court).

The notion of a plaintiff being the master of his or her complaint and entitled to avoid federal jurisdiction is even more compelling in the case of a sovereign State as a plaintiff, where principles of comity augur in favor of deference to the State's choice of forum. The First Circuit recently indicated the significance of comity concerns when it vacated the portion of a district court's order on remand limiting plaintiff to recovery below the federal jurisdictional amount. Christopher v. Stanley-Bostitch, Inc., 240 F.3d 95 (1st Cir. 2001). Although the procedural record suggested that plaintiff was playing games with the court in arguing that defendant had not met its burden of demonstrating the amount in controversy, the appellate court held that any attempt to

10

dictate terms of a remand was beyond the court's jurisdiction and violated basic precepts of comity. Id. at 100. Furthermore, the prerogative of the prosecutor to choose which claims the government pursues has been repeatedly recognized by the courts in the *qui tam* context. E.g., United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine, 1995 U.S. Dist. LEXIS 16095 at *8-10 (D. Me.1995). ("The major concern in judicial interpretation and construction of the *qui tam* action has been preservation of the executive branch's discretionary role in pursuing recoveries").

Abbott incorrectly based its entire Notice of Removal on sealed allegations that have not rendered Abbott "amenable to the process of the Court" for any federal claims (Central Dist. of CA case docket entry CR 1). Defendant's reliance on the sealed Relator's Complaint is insufficient to confer jurisdiction of the federal court. The outstanding Complaint in Intervention fails to indicate an intent to pursue any federal claim. The right to remove is "to be determined according to the plaintiff's pleading at the time of the petition for removal." Mills v. Allegiance Healthcare Corporation, 178 F. Supp. 2d 1, 9 (D. Mass. 2001) (citation omitted). See, Chesapeake & Ohio Ry. v. L.B. Cockrell, 232 U.S. 146, 153, 58 L. Ed. 544, 34 S. Ct. 278 (1914), (A petition, which stated a valid cause of action under state law, did not demonstrate a fraudulent device to prevent a removal unless it was "without any reasonable basis."); Mill-Bern Assoc., Inc. v. Dallas Semiconductor Corp., 69 F. Supp. 2d 240, 245 (D. Mass. 1999), (rejecting claim by a defendant based on one deposition transcript that plaintiff cannot prove claims against non-diverse party where complaint's allegations were sufficient).

Although 28 U.S.C. §1446(b) refers to removal based on any paper from which it may be ascertained that the case is removable, thus allowing the court to look beyond the four corners of

the complaint, the "other paper" has to demonstrate that the case at issue is removable - not that federal claims exist in another pleading or that federal claims could have been asserted. The rule doesn't discard the principle that Plaintiff may choose to plead state claims only. In an attempt to justify removal Defendant Abbott seeks to force inclusion of federal rebate claims in the Complaint in Intervention herein. The Massachusetts District Court has recognized the requirement that to assume inclusion of federal claims in a complaint, the inclusion must be done voluntarily by the Plaintiff.

> Plaintiff's allegation in her opposition to defendants' motion to dismiss that her firing prevented her from being 100% vested in the company's pension plans does not transform her once nonremovable complaint into a removable one. See, e.g., Houston & Texas Cent. R.R. Co. v. Texas, 177 U.S. 66, 78, 44 L. Ed. 673, 20 S. Ct. 545 (1900) ("The Federal character of the suit must appear in the plaintiff's own statement of his claim, and that where a defense has been interposed, the reply to which brings out matters of a Federal nature, those matters thus brought out by the plaintiff do not form a part of his cause of action, but are merely a reply to the defense set up by the defendant.").

Papadopoulos v. UNC Associates Inc.,760 F. Supp. 243, 245 (D. Mass. 1991). (Defendants asserted that the allegation regarding the pension plan automatically stated a federal claim under ERISA).

The majority of cases removed based on an "other paper" involve diversity jurisdiction, where the other paper reveals that the amount in controversy in the complaint at issue exceeds the jurisdictional limit or that parties are in fact diverse. E.g., Bosky v. Kroger, Texas LP, 208 F.3d 208 (5th Cir. 2002); Height v. Southwest Airlines, Inc., 2002 U.S. Dist. LEXIS 13880 (N.D. Ill. 2002); Cabibbo v. Einstein/Noah Bagel Partners, LP, 2002 U.S. Dist. LEXIS 11825 (E.D. Pa. 2002); Shonk Land Co. LLC v. Ark Land Co., 170 F. Supp. 2d 660 (S.D. W.Va. 2001). The other paper must add missing information that renders the complaint at issue removable.

12

There is no case law supporting Abbott's contention that claims from a sealed complaint are grounds for removal. Cases involving motions for leave to amend a state court complaint are instructive. Courts faced with removals based on state court orders granting leave to amend to assert federal claims have remanded the cases where no amended complaint had in fact been filed. *E.g.*, Savilla v. Speedway America, LLC, 2002 U.S. Dist. LEXIS 21630 (S.D. W.Va. 2002); Bezy v. Floyd County Plan. Comm'n, 199 F.R.D. 308, 313 (S.D. Ind. 2001). The Savilla court made clear that it was not holding that the order granting leave to amend could not be an "other paper" for purposes of § 1446(b); rather the court held that the order did not make the original filed complaint removable. 2002 U.S. Dist. LEXIS at *8-10. As the court stated:

> Federal question jurisdiction could become available only if and when a complaint containing a federal claim was filed in state court. The state court's order granting leave to amend the complaint may have notified the defendant of the future possibility of federal question jurisdiction. That order could not, however, have informed the defendant that the case is one which is or has become removable.

Id. at 9-10.[3]

Here, defendants used the Relator's separate complaint as the basis to remove the Intervention Complaint, despite the fact that nothing in the active Intervention Complaint indicates any intent to allege federal claims. The argument apparently is that the Intervention Complaint might be amended one day or the Relator's complaint might be unsealed one day. The clear answer is that

---

[3]     Another example of actual filings in state court that have been deemed non-removable are so-called Rule 27 petitions. A potential plaintiff may bring a petition pursuant to various state laws, e.g., Mass. R.Civ.P. 27(a), to obtain certain discovery before a lawsuit is filed. The targets of the discovery have attempted to remove the proceedings to federal court in some instances. Courts have rejected these attempts. E.g., Barrows v. American Airlines Inc., 164 F. Supp. 2d 179 (D. Mass. 2001); In re Hinolte, 179 F.R.D. 335 (S.D. Ala. 1998).

either of those events would trigger a right to remove at that point, if and when they happen. Given the strong presumption against federal jurisdiction and against removal, these potential claims cannot be the basis for federal jurisdiction.[4]

Significantly, the California State Court has already addressed the interplay between procedural rules and the unique procedural structure of *qui tam* actions in response to Abbott's initial attempt to have the case dismissed under a state civil procedural rule. There, as should be the case here, the court recognized the need to sensibly apply procedural rules in a manner that supports the structure and intent of the *qui tam* statute. Abbott filed a motion to dismiss under California Code of Civil Procedure § 583.210, which provides that an action will be dismissed if the complaint is not served within 3 years after the action is commenced.

The court denied the motion, holding that the *qui tam* statute did not permit service while the case was under seal. Court's Ruling re: Defendants' Motion to Dismiss, State of California v. Abbott, Superior Court of California, County of Los Angeles Case No. BC 287198A. (See, Exhibit "C"). The court's entire analysis was based on the distinction between the sealed, unactivated relator's complaint and the "live"intervention complaint that had been promptly served. The court noted that the *qui tam* structure of keeping an action under seal and not served furthers two goals - protecting the identity of the sealed defendants, and "not embroil[ing] the named defendants in an action that would require the expenditure of time and money until intervention, based on appropriate investigation, has occurred." Id. at 3. The same analysis in the

---

[4]      Indeed the anomaly of conferring federal jurisdiction now is seen by picturing this case ready for trial, in federal court, with no federal claims ever having become at issue.

removal context leads squarely to the conclusion that Abbott's removal of the sealed, unactivated case was improper. Defendants should have no obligations under a sealed relator's complaint until the State has decided whether to intervene. As to the other defendants and as to the rebate claims against Abbott, that decision has not yet been made. There are no activated federal claims to support federal jurisdiction and no activated claims against the remaining defendants to support the procedural maneuver that Abbott has unilaterally initiated.[5]

---

[5]     Curiously, Abbott has argued in response to Plaintiffs' Motion to Remand the Sealed Defendants that the inability of the sealed Defendants to be heard on the remand motion warrants denial of that motion. Defendant Abbott's Memorandum In Response to The State of California's Application for An Order Remanding Those Defendants Which Remain Under Seal to the State Court at p.2. The absurdity of this argument is clear - it was defendant Abbott's inappropriate removal of the case against those defendants, under seal and without their knowledge or consent, that set up the ex parte remand application. If that complaint is subject to removal without those defendants being heard, surely it must be subject to remand to undo the procedural morass Abbott and Wyeth have created. If and when any or all of the defendants are unsealed and subjected to an active complaint that they need to defend against, they could remove at that time if appropriate.

## CONCLUSION

The burden of establishing federal jurisdiction is placed on the party seeking removal,

Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 42 S. Ct. 35, 66 L. Ed. 144 (1921).  Defendant

has not met its burden in showing that the complaint in intervention contains a federal claim.

Because the Intervention Complaint is the only operative complaint, there are no federal issues or

claims in this case on which Abbott may properly base its Notice of Removal.  Based on the

foregoing, the Court should remand this case back to the California Court in its entirety.

Dated:  August 28, 2003                    Respectfully submitted,


                                           BILL LOCKYER
                                           Attorney General for the State of California

                                           By:
                                               TIMOTHY C. FOOTE
                                               Deputy Attorney General
                                               Bureau of Medi-Cal Fraud & Elder Abuse
                                               1455 Frazee Rd., Ste. 315
                                               San Diego, CA  92108
                                               (619) 688-6114 Telephone
                                               (619) 688-4200 Facsimile
                                               Attorneys for the Plaintiff, State of California


                                           BERGER & MONTAGUE, P.C.

                                           By:
                                               SUSAN THOMAS
                                               1622 Locust Street
                                               Philadelphia, PA  19103
                                               (215) 875-5711 Telephone
                                               (215) 875-4636  Facsimile


                                           Attorneys for Relators

                                                16

## CERTIFICATE OF SERVICE

I hereby certify that I, Timothy C. Foote, Deputy Attorney General, Bureau of Medi-Cal

Fraud and Elder Abuse, for the State of California, caused a true and correct copy of the

foregoing The State of California's and Relator's Supplemental Memorandum of Law In Support

of Motion To Remand, to be served electronically on counsel of record on the Master Service

List, pursuant to Section E of the Case Management Order No. 2, this 28 day of August, 2003.

TIMOTHY C. FOOTE
Deputy Attorney General
Bureau of Medi-Cal Fraud and Elder Abuse
State of California

17

# EXHIBIT

# "A"

1   BILL LOCKYER, Attorney General
     of the State of California
2   THOMAS A. TEMMERMAN, S.B. No. 62986
     Senior Assistant Attorney General
3   ELISEO SISNEROS, S.B. No. 99138
     Supervising Deputy Attorney General
4   SIOBHAN FRANKLIN, S.B. No. 175747
     Deputy Attorney General
5   WILLIAM S. SCHNEIDER, S.B. No. 78060
     Deputy Attorney General
6   110 West A Street, Suite 1100
     P. O. Box 85266
7   San Diego, CA 92186-5266
     (619) 688-6099 Telephone
8   (619) 688-4200 FAX

9   Attorneys for the State of California

10  JAMES J. BREEN
     The Breen Law Firm, P.A.
11  3562 Old Milton Parkway
     Alpharetta, GA. 30005
12  (770) 740-0008 Telephone
     (770) 740-9109 FAX
13
     Attorneys for the Qui Tam Plaintiff,
14  Other Counsel listed in signature page

15

16                SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                       COUNTY OF LOS ANGELES

18

19  THE STATE OF CALIFORNIA, ex rel.            CASE NO. BC 287198 A
     VEN-A-CARE OF THE FLORIDA KEYS, INC. a
20  Florida Corporation, by and through its principal    ORIGINALLY FILED UNDER
     officers and directors, ZACHARY T. BENTLEY       SEAL ON JULY 28, 1998
21  and T. MARK JONES,
                                                 COMPLAINT FOR MONEY
22                                               DAMAGES AND CIVIL
                                Plaintiffs,      PENALTIES FOR VIOLATIONS
23                                               OF THE CALIFORNIA FALSE
                         v.                      CLAIMS ACT
24
     ABBOTT LABORATORIES, INC., WYETH Inc.,     [Exempt From Payment of Filing
25  WYETH PHARMACEUTICALS Inc. and DOES         Fees Pursuant to Cal. Gov. Code
     1-200                                       Section 6103]
26
                                Defendants,
27

28           The State of California, by and through its Attorney General, Bill Lockyer, brings this

                                          1.

     Complaint of State of California ex. rel. Ven-A-Care vs. Abbott & Wyeth based on California False Claims Act

ORIGINAL FILED
JAN 0 7 2003
LOS ANGELES
SUPERIOR COURT

1  action against Abbott Laboratories, Inc. ("Abbott"), Wyeth Inc., and Wyeth Pharmaceuticals Inc.,

2  (collectively, "Wyeth") pursuant to the California False Claims Act, California. Government Code

3  sections12650 et seq. and alleges that:

**INTRODUCTION**

5  Defendants Abbott and Wyeth defrauded California's Medicaid Program (known as "Medi-

6  Cal") by reporting excessively high prices for some of their prescription drugs with knowledge that

7  Medi-Cal relied on these reported prices for establishing reimbursement to its Medi-Cal providers for

8  these drugs.   As a result, Medi-Cal sustained significant losses to its program by making

9  reimbursement payments for the drugs at grossly excessive prices compared to the prices at which

10  the Medi-Cal providers actually acquired the same drugs.  In this lawsuit, the Attorney General is

11  demanding triple damages, civil penalties of up to $10,000 for each false claim, and other damages

12  provided by California's *qui tam* law.  The Qui Tam Plaintiff, Ven-A-Care of the Florida Keys, Inc.

13  ("VAC"), originally provided information to the State of California which is the basis for this action

14  and VAC is included as a named party Plaintiff in this case.

**I.**

**THE PARTIES**

17  1.   The Plaintiff in this action is the STATE OF CALIFORNIA ('STATE") by and

18  through the CALIFORNIA ATTORNEY GENERAL ("ATTORNEY GENERAL").  At all times

19  material to this action, the California Department of Health Services ("D.H.S.") and Medi-Cal were

20  agencies of the State, and their activities, operations and contracts in administering the Medi-Cal

21  program were paid largely from State funds.  California's D.H.S., acting on behalf of the State,

22  provided Medi-Cal benefits to qualified recipients, which included payment of claims to providers

23  for the Abbott and Wyeth prescription drugs specified herein.  These claims were paid based upon

24  the false, inflated, direct price representations made by Abbott and Wyeth.

25  2.   The Qui Tam Plaintiff, VEN-A-CARE OF THE FLORIDA KEYS, INC. ("VAC"),

26  is a corporation organized under the laws of the State of Florida, with its principal offices in Key

27  West, Florida. VAC's principal officers and directors include Zachary T. Bentley and T. Mark Jones,

28  who are each citizens of the United States and reside in Key West, Florida. The Qui Tam Plaintiff,

2.

1   VAC, is a pharmacy and provides prescription drugs and pharmaceutical products such as the drugs

2   specified in this Complaint and the exhibits attached hereto.

3       3.      Defendant, ABBOTT LABORATORIES Inc. ("ABBOTT"), is a corporation organized

4   under the laws of the State of Illinois, with its principal offices in Abbott Park, Illinois.  At all times

5   material to this action, Abbott has transacted business in the State of California, including, but not

6   limited to, selling and distributing the prescription drugs at issue here to purchasers within the State

7   of California, including Los Angeles County.

8       4.      Defendant, WYETH PHARMACEUTICALS, INC. ('WYETH"), is a corporation

9   organized under the laws of Pennsylvania and headquartered in Collegeville, Pennsylvania.  Wyeth

10  Pharmaceuticals is engaged in the manufacturing, marketing, and sales of a variety of pharmaceuticals

11  worldwide.  Wyeth Pharmaceuticals, Inc.  holds itself out as a division of, and is wholly-owned by,

12  DEFENDANT WYETH, INC. ('WYETH"),  a corporation organized under the laws of Delaware.

13   Wyeth, Inc. is the successor to  Wyeth-Ayerst Laboratories, Inc. and Wyeth-Ayerst Laboratories

14  Company, and was formerly known as American Home Products Corporation.  To the extent that the

15  acts of Wyeth Pharmaceuticals, Inc. at issue herein were performed by or otherwise attributable to

16  Wyeth, Inc., then judgment should be entered against Wyeth, Inc. where appropriate.  At all times

17  material to this action, Wyeth Pharmaceuticals, Inc. has transacted business in the State of California

18  by, amongst other things, selling directly or through wholesalers its pharmaceuticals in the State of

19  California including Los Angeles County.  For purposes of this Complaint, all of the Wyeth

20  companies, corporations, subsidiaries, and divisions will be collectively referred to as "Wyeth."

21      5.      The true names and capacities, whether corporate, individual or otherwise, of

22  Defendants sued herein as DOES 1-200, inclusive, are unknown to Plaintiff(s) at this time,

23  who/which therefore sue(s) said Defendants by such fictitious names.  Plaintiffs will seek leave of

24  this Court to amend their complaint when the true names and capacities of said Defendants have been

25  ascertained.  Plaintiffs are informed and believe, and thereon allege, that each of the Defendants sued

26  herein as a Doe is legally responsible in some manner for the wrongdoing and damages as herein

27  alleged.  Each of these Defendants is, and at all material times was, an agent, servant, or employee

28  of each of the remaining Defendants, and was acting within the course and scope of said agency or

3.

1   employment with the approval, knowledge, or consent of each of the remaining Defendants.
2   Furthermore, each DOE Defendant is, and at all material times was, the predecessor, successor or
3   related business entity to the named Defendants herein.

**II.**

**JURISDICTION & VENUE**

6.      6.      Jurisdiction is founded upon the State of California False Claims Act, California
7   Government Code sections 12651(a) and 12652(c)(1) et seq  This case was originally filed under seal
8   on July 28, 1998.

9       7.      Abbott and Wyeth have regularly transacted  business in the State of California by
10  selling their drugs directly or through others throughout the State, including Los Angeles County.
11  Defendants knew their drugs would be supplied to Medi-Cal recipients, including those residing in
12  Los Angeles County.

13      8.      Pursuant to California Government Code Section 12652(c)(3), copies of all the
14  pleadings and a written disclosure of substantially all relevant evidence and information that VAC
15  possesses were served on the State by certified mail, return receipt requested, addressed to the
16  Attorney General in Sacramento, California.

17      9.      The Qui Tam Plaintiff alleges: (A) That this action is not based upon allegations nor
18  transactions that were, at the time of the initial pleadings in this action,  the subject of a civil suit or
19  an administrative civil money penalty proceeding in which the State was already a party; (B) that the
20  initial pleadings in this action were not based upon the public disclosure of allegations or transactions
21  in a criminal, civil, or administrative hearing, in an investigation, report, hearing or audit conducted
22  by or at the request of the Senate, Assembly, auditor or governing body of a political subdivision, or
23  by the news media; and (C) that, if the Court makes a finding against the Qui Tam Plaintiff as to the
24  allegations set forth in (A) and/or (B), the Qui Tam Plaintiff is the Relator and the original source of
25  the information, has direct and independent knowledge of the information on which these allegations
26  are based within the meaning of  California Government Code Section 12652(d)(3)(A) and (B),  and
27  voluntarily provided the information to the State before filing the initial pleadings in this action,
28  which are based on the information provided by the Qui Tam Plaintiff to the State.

4.

Complaint of State of California ex. rel. Ven-A-Care vs. Abbott & Wyeth based on California False Claims Act

## III.

## BACKGROUND OF HOW PRESCRIPTION DRUG

## CLAIMS ARE PAID UNDER MEDI-CAL

10.     California routinely provides prescription drug coverage as part of its Medi-Cal program for medical assistance to the poor, needy, and disabled.

11.     Medi-Cal reimburses providers based on the providers' Estimated Acquisition Cost ("EAC") for a drug product.  Pursuant to Title 22, Section 51513 (a)(6) of the California Code of Regulations, EAC is defined as "the Department's best estimate of the price generally and currently paid by providers for a drug product sold by a particular manufacturer or principal labeler in a standard package."  Section 51513 (a)(6)(A) and (B) of the California Code of Regulations provides that the EAC for a drug product can be based on either the product's Average Wholesale Price ("AWP") or, as was the case with Abbott and Wyeth, a "Direct Price" ("DP") reported by the manufacturers.

12.     Medi-Cal's reimbursement formula for Abbott's and Wyeth's drugs determined Estimated Acquisition Cost at the manufacturers' Direct Price, pursuant to California Code of Regulations section 51513.5, which provides in summary as follows:

> The estimated acquisition cost for all of the drug products manufactured or distributed by. . . Defendants Abbott and Wyeth. . . shall be the Direct Price listed for a standard package in the Department's primary reference source; or for products not listed in the Department's primary price reference source, the direct price listed for a standard package in the secondary price reference source; or, if not listed in the secondary price source, the principal labeler's catalogue.

13.     With respect to the State of California, the Direct Price was supposed to represent the price at which Abbott and Wyeth were selling their products to a pharmacy or end distributor without a wholesaler being involved in the transaction.  Based on information and belief, few, if any, other State Medicaid programs in the Union other than California used Direct Price to reimburse providers for their pharmaceutical products.

14.     Medi-Cal obtains pharmaceutical price information from entities that are engaged in

5.

1  collecting and reporting such data, including First Data Bank. The First Data Bank Division of the
2  Hearst Corporation is a nationally recognized company that specializes in gathering prescription drug
3  pricing and cost information, including Average Wholesale Price and Direct Price data. First Data
4  Bank then distributes this information on a national basis.

5       15.   During all relevant times covered by this Complaint:

6            A.    Medi-Cal contracted with a fiscal intermediary, Electronic Data Systems
7  (E.D.S.), to evaluate and process claims for payment.

8            B.    Medi-Cal contracted with First Data Bank to provide the requisite drug pricing
9  information to establish provider reimbursements.

10           C.    Medi-Cal has utilized First Data Bank as its primary reference source
11  and has utilized representations of Direct Price supplied by First Data Bank in setting providers'
12  reimbursement amounts for Abbott's and Wyeth's prescription drugs.

13           D.    First Data Bank reported Abbott's and Wyeth's Direct Prices for the
14  specified prescription drugs based on the price information provided by those manufacturers. In the
15  1995 First Data Bank Blue Book, for example, First Data Bank described Direct Prices as "obtained
16  from the manufacturer."

17           E.    Medi-Cal paid for drugs under two programs

18                 (i)    Pharmacy and;

19                 (ii)   Incident to a physician's service

20       16.   The claims which are the subject of this action include claims from pharmacies,
21  pharmaceuticals administered incident to a physician's services, and claims for certain oral
22  pharmaceuticals, which were submitted to Medi-Cal to obtain reimbursement for prescription drugs
23  provided to Medi-Cal recipients. Claims for each prescription are submitted to Medi-Cal on hard
24  copy claim forms or through an electronic claims filing procedure using drug identification numbers
25  known as National Drug Code numbers (NDC's).

26       17.   This case focuses on specified prescription drugs that are covered under Medi-Cal,
27  which were sold and/or distributed by defendants, and for which Medi-Cal, through its fiscal agents,
28  approved and paid claims to providers based on the falsely inflated direct price representations

6.

Complaint of State of California ex. rel. Ven-A-Care vs. Abbott & Wyeth based on California False Claims Act

1   reported by defendants. Defendants' inflation of their price reports caused each and every claim paid
2   by Medi-Cal for defendants' specified prescription drugs to be a false claim. Abbott and Wyeth, as
3   the parties knowingly supplying the false information that caused the claims to be false, are liable
4   under the California False Claims Act. Abbott's and Wyeth's inflation of their reported prices was
5   a misrepresentation which caused Medi-Cal to pay excessive reimbursement to providers who utilized
6   Defendants' products.

7       18.   At all relevant times, VAC was a small, infusion pharmacy and a Medicaid provider
8   in Florida. Prices available to VAC from Defendants Abbott & Wyeth for the pharmaceutical
9   products in this complaint and the exhibits attached hereto, were available on a nationwide basis
10  including California's Medi-Cal providers.

11                                              **IV.**

12                        **SUMMARY OF DEFENDANTS' FRAUD SCHEME**

13      19.   As to defendant Abbott, the time period relevant to this complaint began on or before
14  January 1, 1988, continued up through June 1, 2001 at which time Abbott reduced its reported prices
15  to First Data Bank for many of its pharmaceutical products, and continues to the present time. As
16  to defendant Wyeth, the time period relevant to this complaint began on or before January 1, 1988
17  and continues through to the present time. During the aforementioned times, Medi-Cal reimbursed
18  health care providers and pharmacies for certain of defendants' pharmaceutical products which were
19  provided to Medi-Cal beneficiaries. Those reimbursements were based on prices that Abbott and
20  Wyeth reported to the First Data Bank, which compiled and reported pharmaceutical prices to various
21  third party payers. Defendants caused the inflated Medi-Cal reimbursements by reporting false and
22  excessive prices for their products to First Data Bank, the price reporting service that Medi-Cal used
23  in setting its reimbursement rates. The difference between the true prices of defendants' drugs and
24  their falsely reported prices is referred to in the industry as the "spread."

25      20.   The spread was an unlawful financial inducement arranged by defendants in order to
26  increase their market share and profits. Defendants caused Medi-Cal to reimburse providers' claims
27  for the specified prescription drugs at inflated amounts while, at the same time, selling the drugs to
28  the same providers at deep discounts, thus increasing the spread. The net result was to maximize the

---

7.

1  market share of the defendants for the specified prescription drugs by inducing Medi-Cal providers
2  to use the defendants' brand of drugs over another.  Consequently, Medi-Cal paid out more in
3  reimbursement than it would have or should have but for this unlawful conduct by the defendants.

4      21.  As a result of their fraudulent and illegal scheme, defendants and their customers have
5  reaped hundreds of millions of dollars in illegal profits at the expense of the State of California and
6  directly contributed to Medi-Cal's soaring cost of providing prescription drugs for the State's needy.
7  The following chart reflects the fact that during the period from 1997 through 2001, California
8  succeeded in reducing the number of Medi-Cal recipients by almost 15%.  However, Medi-Cal
9  prescription drug costs doubled over that period, from $1.55 billion in 1997 to $3.11 billion in 2001,
10  due in part to the false price reporting of Abbott, Wyeth and others, which inflated the prices paid by
11  Medi-Cal for such drugs, as illustrated by the chart below:

| Year | Total Prescription Drug Cost to Medi-Cal | Number of Medi-Cal Recipients | Average Annual Prescription Cost Per Recipient |
|------|------------------------------------------|-------------------------------|------------------------------------------------|
| 2001 | $3,110,003,138.75 | 11,200,055 | $277.67 |
| 2000 | $2,399,891,464.95 | 10,708,028 | $224.12 |
| 1999 | $2,129,665,292.40 | 10,945,838 | $194.56 |
| 1998 | $1,809,364,948.40 | 11,748,817 | $154.00 |
| 1997 | $1,553,151,142.74 | 13,115,974 | $118.41 |

19      22.  Defendants knew that the providers' acquisition costs they were charging for many of
20  their prescription drugs were declining at the same time they falsely reported to First Data Bank that
21  the same drug prices were rising.  The following chart highlights the fact that the true wholesale price
22  for Abbott's drug Vancomycin was declining in the marketplace at the same time that Abbott was
23  misrepresenting an inflated amount for the Direct Price of Vancomycin, which California relied upon
24  in reimbursing its Medi-Cal providers for this drug.  As a result of these inflated representations of
25  Direct Price, Medi-Cal made excessive reimbursement payments to its providers, thus causing Medi-
26  Cal to sustain damages each year from 1994 to the present.

27  / / /
28  / / /

8.

**Vancomycin 1 gm.  NDC# 00074-6533-01**

| Date | Abbott's False Direct Price & Medi-Cal's Corresponding Reimbursement | VAC's Price | Difference Between Reported Direct Price and VAC's Price (the "Spread") |
|---|---|---|---|
| 3-04-1994 | $49.42 | $8.06 | $41.36 |
| 1-05-1995 | $50.90 | $8.06 | $42.84 |
| 1-05-1996 | $52.94 | $7.95 | $44.99 |
| 1-05-1997 | $55.59 | $7.60 | $47.99 |
| 1-05-1998 | $58.37 | $7.60 | $50.77 |
| 1-05-1999 | $61.29 | $7.40 | $53.89 |
| 1-05-2000 | $64.35 | $7.40 | $56.95 |
| 1-05-2001 | $64.35 | $7.40 | $56.95 |
| 6-01-2001 | $14.89 | $7.40 | $7.49 |
| 7-01-2002 | $5.76 | $4.36 | $1.40 |

23.     On or about June 1, 2001, Abbott submitted revised pricing information and data to First Data Bank which resulted in substantially reduced reported Direct Prices.  Based on the lowered reported Direct Prices, which were used as the basis for Medi-Cal reimbursement, Medi-Cal's reimbursement amounts dropped, as demonstrated by the reduction in Medi-Cal's reimbursement for 1 gm of Vancomycin from $64.35 on March 1, 2001 to $14.89 on June 1, 2001.  The 77% reduction in Abbott's *reported* Direct Price for Vancomycin had nothing to do with actual pricing changes in the marketplace.   On or about July 1, 2002, Abbott further reduced their Direct Price for Vancoymycin to $5.76, bringing it more in line with prevailing market prices for this product.

24.     Defendant Wyeth similarly created an illegal spread for its Ativan line of products, as alleged herein.  The spread caused Ativan reimbursement by California's Department of Health Services, which administers the Medi-Cal Program, to be as much as five times the drug's actual cost to providers.

/ / /

/ / /

/ / /

9.

V.

## THE ACTIONABLE CONDUCT OF DEFENDANTS

### A.   AS TO DEFENDANT ABBOTT

25.     At various times from January 1, 1988 to the present, defendant Abbott knowingly caused Medi-Cal to pay false claims for their pharmaceutical products. As a result, Medi-Cal paid grossly excessive, unreasonable, and unlawful amounts for claims for the pharmaceutical products specified in this complaint and Exhibits 1 and 2 attached hereto and incorporated herein. The acts committed by Abbott which caused Medi-Cal to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false representations about the Direct Prices of the drugs specified in this Section which defendant Abbott knew would be used by Medi-Cal in paying or approving claims for the drugs specified in this Section. Each of said representations was in fact used by Medi-Cal in paying or approving claims for the drugs specified in this Section.

26.     For the purposes of specificity and particularity, Abbott's false price representations for certain drugs submitted to First Data Bank by Defendant Abbott in 1996 have been organized into a table entitled "Defendant Abbott's Subject Pharmaceutical Products (With Spread Calculations)" attached to this Complaint as **Exhibit 1**. In this table, the specified pharmaceutical products are listed by name, NDC number, Abbott's reported Direct Price to First Data Bank (and therefore its Medi-Cal reimbursement), VAC's (ergo a provider's) price to acquire the same pharmaceutical products, the gross profit or "spread" to the provider, and the gross profit or "spread" to the provider expressed as a percentage of VAC's price. The amount listed under the estimated true Direct Price based upon VAC's cost for the drugs reflects the actual prices available to VAC for the listed drugs from Abbott or from a wholesaler. As a small pharmacy, VAC does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of VAC's costs with the Direct Price representations made by Defendant Abbott, which were used to set Medi-Cal's reimbursement amount, establishes a minimum degree of falsity of Abbott's price representations for the prescription drugs.

27.     In addition to the pharmaceuticals listed on **Exhibit 1** (attached), Abbott created and marketed the spread on hundreds of other drugs and pharmaceutical products. A table entitled

10.

1  "Abbott's Additional Subject Pharmaceutical Products" listing these drugs by name and NDC number

2  is attached as **Exhibit 2.** The State and VAC intend to pursue their claims with regard to all drugs

3  for which Abbott engaged in pricing fraud and marketing the spread to Medi-Cal providers.

4      28.    The following is alleged with respect to Defendant Abbott as to all relevant periods

5  of time:

6          A.    In furtherance of its scheme to inflate Medi-Cal's reimbursement,

7  and to create an appearance of veracity for the falsely inflated Direct Prices it reported to First Data

8  Bank, Abbott regularly mailed to Medi-Cal catalogs containing the falsely inflated reported Direct

9  Prices.

10         B.    Abbott systematically reported false or misleading prices by

11  concealing or otherwise failing to disclose contract terms that decreased the actual price of specified

12  prescription drugs such as discounts, rebates, off-invoice pricing, free goods, cash payments,

13  kickbacks, charge backs and other financial incentives;

14      29.    The acts of defendant Abbott in providing false and misleading price information to

15  Medi-Cal:

16         A.    Were committed knowingly in order to cause Medi-Cal to pay claims for the

17  specified drugs that substantially exceeded the amounts that otherwise would have been paid

18  according to law.

19         B.    Were committed knowingly in order to cause Medi-Cal to pay unwittingly

20  excessive amounts for Abbott's drugs.

21         C.    Were committed knowingly in order to induce Abbott's customers, and those

22  acting in conjunction with them, to cause Abbott's drugs to be utilized for the treatment of Medi-Cal

23  recipients.

24         D.    Were committed knowingly in order to induce Abbott's customers and those

25  acting in concert with them to select Abbott's drugs for Medi-Cal recipients rather than select similar

26  drugs of competitors, or prescribe alternative therapies.

27         E.    Did in fact cause Abbott's customers, and those acting in concert with them,

28  to utilize Abbott's specified drugs for treatment of Medi-Cal recipients rather than competing drugs

11.

1  or alternative therapies.

2      30.    The impact of Abbott's inflated pricing was enormous.  Providers chose Abbott's

3  products rather than competitors' equivalent drugs which had lower spreads.  For example, in 1996,

4  Florida Medicaid utilization was overwhelmingly concentrated in Abbott's drug Vancomycin, which

5  had a spread that dwarfed that available on its competitors' drugs.  The following table is illustrative:

6

7                    **1996 FLORIDA MEDICAID UTILIZATION FOR**

8                          **VANCOMYCIN HCL 1 GRAM**

| Company/NDC | True Cost $ | Florida Medicaid Reimbursement | The Spread | Reimbursement Paid by Florida Medicaid | Market Share % |
|---|---|---|---|---|---|
| Abbott 00074-6533-01 | $ 7.95 | $58.75 | $50.80 | $381,480.78 | 83.37 |
| Fujisawa 00469-2840-40 | $ 6.42 | $13.91 | $ 7.49 | $ 19,023.54 | 4.16 |
| Lederle 00205-3154-15 | $ 3.98 | $ 9.36 | $ 5.38 | $ 21,297.64 | 4.65 |
| Lilly 00002-7321-10 | $14.30 | $13.35 | $(0.95) | $ 19,096.96 | 4.17 |
| Schein 00364-2473-91 | $ 6.05 | $12.52 | $ 6.47 | $ 16,672.18 | 3.64 |

18  Based on information and belief, Abbott's spread and market share data in California for this same

19  period of time were similar to that of the State of Florida.

20      31.    Evidence that the manufacturer-created spreads in fact caused government-funded

21  subsidies to providers is abundant. For example, in a letter dated May 11, 2001 from Timothy E. Bien

22  of Omnicare, Inc. to Jeffrey F. Balzer, National Account Manager of Abbott's Hospital Products

23  Division, Omnicare strongly protested Abbott's 2001 lowering of its reported Wholesale Acquisition

24  Cost ("WAC") prices:

25              As we discussed in person, this is a written notification by Omnicare
26              to Abbott requesting restitution of Omnicare profits lost as a result of
                the WAC changes by Abbott HPD.

27              Omnicare  currently  purchases  $87,722,773  annually  of  Abbott
28              products as follows:

12.

1

| PPD | $36,868,784 |
| HPD | $ 2,987,094 |
| Ross | $13,900,000 |
| Tap @50% | $33,966,895 |

2

3

The HPD WAC changes cost Omnicare $2,613,651 per quarter or $10,454,604 in revenue loss dropping right to our bottom line.

4

5        **B.        AS TO DEFENDANT WYETH**

6        32.        At various times from on or after January 1, 1988 and continuing through the present

7    date, defendant Wyeth knowingly caused Medi-Cal to pay false claims for drugs. As a result, Medi-

8    Cal paid grossly excessive, unreasonable and unlawful amounts for claims for the drugs specified in

9    this Section. The acts committed by Wyeth which caused Medi-Cal to pay or approve said false or

10   fraudulent claims included, but were not necessarily limited to, knowingly making false

11   representations about the Direct Prices of the drugs specified in this Section, which Wyeth knew

12   would be used by Medi-Cal in paying or approving claims for the drugs specified in this Section.

13   Each of said representations was in fact used by Medi-Cal in paying or approving claims for the drugs

14   specified in this Section.

15       33.        For the purposes of specificity and particularity, the false price and cost representations

16   as they were submitted by Wyeth to First Data Bank in 2001 (unless otherwise noted) have been

17   organized into a table entitled "Defendant Wyeth's Prices & Spread for Ativan" (attached, **Exhibit**

18   **3**). The various sizes and strengths for the subject pharmaceutical products are listed by name, NDC

19   Number, Wyeth's reported Direct Price to First Data Bank (and therefore its Medi-Cal

20   reimbursement), VAC's (ergo a provider's) acquisition price for the same pharmaceutical products,

21   the gross profit or "spread" to the provider, and the gross profit or "spread" to the provider expressed

22   as a percentage of VAC's price. The amount listed under the estimated true Direct Price based upon

23   VAC's cost for the drugs reflects the actual prices available to VAC for the listed drugs from Wyeth

24   or from a wholesaler. As a small pharmacy, VAC does not always receive the lowest prices available

25   to volume purchasers.    Accordingly, a comparison of   VAC's costs with the direct price

26   representations made by Defendant Wyeth and set as Medi-Cal's reimbursement amount establishes

27   a minimum degree of falsity of Wyeth's price representations for the prescription drugs.

28       34.        The acts of defendant Wyeth in providing false and misleading price information to

13.

1  Medi-Cal:

2          A.     Were committed knowingly in order to cause Medi-Cal to pay claims for the
3  specified drugs that substantially exceeded the amounts that otherwise would have been paid
4  according to law.

5          B.     Were committed knowingly in order to cause Medi-Cal to pay unwittingly
6  excessive amounts for Wyeth's drugs.

7          C.     Were committed knowingly in order to induce Wyeth's customers, and those
8  acting in conjunction with them, to cause Wyeth's drugs to be utilized for the treatment of Medi-Cal
9  recipients.

10          D.     Were committed knowingly in order to induce Wyeth's customers and those
11  acting in concert with them to select Wyeth's drugs for Medi-Cal recipients rather than select similar
12  drugs of competitors, or prescribe alternative therapies.

13          E.     Did in fact cause Wyeth's customers, and those acting in concert with them,
14  to utilize Wyeth's specified drugs for treatment of Medi-Cal recipients rather than competing drugs
15  or alternative therapies.

16      35.    As a direct and proximate result of the actions of defendant Wyeth alleged herein, the
17  State of California has sustained damages recoverable under the California False Claims Act as set
18  forth below.

19      **C.**     **CALIFORNIA LAW VIOLATED BY BOTH DEFENDANTS ABBOTT &**
               **WYETH**
20

21      36.    At all times material to this action, defendants "knew" or acted "knowingly," which
22  terms is used interchangeably in this complaint as they are defined in California Government Code
23  §§12650(b)(2), in causing the making, presenting, or submission of false claims.  In that respect,
24  Defendants acted:

25          A.     With actual knowledge of the falsity of the information;

26          B.     In deliberate ignorance of the truth or falsity of the information;

27          C.     With reckless disregard of the truth or falsity of the information.

28      37.    At all times material to this action, defendants "caused" the making, presenting, or

14.

1 submitting of false claims, as that term is defined in California Government Code §§12651, in
2 causing:

3        A. The presentation of false claims for payment or approval by
4 Medi-Cal; and

5        B. The making and using of false statements and/or records for the purpose of getting
6 false claims approved or paid by Medi-Cal.

7     38.    At all times relevant hereto, defendants Abbott and Wyeth knew that their conduct
8 would cause Medi-Cal to pay claims for the specified prescription drugs in amounts exceeding that
9 contemplated by applicable law in that:

10        A.    Defendants knew that Medi-Cal contracted through its fiscal agent
11 with First Data Bank to obtain defendants' reported Direct Prices in order to set Medi-Cal
12 reimbursement rates;

13        B.    Defendants knew that California statutes and regulations limited payment of
14 Medi-Cal claims for the specified prescription drugs to an amount that represented the provider's
15 estimated acquisition cost of the drugs;

16        C.    Defendants knew that Medi-Cal was not authorized or permitted by applicable
17 law to pay claims for the specified prescription drugs in excessive amounts;

18        D.    Defendants knew that Medi-Cal was required to pay claims to the provider
19 submitting the claim based upon the drug's published Direct Price.  Cal. Regs. Title 22, Sec.
20 51513(a)(6)(A);

21        E.    Defendants knew that, pursuant to California Regs., Title 22, Section 51513.5
22 (a) and (b), Medi-Cal utilized their reported Direct Prices as the Estimated Acquisition Cost;

23        F.    Therefore, defendants knew that California statutes and regulations prohibited
24 them from making false or misleading representations about the specified  prescription drugs,
25 including false or misleading price representations, as specified below.

26     39.    Defendants "knowingly" reported false and inflated "Direct Prices" to First Data Bank
27 and the other pricing services by systematically concealing or otherwise failing to report decreases
28 in the prices of the specified prescription drugs.

---

15.

# VI.

## CAUSES OF ACTION AND DAMAGES

### FIRST CAUSE OF ACTION

**CALIFORNIA FALSE CLAIMS ACT,
CAUSING PRESENTATION OF FALSE CLAIMS
California Government Code Section 12651(a)(1)**

40.   The State and Qui Tam Plaintiff reallege and incorporate by reference Paragraphs 1 through 39 as if fully set forth herein.

41.   At all times relevant to this complaint, Defendants Abbott and Wyeth "knowingly" [as defined in California Government Code Sections 12650(b)(2)], caused to be presented to officers or employees of the State of California, false claims for payment or approval, in the form of false price information for the drugs specified herein. As a result, the State paid out as reimbursement to the Medi-Cal providers of the specified prescription drugs, sums of money grossly in excess of the amounts contemplated by law, resulting in great financial loss to the State of California.

42.   Because of Defendants' conduct in violation of California Government Code section 12651(a)(1) as set forth in this Count, the State of California sustained damages in an amount according to proof pursuant to California Government Code section12651(a).

### SECOND CAUSE OF ACTION

**CALIFORNIA FALSE CLAIMS ACT,
CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A
FALSE CLAIM PAID OR APPROVED BY THE STATE OF CALIFORNIA;
California Government Code Section 12651(a)(2)**

43.   The State and Qui Tam Plaintiff reallege and incorporate by reference Paragraphs 1 through 39 as if fully set forth herein.

44.   At all times relevant to this complaint, Defendants Abbott and Wyeth "knowingly" [as defined in California Government Code §12650(b)(2)] caused false records or statements to be made or used to get false claims to be paid or approved by the State of California, in that defendants caused false records or statements of prices of defendants' specified prescription drugs to be used by the State of California to pay or approve claims presented by the providers and suppliers of

16.

1  defendant's specified prescription drugs. These paid or approved claims were grossly in excess of

2  the amounts contemplated by law, resulting in great financial loss to the State of California.

3      45.    Because of Defendants' conduct in violation of California Government Code

4  §12651(a)(2) as set forth in this Count, the State of California sustained damages in an amount

5  according to proof pursuant to California Government Code section 12651(a).

6                                   **VII.**

7                               **JURY DEMAND**

8      46.    The State and Qui Tam Plaintiff respectfully request a trial by jury as to all issues so

9  triable.

10                                 **VIII.**

11                           **PRAYER FOR RELIEF**

12     WHEREFORE, the State of California and the Qui Tam Plaintiff, demand:

13     1.    That judgment be entered in their favor and against Defendant, Abbott Laboratories,

14 Inc., Defendant Wyeth, Inc., Defendant Wyeth Pharmaceuticals, Inc., and DOES 1-200, with

15 judgment to be entered against said Defendants, and each of them, for the amount of damages to

16 Medi-Cal arising from claims for their specified prescription drugs and all other drugs as to which

17 said Defendants engaged in substantially similar misconduct:

18         A.    On the First Cause of Action (California False Claims Act; Causing

19 Presentation of False Claims to the State of California) damages as provided by California

20 Government Code §12651(a) in the amount of:

21              (1).    Triple the amount of the State of California's damages;

22              (2).    Civil penalties of Ten Thousand Dollars ($10,000.00) for each false

23                      claim;

24              (3).    Recovery of costs, attorneys' fees and expenses;

25              (4).    Such other and further relief as the Court deems just and

26                      proper.

27         B.    On the Second Cause of Action (California False Claims Act; Causing False

28 Records or Statements To Be Made or Used To Get False Claims Paid By the State of California)

---

17.

1    damages as provided by California Government Code §12651(a) in the amount of:

2              (1).   Triple the amount of the State of California's damages;

3              (2).   Civil penalties of Ten Thousand Dollars ($10,000.00) for each false

4                     claim;

5              (3).   Recovery of costs, attorneys' fees and expenses;

6              (4).   Such other and further relief as the Court deems just and

7                     proper.

8         2.    Further, the Qui Tam Plaintiff, on its behalf, requests that it receive such maximum

9    amount as permitted by law, of the proceeds of this action or settlement of this action collected by the

10   State of California, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees

11   and costs of this action. The Qui Tam Plaintiff requests that its percentage be based upon the total

12   value recovered, including any amounts received from individuals or entities not parties to this action.

13

14   DATED: January 7, 2003

15                          BILL LOCKYER, Attorney General
                             of the State of California
16
                            THOMAS A. TEMMERMAN, Senior
17                          Assistant Attorney General

18                          ELISEO SISNEROS
                            Supervising Deputy Attorney General
19
                            SIOBHAN FRANKLIN
20                          Deputy Attorney General

21

22
                            WILLIAM R. SCHNEIDER
23                          Deputy Attorney General
                            110 West A Street, Suite 1100
24                          P. O. Box 85266
                            San Diego, CA 92186-5266
25                          Telephone: (619) 688-6099
                            Facsimile: (619) 688-4200
26
                            On Behalf of the State of California
27

28

Complaint of State of California ex. rel. Ven-A-Care vs. Abbott & Wyeth based on California False Claims Act

JAMES J. BREEN
The Breen Law Firm, P.A.
3562 Old Milton Parkway
Alpharetta, GA. 30005
(770) 740-0008 Telephone
(770) 740-9109 FAX

THOMAS V. GIRARDI, S.B. No. 36603
DAVID R. LIRA, S.B. No. 134370
Girardi & Keese
1126 Wilshire Blvd.
Los Angeles, CA. 90017-1904
(213) 489-3330 Telephone
(213) 481-1554 Fax

WALTER V. LACK, S.B. No. 57550
ADAM D. MILLER, S.B. No. 141808
Engstrom, Lipscomb & Lack
10100 Santa Monica Blvd., 16th Floor
Los Angeles, CA. 90067-4107
(310) 552-3800 Telephone
(310) 552-9434 Fax

FRANK M. PITRE, S.B. No. 100077
Cotchett, Pitre & Simon
840 Malcolm Rd., Suite 200
Burlingame, CA. 94010-1413
(650) 697-6000 Telephone
(650) 697-0577 Fax

SHERRIE R. SAVETT
SUSAN SCHNEIDER THOMAS
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000 Telephone
(215) 875-4604 Fax

Attorneys for the Qui Tam Plaintiff

19.

# EXHIBIT 1

## EXHIBIT 1

The table below was prepared from Direct Prices submitted to First Data Bank by Defendant Abbott for their pharmaceutical products in 1996 as compared with Ven-A-Care's (provider's) acquisition prices for these pharmaceuticals at that time.

| DEFENDANT ABBOTT'S SUBJECT PHARMACEUTICAL PRODUCTS (WITH SPREAD CALCULATIONS) | | | | | |
|---|---|---|---|---|---|
| Drug | NDC# | Abbott's Reported Direct Price (Medi-Cal Reimbursement) | VAC (Provider) Price | Provider's Gross Profit or "Spread" | Spread as a % of VAC Price |
| Sodium Chloride 0.9% 50 ml | 00074-7101-13 | $14.55 | $1.23 | $13.32 | 1,083% |
| Sodium Chloride 0.9% 100 ml | 00074-7101-23 | $14.55 | $1.23 | $13.32 | 1,083% |
| Sodium Chloride 0.9% 250 ml | 00074-7983-02 | $12.33 | $0.95 | $11.38 | 1,198% |
| Sodium Chloride 0.9% 500 ml | 00074-7983-03 | $8.45 | $0.95 | $7.50 | 790% |
| Sodium Chloride 0.9% 1000 ml | 00074-7983-09 | $9.20 | $1.03 | $8.17 | 793% |
| 5% Dextrose in Water 50 ml | 00074-7100-13 | $14.55 | $1.23 | $13.32 | 1,082% |
| 5% Dextrose in Water 100 ml | 00074-7100-23 | $14.55 | $1.23 | $13.32 | 1,083% |
| 5% Dextrose in Water 250 ml | 00074-7100-02 | $12.33 | $1.33 | $11.00 | 827% |
| 5% Dextrose in Water 500 ml | 00074-7922-03 | $9.10 | $0.96 | $8.14 | 848% |
| 5% Dextrose in Water 1000 ml | 00074-7922-09 | $10.00 | $1.12 | $8.88 | 793% |
| 5% Dextrose/ NaCl 0.9% 250 ml | 00074-7941-02 | $9.23 | $1.03 | $8.20 | 796% |

1

## DEFENDANT ABBOTT'S SUBJECT PHARMACEUTICAL PRODUCTS (WITH SPREAD CALCULATIONS)

| Drug | NDC# | Abbott's Reported Direct Price (Medi-Cal Reimbursement) | VAC (Provider) Price | Provider's Gross Profit or "Spread" | Spread as a % of VAC Price |
|---|---|---|---|---|---|
| 5% Dextrose/ NaCl 0.9% 500 ml | 00074-7941-03 | $9.25 | $1.03 | $8.22 | 798% |
| 5% Dextrose/ NaCl 0.9% 1000 ml | 00074-7941-09 | $9.25 | $1.23 | $8.02 | 652% |
| Ringers Lactate 250 ml | 00074-7953-02 | $10.23 | $1.08 | $9.15 | 847% |
| Ringers Lactate 500 ml | 00074-7953-03 | $10.20 | $1.08 | $9.12 | 844% |
| Ringers Lactate 1000 ml | 00074-7953-09 | $11.50 | $1.14 | $10.36 | 909% |
| Vancomycin HCL 500 mg | 00074-4332-01 | $27.80 | $3.51 | $24.29 | 692% |
| Vancomycin HCL 1 gm | 00074-6535-01 | $55.59 | $6.29 | $47.30 | 752% |
| Vancomycin HCL 1 gm | 00074-6533-01 | $55.59 | $7.95 | $47.64 | 599% |
| Vancomycin HCL 5 gm | 00074-6509-01 | $125.05 | $35.10 | $89.95 | 256% |
| Tobramycin Sulfate 20 mg | 00074-3577-01 | $4.38 | $1.94 | $2.44 | 125% |
| Tobramycin Sulfate 40 mg/ml 1 ml Syr | 00074-3582-01 | $8.40 | $3.68 | $4.72 | 128% |
| Tobramycin Sulfate 60 mg/ 50 ml | 00074-3469-13 | $12.36 | $5.16 | $7.20 | 140% |
| Tobramycin Sulfate 60 mg/ 6 ml | 00074-3254-03 | $8.61 | $3.97 | $4.64 | 117% |
| Tobramycin Sulfate 80 mg | 00074-3470-23 | $12.95 | $5.57 | $7.38 | 133% |
| Tobramycin Sulfate 80 mg | 00074-3583-01 | $9.43 | $4.12 | $5.31 | 129% |

2

## DEFENDANT ABBOTT'S SUBJECT PHARMACEUTICAL PRODUCTS (WITH SPREAD CALCULATIONS)

| Drug | NDC# | Abbott's Reported Direct Price (Medi-Cal Reimbursement) | VAC (Provider) Price | Provider's Gross Profit or "Spread" | Spread as a % of VAC Price |
|------|------|------|------|------|------|
| Tobramycin Sulfate 80 mg | 00074-3578-01 | $8.69 | $3.63 | $5.06 | 139% |
| Tobramycin Sulfate 80 mg | 00074-3255-03 | $9.66 | $4.33 | $5.33 | 123% |
| Pentamidine 300 mg | 00074-4548-01 | $100.39 | $43.00 | $57.39 | 134% |
| Clindamycin Phosphate 300 mg | 00074-4053-03 | $9.53 | $1.74 | $7.79 | 448% |
| Clindamycin Phosphate 300 mg | 00074-4050-01 | $9.45 | $1.47 | $7.98 | 543% |
| Clindamycin Phosphate 600 mg | 0074-4054-03 | $17.51 | $2.95 | $14.56 | 494% |
| Clindamycin Phosphate 600 mg | 00074-4051-01 | $17.32 | $2.69 | $14.63 | 544% |
| Clindamycin Phosphate 9000 mg | 00074-4197-01 | $190.19 | $30.95 | $159.24 | 515% |
| Clindamycin Phosphate 900 mg | 00074-4055-03 | $23.42 | $3.46 | $19.96 | 577% |
| Sodium Bicarbonate 50 ml | 00074-6625-02 | $5.92 | $0.62 | $5.30 | 855% |
| Amikacin Sulfate 500 mg, 2 ml | 00074-1958-01 | $97.65 | $15.50 | $82.15 | 530% |
| Amikacin Sulfate 100 mg, 2 ml | 00074-1955-01 | $72.45 | $11.50 | $60.95 | 530% |
| Amikacin Sulfate 1gm, 4 ml | 00074-1957-01 | $179.50 | $28.50 | $151.00 | 530% |
| Heparin Lock Flush 10u/ml, 30 ml | 00074-1151-78 | $2.58 | $0.38 | $2.20 | 579% |
| Heparin Lock Flush 100u/ml 30 ml | 00074-1152-78 | $2.94 | $0.44 | $2.50 | 568% |

3

## DEFENDANT ABBOTT'S SUBJECT PHARMACEUTICAL PRODUCTS (WITH SPREAD CALCULATIONS)

| Drug | NDC# | Abbott's Reported Direct Price (Medi-Cal Reimbursement) | VAC (Provider) Price | Provider's Gross Profit or "Spread" | Spread as a % of VAC Price |
|---|---|---|---|---|---|
| Heparin Lock Flush 100u/ml 10 ml | 00074-1152-70 | $1.27 | $0.28 | $0.99 | 354% |
| Water for Injection 20 ml | 00074-4887-20 | $1.55 | $0.23 | $1.32 | 574% |
| Water for Injection 10 ml | 00074-4887-10 | $1.24 | $0.19 | $1.05 | 553% |
| Water for Injection 30 ml | 00074-3977-03 | $1.66 | $0.20 | $1.45 | 725% |
| Water for Injection 1000 ml | 00074-1590-05 | $10.20 | $1.13 | $9.07 | 803% |
| Water for Injection 1000 ml | 00074-7990-09 | $10.20 | $1.04 | $9.16 | 881% |
| Water for Injection 100 ml | 00074-4887-99 | $7.75 | $0.71 | $7.04 | 992% |
| Dextrose 5%/ KCl/NaCl 1000 ml | 00074-7902-09 | $15.70 | $2.05 | $13.65 | 666% |

The table below was prepared from Direct Prices submitted to First Data Bank  by Defendant Abbott for their oral drugs in 2000 as compared with Ven-A-Care's (provider's) acquisition prices for these pharmaceuticals at that time.

| DEFENDANT ABBOTT'S SUBJECT ORAL DRUGS (WITH SPREAD CALCULATIONS BASED ON YEAR 2000 PRICES) | | | | | |
|---|---|---|---|---|---|
| Drug | NDC # | Abbott's Reported Direct Price (Medi-Cal Reimbursement) | VAC (Provider) Price | Provider's Gross Profit or "Spread" | Spread As % of VAC Price |
| Erythromycin Base 250 mg Tab 100's | 00074-6326-13 | $12.45 | $7.40 | $5.05 | 68% |
| Erythromycin Base 250 mg Tab 500's | 00074-6326-53 | $59.15 | $35.89 | $23.26 | 65% |
| Erythromycin Stearate 250 mg Tab 100's | 00074-6346-20 | $12.28 | $7.86 | $4.42 | 56% |
| Erythromycin Stearate 250 mg Tab 500's | 00074-6346-53 | $58.35 | $38.18 | $20.17 | 53% |
| Erythromycin Stearate 500 mg Tab 100's | 00074-6316-13 | $22.19 | $15.30 | $6.89 | 45% |
| Erythromycin Stearate UD 250 mg Tab 100's | 00074-6346-38 | $14.28 | $10.03 | $4.25 | 42% |
| ERY-TAB E/C 250 mg 30's | 00074-6304-30 | $6.36 | $2.76 | $3.60 | 130% |
| ERY-TAB E/C 250 mg 100's | 00074-6304-13 | $21.20 | $7.72 | $13.48 | 175% |
| ERY-TAB E/C UD 250 mg 100's | 00074-6304-11 | $23.20 | $9.90 | $13.30 | 134% |
| EES/Sulfisoxazole 200 mg, 100 ml | 00074-7156-13 | $10.75 | $4.21 | $6.54 | 155% |
| EES/Sulfisoxazole 200 mg 150 ml | 00074-7156-43 | $15.90 | $6.32 | $9.50 | 150% |

| DEFENDANT ABBOTT'S SUBJECT ORAL DRUGS (WITH SPREAD CALCULATIONS BASED ON YEAR 2000 PRICES) | | | | | |
|---|---|---|---|---|---|
| Drug | NDC # | Abbott's Reported Direct Price (Medi-Cal Reimburse ment) | VAC (Provider) Price | Provider's Gross Profit or "Spread" | Spread As % of VAC Price |
| EES/Sulfisoxazole 200 mg 150 ml | 00074-7156-43 | $15.90 | $6.32 | $9.50 | 150% |
| EES/Sulfisoxazole 200 mg  200 ml | 00074-7156-53 | $20.90 | $8.42 | $12.48 | 148% |

6

# EXHIBIT  2

# EXHIBIT 2

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| ACETIC ACID IRRIGATION | 00074614322 |
| ACETIC ACID IRRIGATION .25% IRRIG USP (AQUALITE) 1000ML | 00074614309 |
| ACETIC ACID IRRIGATION .25% IRRIG USP (AQUALITE) 250ML | 00074614302 |
| ACETYLCYSTEINE | 00074330801 |
| ACETYLCYSTEINE | 00074330802 |
| ACETYLCYSTEINE | 00074330803 |
| ACETYLCYSTEINE SOLUTION | 00074330701 |
| ACETYLCYSTEINE SOLUTION | 00074330702 |
| ACETYLCYSTEINE SOLUTION | 00074330703 |
| ACYCLOVIR SODIUM POWDER FOR INJECTION | 00074442749 |
| ACYCLOVIR SODIUM POWDER FOR INJECTION | 00074445249 |
| ACYCLOVIR SODIUM POWDER FOR INJECTION 1GM FLIPTOP VIAL | 00074445201 |
| ACYCLOVIR SODIUM POWDER FOR INJECTION 500MG FLIPTOP VIAL | 00074442701 |
| A-HYDROCORT INJECTION 1000MG 8ML UNIVIAL (SODIUM SUCCINATE) | 00074567408 |
| A-HYDROCORT INJECTION 100MG 2ML UNIVIAL (SODIUM SUCCINATE) | 00074567102 |
| A-HYDROCORT INJECTION 250MG 2ML UNIVIAL (SODIUM SUCCINATE) | 00074567202 |
| A-HYDROCORT INJECTION 500MG 4ML UNIVIAL (SODIUM SUCCINATE) | 00074567304 |
| ALCOHOL 5% AND DEXTROSE 5% INJECTION 1000ML | 00074150005 |
| ALFENTANIL INJECTION | 00074226602 |
| ALFENTANIL INJECTION | 00074226605 |
| ALFENTANIL INJECTION | 00074226610 |
| ALFENTANIL INJECTION | 00074226649 |
| ALFENTANIL INJECTION | 00074226651 |
| ALFENTANIL INJECTION | 00074226652 |
| A-METHAPRED INJECTION 1000MG ADD-VANTAGE VIAL | 00074563108 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| A-METHAPRED INJECTION 125MG 2ML UNIVIAL (SODIUM SUCCINATE) | 00074568502 |
| A-METHAPRED INJECTION 40MG 1ML UNIVIAL (SODIUM SUCCINATE) | 00074568401 |
| A-METHAPRED INJECTION 500MG 4ML UNIVIAL (SODIUM SUCCINATE) | 00074563004 |
| A-METHAPRED INJECTION 500MG ADD-VANTAGE VIAL | 00074560144 |
| AMIDATE INJECTION | 00074806001 |
| AMIDATE INJECTION | 00074806003 |
| AMIDATE INJECTION | 00074806019 |
| AMIDATE INJECTION | 00074806029 |
| AMIDATE INJECTION | 00074806101 |
| AMIDATE INJECTION | 00074806201 |
| AMIDATE SOLUTION INJECTION | 00074669501 |
| AMIDATE SOLUTION INJECTION | 00074669502 |
| AMIKACIN SULFATE | 00074195701 |
| AMIKACIN SULFATE INJECTION | 00074195501 |
| AMIKACIN SULFATE INJECTION | 00074195601 |
| AMIKACIN SULFATE INJECTION | 00074195801 |
| AMIKACIN SULFATE INJECTION | 00074243403 |
| AMIKACIN SULFATE INJECTION | 00074321202 |
| AMINOCAPROIC ACID INJECTION | 00074434673 |
| AMINOPHYLLINE INJECTION | 00074490603 |
| AMINOPHYLLINE INJECTION | 00074490619 |
| AMINOPHYLLINE INJECTION | 00074490903 |
| AMINOPHYLLINE INJECTION | 00074490918 |
| AMINOPHYLLINE INJECTION | 00074592101 |
| AMINOPHYLLINE INJECTION | 00074592201 |
| AMINOPHYLLINE INJECTION | 00074738501 |
| AMINOPHYLLINE INJECTION | 00074738601 |
| AMINOSYN HF SOLUTION INJECTION | 00074721703 |

2

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| AMINOSYN II IN 10% DEXTROSE INJECTION | 00074775129 |
| AMINOSYN II IN 25% DEXTROSE | 00074774429 |
| AMINOSYN II IN 25% DEXTROSE INJECTION | 00074770029 |
| AMINOSYN II IN 25% DEXTROSE INJECTION | 00074770229 |
| AMINOSYN II IN 5% DEXTROSE INJECTION | 00074770129 |
| AMINOSYN II INJECTION | 00074108305 |
| AMINOSYN II INJECTION | 00074108603 |
| AMINOSYN II INJECTION | 00074108803 |
| AMINOSYN II INJECTION | 00074108805 |
| AMINOSYN II INJECTION | 00074109003 |
| AMINOSYN II INJECTION | 00074109005 |
| AMINOSYN II INJECTION | 00074712107 |
| AMINOSYN II M IN 10% DEXTROSE | 00074774229 |
| AMINOSYN II M IN 5% DEXTROSE | 00074774029 |
| AMINOSYN II W/ELECTROLYTES IN DEXTROSE 25% W/CALCIUM | 00074775229 |
| AMINOSYN II WITH ELECTROLYTES IN 20% DEXTROSE INJECTION | 00074775329 |
| AMINOSYN II WITH ELECTROLYTES IN 25% DEXTROSE INJECTION | 00074775627 |
| AMINOSYN II WITH ELECTROLYTES IN 25% DEXTROSE INJECTION | 00074775629 |
| AMINOSYN II WITH ELECTROLYTES IN 25% DEXTROSE INJECTION | 00074775727 |
| AMINOSYN II WITH ELECTROLYTES IN 25% DEXTROSE INJECTION | 00074775729 |
| AMINOSYN II WITH ELECTROLYTES INJECTION | 00074108903 |
| AMINOSYN II WITH ELECTROLYTES INJECTION | 00074109105 |
| AMINOSYN INJECTION | 00074298905 |
| AMINOSYN INJECTION | 00074299103 |
| AMINOSYN INJECTION | 00074299105 |
| AMINOSYN INJECTION | 00074299203 |
| AMINOSYN INJECTION | 00074436005 |
| AMINOSYN INJECTION | 00074585503 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| AMINOSYN INJECTION | 00074585505 |
| AMINOSYN M INJECTION | 00074415405 |
| AMINOSYN SOLUTION INJECTION | 00074299003 |
| AMINOSYN SOLUTION INJECTION | 00074299005 |
| AMINOSYN SOLUTION INJECTION | 00074299025 |
| AMINOSYN WITH ELECTROLYTES INJECTION | 00074585203 |
| AMINOSYN WITH ELECTROLYTES INJECTION | 00074585603 |
| AMINOSYN WITH ELECTROLYTES INJECTION | 00074585605 |
| AMINOSYN-HB INJECTION | 00074110803 |
| AMINOSYN-HB INJECTION | 00074110805 |
| AMINOSYN-PF | 00074161602 |
| AMINOSYN-PF | 00074161603 |
| AMINOSYN-PF INJECTION | 00074161705 |
| AMINOSYN-RF INJECTION | 00074407202 |
| AMMONIUM CHLORIDE INJECTION | 00074604301 |
| ATRACURIUM BESYLATE SOLUTION INJECTION | 00074737601 |
| ATRACURIUM BESYLATE SOLUTION INJECTION | 00074737649 |
| ATRACURIUM BESYLATE SOLUTION INJECTION | 00074737729 |
| ATRACURIUM BESYLATE SOLUTION INJECTION | 00074737735 |
| ATRACURIUM BESYLATE SOLUTION INJECTION | 00074737901 |
| ATRACURIUM BESYLATE SOLUTION INJECTION | 00074737949 |
| ATRACURIUM BESYLATE SOLUTION INJECTION | 00074738401 |
| BACTERIOSTATIC NACL INJECTION | 00074196604 |
| BACTERIOSTATIC NACL INJECTION | 00074196605 |
| BACTERIOSTATIC NACL INJECTION | 00074196607 |
| BACTERIOSTATIC NACL INJECTION | 00074196612 |
| BACTERIOSTATIC NACL INJECTION | 00074196614 |
| BACTERIOSTATIC WATER FOR INJ. | 00074397701 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| BACTERIOSTATIC WATER FOR INJ. | 00074397703 |
| BRETYLIUM TOSYLATE IN 5% DEXTROSE | 00074763862 |
| BRETYLIUM TOSYLATE IN 5% DEXTROSE INJECTION | 00074763962 |
| BRETYLIUM TOSYLATE INJECTION | 00074926301 |
| BRETYLIUM TOSYLATE INJECTION | 00074926801 |
| BRETYLIUM TOSYLATE SOLUTION INJECTION | 00074169810 |
| BREYTLIUM TOSYLATE INJECTION | 00074926701 |
| BREYTLIUM TOSYLATE INJECTION | 00074926718 |
| BUMETANIDE INJECTION USP | 00074141204 |
| BUMETANIDE INJECTION USP | 00074141210 |
| BUMETANIDE INJECTION USP | 00074141214 |
| BUPIVACAINE HCL 0.25% AND EPINEPHRINE 1:200,000 10ML TEARTOP | 00074904201 |
| BUPIVACAINE HCL 0.25% AND EPINEPHRINE 1:200,000 30ML TEARTOP | 00074904202 |
| BUPIVACAINE HCL 0.25% AND EPINEPHRINE 1:200,000 50ML AMPUL | 00074904101 |
| BUPIVACAINE HCL 0.25% AND EPINEPHRINE 1:200,000 50ML FLIPTOP | 00074904301 |
| BUPIVACAINE HCL 0.5% AND EPINEPHRINE 1:200,000 30ML AMPUL | 00074904401 |
| BUPIVACAINE HCL 0.5% AND EPINEPHRINE 1:200,000 50ML FLIPTOP | 00074904601 |
| BUPIVACAINE HCL 0.5% AND EPINEPHRINE 1:200,000 INJ 10ML TEARTOP | 00074904501 |
| BUPIVACAINE HCL 0.5% AND EPINEPHRINE 1:200,000 INJ 30ML TEARTOP | 00074904502 |
| BUPIVACAINE HCL 0.75% AND EPINEPHRINE 1:200,000 30ML AMPUL | 00074904701 |
| BUPIVACAINE HCL INJ. | 00074562201 |
| BUPIVACAINE HCL INJ. | 00074562301 |
| BUPIVACAINE HCL INJ. | 00074562302 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074115801 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074115802 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074115901 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074115902 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074116001 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074116101 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074116201 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074116202 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074116301 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074116401 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074116501 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074116502 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074427201 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074427301 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074427401 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074574801 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074574821 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074574901 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074574922 |
| BUPIVACAINE HYDROCHLORIDE INJECTION | 00074575701 |
| BUPIVACAINE SPINAL INJECTION | 00074361301 |
| BUPRENORPHINE HYDROCHLORIDE INJECTION | 00074201201 |
| BUTORPHANOL TARTRATE INJECTION | 00074230101 |
| BUTORPHANOL TARTRATE INJECTION | 00074230111 |
| BUTORPHANOL TARTRATE INJECTION | 00074230131 |
| BUTORPHANOL TARTRATE INJECTION | 00074230201 |
| BUTORPHANOL TARTRATE INJECTION | 00074230202 |
| BUTORPHANOL TARTRATE INJECTION | 00074230211 |
| BUTORPHANOL TARTRATE INJECTION | 00074230212 |
| BUTORPHANOL TARTRATE INJECTION | 00074230231 |
| BUTORPHANOL TARTRATE INJECTION | 00074230232 |
| BUTORPHANOL TARTRATE INJECTION USP | 00074162301 |
| BUTORPHANOL TARTRATE INJECTION USP | 00074162349 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| BUTORPHANOL TARTRATE INJECTION USP | 00074162601 |
| BUTORPHANOL TARTRATE INJECTION USP | 00074162602 |
| BUTORPHANOL TARTRATE INJECTION USP | 00074162649 |
| BUTORPHANOL TARTRATE INJECTION USP | 00074162651 |
| BUTORPHANOL TARTRATE INJECTION USP | 00074162701 |
| BUTORPHANOL TARTRATE INJECTION USP | 00074162749 |
| BUTORPHANOL TRARTRATE INJECTION USP | 00074162401 |
| BUTORPHANOL TRARTRATE INJECTION USP | 00074162449 |
| CALCIUM CHLORIDE INJECTION | 00074163110 |
| CALCIUM GLUCEPTATE INJECTION | 00074389405 |
| CHLOROPROCAINE HYDROCHLORIDE INJECTION | 00074416901 |
| CHLOROPROCAINE HYDROCHLORIDE INJECTION | 00074417001 |
| CHROMIUM INJECTION | 00074409301 |
| CIMETIDINE HYDROCHLORIDE | 00074744401 |
| CIMETIDINE HYDROCHLORIDE | 00074744501 |
| CIMETIDINE HYDROCHLORIDE IN 0.9% SODIUM CHLORIDE | 00074735002 |
| CIMETIDINE HYDROCHLORIDE IN 0.9% SODIUM CHLORIDE | 00074735102 |
| CIMETIDINE HYDROCHLORIDE IN 0.9% SODIUM CHLORIDE | 00074744716 |
| CLINDAMYCIN PHOSPHATE INJECTION | 00074405001 |
| CLINDAMYCIN PHOSPHATE INJECTION | 00074405101 |
| CLINDAMYCIN PHOSPHATE INJECTION | 00074405201 |
| CLINDAMYCIN PHOSPHATE INJECTION | 00074405303 |
| CLINDAMYCIN PHOSPHATE INJECTION | 00074405403 |
| CLINDAMYCIN PHOSPHATE INJECTION | 00074419701 |
| CLINDAMYLIN PHOSPHATE INJECTION | 00074405503 |
| COPPER INJECTION | 00074409201 |
| DEXTRAN 6% AND 0.9% NACL INJECTION | 00074150503 |
| DEXTRAN 6% AND 0.9% NACL INJECTION | 00074150504 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| DEXTRAN 75 6% AND 5% DEXTROSE INJECTION | 00074150703 |
| DEXTRAN 75 6% AND 5% DEXTROSE INJECTION | 00074150704 |
| DEXTROSE 2.5% AND 0.45% SODIUM CHLORIDE INJECTION | 00074794003 |
| DEXTROSE 2.5% AND 0.45% SODIUM CHLORIDE INJECTION | 00074794009 |
| DEXTROSE 5% AND 0.45% NACL WITH 0.075% KCL | 00074799309 |
| DEXTROSE 5% AND 0.45% NACL WITH 0.15% KCL | 00074790203 |
| DEXTROSE 5% AND 0.45% NACL WITH 0.15% KCL | 00074790209 |
| DEXTROSE 5% AND 0.45% NACL WITH 0.224% KCL | 00074790309 |
| DEXTROSE 5% AND 0.45% NACL WITH 0.3% KCL | 00074790409 |
| DEXTROSE 5% AND 0.9% NACL INJECTION | 00074794102 |
| DEXTROSE 5% AND 0.9% NACL INJECTION | 00074794103 |
| DEXTROSE 5% AND 0.9% NACL INJECTION | 00074794109 |
| DEXTROSE 5% WITH 0.15% POTASSIUM CHLORIDE | 00074790509 |
| DEXTROSE 5% WITH 0.3% POTASSIUM CHLORIDE | 00074790609 |
| DEXTROSE 5% AND 0.225% NACL INJECTION | 00074792402 |
| DEXTROSE 5% AND 0.225% NACL INJECTION | 00074792403 |
| DEXTROSE 5% AND 0.225% NACL INJECTION | 00074792409 |
| DEXTROSE 5% AND 0.225% NACL WITH 0.075% KCL | 00074799709 |
| DEXTROSE 5% AND 0.225% NACL WITH 0.15% KCL | 00074790103 |
| DEXTROSE 5% AND 0.225% NACL WITH 0.15% KCL | 00074790109 |
| DEXTROSE 5% AND 0.225% NACL WITH 0.224% KCL | 00074799109 |
| DEXTROSE 5% AND 0.225% NACL WITH 0.3% KCL | 00074799209 |
| DEXTROSE 5% AND 0.3% NACL INJECTION | 00074792502 |
| DEXTROSE 5% AND 0.3% NACL INJECTION | 00074792503 |
| DEXTROSE 5% AND 0.3% NACL INJECTION | 00074792509 |
| DEXTROSE 5% AND 0.45% NACL INJECTION | 00074792602 |
| DEXTROSE 5% AND 0.45% NACL INJECTION | 00074792603 |
| DEXTROSE 5% AND 0.45% NACL INJECTION | 00074792609 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| DEXTROSE AND LACTATED RINGERS INJECTION | 00074792903 |
| DEXTROSE AND LACTATED RINGERS INJECTION | 00074792909 |
| DEXTROSE HYDROCHLORIDE SOLUTION INJECTION USP | 00074751715 |
| DEXTROSE HYDROCHLORIDE SOLUTION INJECTION USP | 00074751716 |
| DEXTROSE IN RINGER'S INJECTION | 00074793303 |
| DEXTROSE IN RINGER'S INJECTION | 00074793309 |
| DEXTROSE INJ. | 00074151805 |
| DEXTROSE INJ. | 00074793719 |
| DEXTROSE INJECTION | 00074793819 |
| DEXTROSE INJECTION | 00074108001 |
| DEXTROSE INJECTION | 00074108201 |
| DEXTROSE INJECTION | 00074152201 |
| DEXTROSE INJECTION | 00074152202 |
| DEXTROSE INJECTION | 00074152203 |
| DEXTROSE INJECTION | 00074153503 |
| DEXTROSE INJECTION | 00074710002 |
| DEXTROSE INJECTION | 00074710013 |
| DEXTROSE INJECTION | 00074710023 |
| DEXTROSE INJECTION | 00074710066 |
| DEXTROSE INJECTION | 00074710067 |
| DEXTROSE INJECTION | 00074711907 |
| DEXTROSE INJECTION | 00074712007 |
| DEXTROSE INJECTION | 00074791819 |
| DEXTROSE INJECTION | 00074792201 |
| DEXTROSE INJECTION | 00074792202 |
| DEXTROSE INJECTION | 00074792203 |
| DEXTROSE INJECTION | 00074792209 |
| DEXTROSE INJECTION | 00074792253 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| DEXTROSE INJECTION | 00074792254 |
| DEXTROSE INJECTION | 00074792255 |
| DEXTROSE INJECTION | 00074792261 |
| DEXTROSE INJECTION | 00074792313 |
| DEXTROSE INJECTION | 00074792320 |
| DEXTROSE INJECTION | 00074792323 |
| DEXTROSE INJECTION | 00074792336 |
| DEXTROSE INJECTION | 00074792337 |
| DEXTROSE INJECTION | 00074793002 |
| DEXTROSE INJECTION | 00074793003 |
| DEXTROSE INJECTION | 00074793009 |
| DEXTROSE INJECTION | 00074793519 |
| DEXTROSE INJECTION | 00074793617 |
| DEXTROSE INJECTION | 00074793619 |
| DEXTROSE INJECTION | 00074793629 |
| DEXTROSE INJECTION | 00074800415 |
| DEXTROSE INJECTION | 00074800515 |
| DIAZEPAM INJECTION | 00074321001 |
| DIAZEPAM INJECTION | 00074321032 |
| DIAZEPAM INJECTION | 00074321301 |
| DIAZEPAM INJECTION | 00074321302 |
| DIAZEPAM INJECTION USP | 00074127302 |
| DIAZEPAM INJECTION USP | 00074127312 |
| DIAZEPAM INJECTION USP | 00074127322 |
| DIAZEPAM INJECTION USP | 00074127332 |
| DIGOXIN INJECTION | 00074216701 |
| DIGOXIN INJECTION USP | 00074216901 |
| DIGOXIN INJECTION USP | 00074216902 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| DIGOXIN INJECTION USP | 00074216911 |
| DIGOXIN INJECTION USP | 00074216912 |
| DIGOXIN INJECTION USP | 00074216931 |
| DIGOXIN INJECTION USP | 00074216932 |
| DILTIAZEM HYDROCHLORIDE INJECTION | 00074229105 |
| DILTIAZEM HYDROCHLORIDE INJECTION | 00074229111 |
| DILTIAZEM HYDROCHLORIDE INJECTION | 00074229135 |
| DILTIAZEM HYDROCHLORIDE SOLUTION INJECTION | 00074117101 |
| DILTIAZEM HYDROCHLORIDE SOLUTION INJECTION | 00074117102 |
| DILTIAZEM HYDROCHLORIDE SOLUTION INJECTION | 00074117161 |
| DILTIAZEM HYDROCHLORIDE SOLUTION INJECTION | 00074117162 |
| DIPHENHYDRAMINE HYDROCHLORIDE SOLUTION INJECTION US | 00074229001 |
| DIPHENHYDRAMINE HYDROCHLORIDE SOLUTION INJECTION US | 00074229031 |
| DIPYRIDAMOLE INJECTION | 00074204302 |
| DIPYRIDAMOLE INJECTION | 00074204310 |
| DOBUTAMINE HYDROCHLORIDE INJECTION | 00074234401 |
| DOBUTAMINE HYDROCHLORIDE INJECTION | 00074234402 |
| DOBUTAMINE HYDROCHLORIDE INJECTION | 00074472901 |
| DOBUTAMINE IN 5% DEXTROSE INJECTION | 00074234532 |
| DOBUTAMINE IN 5% DEXTROSE INJECTION | 00074234534 |
| DOBUTAMINE IN 5% DEXTROSE INJECTION | 00074234632 |
| DOBUTAMINE IN 5% DEXTROSE INJECTION | 00074234634 |
| DOBUTAMINE IN 5% DEXTROSE INJECTION | 00074234732 |
| DOBUTAMINE IN 5% DEXTROSE INJECTION | 00074372432 |
| DOBUTAMINE INJECTION USP | 00074202520 |
| DOBUTAMINE INJECTION USP | 00074202554 |
| DOPAMINE HCL IN 5% DEXTROSE INJECTION | 00074415502 |
| DOPAMINE HCL INJECTION | 00074426601 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
| --- | --- |
| DOPAMINE HCL INJECTION | 00074426618 |
| DOPAMINE HCL INJECTION | 00074581901 |
| DOPAMINE HCL INJECTION | 00074581916 |
| DOPAMINE HCL INJECTION | 00074910501 |
| DOPAMINE HCL INJECTION | 00074910518 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE | 00074414102 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE | 00074414103 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE INJ. | 00074780802 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE INJ. | 00074780803 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE INJ. | 00074780822 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE INJ. | 00074780824 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE INJ. | 00074780902 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE INJ. | 00074780903 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE INJ. | 00074780922 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE INJ. | 00074780924 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE INJ. | 00074781002 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE INJ. | 00074781022 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE INJECTION | 00074414202 |
| DOPAMINE HYDROCHLORIDE IN 5% DEXTROSE INJECTION | 00074414203 |
| DOPAMINE HYDROCHLORIDE INJECTION | 00074426501 |
| DOPAMINE HYDROCHLORIDE INJECTION | 00074582001 |
| DOPAMINE HYDROCHLORIDE INJECTION | 00074582010 |
| DOPAMINE HYDROCHLORIDE INJECTION | 00074582011 |
| DOPAMINE HYDROCHLORIDE INJECTION | 00074910401 |
| DOPAMINE HYDROCHLORIDE INJECTION | 00074910413 |
| DOPAMINE HYDROCHLORIDE INJECTION | 00074910420 |
| DROPERIDOL INJECTION | 00074118701 |
| DROPERIDOL SOLUTION INJECTION USP | 00074226902 |

12

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| DROPERIDOL SOLUTION INJECTION USP | 00074226911 |
| DROPERIDOL SOLUTION INJECTION USP | 00074226932 |
| EDROPHONIUM CHLORIDE INJECTION USP | 00074228415 |
| EES 200 SUSP. 100ML | 00074630613 |
| EES/SULFISOXAZOLE 200MG, 100ML | 00074715613 |
| EES/SULFISOXAZOLE 200MG, 150ML | 00074715643 |
| EES/SULFISOXAZOLE 200MG, 200ML | 00074715653 |
| ENDRATE150MG/ML) 20ML AMPUL | 00074694003 |
| ERY-TAB E/C 250MG 100'S | 00074630413 |
| ERY-TAB E/C 250MG 30'S | 00074630430 |
| ERY-TAB E/C UD 250MG 100'S | 00074630411 |
| ERYTHROCIN LACTOBIONATE I.V. | 00074647644 |
| ERYTHROCIN LACTOBIONATE I.V. | 00074648101 |
| ERYTHROCIN LACTOBIONATE -I.V. | 00074647844 |
| ERYTHROCIN LACTOBIONATE IV | 00074634205 |
| ERYTHROCIN LACTOBIONATE IV | 00074636502 |
| ERYTHROCIN LACTOBIONATE-I.V. INJECTION | 00074648201 |
| ERYTHROCIN PIGGYBACK | 00074636813 |
| ERYTHROCIN PIGGYBACK | 00074648301 |
| ERYTHROCIN STEARATE | 00074631613 |
| ERYTHROCIN STEARATE TABLETS | 00074634611 |
| ERYTHROCIN STEARATE TABLETS | 00074634619 |
| ERYTHROCIN STEARATE TABLETS | 00074634641 |
| ERYTHROCIN STEARATE TABLETS 250MG 100'S | 00074634620 |
| ERYTHROCIN STEARATE TABLETS 250MG 500'S | 00074634653 |
| ERYTHROCIN STEARATE TABLETS UD 250MG 100'S | 00074634638 |
| ERYTHROMYCIN | 00074632611 |
| ERYTHROMYCIN | 00074632613 |

13

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| ERYTHROMYCIN | 00074632653 |
| ERYTHROMYCIN BASE | 00074622713 |
| ERYTHROMYCIN BASE 250MG 100'S | 00074630113 |
| ERYTHROMYCIN BASE 250MG 500'S | 00074630153 |
| ERYTHROMYCIN ETHYLSUCCINATE ORAL SUSPENSION | 00074374716 |
| ERYTHROMYCIN ETHYLSUCCINATE ORAL SUSPENSION | 00074374816 |
| ETOPOSIDE SOLUTION INJECTION | 00074148501 |
| ETOPOSIDE SOLUTION INJECTION | 00074148502 |
| ETOPOSIDE SOLUTION INJECTION | 00074148503 |
| FENTANYL CITRATE INJECTION | 00074909302 |
| FENTANYL CITRATE INJECTION | 00074909320 |
| FENTANYL CITRATE INJECTION | 00074909322 |
| FENTANYL CITRATE INJECTION | 00074909325 |
| FENTANYL CITRATE INJECTION | 00074909326 |
| FENTANYL CITRATE INJECTION | 00074909328 |
| FENTANYL CITRATE INJECTION | 00074909332 |
| FENTANYL CITRATE INJECTION | 00074909335 |
| FENTANYL CITRATE INJECTION | 00074909336 |
| FENTANYL CITRATE INJECTION | 00074909338 |
| FENTANYL CITRATE INJECTION | 00074909410 |
| FENTANYL CITRATE INJECTION | 00074909412 |
| FENTANYL CITRATE INJECTION | 00074909415 |
| FENTANYL CITRATE INJECTION | 00074909418 |
| FENTANYL CITRATE INJECTION | 00074909420 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| **Drug** | |
| | **NDC** |
| FENTANYL CITRATE INJECTION | 00074909421 |
| FENTANYL CITRATE INJECTION | 00074909422 |
| FENTANYL CITRATE INJECTION | 00074909425 |
| FENTANYL CITRATE INJECTION | 00074909428 |
| FENTANYL CITRATE INJECTION | 00074909431 |
| FENTANYL CITRATE INJECTION | 00074909450 |
| FENTANYL CITRATE INJECTION | 00074909451 |
| FENTANYL CITRATE INJECTION | 00074909461 |
| FENTANYL CITRATE INJECTION | 00074909512 |
| FENTANYL CITRATE SOLUTION INJECTION USP | 00074127602 |
| FENTANYL CITRATE SOLUTION INJECTION USP | 00074127605 |
| FENTANYL CITRATE SOLUTION INJECTION USP | 00074127612 |
| FENTANYL CITRATE SOLUTION INJECTION USP | 00074127615 |
| FENTANYL CITRATE SOLUTION INJECTION USP | 00074127632 |
| FENTANYL CITRATE SOLUTION INJECTION USP | 00074127635 |
| FUROSEMIDE INJ. | 00074605402 |
| FUROSEMIDE INJ. | 00074605610 |
| FUROSEMIDE INJ. | 00074605617 |
| FUROSEMIDE INJ. | 00074605618 |
| FUROSEMIDE INJ. | 00074605620 |
| FUROSEMIDE INJECTION | 00074163910 |
| FUROSEMIDE INJECTION | 00074605504 |
| FUROSEMIDE INJECTION | 00074605514 |
| FUROSEMIDE INJECTION | 00074610102 |
| FUROSEMIDE INJECTION | 00074610104 |
| FUROSEMIDE INJECTION | 00074610110 |
| FUROSEMIDE INJECTION | 00074610202 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| FUROSEMIDE INJECTION | 00074610204 |
| FUROSEMIDE INJECTION | 00074610210 |
| FUROSEMIDE INJECTION | 00074610211 |
| FUROSEMIDE INJECTION USP | 00074127502 |
| FUROSEMIDE INJECTION USP | 00074127512 |
| FUROSEMIDE INJECTION USP | 00074127522 |
| FUROSEMIDE SOLUTION INJECTION USP | 00074127404 |
| FUROSEMIDE SOLUTION INJECTION USP | 00074127414 |
| FUROSEMIDE SOLUTION INJECTION USP | 00074127424 |
| FUROSEMIDE SOLUTION INJECTION USP | 00074127434 |
| GENTAMICIN SULFATE IN 0.9% NACL INJ. | 00074788113 |
| GENTAMICIN SULFATE IN 0.9% NACL INJ. | 00074788423 |
| GENTAMICIN SULFATE IN 0.9% NACL INJ. | 00074788623 |
| GENTAMICIN SULFATE IN 0.9% NACL INJ. | 00074788923 |
| GENTAMICIN SULFATE IN 0.9% SOD. CHL. INJ. | 00074787913 |
| GENTAMICIN SULFATE INJECTION | 00074340001 |
| GENTAMICIN SULFATE INJECTION | 00074340101 |
| GENTAMICIN SULFATE INJECTION | 00074340201 |
| GENTAMICIN SULFATE SOLUTION INJECTION USP | 00074120703 |
| GENTAMICIN SULFATE SOLUTION INJECTION USP | 00074120708 |
| GENTIMICIN SULFATE 0.9% SODIUM CHLORIDE | 00074788313 |
| GLYCINE IRRIGATION | 00074614206 |
| GLYCINE IRRIGATION | 00074614236 |
| GLYCINE IRRIGATION | 00074797408 |
| GLYCOPYRROLATE INJECTION | 00074109801 |
| GLYCOPYRROLATE INJECTION | 00074109802 |
| HEPARIN LOCK FLUSH | 00074115112 |
| HEPARIN LOCK FLUSH | 00074115114 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| HEPARIN LOCK FLUSH | 00074115170 |
| HEPARIN LOCK FLUSH | 00074115171 |
| HEPARIN LOCK FLUSH | 00074115173 |
| HEPARIN LOCK FLUSH | 00074115178 |
| HEPARIN LOCK FLUSH | 00074115212 |
| HEPARIN LOCK FLUSH | 00074115214 |
| HEPARIN LOCK FLUSH | 00074115270 |
| HEPARIN LOCK FLUSH | 00074115271 |
| HEPARIN LOCK FLUSH | 00074115273 |
| HEPARIN LOCK FLUSH | 00074115278 |
| HEPARIN LOCK FLUSH SOLUTION | 00074345405 |
| HEPARIN LOCK FLUSH SOLUTION | 00074345425 |
| HEPARIN LOCK FLUSH SOLUTION | 00074482201 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128001 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128002 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128003 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128005 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128011 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128012 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128013 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128015 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128021 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128022 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128023 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128025 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128031 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128032 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128033 |

17

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128035 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128101 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128102 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128103 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128105 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128111 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128112 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128113 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128115 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128121 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128122 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128123 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128125 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128131 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128132 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128133 |
| HEPARIN LOCK FLUSH SOLUTION USP | 00074128135 |
| HEPARIN SODIUM IN %5 DEXTROSE INJECTION | 00074776003 |
| HEPARIN SODIUM IN 0.45% SODIUM CHLOR. INJ. | 00074765002 |
| HEPARIN SODIUM IN 0.45% SODIUM CHLOR. INJ. | 00074765062 |
| HEPARIN SODIUM IN 0.45% SODIUM CHLORIDE INJ. | 00074765102 |
| HEPARIN SODIUM IN 0.45% SODIUM CHLORIDE INJ. | 00074765103 |
| HEPARIN SODIUM IN 0.45% SODIUM CHLORIDE INJ. | 00074765162 |
| HEPARIN SODIUM IN 0.9% SODIUM CHLORIDE INJECTION | 00074762003 |
| HEPARIN SODIUM IN 0.9% SODIUM CHLORIDE INJECTION | 00074762059 |
| HEPARIN SODIUM IN 5% DEXTROSE | 00074779224 |
| HEPARIN SODIUM IN 5% DEXTROSE | 00074779312 |
| HEPARIN SODIUM IN 5% DEXTROSE | 00074779323 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| HEPARIN SODIUM IN 5% DEXTROSE | 00074779362 |
| HEPARIN SODIUM IN 5% DEXTROSE INJECTION | 00074628602 |
| HEPARIN SODIUM IN 5% DEXTROSE INJECTION | 00074628611 |
| HEPARIN SODIUM IN 5% DEXTROSE INJECTION | 00074776103 |
| HEPARIN SODIUM IN 5% INJECTION | 00074628702 |
| HEPARIN SODIUM IN 5% INJECTION | 00074628703 |
| HEPARIN SODIUM IN DEXTROSE | 00074779412 |
| HEPARIN SODIUM IN DEXTROSE | 00074779462 |
| HEPARIN SODIUM INJECTION UNITS/ML | 00074258202 |
| HEPARIN SODIUM INJECTION UNITS/ML | 00074258302 |
| HEPARIN SODIUM INJECTION UNITS/ML | 00074258402 |
| HEPARIN SODIUM INJECTION USP UNITS/ML | 00074258102 |
| HEPARIN SODIUM SOLUTION INJECTION USP | 00074131601 |
| HEPARIN SODIUM SOLUTION INJECTION USP | 00074131602 |
| HEPARIN SODIUM SOLUTION INJECTION USP | 00074131611 |
| HEPARIN SODIUM SOLUTION INJECTION USP | 00074131612 |
| HEPARIN SODIUM SOLUTION INJECTION USP | 00074131613 |
| HEPARIN SODIUM SOLUTION INJECTION USP | 00074131614 |
| HEPARIN SODIUM SOLUTION INJECTION USP | 00074131631 |
| HEPARIN SODIUM SOLUTION INJECTION USP | 00074140201 |
| HEPARIN SODIUM SOLUTION INJECTION USP | 00074140211 |
| HEPARIN SODIUM SOLUTION INJECTION USP | 00074140231 |
| HYDROMORPHONE HYDROCHLORIDE INJECTION | 00074127201 |
| HYDROXYZINE HYDROCHLORIDE INJECTION USP | 00074127902 |
| HYDROXYZINE HYDROCHLORIDE SOLUTION INJECTION USP | 00074127701 |
| HYDROXYZINE HYDROCHLORIDE SOLUTION INJECTION USP | 00074127801 |
| INFANT DEXTROSE SOLUTION INJECTION USP | 00074177510 |
| INPERSOL LC LM WITH 1.5% DEXTROSE DIALYSIS SOLUTION | 00074122007 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| INPERSOL LC LM WITH 1.5% DEXTROSE DIALYSIS SOLUTION | 00074122008 |
| INPERSOL LC LM WITH 1.5% DEXTROSE DIALYSIS SOLUTION | 00074122027 |
| INPERSOL LC LM WITH 1.5% DEXTROSE DIALYSIS SOLUTION | 00074122028 |
| INPERSOL LC LM WITH 2.5% DEXTROSE DIALYSIS SOLUTION | 00074122108 |
| INPERSOL LC LM WITH 2.5% DEXTROSE DIALYSIS SOLUTION | 00074122118 |
| INPERSOL LC LM WITH 2.5% DEXTROSE DIALYSIS SOLUTION | 00074122127 |
| INPERSOL LC LM WITH 2.5% DEXTROSE DIALYSIS SOLUTION | 00074122128 |
| INPERSOL LC LM WITH 3.5% DEXTROSE DIALYSIS SOLUTION | 00074122228 |
| INPERSOL LC LM WITH 4.25% DEXTROSE DIALYSIS SOLUTIO | 00074122308 |
| INPERSOL LC LM WITH 4.25% DEXTROSE DIALYSIS SOLUTIO | 00074122318 |
| INPERSOL LC LM WITH 4.25% DEXTROSE DIALYSIS SOLUTIO | 00074122327 |
| INPERSOL LC LM WITH 4.25% DEXTROSE DIALYSIS SOLUTIO | 00074122328 |
| INPERSOL WITH 1.5% DEXTROSE INJECTION | 00074794405 |
| INPERSOL WITH 1.5% DEXTROSE INJECTION | 00074794407 |
| INPERSOL WITH 1.5% DEXTROSE INJECTION | 00074794408 |
| INPERSOL WITH 1.5% DEXTROSE INJECTION | 00074794413 |
| INPERSOL WITH 1.5% DEXTROSE INJECTION | 00074794415 |
| INPERSOL WITH 1.5% DEXTROSE INJECTION | 00074794427 |
| INPERSOL WITH 2.5% DEXTROSE | 00074794305 |
| INPERSOL WITH 2.5% DEXTROSE | 00074794307 |
| INPERSOL WITH 2.5% DEXTROSE | 00074794308 |
| INPERSOL WITH 2.5% DEXTROSE | 00074794313 |
| INPERSOL WITH 2.5% DEXTROSE | 00074794315 |
| INPERSOL WITH 2.5% DEXTROSE | 00074794317 |
| INPERSOL WITH 2.5% DEXTROSE | 00074794318 |
| INPERSOL WITH 2.5% DEXTROSE | 00074794327 |
| INPERSOL WITH 4.25% DEXTROSE INJECTION | 00074794505 |
| INPERSOL WITH 4.25% DEXTROSE INJECTION | 00074794507 |

20

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| INPERSOL WITH 4.25% DEXTROSE INJECTION | 00074794508 |
| INPERSOL WITH 4.25% DEXTROSE INJECTION | 00074794513 |
| INPERSOL WITH 4.25% DEXTROSE INJECTION | 00074794515 |
| INPERSOL WITH 4.25% DEXTROSE INJECTION | 00074794517 |
| INPERSOL WITH 4.25% DEXTROSE INJECTION | 00074794518 |
| INPERSOL WITH 4.25% DEXTROSE INJECTION | 00074794527 |
| INPERSOL-LM WITH 1.5% DEXTROSE | 00074789205 |
| INPERSOL-LM WITH 1.5% DEXTROSE | 00074789207 |
| INPERSOL-LM WITH 1.5% DEXTROSE | 00074789208 |
| INPERSOL-LM WITH 1.5% DEXTROSE | 00074789227 |
| INPERSOL-LM WITH 1.5% DEXTROSE | 00074789228 |
| INPERSOL-LM WITH 2.5% DEXTROSE | 00074789305 |
| INPERSOL-LM WITH 2.5% DEXTROSE | 00074789307 |
| INPERSOL-LM WITH 2.5% DEXTROSE | 00074789308 |
| INPERSOL-LM WITH 2.5% DEXTROSE | 00074789318 |
| INPERSOL-LM WITH 2.5% DEXTROSE | 00074789327 |
| INPERSOL-LM WITH 2.5% DEXTROSE | 00074789328 |
| INPERSOL-LM WITH 3.5% DEXTROSE DIALYSIS SOLUTION | 00074783028 |
| INPERSOL-LM WITH 4.25% DEXTROSE | 00074789407 |
| INPERSOL-LM WITH 4.25% DEXTROSE | 00074789408 |
| INPERSOL-LM WITH 4.25% DEXTROSE | 00074789418 |
| INPERSOL-LM WITH 4.25% DEXTROSE | 00074789427 |
| INPERSOL-LM WITH 4.25% DEXTROSE | 00074789428 |
| IONOSOL B AND 5% DEXTROSE | 00074737103 |
| IONOSOL B AND 5% DEXTROSE | 00074737109 |
| IONOSOL MB AND 5% DEXTROSE | 00074737202 |
| IONOSOL MB AND 5% DEXTROSE | 00074737203 |
| IONOSOL MB AND 5% DEXTROSE | 00074737209 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| IONOSOL MB AND 5% DEXTROSE | 00074737262 |
| IONOSOL T AND DEXTROSE INJECTIONS | 00074737302 |
| IONOSOL T AND DEXTROSE INJECTIONS | 00074737303 |
| IONOSOL T AND DEXTROSE INJECTIONS | 00074737309 |
| IONOSOL T AND DEXTROSE INJECTIONS | 00074737362 |
| IONTOCAINE SOLUTION | 00074169302 |
| IOPAMIDOL 200 INJECTION | 00074752902 |
| IOPAMIDOL 200 INJECTION | 00074752913 |
| IOPAMIDOL 200 INJECTION | 00074752923 |
| IOPAMIDOL 200 INJECTION | 00074752972 |
| IOPAMIDOL 250 INJECTION | 00074753001 |
| IOPAMIDOL 250 INJECTION | 00074753013 |
| IOPAMIDOL 250 INJECTION | 00074753014 |
| IOPAMIDOL 250 INJECTION | 00074753023 |
| IOPAMIDOL 250 INJECTION | 00074753026 |
| IOPAMIDOL 250 INJECTION | 00074753031 |
| IOPAMIDOL 250 INJECTION | 00074753072 |
| IOPAMIDOL 300 INJECTION | 00074753114 |
| IOPAMIDOL 300 INJECTION | 00074753115 |
| IOPAMIDOL 300 INJECTION | 00074753124 |
| IOPAMIDOL 300 INJECTION | 00074753126 |
| IOPAMIDOL 300 INJECTION | 00074753131 |
| IOPAMIDOL 300 INJECTION | 00074753162 |
| IOPAMIDOL 370 INJECTION | 00074753314 |
| IOPAMIDOL 370 INJECTION | 00074753315 |
| IOPAMIDOL 370 INJECTION | 00074753321 |
| IOPAMIDOL 370 INJECTION | 00074753322 |
| IOPAMIDOL 370 INJECTION | 00074753324 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| IOPAMIDOL 370 INJECTION | 00074753326 |
| IOPAMIDOL 370 INJECTION | 00074753331 |
| IOPAMIDOL 370 INJECTION | 00074753332 |
| IOPAMIDOL 370 INJECTION | 00074753362 |
| IOPAMIDOL-250 INJECTION | 00074811703 |
| IOPAMIDOL-250 INJECTION | 00074811715 |
| IOPAMIDOL-300 INJECTION | 00074811803 |
| IOPAMIDOL-300 INJECTION | 00074811815 |
| IOPAMIDOL-370 INJECTION | 00074811903 |
| IOPAMIDOL-370 INJECTION | 00074811915 |
| ISOPROTERONOL HCL INJECTION 1:5000 | 00074497701 |
| ISOPROTERONOL HCL INJECTION 1:5000 | 00074497718 |
| ISOPROTERONOL HCL INJECTION 1:5000 | 00074497801 |
| ISOPROTERONOL HCL INJECTION 1:5000 | 00074497815 |
| ISOPROTERONOL HYDROCHLORIDE 1:5,000 INJ. | 00074490501 |
| ISOPROTERONOL HYDROCHLORIDE 1:5,000 INJ. | 00074490518 |
| ISUPREL INJECTION | 00074141001 |
| ISUPREL INJECTION | 00074141005 |
| KCL IN 5% DEXTROSE AND 0.3% SODIUM CHLORIDE INJECTION | 00074780609 |
| KCL IN 5% DEXTROSE AND 0.3% SODIUM CHLORIDE INJECTION | 00074799803 |
| KCL IN 5% DEXTROSE AND 0.3% SODIUM CHLORIDE INJECTION | 00074799809 |
| KETAMINE HCL INJECTION USP | 00074205105 |
| KETAMINE HYDROCHLORIDE SOLUTION INJECTION USP | 00074205310 |
| KETOROLAC TROMETHAMINE INJECTION | 00074228701 |
| KETOROLAC TROMETHAMINE INJECTION | 00074228702 |
| KETOROLAC TROMETHAMINE INJECTION | 00074228711 |
| KETOROLAC TROMETHAMINE INJECTION | 00074228731 |
| KETOROLAC TROMETHAMINE INJECTION | 00074228749 |

23

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| KETOROLAC TROMETHAMINE INJECTION | 00074228751 |
| KETOROLAC TROMETHAMINE INJECTION | 00074228753 |
| KETOROLAC TROMETHAMINE INJECTION | 00074228754 |
| KETOROLAC TROMETHAMINE INJECTION | 00074228755 |
| KETOROLAC TROMETHAMINE INJECTION | 00074228761 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074202302 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074202349 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074203602 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074203649 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074203902 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074203949 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074228801 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074228811 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074228831 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074228849 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074228853 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074228854 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074379301 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074379349 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074379501 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074379549 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074379561 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074379601 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074379649 |
| KETOROLAC TROMETHAMINE SOLUTION INJECTION USP | 00074379661 |
| LABETALOL HYDROCHLORIDE INJECTION | 00074233905 |
| LABETALOL HYDROCHLORIDE INJECTION | 00074233911 |
| LABETALOL HYDROCHLORIDE INJECTION | 00074233934 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| LACTATED RINGER'S | 00074782808 |
| LACTATED RINGERS INJECTION | 00074795302 |
| LACTATED RINGERS INJECTION | 00074795303 |
| LACTATED RINGERS INJECTION | 00074795309 |
| L-CYSTEINE HYDROCHLORIDE INJECTION | 00074897502 |
| L-CYSTEINE HYDROCHLORIDE INJECTION | 00074897518 |
| LEUCOVORIN CALCIUM SOLUTION INJECTION USP | 00074454102 |
| LEUCOVORIN CALCIUM SOLUTION INJECTION USP | 00074454104 |
| LIDOCAINE HCL 1% AND EPINEPHRINE 1:100,000 | 00074317801 |
| LIDOCAINE HCL 1% AND EPINEPHRINE 1:100,000 | 00074317803 |
| LIDOCAINE HCL 1% AND EPINEPHRINE 1:200,000 | 00074317901 |
| LIDOCAINE HCL 1.5% AND EPINEPHRINE 1:200,000 | 00074318101 |
| LIDOCAINE HCL 1.5% AND EPINEPHRINE 1:200,000 INJECTION | 00074252801 |
| LIDOCAINE HCL AND DEXTROSE 7.5% INJECTION | 00074471201 |
| LIDOCAINE HCL AND EPINEPHRINE INJECTION SOLUTION | 00074318201 |
| LIDOCAINE HCL AND EPINEPHRINE INJECTION SOLUTION | 00074318202 |
| LIDOCAINE HCL AND EPINEPHRINE INJECTION SOLUTION | 00074318203 |
| LIDOCAINE HCL IN 5% DEXTROSE INJECTION | 00074793932 |
| LIDOCAINE HCL INJECTION USP | 00074206305 |
| LIDOCAINE HCL INJECTION USP | 00074206605 |
| LIDOCAINE HCL INJECTION USP | 00074206610 |
| LIDOCAINE HYDROCHLORIDE 0.5% & EPINEPHRINE 1:200,000 50ML FLIPTOP | 00074317701 |
| LIDOCAINE HYDROCHLORIDE 1.5% AND EPINEPHRINE 1:200, | 00074318002 |
| LIDOCAINE HYDROCHLORIDE 1.5% AND EPINEPHRINE 1:2000 | 00074120901 |
| LIDOCAINE HYDROCHLORIDE 2% AND EPINEPHRINE 1:200,00 | 00074318301 |
| LIDOCAINE HYDROCHLORIDE IN 5% DEXTROSE | 00074791624 |
| LIDOCAINE HYDROCHLORIDE IN 5% DEXTROSE INJECTION | 00074793124 |
| LIDOCAINE HYDROCHLORIDE IN 5% DEXTROSE INJECTION | 00074793132 |

25

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| LIDOCAINE HYDROCHLORIDE INJ. | 00074477601 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074405601 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074427001 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074427501 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074427601 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074427602 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074427701 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074427702 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074427801 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074427902 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074428201 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074428202 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074428301 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074471301 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074471302 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074471305 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074471332 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074471362 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074471365 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074490301 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074490333 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074490334 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074490401 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074490415 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074490433 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074490434 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074492301 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074492315 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074492401 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074492415 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074621702 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074624801 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074625401 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074802601 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074802701 |
| LIDOCAINE HYDROCHLORIDE INJECTION | 00074913705 |
| LIDOCAINE HYDROCHLORIDE SOLUTION INJECTION | 00074132305 |
| LIPOSYN II EMULSION | 00074978702 |
| LIPOSYN II INJECTION | 00074978402 |
| LIPOSYN II INJECTION | 00074978601 |
| LIPOSYN II INJECTION | 00074978603 |
| LIPOSYN II INJECTION | 00074978621 |
| LIPOSYN II INJECTION | 00074978901 |
| LIPOSYN II INJECTION | 00074978903 |
| LIPOSYN III FOR INJECTION | 00074979001 |
| LIPOSYN III FOR INJECTION | 00074979003 |
| LIPOSYN III FOR INJECTION | 00074979021 |
| LIPOSYN III INJECTION | 00074979101 |
| LIPOSYN III INJECTION | 00074979103 |
| LMD IN 0.9% SODIUM CHLORIDE INJECTION | 00074741903 |
| LMD IN 5% DEXTROSE INJECTION | 00074741803 |
| LORAZEPAM INJECTION | 00074677601 |
| LORAZEPAM INJECTION | 00074677701 |
| LORAZEPAM INJECTION | 00074677801 |
| LORAZEPAM INJECTION | 00074677901 |
| LORAZEPAM INJECTION | 00074678001 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| LORAZEPAM INJECTION | 00074678101 |
| LORAZEPAM INJECTION SOLUTION USP | 00074153901 |
| LORAZEPAM INJECTION SOLUTION USP | 00074153911 |
| LORAZEPAM INJECTION SOLUTION USP | 00074153912 |
| LORAZEPAM INJECTION SOLUTION USP | 00074153921 |
| LORAZEPAM INJECTION SOLUTION USP | 00074153931 |
| LORAZEPAM INJECTION SOLUTION USP | 00074198501 |
| LORAZEPAM INJECTION SOLUTION USP | 00074198502 |
| LORAZEPAM INJECTION SOLUTION USP | 00074198510 |
| LORAZEPAM INJECTION SOLUTION USP | 00074198511 |
| LORAZEPAM INJECTION SOLUTION USP | 00074198512 |
| LORAZEPAM INJECTION SOLUTION USP | 00074198521 |
| LORAZEPAM INJECTION SOLUTION USP | 00074198530 |
| LORAZEPAM INJECTION SOLUTION USP | 00074198531 |
| LORAZEPAM INJECTION SOLUTION USP | 00074198532 |
| MAGNESIUM SULFATE IN 5% DEXTROSE | 00074672803 |
| MAGNESIUM SULFATE IN 5% DEXTROSE | 00074672809 |
| MAGNESIUM SULFATE IN WATER FOR INJECTION | 00074672903 |
| MAGNESIUM SULFATE IN WATER FOR INJECTION | 00074672909 |
| MAGNESIUM SULFATE IN WATER FOR INJECTION | 00074672923 |
| MAGNESIUM SULFATE IN WATER FOR INJECTION | 00074673013 |
| MAGNESIUM SULFATE INJECTION | 00074175410 |
| MAGNESIUM SULFATE INJECTION | 00074962805 |
| MAGNESIUM SULFATE INJECTION IN 5% DEXTROSE | 00074672709 |
| MAGNESIUM SULFATE INJECTION IN 5% DEXTROSE | 00074672723 |
| MANGANESE INJECTION | 00074409101 |
| MANNITOL I.V. FLEXIBLE PLASTIC CONTAINER | 00074771209 |
| MANNITOL I.V. FLEXIBLE PLASTIC CONTAINER | 00074771309 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| MANNITOL INJECTION | 00074403101 |
| MANNITOL IV SOLUTION INJECTION | 00074771403 |
| MANNITOL IV SOLUTION INJECTION | 00074771502 |
| MANNITOL IV SOLUTION INJECTION | 00074771503 |
| MEPERIDINE HYDROCHLORIDE INJECTION | 00074603001 |
| MEPERIDINE HYDROCHLORIDE INJECTION | 00074603004 |
| METHYLDOPATE HYDROCHLORIDE INJECTION | 00074303001 |
| METHYLDOPATE HYDROCHLORIDE INJECTION | 00074303002 |
| METHYLDOPATE HYDROCHLORIDE INJECTION | 00074340602 |
| METHYLDOPATE INJECTION | 00074340502 |
| METOCLOPRAMIDE | 00074341301 |
| METOCLOPRAMIDE | 00074341401 |
| METOCLOPRAMIDE | 00074341429 |
| METOCLOPRAMIDE SOLUTION INJECTION USP | 00074217302 |
| METOCLOPRAMIDE SOLUTION INJECTION USP | 00074217332 |
| METOPROLOL TARTRATE INJECTION USP | 00074177825 |
| METOPROLOL TARTRATE INJECTION USP | 00074177835 |
| METRONIDAZOLE INJECTION | 00074121711 |
| METRONIDAZOLE INJECTION | 00074781123 |
| METRONIDAZOLE INJECTION | 00074781124 |
| METRONIDAZOLE INJECTION | 00074781137 |
| METROPROLOL TARTRATE INJECTION | 00074228505 |
| MORPHINE SULFATE | 00074381401 |
| MORPHINE SULFATE | 00074381402 |
| MORPHINE SULFATE | 00074381412 |
| MORPHINE SULFATE | 00074405701 |
| MORPHINE SULFATE | 00074405702 |
| MORPHINE SULFATE | 00074405712 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| MORPHINE SULFATE INJECTION | 00074202801 |
| MORPHINE SULFATE INJECTION | 00074202802 |
| MORPHINE SULFATE INJECTION | 00074202901 |
| MORPHINE SULFATE INJECTION | 00074202902 |
| MORPHINE SULFATE INJECTION | 00074381501 |
| MORPHINE SULFATE INJECTION | 00074381502 |
| MORPHINE SULFATE INJECTION | 00074381512 |
| MORPHINE SULFATE INJECTION | 00074405801 |
| MORPHINE SULFATE INJECTION | 00074405802 |
| MORPHINE SULFATE INJECTION | 00074405812 |
| NALBUPHINE HYDROCHLORIDE | 00074307501 |
| NALBUPHINE HYDROCHLORIDE | 00074307502 |
| NALBUPHINE HYDROCHLORIDE INJECTION | 00074146301 |
| NALBUPHINE HYDROCHLORIDE SOLUTION INJECTION | 00074146401 |
| NALBUPHINE HYDROCHLORIDE SOLUTION INJECTION | 00074146501 |
| NALBUPHINE HYDROCHLORIDE SOLUTION INJECTION | 00074147601 |
| NALOXONE HYDROCHLORIDE | 00074121201 |
| NALOXONE HYDROCHLORIDE | 00074121301 |
| NALOXONE HYDROCHLORIDE | 00074121501 |
| NALOXONE HYDROCHLORIDE INJECTION | 00074121901 |
| NALOXONE HYDROCHLORIDE INJECTION USP | 00074178201 |
| NALOXONE HYDROCHLORIDE INJECTION USP | 00074178221 |
| NALOXONE HYDROCHLORIDE NEONATAL | 00074121101 |
| NALOXONE HYDROCHLORIDE NEONATAL | 00074121601 |
| NITROGLYCERIN IN 5% DEXTROSE INJECTION | 00074148202 |
| NITROGLYCERIN IN 5% DEXTROSE INJECTION | 00074148302 |
| NITROGLYCERIN IN 5% DEXTROSE INJECTION | 00074148303 |
| NITROGLYCERIN IN 5% DEXTROSE INJECTION | 00074148402 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| NITROGLYCERIN IN 5% DEXTROSE INJECTION | 00074148403 |
| NITROGLYCERIN INJECTION | 00074410401 |
| NITROGLYCERINE INJECTION | 00074410701 |
| NITROPRESS FOR INJECTION | 00074303444 |
| NITROPRESS INJECTION | 00074302401 |
| NORMOSOL-M AND 5% DEXTROSE INJECTION | 00074796503 |
| NORMOSOL-M AND 5% DEXTROSE INJECTION | 00074796509 |
| NORMOSOL-R AND 5% DEXTROSE INJECTION | 00074796809 |
| NORMOSOL-R INJECTION | 00074796703 |
| NORMOSOL-R INJECTION | 00074796709 |
| NORMOSOL-R PH 7.4 INJECTION | 00074767003 |
| NORMOSOL-R PH 7.4 INJECTION | 00074767009 |
| NOVOCAIN INJECTION | 00074180802 |
| NOVOCAIN INJECTION | 00074180806 |
| NOVOCAIN INJECTION | 00074181002 |
| NOVOCAIN INJECTION | 00074182430 |
| NOVOCAIN SOLUTION INJECTION | 00074182530 |
| OCL SOLUTION | 00074909916 |
| PHENYTOIN SODIUM INJECTION | 00074131701 |
| PHENYTOIN SODIUM INJECTION | 00074131702 |
| PHENYTOIN SODIUM INJECTION USP | 00074184402 |
| PHENYTOIN SODIUM INJECTION USP | 00074184405 |
| PHENYTOIN SODIUM INJECTION USP | 00074184415 |
| PHENYTOIN SODIUM INJECTION USP | 00074184432 |
| PHYSIOSOL IRRIGATION | 00074701205 |
| PHYSIOSOL IRRIGATION SOLUTION | 00074614102 |
| PHYSIOSOL IRRIGATION SOLUTION | 00074614103 |
| PHYSIOSOL IRRIGATION SOLUTION | 00074614109 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| PHYSIOSOL IRRIGATION SOLUTION | 00074614122 |
| PLEGISOL | 00074796905 |
| PLEGISOL | 00074796915 |
| POTASSIUM ACETATE INJECTION | 00074329405 |
| POTASSIUM ACETATE INJECTION | 00074329406 |
| POTASSIUM ACETATE INJECTION | 00074329451 |
| POTASSIUM ACETATE INJECTION | 00074818301 |
| POTASSIUM ACETATE INJECTION | 00074818373 |
| POTASSIUM CHLORIDE 0.224% AND DEXTROSE 5% | 00074799609 |
| POTASSIUM CHLORIDE FOR INJECTION CONCENTRATE | 00074499101 |
| POTASSIUM CHLORIDE FOR INJECTION CONCENTRATE | 00074499115 |
| POTASSIUM CHLORIDE FOR INJECTION CONCENTRATE | 00074499201 |
| POTASSIUM CHLORIDE FOR INJECTION CONCENTRATE | 00074499218 |
| POTASSIUM CHLORIDE FOR INJECTION CONCENTRATE | 00074499301 |
| POTASSIUM CHLORIDE FOR INJECTION CONCENTRATE | 00074499319 |
| POTASSIUM CHLORIDE FOR INJECTION CONCENTRATE | 00074499401 |
| POTASSIUM CHLORIDE FOR INJECTION CONCENTRATE | 00074499419 |
| POTASSIUM CHLORIDE IN 0.9% SODIUM CHLORIDE INJ. | 00074711509 |
| POTASSIUM CHLORIDE IN 0.9% SODIUM CHLORIDE INJECTIO | 00074711609 |
| POTASSIUM CHLORIDE IN 5% DEXTROSE AND 0.3% SODIUM C | 00074710509 |
| POTASSIUM CHLORIDE IN 5% DEXTROSE AND 0.9% SODIUM C | 00074710709 |
| POTASSIUM CHLORIDE IN 5% DEXTROSE AND 0.9% SODIUM C | 00074710909 |
| POTASSIUM CHLORIDE IN LACTATED RINGERS AND 5% DEXTR | 00074711109 |
| POTASSIUM CHLORIDE IN LACTATED RINGERS AND 5% DEXTR | 00074711309 |
| POTASSIUM CHLORIDE INJ. | 00074149901 |
| POTASSIUM CHLORIDE INJ. | 00074390703 |
| POTASSIUM CHLORIDE INJECTION | 00074149701 |
| POTASSIUM CHLORIDE INJECTION | 00074149801 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| POTASSIUM CHLORIDE INJECTION | 00074393402 |
| POTASSIUM CHLORIDE INJECTION | 00074493101 |
| POTASSIUM CHLORIDE INJECTION | 00074493201 |
| POTASSIUM CHLORIDE INJECTION | 00074493901 |
| POTASSIUM CHLORIDE INJECTION | 00074663501 |
| POTASSIUM CHLORIDE INJECTION | 00074663601 |
| POTASSIUM CHLORIDE INJECTION | 00074665106 |
| POTASSIUM CHLORIDE INJECTION | 00074665305 |
| POTASSIUM CHLORIDE INJECTION | 00074707514 |
| POTASSIUM CHLORIDE INJECTION | 00074707526 |
| POTASSIUM CHLORIDE INJECTION | 00074707536 |
| POTASSIUM CHLORIDE INJECTION | 00074707537 |
| POTASSIUM CHLORIDE SOLUTION INJECTION | 00074707626 |
| POTASSIUM CHLORIDE SOLUTION INJECTION | 00074707714 |
| POTASSIUM CHLORIDE SOLUTION INJECTION | 00074707726 |
| POTASSIUM CHLORIDE SOLUTION INJECTION CONCENTRATE U | 00074151302 |
| PROCAINAMIDE HYDROCHLORIDE INJECTION | 00074190201 |
| PROCAINAMIDE HYDROCHLORIDE INJECTION | 00074190301 |
| PROCAINAMIDE HYDROCHLORIDE INJECTION USP | 00074182602 |
| PROCAINE HYDROCHLORIDE | 00074192304 |
| PROCAINE HYDROCHLORIDE INJ. | 00074195304 |
| PROCAINE HYDROCHLORIDE INJECTION | 00074723901 |
| PROCHLORPERAZINE EDISYLATE SOLUTION USP | 00074188002 |
| PROCHLORPERAZINE EDISYLATE SOLUTION USP | 00074188022 |
| PROCHLORPERAZINE EDISYLATE SOLUTION USP | 00074188032 |
| PROMETHAZINE HYDROCHLORIDE INJECTION | 00074231201 |
| PROMETHAZINE HYDROCHLORIDE INJECTION | 00074231211 |
| PROMETHAZINE HYDROCHLORIDE INJECTION | 00074231231 |

33

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| PROMETHAZINE HYDROCHLORIDE INJECTION | 00074233501 |
| PROMETHAZINE HYDROCHLORIDE INJECTION | 00074233531 |
| QUELICIN INJECTION | 00074662902 |
| QUELICIN INJECTION | 00074664202 |
| QUELICIN INJECTION | 00074697010 |
| QUELICIN INJECTION | 00074806501 |
| QUELICIN INJECTION | 00074806515 |
| RINGER'S INJECTION | 00074798209 |
| RINGER'S INJECTION | 00074798224 |
| RINGER'S IRRIGATION | 00074614009 |
| SODIUM ACETATE INJECTION | 00074329905 |
| SODIUM ACETATE INJECTION | 00074329906 |
| SODIUM ACETATE INJECTION | 00074729901 |
| SODIUM CHLORIDE INJECTION | 00074107901 |
| SODIUM CHLORIDE INJECTION | 00074108101 |
| SODIUM CHLORIDE INJECTION | 00074195401 |
| SODIUM CHLORIDE INJECTION | 00074195403 |
| SODIUM CHLORIDE INJECTION | 00074488810 |
| SODIUM CHLORIDE INJECTION | 00074488812 |
| SODIUM CHLORIDE INJECTION | 00074488820 |
| SODIUM CHLORIDE INJECTION | 00074488825 |
| SODIUM CHLORIDE INJECTION | 00074488850 |
| SODIUM CHLORIDE INJECTION | 00074488870 |
| SODIUM CHLORIDE INJECTION | 00074488899 |
| SODIUM CHLORIDE INJECTION | 00074665702 |
| SODIUM CHLORIDE INJECTION | 00074665773 |
| SODIUM CHLORIDE INJECTION | 00074666002 |
| SODIUM CHLORIDE INJECTION | 00074666075 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| SODIUM CHLORIDE INJECTION | 00074710102 |
| SODIUM CHLORIDE INJECTION | 00074710113 |
| SODIUM CHLORIDE INJECTION | 00074710123 |
| SODIUM CHLORIDE INJECTION | 00074710166 |
| SODIUM CHLORIDE INJECTION | 00074710167 |
| SODIUM CHLORIDE INJECTION | 00074713202 |
| SODIUM CHLORIDE INJECTION | 00074713213 |
| SODIUM CHLORIDE INJECTION | 00074713223 |
| SODIUM CHLORIDE INJECTION | 00074713266 |
| SODIUM CHLORIDE INJECTION | 00074713267 |
| SODIUM CHLORIDE INJECTION | 00074773013 |
| SODIUM CHLORIDE INJECTION | 00074773020 |
| SODIUM CHLORIDE INJECTION | 00074773036 |
| SODIUM CHLORIDE INJECTION | 00074773037 |
| SODIUM CHLORIDE INJECTION | 00074798301 |
| SODIUM CHLORIDE INJECTION | 00074798302 |
| SODIUM CHLORIDE INJECTION | 00074798303 |
| SODIUM CHLORIDE INJECTION | 00074798309 |
| SODIUM CHLORIDE INJECTION | 00074798353 |
| SODIUM CHLORIDE INJECTION | 00074798354 |
| SODIUM CHLORIDE INJECTION | 00074798355 |
| SODIUM CHLORIDE INJECTION | 00074798361 |
| SODIUM CHLORIDE INJECTION | 00074798369 |
| SODIUM CHLORIDE INJECTION | 00074798413 |
| SODIUM CHLORIDE INJECTION | 00074798420 |
| SODIUM CHLORIDE INJECTION | 00074798423 |
| SODIUM CHLORIDE INJECTION | 00074798436 |
| SODIUM CHLORIDE INJECTION | 00074798437 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| SODIUM CHLORIDE INJECTION | 00074798502 |
| SODIUM CHLORIDE INJECTION | 00074798503 |
| SODIUM CHLORIDE INJECTION | 00074798509 |
| SODIUM CHLORIDE IRRIGATION | 00074613802 |
| SODIUM CHLORIDE IRRIGATION | 00074613803 |
| SODIUM CHLORIDE IRRIGATION | 00074613822 |
| SODIUM CHLORIDE IRRIGATION | 00074614706 |
| SODIUM CHLORIDE IRRIGATION | 00074614736 |
| SODIUM CHLORIDE IRRIGATION | 00074713806 |
| SODIUM CHLORIDE IRRIGATION | 00074713809 |
| SODIUM CHLORIDE IRRIGATION | 00074713836 |
| SODIUM CHLORIDE IRRIGATION | 00074797205 |
| SODIUM CHLORIDE IRRIGATION | 00074797207 |
| SODIUM CHLORIDE IRRIGATION | 00074797208 |
| SODIUM CHLORIDE IRRIGATION | 00074797507 |
| SODIUM LACTATE 1/6 M INJECTION | 00074798703 |
| SODIUM LACTATE 1/6 M INJECTION | 00074798724 |
| SODIUM LACTATE INJECTION | 00074666402 |
| SODIUM PHOSPHATE INJECTION | 00074739101 |
| SODIUM PHOSPHATE INJECTION | 00074739172 |
| SODIUM PHOSPHATES INJECTION | 00074329505 |
| SODIUM PHOSPHATES INJECTION | 00074329551 |
| SORBITOL MANNITOL IRRIGATION | 00074614406 |
| SORBITOL MANNITOL IRRIGATION | 00074614436 |
| SORBITOL-MANNITOL IRRIGATION | 00074798108 |
| STERILE PENTAMIDINE ISETHIONATE INJECTION | 00074454801 |
| STERILE PENTAMIDINE ISETHIONATE INJECTION | 00074454849 |
| STERILE VANCOMYCIN HYDROCHLORIDE | 00074650901 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| STERILE VANCOMYCIN HYDROCHLORIDE | 00074650949 |
| STERILE VANCOMYCIN HYDROCHLORIDE | 00074653301 |
| STERILE VANCOMYCIN HYDROCHLORIDE | 00074653349 |
| STERILE VANCOMYCIN HYDROCHLORIDE ADD-VANTAGE VIALS | 00074653401 |
| STERILE VANCOMYCIN HYDROCHLORIDE ADD-VANTAGE VIALS | 00074653501 |
| STERILE VANCOMYCIN HYDROCHLORIDE ADD-VANTAGE VIALS | 00074653549 |
| STERILE VANCOMYCIN HYDROCHLORIDE INJECTION | 00074433201 |
| STERILE VANCOMYCIN HYDROCHLORIDE INJECTION | 00074433249 |
| STERILE WATER FOR INJ. | 00074799009 |
| STERILE WATER FOR INJECTION | 00074157810 |
| STERILE WATER FOR INJECTION | 00074488710 |
| STERILE WATER FOR INJECTION | 00074488712 |
| STERILE WATER FOR INJECTION | 00074488720 |
| STERILE WATER FOR INJECTION | 00074488725 |
| STERILE WATER FOR INJECTION | 00074488750 |
| STERILE WATER FOR INJECTION | 00074488755 |
| STERILE WATER FOR INJECTION | 00074488768 |
| STERILE WATER FOR INJECTION | 00074488799 |
| STERILE WATER FOR INJECTION | 00074711807 |
| STERILE WATER FOR IRRIGATION | 00074613902 |
| STERILE WATER FOR IRRIGATION | 00074613903 |
| STERILE WATER FOR IRRIGATION | 00074613922 |
| STERILE WATER FOR IRRIGATION | 00074713906 |
| STERILE WATER FOR IRRIGATION | 00074713909 |
| STERILE WATER FOR IRRIGATION | 00074713936 |
| STERILE WATER FOR IRRIGATION | 00074797305 |
| STERILE WATER FOR IRRIGATION | 00074797307 |
| STERILE WATER FOR IRRIGATION | 00074797308 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| SUFENTANIL CITRATE SOLUTION INJECTION USP | 00074338001 |
| SUFENTANIL CITRATE SOLUTION INJECTION USP | 00074338002 |
| SUFENTANIL CITRATE SOLUTION INJECTION USP | 00074338005 |
| SUFENTANIL CITRATE SOLUTION INJECTION USP | 00074338031 |
| SUFENTANIL CITRATE SOLUTION INJECTION USP | 00074338032 |
| SUFENTANIL CITRATE SOLUTION INJECTION USP | 00074338035 |
| SUFENTANIL CITRATE SOLUTION INJECTION USP | 00074338201 |
| SUFENTANIL CITRATE SOLUTION INJECTION USP | 00074338202 |
| SUFENTANIL CITRATE SOLUTION INJECTION USP | 00074338205 |
| SUFENTANIL CITRATE SOLUTION INJECTION USP | 00074338221 |
| SUFENTANIL CITRATE SOLUTION INJECTION USP | 00074338222 |
| SUFENTANIL CITRATE SOLUTION INJECTION USP | 00074338225 |
| THAM SOLUTION | 00074159304 |
| THEOPHYLLINE IN 5% DEXTROSE INJECTION | 00074766209 |
| THEOPHYLLINE IN 5% DEXTROSE INJECTION | 00074766503 |
| THEOPHYLLINE IN 5% DEXTROSE INJECTION | 00074766509 |
| THEOPHYLLINE IN 5% DEXTROSE INJECTION | 00074766602 |
| THEOPHYLLINE IN 5% DEXTROSE INJECTION | 00074766603 |
| THEOPHYLLINE IN 5% DEXTROSE INJECTION | 00074766662 |
| THEOPHYLLINE IN 5% DEXTROSE INJECTION | 00074766823 |
| THEOPHYLLINE IN 5% DEXTROSE INJECTION | 00074767713 |
| THEOPHYLLINE IN 5% DEXTROSE INJECTION | 00074767723 |
| THEOPHYLLINE IN 5% DEXTROSE INJECTION | 00074770562 |
| THIAMINE HYDROCHLORIDE INJECTION USP | 00074217401 |
| TOBRAMYCIN SULFATE IN 0.9% SODIUM CHLORIDE | 00074347023 |
| TOBRAMYCIN SULFATE IN 0.9% SODIUM CHLORIDE INJECTIO | 00074346913 |
| TOBRAMYCIN SULFATE INJECTION | 00074325403 |
| TOBRAMYCIN SULFATE INJECTION | 00074357701 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| TOBRAMYCIN SULFATE INJECTION | 00074357801 |
| TOBRAMYCIN SULFATE INJECTION | 00074358201 |
| TOBRAMYCIN SULFATE INJECTION | 00074358301 |
| TOBRAMYCIN SULFATE INJECTION | 00074359002 |
| TOBRAMYCIN SULFATE SOLUTION INJECTION | 00074325503 |
| TPN ELECTROLYTES | 00074577901 |
| TPN ELECTROLYTES FOR INJECTION | 00074329606 |
| TPN ELECTROLYTES INJECTION | 00074588101 |
| TUBOCURARINE CHLORIDE INJ. | 00074338603 |
| TUBOCURARINE CHLORIDE INJ. | 00074338604 |
| TUBOCURARINE CHLORIDE INJECTION | 00074806601 |
| TUBOCURARINE CHLORIDE INJECTION | 00074806615 |
| UREAPHIL | 00074159202 |
| UROLOGIC G IRRIGATION | 00074716809 |
| VECURONIUM BROMIDE FOR INJECTION | 00074163201 |
| VECURONIUM BROMIDE FOR INJECTION | 00074163249 |
| VECURONIUM BROMIDE FOR INJECTION | 00074163401 |
| VECURONIUM BROMIDE FOR INJECTION | 00074163449 |
| VERAPAMIL HYDROCHLORIDE INJECTION | 00074114301 |
| VERAPAMIL HYDROCHLORIDE INJECTION | 00074114315 |
| VERAPAMIL HYDROCHLORIDE INJECTION | 00074114401 |
| VERAPAMIL HYDROCHLORIDE INJECTION | 00074114402 |
| VERAPAMIL HYDROCHLORIDE INJECTION | 00074400001 |
| VERAPAMIL HYDROCHLORIDE INJECTION | 00074401101 |
| VERAPAMIL HYDROCHLORIDE SOLUTION INJECTION USP | 00074963305 |
| VITAMIN K1 INJECTION | 00074915701 |
| VITAMIN K1 INJECTION | 00074915801 |
| ZINC FOR INJECTION | 00074452605 |

| ABBOTT'S ADDITIONAL SUBJECT PHARMACEUTICAL PRODUCTS | NDC |
|---|---|
| ZINC INJECTION | 00074409001 |
| ZINC INJECTION | 00074409005 |

# EXHIBIT  3

**EXHIBIT 3**

The table below was prepared from Direct Prices submitted to First Data Bank by Defendant Wyeth for Ativan in 1998 as compared with Ven-A-Care's (provider's) acquisition prices for the pharmaceuticals at that time. **Note:** NDC No's 0570-15 and 0570-13 listed below are for the year 2000.

| DEFENDANT WYETH'S PRICES & SPREAD FOR ATIVAN | | | | | |
|---|---|---|---|---|---|
| Drug | NDC | Wyeth's Reported Direct Price (Medi-Cal Reimburse ment) | VAC's (Provider) Acquisition Price | Provider's Gross Profit or "SPREAD" | Spread as a % of VAC Price |
| Ativan 2mg/ml 10ml vial | 00008-0581-01 | $70.19 | $11.20 | $58.99 | 523% |
| Ativan 2mg/ml 1ml 10s | 00008-0581-02 | $101.40 | $20.08 | $81.32 | 405% |
| Ativan 2mg/ml 1ml 10s | 00008-0581-06 | $101.40 | $20.08 | $81.32 | 405% |
| Ativan 2mg/ml 1ml 25s | 00008-0581-15 | $167.50 | $28.75 | $138.75 | 483% |
| Ativan 2mg/ml 10mls 10s | 00008-0581-13 | $597.00 | $110.00 | $487.00 | 443% |
| Ativan 2mg/ml 1ml 10s | 00008-0581-52 | $101.40 | $20.08 | $81.32 | 405% |
| Ativan 2mg/ml 1ml 10s | 00008-0581-53 | $101.40 | $20.08 | $81.32 | 405% |

1

| DEFENDANT WYETH'S PRICES & SPREAD FOR ATIVAN | | | | | |
|---|---|---|---|---|---|
| Drug | NDC | Wyeth's Reported Direct Price (Medi-Cal Reimbursement) | VAC's (Provider) Acquisition Price | Provider's Gross Profit or "SPREAD" | Spread as a % of VAC Price |
| Ativan 2mg/ml 1ml ea | 00008-0581-04 | $7.88 | $1.40 | $6.48 | 463% |
| Ativan 4mg/ml 1ml 10s | 00008-0570-02 | $101.40 | $31.40 | $70.00 | 223% |
| Ativan 4mg/ml 1ml 10s | 00008-0570-05 | $101.40 | $31.40 | $70.00 | 223% |
| Ativan 4mg/ml 1ml 25s | 00008-0570-15 (Year 2000) | $204.75 | $53.75 | $151.00 | 281% |
| Ativan 4mg/ml 10mls 10s | 00008-0570-13 (Year 2000) | $746.00 | $160.00 | $586.00 | 366% |
| Ativan 4mg/ml 1ml 10s | 00008-0570-50 | $101.40 | $31.40 | $70.00 | 223% |
| Ativan 4mg/ml 1ml 10s | 00008-0570-51 | $101.40 | $31.40 | $70.00 | 223% |
| Ativan 4mg/ml 10ml ea | 00008-0570-01 | $87.70 | $16.00 | $71.70 | 448% |
| Ativan 4mg/ml 1ml ea | 00008-0570-04 | $9.64 | $2.15 | $7.49 | 348% |

2

# EXHIBIT

# "B"

LEXSTAT ca gov 12650

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2003 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE 2003 SUPPLEMENT ***
(2001-2002 SESSION)

GOVERNMENT CODE

TITLE 2. Government of the State of California

DIVISION 3. Executive Department

PART 2. Constitutional Officers

CHAPTER 6. Attorney General

ARTICLE 9. False Claims Actions

***GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION***

Cal Gov Code § 12650 (2003)

§ 12650. Citation of article; Definitions

(a) This article shall be known and may be cited as the False Claims Act.

(b) For purposes of this article:

(1) "Claim" includes any request or demand for money, property, or services made to any employee, officer, or agent of the state or of any political subdivision, or to any contractor, grantee, or other recipient, whether under contract or not, if any portion of the money, property, or services requested or demanded issued from, or was provided by, the state (hereinafter "state funds") or by any political subdivision thereof (hereinafter "political subdivision funds").

(2) "Knowing" and "knowingly" mean that a person, with respect to information, does any of the following:

(A) Has actual knowledge of the information.

(B) Acts in deliberate ignorance of the truth or falsity of the information.

(C) Acts in reckless disregard of the truth or falsity of the information.

Proof of specific intent to defraud is not required.

(3) "Political subdivision" includes any city, city and county, county, tax or assessment district, or other legally authorized local governmental entity with jurisdictional boundaries.

(4) "Prosecuting authority" refers to the county counsel, city attorney, or other local government official charged with investigating, filing, and conducting civil legal proceedings on behalf of, or in the name of, a particular political subdivision.

(5) "Person" includes any natural person, corporation, firm, association, organization, partnership, limited liability company, business, or trust.

HISTORY:   Added Stats 1987 ch 1420 § 1. Amended Stats 1994 ch 1010 § 141 (SB 2053); Stats 1997 ch 300 § 3 (AB 1586), effective August 18, 1997.

NOTES:
AMENDMENTS:
  1994 Amendment:
  Added "limited liability company," in subd (e).
  1997 Amendment:
  (1) Added subd (a); and (2) redesignated former subds (a)-(e) to be subds (b)-(b)(5).

NOTES OF DECISIONS

The trial court erred in granting summary judgment in favor of defendant school district and others in plaintiff teacher's action for wrongful termination under *Gov C § 12653*, plaintiff having complained about inadequate staffing. Section 12653 is part of the False Claims Act, which concerns claims made against the state or any of its political subdivisions for money, property, or services (*Gov C § 12650(b)(1)*). The False Claims Act provides for civil penalties against a person who, among other things, knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval (*Gov C § 12651(a)(1)*). The False Claims Act must be construed broadly so as to give the widest possible coverage and effect to the prohibitions and remedies it provides in *Gov C § 12653*. Contrary to defendant's claim that it is not a person within the meaning of the False Claims Act, *Gov C § 12650(b)(5)* defines "person" as "any natural person, corporation, firm, association, organization . . . business, or trust." The terms "association" and "organization" are broad enough to encompass defendant. Moreover, the definition of "person" must be read in light of the context and purpose of the statute. There is no reason to conclude that the Legislature intended that the protection afforded to the public treasury by the Act be denied merely because the entity raiding the treasury is a governmental entity. *LeVine v Weis (1998, 2nd Dist) 68 Cal App 4th 758, 80 Cal Rptr 2d 439, 764.*

Cal Gov Code § 12650

In an action by a city against a supplier of pipes and other water distribution parts, the trial court abused its discretion in sustaining without leave to amend the supplier's demurrer to causes of action alleging violations of the California False Claims Act (*Gov C § 12650* et seq.), where the complaint alleged in part that representations made in defendant's catalogues regarding compliance with industry standards were false and that the false representations induced the city to purchase parts of inferior durability and higher lead content. These allegations established the materiality of the representations. That the city relied on representations made in the supplier's catalogues did not require a different result since, in producing and disseminating a catalogue, a manufacturer or retailer intended by the representations made therein to induce purchases. *City of Pomona v Superior Court (2001, 2nd Dist) 89 Cal App 4th 793, 107 Cal Rptr 2d 710.*

In an action under the False Claims Act (*Gov C § 12650* et seq.), evidence showing that plaintiff, a teacher at a school for juvenile offenders, had threatened to inform the State that the school was claiming average daily attendance (ADA) funds without providing the expected level of classroom staffing, was sufficient to come within the broad purpose and scope of the Act. This evidence showed plaintiff was threatening to expose more than an internal misallocation of funds. The school's certification of the ADA constituted an actual claim for money based on a representation of fact. *LeVine v Weis (2001, 2nd Dist) 90 Cal App 4th 201, 108 Cal Rptr 2d 562.*

Good cause to dismiss a false claims action (*Gov C § 12650* et seq.) on the motion of an intervening political subdivision could be any reason rationally related to a legitimate government purpose; and the trial court's finding of good cause would be reviewed for abuse of discretion. Thus, in a false claim action arising out of a school district's allegedly improper reimbursement of travel expenses, the trial court did not abuse its discretion in dismissing the false claims causes of action, where it was undisputed that the district received full value for its money. The sole basis for the False Claims Act allegations was that the trips were not preapproved; however, the district knew about them, ratified payment for them, and sent the same individuals on a second trip. However, the trial court erred in also dismissing taxpayer causes of action under *CCP § 526a* for injunctive and declaratory relief. These causes of action were not the proper subjects of a False Claims Act dismissal. *Laraway v Sutro & Co. (2002, 2nd Dist) 96 Cal App 4th 266, 116 Cal Rptr 2d 823.*

LEXSTAT Cal Gov 12651

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2003 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE 2003 SUPPLEMENT ***
(2001-2002 SESSION)

GOVERNMENT CODE

TITLE 2. Government of the State of California

DIVISION 3. Executive Department

PART 2. Constitutional Officers

CHAPTER 6. Attorney General

ARTICLE 9. False Claims Actions

***GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION***

Cal Gov Code § 12651 (2003)

§ 12651. Liability for damages; Costs; Civil penalty; Minimum amount in controversy

(a) Any person who commits any of the following acts shall be liable to the state or to the political subdivision for three times the amount of damages which the state or the political subdivision sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the state or to the political subdivision for the costs of a civil action brought to recover any of those penalties or damages, and may be liable to the state or political subdivision for a civil penalty of up to ten thousand dollars ($ 10,000) for each false claim:

(1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval.

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision.

(3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

(4) Has possession, custody, or control of public property or money used or to be used by the state or by any political subdivision and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt.

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the state or by any political subdivision and knowingly makes or delivers a receipt that falsely represents the property used or to be used.

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property.

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision.

(8) Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

(b) Notwithstanding subdivision (a), the court may assess not less than two times and not more than three times the amount of damages which the state or the political subdivision sustains because of the act of the person described in that subdivision, and no civil penalty, if the court finds all of the following:

(1) The person committing the violation furnished officials of the state or of the political subdivision responsible for investigating false claims violations with all information known to that person about the violation within 30 days after the date on which the person first obtained the information.

(2) The person fully cooperated with any investigation by the state or a political subdivision of the violation.

(3) At the time the person furnished the state or the political subdivision with information about the violation, no criminal prosecution, civil action, or administrative action had commenced with respect to the violation, and the person did not have actual knowledge of the existence of an investigation into the violation.

(c) Liability under this section shall be joint and several for any act committed by two or more persons.

(d) This section does not apply to any controversy involving an amount of less than five hundred dollars ($ 500) in value. For purposes of this subdivision, "controversy" means any one or more false claims submitted by the same person in violation of this article.

(e) This section does not apply to claims, records, or statements made pursuant to Division 3.6 (commencing with Section 810) of Title 1 or to workers' compensation claims filed pursuant to Division 4 (commencing with *Section 3200) of the Labor Code.*

(f) This section does not apply to claims, records, or statements made under the Revenue and Taxation Code.

HISTORY:   Added Stats 1987 ch 1420 § 1.

NOTES:
CROSS REFERENCES:
Criminal penalties for false claims: *Pen C § 72.*

COLLATERAL REFERENCES:
ATTORNEY GENERAL'S OPINIONS:
The statutory provisions relating to the disclosure of false claims actions, communications with the Legislature, and the filing of complaints or claims or the institution of proceedings pertaining to the rights of employment by employees of state and local public entities do not supersede the statutes and rules governing the attorney-client privilege. *84 Ops. Cal. Atty. Gen. 71.*

NOTES OF DECISIONS

A city's cross-complaint under the False Claims Act (FCA) (*Gov. Code, § 12650* et seq.), which it filed in response to a public contractor's claim for contract damages, was not barred by the *Civ. Code, § 47,* subd. (b), litigation privilege. Although the contract claim followed the contractor's presentation to the city of its claim under the Tort Claims Act (TCA) for material breaches of contract, and after the TCA claim was rejected, the contractor initiated its breach of contract action for the alleged damages detailed in the contract claim, the filing of the contract claim was also called for under the contract, and it had a life of its own wholly apart from any judicial action. Moreover, under the FCA, even if the contractor had not sued the city, upon suspecting falsities in the claim, the city would have been obligated to undergo further investigation, with discretion to file its own suit. Further, even though *Gov. Code, § 12651,* subd. (e), excludes from liability claims made under the TCA, the contractor had also filed a separate contract claim after it filed its claim under the TCA. Thus, while the TCA claim was an independent item, with statutory requirements governing its contents (*Gov. Code, § 910*), the contract claim did not resemble the claim described in *Gov. Code, § 910,* and was required pursuant to both the terms of the contract and the course of dealing between the parties. While the contract claim ultimately served a litigation purpose as well, it clearly was not a claim, record, or statement made pursuant to the TCA. *Stacy & Witbeck, Inc. v City and County of San Francisco (1996, 1st Dist) 47 Cal App 4th 1, 54 Cal Rptr 2d 530.*

In an action by the Attorney General against a clinical laboratory charging that defendant violated the False Claims Act (*Gov C § 12651(b)*, (e)) by "unbundling" Medi-Cal billing so that certain tests that should have been billed together were billed separately, the trial court did not err in finding that such conduct did not violate the Act. The trial court properly found that defendant adopted the billing practice at issue on instruction of a Medi-Cal representative and did not knowingly make false claims,

Cal Gov Code § 12651

the appellate court rejecting the contention that lack of intent is not a defense to a lawsuit under the Act. Nor was the practice unfair to defendant's competitors in that defendant received greater compensation for unbundled billing than it did under the alternative method. Manuals and regulations governing Medi-Cal billing are technical and complex, and are subject to different interpretations, even by Medi-Cal representatives, and there was no evidence about billing practices of defendant's competitors. *People v Duz-Mor Diagnostic Laboratory, Inc. (1998, 2nd Dist) 68 Cal App 4th 654, 80 Cal Rptr 2d 419, 673.*

LEXSTAT Cal Gov Code § 12652

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2003 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE 2003 SUPPLEMENT ***
(2001-2002 SESSION)

GOVERNMENT CODE

TITLE 2. Government of the State of California

DIVISION 3. Executive Department

PART 2. Constitutional Officers

CHAPTER 6. Attorney General

ARTICLE 9. False Claims Actions

***GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION***

Cal Gov Code § 12652 (2003)

§ 12652.  Investigations; Civil actions

(a) (1) The Attorney General shall diligently investigate violations under Section 12651 involving state funds. If the Attorney General finds that a person has violated or is violating Section 12651, the Attorney General may bring a civil action under this section against that person.

(2) If the Attorney General brings a civil action under this subdivision on a claim involving political subdivision funds as well as state funds, the Attorney General shall, on the same date that the complaint is filed in this action, serve by mail with "return receiptrequested " a copy of the complaint on the appropriate prosecuting authority.

(3) The prosecuting authority shall have the right to intervene in an action brought by the Attorney General under this subdivision within 60 days after receipt of the complaint pursuant to paragraph (2). The court may permit intervention thereafter upon a showing that all of the requirements of *Section 387 of the Code of Civil Procedure* have been met.

(b) (1) The prosecuting authority of a political subdivision shall diligently investigate violations under Section 12651 involving political subdivision funds. If the prosecuting authority finds that a person has violated or is violating Section 12651, the prosecuting authority may bring a civil action under this section against that person.

(2) If the prosecuting authority brings a civil action under this section on a claim involving state funds as well as political subdivision funds, the prosecuting authority shall, on the same date that the complaint is filed in this action, serve a copy of the complaint on the Attorney General.

(3) Within 60 days after receiving the complaint pursuant to paragraph (2), the Attorney General shall do either of the following:

(A) Notify the court that it intends to proceed with the action, in which case the Attorney General shall assume primary responsibility for conducting the action and the prosecuting authority shall have the right to continue as a party.

(B) Notify the court that it declines to proceed with the action, in which case the prosecuting authority shall have the right to conduct the action.

(c) (1) A person may bring a civil action for a violation of this article for the person and either for the State of California in the name of the state, if any state funds are involved, or for a political subdivision in the name of the political subdivision, if political subdivision funds are exclusively involved. The person bringing the action shall be referred to as the qui tam plaintiff. Once filed, the action may be dismissed only with the written consent of the court, taking into account the best interests of the parties involved and the public purposes behind this act.

(2) A complaint filed by a private person under this subdivision shall be filed in superior court in camera and may remain under seal for up to 60 days. No service shall be made on the defendant until after the complaint is unsealed.

(3) On the same day as the complaint is filed pursuant to paragraph (2), the qui tam plaintiff shall serve by mail with "return receipt requested" the Attorney General with a copy of the complaint and a written disclosure of substantially all material evidence and information the person possesses.

(4) Within 60 days after receiving a complaint and written disclosure of material evidence and information alleging violations that involve state funds but not political subdivision funds, the Attorney General may elect to intervene and proceed with the action.

(5) The Attorney General may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal pursuant to paragraph (2). The motion may be supported by affidavits or other submissions in camera.

(6) Before the expiration of the 60-day period or any extensions obtained under paragraph (5), the Attorney General shall do either of the following:

Cal Gov Code § 12652

(A) Notify the court that it intends to proceed with the action, in which case the action shall be conducted by the Attorney General and the seal shall be lifted.

(B) Notify the court that it declines to proceed with the action, in which case the seal shall be lifted and the qui tam plaintiff shall have the right to conduct the action.

(7) (A) Within 15 days after receiving a complaint alleging violations that exclusively involve political subdivision funds, the Attorney General shall forward copies of the complaint and written disclosure of material evidence and information to the appropriate prosecuting authority for disposition, and shall notify the qui tam plaintiff of the transfer.

(B) Within 45 days after the Attorney General forwards the complaint and written disclosure pursuant to subparagraph (A), the prosecuting authority may elect to intervene and proceed with the action.

(C) The prosecuting authority may, for good cause shown, move for extensions of the time during which the complaint remains under seal. The motion may be supported by affidavits or other submissions in camera.

(D) Before the expiration of the 45-day period or any extensions obtained under subparagraph (C), the prosecuting authority shall do either of the following:

(i) Notify the court that it intends to proceed with the action, in which case the action shall be conducted by the prosecuting authority and the seal shall be lifted.

(ii) Notify the court that it declines to proceed with the action, in which case the seal shall be lifted and the qui tam plaintiff shall have the right to conduct the action.

(8) (A) Within 15 days after receiving a complaint alleging violations that involve both state and political subdivision funds, the Attorney General shall forward copies of the complaint and written disclosure to the appropriate prosecuting authority, and shall coordinate its review and investigation with those of the prosecuting authority.

(B) Within 60 days after receiving a complaint and written disclosure of material evidence and information alleging violations that involve both state and political subdivision funds, the Attorney General or the prosecuting authority, or both, may elect to intervene and proceed with the action.

(C) The Attorney General or the prosecuting authority, or both, may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). The motion may be supported by affidavits or other submissions in camera.

(D) Before the expiration of the 60-day period or any extensions obtained under subparagraph (C), the Attorney General shall do one of the following:

(i) Notify the court that it intends to proceed with the action, in which case the action shall be conducted by the Attorney General and the seal shall be lifted.

(ii) Notify the court that it declines to proceed with the action but that the prosecuting authority of the political subdivision involved intends to proceed with the action, in which case the seal shall be lifted and the action shall be conducted by the prosecuting authority.

(iii) Notify the court that both it and the prosecuting authority decline to proceed with the action, in which case the seal shall be lifted and the qui tam plaintiff shall have the right to conduct the action.

(E) If the Attorney General proceeds with the action pursuant to clause (i) of subparagraph (D), the prosecuting authority of the political subdivision shall be permitted to intervene in the action within 60 days after the Attorney General notifies the court of its intentions. The court may authorize intervention thereafter upon a showing that all the requirements of *Section 387 of the Code of Civil Procedure* have been met.

(9) The defendant shall not be required to respond to any complaint filed under this section until 30 days after the complaint is unsealed and served upon the defendant pursuant to *Section 583.210 of the Code of Civil Procedure.*

(10) When a person brings an action under this subdivision, no other person may bring a related action based on the facts underlying the pending action.

(d) (1) No court shall have jurisdiction over an action brought under subdivision (c) against a Member of the State Senate or Assembly, a member of the state judiciary, an elected official in the executive branch of the state, or a member of the governing body of any political subdivision if the action is based on evidence or information known to the state or political subdivision when the action was brought.

(2) A person may not bring an action under subdivision (c) that is based upon allegations or transactions that are the subject of a civil suit or an administrative civil money penalty proceeding in which the state or political subdivision is already a party.

(3) (A) No court shall have jurisdiction over an action under this article based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in an investigation, report, hearing, or audit conducted by or at the request of the Senate, Assembly, auditor, or governing body of a political subdivision, or by the news media, unless the action is brought by the Attorney General or the prosecuting authority of a political subdivision, or the person bringing the action is an original source of the information.

(B) For purposes of subparagraph (A), "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based, who voluntarily provided the information to the state or political subdivision before filing an action based on that information, and whose information provided the basis or catalyst for the investigation, hearing, audit, or report that led to the public disclosure as described in subparagraph (A).

Cal Gov Code § 12652

(4) No court shall have jurisdiction over an action brought under subdivision (c) based upon information discovered by a present or former employee of the state or a political subdivision during the course of his or her employment unless that employee first, in good faith, exhausted existing internal procedures for reporting and seeking recovery of the falsely claimed sums through official channels and unless the state or political subdivision failed to act on the information provided within a reasonable period of time.

(e) (1) If the state or political subdivision proceeds with the action, it shall have the primary responsibility for prosecuting the action. The qui tam plaintiff shall have the right to continue as a full party to the action.

(2) (A) The state or political subdivision may seek to dismiss the action for good cause notwithstanding the objections of the qui tam plaintiff if the qui tam plaintiff has been notified by the state or political subdivision of the filing of the motion and the court has provided the qui tam plaintiff with an opportunity to oppose the motion and present evidence at a hearing.

(B) The state or political subdivision may settle the action with the defendant notwithstanding the objections of the qui tam plaintiff if the court determines, after a hearing providing the qui tam plaintiff an opportunity to present evidence, that the proposed settlement is fair, adequate, and reasonable under all of the circumstances.

(f) (1) If the state or political subdivision elects not to proceed, the qui tam plaintiff shall have the same right to conduct the action as the Attorney General or prosecuting authority would have had if it had chosen to proceed under subdivision (c). If the state or political subdivision so requests, and at its expense, the state or political subdivision shall be served with copies of all pleadings filed in the action and supplied with copies of all deposition transcripts.

(2) (A) Upon timely application, the court shall permit the state or political subdivision to intervene in an action with which it had initially declined to proceed if the interest of the state or political subdivision in recovery of the property or funds involved is not being adequately represented by the qui tam plaintiff.

(B) If the state or political subdivision is allowed to intervene under paragraph (A), the qui tam plaintiff shall retain principal responsibility for the action and the recovery of the parties shall be determined as if the state or political subdivision had elected not to proceed.

(g) (1) (A) If the Attorney General initiates an action pursuant to subdivision (a) or assumes control of an action initiated by a prosecuting authority pursuant to subparagraph (A) of paragraph (3) of subdivision (b), the office of the Attorney General shall receive a fixed 33 percent of the proceeds of the action or settlement of the claim, which shall be used to support its ongoing investigation and prosecution of false claims.

(B) If a prosecuting authority initiates and conducts an action pursuant to subdivision (b), the office of the prosecuting authority shall receive a fixed 33 percent of the proceeds of the action or settlement of the claim, which shall be used to support its ongoing investigation and prosecution of false claims.

(C) If a prosecuting authority intervenes in an action initiated by the Attorney General pursuant to paragraph (3) of subdivision (a) or remains a party to an action assumed by the Attorney General pursuant to subparagraph (A) of paragraph (3) of subdivision (b), the court may award the office of the prosecuting authority a portion of the Attorney General's fixed 33 percent of the recovery under subparagraph (A), taking into account the prosecuting authority's role in investigating and conducting the action.

(2) If the state or political subdivision proceeds with an action brought by a qui tam plaintiff under subdivision (c), the qui tam plaintiff shall, subject to paragraphs (4) and (5), receive at least 15 percent but not more than 33 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the qui tam plaintiff substantially contributed to the prosecution of the action. When it conducts the action, the Attorney General's office or the office of the prosecuting authority of the political subdivision shall receive a fixed 33 percent of the proceeds of the action or settlement of the claim, which shall be used to support its ongoing investigation and prosecution of false claims made against the state or political subdivision. When both the Attorney General and a prosecuting authority are involved in a qui tam action pursuant to subparagraph (C) of paragraph (6) of subdivision (c), the court at its discretion may award the prosecuting authority a portion of the Attorney General's fixed 33 percent of the recovery, taking into account the prosecuting authority's contribution to investigating and conducting the action.

(3) If the state or political subdivision does not proceed with an action under subdivision (c), the qui tam plaintiff shall, subject to paragraphs (4) and (5), receive an amount that the court decides is reasonable for collecting the civil penalty and damages on behalf of the government. The amount shall be not less than 25 percent and not more than 50 percent of the proceeds of the action or settlement and shall be paid out of these proceeds.

(4) If the action is one provided for under paragraph (4) of subdivision (d), the present or former employee of the state or political subdivision is not entitled to any minimum guaranteed recovery from the proceeds. The court, however, may award the qui tam plaintiff those sums from the proceeds as it considers appropriate, but in no case more than 33 percent of the proceeds if the state or political subdivision goes forth with the action or 50 percent if the state or political subdivision declines to go forth, taking into account the significance of the information, the role of the qui tam plaintiff in advancing the case to litigation, and the scope of, and response to, the employee's attempts to report and gain recovery of the falsely claimed funds through official channels.

(5) If the action is one that the court finds to be based primarily on information from a present or former employee who actively participated in the fraudulent activity, the employee is not entitled to any minimum guaranteed recovery from the proceeds. The court, however, may award the qui tam plaintiff any sums from the proceeds that it considers appropriate, but in no case more than 33 percent of the proceeds if the state or political subdivision goes forth with the action or 50 percent if the state or

political subdivision declines to go forth, taking into account the significance of the information, the role of the qui tam plaintiff in advancing the case to litigation, the scope of the present or past employee's involvement in the fraudulent activity, the employee's attempts to avoid or resist the activity, and all other circumstances surrounding the activity.

(6) The portion of the recovery not distributed pursuant to paragraphs (1) to (5), inclusive, shall revert to the state if the underlying false claims involved state funds exclusively and to the political subdivision if the underlying false claims involved political subdivision funds exclusively. If the violation involved both state and political subdivision funds, the court shall make an apportionment between the state and political subdivision based on their relative share of the funds falsely claimed.

(7) For purposes of this section, "proceeds" include civil penalties as well as double or treble damages as provided in Section 12651.

(8) If the state, political subdivision, or the qui tam plaintiff prevails in or settles any action under subdivision (c), the qui tam plaintiff shall receive an amount for reasonable expenses that the court finds to have been necessarily incurred, plus reasonable costs and attorney's fees. All expenses, costs, and fees shall be awarded against the defendant and under no circumstances shall they be the responsibility of the state or political subdivision.

(9) If the state, a political subdivision, or the qui tam plaintiff proceeds with the action, the court may award to the defendant its reasonable attorney's fees and expenses against the party that proceeded with the action if the defendant prevails in the action and the court finds that the claim was clearly frivolous, clearly vexatious, or brought solely for purposes of harassment.

(h) The court may stay an act of discovery of the person initiating the action for a period of not more than 60 days if the Attorney General or local prosecuting authority show that the act of discovery would interfere with an investigation or a prosecution of a criminal or civil matter arising out of the same facts, regardless of whether the Attorney General or local prosecuting authority proceeds with the action. This showing shall be conducted in camera. The court may extend the 60-day period upon a further showing in camera that the Attorney General or local prosecuting authority has pursued the criminal or civil investigation or proceedings with reasonable diligence and any proposed discovery in the civil action will interfere with the ongoing criminal or civil investigation or proceedings.

(i) Upon a showing by the Attorney General or local prosecuting authority that unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the Attorney General's or local prosecuting authority's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court may, in its discretion, impose limitations on the person's participation, including the following:

(1) Limiting the number of witnesses the person may call.

(2) Limiting the length of the testimony of the witnesses.

(3) Limiting the person's cross-examination of witnesses.

(4) Otherwise limiting the participation by the person in the litigation.

(j) The False Claims Act Fund is hereby created in the State Treasury. Proceeds from the action or settlement of the claim by the Attorney General pursuant to this article shall be deposited into this fund. Moneys in this fund, upon appropriation by the Legislature, shall be used by the Attorney General to support the ongoing investigation and prosecution of false claims in furtherance of this article.

HISTORY:   Added Stats 1987 ch 1420 § 1. Amended Stats 1996 ch 700 § 1 (AB 3257); Stats 1997 ch 300 § 4 (AB 1586), effective August 18, 1997.
      Amended Stats 1998 ch 154 § 1 (AB 2046); Stats 1999 ch 83 § 70 (SB 966).

NOTES:
AMENDMENTS:
    1996 Amendment:
    In addition to making technical changes, (1) substituted "proceed with" for "take over" after "if declines to" in subd (b)(3)(B); (2) substituted subds (c)(4)-(c)(8) for former subds (c)(4)-(c)(8) which read: "(4) Within 60 days after receiving a complaint alleging violations which involve state funds but not political subdivision funds, the Attorney General shall do either of the following:
    "(A) Notify the court that it intends to proceed with the action, in which case the seal shall be lifted.
    "(B) Notify the court that it declines to take over the action, in which case the seal shall be lifted and the qui tam plaintiff shall have the right to conduct the action.
    "(5) (A) Within 15 days after receiving a complaint alleging violations which exclusively involve political subdivision funds, the Attorney General shall forward the complaint and written disclosure to the appropriate prosecuting authority for disposition and shall notify the qui tam plaintiff of the transfer.
    "(B) Within 45 days after the Attorney General forwards the complaint and written disclosure pursuant to subparagraph (A), the prosecuting authority shall do either of the following:
    "(i) Notify the court that it intends to proceed with the action, in which case the seal shall be lifted.
    "(ii) Notify the court that it declines to take over the action, in which case the seal shall be lifted and the qui tam plaintiff shall have the right to conduct the action.
    "(6) (A) Within 15 days after receiving a complaint alleging violations which involve both state and political subdivision funds, the Attorney General shall forward copies of the complaint and written disclosure to the appropriate prosecuting authority, and shall coordinate its review and investigation with those of the prosecuting authority.
    "(B) Within 60 days after receiving a complaint alleging violations which involve both state and political subdivision funds, the Attorney General shall do either of the following:
    "(i) Notify the court that it intends to proceed with the action, in which case the seal shall be lifted.
    "(ii) Notify the court that it declines to take over the action but that the prosecuting authority of the political subdivision involved intends to proceed with the action, in which case the seal shall be lifted and the action shall be conducted by the prosecuting authority.
    "(iii) Notify the court that both it and the prosecuting authority decline to take over the action, in which case the seal shall be lifted and the qui tam plaintiff shall have the right to conduct the action.

"(C) If the Attorney General proceeds with the action pursuant to clause (i) of subparagraph (B), the political subdivision shall be permitted to intervene in the action within 60 days after the Attorney General notifies the court of its intentions. The court may authorize intervention thereafter upon a showing that all the requirements of *Section 387 of the Code of Civil Procedure* have been met.

"(7) Upon a showing of good cause and reasonable diligence in its investigation, the Attorney General or the prosecuting authority of a political subdivision may move the court for extensions of the time during which the complaint remains under seal, but in no event may the complaint remain under seal for longer than 90 days.

"(8) When a person brings an action under this subdivision, no other person may bring a related action based on the facts underlying the pending action."; and (3) added subds (c)(9) and (c)(10).

1997 Amendment:

In addition to making technical changes, added subd (j).

1998 Amendment:

Amended subd (g)(9) by (1) substituting ", a" for "or" after "If the state"; (2) substituting ", or" for "does not proceed with the action and" after "political subdivision"; (3) substituting "proceeds with" for "conducts"; (4) adding "against the party that proceeded with the action"; and (5) deleting "of the qui tam plaintiff" after "that the claim".

1999 Amendment:

(1) Substituted "requested" for "request" after "return receipt" in subd (a)(2); (2) amended subd (d) by (a) substituting "Member" for "member" in subd (d)(1); (b) substituting "A person may not" for "In no event may a person" in subd (d)(2); (c) substituting "by" for "from" after "political subdivision, or" in subd (d)(3)(A); (d) substituting "subdivision (c)" for "subsection (c)" after "brought under" in subd (d)(4); and (e) deleting the comma after "or her employment" in subd (d)(4); (3) substituted "If" for "Where" at the beginning of subds (g)(4) and (g)(5); (4) substituted "is not" for "shall not be" after "or political subdivision" in the first sentence of subd (g)(4) and after "the employee" in the first sentence of subd (g)(5); (5) substituted "attorney's" for "attorneys' " after "reasonable cost" in subd (g)(8) and after "its reasonable" in subd (g)(9); and (6) substituted "prosecuting authority's" for "prosecuting's authority" in the introductory clause of subd (i).

CROSS REFERENCES:

Criminal penalties for false claims: *Pen C § 72.*

## NOTES OF DECISIONS

The provision of the False Claims Act prohibiting the bringing of "a related action based on the facts underlying the pending action" (*Gov C § 12652(c)(10)*) does not preclude a subsequent action for alleged violations of the unfair competition law (*B & P C § 17200* et seq.). In light of the nonexclusivity provisions of *Gov C § 12655*, the bar on "related actions" under § 12652(c)(10) applies only to subsequent qui tam actions filed under the False Claims Act. *Rothschild v Tyco Internat. (US), Inc. (2000, 4th Dist) 83 Cal App 4th 488, 99 Cal Rptr 2d 721.*

In an action under the False Claims Act initiated by a private party in which the Attorney General intervened, "good cause" for dismissal (*Gov C § 12652(e)(2)(A)*) existed where the Attorney General established the cause of action was without merit. Further, the submission of a claim for payment on a contract allegedly entered into in violation of state contracting laws did not contravene the Act where

Cal Gov Code § 12652

the state was fully aware of the facts surrounding the claim and approved it. *American Contract Services v Allied Mold & Die, Inc. (2001, 3rd Dist) 94 Cal App 4th 854, 114 Cal Rptr 2d 773.*

LEXSTAT Cal Gov Code § 12653

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2003 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE 2003 SUPPLEMENT ***
(2001-2002 SESSION)

GOVERNMENT CODE

TITLE 2. Government of the State of California

DIVISION 3. Executive Department

PART 2. Constitutional Officers

CHAPTER 6. Attorney General

ARTICLE 9. False Claims Actions

***GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION***

Cal Gov Code § 12653 (2003)

§ 12653.  Prohibited actions by employers; Remedies

(a) No employer shall make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency or from acting in furtherance of a false claims action, including investigating, initiating, testifying, or assisting in an action filed or to be filed under Section 12652.

(b) No employer shall discharge, demote, suspend, threaten, harass, deny promotion to, or in any other manner discriminate against, an employee in the terms and conditions of employment because of lawful acts done by the employee on behalf of the employee or others in disclosing information to a government or law enforcement agency or in furthering a false claims action, including investigation for, initiation of, testimony for, or assistance in, an action filed or to be filed under Section 12652.

(c) An employer who violates subdivision (b) shall be liable for all relief necessary to make the employee whole, including reinstatement with the same seniority status that the employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, compensation for any special damage sustained as a result of the discrimination, and, where appropriate,

punitive damages. In addition, the defendant shall be required to pay litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate superior court of the state for the relief provided in this subdivision.

(d) An employee who is discharged, demoted, suspended, harassed, denied promotion, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of participation in conduct which directly or indirectly resulted in a false claim being submitted to the state or a political subdivision shall be entitled to the remedies under subdivision (c) if, and only if, both of the following occur:

(1) The employee voluntarily disclosed information to a government or law enforcement agency or acted in furtherance of a false claims action, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed.

(2) The employee had been harassed, threatened with termination or demotion, or otherwise coerced by the employer or its management into engaging in the fraudulent activity in the first place.

HISTORY:    Added Stats 1987 ch 1420 § 1.

## NOTES OF DECISIONS

In an action against a public transit district by plaintiffs alleging they were terminated as employees hired by the district to investigate fraud, waste, and corruption, and that their terminations were in retaliation for reports made by them of suspected forgery, fraud, mismanagement, and an official cover-up of such acts in connection with the certification of a minority contractor, the trial court properly determined the action involved a "false claim" within the meaning of *Gov. Code, § 12653*. A claim is defined to include any request for "money, property, or services" from the state or any political subdivision. Plaintiffs alleged the contractor provided false documentation to the district to justify its claimed status as a minority contractor, entitling it to be considered for a special "set aside" contract, which, if received, would doubtless constitute property received from a state or a political subdivision. As a statute obviously designed to prevent fraud on the public treasury, § 12653 should be given the broadest possible construction consistent with that purpose. *Southern Cal. Rapid Transit Dist. v Superior Court (1994, 2nd Dist) 30 Cal App 4th 713, 36 Cal Rptr 2d 665* (disapp on other grnds by *Caldwell v Montoya, 10 Cal 4th 972, 42 Cal Rptr 2d 842, 897 P2d 1320).

The trial court erred in granting summary judgment in favor of defendant school district and others in plaintiff teacher's action for wrongful termination under *Gov C § 12653*, plaintiff having complained about inadequate staffing. Section 12653 is part of the False Claims Act, which concerns claims made against the state or any of its political subdivisions for money, property, or services (*Gov C § 12650(b)(1)*). The False Claims Act provides for civil penalties against a person who, among other things, knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval (*Gov C § 12651(a)(1)*). The False Claims Act must be construed broadly so as to give the widest possible coverage and effect to the prohibitions and remedies it provides in *Gov C § 12653*. Contrary to defendant's claim that it is not a person within the meaning of the False Claims Act, *Gov C § 12650(b)(5)* defines "person" as "any

Cal Gov Code § 12653

natural person, corporation, firm, association, organization . . . business, or trust." The terms "association" and "organization" are broad enough to encompass defendant. Moreover, the definition of "person" must be read in light of the context and purpose of the statute. There is no reason to conclude that the Legislature intended that the protection afforded to the public treasury by the Act be denied merely because the entity raiding the treasury is a governmental entity. *LeVine v Weis (1998, 2nd Dist) 68 Cal App 4th 758, 80 Cal Rptr 2d 439, 764.*

California's False Claims Act does not provide protection from retaliation for federal whistleblowers. Defendant did not violate *Gov C § 12653(b)* by retaliating against plaintiff for filing two cases under the Federal False Claims Act *(31 USCS § § 3729* et seq.) alleging defendant overbilled the federal government. The court granted a motion to dismiss the cause of action in question. *Hoefer v Fluor Daniel, Inc. (1999, CD Cal) 50 F Supp 2d 975.*

California's False Claims Act does not provide protection from retaliation for federal whistleblowers. *Hoefer v Fluor Daniel, Inc. (2000, CD Cal) 92 F. Supp. 2d 1055; 2000 U.S. Dist. LEXIS 4849.*

The False Claims Act imposes liability on the employer, but not on individual supervisors acting for the employer. By its terms, *Gov C § 12653(c)* imposes liability only on the employer. If the Legislature had intended to impose liability on individuals or entities other than the employer, it would have said so. *LeVine v Weis (2001, 2nd Dist) 90 Cal App 4th 201, 108 Cal Rptr 2d 562.*

Cal Gov Code § 12654

LEXSTAT Cal Gov Code § 12654

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2003 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE 2003 SUPPLEMENT ***
(2001-2002 SESSION)

GOVERNMENT CODE

TITLE 2. Government of the State of California

DIVISION 3. Executive Department

PART 2. Constitutional Officers

CHAPTER 6. Attorney General

ARTICLE 9. False Claims Actions

***GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION***

Cal Gov Code § 12654 (2003)

§ 12654. Limitations period; Activity prior to effective date; Burden of proof; Estoppel of defendant by guilty verdict

(a) A civil action under Section 12652 may not be filed more than three years after the date of discovery by the official of the state or political subdivision charged with responsibility to act in the circumstances or, in any event, no more than 10 years after the date on which the violation of Section 12651 is committed.

(b) A civil action under Section 12652 may be brought for activity prior to January 1, 1988, if the limitations period set in subdivision (a) has not lapsed.

(c) In any action brought under Section 12652, the state, the political subdivision, or the qui tam plaintiff shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence.

(d) Notwithstanding any other provision of law, a guilty verdict rendered in a criminal proceeding charging false statements or fraud, whether upon a verdict after trial or upon a plea of guilty or nolo

Cal Gov Code § 12654

contendere, except for a plea of nolo contendere made prior to January 1, 1988, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subdivision (a), (b), or (c) of Section 12652.

(e) Subdivision (b) of *Section 47 of the Civil Code* shall not be applicable to any claim subject to this article.

HISTORY:    Added Stats 1987 ch 1420 § 1. Amended Stats 1996 ch 1051 § 1 (AB 2678).

NOTES:
AMENDMENTS:
   1996 Amendment:
   (1) Substituted "January 1, 1988" for "the effective date of this article" in subd (b); and (2) added subd (e).

### NOTES OF DECISIONS

Under *Gov C § 12654*, providing in part that an action under the False Claims Act must be commenced no more than three years "after the date of discovery," it was appropriate to ascribe the same meaning to the term "discovery" in the context of § 12654(a), as was ascribed to that term in the context of an action based on common law fraud and mistake under *CCP § 338*, under which the limitations period had long been interpreted to commence upon the discovery by the aggrieved party of the fraud or facts that would lead a reasonably prudent person to suspect fraud. As with fraud claims, this interpretation balanced the policy of avoiding stale lawsuits with the policy of providing a reasonable time for a plaintiff to discover a false claim. Accordingly, the limitations period under § 12654(a) commenced when "the official . . . charged with responsibility to act in the circumstances" either knew of the false claim or knew of facts which would lead a reasonably prudent person to suspect it. *Debro v Los Angeles Raiders (2001, 1st Dist) 92 Cal App 4th 940, 112 Cal Rptr 2d 329.*

LEXSTAT Cal Gov Code § 12655

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2003 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE 2003 SUPPLEMENT ***
(2001-2002 SESSION)

GOVERNMENT CODE

TITLE 2. Government of the State of California

DIVISION 3. Executive Department

PART 2. Constitutional Officers

CHAPTER 6. Attorney General

ARTICLE 9. False Claims Actions

***GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION***

Cal Gov Code § 12655 (2003)

§ 12655. Other remedies; Severability

(a) The provisions of this article are not exclusive, and the remedies provided for in this article shall
be in addition to any other remedies provided for in any other law or available under common law.

(b) If any provision of this article or the application thereof to any person or circumstance is held to
be unconstitutional, the remainder of the article and the application of the provision to other persons
or circumstances shall not be affected thereby.

(c) This article shall be liberally construed and applied to promote the public interest.

HISTORY:    Added Stats 1987 ch 1420 § 1.

NOTES OF DECISIONS

The provision of the False Claims Act prohibiting the bringing of "a related action based on the facts
underlying the pending action" (*Gov C § 12652(c)(10)*) does not preclude a subsequent action for
alleged violations of the unfair competition law (*B & P C § 17200* et seq.).    In light of the

nonexclusivity provisions of *Gov C § 12655*, the bar on "related actions" under § 12652(c)(10) applies only to subsequent qui tam actions filed under the False Claims Act. *Rothschild v Tyco Internat. (US), Inc. (2000, 4th Dist) 83 Cal App 4th 488, 99 Cal Rptr 2d 721.*

# EXHIBIT

# "C"

**ORIGINAL FILED**

MAR 2 5 2003

LOS ANGELES
SUPERIOR COURT

## Superior Court of the State of California

### For the County of Los Angeles

| | |
|---|---|
| The State of California ex rel. Ven-A Care of the Florida Keys, Inc, | Case No.: BC287198 A |
| | Assigned: Hon. Peter D. Lichtman |
| Plaintiff, | Court's Ruling re: Defendants' Motions to Dismiss For Failure To Serve Defendants Within Three Years of Commencement of the Action |
| vs. | |
| Abbott Laboratories, Inc. et al., | Hearing Held: March 25, 2003 |
| Defendants | Submitted: March 25, 2003 |

On March 25, 2003, this Court heard the arguments of counsel with respect to Defendants Abbott Laboratories, Inc.'s; Wyeth Inc. 's and Wyeth Pharmaceuticals Inc.'s Motions to Dismiss For Failure To Serve Defendants Within Three Years of Commencement of the Action. Having read and considered all moving and opposing points and authorities (inclusive of the replies), this Court now proceeds with its ruling.

### Court's Ruling And Analysis

By way of this motion the defendants seek dismissal of the instant qui tam action on the grounds that *CCP § 583.210 (a)* mandates dismissal where service of the action has not occurred within the three year time period set forth in the statute.

1   While seemingly simplistic, this Court does not share defendants' view that the
2   analysis involved is quite so facile.

4   The defendants' approach to the instant request for dismissal is as follows:

6   **The original complaint was filed against defendants on July 28, 1998. The**
7   **defendants were not served until January 2003, four and ½ years later.**

9   Accordingly, the defendants argue, *"If service is not made within the time*
10  *prescribed in this article . . . .the action shall be dismissed by the court on its*
11  *own motion or on motion of any person interested in the action . . .."* CCP §
12  *583.250(a)(2).* Moreover, *"the action shall not be further prosecuted and no*
13  *further proceedings shall be held in the action." CCP § 583.250(a)(1).*

15  This Court respectfully disagrees with not only the analytical approach taken by
16  the defendants but also the conclusion reached. To adopt the analysis proffered by
17  the defendants would be to ignore the intent of the statutory scheme behind the
18  prosecution of a qui tam action. The delay attributed to the State in this action is the
19  direct result of strict adherence to the safeguards afforded under the very statute the
20  defendants now assert mandates dismissal. To rule as defendants have requested
21  would require this Court to reach an illogical and unsupported conclusion.

23  Where a qui tam plaintiff initiates the lawsuit, the complaint remains under seal
24  while the Attorney General conducts an investigation to determine whether to
25  intervene. *Govt. Code § 12652(c)(2).* That section provides for the action to remain
26  under seal for up to 60 days in order to permit intervention by the Attorney General.
27  Govt. Code § 12652 (c)(4). This initial 60-day period *may be extended through*
28  *court approval based on a showing of good cause for the extension.* *Govt.*

1 *Code § 12652 (c)(5).* The time required will depend on the complexity of the matters
2 presented and in some instances the cooperation and conduct of the defendants
3 during the investigative phase. ***The qui tam complaint remains under seal during***
4 ***the period of any court approved extensions, (Govt. Code § 12652(c)(5)) and is***
5 ***not permitted to be served on defendants while it is under seal. Govt. Code §***
6 ***12652(c)(2).***
7
8     Here, defendants want the benefit of the statutorily mandated seal by not having
9 their name connected to a false claims action through the vehicle of a public record. In
10 fact, the statutory scheme set up for the prosecution of such actions is designed to
11 protect the named party from economic harm through bad or inappropriate publicity
12 based on mere allegations contained in a complaint. The Attorney General's office is
13 tasked with the responsibility of investigating and scrutinizing allegations of such a
14 volatile nature before deciding to intervene. During this time period the defendants'
15 identity is kept under seal and the action is not to be served. These statutory
16 safeguards are designed to protect the identity of the named defendants and at the
17 same time not embroil the named defendants in an action that would require the
18 expenditure of time and money until intervention, based on an appropriate
19 investigation, has occurred.
20
21     The moving defendants are not complaining about the safeguards of the
22 statutory scheme rather they are complaining that the investigation took too long and
23 thereby runs afoul of the three-year mandate upon which service is to be
24 consummated. Relying on ***Govt. Code § 12652(c)(9)***, defendants argue that the false
25 claims act requires that the defendants be served within 3 years of the filing of the
26 complaint under seal. Subdivision (c)(9) provides: ***"the defendant shall not be***
27 ***required to respond to any complaint filed under this section until 30 days after***
28 ***the complaint is unsealed and served upon the defendant pursuant to section***

1   ***583.210 of the Code of Civil Procedure."*** The key portion of the statute is ***"after the***
2   ***complaint is unsealed"***. This Court believes that the complaint must be unsealed
3   before the provisions of §583.210 are triggered.

4

5       Defendants' argument pits two portions of the same statute against one another
6   without reason.   For example, the defendants conclude that ***Govt. Code §***
7   ***12652(c)(9)*** should be interpreted to require the complaint to be served during a
8   period expressly prohibited by another provision of the same statute, ***Govt. Code §***
9   ***12652(a)(2)*** or alternatively, according to defendants, section (c)(9) overrides section
10  (c)(5), which allows extensions of the seal for good cause. Fundamental statutory
11  construction does not permit such an interpretation or conclusion.

12

13      "Words must be construed in context, and statutes must be harmonized, both
14  internally and with each other, to the extent possible. Interpretations that lead to
15  absurd results or render words surplusage are to be avoided." ***Woods v. Young***
16  (1991) 53 Cal. 3d 315, 323.  The only way to harmonize section ***CCP § 583.210*** with
17  ***Govt. Code § 12652(c)(9)*** is to conclude that unsealing the complaint is a prerequisite
18  to commencement of the three-year service requirement.

19

20      To reiterate that which has been stated above, the purpose behind the sealing
21  portion of the false claims act is to allow the Attorney General to decide, in confidence,
22  whether to conduct an investigation and if so, to allow that investigation to proceed in
23  confidence.  Important reasons for the confidentiality of the seal include allowing the
24  prosecuting government authority an opportunity to (a) evaluate the lawsuit and the
25  facts underlying the suit; (b) determine whether the case is related to an ongoing
26  criminal investigation; and (c) evaluate the effects of intervening in the suit. ***U.S. ex***
27  ***rel. Downy v. Corning, Inc.*** (DNM 2000) 118 F. Supp. 2d 1160. ***U.S. ex rel. Mikes***
28  ***v. Straus*** (SDNY 1996) 931 F. Supp. 248 (the seal enables government entities to

-4-

Court's Ruling re: Defendants' Motions to Dismiss

1   investigate claims and decide **in secret** whether to take over prosecution of the

2   action).

3

4   Assuming arguendo that *CCP § 583.210 (a)* is applicable to the situation at bar,

5   the defendants have still failed to establish that a dismissal is warranted. *CCP §*

6   *583.240* provides for the tolling of the three-year period under a number of

7   circumstances including: (a) the defendant was not amenable to the process of the

8   court; (b) the prosecution of the action was stayed and the stay affected service; or (c)

9   service for any other reason was impossible, impracticable, or futile due to causes

10  beyond the plaintiff's control.

11

12  The phase "amenable to the process of the court" within *CCP § 583.240(a)*

13  "refers to whether a party is subject to being served under the applicable constitutional

14  and statutory provisions, and not to a defendant's reasonable availability, as a

15  practical matter for service of process." *Watts v. Crawford* (1995) 10 Cal.4[th] 743.

16

17  Here, given court extensions of the seal throughout the period following the

18  filing of the qui tam complaint, service upon the defendants was statutorily prohibited.

19  *Govt. 12652(c)(2)*.   While the qui tam complaint was under seal, defendants thus

20  were not "amenable to the process of the Court" as defined by the California Supreme

21  Court in *Watts*. Accordingly, time for service was tolled under *CCP § 583.240(a)*.

22

23  *CCP § 583.240(b)* excuses service while a stay is in effect and the stay affected

24  service. The prior court's extensions of the seal and concurrent prohibition of service

25  under *Govt. Code § 12652(c)(2) and (c)(5)* had the operative effect of a stay of the

26  proceedings.

27

28

-5-

Court's Ruling re: Defendants' Motions to Dismiss

1   Moreover, *CCP § 583.240(d)* excuses service where it is impossible, impractical
2   or futile to prosecute the action. The statutory scheme of the California False Claims
3   Act which encompasses the obligation of the Attorney General to conduct a thorough
4   investigation before deciding whether to intervene and prosecute the claims asserted
5   in the qui tam complaint, made it impossible or impracticable for plaintiffs to effect
6   service.

7

8                                    **Conclusion**

9

10   No matter which of this Court's analysis is pursued the conclusion is the same.
11   The defendants' motion to dismiss is denied.

12

13

14

15

16   Dated: MAR 2 5 2003 _____, 2003

17                                              Peter D. Lichtman
                                                Judge of Superior Court
18

19

20

21

22

23

24

25

26

27

28

Court's Ruling re: Defendants' Motions to Dismiss