UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>CIVIL ACTION: 01-CV-12257-PBS<br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO:<br><br>*State of Montana v. Abbott Labs, Inc., et al.*, D. Mont. Cause No. CV-02-09-H-DWM<br><br>*State of Nevada v. American Home Prods. Corp., et al.*, D. Nev. Cause No. CV-N-02-0202-ECR | |

### B. BRAUN OF AMERICA INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE STATE OF MONTANA'S SECOND AMENDED COMPLAINT AND THE STATE OF NEVADA'S AMENDED COMPLAINT

Montana's Second Amended Complaint ("MTAC") and Nevada's Amended Complaint ("NVAC") must be dismissed because this Court *lacks personal jurisdiction* over B. Braun of America Inc. ("BBA"). BBA also must be dismissed from these States' Medicare-related claims for the reasons stated in the pending motions to dismiss the Amended Master Consolidated Class Action Complaint ("AMCC").[1] The only new allegations here involve the States' *Medicaid* Programs. But these allegations also fail.

## I. BBA MUST BE DISMISSED FOR LACK OF PERSONAL JURISDICTION AND IMPROPER SERVICE.

The States bear the burden of proving that the Court possesses personal jurisdiction over each defendant, as determined by the state laws of Nevada and Montana. *Rivera-Lopez v. Municipality of Dorado*, 979 F.2d 885, 887 (1st Cir.1992); *see American Exp. Intern., Inc. v. Mendez-Capellan*, 889 F.2d 1175 (1st Cir. 1989); *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F.Supp.2d 392, 399 (S.D.N.Y. 2002) (law of transferor forum applies).

As a threshold matter, BBA was not properly served, which precludes the Court from asserting jurisdiction over BBA.[2] In addition, this Court lacks personal jurisdiction over BBA because (i) the States' long-arm provisions are not satisfied, and (ii) BBA lacks sufficient "minimum contacts" with Montana or Nevada.[3] *See Spectrum Pool Products, Inc. v. MW*

---

[1] BBA and the other defendants to the MDL action have filed motions to dismiss the AMCC that are currently pending before the Court. The arguments made in those motions to dismiss are equally applicable to the Medicare Part B-related claims brought by Montana and Nevada and are incorporated herein by reference. In addition, the grounds for dismissal asserted in the original motions to dismiss the Master Consolidated Class Action Complaint, such as justiciability and the filed rate doctrine, apply equally to *all* claims brought by the States. BBA, therefore, reserves its rights of appeal as to all such claims with respect to this action.

[2] Here, the States simply mailed copies of the Amended Complaints and Summonses to BBA's CEO. But under Montana Rule of Civil Procedure 4(D)(b)(i) and Nevada Rule of Civil Procedure 4(d)(2), this is not proper service. *See also Atraqchi v. George*, — P.2d —, 306 Mont. 535, 2001 WL 929023, at **2 (Aug. 14, 2001); *C.H.A. Venture v. G. C. Wallace Consulting Engineers, Inc.*, 794 P.2d. 707, 709 (Nev. 1990).

[3] Under Montana Rule of Civil Procedure 4(B), jurisdiction may be exercised over a foreign defendant only if the claim arises out of: (a) the transaction of business within the state; (b) the commission of acts within the state giving rise to a tort action; (c) the ownership, use or possession of any property, or of any interest therein, situated within this state; (d) contracting to insure any person, property or risk located within this state at the time of contracting; (e) entering into a contract to provide services or materials in this state; or (f) acting as director, manager, trustee, or other officer of a company incorporated, or with its principal place of business, in
(Continued...)

*Golden, Inc.*, 968 P.2d 728, 730 (Mont. 1998); *Freeman v. Second Judicial Dist. Ct.*, 1 P.3d 963, 965 (Nev. 2000). As stated in the attached Declaration, BBA has not done business in Montana or Nevada.[4] It has not manufactured any of the products referenced in the MTAC and the NVAC. It has no relationships or contacts with the States or any of the publishers or PBMs alleged in the complaints. Nor has it entered into any rebate agreements with the States or paid any rebates under the States' Medicaid programs.

## II. THE MEDICAID "BEST-PRICE" CLAIMS MUST BE DISMISSED.

The States' "Best Price" Medicaid-related claims must be dismissed because the alleged "Best-Price Scheme" does not apply to non-innovator, multiple-source drugs -- the type of drugs that the States have identified as BBA. products reimbursed under their Medicaid programs A manufacturer does not pay the States a rebate based on "Best Price" for non-innovator, multiple-source drugs. Rather, its rebate is specified by regulation as 11% of its reported Average Manufacturer Price ("AMP"). MTAC ¶ 606; NVAC ¶ 386; 42 U.S.C. § 1396r-8(c)(3). Because a manufacturer of non-innovator, multiple source drugs is not obligated to provide the States with its "Best Prices," there is no way to breach, or engage in fraud to avoid, such an obligation.

The States alternatively allege that defendants inflated their AMPs. MTAC ¶ 612; NVAC ¶ 396. But inflating AMPs would have the *exact opposite* effect as that alleged. By inflating its AMP, a manufacturer would actually increase the rebate *it pays* to the State, not decrease it, as the States argue, because 11% of a higher AMP would generate a larger rebate to

---

Montana, or as a personal representative of any estate within this state. Mont. R. Civ. P. 4(B). Nevada's long-arm statute allows jurisdiction to be exercised "on any basis not inconsistent with the constitution of this state or the constitution of the United States." Nev. Rev. Stat. § 14.065(1).

[4] Although BBA submits the attached Declaration, it does not believe it is necessary for deciding this motion, as the States have not and cannot offer sufficient evidence to establish a *prima facie* basis for exercising personal jurisdiction or proving proper service. However, should the Court deem it necessary, BBA requests an evidentiary hearing to consider fully its position under the preponderance of the evidence standard. *See, e.g., Daynard v. Ness, Motley, Loadholt, Richardson & Pool, P.A.*, 290 F.3d 42, 51 (1st Cir. 2002).

2

be paid by BBA to the States.[5] Such claims, therefore, make no economic sense and should be dismissed. *See AD/SAT, A Division of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 235 (2nd Cir. 1999) (dismissing claims that do not make "economic sense") (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

Finally, the Medicaid "Best Price" claims must be dismissed because the States failed to allege with particularity that BBA actually submitted inflated "Best Price" or AMP information to the States for any drug "for which relief is currently sought." *See* MTAC ¶ 348 and Exhibit A (listing all drugs for which Montana seeks relief); NVAC ¶ 257 and Exhibit A (listing all drugs for which Nevada seeks relief).[6]

### III. NEVADA'S AWP-BASED CLAIMS RELATING TO DEXTROSE, DEXTROSE SODIUM CHLORIDE, AND SODIUM CHLORIDE MUST BE DISMISSED.

All of Nevada's AWP-based claims relating to dextrose, dextrose sodium chloride, and sodium chloride products allegedly manufactured by BBA must be dismissed because (1) since May 2000, Nevada has not based its reimbursements for these products on published AWPs, and (2) its claims relating to purchases of these products before May 2000 are time-barred under Nevada's existing three-year statute of limitations. *First*, as the Nevada Medicaid Services Manual states, since May of 2000 Nevada Medicaid has been basing its reimbursement on the Department of Justice's federally-mandated pricing study -- not on the basis of published AWPs. *See* Nevada Medicaid Services Manual §§ 1202.3, 1203.1D(2). The May 2000 DOJ Report

---

[5] Moreover, even if BBA's products were innovator, multiple source drugs, inflating the AMP would increase the size of the rebate, because that rebate is based on the difference between the AMP and the Best Price (i.e., lowest price). 42 U.S.C. § 1396r-8(c)(1) A higher AMP, therefore, would result in a greater difference and a greater rebate to be paid to the States.

[6] There is no allegation that BBA provided free samples or improper incentives for any of the drugs listed on Exhibit A. Likewise, in the section of their respective complaints describing "Defendants' [Alleged] 'Best Price' Frauds," the States only provide examples of *other* defendants that have reported false AMP and Best Price information and do not mention BBA. As the Supreme Court has recognized, the reliance on "guilt by association" is a "philosophy alien to the traditions of a free society." *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 932 (1982).

3

covers dextrose, dextrose sodium chloride, and sodium chloride. *See* NVAC ¶ 272. Thus, Nevada has no AWP-based claim for purchases made after May 2000.

*Second*, claims made before May 2000 are time barred under Nevada's three-year statute of limitations for claims sounding in fraud. Nev. Rev. Stat. § 11.190(3)(d) (2002). Because of the DOJ Report, by May 2000, Nevada was aware of its potential claims, if any, relating to past purchases of products allegedly manufactured by BBA. Because the claims against BBA were not brought until the NVAC was filed on August 4, 2003, the statute of limitations has expired, and these claims must be dismissed.[7]

## IV. MONTANA'S AWP-BASED MEDICAID REIMBURSEMENT CLAIMS MUST BE DISMISSED.

Montana's AWP-based Medicaid reimbursement claims fail because, under federal and state Medicaid regulations, reimbursements for the referenced drugs are not necessarily based on the manufacturer's reported AWPs. In Montana, reimbursement for non-innovator, multiple-source drugs is based on the lowest of several options, including the "direct price" of the drugs and the "usual and customary charge" of the physician for the drugs. *See* Mont. Admin. R. 37.86.1101; Mont. Admin. R. 37.86.1105; 42 C.F.R. § 447.331(b). Montana can choose not to use AWP and instead set its own reimbursement amount. Mont. Admin. R. 37.86.1101(1)(c).

Given the existence of all these possibilities, Montana's mere recitation that AWP may be a factor in one of many alternative reimbursement calculations is insufficient to establish injury. Despite its obligation to conduct pre-suit due-diligence, the State has not alleged with particularity *any* transaction in which it actually overpaid for a product allegedly manufactured by BBA based on an allegedly inflated AWP. Thus, Montana's claims against BBA fail.[8]

---

[7] Because Montana clearly was put on notice of its claims by the release of the May 2000 DOJ Report, its claims are also barred by its two-year statute of limitations for fraud-based claims. *See* Mont. Code Ann. § 27-3-203 (2002).

[8] To the extent the Nevada's claims are not time barred, they also must be dismissed for failure to allege with particularity any transactions where reimbursement was based on allegedly inflated AWPs.

## V. MONTANA'S CLAIMS ON BEHALF OF ITS CITIZENS MUST BE DISMISSED.

In addition to the claims on its own behalf, Montana also seeks to recover for injuries incurred by its citizens.[9] But the State of Montana concedes that Medicaid co-payments for covered drugs are a set dollar amount ($1.00 - $2.00), which does not vary based on the amount the State reimburses the provider.[10] MTAC ¶ 163. Therefore, the State cannot allege an injury to its citizens caused by BBA's alleged inflation of AWPs, and all claims based on this theory must be dismissed. *See Cotter v. City of Boston*, 323 F.3d 160, 166 (1st Cir. 2003); *Geil v. Missoula Irrigation District*, 59 P.3d 398, 404 (Mont. 2002).

## CONCLUSION

For the foregoing reasons, as well as those argued in the memoranda submitted jointly by defendants or by other defendants individually (directed at the States' Complaints or Amended Complaints or relating to the MDL Master Consolidated Class Action Complaint and Amended Master Consolidated Class Action Complaint), B. Braun of America Inc. urges that it be dismissed from the cases brought by Montana and Nevada.

---

[9] Nevada has not brought Medicaid-related claims on behalf of its citizens and cannot do so because there is no co-payment obligation under Nevada Medicaid.

[10] The States' efforts to recover for their citizens' alleged overpayments under Medicare Part B also fail because the States lack standing to recover for those injuries. Claims arising from co-payments made under Medicare Part B are already subsumed within the private class actions currently pending in this MDL action. This creates a fundamental conflict between the State claims and those claims asserted in the putative class actions. *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 339 (1st Cir. 2000) (denying parens patriae status to foreign governments because "class actions are often the preferable vehicle to pursue claims on behalf of a country's citizens;" noting that "[c]ommentators have ... suggested that, even as to individual States, *parens patriae* standing should be limited because expansive state standing has a serious potential to undermine rather than complement individual standing in constitutional cases.'") (citations and quotations omitted).

Dated: September 15, 2003

Respectfully submitted,

*/s/ Daniel F. Attridge*

Daniel F. Attridge, P.C.
Colin R. Kass
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
T: (202) 879-5000
F: (202) 879-5200

*Counsel for B. Braun of America Inc.*

**ATTACHMENT**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>CIVIL ACTION: 01-CV-12257-PBS<br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO:<br><br>*State of Montana v. Abbott Labs, Inc., et al.,* D. Mont. Cause No. CV-02-09-H-DWM<br><br>*State of Nevada v. American Home Prods. Corp., et al.,* D. Nev. Cause No. CV-N-02-0202-ECR | |

## DECLARATION OF CHARLES A. DINARDO

1. My name is Charles A. DiNardo. I am the Senior Vice President, Chief Corporate Officer and Secretary at B. Braun of America Inc. ("BBA"). I am over 21 years of age. I provide this declaration based on my own personal knowledge and after reasonable inquiry of available sources of information at BBA.

2. BBA is incorporated in Pennsylvania. It is also based there.

3. I understand that BBA is named as one of the defendants in the Second Amended Complaint filed by the State of Montana ("MTAC") on or about August 4, 2003 and as one of the defendants in the Amended Complaint filed by the State of Nevada ("NVAC") on or about August 4, 2003. Prior to the filing of these amended complaints, BBA was not named as a defendant in either of these actions.

4. BBA's CEO received a copy of redacted versions of Montana's Second Amended Complaint and Nevada's Amended Complaint, along with an accompanying summons for each

action, by certified mail on or about August 18, 2003. So far as BBA is aware, no other attempt has been made to serve BBA with process in either of these actions.

5. I understand that the MTAC and the NVAC allege that an entity called "B. Braun McGaw" is a wholly-owned subsidiary of BBA. This is incorrect. BBA has no such subsidiary, and so far as BBA is aware, no such entity exists as a corporation.

6. I understand that the MTAC and the NVAC admit that McGaw, Inc. ("McGaw") ceased to exist as a corporate entity in 1997, but imply, through their allegations about the acquisition of McGaw, that BBA is the successor-in-interest to McGaw. This is incorrect. BBA is not the successor-in-interest to McGaw; rather, McGaw was merged into a different, separate corporate entity.

7. I understand that the MTAC and the NVAC allege that BBA designs, manufactures and markets six generic drugs: dextrose, dextrose in lactated ringers, dextrose with sodium chloride, heparin sodium (porcine) in d5w, sodium chloride, and sodium chloride (gu irrigant). This is incorrect. BBA does not engage in any of these activities. Nor has BBA engaged in any of these activities at any time.

8. BBA does not do any business in Montana or Nevada; sell or provide any goods within Montana or Nevada; or render any services within Montana or Nevada. Nor has it engaged in any of these activities in Montana or Nevada at any time.

9. BBA has not entered into any Medicaid rebate agreements with Montana or Nevada, nor has BBA paid any Medicaid rebates to Montana or Nevada.

10. BBA has not provided any average manufacturer's price or best price information to Montana or Nevada.

2

11. BBA neither owns, leases, possesses, uses or holds any interest in any real property in Montana or Nevada and has not done so at any time. Also, BBA has not had an office or paid taxes in Montana or Nevada.

12. BBA has not had a registered agent in Montana or Nevada.

13. BBA has not had any relationships or communications with Thomson Medical Economics, First Data Bank, Inc. or Facts & Comparisons, Inc.

14. BBA has not had any relationships or communications with AdvancePCS, Caremark, Rx, Inc., Express Scripts, Inc. or Medco Health Solutions, Inc.

To the best of my knowledge, I declare under penalty of perjury that the foregoing is true and correct based on my own personal knowledge and other reasonable inquiry of available sources of information at B. Braun of America Inc.

Executed on September 11, 2003.

_____
Charles A. DiNardo

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------- x
                                       :
In Re: PHARMACEUTICAL INDUSTRY         :
AVERAGE WHOLESALE PRICE                :
LITIGATION                             :   MDL No. 1456
                                       :
------------------------------------- x
                                       :
THIS DOCUMENT RELATES TO:              :   Master File No. 01-CV-12257-PBS
                                       :
*State of Montana v. Abbott Laboratories, Inc.* :   Judge Patti B. Saris
*et al.*, D Mont. Cause No. CV-02-09-H-DVM      :
                                       :
------------------------------------- x


## DEY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE STATE OF MONTANA'S SECOND AMENDED COMPLAINT


KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

Attorneys for Dey, Inc.

Of Counsel:

Paul F. Doyle
Neil Merkl
Philip D. Robben

I.  **INTRODUCTION**

Pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, all claims asserted by the State of Montana ("Montana") against Dey, Inc. ("Dey") in the Second Amended Complaint (the "Complaint") should be dismissed as to Dey with prejudice.[1]

II. **ALL CLAIMS AGAINST DEY SHOULD BE DISMISSED SINCE ALL DRUGS ATTRIBUTED TO DEY IN THE COMPLAINT ARE NON-INNOVATOR MULTIPLE SOURCE DRUGS**

All of the drugs attributed to Dey in this action are non-innovator multiple source drugs, as that term is defined in the statute which provides for Medicaid rebates. *See* 42 U.S.C. § 1396r-8(k)(7)(A)(iii).[2] As such, for the reasons set forth in Point I of the Abbott Memorandum, all rebate claims asserted against Dey in this action should be dismissed since none of the conduct alleged by Montana would have had the effect of reducing Dey's rebate liability and, therefore, Montana's rebate claims as to the drugs attributed to Dey fail as a matter of law.

In addition, for the reasons set forth in Point II of the Abbott Memorandum, all other claims asserted against Dey should also be dismissed from this action since those allegations either: (a) concern the reimbursement of multiple source drugs as to which any alleged manipulation or overstatement of AWP could not have had any effect or (b) fail to satisfy Rules 8(a) and 9(b).

---

[1] Dey also joins in the Consolidated Memorandum of Law In Support of Defendants' Motion To Dismiss the State of Montana's Second Amended Complaint and the State of Nevada's Amended Complaint (the "Consolidated Memorandum"), which is incorporated herein by reference. Where indicated below, Dey also joins in the arguments asserted by Abbott Laboratories, Inc. ("Abbott") in Abbott's Separate Memorandum of Law In Support of Its Motion To Dismiss Montana's Second Amended Complaint (the "Abbott Memorandum").

[2] Montana impliedly concedes – as it must – that all drugs attributed to Dey in this action are non-innovator multiple source drugs. Indeed, the Complaint defines "generic" drugs as all drugs *other* than single source and innovator multiple-source drugs. (Complaint ¶¶ 127, 606.) Having so defined generic drugs, the Complaint then goes on to identify all of the drugs attributed to Dey which are at issue in this action via a chart which lists each of the drugs as "generic". (Complaint ¶ 386.)

## III.  MONTANA HAS FAILED TO SATISFY RULE 9(b)

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In the First Circuit, Rule 9(b) is "strictly applied". *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 288 (1st Cir. 1987). Rule 9(b) requires that a plaintiff plead the "who, what, when, where, and how of the alleged fraud." *See United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39, 46 (D. Mass. 2001) (Saris, J.). The Complaint wholly fails to meet this standard and should, therefore, be dismissed with prejudice. Several examples specific to Dey illustrate Montana's cavalier use of sweeping allegations of wrongdoing with no specificity to back them up.

### A.  Montana Pleads No Specifics As To Dey

Throughout the Complaint, Montana makes conclusory allegations charging defendants with fraud and various types of associated wrongdoing. For example, the Complaint contends that "defendants" – including Dey – "specifically instructed and expected providers to charge the inflated AWPs for drugs to Medicare, Medicaid, and Patients making co-payments." (Complaint ¶ 180.) Montana also alleges that the defendants provided a variety of benefits to providers to induce them to purchase products, including giving free samples, volume discounts, rebates, "off-invoice pricing", free goods, "credit memos", consulting fees, debt forgiveness, educational grants, and promotional grants. (Complaint ¶¶ 181, 184.) With regard to its allegations regarding free samples, Montana goes so far as to allege that all "defendants specifically told physicians to bill the Montana Medicaid Program and others for free samples, which defendants know was unlawful." (Complaint ¶ 181.) All of these allegations are made generally and without any attempt to provide specific instances of wrongful conduct by Dey.

Even those paragraphs of the Complaint which specifically concern Dey fail to meet plaintiffs' Rule 9(b) burden in that they fail to meet Montana's burden to provide Dey with the who, what, when, where and how of the alleged fraud,. These paragraphs contain nothing more than

- 2 -

innuendo and the mere suggestion that Dey has committed fraud. For example, Montana dwells at length on the fact that Dey has been the subject of several on-going investigations and that Dey is a defendant in lawsuits brought by the attorney generals of West Virginia, Connecticut and, formerly, Texas. (Complaint ¶¶ 404-409.) Yet mere reference to those investigations or lawsuits does not satisfy plaintiffs' obligation to plead specifics as to Dey. *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) ("'[M]ere allegations of fraud, . . . or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such allegations are repeated.'") (quoting *Hayduck v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985)).

In a single paragraph, plaintiffs do allege various correspondence between Dey and the publishers of industry pricing compendia concerning the subject of AWP and WAC figures for a few Dey products. (Complaint ¶ 388.) However, none of this correspondence demonstrates that the AWP figures at issue in that correspondence were, in fact, fraudulent. Likewise, the other out-of-context quotes from a few Dey documents and the various tables Montana sprinkles throughout its allegations concerning Dey similarly do nothing to demonstrate that Dey's AWP figures were "fraudulent", "manipulated" or otherwise part of a "scheme".[3] Moreover, plaintiffs' conclusory allegations and out-of-context discussion of two Dey documents in paragraphs 393-397 of the Complaint cannot save the Complaint from dismissal under Rule 9(b). These allegations amount to nothing more than a claim that Dey was aware that reimbursement rates were a factor in its customers' purchasing decisions; none of these allegations particularize a scheme whereby Dey

---

[3] Nor does Montana's reference in paragraph 392 of the Complaint to a single document from 1992 which talks about the spread in the context of competition demonstrate that Dey engaged in a scheme to commit fraud. Moreover, Montana fails allege, yet alone particularize, how the matters referred to in the document had any actual effect on the amounts paid for drugs by Montana or payors located in Montana. Moreover, the document is only one from nearly 200,000 pages of documents Dey produced in the class action case before the Court and is over 11 years old. Montana fails to show how such an isolated, aged document lends support to the notion that Dey engages in a "*pattern* of fraudulent conduct in artificially inflating the AWPs for drugs . . . ." (Complaint ¶ 174) (emphasis added).

- 3 -

committed fraud by "manipulating" AWP or otherwise. Finally, Montana's failure to particularize any of the prices it or third-parties paid for Dey's drugs is fatal to Montana's claims.[4]

### B. Plaintiffs Resort To The Use Of Manufactured "Evidence"

In recognition of the utter lack of specificity in their allegations as to Dey, Montana attempts to demonstrate fraud by Dey by presenting evidence it simply manufactured. In paragraph 398 of the Complaint, Montana presents a table which it alleges is "excerpted" from a document Dey previously produced. The last column in Montana's table is titled "% Spread" – purporting to be evidence of Dey's marketing of a spread between its reported AWP and its customer's actual acquisition cost. (Complaint ¶ 398, Table 1.) In fact, the table is nothing more than a misleading fabrication Montana uses in an attempt to give its fraud claims a veneer of credibility. Annexed hereto as Exhibit A is a copy of the Dey document which Montana cites as the source for Table 1. As even a cursory review demonstrates, the "% Spread" column purportedly excerpted by Montana does not exist. Dey's attorneys have reviewed all documents of the type plaintiffs cite as the source for Table 1; none of those documents contain a "% Spread" or similar column either. Montana's resort to manufactured evidence to buttress their claims should be rejected.

### C. Dey's Action Against First Data Bank Is Irrelevant To This Action

As did the class action plaintiffs in the AMCC, whose counsel also represents Montana here, Montana quotes at length from the complaint in a lawsuit Dey initiated against First DataBank and Medi-Span (the "FDB Action"). The FBD Action is irrelevant to the issues here. The FDB Action was initiated because First DataBank and Medi-Span began publishing Dey's AWP

---

[4] In paragraphs 402-403 of the Complaint, Montana attempts to particularize its allegations as to Dey concerning improper incentives. Even taken at face value for purposes of this motion, all Montana can point to regarding "free goods" is one sentence from a document taken out of context which does not indicate that Dey was providing improper incentives. Montana's allegations of improper incentives are completely conclusory and provide absolutely no details as to the allegedly improper conduct. Certainly nothing Montana alleges in these two paragraphs comes close to showing that Dey "specifically told physicians to bill the Montana Medicaid Program" for anything, as alleged in paragraph 181 of the Complaint.

numbers using a method and procedure completely different from that used for reporting AWPs of Dey's competitors. The most that the FDB Action stands for is that, in certain contexts, published pricing information forms the basis for the amount paid to providers for drugs. Nothing in the FDB Action supports the assertion that Dey (or any other defendant) engages in AWP manipulation or any other fraudulent scheme involving AWP data.

## IV. CONCLUSION

For the foregoing reasons, as well as those stated in the Consolidated Memorandum and the individual memoranda of other defendants addressing common issues, the Court should dismiss the Second Amended Complaint as to Dey with prejudice.

Dated: September 15, 2003

Respectfully submitted,

KELLEY DRYE & WARREN LLP

By: _____
Paul F. Doyle
Neil Merkl
Philip D. Robben

101 Park Avenue
New York, New York 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

Attorneys for Dey, Inc.

# Exhibit A

# Dey, Inc.'s Memorandum of Law In Support of Its Motion To Dismiss The State of Montana's Second Amended Complaint

12/29/95

**DEY LABORATORIES**
2751 Napa Valley Corporate Drive
Napa, CA 94558
1-800-755-5560

Letter to: Claudio Sertino - Generic Drugs
Claudio Hlund
re: Larenod Pad
Co. past Pares
US VP Finance

## McKESSON DRUG COMPANY
### Source Program Proposal

| McK Econo | Generic Name | Strength | Size | No. /Ctn. | Product # | Brand Name | AWP | WAC | Suggested Sell Price | Source Net Price | % Discount from WAC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3286028 | Acetylcysteine Solution | 10% | 4 mL | 12 | 18104 | Mucomyst | 67.80 | 25.80 | 18.00 | 15.48 | -40.0% |
| 3284007 | Acetylcysteine Solution | 10% | 10 mL | 3 | 18110 | Mucomyst | 40.26 | 15.27 | 13.50 | 10.69 | -30.0% |
| 3225265 | Acetylcysteine Solution | 10% | 30 mL | 3 | 18130 | Mucomyst | 110.48 | 41.87 | 33.50 | 27.28 | -35.b. |
| 3285044 | Acetylcysteine Solution | 20% | 4 mL | 12 | 18204 | Mucomyst | 81.36 | 31.08 | 21.50 | 18.65 | -40.0% |
| 2474112 | Acetylcysteine Solution | 20% | 10 mL | 3 | 18210 | Mucomyst | 48.66 | 18.57 | 16.20 | 12.99 | -30.0% |
| 3286143 | Acetylcysteine Solution | 20% | 30 mL | 3 | 18230 | Mucomyst | 133.43 | 50.84 | 39.60 | 32.92 | -35.0% |
| 3225323 | Acetylcysteine Solution | 20% | 100 mL | 1 | 18200 | Mucomyst | 92.21 | 75.90 | 59.80 | 45.54 | -40.10% |
| 1616160 | Albuterol Sulfate Inhalation Soln. | 0.083% | 3 mL | 25 | 89703 | Proventil or Ventolin | 30.25 | 14.50 | 12.00 | 10.25 | -29.3% |
| 1160233 | Albuterol Sulfate Inhalation Soln. | 0.083% | 3 mL | 30 | 89733 | | 36.30 | 17.40 | 14.40 | 12.30 | -29.3% |
| 2442119 | Albuterol Sulfate Inhalation Soln. | 0.083% | 3 mL | 60 | 89760 | | 72.60 | 34.50 | 28.80 | 24.60 | -28.7% |
| 1162569 | Cromolyn Sodium Inhalation, USP | 20 mg/2 mL | 2 mL | 60 | 68902 | Intal | 42.00 | 34.20 | 29.00 | 25.65 | -25.0% |
| 1161603 | Cromolyn Sodium Inhalation, USP | 20 mg/2 mL | 2 mL | 120 | 68912 | Intal | 84.00 | 66.00 | 58.00 | 51.30 | -22.3% |
| 3427804 | Metaproterenol Sulfate Inhalation Soln. | 0.4% | 2.5 mL | 25 | 67803 | Alupent | 30.75 | 11.00 | 10.00 | 8.64 | -21.5% |
| 3514757 | Metaproterenol Sulfate Inhalation Soln. | 0.6% | 2.5 mL | 25 | 67603 | Alupent | 30.75 | 11.00 | 10.00 | 8.64 | -21.5% |
| 1106971 | Sodium Chloride Solution | 0.9% | 3 mL | 100 | 83003 | -- | 24.20 | 13.00 | 10.94 | 8.75 | -32.7% |
| 1107853 | Sodium Chloride Solution | 0.9% | 5 mL | 100 | 83005 | -- | 24.20 | 13.00 | 10.94 | 8.75 | -3. |

? Ord.# Alb MOI
325868
? 14.00 13.50

DL - TX 0011179