42.5 %.[11] HHS provided this information to the States to help them better gauge EAC. In 2001, HHS OIG issued another report which estimated that the average difference between published AWPs and actual pharmacy acquisition costs was 21.71% for brand name drugs and 65.93% for generic drugs. HHS OIG, "Medicaid Pharmacy-Actual Acquisition Cost of Brand Name Prescription Drug Products," A-06-00-00023 (Aug. 2001) (Defs. App. Ex. K).

*New York State's Medicaid Program*

New York State began its Medicaid program in 1966. In 1978, the State passed what is now Section 367-b of the Social Services Law, which provides that the State, in the first instance, makes payments to medical providers (*see* subsection 2) and the counties, called local "social service districts", in turn are responsible for reimbursing the State for that share of the State's expenditures that the "district would have borne after reimbursement from state and federal funds in accordance with section [368-a] . . . had the expenditure been made by such district." *See* subsection 6. *See also New York Hosp.-Westchester Div. v. Krauskopf*, 469 N.Y.S.2d 408, 409 (N.Y. App. Div. 1983) ("In 1978 . . . the responsibility for making [Medicaid provider] payments was vested in the State Department of Social Services.").

Under the New York State Medicaid drug program, prescription drugs are paid for differently by the State depending on whether the drug is provided by a "medical practitioner" or "pharmacies". N.Y. Soc. Serv. Law § 367-a(9)(a), (b). Significantly, physician-

---

[11] The HHS OIG published over a dozen reports stating that, on average, pharmacies purchase generic drugs at 42.5% below AWP and purchase brand name drugs at 18.3% below AWP. *See generally* HHS OIG, "Medicaid Pharmacy – Actual Acquisition Costs of Prescription Drug Products for Brand Name Drugs, " A-06-96-00030 (Apr. 1997) (Defs. App. Ex. I); HHS OIG, "Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products," A-06-97-00011 (Aug. 1997) (Defs. App. Ex. J). These and the HHS OIG reports relating specifically to the 11 selected states are also available on the HHS OIG's web page, http://www.oig.hhs.gov.

administered drugs that are billed separately by the physician from his or her services in administering the drug are paid for at "the *actual* cost of the drugs to the practitioners." N.Y. Soc. Serv. Law § 367-a(9)(a) (emphasis added). Pharmacist-provided drugs, by contrast, are paid for at the "federal upper limit" established by CMS (if there is one) or the lower of (i) EAC, as determined by State law or (ii) the actual dispensing pharmacy's "usual and customary price charged to the general public." N.Y. Soc. Serv. Law § 367-a(9)(b).[12]

New York's legislation defines EAC as "the average wholesale price of a prescription drug . . . as reported by the prescription drug pricing service used by the [State] department [of Social Services], less twelve percent thereof, and updated monthly by the department."[13] This discount rate, effective May 15, 2003, reflects a compromise between the State, which had originally sought a 15% discount, and the retail pharmacists lobby, which instituted a fierce campaign to keep Medicaid reimbursement levels as high as possible.[14] It is

---

[12] The pharmacist is also entitled to a "dispensing fee" of $4.50 per prescription in the case of "generic" drugs and $3.50 per prescription for "brand-name" drugs, as categorized by the prescription drug pricing service used by the State Department of Social Services. N.Y. Soc. Serv. Law § 367-a(9)(d). These amounts are scheduled to rise by fifty (50) cents effective December 31, 2003.

[13] N.Y. Social Services Law § 367-a(9)(b)(ii), as amended by Act of May 15, 2003, 2003 Session Law News of N.Y. Ch. 62, sec. Z2 (Defs. App. Ex. L). Suffolk County incorrectly cites the former discount of AWP minus ten percent. (Am. Compl. ¶ 73.) Suffolk County correctly notes, however, that New York State pays a different amount for "multiple-source" drugs (*i.e.* brand-name drugs which are subject to generic competition and the generics themselves) even if no federal upper limit exists for such drugs. For such multi-source drugs, pharmacies are paid the lower of (i) the median AWP of all generic forms of the drug or (ii) the lowest AWP of any of the brands subject to the generic competition. *See* Am. Compl. ¶ 95. As a result, New York State Medicaid pays the same amount for all formulations of a multiple-source drug, regardless of which pharmaceutical company manufactures or markets it.

[14] *See, e.g.*, 2003 N.Y.L.S. S. 226, L.2003, C.62, Part Z2, Supplement to Governor's Bill Jacket, Memorandum In Support, Part K entitled "Restructure the Medicaid program, contain Medicaid costs, and make Medicaid Managed Care permanent", at 20, stating "Reducing pharmacy

concrete evidence that the New York legislature understood that AWP does not represent the price actually paid.

There is no state statutory or regulatory definition of "average wholesale price" and there is no statutory requirement that the State "department" use any particular "prescription drug pricing service" to obtain pricing information. Furthermore, the State Department of Social Services has the power to require "[e]very manufacturer or wholesaler of drugs . . . [to provide] upon request of the department . . . any information pertaining to wholesale prices charged to pharmacists for any drugs available" under the State's Medicaid program and to "make the information available to the department on a monthly basis, or such other periodic basis as the department shall request." N.Y. Soc. Serv. Law § 367-a(7). Thus, the State is not dependent on the AWPs appearing in industry publications as the basis for information on drug prices.

---

reimbursement for Medicaid from Average Wholesale Price (AWP) less 10 percent to AWP less 15 percent will *bring reimbursement in line with actual costs*. A recent Office of the Inspector General study indicated that retailers' costs equate to AWP less 22 percent." (emphasis added) (Defs. App. Ex. M).

Joint Budget Hearing Conducted By Senate Finance Comm., Senate Health Comm., Assembly Health Comm. and Assembly Ways & Means Comm., 2003 Leg., 226th Sess., February 10, 2003 (statement of New York State Comm'r of Health, Antonia C. Novello, M.D., M.P.H., Dr. P.H.), "A recent investigation by the U.S. Office of the Inspector General found that state Medicaid payments to pharmacies for prescription drugs appear to be substantially higher than the pharmacies' acquisition costs for those drugs." (Defs. App. Ex. N).

Memorandum in Opposition, Executive Budget, Pharmacists Society of the State of New York, *available at* http://www.pssny.org/Legislative_Info/about.htm (last visited September 3, 2003) (Defs. App. Ex. O).

2003 N.Y.L.S. S. 226, Report of the Fiscal Comms. on the Executive Budget, Fiscal Year April 1, 2003 to March 31, 2004, Dep't of Health at 51-2, referring to "the partial restoration of a proposed 5 percent reduced (*sic*) in pharmacy reimbursement, bringing the reimbursement rate to Average Wholesale Price minus 12 percent instead of Average Wholesale Price minus 15 percent as proposed by the Executive." (Defs. App. Ex. P).

11

*Suffolk County's Allegations*[15]

Suffolk alleges a "systematic and pervasive scheme" involving "two types of wrongdoing". (Am. Compl. ¶ 2.) First, Suffolk claims that through industry pricing publications like the Redbook (the "Publications"), defendants "fraudulent[ly] report[ ] . . . false and inflated average wholesale prices . . . or wholesale acquisition costs . . . on which AWPs are based." Second, Suffolk claims that manufacturers have misreported their AMPs and BPs under the federal rebate statute -- conduct which allegedly "also inflates AWP" -- to "avoid paying rebates to Medicaid." (*Id.* ¶¶ 2, 8.) Suffolk contends that it has been damaged because it is "required by New York State law to contribute 25% towards its Medicaid costs." (*Id.* ¶ 1.) Because defendants' allegedly wrongful acts have purportedly increased the Medicaid payments by New York State and depressed the rebates paid to the State, Suffolk claims that its payments to the State were inflated. (*Id.* ¶ 315.)

The Amended Complaint contains two fatal admissions. First, Suffolk admits that it has "no input into what it is billed" by New York State for Medicaid. (Am. Compl. ¶ 315.) In other words, it is New York State that determines what Medicaid payments should be. Suffolk plays no role in that process.

Second, Suffolk alleges that "governmental studies" indicate that the percentage differential between AWP and providers' actual costs is in fact greater than AWP - 10% (now 12%) that New York pays pharmacists. (Am. Compl. ¶ 73.) In addition, the Amended

---

[15] Another county in New York, Westchester County, represented by the same law firm, has recently filed a largely identical complaint in the Southern District of New York. Defendants anticipate that the Westchester County action will be transferred to this court for pre-trial purposes as a "tag-along" action. The filing of another county's case is, however, relevant to the instant motion because it highlights the arguments made below about the legal and practical impediments to political subdivisions of a State suing over Medicaid.

Complaint relies upon a well-known "June 1996 Dow Jones news article" (Am. Compl. ¶ 63), which clearly documents how AWP is used in the pharmaceutical industry and its lack of relationship to providers' actual acquisition costs. (*See* Defs. App. Ex. Q.) These allegations are admissions that it is widely accepted that the published AWPs are not accurate indicators of what many pharmacists pay for drugs and that *some* discount must be applied *if* actual acquisition cost is the goal.

### Argument

Suffolk asserts claims under RICO (Count I), the federal Medicaid statute (Count II), the State Medicaid and Social Services statutes (Counts III and V), and certain State Medicaid regulations (Count IV), as well as claims for breach of contract (Count VI), unfair trade practices (Count VII), fraud (Count VIII) and unjust enrichment (Count IX). Suffolk's RICO, fraud and unjust enrichment claims appear to pertain to the allegedly inflated AWPs only. The claims alleging violations of the federal and state Medicaid laws, as well as the breach of contract claim, appear to pertain to the best price or rebate-related claim only, while the unfair trade practices claim pertains to both.

Defendants treat the "AWP" claims in Point I and the "Rebate" claims in Point II. In Point III, we show why both sets of claims should be dismissed under Rule 9(b) to the extent the claims are based on unsupported allegations of fraud. In Point IV, we show that plaintiff's fraudulent concealment claims must be dismissed as well.

### I.   THE AWP CLAIMS SHOULD BE DISMISSED.

#### A.   Suffolk County Lacks Standing to Bring Its RICO Claims.

In Count I of the Amended Complaint, Suffolk alleges that defendants have violated RICO, 18 U.S.C. § 1962(c). (Am. Compl. ¶¶ 332-55.) Under the relevant statutory

framework, however, New York is the *only* entity that is legally capable of relying directly on the AWP data provided by the defendants; Suffolk's alleged injury is merely derivative of that alleged to have been suffered by New York. (Am. Compl. ¶ 315.) *See* N.Y. Soc. Serv. Law § 367-b(6) (McKinney 2003). This means that Suffolk does not have standing under RICO.

In determining whether a plaintiff has standing under the federal RICO statute, a court will make three inquiries:

   (1)   Are there more directly injured plaintiffs?

   (2)   Will there be difficulty in ascertaining plaintiff's damages? and

   (3)   Is there a possibility of multiple recoveries so that a court would have to fashion complex rules apportioning damages?

*Rhode Island Laborers' Health & Welfare Fund v. Phillip Morris, Inc.*, 99 F. Supp. 2d 174, 178 (D.R.I. 2000) (*citing Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 269-70 (1992)). The focus of the first required inquiry is "whether there is a more appropriate plaintiff to right defendants' wrongs." *Id.*

Courts have consistently declined to find standing to assert a RICO claim where, as here, a plaintiff alleges only an indirect, derivative injury. *See, e.g., McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) (holding that indirect purchasers lack standing to pursue RICO claims even though direct purchasers may have passed on full amount of damages); *see also County of Oakland v. City of Detroit*, 866 F.2d 839, 849-50 (6th Cir. 1989) (recognizing that direct purchasers of sewer services were proper parties to maintain RICO action even though relevant regulations allowed 100% pass-on of overcharges). *Cf. Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729-36 (1977) (holding that indirect payor lacks standing to assert antitrust claim); *Boos v. Abbott Labs.*, 925 F. Supp. 49, 50 (D. Mass. 1996); *Gallant v. BOC Group, Inc.*, 886 F.

Supp. 202, 206 (D. Mass. 1995) (noting that not "every person tangentially affected by an antitrust violation [may] maintain an action to recover threefold damages for the injury to his business or property"); *Rylewicz v. Beaton Servs., Ltd.*, 698 F. Supp. 1391, 1395 & n.3 (N.D. Ill. 1988) (collecting cases).[16]

Suffolk's position is analogous to that of the consumer plaintiffs who were barred from maintaining an antitrust action on indirect purchaser grounds in *Kansas v. UtiliCorp United Inc.*, 497 U.S. 199 (1990). In *UtiliCorp*, consumers who purchased electricity from state-regulated utilities alleged that they had standing to sue the manufacturers that had conspired to fix prices. *Id.* at 208-09. Plaintiffs conceded that they did not purchase directly from the defendants, but asked the Court to adopt an exception to the indirect purchaser rule for cases where the direct purchaser was required by law to pass on 100% of the overcharge. *Id.* The Supreme Court rejected this argument and held that limiting recovery only to the direct purchasers was the best way to ensure the efficient enforcement of antitrust law:

> The rationales underlying *Hanover Shoe* and *Illinois Brick* will not apply with equal force in all cases. We nonetheless believe that ample justification exists for our stated decision not to carve out exceptions to the [direct purchaser] rule for particular types of markets. The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule.

*Id.* at 216 (citation omitted). Because antitrust standing principles apply equally to alleged RICO violations, *see McCarthy*, 80 F.3d at 855 (collecting cases), the *UtiliCorp* rule would preclude

---

[16] In *Rylewicz*, the court defined the real party in interest as "the one who by the substantive law, possesses the right sought to be enforced, and *not necessarily the person who will ultimately benefit from the recovery*." 698 F. Supp. at 1395 (citations and internal quotations omitted) (emphasis added).

standing for Suffolk even though state law requires New York to pass on a fixed percentage (in this case, 25%) of the overcharge to the County.[17]

As noted above, New York State has already sued certain of the defendants in this case.[18] Allowing the County to pursue this case would subject those defendants to the risk of multiple recoveries and inconsistent judgments, and would require this court to fashion complex methodologies for allocating any damages recoveries. *See generally Laborers Local Health & Benefit Fund v. Phillip Morris, Inc.*, 191 F.3d 229, 236 (2d Cir. 1999) (There is no standing under RICO to assert derivative claims.). Since Suffolk's only alleged injury is indirect and derivative of New York's, Suffolk's RICO claim should be dismissed for lack of standing.[19]

---

[17] Moreover, the RICO statute has no provisions for ascertaining how the treble damages provided for by the statute would be allocated among the direct and indirect victims, which would add yet another layer to the complicated damages calculations the Court would be required to undertake. *See UtiliCorp*, 497 U.S. at 214-15 (in denying antitrust standing to indirect purchasers, the Court noted that issue of whether and to what extent direct purchaser is required to pass on treble damages recovery would unnecessarily complicate damages allocation).

[18] New York has already brought the following actions: *People of the State of New York v. Aventis, Inc.*, D. Mass., 1:03-CV-11228 PBS; *People of the State of New York v. GlaxoSmithKline, P.L.C.*, N.D.N.Y. 03-CV-299 (TJM/DRH); *People of the State of New York v. Pharmacia Corp.*, D. Mass., 1:03-CV-11227 PBS.

[19] These same principles apply to plaintiff's other AWP claims. If there is a cause of action, the State was the injured party in the first instance. If the State does not have a cause of action, the County does not have one either. If the State has a cause of action, there is a substantial risk of inconsistent judgments and duplicative recoveries if the County is permitted to sue. *See Phillip Morris*, 191 F.3d at 242 ("These principles also apply in general terms to the fraud and special duty causes of action asserted by plaintiffs under New York common law."); *Jackson Nat'l Life Ins. Co. v. Ligator*, 949 F. Supp. 200, 204 (S.D.N.Y. 1996) ("[T]he type of secondary standing claimed by [the lender] here is disfavored precisely because it can lead to double recovery, as well as because the necessary causal link between the actions of the primary violator and the party claiming injury is too remote."); *Labovitz v. Washington Times Corp.*, 900 F. Supp. 500, 505 (D.D.C. 1995) (denying standing to parties that suffer derivative injuries prevents the possibility of a double recovery).

B.  **The County's RICO Claim (Count I) Suffers From Even More Substantial Defects Than The RICO Claim Alleged In The AMCC.**

1.  **Causation**

A plaintiff has standing in a civil RICO case only if the RICO violations alleged by the plaintiff in fact and proximately caused injury to the plaintiff's business or property. *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 265-68 (1992); *see also Willis v. Lipton*, 947 F.2d 998, 1000 (1st Cir. 1991). Defendants incorporate by reference pages 20-22 of the brief in support of the motion to dismiss the AMCC ("AMCC Dismissal Brief"), which set forth significant multiple intervening acts between the alleged fraud and plaintiffs' loss that preclude the requisite showing of causation under RICO. The same facts pled there apply here: (1) manufacturers report prices to the Publications and not to plaintiff; (2) a prescription is reimbursed based on AWP only where the medical provider decides to charge the patient a price that is *higher* than the statutory amount calculated based on AWP; and (3) the government (here, New York State), for its own policy reasons, has deliberately chosen to use AWP (minus 12%) as the standard for reimbursement with full knowledge that AWP does not reflect providers' drug acquisition costs. In short, the amount of Suffolk's payment obligation under Medicaid is proximately related to the give-and-take of New York state public assistance law and policy and the actual charging practices of pharmacists, not to the price reporting of drug manufacturers to the Publications.

Furthermore, the causal link is completely broken in connection with multi-source drugs. Suffolk alleges that New York's Medicaid law defines AWP for multi-source drugs as the lesser of the "median" AWP of all generic forms of the drug or the lowest brand name product's AWP. (Am. Compl. ¶ 94.) Thus, the State (and derivatively the County) may pay for the drug of one manufacturer based on the price of a drug by a completely different manufacturer --

17

thereby cutting off the causal link between the first manufacturer's alleged fraud and the County's harm. Suffolk tries to get around this fatal defect by arguing that all defendants benefit when only one fraudulently raises its AWP for a multi-source drug, because the conduct of the one "raised the media[n] AWP." (Am. Compl. ¶ 95.) This is untrue because the median is a middle number in a range; the selection of which may be unaffected if one of the other numbers in the range is raised or lowered. Simply put, in cases of multi-source drugs, the New York State reimbursement rate for Medicaid is often not based on the price reporting of the manufacturer of the drug in question.

### 2. RICO Enterprises And The "Conduct/Participation" Requirements

Most of the County's RICO allegations are taken almost *verbatim* from the Amended Master Consolidated Complaint ("AMCC") before this Court. (*Compare* Am. Compl. ¶¶ 335-55 *with* AMCC ¶¶ 622–45.) The only major difference is that some of the defendant manufacturers are not named in both cases. Defendants incorporate by reference those arguments at pages 12-17 and 19-20 of the AMCC Dismissal Brief, which also necessarily demonstrate (i) that the so-called "Publisher Enterprises" pled here cannot survive and that (ii) the County has not properly pled facts to support the requisite "conduct of" or "participation in" a RICO enterprise through a pattern of racketeering activity.

### C. The County Cannot Establish The Reliance or Scienter Necessary for Common Law Fraud.

Even if Suffolk could sue for statements made to New York State (which it cannot), Suffolk also cannot establish that defendants acted with scienter or that the State itself "relied" on defendants' AWPs (Count VIII). If, for decades, it has been known through "government studies" (Am. Compl. ¶¶ 65, 108, 114-117, 120-121; *see also* "Factual Background" *supra*, citing such studies) and widely circulated press reports (Am. Compl. ¶ 63.)

that AWP represents only an undiscounted "list" or "sticker" price and that some discount must be applied to approximate a pharmacist's actual acquisition costs, it cannot be said that manufacturers act with the requisite "intent to deceive" necessary to support a fraud claim. *See H.B. Singer, Inc. v. Mission Nat'l Ins. Co.*, 636 N.Y.S.2d 316 (N.Y. App. Div. 1996) (alleged misrepresentation or omission cannot constitute fraud when essential facts are matter of public record). Nor can it be said that Suffolk justifiably relied on any alleged misrepresentation by defendants, since it knew that best prices were substantially less than AWPs, and it does not allege that defendants did anything to prevent it from obtaining the so-called "true" price information that appears in Exhibit A to the Amended Complaint. *See* 60A New York Jur. 2d § 232 (2001) (justifiable reliance is an essential element of a fraud claim).[20]

Furthermore, by the County's own admission (Am. Compl. ¶ 315.), it has no input into what it is billed by the State for Medicaid. It cannot say that any statement or omission of any defendant induced it to act or forbear. Accordingly, it cannot sue for fraud. *See Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lullo*, 148 F.3d 194, 196 (2d Cir. 1998) ("[A] plaintiff does not establish the reliance element of fraud ... by showing only that a third party relied on a defendant's false statements."); *Falise v. American Tobacco Co.*, 94 F. Supp. 2d 316, 354 (E.D.N.Y. 2000) (observing that a party seeking recovery for an action sounding in common-law fraud must "establish that *he was*

---

[20] This same publicly available information defeats any claim that New York State itself, and derivatively Suffolk County, justifiably relied on AWPs. *See e.g., Brenner v. American Cyanamid Co.*, 732 N.Y.S.2d 799, 801 (N.Y. App. Div. 2001) (fraud requires reliance); *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 n.13 (2d Cir. 1984) (plaintiff must make use of "means available to him of knowing . . . the truth, or the real quality of the subject of the representation" in order to claim misrepresentation) (quoting *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 600 (N.Y. 1959)).

*misled*, rather than merely alleging that the misrepresentations and omissions in question were relied on by a third party") (emphasis in original).

For these reasons, both Suffolk's RICO and common law fraud claims must be dismissed on scienter grounds and the common law claims must be dismissed on reliance grounds as well.

### D. All AWP-Fraud Claims Relating To Multiple-Source Drugs Should Be Dismissed.

All claims in the Amended Complaint relating to alleged AWP-fraud should be dismissed to the extent that they relate to multiple-source drugs. According to Suffolk, multiple-source drugs are reimbursed by New York Medicaid according to the same methodology as used by Medicare Part B. (*See* Am. Compl. ¶¶ 94 *et seq.*; 42 C.F.R. § 405.517.) These allegations are virtually identical to those asserted by private plaintiffs in the AMCC. *See* AMCC ¶¶ 181 *et seq.* This Court dismissed such claims when asserted by private plaintiffs in the MCC. *In re Pharm. Indus. AWP Litig.*, 263 F. Supp. 2d 171, 194 & n.11 (D. Mass. 2003). In the pending motion to dismiss the AMCC, defendants explain why the claims should again be dismissed in the AMCC. (*See* AMCC Dismissal Brief at 36-39.) Those arguments apply fully here, and the claims relating to alleged AWP fraud in connection with the sale or marketing of multiple-source drugs should be dismissed.

### E. The New York Consumer Fraud Statute is Inapplicable.

The New York Court of Appeals has interpreted General Business Law ("GBL") section 349, under which Suffolk County has sued (Count VII), as follows:

> A plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act.

*Stutman v. Chemical Bank,* 731 N.E.2d 608, 611 (N.Y. 2000). The Amended Complaint fails all three tests.

First, it is clear the "challenged act[s]" -- defendants' reporting of AWPs or WACs to the Publications and of AMPs and BPs to HHS -- were not "consumer-oriented." The Amended Complaint does not allege that defendants' alleged price reporting is directed to consumers. *See Cruz v. NYNEX Info. Res.,* 703 N.Y.S.2d 103, 107 (N.Y. App. Div. 2000) (dismissing claim stemming from the sale of advertising space in a phone book because conduct and commodity was directed at businesses, only, and thus could not affect consumers so as to fall within the parameters of the statute); *cf. New York Univ. v. Continental Ins. Co.,* 662 N.E.2d 763, 770 (N.Y. 1995) (dismissing claim because both parties to the transaction were knowledgeable and had the benefit of external advice and other protections such that transaction was not consumer transaction under the statute).[21]

Second, defendants' conduct cannot be described as "misleading in a material way" because it was at all times public knowledge that the reported prices were higher than the actual prices paid by New York pharmacies. *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 647 N.E.2d 741, 744-45 (N.Y. 1995) (no cause of action under GBL § 349 where defendants' conduct was not "likely to mislead a reasonable consumer acting

---

[21] Where, as here, an industry is the subject of pervasive regulation, application of the state's consumer protection law is especially inappropriate. *See Morris v. Gilbert,* 649 F. Supp. 1491, 1497 (E.D.N.Y. 1986) (plaintiff's allegations regarding broker's misrepresentations failed to state cause of action under New York consumer protection statute); *Gift & Luggage Outlet, Inc. v. People,* 756 N.Y.S.2d 717, 721 (N.Y. Sup. Ct. 2003) (imposition of additional penalties under consumer protection law not warranted where there existed comprehensive scheme for dealing with danger presented); *see also Berger v. E*Trade Group, Inc.,* No. 600721/99, 2000 WL 360092 at *4-5 (N.Y. Sup. Ct. March 28, 2000) (Sections 349 and 350 of the General Business Law not applicable to claims of false advertising regarding securities transactions).

reasonably under the circumstances"). Where, as here, the truth is not exclusively in the defendant's knowledge and the plaintiff has the means of knowing the truth, the plaintiff cannot pretend to have been deceived. *See Sabater v. Lead Indus. Assoc.*, 704 N.Y.S.2d 800, 808 (N.Y. Sup. Ct. 2000) (long established and well known dangers of lead paint barred plaintiffs' claims of ignorance of that fact); *see also Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593, 600 (N.Y. App. Div. 1998) (rejecting GBL § 349 claim because of public knowledge of cigarette hazards), *aff'd*, 720 N.E.2d 892 (N.Y. 1999). Suffolk may be frustrated about New York State's unwillingness to adopt a higher discount to AWP as the basis for Medicaid reimbursement; but it cannot claim to have been deceived. *Zuckerman v. BMG Direct Mktg., Inc.*, 737 N.Y.S.2d 14, 15 (N.Y. App. Div. 2002) (if amount of charge to consumer is disclosed, alleged inflation or excessiveness is not actionable under GBL § 349).

Third, plaintiff has not suffered injury "as result of" a deceptive act. If it has suffered at all, it is because New York State has determined that the AWPs in the Publications minus 12%, and the alleged spreads such rates reflect from providers' actual prices, are necessary to promote the objectives of the Medicaid program. *Cf. Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 898 (N.Y. 1999). The causal link (if any) between defendants' acts and any payment by the County is interrupted by the independent conduct of the State.

F.  **Suffolk Cannot Plead "Enrichment" of Manufacturers to Support an Unjust Enrichment/Constructive Trust Claim.**

Suffolk's unjust enrichment claim (Count IX) fails because the manufacturers are not enriched by the spread between AWPs and the actual costs of medical providers. (Am. Compl. ¶ 13.) Further, there is no correlation between the damages that the County seeks for alleged overpayments and the money received by defendants over which the County seeks to impose a constructive trust.

In order to state a claim for unjust enrichment, a plaintiff must plead that the defendant received a benefit from the plaintiff and that such enrichment was unjust. *McGrath v. Hilding*, 363 N.E.2d 328, 330-31 (N.Y. 1977). Nowhere in the Amended Complaint has plaintiff alleged that defendants received any direct payment or other property from the plaintiff, or that defendants even participated in the transaction that allegedly caused plaintiff's losses. This is fatal to Suffolk's unjust enrichment claim. *See, e.g., Citrin v. Columbia Broad. Sys., Inc.*, 286 N.Y.S.2d 706 (N.Y. App. Div. 1968); *see also Lakeville Pace Mech., Inc. v. Elmar Realty Corp.*, 714 N.Y.S.2d 338, 342 (N.Y. App. Div. 2000); *Lawyers' Fund for Client Protection v. Gateway State Bank*, 709 N.Y.S.2d 243, 245 (N.Y. App. Div. 2000) ("[U]njust enrichment has as one of its elements that the [defendant] hold possession of the proceeds."); *Baratta v. Kozlowski*, 464 N.Y.S.2d 803, 810 (N.Y. App. Div. 1983) (dismissing an unjust enrichment claim against a bank whose employee embezzled plaintiff's funds because bank was not enriched).

Suffolk may recover, if at all, only from the party who received the benefit allegedly conferred by it -- *i.e.* the person who received Suffolk's money, goods or services. Defendants are not that person. *Heller v. Kurz*, 643 N.Y.S.2d 580, 581-82 (N.Y. App. Div. 1996) (rejecting plaintiff broker's unjust enrichment claim against defendant shareholders who benefited from a corporation's initial public offering because plaintiff rendered services to, and

thus could only expect remuneration from, the corporation). *See also Lakeville Pace*, 714 N.Y.S.2d at 342 (contractor could not state unjust enrichment claims against project lender as any benefit lender received from contractor's performance was incidental to contractor's obligations to project's developer); *Allegheny Gen. Hosp. v. Phillip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000) ("incidental benefit . . . is not enough to maintain an [unjust enrichment] action", *i.e.*, where third-parties "got the main benefit, not the [defendant]"); *Weiner v. Bank of King of Prussia*, 358 F. Supp. 684, 704 (E.D. Pa. 1973) (dismissing a claim of unjust enrichment for lack of standing where the defendant never received any money from the plaintiff).

## II.   THE REBATE CLAIMS FAIL TO STATE A CAUSE OF ACTION

### A.   Suffolk Lacks Standing To Pursue Its Rebate Claims.

As is the case with its AWP claims, Suffolk's rebate claims -- which include alleged violations of federal and state Medicaid laws and regulations, breach of the Rebate Agreement and consumer fraud -- are derivative of harm allegedly suffered by the State. As the Amended Complaint concedes, Suffolk has "no input" into the process and is simply billed for 25% of the amount that New York State pays. (Am. Compl. ¶ 315.) Any cause of action, therefore, belongs to New York State, not the County.[22]

A plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties". *McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 68 (1st Cir. 2003). Where, as here, another potential plaintiff has suffered the same alleged injury as the plaintiff but in a more direct way, "secondary standing . . . is

---

[22] This is not to say, however, that the State has a valid cause of action. As explained below, any claim by the State )or the County) against a pharmaceutical manufacturer for violating federal AMP or BP reporting requirements is preempted by federal law.

24