# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE TOGETHER RX DEFENDANTS' MOTION TO DISMISS COUNTS V, VI, VII, VIII AND X OF THE AMENDED MASTER CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................................1

FACTUAL BACKGROUND ....................................................................................................2

ARGUMENT ............................................................................................................................8

    I.       PLEADING STANDARDS................................................................................8

    II.      PLAINTIFFS' CONSPIRACY ALLEGATIONS
            SUPPORT AN ECONOMICALLY PLAUSIBLE
            THEORY OF LIABILITY UNDER 15 U.S.C. § 1 ..............................................9

                A.     The Together Rx Defendants Had An Economic
                        Incentive To Collude To Increase AWPs Or The
                        "AWP Spread" On Both Together Rx And Non-
                        Together Rx Transactions ........................................................10

                B.     The Impact Of The Together Rx Defendants'
                        Conspiracy On Plaintiffs.........................................................13

                C.     Plaintiffs' Conspiracy Theory Is Consistent With
                        The Fundamental Theory Of The AMCC...................................14

                D.     Plaintiffs Have Standing To Assert Their Together
                      Card Claims ............................................................................15

    III.     PLAINTIFFS ASSERT VALID STATE LAW
            ANTITRUST AND UNFAIR COMPETITION CLAIMS...............................17

    IV.     PLAINTIFFS STATE A VALID RICO CLAIM ...............................................17

CONCLUSION........................................................................................................................19

TABLE OF AUTHORITIES

Page(s)

**Cases**

*American Column & Lumber Co. v. United States*, 257 U.S. 377 (1921) ...................... 11

*Car Carriers v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984) .................................... 10

*Corey v. Look*, 641 F.2d 32 (1st Cir. 1981) ........................................................... 8

*De Jesus Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003) ................................... 17

*DJ Mfg. Corp. v. Tex-Shield, Inc.*, No. 02-2114, 2003 U.S. App. LEXIS
 14930 (1st Cir. July 28, 2003) ........................................................................ 9, 10

*DM Research, Inc. v. College of American Pathologists*, 170 F.3d 53 (1st
 Cir. 1999)...................................................................................................... 10

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451
 (1992).......................................................................................................... 10

*Hewlett-Packard Co. v. Boston Scientific Corp.*, 77 F. Supp. 2d 189 (D.
 Mass. 1999)................................................................................................... 8

*Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258 (1992)................................... 18

*Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738 (1976) ................................ 8

*Illinois Brick v. Illinois*, 431 U.S. 720 (1977)...................................................... 17

*In re Brand Name Prescription Drugs Antitrust Litig.*, 1996 WL 167350
 (N.D. Ill. 1996), *rev'd*, 123 F.3d 599 (7th Cir. 1999) ........................................ 7, 8

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574
 (1986)............................................................................................................ 9

*Norte Car Corp. v. FirstBank Corp.*, 25 F. Supp. 2d 9  (D. Puerto Rico
 1998) ............................................................................................................ 7

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Company, Inc.*,
 998 F.2d 1224 (3d Cir. 1993)............................................................................ 12

*Roeder v. Alpha Indus., Inc.*, 814 F.2d 22 (1st Cir. 1987)................................... 8

*Rowe Entertainment, Inc. v. The William Morris Agency*, 2000 WL
 896929 (S.D.N.Y., July 6, 2000) ...................................................................... 12

*Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70 (D. Mass. 1998) ........................... 18

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) ....................................... 7

ii

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ............................................................ 8

*United Magazine Co. v. Murdoch Mag. Distrib.*, 146 F. Supp. 2d 385
(S.D.N.Y. 2001) ............................................................................................................ 10

*United States v. Container Corp. of America*, 393 U.S. 333 (1969) ...................... 1, 9, 10

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) ............................................ 9

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535 (4th Cir.
1998) ........................................................................................................................... 8, 9

## Rules

15 U.S.C. § 1 ........................................................................................................ 1, 2, 9, 12

18 U.S.C. § 1964(c) ......................................................................................................... 17

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 8, 10, 18

## Other Authorities

Niala Boodhoo, *Lilly Joins Discount Drug Card Bandwagon*, REUTERS,
March 12, 2002 ............................................................................................................ 3

Plaintiffs respectfully submit this memorandum of law in opposition to Defendant Together Rx LLC's ("Together Rx") and its member companies' (collectively, the "Together Rx Defendants") motion to dismiss Counts V, VI, VII, VIII and X (the "Together Card Claims") of the Amended Master Consolidated Class Action Complaint ("AMCC").[1]

## INTRODUCTION

The allegations supporting Plaintiffs' Together Card Claims make compelling economic sense and reveal the motivations behind the Together Rx Defendants' conspiracy.[2] The conspiracy, one which stabilizes a volatile market and fixes both prices and discounts, is a classic example of a horizontal, *per se* violation of the Sherman Act. *See* 15 U.S.C. § 1; *United States v. Container Corp. of America*, 393 U.S. 333, 337 (1969). The "economic sense" of the conspiracy can realistically be projected as billions of dollars in revenue for the Together Rx Defendants and intermediaries in the drug distribution chain.

The Together Rx Defendants' conspiracy, an agreement by several major players in the pharmaceutical market to increase the "spread" between the wholesale acquisition cost or "WAC" and the average wholesale price or "AWP"[3] of scores of widely prescribed drugs (the "Together Card Drugs"), effectively accomplishes two anticompetitive goals. First, the conspiracy enables the Together Rx Defendants to stabilize prices within the U.S. pharmaceutical market, thereby both preserving the

---

[1] All paragraph references herein, unless otherwise noted, relate to Plaintiffs' AMCC.
[2] The Together Rx Defendants seek dismissal of the Together Card Claims on grounds that Plaintiffs' "factual allegations make no economic sense and therefore fail to state a claim under the antitrust laws." *See* Together Rx Defendants' Brief ("TRx Brief") at p. 5.
[3] Although their own internal documents reflect their routine practice of establishing and reporting AWPs (*See, e.g.*, ¶¶ 235, 331-32, 380), the Together Rx Defendants nonetheless continue to suggest that they and other pharmaceutical manufacturers "generally" do not report AWPs. *See* TRx Brief at p. 4, n.4.

pharmaceutical industry's highly-contrived, elaborate and lucrative pricing structure in the face of price discounting and other competitive pressures, and quelling widespread public and political outrage over escalating drug costs. Second, the conspiracy enables the Together Rx Defendants to fix both the purported discounts offered to Together Card program enrollees, and the end payor reimbursement rates or prices at which drugs (including those that are part of the Together Card program) are reimbursed or paid for by individuals and entities, including nearly all third party payors, outside of the Together Card program. In short, because the factual allegations of the AMCC support an economically plausible theory of liability under 15 U.S.C. § 1, the Together Rx Defendants' Motion to Dismiss must be denied.

## **FACTUAL BACKGROUND**

As detailed in the AMCC, the Together Rx Defendants and the other Defendants have conspired with others in the pharmaceutical distribution chain, including but not limited to physicians and hospitals, PBMs, and various publishing entities, to collect inflated prescription drug payments from Plaintiffs. ¶ 2. In a perversion of the type of competitive behavior expected in a market not subject to illegal manipulation, rather than promote their drugs based on lower prices, the Together Rx Defendants and the other Defendants promoted their drugs based on reimbursement rates tied to fictitious and inflated AWPs. ¶ 6. An inflated AWP enables providers, PBMs and other intermediaries to generate inflated profits at the expense of Plaintiffs, and increases or maintains the market share of the drugs manufactured by the Together Rx Defendants and the other Defendants. *Id.*

2

Sometime in 2001, recognizing that competitive, regulatory and political pressures might soon curtail previously unbridled inflationary drug pricing practices, the Together Rx Defendants came "together" in an attempt to set and stabilize pharmaceutical prices. ¶ 550. The Together Rx conspiracy was accomplished through the operation of the Together Rx Card program ("Together Card Program"), a purported prescription drug savings program for older, uninsured and poor Americans. ¶ 544.

The Together Rx Defendants encouraged immediate and widespread enrollment in the Together Card Program:

> The individual companies' sales forces, which total more than 30,000 representatives, will assist in making enrollment materials available through participating pharmacies, physicians' offices and community centers.
>
> ****
>
> The members of Together Rx are committed to maximizing enrollment in the Together Rx Card and at the same time to identifying patients who may qualify for their independent [patient assistance programs].

¶ 576. The Together Rx Defendants' promotional efforts yielded an immediate and tremendous response from seniors. Currently, according to the Together Rx Defendants, "the Together Rx program has grown to 900,000 cardholders[.]" TRx Brief at p. 1.[4]

In a July 29, 2002 press release, the Together Rx Defendants encouraged "other pharmaceutical companies to join this effort and help broaden the number of products

---

[4] The Together Rx Defendants suggest that Together Card enrollees have received "more than $125,000,000 of *direct subsidies* at the pharmacy counter from the member companies of Together Rx." TRx Brief at p. 1 (emphasis added). The Together Rx Defendants' suggestion that they "subsidize" any enrollee's purchase of a Together Card Drug is a true misnomer. At best, the Together Card Program might offer an enrollee a discount off an already inflated Together Card Drug price. Are the Together Rx Defendants truly "subsidizing" our nation's low-income elderly if they agree, for example, to make a 50% profit on Together Card Drugs sold to enrollees through the Together Card Program vs. a 90% profit?

offered." ¶ 580.[5]  On their Together Rx website, the Together Rx Defendants offered the

following response to the question "Why are all these pharmaceutical companies doing

this?":

> The participating companies are committed to providing seniors
> and other eligible Medicare patients with broader access to savings
> on many medications with the convenience of one card.  Together
> Rx is designed to fill a gap in the system for the short term.  The
> real solution is implementation of Medicare reform, including a
> prescription drug benefit.

¶ 581.  Although claiming its purpose was to help provide Medicare beneficiaries with

"broader access to savings" on prescription pharmaceuticals, the Together Rx Defendants

used the Together Card Program to raise, fix, maintain and/or stabilize the AWP spread

for their Together Card Drugs.  ¶ 584.

When the Together Rx Defendants aligned themselves in order to offer a

combined drug discount card to elderly Americans, however, they perceived a significant

problem – elderly and poor Americans *might actually end up paying less* for their

Together Card Drugs.  ¶ 585.  Although the Together Rx Defendants did not necessarily

object to elderly and poor Americans paying less for drugs, they did not want to bear that

expense themselves.  The quandary continued, however, because others in the

distribution chain – major retail pharmacy chains, PBMs, wholesalers – similarly did not

wish to bear the cost of reduced expenditures.  In other words, any Together Card

Program discounts could not be borne by retail pharmacists or wholesalers (given their

---

[5] The Together Rx Defendants have invited "about a dozen manufacturers" to join the Together Card Program.  ¶ 564.  However, the CEO of one major pharmaceutical company has publicly rejected a joint discount card program among competing pharmaceutical companies on grounds that it violates "antitrust regulations." *Id.  See* Niala Boodhoo, *Lilly Joins Discount Drug Card Bandwagon*, *REUTERS*, March 12, 2002.

claim to already being squeezed on margin).  *Id.*  Moreover, administration of the Together Card Program would itself carry some cost.

As a result of their desire to avoid the financial burden of the Together Card Program, the Together Rx Defendants conspired and agreed to shift the burden onto end payors (i.e., third party payors or cash paying consumers) by raising reimbursement or end payor prices (typically based on AWPs) in relation to actual cost to wholesalers, pharmacies and mail order companies (usually tied in some way to WAC, although subject to discounting and rebates).  ¶ 587.  Specifically, in conjunction with the establishment and management of their Together Card Program, the Together Rx Defendants agreed to raise, fix, maintain and/or stabilize the AWP "spread" on scores of the 170+ drugs included in the program.  ¶ 588.  Put simply, by increasing the difference between posted AWPs and posted WAC, the Together Rx Defendants created "spread dollars" available to others in the distribution chain as an incentive to participate in the Together Card Program — all to the detriment, and only to the detriment, of Plaintiffs and the Class.  ¶ 589.[6]

Conspicuously absent from Defendants' Motion to Dismiss – a motion predicated on the claim that the alleged conspiracy makes "no economic sense" – is a ***denial*** of any of the following critical facts concerning the Together Card Program:

---

[6] The Together Rx Defendants successfully protected pharmacies from any additional product or administrative costs relative to the Together Card Program.  According to the Together Rx Defendants, "[p]harmacies across the country . . . have shown strong support for the [Together Card].  In addition to accepting the card at their retail outlets in communities across America, participating pharmacies have made the commitment to pass through direct to the patient 100% of the savings being offered by the pharmaceutical companies."  ¶ 577.

- The Together Card Program facilitated the sharing of price information, and the information and maintenance of the Together Rx Defendants' conspiracy. ¶ 546.

- The Together Rx Defendants' agreement and conspiracy have caused Plaintiffs during the Class Period to pay more for the Together Card Drugs than they would have if the Together Rx Defendants had not engaged in their unlawful practices. Plaintiffs have been damaged due to the Together Rx Defendants' conspiracy to raise, fix, maintain and/or stabilize the AWP spread of the Together Card Drugs. ¶ 545.

- The Together Rx Defendants increased the AWP spread on most of their Together Card Drugs – across many therapeutic classes and product lines. The 170+ Together Card Drugs account for approximately 900 pharmaceutical line-items (the line-items reflecting the 170+ drugs in different forms, sizes and dosages). The AWP spreads for over 80% of these line-items were increased. ¶ 588.

- The effectively simultaneous timing of the Together Rx Defendants' increases in AWP spreads is unprecedented in terms of scope (i.e. number of products per manufacturer and number of manufacturers within the pharmaceutical industry). The Together Rx Defendants' increases in the AWP spreads for the Together Card Drugs are not consistent with competitive conduct. ¶ 592.

- Prior to the formation of the Together Rx conspiracy, the AWPs for the Together Card Drugs reflected an AWP pricing spread of roughly 20% ((AWP – WAC)/WAC). Following the formation of the conspiracy, the Together Rx Defendants increased the AWP spreads for these same drugs to a range of 21-26%, whether sold through or outside of the Together Card Program. The percentage of all Together Card Drugs manufactured by the Together Rx Defendants, with an AWP spread level greater than 24%, increased from 25.5% in 2000 – prior to the development and implementation of the Together Card Program – to 92% by 2002 (*see* chart immediately below). ¶ 590.



These uncontested allegations, the product of Plaintiffs' research and analysis of actual industry pricing data, alone are sufficient to defeat the Together Rx Defendants' Motion to Dismiss. *See Norte Car Corp. v. FirstBank Corp.,* 25 F. Supp. 2d 9, 16 (D. Puerto Rico 1998) (recognizing that "[a]ntitrust jurisprudence demands three elements be alleged with sufficient clarity to withstand a motion to dismiss a Sherman Act claim: (1) the existence of a contract, combination or conspiracy among two or more separate entities that (2) unreasonably restrains trade and (3) affects interstate or foreign commerce.")(*citing Standard Oil Co. v. United States,* 221 U.S. 1, 52 (1911)).

Finally, the Together Rx Defendants are no strangers to illegal agreements to raise and stabilize drug prices. *See In re Brand Name Prescription Drugs Antitrust Litig.,* 1996 WL 167350 (N.D. Ill. 1996), *rev'd on other grounds,* 123 F.3d 599 (7th Cir. 1999). Importantly, *all* of the Together Rx Defendants, or their predecessor companies, were named defendants in *Brand Name. Id.* Similar to the present action, "at the heart of the

7

[*Brand Name*] plaintiffs' Sherman Act claims are allegations to the effect that the
***defendants collusively created and maintained a dual pricing system which raises or
stabilizes the prices*** paid for brand name prescription drugs[.]" *Id.* at *16 (emphasis
added).  In finding that the record revealed "substantial support for *each* manufacturer's
participation in the alleged conspiracy" (*Id.* at *19) (emphasis added), in pertinent part,
the *Brand Name* court stated:

> Although each manufacturer aspires to distinguish itself from the
> next, several commonalities emerge from the record. ***The record
> indicates, for example, participation by virtually every
> manufacturer in industry meetings and seminars to discuss
> strategies that should be followed in setting prices for brand
> name prescription drugs.***  Similarly, virtually every manufacturer
> participated in surveys and inquiries conducted by other defendants
> regarding pricing policies.

*Id.* at *18 (emphasis added).[7]  Conceding these critical factual allegations of the AMCC,
the Together Rx Defendants' Motion to Dismiss hinges on a single, flawed argument:
Plaintiffs' conspiracy theory "makes no economic sense."  TRx Brief at p. 5.

## ARGUMENT

### I.   PLEADING STANDARDS

In determining whether to dismiss a complaint for failure to state a claim under
Fed. R. Civ. P. 12(b)(6), "the Court must accept as true 'the well-pleaded facts as they
appear in the complaint, extending the plaintiff every reasonable inference in his favor.'"
*Hewlett-Packard Co. v. Boston Scientific Corp.*, 77 F. Supp. 2d 189, 195 (D. Mass.
1999).  "The complaint may not be dismissed unless 'it appears beyond doubt that the
plaintiff can prove no set of facts in support of his claim which would entitle him to
relief.'"  *Id.* (*citing Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987)).  The

---

[7] At least some of the Together Rx Defendants settled with the *Brand Name* plaintiffs. *See In re
Brand Name*, 1996 WL 167350, *32 n.6.

8

First Circuit has stated that "[t]here is no special rule requiring more factual specificity in antitrust pleadings." *Corey v. Look*, 641 F.2d 32, 38 (1st Cir. 1981) (citation omitted) (reversing dismissal of antitrust complaint).

Dismissals of antitrust cases pursuant to Rule 12(b)(6) are particularly inappropriate where, as here, Plaintiffs have not had the opportunity to pursue discovery of their Together Card Claims. "[W]here the proof is largely in the hands of the defendants, dismissals [of antitrust cases] prior to giving the plaintiff ample opportunity for discovery should be granted sparingly." *Hewlett-Packard*, 77 F. Supp. 2d at 195 (*quoting Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976)). *See also Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (same); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 539 (4th Cir. 1998) (same). "Summary disposals 'should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of alleged conspirators, and hostile witnesses thicken the plot.'" *DJ Mfg. Corp. v. Tex-Shield, Inc.*, No. 02-2114, 2003 U.S. App. LEXIS 14930, *5 (1st Cir., July 28, 2003) (citation omitted) (reversing district court's dismissal of complaint brought under Puerto Rico antitrust statute).[8]

## II.   PLAINTIFFS' CONSPIRACY ALLEGATIONS SUPPORT AN ECONOMICALLY PLAUSIBLE THEORY OF LIABILITY UNDER 15 U.S.C. § 1

Under Section 1 of the Sherman Act, "every contract, combination in the form of trust or otherwise, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. The United States Supreme Court has ruled that "all forms of price-fixing are

---

[8] Pursuant to Case Management Order No. 7, Plaintiffs were precluded from serving discovery on the Together Rx Defendants pertaining to their Together Card Claims. Importantly, proof of the Together Rx Defendants' conspiracy is largely – if not exclusively – in their hands. *See DJ Mfg. Corp.*, 2003 U.S. App. LEXIS 14930 at *5. The Together Rx Defendants correctly note that the AMCC "contains virtually no allegations about the specific subsidies given to cardholders by the Together Rx companies." TRx Brief at p. 9. Of course, only the Together Rx Defendants would possess such information.

per se violations of the Sherman Act." *United States v. Container Corp. of America,* 393 U.S. 333, 338 (1969) (*citing United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224 n.59 (1940)). "*Stabilizing prices* as well as raising them is within the ban of § 1 of the Sherman Act." *Container Corp.,* 393 U.S. at 337 (emphasis added).

The Together Rx Defendants correctly acknowledge that an antitrust conspiracy complaint must allege an economically plausible theory to avoid dismissal pursuant to Fed. R. Civ. P. 12(b)(6). TRx Brief at pp. 7-9.[9] As detailed below, as to both Together Rx and non-Together Rx transactions alike, and contrary to the Together Rx Defendants' contentions, Plaintiffs' Together Card conspiracy allegations make *compelling* economic sense. Accordingly, the Together Rx Defendants' Motion to Dismiss should be denied. *See Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 478 (1992) ("[v]iewing the evidence in the light most favorable to respondents, their allegations of market power 'mak[e] . . . economic sense.'") (citation omitted).

**A.   The Together Rx Defendants Had An Economic Incentive To Collude To Increase AWPs Or The "AWP Spread" On Both Together Rx And Non-Together Rx Transactions**

Since at least 1991, the Together Rx Defendants and the other Defendants have sold pharmaceuticals through a highly-contrived, elaborate and lucrative pricing structure. This pricing structure utilizes two parallel systems – a system of actual

---

[9] Unlike the *plausible* economic theory asserted in the present action, virtually all of the cases cited by the Together Rx Defendants for this well-grounded proposition involve economically *implausible* theories – theories in which the purported conspirators actually suffer financial *harm* as a result of their alleged participation. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (finding a predatory pricing conspiracy to be highly implausible where it would have required the defendants to sustain losses for decades with no foreseeable profits); *DM Research, Inc. v. College of American Pathologists,* 170 F.3d 53, 56 (1st Cir. 1999) (concluding it was "highly implausible [for the defendant] to adopt a faulty standard whose main effect would be to raise costs[.]"); *Car Carriers v. Ford Motor Co.,* 745 F.2d 1101, 1109 (7th Cir. 1984) (finding it "inherently implausible that [defendant] conspired to injure itself."); *United Magazine Co. v. Murdoch Mag. Distrib.,* 146 F. Supp. 2d 385, 402 (S.D.N.Y. 2001) (concluding that "plaintiffs' alleged conspiracy to engage in predatory pricing is entirely unnecessary and makes no economic sense[.]").

transaction costs for pharmacies, PBMs and others in the distribution chain, and a separate system utilizing AWP as the benchmark of payment for, and reimbursement of, prescription drugs by the end payors (third party payors or cash paying customers). ¶ 154. In an effort to increase their respective market shares, the Together Rx Defendants and the other Defendants promoted their drugs based on reimbursement rates tied to fictitious and inflated AWPs – far exceeding true transaction costs. ¶ 6. Not surprisingly, this perverse method of competition has led to exorbitant drug prices, much to the consternation of American consumers. In 2001, Americans spent $172 billion on prescription drugs (including $1,756 annually for the average senior). ¶ 547.

Recognizing that competitive, regulatory and political pressures might soon curtail previously unbridled inflationary drug pricing practices, beginning in 2001, the Together Rx Defendants came "together" in an attempt to set and stabilize pharmaceutical prices. ¶ 550. The market stabilization afforded by the Together Card conspiracy allows the Together Rx Defendants to both: (1) preserve the pharmaceutical industry's highly-contrived, elaborate and lucrative pricing structure in the face of price discounting and other competitive pressures; and (2) respond to widespread public and political outrage over escalating drug costs.

In agreeing to set and maintain identical AWP spreads on their Together Card Drugs, the Together Rx Defendants stabilized competitive pressures on scores of widely prescribed pharmaceuticals while likely staving off some type of price control. *See Container Corp.,* 393 U.S. at 333 n.3 (recognizing that the defendants in *American Column & Lumber Co. v. United States,* 257 U.S. 377, 389 (1921), had a "sophisticated and well-supervised plan for the exchange of price information between competitors with

the idea of *keeping prices reasonably stable*[.]")(emphasis added).  Specifically, in concert, the Together Rx Defendants timely and uniformly increased the AWP spreads on over 80% of their Together Card Drugs.  ¶ 588.  The percentage of all Together Card Drugs manufactured by the Together Rx Defendants, with an AWP spread level greater than 24%, increased from 25.5% in 2000 – prior to the development and implementation of the Together Card conspiracy – to 92% by 2002.  ¶ 590.

The Together Rx Defendants' agreement to establish uniform AWP spreads did more than stabilize prices and quell rampant AWP inflation (which jeopardized the pharmaceutical industry's entire pricing structure).  The agreement also allowed the Together Rx Defendants to stabilize discounts on their Together Card Drugs – in that all of the Together Rx Defendants could begin to discount from the same pricing benchmark.  This stabilization of discounts also worked to minimize the financial burden to the Together Rx Defendants caused by the proliferation of drug discount cards.[10]

Any purported "discounts" afforded to Together Card Program enrollees were but a small price for the Together Rx Defendants to pay to quell competitive pressures, stabilize prices and discounts, preserve their industry's lucrative pricing structure, and otherwise maintain the status quo.[11]  As to both Together Rx and non-Together Rx transactions alike, these legitimate economic incentives motivated[12] the Together Rx

---

[10] Considering that additional members would only mean more industry control, the Together Rx Defendants' ongoing pleas to other pharmaceutical manufacturers to join their conspiracy was predictable.  ¶¶ 564, 580.

[11] Because stabilization of industry prices and discounts was the economic motive behind their conspiracy, the Together Rx Defendants' analysis of whether they profited from Together Rx transactions involving either a specific dollar discount or a discount off AWP is a red herring.  *See* TRx Brief at pp. 9-10.

[12] The Together Rx Defendants also contend there was no need to conspire to increase AWP spreads because each Together Rx Defendant, as alleged in the AMCC, "can manipulate AWP levels as it sees fit."  TRx Brief at pp. 14.  However, existing competitive, political and public pressures would not have allowed any single Together Rx Defendant to unilaterally attempt – or maintain – any such AWP

Defendants to participate in the conspiracy. Accordingly, as Plaintiffs properly allege an economically plausible theory[13] under § 1 of the Sherman Act, the Together Rx Defendants' Motion to Dismiss must be denied.

**B.     The Impact Of The Together Rx Defendants' Conspiracy On Plaintiffs**

By their agreement to increase AWP spreads on their Together Card Drugs, the Together Rx Defendants conspired to hurt the ***broader*** public of prescription drug end payors (such as self-insured employers, health plans and consumers) who reimburse or pay for those drugs ***outside of*** the Together Card Program. ¶ 10. In increasing the difference between posted AWPs and posted WACs, the Together Rx Defendants created spread dollars available to others in the distribution chain as an incentive to participate in the Together Card Program — all to the detriment, and only to the detriment, of Plaintiffs and the Class. ¶ 589.

An increase in AWP directly results in higher reimbursement prices to Plaintiffs and Class members for Together Card Drugs purchased ***outside of*** the Together Card Program. The following chart reflects, for a single drug manufactured by each Together Rx Defendant, the AWP spread increase and related AWP increase which occurred as a result of the Together Card conspiracy:

---

increases. ¶¶ 547-50. Further, the chart on page 6, *supra*, evidences that none of the Together Rx Defendants attempted to unilaterally increase their AWP spreads to 25% in the four years preceding the Together Card conspiracy. The effectively simultaneous timing of the Together Rx Defendants' increases in AWP spreads is unprecedented in terms of the number of products per manufacturer and number of manufacturers within the pharmaceutical industry. ¶ 592. Finally, as a practical matter, an increase in the AWP spreads of a single pharmaceutical manufacturer alone would not stabilize industry prices.

[13] *See, e.g., Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Company, Inc.*, 998 F.2d 1224, 1232 (3d Cir. 1993) (determining that ". . . the plaintiff's theory of conspiracy is not implausible."); *Rowe Entertainment, Inc. v. The William Morris Agency*, Case No. 98 Civ. 8272 (RPP), 2000 WL 896929, *5 (S.D.N.Y., July 6, 2000) (finding "the motive alleged by the plaintiffs for the booking agency defendants to participate in the antitrust conspiracy is sufficiently 'economically plausible' to survive this motion to dismiss.").

| Together Card Defendant | Together Card Drug | AWP Before Alliance | WAC Before Alliance | AWP/WAC Spread Before Alliance | AWP After Alliance | WAC After Alliance | AWP/WAC Spread After Alliance |
|---|---|---|---|---|---|---|---|
| Abbott | Biaxin 500 mg #60 | $396.72 | $334.08 | 18.8% | $437.98 | $350.38 | 25% |
| AstraZeneca | Prilosec 40 mg #1000 | $6,171.66 | $5,143.05 | 20% | $6,621.67 | $5,297.34 | 25% |
| Aventis | Allegra 60 mg #100 | $118.36 | $98.63 | 20% | $123.29 | $98.63 | 25% |
| BMS | Tequin 400 mg #100 | $818.86 | $682.27 | 20% | $895.48 | $716.38 | 25% |
| GSK | Combivir #100 | $1,241.26 | $1,034.38 | 20% | $1,370.55 | $1,096.44 | 25% |
| J&J (Janssen) | Risperdal 2 mg #500 | $2,320.10 | $1,933.42 | 20% | $2,535.20 | $2,028.16 | 25% |
| Novartis | Exelon 2 mg/ml | $246.96 | $205.80 | 20% | $267.29 | $213.83 | 25% |

¶ 591.  Almost all of the Together Card Drugs experienced similar AWP spread increases and related AWP increases.  *Id.*  The Together Rx Defendants' conspiracy has caused Plaintiffs and the Class to overpay millions of dollars for the Together Card Drugs.

## C.    Plaintiffs' Conspiracy Theory Is Consistent With The Fundamental Theory Of The AMCC

The Together Rx Defendants correctly recognize that the "principal thrust" of Plaintiffs' AMCC is that Defendants increased the spread between the WAC and AWP of their drugs in an effort to increase their respective market shares and corresponding profits.  *See* TRx Brief at pp. 13-14.  Further, the Together Rx Defendants accurately state that Defendants traditionally benefit from such spread increases if their spread is greater than those of its competitors.  *Id.*

The Together Rx Defendants erroneously contend, however, that Plaintiffs' conspiracy theory runs "directly contrary to th[e] fundamental theory of the [AMCC]."  TRx Brief at p. 14.  First, the Together Card conspiracy involves only the Together Card Drugs – while the fundamental theory involves the hundreds of drugs identified in

14

Appendix B to the AMCC.  ¶¶ 566-75.  Plaintiffs have no doubt that the Together Rx Defendants, throughout the course of their ongoing and unrelated Together Card conspiracy, continue to manipulate and/or increase AWPs in a misguided attempt to gain market share for their respective non-Together Card Drugs.  Second, any purported inconsistency between the fundamental AWP theory and the Together Card conspiracy theory could only involve a small portion of Plaintiffs' Together Card Claims.  Upon information and belief, the Together Rx Defendants began to conspire sometime in 2001 – a *full decade after* the start of the proposed Class Period for Plaintiffs' non-Together Card Claims.  ¶¶ 542, 596.  Finally, as practical matter, there is nothing inherently inconsistent about the Together Rx Defendants competing for market share within the lucrative pricing structure they conspired to preserve.

### D.  Plaintiffs Have Standing To Assert Their Together Card Claims

Plaintiffs have standing to assert their Together Card Claims because they purchased Together Card Drugs.  The Together Rx Defendants, arguing form over substance, claim that Plaintiffs lack standing because no named plaintiff is presently enrolled in the Together Card Program.  Plaintiffs, however, bring their Together Card Claims on behalf of the following proposed Class:

> All persons or entities in the United States and its territories who paid any portion of the purchase price for, or who reimbursed any portion of the purchase price of, a drug covered by the Together Rx Program on that basis, in whole or in part, on the published average wholesale price during the time period January 1, 2002 up to and including the present.

¶ 604.  Plaintiffs, in the alternative, also seek to represent the following proposed Class:

> All persons or entities in the indirect purchaser states who paid any portion of the purchase price for, or who reimbursed any portion of the purchase price of, a drug covered by the Together Rx Program on the basis, in whole or in part, on the published average wholesale price during the time period January 1, 2002

up to and including the present.

¶ 605.

Importantly, both of these proposed Classes consist of persons who paid the purchase price of, or who reimbursed any portion of a purchase price of, *a drug covered by the Together Card Program*. *See also* ¶ 545 ("The The Together Card Defendants' agreement and conspiracy have caused Plaintiffs and the Nationwide End Payor Together Card Class . . . to pay more for the Together Card Drugs than they would have if the Together Card Defendants had not engaged in their unlawful practices."). The following chart, using information taken from Appendix B of the AMCC, identifies those Together Card Drugs purchased by Plaintiffs.[14]

| Plaintiffs Who Purchased or Reimbursed Drug | Drug Purchased or Reimbursed (Examples taken from AMCC ¶ 567) | Together Rx Defendant |
|---|---|---|
| UFCW, TCBW, THWF, CMHV, MAN, PFTHW | Depakote | Abbott |
| UFCW, TCBW, THWF CMHV, MAN, PFTHW | Casodex | AstraZeneca |
| UFCW, TCBW, THWF CMHV, MAN, PFTHW | Nasacort | Aventis |
| UFCW, TCBW, THWF CMHV, MAN, PFTHW | Monopril | BMS |
| UFCW, TCBW, THWF CMHV, MAN, PFTHW | Imitrex | GSK |
| UFCW, TCBW, THWF CMHV, MAN, PFTHW | Lescol | Novartis |
| UFCW, TCBW, THWF CMHV, MAN, PFTHW | Floxin | J&J (through Janssen and Ortho-McNeil) |
| UFCW, TCBW, THWF CMHV, MAN, PFTHW | Prevacid | TAP |

Consequently, it is irrelevant whether any named Plaintiff is presently enrolled in the Together Card Program.  Rather, because they paid for, or were reimbursed for, Together

---

[14] The chart reflects Together Card Drug purchases by Plaintiffs United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund ("UFCW"), Twin Cities Bakery Workers Health and Welfare Fund ("TCBW"), Teamsters Health & Welfare Fund of Philadelphia and Vicinity ("THWF"), Board of Trustees of Carpenters and Millwrights of Houston and Vicinity Welfare Trust Fund ("CMHV"), Philadelphia Federation of Teachers Health and Welfare Fund ("PFTHW"), and Man-U Service Contract Trust Fund ("MAN").

16

Card Drugs – drugs whose prices were based on AWP – Plaintiffs have standing to assert their Together Card Claims.

## III.   PLAINTIFFS ASSERT VALID STATE LAW ANTITRUST AND UNFAIR COMPETITION CLAIMS

The Together Rx Defendants contend that Plaintiffs' state law antitrust and unfair competition claims should be dismissed because "[i]f the allegations of conspiracy are implausible and lack a rational economic basis, that defeats any conspiracy theories under state as well as federal law." TRx Brief at p. 16. As demonstrated above, Plaintiffs' AMCC alleges an economically plausible conspiracy. Accordingly, Plaintiffs' state law claims should not be dismissed.

Further, contrary to the Together Rx Defendants' contention (TRx Brief at p. 16), Plaintiffs' Count VII is not moot merely because it is asserted in the alternative. A claim is rendered moot only when the underlying controversy alleged in a complaint is no longer occurring. *See, e.g., De Jesus Mangual v. Rotger-Sabat,* 317 F.3d 45, 60 (1st Cir. 2003). Such is not the case in the present action. The controversy underlying all of the Together Card Claims – the Together Rx Defendants' conspiracy to fix AWP spreads – remains despite the fact that Defendants have not moved to dismiss the AMCC based on *Illinois Brick v. Illinois,* 431 U.S. 720 (1977). Dismissal of the state law claims, for mootness or otherwise, is not warranted at this stage of the litigation.

## IV.   PLAINTIFFS STATE A VALID RICO CLAIM

According to the Together Rx Defendants, Plaintiffs' Together Card Claims brought pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") should be dismissed because their conspiracy "makes no economic sense." TRx Brief at

17

p. 16. As demonstrated above, *all* of Plaintiffs' Together Card Claims make compelling economic sense.

Further, the Together Rx Defendants erroneously contend that Plaintiffs' lack standing under 18 U.S.C. § 1964(c) because their alleged conduct was not the proximate cause of Plaintiffs' injuries. *See* TRx Brief at p. 17. First, for the reasons set forth in Plaintiffs' Opposition to Defendants' Combined Motion to Dismiss at Section V.D. (which is incorporated here by reference), the Together Rx Defendants' RICO standing argument fails. Second, in any event, the Together Rx Defendants' argument is merely a backdoor attempt to circumvent the law of this Court – that a RICO plaintiff is *not* required to plead detrimental reliance. *See Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70, 82 (D. Mass. 1998) (finding "the line of cases that decline to read into RICO mail fraud cases a requirement of actual, detrimental reliance are most faithful to the [RICO] statute and, in any event, most persuasive.").

The *Sebago* court illuminated *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258 (1992), relied on by the Together Rx Defendants: "[w]hile the Court described proximate cause as demanding a 'direct' relation between defendant's conduct and the plaintiff's alleged injury, the Court also observed that it did not mean to preclude all possibility of recovery for injury that was caused indirectly." *Sebago*, 18 F. Supp. 2d at 83. The *Sebago* court concluded that "a civil RICO plaintiff basing a claim on mail fraud need only allege 'but for' causation and proximate causation to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Id.* at 84 (holding plaintiffs had sufficiently alleged proximate cause because plaintiffs were "among the intended victims of the defendants' alleged fraudulent scheme"). Accordingly, the Together Rx Defendants'

18

misguided attempt to impose more stringent pleading requirements for Plaintiffs'

Together Card RICO Claims must be rejected.

## CONCLUSION

For the aforementioned reasons, the Together Rx Defendants' Motion to Dismiss

should be denied.

DATED:  September 15, 2003.


Boston, Massachusetts

By_____
    Thomas M. Sobol
    Edward Notargiacomo
    Hagens Berman LLP
    225 Franklin Street, 26th Floor
    Boston, MA  02110
    Telephone: (617) 482-3700
    Facsimile: (617) 482-3003

DATED:      September 15, 2003.

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Samuel Heins
Brian Williams
Heins, Mills & Olson, P.C.
700 Northstar East
608 Second Avenue South
Minneapolis, MN  55402
Telephone: (612) 338-4605
Facsimile: (612) 338-4692

19

Jeffrey L. Kodroff
John A. Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

**CHAIRS OF LEAD COUNSEL COMMITTEE**

Marc H. Edelson
Alan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Elizabeth Fegan Hartweg
The Wexler Firm
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

**MEMBERS OF LEAD COUNSEL COMMITTEE AND EXECUTIVE COMMITTEE**

Michael McShane
Alexander, Hawes & Audet, LLP
300 Montgomery Street, Suite 400
San Francisco, CA  94104
Telephone: (415) 982-1886
Facsimile: (415) 576-1776

Robert E. Piper, Jr.
Piper & Associates
624 Pierre Avenue
Shreveport, LA 71103
Telephone: (318) 226-0826
Facsimile: (318) 424-9900

**MEMBERS OF EXECUTIVE COMMITTEE**

Anthony Bolognese
Bolognese & Associates
One Penn Center
1617 JFK Boulevard, Suite 650
Philadelphia, PA  19103
Tel:  (215) 814-6750
Fax:  (215) 814-6764

Jonathan W. Cuneo
The Cuneo Law Group
317 Massachusetts Avenue, N.E., Suite 300
Washington, D.C. 20002
Tel: (202) 789-3960
Fax: (202) 789-1813

Neal Goldstein (Of Counsel)
Freedman & Lorry, PC
400 Market Street, Suit 900
Philadelphia, PA 19106
Tel: (215) 925-8400
Fax: (215) 925-7516

Michael E. Criden
Hanzman & Criden, PA
Commerce Bank Center, Suite 400
220 Alhambra Circle
Coral Gables, FL  33134
Tel:  (305) 357-9000
Fax: (305) 357-9050

Blake M. Harper
Kirk B. Hulett
Hulett Harper LLP
550 West "C" Street, Suite 1700
San Diego, CA  92101
Tel:  (619) 338-1133
Fax: (619) 338-1139

Jonathan D. Karmel
Karmel & Gilden
221 N. LaSalle Street, Suite 1414
Chicago, IL  60601
Tel: (312) 641-2910
Fax: (312) 641-0781

G. Mark Albright
Albright, Stoddard, Warnick & Albright
Quail Park 1, Building D-4
801 South Rancho Drive
Las Vegas, NV  89106

Dianne M. Nast
Roda & Nast, PC
801 Estelle Drive
Lancaster, PA 17601
Tel: 717-892-3000
Fax: 717-892-1200

Henry H. Rossbacher
Rossbacher & Associates
811 Wilshire Boulevard, Suite 1650
Los Angeles, CA 90017-2666
Tel:  (213) 895-6500
Fax:  (213) 895-6161

Jonathan Shub
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd fl
Philadelphia, PA  19102
Tel:  (215) 790-7300
Fax:  (215) 546-0942

Scott R. Shepherd
Shepherd & Finkleman, LLC
117 Gayley Street, Suite 200
Media, PA 19063
Tel:  (610) 891-9880
Fax:  (610) 891-9883

Lee Squitieri
Squitieri & Fearon
420 Fifth Avenue, 28th Floor
New York, NY  10018
Tel: (212) 575-2092
Fax: (212) 575-2184

Lisa J. Rodriguez
Ira Neil Richards
Trujillo Rodriguez& Richards, LLC
The Penthouse
226 West Rittenhouse Square
Philadelphia, PA  19103
Tel:  (215) 731-9004
Fax:  (215) 731-9044

Mitchell A. Toups
Weller, Green, Toups & Terrell, L.L.P.
2615 Calder Street, Suite 400
P.O. Box 350
Beaumont, TX  77704
Tel: (409) 838-0101
Fax: 409-838-6780

Damon Young
Lance Lee
Young, Pickett & Lee
4122 Texas Boulevard
P.O. Box 1897
Texarkana, TX  75504
Tel: (903) 794-1303
Fax: 903-792-5098; 903-794-5098

**ADDITIONAL ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that I, Edward Notargiacomo, an attorney, caused true and correct copies of the foregoing Plaintiffs Memorandum of Law in Opposition to Together Rx Defendants' Motion to Dismiss Counts V, VI, VII, VIII and X of the Amended Master Consolidated Class Action Complaint to be served on all counsel of record electronically, pursuant to Section D of Case Management Order No. 2., this 15th day of September, 2003.

By:

Edward Notargiacomo, Esq.
HAGENS BERMAN LLP
225 Franklin Street, 26th floor
Boston, MA 02110
(617) 482-3700