# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | CIVIL ACTION:  01-CV-12257-PBS |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | |

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR LEAVE TO TAKE ADDITIONAL LIMITED DISCOVERY

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION AND BACKGROUND .......................................................................1

II.     ARGUMENT......................................................................................................................4

      A.     Plaintiffs Have Adequately Alleged the Circumstances of the Fraud ....................4

      B.     The Court Should Grant Plaintiffs Leave to Obtain Specific Additional
           Discovery ..............................................................................................................6

      C.     The Limited Documents Produced by Defendants to Date Highlight
           the Facts That Are "Peculiarly Within the Defendants' Control" .........................10

      D.     The Discovery Sought...........................................................................................12

III.    CONCLUSION................................................................................................................13

1534.16 0029 MTN.DOC

# TABLE OF AUTHORITIES

## CASES

*Ahmed v. Rosenblatt,*
 118 F.3d 886 (1st Cir. 1997)..................................................................................7

*Feinstein v. Resolution Trust Corp.,*
 942 F.2d 34 (1st Cir. 1991)..................................................................................3

*Freeport Transit, Inc. v. McNulty,*
 239 F. Supp. 2d 102 (D. Me. 2002), aff'd in part,
 239 F. Supp. 2d 102 (D. Me. 2003) ..................................................................7, 9

*Hastings v. Fidelity Mortg. Decisions Corp.,*
 984 F. Supp. 600 (N.D. Ill. 1997)........................................................................2

*Kuney Int'l, S.A. v. DiIanni,*
 746 F. Supp. 234 (D. Mass. 1990) ................................................................2, 4, 6, 9

*New England Data Servs., Inc. v. Becher,*
 829 F.2d 286 (1st Cir. 1987).......................................................................... *passim*

*Overton Corp. v. Case Equip. Co.,*
 1990 U.S. Dist. Lexis 18275 (D. Me. Dec. 20, 1990)..............................................7

*In re Pharm. Indus. Average Wholesale Price Litig.,*
 263 F. Supp. 2d 172 (D. Mass. 2003) ..................................................................1

*United States ex rel. Franklin v. Parke-Davis,*
 147 F. Supp. 2d 39 (D. Mass. 2001) ................................................................3, 4, 6, 9

*United States v. Hougham,*
 364 U.S. 310 (1960)..........................................................................................8

*In re Xcelera.com Sec. Litig.,*
 2002 U.S. Dist. Lexis 7400 (D. Mass. Mar. 8, 2002) ..........................................4, 5

## STATUTES

Fed. R. Civ. P. 9(b) ........................................................................................... *passim*

# I.    INTRODUCTION AND BACKGROUND

In its Memorandum and Order dated May 13, 2003 (the "Order"), the Court invited Plaintiffs to file an Amended Master Consolidated Complaint.  Order at 47.  The Court also directed Plaintiffs, *inter alia*, to provide in any amended complaint "the allegedly fraudulent AWP for each drug."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 194 (D. Mass. 2003) (hereafter "*AWP*").

On June 12, 2003, Plaintiffs filed a detailed 301 page Amended Master Consolidated Complaint ("AMCC") that meets, and in most instances exceeds, the requirements set forth in the Order.  The AMCC contains detailed examples of wrongdoing from Defendants' own documents.  It also narrows and focuses the case on a finite list of approximately 321 drugs (the AWP Identified Drugs or "AWPIDs").  For each such drug it identifies the brand name, generic name (if applicable), National Drug Code ("NDC") number for each dosage and formulation, and the fraudulent AWPs for each drug, usually over multiple years.  *See* AMCC ¶ 11[1] and Appendix A.  In addition, the AMCC identifies, in Appendix B thereto, each drug purchased by each Plaintiff to ensure that at least one Plaintiff has purchased a drug marketed by each Defendant.  This is *exactly* what the Court ordered Plaintiffs to do when it stated that Plaintiffs must "clearly and concisely allege with respect to each defendant:  (1) the specific drug or drugs that were purchased from defendant, (2) the allegedly fraudulent AWP for each drug, and (3) the name of the specific plaintiff(s) that purchased the drug."  *AWP*, 263 F. Supp. 2d at 194.

Not satisfied with Plaintiffs' already excruciatingly detailed allegations that serve both to put Defendants on notice of the claims against them and to identify with particularity each of the items required by the Court's Order, Defendants emphatically – and errantly – assert that Plaintiffs must present a myriad of additional details associated with each drug identified in the AMCC and must specify each fraudulent "spread" for each such drug.  *See, e.g.*, Defendants' Consolidated Memorandum in Support of Motion to Dismiss the AMCC ("Defs. Mem.") at 9

---

[1] Unless otherwise indicated, "¶" references paragraphs in the AMCC.

("Plaintiffs fail to explain how these published AWPs are fraudulent, except to speculate that there is a difference between these published AWPs and the cost to the PBMs (*i.e.* a 'spread'). But mere speculation about a hypothetical 'spread' is not sufficient to satisfy Rule 9(b) or the Court's instructions that they identify the 'fraudulent AWPs' for the drugs at issue in their PBM claims. According, [sic] those claims must be dismissed.") Thus, Defendants maintain, Fed. R. Civ. P. 9(b) cannot be satisfied until this is done.[2]

As set forth in Plaintiffs' Opposition to Defendants' Motions to Dismiss the AMCC, neither Rule 9(b) nor this Court's Order requires Plaintiffs to quantify and identify the amount of the spread for each of the 321 drugs identified in Appendix A of the AMCC. Plaintiffs Opposition at *passim*. To satisfy Rule 9(b), the AMCC need only provide "[t]he general outline of the general scheme to defraud" so that Defendants have "notice of the grounds on which the plaintiff's claim is based." *Kuney Int'l, S.A. v. DiIanni*, 746 F. Supp. 234, 237 (D. Mass. 1990); *see also Hastings v. Fidelity Mortg. Decisions Corp.*, 984 F. Supp. 600, 607 (N.D. Ill. 1997) ("The [RICO] allegations must be specific enough to provide the defendants with a general outline of how the alleged fraud scheme operated and of their purported role in the scheme.") This is precisely what the AMCC does here, particularly with respect to the issues invoked by Defendants.

Nonetheless, in the event that the Court believes that Plaintiffs' allegations do not meet the requirement of Rule 9(b) because Plaintiffs have not specified the amount of fraudulent "spread" associated with each drug, Plaintiffs are willing to undertake these calculations and pinpoint exact "spreads" for each of the 321 drugs targeted in the AMCC. However, Plaintiffs cannot do so until they are provided access to Defendants' confidential and highly protected pricing and actual transaction cost information. Thus, if the Court holds that these spreads are required to be alleged, the Court should permit Plaintiffs to obtain discovery into the actual

---

[2] In their individual briefs most Defendants also argue that the failure of Plaintiffs to identify a specific fraudulent spread for each drug is fatal to Plaintiffs' claims. Abbott Mem. at 3; Amgen Mem. at 1-2; Fujisawa Mem. at 2; GlaxoSmithKline Mem. at 2-3; Hoffman Mem. at 3; Immunex Mem. at 4; Schering-Plough Mem. at 3; Warrick Mem. at 3; Watson Mem. at 4.

transaction prices associated with each drug and other conduct associated with Defendants' marketing strategies, information which is solely in the control of Defendants and unavailable to Plaintiffs. Such discovery, and an opportunity to amend, are supported, if not mandated, by *New England Data Servs., Inc. v. Becher*, 829 F.2d 286 (1st Cir. 1987).

Rather than simply dismissing a RICO complaint that a court finds is deficient in particularities, the First Circuit, in what has become known as the "*Becher* second determination," requires courts to determine whether the plaintiff has sufficiently outlined a general scheme to defraud under RICO (and used the wires and mails to further that scheme) such that additional discovery is warranted in order to bring the complaint into compliance with Rule 9(b). *Id.* at 290.[3]  At a minimum, *if* the Court finds that the AMCC is deficient because it does not specify the amount of the fraudulent "spread," additional discovery and an opportunity to amend is warranted here because Plaintiffs have alleged the scheme to defraud in great detail, citing not just to governmental investigations but to specific documents from each Defendant which support the existence of the scheme described by Plaintiffs. Yet Plaintiffs cannot precisely calculate a "spread" for each of the drugs in the AMCC without additional discovery from Defendants, because, in the words of this Court, the information is "peculiarly within the defendants' control." *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 47 (D. Mass. 2001) (quoting *Boston & Me. Corp. v. Hampton*, 987 F.2d 855, 866 (1st Cir. 1993)); *see also Becher*, 829 F.2d at 292.

Indeed, as highlighted below, the limited documents already produced by Defendants both (i) confirm many of Plaintiffs' existing allegations, and (ii) demonstrate that Defendants possess additional, similar information with respect to other drugs, information that should be produced and incorporated into an amended complaint in lieu of dismissal.

---

[3] Again, Plaintiffs do not believe that their AMCC is deficient and have filed this motion in order to preserve their rights in the event that the Court disagrees. *See, e.g., Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, (1st Cir. 1991) (suggesting that a plaintiff must ask the court, in a timely manner, for a limited period of discovery to bolster the complaint).

- 3 -

Plaintiffs outline below the discrete and targeted discovery they need.  Granting Plaintiffs access to this discovery now without delay, and with an opportunity to amend, complies with *Becher* and can only lead to a more expeditious execution of the Court's Rule 12(b)(6) "gate-keeping" function.

## II.    ARGUMENT

### A.    Plaintiffs Have Adequately Alleged the Circumstances of the Fraud

Consistent with this Court's ruling in *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 46 (D. Mass. 2001), Plaintiffs have "allege[d] the circumstances of the fraud" but are "*not* required to plead *all* of the evidence or facts supporting it." *Id.* at 46-47 (emphasis added); *see also id.* at 46 ("The requirements of Rule 9(b) . . . must be read in conjunction with Fed. R. Civ. P. 8(a)," which requires only a "short and plain statement of the claim.").  Indeed, the Court has recognized that "where the alleged scheme of fraud is complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible." *Id.* at 49.

The *Parke-Davis* ruling is in accord with other decisions from this District, including *In re Xcelera.com Sec. Litig.*, 2002 U.S. Dist. Lexis 7400, at *7-8 (D. Mass. Mar. 8, 2002), where Judge Zobel applied Rule 9(b) and sustained plaintiffs' securities fraud claim because the complaint cited to nine investigative sources and identified and quoted from "supporting documentation to buttress the[] allegations;" and Senior Judge Caffrey's decision in *Kuney Int'l, S.A. v. DiIanni*, 746 F. Supp. 234, 237 (D. Mass. 1990), where the Court commented that Rule 9(b) is satisfied where "[t]he general outline of the general scheme to defraud . . . provides the defendant with notice of the grounds on which the plaintiff's claim is based."

Here, the "circumstances of the fraud" and the "general outline of the general scheme to defraud" are as follows.  Plaintiffs allege that Defendants inflate average wholesale prices ("AWP") for drugs covered by Medicare Part B and then market the spread between the Medicare reimbursement rate or the private reimbursement rate and the providers' actual acquisition cost.  Through this AWP Scheme, Defendants incentivize providers to administer the

- 4 -

drugs for which Defendants have created the biggest spread and, thereby, increase sales for the drugs and their market share.  ¶¶ 160-63.  Plaintiffs and members of the AWP class as defined by the AMCC are damaged by overpaying for the drugs.  ¶¶ 541, 595.

For specifically identified drugs administered outside of the Medicare Part B context, Plaintiffs allege that Defendants specifically marketed the inflated AWP – the price on which Plaintiffs' payments in the private reimbursement market are based – to pharmacy benefit managers ("PBMs") and other intermediaries in order to induce them to place those drugs on their formularies.  ¶¶ 171-73.  The AWP Scheme incentivizes intermediaries to place drugs on formularies based not on their professional judgment but, instead, on their desire to increase their profitability.  Plaintiffs allege that PBMs and other intermediaries pocketed the "spread" between the AWP and the actual cost paid for those drugs.  ¶¶ 175-78.

In the AMCC, Plaintiffs apply these "circumstances of the fraud" to each Defendant.  At the beginning of Section V of the AMCC, entitled "Examples of Unlawful Conduct," Plaintiffs describe the specific unlawful conduct of each named Defendant in great detail.  ¶¶ 200-540.  Further, at the end of almost every Defendant-specific section, Plaintiffs provide specific examples of actual spreads, comparing actual prices offered to customers of each Defendant to the fraudulent AWPs set forth for those drugs in industry compendia.  *See, e.g.,* ¶¶ 213-16 (Abbott); ¶¶ 268-70 (Aventis); ¶¶ 283-84 (Baxter); ¶¶ 324-26 (B. Braun); ¶ 360 (Dey); ¶¶ 371-75 (Fujisawa); ¶ 472 (Pharmacia); ¶¶ 502-03 (Sicor); ¶¶ 535-36 (Watson).  Notably, these specific allegations derive from documents produced by Defendants to governmental investigative sources, and are – in the words of Judge Zobel – quoted from "supporting documentation to buttress the[] allegations" of the general scheme to defraud.  *In re Xcelera.com Sec. Litig.*, 2002 U.S. Dist. Lexis 7400, at *8.

Plaintiffs respectfully submit that they have satisfied Rule 9(b)'s particularity requirement by clearly setting forth the "general outline of the general scheme to defraud" which is sufficient to "provide[] the defendant[s] with notice of the grounds on which the plaintiff's

- 5 -

claim is based." *Kuney Int'l*, 746 F. Supp. at 237.  In fact, Plaintiffs have far exceeded this requirement by citing specific documents from Defendants that directly support the AWP scheme outlined in the AMCC.  Plaintiffs have also satisfied the Court's Order and provided a fraudulent AWP for each of the drugs at issue in the AMCC.

At this stage of the proceedings, it is not possible for Plaintiffs to quantify *the specific fraudulent spread* associated with each drug because the facts necessary to make such calculations – namely the actual transaction prices of these particular drugs and the variety of hidden incentives that Defendants employ to reduce the listed prices of drugs – are peculiarly within the Defendants' control.  In fact, almost all of the information that Plaintiffs have come from Defendants themselves in "governmental" document productions that Defendants identified as "highly confidential."  As this Court recognized in *Parke-Davis*, "where facts underlying the fraud are 'peculiarly within the defendants' control,' a plaintiff may be excused from pleading the circumstances of the fraud with a high degree of precision."  147 F. Supp. 2d at 47 (quoting *Boston & Me. Corp. v. Hampton*, 987 F.2d 855, 866 (1st Cir. 1993)).

**B.**      **The Court Should Grant Plaintiffs Leave to Obtain Specific Additional Discovery**

Notwithstanding the foregoing, if the Court determines that the AMCC is deficient because it does not quantify a spread for each drug,  rather than dismissing Plaintiffs' claims the Court should grant leave to Plaintiffs to obtain specific discovery into the quantifications of AWP spreads associated with the drugs set forth in the AMCC pursuant to the First Circuit's mandate in *New England Data Servs., Inc. v. Becher*, 829 F.2d 286 (1st Cir. 1987).  In *Becher*, the Court held that "Rule 9(b) requires specificity in the pleading of RICO mail and wire fraud," but that dismissal should *not* be automatic in the event that a court determines that the plaintiff has failed to satisfy Rule 9(b).  *Id.* at 290.  Rather, as the First Circuit explained, a court should determine whether sufficient facts have been pled that warrant further discovery and an opportunity to amend the complaint after completion of the discovery:

> In an appropriate case, where, for example the specific allegations
> of the plaintiff make it likely that the defendant used interstate mail

- 6 -

> or telecommunications facilities, and the specific information as to use is likely in the exclusive control of the defendant, the court should make a *second* determination as to whether the claim as presented warrants the allowance of discovery and if so, thereafter provide an opportunity to amend the defective complaint.

*Id.* (emphasis added); *see also Ahmed v. Rosenblatt*, 118 F.3d 886, 889-90 (1st Cir. 1997) ("Rule 9(b) has a special gloss in the RICO context in cases where a plaintiff's specific allegations make it likely that a defendant has used interstate mails or wire, and where this information is in the exclusive control of the defendant: before granting a motion to dismiss, a district court should make a second determination as to whether further discovery is warranted and, if so, the plaintiff should be provided with the opportunity to amend the complaint after the completion of this discovery."); *Freeport Transit, Inc. v. McNulty*, 239 F. Supp. 2d 102, 117 (D. Me. 2002) (applying *Becher* and concluding that, "[o]n balance, Plaintiffs have outlined the contours of a fraudulent scheme, which suggests a fair probability that the details can be uncovered in discovery"), *aff'd in part*, 239 F. Supp. 2d 102 (D. Me. 2003); *Overton Corp. v. Case Equipment Co.*, 1990 U.S. Dist. Lexis 18275, at *13 (D. Me. Dec. 20, 1990) ("The plaintiffs have outlined the general scheme employed to defraud them. . . . Discovery as to when the wires and mails were used and what was communicated by defendants . . . will either produce the facts needed to bring this complaint into compliance with Rule 9 or make clear to the plaintiffs that their asserted claim does not lie.").

In making the so-called "*Becher* second determination," a court balances a number of factors, including allegations of the general scheme to defraud, the establishment of interstate commerce and the resulting implication of the use of interstate wires and mails, and whether the facts were "peculiarly" within the defendants' control. 829 F.2d at 291-92. The First Circuit has also counseled courts to be mindful of Rule 9(b)'s purposes of weeding out groundless claims and providing defendants with an adequate opportunity to supply meaningful responses, and indicated that a "court should note the policy in favor of allowing amendments and trying cases

on their merits, and against dismissals which would deny plaintiffs their day in court." *Id.* at 292 (citing *United States v. Hougham*, 364 U.S. 310, 317 (1960)).

In applying these factors here, this Court should find that the additional discovery sought by Plaintiffs is warranted. Plaintiffs have alleged the general scheme to defraud in great detail, citing to various governmental investigations and many specific documents. Thus, it is clear that Plaintiffs' claims do not offend Rule 9(b) principles, and that the discovery sought is not part of a stereotypical "fishing expedition" designed to support allegations that are otherwise baseless. To the contrary, Defendants have *already* been implicated in governmental investigations. The governmental investigations, powered by the legal right to inquire through, for example, the use of the subpoena or other similar legal instruments (whether at the Congressional or agency level), have brought to light very disturbing evidence of wrongdoing. The AMCC is replete with examples of this wrongdoing taken directly from Defendants' own documents.

Indeed, at least one Defendant has been caught *expressly recognizing* that artificially increasing AWP spreads has an adverse impact not just on government payors, but also on private insurers and their insureds. In a Glaxo internal memo dated October 25, 1994 and titled "Issue considerations on Zofran pricing strategies," Nancy Pekarek[4] recognized the implications of increasing the AWP to create a better spread:

> If Glaxo chooses to increase the NWP and AWP for Zofran in order to increase the amount of Medicaid reimbursement for clinical oncology practices, we must prepare for the potential of a negative reaction from a number of quarters. Some likely responses:
>
> Press: Glaxo's health care reform messages stressed the importance of allowing the marketplace to moderate prices. On the surface, it seems that in response to the entrance of a competitor in the market, Glaxo has actually raised its price on Zofran-perhaps twice in one year. How do we explain that price increase on a drug that is already been cited in the press as one of, if not the most expensive drug on the hospital formulary?

---

[4] Ms. Pekarek was a communications manager for Glaxo who later became Vice-President of U.S. Corporate Media Relations.

> *If we choose to explain the price increase by explaining the pricing strategy, which we have not done before, then we risk further charges that we are cost shifting to government in an attempt to retain market share.*
>
> Congress: Congress has paid a good deal of attention to pharmaceutical industry pricing practices and is likely to continue doing so in the next session. How do we explain to Congress an 8% increase in the NWP between January and November of 1994, if this policy is implemented this year? How do we explain a single 9% increase in the AWP? *What arguments can we make to explain to congressional watchdogs that we are cost-shifting at the expense of the government?* How will this new pricing structure compare with costs in other countries?
>
> *Private insurers, out-of-pocket payers: These groups, and perhaps others, are likely to incur greater costs as a result of this pricing strategy. How will they be affected? What response do we have for them?* [¶ 395 (emphasis added.)] (*See* Sobol Aff., Ex. D)

Thus, the investigations adequately support Plaintiffs' allegations. Yet, if the Court determines that in order to meet the pleading requirements of Rule 9(b) Plaintiffs must specify a fraudulent spread, additional discovery is warranted. Given the fact that discovery in this case to date has been limited to documents previously produced by Defendants elsewhere, they are of necessity limited in scope by document requests made in other proceedings and relate only to the specific drugs that were under investigation by same investigative agency. As described more fully in paragraph 9 of the Affidavit of Thomas M. Sobol in Support of Plaintiffs' Motion to Take Additional Limited Discovery ("Sobol Aff."), many of the Defendants and their subsidiaries have produced no discovery in this litigation to date and, with one exception, no Defendant has produced actual transaction cost information related to the drugs identified in the AMCC. Because Defendants unilaterally set their prices and set their pricing strategies and seek to protect those prices and marketing plans from public disclosure at all costs, this type of information is "peculiarly within the defendants' control." *Becher*, 829 F.2d at 292; *Parke-Davis*, 147 F. Supp. 2d at 47.[5] Without additional discovery, Plaintiffs cannot obtain the

---

[5] Importantly, "peculiarly within defendants' control" does not equate to "exclusively." If the alleged communications involved third parties, it does not necessarily mean that *the plaintiffs* "can be expected to have access to the information they need to comply with Rule 9(b)." *Freeport Transit, Inc. v. McNulty*, 239 F. Supp. 2d

information necessary to quantify the spread associated with each drug. In addition, there should be no debate that Plaintiffs' present allegations have put Defendants on notice of the precise schemes targeted and the breadth of practices at issue in this litigation. These factors, coupled with the AMCC's detailed allegations – rooted as they are in the government investigations and Defendants' own documents– should tip the Court's *Becher* balancing strongly in favor of Plaintiffs and the additional discovery they seek here.

**C.    The Limited Documents Produced by Defendants to Date Highlight the Facts That Are "Peculiarly Within the Defendants' Control"**

The Court has permitted Plaintiffs to engage in limited discovery to date. In October of 2002, this Court directed Defendants to produce the following categories of documents but has otherwise stayed discovery between the parties:

> a.    <u>Existing or Previous Investigations</u>: A copy of the set or sets of documents, if any, previously produced by a defendant to any federal or state executive or legislative agency or entity in connection with any investigation into, in whole or in part, the use of the average wholesale price ("AWP") in the pricing or reimbursement of a drug manufactured by that defendant during the Class Period. Such document shall include a copy of the document request, subpoena or other demand under which the documents were produced by the defendant;

> b.    <u>Other Legal Proceedings</u>: A copy of the set or sets of documents, if any, previously produced by a defendant in connection with any other legal proceeding not listed above (<u>e.g.</u>, court proceedings, arbitrations) in which that defendant is or was alleged to have overstated the AWP, misstated the AWP, manipulated the AWP or otherwise failed to account for certain costs (<u>e.g.</u>, the costs of free samples, purported educational grants, gifts, rebates, offsets, etc.) in the AWP, for any drug manufactured by that defendant during the Class Period.

Case Management Order No. 5 ("CMO No. 5") at 1.

---

at 117. As Magistrate Kravchuk recommended in *McNulty*, this element of the *Becher* balancing test is satisfied where the plaintiff "was not a party to the communications and does not have a non-adversarial means of obtaining the necessary information." *Id.* at 116. Further, as Senior Judge Caffrey wrote in *Kuney Int'l*, "[w]here the plaintiff is not directly involved in the alleged transaction, . . . the plaintiffs cannot be expected to have personal knowledge of the facts constituting the fraud." 746 F. Supp. at 237.

A review of the documents produced by Defendants in response to CMO No. 5 reveals the existence of information that is pointedly relevant to Plaintiffs' claims here but *not* yet disclosed by Defendants. For instance, many of the documents produced by Defendants contain redactions that may conceal information related to drugs in the AMCC because most, if not all, of the investigations in which Defendants have previously produced documents have related to Medicare coverage and related only to a very small number of specific drugs. An example is a document produced by Defendant Gensia Laboratories listing the AWP for certain drugs, a particular wholesaler's contract price,[6] and the spread between the two.[7] (*See* Sobol Aff., Ex. E) This data is revealed for drugs covered by Medicare Part B (Doxorubicin Hydrochloride, Etoposide, Leucovorin Calcium, Pentamidine Isethionate), but redacted for others.

The importance of the redacted material is manifest:  although Plaintiffs have access to AWPs, they do *not* have access to actual average sale prices – the actual prices that organizations pay the drug manufacturer – in order to determine the spreads that are at the heart of the AWP scheme alleged in the AMCC. As demonstrated by the "highly confidential" designation of this document (a designation that *all* Defendants have placed on *all* of the documents produced pursuant to the Court's Order), this type of information is "peculiarly within the Defendants' control."

Other illustrations are provided by a "Market Assessment" document produced by Defendant Aventis summarizing the Average Selling Price, the AWP and the difference for a number of drugs covered by Medicare Part B (*see* Sobol Aff., Ex. H), and a Bayer document listing the spreads between AWPs and Distributor Acquisition Prices for Bayer's Gamimune®N and competitor drugs (*see* Sobol Aff., Ex. G). *See also* Sobol Aff., Ex. F (Antiemetic Cost Comparisons also produced by Defendant Aventis comparing AWP spreads for Anzemet, Kytril

---

[6] The wholesaler is Pharmaceutical Buyers, Inc., a pharmaceutical group purchasing organization. *See* www.pbigpo.com.

[7] This exhibit, and the others attached to the Sobol Aff., have been marked "highly confidential" by the producing party and, therefore, Plaintiffs have filed a separate motion to have this brief and the Sobol Affidavit filed under seal.

- 11 -

and Zofran).  These documents strongly suggest that similar information for other drugs listed in the AMCC exists, information that Plaintiffs can obtain only from Defendants through additional discovery in this litigation.

Thus, it is clear that important, relevant information that is "peculiarly within the Defendants' possession" will, if disclosed, permit Plaintiffs to augment their already detailed allegations of fraud and provide specific spreads associated with each drug listed in the AMCC. Pursuant to the so-called "*Becher* second determination," that information should be produced here, and Plaintiffs provided an opportunity to amend the AMCC if the Court so requires.  That production should occur now, without further delay, so that the Court can most thoroughly and efficiently resolve Defendants' pending motions.

**D.     The Discovery Sought**

Plaintiffs seek narrowly targeted categories of discovery.  For each of the AWPIDS, Plaintiffs request that each Defendant produce the following categories of documents, where such documents were created on or after January 1, 1991:

1.     All documents relating to any actual, proposed, or prospective price announcements, price changes, discount programs, rebates, incentives, penalties, or price lists issued by any defendant for each AWPID;

2.     All documents relating to the use or provision of free samples, educational grants, marketing grants, volume discounts, rebates, payments for specific data gathering, financial incentives, or other incentive to induce purchases of any AWPID during the relevant time period;

3.     For each AWPID, documents sufficient to identify during the relevant time period:

(a)     AMP (average manufacturer price);

(b)     ASP (average sales price, *i.e.*, the price after all discounts);

(c)     EAC (estimated acquisition cost);

(d)     Earned margin (difference between AWP and actual product cost);

- 12 -

(e)     All documents that relate to discussions of spreads or reimbursement profiles, using AWP as an incentive; and

(f)     All documents necessary to determine whether the AWP, ASP, AMP and Earned Margin include all rebates, discounts, allowances, chargebacks, on and off invoice adjustments and credits, and any other incentives provided to any third parties;

4.     All documents accounting for the free samples given of any AWPID;

5.     Copies of all educational grants provided to any purchasing customer of an AWPID during the relevant period;

6.     All data maintained in electronic form relating to the pricing, cost data and transactional sales, of each AWPID in the United States for the relevant time period, including all rebates, discounts, allowances, chargebacks, on and off invoice adjustments and credits. Such data should be produced in electronic form. Plaintiff would also requests that Defendants produce all documents or instructions necessary to access, process, read and use such electronic data;

7.     All data maintained in electronic form relating to customer invoices for each AWPID, including, but not limited to, customer names and addresses, purchase volume, prices, and discounts for the relevant time period. Such data should be produced in electronic form and include all documents and/or instructions necessary to access, process, read and use the electronic data

8.     All documents evidencing any agreements and performance of agreements between defendants and any one or more pharmacy benefit manager identified in the AMCC relating to one or more AWPID.

## III.     CONCLUSION

For the foregoing reasons, if the Court determines that the AMCC is deficient in that it fails to identify the "spread" associated with each drug at issue, the Court should permit

- 13 -

Plaintiffs to (i) take the additional discovery requested herein, and then (ii) to further amend their complaint as appropriate.

DATED:        September 15, 2003

By _____
Thomas M. Sobol (BBO # 471770)
Edward Notargiacomo (BBO #567636)
Hagens Berman LLP
225 Franklin Street, 26th Floor
Boston, MA  02110
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Samuel Heins
Brian Williams
Heins, Mills & Olson, P.C.
700 Northstar East
608 Second Avenue South
Minneapolis, MN  55402
Telephone: (612) 338-4605
Facsimile: (612) 338-4692

Jeff Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

**CHAIRS OF LEAD COUNSEL
COMMITTEE**

Marc H. Edelson
Alan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043

- 14 -

1534.16 0029 MTN.DOC

Facsimile: (215) 230-8735

Kenneth A. Wexler
Elizabeth Fegan Hartweg
The Wexler Firm
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

**MEMBERS OF LEAD COUNSEL
COMMITTEE AND EXECUTIVE
COMMITTEE**

Michael McShane
Alexander, Hawes & Audet, LLP
300 Montgomery Street, Suite 400
San Francisco, CA 94104
Telephone: (415) 982-1886
Facsimile: (415) 576-1776

Robert E. Piper, Jr.
Piper & Associates
624 Pierre Avenue
Shreveport, LA 71103
Telephone: (318) 226-0826
Facsimile: (318) 424-9900

**MEMBERS OF EXECUTIVE
COMMITTEE**

Anthony Bolognese
Bolognese & Associates
One Penn Center
1617 JFK Boulevard, Suite 650
Philadelphia, PA 19103
Tel: (215) 814-6750
Fax: (215) 814-6764

Jonathan W. Cuneo
The Cuneo Law Group
317 Massachusetts Avenue, N.E.
Suite 300
Washington, D.C. 20002
Tel: (202) 789-3960
Fax: (202) 789-1813

Neal Goldstein (Of Counsel)
Freedman & Lorry, PC
400 Market Street, Suit 900
Philadelphia, PA 19106
Tel: (215) 925-8400

- 15 -

Fax: (215) 925-7516

Michael E. Criden
Hanzman & Criden, PA
Commerce Bank Center, Suite 400
220 Alhambra Circle
Coral Gables, FL 33134
Tel: (305) 357-9000
Fax: (305) 357-9050

Blake M. Harper
Kirk B. Hulett
Hulett Harper LLP
550 West C Street, Suite 1700
San Diego, CA 92101
Tel: (619) 338-1133
Fax: (619) 338-1139

Jonathan D. Karmel
Karmel & Gilden
221 N. LaSalle Street
Suite 1414
Chicago, IL 60601
Tel: (312) 641-2910
Fax: (312) 641-0781

G. Mark Albright
Albright, Stoddard, Warnick & Albright
Quail Park 1, Building D-4
801 South Rancho Drive
Las Vegas, NV 89106

Dianne M. Nast
Roda & Nast, PC
801 Estelle Drive
Lancaster, PA 17601
Tel: 717-892-3000
Fax: 717-892-1200

Henry H. Rossbacher
Rossbacher & Associates
811 Wilshire Boulevard,
Suite 1650
Los Angeles, CA 90017-2666
Tel: (213) 895-6500
Fax: (213) 895-6161

Jonathan Shub
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd fl
Philadelphia, PA 19102
Tel: (215) 790-7300

- 16 -

1534.16 0029 MTN.DOC

Fax:  (215) 546-0942

Scott R. Shepherd
Shepherd & Finkleman, LLC
117 Gayley Street, Suite 200
Media, PA 19063
Tel:  (610) 891-9880
Fax:  (610) 891-9883

Lee Squitieri
Squitieri & Fearon
521 Fifth Avenue, 26th floor
New York, NY  10175
Tel: (646) 487-3049
Fax: (646) 487-3095

Lisa J. Rodriguez
Ira Neil Richards
Trujillo Rodriguez& Richards, LLC
The Penthouse
226 West Rittenhouse Square
Philadelphia, PA  19103
Tel:  (215) 731-9004
Fax:  (215) 731-9044

Mitchell A. Toups
Weller, Green, Toups & Terrell, L.L.P.
2615 Calder Street, Suite 400
P.O. Box 350
Beaumont, TX  77704
Tel: (409) 838-0101
Fax: 409-838-6780

Damon Young
Lance Lee
Young, Pickett & Lee
4122 Texas Boulevard
P.O. Box 1897
Texarkana, AR/TX  75504
Tel: (903) 794-1303
Fax: 903-792-5098; 903-794-5098

**ADDITIONAL ATTORNEYS FOR
PLAINTIFFS**

- 17 -

1534 16 0029 MTN.DOC

## CERTIFICATE OF SERVICE

I hereby certify that I, Edward Notargiacomo, an attorney, caused true and correct copies of the foregoing Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion For Leave to Take Additional Limited Discovery to be served on all counsel of record electronically, pursuant to Section D of Case Management Order No. 2., this 15th day of September, 2003.

By:

Edward Notargiacomo, Esq.
HAGENS BERMAN LLP
225 Franklin Street, 26th floor
Boston, MA 02110
(617) 482-3700