

ELIOT SPITZER
Attorney General

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
(212) 416-8306

THOMAS G. CONWAY
Assistant Attorney General In Charge
Consumer Frauds and Protection Bureau

September 22, 2003

<u>By UPS Next Day Delivery</u>
The Honorable Patti B. Saris
United States Courthouse
1 Courthouse Way
Boston, MA 02210

Re:     *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL 1456
        *People of the State of New York v. Aventis, Inc.*, 1:03-cv-11228 PBS; *People of the State*
        *of New York v. GlaxoSmithKline, P.L.C., et al.*,1:03-cv-11529-PBS; *People of the*
        *State of New York v. Pharmacia Corp.*, 1:03-cv-11227 PBS

Dear Judge Saris:

        In accordance with the Court's instruction at the September 18, 2003 argument, the State
of New York is submitting this letter to provide the Court with the statutory and case law
citations that support the State's positions that (1) in the absence of a Medicare statute, regulation
or other clear directive defining "average wholesale price," the act of labeling a number as an
"average wholesale price," although it significantly exceeds real wholesale prices, has the
potential or capacity to deceive and, therefore, violates New York law, and (2) even if the
Medicare Act's legislative history supported the defendants' hypothesis that "average wholesale
price" means something other than the combined meaning of the three words, this argument
would, at most, be a defense and, therefore, not a basis for removal. For the Court's
convenience, we are enclosing copies of the memoranda of law concerning the motion for
remand that the parties submitted to the Northern District of New York. (The State filed a
separate principal memorandum in each case, but is attaching only the one in the
GlaxoSmithKline case, which is representative. The defendants submitted a consolidated
response, and the State filed a single reply.  They are both attached.)

        Under both General Business Law § 349 and Executive Law § 63(12) (copies attached),
an act is deceptive or fraudulent if it has the capacity or tendency to deceive, whether or not
anyone is actually deceived or injured. *E.g., Gaidon v. Guardian Life Ins. Co. of America*, 94
N.Y.2d 330, 343-44 (1999) (Under § 349, a "deceptive act or practice [is] a representation or
omission likely to mislead a reasonable consumer acting reasonably under the circumstances"
[internal quotation marks omitted]); *The People of the State of New York by Spitzer v. General
Electric Co.*, 302 A.D.2d 314, 314-15 (1st Dept. 2003) ("Under § 63(12), the test for fraud is

The Hon. Patti B. Saris
September 22, 2003
Page 2

whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere
conducive to fraud." The court also states the rule set out in the *Gaidon* parenthetical above.);
*The People of the State of New York by Spitzer v. Network Associates, Inc.*, 195 Misc. 2d 384,
389 (S. Ct., N.Y. Co. 2003) (Responding to an argument that no consumer was misled by the
allegedly deceptive act, the court stated, "[t]he standard to be used [in an action brought by the
Attorney General] to determine whether a representation is false and deceptive is not whether the
actual practice is deceptive, but whether it has the capacity to deceive consumers."). (Copies
attached.) Compliance with a federal rule, regulation or statute is explicitly made a defense.
General Business Law § 349(d).

The State would also like to clarify a matter that arose during the September 18th
argument about which it required additional information before it could respond. The cases
brought by the Counties of Rockland, Suffolk and Westchester, New York raise only Medicaid
claims. In contrast, the defendants assert that only the State's Medicare-related claims raise a
removable federal question. The possible overlap of relief sought by the New York
governmental entities, therefore, has no relevance to the federal jurisdictional issue presently
before the Court.

Thank you for your consideration of these matters.

Respectfully submitted,

Eliot Spitzer, Attorney General

By _____
Rose E. Firestein
Assistant Attorney General
Bureau of Consumer Frauds and Protection
For the State of New York

cc:  All Counsel of Record via Verilaw

▷

## MCKINNEY'S CONSOLIDATED LAWS OF NEW YORK ANNOTATED
## GENERAL BUSINESS LAW
### CHAPTER 20 OF THE CONSOLIDATED LAWS
### ARTICLE 22-A--CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES

Copr ©  West Group 2003.  All rights reserved.

Current through L.2003, chs. 4 to 281, 284 to 308, 312 to to 323
325, 326, 328, 330.

§  349. Deceptive acts and practices unlawful

 (a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

 (b) Whenever the attorney general shall believe from evidence satisfactory to him that any person, firm, corporation or association or agent or employee thereof has engaged in or is about to engage in any of the acts or practices stated to be unlawful he may bring an action in the name and on behalf of the people of the state of New York to enjoin such unlawful acts or practices and to obtain restitution of any moneys or property obtained directly or indirectly by any such unlawful acts or practices.  In such action preliminary relief may be granted under article sixty-three of the civil practice law and rules.

 (c) Before any violation of this section is sought to be enjoined, the attorney general shall be required to give the person against whom such proceeding is contemplated notice by certified mail and an opportunity to show in writing within five business days after receipt of notice why proceedings should not be instituted against him, unless the attorney general shall find, in any case in which he seeks preliminary relief, that to give such notice and opportunity is not in the public interest.

 (d) In any such action it shall be a complete defense that the act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any official department, division, commission or agency of the United States as such rules, regulations or statutes are interpreted by the federal trade commission or such department, division, commission or agency or the federal courts.

 (e) Nothing in this section shall apply to any television or radio broadcasting station or to any publisher or printer of a newspaper, magazine or other form of printed advertising, who broadcasts, publishes, or prints the advertisement.

 (f) In connection with any proposed proceeding under this section, the attorney general is authorized to take proof and make a determination of the relevant facts, and to issue subpoenas in accordance with the civil practice law and rules.

 (g) This section shall apply to all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state, and shall not supersede, amend or repeal any other law of this state under which the attorney general is authorized to take any action or conduct any inquiry.

 (h) In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual

Copr. ©  West 2003 No Claim to Orig. U.S. Govt. Works

damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

CREDIT(S)

(Added L.1970, c. 43, § 2;  amended L.1980, c. 346, § 1;  L.1984, c. 157, § 1.)

<<GENERAL BUSINESS LAW>>

**<Laws 1909, Chapter 25>**

McKinney's General Business Law § 349

NY GEN BUS § 349

END OF DOCUMENT

Copr. ©  West 2003 No Claim to Orig. U.S. Govt. Works

▷

## MCKINNEY'S CONSOLIDATED LAWS OF NEW YORK ANNOTATED
## EXECUTIVE LAW
## CHAPTER EIGHTEEN OF THE CONSOLIDATED LAWS
## ARTICLE 5--DEPARTMENT OF LAW

Copr © West Group 2003.  All rights reserved.

Current through L.2003, chs. 4 to 281, 284 to 308, 312 to to 323
325, 326, 328, 330.

§ 63. General duties

The attorney-general shall:

1. Prosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel, in order to protect the interest of the state, but this section shall not apply to any of the military department bureaus or military offices of the state.  No action or proceeding affecting the property or interests of the state shall be instituted, defended or conducted by any department, bureau, board, council, officer, agency or instrumentality of the state, without a notice to the attorney-general apprising him of the said action or proceeding, the nature and purpose thereof, so that he may participate or join therein if in his opinion the interests of the state so warrant.

2. Whenever required by the governor, attend in person, or by one of his deputies, any term of the supreme court or appear before the grand jury thereof for the purpose of managing and conducting in such court or before such jury criminal actions or proceedings as shall be specified in such requirement;  in which case the attorney-general or his deputy so attending shall exercise all the powers and perform all the duties in respect of such actions or proceedings, which the district attorney would otherwise be authorized or required to exercise or perform;  and in any of such actions or proceedings the district attorney shall only exercise such powers and perform such duties as are required of him by the attorney-general or the deputy attorney-general so attending.  In all such cases all expenses incurred by the attorney-general, including the salary or other compensation of all deputies employed, shall be a county charge.

3. Upon request of the governor, comptroller, secretary of state, commissioner of transportation, superintendent of insurance, superintendent of banks, commissioner of taxation and finance or commissioner of motor vehicles, or the head of any other department, authority, division or agency of the state, investigate the alleged commission of any indictable offense or offenses in violation of the law which the officer making the request is especially required to execute or in relation to any matters connected with such department, and to prosecute the person or persons believed to have committed the same and any crime or offense arising out of such investigation or prosecution or both, including but not limited to appearing before and presenting all such matters to a grand jury.

4. Cause all persons indicted for corrupting or attempting to corrupt any member or member-elect of the legislature, or the commissioner of general services, to be brought to trial.

5. When required by the comptroller or the superintendent of public works,  [FN1] prepare proper drafts for contracts, obligations and other instruments for the use of the state.

6. Upon receipt thereof, pay into the treasury all moneys received by him for debts due or penalties forfeited to the people of the state.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

7. He may, on behalf of the state, agree upon a case containing a statement of the facts and submit a controversy for decision to a court of record which would have jurisdiction of an action brought on the same case. He may agree that a referee, to be appointed in an action to which the state is a party, shall receive such compensation at such rate per day as the court in the order of reference may specify. He may with the approval of the governor retain counsel to recover moneys or property belonging to the state, or to the possession of which the state is entitled, upon an agreement that such counsel shall receive reasonable compensation, to be fixed by the attorney-general, out of the property recovered, and not otherwise.

8. Whenever in his judgment the public interest requires it, the attorney- general may, with the approval of the governor, and when directed by the governor, shall, inquire into matters concerning the public peace, public safety and public justice. For such purpose he may, in his discretion, and without civil service examination, appoint and employ, and at pleasure remove, such deputies, officers and other persons as he deems necessary, determine their duties and, with the approval of the governor, fix their compensation. All appointments made pursuant to this subdivision shall be immediately reported to the governor, and shall not be reported to any other state officer or department. Payments of salaries and compensation of officers and employees and of the expenses of the inquiry shall be made out of funds provided by the legislature for such purposes, which shall be deposited in a bank or trust company in the names of the governor and the attorney-general, payable only on the draft or check of the attorney-general, countersigned by the governor, and such disbursements shall be subject to no audit except by the governor and the attorney-general. The attorney-general, his deputy, or other officer, designated by him, is empowered to subpoena witnesses, compel their attendance, examine them under oath before himself or a magistrate and require that any books, records, documents or papers relevant or material to the inquiry be turned over to him for inspection, examination or audit, pursuant to the civil practice law and rules. If a person subpoenaed to attend upon such inquiry fails to obey the command of a subpoena without reasonable cause, or if a person in attendance upon such inquiry shall, without reasonable cause, refuse to be sworn or to be examined or to answer a question or to produce a book or paper, when ordered so to do by the officer conducting such inquiry, he shall be guilty of a misdemeanor. It shall be the duty of all public officers, their deputies, assistants and subordinates, clerks and employees, and all other persons, to render and furnish to the attorney-general, his deputy or other designated officer, when requested, all information and assistance in their possession and within their power. Each deputy or other officer appointed or designated to conduct such inquiry shall make a weekly report in detail to the attorney-general, in form to be approved by the governor and the attorney- general, which report shall be in duplicate, one copy of which shall be forthwith, upon its receipt by the attorney-general, transmitted by him to the governor. Any officer participating in such inquiry and any person examined as a witness upon such inquiry who shall disclose to any person other than the governor or the attorney-general the name of any witness examined or any information obtained upon such inquiry, except as directed by the governor or the attorney-general, shall be guilty of a misdemeanor.

9. Bring and prosecute or defend upon request of the industrial commissioner   [FN2] or the state division of human rights, any civil action or proceeding, the institution or defense of which in his judgment is necessary for effective enforcement of the laws of this state against discrimination by reason of age, race, creed, color or national origin, or for enforcement of any order or determination of such commissioner or division made pursuant to such laws.

10. Prosecute every person charged with the commission of a criminal offense in violation of any of the laws of this state against discrimination because of race, creed, color, or national origin, in any case where in his judgment, because of the extent of the offense, such prosecution cannot be effectively carried on by the district attorney of the county wherein the offense or a portion thereof is alleged to have been committed, or where in his judgment the district attorney has erroneously failed or refused to prosecute. In all such proceedings, the attorney-general may appear in person or by his deputy or assistant before any court or any grand jury and exercise all the powers and perform all the duties in respect of such actions or proceedings which the district attorney would otherwise be authorized or required to exercise or perform.

11. Prosecute and defend all actions and proceedings in connection with safeguarding and enforcing the state's remainder interest in any trust which meets the requirements of subparagraph two of paragraph (b) of subdivision two of section three hundred sixty-six of the social services law.

12. Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law [FN3] or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper.  The word "fraud" or "fraudulent" as used herein shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions. The term "persistent fraud" or "illegality" as used herein shall include continuance or carrying on of any fraudulent or illegal act or conduct.  The term "repeated" as used herein shall include repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person.

  In connection with any such application, the attorney general is authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules. Such authorization shall not abate or terminate by reason of any action or proceeding brought by the attorney general under this section.

  13. Prosecute any person for perjury committed during the course of any investigation conducted by the attorney-general pursuant to statute.  In all such proceedings, the attorney-general may appear in person or by his deputy or assistant before any court or any grand jury and exercise all the powers and perform all the duties necessary or required to be exercised or performed in prosecuting any such person for such offense.

  15. [FN4] In any case where the attorney general has authority to institute a civil action or proceeding in connection with the enforcement of a law of this state, in lieu thereof he may accept an assurance of discontinuance of any act or practice in violation of such law from any person engaged or who has engaged in such act or practice.  Such assurance may include a stipulation for the voluntary payment by the alleged violator of the reasonable costs and disbursements incurred by the attorney general during the course of his investigation.  Evidence of a violation of such assurance shall constitute prima facie proof of violation of the applicable law in any civil action or proceeding thereafter commenced by the attorney general.


CREDIT(S)


(L.1951, c. 800;  amended L.1954, c. 698, §  2;  L.1955, c. 586;  L.1956, cc. 118, 592;  L.1958, cc. 35, 84, 175; L.1959, c. 242;  L.1962, c. 60, §  12; L.1962, c. 165, §  3;  L.1962, c. 310, § §  129, 130;  L.1962, cc. 562, 743; L.1963, c. 589;  L.1965, cc. 666, 790;  L.1967, c. 680, §  33;  L.1968, c. 420, §  103;  L.1969, c. 359, §  1;  L.1969, c. 814;  L.1970, c. 44;  L.1975, c. 115, §  1;  L.1977, c. 451, §  5;  L.1977, c. 539, §  1;  L.1981, c. 476, §  1;  L.1982, c. 656, §  1;  L.1985, c. 86, §  1;  L.1988, c. 108, §  1;  L.1994, c. 170, §  455.)


 [FN1]  Now commissioner of transportation.  See Transportation Law § 267.


 [FN2]  Now commissioner of labor.  See Labor Law § 10.


 [FN3]  Now General Business Law § 130.


 [FN4]  So in original.  There is no subd. 14.


<<EXECUTIVE LAW>>

<Laws 1951, Chapter 800>


Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

NY EXEC § 63
 McKinney's Executive Law § 63

McKinney's Executive Law § 63

NY EXEC § 63

END OF DOCUMENT

94 N.Y.2d 330                                                                      Page 1
725 N.E.2d 598, 704 N.Y.S.2d 177, 1999 N.Y. Slip Op. 10743
**(Cite as: 94 N.Y.2d 330)**

▷

Frank J. Gaidon, Individually and on Behalf of All
Others Similarly Situated,
et al., Appellants,
v.
Guardian Life Insurance Company of America,
Respondent.
Paul A. Goshen, Individually and on Behalf of All
Others Similarly Situated,
Appellant,
v.
Mutual Life Insurance Company of New York et al.,
Respondents.

Court of Appeals of New York

Argued October 14, 1999;

Decided December 20, 1999

SUMMARY

Appeal, in the first above-entitled action, by
permission of the Court of Appeals, from an order of
the Appellate Division of the Supreme Court in the
First Judicial Department, entered November 5, 1998,
which affirmed a judgment of the Supreme Court
(Charles E. Ramos, J.), entered in New York County,
granting a motion by defendant to dismiss the
complaint, and dismissing the complaint alleging
fraudulent and illegal sales techniques arising out of
the sale of "vanishing premium" life insurance
policies.

Appeal, in the second above-entitled action, by
permission of the Court of Appeals, from an order of
the Appellate Division of the Supreme Court in the
First Judicial Department, entered March 18, 1999,
which affirmed a judgment of the Supreme Court
(Beatrice Shainswit, J.), entered in New York
County, granting a motion by defendants for
summary judgment to dismiss the complaint alleging
fraudulent and illegal sales techniques arising out of
the sale of "vanishing premium" life insurance
policies.

Gaidon v Guardian Life Ins. Co., 255 AD2d 101,
modified.

Goshen v Mutual Life Ins. Co., 259 AD2d 360,
modified.

HEADNOTES

Consumer Protection--Deceptive Acts and Practices-
-Common-Law Fraud
(1) Although a person's actions may at once
implicate both common-law fraud and General
Business Law § 349, which declares unlawful
deceptive acts or practices in the conduct of any
business, trade or commerce, or in the furnishing of
any service in the State, the statute contemplates
actionable conduct that does not necessarily rise to
the level of fraud. In contrast to common-law fraud,
section 349 is a creature of statute based on broad
consumer protection concerns, and is critically
different from the common-law right of action.

Consumer Protection--Deceptive Acts and Practices-
-Marketing of "Vanishing Premium" Life Insurance
Policies
(2) In two actions alleging that defendant insurance
companies' marketing of so-called "vanishing
premium" life insurance policies violated General
**\*331** Business Law § 349, which declares unlawful
deceptive acts or practices in the conduct of any
business, trade or commerce, or in the furnishing of
any service in the State, plaintiffs sufficiently
predicated their claims on deceptive acts that were
"consumer oriented." Plaintiffs alleged that the
marketing of the policies was based on knowingly
unrealistic dividend projections that lured the
purchaser into falsely believing that no additional
premiums need be paid after a certain period of time.
The practices complained of involved an extensive
marketing scheme that had a broader impact on
consumers at large. Moreover, by asserting that
defendants made misrepresentations or omissions
likely to mislead a reasonable consumer acting
reasonably under the circumstances, plaintiffs
fulfilled the statutory requirement that they allege
that defendants engaged in acts or practices that were
deceptive in a material way, and that they have been
injured by reason thereof.

Consumer Protection--Deceptive Acts and Practices-
-Marketing of "Vanishing Premium" Life Insurance
Policies--Policy Merger Clauses
(3) In two actions arising out of defendant insurance
companies' marketing of so-called "vanishing
premium" life insurance policies, plaintiffs have
adequately pleaded causes of action based on
violations of General Business Law § 349 by
alleging that defendants lured them into purchasing
policies by using illustrations which created
unrealistic expectations as to the prospects of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

premium disappearance upon a strategically chosen "vanishing date;" that said date was misleading since it was based on the premise that interest rates, which would provide a return sufficient to satisfy the premiums on the policies, would continue at a high, unprecedented rate for, in some cases, 20 or more years; and that defendants knew that premise was unlikely. Although defendants assert that there was no deception in light of the disclaimers and merger clauses contained in the policies themselves, the merger provisions are not determinative of plaintiffs' statutory claims, which are based on deceptive business practices, not deceptive contracts. Moreover, the disclaimers, though more particularized than the merger provisions, do not speak to the true, unrevealed relationship between dividend/interest rates and the vanishing dates, which were the centerpiece of the sales presentations, whereby the expectation of a firm, personalized timetable was created.

Fraud--Factual Misrepresentation--Marketing of "Vanishing Premium" Life Insurance Policies--Policy Merger Clauses
(4) In two actions alleging that defendant insurance companies' marketing of so-called "vanishing premium" life insurance policies constituted common-law fraud, defendants' disclaimers contained in the policies are sufficient to absolve them of fraud. Plaintiffs have not met the threshold element to support a fraud claim--misrepresentation or material omission--where they alleged that consumers were lured into purchasing policies on the strength of knowingly unrealistic projections of rates of returns of accumulated dividends and interest which supposedly would cover the costs of the premiums after several years, ultimately resulting in no out-of-pocket outlay for the purchaser. The elements of fraud are narrowly defined, requiring proof by clear and convincing evidence, and not every misrepresentation or omission rises to the level of fraud. By stating that illustrated dividend/interest rates are not guaranteed and that they may be higher or lower than depicted, defendants made a partial disclosure. They revealed the possibility of a dividend/interest rate decline, but did not reveal its practical implications to the policyholder. Although they did not guarantee that interest rates would remain constant, they failed to reveal that the illustrated vanishing dates were wholly unrealistic.*332

TOTAL CLIENT SERVICE LIBRARY
REFERENCES

Am Jur 2d, Consumer and Borrower Protection, § § 280, 284, 289; Insurance, § § 426, 826-828.

McKinney's, General Business Law § 349.

NY Jur 2d, Consumer and Borrower Protection, § § 5-10, 14; Fraud and Deceit, § § 29, 30, 110, 111; Insurance, § § 406, 971, 1035.

ANNOTATION REFERENCES
See ALR Index under Consumer Protection; Fraud and Deceit; Insurance and Insurance Companies.

POINTS OF COUNSEL

*Milberg Weiss Bershad Hynes & Lerach, L. L. P.*, New York City (*Melvyn I. Weiss* and *Barry A. Weprin* of counsel), *Arnzen, Parry & Wentz, P.S.C.*, Covington, Kentucky, *Bonnett, Fairbourn, Friedman & Balint, P. C.*, Phoenix, Arizona, *Cantilo, Maisel & Hubbard, L. L. P.*, Dallas, Texas, and *James, Hoyer & Newcomer, P.A.*, Tampa, Florida, for appellants in the first above-entitled action. I. Appellants properly pleaded a fraudulent inducement claim. (*Channel Master Corp. v Aluminium Ltd. Sales,* 4 NY2d 403; *Sabo v Delman,* 3 NY2d 155; *First Nationwide Bank v 965 Amsterdam,* 212 AD2d 469; *Schroder Bank & Trust Co. v Metropolitan Sav. Bank,* 117 AD2d 515; *Danann Realty Corp. v Harris,* 5 NY2d 317; *Bridger v Goldsmith,* 143 NY 424; *Mills Studio v Chenango Val. Realty Corp.,* 15 AD2d 138; *Graubard Mollen Dannett & Horowitz v Moskovitz,* 86 NY2d 112; *Meagher v Metropolitan Life Ins. Co.,* 119 Misc 2d 615; *Force v ITT Hartford Life & Annuity Ins. Co.,* 4 F Supp 2d 843.) II. Appellants' General Business Law § 349 claim sufficiently stated misleading and deceptive practices by Guardian. (*Karlin v IVF Am.,* 93 NY2d 282; *Tanzer v Health Ins. Plan,* 91 NY2d 850; *New York Univ. v Continental Ins. Co.,* 87 NY2d 308; *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank,* 85 NY2d 20; *Varela v Investors Ins. Holding Corp.,* 81 NY2d 958; *Weinberg v Hertz Corp.,* 69 NY2d 979; *Guggenheimer v Ginzburg,* 43 NY2d 268; *State of New York v Princess Prestige Co.,* 42 NY2d 104; *People v Volkswagen of Am.,* 33 NY2d 648.) III. The complaint alleged sufficient facts to establish a fiduciary or special relationship on which appellants were entitled to rely. (**333*Meinhard v Salmon,* 249 NY 458; *Penato v George,* 52 AD2d 939; *Meagher v Metropolitan Life Ins. Co.,* 119 Misc 2d 615; *Dornberger v Metropolitan Life Ins. Co.,* 961 F Supp 506; *Kimmell v Schaefer,* 89 NY2d 257; *Scott v Dime Sav. Bank,* 886 F Supp 1073; *In re Prudential Ins.*

94 N.Y.2d 330                                                                                              Page 3
725 N.E.2d 598, 704 N.Y.S.2d 177, 1999 N.Y. Slip Op. 10743
**(Cite as: 94 N.Y.2d 330)**

*Co. of Am. Sales Practices Litig.,* 962 F Supp 450, 148 F3d 283; *Industrial Gen. Corp. v Sequoia Pac. Sys. Corp.,* 44 F3d 40; *Force v ITT Hartford Life & Annuity Ins. Co.,* 4 F Supp 2d 843; *Myers v Guardian Life. Ins. Co.,* 5 F Supp 2d 423.) IV. The Court below erred in holding that appellants' contracts are not ambiguous. (*Matter of Mostow v State Farm Ins. Cos.,* 88 NY2d 321; *Liverpool & London & Globe Ins. Co. v Kearney,* 180 US 132; *United States Fid. & Guar. Co. v Annunziata,* 67 NY2d 229; *Stainless, Inc. v Employers' Fire Ins. Co.,* 69 AD2d 27, 49 NY2d 924; *Matthews v American Cent. Ins. Co.,* 154 NY 449.)

Skadden, Arps, Slate, Meagher & Flom, L. L. P., New York City (*Thomas J. Dougherty* and *James R. Carroll* of counsel), for respondent in the first above-entitled action. I. Standard of review: a court does not credit conclusory allegations and mischaracterizations. (*Leon v Martinez,* 84 NY2d 83; *Credit Alliance Corp. v Andersen & Co.,* 65 NY2d 536; *Kliebert v McKoan,* 228 AD2d 232.) II. The exact same Guardian policy language at issue here repeatedly has been held by State and Federal courts to be unambiguous. (*W.W.W. Assocs. v Giancontieri,* 77 NY2d 157; *Matter of Mostow v State Farm Ins. Cos.,* 88 NY2d 321; *Bensalem Twp. v International Surplus Lines Ins. Co.,* 38 F3d 1303; *Loblaw, Inc. v Employers' Liab. Assur. Corp.,* 57 NY2d 872.) III. Parol evidence is inadmissible to alter the unambiguous Guardian policy. (*Deerfield Communications Corp. v Chesebrough-Ponds, Inc.,* 68 NY2d 954; *Bango v Naughton,* 184 AD2d 961; *Landes v Sullivan,* 235 AD2d 657; *New York Univ. v Continental Ins. Co.,* 87 NY2d 308; *Sabo v Delman,* 3 NY2d 155; *Channel Master Corp. v Aluminium Ltd. Sales,* 4 NY2d 403; *Spellman v Columbia Manicure Mfg. Co.,* 111 AD2d 320; *International CableTel v Le Groupe Videotron Ltee,* 978 F Supp 483; *McKernin v Fanny Farmer Candy Shops,* 176 AD2d 233; *Bell Sports v System Software Assocs.,* 45 F Supp 2d 220.) IV. In any event, the Guardian illustrations at issue here have also been held to be unambiguous and bar appellants' claims. (*Frith v Guardian Life Ins. Co.,* 9 F Supp 2d 734; *Frith v Guardian Life. Ins. Co.,* 9 F Supp 2d 744; *Village of Upper Nyack v Christian & Missionary Alliance,* 143 Misc 2d 414, 155 AD2d 530; *Haddock v City of New York,* 75 NY2d 478; *UA-Columbia Cablevision v Fraken Bldrs.,* 114 AD2d 448; **\*334** *Rhine v New York Life Ins. Co.,* 273 NY 1; *Greeff v Equitable Life Assur. Socy.,* 160 NY 19.) V. The Court below properly affirmed dismissal of appellants' General Business Law § 349 claims because no deceptive

practice was alleged. (*Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank,* 85 NY2d 20; *S.Q.K.F.C., Inc. v Bell Atl. TriCon Leasing Corp.,* 84 F3d 629; *Marcus v AT&T Corp.,* 138 F3d 46.) VI. As to numerous other claims, appellants' alleged reliance on representations that are directly contradicted by the unambiguous policy (and illustration) is unreasonable as a matter of law. (*Bango v Naughton,* 184 AD2d 961; *Ponzini v Gatz,* 155 AD2d 590, 75 NY2d 946; *SKR Resources v Players Sports,* 938 F Supp 235; *Great Neck Saw Mfrs. v Manhattan Life Ins. Co.,* 163 AD2d 273; *Goldberg v Colonial Life Ins. Co.,* 284 App Div 678; *Frith v Guardian Life Ins. Co.,* 9 F Supp 2d 734; *Frith v Guardian Life Ins. Co.,* 9 F Supp 2d 744; *Century 21 v Woolworth Co.,* 181 AD2d 620; *Kimmell v Schaefer,* 89 NY2d 257; *2 Fifth Ave. Tenants Assn. v Abrams,* 183 AD2d 577.) VII. Appellants fail to allege a breach of fiduciary duty or negligent misrepresentation. (*Meagher v Metropolitan Life Ins. Co.,* 119 Misc 2d 615; *Dornberger v Metropolitan Life Ins. Co.,* 961 F Supp 506; *Murphy v Kuhn,* 90 NY2d 266; *Kimmell v Schaefer,* 89 NY2d 257; *Northeast Gen. Corp. v Wellington Adv.,* 82 NY2d 158; *Greenberg v Life Ins. Co.,* 177 F3d 507.)

Milberg Weiss Bershad Hynes & Lerach, L. L. P., New York City (*Melvyn I. Weiss* and *Barry A. Weprin* of counsel), *Arnzen, Parry & Wentz, P.S.C.,* Covington, Kentucky, *Bonnett, Fairbourn, Friedman & Balint, P. C.,* Phoenix, Arizona, *Cantilo, Maisel & Hubbard, L. L. P.,* Dallas, Texas, and *James, Hoyer & Newcomer, P.A.,* Tampa, Florida, for appellant in the second above-entitled action. I. The class' fraudulent inducement claim was erroneously dismissed. (*Barash v Pennsylvania Term. Real Estate Corp.,* 26 NY2d 77; *Sabo v Delman,* 3 NY2d 155; *Hall v Erwin,* 66 NY 649; *Citibank v Plapinger.* 66 NY2d 90; *Danann Realty Corp. v Harris,* 5 NY2d 317; *Long v Fitzgerald,* 240 AD2d 771; *Ward v Hanley,* 130 AD2d 742; *Rodas v Manitaras,* 159 AD2d 341; *Hanover Ins. Co. v Losquadro,* 157 Misc 2d 1014; *Kosierowski v Madison Life Ins. Co.,* 31 AD2d 930, 25 NY2d 737.) II. The advertising, marketing and sale of life insurance profoundly affects consumers and is subject to the strong remedial protections of General Business Law § 349. (*Matter of State of New York [Abrams] v Ford Motor Co.,* 74 NY2d 495; *Karlin v IVF Am.,* 93 NY2d 282; *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank,* 85 NY2d 20; **\*335** *In re Houbigant, Inc.,* 914 F Supp 964.) III. The increasing complexity of today's state of the art insurance products requires a flexible application of fiduciary duty principles.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

94 N.Y.2d 330                                                     Page 4
725 N.E.2d 598, 704 N.Y.S.2d 177, 1999 N.Y. Slip Op. 10743
**(Cite as: 94 N.Y.2d 330)**

(*United States v Brennan*, 938 F Supp 1111; *Penato v George*, 52 AD2d 939; *Schmidt v Bishop*, 779 F Supp 321; *Scott v Dime Sav. Bank*, 886 F Supp 1073, 520 US 1122; *Litton Indus. v Lehman Bros. Kuhn Loeb*, 767 F Supp 1220, 967 F2d 742; *Dornberger v Metropolitan Life Ins. Co.*, 961 F Supp 506; *Meagher v Metropolitan Life Ins. Co.*, 119 Misc 2d 615.) IV. MONY's insurance agents, by virtue of their training, expertise and superior knowledge of MONY's vanishing premium life insurance policies, occupy a special relationship sufficient to support the class' negligent misrepresentation claim. (*International Prods. Co. v Erie R. R. Co.*, 244 NY 331, 275 US 527; *United Safety v Consolidated Edison Co.*, 213 AD2d 283; *Kimmell v Schaefer*, 89 NY2d 257; *Murphy v Kuhn*, 90 NY2d 266; *AFA Protective Sys. v American Tel. & Tel. Co.*, 57 NY2d 912; *Coolite Corp. v American Cyanamid Co.*, 52 AD2d 486.)

*Dewey Ballantine, L. L. P.*, New York City (*Harvey Kurzweil, Richard W. Reinthaler* and *James P. Smith III* of counsel), and *E. Allan Farnsworth* for respondents in the second above-entitled action. I. Abandoning their breach of contract claim underscores, rather than cures, the remaining deficiencies in plaintiffs' complaint. (*Untermyer v Mutual Life Ins. Co.*, 128 App Div 615; *Drennan v Sun Indem. Co.*, 271 NY 182; *Adler & Shaykin v Wachner*, 721 F Supp 472; *W.W.W. Assocs. v Giancontieri*, 77 NY2d 157; *Michaels v City of Buffalo*, 85 NY2d 754; *Fried v North Riv. Ins. Co.*, 710 F2d 1022; *Matter of Mostow v State Farm Ins. Cos.*, 88 NY2d 321; *Moore v Kopel*, 237 AD2d 124.) II. The courts below properly dismissed plaintiffs' fraud and misrepresentation claims. (*Citibank v Plapinger*, 66 NY2d 90; *New York Fruit Auction Corp. v City of New York*, 81 AD2d 159, 56 NY2d 1015; *Danann Realty Corp. v Harris*, 5 NY2d 317; *Chimento Co. v Banco Popular de Puerto Rico*, 208 AD2d 385; *New York Univ. v Continental Ins. Co.*, 87 NY2d 308; *Rocanova v Equitable Life Assur. Socy.*, 83 NY2d 603; *Metropolitan Life Ins. Co. v Noble Lowndes Intl.*, 84 NY2d 430; *Briefstein v Rotondo Constr. Co.*, 8 AD2d 349; *Eastman Kodak Co. v Roopak Enters.*, 202 AD2d 220; *Comtomark, Inc. v Satellite Communications Network*, 116 AD2d 499.) III. The courts below properly dismissed plaintiffs' breach of fiduciary duty claim. (*Moll v US Life Tit. Ins. Co.*, 654 F Supp 1012; *Ponte & Sons v American Fibers Intl.*, 222 AD2d 271; *Clifford v Metropolitan Life Ins. Co.*, 264 App Div 168; \*336*Klonick v Equitable Life Assur. Socy.*, 77 Misc 2d 246; *Fidelity & Cas. Co. v Metropolitan Life Ins. Co.*, 42 Misc 2d 616; *New York Hotel Trades Council*

*& Hotel Assn. Ins. Fund v Prudential Ins. Co.*, 1 Misc 2d 245, 1 AD2d 952; *Equitable Life Assur. Socy. v Brown*, 213 US 25; *Uhlman v New York Life Ins. Co.*, 109 NY 421; *Meagher v Metropolitan Life Ins. Co.*, 119 Misc 2d 615; *Rochester Radiology Assocs. v Aetna Life Ins. Co.*, 616 F Supp 985.) IV. The courts below properly dismissed plaintiffs' negligent misrepresentation and fraudulent "omission" claims due to the absence of any classwide "special relationship." (*Pappas v Harrow Stores*, 140 AD2d 501; *Kimmell v Schaefer*, 89 NY2d 257; *Mobil Oil Corp. v Joshi*, 202 AD2d 318; *East 15360 Corp. v Provident Loan Socy.*, 177 AD2d 280; *Amend v Hurley*, 293 NY 587; *People's Bank v Bogart*, 81 NY 101; *Dambmann v Schulting*, 75 NY 55; *Murphy v Kuhn*, 90 NY2d 266; *Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v Salomon Bros. Intl.*, 251 AD2d 137; *Elghanian v Harvey*, 249 AD2d 206.) V. The courts below properly held that plaintiffs' claim under General Business Law § 349 must be dismissed. (*Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d 20; *Marcus v AT&T Corp.*, 938 F Supp 1158, 138 F3d 46; *S.Q.K.F.C., Inc. v Bell Atl. TriCon Leasing Corp.*, 84 F3d 629; *Karlin v IVF Am.*, 93 NY2d 282; *Gershon v Hertz Corp.*, 215 AD2d 202; *Lewis v Hertz Corp.*, 181 AD2d 493; *Padula v Lilarn Props. Corp.*, 84 NY2d 519.)

*Eliot Spitzer, Attorney General*, New York City (*Preeta D. Bansal, Edward Johnson, Thomas G. Conway, Jane M. Azia* and *Marion R. Buchbinder* of counsel), *amicus curiae* in the first and second above-entitled actions. I. In dismissing plaintiffs' claims under General Business Law § 349, the Court below misconstrued the law intended to protect consumers from deceptive practices. (*State of New York v Princess Prestige Co.*, 42 NY2d 104; *People v Apple Health & Sports Clubs*, 206 AD2d 266; *Matter of State of New York v Maiorano*, 189 AD2d 766; *Karlin v IVF Am.*, 93 NY2d 282; *Matter of State of New York v Colorado State Christian Coll. of Church of Inner Power*, 76 Misc 2d 50; *People v Federated Radio Corp.*, 244 NY 33; *People v Empyre Inground Pools*, 227 AD2d 731; *Matter of Lefkowitz v Bull Inv. Group*, 46 AD2d 25, 35 NY2d 647; *Matter of State of New York v Interstate Tractor Trailer Training*, 66 Misc 2d 678; *Matter of State of New York v Bevis Indus.*, 63 Misc 2d 1088.) II. The tort of negligent misrepresentation may provide consumers with a cause of action to obtain relief from insurance companies for injury arising from misleading sales \*337 practices. (*Heard v City of New York*, 82 NY2d 66; *Eiseman v State of New York*, 70 NY2d 175;

94 N.Y.2d 330
725 N.E.2d 598, 704 N.Y.S.2d 177, 1999 N.Y. Slip Op. 10743
**(Cite as: 94 N.Y.2d 330)**

Page 5

*Kimmell v Schaefer,* 89 NY2d 257; *Elghanian v Harvey,* 249 AD2d 206; *Ultramares Corp. v Touche,* 255 NY 170; *Murphy v Kuhn,* 90 NY2d 266.)

*Rice & Justice,* Albany (*John Carter Rice, Lawrence P. Justice* and *Bradley F. Rice* of counsel), for Business Council of New York State, Inc., *amicus curiae.* I. The unambiguous terms of written agreements must be enforced to preserve a commercial environment predicated on objective and consistent rules. (*W.W.W. Assocs. v Giancontieri,* 77 NY2d 157; *Mercury Bay Boating Club v San Diego Yacht Club,* 76 NY2d 256; *Judnick Realty Corp. v 32 W. 32nd St. Corp.,* 61 NY2d 819; *Long Is. R. R. Co. v Northville Indus. Corp.,* 41 NY2d 455; *Oxford Commercial Corp. v Landau,* 12 NY2d 362; *Drennan v Sun Indem. Co.,* 271 NY 182; *Untermyer v Mutual Life Ins. Co.,* 128 App Div 615; *Intercontinental Planning v Daystrom, Inc.,* 24 NY2d 372.) II. Plaintiffs' fraud and misrepresentation claims are also defeated by the express terms of the policies, illustrations and common understanding. (*Danann Realty Corp. v Harris,* 5 NY2d 317; *Citibank v Plapinger,* 66 NY2d 90; *Seaman-Andwall Corp. v Wright Mach. Corp.,* 31 AD2d 136, 29 NY2d 617; *Wittenberg v Rabinov,* 9 NY2d 261; *Ernst Iron Works v Duralith Corp.,* 270 NY 165; *Goldberg v Manufacturers Life Ins. Co.,* 242 AD2d 175, 92 NY2d 1000; *Bango v Naughton,* 184 AD2d 961; *Rotanelli v Madden,* 172 AD2d 815.) III. Plaintiffs' argument regarding the existence of a fiduciary or special relationship creating a duty of disclosure in these cases would, if accepted, have wide ranging deleterious effects on the conduct of business in New York State. (*Kimmell v Schaefer,* 89 NY2d 257; *Murphy v Kuhn,* 90 NY2d 266.) IV. An objective test under General Business Law § 349 for determining whether a particular practice constitutes deceptive conduct should not be abandoned. (*Varela v Investors Ins. Holding Corp.,* 81 NY2d 958; *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank,* 85 NY2d 20.)

*Milbank, Tweed, Hadley & McCloy, L. L. P.,* New York City (*Jeffrey Barist, David R. Gelfand, Charles Westland* and *Nicholas Smithberg* of counsel), for American Council of Life Insurance, *amicus curiae.* I. Pre-sale illustrations are not a promise or a guarantee. (*Untermyer v Mutual Life Ins. Co.,* 128 App Div 615; *Herman v Mutual Life Ins. Co.,* 108 F2d 678.) II. Plaintiffs cannot reasonably rely upon pre-sale representations that are contradicted by the unambiguous terms of the insurance *338 contract.

(*DiGrazia v United States Life Ins. Co.,* 170 AD2d 246; *Rotanelli v Madden,* 172 AD2d 815, 79 NY2d 754; *Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes v Salomon Bros. Intl.,* 249 AD2d 232; *Bango v Naughton,* 184 AD2d 961; *Johnson v Mutual Benefit Health & Acc. Assn.,* 5 AD2d 103, 5 NY2d 1081; *Richardson v Prudential Ins. Co.,* 29 Misc 2d 202; *Friedman v Prudential Life Ins. Co.,* 589 F Supp 1017; *Minsker v John Hancock Mut. Life Ins. Co.,* 254 NY 333; *Goldberg v Manufacturers Life Ins. Co.,* 242 AD2d 175; *O&M Gourmet Foods v Marino's 184 Foods,* 225 AD2d 340.) III. An insurer has no fiduciary duties to an applicant for insurance. (*Rochester Radiology Assocs. v Aetna Life Ins. Co.,* 616 F Supp 985; *Tyson v Aetna Life & Cas. Co.,* 75 AD2d 1023; *New York Hotel Trades Council & Hotel Assn. Ins. Fund v Prudential Ins. Co.,* 1 Misc 2d 245, 1 AD2d 952; *Fidelity & Cas. Co. v Metropolitan Life Ins. Co.,* 42 Misc 2d 616; *Murphy v Kuhn,* 90 NY2d 266.) IV. Extraterritorial application of General Business Law § 349 would be contrary to the intent of the statute and would usurp the authority of State Departments of Insurance. (*Shorter v Champion Home Bldrs. Co.,* 776 F Supp 333; *People v Lipsitz,* 174 Misc 2d 571; *State of New York v Camera Warehouse,* 130 Misc 2d 498.)

OPINION OF THE COURT

Rosenblatt, J.

In both appeals before us, plaintiffs are policyholders who have brought actions against insurance companies in connection with "vanishing premium" life insurance policies. They allege, in essence, that they purchased their insurance policies based on defendants' false representations that out-of-pocket premium payments would vanish within a stated period of time. Plaintiffs have asserted several theories of liability, two of which merit our review. One is based on plaintiffs' claims that defendants violated General Business Law § 349 by engaging in deceptive marketing and sales practices; the other is based on common-law fraud.

I.
Facts and Procedural History
A. The Gaidon-Guardian Action

In the mid-1980s, plaintiff representatives of a purported class each purchased a life insurance policy from defendant *339 Guardian Life Insurance Company of America. [FN1] Each policy was a "Whole Life Policy With Specified Premium Period." The policies contained provisions setting forth the

94 N.Y.2d 330
725 N.E.2d 598, 704 N.Y.S.2d 177, 1999 N.Y. Slip Op. 10743
**(Cite as: 94 N.Y.2d 330)**

periods for which premiums were to be paid. These periods varied from policy to policy and ranged from 10 years to life.

> FN1 Named plaintiffs are Frank Gaidon, Frank DeHamer, Nicholas DeHamer and Kathleen Warner, along with Allen Glass and Barbara Gaidon, as trustees of two different trust funds that at different times owned the life insurance policy on Frank Gaidon's life. Frank Gaidon, himself, never owned the policy.
> Guardian moved to dismiss in a pre-answer motion, made before plaintiffs sought class certification.

Plaintiffs allege that they bought their policies on the strength of false representations made to them by a Guardian sales agent. They assert that as part of the company's standard marketing presentation, the agent prepared a personalized "vanishing premium" illustration for each plaintiff. Using this device, the agent allegedly represented to each plaintiff that he or she would have to pay annual premiums out-of-pocket for only the first eight years of the policy, assuring each of them that the policy's dividends would thereafter cover the premium costs. Plaintiffs contend that the illustrations were premised on dividend projections that Guardian knew or should have known were untenable. Specifically, they allege that Guardian, in the mid-1980s, artificially inflated its current dividend rates despite waning profits because it wanted to continue depicting competitive vanishing dates.

On a separate page, accompanying each illustration, however, limitations such as the following appeared:

"Figures depending on dividends are neither estimated nor guaranteed, but are based on the [current year's] dividend scale."

"The [current year's] dividend scale reflects current company claims, expense, and investment experience ... and taxes under current laws. Actual future dividends may be higher or lower than those illustrated depending on the company's actual future experience."

After deciding to purchase the policy each plaintiff signed an application. Several weeks later Guardian delivered the policies. Each policy contained the following provisions:

(1) "[a] participating policy shares in Guardian's divisible surplus.**\*340**  The policy's share, if any, is determined yearly by Guardian"; and

(2) "[t]he dividend will reflect Guardian's mortality, expense, and investment experience."

Moreover, the policies contained several integration or merger clauses stating, in words or substance, that only the actual policy provisions controlled. [FN2]

> FN2 These clauses typically stated that "[t]he actual provisions set forth the full details and conditions of this policy; only the actual provisions will control."

In 1995, eight years after the sale of the policies, Guardian informed each plaintiff that his or her premiums would, in fact, not vanish and that if the policies were to remain in force, plaintiffs would have to continue out-of-pocket premium payments. [FN3] Plaintiffs brought this purported class action suit against Guardian in 1996. [FN4]

> FN3 Guardian allegedly informed Frank Gaidon that he would be required to pay premiums for the rest of his life.

> FN4 The complaint included causes of action for fraud, fraudulent inducement, breach of fiduciary duty, breach of contract, negligence, negligent misrepresentation, unjust enrichment and imposition of a constructive trust, declaratory and injunctive relief, reformation, violation of General Business Law § 349 and violation of Insurance Law § § 2123 and 4226.

In its pre-answer motion, Guardian moved to dismiss. Supreme Court granted the motion and dismissed the complaint for reasons that varied with the particular plaintiff. [FN5] The Appellate Division affirmed but made no distinction among plaintiffs, holding that, among others, the fraudulent inducement and General Business Law § 349 claims failed as a matter of law (*Gaidon v Guardian Life Ins. Co.*, 255 AD2d 101, 101-102).

FN5 Supreme Court held that, with the exception of the Gaidon trustees, all plaintiffs lacked standing to assert any claims against Guardian. Specifically, the court determined Frank Gaidon lacked standing because his policy was owned by trusts and not Gaidon himself. The court further ruled that Frank and Nicholas DeHamer and Kathleen Warner lacked standing because they signed releases as part of forms Guardian required them to sign to cancel their policies. Supreme Court then dismissed the Gaidon trustees' fraudulent inducement claims and General Business Law § 349 claims, holding that Guardian did not make the alleged misleading or fraudulent representations directly to the trustees; rather, that its sales agents interacted only with and made representations to Frank Gaidon himself.

B. The Goshen-MONY Action

Plaintiffs' assertions against defendants Mutual Life Insurance Company of New York and MONY Life Insurance *341 Company of America (collectively "MONY") mirror those in the Gaidon/Guardian case. In essence, they allege fraudulent representations and a deceptive marketing scheme, both based on untenable dividend projections.

Plaintiffs (members of certified class) purchased whole and universal life insurance policies in the mid-1980s from MONY. The MONY policies, like Guardian's, set forth premium payment schedules covering a stated number of years. MONY pre-sale illustrations were accompanied by "Limitations" pages similar to those in Guardian:

"This illustration shows the surrender of values dependent in whole or in part on dividends paid by the Company. These values are not guaranteed."

"Dividends shown and amounts dependent on them are based on the current illustrative formula. They are neither guarantees nor estimates of future results."

Each prospective policyholder submitted an application and, several weeks later, received a policy containing generally worded integration clauses. [FN6]

FN6 MONY policies provide that "[t]he policy with the application is the entire contract."

In 1995, MONY began informing plaintiffs that if they wished to keep their policies in force they would be required to pay additional premium payments beyond the depicted vanishing date. Employing theories similar to those in the companion case, plaintiffs commenced this action against MONY. [FN7]

FN7 Plaintiffs asserted causes of action for fraudulent concealment and deceit, negligent misrepresentation, reckless, wanton and/or negligent supervision, breach of contract, breach of fiduciary duty, fraudulent inducement, violations of Insurance Law § § 4226 and 2123 and violations of General Business Law § 349.

Supreme Court certified the class to include

"all persons or entities ... who have, or at the time of the policy's termination had, an ownership interest in one or more whole life or universal life insurance policies issued by [MONY] ... and were harmed due to [MONY's] alleged wrongful conduct with respect to the sale of Policies on an alleged ' vanishing premium' basis ... during the period from January 1, 1982 through and including December 31, 1995." [FN8]

FN8 The propriety of the class certification is not before us on this appeal.

Following discovery, Supreme Court granted MONY summary judgment on all claims, including those for fraudulent *342 inducement and violation of General Business Law § 349. The Appellate Division, citing its decision in *Gaidon (supra)*, affirmed, without opinion.

II.
Vanishing Premium Life Insurance: The Background

The cases before us are not unique. They involve allegations and practices of a national scope that have

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

generated industry-wide litigation (*see,* 7 Holmes, Appleman on Insurance 2d § 49.19). In resolving this case, we consider the various types of cash value life insurance that are marketed, and the import of "vanishing premiums" in that setting.

All the policies in the appeals before us provide "whole life" or "universal life" insurance--each a form of "cash value" life insurance. Cash value life insurance combines "pure" life insurance with an investment component that creates a potential accumulation of money in the policy (Downes and Goodman, Dictionary of Finance and Investment Terms, at 81 [4th ed]; *see also,* Black and Skipper, Life Insurance, at 177-78 [12th ed] [discussing "dual nature" of cash value life insurance]). In a cash value policy, the carrier typically invests accumulated money and pays returns to the policyholder in the form of dividends or interest (Downes and Goodman, *op. cit.,* at 81).

When cash value insurance first emerged, insurance companies invested accumulated money exclusively in conservative securities with fixed interest rates, such as municipal and corporate bonds (*see,* Fischel and Stillman, *The Law and Economics of Vanishing Premium Life Insurance,* 22 Del J Corp L 1, 4 [1997]). Commentators point out that because interest rates "soared" in the late 1970s and early 1980s, the economics of these cash value life insurance policies became unattractive to investors who sought to take advantage of the high interest rates (*see,* Fischel and Stillman, *op. cit.,* at 5; Multi-State Life Insurance Task Force and Multi-State Market Conduct Examination of The Prudential Insurance Company of America, Executive Summary, http://www.naic.org/nj/prusum.htm). In the mid-1980s, the life insurance industry reacted to its diminishing market share by designing policies, like the ones here at issue, in which policyholders' accumulated money is tied to the current rate of interest (*see,* Fischel and Stillman, *op. cit.,* at 5).

Carriers marketed interest rate-sensitive insurance under a host of premium payment options, including the "vanishing **\*343** premium" plan (Fischel and Stillman, *op. cit.,* at 6). Under this plan, the policyholder pays higher-than- normal premiums in the early years of the policy, resulting in a quicker accumulation of premium dollars for investment purposes (Fischel and Stillman, *op. cit.,* at 6-7; Black and Skipper, *op. cit.,* at 112). These policies are marketed on the premise that enough cash value will accumulate so that at a fixed date future administrative and insurance costs will be covered

and the policyholder relieved of any further out-of-pocket premium obligations (Fischel and Stillman, *op. cit.,* at 6-7).

In the late 1980s, however, sharply declining interest rates "upset the economics" of these widely marketed policies (Fischel and Stillman, *op. cit.,* at 7). Accumulated cash values became insufficient to pay expected future insurance and administrative costs. By the early 1990s, many consumers who purchased such policies were required to continue out-of-pocket payments to keep their policies in force (Fischel and Stillman, *op. cit.,* at 7). And the lawsuits followed.

### III.
#### General Business Law § 349 as Compared With Common-Law Fraudulent Inducement
##### A. General Business Law § 349

(1) In addressing the primary issues in these appeals, we must examine the components of both General Business Law § 349 and common-law fraudulent inducement. Although a person's actions may at once implicate both, General Business Law § 349 contemplates actionable conduct that does not necessarily rise to the level of fraud. In contrast to common-law fraud, General Business Law § 349 is a creature of statute based on broad consumer-protection concerns (*see, Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank,* 85 NY2d 20, 24-25). Although General Business Law § 349 claims have been aptly characterized as similar to fraud claims (*e.g., Dornberger v Metropolitan Life Ins. Co.,* 961 F Supp 506, 549 [SD NY 1997]), they are critically different in ways illustrated by the cases at bar.

As this Court noted in *Oswego (supra,* 85 NY2d, at 24), General Business Law § 349 was enacted initially to give the Attorney General enforcement power to curtail deceptive acts and practices--willful or otherwise--directed at the consuming public. Owing to the "ever-changing types of false and deceptive **\*344** business practices which plague consumers in our State," the Governor signed the measure into law (NY Dept of Law, Mem to Governor, Bill Jacket, L 1963, ch 813). In 1980, the Legislature took a significant step to expand the statute's enforcement scheme by allowing a private cause of action (General Business Law § 349 [h]).

(2) As a threshold matter, in order to satisfy General Business Law § 349 plaintiffs' claims must be predicated on a deceptive act or practice that is "consumer oriented" (*Oswego Laborers' Local 214*

*Pension Fund v Marine Midland Bank, supra,* 85 NY2d, at 24-25). We hold that they are. In contrast to a private contract dispute as to policy coverage (*e.g., New York Univ. v Continental Ins. Co.,* 87 NY2d 308), the practices before us involved an extensive marketing scheme that had "a broader impact on consumers at large" (*e.g. Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, supra,* at 25).

Turning to the other components of section 349, "a plaintiff must allege that the defendant has engaged 'in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof' " (*Small v Lorillard Tobacco Co.,* 94 NY2d 43, 55 [quoting *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, supra,* at 25]). This Court has defined a "deceptive act or practice" as a representation or omission " 'likely to mislead a reasonable consumer acting reasonably under the circumstances' " (*Karlin v IVF Am.,* 93 NY2d 282, 294 [quoting *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, supra,* at 26]). We hold that plaintiffs have adequately alleged that defendants violated the statute.

(3) Plaintiffs have alleged, in essence, that defendants lured them into purchasing policies by using illustrations that created unrealistic expectations as to the prospects of premium disappearance upon a strategically chosen "vanishing date." This vanishing date, plaintiffs allege, was misleading, as based on the premise that interest rates would continue at a high, unprecedented rate for, in some cases, 20 or more years--a premise that defendants allegedly knew to be unlikely.

Plaintiffs' argument is supported by the Attorney General, who has submitted an *amicus* brief asserting that the lower courts' interpretation of section 349 was too restrictive. He urges that a matter-of-law finding that the practices were not deceptive or misleading would undermine the State's power to **\*345** redress consumer practices that do not rise to the level of common-law fraud.

In seeking to uphold the dismissal of the section 349 claims, defendants argue, in substance, that the illustrated vanishing dates were not deceptive. They have directed our attention to the policies' merger clauses, which seek to confine their representations to the four corners of the policies. They also point to the above-quoted disclaimer language stating that illustrated dividend/interest rates "are neither guarantees nor estimates of future results" or that

such rates may be "higher or lower ... depending on the company's actual future experience." Defendants' contentions are compelling when resisting plaintiffs' claims of fraud, but they cannot, on this record, justify dismissal of plaintiffs' section 349 claims.

To begin with, the merger provisions--for whatever other importance they may carry--are not determinative of plaintiffs' section 349 claims, which are based on deceptive business *practices,* not on deceptive contracts. Moreover, the disclaimers, though more particularized than the merger provisions, do not speak to the true, unrevealed relationship between dividend/interest rates and the vanishing dates as represented. Consumers vary in their level of sophistication and their ability to perceive the connection between a fluctuation in dividend/interest rates and a vanishing date, or to make the necessary arithmetic adjustments. The issue before us is not whether, as a matter of law, reasonable consumers would be misled in a material way, but whether that prospect is enough to create a question of fact in the *Goshen* appeal, or to state a claim in *Gaidon.* It is, in both cases, for a number of reasons.

Defendants made vanishing dates the centerpiece of their sales presentations. They allegedly marketed vanishing premium policies by tying depicted vanishing dates to a milestone in the policyholder's near future (such as the policyholder's proposed retirement age or the year when a child was expected to go to college), and thereby created the expectation of a firm, personalized timetable. The very goal of the marketing scheme was to convince prospective purchasers that the vanishing date would in fact conform to the individualized projections. Plaintiffs allege that the defendants were aware that the premiums were unlikely to vanish as projected because they allegedly knew or should have known that the opposite was true: dividend/interest rates were not sustainable at the illustrated level. In the face of that unlikelihood, defendants created these expectations with illustrations based on the **\*346** unrealistic dividend/interest forecasts and without disclosure or disclaimer revealing that fact. [FN9]

> FN9 We are not persuaded by the assertion in the dissent that defendants are, as a matter of law, relieved of General Business Law § 349 liability for having based their illustrations on the then "current dividend scale" (*see,* dissenting opn, at 355 [discussing 11 NYCRR 219.4 (n)]). Section

94 N.Y.2d 330                                                                    Page 10
725 N.E.2d 598, 704 N.Y.S.2d 177, 1999 N.Y. Slip Op. 10743
**(Cite as: 94 N.Y.2d 330)**

219.4 (n) was promulgated to preclude insurance companies from depicting speculative interest rates above those currently paid by the carrier. It certainly does not mandate that a carrier project a premium payment plan that it allegedly knows to be unsustainable, while revealing nothing as to the improbability of the projection.

Further, and in spite of this alleged knowledge, defendants allegedly trained sales agents to make presentations in ways that would arguably deceive and mislead prospective policyholders. The record contains a sales training videotape that is revealing. It instructs agents how to "cause the vanish to occur whenever your client wants to see it." Also, vanishing premium policies were marketed with slogans such as "Pay one and done," "4 Pay/No Pay," "Pay One Vanish," "Accelerated Vanish," and "How to get lifetime insurance protection with payments that are ... GOING, GOING, GONE."

The *Gaidon* action was determined solely on the pleadings. Plaintiffs have alleged that Guardian was aware of the unlikelihood that the then current dividend rate could be maintained. This awareness, plaintiff alleges, was based not only on the general state of the economy, but on Guardian's transactions and on its heightened knowledge of its own financial condition.

In *Goshen*, plaintiffs also have produced affidavits averring that the company's current dividend rate, as depicted at the time of the illustration, was based in part on non-recurring transactions that skewed any projection of MONY's ability to maintain the then current interest/dividend rates.

Insisting that they have engaged in no deceptive conduct, defendants have challenged plaintiffs' allegations. Defendant MONY, for example, asserts that "[t]he regulatory ... repercussions of engaging in the sort of pervasive misconduct to which plaintiffs allude would be swift and severe." In this context we note that in 1997 and 1998 the New York State Superintendent of Insurance issued several regulations aimed directly at the marketing scheme before us. One regulation banned outright the use of "vanishing premium" language:

"When using an illustration in the sale of a life insurance policy, an insurer ... shall not ... use the term 'vanish' or 'vanishing premium,' or a similar **\*347** term that implies the policy becomes paid up, to describe a plan for using non-guaranteed elements to pay a portion of future premiums." (*See,* 11 NYCRR 53-3.2 [b] [8].)

Further, section 53-3.3 (a) (13) provides that where pre-sale illustrations depict reinvestment of non-guaranteed dividend/interest to pay off premiums,

"the illustration must *clearly* disclose that a charge continues to be required and that, depending on actual results, the premium payer may need to continue or resume premium outlays. Similar disclosure shall be made for premium outlay of lesser amounts or shorter durations than the contract premium. *If a contract premium is due, the premium outlay display shall not be left blank or show zero unless accompanied by an asterisk or similar mark to draw attention to the fact that the policy is not paid up"* (11 NYCRR 53-3.3 [a] [13] [emphasis added]).

Most pointedly, the Superintendent of Insurance has required carriers to dispel any false impression that dividend/interest rates would continue for all the years shown in a life insurance illustration. The regulation is designed to insure that prospective purchasers, during high interest eras, will no longer be led or misled to believe that their out-of-pocket obligations will be reduced or eliminated. Section 53-3.3 (b) (5) thus requires pre-sale illustrations to include the following statement:

"This illustration assumes that the currently illustrated non-guaranteed elements will continue unchanged for all years shown. *This is not likely to occur,* and actual results may be more or less favorable than those shown" (11 NYCRR 53-3.3 [b] [5] [emphasis added]). [FN10]

FN10 We note also that 25 States have adopted measures similar to these regulations expressly aimed at combating alleged deception caused by "vanishing premium" illustrations (*see, e.g.,* Cal Ins Code § 10509.955; 40 Penn Stat Annot § 625-8; RI Gen Laws § 27-62-5; Ala Ins Departmental Reg No. 114, § 6; 3 Alaska Admin Code 28.815; 3 Colo Code Regs § 4-1-8 [VI]; Conn Agencies Regs § 38a-819-61; Del Ins Reg No. 62; 50 Ill Admin Code 1406.70; 191 Iowa Admin Code 14.6, 15.3

[507B]; Me Bureau of Ins Rule Ch 910, § 6; Miss Ins Reg No. 98-2; 210 Neb Admin Code § 72-006; Nev Admin Code 686A.4785; NJ Admin Code § § 11:4-41.2- -11:4-41.4; 11 NC Admin Code 4.0504; ND Admin Code § 45- 04-01.1-04; Ohio Admin Code Ann 3901-6-04; Okla Admin Code 365:10-3-54; Oregon Admin Rules 836-051- 0540; SC Code of Regs 69-40; Admin Rules of SD 20:06:38:05; 28 Texas Admin Code § 21.2206; Utah Admin Code R590-177- 6; Code of Vermont Rules 21-020-042, § 6; Wisc Admin Code § Ins 2.17).**348**

Contrary to the suggestions of our dissenting colleague, the actions of the Superintendent of Insurance are independent of our conclusion that plaintiffs have pleaded a valid section 349 claim. [FN11] They merely match and fortify our determination.

> FN11 We further note that courts in other jurisdictions have sustained deceptive trade practice causes of action under statutes similar to New York's (see, e.g., Nepomoceno v Knights of Columbus, 1999 WL 66570, 1999 US Dist LEXIS 1366 [US Dist Ct, ND Ill, Feb. 8, 1999, Civ A 96 C 4789]; Force v ITT Hartford Life & Annuity Ins. Co., 4 F Supp 2d 843 [D Minn 1998]; Parkhill v Minnesota Mut. Life Ins. Co., 995 F Supp 983 [D Minn 1998]).

In all, we conclude that plaintiffs in the Gaidon action have adequately pleaded a General Business Law § 349 cause of action and that plaintiffs in Goshen have presented sworn assertions sufficient to raise a question of fact as to a General Business Law § 349 deceptive practice.

B. Common-Law Fraudulent Inducement

A practice may carry the capacity to mislead or deceive a reasonable person but not be fraudulent. That distinction separates plaintiffs' fraud claims from their section 349 claims. Fraud is wrongful enough to occupy a civil classification just short of criminal conduct. Over the years fraud has generally been defined by behavior involving intentional, false representations and other connotations of scienter such as willfulness, knowledge, design and bad faith

(see, e.g. Channel Master Corp. v Aluminium Ltd. Sales, 4 NY2d 403, 407-408; Reno v Bull, 226 NY 546, 550).

To state a claim for fraudulent inducement in an insurance context, plaintiffs must allege a "misrepresentation or material omission" by defendants that induced plaintiffs to purchase the policies, as well as scienter, reliance and injury (New York Univ. v Continental Ins. Co., 87 NY2d 308, 318, supra; see also, Small v Lorillard Tobacco Co., 94 NY2d 43, 57, supra).

The parties' arguments for and against plaintiffs' fraud claims mirror those made in connection with section 349. Notably, plaintiffs stress that the illustrations were one-sided misrepresentations designed to deceive and mislead purchasers by projecting only the brighter prospects while concealing predictably bleaker ones. They assert that they have met the "misrepresentation or material omission" threshold for fraud, **349** alleging that the illustrations painted a purposefully distorted landscape using false, untenable interest rate projections and further, that defendants intentionally diverted funds to conceal the artificially inflated nature of the dividend picture.

Defendants argue that plaintiffs' assertion that they intentionally and artificially inflated dividends is largely conclusory and incompatible with the constraints of a highly regulated industry. Contending further that there was no misrepresentation or falsification that could give rise to a fraud claim, defendants submit that the dividend/interest rates projected in the illustration tables were, in fact, those being paid out to policyholders at the time of the sales presentations. Additionally, defendants claim that the projections were illustrations only, that they were based on the continuation of an existing state of affairs and cannot be construed or characterized as guarantees. They also argue, in substance, that any claim of fraudulent concealment or omission is necessarily defeated by the disclaimer language in the illustrations.

We recognize that a number of courts have gone so far as to sustain fraud charges as adequately pleaded in vanishing premium cases (see, e.g., Greenberg v Life Ins. Co., 177 F3d 507 [6th Cir 1999]; Myers v Guardian Life Ins. Co., 5 F Supp 2d 423 [ND Miss 1998]; Nepomoceno v Knights of Columbus, 1999 WL 66570, 1999 US Dist LEXIS 1366 [US Dist Ct, ND Ill, Feb. 8, 1999, Civ A 96 C 4789], supra; Grove v Principal Mut. Life Ins. Co., 14 F Supp 2d

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

94 N.Y.2d 330                                                           Page 12
725 N.E.2d 598, 704 N.Y.S.2d 177, 1999 N.Y. Slip Op. 10743
**(Cite as: 94 N.Y.2d 330)**

1101 [SD Iowa 1998]; *Force v ITT Hartford Life & Annuity Ins. Co.,* 4 F Supp 2d 843 [D Minn 1998], *supra; Chain v General Am. Life Ins. Co.,* 1996 WL 671394, 1996 US Dist LEXIS 21505 [US Dist Ct, ND Miss, Sept. 30, 1996, No. 4:96CV96-B-B]; *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 975 F Supp 584 [D NJ 1996]; *Mentis v Delaware Am. Life Ins. Co.,* 1997 WL 744430, 1999 Del Super LEXIS 419 [Del Super Ct, July 28, 1999, CA No. 98C-12-023 WTQ]; *but see, Frith v Guardian Life Ins. Co.,* 9 F Supp 2d 744 [SD Tex 1998]; *Solomon v Guardian Life Ins. Co.,* 1996 WL 741888, 1996 US Dist LEXIS 18342 [US Dist Ct, ED Pa, Dec. 11, 1996, Civ A 96-1597], *affd* 162 F3d 1152 [3d Cir 1998] [unpublished table decision]).

(4) We conclude, however, that defendants' disclaimers, although insufficient to defeat plaintiffs' section 349 claims, are sufficient to absolve them of fraud. Defendants are correct in asserting that plaintiffs have not met the threshold element to support a fraud claim--"misrepresentation or material omission." The elements of fraud are narrowly defined, requiring **\*350** proof by clear and convincing evidence (*cf., Vermeer Owners v Guterman,* 78 NY2d 1114, 1116). Not every misrepresentation or omission rises to the level of fraud. [FN12] An omission or misrepresentation may be so trifling as to be legally inconsequential or so egregious as to be fraudulent, or even criminal. Or it may fall somewhere in between, as it does here.

> FN12 *See generally,* 2 Harper and James, Torts § 7.14 (2d ed 1986); Prosser and Keeton, Torts § 106 (5th ed 1984).

By stating that the illustrated dividend/interest rates are not guaranteed and that they may be higher or lower than depicted, defendants made a partial disclosure. They revealed the possibility of a dividend/interest rate decline, but did not reveal its practical implications to the policyholder. Although they did not guarantee that interest rates would remain constant, they failed to reveal that the illustrated vanishing dates were wholly unrealistic.

We conclude that although defendants' sales practice, as pleaded, falls within the purview of General Business Law § 349, it does not constitute a "misrepresentation or material omission" necessary to sustain a cause of action for fraud.

Because the Appellate Division dismissed the entire

Gaidon/Guardian complaint on the merits, it is now necessary for that Court to consider which plaintiffs would be legally entitled to bring a claim under General Business Law § 349. Accordingly, in *Gaidon,* the order of the Appellate Division should be modified, without costs, by reinstating the General Business Law § 349 cause of action, and remitting the case to that Court for consideration of issues raised but not determined on the appeal to that Court. As so modified, the order should be affirmed.

In *Goshen,* the order of the Appellate Division should be modified, without costs, by reinstating the General Business Law § 349 cause of action and remitting the case to Supreme Court for further proceedings consistent with this opinion and, as so modified, affirmed.

Bellacosa, J.

(Dissenting in part). My dissent is respectfully tendered solely with regard to the revival and reinstatement of the General Business Law § 349 claims. I agree with the lower courts, including their rulings that these particular claims are no more sustainable or cognizable on these records than any of the other standard claims.

I dissent also because the precedential implications of the **\*351** Majority holding, as proposed, are beyond the intent, enactment and interpretation of this remedial statute. In particular, I conclude that no deceptive act or practice, which would mislead a reasonable consumer, has been alleged in these cases under this statute. I would therefore affirm the Appellate Division orders outright.

I.

In the *Gaidon* action, defendant's motion to dismiss pursuant to CPLR 3211 was granted, dismissing plaintiffs' complaint containing their causes of action for violations of General Business Law § 349. The standard applied in this case is whether a pleading and its factual allegations manifest any cause of action "cognizable at law" (*Guggenheimer v Ginzburg,* 43 NY2d 268, 275). Dismissal is appropriate when evidentiary material is considered where an alleged material fact "is not a fact at all and ... no significant dispute exists regarding it" (*id.,* at 275).

Here, the complaint must sufficiently set forth a "forbidden type of deception" (*id.,* at 275). While the

94 N.Y.2d 330                                                                 Page 13
725 N.E.2d 598, 704 N.Y.S.2d 177, 1999 N.Y. Slip Op. 10743
**(Cite as: 94 N.Y.2d 330)**

failure to disclose information may be found "less than candid, it cannot, as a matter of law, be found deceitful" when there is no evidence in the record to refute defendant's assertions (*see, St. Patrick's Home for Aged & Infirm v Laticrete Intl.,* 264 AD2d 652, 655). The failure of a pleading to present a deceptive act or practice, under the sweep and provenance of General Business Law § 349, should render the asserted claims deficient on the face of, and at the outset of, the dispute brought to a court (*see, id.*).

Defendants moved in the *Goshen* action for summary judgment. Thus, reviewing the pleadings as well as the evidentiary materials, plaintiffs must present a triable issue of fact to defeat the motion. I conclude, as did the courts below, that no genuine triable issue of fact is presented on this record, and summary judgment was appropriately granted to defendants.

In the instant cases, plaintiffs essentially charge that the use of illustrations by defendants' sales agents, depicting time lines at which premium payments might "vanish," misled the consumers within the meaning of the statute. Additionally, in *Goshen,* plaintiffs claim that defendant MONY knew the use of the "vanishing premium" sales promotion was not viable and that the company attempted to conceal this awareness from the plaintiff class. The *Goshen* plaintiffs submitted affidavits purporting that the dividends illustrated by MONY were not **\*352** sustainable. In my view, on these records, the allegations do not measure up to cognizable causes of action necessitating a trial on the General Business Law § 349 claims.

### II.

In 1970, the Legislature enacted section 349 of the General Business Law to "strengthen the consumer protection powers of the Attorney General by enabling him to obtain injunctions against all deceptive and fraudulent practices affecting consumers and by clarifying his powers to obtain restitution for defrauded consumers in such proceedings" (Governor's Mem approving L 1970, chs 43 and 44, 1970 NY Legis Ann, at 472). Consumers were given a protection for an "honest market place" enforceable by the Attorney General (*id.,* at 472). Section 349 tracked the actions of the FTC with respect to interpretation and enforcement of the Federal Trade Commission Act (15 USC § 45), in that agency's effort to eradicate or penalize deceptive acts and practices (*see generally, Matter of State of New York v Colorado State Christian Coll. of*

*Church of Inner Power,* 76 Misc 2d 50, 54).

In 1980, the New York Legislature enhanced this State's protective mechanism. It gave a private right of action to allegedly wronged consumers to pursue consumer fraud claims personally (General Business Law § 349 [h]). This powerful tool was to "supplement the activities of the Attorney General in the prosecution of consumer fraud complaints" (Governor's Mem approving L 1980, ch 346, 1980 NY Legis Ann, at 147). Moreover, the enactment of this statutory remedy was not to deprive plaintiffs of any common-law remedies (*see generally, Schuster v City of New York,* 5 NY2d 75, 85 [statutory remedy is "merely cumulative"]).

I am not persuaded that support exists to justify a further enhancement of General Business Law § 349 to make it a "catch-all" remedy. It should not be construed as providing all-encompassing redress. To interpose such a procedural and remedial disincentive against aggrieved persons pursuing longstanding traditional remedies at common law, as well as other statutory and regulatory measures affecting a gigantic industry like insurance--and precedentially all others--is a remarkable step and development that I do not believe is warranted or intended.

### III.

Section 349, unlike other States' deceptive practice statutes, does not supply a definition of "deceptive acts or practices." **\*353** Noting the undeniable remedial nature of section 349, this Court proportionately recognized the potential for overbreadth inherent in the interpretation and application of the statute. *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank* (85 NY2d 20) announced the test which should determine whether defendants here violated section 349. The standard is whether "defendant is engaging in an act or practice that is deceptive or misleading in a material way" and whether "plaintiff has been injured by reason thereof" (*id.,* at 25). While I agree with the Majority's acknowledgment of the appropriate test, my application of it results in an affirmance and resolution against the groundbreaking availability of New York's General Business Law § 349. Based on the Majority's holding, a wide expansion of the theory underlying this statutory remedy will henceforth be operative.

Yet, to avoid the possibility of "excessive litigation" (class or individual) under General Business Law § 349, this Court evoked " 'an objective definition of

deceptive acts and practices, whether representations or omissions, limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances' " (*Karlin v IVF Am.,* 93 NY2d 282, 294, quoting *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, supra,* 85 NY2d, at 26; *contrast,* Note, *New York Creates a Private Right of Action to Combat Consumer Fraud: Caveat Venditor,* 48 Brook L Rev 509, 548).

The judicial framework and resolution can be determined as a matter of law or fact (*Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, supra,* 85 NY2d, at 26). Particularly in omissions cases, the statute does not require businesses to "guarantee that each consumer has all relevant information specific to its situation. The scenario is quite different, however, where the business alone possesses material information that is relevant to the consumer and fails to provide this information" (*id.,* at 26).

The capacity and potential of the material to qualify as a misleading act that deceives must be assessed in individual cases and circumstances. The determination of the deceptiveness of the conduct that bears on the reasonableness of the consumer should not be bifurcated between the sales materials and the contract policies themselves, as the Majority's analysis does. That is a commercially unrealistic segmentation that artificially skews the statutory reach.

Deception requires a misrepresentation of fact under the whole set of dealings of the parties (*see generally,* **\*354***State of New York v Unique Ideas,* 85 Misc 2d 258, *affd in part, mod as to damages* 56 AD2d 295, *mod as to damages* 44 NY2d 345). The language of the policies, which included statements that premiums are regularly due, cannot be so facilely cast aside in determining whether a misrepresentation of fact was alleged which would mislead a reasonable consumer, acting reasonably, into buying that policy. The reasonableness of the consumer viewpoint in my judgment of the statute, ought to be evaluated in light of all the facts before the consumers--the sales promotion, the written illustrations expressing no guarantees, and the policies excluding extraneous facets from the sales transaction and agreement. In other words, the integrated transaction determines the availability of the statute, not just the initial contact, sales pitch or some predicate facet.

IV.

Thus, application of *Oswego*'s standards to plaintiffs' General Business Law § 349 claims demonstrates, as a matter of cogent, even compelling, record dealings, that plaintiffs fail to propound cognizable claims or a triable issue of fact under the statute. The complaints, and the accompanying submissions in *Goshen,* simply do not allege a sustainable basis or theory that plaintiffs were materially deceived and harmed by defendants' actions--that is, by the entire array of interrelated steps leading to the purchase of the policies.

In *Gaidon,* the asserted deceptive act is that defendant Guardian, through its sales presentations and policy illustrations, misrepresented that payment of premiums only during the first several years of the policy would suffice to carry out the cost of the policy for the life of the insured. Plaintiffs allege that this illustrative sales promotion induced purchase of the policies and falls within the limitless statute. Yet, the express terms of the policy plainly indicate the duration of the required premium payments; and the written policy illustrations used by defendant Guardian specifically stated they were neither part of the actual insurance policy, nor that the dividends were guaranteed.

Moreover, to the extent that plaintiffs in *Gaidon* argue that they pleaded a cognizable section 349 claim based on defendant Guardian's use of misleading dividend scales in its illustrations, plaintiffs' argument is baseless. The illustrations accord with applicable official regulations which require that "[i]f dividends are illustrated, they must be based on the **\*355** insurer's current dividend scale and the illustration must contain a statement to the effect that they are not to be construed as guarantees or estimates of dividends to be paid in the future" (11 NYCRR 219.4 [n]). The Majority's conclusion--that the use of standard, officially approved and authorized illustrations amounts to a deceptive practice under General Business Law § 349--is a breakaway proposition with troubling precedential implications and a fundamental unfairness by changing the rules of trade after the fact.

Similarly, in *Goshen,* the certified class members sought to recover under General Business Law § 349 based on their understanding of written policy illustrations that premium payments would only have to be paid for a limited number of years. Defendant MONY utilized different versions of the written illustrations. All illustrations, however, included statements that they were not valid without a "Limitations and Definitions" form, which, at

minimum, cautioned any potential purchaser that only the policy itself with the application is the entire contract. The policies then repeated the same admonition that they alone constituted the entire agreement of the parties. To wholly sideline these pervasively employed integration clauses in these circumstances is a discretely portentous precedential development. That alone justifies my dissenting expression as fair notice to the Bench and Bar, and as an incentive for legislative consideration of some reasonable limitations on the sweep of the law.

As an additional argument, the plaintiff class in *Goshen* urges that MONY executives knew that the "vanishing premium" concept was not viable, given inevitably uncertain predictions about future economic conditions. But that unpredictability is a known constant to the world at large, not just to insurance executives.

*Oswego Laborers' Local 214 Pension Fund (supra,* at 26) further teaches another axiom: MONY was not required to "guarantee that each consumer has all relevant information specific to its situation." The sales nomenclature of "vanishing premium" does not even denote a type of life insurance policy (*see,* Fischel and Stillman, *The Law and Economics of Vanishing Premium Life Insurance,* 22 Del J Corp L 1, 7). Rather, the "vanishing premium" notion is a marketing technique and advertising device based on a *proposed* financing spread sheet which provides "a vanishing-premium option or rider to the basic life insurance policy" (Fischel and Stillman, *op. cit.,* at 7, n 28). The illustrations "are based on *projections* of certain *356 outside economic factors which may or may not come true" (Fischel and Stillman, *op. cit.,* at 7, n 28 [emphasis added]). Consumers know as a matter of common sense and knowledge, or ought to be reasonably charged with knowing that truism. Besides, they were informed of this very point in writing--*twice* at least. The illustration materials themselves and the actual policies so declare. They are unassailable documentary proofs, not wispy disappointment claims that the deals did not turn out as hoped for or expected.

The point at which the premium payment obligation "vanishes," as advertised through the illustrations, does not imply, moreover, that the policyholder will never again have an obligation to pay premiums. Rather, the illustrations pro- ject that the policy may be "self-perpetuating," at a point when future premium payments should be paid up using the generated policy dividends (Fischel and Stillman, *op. cit.,* at 7, n 28). Reasonable consumers should not be

allowed to infer--by operation of law through interpretive judicial rulings, statutes and regulations-- that external economic factors would remain static and that the cessation of cash premium payments would be a certainty, for lack of which statutory liability is primed. That consequence defies history and fair dealing on a common sense landscape.

Plaintiffs' allegations that they were deceived into believing that the premium payments would inevitably cease at a fixed point in time is, moreover, contradicted by all the available documentation. Courts should not ignore the explicit language of the insurance contracts and the reasonable understanding and expectation concerning the ineffability of extrinsic economic and market forces. Everyone should be charged with the plain fact that only the unknowable future could ultimately shape and control these matters.

Next, the use of interest rate assumptions in the policy illustrations should not be deemed realistically to have the capacity to mislead prospective policyholders. That is a too far-out legal fiction. The probable level of future interest rates is, again, most certainly and most commonly known and appreciated as something not solely within an insurance company's or anyone else's ability to forecast (*see,* Fischel and Stillman, *op. cit.,* at 14). Even Alan Greenspan and the Federal Reserve Board hedge their "bets" and just do their best. Furthermore, any general information defendants had involving market projections was the type of information plaintiffs, indeed anyone, "could reasonably have obtained" (*Oswego Laborers' *357 Local 214 Pension Fund v Marine Midland Bank, supra,* 85 NY2d, at 27), on their own, through financial advisors or via the "Internet".

Plaintiffs argue--and the Majority adopts--the proposition that defendants created a misleading impression of these policies by not revealing their potential downsides. This aspect, as that syllogism sets the stage for the future, helps to drive the General Business Law § 349 claims in these cases. My simple answer is that the entire insurance industry, by its nature, insures many things. But to derive an insurance obligation out of this new "pros and cons" balancing technique is a far-reaching concept and legal responsibility, bound to confound any rate or risk underwriter. Risk projections and re-allocation on this basis constitute a major shift for any type of sales- oriented business. By court decree instead of market forces they must, when emphasizing the positive aspects of their policies or

Copr. ©  West 2003 No Claim to Orig. U.S. Govt. Works

products, also provide minimizing features and negatives (*contrast,* Fischel and Stillman, *op. cit.,* at 15).

To hold, even in part, that giving a product its best sales "face," even with some "puffery" and artfully spun advertising, is actionable under General Business Law § 349 pushes this consumer protection statute into uncharted and unintended territories. "Puffing" defenses--a seller's claim that no reasonable person would believe some sales promotion to be literally true--should have some reasonable place in the General Business Law § 349 universe as to who bears the risk of the bargain (*see generally,* Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising,* 90 Harv L Rev 661, 677). If not, this statute launches limitless liability.

Reasonable consumers acting reasonably recognize sales pitches and ordinarily discount them accordingly. In addition, to acknowledge that consumers understand that future interest rates will affect their future premium rates is reasonable and even respectful of individual intelligence, personal accountability and good common sense (*see,* Fischel and Stillman, *op. cit.,* at 16).

Based on the records of these cases, I agree with the lower courts that plaintiffs failed to show that defendants engaged in materially misleading or deceptive acts or practices. The alleged representations made by defendants were not "likely to mislead a reasonable consumer acting reasonably" (*Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, supra,* at 26). Prospective market forces predominantly control *358 here, and a remedial rescue by statute or judicial gloss on a statute--after the economic facts inexorably unfold under their own power--ought not become the benevolent standard for shifting fault, reallocating risk and relieving individuals of some measure of reasonable responsibility and private accountability.

In sum, I would wholly affirm the orders of the Appellate Division in the actions entitled under *Gaidon* and *Goshen.* While I agree with the Majority rationale and result on plaintiffs' common-law fraud claims, I respectfully dissent for the reasons given and conclude that plaintiffs have not propounded cognizable or triable General Business Law § 349 claims.

Chief Judge Kaye and Judges Levine, Ciparick and

Wesley concur with Judge Rosenblatt; Judge Bellacosa dissents in part and votes to affirm in a separate opinion; Judge Smith taking no part.

In *Gaidon v Guardian Life Ins. Co.:* Order modified, etc.

In *Goshen v Mutual Life Ins. Co.:* Order modified, etc.*359

Copr. (c) 2001, Randy A. Daniels, Secretary of State, State of New York.

N.Y. 1999.

GAIDON v GUARDIAN LIFE INS.

END OF DOCUMENT

302 A.D.2d 314                                                                                                    Page 1
756 N.Y.S.2d 520, Prod.Liab.Rep. (CCH) P 16,538, 2003 N.Y. Slip Op. 11459
**(Cite as: 302 A.D.2d 314)**

**C**

The People of the State of New York by Eliot
Spitzer, as Attorney General of
the State of New York, Respondent,
v.
General Electric Company, Inc., Appellant.

Supreme Court, Appellate Division, First
Department, New York

(February 27, 2003)

Order, Supreme Court, New York County (Louise
Gruner Gans. J.), entered on or about July 30, 2001,
which, upon findings that respondent General
Electric Company (GE) had engaged in deceptive
practices violative of Executive Law § 63 (12) and
General Business Law § 349, set forth procedures
pursuant to which GE would compensate certain
consumers who had purchased replacements for GE's
defective dishwashers, unanimously affirmed,
without costs. Order, same court and Justice, entered
April 8, 2002, which denied GE's motion to renew
and granted its motion to reargue but, upon
reargument, adhered to its prior orders, except that it
allowed GE, under certain circumstances, to move for
a hearing as to the eligibility of an individual
consumer for restitution, and order, same court and
Justice, entered April 16, 2002, which, inter alia,
granted petitioner's motion to enjoin GE from
representing that the defective dishwashers could not
be repaired, directed GE to contact consumers who
had previously requested a repair but had not
received one, and directed GE to publish
advertisements in newspapers announcing the
availability of repairs, unanimously affirmed, without
costs.

Petitioner Attorney General brings this proceeding
under Executive Law § 63 (12) and General
Business Law § 349 to obtain injunctive relief and
restitution on behalf of consumers allegedly damaged
by representations made by respondent GE to the
effect that certain defective dishwashers it
manufactured were not repairable. Under section 63
(12), the test for fraud is whether the targeted act has
the capacity or tendency to deceive, or creates an
atmosphere conducive to fraud (see e.g. State of New
York v General Motors Corp., 120 Misc 2d 371, 374
[1983]; People v Life Science Church, 113 Misc 2d
952, 963 [1982], appeal dismissed 93 AD2d 774
[1983], lv denied 61 NY2d 604 [1984], cert denied

469 US 822 [1984]; Matter of State of New York v
Colorado State Christian Coll. of Church of Inner
Power, 76 Misc 2d 50, 56 [1973]). Executive Law §
63 (12) was meant to protect not only the average
consumer, but also "the ignorant, the unthinking and
the credulous" (Guggenheimer v Ginzburg, 43 NY2d
268, 273 [1977]).**315**

In contrast, under General Business Law § 349, the
plaintiff must prove that the challenged act or
practice "was misleading in a material way" (Stutman
v Chemical Bank, 95 NY2d 24, 29 [2000]), and "the
deceptive practice must be 'likely to mislead a
reasonable consumer acting reasonably under the
circumstances'" (id., quoting Oswego Laborers' Local
214 Pension Fund v Marine Midland Bank, 85 NY2d
20, 26 [1995]).

The statements made by GE satisfy both standards.
The distinction that GE seeks to draw between
"repair" on the one hand and "rewire" on the other is
artificial, and is belied by GE's own past usage of
these terms (e.g., in the Amendment to the Settlement
Agreement between GE and the Consumer Product
Safety Commission [CPSC] and in GE's answer to
the verified petition). Even if, according to some
dictionary definition of "repair," GE's statement that
repairs were not an option were literally true, literal
truth is not an availing defense in light of the evident
capacity of the representations at issue to mislead
even reasonable consumers acting reasonably under
the circumstances (see Matter of Lefkowitz v E.F.G.
Baby Prods. Co., 40 AD2d 364, 368 [1973]). Nor did
GE's statement "comport substantively with" the
statements approved by the CPSC (see Cytyc Corp. v
Neuromedical Sys., Inc., 12 F Supp 2d 296, 301
[1998]).

GE's actions with respect to the supplemental recall
satisfy the standards for consumer fraud because,
even after GE and the CPSC agreed that GE would
offer consumers free repairs, GE or its
representatives told some consumers that free
rewiring was not available. Although GE argues that
it conducted its supplemental recall in good faith,
neither bad faith nor scienter is required under
Executive Law § 63 (12) (see e.g. People v Apple
Health & Sports Clubs, 206 AD2d 266, 267 [1994],
lv dismissed in part and denied in part 84 NY2d
1004 [1994]; Matter of State of New York v Ford
Motor Co., 136 AD2d 154, 158 [1988], affd 74 NY2d
495 [1989]). Similarly, intent to defraud or mislead is
not required under General Business Law § 349
(Oswego Laborers' Local 214 Pension Fund v
Marine Midland Bank, 85 NY2d at 26).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

302 A.D.2d 314
756 N.Y.S.2d 520, Prod.Liab.Rep. (CCH) P 16,538, 2003 N.Y. Slip Op. 11459
**(Cite as: 302 A.D.2d 314)**

Page 2

Because the letters the IAS court found deceptive were not approved by the CPSC, General Business Law § 349 (d) does not bar this proceeding (*see e.g. Marcus v AT & T Corp.*, 938 F Supp 1158, 1173 [1996], *affd* 138 F3d 46 [1998]). Furthermore, making deceptive statements cannot be considered *compliance* with federal rules, regulations, and statutes, as required by General Business Law § 349 (d) (*cf. Matter of State of New York v Interstate Tractor Trailer Training*, 66 Misc 2d 678, 681 [1971]).**\*316**

GE's argument that section 349 (d) bars claims based on the supplemental recall is also unavailing. The Attorney General's office sent the CPSC its proposed injunction order, which relates to the supplemental recall program; the CPSC said it had no objections.

The affidavits GE submitted do not raise a triable issue of fact. They do not deny that the conversations, related in the consumer complaints and affidavits, occurred. Instead, GE's affidavits say that it instructed the company, which it chose to staff the recall telephone line (West Telemarketing Corp.), not to deviate from the CPSC-approved script, and that various GE and West quality assurance supervisors listened to *selected* conversations, not all of them.

Even though GE voluntarily ceased its deceptive practices, the IAS court in the context of this consumer protection proceeding nonetheless retained the power to grant injunctive relief (*see State of New York v Midland Equities of N.Y.*, 117 Misc 2d 203, 206-207 [1982]; *Matter of State of New York v Hotel Waldorf-Astoria Corp.*, 67 Misc 2d 90, 91-92 [1971]). Since GE is presently complying voluntarily with the entire April 16, 2002 injunction, except the publication requirement, the bulk of the injunction will not cause it prejudice (*see Interstate Tractor Trailer*, 66 Misc 2d at 683; *Matter of State of New York v Bevis Indus.*, 63 Misc 2d 1088, 1092 [1970]).

The publication which the injunction directs will not harm GE, since it is, as a practical matter, the same as the one previously approved by the CPSC. It is needed because GE is unlikely to have contact information for those people who called for a free repair but were disconnected (*see State of New York v Ford Motor Co.*, 136 AD2d at 158-159). The risk of fire renders it especially important to reach any remaining consumers who have not yet repaired or replaced their defective dishwashers.

The authority to direct restitution includes the authority to order respondents to notify consumers of the right to seek restitution (*State of New York v Princess Prestige*, 42 NY2d 104, 108 [1977]).

GE's proposed formula for restitution rests on its contention that the recalled dishwashers were at the end of their useful lives. However, this is contradicted, inter alia, by the fact that GE was urging consumers to renew service contracts on old dishwashers while contemporaneously trying to induce consumers to buy new dishwashers. The IAS court's restitution formula forces consumers to absorb some costs, such as the cost of installing their new machines and disposing of the old ones. The remedy that the IAS court fashioned is reasonable \*317 and within the court's sound discretion. GE, whose deceptive practices caused damages to so many consumers, can now hardly complain that petitioner has not quantified actual damages with exactitude (*see generally id.; In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 FRD 493, 527 [1996]).

Finally, since the recall provided for indirect notice, GE can be held liable for the statements of third parties, such as its retailers and distributors, who had actual or apparent authority to make statements about the recall (*see Federal Trade Commn. v Five-Star Auto Club, Inc.*, 97 F Supp 2d 502, 527, 530 [2000]).

Concur--Saxe, J.P., Ellerin, Lerner and Marlow, JJ.

Copr. (c) 2001, Randy A. Daniels, Secretary of State, State of New York.

N.Y.A.D.,2003.

People v General Elec. Co.

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

195 Misc.2d 384
758 N.Y.S.2d 466, 2003 N.Y. Slip Op. 23472
**(Cite as: 195 Misc.2d 384)**

Page 1

## C

The People of the State of New York, by Eliot
Spitzer, as Attorney General of
the State of New York, Petitioner,
v.
Network Associates, Inc., Doing Business as McAfee
Software, Respondent.

Supreme Court, New York County,

January 6, 2003

### HEADNOTE

Consumer Protection--Deceptive Acts and Practices-
-Restrictions on Reviewing Software
 In a proceeding to enjoin respondent software
company from adding to its license agreement a
"restrictive clause" referring to "rules and
regulations" prohibiting the review and benchmark
testing of its products, the Attorney General has made
a showing that the language at issue may be
deceptive. Thus, the language is not merely
unenforceable, but warrants an injunction and the
imposition of civil sanctions pursuant to Executive
Law § 63 (12) and General Business Law § 349.
The language of the restrictive clause specifically
directs consumers to read the license agreement.
Because the license agreement contains a merger
clause which states that all of the rights and duties of
the parties are contained within that agreement, and
does not contain any of the restrictions on publishing
reviews and results of benchmark testing, consumers
may conclude that those restrictions are not
contractual restrictions. Therefore, consumers may
reasonably conclude that the rules and regulations
enumerated in the restrictive clause exist
independently of the license contract, that they are
made and enforced by an entity other than respondent
itself, and that limitations on the publication of
reviews do not reflect the policy of respondent, but
result from some binding edict imposed by an entity
other than respondent. As such, they are deceptive.

### TOTAL CLIENT SERVICE LIBRARY
### REFERENCES
 Am Jur 2d, Consumer and Borrower Protection § §
284-288, 294, 300.

 McKinney's, Executive Law § 63 (12); General
Business Law § 349.

 NY Jur 2d, Consumer and Borrower Protection § §
5-7, 12, 17.

### ANNOTATION REFERENCES
See ALR Index under Consumer Protection.

### APPEARANCES OF COUNSEL

 *Eliot Spitzer, Attorney General,* New York City
(*Kenneth M. Dreifach* of counsel), for petitioner. *Hall
Dickler Kent Goldstein & Wood LLP,* New York City
(*James E. Daniels* and *John B.* **\*385** *Webb* of
counsel), and *Wilson, Sonsini, Goodrich & Rosati,*
Palo Alto, California (*Andrew P. Bridges* and *John L.
Slafsky* of counsel), for respondent.

### OPINION OF THE COURT

Marilyn Shafer, J.

 Petitioner, the People of the State of New York by
Eliot Spitzer, Attorney General of the State of New
York, moves, pursuant to Executive Law § 63 (12)
and General Business Law § 349, for an order
permanently enjoining respondent Network
Associates, Inc., doing business as McAfee Software
(Network Associates), from engaging in allegedly
fraudulent, deceptive and illegal acts and practices,
and directing (1) respondent to provide a sworn
certified statement indicating the number of instances
in which software was sold on discs or through the
Internet which contained the alleged
misrepresentations; (2) a judgment, pursuant to
General Business Law § 350-d, based upon the sum
of 50¢ for each instance of such practice; (3) a
judgment in the amount of $2,000 for costs, pursuant
to CPLR 8303 (a) (6); and (4) respondent to notify
petitioner within 30 days prior to making any
representation to customers that relates to the right to
review, test or criticize any of the respondent's
software products.

 Network Associates is a Delaware limited liability
company engaged in the business of developing,
selling and marketing a range of software products,
including the popular McAfee antivirus and firewall
software named VirusScan and Gauntlet. Network
Associates sells its products over the Internet and at
various retail locations. Network Associates included
on the face of many of its software diskettes and on
its download page on the Internet the following
restrictive clause:

 "Installing this software constitutes acceptance of the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

195 Misc.2d 384
758 N.Y.S.2d 466, 2003 N.Y. Slip Op. 23472
**(Cite as: 195 Misc.2d 384)**

terms and conditions of the license agreement in the box. Please read the license agreement before installation. Other rules and regulations of installing the software are:

"a. The product can not be rented, loaned, or leased-- you are the sole owner of this product.

"b. The customer shall not disclose the result of any benchmark test to any third party without Network Associates' prior written approval.

"c. The customer will not publish reviews of this product without prior consent from Network **\*386** Associates, Inc." (Affirmation of Kenneth M. Dreifach, exhibit 2.)

Network Associates' form license agreement included with its software did not contain the restrictive clause. Furthermore, the form license agreement contained a merger clause which provides that it constitutes the entire agreement between the parties and supercedes any prior communications with respect to software and documentation. The form agreement also stated that it may be modified only by a written addendum issued by an authorized representative of the company. (*Id.,* exhibit 4, ¶ 11.)

In July 1999, Network World Fusion, an online magazine, published a comparative review of six firewall software products, including Network Associates' Gauntlet. It appears that Network World Fusion sought permission to publish the review of Gauntlet and that Network Associates denied it. Network World Fusion performed the review despite Network Associates' refusal to allow the review of Gauntlet. In response to the unsatisfactory results of the review, Network Associates communicated its protest, quoting the language of the restrictive clause.

This conduct prompted an investigation by the office of the Attorney General of the State of New York. In the course of investigation, on January 30, 2001, the Attorney General requested the production of documents related to the restrictive clause. (*Id.,* exhibit 7.) Respondent provided certain documents, and on September 18, 2001, counsel for respondent sent a letter to the Attorney General stating that respondent had discontinued the practice of including the restrictive clause. (*Id.,* exhibit 9.) The letter also stated that respondent never withheld any consent to allow review of its software, and that it never enforced the restrictive clause. (*Id.*) Petitioner alleges that despite the representations in this letter, an investigation by the office of Attorney General

discovered that, as of January 2, 2002, respondent continued to utilize language similar to the restrictive clause. (*Id.,* exhibit 10.)

Respondent states that in response to the inquiry by the Attorney General, on July 2001, it adopted the following new language replacing the restrictive clause in all of its new products:

"Network Associates, Inc. updates its products frequently and performance data for its products change. Before conducting benchmark tests regarding this product, contact Network Associates to **\*387** verify that you possess the correct product for the test and the then current version and edition of the product. Benchmark test[s] of former, outdated or inappropriate versions or editions of the product may yield results that are not reflective of the performance of the current version or edition of the product." (Affirmation of Kent H. Roberts, exhibit F.)

Respondent states that because distributors and retailers still have some of the old software packages left over, respondent anticipates that it will take approximately six months to phase out the products containing the old restrictive clause. Respondent also states that because certain old software available for download from its Web site may contain the restrictive clause in embedded files, and because the removal of that clause would be very costly and complicated, it provides every consumer purchasing any of respondent's products directly from its Web site with the notice that the restrictive clause has been replaced and superceded by the new language. (*Id.,* exhibit G.) However, it appears that certain new products made by respondent contain restrictive language prohibiting publication of benchmark test results similar to that in the restrictive clause. Petitioner submits a copy of a license agreement printed in September 2001, which contains a clause which restricts publication of benchmark test results. (Reply affirmation of Kenneth Dreifach, exhibits B, C, ¶ 5.) Finally, respondent maintains that the prohibition of publication of any benchmark test results is accepted in the industry, and submits copies of license agreements by other software companies containing similar language.

Petitioner commenced this proceeding alleging deceptive acts and practices in violation of General Business Law § 349, and seeking a permanent injunction based on fraud and illegality of respondent's acts, pursuant to Executive Law § 63 (12).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

195 Misc.2d 384                                                                    Page 3
758 N.Y.S.2d 466, 2003 N.Y. Slip Op. 23472
**(Cite as: 195 Misc.2d 384)**

According to Executive Law § 63 (12),

"[W]henever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing **\*388** restitution and damages .... The word 'fraud' or 'fraudulent' as used herein shall include any device, ... misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

Petitioner argues that respondent's acts of including the reference to "rules and regulations" in the restrictive clause are deceptive. The standard governing such special proceeding commenced by the Attorney General is one generally applied on a motion for summary judgment. (*State of New York v Management Transition Resources,* 115 Misc 2d 489, 492 [Sup Ct, NY County 1982].) The court may enjoin defendant's improper practices, even where they are alleged to have been voluntarily discontinued, because a voluntary discontinuance provides no guaranty that such practices will not recommence. (*Matter of State of New York v Person,* 75 Misc 2d 252, 253 [Sup Ct, NY County 1973].)

Petitioner argues that the use of words "rules and regulations" in the restrictive clause is designed to mislead consumers by leading them to believe that some rules and regulations outside exist under state or federal law prohibiting consumers from publishing reviews and the results of benchmark tests. Petitioner also maintains that the language is deceptive because it may mislead consumers to believe that such clause is enforceable under the lease agreement, when in fact it is not enforceable under the terms of the lease. Petitioner argues that as a result consumers may be deceived into abandoning their right to publish reviews and results of benchmark tests.

According to General Business Law § 349,

"(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

"(b) Whenever the attorney general shall believe from evidence satisfactory to him that any person, firm, corporation or association or agent or employee

thereof has engaged in or is about to engage in any of the acts or practices stated to be unlawful he may bring an action in the name and on behalf of the people of the state of New York to enjoin such unlawful acts or practices and to obtain restitution of any moneys or property obtained directly or indirectly by any such unlawful acts or practices."**\*389**

Respondent argues that there is no evidence that consumers were misled by the language of the restrictive clause or that it deterred them from publishing their reviews and results of tests. The Attorney General need not first receive consumer complaints in order to commence a proceeding, but may proceed on his own initiative. (*Management Transition Resources,* 115 Misc 2d at 491.) The standard to be used to determine whether a representation is false and deceptive is not whether the actual practice is deceptive, but whether it has the capacity to deceive consumers. (*Id.*) The following are examples of conduct which New York courts have found to represent deceptive practices in violation of Executive Law § 63 (12) and General Business Law § 349: misleading authors into believing that their work has been selected for referral to an editing company because of its commercial potential, where instead authors were referred to the editing company only so that the editing company and agents could derive profits (*People ex rel. Vacco v Appel,* 258 AD2d 957 [4th Dept 1999]); mailing to prospective customers a card that creates an impression that it is from some type of a parcel delivery service, when the card, which does not identify the sender, is a solicitation for a free gift to be delivered by a salesperson devised to lure prospective customers into admitting the salesperson into their house (*Matter of Lefkowitz v E.F.G. Baby Prods. Co.,* 40 AD2d 364 [3d Dept 1973]); representations by an employment agency that it had access to "hidden job market" and job orders for positions around the world, and that the agency arranged interviews for clients and had successfully placed hundreds of top-level executives and professionals, when in fact the agency received only one job order and utilized only readily available public information (*Management Transition Resources,* 115 Misc 2d 489 [1982]).

Respondent is correct in contending that the plain meaning of the language of the restrictive clause indicates that the rules and regulations referred to are the three rules listed immediately thereafter. Petitioner, however, argues that the clause clearly distinguishes between the license agreement

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

containing contractual provisions, and listed rules and regulations. The language of the restrictive clause specifically directs consumers to read the license agreement. Because the license agreement contains a merger clause which states that all of the rights and duties of the parties are contained within that agreement, and does not contain any of the restrictions on publishing reviews and results of benchmark testing, consumers may conclude that those restrictions are not contractual **\*390** restrictions. Therefore, following respondent's instructions, after reading the license agreement and the restrictive clause, consumers may reasonably interpret that the rules and regulations enumerated in the restrictive clause exist independently of the license contract and are made and enforced by an entity other than the corporation itself. This language implies that limitations on the publication of reviews do not reflect the policy of Network Associates, but result from some binding law or other rules and regulations imposed by an entity other than Network Associates. Thus, the Attorney General has made a showing that the language at issue may be deceptive, and as such, the language is not merely unenforceable, but warrants an injunction and the imposition of civil sanctions according to Executive Law § 63 (12) and General Business Law § 349.

Petitioner also seeks an imposition of penalties and accounting. Section 350-d of General Business Law provides, in part, that:

"[A]ny person, firm, corporation or association or agent or employee thereof who engages in any of the acts or practices stated in this article to be unlawful shall be liable to a civil penalty of not more than five hundred dollars for each violation, which shall accrue to the state of New York and may be recovered in a civil action brought by the attorney-general."

Even though the Attorney General requests the imposition of a penalty in the amount of 50¢ for each instance of violation, as the number of violations is yet to be determined, the amount of penalties cannot be determined at this time. (See People v Allied Mktg. Group, 220 AD2d 370, 370 [1st Dept 1995].) Similarly, no costs, pursuant to CPLR 8303, may be awarded at this time.

Petitioner also seeks an injunction prohibiting Network Associates from including any language restricting the right to publish the results of testing and review without notifying the Attorney General at least 30 days prior to such inclusion. Respondent argues that such order would represent prior restraint

on free speech. Respondent is incorrect in this contention, and this court grants the injunction.

Respondent also argues in conclusory fashion that it would be very costly and complicated to require respondent to remove the restrictive clause, which contains the deceptive language referring to "rules and regulations" that limit consumers' rights to publish reviews and results of benchmark tests, that may be **\*391** contained in embedded files available for download from Network Associates' Web site. As respondent gives no details as to the cost or the difficulty in removing the restrictive clause, this relief is granted.

Accordingly, it is hereby ordered that the motion by petitioner the People of the State of New York by Eliot Spitzer, Attorney General of the State of New York, is granted, to the extent of permanently enjoining respondent Network Associates, Inc., doing business as McAfee Software, from distributing, advertising and selling its software which contains the following language:

"Installing this software constitutes acceptance of the terms and conditions of the license agreement in the box. Please read the license agreement before installation. Other rules and regulations of installing the software are:

"a. The product can not be rented, loaned, or leased-- you are the sole owner of this product.

"b. The customer shall not disclose the result of any benchmark test to any third party without Network Associates' prior written approval.

"c. The customer will not publish reviews of this product without prior consent from Network Associates, Inc.";

and it further enjoined from including any language restricting the right to publish the results of testing and review without notifying the Attorney General at least 30 days prior to such inclusion, and is directed to provide a sworn certified statement indicating the number of instances in which software was sold on discs or through the Internet containing the above-mentioned language in order for the court to determine what, if any, penalties and costs should be ordered, and it is otherwise denied.**\*392**

Copr. (c) 2001, Randy A. Daniels, Secretary of State, State of New York.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

OAG 297

U.S. DISTRICT COURT
N.D. OF N.Y.
ORIGINAL FILED

APR 1 1 2003

LAWRENCE K. BAERMAN, CLERK
ALBANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
THE PEOPLE OF THE STATE OF NEW YORK,   :
by ELIOT SPITZER, Attorney General of the   :
State of New York,   :
                                                                      :
                          Plaintiffs,                        :
                                                                      :
              - against -                                   :          Case No. 03-CV-299 (TJM/DRH)
                                                                      :
GLAXOSMITHKLINE, P.L.C.,                    :
d/b/a GLAXOSMITHKLINE, et al.,             :
                                                                      :
                          Defendants.                     :
-------------------------------------------------------------- x

## MEMORANDUM IN SUPPORT OF STATE OF NEW YORK'S
## MOTION FOR REMAND TO NEW YORK SUPREME COURT

ELIOT SPITZER
Attorney General of the State of New York
Attorney for Plaintiffs

MATTHEW BARBARO
Assistant Attorney General
Bar roll number:  101079
Justice Bldg. D-10 Annex
Albany, New York 12224
(518) 486-9630

CAROL BEYERS
PATRICK LUPINETTI
DAVID SHARPE
SHIRLEY STARK
Assistant Attorneys General
Of Counsel

ROSE E. FIRESTEIN
Assistant Attorney General
Bar roll number: 602106
120 Broadway, 3rd Floor
New York, New York 10271
(212) 416-8306

## TABLE OF CONTENTS

Page

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**THE STATE'S CLAIMS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**THE DEFENDANT'S REMOVAL NOTICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
**BECAUSE THIS COURT DOES NOT HAVE
SUBJECT MATTER JURISDICTION OF THE
STATE' S CLAIMS, THIS CASE SHOULD BE
REMANDED TO NEW YORK STATE COURT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    **A.**    **The State's Well-Pleaded Complaint Raises No Substantial
        Federal Questions.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

           1.    THE CLAIMS ASSERTED ON BEHALF OF MEDICARE BENEFICIARIES
                DO NOT RAISE FEDERAL QUESTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . 10

           2.    THE MULTIDISTRICT LITIGATION REFERENCED BY DEFENDANT HAS
                NO RELEVANCE TO THE QUESTION OF FEDERAL JURISDICTION . . . . . . . . . 15

    **B.**    **The State is Entitled to Costs and Expenses, Including Attorneys'
        Fees, Incurred Due to the Defendant's Removal of this Action.** . . . . . . . . . 16

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Exhibit A, Unpublished Opinions (In order of citation in memorandum)

*VenaCare U.S.A., Inc. v. Alternative Health Group Ltd.*, 1995 U.S. Dist. LEXIS 3736 (E.D. La. 1995)

*People of the State of New York v. General Electric Co., Inc.*, 2003 N.Y. App. Div. LEXIS 1794 (1st Dept. February 27, 2003)

*Phelan v. Life Insurance Co. of Georgia, Inc.*, 1995 U.S. Dist. LEXIS 4515 (S.D. Ala. 1995)

## INTRODUCTION

On behalf of the People of the State of New York ("State"), the Attorney General brought

this action in New York State Supreme Court, Albany County, against GlaxoSmithKline, P.L.C.,

d/b/a/ GlaxoSmithKline; Glaxo Wellcome, Inc., d/b/a/ GlaxoSmithKline; and SmithKline

Beecham Corporation, d/b/a/ GlaxoSmithKline (collectively "GSK" or "defendant"), which has

removed the case to this Court. This memorandum is submitted in support of the State's motion

to remand this matter to the state court.

Through this litigation, the State seeks to stop GSK from engaging in fraudulent and

deceptive business practices under state law by reporting false commercial information, which it

knows is used to determine the amount of reimbursement the Medicare, State Medicaid and

EPIC (Elderly Pharmaceutical Insurance Coverage)[1] programs pay for covered drugs. The State

also seeks to enjoin GSK from engaging in commercial bribery by marketing the greater profit

offered by its products to induce doctors to prescribe GSK's drugs rather than exercise their

professional judgment solely to benefit their patients. In addition to injunctive relief, the State

seeks to recover restitution for the State and injured consumers for excess payments for the

defendant's products, as well as civil penalties.

---

[1] EPIC is a state program that provides prescription drug coverage to lower income
persons who are 65 years of age or older.

This case challenges the defendant's commercial misrepresentations and acts of bribery that exploit the healthcare programs' reimbursement rules; it does not question the laws governing or the operation of the programs themselves. Medicare, Medicaid and EPIC merely form the backdrop for the defendant's illegal acts by providing the means by which the defendant profits from its fraudulent, deceptive and illegal conduct. No aspect of the defendant's conduct about which the State complains is governed by any federal act or regulation. Consequently, this case raises no federal questions, and it belongs in state court. Removal was improper, and this Court should remand this matter to the New York Supreme Court.

## THE STATE'S CLAIMS

GSK's scheme to manipulate the reimbursement amount that Medicare, Medicaid and EPIC pay for covered drugs lies at the heart of all of the State's claims. The reimbursements that are at issue in this case are to physicians for covered drugs that they administer in their offices (Medicare) and to pharmacists for covered drugs they dispense (Medicare, Medicaid and EPIC). The physician or pharmacist purchases the drugs from a middleman or GSK, charges the patient or customer, and is reimbursed by the healthcare program. The healthcare program allows a certain amount as reimbursement for each drug, and the consumer pays a portion of that allowed amount. In New York, all three healthcare programs base the reimbursement amount on average wholesale price; Medicare allows 95 percent of average wholesale price, and New York Medicaid and EPIC allow 90 percent of average wholesale price. (Complaint, ¶¶ 9-14.)

GSK employs a simple scheme to exploit this reimbursement system in order to sell more of its products. It starts with GSK's reporting of "wholesale acquisition cost" to private price reporting services, although no law or regulation requires it to do so. These private reporting

services add a standard mark-up to the wholesale acquisition cost GSK reports and publish that amount as "average wholesale price."[2] The private carriers (for Medicare) and the State (for Medicaid and EPIC) use these published average wholesale prices to set the reimbursement amount for GSK's drugs. GSK is fully aware of how its reported wholesale acquisition costs become the basis for reimbursement amounts under the healthcare programs. (Complaint, ¶¶ 15-16, 18, 20, 22-23, 28-29, 31.)

GSK perverts the reimbursement-setting process -- and engages in the fraudulent and deceptive conduct that gives rise to the State's causes of action -- by reporting wholesale acquisition costs that are grossly inflated and "bear[] no relationship either to the price middlemen pay GSK or to the price physicians, other healthcare providers and pharmacists actually pay to purchase these drugs." (Complaint, ¶ 21-22, 28-29, 31.) GSK reports these false, misleading and deceptive amounts knowing they will be used to determine a false, misleading and deceptive average wholesale price. (Complaint, ¶ 19, 22, 28, 31, 35, 38.)

In fact, the prices physicians and pharmacists pay are far below the wholesale acquisition cost GSK reports or the published average wholesale price. (Complaint, ¶¶22, 25, 28-29, 31.) The doctors and pharmacists receive the allowed reimbursement amount (90 or 95 percent of average wholesale price) regardless of what they actually pay for a covered drug. The difference between the reimbursement amount and the actual cost is guaranteed profit for the physician or pharmacist (called the "spread"), a profit GSK creates simply by reporting wholesale acquisition costs that greatly exceed and have no connection to the real wholesale prices. For example, the

---

[2]In the past, GSK reported average wholesale price or other price measurements instead of wholesale acquisition cost, each of which in turn was the basis the price reporting services used to derive average wholesale price. (Complaint, ¶ 17.)

average wholesale price of Albuterol sulfate, a drug administered through a nebulizer to ease the

symptoms of emphysema and other lung diseases, which GSK sells as Ventolin®, exceeded by 72

percent the drug's catalog price, which itself greatly outstripped the price doctors and

pharmacists routinely pay. The inflated reimbursement that GSK engineers increases the cost of

Medicare-, Medicaid- and EPIC-covered drugs to consumers and the State. Indeed, in just one

year, the overcharge to Medicare for four drugs sold by GSK's predecessor companies was over

$23.8 million, over $4.5 million of which was paid by consumers. (Complaint, ¶¶ 10, 12, 14, 23-

25, 28, 30-34, 37.)

GSK furthers its scheme by using the often huge spread it has contrived for its drugs as a

selling point when marketing the drugs to physicians and pharmacists. Based on the large and

assured profit available for its drugs, GSK induces doctors to select its drugs for their patients,

which creates a conflict with the physician's fiduciary duty to the patient. GSK also induces

pharmacists to recommend GSK drugs to their customers and their customers' doctors. As a

result of this profit-driven marketing, physicians and pharmacists purchase more of GSK's drugs

and bill those drugs to the relevant healthcare program. Increasing, or at least maintaining, the

sales of its products is the whole point of GSK's scheme to manipulate the amount of

reimbursement the healthcare programs pay for its drugs. (Complaint, ¶¶ 24, 26-27, 30, 32, 36,

38.)

The State's claims that arise from these facts are based entirely on state law. Thus, the

State asserts five purely state law causes of action against GSK alleging that GSK has violated

the following New York statutes and regulations: 1) N.Y. General Business Law ("GBL") § 349,

by engaging in deceptive and misleading business practices; 2) N.Y. Executive ("Exec.") Law

§ 63(12), by persistently and repeatedly engaging in fraudulent business practices; 3) N.Y. Exec.

Law § 63(12) and N.Y. Penal Law § 180.00, by committing commercial bribery;  4) N.Y. Exec.

Law § 63(12) and 18 N.Y.C.R.R. § 515.2(b)(5), by engaging in Medicaid fraud and paying

kickbacks to Medicaid providers; and 5) N.Y. Exec. Law § 63(12) and N.Y. Social Services Law

§ 145-b, by making false representations to obtain, for themselves or others, overpayments of

Medicaid and EPIC public funds.

These five purely state law causes of action do not create federal questions that are

sufficient to warrant federal jurisdiction.

## THE DEFENDANT'S REMOVAL NOTICE

The defendant asserts 29 U.S.C. § 1441, *et seq.* as the basis for removal, referring only to

"arising under" jurisdiction.  28 U.S.C. § 1331.  Although the complaint alleges only state-law

causes of action, the defendant asserts that the state-law claims raise "substantial" federal

questions in that the state-law "fraud" claims asserted on behalf of Medicare beneficiaries

"necessarily depend" on an interpretation of the term "average wholesale price" under the federal

Medicare law and regulations.[3]  As seen below, the defendant has misstated the crux of the

State's claims and the law that will determine those claims and has, therefore, erroneously

asserted federal jurisdiction in this matter.

---

[3]GSK does not assert that this Court has federal-question jurisdiction over the claims
stated on behalf of the State, Medicaid recipients or EPIC participants.

## ARGUMENT

### BECAUSE THIS COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION OF THE STATE'S CLAIMS, THIS CASE SHOULD BE REMANDED TO NEW YORK STATE COURT.

Federal courts are courts of limited jurisdiction, and the party asserting jurisdiction -- the defendant in this case -- has the burden of establishing subject matter jurisdiction. *Foy v. Pratt & Whitney Group*, 127 F.3d 229 (2d Cir. 1997). "Where, as here, jurisdiction is asserted by a defendant in a removal petition, it follows that the defendant has the burden of establishing that removal is proper." *United Food & Commercial Workers Union, Local 919, AFL-CIO v. Centermark Properties Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994). The defendant, therefore, must overcome the presumption that this matter is properly in state court, and any questions concerning the existence of federal jurisdiction must be resolved in favor of state court jurisdiction. *Macro v. Independent Health Assoc., Inc.*, 180 F. Supp. 2d 427, 431 (W.D.N.Y. 2001). Federal removal statutes, moreover, are strictly construed. *Macro*, 180 F. Supp. 2d at 431 (*citing Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09 (1941)); *Horowitz v. Marlton Oncology, P.C.*, 116 F. Supp. 2d 551 (D.N.J. 1999); *State of New York v. Lutheran Center for the Aging, Inc.*, 957 F. Supp. 393 (E.D.N.Y. 1997); *In re Matter of 17,325 Liters of Liquor*, 918 F. Supp. 51 (N.D.N.Y. 1996).

There are especially compelling reasons to take a cautious approach to finding federal-question jurisdiction in the instant case, which was brought by the Attorney General of the State of New York on behalf of the People of the State. The Supreme Court has stated that, "considerations of comity make us reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it." *Franchise Tax Bd. of California v.*

*Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 22, 103 S. Ct. 2841 (1983).  No rule creates a basis for federal-question subject matter jurisdiction in this case, let alone "demands" that the federal court retain jurisdiction.

A.   **Plaintiff's Well-Pleaded Complaint Raises No Substantial Federal Questions.**

It is beyond cavil that the existence of federal jurisdiction is determined by the contents of the well-pleaded complaint.  *E.g., Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 118 S. Ct. 921 (1998).  "[T]he paramount policies embodied in the well-pleaded complaint rule [are] that the plaintiff is the master of the complaint, that a federal question must appear on the face of the complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the case heard in state court."  *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 398-99, 107 S. Ct. 2425 (1987).  The plaintiff is, therefore, free to choose among the available causes of action and, as master of the complaint, select which ones will be pursued.  In making those choices, the plaintiff determines the forum in which to bring the litigation.  Even assuming federal causes of action were available to the Attorney General, he chose to rely solely on state law and, therefore, brought this matter in state court, where it belongs.[4]

---

[4]A plaintiff may not disguise a claim that is federal in nature by "artful pleading."

> The law recognizes one limited exception to the "well-pleaded complaint" rule. It has been held that a plaintiff may not defeat removal by clothing a federal claim in state garb, or by use of "artful pleading". . . However, the artful pleading doctrine should be invoked only in exceptional circumstances and only if the particular conduct complained of is governed exclusively by federal law.

*VenaCare U.S.A., Inc. v. Alternative Health Group Ltd.*, 1995 U.S. Dist. LEXIS 3736, at *5 - *6 (E.D. La. 1995) (citations omitted) (copy attached).  Here the defendant does not assert artful pleading, nor would such a position be supportable.

A case will be said to "arise under" the Constitution or laws of the United States, and thereby confer jurisdiction over the matter on the federal court, 28 U.S.C. § 1331, if either federal law creates the cause of action, which is obviously irrelevant here since no federal cause of action is alleged, or "the vindication of a right under state law necessarily turn[s] on some construction of federal law." *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 808, 106 S. Ct. 3229 (1986) (*quoting Franchise Tax Bd.*, 463 U.S. at 9 n5). In *Merrell Dow*, the Court warned that the quoted language "must be read with caution," *id.* at 809, so as to avoid sweeping into the federal court's ambit cases in which the federal question is ancillary to the state claim. Indeed, "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction," *id.* at 813, because a "right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action" in order to create federal-question jurisdiction when none appears from the face of the complaint. *Franchise Tax Bd.*, 463 U.S. at 10-11 (emphasis supplied) (*quoting Gully v. First National Bank in Meridian*, 299 U.S. 109, 112). The Supreme Court has noted that "what is needed is ... a selective process which picks the substantial causes out of the web and lays the other ones aside." *Merrell Dow*, 478 U.S. at 813-14 (citations omitted).

In evaluating whether a federal question is an essential element of the plaintiff's state-law claim for the purpose of determining the existence of federal jurisdiction, the court is to consider the nature of the plaintiff's claims, not the federal or state character of the underlying program. *See State of New York v. Lutheran Center for the Aging, Inc.*, 957 F. Supp. 393 (E.D.N.Y. 1997) (removal improper where claim based on state law requiring Medicaid provider to submit claims to Medicare before submitting them to Medicaid). *See generally, VenaCare U.S.A., Inc. v. Alternative Health Group Ltd.*, 1995 U.S. Dist. LEXIS 3736, at *5 - *6 (E.D. La.

1995) (citations omitted; copy attached) (holding that, although Social Security Act was a

pervasive statutory scheme, there were no substantial and disputed questions of federal law that

were a necessary element of plaintiffs' state law claims and thus case should be remanded to state

court). It is irrelevant to the nature of the State's claims that those claims arise in the context of

the Medicare and Medicaid programs. Price misrepresentations that cause consumers and/or the

State to overpay for drugs are straightforward consumer protection claims and no different from

misrepresentations that result in overpayments for any other type of consumer product. The

claims would remain the same if they overpaid for vacuum cleaners based on the defendant's

misrepresentation of the list price of its product. *See, e.g., Regina Corp. v. FTC*, 322 F.2d 765

(3d Cir. 1963).

Nor does a state-law claim "turn on some construction of federal law," because a federal

statute clarifies or adds meaning to the state-created right being vindicated. *Merrell Dow*, 478

U.S. at 808; *see also Loussides v. America Online, Inc.*, 175 F. Supp. 2d 211, 241 (D. Conn.

2001) (claim asserted under state consumer protection statute did not "arise under" federal

statute, although the violation of the federal law was the gravamen of the state-law claim; the

right being asserted was to be free from economic harm, which had been created by the state);[5]

---

[5]*Loussides*, 175 F. Supp. 2d at 214, noted, "Numerous other courts have found federal
question jurisdiction lacking for claims under state consumer protection statutes alleging
violations of federal consumer protection laws. *See, e.g., Kentucky ex rel. Gorman*, 881 F. Supp.
285 at 288-89; *Illinois ex rel. Burris v. Comcast Cable*, 1994 U.S. Dist. LEXIS 12802, 1994 WL
502008, *4-5 (N.D. Ill. Sept. 12, 1994); *Mid America Title Co. v. Chicago Title Ins. Co.*, 1989
U.S. Dist. LEXIS 4198, 1989 WL 39780 (N.D. Ill. April 18, 1989); *cf. Dean v. American
General Finance, Inc.*, 191 B.R. 463, 466-67 (M.D. Ala. 1996) (finding no federal question
jurisdiction when plaintiffs' state law fraud claim was based on a violation of the FTC Act);
*Austin v. American General Finance, Inc.*, 900 F. Supp. 396, 398-99 (M.D. Ala. 1995) (same);
*Vermont v. Oncor Communications*, 166 F.R.D. 313, 318 (D. Vt. 1996) (finding no federal
question jurisdiction when complaint alleged as alternative bases for a violation of Vermont
(continued...)

*Horowitz v. Marlton Oncology, P.C.*, 116 F. Supp. 2d 551 (D.N.J. 1999) (no federal-question jurisdiction although violations of federal wire and mail fraud statutes were the predicate acts for a state RICO claim alleging fraudulent Medicare billing). Where, as here, the State's claims are based on state laws designed to protect against, and provide redress for, deceptive and fraudulent business practices, and do not depend on the defendant's compliance or noncompliance with any federal statute or regulation, they turn on questions of state, not federal, law. *See Donovan v. Rothman*, 106 F. Supp. 2d 513, 516 (S.D.N.Y. 2000). The State's claims, therefore, do not create a substantial federal question, and this Court does not have subject matter jurisdiction over the case at bar.

1.  THE CLAIMS ASSERTED ON BEHALF OF MEDICARE BENEFICIARIES DO NOT RAISE FEDERAL QUESTIONS.

In its Removal Notice, the defendant asserts that the State cannot recover on its state-law "fraud" claims unless it proves that average wholesale price "was a 'false and fraudulently inflated' [average wholesale price] *as the term [average wholesale price] has been interpreted under the federal Medicare reimbursement statute and regulations* -- which explicitly peg Medicare Part B drug reimbursement rates to a drug's [average wholesale price]." (Notice of Removal, ¶ 16, emphasis in original.) This is not an accurate statement of the essential elements of the State's claims, which govern whether a substantial federal question is presented by a well-pleaded complaint. Nor would this alleged ground for federal jurisdiction, standing alone, suffice to establish a sufficiently substantial federal question to create "arising under" jurisdiction.

---

[5](...continued)
Consumer Fraud Act either violation of FCC guidelines or commission of unfair practices as defined by the state statute)."

Whether a federal question is an essential element of a state-law claim begins, of course, with the elements of the claim. *Foy v. Pratt Whitney Group*, 127 F.3d at 233. Under N.Y. Exec. Law § 63(12), an act is fraudulent if it "creates an atmosphere conducive to fraud," *People of the State of New York v. General Electric Co., Inc.*, 2003 N.Y. App. Div. LEXIS 1794, *2 (1st Dept. February 27, 2003) (copy attached), or "could be characterized as dishonest or misleading." *E.g., People of the State of New York v. Concert Connection, Ltd.*, 211 A.D.2d 310, 320 (2d Dept. 1995).[6] *Gaidon v. Guardian Life Ins. Co. of America*, 94 N.Y.2d 330, 455 (1999). To state a claim under N.Y. GBL § 349, a plaintiff must allege that the defendant has engaged "in an act or practice that is deceptive or misleading in a material way." *General Electric Co., Inc.*, 2003 N.Y. App. Div. LEXIS 1794, at *2 (copy attached). Detrimental reliance is not required. *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 N.Y.2d 20, 27 (1995).

Specifically, the State alleges that GSK's reported wholesale acquisition costs are deceptive and misleading because they are grossly inflated and "bear no relationship either to the price middlemen pay GSK or to the price physicians, other healthcare providers and pharmacists actually pay to purchase these drugs." (Complaint, ¶ 22, 28-29, 31, 35, 38.) Thus, the defendant's reported "wholesale" prices do not represent or even approximate any actual price paid by or to wholesalers. Rather they are fictitious prices fabricated by defendant to maximize the spread and increase GSK's sales to the inevitable injury of consumers and the State. As such, defendant's manipulation of its reported wholesale prices is a deceptive business practice within the meaning of N.Y. GBL § 349 and persistent and repeated fraud under N.Y. Exec. Law § 63(12).

---

[6]"Fraud" is defined by N.Y. Exec. Law § 63(12) as including "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

The defendant asserts that the deceptiveness of its reported wholesale acquisition costs and the derived average wholesale prices depends on the interpretation given the term "average wholesale price" under the federal Medicare statute and regulations. This is untrue. All of the State's claims can be determined without interpreting federal law. The State is not challenging the use of the average wholesale price as the basis for drug pricing and reimbursement. In fact, "average wholesale price" is not defined by the Medicare statutes or regulations. Nor is there any case law that interprets the term. The State's claims, therefore, do not turn on the meaning of this term under federal law.

The Medicare Act and regulations are equally silent concerning the defendant's practice of reporting information it knows will be used to determine average wholesale price and consequently the allowed reimbursement amount for its drugs. GSK makes these reports voluntarily in the complete absence of any federal obligation to do so. By itself, the total absence of a federally imposed duty to perform the acts that give rise to the State's claims defeats the defendant's assertion of federal-question jurisdiction. *Phelan v. Life Insurance Co. of Georgia, Inc.*, 1995 U.S. Dist. LEXIS 4515 (S.D. Ala. 1995) (copy attached) (no federal jurisdiction where the duty to explain Medigap insurance coverage was created by the circumstances of the parties' relationship, not the Social Security Act); *see Barbara v. New York Stock Exchange, Inc.*, 99 F.3d 49 (2d Cir. 1996) (no federal jurisdiction because the federal Exchange Act did not require the stock exchange to enforce the particular internal exchange rule at issue) (*see discussion of Barbara in D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93,100-02 (2d Cir. 2001)). *Donovan v. Rothman*, 106 F. Supp. 2d at 517-18 (remand required where federal law does not define the rights of or relationship between the parties).

-12-

At best, defendant's attempt to justify its fraudulent and deceptive acts on the basis of a purported interpretation of "average wholesale price," if relevant at all, would only be a defense. Federal jurisdiction, however, cannot be based on a federal defense that is interjected to defeat a claim. This is true even if the defense is the only issue in dispute, it completely defeats the claim or it is anticipated in the complaint. *E.g., Rivet v. Regions Bank of Louisiana*, 522 U.S. *at 475; Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S. Ct. 2425 (1987). In *Foy v. Pratt & Whitney Group*, 127 F.3d 229, the defendant failed to establish "arising under" jurisdiction because it was only asserting a defense; it argued that the plaintiff employee could have consulted the collective bargaining agreement to determine that management's affirmative representations concerning matters covered by the agreement were misleading. Remand was mandated even though federal jurisdiction would have been proper if the claim had required an interpretation of the collective bargaining agreement. In the instant case, the defendant's assertion that "average wholesale price" means something other than average wholesale price is, like the actual text of the collective bargaining agreement in *Foy*, a defense -- not an essential element of the State's claims. The defendant has, therefore, not established "arising under" jurisdiction in this matter.

Finally, and irrespective of the foregoing, the defendant has failed to establish a basis for "arising under" jurisdiction because it has not demonstrated that the State has a federal cause of action by which it can assert the claims that allegedly give rise to federal-question jurisdiction. In *Merrell Dow*, 478 U.S. at 814, the Court held that "the congressional determination that there should be no federal remedy for the violation of a federal statute is tantamount to a congressional conclusion that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently 'substantial' to confer federal-question jurisdiction." The Second Circuit

has stated that "[t]he lack of a private right of action counsels against a finding of federal

question jurisdiction." *Barbara*, 99 F.3d at 54.

The federal Medicare statute does not provide an express cause of action that the State of

New York can bring to remedy the defendant's fraudulent and deceptive business practices or

commercial bribery, or to obtain restitution for the injured Medicare beneficiaries or civil

penalties for the State. *See Donovan v. Rothman*, 106 F. Supp. 2d 513 (S.D.N.Y. 2000) (federal

healthcare program anti-kickback statute does not create a private cause of action); *VenaCare,*

*U.S.A., Inc. v. Alternative Health Group, Ltd.*, 1995 U.S. Dist. LEXIS 3736 (E.D. La. 1995)

(copy attached) (Social Security Act provides no remedy for recovery of Medicare

reimbursement funds owed under purchase and credit sale agreement and employment contract).

The defendant, moreover, would have the burden of demonstrating that the Attorney General has

an implied federal cause of action if it intends to rely on it as the basis for federal jurisdiction.

*See United Food & Commercial Workers Union*, 30 F.3d at 301. It has not even asserted the

existence of such a federal cause of action, let alone met its burden of demonstrating that

Congress intended the State to be able to sue directly under the Social Security Act to challenge

the defendant's practice of reporting false wholesale acquisition costs or average wholesale

prices to a private reporting service. *See Alexander v. Sandoval*, 532 U.S. 275, 287-88 (2001).

Based on the claims that appear on the face of the State's well-pleaded complaint, the

State's claims do not "arise under" the laws of the United States, and this Court does not have

jurisdiction over this matter.[7]

_____

[7]For all the reasons cited above, none of the State's claims provide a basis for federal-question jurisdiction, and GSK does not assert that such jurisdiction exists for any claims other than those pertaining to the Medicare beneficiaries.

2.    THE MULTIDISTRICT LITIGATION REFERENCED BY DEFENDANT HAS NO
RELEVANCE TO THE QUESTION OF FEDERAL JURISDICTION

In its Notice of Removal, the defendant inexplicably purports to describe the current

status of other lawsuits brought by individuals and other Attorneys General alleging drug

manufacturers' manipulation of average wholesale price, including the incorporation of certain of

these actions into the Multidistrict Litigation ("MDL") pending in the District of Massachusetts.

*Pharmaceutical Average Wholesale Price Litigation*, MDL 1456. Even if the defendant's litany

gave an accurate picture, which it does not, it is entirely irrelevant to the defendant's removal

notice. At issue in removal and a subsequent remand motion is whether <u>any</u> federal court has

jurisdiction, not <u>which</u> federal district court should hear a case that is within the subject matter

jurisdiction of the United States courts.

Although these cases are not germane to the question of federal jurisdiction, several

pieces of information are missing from the defendant's recitation, which creates an inaccurate

impression of the current status of the Attorneys' General cases. First, remand motions are still

pending in all two Attorneys' General actions that were transferred to the MDL. Second, before

*State of Minnesota v. Pharmacia Corporation*, Case No. 02-CV1779 (MJD/JGL) (D. Minn.),

was transferred, the District Court for Minnesota referred the Attorney's General remand motion

to a Magistrate Judge, whose Report and Recommendation would grant the remand. (This

Report and Recommendation is annexed as Exhibit B to the Affirmation of Rose E. Firestein

submitted in support of the State's motion to remand.) Finally, two cases brought by other

Attorneys General challenging other companies' manipulation of average wholesale price have

not been removed. *State of West Virginia ex rel McGraw v. Warrick Pharmaceuticals Corp.*,

(Circuit Ct., Kanawha Co.); *State of Texas ex rel. Vena-Care of the Florida Keys v. Roxane*

-15-

*Laboratories, Inc.*, Case No. GV002327 (Texas 53rd Dist. Ct., Travis Co.). In any event, the

transfer of other cases to the MDL simply has no relevance to the question of whether this or any

federal court has subject matter jurisdiction over the claims the People of New York assert in this

action.

**B.      The State is Entitled to Costs and Expenses, Including Attorneys' Fees, Incurred Due to the Defendant's Removal of this Action.**

"An order remanding [a] case may require payment of just costs and any actual expenses,

including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). To award

expenses, including attorneys' fees, the Court need not find that the removal was undertaken in

bad faith. *Morgan Guaranty Trust Co. of New York v. Republic of Palau*, 971 F.2d 917, 923-24

(2d Cir. 1992). The Court has substantial discretion in determining whether to award expenses

and costs and may do so based on the lack of subject matter jurisdiction and the

inappropriateness of the removal. *See Tenner v. Zurek*, 168 F.3d 328 (7th Cir. 1998); *Mattice v.*

*ITT Hartford Ins. Group*, 837 F. Supp. 499 (N.D.N.Y. 1993); *see also Wallace v. Wiedenbeck*,

985 F. Supp. 288 (N.D.N.Y. 1998) (proper case for award; Court found removal contrary to

weight of authority).

In the instant case, the defendant has relied only on a defense to the State's claim as a

basis for federal jurisdiction, which is absolutely foreclosed by governing Supreme Court case

law. It has, additionally, asserted federal jurisdiction on the basis of the presence of a substantial

federal question in the state-law claims despite the absence of a federal private right of action to

assert the State's claims or a federal obligation to engage in the actions that give rise to the

State's claims.

-16-

There is not even a colorable claim of federal subject matter jurisdiction in this case, and the State should not have been put to the expense -- and suffered the delay -- occasioned by the defendant's indefensible removal notice. This is, therefore, an appropriate case for the Court to require the defendant to pay the State's costs and expenses, including attorneys' fees, incurred in opposing the removal.

### CONCLUSION

For the reasons set forth above, the State requests that this Court remand this matter to the New York Supreme Court, County of Albany; require the defendant to pay the State's costs and expenses, including attorneys' fees, incurred in connection with the removal and remand motion; and grant all other appropriate relief.

Dated:  Albany, New York
      April 11, 2003

Respectfully submitted,

ELIOT SPITZER
Attorney General of the
  State of New York
Attorney for Plaintiffs
By:

Matthew Barbaro
Assistant Attorney General
Bar roll number: 101079
Justice Bldg. D-10 Annex
Albany, New York 12224
(518) 486-9630

CAROL BEYERS
PATRICK LUPINETTI
DAVID SHARPE
SHIRLEY STARK

Assistant Attorneys General
    of Counsel

Rose E. Firestein
Assistant Attorney General
Bar roll number:  602106
120 Broadway, 3rd Floor
New York, New York 10271
(212) 416-8306

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11 day of April, 2003, I caused a copy of the foregoing

Memorandum in Support of State of New York's Motion for Remand to New York Supreme

Court to be deposited in the United States mail, first class, postage pre-paid, addressed to the

following counsel for defendant:

> Neil L. Levine, Esq.
> Whiteman Osterman & Hanna LLP
> One Commerce Plaza
> Albany, New York 12260
>
> Frederick G. Herold, Esq.
> Dechert LLP
> 100 Bell Atlantic Tower
> 1717 Arch Street
> Philadelphia, PA 19103

Matthew Barbaro (Bar roll number: 101079)

$\left( OAG \quad 267 \right)$

1995 U.S. Dist. LEXIS 3736, *

LEXSEE 1995 U.S. Dist. LEXIS 3736

**VENACARE U.S.A., INC. VERSUS ALTERNATIVE HEALTH GROUP, LTD.**

**CIVIL ACTION 94-4088 SECTION "T"**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

**1995 U.S. Dist. LEXIS 3736**

**March 16, 1995, FILED; March 17, 1995, ENTERED**

**COUNSEL:**
[*1]

For VENACARE USA INC, SALVATORE J. D'ANGELO, LOUIS R CAPACI, plaintiffs: Max Nathan, Jr., Andrew A. Braun, Sessions & Fishman, New Orleans, LA.

For ALTERNATIVE HEALTH GROUP, LTD, ST. GABRIEL HEALTH SERVICES, INC., GERALD P PETERMAN, JR., defendants: Gordon N. Blackman, Jr., Blackman & Blackman, Shreveport, LA.

**JUDGES:**
G. THOMAS PORTEOUS, JR., United States District Judge

**OPINIONBY:**
G. THOMAS PORTEOUS, JR.

**OPINION:**

**ORDER**

Before the Court is the Motion for Remand, Costs and Attorneys Fees submitted by Plaintiffs Venacare U.S.A., Inc., Salvatore J. D'Angelo and Louis R. Capaci. An opposition was filed by Defendants Alternative Health Group, Ltd., St. Gabriel Health Services, Inc. and Gerald P. Peterman, Jr. This motion was submitted on briefs on Wednesday, March 8, 1995. Upon consideration of the arguments and memoranda submitted by counsel and a review of the applicable law, it is the opinion of this Court that Plaintiffs' Motion for Remand should be granted and Plaintiffs' Motion for Costs and Attorneys Fees should be denied.

**I. BACKGROUND**

Plaintiffs seek damages arising out of the breach of a Purchase and Credit Sale Agreement and certain Employment Contracts by Defendants. Defendants had agreed to acquire virtually all of the assets of Venacare, a home health care agency. Defendant Alternative Health Group, Ltd. is a new business providing home health care services by transferring and using the Venacare home health care agency license, provider number, and assets.

The complaint was [*2] originally filed in state court. Defendants removed the action to this Court. Plaintiffs filed this motion to remand the action to state court at the Twenty-Fourth Judicial District Court for the Parish of Jefferson. Plaintiffs further seek an order, under 28 U.S.C. § 1447(c), for costs and attorney's fees incurred by Plaintiffs in bringing this motion for remand.

**II. FEDERAL QUESTION JURISDICTION**

Under 28 U.S.C. § 1331, in order for a case to be within the federal question jurisdiction of the federal courts and removable under 28 U.S.C. 1441(b), the case must "arise under" federal law. It has been held that for a case to "arise under" federal law, a right or immunity created by that law must be an essential element of the plaintiff's claim.

It is well-settled that where the plaintiff's action is properly brought under state law, the defendant is not entitled to remove the case to federal court simply because federal law or principles of federal preemption will provide a defense, even a complete defense, to plaintiff's state law claims. M. Nahas & Co. v. First National Bank of Hot Springs, 930 F.2d 608, 611 (8th Cir. 1991).

Defendants contend that the Court has [*3] federal question jurisdiction because the allegations contained in Plaintiffs' complaint are governed by Title XVIII of the Social Security Act, 42 U.S.C. § § 1395, et. seq. Plaintiffs assert a cause of action seeking payment of Medicare reimbursement funds allegedly in the

1995 U.S. Dist. LEXIS 3736, *

possession of Defendants. The Medicare reimbursement provisions are set forth in the Social Security Act. The Social Security Act and the regulations promulgated under the Social Security Act establish a provider's right to reimbursement and set up the manner in which a provider may collect reimbursement. Any purchase of assets that involves the assignment of the provider agreement is subject to the relevant statutory and regulatory conditions provided under the Medicare program. United States v. Vernon Home Health, Inc., 21 F.3d 693, 696 (1994).

The Court finds Defendants' arguments to be unpersuasive. Although one issue in this case, the payment of Medicare reimbursement funds, may involve the application of federal law, this issue is not a federal question with respect to the lawsuit in its entirety. The breach of contract claims alleged in Plaintiffs' complaint are not governed by the Social Security [*4] Act and do not arise under the laws of the United States. Plaintiffs solely allege state law breach of contract claims.

## III. WELL-PLEADED COMPLAINT DOCTRINE

Under the "well-pleaded complaint" doctrine, the plaintiff is master of his claim and may avoid federal removal jurisdiction by exclusive reliance on state law. M. Nahas & Co. v. First National Bank of Hot Springs, 930 F.2d 608, 611 (8th Cir. 1991). It is well-settled that where the plaintiff's action is properly brought under state law, the defendant is not entitled to remove the case to federal court simply because federal law or principles of federal preemption will provide a defense, even a complete defense, to plaintiff's state law claims. M. Nahas & Co., 930 F.2d at 611. The law recognizes one limited exception to the "well-pleaded complaint" rule. It has been held that a plaintiff may not defeat removal by clothing a federal claim in state garb, or by use of "artful pleading". Travelers Indemnity Company v. Sarkisian, 794 F.2d 754, 758 (2d Cir. 1986). However, the artful pleading doctrine should be invoked only in exceptional circumstances and only if the particular conduct complained of is governed [*5] exclusively by federal law. Sullivan v. First Affiliated Securities, Inc., 813 F.2d 1368, 1372 (9th Cir. 1987).

Plaintiffs allege state law claims for breach of the Purchase Agreement, misrepresentation, breach of certain Employment Contracts, to recover sums due under two promissory notes, and for an accounting of

pre-sale Medicare receipts collected by Defendants after their purchase of Venacare. Plaintiffs do not assert federal claims or refer to federal law in their complaint. While the Social Security Act is a pervasive statutory scheme, there is nothing in the Social Security Act which expressly states or by which it can be inferred that Congress intended it to exclusively govern the relationship between purchasers and sellers of the assets of home health care agencies. The Social Security Act does not provide a federal cause of action or remedy which would afford Plaintiffs relief in this matter.

Defendants argue that in considering whether the allegations set forth in plaintiff's complaint create federal jurisdiction, the fact that the complaint fails to reference federal law is not determinative. Holcomb v. ERA Helicopters, Inc., 618 F. Supp. 339, 341 (W.D. La. 1985). [*6] Federal jurisdiction is present even though plaintiff's complaint only asserts rights under state law when a substantial and disputed question of federal law is a necessary element of the plaintiff's state law claim. Franchise Tax Board v. Laborers Vac. Trust,, 463 U.S. 1, 77 L. Ed. 2d 420, 433, 103 S. Ct. 2841 (1983). In this case, however, there is no substantial and disputed question of federal law that is a necessary element of Plaintiffs' state law claims. Plaintiffs' breach of contract claims rely only upon state law.

It is this Court's opinion that this is not a case of artful pleading. The artful pleading doctrine is invoked in exceptional circumstances and when the claims and remedies asserted are governed exclusively by federal law. Plaintiffs' complaint makes no mention of the Social Security Act or Medicare, nor does the complaint assert any federal claims or remedies.

## IV. CONCLUSION

For the foregoing reasons, this Court finds that Plaintiffs have met their burden. Accordingly, Plaintiffs' Motion for Remand is hereby **GRANTED**. Further, the Court finds that an award to Plaintiffs of costs and attorneys fees incurred in bringing this motion for remand [*7] is unwarranted. Accordingly, Plaintiffs' Motion for Costs and Attorneys Fees is hereby **DENIED**.

G. THOMAS PORTEOUS, JR.

United States District Judge

LEXSEE 2003 N.Y. App. Div. LEXIS 1794

**The People of the State of New York by Eliot Spitzer, Attorney General of the State of New York, Petitioner-Respondent, v. General Electric Company, Inc., Respondent-Appellant.**

**117, 117A, 117B**

**SUPREME COURT OF NEW YORK, APPELLATE DIVISION, FIRST DEPARTMENT**

**2003 N.Y. App. Div. LEXIS 1794**

**February 27, 2003, Decided**

**February 27, 2003, Entered**

**NOTICE:**

[*1]     THE LEXIS PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING THE RELEASE OF THE FINAL PUBLISHED VERSION.

**COUNSEL:**

For Petitioner-Respondent: Joy Feigenbaum.

For Respondent-Appellant: Peter N. Wang.

**JUDGES:**

Saxe, J.P., Ellerin, Lerner, Marlow, JJ.

**OPINION:**

Order, Supreme Court, New York County (Louise Gruner Gans, J.), entered on or about July 30, 2001, which, upon findings that respondent General Electric Company (GE) had engaged in deceptive practices violative of Executive Law § 63(12) and General Business Law § 349, set forth procedures pursuant to which GE would compensate certain consumers who had purchased replacements for GE's defective dishwashers, unanimously affirmed, without costs. Order, same court and Justice, entered April 8, 2002, which denied GE's motion to renew and granted its motion to reargue but, upon reargument, adhered to its prior orders, except that it allowed GE, under certain circumstances, to move for a hearing as to the eligibility of an individual consumer for restitution, and order, same court and Justice, entered April 16, 2002, which, inter alia, granted petitioner's motion to enjoin GE from representing [*2] that the defective dishwashers could not be repaired, directed GE to contact consumers who had previously requested a repair but had not received one, and directed GE to publish advertisements in newspapers announcing the availability of repairs, unanimously affirmed, without costs.

Petitioner Attorney General brings this proceeding under Executive Law § 63(12) and General Business Law § 349 to obtain injunctive relief and restitution on behalf of consumers allegedly damaged by representations made by respondent GE to the effect that certain defective dishwashers it manufactured were not repairable. Under § 63(12), the test for fraud is whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud (see e.g. State of New York v Gen. Motors Corp., 120 Misc 2d 371, 374, 466 N.Y.S.2d 124; People v Life Science Church, 113 Misc 2d 952, 963, 450 N.Y.S.2d 664, appeal dismissed 93 A.D.2d 774, 461 N.Y.S.2d 803, lv denied 61 N.Y.2d 604, 462 N.E.2d 155, 473 N.Y.S.2d 1025 cert denied 469 U.S. 822; Matter of State of New York v Colorado State Christian Coll. of Church of Inner Power, Inc., 76 Misc 2d 50, 56, 346 N.Y.S.2d 482). [*3] Executive Law § 63 (12) was meant to protect not only the average consumer, but also "the ignorant, the unthinking and the credulous" ( Guggenheimer v Ginzburg, 43 N.Y.2d 268, 273, 401 N.Y.S.2d 182, 372 N.E.2d 17).

In contrast, under General Business Law § 349, the plaintiff must prove that the challenged act or practice "was misleading in a material way" ( Stutman v Chemical Bank, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608), and "the deceptive practice must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances'" (id., quoting Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, 85 N.Y.2d 20, 26, 623 N.Y.S.2d 529, 647

2003 N.Y. App. Div. LEXIS 1794, *

N.E.2d 741).

The statements made by GE satisfy both standards. The distinction that GE seeks to draw between "repair" on the one hand and "rewire" on the other is artificial, and is belied by GE's own past usage of these terms (e.g., in the Amendment to the Settlement Agreement between GE and the Consumer Product Safety Commission [CPSC] and in GE's Answer to the Verified Petition). Even if, according to some [*4] dictionary definition of "repair," GE's statement that repairs were not an option were literally true, literal truth is not an availing defense in light of the evident capacity of the representations at issue to mislead even reasonable consumers acting reasonably under the circumstances (see    Matter of Lefkowitz v E.F.G. Baby Prods. Co., 40 A.D.2d 364, 368, 340 N.Y.S.2d 39). Nor did GE's statement "comport substantively with" the statements approved by the CPSC (see  Cytyc Corp. v Neuromedical Sys., Inc., 12 F. Supp. 2d 296, 301).

GE's actions with respect to the supplemental recall satisfy the standards for consumer fraud because, even after GE and the CPSC agreed that GE would offer consumers free repairs, GE or its representatives told some consumers that free rewiring was not available. Although GE argues that it conducted its supplemental recall in good faith, neither bad faith nor scienter is required under Executive Law § 63(12) (see e.g.  People v Apple Health & Sports Clubs, Ltd., 206 A.D.2d 266, 267, 613 N.Y.S.2d 868, lv dismissed in part, lv denied in part 84 N.Y.2d 1004, 647 N.E.2d 114, 622 N.Y.S.2d 908; Matter of State of New York v Ford Motor Co., 136 A.D.2d 154, 158, 526 N.Y.S.2d 637, [*5] affd 74 N.Y.2d 495, 548 N.E.2d 906, 549 N.Y.S.2d 368). Similarly, intent to defraud or mislead is not required under General Business Law § 349 ( Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, 85 N.Y.2d at 26).

Because the letters the IAS court found deceptive were not approved by the CPSC, General Business Law § 349(d) does not bar this proceeding (see e.g.  Marcus v AT&T Corp., 938 F. Supp. 1158, 1173, affd 138 F.3d 46). Furthermore, making deceptive statements cannot be considered *compliance* with federal rules, regulations, and statutes, as required by General Business Law § 349(d) (cf.  Matter of the State of New York v Interstate Tractor Trailer Training, Inc., 66 Misc 2d 678, 681, 321 N.Y.S.2d 147).

GE's argument that § 349(d) bars claims based on the supplemental recall is also unavailing. The Attorney General's office sent the CPSC its proposed injunction order, which relates to the supplemental recall program; the CPSC said it had no objections.

The affidavits GE submitted do not raise a triable issue of fact. They do not [*6] deny that the conversations, related in the consumer complaints and affidavits, occurred. Instead, GE's affidavits say that it instructed the company, which it chose to staff the recall telephone line (West Telemarketing Corp.), not to deviate from the CPSC-approved script, and that various GE and West quality assurance supervisors listened to *selected* conversations, not all of them.

Even though GE voluntarily ceased its deceptive practices, the IAS court in the context of this consumer protection proceeding nonetheless retained the power to grant injunctive relief (see    State of New York v Midland Equities of New York, Inc., 117 Misc 2d 203, 206-207, 458 N.Y.S.2d 126; Matter of State of New York v Hotel Waldorf-Astoria Corp., 67 Misc 2d 90, 91-92, 323 N.Y.S.2d 917). Since GE is presently complying voluntarily with the entire April 16, 2002 injunction, except the publication requirement, the bulk of the injunction will not cause it prejudice (see    Interstate Tractor Trailer, 66 Misc 2d at 683; Matter of State of New York v Bevis Indus., Inc., 63 Misc 2d 1088, 1092, 314 N.Y.S.2d 60).

The publication which the injunction directs [*7] will not harm GE, since it is, as a practical matter, the same as the one previously approved by the CPSC. It is needed because GE is unlikely to have contact information for those people who called for a free repair but were disconnected (see    State of New York v Ford Motor Co., 136 A.D.2d at 158-159). The risk of fire renders it especially important to reach any remaining consumers who have not yet repaired or replaced their defective dishwashers.

The authority to direct restitution includes the authority to order respondents to notify consumers of the right to seek restitution ( State of New York v Princess Prestige, 42 N.Y.2d 104, 108, 397 N.Y.S.2d 360, 366 N.E.2d 61).

GE's proposed formula for restitution rests on its contention that the recalled dishwashers were at the end of their useful lives. However, this is contradicted, inter alia, by the fact that GE was urging consumers to renew service contracts on old dishwashers while contemporaneously trying to induce consumers to buy new dishwashers. The IAS court's restitution formula forces consumers to absorb some costs, such as the cost of installing their new machines and disposing of the old [*8] ones. The remedy that the IAS court fashioned is reasonable and within the court's sound discretion. GE, whose deceptive practices caused damages to so many consumers, can now hardly complain that petitioner has not quantified actual damages with exactitude (see generally id.; Matter of Nasdaq Mkt.-Makers Antitrust Litig., 169 F.R.D. 493, 527).

Finally, since the recall provided for indirect notice, GE can be held liable for the statements of third parties,

2003 N.Y. App. Div. LEXIS 1794, *

such as its retailers and distributors, who had actual or apparent authority to make statements about the recall (see   Fed. Trade Commm. v Five-Star Auto Club, Inc., 97 F. Supp. 2d 502, 527, 530).

ENTERED: FEBRUARY 27, 2003

(OAG 269)

1995 U.S. Dist. LEXIS 4515, *

LEXSEE 1995 U.S. Dist. LEXIS 4515

**ANNIE MAE PHELAN, individually and on behalf of herself and all others similarly situated, Plaintiffs, vs. LIFE INSURANCE COMPANY OF GEORGIA, INC., et al., Defendants.**

**CIVIL ACTION 94-0719-P-S**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION**

**1995 U.S. Dist. LEXIS 4515**

**January 13, 1995, Decided**

**January 13, 1995, FILED**

**SUBSEQUENT HISTORY:**
Adopting Order of March 23, 1995, Reported at: 1995 U.S. Dist. LEXIS 4501.

**COUNSEL:**
[*1] For ANNIE MAE PHELAN, individually and on behalf of herself and all others similarly situated, plaintiff: Wyman O. Gilmore, Jr., Esq., Grove Hill, AL. Sidney W. Jackson, III, Mobile, Al. Martin H. Levin, Liaison Counsel for the Plaintiffs, Levin, Middlebrooks, Pensacola, FL.

For LIFE INSURANCE COMPANY OF GEORGIA INC., ASSOCIATED DOCTORS, RONALD E. WALLACE, defendants: James W. Lampkin, II, Esq., Mobile, AL. Davis Carr, Esq., Mobile, AL. Helen Johnson Alford, Esq., Mobile, AL. Paul A. Howell, Jr., Pursley, Howell, Lowery & Meeks, Atlanta, GA.

**JUDGES:**
WILLIAM H. STEELE, UNITED STATES MAGISTRATE JUDGE

**OPINIONBY:**
WILLIAM H. STEELE

**OPINION:**

RECOMMENDATION OF MAGISTRATE JUDGE

This cause is before the Court on Defendant Ronnie Wallace's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Docs. 5, 6, 7, and 23); Plaintiffs' Motion to Amend the Complaint (Doc. 10); Plaintiffs' Response to Defendant Ronnie Wallace's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Doc. 12); Plaintiffs' Motion and Memorandum of Law to Remand (Doc. 13); Plaintiffs' Motion for Class Certification (Docs. 14 and 15); Defendant Ronnie Wallace's Reply to Plaintiffs' Response to Wallace's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Doc. 22); Affidavit of James C. Brooks, Jr. (Doc. 24); Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion to Remand (Doc. 25); Defendant's Memorandum of Law in Opposition to Motion for Class Certification (Doc. 26); and Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion to Amend (Doc. 27). The undersigned heard oral argument on these motions on November 2, 1994, and after that hearing allowed the parties to submit supplemental briefs. Accordingly, [*2] the following briefs have been submitted: Plaintiffs' Supplemental Brief on the Various Issues Addressed at the November 2, 1994, Hearing (Doc. 29); Defendants' Supplemental Memorandum of Law in Support of Defendants' Motions to Dismiss or, in the Alternative, Motions for Summary Judgment (Doc. 30); and Defendants' Supplemental Memorandum of Law in Opposition to Plaintiffs' Motions to Amend the Complaint, to Remand, and for Class Certification (Doc. 31). All of these matters have been referred to the undersigned Magistrate Judge for a recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 26. For the reasons set forth herein, the undersigned recommends as follows: (1) that Plaintiffs' motion to amend the complaint be granted; (2) that Defendant Wallace's motion to dismiss be granted; (3) that Plaintiff's motion to remand be granted; and (4) that this Court take no action with respect to Plaintiff's motion for class certification.

1995 U.S. Dist. LEXIS 4515, *

Procedural History and Background

On August 11, 1994, Plaintiff initiated this action by filing a complaint in the Circuit Court of Mobile County, Alabama against Defendants Life Insurance Company of Georgia, Inc. ("Life of Georgia"), [*3] Associated Doctors n1, and Ronald E. Wallace ("Wallace"). On September 20, 1994, Defendants filed a Notice of Removal (Doc. 1) removing this lawsuit from the Mobile Circuit Court to this Court. In the notice, Defendants assert that this Court has both federal diversity jurisdiction pursuant to 28 U.S.C. § 1332 and federal question jurisdiction pursuant to 28 U.S.C. § 1331. n2

> n1 Defendant Associated Doctors was dismissed by Order dated November 3, 1994 (Doc. 28) pursuant to Fed.R.Civ.P. 41(a)(2).

> n2 There is no dispute regarding the timeliness of the notice of removal, see 28 U.S.C. § 1446(b), nor is there any dispute that the amount in controversy exceeds this Court's jurisdictional limit. See 28 U.S.C. § 1332(a).

In Defendants' Notice of Removal, Defendants stipulate that Defendant Wallace is a resident of Baldwin County, Alabama; however, Defendants assert that Defendant Wallace was fraudulently joined as a Defendant to defeat diversity jurisdiction. Defendants also contend that this [*4] Court has federal question jurisdiction inasmuch as Plaintiffs' claims arise under the Federal Medicare and Medicaid Statutes. Specifically, Defendants assert that the wrong for which Plaintiff is seeking damages arises under and is governed by the Social Security Act codified at 42 U.S.C. § 1395ss. Along with the notice of removal, Defendant Wallace has filed various motions to dismiss the complaint against him pursuant to Fed.R.Civ.P. 12(b)(6) and 56.

On October 4, 1994, Plaintiff filed a Motion to Amend the Complaint (Doc. 10) in which Plaintiff argues that the amendment is necessary to dismiss Defendant Associated Doctors, clarify the cause of action against Defendant Wallace, and to add Defendant Gary Pickard ("Pickard") as a Defendant in this lawsuit. Specifically, Plaintiff asserts that the amended complaint makes "clear that her allegations are that Defendant Wallace failed to supervise the agents under him, and failed to implement a policy and procedure for identifying persons covered by Medicaid." Court File, Doc. 2, page 2. Plaintiff also states that "it is crucial for Plaintiff to amend her complaint in order to add Gary Pickard as a Defendant, as he is the agent who [*5] actually sold the Medicare supplement policy to Plaintiff Phelan, and the person who continued to collect premiums from her when she

was already covered by Medicaid." Id. On that same date, Plaintiff filed her Motion and Memorandum of Law to Remand (Doc. 13), asserting that this Court has neither diversity jurisdiction or federal question jurisdiction. Plaintiff argues that Defendants Wallace and Pickard are necessary parties to the litigation, that they were appropriately joined in this litigation, and therefore destroy diversity jurisdiction. With respect to federal question jurisdiction, Plaintiff asserts that, in passing the Federal Medicare Supplement Statute (42 U.S.C. § 1395ss), Congress evinced no intent to "completely preempt" litigation in state courts where state courts are called upon to interpret all or part of this federal statute.

On October 28, 1994, Defendants filed their Memorandum of Law in Opposition to Plaintiffs' Motion to Remand (Doc. 25). In this brief, Defendants argue that there is diversity jurisdiction inasmuch as Defendant Wallace was fraudulently joined and that Plaintiff's sole motive in amending her complaint to add Defendant Pickard is to defeat diversity [*6] jurisdiction. Additionally, Defendants argue that Plaintiff's claims arise under the Federal Medicare Act and therefore require application and interpretation of both the Federal Medicare and Medicaid Statutes. Moreover, Defendants argue that Plaintiff's claims are completely preempted by the Medicare statute and that notwithstanding the fact that Plaintiff has artfully plead her complaint, her claims arise under 42 U.S.C. § 1395ss.

Also on October 28, 1994, Defendants filed a Memorandum of Law in Opposition to Plaintiffs' Motion to Amend (Doc. 27). In this brief, Defendants contend that even the amended complaint fails to state a claim against Defendant Wallace. Additionally, Defendants argue that Defendant Pickard cannot be joined because he is not an indispensable party within the meaning of Fed.R.Civ.P. 19. Alternatively, Defendants assert that this Court should deny joinder of Defendant Pickard pursuant to 28 U.S.C. § 1447(e).

Following oral argument in this case, the parties were allowed to submit supplemental briefs on the issues regarding jurisdiction. Accordingly, Plaintiff supplemented her response on November 15, 1994 (Doc. 29), Defendants supplemented their response [*7] on November 23, 1994 (Docs. 30 and 31), and Plaintiff filed a final response on January 4, 1995 (Doc. 35).

Discussion

When the issues before this Court are reduced to their essence, there are two questions regarding jurisdiction which must be answered in order to determine whether this Court can properly decide the case on its merits. First, this Court must decide whether there is diversity jurisdiction, that is, that all Defendants are diverse from all Plaintiffs, see Vermeulen v. Renault,

1995 U.S. Dist. LEXIS 4515, *

U.S.A., Inc., 985 F.2d 1534, 1542 (11th Cir. 1993). It is undisputed that Defendants Wallace and Pickard are resident Defendants and therefore the presence of either or both of them in this lawsuit would destroy diversity jurisdiction. Then, the Court must decide whether this is a case of federal question jurisdiction. The answer to either one of these jurisdictional questions does not necessarily conclude the matter. Therefore, it is necessary to discuss both aspects of jurisdiction.

Diversity Jurisdiction, Fraudulent Joinder, and Removal

In relevant part, 28 U.S.C. § 1441(a) provides:

Except as otherwise expressly provided by act of Congress, any civil action brought [*8] in a state court of which the District Courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the District Court of the United States for the district and division embracing the place where such action is pending. n3

As the right of removal is purely statutory, the statute must be strictly construed to limit federal jurisdiction. Harris v. Huffco Petroleum Corp., 633 F. Supp. 250, 252 (S.D.Ala. 1986).

> n3 Subsection (b) of 28 U.S.C. § 1441 authorizes the removal of cases based on diversity if none of the defendants is a citizen of the state in which the action is brought.

Article III, Section 2 of the United States Constitution extends the federal judicial power to controversies "between Citizens of different States" thereby creating a class of cases known as "diversity of citizenship" cases. Under the principles set forth in the Supreme Court's decision in Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806), diversity of [*9] citizenship exists, for purposes of federal jurisdiction, whenever all of the plaintiffs are of different citizenship than all of the defendants. Federal district courts are granted original jurisdiction over diversity cases in which the amount in controversy exceeds $ 50,000.00. 28 U.S.C. § 1332. Defendants in a state court action, not all of whom are of different citizenship than the plaintiff or plaintiffs, may remove the action to federal district court and seek to invoke the federal court's diversity jurisdiction by demonstrating that the non-diverse defendant or defendants were not properly joined as defendants in state court. In such cases, the removing parties bear the burden of proving that the non-diverse defendants were "fraudulently joined", that is, either that "there is no possibility that the plaintiff would

be able to establish a cause of action against the [non-diverse] defendant[s] in state court or that there has been outright fraud in the plaintiff's pleading of jurisdictional facts." Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983). The concept embraces the joinder of defendants against whom a plaintiff cannot state a claim for relief or obtain [*10] a recovery. See Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989). The citizenship of a fraudulently joined defendant may be disregarded in determining whether diversity jurisdiction exists. Id. at 1561; Lailhengue v. Mobil Oil Co., 775 F. Supp. 908, 910 (E.D.La. 1991). However, "if there is even a possibility that the state court would find that the complaint states a cause of action against the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court." Coker, 709 F.2d at 1440-41.

"The burden on the defendant [in establishing fraudulent joinder] is high; its presentation must be one that 'compels the conclusion that the joinder is without right and made in bad faith' ...." Frontier Airlines, Inc. v. United Airlines, Inc., 758 F. Supp. 1399, 1404 (D.Colo. 1989) (quoting Chesapeake and Ohio Railroad Co. v. Cockrell, 232 U.S. 146, 152, 34 S. Ct. 278, 280, 58 L. Ed. 544 (1914)). A claim that joinder is fraudulent must be asserted with particularity and supported by clear and convincing evidence. Parks v. New York Times Co., 308 F.2d 474, 478 (5th Cir. 1962).

Both parties may submit [*11] affidavits or deposition transcripts on a motion to remand. Coker, 709 F.2d at 1440; Frontier Airlines, 758 F. Supp. at 1404; McCabe v. General Foods Corp., 811 F.2d 1336, 1339 (9th Cir. 1987). To give rise to a possibility of recovery against a non-diverse defendant, a plaintiff need only present affidavits or other evidence controverting facts set forth in defendant's submissions. The court must resolve all disputed issues of fact and law in favor of the plaintiff. Coker, 709 F.2d at 1440. "Joinder of a defendant is not fraudulent simply because the motive is to defeat diversity." Schwegmann Bros. Giant Super Markets v. Pharmacy Reports, Inc., 486 F. Supp. 606, 614 (E.D.La. 1980) (citing Parks v. New York Times Co., 308 F.2d 474 (5th Cir. 1962)). If the plaintiff's allegations set forth a good faith claim under state law, no matter how doubtful, the presence of the non-diverse defendant will prevent removal. Tedder v. F.M.C. Corp., 590 F.2d 115, 116-17 (5th Cir. 1979). In resolving a claim of fraudulent joinder, our courts are encouraged to use a proceeding similar to that which is used for ruling on a motion for summary judgment. See B., Inc. v. Miller [*12] Brewing Co., 663 F.2d 545 (5th Cir. 1981); Carriere v. Sears, Roebuck and Co., 893 F.2d 98, 100 (5th Cir. 1990); Veltmann v. Crowley Maritime Corp., 784 F. Supp. 366 (E.D.Tx. 1992).

Taking into consideration the heavy burden placed

1995 U.S. Dist. LEXIS 4515, *

on the Defendants, this Court first must determine whether the Defendants have proven by clear and convincing evidence that there is no possibility that the Plaintiff could obtain a judgment against Defendants Wallace and Pickard in state court. See Veltmann, 784 F. Supp. at 368-69.

Assuming that the Defendants satisfy their initial burden, the Defendants then shall shift to the Plaintiff to establish, at the very least, that there are genuine issues of fact or law existing with regard to the propriety of the joinder of these Defendants in this case. However, in order to address the claims against Defendants Wallace and Pickard, it is first necessary to determine whether Plaintiff should be allowed to amend her complaint since it is her contention that the amended complaint clarifies the claims against Wallace and because the amended complaint seeks to join Defendant Pickard.

The Federal Rule of Civil Procedure governing the amendment of pleadings [*13] provides:

A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served ... otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Fed.R.Civ.P. 15(a). Because the Defendants have already answered the Plaintiff's complaint at the time the motion to amend was filed and have not consented in writing to the amendment, the Plaintiff requires the Court's leave to amend. The determination of whether to grant leave to amend the complaint after responsive pleadings have been filed is "committed to the sound discretion of the trial court." Shipner v. Eastern Airlines, Inc., 868 F.2d 401, 406 (11th Cir. 1989). The Rules of Civil Procedure, embodying a policy of liberally permitting amendments to facilitate determination of claims on the merits, restrict this discretion, however, by directing that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); Shipner, 868 F.2d at 407. Thus, in the absence of any apparent reason not to do so, this Court should grant leave to amend, [*14] Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962), for "unless a substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial." Shipner, 868 F.2d at 407.

Although generally leave to file an amended pleading shall be freely given, "the trial court [is] required to take into account any prejudice" that might result to the party opposing the amendment. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330-31, 91 S. Ct. 795, 802, 28 L. Ed. 2d 77 (1971). Examples given by the Supreme Court of reasons to deny

a motion to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Foman v. Davis, 371 U.S. at 182, 83 S. Ct. at 230.

Upon consideration of all matters presently before this Court, the undersigned is of the opinion that the amendment sought by the Plaintiff has not been unduly delayed, is not dilatory, is not made in bad faith, is not futile, and will not cause [*15] Defendants undue prejudice. Therefore, it is the recommendation of the undersigned that the interests of justice require the allowance of the amended complaint.

With respect to Defendant Wallace, Plaintiff asserts that Wallace was hired by Defendant Life of Georgia on December 29, 1987. Wallace became sales manager for Defendant Life of Georgia in August, 1988, and became the district manager for the Mobile County office on November 1, 1992. Plaintiff contends that Wallace, as manager of the Mobile district, was in charge of supervising the agents in the Mobile district and servicing policies and policyholders within the Mobile district. Plaintiff contends that Wallace had the duty and responsibility for developing and implementing policies and procedures for determining which insureds were covered by Medicaid. Plaintiff contends that during a portion of the time in which Plaintiff's policy was being serviced in the Mobile district, Defendant Wallace was the district manager. According to Plaintiff, "the issue in this case is whether Alabama law recognizes a cause of action against Defendant Wallace for negligent failure to train and/or supervise his agents, and whether Defendant [*16] Wallace's negligence resulted in the agent's being able to continue to collect premiums on a policy that Plaintiff Phelan should not have possessed." Court File, Doc. 29, page 7.

In the second affidavit of Defendant Wallace, Wallace succeeds in refuting most of the allegations made against him with respect to his connection with or responsibility for the policy sold to the Plaintiff and serviced by representatives of Defendant Life Insurance Company of Georgia. Plaintiff has offered no evidence to rebut Defendant Wallace's affidavit but instead attempts to rely on that same affidavit to make her case. At oral argument, and in the written motions before this Court, Plaintiff has attempted to interpret paragraphs 15 and 16 of Defendant Wallace's second affidavit as supporting her claim that Defendant Wallace had some connection with or responsibility for servicing her policy. Then, as if to confess the weakness of Plaintiff's position, Plaintiff states that "if the Court remands the case to state court, the Defendants will have an opportunity to move for a summary judgment after discovery has progressed. If Defendants are correct, and Defendants move for a

1995 U.S. Dist. LEXIS 4515, *

summary judgment within one [*17] year after the date of filing, then the case can be removed to federal court at that time." Court File, Doc. 29, page 7.

There appears to be little question and the Defendants do not dispute that Alabama law recognizes a cause of action, under respondeat superior, against a principal for the negligent acts of the agent. However, after review of the evidence presently before this Court, the undersigned cannot say that Plaintiff has carried her burden in demonstrating that Defendant Wallace is causally connected in the sequence of events which led to Plaintiff's alleged injury. It is undisputed that Defendant Wallace did not sell Plaintiff the policy at issue; Wallace did not service the policy at issue; Wallace was not in a supervisory or managerial position when Plaintiff purchased the policy; Wallace had no control or supervision over the individual who sold the policy to Plaintiff; Wallace made no representations to Plaintiff regarding the policy, Plaintiff's personal insurance needs, or Plaintiff's coverage with Life of Georgia; Wallace made no representations to Plaintiff regarding Plaintiff's entitlement to benefits under the Medicaid system; and Wallace did not receive any compensation [*18] or a commission for the sale of Plaintiff's policy. Thus, there is clear and convincing evidence before this Court that demonstrates that there is no possibility that Plaintiff could obtain a judgment against Defendant Wallace.

Given this proof, the undersigned finds that the burden has now shifted to the Plaintiff to demonstrate that there is a material issue of fact which demonstrates that Plaintiff can possibly state a claim against Defendant Wallace for his actions or inactions. Considering the quality and quantity of Plaintiff's evidence, it is the opinion of the undersigned that Plaintiff has failed to meet this burden however slight. Therefore, it is the recommendation of the undersigned that the Defendant's motion to dismiss Defendant Wallace is due to be granted on the grounds that Defendant Wallace has been improperly joined in this lawsuit.

However, dismissal of Defendant Wallace from this lawsuit does not aid the Defendants in their attempt to remain in federal court. The necessary sequence of review requires that this Court now review the propriety of the claim or claims against Defendant Pickard. There is no dispute that Defendant Pickard is the agent who sold the Medicare [*19] Supplement policy to the Plaintiff. In Plaintiff's second amended complaint, Plaintiff alleges that Pickard made the following fraudulent misrepresentations to her: (1) that the Medicare Supplement Policy provided her with coverage which was not covered by her other policies or governmental programs; (2) that she needed the Medicare Supplement Policy in order to be admitted to a hospital in case of illness; (3) that if she purchased the Medicare Supplement Policy, all of her medical bills

would be paid and she would not have to incur a medical expense for which she would be personally liable; (4) that the purchase of the Medicare Supplement Policy would take care of her needs; and (5) that all of the other insurance policies Plaintiff had with the Defendants were necessary, in her best interests, and reasonable. The second amended complaint also alleges that Defendant Pickard suppressed material facts from the Plaintiff, including, but not limited to: (1) the fact that if Plaintiff was receiving Medicaid benefits, she was not eligible or qualified for the Medicare Supplement Policy; and (2) the fact that Plaintiff did not need the Medicare Supplement Policy as her Medicaid coverage [*20] paid virtually all, if not all, the benefits that the Medicare Supplement Policy paid. Plaintiff contends that Plaintiff has, through her second amended complaint, stated claims against Defendant Pickard for fraudulent suppression pursuant to Ala. Code § 6-5-102, and for fraudulent misrepresentation pursuant to Ala. Code § 6-5-101.

Defendants do not refute these allegations against Defendant Pickard but merely argue that "it is obvious that Phelan's sole motivation for adding Pickard is to deprive this Court of jurisdiction." Court File, Doc. 25, page 2. Defendants contend that Plaintiff has known of Defendant Pickard and his purported involvement in the sale of the insurance policy for some time but failed to name him as a defendant when filing the initial complaint in state court. Defendant asserts that "to add a non-diverse defendant after an action has been removed to federal court, a plaintiff must show that the additional party is indispensable or, at the very least, that the factors under 28 U.S.C. § 1447(e) are satisfied." Id. at page 3. Additionally, Defendants contend that "Plaintiff has absolutely no intention of seeking a judgment against Pickard." Id. In support [*21] of this allegation, Defendants reference other cases against Life of Georgia litigated by Plaintiff's counsel in which counsel voluntarily dismissed the insurance agent Defendants. Thus, it appears that the Defendants do not argue that Plaintiff cannot possibly state a claim against Defendant Pickard, they merely allege that Plaintiff's motive in joining Pickard is improper inasmuch as Plaintiff's sole motivation is to defeat the jurisdiction of this Court. However, as set forth above, consideration of the motive of the Plaintiff in joining a nondiverse Defendant is not the only criteria for judging the propriety of joinder. Moreover, notwithstanding Defendant's argument to the contrary, indispensability of the joined party as provided by Fed.R.Civ.P. 19, is no longer a criteria.

Where a plaintiff seeks to join an additional defendant whose joinder would destroy diversity jurisdiction after the original defendants have successfully accomplished a removal, this Court faces two options: "The court may deny joinder, or permit joinder and remand the action to the state court." 28

1995 U.S. Dist. LEXIS 4515, *

U.S.C. § 1447(e). The plain construction of 28 U.S.C. § 1447(e), which employs the word "may," permits this [*22] Court to exercise discretion with respect to joinder and does not require indispensability by its terms. See Le Duc v. Bujake, 777 F. Supp. 10, 12 (E.D.Mo. 1991); Carter v. Dover Corp., 753 F. Supp. 577, 579 (E.D.Pa. 1991); Heininger v. Wecare Distributors, Inc., 706 F. Supp. 860, 862 (S.D.Fla. 1989). Courts that have determined motions for joinder and remand pursuant to 28 U.S.C. § 1447(e) have considered four factors: (1) whether plaintiff states a legitimate claim against the party sought to be joined; (2) prejudice to either party; (3) whether plaintiff has been dilatory; (4) the extent to which the amendment is sought to destroy federal jurisdiction. See Heininger, 706 F. Supp. at 862; St. Louis Trade Diverters v. Constitution State Ins. Co., 738 F. Supp. 1269, 1271 (E.D.Mo. 1990) (citing Hensgens v. Deere and Co., 833 F.2d 1179 (5th Cir. 1987)); Righetti v. Shell Oil Co., 711 F. Supp. 531, 535 (N.D.Cal. 1989) (finding that under § 1447(e) the district court need not consider plaintiff's motive for amendment).

In the case sub judice, there appears to be little question that given the facts taken in a light favorable to the Plaintiff, there is [*23] a possibility that Plaintiff can state a claim against Defendant Pickard. See Independent Life and Accident Insurance Co. v. Harrington, 1994 WL 407246 (Ala., August 5, 1994); Boswell v. Liberty Nat. Life Ins. Co., 643 So. 2d 580 (Ala. 1994); Northwestern Mut. Life Ins. Co. v. Sheridan, 630 So. 2d 384 (Ala. 1983); Guinn v. American Integrity Ins. Co., 568 So. 2d 760 (Ala. 1990).

Following the sequence of analysis for this present motion to remand pursuant to 28 U.S.C. § 1447(e), the Court finds that Defendants have failed to demonstrate to the Court how they will be prejudiced if Defendant Pickard is joined in this lawsuit and the case is remanded to state court. Again, Defendants have failed to demonstrate to this Court that Defendant Pickard is not a proper party to this litigation and have failed to demonstrate that his presence in the state court litigation will prejudice the other Defendants in any way. Moreover, this case is in the early stages of litigation; in fact, formal discovery has been stayed pending ruling on these motions. Therefore, the parties cannot say that they have incurred unnecessary delay or expense as a result of having Defendant Pickard [*24] joined in this lawsuit. This Court is not unmindful of the prior history of litigation against Defendant Life of Georgia in the state courts. This Court knows that Defendant Life of Georgia has sustained large verdicts against it in similar actions in state court. However, this Court does not find that the possibility of a large jury verdict in state court creates an element of prejudice within the meaning of this analysis. While the Defendants in this present case and the other state court lawsuits may be identical, the Plaintiffs are not. Moreover, there is no evidence before this Court

which would convince the Court that similar verdicts could not be returned against Defendant Life of Georgia in this federal court.

In step three of the analysis, this Court is required to ascertain whether the Plaintiff has been dilatory in amending her complaint so as to join the non-diverse Defendant. A review of the procedural history of this case reveals that the amended complaint was filed early in the progress of this case. According to Plaintiff's counsel, Mr. Levin, he filed the motion to amend the complaint within a short time after he appeared as co-counsel for the Plaintiff. Defendants [*25] have failed in producing any substantial evidence or argument that the Plaintiff was dilatory in amending her complaint.

Finally, at step four of the analysis, this Court is required to analyze the extent to which the amendment is sought to destroy federal jurisdiction. There is little question that if this Court allows the amendment, it will effectively allow the Plaintiff to defeat the diversity jurisdiction of this Court. A proper analysis of this factor perhaps requires the Court to look into the mind of the Plaintiff to discern the motives, aims, and intent of the Plaintiff. The Defendants encourage this Court to look at the prior acts and actions of Plaintiff's counsel in previous litigation. Specifically, Defendants contend that Plaintiff's counsel in a similar lawsuit in state court had previously sued Defendant Pickard under similar circumstances. According to Defendants, during the course of litigation, the Plaintiff in that case moved to dismiss Defendant Pickard. While counsel's actions with respect to Defendant Pickard in other litigation is certainly noteworthy, it is not controlling in this present litigation. It is the opinion of the undersigned that the other factors [*26] considered by the Court outweigh the final factor regarding the motive of the Plaintiff in joining Defendant Pickard.

Thus, upon consideration of all matters presented and after application of the factors required in analyzing a motion to remand pursuant to § 1447(e), it is the opinion of the undersigned that Defendant Pickard has been properly joined, that his presence in this lawsuit destroys diversity jurisdiction, and that this case is subject to being remanded to the state court pursuant to § 1447(e).

Federal Question Jurisdiction

Finally, this Court is called upon to consider Defendants' claim that this Court is required to retain jurisdiction over this lawsuit because "the very rights Plaintiff seeks to vindicate ... arise under § 1395ss(d)(3)(B) of the federal Medicare Supplement Insurance provisions." Court File, Doc. 31, page 10. According to Defendants, Plaintiff's claims "clearly arise under the Federal Medigap Statute, require the

1995 U.S. Dist. LEXIS 4515, *

application and construction of the Federal Medicare and Medicaid statutes, and are completely preempted." Id. at page 12.

The general rule regarding removal as set forth in 28 U.S.C. § 1441(b) provides that "any civil action [*27] of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable ..." Whether a claim "arises under" federal law for removal purposes is determined by the "well pleaded complaint rule." The U.S. Supreme Court has stated that "federal courts [have] jurisdiction to hear, ... by removal from a state court, only those cases in which a well pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Franchise Tax Bd. v. Laborers Vacation Trust, 463 U.S. 1, 27-28, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983). However, the "mere presence of a federal issue in a state cause of action does not automatically confer federal question jurisdiction." Merrill-Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 813, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986). Courts must apply a "common sense" approach which "picks the substantial causes out of the web and lays the other ones aside." Franchise Tax Bd., 463 U.S. at 20-21, quoting Gully v. First [*28] Nat. Bank, 299 U.S. 109, 117-18, 57 S. Ct. 96, 81 L. Ed. 70 (1936).

The "well pleaded complaint rule" makes the plaintiff "master of the claim" for purposes of removal jurisdiction. According to Justice Holmes, "the party who brings a suit is master to decide what law he will rely upon." The Fair v. Kohler Die and Specialty Co., 228 U.S. 22, 25, 33 S. Ct. 410, 57 L. Ed. 716 (1913). Accordingly, a case is generally removable only where a federal question is presented on the face of the complaint. However, a plaintiff cannot defeat removal by disguising or "artfully pleading" a federal claim as a state claim. "Courts will not permit [the] plaintiff to use artful pleading to close off [the] defendant's right to a federal form ... [and] occasionally the removal court will seek to determine whether the real nature of the claim is federal, regardless of the plaintiff's characterization." Federated Dept. Stores, Inc. v. Moitie, 452 U.S. 394, 397, 101 S. Ct. 2424, 69 L. Ed. 2d 103 (1981).

With these legal principles in mind, the issues before this Court become clear. The Plaintiff claims that the complaint only alleges violations of state law, and that this action should [*29] therefore be remanded. The Defendants argue that the federal claims have been disguised by artful pleading, and that the Defendants are therefore entitled to a federal forum. Initially, this Court must determine whether the allegations of Plaintiff's complaint give rise to claims under the Medicare statute codified at 42 U.S.C. § 1395ss and do not set forth

claims under state law. If this Court determines that the allegations may give rise to state law claims, the Court must then decide whether "Plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Franchise Tax Bd., 463 U.S. at 27-28. In order to make this determination, a review of Plaintiff's second amended complaint is essential.

A review of the complaint reflects that the basis of Plaintiff's complaint and injury is that the Defendants improperly sold Plaintiff a Medicare Supplement (Medigap) policy, and in so doing, caused Plaintiff injury. In count one of the complaint, Plaintiff alleges suppression and non-disclosure of material facts by the Defendants in violation of Ala. Code § § 6-5-102, 103, and 104. In count two of the complaint, Plaintiff alleges wrongful conversion [*30] of Plaintiff's policy premiums by the Defendants. Count three alleges that Defendants wrongfully failed to explain the overlap of coverage caused by the purchase of the Medicare Supplement Insurance Policy. Count four alleges a breach of fiduciary duty. Count five alleges that the Defendants were unjustly enriched. Count six asserts that the Defendants committed fraud in violation of Ala. Code § § 6-5-100, 101, 103, and 104. Count seven alleges a claim of negligent misrepresentation in violation of Ala. Code § § 6-5-101 and 102. Count eight asserts a claim for improper hiring, supervision, retention, and failure to monitor actions of officers, agents, and/or employees. Count nine asserts a claim for deceit pursuant to Ala. Code § § 6-5-103 and 104. And finally, count ten of the amended complaint alleges a claim of oppression.

Defendants argue that this complaint has been artfully drafted to avoid any reference to federal law. Additionally, Defendants argue that an interpretation of 42 U.S.C. § 1395ss is essential to defining the claims set forth in Plaintiff's complaint and necessary to determine the propriety of the claims. Moreover, Defendants argue that the Medigap provisions [*31] contained in § 1395ss create a regulatory scheme so broad and pervasive as to completely preempt state law. See Defendants' Brief, Court File, Doc. 25, pages 6-18. However, as stated by Defendants, no court has specifically addressed the preemptive effect of the Medicare provisions governing Medigap insurance. Thus, the Defendants encourage this Court to be the first Court to hold that claims brought in state courts based upon an interpretation of § 1395ss are to be completely preempted by the federal regulation. For the reasons set forth below, the undersigned recommends that Defendants' offer be declined.

There is little question that some reference to the federal statute is required in order to understand the basis for Plaintiff's complaint against the Defendants. For instance, with respect to the sale and issuance of a Medigap policy, the insurer is prohibited from selling the

1995 U.S. Dist. LEXIS 4515, *

policy if "such policy duplicates health benefits to which such individual is otherwise entitled," including Medicaid benefits. 42 U.S.C. § 1395ss(d)(3)(A). The statute also forbids the sale of Medigap policies to Medicaid recipients. 42 U.S.C. § 1395ss(d)(3)(B)(iii). Moreover, no insurer may sell [*32] a Medigap policy without first obtaining a written statement from the purchaser indicating whether the purchaser is receiving Medicaid benefits. 42 U.S.C. § 1395ss(d)(3)(B). The code section also provides for criminal and civil penalties for certain violations of the statute. 42 U.S.C. § 1395ss(d)(3)(B)(iv). n4

> n4 This subsection of the statute provides as follows:
> "Whoever issues or sells a Medicare Supplemental policy in violation of this subparagraph shall be fined under Title 18, or imprisoned not more than five years, or both, and, in addition to or in lieu of such criminal penalty, is subject to a civil money penalty of not to exceed $ 25,000.00 (or $ 15,000.00 in the case of the seller who is not the issuer of a policy) for each violation."
> It is not clear by the statute or the annotations thereto what is meant by the language "in addition to or in lieu of such criminal penalty, is subject to a civil money penalty ...." Moreover, there is no guidance offered in the statutory scheme directing a claimant to a forum for the purpose of collecting a civil money penalty.

[*33]

It is the opinion of this Court that the Defendants have the burden of demonstrating that these provisions of the Federal Code create a regulatory scheme so broad and so pervasive as to preempt state law. Defendants have offered nothing to show that it was the intent of Congress in passing this legislation to preempt claims brought in state court which are associated with the Medicare provisions. Thus, this Court is unconvinced that 42 U.S.C. § 1395ss preempts state law for removal purposes.

What is present in this case is a regulatory scheme under § 1395ss which prohibits insurance companies and agents from taking certain actions. The Plaintiff is not complaining that her claims against the Defendants arise from the Defendants' violations of these various federal statutes, but that these statutes regulate the conduct of the Defendants in prohibiting them from taking certain actions. Plaintiff does not allege a violation of federal law but alleges a violation of Alabama state law, specifically, Ala. Code §§ 6-5-101, 102, and 103. Ala. Code § 6-5-101 provides that "misrepresentations of a material fact made willfully to deceive, ... and acted

on by the opposite party, [*34] constitute legal fraud." Ala. Code § 6-5-102 provides that the "suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the party or from the particular circumstances of the case." Ala. Code § 6-5-103 provides that a "willful misrepresentation of a material fact made to induce another to act, and upon which he does act to his injury, will give a right of action." If the Defendants made a knowing misrepresentation of a material fact which was relied on by the Plaintiff as alleged in the amended complaint, that count would give rise to a claim under Ala. Code § 6-5-101 or 103. If the Defendants failed to disclose a material fact which it had a duty to disclose, as alleged in the complaint, then that circumstance would give rise to a claim under Ala. Code § 6-5-102. There is an argument that the material facts which were misrepresented or suppressed were the duties or prohibitions created or defined by § 1395ss. However, this does not, in the opinion of the Court, convert the real nature of the claims to federal claims.

Next, the Court must determine [*35] whether the "plaintiff's right to relief [under Alabama law] necessarily depends on [the] resolution of a substantial question of federal law." Franchise Tax Bd., 463 U.S. at 27-28. The Defendants assert that the Plaintiff must rely upon 42 U.S.C. § 1395ss in order to define the duty that was owed Plaintiff by the Defendants with respect to the Medigap policies. The Court disagrees, as § 6-5-102 provides that the obligation to disclose information may arise from the "particular circumstances of the case." An "obligation [to disclose] may arise where confidential relations or particular circumstances exist." Trio Broadcasters, Inc. v. Ward, 495 So. 2d 621, 623 (Ala. 1986) (citations omitted). "Whether there is a duty to disclose depends upon the relation of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances." RNH, Inc. v. Beatty, 571 So. 2d 1039, 1042 (Ala. 1990). Therefore, the duty to disclose in this case may have arisen solely because of the circumstances which surround the relationship of the Plaintiff and the Defendants in this transaction, and not because of some particular duty imposed by other legislation. [*36]

Given the evidence before this Court, the undersigned cannot say that the Plaintiff's right to relief under Alabama law, depends on the resolution of a "substantial question of federal law." The substance of Plaintiff's claims is not federal but sounds in the traditional notions of fraud, misrepresentation, deceit, suppression, oppression, etc., which are concepts easily defined by and applied in the Alabama state courts. Thus, it is the opinion of the undersigned that Plaintiff's claims do not arise under federal law; therefore, this Court does not have federal question jurisdiction.

1995 U.S. Dist. LEXIS 4515, *

Conclusion

In consideration of the foregoing, the Magistrate Judge recommends (1) that Plaintiffs' motion to amend the complaint be granted; (2) that Defendant Wallace's motion to dismiss be granted; (3) that Plaintiff's motion to remand be granted; and (4) that this Court take no action with respect to Plaintiff's motion for class certification.

The attached sheet contains important information regarding objections to this recommendation.

DONE this 13th day of January, 1995.

WILLIAM H. STEELE

UNITED STATES MAGISTRATE JUDGE

MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES [*37] FOLLOWING RECOMMENDATION, AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1. Objection. Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of this court. Failure to do so will bar a de novo determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982) (en banc). The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in Local Rule 26(4)(b), which provides that:

Any party may object to a magistrate judge's proposed findings, recommendations or report made under 28 U.S.C. § 636(b)(1)(B) within ten (10) days after being served with a copy thereof. **The appellant shall file with the Clerk, and serve on the magistrate judge** and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations [*38] or report to which objection is made and the basis for such objections. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his discretion or where required by law, and may consider the record developed before the magistrate judge, making his own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

A Magistrate Judge's recommendation cannot be appealed to a Court of Appeals; only the District Judge's order or judgment can be appealed.

2. Transcript (applicable Where Proceedings Tape Recorded). Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination [*39] that transcription is necessary is required before the United States will pay the cost of the transcript.

William H. Steele

UNITED STATES MAGISTRATE JUDGE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, by ELIOT SPITZER, Attorney General of the State of New York | ) ) ) ) ) | |
| *Plaintiff,* | ) ) | Civil Action No. 03-CV-305 (NAM/RFT) |
| v. | ) ) ) | |
| AVENTIS PHARMACEUTICALS INC. *Defendant.* | ) ) ) | |

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, by ELIOT SPITZER, Attorney General of the State of New York | ) ) ) ) ) ) | |
| *Plaintiff,* | ) ) ) | Civil Action No. 03-CV-299 (TJM/DRH) |
| v. | ) ) ) | |
| GLAXOSMITHKLINE, PLC, et al., *Defendants.* | ) ) ) | |

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, by ELIOT SPITZER, Attorney General of the State of New York | ) ) ) ) ) ) | |
| *Plaintiff,* | ) ) ) | Civil Action No. 03-CV-295 (DNH/DHH) |
| v. | ) ) ) | |
| PHARMACIA CORPORATION, *Defendant.* | ) ) ) | |

# DEFENDANTS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTIONS TO REMAND

## TABLE OF CONTENTS

STATEMENT OF THE CASE ................................................................................................

    A.     Medicare Part B Coverage For Drugs ...........................................................................

    B.     Congress And HHS Decided To Use AWP For Medicare Reimbursement
             Knowing That Published AWPs Often Exceeded Provider Acquisition Cost................

          1.     HHS' Adoption And Continued Use Of AWP From 1991-1996........................

          2.     In 1997, Congress Rejected the Administration's Proposal To
                Abandon AWP And Set Reimbursement At 95% Of AWP .................................

          3.     In 2000, Congress Again Decided That Medicare Reimbursement
                Should Be Based on AWP .....................................................................................

    C.     The State of New York Cases .......................................................................................

    D.     The Multidistrict Litigation Proceeding in Boston ....................................................

ARGUMENT .......................................................................................................................................

I.     THE STATE'S CLAIMS BROUGHT ON BEHALF OF FEDERAL MEDICARE
    BENEFICIARIES PRESENT SUBSTANTIAL FEDERAL QUESTIONS
    BECAUSE THEY "NECESSARILY TURN ON" AN INTERPRETATION OF
    THE TERM "AWP" UNDER THE MEDICARE STATUTE AND REGULATIONS ............

II.   THE STATE'S ARGUMENTS FOR WHY FEDERAL QUESTION
    JURISDICTION IS LACKING ARE WITHOUT MERIT...............................................

    A.     The State's Cases in Which Federal Law Provided Mere "Background" Or
          "Context" Are Easily Distinguished...........................................................................

    B.     It Is Irrelevant That Defendants Do Not Have A Duty Under Federal Law To
          Report Their Drug Pricing Information......................................................................

    C.     The Absence Of A Federal Cause Of Action Does Not Defeat Federal
          Question Jurisdiction..................................................................................................

CONCLUSION ....................................................................................................................................

# TABLE OF AUTHORITIES

## FEDERAL CASES

Barbara v. New York Stock Exchange, Inc.,
  99 F.3d 49 (2d Cir. 1996)................................................................................................ 21

City of New York v. Rapgal Assocs.,
  703 F. Supp. 284 (S.D.N.Y. 1989) ............................................................................ 16, 23

County of Suffolk v. Long Island Lighting Co.,
  549 F. Supp. 1250 (E.D.N.Y. 1982) ............................................................................... 16

D'Alessio v. New York Stock Exchange, Inc.,
  258 F.3d 93 (2d Cir. 2001)................................................................................... 12, 14, 21

Donovan v. Rothman,
  106 F.Supp.2d 513 (S.D.N.Y. 2000)............................................................................... 19

Dunson-Taylor v. Metro. Life Ins. Co.,
  164 F. Supp. 2d 988 (S.D. Ohio 2001) ............................................................................. 4

Franchise Tax Bd. v. Constr. Laborers Vacation Trust,
  463 U.S. 1 (1983)................................................................................................. 2, 12, 13

Greenery Rehabilitation Group, Inc. v. Sabol,
  841 F. Supp. 58 (N.D.N.Y. 1993)................................................................................... 18

Gully v. First Nat'l Bank,
  299 U.S. 109 (1936)........................................................................................................ 2

Horowitz v. Marlton Oncology,
  116 F.Supp.2d 551 (D.N.J. 1999) ................................................................................... 20

In re Universal Serv. Fund Tel. Billing Practices Litig.,
  2002 WL 31929179 (D. Kan. December 19, 2002)............................................................ 15

In re Wireless Telephone Radio Frequency Emissions Prod. Liability Litig.,
  216 F. Supp. 2d 474 (D. Md. 2002)..................................................................... 16, 17, 19

Ireland v. Suffolk County of New York,
  242 F. Supp. 2d 178 (E.D.N.Y. 2003) .............................................................................. 4

Long v. Bando Mfg. of Am., Inc.,
  201 F.3d 754 (6th Cir. 2000) .......................................................................................... 23

_Loussides v. America Online, Inc._,
   175 F.Supp.2d 211 (D. Conn. 2001) ................................................................. 19

_McNeill v. Franke_,
   171 F.3d 561 (8th Cir. 1999) ........................................................................ 23

_Meierhenry v. Rippling Water Ranch, Inc._,
   531 F. Supp. 449 (D.S.D. 1982) ..................................................................... 4

_Merrell Dow Pharmaceuticals, Inc. v. Thompson_,
   478 U.S. 804 (1986)................................................................................. 13, 22

_Milan Express Co. v. Western Surety_,
   886 F.2d 783 (6th Cir. 1989) ........................................................................ 23

_Milano Hat Co. v. Haden & Co._,
   2003 WL 282450, at *2 (N.D. Tex. Feb. 5, 2003) ..................................................... 15

_Ormet Corp. v. Ohio Power Co._,
   98 F.3d 799 (4th Cir. 1996) .............................................................. 3, 15, 16, 17

_Platzer v. Sloan-Kettering Institute for Cancer Research_,
   787 F. Supp. 360 (S.D.N.Y. 1992) .................................................................. 22, 23

_Smith v. Industrial Valley Title Ins. Co._,
   1990 WL 112077 (E.D. Pa. Aug. 2, 1990) ............................................................ 23

_State of New York v. Lutheran Center for the Aging, Inc._,
   957 F. Supp. 393 (E.D.N.Y. 1997) .................................................................... 18

_Still v. DeBuono_,
   927 F. Supp. 125 (S.D.N.Y. 1996) .................................................................... 15

_W. 14th St. Commercial Corp. v. 5 W. 14th Owners Corp._,
   815 F.2d 188 (2d Cir. 1987)............................................................... 2, 13, 16, 23

## FEDERAL STATUTES

42 U.S.C. § 1395........................................................................................ 1, 5, 14

42 C.F.R. § 405.517 (1992) ................................................................................ 6, 8

Pub. L. No. 101-239 § 6102(a) (codified in part at 42 U.S.C. § 1395w-4(a) & (j)(3)) .............6

Pub. L. No. 105-33 § 4566 (a) (codified at 42 U.S.C. § 1395u(o)).. ...............................8

S. Rep. 105-30 at 157-58 (1997).................................................................................8

## FEDERAL REGULATIONS

42 C.R.F. § 405.517(1992) ....................................................................................6, 8

## STATE STATUTES

NY Social Services Law § 367 .................................................................................. 11

## OTHER AUTHORITIES

Bill Alpert, *Hooked on Drugs: Why Do Insurers Pay such Outrageous Prices for Pharmaceuticals?*, Barron's, June 10, 1996 ...........................................................7

Charles A. Wright, et al., Federal Practice & Procedure § 3734 (3d ed. Supp. 2003) ..................4

H. Rep. No. 105-149 at 1354 (1997) ........................................................................8

HHS IG, "Use of Average Wholesale Prices in Reimbursing Pharmacies in Medicaid and the Medicare Prescription Drug Program" (Oct. 1989)....................................................7

*Medicare Drug Reimbursements: A Broken System for Patioents and Taxpayers: House Comm. on Energy & Commerce,* 107th Cong. at 88 (2001) ....................................................6

*President's Fiscal Year 1998 Budget Proposal for Medicare, Medicaid and Welfare: Hearings Before the Senate Comm. on Finance,* 105th Cong. at 265 (1997) ...........................................7

In February 2003, the State of New York ("the State") filed separate lawsuits in state court against defendants SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK"), Pharmacia Corporation ("Pharmacia") and Aventis Pharmaceuticals Inc. ("Aventis"). According to the State, defendants fraudulently and deceptively misrepresented and concealed the true average wholesale price ("AWP") of their drugs, causing beneficiaries of the federal Medicare program as well as the State under its Medicaid and EPIC programs to pay more for prescription drugs than "the legally permitted amount." GSK Cplt. ¶¶ 1, 35; Pharmacia Cplt. ¶¶ 1, 35; Aventis Cplt. ¶¶ 1, 35.

Defendants properly removed these cases based on federal question jurisdiction. Even though the State has tried to couch its alleged violations of the Medicare Act as claims under state law, the claims on behalf of Medicare beneficiaries "arise under federal law" because they require the resolution of substantial issues of federal Medicare law. In particular, in order for the State to recover on its fraud and deception claims, it must prove that the drug pricing information reported by defendants defrauded and deceived the federal Medicare program. It was federal Medicare law, after all, that established reimbursement based upon 95% of the AWP and obligated Medicare beneficiaries to make a copayment of 20% of that amount. *See* 42 U.S.C. § 1395u(o). Likewise, it has been the federal government, acting through Congress and the Center for Medicare and Medicaid Services "(CMS")", that has interpreted the meaning of AWP under federal Medicare law. Thus, if the State is to prevail on its allegation that the Medicare beneficiaries' copayments were too high, it has to show that the prices reported by defendants were unlawful under the Medicare statute, as interpreted by Congress and CMS. On this core issue, the meaning of AWP under the Medicare statute, state law is *completely silent*. Instead, the definition of AWP under Medicare is *entirely* a matter of federal law.

Thus, contrary to the State's assertion, federal Medicare law is not just a defense to the State's claims -- it is the "essential element" of the State's claims, as the State cannot prevail without establishing what AWP means under the Medicare statute and then demonstrating that defendants fraudulently reported AWPs that were higher than what was intended. *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 10-11 (1983) (claim arises under federal law where "a right or immunity created by the Constitution or laws of the United States [is] an element, and an essential one, of the plaintiff's state law cause of action.") (quoting *Gully v. First Nat'l Bank*, 299 U.S. 109, 112 (1936)). Nor is there any merit to the State's argument that the absence of a private right of action under the Medicare Act defeats federal question jurisdiction -- numerous courts, including the Second Circuit, have rejected that proposition. *See W. 14th St. Commercial Corp. v. 5 W. 14th Owners Corp.*, 815 F.2d 188, 196 (2d Cir. 1987) ("[A]ssuming that plaintiffs have no private right of action under [the federal statute], we conclude that the federal element in the plaintiff's state cause of action would still be sufficiently substantial to confer arising under jurisdiction."). Accordingly, this case easily satisfies the test for federal question jurisdiction established in *Franchise Tax Board*, *i.e.*, the State's "right to relief" requires "resolution of a substantial question of federal law in dispute between the parties." 463 U.S. at 13.

Not surprisingly, in its remand motion, the State barely references federal Medicare law, treating it as "background" and "context" for what it claims is a case about state law. In this regard, the State improperly conflates its claims for ***Medicaid*** beneficiaries with those asserted on behalf of federal ***Medicare*** beneficiaries. Unlike New York's use of AWP in its Medicaid program, the meaning of AWP in the federal Medicare program is purely an issue of federal law.

2

Indeed, the State's entire argument about Medicare is premised upon the fact that the federal statute and regulations (and case law) do not expressly define "AWP." But, contrary to the State's assertion, the meaning of AWP under the federal statute and regulations is a question of federal law regardless of whether the statute and regulations explicitly define the term. Because determining the meaning of that term in the federal Medicare statute and regulations will ultimately require resort to the federal regulatory and Congressional legislative history, it is nonetheless indisputably a question of federal law. The State's misleading focus on the absence of an express definition does not mean that the term "AWP" in the federal Medicare statute and regulations is not a federal question, nor does it mean that the term is to be defined differently in each of the 50 states.

By seeking to have a state court define proper AWP reimbursement under the federal Medicare program, the State's case threatens the uniform administration of the Medicare program. Along with other States that have filed analogous actions, New York seeks to have a state court judge define AWP under Medicare. It would, of course, wreak havoc on the Medicare program if AWP was defined one way in New York, but another way in Connecticut and still a third way in New Jersey. This would mean that providers would be reimbursed different amounts in different states and beneficiaries would make different co-payments based on the particular state court ruling at issue. This state of affairs would plainly undermine the federal government's substantial interest in the uniform administration of the Medicare Act. *See Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 807 (4th Cir. 1996) ("Where the resolution of a federal issue in a state-law cause of action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for

3

uniformity becomes a substantial federal interest, justifying the exercise of jurisdiction by federal courts.").

The same removal question at issue in this case is currently pending before Judge Patti B. Saris of the United States District Court for the District of Massachusetts. *See* Statement of the Case, Part D, *infra*. For the reasons set forth herein, defendants contend that removal was proper on the basis of federal question jurisdiction. Defendants respectfully submit, however, for consistency and efficiency purposes, that the Court should refrain from ruling on the State's motion and should instead stay this matter pending a ruling by the Judicial Panel on Multidistrict Litigation on whether these cases should be transferred to Judge Saris for pre-trial coordination.

## STATEMENT OF THE CASE

The fraud and deception claims asserted by the State on behalf of Medicare beneficiaries require the Court to construe the statute and regulations governing the Medicare reimbursement system. As set forth below, the AWP statute and regulations, as interpreted by Congress, are entirely creations of federal law. It is this statute, these regulations, and the relevant legislative history -- not New York law -- that a court must consider to interpret and define the correct AWP under Medicare.[1]

---

[1]     For the Court's convenience, defendants have attached to the Declaration of John Henry many of the public record documents cited herein. The Court may rely on such documents in determining whether it has subject matter jurisdiction over plaintiff's claims. *See, e.g., Ireland v. Suffolk County of New York,* 242 F. Supp. 2d 178, 185 (E.D.N.Y. 2003) (court may consider matters of public record in determining whether it has subject matter jurisdiction); *Dunson-Taylor v. Metro. Life Ins. Co.,* 164 F. Supp. 2d 988, 990 (S.D. Ohio 2001) (a "court has 'wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts.'") (quoting *Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir. 1990)); *Meierhenry v. Rippling Water Ranch, Inc.,* 531 F. Supp. 449, 454 (D.S.D. 1982) (to determine whether a case was properly removed, "[a] court may take judicial notice of any federal laws necessarily brought into play by the allegations of the complaint"); 14C Charles A. Wright, et al., *Federal Practice & Procedure* § 3734 (3d ed. Supp. 2003) ("the federal courts (continued...)

A.    **Medicare Part B Coverage For Drugs**

The Medicare program provides basic and supplementary health insurance to individuals age 65 and older and to other qualifying individuals.  *See* 42 U.S.C. §§ 1395-1395pp. The Medicare program is administered by the Center for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), a branch of the Department of Health and Human Services ("HHS").  Congress has authorized the Secretary of HHS (the "Secretary") to promulgate regulations setting limits on the levels of costs that Medicare will reimburse.

Part B of Medicare establishes a voluntary, federally subsidized program of supplemental medical insurance that covers, *inter alia*, certain limited categories of outpatient drugs, including physician-administered drugs ("Covered Drugs").  *See* 42 U.S.C. § 1395k(a)(1). Part B generally provides beneficiaries coverage for 80 percent of the allowable amount for a particular medical service or pharmaceutical.  42 U.S.C. § 1395l(o).  The beneficiary is responsible for the remaining 20 percent as a copayment.  GSK Complaint ¶ 10; Pharmacia Cplt. ¶ 10; Aventis Cplt. ¶ 10; 42 U.S.C. § 1395u(o).

B.    **Congress And HHS Decided To Use AWP For Medicare Reimbursement Knowing That Published AWPs Often Exceeded Provider Acquisition Cost.**

At the core of the State's claims on behalf of Medicare beneficiaries is a dispute over the meaning of AWP.  The State contends that defendants were required to report the actual acquisition costs (or something very close to those costs); defendants contend that AWP means a non-discounted list or sticker price.  The State will have the burden of establishing that its interpretation of the statutory term is correct in order to prove that the prices reported by

---

usually do not limit their inquiry to the face of the plaintiff's complaint, but rather consider the facts disclosed on the record of the case as a whole in determining the propriety of removal.").

defendants were fraudulent or deceptive. In order to resolve this dispute and determine the meaning of AWP under Medicare, a court will have to consider the following legislative and regulatory history. New York law is silent on this question.

### 1.   HHS' Adoption And Continued Use Of AWP From 1991-1996.

In 1989, Congress amended the Medicare Act to provide (effective in 1991) reimbursement for certain additional medical services. The amendment provided that Medicare would reimburse for those services based on the physicians' "actual charge" (*i.e.*, whatever physicians actually charged) <u>or</u> pursuant to a fee schedule to be developed by HCFA. *See* Pub. L. No. 101-239 § 6102(a), 103 Stat. 2106 (1989) (codified in part at 42 U.S.C. § 1395w-4(a) & (j)(3)). HCFA did not, however, establish a specific fee schedule for Covered Drugs administered incident to physician services. Instead, HCFA set the allowable Medicare reimbursement amount as the lesser of (1) 100% of AWP, or (2) estimated acquisition cost ("EAC"), as determined by Medicare carriers' surveys of the prices paid for the drug, taking into account additional cost factors such as inventory, waste, and spoilage. *See id.* at 59,621, *codified at* 42 C.F.R. § 405.517 (1992) (now superseded). However, Medicare carriers were unable to compile accurate EAC data so reimbursement at 100% of AWP continued from 1991 through 1997 despite at least fourteen studies by HHS showing that AWP often far exceeded the providers' acquisition costs.[2] *See* HHS IG, *Physicians' Costs for Chemotherapy Drugs* at 5 and App. II & III (Nov. 1992) (Henry Decl., Ex. 3) (concluding that "AWP is not designed to reflect

---

[2]   *See Medicare Drug Reimbursements: A Broken System for Patients and Taxpayers: Joint Hearing Before the Subcomm. on Health and the Subcomm. on Oversights and Investigations of the House Comm. on Energy and Commerce*, 107th Cong. 88 (Sept. 21, 2001) (Henry Decl., Ex. 1); Letter from Donna Shalala, Secretary, HHS, to Hon. Thomas Bliley, Chairman, House Comm. on Energy and Commerce (May 31, 2000) (Henry Decl., Ex. 2).

physicians' costs," which for some drugs were found to be as much as 83% lower than the published AWPs).[3]

> ## 2.   In 1997, Congress Rejected the Administration's Proposal To Abandon AWP And Set Reimbursement At 95% Of AWP.

In enacting the Balanced Budget Act of 1997 (the "BBA"), Congress rejected the Administration's proposal to set reimbursement for Covered Drugs at the provider's actual cost and instead reset the Medicare reimbursement rate for covered drugs at 95% of AWP. The legislative and regulatory history generated during this period leaves no doubt that Congress and the Administration fully understood that published AWPs exceeded -- often substantially -- providers' actual acquisition costs.

The Administration initially proposed reducing Medicare drug reimbursement to the amount the provider actually paid for the drug.[4] In support of this proposal, Secretary of HHS Donna Shalala explained to Congress that "AWP is not the average price actually charged by wholesalers to their customers. Rather, it is a 'sticker' price set by drug manufacturers and

---

[3]      This was nothing new. Even prior to 1991, Congress and HHS had experience with the use of AWP in the context of the federal Medicaid program, and was well aware that AWPs often exceeded provider acquisition cost. *See* HHS Inspector General, *Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program* [1989-1990 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 38,215 (Oct. 1989) (Henry Decl, Ex. 4); HHS Inspector General, *Medicaid – Limitation of Payment of Drugs,* Medicare & Medicaid Guide (CCH) ¶ 34,157 (Oct. 1984) (Henry Decl., Ex. 5). The difference, or "spread," between AWP and provider acquisition costs was well publicized in the press as well. In June 1996, for example, an article appeared in Barron's that described AWP as "Ain't What's Paid." Bill Alpert, *Hooked on Drugs: Why Do Insurers Pay Such Outrageous Prices for Pharmaceuticals?*, Barron's, June 10, 1996, at 3 (Henry Decl., Ex. 6). *See also, e.g.,* Spencer Rich, *Battling the High Prices Medicare Pays for Drugs,* Wash. Post, Jan. 2, 1997, at A15; Robert Cohen et al., *Physicians Overcharge U.S. for Drugs; Cost to Medicare Put at $447 Million in 1996,* The Star Ledger (Newark), Dec. 27, 1997.

[4]      *See President's Fiscal Year 1998 Budget Proposal for Medicare, Medicaid and Welfare: Hearings Before the Senate Comm. on Finance,* 105th Cong. 265 (1997) (written submission of Donna Shalala, Secretary, HHS) (Henry Decl., Ex. 7).

published in several commercial catalogs." (Henry Decl., Ex. 7 at 265)  Secretary Shalala

asserted that "physicians should be paid for their professional services and not derive a profit

from drugs furnished incident to their professional services." *Id.*  She also pointed out that "the

current payment rules for drugs allow an increase in the AWP even if the cost to the physician

remains constant.  This creates an incentive for physicians to furnish the most profitable drugs."

*Id.*  The Administration proposed to "remove this incentive."

Despite these explicit policy arguments, Congress rejected the Administration's

proposal to peg Medicare reimbursements to actual acquisition costs.  Instead, Congress

amended the Medicare Act to set allowable reimbursement at 95% of AWP and to eliminate

estimated acquisition cost as a criterion for payment.  *See* Pub. L. No. 105-33 § 4566(a), 111

Stat. 251 (1997) (codified at 42 U.S.C. § 1395u(o)).  Although Congress did not include a

definition of AWP in the statute, the legislative history reveals that Congress recognized that

reliance on AWPs caused Medicare reimbursements far in excess of acquisition costs.  *See* H.R.

Rep. No. 105-149, at 1354 (1997) (HHS IG "reports that Medicare reimbursement for the top 10

oncology drugs ranges from 20 percent to nearly 1000 percent per dosage more than acquisition

costs.") (Henry Decl., Ex. 8); S. Rep. No. 105-30, at 158 (1997) (Medicare pays "substantially

more than most other payers for prescription drugs.") (Henry Decl., Ex. 9); *see also*, *e.g.*, Henry

Decl. Exs. 4 & 5.  Bound by this legislation, HCFA instructed its carriers to continue to

reimburse covered drugs on the basis of AWPs published in industry compendia.  *See* HCFA

Transmittal Nos. AB-97-25 (Jan. 1998) & AB-98-76 (Dec. 1998) (Henry Decl., Exs. 10 & 11).

### 3.   In 2000, Congress Again Decided That Medicare Reimbursement Should Be Based on AWP

After legislative efforts to eliminate AWP-based reimbursement failed, HCFA

tried administratively to accomplish the same objective.  In May 2000, Secretary Shalala

informed Congress that HCFA was preparing to instruct Medicare carriers to cease using published AWPs and to use instead lower price data recently estimated through a government-sponsored pricing survey for certain drugs. *See* Letter from Donna Shalala, Secretary, HHS, to Hon. Thomas Bliley, Chairman, House Commerce Comm. (May 31, 2000) (Henry Decl., Ex. 2).

Congress acted swiftly to stop the Administration's effort to unilaterally change the way AWP is determined and thereby change the reimbursement rates for Medicare drugs. In July 2000, 89 members of Congress wrote Secretary Shalala objecting to her plan to abandon the use of published AWPs in favor of alternative prices that purportedly approximated those actually paid by physicians for drugs: "Congress in 1997 instructed the Department to base reimbursement for drugs on 95% of AWP, a term widely understood and indeed defined by Department manuals to reference amounts reflected in specified publications . . . [T]he Department's unilateral declaration of a new definition of AWP, with no regulatory process, is inappropriate." Letter from 89 Members of Congress, to Donna Shalala, Secretary, HHS 1-2 (July 28, 2000) (Henry Decl., Ex. 12). These 89 Members stressed that oncologists rely on Medicare paying a markup on drugs to offset the fact that Medicare underpays them for their professional services: "If reimbursement for drugs is drastically reduced, many physicians will be unable to continue providing cancer care in their offices, and patients will be deprived of a humane, convenient and cost-effective treatment option." *Id.* at 1.

In November 2000, the Administration bowed to Congressional pressure. HCFA suspended its instructions to carriers to use alternative pricing data and directed carriers to return to using "AWP data from your usual source." HCFA Transmittal No. AB-00-115 (Nov. 17, 2000) (Henry Decl., Ex. 13). Not content with HCFA's retreat, Congress enacted legislation barring the Secretary of HHS from "directly or indirectly decreas[ing] the rates of reimburse-

ment" for drugs covered by Part B until the Comptroller General (*i.e.*, the General Accounting Office) studied the issue of Medicare drug reimbursement.  Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA"), Pub. L. No. 106-554 § 429(c), 114 Stat. 2763 (2000) (Henry Decl., Ex. 14).  BIPA also directed the GAO to comment on whether changes to Medicare payment for professional services would be warranted if the drug reimbursement methodology were changed.  *See id.* at § 429(a)(3).  In response to this legislation, HCFA instructed the carriers to continue to use AWPs published in industry compendia.  *See* HCFA Transmittal No. AB-01-66 (May 3, 2001) (Henry Decl., Ex. 15).

### C.    The State of New York Cases

In February 2003, the State of New York filed three separate AWP complaints against GSK, Pharmacia and Aventis.  The three complaints contain nearly identical allegations regarding defendants' alleged inflation of the drug pricing information they reported to national drug price publications.  According to the State, defendants fraudulently and deceptively misrepresented and concealed the "true average wholesale price" of their drugs (GSK Cplt. ¶ 1; Pharmacia Cplt. ¶ 1; Aventis Cplt. ¶1) and, as a result of these alleged acts, New York Medicare beneficiaries were injured by making a coinsurance payment that was significantly greater than 20 percent of the "bona fide average wholesale price."  GSK Cplt. ¶ 33; Pharmacia Cplt. ¶ 33; Aventis Cplt. ¶ 33.  As a remedy, the State seeks to enjoin defendants from concealing the "true average wholesale price" and to pay restitution to Medicare beneficiaries residing in the State who paid more than the "bona fide average wholesale price."  GSK Cplt. ¶¶ 1, 33 & Prayer for Relief; Pharmacia Cplt. ¶¶ 1, 33 & Prayer for Relief; Aventis Cplt. ¶¶ 1, 33 & Prayer for Relief.  As the State acknowledges, it was Congress that decided to base Medicare reimbursement upon the reported AWPs; the complaint even cites the federal AWP statute.  GSK Cplt. ¶ 10;

Pharmacia Cplt. ¶ 10; Aventis Cplt. ¶ 10.  In contrast, the use of AWP by Medicaid was determined by state law.  *See* NY Social Services Law § 367-a.

On March 12, 2003, GSK removed the State's case against it on the grounds that the state law claims brought on behalf of Medicare beneficiaries presented substantial federal questions because the resolution of those claims necessarily depends upon an interpretation of the federal statute and regulations governing AWP-based Medicare Part B reimbursement. Defendants Pharmacia and Aventis also removed the State's two cases against them on similar grounds.[5]

Shortly after the cases were removed, each defendant filed a notice of related action with the Judicial Panel on Multidistrict Litigation ("MDL Panel") identifying the case as a "tag-along" action to *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL 1456 ("AWP MDL").  To date, the MDL Panel has issued a conditional transfer order in the Pharmacia case, with similar transfer orders expected shortly in the GSK and Aventis cases. Each defendant also moved to stay each case pending a final determination on transfer by the MDL Panel, a stay which numerous other district courts have entered when confronted with similar remand motions.

D.      **The Multidistrict Litigation Proceeding in Boston**

The cases brought by the State of New York are virtually identical to dozens of cases that have been transferred and consolidated from district courts throughout the country to the AWP MDL, which is currently pending before Judge Patti B. Saris in the United States

---

[5]     Like GSK, Pharmacia (and Aventis) asserted in its notice of removal that the claims brought by the State on behalf of Medicare beneficiaries were subject to federal question jurisdiction.  The State appears to have misunderstood the grounds for removal asserted by Pharmacia, as the State's remand motion in the Pharmacia case omits any reference to Pharmacia's Medicare ground for removal.

District Court for the District of Massachusetts. Among the actions that have been transferred to the AWP MDL are four cases brought by the States of Minnesota, Montana and Nevada. These four cases were filed originally in state court and were removed by defendants to federal court based on the substantial federal questions presented by those cases. On March 7, 2003, Judge Saris heard oral argument on the motions to remand the Minnesota, Montana and Nevada cases, each of which raise similar issues to the motions filed by the State.

In addition, Judge Saris is considering nearly identical AWP class actions brought by Medicare beneficiaries -- including the *same Medicare beneficiaries* that New York seeks to represent in this case -- and union benefit funds and other payors who reimbursed based upon AWP. Just as in this case, the plaintiffs in the private AWP class actions have made the same allegations about how Medicare and Medicare beneficiaries were defrauded because the AWPs reported by drug companies were allegedly inflated. The defendants moved to dismiss these allegations, contending in part that the plaintiffs' claims of fraud and deception were not cognizable under the Medicare AWP statute. Judge Saris is still considering this obviously federal question.

## ARGUMENT

### I. THE STATE'S CLAIMS BROUGHT ON BEHALF OF FEDERAL MEDICARE BENEFICIARIES PRESENT SUBSTANTIAL FEDERAL QUESTIONS BECAUSE THEY "NECESSARILY TURN ON" AN INTERPRETATION OF THE TERM "AWP" UNDER THE MEDICARE STATUTE AND REGULATIONS.

As the State acknowledges, state law claims "arise under" federal law "where the vindication of a right under state law necessarily turn[s] on some construction of federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9 (1983); *see also D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 99 (2d Cir. 2001). Put another way, "[e]ven though state law creates [plaintiff's] causes of action, its case might still 'arise under' the laws of

the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Bd.*, 463 U.S. at 13; *see also W. 14th St. Commercial Corp. v. 5 W. 14th Owners Corp.*, 815 F.2d 188, 192 (2d Cir. 1987) ("If state law creates the cause of action, the [court] asks whether that cause of action poses a substantial federal question."). Moreover, a federal issue is "decisive," and federal question jurisdiction exists, where "the vindication of rights and definition of relationships *created by federal law* depends" on the construction of federal law. *W. 14th St. Commercial Corp.*, 815 F.2d 188 at 196 (emphasis in original). In addition, "[t]o determine when the federal element is deemed sufficiently substantial [the court] must look to the nature of the federal interest at stake." *Id.* at 192 (citing *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804 (1986)).

The State's claims on behalf of Medicare beneficiaries derive entirely from the allegation that Medicare and Medicare beneficiaries paid too much because defendants reported higher-than-appropriate AWPs and other pricing information. *See* GSK Cplt. ¶¶ 34-35 (claiming that GSK's reporting of allegedly inflated AWPs is deceptive and has caused Medicare economic injury); Pharmacia Cplt. ¶¶ 34-35 (Pharmacia's report of allegedly inflated AWPs is deceptive and has caused Medicare economic injury); Aventis Cplt. ¶¶ 34-35 ("Aventis' fraudulent misrepresentation that conceal[s] the average wholesale price of its drugs deceive . . . New York Medicare beneficiaries . . . into believing they are paying the legally permitted amount for the drugs"). For the State to prevail on this claim, therefore, a court will have to determine "the legally permitted amount" that the defendants can charge Medicare and Medicare beneficiaries for prescription drugs. This in turn requires an interpretation of the part of the Medicare Act setting allowable reimbursement at 95% of AWP "and obligating Medicare beneficiaries to make

a 20% copayment of that amount." 42 U.S.C. § 1395u(o). The State will ultimately have to

establish what the correct AWP should have been under the Medicare program in order to

establish that the prices reported by defendants were deceptive or fraudulent under this statute.

For a court to consider this claim, it must, of course, interpret the AWP statute

using traditional tools of statutory construction such as the relevant legislative and regulatory

history. Thus, in this case, a court will have to consider the fact that Congress used 95% of AWP

with the knowledge that most published AWPs were far in excess of provider acquisition cost.

Likewise, in defining what AWP means under the statute, a court will have to consider the fact

that Congress repeatedly approved use of the published AWPs to ensure adequate reimbursement

for physicians. In short, in order for the State to prevail on its central allegation of fraud and

deception, the court will have to interpret a federal statute using the federal regulatory history

and Congressional intent. Under these circumstances, the state law claims present removable

federal questions.[6]

First, as shown above, the State's claims "necessarily turn" on the construction of

the federal AWP statute, requiring a court to "evaluate the scope" of the defendants' obligations

to the Medicare program and its beneficiaries. As the Second Circuit has held, where resolution

of a state law claim requires a court to construe a federal statute or "evaluate the scope" of a

defendant's obligations under federal law, federal question jurisdiction exists. *D'Alessio v. New*

*York Stock Exch., Inc.*, 258 F.3d 93, 100-02 (2d Cir. 2001) (federal question jurisdiction existed

because resolution of plaintiff's state law claims required construction of "federal securities

---

[6]     In the AWP class actions pending before Judge Saris in Boston, even the plaintiffs agreed
that the meaning of AWP under the Medicare Act was a question of statutory construction on
which federal law and the relevant legislative history provided the sole guidance. *See* Pls.'
Consolidated Opp'n to Defs.' Mot. to Dismiss, CA No. 01-CV-12257-PBS, MDL No. 1456, at
13-14 (Henry Decl., Ex. 16).

laws"); *see also Ormet Corp.*, 98 F.3d at 807 (federal question jurisdiction existed because resolution of plaintiff's claims required court to construe Title IV of the Clean Air Act); *Still v. DeBuono*, 927 F. Supp. 125, 128-29 (S.D.N.Y. 1996) (federal question jurisdiction existed because resolution of plaintiff's claims required court to construe Individuals with Disabilities Education Act).  Likewise, in this case, the court will have to construe the AWP statute and "evaluate the scope" of the defendants' obligations to the Medicare program.  Contrary to the State's remarkable assertion that its claims "can be determined without any reference to federal law," the claims on behalf of Medicare beneficiaries can be determined *only* by reference to the Medicare Act and the accompanying regulatory and legislative history.  The only way to decide whether the federal Medicare program and its beneficiaries have been defrauded or deceived under the AWP system is by defining and construing the federal AWP statute.  New York law is silent on that question.

Second, as a consequence, federal law provides the most essential element of the State's claims.  As the State acknowledges, federal question jurisdiction exists where the federal question serves as an "essential element" of the state law claim.  *See, e.g., Milano Hat Co. v. Haden & Co.*, 2003 WL 282450, at *2 (N.D. Tex. Feb. 5, 2003) (federal question jurisdiction existed because federal issue was "essential element" of plaintiff's state law claim); *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 2002 WL 31929179 (D. Kan. December 19, 2002) (federal jurisdiction existed because plaintiff's reliance on Federal Communications Act was an "essential element" of the state law claim); *Still v. DeBuono*, 927 F. Supp. 125, 128-29 (S.D.N.Y. 1996) (interpretation of Individuals with Disabilities Education Act was an "essential element" of plaintiff's claims); *County of Suffolk v. Long Island Lighting Co.*, 549 F. Supp. 1250,

1256 (E.D.N.Y. 1982) (plaintiff's reliance on federal law was an "essential element" in establishing right to relief, thus federal question jurisdiction existed).

Third, federal question jurisdiction exists where the state law claim derives from rights "created by federal law." Put another way, if the state law claims would not exist but for the federal statute in question, the claims arise under federal law. *See City of New York v. Rapgal Assocs.*, 703 F. Supp. 284, 287 (S.D.N.Y. 1989) ("Without the federal statute and federal regulations, the right asserted by the [plaintiff] in this suit would never have existed."). In this case, if the Medicare AWP statute never existed, the Medicare beneficiaries would have no claim of AWP fraud, whether asserted by the State or not or whether asserted under state law or federal law. The Medicare AWP system is what gives rise to the claim by the Medicare beneficiaries in this case. Under these circumstances, the state law claims "arise under" federal law for purposes of Section 1331. *Id.*

Finally, federal question jurisdiction exists because of the substantial federal interest in the uniform interpretation of the federal AWP statute in the Medicare program. As the Second Circuit has noted, "[t]o determine when the federal element is deemed sufficiently substantial [the court] must look to the nature of the federal interest at stake." *W. 14th St. Commercial Corp.*, 815 F.2d 188 at 193. "Where the resolution of a federal issue in a state-law cause of action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for uniformity becomes a substantial federal interest, justifying the exercise of jurisdiction by federal courts." *Ormet Corp.*, 98 F.3d at 807 (internal citation omitted); *see also In re Wireless Telephone Radio Frequency Emissions Prod. Liability Litig.*, 216 F. Supp. 2d 474, 490-91 (D. Md. 2002) (citing *Ormet Corp.*). In this case, the federal interest in the uniform administration of the Medicare program is at its zenith.

If the case is remanded and a state court judge is permitted to define AWP and therefore set the standard for federal Medicare reimbursement rates of covered drugs, it will likely mean that AWP will mean one thing in New York and something else elsewhere, to the detriment of beneficiaries, providers, and other Medicare participants. In analogous circumstances, courts have concluded that the importance of a uniform application of a federal standard is sufficiently substantial to support a finding of federal question jurisdiction. *Ormet Corp.*, 98 F.3d at 807; *In re Wireless*, 216 F. Supp. 2d at 490-91.[7]

Despite the State's effort to dress its case in state law clothes, the fundamental question presented on behalf of the Medicare beneficiaries is whether the AWPs allegedly reported by defendants were consistent with the meaning of AWP under the federal Medicare statute, or whether the Medicare program (and its beneficiaries) were deceived by the reporting of AWPs that were different from those contemplated by the federal statute. On this issue, federal law, not New York law, provides the entire answer.

## II.  THE STATE'S ARGUMENTS FOR WHY FEDERAL QUESTION JURISDICTION IS LACKING ARE WITHOUT MERIT.

### A.  The State's Cases in Which Federal Law Provided Mere "Background" Or "Context" Are Easily Distinguished.

Given that federal law provides the sole guidance on the AWP issue as applied to the Medicare beneficiaries, the cases cited by the State where federal law provided background or mere context are easily distinguished.

---

[7]     The substantial federal interest in the uniform administration of the Medicare reimbursement system also counsels in favor of staying this action pending transfer to the MDL proceeding in Boston. As described in defendants' motions to stay, Judge Saris is currently considering similar remand motions in other cases and she is also considering the meaning of AWP under the Medicare Act.

17

*State of New York v. Lutheran Center for the Aging, Inc.*, 957 F. Supp. 393

(E.D.N.Y. 1997), relied on by the State, involved claims related to the ***Medicaid*** program, not the

Medicare program.  Unlike the Medicare program, which is entirely federal in nature, the

Medicaid program is a cooperative state-federal program in which New York law provides

explicit guidance.  Although federal law establishes general guidelines for the Medicaid

program, states have broad discretion in the implementation of the program.  In *Lutheran Center*,

the State brought claims under state law alleging that the defendant had wrongfully obtained

Medicaid benefits.  Granting the State's motion to remand after removal, the court found that

state law, not federal law, governed the State's Medicaid program and provided for the benefits

the State sought to recover.  *Lutheran Center for the Aging, Inc.*, 957 F. Supp. at 400 ("The

mechanism governing Medicaid in New York is found in the State's Social Services Law and

regulations and [Department of Social Services] is the sole agency authorized to administer the

State's Medicaid program.").  Based on this, the court concluded that  "neither the [federal]

statute nor the [federal] regulations provide[d] the grounds for liability.  Any basis for liability

turn[ed] on an interpretation of state law." *Id.* (internal citations omitted).  Significantly,

however, the court recognized that "a clear ground to invoke federal question jurisdiction" exists

when a state cause of action turns on the interpretation of *federal* law.  *Id.* at 402 (discussing

*Greenery Rehabilitation Group, Inc. v. Sabol*, 841 F. Supp. 58 (N.D.N.Y. 1993), the court stated

that *Greenery* "held that the case turned on the interpretation of the term 'emergency medical

condition' as it is defined in a federal statute, which this Court views as a clear ground to invoke

federal question jurisdiction.").  Thus, *Lutheran Center for the Aging, Inc.*, supports defendants,

not the State, because it is the Medicare program, governed exclusively by federal law, that determines whether the Medicare beneficiaries can recover.[8]

Similarly, in *Loussides v. America Online, Inc.*, 175 F.Supp.2d 211, 213-214 (D. Conn. 2001), the court explicitly found that the basis for liability under the state law claims did not turn on construction of a federal law. *Loussides*, 175 F.Supp.2d at 214 ("[P]laintiffs' amended complaint alleges theories of CUTPA liability that are separate and distinct from their theory based on the alleged violation of the [federal consumer protection statute]. . . . Accordingly, plaintiffs' reliance on the alleged violation of the [federal consumer protection statute] is not essential to their success on the CUTPA claim."). By contrast, in this case, the State cannot recover on its state law claims unless the Court interprets the term AWP under federal law.[9]

*Donovan v. Rothman*, 106 F.Supp.2d 513, (S.D.N.Y. 2000), another case relied on by the State, also is easily distinguishable. The court in *Donovan* held that where defendant's alleged violation of the federal Medicare anti-kickback statute "simply inform[ed]" plaintiff's claim under state law for breach of fiduciary duty, federal jurisdiction was lacking. *Donovan*, 106 F.Supp.2d at 516-17. As demonstrated above, in this case federal law does not "simply

---

[8]    For this reason, the State's reliance on *Venacare U.S.A., Inc. v. Alternative Health Group, Ltd.*, 1995 U.S. Dist. LEXIS 3726 (E.D. La. 1995), is misplaced. Unlike in this case, where the interpretation of federal law is essential to the State's fraud claims, in *Venacare*, the court found that one issue in the case *might* have involved the application of federal law relating to the Medicare program. *See Venacare*, 1995 U.S. Dist. LEXIS 3726, at *6 (E.D. La. 1995).

[9]    The State's assertion that no court has found federal question jurisdiction based on a claim under state consumer protection statutes is incorrect. *See, e.g., In re Wireless Tel. Radio Frequency Emissions Prod. Liab. Litig.*, 216 F.Supp.2d 474 (D. Md. 2002) (denying motion to remand state consumer protection act claim, among other state law claims, based on substantial federal question doctrine).

inform" the State's fraud claims. The State's fraud claims "necessarily depend" on an

interpretation of federal law.[10]

**B.      It Is Irrelevant That Defendants Do Not Have A Duty Under Federal Law To Report Their Drug Pricing Information.**

The State argues that federal question jurisdiction does not exist because

defendants are not under a federally imposed duty to report prices to the price reporting services.

Plaintiff's argument misses the point. Even if the defendants were not under a duty to report any

prices to the government or the independent reporting services, the State has claimed that the

prices that were reported were "false," "misleading," and not "legally permitted" under the

federal Medicare AWP system. That requires the court to determine what the proper and

"legally permitted" Medicare AWP should have been and whether defendants' reported prices

deviated from that standard. That is an issue of federal law that must be resolved, and it is at the

core of the Medicare claims. Thus, the cases cited by the State are readily distinguishable

because none of them turned on an interpretation of federal law. In *Phelan v. Life Ins. Co. of

Georgia, Inc.*, 1995 U.S. Dist. LEXIS 4515 (S.D. Ala. 1995), for example, plaintiff claimed that

defendants improperly sold her a Medicare Supplement policy without disclosing material facts.

*Id.* at *29-30. Plaintiff's claims did not turn on the construction of federal law because the key

issue was the adequacy of the disclosure, an issue on which federal law did not provide the

---

[10]      The essential role played by federal law in this case also serves to distinguish it from
another of the State's cases, *Horowitz v. Marlton Oncology*, 116 F.Supp.2d 551, 555 (D.N.J.
1999). In *Horowitz*, the court concluded although the state RICO statute had borrowed a federal
definition for an element of the state RICO cause of action, this was insufficient to confer federal
question jurisdiction. *Horowitz*, 116 F.Supp.2d at 555. By contrast, the state law claims in this
case do not merely involve definitions borrowed from federal law. Instead, the interpretation of
federal law is required in order for the State to recover on its fraud claims.

answer.  Here, of course, the question is the meaning of AWP under the Medicare program, an issue on which federal law supplies the sole answer.

The State's reliance on *Barbara v. New York Stock Exchange, Inc.*, 99 F.3d 49 (2d Cir. 1996), is equally misplaced.  In *Barbara*, the SEC initiated an investigation into alleged misconduct by Barbara, a floor clerk at the NYSE.  *Id.* at 51.  After the SEC filed disciplinary charges against him, the NYSE suspended Barbara from working on the floor of the exchange pending a hearing.  *Id.* at 52.  In a subsequent decision, the NYSE reversed all charges against Barbara because he was denied adequate discovery.  *Id.*  The NYSE, however, continued to bar Barbara from working on the floor of the exchange, and Barbara was forced to leave the securities industry.  *Id.*  Barbara filed an action in state court claiming that the NYSE wrongfully barred him from the floor of the exchange, and the NYSE removed the action to federal court.  On appeal, the Second Circuit held that Barbara's claims were insufficiently substantial to "arise under" federal law because Barbara's claims only required interpretation of the internal rules of the NYSE, which were governed by state contract law.  *Id.* at 55; *see also D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 100-02 (2d Cir. 2001) (discussing *Barbara* and distinguishing it on the grounds that it did not turn on interpretation of federal law).

The instant case, by contrast, does not concern itself with simple contract construction, which state courts are fully competent to perform.  The State's claims here raise substantial issues regarding Congress's intent regarding the price pharmaceutical companies are permitted to charge the Medicare program for prescription drugs – and issue that should be decided by a federal court.

### C. The Absence Of A Federal Cause Of Action Does Not Defeat Federal Question Jurisdiction.

Citing *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804 (1986), the State argues that federal question jurisdiction is lacking because the federal Medicare statute does not provide an express cause of action that the State can bring to remedy the defendants' alleged fraudulent and deceptive practices. But *Merrell Dow* never held that an express cause of action was required under the federal statute in question. If it had, it would have overruled *Franchise Tax Board* and the numerous other cases holding that federal question jurisdiction existed even though the statute in question contained no private cause of action. *See Platzer v. Sloan-Kettering Institute for Cancer Research*, 787 F. Supp. 360, 366 (S.D.N.Y. 1992) (noting that *Merrell Dow* "left undisturbed the holding of *Franchise Tax Board*").

Cases decided after *Merrell Dow* make this abundantly clear. In *Platzer*, for example, the court explicitly rejected the argument that federal question jurisdiction was lacking because the statute at issue created no private right of action:

> That *Merrell Dow*'s reach should not be so extended is suggested in the language of the opinion itself. The Court left undisturbed the holding of *Franchise Tax Board*, that federal question jurisdiction is "appropriate when 'it appears that some substantial, disputed question of federal law is a necessary element of the well-pleaded state claims.'" *Merrell Dow*, 478 U.S. at 813 (quoting *Franchise Tax Bd.*, 463 U.S. at 13). Leaving intact "arising under jurisdiction" to determine substantial questions of federal law, the Court held that the "*mere presence* of a federal issue in a state cause of action does not automatically confer federal question jurisdiction." *Merrell Dow*, 478 U.S. at 813 (emphasis in *Platzer*) . . .
>
> Thus, even where no private right of action exists for the underlying federal issue, if the nature of the federal issue is sufficiently substantial, subject matter jurisdiction may still exist . . . .

787 F. Supp. at 366. The court held that the federal issues involved were essential to plaintiff's claims and thus were sufficiently substantial to confer "arising under" jurisdiction, notwithstanding the lack of a private right under the federal statute. *Id.* at 367. Other cases, including those decided by the Second Circuit, are in accord. *See West 14th Street Commercial Corp.*, 815 F.2d 188 at 196 ("[A]ssuming that plaintiffs have no private right of action under [the federal statute], we conclude that the federal element in the plaintiff's state cause of action would still be sufficiently substantial to confer arising under jurisdiction."); *Milan Express Co. v. Western Surety*, 886 F.2d 783 (6th Cir. 1989) (distinguishing *Merrell Dow* and holding that the lack of a private right of action did not preclude a finding that subject matter jurisdiction existed); *Smith v. Industrial Valley Title Ins. Co.*, 1990 WL 112077 (E.D. Pa. Aug. 2, 1990) (interpreting the "delphic" *Merrell Dow* opinion as being limited to cases where the federal issue is "merely present" rather than substantial); *New York v. Rapgal Assocs.*, 703 F. Supp. 284 (S.D.N.Y. 1989) (finding that the existence of a private right of action was immaterial where resolution of plaintiff's claims turned on construction of federal law).[11]

---

[11] *See also Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 759 (6th Cir. 2000) (finding lack of private right of action not to be dispositive); *McNeill v. Franke*, 171 F.3d 561, 563-64 (8th Cir. 1999) (same).

## CONCLUSION

The federal issues raised by the State's Medicare claims are sufficiently substantial to confer "arising under" jurisdiction. Indeed, whether Congress intended that defendants' AWPs were required to reflect actual acquisition cost or whether Congress intended that defendants' AWPs were meant to be the non-discounted list price is essential to the resolution of the claims the State asserted on behalf of its Medicare beneficiaries. Accordingly, a substantial federal issue exists and the Court should deny the State's motions to remand.

Dated: Albany, New York
April 23, 2003

BY _____

Neil L. Levine, Esq. (Bar Roll No. 102045)
John J. Henry, Esq. (Bar Roll. No. 507445)
Whiteman Osterman & Hanna LLP
One Commerce Plaza
Albany, NY  12260
(518) 487-7600
(518) 487-7777 (facsimile)

Frederick G. Herold, Esq.
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA  19103

Ethan M. Posner, Esq.
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, DC  20004

*Attorneys for Defendant GSK*

BY ___/S/___

Alan Mansfield (Bar Roll No. 511715)
Stephen L. Saxl (Bar Roll No. 511714)
Greenberg Traurig LLP
885 Third Avenue, 21st Floor
New York, NY 10022
(212) 801-2100 (telephone)
(212) 688-2449 (facsimile)

Michael L. Koon
Shook Hardy & Bacon LLP
One Kansas City Place
1200 Main Street
Kansas City, MO 64105-2118

Paul S. Schleifman
Shook Hardy & Bacon LLP
Hamilton Square
600 14th Street, NW Suite 800
Washington, D.C. 20005-2004

*Attorneys for Defendant Aventis Pharmaceuticals Inc.*

BY _____

John M. Vassos (Bar Roll No. 105895)
Stuart M. Altman
Morgan Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178
212.309.6000 (telephone)
212.309.6001 (facsimile)

John C. Dodds
Jennifer B. Jordan
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
215.963.5000 (telephone)
215.963.5001 (facsimile)

Scott A. Stempel
Morgan Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202.739.3000 (telephone)
202.739.3001 (facsimile)

*Attorneys for Defendant Pharmacia Corporation*

2002 WL 31929179                                                    Page 1
--- F.Supp.2d ----
(Cite as: 2002 WL 31929179 (D.Kan.))

**C**

United States District Court,
D. Kansas.

In re UNIVERSAL SERVICE FUND TELEPHONE
BILLING PRACTICES LITIGATION.
Myhre v. AT & T, No. 02-CV-1583.
Thomas v. AT & T, No. 02-CV-4007.
Gordon v. AT & T, No. 02-CV-4032.
Risher v. AT & T, No. 02-CV-2459.
Benjamin v. Sprint, No. 02-CV-2458.
Jordan v. Sprint, No. 02-CV-5972.
Mount v. Sprint, No. 02-CV-6642.
McKown and Professional Recovery Network, Inc. v.
Sprint, No. 02-CV-1052.

Nos. 02-MD-1468.

Dec. 19, 2002.

Customers of two interstate telecommunications carriers
brought federal and state actions challenging carriers'
practice of charging customers to recoup mandatory
contributions to universal service fund (USF). Following
removal of state cases and transfer of actions for
coordinated and consolidated pretrial proceedings,
customers moved to remand eight cases. The District Court,
Lungstrum, J., held that: (1) state statutory unfair
competition claims did not support removal under
substantial federal question doctrine; (2) money had and
received and unjust enrichment claims did not support
removal under substantial federal question doctrine; (3)
substantial federal question doctrine supported removal of
complaints asserting conversion claims; (4) Federal
Communications Act (FCA) did not completely preempt
state-law claims that arose after demise of filed tariffs; and
(5) claims arising before demise of filed tariffs were not
completely preempted by FCA.

Motions granted in part and denied in part.

West Headnotes

[1] Federal Courts ⬤═5
170Bk5 Most Cited Cases

[1] Federal Courts ⬤═34
170Bk34 Most Cited Cases

Because federal courts are courts of limited jurisdiction,
there is a presumption against federal jurisdiction.
[2] Removal of Cases ⬤═2
334k2 Most Cited Cases

Courts must strictly construe the federal removal statute.

[3] Removal of Cases ⬤═107(7)
334k107(7) Most Cited Cases

Any doubts concerning whether a case is removable must be
resolved in favor of remand.

[4] Removal of Cases ⬤═11
334k11 Most Cited Cases

Defendant may remove a state-court action to federal court
only if the case originally could have been filed in federal
court. 28 U.S.C.A. § 1441(a).

[5] Removal of Cases ⬤═19(1)
334k19(1) Most Cited Cases

[5] Removal of Cases ⬤═26
334k26 Most Cited Cases

When diversity jurisdiction does not exist, federal question
jurisdiction is required for removal. 28 U.S.C.A. §§ 1331,
1332(a), 1441(a).

[6] Federal Courts ⬤═241
170Bk241 Most Cited Cases

Well-pleaded complaint rule governs whether there is
federal question jurisdiction. 28 U.S.C.A. § 1331.

[7] Federal Courts ⬤═241
170Bk241 Most Cited Cases

Well-pleaded complaint rule provides that federal
jurisdiction exists only when a federal question is present on
the face of plaintiff's properly pleaded complaint. 28
U.S.C.A. § 1331.

[8] Federal Courts ⬤═241
170Bk241 Most Cited Cases
Plaintiff is the master of his or her complaint, free to
sidestep federal jurisdiction by pleading only state claims
even when federal claims are also available.

[9] Removal of Cases ⬤═25(1)
334k25(1) Most Cited Cases

Under well-pleaded complaint rule, cases brought in state
court may not be removed to federal court based on federal
question jurisdiction even if a federal defense, such as
preemption, is anticipated in plaintiff's complaint, and even
if both parties concede that the federal defense is the only
question truly at issue. 28 U.S.C.A. §§ 1331, 1441(a).

[10] Federal Courts ⬤═161
170Bk161 Most Cited Cases

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2002 WL 31929179                                                              Page 2
--- F.Supp.2d ----
(Cite as: 2002 WL 31929179 (D.Kan.))

Case may arise under federal law, for purposes of federal question jurisdiction, if the vindication of a right under state law necessarily turns on some construction of federal law. 28 U.S.C.A. § 1331.

**[11] Federal Courts ⬅161**
170Bk161 Most Cited Cases

Only when the federal interest at stake is substantial will federal jurisdiction lie under substantial federal question doctrine. 28 U.S.C.A. § 1331.

**[12] Removal of Cases ⬅19(1)**
334k19(1) Most Cited Cases

State statutory unfair competition claims raised by customers in removed state actions, which were based on alleged misrepresentations made by long-distance telecommunications carriers respecting their practice of recouping universal service fund (USF) contributions from consumers, but did notchallenge lawfulness of USF charges themselves, could be determined without reference to federal law, and thus did not support removal under substantial federal question corollary to well-pleaded complaint rule. 28 U.S.C.A. §§ 1331, 1441(a); West's Ann.Cal.Bus. & Prof.Code § 17200 et seq.

**[13] Removal of Cases ⬅19(1)**
334k19(1) Most Cited Cases
Issue of federal law that was not clearly disputed by parties could not serve as basis for removal under substantial federal question doctrine. 28 U.S.C.A. §§ 1331, 1441(a).

**[14] Removal of Cases ⬅25(1)**
334k25(1) Most Cited Cases

Ordinary preemption is not sufficient basis for removal based on federal question jurisdiction. 28 U.S.C.A. §§ 1331, 1441(a).

**[15] Removal of Cases ⬅19(1)**
334k19(1) Most Cited Cases

Customers' claims against long-distance telecommunications carriers for money had and received and unjust enrichment could reasonably be read to rest exclusively on carriers' alleged misrepresentations regarding their collection of universal service fund (USF) contributions from customers, and so could be decided without reference to federal law, and therefore claims did not arise under federal law, so as to support removal under substantial federal question doctrine, even though claims also could reasonably be construed as challenging propriety of carriers' USF charges, a theory which did implicate federal law. 28 U.S.C.A. §§ 1331, 1441(a); 47 U.S.C.A. §§ 201, 202, 254; 47 C.F.R. §§ 54.706, 54.709(a).

**[16] Removal of Cases ⬅19(1)**
334k19(1) Most Cited Cases

Customers' breach of contract claims against long-distance telecommunications carrier that arose following detariffing did not require reference to federal law, so as to give rise to federal question jurisdiction supporting removal under substantial federal question doctrine. 28 U.S.C.A. §§ 1331, 1441(a).

**[17] Federal Courts ⬅161**
170Bk161 Most Cited Cases

If a claim is supported not only by a theory establishing federal subject matter jurisdiction but also by an alternative and independent theory that does not establish such jurisdiction, federal question subject matter jurisdiction does not exist. 28 U.S.C.A. § 1331.

**[18] Removal of Cases ⬅19(1)**
334k19(1) Most Cited Cases

Issue of whether charges by which long-distance telecommunications carriers recouped their contributions to universal service fund (USF) were unfair, excessive, or otherwise unlawful were governed by Federal Communications Act (FCA), and therefore customers' state-law conversion claims based on alleged overcharges involved disputed questions of federal law, satisfying first step of three-step analysis for determining whether removal under substantial federal question doctrine is proper. 28 U.S.C.A. §§ 1331, 1441(a); 47 U.S.C.A. §§ 201, 202.

**[19] Removal of Cases ⬅19(1)**
334k19(1) Most Cited Cases

Essential element of customers' state-court conversion claims against long- distance telecommunications carriers, which were based on contention that carriers' charges related to their universal service fund (USF) contributions were excessive, unfair, or otherwise unlawful, was that carriers violated provision of Federal Communications Act (FCA), and therefore claims raised substantial questions of federal law, as required for application of substantial federal question doctrine as basis for removal. 28 U.S.C.A. §§ 1331, 1441(a); 47 U.S.C.A. §§ 201, 202.

**[20] Removal of Cases ⬅19(1)**
334k19(1) Most Cited Cases

Substantial federal question doctrine supported removal of customers' state- court conversion claims against long-distance telecommunications carriers, inasmuch as claims, which required showing that carriers' charges related to their universal service fund (USF) contributions violated provision of Federal Communications Act (FCA), would be

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2002 WL 31929179                                                    Page 3
--- F.Supp.2d ----
**(Cite as: 2002 WL 31929179 (D.Kan.))**

actionable under FCA provision creating private cause of
action for such overcharge claims. 28 U.S.C.A. §§ 1331,
1441(a); 47 U.S.C.A. §§ 201, 202, 207.

**[21] Federal Courts** ⚖➞241
170Bk241 Most Cited Cases

**[21] States** ⚖➞18.3
360k18.3 Most Cited Cases

Under the complete preemption doctrine, the preemptive
force of a statute is so extraordinary that it converts an
ordinary state common-law complaint into one stating a
federal claim for purposes of the well-pleaded complaint
rule.

**[22] Federal Courts** ⚖➞241
170Bk241 Most Cited Cases

**[22] States** ⚖➞18.81
360k18.81 Most Cited Cases

**[22] Telecommunications** ⚖➞337.1
372k337.1 Most Cited Cases

Federal Communications Act (FCA) did not, pursuant to
complete preemption doctrine, completely preempt
customers' state-law claims against long-distance
telecommunications carriers that arose after demise of filed
tariffs. 47 U.S.C.A. § 151 et seq.

**[23] States** ⚖➞18.81
360k18.81 Most Cited Cases

**[23] Telecommunications** ⚖➞337.1
372k337.1 Most Cited Cases

Even assuming that, pursuant to complete preemption
doctrine, Federal Communications Act (FCA) completely
preempted challenges to rates, terms, and conditions of
interstate long-distance telephone service prior to
detariffing, state-law claims in which customers sought
recovery based on alleged misrepresentations by
long-distance carriers respecting their practice of recouping
universal service fund (USF) contributions did not assert
challenges to rates, terms, and conditions of interstate
long-distance service, and thus were not completely
preempted. 47 U.S.C.A. §§ 151 et seq., 414.
Isaac L. Diel, Diel & Seelman, P.C., Prairie Village, KS, for
Plaintiffs.

Christopher J. Leopold, Stinson Morrison Hecker LLP,
Kansas City, MO, David P. Murray, Willkie Farr &
Gallagher, Washington, DC, Julie E. Grimaldi, Mark D.
Hinderks, Stinson Morrison Hecker LLP, Overland Park,
KS, Mark M. Iba, Stinson Morrison Hecker LLP, Lynn S.

McCreary, Bryan Cave LLP, Kansas City, MO, Mark B.
Blocker, Sidley Austin Brown & Wood, Chicago, IL, for
Defendants.

Patricia C. Howard, Washington, DC, Pro se.

## MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

**\*1** This multidistrict litigation arises out of AT & T's and
Sprint's practice of charging their customers to recoup
contributions they are required to make to the Universal
Service Fund ("USF") program. [FN1] Plaintiffs, customers
of AT & T and Sprint who believe the charges to be
excessive and/or believe AT & T and Sprint have
misrepresented the charges, brought multiple class action
and individual lawsuits against AT & T and Sprint
throughout the country. Many of the lawsuits were filed in
state court; however, AT & T and Sprint removed nearly all
of the lawsuits to federal court under 28 U.S.C. § 1441(b),
asserting federal jurisdiction.

The Judicial Panel on Multidistrict Litigation transferred the
cases to this court for coordinated and consolidated pretrial
proceedings pursuant to 28 U.S.C. § 1407. After the
transfer, this court issued Practice and Procedure Order No.
2, appointing plaintiffs' co-lead counsel. Plaintiffs' co-leads
then filed both a first consolidated and amended class action
complaint (Doc. 24) and a joint motion for remand and brief
in support (Doc. 25). Certain other plaintiffs also filed
motions to remand and a memorandum in support (Docs.
20, 21, 22, 29, and 88). [FN2] In total, plaintiffs seek to
remand eight of the complaints [FN3] pursuant to 28 U.S.C.
§ 1447(c). [FN4] Each cause of action in each of the
complaints is brought, on its face, under state statutory or
common law. AT & T and Sprint, nonetheless, contend
removal is proper under the "substantial federal-question"
and "complete preemption" doctrines. More specifically, AT
& T and Sprint argue that at least one claim in each of
plaintiffs' complaints requires resolution of a substantial
disputed question of federal law under the Federal
Communications Act of 1934 ("FCA"), 47 U.S.C. § 151, *et
seq.* [FN5] Alternatively, AT & T and Sprint argue that the
FCA completely preempts plaintiffs' state law claims.

The issues have been fully briefed, and a hearing was held
on November 20, 2002. After considering the parties'
arguments, the court concludes that the complaints which
include a facially state law claim which is premised
exclusively on the notion that AT & T's and Sprint's alleged
practice of charging their customers more than they are
required to remit to the USF program (plus their reasonable
expenses) is wrongful in fact raise substantial disputed
questions of federal law under the FCA. Accordingly, such
complaints-- *Benjamin, Risher,* and *McKown*--do arise

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

under federal law and were therefore properly removed from state court. On the other hand, the complaints in which at least one theory of each claim rests on AT & T's and Sprint's alleged misrepresentations regarding their recoupment of their USF contributions, but which theory does not challenge the practice itself, do not raise substantial questions of federal law under the FCA. Moreover, such claims are not completely preempted by the FCA. Accordingly, such complaints--*Thomas, Jordan, Myhre, Gordon,* and *Mount*--do not arise under federal law and therefore should be remanded to state court.

• **Background**

*2 Resolution of these issues requires a close reading of the FCA and of plaintiffs' complaints. The court begins then with a brief review of the relevant sections of the FCA and then will turn to the allegations of the causes of action in each of the eight complaints in question.

**A. Federal Communications Act**

The FCA regulates interstate telecommunications carriers, such as AT & T and Sprint. The USF is a part of the FCA. Congress created the USF as part of the Telecommunications Act of 1996 to support telecommunications services to rural customers, under-served markets, non-profit organizations, and other entities designated by the FCC. 47 U.S.C. § 254. Section 254 sets forth the FCC's authority to administer and implement the USF program, as well as the carriers' obligations to contribute to the USF. 47 U.S.C. § 254(a)(2), (d), (g). Under FCC regulations, Sprint and AT & T (as well as other carriers) must contribute a percentage of their gross-billed interstate and internationalend- user revenues to the USF. 47 C.F.R. § 54.706; *Federal-State Joint Board on Universal Service,* CC Docket No. 96-45, Report and Order, 12 FCC Rcd 8776, 9205-07 (¶¶ 842-44) (1997). Each quarter, the FCC adjusts the percentage of revenues that a carrier must contribute, the "Contribution Factor," to ensure sufficient funding for the program. 47 C.F.R. § 54.709(a); Proposed Second Quarter 2002 Universal Service Contribution Factor, 17 FCC Rcd 4451, 4451-53 (Rel. March 8, 2002). The FCC authorizes carriers to recover their USF contributions from their customers. *Federal-State Joint Board on Universal Service,* CC Docket No. 96-45, Report and Order, 12 FCC Rcd at 9209-11 (¶¶ 851-53) (1997).

As "common carriers, [FN6]" AT & T and Sprint are also subject to the substantive requirements of sections 201 and 202 of the FCA. 47 U.S.C. § 201 and 202. Under section 201(b), common carriers may impose only those "charges, practices, classifications, and regulations" that are "just and reasonable." 47 U.S.C. § 201(b). Under section 202(a), common carriers are prohibited from making any "unjust or

unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services" and they may not give any "undue or unreasonable preference or advantage to any particular person, class of persons, or locality." 47 U.S.C. § 202(a). The FCC has recognized that these sections apply to USF charges as well as other rates and charges imposed by carriers. *See, e.g., Federal-State Joint Board on Universal Service,* CC Doc. No. 96-45, Further Notice of Proposed Rulemaking and Report and Order, 17 FCC Rcd 3752 ¶ 95 (rel. Feb. 26, 2002). [FN7]

Should a common carrier "omit to do any act, matter, or thing in this chapter required to be done," section 206 dictates that the "common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation ... together with a reasonable counsel or attorney's fee[.]" 47 U.S.C. § 206. Section 207 then explains how a party can pursue remedies for alleged injuries sustained under the preceding sections:

*3 Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to [the FCC] ... or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

47 U.S.C. § 207.

Finally, section 414 makes clear that the federal remedy does not negate state law claims: "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U.S.C. § 414.

• **Plaintiffs' Complaints**

• **California Complaints**

*Jordan, Thomas,* and *Myhre* were originally filed in California state courts. The *Jordan* and *Thomas* complaints are very similar; they both plead private attorney general actions brought on behalf of the general public. [FN8] In *Jordan,* the thrust of the complaint is that Sprint has represented to its customers (through billing labels, a 1-800 number, their website, and invoices) that the USF charge [FN9] "is required by law and will be paid over [to the government] by Sprint in its entirety to meet a governmental obligation." These representations, according to the complaint, are false, misleading, and/or likely to deceive Sprint's long distance customers because Sprint has charged its customers significantly more in USF charges than the contribution factor (and, even more than the contribution factor plus any reasonable expenses of collecting and paying

its USF contributions). Thus, the USF charge is a secret profit center that allows Sprint to charge a higher-than-advertised, and higher than represented, per-minute long distance rate. [FN10] These misrepresentations also prevent plaintiffs from being able to compare services and rates so that they can make an informed decision in choosing a long- distance carrier.

The complaint includes two causes of action, both alleging violations of unfair competition law under California Business & Professional Code § 17200, et seq. The statute defines unfair business competition as any "unlawful, unfair or fraudulent" act or practice, as well as "unfair, deceptive, untrue or misleading advertising." The first cause of action alleges that Sprint violates the California statute by advertising and representing that its USF charge solely recoups its contribution to the USF, when in fact the charge generates significant extra revenue for Sprint. As an alternative theory, plaintiffs allege that Sprint violates the statute by effectively charging its customers a higher long distance rate than it advertises. The second cause of action alleges that Sprint violates the statute by creating the false impression that it is required by law to charge the USF charge. To remedy these violations, the complaint seeks repayment of all sums collected above the contribution factor and seeks to enjoin Sprint from continuing to violate the unfair competition law in the future.

*4 The complaint in *Thomas,* though against AT & T and not Sprint, makes similar allegations and brings the same two statutory causes of action as *Jordan.* [FN11] The complaint also adds a third cause of action alleging that AT & T violates the statute by representing that there is not much difference among major telecommunications carriers in the percentage charged to customers to recoup USF contributions, when in fact AT & T actually charges a significantly higher rate.

*Myhre,* a class action lawsuit, includes allegations and claims similar to those in *Thomas* and *Jordan.* But the complaint differs because it includes claims for "money had and received" and common law fraud. The money had and received claim alleges that AT & T received money which belongs to plaintiffs. According to the complaint, AT & T is therefore indebted to plaintiffs for all money charged in excess of the contribution factor. The common law fraud claim stems from allegations, similar to the allegations in the unfair competition claims, that AT & T represented that it was merely recouping its USF contribution and that AT & T represented that the charges for USF contributions were required by law.

• New York Complaints

*Gordon* and *Mount* include nearly identical allegations and claims. The first count is a claim that AT & T and Sprint [FN12] violated New York's consumer protection from deceptive acts and practices law by failing to disclose that they are charging and collecting money in excess of the contribution factor, their contribution to the USF, and/or their costs incurred in connection with their USF contributions. The second count is an "unjust enrichment money had and received--restitution" claim alleging that AT & T and Sprint stated and misrepresented that they were recouping only their contribution to the USF and/or costs of its contribution to the USF, when in fact they collected sums in excess of that amount and, therefore, they have been unjustly enriched. Finally, the third count is a breach of contract claim alleging that AT & T and Sprint breached their contracts by charging and collecting money from customers that were not authorized by the parties' agreement.

• South Carolina Complaints

*Benjamin* and *Risher* [FN13] are also very similar. The complaints rest on allegations that AT & T's and Sprint's USF charges are excessive and that they have misrepresented the charges or failed to disclose how the charges are calculated. The complaints include a claim under South Carolina's unfair trade practices act, a conversion claim, an unjust enrichment claim, a breach of duty of good faith and fair dealing claim, "a breach of contract accompanied by a fraudulent act" claim, and a declaratory judgment claim. [FN14]

• Florida Complaint

Finally, *McKown,* relying on similar allegations that AT & T's and Sprint's USF charges are excessive and that AT & T and Sprint have misrepresented the charges to their customers, includes a declaratory judgment and injunctive relief claim under Florida's deceptive and unfair trade practices act ("FDUTPA"), a deceptive conduct claim under FDUTPA, an unfair conduct claim under FDUTPA, a misrepresentation claim, a conversion claim, and an unjust enrichment claim.

• Removal Jurisdiction

*5 [1][2][3] Because federal courts are courts of limited jurisdiction, there is a presumption against federal jurisdiction. *Basso v. Utah Power & Light Co.,* 495 F.2d 906, 909 (10th Cir.1974). In the context of removal, this means that courts must strictly construe the federal removal statute. *Fajen v. Found. Reserve Ins. Co.,* 683 F.2d 331, 333 (10th Cir.1982). Moreover, any doubts concerning whether a case is removable must be resolved in favor of remand. *Henderson v. Holmes,* 920 F.Supp. 1184, 1186 (D.Kan.1996) (citing *Boyer v. Snap-on Tools Corp.,* 913 F.2d 108, 111 (3rd Cir.1990)).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2002 WL 31929179                                                                    Page 6
--- F.Supp.2d ----
(Cite as: 2002 WL 31929179 (D.Kan.))

[4][5] A defendant may remove a state court action to federal court only if the case originally could have been filed in federal court. *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987); *Garley v. Sandia Corp.,* 236 F.3d 1200, 1207 (10th Cir.2001) [FN15]. Where, as here, diversity jurisdiction does not exist, federal-question jurisdiction is required for removal. *Caterpillar,* 482 U.S. at 392, 107 S.Ct. 2425. [FN16] In other words, the propriety of the removal here hinges on whether the cases fall within the original federal-question jurisdiction of the federal courts. *Merrell Dow Pharms., Inc. v. Thompson,* 478 U.S. 804, 808, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986).

[6][7][8][9] The well-pleaded complaint rule governs whether there is federal-question jurisdiction. *Caterpillar,* 482 U.S. at 392, 107 S.Ct. 2425. This rule "provides that federal jurisdiction exists only when a federal question is present on the face of the plaintiff's properly pleaded complaint." *Id.* The plaintiff, therefore, is the master of his or her complaint, free to sidestep federal jurisdiction by pleading only state claims even where federal claims are also available. *Id.* Consequently, cases brought in state court may not be removed to federal court even if a federal defense, such as preemption, is anticipated in the plaintiff's complaint, and "even if both parties concede that the federal defense is the only question truly at issue." *Id.* at 393, 107 S.Ct. 2425.

Acknowledging that none of plaintiffs' complaints allege any federal claims on their face, AT & T and Sprint seek to invoke two independent corollaries to the well-pleaded complaint rule to support federal question jurisdiction: the "substantial federal question" and "complete preemption" doctrines.

• **Substantial Federal Question**

[10] While the "vast majority of cases brought under the general federal-question jurisdiction of the federal courts are those in which federal law creates the cause of action," *Merrell Dow,* 478 U.S. at 808, 106 S.Ct. 3229, a case may still arise under federal law if "the vindication of a right under state law necessarily turn[s] on some construction of federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 9, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (noting that "[l]eading commentators have suggested that for purposes of § 1331 an action 'arises under' federal law if in order for the plaintiff to secure the relief sought he will be obligated to establish both the correctness and the applicability to his case of a proposition of federal law") (internal quotation marks omitted); *see also Rice v. Office of Servicemembers' Group Life Ins.,* 260 F.3d 1240, 1245 (10th Cir.2001) (explaining that a state law cause of action arises under federal law if "its resolution ...

necessarily turn[s] on a substantial question of federal law, and that federal law in turn ... create[s] a private right of action"). Federal jurisdiction, then, is grounded on "the presence of a federal issue in a state-cause of action." *Merrell Dow,* 478 U.S. at 810, 106 S.Ct. 3229.

*6 [11] While at first blush that characterization appears straightforward, the Supreme Court has acknowledged that applying the concept requires "principled, pragmatic distinctions" and "careful judgments about the exercise of federal judicial power." *Id.* at 813-14, 106 S.Ct. 3229. [FN17] Only where the "federal interest at stake" is substantial will federal jurisdiction lie. *Id.* at 814 n. 12, 106 S.Ct. 3229. In short, the Court's teachings instruct lower courts to apply the substantial federal question doctrine with caution. *See, e.g., Almond v. Capital Properties, Inc.,* 212 F.3d 20, 23 (1st Cir.2000) (noting "[p]erhaps the best one could say is that [the substantial federal question doctrine] endures in principle but should be applied with caution and various qualifications").

In *Rice,* the Tenth Circuit, in finding removal was proper under the substantial federal question doctrine, applied a three-step analysis: first, it asked whether the issues implicated were governed by federal law; second, it inquired whether the issues raised substantial questions of federal law that must be resolved; and third, it asked whether the applicable statute gave rise to a private cause of action. *Id.* at 1245. [FN18] Accordingly, the court will similarly seek to answer each of these questions in turn.

• **Are the Issues in Plaintiffs' State Law Claims Governed by Federal Law?**

Plaintiffs' co-leads and AT & T and Sprint differ significantly in their characterization of the gravamen of the complaints filed in this case. Plaintiffs' co-leads contend that they carefully selected the complaints in *Jordan, Thomas, Myhre, Gordon,* and *Mount* as candidates for remand because each of the complaints contains state law claims aimed solely at AT & T's and Sprint's alleged misrepresentations surrounding their practice of recouping their USF contributions. In other words, these complaints, according to plaintiffs' co-leads, include claims that do not allege that AT & T and Sprint overcharged their customers. Plaintiffs also point out that if a particular state law claim is supported by alternative theories in the complaint, *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 810, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1998) instructs that each of those theories must require resolution of a substantial disputed issue of federal law. By contrast, AT & T and Sprint assert that the true focus of each of these complaints, as well as the complaints in *Benjamin, Risher,* and *Mckown,* is to challenge the lawfulness of the USF charges AT & T and Sprint impose on their customers.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

The parties agree, then, that there is a distinction between challenging AT & T's and Sprint's representations as opposed to the charges themselves. While each of these complaints arises out of AT & T's and Sprint's decision to recoup their USF contributions, the allegations and causes of action in the complaints are different. Only by focusing on the causes of action in each complaint will the gravamen of each well-pleaded complaint become clear.

*7 [12] As noted above, the two statutory unfair competition claims in *Jordan* are tied exclusively to Sprint's alleged misrepresentations. These claims do not allege that Sprint's USF charges are excessive. *Thomas* treads closer to the line by including the following paragraph which appears to allege that AT & T's USF practices are unlawful:

19. Thus, AT & T utilizes what should be, and what AT & T claims to be, a charge to recoup costs incurred through contributions to the Universal Service Fund as a secret profit center that earns AT & T hundreds of millions of dollars of illicit revenue each year. The Universal Connectivity Charge to residential long distance customers contains a significant hidden charge that does not fit into any of the categories of charges authorized by the FCC or other regulatory bodies; its true function is purposely concealed from regulators, the states and AT & T's customers. That true function is charging a higher-than-advertised per minute long distance rate.

Nonetheless, because the statutory unfair competition claims in *Thomas*, like *Jordan*, are tied to AT & T's alleged misrepresentations, the court concludes that *Thomas* similarly does not challenge the lawfulness of AT & T's USF practices. The critical point is that in *Thomas*, the claim itself is still based on the alleged false characterization of the charge, not on the wrongfulness of the charge itself. The quoted language may signal that the plaintiff will attempt to introduce at trial "profit center" evidence by way of explaining the character of the misrepresentations but it does not constitute a separate claim for relief absent a finding of misrepresentations.

[13] *Thomas* and *Jordan*, therefore, include claims that rest solely on AT & T's and Sprint's misrepresentations, not allegations that the USF charges are excessive. The court agrees with plaintiffs' co-leads that reference to federal law is not necessary to determine these state law claims. [FN19] For example, whether AT & T and Sprint collected more in USF charges than they remitted to the USF or whether the percentage AT & T charges its customers to recoup its USF contributions is higher than other carriers are questions of fact, not questions of law. [FN20] Indeed, similar theories have been held not to require resolution of substantial disputed questions of federal law under the FCA. *See, e.g., Sanderson, Thompson, Ratledge, & Zimny v. AWACS, Inc.,* 958 F.Supp. 947 (D.Del.1997) (holding that claims alleging

that carrier failed to accurately disclose its billing practice were not governed by FCA); *Bauchelle v. AT & T,* 989 F.Supp. 636 (D.N.J.1997) (holding that sections 201, 202 and 203 of the FCA do not apply to state law challenges to carrier's advertising and promotion practices); *In re Comcast Cellular Telecomm. Lit.,* 949 F.Supp. 1193 (E.D.Pa.1996) (holding that claims alleging that carrier failed to accurately disclose its billing practice were not governed by FCA); *Weinberg v. Sprint Corp.,* 165 F.R.D. 431 (D.N.J.1996) (holding same).

*8 [14] In other words, regardless of whether AT & T's and Sprint's charges are lawful under section 201 or 202 of the FCA, if AT & T and Sprint made representations about the USF contribution that were not true and harmed plaintiffs, then plaintiffs are entitled to recover under state law. [FN21] These claims, then, are merely alternative claims to section 201 or 202 claims such that they can exist concurrently with those claims. [FN22] Accordingly, plaintiffs, as masters of their claims, have the right to omit the potential federal claims if they choose to forego such recovery. *Schmeling v. NORDAM,* 97 F.3d 1336, 1340 (10th Cir.1996) (noting that plaintiffs are the masters of their complaints and, therefore, may choose to exclude federal claims).

[15][16] *Myhre, Gordon,* and *Mount* present a different situation because as AT & T and Sprint point out, they include claims--*Myhre* includes a money had and received claim and *Gordon* and *Mount* include unjust enrichment claims--that could be construed as challenging the propriety of AT & T's and Sprint's USF charges. For example, the money had and received claim in *Myhre* provides:

33. Plaintiff, on behalf of himself and the Class, realleges each allegation contained in each of the paragraphs above as if set forth here verbatim.

34. As alleged above, AT & T, through its Universal Connectivity Charge, received money which, in equity and good conscience, belongs to Plaintiff and the members of the Class.

35. AT & T is, accordingly, indebted to Plaintiff and the members of the Class for all money had and received by AT & T in the amount of the Universal Connectivity Charge it collected in excess of the Contribution Factor. Plaintiff and the members of the Class request this Court to order AT & T to pay this amount to Plaintiff and the members of the Class.

The complaints in *Gordon* and *Mount* seek to recover under a New York consumer protection claim, an unjust enrichment claim, and a breach of contract claim. [FN23] The consumer protection claim in both complaints rests exclusively on AT & T's and Sprint's alleged misrepresentations. The complaints then go on to allege:

31. Plaintiff repeats and incorporates herein by reference the allegations of paragraphs 1 through 38.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2002 WL 31929179                                                                                      Page 8
--- F.Supp.2d ----
(Cite as: 2002 WL 31929179 (D.Kan.))

32. Defendant stated and misrepresented that its Carrier Universal Service Charge was a means of recovering its contribution to the USF and/or the costs of its contribution to the USF.

33. Defendant has collected monies from the plaintiff and the Class by means of the Carrier Universal Service Charge in excess of its contribution to the USF and/or the costs of its contribution to the USF.

34. As [a] result of defendant's collection and retention of monies in excess of its contribution to the USF and/or the costs of its contribution to the USF, defendant has been unjustly enriched.

35. Defendant has no right to retain said monies collected from plaintiff and other New York users and said monies rightfully belong to plaintiff and the Class.

*9 36. Plaintiff and the Class are entitled to an order of restitution reimbursing them for said monies.

Even if these claims are construed as alleging that AT & T's and Sprint's USF charges are excessive, plaintiffs argue that the claims are also premised on an alternative and independent theory that it is unjust and inequitable for AT & T and Sprint to retain the USF charges they collected from plaintiffs because the charges were collected based on AT & T's and Sprint's alleged misrepresentations. The court agrees, especially in light of the fact that AT & T and Sprint do not directly address this argument, and the court must construe any uncertainties in favor of remand, *Henderson,* 920 F.Supp. at 1186.

As the above quoted language indicates, each of these claims--the money had and received claim in *Myhre* and the unjust enrichment claim in *Gordon* and *Mount*--incorporates all prior allegations of the complaint into the claims. Those prior allegations include assertions that AT & T and Sprint misrepresented their USF charges. Additionally, the claims each contain broad language that, when read in context with the prior allegations regarding the misrepresentations, can be construed to allege that it is unjust and inequitable for AT & T and Sprint to retain the USF charges they collected because they misrepresented the charges. In fact, the unjust enrichment claim in *Gordon* and *Mount* provides that AT & T and Sprint stated and misrepresented that their USF charge was a means of recovering their contribution to the USF and/or the costs of their contribution to the USF. The claim then asserts that AT & T and Sprint collected and retained sums in excess of that amount and, therefore, they have been unjustly enriched. In short, a reasonable reading of these claims is that one theory of recovery rests exclusively on AT & T's and Sprint's misrepresentations regarding their USF charges.

As noted above, these misrepresentation theories do not require reference to federal law. Thus, the court is presented with a situation where a claim is supported by alternative and independent theories, one of which does not implicate

federal law. The Supreme Court's reasoning in *Christianson* dictates that in such a situation, the claim does not "arise under" federal law. 486 U.S. at 810, 108 S.Ct. 2166.

[17] In Christianson, the Court was faced with determining whether a claim was one "arising under any Act of Congress relating to patents" for purposes of federal subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a). The Court stated explicitly that the same approach applies in determining "arising under" jurisdiction for § 1331 purposes. *Id.* at 808, 108 S.Ct. 2166; *see also* 13B Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure, § 3562 n. 68 (1995 Supp.) (discussing *Christianson* ). The Court noted that the patent law issue was only essential to one of several theories under which the petitioner could prove its claim. *Id.* at 811-814, 108 S.Ct. 2166. Concluding that the case did not "arise under" federal patent law, the Supreme Court held that "a claim supported by alternative theories in the complaint may not form the basis for § 1338(a) jurisdiction unless patent law is essential to each of those theories." *Id.* at 810, 108 S.Ct. 2166. Christianson, therefore, instructs that if a claim is supported not only by a theory establishing federal subject matter jurisdiction but also by an alternative and independent theory that does not establish such jurisdiction, then federal subject matter jurisdiction does not exist. *See, e.g., Mulcahey v. Columbia Organic Chemicals Co., Inc.,* 29 F.3d 148, 152 (4th Cir.1994) (applying *Christianson* in deciding whether plaintiffs' state law claims were properly removed because the claims arose under federal law). Accordingly, it is clear that the money had and received claim in *Myhre* and the unjust enrichment claims in *Gordon* and *Mount* do not "arise under" federal law. As such, those complaints, like *Jordan* and *Thomas,* do not implicate disputed questions of federal law.

*10 [18] Finally, there is no dispute that the conversion claims in *Benjamin, Risher,* and *Mckown* allege that AT & T's and Sprint's charges, to recoup their USF contributions, are unfair, excessive, or otherwise unlawful. The court agrees with AT & T and Sprint that this issue is governed by sections 201 and 202 of the FCA. [FN24] *Boomer v. AT & T Corp.,* 309 F.3d 404, 420 (7th Cir.2002); *see also In re Long Distance Telecomm. Litig.,* 831 F.2d 627, 631 (6th Cir.1987) (noting that "[s]ection 201(b) speaks in terms of reasonableness, and the very charge of Count I is that the defendants engaged in unreasonable practices[;][t]his is a determination that Congress has placed squarely in the hands of the [FCC.]") (internal quotations omitted). In fact, AT & T and Sprint point out that the very issue raised by plaintiffs' complaints regarding the level of USF charges is currently before the FCC, which initiated rulemaking proceedings in February of this year to consider the issue under applicable federal law. *Federal-State Joint Bd on Univ. Serv.,* Further Notice of Proposed Rulemaking and

Report and Order, 17 FCC Rcd 3752 (¶ 89-109) (rel. Feb. 26, 2002). The FCC order states unequivocally that recovery of universal service contributions is governed by sections 201 and 202 of the FCA. *Id.* at ¶ 89-90. [FN25]

In *Allison v. AT & T,* No. 02-381, slip op. at 1 (D.N.M. June 13, 2002)--one of the USF cases now pending before this court--Judge Black explained why plaintiffs' allegations that Sprint's and AT & T's USF charges are excessive requires reference to section 201(b) of the FCA. [FN26] *Id.* at 2-6. The court finds his reasoning persuasive and applicable here. As set out above, plaintiffs' claims allege that the USF percentages charged and collected by AT & T and Sprint are higher than the contribution factors set by the FCC and that amounts collected above those contribution factors constitute conversion. The FCC has noted that the variance between the contribution factor and the amounts charged by plaintiffs ("the mark-ups" [FN27]) can be explained several different ways, however. [FN28] As Judge Black noted, the various explanations could include: (1) accounting for administrative costs surrounding the USF collections and contributions; (2) adjusting the percentage to account for customers who do not pay their bills; (3) declining revenues in the six- month lapse between receipt of revenues and the FCC's determination of the contribution factor; and (4) charging certain classes of customers (such as "pre-subscribed" customers) a higher percentage than other customers (such as pre-paid calling-card customers). To recover, therefore, plaintiffs will necessarily have to prove that these explanations for the higher percentage charged are unreasonable or unjust under section 201(b). Thus, as Judge Black concluded, "to establish that recoverable overcharges occurred, Plaintiffs will necessarily become enmeshed in questions of the justness or reasonableness of the explanations Defendant offers for the variance between the contribution factors and the amounts charged Plaintiffs and other customers." *Id.* at 5. As such, plaintiffs' claims in *Benjamin, Risher,* and *McKown* involve disputed questions of federal law.

**B. Is the Federal Issue a Substantial Part of the State Law Claims?**

*11 [19] It is not enough, however, for a disputed issue of federal law simply to be a part of a state law claim. *Merrell Dow,* 478 U.S. at 813-14, 106 S.Ct. 3229. In *Merrell Dow,* the Supreme Court reaffirmed "the long- settled understanding that the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Id.* at 813, 106 S.Ct. 3229. The question of federal law, therefore, must be substantial. *Id.*

The Supreme Court has acknowledged that there is no bright line test for determining whether a federal issue is substantial: "Far from creating some kind of automatic test, *Franchise Tax Board* thus candidly recognized the need for careful judgments about the exercise of federal judicial power." *Id.* at 814, 106 S.Ct. 3229. In *Merrell Dow,* the Supreme Court did, however, provide lower courts with several guiding principles. [FN29] The Court urged lower courts to consider the broad issues of "congressional intent, judicial power, and the federal system." *Id.* at 810, 106 S.Ct. 3229. In a footnote, the Court also stressed the importance of examining "the *nature* of the federal interest at stake." *Id.* at 814 n. 12, 106 S.Ct. 3229 (emphasis in original).

Following the Court's guidance, this court concludes that *Benjamin, Risher,* and *McKown* include claims in which a substantial, disputed question of federal law is "in the forefront of the case and not collateral, peripheral or remote." *Id.* at 814 n.11, 106 S.Ct. 3229 (citing *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 470, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (Frankfurter, J., dissenting)).

As noted above, plaintiffs' claims for conversion allege, in essence, that AT & T's and Sprint's charges related to their USF contributions are excessive, unfair, or otherwise unlawful. As AT & T and Sprint correctly noted, these state law claims require proof of an unlawful act by AT & T and Sprint, and this element is only satisfied if plaintiffs can show that AT & T and Sprint violated the FCA. Put another way, an essential element of each of these state law claims is that AT & T and Sprint violated section 201 or 202 of the FCA.

In fact, section 201 or 202 is not just an element of the state law claims; the federal statute is the cornerstone of the state law claims. That is, if AT & T and Sprint are found not to have violated section 201 or 202, the state law claims are not actionable. The state law conversion claims, then, are merely remedies for the violation of section 201 or 202. In short, these claims raise substantial questions of federal law "on which the outcome of this lawsuit turn." *Rice,* 260 F.3d at 1246 (noting that the federal issues were substantial because the outcome of the lawsuit turned on how they were resolved).

**• Does the FCA Provide a Private Cause of Action?**

[20] Congress has expressed its intent for violations of section 201 and 202 of the FCA to be actionable under federal law. Section 207 provides that any person claiming to be damaged by a carrier can bring an action in federal court for those damages. Courts have applied this provision to claims involving USF charges. *See, e.g., Panatronic USA v. AT&T Corp.,* 287 F.3d 840, 843 (9th Cir.2002) (holding section 207 provides cause of action for plaintiff's claim that carrier's USF charges violated section 202(a)). In other words, plaintiffs' claims of being overcharged with regard to AT & T's and Sprint's USF contributions, which fit within

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2002 WL 31929179                                                                           Page 10
--- F.Supp.2d ----
(Cite as: 2002 WL 31929179 (D.Kan.))

section 201(b), would be actionable under section 207. Thus, Congress has created a private cause of action under the FCA for plaintiffs' overcharge claims. [FN30] Accordingly, the substantial federal question doctrine supports removal, and the court denies plaintiffs' motions to remand the complaints in *Benjamin, Risher,* and *McKown.*

• **Complete Preemption**

**\*12** [21] Alternatively, AT & T and Sprint argue that the "complete preemption" doctrine supports removal. Under the "complete preemption" doctrine, which the Supreme Court has referred to as a corollary to the well-pleaded complaint rule, *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542,95 L.Ed.2d 55 (1987), "the preemptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.' " *Caterpillar,* 482 U.S. at 393, 107 S.Ct. 2425 (internal citations and quotations omitted). As the Supreme Court explained: "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre- empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id.; see also Franchise Tax,* 463 U.S. at 24, 103 S.Ct. 2841 (holding that "if a federal cause of action completely preempts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law"). [FN31]

[22] AT & T and Sprint argue that the FCA completely preempts each of plaintiffs' complaints. The complaints in *Myhre, Gordon,* and *Mount* are limited to the time period after detariffing and the court can easily dispense with the argument that the FCA completely preempts state law claims after detariffing. Courts universally agree that "[w]ith the demise of filed tariffs, ... complete preemption clearly no longer exists." *Wisconsin v. AT&T Corp.,* 217 F.Supp.2d 935, 938 (W.D.Wis.2002) (noting that without exception courts and the FCC have concluded as such); *see also Boomer,* 309 F.3d at 423-24 (holding, in dicta, that after detariffing the FCA does not completely preempt state law claims).

[23] Whether the claims in *Thomas* and *Jordan* are completely preempted presents a more difficult issue because, as noted above, these claims are not limited to the time period after detariffing. That is, the claims relate to events that occurred prior to August 1, 2001. Relying principally on the Seventh Circuit's holding in *Cahnmann v. Sprint Corp.,* 133 F.3d 484 (7th Cir.1998), AT & T and Sprint argue that prior to detariffing the FCA completely preempted challenges to rates, terms, and conditions of interstate long distance service. [FN32] For purposes of this order, the court will accept this as true. [FN33] But even

assuming that were so, the court concludes that the claims in *Jordan* and *Thomas* would not be preempted because the claims are not challenges to rates, terms, and conditions of interstate long distance service.

In *Cahnmann,* customers of a long distance carrier filed a class action lawsuit in Illinois state court alleging assorted state law breach of contract and fraud claims. *Id.* at 486-88. The plaintiffs alleged that the carrier offered one year of free long distance telephone calls on Fridays to small business customers who subscribed to the carrier. *Id.* After the plaintiffs subscribed, however, the carrier amended the applicable tariff, eliminating several countries from the "Fridays Free" program. *Id.* The plaintiffs in effect sought to have the Illinois court throw out the amended tariff because it violated the contract to provide service pursuant to the original tariff. *Id.*

**\*13** Although the plaintiffs pled only state law claims in their complaint, the carrier removed the case to federal district court. *Id.* The district court allowed removal, reasoning that a suit to invalidate a filed tariff necessarily arises under federal law. *Id.* The Seventh Circuit affirmed. *Id.* The court noted that "[a] tariff filed with a federal agency is the equivalent of a federal regulation." *Id.* at 488. It then concluded that "since the federal regulation defines the entire contractual relation between the parties, there is no contractual undertaking left over that state law might enforce." *Id.* at 489. Thus, "[f]ederal law does not merely create a right; it occupies the whole field, displacing state law." *Id.*

The court, in reaching its conclusion, distinguished its facts from those in *In re Long Distance Telecommunications Litigation,* 831 F.2d 627 (6th Cir.1987). *Cahnmann,* 133 F.3d at 488. In that case, a carrier was accused of representing that its rates were lower than its competitor's without revealing that, unlike the competitor, it charged its customers for their dropped or uncompleted calls. *Id.* The case, therefore, involved "a claim of simple fraud, and its adjudication did not require determining the validity of a tariff." *Id.* Thus, the court in *Cahnmann* concluded that such a claim would not be completely preempted, but instead is the type of state law claim preserved by section 414 (the "savings provision") of the FCA. *Id.*

The claims in *Jordan* and *Thomas* are very similar to those in Long Distance Telecommunications Litigation. In each of the cases the plaintiffs' state law claims revolve around the defendants' misrepresentations, wholly apart from reference to federal law. In other words, the claims do not challenge the validity of the filed tariffs. This court is not aware of any court that has held that such claims are completely preempted by the FCA. *See, e.g., Sanderson, Thompson, Ratledge & Zimny,* 958 F.Supp. at 955-58 (holding that

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2002 WL 31929179                                                    Page 11
--- F.Supp.2d ----
**(Cite as: 2002 WL 31929179 (D.Kan.))**

customer's state law claims that defendant failed to disclose its billing practices was not completely preempted by the FCA). Accordingly, the court concludes that the claims in *Jordan, Thomas, Myhre, Gordon,* and *Mount* are not completely preempted, and plaintiffs' motions to remand those complaints are granted.

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiffs' co-leads' motion to remand (Doc. 25) is granted, and the other plaintiffs' motions to remand (Docs. 20, 21, 22, 29, and 88) are granted in part and denied in part. Specifically, the other plaintiffs' motions are granted as to *Gordon* (Doc. 29) and *Mount* (Doc. 88) and denied as to *Benjamin* (Doc. 20), *Risher* (Doc. 22), and *McKown* (Doc. 21). Accordingly, *Jordan, Thomas, Myhre, Gordon,* and *Mount* are remanded to state court.

> FN1. The federal USF program is aimed at making telephone service available and affordable for all Americans. 47 U.S.C. § 254.
>
> FN2. Plaintiffs' co-leads filed a memorandum in opposition to the unauthorized remand motions (Doc. 65) filed by certain other plaintiffs in five of the cases. After discussing these motions with the parties at a hearing, it was agreed that the circumstances of the remand motions were unique and, therefore, the court would permit the unauthorized motions. The court noted on the record that in the future unauthorized motions would not be permitted in this case.
>
> FN3. Plaintiffs' co-leads seek remand in: *Jordan v. Sprint* ("Jordan"); *Myhre v. AT & T* ("Myhre"); *Thomas v. AT & T* ("Thomas"); *Gordon v. AT & T* ("Gordon"); and *Mount v. Sprint* ("Mount"). Certain other plaintiffs seek remand in: *Gordon v. AT & T* ("Gordon"); *Mount v. Sprint* ("Mount"); *Risher v. AT & T* ("Risher"); *Benjamin v. Sprint* ("Benjamin"); and *McKown and Professional Recovery Network, Inc. v. Sprint* ("McKown").
>
> FN4. Section 1447(c) provides, in pertinent part: A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under section 1446(c). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. 28 U.S.C. § 1447(c).
>
> FN5. AT & T and Sprint correctly point out that if one claim in a complaint is removable, the entire case may be removed to federal court. 28 U.S.C. § 1441(c) ("Whenever a separate and independent

claim or cause of action within the jurisdiction conferred by section 1331 of this title is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates.").

> FN6. AT & T and Sprint, as providers of long distance telephone services, are classified as common carriers under the FCA. 47 U.S.C. § 153(h).
>
> FN7. Until August 1, 2001, section 203 of the FCA required long distance carriers to set forth the charges and other terms and conditions of their service in "schedules" that were filed with the FCC. 47 U.S.C. § 203(a). In a series of rulemaking orders, however, the FCC adopted rules that eliminated tariffs (referred to as "detariffing"). *Policy and Rules Concerning the Interstate, Interchange Marketplace,* CC Docket No. 96-61, Second Report and Order, 11 FCC Rcd 20,730 (1996) ( "Second Report and Order"); *Policy and Rules Concerning the Interstate, Interchange Marketplace,* CC Docket No. 96-61, Order on Reconsideration, 12 FCC Rcd 15,014 (1997) ("Order on Reconsideration"); *Policy and Rules Concerning the Interstate, Interchange Marketplace,* CC Docket No. 96-61, Second Order on Reconsideration, 14 FCC Rcd 6004 (1999) ("Second Order on Reconsideration"). The FCC set August 1, 2001, as the effective date for detariffing.
> Detariffing did not change the telecommunications carriers obligation to comply with the substantive requirements of sections 201 and 202. *Order on Reconsideration,* 12 FCC Rcd at 15,057 (¶ 77). The FCC, in granting a petition by AT & T to "clarify that federal, and not state, law governs the determination as to whether a nondominant interexchange carrier's rates, terms, and conditions ... are lawful," stated:
> We therefore agree with AT & T, Sprint, and WorldCom tha2t the Communications Act continues to govern determinations as to whether rates, terms, and conditions for interstate, domestic, interexchange services are just and reasonable, and are not unjustly or unreasonably discriminatory. While the parties only sought certification that the Communications Act governs the determination as to the lawfulness of rates, terms, and conditions, we note that the Communications Act does not govern other issues, such as contract formation and breach of contract, that arise in a detariffing

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

environment. As stated in the *Second Report and Order,* consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime.
*Order on Reconsideration,* 12 FCC Rcd at 15,057 (¶ 77).

FN8. Unlike the other six complaints at issue, the claims in these complaints arise prior to detariffing. That is, the claims rest on events that occurred prior to August 1, 2001.

FN9. On their bills, Sprint labels the charge a "Carrier Universal Service Charge," while AT & T labels it a "Universal Connectivity Charge." To simplify the discussion, the court will call it a USF charge.

FN10. The complaint elaborates on this point by explaining that the USF charge gives Sprint an unfair advantage in the highly competitive long distance market. Long distance carriers compete to offer the lowest per minute rates, and hundreds of thousands of customers switch companies every year to save one or two cents per minute, often based on such carrier's advertisements. Because Sprint hides part of this basic per minute long distance charge in its USF charge, it advertises and represents that it charges a lower per-minute long distance rate than it actually charges.

FN11. The complaint does not contain the alternative theory in the first cause of action that the statute is violated by charging a higher per minute long distance rate than is advertised.

FN12. In *Mount* Sprint is the defendant while in *Gordon* it is AT & T.

FN13. In *Benjamin* Sprint is the defendant while in *Risher* it is AT & T.

FN14. In addition, *Benjamin* includes a fraud and negligent misrepresentation claim.

FN15. Section 1441(a) provides, in pertinent part:
Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. 28 U.S.C. § 1441(a).

FN16. Section 1331 provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 47 U.S.C. § 1441(a).

FN17. As the Supreme Court explained with regard to "federal question" jurisdiction: "There is no 'single, precise' definition of that concept; rather, 'the phrase arising under masks a welter of issues regarding the interrelation of federal and state authority and the proper management of the federal judicial system.' " *Merrell Dow,* 478 U.S. at 808, 106 S.Ct. 3229 (quoting *Franchise Tax,* 463 U.S. at 8, 103 S.Ct. 2841).

FN18. The court did not decide whether plaintiff asserted a cause of action under federal or state law; instead, it concluded it was sufficient to find that "(1) the issues of mental capacity and undue influence are governed by federal law; (2) these issues raise substantial questions of federal law that must be resolved; and (3) the federal SGLI statute gives rise to an implied private cause of action." *Id.* at 1245.

FN19. As noted above, *Thomas* and *Jordan* include claims involving the time period prior to detariffing. This does not impact the claims, however. The court rejects the argument that reference to federal law is necessary because of the federal filed rate doctrine. As explained below in the complete preemption section, these claims would not require reference to the filed tariffs.

FN20. Plaintiffs' co-leads acknowledge that the second cause of action in *Thomas* and *Jordan,* which alleges that AT & T and Sprint misrepresent that the USF charge is required by law, would require reference to federal law. They point out, however, that AT & T and Sprint do not deny the truth of this allegation. In fact, AT & T and Sprint's papers state that the USF charge is not required by law. Thus, this issue of law is clearly not disputed and, therefore, cannot serve as a basis for removal.

FN21. This point illustrates the flaw in AT & T and Sprint's position that if federal law authorizes both the nature and amount of AT & T's and Sprint's USF charges, "then these and other alleged 'misstatements' are accurate and cannot form the basis of a fraud or unfair business practice claim." Regardless of whether federal law authorizes the charges, plaintiffs are alleging that AT & T and Sprint represented that they were charging only the amount needed to recoup their USF contributions. The truth of these representations hinges not on the

2002 WL 31929179
--- F.Supp.2d ----
(Cite as: 2002 WL 31929179 (D.Kan.))

lawfulness of the charges, but on the amount actually collected as compared to the amount AT & T and Sprint represented that they collected.

FN22. Thus, AT & T and Sprint's argument that carrier disclosures are governed by section 201(b) is irrelevant. Even if this is true, AT & T and Sprint have not shown that reference to section 201(b) is required to resolve plaintiffs' state law claims. Moreover, any argument that section 201(b) would preempt plaintiffs' state law claims would not form the basis for removal. As noted above, ordinary preemption is not sufficient for removal. *Caterpillar,* 482 U.S. at 392, 107 S.Ct. 2425.

FN23. Because the breach of contract claim arises after detariffing, it does not require reference to federal law. *Order on Reconsideration,* 12 FCC Rcd at 15,057 (¶ 77) (noting that after detariffing the FCA does not govern breach of contract issues and consumers may have remedies under state law).

FN24. The other plaintiffs' joint memorandum in support of remand argues that neither the FCA nor the FCC governs recovery of USF contributions from customers. The court cannot agree. While it is true that the FCA and FCC give carriers "flexibility to decide whether, how, and how much to recover from their customers [for their USF contributions]," *Federal-State Joint Bd. on Univ. Serv.,* 15 FCC Rcd 12,050 (¶ 11) (2000), it is clear that if carriers decide to recover their USF contributions from their customers, they must comply with sections 201 and 202 of the FCA. *Federal-State Joint Bd on Univ. Serv.,* Further Notice of Proposed Rulemaking and Report and Order, 17 FCC Rcd 3752 (¶ 89-109) (rel. Feb. 26, 2002).

FN25. Paragraphs 89 and 90 of the order provide in pertinent part:
In considering reforms to the universal service contribution recovery process, we seek to ensure that this process is flexible, fair, and understandable for consumers, while maintaining the flexibility that providers of interstate telecommunications services may need in recovering the costs of their contributions. We also seek to ensure that telecommunications carriers' recovery practices are within the bounds of reasonableness that Congress established in sections 201 and 202.
A statutory framework established by Congress in the [FCA] governs the recovery of universal service contributions by telecommunications service providers. Sections 201(b) and 202(a) of the [FCA] govern common carrier services and charges....
*Federal-State Joint Board on Universal Service,* CC Docket No. 96-45, Further Notice of Proposed Rulemaking and Report and Order, 17 FCC Rcd 3752 (¶ 89-90) (rel. Feb. 26, 2002).

FN26. While Judge Black preliminarily concluded that he believed removal was proper under the substantial federal question doctrine, he did not decide the case. Instead, he stayed it to avoid inconsistent results and allow the Multidistrict Litigation Panel to determine whether the case should be transferred, along with other class action cases, to one district.

FN27. As Judge Black noted, this is a term used by the FCC for the difference between the contribution factor and the USF percentage charged to customers. The court notes that the FCC is mindful of these mark-ups, and has requested comments on several proposals to regulate the mark-ups to ensure that they are imposed without violating sections 201 or 202. *Federal State Joint Board on Universal Service,* CC Docket No. 96-45, Further Notice of Proposed Rulemaking and Report and Order, 17 FCC Rcd 3752 (¶ 92-100) (rel. Feb. 26, 2002).

FN28. The FCC reports included: *Federal-State Joint Board on Universal Service,* CC Docket No. 96-45, Further Notice of Proposed Rulemaking and Report and Order, 17 FCC Rcd 3752 (rel. Feb. 26, 2002) and *Federal-State Joint Board on Universal Service,* CC Docket No. 96-45, 16 FCC Rcd. 9892, 9895-96.

FN29. *In Merrill Dow,* the plaintiffs brought an action in state court, alleging that the manufacturer and distributor of the drug Benedictin had negligently failed to warn consumers that the drug could cause birth defects when taken during pregnancy. *Id.* at 806, 106 S.Ct. 3229. While plaintiffs did not allege a federal cause of action, one of their six claims did rely on the Federal Food, Drug, and Cosmetic Act's ("FDCA") definition of "misbranded," 21 U.S.C. § 301 *et seq.,* to create a rebuttable presumption of the defendant's negligence. *Id.* The defendants, therefore, removed the case to federal court, arguing that the plaintiff's case was based in part on federal law. In finding that removal was improper, the Supreme Court explained that it

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

would undermine congressional intent to permit federal-question jurisdiction when Congress chose not to provide a federal remedy for violations of the statute that it enacted. *Id.* at 811-13, 106 S.Ct. 3229. Thus, the Court held that "a complaint alleging a violation of a federal statute as an element of a state cause of action, when Congress has determined that there should be no private, federal cause of action for the violation, does not state a claim 'arising under the Constitution, laws, or treaties of the United States.' " *Id.* (quoting 28 U.S.C. § 1331). The circumstances here are clearly distinguishable from *Merrell Dow* because the parties concede that section 207 of the FCA provides plaintiffs with a federal cause of action for violations of sections 201 and 202.

FN30. The other plaintiffs' joint memorandum in support of remand suggests that each of these cases is much like *Fair v. Sprint Payphone Servs., Inc.,* 148 F.Supp.2d 622 (D.S.C.2001). In *Fair,* Sprint argued that the substantial federal question doctrine supported removal of plaintiffs' state law claims. *Id.* at 624. The court rejected this argument largely because federal law did not create a private cause of action. *Id.* at 625. Because federal law creates a private cause of action here, these cases are clearly distinguishable from *Fair* and other similar cases following *Merrell Dow.*

FN31. Much like the substantial federal question doctrine, application of the complete preemption doctrine is far from straightforward. As the Tenth Circuit noted: "Unfortunately, the scope of the doctrine is not entirely clear; '[t]he evolution of the doctrine ... has been one of fits-and-starts and zig-zags [and] has, not surprisingly, occasioned both confusion and disagreement among the federal circuit and district courts.' " *Schmeling,* 97 F.3d at 1339 (quoting *Burke v. Northwest Airlines, Inc.,* 819 F.Supp. 1352, 1356 (E.D.Mich.1993)).

FN32. Although AT & T and Sprint do not state that their argument is limited to the time period prior to detariffing, as noted above, courts universally agree that after detariffing the FCA does not completely preempt state law claims. Thus, to the extent that AT & T and Sprint argue that *Cahnmann* would continue to be good law after detariffing, the court rejects this argument.

FN33. Because the court can decide this issue even assuming the FCA completely preempts challenges to rates, terms, and conditions of interstate long distance service prior to detariffing, the court does

not reach plaintiffs' co-leads' argument that the overwhelming majority of courts (according to plaintiffs approximately 21) have found that, even before detariffing, the FCA did not completely preempt state law claims. *See, e.g., Smith v. GTE Corp.,* 236 F.3d 1292 (11th Cir.2001); *Marcus v. AT&T, Corp.,* 138 F.3d 46, 54 (2d Cir.1998).

2002 WL 31929179, --- F.Supp.2d ----, 2002 WL 31929179 (D.Kan.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Dallas Division.

MILANO HAT CO., et al., Plaintiffs,
v.
HADEN & CO., et al., Defendant.

No. Civ.A. 302CV2170-N.

Feb. 5, 2003.

*MEMORANDUM OPINION AND ORDER*

GODBEY, J.

*1 Before the Court are various motions by the parties generally concerning where their disputes will be resolved. Plaintiffs are Milano Hat Co. ("Milano"), Milano Hat Company, Inc., Pension Plan and Trust (the "Pension Plan"), Milano Hat Company, Inc. Target Benefit Plan and Trust (the "Target Benefit Plan"), and Milano Hat Company, Inc. Defined Benefit Trust (the "Old Plan"). Defendants Haden & Company ("H & CO") and its principal Charles M. Hayden, Jr. ("Hayden"). The Pension Plan and the Target Benefit Plan are qualified ERISA plans for employees of Milano. 29 U.S.C. §§ 1001, *et seq.* ("ERISA").

H & CO entered into an agreement with Plaintiffs to terminate the Old Plan and create and provide services for the Pension Plan and the Target Benefit Plan. Part of this transaction was memorialized in writing, to which Milano, the Pension Plan, the Target Benefit Plan, and H & CO were signatories (the "Written Agreement"). The Written Agreement contains an arbitration provision. Neither the Old Plan nor Hayden were signatories to the Written Agreement. Plaintiffs allege the existence of an oral agreement by H & CO to terminate the Old Plan. Although Plaintiffs allege both a written and oral agreement, Plaintiffs acknowledge those two agreements were part and parcel of a single transaction. *See, e.g.,* Plaintiffs' Original Petition ¶ 3.1 ("For the consideration expressed and other consideration, Defendants agreed to establish the two qualified plans and terminate the Old Plan (a defined contribution plan)."); Plaintiffs' Motion to Remand ¶ 1 (plaintiffs' complaints "related to Defendants' agreement to establish the Pension Plan and the Target Benefit Plan and to terminate the Old Plan.").

Plaintiffs were dissatisfied with H & CO's services. Accordingly, Plaintiffs sued H & CO and Hayden for breach of contract and various tort claims in County Court at Law No. 5, in Dallas County. Defendants removed to this Court, and moved to transfer venue to the Southern District of Texas and to stay proceedings pending arbitration. In the meantime, Defendants also commenced arbitration proceedings in Houston. Plaintiffs moved to remand this proceeding back to the state court and alternatively to stay the arbitration proceeding in Houston. The Court will address those motions in turn.

The Court first turns to Plaintiffs' motion to remand. Defendants' notice of removal relied on two grounds: ERISA preemption and federal question. In their briefing on the motion to remand, the parties focus on the federal question issue, and the Court will do likewise. Plaintiffs move to remand, arguing that their claims are all state law breach of contract and related tort claims, and present no federal question. Defendants argue that although the claims all arise out of the contractual relation, that contractual relation was centered on performing duties arising under ERISA, citing *Howery v. All State Ins. Co.,* 243 F.3d 912, 917 (5th Cir.2001). Plaintiffs reply that when only the damages are measured in relation to federal law, that incidental relation to ERISA does not support federal question jurisdiction, citing *Memorial Hospital System v. Northbrook Life Ins. Co.,* 904 F.2d 236, 247 (5th Cir.1990). [FN1]

> FN1. The cited portion of *Northbrook Life* deals with ERISA preemption, not federal question jurisdiction arising out of embedded federal law issues. In any event, the ERISA issues raised here go well beyond the measure of damages.

*2 *Howery* articulates a three-part test for deciding when federal question jurisdiction may arise out of "a question of federal law embedded in the matrix of state law": a "complaint also creates federal question jurisdiction when it states a cause of action created by state law and (1) a federal right is an essential element of the state claim, (2) interpretation of the federal right is necessary to resolve the case, and (3) the question of federal law is substantial. Ultimately, whether a federal issue embedded in the matrix of a state law claim will support federal question jurisdiction entails a pragmatic assessment of the nature of the federal interest at stake...." *Howery,* 243 F.3d at 917.

The instant case does not fit precisely within the guidelines of *Howery,* because it does not deal with a federal right, but rather a federal obligation. The contracts at issue required H & CO to provide on behalf of Plaintiffs services that Plaintiffs were required perform by ERISA. The essence of Plaintiffs' claims is that the services provided by H & CO did not meet the standards required by ERISA. The fact that the standard against which conduct is measured is a federal obligation, rather than a federal right, does not appear to be material under *Howery.*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Under the claims at issue here, (1) a federal obligation is an essential element of the state claim; (2) interpretation of the federal obligation is necessary to resolve the case, and (3) the question of federal law is substantial. A pragmatic assessment of the nature of the federal interest at stake suggests that this controversy is sufficiently federal in nature that federal jurisdiction should attach. Accordingly, Plaintiffs' motion to remand is denied.

The Court now turns to Defendants' motion to transfer venue pursuant to 28 U.S.C. § 1404(a). Defendants argue that all the witnesses and records relating to their performance are in the Southern District of Texas. Plaintiffs respond that all the witnesses and records relating to their side of the case are in Dallas, and that Dallas is the site of the alleged misrepresentations at issue. Aside from the plaintiffs' choice of forum, issues of convenience of the parties and witnesses and access to proof appear fairly evenly balanced. Adding the plaintiffs' choice of forum to the mix tips the balance firmly in favor of retaining venue in the Northern District of Texas. Accordingly, Defendants' motion to transfer is denied.

The Court now turns to the motions relating to arbitration. All parties appear agreed that *some* arbitration is required. The dispute is over which parties must arbitrate, and where. Plaintiffs argue that the Old Plan and Haden are not signatories to the Written Agreement, and so cannot be required to arbitrate. Both parties agree that the scope of the agreement to arbitrate is determined by Texas state contract law. Under Texas law, a person who is involved only as agent for a signatory to a agreement providing for arbitration may also compel arbitration of claims against him as agent. *McMillan v. Computer Translation Systems & Support, Inc.,* 66 S.W.3d 477, 481 (Tex.App.--Dallas 2001, no pet.) (conditionally granting mandamus against Godbey, J.). All of the claims against Haden are in his capacity as principal of H & CO. Therefore, claims by the signatory plaintiffs against Haden are subject to arbitration.

*3 The situation with regard to plaintiff Old Plan is a bit different. [FN2] Defendants argue that any oral agreement regarding Old Plan must be construed as part and parcel of the same transaction as the Written Agreement. Under Texas law, separate contracts that are part of the same transaction must be construed together. *Fort Worth Independent School District v. City of Fort Worth,* 22 S.W.3d 831, 840 (Tex.2000); *Jones v. Kelley,* 614 S.W.2d 95, 98 (Tex.1981). The fact that one of the agreements here is oral should not alter that result. As cited in the introductory factual background, Plaintiffs' original petition and motion to remand treat the Written Agreement and the alleged oral agreement regarding the Old Plan as a single agreement, and they are plainly part of a single overall transaction. Accordingly, the Court holds that any

agreement regarding the Old Plan is subject to the arbitration agreement contained in the Written Agreement. Defendants' motion to arbitrate is therefore granted.

> FN2. Under *Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 527 (5th Cir.2000), the theory of equitable estoppel can be invoked "when the signatory to the contract containing an arbitration clause raises allegations of a substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." (quoting *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 947 (11th Cir.1999)). While this would likewise appear to apply to Haden, it is pointing the wrong way to include Old Plan. Here, rather than a nonsignatory defendant invoking the arbitration agreement against a signatory, we have the case of signatory defendants attempting to invoke the arbitration agreement against a nonsignatory. Thus equitable estoppel against Old Plan, under *Grigson,* does not quite fit this case.

The last remaining piece is where the arbitration should proceed. Defendants argue that they already have something going down in Houston and should proceed there; they also argue that this Court does not have jurisdiction to stay arbitration proceeding outside this district under 9 U.S.C. § 4. Accepting that argument would seem to negate Plaintiffs' victory on the venue motion. More to the point, Defendants have asked this Court to "enforce the arbitration provision in the Agreement...." Defendants' Motion to Stay Proceedings Pending Arbitration ¶ 12. Under section 4 of the Federal Arbitration Act, if this Court is to order arbitration, it must order that within this district. Moreoever, regardless whether this Court has jurisdiction over a pending arbitration in another district, it certainly has jurisdiction over the parties before it. It is, therefore, ordered that all parties to this action must arbitrate their claims in this action in the Northern District of Texas, Dallas Division, and in no other location, and that this action is stayed pending the result of that arbitration.

SO ORDERED.

2003 WL 282450 (N.D.Tex.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1990 WL 112077                                                    Page 1
(Cite as: 1990 WL 112077 (E.D.Pa.))

**H**
Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

Anne Marie SMITH, Individually and on Behalf of Persons
Similarly Situated
v.
INDUSTRIAL VALLEY TITLE INSURANCE
COMPANY.
Gary VOLINER and Cindy VOLINER, h/w, Individually
and on Behalf of Persons
Similarly Situated
v.
CHICAGO TITLE INSURANCE COMPANY and
Professional Abstract and Assurance Corp.
May FRANKEL, Individually and on Behalf of a Class of
Persons Similarly
Situated
v.
CONTINENTAL TITLE INSURANCE COMPANY and
Legal Abstract Company.
Carolyn BURNS, as Executrix of the Estate of Juliette L.
Echols, Deceased, et
al.
v.
COMMONWEALTH LAND TITLE INSURANCE
COMPANY and Northwestern Abstract Company,
Inc.
**CIV. A. Nos. 90-2132, 90-2175, 90-2971 and 90-3856.**

Aug. 2, 1990.

Morris M. Shuster, Simon J. Denenberg, Morris M. Shuster,
P.C., Philadelphia, Pa., William D. Marvin, Baly Cynwyd,
Pa., for plaintiffs.

Franklin Poul, Martha E. Johnston, Philadelphia, Pa., for
Commonwealth Land Title Ins. Co., Northwestern Abstract
Co., Inc.

Patrick J. O'Connor, Richard C. Bennett, Philadelphia, Pa.,
for Industrial Valley Title Insurance Company.

Richard C. Bennett, Cozen & O'Connor, Philadelphia, Pa.,
for Continental Title Insurance Company.

Steven R. Waxman, Pamela L. Pentin, Fox, Rothschild,
O'Brien & Frankel, Philadelphia, Pa., for Chicago Title
Insurance Company.

Carl N. Martin, II, Philadelphia, Pa., for Professional
Abstract and Assurance Corp.

MEMORANDUM OF DECISION

McGLYNN, District Judge

*1 These actions were removed to this court in March,
April, and June 1990 and were later consolidated for pretrial
purposes. In each action, plaintiffs individually and on
behalf of a class of similarly situated persons allege that
they were charged real estate reporting fees in violation of
Section 6045 of the Internal Revenue Code (I.R.C.).
Plaintiffs contend that they are entitled, as a consequence of
such violations, to recover damages against defendants
under various state-law causes of action. The question
before the court is whether the actions fail to arise under
federal law and should be remanded to the Court of
Common Pleas of Philadelphia County pursuant to 28
U.S.C.A. § 1447(c). [FN1] Because the court concludes that
a substantial, disputed question concerning Section 6045
forms a necessary element of each of the state-law causes of
action, the court has subject matter jurisdiction pursuant to
28 U.S.C.A. § 1331, and plaintiffs' motions to remand will
be denied.

BACKGROUND AND PROCEDURAL HISTORY

The complaints in each of the four actions were filed in the
Court of Common Pleas of Philadelphia County in March
1990. Each complaint avers that,since November 1988,
individual defendant title insurance companies and their
agents have been "real estate reporting persons" under
I.R.C. § 6045. [FN2] As real estate reporting persons,
defendants, when involved in a real estate transaction, are
required by Subsections 6045(a) and (b) of the Internal
Revenue Code to file an information return with the federal
government and to send I.R.S. Form 1099 payee statements
to transferor-customers. Subsection 6045(e)(3) of the Code,
effective November 10, 1988 as Section 1015 of the
Technical and Miscellaneous Revenue Act of 1988,
provides:

*Prohibition of separate charge for filing return.*--It shall be
unlawful for any real estate reporting person to separately
charge any customer for complying with any requirement of
paragraph (1).

I.R.C. § 6045(e)(3) (West Supp.1990). According to
plaintiffs, that subsection makes it illegal for a real estate
reporting person to charge *any fee* for compliance with the
reporting requirements of Section 6045. *See* Smith
Complaint ¶ 8; Voliner Complaint ¶ 12; Frankel Complaint
¶ 12; Burns Complaint ¶ 12.

Plaintiffs and the members of the class of persons that they
seek to represent were parties to real estate transactions that
were consummated after November 10, 1988 and that
involved one or more of the defendants as title insurers or
settlement agents. Plaintiffs aver that defendants charged
fees arising out of those transactions for fulfilling the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

reporting requirements of Section 6045. See Smith Complaint ¶ 13; Voliner Complaint ¶ 17; Frankel Complaint ¶ 17; Burns Complaint ¶ 17. Such fees, plaintiffs allege, were "contrary to law." See Smith Complaint ¶¶ 15, 17, 18, 23, 46; Voliner Complaint ¶¶ 19, 21, 22, 27, 50; Frankel Complaint ¶¶ 19, 21, 22, 27, 50; Burns Complaint ¶¶ 19, 21, 22. Plaintiffs therefore seek to recover damages both for themselves and for prospective class members under Pennsylvania common-law causes of action for conversion, unjust enrichment, and money had and received, as well as under the Pennsylvania Unfair Trade Practice and Consumer Protection Law (UTPCPL), 73 Pa.Cons.Stat.Ann. § 201-1 *et seq.* (Purdon Supp.1990).

*2 An essential element of each of those state-law causes of action is a showing of wrongful, illegal conduct. Under Pennsylvania law, "A conversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent *and without lawful justification*." *Stevenson v. Economy Bank of Ambridge,* 413 Pa. 442, 451, 197 A.2d 721, 726 (1964) (emphasis added); *accord Schonberger v. Oswell,* 365 Pa.Super. 481, 484, 530 A.2d 112, 114 (1987). Money may be the subject of conversion. *Schonberger,* 365 Pa.Super. at 484, 530 A.2d at 114. To sustain a claim of unjust enrichment,

[A] claimant must show that the party against whom recovery is sought either "*wrongfully secured* or passively received a benefit that it would be unconscionable for her to retain." "In order to recover, there must be *both* (1) an enrichment, and (2) *an injustice resulting* if recovery for the enrichment is denied."

*Torchia v. Torchia,* 346 Pa. Super. 229, 233, 499 A.2d 581, 582-83 (1985) (citations omitted) (emphasis added); *accord Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir.1987). Additionally, with regard to a claim for money had and received, "where one has ... money which in equity and good conscience *belongs and ought to be paid to another,* an action for money had and received will lie for the recovery thereof." *First National Bank v. Carroll Township,* 150 Pa.Super. 241, 246, 27 A.2d 527, 530 (1942) (emphasis added). " '[A] person is not permitted to profit by *his own wrong* at the expense of another.' ... By 'wrong' is meant ... *the violation of another's legal right.*" *Greek Catholic Congregation of Borough of Olyphant v. Plummer,* 347 Pa. 351, 353, 32 A.2d 299, 300 (1943) (emphasis added).

Finally, the Pennsylvania UTPCPL expressly provides a private cause of action to remedy "a method, act or practice declared *unlawful* by section 3 of [the] act." 73 Pa.Cons.Stat.Ann. § 201-9.2 (Purdon Supp.1990) (emphasis added). Section 3 of the UTPCPL declares *unlawful* the

seventeen "unfair methods of competition" and "unfair or deceptive acts or practices" set forth in the subclauses of clause (4) of section 2 of the act, among which is subclause (xvii). That subclause proscribes "Engaging in any ... *fraudulent conduct* which creates a likelihood of confusion or of misunderstanding." *See* 73 Pa.Cons.Stat.Ann. §§ 201-2(4), 201-3 (Purdon Supp.1990) (emphasis added); *see also Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 480, 329 A.2d 812, 826-27 (1974) (the phrase "fraudulent conduct" should be construed broadly to make all "mischief caused by unfair and deceptive market practices" unlawful).

In their notices of removal that were filed in March, April, and June 1990, defendants aver the following: that plaintiffs' causes of action are "premised upon ... allegation[s] that defendant[s] violated a federal statute, 26 U.S.C. § 6045"; that the court, consequently, has original jurisdiction under 28 U.S.C. § 1331; and that removal was, therefore, proper under 28 U.S.C. § 1441. [FN3] Plaintiffs responded with their motions to remand, in which they contend that no federal remedy is involved in the actions, that the complaints are not well-pleaded, that the language of Subsection 6045(e)(3) is unambiguous, and that, as a result, plaintiffs' claims do not arise under federal law. Hence, plaintiffs assert, removal was improper.

## DISCUSSION

*3 The jurisdiction of the federal courts is limited. "[T]he fair presumption is ... that a cause is without [the] jurisdiction [of the court], until the contrary appears." *Turner v. Bank of North Am.,* 4 Dall. 8, 10, 1 L.Ed. 718, 719 (1799). Moreover, when a party wishes to remove a case from state to federal court, the removal statute has been strictly interpreted. *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 61 S.Ct. 868, 85 L.Ed. 1214 (1941); *see also Donofry v. Nazareth Hosp.,* 721 F.Supp. 732, 733-34 (E.D.Pa.1989).

Removal of civil actions from state to federal court is governed by 28 U.S.C.A. § 1441 (West 1973 & Supp.1990). Section 1441(a) provides in part:

Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants[ ] to the district court of the United States for the district and division embracing the place where such action is pending.

There is no diversity of citizenship between the parties to any of the instant actions. Therefore, original jurisdiction must rest on a federal question. *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987); *see also Krashna v. Oliver Realty, Inc.,* 895 F.2d

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1990 WL 112077                                                         Page 3
(Cite as: 1990 WL 112077 (E.D.Pa.))

111, 113 (3d Cir.1990).

Under the federal-question statute, the district courts have original jurisdiction of all civil actions "arising under the ... laws ... of the United States." 28 U.S.C. § 1331. As the Supreme Court has stated, "[e]specially when considered in light of ... § 1441[ ][,] the phrase 'arising under' *masks a welter of issues regarding the interrelation of federal and state authority and the proper management of the federal judicial system.* " *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 8, 103 S.Ct. 2841, 2846, 77 L.Ed.2d 420, 430 (1983); *accord Merrell Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. 804, 808, 106 S.Ct. 3229, 3232, 92 L.Ed.2d 650, 658 (1986). "In order for a case to be removable under § 1441 and § 1331, the well-pleaded complaint rule requires [that] the federal question be presented on the face of the *plaintiff's* properly pleaded complaint." *Railway Labor Executives Ass'n v. Pittsburgh & L.E.R.R.,* 858 F.2d 936, 939 (3d Cir.1988) (emphasis added) (citations omitted); *see Caterpillar,* 482 U.S. at 392, 107 S.Ct. at 2429, 96 L.Ed.2d at 327. "The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar,* 482 U.S. at 392, 107 S.Ct. at 2429, 96 L.Ed.2d at 327. It follows that an action may not be removed on the basis of a federal defense, even if the defense is anticipated in the complaint. *Id.* at 393, 107 S.Ct. at 2430, 96 L.Ed.2d at 327; *see Krashna,* 895 F.2d at 113.

A line of Supreme Court authority nevertheless establishes that a limited class of claims brought under state-law causes of action may "arise under" federal law "if vindication of the state right necessarily turns upon construction of a substantial question of federal law, i.e., if federal law is a necessary element of one of the well-pleaded [state-law] claims." *Ulramar Am. Ltd. v. Dwelle,* 900 F.2d 1412, 1414 (9th Cir.1990). That line of authority bears directly on whether plaintiffs' claims arise under federal law in these actions.

*4 In 1916, Justice Holmes stated his now familiar definition of the statutory "arising under" limitation: "A suit arises under the law that creates the cause of action." *American Well Works Co. v. Layne & Bowler Co.,* 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987, 989 (1916). That test, which describes the vast majority of cases coming within the district courts' original jurisdiction (those in which the plaintiff states a federal cause of action), has since been found to be more helpful as an inclusionary than as an exclusionary test. *See, e.g., Franchise Tax Board,* 463 U.S. at 9, 103 S.Ct. at 2846, 77 L.Ed. 2d at 430.

To be sure, in *Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921), the Court rejected the Holmes test as a limit on federal-question jurisdiction where federal law was indirectly involved in well-pleaded state-law causes of action. In that case, a shareholder sued the defendant corporation, its directors and officers, to enjoin the corporation from investing funds in farm loan bonds. Banks had issued such bonds under authority of the Federal Farm Loan Act of 1916. The shareholder sought his state-law injunctive relief on the grounds that the Act was unconstitutional and that the bonds were, consequently, illegal; he contended that the corporation could invest only in legal securities. The directors responded that the Act was constitutional and that the investment was legal and would be favorable to the corporation. Because no diversity of citizenship existed between the parties, the Court confronted the issue whether the action arose under federal law and was countenanced by the predecessor statute to 28 U.S.C. § 1331, Judicial Code § 24.

In holding that the action did arise under the Constitution and laws of the United States, the Court reasoned:

The general rule is that, where it appears from the bill or statement of the plaintiff that the *right to relief depends upon the construction or application of the Constitution or laws of the United States,* and that such Federal claim is *not merely colorable,* and rests upon a reasonable foundation, the district court has jurisdiction.... It is ... apparent that the controversy concerns the constitutional validity of an act of Congress which is *directly drawn in question.* The decision *depends upon the determination of* this issue.

*Smith,* 255 U.S. at 199, 201, 65 L.Ed. at 585, 586 (emphasis added).

Thirteen years after *Smith,* the Supreme Court addressed the question whether a district court has original jurisdiction *whenever* a plaintiff pleads a state-law cause of action that incorporates a federal-law element. In *Moore v. Chesapeake & Ohio Railway Co.,* 291 U.S. 205, 54 S.Ct. 402, 78 L.Ed. 755 (1934), the plaintiff switchman alleged that he had been injured while working on railroad tracks used in interstate commerce. The use of the tracks in interstate commerce made the Federal Employers' Liability Act (FELA) and the Federal Safety Appliance Acts apply of their own force in administrative actions; those statutes did not, however, provide private civil remedies. The plaintiff therefore additionally alleged that he had been involved in intrastate commerce when injured, and he sued under the Kentucky Employers' Liability Act and the Federal Safety Appliance Acts. Before the Court were venue questions and the question whether jurisdiction was based only upon diversity of citizenship or also upon claims arising under the Federal Safety Appliance Acts.

*5 The Kentucky Act, which created a state-law remedy for the plaintiff's injury, provided that "no employee should be

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

held 'to have been guilty of contributory negligence' or 'to have assumed the risk of his employment' in any case 'where the violation by [the] common carrier *of any statute, state or Federal,* enacted for the safety of employees, contributed to the injury or death of such employee.' " *Moore,* 291 U.S. at 212-13, 54 S.Ct. at 404-05, 78 L.Ed. at 761 (emphasis added). The Court concluded that "the Federal Safety Appliance Acts were manifestly embraced in this description" and that a violation of those Acts "was to constitute negligence per se in applying the [Kentucky Act] and was to furnish the ground for precluding the defense of contributory negligence as well as that of assumption of risk." *Id.*

In holding that the only basis for jurisdiction in the suit was diversity of citizenship, the Court stated:

Questions arising in actions in state courts to recover for injuries sustained by employees in intrastate commerce and relating to the scope or construction of the Federal Safety Appliance Acts are, of course, Federal questions which may appropriately be reviewed *in this* [Supreme] *Court.* But it does not follow that a suit brought under the state statute which defines liability to employees who are injured while engaged in intrastate commerce, and brings within the purview of the statute a breach of the duty imposed by the Federal statute, should be regarded as a suit arising under the laws of the United States and cognizable in the Federal court in the absence of diversity of citizenship.

*Id.* at 214, 78 L.Ed. at 762 (citations omitted) (emphasis added); *see Kravitz v. Homeowners Warranty Corp.,* 542 F.Supp. 317, 319 (E.D.Pa.1982) (speculating that *Moore* may be explained as a case in which the complaint was not well-pleaded: that is, violations of the Federal Safety Appliance Acts were pleaded in order to anticipate the defendant's defenses of contributory negligence and assumption of risk).

In its "arising under" decisions that followed *Moore,* the Court expanded upon the *Smith* rule but declined to reconcile explicitly that rule with the holding in *Moore.* For example, in *Gully v. First National Bank,* 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936), the Court reasoned that to bring a case within the purview of § 1331,

a right or immunity created by the Constitution or laws of the United States must be an *element,* and an *essential one,* of the plaintiff's cause of action.... [The case must] *really and substantially involve[ ] a dispute or controversy respecting the validity, construction or effect of ... a law [of the United States], upon the determination of which the result depends.*

\* \* \*

This Court has had occasion to point out how futile is the

attempt to define a "cause of action" without reference to the context. To define broadly and in the abstract "a case arising under the Constitution or laws of the United States" has hazards of a kindred order. What is needed is something of that common-sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation.... [T]here has been a selective process which *picks the substantial causes out* of the web and lays the other ones aside. As in problems of causation, so here in the search for the underlying law. If we follow the ascent far enough, countless claims of right can be discovered to have their source or their operative limits in the provisions of a federal statute or in the Constitution itself.... To set bounds to the pursuit, *the courts have formulated the distinction between controversies that are basic and those that are collateral, between disputes that are necessary and those that are merely possible.* We shall be lost in a maze if we put that compass by.

\*6 *Gully,* 299 U.S. at 112, 114, 117, 81 L.Ed. at 72, 73, 74-75 (citations omitted) (emphasis added); *accord Lindy v. Lynn,* 501 F.2d 1367, 1369 (3d Cir.1974) (action arises under federal law if complaint seeks a remedy that requires the construction of a federal statute).

The "eye to practicality and necessity" with which the Court in *Gully* viewed § 1331 remained open in *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). Writing for the majority in *Franchise Tax Board,* Justice Brennan stated that, because state law created the causes of action under which the plaintiff sought recovery, "original federal jurisdiction is unavailable unless it appears that *some substantial, disputed question of federal law is a necessary element* of one of the well-pleaded state claims...." *Franchise Tax Board,* 463 U.S. at 13, 103 S.Ct. at 2848, 77 L.Ed.2d at 433 (emphasis added). A substantial question of federal law concerning the Employee Retirement Income Security Act (ERISA) was apparent from the face of the plaintiff's complaint. Justice Brennan nonetheless concluded for the majority that the complaint suggested "many reasons completely unrelated to the provisions and purposes of ERISA why the [plaintiff] may or may not be entitled to the relief it seeks." *Id.* at 25-26, 103 S.Ct. at 2855, 77 L.Ed.2d at 441. Thus, the ERISA question was not a "necessary element" of the well-pleaded state-law claims, and the district court did not have federal-question jurisdiction. *Accord Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 808, 108 S.Ct. 2166, 2173, 100 L.Ed.2d 811, 825 (1988) (in an action involving § 1338 "arising under" jurisdiction, Court quoted with approval language from *Franchise Tax Board* finding federal-question jurisdiction where "plaintiff's right to relief depends necessarily on resolution of a substantial question of federal law, in that federal law is a necessary element of one of the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

well-pleaded ... claims").

Although it clarified the test for "arising under" jurisdiction, Justice Brennan's *Franchise Tax Board* opinion was not the final word on that test. Indeed, all roads in the Court's indirect federal-question jurisprudence eventually intersect in *Merrell Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986), a somewhat delphic 5 to 4 decision from which Justice Brennan dissented. In *Merrell Dow,* plaintiffs had alleged in two separate complaints that children had been born with deformities resulting from their mothers' ingestion of the drug Bendectin during pregnancy. In five of the six counts in each complaint, recovery was sought against the manufacturer of the drug on state common-law theories of negligence, breach of warranty, strict liability, fraud, and gross negligence. In the other count, the plaintiffs alleged that Bendectin was "misbranded" in violation of the Federal Food, Drug, and Cosmetic Act (FDCA). Such misbranding, they alleged, "constitute[d] a rebuttable presumption of negligence." Assuming that the FDCA did not provide a private federal remedy for the alleged violation, the Court framed the question with which it was presented as "whether the incorporation of a federal standard in a state-law private action, when Congress has intended that there not be a federal private action for violations of that federal standard, makes the action one 'arising under the Constitution, laws, or treaties of the United States....' " *Merrell Dow,* 473 U.S. at 805, 106 S.Ct. at 3230, 92 L.Ed.2d at 656.

*7 Reciting the "need for [the same] prudence and restraint" in its jurisdictional inquiry that had characterized its approach in *Franchise Tax Board,* the Court found of telling importance its assumption that Congress had not provided a private federal remedy for violations of the FDCA. The Court stated that, just as providing a federal remedy for violation of the statute would "flout Congressional intent," so would that intent be similarly flouted were federal courts allowed to exercise federal-question jurisdiction over state-law causes of action that simply made violation of the FDCA a "rebuttable presumption of negligence." *Id.* at 812, 106 S.Ct. at 3234, 92 L.Ed.2d at 661.

But the Court did not set forth a bright-line rule that federal courts are without federal-question jurisdiction whenever such jurisdiction hinges upon a state-law cause of action with a federal-law element for which Congress has provided no private remedy. Instead, in footnotes and in its textual response to the plaintiffs' arguments in support of jurisdiction, the Court cautiously demarcated a faint boundary at the frontier of federal-question jurisdiction that embraces a limited class of such actions.

In response to the plaintiffs' reliance on the statement in

*Franchise Tax Board* that federal-question jurisdiction is appropriate when "it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims," the *Merrell Dow* Court reasoned:

*Franchise Tax Board* ... did not purport to disturb the long-settled understanding that the *mere presence* of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction.

*Id.* at 813, 106 S.Ct. at 3234, 92 L.Ed.2d at 661 (emphasis added). The Court elaborated upon the meaning of "mere presence" in a footnote in which it quoted from *Gully* and from Justice Frankfurter's dissenting opinion in *Textile Workers v. Lincoln Mills,* 353 U.S. 448 (1957). From Justice Frankfurter's dissent, the Court borrowed the following definition of its jurisdictional inquiry: "the degree to which federal law must be in the forefront of the case and not collateral, peripheral or remote." *Id.* at 813 n. 11, 106 S.Ct. at 3234 n. 11, 92 L.Ed.2d at 661 n. 11 (quoting *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 470, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (Frankfurter, J., dissenting)). From *Gully,* the Court repeated the distinction "between controversies that are basic and those that are collateral, between disputes that are necessary and those that are merely possible." *Id.* The Court then echoed the emphasis in *Franchise Tax Board* and *Gully* on "principled, pragmatic distinctions" and on picking "the *substantial* causes out of the web and lay[ing] the other ones aside." *Id.* at 813-14, 106 S.Ct. at 3234-35, 92 L.Ed.2d at 662.

Finally, the Court set forth its carefully worded, fact-specific conclusion:

*8 We simply conclude that the congressional determination that there should be no federal remedy for the violation of this federal statute is tantamount to a congressional conclusion that *the presence* of a claimed violation of the statute as an element of a state cause of action is *insufficiently "substantial"* to confer federal-question jurisdiction.

*Id.* at 814, 106 S.Ct. at 3235, 92 L.Ed.2d at 662 (emphasis added). Light was shed on the meaning of that conclusion and its use of the words "presence" and "substantial" in footnote 12 of *Merrell Dow,* in which the Court intimated that its § 1331 decisions can best be understood as an evaluation of the "nature" of the "federal interest" at stake. As the Court stated,

Focusing on the nature of the federal interest ... suggests that the widely perceived "irreconcilable" conflict between the finding of federal jurisdiction in *Smith* ... and the finding of no jurisdiction in *Moore* ... is far from clear. *For the difference in results can be seen as manifestations of the differences in the nature of the federal issues at stake.* In

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*Smith* ... the issue was the constitutionality of an important federal statute. In *Moore* ... the violation of the federal standard ... did not fundamentally change the *state tort nature* of the action.

*Id.* at 814-15 n. 12, 106 S.Ct. at 3235 n. 12, 92 L.Ed.2d at 662 n. 12 (citations omitted) (emphasis added). *See also id.* at 820, 106 S.Ct. at 3238, 92 L.Ed.2d at 666 (Brennan, J., dissenting) ("The continuing vitality of *Smith* is beyond challenge"). Thus, in *Merrell Dow* the FDCA element was "merely present" in the plaintiffs' complaints, and the actions did not arise under federal law for the following reasons: the actions remained "state" in nature; relief could have been granted solely on state-law grounds; federal law served insubstantially as a rebuttable presumption of negligence in only one of the six counts of each complaint; and Congress had not provided a federal remedy for violations of that federal law.

Indirect federal-question jurisdiction cases that have been decided in the wake of *Merrell Dow* have recognized the continuing vitality of the *Smith- Gully-Franchise Tax Board* "arising under" test and have been guided by *Merrell Dow's* charge to the federal courts to examine "the *nature* of the federal interest at stake" to determine whether a state-law cause of action that relies in part on federal law can "arise under" federal law for jurisdictional purposes. *See e.g., Ultramar Am. Ltd. v. Dwelle,* 900 F.2d 1412, 1414 (9th Cir.1990) (concluding that alternative theories of relief, each not dependent upon federal law, existed for each claim alleged in complaint, and therefore there was no federal-question jurisdiction because right to relief did not *necessarily depend* upon construction of substantial question of federal law); *Milan Express Co. v. Western Surety Co.,* 886 F.2d 783, 788- 89 (6th Cir.1989) (distinguishing *Merrell Dow,* in which "plaintiffs failed to prove that their relief *depended necessarily* on a substantial question of federal law" and in which "no specific and compelling federal interest was demonstrated," from the case before it in which a finding of federal-question jurisdiction was "entirely consistent with the specific federal interest in the protection of motor carriers and the historical federal interest in the regulation of interstate commerce); *Donofry v. Nazareth Hosp.,* 721 F.Supp. 732, 734-35 (E.D.Pa.1989) (court did not have jurisdiction where it would not have to pass upon the validity, construction, or effect of the federal law to decide the case, and where the rights claimed by the plaintiffs would not be altered by the court's construction of the federal law); *Glass Molders Int'l Union v. Wickes Co.,* 707 F.Supp. 174, 179-80 (D.N.J.1989) (action did not arise under federal law where plaintiffs' complaint clearly did not place exclusive reliance on federal law, federal law was not a "necessary element" of the complaint, and, in light of *Merrell Dow,* the "nature" of the interest at stake was not significantly federal); *Wilkinson v.*

*United States,* 724 F.Supp. 1200, 1203-04 (W.D.N.C.1989) (in action brought under state law to quiet title, the construction of federal law concerning the validity and priority of an I.R.S. tax lien was the "central issue" raised in the complaint, and court exercised federal-question jurisdiction, but court cited no Supreme Court cases); *cf. Kravitz v. Homeowners Warranty Corp.,* 542 F.Supp. 317, 319 (E.D.Pa.1982) (decided before *Franchise Tax Board* and *Merrell Dow,* and declining to exercise federal-question jurisdiction where "the *essential Pennsylvania elements* of [the] suit ... would be more appropriately dealt with by" the state court). *But see Willy v. Coastal Corp.,* 855 F.2d 1160, 1168 (5th Cir.1988) (reading *Merrell Dow* to hold that the existence of a private federal remedy is a necessary predicate to determining that the presence of a federal element in a state-created cause of action results in that cause of action being one that arises under federal law).

**\*9** For purposes of this decision, the court will assume that the Internal Revenue Code does not provide a private remedy for violations of Subsection 6045(e)(3). [FN4] Even with that assumption, the court concludes that it has federal-question jurisdiction over these four actions.

In each action, the alleged violations of Subsection 6045(e)(3) are not "merely present" in the state-law causes of action. In order for the plaintiffs to recover under Pennsylvania common-law causes of action for conversion, unjust enrichment, and money had and received, as well as under the UTPCPL, the plaintiffs must prove that defendants charged a reporting fee that violated Section 6045. Hence, a violation of Section 6045 is a necessary element of each of plaintiffs' well-pleaded state-law causes of action, and is in the forefront of the plaintiffs' complaints.

Moreover, the meaning of Subsection 6045(e)(3) is in dispute between the parties. The plaintiffs' right to relief necessarily depends upon whether the Court construes that provision to prohibit the charging of *any* fee for real estate reporting costs and services, *or* only a "separate" fee--for example, a fee for filing an information return and sending a payee statement that is separate from a fee for preparing that return and statement. Thus, the dispute between the parties over the meaning of Subsection 6045(e)(3) and its use of the word "separate" is not merely possible or collateral. That dispute is the core of these actions. Whether defendants will be found to have violated Section 6045 depends upon the court's resolution of that dispute.

Finally, the dispute over the meaning of Subsection 6045(e)(3) is substantial in *nature.* To be sure, Section 6045 is invested with a weighty federal interest: Congress has mandated that the I.R.S. and parties to real estate transactions be provided with accurate information returns and payee statements setting forth clearly certain details of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

the transactions that might bear on the amount of a taxpayer-transferor's taxable income. Significantly, information statements put a transferor on notice both that the I.R.S. has been provided with a Form 1099 concerning a real estate transaction in which the transferor has been involved and that the transferor might be required to report the specific items listed in that form on his annual return. By enacting Subsection 6045(e)(3), Congress has concluded that the charging of a fee for fulfilling the reporting requirements of Section 6045 may affect the accuracy, regular filing, and distribution of those important statements and returns. This court's determination of the extent to which defendants, as real estate reporting persons, can charge for fulfilling the requirements of Section 6045 will therefore directly impact upon the specific federal interest in ensuring accurate, regular filings of real estate reporting documents.

Thus, a substantial question concerning Section 6045 is a necessary element of the plaintiffs' well-pleaded state-law claims and is in dispute between the parties. Accordingly, with an eye to practicality, necessity, the proper relation of state and federal courts, and the proper management of the federal system, the court concludes that the exercise of federal-question jurisdiction over these actions is appropriate under § 1331 and § 1441.

### CONCLUSION

*10 For the reasons stated above, plaintiffs' motions to remand these actions to the Court of Common Pleas of Philadelphia County will be denied.

### ORDER

AND NOW, this 2nd day of August, 1990, upon consideration of the motions of the plaintiffs to remand these four actions to the Court of Common Pleas of Philadelphia County and the defendants' responses thereto, and for the reasons set forth in the accompanying memorandum, it is

ORDERED

that the motions are DENIED.

> FN1. That subsection of title 28 provides:
> A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under section 1446(a). *If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.* An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a

result of the removal. A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.
28 U.S.C.A. § 1447(c) (West Supp.1990) (emphasis added).

FN2. Section 6045 provides in part:
(a) *General Rule.*--Every person doing business as a broker shall, when required by the Secretary, make a return, in accordance with such regulations as the Secretary may prescribe, showing the name and address of each customer, with such details regarding gross proceeds and such other information as the Secretary may by forms or regulations require with respect to such business.
(b) *Statements to be furnished to customers.*--Every person required to make a return under subsection (a) shall furnish to each customer whose name is required to be set forth in such return a written statement showing--
(1) the name and address of the person required to make such return, and
(2) the information required to be shown on such return with respect to such customer.
The written statement required under the preceding sentence shall be furnished to the customer on or before January 31 of the year following the calendar year for which the return under subsection (a) was required to be made.

* * *

(e) *Return required in the case of real estate transactions.*--
(1) *In general.*--In the case of a real estate transaction, the real estate reporting person shall file a return under subsection (a) and a statement under subsection (b) with respect to such transaction.
(2) *Real estate reporting person.*--For purposes of this subsection, the term "real estate reporting person" means any of the following persons involved in a real estate transaction in the following order:
(A) the person (including any attorney or title company) responsible for closing the transaction,
(B) the mortgage lender,
(C) the seller's broker, (D) the buyer's broker, or
(E) such other person designated in regulations prescribed by the Secretary.
26 U.S.C. § 6045.

FN3. Defendants did not rely upon either 28 U.S.C. § 1337 or 28 U.S.C. § 1340 as grounds for the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

court's subject matter jurisdiction.

FN4. The Code provides that persons who do not comply with Subsection 6045(e) and fail to file an information return or payee statement must pay a civil penalty. I.R.C. §§ 6721, 6722. Those persons who fail to include correct information in such returns and statements are likewise required to pay a civil penalty. I.R.C. § 6723. Additionally, Section 7203 of the Code provides criminal penalties for willful failures to file returns or to supply information. I.R.C. § 7203. While Subchapter B of Chapter 76 of the Code expressly provides various private civil remedies to taxpayers and third parties, none of the sections in that subchapter provides an express private civil remedy for violations of Subsection 6045(e)(3).

Given the presence of civil remedy provisions in the Code and the absence of an express private remedy provision for violations of Subsection 6045(e)(3), my assumption that there is no implied private cause of action in the Code for such violations rests on firm ground. As the Supreme Court has stated, "Where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146, 154-55 (1979); *accord Lechtner v. Brownyard,* 679 F.2d 322, 326 (3d Cir.1982). Although the Supreme Court has stated that, in attempting to ascertain whether an implied private remedy exists under a federal statute, a court should analyze the four factors first identified in *Cort v. Ash,* 422 U.S. 66 (1975), the Court has also stated that the second *Cort* factor--Congressional intent--is determinative in such analyses, with the remaining factors merely indicative of the presence or absence of Congressional intent. *Transamerica Mortgage Advisors, Inc.,* 444 U.S. at 23, 100 S.Ct. at 249, 62 L.Ed.2d at 157; *Thompson v. Thompson,* 484 U.S. 174, 188-90, 108 S.Ct. 513, 521, 98 L.Ed.2d 512, 526 (1988) (Scalia, J., concurring); *accord Bakerstown Container Corp. v. International Bhd. of Teamsters,* 884 F.2d 105, 108 n. 2 (3d Cir.1989).

I have found no basis in the Code, the regulations, or the legislative history for concluding that Congress intended there to be an implied private federal remedy for violations of Subsection 6045(e). *See* 26 C.F.R., Part I, § 1.6045-3T (1989); 1988 U.S.CODE CONG. & ADMIN.NEWS 4515, 4530, 100th Cong., 2d Sess., vol. 6 ("The technical correction titles ... contain clerical, conforming amendments ... [and] are meant to carry out the intent of Congress in enacting the original [Tax Reform Act of 1986]. Therefore, no separate "Reasons for Change" is set forth for each individual amendment."). Without looking to the three additional *Cort* factors, therefore, I assume that no implied private remedy exists for violations of Subsection 6045(e)(3).

1990 WL 112077, 1990 WL 112077 (E.D.Pa.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

## TABLE OF CONTENTS

Page

A.  Defendants Have Failed To Meet Their Burden of Demonstrating That This Court
    Has Jurisdiction Over Plaintiff's State Law Claims Under GBL § 349 and Exec.
    Law § 63(12). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B.  The Federal Government Does Not Have a Significant Interest in National
    Uniformity in the Implementation of the Medicare Program. . . . . . . . . . . . . . . . . . 8

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Exhibit A, Unpublished Opinion

*People of the State of New York v. General Electric Co., Inc.*, 2003 N.Y. App. Div. LEXIS 1794
(1st Dept. February 27, 2003)

## **INTRODUCTION**

Defendants' opposition to remanding this action to state court fails for the following reasons.[1]

First, defendants contend that the meaning of the terms "average wholesale price" presents a substantial federal question that justifies the assertion of federal subject matter jurisdiction. However, two of the three defendants, GlaxoSmithKline ("GSK") and Aventis, do not even report "average wholesale prices." The complaints allege that these two defendants report wholesale acquisition cost, not average wholesale price, to the price reporting services. The term "wholesale acquisition cost" is not found in the federal Medicare statute. There is, therefore, no federal question with respect to the claims asserted by plaintiffs, the People of the State of New York ("State"), against these two defendants.

Second, in asserting that federal law is an "essential" element of the State's claims, defendants misstate or ignore the substance of the specific causes of action the State asserts. The State's claims are based entirely on state law. The State alleges that the fictitious wholesale prices reported by the defendants are deceptive under GBL § 349 and fraudulent under Exec. Law § 63(12). Defendants' assertion that Congress has approved the fictitious "wholesale" prices

---

[1]It should also be noted that defendants Pharmacia Corporation ("Pharmacia") and Aventis Pharmaceuticals, Inc. ("Aventis") have relinquished their assertion of federal jurisdiction based on federal Medicaid statutes, which they had asserted in their removal notices.

that they report is, at best, merely a defense to the State's fraud and deception claims, and as such can not create federal question jurisdiction.

Third, the cases defendants cite to support their assertion that the State's claims turn on federal law actually support remand. They all involve claims that derive directly from a right, obligation or relationship created by federal law, and no such federally created right, obligation or relationship exists between drug manufacturers and Medicare beneficiaries.

Fourth, Congress's actions belie a strong federal interest in national uniformity in the implementation of the Medicare Act, and the absence of such an interest has been confirmed by the federal courts, including the Second Circuit. Specifically, Congress has placed the responsibility for determining Medicare reimbursement amounts, which are based on average wholesale price, with multiple private carriers. 42 U.S.C. § 1395u(o). In New York alone, there are four such private entities, and each operates independently.

## ARGUMENT

**A.    Defendants Have Failed To Meet Their Burden of Demonstrating That This Court Has Jurisdiction Over Plaintiff's State Law Claims Under GBL § 349 and Exec. Law § 63(12)**

In *Foy v. Pratt & Whitney Group*, 127 F.3d 229, 233 (2d Cir. 1997), the Second Circuit held that to determine whether a state law claim requires an interpretation of federal law, a court must begin with an analysis of the state law claims. Defendants, however, ignore the State's actual claims and baldly assert, "The State will have the burden of establishing that its interpretation of the statutory term [average wholesale price] is correct in order to prove that the prices reported by defendants were fraudulent or deceptive." (Def. Mem. Opp. Rem., at 5-6.) This approach disregards the Second Circuit's analytical framework and good sense. Until the elements of the state law claim are identified and described, it is impossible to tell whether federal law is an element of the claim or if it might be relevant only as a defense. This is a critical question because a defense cannot create federal-question jurisdiction. *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470 (1998).

In this case, the issue of whether defendants' reported wholesale prices are deceptive is straightforward and does not require reference to any federal standard. Defendants' reported wholesale prices are false because they bear no relationship either to the price middlemen pay defendants or to the price physicians, other healthcare providers and pharmacists actually pay to purchase these drugs. Indeed, defendants' reported "wholesale" prices do not represent or even approximate any actual price paid by or to wholesalers. Defendants' reporting of fictitious wholesale prices constitutes a deceptive and fraudulent business practice within the meaning of GBL § 349 and Exec. Law § 63(12), neither of which requires proof of fraudulent intent, reliance or actual consumer injury. *See, e.g., Oswego Laborers' Local 214 Pension Fund v Marine*

*Midland Bank*, 85 N.Y.2d 20, 27 (1995); *People v. General Electric* Co., *Inc.*, 2003 N.Y. App. Div. LEXIS 1794 (1st Dept. Feb. 27, 2003), at *4-5.

Defendants' base their assertion of federal jurisdiction entirely on their argument that to resolve the State's entitlement to relief under its purely state law claims, the Court will have to interpret the term "average wholesale price"as it is used in the Medicare Act. This is unequivocally wrong.

The words "average wholesale price" occur only once in the Medicare Act. Private carriers are required by 42 U.S.C. § 1395u(o) to set Medicare reimbursement for covered drugs at 95% of average wholesale price. The carrier is the only entity that has any federally imposed duty with respect to average wholesale price, and the nature of the carriers' obligation is to use it to set reimbursement rates. Congress did not require that average wholesale prices be reported to any entity, including the carriers that must use them, or that it be reported by any entity, including the manufacturers.

Under the Medicare Act, the manufacturers do not have any obligations to or relationship with the price reporting services that publish average wholesale prices, the carriers who use the published average wholesale prices, or the federal government or Medicare beneficiaries who pay for covered drugs based on average wholesale price. Unless the carrier's duty to use average wholesale price can be extrapolated to impose an obligation on the manufacturers to report that price, their pricing reports neither comport with nor violate federal law.

For GSK and Aventis, the defendants' argument is even further strained, for they report to the price reporting services not average wholesale price, but wholesale acquisition cost, a term that does not appear in the United States Code or the Code of Federal Regulations. These defendants would have to show that a term which, under the statute, has no relevance to them as

-4-

manufacturers, dictates what they report on a completely voluntary basis under an entirely
different label. No statutory term, including "average wholesale price," has such an
extraordinary sweep.

The cases defendants cite to support their assertion of a substantial federal question
demonstrate the fallacy in their argument. These cases hold that a state law claim turns on a
federal question, and creates "arising under" jurisdiction, only if the federal law creates the right,
obligation or relationship that must be resolved to determine if the plaintiff has made out a prima
facie case, *i.e.*, is an element of the claim. Because the Medicare statute does not impose any
right, obligation or relationship on the defendant manufacturers, these cases show that the
meaning of the statutory term "average wholesale price" is irrelevant to the State's claims.

Each of the cases defendants cite in an attempt to show the State's claims turn on federal
law did, in fact, involve a federally created right, obligation or relationship. *W. 14th St.
Commercial Corp. v. 5 W. 14th Owners Corp.*, 815 F.2d 188, 191, 194 (2d Cir. 1987) (a
declaratory judgment; federal law created the defendants' authority to terminate the leases; the
issue was whether the terminated leases were of the type the Act permitted to be terminated);
*D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 101 (2d Cir. 2001) (the federal Act
obligated defendants to promulgate rules and to enforce them and the federal statute; the issue
was whether they had performed this statutory duty); *Ormet Corp. v. Ohio Power Co.*, 98 F.3d
799, 897 (4th Cir. 1996) (federal law defined the term "owner" and gave owners rights to
allowances; the issue was whether the plaintiff was an "owner" and entitled to allowances); *Still
v. DeBuono*, 927 F. Supp. 125, 128-29 (S.D.N.Y. 1996) (the federal statute created the plaintiff's
right to appropriate early intervention services and the defendant's obligation to pay for such
services;  the issue was whether the early intervention services that were provided were

appropriate and if the defendant was required to pay for other services); *Milano Hat Co. v. Haden & Co.*, 2003 WL 282450 (N.D. Tex. Feb. 5, 2003) (federal ERISA imposed duties on plaintiff company, which then contracted with defendant to fulfill those duties; the issue was whether defendant fulfilled the plaintiff's obligations under the federal statute); *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 2002 WL 31929179, at *11 (D. Kan. Dec. 19, 2002) (Federal Communications Act created obligation on defendants not to impose excessive, unfair or otherwise unlawful charges; conversion claim required proof of an unlawful act, which could only be supplied by violation of federal duty not to impose unlawful charges); *County of Suffolk v. Long Island Lighting Co.*, 549 F. Supp. 1250, 1256 (E.D.N.Y. 1982) (federal regulations imposed design and safety requirements in construction of nuclear power plant; plaintiff based its claim that facility was negligently constructed specifically on violations of those federal regulations); *New York v. Rapgal Assoc.*, 703 F. Supp. 284 (S.D.N.Y. 1989) (because "[a]n earlier decision in [*Rapgal*] held specifically that 'dealings between the parties ... created no contract between them' .... the plaintiff's right to relief in that case was created by the regulations themselves." *J.A. Jones Const. Co. & Daiddone Elect. of N.Y. v. City of New York*, 753 F. Supp. 497, 505 (S.D.N.Y. 1990)).[2]

The instant case has nothing in common with the cases defendants cite. Instead, like the circumstances in *Phelan v. Life Ins. Co. of Georgia, Inc.*, 1995 U.S. Dist. LEXIS 4515 (S.D. Ala. 1995) (cited in State's Mem. Sup. Rem. at 12 and Def. Mem. Opp. Rem. at 20-21), the State's claims are independent of any rights, obligations or relationships created by federal law. Drug manufacturers do not owe Medicare beneficiaries any federally created right or obligation. There is no federally created relationship between a drug manufacturer and the consumer. Drug

---

[2]Also note that *Smith v. Industrial Valley Title Ins. Co.*, 14990 WL 112077 (E.D. Pa., Aug. 2, 1990), was reversed on the point for which defendants cite it.

manufacturers do not "charge the Medicare program for prescription drugs." (*id.* at 21.) And the

Medicare Act does not limit the price manufacturers can charge for their drugs. Indeed, the right

the State asserts on behalf of itself and its Medicare beneficiaries is the right not to be deceived.

This right is created by GBL § 349 and Exec. Law § 63(12), not by any aspect of the Medicare

Act. *See Loussides v. America Online, Inc.*, 175 F. Supp. 2d 211, 214 (D. Conn. 2001). *See also*

*In re Universal Serv. Fund Tel. Billing Practices Litig.*, 2002 WL 31929179, at *7-9 (attached to

defendants' memorandum) (although the Federal Communications Act governed whether the

charges were excessive or unlawful, no federal jurisdiction existed over claim that the nature of

such charges were misrepresented to consumers).

Not only are the State's claims independent of any right, obligation or relationship created

by federal law, the words "average," "wholesale" and "price" (upon which defendants rely

exclusively for their claim of federal jurisdiction) are not defined by federal law or regulations -

as even defendants appear to concede. Nor is there any case law that would even hint that these

common words have special meaning under federal law.

In the absence of any federal laws, regulations or judicial precedents that define or

regulate how manufacturers report their wholesale prices, defendants nevertheless assert that the

State's claims "necessarily turn" on federal law because Congress knew that the average

wholesale prices reported by drug manufacturers often exceeded providers' acquisition costs, yet

continued to use such "average wholesale price" as the basis for determining reimbursement rates

in the Medicare program. Defendants are simply wrong. Nothing in the regulatory history

justifies defendants' fraudulent pricing practices or demonstrates that Congress approved or

endorsed such practices. Moreover, there is no authority, and defendants have presented none,

for the proposition that congressional acquiescence confers federal jurisdiction on this Court.

Thus, an interpretation of "average wholesale price" under the Medicare law is not an "essential element" of the State's fraud and deception claims. At best, defendants' claims that their fictitious prices have been condoned by Congress present a defense to the State's causes of action under GBL § 349 and Exec. Law § 63(12). However, since federal jurisdiction cannot be premised on a defense, defendants have failed to meet their burden of demonstrating the existence of a federal question, and the case must be remanded.

**B.    The Federal Government Does Not Have a Significant Interest in National Uniformity in the Implementation of the Medicare Program.**

In support of their contention that federal jurisdiction is appropriate here, defendants further contend, without any support, that "the federal interest in the uniform administration of the Medicare program is at its zenith." (Def. Mem. Opp. Rem., at 16.) This is a false assumption.

Congress has organized Medicare's system for reimbursement of covered drugs in a manner that is marked by a lack of uniformity. In 42 U.S.C. § 1395u(o), it authorized the Secretary to enter into contracts with carriers to determine the amount of reimbursement for drugs covered under Part B of the Medicare Act, based on 95 percent of the drug's average wholesale price. Its express purposes in utilizing private carriers to perform a multitude of tasks under the Medicare Program were "to provide for the administration of the benefits under this part with maximum efficiency and convenience for individuals entitled to benefits under this part and for providers of services and other persons furnishing services to such individuals, and with a view to furthering coordination of the administration of the benefits under part A." 42 U.S.C. § 1395u(a). Congress clearly had interests other than national uniformity in mind. In fact, there

are four carriers that have operated simultaneously in New York, and reimbursement amounts have differed across carriers for the same drug.[3]

The Second Circuit has found there is no evidence Congress intended that a single federal decision-maker should set all Medicare billing and reimbursement policy. There is, therefore, no particularized federal interest in national uniformity in the Act's implementation. *Medical Soc. of N.Y. v. Cuomo*, 976 F.2d 812, 820 (2d Cir. 1992). *Accord Downhour v. Somani*, 85 F.3d 261, 267-68 (6th Cir. 1996); *Pennsylvania Med. Soc. v. Marconis*, 942 F.2d 842, 852-53 (3d Cir. 1991); *Massachusetts Med. Soc. v. Dukakis*, 815 F.2d 790, 794-95 (1st Cir. 1987). Defendants' "uniformity" argument is, therefore, without merit.

## CONCLUSION

For the reasons set forth above and in the State's principal memorandum, the State requests this Court to remand this matter to the New York Supreme Court, County of Albany, to require the defendant to pay the State's costs and expenses, including attorneys' fees, incurred in connection with the removal and remand motion, and for all other appropriate relief.

Dated: Albany, New York
       April 30, 2003

Respectfully submitted,

ELIOT SPITZER
Attorney General of the State of New York
Attorney for Plaintiffs

---

[3]Beginning in January 2003, the Center for Medicare and Medicaid Services delegated the reimbursement-setting responsibility to one national "Single Drug Pricer."

By:

Matthew Barbaro
Assistant Attorney General
Bar Roll Number: 101079
Justice Bldg. D-10 Annex
Albany, New York 12224
(518) 486-9630

ROSE E. FIRESTEIN
PATRICK LUPINETTI
DAVID SHARPE
SHIRLEY STARK

Assistant Attorneys General
of Counsel

-10-

1 of 1 DOCUMENT

**The People of the State of New York by Eliot Spitzer, Attorney General of the State of New York, Petitioner-Respondent, v. General Electric Company, Inc., Respondent-Appellant.**

**117, 117A, 117B**

**SUPREME COURT OF NEW YORK, APPELLATE DIVISION, FIRST DEPARTMENT**

**2003 N.Y. App. Div. LEXIS 1794**

**February 27, 2003, Decided**

**February 27, 2003, Entered**

**NOTICE:**
    [*1]    THE LEXIS PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING THE RELEASE OF THE FINAL PUBLISHED VERSION.

**COUNSEL:**
For Petitioner-Respondent: Joy Feigenbaum.

For Respondent-Appellant: Peter N. Wang.

**JUDGES:**
Saxe, J.P., Ellerin, Lerner, Marlow, JJ.

**OPINION:**

    Order, Supreme Court, New York County (Louise Gruner Gans, J.), entered on or about July 30, 2001, which, upon findings that respondent General Electric Company (GE) had engaged in deceptive practices violative of Executive Law §  63(12) and General Business Law §  349, set forth procedures pursuant to which GE would compensate certain consumers who had purchased replacements for GE's defective dishwashers, unanimously affirmed, without costs. Order, same court and Justice, entered April 8, 2002, which denied GE's motion to renew and granted its motion to reargue but, upon reargument, adhered to its prior orders, except that it allowed GE, under certain circumstances, to move for a hearing as to the eligibility of an individual consumer for restitution, and order, same court and Justice, entered April 16, 2002, which, inter alia, granted petitioner's motion to enjoin GE from representing [*2] that the defective dishwashers could not be repaired, directed GE to contact consumers who had previously requested a repair but had not received one, and directed GE to publish advertisements in newspapers announcing the availability of repairs, unanimously affirmed, without costs.

    Petitioner Attorney General brings this proceeding under Executive Law §  63(12) and General Business Law §  349 to obtain injunctive relief and restitution on behalf of consumers allegedly damaged by representations made by respondent GE to the effect that certain defective dishwashers it manufactured were not repairable. Under §  63(12), the test for fraud is whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud (see e.g. State of New York v Gen. Motors Corp., 120 Misc 2d 371, 374, 466 N.Y.S.2d 124; People v Life Science Church, 113 Misc 2d 952, 963, 450 N.Y.S.2d 664, appeal dismissed 93 A.D.2d 774, 461 N.Y.S.2d 803, lv denied 61 N.Y.2d 604, 462 N.E.2d 155, 473 N.Y.S.2d 1025 cert denied 469 U.S. 822; Matter of State of New York v Colorado State Christian Coll. of Church of Inner Power, Inc., 76 Misc 2d 50, 56, 346 N.Y.S.2d 482). [*3] Executive Law §  63 (12) was meant to protect not only the average consumer, but also "the ignorant, the unthinking and the credulous" ( Guggenheimer v Ginzburg, 43 N.Y.2d 268, 273, 401 N.Y.S.2d 182, 372 N.E.2d 17).

    In contrast, under General Business Law §  349, the plaintiff must prove that the challenged act or practice "was misleading in a material way" ( Stutman v Chemical Bank, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608), and "the deceptive practice must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances'" (id., quoting Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, 85 N.Y.2d 20, 26, 623 N.Y.S.2d 529, 647

2003 N.Y. App. Div. LEXIS 1794, *

N.E.2d 741).

The statements made by GE satisfy both standards. The distinction that GE seeks to draw between "repair" on the one hand and "rewire" on the other is artificial, and is belied by GE's own past usage of these terms (e.g., in the Amendment to the Settlement Agreement between GE and the Consumer Product Safety Commission [CPSC] and in GE's Answer to the Verified Petition). Even if, according to some [*4] dictionary definition of "repair," GE's statement that repairs were not an option were literally true, literal truth is not an availing defense in light of the evident capacity of the representations at issue to mislead even reasonable consumers acting reasonably under the circumstances (see    Matter of Lefkowitz v E.F.G. Baby Prods. Co., 40 A.D.2d 364, 368, 340 N.Y.S.2d 39). Nor did GE's statement "comport substantively with" the statements approved by the CPSC (see  Cytyc Corp. v Neuromedical Sys., Inc., 12 F. Supp. 2d 296, 301).

GE's actions with respect to the supplemental recall satisfy the standards for consumer fraud because, even after GE and the CPSC agreed that GE would offer consumers free repairs, GE or its representatives told some consumers that free rewiring was not available. Although GE argues that it conducted its supplemental recall in good faith, neither bad faith nor scienter is required under Executive Law § 63(12) (see e.g.  People v Apple Health & Sports Clubs, Ltd., 206 A.D.2d 266, 267, 613 N.Y.S.2d 868, lv dismissed in part, lv denied in part 84 N.Y.2d 1004, 647 N.E.2d 114, 622 N.Y.S.2d 908; Matter of State of New York v Ford Motor Co., 136 A.D.2d 154, 158, 526 N.Y.S.2d 637, [*5] affd 74 N.Y.2d 495, 548 N.E.2d 906, 549 N.Y.S.2d 368). Similarly, intent to defraud or mislead is not required under General Business Law § 349 ( Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, 85 N.Y.2d at 26).

Because the letters the IAS court found deceptive were not approved by the CPSC, General Business Law § 349(d) does not bar this proceeding (see e.g.  Marcus v AT&T Corp., 938 F. Supp. 1158, 1173, affd 138 F.3d 46). Furthermore, making deceptive statements cannot be considered *compliance* with federal rules, regulations, and statutes, as required by General Business Law § 349(d) (cf.  Matter of the State of New York v Interstate Tractor Trailer Training, Inc., 66 Misc 2d 678, 681, 321 N.Y.S.2d 147).

GE's argument that § 349(d) bars claims based on the supplemental recall is also unavailing. The Attorney General's office sent the CPSC its proposed injunction order, which relates to the supplemental recall program; the CPSC said it had no objections.

The affidavits GE submitted do not raise a triable issue of fact. They do not [*6] deny that the conversations, related in the consumer complaints and affidavits, occurred. Instead, GE's affidavits say that it instructed the company, which it chose to staff the recall telephone line (West Telemarketing Corp.), not to deviate from the CPSC-approved script, and that various GE and West quality assurance supervisors listened to *selected* conversations, not all of them.

Even though GE voluntarily ceased its deceptive practices, the IAS court in the context of this consumer protection proceeding nonetheless retained the power to grant injunctive relief (see    State of New York v Midland Equities of New York, Inc., 117 Misc 2d 203, 206-207, 458 N.Y.S.2d 126; Matter of State of New York v Hotel Waldorf-Astoria Corp., 67 Misc 2d 90, 91-92. 323 N.Y.S.2d 917). Since GE is presently complying voluntarily with the entire April 16, 2002 injunction, except the publication requirement, the bulk of the injunction will not cause it prejudice (see    Interstate Tractor Trailer, 66 Misc 2d at 683; Matter of State of New York v Bevis Indus., Inc., 63 Misc 2d 1088, 1092, 314 N.Y.S.2d 60).

The publication which the injunction directs [*7] will not harm GE, since it is, as a practical matter, the same as the one previously approved by the CPSC. It is needed because GE is unlikely to have contact information for those people who called for a free repair but were disconnected (see    State of New York v Ford Motor Co., 136 A.D.2d at 158-159). The risk of fire renders it especially important to reach any remaining consumers who have not yet repaired or replaced their defective dishwashers.

The authority to direct restitution includes the authority to order respondents to notify consumers of the right to seek restitution ( State of New York v Princess Prestige, 42 N.Y.2d 104, 108, 397 N.Y.S.2d 360, 366 N.E.2d 61).

GE's proposed formula for restitution rests on its contention that the recalled dishwashers were at the end of their useful lives. However, this is contradicted, inter alia, by the fact that GE was urging consumers to renew service contracts on old dishwashers while contemporaneously trying to induce consumers to buy new dishwashers. The IAS court's restitution formula forces consumers to absorb some costs, such as the cost of installing their new machines and disposing of the old [*8] ones. The remedy that the IAS court fashioned is reasonable and within the court's sound discretion. GE, whose deceptive practices caused damages to so many consumers, can now hardly complain that petitioner has not quantified actual damages with exactitude (see generally id.; Matter of Nasdaq Mkt.-Makers Antitrust Litig., 169 F.R.D. 493, 527).

Finally, since the recall provided for indirect notice, GE can be held liable for the statements of third parties,

2003 N.Y. App. Div. LEXIS 1794, *

such as its retailers and distributors, who had actual or apparent authority to make statements about the recall (see   Fed. Trade Commn. v Five-Star Auto Club, Inc., 97 F. Supp. 2d 502, 527, 530).

ENTERED: FEBRUARY 27, 2003

U.S. DISTRICT COURT
N.D. OF N.Y.
**ORIGINAL FILED**

APR 3 0 2003

LAWRENCE K. BAERMAN, CLERK
ALBANY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

THE PEOPLE OF THE STATE OF NEW YORK, :
by ELIOT SPITZER, Attorney General of the
State of New York,                            :

                                   :

          Plaintiffs,                      :

                                   :

     - against -                          :          Case No. 03-CV-295 (DNH/DRH)

                                   :

AVENTIS PHARMACEUTICALS, INC.,               :

          Defendant.                      :

-------------------------------------------------------------- x
-------------------------------------------------------------- x

THE PEOPLE OF THE STATE OF NEW YORK, :
by ELIOT SPITZER, Attorney General of the
State of New York,                            :

                                   :

          Plaintiffs,                      :

                                   :

     - against -                          :          Case No. 03-CV-299 (TJM/DRH)

                                   :

GLAXOSMITHKLINE, P.L.C.,                      :
d/b/a GLAXOSMITHKLINE, et al.,               :

          Defendants.                     :

-------------------------------------------------------------- x
-------------------------------------------------------------- -x

THE PEOPLE OF THE STATE OF NEW YORK, :
by ELIOT SPITZER, Attorney General of the
State of New York,                            :

                                   :

          Plaintiffs,                      :

                                   :

     - against -                          :          Case No. 03-CV-295 (DNH/DRH)

                                   :

PHARMACIA CORPORATION,                        :

          Defendant.                      :

-------------------------------------------------------------- -x

**PLAINTIFF STATE'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO REMAND**