UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | M.D.L. No. 1456<br><br>Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS | Judge Patti B. Saris |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR LEAVE TO TAKE ADDITIONAL LIMITED DISCOVERY**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

FACTUAL BACKGROUND ................................................................. 3

ARGUMENT ........................................................................................ 5

    I.    The Information that Plaintiffs' Seek is Not Necessary ............................ 6

    II.   The Allegations in the AMCC Do Not Satisfy the Threshold
        Standard of Alleging With Particularity a "General Scheme To
        Defraud" in the PBM Context Necessary to Justify Discovery on
        Dismissed Claims.................................................................................. 9

    III.  The Character of the Information Requested by Plaintiffs
        Distinguishes this Case from Becher. ..................................................... 15

    IV.  The Court Has Already Held that Plaintiffs are Not Entitled to the
        Broad and Intrusive Discovery that They Seek ....................................... 17

CONCLUSION...................................................................................... 18

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Ahmed v. Rosenblatt*, 118 F.3d 886 (1st Cir. 1997) ........................................................13

*Cutler v. Fedl Dep. Insurance Corp.*, 781 F. Supp. 816 (D. Me. 1992)._ ..........................6

*Feinstein v. Resolution Trust Corp.*, 942 F.2d 34 (1st Cir. 1991) ....................................5

*Freeport Transit, Inc. v. McNulty*, 239 F.Supp.2d 102 (D. Me. 2003) .............................15

*Gott v. Simpson*, 745 F. Supp. 765 (D. Me. 1990) ....................................................11, 14

*Gublo v. Novacare, Inc.*, 62 F.Supp.2d 347, 354 (D. Mass. 1999)...................................11

*Hart Enters., Inc. v. Cheshire Sanitation, Inc.*, 1999 WL 33117189 (D. Me. Feb.
    22, 1999) ..................................................................................................................14

*Hayduk v. Lanna*, 775 F.2d 441 (1st Cir. 1985) ...............................................................13

*In re Pharmaceutical Industry Average Wholesale Price Litig.*, 263 F.Supp.2d
    172 (D. Mass. 2003) ..................................................................................................3

*Kostantinako v. Fedl Dep. Insurance Corp.*, 719 F. Supp. 35 (D. Mass. 1989) .........16, 17

*New England Data Services, Inc. v. Becher*, 829 F.2d 286 (1st Cir. 1987)....1, 5,15

*North Bridge Associates, Inc. v. Boldt*, 274 F.3d 38 (1st Cir. 2001) ..........................13, 15

*Overton Corp. v. Case Equip. Co.*, 1991 WL 16170  (D. Me. Jan. 17, 1991) .................15

*Rodriguez-OFerral v. Trebol Motors Corp.*, 1993 WL 261993 at 4 (1st Cir. July
    9, 1993) (unpublished) ...............................................................................................17

*Romani v. Shearson Lehman Hutton*, 929 F.2d 875 (1st Cir 1991)..................................13

*Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997) .............................................................8

*United States ex rel. Franklin v. Parke-Davis*, 147 F.Supp.2d 39 (D. Mass. 2001) .........11

*Wilkes v. Heritage Corp., Inc.*, 767 F. Supp. 1166 (D. Mass. 1991) ................................14

### FEDERAL STATUTES

F.R.C.P. 11(b)(3).     13

# INTRODUCTION

Plaintiffs have conditionally moved for leave to take additional "limited" discovery "in the event the Court believes that Plaintiffs' allegations do not meet the requirement of Rule 9(b) because Plaintiffs have not specified the amount of fraudulent 'spread' associated with each drug." Pls. Mem. at 2. But defendants do not argue in their Consolidated Memorandum that the AMCC should be dismissed just because it fails to quantify specific spreads for all 321 drugs at issue.

Plaintiffs' pleading failure is more fundamental – they never allege a factual basis for their claim that AWPs were "fraudulent" for any drug sold in the retail pharmacy market through PBMs or for most Medicare Part B drugs sold by physicians. For instance, the AMCC fails to allege the terms of any contract between any plaintiff and any PBM, despite the fact that plaintiffs' PBM claims are predicated on allegations that the terms of these contracts were somehow part of a fraudulent scheme. *See* AMCC ¶¶ 169-171. Indeed, plaintiffs do not allege a single price that they paid for any non-Medicare Part B drug, even though their claims are based on paying these allegedly fraudulent prices. Supplying the precise mathematical disparity between AWPs and transaction prices will not cure these fundamental pleading defects. Thus, the logic of plaintiffs' own argument makes clear that their motion must be denied.

Plaintiffs' motion fails for three additional reasons. First, plaintiffs have not alleged even the contours of a scheme to defraud in the context of their claims based on purchases in the retail pharmacy market through pharmacy benefits managers ("PBMs") with the particularity required to meet the threshold requirement for discovery following

dismissal for failing to meet Rule 9(b) requirements. *See New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 291 (1st Cir. 1987). The only allegations in the AMCC that detail allegedly fraudulent conduct with even a semblance of particularity relate to a handful of Medicare Part B drugs sold in the physician market. Those allegations cannot be used to justify discovery regarding drugs sold in the retail pharmacy market through PBMs, a completely separate distribution system that does not fit plaintiffs' theory of their Medicare Part B case.

Second, the First Circuit precedent on which plaintiffs rely does not contemplate the type of discovery that plaintiffs seek here. The cases that plaintiffs cite permitted extremely limited discovery to fill narrow gaps regarding the specific "time, place and contents" of interstate wire and mail communications in otherwise particularized allegations of fraud. Here, by contrast, plaintiffs seek discovery in an attempt to bolster their otherwise deficient allegations regarding the basic allegedly fraudulent conduct at issue in this case. *Becher* and the other cases plaintiffs cite do not justify discovery to identify such basic and fundamental facts.

Finally, plaintiffs have already requested the discovery they seek here in document requests served in June 2003. Although plaintiffs characterize their requests as "limited," they seek from defendants every document regarding every price charged or considered for 321 drugs over a 12 year period, as well as an array of documents concerning discounts, rebates, sales, profit margins and other issues. Review and production of these documents would require a massive undertaking. The Court rejected plaintiffs' previous request for most of these documents in CMO 7 and recently reiterated in CMO 8 that plaintiffs should only be permitted to take discovery on claims that *survive*

a motion to dismiss. That rule should apply to plaintiffs' current request as well.

## FACTUAL BACKGROUND

Plaintiffs filed the AMCC in June, 2003 after the Court dismissed the MCC, inter alia, for failing to plead fraud with sufficient particularity. *See In re Pharmaceutical Industry Average Wholesale Price Litig.*, 263 F.Supp.2d 172 (D. Mass. 2003) (*"AWP"*). The AMCC asserts claims for damages allegedly arising from the purchases of 321 separate drugs, sold through at least two separate distribution channels. *See* AMCC ¶ 141 (indicating that class plaintiffs seek damages for purchases of "(i) all drugs administered under Medicare Part B and (ii) drugs administered outside of the Medicare context whose reimbursement was established by use of AWP as a benchmark."). But in an effort to bootstrap claims relating to one class of drugs to its "evidence" relating to an entirely distinct class of drugs, plaintiffs intentionally and improperly conflate the two.

Some of the drugs identified in the Complaint are administered and sold directly by physicians who make prescribing decisions. *See id.* at ¶ 144. Medicare reimburses physicians for sales of those drugs, and they are identified as "Medicare Part B drugs." *Id.* It is with respect to a handful of these drugs that plaintiffs claim they have pleaded "Examples of Unlawful Conduct," Pls. Mem. at 5, and for which they claim various investigations have unearthed "evidence of wrongdoing." Pls. Mem. at 8.

All the other prescription drugs identified in the AMCC are, as plaintiffs concede, sold through retail pharmacies, and paid for by parties to private commercial transactions. AMCC ¶ 169. With respect to this category of drugs, plaintiffs allege that some health plans contract with PBMs to provide brand name drugs – either themselves directly or

indirectly through pharmacies – priced at the "AWP less a certain percentage 'discount.'" *Id.* But unlike physicians, pharmacists and PBMs do not write prescriptions for drugs and plaintiffs do not allege otherwise. Nor do plaintiffs dispute that payment for PBM drugs, unlike payment for Medicare Part B drugs, is purely a matter of private commercial transactions to which plaintiffs themselves are parties.

Substantially all of the allegations of specific conduct in the AMCC relate to Medicare Part B drugs sold by physicians. In fact, in their opposition to defendants' motion to dismiss, plaintiffs were only able to point to a single allegation from the entire AMCC of "specific conduct" relating to drugs sold through PBMs. *See* Plaintiffs' Memorandum in Opposition to Motion to Dismiss the Amended Class Action Complaint and in Opposition to Defendants' Consolidated Memorandum, at 13 (citing AMCC ¶ 236(b)). That allegation, however, actually relates to a Medicare Part B drug.

As defendants argued in their Consolidated Memorandum, the AMCC fails to allege any specific factual basis for plaintiffs' claim that AWPs were "fraudulent" for drugs sold in the retail pharmacy market through PBMs or for most Medicare Part B drugs sold by physicians. Consol. Mem. at 8-9. Defendants never argued in the Consolidated Memorandum that calculating specific "spreads" would cure that failure. *See id.* Thus, the entire premise of plaintiffs' motion for discovery – that they need discovery in the event that the Court grants defendants' motion to dismiss for failing to allege specific spreads – is fundamentally wrong.

Plaintiffs attempt to leverage this mischaracterization of the Rule 9(b) argument in defendants' Consolidated Memorandum into highly intrusive discovery of defendants'

transactional information in order to help them try to amend their complaint for the third time. The information that plaintiffs seek in their motion is far from "limited." Plaintiffs have requested essentially every document in defendants' control regarding any aspect of pricing (actual or proposed) for 321 drugs over a 12 year period, as well as an array of documents concerning discounts, rebates sales, profit margins and other issues. Complying with these discovery requests would take a massive effort and would be extremely burdensome.

## ARGUMENT

As a general rule, discovery is not permitted to bolster allegations insufficient to meet the requirements of Rule 9(b). *See Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 43 (1st Cir. 1991). The First Circuit has recognized a narrow exception to this rule in RICO cases based on predicate acts of mail or wire fraud where (1) the particularized allegations of a complaint set out a general scheme to defraud, (2) the facts of the case strongly suggest that defendants must have used interstate mail or wire communications to carry out their scheme, and (3) plaintiffs would be unable to discover the particular date, time and content of those communications absent discovery. *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 291 (1st Cir. 1987).

That exception, however, does not apply here for four reasons. First, plaintiffs have requested discovery only if the Court dismisses their claims for failing to plead specific "spreads" for all of the drugs in the AMCC; but defendants never argued in their Consolidated Memorandum that Rule 9(b) requires plaintiffs to allege specific "spreads" for all 321 drugs for which plaintiffs are pursuing damages. Second, the particularized allegations in the complaint do not establish the contours of a "general scheme"

applicable to all of the drugs at issue in the AMCC with the particularity required to justify discovery. Third, the *Becher* exception does not permit discovery of the type that plaintiffs seek here – which goes to the fundamental question of how the published AWPs are fraudulent. Fourth, the Court has already held twice that plaintiffs are not entitled to take discovery on claims that have not yet survived a motion to dismiss. Thus, plaintiffs' conditional motion for leave to take discovery if the Court grants defendants' motion to dismiss the AMCC for failure to satisfy Rule 9(b) should be denied.[1]

## I.   The Information that Plaintiffs' Seek is Not Necessary.

Plaintiffs' motion for leave to take additional discovery is explicitly conditional. They have only requested discovery if the Court dismisses the AMCC for failing to allege specific spreads for all 321 drugs listed in Appendix A to the AMCC. Pls. Mem. at 2. Because plaintiffs target a straw man and ignore the real fundamental defects of their Complaint under Rule 9(b), the motion should be summarily denied.

Plaintiffs contend that they need this discovery in order to counter an argument in defendants' Consolidated Memorandum that the AMCC should be dismissed for failing to allege specific "spreads" for each of the drugs at issue in this case. Pls. Mem. at 5-6. To support that contention, Plaintiffs point to a single quotation from the Consolidated Memorandum:

---

[1]   In addition, if the Court dismisses the claims in the AMCC for reasons other than class plaintiffs' failure to plead specific spreads for each of the 321 drugs identified in the AMCC, then plaintiffs' motion should be denied as moot. *See Cutler v. Fed'l Dep. Ins. Corp.*, 781 F.Supp. 816 (D. Me. 1992) (discovery not permitted to remedy Rule 9(b) failures because complaint was also deficient for other reasons).

> Plaintiffs fail to explain how these published AWPs are fraudulent, except
> to speculate that there is a difference between these published AWPs and
> the cost to the PBMs (*i.e.*, a 'spread'). But mere speculation about a
> hypothetical 'spread' is not sufficient to satisfy Rule 9(b) or the Court's
> instructions that they identify the 'fraudulent AWPs' for the drugs at issue
> in their PBM claims. According, [sic] those claims must be dismissed.

Pls. Mem. at 2 (quoting Consol. Mem. at 9). Plaintiffs then spin that quotation into an

argument that defendants attack the AMCC solely for failing to plead specific spreads for

all of the drugs at issue in the AMCC.

In fact, Defendants argue in their Consolidated Memorandum that the AMCC

fails to meet the Rule 9(b) standard because it never alleges any facts to support

plaintiffs' conclusory allegation that the published AWPs for all drugs sold in the retail

pharmacy market through PBMs and most Medicare Part B drugs sold in the physician

market were fraudulent. Even if there were some "spread" between AWP and actual

transaction prices, that would not necessarily establish that the published AWP was

fraudulent. Plaintiffs allege that they purchased drugs from PBMs at a discount from

AWP, so they must have understood that there was some "spread" between AWP and

their own transaction prices and that PBMs and/or pharmacies did not pay AWP for those

drugs.[2/] *See* AMCC at ¶ 169.

The discovery that plaintiffs seek has little, if anything, to do with their failure,

with respect to all PBM drugs and most Medicare Part B drugs, to plead facts supporting

their claim that these AWPs were fraudulent. And contrary to plaintiffs' suggestion,

relevant information is by no means within defendants' exclusive control. For example,

plaintiffs allege that PBMs contracted with private health plans to provide brand name

drugs purchased through the retail pharmacy market at AWP less some contractually negotiated discount. AMCC ¶ 169. Plaintiffs contend that these negotiations were part and parcel of a "scheme" to permit PBMs to profit from the difference between the amount PBMs collect from the private health plans and the amount that they pay retail pharmacies for brand name drugs. AMCC ¶¶ 169-171. Six of the seven named plaintiffs are private health plans, and presumably they have contracted with PBMs to provide drug benefits. Yet, there is not a single allegation in the AMCC describing (1) communications with PBMs regarding these contracts; (2) the terms of any contract with a PBM requiring a private health plan to pay for prescription drugs at AWP minus some discount; or (3) any drugs that were subject to these agreements. The private health plan plaintiffs – not defendants – know the allegedly fraudulent prices that they paid for these products, but the AMCC does not allege a single price plaintiffs paid.

Even if plaintiffs were to allege an AWP, an actual transaction price, and a "spread" for a drug sold in the PBM market (which they don't do), that would not necessarily satisfy their pleading obligations pursuant to Rule 9(b) nor the obligations imposed by this Court's May 13 Order. *See generally Suna v. Bailey Corp.*, 107 F.3d 64, 70-71 (1st Cir. 1997) (dismissing claims because "[a]lthough appellants specify statements that they contend were fraudulent, identify the speaker, and state where and when the statements were made, they fail, on every allegation of fraud, to explain why the statements were fraudulent."). They still need to make allegations to support a conclusion that whatever "spreads" existed were fraudulent—that is, they need to make

---

2/     To assume otherwise would be to assume that the plaintiffs believed that wholesalers lost money on every transaction – an irrational assumption.

specific allegations such as those previously made with respect to the few drugs that survived the first motion to dismiss.

## II.    The Allegations in the AMCC Do Not Satisfy the Threshold Standard of Alleging With Particularity a "General Scheme To Defraud" in the PBM Context Necessary to Justify Discovery on Dismissed Claims

Plaintiffs argue that, even if the Court dismisses their claims for lack of particularity, they should be permitted intrusive discovery regarding "actual transaction prices" charged by defendants because they have alleged "the general scheme to defraud in great detail, citing to various governmental investigations and many specific documents."[3] Pls. Mem. at 8. In making this argument, plaintiffs perpetuate a blatant shell game that they play with the claims of their AMCC. In fact, plaintiffs employ a sleight of hand to conflate claims based on purchases of drugs in two completely different contexts: (1) Medicare Part B drugs purchased through physicians and (2) all other drugs purchased through private insurance arrangements that are managed by PBMs.[4]

The distribution system and market dynamics relating to drugs for which purchases are managed by PBMs is completely different than the distribution system for Medicare Part B drugs. Medicare Part B drugs are administered and sold directly by physicians, who make the decisions about what drugs to prescribe. *See, e.g.,* AMCC

---

[3]    Defendants do not address here whether these allegations are sufficient to satisfy the particularity requirements for those few Medicare Part B drugs to which these allegations relate. The failure of plaintiffs' allegations generally to meet the Rule 9(b) standard is addressed in defendants' motions to dismiss the AMCC.

[4]    Moreover, plaintiffs have not, with the limited exception of the Together Card allegations, alleged that defendants conspired together to implement a general scheme to defraud. Thus, there must logically be a separate scheme for each defendant. Accordingly, allegations that Abbott, for example, may have engaged in some fraudulent conduct is irrelevant to determining whether Watson engaged in some fraudulent conduct.

¶ 150. The federal government reimburses the physicians for their sales of those drugs based on a formula, fixed by statute, that uses AWPs for the prescribed drugs as part of the reimbursement calculation. *Id.* at ¶¶148-152. Physicians do not negotiate with their customers – they receive, and those making co-payments pay, based on a government mandated formula.

Plaintiffs allege that defendants inflated AWPs for Medicare Part B drugs sold in the physician market in order to induce medical providers to prescribe their drugs. Specifically, plaintiffs allege that inflating AWPs permitted the physicians prescribing Medicare Part B drugs to "earn a substantial profit from the 'spread' between the real cost and the various AWP-related reimbursement rates." *Id.* ¶ 161.

PBMs and pharmacies, by contrast, do not prescribe drugs. When a physician prescribes a brand name drug, PBMs and pharmacies are not generally free to dispense another brand name drug. But even more significantly, PBMs negotiate contracts with private health plans to set the terms of reimbursement. Plaintiffs broadly allege that the resulting agreements generally provide for reimbursement at "AWP less a certain percentage discount," *id.* at 169, but they do not dispute that contracts between PBMs and private health plans are separately negotiated, likely resulting in different reimbursement rates for drugs sold by different PBMs or to patients in different private health plans. Plaintiffs further allege that PBMs earn a margin on their sales of drugs reflecting the difference between the prices that they pay for the drugs and the prices that they charge the private health plans. *Id.* at ¶ 175. They also allege that the difference in the spreads for different drugs influences PBMs' decisions regarding the drugs to keep on their formularies. *Id.* at ¶ 176.

Six of the seven named class plaintiffs are private health plans that presumably contracted with PBMs for drug benefits. But they never allege (1) the terms of any specific agreement, (2) the identity of a single drug that was subject to such an agreement, or (3) a single price that private health plans paid for drugs purchased in the retail pharmacy market through PBMs.

Because the distribution systems and reimbursement mechanisms are so different, allegations that some of the defendants engaged in fraudulent conduct relating to the publication of AWPs for some Medicare Part B drugs sold in the physician market would not support or even suggest the inference that they engaged in fraudulent conduct with regard to drugs sold in the retail pharmacy market through PBMs. Thus, allegations relating to Medicare Part B drugs sold in the physician market, however colorful they may be, cannot be used to support claims – and therefore discovery – relating to drugs sold in the retail pharmacy market through PBMs. *See Gott v. Simpson*, 745 F.Supp.765, 770 (D. Me. 1990) (discovery on certain bare-bones RICO fraud claims not justified even though plaintiffs had much more specific allegations relating to other RICO fraud claims); *United States ex rel. Franklin v. Parke-Davis*, 147 F.Supp.2d 39, 48-50 (D. Mass. 2001) (Saris, J.) (dismissing RICO claims as to certain products and defendants while permitting other claims to proceed); *Gublo v. Novacare, Inc.*, 62 F.Supp.2d 347, 354 (D. Mass. 1999) (dismissing Medicare and Medicaid fraud claims relating to prosthetics for failure to allege fraud with sufficient particularity despite concluding that complaint alleged sufficient facts relating to orthotics).

But that is essentially what plaintiffs attempt to do. They point to governmental investigations and defendant-specific allegations relating overwhelmingly to a handful of

Medicare Part B drugs in arguing that they have alleged a scheme to defraud with sufficient particularity to justify discovery. Pls. Mem. at 5.[5/] The discovery that plaintiffs seek in this motion, however, relates to a much broader category of drugs that are sold through entirely different distribution channels – *i.e.*, drugs sold in the retail pharmacy market through PBMs.

Plaintiffs' allegations of fraudulent conduct in the sale of drugs through PBMs are confined to eleven paragraphs in the complaint. *Id.* at ¶¶ 168-178. Those paragraphs are exceedingly general, and fail to allege any specific facts, with the exception of a single Wall Street Journal Article, relating to any specific drug. *See* Consol. Mem. at 8. In fact, in their opposition to defendants' motion to dismiss, plaintiffs were only able to point to a single allegation from the entire AMCC of "specific conduct" relating to a drug sold through PBMs. *See* Plaintiffs' Memorandum in Opposition to Motion to Dismiss the Amended Class Action Complaint and in Opposition to Defendants' Consolidated Memorandum, at 13 (citing AMCC ¶ 236(b)). That allegation, however, actually relates to a Medicare Part B drug and therefore provides no support for any allegation of fraud in the sale of drugs in the retail pharmacy market through PBMs.

The remainder of the PBM-related allegations in the complaint are implicitly made on information and belief, but there are no facts alleged to support that belief. Rule 9(b) requires more: "Even when allegations are based on information and belief, supporting facts on which the belief is founded must be set forth in the complaint. And

---

[5/]   For instance, plaintiffs specifically allege in their complaint that several governmental organizations conducted investigations of published AWPs for Medicare Part B drugs. AMCC ¶¶ 155-158.

this holds true even when the fraud relates to matters peculiarly within the knowledge of the opposing party." *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985); *see also Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir 1991) ("The requirement that supporting facts be pleaded applies even when the fraud relates to matters peculiarly within the knowledge of the opposing party.") (other portions of opinion superseded by statute).[6/]

As explained above, relevant information supporting plaintiffs' PBM claims is by no means within defendants' exclusive control.  Plaintiffs never allege (a) the terms of a single contract between any plaintiff and any PBM; (b) the identity of any drug sold in the retail pharmacy market through PBMs; or (c) the price that any plaintiff paid for any drug purchased in the retail pharmacy market through a PBM.

The fundamental deficiencies of plaintiffs' PBM allegations preclude further discovery on those claims, even under the standard established in *Becher*.  "[T]he application of the *Becher* second determination is neither automatic, nor of right, for every plaintiff."  *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997) (denying discovery to plaintiff whose RICO claims were dismissed for failure to plead fraud with the requisite particularity).  As the First Circuit explained in *North Bridge Assocs., Inc. v.*

---

[6/]    Plaintiffs have stated that the AMCC is the product of a "massive review of each Defendant, its products and its pricing conduct with respect to those products," including consultations "with pharmaceutical industry experts and insiders."  Plaintiffs' Separate Memorandum in Opposition to Defendant-Specific Memoranda on Motions to Dismiss, at 4.  If plaintiffs believed that, after such a "massive review" of available information and documents,  they needed additional discovery from defendants to properly state their claims, they were required to state that belief directly in the AMCC.  Plaintiffs have implicitly certified that all "the allegations and other factual contentions [in the AMCC] have factual support" because they never "specifically [] identified" any factual allegations from the AMCC that "are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."  F.R.C.P. 11(b)(3).

*Boldt*, 274 F.3d 38, 44 (1st Cir. 2001), discovery was only justified in *Becher* because the plaintiff's factual allegations in that case "rendered it likely that the defendants committed mail or wire fraud, and the original allegations were likely deficient only because the details of the relevant communications were 'peculiarly within defendants' knowledge and difficult to expose.'" (internal citations omitted).

When the facts alleged in the complaint do "not adequately support plaintiffs' allegations of fraud," discovery is not justified. *Wilkes v. Heritage Corp., Inc.*, 767 F.Supp. 1166, 1174 (D. Mass. 1991). Here, the vast majority of the specific claims in the AMCC relate to Medicare Part B drugs sold through the physician market. They do not adequately support plaintiffs' separate allegations relating to drugs sold in the retail pharmacy market through PBMs. Thus, discovery should not be permitted as to drugs sold in the retail pharmacy market through PBMs. And with respect to Medicare Part B drugs, the Court has already drawn a line in determining which of those drugs should be subject to further discovery. As the court explained in *Gott*, "where, as here, the fraud allegations are so deficient, the purposes of Rule 9(b), including 'avoiding groundless claims and strike suit, the potential damage to a defendant's reputation, and ensuring that defendants have been adequately put on notice to enable them to give meaningful responses,' outweigh the competing policies in favor of allowance of discovery." 745 F.Supp. at 770 (internal citations omitted); *see also Hart Enters., Inc. v. Cheshire Sanitation, Inc.*, 1999 WL 33117189, *6, *9 (D. Me. Feb. 22, 1999) (underlying allegations of fraud were so insufficient that discovery was not warranted).

### III.   The Character of the Information Requested by Plaintiffs Distinguishes this Case from Becher.

Moreover, the character of the discovery requested in this case is fundamentally different from the discovery that the First Circuit permitted in *Becher*. The plaintiffs in this case are not trying to fill minor gaps – *i.e.,* the who, what and when of interstate wire and mail communications clearly implied in the complaint – in the detailed allegations of fraudulent conduct in their complaints. Instead, they seek information regarding defendants' transaction prices for the purposes of trying to find a factual basis for their conclusory allegations that AWPs were "fraudulent."

*Becher* does not permit such discovery. The First Circuit there went to great pains to stress the limited nature of the issue before it and the limited nature of its holding. The plaintiff in *Becher* had alleged the underlying circumstances of the fraud with particularity, but failed to detail the "who, what, and when" of specific interstate wire and mail transactions. *Becher*, 829 F.2d at 291. Discovery was permitted for the limited purpose of determining whether and how the defendants had used the interstate mail and wires because the complaint alleged "detailed facts that make it seem likely that interstate mail or telecommunications facilities were used." *Id., see also North Bridge Assocs.*, 274 F.3d at 43-44 (describing the extremely limited circumstances in which *Becher* would permit discovery)(quoting *Feinstein*, 942 F.2d at 43). The other cases cited by plaintiffs to support their contention that they should be permitted discovery likewise involved very limited discovery to determine whether and how the interstate wire and mail facilities were used. *See Overton Corp. v. Case Equip. Co.*, 1991 WL

16170, * (D. Me. Jan. 17, 1991)(limited discovery permitted to determine "when wires and mails were used and what was communicated"); *Freeport Transit, Inc. v. McNulty*, 239 F.Supp.2d 102, 118 (D. Me. 2003) (plaintiff permitted discovery to determine the "time, place and content" of wire and mail communications) (both cited in Pls. Mem. at 7).

The discovery sought in this case is starkly different.  Plaintiffs seek discovery here in an attempt to discover facts that will provide a basis for their conclusory allegations that AWPs were fraudulent, not to discover the who, what and when of specific wire and mail transactions. This court has refused to allow discovery in a case involving requests very similar to those made here. In *Kostantinako v. Fed'l Dep. Ins. Corp.*, 719 F.Supp. 35 (D. Mass. 1989), a shareholder of a bank brought securities and RICO claims against the FDIC and several of the bank's former officers and directors for damages allegedly suffered as a result of allegedly fraudulent statements made by the bank.  *Id.* at 37.  Although the plaintiff detailed specific "misstatements" made by the bank, he did "not explain what was misleading about any of the challenged statements." *Id.* at 38. Moreover, the complaint failed to detail specific conduct by any of the defendants except the FDIC.  *Id.* at 39.  Because these pleading failures related to the fundamental basis of plaintiff's claims, discovery was not warranted:

> Allowing limited discovery in this case would not serve the purposes of Rule 9(b).  *Becher* intended to permit plaintiffs limited discovery only to provide 'the details of just when and where the mail or wires were used. A plaintiff is not relieved of his obligation to inform the defendants of the nature of the fraud alleged, and to do so in his initial complaint.
>
> The mail and wire fraud acts contained in plaintiff's complaint are all alleged to relate to the dissemination of material misrepresentations and omissions. But plaintiff's complaint does not particularize the

misrepresentations or omissions which form the basis for the mail and
wire fraud allegations.

> While *Becher* would entitle plaintiff to additional time to particularize
> the fraudulent communications, it does not afford him an opportunity
> to provide the necessary specifics about the underlying basis for the
> mail and wire fraud claims—namely, details about the alleged
> material misrepresentations and omissions.

*Konstantinako*, 719 F.Supp. at 41 (emphasis added).

Plaintiffs in this case are in a similar position to the plaintiff in *Kostantinako*.  As
explained further above, defendants argued in their motion to dismiss that the complaint
was fundamentally flawed for failing to identify "fraudulent AWPs" – in other words the
failure to explain how the AWPs identified in plaintiffs' complaint are fraudulent.  The
statement from defendants' Consolidated Memorandum on which plaintiffs base their
request for discovery merely clarifies defendants' position that identifying a hypothetical
spread does not discharge plaintiffs' pleading duty in this regard. "Were these RICO
plaintiffs licensed to launch a belated "fishing expedition" on the brink of a dismissal,
without having made at least one *manifest allegation* of actionable fraud, we would invite
commonplace abuse of civil RICO and routine deferral of the particularized pleading
required by Rule 9(b)." *Rodriguez-O'Ferral v. Trebol Motors Corp.*, 1993 WL 261993 at
* 4 (1st Cir. July 9, 1993) (unpublished).

## IV.     The Court Has Already Held that Plaintiffs are Not Entitled to the Broad and Intrusive Discovery that They Seek.

The instant motion represents yet another attempt by plaintiffs to make an end-run
around the careful limitations imposed by this Court's previous discovery orders.  The
Court has held on three separate occasions – in its May 13 Order, in CMO 7, and in CMO
8 – that plaintiffs are not permitted to take discovery on claims until they have survived a

motion to dismiss. There is no reason for the Court to depart from that holding now.

The discovery that plaintiffs seek here is far from "limited." Complying with the requests in plaintiffs' motion would require defendants to produce every document in their possession relating to pricing (including proposed pricing), sales, rebates, profit margins and other issues for 321 separate drugs over a 12 year period. They also seek all documents kept in electronic form for the last 12 years relating to all customer invoices, including customer names, addresses, purchase volumes, prices and discounts. It would be extremely burdensome, time consuming and expensive for defendants to review and produce all of the documents that plaintiffs request. Plaintiffs should be required at the very least to meet basic pleading standards before imposing the burden of such broad and intrusive discovery on defendants.

In fact, plaintiffs previously sought all of the discovery that they now request through this motion. The Court rejected most of that discovery in CMO 7. The Court refused to require defendants to shoulder the burden of producing discovery on claims that have not been tested in the crucible of defendants' motions to dismiss and survived that test. The Court reiterated that principle recently in CMO 8. That order was adopted after defendants filed their motion to dismiss, after plaintiffs filed their opposition to that motion and after plaintiffs filed the instant motion for discovery. Obviously, nothing has changed since the Court issued CMO 8 that would justify changing course now to permit discovery to proceed as to claims that have not survived a motion to dismiss.

## CONCLUSION

For the foregoing reasons, defendants respectfully request the Court to deny

plaintiffs' motion for leave to take additional limited discovery.

Respectfully submitted,

ON BEHALF OF DEFENDANTS
IN ALL CLASS ACTIONS

BY:  _____

Mark D. Smith (BBO #542676)
Laredo & Smith LLP
15 Broad Street, Suite 600
Boston, MA 02109
(617) 367-7984 (telephone)
(617) 367-6475 (facsimile)

John C. Dodds, Esq.
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000 (telephone)
(215) 963-5001 (facsimile)

Scott A. Stempel, Esq.
J. Clayton Everett, Jr., Esq.
Morgan Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-3000 (telephone)
(202) 739-3001 (facsimile)

*Attorneys for Defendants Pfizer, Inc.,
Pharmacia Corp. and Pharmacia &
Upjohn, Inc.*

Dated:  September 29, 2003

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2003, I caused a true and correct copy of the aforementioned DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO TAKE ADDITIONAL LIMITED DISCOVERY to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

Mark D. Smith, Esq.