# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In Re:  PHARMACEUTICAL INDUSTRY     :     **MDL NO. 1456**
AVERAGE WHOLESALE PRICE          :
LITIGATION                    :     **Master File No. 01-CV-12257-PBS**
:
                                     :     **Judge Patti B. Saris**
THIS DOCUMENT RELATES TO      :
ALL CLASS ACTIONS              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CONSOLIDATED REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE AMENDED
## MASTER CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

ARGUMENT .................................................................................................................. 2

I.     PLAINTIFFS' GENERALIZED ALLEGATIONS OF A FRAUDULENT
SCHEME ARE INADEQUATE TO SUPPORT CLAIMS AGAINST 23
DIFFERENT DEFENDANTS REGARDING 321 DIFFERENT DRUGS ........... 2

     A.    The PBM Allegations Are Plainly Deficient ....................................................... 2

     B.    Plaintiffs Also Fail To Allege a "Fraudulent AWP" for the Vast Majority of
Medicare Part B Drugs Named in the AMCC ..................................................... 5

     C.    The Allegations Pertaining to "Other" Alleged "Hidden and Improper
Inducements" Are Also Devoid of Any Particulars............................................. 6

II.    PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED ................................. 6

     A.    The Enterprise Allegations Are Deficient as a Matter of Law ............................ 6

     B.    Plaintiffs Cannot Show That the Defendants Conducted or Participated in
the Affairs of the Alleged Enterprises ............................................................... 10

     C.    Plaintiffs Cannot Show That Defendants Directly Caused Their Injuries......... 11

III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR CIVIL CONSPIRACY .......... 13

IV.   THE STATE CONSUMER FRAUD CLAIMS SHOULD BE DISMISSED ...... 15

V.    ALL MULTIPLE-SOURCE DRUG CLAIMS SHOULD BE DISMISSED ....... 17

     A.    Medicare Part B Pays for Multiple-Source Drugs at a Flat Rate....................... 17

     B.    Plaintiffs Fail to Allege Circumstances Permitting AWP-Based Competition
in the Private Payor Context ............................................................................. 18

     C.    The Mere Existence of a "Spread" Does Not State a Claim.............................. 19

CONCLUSION.............................................................................................................. 20

## TABLE OF AUTHORITIES

### Cases

*Aetna Cas. Sur. Co. v. P & B Autobody*,
43 F.3d 1546 (1st Cir. 1994) ...................................................................................... 14

*Allandale Farm, Inc. v. Koch*, No. 97350, 1997 WL
1229248 (Mass. Super. Ct. Nov. 3, 1997) .................................................................. 14

*Arc Networks, Inc. v. The Gold Phone Card Co., Inc.*,
756 A.2d 636 (N.J. Super. Ct. Law Div. 2000) ......................................................... 17

*Arrandt v. Steiner*, No. 00 C 2317, 2001 WL 893807
(N.D. Ill. Aug. 6, 2001) .............................................................................................. 11

*BCCI Holdings (Lux.), S.A.N. v. Khalil*, 214 F.3d 168 (D.C. Cir.),
*cert. denied*, 531 U.S. 958 (2000) .............................................................................. 12

*Blewett v. Abbott Labs.*, 938 P.2d 842 (Wash. Ct. App. 1997) .................................... 17

*Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*,
178 F. Supp. 2d 198 (E.D.N.Y. 2001) ........................................................................ 15

*Camelio v. American Fed'n*, 137 F.3d 666 (1st Cir. 1998) ........................................... 11

*Capiccioni v. Brennan Naperville, Inc.*, 791 N.E.2d 553
(Ill. App. Ct. 2003) ..................................................................................................... 15

*Cashman Equipment Corp. v. Acadian Shipyard, Inc.*, No. 01-241,
2002 U.S. Dist. LEXIS 12243 (E.D. La. June 28, 2002), *aff'd*,
2003 U.S. App. LEXIS 8927 (5th Cir. Apr. 11, 2003) ............................................... 16

*Center Cadillac, Inc. v. Bank Leumi Trust Co.*, 808 F. Supp. 213
(S.D.N.Y. 1992), *aff'd*, 99 F.3d 401 (2d Cir. 1995) ................................................... 6

*City Check Cashing, Inc. v. The National State Bank*,
582 A.2d 809 (N.J. Super. Ct. App. Div. 1990) ......................................................... 17

*Coastal Physician Services of Broward County, Inc. v. Ortiz*,
764 So. 2d 7 (Fla. Dist. Ct. App. 1999) ..................................................................... 16

*Commonwealth v. Percudani*, 825 A.2d 743 (Pa. Commw. Ct. 2003) ......................... 16

**Page**

*DiLucido v. Terminix Int'l, Inc.*, 676 A.2d 1237 (Pa. Super. Ct. 1996)..........................................17

*Doyle v. Hasbro, Inc.*, 103 F.3d 186 (1st Cir. 1996) ....................................................14

*Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12 (1st Cir. 2000),
*cert. denied*, 532 U.S. 905 (2001) .......................................................................... 4-5

*Feinstein v. Resolution Trust Corp.*, 942 F.2d 34 (1st Cir. 1991) ....................................8

*Foval v. First Nat'l Bank of Commerce in New Orleans*,
841 F.2d 126 (5th Cir. 1988) ................................................................................8

*United States ex rel. Franklin v. Parke-Davis*,
147 F. Supp.2d 39 (D. Mass. 2001) ...................................................................5, 6

*Goren v. New Vision Int'l, Inc.*, 156 F.3d 721 (7th Cir. 1998) ........................................8

*Grant v. John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344
(D. Mass. 2002)..................................................................................................14

*United States ex rel. Gublo v. Novacare, Inc.*,
62 F. Supp. 2d 347 (D. Mass. 1999) ...................................................................18

*Herring v. Vadala*, 670 F. Supp. 1082 (D. Mass. 1987)................................................14

*Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258 (1992)....................................13

*Kuney Int'l S.A. v. DiIanni*, 746 F. Supp. 234 (D. Mass. 1990) ......................................5

*United States v. London*, 66 F.3d 1227 (1st Cir. 1995) ...............................................8, 9

*United States v. Luna*, 585 F.2d 1 (1st Cir. 1978) .......................................................18

*Millennium Communications & Fulfillment, Inc. v. Florida*,
761 So. 2d 1256 (Fla. 3rd Dist. Ct. App. 2000)...................................................16

*In re Pharm. Indus. Average Wholesale Price Litig.*,
263 F. Supp. 2d 172 (D. Mass. 2003) .................................................6, 9, 17, 20

*Queeno v. Cote*, No. 98-2585 B, 1999 Mass. Super. LEXIS 506
(Mass. Super. Ct. Dec. 30, 1999)....................................................................14, 15

*S&R Assocs. v. Shell Oil Co.*, 725 A.2d 431 (Del. Super. 1998)....................................16

iii

**Page**

*Schmidt v. Fleet Bank*, 1998 WL 47827
(S.D.N.Y. Feb. 4, 1998) ................................................................................................7

*Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70
(D. Mass. 1998)...........................................................................................................12

*Tank v. State Farm Fire & Cas. Co.*, 715 P.2d 1133 (Wash. 1986) ...............................17

*Traina v. NationsBank of Texas, N.A.*, 00-1160, 2001 U.S. Dist.
LEXIS 14612 (E.D. La. Sept. 7, 2001) .......................................................................16

*Transamerica Title Ins. Co. v. Johnson*, 693 P.2d 697 (Wash. 1985) ...........................17

*United States v. Turkette*, 452 U.S. 576 (1981) ........................................................8, 9

*Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.*,
574 A.2d 641 (Pa. Super. Ct. 1990)............................................................................17

*VanDenBroeck v. CommonPoint Mortg. Co.*,
210 F.3d 696 (6th Cir. 2000) .......................................................................................8

*Van Schaick v. Church of Scientology of Cal., Inc.*,
535 F. Supp. 1125 (D. Mass. 1982) ............................................................................13

*United States ex rel. Walsh v. Eastman Kodak Co.*,
98 F. Supp. 2d 141 (D. Mass. 2000) .......................................................................3, 19

*Weiler v. SmithKline Beecham Corp.*, No. 2422, 2001 Pa. D. & C.
LEXIS 154 (C.P. Phila.Cty. Oct. 8, 2001) ..................................................................16

*Yuhasz v. Brush Wellman, Inc.*, 181 F. Supp. 2d 785 (N.D. Ohio 2001),
*aff'd*, 341 F.3d 559 (6th Cir. 2003)..............................................................................5

**Statutes & Rules**

18 U.S.C. § 1962(c)  ......................................................................................................11

42 C.F.R. § 405.517 (2003) ...........................................................................................18

Fed. R. Civ. P. 9(b)  ................................................................................................*passim*

6 Del. Code Ann. § 2533 (2003).....................................................................................16

Fla. Stat. Ann. §501.204 ...............................................................................................16

**Page**

La. Rev. Stat. Ann. § 1405 ..........................................................................................................16

N.J. Stat. Ann. 56:8-1, *et seq.* (1999) ........................................................................................16

N. Y. Gen. Bus. Law § 349 (2003) ..............................................................................................15

N. Y. Gen. Bus. Law § 350 (2003) ..............................................................................................15

73 Pa. Stat. Ann. § 201-2(4)(ix) (West 2003) ............................................................................16

73 Pa. Stat. Ann. § 201-9.2 (West 2003) .............................................................................16, 17

RCW 19.86.010, *et seq.* ...............................................................................................................16

### Other Authorities

Charles Alan Wright & Arthur R. Miller
5 *Fed. Prac. & Pro. Civ.2d* § 1298 (1990) ..................................................................................13

*Civil RICO Litigation § 6.05* 6-70
(A. Mathews, A. Weisman, & J. Sturc eds., 2d ed. 1992) ............................................................7

The AMCC attempts to expand this case far beyond its original focus – a discrete set of drugs administered by physicians and reimbursed through the Medicare Part B program – by asserting claims relating to hundreds of drugs sold by retail pharmacies and reimbursed through a wide array of negotiated contractual arrangements between private institutional health plans and various PBMs.  Moreover, plaintiffs attempt to accomplish this dramatic expansion without any specific allegations of fraud in the PBM context.  Their "general outline of a general scheme to defraud" in the PBM context fails to identify a single specific drug or specific conduct by a single manufacturer or PBM.  Instead, plaintiffs rely on a few allegations relating to a handful of Medicare Part B drugs, and ask this Court to speculate that nearly every member of the pharmaceutical industry has engaged in a course of pervasive fraud relating to hundreds of entirely different drugs outside the Medicare Part B context.  This Court should reject plaintiffs' blatant attempt to evade their obligation to state their claims with particularity, defendant by defendant and drug by drug.

In opposition to defendants' motion to dismiss, plaintiffs rely heavily on their identification of 321 drugs, 154 RICO enterprises, and  88 separate conspiracies.  But, more bulk has not produced more particularity.[1]  Despite over 300 prolix pages, plaintiffs have failed to cure the defects that this Court found fatal to most of the claims asserted in the MCC.

First, plaintiffs fail to plead their allegations of fraud with the particularity required by Rule 9(b) for all but a few Medicare Part B drugs.  Accordingly, the PBM allegations in their entirety and the vast majority of Part B claims should be dismissed under Rule 9(b).  Second,

---

[1] This is demonstrated not only by the ever expanding number of claims and allegations, but also by the length of the briefs plaintiffs filed in opposition to this motion. CMO 7 and this Court's November 6, 2002 Order provide that plaintiffs' opposition to defendants' motions to dismiss "shall not be longer than 60 pages." Plaintiffs have boldly disregarded this limitation and filed more than *double* the allowed number of pages: a total of 136 pages consisting of one 58-page memorandum responding to points raised in defendants' 40-page consolidated memorandum and one 78-page memorandum responding to the points raised in defendants' individual memoranda.

plaintiffs still fail to allege a viable RICO claim.  Third, plaintiffs fail to allege facts supporting a

claim of civil conspiracy under Massachusetts law.  Fourth, plaintiffs fail to establish critical

elements of their state consumer fraud claims.  And fifth, plaintiffs fail to allege a viable theory

supporting their claims relating to multiple-source drugs.  Accordingly, plaintiffs have no basis

on which to launch their broadside attack against the entire pharmaceutical industry.  All claims

in the AMCC should be dismissed.

## ARGUMENT

## I. PLAINTIFFS' GENERALIZED ALLEGATIONS OF A FRAUDULENT SCHEME ARE INADEQUATE TO SUPPORT CLAIMS AGAINST 23 DIFFERENT DEFENDANTS REGARDING 321 DIFFERENT DRUGS

Plaintiffs concede that the AMCC does not include particularized allegations of

fraudulent conduct relating to each defendant or each of the approximately 321 different drugs

identified in Appendix A to the AMCC.  *See* Pl. Opp. at 11-14.  Instead, plaintiffs argue that they

need only provide a "general outline of the general scheme to defraud" to support their claims.

Pl. Opp. at 10, 12, 14.  There is no justification for the application of this relaxed pleading

standard to plaintiffs' claims.  Indeed, plaintiffs have failed to plead specific facts within their

control regarding "exactly what the fraud is" for the vast majority of drugs identified in the

AMCC.

### A.     The PBM Allegations Are Plainly Deficient

Through their PBM claims, plaintiffs seek to expand the scope of this litigation well

beyond the drugs reimbursed through Medicare Part B, to include "the drug benefits of 210

million people in the United States."  AMCC ¶ 170.  Yet, plaintiffs concede that the PBM claims

in the AMCC are supported by nothing more than a "general explanation of the scheme," without

any particulars as to *any* defendant or *any* drug.  *See* Pl. Opp. at 12-13; *see also* AMCC ¶¶ 168-

2

78.  In fact, *all* of the purported "examples of specific unlawful conduct" in the AMCC, *see*

AMCC ¶¶ 201-540, relate to drugs in the Medicare Part B program, including plaintiffs' only

purported example of "conspiratorial conduct with PBMs," *see* Pl. Opp. at 13 (citing AMCC ¶

236(b)).  Plaintiffs' narrow allegations relating to Medicare Part B drugs administered and sold

by physicians do not satisfy Rule 9(b) with respect to their PBM claims, because these claims

involve hundreds of different drugs sold through retail pharmacies and reimbursed in the entirely

different context of privately negotiated contractual arrangements.  In short, the AMCC is devoid

of any defendant- or drug-specific allegations relating to the PBM claims.  This Court should not

countenance the dramatic expansion of this litigation into the PBM context on the basis of a few

conclusory allegations and contrary to the Court's instruction that plaintiffs must focus and

particularize their allegations.

Recognizing that their PBM allegations do not meet the requirements of Rule 9(b),

plaintiffs argue that they should be excused from pleading these claims with particularity.  Pl.

Opp. at 10, 13.  This argument is meritless.  No relaxation of the standards for pleading fraud is

warranted because relevant information supporting plaintiffs' PBM claims is by no means within

defendants' *exclusive* control.  *See, e.g., United States ex rel. Walsh v. Eastman Kodak Co.*, 98 F.

Supp. 2d 141, 147 (D. Mass. 2000) (dismissing False Claim Act claim with prejudice where

relator was in a position to uncover false cost report but his complaint merely "set[] out a

methodology by which the [vendor defendants] might have produced false invoices, which in

turn could have led to false claims [,w]ithout citing a single false claim").

Plaintiffs allege generally that health plans contract with PBMs so that plan participants

can obtain brand name drugs through retail pharmacies or via mail order, and that pursuant to

3

these contracts brand name drugs are priced at AWP less a percentage discount, in part so that PBMs can profit from the difference between the amount collected from the plans and the amount paid out to pharmacies.  AMCC ¶¶ 169-71.  But, six of the eleven named plaintiffs are themselves health plans that presumably contract with a PBM.  Even so, the AMCC contains no allegations relating to communications with any specific PBM, the terms of any specific contract with a PBM, the discounts off AWP that were negotiated by these plans, or the drugs subject to these agreements.  All of this information is within plaintiffs' possession.

Most importantly, plaintiffs – not  defendants – know the allegedly fraudulent prices paid for defendants' products.  Still, the AMCC contains no such allegations.  The amount paid for every purchase of each drug arguably is not required, and defendants have not suggested that such detail must be plead.  But plaintiffs have failed even to allege a single price paid by a single plaintiff for a single drug.[2]

Plaintiffs also fail to allege another basic, easily obtainable fact – the specific reimbursement formulas contained in the contracts they themselves negotiated with PBMs. Without this most basic allegation, it is impossible to know whether plaintiffs paid anything close to the published AWP they allege is fraudulent.[3]  Again, this information is indisputably within plaintiffs' control; accordingly, plaintiffs cannot be excused from meeting the requirements of Rule 9(b).  *See Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 16 (1st Cir. 2000) (explaining that relaxed pleading standard does not apply where information is held by

---

[2] Nor do defendants argue, as plaintiffs suggest, that the precise spread between published AWPs and acquisition costs of providers and PBMs must be quantified.  *See* Pl. Separate Opp. at 7.  Rather, defendants argue that the mere regurgitation of published AWPs and speculative allegations of hypothetical spreads are not sufficient. Def. Mem. at 9.  Plaintiffs bear the burden of alleging particularized facts demonstrating why any such spread is fraudulent.

[3] Note that, in the PBM context, the only example set forth in the AMCC is from a *Wall Street Journal* article describing a PBM client receiving a 60% discount off AWP.  *See* AMCC ¶ 178.

4

plaintiffs), *cert. denied*, 532 U.S. 905 (2001).[4]

Ironically, plaintiffs attempt to hide behind the massive case that they have created as a reason to disregard the requirements of Rule 9(b). *See* Pl. Opp. at 12 (arguing that this case involves thousands of fraudulent statements). Plaintiffs chose to name over twenty defendants in a single suit involving over 300 drugs, rather than to streamline their complaint to focus on the limited number of Medicare Part B drugs with which they started. Plaintiffs now must live with the obligation to allege these claims with specificity, defendant by defendant and drug by drug. *See Yuhasz v. Brush Wellman, Inc.*, 181 F. Supp. 2d 785, 792-93 (N.D. Ohio 2001) (holding that "relator should not be able to avoid the specificity requirements of Rule 9(b) by 'relying on the complexity of the edifice which he created'") (citation omitted), *aff'd* 341 F.3d 559 (6th Cir. 2003). Their failure to do so with respect to the PBM claims requires that those claims be dismissed.

### B. Plaintiffs Also Fail To Allege a "Fraudulent AWP" for the Vast Majority of Medicare Part B Drugs Named in the AMCC

Likewise, in the Medicare Part B context, plaintiffs assert that they overpaid for "all drugs administered under Medicare Part B." AMCC ¶ 140, 141. Yet, the AMCC includes particularized allegations relating to only a handful of Part B drugs. Accordingly, this Court should dismiss plaintiffs' claims relating to Medicare Part B drugs for which the AMCC contains no particularized allegations of fraud.[5]

---

[4] To the extent plaintiffs rely on "information and belief" allegations, they acknowledge that they must plead those facts upon which their beliefs are found, *see* Pl. Opp. at 10 (citing *Kuney Int'l S.A. v. DiIanni*, 746 F. Supp. 234, 237 (D. Mass. 1990)), yet none is included with respect to the PBM allegations in the AMCC.

[5] Plaintiffs mistakenly rely on *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39 (D. Mass. 2001) to support their argument that they should be excused from satisfying Rule 9(b). In *Parke-Davis*, however, this Court carefully considered the plaintiff's claims drug by drug, and ultimately dismissed claims relating to one

### C. The Allegations Pertaining to "Other" Alleged "Hidden and Improper Inducements" Are Also Devoid of Any Particulars

With a similarly broad brush, plaintiffs list purported examples of alleged "inducements" offered by some defendants relating to a few drugs, and argue that they have adequately alleged that all defendants have engaged in all of the alleged conduct with respect to all of the drugs listed in Appendix A. *See* Pl. Opp. at 15. These allegations blatantly violate Rule 9(b). *See Center Cadillac, Inc. v. Bank Leumi Trust Co.*, 808 F. Supp. 213, 230 (S.D.N.Y. 1992), *aff'd*, 99 F.3d 401 (2d Cir. 1995).

For these reasons, Counts I, II, IV, and IX should be dismissed.

## II. PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED

### A. The Enterprise Allegations Are Deficient as a Matter of Law

In evaluating the MCC, this Court was "mindful of the First Circuit's instruction that while 'the pleadings should generally be construed liberally . . . a greater level of specificity is required in RICO cases.'" *In re. Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 178 (D. Mass. 2003) (citations omitted) (hereinafter "*AWP Litigation*"). Following this instruction, the Court rejected plaintiffs' first attempt to plead RICO claims because plaintiffs "failed to allege *facts*" that would establish the existence of the proffered enterprises. *Id.* at 184 (emphasis supplied).

Plaintiffs assert that they have succeeded in their second attempt to plead viable RICO claims by "[r]edefining the definition of the enterprises pled under [RICO] to eliminate the so-called 'hub-and-spoke' problem that concerned the Court." Pl. Opp. at 1. However, while plaintiffs go to great lengths to explain their new enterprise "definition," they do not demonstrate

---

drug where a "general scheme" was alleged without any specific facts. 147 F. Supp. 2d at 47-50. The same analysis applies here, and requires the dismissal of all claims relating to the vast majority of drugs identified in Appendix A.

6

in any way how the AMCC pleads *facts* to support this "definition."

Plaintiffs do not deny that the AMCC merely disaggregates the MCC's 79 enterprises into 154 "mini enterprises" that are nothing more than the component parts of the enterprises that the Court has already found to be defective.[6]  Pl. Opp. at 19, 25.  Plaintiffs also do not deny that all they have done is cut and pasted the Court's language regarding the legal standards governing the RICO enterprise requirement into the AMCC.  Plaintiffs have lifted these phrases and repeated them over and over in the AMCC.  But, these phrases merely describe characteristics of a viable RICO enterprise; a plaintiff must plead facts showing that the alleged enterprises have these characteristics.  Plaintiffs have not done so here.  Rather, they confuse their obligation to allege facts with the mere recitation of unsubstantiated generalizations.  *See Schmidt v. Fleet Bank*, 1998 WL 47827, at *8 (S.D.N.Y. Feb. 4, 1998) (RICO action dismissed where allegations are "entirely conclusory and simply parrot the statutory requirements.").

For example, with regard to the Manufacturer-Publisher Enterprises, plaintiffs assert that they have set forth a "'systematic linkage' through 'contractual relationships, financial ties, and continuing coordination of activities' including a 'common communication network.'"  Pl. Opp. at 19-20 (citing AMCC ¶ 625).  Similarly, with respect to the Manufacturer-PBM Enterprises, plaintiffs allege that there is a "common communications network between each PBM and each manufacturer for the purpose of implementing the AWP spread scheme."  AMCC ¶ 659.  Nowhere in the AMCC do plaintiffs allege a single fact that would, if true, prove that a single specific defendant had a "systematic linkage" or a "common communication network" with a

---

[6] *See* Civil RICO Litigation § 6.05 at 6-70 (A. Mathews, A. Weisman, & J. Sturc eds., 2d ed. 1992) ("[P]laintiffs' search for an acceptable enterprise [sometimes] results in presenting a confusing array of alternate enterprise allegations, under the theory that the more seeds that are sown, the more likely it is that one will ultimately bear fruit.").

single specific publisher or PBM.  Rather, plaintiffs simply take language from the Court's

Opinion and repeat it like a "statutory mantra," making "ritualistic averment[s], in wholly

conclusory terms." *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 42, n.7 (1st Cir. 1991); *see

also Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998).  This cannot, as a matter

of law, suffice to set forth a viable association-in-fact RICO enterprise.  Plaintiffs must plead

facts; instead they seek to link all of the defendants, all of the publishers, and all of the PBMs

through a series of undifferentiated conclusions.

Thus, plaintiffs have not satisfied the requirements of *United States v. Turkette*, 452 U.S.

576, 583 (1981).  Plaintiffs do not point to a single fact specific to any of the defendants showing

how a defendant actually formed an "ongoing organization" with any publisher or PBM separate

and apart from the alleged pattern of racketeering activity.  *See Turkette*, 452 U.S. at 583;

*VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir. 2000).  In addition,

plaintiffs have failed to plead any facts showing a level of organization and purpose beyond a

mere arms-length business arrangement between any defendant and any publisher or PBM.  *See

Foval v. First Nat'l Bank of Commerce in New Orleans*, 841 F.2d 126, 129 (5th Cir. 1988).

One of the cases cited by plaintiffs, *United States v. London*, 66 F.3d 1227 (1st Cir.

1995), actually highlights the deficiencies of the AMCC's enterprise allegations.[7]  In *London*, the

court upheld a conviction based on an association-in-fact enterprise between a check cashing

service and a bar.  The court noted that the two entities "functioned as a continuing unit and had

an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering

---

[7] Plaintiffs cite *London* for the self-evident proposition that an association-in-fact may be comprised of legal entities.  Pl. Opp. at 21 (citing *London*, 66 F.3d at 1243).  However, such an enterprise must still satisfy the threshold requirements set forth in *Turkette*.  *See London*, 66 F.3d at 1243.

activity . . . ." *Id.* at 1244.  Plaintiffs have made no such allegations with respect to the "Manufacturer-Publisher Enterprises" or the "Manufacturer-PBM Enterprises."  Indeed, the AMCC itself describes the publishers as "independent," AMCC ¶ 152, and the Opposition acknowledges that that the manufacturers and the publishers are "separate legal entities, each conducting their own respective businesses . . . ."  Pl. Opp. at 21.  Moreover, in *London* the check cashing service was located within the bar, and both entities were operated by the same individual.  *London,* 66 F.3d at 1230.  This level of interrelation between associates clearly is not present in the enterprise allegations set forth in the AMCC.

Plaintiffs have also failed to plead facts showing that the Manufacturer-Publisher and Manufacturer-PBM enterprises shared the "common purpose" required by *Turkette*.  With regard to the MCC, this Court observed that "[t]here is no allegation that the publishing companies even benefited from the 'spread' scheme other than by the profits generated for publishing data provided to them."  *AWP Litigation,* 263 F. Supp. 2d at 185.  In response, plaintiffs assert that the publishers reported AWPs provided by manufacturers because to do otherwise would "require publishers to spend money to extensively survey actual sales prices in the market."  AMCC ¶ 624.  This assertion, even if true, shows nothing more than a unilateral decision by the publishers.

The allegations of "common purpose" with regard to the Manufacturer-PBM Enterprises are equally deficient.  Plaintiffs assert that "each Manufacturer-PBM Enterprise has a common purpose of 'selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members' and 'perpetuating the use of AWPs as a benchmark for reimbursement in the Pharmaceutical industry.'"  Pl. Opp. at 27 (citing AMCC ¶¶ 652, 654).  Plaintiffs assert that the

9

PBMs "share this common purpose, because they are subject to a great deal of control from the manufacturers." AMCC at ¶ 654. However, plaintiffs do not point to a single factual allegation in the AMCC that, if true, would support the surprising assertion that a single PBM was subject to "a great deal of control" by a single manufacturer. Indeed, a factual showing that any one manufacturer "controlled" a PBM would negate plaintiffs' ability to demonstrate "control" by other manufacturers – much less that each PBM was subject to control by all 22 RICO defendants.

Plaintiffs' theory in the MCC was that each of the competitor manufacturers simultaneously joined separate but identical enterprises with all of the publishers and all of the PBMs to do the same things at the same time. That theory failed for lack of particularized factual allegations. In response, plaintiffs have switched to the theory that each of the competitor manufacturers simultaneously joined separate but identical enterprises with each individual publisher and each individual PBM to do the same things at the same time. Plaintiffs' latest theory is no less farfetched than its predecessor. This theory is not based on particularized factual allegations, but, instead, is the product of a cynical pleading game aimed at making this case as large, sprawling, and unmanageable as possible.

### B. Plaintiffs Cannot Show That the Defendants Conducted or Participated in the Affairs of the Alleged Enterprises

With respect to the Manufacturer-Publisher Enterprises, plaintiffs claim that each defendant "controls each of its respective Manufacturer-Publisher Enterprises" simply "by reporting to the Publishers the AWP." Pl. Opp. at 29. Plaintiffs claim that defendants "exercise a similarly large degree of control over their respective Manufacturer-PBM Enterprises" by simply "setting the AWP." Pl. Opp. at 30. However, plaintiffs do not cite a single case in which

10

a court has found the requirements of 18 U.S.C. § 1962(c) to be satisfied by such acts.

Plaintiffs' attempt to distinguish *Arrandt v. Steiner*, No. 00 C 2317, 2001 WL 893807

(N.D. Ill. Aug. 6, 2001), fails. The *Arrandt* court determined that the plaintiff's failure to allege

that the defendant corporation in some way directed the affairs of an association-in-fact made up

of linen providers scuttled plaintiffs' RICO claims:

> the same pleading deficiencies that undermine Arrandt's attempt to plead an
> association in fact enterprise (lack of specific allegations from which to infer that
> the members are organized in a unit with differentiated roles) also dooms
> Arrandt's attempt to plead that Steiner conducts the affairs of such an association
> in fact enterprise. There is nothing in the amended complaint from which to infer
> that Steiner directs the other members of the enterprise, takes orders from the
> other members, or controls the enterprise's affairs in a way that is distinct from
> merely directing its own affairs.

*Id.* at *5. These same deficiencies are present in the AMCC. Plaintiffs have merely alleged

arms-length business relationships between the manufacturers, the publishers, and the PBMs.

Plaintiffs have not alleged any facts explaining how any one of the defendants exerted control

over independent publishers and PBMs, let alone how this occurred simultaneously with twenty-

two separate manufacturers. Plaintiffs assert that "the AMCC's allegations of control and

participation" are "equally manifest" as to both the Manufacturer-Publisher and Manufacturer-

PBM enterprises. In reality, they are equally lacking.

### C.   Plaintiffs Cannot Show That Defendants Directly Caused Their Injuries

Plaintiffs concede that RICO requires a "direct relationship" between plaintiffs' alleged

injury and the alleged fraud. *See* Pl. Opp. at 32; *see also Camelio v. American Fed'n*, 137 F.3d

666, 669-70 (1st Cir. 1998). Plaintiffs claim that they have satisfied this requirement because

they were "the targets of the Defendants' AWP scheme." Pl. Opp. at 32. Even if this assertion

11

were correct, it would not satisfy the proximate cause requirement that plaintiffs concede they must meet.[8]

In fact, plaintiffs do not deny the numerous intervening acts between the alleged fraud and their alleged injuries.  First, plaintiffs concede that defendants made no misrepresentations directly to them.  Second, plaintiffs do not deny that the prescribing doctor can set the charge submitted to Medicare at an amount below AWP, rendering AWP entirely irrelevant to the Medicare co-payment amount.  Third, plaintiffs do not deny that Congress, CMS/HCFA, and the Medicare carriers chose to base reimbursement on AWP – and that, absent their decisions, plaintiffs' alleged injury would not have occurred.  Finally, plaintiffs do not deny that defendants have no involvement in the contractual relationships between plaintiffs and their PBMs, and therefore no involvement in the amount that the PBMs charge health plans or whether the health plans chose to base their payments to the PBMs on AWP.  *See* Pl. Opp. at 37-38.

Plaintiffs cite *Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70 (D. Mass. 1998), but that case does not support their position.  Pl. Opp. at 33-35.  In *Sebago*, the plaintiff property owners sued a manufacturer of roofing insulation that had caused damage to their properties. Unlike this case, the plaintiffs (or their predecessors) bought the defective products directly from the defendants.  The court held that the plaintiffs had alleged a direct RICO injury, because their injury was caused by the defective product manufactured and marketed by defendants.  *Id.* at 83.

---

[8] Plaintiffs look to *BCCI Holdings (Lux.), S.A.N. v. Khalil*, 214 F.3d 168, 174 (D.C. Cir.), *cert. denied*, 531 U.S. 958 (2000), to support their causation argument. This reliance is misplaced. The plaintiffs in *BCCI Holdings* were court-appointed liquidators for BCCI, a failed bank. Plaintiffs sought to recover damages suffered by BCCI as a result of various fraudulent acts. The Court found RICO liability as to defendant Khalil, because he was directly involved in the fraudulent schemes that led to BCCI's collapse, including allowing BCCI's former management to use his name "to disguise risky investments and to create the false impression that BCCI was servicing large loans that were actually in default" and that Khalil actively "conspired to loot BCCI's assets." *Id.* at 170, 174. Such a direct connection between defendants' alleged acts and plaintiffs' harm is clearly lacking in the AMCC. Moreover, the Court rejected the bank's claim for certain other losses because they were "much more contingent on other factors." *Id.* at 174. Likewise, plaintiffs' alleged injuries in this case are also contingent on various other factors.

*Sebago* did not involve any of the multi-layered intervening actors and actions present here.

Plaintiffs' theory of liability is completely contrary to the principles set forth in *Holmes*. There, the Supreme Court stated that, although the language of the RICO statute could be read to authorize liability on the basis of "but for" causation, "[t]his construction is hardly compelled . . . and the very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover persuades us that RICO should not get such an expansive reading." *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 263-64 (1992) (citations omitted). Because plaintiffs cannot show that their injuries were caused directly by defendants, the RICO claims must be dismissed.

For these reasons, Counts I and II should be dismissed.

## III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR CIVIL CONSPIRACY

Plaintiffs' conclusory, boilerplate allegations of civil conspiracy are woefully inadequate under Rule 9(b). The AMCC alleges that each of 22 defendants engaged in separate civil conspiracies with each of the four major PBMs to maintain an AWP-based reimbursement system for private-payors. Thus, 88 separate conspiracies are alleged. Despite the requirement that they do so, however, plaintiffs have not even attempted to delineate the participation of the 22 alleged defendant conspirators in the purported conspiracies. Indeed, the factual allegations regarding each of the 88 conspiracies are identical; the only difference is the name of the defendant. *See* AMCC ¶ 728 (a) – (v). For this reason alone, the conspiracy claims must be dismissed under Rule 9(b). *See, e.g., Van Schaick v. Church of Scientology of Cal., Inc.*, 535 F. Supp. 1125, 1141 (D. Mass. 1982); *see also* Charles Alan Wright & Arthur R. Miller, 5 Fed. Prac. & Pro. Civ.2d § 1298 n.18 (1990) (when suing multiple defendants, plaintiff must allege fraud perpetrated by each defendant with specificity) (citing cases).

13

For example, plaintiffs fail to allege how each specific defendant, none of whom was a party to the private contracts that plaintiff funds negotiated with the PBMs, specifically conspired with each PBM to require plaintiff funds to reimburse PBMs for pharmaceuticals pursuant to a formula that incorporates published AWPs.  This failure is fatal.  *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996); *Aetna Cas. Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994); *Herring v. Vadala*, 670 F. Supp. 1082, 1087 (D. Mass. 1987).

Moreover, plaintiffs' conspiracy claims are logically inconsistent; plaintiffs have failed to explain how each defendant could induce each PBM to agree to favor that defendant's products over those of 21 other defendants, with whom each PBM was also allegedly conspiring.[9] Plaintiffs also have failed to explain how the defendants' reporting of AWPs furthered an alleged fraud when the reimbursement formulas contained in plaintiffs' contracts with the PBMs were negotiated by plaintiff funds and PBMs in arm's-length transactions, without the participation of defendants.  *See Allandale Farm, Inc. v. Koch*, No. 97350, 1997 WL 1229248, at *3 (Mass. Super. Ct. Nov. 3, 1997) (a mere allegation of a conspiracy, "standing by itself, does not constitute grounds for relief").

Finally, plaintiffs' conspiracy claims must be dismissed because there is no separate conspiracy action under Massachusetts law when the alleged conspiracy is based on the same underlying conduct as plaintiff's other claims.  *See Grant v. John Hancock Mut. Life Ins. Co.*, 183 F. Supp.2d 344, 364 (D. Mass. 2002).[10]  For these reasons, Count IX should be dismissed.

---

[9] *See* AMCC ¶ 729 ("The Defendant Drug Manufacturers deliberately and fraudulently overstate the AWPs . . . in order to obtain each of the PBM agreement [sic] to advocate and favor that particular Defendant Drug Manufacturer's drug to the members of that PBM's clients.").

[10] In an attempt to evade the clear holding of *Grant*, plaintiffs cite *Queeno v. Cote*, No. 98-2585B, 1999 Mass. Super. LEXIS 506 (Mass. Super. Ct. Dec. 30, 1999).  That case did not sustain separate causes of action for

14

## IV.    THE STATE CONSUMER FRAUD CLAIMS SHOULD BE DISMISSED

With respect to plaintiffs' claims under state consumer fraud statutes, plaintiffs do not allege that their purported injuries were directly caused by defendants' conduct. *See* Def. Mem. at 29-31.  Plaintiffs' argument that third parties such as PBMs, the government, and medical providers "advanced" a causal chain of events set into motion by defendants' conduct ignores the legal significance of the independent decisions made by these intervening actors.[11]  Accordingly, plaintiffs' claims under the consumer fraud statutes of Florida, Illinois, Louisiana, New Jersey, New York, Pennsylvania, Texas, and Washington should be dismissed for failure to allege the requisite causation.

In addition, the state statutes invoked by plaintiffs require a showing that the public was, or could have been, deceived by defendants' conduct. *See* Def. Mem. at 32 & n.21.  Plaintiffs effectively concede that they cannot satisfy this critical element by admitting that plaintiffs' purchases were not influenced by defendants' allegedly fraudulent conduct. *See* Pl. Opp. at 45-46 (acknowledging that class members "did not decide to purchase drugs based on [AWP] prices listed in the *Red Book*").

Further, plaintiffs' claims under New York's General Business Law § 350[12] and Section

---

fraud and civil conspiracy.  Rather, the court held that, in order to state a single cause of action, plaintiff's fraud allegations "must, by necessity, be read with the count that alleges a civil conspiracy." *Id.* at *8, *13-14.

[11] Plaintiffs' reliance on *Capiccioni v. Brennan Naperville, Inc.*, 791 N.E.2d 553 (Ill. App. Ct. 2003), is misplaced.  Pl. Opp. at 43.  In *Capiccioni*, the defendant real estate agent gave plaintiff homebuyers a brochure that falsely represented that the home they purchased was in a particular school district.  Thus, a misrepresentation was made directly to the plaintiffs by the defendant.  Here, plaintiffs have acknowledged that the allegedly fraudulent statement (the reported AWPs) did not play a role in their clients' decision to purchase drugs.  Pl. Opp. at 45.

[12] *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 178 F. Supp.2d 198 (E.D.N.Y. 2001), relied on by plaintiffs, is inapposite because it addresses the pleading requirements of GBL § 349 only.

201-2(4)(ix) of Pennsylvania's Unfair Trade Practices and Consumer Protection Law[13] must be

dismissed because these statutes requires proof of reliance, *see* Def. Mem. at 35, and plaintiffs

have conceded that they did not rely on defendants' allegedly fraudulent statements, *see* Pl. Opp.

at 45-46, 51-52.

Finally, plaintiffs lack standing to sue under:

- Delaware's Uniform Deceptive Trade Practices Act because they are not defendants' competitors, *see* 6 Del. Code Ann. § 2533; *see also S&R Assocs. v. Shell Oil Co.*, 725 A.2d 431 (Del. Super. 1998);[14]

- Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §501.204, because they are not residents of Florida, *see Coastal Physician Services of Broward County, Inc. v. Ortiz*, 764 So. 2d 7, 8 (Fla. Dist. Ct. App. 1999);[15]

- Louisiana's Unfair Trade Practices Act, La. Rev. Stat. Ann. § 1405, because they are neither direct consumers nor business competitors of defendants;[16]

---

[13] 73 Pa. Stat. Ann. Section 201-2(4)(ix), which plaintiffs invoke, *see* AMCC ¶ 686, provides a cause of action for "[a]dvertising goods or services with intent not to sell them as advertised." Plaintiffs do not contest that reliance is a necessary element of a cause of action based on allegedly false advertising. Instead, they argue that they are not alleging a claim for false advertising, despite the fact that they have invoked Section 201-2(4)(ix). If that is the case, their claim under section 201-2(4)(ix) should be dismissed for that reason alone.

Furthermore, even under the catchall provision of the Pennsylvania UTPCPL, 73 Pa. Stat. Ann. § 201-9.2 (xxi), private plaintiffs must allege that they relied on the allegedly false statement. The 1996 amendment to the catchall definition of deceptive practices, 73 Pa. Stat. Ann. § 201-2(4)(xxi), did not change the pleading requirement for private plaintiffs. *Commonwealth v. Percudani*, 825 A.2d 743 (Pa. Commw. Ct. 2003), is not apposite because it deals with an enforcement action by the Attorney General. Likewise, plaintiffs' reliance on *Weiler v. SmithKline Beecham Corp.*, No. 2422, 2001 Pa. D. & C. LEXIS 154 (C.P. Phila. Cty. Oct. 8, 2001), is misplaced. Plaintiffs in *Weiler* based their claim on an alleged omission. Where an omission forms the basis of the allegedly deceptive behavior, reliance would be impossible to prove, which is why that claim could only be brought under the catchall provision of Pennsylvania's consumer fraud law. Here, plaintiffs do not allege an omission, but rather, affirmative reporting of fraudulent AWPs. Accordingly, plaintiffs must allege reliance, which they have failed to do.

[14] Indeed, plaintiffs have apparently abandoned any claim under this Act. *See* Pl. Opp. at 47 (stating that they "assert their claims under the Delaware Consumer Fraud Act").

[15] The case cited by plaintiffs, *Millennium Communications & Fulfillment, Inc. v. Florida*, 761 So.2d 1256 (Fla. Dist. Ct. App. 2000), is inapposite because it involved an enforcement action brought by the Florida Attorney General regarding conduct that occurred entirely within the state. *See id.* at 1260, 1262.

[16] Although there is a split among the intermediate courts of Louisiana, *see* Pl. Opp. at 48, this Court must base its decision on how it believes the Louisiana Supreme Court would rule on the issue. Both the United States District Court for the Eastern District of Louisiana and the Fifth Circuit have concluded that the Louisiana Supreme Court would agree with those cases that have held that only consumers and competitors have standing to assert a claim under this statute. *See Cashman Equipment Corp. v. Acadian Shipyard, Inc.*, No. 01-241, 2002 U.S. Dist. LEXIS 12243, at *3-6 (E.D. La. June 28, 2002), *aff'd* 2003 U.S. App. LEXIS 8927 (5th Cir. Apr. 11, 2003); *Traina v. NationsBank of Texas, N.A.*, 00-1160, 2001 U.S. Dist. LEXIS 14612, at *19-21 (E.D. La. Sept. 7, 2001).

16

- New Jersey's Consumer Fraud Act, N.J. Stat. Ann. 56:8-1 *et seq.*, because they are not "consumers," *see* Def. Mem. at 34;[17]

- Pennsylvania's Unfair Trade Practices and Consumer Protection Law because they did not purchase drugs for "personal, family or household purposes," but, instead, are suing for business losses, *see* 73 Pa. Stat. Ann. § 201-9.2;[18] and

- Washington's Consumer Protection Act, RCW 19.86.010, *et seq.*, because they are not direct purchasers. Plaintiffs offer no authority for their misguided proposition that indirect purchasers can bring a claim under this statute.[19]

For these reasons, Count IV should be dismissed.

## V.   ALL MULTIPLE-SOURCE DRUG CLAIMS SHOULD BE DISMISSED

### A.   Medicare Part B Pays for Multiple-Source Drugs at a Flat Rate

Inflation of AWPs provides no competitive advantage to manufacturers of multiple-source drugs in the context of Medicare Part B, as all formulations of a drug are paid at a single rate. *See* 42 C.F.R. § 405.517. As this Court recognized, this payment scheme is inconsistent with the theory of plaintiffs' case.[20] *See AWP Litigation,* 263 F. Supp.2d at 194 n.11.

---

[17] Plaintiffs' effort to distinguish *City Check Cashing, Inc. v. The National State Bank,* 582 A.2d 809 (N.J. Super. Ct. App. Div. 1990) is unavailing. Plaintiffs cannot avoid the fact that, even though they pay for defendants' products, they do not "use[] [the drugs], and so diminish[] or destroy[] their utilities." *Id.* at 811. Plaintiffs here, like the claimants in *City Check Cashing,* allege economic loss. Under New Jersey law, such allegations are not sufficient. *See also Arc Networks, Inc. v. The Gold Phone Card Co., Inc.,* 756 A.2d 636, 638-39 (N.J. Super. Ct. Law Div. 2000) (claim dismissed where plaintiff was not ultimate consumer of phone services for which it contracted).

[18] Plaintiff's reliance on *Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.,* 574 A.2d 641 (Pa. Super. Ct. 1990), is misplaced. In that case, the court held that a condominium association had standing only because the Uniform Condominium Act expressly authorized such associations to sue in a representative capacity on behalf of the unit owners. *Id.* at 645, 648. Plaintiffs in this case, like the landlord who purchased goods for the household use of her tenants in *DiLucido v. Terminix Int'l, Inc.,* 676 A.2d 1237, 1242 (Pa. Super. Ct. 1996), clearly do not have standing.

[19] Plaintiffs' effort to distinguish *Blewett v. Abbott Labs,* 938 P.2d 842 (Wash. Ct. App. 1997), is not supported by Washington precedent. Other cases have also denied standing under the CPA because plaintiffs were only indirectly injured by the allegedly unfair or deceptive conduct. *See, e.g., Tank v. State Farm Fire & Cas. Co.,* 715 P.2d 1133 (Wash. 1986) (denying standing to a third party claimant to an insurance agreement); *Transamerica Title Ins. Co. v. Johnson,* 693 P.2d 697 (Wash. 1985) (denying standing to a seller of property in claim against title insurer where seller was not purchaser of insurance policy).

[20] Plaintiffs' arguments relating to Medicaid payment for multiple-source drugs have no place here. *See, e.g.,* Pl. Opp. at 53. Plaintiffs assert no Medicaid-related claims. To the extent that some government entities

Remarkably, plaintiffs never address the regulatory provision controlling payment of multiple-source drugs under Medicare Part B.  Indeed, plaintiffs cite no authority at all when purporting to describe how such drugs are treated by the federal government.  *See, e.g.,* Pl. Opp. at 52 n.4, 53, 54-55.  Instead, plaintiffs assert that the payment methodology described in 42 C.F.R. § 405.517 constitutes a "matter of fact outside the record." *Id.* at 54.  Plaintiffs clearly are wrong, as Courts routinely rely on published regulations in deciding motions to dismiss. *See, e.g., United States ex rel. Gublo v. Novacare, Inc.,* 62 F. Supp.2d 347, 355-56 (D. Mass. 1999).

Plaintiffs further assert that Medicare carriers do not comply with 42 C.F.R. § 405.517, suggesting that various carriers calculate payment in different ways under that regulation. Pl. Opp. at 56.  This argument is misguided.  First, the Court may assume that the government will act in accordance with valid regulations. *See United States v. Luna,* 585 F.2d 1, 12 (1st Cir. 1978).  Second, even if true, all formulations of a given multiple-source drug still would be paid at the same flat rate, but that amount might vary from state to state.  Accordingly, the fundamental flaw in plaintiffs' theory remains, and their claims must be dismissed.

### B.    Plaintiffs Fail to Allege Circumstances Permitting AWP-Based Competition in the Private Payor Context

Plaintiffs' allegations regarding payment for multiple-source drugs in the private payor context also remain inadequate.  Plaintiffs do not identify a single example of a payment methodology under which manufacturers of multiple-source drugs can gain competitive advantage by inflating AWPs in the private payor context.  Instead, plaintiffs continue to rely exclusively on broad generalities, many of which conflict with the allegations of the AMCC.

---

advance such claims, those issues are discussed in the appropriate motions to dismiss. *See, e.g.,* Memoranda in Support of Motion to Dismiss the State of Montana's Second Amended Complaint (filed September 15, 2003).

Plaintiffs contend that "in the private payor arena, generic drug reimbursement is closely tied to the published AWP for a generic drug." Pl. Opp. at 53.  The mere fact that reimbursement is "tied" to AWP is not enough to withstand dismissal.  The same could be said of Medicare Part B reimbursement, where reimbursement is based on the *median* AWP, yet competition based on *individual* AWPs is impossible.  The question is not whether reimbursement is "tied" to AWP in the private payor context, but whether individual drugs are reimbursed in such a way that raising one drug's AWP can create a competitive advantage against another drug.  As even the AMCC makes clear, private payors "sometimes" reimburse multiple-source drugs based on a "maximum allowable cost" or MAC.  AMCC ¶¶ 181-82.  When that is the case, changes in an individual AWP provide no competitive advantage.

Plaintiffs' failure to explain reimbursement rules in the "private payor arena" is inexcusable.  Plaintiffs UFCW, TCBW, THWF, CMHV, MAN-U, and PFTHW are themselves "private payors." *See* AMCC ¶¶ 26-31.  They surely know how much they paid for individual drugs and whether the amount paid for a particular multiple-source drug was based on a flat rate (such as a MAC) or on individual AWPs.  Nonetheless, these plaintiffs rely on broad and contradictory allegations about an entire industry in an attempt to establish that all drugs are subject to competition based on AWP in all contexts.  *See* Pl. Opp. at 53.  This general allegation of a fraudulent scheme does not satisfy Rule 9(b).  *See Eastman Kodak,* 98 F. Supp.2d at 147-48.

## C.   The Mere Existence of a "Spread" Does Not State a Claim

Finally, plaintiffs attempt to save their claims as to multiple-source drugs by pointing to the existence of alleged "spreads" for such drugs.  *See* Pl. Opp. at 56-58.  In doing so, plaintiffs step outside the allegations of the AMCC and rely instead on so-called "reports."  *See id.* at 55-

56. Plaintiffs conclude that, because "the spread still exists" for such drugs, their claims must survive. *Id.* at 57. Plaintiffs' naked reliance on the existence of a "spread" does not state a claim. At most, these allegations establish that multiple-source drugs can be heavily discounted. *See id.* Plaintiffs made the same allegations of large "spreads" among multiple-source drugs in the MCC, and this Court nevertheless found them insufficient under Rule 9(b). *See AWP Litigation,* 263 F. Supp.2d at 194. The Court should again reject plaintiffs' attempt to rely only on the existence of discounts to prove fraud and, instead, dismiss plaintiffs' claims for failure to explain how competition *based on AWP* can exist for multiple-source drugs.

## CONCLUSION

For the reasons stated above and in the Consolidated Memorandum in Support of Defendants' Motion to Dismiss, the Amended Master Consolidated Class Action Complaint should be dismissed.

Respectfully Submitted,
ON BEHALF OF ALL DEFENDANTS

By:   _Lucy Fowler_
Nicholas C. Theodorou, Esq. (BBO# 496730)
Lucy Fowler, Esq. (BBO# 647929)
FOLEY HOAG, LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

D. Scott Wise, Esq.
Kimberley D. Harris, Esq.
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

20

## CERTIFICATE OF SERVICE

I certify that on September 30, 2003, a true and correct copy of the foregoing

Consolidated Reply Memorandum in Support of Defendants' Motion to Dismiss the Amended

Master Consolidated Complaint was served on all counsel of record by electronic service

pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to Verilaw

Technologies for posting and notification to all parties.

Lucy Fowler