UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION

MDL. NO. 1456

THIS DOCUMENT RELATES TO:

Civil Action No. 01-CV-12257- PBS

*County of Suffolk v. Abbott Laboratories, Inc., et al.,*
E.D.N.Y. Case No. CV-03-229

Judge Patti Saris

**SUFFOLK COUNTY'S SURREPLY MEMORANDUM IN OPPOSITION TO THE DEFENDANT-SPECIFIC REPLY**
**MEMORANDA IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

RESPONSE TO COMMON ARGUMENTS . . . . . 1

A. Suffolk Has Satisfied Rules 9(b) . . . . . 1

B. Alleged Government Knowledge Is Not Grounds For Dismissal . . . . . 1

C. Suffolk's Best Price Allegations Properly State Claims . . . . . 7

D. Competition / Motive Are Irrelevant . . . . . 9

RESPONSES TO DEFENDANT SPECIFIC ARGUMENTS . . . . . 11

A. Amgen Inc. . . . . . 11

B. AstraZeneca . . . . . 11

C. Bayer Corporation . . . . . 12

D. Forest Pharmaceuticals, Inc. . . . . . 12

E. MedImmune, Inc. . . . . . 12

F. Novartis . . . . . 13

G. Merck & Co., Inc. . . . . . 13

H. Schering-Plough and Warrick . . . . . 13

CONCLUSION . . . . . 16

**TABLE OF AUTHORITIES**

*Congress Financial Corp. v. John Morrell & Co.*,
790 F.Supp. 459 (S.D.N.Y.1992) . . . . . . . . . . 6

*In re Pharm. Industries Average Wholesale Price Litigation*,
263 F. Supp. 2d 172 (D. Mass. 2003) . . . . . . . . . . 1, 9, 10, 13

*Grumman Allied Indus., Inc., v. Rohr Indus., Inc.*,
748 F.2d 729 (2nd Cir. 1984) . . . . . . . . . . 6

*United States ex rel. Franklin v. Parke-Davis*,
147 F. Supp. 2d 39 (D. Mass. 2001) . . . . . . . . . . 7, 9

## RESPONSE TO COMMON ARGUMENTS

### A. Suffolk Has Satisfied Rules 9(b)

Nearly every defendant who filed a "defendant specific" brief[1] again complains that Suffolk has not satisfied 9(b) particularity for its fraud claims.[2] These defendants are incorrect. As previously stated in Suffolk's Opposition to the Defendant Specific Motions ("Suffolk Specific Opp.") at 2-4, Suffolk has satisfied Rule 9(b) and this Court's May 13 directive requiring identification of "the specific drug or drugs that were purchased from the defendant [and] the allegedly fraudulent AWP for each drug." *In re Pharm. Industries Average Wholesale Price Litigation*, 263 F. Supp. 2d 172, 194 (D. Mass. 2003) ("*In re AWP Litigation*"); AC at ¶¶ 122-314, and Exhibit A. Defendants reply brief simply rehearses earlier arguments already addressed and resolved. *See* Suffolk Specific Opp. at 2-4.

### B. Alleged Government Knowledge Is Not Grounds For Dismissal

A number of defendants reiterate that because New York State allegedly had the means to detect their lies, no liability attaches for them.[3] Suffolk's Specific Opposition brief addressed this point fully. *See* Suffolk Specific Opp. at 4-5. To summarize, defendants' argument contradicts entirely Suffolk's allegations, controlling at this stage, that Suffolk did not know the truth respecting the full amount of

---

[1] "Defendant Specific" Reply Memoranda were filed by : Abbott Laboratories, Inc., Amgen Inc., AstraZeneca Pharmaceuticals LP, Aventis Pharmaceuticals, Bayer Corporation, Forest Pharmaceuticals, Inc., MedImmune, Inc., Merck & Co., Inc., Novartis Pharmaceuticals Corporation, Pfizer Inc. & Agouron Pharmaceuticals, Inc., Pharmacia Corporation & Pharmacia & Upjohn, Inc., Purdue Pharma L.P., Sanofi-Synthelabo, Inc., Schering-Plough Corporation/Warrick Pharmaceuticals Corp., and TAP Pharmaceutical Products, Inc..

[2] *See* Abbott Reply at 1, Amgen Reply at 1, AstraZeneca Reply at 2, Bayer Reply at 2, Forest Pharmaceuticals Reply at 1, MedImmune Reply at 1, Novartis Reply at 1 , Merck Reply at 1, Pfizer & Agouron Reply at 1, Pharmacia Corporation and Pharmacia & Upjohn Reply at 1, Purdue Pharma Reply at 1, Sanofi-Synthelabo Reply at 1, Schering Plough & Warrick Reply at 3, and TAP Pharmaceutical Products Reply at 1.

[3] *See* Abbott Reply at 2, Amgen Reply at 3, Forest Pharmaceuticals Reply at 2, Merck Reply at 2, and Schering Plough & Warrick Reply at 1.

defendants' fraudulent reporting of AWPs and failures to report best prices due to defendants' fraudulent concealment. *Id.*; *see, also,* AC at ¶¶ 98, 322-331. It ignores also that defendants themselves concede that the Best Price data is not disclosed to States. Defendants' Consolidated Memorandum In Support of Motion to Dismiss ("Con Mem") at 7. Finally, the argument is, at its essence, an affirmative defense raising disputed facts not properly resolved at this stage of the litigation.

Abbott and Merck endeavor to add new wrinkles to the argument. Abbott claims Suffolk "had actual knowledge of market prices ... [s]pecifically, Suffolk could derive the most that "average manufacturer's price" could be merely by dividing its rebate payments... by .151." Abbott Reply at 2. Abbott states that the fact that Average Manufacturer's Price ("AMP') could have been calculated "is flatly contrary to Suffolk's fraud claim" because Suffolk's ability to discern AMP would allow Suffolk to determine the true nature of AWP.[4] *Id*. First, the argument assumes that proper rebates are paid. One of Suffolk's claims is that they are not. *See* AC at ¶¶ 84-93. Abbott, Astrazeneca, Bayer, GSK, Pfizer, Schering Plough and TAP recently have paid hundreds of millions of dollars to settle claims alleging that they falsely reported Best Price despite their reporting of AMP. (*See* Abbott settlements at AC ¶¶ 130-131, AstraZeneca at AC ¶ 151, Bayer at AC ¶¶ 175-180, GSK at AC ¶ 236-238, Pfizer at AC ¶ 272-273, Schering Plough at AC ¶¶ 294-297, and TAP at AC ¶ 304). Why settle if reporting AMP is an affirmative defense to Best Price fraud? In any event, an affirmative defense will not resolve Suffolk's claim

---

4 Similar claims are made by Amgen and Forest. "[G]iven that the non-AWP reimbursement rate for Epogen under Medicare is and was at all times both publicly available and widely known, whatever the published AWP for Epogen, Suffolk cannot reasonably claim that it was deceived into reimbursing for Epogen at a falsely inflated price." Amgen Reply at 3. Similarly, Forest claims that its reporting Wholesale Acquisition Cost saves it of any claim based on its simultaneous reporting of AWP. Forest Pharmaceutical Reply at 2. Since Forest and Amgen made these assertions without elaboration, Suffolk will only mention them in passing, and respond to the substantive development of the same argument by Abbott.

as a matter of law at the motion to dismiss stage. Since Abbott's calculation assumes truthful reporting, it merely dodges Suffolk's claim without resolving it.

Abbott also states that the fact that Suffolk's claim is based on Average Wholesale, (not Manufacturer's) price is "irrelevant" because "Suffolk knows the pertinent Medicaid statutes, regulations, and terms." *Id*. What this means is for the reader to guess, but Suffolk can only assume that Abbott is suggesting AMP is relevant to AWP because it imparts knowledge of the true market price to Suffolk. This may be relevant if Suffolk were reimbursing based on "the true market price," but it is not. The statute requires reimbursement based on Abbott's reported AWP. N.Y. Soc. Serv. L. 367-a(7). Moreover, defendants' own papers contradict on the definition of AMP. Defendants Memorandum in Support of The Consolidated Motion To Dismiss ("Con. Mem.") says AMP is the "average price paid to the manufacturer . . . by wholesalers." *Id.* at 7, quoting 42 U.S.C. § 1396r-8(b)(2)(A). Abbott says AMP is "the average price at which retail pharmacies purchase the drugs." Abbott Reply at 2.

Abbott is essentially arguing that it should not be held responsible for its false reporting of AWPs because it also reported a second different number, AMP, that could have informed Medicaid payors, like Suffolk (either constructively or actually), of true AWP. And, because HHS issued publications regarding AWP inflation, everyone knew that the reputed AWPs were false, and Abbott therefore was permitted to inflate AWPs at will. Abbott Reply at 2-3.

This is akin to a person who obtains Medicare benefits with false proof of age claiming innocence when the government sues her for fraud on the grounds that the government had access to her true age elsewhere. That same person would argue the government was on notice that she was not 65

because she appeared only 60. Thus, the government could not have been deceived when it paid her benefits. The argument would conclude that despite flagrant misrepresentation, the person is not guilty of fraud. The government should have known her misrepresentation and so had the power to stop her. Thus, the government's failure to do so absolves her.

The argument is ridiculous of course. Neither Suffolk County nor other government entities are required to rummage through various databases to ensure defendants are not lying in one scenario, but telling the truth elsewhere.[5] Defendants are obligated to comply with the law and with Federal and State Medicaid Statutes in the first instance.

Merck argues likewise. "[T]he legislative finding . . . that AWP was substantially in excess of a drug's estimated acquisition cost" and "the statutory power [of the State of New York] to demand drug pricing information from all manufacturers" cannot be squared with Suffolk's simultaneous claim that defendants misrepresented AWP to be equal to actual market price. Merck Reply at 2, quoting Merck's Defendant-Specific Memorandum at 4-5. Merck is entirely wrong.

First, there has been no "legislative finding" that EAC = AWP-12%, (or, until May 15, 2003, AWP -10%). Merck Reply at 2. Defendants' own papers explain that the 12% discount rate "reflects a compromise between the State, which had originally sought a 15% discount, and the retail pharmacists lobby, which instituted a fierce campaign to keep Medicaid reimbursement levels as high as

---

[5] Defendants suggestion that Suffolk should rummage in this way, (*see*, e.g. Abbott Reply at 3), would be prohibitively expensive. Suffolk pays for thousands of drugs every year. Defendants report AWP in order that Government entities do not have to research and calculate AWP otherwise.

possible." Con. Mem. at 10. Thus, by defendants' admission, AWP -12% does not reflect even a marketplace reality, much less "legislative finding" of same.

However, assume *arguendo*, that 10% or 12% represents the legislature's best effort to estimate true EAC for the industry. Only if every defendant adopts identical pricing practices for every drug is the percentage figure meaningful when applied to any individual drug. Absent such consistency, the 10 or 12% would impart no particularized knowledge to Suffolk. Finally, Suffolk's own preliminary research flatly contradicts either a 10% or 12% spread as an industry average, finding significant variation from defendant to defendant in terms of an estimated overcharge, with overcharges ranging from 3% to 69%. *See* AC at ¶¶ 122-311, and Exhibit A.

Second, while New York State may have had the ability to access manufacturers' wholesale price information under § 367a-7(a), § 367a-7(b) makes plain the enormous cost in time and money involved in so doing. Suffolk's Amended Complaint seeks recovery for only its top 100 Medicaid costs. The county pays for thousands of drugs each year. The costs and time involved to obtain wholesale prices or verify AMPs for each drug paid for, for each reporting period, would be prohibitive. To assert that New York State or Suffolk had an obligation to undertake such an audit year after year for all drugs demonstrates a complete abdication of defendants' own statutory obligations, not to mention an extreme insensitivity to the expense and time such an audit would involve. It further assumes a government with few competing priorities. New York State is under no obligation to request wholesale price data from manufacturers, or to reverse-engineer AMPs from rebate data. In sum, that Suffolk has access to such data does not excuse the affirmative fraud in the first, and does not amount to constructive knowledge on

the part of New York State or Suffolk County. Accurate reporting by Defendants in the first place would render such an inquiry entirely unnecessary. Moreover, even such a reverse-engineer would be worthless if the rebate date itself were inaccurate, as Suffolk alleges. AC at ¶¶ 84-93.

Merck's authorities are inapposite. Both *Grumman Allied Indus., Inc., v. Rohr Indus., Inc.*, 748 F.2d 729 (2nd Cir. 1984) (Merck Defendant-Specific Memorandum at 5) and its progeny, *Congress Fin. Corp. v. John Morrell & Co.*, 790 F.Supp. 459 (S.D.N.Y. 1992)[6] dealt with single, multi-million dollar purchases. A one shot expensive investigation made economic sense in such circumstances. It makes no economic sense here.

Additionally, the courts in both cases held plaintiffs could not reasonably rely on the statements provided. *Congress Fin.* at 470, *Grumman Allied* at 735. Each had a legitimate incentive to inspect the defendants information on their own, given the significant economic interests at issue (not outweighed by the cost of an investigation), and that both purchase agreements contemplated access to and inspection of relevant documents. *Grumman Allied* at 732, *Congress Fin.* at 472. Suffolk, by contrast, is statutorily required to rely on defendants reported AWP.

Finally, even were there a legislative finding that AWP was inflated by 10% or 12%, it would serve only to put New York and Suffolk on notice that the price is inflated by 10% or 12% respectively. Suffolk's own investigations (AC at ¶¶ 122-311) and recent settlements suggest that the actual inflation is significantly higher. (*See* Abbott settlements at AC ¶¶ 130-131, AstraZeneca at AC ¶

6 Merck cited *Grumman* in its original individual motion to dismiss, and *Congress Fin. Corp.* in its individual reply memorandum. Both cases involve large, single-unit purchases by sophisticated corporate entities where the plaintiffs were required to conduct due diligence on their purchases.

151, Bayer at AC ¶¶ 175-180, GSK at AC ¶ 236-238, Pfizer at AC ¶ 272-273, Schering Plough at AC ¶¶ 294-297, and TAP at AC ¶ 304). Suffolk should, even under Defendants logic, be able to recover any AWP that was inflated in excess of 10% or 12 % over AWP, depending on the applicable period.

### C. Suffolk's Best Price Allegations Properly State Claims

Defendants reiterate that Suffolk has failed to allege its rebate claims with particularity.[7] In so doing, defendants again ignore this Court's decision in *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39 (D. Mass. 2001) which holds that where a complaint has "allege[d] the circumstances of the fraud," it is "not required to plead all of the evidence or facts supporting it." *Id*. at 46-47; *see also, Id.* at 46, ("The requirements of Rule 9(b)... must be read in conjunction with Fed. R. Civ. P. 8(a)," which requires only a "short and plain statement of the claim."). Indeed, this Court has recognized that "where the alleged scheme of fraud is complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible." *Id.* at 49.

The Suffolk Amended Complaint provides a "general framework of the purported medicaid fraud." *Id*. It alleges that, in keeping with their artificial price inflation scheme, each defendant did not report actual Best Price, but instead reported higher prices that excluded discounts and other inducements offered to physicians, such as free goods, volume discounts, rebates, educational grants and other programs that lower the providers' actual cost of the drugs. Consequently, defendants paid rebates lower than those actually due had defendants accurately reported Best Prices. AC at ¶¶ 84-93. Suffolk provides details

[7] The following defendants have claimed that Suffolk's Best Price Allegations aren't sufficiently particular: Abbott Reply at 1, Amgen Reply at 1, AstraZeneca Reply at 2, Forest Pharmaceuticals Reply at 2, Merck Reply at 2, Novartis Reply at 1, Pfizer & Agouron Pharmaceuticals Reply at 1, Pharmacia and Pharmacia & Upjohn Reply at 2, Schering Plough & Warrick Reply at 2, and TAP Pharmaceuticals Corp. Reply at 1.

supporting this general outline. *See, e.g.*, AC ¶ 130 (Abbott failure to report discounts); AC at ¶ 150 (AstraZeneca providing unreported free and discounted samples); AC at ¶ 179 (Bayer's failure to report discounted private label price); AC at ¶ 237 (GSK's unreported discounts); AC at ¶ 272-277 (Pfizer providing unrestricted educational grants and unreported rebates); AC at ¶¶ 294-295 (Schering failing to report free samples to induce purchases of Schering products and taking a $150 Million charge to reflect its estimate of likely legal liability); AC at ¶ 304 (TAP failing to report discounts and free samples).

Defendants GSK, AstraZeneca, Pfizer, and TAP have settled claims that they manipulated their Best Price reporting.

| **Defendant** | **Drugs** | **Settlement/Plea** | **Citation** |
|---|---|---|---|
| GSK | Flonase, Paxil | $87,600,922 | AC ¶¶ 236-244 |
| Bayer | Cipro<br>Adalat CC | $251 Million civil damages<br>$5.6 Million criminal fine | AC ¶¶ 179-180 |
| AstraZeneca | Zoladex | $355 Million in criminal penalties and civil damages and penalties<br><br>Guilty plea. | AC ¶¶ 150-157. |
| Pfizer | Lipitor | $49 Million | AC ¶¶ 272-277 |
| TAP | Lupron | $875 Million to resolve civil and criminal penalties<br>$25.5 million to paid to States | AC ¶¶ 304-305 |

These settlements and guilty pleas provide even more weight to Suffolk's claim of Best Price fraud. In any event, Suffolk's Best Price allegations go far beyond putting defendants on notice of the claims against them, and nothing more is required per *Parke-Davis*.

**D. Competition / Motive Are Irrelevant**

Certain defendants seek dismissal arguing that because there are no competitors for their drugs, they have no motive to engage in the wrongdoing alleged in Suffolk's complaint.[8] First, whether a drug is a competitor for another is a fact-based question, inappropriate on a motion to dismiss. Second, government investigations and settlements, not to mention defendants' own submissions confirm that defendants report false and misleading AWPs, competitor or not. AC at ¶¶ 94-99. Why? The reason cannot be resolved on this motion.[9] Third, motive is irrelevant at this stage. What matters is that defendants

---

8 *See* Abbott Reply at 3, MedImmune Reply at 1, TAP Pharmaceuticals Corp. Reply at 2, and Forest Pharmaceuticals Reply at 2.

9 In any event, when defendants' arguments are considered in the context of industry purchasing considerations, one possible motive emerges.

Defendants' quote HHS for the proposition that "within the pharmaceutical industry, AWP means non-discounted list price" and Abbott States that AWP is "akin to a list price." *See* Con. Mem. at 5, Abbott Reply at 3.

*See also, In re AWP Litigation* at 194 ("Defendants concede that the 'national average wholesale price' figures . . . are not the actual average of wholesale prices they charge for their drugs.") This means that defendants may grant discounts off AWP. A purchaser ignorant of the inflated nature of AWP likely would think that obtaining a price that was significantly lower than AWP was a good deal for a retail purchaser, since in a traditional market, retail customers pay a significant mark-up from wholesale price.

An inflated sticker price / AWP allows defendants to charge more to those people who are not price sensitive or are ignorant of the true nature of AWP. At the same time, it provides flexibility to compete on price when dealing with customers knowledgeable of the true nature of AWP. Further, this "sticker price" feature is attractive to an intermediary who 1) knows the true nature of drug manufacturer's pricing practices (i.e. PBMs or Wholesalers), 2) has the ability to influence purchasing decisions, (by devising a drug formulary, for example), 3) is dealing with a purchasing population ignorant to the meaning of AWP, or 4) who is in a much stronger negotiating position (*See* David A. Balto, Competitive Concerns and Price Transparency in the PBM Market, UPDATE, September/October 2003, at 35 ("Competitive concerns have arisen in the PBM market -- a highly concentrated industry in which the four largest firms hold about a combined 80% market share." )) Manufacturers clearly have an

(continued...)

inflated AWP and Suffolk was damaged as a result. Also irrelevant is whether a marketing the spread motive applies in a Medicaid context. This Court already has recognized this motive obtains in the PBM and Medicare context. *In re AWP Litig.*, 163 F.Supp.2d at 184. Medicaid reimbursements are based on the same AWPs utilized there.

Finally, the Court made no mention of a competitor requirement in its ruling on the AMCC, when it was considering similar allegations of AWP fraud. As has been stated repeatedly, the Court required only that defendants allege "the specific drug or drugs that were purchased from the defendant [and] the allegedly fraudulent AWP for each drug." *In re AWP Litigation*, 263 F. Supp. 2d at 194.

---

9 (...continued)
incentive to inflate AWP to influence PBMs to include their drugs on their formularies, competitor or not.

In sum, Defendants could easily seek to maintain the option to charge a high price to an ignorant, powerless or price-insensitive portion of the population while retaining the ability to discount to informed consumers or where they have to either compete on price or market the spread to sell drugs.

**RESPONSES TO DEFENDANT-SPECIFIC ARGUMENTS**

**A. Amgen Inc.**

Suffolk alleges that it paid for Neupogen, Epogen, and Enbrel, in 2001, and that each had a fraudulent inflated AWP. AC at ¶ 25. Amgen ignores this, and that Suffolk's pleading satisfies the Court's May 13th directive. Instead, Amgen complains that Suffolk has not explained how its pleadings based on "information and belief" can be reconciled with 9(b). *See* Amgen Reply at 2. But 9(b) is satisfied by Suffolk's allegation of particular drugs and an allegedly fraudulent AWP for each. *See* AC, ¶¶ 122-314, Exhibit A.

Amgen's EPOGEN reimbursement argument (Amgen Reply at 3) clearly raises factual questions not resolvable in this motion. Moreover, even the cited statutory provisions appear to concern only individuals eligible for both Medicare and Medicaid, a subset of Suffolk's costs.

**B. AstraZeneca**

AstraZeneca again complains that Suffolk references Zoladex-related evidence in its complaint, while suing for overcharges on other covered drugs. AstraZeneca Reply at 2. But, Suffolk's own research strongly suggests that AstraZeneca's misconduct is not confined to Zoladex. AstraZeneca certainly cannot argue on this motion that it did not engage in Zoladex-like behavior with respect to the drugs for which Suffolk paid. In any event, AstraZeneca's misconduct respecting Zoladex is part of the general scheme to defraud discussed *infra* at Point I (C).

**C. Bayer Corporation**

Suffolk does not, as Bayer misrepresents, "admit the majority of the claims set forth in the amended complaint have been settled." Bayer Reply at 1. Suffolk has stated rather that Bayer's 2003 settlements may have resolved Suffolk's rebate claims for Cipro from 1995 to 2000, and Adalat from 1997 to 2000. Suffolk specifically notes that the "2003 settlement does not resolve, or even purport to resolve, Suffolk's AWP claims for Cipro, or any other claims Suffolk asserts." Suffolk Opp. at 12. As to those claims, Suffolk has satisfied 9(b) by pleading the dosage paid for and alleged in fraudulent AWP. AC at ¶ 171.

**D. Forest Pharmaceuticals, Inc.**

Forest is operating under the mistaken impression that Suffolk's claims against it are based on the allegation that Forest inflated its AMP. That is not Suffolk's charge. Rather, Suffolk stated that, *inter alia*, Forest reported an inflated best price figure that resulted in a decrease of the rebate paid to Suffolk. See AC at ¶¶ 360, 370.

**E. MedImmune, Inc.**

Contrary to what MedImmune snappishly writes, Suffolk does not ignore that MedImmune manufactured Respigam. That is beside the point. If Respigam, coming off patent, was about to enter a competitive market and Synagis was MedImmune's high-cost alternative, MedImmune may well have had been incentivized to market the Synagis spread to move providers off Respigam. In any event, motive is irrelevant at this stage in the proceedings. *See* Point I (D) , *infra*.

**F. Novartis**

Even if Novartis were correct that 9(b)'s heightened pleading standard applied to each of Suffolk's claims (and Novartis is wrong, *see* Con. Surreply at 3), Suffolk has satisfied 9(b) and this Court's may 13, 2003 directive. *See* Point I (A), *infra*.

**G. Merck & Co., Inc.**

Merck claims that Suffolk's claims should be dismissed here because they are "largely identical" to those dismissed allegations in the MCC. Merck Reply at 3. False. The MCC did not name a single Merck drug or allegedly fraudulent Merck AWP. Suffolk does. This complies entirely with the Court's May 13th requirement that plaintiffs identify which drug they purchased and the allegedly fraudulent AWP. *See In re AWP Litigation* 263 F. Supp. 2d 172, 194 (D. Mass. 2003).

**H. Schering-Plough and Warrick**

Schering Plough and Warrick ("S&W") state that:

> "[o]nly if Warrick's Albuterol was the least costly therapeutic equivalent would the FUL have anything to do with Warrick's AWP . . . even if Albuterol was not subject to an FUL, raising its AWP could not have affected its reimbursement amount relative to its competitors. No manufacturer could garner for itself a competitive advantage or an increased market share based on its own AWP under New York's reimbursement scheme for Multi-Source drugs."

S&W Reply at 2. S&W are wrong. Suffolk has plead a connection between AWP and FUL even when the drug at issue is not the "least costly therapeutic equivalent." Suffolk alleges that multi-source drug makers act in unison by elevating the AWPs for all generic drugs, "thereby inflating the amount of the reimbursement that occurs through Medicaid." AC at ¶95. Since the government reimburses on the basis

of the lowest AWP in the FUL context, every defendant has an incentive to inflate AWPs. This becomes crystal clear when defendants' characterization of AWP as a "list price" is considered. *See* Con. Mem. at 5, Abbott Reply at 3. Defendant drug manufacturers concede the ability to discount from AWP by characterizing the price as a list price. The Court has also recognized this ability to discount. *See In re AWP Litigation* at 194 ("Defendants concede that the 'national average wholesale price' figures . . . are not the *actual* average of wholesale prices they charge for their drugs.") Thus, reporting inflated and discountable AWPs has no downside for defendants, as they can simply discount whatever quoted AWP they report, and reap the benefits of the inflated AWP when they do not discount.

Defendants also incorrectly state that there is no connection between their reporting AWP in the multi-source arena when there is no FUL, as reimbursement is based on "either the lesser of the median AWP . . . or the lowest brand name product." S&W Reply at 2. S&W state that because of this reimbursement methodology, "no manufacturer could garner for itself a competitive advantage . . . under New York's reimbursement scheme for Multi-Source drugs." *Id.* Suffolk's allegations, controlling at this stage, are directly contrary. Suffolk alleges significant incentives for defendants who manufacture multi-source drugs to overstate AWP, because raising individual AWPs allows these manufacturers to thereby raise the median AWP, and generally increase reimbursement to pharmacists. AC at ¶97. Even if true that there is no competitive advantage in the context of Medicaid reimbursement (a fact disputed at this point), Suffolk has alleged that defendants, knowing that reimbursement is based on AWP outside of Medicaid, individually inflate their AWPs to inflate reimbursement to retail pharmacists and so enhance the competitive

position of their respective drugs in that context: Pharmacists have the option of choosing between generic alternatives. AC at ¶96.

Finally, S&W notably claim "no . . . competitive advantage or increased market share ... under New York's reimbursement scheme for multi-source drugs." S&W Reply at 2. This is a disingenuous characterization at best. As stated above, Suffolk's pleadings adequately refute this contention by showing that defendants have significant incentives to increase AWPs generally, because defendants are able to give higher reimbursement to pharmacists and so induce them to fill prescriptions with their generic formulation. AC at ¶96. This motive to inflate AWPs generally, results in inflated AWPs being reported to Medicaid AC at ¶97. Simultaneously, with an inflated AWP, defendants' maintain the ability to compete on price through discounting when desirable.

In any event, irrelevant at this stage is why defendants inflate AWP in the multi-source drug arena. The point is that they do. Indeed, as Suffolk alleges, manipulation of AWP appears greatest in the generic context. AC at ¶96.

## CONCLUSION

For all the foregoing reasons, the defendant-specific motions to dismiss should be denied in their entirety.

Dated: December 1, 2003
New York, New York

**KIRBY McINERNEY & SQUIRE, LLP**

By: s/ Joanne M. Cicala

Roger W. Kirby
Joanne M. Cicala (admitted *pro hac vice*)
Aaron D. Hovan (admitted *pro hac vice*)
830 Third Avenue
New York, New York 10022
(212) 371-6600

K:\Users\LESLIE\AWP\SUFFOLK\Surreply Memo On Individual Defendants MTD - Saved.wpd