UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| )<br>)<br>In Re: PHARMACEUTICAL )<br>INDUSTRY AVERAGE WHOLESALE )<br>PRICE LITIGATION )<br>)<br>)<br>THIS DOCUMENT RELATES TO: )<br>(All Actions) )<br>) | MDL No. 1456<br><br>Master File No. 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**DEFENDANTS' MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 4

    A.    Plaintiffs and the Putative Class ........................................................................ 4

    B.    Health Plans ...................................................................................................... 5

    C.    The Reimbursement Roles of Funds and Health Plans Differ Markedly ........... 5

    D.    Defendants' Good Faith Subpoenas ................................................................... 6

ARGUMENT ................................................................................................................. 8

DEFENDANTS ARE ENTITLED TO DISCOVERY FROM HEALTH PLANS ................... 8

    A.    Defendants' Subpoenas Go To Common Questions ........................................... 9

    B.    Defendants' Subpoenas Were Tendered In Good Faith ...................................... 10

    C.    The Demanded Disclosures Are Not Unduly Burdensome ................................. 11

    D.    The Subpoenaed Information Cannot Be Obtained From Other Sources ............. 13

    E.    "Pre-Authorization" Is Not Required ................................................................. 14

CONCLUSION .............................................................................................................. 16

# TABLE OF AUTHORITIES

## CASES

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) ...............................9, 15

*Baldwin & Flynn v. National Safety Associates*, 149 F.R.D. 598
    (N.D. Ca. 1993)..............................................................................................................15

*Brennan v. Midwestern United Life Insurance Co.*, 450 F.2d 999
    (7th Cir. 1971)...........................................................................................................9, 11

*Clark v. Universal Builders, Inc.*, 501 F.2d 324 (7th Cir. 1974) ...................................12

*Easton & Co. v. Mutual Benefit Life Insurance*, Civ. Nos. 91-4012, 92-2095,
    1994 WL 248172 (D.N.J. May 18, 1994)..........................................................8, 9, 10

*Kamm v. California City Development Co.*, 509 F.2d 205
    (9th Cir. 1975)................................................................................................................15

*Krueger v. New York Telephone Co.*, 163 F.R.D. 446 (S.D.N.Y. 1995) ........................10

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, No. 97 Civ.
    4550, 97 Civ. 4676, 1998 WL 241279 (S.D.N.Y. May 12, 1998)..........................9, 12

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 103 F.R.D. 635
    (D. Mass. 1984)....................................................................................................8, 9, 15

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ...................................................9, 15

*Robertson v. National Basketball Association*, 67 F.R.D. 691
    (S.D.N.Y. 1975)........................................................................................................12, 15

*Wainwright v. Kraftco Corp.*, 54 F.R.D. 532 (N.D. Ga. 1972)....................................12, 15

## INTRODUCTION

The Amended Master Consolidated Complaint ("AMCC") alleges a fraud of enormous scope on the diverse universe of payors for prescription drugs, ranging from individual senior citizens covered by Medicare Part B to the biggest and most sophisticated corporations in the business of providing health care insurance ("Health Plans"). Yet, when defendants seek to defend against these allegations by taking discovery from a limited number of Health Plans, plaintiffs intervene in an opportunistic effort to prevent defendants from obtaining essential discovery. The case law clearly supports defendants' right to good faith discovery from a representative number of Health Plans on issues that are central to plaintiffs' class allegations and the merits of their claims.[1]

The central allegation of the AMCC is the assertion that all pharmaceutical payors, including Health Plans, were duped into believing that AWPs were an actual average of the prices that doctors and pharmacies paid for drugs, thereby causing the putative class members to reimburse or purchase at a higher rate than they otherwise would have. (AMCC ¶¶ 1-5). The class action allegations assert that all members of the alleged class are similarly situated in being subjected to defendants' "common thread of fraud and other misconduct." (AMCC, ¶¶ 600-601).

Defendants' discovery is intended to gather evidence that will show that the AMCC is based on a false premise. First, there are critical differences among the many thousands of varied members of the putative class relating to, among other things, reimbursement methodologies for prescription drugs and the putative class members'

---

[1] The subpoenas were served by, and this motion is filed on behalf of, the following defendants: AstraZeneca, Bristol-Myers Squibb, Centocor, GlaxoSmithKline, and Immunex.

956794v6

understanding of AWP.  In particular, defendants' expect that the requested discovery will

provide evidence that these Health Plans:

- **employed** myriad reimbursement approaches;
- **knew** that AWP did not equal the actual price paid by doctors, hospitals, pharmacies, or PBMs;
- **knew** that the Wholesalers Acquisition Cost ("WAC") or its equivalent was, in m ny cases, a published list price, and that AWP was a markup over WAC and, further that AWP-based reimbursement was intended to compensate health care providers for other unreimbursed or under-reimbursed costs, such as storage costs, wastage, spoilage, dispensing costs, etc.;
- **knew** that manufacturers responded to market forces by offering rebates, discounts, and other lawful adjustments and incentives;
- **knew** that price reporting services (such as Red Book and First Data Bank) did not adjust WAC or AWP for such factors;
- **could have** based and conditioned reimbursement on proof of the actual price paid but **elected** not to do so for a variety of reasons including administrative simplicity and the disadvantages of pass-through reimbursement;
- **knew** that, by basing reimbursement on AWP, the Plans enabled doctors and others to earn a margin on the drug they administered or dispensed; and
- **negotiated and contracted** with doctors, doctors' groups, hospitals, GPOs, and PBMs concerning the amount of that margin, often by basing reimbursement on a percentage of AWP but not such a low percentage that the overall compensation to the health care provider deterred their participation.

Such evidence – showing, in effect, that Health Plans, a large segment of the putative class, were

not misled as to the meaning of AWP, and in fact had valid reasons when they chose to

reimburse providers in excess of their direct costs – would be dispositive of plaintiffs'

substantive allegations.  Further, the individualized negotiations and resulting differences in

contractual arrangements by Health Plans – together with the myriad different reimbursement

arrangements of the named plaintiff benefit Funds and other putative class members – will defeat

class certification.  Defendants thus seek discovery from Health Plans, not merely because it is

2

relevant, but because it is crucial. Plaintiffs oppose it, not because it is irrelevant and burdensome, but because it is fatal, as to the merits and as to class certification.[2]

Plaintiffs' main argument is that discovery of the Health Plans should not be allowed because it would burden absent putative class members. This argument fails. The subpoenaed Health Plans are large, sophisticated entities, with ample resources, including experienced counsel. Such entities are not immune from discovery because they are part of a putative class. Indeed, there is no other way for defendants to explore the diversity of the arrangements for prescription drug reimbursement within the marketplace. As the Court noted during the November Hearing: "Normally you don't subpoena class members. This is a little different, this is industry wide. Maybe there's some other ways of doing it. I'm always worried about harassing individual people, but these people are huge third-party payors." (Tr. of 11/21/03 Hr'g, p. 117).

The Court's comment correctly acknowledges (i) the propriety of absent class member discovery where required to respond to allegations of an industry-wide fraud on a large and heterogeneous class of sophisticated entities, and (ii) the vast difference between individuals with small claims and corporations with large ones. Courts in this Circuit and elsewhere allow good faith discovery of class members that goes to common issues (*e.g.*, whether the market was duped) and is not unduly burdensome. Such discovery is particularly appropriate when, as here, the subpoenaed class members each stand to gain a significant recovery if they were to prevail,

---

[2] Defendants' belief that Health Plans fully understood that AWPs did not represent an actual average of actual wholesale prices is confirmed by a survey of Health Plans conducted for MedPac, the Medicare Payment Advisory Committee. The authors of that survey concluded, among other things, that "[t]here is a general understanding among health plans that physicians purchase drugs at prices that are below 95% of AWP and, given that health plan prices are generally at or above this rate, the sale of drugs is a profit center for physicians." Zachary Dyckman, Ph.D. & Peggy Hess, MHA, Health Plan Payment for Physician-Administered Drugs, *available at* http://medpac.gov/publications/Contractor_reports/Aug03_DrugsPay(cont)Rpt.pdf (July 2003).

3

and the discovery is unavailable elsewhere. With all of the necessary conditions satisfied, the Court should deny plaintiffs' motion for a protective order.

## BACKGROUND

### A.    Plaintiffs and the Putative Class

There are eleven named plaintiffs in this action. Five are associations and six are health and welfare union benefit fund plans ("Funds"). The associations purport to sue on behalf of all consumers who allegedly purchased one or more of defendants' products based on AWP. The Funds contracted for the health and welfare benefits of their own union participants or beneficiaries. None of the named plaintiffs are in the business of providing drug benefits or health insurance to third parties.

These eleven plaintiffs purport to sue on behalf of a single, sprawling class that includes an incredibly large subclass of third-party payors. The class purportedly consists of *all* persons or entities that paid any amount for "a prescription drug manufactured by a Defendant Drug Manufacturer . . . at a price calculated by reference to the published AWP during the Class Period." (AMCC, ¶ 595). This putative class encompasses individuals and entities that paid for drugs administered in a physician's office ("physician-administered drugs", *e.g.*, injections) and those prescribed by a physician and self-administered by the patient ("self-administered drugs", *e.g.*, pills). The putative sub-class alleged in the AMCC includes all entities that "contracted with a PBM to provide to its participants a prescription drug manufactured by a Defendant Drug Manufacturer." *Id.*[3] Accordingly, individual payors are only a small portion of the putative class. A vastly greater portion consists of a wide variety of sophisticated institutions.

---

[3] The AMCC also alleges a separate, "Together Rx" class that defendants do not address herein as its allegations are not currently subject to discovery.

956794v6

**B.     Health Plans**

Health Plans include a variety of sophisticated entities such as Health
Maintenance Organizations ("HMOs"), Indemnity Insurance Plans, and Preferred Provider
Organizations ("PPOs").  Unlike the named plaintiffs, Health Plans are in the business of
providing health care insurance to individuals and employer groups.  The various types of Health
Plans generally are distinguishable based upon (i) the extent of coverage for treatment
administered outside a preferred or defined network, and (ii) the level of patient cost sharing [4]

**C.     The Reimbursement Roles of Funds and Health Plans Differ Markedly**

Contrary to plaintiffs' claims, discovery from the six named Funds is no substitute
for discovery from Health Plans.  While both types of entities provide reimbursement for drugs
administered to or by their members, defendants believe that discovery will show that Funds and
Health Plans are very different types of entities, with very different roles with respect to drug
reimbursement.  Although the Funds will ultimately be bound by the knowledge and actions of
their agents, plaintiffs' counsel appear to have selected them (and the associations) precisely
because they have little direct exposure to information about AWP.

Because they are in the business of providing coverage for medical and drug
benefits, Health Plans tend to represent far more "lives" or individual patients than Funds.  As a
consequence, Health Plans typically have more buying power and devote far more resources and
personnel to determining and negotiating reimbursement rates.  Funds tend to delegate that

---

[4]  At one end of the spectrum is the HMO, which offers a proprietary healthcare network to enrollees for a
pre-paid monthly premium.  While typically the patient cost sharing amounts under HMO plans are low,
enrollees may not go outside the HMO network except in cases of emergent or urgent care needs.  A PPO
is a plan that offers lower patient cost sharing when the patient utilizes a network of preferred
independent healthcare providers.  Patients can choose to go outside of this provider network, but will pay
higher cost sharing amounts.  Indemnity insurance refers to a plan where patients have the greatest
flexibility in terms of the healthcare providers they may utilize, but bear the highest level of cost sharing.
Under indemnity insurance, patients usually pay a percentage of medical costs (*i.e.*, coinsurance).

5

responsibility to agents or, indeed, to Health Plans such as the ones at issue here. This is especially true with respect to physician-administered drugs. Funds thus tend to be one step removed from the negotiations of the underlying amount of reimbursement that health care providers are paid for their drugs and services.

The six plaintiff Funds appear to be no exception to this general rule. Based on their paltry document productions to date, the six plaintiff Funds appear to have had very little or no direct involvement in or knowledge of the determination of the reimbursement rates for the physician-administered drugs administered to their members. Plaintiffs have produced few documents regarding the negotiation of reimbursement rates, and no contracts with physicians, hospitals, or other health care providers. In short, plaintiffs have produced no documentation concerning the issues central to their claims, *e.g.*, (i) what payors understood AWP to mean, and (ii) why AWP was or was not used to determine reimbursement.

Thus, plaintiffs' own productions establish defendants' need for discovery from Health Plans and other entities that are actively involved in, and therefore would have information relevant to, the negotiation of drug reimbursement.

### D.  Defendants' Good Faith Subpoenas

Pursuant to the Court's May 13, 2003, order to proceed with discovery on merits and class certification issues on certain drugs, defendants compiled a list of forty Health Plans from among the thousands of plans operating in the United States. The targeted Health Plans were intended to represent a cross section of the industry, in terms of geographic diversity, size, and type of plan.

Defendants primarily seek evidence of the Plans' understanding of the term AWP and the methodology used to set drug reimbursement. Without an understanding of the particular documentation and information maintained by any particular plan, defendants styled

6

the requests somewhat broadly with the view that they would negotiate with each respondent to address their individual concerns and the responsive information available.

Since serving the subpoenas, defendants have been contacted by legal counsel for thirty-seven of the forty Health Plans.  In each instance, defendants have volunteered to work with Plan counsel to narrow the production so as not to unduly burden or interfere with the operations of the Plan, and, at the same time, to obtain the information required to respond to plaintiffs' claims.  To simplify the process, defendants explained that the requests were intended to secure documents concerning six general areas:

- the many methodologies used to reimburse for drugs, some of which are based on AWP and some not, and that AWP formulae are used for practical reasons such as administrative simplicity.  (Document requests 2, 3 and 4);

- the Health Plans' understanding (a) of the term "AWP" (including the extent of private payors' knowledge that AWP does not equal the actual acquisition price) and (b) that doctors (and PBMs) earn a spread on drugs administered (or purchased by the plan beneficiaries).  (Document requests 1, 5, 7, 8, 11, 16, and 18);

- the extent of Health Plans' knowledge that servicing fees (*e.g.*, administration fees for doctors) are inadequate to cover overhead costs and that drug reimbursement is intended to include a subsidy.  (Document requests 2, 4, 8, 11, and 16);

- the PBMs with which Health Plans have contractual relationships and, with respect to those PBMs, the methodologies used by the PBM to calculate amounts due to pharmacies and from the Plans for drugs provided to the Plan beneficiaries.  (Document requests 2, 10, 16, 18);

- that Health Plans (historically) have provided lower reimbursement for a drug when administered in doctors' offices versus in hospitals.  (Document requests 20 and 21); and

- private payor communications with the government regarding the above points.  (Document requests 22, 23 and 24). [5]

---

[5] Although defendants' discovery requests include requests for documents relating to PBMs, defendants do not concede that plaintiffs' PBM claims have been adequately plead or are properly the subject of discovery.  *See* Consolidated Memorandum in Support of Defendants' Motion to Dismiss the Amended Master Consolidated Class Action Complaint (filed August 1, 2003).  In fact, Plaintiffs' recent "modifications" to the AMCC make the fatal deficiencies of plaintiffs' PBM claims strikingly clear.  *See* Defendants' Response to Notice of Filing Modified Amended Master Consolidated Class Action Complaint (filed December 19, 2003).

956794v6

Defendants also have provided the Plans with copies of the public AMCC, the parties' correspondence concerning plaintiffs' motion for a protective order, plaintiffs' protective order motion, and the transcript of the November 21, 2003 conference where plaintiffs first objected to defendants' subpoenas.

The reaction of the Plans to defendants' efforts to address their concerns has been largely positive, with a number of plans expressing appreciation for defendants' efforts. Notably, not one of the subpoenaed entities has elected to join plaintiffs' motion for a protective order. At plaintiffs' urging, however, all the Plans have advised defendants that they will not produce documents until after the resolution of plaintiffs' motion, which may make it virtually impossible for the defendants who are engaged in discovery to secure the discovery required to defend this case in advance of the scheduled March 2004 discovery cut-off.

## ARGUMENT

### DEFENDANTS ARE ENTITLED
### TO DISCOVERY FROM HEALTH PLANS

Defendants are entitled to proceed with their discovery of the subpoenaed Health Plans, even though they are putative class members. As this Court has explained, Rule 26 of the Federal Rules of Civil Procedure requires "the scope of discovery [to] be liberally construed so as to provide both parties with information essential to proper litigation of all the facts." *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 103 F.R.D. 635, 637 (D. Mass. 1984). The discovery of the subpoenaed Health Plans is necessary to respond to plaintiffs' allegations that defendants perpetrated a fraud on the entire health care industry, and therefore "essential" to the proper defense of this litigation. *See Easton & Co. v. Mutual Benefit Life Ins.*, Civ. Nos. 91-4012, 92-2095, 1994 WL 248172, at *4 (D.N.J. May 18, 1994) (allowing discovery of absent

class members where it "would tend to prove that the market was not defrauded, and thus the benefit of the 'fraud on the market' presumption would be unavailable").

Contrary to plaintiffs' contentions, moreover, the subpoenaed Health Plans' status as absent class members does not exempt them from discovery.[6]  Rather, this Court has held that discovery of absent class members is entirely appropriate if certain conditions are met:

> [T]he overwhelming majority of courts which have considered the scope of discovery against absentees have concluded that such discovery is available, at least when the information requested is relevant to the decision of common questions, when the interrogatories or document requests are tendered in good faith and are not unduly burdensome, and when the information is not available from the representative parties.

*M. Berenson Co.*, 103 F.R.D. at 637 (citing *Dellums v. Powell*, 566 F.2d 167, 187 (D.C. Cir. 1977)).[7]  Defendants' subpoenas satisfy each of those conditions:  The demands (i) seek information relevant to the resolution of common questions, (ii) were tendered in good faith, (iii) are not unduly burdensome, and (iv) seek disclosure of information that is not available from other sources.

## A.   Defendants' Subpoenas Go To Common Questions

By their subpoenas, defendants seek disclosures concerning some of the fundamental questions at issue in this litigation – the methodologies used by third-party payors to

---

[6]  The cases plaintiffs cite to support their contention that absent class members are exempt from discovery do not even address the issue.  In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the issue was whether the statute of limitations in a class action was tolled as to unnamed plaintiffs who sought to join the class after the statute of limitations had run.  The Court held that the unnamed plaintiffs were considered a part of the class, and therefore, were considered to be within the limitations period. *Id.* at 551-52.  In *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), the Court explicitly stated that it was not addressing the issue of whether discovery of absent class members would be permitted, holding that the issue "is best left to a case which presents them in a more concrete way." *Id.* at 810 n.2.

[7]  *Accord, Brennan v. Midwestern United Life Ins. Co.*, 450 F.2d 999, 1005 (7th Cir. 1971); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, No. 97 Civ. 4550, 97 Civ. 4676, 1998 WL 241279, at *2 (S.D.N.Y. May 12, 1998); *Easton & Co. v. Mutual Benefit Life Ins. Co.*, Civ. Nos. 91-4712, 92-2095, 1994 WL 248172, at *3 (D.N.J. May 18, 1994).

9

reimburse prescription drug purchases and whether payors who based reimbursement on AWP knew that AWP was not an average of wholesalers' prices. Indeed, the subpoenas squarely seek evidence relevant to the common questions alleged in the AMCC:

- Whether AWPs are used as a benchmark for negotiating payments by Third-Party Payors for subject drugs. (AMCC ¶ 601(h))
- Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class Members to make inflated payments for subject drugs. (AMCC ¶ 601(i))
- Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiffs and the Class members (AMCC ¶ 601(j))
- Whether Defendants are liable to Plaintiffs and the Class members for damages for conduct actionable under the various state consumer protection statutes (AMCC ¶ 601(n))

Defendants fully expect the disclosures to establish that Health Plans were not deceived by the reporting of AWP and, in fact, that the Health Plans followed myriad different reimbursement approaches, some based on AWP and some not, knowing full well that AWP did not equal actual acquisition cost.

Accordingly, the discovery is relevant to, and likely dispositive of, plaintiffs' fraud theory. *Easton & Co.*, 1994 WL 248172 at *4 ("these issues of individual reliance are relevant to the ultimate determination of liability under the 'fraud on the market' theory . . . [and therefore] the requested discovery is relevant to the determination of common questions"). *See also Krueger v. New York Tel. Co.*, 163 F.R.D. 446, 451 (S.D.N.Y. 1995) ("the issues of liability on which defendants seek to depose the [absent class members] is a class-wide issue going to the heart of the plaintiffs' claim . . . and therefore properly the subject of defendants discovery").

## B.   Defendants' Subpoenas Were Tendered In Good Faith

There is no legitimate dispute that defendants' subpoenas were tendered in good faith. Seeking only those disclosures necessary to defend plaintiffs' allegations, defendants

10

956794v6

made targeted demands and, thereafter, took reasonable measures to ensure that the recipients are not unduly burdened.

Defendants limited the number of subpoenas to a small yet representative sample of the thousands of Health Plans currently operating in the United States. Defendants tailored the individual demands to the central issues of this case. Working with the subpoenaed Health Plans, defendants have proposed narrowed responses to those demands. Because this conduct precludes plaintiffs from showing that defendants sought to harass or dissuade absent class members from joining the litigation, the requested discovery should be allowed. *Brennan*, 450 F.2d at 1005 (allowing discovery after concluding that "there is nothing in the record to suggest that the discovery procedures were used as a tactic to take undue advantage of the class members or as a stratagem to reduce the number of claimants").

### C.    The Demanded Disclosures Are Not Unduly Burdensome

Plaintiffs complain that defendants' requests are "breathlessly overbroad" and impose an undue burden on the Health Plans. This is simply not the case.

Plaintiffs correctly state that, in assessing the propriety of absent class member discovery, courts look to protect individuals, particularly those without legal counsel or significant resources, from being confused or even manipulated by unscrupulous defendants. Those concerns do not exist where, as here, the absent class members are sophisticated corporate entities with their own legal representation. As one court explained when it permitted discovery of absent class members that were Funds:

> [S]ince the class members here are not the typical members of a plaintiff class – individuals with small claims and presumably limited means – but rather are organized entities providing financial and other benefits to members of their constituencies under pre-existing collective bargaining agreements, *there is less concern that some controlled discovery will be unduly burdensome or imperil the maintenance of the class.*

11

956794v6

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, No. 97 Civ. 4550, 97 Civ. 4576, 1998 WL 241279, at *3 (May 12, 1998) (emphasis added).  Further proving this point, *all* of the cases cited by plaintiffs where the court barred discovery as overly burdensome involved individuals who likely would not fully appreciate the legal significance of their status, or the consequences of decisions they may make in the class action.[8]  The subpoenaed Health Plans are not similarly prejudiced.[9]

To the contrary, the Health Plans are sophisticated organizations represented by counsel that are fully capable of objecting to any demands that they view as unduly burdensome or otherwise overly broad.  In fact, defendants' have worked with counsel for the Health Plans to narrow the demands in response to their objections and concerns.[10]

Those courts that have intercepted discovery against absent class members have often been concerned that the burden would outweigh the small monetary recovery that each individual class member stands to gain, and that such a situation would be unfair to the selected few and would tend to undercut the purpose of Rule 23 to provide an efficient remedy where individual action would not be cost-justified.  That concern hardly applies here, where plaintiffs' calculations suggest that each of the subpoenaed Health Plans stands to recover millions of dollars if plaintiffs are successful in this action.

---

[8]  *See Wainwright v. Kraftco Corp.*, 54 F.R.D. 532 (N.D. Ga. 1972) (absent class members were individual board of education members); *Clark v. Universal Builders, Inc.*, 501 F.2d 324 (7th Cir. 1974) (absent class members were individual home purchasers); *Robertson v. Nat'l Basketball Ass'n*, 67 F.R.D. 691 (S.D.N.Y. 1975) (absent class members were individual basketball players).

[9]  Thus, plaintiffs' request for "safeguards" to "protect" the subpoenaed Health Plans (Pls' Mem., p. 14), should be rejected.

[10]  Ironically, while plaintiffs cast aspersions on defendants' disclosure in its subpoenas of the entire list of drugs identified in the AMCC, certain of the subpoenaed Health Plans have thanked defendants for providing advance notice of the possible expansion of discovery.

12

**D.     The Subpoenaed Information Cannot Be Obtained From Other Sources**

Plaintiffs' assertion that the disclosures sought from the subpoenaed Health Plans could just as readily be obtained from the six named Funds is flatly wrong and belied by plaintiffs' production to date.

As discussed above, Funds and Health Plans are very different entities that play very different roles in the reimbursement of drugs used by their members. It stands to reason, therefore, that these entities have very different perspectives and knowledge regarding drug pricing and reimbursement. For example, Health Plans typically negotiate reimbursement rates directly with physician groups, whereas Funds typically do not. Thus, the former has information concerning those negotiations and the latter does not. The Funds' lack of involvement in negotiations with health care providers is borne out by their meager responses to defendants' document requests – the Funds have produced no documents concerning the determination of reimbursement for physician-administered drugs or, for that matter, any documents bearing on their understanding of AWP.

Plaintiffs also claim that the documents within the possession of PBMs would cover all of defendants' PBM-related discovery requests. Again, this is not the case. While PBMs presumably would have contracts with Health Plans and correspondence between PBMs and Health Plans, they would not have the internal Health Plan documents that would demonstrate the Health Plans' understanding of the key issues in negotiations with PBMs, including the significance of AWP. It is the knowledge of the putative class members, not PBMs, that is critical to defendants' ability to disprove plaintiffs' sweeping allegations of deception.

Plaintiffs similarly object to defendants' request for documents created or received by a government agency regarding AWP by blithely asserting that defendants can

13

obtain reports and other documents directly from the government.  Plaintiffs again miss the point.  There are innumerable government reports that discuss the fact that AWP is not an actual average of wholesaler's prices and that the Government's policy of reimbursing drugs under Medicare Part B based on AWP had the effect of generating profits for physicians.  Many of these documents are publicly available.  Defendants do not seek these documents from the Health Plans in order to show that they exist, but rather to show *that the entire health insurance industry was aware of this body of literature and, therefore, was well-aware of the realities of AWP, and yet, for their own reasons, chose to use it in many cases as a benchmark for reimbursement.*  Obtaining the documents from the Government is no substitute for obtaining the documents directly from the Plans.

Finally, plaintiffs claim in conclusory fashion that defendants can "obtain much of the information sought in the Medical Plan subpoenas from the Medical Plan Processors and Benefit Consultants, Claims Administrators and Medical Plan Auditors."  As discussed above, no third party is likely to have documents that go to what the Health Plans knew about AWP; nor will they enable defendants to establish the myriad variations in the relationships between class members and providers and PBMs.

### E.    "Pre-Authorization" Is Not Required

Plaintiffs complain mightily that defendants failed to seek the Court's prior approval before issuing subpoenas to selected putative class member Plans.  (Pls' Mem., pp. 1-2, 6-7)  Presumably foreseeing that their attempt to block defendants' subpoenas will fail, plaintiffs seek to impose, on a going forward basis, a three-step protocol whereby defendants would be required to seek plaintiffs' approval or a court order before proceeding with discovery.  (Pls' Mem., p. 15)  This proposed pre-authorization protocol is contrary to the Federal Rules and the precedent of this Court, is unwarranted, and is unworkable.

14

As this Court advised plaintiffs at the November 21, 2003 hearing, any objec on to the propriety of a party's subpoenas should be made by a properly noticed protective ordei motion. (Tr. of 11/21/03 Hr'g, p. 116) Indeed, plaintiffs have not cited any case where a par y's subpoena was quashed for failing to seek prior authorization. To the contrary, this Court has allowed outstanding subpoenas on absent class members to proceed without regard to wheth r pre-authorization was sought. *M. Berenson Co.*, 103 F.R.D. at 637.

The primary case on which plaintiffs rely for their pre-authorization proposal is readily distinguishable. *See Baldwin & Flynn v. Nat'l Safety Assocs.*, 149 F.R.D. 598 (N.D. Ca. 1993). In *Baldwin* the defendants sought to take the depositions of approximately half of the absent class members for the purposes of class certification issues. The court found that the depositions only would provide "minor additions to the overwhelming volume of evidence" (including "ample documentation of written and scripted materials") that the defendants alrea ly had obtained. *Id.* at 601. The court refused to allow the additional discovery since it was not required for the determination of class issues, which it concluded did not require the same de ree of proof as determination on the merits. *Id.* The discovery was not denied for failure to seek pre-authorization.[11] Indeed, in a majority of cases cited by the plaintiffs, it is clear that the defendants did not seek pre-approval, and the courts do not even address this alleged "deficiency." *Wainwright v. Kraftco Corp.*, 54 F.R.D. 532 (N.D. Ga. 1972); *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (19 5); *Robertson v. Nat'l Basketball Ass'n*, 67 F.R.D. 691 (S.D.N.Y. 1975).

---

[11] *Kamm v. California City Development Co.*, 509 F.2d 205 (9th Cir. 1975), is also distinguishable. *Kamm* involved a plaintiff class that was seeking additional discovery, which is not instructive to the issue of whether absent class member discovery should be permitted. Plaintiffs in Kamm argued the District Court erred in using only the public record of a related state court action in making its determination that a class action was not the proper method of adjudicating the case. The appellate cc rt held that this was not an abuse of discretion and affirmed the denial of the request for further discover .

Plaintiffs' assertion that defendants should have sought pre-approval is a red herring, and their proposal to implement a pre-authorization protocol on a going-forward basis is nothing more than a delaying tactic.

## CONCLUSION

For all of the above reasons, Defendants respectfully request that the Court deny plaintiffs' motion for a protective order and allow discovery of the forty Health Plans to proceed.

Respectfully submitted,

By:

Nicholas C. Theodorou (BBO #49673)
Lucy Fowler (BBO # 647929)
FOLEY HOAG LLP
115 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

– and –

Andrew D. Schau (admitted *pro hac vice*)
Erik Haas (admitted *pro hac vice*)
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2000

16

956794v6

## CERTIFICATE OF SERVICE

I certify that on January 9, 2004, a true and correct copy of the forgoing

Memorandum in Opposition to Plaintiffs' Motion for a Protective Order was served on all

counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order

No. 2 by sending a copy to Verilaw Technologies for posting and notification to all parties.

Andrew D. Schau

956794v6

17