UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br><br>CIVIL ACTION: 01-CV-12257-PBS<br><br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | Chief Mag. Judge Marianne B. Bowler |

**DEFENDANT BMS'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PLAINTIFFS TO PROVIDE PROPER ANSWERS TO INTERROGATORIES**

Defendants Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp. and Apothecon, Inc. ("BMS") submit this memorandum in support of their motion, pursuant to Rules 33 (b)(5) and 37(a), Fed. R. Civ. P., to compel proper answers to certain of BMS's interrogatories served May 18, 2004.[1]

**Preliminary Statement**

BMS served 18 simple interrogatories on plaintiffs asking them to clarify certain contentions that they make in the case. These interrogatories were not "state the basis" contention interrogatories that require a party to identify all evidence supporting a claim or defense. They were requests for clarification that could have been answered without any research or material expenditure of time.

---

[1] The interrogatories are annexed to the Declaration and Certificate Pursuant To Local Rule 37.1 of Steven M. Edwards, sworn to July 1, 2004 ("Edwards Decl."), as Exhibit A. Plaintiffs' response, served June 17, 2004, is Exhibit B. BMS's letter identifying deficiencies in the response, dated June 18, 2004, is Exhibit C. On June 18, 2004, BMS's counsel called plaintiffs' counsel and left a message that he would like to confer about the responses. (Edwards Decl., ¶ 5.) When plaintiffs' counsel had not returned the call by June 22, 2004, BMS's counsel wrote another letter seeking a response. (Exhibit D.) On June 22, 2004, plaintiffs' counsel responded by stating, inter alia, that they do not intend to provide further answers at this time. (Exhibits E and F.) Plaintiffs' counsel also served contention interrogatories on the fast track defendants (Exhibit G) and sent a letter to BMS complaining about BMS's prior answers to interrogatories (Exhibit H).

While plaintiffs provided marginally acceptable answers to 11 of the interrogatories (in the sense that one can glean some information from the answers), they refused to provide proper answers to the first seven questions. As shown below, in some cases their answers were incomplete or non-responsive. In other cases, they refused to provide any answer at all.

Plaintiffs should be required to provide complete and responsive answers to those seven interrogatories.

## Statement of Facts

This is an action against more than 23 pharmaceutical manufacturers and related entities asserting claims under the Racketeering Influenced and Corrupt Organizations Act, the antitrust laws, state conspiracy law and the consumer protection statutes of ten states, among other things. Plaintiffs purport to represent a class of all persons who purchased prescription drugs manufactured by defendants during the period 1991 to the present at a price calculated by reference to the published average wholesale price ("AWP"). Plaintiffs have amended their complaint five times, and their current complaint, the "[Proposed] Intervenors' Amended Master Consolidated Class Action Complaint" ("AMCC"), is more than 300 pages long.[2]

The AMCC alleges, in substance, that defendants have reported AWPs to industry publications -- such as the Redbook, Medispan and First DataBank -- that are fictitious because defendants sell their drugs at prices below the reported AWPs. (AMCC ¶¶ 3, 135, 138.) The AMCC further alleges that defendants "market" the difference or "spread" between the allegedly fictitious AWPs and the actual transaction prices to their customers. (Id. ¶¶ 341, 666, 687.) Plaintiffs also allege that defendants have "manipulated" the spread. (Id. ¶¶ 6, 156, 346.)

In its defense, BMS intends to demonstrate, inter alia, that BMS does not report AWPs to the publications; it reports wholesale list prices or "WLPs," -- which are nothing more than the

_____

[2]   A copy of the AMCC is provided separately for the Court's convenience.

2

actual undiscounted list prices that appear on invoices that BMS sends to wholesalers -- and the publications apply a markup to the WLPs to arrive at the AWPs. BMS also intends to demonstrate that it provides a variety of discounts to various customers because the marketplace is extremely competitive, but it is under no obligation to disclose those discounts to the general public.[3] In addition, if "marketing" the spread means informing a customer of its existence, and "manipulating" the spread means raising list prices, then BMS will show -- without regard to whether it has engaged in those practices -- that these practices do not violate the law.

In order to understand plaintiffs' allegations, BMS needs to obtain the answers to certain questions. For example, while the AMCC alleges that the reported AWPs are fictitious, it does not explain what the proper definition of AWP should be. Furthermore, while the AMCC is replete with references to "spreads," it does not explain whether a spread -- standing alone -- violates the law. Moreover, the AMCC does not explain what plaintiffs mean by "marketing" and "manipulating" the spread.

The first seven interrogatories propounded by BMS were designed to obtain the answers to these questions. Those interrogatories, which are simple and straightforward, are as follows:

> "1.  State what you contend is the proper definition of AWP, as that term is used in the AMCC, and identify any statute, regulation or authority that supports that definition.
>
> "2.  State whether you contend that the existence of a "spread" as that term is used in the AMCC, without more, violates the law, and if not, identify the additional conduct that you claim gives rise to a violation.

---

[3] Discounting in the pharmaceutical business is very complex. As explained by Judge Posner in In re Brand Name Prescription Drugs Antitrust Litig., 186 F.3d 781, 783-85 (7th Cir. 1999), in some cases manufacturers offer direct discounts, such as a 2% prompt pay discount to wholesalers. In some cases, manufacturers offer discounts to customers of the wholesalers, which are effectuated by paying the wholesaler a "chargeback" in return for the wholesaler's agreement to sell the product to the customer at a lower price than the wholesaler paid for the product. In other cases, manufacturers offer "rebates" to customers or pharmacy benefit managers in return for purchasing their product.

> "3.     State whether a spread, as that term is used in the AMCC, of any size violates the law, and if not, identify the size at which you contend a spread violates the law.
>
> "4.     Explain what you mean by the phrase "marketing the spread" as it is used in the AMCC.
>
> "5.     Identify each act that constitutes marketing the spread as that phrase is used in the AMCC.
>
> "6.     Explain what you mean by the phrase "manipulating the spread" as it is used in the AMCC.
>
> "7.     Identify each act that constitutes manipulating the spread as that phrase is used in the AMCC."

(Edwards Decl., Ex. A.) Unfortunately, plaintiffs' answers were anything but simple and straightforward.

Answer to Interrogatory 1. Instead of articulating a clear and simple definition of AWP, plaintiffs made a variety of statements, including, "'AWP' means average wholesale price, a term capable of plain meaning, industry and statutory interpretation and definition"; "[t]he average wholesale price is the most commonly used benchmark to set reimbursement or endpayor prices for prescription drugs in the United States"; and "AWP is intended to estimate an average price at which dispensers (such as pharmacies or physicians) purchase a drug at wholesale." (Edwards Decl., Ex. B.) In his June 18, 2004 letter to plaintiffs' counsel, BMS's counsel asked plaintiffs to clarify whether there is one definition, or multiple definitions, and if there is a single definition, which one is correct. (Id. Ex. C.) Plaintiffs' counsel refused to do that. (Id. Ex. F.)

Answer to Interrogatory 2. In its second interrogatory, BMS asked plaintiffs whether the existence of a spread, without more, violates the law. Instead of answering the question, however, plaintiffs provided the following response:

> "The term 'without more' is so vague as to render this interrogatory meaningless. For example, a spread of 1,000% does not exist in isolation. The 'more' includes a published AWP that disguises the real average wholesale price. Many other

4

factors potentially exist that constitute the 'more' making this question 'without more' too vague to answer."

(Edwards Decl. Ex. B at 5.) In his June 18, 2004 letter to plaintiffs' counsel, BMS's counsel explained that the AMCC talks about (1) the existence of spreads, (2) marketing the spread and (3) manipulating the spread, and it is impossible to tell whether plaintiffs contend that the existence of spreads -- standing alone -- violates the law. (Id. Ex. C.) Again, plaintiffs refused to clarify their response. (Id. Ex. F.)

Answer to Interrogatory 3. In addition to determining whether the mere existence of a spread -- standing alone -- violates the law, it is important for BMS to understand whether legality depends on the size of the spread. In In re Lupron Marketing and Sales Practices Litig., 295 F. Supp. 2d 148, 168 n.19 (D. Mass. 2003), Judge Stearns suggested, in response to the defendant's argument that AWP is a "sticker price", that "[t]here is difference between a sticker price and a sucker price" and if one were confronting a "modest" markup the plaintiffs might not have a case. BMS has no idea whether plaintiffs intend to make a similar assertion here and, if so, what the dividing line is between a legal spread and an illegal spread, so it asked that question in Interrogatory 3. Plaintiffs responded by referring to their answer to Interrogatory 2 and quoting a document which states: "In other words, it is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the 'spread' to induce customers to purchase its product." (Edwards Decl. Ex. B.) BMS's counsel pointed out that this is not a response to the question because it says nothing about size (id. Ex. C), but again plaintiffs refused to provide a further answer. (Id. Ex. F.)

Answer to Interrogatory 4. In this interrogatory, BMS asked plaintiffs to explain what they mean by "marketing the spread." Plaintiffs' entire answer is as follows:

> "*See* General Objection No. 1. Subject to that objection, *see, e.g.*, AMCC ¶¶ 3-7, 133-78, 339, 345 and 347. *See also* response to No. 3."

5

(Edwards Decl. Ex. B.) As before, plaintiffs rejected BMS's request that they answer the question. (Id. Exs. C and F.)

Answer to Interrogatory 5. In order to ensure that it fully understood what plaintiffs meant by the phrase "marketing the spread," BMS asked plaintiff to identify each act that constitutes marketing the spread. (Edwards Decl. Ex. A.) Plaintiffs construed this interrogatory to require them to identify each piece of evidence supporting the allegation and responded by stating that, "there are likely hundreds if not thousands of such acts the precise identity of which is hidden in defendants' own files and known by defendants' employees and to which plaintiffs do not have access." (Edwards Decl. Ex. B at 6.) BMS then told plaintiffs that it is not seeking an evidentiary basis for the allegation or a list of documents that allegedly support the claim; rather it is simply trying to understand the type of conduct that allegedly constitutes marketing the spread, and it posed the following question: "Is a manufacturer marketing the spread when a salesperson responds to questions about reimbursement, or does marketing the spread require and affirmative act such as providing the customer with sales literature comparing the spread of one manufacturer to another?" (Id. Ex. C.) Plaintiffs again refused to respond. (Id. Ex. F.)

Answer to Interrogatory 6. Similar to Interrogatory 4, which asked plaintiffs to explain what they mean by "marketing the spread", this interrogatory asked plaintiffs to explain what they mean by "manipulating the spread". Unlike plaintiffs' answer to Interrogatory 4, which provided no information, plaintiffs' answer to Interrogatory 6 is a lengthy discourse which appears to suggest that manipulation occurs whenever a manufacturer's reported price does not take into account price concessions. In his June 18, 2004 letter to plaintiffs' counsel, BMS's counsel pointed out that plaintiffs' answer "seems to suggest that your allegations with respect to allegedly false AWPs and manipulating the spread are the same thing", and he asked whether that is correct. (Edwards Decl. Ex. C.) Again, plaintiffs refused to respond. (Id. Ex. F.)

6

Answer to Interrogatory 7. Similar to Interrogatory 5, which asked plaintiffs to identify each act that constitutes marketing the spread, this interrogatory asked plaintiffs to identify each act that constitutes manipulating the spread. (Edwards Decl. Ex. A.) Plaintiffs again objected on the ground that they should not be required to "comb through thousands of documents, many of which have not yet been produced and . . . cull through testimony that has not yet been provided", and they suggested that the BMS practices they are complaining about "are set forth in the AMCC as well as in the [sic] TAP's indictments and guilty plea." (Id. Ex. B.) BMS again made it clear that it is not seeking the evidentiary basis for the claim or an identification of documents that support it, and it suggested that plaintiffs simply set forth the Rule 11 basis for the claim since the TAP indictment and guilty plea are plainly irrelevant. (Id. Ex. C.) Again, however, plaintiffs refused to respond further, stating: "As for Rule 11, bring it on." (Id. Ex. F.)

## Argument

### I.

### BMS'S INTERROGATORIES ARE A PERMISSIBLE FORM OF DISCOVERY.

Plaintiffs' response includes a general objection stating that BMS's interrogatories constitute contention interrogatories that are premature and are more appropriate after substantial discovery has been conducted. (Edwards Decl. Ex. B at 1.) Plaintiffs nevertheless purport to answer the interrogatories -- albeit in a completely deficient fashion. Plaintiffs have also served contention interrogatories on the Track 1 Defendants (id. Ex. G), thereby suggesting that any principle they are trying to vindicate by objecting to BMS's interrogatories as premature evaporates when plaintiffs are pursuing their own interests.

It is well-established that contention interrogatories are proper. See, e.g., Cable & Computer Technology, Inc. v. Lockheed Saunders, Inc., 175 F.R.D. 646, 650-1 (C.D. Cal. 1997). As the Advisory Committee notes to the 1970 amendments to Rule 33 state, contention

interrogatories "can be most useful in narrowing and sharpening the issues, which is a major purpose of discovery". See also Schaap v. Executive Industries, Inc., 130 F.R.D. 384, 388 (N.D. Ill. 1990) ("After all, one of the main goals of discovery is to clarify, narrow, and sharpen the issues."). In that sense, contention interrogatories have replaced the Bill of Particulars as a means for obtaining clarification of a plaintiffs' claim. Sempier v. Johnson & Higgins, 45 F.3d 724, 735 (3d Cir. 1995).

While Rule 33(c), Fed. R. Civ. P., provides that a court "may" order that answers to contention interrogatories be deferred, it does not require deferral. In re One Bancorp Securities Litig., 134 F.R.D. 4, 7-8 (D. Me. 1991) (rejecting plaintiffs' argument that contention interrogatories were premature). A "[d]efendant is entitled to know what the plaintiff is accusing it of doing." Stabiles v. Haynsworth, Baldwin, Johnson and Greaves, 144 F.R.D. 258, 265 (E.D. Pa. 1992). A defendant is also "entitled to know the facts upon which plaintiff's claim is founded." Sergeant-Welch Scientific Co. v. Ventron Corp., 59 F.R.D. 500, 503 (N.D. Ill. 1973).

BMS's interrogatories are simple and straightforward, and answering them would "require no great expense." Stabiles, 144 F.R.D. at 263. Unlike some contention interrogatories, they do not require plaintiffs to "state the basis" for plaintiffs' claims or identify every document and communication that supports those claims. See Local Rule 26.5 (8). BMS's interrogatories can be answered simply and easily, based on information plaintiffs presently have. See Cable & Computer, 175 F.R.D. at 652 (requiring plaintiff to answer a contention interrogatory "based on the information it has to date").

For these reasons, plaintiffs' objection that BMS's contention interrogatories are premature should be overruled.

## II.

## PLAINTIFFS HAVE FAILED TO PROVIDE PROPER ANSWERS TO THE FIRST SEVEN INTERROGATORIES.

Rule 33 requires that each interrogatory "shall be answered separately and fully in writing under oath". See generally Mahoney v. Kempton, 142 F.R.D. 32, 33 (D. Mass. 1992) ("[I]nterrogatory answers must be complete in and of themselves; other documents or pleadings may not be incorporated into an answer by reference."). It is not permissible to answer an interrogatory by referring to the complaint. Dipietro v. Jefferson Bank, 144 F.R.D. 279, 281-82 (E.D. Pa. 1992). Nor is it permissible to answer an interrogatory by referring to the answer to another interrogatory. Sempier, 45 F.3d at 733-34.

BMS's first interrogatory asked a simple question: define AWP. BMS is entitled to a simple and straightforward answer to the question. Plaintiffs should not be permitted to evade the question. See Cable & Computer, 175 F.R.D. at 652 ("straightforward 'factual' contention interrogatories . . . should . . . be . . . answer[ed] now").

BMS's second interrogatory asks plaintiffs whether the existence of a spread -- standing alone -- violates the law. BMS's third interrogatory asks plaintiffs whether the size of the spread matters. There is no reason why plaintiffs cannot answer these simple questions.

BMS's fourth and sixth interrogatories ask plaintiffs to explain what they mean by the phrases "marketing the spread" and "manipulating the spread" as they are used in the AMCC. Plaintiffs' response to Interrogatory 4, which refers to the AMCC, is improper. Plaintiffs' refusal to explain, in response to Interrogatory 6, whether there is a difference between having a spread and "manipulating" spread, is unacceptable.

Finally, BMS's fifth and seventh interrogatories simply ask plaintiffs to identify the types of conduct that constitute "marketing the spread" and "manipulating the spread". BMS has made it clear that plaintiffs can satisfy their obligation to answer these questions by setting forth the

Rule 11 basis for their claims. Again, there is no excuse for plaintiffs' refusal to do so. <u>See generally</u> <u>One Bancorp</u>, 134 F.R.D. at 8 ("Consistent with Rule 11 of the Federal Rules of Civil Procedure, Plaintiffs must have some factual basis for the allegations in their complaint.").

## Conclusion

For the foregoing reasons, BMS's motion to compel proper answers to its interrogatories should be granted.

Dated:  July 1, 2004

                         Respectfully submitted,

                         HOGAN & HARTSON L.L.P.

                         By: _____
                             Steven M. Edwards
                             Lyndon M. Tretter
                             James S. Zucker

                         875 Third Avenue
                         New York, New York 10022
                         (212) 918-3000

                         Thomas E. Dwyer Jr. (BBO No. 139660)
                         Dwyer & Collora, LLP
                         600 Atlantic Avenue
                         Boston, MA  02210
                         (617) 371-1000

                         *Attorneys for BMS*

## CERTIFICATE OF SERVICE

I, Anne E. Kelly, certify that a true and correct copy of Defendant Bristol-Myers Squibb Company's Motion to Compel Plaintiffs to Provide Proper Answers to Interrogatories was served on all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2 on July 1, 2004, by sending a copy to Verilaw Technologies for posting and notification to all parties.

_____
Anne E. Kelly