## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | Chief Mag. Judge Marianne B. Bowler |

## DECLARATION OF STEVEN M. EDWARDS

Steven M. Edwards, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am a member of Hogan & Hartson L.L.P., attorneys for Defendants Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp. and Apothecon, Inc. ("BMS"). I submit this declaration of my own personal knowledge in support of BMS's Motion to Compel Plaintiffs to Provide Proper Answers to Interrogatories.

2.      On May 18, 2004, BMS served interrogatories on plaintiffs. A true and correct copy of the interrogatories served on that date is attached hereto as Exhibit A.

3.      On June 17, 2004, plaintiffs served responses to BMS's interrogatories. A true and correct copy of plaintiffs' responses is attached hereto as Exhibit B.

4.      On June 18, 2004, I sent a letter to plaintiffs' counsel identifying deficiencies in the responses they served on June 17, 2004. A true and correct copy of the June 18, 2004 letter is attached hereto as Exhibit C.

5.      On June 18, 2004, I called plaintiffs' counsel, Steve Berman, and left a message stating that I would like to confer with him regarding plaintiffs' responses to BMS's

interrogatories.  When Mr. Berman had not returned my call by June 22, 2004, I sent him a letter

reminding him that I had called.  A true and correct copy of that letter is attached hereto as

Exhibit D.

6.      In response to the letter I sent on June 22, 2004, Mr. Berman sent two letters to

my attention that same day.  In these letters, Mr. Berman stated, in substance, that plaintiffs do

not intend to provide further answers to BMS's interrogatories at this time.  True and correct

copies of those letters are attached hereto as Exhibits E and F.

7.      On June 22, 2004, plaintiffs served contention interrogatories on all of the Fast

Track Defendants.  A true and correct copy of those interrogatories is attached hereto as Exhibit

G.  BMS intends to respond to those interrogatories except to the extent that they are premature

"state the basis" interrogatories or they seek to elicit BMS's response to plaintiffs' class

certification motion, which plaintiffs have not yet made.

8.      On June 23, 2004, Mr. Berman sent a letter to BMS's counsel complaining about

BMS's responses to interrogatories served on BMS on January 19, 2004.  A true and correct

copy of that letter is attached hereto as Exhibit H.  In that letter, which based on its timing

appears to be in response to BMS's request for proper answers to its contention interrogatories,

plaintiffs demand that BMS summarize voluminous records that have either been produced in

discovery or are in the public domain.

I declare the foregoing to be true under the penalty of perjury.

New York, New York
July 1, 2004

Steven M. Edwards

2

# EXHIBIT A



05/18/04
08:42 PM E
MDL NO

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | Judge Patti B. Saris |

### BMS'S CONTENTION INTERROGATORIES TO PLAINTIFFS

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, defendants Bristol Meyers Squibb Co., Oncology Therapeutics Network Corp. and Apothecon, Inc. ("BMS") hereby request that plaintiffs answer, separately and fully in writing and under oath, the interrogatories set forth below in accordance with the following definitions.

### DEFINITIONS

1.    "AMCC" means the Amended Master Consolidated Complaint.

2.    "GPO" means any group purchasing organization that purchases pharmaceutical products.

3.    "Manufacturer" means a company that manufactures pharmaceutical products.

4.    "Participant" or "beneficiary" means a person for whom a health plan or health and welfare fund provides any medical or health insurance benefit.

5.    "PBM" means a pharmacy benefit manager.

6.    "Person" means any natural person or any business, legal, or governmental entity or association.

7.    "Payor" means any non-government entity or program that pays for prescription drugs including, but not limited to heath insurance companies, self insurance plans and welfare and benefit funds.

8.    "Provider" means any physician or entity that provides health care.

9.    "Retailer" means a retail pharmacy.



10.     "Wholesaler" means any entity that purchases prescription drugs from a manufacturer and resells such drugs to any other entity.

11.     "You" or "your" means the plaintiffs identified in the AMCC.

## INTERROGATORIES

1.     State what you contend is the proper definition of AWP, as that term is used in the AMCC, and identify any statute, regulation or authority that supports that definition.

2.     State whether you contend that the existence of a "spread" as that term is used in the AMCC, without more, violates the law, and if not, identify the additional conduct that you claim gives rise to a violation.

3.     State whether a spread, as that term is used in the AMCC, of any size violates the law, and if not, identify the size at which you contend a spread violates the law.

4.     Explain what you mean by the phrase "marketing the spread" as it is used in the AMCC.

5.     Identify each act that constitutes marketing the spread as that phrase is used in the AMCC.

6.     Explain what you mean by the phrase "manipulating the spread" as it is used in the AMCC.

7.     Identify each act that constitutes manipulating the spread as that phrase is used in the AMCC.

8.     State whether you contend that it violates the law for a manufacturer to submit a wholesale acquisition cost to a publisher that reflects the actual price that the manufacturer charges to wholesalers.

9.     State whether you contend that it violates the law for a manufacturer to offer chargebacks, discounts or rebates to wholesalers, retailers, PBMs, GPOs, providers or payors.

10.     State whether you contend that a manufacturer is required to offer the same discount to every purchaser of prescription drugs.

11.     State whether you contend that a manufacturer is required to publicly disclose every chargeback, discount or rebate that it offers to purchasers of prescription drugs.

12.     State whether individuals who pay cash at retail pharmacies, and are not members of the Together Rx program, are members of any class or subclass for which you intend to seek certification in this case.



13.   State whether hospitals are members of any class or subclass for which you seek certification in this case.

14.   Explain what you mean by the phrase "price calculated by reference to the published AWP" as it is used in the definition of the AWP payor class in the AMCC.

15.   State whether you are asserting any claims on behalf of payors who purchase prescription drugs from retailers without utilizing the services of a PBM.

16.   State whether you are asserting any claims on behalf of beneficiaries or participants of payors on whose behalf you are asserting claims.

17.   Set forth what you contend is the proper measure of damages in this case.

18.   State whether you are prepared to pay for the expense of personalized notice to any class member whose name and address can be ascertained and, if so, identify the source and amount of funds available for that purpose.

Dated:  May 18, 2004


**HOGAN & HARTSON L.L.P.**

By:

Steven M. Edwards
Lyndon M. Tretter
James S. Zucker

875 Third Avenue
New York, New York 10022
(212) 918-3000

*Attorneys for Defendants*
*Bristol-Myers Squibb Company,*
*Oncology Therapeutics Network Corporation and*
*Apothecon, Inc.*



05/18/04
08:42 PM E

## CERTIFICATE OF SERVICE

I, James S. Zucker, certify that a true and correct copy of Defendant Bristol-Myers Squibb Company's Contention Interrogatories to Plaintiffs was served on all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2 on May 18, 2004, by sending a copy to Verilaw Technologies for posting and notification to all parties.

James S. Zucker

# EXHIBIT B



06/17/04
05:36 PM E
AWP-MDL NO

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | )<br>)<br>) |
| | ) |
| | ) |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | )<br>)<br>) |
| | ) |

MDL No. 1456

CIVIL ACTION:  01-CV-12257-PBS

Judge Patti B. Saris

## PLAINTIFFS' OBJECTIONS AND RESPONSES TO BMS'S CONTENTION INTERROGATORIES TO PLAINTIFFS

### GENERAL OBJECTIONS

1.      (a)      Plaintiffs object to each of these interrogatories on the grounds that they constitute contention interrogatories that are premature.  Contention interrogatories are "more appropriate after a substantial amount of discovery has been conducted." *McCarthy v. Paine Webber Group, Inc.*, 168 F.R.D. 448, 450 (D. Conn. 1996) (citing *Fischer and Porter Co. v. Tolson*, 143 F.R.D. 93, 95 (E.D. Pa. 1992).  Although contention interrogatories are allowed, "plaintiffs are generally excused from responding to defendants' contention interrogatories until they have completed a substantial amount of discovery, particularly document inspection." *Bonilla v. Trebol Motors Corp.*, 1997 WL 17844 *65 (D. Puerto Rico 1997).

(b)      Courts have held that it is up to the party serving contention discovery to justify its use during the discovery period:

> A party filing contention interrogatories early in the pretrial period, before substantial documentary or testimonial discovery has been completed, has the burden of justification.  It must present "specific, plausible grounds for believing that securing early



answers to its contention questions will materially advance the
goals of the Federal Rules of Civil Procedure."

*Fischer and Porter Co. v. Tolson*, 143 F.R.D. 93, 96 (E.D. Pa. 1992) (citing *In re Convergent*

*Technologies Sec. Litig.*, 108 F.R.D. 328, 338-339 (N.D. Cal. 1985).  In this case, contention

interrogatories are particularly premature given the lack of discovery and are especially

inappropriate considering defendants' refusal to fully comport with CMO No. 10.

    2.    (a)    Certain of the interrogatories go to the issue of damages.  As set forth in

the AMCC, a central issue in the present action is whether AWPs for defendants' drugs bear

some relationship to the actual cost or wholesale price.  It is premature to require plaintiffs to

calculate how much they should have paid for AWPIDs or a precise damage methodology while

defendants have not yet allowed them to learn how the drugs were priced.

    (b)    In order for the plaintiffs to fully comply with their obligations under Rule

26(a)(1)(C), defendants must first provide them with the opportunity to do so.  *See* Comments to

Fed. R. Civ. P. 26(a)(1)(C) ("[A] party would not be expected to provide a calculation of

damages which ... depends on information in the possession of another party or person." *See*

*also Kleiner v. Burns*, 2000 WL 1909470 (D. Kan. 2000); *City and County of San Francisco v.*

*Tutor-Saliba Corporation*, 218 F.R.D. 219, 222 (N.D. Cal. 2003) (refusing to mandate disclosure

of detailed calculation of damages, in part, "given that many of the documents which are likely

to inform the calculation remain in defendants' hands").  No opportunity has yet occurred in this

case.

    (c)    Federal courts routinely allow parties to consult with experts prior to

making a full disclosure of their damage computations or methods under Fed. R. Civ. P.

26(a)(1)(C).  *See, e.g., Pine Ridge Recycling, Inc. v. Butts County, Georgia*, 889 F. Supp. 1526,

- 2 -



1527 (M.D. Ga. 1995) (denying the motion to exclude evidence of the plaintiff's claimed

damages under Fed. R. Civ. P. 26(a)(1)(C) where the "method of computation ... *will necessitate*

*expert testimony*, which is not due until later this year") (emphasis added); *City and County of*

*San Francisco*, 218 F.R.D. at 222 (refusing to mandate disclosure of detailed calculation of

damages, in part, because "some type of *expert analysis may be required*" (emphasis added).

   3.  Plaintiffs reserve the right to supplement these responses as discovery proceeds in

this case.  Plaintiffs also note in this regard that defendants have in many instances not produced

relevant documents, thus it is premature to supply answers to many of the requests.

   4.  All responses provided herein are made subject to, and without waiving, these

general objections.

**RESPONSES**

   1.  State what you contend is the proper definition of AWP, as that term is used in the

AMCC, and identify any statute, regulation or authority that supports that definition.

    ANSWER:  *See* General Objection 1.  Notwithstanding the foregoing objection,

plaintiffs state at this time the following:  "AWP" means average wholesale price, a term capable

of plain meaning, industry and statutory interpretation and definition.  The average wholesale

price is the most commonly used benchmark to set reimbursement or endpayor prices for

prescription drugs in the United States, both in the private sector (for oral pharmaceuticals

distributed in the pharmacy and mail order channels, as well as for injectibles and other drugs in

the provider administered channel) and in the public sector (under the Medicare Part B program

and under Medicaid).  For covered drugs and biologicals, Medicare Part B generally reimburses

at "95 percent of average wholesale price."  42 U.S.C. 1395u(o).  AWP is intended to estimate an

- 3 -

average price at which dispensers (such as pharmacies or physicians) purchase a drug at wholesale. As a result, private and public sector endpayers use AWP as a benchmark for cost reimbursement, and each year AWP is used as the benchmark price to effectuate many billions of dollars of public and private drug reimbursement. AWP, as the term and practice shows, reflects an administratively efficient, reasonable basis upon which to reimburse dispensers (typically pharmacy or physician) for the cost to the dispenser of purchasing a drug product.

Traditionally, AWP has been based on prices reported by drug manufacturers and published in compendia such as the Red Book. However, manufacturers and wholesalers increasingly give physicians and providers discounts that reduce the actual amount that the physician or provider actually pays for the drugs. These discounts are not reflected in the published price and reduce the amount providers actually pay to levels far below those prices published in industry publications. Furthermore, use of the AWP, as reported by manufacturers to companies which compile such prices, creates a situation where a manufacturer can, for certain drugs, increase the reported AWP and, in turn, offer physicians and others in the distribution chain a deeper discount. Authority for this definition is found in the April 2003 Report of the Office of the Inspector General.

In addition, CMS Administrator, Thomas Scully, identified a definition that reflects a common understanding of AWP, namely that "AWP is intended to represent the average price at which wholesalers sell drugs to their customers, which include pharmacies and physicians." This definition is consistent with similar definitions in the marketplace. For example, Express Scripts 10-K (Dec. 31, 2001) defines AWP as:

> AWP is a standard pricing measure used throughout the industry as well as by us as the basis for calculating drug prices under our

- 4 -



health plans and pharmacies and rebates with pharmaceutical manufacturers.

GSK defines AWP as:

> Average Wholesale Price (AWP): The composite wholesale prices charged on a specific commodity that is assigned by the drug manufacturer and is listed in either the Red Book or Blue Book and **_used by third-party payers as a basis for reimbursement_**.

(GSK-MDL-ZN02-035985)(AMCC Para. 379).

Authority for these definitions is found in the references cited above.

2.   State whether you contend that the existence of a "spread" as that term is used in the AMCC, without more, violates the law, and if not, identify the additional conduct that you claim give rise to a violation.

ANSWER:  *See* General Objection No. 1.  The term "without more" is so vague as to render this interrogatory meaningless.  For example, a spread of 1,000% does not exist in isolation.  The "more" includes a published AWP that disguises the real average wholesale price.  Many other factors potentially exist that constitute the "more" making this question "without more" too vague to answer.

3.   State whether a spread, as that term is used in the AMCC, of any size violates the law, and if not, identify the size at which you contend a spread violates the law.

ANSWER:  *See* response to Interrogatory No. 2.  *See also* the Final OIG Guidance Office Of Inspector General, April 2003 wherein it states, "In other words, it is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the "spread" to induce customers to purchase its product"

4.   Explain what you mean by the phrase "marketing the spread" as it is used in the AMCC.

- 5 -



ANSWER: *See* General Objection No. 1.  Subject to that objection, *see*, *e.g.*, AMCC ¶¶ 3-7, 133-78, 339, 345 and 347.  *See also* response to No. 3.

     5.     Identify each act that constitutes marketing the spread as that phrase is used in the AMCC.

ANSWER: *See* General Objection No. 1.  Plaintiffs object to the phrase "identify each act" for in the context of this case there are likely hundreds if not thousands of such acts the precise identity of which is hidden in defendants' own files and known by defendants' employees and to which plaintiffs do not have access.  The AMCC identifies examples of marketing the spread.

     6.     Explain what you mean by the phrase "manipulating the spread" as it is used in the AMCC.

ANSWER: *See* General Objection No. 1.  *See* Response No. 3.  The "spread" is the difference between the amount a customer pays for a product and the amount the customer receives upon resale of the product to the patient or other payer.  In many situations under the federal programs, pharmaceutical manufacturers control not only the amount at which they sell a product to their customers, but also the amount those customers who purchase the product for their own accounts and thereafter bill the federal health care programs will be reimbursed.  To the extent that a manufacturer controls the "spread," it controls its customer's profit.

Manufacturers' reported prices should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers.  To the extent reported prices are not accounting for the foregoing, a manipulation of the spread has occurred.  *See also* The

- 6 -



Final OIG Guidance Office of Inspector General, April 2003 wherein it states, "If a
pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers'
profits by increasing the amount the federal health care programs reimburse its customers, the
anti-kickback statute is implicated.  Unlike bona fide discounts, which transfer remuneration
from a seller to a buyer, manipulation of the AWP transfers remuneration to a seller's immediate
customer from a subsequent purchaser (the federal or state government).  Under the anti-
kickback statute, offering remuneration to a purchaser or referral source is improper if one
purpose is to induce the purchase or referral of program business."

7.      Identify each act that constitutes manipulating the spread as that phrase is used in
the AMCC.

ANSWER:  *See* General Objection No. 1.  To the extent you contend that
plaintiffs must specify "each act," such a contention interrogatory is overbroad and premature as
it would require plaintiffs to comb through thousands of documents many of which have not yet
been produced and to cull through testimony that has not yet been provided.  To the extent BMS
seeks a description of the practices in general they are set forth in the AMCC as well as in the
TAP's indictments and guilty plea.

8.      State whether you contend that it violates the law for a manufacturer to submit a
wholesale acquisition cost to a publisher that reflects the actual price that the manufacturer
charges to wholesalers.

ANSWER:  *See* General Objection No. 1.  Plaintiffs do not contend that it is a
violation of the law for a manufacturer to submit a WAC that reflects actual prices charged
wholesalers.  However, in instances where AWP is determined from WAC, it is unlawful to
submit a WAC that does not include in its calculation, rebates, discounts, chargebacks, free

- 7 -



goods, special offers and any other incentive that impacts the actual average price paid by a

wholesaler, hospital, physician, or purchasing group acting as a wholesaler.  The importance of

accurate price reporting was recently reconfirmed by the Office of the Inspector General ("OIG")

in an April 2003 report:  "Compliance Program Guidance for Pharmaceutical Manufacturers."

The OIG report found that the "government sets reimbursement with the expectation that the data

provided are complete and accurate."  The OIG report made it clear that the AWP must be a

meaningful figure that is not artificially inflated:

> Where appropriate, manufacturers' reported prices should
> accurately take into account price reductions, cash discounts, free
> goods contingent on a purchase agreement, rebates, up-front
> payments, coupons, goods in kind, free or reduced-price services,
> grants, or other price concessions or similar benefits offered to
> some or all purchasers.  Any discount, price concession, or similar
> benefit offered on purchases of multiple products should be fairly
> apportioned among the products (and could potentially raise anti-
> kickback issues).  Underlying assumptions used in connection with
> reported prices should be reasoned, consistent, and appropriately
> documented, and pharmaceutical manufacturers should retain all
> relevant records reflecting reported prices and efforts to comply
> with federal health care program requirements.

9.   State whether you contend that it violates the law for a manufacturer to offer

chargebacks, discounts or rebates to wholesalers, retailers, PBMs, GPOs, providers or payors.

ANSWER:  Plaintiff objects to this interrogatory on the grounds that it is

overbroad.  For example, discounts or rebates may violate state or federal antitrust laws.  They

are not the subject of this lawsuit.  In the context of AWP litigation, plaintiffs have outlined in

the AMCC the circumstances under which the use of chargebacks, discounts, rebates, etc. violate

the laws cited in the AMCC.  These circumstances include any situation where a manufacturer

has caused to be published a WAC, WLP, NDP, list price and/or an AWP, which did not reflect

such offers.

- 8 -



10.    State whether you contend that a manufacturer is required to offer the same discount to every purchaser of prescription drugs.

ANSWER:  No such contention is made.

11.    State whether you contend that a manufacturer is required to publicly disclose every chargeback, discount or rebate that it offers to purchasers of prescription drugs.

ANSWER:  No.  However, the chargebacks, discounts or rebates must be reflected in the manufacturer's reported prices, submitted to industry publishers, if the manufacturer knows that WAC, NDP or WLP is being used to calculate AWP, or if the manufacturer reports AWP itself.

12.    State whether individuals who pay cash at retail pharmacies, and are not members of the Together Rx program, are members of any class or subclass for which you intend to seek certification in this case.

ANSWER:  Yes.

13.    State whether hospitals are members of any class or subclass for which you seek certification in this case.

ANSWER:  Yes, if the hospital purchased for its own use based on AWP. Further, the prices at which hospitals purchase drugs are relevant in determining AWP, WAC, NDP and WLP.

14.    Explain what you mean by the phrase "price calculated by reference to the published AWP" as it is used in the definition of the AWP payor class in the AMCC.

ANSWER:  The words mean exactly what they say. *See also* definition of AWP by GSK referred to in response to No. 1.



15.     State whether you are asserting any claims on behalf of payors who purchase

prescription drugs from retailers without utilizing the services of a PBM.

ANSWER:  Yes.

16.     State whether you are asserting any claims on behalf of beneficiaries or

participants of payors on whose behalf you are asserting claims.

ANSWER:  Yes, to the extent they paid a graduated co-pay that would be affected

by a change in the AWP they are.

17.     Set forth what you contend is the proper measure of damages in this case.

ANSWER:  *See* General Objections, as well as Judge Stearns' order denying

similar interrogatories in *In re Lupron Marketing and Sales Practices Litig.*, dated March 1,

2004.  The AMCC itself discloses plaintiffs' theory of damages:

> 3.     More specifically, the Defendant Drug
> Manufacturers report to trade publications a drug price – the
> Average Wholesale Price (or "AWP") – that for many drugs is
> deliberately set far above the prices that these drugs are available
> in the marketplace.  The AWPs for these drugs are deliberately
> false and fictitious and created solely to cause Plaintiffs and the
> Class members to overpay for drugs.  Because all drugs
> administered under Medicare Part B are priced based on the
> published AWPs, the Defendant Drug Manufacturers inflate AWP
> reimbursement rates to enable providers and others to make secret
> profits through overcharges to patients, their insurers and other end
> payors.  This, in turn, motivates the providers to sell and
> administer the drugs with the most inflated AWPs, resulting in
> increased market share and profit for the Defendant Drug
> Manufacturers and inflated payments for drugs by individual
> patients (through co-pays or direct payments), health plans and
> insurers.

> 139.    Plaintiffs and the members of the Class paid for the
> drugs based on the inflated AWPs reported by the Defendant Drug
> Manufacturers.



140.    The Defendant Drug Manufacturers' pattern of fraudulent conduct in artificially inflating the AWPs for their drugs (sometimes referred to herein as the "AWP Scheme") directly caused Plaintiffs and the members of the Class to substantially overpay for those drugs.

196.    Thus, each Defendant concealed that (i) its AWPs were highly-inflated (and were inflated solely to cause Plaintiffs and the Class to overpay for the AWPIDs), (ii) it was manipulating the AWPs of the AWPIDs, and (iii) the AWPs bore no relationship to the prices paid for, or the pricing structure of, the AWPIDs as they were sold to providers and others.

541.    Plaintiffs and other Third-Party Payors who are members of the class reimburse health care providers for pharmaceuticals based upon the published AWP for brand name drugs and based upon MAC, for generic drugs, which in turn is derived from AWP.  Accordingly, plaintiffs and Third-Party Payors are directly damaged by fraudulent AWP pricing schemes for drugs covered by employee health and benefit plans.  By virtue of the fact that AWP is the reimbursement benchmark for pricing of the AWPIDs at issue, such injury occurs in all aspects of the distribution chain for the AWPIDs, including the PBM segment, non-PBM purchases, Part B covered drugs and non-Part B covered drugs.

18.    State whether you are prepared to pay for the expense of personalized notice to any class member whose name and address can be ascertained and, if so, identify the source and amount of funds available for that purpose.

ANSWER:  Plaintiffs will propose the type and manner of appropriate notice when they file their motion for class certification.  The source of payment is not calculated to lead to discoverable information and therefore the interrogatory is improper.  It is also premature since the exact size and scope of the class and manner of notice is not yet known.



06/17/04
05:36 PM E
MDL NO

DATED:  June 17, 2004.

By       **/s/ Steve W. Berman**
Thomas M. Sobol (BBO#471770)
Edward Notargiacomo (BBO#567636)
Hagens Berman LLP
225 Franklin Street, 26th Floor
Boston, MA  02110
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Kevin P. Roddy
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Samuel Heins
Heins, Mills & Olson, P.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone: (612) 338-4605
Facsimile: (612) 338-4692

Eugene A. Spector
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
**CHAIRS OF LEAD COUNSEL
COMMITTEE**

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735



Kenneth A. Wexler
Elizabeth A. Fegan
The Wexler Firm
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
**MEMBERS OF LEAD COUNSEL
COMMITTEE AND EXECUTIVE
COMMITTEE**

1534.16 0060 DSC.DOC



## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing Plaintiffs' Objections and Responses to BMS's Contention Interrogatories to Plaintiffs to be served on all counsel of record electronically on June 17, 2004, pursuant to Section D of Case Management Order No. 2.

By_____ **/s/ Steve W. Berman**_____
Thomas M. Sobol, Esq.
**HAGENS BERMAN LLP**
225 Franklin Street, 26th Floor
Boston, MA  02110
Telephone: (617) 482-3700

- 14 -

# EXHIBIT C



# HOGAN & HARTSON
## L.L.P.

STEVEN M. EDWARDS
PARTNER
(212) 918-3506
SMEDWARDS@HHLAW.COM

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

June 18, 2004

*VIA TELECOPY*

Steve W. Berman, Esq.
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

> **Re:   In re Pharmaceutical Industry AWP MDL Litigation
> MDL No. 1456**

Dear Steve:

Your objections and responses to certain of BMS's interrogatories, which we received yesterday, are unacceptable. In our first seven interrogatories, we propounded a series of simple and straightforward questions seeking clarification of your contentions in this case -- questions that you should be able to answer without doing any research or discovery. With minor exceptions, instead of answering those questions simply and directly, you have provided a series of evasive responses and specious objections.

For example, in the first interrogatory, we asked you to "[s]tate what you contend is the proper definition of AWP". Instead of answering the question clearly and directly, you provide a series of tautologies and largely irrelevant comments including AWP "means average wholesale price", AWP is a "commonly used benchmark" and GSK defines AWP as a price listed in the Red Book or Blue Book. We are entitled to know what you contend the definition is in this case. At one point you suggest a possible definition -- "AWP is intended to estimate an average price at which dispensers (such as pharmacies or physicians) purchase a drug at wholesale" -- but then you go on to suggest that there are other definitions of AWP. Please clarify whether you contend that the definition of AWP is captured

WASHINGTON, DC

BERLIN  BRUSSELS  LONDON  PARIS  BUDAPEST  PRAGUE  WARSAW  MOSCOW  BEIJING  TOKYO
\\\NY - 58559/0059 - 843861 v1   NEW YORK  BALTIMORE  McLEAN  MIAMI  DENVER  BOULDER  COLORADO SPRINGS  LOS ANGELES



HOGAN & HARTSON L.L.P.

Steve W. Berman, Esq.
June 18, 2004
Page 2

by the language quoted above, or whether you contend that AWP is susceptible to multiple definitions.

In our second interrogatory, we asked you whether you contend that the existence of a "spread" -- without more -- violates the law, and if not to identify the additional conduct that gives rise to a violation. The reason we asked the question is your complaint talks about (1) the existence of spreads, (2) marketing the spread and (3) manipulating the spread, and it is impossible to tell whether you contend that the existence of spreads, standing alone, violates the law, or whether it is only when spreads are marketed or manipulated that a violation occurs. This is a simple question that is capable of a simple answer. Instead of giving us a simple answer, however, you contend that the term "without more" is so vague as to render this interrogatory meaningless. We do not believe that the Court is going to accept this objection, especially since the Court is going to have to answer that question itself. In your response, you say that "a spread of 1,000% does not exist in isolation" and that "[m]any other factors potentially exist that constitute the 'more' . . . ." If this is your way of saying that the existence of a spread, without more, does not violate the law, then you should say so clearly and directly instead of giving us an evasive answer.

In the third interrogatory, we asked you whether you contend that a spread of any size violates the law, and if not, to identify the size at which a spread violates the law. Instead of answering the question, you refer to your response to interrogatory 2 and an OIG report on another issue. In addition to failing to comply with the basic requirement that every interrogatory must be answered individually without reference to other interrogatories or unresponsive documents, you do not answer the question. If you contend that a spread of any size violates the law, we are entitled to know that; if you contend that spreads only violate the law when they reach a certain size, we are entitled to know that. Your current answer, which simply evades the question, is unacceptable.

In the fourth interrogatory, we asked you to explain what you mean by the phrase "marketing the spread" as it appears in your complaint. Instead of answering the question, you refer to your complaint. You are an experienced lawyer, so I assume that I do not have to cite for you the dozens of cases that say it is improper to respond to a contention interrogatory by referring to the complaint. Nor it is acceptable to object to such an interrogatory on the ground that it is



HOGAN & HARTSON L.L.P.

Steve W. Berman, Esq.
June 18, 2004
Page 3

premature when the interrogatory simply asks for clarification of what you are saying in your complaint. We insist on an answer to this question.

In the fifth interrogatory, we asked you to identify each act that allegedly constitutes marketing the spread as that phrase is used in your complaint. We are not seeking an evidentiary basis for the allegation or a list of documents that allegedly support the claim. We are just trying to find out what you mean. Is a manufacturer marketing the spread when a salesperson responds to questions about reimbursement, or does marketing the spread require an affirmative act such as providing the customer with sales literature comparing the spread of one manufacturer to another? We are entitled to an answer to this question.

In the sixth interrogatory, we asked you to explain what you mean by "manipulating the spread". While you actually provide some information in response to this interrogatory (which raises questions about why you are seemingly unable or unwilling to provide answers to other interrogatories), your answer is unclear. You state that manufacturers' reported prices should take into account price concessions. This seems to suggest that your allegations with respect to allegedly false AWPs and manipulating the spread are the same thing. Is that what you mean? If it is not, then you need to clarify your answer.

In the seventh interrogatory, we asked you to identify each act that constitutes manipulating the spread. Again, we are not seeking an evidentiary basis for your claim or identification of documents that support it -- we simply want to know what you mean. Your citation to TAP's indictment and guilty plea is plainly irrelevant and insufficient. If this is your way of saying that you think BMS is somehow responsible for TAP's conduct, then we have a motion to make. If you have a Rule 11 basis for believing that BMS has manipulated the spread, then your answer should set forth that basis. If you do not have a Rule 11 basis for your claim, then tell us and we will deal with it.



HOGAN & HARTSON L.L.P.

Steve W. Berman, Esq.
June 18, 2004
Page 4

   While the remainder of your responses leave a lot to be desired, we will take them for what they are worth at this time. The responses discussed above, however, are plainly insufficient, and if you are not willing to correct them we will make an appropriate motion. Under the circumstances, we think it is reasonable for us to insist on receiving proper answers in a week – which would be June 25.

   I will call you later today to discuss this matter.

       Sincerely yours,

       Steven M. Edwards

SME/cjl

cc: Thomas M. Sobol, Esq.

# EXHIBIT D

June 22, 2004

*VIA TELECOPY*

Steve W. Berman, Esq.
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

> **Re:   In re Pharmaceutical Industry AWP MDL Litigation**
> **MDL No. 1456**

Dear Steve:

On Friday, June 18, 2004, I wrote you a letter pointing out certain deficiencies in plaintiffs' answers to BMS's contention interrogatories. I then called you on Friday to determine whether plaintiffs are willing to correct those deficiencies, but you have not returned the call. If we do not hear from you by the end of the day today, we will assume that you are unwilling to correct those deficiencies and will proceed accordingly.

Very truly yours,

Steven M. Edwards

cc:   Tom Sobol

# EXHIBIT E



CAMBRIDGE   LOS ANGELES   PHOENIX [PLLC]   SEATTLE

hagens-berman.com
1301 FIFTH AVENUE, SUITE 2900 · SEATTLE, WA 98101
(206) 623-7292 · FAX (206) 623-0594

STEVE W. BERMAN
(206) 224-9320
steve@hagens-berman.com

June 22, 2004

*Via Facsimile*

Mr. Steven M. Edwards
Hogan & Hartson, LLP
875 Third Ave., Suite 2600
New York, NY 10022

    Re:   In re Pharmaceutical Industry AWP Litigation
            MDL No. 1456

Dear Steve:

As you noted on Friday, June 18, 2004, you wrote a long letter. You called the same day demanding we discuss it.

Today is Tuesday, we will respond tomorrow. But we gladly accept your new case standard and expect that BMS will respond to each of our letters within 24 to 48 hours.

You are now overdue on quite a few so unless we hear by close of business today we assume we can make the appropriate motions.

                      Sincerely,

                      Steve W. Berman

SWB:dld

cc:   Tom Sobol

1534.16 0148 LTR.DOC

# EXHIBIT F

**HAGENS BERMAN LLP**
*Attorneys at Law*

CAMBRIDGE   LOS ANGELES   PHOENIX [PLLC]   SEATTLE

hagens-berman.com
1301 FIFTH AVENUE, SUITE 2900 · SEATTLE, WA 98101
(206) 623-7292 · FAX (206) 623-0594

STEVE W. BERMAN
(206) 224-9320
steve@hagens-berman.com

June 22, 2004

*Via Facsimile*

Mr. Steven M. Edwards
Hogan & Hartson, LLP
875 Third Ave., Suite 2600
New York, NY 10022

Re:   **In re Pharmaceutical Industry AWP MDL Litigation
MDL No. 1456**

Dear Steven:

Unlike the bulk of discovery responses from BMS and other defendants, plaintiffs served a response to BMS' contention interrogatories within the time called for by Fed. R. Civ. P. 33.

On June 18, 2004, you served a four-page single-spaced letter addressing what you allege are deficiencies in plaintiffs' response. A few hours later, you called demanding a discussion that day on your letter. Plaintiffs expect in the future that BMS will itself respond to discovery requests within the period called for by the Federal Rules and will be ready for meet and confers within 24 hours of any letter we send pointing out deficiencies.

Turning now to the "substance" of your letter. As to Interrogatory No. 1, we stand by our answer. The problem with your interrogatory is that it's premature. As you know, a great deal of discovery from defendants and third parties is presently underway which bears on this issue. We could have simply stood on our objection. Instead, we identified several examples of definitions that could help you focus further inquiry.

As for Interrogatory No. 2, we stand by our answer. The problem is your question. "Without more" is nonsensical. There is never a spread "without more." Our example points that out clearly. If a company has a 1,000% spread, there is more. At a minimum, there is the posting of a fraudulent AWP. Thus, we stand on our answer until you can clarify the vagueness of the question.

1534.16 0149 LTR.DOC

Mr. Steven M. Edwards
June 22, 2004
Page 2

As for Interrogatory No. 3, again this issue is the subject of fact and expert discovery. We could have stood on our objection. Instead, we provided an answer to alert you that authority exists that under certain circumstances, a spread of any size is illegal.

As for Interrogatory No. 4, our objection is proper. To the extent that the AMCC does not give examples, to require us now to pore through discovery and provide an answer, when the information is still in your possession and has not yet been produced, is an improper contention interrogatory. *See* 108 F.R.D. at 337-38.

Interrogatory No. 5 suffers from the same deficiencies as No. 4. To answer your questions, both acts can be marketing the spread.

Interrogatory No. 6. Again, we could have stood on our objection and we provided examples of manipulation to give you early guidance. When discovery is at the appropriate stage, we can and will supplement this answer.

Interrogatory No. 7, contrary to your letter, does ask for "each act" that constitutes manipulation of the spread. This is an improper contention interrogatory. To the extent you are not seeking an evidentiary basis for this claim, but are trying to understand it, the TAP's indictment provides such examples. As for Rule 11, bring it on. Given the spreads we have seen in the documents produced to date, not only are we confident in our claim, we believe as to certain of the drugs Rule 56 judgment in our favor will be forthcoming.

In sum, we do not oppose contention interrogatories per se and are willing to answer at the appropriate time when we have access to the information largely in the possession of defendants or third parties.

Sincerely,

Steve W. Berman

SWB:taw
cc:    Thomas Sobol
       Sean Matt

# EXHIBIT G



# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY          )
AVERAGE WHOLESALE PRICE                 )       MDL No. 1456
LITIGATION                              )
_____    )       CIVIL ACTION:  01-CV-12257-PBS
                                        )
THIS DOCUMENT RELATES TO                )       Judge Patti B. Saris
01-CV-12257-PBS AND 01-CV-339           )
_____    )

## PLAINTIFFS' INTERROGATORIES TO THE FAST-TRACK DEFENDANTS

Pursuant to Rule 33 of the Federal Rules of Civil Procedures, plaintiffs hereby request that the Fast-Track Defendants answer, separately and fully in writing and under oath, the interrogatories set forth below in accordance with the following definitions.

### DEFINITIONS

1.    "AMCC" means the Amended Master Consolidated Complaint.

2.    "GPO" means any group purchasing organization that purchases pharmaceutical products.

3.    "Manufacturer" means a company that manufactures pharmaceutical products.

4.    "Participant" or "beneficiary" means a person for whom a health plan or health and welfare fund provides any medical or health insurance benefit.

5.    "PBM" means a pharmacy benefit manager.

6.    "Person" means any natural person or any business, legal, or governmental entity or association.

- 1 -



7.      "Payor" means any non-government entity or program that pays for prescription drugs including, but not limited to, health insurance companies, self insurance plans and welfare and benefit funds.

8.      "Provider" means any physician or entity that provides health care.

9.      "Retailer" means a retail pharmacy.

10.     "Wholesaler" means any entity that purchases prescription drugs from a manufacturer and resells such drugs to any other entity.

11.     "You" or "your" or "company" means the defendants identified in the AMCC.

## INTERROGATORIES

INTERROGATORY NO. 1:

Set forth the definition of AWP, as that term has been used by your company when used in the course of business during the period 1991 to the present, identifying any regulation or authority that supports that definition.  If the definition has changed over time, identify it by year.

ANSWER:

INTERROGATORY NO. 2:

With respect to each definition set forth above, identify all instances in which the company's definition was communicated to (a) the public, or (b) any governmental entity, or (c) any third-party payor.

ANSWER:



06/22/04
03:37 PM E

INTERROGATORY NO. 3:

Identify all persons at the company who are the source of the above definition(s) or who have knowledge as to the meaning of AWP as used by the company.

ANSWER:

INTERROGATORY NO. 4:

State whether any person at the company has considered whether the existence of a "spread" between AWP and either ASP or WAC violates the law, or may be misleading to any member of the public, or may result in excessive reimbursement.

ANSWER:

INTERROGATORY NO. 5:

Identify all persons with knowledge of such consideration.

ANSWER:

INTERROGATORY NO. 6:

Has anyone at the company cautioned or warned sales employees concerning marketing the spread. If so, state who and why such cautions or warnings have been issued.

1534.16 0061 DSC.DOC



ANSWER:


INTERROGATORY NO. 7:

Has anyone at the company ever cautioned or warned employees not to market the difference between sales price and reimbursement when calling upon physicians or those reimbursed for the use of drugs. If so, identify who was involved in such discussions, and state when and why such cautions or warnings have been issued.

ANSWER:


INTERROGATORY NO. 8:

Do you contend that those making co-pays for drugs covered by Part B were aware of the spread or difference between AWP and ASP? If so, identify how they would have been aware both as to the existence of the spread and its magnitude.

ANSWER:


INTERROGATORY NO. 9:

Do you contend that the AWPs for each of your drugs subject to the AMCC are a fair and accurate reporting of the price at which wholesalers sell drugs to their customers, including physicians, pharmacies and others negotiating prices directly with the company, after all chargebacks, rebates, free goods, discounts, and credit memos have been included in the price?

- 4 -

ANSWER:

INTERROGATORY NO. 10:

For each drug that is subject of the AMCC, identify for each year the reported AWP and the actual AWP after deducting for all rebates, chargebacks, discounts, free goods and other reductions in the actual price paid by wholesalers, physicians or hospitals.

ANSWER:

INTERROGATORY NO. 11:

If you assert an affirmative defense based upon "established industry practice," set forth all factual support that defendants' conduct as alleged in the AMCC was justified or in accordance with established industry practice.

ANSWER:

INTERROGATORY NO. 12:

If you contend that plaintiffs' claims for injunctive relief are mooted by passage of the 2003 Medicare reform legislation state all facts in support of such contention.



ANSWER:

INTERROGATORY NO. 13:

Do you contend that there existed public information disclosing that the AWP exceeded

actual prices at which pharmaceuticals were purchased by physicians, pharmacies and hospitals.

If so, for each AWPID; and for the years 1991 to the present:

      (a)     Set forth the reported AWP from First Data and Red Book;

      (b)     Set forth the ASP or the price that reflects chargebacks, rebates, discounts and

credits for each such drug;

      (c)     Identify where the spread between AWP and ASP was disclosed to the public or

to any third party payor;

      (d)     Identify the AMP for each such AWPID for each cusch year.

      ANSWER:

INTERROGATORY NO. 14:

Do you contend that this case cannot be maintained as a class action pursuant to Fed. R.

Civ. P. 23? If so, state all grounds in support of this contention and identify all witnesses who

have knowledge on this issue.

      ANSWER:



INTERROGATORY NO. 15:

Do you contend that the common questions of law and fact identified in the AMCC do not exist? If so, identify your grounds for so stating and identify each witness with knowledge of those grounds.

ANSWER:

INTERROGATORY NO. 16:

Do you contend that plaintiffs' claims are not typical? If so, state the basis for such contention and identify persons with knowledge of the facts supporting your contention.

ANSWER:

INTERROGATORY NO. 17:

Do you contend that a class action is not a superior method for proceeding? If so, (i) identify why, (ii) identify methods which you contend are superior to a class or subclass; and (iii) identify persons with knowledge of the facts supporting your contention.

ANSWER:

INTERROGATORY NO. 18:

If you contend that plaintiffs and class members have not been damaged, set forth the basis for that contention.

- 7 -



ANSWER:

INTERROGATORY NO. 19:

Do you contend that class members have suffered different types of damages as opposed to differences in the amount of damages?  If so, identify such differences.

ANSWER:

INTERROGATORY NO. 20:

Do you contend that individuals who pay cash at retail pharmacies should not be members of the class?  If so, (a) state with specificity why, and (b) identify persons which knowledge of the facts upon which your answer is based.

ANSWER:

INTERROGATORY NO. 21:

Do you contend that hospitals should not be part of the class?  If so, (a) state with specificity why, and (b) identify persons with knowledge of the facts upon which your answer is based.

- 8 -



ANSWER:

DATED:  June 22, 2004

By   /s/ **Steve W. Berman**
   Thomas M. Sobol (BBO#471770)
   Edward Notargiacomo (BBO#567636)
   Hagens Berman LLP
   225 Franklin Street, 26th Floor
   Boston, MA  02110
   Telephone: (617) 482-3700
   Facsimile: (617) 482-3003
   **LIAISON COUNSEL**

   Steve W. Berman
   Sean R. Matt
   Kevin P. Roddy
   Hagens Berman LLP
   1301 Fifth Avenue, Suite 2900
   Seattle, WA  98101
   Telephone: (206) 623-7292
   Facsimile: (206) 623-0594

   Eugene A. Spector
   Jeffrey L. Kodroff
   Spector, Roseman & Kodroff, P.C.
   1818 Market Street, Suite 2500
   Philadelphia, PA  19103
   Telephone: (215) 496-0300
   Facsimile: (215) 496-6611

   Samuel Heins
   Heins, Mills & Olson, P.C.
   3550 IDS Center
   80 South Eighth Street
   Minneapolis, MN  55402
   Telephone: (612) 338-4605
   Facsimile: (612) 338-4692

   **CHAIRS OF LEAD COUNSEL
   COMMITTEE**



Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Elizabeth A. Fegan
The Wexler Firm
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
**MEMBERS OF LEAD COUNSEL
COMMITTEE AND EXECUTIVE
COMMITTEE**



## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing Plaintiffs' Interrogatories To The Fast-Track Defendants to be served on all counsel of record electronically on June 22, 2004, pursuant to Section D of Case Management Order No. 2.

By_____ **/s/ Steve W. Berman**_____

Thomas M. Sobol, Esq.
**HAGENS BERMAN LLP**
225 Franklin Street, 26th Floor
Boston, MA  02110
Telephone: (617) 482-3700

- 11 -

# EXHIBIT H



CAMBRIDGE    LOS ANGELES    PHOENIX [PLLC]    SEATTLE

**hagens-berman.com**
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

STEVE W. BERMAN
(206) 224-9320
steve@hagens-berman.com

June 23, 2004

*__Via Facsimile__*

Mr. Lyndon M. Tretter
Mr. Steven M. Edwards
Hogan & Hartson, LLP
875 Third Ave., Suite 2600
New York, NY  10022

Dear Lyndon and Steven:

After reviewing the data produced we have determined that we need answers to Interrogatory No. 1(a)-(h) of the set served on January 19, 2004 and No. 1(a)-(f) of the set answered by BMS on May 3, 2004. The answers to these questions are not as you assert equally available to us or a matter of public record. In fact the AWP is hardly public but is protected by the federal government. I enclose a copy of those interrogatories.

Please let us know by the close of business tomorrow if BMS will answer, if not we will move to compel.

Sincerely,

Steve W. Berman

SWB:taw

1534.16 0150 LTR.DOC



All documents sufficient to identify your policy or practice of document retention, destruction, disposal or preservation for the time period 1991 to the present.

### RESPONSE:

BMS objects to Request No. 39 on the grounds that it is vague, overly broad and unduly burdensome. BMS also objects on the ground that this request is outside the scope of its agreement with Plaintiffs. Subject to the foregoing Preliminary Statement and General Objections, BMS will produce representative examples of such documents.

### SPECIFIC RESPONSES - INTERROGATORIES

### INTERROGATORY NO. 1:

For the period beginning January 1, 1998, and for each subsequent calendar quarter, and with respect to each of the AWPIDs, identify the following information:

a.     the total volume of sales, indicating both the number of units and net revenue;

b.     the "average wholesale price" (AWP), as reported in Medical Economics *Red Book, First Data Bank* and/or *MediSpan*, and the volume of sales (in both units and net revenue) occurring (i) at or within five percent of AWP, whether higher or lower, (ii) at more than five percent above AWP, and (iii) at more than five percent below AWP;

c.     the "average manufacturer price" ("AMP"), as reported to the Secretary of Health and Human Services, pursuant to the requirements of Social Security Act ("SSA") § 1927(b)(3), and the volume of sales (in both units and net revenue) occurring (i) at AMP and up to and including 10% above AMP, and less than or equal to 10% below AMP (broken out separately), (ii) at greater than 10% above AMP but less than or equal to 20% above AMP, and at greater than 10% below AMP but less than or equal to 20% below AMP (broken or separately), (iii) at greater than 20% above AMP but less than or equal to 30% above AMP, and at greater than 20% below AMP but less than or equal to 30% below AMP (broken out separately), (iv) at greater than 30% above AMP but less than or equal to 40% above AMP, and at greater than 30% below AMP but less than or equal to 50% above AMP, and at greater than 40% below AMP but less than or equal to 50% below AMP (broken out separately);

d.     the "wholesale acquisition cost" ("WAC"), as reported by Medical Economics *Red Book, First Data Bank* and/or *MediSpan* or any other such entity that gathers and publishes "wholesale acquisition costs," and the volume of sales (in both units and net revenue) occurring (i) at or within five percent of WAC, whether higher or



lower, (ii) at more than five percent above WAC, and (iii) at more than five percent below WAC;

    e.    the "best price," as reported to the Secretary of Health and Human Services, pursuant to the requirements of SSA § 1927(b)(3), and the volume of sales (in both units and net revenue) occurring (i) at or within five percent of the best price, whether higher or lower, (ii) at more than five percent above best price, and (iii) at more than five percent below best price (if applicable);

    f.    the total volume of sales, in both the number of units and net revenue, exempted from the calculation of the Medicaid best price as "merely nominal in amount," pursuant to the requirements of SSA § 1927(c)(1)(C)(ii)(III);

    g.    the average price of the "nominal" sales, referenced in subsection (f), above; and

    h.    the total volume of the subject drug, in units, distributed as free goods.

**ANSWER:**

BMS objects to Interrogatory No. 1 on the grounds that it is vague, overly broad, unduly burdensome, and calls for the compilation of information that is a matter of public record, is equally available to Plaintiffs, or is already in their possession, custody or control. BMS further objects on the ground that information responsive to this interrogatory can be found in documents it has previously produced and the documents it is producing pursuant to its agreement with Plaintiffs.

**INTERROGATORY NO. 2:**

For the period beginning January 1, 1998, to the present, has the distribution, marketing, sales or promotion of any AWPID considered, incorporated, or been based upon, in any way, the spread? If so, please describe the circumstances of such distribution, marketing, sales, or promotion, and provide all documents relating thereto, and identify all past and current employees with knowledge of the facts relating to such marketing, sales or promotion.

**ANSWER:**

BMS objects to Interrogatory No. 2 on the grounds that it is vague, overly broad, and unduly burdensome, and calls for the compilation of information that is equally



All documents sufficient to identify your policy or practice of document retention, destruction, disposal or preservation for the time period 1991 to the present.

**RESPONSE:**

BMS objects to Request No. 39 on the grounds that it is vague, overly broad and unduly burdensome. BMS also objects on the ground that this request is outside the scope of its agreement with Plaintiffs. Subject to the foregoing Preliminary Statement and General Objections, BMS will produce representative examples of such documents.

## SPECIFIC RESPONSES - INTERROGATORIES

### INTERROGATORY NO. 1:

For the period beginning January 1, 1998, and for each subsequent calendar quarter, and with respect to each of the AWPIDs, identify the following information:

a.     the total volume of sales, indicating both the number of units and net revenue;

b.     the "average wholesale price" (AWP), as reported in Medical Economics *Red Book, First Data Bank* and/or *MediSpan*, and the volume of sales (in both units and net revenue) occurring (i) at or within five percent of AWP, whether higher or lower, (ii) at more than five percent above AWP, and (iii) at more than five percent below AWP;

c.     the "average manufacturer price" ("AMP"), as reported to the Secretary of Health and Human Services, pursuant to the requirements of Social Security Act ("SSA") § 1927(b)(3), and the volume of sales (in both units and net revenue) occurring (i) at AMP and up to and including 10% above AMP, and less than or equal to 10% below AMP (broken out separately), (ii) at greater than 10% above AMP but less than or equal to 20% above AMP, and at greater than 10% below AMP but less than or equal to 20% below AMP (broken or separately), (iii) at greater than 20% above AMP but less than or equal to 30% above AMP, and at greater than 20% below AMP but less than or equal to 30% below AMP (broken out separately), (iv) at greater than 30% above AMP but less than or equal to 40% above AMP, and at greater than 30% below AMP but less than or equal to 50% above AMP, and at greater than 40% below AMP but less than or equal to 50% below AMP (broken out separately);

d.     the "wholesale acquisition cost" ("WAC"), as reported by Medical Economics *Red Book, First Data Bank* and/or *MediSpan* or any other such entity that gathers and publishes "wholesale acquisition costs," and the volume of sales (in both units and net revenue) occurring (i) at or within five percent of WAC, whether higher or



lower, (ii) at more than five percent above WAC, and (iii) at more than five percent below WAC;

e.     the "best price," as reported to the Secretary of Health and Human Services, pursuant to the requirements of SSA § 1927(b)(3), and the volume of sales (in both units and net revenue) occurring (i) at or within five percent of the best price, whether higher or lower, (ii) at more than five percent above best price, and (iii) at more than five percent below best price (if applicable);

f.     the total volume of sales, in both the number of units and net revenue, exempted from the calculation of the Medicaid best price as "merely nominal in amount," pursuant to the requirements of SSA § 1927(c)(1)(C)(ii)(III);

g.     the average price of the "nominal" sales, referenced in subsection (f), above; and

h.     the total volume of the subject drug, in units, distributed as free goods.

**ANSWER:**

BMS objects to Interrogatory No. 1 on the grounds that it is vague, overly broad,

unduly burdensome, and calls for the compilation of information that is a matter of public

record, is equally available to Plaintiffs, or is already in their possession, custody or

control. BMS further objects on the ground that information responsive to this

interrogatory can be found in documents it has previously produced and the documents it

is producing pursuant to its agreement with Plaintiffs.

**INTERROGATORY NO. 2:**

For the period beginning January 1, 1998, to the present, has the distribution, marketing, sales or promotion of any AWPID considered, incorporated, or been based upon, in any way, the spread? If so, please describe the circumstances of such distribution, marketing, sales, or promotion, and provide all documents relating thereto, and identify all past and current employees with knowledge of the facts relating to such marketing, sales or promotion.

**ANSWER:**

BMS objects to Interrogatory No. 2 on the grounds that it is vague, overly broad,

and unduly burdensome, and calls for the compilation of information that is equally