

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) ) ) ) |

MDL No. 1456

CIVIL ACTION: 01-CV-12257-PBS

Judge Patti B. Saris

## [PROPOSED] INTERVENORS' AMENDED MASTER CONSOLIDATED CLASS ACTION COMPLAINT

- 1 -



## TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................... 1

II. JURISDICTION AND VENUE ............................................................................ 7

III. PARTIES ................................................................................................................ 8

    A.    Plaintiffs ........................................................................................................ 8

    B.    Defendants .................................................................................................. 15

        1.    Abbott ........................................................................................... 15

        2.    Amgen ........................................................................................... 16

        3.    AstraZeneca ................................................................................. 16

        4.    The Aventis Group (Aventis, Pharma, Hoechst and Behring) ................... 17

        5.    Baxter ........................................................................................... 18

        6.    Bayer ............................................................................................. 19

        7.    The Boehringer Group (Boehringer, Ben Venue, Bedford) ...................... 20

        8.    Braun ............................................................................................. 21

        9.    The BMS Group (Oncology Therapeutics; Apothecon) ............................ 21

        10.   Dey, Inc. ....................................................................................... 23

        11.   The Fujisawa Group (Fujisawa Healthcare, Fujisawa USA) ..................... 23

        12.   The GSK Group (GlaxoSmithKline, SmithKline Beecham, Glaxo Wellcome) ....................................................................... 24

        13.   Hoffman-LaRoche, Inc. .............................................................. 25

        14.   Immunex ....................................................................................... 26

        15.   The Johnson & Johnson Group (J&J, Centocor, Janssen, NcNeil, Ortho) ............................................................................ 26

        16.   Novartis ......................................................................................... 28

        17.   Pfizer, Inc. .................................................................................... 28

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



18.    The Pharmacia Group (Pharmacia and Pharmacia & Upjohn)...............29

19.    The Schering-Plough Group (Schering Plough & Warrick)......................30

20.    The Sicor Group (Sicor and Gensia)...........................................31

21.    TAP ..........................................................................32

22.    Watson .......................................................................32

23.    Together Rx ..................................................................33

IV.    GENERAL ALLEGATIONS APPLICABLE TO ALL DEFENDANTS........................33

A.    The AWP System.................................................................33

B.    The Defendant Drug Manufacturers Commit AWP Fraud to
      Increase Market Share For Their Drugs Covered by Medicare Part B................35

       1.    The Medicare Insurance Program.........................................35

       2.    Congressional and Other Federal Investigations and Actions ...................39

       3.    Certain of the Defendants Drug Manufacturers' Fraudulent
             Conduct Within the Medicare Part B Program ...........................40

             a.    Artificially Inflating AWPs.............................................40

             b.    Improper Use of Free Samples .....................................41

             c.    Other Hidden and Improper Inducements and Price
                   Reductions.........................................................41

C.    The Defendant Drug Manufacturers' Use of AWP Fraud to Increase
      and Maintain the Price of Drugs Outside of the Medicare Part B Context...........42

D.    The Defendant Drug Manufacturers' Use of AWP Fraud to Increase
      and Maintain Volume and Market Share For Generic and
      Multi-Source Drugs .............................................................45

E.    Defendants' Concealment of the Truth................................................50

F.    Tolling of Applicable Statutes of Limitation ...........................................51

V.    EXAMPLES OF SPECIFIC UNLAWFUL CONDUCT ...................................52

A.    Abbott ..........................................................................52

       1.    Abbott Has Been The Target of Government Investigations....................54

       2.    Abbott Controls the Published AWP for Its Products ...............................55

AMENDED MASTER CONSOLIDATED                    - ii -
CLASS ACTION COMPLAINT



3.    Abbott's AWP Manipulation Benefited Providers at the
      Expense of the Class ...................................................................55

4.    Specific Abbott AWPs Documented by the DOJ ........................56

5.    Additional Evidence Concerning Vancomycin ...........................57

6.    Additional Evidence for Amikacin .............................................58

7.    Inflated AWPs From Abbott Price Lists......................................58

B.    Amgen...........................................................................................60

1.    Amgen's Definition and Understanding of AWP ........................61

2.    Amgen Controls the Published AWP for Its Products..................61

3.    Amgen's AWP Manipulation Benefited Providers at the
      Expense of the Class ...................................................................61

4.    Amgen Provided Free Goods and Other Incentives ....................62

5.    Amgen Concealed Its AWP Manipulation ..................................63

C.    AstraZeneca ..................................................................................64

1.    AstraZeneca Has Been the Target of a Government
      Investigation.................................................................................65

2.    AstraZeneca's Definition and Understanding of AWP ................65

3.    AstraZeneca Controls the Published AWP for Its Products .......66

4.    AstraZeneca's AWP Manipulation Benefited Providers at
      the Expense of the Class ..............................................................66

D.    The Aventis Group (Aventis, Pharma, Hoechst and Behring)................................72

1.    Aventis Has Been the Target of Government Investigations....................74

2.    Aventis' Definition and Understanding of AWP .........................74

3.    Aventis Controls the Published AWP for Its Products ................75

4.    Aventis' AWP Manipulation Benefited Providers at the Expense
      of the Class...................................................................................75

5.    Specific Aventis AWPs Documented by the DOJ .......................77

6.    Additional Evidence Concerning Anzemet ................................78



7.    Additional Evidence Concerning Gammar ................................79

8.    Inflated AWPs From Aventis' Price Lists ................................80

9.    Aventis Concealed its AWP Manipulation ................................81

E.    Baxter..........................................................................................81

1.    Baxter Has Been the Target of Government Investigations ......................83

2.    Baxter's Definition and Understanding of AWP ........................83

3.    Baxter Controls the Published AWP for its Products ..............................84

4.    Baxter's AWP Manipulation Benefited Providers at the Expense of the Class ....................................................................84

5.    Specific Baxter AWPs Documented by the DOJ........................85

6.    Evidence Concerning Gammagard S/D (immune globulin solution) ..........................................................................86

7.    Inflated AWPs From Baxter's Price Lists .................................86

8.    Baxter Provided Free Goods and Other Incentives....................88

F.    Bayer............................................................................................88

1.    Bayer Has Been the Target of Government Investigations .......................89

2.    Bayer Controls the Published AWP for Its Products..................90

3.    Bayer's AWP Manipulation Benefited Providers at the Expense of the Class ....................................................................90

4.    Specific Bayer AWPs Documented by the DOJ.........................91

5.    Inflated AWPs From Bayer's Price Lists....................................92

6.    Bayer Provided Free Goods and Other Incentives.....................92

7.    Bayer Concealed Its AWP Manipulation....................................93

G.    The Boehringer Group ................................................................93

1.    The Boehringer Group Has Been the Target of Government Investigations ..........................................................................94

2.    The Boehringer Group Controls the Published AWP for Its Products..........................................................................94



3.   Specific Boehringer AWPs Documented by the DOJ ..............................97

4.   Inflated Boehringer Group AWPs From Bedford's Price Lists.................98

H.   B. Braun .................................................................................................98

1.   B. Braun Has Been the Target of Government Investigations...................99

2.   B. Braun's Understanding of AWP ...........................................................99

3.   B. Braun Controls the Published AWP for Its Products ...........................100

4.   B. Braun's AWP Manipulation Benefited Providers at the
     Expense of the Class ................................................................................101

5.   Specific B. Braun AWPs Documented by the DOJ..................................102

6.   Inflated AWPs From B. Braun Price Lists................................................103

I.   The BMS Group (Bristol-Myers, OTN and Apothecon) ......................................104

1.   The BMS Group Has Been the Target of Government
     Investigations ..........................................................................................105

2.   The BMS Group Controls the Published AWP for Its Products..............106

3.   BMS's AWP Manipulation Benefited Providers at the Expense
     of the Class...............................................................................................107

4.   Specific BMS AWPs Documented by the DOJ........................................107

5.   Other AWPs Related to VEPESID (etoposide) .......................................108

6.   Other AWPs Related to Blenoxane...........................................................108

7.   The BMS Group Provided Free Goods and Other Incentives .................109

J.   Dey...........................................................................................................111

1.   Dey Has Been the Target of Government Investigations .........................111

2.   Dey Controls the Published AWP for Its Products...................................113

3.   Dey's AWP Manipulation Benefited Providers at the Expense
     of the Class...............................................................................................114

4.   Specific Dey AWPs Documented by the DOJ..........................................115

5.   Inflated Dey AWPs From Dey's Price Lists.............................................115

6.   Dey Provided Free Goods and Other Incentives......................................116

AMENDED MASTER CONSOLIDATED                    - v -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



| | 7. | Dey Has Concealed Its AWP Manipulation ............................................ 117 |
| K. | | The Fujisawa Group (Fujisawa Pharmaceutical, Fujisawa Healthcare, Fujisawa USA) ................................................................................................ 117 |
| | 1. | Fujisawa Has Been the Target of Government Investigations ................ 119 |
| | 2. | Fujisawa Controls the Published AWP for Its Products ......................... 119 |
| | 3. | Fujisawa's AWP Manipulation Benefited Providers at the Expense of the Class ................................................................................... 119 |
| | 4. | Specific Fujisawa AWPs Documented by the DOJ .................................. 120 |
| | 5. | Inflated AWPs From Fujisawa Price Lists ............................................... 121 |
| L. | | The GSK Group (GlaxoSmithKline, SmithKline Beecham, Glaxo Wellcome) ................................................................................................... 123 |
| | 1. | The GSK Group Has Been the Target of Government Investigations ...................................................................................... 125 |
| | 2. | The GSK Group's Definition and Understanding of AWP ..................... 126 |
| | 3. | The GSK Group Controls the Published AWP for Its Products .............. 126 |
| | 4. | The GSK Group's AWP Manipulation Benefited Providers at the Expense of Plaintiffs and the Class ..................................................... 127 |
| | 5. | Glaxo's Zofran® ....................................................................................... 128 |
| | 6. | SKB's Kytril ............................................................................................. 133 |
| | 7. | General Counsel Correspondence Between Glaxo and SKB ................. 134 |
| | 8. | Other Improper Incentives ....................................................................... 136 |
| | 9. | Specific GSK Group AWPs Documented by the DOJ ............................ 137 |
| M. | | Hoffman-LaRoche ............................................................................................ 138 |
| | 1. | Hoffman-LaRoche Controls the Published AWP for Its Products .......... 138 |
| | 2. | Inflated Hoffman-LaRoche AWPs From Hoffman LaRoche Price Lists ................................................................................................. 139 |
| | 3. | Hoffman-LaRoche Provided Free Goods and Other Incentives ............. 139 |
| N. | | Immunex ........................................................................................................... 139 |
| | 1. | Immunex Has Been the Target of Government Investigations ................ 140 |

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT



2. Immunex Definition and Understanding of AWP .....................................140

3. Immunex Controls the Published AWP for its Products .........................140

4. Immunex's AWP Manipulation Benefited Providers at the Expense of the Class .................................................................................141

5. Specific Immunex AWPs Documented by the DOJ ................................143

6. Inflated AWPs From Immunex Price Lists................................................144

7. Immunex Concealed Its AWP Manipulation.............................................144

O. The Johnson & Johnson Group (J&J, Centocor and Ortho) .................................144

1. The Johnson & Johnson Group Has Been the Target of Government Investigations ........................................................................147

2. J&J Concealed Its AWP Manipulation.....................................................149

P. Novartis...............................................................................................................150

1. Novartis Has Been the Target of Government Investigations ................151

2. Inflated Novartis AWPs From Novartis Price Lists .................................151

Q. Pfizer..................................................................................................................152

R. The Pharmacia Group (Pharmacia and P&U)....................................................154

1. The Pharmacia Group Has Been the Target of Government Investigations .........................................................................155

2. Pharmacia's Definition and Understanding of AWP................................155

3. The Pharmacia Group Controls the Published AWP for Its Products......................................................................................................156

4. The Pharmacia Group's AWP Manipulation Benefited Providers at the Expense of the Class........................................................156

5. Specific Pharmacia AWPs Documented by the DOJ ..............................159

6. Inflated Pharmacia AWPs From Pharmacia's Price Lists ......................161

7. The Pharmacia Group Provided Free Goods and Other Incentives.........162

S. The Schering-Plough Group (Schering-Plough and Warrick)..............................163

1. The Schering Plough Group Has Been the Target of Government Investigations ....................................................................165



2.  The Schering Plough Group Controls the Published AWP for Its Products ...................................................... 166

3.  The Schering Plough Group's AWP Manipulation Benefited Providers at the Expense of the Class ...................................... 167

4.  The DOJ Specifically Documented AWP Inflation for Albuterol Sulfate ...................................................................... 169

5.  The Schering Plough Group Provided Free Goods and Other Incentives ............................................................................. 170

T.  The Sicor Group (Sicor, Gensia and Gensia Sicor) ............................. 170

1.  The Sicor Group Has Been the Target of Government Investigations ........................................................................... 171

2.  The Sicor Group Controls the Published AWP for Its Products ............. 171

3.  The Sicor Group's AWP Manipulation Benefited Providers at the Expense of the Class .......................................................... 172

4.  Specific Sicor Group AWPs Documented by the DOJ ........................... 174

5.  Inflated Sicor Group AWPs From the Sicor Group's Price Lists ............ 174

6.  The Sicor Group Provided Free Goods and Other Incentives ................. 175

U.  TAP ....................................................................................................... 176

1.  TAP Has Been the Target of Government Investigations ...................... 176

2.  TAP Controls the Published AWP for Its Products ................................ 178

3.  TAP's AWP Manipulation Benefited Providers at the Expense of the Class .................................................................................... 178

4.  TAP Provided Free Goods and Other Incentives ................................... 178

5.  TAP Concealed Its AWP Manipulation ................................................ 180

V.  Warrick ................................................................................................. 180

W.  Watson .................................................................................................. 181

1.  Watson Has Been the Target of Government Investigations ................. 182

2.  Watson's Definition and Understanding of AWP ................................. 182

3.  Watson Controls the Published AWP for Its Products .......................... 182



E-SERVED 01/22/04 05:20 PM ET AWP-MDL No.1456

4. Watson's AWP Manipulation Benefited Providers at the Expense of the Class ....183

5. Specific Watson AWPs Documented by the DOJ ....183

6. Inflated Watson AWPs From Watson's Price Lists ....184

7. Watson Provided Free Goods and Other Incentives ....185

8. Watson Concealed Its AWP Manipulation ....185

VI. DIRECT DAMAGE SUSTAINED BY PLAINTIFFS AND THE MEMBERS OF THE AWP CLASS ....185

VII. CERTAIN DEFENDANTS USE AWP TO ENGAGE IN A SCHEME TO FIX PRICES – THE TOGETHER CARD SCHEME ....186

A. The Formation of the Together Card Conspiracy ....186

B. The Drug Discount Card Response to the Lack of Medicare Drug Coverage and the Underpinnings of the Together Card Scheme ....187

1. GSK Orange Card ....188

2. Novartis Care Card ....190

C. Implementation of the Together Rx Card Program ....191

D. Marketing of the Together Card Program ....195

E. The Together Card Defendants' Conspiracy to Fix the AWP Spread of the Together Card Drugs ....197

VIII. CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME ....202

IX. CLASS ACTION ALLEGATIONS FOR THE TOGETHER CARD SCHEME ....205

COUNT I VIOLATIONS OF 18 U.S.C. § 1962(c) (AGAINST DEFENDANT DRUG MANUFACTURERS IDENTIFIED HEREIN FOR UNLAWFUL CONDUCT ASSOCIATED WITH MEDICARE PART B COVERED DRUGS) ....210

COUNT II VIOLATIONS OF 18 U.S.C. § 1962(c) (AGAINST DEFENDANT DRUG MANUFACTURERS IDENTIFIED HEREIN) ....241

COUNT III DECLARATORY AND OTHER RELIEF PURSUANT TO 28 U.S.C. §§ 2201, 2002 ....271

COUNT IV VIOLATIONS OF CONSUMER PROTECTION STATUTES ....272

COUNT V  CLAIM FOR INJUNCTIVE RELIEF UNDER SECTION 16 OF
 THE CLAYTON ACT ARISING FROM THE TOGETHER CARD
 CONSPIRACY .......................................................................................................274

COUNT VI  CLAIM FOR VIOLATION OF SHERMAN ACT, 15 U.S.C. § 1
 ON BEHALF OF NATIONWIDE END PAYOR TOGETHER CARD CLASS...........275

COUNT VII  CLAIM FOR VIOLATION OF THE ANTITRUST STATUTES OF
 THE INDIRECT PURCHASER STATES ON BEHALF OF INDIRECT
 PURCHASER STATES END PAYOR TOGETHER CARD CLASS...........................277

COUNT VIII  VIOLATIONS OF 18 U.S.C. § 1962(c)-(d) (AGAINST THE
 TOGETHER CARD DEFENDANTS FOR UNLAWFUL CONDUCT
 ASSOCIATED WITH TOGETHER RX) ........................................................................281

COUNT IX  CIVIL CONSPIRACY (AGAINST ALL DEFENDANTS IDENTIFIED
 HEREIN FOR CONSPIRING WITH PBMs) ..................................................................286

COUNT X  CIVIL CONSPIRACY (AGAINST THE TOGETHER CARD
 DEFENDANTS)..................................................................................................................297

X.      PRAYER FOR RELIEF ....................................................................................................298

XI.     DEMAND FOR JURY TRIAL .........................................................................................299



Plaintiffs, by and through their counsel, upon personal knowledge as to their own acts and beliefs, and upon information and belief as to all other matters based upon the investigations of counsel, allege as follows:  This version of the AMCC adds allegations as to the relationship between each plaintiff and the AWP scheme described herein as requested by the Court on November 21, 2003.[1]

## I.    INTRODUCTION

1.    This case is brought by Plaintiffs as a proposed class action on behalf of consumers, self-insured employers, health and welfare plans, health insurers and other end payors for prescription drugs (the "Class") against certain pharmaceutical companies (referred to as the "Defendant Drug Manufacturers").

2.    For the last decade, the Defendant Drug Manufacturers have conspired with others in the pharmaceutical distribution chain, including but not limited to physicians and hospitals (hereafter "medical providers" or "providers"), pharmacy benefit managers ("PBMs") and various publishing entities, to collect inflated prescription drug payments from Plaintiffs and the Class.

3.    More specifically, the Defendant Drug Manufacturers report to trade publications a drug price – the Average Wholesale Price (or "AWP") – that for many drugs is deliberately set far above the prices that these drugs are available in the marketplace.  The AWPs for these drugs are deliberately false and fictitious and created solely to cause Plaintiffs and the Class members to overpay for drugs.  Because all drugs administered under Medicare Part B are priced based on the published AWPs, the Defendant Drug Manufacturers inflate AWP reimbursement rates to enable providers and others to make secret profits through overcharges to patients, their insurers

---

[1] The complaint also fixes a typo that carried from the MCC to the AMCC in Count I.  The title stated that the claims were asserted as to Medicare Part B Drugs.  However, the body of the count does not limit Count I to Part B drugs and it was not intended to be limited in that fashion.  Count I covers all AWPIDs in Appendix A in any fashion they were sold in the distribution chain outside of the PBM context.

AMENDED MASTER CONSOLIDATED                - 1 -
CLASS ACTION COMPLAINT



and other end payors.  This, in turn, motivates the providers to sell and administer the drugs with the most inflated AWPs, resulting in increased market share and profit for the Defendant Drug Manufacturers and inflated payments for drugs by individual patients (through co-pays or direct payments), health plans and insurers.

4.      For drugs reimbursed by Medicare Part B (which generally, but not always, require administration in a provider's office), the health care providers administer the drugs and are reimbursed by Medicare based on the inflated AWP.  Thus, the providers benefit by pocketing the "spread" between the AWP and the actual cost that they pay for the drugs, and the Defendant Drug Manufacturers benefit by increasing the sales of their drugs that are covered by Medicare Part B ("Covered Drugs") and by increasing their market share.  In some cases, the Defendant Drug Manufacturers also provide chargebacks, rebates, hidden price discounts and/or other unlawful financial inducements, including free samples, to further increase the provider's spread and, therefore, their incentive to prescribe a particular Defendant Drug Manufacturer's product.  Those discounts are not used by the Defendant Drug Manufacturers in calculating the published AWPs, resulting in their inflation.

5.      The use of AWP is not limited to Medicare reimbursement.  Rather, AWP is a benchmark from which hundreds of drug prices are derived in transactions throughout the pharmaceutical distribution chain.  For "Part B covered drugs" administered outside of the Medicare Part B context, non-Medicare patients and health plans pay for these drugs based on the inflated AWP with an intermediary (for example, a pharmacy benefit manager) pocketing the "spread" between the AWP and the actual cost that the intermediaries pay for these drugs.  And similar to the benefit that the Defendant Drug Manufacturers obtain through the AWP scheme for Part B drugs, the Defendant Drug Manufacturers also benefit from the AWP scheme with respect to these drugs by increasing the sales of their particular AWP-inflated drugs and their market share for those drugs.  The use of AWP as a benchmark for reimbursement is also not



limited to Part B drugs being administered outside of Medicare, but extends to thousands of other drugs as well. And again, with respect to these non-Part B drugs, it is the end payor, be it a health plan or private insurer, that pays the inflated amount. All others in the distribution chain, be they wholesalers, pharmacies or pharmacy benefit manufacturers, benefit from the spread between AWP and actual costs.

6.     Thus, in a perversion of the type of competitive behavior expected in a market not subject to illegal manipulation, the Defendant Drug Manufacturers often promote their drugs not based on lower prices, but by the use of reimbursement rates based on a fictitious and inflated AWP that allows purchasers and intermediaries (including providers and PBMs) to make inflated profits – and the Defendant Drug Manufacturers to increase their market share – at the expense of Plaintiffs and the Class. The Class, as further defined below, consists of all purchasers of drugs whose AWPs were inflated ("AWP End Payor Class").

7.     The Defendant Drug Manufacturers also caution providers and other intermediaries that the success of the high profit scheme will be jeopardized if anyone discloses the significantly lower prices actually paid for the drugs (allowing the scheme to be concealed and to continue). All Defendants actively conceal, and caused others to conceal, information about the true pricing structure for the prescription drugs, including the fact that the AWPs for the drugs are deliberately overstated. And, all those in the distribution chain also conceal the rebates, free samples, educational grants and other economic rewards which they receive, but which are not reflected in calculating AWP.

8.     The harm flowing from the misuse of the AWP does not stop with the aforementioned scheme. As detailed herein, in a new section of the Complaint, certain of the Defendants used these AWPs for an additional purpose, as part of a scheme and unlawful agreement to fix the AWP spread of drug prices under the guise of offering seniors a discount on their drugs. Thus, in new sections of the Complaint, plaintiffs charge certain pharmaceutical

AMENDED MASTER CONSOLIDATED          - 3 -
CLASS ACTION COMPLAINT



SERVED
01/22/04
05:20 PM ET
AMP-MDL NO. 1456

manufacturers with price fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and in violation of applicable state antitrust and consumer protection laws. These certain defendant manufacturers (identified below as the "Together Card Defendants") participate in the "Together Rx Card Program" ("Together Rx"), a drug discount card program commenced in 2002 that ostensibly makes available a single drug discount card to elderly poor Americans to enable them to obtain substantial discounts for approximately 170 brand name and generic drugs.

9.      In fact, the Together Card Defendants have not offered *bona fide* discounts off of *bona fide* prices, but instead used the Together Rx Card Program to raise, fix and maintain the end payor reimbursement rates, costs and margins for scores of their popular drugs. The Together Card Defendants conspired and agreed to restrain trade both by agreeing to increase the AWP for scores of drugs that were part of the Together Rx Card Program, and by increasing the related "spread," between the AWP and the posted wholesale acquisition cost or "WAC" for those drugs.

10.      The Together Card Defendants have caused widespread damage. As to about one-half million Together Rx Card enrollees, the Together Card Defendants gave with one hand but secretly took with another, duping them with the belief that they were receiving real discounts off real prices when in fact they had agreed to raise their AWPs prior to commencement of the Together Rx Card Program. Thus the actual prices paid by these consumers is higher than what they would have paid but for this conspiracy. As to the broader public of prescription drug end payors (such as self-insured employers, health plans and consumers who reimburse or pay for their drugs based upon the average wholesale price), and who were purchasing drugs covered by the Together Rx Card outside of that program, by agreeing to raise AWPs, the Together Card Defendants caused hundreds of millions of dollars of unlawfully imposed expenditures.



11.     In response to the Court's Order on the motion to dismiss, plaintiffs have prepared a list of each of the specific drugs that are the subject of the claims herein. This list is attached as Exhibit A to the Complaint. The drugs identified in Exhibit A will be referred to herein as the AWP Inflated Drugs ("AWPID" or "AWPIDs"). And, in Appendix A, plaintiffs identify the AWP that is the subject of this Complaint for each drug currently at issue pursuant to this Court's Order. Appendix B details which AWPIDs were purchased by each plaintiff.

12.     Count I of the Complaint is asserted on behalf of a class of all persons or entities who purchased or were reimbursed for an AWPID during the class period ("the AWP Payor Class") and asserts claims under 18 U.S.C. § 1962(c) for violating RICO. In this Count, plaintiffs claim that the Defendant Drug Manufacturers engaged in an illegal pattern of racketeering wherein each manufacturer formed a separate association-in-fact enterprise with each of the companies that published their inflated AWPs, and that each manufacturer conducted the affairs of each such enterprise. *Infra* at 210.

13.     In Count II of the Complaint, plaintiffs on behalf of the AWP End Payor Class assert claims under 18 U.S.C. § 1962(c) against the Defendant Drug Manufacturers alleging that they engaged in a pattern of racketeering via each manufacturer's separate association-in-fact enterprise with each of the four major pharmacy benefit manufacturers ("PBMs"), and that each manufacturer conducted the affairs of its PBM enterprises. *Infra* at 241.

14.     Count III is asserted by the AWP End Payor Class and seeks declaratory relief declaring the AWP practices described herein to be illegal. *Infra* at 271.

15.     Count IV is brought by the AWP End Payor Class on behalf of consumers alleging that the AWP inflation scheme violates the consumer protection laws of various states. *Infra* at 272.

16.     Count V is brought on behalf of a Nationwide End Payor Together Card Class (further defined below) and seeks declaratory and injunctive relief under Section 16 of the



Clayton Act. Count V seeks, among other things, a judgment: (i) adjudicating and declaring that the Together Card Defendants have violated Section 1 of the Sherman Act by unlawfully raising and maintaining the applicable reimbursement price, or average wholesale price, in relation to the wholesale acquisition cost to create an increased "spread," (ii) enjoining the Together Card Defendants from failing to reverse the increased rates and spread margins imposed by them during the conspiracy period, (iii) enjoining them from failing to disclose fully and accurately the true Together Rx Card discounts available to Together Rx Card enrollees; and (iv) otherwise requiring the Together Card Defendants to cease and desist from further violations of the applicable laws. *Infra* at 274.

17.     Count VI is brought by the Nationwide End Payor Together Card Class pursuant to Section 1 of the Sherman Act, and seeks damages for the artificial inflation in the AWP of Together Card Drugs as a result of the Together Card Defendants restraint of trade. *Infra* at 275.

18.     Count VII is brought by the Indirect Purchaser States End Payor Together Card Class for payors in states that have "indirect purchaser statutes," and is brought as an alternative count to Count V, on behalf of those who paid inflated prices for Together Card Drugs whose prices were artificially inflated as a result of the Together Card Defendants restraint of trade. *Infra* at 277.

19.     Count VIII is brought by the Nationwide End Payor Together Card Class under RICO, alleging that the Together Card Defendants conducted the affairs of an enterprise they created and controlled, Together Rx, LLC, through a pattern of racketeering. The effect of this conduct was to injure all those who purchased drugs that were part of the Together Rx Card program. *Infra* at 281.

20.     Count IX is brought by the AWP End Payor Class against various Defendant Drug Manufacturers for engaging in a series of separate civil conspiracies with each of the pharmacy benefit manufacturers to artificially inflate AWPs. *Infra* at 286.



21.    Count X is brought by the Nationwide End Payor Together Card Class asserting a civil conspiracy claim against the Together Card Defendants. *Infra* at 297.

## II.    JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, 18 U.S.C. § 1964(c), and because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. This Court also has subject matter jurisdiction under 15 U.S.C. § 1. The Court also has diversity jurisdiction on Counts IX and X pursuant to 28 U.S.C. § 1332(a) as there is diversity between plaintiff Board of Trustees of Carpenters and Millwrights of Houston and Vicinity Welfare Trust Fund and each Defendant, and the amount in controversy exceeds $75,000. Those claims are asserted only on behalf of this plaintiff as the named plaintiff.

23.    The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. To the extent necessary, the District Court should retain jurisdiction over all parties pursuant to 28 U.S.C. § 1367 as the claims against all parties are related to the claims upon which original jurisdiction is based.

24.    A substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial District, and Defendants may be found within this judicial District. Venue is proper in this jurisdiction under 28 U.S.C. § 1391 and 18 U.S.C. § 1965. Defendants implemented their fraudulent marketing scheme in this District, as well as nationwide, through providers and sales representatives who reside or transact business in this District and thereby affected Class Members, who similarly reside or transact business in this District.

25.    The Judicial Panel on Multidistrict Litigation has, by Order dated April 30, 2002, ordered all related cases in the *In re: Pharmaceutical Industry Average Wholesale Price*



*Litigation*, MDL Docket Number 1456, transferred to the District of Massachusetts for coordinated or consolidated pre-trial proceedings.

## III.   PARTIES

### A.   Plaintiffs

26.     Plaintiff Board of Trustees of Carpenters and Millwrights of Houston and Vicinity Welfare Trust Fund ("CMHV") is an employee welfare benefit plan and employee benefit plan established and maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5), and as defined by §§ 1002(1) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, for the purpose of providing health benefits to eligible participants and beneficiaries. As such, CMHV is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d). CMHV maintains its principal place of business at 9555 West Sam Houston Parkway South, Suite 400, Houston, Texas. During the Class Period, Carpenters Welfare Trust Fund has been billed for and paid charges for Covered Drugs and otherwise made payments for drugs outside of the Medicare Part B context based on published AWPs. These drugs are identified in Appendix B. During the period relevant to the complaint, CMHV used an administrator to provide medical and drug benefits to its members. CMHV's administrator contracted directly with a PBM to provide pharmacy services to CMHV participants. By contract, all of CMHV's drug purchases were directly and expressly tied to AWP. CMHV paid for brand named drugs in both the retail and mail order context based on AWP minus a fixed percentage. For generic drugs in the retail context CMHV paid based upon MAC, which itself was tied to AWP and in the mail order context CMHV's generic purchases were made at either MAC or AWP minus a fixed percentage. By contract, the AWP used to determine prices was based on that published by "First Databank Blue Book."

AMENDED MASTER CONSOLIDATED            - 8 -
CLASS ACTION COMPLAINT



27.     Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity ("THWF") is an employee welfare benefit plan and employee benefit plan established and maintained pursuant to Section 302(c)(5) of the LMRA, and is an employee welfare benefit plan established and maintained pursuant to §§ 1002(1) and (3) of ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. As such, THWF is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. 1132(d). THWF maintains its principal place of business at Fourth & Cherry Streets, Philadelphia, Pennsylvania 19106. It provides comprehensive health coverage for over 28,000 participants and beneficiaries in parts of Pennsylvania, New Jersey and Delaware. During the Class Period, THWF has been billed for and paid charges for AWPIDs. THWF also made payments for drugs outside of the Medicare Part B context based on published AWPs. All drugs covered by this Complaint purchased by this plaintiff are identified in Appendix B. THWF uses the services of a PBM to administer its prescription drug program. Based upon its contracts it pays for brand name drugs at AWP minus a fixed percentage, and pays for generics based on MAC, which is itself based on AWP. It also pays for certain drugs outside the PBM context and does so based on AWP.

28.     Plaintiff Twin Cities Bakery Workers Health and Welfare Fund ("TCBW") is a jointly administered Taft-Hartley Fund established and maintained pursuant to Section 302(c)(5) of the LMRA, and is an employee welfare benefit plan established and maintained pursuant to ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. TCBW maintains its principal place of business in Eagan, Minnesota. As such, TCBW is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d). TCBW provides health benefits, including prescription drug benefits, to approximately 2000 active participants, and their spouses and dependants. During the Class Period, TCBW has been billed for and paid charges for AWPIDs. TCBW also made payments for drugs outside of the Medicare Part B context based on published AWPs. The drugs purchased by TCBW at issue in this litigation are



identified in Appendix B. TCBW contracts with a third-party administrator for administration of its pharmacy and medical benefits programs. This administrator in turn contracts with pharmacies and reimburses the pharmacies based upon published AWPs. For example, a typical agreement with a pharmacy providing services to TCBW members provides that reimbursement is at "AWP minus 10%." It further provides that the AWP is determined by Medispan. As for generics, reimbursement is based on MAC, which in turn is derived from AWP.

29.     Plaintiff United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund ("UFCW") is an employee welfare benefit plan and employee benefit plan maintained pursuant to Section 302(c)(5) of the LMRA, and is an employee welfare benefit plan established and maintained pursuant to ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. UFCW maintains its principal place of business in Cook County, Illinois. During the Class Period, UFCW has been billed for and paid charges for AWPIDs, including: Abbott's sodium chloride, gentamicin sulfate, furosemide, heparin lock flush and dextrose; Baxter's sodium chloride and dextrose; Bedford's leucovorin calcium; Sicor's leucovorin calcium; Pharmacia's methylprednisolone sodium; Braun's sodium chloride; Aventis' Furosemide; Immunex' leucovorin calcium and Johnson & Johnson's Remicade. UFCW also made payments for drugs outside of the Medicare Part B context based on published AWPs. All of UFCW drugs that are at issue in the Complaint are identified in Appendix B. From December 2000 to the present, UFCW has contracted with a PBM to administer the drug program for its members. For brand name drugs its contract expressly provides that reimbursement is at "AWP less13%." For generic drugs its reimbursement is also based on AWP. Prior to December 2000, UFCW contracted with pharmacies for the payment of purchases of pharmaceutical drugs by its members and beneficiaries at an estimated acquisition cost based on the AWPs (less a specified percentage) published by the manufacturers in Medispan. Further, UFCW has paid and continues to pay for Medicare Part B drug coverage to

AMENDED MASTER CONSOLIDATED            - 10 -
CLASS ACTION COMPLAINT



the extent it is not fully covered by Medicare. Typically, 20% of a Part B bill would not be covered, and is paid by UFCW.

30.     Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("PFTHW") is a voluntary employee benefits plan organized pursuant to § 501(c) of the Internal Revenue Code for the purpose of providing health benefits to eligible participants and beneficiaries. PFTHW maintains its principal place of business in Philadelphia, Pennsylvania. PFTHW provides health benefits, including prescription drug benefits, to approximately 20,000 active participants, and their spouses and dependents. During the class period, PFTHW has been billed for and paid charges for covered drugs and otherwise made payments for drugs outside of the Medicare Part B context based on published AWPs. These drugs are identified in Appendix B. During the period relevant to this Complaint PFTHW used a PBM to provide prescription services for its members. At all times its payment formula for both brand name and generic drugs was expressly tied to AWP.

31.     Plaintiff Man-U Service Contract Trust Fund ("Man-U Service Fund") is a trust fund established and maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5), and is an employee benefit plan established and maintained pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.*, for the purpose of providing health benefits, including prescription drug coverage, to eligible participants and beneficiaries. The Man-U Service Fund maintains its principal place of business at 4600 Powder Mill Road, Suite 100, Beltsville, Maryland 20705. The Manu-U Service Fund provides comprehensive health coverage, including prescription drug coverage, for approximately 1,200 participants and beneficiaries located in Maryland, Delaware, Virginia, North Carolina, Pennsylvania and Washington, D.C. All of Man-U Service Fund's drugs at issue in the Complaint are identified in Appendix B. Plaintiff Man-U Service Fund utilizes the services of a PBM and all of its contracts provide that its drug purchases are directly based on

AMENDED MASTER CONSOLIDATED           - 11 -
CLASS ACTION COMPLAINT



AWP. For example, for drugs purchased through the pharmacy, its contract provides for payment at "AWP – 16%," and for mail-order drugs, "AWP – 23%."

32.     Plaintiff Vermont Public Interest Research Group ("VPIRG") has been Vermont's leading watchdog and advocacy group since 1972. It is located at 141 Main Street, Ste. 6, Montpelier, Vermont. During the Class Period, VPIRG's members purchased prescription pharmaceuticals manufactured and/or distributed by the Defendant Drug Manufacturers and made inflated payments or co-payments based in whole or in part on published AWPs, and were injured by the illegal conduct alleged herein. For example, Ms. Elizebeth Ryan Cole of Thetford, Vermont, an active VPIRG member, purchased the Johnson & Johnson Group's drug Retin-A based in whole or in part upon the published AWP and Ms. Dawn Taylor of Hinesburg, Vermont, an active VPIRG member, purchased BMS's drug Plavix in whole or in part based upon Defendants' published AWP. As an unincorporated association, VPIRG has standing to pursue this action under Fed. R. Civ. P. 17(b)(1). VPIRG appears in this action for purposes of seeking declaratory, injunctive and other non-monetary relief pursuant to 28 U.S.C. §§ 2201, 2202, §16 of the Clayton Act and any other applicable statute.

33.     Plaintiff Wisconsin Citizen Action ("WCA") is the state's premiere public interest organization with 53,000 individual members and 250 affiliate organizations. It is located at 1202 Williamson St., Suite B, Madison, Wisconsin. During the Class Period, Plaintiff's members purchased prescription pharmaceuticals manufactured and/or distributed by the Defendant Drug Manufacturers and made inflated payments or co-payments based in whole or in part upon the published AWP, and were injured by the illegal conduct alleged herein. For example, Ms. Ida Johnson of Oconomowoc, Wisconsin, and active WCA member, purchased Pfizer's drug Lipitor in whole or in part based upon Defendants' published AWP. As an unincorporated association, WCA has standing to pursue this action under Fed. R. Civ. P. 17(b)(1). WCA appears in this action for purposes of seeking declaratory, injunctive and other

AMENDED MASTER CONSOLIDATED          - 12 -
CLASS ACTION COMPLAINT



non-monetary relief pursuant to 28 U.S.C. §§ 2201, 2202, §16 of the Clayton Act and any other applicable statute.

34.    Plaintiff New York StateWide Senior Action Council ("StateWide") is a grassroots membership organization made up of individual senior citizens and senior citizen clubs from all parts of New York State. It is located at 275 State Street, Albany, New York. During the Class Period, StateWide's members purchased prescription pharmaceuticals manufactured and/or distributed by the Defendant Drug Manufacturers, made inflated payments or co-payments based in whole or in part upon published AWPs, and were injured by the illegal conduct alleged herein. For example, Ms. Mary Jane Snyder of Clifton Park, New York, an active StateWide member, purchased AstraZenaca's drugs Prilosec and Nexium, Boehringer's drug Atrovent, BMS's drug Tequin, Novartis' drug Starlix and Schering's drugs Clarinex and K-Dur based in whole or in part on Defendants' published AWPs. As an unincorporated association, StateWide has standing to pursue this action under Fed. R. Civ. P. 17(b)(1). StateWide appears in this action for purposes of seeking declaratory, injunctive and other non-monetary relief pursuant to 28 U.S.C. §§ 2201, 2202, §16 of the Clayton Act and any other applicable statute.

35.    Plaintiff Citizen Action of New York ("CANY") is a coalition of labor, senior citizen, women's, student, tenant and community organizations that works with community activists for social and economic justice. It is located at 94 Central Avenue, Albany, New York. During the Class Period, CANY's members purchased prescription pharmaceuticals manufactured and/or distributed by the Defendant Drug Manufacturers, made inflated payments or co-payments therefore based in whole or in part on published AWPs, and were injured by the illegal conduct alleged herein. For example, Ms. Marilyn Gourley of Binghamton, New York, an active CANY member, purchased Pfizer's drug Zoloft based in whole or in part upon Defendants' published AWPs. As an unincorporated association, CANY has standing to pursue



this action under Fed. R. Civ. P. 17(b)(1). CANY appears in this action for purposes of seeking declaratory, injunctive and other non-monetary relief pursuant to 28 U.S.C. §§ 2201, 2202, §16 of the Clayton Act and any other applicable statute.

36.     Plaintiff Citizens for Consumer Justice ("CCJ") is a Pennsylvania nonprofit umbrella organization that promotes affordable, quality health care. It is located at Architects Building, 117 South 17th Street, Suite 311, Philadelphia, Pennsylvania. During the Class Period, CCJ's members purchased prescription pharmaceuticals manufactured and/or distributed by the Defendant Drug Manufacturers, made inflated payments or copayments based in whole or in part on published AWPs, and were injured by the illegal conduct alleged herein. For example, Ms. Patricia Pudyk of Aliquippa, Pennsylvania, an active CCJ member, purchased AZ's drug Nexium in whole or in part based upon Defendants' published AWP. As an unincorporated association, CCJ has standing to pursue this action under Fed. R. Civ. P. 17(b)(1). CCJ appears in this action for purposes of seeking declaratory, injunctive and other non-monetary relief pursuant to 28 U.S.C. §§ 2201, 2202, § 16 of the Clayton Act and any other applicable statute.

36 (a)  Plaintiff Roberta S. Starks is a Minnesota resident residing in St. Paul, MN. During the Class Period, Plaintiff Starks was enrolled in the Together Rx Card Program and purchased Paxil, a prescription drug manufactured by Defendant GlaxoSmithKline, P.L.C., through the Together Rx Card Program.

36 (b)  Plaintiff Kimberly K. Hoover, as attorney-in-fact for her mother, Jeanne F. Kennedy, is a Minnesota resident residing in Willmar, MN. During the Class Period, Jeanne F. Kennedy was enrolled in the Together Rx Card Program and purchased Nexium and Nolvadex, prescription drugs manufactured by Defendant AstraZeneca Pharmaceuticals, L.P., through the Together Rx Card Program.

36(c).  As set forth above, each of the plaintiffs has paid for drugs at prices that are



expressly tied to AWP. Each has overpaid for AWPIDs by virtue of defendants' manipulation of the AWPs for these drugs.

**B.    Defendants**

37.    The acts charged in this Complaint as having been done by the Defendants were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of the Defendants' business or affairs.

38.    Various other individuals, partnerships, sole proprietors, business entities, companies and corporations, presently unknown to Plaintiffs and not named as Defendants in this Complaint, participated as co-conspirators in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof. Such unknown persons or entities acted as co-conspirators and aided, abetted or participated with Defendants in the commission of the wrongful acts alleged in this Complaint.

**1.    Abbott**

39.    Defendant Abbott Laboratories ("Abbott") is an Illinois corporation with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois. Abbott is a diversified health care company that discovers, develops, manufactures, and markets health care products and pharmaceuticals. Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products. Abbott reported revenues for the year 2000 of approximately $13.7 billion and net earnings of $2.8 billion.

40.    Abbott, one of the world's largest pharmaceutical companies, is in the business of manufacturing prescription medications for clinical distribution by Medicare Plan B providers nationwide. The drugs manufactured by Abbott and covered by Medicare Part B include, but may not be limited to:  acetylcysteine, acyclovir, amikacin sulfate, calcitriol, cimetidine hydrochloride, clindamycin phosphate, dextrose, dextrose sodium chloride, diazepam,

AMENDED MASTER CONSOLIDATED            - 15 -
CLASS ACTION COMPLAINT



furosemide, gentamicin sulfate, heparin lock flush, metholprednisolone sodium succinate, sodium chloride, tobramycin sulfate, vancomycin, and zemplar.

41.     Abbott is also sued herein in its capacity as a participant in the Together Rx conspiracy.

### 2.     Amgen

42.     Defendant Amgen Inc. ("Amgen") is a Delaware corporation with its principal place of business at One Amgen Drive, Thousand Oaks, California. Amgen is a biotechnology corporation that focuses its research and development efforts on drugs related to nephrology, cancer, inflammation, neurology and metabolism. In 2000, Amgen's revenues exceeded $3.6 billion.

43.     Amgen is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide. Pharmaceuticals that are manufactured by Amgen and covered by Medicare Part B include, but may not be limited to: Epogen® (epoetin alfa) and Neupogen® (filgrastim).

### 3.     AstraZeneca

44.     Defendant Zeneca, Inc. ("Zeneca") is a Delaware corporation with its principal place of business at Malvern, Pennsylvania. Zeneca is a wholly owned subsidiary of AstraZeneca, PLC, a limited liability company domiciled in the United Kingdom.

45.     Defendant AstraZeneca US is a Delaware corporation with its principal place of business at 1800 Concord Pike, Wilmington, Delaware.

46.     Defendant AstraZeneca Pharmaceuticals L.P. is a Delaware corporation, with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware. AstraZeneca Pharmaceuticals L.P. is owned and controlled by AstraZeneca PLC, a public limited liability company domiciled in the United Kingdom.



47.     AstraZeneca, PLC, Zeneca, Inc., AstraZeneca Pharmaceuticals L.P. and AstraZeneca U.S. are collectively referred to as "AstraZeneca."

48.     AstraZeneca maintains research and development and manufacturing facilities worldwide, including in the United States. AstraZeneca reported annual sales of $16.5 billion in 2001, with an operating profit of $4.2 billion.

49.     AstraZeneca manufactures and markets several drugs covered by Medicare Part B including, but not limited to: Zoladex® (goserilin acetate implant), Nolvadex® (tamoxifen citrate), Tomudex® (raltitrexed), and Diprivan® (propofol).

50.     AstraZeneca is also sued herein in its capacity as a participant in the Together Rx conspiracy.

### 4.     The Aventis Group (Aventis, Pharma, Hoechst and Behring)

51.     Defendant Aventis Pharmaceuticals, Inc. ("Pharma") is a Delaware corporation with its principal place of business located at 300-400 Somerset Corporate Blvd., Bridgewater, New Jersey. Pharma is a wholly owned subsidiary of Aventis, S.A., a company domiciled in France. Pharma is comprised of the U.S. commercial operations of predecessor companies Rhone-Poulenc Rorer, S.A. and Defendant Hoechst Marion Roussel, Inc. ("Hoechst"). Prior to its acquisition by Pharma, Hoechst was a Delaware corporation with its principal place of business located at 10236 Marion Park Drive, Kansas City, Missouri.

52.     Pharma's principal business activities are the discovery, development, manufacture and sale of prescription pharmaceuticals in the areas of cardiology, oncology, infectious diseases, arthritis, allergies and respiratory disorders, diabetes and central nervous system disorders. Pharma reported U.S. net sales of approximately $5.8 billion in 2001.

53.     Defendant Aventis Behring L.L.C. ("Behring"), located at 1020 First Avenue, King of Prussia, Pennsylvania, formerly did business as Centeon L.L.C., a 50/50 joint venture

AMENDED MASTER CONSOLIDATED          - 17 -
CLASS ACTION COMPLAINT



between Hoechst and Rhone-Poulenc Rorer, S.A.  When Centeon L.L.C.'s parent companies merged to create Aventis in 1996, Behring became its wholly-owned subsidiary.

54.     Behring is the plasma protein business of Pharma, producing a line of therapies including coagulation therapies for the treatment of hemophilia, wound healing agents used during major surgical procedures, inhibitor treatments that inhibit the formation of blood clots, immunoglobulins for the prevention and treatment of immune disorders, and plasma expanders for the treatment of a variety of conditions such as shock, burns and circulatory disorders.  In 2000, Behring held assets estimated at $1.5 billion.

55.     The drugs manufactured by Pharma, Hoechst and Behring (collectively referred to as "The Aventis Group") and covered by Medicare Part B include, but may not be limited to: Anzemet® (dolasteron mesylate), Bioclate® (antihemo factor viii), Gammar® (immune globulin), Helixate® (antihemo factor viii), Humate-P® (antihemo factor viii), Mononine® (antihemo factor ix complex), Monoclate-P® (antihemo factor viii), and Taxotere® (docetaxel).

56.     Aventis is also sued in its capacity as a participant in the Together Card Rx conspiracy.

### 5.     Baxter

57.     Defendant Baxter International Inc. ("Baxter") is a Delaware corporation with its principal place of business at One Baxter Parkway, Deerfield, Illinois.  Baxter manufactures and distributes prescription drugs to clinical administrators.  Baxter's annual sales from January 1, 2000 through December 31, 2000 were over $6.8 billion.

58.     Defendant Baxter Healthcare Corporation is the principal domestic operating subsidiary of Baxter International.  Baxter International and Baxter Healthcare Corporation are collectively referred to as "Baxter."

59.     Baxter is a global medical products company that, *inter alia*, develops, manufactures, markets and/or distributes drugs to treat cancer, trauma, hemophilia, immune



deficiencies, infectious diseases, kidney disease and other disorders. Baxter reported a year 2000 sales of $6.9 billion.

60.     The drugs developed, manufactured, marketed, sold and/or distributed by Baxter that are covered by Medicare Part B include, but may not be not limited to: albumin, Bebulin® (factor ix complex), Buminat® (human albumin), dextrose, dextrose sodium chloride, Gammagard® (immune globulin), Iveegam® (immune globulin), Holoxan® (ifosfanide), Uromitexan® (mesna), Endoxan® (cyclophosphamide), Hemofil M® (antihemo factor viii), Proplex T® (factor ix complex), Recombinate® (antihemo factor viii), cisplatin, sodium chloride, and diazepam.

### 6.     Bayer

61.     Defendant Bayer Corporation ("Bayer") is an Indiana corporation with its principal place of business located at 100 Bayer Road, Pittsburgh, Pennsylvania. Bayer is a wholly owned United States subsidiary of a German corporation, Bayer AG. Bayer's pharmaceutical division is located at 400 Morgan Lane, West Haven, Connecticut.

62.     Bayer is a highly diversified health care company whose principal business includes the development, manufacture, marketing, sale and/or distribution of healthcare products and services, including pharmaceuticals. Bayer reported sales in the United States of $10.1 billion in 2001 and $8.9 billion in 1999.

63.     Bayer is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide. The pharmaceutical drugs manufactured by Bayer and covered by Medicare Part B include, but may not be limited to: Kogenate® (antihemo factor viii), FS/Kogenate® (antihemo factor viii), and Koate-DVI® (antihemo factor viii) and Gamimune® (immune globulin), all used to treat hemophilia, and Gamimune® which is used in the treatment of immunodeficiency and autoimmune disorders.

AMENDED MASTER CONSOLIDATED          - 19 -
CLASS ACTION COMPLAINT



7.    **The Boehringer Group (Boehringer, Ben Venue, Bedford)**

64.    Defendant Boehringer Ingelheim Corp. ("Boehringer") is a Nevada corporation with its principal place of business located at 900 Ridgefield Road, Ridgefield, Connecticut. Boehringer is a United States subsidiary of Pharma Investment Ltd., of Burlington, Canada, which in turn is a division of C.H. Boehringer Sohn Gurdstucksverwaltung GmbH & Co. KG of Ingelheim, Germany.  Boehringer designs, manufactures and markets pharmaceuticals. Boehringer is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

65.    Defendant Ben Venue Laboratories Inc. ("Ben Venue") is a Delaware corporation with its principal place of business located at 300 Northfield Road, Bedford, Ohio.  Ben Venue is a wholly owned subsidiary of Defendant Boehringer.  Ben Venue is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

66.    Defendant Bedford Laboratories ("Bedford") is a division of Ben Venue with its principal place of business located at 300 Northfield Road, Bedford, Ohio.  Bedford manufactures and markets injectable pharmaceuticals.  Bedford is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.  (Boehringer, Ben Venue, and Bedford are collectively referred to herein as the "Boehringer Group.")

67.    The pharmaceuticals manufactured by the Boehringer Group and covered by Medicare Part B include, but may not be limited to injectable forms of:  acyclovir, bleomycin, cisplatin, cyclosporine, cytarabine, doxorubicin hydrochloride, doxorubicin hydrochloride, doxycycline, etoposide, leucovorin calcium, leucovorin calcium, methotrexate, mitomycin, paclitaxel, pamidronate disodium, and vinblastine sulfate.



### 8.    Braun

68.     Defendant B. Braun of America, Inc. is a Pennsylvania corporation with its principal place of business located at 824 Twelfth Avenue, Bethlehem, Pennsylvania. B. Braun of America is a wholly-owned subsidiary of B. Braun Melsunger Aktiengesellschaft.

69.     In 1997, B. Braun of America acquired McGaw, Inc. ("McGaw"), a Delaware corporation with a principal place of business in Irvine, California. B. Braun McGaw ("Braun"), which produces pharmaceutical products, is a wholly-owned subsidiary of B. Braun of America, Inc. Upon information and belief, McGaw ceased to maintain a separate corporate entity upon the acquisition of McGaw by B. Braun of America. Until its acquisition by B. Braun of America, McGaw was in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide. (B. Braun of America, McGaw and B. Braun McGaw are collectively referred to herein as "Braun.") Braun designs, manufactures and markets medical devices and certain intravenous solutions. Braun is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

70.     The pharmaceuticals manufactured by Braun and covered by Medicare Part B include, but may not be limited to intravenous solutions of dextrose, dextrose sodium chloride, and sodium chloride.

### 9.    The BMS Group (Oncology Therapeutics; Apothecon)

71.     Defendant Bristol-Myers Squibb Co. ("Bristol-Myers") is a Delaware corporation with its principal place of business located at 345 Park Avenue, New York, New York. Bristol-Myers is a multi-national health care company specializing in the manufacturing, marketing and sale of pharmaceuticals and medical devices. For the year 2000, Bristol-Meyers reported revenues of approximately $20 billion and net earnings of $4.7 billion.

72.     Defendant Oncology Therapeutics Network Corp. ("OTN") is a Delaware corporation with its principal place of business located at 395 Oyster Point Boulevard, Suite 405,

AMENDED MASTER CONSOLIDATED                    - 21 -
CLASS ACTION COMPLAINT



South San Francisco, California. OTN has been a wholly-owned subsidiary of Bristol-Myers since its acquisition in 1996. Prior to 1996, OTN was an independent company. In 2001, OTN reported revenues of over $1.4 billion.

73.     OTN is a healthcare services and distribution firm that directly sells Bristol-Myers' infusion oncology drugs and related products to approximately 2,300 office-based oncology practices in the United States. At the time of its acquisition by Bristol-Myers, OTN was the leading distributor of chemotherapeutic drugs and related products for the treatment of cancer. Bristol-Myers paid OTN a commission for marketing and selling its drugs. Both prior to and after Bristol-Myers acquired OTN, Bristol-Myers marketed and sold its drugs directly to medical providers across the country, and thus Bristol-Myers and OTN employed and maintained extensive marketing and sales departments.

74.     Defendant Apothecon, Inc. ("Apothecon") is a Delaware corporation with its principal place of business located in Princeton, New Jersey. It is a subsidiary of Bristol-Myers specializing in small to mid-size niche brand and generic products.

75.     Bristol-Myers, OTN and Apothecon are collectively referred to herein as the "BMS Group."

76.     The BMS Group manufactures and distributes prescription drugs that are clinically distributed by Medicare Plan B providers nationwide. The drugs manufactured by the BMS Group and covered by Medicare Part B include, but may not be not limited to: Blenoxane® (bleomycin sulfate), Paraplatin® (carboplatin), Cytoxan® (cyclophospamide), Rubex® (doxorubicin hydrochloride), Etopophos® (etoposide), Vepesid® (etoposide), TaxolV (paclitaxel), and Fungizone® (amphotericin B).

77.     Bristol-Myers is also sued herein in its capacity as a participant in the Together Rx conspiracy.

AMENDED MASTER CONSOLIDATED                 - 22 -
CLASS ACTION COMPLAINT



78.     The BMS Group engages in an organization-wide and deliberate scheme to inflate AWPs. The BMS Group has stated fraudulent AWPs for all or almost all of its drugs including Amikacin Sulfate, Amphotercin B, Bleomycin Sulfate, Cyclophospamide, Vespid (Etoposide), Carboplatin (Paraplatin), Taxol (paclitaxel), and Blenoxane.   The specific drugs of the BMS Group for which relief is sought in this case are set forth in Appendix A.

      **10.     Dey, Inc.**

79.     Defendant Dey, Inc. ("Dey") is a Delaware corporation with its principal place of business at 2751 Napa Valley Corporate Drive, Napa, California. Dey is a unit of Merck KGaA, a German pharmaceutical conglomerate.

80.     Dey is a specialty pharmaceutical company that primarily develops, manufactures and markets generic drugs used in the treatment of selected respiratory diseases and allergies. Dey, one of the largest U.S. manufacturers of such pharmaceuticals, had net sales of $266 million in 1998.

81.     The drugs manufactured by Dey and covered by Medicare Part B include, but may not be not limited to:  albuterol sulfate, acetylcysteine, cromolyn sodium, ipratropium bromide, and metproterenol sulfate.

82.     Defendant Dey, Inc. f/k/a Dey Laboratories, Inc. ("Dey") is a corporation organized under the laws of Delaware with its principal offices in Napa, California.

83.     Dey is a specialty pharmaceutical company focusing on drug products for respiratory diseased and related allergies.  The products it manufactures and publishes AWPs on include:  Ipratropium, Bromide; Metapeoterenol Sulfate, and Accuneb.

      **11.     The Fujisawa Group (Fujisawa Healthcare, Fujisawa USA)**

84.     Defendant Fujisawa Healthcare, Inc. ("Fujisawa Healthcare") is a Delaware corporation with its principal place of business located at Three Parkway North, Deerfield, Illinois, 60015. Fujisawa Healthcare is a wholly-owned subsidiary of Fujisawa Pharmaceutical



Co. Ltd., a Japanese corporation. Fujisawa Healthcare focuses its efforts in the therapeutic areas of immuno-suppression and transplantation, cardiovascular care, skin care, oncology, and antifungal and anti-infective treatment.

85.     Defendant Fujisawa USA, Inc. ("Fujisawa USA") is a Delaware corporation with its principal place of business located at Three Parkway North, Deerfield, Illinois. Fujisawa USA was a wholly-owned subsidiary of Fujisawa Pharmaceutical Co. Ltd. In 1998, Fujisawa Healthcare assumed responsibility for Fujisawa USA's portfolio of proprietary products

86.     The drugs manufactured by Fujisawa Healthcare and Fujisawa USA (collectively referred to as "The Fujisawa Group") and covered by Medicare Part B include, but may not be limited to: Acyclovir Sodium, Dexamethasone Sodium Phosphate, Doxorubicin Hydrochloride, Fluorouracil, Gentamicin Sulfate, Pentamidine Isethionate, and Vancomycin Hydrochloride.

### 12.     The GSK Group (GlaxoSmithKline, SmithKline Beecham, Glaxo Wellcome)

87.     Defendant GlaxoSmithKline, P.L.C. ("GlaxoSmithKline") is a public limited company incorporated under the laws of England and Wales, with its corporate headquarters located at 980 Great West Road, Brentford, Middlesex, United Kingdom TW8 9GS. GlaxoSmithKline was created through the December 27, 2000, merger of GlaxoWellcome, P.L.C. and SmithKline Beecham, P.L.C. GlaxoSmithKline's operational headquarters are located at One Franklin Plaza, 16th and Race Streets, Philadelphia, Pennsylvania.

88.     Defendant SmithKline Beecham Corporation ("SKB"), a wholly-owned U.S. subsidiary of the former SmithKline Beecham P.L.C., is a Pennsylvania corporation with its principal place of business at One Franklin Plaza, 16th and Race Streets, Philadelphia, Pennsylvania.

89.     Defendant GlaxoWellcome, Inc. ("Glaxo"), a wholly-owned subsidiary of GlaxoSmithKline, is a North Carolina corporation with its principal place of business at 5 Moore Drive, P.O. Box 13398, Research Triangle Park, North Carolina. Cerenex Pharmaceuticals



("Cerenex"), a division of Glaxo prior to the merger, was responsible for Glaxo's central nervous system drugs, including Zofran.

90.     Defendants GlaxoSmithKline, SKB and Glaxo are referred to collectively as the "GSK Group."

91.     The GSK Group is a diversified pharmaceutical company which controls an estimated 7 percent of the world's pharmaceutical market. In 2001, the GSK Group reported pharmaceutical sales of $24.8 billion.

92.     The drugs manufactured by the GSK Group and covered by Medicare Part B include, but may not be limited to: Hycamtin® (topotecan hydrochloride), Ventolin® (albuterol) and Zofran® (ondansetron hydrochloride). Pierre Fabré Médicament licenses another Medicare Part B drug, Navelbine® (vinorelbine tartrate), to the GSK Group. SmithKline Beecham P.L.C. manufactured and sold Kytril® (granisteron hydrochloride), another drug covered by Medicare Part B (and a competitor to Zofran®), prior to the merger. To secure regulatory approval for the merger, SmithKline Beecham P.L.C. sold Kytril®'s global rights to the Roche Group in December of 2000.

93.     GSK is also sued herein as a member of the Together Rx conspiracy.

**13.     Hoffman-LaRoche, Inc.**

94.     Defendant Hoffman-LaRoche, Inc. ("Roche") is a New Jersey corporation with its principal place of business at 340 Kingsland Street, Nutley, New Jersey. Roche is a research-based company that develops, manufacturers and markets numerous prescription and non-prescription drugs.

95.     Roche is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide. Pharmaceuticals that are manufactured by Roche and covered by Medicare Part B include, but may not be limited to: Cellcept® (mycophenolate mofetil), Cytovene® (ganciclovir), Demadex® (torsemide), Kytril®



(granisetron HCL), Rolcatrol® (calcitriol), Rocephin® (ceftriaxone), Roferon-A® (Interferon 2-alfa), Toradol® (ketorolac tromethamine), Valium® (diazepam), Versed® (midazolam), Xeloda® (capecitabine), Zenapx® (daclizumab), Rituxan® (rituximab), Herceptin® (trastuzumab), and Xeloda® (capecitabine).

96.     In addition to manufacturing and marketing drugs that are reimbursed by Medicare Plan B, Roche also manufactures and distributes other named brand drugs for which it publishes, or causes to be published, an AWP in various industry compendia.

### 14.    Immunex

97.     Defendant Immunex Corporation ("Immunex"), a wholly owned subsidiary of Defendant Amgen, Inc., is a Washington corporation with its principal place of business at 51 University Street, Seattle, Washington. Immunex is a company that develops products for the treatment of cancer, asthma, rheumatoid arthritis, inflammatory diseases, infectious diseases, and cardiovascular diseases. In 1999, its total revenues were $542 million.

98.     Immunex is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide. Pharmaceutical drugs that are manufactured by Immunex and covered by Medicare Part B include, but may not be limited to: Leucovorin Calcium, Enbrel® (etanercept), Novantrone® (mitoxane hydrochloride), Leukine® (sargramostim), and Thioplex®(thiotepa).

99.     Defendant Immunex has been a wholly owned subsidiary of Defendant Amgen, since Immunex' acquisition in July 2002.

### 15.    The Johnson & Johnson Group (J&J, Centocor, Janssen, NcNeil, Ortho)

100.    Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey. In 2001, pharmaceutical sales represented 45% of J&J's worldwide sales and 19% of its



operational growth. J&J is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

101.    Defendant Centocor, Inc. ("Centocor") is a Pennsylvania corporation and has been a wholly owned subsidiary of Defendant J&J since its acquisition by J&J in October 1999. Centocor's principal place of business is located at 200 Great Valley Parkway, Malvern, Pennsylvania. Centocor manufactures, markets and distributes prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

102.    Defendant Janssen Pharmaceutica Products, L.P. ("Janssen") is a New Jersey limited partnership with a principal place of business located at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560. Janssen is a subsidiary of Johnson & Johnson. Janssen is sued for its role in the Together Rx conspiracy.

103.    Defendant McNeil-PPC, Inc., is a New Jersey corporation. McNeil-PPC, Inc. is a subsidiary of Johnson & Johnson. McNeil Consumer & Specialty Pharmaceuticals is a division of McNeil-PPC, Inc. and has a principal place of business located at 7050 Camp Hill Road, Fort Washington, Pennsylvania 19034. McNeil-PPC is sued for its role in the Together Rx conspiracy.

104.    Defendant Ortho Biotech ("Ortho") is New Jersey corporation and has been a wholly owned subsidiary of Defendant J&J since its formation by J&J in 1990. Ortho's principal place of business is located at 700 U.S. Highway 202, Raritan, New Jersey. Ortho manufactures and distributes prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

105.    The drugs manufactured by J&J, Centocor, Ortho, McNeil-PPC and Janssen (collectively referred to as "J&J Group") and covered by Medicare Part B include, but may not be limited to:  ReoPro® (abciximab), an anti-blood clotting medication, Retavase® (reteplase), an anti blood clotting agent, Procrit® (epoetin alfa), for the treatment of anemia, Leustatin®



(cladribine), for the treatment of leukemia, Orthoclone® (muromonab-CD3), used to prevent organ transplant rejection, Sporanox® (itraconazole), used in the treatment of fungal infections, and Remicade® (infliximab), an anti-inflammatory drug.

106.    J&J, Ortho, McNeil and Janssen are also sued herein as members of the Together Rx conspiracy.

### 16.    Novartis

107.    Defendant Novartis Pharmaceuticals Corporation ("Novartis") is a New Jersey corporation with its principal place of business at One Health Plaza, East Hanover, New Jersey. Novartis, a U.S. affiliate of Swiss-based Novartis AG, has core businesses in pharmaceuticals, consumer health, generics, eye care and animal health.  Novartis AG reported a net income of $4.2 billion on sales of $19.1 billion in 2001.

108.    The drugs manufactured by Novartis and distributed through the Together Rx Card Program include, but may not be limited to:  Clozaril, CombiPatch, Comtan, Diovan, Diovan HCT, Elidel, Estraderm, Exelon, Famvir, Femara, Focalin, Lamisil, Lescol/Lescol XL, Lotensin, Lotensin HCT, Miacalcin Injection & Nasal Spray, Parlodel, Rescula, Ritalin Hydrochloride, Ritalin LA, Starlix, Tegretol, Tegretol-XR, Trileptal, Vivelle/Vivelle-Dot, Voltaren Opthalmic, Zaditor, and Zelnorm.

### 17.    Pfizer, Inc.

109.    Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, New York.  Pfizer is one of the largest pharmaceutical companies in the United States, whether measured by number of prescriptions written, revenues, or market capitalization.

110.    Pfizer is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.  Pharmaceuticals that are manufactured by the Pfizer Group and covered by Medicare Part B include, but may not be



limited to:  Cerebyx® (fosphenytoin sodium injection), Dilatin® (phenytoin), Diflucan®
(fluconazole), Zithromax® (azithromycin), Trovan® (trovafloxacin mesylate), and Unasyn®
(ampicillin sodium/sulbactam sodium).

111.    In addition to manufacturing and marketing drugs that are reimbursed by
Medicare Plan B, the Pfizer Group also manufactures and distributes other named brand drugs
for which it publishes, or causes to be published, an AWP in various industry compendia.

### 18.    The Pharmacia Group (Pharmacia and Pharmacia & Upjohn)

112.    Defendant Pharmacia Corporation ("Pharmacia") is a Delaware corporation with
its principal place of business located at 100 Route 206, North Peapack, New Jersey.  Pharmacia
was created through the merger of Defendant Pharmacia and Upjohn, Inc. and Monsanto
Company on March 31, 2000.

113.    Defendant Pharmacia & Upjohn, Inc. ("P&U") is a subsidiary of Pharmacia Corp.
In 1995, P&U was formed through the merger of Pharmacia AB and The Upjohn Company.
P&U became a global provider of human healthcare products, animal health products,
diagnostics and specialty products.  In 1998, Pharmacia & Upjohn relocated its global
headquarters from the United Kingdom to New Jersey.  In September 1999, the company
established its global headquarters on a 70-acre campus in Peapack, New Jersey.  This site is
now the management and pharmaceutical headquarters for Pharmacia.

114.    Pharmacia is a highly diversified health care company whose business focuses on
the discovery, development, manufacture and sale of a broad and diversified line of health care
products and services, including pharmaceuticals, diagnostics and hospital products.
Pharmacia's Prescription Pharmaceuticals business segment is involved in researching,
developing, registering, manufacturing and selling prescription pharmaceutical products,
including general therapeutics, ophthalmology, and hospital products, which include oncology
products and diversified therapeutics.  Pharmacia reported sales of $18.1 billion for the fiscal

AMENDED MASTER CONSOLIDATED           - 29 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



year ended December 31, 2000. Pharmacia also reported $12.0 billion in prescription pharmaceuticals sales for the year 2001, and $10.8 billion in prescription pharmaceuticals sales for the year 2000. Prescription pharmaceuticals sales account for over 85 percent of Pharmacia's overall pharmaceutical sales. According to its Annual Report, Pharmacia's oncology drugs generated more than $1 billion in sales in 2001.

115.    The drugs manufactured by Pharmacia and P&U (collectively referred to as "The Pharmacia Group") and covered by Medicare Part B include, but may not be limited to: Adriamycin PFS® (doxorubicin hydrochloride), Adrucil® (fluorouracil), Amphocin® (amphotericin), Aromasin® (bleomycin), Camptosar® (irinotecan hydrochloride), Cleocin Phosphate® (clindamycin phosphate), Neosar ® (cyclophosphamide), Cytosar-U (cytarabine), Depo-Testosterone® (testosterone cypionate), Adriamycin PFS® (doxorubicin HCL), Ellence® (epirubicin HCL), Toposar® (etoposide), Adrucil® (fluorouracil),  Solu-Cortef® (hydrocortisone sodium succinate), Idamycin® (idarubicin hydrochloride), Medrol® (methylprednisolone), and Vincasar® (vincristine sulfate).

### 19.    The Schering-Plough Group (Schering Plough & Warrick)

116.    Defendant Schering-Plough Corporation ("Schering-Plough") is a New Jersey corporation with its principal place of business located at 2000 Galloping Hill Road, Kenilworth, New Jersey.

117.    Schering-Plough's primary business involves prescription products in core product categories, including allergy and respiratory, anti-infective and anticancer, cardiovasculars, dermatologicals and central nervous systems and other disorders. Schering-Plough's revenues in 2001 totaled $9.8 billion.

118.    Defendant Warrick Pharmaceuticals Corporation ("Warrick"), is a Delaware corporation with its principal place of business at 12125 Moya Boulevard, Reno, Nevada.



Warrick is a wholly-owned subsidiary of Defendant Schering-Plough and has been since its formation in 1993. Warrick manufactures generic pharmaceuticals.

119.    The drugs manufactured by Schering-Plough and Warrick (collectively at times referred to as "The Schering-Plough Group") and covered by Medicare Part B include, but may not be limited to: Proventil® (albuterol sulfate), Integrelin® (eptifibatide), Intron A® (interferon alfa-2b recombinant), and Temodar® (temozolomide). The Schering-Plough Group's Albuterol sulfate sales alone totaled $154 million in 2000.

###    20.    The Sicor Group (Sicor and Gensia)

120.    Defendant Sicor, Inc. ("Sicor") is a Delaware corporation with its principal place of business located at 19 Hughes, Irvine, California. Sicor was the result of the 1997 merger between Defendant Gensia, Inc. ("Gensia"), a finished dosage manufacturer, and Rakepoll Holding, a Europe-based supplier of active pharmaceutical ingredients.

121.    Sicor markets itself as a vertically-integrated specialty pharmaceutical company with expertise in the development, manufacturing and marketing of injectable pharmaceutical products, primarily used worldwide by hospitals. Sicor's finished dosage products manufacturing operations account for 32% of its total revenue, and is comprised of a portfolio of products that includes oncology, anesthesiology, and critical care. Sicor's 2001 revenues totaled nearly $370 million. According to its website, Sicor operates its business through several subsidiaries.

122.    Defendant Gensia Sicor Pharmaceuticals, Inc. ("Gensia Sicor"), a Delaware corporation, is a wholly-owned subsidiary of Sicor with its principal place of business located at 17 Hughes, Irvine, California. Gensia Sicor focuses on acute-care multisource products in the fields of oncology, cardiology, and anesthesiology. Gensia Sicor's injectable drug business includes more than 60 products.



123. In 1999, Gensia Sicor entered into a sales distribution agreement with Abbott Laboratories under which the two companies formed a strategic alliance for the marketing and distribution of oncology products in the U.S. The agreement was restructured in March 2002. In 1999, Gensia Sicor also amended an earlier agreement with Baxter Pharmaceutical Products, Inc. Notably, Abbott (6%) and Baxter (34%) accounted for nearly 40% of Sicor's total product sales in 2001.

124. The drugs manufactured by Sicor, Gensia, and Gensia Sicor (collectively referred to as "The Sicor Group") and covered by Medicare Part B include, but may not be not limited to: amikacin sulfate and tobramycin sulfate.

### 21. TAP

125. Defendant TAP Pharmaceutical Products, Inc. ("TAP") is a corporation that arose in 1977 from a partnership between Takeda Chemical Industries, Ltd. and Defendant Abbott, under which each company owns 50 percent of TAP's stock. Abbott and Takeda jointly control TAP's operations and rotate control of TAP's presidency.

126. Prior to April 2000, TAP was known as TAP Holdings, Inc. TAP, together with its subsidiary, TAP Pharmaceuticals, Inc., develops and markets pharmaceutical products for the United States and Canada. TAP's headquarters is located in Waukegan, Illinois.

127. The pharmaceuticals manufactured by TAP include Lupron and Prevacid.

128. TAP is also sued herein for its role in the Together Rx Card Program.

### 22. Watson

129. Defendant Watson Pharmaceuticals, Inc. ("Watson") is a Delaware corporation with its principal place of business at 311 Bonnie Circle, Corona, California. Watson develops, manufactures and markets brand and generic pharmaceuticals. Watson is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.



130.    The pharmaceuticals manufactured by Watson and covered by Medicare Part B include, but may not be limited to: albuterol sulfate, dexamethasone acetate, diazepam, gentamicin sulfate, iron dextran, testosterone enanthate, vancomycin hydrochloride, and cytarabine.

### 23.    Together Rx

131.    Defendant Together Rx LLC is a Delaware limited liability company, formed and controlled by its founding partners: Abbott; AstraZeneca; Aventis; Bristol; GSK, Janssen; Novartis; and Ortho-McNeil, and later TAP.

## IV.    GENERAL ALLEGATIONS APPLICABLE TO ALL DEFENDANTS

132.    The allegations contained herein apply generally to all Defendants.

### A.    The AWP System

133.    There are approximately 65,000 different drug products in the United States market, including different dosages of the same drug. Prescription drugs are dispensed to patients by or through different types of medical providers, including but not limited to: (a) physicians who administer the drug in an office, (b) retail pharmacies, (c) home infusion pharmacies, and (d) other medical providers.

134.    Providers regularly submit claims for reimbursement, seeking payment for the drugs from Medicare, insurers and patients. During the Class Period, the Defendants were aware that the Medicare program and virtually all end payors (the latter are included as members of the Class) use published AWPs to reimburse providers for drugs. Use of the published AWPs to establish reimbursement rates for drugs is an industry-wide practice and exists with respect to all classes of drugs, brand name and generic and is used for Part B drugs and non-Part B drugs.

135.    There are several pharmaceutical industry compendia that periodically publish, in printed and electronic media, the AWPs for the tens of thousands of drugs on the market, including the *Drug Topics Red Book* (the "*Red Book*"), *American Druggist First Databank*



*Annual Director of Pharmaceuticals* and *Essential Director of Pharmaceuticals* (the "*Blue Book*") and Medi-Span's *Master Drug Database* (collectively referred to herein as the "Publishers"). These Publishers publish AWPs for the various dosage forms for drugs. And the AWPs are published for Part B, non-Part B, brand name and generic drugs.

136.    In periodically announcing the AWP for each drug, during the time period relevant to this Complaint the Publishers publish the prices that are supplied to them by the Defendant Drug Manufacturers for their respective drugs. For instance, the forward to the 1999 edition of the *Red Book* states that "all pricing information is supplied and verified by the products' manufacturers, and it should be noted that no independent review of those prices for accuracy is conducted." In addition, a June 1996 Dow Jones news article reported that Phil Southerd, an associate product manager of the *Red Book*, stated that it only publishes prices that are faxed directly from the manufacturer. Thus, the Defendant Drug Manufacturers control the prices listed as the AWPs for each drug listed by the Publisher.

137.    A system that bases its reimbursement rates for drugs on the published AWP is thus dependent on the honesty of the drug manufacturers. The Defendant Drug Manufacturers knew they could directly control and fabricate the AWP for their drugs at any time by forwarding to the Publishers a phony AWP. The Defendant Drug Manufacturers also knew that actual transaction price data – the amounts charged to providers and others for their drugs – was not publicly available, and they kept this information (on which AWPs should have been calculated) highly confidential and secret.

138.    As detailed, the AWPs for the drugs at issue here bore little relationship to the drugs' pricing in the marketplace. They were simply fabricated and overstated in furtherance of Defendants' scheme to generate the profit spread to providers, PBMs and others and to increase Defendants' profits at the expense of Plaintiffs and the Class members.



139.    Plaintiffs and the members of the Class paid for the drugs based on the inflated AWPs reported by the Defendant Drug Manufacturers.

140.    The Defendant Drug Manufacturers' pattern of fraudulent conduct in artificially inflating the AWPs for their drugs (sometimes referred to herein as the "AWP Scheme") directly caused Plaintiffs and the members of the Class to substantially overpay for those drugs.

141.    As detailed below, this overpayment manifested itself in two contexts, both of which were well known and understood by the Defendant Drug Manufacturers: (i) all drugs administered under Medicare Part B and (ii) drugs administered outside of the Medicare context whose reimbursement was established by use of AWP as a benchmark.

**B.     The Defendant Drug Manufacturers Commit AWP Fraud to Increase Market Share For Their Drugs Covered by Medicare Part B**

**1.     The Medicare Insurance Program**

142.    In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care.

143.    The United States Department of Health & Human Services ("HHS") is responsible for the funding, administration and supervision of the Medicare Program. The Centers for Medicare and Medicaid Services ("CMMS"), formerly known as the Health Care Financing Administration ("HCFA"), is a division of HHS and is directly responsible for the administration of the Medicare Program.

144.    The Medicare Program generally does not cover the cost of prescription drugs that a Medicare beneficiary self administers (*e.g.*, by swallowing the drug in liquid or pill form). However, Medicare Part B does cover some drugs, including injectables administered directly by a doctor, certain oral anti-cancer drugs, and drugs furnished under a durable medical equipment benefit. Approximately 450 drugs are covered by Medicare Part B.

145.    In determining the amount it will pay, Medicare calculates the "allowed" amount for the drug. During the period 1992 through 1997, Medicare's reimbursement for Covered

AMENDED MASTER CONSOLIDATED          - 35 -
CLASS ACTION COMPLAINT



Drugs was set at the lesser of the estimated acquisition cost or national average wholesale price. For generic drugs (where more than one company sells a certain drug, sometimes called multiple-source drugs), payment was based on the lower of the estimated acquisition cost or the wholesale price that was defined as the median price for all sources of the generic form of the drug. This payment methodology was set forth in 42 C.F.R. § 405.517, a regulation first published in the Federal Register on November 25, 1991 and which became effective on or about January 1, 1992.

146.    The estimated acquisition cost for a drug could be determined by the Medicare Program "based on surveys of the actual invoice prices paid for the drug" taking into consideration the estimated acquisition cost, including "factors such as inventory, waste and spoilage." However, historically it has been the AWP published in the *Red Book* or other compendia that has been used as a ceiling for Medicare reimbursement.

147.    On January 1, 1998, 42 C.F.R. § 405.517 was amended to provide that the allowed amount would be based upon the lower of the billed charge on the Medicare claim form or 95 percent of AWP.

148.    The Medicare Program has publicly announced that it would use the AWP published in pharmaceutical industry magazines as the basis for reimbursement. Specifically, Program Memorandum AB-99-63 (dated September 1999 but re-issuing PM AB-98-76 dated in December 1998), a publicly available Medicare Program bulletin, confirmed that reimbursement for certain Medicare Part B drugs and biologicals "are paid based on the lower of the billed charge or 95 percent of the AWP as reflected in sources such as the *Red Book*, *Blue Book*, or Medi-Span."

149.    Pursuant to PM AB-99-63, the AWP for a single-source drug or biological equals the AWP of the single product. For a multi-source drug or biological, the AWP is equal to the



lesser of the median AWP of all of the generic forms of the drug or biological or the lowest brand name product AWP.

150.    Medicare Part B reimburses medical providers 80% of the allowable amount for a drug. The remaining 20% is paid by the Medicare Part B beneficiary, and is called the "co-payment" amount. All medical providers are required by law to bill the 20% co-payment and make attempts beyond merely billing to collect that amount. In addition, beneficiaries under Part B are required to pay an annual deductible amount before Part B benefits are payable.

151.    Some Medicare beneficiaries are able to purchase private Medigap insurance, which covers, among other things, all or part of the 20% co-payment for Covered Drugs.

152.    In setting reimbursement rates, the Medicare Program uses the AWPs generated by the pharmaceutical industry. There are no regulations describing how AWPs are to be calculated, nor any regulatory process for approving them. Pharmaceutical companies do not report AWPs directly to the federal government, but instead send their pricing information to independent publishing companies that compile the data and publish the AWPs in trade publications, which are then used by the government, as well as private health plans.

153.    The importance of an accurate AWP was recently reconfirmed by the Office of the Inspector General ("OIG") in an April 2003 report: "Compliance Program Guidance for Pharmaceutical Manufacturers." The OIG report found that the "government sets reimbursement with the expectation that the data provided are complete and accurate." The OIG report made it clear that the AWP must be a meaningful figure that is not artificially inflated:

> Where appropriate, manufacturers' reported prices should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers. Any discount, price concession, or similar benefit offered on purchases of multiple products should be fairly apportioned among the products (and could potentially raise anti-kickback issues). Underlying assumptions used in connection with reported prices should be reasoned, consistent, and appropriately



documented, and pharmaceutical manufacturers should retain all relevant records reflecting reported prices and efforts to comply with federal health care program requirements.

154.    And, the OIG rejected the notion that purposeful AWP manipulation was a lawful

practice:

> The "spread" is the difference between the amount a customer pays for a product and the amount the customer receives upon resale of the product to the patient or other payer. In many situations under the federal programs, pharmaceutical manufacturers control not only the amount at which they sell a product to their customers, but also the amount those customers who purchase the product for their own accounts and thereafter bill the federal health care programs will be reimbursed. To the extent that a manufacturer controls the "spread," it controls its customer's profit.
>
> Average Wholesale Price (AWP) is the benchmark often used to set reimbursement for prescription drugs under the Medicare Part B program. For covered drugs and biologicals, Medicare Part B generally reimburses at "95 percent of average wholesale price." 42 U.S.C. 1395u(o). Similarly many state Medicaid programs and other payers base reimbursement for drugs and biologicals on AWP. Generally, AWP or pricing information used by commercial price reporting services to determine AWP is reported by pharmaceutical manufacturers.
>
> If a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated. Unlike *bona fide* discounts, which transfer remuneration from a seller to a buyer, manipulation of the AWP transfers remuneration to a seller's immediate customer from a subsequent purchaser (the federal or state government). Under the anti-kickback statute, offering remuneration to a purchaser or referral source is improper if one purpose is to induce the purchase or referral of program business. In other words, it is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the "spread" to induce customers to purchase its product.
>
> In the light of this risk, we recommend that manufacturers review their AWP reporting practices and methodology to confirm that marketing considerations do not influence the process. Furthermore, manufacturers should review their marketing practices. ***The conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is strong evidence of the unlawful intent necessary to trigger the anti-kickback statute.*** Active marketing of the spread includes, for example, sales representatives promoting the spread



as a reason to purchase the product or guaranteeing a certain profit
or spread in exchange for the purchase of a product. [Emphasis
added.]

## 2.    Congressional and Other Federal Investigations and Actions

155.    The United States Department of Justice ("DOJ"), the United States General

Accounting Office ("GAO"), the Office of the Inspector General at the United States Department

of HHS ("OIG"), and certain Congressional subcommittees have been investigating the

Defendant Drug Manufacturers and other pharmaceutical manufacturers for questionable

practices regarding the industry's calculation of AWPs and for offering illegal incentives to

providers.

156.    In a letter dated September 28, 2000, sent from the House of Representatives

Committee on Ways and Means, Subcommittee on Health to the President of the trade

organization known as the Pharmaceutical Research and Manufacturers of America (most of the

Defendant Drug Manufacturers are members of this association), Congressman Stark identified

the improper scheme of manipulating AWPs and noted:

> This corruptive scheme is perverting financial integrity of the
> Medicare program and harming beneficiaries who are required to
> pay 20% of Medicare's current limited drug benefit.

157.    In his September 28 letter, Congressman Stark made the following five "shocking

conclusions":

> First – Certain drug manufacturers have abused their position of
> privilege in the United States by reporting falsely inflated drug
> prices in order to create a de facto improper kickback for their
> customers.
>
> Second – Certain drug manufacturers have routinely acted with
> impunity in arranging improper financial inducements for their
> physicians and other healthcare provider customers.
>
> Third – Certain drug manufacturers engage in the fraudulent price
> manipulation for the express purpose of causing federally funded
> health care programs to expend scarce tax dollars in order to
> arrange de facto kickbacks for the drug manufacturers' customers
> at a cost of billions of dollars.

AMENDED MASTER CONSOLIDATED                        - 39 -
CLASS ACTION COMPLAINT



Fourth – Certain drug manufacturers arrange kickbacks to improperly influence physicians' medical decisions and judgments notwithstanding the severely destructive effect upon the physician/patient relationship and the exercise of independent medical judgment.

Fifth – Certain drug manufacturers engage in illegal price manipulation in order to increase utilization of their drugs beyond that which is necessary and appropriate based on the exercise of independent medical judgment not affected by improper financial incentives.

158.   The DOJ and Congressional investigations are ongoing.

### 3.   Certain of the Defendants Drug Manufacturers' Fraudulent Conduct Within the Medicare Part B Program

159.   As set forth below, certain of the Defendants Drug Manufacturers each perpetrated the alleged fraudulent scheme by using some and/or all of the following practices:

#### a.   Artificially Inflating AWPs

160.   Each Defendant Drug Manufacturer provided AWPs for each of its drugs to the *Red Book*, the *Blue Book*, Medi-Span and other pharmaceutical compendia for Covered Drugs and non-Part B drugs, both brand name and generic.

161.   During the Class Period, the Defendant Drug Manufacturers deliberately and intentionally published AWPs for Covered Drugs that did not reflect the actual pricing structure of the drugs, but was created solely to cause Plaintiffs and the Class members to overpay for the Covered Drugs. The Defendant Drug Manufacturers created and perpetuated this scheme so that the medical providers who purchased these drugs at a low cost would bill patients and their insurers at the inflated AWPs and earn a substantial profit from the "spread" between the real cost and the various AWP-related reimbursement rates.

162.   The Defendant Drug Manufacturers knew and understood that Medicare and Plaintiffs and the Class members used the *Red Book* and other publications to determine the AWPs of the drugs. Because the Defendant Drug Manufacturers controlled the AWPs published in the *Red Book* and other compendia, the Defendant Drug Manufacturers knew and understood

AMENDED MASTER CONSOLIDATED                   - 40 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



that they could manipulate the providers' profits from Plaintiffs and the Class. The purpose of artificially inflating the providers' profits was to create an illegal kickback to the providers, funded by Plaintiffs' and the Class members' overpayments.

163.    As part of their scheme, the Defendant Drug Manufacturers specifically instructed and expected the providers to charge the inflated AWPs for Covered Drugs to Medicare, Plaintiffs and the Class members.

### b.    Improper Use of Free Samples

164.    The Defendant Drug Manufacturers, through their sales personnel and marketing representatives, also provided free samples of their drugs to providers as a means of lowering the price. The free samples were used to offset the total cost associated with the purchases of the drugs, thereby increasing the "spread." Moreover, the Defendant Drug Manufacturers specifically told providers to bill Plaintiffs and the members of the Class for the free samples, which Defendants knew was unlawful.

165.    Every free sample of a drug for which a provider bills a patient or insurer effectively reduces that provider's overall cost for that drug. However, the full cost of the Covered Drug was charged to the Plaintiffs and the Class members, and the free sample is not used by the drug company in calculating the AWP, which in turn inflates the AWP.

166.    Although the Defendant Drug Manufacturers provided free samples and marketed them as a way to lower the providers' actual cost of the Covered Drugs, they did not include the value of the free samples in calculating the AWPs for those drugs. Thus, the Defendant Drug Manufacturers effectively and improperly passed on the cost of the free samples directly to Plaintiffs and the members of the Class.

### c.    Other Hidden and Improper Inducements and Price Reductions

167.    The Defendant Drug Manufacturers also have provided and/or arranged for many other non-public financial inducements to stimulate sales of their Covered Drugs at the expense

AMENDED MASTER CONSOLIDATED          - 41 -
CLASS ACTION COMPLAINT



of Plaintiffs and the members of the Class. Such inducements included volume discounts, rebates, off-invoice pricing, free goods, credit memos, consulting fees, debt forgiveness and educational and promotional grants. All of these incentives were designed to lower the providers' net cost of purchasing the Defendant Drug Manufacturers' Covered Drugs. And again, the value of these services was kept "off the book," so as to not be reflected in the AWP, which in turn inflates the AWP.

### C. The Defendant Drug Manufacturers' Use of AWP Fraud to Increase and Maintain the Price of Drugs Outside of the Medicare Part B Context

168.    The Defendant Drug Manufacturers' AWP fraud strikes well beyond Medicare Part B, adversely impacting health plans and their participants with respect to reimbursements for scores of other drugs. As described below, one such area is the use of AWPs by PBMs.

169.    Health plans typically contract with intermediaries called pharmacy benefit managers ("PBMs") so that a health plan's participants can obtain brand name drugs from pharmacies or, via mail order, directly from the PBMs. In these contracts, the brand name drugs are priced at the AWP less a certain percentage "discount."

170.    Pharmacy benefit managers – or "PBMs" – are fiscal intermediaries that specialize in the administration and management of prescription benefit programs. PBM clients include HMOs, employers, preferred provider organizations and other health insurers. Collectively, four PBMs comprise the significant market share of the PBM market. They are: AdvancePCS; Caremark; Express Scripts; and Medco Health. These four companies handle the drug benefits of 210 million people in the United States, or 70 percent of the nation's population.

171.    For brand name drugs, PBMs use inflated "Average Wholesale Price" – or "AWP" – set by drug manufacturers as the basis for reimbursement (i) made by health plans to the PBMs for their members' drug purchases; and (ii) from the PBMs to the pharmacies for the purchases made by health plans' members. The PBMs typically contract with retail pharmacies to reimburse an amount equal to each drug's AWP, less a specified discount, plus a dispensing



fee. Because the PBMs consider the contracting relationship with retail pharmacies to be confidential, health plans are never informed of the reimbursement amount to pharmacies. However, the PBM frequently pockets a "spread" or differential between charges paid to pharmacies and collected from clients. So, for example, clients may be charged the AWP minus 13 percent, but the retail pharmacy may only receive the AWP minus 15 percent, generating an undisclosed 2 percent spread for the PBM. Furthermore, as the example presented demonstrates, PBMs are motivated to, and do place on their formulary those drugs with inflated AWPs: the greater the AWP inflation, the greater the profit to the PBM based on the 2 percent spread. A similar situation occurs for generic drug pricing based on Maximum Acquisition Cost ("MAC") lists, as the PBM uses one MAC list to charge clients and another MAC list to reimburse pharmacies. Further, with respect to mail order prescriptions, PBMs do business with companies that have the right to repackage drugs; they are called repackagers. These repackagers assign a new NDC number to a drug and publish a higher AWP. The PBM then negotiates with the repackager a discount off the AWP and tells the health plan it has saved a certain percentage off the AWP. But because the repackager's AWP is higher, the health plan pays more and the PBM pockets the spread between the AWP and the price paid to the repackager. PBMs also have mail order services in which case they act as the pharmacy. In this situation, the PBM keeps the spread between the AWP and the list price as there is no intermediary, like a pharmacy dispensing the drug. The PBMs keep this spread knowing that the AWPs are inflated and not the true AWP.

172.    The Defendant Drug Manufacturers knew and understood that the PBM Defendants used the *Red Book* and other publications to determine the AWPs of the drugs. Because the drug manufacturers controlled the AWPs published in the *Red Book* and other compendia, the drug manufacturers knew and understood that they could help manipulate the PBMs' profits from Plaintiffs and the classes. The purpose of artificially inflating the PBMs'



profits was to create an illegal kickback to the PBMs, funded by health plan and subscriber overpayments.

173.    PBMs use the inflated AWPs set by drug manufacturers as the basis for the payments (i) made by health plans to the PBMs for their members' drug purchases, and (ii) from the PBMs to the pharmacies for the purchases made by health plans' members.

174.    The PBMs typically contract with retail pharmacies to reimburse in an amount equal to each drug's AWP, less a specified discount, plus a dispensing fee. Because the PBMs consider the contracting relationship with retail pharmacies to be confidential, health plans are never informed of the reimbursement amount to pharmacies.

175.    However, the PBMs frequently pockets a secret "spread" or differential between charges paid to pharmacies and collected from clients. So, for example, clients may be charged the AWP minus 13 percent, but the retail pharmacy may only receive the AWP minus 15 percent, generating an undisclosed 2 percent spread for the PBMs.

176.    Furthermore, as the example presented demonstrates, PBMs are motivated to place on their formulary those drugs with inflated AWPs: the greater the AWP inflation, the greater the profit to the PBM based on the 2 percent spread.

177.    A similar situation occurs for generic drug pricing based on MAC lists, as the PBM uses one MAC list to charge clients and another MAC list to reimburse pharmacies.

178.    The PBMs deliberately utilize the inflated AWP to overcharge health plans for brand name drugs purchased by their participants and beneficiaries at retail pharmacies. An example of this practice was recently reported in the WALL STREET JOURNAL on March 30, 2003. According to the JOURNAL article, the AWP for fluoxetine is $2.66 a pill. With a 60 percent discount off the AWP, that brings the price to $1.06 a pill the PBM collects from the plan. Express Scripts pays the pharmacy 25 cents a pill and keeps the rest as profit. Express Scripts claims that currently its client pays 60 cents a pill, but since Express Scripts pays a pharmacy 25



cents per pill, it receives almost a 100 percent profit. And at the same time it was making this profit, Express Scripts was notifying its clients it was saving them money by having switched to fluoxetine, instead of Prozac.

### D.   The Defendant Drug Manufacturers' Use of AWP Fraud to Increase and Maintain Volume and Market Share For Generic and Multi-Source Drugs

179.   The Defendant Drug Manufacturers' AWP fraud is most exacerbated for generic drugs or for brand name drugs for which there are biological or therapeutic equivalents.

180.   Health plans and other sponsors of drug benefits contract with PBMs both so that the plan's participants can obtain *brand name* drugs from pharmacies or mail order distribution, but also so that they might receive *multi-source*, or *generic, drugs*. As with brand name drugs, reimbursement for multi-source, or generic, drugs is also related to a published average wholesale price for each generic drug manufactured and/or distributed by a generic drug company.

181.   In the private payor arena, generic drug reimbursement is determined either in the same manner for brand name drugs (*i.e.*, a certain percentage "discount" off of the AWP), or is based on the amount specified as the maximum allowable cost or "MAC." MAC prices or reimbursements rates are a schedule of pricing for generically equivalent drugs based upon the listed average wholesale prices (AWPs) of competing generic drug manufacturers. The federal government originally introduced the concept of MAC reimbursement for generic medications. The CMS issues a MAC price list for generic products that have three or more manufacturers or distributors on the market. Because of this limitation, not all generics have a corresponding CMS MAC price.

182.   PBMs often utilize this government-issued MAC reimbursement publication as a basis for their proprietary MAC list and supplement the list with other generic products or modify it for a variety of purposes. Sometimes, to stabilize the cost variance of different generic products of the same compound, pharmacy benefit administrators calculate a maximum

AMENDED MASTER CONSOLIDATED            - 45 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



allowable cost based on the list average wholesale prices of competing generic drug manufacturers (indeed, this is termed in the industry as the average average wholesale price or "AAWP"). The resulting proprietary MAC generic drug reimbursement lists are typically based on the AAWP and, in turn, the AWP.

183.    Accordingly, in the private payor arena generic drug reimbursement is closely tied to the published AWP for a generic drug. Generic drug makers are able to push market share for their generic drugs by intentionally increasing the published AWP for a generic drug with the intention to create a profit margin for others in the distribution chain. That profit margin is taken advantage of either directly (through reimbursement based upon the AWP for some plans and in some channels) or indirectly on the AWP based upon the establishment of a MAC tied to the AWP.

184.    In the public payor arena under Medicare Part B, multi-source drugs or biologicals are also reimbursed on the basis of AWP. For multi-source drugs or biologicals, under Medicare Part B the AWP is equal to the lessor of the median AWP of all of the generic forms of the drug or biological, or the lowest brand name product AWP. Because reimbursement is pegged to the AWP, drug makers act in unison by elevating the AWP for all generic drugs, thereby inflating the amount of the reimbursement that occurs through Medicare Part B, including the Medicare co-payment through Part B.

185.    As stated by one industry consultant:

> . . . This situation is more pronounced with generic drugs. Many generic companies have taken advantage of this use of AWP by substantially inflating their published AWPs.. . . [T]he system allows a retailer to acquire a drug at a low cost $2.50 per 100 tablets, for example) while relying on a published AWP ($20.00 or more) for its own pricing. It is not uncommon that the $25.00 retail price for a generic drug renders a gross profit well above $20.00 for the retailer. It is also common for the AWP of a generic product to remain stable while the actual selling price declines. . . .It is obvious that AWP is not an accurate measure of the prices manufactures charge. It must also be noted that not all generic products will be priced similarly. Some, in fact, use the more

AMENDED MASTER CONSOLIDATED                - 46 -
CLASS ACTION COMPLAINT



> traditional method of a 20% markup to reach an AWP. This can be
> a handicap for generic companies choosing this method because
> retailers often use the AWP as the starting point for many pricing
> decisions and an artificially high AWP provides the retailer with
> greater profits.

186.    The raising of an individual Defendant's reported AWP for a multi-source drug

raises the median AWP at which the generic drug is reimbursed. As a result, the publication and

reporting of fraudulent AWPs by Defendants for generic drugs squarely fits generic drugs in

which the cure of unlawful AWP inflation within the activity complained of in the MCC.

Moreover, while any one generic manufacturer can only effect the median generic

reimbursement AWP for a product, Defendants can and do create a spread between the median

AWP and the actual prices paid by reporting AWPs that are far in excess of the actual wholesale

prices while simultaneously maintaining or lowering actual wholesale prices.

187.    Documents produced by Defendant generic manufacturers show that they are

aware of the AWPs reported by their competitors and of the actual sales price of their generic

competitors and that they manipulate their own AWPs in order to gain or maintain a competitive

advantage in the market for their generic products. Each Defendant generic maker or distributor

competes by inflating its AWP and thereby inflating the median AWP. The natural and expected

result of this "leap frogging" of increasing AWPs is that multi-source drugs have some of the

highest spreads of any drugs, sometimes resulting in an AWP over 50,000% over actual costs. A

few examples are set forth below:

| Defendant | Multisource Drug | RedBook AWP | DOJ Determined Actual AWP | Percentage Spread |
|---|---|---|---|---|
| Abbott | Sodium Chloride | $670.89 | $3.22 | 20,735% |
| Baxter | Dextrose | $928.51 | $2.25 | 41,167% |
| Baxter | Sodium Chloride | $928.51 | $1.71 | 54,199% |
| Boehringer Group | Leucovorin Calcium | $184.40 | $2.76 | 6,581% |
| B. Braun | Sodium Chloride | $11.33 | $1.49 | 660% |
| BMS Group | Etoposide (Vepesid) | $136.49 | $34.30 | 298% |
| Dey | Albuterol Sulfate | $30.25 | $9.17 | 230% |

AMENDED MASTER CONSOLIDATED                    - 47 -
CLASS ACTION COMPLAINT



| Defendant | Multisource Drug | RedBook AWP | DOJ Determined Actual AWP | Percentage Spread |
|---|---|---|---|---|
| Immunex | Leucovorin Calcium | $137.94 | $14.58 | 846% |
| Pharmacia | Etoposide | $157.65 | $9.47 | 1,565% |
| Sicor Group | Tobramycin Sulfate | $342.19 | $6.98 | 4,802% |
| Watson | Vancomycin HCL | $70.00 | $3.84 | 1,567% |

188.    In summary, generic or multi-source drugs are subject to fraudulent AWP manipulation as set forth in this Amended MCC.

189.    The importance of AWPs to generic drugs was recently revealed in a lawsuit filed by Dey and two of the Publishers. In this lawsuit, Dey's allegations can be summarized as follows:

(a)    Dey is a generic manufacturer, and generic manufacturers largely compete on price because they market products that contain the same active ingredients and are predominantly therapeutically interchangeable. (¶ 9 of Dey Complaint.)

(b)    A large segment of the generic marketplace for respiratory drugs is comprised of a relatively small number of entities controlling purchase decisions. (¶ 12 of Dey Complaint.)

(c)    The vast majority of prescription drug transactions – as much as 85% – are covered, in whole or in part, by third-party payor reimbursement arrangements such as managed care plans and Medicaid. (¶ 13 of Dey Complaint.) Both Medicaid and the private insurance system rely on reimbursement formulas that utilize the AWP. (¶¶ 14-16 of Dey Complaint.) *This allegation confirms Plaintiffs' allegations in this Complaint that the AWP fraud impacts private markets, not just Medicaid.*

(d)    Dey has an agreement with First DataBank and Medi-Span to provide the reporting services with AWP pricing information. Pursuant to this agreement (and in order to make Dey's products eligible for reimbursement through Medicaid Programs), Dey has reported WACs and AWPs. (¶¶ 26-32 of Dey Complaint.)

AMENDED MASTER CONSOLIDATED                - 48 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



e-SERVED
01/22/04
05:20 PM ET
AWP-MDL NO. 1456

> In each case, until the events that have resulted in the present
> crisis, First DataBank has (except for some inadvertent errors)
> selected for listing in its published reports the AWP as suggested
> by Dey. For over ten years, until April 2003, no prices other than
> those submitted by Dey have been listed by First DataBank as
> AWP for Dey products in its databases [even though Dey also
> reported declining WACs for the products]."

(¶ 32 of Dey Complaint; *see also* ¶ 36 of Dey Complaint for similar allegation against Medi-

Span.) This has also been the course of dealings between the Publishers and Dey's competitors:

> Virtually every drug manufacturer who participates in these
> reimbursement programs, and against whom Dey competes also
> communicates their suggested AWP prices to the reporting
> services. To the best of Dey's knowledge, with few, if any
> exceptions, First DataBank and Medi-Span have selected and
> reported the AWP pricing exactly as suggested by these competing
> manufacturers.

(¶ 37 of Dey Complaint.) *See also* ¶ 47 of Dey Complaint (recounting testimony of First

DataBank representative who admits that First DataBank had always accepted the AWPs

suggested by the manufacturers).

      (e)    Providers who dispense generic drugs "are cognizant of, and are highly

attentive to, AWPs as reported by the recognized industry compendia published by First

DataBank and Medi-Span because of the direct relationship between the level of reimbursement

anticipated for the drugs selected and the reported AWPs of those drugs." (¶ 38 of Dey

Complaint.) Indeed, Dey admits that it has relied on the publishers' practice of treating all

manufacturers equally by simply reporting whatever AWP a manufacturer submitted.

Consequently, First DataBank and Medi-Span have frustrated Dey's "reasonable expectations"

by ***independently reporting*** an AWP different than that submitted by Dey. (¶ 39 of Dey

Complaint.) These allegations become even more emphatic in a section of the Complaint titled

"The Immediate Consequences of the Arbitrary Changes:"

> Since reimbursement to Dey's customers is, in Medicaid program
> in many states and in and [sic] insurance programs, most
> frequently based on the AWP as reported by the reporting services,
> this arbitrary and capricious reduction by First DataBank and
> Medi-Span in AWP would result in a drastic reduction in the

AMENDED MASTER CONSOLIDATED      - 49 -
CLASS ACTION COMPLAINT



reimbursement to drug providers who choose to dispense Dey's product. Since there has not been a comparable reduction in the AWP for Dey's competitors, there would be no comparable reduction in the reimbursement the purchasers of competitive products receive.

Because reimbursement for Dey products would be significantly reduced, but reimbursement for those competing products would remain as they have been, Dey is prevented, by First DataBank's and Medi-Span's arbitrary and capricious acts, from effectively competing in the marketplace.

In fact, within one day of learning that First DataBank and Medi-Span had arbitrarily changed Dey's AWP, Dey has already been contacted by at least nine of its customers complaining about the drastic changes and indicating that, because of those changes, the customers would not be able to purchase Dey products since they could not earn a reasonable profit from the sale of such products.

Further, at least one customer has already indicated that he had canceled all of his purchases presently on order from Dey and was, instead, buying those products from Dey's direct competitors.

..... These providers will cease to purchase and dispense Dey's drugs if the reimbursement for those drugs is a fraction of those obtained from competing companies. Because purchasing decisions are highly concentrated in this industry among wholesalers and group purchasing organizations, this scenario is playing out across the country and threatens to eliminate sales of Dey's products that are covered by Medicaid and insurance reimbursement programs.

(¶¶ 50-54 of Dey Complaint.)

190.    ***These allegations confirm the allegations herein that medical providers rely on spreads in dispensing (and, consequently, so do the manufacturers in order to move market share).*** Further, these allegations are akin to saying: "We all committed fraud on an even basis, but now only my competitors can commit fraud; consequently, I have now suffered damage."

**E.    Defendants' Concealment of the Truth**

191.    Each Defendant concealed its fraudulent conduct from the Plaintiffs and the Class by controlling the process by which the AWPs for Covered Drugs and brand name drugs were set. Defendants prevented Plaintiffs and the Class Members from knowing what the actual pricing structures for these drugs were, and failed to inform them of the usage of free samples

AMENDED MASTER CONSOLIDATED            - 50 -
CLASS ACTION COMPLAINT



and the provision of other financial incentives to providers and other intermediaries to lower their respective costs for the drugs. Moreover, Defendants' fraudulent conduct was of such a nature as to be self-concealing.

192.    Each Defendant closely guarded its pricing structures and sales figures for their Covered Drugs and brand name drugs. CMS Health Care Industry Market Update (dated January 10, 2003) stated that drug "price discounts are closely guarded as competitive information." *See* p. 39.

193.    Each Defendant also concealed its fraudulent conduct by instructing providers and others not to report the prices they paid for the Covered Drugs and brand name drugs, respectively.

194.    Each Defendant also worked with and motivated provider and intermediary trade associations to halt any investigations or change in the AWP system.

195.    Each Defendant's efforts to conceal its pricing structures for Covered Drugs and brand name drugs is evidence that it knew that its conduct was fraudulent.

196.    Thus, each Defendant concealed that (i) its AWPs were highly-inflated (and were inflated solely to cause Plaintiffs and the Class to overpay for the AWPIDs), (ii) it was manipulating the AWPs of the AWPIDs, and (iii) the AWPs bore no relationship to the prices paid for, or the pricing structure of, the AWPIDs as they were sold to providers and others.

197.    Plaintiffs were diligent in pursuing an investigation of the claims asserted in this Complaint. Through no fault of their own, they did not receive inquiry notice nor learn of the factual basis for their claims in this Complaint and the injuries suffered therefrom until recently.

**F.    Tolling of Applicable Statutes of Limitation**

198.    Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Class have been kept in ignorance of vital information essential to knowledge of and the pursuit



of these claims, without any fault or lack of diligence on their part. Plaintiffs and members of the Class could not reasonably have discovered the fraudulent nature of the published AWPs.

199.     Defendants were and continue to be under a continuing duty to disclose to Plaintiffs and the Class the fact that the published AWPs bore and continue to bear no relationship to the prices or pricing structures for Covered Drugs and brand name drugs. Because of their knowing, affirmative, and/or active concealment of the fraudulent nature of the published AWPs, Defendants are estopped from relying on any statutes of limitations.

## V.     EXAMPLES OF SPECIFIC UNLAWFUL CONDUCT

200.     Due to acts of concealment by each Defendant, the following examples of the specific unlawful conduct engaged in by each particular Defendant are merely illustrative. They are not intended to be an exhaustive account of all of the unlawful activity engaged in by each Defendant. Instead, these allegations allege the circumstances of the wrongdoing with some detail. Additional detail is peculiarly within the Defendants' control and warrants that further discovery should proceed as to each drug identified in this Complaint as well as other drugs whose AWP is published by any Defendant.

## A.     Abbott

201.     Abbott engages in an organization-wide and deliberate scheme to inflate AWPs. Abbott has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below. The specific drugs of Abbott for which relief is currently sought in this case are set forth in Appendix A, and are identified below:

|  |  |  |  |
|---|---|---|---|
| ABBOTT | A-Methapred | methylprednisolone sodium succinate | Anti-Inflammatory Agent<br>Used to provide relief for inflamed areas of the body. Also used for control of allergic processes |
|  | Aminosyn | amino acid | Nitrogen Product<br>Used as a nutritional supplement |



| Manufacturer | Brand Name | Generic Name | Therapeutic Class/Indications |
|---|---|---|---|
| | Biaxin | clarithromycin | Macrolide (Anti-Infective Agent)<br>Used to treat mild to moderate infections |
| | Calcijex | calcitrol | Hormone<br>Used in the treatment of hypocalcemia |
| | Depakote | divalproex sodium | Anticonvulsant<br>Used in the treatment of complex partial seizures |
| | Ery-tab | erythromycin, enteric-coated | Antibiotic Agent (Anti-Infective Agent)<br>Used in the treatment of various infections |
| | Erythromycin | erythromycin base | Antiacne Agent; Anti-Infective Agent<br>Used in the treatment of various infections |
| | Liposyn II | fat emulsion | Caloric Agent; Nutritional Supplement<br>Used as a nutritional supplement |
| | Prevacid | lansoprazole | Proton Pump Inhibitor (Gastrointestinal Agent)<br>Used in the treatment of duodenal ulcer and erosive esophagitis |
| | | acetylcysteine | Mucolytic (Respiratory Agent: Diagnostic Aid)<br>Used for certain lung conditions when increased amounts of mucus make breathing difficult |
| | | acyclovir sodium | Anti-Infective Agent<br>Used in the treatment of herpes infections |
| | | amikacin sulfate | Antibiotic Agent (Anti-Infective Agent)<br>Used to treat respiratory tract, urinary tract, bone, skin and soft tissue infections |
| | | cimetidine hydrochloride | Gastrointestinal Agent<br>Used in the treatment of duodenal ulcer and prevention of ulcer recurrence |
| | | clindamycin phosphate | Anti-Infective Agent<br>Used in the treatment of vaginal infections |
| | | dextrose | Caloric Agent<br>Used to increase intake of calories and fluids |
| | | dextrose sodium chloride | Caloric Agent; Electrolyte Replenisher<br>Used to increase intake of calories and fluids |
| | | diazepam | Central Nervous System Agent<br>Used to treat status eplipeticus and anxiety disorders.  Also used as an amnesic prior to surgical procedures |
| | | fentanyl citrate | Central Nervous System Agent<br>Used for anesthetic purposes |



E-SERVED
01/22/04
05:20 PM ET
MDL No. 1456

| Manufacturer | Brand Name (If applicable) | Generic Name | Therapeutic Category |
|---|---|---|---|
| | | furosemide | Diuretic<br>Used in the treatment of edema associated with cirrhosis and kidney disease. Also used to manage hypertension |
| | | gentamicin sulfate | Anti-Infective Agent<br>Used as a general antibiotic to treat serious gastrointestinal, respiratory, bone, skin and soft tissue infections |
| | | heparin sodium or heparin lock flush | Blood Modifier<br>Used to prevent and treat thrombosis and pulmonary embolism. Also used as an anticoagulant in blood transfusions and dialysis procedures |
| | | leucovorin calcium | Antianemic Agent (Blood Modifier)<br>Used in the treatment of anemia |
| | | lorazepam | Central Nervous System Agent<br>Used in the treatment of anxiety disorders |
| | | sodium chloride | Flush; Abortifacient<br>Used to remove medicine and blockage from intravenous (IV) catheter. Also used to induce abortion |
| | | tobramycin sulfate | Antibiotic Agent (Anti-Infective Agent)<br>Used to treat severe infection |
| | | vancomycin hydrochloride | Antibiotic Agent (Anti-Infective Agent)<br>Used as a general antibiotic |

### 1.    Abbott Has Been The Target of Government Investigations

202.    In connection with its scheme to inflate AWPs, Abbott has been investigated by the United States Department of Justice, Commonwealth of Massachusetts, the Office of Inspector General of the Department of Health and Human Services, the Attorney General for the State of Texas, the Attorney General for the State of California, and the State of California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse.

203.    These investigations confirm that Abbott has engaged in a deliberate scheme to inflate the published AWPs for many of its drugs. According to Representative Pete Stark, the ranking member of the Congressional Ways and Means Committee:



> The price manipulation scheme is executed through Abbott's inflated representations of average wholesale price ("AWP") and direct price ("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers. The difference between the inflated representations of AWP and DP versus the true price providers are paying, is regularly referred to . . . as "the spread." The evidence . . . clearly shows that Abbott has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs. The evidence further reveals that Abbott manipulated prices for the express purpose of expanding sales and increasing market share of certain drugs. This was achieved by arranging financial benefits or inducements that influenced the decisions of health care providers submitting Medicare and Medicaid claims.

*See* October 31, 2000 letter from U.S. Representative Pete Stark to Miles White, Chief Executive

Officer of Abbott. (P007647-78.)

### 2.  Abbott Controls the Published AWP for Its Products

204.    Abbott has controlled and set the AWPs for its pharmaceutical products through

direct communications with industry compendia during the Class Period.

### 3.  Abbott's AWP Manipulation Benefited Providers at the Expense of the Class

205.    The purpose of Abbott's manipulation was to increase the spread in order to

maximize the profit to providers and other intermediaries at the expense of Plaintiffs and the

Class.

          a.    For example, Abbott anticipated that the spread between AWP and cost

would be eliminated by legislative changes in 1997. Accordingly, Abbott looked for ways to

maximize the profit spread immediately. In one internal memorandum about a third party's

pricing product, Abbott states:

> One of GeriMed's goals of obtaining maximum profitability for its members presents an opportunity for our injectables. They think there is about an 18 month window of opportunity to promote our injectables as more profitable for their members to use because of the bigger spread between AWP and cost. Legislative changes in reimbursement are expected to do away with this spread advantage by mid 1997.



(ABT AWP/MDL 015839) (Highly Confidential).

      b.    In a second memorandum about this same product, Abbott states:

> The purpose of these programs was to "enhance revenue and decrease cost." \*\*\* These suggestions are made to save money through lower contract pricing or increase revenue through better spread between AWP and contract price.... The [distributor's] program identifies the lowest cost product and *the best spread for the particular state*.

(ABT AWP/MDL 010407-09) (Highly Confidential) (emphasis added).

    206.    Abbott tried to maximize spread because it understood that its customers routinely engaged in "spread shopping" – comparing Abbott's AWPs with those of its competitors in order to determine the greatest spread (and therefore sell or administer the drug with the greatest spread). An example is a document produced by Abbott, prepared by a customer in late 1993, comparing Abbott's proposed contract price and its published AWPs with that of Baxter's competing generic drugs. (ABT AWP/MDL 028546) (Highly Confidential).

    207.    Just as Abbott motivates providers to administer drugs based on the AWP, Abbott's 1996 Pricing Guidelines reveal that Abbott rewards PBMs based on the degree of influence they exert to drive utilization of Abbott products. (ABT AWP/MDL 053922-23) (Highly Confidential).

### 4.    Specific Abbott AWPs Documented by the DOJ

    208.    In a report published by the DHHS (the "DHHS Report"; PM Rev. AB-00-86, "An Additional Source of Average Wholesale Price Data In Pricing Drugs and Biologicals Covered by the Medicare Program," Sept. 8, 2000), the DOJ documented at least 81 instances where the published AWPs for various dosages of 16 drugs manufactured by Abbott were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the 16 drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular



dosage, based upon wholesalers' price lists, with the AWP reported by Abbott in the 2001 *Red Book*.

| Drug | Abbott's 2001 Red Book AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|------|-----------------------------|----------------------------|------------|-------------------|
| Acetylcysteine | $35.87 | $21.90 | $13.97 | 64% |
| Acyclovir | $1047.38 | $349.05 | $698.33 | 200% |
| Amikacin Sulfate | $995.84 | $125.00 | $870.84 | 697% |
| Calcitriol (Calcijex) | $1,390.66 | $1079.00 | $311.66 | 29% |
| Cimetidine Hydrochloride | $214.34 | $35.00 | $179.34 | 512% |
| Clindamycin Phosphate | $340.52 | $75.35 | $265.17 | 352% |
| Dextrose | $239.97 | $3.91 | $236.06 | 6,037% |
| Dextrose Sodium Chloride | $304.38 | $1.93 | $302.45 | 15,671% |
| Diazepam | $28.50 | $2.03 | $26.47 | 1,304% |
| Furosemide | $74.52 | $14.38 | $60.14 | 418% |
| Gentamicin Sulfate | $64.42 | $.51 | $63.91 | 12,531% |
| Heparin Lock Flush | $38.30 | $13.60 | $24.70 | 182% |
| Metholprednisolone Sodium Succinate | $34.08 | $2.30 | $31.78 | 1,382% |
| Sodium Chloride | $670.89 | $3.22 | $667.67 | 20,735% |
| Tobramycin Sulfate | $150.52 | $2.94 | $147.58 | 5,020% |
| Vancomycin Hydrochloride | $382.14 | $4.98 | $377.16 | 7,574% |

(P006299-316.)

### 5.   Additional Evidence Concerning Vancomycin

209.   At least one Publisher, Medi-Span, challenged the manner in which Abbott set its AWPs for vancomycin. The following statement appeared in a February 9, 1996 faxed letter to Abbott from a representative of Medi-Span:

> It appears that the only difference between these two products listed is the vial it comes in. If it is, please let us know why the $400 plus difference in AWPs?... [T]his customer claims he can get Vancomycin for $6 or $7 per vial DP as opposed to the $52.94 and $19.50 the Abbott Vancomycin cost.

(ABT AWP/MDL 001215.)

210.   The government investigation into Abbott's AWP for vancomycin identified:

> prices that are routinely made available to many providers, but are far below Medicare reimbursement rates. They include 1999 prices for vancomycin, the Abbott Labs-manufactured antibiotic, which a health care provider could buy for $76.00 but for which

AMENDED MASTER CONSOLIDATED          - 57 -
CLASS ACTION COMPLAINT



the AWP upon which Medicare's reimbursement was based on was $261.84.

*See* September 25, 2000 letter from U.S. Rep. Tom Bliley to the Honorable Nancy-Ann Min DeParle, Administrator of the Health Care Financing Administration.  (P007015-490.)

211.    For other doses of vancomycin, Abbott reported an AWP of $68.77 as of April 2000. The DOJ adjusted it to $8.14.

### 6.    Additional Evidence for Amikacin

212.    One published report states: "Amikacin, used to treat an infection that HIV+ people get and manufactured by Abbott, had an AWP of $54.56.  DOJ said the actual price was $6.75."  *See States Mull Suit Against Drug Companies*, www.stateline.org (April 2, 2001) (P011268-70).

### 7.    Inflated AWPs From Abbott Price Lists

213.    In response to government subpoenas, Abbott produced numerous price lists setting forth spreads between AWPs and prices offered to wholesalers, providers and other intermediaries.  A review of those price lists reveals that Abbott has consistently offered hundreds of its drugs and other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers.  To repeat every one of those drugs and the spread offered to each specific customer here is not practical. However, set forth below in Tables 1 and 2 are a number of those drugs (not already referenced above) with spreads in excess of 100% from two specific Abbott customers.





| | | | | |
|---|---|---|---|---|
| ■ | ■■■■ | ■■ | ■■■ | ■■■ |
| ■■■■■ | ■ | ■ | ■ | ■ |
| ■■■■ | ■ | ■ | ■ | ■ |
| ■■■ | ■ | ■ | ■ | ■ |
| ■■■■■ | ■ | ■ | ■ | ■ |
| ■■■■■ | ■ | ■ | ■ | ■ |
| ■■■■■ | ■ | ■ | ■ | ■ |
| ■■■■ | ■ | ■ | ■ | ■ |
| ■■■■■■ | ■ | ■ | ■ | ■ |
| ■■■■■■ | ■ | ■ | ■ | ■ |
| ■■■■ | ■ | ■ | ■ | ■ |
| ■■ | ■ | ■ | ■ | ■ |
| ■■■■■ | ■ | ■ | ■ | ■ |
| ■■■■■ | ■ | ■ | ■ | ■ |
| ■■■■■ | ■ | ■ | ■ | ■ |
| ■■■ | ■ | ■ | ■ | ■ |
| ■■■■ | ■ | ■ | ■ | ■ |
| ■■■■ | ■ | ■ | ■ | ■ |
| ■■■■ | ■ | ■ | ■ | ■ |
| ■■■ | ■ | ■ | ■ | ■ |
| ■■ | ■ | ■ | ■ | ■ |
| ■■■■ | ■ | ■ | ■ | ■ |
| ■■■■ | ■ | ■ | ■ | ■ |
| ■■■■ | ■ | ■ | ■ | ■ |
| ■■■■ | ■ | ■ | ■ | ■ |
| ■■■■ | ■ | ■ | ■ | ■ |
| ■■■ | ■ | ■ | ■ | ■ |
| ■■■■ | ■ | ■ | ■ | ■ |
| ■■■ | ■ | ■ | ■ | ■ |

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC





216.    As set forth above, Abbott's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Plaintiffs and the Class.

**B.    Amgen**

217.    Amgen engages in an organization-wide and deliberate scheme to inflate AWPs. Amgen has stated fraudulent AWPs for all or almost all of its drugs, including: Epogen (eportin alfa for ESRD use),[2] Neupogen (filgrastim), Aransep (darbepoetin alfa), Enbrel, Kineret (anakrina), and Neulasta (pegfilgrastim). The specific drugs of Amgen for which relief is sought in this case are set forth in Appendix A and are set forth below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| AMGEN | Aranesp | darbepoetin alfa albumi | Antianemic Agent; Blood Modifier Used in the treatment of anemia associated with chronic renal failure and/or chemotherapy |
| | Enbrel | etanercept | Antirheumatic Agent Used to reduce signs and symptoms of rheumatoid arthritis |
| | Epogen | epoetin alfa | Antianemic Agent; Blood Modifier Used in the treatment of anemia associated with chronic renal failure, chemotherapy and/or HIV-infected patients |

---

[2]   In the Medicare Part B context, reimbursement for Epogen is not based on the AWP, but rather on a specific dollar amount set by statute. However non-Medicare Part B reimbursement for Epogen is based on AWP for many Class members.

AMENDED MASTER CONSOLIDATED           - 60 -
CLASS ACTION COMPLAINT