

It is clear that Pharmacia & Upjohn targeted health care providers, who might be potential purchasers, by creating and then touting the windfall profits arising from the price manipulation. For example, Pharmacia & Upjohn routinely reported inflated average wholesale prices for its cancer drug Bleomycin, 15u, as well as direct prices. The actual prices paid by industry insiders was in many years less than half of what Pharmacia & Upjohn represented. Pharmacia & Upjohn reported that the average wholesale price for Bleomycin, 15u, rose from $292.43 to $309.98, while the price charged to industry insiders fell by $43.15 (Composite Exhibit "4").

* * *

Pharmacia & Upjohn reported price increases in October 1997 with full knowledge that the true prices of the drugs were falling. For example, Composite Exhibit "7" reveals that Pharmacia & Upjohn voluntarily lowered its price of Adriamycin PFS 200 mg to $152.00 while reporting an AWP of $946.94:

> "Dear Willie,
>
> > A (VPR) Voluntary Price Reduction will become effective May 9, 1997. The wholesalers have been notified, however it may take two weeks to complete the transition . . ."

Additionally, internal Pharmacia & Upjohn documents secured through the Congressional investigations show that Pharmacia & Upjohn also utilized a large array of other inducements to stimulate product sales. These inducements, including "educational grants" and free goods, were designed to result in a lower net cost to the purchaser while concealing the actual price beneath a high invoice price. Through these means, drug purchasers were provided substantial discounts that induced their patronage while maintaining the fiction of a higher invoice price – the price that corresponded to reported AWPs and inflated reimbursements from the government. Composite Exhibit "8" highlights these inducements:

AOR/PHARMACIA & UPJOHN PARTNERSHIP PROPOSAL: Medical Education Grants. A $55,000 grant has been committed for 1997 for the AOR Partnership for excellence package including Education/Disease Management, Research Task Force, AOR Annual Yearbook. A $40,000 grant to sponsor the AOR monthly teleconference. This sponsorship was committed and complete in February 1997 . . .

PHARMACIA & UPJOHN, INC. INTEROFFICE MEMO: If needed, you have a "free goods" program to support your efforts against other forms of generic doxorubicin . . .



> Use your "free goods" wisely to compete against other generic
> forms of Adriamycin, not to shift the customer to direct shipments.
> <u>The higher we can keep the price of Adriamycin, the easier it is for
> you to meet your sales goals for Adriamycin</u> (emphasis added by
> Rep. Stark).

(P007613-P007632).

464.    Pharmacia's marketing pitches, as quoted by U.S. Rep. Pete Stark in a

September 28, 2000 letter to Alan F. Holmer, President of the Pharmaceutical Research and

Manufacturers of America, promoted a physician's ability to profit at the expense of Medicare

and its beneficiaries:

> PHARMACIA: Some of the drugs on the multi-source list offer
> you savings of over 75% below list price of the drug.  For a drug
> like Adriamycin, the reduced pricing offers AOR a reimbursement
> of over $8,000,000 profit when reimbursed at AWP.  The spread
> from acquisition cost to reimbursement on the multi-source
> products offered on the contract give AOR a wide margin for
> profit.

(P007548-P007588).

465.    In 1997, Pharmacia sent to a clinic a proposal listing the AWP and the contract

price at which several drugs would be sold to the provider.  The differences are staggering and

just a few are noted below:

| Drug | AWP | Suggested New Contract Price |
|------|-----|------------------------------|
| Adriamycin (10 mg) | 46.00 | 7.50 |
| Adriamycin (50 mg) | 230.00 | 37.50 |
| Neosar (2 g) | 86.00 | 18.00 |
| Toposar (1 g) | 1,330.75 | 120.00 |
| Vincasar (2 mg) | 741.50 | 7.50 |

(P007615).

### 5.    Specific Pharmacia AWPs Documented by the DOJ

466.    In a report published by the DHHS, the DOJ documented at least 43 instances

where the published AWPs for various dosages of drugs manufactured by The Pharmacia Group

AMENDED MASTER CONSOLIDATED          - 159 -
CLASS ACTION COMPLAINT



were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by The Pharmacia Group in the 2001 *Red Book*.

| Drug | The Pharmacia Group's 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Spread |
|------|------|------|------|------|
| Amphotercin B | $36.26 | $16.00 | $20.26 | 127% |
| Bleomycin Sulfate | $309.98[9] | $158.67 | $151.31 | 96% |
| Clindamycin Phosphate | $93.60 | $61.20 | $32.40 | 53% |
| Cyclophospamide | $6.29 | $3.92 | $2.37 | 60% |
| Cytarabine | $8.98 | $4.06 | $4.92 | 122% |
| Doxorubicin HCL | $1104.13 | $150.86 | $953.27 | 632% |
| Etoposide | $157.65 | $9.47 | $148.18 | 1,565% |
| Fluorouracil | $3.20 | $1.47 | $1.73 | 118% |
| Hydrocortisone Sodium Succinate | $2.00 | $1.55 | $.45 | 29% |
| Metholprednisolone Sodium Succinate | $2.05 | $1.45 | $.60 | 41% |
| Testosterone Cypionate | $17.01 | $11.79 | $5.22 | 44% |
| Vincristine Sulfate | $43.23 | $5.10 | $38.13 | 748% |

467.   In OIG report OEI-03-00-00310, the government noted that 20 mg of irinotecan, which according to the *Red Book* is manufactured only by The Pharmacia Group, had a Medicare Median of $117.81 and a Catalog Median of $98.63, resulting in a spread of 19.45%. (P006398-P006424).

468.   The GAO issued a report entitled "Payments for Covered Outpatient Drugs Exceed Providers' Cost" (GAO-01-1118) wherein it found that irinotecan had an Average AWP

---

[9] Calculation based on the AWP listed in the 2000 *Red Book*.



of $141.32, the Average Widely Available Discount from AWP to physicians for irinotecan was

22.9%, and the drug constituted 2.0% of the total amount of Medicare spending in 1999.

(P005546-P005578).

469.    As of April 2000, another Pharmacia Group drug, Toposar® (etoposide), had an

AWP of $28.38. The DOJ found that retailers were buying it for $1.70. (P006299-006316).

470.    Similarly, by letter dated September 25, 2000 to the HCFA Administrator, the

Chairman of the Commerce Committee revealed that:

> [I]n 1998, Pharmacia-Upjohn's Bleomycin had an AWP of
> $309.98, but health care providers could purchase it for $154.85.
> In 1997, Pharmacia-Upjohn's Vincasar could be purchased for
> $7.50, while the AWP was a staggering $741.50.

*See* letter dated May 25, 2000 from U.S. Rep. Thomas J. Bliley to Nancy-Ann Min DeParle,

HCFA Administrator. (P007015-P007490).

471.    Exhibit 1 to U.S. Rep. Pete Stark's September 28, 2000 letter to Alan F. Holmer,

President of the Pharmaceutical Research and Manufacturers of America, reveals that while the

AWP for 1 mg of Vincasar® (vincritine sulfate) was $370.75 in 1997, one physician group's

(American Oncology Resources) price in 1997 was only $4.15. (P007515). Similarly, while the

AWP for 2 mg of Vincasar® was $741.50, AOR's actual pre-April 1997 price was $7.75 (in fact,

The Pharmacia Group had offered to reduce it to $7.50). *Id.* As of April 2000, Adriamycin had

a reported AWP of $241.36, while the real wholesale price was $33.43.

### 6.    Inflated Pharmacia AWPs From Pharmacia's Price Lists

472.    According to Pharmacia's own documents, the published AWPs for its drugs were

higher than the actual prices provided to wholesalers. In response to government subpoenas, the

Pharmacia Group produced numerous price lists setting forth spreads between AWPs and prices

apparently offered to wholesalers, providers and other intermediaries. A review of those price

lists reveals that Pharmacia has consistently offered hundreds of its drugs and other solutions to

its customers at prices significantly below the published AWP and that the spread was of great



importance to its customers. To repeat every one of those drugs and the spread offered to each specific customer here is not practical. However, set forth below in Table 1 are a number of those drugs with spreads between the AWPs and direct prices. Table 1 is an analysis of certain dosages of P&U drugs from a document entitled "Oncology Express CONTRACT PRICING" (PH011977) (Highly Confidential).

**Table 1**

| PRODUCT | LIST | AWP | CONTRACT PRICE | DIFFERENCE (between AWP and contract price) | PERCENTAGE SPREAD |
|---|---|---|---|---|---|
| Adriamycin | 883.80 | 1104.13 | 119.00 | 985.13 | 828% |
| Adrucil | 12.83 | 16.04 | 4.56 | 11.48 | 252% |
| Amphocin | 29.01 | 36.26 | 13.00 | 23.26 | 179% |
| Neosar | 80.22 | 100.28 | 16.15 | 84.13 | 521% |
| Toposar | 614.81 | 768.51 | 33.84 | 734.67 | 2,171% |

### 7.    The Pharmacia Group Provided Free Goods and Other Incentives

473.    In addition to marketing the spread, The Pharmacia Group has utilized other impermissible inducements to stimulate sales of its drugs. These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price. By utilizing "off-invoice" inducements, The Pharmacia Group provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

474.    The government investigators also uncovered an October 3, 1996 internal memorandum wherein Pharmacia told three oncology sales representatives:

> Our competitive intelligence tells us that our pricing on Adriamycin, although higher than generics, is in the "ball park" for you to attain the customers Adriamycin business. If needed, you have a "free goods" program to support your efforts against other forms of generic doxorubicin.
>
> . . . .
>
> You should not have to use "free goods" to steer customer [sic] away from NSS or OTN. OTN and NSS Adriamycin pricing is competitive. Use your "free goods" wisely to compete against

AMENDED MASTER CONSOLIDATED          - 162 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



> other generic forms of Adriamycin, not to shift the customer to
> direct shipments. The higher we can keep the price of Adriamycin,
> the easier it is for you to meet your sales goals for Adriamycin.

(PH 024315).

475.   As set forth above, The Pharmacia Group's scheme to inflate its reported AWPs

and market the resulting spread to increase the market share of its drugs and its use of other "off

invoice" rebates and financial inducements to its customers has resulted in excessive

overpayments by Plaintiffs and the Class.

**S.   The Schering-Plough Group (Schering-Plough and Warrick)**

476.   The Schering Plough Group engages in an organization-wide and deliberate

scheme to inflate AWPs. The Schering Plough Group has stated fraudulent AWPs for all or

almost all of its drugs, including those set forth below. The specific drugs of The Schering

Plough Group for which relief is sought in this case are set forth in Appendix A, and are set forth

below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| SCHERING-PLOUGH GROUP | Clarinex | desloratadine | Antihistamine<br>Used to relieve the symptoms of hay fever and hives of the skin |
| (Schering-Plough and Warrick) | Claritin | loratadine | Antihistamine<br>Used to relieve or prevent the symptoms of asthma |
| | Claritin-D | loratadine & pseudoephedrine | Antihistamine<br>Used to treat the nasal congestion, sneezing, and runny nose caused by colds and hay fever |
| | Diprolene | aug betamethasone dipropionate | Antipruritic (Skin & Mucous Membrane Agent)<br>Used to help relieve redness, swelling, itching, and discomfort of many skin problems |
| | Diprosone | betamethasone dipropionate | Antipruritic (Skin & Mucous Membrane Agent)<br>Used to help relieve redness, swelling, itching, and discomfort of many skin problems |
| | Elocon | mometasone furoate | Antipruritic (Skin & Mucous Membrane Agent)<br>Used to help relieve redness, swelling, itching, and discomfort of many skin problems |
| | Eulexin | flutamide | Antineoplastic<br>Used to treat cancer of the prostate gland |



E-SERVED
01/22/04
05:20 PM ET
BMP-MDL NO. 1456

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Use/Purpose |
|---|---|---|---|
| | Integrilin | eptifibatide | Cardiovascular Agent<br>Used in the treatment of patients with acute coronary syndrome |
| | Intron-A | interferon alfa-2b | Immunomodulator<br>Used in the treatment of hairy cell leukemia and chronic hepatitis B or C. |
| | Lotrisone | clotrimazole w/ betamethasone | Antifungal Agent (Anti-Infective Agent)<br>Used to treat fungus infections |
| | Nasonex | mometasone furoate (nasal) | Anti-Inflammatory Agent (Nasal Preparation)<br>Relieve the stuffy nose, irritation, and discomfort of hay fever and other allergies |
| | Peg-Intron | peginterferon alfa-2b | Biological Response Modifier<br>Used to treat chronic hepatitis C |
| | Proventil | albuterol sulfate | Bronchodilator (Respiratory Agent)<br>Used to treat the symptoms of asthma, chronic bronchitis, emphysema, and other lung diseases |
| | Rebetol | ribavirin | Biological Response Modifier<br>Used to treat hepatitis C |
| | Sebizon | sulfacetamide sodium | Anti-Infective Agent<br>Used in the treatment of conjunctivitis and other ocular infections |
| | Temodar | temozolomide | Antineoplastic<br>Used to treat a specific type of cancer of the brain in adults whose tumors have returned |
| | Trinalin Rep | azatadine & pseudoephedrine | Antihistamine<br>Used to treat the nasal congestion, sneezing, and runny nose caused by colds and hay fever. |
| | Vanceril | beclomethosone (nasal) | Anti-Inflammatory Agent; Antiasthmatic<br>Used to help prevent the symptoms of asthma |
| | | albuterol | Bronchodilator (Respiratory Agent)<br>Used for relief of bronchospasm in asthma sufferers |
| | | clotrimazole | Antifungal Agent (Anti-Infective Agent)<br>Used to treat yeast (fungus) infections of the vagina |
| | | griseofulvin ultramicrocrystalline | Antifungal Agent (Anti-Infective Agent)<br>Used to treat fungus infections of the skin, hair, fingernails, and toenails |
| | | oxaprozin | Central Nervous System Agent; Antipyretic (Analgesic)<br>Used in the treatment of osteoarthritis and rheumatoid arthritis |



| | | | |
|---|---|---|---|
| | | perphenazine | Antiemetic (Gastrointestinal Agent); Antipsychotic Agent (Psychotherapeutic Agent) Used to treat serious mental and emotional disorders. Also used to relieve moderate to severe pain in some hospitalized patients |
| | | potassium chloride | Electrolytic Agent Used to prevent and treat potasium deficit secondary to diuretic or cortiocosteroid therapy |
| | | sodium chloride | Flush; Abortifacient Used to remove medicine and blockage from intravenous (IV) catheter. Also used to induce abortion |
| | | sulcrafate | Gastrointestinal agent Used for short term treatment of duodenal ulcer |
| | | theophylline er | Bronchodilator (Respiratory Agent) Used to treat and/or prevent the symptoms of bronchial asthma, chronic bronchitis, and emphysema |

### 1. The Schering Plough Group Has Been the Target of Government Investigations

477. In connection with its scheme to inflate AWPs, The Schering Plough Group has been investigated by the Department of Justice, Texas Attorney General, West Virginia Attorney General, California Attorney General, California Bureau of Medi-Cal Fraud and Elder Abuse, and the Department of Health and Human Services Office of Inspector General, and the U.S. Attorney for the District of Massachusetts.

478. On May 30, 2003, Schering Plough announced that the U.S. Attorney for the District of Massachusetts had advised that its subsidiary, Schering Corporation, is the subject of a federal grand jury investigation. Schering Plough is the target of a criminal investigation involving: (i) providing remuneration, such as drug samples, to providers to induce the purchase of Schering products for which payment was made through federal health care programs; (ii) selling misbranded or unapproved drugs; (iii) submitting false wholesale pricing information for its pharmaceutical products to the government; and (iv) destroying evidence and obstructing



justice relating to the government's investigation. *See* Schering Plough Press Release dated May 30, 2003, located at http://www.sch-plough.com/news/2003/business/20030530.html; "Schering Plough expects indictment," The Philadelphia Inquirer, at C3 (May 31, 2003). Moreover, according to Schering Plough's Form 10-K for the year 2000, this investigation has focused on "whether the AWP set by pharmaceutical companies for certain drugs improperly exceeds the average prices paid by dispensers . . . and other pricing and/or marketing practices."

479. A Medicaid investigation by the Texas Attorney General revealed that The Schering-Plough Group defrauded the State of Texas $14.5 million. Investigators determined that The Schering-Plough Group provided the greatest "spread" amongst the drug companies selling albuterol in Texas, and thereby obtained the largest market share for albuterol. The Schering-Plough Group sold a box of albuterol to pharmacies for $13.50, while it charged the Texas Medicaid program $40.30, a 200% increase. *See Cornyn Sues Three Drug Companies for Medicaid Fraud*, Press Release by the Office of the Attorney General, State of Texas, Sept. 7, 2000. (www.oag.state.tx.us.gov)

480. On October 11, 2001, the West Virginia Attorney General filed suit against Warrick, alleging that Warrick defrauded state agencies and citizens by deliberately overstating the AWP for certain drugs, including albuterol, from approximately 1995 until December 2000.

## 2. The Schering Plough Group Controls the Published AWP for Its Products

481. The Schering Plough Group has controlled and set the AWPs for its pharmaceutical products through direct communications with industry compendia during the Class Period. For example, on February 23, 1995, Warrick sent a letter to First Data Bank, stating:



Effective Friday, February 24, 1995, at 5:00 p.m., the price of
Warrick Albuterol Solution 0.5% 20ml will increase as follows:

|  | NDC 59930- | AWP |
|---|---|---|
| Albuterol Solution 0.5% 20 ml | 1515-04 | $13.95 |

(WAR0024086) (Highly Confidential).

### 3. The Schering Plough Group's AWP Manipulation Benefited Providers at the Expense of the Class

482.    A Schering Laboratories memorandum dated May 20, 1993 demonstrates

Defendant's recognition that intermediaries choose drugs based on favorable AWP

spreads. At the generic launch of albuterol, Schering stated:

> Proventil will stay listed at AWP; therefore, Proventil is a favored
> product for third party reimbursement that provides for the AWP
> minus 10% reimbursement rate to chains. Thus, they can buy off
> the Proventil deal and bill at AWP.

(WAR005419-20) (Highly Confidential).

483.    According to Warrick's own documents, Warrick consistently maintained a

spread between the AWPs and the direct prices it offered for its albuterol products. For example,

a "Price Change" alert dated June 7, 1999 sent to Warrick customers provides:

| Product | Pkg. Size | NDC 59930 | AWP | Direct Price |
|---|---|---|---|---|
| Albuterol Inhalation Aerosol | 17 g | 1560-1 | $21.41 | $3.40 |
| Albuterol Aerosol Refill | 17 g | 1560-2 | $19.79 | $3.40 |

(WAR0000532) (Highly Confidential). Thus, Warrick touted a 529% spread on its albuterol

inhalation aerosol and a 482% spread on the refill.

484.    In a report to Congress, the GAO reported that albuterol sulfate was one of a

small number of products that accounted for the majority of Medicare spending and volume.

Albuterol sulfate accounted for 6.3% of total Medicare spending, ranking fifth out of more than

400 covered drugs. Albuterol sulfate ranked first for volume of units covered, accounting for

65.8% of total units reimbursed. *See* GAO Report to Congressional Committees, "Payments for

AMENDED MASTER CONSOLIDATED          - 167 -
CLASS ACTION COMPLAINT



Covered Outpatient Drugs Exceed Providers' Cost," Tables 1 and 2, pp. 7-8 (GAO-01-0118 (P005546-005578)). The Schering Plough Group is one of three companies noted by the DOJ as manufacturing albuterol. *See* DHHS report, AB-00-86 (P006299-006316).

485.    According to The Schering Plough Group's own documents, the published AWPs for most of its drugs were higher than the actual prices provided to wholesalers.

486.    In response to government subpoenas, The Schering Plough Group produced numerous price lists setting forth spreads between AWPs and prices apparently offered to wholesalers, providers and other intermediaries. A review of those price lists reveals that Warrick has consistently offered hundreds of its drugs and other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers. To repeat every one of those drugs and the spread offered to each specific customer here is not practical. However, set forth below in Tables 1, 2 and 3 are a number of those drugs with spreads between the AWPs and direct prices. Table 1 is an analysis of certain dosages of Warrick drugs from a document entitled, "Amerisource" (WAR0022160) (Highly Confidential).

**TABLE 1**

| LABEL (MFG) | GENERIC NAME | AWP | INVOICE COST | DIFFERENCE | PERCENTAGE SPREAD |
|---|---|---|---|---|---|
| Warrick | Albuterol Inhaler | 21.41 | 5.75 | 15.66 | 272% |
| | Aug Beta Dip Oint 0.05% | 43.20 | 26.90 | 16.30 | 61% |
| | Griseofulvin | 82.47 | 37.22 | 45.25 | 122% |
| | Theophylline | 11.70 | 2.83 | 8.87 | 313% |

Table 2 is an analysis of certain dosages of Warrick drugs from a document entitled, "1997 Care Group Bid Proposal." (WAR0022122) (Highly Confidential).

**TABLE 2**

| PRODUCT | AWP | INVOICE PRICE | NET PRICE (AFTER REBATE) | DIFFERENCE BETWEEN AWP AND INVOICE PRICE | PERCENTAGE SPREAD |
|---|---|---|---|---|---|
| Clotrimazole | 22.25 | 7.77 | 6.99 | 14.48 | 186% |
| Perphenazine | 78.00 | 19.53 | 17.58 | 58.47 | 299% |



Table 3 is an analysis of certain dosages of Warrick drugs from a document entitled, "Managed Care Pricing," dated July 1, 2002. (WAR0054226) (Highly Confidential).

**TABLE 3**

| Product | Minimum PBM/Mail Order/ Staff Price Guide | Target PBM/Mail Order/ Staff Price Guide | Minimum GPO Price Guide | Target GPO Price Guide | AWP | Difference | % Spread |
|---|---|---|---|---|---|---|---|
| ISMN | 4.48 | 4.93 | 5.15 | 5.38 | 117.40 | 112.02 | 2,082% |
| Oxaprozin | 11.42 | 12.56 | 13.13 | 13.70 | 117.40 | 103.70 | 757% |
| Potassium Chloride | 9.67 | 10.64 | 11.12 | 11.60 | 65.00 | 53.40 | 460% |
| Sodium Chloride | 6.12 | 6.73 | 7.04 | 7.34 | 24.30 | 16.96 | 231% |
| Sulcrafate Tablets | 45.15 | 49.67 | 51.92 | 54.18 | 353.71 | 299.53 | 553% |

**4.     The DOJ Specifically Documented AWP Inflation for Albuterol Sulfate**

487.    In a report published by the DHHS (AB-00-86 (P006299-006316)), the DOJ documented at least one instance where the published AWPs for various dosages of albuterol sulfate manufactured by The Schering Plough Group were substantially higher than the actual prices listed by wholesalers. The following figures compare the DOJ's determination of an accurate AWP for one particular dosage, based upon wholesalers' price lists, with the AWP reported by The Schering Plough Group in the 2001 *Red Book*: The Schering-Plough Group reported to *Red Book* an AWP of $30.25 for albuterol sulfate, yet the DOJ determined the actual AWP to be $9.16, or $21.09 less.

488.    As stated in a May 4, 2000, letter from U.S. Rep. Tom Bliley, Chairman of the Congressional Committee on Commerce, to Raman Kapur, President of Warrick:

> I am writing to you because one of the drugs reflecting a significant variation between the AWP-based prices paid by Medicare and the prices generally charged to private sector purchasers is albuterol sulfate, a drug manufactured by Warrick Pharmaceuticals.

(P006938-006941).

AMENDED MASTER CONSOLIDATED          - 169 -
CLASS ACTION COMPLAINT



489.    In his May 4, 2000, letter, Bliley outlined The Schering Plough Group's scheme with respect to the prescription drug albuterol sulfate. The government's investigation uncovered a significant spread between the amount Medicare reimbursed for albuterol sulfate and the amount the Schering-Plough Group actually charged. U.S. Rep. Bliley stated:

> The OIG [Office of the Inspector General] has determined that the Medicare-allowed amount for albuterol sulfate, a pharmaceutical product sold by your company, in the Fiscal Year 1996 was $.42. The OIG further estimated that the actual wholesale price of this drug was $.15 and the highest available wholesale price that the OIG was able to identify was $.21.

*Id.*

### 5.    The Schering Plough Group Provided Free Goods and Other Incentives

490.    In addition to marketing the spread, The Schering Plough Group has utilized other impermissible inducements to stimulate sales of its drugs. These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price. By utilizing "off-invoice" inducements, The Schering Plough Group provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

491.    As set forth above, The Schering Plough Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

### T.    The Sicor Group (Sicor, Gensia and Gensia Sicor)

492.    The Sicor Group engages in an organization-wide and deliberate scheme to inflate AWPs. The Sicor Group has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below. The specific drugs of The Sicor Group for which relief is sought in this case are set forth in Appendix A, and are identified below:



| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Uses |
|---|---|---|---|
| SICOR GROUP (Sicor, Gensia and Gensia-Sicor) | | acyclovir sodium | Anti-Infective Agent<br>Used in the treatment of herpes infections |
| | | amikacin sulfate | Antibiotic Agent (Anti-Infective Agent)<br>Used to treat respiratory tract, urinary tract, bone, skin and soft tissue infections |
| | | amphotercin b | Antifungal Agent (Anti-Infective Agent)<br>Used to help the body overcome serious fungus infections |
| | | doxorubicin hydrochloride | Antineoplastic<br>Used in the treatment of ovarian cancer and AIDS-related Kaposi's sarcoma |
| | | etoposide | Mitotic Inhibitor (Antineoplastic)<br>Used in the treatment of testicular neoplasm and small cell cancer of the lung |
| | | leucovorin calcium | Antianemic Agent (Blood Modifier)<br>Used in the treatment of anemia |
| | | pentamidine isethionate | Anti-Infective Agent<br>Used in the treatment of pneumonia |
| | | tobramycin sulfate | Antibiotic Agent (Anti-Infective Agent)<br>Used to treat severe infection |

### 1.    The Sicor Group Has Been the Target of Government Investigations

493.    In connection with its scheme to inflate AWPs, The Sicor Group has been investigated by the Department of Justice, Department of Health and Human Services Office of Inspector General, the Texas Department of Health, and the California Attorney General.

### 2.    The Sicor Group Controls the Published AWP for Its Products

494.    The Sicor Group has controlled and set the AWPs for its pharmaceutical products through direct communications with industry compendia during the Class Period. For example, by letter dated February 21, 1994, Gensia advised MediSpan of the impending launch of its new product called "Etoposide" and stated: "I have also include [sic] some guidelines in this pack for establishing Gensia's AWPs for our Etoposide." (SICOR 00955) (Confidential). That same day, Gensia sent a second letter to MediSpan stating, in part:

> The following represents the detailed information for this product and the AWP that we would like MediSpan to use:

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT

- 171 -



## ETOPOSIDE INJECTION

| NDC #        | PRODUCT DESC.     | VIALSIZE | LIST PRICE | AWP      |
|--------------|-------------------|----------|------------|----------|
| 0703-5643-01 | 20MG/ML (100MG)   | 5ML      | $105.16    | $131.30  |
| 0703-5646-01 | 20MG/ML (500MG)   | 25ML     | $483.74    | $638.76  |

(SICOR 00956).

495.    Moreover, The Sicor Group has told its sales force to rely on the AWP

information contained in the industry compendia when marketing to customers. For example, a

memorandum dated April 6, 1994 to "Field Sales force" regarding "Average Wholesale Prices

(AWP)" provides in pertinent part:

> Attached is a copy of Medi-Span's March 31, 1994 printout of
> product and AWP information for Gensia Laboratories.  Since this
> information comes directly from Medi-Span's computer file, you
> will find it to be more accurate than the information that your
> customers are using from their reference texts.  You will note, that
> the AWP information (listed in pack quantity) is found in the third
> column from the right. Additionally, the two columns to the
> immediate left of the AWP column represent: WAC (Wholesalers
> Acquisition Cost) and DP (Direct Price).

(SICOR 00753) (Highly Confidential).

### 3.    The Sicor Group's AWP Manipulation Benefited Providers at the Expense of the Class

496.    The Sicor Group has engaged in an ongoing deliberate scheme to inflate AWPs.

For example, by letter dated September 25, 2000 to the HCFA administrator, the Chairman of the

Commerce Committee revealed that: "[I]n 1998, a health care provider could buy Gensia's

Etoposide for $14.00, while the AWP used to determine Medicare reimbursement was $141.97."

(P007015-P007490).

497.    The Sicor Group's marketing strategies further demonstrate its fraudulent

practices.  In a marketing document prepared by Gensia and obtained by the government in its

investigation, Gensia stated:

> Concentrate field reps on the top 40 AIDS hospitals using a $54.00
> price in conjunction with a 10% free goods program to mask the
> final price.  Provides the account with an effective price of $48.60
> per vial.

AMENDED MASTER CONSOLIDATED          - 172 -
CLASS ACTION COMPLAINT



*See* letter dated September 28, 2000 from U.S. Rep. Pete Stark to Alan F. Holmer, President of

the Pharmaceutical Research and Manufacturers of America. (P007512).

     498.    Certain handwritten notations appear on this same marketing document

comparing the AWP with other prices used for the same drug:

> FSS   $44.95
>
> Whls  $71.00
>
> Distr.  $51.50
>
> AWP  $109.20

(P007532).

     499.    Similarly, a document entitled "Comparison of AWPs" based on the 1996 *Red*

*Book* contains the following handwritten notation:

> Rob, Joe,
>
> Tim suggested sending this info to the reps.  Your thoughts?
>
> B

(SICOR 00756) (Highly Confidential).  Following this notation is a chart comparing the AWPs

for certain drugs published by various manufacturers, including Gensia. One example follows:

| Doxurubicin | | Abbott/ Adria | Bedford | FUSA | Gensia | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | X | | | |
| 10 | | $48.31 | $47.35 | $44.50 | $49.29 | <Polymer | | |
| | | | | | X | | | |
| 50 | | $241.56 | $236.74 | $231.00 | $246.46 | <Polymer | | |
| | | | | | X | | | |
| 200 | | $946.94 | $945.98 | NA | $966.14 | <Polymer | | |

*Id.*

     500.    Moreover, Gensia disseminated advertisements that actually contained a

comparison of the Contract Price with the AWP and set forth the resulting spread (SICOR

00751, 00752) (Highly Confidential), because Gensia knew that marketing the spread was in its



best interests.  Realizing this, one customer of Gensia, Opti Care, sent a memorandum to all its offices (with a copy to Gensia) stating:  "Gensia's products offer a significant spread between AWP and contract price.  This spread may be attractive, when a payor's reimbursement is based on AWP and the drug is not MAC'd. (SICOR 00758) (Highly Confidential).

### 4.   Specific Sicor Group AWPs Documented by the DOJ

501.   In a report published by the DHHS, the DOJ documented at least 17 instances where the published AWPs for various dosages of drugs manufactured by The Sicor Group were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by The Sicor Group in the 2001 *Red Book.*

| Drug | The Sicor Group's 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Spread |
|------|----------------------------|---------------------------|------------|--------|
| Acyclovir Sodium | $125.00[10] | $100.00 | $25.00 | 25% |
| Amikacin Sulfate | $87.50 | $72.68 | $14.82 | 20% |
| Tobramycin Sulfate | $342.19 | $6.98 | $335.21 | 4,802% |

(P006299-006316).

### 5.   Inflated Sicor Group AWPs From the Sicor Group's Price Lists

502.   According to The Sicor Group's own documents, the published AWPs for its drugs were higher than the actual prices provided to wholesalers. In response to government subpoenas, The Sicor Group produced numerous price lists setting forth spreads between AWPs and prices apparently offered to wholesalers, providers and other intermediaries. A review of those price lists reveals that The Sicor Group has consistently offered hundreds of its drugs and

---

[10] Calculation based on the AWP listed in the 2000 *Red Book.*

AMENDED MASTER CONSOLIDATED          - 174 -
CLASS ACTION COMPLAINT



other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers. To repeat every one of those drugs and the spread offered to each specific customer here is not practical. However, set forth below in Tables 1 and 2 are a number of those drugs with spreads between the AWPs and direct prices. Table 1 is an analysis of certain dosages of two Gensia drugs from a Medi-Span printout on which Gensia wanted its sales force to rely (the remaining drugs were redacted by The Sicor Group prior to production).   (SICOR 00754-755) (Highly Confidential).

**Table 1**

| Product | WAC | DP | AWP | DIFFERENCE (between AWP and DP) | PERCENTAGE SPREAD |
|---------|-----|----|----|-------------------------------|-------------------|
| Etoposide Inj | 483.73 | 483.73 | 638.76 | 155.03 | 32% |
| Leucovorin CA Inj | 32.50 | 32.50 | 40.63 | 8.13 | 25% |

503.    Table 2 is an analysis of certain dosages of four Gensia drugs from multiple Gensia price lists for a particular customer, Pharmaceutical Buyers, Inc., comparing the customer's Contract Price with the AWP and the resulting spread (the remaining drugs were redacted by The Sicor Group prior to production).   (SICOR 00555, 573, 614, 633) (Highly Confidential).

**Table 2**

| Product | AWP | PBI CONTRACT | SPREAD | PERCENTAGE SPREAD |
|---------|-----|--------------|--------|-------------------|
| DOXURUBICIN HYDROCHLORIDE | 871.70 | 293.60 | 578.10 | 1,969% |
| ETOPOSIDE | 1207.33 | 456.00 | 751.33 | 1,648% |
| LEUCOVORIN CALCIUM | 39.00 | 4.58 | 34.42 | 752% |
| PENTAMIDINE ISETHIONATE | 468.00 | 193.75 | 274.25 | 1,415% |

### 6.    The Sicor Group Provided Free Goods and Other Incentives

504.    In addition to marketing the spread, The Sicor Group has utilized other impermissible inducements to stimulate sales of its drugs. These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price. By utilizing "off-invoice" inducements, such as free goods, The Sicor Group

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT

- 175 -



provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price. (SICOR 00718, 04182, 00689) (Highly Confidential).

505. As set forth above, The Sicor Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

**U. TAP**

506. TAP engages in an organization-wide and deliberate scheme to inflate AWPs. TAP has stated fraudulent AWPs for Prevacid, as set forth in Appendix A, and identified below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Uses |
|---|---|---|---|
| TAP | Prevacid | lansoprazole | Proton Pump Inhibitor (Gastrointestinal Agent) Used in the short-term treatment of duodenal ulcer, erosive esophagitis and gastroesophageal reflux disease |

**1. TAP Has Been the Target of Government Investigations**

507. In connection with its scheme to inflate AWPs, TAP has been investigated by the Department of Justice.

508. On October 13, 2001, the United States Attorney in Boston, Massachusetts announced that TAP had agreed to pay $875 million to resolve criminal charges and civil liabilities in connection with its fraudulent pricing and marketing practices for the drug named Lupron®. As part of the agreement:

    a    TAP agreed to plead guilty to a conspiracy to violate the Prescription Drug Marketing Act, 21 U.S.C. §§ 331(t) and 333(b), and to pay a $290 million criminal fine, the largest criminal fine ever in a health care fraud prosecution. The plea agreement between the United States and TAP specifically stated that TAP's criminal conduct caused the Government losses of $145,000,000;



b.      TAP agreed to pay the United States Government $559,483,560 for filing false and fraudulent claims with the Medicare and Medicaid programs as a result of TAP's fraudulent drug pricing schemes and sales and marketing misconduct;

c.      TAP agreed to pay the fifty states and the District of Columbia $25,516,440 for filing false and fraudulent claims with the States, as a result of TAP's drug pricing and marketing misconduct, and for TAP's failure to provide state Medicaid programs TAP's best price for Lupron®, as required by law;

d.      TAP agreed to comply with the terms of a sweeping Corporate Integrity Agreement that, among other things, significantly changes the manner in which TAP supervises its marketing and sales staff and ensures that TAP will report to the Medicare and Medicaid programs the true average sale price for drugs reimbursed by those programs;

e.      Abbott and Takeda agreed to cooperate fully with the ongoing government investigation of TAP and its former officers and employees in exchange for the United States declining prosecution of Abbott and Takeda for conduct relating to Lupron®; and

f.      An Indictment was unsealed in the District of Massachusetts against six current or former TAP employees (including an account executive, three District Managers, a National Accounts Manager and the former Vice President of Sales), and a urologist, alleging that they conspired to (i) bill Medicare for free samples of Lupron® and (ii) market Lupron® using the "spread" and the "return to practice" program.

The TAP defendants have been sued in a separate class action in connection with their fraudulent pricing and marketing practices for Lupron®.

509.    At a hearing in the criminal matter, which has an extensive record, United States District Court Judge William G. Young found:

> This has been a gross abuse of the Medicare/Medicaid repayment system, knowing, intelligent. You have demonstrated, and it's all



> been confirmed in open court, and I don't want anyone forgetting
> about the fact that this company, not under its present
> management, knowingly abused the public trust in a most, and I
> use my words carefully, despicable way.

*United States v. TAP Pharm. Prods., Inc.*, No. CR-01-10354-WGY (D. Mass. Dec. 6, 2001).

### 2.    TAP Controls the Published AWP for Its Products

510.    TAP has controlled and set the AWPs for its pharmaceutical products through direct communications with industry compendia during the Class Period.

### 3.    TAP's AWP Manipulation Benefited Providers at the Expense of the Class

511.    According to Criminal Information filed against several doctors and the Indictment filed against six former TAP employees and a urologist, TAP referred its practice of inflating the AWP for Lupron and the corresponding inducement to the physicians as its "Return to Practice" program.

512.    At various times, TAP employees would conduct a "Business Review Meeting" with individual doctors or their staff to explain in detail how a doctor could make money by buying Lupron® and exploiting the spread.

513.    TAP created sophisticated computer programs, including spreadsheets for use with physicians, to further explain how "Return to Practice" worked and how much money a physician could make from the spread.  These computer programs were loaded onto laptop computers used by sales representatives and taken directly into physician's offices.

514.    TAP knew and understood that, because Medicare and other insurers relied upon the Publishers to establish AWPs, and because TAP could precisely control the published AWP, TAP could increase whenever they so desired the profit obtained by physicians from Plaintiffs and the Class.

### 4.    TAP Provided Free Goods and Other Incentives

515.    In addition to marketing the spread, Watson has utilized other impermissible inducements to stimulate sales of its drugs.  These inducements were designed to result in a

AMENDED MASTER CONSOLIDATED          - 178 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.

516.    For example, TAP has pled guilty to illegally conspiring with medical providers to provide free samples which would then be billed to Medicare. In an October 3, 2001, press release that referenced the guilty plea, TAP's president, Thomas Watkins, stated:

> We admit that TAP provided free samples of Lupron to a number of physicians, primarily in the early to mid-1990s, with the knowledge that those physicians would seek and receive reimbursement. The billing for free samples is wrong, and it should never have happened.

517.    TAP has also provided and/or arranged for many other non-public financial inducements to stimulate the sales of its drugs at the expense of Plaintiffs and the Class. Such inducements included volume discounts, rebates, off-invoice pricing, free goods, credit memos, consulting fees, debt forgiveness and grants. All of these incentives are designed to lower the cost of the drug to the medical provider while concealing the actual cost from Plaintiffs and the Class.

518.    For example, the Indictment alleges three specific instances when TAP employees offered an HMO, a urology practice and a hospital unrestricted "educational grants" of more than $75,000 to continue their use of Lupron. It offered Tufts HMO $65,000 in grants.

519.    Another way that TAP funneled illicit payments to physicians was through the "TAP into the Future" program, which consisted of providing physicians with all-expense paid weekends at luxurious resorts. These junkets were disguised as educational or consulting programs, with all of the doctors in attendance designated as "consultants" even though the doctors who attended did not do anything that could reasonably be deemed consulting services.

520.    As set forth above, TAP scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates



and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

### 5. TAP Concealed Its AWP Manipulation

521. TAP deliberately acted to conceal its fraudulent reporting and marketing of the AWP spread.

522. For example, TAP instructed physicians not to report the true price they paid for Lupron. According to the Indictment, a TAP Senior Marketing executive, Alan MacKenzie, advised TAP's sales force to:

> tell physicians that if doctors disclosed their invoice costs to the Medicare Program, that Program would take steps to reduce the maximum payment allowed for Lupron and thus reduce the physician's profit for Return to Practice.

523. MacKenzie also told the sales force to caution doctors not to discuss their price discounts with other physicians and instructed TAP employees to tell urologists that:

> by discussing your costs of Lupron with other physicians, you run the risk of that information getting back to HCFA. If HCFA then realizes that AWP is not a true reflection of the price, the AWP could be affected, thus lowering the amounts you may charge.

524. A presentation to TAP's sales representatives included the same statements listed above, as well as directions for the leader of the presentation, which stated:

> The main point to make to physicians is that confidentiality clause is a protection for them. If word is leaked back to HCF/Medicare that the cost of Lupron is going down, they very well may take steps in reducing allowable. This tactic should help prevent physicians talking amongst themselves.

### V.   Warrick

525. Warrick has acted to inflate AWPs pursuant to the scheme identified above. The specific drugs are identified in Appendix A.



### W.    Watson

526.    Watson engages in an organization-wide and deliberate scheme to inflate AWPs. Watson has stated fraudulent AWPs for all or almost all of its drugs, including: Ferrlecit, Verapamil HCL, Vinblastine Sulfate, Vincristine Sulfate, Dexamethasone, Diazepam, Gentamicin, Testosterone Ethanate, Vancomycin, Fluphenazine, Gemfibrozil, Imipramine, Nadolol, and Perphenazine. The specific drugs of Watson for which relief is sought in this case are set forth in Appendix A, and as identified below:

| | | | Therapeutic Category/Usage |
|---|---|---|---|
| WATSON (Watson and Schein) | Ferrlecit | sodium ferric gluconate complex in sucrose injection | Iron Preparation (Blood modifier)<br>Used for treatment of anemia in patients undergoing hemodialysis |
| | InfeD | iron dextran | Iron Preparation (Blood modifier); Nutritional Supplement<br>Used for treatment of iron deficiency |
| | | dexamethasone acetate | Hormone; Glucocorticoid<br>Used to treat inflammatory conditions, hematologic disorders and cerebral adema |
| | | dexamethasone sodium phosphate | Hormone; Glucocorticoid<br>Used to treat inflammatory conditions, hematologic disorders and cerebral adema |
| | | diazepam | Central Nervous System Agent<br>Used to treat status eplipeticus and anxiety disorders.  Also used as an amnesic prior to surgical procedures |
| | | estradiol | Estrogen (Hormone)<br>Used for treatment of menopausal symptoms and postmenopausal osteoporosis |
| | | fluphenazine hcl | Central Nervous System Agent; Psychotherapeutic Agent<br>Used to manage psychotic disorders |
| | | gemfibrozil | Antilipemic Agent (Cardiovascular Agent)<br>Used to lower cholesterol |
| | | gentamicin sulfate | Anti-Infective Agent<br>Used as a general antibiotic to treat serious gastrointestinal, respiratory, bone, skin and soft tissue infections |
| | | imipramine hcl | Central Nervous System Agent; Psychotherapeutic Agent<br>Used in the treatment of depression |



E SERVED
01/22/04
05:20 PM ET
AWP-MDL NO. 1456

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | | lorazepam | Central Nervous System Agent Used for treatment of anxiety disorders |
| | | nadolol | Antihypertensive (Cardiovascular Agent) Used in the treatment of hypertension and management of angina |
| | | perphenazine | Central Nervous System Agent; Psychotherapeutic Agent Used to manage psychotic disorders |
| | | propanolol hcl | Beta Adrenergic Blocking Agent (Cardiovascular Agent) Used to treat hypertension |
| | | ranitidine hcl | Histamine Receptor Antagonist (Gastrointestinal Agent) Used for treatment of duodenal ulcer, gastric ulcer, gastroesophagael disease and heartburn |
| | | vancomycin hcl | Antibiotic Agent (Anti-Infective Agent) Used as a general antibiotic |
| | | verapamil hcl | Calcium Channel Blocker (Cardiovascular Agent) Used in the treatment of tachyarrhythmia, angina and hypertension |

### 1.   Watson Has Been the Target of Government Investigations

527.   In connection with its scheme to inflate AWPs, Watson has been investigated by the Department of Justice, Department of Health and Human Services Office of Inspector General, and the State of California.

### 2.   Watson's Definition and Understanding of AWP

528.   Watson plainly recognizes that "AWP drives reimbursement." (MDLW12564) (Highly Confidential).

### 3.   Watson Controls the Published AWP for Its Products

529.   Watson has controlled and set the AWPs for its pharmaceutical products through direct communications with industry compendia during the Class Period. In a memo, Watson states that it is faxing prices to various pricing services, but "not all pricing services received all of the prices listed on this letter. Most only received the AWP price..." The memo goes on to

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT

- 182 -



state that "AWP is the primary price being communicated in these faxes to establish a reference for reimbursement." (MDLW25203) (Highly Confidential).

530.    A *Red Book* Product Listing Verification form asks for approval of changes to the stated AWP for Schein's (which was later acquired by Watson) Verapamil HCL, Vinblastine Sulfate and Vincristine Sulfate. A Schein executive okayed the changes and signed the *Red Book* form. (MDLW00887).

### 4.    Watson's AWP Manipulation Benefited Providers at the Expense of the Class

531.    When deciding where to set the price for its drug Ferrlecit, Watson recognized that, in a Medicare Reimbursement Mechanism, "margin drives AWP and ASP" and that a goal of setting the price is that "profit margin at the unit level must not decrease." Watson recognizes that 20% of reimbursement is patient co-pay, which can be private insurance, Medicaid or cash. (MDLW05457-05460) (Highly Confidential).

532.    Watson was well aware that payors relied on the AWP, and was sensitive to avoid alerting payors to Watson's AWP manipulation. In the context of a pricing study, a Schein executive noted that "it would be great to get a read from some HCFA personnel regarding what level of price will set off alarms with reimbursement." (MDLW25216) (Highly Confidential).

533.    In that same document, Watson acknowledges that AWP manipulation is the key to its customers' profits "if through reimbursement we can maintain or increase the money a unit makes on using this product does the price even matter?" (MDLW25216) (Highly Confidential).

### 5.    Specific Watson AWPs Documented by the DOJ

534.    In a report published by the DHHS (AB-00-86), the DOJ documented at least 12 instances where the published AWPs for various dosages drugs manufactured by Watson were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each drug.



These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by Watson in the *Red Book*.

| Drug | Watson's 1998-2001 *Red Book* AWPs | DOJ Determined Actual AWP | Difference | Spread |
|---|---|---|---|---|
| Dexamethasone Acetate | $46.45 (1998) | $11.50 | $34.95 | 304% |
| Dexamethasone Sodium Phosphate | $93.04 (2001) | $1.08 | $91.96 | 851% |
| Diazepam | $18.15 (2000) | $2.50 | $15.65 | 626% |
| Gentamicin Sulfate | $114.10 (1999) | $1.18 | $112.92 | 957% |
| Iron Dextran | $377.04 (2001) | $24.69 | $352.35 | 1,427% |
| Testosterone Ethanate | $42.10 (2001) | $13.39 | $28.71 | 214% |
| Vancomycin HCL | $70.00 (1998) | $3.84 | $60.16 | 1,567% |

(P006299-P006316).

### 6.   Inflated Watson AWPs From Watson's Price Lists

535.   In response to government subpoenas, Watson produced numerous price lists setting forth spreads between AWP and prices offered to wholesalers, providers and other intermediaries. A review of those lists indicates that Watson has consistently offered drugs to its customers at prices significantly below the published AWP, and that the spread was of great importance to Watson's customers.  It is not practical to repeat every one of those drugs and the spread offered to specific customers.  However, set forth below in Table 1 are a number of those drugs (not already referenced above) and the substantial spread offered to Watson customers.

536.   Table 1 is an analysis of certain dosages of Schein drugs from a chart titled Schein Product Status Report, February 1996.  (MDLW01237).

### Table 1

| Drug | AWP | WAC | % Spread |
|---|---|---|---|
| Fluphenazine HCL 1mg | $46.08 | $15.71 | 193% |
| Gemfibrozil 600mg | $55.65 | $7.95 | 600% |
| Imipramine HCL 10mg | $4.45 | $1.32 | 237% |
| Nadolol 20mg | $85.32 | $42.95 | 98% |
| Perphenazine 2mg | $42.53 | $19.76 | 115% |



537.   As set forth above, Watson's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Plaintiffs and the Class.

### 7.   Watson Provided Free Goods and Other Incentives

538.   In addition to marketing the spread, Watson has utilized other inducements to stimulate sales of its drugs.  These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.  In one instance in May 2000, Schein offered "Priority Customers" an additional 5% discount on Ferrlecit "off invoice" for all purchases made that month.  (MDLW15896.)  By utilizing "off-invoice" inducements, Watson provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

539.   As set forth above, Watson's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

### 8.   Watson Concealed Its AWP Manipulation

540.   Watson deliberately acted to conceal its fraudulent reporting and marketing of the AWP spread.  For example, as noted above, Watson reported its AWP to various industry compendia, but disclosed WAC, direct price and average sale price to only a very few, if any, outside entities.  (MDLW25204) (Highly Confidential).  Also as noted above, Watson needed to keep the AWP high, but at a level that would not "set off alarms with reimbursement" (MDLW25216).  Watson effectively hid the AWP spread from Plaintiffs and the Class.

### VI.   DIRECT DAMAGE SUSTAINED BY PLAINTIFFS AND THE MEMBERS OF THE AWP CLASS

541.   Plaintiffs and other Third-Party Payors who are members of the class reimburse health care providers for pharmaceuticals based upon the published AWP for brand name drugs

AMENDED MASTER CONSOLIDATED          - 185 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



and based upon MAC, for generic drugs, which in turn is derived from AWP. Accordingly, plaintiffs and Third-Party Payors are directly damaged by fraudulent AWP pricing schemes for drugs covered by employee health and benefit plans. By virtue of the fact that AWP is the reimbursement benchmark for pricing of the AWPIDs at issue, such injury occurs in all aspects of the distribution chain for the AWPIDs, including the PBM segment, non-PBM purchases, Part B covered drugs and non-Part B covered drugs.

### VII.    CERTAIN DEFENDANTS USE AWP TO ENGAGE IN A SCHEME TO FIX PRICES – THE TOGETHER CARD SCHEME

**A.    The Formation of the Together Card Conspiracy**

542.    Beginning in 2001 or 2002, the exact date of which is not yet known but is discoverable, certain of the Defendants also began to use AWPs and the growing concern over the cost of care to seniors, for another purpose – to artificially fix and/or increase the spread between their posted AWPs and their posted wholesale acquisition cost, or WAC, in connection with the commencement of the Together Card Program.

543.    Defendants Abbott, AstraZeneca, Aventis, BMS, GSK, Novartis and J&J, through its subsidiaries Janssen and Ortho-McNeil ("the Founding Together Card Defendants"), later Defendant TAP, and an alliance they formed, Defendant Together Rx LLC (the "Together Card Defendants"), have engaged in a conspiracy to fix the AWP spread of drug prices in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, 18 U.S.C. § 1962(c), and certain state antitrust laws.

544.    This conspiracy was accomplished with the use of the Together Rx Card Program ("Together Card Program"), which was supposedly designed as a prescription drug savings program for older, uninsured and poor Americans. The Together Card Defendants, in conjunction with their establishment and ongoing management of the Together Card Program, have agreed and conspired among themselves to raise, fix, maintain and/or stabilize the AWP



spread of over 170 widely prescribed brand name drugs (the "Together Card Drugs") purchased through, and outside of, the Together Card Program.

545.    The Together Card Defendants' agreement and conspiracy have caused Plaintiffs and the Nationwide End Payor Together Card Class during the class period to pay more for the Together Card Drugs than they would have if the Together Card Defendants had not engaged in their unlawful practices. Plaintiffs and the Nationwide End Payor Together Card Class have therefore been damaged due to the Together Card Defendants' conspiracy to raise, fix, maintain and/or stabilize the AWP spread of the Together Card Drugs.

546.    Defendant Together Rx LLC, a Delaware limited liability company, was formed by the Founding Together Card Defendants as an alliance to effectuate this conspiracy. Indeed, these Founding Together Card Defendants refer to themselves as the "Founding Partners" of the alliance and the Together Card Program. The alliance and Together Card Program facilitated the sharing of price information, and the information and maintenance of the Together Card Defendants' conspiracy.

## B.    The Drug Discount Card Response to the Lack of Medicare Drug Coverage and the Underpinnings of the Together Card Scheme

547.    In 2001, Americans spent over $172 billion on prescription drugs. The total is expected to more than double in a few years. Elderly Americans bear a disproportionate burden. While accounting for only 13 percent of the U.S. population, seniors pay for more than one-third of all prescription drugs. The average senior spent $1,756 for prescription drugs in 2001, with nearly half of that ($858) coming out of pocket.

548.    Congress has long debated whether to add a prescription drug benefit to the Medicare program. Currently, however, the Medicare Program generally does not cover the cost of self-administered prescription drugs. Accordingly, it is estimated that nearly one-third of the 40 million Medicare beneficiaries in the U.S. have no prescription drug coverage.



549.    Recently, Congress began considering a number of other measures designed to lower the cost of prescription drugs for U.S. seniors, including price controls and the importing of cheaper drugs from countries with price controls. For example, on April 4, 2001, U.S. Rep. Tom Allen (D-Maine) reintroduced the Prescription Drug Fairness for Seniors Act to protect senior citizens from drug price discrimination and make prescription drugs available to Medicare beneficiaries at substantially reduced prices. According to Rep. Allen, the legislation is intended to allow pharmacies that serve Medicare beneficiaries to purchase prescription drugs at the average price that the drugs are sold in other developed nations. Rep. Allen estimated that his legislation would reduce prices for brand name prescription drugs, on average, by 40 percent.

550.    Faced with growing Congressional and public scrutiny, and recognizing that true drug pricing reform would likely involve price controls or other unwelcome government regulation, certain Defendants introduced a number of pharmaceutical "discount" cards to Medicare beneficiaries.

### 1.    GSK Orange Card

551.    On October 3, 2001, GSK launched its Orange Card. According to a GSK press release, the Orange Card – an innovative prescription medicine savings program for seniors in need – was created to "help address a critical gap in prescription drug coverage." The Orange Card, an extension of GSK's patient assistance program, was purportedly designed so participants "will realize average savings of 30% off the usual price they pay for all outpatient GSK medicines. In some cases, savings may be 40% or greater." The Orange Card, effective January 1, 2002, is completely free to participants.

552.    GSK claimed that Orange Card participants would receive direct savings on their purchase of GSK outpatient prescription drugs equal to 25% of its list price to wholesalers – AWP – as reported by *First DataBank*. GSK indicated that participating pharmacies will charge Orange Card holders no more than a negotiated price for outpatient GSK prescription drugs.



Because of variations in pharmacy prices, according to GSK, actual savings to Orange Card participants on each prescription will vary. However, GSK expected participants to realize average savings of 30% off the price individuals without prescription drug coverage would usually pay for GSK medicines at their pharmacy. In some cases, GSK claimed that savings could be 40% or greater depending on their pharmacy's usual and customary price for the prescribed GSK medicine.

553.    The same press release quoted GSK CEO Jean-Pierre Garnier:

> The GlaxoSmithKline Orange Card program assists low-income seniors who have no prescription coverage. We support a Medicare prescription drug benefit, but while the issue is still being debated in Congress, GSK wants to provide relief now for America's most needy seniors.
>
> ****
>
> We spend a great deal of time and effort in developing effective medicines. With the Orange Card, we hope to help participants be able to afford to follow their doctors' prescribed treatment and realize the full value of those medicines through a longer healthier life.

554.    According to the October 3, 2002 press release, eleven million seniors are eligible for the Orange Card. Those eligible are senior citizens age 65 and older, and the disabled, who are enrolled in Medicare and: (1) have annual incomes at or below 300% of the federal poverty level (annual incomes at or below $26,000 single or $35,000 for a couple) and (2) lack public or private insurance programs or other pharmaceutical benefit programs, such as Medicaid.

555.    GSK reported that seniors and other Medicare beneficiaries could apply for the Orange Card through healthcare providers or by calling a toll-free number. The Orange Card application process began immediately, and participants could begin using it on January 1, 2002. According to GSK, seniors could simply present the Orange Card with their prescription to their pharmacist to receive the savings on GSK outpatient prescriptions. GSK retained Express Scripts Specialty Distribution Services to administer the Orange Card program.



556.    By October 2002, just one year after the launch of the Orange Card, GSK had enrolled over 100,000 seniors and other Medicare beneficiaries.  GSK's participation in the Together Card alliance did not affect its Orange Card program.  Orange Card and Together Card participants receive identical discounts on all GSK outpatient prescriptions.

### 2.    Novartis Care Card

557.    In November of 2001, just one month after GSK announced the Orange Card, Novartis launched its Care Plan.  Novartis claims that the Novartis Care Plan "is a comprehensive and flexible prescription savings plan that offers help to a broad range of lower income patients enrolled in Medicare without prescription drug coverage."  The Care Plan, effective January 1, 2002, purports to be completely free to participants.

558.    The Care Plan claims to offer "participating prescription medicines to patients with annual income up to $18,000 ($24,000 per couple) for a $12 flat fee per prescription.  Individuals whose annual income is between $18,000-28,000 ($24,000-38,000 per couple) will receive 25-40% savings off their usual [AWP] price, on selected Novartis products."  Novartis estimated that eleven million Medicare recipients might be eligible for its Care Plan.

559.    According to Novartis, eligible applicants would receive a Care Card from either Novartis or their participating pharmacy.  Participants would present their Care Card and prescription to a participating pharmacy.  The pharmacist would automatically reduce the participant's cost based on his or her eligibility.  In turn, Novartis paid participating pharmacies $5 per enrollee.  Novartis retained McKesson Health Solutions to administer its Care Card.

560.    Although existing cardholders could still use the Novartis Care Card, after the launch of the Together Card in April of 2002, Novartis directed all of its new Care Plan applicants to the Together Card.

561.    Novartis, on its company website, offered an explanation as to why it forged an alliance with six competing pharmaceutical manufacturers:



When the Novartis Care Card was launched, *Novartis issued a call-to-action asking other pharmaceutical companies to help create an interim solution to help Medicare recipients who lack drug coverage.* Novartis joined the Together Rx card to help this population gain access to medicines with a single, easy-to-use card. The Together Rx card represents a voluntary industry contribution to an immediate interim solution for millions of Medicare enrollees without prescription drug coverage. Each of the participating companies supports long-term solutions by federal and/or state governments. [Emphasis added.]

## C.    Implementation of the Together Rx Card Program

562.    On April 10, 2002, the Together Card Defendants announced their new

pharmaceutical alliance, Defendant Together Rx, LLC. According to the Together Card

Defendants' joint press release:

> For the first time, millions of people enrolled in Medicare will have access to savings on more than 150 widely prescribed medicines through one free, easy-to-use card unveiled by seven major pharmaceutical companies. By offering one-card access to savings on more medicines than any existing pharmaceutical company savings program, the Together Rx Card makes it easier for 8 to 11 million Medicare enrollees who have no prescription drug coverage to get the medicines they need to help them maintain active and independent lifestyles.

> ****

> The lack of prescription drug coverage among Medicare beneficiaries is a serious national problem that no individual company can solve.

> ****

> Together Rx encourages other pharmaceutical companies to join the coalition in this significant step forward.

563.    BMS states on its website that it "has teamed up" with the other Together Card

Defendants to form the Together Card Program, which BMS describes as "the most

comprehensive savings program ever offered by the pharmaceutical industry." It further states:

"One free card + seven pharmaceutical companies = significant savings."

564.    The alliance of Together Card Defendants states that it has communicated with

"about a dozen manufacturers" to join the alliance. The Chief Executive Officer of at least one

AMENDED MASTER CONSOLIDATED          - 191 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



major pharmaceutical company that created its own discount card program publicly rejected a joint discount program among competing pharmaceutical companies because it violated "antitrust regulations." *See* Niala Boodhoo, "Lilly Joins Discount Drug Card Bandwagon," *Reuters*, Mar. 12, 2002.

565.    Although not a Founding Together Card Defendant, TAP's website presently indicates that it participates in the Together Card Program through its blockbuster drug, Prevacid (along with Abbott). Prevacid's U.S. sales in 2002 totaled $3.7 billion.

566.    The Together Card Defendants claim that the Together Card Program, effective in early June of 2002, provides savings to eligible Medicare enrollees on more than 170 widely prescribed brand name medicines, including 26 different medicines used to treat diabetes, hypertension, high cholesterol, cancer, allergy, asthma, arthritis and depression, which are among the most common conditions affecting older Americans.

567.    The Together Card Defendants prominently proclaim that members will "save on these brand-name medicines with Together Rx." The medicines are: Accolate, Aciphex, Advair Diskus, Agenerase, Albenza, Allegra, Allegra-D Extended Release Tablets, Amaryl, Amerge, Amoxil, Anxemet Tablets, Arava Tablets, Arimidex, Atacand, Atacand HCT, Augmentin, Avandamet, Avandia, Avodart, Axert, Azmacort Inhalation Aerosol, Bactroban Cream, Beconase, Biaxin Filmtab, Biaxin XL Filmtab, Biaxin Granules, Bicitra, BuSpar, Carafate Tablets and Suspension, Casodex, Ceftin Tablets and Power for Oral Suspension, Cefzil, Clozaril, CombiPatch, Combivir, Compazine, Comtan, Concerta, Coreg, Coumadin, Daraprim Tablets, Depakote, Depakote Sprinkle Capsules, Depakote ER, Dexedrine, DiaBeta, Diovan, Diovan HCT, Ditropan, Duragesic, Dyazide, Elidel, Elmiron, Emla Anesthetic Disc, Emla Cream, Entocort EC, Epivir, Epivir-HBV, Erycette, Eskalith CR, Estraderm, Exelon, Famvir, Femara, Flexeril, Flonase, Flovent, Floxin, Focalin, Glucophage, Glucophage XR, Glucovance, Grifulviin V, Imitrex, Kaletra, Lamictal, Lamisil, Lanoxicaps, Lanoxin, Lantus, Lasix,



Lescol/Lescol XL, Leukeran Tablets, Levaquin, Lotensin, Lotensin HCT, Lotrel, Malarone, Mavik, Mepron, Metaglip, Miacalcin Injection & Nasal Spray, Monistat-Derm, Monopril, Monopril-HCT, Mycelex, Myleran, Nasacort, Nasacort AQ Nasal Spray, Neutraphos, Nexium, Nolvadex, Norvir, Omnicef Capsules/Oral Suspension, Pancrease, Parafon Forte DSC, Parlodel, Parnate, Paxil, Plendil, Polycitra, Pravachol, Prevacid, PrevPac, Prilosec, Pulmicort Turbuhaler, Purinethol, Regranex, Relafen, Relenza, Reminyl, Renova, Requip, Rescula, Retin-A, Retrovir, Rhinocort Aqua Nasal Spray, Risperdal, Risperdal M-Tab, Ritalin hydrochloride, Ritalin LA, Serevent, Seroquel, Serzone, Sinemet, Sinemet CR, Spectazole, Sporanox, Starlix, Stelazine, Synthroid, Tabloid brand Thiguanine, Tagamet, Tarka, Tegretol, Tegretol XR, Tequin, Terazol, Thorazine, Tolectin, Topamax, Toprol-XL, Trental, TriCor, Trileptal, Trizivir, Tylenol with Codeine, Tylox, Ultracet, Ultram, Urispas, Valtrex, Vascor, Ventolin, Vermos, Vivelle/Vivelle-Dot, Voltaren Ophthalmic, Wellburtin SR, Zaditor, Zantac, Zelnorm, Ziagen, Zofran, Zomig, Zomig-ZMT, Zovirax, and Zyban.

568.    The drugs manufactured by Abbott and distributed through the Together Card Program, include but may not be limited to:  Biaxin Filmtab, Biaxin XL Filmtab, Depakote, Depakote Sprinkle Capsules, Depakote ER, Kaletra, Mavik, Norvir, Omnicef Capsules/Oral Suspension, Prevacid, PrevPac, Synthroid, Tarka, and TriCor.

569.    The drugs manufactured by AstraZeneca and distributed through the Together Card Program include, but may not be limited to: Accolate, Arimidex, Atacand, Atacand HCT, Casodex, Emla Anesthetic Disc, Emla Cream, Entocort, Nexium, Nolvadex, Plendil, Prilosec. Pulmicort Turbuhaler, Rhinocort Aqua, Seroquel, Toprol, Zomig, and Zomig-ZMT.

570.    The drugs manufactured by Aventis and distributed through the Together Card Program include, but may not be limited to: Allegra, Allegra-D, Amaryl, Anzemet Tablets, Arava Tablets, Azmacort, Carafate Tablets and Suspension, DiaBeta, Intal, Lantus, Lasix, Nasacort, Nasacort AQ, Tilade, and Trental.



571.    The drugs manufactured by BMS and distributed through the Together Card Program include, but may not be limited to: BuSpar, Cefzil, Coumadin, Glucophage, Glucophage XR, Glucovance, Metaglip, Monopril, Monopril HCT, Pravachol, Serzone, Sinemet, Sinemet CR, and Tequin.

572.    The drugs manufactured by GSK and distributed through the Together Card Program include, but may not be limited to: Agenerase, Albenza, Alkeran Tablets, Amerge, Amoxil, Augmentin, Avandamet, Avandia, Avodart, Bactroban Cream, Beconase, Ceftin Tablets and Powder for Oral Suspension, Combivir, Compazine, Coreg, Daraprim Tablets, Dyazide, Epivir, Epivir-HBV, Eskalith CR, Flonase, Flovent, Imitrex, Lamictal, Lanoxicaps, Lanoxin, Leukeran Tablets, Malarone, Mepron, Myleran, Parnate, Paxil, Purinethol, Relafen, Relenza, Requip, Retrovir, Serevent, Stelazine, Tagamet, Tabloid brand Thioguanine, Thorazine, Trizivir, Urispas, Valtrex, Ventolin, Wellbutrin, Zantac, Ziagen, Zofian, Zovirax and Zyban.

573.    The drugs manufactured by J&J and distributed through the Together Card Program include, but may not be limited to:  Aciphex, Bicitra, Concerta, Ditropan XL, Duragesic, Ehmiron, Erycette, Flexeril, Floxin, Grifulvin V, Haldol, Levaquin, Monistat-Derm, Mycelex, Neutraphos, Pancrease, Parafon Forte DSC, Polycitra, Regranex, Reminyl, Renova, Retin-A Micro, Risperdal, Spectrazole, Sporanox, Terazol, Tolectin, Topamax, Tylenol with Codeine, Tylox, Ultracet, Ultram, Vascor and Vermox.

574.    The drugs manufactured by Novartis and distributed through the Together Card Program include, but may not be limited to:  Clozaril, CombiPatch, Comtan, Diovan, Diovan HCT, Elidel, Estraderm, Exelon, Famvir, Femara, Focalin, Lamisil, Lescol/Lescol XL, Lotensin, Lotensin HCT, Miacalcin Injection & Nasal Spray, Parlodel, Rescula, Ritalin Hydrochloride, Ritalin LA, Starlix, Tegretol, Tegretol-XR, Trileptal, Vivelle/Vivelle-Dot, Voltaren Opthalmic, Zaditor, and Zelnorm.



575.    The drugs manufactured by TAP and distributed through the Together Card

Program, include but may not be limited to: Prevacid.

## D.    Marketing of the Together Card Program

576.    The Founding Together Card Defendants encouraged immediate and widespread

enrollment in the Together Card Program:

> The individual companies' sales forces, which total more than
> 30,000 representatives, will assist in making enrollment materials
> available through participating pharmacies, physicians' offices and
> community centers.

**** 

> The members of Together Rx are committed to maximizing
> enrollment in the Together Rx Card and at the same time to
> identifying patients who may qualify for their independent [patient
> assistance programs].

577.    According to the Founding Together Card Defendants, "[p]harmacies across the

country . . . have shown strong support for the [Together Card].  In addition to accepting the card

at their retail outlets in communities across America, participating pharmacies have made the

commitment to pass through direct to the patient 100% of the savings being offered by the

pharmaceutical companies."

578.    The website of the alliance, www.together-rx.com, addresses enrollment,

eligibility and use issues pertaining to the Together Card:

> Enrollment in Together Rx is free.  There is no fee to apply for or
> to receive the Card.  Enrollees apply for the Together Rx Card by
> completing and mailing a postage-paid application available from
> Together Rx.

****

> Together Rx Card users present the Card, along with their doctor's
> prescription (or when obtaining a refill), at a participating
> pharmacy.  Card users are to receive savings right at the pharmacy
> counter.  The Card could be used at participating retail pharmacies
> beginning June 2002.

****

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



Approximately 11 million Medicare enrollees may be eligible for
Together Rx. Enrollees must: (1) be a Medicare enrollee; (2) have
an annual income of less than $28,000 (individuals) or $38,000
(couples); and (3) not have public or private prescription drug
coverage. In Alaska, enrollees must have an annual income of less
than $35,000 (single) or $48,000 (couple). In Hawaii, enrollees
must have an annual income less than $33,000 (single) or $44,000
(couple). Households of three or more are to contact Together Rx
for eligibility information.

579.    The Founding Together Card Defendants, in their April 10, 2002 press release and

at www.together-rx.com, claim participants in the Together Card Program will save

"approximately 20-40% off the amount [they] usually pay for prescriptions and, in many cases,

substantially more." The Founding Together Card Defendants also note:

This range of savings reflects the mix of savings programs
presently offered by each company and is subject to change. Each
company sets its own levels of savings independently, with a
minimum savings of 15% off its list price to wholesalers [AWP].
Actual consumer savings may vary depending on a pharmacy's
customary pricing for a specific medicine and each company's
saving program requirements, including any minimum quantity
requirements. Each company independently determines which
products are included in the savings program. Products covered
are subject to change. [Emphasis added].

580.    The Founding Together Card Defendants' promotional efforts yielded an

immediate and tremendous response from seniors. According to another press release, by

July 29, 2002, enrollment in the Together Card Program had reached 118,000. The Founding

Together Card Defendants encouraged "other pharmaceutical companies to join this effort and

help broaden the number of products offered." By November of 2002, enrollment was estimated

at nearly 400,000. Just weeks earlier, on October 3, 2002, a spokesman for BMS claimed that

the Together Card had already saved seniors $6.4 million on prescription drugs since June of

2002.

581.    On their Together Rx website, the Together Card Defendants offered the

following response to the question "Why are all these pharmaceutical companies doing this?":

The participating companies are committed to providing seniors
and other eligible Medicare patients with broader access to savings

AMENDED MASTER CONSOLIDATED          - 196 -
CLASS ACTION COMPLAINT



on many medications with convenience of one card. Together Rx is designed to fill a gap in the system for the short term. The real solution is implementation of Medicare reform, including a prescription drug benefit.

582.    The current website continues to promise savings:

**Savings and medicines. Together.**

**Save big on many commonly prescribed medicines.**
Together RX is a prescription savings program that offers a free, easy way to save approximately 20% to 40% on brand-name medicines and, in many cases, much more (depending on your prescription and pharmacy). You can save on more than 170 medicines (click here to see the entire list). And some pharmacies even offer savings on generics.

583.    On February 3, 2003, Together Rx informed pharmaceutical industry publication

*The Pink Sheet* that Together Card enrollment had recently surpassed 570,000 members.

Together Rx also indicated that it had targeted 2003 enrollment at 1.5 million members.

**E.    The Together Card Defendants' Conspiracy to Fix the AWP Spread of the Together Card Drugs**

584.    Although claiming its purpose was to help provide Medicare beneficiaries with

"broader access to savings" on prescription pharmaceuticals, the Together Card Defendants used

their alliance and the Together Card Program to raise, fix, maintain and/or stabilize the AWP

spread for their prescription drugs and maximize profits.

585.    When the Together Card Defendants aligned themselves in order to offer a

combined drug discount card for elderly Americans, they perceived a significant problem with a

discount card effort — elderly and poor Americans *might actually end up paying less* for their

prescription drugs. Although the Together Card Defendants did not necessarily object to elderly

and poor Americans paying less for drugs, they did not want to bear that expense themselves.

The quandary continued, however, because others in the distribution chain — major retail

pharmacy chains, PBMs, wholesalers — similarly did not wish to bear the cost of reduced

expenditures by elderly and poor Americans. Put differently, the discounts could not be borne

by retail pharmacists or wholesalers (given their claim to already being squeezed on margin).



586.    Moreover, administration of the Together Card Program would itself carry some cost. While the Together Card Defendants wished the publicity attendant on providing a "free" discount drug card, they did not wish to bear the financial administrative costs for the program, and they needed to persuade retail pharmacists to participate without incurring product or administrative costs.

587.    As a result of their desire to avoid the financial burden of the Together Rx Program, the Together Card Defendants conspired and agreed to simply impose the burden of the Together Card Drugs right back upon consumers by raising reimbursement or end payor prices (typically based on AWPs) in relation to actual cost to wholesalers, pharmacies and mail order companies (typically tied in some way to WAC, although subject to discounting and rebates).

588.    Specifically, in conjunction with the establishment and management of their Together Card Program, the Together Card Defendants agreed to raise, fix, maintain and/or stabilize the AWP "spread" on nearly every one of the 170+ drugs included in the Together Card Program. The Together Card Defendants increased the AWP spread on most of their Together Card Drugs – across many therapeutic classes and product lines. The 170+ Together Card Drugs account for approximately 900 pharmaceutical line-items (the line-items reflecting the 170+ drugs in different forms, sizes and dosages). The AWP spread for over 80% of these line-items were increased.

589.    Put simply, by increasing the difference between posted AWPs and posted WAC, the Together Card Defendants created spread dollars available to others in the distribution chain as an incentive to participate in the program — all to the detriment, and only to the detriment, of end payros (and enrollees).

590.    Prior to the formation of the Together Rx alliance, the AWPs for the Together Card Drugs reflected an AWP pricing spread of roughly 20% (AWP – WAC/WAC). Following formation of the alliance, the Together Card Defendants increased the AWP spreads for these

AMENDED MASTER CONSOLIDATED                - 198 -
CLASS ACTION COMPLAINT



same drugs to a range of 21-26%, whether sold through or outside of the Together Card Program. As reflected by the chart below, the percentage of all Together Card Drugs manufactured by the Together Card Defendants with an AWP spread level greater than 24% increased from 25.5 % in 2000 – prior to the development and implementation of the Together Card Program – to 92% by 2002, as depicted by the following chart.





Percentage of Together Card Drugs with AWP Spread Level > 24% from Dec. 1997 to Dec. 2002

1534.16 0046 BSC.DOC



591.    An increase in the AWP spread was often achieved through an increase in the AWP of a Together Card Drug.  An increase in AWP directly results in higher prices to Plaintiffs and the Nationwide End Payor Together Card Class.  For example, in the case of AstraZeneca's Prilosec (as reflected in the chart below), the AWP spread increase raised the AWP for that drug by $295.72. The following chart reflects, for a single drug manufactured by each Founding Together Card Defendant, the AWP spread increase and related AWP increase which occurred as a result of the Together Card Program.

| Together Card Defendant | Together Card Drug | AWP Before Alliance | WAC Before Alliance | AWP Spread Before Alliance | AWP After Alliance | WAC After Alliance | AWP Spread After Alliance |
|---|---|---|---|---|---|---|---|
| Abbott | Biaxin 500 mg #60 | $396.72 | $334.08 | 18.8% | $437.98 | $350.38 | 25% |
| AstraZeneca | Prilosec 40 mg #1000 | $6,171.66 | $5,143.05 | 20% | $6,621.67 | $5,297.34 | 25% |
| Aventis | Allegra 60 mg #100 | $118.36 | $98.63 | 20% | $123.29 | $98.63 | 25% |
| BMS | Tequin 400 mg #100 | $818.86 | $682.27 | 20% | $895.48 | $716.38 | 25% |
| GSK | Combivir #100 | $1,241.26 | $1,034.38 | 20% | $1,370.55 | $1,096.44 | 25% |
| J&J (Janssen) | Risperdal 2 mg #500 | $2,320.10 | $1,933.42 | 20% | $2,535.20 | $2,028.16 | 25% |
| Novartis | Exelon 2 mg/ml | $246.96 | $205.80 | 20% | $267.29 | $213.83 | 25% |

Almost all of the Together Card Drugs experienced similar AWP spread increases and related AWP increases.

592.    The Together Card Defendants' increases in AWP spreads occurred in 2001 and 2002.  The effectively simultaneous timing of the Together Card Defendants' increases in AWP spreads is unprecedented in terms of scope (i.e. number of products per manufacturer and number of manufacturers within the pharmaceutical industry).  The Together Card Defendants' increases in AWP spread for the Together Card Drugs are not consistent with competitive conduct.



593. The Together Card Defendants' conduct is also inconsistent with their alleged motive to make prescription drugs more affordable to Medicare recipients by offering discounts on prescription prices. Indeed, the Together Card Defendants' immediate increase of the AWP spread on their Together Card Drugs diluted any meaningful discount for the relatively small number of eligible consumers and raised the price for other consumers significantly beyond what was charged prior to the Together Card Defendants' formation of the alliance.

594. The Together Card Defendants' conspiracy — agreeing to raise, fix, maintain and/or stabilize the AWP spread of their Together Card Drugs under the guise of a discount program – directly caused Plaintiffs to pay substantially more for those drugs than they would have paid if the Together Card Defendants had not engaged in their illegal conduct.

## VIII.   CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME

595. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and two Classes comprised of:

> *AWP Payor Class:*
>
> All persons or entities who, for purposes other than resale and during the Class Period, paid any portion of the purchase for a prescription drug manufactured by a Defendant Drug Manufacturer (as identified in Appendix A) at a price calculated by reference to the published AWP during the Class Period.[11]
>
> *Sub-Class: The PBM Third-Party Payor Class:*
>
> All Third-Party Payors that, during the Class Period, contracted with a PBM to provide to its participants a prescription drug manufactured by a Defendant Drug Manufacturer and identified in Appendix A.

Excluded from the Classes are (a) each Defendant and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors;

---

[11] Plaintiffs reserve the right to modify the Class Definition based on class related discovery and/or merits discovery.



(b) any co-conspirators; and (c) any governmental entities who purchased such drugs during the Class Period.

596.    The Class Period is January 1, 1991 to the present.

597.    The Class consists of numerous individuals and entities throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a) (1).  The disposition of the claims of the Class Members in a single class action will provide substantial benefits to all parties and to the Court.

598.    The claims of the representative Plaintiffs are typical of the claims of the Class, as required by Rule 23(a) (3), in that the representative Plaintiffs include people and entities who, like all Class Members, purchased the AWPIDs at inflated prices based on AWPs.  Such representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct because, among other things, they paid prices for these drugs that were higher than they would have been but for Defendants' improper actions and have had medical providers make pharmacy decisions based on economic factors as opposed to purely medical factors.

599.    The Class representatives for the Classes are all of the plaintiffs.

600.    The factual and legal bases of each Defendant's misconduct are common to the Class Members and represent a common thread of fraud and other misconduct resulting in injury to Plaintiffs and members of the Class.

601.    There are many questions of law and fact common to Plaintiffs and the Class, and those questions predominate over any questions that may affect individual Class Members, within the meaning of and fulfilling Rules 23(a) (2) and 23(b) (3).  Common questions of law and fact include, but are not limited to, the following:

        a.      Whether Defendants engaged in a fraudulent and/or deceptive scheme of improperly inflating the AWPs for the Drugs identified in Appendix A used by Plaintiffs and Class Members as the basis for reimbursement;

AMENDED MASTER CONSOLIDATED             - 203 -
CLASS ACTION COMPLAINT



b.      Whether Defendants artificially inflated the AWPs for these drugs;

c.      Whether it was the policy and practice of Defendants to prepare marketing and sales materials that contained comparisons of the published AWPs and the spreads available;

d.      Whether Defendants provided free samples of the AWPIDs to providers, and whether Defendants instructed them to bill Plaintiffs and the Class for those free samples;

e.      Whether Defendants' provision of free samples to providers, with the intent that the providers bill Plaintiffs and the Class for the free samples, was unlawful;

f.      Whether Defendants paid financial inducements to providers and other intermediaries, with the effect of lowering their costs for AWPIDs;

g.      Whether Defendants engaged in a pattern and practice of paying illegal kickbacks, disguised as free goods, rebates, consulting fees, junkets and education grants to providers and other intermediaries;

h.      Whether AWPs are used as a benchmark for negotiating payments by Third-Party Payors for the AWPIDs;

i.      Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class Members to make inflated payments for the AWPIDs;.

j.      Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiffs and the Class members;

k.      Whether Defendants formed enterprises for the purpose of carrying out the AWP Scheme;

l.      Whether Defendants used the U.S. mails and interstate wire facilities to carry out the AWP Scheme;

m.      Whether Defendants' conduct violated RICO;

n.      Whether Defendants are liable to Plaintiffs and the Class members for damages for conduct actionable under the various state consumer protection statutes.



602.    Plaintiffs will fairly and adequately represent and protect the interests of the

Class, as required by Rule 23(a)(4).  Plaintiffs have retained counsel with substantial experience

in prosecuting nationwide consumer class actions.  Plaintiffs and their counsel are committed to

vigorously prosecuting this action on behalf of the Class, and have the financial resources to do

so.  Neither Plaintiffs nor their counsel have any interest adverse to those of the Class.

603.    Plaintiffs and members of the Class have all suffered, and will continue to suffer,

harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is

superior to other available methods for the fair and efficient adjudication of this controversy

under Rule 23(b)(3).  Absent a class action, most members of the Class likely would find the cost

of litigating their claims to be prohibitive, and will have no effective remedy at law.  The class

treatment of common questions of law and fact is also superior to multiple individual actions or

piecemeal litigation in that it conserves the resources of the Courts and the litigants, and

promotes consistency and efficiency of adjudication.  Additionally, Defendants have acted and

failed to act on grounds generally applicable to Plaintiffs and the Class and require Court

imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby

making appropriate equitable relief to the Class as a whole within the meaning of Rules 23(b)(1)

and (b)(2).

## IX.    CLASS ACTION ALLEGATIONS FOR THE TOGETHER CARD SCHEME

604.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure, on behalf of themselves and two classes ("the Classes"):

*The Nationwide End Payor Together Card Class*:

> *All person or entities in the United States and its territories who
> paid any portion of the purchase price for, or who reimbursed any
> portion of the purchase price of, a drug covered by the Together
> Rx Program on the basis, in whole or in part, on the published
> average wholesale price during the time period January 1, 2002
> up to and including the present.*



605. In the event the Court rules that plaintiffs do not have standing under the antitrust laws, an alternate class to that set forth above is:

*The Indirect Purchaser States End Payor Together Card Class*:

> *All persons or entities in the indirect purchaser states who paid any portion of the purchase price for, or who reimbursed any portion of the purchase price of, a drug covered by the Together Rx Program on the basis, in whole or in part, on the published average wholesale price during the time period January 1, 2002 up to and including the present.*

Excluded from the Classes are (a) each Defendant and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors; (b) any co-conspirators; and (c) any governmental entities who purchased such drugs during the Class Period.

606. The Class representatives for the Nationwide End Payor Together Card Class are all of the plaintiffs, excluding the association plaintiffs.

607. The Class representatives for the Indirect Purchaser States End Payor Together Card Class are all plaintiffs, excluding the association plaintiffs.

608. Each of the Class Representatives purchased the Together Card Drugs identified herein.

609. The Class Period is January 1, 2002 to the present.

610. The Classes consist of numerous individuals and entities throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a)(1). The disposition of the claims of the Class Members in a single class action will provide substantial benefits to all parties and to the Court.

611. The claims of the representative Plaintiffs are typical of the claims of the Classes, as required by Rule 23(a)(3), in that the representative Plaintiffs include people and entities who, like all Class Members, purchased the Together Card Drugs in, our outside of, the Together Card Program. Such representative Plaintiffs, like all Class Members, have been damaged by

AMENDED MASTER CONSOLIDATED
CLASS ACTION COMPLAINT

- 206 -



Defendants' misconduct because, among other things, they paid prices for the Together Card Drugs that were higher than they would have been but for Defendants' improper actions.

612.    The factual and legal bases of each Defendant's misconduct are common to the Class Members and represent a common thread of conspiracy and other misconduct resulting in injury to Plaintiffs and member of the Classes.

613.    There are many questions of law and fact common to Plaintiffs and the Classes, and those questions predominate over any questions that may affect individual Class Members, within the meaning of and fulfilling Rules 23(a)(2) and 23(b)(3).  Common questions of law and fact include, but are not limited to, the following:

(a)    Whether Defendants engaged in a combination or conspiracy to raise, fix, stabilize and maintain the AWP spreads for the Together Card Drugs;

(b)    The duration and extent of the combination or conspiracy alleged herein;

(c)    Whether Defendants, and each of them, was a participant in the combination or conspiracy alleged herein;

(d)    Whether the alleged combination and conspiracy violated Section 1 of the Sherman Act;

(e)    Whether the alleged combination and conspiracy violated the antitrust statutes of the Indirect Purchaser States;

(f)    Whether the Together Card Defendants engaged in a pattern and practice that caused Plaintiffs and Together Card Class Members to make inflated payments for the Together Card Drugs;

(g)    Whether the Together Card Defendants formed an enterprise for the purpose of carrying out their conspiracy and agreement;

(h)    Whether the Together Card Defendants used the U.S. mails and interstate wire facilities to carry out their conspiracy and agreement; and



     (i)    Whether the Together Card Defendants' conduct violated RICO; and

     (j)    Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class Members to make inflated payments for the Together Card Drugs.

614.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes, as required by Rule 23(a)(4). Plaintiffs have retained counsel with substantial experience in prosecuting nationwide consumer class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the Classes.

615.    Plaintiffs and members of the Classes have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Absent a class action, most members of the Classes likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the Courts and the litigants, and promotes consistency and efficiency of adjudication.

616.    The Nationwide Enrollees Class and the Nationwide End Payor Together Card Class have both suffered antitrust injury within the meaning of federal antitrust laws and have standing to sue for damages under Section 1 of the Sherman Act and Section IV of the Clayton Act. The Together Card Class Representatives and the National Together Card Enrollee Class are persons who have suffered injury to business or property by reason of a violation of Section 1 of the Sherman Act. Similarly, the End Payor Class Representatives and the Nationwide End Payor Together Card Class are persons who have suffered injury to business or property by reason of a violation of Section 1 of the Sherman Act. Members of each of the Nationwide



Classes are consumers or business entities that have standing to seek a Section IV Clayton Act remedy reflecting the increase in the purchase price or reimbursement rate for applicable drugs that is attributable to the price fixing conspiracy of the Defendants.

617.    Members of the two Nationwide Classes are the directly injured persons.  The conspiracy alleged herein is a conspiracy to effectuate over-reimbursement or end payor purchase cost in relation to actual transaction cost through intermediaries in the drug distribution channels.  The conspiracy alleged here is *not* that initial actual prices to those in the distribution chain but passed on and eventually imposed upon consumers and other end payors; the opposite is alleged here.  Here, the conspiracy alleged is that the end payor reimbursement for purchase price benchmark was secretly and unlawfully inflated, thereby enabling over reimbursement and over payments to all of those in the distribution chain, including retail pharmacies, mail order companies, PBMs and manufacturers.  None of those in the distribution chain actually pay the cost imposed by the reimbursement fix alleged herein.  The first and only party to bear this cost are the end payors, be they uninsured consumers, health plans or insurance companies.

618.    This case poses no likelihood of duplicative recovery.  The conspiracy alleged does not even theoretically present potential damage to intermediaries in the retail or mail order drug distribution channels.  Instead, only one level of injured persons is alleged here – the end payors for applicable drugs whose purchases were made, in whole or in part, on the basis of the published average wholesale price for the applicable drugs.

AMENDED MASTER CONSOLIDATED            - 209 -
CLASS ACTION COMPLAINT



E SERVED
01/22/04
05:20 PM ET
AWP MDL NO. 1456

## COUNT I[12]

### VIOLATIONS OF 18 U.S.C. § 1962(C)

### (AGAINST DEFENDANT DRUG MANUFACTURERS IDENTIFIED HEREIN FOR UNLAWFUL CONDUCT ASSOCIATED WITH AWPID DRUGS)

619.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

620.    This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against the Defendant Drug Manufacturers on behalf of the AWP classes with respect to all AWPID drugs not purchased through use of a PBM and includes drugs covered under Medicare Part B and those outside of Part B coverage.  The pricing of all such AWPIDs was directly tied to the published AWPs

621.    Plaintiffs, the members of Classes, and the Defendant Drug Manufacturers are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

622.    The following publishers of pharmaceutical industry compendia that periodically publish the AWPs, both in printed and electronic media, for various dosages of drugs are each "persons," as that term is defined in 18 U.S.C. § 1961(3):  (a) **Thomson Medical Economics** ("Thomson Medical") is a division of Thomson Corporation, a Delaware corporation with its principal place of business located at One Station Place, Stamford, Connecticut, and it is the publisher of the *Drug Topics Red Book* (the "*Red Book*"); (b) **First DataBank, Inc.,** ("First DataBank") a Missouri corporation, with its principal place of business at 1111 Bayhill Drive, San Bruno, California, and it is the publisher of drug pricing information including, but not limited to, *American Druggist First Databank Annual Directory of Pharmaceuticals* and

---

[12] This Amended Complaint does not contain certain material struck or dismissed by the Court in its May 13, 2003 Memorandum and Order.  For instance, many association plaintiffs and several RICO counts that were included in the MCC have not been included in this amended complaint in order to reduce the volume of an already lengthy pleading.  However, plaintiffs incorporate by this reference, into this Complaint, material struck or dismissed by the Court in order to, if necessary, preserve appellate rights.  Plaintiffs acknowledge that these allegations would be dismissed if reasserted.



*Essential Directory of Pharmaceuticals*, commonly referred to as the *Blue Book*; (c) and **Facts &**

**Comparisons, Inc.,** ("Facts & Comparisons") a division of Lippincott Williams & Wilkins, Inc.,

a Pennsylvania corporation which acquired all drug information reference products formerly

published by Medi-Span, Inc. and which currently makes available drug pricing information,

including, but not limited to, the Medi-Span *Master Drug Data Base*. These entities are

sometimes collectively referred to herein as "the Publishers."

623.    At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendant Drug

Manufacturers conducted the affairs of certain association-in-fact enterprises identified herein,

the affairs of which affected interstate commerce through a pattern of racketeering activity.

**The Manufacturer-Publisher Enterprises**

624.    For purposes of this claim, certain RICO "enterprises" are associations-in-fact

consisting of (a) one of the Publishers that reported AWPs for AWPIDs, and (b) a Defendant

Drug Manufacturer, including its directors, employees and agents. These associations-in-fact are

sometimes collectively referred to herein as the "Manufacturer-Publisher Enterprises." Each of

the Manufacturer-Publisher Enterprises is an ongoing and continuing business organization

consisting of both corporations and individuals that are and have been associated for the common

or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price

information, which all too often includes disseminating false and misleading AWPs, (b) selling,

purchasing, and administering AWPIDs to Plaintiffs and Class members, and (c) deriving profits

from these activities. Each of the enterprises had a common purpose of perpetuating use of

AWPs as a benchmark for reimbursement in the pharmaceutical industry, generally, and

specifically for the drugs of that defendant. The manufacturing defendants have this as a purpose

because without the AWP scheme, they would not be able to push the spread. The publishers

agree to this scheme, because if they did not, the manufacturers could easily revert to the other

methods of publishing prices or the publishers would have to independently investigate the AWP



at significant expense. The Publishers also have an economic incentive to merely report the AWPs provided to them by the manufacturers, because to do otherwise would require the Publishers to spend money to extensively survey actual sales prices in the market. By simply republishing what is submitted to them by the drug manufacturers, the Publishers save on expenses and consequently reap greater profits. Thus, each of the Manufacturer-Publisher Enterprises has a common purpose of perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry.

625.     Each of the Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the Defendant Drug Manufacturer and the specific Publisher that are its associates. As to each of the Manufacturer-Publisher Enterprises, there is a common communication network by which the Defendant Drug Manufacturer and the specific Publisher share information on a regular basis. Typically this communication occurs by use of the wires and mails in which a manufacturer will instruct a publisher to list a certain AWP. As to each of the Manufacturer-Publisher Enterprises, the Defendant Drug Manufacturer and the specific Publisher functioned as a continuing unit. At all relevant times, each of the Manufacturer-Publisher Enterprises was operated by the specific Defendant Drug Manufacturer for criminal purposes, namely, carrying out the AWP Scheme.

626.     At all relevant times, each one of the Publishers was aware of the Defendants Drug Manufacturers' AWP Scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme. Each of the publishing manufacturers is aware that the published AWPs are inflated. This awareness comes from the following sources: First, at some point prior to 1992 the publishers in many instances obtained AWPs themselves by survey. From their surveys of those in the distribution chain, they were and are aware that the reported AWPs were not accurate. Second, as various congressional bodies and government agencies



reported on AWP inflation, the Publishers did not change or challenge the self-reported AWPs, but continued blindly accepting the requested AWPs. Third, when the State of Texas began prosecuting Dey for its AWP practices, and when other states began focusing on Dey, the Publishers stopped accepting Dey's reported AWPs and published a different, far lower AWP. They withdraw from the Dey enterprise due to fear that they would be sued if they continued to publish Dey's false AWPs. This prompted a lawsuit by Dey alleging that the Publishers were treating Dey differently than they were treating all other manufacturers. In other words, Dey was complaining of the others being allowed to continue the scheme while it could not.

627.    The foregoing evidences the Publishers willing participation in the enterprise; their common purpose in the AWP scheme; and their agreement to a structure wherein the manufacturers made decisions as to what AWPs would be reported. This structure was the basis in which each of the enterprises was structured and its affairs conducted. The only exception occurred when the Publishers, fearing litigation, refused to accept Dey's instructions. The Publishers were willing participants in the scheme because if the truth were revealed the entire AWP reporting system would collapse.

628.    For purposes of this count, the Manufacturer-Publisher Enterprises are identified as follows:

(a)    *The Abbott Manufacturer-Publisher Enterprises:*  The Abbott Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Abbott, and Abbott, including its directors, employees and agents: (1) the Abbott-Thomson Medical Enterprise; (2) the Abbott-First DataBank Enterprise; and (3) the Abbott-Facts & Comparisons Enterprise. Each of the Abbott Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared



purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Abbott Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Abbott and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons. As to each of these Abbott Manufacturer-Publisher Enterprises, there is a common communication network by which Abbott and Thomson Medical, Abbott and First Data Bank, and Abbott and Facts & Comparisons share information on a regular basis. As to each of these Abbott-Manufacturer-Publisher Enterprises, Abbott and Thomson Medical, Abbott and First Data Bank, and Abbott and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Abbott Manufacturer-Publisher Enterprises was operated and conducted by Abbott for criminal purposes, namely, carrying out the AWP Scheme.

(b) *The Amgen Manufacturer-Publisher Enterprises:* The Amgen Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Amgen, and Amgen, including its directors, employees and agents: (1) the Amgen-Thomson Medical Enterprise; (2) the Amgen-First DataBank Enterprise; and (3) the Amgen-Facts & Comparisons Enterprise. Each of the Amgen Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class



members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Amgen Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Amgen and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons. As to each of these Amgen Manufacturer-Publisher Enterprises, there is a common communication network by which Amgen and Thomson Medical, Amgen and First Data Bank, and Amgen and Facts & Comparisons share information on a regular basis. As to each of these Amgen-Manufacturer-Publisher Enterprises, Amgen and Thomson Medical, Amgen and First Data Bank, and Amgen and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Amgen Manufacturer-Publisher Enterprises was operated and conducted by Amgen for criminal purposes, namely, carrying out the AWP Scheme.

(c)     *The AstraZeneca Manufacturer-Publisher Enterprises:* The AstraZeneca Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by AstraZeneca, and AstraZeneca, including its directors, employees and agents: (1) the AstraZeneca -Thomson Medical Enterprise; (2) the AstraZeneca -First DataBank Enterprise; and (3) the AstraZeneca -Facts & Comparisons Enterprise. Each of the AstraZeneca Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from



these activities. Each of the AstraZeneca Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between AstraZeneca and Thomson Medical, AstraZeneca and First DataBank, and AstraZeneca and Facts & Comparisons. As to each of these AstraZeneca Manufacturer-Publisher Enterprises, there is a common communication network by which AstraZeneca and Thomson Medical, AstraZeneca and First Data Bank, and AstraZeneca and Facts & Comparisons share information on a regular basis. As to each of these AstraZeneca -Manufacturer-Publisher Enterprises, AstraZeneca and Thomson Medical, AstraZeneca and First Data Bank, and AstraZeneca and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the AstraZeneca Manufacturer-Publisher Enterprises was operated and conducted by AstraZeneca for criminal purposes, namely, carrying out the AWP Scheme.

(d)     *The Aventis Group Manufacturer-Publisher Enterprise:*  The Aventis Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Aventis Group, and Aventis Group, including its directors, employees and agents: (1) the Aventis Group -Thomson Medical Enterprise; (2) the Aventis Group-First DataBank Enterprise; and (3) the Aventis Group-Facts & Comparisons Enterprise. Each of the Aventis Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Aventis Group Manufacturer-Publisher Enterprises has a



systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Aventis Group and Thomson Medical, Aventis Group and First DataBank, and Aventis Group and Facts & Comparisons. As to each of these Aventis Group Manufacturer-Publisher Enterprises, there is a common communication network by which Aventis Group and Thomson Medical, Aventis Group and First Data Bank, and Aventis Group and Facts & Comparisons share information on a regular basis. As to each of these Aventis Group-Manufacturer-Publisher Enterprises, Aventis Group and Thomson Medical, Aventis Group and First Data Bank, and Aventis Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Aventis Group Manufacturer-Publisher Enterprises was operated and conducted by Aventis Group for criminal purposes, namely, carrying out the AWP Scheme.

(e)    *The Baxter Manufacturer-Publisher Enterprises:* The Baxter Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Baxter, and Baxter, including its directors, employees and agents: (1) the Baxter-Thomson Medical Enterprise; (2) the Baxter-First DataBank Enterprise; and (3) the Baxter Facts & Comparisons Enterprise. Each of the Baxter Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class 1 members and to participants in those Plaintiffs and Class 1 members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Baxter Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Baxter and



Thomson Medical, Baxter and First DataBank, and Baxter and Facts & Comparisons. As to each of these Baxter Manufacturer-Publisher Enterprises, there is a common communication network by which Baxter and Thomson Medical, Baxter and First Data Bank, and Baxter and Facts & Comparisons share information on a regular basis. As to each of these Baxter-Manufacturer-Publisher Enterprises, Baxter and Thomson Medical, Baxter and First Data Bank, and Baxter and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Baxter Manufacturer-Publisher Enterprises was operated and conducted by Baxter for criminal purposes, namely, carrying out the AWP Scheme.

(f) *The Bayer Manufacturer-Publisher Enterprises:* The Bayer Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Bayer, and Bayer, including its directors, employees and agents: (1) the Bayer-Thomson Medical Enterprise; (2) the Bayer-First DataBank Enterprise; and (3) the Bayer-Facts & Comparisons Enterprise. Each of the Bayer Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Bayer Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Bayer and Thomson Medical, Bayer and First DataBank, and Bayer and Facts & Comparisons. As to each of these Bayer Manufacturer-Publisher Enterprises, there is a common communication network



by which Bayer and Thomson Medical, Bayer and First Data Bank, and Bayer and Facts & Comparisons share information on a regular basis. As to each of these Bayer Manufacturer-Publisher Enterprises, Bayer and Thomson Medical, Bayer and First Data Bank, and Bayer and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Bayer Manufacturer-Publisher Enterprises was operated and conducted by Bayer for criminal purposes, namely, carrying out the AWP Scheme.

(g)     *The Boehringer Group Manufacturer-Publisher Enterprises:* The Boehringer Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Boehringer Group, and Boehringer Group, including its directors, employees and agents: (1) the Boehringer Group-Thomson Medical Enterprise; (2) the Boehringer Group-First DataBank Enterprise; and (3) the Boehringer Group-Facts & Comparisons Enterprise. Each of the Boehringer Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Boehringer Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Boehringer Group and Thomson Medical, Boehringer Group and First DataBank, and Boehringer Group and Facts & Comparisons. As to each of these Boehringer Group Manufacturer-Publisher Enterprises, there is a common communication network by which Boehringer Group and Thomson Medical, Boehringer Group and First Data Bank,

1534.16 0046 BSC.DOC



and Boehringer Group and Facts & Comparisons share information on a regular basis. As to each of these Boehringer Group Manufacturer-Publisher Enterprises, Boehringer Group and Thomson Medical, Boehringer Group and First Data Bank, and Boehringer Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Boehringer Group Manufacturer-Publisher Enterprises was operated and conducted by Boehringer Group for criminal purposes, namely, carrying out the AWP Scheme.

   (h)  *The Braun Manufacturer-Publisher Enterprises:*  The Braun Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Braun, and Braun, including its directors, employees and agents: (1) the Braun-Thomson Medical Enterprise; (2) the Braun-First DataBank Enterprise; and (3) the Braun-Facts & Comparisons Enterprise. Each of the Braun Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Braun Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Braun and Thomson Medical, Braun and First DataBank, and Braun and Facts & Comparisons. As to each of these Braun Manufacturer-Publisher Enterprises, there is a common communication network by which Braun and Thomson Medical, Braun and First Data Bank, and Braun and Facts & Comparisons share information on a regular basis.  As to each of these Braun



Manufacturer-Publisher Enterprises, Braun and Thomson Medical, Braun and First Data Bank, and Braun and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Braun Manufacturer-Publisher Enterprises was operated and conducted by Braun for criminal purposes, namely, carrying out the AWP Scheme.

(i)      *The BMS Group Manufacturer-Publisher Enterprises:*  The BMS Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by BMS Group, and BMS Group, including its directors, employees and agents: (1) the BMS Group-Thomson Medical Enterprise; (2) the BMS Group-First DataBank Enterprise; and (3) the BMS Group-Facts & Comparisons Enterprise. Each of the BMS Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the BMS Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between BMS Group and Thomson Medical, BMS Group and First DataBank, and BMS Group and Facts & Comparisons. As to each of these BMS Group Manufacturer-Publisher Enterprises, there is a common communication network by which BMS Group and Thomson Medical, BMS Group and First Data Bank, and BMS Group and Facts & Comparisons share information on a regular basis. As to each of these BMS Group Manufacturer-Publisher Enterprises, BMS Group and Thomson Medical, BMS Group and First Data Bank, and BMS Group and Facts & Comparisons



functioned as continuing but separate units. At all relevant times, each of the BMS Group Manufacturer-Publisher Enterprises was operated and conducted by BMS Group for criminal purposes, namely, carrying out the AWP Scheme.

      (j)    *The Dey Manufacturer-Publisher Enterprises:* The Dey Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Dey, and Dey, including its directors, employees and agents: (1) the Dey-Thomson Medical Enterprise; (2) the Dey-First DataBank Enterprise; and (3) the Dey-Facts & Comparisons Enterprise. Each of the Dey Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Dey Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Dey and Thomson Medical, Dey and First DataBank, and Dey and Facts & Comparisons. As to each of these Dey Manufacturer-Publisher Enterprises, there is a common communication network by which Dey and Thomson Medical, Dey and First Data Bank, and Dey and Facts & Comparisons share information on a regular basis. As to each of these Dey Manufacturer-Publisher Enterprises, Dey and Thomson Medical, Dey and First Data Bank, and Dey and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Dey Manufacturer-Publisher Enterprises was operated and conducted by Dey for criminal purposes, namely, carrying out the AWP Scheme.



(k)     *The Fujisawa Group Manufacturer-Publisher Enterprises:*  The Fujisawa Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Fujisawa Group, and Fujisawa Group, including its directors, employees and agents:  (1) the Fujisawa Group-Thomson Medical Enterprise; (2) the Fujisawa Group-First DataBank Enterprise; and (3) the Fujisawa Group-Facts & Comparisons Enterprise. Each of the Fujisawa Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Fujisawa Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Fujisawa Group and Thomson Medical, Fujisawa Group and First DataBank, and Fujisawa Group and Facts & Comparisons.  As to each of these Fujisawa Group Manufacturer-Publisher Enterprises, there is a common communication network by which Fujisawa Group and Thomson Medical, Fujisawa Group and First Data Bank, and Fujisawa Group and Facts & Comparisons share information on a regular basis.  As to each of these Fujisawa Group Manufacturer-Publisher Enterprises, Fujisawa Group and Thomson Medical, Fujisawa Group and First Data Bank, and Fujisawa Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Fujisawa Group Manufacturer-Publisher Enterprises was operated and conducted by Dey for criminal purposes, namely, carrying out the AWP Scheme.



(I)     *The GSK Group Manufacturer-Publisher Enterprises:*  The GSK Group
Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of
each of the Publishers that reported the AWPID AWPs that were provided to them by
GSK Group, and GSK Group, including its directors, employees and agents: (1) the GSK
Group-Thomson Medical Enterprise; (2) the GSK Group-First DataBank Enterprise; and
(3) the GSK Group-Facts & Comparisons Enterprise.  Each of the GSK Group
Manufacturer-Publisher Enterprises is an ongoing and continuing business organization
consisting of both corporations and individuals that are and have been associated for the
common or shared purposes of (a) publishing or otherwise disseminating false and
misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual
Plaintiffs and Class members and to participants in those Plaintiffs and Class members
that comprise health and welfare plans, and (c) deriving profits from these activities.
Each of the GSK Group Manufacturer-Publisher Enterprises has a systemic linkage
because there are contractual relationships, financial ties, and continuing coordination of
activities between GSK Group and Thomson Medical, GSK Group and First DataBank,
and GSK Group and Facts & Comparisons.  As to each of these GSK Group
Manufacturer-Publisher Enterprises, there is a common communication network by
which GSK Group and Thomson Medical, GSK Group and First Data Bank, and GSK
Group and Facts & Comparisons share information on a regular basis.  As to each of
these GSK Group Manufacturer-Publisher Enterprises, GSK Group and Thomson
Medical, GSK Group and First Data Bank, and GSK Group and Facts & Comparisons
functioned as continuing but separate units.  At all relevant times, each of the GSK Group
Manufacturer-Publisher Enterprises was operated and conducted by GSK Group for
criminal purposes, namely, carrying out the AWP Scheme.



(m)     *The Hoffman-La Roche Manufacturer-Publisher Enterprises:*  The
Hoffman-La Roche Group Manufacturer-Publisher Enterprises are three separate
associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs
that were provided to them by Hoffman-La Roche, and Hoffman-La Roche, including its
directors, employees and agents:  (1) the Hoffman-La Roche-Thomson Medical
Enterprise; (2) the Hoffman-La Roche-First DataBank Enterprise; and (3) the Hoffman-
La Roche-Facts & Comparisons Enterprise.  Each of the Hoffman-La Roche
Manufacturer-Publisher Enterprises is an ongoing and continuing business organization
consisting of both corporations and individuals that are and have been associated for the
common or shared purposes of (a) publishing or otherwise disseminating false and
misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual
Plaintiffs and Class members and to participants in those Plaintiffs and Class members
that comprise health and welfare plans, and (c) deriving profits from these activities.
Each of the Hoffman-La Roche Group Manufacturer-Publisher Enterprises has a systemic
linkage because there are contractual relationships, financial ties, and continuing
coordination of activities between Hoffman-La Roche and Thomson Medical, Hoffman-
La Roche and First DataBank, and Hoffman-La Roche and Facts & Comparisons.  As to
each of these Hoffman-La Roche Manufacturer-Publisher Enterprises, there is a common
communication network by which Hoffman-La Roche and Thomson Medical, Hoffman-
La Roche and First Data Bank, and Hoffman-La Roche and Facts & Comparisons share
information on a regular basis.  As to each of these Hoffman-La Roche Manufacturer-
Publisher Enterprises, Hoffman-La Roche and Thomson Medical, Hoffman-La Roche
and First Data Bank, and Hoffman-La Roche and Facts & Comparisons functioned as
continuing but separate units.  At all relevant times, each of the Hoffman-La Roche



Manufacturer-Publisher Enterprises was operated and conducted by Hoffman-La Roche for criminal purposes, namely, carrying out the AWP Scheme.

      (n)    *The Immunex Manufacturer- Publisher Enterprises:*  The Immunex Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Immunex, and Immunex, including its directors, employees and agents:  (1) the Immunex-La Roche-Thomson Medical Enterprise; (2) the Immunex-First DataBank Enterprise; and (3) the Immunex-Facts & Comparisons Enterprise.  Each of the Immunex Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Immunex Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Immunex and Thomson Medical, Immunex and First DataBank, and Immunex and Facts & Comparisons.  As to each of these Immunex Manufacturer-Publisher Enterprises, there is a common communication network by which Immunex and Thomson Medical, Immunex and First Data Bank, and Immunex and Facts & Comparisons share information on a regular basis.  As to each of these Immunex Manufacturer-Publisher Enterprises, Immunex and Thomson Medical, Immunex and First Data Bank, and Immunex and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Immunex Manufacturer-Publisher



Enterprises was operated and conducted by Immunex for criminal purposes, namely, carrying out the AWP Scheme.

(o)    *The Johnson & Johnson Group Manufacturer-Publisher Enterprise:*  The Johnson & Johnson Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Johnson & Johnson Group, and Johnson & Johnson Group, including its directors, employees and agents: (1) the Johnson & Johnson Group-La Roche-Thomson Medical Enterprise; (2) the Johnson & Johnson Group-First DataBank Enterprise; and (3) the Johnson & Johnson Group-Facts & Comparisons Enterprise. Each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Johnson & Johnson Group and Thomson Medical, Johnson & Johnson Group and First DataBank, and Johnson & Johnson Group and Facts & Comparisons. As to each of these Johnson & Johnson Group Manufacturer-Publisher Enterprises, there is a common communication network by which Johnson & Johnson Group and Thomson Medical, Johnson & Johnson Group and First Data Bank, and Johnson & Johnson Group and Facts & Comparisons share information on a regular basis. As to each of these Johnson & Johnson Group Manufacturer-Publisher Enterprises, Johnson & Johnson Group and Thomson Medical,

AMENDED MASTER CONSOLIDATED          - 227 -
CLASS ACTION COMPLAINT