

Johnson & Johnson Group and First Data Bank, and Johnson & Johnson Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises was operated and conducted by Johnson & Johnson Group for criminal purposes, namely, carrying out the AWP Scheme.

(p)    *The Pfizer Manufacturer-Publisher Enterprises:* The Pfizer Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Pfizer, and Pfizer, including its directors, employees and agents: (1) the Pfizer-La Roche-Thomson Medical Enterprise; (2) the Pfizer-First DataBank Enterprise; and (3) the Pfizer-Facts & Comparisons Enterprise. Each of the Pfizer Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Pfizer Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pfizer and Thomson Medical, Pfizer and First DataBank, and Pfizer and Facts & Comparisons. As to each of these Pfizer Manufacturer-Publisher Enterprises, there is a common communication network by which Pfizer and Thomson Medical, Pfizer and First Data Bank, and Pfizer and Facts & Comparisons share information on a regular basis. As to each of these Pfizer Manufacturer-Publisher Enterprises, Pfizer and Thomson Medical, Pfizer and First Data Bank, and Pfizer and Facts & Comparisons functioned as continuing



but separate units. At all relevant times, each of the Pfizer Manufacturer-Publisher Enterprises was operated and conducted by Pfizer for criminal purposes, namely, carrying out the AWP Scheme.

(q)     *The Pharmacia Group Manufacturer-Publisher Enterprises:*  The Pharmacia Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Pharmacia Group, and Pharmacia Group, including its directors, employees and agents:  (1) the Pharmacia Group-Thomson Medical Enterprise; (2) the Pharmacia Group-First DataBank Enterprise; and (3) the Pharmacia Group-Facts & Comparisons Enterprise.  Each of the Pharmacia Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Pharmacia Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pharmacia Group and Thomson Medical, Pharmacia Group and First DataBank, and Pharmacia Group and Facts & Comparisons.  As to each of these Pharmacia Group Manufacturer-Publisher Enterprises, there is a common communication network by which Pharmacia Group and Thomson Medical, Pharmacia Group and First Data Bank, and Pharmacia Group and Facts & Comparisons share information on a regular basis.  As to each of these Pharmacia Group Manufacturer-Publisher Enterprises, Pharmacia Group and Thomson Medical, Pharmacia Group and First Data Bank, and Pharmacia Group and



Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Pharmacia Group Manufacturer-Publisher Enterprises was operated and conducted by Pharmacia Group for criminal purposes, namely, carrying out the AWP Scheme.

(r)      *The Schering-Plough Group Manufacturer-Publisher Enterprises:* The Schering-Plough Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Schering-Plough Group, and Schering-Plough Group, including its directors, employees and agents: (1) the Schering-Plough Group-Thomson Medical Enterprise; (2) the Schering-Plough Group-First DataBank Enterprise; and (3) the Schering-Plough Group-Facts & Comparisons Enterprise. Each of the Schering-Plough Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Schering-Plough Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Schering-Plough Group and Thomson Medical, Schering-Plough Group and First DataBank, and Schering-Plough Group and Facts & Comparisons. As to each of these Schering-Plough Group Manufacturer-Publisher Enterprises, there is a common communication network by which Schering-Plough Group and Thomson Medical, Schering-Plough Group and First Data Bank, and Schering-Plough Group and Facts & Comparisons share information on a regular basis.



As to each of these Schering-Plough Group Manufacturer-Publisher Enterprises, Schering-Plough Group and Thomson Medical, Schering-Plough Group and First Data Bank, and Schering-Plough Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Schering-Plough Group Manufacturer-Publisher Enterprises was operated and conducted by Schering-Plough Group for criminal purposes, namely, carrying out the AWP Scheme.

(s) *The Sicor Group Manufacturer-Publisher Enterprises:* The Sicor Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Sicor Group, and Sicor Group, including its directors, employees and agents: (1) the Sicor Group-Thomson Medical Enterprise; (2) the Sicor Group-First DataBank Enterprise; and (3) the Sicor Group-Facts & Comparisons Enterprise. Each of the Sicor Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Sicor Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sicor Group and Thomson Medical, Sicor Group and First DataBank, and Sicor Group and Facts & Comparisons. As to each of these Sicor Group Manufacturer-Publisher Enterprises, there is a common communication network by which Sicor Group and Thomson Medical, Sicor Group and First Data Bank, and Sicor Group and Facts & Comparisons share information on a regular basis. As to each



of these Sicor Group Manufacturer-Publisher Enterprises, Sicor Group and Thomson Medical, Sicor Group and First Data Bank, and Sicor Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Sicor Group Manufacturer-Publisher Enterprises was operated and conducted by Sicor Group for criminal purposes, namely, carrying out the AWP Scheme.

(t)     *The TAP Group Manufacturer-Publisher Enterprises:* The TAP Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by The TAP Group, and The TAP Group, including its directors, employees and agents: (1) the TAP Group-Thomson Medical Enterprise; (2) the TAP Group-First DataBank Enterprise; and (3) the TAP Group-Facts & Comparisons Enterprise. Each of the TAP Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the TAP Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the TAP Group and Thomson Medical, the TAP Group and First DataBank, and the TAP Group and Facts & Comparisons. As to each of these TAP Group Manufacturer-Publisher Enterprises, there is a common communication network by which the TAP Group and Thomson Medical, the TAP Group and First Data Bank, and the TAP Group and Facts & Comparisons share information on a regular basis. As to each of these TAP Group Manufacturer-Publisher Enterprises, the TAP Group and



Thomson Medical, the TAP Group and First Data Bank, and the TAP Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the TAP Group Manufacturer-Publisher Enterprises was operated and conducted by the TAP Group for criminal purposes, namely, carrying out the AWP Scheme.

(u)     *The Watson Manufacturer-Publisher Enterprises:*  The Watson Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Watson, and Watson, including its directors, employees and agents: (1) the Watson-Thomson Medical Enterprise; (2) the Watson-First DataBank Enterprise; and (3) the Watson-Facts & Comparisons Enterprise. Each of the Watson Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Watson Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Watson and Thomson Medical, Watson and First DataBank, and Watson and Facts & Comparisons. As to each of these Watson Manufacturer-Publisher Enterprises, there is a common communication network by which Watson and Thomson Medical, Watson and First Data Bank, and Watson and Facts & Comparisons share information on a regular basis. As to each of these Watson Manufacturer-Publisher Enterprises, Watson and Thomson Medical, Watson and First Data Bank, and Watson and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Watson



Manufacturer-Publisher Enterprises was operated and conducted by Watson for criminal purposes, namely, carrying out the AWP Scheme.

(v)     *The Warrick Manufacturer-Publisher Enterprises*:  The Warrick Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Warrick, and Warrick, including its directors, employees and agents: (1) the Warrick-Thomson Medical Enterprise; (2) the Warrick-First DataBank Enterprise; and (3) the Warrick-Facts & Comparisons Enterprise.  Each of the Warrick Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Warrick Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Warrick and Thomson Medical, Warrick and First DataBank, and Warrick and Facts & Comparisons.  As to each of these Warrick Manufacturer-Publisher Enterprises, there is a common communication network by which Warrick and Thomson Medical, Warrick and First Data Bank, and Warrick and Facts & Comparisons share information on a regular basis.  As to each of these Warrick Manufacturer-Publisher Enterprises, Warrick and Thomson Medical, Warrick and First Data Bank, and Warrick and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Warrick Manufacturer-Publisher Enterprises was operated and conducted by Warrick for criminal purposes, namely, carrying out the AWP Scheme.



**The Defendant Drug Manufacturers' Use of the U.S. Mails and Interstate Wire Facilities**

629. Each of the Manufacturer-Publisher Enterprises engaged in and affected interstate commerce because they engage in the following activities across state boundaries: The transmission and publication of false and misleading information concerning AWPs; the sale, purchase and/or administration of AWPIDs; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission and/or receipt of invoices, statements and payments related to the use or administration of AWPIDs.

630. During the Class Period, the Defendants Drug Manufacturers' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

631. The nature and pervasiveness of the Defendant Drug Manufacturers' AWP Scheme, which was orchestrated out of the corporate headquarters of the Defendant Drug Manufacturers, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the various local district managers overseeing the sales force(s), the numerous pharmaceutical sales representatives who, in turn, directly communicated with providers and employees who communicated with the Publishers.

632. Many of the precise dates of Defendant Drug Manufacturers' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records. Indeed, an essential part of the successful operation of the AWP Scheme alleged herein depended upon secrecy, and as alleged above, the Defendant Drug Manufacturers took deliberate steps to conceal their wrongdoing. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the AWP Scheme and do so below.



633.    The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities to perpetrate the AWP Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

(a)    Marketing materials about the AWPs for AWPIDs and the available spread, which were sent by the Defendant Drug Manufacturers to health care providers located across the country;

(b)    Written representations of the AWPs made by the Defendant Drug Manufacturers to the Publishers, which were made at least annually and in many cases several times during a single year;

(c)    Documents providing information or incentives designed to lessen the prices that health care providers paid for AWPIDs and/or to conceal those prices or the AWP Scheme alleged here;

(d)    Written communications, relating to rebates, kickbacks, or other financial inducements included, but not limited to, checks, as detailed herein;

(e)    Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

(f)    Written and oral communications with health insurers and patients, including Plaintiffs and members of the Class, inducing payments for the drugs that were made in reliance on AWPs; and

(g)    Receipts of money sent on tens of thousands of occasions through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Defendant Drug Manufacturers' AWP Scheme.



(h)     In addition to the above-referenced RICO predicate acts, it was foreseeable to the Defendant Drug Manufacturers that the Publishers would distribute their publications containing false AWPs through the U.S. mails and by interstate wire facilities. Further, the Defendant Drug Manufacturers' corporate headquarters have, in furtherance of the AWP Scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions. These uses of the U.S. mails include some of the documents referenced in this Amended Complaint.

**Conduct of the RICO Enterprises' Affairs**

634.    During the Class Period, the Defendant Drug Manufacturers have exerted control over their Manufacturer-Publisher Enterprises and, in violation of Section 1962(c) of RICO, the Defendant Drug Manufacturers have conducted or participated in the conduct of the affairs of those RICO enterprises, directly or indirectly, in the following ways:

(a)     Each of the Defendant Drug Manufacturers has directly controlled the price for its AWPIDs;

(b)     Each of the Defendant Drug Manufacturers has directly controlled the AWPs that are reported by the Publishers;

(c)     Each of the Defendant Drug Manufacturers has directly controlled the creation and distribution of marketing, sales, and other materials used to inform health care providers nationwide of the profit potential of its AWPIDs;

(d)     Each of the Defendant Drug Manufacturers has controlled and participated in the affairs of its Manufacturer-Publisher Enterprises by using a fraudulent scheme to manufacture, market and sell its AWPIDs on the basis of AWPs that each of the Defendant Drug Manufacturers provides to the Publishers;



(e)     Each of the Defendant Drug Manufacturers intended that each of the Publishers would (and did) distribute their publications containing false AWPs through the U.S. mails and by interstate wire facilities; and

(f)     Each of the publishers has allowed these Defendants to exert control over their organizations knowing that the AWPs were inflated and were not real numbers. Each publisher did so because the reporting of AWPs was, and is, a major part of its business.

635.     Each of the Manufacturer-Publisher Enterprises had a hierarchical decision-making structure headed by the respective Defendant Drug Manufacturer. The Defendant Drug Manufacturers issued instructions on how its AWPs were to be reported and each publisher accepted those instructions despite knowing of their falsity.

636.     In violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers have conducted the affairs of each of the Manufacturer-Publisher Enterprises with which they associated by reporting fraudulently inflated AWPs for AWPIDs that were then published by the Publishers and disseminated nationwide.

**The Defendant Drug Manufacturers' Pattern of Racketeering Activity**

637.     Each of the Defendant Drug Manufacturers have conducted and participated in the affairs of their above-referenced Manufacturer-Publisher Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The Defendant Drug Manufacturers' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their AWP Scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the



Defendant Drug Manufacturers intended to defraud Plaintiffs, members of the Classes and other intended victims of the AWP Scheme.

638.    The Defendants Drug Manufacturers' fraudulent and unlawful AWP Scheme consisted, in part, of deliberately overstating the AWPs for their AWPIDs, thereby creating a "spread" based on the inflated figure in order to induce others to advocate and favor that Defendant Drug Manufacturer's AWPIDs. Further, others would bill their clients for the Defendant Drug Manufacturers' AWPIDs based on the inflated AWPs, which did not reflect the true price paid for the AWPIDs.

639.    The AWP Scheme was calculated and intentionally crafted to ensure that Plaintiffs and members of the Classes would be over-billed for the drugs. In designing and implementing the AWP Scheme, at all times the Defendant Drug Manufacturers were cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the Defendant Drug Manufacturers in setting the AWPs, as reported by the Publishers.

639(a). Each of the plaintiffs, to the extent they purchased drugs outside of the PBM context, made purchases with the price being tied to AWP. *See* ¶¶ 26-36.

640.    By intentionally and artificially inflating the AWPs, and by subsequently failing to disclose such practices to the individual patients, health plans and their insurers, the Defendant Drug Manufacturers engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

641.    The Defendant Drug Manufacturers' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and members of the Classes. Each separate use of the U.S. mails and/or interstate wire facilities employed by the Defendant Drug Manufacturers was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Classes. Each of the Defendant Drug

AMENDED MASTER CONSOLIDATED          - 239 -
CLASS ACTION COMPLAINT



Manufacturers has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular Manufacturer-Publisher Enterprises.

### The Defendant Drug Manufacturers' Motive

642.    The Defendant Drug Manufacturers' motive in creating and operating the AWP Scheme and conducting the affairs of the Manufacturer-Publisher Enterprises described herein was to fraudulently obtain sales of and profits from their AWPIDs.

643.    The AWP Scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the Defendant Drug Manufacturers' AWPIDs.  Thus, each of the Defendant Drug Manufacturers used the AWP Scheme to sell more of its drugs, thereby fraudulently gaining sales and market share and profits.

### Damages Caused by the Defendant Drug Manufacturers' AWP Scheme

644.    The Defendant Drug Manufacturers' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Classes to be injured in their business or property because Plaintiffs and members of the Classes have paid many hundreds of millions of dollars in inflated reimbursements or other payments for AWPIDs.

645.    The Defendant Drug Manufacturers sent billing statements through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their AWP Scheme.  Plaintiffs and members of the Classes have made inflated payments for AWPIDs based on and/or in reliance on reported and false AWPs.

646.    Under the provisions of Section 1964(c) of RICO, the Defendant Drug Manufacturers are jointly and severally liable to Plaintiffs and members of the Classes for three times the damages that Plaintiffs and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.



## COUNT II

## VIOLATIONS OF 18 U.S.C. § 1962(C)

## (AGAINST DEFENDANT DRUG MANUFACTURERS IDENTIFIED HEREIN)

647. Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

648. This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against the Defendant Drug Manufacturers identified below on behalf of AWP Classes by the AWP Class representatives.

649. Plaintiffs, the members of Classes, and the Defendant Drug Manufacturers are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

650. The following pharmacy benefit managers (collectively "PBMs") are each "persons," as that term is defined in 18 U.S.C. § 1961(3): (a) **AdvancePCS** ("Advance PCS"), a Delaware corporation with its principal place of business located at 750 West John Carpenter Freeway, Suite 1200, Irving, Texas; Advance PCS is the largest PBM in the United States and currently serves more than 75 million health plan members; (b) **Caremark, Rx, Inc.** ("Caremark Rx"), a Delaware corporation with its principal place of business located at 300 Galloria Tower, Suite 1000, Birmingham, Alabama; Caremark Rx is one of the largest pharmaceutical services companies in the United States with net revenues of approximately $5.6 billion in 2001; (c) **Express Scripts, Inc.** ("Express Scripts"), a Delaware corporation with its principal place of business located at 13900 Riverpoint Drive, Maryland Heights, Missouri; Express Scripts is the third largest PBM in North America; and (d) **Medco Health Solutions, Inc.** ("Medco Health"), a successor-in-interest to Merck-Medco Managed Care, L.L.C., is a Delaware corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey; since its acquisition in 1993, Medco Health has been a wholly-owned subsidiary of Defendant Drug Manufacturer Merck.



### The Manufacturer-PBM RICO Enterprises

651.    For purposes of this claim, the RICO "enterprises" are associations-in-fact consisting of (a) one of the PBMs that administered purchases of a Defendant Drug Manufacturer's brand name drugs and billed its members on the basis of the Defendant Drug Manufacturer's reported AWPs, and (b) a Defendant Drug Manufacturer, including its directors, employees and agents. These associations-in-fact are collectively referred to herein as the "Manufacturer-PBM Enterprises."

652.    Each of the Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Classes that comprise health and welfare plans, and deriving profits from these activities.

653.    Each of the Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the Defendant Drug Manufacturer and the specific PBM that are associates. As to each of the Manufacturer-PBM Enterprises, there is a common communication network by which the Defendant Drug Manufacturer and the specific PBM share information on a regular basis. As to each of the Manufacturer-PBM Enterprises, the Defendant Drug Manufacturer and the specific PBM functioned as a continuing unit. At all relevant times, each of the Manufacturer-PBM Enterprises was operated by the specific Defendant Drug Manufacturer for criminal purposes, namely, carrying out the AWP Scheme.

654.    Each manufacturer-PBM enterprise had a common purpose of perpetuating use of AWPs as a benchmark for reimbursement in the pharmaceutical industry. The manufacturing defendants had this as a purpose, because without the use of inflated AWPs as an industry price setting benchmark, they would not be able to push the spread to those in the distribution chain.



The PBMs share this common purpose, because they are subject to a great deal of control from the manufacturers. PBMs are now turning to drug manufacturers for hidden profit-making schemes, because PBM clients are no longer allowing PBMs to collect as much for claims administration. Thus, as a result, PBMs have, with the knowing and willful participation and assistance of the drug manufacturers, engaged in hidden profit-making schemes falling into three general categories: (i) garnering rebates and other "soft dollars" from drug manufacturers that the PBM Defendants, to a large extent, keep without disclosing to their health plans the true amounts of the rebates; (ii) pocketing secret spreads between actual drug costs and the prices charged to health plans and their members; and (iii) keeping secret discounts provided by the drug manufacturers in association with the PBMs' mail order operations.

655.    The existence and magnitude of PBM rebates and accompanying profits at the expense of PBM clients is acknowledged within the PBM industry. For example, a recent industry report observed:

> [R]ebates paid to the PBMs by pharmaceutical companies continue
> to increase, as evidenced by the increasing PBM profits . . . . [T]his
> should hold true so long as the PBMs add value [apparently to the
> drug makers] by moving market share within drug classes.

656.    Thus, PBMs were willing participants in the enterprise, and each participant in the enterprise shared many common purposes.

657.    Further, as a result of their reliance on the manufacturers, PBMs took instructions and commands from the manufacturers regarding the use of AWP, not only so that they could keep part of the spread, but also so as to continue to earn from the manufacturers: (i) *Access rebates* for placement of products on the PBMs' formulary; (ii) *Market share rebates* for garnering higher market share than established targets; (iii) *Administrative fees* for assembling data to verify market share results; and (iv) *Other fees and grants* in an effort to promote products.



658.   In order to garner all of these fees from the drug manufacturers, the PBMs each meet on a frequent basis to discuss drug prices, spreads, marketing opportunities and coordination of all of the above.

659.   There is a common communication network between each PBM and each manufacturer for the purpose of implementing the AWP spread scheme and for the exchange of financial rewards for the PBMs activities that benefit the drug company manufacturers.

660.   At all relevant times, each one of the PBMs was aware of the Defendants Drug Manufacturers' AWP Scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.

661.   For purposes of this count, the Manufacturer-PBM Enterprises are identified as follows:

(a)   *The Abbott Manufacturer-PBM Enterprises:*   The Abbott Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Abbott's AWPIDs and billed its members on the basis of Abbott's reported AWPs, and Abbott, including its directors, employees and agents: (1) the Abbott-AdvancePCS Enterprise; (2) the Abbott-Caremark Rx Enterprise; (3) the Abbott-Express Scripts Enterprise; and (4) the Abbott-Medco Health Enterprise.   Each of the Abbott Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.   Each of the Abbott Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and Abbott and Medco Health.   As to each of these Abbott



Manufacturer-PBM Enterprises, there is a common communication network by which Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and Abbott and Medco Health share information on a regular basis. As to each of these Abbott-Manufacturer-PBM Enterprises, Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and Abbott and Medco Health functioned as continuing but separate units. At all relevant times, each of the Abbott Manufacturer-PBM Enterprises was operated and conducted by Abbott for criminal purposes, namely, carrying out the AWP Scheme.

 (b) *The Amgen Manufacturer-PBM Enterprises:* The Amgen Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Amgen's AWPIDs and billed its members on the basis of Amgen's reported AWPs, and Amgen, including its directors, employees and agents: (1) the Amgen-AdvancePCS Enterprise; (2) the Amgen-Caremark Rx Enterprise; (3) the Amgen-Express Scripts Enterprise; and (4) the Amgen-Medco Health Enterprise. Each of the Amgen Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Amgen Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and Express Scripts, and Amgen and Medco Health. As to each of these Amgen Manufacturer-PBM Enterprises, there is a common communication network by which Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and Express Scripts, and Amgen and Medco Health share information on a regular basis. As to each of these



Amgen-Manufacturer-PBM Enterprises, Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and Express Scripts, and Amgen and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Amgen Manufacturer-PBM Enterprises was operated and conducted by Amgen for criminal purposes, namely, carrying out the AWP Scheme.

(c)     *The AstraZeneca Manufacturer-PBM Enterprises:*  The AstraZeneca Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of AstraZeneca's AWPIDs and billed its members on the basis of AstraZeneca's reported AWPs, and AstraZeneca, including its directors, employees and agents:  (1) the AstraZeneca-AdvancePCS Enterprise; (2) the AstraZeneca-Caremark Rx Enterprise; (3) the AstraZeneca-Express Scripts Enterprise; and (4) the AstraZeneca-Medco Health Enterprise.  Each of the AstraZeneca Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the AstraZeneca Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca and Express Scripts, and AstraZeneca and Medco Health.  As to each of these AstraZeneca Manufacturer-PBM Enterprises, there is a common communication network by which AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca and Express Scripts, and AstraZeneca and Medco Health share information on a regular basis.  As to each of these AstraZeneca-Manufacturer-PBM Enterprises, AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca and Express Scripts, and



AstraZeneca and Medco Health functioned as continuing but separate units. At all relevant times, each of the AstraZeneca Manufacturer-PBM Enterprises was operated and conducted by AstraZeneca for criminal purposes, namely, carrying out the AWP Scheme.

(d)     *The Aventis Group Manufacturer-PBM Enterprise:*  The Aventis Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Aventis Group's AWPIDs and billed its members on the basis of Aventis Group's reported AWPs, and Aventis Group, including its directors, employees and agents: (1) the Aventis Group-AdvancePCS Enterprise; (2) the Aventis Group-Caremark Rx Enterprise; (3) the Aventis Group-Express Scripts Enterprise; and (4) the Aventis Group-Medco Health Enterprise. Each of the Aventis Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Aventis Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health. As to each of these Aventis Group Manufacturer-PBM Enterprises, there is a common communication network by which Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health share information on a regular basis. As to each of these Aventis Group-Manufacturer-PBM Enterprises, Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Aventis Group



Manufacturer-PBM Enterprises was operated and conducted by Aventis Group for criminal purposes, namely, carrying out the AWP Scheme.

　　　　(e)　　*The Baxter Manufacturer-PBM Enterprises:*　The Baxter Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Amgen's AWPIDs and billed its members on the basis of Baxter's reported AWPs, and Baxter, including its directors, employees and agents: (1) the Baxter-AdvancePCS Enterprise; (2) the Baxter-Caremark Rx Enterprise; (3) the Baxter-Express Scripts Enterprise; and (4) the Baxter-Medco Health Enterprise.  Each of the Baxter Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Baxter Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health.  As to each of these Baxter Manufacturer-PBM Enterprises, there is a common communication network by which Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health share information on a regular basis.  As to each of these Baxter-Manufacturer-PBM Enterprises, Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Baxter Manufacturer-PBM Enterprises was operated and conducted by Baxter for criminal purposes, namely, carrying out the AWP Scheme.

1534.16 0046 BSC.DOC



(f)     *The Bayer Manufacturer-PBM Enterprises:*  The Bayer Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Bayer's AWPIDs and billed its members on the basis of Bayer's reported AWPs, and Bayer, including its directors, employees and agents: (1) the Bayer-AdvancePCS Enterprise; (2) the Bayer-Caremark Rx Enterprise; (3) the Bayer-Express Scripts Enterprise; and (4) the Bayer-Medco Health Enterprise.  Each of the Bayer Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Bayer Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health.  As to each of these Bayer Manufacturer-PBM Enterprises, there is a common communication network by which Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health share information on a regular basis.  As to each of these Bayer-Manufacturer-PBM Enterprises, Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Bayer Manufacturer-PBM Enterprises was operated and conducted by Bayer for criminal purposes, namely, carrying out the AWP Scheme.

(g)     *The Boehringer Group Manufacturer-PBM Enterprise:*  The Boehringer Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Boehringer Group's AWPIDs and billed its members on the basis of Boehringer Group's reported AWPs, and Boehringer Group,



including its directors, employees and agents:  (1) the Boehringer Group-AdvancePCS Enterprise; (2) the Boehringer Group-Caremark Rx Enterprise; (3) the Boehringer Group-Express Scripts Enterprise; and (4) the Boehringer Group-Medco Health Enterprise. Each of the Boehringer Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Boehringer Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Boehringer Group and AdvancePCS, Boehringer Group and Caremark Rx, Boehringer Group and Express Scripts, and Boehringer Group and Medco Health.  As to each of these Boehringer Group Manufacturer-PBM Enterprises, there is a common communication network by which Boehringer Group and AdvancePCS, Boehringer Group and Caremark Rx, Boehringer Group and Express Scripts, and Boehringer Group and Medco Health share information on a regular basis.  As to each of these Boehringer Group-Manufacturer-PBM Enterprises, Boehringer Group and AdvancePCS, Boehringer Group and Caremark Rx, Boehringer Group and Express Scripts, and Boehringer Group and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Boehringer Group Manufacturer-PBM Enterprises was operated and conducted by Boehringer Group for criminal purposes, namely, carrying out the AWP Scheme.

(h)     *The Braun Manufacturer-PBM Enterprise:*  The Braun Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Braun's AWPIDs and billed its members on the basis of Braun's reported AWPs, and Braun, including its directors, employees and agents:  (1)



the Braun-AdvancePCS Enterprise; (2) the Braun-Caremark Rx Enterprise; (3) the
Braun-Express Scripts Enterprise; and (4) the Braun-Medco Health Enterprise. Each of
the Braun Manufacturer-PBM Enterprises is an ongoing and continuing business
organization consisting of both corporations and individuals that are and have been
associated for the common or shared purposes of selling, purchasing, prescribing and
administering AWPIDs to Plaintiffs and Class members, and deriving profits from these
activities. Each of the Braun Manufacturer-PBM Enterprises has a systemic linkage
because there are contractual relationships, financial ties, and continuing coordination of
activities between Braun and AdvancePCS, Braun and Caremark Rx, Braun and Express
Scripts, and Braun and Medco Health. As to each of these Braun Manufacturer-PBM
Enterprises, there is a common communication network by which Braun and
AdvancePCS, Braun and Caremark Rx, Braun and Express Scripts, and Braun and
Medco Health share information on a regular basis. As to each of these Braun-
Manufacturer-PBM Enterprises, Braun and AdvancePCS, Braun and Caremark Rx,
Braun and Express Scripts, and Braun and Medco Health functioned as continuing but
separate units. At all relevant times, each of the Braun Manufacturer-PBM Enterprises
was operated and conducted by Braun for criminal purposes, namely, carrying out the
AWP Scheme.

(i)     *The BMS Group Manufacturer-PBM Enterprises:*  The BMS Group
Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each
of the PBMs that administered purchases of BMS Group's AWPIDs and billed its
members on the basis of BMS Group's reported AWPs, and BMS Group, including its
directors, employees and agents: (1) the BMS Group-AdvancePCS Enterprise; (2) the
BMS Group-Caremark Rx Enterprise; (3) the BMS Group-Express Scripts Enterprise;
and (4) the BMS Group-Medco Health Enterprise. Each of the BMS Group

AMENDED MASTER CONSOLIDATED          - 251 -
CLASS ACTION COMPLAINT



Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the BMS Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health. As to each of these BMS Group Manufacturer-PBM Enterprises, there is a common communication network by which BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health share information on a regular basis. As to each of these BMS Group-Manufacturer-PBM Enterprises, BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the BMS Group Manufacturer-PBM Enterprises was operated and conducted by BMS Group for criminal purposes, namely, carrying out the AWP Scheme.

(j)     *The Fujisawa Group Manufacturer-PBM Enterprise:* The Fujisawa Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Fujisawa Group's AWPIDs and billed its members on the basis of Fujisawa Group's reported AWPs, and Fujisawa Group, including its directors, employees and agents: (1) the Fujisawa Group-AdvancePCS Enterprise; (2) the Fujisawa Group-Caremark Rx Enterprise; (3) the Fujisawa Group-Express Scripts Enterprise; and (4) the Fujisawa Group-Medco Health Enterprise. Each of the Fujisawa Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have



been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Fujisawa Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health. As to each of these Fujisawa Group Manufacturer-PBM Enterprises, there is a common communication network by which Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health share information on a regular basis. As to each of these Fujisawa Group-Manufacturer-PBM Enterprises, Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Fujisawa Group Manufacturer-PBM Enterprises was operated and conducted by Fujisawa Group for criminal purposes, namely, carrying out the AWP Scheme.

(k)     *The GSK Group Manufacturer-PBM Enterprises:* The GSK Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of GSK Group's AWPIDs and billed its members on the basis of GSK Group's reported AWPs, and GSK Group, including its directors, employees and agents:  (1) the GSK Group-AdvancePCS Enterprise; (2) the GSK Group-Caremark Rx Enterprise; (3) the GSK Group-Express Scripts Enterprise; and (4) the GSK Group-Medco Health Enterprise. Each of the GSK Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and



Class members, and deriving profits from these activities. Each of the GSK Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between GSK Group and AdvancePCS, GSK Group and Caremark Rx, GSK Group and Express Scripts, and GSK Group and Medco Health. As to each of these GSK Group Manufacturer-PBM Enterprises, there is a common communication network by which GSK Group and AdvancePCS, GSK Group and Caremark Rx, GSK Group and Express Scripts, and GSK Group and Medco Health share information on a regular basis. As to each of these GSK Group-Manufacturer-PBM Enterprises, GSK Group and AdvancePCS, GSK Group and Caremark Rx, GSK Group and Express Scripts, and GSK Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the GSK Group Manufacturer-PBM Enterprises was operated and conducted by GSK Group for criminal purposes, namely, carrying out the AWP Scheme.

(*l*) *The Hoffman-La Roche Manufacturer-PBM Enterprises:* The Hoffman-La Roche Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Hoffman-La Roche's AWPIDs and billed its members on the basis of Hoffman-La Roche's reported AWPs, and Hoffman-La Roche, including its directors, employees and agents: (1) the Hoffman-La Roche-AdvancePCS Enterprise; (2) the Hoffman-La Roche-Caremark Rx Enterprise; (3) the Hoffman-La Roche-Express Scripts Enterprise; and (4) the Hoffman-La Roche-Medco Health Enterprise. Each of the Hoffman-La Roche Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Hoffman-La Roche



Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Hoffman-La Roche and AdvancePCS, Hoffman-La Roche and Caremark Rx, Hoffman-La Roche and Express Scripts, and Hoffman-La Roche and Medco Health. As to each of these Hoffman-La Roche Manufacturer-PBM Enterprises, there is a common communication network by which Hoffman-La Roche and AdvancePCS, Hoffman-La Roche and Caremark Rx, Hoffman-La Roche and Express Scripts, and Hoffman-La Roche and Medco Health share information on a regular basis. As to each of these Hoffman-La Roche Manufacturer-PBM Enterprises, Hoffman-La Roche and AdvancePCS, Hoffman-La Roche and Caremark Rx, Hoffman-La Roche and Express Scripts, and Hoffman-La Roche and Medco Health functioned as continuing but separate units. At all relevant times, each of the Hoffman-La Roche Manufacturer-PBM Enterprises was operated and conducted by Hoffman-La Roche for criminal purposes, namely, carrying out the AWP Scheme.

(m)     *The Immunex Manufacturer-PBM Enterprises:* The Immunex Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Immunex's AWPIDs and billed its members on the basis of Immunex's reported AWPs, and Immunex, including its directors, employees and agents: (1) the Immunex-AdvancePCS Enterprise; (2) the Immunex-Caremark Rx Enterprise; (3) the Immunex-Express Scripts Enterprise; and (4) the Immunex-Medco Health Enterprise. Each of the Immunex Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Immunex

AMENDED MASTER CONSOLIDATED             - 255 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Immunex and AdvancePCS, Immunex and Caremark Rx, Immunex and Express Scripts, and Immunex and Medco Health. As to each of these Immunex Manufacturer-PBM Enterprises, there is a common communication network by which Immunex and AdvancePCS, Immunex and Caremark Rx, Immunex and Express Scripts, and Immunex and Medco Health share information on a regular basis. As to each of these Immunex Manufacturer-PBM Enterprises, Immunex and AdvancePCS, Immunex and Caremark Rx, Immunex and Express Scripts, and Immunex and Medco Health functioned as continuing but separate units. At all relevant times, each of the Immunex Manufacturer-PBM Enterprises was operated and conducted by Immunex for criminal purposes, namely, carrying out the AWP Scheme.

(n)      *The Johnson & Johnson Group Manufacturer-PBM Enterprise:* The Johnson & Johnson Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Johnson & Johnson Group's AWPIDs and billed its members on the basis of Johnson & Johnson Group's reported AWPs, and Johnson & Johnson Group, including its directors, employees and agents: (1) the Johnson & Johnson Group-AdvancePCS Enterprise; (2) the Johnson & Johnson Group-Caremark Rx Enterprise; (3) the Johnson & Johnson Group-Express Scripts Enterprise; and (4) the Johnson & Johnson Group-Medco Health Enterprise. Each of the Johnson & Johnson Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Johnson & Johnson Group Manufacturer-PBM



Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Johnson & Johnson Group and AdvancePCS, Johnson & Johnson Group and Caremark Rx, Johnson & Johnson Group and Express Scripts, and Johnson & Johnson Group and Medco Health. As to each of these Johnson & Johnson Group Manufacturer-PBM Enterprises, there is a common communication network by which Johnson & Johnson Group and AdvancePCS, Johnson & Johnson Group and Caremark Rx, Johnson & Johnson Group and Express Scripts, and Johnson & Johnson Group and Medco Health share information on a regular basis. As to each of these Johnson & Johnson Group-Manufacturer-PBM Enterprises, Johnson & Johnson Group and AdvancePCS, Johnson & Johnson Group and Caremark Rx, Johnson & Johnson Group and Express Scripts, and Johnson & Johnson Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Johnson & Johnson Group Manufacturer-PBM Enterprises was operated and conducted by Johnson & Johnson Group for criminal purposes, namely, carrying out the AWP Scheme.

(o) *The Pfizer Manufacturer-PBM Enterprises:* The Pfizer Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Pfizer's AWPIDs and billed its members on the basis of Pfizer's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Pfizer-AdvancePCS Enterprise; (2) the Pfizer-Caremark Rx Enterprise; (3) the Pfizer-Express Scripts Enterprise; and (4) the Pfizer-Medco Health Enterprise. Each of the Pfizer Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Pfizer Manufacturer-PBM Enterprises has a systemic linkage



because there are contractual relationships, financial ties, and continuing coordination of activities between Pfizer and AdvancePCS, Pfizer and Caremark Rx, Pfizer and Express Scripts, and Pfizer and Medco Health. As to each of these Pfizer Manufacturer-PBM Enterprises, there is a common communication network by which Pfizer and AdvancePCS, Pfizer and Caremark Rx, Pfizer and Express Scripts, and Pfizer and Medco Health share information on a regular basis. As to each of these Pfizer Manufacturer-PBM Enterprises, Pfizer and AdvancePCS, Pfizer and Caremark Rx, Pfizer and Express Scripts, and Pfizer and Medco Health functioned as continuing but separate units. At all relevant times, each of the Pfizer Manufacturer-PBM Enterprises was operated and conducted by Pfizer for criminal purposes, namely, carrying out the AWP Scheme.

(p)     *The Pharmacia Group Manufacturer-PBM Enterprises:*  The Pharmacia Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Pharmacia Group's AWPIDs and billed its members on the basis of Pharmacia Group's reported AWPs, and Pharmacia Group, including its directors, employees and agents:  (1) the Pharmacia Group-AdvancePCS Enterprise; (2) the Pharmacia Group-Caremark Rx Enterprise; (3) the Pharmacia Group-Express Scripts Enterprise; and (4) the Pharmacia Group-Medco Health Enterprise. Each of the Pharmacia Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Pharmacia Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pharmacia Group and AdvancePCS, Pharmacia Group and Caremark Rx, Pharmacia Group and Express Scripts, and Pharmacia Group and



Medco Health. As to each of these Pharmacia Group Manufacturer-PBM Enterprises, there is a common communication network by which Pharmacia Group and AdvancePCS, Pharmacia Group and Caremark Rx, Pharmacia Group and Express Scripts, and Pharmacia Group and Medco Health share information on a regular basis. As to each of these Pharmacia Group-Manufacturer-PBM Enterprises, Pharmacia Group and AdvancePCS, Pharmacia Group and Caremark Rx, Pharmacia Group and Express Scripts, and Pharmacia Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Pharmacia Group Manufacturer-PBM Enterprises was operated and conducted by Pharmacia Group for criminal purposes, namely, carrying out the AWP Scheme.

(q)     *The Schering-Plough Group Manufacturer-PBM Enterprises:* The Schering-Plough Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Schering-Plough Group's AWPIDs and billed its members on the basis of Schering-Plough Group's reported AWPs, and Schering-Plough Group, including its directors, employees and agents: (1) the Schering-Plough Group-AdvancePCS Enterprise; (2) the Schering-Plough Group-Caremark Rx Enterprise; (3) the Schering-Plough Group-Express Scripts Enterprise; and (4) the Schering-Plough Group-Medco Health Enterprise. Each of the Schering-Plough Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Schering-Plough Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Schering-Plough Group and AdvancePCS,



Schering-Plough Group and Caremark Rx, Schering-Plough Group and Express Scripts, and Schering-Plough Group and Medco Health. As to each of these Schering-Plough Group Manufacturer-PBM Enterprises, there is a common communication network by which Schering-Plough Group and AdvancePCS, Schering-Plough Group and Caremark Rx, Schering-Plough Group and Express Scripts, and Schering-Plough Group and Medco Health share information on a regular basis. As to each of these Schering-Plough Group-Manufacturer-PBM Enterprises, Schering-Plough Group and AdvancePCS, Schering-Plough Group and Caremark Rx, Schering-Plough Group and Express Scripts, and Schering-Plough Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Schering-Plough Group Manufacturer-PBM Enterprises was operated and conducted by Schering-Plough Group for criminal purposes, namely, carrying out the AWP Scheme.

(r)     *The Sicor Group Manufacturer-PBM Enterprises:* The Sicor Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Sicor Group's AWPIDs and billed its members on the basis of Sicor Group's reported AWPs, and Sicor Group, including its directors, employees and agents: (1) the Sicor Group-AdvancePCS Enterprise; (2) the Sicor Group-Caremark Rx Enterprise; (3) the Sicor Group-Express Scripts Enterprise; and (4) the Sicor Group-Medco Health Enterprise. Each of the Sicor Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Sicor Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities

1534.16 004 i BSC.DOC



between Sicor Group and AdvancePCS, Sicor Group and Caremark Rx, Sicor Group and Express Scripts, and Sicor Group and Medco Health. As to each of these Sicor Group Manufacturer-PBM Enterprises, there is a common communication network by which Sicor Group and AdvancePCS, Sicor Group and Caremark Rx, Sicor Group and Express Scripts, and Sicor Group and Medco Health share information on a regular basis. As to each of these Sicor Group-Manufacturer-PBM Enterprises, Sicor Group and AdvancePCS, Sicor Group and Caremark Rx, Sicor Group and Express Scripts, and Sicor Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Sicor Group Manufacturer-PBM Enterprises was operated and conducted by Sicor Group for criminal purposes, namely, carrying out the AWP Scheme.

(s) *The Watson Manufacturer-PBM Enterprises:* The Watson Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Watson's AWPIDs and billed its members on the basis of Watson's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Watson-AdvancePCS Enterprise; (2) the Watson-Caremark Rx Enterprise; (3) the Watson-Express Scripts Enterprise; and (4) the Watson-Medco Health Enterprise. Each of the Watson Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Watson Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Watson and AdvancePCS, Watson and Caremark Rx, Watson and Express Scripts, and Watson and Medco Health. As to each of these Watson Manufacturer-PBM Enterprises, there is a common communication network by which



Watson and AdvancePCS, Watson and Caremark Rx, Watson and Express Scripts, and Watson and Medco Health share information on a regular basis. As to each of these Watson Manufacturer-PBM Enterprises, Watson and AdvancePCS, Watson and Caremark Rx, Watson and Express Scripts, and Watson and Medco Health functioned as continuing but separate units. At all relevant times, each of the Watson Manufacturer-PBM Enterprises was operated and conducted by Watson for criminal purposes, namely, carrying out the AWP Scheme.

(t)     *The TAP Manufacturer-PBM Enterprises:* The TAP Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of TAP's AWPIDs and billed its members on the basis of TAP's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the TAP-AdvancePCS Enterprise; (2) the TAP-Caremark Rx Enterprise; (3) the TAP-Express Scripts Enterprise; and (4) the TAP-Medco Health Enterprise. Each of the TAP Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the TAP Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between TAP and AdvancePCS, TAP and Caremark Rx, TAP and Express Scripts, and TAP and Medco Health. As to each of these TAP Manufacturer-PBM Enterprises, there is a common communication network by which TAP and AdvancePCS, TAP and Caremark Rx, TAP and Express Scripts, and TAP and Medco Health share information on a regular basis. As to each of these TAP Manufacturer-PBM Enterprises, TAP and AdvancePCS, TAP and Caremark Rx, TAP and Express Scripts, and TAP and Medco Health functioned



as continuing but separate units. At all relevant times, each of the TAP Manufacturer-PBM Enterprises was operated and conducted by TAP for criminal purposes, namely, carrying out the AWP Scheme.

(u)     *The Warrick Manufacturer-PBM Enterprises:* The Warrick Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Warrick's AWPIDs and billed its members on the basis of Warrick's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Warrick-AdvancePCS Enterprise; (2) the Warrick-Caremark Rx Enterprise; (3) the Warrick-Express Scripts Enterprise; and (4) the Warrick-Medco Health Enterprise. Each of the Warrick Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Warrick Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Warrick and AdvancePCS, Warrick and Caremark Rx, Warrick and Express Scripts, and Warrick and Medco Health. As to each of these Warrick Manufacturer-PBM Enterprises, there is a common communication network by which Warrick and AdvancePCS, Warrick and Caremark Rx, Warrick and Express Scripts, and Warrick and Medco Health share information on a regular basis. As to each of these Warrick Manufacturer-PBM Enterprises, Warrick and AdvancePCS, Warrick and Caremark Rx, Warrick and Express Scripts, and Warrick and Medco Health functioned as continuing but separate units. At all relevant times, each of the Warrick Manufacturer-PBM Enterprises was operated and conducted by Warrick for criminal purposes, namely, carrying out the AWP Scheme.



(v)    *The Dey Manufacturer-PBM Enterprises:*  The Dey Manufacturer-PBM

Enterprises are four separate associations-in-fact consisting of each of the PBMs that

administered purchases of Dey's AWPIDs and billed its members on the basis of Dey's

reported AWPs, and Pfizer, including its directors, employees and agents:  (1) the Dey-

AdvancePCS Enterprise; (2) the Dey-Caremark Rx Enterprise; (3) the Dey-Express

Scripts Enterprise; and (4) the Dey-Medco Health Enterprise.  Each of the Dey

Manufacturer-PBM Enterprises is an ongoing and continuing business organization

consisting of both corporations and individuals that are and have been associated for the

common or shared purposes of selling, purchasing, prescribing and administering

AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.

Each of the Dey Manufacturer-PBM Enterprises has a systemic linkage because there are

contractual relationships, financial ties, and continuing coordination of activities between

Dey and AdvancePCS, Dey and Caremark Rx, Dey and Express Scripts, and Dey and

Medco Health.  As to each of these Dey Manufacturer-PBM Enterprises, there is a

common communication network by which Dey and AdvancePCS, Dey and Caremark

Rx, Dey and Express Scripts, and Dey and Medco Health share information on a regular

basis.  As to each of these Dey Manufacturer-PBM Enterprises, Dey and AdvancePCS,

Dey and Caremark Rx, Dey and Express Scripts, and Dey and Medco Health functioned

as continuing but separate units.  At all relevant times, each of the Dey Manufacturer-

PBM Enterprises was operated and conducted by Dey for criminal purposes, namely,

carrying out the AWP Scheme.

### The Defendant Drug Manufacturers' Use of the U.S. Mails and Interstate Wire Facilities

662.    Each of the Manufacturer-PBM Enterprises and Medco Health engaged in and

affected interstate commerce because they engage in the following activities across state

boundaries:  The sale, purchase and/or administration of drugs; and/or the transmission and/or



receipt of sales and marketing literature; and/or the transmission to patients of individual prescriptions for drugs by mail-order pharmacies; and/or the transmission and/or receipt of invoices, statements and payments related to the use or administration of drugs. During the Class Period, the Manufacturer-PBM Enterprises and Medco Health participated in the administration of prescription drugs to millions of individuals located throughout the United States.

663.    During the Class Period, the Defendants Drug Manufacturers' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

664.    The nature and pervasiveness of the Defendant Drug Manufacturers' AWP Scheme, which was orchestrated out of the corporate headquarters of the Defendant Drug Manufacturers, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the various local district managers overseeing the sales force(s), the numerous pharmaceutical sales representatives who, in turn, directly communicated with providers and employees who communicated with the PBMs, including Medco Health.

665.    Many of the precise dates of Defendant Drug Manufacturers' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records. Indeed, an essential part of the successful operation of the AWP Scheme alleged herein depended upon secrecy, and as alleged above, the Defendant Drug Manufacturers took deliberate steps to conceal their wrongdoing. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the AWP Scheme and do so below.

AMENDED MASTER CONSOLIDATED          - 265 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



666.    The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities to perpetrate the AWP Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

(a)    Marketing materials about the AWPs for brand name drugs and the available spread, which were sent by the Defendant Drug Manufacturers to PBMs (including Medco Health) located across the country;

(b)    Written representations of the AWPs made by the Defendant Drug Manufacturers to the Publishers, which were made at least annually and in many cases several times during a single year;

(c)    Thousands of written and oral communications discussing, negotiating and confirming the placement of a Defendant Drug Manufacturer's drugs on a particular PBM's formulary;

(d)    Documents providing information or incentives designed to lessen the prices that each of the PBMs paid for drugs, and/or to conceal those prices or the AWP Scheme;

(e)    Written communications, including checks, relating to rebates, kickbacks or other financial inducements paid to each of the PBMs to persuade them to advocate one Defendant Drug Manufacturers' drug over a drug manufactured by a competitor;

(f)    Written and oral communications with U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

(g)    Written and oral communications with health insurers and patients;



(h)    Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Defendant Drug Manufacturers' AWP Scheme; and

(i)    In addition to the above-referenced RICO predicate acts, Defendants' corporate headquarters have communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the AWP Scheme. These mails include some of the documents referenced in this Amended Complaint.

**Conduct of the RICO Enterprises' Affairs**

667.    During the Class Period, each of the Defendant Drug Manufacturers have exerted control over the Manufacturer-PBM Enterprises with which they were associated and, in violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers have conducted or participated in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly.  Such participation was carried out in the following ways:

(a)    Each of the Defendant Drug Manufacturers has directly controlled the price for its AWPIDs, which determines the amount of each of the PBMs' compensation;

(b)    Each of the Defendant Drug Manufacturers has directly controlled the AWPs that are reported by the Publishers;

(d)    Each of the Defendant Drug Manufacturers has directly controlled the creation and distribution of marketing, sales, and other materials used to inform each of the PBMs of the profit potential of its AWPIDs;

(e)    Each of the Defendant Drug Manufacturers has relied upon its employees and agents to promote the AWP Scheme through the U.S. mails, through interstate wire facilities, and through direct contacts with providers and the PBMs; and



(f)      Each of the Defendant Drug Manufacturers has controlled and participated in the affairs of the Manufacturer-PBM Enterprises with which they are associated by providing or receiving rebates (as detailed above) or other inducements to place a certain Defendant Drug Manufacturer's AWPIDs on a PBM formulary or advocate the use of a certain AWPID. These inducements include drug manufacturers' payment to PBMs of: (i) access rebates for placement of products on the PBMs' formulary; (ii) market share rebates for garnering higher market share than established targets; (iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants. Although PBMs typically agree to share rebates in some form with clients, they link the rebates to formulary savings in such a manner that the PBM often is able to secretly retain all of the rebates. Furthermore, PBMs refuse to disclose specific rebate amounts to clients in any fashion other than in the aggregate compared to performance standards, thereby preventing the client from learning the true amount of rebates that the PBM has received in connection with the health plan client.

668.     Each of the Manufacturer-PBM Enterprises identified above had a hierarchical decision-making structure headed by the respective Defendant Drug Manufacturer.

669.     In violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers has conducted the affairs of each of the Manufacturer-PBM Enterprises with which they associated by reporting fraudulently inflated AWPs for AWPIDs and by submitting false and misleading invoices to Plaintiffs and members of the Classes, thereby inducing Plaintiffs and Class members to pay inflated amounts for AWPIDs.

**The Defendant Drug Manufacturers' Pattern of Racketeering Activity**

670.     Each of the Defendant Drug Manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18



U.S.C. § 1343, relating to wire fraud. The Defendant Drug Manufacturers' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their AWP Scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Defendant Drug Manufacturers intended to defraud Plaintiffs, members of the Classes and other intended victims of the AWP Scheme.

671.   The Defendant Drug Manufacturers' fraudulent and unlawful AWP Scheme consisted, in part, of deliberately overstating the AWPs for their AWPIDs, thereby creating a "spread" based on the inflated figure in order to induce each of the PBMs to advocate and favor that particular Defendant Drug Manufacturer's drugs to the members of that PBM's clients. Further, each of the PBMs billed their clients for the particular Defendant Drug Manufacturers' AWPIDs based on the inflated AWPs, which did not reflect the true price paid by the PBMs for the AWPIDs.

672.   The AWP Scheme was calculated and intentionally crafted to ensure that Plaintiffs and members of the Classes would be over-billed for AWPIDs. In designing and implementing the AWP Scheme, at all times the Defendant Drug Manufacturers were cognizant of the fact those in the distribution chain that were not part of the enterprise relied upon the integrity of the Defendant Drug Manufacturers in setting the AWPs, as reported by the Publishers.

673.   By intentionally and artificially inflating the AWPs, and by subsequently failing to disclose such practices to the individual patients and their insurers, each of the Defendant Drug Manufacturers engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.



674.    The Defendant Drug Manufacturers' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and members of the Classes. Each separate use of the U.S. mails and/or interstate wire facilities employed by each of the Defendant Drug Manufacturers was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Classes. Each of the Defendant Drug Manufacturers has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Enterprises with which each of them is and was associated-in-fact.

**The Defendant Drug Manufacturers' Motive**

675.    The Defendant Drug Manufacturers' motive in creating and operating the AWP Scheme and conducting the affairs of the Manufacturer-PBM Enterprises described herein was to fraudulently obtain sales of and profits from their AWPIDs.

676.    The AWP Scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the Defendant Drug Manufacturers' AWPIDs. Thus, each of the Defendant Drug Manufacturers used the AWP Scheme to sell more of its drugs, thereby fraudulently gaining sales and market share and profits.

**Damages Caused by the Defendant Drug Manufacturers' AWP Scheme**

677.    The Defendant Drug Manufacturers' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Classes to be injured in their business or property because Plaintiffs and Class members have paid many hundreds of millions of dollars in inflated reimbursements for AWPIDs.

678.    The Defendant Drug Manufacturers sent billing statements through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in



furtherance of their AWP Scheme. Plaintiffs and members of the Classes have made inflated payments for AWPIDs based on and/or in reliance on reported and false AWPs.

679. Under the provisions of Section 1964(c) of RICO, the Defendant Drug Manufacturers are jointly and severally liable to Plaintiffs and members of the Classes for three times the damages that Plaintiffs and Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT III

### DECLARATORY AND OTHER RELIEF PURSUANT TO 28 U.S.C. §§ 2201, 2002
### (AGAINST DEFENDANT DRUG MANUFACTURERS FOR UNLAWFUL CONDUCT ASSOCIATED WITH MEDICARE PART B COVERED DRUGS)

680. Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

681. An actual case and controversy exists between the Plaintiffs and each of the Defendant Drug Manufacturers with respect to the Defendant Drug Manufacturers' conduct of inflating the published reimbursement rates for AWPIDs. The Plaintiffs contend that setting stated reimbursement prices above the actual average wholesale price for AWPIDs is unlawful, and that each Defendant Drug Manufacturer does so in violation of applicable law, knowing that Medicare beneficiaries and other end payors will incur similarly inflated co-payments and payments for AWPIDs.

682. Each Defendant Drug Manufacturer contends to the contrary. Each of the Defendant Drug Manufacturers, either by itself or through groups or its trade association, contend that they may exploit the Medicare reimbursement system without limit, and regardless of its effect on Medicare beneficiaries and their insurers.

683. The Plaintiffs, on behalf of themselves, their constituent members and all others similarly situated, are entitled to a judgment declaring that the practice of the Defendant Drug

AMENDED MASTER CONSOLIDATED                - 271 -
CLASS ACTION COMPLAINT



Manufacturers of inflating stated reimbursement rates for AWPIDs is unlawful, and are entitled to further relief pursuant to 28 U.S.C. § 2202.

## COUNT IV

## VIOLATIONS OF CONSUMER PROTECTION STATUTES

684.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

685.    This Count is asserted by the AWP End Payor Class by each class representative.

686.    Defendants are incorporated, or maintain their principal places of business, in either California, Delaware, Illinois, New Jersey, Pennsylvania or Washington.  In addition, individual Patient and Third-Party Payor Plaintiffs reside in either California, Florida, New York, Minnesota, Louisiana, Pennsylvania or Texas.  Each of these states has enacted statutes to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising.  The statutes of these states, legally and substantively common, provide consumers with a private right of action, as follows:

| | |
|---|---|
| *California*: | Cal. Civ. Code §§ 1750, Bus. & Prof. Code § 17200, *et seq.* and 17500, *et seq.* |
| *Delaware*: | 6 Del. Code §§ 2511-2537 |
| *Florida*: | Fla. Stat. Stat. §§ 501.201-501.213 |
| *Illinois*: | 815 ILCS § 505/1, *et seq.* |
| *Louisiana:* | La. Rev. Stat. Ann. § 51:1405 |
| *Minnesota:* | Minn. Stat. Ann. §§ 325D.09 - 325D.16, § 325F.67 - 69 |
| *New Jersey*: | N.J. Stat. Ann. §§ 56:8-1 - 56:8-24 |
| *New York*: | N.Y. Gen. Bus. L. §§ 349-350 |
| *Pennsylvania*: | 73 Pa. Stat. § 201-1 *et seq.* |
| *Texas:* | Tex. Bus. & Com. Code §§ 17.41 ☐ 17.63 |



*Washington:*                    RCW 19.86.010, *et seq.*

These statutes do not require a showing of either scienter or individual reliance.

687.    Defendants' conduct, as alleged in this Complaint, constitutes unfair and

deceptive acts or practices, unconscionable practices, fraud, false pretense, false promise,

misrepresentation, concealment, suppression or omission of material fact in violation of these

statutes. Defendants' continuing violations include:

> (a)    Failing to disclose material facts in the conduct of trade or commerce in that they have not disclosed that the AWP does not reflect the true average wholesale price of the drugs they sell, and that the published AWPs are instead deliberately inflated in order to (1) increase the prices paid by Plaintiffs and the members of the Classes; (2) increase the profitability of the Defendant Drug Manufacturer's drugs to the providers who prescribe or dispense them, and to the other intermediaries that promote them; and thereby (3) increase Defendants' market shares and profits;

> (b)    Making false or misleading statements of fact concerning the price of goods in that they have not reported the true AWP paid for their medications in order to accomplish the goals described above;

> (c)    Knowingly making false representations in a transaction by representing that the AWP is an accurate reflection of the average wholesale price paid for their drugs when AWP is, in reality, a fictitious and inflated amount;

> (d)    Publishing fictitious and inflated AWPs in the *Red Book* and other publications;

> (e)    Encouraging Medicare Part B providers to use drugs based upon the "spread" as opposed to medicines being prescribed based on medical reasons; and

> (f)    Providing PBMs with a cut on the spread in return for the PBMs' participation in the AWP scheme.

688.    Defendants willfully engaged in such practices knowing them to be deceptive and

with the intent that Plaintiffs and the Class would rely thereon.

AMENDED MASTER CONSOLIDATED            - 273 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



689.    The wrongful conduct alleged in this Complaint occurs, and continues to occur, in the ordinary course of Defendants' business or occupation and has caused great harm to Plaintiffs and the Class, who were foreseeable and direct victims.

690.    Defendants have injured the public interest, and Defendants' actions continue to pose a threat to the public.

691.    As a direct and legal result of Defendants' misleading, deceptive, unfair, false and fraudulent trade practices, Plaintiffs and the Class have sustained damages.

## COUNT V

### CLAIM FOR INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT ARISING FROM THE TOGETHER CARD CONSPIRACY

692.    Plaintiffs, on behalf of themselves and the Nationwide End Payor Together Card Class, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

693.    The acts of the Together Card Defendants which violated federal and state antitrust laws were authorized, ordered, or done by the Together Card Defendants' officers, agents, employees, or representatives while actively engaged in the management of the Together Card Defendants' business or affairs.

694.    Various other individuals, partnerships, sole proprietors, business entities, companies and corporations, presently unknown to Plaintiffs and not named as Together Card Defendants in this complaint, participated as co-conspirators in the violations of federal and state antitrust laws alleged herein and performed acts and made statements in furtherance thereof. Such unknown persons or entities acted as co-conspirators and aided, abetted or participated with the Together Card Defendants in the commission of the wrongful acts alleged in this complaint.

695.    During the Class Period, the Together Card Defendants sold, or facilitated the sale of, Together Card Drugs in a continuous and uninterrupted flow of interstate commerce to customers located in countries and states other than the countries or states in which Defendants

AMENDED MASTER CONSOLIDATED          - 274 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC



produced the Together Card Drugs. The business activities of the Together Card Defendants were thus within the flow of, and substantially affected, interstate trade and commerce.

696.    The combination or conspiracy alleged in this Complaint consisted of a continuing agreement, understanding or concert of action by Defendants, and their other co-conspirators, the substantial terms of which were to raise, fix and maintain the AWP spreads of the Together Card Drugs.

697.    As the result of the Together Card Defendants' wrongful conduct, Plaintiffs and the Nationwide End Payor Together Card Class paid higher prices for the Together Card Drugs than they would have paid but for the Together Card Defendants' anticompetitive conduct, and have been injured in their business or property.

698.    The Together Card Defendants should be enjoined under federal law, including Section 16 of the Clayton Act, from continuing their anticompetitive conduct. Absent an injunction, the effects of this anticompetitive conduct will continue. In a country where tens of thousands of citizens cannot afford prescription drugs, or where the expense of such drugs is a great burden on millions, any continuing anticompetitive conduct is a serious matter that needs injunctive relief as a remedy.

## COUNT VI

### CLAIM FOR VIOLATION OF SHERMAN ACT, 15 U.S.C. § 1
### ON BEHALF OF NATIONWIDE END PAYOR TOGETHER CARD CLASS

699.    Plaintiffs, on behalf of themselves and the Nationwide End Payor Together Card Class, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

700.    The combination or conspiracy alleged in this complaint consisted of a continuing agreement, understanding or concert of action by the Together Card Defendants, and their other co-conspirators, the substantial terms of which were to raise, fix and maintain the AWP spreads of the Together Card Drugs.

AMENDED MASTER CONSOLIDATED                    - 275 -
CLASS ACTION COMPLAINT



701.    The Together Rx Card conspiracy was intended to affect directly, and to affect the
end payors of the pharmaceutical products covered by the Together Card program, *i.e.*, the
National End Payor Together Card Class and Together Card enrollees. The intent, purpose and
effect of the Together Rx Card conspiracy was to cause over-reimbursement for certain drugs,
and thereby increase available "spread" dollars for other participants in the distribution channel
(*i.e.*, wholesalers, distributors, pharmacies and/or PBMs) to the detriment of the National End
Payor Together Card Class.

702.    Through the Together Rx Card conspiracy, the Together Card Defendants have in
fact caused an increase in end payor reimbursement or payments for many of the drugs that are
covered by the Together Rx Card program, and at the same time the conspiracy had the intent,
purpose and effect of not affecting (either directly or indirectly) transaction costs and/or prices to
all other participants in the distribution chain (*i.e.*, wholesalers, distributors, pharmacies and
PBMs).

703.    As the result of the Together Card Defendants' wrongful conduct, Plaintiffs and
the Nationwide End Payor Together Card Class paid higher prices for the Together Card Drugs
than they would have paid but for Defendants' anticompetitive conduct, have been injured in
their business or property, and have suffered damages in an amount to be determined at trial.

704.    Plaintiffs and the Nationwide End Payor Together Card Class are entitled to
recover all damages and treble damages allowed under § 1 of the Sherman Act against Together
Card Defendants, jointly and severally, together with their costs of suit, including reasonable
attorneys' fees.



## COUNT VII

### CLAIM FOR VIOLATION OF THE ANTITRUST STATUTES OF THE INDIRECT PURCHASER STATES ON BEHALF OF INDIRECT PURCHASER STATES END PAYOR TOGETHER CARD CLASS

705.    Plaintiffs, on behalf of themselves and the Indirect Purchaser States End Payor Together Card Class, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint. Plaintiffs allege and assert that Plaintiffs and members of the Nationwide End Payor Together Card Class are direct purchasers in that they are the first and only ones in the distribution chain that actually pay and are harmed as a result of the agreement to fix reimbursement rates and the AWP spreads. Everyone else in the distribution chain benefits from the AWP, *i.e.*, they receive a portion of the spread, but they do not pay or reimburse based on AWP. However, to the extent any are deemed indirect purchasers, this Count is asserted alternatively.

706.    The Together Card Defendants' conduct described herein constitutes unlawful acts under the antitrust laws of the Indirect Purchaser States as follows:

    a.    Arizona: The aforementioned practices by the Together Card Defendants were and are in violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.*, the Arizona Consumer Fraud Act, Ariz. Rev. Stat §§ 44-1521, *et seq.*, and the Constitution of the State of Arizona, Article 14, § 15;

    b.    California: The aforementioned practices by the Together Card Defendants were and are in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.* and the California Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

    c.    District of Columbia: The aforementioned practices by the Together Card Defendants were and are in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.*;



      d.     <u>Florida</u>: The aforementioned practices by the Together Card Defendants were and are in violation of the Florida Antitrust Act, Fla. Stat. Ann. §§ 542.15, *et seq.*, and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.*;

      e.     <u>Kansas</u>:  The aforementioned practices by the Together Card Defendants were and are in violation of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.*, and the Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50-623, *et seq.*;

      f.     <u>Kentucky</u>: The aforementioned practices by the Together Card Defendants were and are in violation of the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.*;

      g.     <u>Louisiana</u>: The aforementioned practices by the Together Card Defendants were and are in violation of the Louisiana Monopolies Law, La. Rev. Stat. Ann. §§ 51:121, *et seq.,* and the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*;

      h.     <u>Maine</u>: The aforementioned practices by the Together Card Defendants were and are in violation of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, and the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, §§ 205-A, *et seq.*;

      i.     <u>Massachusetts</u>: The aforementioned practices by the Together Card Defendants were and are in violation of the Massachusetts Antitrust Act, Mass. Gen. Laws, ch. 93, and the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A;

      j.     <u>Michigan</u>: The aforementioned practices by the Together Card Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §§ 445.771, *et seq.*, and the Michigan Consumer Protection Act, §§ 445.901, *et seq.*;



k.    Minnesota: The aforementioned practices by the Together Card
Defendants were and are in violation of the Minnesota Antitrust Law of 1971, Minn. Stat.
§§ 325D.49, *et seq.,* and the Minnesota Consumer Fraud Act, Minn. Stat §§ 325F.67, *et seq.*;

l.    Nevada: The aforementioned practices by the Together Card Defendants
were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat.
§§ 598A.010, *et seq.*, and the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat.
§§ 598.0903, *et seq.*;

m.    New Jersey: The aforementioned practices by the Together Card
Defendants were and are in violation of the New Jersey Antitrust Act, N.J. Stat. Ann. §§ 56:9-1,
*et seq.*, and the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.*;

n.    New Mexico: The aforementioned practices by the Together Card
Defendants were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-
1, *et seq.*, and the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

o.    New York: The aforementioned practices by the Together Card
Defendants were and are in violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*,
and the New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.*;

p.    North Carolina: The aforementioned practices by the Together Card
Defendants were and are in violation of North Carolina's antitrust and unfair competition law,
N.C. Gen. Stat. §§ 75-1, *et seq.*;

q.    North Dakota: The aforementioned practices by the Together Card
Defendants were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code §§ 51-
08.1-01, *et seq.*, and the North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51-15-01, *et
seq.*;

r.    South Dakota: The aforementioned practices of the Together Card
Defendants were and are in violation of South Dakota's antitrust law, S.D. Codified Laws §§ 37-



1-3, *et seq.,* and deceptive trade practices and consumer protection law, S.D. Codified Laws §§ 37-24-1, *et seq.*;

     s.    Tennessee: The aforementioned practices of the Together Card Defendants were and are in violation the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, and the Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.*;

     t.    Vermont: The aforementioned practices of the Together Card Defendants were and are in violation of the Vermont Consumer Fraud Act, Vt. Stat. tit. 9. §§ 2451, *et seq.*;

     u.    West Virginia: The aforementioned practices by the Together Card Defendants were and are in violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.*, and the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-6-101, *et seq.*; and

     v.    Wisconsin: The aforementioned practices by the Together Card Defendants were and are in violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*, and the Wisconsin Unfair Trade Practices Act, Wis. Stat. §§ 100.20, *et seq.*

     707.    As the result of the Together Card Defendants' wrongful conduct, Plaintiffs and the Indirect Purchaser States End Payor Together Card Class paid higher prices for the Together Card Drugs than they would have paid but for the Together Card Defendants' anticompetitive conduct, have been injured in their business or property, and have suffered damages in an amount to be determined at trial.

     708.    Plaintiffs and the Indirect Purchaser States End Payor Together Card Class are entitled to recover all damages and treble damages, as permitted by law under these antitrust statutes against the Together Card Defendants, together with their costs of suit, including reasonable attorneys' fees.



## COUNT VIII

### VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)

#### (AGAINST THE TOGETHER CARD DEFENDANTS
#### FOR UNLAWFUL CONDUCT ASSOCIATED WITH TOGETHER RX)

709.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

710.    This Count, which alleges violations of Section 1962(c) and (d) of RICO, 18 U.S.C. § 1962(c)-(d), is asserted against the Together Card Defendants on behalf of the Nationwide End Payor Together Card Class.

711.    Plaintiffs, the members of the Nationwide End Payor Together Card Class, and the Together Card Defendants identified in the previous paragraphs of this complaint are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

712.    Together Rx, LLC, which administers the Together Rx Card Program, is the product of an alliance formed by Abbot, AstraZeneca, Aventis, BMS Group, GSK Group, Johnson & Johnson Group, Novartis, and TAP.  For purposes of this claim, Together Rx is and was an "enterprise" (the "Together Rx Enterprise"), as that term is defined in 18 U.S.C. § 1961(4).  During the Class Period, the Together Card Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Together Rx Enterprise through a pattern of racketeering activity and/or conspired to do so, in violation of Section 1962(c) and (d) of RICO, 18 U.S.C. § 1962(c)-(d) (the "Together Rx Card Scheme").

#### The Together Card Defendants' Use of the U.S. Mails and Interstate Wire Facilities

713.    The Together Rx Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries:  The dissemination of Together Rx Cards to hundreds of thousands of consumers located nationwide; the use of Together Rx Cards in consumers' purchases of brand name drugs; the transmission and/or receipt of sales and



marketing literature; the transmission to patients of individual prescriptions for brand name drugs by mail-order pharmacies; and the transmission and/or receipt of invoices, statements and payments related to the use or administration of brand name drugs.

714.    During the Together Rx Class Period, the Together Card Defendants' illegal conduct and wrongful practices regarding the Together Rx Card Scheme were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

715.    The nature and pervasiveness of the Together Card Defendants' scheme or artifice to defraud consumers via the Together Rx Card Scheme, which was orchestrated out of the corporate headquarters of the Together Card Defendants, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with each other, with Together Rx, and with consumers located nationwide who signed up for the Together Rx Card Program.

716.    Many of the precise dates of Together Card Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records. Indeed, an essential part of the successful operation of the Together Rx Card Scheme depended upon secrecy, and as alleged above, these defendants took deliberate steps to conceal their wrongdoing. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme and do so below.

717.    The Together Card Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the Together Rx Card Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

AMENDED MASTER CONSOLIDATED          - 282 -
CLASS ACTION COMPLAINT



(a)     Joint press releases disseminated by the Together Card Defendants announcing and promoting the Together Rx Card Program;

(b)     Postings on the Internet website of the Together Card Program: www.together-rx.com; and

(c)     Written communications received from consumers located nationwide about the Together Rx Card Program, and the dissemination of written information to such consumers about the Together Rx Card Program.

**Conduct of the Together Rx Enterprise's Affairs**

718.   During the Class Period, each of the Together Card Defendants have exerted control over the Together Rx Enterprise with which they were associated and, in violation of Section 1962(c) of RICO, each of the Together Card Defendants has conducted or participated in the conduct of the affairs of the Together Rx Enterprise, directly or indirectly. During the Class Period, in violation of Section 1962(d) of RICO, 18 U.S.C. § 1962(d), each of the Together Card Defendants has conspired to conduct or participate, directly or directly, in the conduct of the affairs of the Together Rx Enterprise. Such participation, direct or indirect, in the affairs of that RICO enterprise was carried out by the Together Card Defendants in the following ways:

(a)     As alleged above, Together Rx represents an alliance of, and was formed by, the Together Card Defendants;

(b)     Each of the Together Card Defendants has participated in designing and drafting the promotional and marketing materials for the Together Rx Card Program including, but not limited to, press releases and Internet website postings;

(c)     Each of the Together Card Defendants has participated in the dissemination of promotional and marketing materials to consumers located nationwide concerning the Together Rx Card Program; and



(d)     The sales forces of each of the Together Card Defendants has assisted in distributing promotional and marketing materials concerning the Together Rx Card Program to pharmacies, physicians' offices and community centers located nationwide.

**The Together Card Defendants' Pattern of Racketeering Activity**

719.     Each of the Together Card Defendants have conducted and participated in the affairs of the Together Rx Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The Together Card Defendants' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their Together Rx Card Scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) (B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Together Card Defendants intended to defraud Plaintiffs, the members of the Nationwide End Payor Together Card Class and other intended victims of the Together Rx Card Scheme.

720.     The Together Rx Card Scheme was calculated and intentionally crafted by the Together Card Defendants to ensure that Plaintiffs and members of the Nationwide End Payor Together Card Class would be over-billed (and would overpay) for Together Card drugs. In designing and implementing the Together Rx Card Scheme, at all times the Together Card Defendants were cognizant of the fact that Plaintiffs and members of the Nationwide End Payor Together Card Class rely upon the honesty of the Together Card Defendants in setting the AWPs, as reported by the Publishers.

721.     The Together Card Defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and members of the Nationwide End Payor Together Card Class. Each separate use of the U.S. mails and/or



interstate wire facilities employed by each of the Together Card Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Nationwide End Payor Together Card Class. Each of the Together Card Defendants has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Together Rx Enterprise.

### The Together Card Defendants' Motive

722.    The Together Card Defendants' motive in creating and operating the Together Rx Card Scheme was to fraudulently obtain sales of and profits from their Together Card Drugs.

723.    The Together Rx Card Scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the Together Card Drugs. Thus, each of the Together Card Defendants used the Together Rx Card Scheme to sell more of its drugs, thereby fraudulently gaining sales and market share and profits.

### Damages Caused By The Together Card Defendants' Together Rx Card Scheme

724.    The violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and the members of Nationwide End Payor Together Card Class to be injured in their business or property because Plaintiffs and the members of the Nationwide End Payor Together Card Class have paid millions of dollars in inflated reimbursements or other payments for Together Card Drugs.

725.    Under the provisions of Section 1964(c) of RICO, the Together Card Defendants are jointly and severally liable to Plaintiffs and members of the Nationwide End Payor Together Card Class for three times the damages that Plaintiffs and Nationwide End Payor Together Card Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.



## COUNT IX

## CIVIL CONSPIRACY

### (AGAINST ALL DEFENDANTS IDENTIFIED
### HEREIN FOR CONSPIRING WITH PBMS)

726.     Plaintiffs incorporate the preceding allegations as if fully set forth above.

727.     This Court is asserted on behalf of the AWP Payor class by class representative CMHV and the Court has diversity jurisdiction over this claim.

728.     Each of the defendants named below, for the purpose of implementing the AWP scheme, and thereby causing plaintiffs and the Class to overpay for AWPIDs, conspired with each of the four major PBMs:  AdvancePCS, Caremark, Rx, Inc., Express Scripts, Inc. and Medco Health Solutions.  The conspiratorial arrangements are as follows:

(a)     *The Abbott Manufacturer-PBM Conspiracies:*  The Abbott Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Abbott's AWPIDs and billed its members on the basis of Abbott's reported AWPs, and Abbott, including its directors, employees and agents: (1) the Abbott-AdvancePCS; (2) the Abbott-Caremark Rx; (3) the Abbott-Express Scripts; and (4) the Abbott-Medco Health.  Each of the Abbott Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(b)     *The Amgen Manufacturer-PBM Conspiracies:*  The Amgen Manufacturer-PBM Conspiracies are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Amgen's AWPIDs and billed its members on the basis of Amgen's reported AWPs, and Amgen, including its directors, employees and agents:  (1) the Amgen-AdvancePCS; (2) the Amgen-Caremark Rx; (3) the Amgen-Express Scripts;



and (4) the Amgen-Medco Health. Each of the Amgen Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPID drugs to individual Plaintiffs and Class members.

(c)     *The AstraZeneca Manufacturer-PBM Conspiracies:* The AstraZeneca Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of AstraZeneca's AWPIDs and billed its members on the basis of AstraZeneca's reported AWPs, and AstraZeneca, including its directors, employees and agents: (1) the AstraZeneca-AdvancePCS; (2) the AstraZeneca-Caremark Rx; (3) the AstraZeneca-Express Scripts; and (4) the AstraZeneca-Medco Health. Each of the AstraZeneca Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(d)     *The Aventis Group Manufacturer-PBM Conspiracies:* The Aventis Group Manufacturer-PBM Conspiracies are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Aventis Group's AWPIDs and billed its members on the basis of Aventis Group's reported AWPs, and Aventis Group, including its directors, employees and agents: (1) the Aventis Group-AdvancePCS; (2) the Aventis Group-Caremark Rx; (3) the Aventis Group-Express Scripts; and (4) the Aventis Group-Medco Health. Each of the Aventis Group Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.



(e)     *The Baxter Manufacturer-PBM Conspiracies:* The Baxter Manufacturer-
PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that
administered purchases of Baxter's AWPIDs and billed its members on the basis of
Baxter's reported AWPs, and Baxter, including its directors, employees and agents:
(1) the Baxter-AdvancePCS; (2) the Baxter-Caremark Rx; (3) the Baxter-Express Scripts;
and (4) the Baxter-Medco Health. Each of the Baxter Manufacturer-PBM Conspiracies is
an ongoing and continuing conspiracy organization consisting of both corporations and
individuals that are and have been associated for the common or shared purposes of
selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and
Class members.

(f)     *The Bayer Manufacturer-PBM Conspiracies:* The Bayer Manufacturer-
PBM Conspiracy are four separate conspiracies consisting of each of the PBMs that
administered purchases of Bayer's AWPIDs and billed its members on the basis of
Bayer's reported AWPs, and Bayer, including its directors, employees and agents:
(1) the Bayer-AdvancePCS; (2) the Bayer-Caremark Rx; (3) the Bayer-Express Scripts;
and (4) the Bayer-Medco Health. Each of the Bayer Manufacturer-PBM Conspiracies is
an ongoing and continuing conspiracy consisting of both corporations and individuals
that are and have been associated for the common or shared purposes of selling,
purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class
members.

(g)     *The BMS Group Manufacturer-PBM Conspiracies:* The BMS Group
Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the
PBMs that administered purchases of BMS Group's AWPIDs and billed its members on
the basis of BMS Group's reported AWPs, and BMS Group, including its directors,
employees and agents: (1) the BMS Group-AdvancePCS; (2) the BMS Group-Caremark



Rx; (3) the BMS Group-Express Scripts; and (4) the BMS Group-Medco Health. Each of the BMS Group Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

    (h)    *The GSK Group Manufacturer-PBM Conspiracies:* The GSK Group Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of GSK Group's AWPIDs and billed its members on the basis of GSK Group's reported AWPs, and GSK Group, including its directors, employees and agents: (1) the GSK Group-AdvancePCS; (2) the GSK Group-Caremark Rx; (3) the GSK Group-Express Scripts; and (4) the GSK Group-Medco Health. Each of the GSK Group Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

    (i)    *The Hoffman-La Roche Manufacturer-PBM Conspiracies:* The Hoffman-La Roche Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Hoffman-La Roche's AWPIDs and billed its members on the basis of Hoffman-La Roche's reported AWPs, and Hoffman-La Roche, including its directors, employees and agents: (1) the Hoffman-La Roche-AdvancePCS; (2) the Hoffman-La Roche-Caremark Rx; (3) the Hoffman-La Roche-Express Scripts; and (4) the Hoffman-La Roche-Medco Health. Each of the Hoffman-La Roche Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the



common or shared purposes of selling, purchasing, prescribing and administering
AWPIDs to individual Plaintiffs and Class members.

      (j)    *The Immunex Manufacturer-PBM Enterprises:*  The Immunex
Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the
PBMs that administered purchases of Immunex's AWPIDs and billed its members on the
basis of Immunex's reported AWPs, and Immunex, including its directors, employees
and agents: (1) the Immunex-AdvancePCS; (2) the Immunex-Caremark Rx; (3) the
Immunex-Express Scripts; and (4) the Immunex-Medco Health. Each of the Immunex
Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of
both corporations and individuals that are and have been associated for the common or
shared purposes of selling, purchasing, prescribing and administering AWPIDs to
individual Plaintiffs and Class members.

      (k)    *The Johnson & Johnson Group Manufacturer-PBM Conspiracies:*  The
Johnson & Johnson Group Manufacturer-PBM Conspiracies are four separate
conspiracies consisting of each of the PBMs that administered purchases of Johnson &
Johnson Group's AWPIDs and billed its members on the basis of Johnson & Johnson
Group's reported AWPs, and Johnson & Johnson Group, including its directors,
employees and agents: (1) the Johnson & Johnson Group-AdvancePCS; (2) the Johnson
& Johnson Group-Caremark Rx; (3) the Johnson & Johnson Group-Express Scripts; and
(4) the Johnson & Johnson Group-Medco Health. Each of the Johnson & Johnson Group
Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of
both corporations and individuals that are and have been associated for the common or
shared purposes of selling, purchasing, prescribing and administering AWPIDs to
individual Plaintiffs and Class members.



(*l*)     *The Pfizer Manufacturer-PBM Conspiracies:*  The Pfizer Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Pfizer's AWPIDs and billed its members on the basis of Pfizer's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Pfizer-AdvancePCS; (2) the Pfizer-Caremark Rx; (3) the Pfizer-Express Scripts; and (4) the Pfizer-Medco Health.  Each of the Pfizer Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(m)     *The Pharmacia Group Manufacturer-PBM Conspiracies:*  The Pharmacia Group Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Pharmacia Group's AWPIDs and billed its members on the basis of Pharmacia Group's reported AWPs, and Pharmacia Group, including its directors, employees and agents:  (1) the Pharmacia Group-AdvancePCS; (2) the Pharmacia Group-Caremark Rx; (3) the Pharmacia Group-Express Scripts; and (4) the Pharmacia Group-Medco Health.  Each of the Pharmacia Group Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(n)     *The Schering-Plough Group Manufacturer-PBM Conspiracies:*  The Schering-Plough Group Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Schering-Plough Group's AWPIDs and billed its members on the basis of Schering-Plough Group's reported



AWPs, and Schering-Plough Group, including its directors, employees and agents: (1) the Schering-Plough Group-AdvancePCS; (2) the Schering-Plough Group-Caremark Rx; (3) the Schering-Plough Group-Express Scripts; and (4) the Schering-Plough Group-Medco Health. Each of the Schering-Plough Group Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(o) *The Sicor Group Manufacturer-PBM Conspiracies:* The Sicor Group Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Sicor Group's AWPIDs and billed its members on the basis of Sicor Group's reported AWPs, and Sicor Group, including its directors, employees and agents: (1) the Sicor Group-AdvancePCS; (2) the Sicor Group-Caremark Rx; (3) the Sicor Group-Express Scripts; and (4) the Sicor Group-Medco Health. Each of the Sicor Group Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(p) *The TAP Group Manufacturer-PBM Conspiracies:* The TAP Group Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of The TAP Group's AWPIDs and billed its members on the basis of The TAP Group's reported AWPs, and Pfizer, including its directors, employees and agents: (1) The TAP Group-AdvancePCS; (2) The TAP Group-Caremark Rx; (3) The TAP Group-Express Scripts; and (4) The TAP Group-Medco Health. Each of The TAP Group Manufacturer-PBM Conspiracies is an ongoing and continuing



conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(q)     *The Watson Manufacturer-PBM Conspiracies:*  The Watson Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Watson's AWPIDs and billed its members on the basis of Watson's reported AWPs, and Pfizer, including its directors, employees and agents:  (1) the Watson-AdvancePCS; (2) the Watson-Caremark Rx; (3) the Watson-Express Scripts; and (4) the Watson-Medco Health.  Each of the Watson Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(r)     *The Warrick Manufacturer – PBM Conspiracies:*  The Warrick Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Warrick's AWPIDs and billed its members on the basis of Warrick's reported AWPs, and Pfizer, including its directors, employees and agents:  (1) Warrick-AdvancePCS; (2) Warrick-Caremark Rx; (3) Warrick-Express Scripts; and (4) Warrick-Medco Health.  Each of the Warrick Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(s)     *The Dey-PBM Conspiracies:*  The Dey-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of



Dey's AWPIDs and billed its members on the basis of Dey's reported AWPs, and Pfizer, including its directors, employees and agents: (1) Dey -AdvancePCS; (2) Dey-Caremark Rx; (3) Dey -Express Scripts; and (4) Dey -Medco Health. Each of Dey-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(t)     *The Boehringer Group-PBM Conspiracies:* The Boehringer Group-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Boehring Group's AWPIDs and billed its members on the basis of Boehring Group's reported AWPs, and Pfizer, including its directors, employees and agents: (1) Boehring Group-AdvancePCS; (2) Boehring Group-Caremark Rx; (3) Boehring Group-Express Scripts; and (4) Boehring Group-Medco Health. Each of Boehringer Group-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(u)     *The B. Braun-PBM Conspiracies:* The B. Braun-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of B. Braun's AWPIDs and billed its members on the basis of B. Braun's reported AWPs, and Pfizer, including its directors, employees and agents: (1) B. Braun-AdvancePCS; (2) B. Braun-Caremark Rx; (3) B. Braun-Express Scripts; and (4) B. Braun-Medco Health. Each of B. Braun-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the



common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(v)    *The Fujisawa-PBM Conspiracies:*  The Fujisawa-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Fujisawa's AWPIDs and billed its members on the basis of Fujisawa's reported AWPs, and Pfizer, including its directors, employees and agents: (1) Fujisawa-AdvancePCS; (2) Fujisawa-Caremark Rx; (3) Fujisawa-Express Scripts; and (4) Fujisawa-Medco Health. Each of Fujisawa-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

729.    Defendants consciously conspired and deliberately pursued a common plan or design to commit tortious acts, with each PBM that was part of its conspiracy, subjecting each to joint liability. Each Defendant Drug Manufacturer and each PBM had the common purpose of perpetuating a reimbursement system based on AWP, because such a system financially benefits **both** the manufacturer and the PBM. The Defendant Drug Manufacturers deliberately and fraudulently overstate the AWPs for their AWPIDs, thereby creating a "spread" based on the inflated figure in order to obtain each of the PBM agreement to advocate and favor that particular Defendant Drug Manufacturer's drugs to the members of that PBM's clients. Each of the PBMs then billed their clients for the particular Defendant Drug Manufacturers' AWPIDs based on the inflated AWPs, which did not reflect the true price paid by the PBMs for the AWPIDs. All of these acts – and more – were done as part of a conspiracy to deceive payors, in violation of applicable state consumer protection laws and the common law of fraud. All of these acts were done in violation of Medicare anti-fraud kickback statutes and were done pursuant to acts of wire and mail fraud.

AMENDED MASTER CONSOLIDATED                    - 295 -
CLASS ACTION COMPLAINT



730. Defendants each committed an unlawful act or acts in furtherance of this conspiracy, including:

(a) Issuing false marketing materials about the AWPs for AWPIDs and the available spread, which were sent by the Defendant Drug Manufacturers to PBMs (including Medco Health) located across the country;

(b) Written representations of the AWPs made by the Defendant Drug Manufacturers to the Publishers, which were made at least annually and in many cases several times during a single year and which the PBMs knew were false;

(c) Thousands of written and oral communications discussing, negotiating and confirming the placement of a Defendant Drug Manufacturer's brand name drugs on a particular PBM's formulary;

(d) Documents providing information or incentives designed to lessen the prices that each of the PBMs paid for AWPIDs, and/or to conceal those prices or the AWP Scheme;

(e) Written communications, including checks, relating to rebates, kickbacks or other financial inducements paid to each of the PBMs to persuade them to advocate one Defendant Drug Manufacturers' AWPIDs over a drug manufactured by a competitor;

(f) Written and oral communications with U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

(g) Written and oral communications with health insurers and patients, including Plaintiffs and the members of Classes, inducing payments for the drugs that were made in reliance on AWPs; and



(h) Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Defendant Drug Manufacturers' AWP Scheme.

731. All of these acts were done as part of a conspiracy to deceive end payors, in violation of applicable state consumer protection laws and the common law of fraud. All of these acts were also committed in violation of applicable Medicare anti-fraud kickback statutes, and were committed pursuant to acts of unlawful instances of mail and wire fraud.

732. Plaintiffs are entitled to a presumption of reliance on the false representations, concealments and nondisclosures by Defendants. The Class Members were ignorant of Defendants' representations and were ignorant of the full and true facts suppressed by Defendants, and such reliance was justified.

733. As a direct, proximate result of this conspiracy, Plaintiffs and Class Members have been injured, as they have suffered and continue to suffer economic losses and general and specific damages, all in an amount to be determined according to proof.

**COUNT X**

**CIVIL CONSPIRACY**

**(AGAINST THE TOGETHER CARD DEFENDANTS)**

734. Plaintiffs incorporate the preceding allegations as if fully set forth above.

735. This count is asserted by the Nationwide End Payor Together Card Class, and by class representative CMHV. The Court has diversity jurisdiction over this claim.

736. Each of the Together Card Defendants joined in a conspiracy to fix, set and/or maintain the spread between their reported AWP and WAC and each agreed to raise their AWPs prior to implementation of the Together Card Program. Each Together Card Defendant also agreed to publish AWPs that were inflated. Each Together Card Defendant also knew that the

1534.16 0046 BSC.DOC



other Together Card Defendant's AWPs were often inflated, so each was aware that by agreeing to raise and fix AWPs, they were perpetuating the use of inflated AWPs on a nationwide basis.

737.    The Together Card Defendants consciously conspired and deliberately pursued a common plan or design to commit tortious acts, subjecting each to joint liability.

738.    Together Card Defendants each committed unlawful act or acts in furtherance of this conspiracy, including acts violating the Sherman Act, state consumer protection laws, the common law and committed acts of mail and wire fraud. All of these acts were in furtherance of the conspiracy.

739.    As a necessary, inevitable and intended part of the conspiracy (and as detailed throughout this complaint), each of the Together Card Defendants structured, arranged and/or otherwise participated in transactions designed to conceal the scheme.

740.    Plaintiffs are entitled to a presumption of reliance on the false representations, concealments and nondisclosures by the Together Card Defendants. The Nationwide End Payor Together Card Class Members were ignorant of Together Card Defendants' conduct and were ignorant of the full and true facts suppressed by them, and such reliance was justified.

741.    As a direct, proximate result of this conspiracy, Plaintiffs and the Nationwide End Payor Together Card Class Members have been injured, as they have suffered and continue to suffer economic losses and general and specific damages, all in an amount to be determined according to proof.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

A.    The Court determine that this action may be maintained as a class action pursuant to Rule 23(b) (2) of the Federal Rules of Civil Procedure with respect to Plaintiffs' claims for declaratory, equitable and injunctive relief, and Rule 23(b) (3) of the Federal Rules of Civil



Procedure with respect to the claims for damages, and declaring Plaintiffs as representatives of the Classes and their counsel as counsel for the Classes;

B.    The conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.    Plaintiffs and the Classes be granted an award of damages in such amount to be determined at trial, with trebling under Counts I, II, VI and VIII;

D.    Plaintiffs and the Classes be granted an award of punitive damages in such amount to be determined at trial;

E.    Defendants be enjoined from continuing the illegal activities alleged herein;

F.    Plaintiffs and the Classes recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law; and

G.    Plaintiffs and the Classes be granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## XI.    DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

DATED:  December 5, 2003.

Boston, Massachusetts


By Steve W. Berman/Signature on File
    Thomas M. Sobol
Edward Notargiacomo
Hagens Berman LLP
225 Franklin Street, 26th Floor
Boston, MA  02110
Telephone: (617) 482-3700
Facsimile: (617) 482-3003



Steve W. Berman
Sean R. Matt
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

*LIAISON AND CO-LEAD COUNSEL*

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Elizabeth Fegan Hartweg
The Wexler Firm
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Samuel Heins
Brian Williams
Heins, Mills & Olson, P.C.
700 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Telephone: (612) 338-4605
Facsimile: (612) 338-4692

CO-LEAD COUNSEL



Michael McShane
Alexander, Hawes & Audet, LLP
300 Montgomery Street, Suite 400
San Francisco, CA  94104
Telephone: (415) 982-1886
Facsimile: (415) 576-1776

Robert E. Piper, Jr.
Piper & Associates
624 Pierre Avenue
Shreveport, LA 71103
Telephone: (318) 226-0826
Facsimile: (318) 424-9900

PLAINTIFFS LEAD COUNSEL COMMITTEE

Anthony Bolognese
Bolognese & Associates
One Penn Center
1617 JFK Boulevard, Suite 650
Philadelphia, PA  19103
Tel:  (215) 814-6750
Fax:  (215) 814-6764

Jonathan W. Cuneo
The Cuneo Law Group
317 Massachusetts Ave. N.E., Suite 300
Washington, DC 20002
Tel: (202) 789-3960
Fax: (202) 789-1813

Neal Goldstein (Of Counsel)
Freedman & Lorry, PC
400 Market Street, Suit 900
Philadelphia, PA 19106
Tel: (215) 925-8400
Fax: (215) 925-7516

Michael E. Criden
Hanzman & Criden, PA
Commerce Bank Center, Suite 400
220 Alhambra Circle
Coral Gables, FL  33134
Tel:  (305) 357-9000
Fax: (305) 357-9050



Blake M. Harper
Kirk B. Hulett
Hulett Harper LLP
550 West C Street, Suite 1700
San Diego, CA  92101
Tel:  (619) 338-1133
Fax: (619) 338-1139

Jonathan D. Karmel
Karmel & Gilden
221 N. LaSalle Street
Suite 1414
Chicago, IL  60601
Tel: (312) 641-2910
Fax: (312) 641-0781

Dianne M. Nast
Roda & Nast, PC
801 Estelle Drive
Lancaster, PA 17601
Tel: 717-892-3000
Fax: 717-892-1200

Henry H. Rossbacher
Rossbacher & Associates
811 Wilshire Boulevard, Suite 1650
Los Angeles, CA 90017-2666
Tel:  (213) 895-6500
Fax:  (213) 895-6161

Jonathan Shub
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd Floor
Philadelphia, PA  19102
Tel:  (215) 790-7300
Fax:  (215) 546-0942

Scott R. Shepherd
Shepherd & Finkleman, LLC
117 Gayley Street, Suite 200
Media, PA 19063
Tel:  (610) 891-9880
Fax:  (610) 891-9883

AMENDED MASTER CONSOLIDATED          - 302 -
CLASS ACTION COMPLAINT

1534.16 0046 BSC.DOC