## CLAIM FOR CIVIL PENALTIES AND INJUNCTIVE RELIEF

430.    The State of Nevada repeats and realleges the preceding paragraphs of this

Amended Complaint as if fully set forth herein.

431.    This Claim is brought for civil penalties and injunctive relief to prevent the harm

caused to elderly Patients in Nevada by the AWP Inflation Scheme.

432.    Defendants' conduct as alleged in this Amended Complaint constitutes deceptive

acts or practices in violation of NRS 598.0915(13), 598.0915(15), 598.0923(2), and 598.0923(3)

in that:

>    (a)    Defendants have failed to disclose material facts in
> connection with the sale of goods in that they have not disclosed
> that their AWPs greatly exceeded the average of the wholesale
> prices based upon a good faith and reasonable estimate utilizing
> the pricing and transaction information available to defendants in
> conducting their ordinary business affairs, but were instead inflated
> in order to drive up the prices paid by Patients and Third-Party
> Payors within the State of Nevada;
>
>    (b)    Defendants have made false or misleading
> statements of facts concerning the price of goods in that they have
> made deceptive statements about the true AWP paid for their
> medications in order to drive up the prices paid by elderly Patients
> within the State of Nevada;
>
>    (c)    Defendants have knowingly made false
> representations in a transaction by representing that the AWP is an
> accurate reflection of the average wholesale price paid for their
> drugs; and
>
>    (d)    Defendants have violated state and federal statutes
> and regulations relating to the sale or lease of goods including,
> without limitation, the Nevada RICO statute (NRS 207.470 *et
> seq.*), the federal regulations governing the determination of
> Medicare payments for drugs (42 C.F.R. § 405.517), the federal
> mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 and the
> Racketeer Influenced and Corrupt Organizations Act (RICO),
> particularly 18 U.S.C. § 1962(c) & (d).

433.    Defendants' conduct was in disregard of the rights of elderly persons, many of

whom are forced to make expensive co-payments based on defendants' falsified AWP.

Defendants knew that their AWP Inflation Scheme would adversely affect elderly persons, and

such persons are more vulnerable to defendants' scheme given their age and/or conditions and

- 121 -

their need for defendants' drugs.  Further, defendants' conduct caused elderly persons to suffer
substantial economic damage.

434.   The wrongful conduct alleged in this Amended Complaint occurs and continues
to occur in the ordinary course of defendants' business or occupation and has caused great harm
to the State of Nevada and its residents.

435.   Defendants' violations of the Deceptive Trade Practices Act were committed with
the intent to mislead and defraud.

436.   Defendants' wrongful, deceptive and illegal conduct has resulted in excessive and
illegal profits to defendants and excessive payments made by elderly Patients in Nevada.

WHEREFORE, the State of Nevada prays as follows:

A.   That the Court adjudge and decree that defendants have engaged in the conduct
alleged herein.

B.   That the Court adjudge that the conduct is unlawful and in violation of
NRS 598.0915(13), 598.0915(15), 598.0923(2), 598.0923(3) and 598.0973.

C.   That the Court enjoin and restrain defendants and their officers, agents, servants,
and employees, and those in active concert or participation with them, from continuing or
engaging in such conduct or other conduct having similar purpose or effect.

D.   That the Court enjoin defendants and order that any and all future disseminations
of AWP accurately reflect the average of wholesale prices based upon a good faith and
reasonable estimate utilizing the pricing and transaction information available to the defendant in
conducting their ordinary business affairs.

E.   That, pursuant to NRS 598.0973(1), the Court assess civil penalties of $10,000
from each defendant for each violation directed toward an elderly person as complained of
herein.

F.   That the State of Nevada recover from defendants the costs of this action,
including reasonable attorneys' fees.

G.    That the Court order such other and further relief as it may deem just, necessary and appropriate.

## COUNT III

### DECEPTIVE TRADE PRACTICES
### (Violations of NRS 598.0903, *et seq.*)

### CLAIM FOR CIVIL PENALTIES, INJUNCTIVE RELIEF, AND RESTITUTION FOR THE STATE OF NEVADA

437.    The State of Nevada repeats and realleges the preceding paragraphs of this Amended Complaint as if fully set forth herein.

438.    This Claim is brought for restitution of the losses suffered by State of Nevada as a result of the AWP Inflation Scheme and the Best Price Scheme to recover civil penalties for defendants' violations of Nevada law, and to impose injunctive relief ending the unlawful schemes.

439.    Defendants' conduct as alleged in this Amended Complaint constitutes deceptive acts or practices in violation of NRS 598.0915(13), 598.0915(15), 598.0923(2), and 598.0923(3) in that:

> (a)    Defendants have failed to disclose material facts in connection with the sale of goods in that they have not disclosed that their AWPs greatly exceeded the average of the wholesale prices based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to the defendant in conducting its ordinary business affairs, and that the "best prices" they report are not the actual "best prices" offered to other commercial entities, but were instead inflated in order to drive up the prices paid for medications by the State of Nevada;

> (b)    Defendants have made false or misleading statements of facts concerning the price of goods in that they have made deceptive statements about the true AWP and "best prices" paid for their medications in order to drive up the prices paid by the State of Nevada;

> (c)    Defendants have knowingly made false representations in a transaction by representing that the AWP is an accurate reflection of the average wholesale price paid for their drugs, and that their reported "best prices" are in fact the "best prices" offered to a commercial entity for their drugs; and

- 123 -

> (d)    Defendants have violated state and federal statutes and regulations relating to the sale or lease of goods including, without limitation, the "best price" requirement of the Medicaid statute (Nevada RICO statute (NRS 207.470 *et seq.*), the federal regulations governing the determination of Medicare payments for drugs (42 C.F.R. § 405.517), the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 and the Racketeer Influenced and Corrupt Organizations Act (RICO), particularly 18 U.S.C. § 1962(c) & (d).

440.    Defendants acted willfully and knowingly in committing the actions set forth above.

441.    The wrongful conduct alleged in this Amended Complaint occurs and continues to occur in the ordinary course of defendants' business or occupation and has caused great harm to the State of Nevada and its residents.

442.    Defendants' violations of the Deceptive Trade Practices Act were committed with the intent to mislead and defraud.

443.    Defendants' wrongful, deceptive and illegal conduct has resulted in excessive and illegal profits to defendants and excessive payments by the State of Nevada and its residents.

WHEREFORE, the State of Nevada prays as follows:

A.    That the Court adjudge and decree that defendants have engaged in the conduct alleged herein.

B.    That the Court adjudge that the conduct is unlawful and in violation of NRS 598.0915(13), 598.0915(15) and 598.0923(3).

C.    That the Court enjoin and restrain defendants and their officers, agents, servants, and employees, and those in active concert or participation with them, from continuing to engage in such conduct or other conduct having similar purpose or effect.

D.    That the Court enjoin defendants and order that any and all future disseminations of AWP accurately reflect the average of wholesale prices based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to defendants in conducting their ordinary business affairs, and the "best price" offered to any commercial entity, respectively.

- 124 -

E.     That, pursuant to NRS 598.0999, the Court assess civil penalties of $2,500 from each defendant for each willful violation of NRS 598.0903 to 598.0997 complained of herein.

F.     That, pursuant to NRS 598.0993, the Court make such additional orders or judgments as may be necessary to restore to the State all moneys which defendants acquired from it by means of any of the deceptive trade practices complained of herein.

G.     That, pursuant to NRS 598.0993, the Court order defendants to pay restitution that restores the State to the financial position that it would be in, absent the defendants' conduct.

H.     That the State of Nevada recover from defendants the costs of this action, including reasonable attorneys' fees.

I.     That the Court order such other and further relief as it may deem just, necessary and appropriate.

**COUNT IV**

**RACKETEERING**
**(Violations of NRS 207.400, *et seq.*)**

**CLAIM FOR TREBLE DAMAGES TO STATE OF**
**NEVADA AND CIVIL FORFEITURE**

444.   The State of Nevada incorporates by reference all preceding paragraphs as if fully set forth herein.

445.   This Claim is brought for treble damages to the State of Nevada and civil forfeiture of the profits wrongfully obtained by defendants as a result of their racketeering activities as detailed herein.

446.   At all relevant times, defendants each conducted the affairs of an association-in-fact enterprise within the meaning of NRS 207.380.

447.   Subsequent to July 1, 1983, and within five-year periods, each defendant engaged in far more than two crimes related to racketeering that have the same or similar pattern, intents, results, accomplices, victims or methods of commission, and are otherwise related by distinguishing characteristics and are not isolated instances.

**The Manufacturer-Publisher Enterprises**

- 125 -

448.    The following are publishers of pharmaceutical industry compendia that periodically publish the AWPs, both in printed and electronic media, for various dosages of drugs: (a) **Thomson Medical Economics** ("Thomson Medical") is a division of Thomson Corporation, a Delaware corporation with its principal place of business located at One Station Place, Stamford, Connecticut, and it is the publisher of the *Drug Topics Red Book* (the "*Red Book*"); (b) **First DataBank, Inc.**, ("First DataBank") a Missouri corporation, with its principal place of business at 1111 Bayhill Drive, San Bruno, California, and it is the publisher of drug pricing information including, but not limited to, *American Druggist First Databank Annual Directory of Pharmaceuticals* and *Essential Directory of Pharmaceuticals*, commonly referred to as the *Blue Book*; (c) and **Facts & Comparisons, Inc.**, ("Facts & Comparisons") a division of Lippincott Williams & Wilkins, Inc., a Pennsylvania corporation which acquired all drug information reference products formerly published by Medi-Span, Inc. and which currently makes available drug pricing information, including, but not limited to, the Medi-Span *Master Drug Data Base*. These entities are sometimes collectively referred to herein as "the Publishers."

449.    For purposes of this claim, certain RICO "enterprises" are associations-in-fact consisting of (a) one of the Publishers that reported AWPs for drugs, and (b) a defendant, including its directors, employees and agents. These associations-in-fact are sometimes collectively referred to herein as the "Manufacturer-Publisher Enterprises." Each of the Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price information, which all too often includes disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities. Each of the enterprises had a common purpose of perpetuating use of AWPs as a benchmark for reimbursement in the pharmaceutical industry, generally, and specifically for the drugs of that defendant. Defendants have this as a purpose because without the AWP scheme, they would not

- 126 -

be able to push the spread. The Publishers agree to this scheme, because if they did not, the manufacturers could easily revert to the other methods of publishing prices, or the publishers would have to independently investigate the AWP at significant expense. The Publishers also have an economic incentive to merely report the AWPs provided to them by the manufacturers, because to do otherwise would require the Publishers to spend money to extensively survey actual sales prices in the market. By simply republishing what is submitted to them by the drug manufacturers, the Publishers save on expenses and consequently reap greater profits. Thus, each of the Manufacturer-Publisher Enterprises has a common purpose of perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry.

450.    Each of the Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the defendant and the specific Publishers that are its associates. As to each of the Manufacturer-Publisher Enterprises, there is a common communication network by which the defendant and the specific Publisher share information on a regular basis. Typically, this communication occurs by use of the wires and mails in which a manufacturer will instruct a publisher to list a certain AWP. As to each of the Manufacturer-Publisher Enterprises, the defendant and the specific Publisher functioned as a continuing unit. At all relevant times, each of the Manufacturer-Publisher Enterprises was operated by the specific defendant for criminal purposes, namely, carrying out the AWP Inflation Scheme.

451.    At all relevant times, each one of the Publishers was aware of the defendants' AWP Inflation Scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme. Each of the Publishers is aware that the published AWPs are inflated. This awareness comes from the following sources: First, at some point prior to 1992 the Publishers in many instances obtained AWPs themselves by survey. From their surveys of those in the distribution chain, they were and are aware that the reported AWPs were not accurate. Second, as various congressional bodies and government agencies reported on AWP inflation, the Publishers did not change or challenge the self-reported AWPs, but continued blindly accepting

- 127 -

the requested AWPs.  Third, when the State of Texas began prosecuting Dey for its AWP
practices, and when other states began focusing on Dey, the Publishers stopped accepting Dey's
reported AWPs and published a different, far lower AWP.  They withdrew from the Dey
enterprise due to fear that they would be sued if they continued to publish Dey's false AWPs.
This prompted a lawsuit by Dey alleging that the Publishers were treating Dey differently than
they were treating all other manufacturers.  In other words, Dey was complaining of the others
being allowed to continue the scheme while it could not.

452.    The foregoing evidences the Publishers' willing participation in the enterprise;
their common purpose in the AWP Inflation Scheme; and their agreement to a structure wherein
the manufacturers made decisions as to what AWPs would be reported.  This structure was the
basis on which each of the enterprises was structured and its affairs conducted.  The only
exception occurred when the Publishers, fearing litigation, refused to accept Dey's instructions.
The Publishers were willing participants in the scheme because, if the truth were revealed, the
entire AWP reporting system would collapse.

453.    For purposes of this count, the Manufacturer-Publisher Enterprises are identified
as follows:

(a)    *The Amgen Manufacturer-Publisher Enterprises:*  The Amgen
Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of
each of the Publishers that reported the AWPs that were provided to them by Amgen, and
Amgen, including its directors, employees and agents:  (1) the Amgen-Thomson Medical
Enterprise; (2) the Amgen-First DataBank Enterprise; and (3) the Amgen-Facts &
Comparisons Enterprise.  Each of the Amgen Manufacturer-Publisher Enterprises is an
ongoing and continuing business organization consisting of both corporations and
individuals that are and have been associated for the common or shared purposes of (a)
publishing or otherwise disseminating false and misleading AWPs, (b) selling,
purchasing, and administering drugs, and (c) deriving profits from these activities.  Each
of the Amgen Manufacturer-Publisher Enterprises has a systemic linkage because there

- 128 -

are contractual relationships, financial ties, and continuing coordination of activities between Amgen and Thomson Medical, Amgen and First DataBank, and Amgen and Facts & Comparisons. As to each of these Amgen Manufacturer-Publisher Enterprises, there is a common communication network by which Amgen and Thomson Medical, Amgen and First DataBank, and Amgen and Facts & Comparisons share information on a regular basis. As to each of these Amgen-Manufacturer-Publisher Enterprises, Amgen and Thomson Medical, Amgen and First DataBank, and Amgen and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Amgen Manufacturer-Publisher Enterprises was operated and conducted by Amgen for criminal purposes, namely, carrying out the AWP Inflation Scheme.

(b)     *The AstraZeneca Manufacturer-Publisher Enterprises:*  The AstraZeneca Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by AstraZeneca, and AstraZeneca, including its directors, employees and agents: (1) the AstraZeneca-Thomson Medical Enterprise; (2) the AstraZeneca -First DataBank Enterprise; and (3) the AstraZeneca-Facts & Comparisons Enterprise. Each of the AstraZeneca Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities. Each of the AstraZeneca Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between AstraZeneca and Thomson Medical, AstraZeneca and First DataBank, and AstraZeneca and Facts & Comparisons. As to each of these AstraZeneca Manufacturer-Publisher Enterprises, there is a common communication network by which AstraZeneca and Thomson Medical, AstraZeneca and First DataBank, and AstraZeneca and Facts &

- 129 -

Comparisons share information on a regular basis.  As to each of these AstraZeneca -
Manufacturer-Publisher Enterprises, AstraZeneca and Thomson Medical, AstraZeneca
and First DataBank, and AstraZeneca and Facts & Comparisons functioned as continuing
but separate units.  At all relevant times, each of the AstraZeneca Manufacturer-Publisher
Enterprises was operated and conducted by AstraZeneca for criminal purposes, namely,
carrying out the AWP Inflation Scheme.

     (c)    *The Aventis Group Manufacturer-Publisher Enterprise:*  The Aventis
Group Manufacturer-Publisher Enterprises are three separate associations-in-fact
consisting of each of the Publishers that reported the AWPs that were provided to them
by Aventis Group, and Aventis Group, including its directors, employees and agents:
(1) the Aventis Group-Thomson Medical Enterprise; (2) the Aventis Group-First
DataBank Enterprise; and (3) the Aventis Group-Facts & Comparisons Enterprise.  Each
of the Aventis Group Manufacturer-Publisher Enterprises is an ongoing and continuing
business organization consisting of both corporations and individuals that are and have
been associated for the common or shared purposes of (a) publishing or otherwise
disseminating false and misleading AWPs, (b) selling, purchasing, and administering
drugs, and (c) deriving profits from these activities.  Each of the Aventis Group
Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual
relationships, financial ties, and continuing coordination of activities between Aventis
Group and Thomson Medical, Aventis Group and First DataBank, and Aventis Group
and Facts & Comparisons.  As to each of these Aventis Group Manufacturer-Publisher
Enterprises, there is a common communication network by which Aventis Group and
Thomson Medical, Aventis Group and First DataBank, and Aventis Group and Facts &
Comparisons share information on a regular basis.  As to each of these Aventis Group-
Manufacturer-Publisher Enterprises, Aventis Group and Thomson Medical, Aventis
Group and First DataBank, and Aventis Group and Facts & Comparisons functioned as
continuing but separate units.  At all relevant times, each of the Aventis Group

- 130 -

Manufacturer-Publisher Enterprises was operated and conducted by Aventis Group for criminal purposes, namely, carrying out the AWP Inflation Scheme.

(d)     *The Boehringer Group Manufacturer-Publisher Enterprises:*  The Boehringer Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Boehringer Group, and Boehringer Group, including its directors, employees and agents:  (1) the Boehringer Group-Thomson Medical Enterprise; (2) the Boehringer Group-First DataBank Enterprise; and (3) the Boehringer Group-Facts & Comparisons Enterprise.  Each of the Boehringer Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities.  Each of the Boehringer Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Boehringer Group and Thomson Medical, Boehringer Group and First DataBank, and Boehringer Group and Facts & Comparisons.  As to each of these Boehringer Group Manufacturer-Publisher Enterprises, there is a common communication network by which Boehringer Group and Thomson Medical, Boehringer Group and First DataBank, and Boehringer Group and Facts & Comparisons share information on a regular basis.  As to each of these Boehringer Group Manufacturer-Publisher Enterprises, Boehringer Group and Thomson Medical, Boehringer Group and First DataBank, and Boehringer Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Boehringer Group Manufacturer-Publisher Enterprises was operated and conducted by Boehringer Group for criminal purposes, namely, carrying out the AWP Inflation Scheme.

- 131 -

(e)    *The Braun Manufacturer-Publisher Enterprises:* The Braun
Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of
each of the Publishers that reported the AWPs that were provided to them by Braun, and
Braun, including its directors, employees and agents: (1) the Braun-Thomson Medical
Enterprise; (2) the Braun-First DataBank Enterprise; and (3) the Braun-Facts &
Comparisons Enterprise. Each of the Braun Manufacturer-Publisher Enterprises is an
ongoing and continuing business organization consisting of both corporations and
individuals that are and have been associated for the common or shared purposes of (a)
publishing or otherwise disseminating false and misleading AWPs, (b) selling,
purchasing, and administering drugs, and (c) deriving profits from these activities. Each
of the Braun Manufacturer-Publisher Enterprises has a systemic linkage because there are
contractual relationships, financial ties, and continuing coordination of activities between
Braun and Thomson Medical, Braun and First DataBank, and Braun and Facts &
Comparisons. As to each of these Braun Manufacturer-Publisher Enterprises, there is a
common communication network by which Braun and Thomson Medical, Braun and
First DataBank, and Braun and Facts & Comparisons share information on a regular
basis. As to each of these Braun Manufacturer-Publisher Enterprises, Braun and
Thomson Medical, Braun and First DataBank, and Braun and Facts & Comparisons
functioned as continuing but separate units. At all relevant times, each of the Braun
Manufacturer-Publisher Enterprises was operated and conducted by Braun for criminal
purposes, namely, carrying out the AWP Inflation Scheme.

(f)    *The Fujisawa Group Manufacturer-Publisher Enterprises:* The Fujisawa
Group Manufacturer-Publisher Enterprises are three separate associations-in-fact
consisting of each of the Publishers that reported the AWPs that were provided to them
by Fujisawa Group, and Fujisawa Group, including its directors, employees and agents:
(1) the Fujisawa Group-Thomson Medical Enterprise; (2) the Fujisawa Group-First
DataBank Enterprise; and (3) the Fujisawa Group-Facts & Comparisons Enterprise. Each

- 132 -

of the Fujisawa Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities.  Each of the Fujisawa Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Fujisawa Group and Thomson Medical, Fujisawa Group and First DataBank, and Fujisawa Group and Facts & Comparisons.  As to each of these Fujisawa Group Manufacturer-Publisher Enterprises, there is a common communication network by which Fujisawa Group and Thomson Medical, Fujisawa Group and First DataBank, and Fujisawa Group and Facts & Comparisons share information on a regular basis.  As to each of these Fujisawa Group Manufacturer-Publisher Enterprises, Fujisawa Group and Thomson Medical, Fujisawa Group and First DataBank, and Fujisawa Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Fujisawa Group Manufacturer-Publisher Enterprises was operated and conducted by Dey for criminal purposes, namely, carrying out the AWP Inflation Scheme.

(g)     *The Immunex Manufacturer- Publisher Enterprises:*  The Immunex Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Immunex, and Immunex, including its directors, employees and agents: (1) the Immunex-Thomson Medical Enterprise; (2) the Immunex-First DataBank Enterprise; and (3) the Immunex-Facts & Comparisons Enterprise.  Each of the Immunex Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these

- 133 -

activities. Each of the Immunex Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Immunex and Thomson Medical, Immunex and First DataBank, and Immunex and Facts & Comparisons. As to each of these Immunex Manufacturer-Publisher Enterprises, there is a common communication network by which Immunex and Thomson Medical, Immunex and First DataBank, and Immunex and Facts & Comparisons share information on a regular basis. As to each of these Immunex Manufacturer-Publisher Enterprises, Immunex and Thomson Medical, Immunex and First DataBank, and Immunex and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Immunex Manufacturer-Publisher Enterprises was operated and conducted by Immunex for criminal purposes, namely, carrying out the AWP Inflation Scheme.

(h)     *The Johnson & Johnson Group Manufacturer-Publisher Enterprise:*  The Johnson & Johnson Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Johnson & Johnson Group, and Johnson & Johnson Group, including its directors, employees and agents: (1) the Johnson & Johnson Group-Thomson Medical Enterprise; (2) the Johnson & Johnson Group-First DataBank Enterprise; and (3) the Johnson & Johnson Group-Facts & Comparisons Enterprise. Each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities. Each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Johnson & Johnson Group and Thomson Medical, Johnson & Johnson Group

- 134 -

and First DataBank, and Johnson & Johnson Group and Facts & Comparisons. As to each of these Johnson & Johnson Group Manufacturer-Publisher Enterprises, there is a common communication network by which Johnson & Johnson Group and Thomson Medical, Johnson & Johnson Group and First DataBank, and Johnson & Johnson Group and Facts & Comparisons share information on a regular basis. As to each of these Johnson & Johnson Group Manufacturer-Publisher Enterprises, Johnson & Johnson Group and Thomson Medical, Johnson & Johnson Group and First DataBank, and Johnson & Johnson Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises was operated and conducted by Johnson & Johnson Group for criminal purposes, namely, carrying out the AWP Inflation Scheme.

(i)     *The Novartis Manufacturer-Publisher Enterprises:* The Novartis Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Novartis, and Novartis, including its directors, employees and agents: (1) the Novartis-Thomson Medical Enterprise; (2) the Novartis-First DataBank Enterprise; and (3) the Novartis-Facts & Comparisons Enterprise. Each of the Novartis Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities. Each of the Novartis Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Novartis and Thomson Medical, Novartis and First DataBank, and Novartis and Facts & Comparisons. As to each of these Novartis Manufacturer-Publisher Enterprises, there is a common communication network by which Novartis and Thomson Medical, Novartis and First DataBank, and Novartis and

- 135 -

Facts & Comparisons share information on a regular basis.  As to each of these Novartis Manufacturer-Publisher Enterprises, Novartis and Thomson Medical, Novartis and First DataBank, and Novartis and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Novartis Manufacturer-Publisher Enterprises was operated and conducted by Novartis for criminal purposes, namely, carrying out the AWP Inflation Scheme.

(j)     *The Pfizer Manufacturer-Publisher Enterprises:*  The Pfizer Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Pfizer, and Pfizer, including its directors, employees and agents:  (1) the Pfizer-Thomson Medical Enterprise; (2) the Pfizer-First DataBank Enterprise; and (3) the Pfizer-Facts & Comparisons Enterprise.  Each of the Pfizer Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities.  Each of the Pfizer Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pfizer and Thomson Medical, Pfizer and First DataBank, and Pfizer and Facts & Comparisons.  As to each of these Pfizer Manufacturer-Publisher Enterprises, there is a common communication network by which Pfizer and Thomson Medical, Pfizer and First DataBank, and Pfizer and Facts & Comparisons share information on a regular basis.  As to each of these Pfizer Manufacturer-Publisher Enterprises, Pfizer and Thomson Medical, Pfizer and First DataBank, and Pfizer and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Pfizer Manufacturer-Publisher Enterprises was operated and conducted by Pfizer for criminal purposes, namely, carrying out the AWP Inflation Scheme.

- 136 -

(k)    *The Schering-Plough Group Manufacturer-Publisher Enterprises:*  The Schering-Plough Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Schering-Plough Group, and Schering-Plough Group, including its directors, employees and agents:  (1) the Schering-Plough Group-Thomson Medical Enterprise; (2) the Schering-Plough Group-First DataBank Enterprise; and (3) the Schering-Plough Group-Facts & Comparisons Enterprise.  Each of the Schering-Plough Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities.  Each of the Schering-Plough Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Schering-Plough Group and Thomson Medical, Schering-Plough Group and First DataBank, and Schering-Plough Group and Facts & Comparisons.  As to each of these Schering-Plough Group Manufacturer-Publisher Enterprises, there is a common communication network by which Schering-Plough Group and Thomson Medical, Schering-Plough Group and First DataBank, and Schering-Plough Group and Facts & Comparisons share information on a regular basis.  As to each of these Schering-Plough Group Manufacturer-Publisher Enterprises, Schering-Plough Group and Thomson Medical, Schering-Plough Group and First DataBank, and Schering-Plough Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Schering-Plough Group Manufacturer-Publisher Enterprises was operated and conducted by Schering-Plough Group for criminal purposes, namely, carrying out the AWP Inflation Scheme.

(l)    *The Sicor Group Manufacturer-Publisher Enterprises:*  The Sicor Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of

- 137 -

each of the Publishers that reported the AWPs that were provided to them by Sicor Group, and Sicor Group, including its directors, employees and agents: (1) the Sicor Group-Thomson Medical Enterprise; (2) the Sicor Group-First DataBank Enterprise; and (3) the Sicor Group-Facts & Comparisons Enterprise. Each of the Sicor Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities. Each of the Sicor Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sicor Group and Thomson Medical, Sicor Group and First DataBank, and Sicor Group and Facts & Comparisons. As to each of these Sicor Group Manufacturer-Publisher Enterprises, there is a common communication network by which Sicor Group and Thomson Medical, Sicor Group and First DataBank, and Sicor Group and Facts & Comparisons share information on a regular basis. As to each of these Sicor Group Manufacturer-Publisher Enterprises, Sicor Group and Thomson Medical, Sicor Group and First DataBank, and Sicor Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Sicor Group Manufacturer-Publisher Enterprises was operated and conducted by Sicor Group for criminal purposes, namely, carrying out the AWP InflationScheme.

(m)     *The Watson Manufacturer-Publisher Enterprises:*  The Watson Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Watson, and Watson, including its directors, employees and agents: (1) the Watson-Thomson Medical Enterprise; (2) the Watson-First DataBank Enterprise; and (3) the Watson-Facts & Comparisons Enterprise. Each of the Watson Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and

- 138 -

individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities. Each of the Watson Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Watson and Thomson Medical, Watson and First DataBank, and Watson and Facts & Comparisons. As to each of these Watson Manufacturer-Publisher Enterprises, there is a common communication network by which Watson and Thomson Medical, Watson and First DataBank, and Watson and Facts & Comparisons share information on a regular basis. As to each of these Watson Manufacturer-Publisher Enterprises, Watson and Thomson Medical, Watson and First DataBank, and Watson and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Watson Manufacturer-Publisher Enterprises was operated and conducted by Watson for criminal purposes, namely, carrying out the AWP Inflation.

**Conduct of the RICO Enterprises' Affairs**

454.    Defendants have exerted control over their Manufacturer-Publisher Enterprises and, in violation of NRS 207.400, defendants have conducted or participated in the conduct of the affairs of those RICO enterprises, directly or indirectly, in the following ways:

(a)    Each of the defendants has directly controlled the reimbursement rates for its drugs;

(b)    Each of the defendants has directly controlled the AWPs that are reported by the Publishers;

(c)    Each of the defendants has directly controlled the creation and distribution of marketing, sales, and other materials used to inform health care providers nationwide of the profit potential of its drugs;

(d)    Each of the defendants has controlled and participated in the affairs of its Manufacturer-Publisher Enterprises by using a fraudulent scheme to manufacture, market

- 139 -

and sell its drugs on the basis of AWPs that each of the defendants provides to the Publishers;

(e) Each of the defendants intended that each of the Publishers would (and did) distribute their publications containing false AWPs through the U.S. mails and by interstate wire facilities; and

(f) Each of the Publishers has allowed these defendants to exert control over their organizations knowing that the AWPs were inflated and were not real numbers. Each Publisher did so because the reporting of AWPs was, and is, a major part of its business.

455. Each of the Manufacturer-Publisher Enterprises had a hierarchical decision-making structure headed by the respective defendant. The defendant issued instructions on how its AWPs were to be reported and each Publisher accepted those instructions despite knowing of their falsity.

456. Each of the defendants has conducted the affairs of each of the Manufacturer-Publisher Enterprises with which they associated by reporting fraudulently inflated AWPs for drugs that were then published by the Publishers and disseminated nationwide.

**Defendants' Racketeering**

457. Defendants have conducted and participated in the affairs of the AWP Enterprise through racketeering activity that includes acts indictable under NRS 205.380. In particular, by (i) reporting artificially high AWPs, and (ii) representing that their sales price was related to the AWP, defendants obtained money from the State of Nevada, and Patients and Third-Party Payors residing therein under false pretenses.

458. In conducting the AWP Inflation Scheme as detailed above and throughout this Amended Complaint, each defendant had the intent to defraud the State of Nevada, and Patients and Third-Party Payors residing therein.

459. Defendants' racketeering involved hundreds, if not thousands, of separate instances of obtaining money under false pretenses pursuant to NRS 205.380, and insurance

- 140 -

fraud in violation of NRS 686A.291 and 686A.2815. Each of these instances constitutes a "crime related to racketeering" within the meaning of NRS 207.360.26. Collectively, these violations constitute "racketeering activity" within the meaning of NRS 207.390 in which the defendants intended to defraud Plaintiff and other intended victims of the scheme.

460.    Defendants' fraudulent and unlawful scheme consisted first of deliberately overstating the AWPs for the drugs, creating a "spread" based on the inflated figure to induce medical providers to prescribe the drugs to their patients, thereby causing Medicare and the Nevada Medicaid Program to reimburse an artificially-inflated rate of reimbursement for the drugs. Defendants' fraudulent and unlawful marketing scheme also consisted of providing free samples of the drugs to medical providers, instructing these professionals to bill the Medicare and Medicaid Programs for these free samples, and providing other unlawful financial incentives, including kickbacks, to induce use of the drugs.

461.    Finally, in order to obtain higher payments from residents in Nevada, defendants fraudulently misrepresented that the AWPs accurately reflected the average wholesale prices paid by hospitals and physicians for their drugs, thereby committing insurance fraud within the meaning of NRS 686A.2815(2)-(4), (6) and (8).

462.    These schemes were calculated and intentionally crafted so as to ensure that the Medicare and Medicaid Programs would be over-billed for the drugs, as well as Patients residing in Nevada. In designing and implementing these fraudulent schemes, defendants were at all times cognizant of the facts that (a) the entire Medicare Program and all patients for whom the drugs are prescribed, and (b) the State of Nevada in its Medicaid payments for prescription drugs, as well as payments made by other state agencies, all rely upon the honesty of defendants in setting the AWP as reported in the *First DataBank* and similar publications.

463.    By intentionally and artificially inflating AWPs and by providing medical providers with unlawful financial inducements to use the drugs, and by subsequently failing to disclose such practices to the Patients and others from whom reimbursement was sought,

- 141 -

defendants engaged in a repeated, fraudulent, and unlawful course of conduct constituting racketeering.

464.   These racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive plaintiff and other victims of the scheme.  Each separate instance of racketeering activity perpetrated by defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including the State of Nevada, and Patients residing therein. Defendants have engaged in this racketeering activity for the purpose of conducting the ongoing business affairs of the enterprises.

465.   Defendants' violations have directly and proximately caused the State of Nevada and Patients and Third-Party Payors residing therein to be injured in their property insofar as they have paid millions of dollars in inflated reimbursements or other payments for the drugs.

466.   The State of Nevada and Patients residing therein have relied to their detriment on billing statements that were based on information reported directly or indirectly by defendants. As a result of defendants' fraudulent acts, the billing statements so distributed have resulted in inflated payments for the State and its resident Patients.

WHEREFORE, the State of Nevada prays as follows:

A.   That the Court adjudge and decree that defendants have engaged in the conduct alleged herein.

B.   That the Court adjudge that the conduct is unlawful and in violation of NRS 207.400, and NRS 207.360.26.

C.   That the Court enjoin and restrain defendants and their officers, agents, servants, and employees, and those in active concert or participation with them, from continuing to engage in such conduct or other conduct having similar purpose or effect.

D.   That the Court enjoin defendants and order that any and all future disseminations of AWP accurately reflect the average of wholesale based upon a good faith and reasonable

- 142 -

1534.13 0045 BSC.DOC

estimate utilizing the pricing and transaction information available to defendants in conducting their ordinary business affairs.

E.      That, pursuant to NRS 207.460, the Court order that defendants forfeit all property, including money, derived from or gained through defendants' conduct in violation of NRS 207.400.

F.      That, pursuant to NRS 207.470, the Court find that defendants are jointly and severally liable to the State of Nevada for three times the damages it has sustained as a result of the defendants' violations of NRS 207.400.1.

G.      That, pursuant to NRS 207.480, the Court order defendants to pay restitution that restores the State to the financial position that it would be in, absent the defendants' conduct.

H.      That, pursuant to NRS 207.480, the State of Nevada recover from defendants the costs of this action, including reasonable attorneys' fees.

I.      That the Court order such other and further relief as the Court deems just, necessary and appropriate.

**COUNT V**

**MEDICAID FRAUD**
**(Violations of NRS 422.540, *et seq.*)**

**CLAIM FOR COST RECOVERY AND CIVIL PENALTIES**

467.    The State of Nevada realleges and incorporates the previous paragraphs of this Amended Complaint as though fully set forth herein.

468.    This Claim is brought for treble damages and civil penalties pursuant to NRS 422.580.

469.    Each of the defendant pharmaceutical companies is a manufacturer of drugs included in the Nevada Medicaid drug formulary.

470.    Pursuant to 42 U.S.C. § 1396r-8, each of the defendant pharmaceutical companies entered into a rebate agreement with the Medicaid Program under which the Medicaid Program would receive rebates determined in part by Best Price," which is defined as "the lowest price available from the manufacturer."

- 143 -

471.    In particular, as part of the rebate agreement, each defendant agreed that:

(a)    It would determine its Best Price, taking into account discounts, free goods contingent upon any purchase requirements, volume discounts and rebates, in any quarter and would make quarterly rebates where necessary to bring the price down to the actual lowest price offered to any commercial entity;

(b)    It would also determine its Best Price based upon its average manufacturer's price, calculated as "net Sales divided by numbers of units sold, excluding free goods (*i.e.,* drugs or any other items given away, but not contingent on any purchase requirements)" and that it would include in that calculation cash discounts and all other price reductions "which reduce the actual price paid;" and

(c)    It would not take into account nominal prices, defined as prices that are less than 10 percent of the average manufacturer's price in that quarter, so long as the sale of a product at a nominal price was not contingent on any other sale.

472.    After execution of its agreement, each defendant reported its Best Price in each quarter to the Medicaid Program.

473.    In keeping with their artificial price inflation scheme, each defendant did not report the actual Best Price or "average manufacturer's price," but instead (i) reported higher prices and (ii) excluded discounts and other inducements offered to physicians that resulted in lower prices than the prices reported to the Medicaid Program.

474.    Each of the defendants thereby violated NRS 422.540(1)(a) in that, acting with the intent to defraud, each defendant made or caused claims to be made to the effect that the Nevada Medicaid Program was receiving rebates based upon accurately reported Best Price information, knowing the claims to be rendered false, in whole or in part, by falsely reporting the prices paid by commercial entities for its products and not accounting for the discounts and other inducements offered to commercial entities.

475.    Each of the defendants also violated NRS 422.540(1)(b) and (d), in that, acting with the intent to defraud and in order to obtain authorization to qualify as a provider and to

- 144 -

provide specific goods, each defendant made or caused to be made false statements promising that it would comply with the mandates of 42 U.S.C. § 1396r-8.

476.    Each of the defendants also violated NRS 422.540(1)(c) in that, acting with intent to defraud, they made false statements by reporting inflated AWPs that greatly exceeded the average of wholesale prices, based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to the defendants in conducting their ordinary business affairs. In making these false representations, each defendant knew that others, including providers, hospitals, pharmacies and other providers, would use the inflated AWPs to obtain reimbursement from the Nevada Medicaid Program.

477.    As a result of defendants' violations of NRS 422.540(1)(a), (b), (c) and (d), the Nevada Medicaid Program made substantially higher reimbursements for defendants' products than it otherwise would have, and the Nevada Medicaid Program was deprived of its appropriate rebate as a result of defendants' inaccurate reporting of Best Prices.

WHEREFORE, the State of Nevada prays as follow:

A.    That the Court adjudge and decree that the defendants have engaged in the conduct alleged herein;

B.    That the Court adjudge that the conduct is unlawful and in violation of NRS 422.540(1)(a), (b) and (d);

C.    That, pursuant to NRS 422.580, the Court find each defendant liable for:

      (a)    An amount equal to three times the amount unlawfully obtained;

      (b)    Not less than $5,000 for each false claim, statement or representation;

      (c)    An amount equal to three times the total of the reasonable expenses incurred by the State in enforcing NRS 422.580; and

      (d)    Payment of interest on the amount of the excess payment at the rate fixed pursuant to NRS 99.040 for the period from the date upon which payment was made to the date upon which repayment is made pursuant to the plan.

- 145 -

D.     That the Court order such other and further relief as it may deem just, necessary and appropriate.

COUNT VI

PUNITIVE DAMAGES

CLAIM BROUGHT ON BEHALF OF THE STATE OF NEVADA

478.    The State of Nevada realleges and incorporates the previous paragraphs of this Amended Complaint as though fully set forth herein.

479.    The defendants' conduct as described in this Amended Complaint was oppressive, fraudulent, and malicious, and the State is therefore entitled to an award of punitive damages against the defendants.

WHEREFORE, the State of Nevada prays as follows:

A.     That the Court adjudge and decree that defendants have engaged in the conduct alleged herein.

B.     That the Court order defendants to pay punitive damages to the State of Nevada in an amount to be determined after trial.

C.     That the Court order such other and further relief as the Court deems just, necessary and appropriate.

XII.    DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

DATED:        August 1, 2003.

By    _Steven W. Berman_
Steve W. Berman
Sean R. Matt
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

- 146 -

Brian Sandoval
Attorney General of the State of Nevada
L. Timothy Terry
Assistant Attorney General
100 N. Carson Street
Carson City, Nevada 89701-4714

COUNSEL FOR PLAINTIFF
STATE OF NEVADA

1534.13 0045 BSC.DOC