**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY )<br>AVERAGE WHOLESALE PRICE LITIGATION ) | MDL No. 1456 |
| ) | |
| THIS DOCUMENT RELATES TO )<br>01-CV-12257-PBS AND 01-CV-339 ) | Civil Action No. 01-CV-12257 PBS<br><br>Judge Patti B. Saris<br>Chief Magistrate Judge Marianne B. Bowler |

**RESPONSE OF DEFENDANT BRISTOL-MYERS SQUIBB COMPANY TO**
**PLAINTIFFS' MOTION TO COMPEL BMS TO ANSWER INTERROGATORIES**

Defendant Bristol-Myers Squibb Company ("BMS"), by its undersigned counsel,

hereby responds to Plaintiffs' Motion To Compel BMS To Answer Interrogatories.

Summary of Argument

In an apparent effort to punish BMS for moving to compel proper answers to its

interrogatories, plaintiffs have moved to compel BMS to answer interrogatories to which BMS

initially responded several months ago.  Those interrogatories ask BMS to organize and compare

drug price and sales volume information in various ways that conform to their damages theory.

BMS responded by stating that it had produced its drug price and sales volume information that

related to plaintiffs' claims as that information is kept in the ordinary course of BMS's business.

After saying nothing for months, plaintiffs now seek to renew the Interrogatories.

They ask this Court to compel BMS's "accountants and business managers" (Pl. Mem. at 5) to

do the work necessary to provide the responses.  This exercise would cost BMS hundreds of

thousands of dollars in employee, computer and expert time, and would not accomplish anything

that plaintiffs and their experts cannot accomplish themselves.  Moreover, plaintiffs' motion

suspiciously comes (i) on the heels of BMS's motion to compel plaintiffs to correct woefully

deficient answers to BMS's interrogatories, and (ii) under circumstances in which plaintiffs did not even bother to have a discovery conference in compliance with Local Rule 37.1(b).

The Court should not require BMS to spend hundreds of thousands of dollars to perform calculations so that plaintiffs can avoid paying for their own expert analyses.

Background

The Amended Master Consolidated Complaint ("AMCC") identifies 20 drugs manufactured by BMS and its former subsidiary Apothecon, Inc.  Those 20 drugs are manufactured in different dosage forms, strengths and sizes, each of which under federal regulations has its own National Drug Code or "NDC."  The Interrogatories define each NDC as a separate drug and therefore purport to demand (in numerous intricate subparts) thousands of calculations on 150 AWP identified drugs ("AWPIDs") in order to fit plaintiffs theory of "spread" damages.

More specifically, for each of these 150 AWPIDs, the Interrogatories seek calculations of (i) "net revenue" (undefined, but presumably some analysis matching each BMS sale to wholesalers with discounts and rebates and perhaps free samples given to "downstream" customers like hospitals, managed care organizations and group purchasing organizations); (ii) the percentile of sales by net revenue and numbers of units within various tranches of different price points ("AWP", "AMP", "WAC" and "Best Price"); (iii) the units and net revenue of sales that BMS exempted from its Best Price reporting to federal Medicaid authorities under the "nominal" sales exception; and (iv) the number of units distributed as "free goods."[1]

---

[1] On this last issue of free goods, plaintiffs subsequently narrowed their request to information concerning only certain physician-administered BMS drugs (e.g. injectables) as opposed to pharmacy-dispensed drugs (e.g. pills).  BMS has agreed to provide this information.  BMS has also supplied plaintiffs with its "AMPs" for each of the drugs at issue in the case.

2

As the accompanying Declaration of BMS employee Zoltan Szabo reveals, BMS maintains the bulk of its records of its drug sales, discounts and rebates in large computer systems. The "SHARP" system tracks BMS's direct sales to wholesalers; the "Prime Vendor" system tracks BMS's contracts with and discounts to particular customers, and the "CARS/IS" system tracks rebates to managed healthcare organizations (although there are also paper records of rebates). These are the only systems that contain price and volume data at the "NDC" level that plaintiffs have sought.

All of this information has been produced to plaintiffs in the form in which it is kept by BMS. To the extent that BMS has manipulated that information in order to respond to requests from the government in AWP investigations, BMS has produced that information as well. The most closely analogous response -- to a request from the U.S. House of Representatives Energy and Commerce Committee[2] -- was created by BMS after a tremendous expenditure of time and expense. See Szabo Decl. ¶ 7.

Plaintiffs' counsel's statement that they are being compelled to search "hundreds of thousands, if not millions of pages" for this information (Pl. Mem. at 3) is simply false. BMS has specifically identified the information in question in numerous letters to plaintiffs' counsel. (The letters are annexed hereto as Exhibit A). Furthermore, if plaintiffs' counsel had questions about the information, they could have asked BMS to answer them. Instead of having the discovery conference contemplated by Local Rule 37.1(b), plaintiffs simply fired off their motion.

Plaintiffs' interrogatories also require BMS to identify the AWPs that appear in publications such as Red Book, First DataBank or MediSpan. BMS does not provide those

---

[2] It appears that parts of plaintiffs' Interrogatories are patterned after the House Committee's request.

AWPs to the publications; the publications create them. The publications are equally available to plaintiffs and BMS.

Finally, it is worth noting that the interrogatories upon which plaintiffs now move to compel were also served on other defendants. Even though the other defendants took a position similar to BMS, plaintiffs have seen fit only to move to compel BMS's response. This demonstrates that plaintiffs' motion is nothing more than an act of retaliation against BMS because BMS moved to compel plaintiffs' responses to contention interrogatories.

<u>Argument</u>

I.    <u>Plaintiffs Cannot Use Interrogatories To Shift Their Expert Costs To BMS</u>

Analyzing and organizing the data in the form plaintiffs have requested would be an enormous task. (Szabo Decl. ¶ 7.) BMS would be required to retain an outside expert to do it or to divert numerous company employees away from their normal responsibilities. The burden on BMS is equal to the burden on plaintiffs. (<u>Id.</u> ¶ 8.)

The Advisory Committee comments to the 1993 Amendments to Fed. R. Civ. P. 33 make clear that interrogatories should be limited in scope because much of the information reasonably sought under such a discovery device is already called for under Fed. R. Civ. P. 26(a)(1)-(3).[3] Rule 26(a)(1)(C) requires that a disclosing party make available for inspection and copying the documents or evidentiary material that will be needed to compute damages. A plaintiff cannot fairly use Rule 33 interrogatories to go beyond this and to require a defendant to <u>do</u> the damages computations for a plaintiff or to act as its expert. <u>Halder v. Int'l Tel. & Tel. Co.</u>, 75 F.R.D. 657, 658 (E.D.N.Y. 1977).

---

[3] In fact, the same Advisory Committee comments encourage the courts to use their powers under Fed. Civ. P. 26(b)(2) to prohibit interrogatories used "as a means of harassment" and the response to which would be "costly" for the other party.

Rule 33(d) itself recognizes that where (i) the answer to an interrogatory has to "be derived or ascertained from . . . business records" because (ii) it is <u>not</u> contained in any existing "compilation, abstract or summary" and (iii) to derive the answer, the party served with the interrogatory would have to undertake a burden substantially similar to that of propounding party, it is a sufficient response to refer the propounding party to the underlying business records. <u>Mid-America Facilities Inc. v Argonaut Ins. Co.</u>, 78 F.R.D. 497, 498 (E.D. Wis. 1978); <u>Spector Freight Sys., Inc. v. Home Indem. Co.</u>, 58 F.R.D. 162, 164-65 (N.D. Ill. 1973).  That is precisely this case and, again, that is precisely what BMS has done.  <u>Cf.</u> <u>Oppenheimer Fund v. Sanders</u>, 437 U.S. 340, 357 (1978) (purpose of Rule 33(d), formerly Rule 33(c) is to "place the burden of discovery upon its potential benefitee.") (citing Advisory Committee rule)

Plaintiffs have offered absolutely <u>no</u> record evidence (such as expert reports, attorney time sheets, or disbursements) of the burden on them of deriving the information they seek.  This failure, in and of itself, requires denial of the motion to compel.  <u>Petroleum Ins. Agency, Inc. v Hartford Accident & Indem. Co.</u>, 111 F.R.D. 318, 320-21 (D. Mass. 1984). Moreover, the cases cited by plaintiffs in support of their motion are inapposite.  The question is not simply whether BMS is more "familiar" with its own data; rather, the question is the burden of manipulating that data in the unique way that plaintiffs desire.  <u>Id.</u>  As the Declaration of Mr. Szabo of BMS demonstrates, BMS has no advantage over plaintiffs in this regard.

If plaintiffs have questions about BMS's data, we would be happy to answer them.  That is the purpose of the discovery conference under Local Rule 37.1(b).  Unfortunately, plaintiffs failed to follow that procedure here.

II.     BMS Properly Has Referred Plaintiffs To Produced Documents

        Plaintiffs complain that BMS has not sufficiently specified — within the meaning
of Fed. R. Civ. P. 33(d)— where in BMS's production the information is located that plaintiffs
would need to make the calculations called for in the Interrogatories.  As noted above, this is
wrong.  The computer disks and the production to Congress have been specifically identified.
Plaintiffs' counsel can put their hands on this material at any time.

III.    Plaintiffs Should Obtain Public Data Themselves

        To the extent that plaintiffs' Interrogatories are directed to information like AWPs
that are "reported in . . . Red Book, First Data Bank and/or Medispan," that information is
obviously in those publications and is available to plaintiffs.  (Szabo Decl. ¶ 6.)  Plaintiffs should
not seek from BMS information in the hands of third parties.  Once again, the burden of
answering these questions is equal for BMS and plaintiffs.

IV.     Plaintiffs' Request For Medicaid Data

        Plaintiffs also seek to compel BMS to identify its "Best Price" reported to the
Secretary of Health and Human Services under the Medicaid statute and the volume of sales
exempted from Best Price reporting under the "nominal" price exception.  Neither of these
reports to the Secretary has anything to do with AWPs that are the subject of this case.[4]
Nevertheless, BMS is willing to produce such information -- and would have agreed to do so

---

[4] Briefly, there are two transactions under Medicaid relevant to this discussion.  First, the Medicaid
patient obtains a drug from a pharmacy.  In some states, the pharmacist is reimbursed by Medicaid based
on AWP.  Second, each drug manufacturer who wants its drugs to be eligible for use in the Medicaid
program must pay a quarterly "rebate" to the Medicaid program itself.  That rebate has nothing to do with
AWP, but instead is based on statutorily-defined terms such as Average Manufacturers Price, Best Price
and nominal sales.

without judicial information if plaintiffs had raised it at a discovery conference pursuant to Local

Rule 37.1(b).

Conclusion

For the foregoing reasons, plaintiffs' motion should be denied and plaintiffs

should be directed to comply with Local Rule 37.1 in the future.

Dated: New York, New York
       July 30, 2004

           /s/ Joseph E. Haviland
          Thomas Dwyer, Esq.
          Joseph E. Haviland, Esq.
          **DWYER & COLLORA, LLP**
          Federal Reserve Plaza
          600 Atlantic Avenue
          Boston, MA  02210-2211
          (617) 371-1000

          Steven M. Edwards, Esq. (admitted *pro hac vice*)
          Lyndon M. Tretter, Esq. (admitted *pro hac vice*)
          **HOGAN & HARTSON L.L.P.**
          875 Third Avenue
          New York, New York  10022
          (212) 918-3000

          *Attorneys for Defendant Bristol-Myers Squibb Company*

**EXHIBIT A**

# HOGAN & HARTSON
## L.L.P.

LYNDON M. TRETTER
PARTNER
(212) 918-3528
LMTRETTER@HHLAW.COM

December 3, 2003

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

**_BY FEDERAL EXPRESS_**

Thomas M. Sobol, Esq.
Hagens Berman LLP
225 Franklin Street, 26th Floor
Boston, MA 02110

> Re:  **In re Pharmaceutical Industry Average Wholesale Price Litigation, MDL No. 1456**

Dear Tom:

     I write on two matters relating to document production by Bristol-Myers Squibb ("BMS").

     First, pursuant to CMO # 7, enclosed please find a copy set of documents recently produced by BMS to the U.S. House of Representatives' Committee on Energy & Commerce.  We have marked the documents BMS/AWP/0051157-730.  We have also stamped the documents "Highly Confidential" pursuant to the December 13, 2002 Protective Order entered by Judge Saris as the documents contain very sensitive financial information.  Please be guided accordingly.

     Second, in light of recent correspondence from your partner, Steve Berman, to all defendants about which drugs are currently the subject of discovery, I wish to confirm the scope of the BMS discovery on which you and I had previously agreed.  BMS is producing on 5 drugs:  blenoxane, cytoxan, vepesid, amkacin sulfate and amphotercin b.  (See your definition of "Identified Drugs" in your subpoena to the Publications).  We believe that this mutually-agreed list (which was larger than what Judge Saris had then ordered and which includes two multi-source drugs) remains unaffected by Judge Saris' remarks at the November 21· 2003 hearing.

WASHINGTON, DC

BERLIN   BRUSSELS   LONDON   PARIS   BUDAPEST   PRAGUE   WARSAW   MOSCOW   TOKYO
NEW YORK   BALTIMORE   McLEAN   MIAMI   DENVER   BOULDER   COLORADO SPRINGS   LOS ANGELES

HOGAN & HARTSON L.L.P.

Thomas M. Sobol, Esq.
December 3, 2003
Page 2

        If you feel differently on this second point, please let me know
immediately.  We expect to make further productions to you regarding these five
BMS drugs in the near future.

                                Very truly yours,

                                Lyndon M. Tretter

Enclosure

# HOGAN & HARTSON
### L.L.P.

STEVEN M. EDWARDS
PARTNER
(212) 918-3506
SMEDWARDS@HHLAW.COM

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

January 19, 2004

## BY FEDERAL EXPRESS

Steve W. Berman, Esq.
Hagens Berman LLP
130 Fifth Avenue, Suite 2900
Seattle, WA  98101

Re:    In re Pharmaceutical Industry Average Wholesale Price
Litigation, MDL No. 1456

Dear Steve:

I am writing to you as part of the continuing document production by Bristol-Myers Squibb Company ("BMS"), Oncology Therapeutics Network Corp. and Apothecon, Inc.  Today, we are providing you – as liaison counsel for plaintiffs in the above MDL – the following:

1.    A copy set of additional documents produced on December 12, 2003 by BMS to the U.S. House of Representatives' Committee on Energy & Commerce.  We have marked the documents BMS/AWP/0051731 - 52804.

2.    Responses and objections to plaintiffs' (a) document requests and interrogatories dated December 3, 2003 (which we assume superseded the requests dated June 19, 2003) and (b) second set of document requests dated December 19, 2003.  Note that we have not yet obtained our client's signature on the interrogatory responses.  We will do so shortly.

3.    Eighteen (18) boxes of documents responsive to your discovery requests (BMS/AWP/000052085 - 000097171).

4.    Charts for three drugs – Vepesid, Amikin, Fungizone – which contain the prices by NDC, quarter and customer class that we agreed to provide plaintiffs.  (BMS/AWP/000096283 - 000096289).  Please note that there is some "overlap" between the wholesaler/distributor prices and the prices in other customer

WASHINGTON, DC

BERLIN  BRUSSELS  LONDON  PARIS  BUDAPEST  PRAGUE  WARSAW  MOSCOW  TOKYO
\\\NY - 58559/0059 - 82374NEW YORK  BALTIMORE  McLEAN  MIAMI  DENVER  BOULDER  COLORADO SPRINGS  LOS ANGELES

HOGAN & HARTSON L.L.P.

Steve W. Berman, Esq.
January 19, 2004
Page 2

classes.  By this I mean that if a drug initially purchased by a
wholesaler/distributor is ultimately purchased by a provider or entity with whom
BMS has a direct contractual relationship for the same drug at a lower price, the
chart encompasses both the original price to the wholesaler/distributor and the
lower price to the other customer.

        We have stamped the documents "Highly Confidential" pursuant to the
December 13, 2002 Protective Order entered by Judge Saris as the documents
contain very sensitive financial information.  Please be guided accordingly.

        Finally, we are continuing our review of documents and are creating
additional charts for other drugs pursuant to our agreement.  We will continue to
produce documents on a rolling basis.  We will also make the additional charts as
soon as possible.

                                Very truly yours,

                                Steven M. Edwards

Enclosures

# HOGAN & HARTSON
### L.L.P.

LYNDON M. TRETTER
PARTNER
(212) 918-3528
LMTRETTER@HHLAW.COM

May 24, 2004

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

*BY OVERNIGHT DELIVERY*

Steve W. Berman, Esq.
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Re:    **AWP MDL Litigation**

Dear Steve:

In response to your letter of May 17, 2004 and pursuant to our agreement on Phase II discovery of Bristol-Myers Squibb Company ("BMS"), Oncology Therapeutics Network Corp. ("OTN") and Apothecon Inc. ("Apothecon"), enclosed are two (2) CDs, Bates Nos. BMS/AWP/00258327 & 28 containing transaction data for seven BMS oncology products and two Apothecon products that are the subject of plaintiffs' Amended Master Consolidated Complaint ("AMCC")

More specifically, these disks contain "direct sales" "chargeback" and "rebate" data for Blenoxane, Cytoxan, Etophopos, Paraplatin, Rubex, Taxol, Vepesid, as well as for Fungizone and Amikin. I also enclose text versions of the record layouts for the disks so that you can better understand the data.

A few notes on the disks are in order. First, certain products are sold by both BMS and OTN personnel. In the case of one such product, Rubex, we currently do not have the data for sales by OTN. We will provide that shortly. Second, because information regarding rebates on BMS products is often not located in one central database, we have not yet captured several rebate programs related to the products on the disks. We will provide that rebate information as soon as we have collected it. Third, we have previously produced to you, in hard copy form, prepared for litigation charts concerning three products – Vepesid, Fungizone and Amikin. The data on the enclosed disks is more comprehensive and should be deemed to supercede the previously-supplied data.

These disks contain "Highly Confidential" material. Unfortunately, it is not possible to stamp the data themselves. Accordingly, we have made our confidentiality designations on the disks and in this letter.

WASHINGTON, DC

BERLIN   BRUSSELS   LONDON   PARIS   BUDAPEST   PRAGUE   WARSAW   MOSCOW   TOKYO
\\\NY - 58559/0059 - 839436 v1   NEW YORK   BALTIMORE   McLEAN   MIAMI   DENVER   BOULDER   COLORADO SPRINGS   LOS ANGELES

HOGAN & HARTSON L.L.P.

Steve W. Berman
May 24, 2004
Page 2

Because none of the above products are in the Together Rx program, we are not supplying a copy of the disks to the Heins, Mills law firm. However, we hope to begin producing soon data on the eleven "Primary Care" BMS drugs listed in the AMCC, which includes several Together Rx drugs. We will make duplicate sets of those data productions.

Finally, I would like to respond to your May 18 and two May 21 letters to me and Steve Edwards. It would be difficult if not impossible for BMS to provide electronic copies of all documents produced to you prior to CMO #10. I believe that you will agree that such a wholesale re-production is rendered moot by the data production that we are now making and will be making in the future. However, if you have specific hardcopy documents from prior productions for which you would like us to search their electronic equivalents, please let me know and we can discuss the issue further. Further, I assume that you are seeing unusual dates on a handful of the documents we have produced because sometimes word-processed documents have "codes" in the date field that automatically change the date when the document is opened (which we are doing in order to see if the document is responsive to your discovery requests). If the date on the opening computer is erroneously set to the year "2031," then that unfortunately is the date which the document will show. As to your general comment that you have "concerns" about BMS' production, and in particular over the amount of "useless computer information," I can only respond that I believe that BMS has been faithful to the discovery demands plaintiffs have propounded and to the agreements on discovery that the we, as counsel, have reached. I am, however, available to discuss with you any and all aspects of BMS' production.

Very truly yours,

Lyndon M. Tretter

cc (via Verilaw):   Counsel of record (w/o enclosures)

\\\NY - 58559/0059 - 839436 v1



# HOGAN & HARTSON
### L.L.P.

LYNDON M. TRETTER
PARTNER
(212) 918-3528
LMTRETTER@HHLAW.COM

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

June 10, 2004

*BY OVERNIGHT DELIVERY*

Steve W. Berman, Esq.
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Re:    **AWP MDL Litigation**

Dear Steve:

Pursuant to our agreement on Phase II discovery of Bristol-Myers Squibb Company ("BMS"), Oncology Therapeutics Network Corp. ("OTN") and Apothecon Inc. ("Apothecon"), enclosed are 3 CDs, Bates Nos. BMS/AWP/00258329-00258331 containing (a) transaction data for eleven BMS "Primary Care" drugs that are the subject of plaintiffs' Amended Master Consolidated Complaint ("AMCC"); (b) revised "chargeback" data for the seven BMS oncology products and two Apothecon products previously provided to you and (c) the Rubex transaction data from OTN that I mentioned in my letter of May 24, 2004.

More specifically, the first disk contains "direct sales" and "chargeback" data for Avapro, BuSpar, Cefzil, Coumadin, Glucophage, Monopril, Monopril HCT, Plavix, Serzone, Tequin and Videx EC. I have previously provided you text versions of the record layouts for the disks so that you can better understand the data. Under copy of this letter, I am also sending a copy of this disk to the Heins Mills law firm.

We are providing a disk with revised chargeback data for the nine other drugs in the AMCC because we discovered that incorrect data may have been pulled for the fields "OWNERID," "OWNERNAME," "OWNERCCC," and "OWNERBC." This may have affected not only the contents of these four fields, but also the records included in the chargeback data set, because "OWNERCCC" and/or "OWNERBC" were fields that have been used to identify and exclude federal purchasers. It has been our intent to exclude from the data set transactions with federal agencies or buyers, which are often made at prices below commercial rates. This new disk has the proper field information and should be used instead of the previous disk which contains inaccurate data.

WASHINGTON, DC

BERLIN   BRUSSELS   LONDON   PARIS   BUDAPEST   PRAGUE   WARSAW   MOSCOW   TOKYO
\\\NY - 58559/0059 - 841878 v1   NEW YORK   BALTIMORE   McLEAN   MIAMI   DENVER   BOULDER   COLORADO SPRINGS   LOS ANGELES



HOGAN & HARTSON L.L.P.


Steve W. Berman
June 10, 2004
Page 2

Again, all these disks contain "Highly Confidential" material. Unfortunately, it is not possible to stamp the data themselves. Accordingly, we have made our confidentiality designations on the disks and in this letter.

We have now provided you virtually all of the agreed-upon transaction data. As I mentioned to you in my letter of May 24, 2004, there remains a large amount of "rebate" information. Some of this information is available through a software application called "CARS/IS" and relates primarily to rebates paid on Primary Care products to managed healthcare customers. We expect to provide that to you shortly. Other rebate information, however, is more widely dispersed and exists primarily in hard-copy form, Excel spreadsheets (which may or may not be complete or updated) and/or at very "gross" or "high" level (i.e., that is not specific to individual drug NDC's), accounts payable records. We should discuss the most efficient way to provide you this information.

Finally, in response to your letter of June 10, 2004, we are endeavoring to produce documents to you as quickly as we can. In addition, as you have requested, we will provide you by the close of business on Monday a specific and detailed rebate plan information when production will be completed. We are also prepared to take and defend depositions during the months of July and August and look forward to working with you on a reasonable schedule that accommodates the interests of all.

Very truly yours,

Lyndon / AME

Lyndon M. Tretter


Cc: Sam Heins, Esq. (w/enc. of Disk #1)
     All counsel of record (via Verilaw w/o enclosures)

# HOGAN & HARTSON
## L.L.P.

LYNDON M. TRETTER
PARTNER
(212) 918-3528
LMTRETTER@HHLAW.COM

June 25, 2004

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

*BY OVERNIGHT DELIVERY*

Steve W. Berman, Esq.
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Re:    AWP MDL Litigation

Dear Steve:

Pursuant to our agreement on Phase II discovery of Bristol-Myers Squibb Company ("BMS"), Oncology Therapeutics Network Corp. ("OTN") and Apothecon Inc. ("Apothecon"), enclosed are:

1.    Rebate agreements between BMS and its PBM and other Managed Healthcare "National" accounts and "blue sheets" reflecting the negotiations with those accounts;

2.    A CD containing the "CARS/IS" rebate data that I mentioned in my letter of June 10, 2004 and that relates primarily to rebates paid on Primary Care products to Managed Healthcare customers (including, but not limited to the "National" accounts); and

3.    Hard-copy files relating to rebates paid to customers of BMS' oncology products.

Again, the CD contains "Highly Confidential" material. Unfortunately, it is not possible to stamp the data themselves. Accordingly, we have made our confidentiality designations on the disks and in this letter. All of the other materials enclosed herewith are also designated "Highly Confidential".

The remaining rebate information BMS has to produce is more widely dispersed and exists primarily in hard-copy form, Excel spreadsheets (which may or may not be complete or updated) and/or at very "gross" or "high" level (i.e., that is not specific to individual drug NDC's), accounts payable records. In response to your letter of June 18, 2004, we will let you

WASHINGTON, DC

BERLIN   BRUSSELS   LONDON   PARIS   BUDAPEST   PRAGUE   WARSAW   MOSCOW   TOKYO
\\\NY - 58559/0059 - 844597 v1   NEW YORK   BALTIMORE   McLEAN   MIAMI   DENVER   BOULDER   COLORADO SPRINGS   LOS ANGE

HOGAN & HARTSON L.L.P.

Steve W. Berman
June 25, 2004
Page 2

know when we have collected a "critical mass" of this material and the volume thereof so that
you can send a team to inspect it.

Very truly yours,

Lyndon M. Tretter

cc: Sam Heins, Esq. (w/enc. of CD)
　　 All counsel of record (via Verilaw w/o enclosures)

\\\NY - 58589/0059 - 844597 v1

# HOGAN & HARTSON
### L.L.P.

LYNDON M. TRETTER
PARTNER
(212) 918-3528
LMTRETTER@HHLAW.COM

July 2, 2004

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

*BY OVERNIGHT DELIVERY*

Steve W. Berman, Esq.
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Re:   **AWP MDL Litigation**

Dear Steve:

Pursuant to our agreement, enclosed is the AMP data on the products that are the subject of the AMCC.   In exchange, Plaintiffs have agreed to withdraw their deposition subpoena directed to AMP issues.

This will also confirm that we hope to produce to you next Friday,  July 9, 2004, our privilege log.  At that time, I hope also to respond to your letter of June 23, 2004 concerning alleged "gaps" in the BMS/OTN/Apothecon data produced to date.

As you know, AMP data is "Highly Confidential" material.  Unfortunately, it is not possible to stamp the data themselves.  Accordingly, we have made our confidentiality designations on the disk and in this letter.

Very truly yours,

Lyndon M. Tretter

cc:  All counsel of record (via Verilaw w/o enclosures)

WASHINGTON, DC

BERLIN   BRUSSELS   LONDON   PARIS   BUDAPEST   PRAGUE   WARSAW   MOSCOW   TOKYO
\\\NY - 58559/0059 - 845762 v1   NEW YORK   BALTIMORE   McLEAN   MIAMI   DENVER   BOULDER   COLORADO SPRINGS   LOS ANGELES

# HOGAN & HARTSON
## L.L.P.

LYNDON M. TRETTER
PARTNER
(212) 918-3528
LMTRETTER@HHLAW.COM

July 12, 2004

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

*BY OVERNIGHT DELIVERY*

Steve W. Berman, Esq.
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Re:   **AWP MDL Litigation**

Dear Steve:

This is to respond to your letter and attached chart of June 23, 2004 concerning the data production by Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp. and Apothecon, Inc. (collectively, "BMS").

Your identification of gaps in the chargeback data for for the seven BMS oncology products and two Apothecon products previously provided to you on June 10, 2004 is correct. There was a technical "glitch" in assembling the data onto the CD. We are enclosing a re-revised CD.[1]

On chargebacks for "Primary Care" drugs, with the exception of Coumadin, we believe the data on the drugs that you question (BuSpar (fn. 6), Glucophage (fn. 10), Glucophage XR (fn. 12), Plavix (fn. 16) and Videx EC (fn. 20)) to be correct. The reason data is missing for Coumadin is that BMS did not acquire that drug (which was purchased from DuPont Pharma) until December 2001. Data prior to that time is not resident on BMS' mainframe computer systems. We are attempting to obtain such data from archival tapes; however, it will likely not be of the same level of detail or reliability as the other data provided. Finally, we do not understand your questions as to chargebacks on Monopril and Monopril HCT. Our examination of the data for these drugs reveal only a relatively small number of transactions in which "chargeback = 0". Moreover, your expert's footnote 13 is answered by the fact that although Monopril HCT was approved by the FDA in 1994, it was not launched by BMS until 2000.

---

[1] As always, the disk contains "Highly Confidential" material. Unfortunately, it is not possible to stamp the data themselves. Accordingly, we have made our confidentiality designations on the disks and in this letter.

WASHINGTON, DC

BERLIN   BRUSSELS   LONDON   PARIS   BUDAPEST   PRAGUE   WARSAW   MOSCOW   TOKYO
\\\NY - 58559/0059 - 846545 v1   NEW YORK   BALTIMORE   McLEAN   MIAMI   DENVER   BOULDER   COLORADO SPRINGS   LOS ANGELES

HOGAN & HARTSON L.L.P.

Steve W. Berman
July 12, 2004
Page 2

On the two Apothecon products, Amikin and Fungizone, you should be aware that BMS divested those products in 2001.  That is why there is no direct sales or chargback data thereafter.

As far as rebates are concerned, you already have all BMS data that resides in electronic format that is accessable via the CARS/IS software system, as well as through OTN's computer systems.  We have also provided you with many of the "hard-copy" rebate documents for the oncology products at issue in the case, although we expect to produce additional documents relating to Taxol rebates.   Please note that, in response to your expert's footnotes 14 and 17 concerning Paraplatin and Taxol, OTN's systems do not maintain rebate records at the NDC level.  We are searching to see whether there are individual Excel spreadsheets that might contain this kind of breakdown.

It will take us a considerable amount of time and effort to locate any hard-copy rebate information not already captured in CARS/IS that relates to the two Apothecon products and the Primary Care products.  We do, however, expect to be providing you shortly with some additional information on Tequin (although, again, this data may not be broken down to the NDC level).

Very truly yours,

Lyndon M. Tretter

Cc:  All counsel of record (via Verilaw w/o enclosures)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 30, 2004, a true and correct copy of Response of Defendant Bristol-Myers Squibb Company to Plaintiffs' Motion to Compel BMS to Answer Interrogatories was served upon all counsel of record by electronic service pursuant to CMO No. 2, by causing a copy to be sent to Verilaw Technologies for posting and notification.

_____
Hoa T. T. Hoang