# Exhibit 1



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br><br>CIVIL ACTION:  01-CV-12257-PBS<br><br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | |

## AMENDED NOTICE OF RULE 30(B)(6) DEPOSITION

TO:     ALL COUNSEL ON ATTACHED SERVICE LIST:

PLEASE TAKE NOTICE that the undersigned attorneys for Plaintiffs shall take the

deposition upon oral examination of a representative of each Defendant in this action who is

knowledgeable regarding the matters designated on Exhibit "A," attached.  These depositions

will being taken pursuant to Federal Rule of Civil Procedure 30(b)(6) and will be recorded by

stenographic and/or sound and visual means.  The depositions will be take place as follows:

| Deponent | Date and Time | | Location |
|---|---|---|---|
| Abbott | 10:00 a.m. | Within 45 days or on May 10, 2004 | The Wexler Firm LLP<br>One N. LaSalle Street, Suite 2000<br>Chicago, IL  60602 |
| Astra Zeneca | 10:00 a.m. | Within 45 days or on May 11, 2004 | The Wexler Firm LLP<br>One N. LaSalle Street, Suite 2000<br>Chicago, IL  60602 |



E-SERVED
04/02/04
01:09 PM ET
BMP-MDL NO. 1456

| | | | |
|---|---|---|---|
| Amgen | 10:00 a.m. | Within 45 days or on May 12, 2004 | Hagens Berman LLP<br>225 Franklin Street, 26th Floor<br>Boston, MA 02110 |
| Bristol Myers Squibb | 10:00 a.m. | Within 45 days or on May 12, 2004[1] | Hagens Berman LLP<br>225 Franklin Street, 26th Floor<br>Boston, MA 02110 |
| Baxter | 10:00 a.m. | Within 45 days or on May 14, 2004 | Hagens Berman LLP<br>225 Franklin Street, 26th Floor<br>Boston, MA 02110 |
| Immunex | 10:00 a.m. | Within 45 days or on May 17, 2004 | Hagens Berman LLP<br>1301 Fifth Avenue, Suite 2900<br>Seattle, WA 98101 |
| Schering Plough | 10:00 a.m. | Within 45 days or on May 17, 2004 | Spector, Roseman & Kodroff<br>1818 Market St., Ste 2500<br>Philadelphia, PA 19103 |
| Aventis | 10:00 a.m. | Within 45 days or on May 17, 2004 | Spector, Roseman & Kodroff<br>1818 Market St., Ste 2500<br>Philadelphia, PA 19103 |
| Dey | 10:00 a.m. | Within 45 days or on May 18, 2004 | Hagens Berman LLP<br>225 Franklin Street, 26th Floor<br>Boston, MA 02110 |
| Fujisawa | 10:00 a.m. | Within 45 days or on May 18, 2004 | Spector, Roseman & Kodroff<br>1818 Market St., Ste 2500<br>Philadelphia, PA 19103 |
| Pharmacia | 10:00 a.m. | Within 45 days or on May 18, 2004 | Spector, Roseman & Kodroff<br>1818 Market St., Ste 2500<br>Philadelphia, PA 19103 |
| Watson | 10:00 a.m. | Within 45 days or on May 12, 2004 | Spector, Roseman & Kodroff<br>1818 Market St., Ste 2500<br>Philadelphia, PA 19103 |
| Novartis | 10:00 a.m. | Within 45 days or on May 12, 2004 | Hagens Berman LLP<br>225 Franklin Street, 26th Floor<br>Boston, MA 02110 |
| Boehringer | 10:00 a.m. | Within 45 days or on May 12, 2004 | The Wexler Firm LLP<br>One N. LaSalle Street, Suite 2000<br>Chicago, IL  60602 |

---

[1] To the extent not covered by prior deposition.



| Johnson & Johnson | 10:00 a.m. | Within 45 days or on May 19, 2004 | Spector, Roseman & Kodroff 1818 Market St., Ste 2500 Philadelphia, PA 19103 |
| Pfizer | 10:00 a.m. | Within 45 days or on May 19, 2004 | Hagens Berman LLP 225 Franklin Street, 26th Floor Boston, MA 02110 |

You are invited to attend and participate.

DATED: April 1, 2004

By  Steve W. Berman, signature on file
   Thomas M. Sobol (BBO#471770)
   Edward Notargiacomo (BBO#567636)
   Hagens Berman LLP
   225 Franklin Street, 26th Floor
   Boston, MA  02110
   Telephone: (617) 482-3700
   Facsimile: (617) 482-3003
   **LIAISON COUNSEL**

   Steve W. Berman
   Sean R. Matt
   Kevin P. Roddy
   Hagens Berman LLP
   1301 Fifth Avenue, Suite 2900
   Seattle, WA  98101
   Telephone: (206) 623-7292
   Facsimile: (206) 623-0594

   Samuel Heins
   Heins, Mills & Olson, P.C.
   3550 IDS Center
   80 South Eighth Street
   Minneapolis, MN  55402
   Telephone: (612) 338-4605
   Facsimile: (612) 338-4692



Eugene A. Spector
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
**CHAIRS OF LEAD COUNSEL
COMMITTEE**

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Elizabeth Fegan Hartweg
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
**MEMBERS OF LEAD COUNSEL
COMMITTEE AND EXECUTIVE
COMMITTEE**

Michael McShane
Alexander, Hawes & Audet, LLP
300 Montgomery Street, Suite 400
San Francisco, CA 94104
Telephone: (415) 982-1886
Facsimile: (415) 576-1776

Robert E. Piper, Jr.
Piper & Associates
624 Pierre Avenue
Shreveport, LA 71103
Telephone: (318) 226-0826
Facsimile: (318) 424-9900
**MEMBERS OF EXECUTIVE
COMMITTEE**



Anthony Bolognese
Bolognese & Associates
One Penn Center
1617 JFK Boulevard
Suite 650
Philadelphia, PA  19103
Tel:  (215) 814-6750
Fax:  (215) 814-6764

Jonathan W. Cuneo
The Cuneo Law Group
317 Massachusetts Avenue, N.E.
Suite 300
Washington, D.C. 20002
Tel: (202) 789-3960
Fax: (202) 789-1813

Neal Goldstein (Of Counsel)
Freedman & Lorry, PC
400 Market Street, Suit 900
Philadelphia, PA 19106
Tel: (215) 925-8400
Fax: (215) 925-7516

Michael E. Criden
Hanzman & Criden, PA
Commerce Bank Center, Suite 400
220 Alhambra Circle
Coral Gables, FL  33134
Tel:  (305) 357-9000
Fax: (305) 357-9050

Blake M. Harper
Kirk B. Hulett
Hulett Harper LLP
550 West C Street
Suite 1700
San Diego, CA  92101
Tel:  (619) 338-1133
Fax: (619) 338-1139



Jonathan D. Karmel
Karmel & Gilden
221 N. LaSalle Street
Suite 1414
Chicago, IL  60601
Tel: (312) 641-2910
Fax: (312) 641-0781

Dianne M. Nast
Roda & Nast, PC
801 Estelle Drive
Lancaster, PA 17601
Tel: 717-892-3000
Fax: 717-892-1200

Henry H. Rossbacher
Rossbacher & Associates
811 Wilshire Boulevard,
Suite 1650
Los Angeles, CA 90017-2666
Tel:  (213) 895-6500
Fax:  (213) 895-6161

Jonathan Shub
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd fl
Philadelphia, PA  19102
Tel:  (215) 790-7300
Fax:  (215) 546-0942

Scott R. Shepherd
Shepherd & Finkleman, LLC
117 Gayley Street,
Suite 200
Media, PA 19063
Tel:  (610) 891-9880
Fax:  (610) 891-9883

Lisa J. Rodriguez
Ira Neil Richards
Trujillo Rodriguez& Richards, LLC
The Penthouse
226 West Rittenhouse Square
Philadelphia, PA  19103
Tel:  (215) 731-9004
Fax:  (215) 731-9044

AMENDED NOTICE OF
RULE 30(B)(6) DEPOSITION
1534.16 0043 DSC.DOC

- 6 -



Mitchell A. Toups
Weller, Green, Toups & Terrell, L.L.P.
2615 Calder Street, Suite 400
P.O. Box 350
Beaumont, TX 77704
Tel: (409) 838-0101
Fax: 409-838-6780

Damon Young
Lance Lee
Young, Pickett & Lee
4122 Texas Boulevard
P.O. Box 1897
Texarkana, AR/TX 75504
Tel: (903) 794-1303
Fax: 903-792-5098; 903-794-5098
**ADDITIONAL ATTORNEYS FOR
PLAINTIFFS**



## EXHIBIT "A"

### INSTRUCTIONS

All of the definitions from Plaintiffs' Omnibus Requests For Production of Documents Directed to All Defendants are incorporated herein by reference.

"AWPID" refers to all of the drugs identified Appendix A to the AMCC.

"Spread" refers to the difference between AWP or any price upon which reimbursement for a drug is based, on the one hand, and the actual or net price paid for a drug on the other hand.

Unless otherwise specifically stated, each of these Areas of Inquiry encompasses the years 1991 through the present.

### AREAS OF INQUIRY

1.    The identity of documents describing the process by which You establish, state, change or are otherwise directly or indirectly involved in setting the AWP, List Price, WAC, Average Sales Price ("ASP"), actual sales price, contract price or any other price for each of Your AWPIDs, and the names or job titles of all personnel involved in said process.

2.    The identity of documents describing Your policies or practices concerning the calculation, determination, dissemination, communication or publication of the AWP, List Price, WAC, or any other price for all of Your drugs.

3.    The identity of documents containing any definition of AWP, ASP, List Price of WAC.

4.    The identity of documents describing the process by which You decide to offer any type of discount, rebate, incentive or penalty in connection with the purchase of any AWPID, and the names or job titles of all personnel involved in said process.

AMENDED NOTICE OF
RULE 30(B)(6) DEPOSITION
1534.16 0043 DSC.DOC

- 8 -



5.      The identity of documents identifying all management personnel or management committees responsible for directing, overseeing or coordinating any of the activities referenced in items 1, 2 and 3 above.

6.      The identity and nature of any regularly created documents which report, review, comment upon or analyze any price stated or charged for any of Your AWPIDs.

7.      The identity and nature of documents describing the method by which You calculate or determine the average sales price for Your AWPIDs, including any determination or rendering of actual transaction costs and/or revenues at any level of the distribution or processing chains.

8.      The identity and nature of any regularly created documents which report, review, comment upon or analyze the profit from any of Your AWPIDs.

9.      The identity and nature of any regularly created documents which report, review, comment upon or analyze the average sales price, or actual sales prices for any of Your AWPIDs.

10.     The nature of Your electronic data or computer databases which relate directly or indirectly to either: (i) the amount of sales, sales prices, discounts or average sales prices for all of Your AWPIDs, and/or (ii) sales and marketing efforts and/or results.

11.     The nature of all computer and e-mail systems or networks used by You for internal communications among Your various offices, departments, sub-divisions and employees and the availability of the electronic data created and/or stored on such systems or networks.

12.     The nature of Your documents discussing, analyzing or marketing the Spread on any of Your drugs.

AMENDED NOTICE OF                           - 9 -
RULE 30(B)(6) DEPOSITION
1534.16 0043 DSC.DOC



13.     The location of or identity of documents relating to the nature of Your efforts to market, promote or tout the Spread on any of Your drugs, and the names or job titles of all personnel involved in said efforts.

14.     The nature of all documents comparing any price, rebate or incentive for any of Your drugs with any price, rebate or incentive offered for a competing drug.

15.     Any information related to any contention by You that the government had knowledge of any pharmaceutical manufacturer's practices and methodologies for setting the AWP for any drug, without regard to time period.

16.     The identity of documents regarding communications and agreements between You and any PBM.

17.     The identity of documents regarding communications between You and any other pharmaceutical manufacturer regarding:  (a) definitions of AWP, ASP, List Price of WAC: (b) calculation, determination, dissemination, communication or publication of AWP, List Price, WAC or any other price; and (c) rebates, chargebacks, free samples or any other marketing practice that an pharmaceutical manufactures contended was inappropriate, illegal, unethical, fraudulent, or otherwise should be ceased.

18.     The identity and nature of documents relating to any Government Investigation concerning You or any of Your drugs, including your response to any request for information in connection with any Government investigation and the identities or job titles of all personnel involved with any Government Investigation.

19.     The identity of documentation describing Your distribution channels and methods and strategies for distributing each of Your AWPIDs.



20.    Your document and e-mail retention or destruction policies, and the steps you have taken to preserve documents since this litigation began.



## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing PLAINTIFFS' REPLY MEMORANDUM TO DEFENDANT-SPECIFIC MEMORANDA RELATED TO PROPOSED CASE MANAGEMENT ORDER NO. 10 to be served on all counsel of record electronically on 4\2_____, 2004, pursuant to Section D of Case Management Order No. 2.

Steve W. Berman
**HAGENS BERMAN LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292

AMENDED NOTICE OF                    - 12 -
RULE 30(B)(6) DEPOSITION
1534.16 0043 DSC.DOC

# Exhibit 2

1

<pre>
 1            H I G H L Y   C O N F I D E N T I A L

 2              UNITED STATES DISTRICT COURT

 3            FOR THE DISTRICT OF MASSACHUSETTS

 4       ------------------------------X

 5   IN RE PHARMACEUTICAL INDUSTRY )  MDL No. 1456

 6   AVERAGE WHOLESALE PRICE        )  CIVIL ACTION:

 7   LITIGATION                     )  01-CV-12257-PBS

 8                                  )  Judge Patti B. Saris

 9       ------------------------------X

     THIS DOCUMENT RELATES TO       )

10

     01-CV-12257-PBS and 01-CV-339 )

11       ------------------------------X

12

13              THURSDAY, MAY 20, 2004

14

15            Deposition of JOHN RICHARD FREEBERRY, held

16   at the Law Offices of McCarter & English, 919 North

17   Market Street, Suite 1800, Wilmington, DE, before

18   Cindy Sebo of Spherion Deposition Services, Notary

19   Public in and for the State of Maryland.

20

21

22
</pre>

John Richard Freeberry        Highly Confidential              May 20, 2004
                              Wilmington, DE

74

```
 1              MS. HARRIS:  I can't guarantee you the

 2    person is going to be able to testify about the

 3    electronic mail systems.

 4              MR. WEXLER:  Who would be able to do

 5    that?  Do you have a witness lined up for that?

 6              MS. FEGAN:  Can we take a break,

 7    please?

 8              MR. WEXLER:  Yes.

 9              MR. WISE:  This can't be news to you

10    guys, it can't be, based on these conversations.

11              MS. FEGAN:  I thought he would know

12    what topics he was going to be designated on.

13    It's pretty clear.

14              MR. WISE:  If you want to stop, we'll

15    certainly stop, Beth.

16              MS. FEGAN:  I'm going to get the Rule.

17              (Recess.)

18              MR. WISE:  I think we've reached an

19    understanding in our -- an understanding among

20    counsel off the record.

21              Let me see if I can state it:  It's

22    that Mr. Freeberry is being designated by
```

John Richard Freeberry        Highly Confidential        May 20, 2004
Wilmington, DE

75

1    AstraZeneca as the 30(b)(6) on behalf of the

2    company, with expertise in the areas that he has

3    testified in which he has such expertise so far

4    this morning.  And he's not being designated with

5    respect to any other area.

6              So I think he's also indicated in many,

7    if not all, of those other areas who he thinks

8    would be an appropriate designee of the company.

9    And we can pursue whether Plaintiffs want to have

10   depositions of all of those people or some of them

11   in the future.

12             With that understanding and the

13   understanding that we're here to answer any

14   questions for however -- you know, for the rest of

15   the day on any topic, to the extent Plaintiffs

16   want to ask him, we will proceed.

17             BY MS. FEGAN:

18        Q    I think where we left off, just to be

19   clear, I wanted to make sure that I understood

20   which topics you felt like you were the most

21   knowledgeable to testify on.

22             And so we're all on the same page as to

John Richard Freeberry       Highly Confidential                May 20, 2004
                             Wilmington, DE

                                                                        76

1     what you're being designated -- I understand that

2     you're being designated as the 30(b)(6) for

3     AstraZeneca to testify regarding Topics 1, 2

4     and 3, except as to average sales price, actual

5     sales price or contract prices.

6              Do you understand that, Mr. Freeberry?

7     A    Yes.

8     Q    I also understand that you're being

9     designated to testify regarding Topics 5 and 6,

10    other than as to average sales price, actual sales

11    price or contract price.

12             Do you understand that, Mr. Freeberry?

13    A    Yes.

14    Q    And I believe that that's all; is that

15    correct?  I apologize, I'm making you go through

16    these again.  I want us all to be on the same

17    page.

18             (The witness reviews the document.)

19             THE WITNESS:  Yes.

20             MR. WISE:  Okay.

21             MS. HARRIS:  Also, let me just note,

22    Topic 14 with respect to price.

John Richard Freeberry      Highly Confidential      May 20, 2004
Wilmington, DE

77

1            MS. FEGAN:  You're right.  I apologize.

2            BY MS. FEGAN:

3       Q     Topic 14, with respect to price, but

4  not rebates and incentives?

5       A     Let me just read it over to be sure.

6       Q     Sure.

7            (The witness reviews the document.)

8            THE WITNESS:  Yes.

9            MR. WISE:  One other, maybe, perhaps

10  additional, 17, I think he testified that there

11  would be no such person.

12            MS. FEGAN:  Well, he testified that he

13  didn't do any research to determine whether there

14  would be any such person or whether, in fact,

15  there had been communications.  We can

16  certainly --

17            MR. WISE:  We can have an argument

18  about that later.

19            MS. FEGAN:  -- deal with that later,

20  particularly since we know there were.

21            MS. HARRIS:  I'll say that he is

22  designated with respect to 17(a) and (b),

John Richard Freeberry        Highly Confidential              May 20, 2004
                              Wilmington, DE

78

1    discussions with pharmaceutical manufacturers on

2    those two topics.

3              BY MS. FEGAN:

4         Q    Are you aware of any communications

5    between AstraZeneca and any pharmaceutical

6    manufacturer regarding Topics (a) or (b) in

7    Number 17?

8         A    No.

9         Q    Did you do any research or

10   investigation to determine whether there had been

11   any communications between AstraZeneca and any

12   other pharmaceutical manufacturer regarding

13   Topics (a) and (b)?

14        A    No.

15        Q    What did you do to prepare for this

16   deposition?

17        A    I met with counsel here yesterday

18   afternoon for three hours or so.

19        Q    When you say "counsel here," who are

20   you referring to?

21        A    Everybody from Stuart on down

22   (indicating).

John Richard Freeberry         Highly Confidential         May 20, 2004
Wilmington, DE

212

1    talking about, being well-rated in that regard.

2            MS. FEGAN:  Okay.  Can we take a break?

3            MR. WISE:  Sure.

4            (Recess.)

5            BY MS. FEGAN:

6        Q    Mr. Freeberry, we talked a little bit

7    about different times of the merger and who

8    reported to you and who you reported to.

9            Who was responsible prior to the time

10   that Zeneca merged in -- who was responsible at

11   Zeneca in an equivalent position to yours?

12       A    There was not one that I'm aware of.

13       Q    At Zeneca premerger, are you

14   knowledgeable about how prices were set?

15       A    No.

16       Q.   Do you know who would be knowledgeable

17   about that?

18       A    With Zeneca?

19       Q    Yes.

20       A    A former Zeneca executive.  I don't

21   know who that might be.  I don't know if there's

22   any around or not.

# Exhibit 3

Jeffrey L. Alverson                  Highly Confidential                  June 29, 2004
                                     Wilmington, DE

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3

   In Re:  PHARMACEUTICAL        :  MDL DOCKET NO.

4                                :  CIVIL ACTION #

   INDUSTRY AVERAGE WHOLESALE    :  01CV12257-PBS

5                                :

   PRICE LITIGATION              :  HIGHLY CONFIDENTIAL

6

7    -------------------------------------------------------

   THIS DOCUMENT RELATES TO:

8

   ALL ACTIONS

9    -------------------------------------------------------

10

11                    VOLUME I

12          30(b)(6) Deposition of AZTRAZENECA, taken

13   by and through its corporate designee, JEFFREY L.

14   ALVERSON, taken pursuant to notice at the law offices

15   of Morris, Nichols, Arsht & Tunnell, 1201 North Market

16   Street, 17th Floor, Wilmington, Delaware, beginning at

17   9:31 a.m., on Tuesday, June 29, 2004, before Julie H.

18   Parrack, Registered Merit Reporter and Notary Public,

19   there being present:

20                       - - -

21

22

Jeffrey L. Alverson         Highly Confidential          June 29, 2004
                            Wilmington, DE

4

1                    JEFFREY L. ALVERSON,

2           the deponent herein, having first been duly

3           sworn on oath, was examined and testified as

4           follows:

5    BY MR. WEXLER:

6    Q.   Can you state your full name for the record,

7    please?

8    A.   Jeffrey Lee Alverson.

9           MR. WISE:  Could I interrupt and just make

10   a couple preliminary points?

11          MR. WEXLER:  Depends what they are.

12          MR. WISE:  Listen and then give me

13   permission afterward, if you will.

14          MR. WEXLER:  Okay.

15          MR. WISE:  First, on behalf of

16   AstraZeneca, we would like to designate this

17   transcript that's to be created today as highly

18   confidential under the protective order in the case.

19   And presumably the court reporter knows how to so

20   indicate on the transcript that gets created, highly

21   confidential pursuant to protective order.

22          Secondly, I will just state for the record

Jeffrey L. Alverson          **Highly Confidential**          June 29, 2004
Wilmington, DE

5

1    at the outset that Mr. Alverson is being tendered as a

2    witness this morning in response to the plaintiffs'

3    30(b)(6) deposition notice, and specifically to

4    address the items in that notice that were not

5    addressed by our previous witness, Mr. Freebery.  So

6    it is our intent Mr. Alverson is being designated as a

7    30(b)(6) witness for the remainder of all topics in

8    that 30(b)(6) notice.    Okay?

9              MR. WEXLER:  Thank you.

10              MR. WISE:  Thanks.

11   BY MR. WEXLER:

12      Q.    Okay.  Where are you employed?

13      A.    AstraZeneca.

14      Q.    How long have you worked there?

15      A.    I have been with -- started with Astra/Merck

16   six and a half years ago and through the mergers --

17   there were two mergers, Astra merger with Astra,

18   become Astra, then Astra with Zeneca to become

19   AstraZeneca.

20      Q.    In preparation for today's deposition did you

21   do anything to inform yourself about the matters in

22   the deposition notice that go back to 1991?

Jeffrey L. Alverson          Highly Confidential          June 29, 2004
                              Wilmington, DE

6

1    A.   I did things to make myself more aware of areas

2    of the inquiry that I wasn't -- want to make sure I

3    had all my facts.  Back to 1991, no, sir, I did not.

4    Q.   How far back did you go?

5    A.   I didn't do anything relative to a time.  I did

6    it relative to an area of knowledge.  I don't know if

7    I'm answering your question correctly.  But I didn't

8    look --

9    Q.   How about 1992?

10   A.   Once again, my information was relative to

11   areas of knowledge, not a time frame of that area of

12   knowledge.

13   Q.   What did you do?

14   A.   Talked to different individuals in different

15   areas to make sure that information I had in my head

16   was correct, or fill in parts that I might be missing

17   for areas that were not germane to my day-to-day

18   activity.

19   Q.   Who did you talk to?

20   A.   Talked to Joe Skupen, who is in our contact

21   operations department.  I talked to Jim Brady, who is

22   in our managed care finance department.  Paul Maillet,

Jeffrey L. Alverson         Highly Confidential         June 29, 2004
                            Wilmington, DE

15

1    Q.   All right.  And are you prepared to speak to

2    these areas of inquiry from 1991 to the present?

3    A.   I am able to testify to them as it is

4    currently.

5    Q.   Do you know of anyone at AstraZeneca, or who

6    used to be at AstraZeneca, who could have informed you

7    on any of these topics prior to the present, or with

8    respect to the time period prior to the present?

9    A.   No, I do not.

10   Q.   Did you tell counsel or anyone that you could

11   not testify back to the 1991 time period?

12   A.   Yes.

13   Q.   Who did you tell?

14   A.   Outside counsel.

15   Q.   What did they say?

16   A.   Well, I'd like to clarify, in that as we

17   discussed these issues, I just made mention of the

18   fact that I was with Astra/Merck before this, and only

19   joined the company six and a half years ago.  So that,

20   that is how I expressed that I could not testify back

21   to '91.  But time didn't come up a lot in my

22   preparation for the deposition.  It was more of

Jeffrey L. Alverson          Highly Confidential          June 29, 2004
                              Wilmington, DE

                                                                    16

1    knowledge of the areas of inquiry, irrelevant to time.

2        Q.   When did you start at AstraMerck?

3        A.   Six and a half years ago.

4        Q.   Do you know a precise date?

5        A.   October 1st, what, 1999?  Is that right, '98?

6    I'm horrible with years.  But whatever six and a half

7    years backwards goes.

8        Q.   Okay.  Where did you work before then?

9        A.   I was with an HMO in Alabama.

10       Q.   What HMO?

11       A.   Health Partners Southeast.

12       Q.   What was your position?

13       A.   Vice President of Health Services.

14       Q.   What were your duties?

15       A.   I was the executive in charge of medical

16   services, pharmaceutical services, physician

17   credentialing; tertiary medical services that were

18   provided, such as lab, others.  Basically if it was

19   relative to the PMPM cost of the HMO, it was under my

20   purview.

21       Q.   What's PMPM cost?

22       A.   Per-member-per-month cost.

Jeffrey L. Alverson          Highly Confidential          June 29, 2004
                            Wilmington, DE

205

1    didn't tell you anything?

2       A.   Right.

3       Q.   About that or --

4       A.   When we went over this issue, issue 15, she did

5    not make me aware of anything else.   In other words, I

6    didn't know of anything before I talked to her and I

7    still don't know of anything.

8              MR. WISE:   I think you're misremembering.

9              THE WITNESS:   Maybe I don't know.

10             MS. FEGAN:   He said maybe you're

11   misremembering.

12             MR. WISE:   I think maybe you're

13   misremembering the conversation.

14             MR. WEXLER:   Do you think that's a

15   coaching technique?

16             MS. HIGGINS:   We're trying to help you.

17             MR. WISE:   There are 20 different

18   paragraphs.   It's been a long day, you know.

19      A.   I will tell you that at this point in time, I

20   don't remember.

21             MR. WEXLER:   All right.   Why don't we take

22   a break, and we're going to go look through our

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | Master File No. 01-CV-12257-PBS |
| This Document Relates to ALL ACTIONS. | Judge Patti B. Saris |

**DECLARATION OF KENNETH A. WEXLER**
**PURSUANT TO LOCAL RULE 37.1**

I, Kenneth A. Wexler, certify that I complied with Local Rule 37.1 as follows:

1. I am one of the Plaintiffs' lawyers in the above-captioned case. I personally have been responsible for engaging in discovery conferences with counsel for AstraZeneca.

2. On July 26, 2004, Elizabeth Fegan and I conducted a discovery conference by telephone with AstraZeneca's counsel, Scott Wise and Kimberley Harris.

3. First, AstraZeneca asked that we reduce the number of AstraZeneca witnesses that were listed in a recent Notice of Deposition. I stated that the seven witnesses noticed for deposition had each been identified as persons with knowledge of relevant issues at the 30(b)(6) depositions that we had conducted of AstraZeneca.

4. Next, we discussed plaintiffs' position that AstraZeneca had failed to fully comply with its obligations pursuant to Rule 30(b)(6). I stated that neither of the witnesses proffered by AstraZeneca was able to testify for the entire period from

1991 to the present ("Relevant Period").   Therefore, I requested that AstraZeneca designate a witness who was knowledgeable or would make himself knowledgeable about the 30(b)(6) topics for the entire Relevant Period.

5.  In response, one of defendant's attorneys, Scott Wise, said that he was not aware of what AstraZeneca's obligations were to produce a witness who could testify for the entire Relevant Period.   I responded, in part, that Mr. Wise should have researched his obligations and produced witnesses who could testify for the entire Relevant Period, and that this should have been done with the 45-day parameters required by CMO 10.

6.  Mr. Wise said that AstraZeneca's obligations had to end at some point.  Further, when I asked him directly, Mr. Wise admitted that he had not made any effort to locate any person who could testify to matters for the period 1991-1997.

7.  When I expressed my belief that AstraZeneca had failed to fulfill its obligations under Rule 30(b)(6), Mr. Wise indicated that he did not believe that this meet and confer was going to be productive and hung up on us.

8.  Because Mr. Wise hung up on us, we were not able to raise the remainder of the discovery issues that had not yet been discussed.


Date: August 3, 2004


Kenneth A. Wexler

# Exhibit 5



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY | ) | |
| AVERAGE WHOLESALE PRICE | ) | MDL No. 1456 |
| LITIGATION | ) | |
| | ) | CIVIL ACTION: 01-CV-12257-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Judge Patti B. Saris |
| 01-CV-12257-PBS AND 01-CV-339 | ) | |
| | ) | |

**PLAINTIFFS' OMNIBUS REQUESTS FOR PRODUCTION AND INTERROGATORIES
TO DEFENDANTS ABBOTT, AMGEN, AVENTIS, BAXTER, BAYER, BOEHRINGER,
BRAUN, DEY, FUJISAWA, NOVARTIS, PFIZER, PHARMACIA, SICOR, TAP AND
WATSON AND TO ALL OTHER DEFENDANTS WITH RESPECT TO DRUGS
THAT WERE NOT PREVIOUSLY SUBJECT TO DISCOVERY**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and LR D. Mass. 26.5 and 34.1, and pursuant to case management orders of this Court including the March 25, 2004 Order, the plaintiffs hereby request that each defendant produce the documents requested herein in compliance with the March 25, 2004 Order.

Prior to the Court's March 25, 2004 Order, several defendants commenced production for specific drugs pursuant to prior document requests. This Omnibus Request does not seek production of documents to the extent that such documents were both previously requested and actually produced by a defendant.

## I.    DEFINITIONS

1.    "Agreement" means a contract, arrangement or understanding, formal or informal, oral or written, between two or more persons.

2.    "All documents" means every document and every non-identical copy known to you and every such document or writing which you can locate or discover by reasonably diligent efforts, including, but not limited to, documents now in the possession, custody or control of a defendant, its merged or acquired predecessors, its former and present directors, officers, counsel, agents, employees and/or persons acting on its behalf.

3.    "AMCC" means the Amended Master Consolidated Complaint.

4.    "AMP" or "Average Manufacturer Price" shall have the meaning set forth in 42 U.S.C. § 1396r-8(k)(1).

5.    "Any" means one or more.

6.    "ASP" means average sales price.



7.     "AWP" means the average wholesale price reported to and/or reported by an industry trade publication.

8.     "AWPID" means any of the drugs identified in Appendix A to the AMCC and, pursuant to Case Management Order No. 10 dated March 25, 2004, includes all NDC's for that drug, including NDC's not in the AMCC.

9.     "Best Price" shall have the meaning ascribed to that term pursuant to 42 U.S.C. § 1396r-8(c)(1)(C).

10.    "CMS" means the Centers for Medicare and Medicaid Services.

11.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

12.     "Concerning"  means referring to, describing, evidencing, or constituting.

13.    "Covered Drugs" means pharmaceuticals that are reimbursed under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*.

14.    "Defendant" refers to any of the defendants in the AMCC, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.  This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

15.    "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Fed.R.Civ.P. 34(a).  A draft or non-idential copy is a separate document within the meaning of this term.  The term is used in the broadest possible sense and means without limitation, any written, printed, typed, photostated, photographed, recorded or otherwise reproduced or stored communication or representation, whether comprised of letters, words, numbers, data, pictures, sounds or symbols, or any combination thereof.  This definition includes copies or duplicates of documents contemporaneously or subsequently created which have any non-conforming notes or other markings.  Without limiting the generality of the foregoing, "document" includes, but is not limited to, correspondence, memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, working papers, accounts, analytical records, reports and/or summaries of investigations, trade letters, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions, notes of minutes of meetings or of other communications of any type, including inter-office and intra-office communications, electronic mail/messages and/or "e-mail," electronically stored telephone messages and/or "voice-mail," questionnaires, surveys, charts, graphs, photographs, phonograph recordings, films, tapes, disks, data cells, print-outs of information stored or maintained by electronic data processing or word processing equipment, all other data compilations from which information can be obtained (by translation, if necessary, by you through detection devices into usable form), including, without limitation, electromagnetically sensitive storage media such as floppy disks, hard disks and magnetic tapes and any preliminary versions, as well as drafts or revisions of any of the foregoing, whether produced or authored by you or anyone else.



16.    "EAC" or "Estimated Acquisition Cost" shall have the meaning ascribed to that term pursuant to 42 C.F.R. § 447.301.

17.    "Government Investigation" refers to any ongoing or closed investigation conducted by the Commerce, Energy and/or Ways and Means Committees of the United States Congress, the United States Department of Justice, the United States General Accounting Office, Federal Trade Commission, the Office of the United States Inspector General, the United States Department of Health and Home Services, or any other federal, state or local governmental entity without regard to time period.

18.    "Government payor" means any federal or state government entity or program that reimburses Providers for drugs or health care services, including but not limited to CMS, Medicare, and Medicaid.

19.    "Identify":  When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and, when referring to a natural person, the present or last known place of employment.  Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

20.    "Identify":  When referring to documents, "to identify" means to give, to the extent known, the

      (a)    type of document;

      (b)    general subject matter;

      (c)    date of the document; and

      (d)    author(s), addressee(s), and recipients(s).

21.    "Independent Practice Association" means any organized group of providers whose members provide health care to any participant, beneficiary or patient.

22.    "MAC" means the maximum allowable cost, and includes the meaning ascribed to that term pursuant to 42 C.F.R. § 442.332.

23.    "Manufacturer" means a company that manufactures pharmaceutical products, including, without limitation, AWPIDs.

24.    "Medicare," "Medicare Program" or "Medicare Part B" means the government reimbursement system for prescription pharmaceuticals under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*



25.     "Meeting" means any discussion between two or more persons either in person or telephonically.

26.     "Participant" and "Beneficiary" means a person for whom a health plan or health and welfare fund provides any medical or health insurance benefit.

27.     "PBM" means a pharmacy benefit manager.

28.     "Person" means any natural person or any business, legal, or governmental entity or association.

29.     "Price" means any measure for the charging, payment or reimbursement of a drug, including but not limited to actual wholesale price, AMP, ASP, AWP, Best Price, direct price, estimated acquisition cost, list price, net wholesale price or other measure, comparison, estimate, benchmark or computation of price, and includes prices both with or without discounts, rebates or other incentives affecting the cost of the drug.

30.     "Private payor" means any non-government entity or program that reimburses Providers for drugs or health care services, including but not limited to health insurance companies, health maintenance organizations, preferred provider organizations, self insurance plans, health plans, unions, and welfare and benefit funds.

31.     "Provider" means any physician or entity that provides health care to any Participant or Beneficiary.

32.     "Publisher" means an entity that publishes a listing of pharmaceutical prices, and includes publications identified in Health Care Financing Administration Program Memorandum AB-99-63 and includes *First DataBank*, *Red Book*, *Blue Book* and *Medispan*.

33.     "Relating" means concerning or referring to, consisting of, involving, regarding or connected with the subject matter of the request.

34.     "State the Basis."  When an interrogatory calls upon a party to "state the basis" of or for a particular claim, assertion, allegation, or contention, the party shall:

(a)     identify each and every document, (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(b)     identify each and every communication which forms any party of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(c)     state separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time and place and identifying the persons involved) which form any part of the party's information regarding the alleged facts or legal



conclusions referred to in the interrogatory; and

(d)     state separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the interrogatory.

35.     "Third Party Administrator" means any entity that provides administrative services to any health plan or health and welfare fund relating to any medical benefit provided to any participant or beneficiary.

36.     "WAC" means wholesale acquisition cost or the list prices for sales by manufacturers to wholesalers.

37.     "Wholesaler" means any entity that purchase AWPIDs from a manufacturer and resells such drugs to any other entity.

38.     "You" or "Your" means the Defendant responding to these requests.

## II.     RULES OF CONSTRUCTION

1.     All/Each – The terms "all" and "each" shall be construed as meaning either all and each as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

2.     And/Or – The connectives "and" and "or" shall be construed either disjunctively and conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

3.     The use of the singular form of any word shall include the plural and vice versa.

4.     The masculine gender includes the feminine.

## III.     INSTRUCTIONS

1.     Control.  A document shall be deemed to be in your control if you have the right to secure the document or copy thereof from another person or public or private entity having possession or custody thereof.  If any otherwise responsive document was, but is no longer, in existence or in your possession, custody or control, or has been lost, discarded or destroyed, said document shall be identified as completely as possible including, but not limited to, the following information:

(a)     the date of disposal or disposition from your possession, custody or control;

(b)     the manner of disposal or disposition from your possession, custody or control;

(c)     the reason for disposal or disposition from your possession, custody or control;



(d)      the person authorizing disposal or disposition from your possession, custody or control;

(e)      the document's current or last known custodian;

(f)      the circumstances surrounding the document's disposition from your possession, custody or control;

(g)      the generic category of the document, *e.g.*, memo, letter, computer print-out, etc.;

(h)      the type(s) of information contained in the document; and

(i)      the identity of all persons having knowledge or who had knowledge of the contents of the document.

2.    <u>All Documents</u>.  Unless otherwise indicated, the documents to be produced include all documents prepared, sent, dated or received, or those which otherwise came into existence at anytime during the relevant period described herein.

3.    <u>Objections</u>.

(a)      Where an objection is made to any document request under Fed. R. Civ. P. 34, the objection shall state with specificity all grounds.  Any ground not stated in an objection within the time provided by the Federal Rules of Civil Procedure, or by the Court's order, or any extensions thereof, shall be waived.

(b)      Where a claim of privilege is asserted in objecting to any document demand, or sub-part thereof, and an answer is not provided on the basis of such assertion:

(i)      the attorney asserting the privilege shall in the objection to the document demand, or sub-part thereof, identify the nature of the privilege (including work product) that is being claimed and if the privilege is being asserted in connection with a claim or defense governed by state law, indicate the state's privilege rule being invoked; and

(ii)      the following information shall be provided in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged information:

(A)      for documents: (1) the type of document; (2) general subject matter of the document; (3) the date of the document; and, (4) such other information as is sufficient to identify the document for a subpoena duces tecum, including, where appropriate, the author of the document, the addressee of the document, and, where not apparent, the relationship of the author and addressee to each other;



     **(B)**   for oral communications: (1) the name of the person making the communication and the names of persons present while the communication was made and, where not apparent, the relationship of the persons present to the person making the communication; (2) the date and the place of communication; and, (3) the general subject matter of the communication.

   4.   <u>Non-Objected Sub-Parts</u>. Notwithstanding the assertion of any objection to production, any document to which an objection is raised containing non-objectional subject matter which is relevant and material to a request must be produced, but that portion of the document for which the objection is asserted may be withheld or redacted provided that the above-requested information is furnished.

   5.   <u>Continuing Duty</u>. This request is continuing and all documents coming into your possession, custody or control which you would have been required to produce had they been available at an earlier time shall be produced forthwith in accordance with the Federal Rules of Civil Procedure.

   6.   <u>Entire Document</u>. Each document requested herein is requested to be produced in its entirety and without deletion or excisions, regardless of whether you consider the entire document to be relevant or responsive to these requests. If you have redacted any portion of a document, stamp the word "redacted" on each page of the document which you have redacted. Redactions should be included on the privilege log described in Instruction 3.

   7.   <u>Each Defendant Separate</u>. The fact that a document is produced by one defendant does not relieve any other defendant of the obligation to produce his or its copy of the same document, even if the two documents are identical in all respects.

   8.   <u>Originals and Non-Identical Copies</u>. In producing documents, you are requested to produce the original of each document requested together with all non-identical copies and drafts of that document. If the original of any document cannot be located, a copy shall be provided in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

   9.   <u>Container Intact</u>. All documents shall be produced in the file folder, envelope or other container in which the documents are kept or maintained by you. If, for any reason, the container cannot be produced, produce copies of all labels or other identifying marks.

   10.   <u>Source Identifiable</u>. Documents shall be produced in such fashion as to identify the department, branch or office in whose possession it was located and, where applicable, the natural person in whose possession it was found and the business address of each document's custodian(s).

   11.   <u>Don't Separate Attachments</u>. Documents attached to each other should not be separated.



E-SERVED
03/31/04
06:55 PM ET
MDL NO. 1456

12.    <u>Electronic Availability</u>.  Any documents available in an electronic format shall be so provided in that format, i.e., in an identical, usable electronic format.  If issues regarding compatibility of computer systems and software arise, the producing parties shall confer to resolve the matters.  In producing documents consisting of electronically stored data in machine readable form in response to any document request, provide such data in a form that does not require specialized or proprietary hardware or software.  Data files typically should be in sequential format, also known as ASCII files or flat files, with the data fields in fixed-column positions. For each data file provided, the following information should be included: a record layout, a short narrative description of the contents of the file, translation of any coded fields, the number of records in the file, and a printout of the first 100 records in report format. A record layout must contain the following pieces of information: name of the field, starting and ending position in the record, length of the field, and characteristics of the field (e.g., packed decimal, zoned decimal, alphanumeric).  The magnetic media should be in the most efficient, transferable form.  Data typically can be accepted in either ASCII or EBCDIC format.  Do not convert the data between ASCII and EBCDIC formats. The record length, blocksize and tape density must be provided. The tapes should be written with generic copy utilities rather than backup programs from a specific operating system. Where multiple magnetic media are necessary, recreation of the entire data must be enabled.  For example, where PC files are too large for one diskette, DOS BACKUP disk sets will be acceptable so long as they are accompanied by backup listings. Backup listings may be hard copy or ASCII files on non-backup diskettes. A backup listing must provide the path name necessary to individually restore each file in the backup. Compression utilities are acceptable so long as the utility is provided and such provision does not violate licensing or copyright laws.

13.    <u>Don't Alter Contents</u>.  No watermarks, stamps of "confidential" or the like shall be on the text or other contents of a document and (if the parties agree to production of photocopies in lieu of originals as requested by this pleading) no reduction of the size of an original document shall be made.

14.    <u>Reference Documents</u>.  Documents not otherwise responsive to this discovery request shall be produced if such documents mention, discuss, refer to, or explain the documents which are called for by this discovery request, or if such documents are attached to documents called for by this discovery request and constitute routing slips, transmittal memoranda, or letters, comments, evaluations or similar materials.

## IV.    DRUGS AT ISSUE

1.    "Class A drugs" means all physician or other provider-administered AWPIDs and all other AWPIDs that are, or at any time during the relevant period were, coverable under Medicare Part B.

2.    "Class B drugs" are all other AWPIDs.

3.    "All Classes" or "All Drugs" means all drugs identified in the AMCC.



## V.    RELEVANT TIME PERIOD

The relevant period of these document requests, unless otherwise indicated, shall be from January 1, 1991, to the date of production and shall include all documents and information which relate in whole or in part to such period, or to events or circumstances during such period, even though dated, prepared, generated or received prior or subsequent to that period.

## VI.    REQUESTS FOR PRODUCTION

### *Category 1:  General Corporate*

1.    All documents sufficient to identify your policy or practice of document retention, destruction, disposal or preservation during the relevant time period.

2.    All current and historical organizational charts for all of your sales, marketing and pricing departments or divisions.

3.    Any and all company, organizational and policy information in its entirety, including but not limited to corporate policy and procedure manuals, and policy memoranda.

4.    Documents sufficient to identify your electronic mail, document management and other automated information systems.

5.    Documents sufficient to identify your electronic mail retention policies.

6.    Documents evidencing steps were taken by you (if any) from January 1, 2001 to the present to insure that discoverable information with respect to average wholesale price litigation is not destroyed or otherwise made unavailable.

7.    Documents sufficient to identify your policies and procedures concerning the back-up of data for your financial and your marketing, sales and promotion divisions, including but not limited to, the frequency of back-ups, all software and hardware used to perform back-ups, and all media onto which data is backed-up.

### *Category 2:  Trade Associations*

8.    All documents received from or provided to any trade association (such as the Pharmaceutical Research and Manufacturers of America), and any of its organizational subcommittees, including meeting agendas and minutes, concerning (i) Medicare reimbursement for drugs and/or the use of AWP in the reimbursement process; (ii) publications identified in Health Care Financing Administration Program Memorandum AB-99-63, including the *Red Book*, *Blue Book*, and *Medispan* ("pharmaceutical industry publications"); or (iii) a Government Investigation or inquiry as to the use of AWP in the reimbursement process.



E-SERVED
03/31/04
06:55 PM ET
MDL NO. 14 ?

### *Category 3:  Governmental Investigations; Litigation*

9.      All documents produced by you, whether voluntarily or involuntary, in any governmental investigation or inquiry concerning the use of AWP.

10.     All documents relating to any legal proceeding (by country, court, caption, case number, etc.), including but not limited to court hearings, legislative hearings, mediations or arbitrations, in which you were a party or witness, regarding any allegations relating to AWPs.

11.     All affidavits, declarations, depositions, or other written statements, including drafts, provided by you regarding any allegations relating to the use of AWP.

### *Category 4:  Communications With Governmental Entities*

12.     All documents created by or received from CMS, the United States Department of Health and Human Services, the Health and Human Services Office of the Inspector General, the General Accounting Office, Congress or any other federal institution, agency, department, or office concerning prices for prescription drugs.

13.     All documents provided to CMS, the United States Department of Health and Human Services, and Department of Health and Human Services Office of the Inspector General, the General Accounting Office, Congress, or any other federal institution, agency, department, or office concerning the price of any AWPID.

### *Category 5:  AWPs and Pricing Related*

14.     All documents concerning any definition or meaning of AWP, including documents discussing how you or others define AWP.

15.     All documents discussing how the AWP has been or is currently determined for any AWPID.

16.     As to each of your AWPIDs, all documents concerning any actual, proposed, or prospective AWP announcements, changes or price lists, including the methodology and procedures used by you in considering whether to increase or decrease the AWP of each AWPID.

17.     As to each of your AWPIDs, all documents concerning any actual, proposed or prospective price announcement, price change or price list, including the methodology and procedures used by you in considering whether to increase or decrease the price for each AWPID.

18.     As to Class A drugs only, all sales-level detailing reports where AWPs, reimbursement based on AWPs, or the prices for AWPIDs was discussed.  (Class A Drugs)

19.     As to Class A drugs only, all sales-level detailing reports where price, discounts,



rebates, price concessions, forgiveness of debt, free samples, educational grants or other remuneration were discussed with a purchaser or potential purchaser of any of your AWPIDs.

20.  All documents, including organizational charts, that describe or list the individuals responsible for determining the price for each AWPID.

21.  All documents, including organizational charts, that describe or list the individuals responsible for determining the price for each AWPID.

22.  For each of your AWPIDs, all documents concerning the "product market," as defined in the 1992 Department of Justice and Federal Trade Commission Horizontal Merger Guidelines, in which each AWPID competes including, but not limited to, all documents that: (a) discuss, address, concern, regard, or reflect products that have a significant cross-elasticity of demand, or that are reasonably substitutable for, interchangeable with, or close therapeutic equivalents and/or (b) discuss, address, concern, regard, or reflect whether, and to what extent, the marketing, pricing, and/or sale of a drug other than your AWPID has caused, or could or might cause, physicians, consumers, and other individuals or entities to terminate or reduce their purchase or use of your AWPID.

23.  For each of your AWPIDs, all documents concerning the "geographic market" or markets in which the AWPID competes including, but not limited to, all documents that (a) discuss, concern, regard, or reflect the geographic area within which the AWPID is marketed, and (b) discuss, concern, regard or reflect the area within which you and your competitors view themselves as competing with respect to the AWPID.

24.  For each of your AWPIDs, all documents concerning your strategic and marketing plans including, but not limited to all pricing, reimbursement, brand switching, and consumer segmentation studies and/or surveys.

25.  For each of your AWPIDs, all documents (in digital, computerized form where available) that identify each customer who purchased the AWPID. For each of these purchasers, all documents that reflect:

(a)  Each sale or other transaction involving the AWPID including the date thereof;

(b)  The number or units of the AWPID sold by dosage strength and package size for each sale or other transaction;

(c)  The invoice amount in dollars for each sale or other transaction concerning the AWPID;

(d)  Discounts, rebates, chargebacks, and other price adjustments relating to each sale, transaction, or set of transactions involving or relating to the AWPID;

(e)  The net amount in dollars for each sale or transaction concerning the AWPID;

(f)  Any other price or unit adjustments – whether monthly, quarterly or on any other basis – involving or relating to sales or transaction involving the AWPID;



(g)     The full name and address of each entity purchasing the AWPID (and, in addition, the full name and address of the parent company where the database or documents identify a subsidiary, corporate affiliate, division, satellite office, or warehouse).

26.     For each of your AWPIDs, all documents that reflect the prices charged to, or terms of conditions of sale for, purchasers of the AWPID including, but not limited, to:

(a)     The wholesale acquisition price or other published price of the AWPID or any generic equivalent;

(b)     Payment terms;

(c)     discounts, rebates, chargebacks or other adjustments offered to any class of purchaser;

(d)     Prices and terms of sales for wholesale purchasers;

(e)     Prices and/or discounts and/or rebates or other adjustments for chain pharmacy purchasers;

(f)     Prices and/or discounts and/or rebates or other adjustments for hospital purchasers;

(g)     Prices and/or discounts and/or rebates or other adjustments for managed care purchasers;

(h)     Prices and/or discounts and/or rebates or other adjustments for pharmacy benefit managers;

(i)     Prices and/or discounts and/or rebates or other adjustments for internet pharmacies;

(j)     Prices and/or discounts and/or rebates or other adjustments for mail order purchasers; and

(k)     Prices and/or discounts and/or rebates or other adjustments for any other purchaser class or subgroup.

27.     For each of your AWPIDs, documents sufficient to show, in digital or computerized form, in chronological order:

(a)     The date of each sales transaction;

(b)     Every discount, rebate, and/or any other adjustment that any customer of D has received;



(c)     The date each discount, rebate, and/or any other adjustment was given;

(d)     The time period covered by each discount, rebate, and/or any other adjustment;

(e)     Sales in units by National Drug Code sold, shipped, and/or returned by dosage form, strength, and package size;

(f)     Sales in dollars by National Drug Code sold, shipped, and/or returned by dosage form, strength, and package size;

(g)     Net sales in dollars for each sale;

(h)     The name, address, account number, and all other identifying numbers or codes for the person or entity billed, invoices, and/or credited for the transaction; and

(i)     The name, address, account number, and all other identifying numbers or codes for the person or entity to whom the product was shipped or from whom product returns were received.

28.     For each of your AWPIDs, documents sufficient to identify:

(a)     The published AWP;

(b)     AMP;

(c)     ASP;

(d)     EAC;

(e)     WAC;

(f)     MAC;

(g)     Earned margin (difference between AWP and actual product cost);

(h)     Documents that indicate whether the AWP, ASP, AMP and Earned Margin include all rebates, chargebacks, discounts, allowances, credits, administrative fees, price/volume discounts and any other incentives provided to third parties.

(i)     Documents summarizing all rebates, chargebacks, discounts, allowances, credits, administrative fees, price volume discounts or other incentives.

29.     For each of your AWPIDs, all agreements for sale of the AWPID, whether or not those contracts are with customers who purchased the AWPID directly, including drafts, correspondence, and supporting detail and data (in computerized form where available).



30.     All documents concerning communications between you and IMS Health (or any similar entity providing pharmaceutical database information) concerning or relating to any of your AWPIDs.

31.     For each of your AWPIDs, documents sufficient to estimate the number of patients taking the AWPID over each one year period.

32.     For each of your AWPIDs, all documents concerning your actual, potential, or expected revenues and/or profits from the sale of that AWPID.

33.     All documents concerning or relating to the actual or potential impact of the pricing or reimbursement of any drug on the quantity of any of your AWPIDs that have been or might be sold.

34.     Documents sufficient to show your per-unit average total cost for each of your AWPIDs, and the components that make up that figure, including but not limited to raw materials, manufacturing, marketing, sales and packaging costs.

35.     All documents concerning or relating to the difference between an AWP and any other price for any AWPID.

## *Category 6: Inducements*

36.     All documents describing any discount programs (including but not limited to volume discounts), rebates, incentives, or penalties for each AWPID.

37.     All documents relating to the use or provision of free samples, educational grants, marketing grants, and payments for specific data gathering or other incentives relating to any AWPID.

38.     All documents evidencing any "credit memos" or credit extended to hospitals, GPOs or other purchasers of AWPIDs, including but not limited to credit memos or credit issued via a wholesaler to a purchaser, and/or credit for the purpose of "returned goods."

39.     All documents setting forth the circumstances in which credit against the purchase of AWPIDs was or could be given to any hospital, GPO, HMO, physician, wholesaler or other purchaser of AWPIDs.

40.     All documents setting forth the circumstances in which credit against the purchase of AWPIDs was or could be given to any hospital, GPO, HMO, physician, wholesaler or other purchaser of AWPIDs.

41.     All documents relating to or reflecting any payments you gave to providers relating to any AWPID.  (Class A Only)



42.    All documents evidencing any chargebacks with respect to the sale of an AWPID.

### *Category 7:  Marketing Plans and Sales Representatives*

43.    Documents sufficient to determine complete contact information for all personnel with responsibility for marketing and promotional activity for AWPIDs.  Include Marketing Department Product or Brand Managers, and members of Marketing Advisory Boards, and include home address and telephone number.  (Class A Drugs)

44.    A list of all national level sales awards available for each AWPID.  (Class A Drugs)

45.    Quarterly, semi-annual and annual business plans for each winner of the top national sales award winners and direct supervisors.  (Class A Drugs)

46.    Any summaries or reports made by a sales representative that evidence a discussion between that sales representative and a provider regarding AWPs for AWPIDs, reimbursements based on AWPs for AWPIDs, and any difference between what the provider is reimbursed for AWPIDs and what the provider pays for the AWPID.  (Class A Drugs)

47.    For each AWPID, sales representatives' field notes for the top 50 sales representatives for each year.  (Class A Drugs)

48.    Documents sufficient to describe any computer programs that you employ or have employed to manage your sales force, including but not limited to programs that collect data on the number of provider contacts and summarize the nature of the discussions between your sales representatives and providers.  Examples of such programs include programs marketed by Siebel Systems and ImpactRx, as well as any programs developed by you.  (Class A Drugs)

49.    All documents relating to discussions between sales managers and sales representatives after field visits where AWPs, reimbursements rates, or the spread was discussed.  (Class A Drugs)

50.    All documents evidencing any meetings where raising the AWP, or use of AWP as a marketing tool, on any AWPID was discussed.  (Class A Drugs)

51.    All communications between you and any party in the reimbursement cycle or pharmacies relating to reimbursement and AWP.  (Class A Drugs)

52.    All documents relating to any requests by you for any information concerning the reimbursement, pricing or payment for any subject drug.  (Class A Drugs)

53.    All documents relating to all actual, proposed, or prospective marketing methods, practices, policies, or strategies for each AWPID to the extent such documents refer to AWP, the spread, or to discounts of any type.



54.    All documents relating to any communication with doctors, other health care professionals, or any person or entity providing health care services to seek Medicare reimbursement or consumer co-payment for free samples of each AWPID you provided to them. (Class A Drugs)

55.    All marketing and sales materials which compare the AWP, price, market share, rebates, pricing discounts, incentives, or penalties for each AWPID with the AWP of any other pharmaceutical.  (Class A Drugs)

### *Category 8:  Publishers*

56.    All documents concerning communications between you and any publisher concerning measures of price for pharmaceuticals, including ASP, AWP, WAC or other measures of price.

57.    For each of your AWPIDs, separately produce all documents concerning communications between you and a publisher regarding the price(s) for that AWPID.

58.    All documents concerning your role in the publication, appearance and/or advertisement of the AWP, WAC or other price measure for your AWPIDs in any publication of a publisher.

59.    All documents concerning the role of the publisher in the publication, appearance and/or advertisement of the AWP, WAC or other price measure for each of your AWPIDs in a publication of a publisher.

60.    All documents relating to the role of some person other than yourself and the publisher in the publication, appearance and/or advertisement of the AWP, WAC and/or other price measure for each of your AWPIDs in any publication of a publisher.

61.    All documents relating to your role in the publication, appearance, or advertisement of the AWP, WAC or other pricing information in any pharmaceutical-related industry publications, including publications of the publishers.

62.    All documents concerning the use by any participant in the drug distribution/sales channels (e.g., wholesalers, retailers, pharmacies, pharmacy benefit managers, insurers, etc.).

63.    All documents concerning agreements between you and any publisher.

64.    All documents concerning any payments made by you to a publisher, where such payments related in any way to drug pricing.

65.    All documents relating to any investments or loans that you have made in or to a publisher.

66.    All notes or minutes of any meetings between you and a publisher where drug



pricing was discussed.

       67.    All documents concerning communications between you and a publisher about litigation involving AWP or drug pricing.

       68.    All documents regarding any pricing surveys that publishers have done for AWPIDs.  (All Drugs)

       69.    All documents regarding communications between you and a publisher about drug reimbursement systems, including Medicare, Medicaid and private insurance.  (All Drugs)

### *Category 9:  PBMs; Wholesalers*

       70.    All documents concerning your contractual relationships with wholesalers, independent practice associations, pharmacies or providers insofar as they cover AWPIDs, including, without limitation, master agreements, addenda, schedules, attachments, requests for proposal, responses to requests for proposal and correspondence.

       71.    Documents sufficient to identify all persons involved in negotiation of contractual relationships with wholesalers, manufacturers, independent practice associations, pharmacies, PBMs or providers insofar as they cover any AWPID.

       72.    All documents relating or referring to your contractual relationships with PBMs insofar as they cover AWPIDs, including, without limitation, master agreements, addenda, schedules, attachments, requests for proposal, responses to requests for proposal and correspondence.

       73.    Documents sufficient to identify all persons involved in negotiation of contractual relationships with PBMs insofar as they cover any AWPID.

       74.    All documents relating to marketing materials that you have provided PBMs for any AWPID.

       75.    All documents relating to any communications between you and PBM regarding AWP, or to any fees or monies paid to or retained by a PBM.

       76.    All documents relating to any communications between you and any PBM regarding the revenue, profit, spread or other consideration that a PBM would earn based on any difference between your price for any AWPID and the compensation that the PBM receives for the AWPID.

       77.    All documents relating to the pricing of any of your AWPIDs sold to or through any PBM.

       78.    All documents relating to any rebates that you have provided PBMs for any AWPID.



79.   Excluding Rebates, all documents referring or relating to your provision of any other consideration to a PBM for AWPIDs, including but not limited to:

    a.   Administrative fees for assembling data to verify market share results;

    b.   Fees for selling other data;

    c.   Fees for encouraging physicians to change prescribing patterns;

    d.   Prompt payment discounts;

    e.   Free drugs;

    f.   Drug samples;

    g.   Credit memos or credit extended to any PBM, including but not limited to credit memos or credit issued for the purported reason of "returned goods;"

    h.   Other discounts, fees or grants.

80.   All documents relating to the placement of any of your AWPIDs on a PBM formulary.

### *Category 10:  Communications With Other Manufacturers*

81.   All documents relating to any communications, including meetings, between you and any other pharmaceutical company regarding:

    (a)   any actual, proposed or prospective price, price announcements, price changes, or price lists for any AWPID;

    (b)   any actual, proposed, or prospective pricing methods, practices, policies or strategies for any AWPID;

    (c)   any actual, proposed, or prospective marketing methods, practices, policies, or strategies for any AWPID;



(d)     any actual, proposed, or prospective pricing discounts, rebates, bids, or incentives for any AWPID;

(e)     territories or markets for sales or potential sales for any AWPID;

(f)     Medicare Part B and its policy of reimbursement for any AWPID;

(g)     the AWP of any AWPID;

(h)     pharmaceutical industry publications; and

(i)     market conditions or market shares.

### *Category 11: Miscellaneous*

82.     Any documents relating to the repackaging or relabeling of any AWPID including but not limited to:  (a) documents indicating that any AWPID with a specific NDC has been repackaged and is being sold with a different NDC, but is the same drug; and (b) for any repackaged AWPID, documents evidencing the AWP of the original AWPID and of the repackaged AWPID, and documents evidencing the bases, methods and/or reasons for any change in the AWP.

## VII.   INTERROGATORIES

1.     For the period beginning January 1, 1997, and for each subsequent calendar quarter, and with respect to each of the AWPIDs, identify the following information:

a.     the total volume of sales, indicating both the number of units and net revenue;

b.     the "average wholesale price" (AWP), as reported in Medical Economics *Red Book*, *First Data Bank* and/or *MediSpan*, and the volume of sales (in both units and net revenue) occurring (i) at or within five percent of AWP, whether higher or lower, (ii) at more than five percent above AWP, and (iii) at more than five percent below AWP;

c.     the " average manufacturer price" ("AMP"), as reported to the Secretary of Health and Human Services, pursuant to the requirements of Social Security Act ("SSA") § 1927(b)(3), and the volume of sales (in both units and net revenue) occurring (i) at AMP and up to and including 10% above AMP, and less than or equal to 10% below AMP (broken out separately), (ii) at greater than 10% above AMP but less than or equal to 20% above AMP, and at greater than 10% below AMP but less than or equal to 20% below AMP (broken out separately), (iii) at greater than 20% above AMP but less than or equal to 30% above AMP, and at greater than 20% below AMP but less than or equal to 30% below AMP (broken out separately), (iv) at greater than 30% above AMP but less than or equal to 40% above AMP, and at greater than 30% below AMP but less than or equal to 40% below AMP (broken out separately), and (v) at greater than 40% above AMP but less than or equal to 50% above AMP,



and at greater than 40% below AMP but less than or equal to 50% below AMP (broken out separately);

       d.      the "wholesale acquisition cost" ("WAC"), as reported by Medical Economics *Red Book*, *First Data Bank* and/or *MediSpan* or any other such entity that gathers and publishes "wholesale acquisition costs," and the volume of sales (in both units and net revenue) occurring (i) at or within five percent of WAC, whether higher or lower, (ii) at more than five percent above WAC, and (iii) at more than five percent below WAC;

       e.      the "average sales price" (ASP), *i.e.*, the price after reflecting discounts, rebates, chargebacks, to all classes except FSS;

       f.      the total volume of the subject drug, in units, distributed as free goods.

       2.      For the period beginning January 1, 1997, to the present, has the distribution, marketing, sales or promotion of any AWPID considered, incorporated, or been based upon, in any way, the difference between the cost to the provider and the amount that the provider receives for reimbursement or sale?  If so, please describe the circumstances of such distribution, marketing, sales, or promotion, and provide all documents relating thereto, and identify all past and current employees with knowledge of the facts relating to such marketing, sales or promotion.

       3.      For the period of January 1, 1997, to the present, please state for each calendar quarter the largest single purchaser, in terms of units, of each of the AWPIDs and the following:

       a.      the total number of units of the AWPIDs received by that purchaser; and

       b.      the total net revenue received for the AWPIDs by your company from that purchaser.

Please also produce the contract or agreement governing your relationship with that purchaser for each relevant quarter.

       4.      For the period of January 1, 1997, to the present, and for each subject drug, please provide a list of all purchasers who received the subject drug at a price exempted from the calculation of the Medicaid "best price," pursuant to the requirements of SSA _1927(c)(1)(C)(ii)(III), and, for each such purchaser, indicate the volume of the AWPID received by calendar quarter, in units, and the range of prices at which such purchaser received the subject drug for that quarter.

       5.      With respect to each AWPID, please describe how you calculate the prices and/or data reported to Medical Economics *Red Book*, *First Data Bank* or *MediSpan* or any other such entity that gathers and publishes either "average wholesale prices," "list prices," or "wholesale acquisition costs."  And for each drug identify the persons responsible for doing so.  (All Drugs)



6.    Identify the source of each of the documents produced in response to plaintiffs' requests for the production of documents throughout this litigation by identifying the person(s) who possessed those documents, the job position of any such individuals, and the division and department where such documents were located.  If you are unable to determine the individual(s) who possessed the documents, identify the department and division where they were/are located when produced.

DATED:        March 31, 2004                    By _____

                                                Thomas M. Sobol (BBO # 471770)
                                                Edward Notargiacomo (BBO #567636)
                                                Hagens Berman LLP
                                                225 Franklin Street, 26th Floor
                                                Boston, MA  02110
                                                Telephone: (617) 482-3700
                                                Facsimile: (617) 482-3003

                                                **LIAISON COUNSEL**

                                                Steve W. Berman
                                                Sean R. Matt
                                                Hagens Berman LLP
                                                1301 Fifth Avenue, Suite 2900
                                                Seattle, WA  98101
                                                Telephone: (206) 623-7292
                                                Facsimile: (206) 623-0594

                                                Samuel Heins
                                                Brian Williams
                                                Heins Mills & Olson, P.L.C.
                                                3550 IDS Center
                                                80 South Eighth Street
                                                Minneapolis, MN 55402
                                                Telephone: (612) 338-4605
                                                Facsimile: (612) 338-4692

                                                Jeff Kodroff
                                                John Macoretta
                                                Spector, Roseman & Kodroff, P.C.
                                                1818 Market Street, Suite 2500
                                                Philadelphia, PA  19103
                                                Telephone: (215) 496-0300
                                                Facsimile: (215) 496-6611

                                                **CHAIRS OF LEAD COUNSEL
                                                COMMITTEE**



Marc H. Edelson
Alan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Elizabeth Fegan Hartweg
The Wexler Firm
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

**MEMBERS OF LEAD COUNSEL
COMMITTEE AND EXECUTIVE
COMMITTEE**

Michael McShane
Alexander, Hawes & Audet, LLP
300 Montgomery Street, Suite 400
San Francisco, CA  94104
Telephone: (415) 982-1886
Facsimile: (415) 576-1776

Robert E. Piper, Jr.
Piper & Associates
624 Pierre Avenue
Shreveport, LA 71103
Telephone: (318) 226-0826
Facsimile: (318) 424-9900

**MEMBERS OF EXECUTIVE
COMMITTEE**

Anthony Bolognese
Bolognese & Associates
One Penn Center
1617 JFK Boulevard, Suite 650
Philadelphia, PA  19103
Tel:  (215) 814-6750
Fax:  (215) 814-6764

Jonathan W. Cuneo
The Cuneo Law Group
317 Massachusetts Avenue, N.E.
Suite 300
Washington, D.C. 20002
Tel: (202) 789-3960
Fax: (202) 789-1813



Neal Goldstein (Of Counsel)
Freedman & Lorry, PC
400 Market Street, Suit 900
Philadelphia, PA 19106
Tel: (215) 925-8400
Fax: (215) 925-7516

Michael E. Criden
Hanzman & Criden, PA
Commerce Bank Center, Suite 400
220 Alhambra Circle
Coral Gables, FL 33134
Tel: (305) 357-9000
Fax: (305) 357-9050

Blake M. Harper
Kirk B. Hulett
Hulett Harper LLP
550 West C Street, Suite 1700
San Diego, CA 92101
Tel: (619) 338-1133
Fax: (619) 338-1139

Jonathan D. Karmel
Karmel & Gilden
221 N. LaSalle Street
Suite 1414
Chicago, IL 60601
Tel: (312) 641-2910
Fax: (312) 641-0781

Dianne M. Nast
Roda & Nast, PC
801 Estelle Drive
Lancaster, PA 17601
Tel: 717-892-3000
Fax: 717-892-1200

Henry H. Rossbacher
Rossbacher & Associates
811 Wilshire Boulevard,
Suite 1650
Los Angeles, CA 90017-2666
Tel: (213) 895-6500
Fax: (213) 895-6161

Jonathan Shub
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd fl
Philadelphia, PA 19102
Tel: (215) 790-7300
Fax: (215) 546-0942



Scott R. Shepherd
Shepherd & Finkleman, LLC
117 Gayley Street, Suite 200
Media, PA 19063
Tel: (610) 891-9880
Fax: (610) 891-9883

Lisa J. Rodriguez
Ira Neil Richards
Trujillo Rodriguez& Richards, LLC
The Penthouse
226 West Rittenhouse Square
Philadelphia, PA 19103
Tel: (215) 731-9004
Fax: (215) 731-9044

Mitchell A. Toups
Weller, Green, Toups & Terrell, L.L.P.
2615 Calder Street, Suite 400
P.O. Box 350
Beaumont, TX 77704
Tel: (409) 838-0101
Fax: 409-838-6780

Damon Young
Lance Lee
Young, Pickett & Lee
4122 Texas Boulevard
P.O. Box 1897
Texarkana, AR/TX 75504
Tel: (903) 794-1303
Fax: 903-792-5098; 903-794-5098

**ADDITIONAL ATTORNEYS FOR
PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that I, Thomas M. Sobol, an attorney, caused a true and correct copy of the foregoing Plaintiffs' Omnibus Requests For Production And Interrogatories To Defendants Abbott, Amgen, Aventis, Baxter, Bayer, Boehringer, Braun, Dey, Fujisawa, Novartis, Pfizer, Pharmacia, Sicor, Tap And Watson And To All Other Defendants With Respect To Drugs That Were Not Previously Subject To Discovery to be served on all counsel of record electronically on March 31, 2004, pursuant to Section D of Case Management Order No. 2.

Thomas M. Sobol, Esq.
**HAGENS BERMAN LLP**
225 Franklin Street, 26th Floor
Boston, MA 02110
Telephone: (617) 482-3700

-24-

# Exhibit 6

DAVIS POLK & WARDWELL **COPY**

450 LEXINGTON AVENUE
NEW YORK, N.Y. 10017
212 450 4000
FAX 212 450 3800

WRITER'S DIRECT
212 450-4859

MESSETURM
60308 FRANKFURT AM MAIN

MARQUÉS DE LA ENSENADA. 2
28004 MADRID ESPAÑA

1-6-1 ROPPONGI
MINATO-KU, TOKYO 106-6033

3A CHATER ROAD
HONG KONG

April 23, 2004

Re:   **In re Pharmaceutical Industry Average Wholesale Price Litigation**

Kenneth A. Wexler, Esq.
The Wexler Firm
One North LaSalle Street, Suite 2000
Chicago, IL 60602

Dear Ken:

As you requested, I am writing to confirm AstraZeneca's proposed limitations on the scope of our search for documents and data responsive to Plaintiffs' Omnibus Requests for Production and Interrogatories, as well as Plaintiffs' first Request for Production of Documents to the Together Rx Defendants.

As I noted in our teleconference yesterday, AstraZeneca generally objects to Plaintiffs' discovery requests on a variety of grounds. For example, the requests are shockingly overbroad and unduly burdensome, as well as vague and ambiguous. Any attempt to respond to these requests on their face would take years and cost tens of millions of dollars. Similarly, many of the requests are neither relevant to the claims in the AMCC nor likely to lead to the discovery of admissible evidence. AstraZeneca has many other general and specific objections to the discovery requests that we will detail separately in our written responses and objections, which we intend to provide to you shortly.

As a result, AstraZeneca proposes to limit our search for responsive documents to documents from January 1, 1997 to September 6, 2002 from the following relevant groups or individuals:

- pricing strategy group
- managed markets group (including, managed markets brand directors, managed markets finance, managed markets contract

Please note that we will seek reimbursement for attorneys' fees and costs in connection with collecting, reviewing and producing documents and data in response to the Together Rx requests in connection with our Rule 11 Motion. If you prefer that we defer these efforts until a later date as a result, please let us know as soon as possible.

DPW 30-51

Kenneth A. Wexler, Esq.                    2                           April 23, 2004

directors, and the managed market national account directors for the four PBMs referenced in the complaint) individuals responsible for AstraZeneca's participation in the Together Rx program (with respect to Together Rx-specific documents).[2]

AstraZeneca will also search the files of relevant employees for documents responsive to Categories 1 through 4 of the Omnibus Requests, to the extent any such documents exist and are not subject to an objection. Together, these groups encompass the individuals at AstraZeneca responsible for 1) pricing with respect to the relevant drugs, including price strategy, price changes, price announcements, discounting and rebating; 2) sales, marketing and contracting in the managed care market, including the four major PBMs; and 3) AstraZeneca's policies, procedures and participation in the Together Rx program. In addition, AstraZeneca will produce transactional sales data for the time period noted above for all drugs subject to these discovery requests.

These groups and individuals are the only sources that AstraZeneca believes may possess documents relevant to the claims in the AMCC. Specifically, we will not search the documents of field sales employees or the brand marketing teams. These groups, which focus on marketing AstraZeneca's products to the patient and physician populations, are irrelevant to the claims asserted in the AMCC with respect to pharmacy-dispensed drugs. Moreover, even if there were the possibility that these groups may have relevant documents, the burden of searching the files of thousands of employees would outweigh any likely benefit. However, we will agree to produce any strategic or operational plans for the drugs subject to these discovery requests during the time period indicated above. In addition, as you review our productions, we would, of course, be willing to discuss reasonable follow-up requests.

Please note that AstraZeneca does not consider any of the drugs subject to these discovery requests to be "Class A Drugs" as defined in the Omnibus Requests. Although Diprivan and Pulmicort have been assigned J-codes, Diprivan is a hospital product that is billed under Medicare Part A as part of the overall charge for medical services and Pulmicort was not reimbursed under Part B during the time period relevant to the complaint. Accordingly, we will treat these drugs as "Class B Drugs" for the purpose of responding to the Omnibus requests.

_____

[2] AstraZeneca will search for and produce responsive Together Rx documents and data from January 1, 2001 to June 12, 2003, the date of the filing of the AMCC.

Kenneth A. Wexler, Esq.                        3                                    April 23, 2004

Provided you agree to these limitations, AstraZeneca intends to produce responsive data, as well as responsive documents from the Pricing Strategy Project within 60 days of service of the Omnibus Requests. We will commit to rolling productions of the remaining responsive documents every three weeks thereafter, and will make every effort to complete the production no later than July 30, 2004. In addition, we will continue to produce documents in .tif format and any data in electronic database format.

Sincerely,

Kimberley Harris

By Facsimile & Mail



**T H E | W E X L E R | F I R M** <sup>LLP</sup>

April 26, 2004

VIA VERILAW

Ms. Kimberley Harris
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

          RE:   In re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL
                  No. 1456

Dear Kim:

We are writing in response to your April 22, 2004 proposal (as stated in your April 23,
2004 letter) for certain initial limitations on AstraZeneca's document production in
response to Plaintiffs' Omnibus Requests for Production of Documents and
Interrogatories. With respect to your proposal on Plaintiffs' First Request for Production
of Documents to the Together Rx Defendants, we request that we have a follow-up call
with us and Brian Williams, Esq. this week.

**A.      Timing of Production**

First, paragraph II.4 of Case Management Order No. 10 ("CMO 10") requires that "[a]
responding party to an initial document request shall complete production of all
documents within sixty (60) days of service of such request." You propose to produce a
certain subset of documents within 60 days, but defer the remainder of the production on
a rolling basis every three weeks with a goal of completing the production no later than
July 31, 2004.

While we certainly understand the superficial constraints that appear to be imposed by a
60-day production, this is certainly not the case in reality. This case has been pending for
more than two years and plaintiffs' initial discovery requests in this consolidated

Contact Information:    **Elizabeth Fegan Hartweg**      **One North LaSalle Street**    **312 346 2222**
                          **312 261 6191 Direct Dial**          **Suite 2000**             **312 346 0022 fax**
                          **efhartweg@wexlerfirm.com**      **Chicago, Illinois 60602**    **www.wexlerfirm.com**



# T H E | W E X L E R | F I R M LLP

Ms. Kimberley Harris
April 26, 2004
Page 2 of 4

proceeding were served June 17, 2003.  Moreover, a July 31, 2004 final date for production is unrealistic in light of the fact that plaintiffs' motion for class certification is due September 2, 2004. A one-month interval is not sufficient time for plaintiffs to review the documents and take the necessary depositions in preparation for the filing of the motion.

Accordingly, we cannot agree to the timing proposed by you. If you have an alternative proposal, please let us know.  Otherwise, AstraZeneca must comply with the requirements of CMO 10.

## B.      Relevant Time Period

Second, AstraZeneca proposes to limit the search for responsive documents to the period January 1, 1997 to September 6, 2002. This proposal is certainly in direct contravention to defendants' requirement that the plaintiffs produce all documents for the period January 1, 1991 to the present. *See, e.g.,* Letter from Lyndon Tretter to me dated April 21, 2004.  Obviously, defendants cannot use time periods as both a sword and a shield. Moreover, the Court has not limited plaintiffs' claims in any way by time period.

Accordingly, we request that for this initial production AstraZeneca produce documents for the period January 1, 1991 through March 31, 2004 (the date of the Omnibus Requests). Further, this does not obviate the need for supplemental productions in accordance with the rules.[1]

## C.      Scope Limitations With Respect to Non-Physician-Administered Drugs

Next, we want to be clear that your proposed limitations on groups and individuals to be searched in your April 22, 2004 proposal apply only to non-physician-administered drugs.

With respect to non-physician-administered drugs, we agree that materials relating to marketing to consumers or to physicians need not be produced. However, as we discussed, the requests do require production of documents related to marketing and communications (among other things) to others in the distribution chain, including but not limited to wholesalers and pharmacy benefit managers. Assuming that the groups you have identified at AstraZeneca – including the pricing strategy group, the managed

---

[1] In fact, AstraZeneca's prior productions, despite the fact that defendant represented it had produced documents for the period 1997-2002, focused almost exclusively on the period 1997-2000. Thus defendant should supplement its prior productions in accordance with the requests.



**T H E | W E X L E R | F I R M** LLP

Ms. Kimberley Harris
April 26, 2004
Page 3 of 4

markets group (as defined in your April 23 letter), and the employees relevant to Categories 1-4 of the Omnibus Requests (General Corporate,[2] Trade Associations,[3] Governmental Investigations and Litigation, Communications with Governmental Entities) – include every group at AstraZeneca relevant to Categories 5-11 (other than those marketing to consumers and physicians ("non-searched groups")), we accept this proposal. If it does not include every group at AstraZeneca relevant to Categories 5-11 (other than the non-searched groups), please advise immediately.[4]

You also agreed to produce any strategic or operational plans for the drugs subject to these requests and will not redact any portion of those plans even if some portions refer to work being done by any non-searched group.

Finally, by agreeing to these scope limitations, plaintiffs do not waive their right to re-visit any of the Omnibus Requests and/or AstraZeneca's responses thereto.

**D.**     **General Objections**

Finally, you generally characterize plaintiffs' discovery requests as "shockingly overbroad and unduly burdensome" and "vague and ambiguous" ("General Objections"). You have yet to provide specific objections to the discovery requests however. We assume that your April 22, 2004 proposal is a representation that the documents you propose to produce will be produced in full, *i.e.* will not be additionally limited or will not have sub-sets withheld based on the General Objections, other than on the basis of attorney-client privilege or the work product doctrine. If this is not the case, please advise ASAP so that we can bring these matters to the Magistrate by May 3, 2004.

---

[2] Additionally, AstraZeneca's prior productions do not appear to have included certain general corporate information, such as annual reports, summary reports, comprehensive financial reports or drafts thereof, that would be responsive to nos. 36, 37 and 38 in plaintiffs' First Amended Requests for Production.

[3] Please note that AstraZeneca has yet to produce documents related to trade associations responsive to No. 2 in plaintiffs' First Amended Requests for Production of Documents, and should supplement its prior productions accordingly.

[4] For example, AstraZeneca has not yet produced any correspondence or other documents from its General Counsel's office. Certain communications between General Counsel and other third parties, including but not limited to other pharmaceutical companies, distributors and customers, would not be protected by the attorney-client privilege and would be responsive to a wide variety of plaintiffs' initial discovery requests and of the Omnibus Requests. Moreover, defendant has yet to produce a privilege log for any production it has made.



**T H E ⏐ W E X L E R ⏐ F I R M** LLP

Ms. Kimberley Harris
April 26, 2004
Page 4 of 4


In sum, please let us know this week if you have any alternative proposals with respect to sections A or B. If you have any disagreement with section C, let us know immediately; otherwise, I believe we have an agreement on the scope of the initial production in response to the Omnibus Requests. Finally, with respect to section D, please advise whether there are any issues that need to be raised before the Magistrate by May 3, 2004.

Sincerely,

Elizabeth Fegan Hartweg

EFH:lyr

cc.      All Counsel of Record via Verilaw



**T H E** | **W E X L E R** | **F I R M**<sup>LLP</sup>

April 26, 2004

VIA VERILAW

Ms. Kimberley Harris
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

       RE:    In re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL
               No. 1456

Dear Kim:

In your April 24, 2004 letter, you state that: "[a]lthough Diprivan and Pulmicort have
been assigned J-codes, Diprivan is a hospital product that is billed under Medicare Part A
as part of the overall charge for medical services and Pulmicort was not reimbursed under
Part B during the time period relevant to the complaint. Accordingly, we will treat these
drugs as "Class B Drugs" for the purpose of responding to the Omnibus requests." Please
confirm in writing that there are not any sales by of Diprivan or Pulmicort to the
clinic/physician market (private payer arena). If there are not any such sales, we agree
that these drugs should be treated as "Class B Drugs". If there are such sales however,
we do not and will not agree to the imposition of the discovery scope limitations
proposed for the non-physician-administered drugs on Diprivan or Pulmicort.

Sincerely,

Elizabeth Fegan Hartweg

EFH:lyr

cc.    All Counsel of Record via Verilaw

Contact Information:    **Elizabeth Fegan Hartweg**        **One North LaSalle Street**    312 346 2222
                           **312 261 6191 Direct Dial**          **Suite 2000**               312 346 0022 fax
                           **efhartweg@wexlerfirm.com**     **Chicago, Illinois 60602**    www.wexlerfirm.com

# DAVIS POLK & WARDWELL

-J300 I STREET, N.W.
WASHINGTON, D.C. 20005

I600 EL CAMINO REAL
MENLO PARK, CA 94025

99 GRESHAM STREET
LONDON EC2V 7NG

I5, AVENUE MATIGNON
75008 PARIS

450 LEXINGTON AVENUE
NEW YORK, N.Y. I00I7
212 450 4000
FAX 212 450 3800

WRITER'S DIRECT

212 450-4859

MESSETURM
60308 FRANKFURT AM MAIN

MARQUÉS DE LA ENSENADA, 2
28004 MADRID

I-6-I ROPPONGI
MINATO-KU, TOKYO I06-6033

3A CHATER ROAD
HONG KONG

April 29, 2004

Re:     **In re Pharmaceutical Industry Average Wholesale Price Litigation**

Elizabeth Fegan Hartweg, Esq.
The Wexler Firm LLP
One North LaSalle Street
Suite 2000
Chicago, IL 60602

Dear Beth:

I am writing in response to your letter dated April 26, 2004, regarding AstraZeneca's proposed limitations on its response to Plaintiffs' Omnibus Requests for Production.[1]

First, our review of the transactional sales data for Pulmicort and Diprivan confirms that there were no direct sales to physicians during the relevant time period.[2]  In light of this representation, it is our understanding that you agree that these drugs will be treated as "Class B" drugs for the purposes of Plaintiffs' Omnibus Requests.  Accordingly, AstraZeneca has no physician-administered or Medicare Part B drugs (defined by Plaintiffs as "Class A" drugs) subject to the Omnibus Requests.

Second, we understand from your April 26 letter that you agree to the proposed limitations in our April 23 letter on the groups and individuals whose files we will search for relevant documents, namely 1) the pricing strategy group (now formally known as Managed Markets/Pricing Group); 2) the various other

---

[1] We will respond separately to your footnote references to alleged deficiencies in AstraZeneca's production of document relating to Zoladex in response to Plaintiffs' First Request for Production of Documents.  Most, if not all, of your assertions are incorrect.  For example, you assert in footnote 4 that AstraZeneca "has yet to produce a privilege log for any production it has made."  In fact, a privilege log was produced on April 2, 2004.  If you have misplaced the log, we can send you a second copy.

[2] You will be able to confirm this representation from the transactional sales data that we propose to produce sixty days from the date the Omnibus Requests were served.

Ms. Hartweg                              2                        April 29, 2004

relevant groups within the managed markets department (now formally known as the Managed Markets, Government and Policy Group); and 3) other employees likely to have relevant documents responsive to those requests in Categories 1-4 of the Omnibus Requests for which we have agreed to produce documents. As previously noted in our April 23 letter, we believe these are the only groups that may have relevant documents responsive to the Omnibus Requests. We suggest that you confirm this representation at the Rule 30(b)(6) deposition of AstraZeneca, currently scheduled to occur the week of May 17, 2004. In addition, you are correct that we agreed to produce the strategic and operational plans for the drugs subject to these requests. As you request, we will also agree not to redact any non-privileged material from these plans.

However, the proposal reflected in our April 23 letter was not a representation that we would search for all documents from these individuals and groups that are facially responsive to each and every Omnibus Request. As previously noted in our April 23 letter, many of the requests are overbroad, unduly burdensome, vague, ambiguous and, in some cases, call for irrelevant material. To facilitate a prompt discussion of these objections, we have served today our specific written responses and objections to the Omnibus Requests. With respect to our relevancy objections, we are open to discussing why you believe the requested documents are relevant to the claims asserted in the AMCC. With respect to our objections based on overbreadth, burden and ambiguity, we suggest that we discuss appropriate limitations on the scope of these requests.

In addition, we maintain our objection to producing at this time documents outside of the January 1, 1997 to September 6, 2002 time period. It would be impossible to search for, review and produce documents responsive to each of your eighty-two requests for the entire fourteen years you propose within the sixty days you demand. We do not view this as a reasonable request. We suggest that you agree, at least for now, to limit your requests to the time frame we proposed.

Moreover, even if you agree to this time limitation, it is simply not feasible to complete AstraZeneca's production within sixty days. It is irrelevant that this action has been pending for two years or that plaintiffs' initial discovery requests were served some time ago. Plaintiffs' Omnibus Requests are significantly different in scope and expanded in breadth from those initial requests. Moreover, the drugs subject to these requests have only been at issue in this litigation since the Court's decision in February 2004. Moreover, we do not agree that discovery must be completed before plaintiffs file a motion for class certification.

Accordingly, as suggested in our April 23 letter, we propose to make a substantial production sixty days from the date the Omnibus requests were served, but we do not believe it is possible to complete the production in that timeframe. Moreover, we are willing to prioritize our review and production, if plaintiffs

Ms. Hartweg                          3                          April 29, 2004

have a proposal as to the categories of documents that are most important to be produced on an expedited basis.  Finally, we may be able to make significant progress on the production if reasonable limitations are placed on the scope of certain requests.

Your letter did not address our proposal with respect to Together Rx.  To reiterate, we propose to limit our search to the individuals at AstraZeneca responsible for AstraZeneca's participation in the Together Rx program.  We also propose to limit the Together Rx-specific production to documents within the January 1, 2001 to June 13, 2003 timeframe.[3]  Our more specific objections to particular requests are reflected in our written responses and objections.

Please let us know when you are available for a meet and confer to further discuss these issues.

Sincerely,

*Kimberley Harris* mₗ

Kimberley Harris

By Facsimile & Mail

---

[3] This also means that we will extend the cut-off date for the transactional sales data for Together Rx drugs to June 13, 2003.

# DAVIS POLK & WARDWELL

1300 I STREET, N.W.
WASHINGTON, D.C. 20005

1600 EL CAMINO REAL
MENLO PARK, CA 04025

99 GRESHAM STREET
LONDON EC2V 7NG

15, AVENUE MATIGNON
75008 PARIS

450 LEXINGTON AVENUE
NEW YORK, N.Y. 10017
212 450 4000
FAX 212 450 3800

WRITER'S DIRECT

212 450 4859

MESSETURM
60308 FRANKFURT AM MAIN

MARQUÉS DE LA ENSENADA, 2
28004 MADRID

1-6-1 ROPPONGI
MINATO-KU, TOKYO 106-6033

3A CHATER ROAD
HONG KONG

May 21, 2004

Re:    **AstraZeneca Response to Plaintiffs' Omnibus Document Requests**

Elizabeth Fegan, Esq.
The Wexler Firm
One North LaSalle Street
Suite 2000
Chicago, IL 60602

Dear Beth:

I am writing to summarize our telephone conversations of May 3, 2004 and May 14, 2004, regarding AstraZeneca's responses to Plaintiffs' Omnibus Requests for Production and Interrogatories ("Omnibus Requests") and to confirm AstraZeneca's position on various unresolved issues, including our proposed limitations on the scope of certain requests.

First, regarding the drugs subject to the Omnibus Requests, it is AstraZeneca's position that documents relating to Zoladex® are not subject to the Omnibus Requests, and the title and second paragraph of the Omnibus Requests support this position. Additionally, Steve Berman's letter to Erik Haas of April 8, 2004, which was posted to Verilaw, states that the Omnibus Requests do not cover drugs that were the subject of prior requests. Accordingly, as we have consistently stated in our objections, in previous letters and in our recent conversations, AstraZeneca does not intend to produce documents or data relating to Zoladex® in response to the Omnibus Requests.[1]  Moreover, in light of the fact that AstraZeneca has already produced approximately 500,000 pages relating to Zoladex®, as well as a substantial amount of data, it is simply unnecessary for the Omnibus Requests to apply to Zoladex®. You have indicated in our recent conversations that plaintiffs may disagree with AstraZeneca on this issue. Please confirm plaintiffs' position as soon as possible.

Second, regarding the time frame subject to discovery, AstraZeneca reiterates its objection to plaintiffs' demand that AstraZeneca produce responsive documents from January 1, 1991 to March 31, 2004. It would be virtually

---

[1] Please note that AstraZeneca intends to produce additional documents relating to Zoladex on or around June 1, 2004, which will substantially complete its response to Plaintiffs' First Request for Production of Documents.

Elizabeth Fegan, Esq.                2                May 21, 2004

impossible for AstraZeneca to search for, review, and produce documents responsive to each of your eighty-two requests for the entire fourteen years you propose. Nonetheless, in an effort to resolve this dispute, AstraZeneca offered to produce transactional sales data for this entire time period in lieu of documents. It is our understanding that you have rejected this proposal, although you indicated that you may be willing to accept a limitation on the scope of the documents to be produced. You have asked us to propose such a limitation.

Accordingly, subject to our previous agreement on the relevant groups to be searched and our written objections, we propose to search for responsive data and documents from the following categories for the time period January 1, 1991 to March 31, 2004, to the extent such data and documents still exist: 1) in response to Requests 25-27, transactional sales and rebate data; 2) in response to Requests 29 and 70, contracts with PBMs, wholesalers and retailers; 3) in response to Category 9 of the Omnibus Requests, responsive documents relating to ExpressScripts, AdvancePCS, Medco Health and Caremark; and 4) in response to the particular requests indicated in AstraZeneca's written responses and objections, responsive documents from the Managed Markets/ Pricing Strategy Group. With respect to all other requests not included above, AstraZeneca proposes to search only active files for responsive documents[2], subject to the following limitations on certain of these requests (many of which we have already discussed):

- With respect to Requests 1, 2, 5, 7, and 20 you agreed to limit the scope of these requests to the groups that we have agreed should be searched for responsive documents.

- With respect to Request 3, you agreed to get back to us with a more specific request as to the type of policy and procedure manuals plaintiffs are requesting. You also agreed to limit the scope of this request to policy or procedure manuals applicable to the departments we have agreed to search.

- In response to Request 4, AstraZeneca proposes to search for and produce documents sufficient to identify AstraZeneca's electronic mail systems and electronic databases relating to transactional sales and rebate data. If plaintiffs can identify additional specific types of electronic systems believed to be within the scope of this request, AstraZeneca will consider the proposal.

- In response to Request 6, AstraZeneca will either produce these documents or add them to its privilege log.

---

[2] We will also agree not exclude from production responsive documents located in the active files solely on the grounds that the documents fall outside of the 1997 to 2002 timeframe we originally proposed.

Elizabeth Fegan, Esq.                3                    May 21, 2004

- In response to Requests 12 and 13, you agreed to limit the scope of this request to exclude documents related to the Medicaid rebate program. We agreed to evaluate whether certain Zestril subpoenas you described may have resulted in the production of documents responsive to these requests.

- With respect to Request 20, you agreed to limit the scope of this request to documents sufficient to identify the individuals described.

- With respect to Requests 22 and 23, you clarified that plaintiffs only seek documents relating to the competitive market for the AstraZeneca drugs subject to the Omnibus Request.

- In response to Request 24, AstraZeneca agreed to produce strategic and operational plans and agreed not to redact any non-privileged material.

- In response to Request 28, AstraZeneca will produce information on the WAC and AWP published in First Databank.[3] We will also confirm that the terms EAC, earned margin and ASP are not used in practice at AstraZeneca with respect to the drugs subject to the Omnibus Request (outside of the new Medicare regulations).

- With respect to Request 30, AstraZeneca agreed to reconsider our objection. We will get back to you promptly on our views with respect to this request.

- With respect to Request 31, you agreed to reserve your demand for these documents.

- In response to Requests 32 and 34, AstraZeneca maintains its objection that documents relating to the cost of manufacturing and marketing its products and its profits from the sale of any product are not relevant to this litigation. However, we will agree to produce responsive documents relating to cost, profit or revenue, to the extent they are contained in the files of the groups we agreed to search.

- With respect to Request 35, you clarified that plaintiffs only seek documents relating to a "spread" between two concurrent measures of price for a single drug.

---

[3] We will also agree to produce this information from January 1, 1991 through March 31, 2004.

Elizabeth Fegan, Esq.                    4                    May 21, 2004

- With respect to Request 37, you agreed that with respect to pharmacy-dispensed drugs, this request was effectively duplicative of Request 79.

- In response to Requests 38, 39, and 40, AstraZeneca proposes to produce only line-item credit information in the transactional data.

Of course, as a general matter, we expect that both sides will be willing to discuss specific follow-up requests as the litigation progresses.

Please note that this proposed expansion of the scope of AstraZeneca's production is significant and means that although we will make a substantial production on or before June 1, 2004, it would be impossible to complete the production by that date. As we have stated in the past, we will make rolling productions every three weeks thereafter and will make all reasonable efforts to complete the production by July 31, 2004.

We believe that this letter presents a reasonable compromise between our significant objections regarding the burdensome nature of plaintiffs' requests and your interest in obtaining information on a timely basis. If plaintiffs agree to this proposal, we expect that plaintiffs will withdraw their Motion to Compel against AstraZeneca. If plaintiffs' do not agree, please let us know immediately. We will then proceed to vigorously oppose the Motion to Compel and will only produce documents and data, subject to our written objections, from the 1997 to 2002 timeframe that we previously proposed.

I look forward to your prompt reply. Please also feel free to call me if you would like to discuss this further.

Sincerely,

Kimberley D. Harris

**By Facsimile**

# THE | WEXLER | FIRM LLP

May 24, 2004

VIA FACSIMILE

Ms. Kimberley Harris
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

RE:   In re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL
No. 1456

Dear Kim:

I am writing regarding AstraZeneca's ("AZ") Responses to Plaintiffs' Omnibus Requests for Production and Interrogatories ("Responses") and certain matters that arose during John Freeberry's deposition.

## Discovery Search Limitations

As you know, during our meet and confers on the Responses, you made certain representations about the two "groups" or departments at AZ that you believed would maintain the majority of documents responsive to the discovery requests. Accordingly, you suggested that we agree to allow AZ to limit its search to those two groups, subject to confirmation at last week's Rule 30(b)(6) deposition.

Based on the 30(b)(6) deposition of Mr. Freeberry, we cannot agree to the limitation you propose. Despite the fact that Mr. Freeberry's designation was limited to just a handful of topics, Mr. Freeberry testified, for example, that the Pricing Strategy Team is composed of "somebody from finance, the marketing manager, managed care representative … finance, professional, somebody who represents the consumer, strategy, we will have health economics individual on that team." (Freeberry dep., at 20-22). Mr. Freeberry further testified that the recommendations of the Pricing Strategy Team go through several levels of review, including the Operations Portfolio Management Committee ("OPMT"), and then the AstraZeneca Leadership Team ("AZLT"), and

Contact Information:   **Elizabeth A. Fegan**
**312 261 6191 Direct Dial**
**eafegan@wexlerfirm.com**

One North LaSalle Street
Suite 2000
Chicago, Illinois 60602

312 346 2222
312 346 0022 fax
**www.wexlerfirm.com**

**T H E | W E X L E R | F I R M**<sup>LLP</sup>

Ms. Kimberley Harris
May 24, 2004
Page 2 of 4

finally to the CEO. (*Id.* at 23-24). Each of these teams or committees would certainly have documents directly responsive and relevant to this AWP litigation.

## Document Storage Index

Further, Mr. Freeberry had no knowledge of the groups or persons that would have documents relevant to this litigation at Zeneca and, thus, Zoladex. Accordingly, we cannot agree to any limitation for the pre-merger period without a review of an index of the boxes that exist in storage. You have previously stated that you have a box index for the boxes that AZ has in storage. As we discussed, as soon as you provide us with a copy, we will review it and turn it around in 48 hours to identify the boxes that are most likely to contain responsive documents. Please provide us with a copy by Friday, or advise us if you have no intention of doing so.

## E-mail Search

Mr. Freeberry also testified that most of the communications, both internal and external, regarding pricing at AZ are done through e-mail. Accordingly, we request that AZ agree to run search terms through its e-mail databases to identify relevant correspondence. We suggest the following search terms:

| | |
|---|---|
| AWP | Spread |
| Suggested | Sample(s) |
| List Price(s) | Volume |
| Bundle | Reduce/reduction |
| Chargeback(s) | Profit |
| Credit(s) | Return to Practice/ RTP |
| Discount(s) | Medicare |
| Educational Grant | Part B |
| Free | Advantage |
| Grant(s) | Cost advantage |
| Incentive(s) | Profit advantage |
| Net | Margin |
| Price(s) | Influence |
| Rebate(s) | Unrestricted |
| Reimbursement | Complimentary |
| Returned Goods | |

These terms represent a reasonable attempt to capture the words used by AZ personnel in the documents produced to date and/or that were referenced by Mr. Freeberry

T H E | W E X L E R | F I R M<sup>LLP</sup>

Ms. Kimberley Harris
May 24, 2004
Page 3 of 4

**Alleged Privileged Communications**

Next, Mr. Freeberry testified, in early 2002, he made a decision in conjunction with in-house counsel, Stuart Fullerton, Esq., to stop reporting suggested AWPs and only report WAC to the publishers. (Freeberry dep., at 93-94). Mr. Freeberry refused to answer questions regarding his discussions with Mr. Fullerton or his discussions with his pricing team (despite the fact that no attorney was present for those conversations) regarding the decision to stop reporting suggested AWPs on the basis of privilege. This is problematic for several reasons.

First, conversations with an attorney that are primarily related to business, as opposed to legal, advice are not protected by the attorney-client privilege.   *See Continental Cablevision of Massachusetts, Inc. v. Irwin*, 1991 U.S. Dist. LEXIS 21805 (D. Mass. 1991).   Thus, the privilege does not attach when "in-house counsel is engaged in non-legal work", which includes "the rendering of business or technical advice…." *Borase v. M/A Com, Inc.*, 171 F.R.D. 10, 14, 1997 U.S. Dist. LEXIS 4773 (D. Mass. 1997).   That is exactly what it appears that Mr. Fullerton was doing here, when he jointly made the decision with Mr. Freeberry to stop reporting suggested AWPs to the publishers. To the extent that you disagree, defendant has the burden "of producing evidence in support of its contention that in-house counsel was engaged in giving legal advice and not in some other capacity at the time of the disputed conversations." *Id.*

Second, conversations where no attorney is present and that are with not members of the control group (which Mr. Freeberry's team would not be) certainly cannot be protected by the privilege.  Accordingly, Mr. Freeberry and the members of his team should be directed to respond to conversations they had amongst themselves related to AZ's 2002 decision to stop reporting suggested AWPs.  If you have authority to the contrary, please advise us so that we may reconsider our position.

Finally, AZ has raised certain affirmative defenses which place this 2002 decision made by Mr. Fullerton and Mr. Freeberry directly at issue. *See, e.g.,* Answer and Defenses of Defendant AstraZeneca Pharmaceuticals LP to the Intervenors' Amended Master Consolidated Class Action Complaint, Ninth Defense ("Any and all actions taken by AstraZeneca with respect to any of the matters alleged in the AMCC were taken in good faith and in accordance with established industry practice."), Fourteenth Defense ("…Plaintiffs and the putative class members seek to impose liability retroactively for conduct that was not actionable at the time it occurred."); Eighteenth Defense ("…AstraZeneca had no reasonable grounds to believe, and did not believe at the time such a statement was made, that the statement was false or misleading."); Thirty-Seventh Defense ("Any alleged restraints complained of in the AMCC are ancillary to legitimate,

T H E │ W E X L E R │ F I R M LLP

Ms. Kimberley Harris
May 24, 2004
Page 4 of 4

procompetitive activity"); Thirty-Eighth Defense ("AstraZeneca's conduct was not intended to have, did not have and was not likely to have had any adverse effects on competition in any relevant market."); Forty-Eighth Defense ("Plaintiffs' and the putative class' claims are barred, in whole or in part, because any injuries sustained by Plaintiffs or the putative class were the result of intervening or superceding conduct of third parties.).   Accordingly, AZ cannot shield from discovery the rationale behind its decisions related to AWP merely by the fact that an attorney made, or jointly made, the decision.

### Continued 30(b)(6) Deposition

Finally, AZ will need to designate and make available 30(b)(6) witnesses on the remainder of the topics about which Mr. Freeberry had made no attempt to inform himself of the facts reasonably available to the corporation. Please advise by Wednesday of the identity of the witness(es), the topics on which each is designated, and their availability for deposition. As we indicated, we will make ourselves available at your convenience to complete this deposition as soon as possible. Please note, however, that we cannot enter into a "final" agreement on the groups to be searched for responsive documents until the 30(b)(6) is completed.

Because of the deadlines imposed by the Court, we need to resolve all outstanding issues this week. Please advise of your availability for a call Wednesday, May 26, 2004 at 9 a.m. EDT.  We look forward to hearing from you.

Sincerely,

Elizabeth Fegan Hartweg

EFH:lyr

cc.     Co-Lead Counsel (via facsimile)

# DAVIS POLK & WARDWELL

1300 I STREET, N W
WASHINGTON, D C  20005

1600 EL CAMINO REAL
MENLO PARK, CA 04025

99 GRESHAM STREET
LONDON EC2V 7NG

10. AVENUE MATIGNON
75008 PARIS

450 LEXINGTON AVENUE
NEW YORK, N.Y. 10017
212 450 4000
FAX 212 450 3800

WRITER'S DIRECT

212 450-4859

MESSETURM
60308 FRANKFURT AM MAIN

MARQUÉS DE LA ENSENADA. 2
28004 MADRID

1-6-1 ROPPONGI
MINATO-KU, TOKYO 106-6033

3A CHATER ROAD
HONG KONG

May 25, 2004

Re:   **In re Pharmaceutical Industry Average Wholesale Price Litigation**

Elizabeth Fegan, Esq.
The Wexler Firm
One North LaSalle Street
Suite 2000
Chicago, IL 60602

Dear Beth:

I am writing in response to your letter dated May 24, 2004. As a preliminary matter, it is not clear whether your letter was intended to respond to my letter dated May 21, 2004, wherein AstraZeneca proposed a reasonable compromise to the parties' dispute regarding the burden imposed by plaintiffs' requested time frame for discovery. We encourage you to respond to that letter immediately, in light of the pending deadline for an opposition to the Motion to Compel. In the interim, we respond to each of the points raised in your letter below.

<u>Discovery Search Limitations</u>

You appear to be concerned that documents created in connection with the recommendations of the pricing strategy team would not be captured in our search of the files of the Pricing Strategy Group. However, Mr. Freeberry testified, in response to your questions, that documents created in connection with the recommendations of the pricing strategy team would be created by his group and maintained by his group. Freeberry Dep. at 77-78. Accordingly, we believe that most, if not all, of the relevant pricing documents will be contained in the files of the Pricing Strategy Group, which we have already agreed to search. In addition, if you agree to the rest of the proposal set forth in my May 21, 2004 letter, we will also agree to search the pricing files of the commercial brand teams, OPMT and the AZLT, to the extent any such files exist, for responsive documents relating to pricing recommendations. (Note that we have already agreed to search the files of the managed markets brand directors.) We believe, according to Mr. Freeberry's

Ms. Fegan                              2                        May 25, 2004

testimony, that these additional searches would capture any documents not
maintained by Mr. Freeberry's group directly.

### Document Storage Index

It appears that your concern regarding documents in storage relates to
Zoladex.  However, the approximately 500,000 pages relating to Zoladex that
have been produced to date include responsive documents from storage.
Accordingly, there is no need to search a storage index for Zoladex-related
documents.  With respect to the Omnibus Requests, my May 21, 2004 letter
contains AstraZeneca's proposal regarding our search for documents from the
time frame requested by plaintiffs.

### E-mail Search

We have already undertaken a substantive review of the email of the
Pricing Strategy Group.  Accordingly, the search you propose is unnecessary.

### Privileged Communications

We disagree with your privilege analysis.  However, we suggest
postponing a discussion of this dispute until the broader, more fundamental issues
regarding the scope of your discovery requests are resolved.

### Continued 30(b)(6) Deposition

We will get back to you by the end of this week regarding date(s) and
designee(s) for the completion of the AstraZeneca Rule 30(b)(6) deposition.

We are available for a continued meet and confer on Wednesday, May 26
at 9:00 a.m. EDT.  If you respond substantively to my letter dated May 21, 2004
in advance of that call, hopefully we can narrow the range of issues to be
discussed.

Very Truly Yours,

Kimberley Harris

T H E │ W E X L E R │ F I R M LLP

May 26, 2004


VIA FACSIMILE & E-MAIL

Ms. Kimberley Harris
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

> RE:   In re: *Pharmaceutical Industry Average Wholesale Price Litigation*, MDL
> No. 1456

Dear Kim:

Pursuant to your request during this morning's continued meet and confer, set forth below is plaintiffs' response to your May 21, 2004 proposal, corrections to the prior agreements we made, and the further scope proposals you requested. I have generally tried to follow the outline of your May 21 letter and this morning's meet and confer.

To sum up two undisputed issues, we agreed that you would provide me by Friday with the names, designations and availability of the persons who are responsive to the topics in the 30(b)(6) notice for which Mr. Freeberry was not the designee.  We also agreed to defer a conversation on the privilege dispute until some time next week after the following document-related issues are resolved.

**Extension of Time to Respond to the Motion to Compel**

Plaintiffs will agree to a one-week extension of time to respond to the motion to compel as AstraZeneca's ("AZ") objection regarding the time period of documents to be produced relates to hard copy documents.  The one-week time period will provide both parties with the opportunity to further discuss the issues set forth in your May 21 letter, my May 24 letter and today's letter.

However, as we discussed, plaintiffs will not agree to any extension as AZ's objection relates to transactional data.

THE│WEXLER│FIRM<sup>LLP</sup>

Ms. Kimberley Harris
May 26, 2004
Page 2 of 6

You advised me that if I did not agree to your May 21 proposal or we cannot agree to a scope limitation on hard copy documents, you will only produce transactional data on June 1, 2004 for the period 1997 to 2002. As I discussed with you, you have not raised any burden or relevance issues as to transactional data in any of our meet and confers or in any letters confirming the meet and confers. Instead, as set forth in your May 21 letter and as you stated in today's call, you are using the production of transactional data for the full time period (1991-present) as a chit to trade for the non-production of hard copy documents, such as correspondence, negotiations, etc. Plaintiffs cannot agree to such a trade.

**Index**

You have advised plaintiffs that AZ has an index for documents in storage (which you approximate is comprised of 6,000 boxes). Importantly, you have advised me that the documents in storage are not just for the pre-1997 period but could include anything that the company has sent off site as recently as a week ago. You have further advised me that these indices were created by persons at the company as a way of tracking and archiving information and were not produced by lawyers as part of this litigation.

You have requested on numerous occasions that plaintiffs formulate a proposal to limit the burden on AZ of producing or searching all 6,000 boxes. As we have discussed and I stated in my May 24 letter, plaintiffs request a copy of that index. As soon as the index is provided, we will turn it around within 48 hours to identify the boxes we believe would contain responsive information. Obviously, you may have a different viewpoint which we could then meaningfully discuss. However, to ask plaintiffs to propose a limitation on searching those 6,000 boxes in a vacuum when you and AZ have the index in your possession does not move this discussion forward.

You have suggested that I provide you with search terms to search the index. As I explained to you several times, I have no information about the words used by AZ personnel to catalogue boxes (and you do), so I would not be able to again formulate search terms in a vacuum.

Moreover, indices are generally not written in a "conversational" tone and thus are not conducive to search terms, such as e-mail would be.

You have threatened several times to do a document dump of all 6,000 boxes on plaintiffs if we do not agree to the scope limitations you have proposed. I do not believe that these types of threats are conducive to compromise, nor do they recognize the reality of the

# T H E | W E X L E R | F I R M LLP

situation -- which is that an index exists that would aid both parties in greatly narrowing the scope of production and thus the burden on AZ.

We obviously discussed all of above this morning. I asked at the end of that conversation whether we could agree to disagree on this subject and thus agree that we had conducted the meet and confer required by the local rules in order to bring this issue to the Court's attention. You said no, although I am unclear why. Unless AZ agrees by Friday to produce this index for the documents in storage, we will consider this issue to be a disputed one to be decided by the Court.

## E-Mail Search

In my May 24 letter, we proposed that AZ conduct a search of its e-mails with plaintiffs' proposed search terms. You advised me that AZ has already conducted an e-mail search of just its Pricing Strategy Group with different search terms. I objected to limiting the e-mail search to just the Pricing Strategy Group and further requested that you provide me with a copy of the search terms that AZ chose so that we can have a meaningful discussion about the responsiveness of the search. You agreed to set out in writing the process by which the search was conducted and the department(s) for which AZ would conduct an e-mail search. As soon as we receive this, we can discuss this issue further.

## Requests 29 and 70

As you know, Requests 29 and 70 generally request contracts for the sale of any AWPID, together with correspondence and related negotiation/RFP material. AZ proposed to limit AZ's response to just contracts with PBMs, retailers and wholesalers. As we discussed, plaintiffs cannot agree to this proposal because (i) it does not encompass every customer group with which AZ has contracts; and (ii) does not include the full scope of correspondence and other related material requested. You thus requested that plaintiffs formulate a proposal.

Plaintiffs propose as follows: For each customer category, provide documents related to the "top 50," "middle 50," and "bottom 50" customers in terms of aggregate annual sales dollars. Obviously, the companies that fit one of these profiles may differ by year; plaintiffs' proposal would require that the responsive documents be produced for all customers that fall within one of those categories in any relevant year. For the PBMs, contracts and all related documents as set forth in the requests with AdvancePCS, Caremark, Express Scripts, Medco and their predecessor entities would suffice. For wholesalers, contracts and all related documents as set forth in the requests with McKesson, AmerisourceBergen and Cardinal will suffice. This should be a fair initial

T H E | W E X L E R | F I R M LLP

Ms. Kimberley Harris
May 26, 2004
Page 4 of 6

limitation that will ease the burden on scope of the documents that must be retrieved and produced and will provide a broader cross section of evidence.

Plaintiffs' proposal is not a waiver of our right to request additional responsive documents from any of these customer groups.

**Group/Department Files to be Searched**

We generally agreed that AZ's search for responsive documents would be limited to the Managed Markets/Pricing Strategy Group, subject to confirmation at the 30(b)(6) deposition. As we discussed this morning, we found at Mr. Freeberry's deposition last week (as stated in my May 24 letter) that this may not be sufficient because of line reporting and approval processes through which decisions are made.

You intimated that perhaps I was confused about the hierarchy at the company. I suggested that the simple production of the organizational charts (in response to Requests Nos. 2 and 20) that Mr. Freeberry testified exist on AZ's intranet under the Human Resources/Personnel Department would obviate your stated frustration with my purported lack of knowledge. Moreover, as defendants (and you specifically) requested in the meet and confers on plaintiffs' productions, production of these charts and identification of the persons who hold the relevant positions would, perhaps, allow for a more focused discussion and agreement among us. You balked at this suggestion, stating that I should know enough about the company by now from Mr. Freeberry's deposition and the production of the Zoladex documents. However, what both have taught me is that there are other groups/departments/teams/committees above the Managed Markets/Pricing Strategy Group that have information specifically responsive to plaintiffs' requests. Let's find a way to identify those from the organizational charts and move forward.

**Miscellaneous Requests**

- **Request 3:** We will agree to limit the response to this request to any company, organizational and policy information relevant to this litigation.
- **Request 4:** Plaintiffs will not agree to the limitation proposed. There certainly is no burden on AZ to produce documents **sufficient to identify** its electronic mail, document management and other automated information systems. Moreover, the standard only requires that the request identify documents that are likely to lead to the discovery of admissible evidence, which standard is certainly met here -- particularly where AZ's production to date has been in electronic form in its entirety.

T H E | W E X L E R | F I R M <sup>LLP</sup>

Ms. Kimberley Harris
May 26, 2004
Page 5 of 6

- **Request 28:**  Contrary to your May 21 letter, I have never agreed to limit the production of documents in response to Request no. 28 to the WAC and AWP published in **First DataBank** only. Moreover, I never agreed to limit the production of documents related to ASP to those outside the new Medicare regulations.   The only discussions we have had focused on which pricing terms you believed were actually used by AZ and which were not. Plaintiffs request for documents responsive to no. 28 stands as written.

- **Request 31:**  You state that, with respect to Request 31, plaintiffs agreed to reserve our demand for these documents. To be clear, I agreed to reserve this demand based on your stated belief that the annual strategic plans for each of the AWPIDs would contain the information sought by these requests. If the plans do not, then AZ must otherwise produce documents responsive to this request.

- **Requests 32 and 34:**  AZ has agreed to produce documents related to, *inter alia*, the cost, profit and revenue for its AWPIDs only if that information exists in the Managed Markets/Pricing Strategy Group's documents. Plaintiffs cannot agree to such a limitation. AZ cannot hide the ball if this information is kept/maintained elsewhere and should be produced regardless of which department maintains and tracks this core information.

- **Request 35:**  We agreed that AZ agreed to produce documents relating to spread between any two price points for a single drug.

- **Requests 37 and 79:**  I agreed that these two requests are duplicative with respect to PBMs only, but not with respect to wholesalers, retailers or any other customer that may receive the incentives outlined.

- **Requests 38, 39, and 40:**  Requests 38, 39 and 40 request all documents related to credit memos.  You propose to just produce the transactional data which will include "line-item credit information".  This proposal is too narrow. Based on the allegations of the AMCC, the parties will need to explore, *inter alia*, the reasons behind why a credit memo is being issued, how it was calculated, how it is characterized (*e.g.,* rebate, administrative fee, chargeback, returned goods, etc.). Credit memos can be used for various reasons, some of which may or may not relate to inflated AWPs, *e.g.,* returned goods.  Accordingly, it is important for both parties to know exactly what the credit memo represents to AZ and the customer.  The data and the line item will not explore this background information.  Accordingly, plaintiffs propose that AZ produce documents sufficient to demonstrate the background and purposes for each line item credit.

T H E ⎪ W E X L E R ⎪ F I R M <sup>LLP</sup>

Ms. Kimberley Harris
May 26, 2004
Page 6 of 6

As I advised you this morning, I am in California for a deposition, but will be available
this evening by cell phone and, as always, by e-mail.  Also, tomorrow morning, I have a
12:45 p.m. EDT flight home, so can be available early to speak again by cell phone if
need be.


Sincerely,

*Elizabeth Anne Fegan*

Elizabeth Anne Fegan

EAF:lyr

cc.     Scott Wise, Esq. (via facsimile & e-mail)
        Plaintiffs' Co-Lead Counsel (via e-mail)

# Exhibit 7



**T H E  |  W E X L E R  |  F I R M** LLP

June 1, 2004

VIA FACSIMILE and VERILAW

Mr. Scott Wise
Ms. Kimberley Harris
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

> RE:  In re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL
> No. 1456

Dear Scott and Kim:

I am writing regarding AstraZeneca's ("AZ") failure to comply with paragraph 4 of CMO
No. 10, in responding to Plaintiffs' Omnibus Requests for Production and Interrogatories
("Responses").  As you know, paragraph 4 requires that "[a] responding party to an initial
document request shall complete production of all documents within sixty (60) days of
service of such request."  While we understand that we have been engaged in meet and
confers, the fact that AZ has yet to produce any documents[1] in compliance with CMO
No. 10 fails to at least comply with the spirit, if not the letter, of the Court's Order.

In fact, Kim and I have formally met and conferred on at least four occasions by
telephone and have exchanged no less than eight letters regarding the scope of the
Omnibus Requests.  During none of those has AZ maintained a blanket objection to the
production of documents. However, despite the fact that paragraph 4 of CMO 10 requires
that "undisputed documents shall be produced within 60 days," AZ has yet to produce a
single responsive document to CMO No. 10.  Surely AZ cannot maintain that there are
not any "undisputed documents."

Further, AZ has maintained that, once it starts producing documents (for which AZ has
not given us a firm date), it will engage in a rolling production every three weeks.  As I
have told Kim numerous times, this is not practicable or acceptable given the fact that,

---

[1] It is unclear whether AZ intends to produce electronic transactional data today.  As of the time this letter
was sent, plaintiffs have not received any transactional data responsive to the Omnibus Requests.  Even if
AZ had produced transactional data today however, AZ would nonetheless be in violation of CMO No. 10
and plaintiffs' position set forth in this letter would remain unchanged.

Contact Information:     Elizabeth A. Fegan          One North LaSalle Street     312 346 2222
                         312 261 6191 Direct Dial   Suite 2000                   312 346 0022 fax
                         eafegan@wexlerfirm.com     Chicago, Illinois 60602      www.wexlerfirm.com



THE │ WEXLER │ FIRM<sup>LLP</sup>

Mr. Scott Wise
Ms. Kimberley Harris
June 1, 2004
Page 2 of 2

per CMO No. 10, plaintiffs' motion for class certification is due in just 90 days on
September 3, 2004. Obviously, the Court's class deadline assumed that defendants would
comply with paragraph 4 of CMO No. 10.   AZ's failure to do so appears to be an attempt
to seriously hinder and prejudice plaintiffs' position.

Sincerely,

Elizabeth A. Fegan

EFH:lyr

cc.      All Counsel of Record (via Verilaw)

# Exhibit 8

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATON | ) ) ) ) | **MDL No. 1456** |
| THIS DOCUMENT RELATES TO | ) ) ) ) | **Civil Action 01-CV-12257-PBS** **Judge Patti B. Saris** |

## DECLARATION OF ELIZABETH A. FEGAN
## PURSUANT TO LOCAL RULE 37.1

I, Elizabeth A. Fegan, certify that I complied with Local Rule 37.1 as follows:

1. I am one of the Plaintiffs' lawyers in the above-captioned case. I personally have been responsible for engaging in discovery conferences with counsel for AstraZeneca regarding AstraZeneca's Responses to Plaintiffs' Omnibus Requests for Production and Interrogatories ("Responses").

2. On May 14, 2004, I engaged in an extensive discovery conference with Kim Harris via telephone. This telephone conference was a continuation of previous meet and confers in which Ms. Harris and I had engaged regarding AstraZeneca's Responses to the Omnibus Requests.

3. During this May 14 conference, Ms. Harris advised me that AZ has an index for documents in storage (of which she approximated at least 6,000 boxes could be composed of documents responsive to the Omnibus Requests). Ms. Harris further advised me that the documents AZ maintains in storage are not just for the period prior to 1997, but could include documents that AZ sent off site as recently as a week ago. Ms. Harris further advised me that these indices were created by

persons at the company as a way of tracking and archiving information and were not produced by lawyers as part of this litigation.

4. During this May 14 discovery conference and in discovery conferences held by telephone on May 25, 2004 and May 26, 2004, and in letters I sent to Ms. Harris on May 24, 2004 and May 26, 2004, I have repeatedly asked that AZ produce this index.

5. In fact, Ms. Harris has requested on numerous occasions that plaintiffs formulate a proposal to limit the burden on AZ of producing or searching all 6,000 boxes. Among other things, I specifically suggested to Ms. Harris that AZ produce the index of boxes, at which time plaintiffs' counsel would review it and return it to Ms. Harris within 48 hours to identify the boxes plaintiffs believe would contain responsive information.  As I explained to Ms. Harris, to ask plaintiffs to propose a limitation on searching those 6,000 boxes in a vacuum when she and AZ have the index in their possession does not move the discovery disputes towards resolution in any meaningful manner.

6. Ms. Harris did suggest that I provide AZ with search terms to search the index. However, I told Ms. Harris that plaintiffs have no information about the words used by AZ personnel to catalogue boxes, so I would not be able to formulate search terms in a vacuum.   Moreover, indices are generally not written in a "conversational" tone and thus are not conducive to search terms, such as e-mail would be.

7. During the oral discovery conferences and in at least one letter to me, Ms. Harris threatened several times to do a document dump of all 6,000 boxes on plaintiffs

if we did not agree to the scope limitations proposed by AZ without a copy of the index.  I have repeatedly advised Ms. Harris that these types of threats are not conducive to compromise, nor do they recognize the reality of the situation -- which is that an index exists that would aid both parties in greatly narrowing the scope of production and thus the burden on AZ.

8. I advised Ms. Harris orally on May 26, 2004 and in my letter to her dated May 26, 2004 that if AZ did not produce the index by Friday, May 28, 2004 that we would consider this issue a disputed one to be decided by the Court.

9. As of June 1, 2004, AstraZeneca had not yet produced a single document in response to the Omnibus Requests as required by CMO No. 10.

10. Between June 1, 2004 and August 1, 2004, other than transactional data, AZ produced just four computer disks of documents:  one on June 14 of inadvertently omitted images from previous production; two on June 24; and one on July 15. AZ also made 78 boxes of documents available for inspection at a warehouse in Wilmington, Delaware.

11. Of those 78 boxes, 27 boxes – or 35 percent of the production –contained direct to consumer advertising materials or physician promotional materials for pharmacy-dispensed drugs.  We were surprised by the production of these documents because in the numerous oral meet and confers and discovery dispute letters between Ms. Harris and me, Ms. Harris proposed and I agreed that AZ would not produce documents in these categories because it would be a waste of both parties' time.

12. Of the remaining 51 boxes, 11 boxes – or 22 percent of the purportedly responsive information – were comprised in large part of scientific journals and studies regarding strokes and asthma, non-pricing market research for pharmacy-dispensed drugs, and additional direct to consumer advertising materials or physician promotional materials for pharmacy-dispensed drugs. Again, these types of documents were never part of the scope of documents that plaintiffs and AZ agreed would be produced.

13. On August 2, 2004, AstraZeneca produced more than 59,000 pages. AstraZeneca did not produce an index with these documents.

FURTHER AFFIANT SAYETH NOT.

Dated: August 2, 2004

Elizabeth A. Regan

# Exhibit 9



**T H E  |  W E X L E R  |  F I R M**<sup>LLP</sup>

June 1, 2004

<u>VIA FACSIMILE and VERILAW</u>

Mr. Scott Wise
Ms. Kimberley Harris
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

      RE:    In re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL
                No. 1456

Dear Scott and Kim:

I am writing regarding AstraZeneca's ("AZ") production of documents since my letter
dated June 1, 2004 at which time AZ had yet to produce any documents in compliance
with CMO No. 10 or responsive to plaintiffs' requests for production.

Since June 1, 2004, AZ has produced virtually no documents responsive to plaintiffs'
requests for production or relevant to the parties' claims and defenses. In fact, other than
transactional data, AZ has produced just four disks (one on June 14 of inadvertently
omitted images from previous production; two on June 24; and one on July 15) and made
78 boxes of documents available for inspection.

Of those 78 boxes, 27 boxes – or 35 percent of the production – were completely
worthless. Those 27 boxes contained direct to consumer advertising materials or
physician promotional materials for pharmacy-dispensed drugs. In our numerous oral
meet and confers and discovery dispute letters, Kim proposed and agreed that AZ would
not produce documents in these categories because it would be a waste of both parties'
time. Indeed, it was.

Moreover, of the remaining 51 boxes, 11 boxes – or 22 percent of the purportedly
responsive information – were comprised in large part of scientific journals and studies
regarding strokes and asthma, non-pricing market research for pharmacy-dispensed
drugs, and additional direct to consumer advertising materials or physician promotional
materials for pharmacy-dispensed drugs. Again, these types of documents were never
part of the scope of documents that plaintiffs and AZ agreed would be produced.

Contact Information:    Elizabeth A. Fegan         One North LaSalle Street    312 346 2222
                             312 261 6191 Direct Dial    Suite 2000               312 346 0022 fax
                             eafegan@wexlerfirm.com    Chicago, Illinois 60602    www.wexlerfirm.com



**T H E** | **W E X L E R** | **F I R M** LLP

Mr. Scott Wise
Ms. Kimberley Harris
July 23, 2004
Page 2 of 2

AZ promised that production would be completed by July 31, 2004. Based on the lack of production to date, AZ apparently intends to dump documents on plaintiffs at the last minute. This would be a direct violation of CMO No. 10 and AZ's agreements with plaintiffs. Moreover, as I have told Kim numerous times, this is not practicable or acceptable given the fact that, per CMO No. 10, plaintiffs' motion for class certification is due on September 3, 2004.

This issue must be resolved immediately. Ken and I are available any time next week to have a meet and confer on the discovery issues that are outstanding, as well as the volume and timing of AZ's remaining production. Please let us know your availability.

Sincerely,

Elizabeth A. Fegan

EFH:lyr

cc.   All Counsel of Record (via Verilaw)

# Exhibit 10

# DAVIS POLK & WARDWELL

<table>
<tr><td>1300 I STREET, N.W.<br>WASHINGTON, D.C. 20005</td><td rowspan="5">450 LEXINGTON AVENUE<br>NEW YORK, N.Y. 10017<br>212 450 4000<br>FAX 212 450 3800<br><br>WRITER'S DIRECT<br><br>212 450 4285</td><td>MESSETURM<br>60308 FRANKFURT AM MAIN</td></tr>
<tr><td>1600 EL CAMINO REAL<br>MENLO PARK, CA 94025</td><td>MARQUÉS DE LA ENSENADA, 2<br>28004 MADRID</td></tr>
<tr><td>99 GRESHAM STREET<br>LONDON EC2V 7NG</td><td>1-6-1 ROPPONGI<br>MINATO-KU, TOKYO 106-6033</td></tr>
<tr><td>15, AVENUE MATIGNON<br>75008 PARIS</td><td>3A CHATER ROAD<br>HONG KONG</td></tr>
</table>

July 30, 2004

Re:     **In re Pharmaceutical Industry Average Wholesale Price Litigation
        MDL No. 1456**

Elizabeth A. Fegan, Esq.
The Wexler Firm
One North La Salle
Suite 2000
Chicago, IL 60602

Dear Ms. Fegan:

On behalf of our client, AstraZeneca Pharmaceuticals LP, enclosed please find eight CD-ROMs containing .tif images of documents bearing the bates numbers AZ0492928 to AZ0547537, in partial response to Plaintiffs' Omnibus Requests for Production and Interrogatories.   Also included is a CD bearing DII format load files.  These documents are being produced in accordance with the terms of the Protective Order entered by the Court in December 2002.

This production represents AstraZeneca's fourth production in a series of rolling productions in response to the Omnibus Requests.  As required by CMO 10, we anticipate providing a privilege log within 14 days.

Sincerely,

*Monica Lamb*

Monica Lamb

Enclosure