UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------- x
IN RE PHARMACEUTICAL INDUSTRY  : MDL 1456
AVERAGE WHOLESALE PRICE        :
LITIGATION,                    :
                               :
                               : Master File No. 01-CV-12257-PBS
THIS DOCUMENT RELATES TO:      :
ALL ACTIONS                    : Judge Patti B. Saris
                               :
                               : **[REDACTED VERSION]**
---------------------------------- x

## MEMORANDUM OF FIRST DATABANK, INC. IN OPPOSITION TO MOTION TO COMPEL DISCOVERY AND IN SUPPORT OF COUNTER-MOTION TO LIMIT *ALL* SUBPOENAS SEEKING ADDITIONAL TESTIMONY FROM THIS NON-PARTY

**Preliminary Statement**

Non-party First DataBank, Inc. strenuously opposes the motion to compel it to provide still *further* discovery. Through significant, time consuming and burdensome efforts, FDB already has produced in this litigation more than 28,000 hard-copy pages of documents, and thousands more on electronic media. It has also provided hundreds of pages of sworn testimony containing the very information the parties claim to need – a fact acknowledged in the motion to compel, which asserts only a need to "clarify" and "elaborate" on the detailed information already provided. No proper basis exists to impose additional demands on a small publisher that is being overwhelmed with requests for information by litigants in this case and in others around the country.

First DataBank, Inc., a specialty publisher of medical information, and Patricia Kay Morgan, a member of its editorial staff (collectively "FDB"), have been served in this action alone with seven cumulative and duplicative subpoenas and one procedurally improper "notice"

of FDB's deposition.[1] They have received scores of similar non-party discovery demands in other proceedings, reflecting an explosion of litigation over drug pricing practices, a specific area covered by FDB's publications. The demands for access to information collected by FDB over the years for use in this litigation is literally overwhelming. In just the past few years, FDB has produced thousands upon thousands of documents to litigants, and its employees have provided 15 separate depositions and sworn statements concerning the drug price information that FDB publishes. Responding to these demands inflicts unreasonable and unacceptable burdens on FDB, which has only two professionals trained to collect and update the drug pricing information that has become the center of so much attention. FDB can scarcely survive the continuing demands on its time and resources that are required to address non-party discovery demands.

Typical of these demands, the multiple subpoenas served by various parties in this action each broadly seek documents and testimony relating to a variety of drugs, drug manufacturers and drug wholesalers. FDB has not moved to quash these subpoenas, and does not do so now. In the spirit of cooperation, FDB has offered to every requestor – including the moving parties here – a "package" of information intended to address their legitimate litigation needs without overwhelming the company. This package consists in each case of: (1) all documents in FDB's possession concerning the pricing of a particular drug and/or manufacturer; (2) sworn testimony previously provided by FDB that explains precisely how FDB gathers data and develops the drug pricing information it publishes; and (3) an affidavit to authenticate the documents and testimony for use in court.

Plaintiffs have appeared on this motion to suggest that this information has not all been produced, but as set forth in the Hawley Declaration (¶¶ 25-30), FDB has provided four "waves"

---

[1] The specific discovery demands that are the subject of this motion are annexed as Exhibits A-E to the Declaration of Robert J. Hawley ("Hawley Dec.") submitted herewith.

2

of documents and testimony, and will produce as part of the package offered all of the drug pricing information that has been requested for the relevant drugs at issue in these cases. The approach proposed by FDB reasonably provides the information needed by litigants while limiting the enormous burden on FDB. It has been accepted elsewhere, and a protective order should be entered to similarly limit disclosure here to the package offered by FDB.

As will appear, the motion by Novartis and Bristol-Myers Squibb seeking to compel "clarification" information from FDB should be denied, and all other subpoenas issued to FDB should be limited to the evidence already offered by FDB, for a number of reasons:

- First, the demands for additional testimony seek cumulative discovery. The method by which FDB arrives at the Blue Book average wholesale price ("AWP") it publishes for various drugs is explained in detail in both the documents and testimony already provided.

- Second, the additional demands are unduly burdensome. The moving defendants want "only" a day of further testimony, but as plaintiffs' submission makes plain, the other parties here are seeking much more from FDB. Litigants around the country advance the very same requests, each seeking additional testimony for the different drugs or companies at issue in a given case. The cumulative effect threatens to impose a crushing burden on a small, specialty publisher, and is entirely unnecessary to satisfy the true needs of the litigants.

- Third, the additional unpublished information sought is subject to FDB's constitutional privilege as a publisher – a privilege designed to protect against the very types of litigation demands being imposed here. The privilege places a heavier burden on parties seeking to compel discovery from FDB than imposed by Fed. R. Civ. P. 26, and it is a burden the parties in this action cannot meet.

As set forth below, the motion to compel additional testimony should be denied and FDB's counter-motion for a protective order should be granted, limiting discovery from FDB to the extensive package of evidence it has offered to provide. At a minimum, any additional discovery beyond that package should be limited to those facts specifically demonstrated by a party to be essential to its case, not already disclosed, and not available from a source other than FDB.

3

## STATEMENT OF FACTS

The relevant facts are fully set forth in the Declarations of James Breen ("Breen Dec.") and Robert J. Hawley ("Hawley Dec."), and are summarized here in brief.

### A.   The Non-Party From Whom Discovery Is Demanded

Founded in 1980 and based in California, FDB is a leading publisher of medical and drug information that has amassed a wealth of information that has become of great interest to a variety of litigants. FDB has invested tens of thousands of hours in collecting historic data and developing proprietary information that it maintains in several large databases. (Breen Dec. ¶ 5.) One of FDB's state-of-the-art databases is its *National Drug Data File Plus*™ ("*NDDF Plus*") that contains pricing and clinical information gathered by FDB on approximately 280,000 pharmaceutical products arranged by their national drug codes. (Breen Dec. ¶¶ 5-6, 11.)

Drawing on its collected information, FDB publishes a number of industry newsletters and monographs, in print and electronic format.[2] (Breen Dec. ¶ 4.) FDB also produces customized data files and "drug data modules" that it licenses to physicians, pharmacists, hospitals, insurers, and government reimbursement agencies. (Breen Dec. ¶ 6.) FDB knows the pharmaceutical industry well, and is relied upon by professionals in that industry to report reliable information.

To be useful to its audience, FDB's data must be accurate and up-to-date. Ms. Morgan, whose testimony is specifically sought, is FDB's Manager of Product Knowledge Base Services,

---

[2] These publications include the *AHFS Drug® Information Monographs*, providing detained information about more than 1,100 pharmaceutical products to pharmacists, doctors and other medical professionals; *Evaluations of Drug Interactions*™, detailing interactions of both prescription and over-the-counter medications; *First Tox*™, providing clinicians with information necessary to treat drug overdoses and poisoning; and *Price Probe*™, comparing current drug prices, providing drug price history, and analyzing drug price trends. (Breen Dec. ¶ 4.) FDB also publishes various software programs designed to interact with its databases for use in particular clinical settings or to allow other software and system designers to incorporate FDB's databases into their programs.

4

and she is one of just two individuals at FDB trained to deal with manufacturers in collecting drug pricing information. Her active involvement is critical to FDB's ongoing business. (Breen Dec. ¶¶ 19-25.) In recent months, Ms. Morgan has been pulled away from her duties repeatedly to testify about the simple method FDB uses to collect data and generate AWP, and her testimony has been sought in many additional proceedings. (Hawley Dec. ¶¶ 16-20.)

## B.  A Flood of Litigation and the Ensuing Discovery Demands On FDB

The past demands on Ms. Morgan, like the subpoenas at issue, reflect an unprecedented number of lawsuits and investigations involving the pharmaceutical industry. Over the past few years, the Department of Justice has investigated any number of drug manufacturers for allegedly conspiring to inflate or fix prices of various drug products, and several states have filed lawsuits against pharmaceutical companies making similar allegations. For example, in September 2000, the Texas Attorney General sued three drug companies for allegedly defrauding the Texas Medicaid program of more than $20 million over a five-year period.[3] The Minnesota Attorney General filed a similar lawsuit against a different drug company in June 2002.[4] Ohio and Pennsylvania recently filed suit accusing several drug companies of price inflation.[5] These and other governmental probes have spawned scores of private lawsuits against pharmaceutical companies seeking to recover profits from allegedly inflated drug prices, including this and other

---

[3] See Bill Lodge, *Cornyn Accuses 3 Companies of Medicaid Fraud; Firms Deny Lawsuit's Allegations*, THE DALLAS MORNING NEWS, Sept. 8, 2000, at 31A.

[4] See Deborah Caulfield Rybak, *The Whistle-Blowing 'Boys" Behind Drug-Price Suits; Ven-A-Care's Groundwork Paved Way for Recent Suits*, MINNEAPOLIS STAR TRIBUNE, June 24, 2002, at 1D.

[5] See Kristen Hallam & Phil Milford, *State Sues Pfizer, Bayer, 11 Others Over Prices*, PITTSBURGH POST-GAZETTE, Mar. 11, 2004, at E-1. *See also* Andy Miller, *Ga. Questions Drug Makers' Price Policies; Group of States Trying to Trim Costs for Medicaid Programs*, THE ATLANTA JOURNAL-CONSTITUTION, Apr. 4, 2001, at 1E (reporting that Georgia, Florida and "several other states . . . are investigating pricing practices of pharmaceutical manufacturers"); Susan Warner, *Agencies Probe Drug Pricing; Makers Are Accused of Fraud*, THE PHILADELPHIA INQUIRER, July 15, 2001, at C01 (at least one drug company reported having received subpoenas from states of Texas, California and Nevada in connection with drug pricing).

5

federal lawsuits being handled as multidistrict litigations, and a number of state court cases involving a variety of drugs. Litigation pending in New Jersey and North Carolina over the drug Lupron is just one example.[6] (Annexed to this brief as an appendix is a list of some of the cases FDB believes to be pending.)

None of these lawsuits are aimed at FDB, but this wave of litigation has inundated FDB with non-party litigation discovery demands. (Hawley Dec. ¶¶ 16-20.) In the past five years, FDB has been subpoenaed as a non-party to produce documents, to provide testimony, or both, in at least 10 separate lawsuits or investigations involving drug pricing, and additional demands are on the way. (Hawley Dec. ¶ 16.) In several of these cases, as here, FDB has received multiple demands from differing parties. FDB has received Civil Investigative Demands from state attorneys general, and dozens of informal inquiries from both state and federal agencies and private litigants, all looking for information about AWP. (Hawley Dec. ¶¶ 16-18.)

In response, FDB – as a non-party – has produced over 70,000 hard-copy pages of documents, and turned over dozens of electronic disks and CD-ROMs, each containing thousands of additional pages of information. (Hawley Dec. ¶ 19.) Ms. Morgan and other employees of FDB have provided detailed, repetitive testimony on 15 different occasions. (Hawley Dec. ¶ 19.)

While each case has a different focus, the discovery sought from FDB generally addresses the same thing: FDB's historic information on drug pricing and AWP. The method used by FDB to populate the AWP field in its databases is not complicated and not secret. It is described on FDB's internet website, at http://www.firstdatabank.com/customer_support/faqs/, and explained in a variety of FDB's publications. (Hawley Dec. ¶ 24.) The method has also

---

[6] *See, e.g., Stetser v. TAP Pharmaceutical Products, Inc.*, 01 CVS 5268 (New Hanover Co., N.C.); *Walker v. TAP Pharmaceutical Products, Inc.*, CPM-682-01 (Cape May Co., N.J.).

6

been described repeatedly in the sworn testimony taken from Ms. Morgan. For example, the Texas Attorney General deposed FDB's Ms. Morgan for 10 hours, just on the issue of how FDB develops Blue Book AWP, the specific information that FDB gathers, the sources of information and the methodology used to determine AWP. The prior testimony has been provided to the parties here and it fully explains FDB's published AWP data. (Hawley Dec. ¶ 14.)

### C. The Multiple Subpoenas in Just this Action

While Novartis and Bristol-Myers Squibb seek information about the products of "just" the Together Rx defendants, theirs is not the only subpoena issued by the parties to this multi-district litigation. In October 2003, plaintiffs, through their liaison counsel, served FDB with a broad subpoena, seeking 30 categories of documents and spanning more than a dozen years. (Hawley Dec. ¶ 3, Ex. A.) Among other things, plaintiffs demanded all documents relating to AWP and other measures of prices for pharmaceutical products; all of FDB's communications with any of the defendants, with pharmaceutical trade associations and wholesalers, and with pharmacy benefits managers from whom pricing information is obtained; and, all of FDB's discovery responses in any other litigation or investigation concerning AWP. Beyond seeking documents, plaintiffs served a notice purporting to schedule the deposition of an appropriate FDB witness to explain AWP.[7]

While proceeding to respond to these initial demands, FDB received *six* additional, duplicative subpoenas from other parties in this case, also demanding voluminous document disclosure and seeking deposition testimony.[8] (Hawley Dec., Exs. C-E.) These demands,

---

[7] (Hawley Dec. Ex. B.) This notice was not accompanied by a third-party subpoena and is defective under Rule 45.

[8] Some of the subpoenas named Ms. Morgan while others sought testimony from a Rule 30(b)(6) witness. (Hawley Dec., Exs. A-E.) As Ms. Morgan is the most likely person to give such a deposition, the subpoenas all are tantamount to demands for her testimony.

essentially, seek all drug pricing information concerning the defendant manufacturers collected and developed by FDB over the past 13 years.

Exercising its rights under Rule 45, FDB served written objections to each of the subpoenas when they were served. (Hawley Dec., Ex. F.) FDB continued to respond to the initial subpoena, while participating in more than 20 meet and confer sessions with the various parties who had issued subpoenas in an effort to reasonably address their legitimate need for information. (Hawley Dec. ¶ 23.) Contrary to plaintiffs' suggestion, FDB is providing *all* drug pricing information in its possession for each of the drugs at issue in these actions, including historic pricing information back to 1990/91. (Hawley Dec. ¶ 28.) This includes a massive database and all relevant pricing information from all of FDB's monthly publications. (Hawley Dec. ¶¶ 26, 28.) FDB is providing all relevant documents reasonably identifiable, and has gone to extraordinary lengths to respond to the massive demands in this case. FDB even made a complete duplicate set of the documents it had already produced to counsel for one set of plaintiffs, when liaison counsel for some reason would not provide a copy of the documents on its own. (Hawley Dec. ¶ 10.)

### D.  The Package Offered by FDB

Understanding that it has information that may be useful to the parties in many lawsuits, in response to the continuing requests it received, FDB developed a package of relevant information to provide to litigants. This package consists of:

> (1) **All relevant documents about particular drugs or drug manufacturers and all documents concerning FDB's methodologies for calculating average wholesale price.** FDB has produced more than 28,000 pages of documents in this litigation, and continues to be willing to respond to non-duplicative requests for needed documents.

8

    **(2)    Sworn testimony explaining FDB's methods for developing drug pricing information.** This testimony consists of sworn statements previously given by Ms. Morgan, and other FDB employees, including a 10-hour deposition of Ms. Morgan taken by the Texas Attorney General addressing in detail FDB's methods in publishing AWP.

    **(3)    An affidavit authenticating FDB's documents and testimony for use in court.**

This package provides detailed information – in documents and testimony – concerning FDB's practices in developing AWP, and provides the specific historic evidence required so the parties in any lawsuit can understand and analyze the relevant AWPs for products at issue. FDB offered this same detailed package of information to the parties here. (Hawley Dec. ¶¶ 12-15.) Despite the broad disclosures offered by FDB, counsel for the parties have insisted on proceeding with additional, multiple days of depositions of Ms. Morgan to rehash, once again, the explanations already provided in previous testimony on the same subject.

**E.    The Impact on FDB of the Continuous Stream of Subpoenas**

Responding to the myriad demands for information from around the country has required FDB to divert the attention of critical employees, to the substantial detriment of its business. Each time FDB receives a subpoena it must enlist the participation of key employees from several departments to search for documents and prepare for testimony. Identifying, assembling and coordinating document collection and review, and preparing for deposition testimony, entails numerous meetings, conference calls and follow-up conversations – all which distract employees and their managers from everyday work responsibilities. (Breen Dec. ¶¶ 20-29.) FDB is a small company with few staff members, and responding to litigation requests has become a significant interference with its business operations. (Breen Dec. ¶¶ 7, 19-31.)

9

FDB also has been forced to hire temporary staff and to incur substantial legal fees in responding to discovery demands. (Breen Dec. ¶ 27.) Just to respond to the initial subpoena in this case, FDB spent over $50,000 in unbudgeted administrative costs on temporary staff and costs related to document collection and reproduction. (Breen Dec. ¶ 28.)

The discovery demands on FDB have become oppressive, and the insistence on yet further discovery in *this* case is unreasonable. As discussed below, the Court should limit all outstanding discovery demands on FDB to the information contained in the broad package of information FDB has offered to provide.

## ARGUMENT

### I.

### FDB IS ENTITLED TO RELIEF FROM THE EXCESSIVE DEMANDS BEING MADE ON IT BY THE PARTIES TO THESE CONSOLIDATED ACTIONS

The moving defendants suggest that FDB is seeking to avoid legitimate discovery demands, and that Judge Saris has already sanctioned the specific discovery they seek. Neither is true. FDB has not disputed legitimate discovery needs, but to the contrary has produced voluminous discovery – including sworn testimony from Ms. Morgan – and seeks only to limit the undue burden of the parties' unreasonable demands for further testimony. And, Judge Saris has never considered the need for the *additional* discovery sought here, which is far beyond what is necessary to answer the very questions about AWP raised with Judge Saris.

Novartis and Bristol-Myers Squibb acknowledge that the testimony already provided explains FDB's process for developing AWP (Moving Mem. at 5), but insist on the right to "clarify and elaborate upon certain aspects of the testimony." (*Id.*) Every litigant in every case around the country makes the same claim. No such right to "elaboration" exists, particularly where, as here, it would impose such a heavy burden on FDB, and any further "clarification"

really needed can be obtained from other sources – the manufacturers and wholesalers who provide the pricing information to FDB.

Nor has Judge Saris already sanctioned further discovery from FDB. The moving defendants quote Judge Saris at a March 8 status conference – where FDB was not present – suggesting that a deposition of FDB "would be a starting point" to determine how FDB calculates AWP. This statement, however, was made without knowledge of the controlling facts: Judge Saris was not advised that FDB is providing, in both documents and sworn testimony, a precise explanation of *how FDB calculates AWP*.[9] Judge Saris was not advised of the extraordinary burden the *additional* demands place on FDB and the tidal-wave of other discovery requests it faces. And, Judge Saris was not advised that the demands for discovery from FDB, as a publishing company, raise additional constitutional concerns.

Given the substantial discovery provided, the undue burden imposed by additional disclosures, and the presence of constitutional concerns, the subpoenas to FDB should plainly be limited to the documents and testimony FDB has offered to provide. This is especially true because limitations on the scope of discovery are to be enforced with particular care for non-parties, in order to protect them "from unnecessary harassment, inconvenience, expense or disclosure of confidential information." *In re Candor Diamond Corp.*, 26 B.R. 847, 849 (S.D.N.Y. 1983) (citing *Dart Industries Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980)). "Nonparty witnesses are powerless to control the scope of litigation and discovery," and

---

[9] At the status conference, defendants claimed that FDB unilaterally increased reported AWPs at a time when Redbook, another drug pricing publisher, reported no change in AWPs. As defendants must know from the extensive material FDB has produced, Redbook utilizes a different method of determining AWP than does FDB, so it is not surprising that each publication may have reported a different AWP for the same drug. The AWP as published by the Redbook "is in most cases the *manufacturers'* suggested AWP" or the AWP as "calculated based on a markup specified by the *manufacturer*." *See* www.micromedex.com/products/redbook/awp/AWP_Policy.pdf (emphasis added). In stark contrast, FDB calculates AWP based on information collected from the both the manufacturer (the wholesale acquisition cost) and, importantly, *the wholesaler* (the markup).

11

therefore they "should not be forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party." *Compaq Computer Corp. v. Packard Bell Elec., Inc.*, 163 F.R.D. 329, 339 (N.D. Cal. 1995) (quoting *United States v. Columbia Broad. Sys., Inc.*, 666 F.2d 364, 371 (9th Cir. 1982)); *see also Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001) (court must protect non-party witness from substantial costs of compliance).

### A. The Subpoenas Seek Unnecessarily Cumulative Evidence

Federal Rule of Civil Procedure 26(b)(2) provides that a court may bar discovery that is "unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive," as well as precluding discovery when the "burden . . . outweighs its likely benefit." Rule 26(b)(2)(i) makes plain that "unreasonably cumulative" discovery is not to be tolerated. In this case, FDB employees have previously been deposed at length about the methods used generally to collect drug pricing information and to calculate Blue Book AWP. Their sworn testimony has been provided to the parties here.[10] There is no proper reason to require FDB, as a non-party, to repeat this same explanation again and again through new depositions in lawsuit after lawsuit, just because the same information is relevant to the case. Production of the prior testimony should satisfy the demand for testimony here. *See Foltz v. State Farm Mut. Auto Ins. Co.*, 331 F.3d 1122, 1131 (9th Cir. 2003) ("[a]llowing the fruits of one litigation to facilitate preparation in other cases advances the interests of judicial economy by avoiding the wasteful duplication of discovery"); *Wilk v. American Medical Ass'n*, 635 F.2d 1295, 1299 (7th Cir. 1980) (in large litigation courts should avoid "the wastefulness of requiring [a party] to duplicate discovery already made").

---

[10] Plaintiffs object that the exhibits have not been produced with these transcripts, but FDB is working to obtain and provide a full set of exhibits as a part of the package offered to litigants. (Hawley Dec. ¶ 26.)

12

FDB has provided the parties in this case detailed evidence about the calculation of AWP, in the form of sworn testimony and FDB publications. The moving defendants admit that Ms. Morgan's testimony from the deposition taken by the Texas Attorney General covers this issue in detail. (Moving Mem. at 4-5, citing Ms. Morgan's testimony.) That testimony explains that FDB calculates Blue Book AWP, by

**REDACTED**

The sworn testimony establishes that FDB's BlueBook AWP is nothing more than the product of (a) the net wholesale price reported by *the manufacturer* and (b) the markup for a given drug or manufacturer reported by *the wholesalers*. All of the information used to generate Blue Book AWP is provided to FDB by either the manufacturers or the wholesalers. (Breen Dec. ¶ 9-18.)

Ms. Morgan has already been cross-examined about the specific role of manufacturers in setting AWP as reported by FDB. She testified that a manufacturer may *suggest* an AWP, but its suggestion is meaningless to FDB unless the wholesalers independently report that they have adopted a manufacturer's suggested AWP, or in those instances where a drug is not sold through any wholesaler.

**REDACTED**

FDB's website also makes this clear, stating:

---

[11] A copy of the transcript of Ms. Morgan's deposition is attached to the Hawley Declaration as Exhibit H.

12

**REDACTED**

> FDB's Blue Book AWP is not intended to represent the wholesale price suggested by the manufacturer. Instead, FDB reports the manufacturers suggested wholesale prices in a separate data field known as "SWP." Thus, the Blue Book AWP field will be populated with a price determined by the wholesaler survey, even if it is different from the SWP.

www.firstdatabank.com/customer_support/faqs/.[13]

Ms. Morgan has also already testified that

**REDACTED**

All of the data on which AWP is based comes from manufacturers and wholesalers, and can be obtained from these companies without requiring any disclosure from FDB at all. *See, e.g., Allen v. Howmedica Leibinger*, 190 F.R.D. 518, 525 (W.D. Tenn. 1999) (denying motion to compel information from non-party where such information available from other sources).

With the testimony provided, and the data available from manufacturers and wholesalers, the parties can determine for themselves AWP as reported by FDB, as well as the source of any changes. The exhaustive testimony concerning AWP provided in other lawsuits precludes the efforts by the parties here to ask the questions all over again. FDB can contribute little, if anything, to resolving the issues under contention in this case, beyond explaining the basis of its published information, and that is fully disclosed in the package offered to the parties.

---

[13]

**REDACTED**

14

**B. The Subpoenas Are Unreasonably Burdensome**

Even if the additional testimony sought were not entirely cumulative, the sheer burden of the discovery directed at FDB provides an independent basis for limiting these subpoenas, particularly given the marginal value of additional testimony from FDB. *See* Fed. R. Civ. P. 26(c) (separately authorizing the court to stop discovery that will cause "undue burden or expense"); *see also* Federal Judicial Center, Manual for Complex Litigation (Fourth) § 11.447 (2004) ("A party seeking such production [from a non-party] has a duty to take reasonable steps to avoid imposing undue burden or expense on the person subpoenaed.").

FDB faces seven separate subpoenas, with demands for four different depositions of Ms. Morgan in this case alone. (Hawley Dec. ¶ 11.) FDB has also been inundated with subpoenas and civil investigatory demands in other cases going on around the country involving drug pricing. As described in the Hawley Declaration (¶ 16), these include:

- Medicaid fraud investigation conducted by the Inspector General of the Department of Health and Human Services

- Medicaid fraud investigation conducted by the United States Attorney's Office in the District of Massachusetts

- Serostim AWP investigation conducted by the United States Attorney's Office in the District of Massachusetts

- *State of Texas ex rel Ven-A-Care v. Dey, Inc., et al.*, Texas District Court, Case No. GV002327

- Medicaid fraud investigation conducted by the Texas Attorney General

- Investigation of Average Wholesale Pricing Practices by the Minnesota Attorney General

- *In Re Lupron Marketing & Sales Practices Litigation* (MDL No. 1430)

- *Stetser v. TAP Pharmaceutical Products Inc.*, North Carolina Superior Court, Case No. 01 CVS 5268

- *Walker v. TAP Pharmaceutical Products Inc.*, New Jersey Superior Court, Case No. CPM-682-01

- *Benoit v. Takeda Chemical Industries*, Texas Superior Court (Docket No. B-166742)

The Connecticut Attorney General's office has also notified FDB that subpoenas are imminently forthcoming in several matters in that State:

- *State of Connecticut v. Dey, Inc.*, Docket No. X07-CV03-0083296S

- *State of Connecticut v. GlaxoSmithKline, P.L.C.*, Docket No. X07-CV03-0083297S

- *State of Connecticut v. Pharmacia Corp.*, Docket No. X07-CV03-0083298S

- *State of Connecticut v. Aventis Pharmaceuticals, Inc.*, Docket No. X07-CV03-0083299S

(Hawley Dec. ¶ 17.) In addition, FDB has received dozens of informal inquiries from both state and federal agencies and private litigants seeking information on AWP. (Hawley Dec. ¶ 18.)

In response to the avalanche of non-party discovery demands, FDB has already searched for, reviewed, and produced more than 70,000 hard-copy pages of documents, and thousands more documents in electronic format, and it has provided live witnesses for at least 15 depositions or sworn interviews, all addressing AWP. (Hawley Dec. ¶ 19.) Responding to these demands has inflicted significant costs on FDB, both quantifiable and non-quantifiable. It has spent more than $50,000 just to respond to plaintiffs' initial subpoena in this case, and – most importantly – has suffered the repeated loss of Ms. Morgan's time and attention to her critical responsibilities. Ms. Morgan is one of only two FDB employees trained to deal with drug pricing information, and her efforts are needed to keep FDB's data collection and reporting operation functioning for FDB's subscribers. (Breen Dec. ¶ 7.)

16

The onslaught of subpoenas and other requests for information from FDB is not likely to stop. FDB is aware of at more than a dozen additional cases around the county involving drug pricing – some private, some brought by state attorneys general – in which the litigants are likely to want drug pricing information from FDB. (Hawley Dec. ¶ 20.)

In deciding whether to enforce a particular subpoena, the court must generally balance "the inquirer's right to know against the responder's right to be free from unwanted intrusions." *Mack v. Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 187 (1st Cir. 1989). When considering whether a subpoena imposes an undue burden on a non-party, courts consider a variety of factors, including: "the need of the party for the [information], whether the request is cumulative and duplicative, [and] the time and expense required to comply with the subpoena (relative to the responder's resources)." *Linder v. Calero-Portocarrero*, 183 F.R.D. 314, 319 (D.D.C. 1998). They also give "special weight" to the "concern for the unwanted burden thrust upon non-parties." *Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38 (1st Cir. 2003) (citing *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998)); *High Tech Med. Instrumentation v. New Image Indus.*, 161 F.R.D. 86, 88 (N.D.Cal. 1995) ("nonparties subject to discovery requests deserve extra protection from the courts").

Here, as explained above, the parties do not *need* additional information beyond what FDB has agreed to provide in the form of both documents and sworn testimony. The additional testimony demanded would largely be cumulative and duplicative of the information already in the parties' possession. (*See supra* at 12-14.) Moreover, "the time and expense required to respond to the subpoena[s]," relative to FDB's resources, is astounding. The very same demand for additional "clarifying" testimony urged here is demanded in every case where the parties are interested in AWP. Every litigant makes the same claim that their lawsuit concerns a different

17

drug or different manufacturer, even though FDB's practices for obtaining data and publishing AWPs do not vary by drug or manufacturer. (Breen Dec. ¶ 10.) The package provided by FDB sets forth all of the facts about the development of AWP, at length and in detail. Any further "clarification" needed can be obtained by going directly to the relevant manufacturers and wholesalers, who provide the information to FDB in the first place. FDB's use of that data is purely mechanical and fully disclosed.

In *Linder*, the court confirmed that other demands facing non-parties may be relevant in determining the scope of response required. In that case, the court refused to enforce a subpoena directed to the federal government for the production of documents because responding "would take an inordinate amount of time and resources" considering "the heavy workload which the [Department] is already facing in response to other cases, investigations, and Freedom of Information Act requests." *Id.* at 320. If a subpoena directed to the federal government – which has far greater resources than a small operation like FDB – must be weighed in light of other competing disclosure demands, then surely a subpoena to FDB should at least be limited to the extensive package of relevant information, where FDB is likewise facing numerous requests for information on all fronts. *See also, e.g., Premium Serv. Corp. v. Sperry & Hutchinson Co.*, 511 F.2d 225, 229 (9th Cir. 1975) (quashing subpoena to non-party where compliance would have involved substantial expenditure of time); *Buchanan v. American Motors Corp.*, 697 F.2d 151, 152 (6th Cir. 1983) (quashing subpoena to non-party witness where compliance would have required many days of testimony and review of thousands of documents).

In moving to compel, Novartis and Bristol-Meyers Squibb assert that mere "inconvenience" to Ms. Morgan and to FDB is insufficient to limit their subpoenas (Moving Mem. at 8-9), but as described in great detail in the declarations of Robert J. Hawley and James

18

Breen, the demands on FDB for evidence to use in litigation has greatly impeded its ability to function. *See U.S. v. Chevron U.S.A., Inc.*, 186 F.3d 644, 649 (5th Cir. 1999) (subpoena unreasonably burdensome if "compliance threatens to unduly disrupt or seriously hinder normal operations of a business"); *accord Linder*, 183 F.R.D. at 320. This is not a mere inconvenience.

None of the cases cited by defendants addresses a burden of the magnitude that FDB faces here. None involves a non-party repeatedly subpoenaed in scores of proceedings for the same information. The principal case relied upon by defendants, *Horizons Titanium Corp. v. Norton Co.*, 290 F.2d 421 (1st Cir. 1961), is particularly inapposite. That case involved a subpoena to a non-party seeking documents and testimony related to just one patent application, and the Court found concerns about the non-party's private business matters insufficient to quash the subpoena. *Id.* at 422. No similar issue is even raised here. FDB is *not* seeking to quash the subpoenas in their entirety, is *not* trying to protect private business practices, and *has* already disclosed the very information the parties claim to need. *See id.* at 425 (noting that subpoenaed party "must make substantial showing in support of a motion to quash *as contrasted to some more limited protection*") (emphasis added). *Horizons* also involved a limited document production and a witness who was subpoenaed to testify *once*. FDB faces a much more oppressive burden, and does not rely upon the sort of "generalizations" of burden presented to the court in *Horizons*.

FDB submits that the burden it faces as a non-party is virtually unprecedented, and plainly warrants an order limiting *all* subpoenas in this case to the package of testimony and documents FDB has offered to produce.

19

## C.     The Information Sought is Subject to a Constitutional Privilege

In deciding this motion, the Court is also obligated to weigh the "societal interests in full and complete litigation" against "other important values which may deserve confidentiality or protection even though not given formal privilege status." *Anker v. G.D. Searle & Co.*, 126 F.R.D. 515, 518 (M.D.N.C. 1989). The discovery sought from non-party witness FDB implicates important statutory and constitutional concerns for the protection of material collected by publishers, and for this reason, too, should be considered "'unreasonable and oppressive' within the meaning of Fed. R. Civ. P. 45(b)." *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 489, 496 (C.D. Cal. 1981) (citation omitted).[14]

The First Amendment affords publishers a qualified privilege against discovery. *In re Pan Am Corp.*, 161 B.R. 577, 580 (S.D.N.Y. 1993); *see also Branzburg v. Hayes*, 408 U.S. 665, 681, 707 (1972). Applying this privilege, the Ninth Circuit[15] has expressly held that publishers may resist the disclosure of information they obtain in connection with their publishing activities, because "[e]nsuring the free flow of information to the public is an interest of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." *Shoen v. Shoen ("Shoen I")*, 5 F.3d 1289, 1292 (9th Cir. 1993).

---

[14] Even those courts that have questioned whether the qualified First Amendment privilege applies in certain circumstances have found it appropriate to impose limits on discovery directed at publishers. *See, e.g., Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 595 (1st Cir. 1980) (finding that "courts faced with enforcing requests for the discovery of materials used in the preparation of journalistic reports should be aware...that the unlimited or unthinking allowance of such requests will impinge upon First Amendment rights"); *In re Daimler Chrysler Sec. Litig.*, 216 F.R.D. 395, 403 (E.D. Mich. 2003) (quashing subpoenas to reporters to strike a proper balance "between freedom of the press and the obligation of all citizens to provide relevant information in a lawsuit.").

[15] Because FDB is a California corporation, and its subpoenas were issued out of the Northern District of California, Ninth Circuit law applies to the disposition of this motion, and any appeal would go to the Ninth Circuit. 28 U.S.C. § 1407 (MDL judge "may exercise the powers of a district judge in any district for the purpose of conducting pre-trial . . . proceedings"); *In re Corrugated Container Antitrust Litig.*, 655 F.2d 748, 750, n.2 (7th Cir. 1981) (accepting appeal of discovery matter emanating from MDL in Texas); *Pogue v. Diabetes Treatment Ctrs. of America*, 238 F. Supp. 2d 270, 276 (D.D.C. 2002) ("appeal goes to the circuit of the district in which the deposition is being taken").