## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY<br>AVERAGE WHOLESALE PRICE LITIGATION ) | |
| ) | MDL No. 1456 |
| THIS DOCUMENT RELATES TO ) | Civil Action No. 01-CV-12257 PBS |
| 01-CV-12257-PBS AND 01-CV-339 ) | |
| ) | Judge Patti B. Saris |
| ) | Chief Magistrate Judge Marianne B. Bowler |

## DECLARATION OF LYNDON M. TRETTER, ESQ. IN SUPPORT OF DEFENDANT BMS' MOTIONS (A) TO COMPEL CERTAIN PLAINTIFFS' PRODUCTION OF DOCUMENTS AND (B) FOR A PROTECTIVE ORDER AGAINST A DEPOSITION NOTICE

I, LYNDON M. TRETTER, declare as follows:

1.     I am a partner with the law firm of Hogan & Hartson, L.L.P., attorneys

for defendants Bristol Myers Squibb Company, Onocology Therapeutics Network Corp. and

Apothecon, Inc. (collectively, "BMS"). I have been admitted to this Court *pro hac vice*. I am

familiar with the facts and circumstances of this action and the background of this motion.

2.     I make this Declaration pursuant to Rules 26, 34 and 37 of the Federal

Rules of Civil Procedure, in support of BMS' motions (A) to compel the production of

documents from two plaintiffs (1) New York StateWide Senior Action Council ("Statewide")

and (2) United Food and Commercial Unions and Employers Midwest Health Benefits Fund

("UFCW") and (B) for a protective order against a retaliatory deposition notice served against

BMS.

3.     As this Court is aware, this is a putative class action brought by several

multi-employer union benefit funds and public interest organizations against numerous

pharmaceutical manufacturers, including BMS, for alleged fraud in connection with the publication of Average Wholesale Prices ("AWPs") for prescription drugs.

4.   Defense counsel have divided the task of discovery of the named plaintiffs among themselves.  I, as one of BMS' counsel, have had primary responsibility for one fund, UFCW and one organization, Statewide.

<u>Statement of Facts (Statewide)</u>

5.   On March 18, 2004, I took the deposition of Mr. Michael Burgess, the Executive Director of Statewide.  During the deposition, I made a number of requests for documents responsive to defendants' outstanding document demands, as well as requests for documents that Mr. Burgess referred to during his testimony.  (<u>See</u> Burgess Dep. Tr., Ex 1 hereto, at 22, 46, 48 – 50, 73 – 74, 108 – 109, 187 – 188, 193, 227, 235 – 238, 260, 267).

6.   Statewide's counsel, Mr. Edward Notargiacomo, asked that BMS confirm its requests in writing.  (<u>See</u> Ex. 1, at 22 – 23, 46, 188, 227 – 228).  After the Burgess deposition transcript became available, I followed up with a letter to Mr. Notargiacomo dated April 16, 2004  (Ex. 2 hereto).

7.   A month passed and I received no response from Statewide or its counsel.  On May 17, 2004, Ms. Hoa Hoang, an associate from my law firm, left a voicemail message for Mr. Notargiacomo regarding the Statewide's supplemental production.  Neither Ms. Hoang nor I received a response.  Ms. Hoang followed-up by letter to Mr. Notargiacomo on May 21, 2004.  (Ex. 3 hereto).

8.   On June 16, 2004, I wrote another letter to Mr. Notargiacomo in an attempt to resolve the discovery issue without court intervention pursuant to Local Rule 37.1(a).  I advised Mr. Notargiacomo that if we did not receive the requested documents by

June 30, 2004, we would raise the discovery issue with the Magistrate Judge and/or seek to preclude Statewide from further participation in this action for dereliction of its discovery obligations. (See Ex. 4 hereto).

9.      Mr. Notargiacomo finally responded to the voicemails and letters by agreeing to produce the Statewide documents on July 16, 2004. However, we did not receive the requested documents (or any update on when they might be expected).

10.      On July 23, 2004, Ms. Hoang again asked Mr. Notargiacomo about the Statewide production when Mr. Notargiacomo was present at our law offices for a deposition of a third-party witness. Mr. Notargiacomo informed her that the Statewide production would be sent to our offices on July 30, 2004.

11.      On July 29, 2004 and again on August 2, 2004, Ms. Hoang called and left voicemails regarding the Statewide production. Mr. Notargiacomo did not return her calls. To date, we have not received the Statewide documents we requested.

<u>Statement of Facts (UFCW)</u>

12.      On October 2, 2003, defendants' served their first request for production of documents to all plaintiffs including UFCW. (Ex. 5 hereto).

13.      Over time, and on a "rolling" basis, UFCW produced some responsive documents, including contracts, correspondence and minutes of the meetings of its Board of Trustees'. UFCW also produced two data CDs that contained information relating to a portion of the prescription drug claims on which UFCW is suing in this case.

14.      On March 16, 2004 and April 30, 2004, I took the deposition of UFCW's Administrator, Mr. Daniel Ryan. Among other things, I questioned Mr. Ryan about UFCW's document production. I learned that (a) UFCW had produced Trustee meeting

minutes, "redacted" on privilege grounds, despite the fact that unrelated third-parties were present during the meetings; (b) UFCW had not searched any electronic files of its personnel likely to have responsive documents; (c) UFCW had been reimbursed or subrogated by third-parties (such as workers' compensation insurers) for certain drug expenditures on which it was suing defendants, but had not itemized which expenditures so as to avoid a double-recovery; and (d) UFCW possessed claims data regarding the fees it was charged for both physician-administered drugs and the services of the physicians in administering the drugs, but had not provided the data on the services.

*Improper Redactions*

15.     On April 5, 2004 counsel for UFCW produced the first of two privilege logs.  This first log indicated that the documents they were claiming attorney-client privilege were minutes from meetings of UFCW Board of Trustees.  (See "Privilege Log for Documents Produced by UFCW in AWP Litigation," attached hereto as Ex. 6).

16.     By letter dated May 13, 2004 (Ex. 7 hereto), I notified counsel for UFCW that the redactions of the minutes were improper and that full minutes should be produced.   In a response dated June 4, 2004 (Ex. 8 hereto), UFCW's counsel stated that they were "investigating" the continued viability of the privilege claims and would get back to me "by the end of next week."  To date, despite repeated reminders (see, e.g. Ex. 9 hereto), UFCW's counsel has neither substantiated its claim of privilege nor produced unredacted documents.

*Documents Stored Electronically*

17.     In my letter dated May 13, 2004, I reminded counsel for UFCW that plaintiffs were requiring defendants to engage in exhaustive searches of electronically-stored

documents and that both fairness and the Federal Rules of Civil Procedure required UFCW to do the same.  (See Ex. 7).  Counsel for UFCW assured me in a letter dated June 23, 2004 that they would conduct the search and produce responsive documents by July 2, 2004.  (See Ex. 10).

18.     On August 20, 2004, UFCW produced fewer than 150 pages of what appears to be electronically-stored materials.  The bulk of this small production consists of very recent communications between UFCW and representatives from National Medical Health Card Systems, Inc., UFCW's current pharmacy benefits manager.  On August 24, 2004, my associate Ms. Sandhya Kawatra contacted Anthony Sievert of The Wexler Firm to gain a better understanding of what UFCW's most recent production represented.  Mr. Sievert explained to Ms. Kawatra that the documents produced came from the electronic data of two UFCW workers.  Mr. Sievert claimed that these two individuals are the only employees that have email.  Moreover, Mr. Sievert informed Ms. Kawatra that he searched only those documents that remained on the hard drives of these individuals.  Mr. Sievert claimed that the small set of documents represented any and all responsive electronic documents UFCW had within its possession.

*Documents Relating To Third-Party Reimbursement*

19.     At his deposition, the Mr. Ryan testified that UFCW is sometimes reimbursed by third-parties, such as workers' compensation insurers or insurers for plan participants' spouses, for prescription drug expenditures UFCW has paid on participants' behalf.  In my letter dated May 13, 2004, I requested that UFCW identify those instances in which this happened so that UFCW was not permitted to sue defendants for expenditures as to which it had recovered from another source.  (See Ex. 7).  UFCW's counsel responded that it

was too difficult for UFCW to produce such information.  (See Ex. 10).  BMS maintains that either UFCW must produce this information so as to avoid double recoveries or must stipulate that it is unable to do so.  (See my letter to Kenneth Wexler dated July 19, 2004, attached hereto as Ex. 11).

*Full Claims Data for Physician-Administered Drugs*

20.     In my letter dated May 13, 2004, I also requested that UFCW produce all claims data related to the physician-administered drugs on which it was suing defendants, including the claims data reflecting the charges by medical providers for administering the drugs and the charges for the office visits.  (See Ex. 7).  On June 16, 2004, I sent a follow-up letter reiterating my request for the "entire set of claims data" relating to physician-administered drugs.  (See Ex. 9).

21.     On June 23, 2004, UFCW's counsel wrote they did not see why charges related to the office visit were relevant.  (See Ex. 10).  Further, by letter dated July 8, 2004 UFCW's counsel objected to producing full claims data on the grounds of "burden," "harass[ment]" and on the ground that it was "not reasonably calculated to lead to the discovery of admissible evidence."  (Ex. 12 hereto).

*Retaliatory Deposition Notice Directed To BMS*

22.     Under cover of the same July 8, 2004 letter, and obviously in response to requests for all incidental charges related to physician-administered drugs, counsel for UFCW served BMS with a retaliatory deposition notice demanding that BMS produce a witness with knowledge regarding doctors' charges for the administration of physician-administered drugs.  (See Ex. 12).

23.     By letter dated July 19, 2004, I informed UFCW's counsel that BMS did not have a witness knowledgeable about such matters, that the link made by payers or insurers between reimbursement for physician-administered drugs and services was a link that defense counsel had learned about in discovery and that BMS would seek a protective order against what was clearly a deposition notice interposed simply to harass it.  (See Ex. 11).

Meet and Confer Obligation

24.     As the Court will appreciate from both my letter of July 19, 2004 and the earlier correspondence and phone calls referenced in this Declaration, BMS has tried to resolve these discovery disputes in accordance with Local Rules 7.1(a)(2) and 37.1(a) without Court intervention.  Unfortunately, BMS has been forced to move to compel Statewide and UFCW to produce documents and to seek the protective order against the deposition notice directed at BMS.

I declare under the penalty of perjury that the foregoing is correct.  This declaration was executed by me on August 27, 2004 at New York, New York.

Lyndon M. Tretter

# EXHIBIT 1

Michael Burgess                                    March 18, 2004
                        Albany, NY

                                                              1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3                                          CERTIFIED

4   In Re: PHARMACEUTICAL          )          COPY

5   INDUSTRY AVERAGE WHOLESALE  ) MDL DOCKET NO.

    PRICE LITIGATION             ) CIVIL ACTION NO.

6                                )   01-CV-12257-PBS

    ---------------------------)

7   THIS DOCUMENT RELATES TO     )

    ALL ACTIONS                  )

8   ---------------------------)

9

10       30(b)(6) DEPOSITION OF MICHAEL BURGESS

11                 Albany, New York

12              Thursday, March 18, 2004

13                    10:00 a.m.

14

15       30(b)(6) deposition of MICHAEL BURGESS,

16   held at the offices of Wilson Elser

17   Moskowitz Edelman & Dicker, One Steuben

18   Place, Albany, New York, pursuant to Notice,

19   before Frank J. Bas, a Registered

20   Professional Reporter and Notary Public of

21   the State of New York.

22

22

1    talking about staff?

2         A.    That's right.

3         Q.    And how many people would that be today?

4         A.    Well, we have one person in New York

5    City, and we have a person in -- two people in

6    Albany.  In addition to myself, I'm sorry.

7         Q.    Was any search made for their documents?

8         A.    No.  No, not for their particular

9    documents, because as I said, I don't think that

10   they were the ones that would be inclusive of

11   anything the organization was doing.  They might

12   have been things that they were keeping, you know,

13   for their own use.

14   RQ   Q.    Yes, well, that could be important as

15   well.  So we would ask for a search to be made of

16   those other staff members on this issue of

17   prescription drugs and hopefully that won't be too

18   burdensome on that.

19        A.    There's probably not much.

20             MR. NOTARGIACOMO:  I would just ask if

21        there are such requests as we go along, that

22        you put those in a letter to me and then I

Michael Burgess

Albany, NY

March 18, 2004

23

1       will respond to it.

2                MR. TRETTER:   Okay.

3    BY MR. TRETTER:

4       Q.    Okay, so we were going back to your

5    subject matter files.  Were there any other areas

6    that you looked in besides that box for

7    prescription drugs?

8       A.    Well, as I said, the newsletters

9    certainly contained that information.  There was a,

10   what do you call it, a magazine style holder of

11   reports that had been put out on prescription drug

12   pricing.  And all of those reports, which were, you

13   know, stapled reports bound by different national

14   groups, they were all, I think, included in what

15   you got.

16      Q.    Yes.

17      A.    So that would be another file, as I'm

18   remembering now of where we looked.  Documents

19   related to, you know, lawsuits I think were in

20   there, included in some of the files that I

21   presented.

22                And then just as I said, any kind of

Michael Burgess

March 18, 2004

Albany, NY

46

1    State University of New York at Albany.  Historic

2    stuff.  You know, not more recent things.

3        Q.    Is there anyplace other than the 275

4    State Street location where Statewide keeps any of

5    its documents?  Or maybe New York City?

6        A.    Well, if she does -- she only works out

7    of her home.  So if she does, she has another

8    house.  And I have a few things in my house, but

9    they're mostly just memorabilia.

10       Q.    That was my question.  Did you search

11   for any of your files at home that would be

12   relevant to any of the documents?

13       A.    I didn't, but I think that they're

14   mostly duplicates of things that are in the office.

15   RQ  Q.    All right.  If you would just take a

16   quick look to see if there's anything that's not

17   duplicative at home.

18              MR. NOTARGIACOMO:  Again, if you would

19         put that request in a letter to me, I'll

20         follow up.

21       Q.    Is there any records of a retention

22   policy at Statewide?

Michael Burgess

March 18, 2004

Albany, NY

47

1    A.    No.   We're a small nonprofit.   We don't

2    have -- I shouldn't -- let me just go back.

3    Legally, you know, for financial documents --

4    obviously we keep, as the IRS requires, we have to

5    keep our financials for, I don't know, what is it,

6    seven years?   My office manager handles all of

7    that.

8        Q.    Was any memo sent around asking people

9    to preserve documents after the complaints were

10   filed in this case?

11       A.    No, but I'm notorious for never throwing

12   anything out, so I doubt that anything has been

13   taken.

14       Q.    You didn't throw anything out but you

15   don't know whether any -- all my question was, did

16   you send a memo --

17       A.    No.

18       Q.    -- asking any other staff members?

19       A.    No.

20       Q.    Are there regular minutes, or are there

21   any minutes of the board of directors meetings?

22       A.    Yes.

Michael Burgess                                    March 18, 2004

Albany, NY

48

1        Q.    Where are those kept?

2        A.    In the Albany office.

3        Q.    Were those searched at all for whether,

4   you know, discussions of prescription drug issues?

5        A.    I thought we gave you them.  You know, I

6   don't know what you have, but I know we discussed

7   giving you those.

8        Q.    We did not get any board of directors

9   minutes.  It could be argued that none were

10  responsive.  But I would think there would be one

11  authorizing this lawsuit, for instance.

12       A.    We'll check and see where everything is.

13            MR. TRETTER:  We would ask --

14            MR. NOTARGIACOMO:  I'll go back and

15       check.  It was my understanding that they

16       were produced to us.  It may be they weren't

17       produced to you because nothing was

18       responsive.  But I don't know that for

19       certain.

20  RQ       MR. TRETTER:  We would like to

21       double-check that.

22       Q.    Are any other minutes kept, like for

1    instance, annual member meetings or executive

2    committee meetings, or things like that?

3        A.    Any official meeting, there are minutes

4    kept.

5        Q.    That's kind of what I'm asking, is would

6    an annual meeting of the membership be an official

7    meeting, in your mind?

8        A.    Yes, because any meeting where they take

9    an action related to the organization, we have to

10   record that.

11   RQ        MR. TRETTER:  Would we would include

12       that sort of stuff in our request.

13       Q.    Are there any other committees of the

14   board, or of the total membership?  I know there

15   are regional --

16       A.    There are committees, yes, and they meet

17   with the board.

18       Q.    Okay.  What kind of committees are

19   there?

20       A.    Membership, financial, bylaws, and

21   legislative.  They don't meet regularly, but they

22   exist.

Michael Burgess                                    March 18, 2004
                          Albany, NY

50

1       Q.     Do any of those committees do any work

2    relating specifically to prescription drugs,

3    perhaps the legislative committee?

4       A.     We've tended to have those discussions

5    as a board, so, you know, they -- there probably

6    wouldn't be any record of any legislative action

7    other than to review bills.

8       Q.     Does Statewide have an annual report to

9    members?

10      A.     Yes.  It's not a slickly-produced

11   document.  At our convention every year they are

12   given a report within the booklet of the agenda,

13   and so forth.  Included in that is a report to the

14   members about the activities of the organization.

15   RQ          MR. TRETTER:  We would like to see

16          those, if there are any that are responsive.

17      A.     I believe those might have been given to

18   you, but...

19      Q.     You mentioned that Statewide has to make

20   some federal filings, like tax filings?

21      A.     That's right.

22      Q.     Any other kind of regular filings that

Michael Burgess                                                  March 18, 2004
                            Albany, NY

                                                                        73

1        A.    Yes.  In those years, all those years.

2        Q.    And then after 1999 it varied more?

3        A.    Right, yes.

4        Q.    Has Statewide ever held any conferences

5   that -- or sponsored any conferences on

6   prescription drug coverage or prescription drug

7   costs?

8        A.    Not -- I mean they've always been

9   subjects within our annual convention, and they've

10  been major items there, but they were not per se on

11  prescription drugs.

12            We did have a -- we did sponsor in

13  January 8 of this year a summit meeting on

14  prescription drugs following the enactment of the

15  Medicare bill.  So that was related to that.

16            Just going back to your previous

17  question, you said about just doing EPIC.  We've

18  also done Medicare, just for the record, all these

19  years, too.

20       Q.    I want to switch over to Medicare in a

21  second, but with respect to that conference that

22  you just mentioned --

Michael Burgess

March 18, 2004

Albany, NY

74

1     A.    Yes.

2     Q.    -- where was that held?

3     A.    That was held here in the capitol

4  district at the New York State United Teachers

5  auditorium.

6     Q.    Did you speak at it?

7     A.    Yes.

8     Q.    Was there some sort of agenda?

9     A.    We have a record of the agenda, yes.  I

10  don't think there's minutes from it.

11  RQ         MR. TRETTER:  Maybe we can get a copy of

12      that agenda.

13     Q.    You say you were active in campaigning

14  on Medicare issues, and I would like to follow up

15  on that a little bit.  What has been Statewide's

16  role on Medicare?

17     A.    Well, in the late '90s when I returned

18  to the job, the major focus, prior to '99, when it

19  turned into the prescription drugs, were two

20  things:  There were major attempts to cut Medicare

21  in the federal budget during the Balanced Budget

22  Act, and during the time that, I guess you would

Michael Burgess                                    March 18, 2004
                        Albany, NY

108

1    I was doing a survey at that time, just so we could

2    give information to people.  I didn't have any -- I

3    wasn't eligible, you know, so I would have to get

4    someone else to do it.

5          Q.    Is it fair to say Statewide hasn't done

6    any analysis of whether the Together RX card is a

7    useful discount for seniors or not?

8          A.    We have not, but we have read others'

9    analysis that questioned that.

10         Q.    Whose analyses are you talking about?

11         A.    I don't remember right now, but I know

12   that there was a report done by, you know, a

13   national organization, I would have to look back to

14   some of the filings we gave you, but there was one

15   report done, and I don't know if there has been

16   others, that basically said that the discounts were

17   negativible, you know.

18         Q.    We would ask for a copy of that report.

19         A.    You may have it.

20         Q.    Okay.  If you don't have it, if we could

21   just leave a place open in the deposition, if you

22   could give us your best recollection of who did it.

Michael Burgess                                    March 18, 2004
                        Albany, NY

                                                            109

1        A.     Okay.

2    TO BE FURNISHED: _____

3    _____

4        A.     I would just make one point here.

5        Q.     Sure.

6        A.     It may well have been the General

7    Accounting Office.  I would like -- I mean, if you

8    want me to look, but I mean you may be able to find

9    that.  I happen to -- that's what comes to my mind,

10   is it was a government report or a congressional.

11   Either the GAO or a House or Senate committee, or

12   somebody like that did a report.

13       Q.     We'll both look, how's that?

14       A.     Official -- you know, it wasn't a

15   private report.

16              (Exhibit NYSW 005, for identification,

17       Bates stamped NYSW 3751 through 3752, draft

18       letter.)

19       Q.     We've marked our next Exhibit,

20   Exhibit NYSW 005.  It looks like a draft letter.

21   Perhaps you could identify it for us.

22       A.     Yeah.  This is a letter -- it's generic.

187

1    Q.    Were others involved?  Was Statewide

2    involved?

3    A.    We supported the pharmacists.  We might

4    have written a letter, I don't know for sure.  I

5    think -- I know we met with them.  And I know that

6    they asked us for our support, and they've always

7    shared their document -- their position papers with

8    us.

9    Q.    You were supporting, in other words, a

10   higher reimbursement rate by the state for

11   pharmacists?

12   A.    Yeah.  That we were not supporting the

13   budget cut to lower it, because we were afraid, as

14   they said, that -- they made the point, for

15   example, that some independent pharmacies would no

16   longer provide home delivery, if they had, you

17   know -- this was their point, was we won't be able

18   to do all these extra things we do for the elderly,

19   including home delivery, if we don't have enough

20   money to hire a driver or whatever.

21   RQ          MR. TRETTER:  We would call for what

22         was -- if there's anything that relates to

Michael Burgess                                        March 18, 2004
                          Albany, NY

188

1          that negotiation that was either given to

2          Statewide by the pharmacist lobby or that

3          was given by Statewide to them.

4          A.     Pardon?

5                 MR. TRETTER:  I'm just talking to your

6          counsel.

7                 THE WITNESS:  Okay.

8                 MR. NOTARGIACOMO:  I would just ask

9          that it go into the same letter that we

10         referenced earlier.

11         A.     Yeah, we still have those letters from

12    them, so I can give you that.

13    BY MR. TRETTER:

14         Q.     Can we go back to the Families USA

15    document.  I forget what number exhibit that is.

16    19?  I direct your attention to page 9 of the

17    study, or the report, which is NYSW 1068.  And at

18    the top of the page, they're referring to some

19    price increases in drugs, and they write: "The

20    price increase data in this report is based on

21    price increases in average wholesale prices.  This

22    list price is set by manufacturers as the suggested

Michael Burgess                          March 18, 2004
                    Albany, NY

1    Force over the summer that I was on, that we talked

2    about before, with the 340B program.  So it

3    probably was part of -- it might have been

4    something I pulled out from one of the things they

5    had on all the documents that they used.

6         Q.    This wasn't created by Statewide?

7         A.    No.

8    RQ         MR. TRETTER:  We would just ask, we'll

9              put it in the letter, if you could look for

10             whether this was part of some wider document

11             that might give it some context.

12        A.    This looks to me -- this looks to me

13   like a state document that relates to how to

14   control drug costs in some fashion.  It might have

15   been part of the budget, or something like that.

16             (Exhibit NYSW 025, for identification,

17            document Bates-numbered NYSW 1740 through

18            1752,  memorandum re: State payment for

19            prescription drugs.)

20        Q.    We have another document that we can't

21   figure out where it came from.  Maybe you could

22   help us with that one.  It will be Exhibit NYSW 025.

Michael Burgess                                    March 18, 2004
                          Albany, NY

1    I'm trying to remember what form it would have been

2    in.  I might have gotten a one-pager saying, you

3    know, these are the plaintiff -- these are the

4    issues that are being discussed here and, you know,

5    if you took this drug from such-and-such a time to

6    such-and-such a time, and paid cash or whatever, or

7    sometimes if you were co-pays, depending on which

8    drug it was, then that were the criteria.  And we

9    would talk to our membership about it.

10            I would go out to meetings sometimes and

11   ask anybody if they've ever taken any of these

12   drugs and a lot of hands would go up, and so then

13   you would follow up with people.

14        Q.    But now I want to distinguish in your

15   mind if you can between the BuSpar cases and the

16   tamoxifen cases and really focus in on AWP and what

17   was going -- you know, whether you were sent

18   anything by PAL --

19        A.    Yes.

20   RQ   Q.    -- whether you -- yes?  Okay, so we'd

21   like to get copies of that.

22            MR. NOTARGIACOMO:  My understanding is

Michael Burgess

March 18, 2004

Albany, NY

228

1        whatever was in the file has been produced.

2        But we'll look again, if you ask.

3    BY MR. TRETTER:

4        Q.    You said then you analyzed what the suit

5    was about?

6        A.    Yes.

7        Q.    How did you go about doing that?

8        A.    Well, we were aware -- I reviewed what

9    the charges were.  Was there potentially illegal

10   activity that was being alleged, about pricing

11   or -- in the BuSpar, for example, it was about the

12   generic drug coming on the market.  So it wasn't

13   just about pricing.  It was about --

14       Q.    I'm trying to focus now, our attention

15   on this case --

16       A.    That's right.

17       Q.    -- and what analysis you did about the

18   facts or the allegations in this case, the

19   AWP pricing case.

20       A.    Well, we were given a whole list of

21   drugs.  This is the most extensive list of drugs

22   that were put together, to see if people took -- I

Michael Burgess                                    March 18, 2004
                        Albany, NY

235

1       A.    Yes.

2       Q.    Did you sign something similar with

3   respect to this suit?

4       A.    I would assume I did.  I can't say that

5   for sure, but I would assume that I did, with all

6   of these.

7              MR. NOTARGIACOMO:  Can I just ask.  I

8         know for a fact that this is the last page

9         of a larger document.  Do you have the

10        larger document?

11             MR. TRETTER:  I don't think we do.  I

12        think we just got it like this.  But we

13        would be happy to have the larger document.

14             MR. NOTARGIACOMO:  I'm not an attorney

15        at BuSpar, so I don't have the larger

16        document, I don't think.

17   BY MR. TRETTER:

18       Q.    Do you have any writings that govern

19   your relationship or your responsibilities as a

20   class representative, or your relationship with

21   attorneys in this particular case?

22       A.    I can look.  I don't -- I would assume

Michael Burgess

March 18, 2004

Albany, NY

236

1    we have one, something like this, but I, you know,

2    I didn't review all the stuff you got, so I

3    wouldn't know if it was in there.  But I would

4    assume, or hope it would have been in there.

5    RQ          MR. TRETTER:  We'll ask you to go back

6         and look for that.

7         Q.    At some point did you have to get

8    approval from the board of directors of Statewide

9    to have your name be part of this suit?

10        A.    I would have to get the minutes, but I

11   believe that we had a discussion, or I know we had

12   a discussion about any lawsuit, because of the fact

13   that it is a lawsuit, and get the board of

14   directors to approve that we would pursue a

15   lawsuit, yes.

16        Q.    That presumably would be -- that

17   resolution would be in writing somewhere?

18        A.    It should be.  Certainly the discussion

19   of that.  You've got to remember, just so when you

20   see it, that the seniors write the minutes, so they

21   may or may not be in the legal format.

22        Q.    That's fine.  Are there any

Michael Burgess                                      March 18, 2004

Albany, NY

237

1    communications with members about the lawsuit that

2    you know of?  And again I'm talking about this

3    lawsuit.  Not any of the other ones.

4         A.    I believe -- and I would have to look at

5    our newsletter, I'm quite sure that in our

6    newsletter -- I know for -- and I hope it's a

7    document you have -- but I know that we had a

8    one-page flyer suggesting that anybody who, you

9    know, fit the criteria for I'm quite sure this

10   lawsuit, that they could contact us if they wanted

11   to consider being a plaintiff in this lawsuit.

12        Q.    One thing we've asked for, maybe, we're

13   soon going to get to Ms. Snyder and the reason she

14   responded, if there was any mailing or --

15        A.    But within the newsletter.

16        Q.    Okay, within the newsletter even, I

17   would appreciate you pointing out -- we may have

18   the newsletter, but I can't find that particular

19   reference.

20        A.    You know, I may -- in my own mind I seem

21   to remember that in one of the newsletters there

22   was a full page statement there saying that if you,

Michael Burgess                                    March 18, 2004
                        Albany, NY

238

1    you know, meet any of these conditions and are

2    interested in pursuing this lawsuit on these

3    issues, to contact us.  That type of thing.

4         Q.    It may well be that we already have it.

5    If you could just tell us where it was.

6         A.    Yes.

7         Q.    Do you know whether there was any other

8    communications with any of the members, other than

9    that sort of publication within the newsletter?

10        A.    Well, that same statement would have

11   been sent out on e-mail to our e-mail list and

12   asking solicitation information, that if you're

13   interested, here's what's going on with this

14   lawsuit, are you interested in being involved in

15   this.

16   RQ         MR. TRETTER:  We would like to get that

17        as well.

18        A.    We wouldn't have the e-mail anymore,

19   but it should have been the same thing as this page

20   that was in the newsletter.

21        Q.    Okay.

22        A.    The hard copy.

Michael Burgess                                          March 18, 2004

Albany, NY

260

1    participation in this lawsuit in some way, shape or

2    form before she provided you this material?

3        A.    She said to me, when I met her in the

4    meeting she was so outraged about drug prices that

5    anything she could do to help change it, she would

6    be interested in doing.  In speaking to the press

7    or anything.  So when this opportunity was up, I

8    said well, what do you think about doing this, and

9    she was willing to.

10       Q.    What exactly did you ask her to do?

11       A.    I said, you know, there's a lawsuit

12   regarding prices and, you know, if you showed -- I

13   don't remember, but I assume I showed her the

14   criteria that I talked about in that one-page

15   statement, and then I referred her on to Kim

16   Schellenberger, and I don't remember if it was Kim,

17   but one of the folks from PAL who was kind of

18   screening people, and they took over with her.

19       Q.    Did you ever talk with her again about

20   this case?

21       A.    Yeah, because PAL had her in their

22   newsletter.  So I talked to her.  I said gee, they

Michael Burgess                                    March 18, 2004

Albany, NY

267

1    get that?

2        A.    I'm just saying to you that I believe I

3    got all of the judge's statements or opinions that

4    were made.

5        Q.    So now we've got the complaints and the

6    judge's opinions.  Any other kind of documents that

7    you've received?

8        A.    I don't think I got anything else from

9    anybody else who is a party to it, no.

10       Q.    Have you spoken with representatives of

11   any of the other plaintiffs in this case?  Any of

12   the other organizations that have been named as

13   plaintiffs, like Vermont PIRG?  Citizens for

14   Consumer Justice?

15       A.    Yes.

16       Q.    Who?

17       A.    Vermont PIRG?  Zina Carey, I have talked

18   to.  Not recently.

19       Q.    About this case?

20       A.    No, just about drug issues in general.

21       Q.    I'm talking about this case.

22       A.    We have a meeting, which was not -- we

```
 1              C E R T I F I C A T E

 2

 3    STATE OF NEW YORK        )

 4                             ) ss.:

 5    COUNTY OF SUFFOLK        )

 6

 7            I, FRANK J. BAS, a Registered

 8    Professional Reporter and Notary Public

 9    within and for the State of New York, do

10    hereby certify:

11            That I reported the proceedings in the

12    within-entitled matter, and that the within

13    transcript is a true record of such

14    proceedings.

15            I further certify that I am not

16    related by blood or marriage, to any of the

17    parties in this matter and that I am in no

18    way interested in the outcome of this

19    matter.

20            IN WITNESS WHEREOF, I have hereunto

21    set my hand this _18_ of _March_____, 2004.

22

23                    _Frank J. Bas_____

24                      FRANK J. BAS, RPR

25
```

# EXHIBIT 2



# HOGAN & HARTSON
### L.L.P.

LYNDON M. TRETTER
PARTNER
(212) 918-3528
LMTRETTER@HHLAW.COM

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

April 16, 2004

*BY FIRST CLASS MAIL AND VERILAW*

Edward Notargiacomo, Esq.
Hagens Berman LLP
225 Franklin Street, 26th Floor
Boston, MA  02110

> Re:   **In re Pharmaceutical Industry AWP Litigation
> MDL No. 1456, 01-CV-12257-PBS**

Dear Ed:

    I am writing to follow-up on the document requests we made during the deposition of Mr. Michael Burgess, Executive Director of New York Statewide Senior Action Council, Inc ("Statewide").  As discussed, we request production of the following documents responsive to our previous demands, as well as a few specific items that came up during the deposition:

    1)     documents from the files and computers of any and all Statewide personnel and employees, other than Mr. Burgess, relating to the subjects and topics covered by our previous document requests;

    2)     nonduplicative documents from Mr. Burgess' home including documents from files and any home computer(s);

    3)     minutes and reports of Statewide annual meetings;

    4)     minutes of Statewide Board of Directors meetings (including but not limited to the minutes approving Statewide's participation in this suit);

    5)     agenda of meeting on prescription drugs on or about January 8, 2004;

    6)     report on Together Rx or other senior discount programs cited by Mr. Burgess on pages 108-109 of his deposition transcript;

**WASHINGTON, DC**

\\NY - 58559/0059 - 832430 v1     BERLIN   BRUSSELS   LONDON   PARIS   BUDAPEST   PRAGUE   WARSAW   MOSCOW   TOKYO
NEW YORK   BALTIMORE   McLEAN   MIAMI   DENVER   BOULDER   COLORADO SPRINGS   LOS ANGELES



HOGAN & HARTSON L.L.P.

7)    communications relating to the amounts or rates at which Medicaid or EPIC reimburses pharmacies for prescription drugs or possible changes to the reimbursement rates or amounts;

8)    production of the entire document from which deposition NYSW Exhibit 24 (NYSW 6358-59) is part of;

9)    communications with Prescription Access Litigation Project (PAL) regarding this lawsuit or potential suit;

10)    newsletter or other request to Statewide membership regarding potential participation in this lawsuit;

11)    documents relating to Statewide's responsibilities as a class representative in this matter (If there is none, please so state.);

12)    documents that govern Statewide's relationship with attorneys in this matter (If there is none, please so state.);

13)    communications between Statewide and other Plaintiffs in this matter (If there is none, please so state); and

14)    PAL newsletters referring to Ms. Mary Jane Snyder.

Sincerely,

Lyndon M. Tretter

LMT/hh

# EXHIBIT 3



# HOGAN & HARTSON
## L.L.P.

**Writer's Direct Dial:**
**(212) 918-3640**

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

May 21, 2004

*BY FIRST CLASS MAIL AND VERILAW*

Edward Notargiacomo, Esq.
Hagens Berman LLP
225 Franklin Street, 26th Floor
Boston, MA  02110

> Re:   In re Pharmaceutical Industry AWP Litigation
>        MDL No. 1456, 01-CV-12257-PBS

Dear Ed:

      I am writing to follow-up on my voicemail message of May 17, 2004 and Mr. Lyndon Tretter's letter of April 16, 2004 concerning the document requests we made during the deposition of Mr. Michael Burgess, Executive Director of New York Statewide Senior Action Council, Inc ("Statewide").  To date, we have not received any response to our requests, set forth in Mr. Tretter's letter, or any documents responsive to our requests.  Please provide us with Statewide documents responsive to our requests as soon as possible.

Sincerely,

Hoa T. T. Hoang

WASHINGTON, DC

BERLIN   BRUSSELS   LONDON   PARIS   BUDAPEST   PRAGUE   WARSAW   MOSCOW   BEIJING   TOKYO
NEW YORK   BALTIMORE   McLEAN   MIAMI   DENVER   BOULDER   COLORADO SPRINGS   LOS ANGELES

# EXHIBIT 4



# HOGAN & HARTSON
### L.L.P.

LYNDON M. TRETTER
PARTNER
(212) 918-3528
LMTRETTER@HHLAW.COM

June 16, 2004

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

*BY FAX AND VERILAW*

Edward Notargiacomo, Esq.
Hagens Berman LLP
225 Franklin Street, 26th Floor
Boston, MA  02110

Re:     **In re Pharmaceutical Industry Average Wholesale Price Litigation,
         MDL No. 1456, 01-CV-12257**

Dear Ed:

We have made several requests to you regarding the production of New York Statewide Senior Action Council ("Statewide") documents.  During Mr. Michael Burgess' deposition, we requested documents responsive to our previous demands as well as documents that Mr. Burgess referred to during his testimony.  You asked that our requests be sent to you in writing and we complied by setting forth the open issues in my letter dated April 16, 2004.  We gave Statewide a month to respond to the document demands.  An associate from my firm, Ms. Hoa Hoang, followed up on my letter by leaving you a voicemail message on May 17, 2004.  Hearing no response from you, Ms. Hoang sent you a letter dated May 21, 2004 regarding the Statewide supplemental production.  Once again, there was no response.  Ms. Hoang left another voicemail message on June 15, 2004, which you also ignored.  If we do not receive the requested documents from Statewide by June 30, 2004, we will raise this discovery issue with the Magistrate Judge and/or seek to preclude Statewide from further participation in this action for dereliction of its discovery obligations.

Sincerely,

Lyndon M. Tretter

cc:  All Counsel of Record (via Verilaw)

WASHINGTON, DC

BERLIN   BRUSSELS   LONDON   PARIS   BUDAPEST   PRAGUE   WARSAW   MOSCOW   TOKYO
\\\NY - 58559/0059 - 843405 v1   NEW YORK   BALTIMORE   McLEAN   MIAMI   DENVER   BOULDER   COLORADO SPRINGS   LOS ANGELES

# EXHIBIT 5



E-SERVED
09/02/03
06:14 PM ET
AWP-MDL No. 1456

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                     )
In re: PHARMACEUTICAL INDUSTRY                       )
AVERAGE WHOLESALE PRICE                               ) MDL NO. 1456
LITIGATION                                           )
                                                     )
                                                     )
- - - - - - - - - - - - - - - - - - - - - - - - - - x Civil Action No. 01-12257-PBS
                                                     )
THIS DOCUMENT RELATES TO ALL                         ) Judge Patti B. Saris
ACTIONS                                              )
                                                     )
                                                     )
                                                     )
- - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF FUNDS

By their counsel, the Defendants listed on Exhibit A hereby request, pursuant to

Rules 26 and 34 of the Federal Rules of Civil Procedure, that all plaintiff Funds produce within

thirty (30) days of service the documents listed below.

## DEFINITIONS

1.   "Fund" or "Funds" means any and/or all of the plaintiff health and welfare

funds identified in the Amended Master Consolidated Complaint, including, without limitation,

Teamsters Health & Welfare Fund of Philadelphia and Vicinity, Board of Trustees of Carpenters

and Millwrights of Houston and Vicinity Welfare Trust Fund, Twin Cities Bakery Workers

Health and Welfare Fund, United Food and Commercial Workers Unions and Employers

Midwest Health Benefits Fund, Philadelphia Federation of Teachers Health and Welfare Fund,

and Man-U Service Contract Trust Fund, and any of their past or present trustees, officials,

officers, fiduciaries, third-party administrators, representatives, agents, assigns, attorneys,



employees, divisions, departments, affiliates, and all other persons or entities acting or purporting to act on its behalf or under its control.

    2.  "You" or "your" shall refer to any of the Funds.

    3.  "AMCC" means the Amended Master Consolidated Class Action Complaint filed in connection with MDL Docket No. 1456, Civil Action No. 01-12257-PBS, in the United States District Court for the District of Massachusetts.

    4.  "Defendants" mean the Defendants identified in Exhibit A hereto.

    5.  "Third Party Administrator" means any entity that provides administrative services to any Fund relating to any medical benefit provided to any Participant and/or Beneficiary.

    6.  "Benefit Consultant" means any person and/or entity that provides information, counsel and/or advice to any Fund regarding any medical benefit and/or service provided by any Fund to any Participant or Beneficiary.

    7.  "Auditor" means any independent entity that provides an independent, third-party audit review of any aspect of medical coverage and/or services provided by any Fund to any of its Participants and/or Beneficiaries.

    8.  "Wholesaler" means any entity that purchases Subject Drugs from a Manufacturer and resells such drugs to any other entity.

    9.  "Manufacturer" means a company that manufactures pharmaceutical products, including, without limitation, Subject Drugs.

    10. "Provider" means any entity and/or physician that provides health care to any Participant or Beneficiary.



11. "Mail Order Pharmacy" means an entity that resells drugs including, without limitation, Subject Drugs, exclusively by mail to any Participant and/or Beneficiary.

12. "Subject Drugs" means the drugs as to which plaintiffs seek discovery from defendants.

13. "AWP" or "Average Wholesale Price" means the price for drugs as periodically published by several pharmaceutical industry compendia, including the Drug Topics Red Book (the "Red Book"), American Druggist First Databank Annual Directory of Pharmaceuticals ("First DataBank"), Essential Directory of Pharmaceuticals (the "Blue Book") and Medi-Span's Master Drug Database ("Medi-span").

14. "Publisher" or "Publishers" refers to any pharmaceutical price publishing service, including but not limited to, the Red Book, First Data Bank, Blue Book and Medi-Span.

15. "Price" means any payment made for a drug with or without discounts, rebates or other incentives affecting the cost of the drug.

16. "P & T" or "Pharmaceutical and Therapeutic" means any entity and/or committee responsible for making decisions regarding drugs to be included and/or excluded from a formulary.

17. The terms "Participant" and "Beneficiary" mean a person for whom any Fund provides health insurance coverage, including policyholders and dependents.

18. "Independent Practice Association" means any organized group of Providers whose members provide health care to any Participant and/or Beneficiary.

19. The term "PBM" means pharmacy benefit manager.

20. "AMP" or "Average Manufacturer Price" shall have the meaning set forth in 42 U.S.C. § 1396r-8(k)(1).



21. "MAC" or "Maximum Allowable Cost" shall have the meaning ascribed to that term pursuant to 42 C.F.R. § 442.332.

22. "EAC" or "Estimated Acquisition Cost" shall have the meaning ascribed to that term pursuant to 42 C.F.R. § 447.301.

23. "Best Price" shall have the meaning ascribed to that term pursuant to 42 U.S.C. § 1396r-8(c)(1)(C).

24. "CMS" shall mean Centers for Medicare and Medicaid Services.

25. "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request any information that might otherwise be construed to be outside its scope.

26. "Communication," as defined in Local Rule 26.5(c)(1), means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

27. "Concerning," as defined in Local Rule 26.5(c)(7), means referring to, describing, evidencing, or constituting.

28. "Copy" or "Copies" when used in reference to a document means any color or black-and-white reproduction of a document, regardless of whether the reproduction is made by means of carbon paper pressure, sensitive paper, photostat, xerography, or other means or process.

29. "Document" means the original and each non-identical copy of a document in any medium, including electronic form, whether or not it was communicated to any person other than the author, and shall include but not be limited to, writings, printings, photographs, photocopies, tapes, recordings, video recordings, electronic data, e-mails, and any other symbolic representations in your possession, custody or control or known or believed by you to exist.



30. "Person," as defined in Local Rule 26. 5(c)(6), means any natural person or any business, legal, or governmental entity or association.

31. "Relating" means in any way concerning or referring to, consisting of, involving, regarding or connected with the subject matter of the request.



## INSTRUCTIONS

1.  Unless otherwise specifically stated, the requests below refer to the period of January 1, 1997 to the present.

2.  The singular form of a noun or pronoun shall include within its meaning the plural form of the noun or pronoun and vice versa; the masculine form of a pronoun shall include within its meaning the feminine form of the pronoun and vice versa; and the use of any tense of any verb shall include within its meaning all other tenses of the verb.

3.  Each request for production of documents extends to all documents in the possession, custody, or control of you or anyone acting on your behalf.  A document is to be deemed in your possession, custody, or control if it is in your physical custody, or if it is in the physical custody of any other person and you (a) own such document in whole or in part; (b) have a right, by contract, statute, or otherwise, to use, inspect, examine, or copy such document on any terms; (c) have an understanding, express or implied, that you may use, inspect, examine, or copy such document on any terms; or (d) have, as a practical matter, been able to use, inspect, examine, or copy such document when you sought to do so.

4.  If production is requested of a document that is no longer in your possession, custody, or control, your response should state when the document was most recently in your possession, custody, or control, how the document was disposed of, and the identity of the person, if any, presently in possession, custody, or control of such document.  If the document has been destroyed, state the reason for its destruction.

5.  Provide the following information for each document withheld on the grounds of privilege:

(a)   its date;



(b)  its title;

(c)  its author;

(d)  its addressee;

(e)  the specific privilege under which it is withheld;

(f)  its general subject matter; and

(g)  a description of it that you contend is adequate to support your contention that it is privileged.

6.  These requests for production of documents are continuing in nature pursuant to Rule 26 of the Federal Rules of Civil Procedure so as to require, whenever necessary, continuing production and supplementation of responses between the initial date for production set forth above and the end of trial.

7.  To the extent that you consider any of the following requests for production of documents objectionable, please respond to the remainder of the production request, and separately state the part of each request to which you object and each ground for each objection.

## DOCUMENTS TO BE PRODUCED

1.  All documents relating or referring to your contractual relationships with PBMs, Third Party Administrators, Benefit Consultants, Auditors, Wholesalers, Manufacturers, Independent Practice Associations or Providers insofar as they cover Subject Drugs, including, without limitation, master agreements, addenda, schedules, attachments, requests for proposal, responses to requests for proposal and correspondence.

2.  Documents sufficient to identify all persons involved in negotiation of contractual relationships with PBMs, Third Party Administrators, Benefit Consultants, Auditors, Manufacturers or Providers insofar as they cover Subject Drugs.



3. All documents relating or referring to the difference, if any, between any payments made by you to PBMs and any payments made by PBMs to others for Subject Drugs, including, without limitation, payments made by PBMs to retailers, payments received by PBMs from retailers, rebates received by you from any PBM and rebates received by PBMs from manufacturers.

4. For the period 1991 to the present, all documents relating or referring to AWPs for drugs and all documents reflecting any difference between an AWP and an actual payment by anyone for a drug.

5. For the period 1991 to the present, all documents relating or referring to any definition or meaning of AWP.

6. For the period 1991 to the present, to the extent not otherwise produced, all documents concerning AWP, AMP, WAC, MAC, EAC, Best Price or any other drug pricing or reimbursement information for the Subject Drugs.

7. For the period 1991 to the present, all documents concerning any requests by you for any information concerning the pricing or reimbursement for Subject Drugs.

8. For the period 1991 to the present, all documents concerning your decision to rely on, reliance on, or use of drug pricing information published by any Publisher.

9. For the period 1991 to the present, all documents created by or received from any Publisher, including but not limited to drug pricing information, and communications, memoranda, contracts or agreements between you and any Publisher.

10. For the period 1991 to the present, all documents provided to, created by or received from CMS, United States Department of Health and Human Services, The Health and Human Services Office of the Inspector General, the General Accounting Office, Congress or



any other federal institution, agency, department, or office regarding the pricing of prescription drugs.

11. For the period 1991 to the present, all documents concerning any internal or external, formal or informal, assessments, studies, analyses, reviews or audits regarding drug pricing or reimbursement amounts or rates for the Subject Drugs.

12. All communications between you and PBMs relating or referring to the Subject Drugs, including, without limitation, invoices, evidence of payments, performance reports, presentations made by PBMs, formulary descriptions, claims against PBMs, responses to claims by PBMs, formulary rebates, formulary rebate audit reports, remittances, drug cost models and annual client reviews.

13. All communications between you and any Third Party Administrator, Benefit Consultant, Auditor, Retailer, Mail Order Pharmacy, Independent Practice Association and/or Provider relating or referring to Subject Drugs.

14. All documents relating or referring to your relationships with Participants and Beneficiaries insofar as they cover Subject Drugs, including, without limitation, summary plan documents, detailed plan documents, adoption agreements and/or all amendments thereto, summaries of material modifications, riders, addenda and co-payment schedules.

15. All communications between you and Participants or Beneficiaries relating or referring to Subject Drugs, including, without limitation, invoices from Providers, payments to Providers, claims materials, marketing materials, coverage materials, benefit evaluations, benefit decisions, reimbursements, discounts or medigap coverage.



16. All documents relating or referring to any Participant or Beneficiary that bought Subject Drugs, including, without limitation, any co-payments made by any Participant or Beneficiary, and any damages arising from such purchases.

17. Documents sufficient to identify all of your Participants and Beneficiaries.

18. All Documents which reflect, discuss, memorialize, or otherwise relate to the setting of reimbursement rates for any Subject Drug.

19. All Documents which you or someone acting on your behalf relied upon in setting reimbursement rates for any Subject Drug.

20. All documents relating or referring to any relationships with insurers insofar as they cover Subject Drugs, including, without limitation, base medical contracts, contracts for facilities or contracts with Providers.

21. All documents relating or referring to any subrogation rights that you may have relating to damages incurred by any of your Participants or Beneficiaries as such damages relate or refer to Subject Drugs.

22. All union contracts and communications between you and unions or employers insofar as they relate or refer to Subject Drugs.

23. All benefit committee and Pharmaceutical and Therapeutic Committee meeting minutes relating or referring to Subject Drugs.

24. For the period 1991 to the present, all drug cost models, pricing models, drug utilization reviews, experience and actuarial analyses, assessments, studies, analyses, reviews and reports relating or referring to Subject Drugs.



25. All annual reports, state and federal tax filings, documents filed with federal or state agencies, articles of incorporation, by-laws, charters and minutes of executive committee, directors or trustees meetings.

26. Documents sufficient to identify all of your employees and documents sufficient to show your organizational structure during the time period for which you claim damages in the AMCC.

27. All communications with witnesses or potential witnesses in connection with this case including, without limitation, expert witnesses and fact witnesses.

28. All documents that support any claim asserted in the AMCC, as well as any other documents that you plan to offer in evidence in this case, to the extent not otherwise produced.

29. All documents concerning the computation of damages for the claims set forth in the AMCC.

30. All Documents relating to any alleged misrepresentation or omission by any of the Defendants which you claim you relied upon with respect to any Subject Drug.

31. All agreements, understandings and fee or cost arrangements with your counsel and/or with any other plaintiff or third party relating to this case.


E-SERVED
09/02/03
06:14 PM ET
AMP-MDL No.1456

ON BEHALF OF DEFENDANTS
ASTRAZENECA PHARMACEUTICALS LP,
BRISTOL-MYERS SQUIBB CO., CENTOCOR,
INC., SMITHKLINE BEECHAM CORP. d/b/a/
GLAXOSMITHKLINE AND IMMUNEX, CORP.

By: _____

Steven M. Edwards (admitted *pro hac vice*)
Lyndon M. Tretter (admitted *pro hac vice*)
HOGAN & HARTSON L.L.P.
875 Third Avenue
New York, NY 10022
(212) 918-3000
Attorneys for defendants Bristol-Myers Squibb
Company, Oncology Therapeutics Network Corp.
and Apothecon, Incorporated

D. Scott Wise (admitted *pro hac vice*)
Kimberley Harris (admitted *pro hac vice*)
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
Attorneys for defendant AstraZeneca
Pharmaceuticals LP

Ethan Posner (admitted *pro hac vice*)
COVINGTON & BURLING
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
(202) 662-6000
Attorneys for SmithKline Beecham Corp. d/b/a
GlaxoSmithKline

David J. Burman (admitted *pro hac vice*)
Kathleen M. O'Sullivan (admitted *pro hac vice*)
PERKINS COIE L.L.P.
1201 Third Avenue
Suite 4800
Seattle, WA 98101-3099
Phone: (206) 359-8000
Attorneys for defendant Immunex Corporation



E-SERVED
09/02/03
06:14 PM ET
AMP-MDL No. 1456

William F. Cavanaugh, Jr. (admitted *pro hac vice*)
PATTERSON, BELKNAP, WEBB & TYLER
L.L.P.
1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2000
Attorneys for defendant Centocor, Inc.

Dated: September 2, 2003



E-SERVED
09/02/03
06:14 PM ET
AMP-MDL No. 1456

## EXHIBIT A

Steven M. Edwards (admitted *pro hac vice*)
Lyndon M. Tretter (admitted *pro hac vice*)
HOGAN & HARTSON L.L.P.
875 Third Avenue
New York, NY 10022
(212) 918-3000
Attorneys for defendant Bristol-Myers Squibb Company, Oncology Therapeutics Network Corp.
and Apothecon, Incorporated

D. Scott Wise (admitted *pro hac vice*)
Kimberley Harris (admitted *pro hac vice*)
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
Attorneys for defendant AstraZeneca Pharmaceuticals LP

Ethan Posner (admitted *pro hac vice*)
COVINGTON & BURLING
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
(202) 662-6000
Attorneys for SmithKline Beecham Corp. d/b/a GlaxoSmithKline

David J. Burman (admitted *pro hac vice*)
Kathleen M. O'Sullivan (admitted *pro hac vice*)
PERKINS COIE L.L.P.
1201 Third Avenue
Suite 4800
Seattle, WA 98101-3099
Phone: (206) 359-8000
Attorneys for defendant Immunex Corporation

William F. Cavanaugh, Jr. (admitted *pro hac vice*)
PATTERSON, BELKNAP, WEBB & TYLER L.L.P.
1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2000
Attorneys for Centocor, Inc.



## CERTIFICATE OF SERVICE

I, Lyndon M. Tretter, certify that a true and correct copy of the foregoing Defendants' First Request For Production of Documents To Plaintiff Funds was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on September 2, 2003, a copy to Verilaw Technologies for posting and notification to all parties.

_____
Lyndon M. Tretter

# EXHIBIT 6

Privilege Log for
Documents Produced by UFCW in AWP Litigation

| DOCUMENT TITLE | DATE OF MEETING | SPEAKER(S) | DESCRIPTION OF TOPIC REDACTED | BASIS FOR REDACTION |
|---|---|---|---|---|
| United Food and Commercial Workers Unions and Employers Midwest Benefits Fund Board of Trustees Meeting No. 109 (UFCW 0016758-UFCW 0016770) | June 10, 1993 | Leslie Kite, Esq. and Jay Gilden, Esq. | (UFCW 0016764-UFCW 0016768) Administrative Report - Co-counsel gave "joint opinion" re: Laborcare structure | Attorney Client Privileged |
| United Food and Commercial Workers Unions and Employers Midwest Benefits Fund Board of Trustees Meeting No. 130 (UFCW 0016445-UFCW 006460) | March 18, 1999 | Jonathan D. Karmel, Esq. and Jeffrey R. Fuller, Esq. | (UFCW 0016456) Tobacco Litigation Report - Co-Counsel addressed pursuing litigation against tobacco companies. | Attorney Client Privileged |
| United Food and Commercial Workers Unions and Employers Midwest Benefits Fund Board of Trustees Meeting No. 105 (UFCW 0016662-UFCW 0016681) | October 28, 1992 | Mr. CharLeslie Brazik, Leslie Kite, Esq. and Jonathan Karmel, Esq. | (UFCW 0016676-UFCW 0016680) Motion to obtain third party administrator: Discussions of legal issues with respect to claims administration, and LaborCare | Attorney Client Privileged |

| | | | |
|---|---|---|---|
| United Food and Commercial Workers Unions and Employers Midwest Benefits Fund Board of Trustees Meeting No. 107 (UFCW 001414-UFCW 0016427) | February 25, 1993 | Leslie Kite, Esq., Jonathan Karmel, Esq.and Mr. Ronald F. Luesmann | (UFCW 0016415-UFCW 0016417) (UFCW 0016418-UFCW 0016419) Laborcare Audit – Counsels' discussion of legal questions arising from audit | Attorney Client Privileged |
| United Food and Commercial Workers Unions and Employers Midwest Benefits Fund Board of Trustees Meeting No. 122 (UFCW 0016694-UFCW 0016713) | October 16, 1996 | Jeffrey R. Fuller, Esq. | (UFCW 0016702) Budget Review – Legal opinion regarding potential conflicts with 401(k) plans | Attorney Client Privileged |
| United Food and Commercial Workers Unions and Employers Midwest Benefits Fund Board of Trustees Meeting No. 105 (UFCW 0016461-UFCW 0016469) | November 4, 1993 | Irwin Thall, Esq. | (UFCW 0016468) "Other Business" – Legal Opinion regarding prescription plan language | Attorney Client Privileged |
| United Food and Commercial Workers Unions and Employers Midwest Benefits Fund Board of Trustees Meeting No. 132 (UFCW 0016595-UFCW 0016604.02) | December 3, 1999 | Jonathan Karmel, Esq., Jeffrey R. Fuller, Esq. and Dan Ryan | (UFCW 0016387) Potential Amendments to claims appeal section of the restated DH and DM plans | Attorney Client Privileged |

| | | | |
|---|---|---|---|
| United Food and Commercial Workers Unions and Employers Midwest Benefits Fund Board of Trustees Meeting No. 131 (UFCW 0016729-UFCW 0016742.02) | July 22, 1999 | Jonathan Karmel, Esq. and Mr. Dan Ryan | (UFCW 0016734) Administrator's Report - Attorneys delinquency report | Attorney Client Privileged |
| United Food and Commercial Workers Unions and Employers Midwest Benefits Fund Board of Trustees Meeting No. 113 (UFCW 0016743-UFCW 0016757.01) | June 24, 1994 | Leslie Kite, Esq. | (UFCW 0016743-UFCW 0016757.01) Mr. Kite's legal opinion of Laborcare issues and the fitness of UFCW's relationship with Laborcare | Attorney Client Privileged |
| United Food and Commercial Workers Unions and Employers Midwest Benefits Fund Board of Trustees Meeting No. 105 (UFCW 0016341-UFCW 0016351) | June 27, 2001 | Jonathan Karmel, Esq. | (UFCW 0016347-UFCW 0016349) Co-Counsel report - Prescription Drug class action suits | Attorney Client Privileged |
| United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund Board of Trustees meeting No. 134 (UFCW 0016366-UFCW 0016381) | April 13, 2000 | Jeffrey R. Fuller, Esq.  and Jonathan Karmel, Esq. | (UFCW 0016373) Trust Agreement Amendments - Co-Counsel suggested language for trust agreements | Attorney Client Privileged |

# EXHIBIT 7



# HOGAN & HARTSON
### L.L.P.

LYNDON M. TRETTER
PARTNER
(212) 918-3528
LMTRETTER@HHLAW.COM

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

May 13, 2004

*BY OVERNIGHT COURIER*

Elizabeth Hartweg
The Wexler Firm
One North LaSalle Street
Suite 2000
Chicago, IL 60602

**Re:    In Re Pharmaceutical Average Wholesale Price Litigation, MDL 1456**

Dear Beth:

         We have attempted to analyze the data for physician-administered drugs that UFCW produced prior to Dan Ryan's deposition.  However, it appears that UFCW has not provided us with the necessary information to do so.  For example, the data includes only the charge for the drug dispensed; we request that UFCW provide all related claims data, since other charges including, but not limited to, the charge for the office visit and any other fees for the drug's administration are relevant to this bundled drug and service.  We also request that you confirm that the data set you provided to us encompass all of the physician-administered drug claims for the relevant class period.

         In addition, as we have set out in prior correspondence (see my letter dated April 21, 2004), and at Mr. Ryan's continued deposition, there are other documents that UFCW has still not produced despite multiple requests to do so.  Accordingly, we request that you immediately produce the following items:

   1)   Amendment No. 2 referenced in the October 23, 2001 Board of Trustee Meeting
        Minutes (Bates numbered UFCW 16332) and any other amendments, resolutions
        by the Board of Trustees or meeting minutes related to the "Plan" referred to
        throughout Segal's "Historical Summary of Benefit and Funding Issues"  (Exhibit
        30; bates numbered UFCW 0017153 – 17190).

   2)   A list of Plan participants for whom Medicare is the primary payor.



HOGAN & HARTSON L.L.P.

Elizabeth Hartweg
May 7, 2004
Page 2

3) Documents evidencing the amounts UFCW charged the "Gary Fund" for prescription drug benefits.

4) The February 2nd memorandum referenced in a memorandum dated March 30, 2000 to the Board of Trustees (Exhibit 37; bates numbered UFCW 16604.01).

5) Analyses of UFCW's prescription drug outlays (i.e. any data regarding the analysis of increased drug costs as compared to other factors, such as utilization, that may have affected how much the Fund paid for pharmaceutical benefits).

6) Data regarding reimbursements UFCW received from a Fund member's primary plan, or other insurance, and any other "records of coordination recoveries" such as Mr. Ryan made reference to in his deposition on April 30, 2004.

7) Information or data related to the rebate checks, marked as Exhibit 48 at Mr. Ryan's deposition, including, but not limited to, financial documents and spreadsheets that indicate all the rebates UFCW has received from NPA or Express Scripts.[1]

8) Unredacted Meeting Minutes where any Segal consultants, or other guests, were present during the discussion of allegedly privileged material.   Additionally, we again request a privilege log of all documents that have been withheld on the basis of attorney-client privilege.[2]

9) Exhibits to each of the Board of Trustee Meeting Minutes including, but not limited to, Segal presentations of other exhibits that relate to prescription drug benefits (as you requested at the deposition, we have attached the Meeting Minutes, highlighting the relevant exhibits).

10) Documents relating to UFCW's communications with Dominick's regarding its relationship with NPA

---

[1] We also ask that you confirm that UFCW has produced a complete set of all the rebates received by any prescription benefit manager to date.

[2] Also, please produce the resolution authorizing UFCW to bring this or any predecessor lawsuit.



HOGAN & HARTSON L.L.P.

Elizabeth Hartweg
May 7, 2004
Page 3

11) Documents responsive to our discovery demands in the possession of any UFCW trustee including, but not limited to, any Segal presentations or exhibits referenced to in Board of Trustee Meeting Minutes.

Lastly, it is apparent from the discovery taken to date that UFCW has not searched and produced responsive documents from various sources within its possession, custody and control. Therefore, we once again ask that you confirm that UFCW has searched and produced <u>electronic</u> documents from the hard drives, e-mail, correspondence and work files of every person who may possess information regarding UFCW's reimbursement for prescription drugs, health benefits provided by UFCW or pharmacy contract negotiations.

Very truly yours,

Lynden Tretter/(spk)

Lyndon M. Tretter

LMT/spk

Enclosures
cc: All counsel of record via Verilaw

# EXHIBIT 8



# THE | WEXLER | FIRM<sup>LLP</sup>

June 4, 2004

Via Verilaw

Mr. Lyndon Tretter
Hogan & Hartson, L.L.P.
875 Third Avenue
New York, NY 10022

      RE:   *In re: Pharmaceutical Industry Average Wholesale Price Litigation,* MDL
            No. 1456

Dear Lyndon:

I am writing in response to your May 13, 2004 letter regarding UFCW's production.

After an exhaustive search, UFCW has produced all documents you describe in
paragraphs 5, 7, and 10.

UFCW will agree to produce: (i) the exhibits to meeting minutes and other documents
you identify in numbers 1, 4, 9; and (ii) the document(s) in UFCW's possession in
response to paragraph number 3. These are being produced under separate cover.

UFCW is still researching the issue you set forth in paragraph 8, but should have this
resolved by the end of next week. With respect to footnote 2 to paragraph 8, we are not
aware of the existence of a written resolution.

Consistent with the global objections and positions plaintiffs have taken, UFCW will not
agree to produce, as you request in paragraph 2, a list of Plan participants for whom
Medicare is the primary payor as previously articulated in several meet and confers with
and letters to Kim Harris. Finally, we believe that paragraph 11 is overly burdensome
and harassing, particularly given that you have received all of the meeting minutes and
relevant attachments.

---

Contact Information:    **Elizabeth A. Fegan**     One North LaSalle Street    312 346 2222
                      **312 261 6191 Direct Dial**   Suite 2000              312 346 0022 fax
                      **eafegan@wexlerfirm.com**   Chicago, Illinois 60602   www.wexlerfirm.com



## T H E | W E X L E R | F I R M LLP

Mr. Lyndon Tretter
June 4, 2004
Page 2 of 2

If you have any questions, please let me know.

Sincerely,

Elizabeth A. Fegan

EAF:lyr

cc.     All Counsel of Record via Verilaw

# EXHIBIT 9



# HOGAN & HARTSON
### L.L.P.

LYNDON M. TRETTER
PARTNER
(212) 918-3528
LMTRETTER@HHLAW.COM

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

June 16, 2004

**BY FAX AND VERILAW**

Elizabeth Fegan, Esq.
The Wexler Firm
One North LaSalle Street
Suite 2000
Chicago, IL 60602

> **Re:**   **In Re Pharmaceutical Average Wholesale Price Litigation, MDL 1456**

Dear Beth:

This is to reply to your letter of June 4, 2004, which you write was intended to respond to my letter of May 13, 2004 regarding UFCW's document production.  Unfortunately, you have ignored several aspects of my letter.  We need to resolve these issues right away.

First, I previously wrote that, with respect to data on physician-administered drugs, UFCW seems to have divorced the claims data on the drug itself from the claims data on the administration of the drug.  I wrote that we need the entire set of claims data, "since other charges including, but not limited to, the charge for the office visit and any other fees for the drug's administration are relevant to this bundled drug and service."  Also, since the limited data you provided only went back to 1994, I wrote that "[w]e also request that you confirm that the data set you provided to us encompass all of the physician-administered drug claims for the relevant class period."  You have not said anything on either of the above points.  Please either provide the data or let me know why you decline to do so.

Second, I requested that UFCW search for documents stored in electronic form responsive to defendants requests, like e-mails and word-processed documents.  Again, your letter is silent.  Considering the pains to which plaintiffs

WASHINGTON, DC

BERLIN  BRUSSELS  LONDON  PARIS  BUDAPEST  PRAGUE  WARSAW  MOSCOW  TOKYO
NEW YORK  BALTIMORE  McLEAN  MIAMI  DENVER  BOULDER  COLORADO SPRINGS  LOS ANGELES



HOGAN & HARTSON L.L.P.
Elizabeth Fegan, Esq.
June 16, 2004
Page 2

have put defendants in terms of producing electronic discovery, I do not see how plaintiffs can justify not making electronic searches of themselves.

Third, while you do deal directly with my request that you search the files of the UFCW trustees for responsive documents (by objecting to it as "overly burdensome and harassing"), I am asking you to reconsider. I have read your June 11, 2004 letter to Kim Harris in which you analogize the plaintiff funds' trustees to the members of the boards of directors of the defendants. That analogy simply does not hold up. The plaintiff funds in this case are very small organizations. They generally have no operational management above an administrator and the administrator has no decision-making power on the matters at issue in this litigation. Conversely, corporate boards of directors rely on fairly large organizations comprising numerous levels of officers and employees who are responsible for the operation of the business and therefore board members do not receive or work with the kind of documents or data likely to be relevant in this litigation.

Moreover, I have asked you to search the UFCW trustees' files specifically because documents that I would expect the administrator, Dan Ryan, to have (such as Segal reports to the trustees) were not previously produced. Indeed, if we had not subpoenaed Segal, we might not have received some of the most important documents in the case with respect to UFCW. I suspect that these documents (and probably more) are in the possession of the trustees and that therefore UFCW has not engaged in good faith discovery. One final thought on this point: if on the other hand, no one on behalf of UFCW, including the trustees, has the missing documents, then it appears that UFCW has engaged in spoliation of relevant evidence.

Fourth, you have not responded to paragraph #6 in my May 13 letter seeking, "Data regarding reimbursements UFCW received from a Fund member's primary plan, or other insurance, and any other 'records of coordination recoveries' such as Mr. Ryan made reference to in his deposition on April 30, 2004." Such data is absolutely necessary to make sure that UFCW is not seeking money for drugs for which it was reimbursed from another source.

Fifth, you have not responded to my request (and to the Court's order) that you produce a log of documents withheld on the ground of privilege. I am not referring here simply to meeting minutes you that have redacted (we believe, improperly), but to other kinds documents that have been completely withheld.



HOGAN & HARTSON L.L.P.
Elizabeth Fegan, Esq.
June 16, 2004
Page 3

Finally, you write that you are not aware of the existence of a written "resolution" by the UFCW trustees authorizing this or a related earlier lawsuit. However, if there is any evidence of the trustees' having authorized this suit, such as a reference in a meeting minute or a communication to Mr. Ryan, we believe that is fairly encompassed in our request. Alternatively, if you are saying that the authorization was "oral" please inform us of when and how this was communicated.

I would appreciate your giving me a response by the end of next week. We are at the point where we must seek the Court's assistance if we cannot resolve these matters promptly.

Very truly yours,

Lyndon M. Tretter

cc: All counsel of record via Verilaw

# EXHIBIT 10



THE | WEXLER | FIRM LLP

June 23, 2004

Mr. Lyndon Tretter
Hogan & Hartson, L.L.P.
875 Third Avenue
New York, NY  10022

      Re:   *In re: Pharmaceutical Industry Average Wholesale Price Litigation*
            MDL No. 1456

Dear Mr. Tretter:

This is in response to your letter of June 16, 2004,  regarding UFCW's production of documents.

First, you assert that UFCW's claims database for physician-administered drugs is insufficient without including claims data on the administration of the drug.  We disagree.  UFCW has produced the entire "J-Code" database it has reflecting reimbursements for drug purchases that were administered by a physician.  Plaintiffs' claims in this litigation relate only to the price of the drug itself.  Therefore, we do not understand why you believe that ancillary charges related to office visits are relevant.  Please advise.

Second, you request the production of additional documents in electronic form, including e-mails and word processed documents.  UFCW is conducting a search for these documents.  We expect to produce to you whatever responsive documents there are by July 2, 2004.

Third, you again request responsive documents from the files of the current and former UFCW trustees.  All of the Plaintiff Funds have objected to this request as overbroad, duplicative, overly burdensome, harassing and unlikely to lead to the discovery of admissible evidence.  In your letter, you maintain that simply because Plaintiff Funds are smaller organizations than the defendants, their trustees should be subject to burdensome document searches from which the defendants' board members are exempt.  There is no basis for this assertion.  We stand by our objections.

Contact Information:  **Kenneth A. Wexler**       One North LaSalle Street    312 346 2222
              **312 261 6197 Direct Dial**   Suite 2000           312 346 0022 fax
              kawexler@wexlerfirm.com   Chicago, Illinois 60602   **www.wexlerfirm.com**



THE | WEXLER | FIRM **LLP**

Mr. Lyndon Tretter
June 23, 2004
Page 2 of 2

As Beth Fegan stated in her letter to Kim Harris on June 16, 2004, UFCW has already produced the minutes of its trustee meetings, as well as relevant hand-outs and exhibits. As you admit, defendants have subpoenaed UFCW documents from Segal. Your insinuations that documents may be "missing," or that there has been spoliation, are groundless. If you believe that a particular trustee or trustees have specific documents that you do not have, please advise and we will discuss it. Otherwise, from our perspective, the matter is closed.

Fourth, you request "data regarding reimbursements UFCW received from a Fund member's primary plan, or other insurance, and any other 'records of coordination recoveries' such as Mr. Ryan made reference to in his deposition on April 30, 2004." Reimbursement by coordination recoveries is a factor in approximately 1% of UFCW's pharmaceutical payments. The data for these recoveries is not maintained in a readily accessible form. The searching for and compiling of this data would be a highly burdensome task that would yield little helpful or relevant information for your purposes. Under these circumstances, we ask you to reconsider this request.

Fifth, you ask for the production of a privilege log. We have provided one, but will provide a supplemental log by July 2, 2004.

Finally, you again request evidence of a resolution "authorizing this or a related earlier lawsuit." As you note, we have previously told you that we are not aware of the existence of a written resolution. Moreover, as discussed above, we have produced all of the meeting minutes and related documents for the relevant time period. We are investigating your comments about an "oral" authorization and will advise you accordingly.

If you have any further questions, please let me or Beth know.

Very truly yours,

*K.A. Wexler / ABS*

Kenneth A. Wexler

KAW/jb

cc:   Elizabeth A. Fegan
      All counsel via Verilaw

# EXHIBIT 11



# HOGAN & HARTSON
L.L.P.

LYNDON M. TRETTER
PARTNER
(212) 918-3528
LMTRETTER@HHLAW.COM

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

July 19, 2004

**BY FAX AND VERILAW**

Kenneth A. Wexler, Esq.
The Wexler Firm
One North LaSalle Street
Suite 2000
Chicago, IL 60602

Re:   In Re Pharmaceutical Average Wholesale Price
Litigation, MDL 1456

Dear Mr. Wexler:

This is to reply to your letter of June 23, 2004 regarding UFCW's document production and to fulfill defendants' "meet and confer" obligation prior to making a motion to compel discovery.

On physician-administered drugs, our position is clear: one cannot look at the reimbursement of the drug in the abstract. Physicians and reimbursers negotiate prices based on both the drug and the services related to administering the drug. Indeed, in the Medicare Part B program, Congress and CMS (formerly HCFA), have for years noted that AWP-based drug reimbursements "cross-subsidize" low fees for drug administrative services and the practice component of reimbursement. Similarly, pharmacy-dispensed drugs often involve both an ingredient cost (drug) and a dispensing fee (service). UFCW has shown no resistance to disclosing the dispensing fees. Why UFCW insists on producing only the drug information and not the related claims information for physician-administered drugs is a mystery.

We intend to bring this issue to the attention of the Magistrate Judge unless you agree to produce full information (with the exception of patient identifying data) for those claims that involve physician-administered drugs and for which UFCW seeks recovery in this lawsuit. At the same time, we will move for a

WASHINGTON, DC

BERLIN   BRUSSELS   LONDON   PARIS   BUDAPEST   PRAGUE   WARSAW   MOSCOW   TOKYO
NEW YORK   BALTIMORE   McLEAN   MIAMI   DENVER   BOULDER   COLORADO SPRINGS   LOS ANGELES


E-SERVED
07/19/04
06:07 PM ET
AMP-MDL NO. 1456

HOGAN & HARTSON L.L.P.

Kenneth Wexler, Esq.
July 19, 2004
Page 2

protective order against the deposition notice plaintiffs recently served upon Bristol-Myers Squibb Company ("BMS") for a witness with knowledge of the link between reimbursement for physician-administered drugs and for reimbursement for the related services.  As I have told Beth Fegan of your office, BMS does not purport to have any such knowledge.  Rather, this is a fact about public and private reimbursers that I and other counsel have learned during the case.  Indeed, it is clear that the deposition notice addressed to BMS was served simply as a "knee-jerk" reaction to my continuing to seek this discovery from UFCW.

On the search of the UFCW trustees' files, we have limited our request to a search of documents relating to communications with The Segal Company.  We have asked that the trustees' files be searched for these particular documents because we know that they exist and the Administrator's office has not been able to provide them to us.  Please let me know if you are refusing even this limited request.

I am willing to reconsider our request for "Data regarding reimbursements UFCW received from a Fund member's primary plan, or other insurance, and any other 'records of coordination recoveries'" if UFCW will stipulate that it is unable for the purposes of this litigation to specify the drugs for which it was reimbursed from another source.   Otherwise, we must have the information.

On privilege issues relating to Board of Trustee meetings minutes, we have established that UFCW improperly redacted those portions of trustee meeting minutes where Segal and other visitors were present when the alleged legal advice was given.   Please produce the full minutes immediately.

In addition to the above, I look forward to receiving (a) the electronically-stored documents you refer to in your letter (which you said that you would supply by July 2nd) and (b) the results of your investigation into whether and in what form the UFCW trustees authorized this lawsuit.

Very truly yours,

Lyndon M. Tretter

cc: All counsel of record via Verilaw

# EXHIBIT 12



# T H E | W E X L E R | F I R M LLP

July 8, 2004

<u>Via Verilaw</u>

Mr. Lyndon Tretter
Hogan & Hartson, L.L.P.
875 Third Avenue
New York, NY 10022

RE:   *In re: Pharmaceutical Industry Average Wholesale Price Litigation,* MDL
No. 1456

Dear Lyndon:

As you know, plaintiff Funds have produced or made every effort to produce all
transactional data reflecting the payments that they have made for all branded and generic
drugs (and not just the AWPIDs) in their possession or control for the Relevant Period, in
accordance with the global agreement reached with Kim Harris in November 2003.

Now, you are requesting the production of fund payments for office visits and
administration related to Medicare Part B-covered drugs that are administered and paid
for outside of Medicare Part B. You stated that this information is related to the
manufacturers' defense that the AWP spread was used to help make up for the alleged
shortfall that the providers suffered in the cost of administration.

First, there is no evidence that the defendants' fraudulent inflation of AWPs was: (i) only
related to AWPs for Medicare Part B-covered drugs; or (ii) at all done in order to make
up for administration shortfalls. Second, an individual fund's payments for a bundle of
services will not demonstrate what the providers' costs were or whether insurance
payments overall were sufficient to cover them. Third, in the event that the
manufacturers' defense is true, the manufacturers will possess the relevant information,
*i.e.* the data used to calculate provider overhead and administration costs before the
manufacturers established the AWP and spread on a drug. Accordingly, there is no
reason to burden and harass the funds, or their third party administrators or insurers, for
information that is not reasonably calculated to lead to the discovery of admissible
evidence.

---

Contact Information:    **Elizabeth A. Fegan**          One North LaSalle Street      312 346 2222
                        **312 261 6191 Direct Dial**    Suite 2000                    312 346 0022 fax
                        **eafegan@wexlerfirm.com**      Chicago, Illinois 60602       www.wexlerfirm.com



T H E │ W E X L E R │ F I R M <sup>LLP</sup>

Mr. Lyndon Tretter
July 8, 2004
Page 2 of 2

However, in the interests of good faith, we are willing to explore these issues further with
BMS and reconsider our position if we are wrong. Accordingly, enclosed herewith please
find a Notice of 30(b)(6) deposition for BMS related to this issue.

Sincerely,

Elizabeth A. Fegan

EFH:lyr

Enclosure

cc:      All Counsel of Record via Verilaw (w/o encl.)



SERVED
07/08/04
01:54 PM ET
AWP-MDL No. 1456

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | |

## NOTICE OF RULE 30(B)(6) DEPOSITION OF BRISTOL MYERS SQUIBB

TO:    All Counsel of Record via Verilaw

PLEASE TAKE NOTICE that the undersigned attorneys for Plaintiffs shall take the deposition upon oral examination of the person most knowledgeable at **Bristol Myers Squibb** in this action regarding the matters designated on Exhibit "A," attached.  This deposition will be taken pursuant to Federal Rule of Civil Procedure 30(b)(6) and will be recorded by stenographic and/or sound and visual means.   The deposition will be take place as at 9:30 a.m. on July 22, 2004 at Hagens Berman LLP, One Main Street  4th Floor, Cambridge, MA 02142.

You are invited to attend and participate.

Dated: July 8, 2004

- 1 -



Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103


Tom Sobol
Edward Notargiacomo
Hagens Berman LLP
225 Franklin Street, 26th Floor
Boston, MA  02110

Steve W. Berman
Sean R. Matt
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101

Samuel Heins
Brian Williams
Heins, Mills & Olson, P.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402

CHAIRS OF LEAD COUNSEL COMMITTEE


Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901

Kenneth A. Wexler
Elizabeth A. Fegan
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602

MEMBERS OF LEAD COUNSEL COMMITTEE
AND EXECUTIVE COMMITTEE



## EXHIBIT "A"

### INSTRUCTIONS

All of the definitions from Plaintiffs' First Requests For Production of Documents Directed to All Defendants are incorporated herein by reference.

"AWPID" refers to all of the drugs identified in Exhibit A of the proposed Amended Master Consolidated Class Action Complaint.

"Spread" refers to the difference between AWP or any price upon which reimbursement for a drug is based, on the one hand, and the actual or net price paid for a drug on the other hand.

Unless otherwise specifically stated, each of these Areas of Inquiry encompasses the years 1991 through the present.

### AREAS OF INQUIRY

1.      The alleged shortfall that doctors or providers purportedly suffered in the cost of administration of any AWPID.

2.      The identity of the employees involved in the process of establishing, stating, changing or setting the AWP and/or  spread in order to help make up for the alleged shortfall that the providers purportedly suffered in the cost of administration of any AWPID

3.      The identity of all documents related to any contention that the AWP and/or spread was used to help make up for the alleged shortfall that the providers purportedly suffered in the cost of administration of any AWPID.

4.      The identity of all documents related to any  attempt to determine, calculate, evaluate or quantify a provider's cost to administer any AWPID.



5.      The identity of all documents related to any communications with any doctor or provider regarding the alleged shortfall purportedly suffered in the cost of administration of any AWPID.

6.      The process by which Bristol Myers Squibb analyzes, calculates, determines or otherwise considers the alleged shortfall that the providers suffered in the cost of administration of any AWPID.

7.      The process by which any pharmaceutical manufacturer analyzes, calculates, determines or otherwise considers the alleged shortfall that the providers suffered in the cost of administration of any AWPID.