# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) |
|  | ) |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) ) ) ) |

MDL No. 146

CIVIL ACTION: 01-CV-12257 PBS

Judge Patti B. Saris

Chief Magistrate Judge
Marianne B. Bowler

## OPPOSITION OF MCKESSON CORPORATION TO PLAINTIFFS MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS

COOPER, WHITE & COOPER LLP
201 California Street, 17th floor
San Francisco California 94111
415.433.1900

BONNER, KIERNAN, TREBACH & CROCIATA
One Liberty Square
Boston Massachusetts 02109
617.426.3900

**ATTORNEYS FOR MCKESSON CORPORATION**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................1

FACTUAL BACKGROUND.........................................................................................................2

ARGUMENT................................................................................................................................9

I.   In The Court's Balancing Of The Discovery Scales, McKesson Is Entitled
     To Special Consideration Because It Is Not A Party. ........................................................9

II.  McKesson Has Provided Appropriate Documents. ...........................................................9

III. McKesson Requests Sanctions .......................................................................................17

CONCLUSION...........................................................................................................................19

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*Echostar Communications Corp. v. The News Corporation Limited*,
180 F.R.D. 391, 394 (D. Colo. 1998)...................................................................... 9

*In re Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir.1998).......................... 9

*Solarex Corp. v. Arco Solar, Inc.*, 121 F.R.D. 163,179 (E.D.N.Y. 1998)................ 9

## Federal Rules

Federal Rule of Civil Procedure 34............................................................... 1
Federal Rule of Civil Procedure 45.........................................................2, 3, 4

## INTRODUCTION

McKesson Corporation ("McKesson") is not a party to this litigation. Nevertheless, in the past few months it has received four subpoenas requesting documents pursuant to FEDERAL RULE OF CIVIL PROCEDURE 34. Taken at face value, the document requests would require production of documentation concerning billions of transactions. In response McKesson investigated what responsive documents it has, negotiated with the requesting parties in an attempt to reach agreement on the extent of production and has made two productions, totaling thousands of documents.

For some reason, in the midst of these discussions, plaintiffs filed this motion to compel that makes assertions of noncompliance that are false and, worse, that plaintiffs' counsel know are false. The repeated statements that McKesson has not provided any documents were untrue at the time the motion was filed on August 16, 2002 and are even less true today, since a second production was made on August 27, 2004. Similarly, plaintiffs' assertion that McKesson did not object under Rule 45 to the Amended Subpoena that is the object of this motion is demonstrably false, based on the correspondence that is attached to plaintiffs' own motion. Indeed, while these assertions are made in the memorandum, they are not supporting by anything offered as evidence.

Counsel for McKesson has brought these factual inaccuracies to the attention of plaintiffs' counsel who have treated this subject with indifference and refused to withdraw the motion. Thus, McKesson files this response demonstrating that it has responded appropriately to discovery requests and that the demands are unreasonable as to both the

1

amount of material requested and the time by which delivery is expected. While McKesson still intends to cooperate with legitimate requests for documents, McKesson requests that this motion to compel be denied and that, as sanctions, McKesson be awarded the costs of preparing this response.

## **FACTUAL BACKGROUND**

McKesson is a wholesaler of pharmaceutical products, such as those involved in this litigation. McKesson is not a party to this case and is familiar with the issues presented only through word of mouth and review by its counsel of a selection of pleadings available on this Court's website.

Initial Document Subpoena: In February 2004, McKesson received the first of two subpoenas from plaintiffs' counsel Elizabeth Fegan Hartweg of the Wexler Firm LLP in Chicago. (Declaration of Scott A. George filed in support of the motion to compel ("George Decl."), Exh. A.). McKesson referred to the matter to its counsel, Peter K. Huston of Lathan & Watkins LLP, San Francisco, who served an appropriate objection letter under FEDERAL RULE OF CIVIL PROCEDURE 45, dated March 15, 2004. (George Decl., Exh. B.)

Amended Subpoena: There the matter rested for two months, until May 5, 2004, when an Amended Subpoena was sent to Huston with a request that he accept service. (Declaration of Peter K. Huston in support of this opposition ("Huston Decl."), Exh. A.) This Amended Subpoena was identical to the first subpoena except that it increased the number of drugs for which information was requested. (George Decl., ¶ 4, Exh. C.)

Rule 45 Objection to Amended Subpoena:  Huston, who was investigating a possible conflict with another client, never accepted service.  (Huston Decl., ¶4.) Plaintiffs' motion offers no evidence that it was ever served on McKesson.  In any event, when George brought the Amended Subpoena to Huston's attention, they agreed that Huston's previous objection letter, made pursuant to FEDERAL RULE OF CIVIL PROCEDURE 45, would apply to the Amended Subpoena as well, since the areas of inquiry were identical. (Huston Decl., ¶5.)[1]  Huston's June 16, 2004 letter to George (George Decl., contained in Exh. E), confirming this agreement made during their June 11, 2004 telephone call also confirms that Huston would be unable to represent McKesson with regard to this subpoena due to a conflict of interest.  Huston suggested that until McKesson retained outside counsel, George should deal directly with Kimbir Tate in the McKesson Law Department.  Indeed, the copy of Huston's letter that George has attached to his declaration has Ms. Tate's telephone number handwritten in the margin.

New Counsel:  On approximately June 15, 2004, McKesson contacted Stephen Kaus and Cooper, White & Cooper LLP about serving as outside counsel with regard to the Amended Subpoena.  This new representation was not instantaneously effective because the firm had to run a conflict check involving over one hundred parties. (Declaration of Stephen Kaus ("Kaus Decl.") ¶ 2.)  On Friday June 18th, after business hours in the East, Kaus e-mailed George and left a voicemail, introducing himself as

---

1       A June 16, 2004 confirming letter from Huston to George states "[y]ou agreed that the objection letter that McKesson's [sic] sent in response to the previous subpoena would suffice for purposes of the May 5 subpoena." Although plaintiffs' memorandum states twice on page 2 that McKesson did not respond to the Amended Subpoena,

counsel to McKesson, stating his understanding that the subpoena had not been served and promising to call on the next business day, Monday June 21, 2004. (*Id.*)

Discussions: That conversation occurred on Tuesday, June 22, 2004. Kaus agreed to accept service of the subpoena as of that date. Kaus and George also discussed the categories of documents plaintiffs had requested. George admitted that the subpoena was too broad to expect literal compliance, as it called for millions of documents. George offered to narrow the subpoena and suggested a sampling of documents rather than every single document in each category. George gave Kaus the impression that he would work with Kaus to narrow the subpoena to manageable proportions. (Kaus Decl., ¶ 3.)

On Friday, June 25, 2004, three days later, George left an impatient voicemail for Kaus at 5:15 a.m. Pacific Daylight Time and followed up with a letter faxed later that day. Although service had been accepted only three days earlier, George's letter inexplicably refers to McKesson's response as being "long delinquent." He closes his letter by threatening that that "[t]o insure that this matter moves forward, a Motion to Compel may follow shortly." (Kaus Decl., Exh. A)

Kaus' response letter of June 28, 2004 (George Decl., Exh. E, and Kaus Decl., Exh. B), set out the difficulty of obtaining the data that George requested. As is indicated in that letter and in the Declaration of Kimbir Tate in support of this opposition ("Tate Decl.") there are insurmountable hurdles in obtaining the 13 years of transactional information George requested. Information concerning the transactions is stored in an

---

neither George's declaration or any other evidence supports this false assertion.

undifferentiated manner making both the search for and retrieval of the information extremely difficult at best.   McKesson has no business need for this information. Because McKesson retains two years worth of data in a more accessible manner, Kaus suggested that plaintiffs limit their requests to two years.[2] In addition to the letter of June 28, Kaus and George spoke that day and discussed obtaining documents in various other categories.   These included McKesson's contracts with major pharmacies and pharmacy benefit managers and evidence given by McKesson in other investigations into Average Wholesale Price ("AWP").  Kaus informed George that McKesson has been asked to provide evidence in many investigations and has no way of knowing which investigations deal significantly with AWP.  Kaus requested that George identify the investigations in which he was interested.  George indicated that California, Texas and Arkansas had conducted investigations.  (Kaus Decl., ¶ 5)

On June 30, Kaus and George again spoke.  George said "lead counsel" was "itching to make a motion."  Kaus told him to go ahead, but that as far as McKesson was concerned, it had only been ten days since service.  (Kaus Decl., ¶ 6)

On July 11, 2004, 19 days after he agreed to accept service on behalf of McKesson, Kaus sent a lengthy substantive e-mail to George, following upon their discussion and narrowing the original request to something manageable.  (Kaus Decl., ¶7, Exh. C.)  Specifically, Kaus summarized the requests by category.  With regard to the

---

2        Beyond two years, the information is ineligible and virtually impossible to retrieve.  (See Tate Decl., pp 2-4.)  Additionally, the cost of historic data retrieval is considerable and Kaus indicated in his June 28, 2004 letter that McKesson expected to be compensated the costs that were expected to run into the hundreds of thousand of dollars,

category 1 transactional data request, Kaus confirmed George's statement that two years of information would be satisfactory and indicated that the file could be sorted by drugs, if George would provide the identifying NDC numbers for each drug.  Kaus also indicated that some of the requested information regarding rebates, discounts, other adjustments was not maintained by McKesson and although chargeback information for the last 2 years was available electronically, it would take six weeks to obtain.  Kaus offered paper records of this information for immediate review in Carollton, Texas.

With respect to category 2, which requests various contracts regarding sharing of information, Kaus indicated which documents were available.  In category 3, calling for agreements with pharmacies and pharmacy benefit managers, Kaus agreed to provide the agreements that could be located.  In category 4, concerning information provided in other investigations and proceedings regarding AWP, Kaus offered to provide the material that McKesson submitted to a 2003 Congressional investigation relating to AWP.  Kaus further indicated that McKesson would review other investigations if George would identify them, but that McKesson was unaware of any other investigations focusing on AWP. With regard to category 5, the e-mail agreed to provide an organizational chart and indicated that although there is no broad document retention policy, the company complies with different governmental and business requirements for each type of data.

George never seriously responded to the detailed July 11th e-mail and indeed the

---

something to which plaintiffs refused to commit.  (See Kaus Decl., ¶ 11)

final communication in his declaration supporting the motion to compel and the final note in his telephone log is dated July 7, reporting accurately that McKesson's response was delayed by a flood of its Law Department. No facts occurring after July 7th are discussed in plaintiffs' August 16th motion or the George declaration, which may explain why so many assertions in the memorandum are erroneous.

Initial Production: Ten days after Kaus sent this e-mail, on July 21, 2004, McKesson made a significant document production to George by overnight courier.[3] This included (1) a compact disc containing contracts with several large pharmacy chains (Rite-Aid, Costco, Wal Mart, Target, Walgreens and Safeway); (2) an organizational chart of McKesson; and (3) a compact disc containing electronic copies of the materials McKesson supplied to the Congressional investigation into AWP. Additionally, Kaus reiterated in his cover letter that McKesson would search for and supply two years of transactional data if George would provide the appropriate identifying NDC numbers for the drugs at issue. (Kaus Decl., ¶9, Exh. D.)

Subsequently, Kaus and George spoke by telephone about whether there were other investigations into AWP for which McKesson had provided information. Kaus obtained materials from the Texas investigation and although AWP appeared to be only peripheral, indicated to George that those materials would be supplied.

Motion to Compel: On August 16, 2004, although the documents indicated above

---

3    Plaintiff's memorandum repeatedly states that McKesson provided no documents. This was false and not supported by any evidence.

had been supplied and although plaintiffs and McKesson had agreed that two years of

transactional data would be supplied if plaintiffs supplied the NDC numbers, and

McKesson had promised the Texas materials, plaintiffs filed this motion to compel.  The

memorandum, falsely and without support, states that McKesson provided no documents

in response to the subpoena.  When Kaus pointed this significant inaccuracy out to

plaintiffs' counsel, Tony Sievert and later to George.  (Kaus Decl., ¶10, Exh. E), they

refused to withdraw the motion, necessitating this opposition.

Second Production:  On Friday, August 27, 2004, McKesson provided substantial

additional documents to plaintiffs.  These included the transcripts of three lengthy

depositions by McKesson employees in the Texas investigation; 2397 documents from

that investigation, both highly confidential and non-confidential, the document request

from the congressional investigation and the cover letter from McKesson's associate

general counsel that accompanied the provision of data to the United States House of

Representatives Committee on Energy and Commerce (documents that George

specifically requested), and two contracts between McKesson and First Data Bank

regarding provision of information.[4]

NDC Numbers Provided:  On August 30, 2004, George finally e-mailed a list of

the NDC numbers for most of the drugs for which plaintiffs are requesting transactional

information.  McKesson now will provide two years of data as promised.

---

4       McKesson also will produce witnesses responsive to plaintiffs' deposition notice under F.R. Civ. P.
30(b)(6).

## ARGUMENT

**I.    In The Court's Balancing Of The Discovery Scales, McKesson Is Entitled To Special Consideration Because It Is Not A Party.**

While McKesson, as a third party is, of course, subject to discovery, McKesson's non-party status weighs against disclosure. *Echostar Communications Corp. v. The News Corporation Limited*, 180 F.R.D. 391, 394 (D. Colo. 1998); *Solarex Corp. v. Arco Solar, Inc.,* 121 F.R.D. 163,179 (E.D.N.Y. 1988) (nonparty status a significant factor in determining whether discovery is unduly burdensome).

The current generally prevailing view is that a court should first consider whether information should be obtained by direct discovery from a party, as opposed to from a non-party, and that the court should give special weight to the unwanted burden thrust upon non-parties when evaluating the balance of competing needs. *In re Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir.1998) (collecting cases).

**II.    McKesson Has Provided Appropriate Documents.**

McKesson will discuss the document requests individually.  The requests are reproduced in bold type.  These responses are substantiated by the Tate Declaration .

### *Category 1: Pricing and Pricing Related*

**1. All documents evidencing prices paid to You for Identified Drugs.**

As plaintiffs' memorandum acknowledges, McKesson offered two years of transactional data for item 1, obviously a key request.  In fact, this was offered in early July.  Plaintiffs complain that no documents have been provided in this category, but omit

9

to tell the Court that this is because plaintiffs had not provided the identifying NDC numbers as they promised they would do. On August 30, 2004, plaintiffs finally supplied the majority of the NDC numbers. Now that those numbers have been provided, McKesson will provide the requested data for the past two years.

McKesson has explained to plaintiffs that the data for two years is kept in electronic form that is easily searched and sorted, while the earlier data is unreliable and must be searched with a specially written computer program. As is set out in the Tate Declaration, beyond two years, the historical information plaintiffs seek would have to be farmed from the sales history tapes at a single McKesson Data Center where all orders are received and then transmitted to regional distribution centers ("Distribution Centers"). McKesson processes approximately 15 million transactions a day. This information is not sorted in any way and a computer program has to be written to search for whatever is sought, reading every single line of the tape. The program has to be run, which can take days or weeks, depending on the extent of the search.

Even then, the information will not be complete, because it is recorded by NDC numbers that change over time. McKesson has no historical information on previous NDC numbers, has no way to track changes. Internally, McKesson tracks drugs by Economost numbers that must be converted to NDC numbers. Numbers change and are reused over time.

The data retrieval is not particularly reliable. Although the same program appears to have been used over the years in question, the program and coding language

10

have been updated periodically and older data may not be accessible. McKesson has experienced serious validity problems with searches for data from prior to 1998, the last time that a major change occurred. Additionally, all of the information is on a single set of tapes that is used for other requests that precede those of plaintiffs.

Finally, the cost of historical data retrieval is considerable and McKesson expects to be compensated pursuant to the Federal Rules. To obtain a report on a single drug can take in excess of 80 hours including writing a search request converting NDCs to Economost numbers, debugging, validating data and conducting the search. Several years ago, McKesson determined that its search cost was $50 per Distribution Center per month searched. It is higher now. What plaintiffs are requesting would cost hundreds of thousands of dollars. McKesson has requested that plaintiffs commit to paying this cost, but this request has been ignored. Plaintiffs took the position that McKesson should retrieve the data and then request compensation through the court. (Kaus Decl., ¶ 11.)

**2. All documents evidencing the Net Transaction Cost to Your customers for Your Sales of Identified Drugs.**

McKesson has explained that it does not have access to all discounts and therefore cannot know the "Net Transaction Cost" to its customers and does not have documents described by item 2.

**3. All documents sufficient too show the rebates, discounts, chargebacks and other adjustments provided to You by a Defendant, or administered by You on behalf of a Defendant, for each of the Identified Drugs.**

McKesson has explained various problems and plaintiffs have not seriously

11

attempted to "meet and confer", but instead proceeded to file this motion.  First, although

McKesson has sales history data through the Relevant Time Period from January 1, 1991,

those tapes do not contain rebate, discounts, chargeback or other adjustments.  McKesson

has a chargeback system which it began automating in July 2000.  There are "electronic"

records of chargebacks, but the data is captured by manufacturer and not by product, so

the breakdown requested by plaintiffs is virtually impossible and certainly very time

consuming.  In addition, multiple requests for chargebacks are sent to a manufacturer in a

single Credit Memo.  To obtain a line item, McKesson would have to manually review

each Credit Memo, which could take several months.  Using the NDC numbers that were

finally provided on August 30, 2004, McKesson can provide chargeback data for

approximately two years, within a month.  As for discounts, McKesson routinely receives

a two percent (2%) discount for prompt payment, but doers not amortize that amount for

each product, so the documents sought do not exist.

> **4. All documents relating to a Defendant's suggested price for Any identified Drug, including, but not limited to prices that a Defendant has suggested for sales that You make to a member of a group purchasing organization.**

Item 4 is inconsistent with the structure of drug wholesaling.  McKesson generally

sells drugs either at a contract price negotiated between the manufacturer and McKesson's

downstream customer or for Wholesale Acquisition Cost plus or minus McKesson's

mark-up.  As for group purchasing organizations ("GPOs"), McKesson provides products

to the members of at a price negotiated between the GPO and the manufacturer.

McKesson receives the pricing from the manufacturer and the membership list and

12

eligibility from the GPO. This process creates a negotiated contractual price between the GPO and the manufacturer, not a "suggested" price. McKesson does not keep historical information other than the chargeback data discussed in connection with item 3 above.

### *Category 2: AWP, Publications and Pricing Surveys*

**5. All documents concerning AWP, including, but not limited to (i) documents related to your use of AWP as a pricing term or pricing benchmark in any of Your contracts; (ii) documents discussing how You or others define AWP; (iii) documents discussing how AWP has been, or is currently, calculated; (iv) documents identifying the source that You use for determining AWPs; (v) all communications between you and a Defendant concerning AWP; (vi) all communications between you and a Publisher concerning AWP; and (vii) all communications between you and a Pharmacy Benefit Manager concerning AWP.**

McKesson does not use AWP in its pricing and has no interest in it. Therefore McKesson is not aware of having any of the described documents. McKesson has explained to plaintiffs that it receives a report of the AWP from publisher First Databank and includes that on invoices and computer screens at the request of customers. McKesson does not keep a record of the data it receives from First Databank. Each set of data overwrites the previous data. McKesson also reports sales data to publishers, but not denominated AWP. McKesson is not aware of the manner in which publishers use this sales data.

**6. All documents relating to Your role, or a Defendant's role, in the publication, appearance, or advertisement of the AWP of each identified Drug in Publications during the Relevant Time Period.**

McKesson is not aware of having a role in the publication, appearance, or advertisement of the AWP and therefore believes that it has no such documents.

13

**7.  All documents concerning any pricing survey conducted by any Publication.  This request included but is not limited to any Pricing data that you provided to a Publication.**

As stated above, McKesson reports sales data to publishers through contractual arrangements, but not any data denominated AWP.  McKesson is not aware of the manner in which publishers use this sales data and whether it qualifies as a "survey".

**8.  All contracts with Publications and all communications with Publications regarding Identified Drugs.**

On August 27, 2004, as it represented it would, McKesson provided two such contracts with entities that became First Databank.  McKesson is unaware of any other such contracts.

### *Category 3: Relationships with Pharmacies and PBMs*

**9.  All contracts between You and the five largest retail pharmacies.  "Five largest retail pharmacies" refers to the five pharmacies that represent your largest retail sales volume over the past three calendar years.**

The statements in support of plaintiff's motion that McKesson has provided no documents in this category were untrue when the motion was filed, and difficult to reconcile with a good faith attempt to recite the facts accurately.  In fact, contracts with the six largest retail pharmacies – Costco, Wal-Mart, Rite-Aid, Target, Walgreens and Safeway - were provided on July 21, 2004, 26 days before plaintiffs filed the motion and affidavit stating that no such documents had been provided.

**10.  All contracts between You and Pharmacy Benefit Managers Caremark, Medco, Express Scripts and AdvancePCS.**

McKesson is still searching for any such documents.

14

### Category 4: Investigations, Suits and Complaints

**11. All documents produced by You, whether voluntarily or involuntarily, in any Government Investigation or inquiry related to the use of AWP, Rebates or any other consideration provided to you by a defendant.**

On July 21, 2004, McKesson gave plaintiffs a CD containing the information that it provided to a 2003 Congressional investigation relating to AWP. McKesson provided this information in electronic, rather than paper form to assist plaintiffs in reviewing and sorting the data. (Kaus Decl., ¶ 9) Plaintiffs then requested the cover letter that accompanied the submission and the document request. (Kaus Decl., ¶ 12) On August 27, 2004, McKesson provided the cover letter from Associate General Counsel Richard Ardoin and a press release containing the text of the document request. McKesson explained to plaintiffs that it does not believe that it ever actually received a document request from Representative Tauzin's committee. (Kaus Decl., Exh. F)

George and Kaus have discussed this item several times. Kaus, on behalf of McKesson requested that George identify the investigations he had in mind. McKesson believes that plaintiffs know full well what investigations they believe relate to AWP, while McKesson, which responds to numerous governmental inquiries, generally is not in a position to know the purpose of any particular investigation. George has declined to do this, except that he identified several states where he thought there had been investigation. McKesson retrieved the documents from a Texas proceeding that George had mentioned from its counsel in Texas and reviewed them. Although it does not appear that AWP was at the heart of the matter, and although this action was *qui tam* litigation rather than an

15

investigation strictly speaking, on August 27, 2004, McKesson provided the transcripts of three McKesson employees' depositions and 2397 additional pages of documents that was provided to the Texas Attorney General. McKesson remains willing to attempt to determine what was provided in other investigations if plaintiffs will identify the investigations in which they are interested.

> **12. All documents relating to any legal proceeding (by country [sic], court, caption case number etc.) including but not limited to court hearings, legislative hearings, mediations, or arbitrations, in which you were a party, regarding the use of AWP, Rebates or any other consideration provided to you by a Defendant.**

McKesson is unaware of any such matters in which it was a party.

> **13. All affidavits, declarations, or other written statements, including drafts, provided by you regarding the use of AWP, Rebates or any other consideration provided to you by a defendant.**

As with item No. 11, McKesson would research, within reason, any proceeding identified by plaintiffs, but is unaware of any McKesson employee having provided any such written statement.

### *Category 5: Miscellaneous*

> **14. All current and historical organizational charts for all of Your departments.**

McKesson has provided a general organization chart and has identified witnesses that it will produce in response to the categories identified in plaintiffs' deposition subpoena to McKesson under F. R. Civ. P 30(b)(6). The organizational chart was provided on July 21, 2004, so plaintiffs' statement at page 6 of the memorandum in support of the August 16th Motion to Compel that " not a single [category 5] document

has yet been produced to plaintiffs" is difficult to justify.

> **15. All documents sufficient to identify Your policy or practice of document retention, destruction, disposal or preservation for each year during the relevant Time Period.**

In the July 11 e-mail from Kaus to George, plaintiffs were informed that "McKesson has no wide-reach document retention policy. McKesson complies with different governmental and business requirements for each type of data." Plaintiffs have never followed up this response with more specific inquiries. This is one of the categories in the deposition of McKesson that plaintiffs are taking under F.R.Civ. P 30(b)(6).

## III.   <u>McKesson Requests Sanctions</u>

Under F.R.Civ. P. 37 (4)(B), if a motion to compel is denied, the Court "shall" require the moving party or attorney to pay the responding party's reasonable expenses incurred in opposing the motion, including attorneys' fees, unless the Court finds that the motion was substantially justified or other circumstances make an award of expenses unjust. McKesson submits that an award of such expenses is appropriate here.

## **CONCLUSION**

The Court should deny the motion to compel and award McKesson the expenses it

has incurred.

Dated:  September 3, 2004

COOPER, WHITE & COOPER LLP
201 California Street, 17th floor
San Francisco California 94111

BONNER, KIERNAN, TREBACH &
CROCIATA
One Liberty Square
Boston Massachusetts 02109

**ATTORNEYS FOR MCKESSON
CORPORATION**

**504118**