## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE ) | |
| LITIGATION ) | CIVIL ACTION: 01-CV-12257-PBS |
| ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | Judge Patti B. Saris |
| ALL ACTIONS ) | |
| ) | |
| ) | |
| ) | |

## B. BRAUN OF AMERICA INC.'S OPPOSITION TO PLAINTIFFS'
## MOTION TO COMPEL B. BRAUN OF AMERICA TO MAKE
## SUPPLEMENTAL RULE 30(B)(6) DESIGNATION

The plaintiffs have no reasonable basis for moving to compel B. Braun of America Inc. ("BBA") to engage in further discovery to prove that BBA is not properly a party to this litigation. Having squandered the time given by this Court to engage in jurisdictional discovery, the plaintiffs have no grounds for seeking to delay even further the dismissal of their meritless claims against BBA.

Moreover, despite their attempt to cast blame on BBA through this frivolous motion, the plaintiffs have not identified a single piece of information that is remotely relevant to the jurisdictional issues before the Court that was not fully addressed by BBA in its 30(b)(6) deposition. The instant motion is wholly without merit and should be rejected by this Court on the grounds that it is untimely and in bad faith, directly violates the Local Rules of this Court, and has been submitted solely in an attempt to justify the plaintiffs' utter failure to engage in the jurisdictional discovery allowed by the Court.

## FACTUAL BACKGROUND

In their September 6, 2002 Master Consolidated Class Action Complaint ("MCC"), the plaintiffs brought claims against B. Braun Medical Inc. ("BBM") based on the Average Wholesale Prices ("AWPs") established by industry publications for some of its drugs. That Complaint was dismissed as to BBM by the Court's Order of May 13, 2003 for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and 9(b). (Mem. and Order of May 13, 2003 at 45-47.) The plaintiffs were given thirty days to remedy the deficiencies in their allegations and to seek leave to file an amended complaint against these defendants. (*Id.* at 47.) The plaintiffs filed their proposed Amended Master Consolidated Class Action Complaint ("AMCC") on June 12, 2003. In the AMCC, which the Court allowed to be filed on June 18, 2003, the plaintiffs made no

1

attempt to reassert any claims against BBM.  Instead, they brought claims only against a new party, B. Braun of America Inc.

BBA immediately objected, informing the plaintiffs that it was not a proper party to this litigation and did not manufacture, distribute, or sell any of the drugs identified in the AMCC. (Mem. in Support of BBA Mot. to Dismiss the AMCC ("BBA Mem.") at 1-2.)  Further, as BBA has no contacts with the Commonwealth of Massachusetts, BBA moved to dismiss the AMCC for lack of personal jurisdiction.  In response, the plaintiffs acknowledged that BBA is "the parent company of B. Braun Medical, Inc., the original B. Braun Defendant named by Plaintiffs" (Pls.' Resp. to Def. Spec. Mem. at 43), but they failed to address BBA's argument, supported by a declaration from its Senior Vice President, that it does not manufacture any of the drugs at issue and has no contacts that would subject it to the personal jurisdiction of this Court.  (Decl. of Charles A. DiNardo, Attach. to BBA Mem., at 2.)

When BBA subsequently pointed out to the Court in its Reply that the claims against it must be dismissed because the plaintiffs had "offered absolutely no evidence" and "utterly failed to address" the merits of BBA's claim of lack of personal jurisdiction (BBA Reply in Support of Mot. to Dismiss AMCC at 1), the plaintiffs, for the first time, claimed that they needed "limited discovery into jurisdictional issues" in order to determine whether there was a basis for exerting jurisdiction over BBA.  (Pls.' Reply to Def. Spec. Mem. at 35-36.)  On February 24, 2004, the Court granted the plaintiffs' request and allowed them *six months* to engage in jurisdictional discovery before a decision would be reached on BBA's motion to dismiss.  The Court expressly directed the plaintiffs to "respond to the issues of personal jurisdiction ... *by August 24, 2004*." (Mem. and Order of Feb. 24, 2004 at 23) (emphasis added).)

2

Having gotten their temporary reprieve from the dismissal of BBA from the AMCC, the plaintiffs proceeded to take *no further action*. For more than five months, the plaintiffs sent no document requests, interrogatories, or requests for admission to BBA relating to the jurisdictional issues. The plaintiffs did not send any notices of deposition to BBA or to any related third parties who might have information relevant to their jurisdictional arguments. In fact, the plaintiffs made *not a single attempt* to obtain information from BBA regarding the jurisdictional issues.

Then, shortly before their six-month deadline was about to expire, the plaintiffs made one half-hearted attempt to save their meritless claims against BBA by undertaking some jurisdictional discovery. On the evening of August 4, 2004, less than three weeks before the Court-imposed deadline to provide evidence to support their jurisdictional arguments, they sent to BBA's counsel notice of their intent to take a 30(b)(6) deposition of BBA *eight days later*, on August 12, 2004, identifying six areas of inquiry. (*See* Notice of 30(b)(6) Dep. at 3-4) (Attached hereto as Exhibit A.)

The plaintiffs' notice was made in direct violation of the Court's Order regarding the scheduling of discovery in this case. As the plaintiffs are well aware, Case Management Order ("CMO") No. 10 specifies that parties must provide each other "*at least* 21 days notice for a proposed deposition" and that a party has up to 45 days to produce 30(b)(6) witnesses. (CMO 10 ¶¶ 6-7 (emphasis added).) Having done nothing until the Court's deadline was only *twenty days* away, the plaintiffs had effectively precluded themselves from seeking to depose any BBA witnesses, through a 30(b)(6) deposition or otherwise. Nonetheless, without acknowledging their blatant violation of CMO 10, the plaintiffs sent their demand for a 30(b)(6) deposition to occur on eight days' notice.

3

Clearly, BBA had every right to demand compliance with CMO 10 and to refuse to prejudice itself with the burden of producing a 30(b)(6) witness in such a short period after the plaintiffs had squandered their six-month opportunity to take jurisdictional discovery. Had BBA justifiably refused to allow the plaintiffs to disregard CMO 10, they would have had no choice but to admit to the Court that, due solely to their own inactivity, they had gathered absolutely no evidence to refute BBA's showing that it is not properly a party to this litigation. However, hoping to bring this long-delayed process to a close and to facilitate a resolution of its motion to dismiss that has been pending for more than a year, BBA accommodated the plaintiffs' eleventh-hour demands and agreed to make a 30(b)(6) witness available on August 17, 2004 for the limited purpose of engaging in jurisdictional discovery of BBA.

On August 11, 2004, well before the scheduled deposition, BBA filed its Objections to the plaintiffs' Notice of Deposition. In those objections, BBA reiterated that it "neither manufactures nor sells any of the pharmaceuticals listed in Appendix A to the Amended Master Consolidated Class Action Complaint ("AMCC")" and that it was designating a 30(b)(6) witness solely to "allow[] limited discovery by the plaintiffs for the purpose of resolving BBA's motion to dismiss for lack of personal jurisdiction." (Corrected Obj. at 1) (Attached hereto as Exhibit B.) BBA further expressly objected to the Notice "to the extent it seeks information beyond 'matters known or reasonably available to' BBA, *such as matters concerning other entities* ***but not BBA***." (*Id.* at 2 (emphasis added).) BBA reiterated this objection to each of the specific Areas of Inquiry identified by the plaintiffs. (*Id.* at 4-7.) At no time prior to the deposition nor since have the plaintiffs responded or objected to the limitations placed on the scope of the deposition by BBA.

4

During the deposition, both the witness and counsel for BBA reiterated that the witness was present subject to BBA's objections and, as the designated representative of BBA, could provide only information that was known or reasonably available to BBA.  In that role, the witness fully addressed each of the plaintiffs' inquiries and provided the plaintiffs with the knowledge of B. Braun of America Inc.  When BBA's designee understandably was unable to provide information *unknown and unavailable to BBA*, the plaintiffs did not attempt to reach a resolution with BBA and did not seek the desired information through other means.  Instead, without any notice to or discussion with BBA, the plaintiffs filed the instant motion to compel, claiming that the parties were unable to resolve their disputes and that BBA had single-handedly prevented them from obtaining the information they needed to address the jurisdictional issues pending before the Court for more than a year.  The plaintiffs' motion is procedurally improper, was not brought in good faith, and lacks merit.  As a result, the motion should be denied.

## ARGUMENT

**I.    The Plaintiffs' Motion to Compel Should be Denied as Violating  the Court's Order to Complete All Jurisdictional Discovery by August 24, 2004.**

The Court allowed the plaintiffs six months to engage in discovery to refute BBA's well-supported argument that it is not properly a party to this litigation.  That period expired on August 24, 2004.  Through this motion, the plaintiffs improperly are seeking to extend that Court-imposed deadline.  The plaintiffs have no reasonable explanation for their failure to engage in jurisdictional discovery in a timely fashion, and their dilatory conduct should not be rewarded.

As clearly established in BBA's Motion to Dismiss, the plaintiffs have no grounds for bringing claims against it in the MDL litigation.  Despite the fact that the plaintiffs had offered

absolutely no evidence to support their claim of jurisdiction over BBA, the Court allowed them six months of jurisdictional discovery before ruling on BBA's motion.

At the completion of that six-month period, it has only become even more obvious that the plaintiffs had no basis whatsoever for bringing claims against BBA, notwithstanding their express obligation to have engaged in a reasonable inquiry prior to filing the AMCC to ensure that their claims were well-grounded in fact. *See* Fed. R. Civ. P. 11(b) ("By presenting to the court . . . a pleading . . . an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . (3) the allegations and other factual contentions have evidentiary support . . . ."); *see also Divot Golf Corp. v. Citizens Bank of Mass.*, No. 02-CV-10654, 2003 WL 61287, at *1 (D. Mass. Jan. 8, 2003) ("Rule 11 'require[s] litigants to "stop-and-think" before initially making legal or factual contentions.'" (quoting Fed. R. Civ. P. 11 (b), advisory committee notes to 1993 Amendments)).

The plaintiffs have made no meaningful effort to engage in jurisdictional discovery of BBA or to seek relevant information from any other sources.   For example, although the plaintiffs seem to believe that information regarding the business activities of B. Braun Medical Inc., a separate corporate entity that was dismissed from this litigation on May 13, 2003 and that the plaintiffs knowingly chose *not* to include in their AMCC, is somehow relevant to their claims against BBA, they failed to engage in discovery of B. Braun Medical Inc. itself.

Instead, the plaintiffs waited until the time allotted by the Court had effectively expired, attempted to discover information through BBA that it does not have and has no obligation to obtain, frivolously blamed BBA for the plaintiffs' own inactivity, and now improperly seek to continue this charade indefinitely. *See* Pls.' Mem. in Support of Mot. to Compel at 14 (seeking both to compel BBA to designate a second 30(b)(6) witness and "leave to file a second

6

supplement to their opposition to BBA's motion to dismiss the AMCC" at some indefinite time in the future).

Having wasted every opportunity given to them to develop some jurisdictional basis for their claims against BBA, the plaintiffs cannot be heard to complain. Their motion to compel, which is nothing more than a dilatory tactic to postpone the inevitable dismissal of BBA from this litigation, must be denied.

## II.     The Plaintiffs' Motion to Compel Should be Denied for Failure to Engage in Good-Faith Negotiations to Resolve Their Dispute Prior to Filing.

The plaintiffs' motion must be denied for failure to comply with Fed. R. Civ. P. 37(a)(2)(B) and Local Rule 37.1(a). Local Rule 37.1(a) expressly provides that, "[b]efore filing any discovery motion . . . counsel for each of the parties shall confer in good faith to narrow the areas of disagreement to the greatest possible extent. It shall be the responsibility of counsel for the moving party to arrange for the conference." Further, Local Rule 37.1(b) provides that a discovery motion, such as the instant motion to compel,

> shall include a certificate in the margin of the last page that the provisions of this rule have been complied with. The memorandum shall state with particularity the following:
>
> (1)     If a discovery conference was not held, the reasons why it was not;
>
> (2)     If a discovery conference was held, the time, date, location and duration of the conference; who was present for each party; the matters on which the parties reached agreement; and the issues remaining to be decided by the court;
>
> (3)     The nature of the case and the facts relevant to the discovery matters to be decided;
>
> (4)     Each interrogatory, deposition question, request for production, request for admission or other discovery matter raising an issue to be decided by the court, and the response thereto; and
>
> (5)     A statement of the moving party's position as to each contested issue, with supporting legal authority, which statement shall be set forth separately immediately following each contested item.

Local Rule 37.1(b).

Plaintiffs wholly failed to submit the certification required by Fed. R. Civ. P. 37(a)(2)(B) and Local Rule 37.1(b). Instead, the plaintiffs improperly included in their motion a "Certification Pursuant to Local Rule 7.1," which states: "Pursuant to Local Rule 7.1(a)(2), the undersigned hereby certify that counsel for plaintiffs conferred with counsel for B. Braun of America, Inc. regarding the issues addressed in this motion, but were unable to resolve or narrow the issues." (Plaintiffs' Mot. to Compel at 2.) This certification is both woefully inadequate and a gross misrepresentation of events.

The failure to comply with Local Rule 37.1(b) is sufficient, in and of itself, to justify denying the plaintiffs' motion to compel. It carries additional significance in this instance, however, because the lack of detail in plaintiffs' Rule 7.1 certification forces BBA to guess what events the plaintiffs claim to be certifying. No discovery conference between the plaintiffs and BBA with regard to this 30(b)(6) deposition has ever taken place. No communications were made by the plaintiffs prior to the deposition – in writing, over the telephone, or in person – regarding BBA's objections to the scope of the deposition. And no communications have taken place between counsel for BBA and counsel for the plaintiffs since the completion of Ms. Codrea's deposition on August 17, 2004.

Thus, BBA can only assume that the plaintiffs are attempting to rely on some discussion between counsel that occurred during the deposition of Ms. Codrea as sufficient to qualify as a "good faith" conference regarding the discovery issues raised in their motion to compel. But such discussions between counsel regarding deposition questions cannot be sufficient to satisfy either Fed. R. Civ. P. 37(a)(2)(B) or Local Rule 37.1(b). As one Court has recognized:

> This 'meet-and-confer' requirement mandates that the parties 'meet, in person or by telephone, and make a genuine effort to resolve the dispute by determining . . .

8

what the requesting party is actually seeking; what the discovering party is reasonably capable of producing that is responsive to the request; and what specific genuine issues, if any, cannot be resolved without judicial intervention.

*Yoon v. Celebrity Cruises, Inc.*, No. 97 CIV 3808, 1999 WL 135222, at \*6 (S.D.N.Y. March 12,

1999) (quoting *PRescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, No. 96 Civ. 7590, 1998 WL

67672, at \*2-3 (S.D.N.Y. Feb. 18, 1999)); *see also Tri-Star Pictures, Inc. v. Unger*, 171 F.R.D.

94, 100 (S.D.N.Y. 1997) (rejecting reliance on preliminary objections to document requests as

definitive statements of a refusal to comply and noting that "[d]isagreement . . . is an obvious

precursor to negotiated compromise, and thus, is a necessary component of the meet-and-confer

prerequisite to bringing a motion to compel"); *Porter v. Brancato*, No. 96-2208, 1997 WL

150050, at \*1 (D. Kan. Feb. 24, 1997) ("A 'reasonable effort to confer' means more than mailing

a letter to opposing counsel. It requires that counsel converse, confer, compare views, consult

and deliberate.").

At most, counsels' discussions during a deposition bring into relief the scope of the initial

disputes that need to be resolved. Numerous objections are raised during depositions that are not

resolved until trial, if ever. If such discussions on the record were a sufficient basis for a motion

to compel, there would be no point in having the meet-and-confer requirement. This is

highlighted by the current motion, where the following exchange is the closest counsel ever

came to conferring about their disputes over the scope of the deposition:

Ms. Connolly: Okay. Well, I'm just going to note for the record that I don't believe you have complied with the notice and that we'll seek all relief from the court in connection –

Mr. Attridge: What haven't we done? She's a representative of B. Braun of America and she's testified that she's prepared herself and she's talked to other people and reviewed documents. She's talked about what the limitations are in terms of the information that the company has.

9

Ms. Connolly: She hasn't educated herself on topics that were specifically identified in the notice in which she has already made clear are available to her for examination.

Mr. Attridge:  No, it's – you don't understand rule 30(b)(6).  You began –

Ms. Connolly: Well, I'm not interested in your education on Rule 30(b)(6).  I've made my objection and I'm going to move on with the questions.

Mr. Attridge:  Can you just tell me specifically what information you think she should have because I think you're dead wrong.

Ms. Connolly: Well, I think she should have information on which B. Braun entity manufactures each of those AWPID's.

Mr. Attridge:  If B. Braun of America has that information, she will tell you about it.  What she's told you, and you're just not listening, is that B. Braun of America doesn't make any drugs, okay.

Ms. Connolly: I'm saying that her failure to inquire from B. Braun Medical is in direct violation of the 30(b)(6) Notice.

Mr. Attridge:  No, it's not because what Rule 30(b)(6) requires and what she has done is learn about information that B. Braun of America has, okay.  That doesn't mean that B. Braun of America has to solicit other companies for information that they have in order to have your deposition.  You're just wrong if you think the rule requires that.

Ms. Connolly: Well, I really don't care what your opinion is.  I have put my objection on the record and I would like to move on with the questioning.

* * *

Mr. Attridge:  Well, I don't want you to be complaining that you didn't have an opportunity to seek whatever answers or relief you want.  I think you've gotten everything you're entitled to.

Ms. Connolly: Well, I think we should go on with the remainder of the topics and then we will re-visit what we're going to do from there.

Mr. Attridge: Okay.

(Codrea Dep. at 54:6 – 57:3 (Submitted as Pls.' Supp. to Their Opp. to BBA's Mot. to Dismiss

AMCC, Exh. 1) (filed under seal).)

Clearly, counsels' exchange demonstrates that the parties have a dispute about whether a 30(b)(6) designee is required to testify about matters known to a subsidiary corporation that are not within the knowledge of the deponent corporation. But it also clearly establishes that plaintiffs' counsel did not want to confer about possible resolutions of the dispute and instead wished to move forward with the deposition. It also shows that counsel for BBA asked for clarification about the plaintiffs' concerns and endeavored to address them. But plaintiffs' counsel *expressly* stated that she wanted to "go on with the remainder of the topics *and then we will re-visit what we're going to do from there.*" (Codrea Dep. at 56:22 – 57:2.) In light of the fact that plaintiffs' counsel expressly stated that the parties would further discuss the resolution of their dispute after the completion of the deposition, this exchange cannot constitute a discovery conference sufficient to satisfy either Rule 37(a)(2)(b) or Local Rule 37.1(b).

Despite this statement by plaintiffs' counsel, no such discussion ever occurred, and plaintiffs never sought to engage in further discussions with BBA. Instead, the plaintiffs waited until the six months given by the Court had passed and then filed the instant motion to compel, with a certification that the parties had been unable to resolve their dispute. As one court has explained,

> [T]hese conversations during depositions do not satisfy the requirements of Rule 37(a)(2)(B). PRescient has not shown that the parties specifically discussed the twenty-three categories of items it seeks to have compelled, let alone shown that any negotiations that occurred were a good faith effort to resolve the dispute without court action. To satisfy the meet-and-confer requirement, PRescient had to provide an account of a 'live exchange of ideas and opinions,' including details such as the positions taken by each side, the extent to which the parties compromised their positions, and why the negotiations proved fruitless.

*PRescient Partners*, 1998 WL 67672, at *4. The plaintiffs made no effort to participate in such an exchange and certainly provided no indication to BBA that they intended to file a motion to compel based solely on the discussions between counsel during Ms. Codrea's deposition. This

11

cannot be sufficient to satisfy the plaintiffs' obligation under either Fed. R. Civ. P. 37(a)(2)(B) or Local Rule 37.1(b). As a result, the plaintiffs' motion to compel should be denied as procedurally improper.

### III.     The Plaintiffs' Motion Should be Denied Because BBA Fulfilled Its Obligations Under Fed. R. Civ. P. 30(b)(6).

Even if the Court were willing to consider the plaintiffs' improper and untimely motion, it should be denied because it is wholly without merit. As the transcript reveals, BBA's 30(b)(6) representative provided the plaintiffs with the full extent of BBA's knowledge as to every matter raised by the plaintiffs, a fact the plaintiffs do not dispute in their motion. Rather, the plaintiffs complain that they were somehow prejudiced because Ms. Codrea could not provide them with information *unknown and unavailable to BBA*.

The obligations of a corporation responding to a notice of 30(b)(6) deposition are clear. The corporation "receiving such a notice must designate a person or persons to testify on its behalf, and the persons so designated must 'testify as to matters known or reasonably available' to the corporation." *SmithKline Beecham Corp. v. Apotex Corp.*, No. 99-CV-04304, 2004 WL 739959, at *2 (E.D. Pa. March 23, 2004) (quoting Fed. R. Civ. P. 30(b)(6)). Ultimately, "[t]he testimony elicited at the Rule 30(b)(6) deposition represents the knowledge of the organization ..., not of the individual deponents." *McClellan Highway Corp. v. United States*, 95 F.Supp. 2d 1, 9 (D. Mass. 2000) (citing *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996)). Thus, if the corporation does not possess the information, then its obligations under Rule 30(b)(6) are at an end. *See Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 38 (D. Mass. 2001) ("If the Fabiano sons reviewed the available documentation and still would not have been able to give complete answers on behalf of Fabiano . . . and there were no other available witnesses who could do so, then Fabiano's obligations under Rule 30(b)(6)

cease, since the rule requires testimony only as to 'matters known *or reasonably available* to the organization.'"); *Dravo Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 76 (D. Neb. 1995) ("If [the corporation] does not possess such knowledge as to so prepare Hartsock or another designate, then its obligations under Rule 30(b)(6) obviously cease, since the rule requires testimony only as to 'matters known or reasonably available to the organization.'").

In their Notice of Deposition, the plaintiffs identified six categories of information upon which they sought BBA's knowledge. The only Area of Inquiry that the plaintiffs have identified as not having been addressed to their satisfaction is "Area of Inquiry No. 3 – all AWPIDs manufactured, distributed, marketed or sold by the three B. Braun entities in plaintiffs' amended notice – with regard to BBM." (Mem. in Support of Pls.' Mot. to Compel at 8.) Thus, there is no dispute that BBA fulfilled its obligations with regard to the remaining Areas of Inquiry in the 30(b)(6) Notice, including Area of Inquiry No. 3 to the extent the plaintiffs sought information about BBA.[1]

BBA fully disclosed its knowledge with regard to Area of Inquiry No. 3. Specifically, BBA's designee testified that BBA "does not sell any products" (Codrea Dep. at 61:15-16), that "B. Braun of America does not manufacture any drugs" and has not done so from 1991 to the present (*id.* at 45:16-21), that BBA "does not distribute any drugs" (*id.* at 45:22-46:2), that BBA "does not sell any drugs" (*id.* at 46:3-4), that BBA "does not market or advertise any drugs" (*id.* at 46:5-8), and that she was not aware of any "sales, advertising, marketing, distribution, or manufacturing of AWPID's into Massachusetts" by BBA (*id.* at 61:1-5). As Ms. Codrea

---

[1]   Plaintiffs' suggestion that BBA "failed to appear" at the deposition because of the alleged inability of Ms. Codrea to address this Area of Inquiry to the plaintiffs' satisfaction (Mem. in Support of Pls.' Mot. to Compel at 7), is insupportable. In *United States v. Mass. Indus. Fin. Agency*, 162 F.R.D. 410, 412 (D. Mass. 1995), the court rejected a similar attempt to claim that a 30(b)(6) designee's "inability to fully testify on all the topics set forth in the notice was tantamount to a complete failure of the agency to appear."

explained, "B. Braun of America is a company that holds stock. It does not operate a business. It does not sell any products. It does not have any employees. It holds stock." (*Id.* at 61:13-17.)

Ms. Codrea also provided the plaintiffs with BBA's knowledge concerning "B. Braun McGaw, Inc." and B. Braun Medical Inc. With regard to the non-existent corporation that the plaintiffs call "B. Braun McGaw, Inc.," Ms. Codrea testified that it "is not a legal entity" (*id.* at 25:22-26:1), and that, as a result, she could not address any questions relating to "B. Braun McGaw, Inc." (*id.* at 46:13-15). With regard to BBM, Ms. Codrea explained that "B. Braun of America Inc. does not receive specific information on a drug-by-drug basis from B. Braun Medical Inc." (*id.* at 50:22-51:3), which meant that BBA "has no knowledge o[n] the drug-by-drug basis" that plaintiffs' counsel was seeking (*id.* at 54:3-5). Ms. Codrea fully disclosed all information known to BBA relating to these matters; as the designated representative of BBA, she could not do more. Moreover, to the extent the plaintiffs need confirmation that BBM, and not BBA, is the manufacturer of the products at issue, they need only turn to the Answer filed by BBA to the AMCC in April 2004, where BBA explicitly admits that BBM is the manufacturer of the products identified as the basis for the plaintiffs' claims against BBA. (BBA's Answer to AMCC ¶ 314.)

The plaintiffs offer two grounds for their claim that BBA failed to comply with the Notice of Deposition with regard to Area of Inquiry No. 3: (1) BBA refused to provide information that was not known to it but was known solely to its subsidiary, B. Braun Medical Inc.; and (2) Ms. Codrea refused to provide information relating to BBM as protected by the attorney-client privilege. Because BBA's uncontested objections to the Notice of Deposition limited the scope of the 30(b)(6) deposition specifically with regard to both of these areas of

14

inquiry and because BBA's position on both of these issues is legally correct, the plaintiffs' motion is without merit.

### A.     BBA Fully Complied With Its Obligations Under Rule 30(b)(6) and Provided All Information Known to It.

In its Objections to the plaintiffs' Notice of Deposition, BBA expressly stated that it "objects to the Notice of Deposition to the extent it seeks information beyond 'matters known or reasonably available' to BBA, such as matters concerning other entities but not BBA." (BBA's Corrected Obj. ¶ 7.)   The plaintiffs did not contest this objection prior to BBA's 30(b)(6) deposition. BBA also expressly stated that it was designating a 30(b)(6) witness "subject to the following objections," including the above and an objection to disclosing any information protected by the attorney-client privilege. (*Id.* at 1-2.) BBA had no obligation to produce a 30(b)(6) witness to testify about the detailed activities of a subsidiary corporation, which is information outside the scope of BBA's knowledge. *See, e.g., Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co.*, 201 F.R.D. 33, 38 (D. Mass. 2001) (If the corporate representatives "reviewed the available documentation" and there was no one at the corporation who knew the answers, then the corporation's "obligations under Rule 30(b)(6) cease."); *Dravo Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 76 (D. Neb. 1995) ("If [the corporation] does not possess such knowledge . . . then its obligations under Rule 30(b)(6) obviously cease . . . .'") .

Moreover, the plaintiffs cannot establish through controlling case law or rule that BBA was obligated to educate itself about the details of the operations of its subsidiary corporation in order to respond to the 30(b)(6) Notice. The only support the plaintiffs offer for their claim is a single unpublished decision, *Twentieth Century Fox Film Corp. v. Marvel Enter., Inc.*, 2002 WL 1835439 (S.D.N.Y. Aug. 8, 2002), in which the Court notes that "[n]either the parties' research

nor my own has found any authority directly addressing the specific question of whether a corporation receiving a Rule 30(b)(6) notice is obligated to prepare its witness with both the entity's own knowledge and the knowledge of its subsidiaries and affiliates," *id.* at *3.[2]  But this unpublished opinion ignores the general principle, premised on the text of Rule 30(b)(6) itself, that a corporation's obligations "cease" when its designee provides information within its own knowledge. *See Calzatturficio S.C.A.R..P.A. s.p.a.*, 201 F.R.D. at 38; *Dravo Corp.*, 164 F.R.D. at 76.  In any event, one unpublished decision is hardly sufficient to justify a motion to compel, especially where, as here, the plaintiffs failed to seek the information directly from the subsidiary corporation through a third-party deposition.[3]

The plaintiffs' argument that BBA had an obligation to educate itself about the minute details of the operations of BBM completely disregards corporate distinctions.  Under the plaintiffs' theory, a party can submit a single 30(b)(6) notice to one of dozens of related corporations and thereby gather all the information known to all of the corporations, with no consideration for corporate separateness, the ease of gathering the information directly from the individual corporations, or the limited information known to any one of the corporations.  The

---

[2]    The plaintiffs also cite *Green Constr. Co. v. Kansas Power and Light Co.*, 1990 WL 120925 (D. Kan. July 9, 1990), (Mem. in Support of Pls.' Mot. to Compel at 10), but that case is inapposite.  Although the Court did allow the 30(b)(6) deposition to go forward on "matters regarding Green Holdings' conduct with its other subsidiaries," *Green Constr.*, 1990 WL 120925, at *1, nothing in the decision indicated or directed that the 30(b)(6) designee would be required to obtain information from its subsidiaries or testify about information not known to the corporation being deposed.

[3]    The plaintiffs claim that, because BBA stated a willingness to produce documents obtained from its subsidiary corporation in response to the plaintiffs' specific requests for the production of documents, it must also have access to all other information known to BBM.  (Mem. in Support of Pls.' Mot. to Compel at 10-11.)  Once again, the plaintiffs are misstating the facts.  As BBA made clear in its Objections and Responses to the plaintiffs' requests for the production of documents, BBA *requested* that BBM treat the document requests as if they were directed toward BBM; BBA did not "instruct" BBM to produce documents, as alleged by the plaintiffs.  (*Id.* at 10; *see also* BBA's Obj. and Resp. to Ps.' Omnibus Req. for Prod. at 1.)  Other than the fact that BBA owns the stock of BBM, the plaintiffs have offered absolutely no basis for their claim that BBA has access to all information known to BBM, as would be required to satisfy the plaintiffs' apparent expectations of a 30(b)(6) designee.

plaintiffs' reconstruction of Rule 30(b)(6) would create an almost-insurmountable burden for any corporation in any case, and an impossibility for BBA in this litigation, given the thirteen days it had to prepare for this 30(b)(6) deposition.

### B.     BBA Did Not Improperly Invoke the Attorney-Client Privilege.

The plaintiffs also claim that BBA failed to comply with the Notice of Deposition by refusing to divulge information protected by the attorney-client privilege. As Ms. Codrea and counsel for BBA made clear, Ms. Codrea was designated to offer testimony regarding BBA's knowledge of the Areas of Inquiry, and not to provide any information solely known to BBM. When the plaintiffs attempted to circumvent this objection by seeking information known to Ms. Codrea in her individual capacity – a basis upon which she was not called to testify – Ms. Codrea informed the plaintiffs that she could not provide that information without also violating the attorney-client privilege. Ms. Codrea was not refusing to provide information *known to BBA* on the grounds that it was protected from disclosure by the attorney-client privilege; thus, the plaintiffs have no basis for claiming that BBA was using the privilege to "hide" information properly within the scope of the 30(b)(6) deposition.[4]

Further, the information sought from Ms. Codrea, such as the products sold by BBM in each State and the role of employees in actions occurring long before Ms. Codrea began her employment at BBM, was information known to her *solely* as a result of her role as in-house

---

[4]   The plaintiffs' cases are not to the contrary, but they deal with the situation of where in-house counsel for the corporation being deposed was designated to speak on behalf *of that corporation. See, e.g., Sony Elec., Inc. v. Soundview Tech., Inc.,* 217 F.R.D. 104, 109-110 (D. Conn. 2002) ("When general counsel is designated by a party as one of its Rule 30(b)(6) witnesses the witness is required to testify about the business operations of the corporation to the extent he is knowledgeable about the operations, irrespective of the fact that he also serves as legal adviser for the corporation."). Ms. Codrea was not designated to testify on behalf of BBM, and BBM did not waive its attorney-client privilege precluding disclosure of information given to Ms. Codrea for the purpose of seeking legal advice.

counsel for BBM rendering legal advice relating to this litigation and other similar investigations.[5] Although the facts may not be privileged if sought from another witness, asking Ms. Codrea to testify to these issues goes directly to the heart of the attorney-client privilege. *See Savoy v. Richard A. Carrier Trucking, Inc.*, 176 F.R.D. 10, 13 (D. Mass. 1997) ("As the Supreme Court has indicated, the attorney-client privilege 'exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.'") (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981)).  Clearly, a lawyer cannot be asked to disclose what information she has been provided for the purpose of rendering legal advice. *See id.* at 13 ("The shelter afforded by the attorney-client privilege, however, 'only protects disclosure of communications . . . .'") (quoting *Upjohn*, 449 U.S. at 395)).  Unless the information was obtained through means other than her legal work for that client, the attorney cannot disclose any facts relating to her client without revealing information *that was provided to counsel for the purpose of seeking legal advice.*

### C.   The Plaintiffs Have Not Been Deprived of Any Information Relevant to the Issue of this Court's Lack of Jurisdiction Over BBA.

In the end, the plaintiffs' gripe is that they were not allowed to seek information not known or reasonably available to BBA and also not relevant to the jurisdictional issue presented by BBA's Motion to Dismiss.  None of this justifies the plaintiffs' Motion to Compel.  Specific information on the individual products manufactured and sold by BBM is well outside the

---

[5]   Although the plaintiffs assert that Ms. Codrea's testimony that she does not engage in non-legal work at BBM is "not credible" (Mem. in Support of Pls.' Mot. to Compel at 13), they have no basis for disputing the veracity of this testimony.

knowledge of BBA and has no bearing on the Court's lack of jurisdiction over BBA. As a result, BBA's 30(b)(6) designee had no obligation to offer any testimony with regard to this subject.

The plaintiffs' claims of gamesmanship by Ms. Codrea are not well taken. Plaintiffs' counsel's questions were often vague and confusing, intermingling BBA and BBM and seeking information that would not be known to any 30(b)(6) designee, such as the number of "regular meetings" attended at BBM by BBA officers and directors, some of whom, as Ms. Codrea explained, held positions in both corporations. Tellingly, other than quibbling that Ms. Codrea could not answer detailed questions whether BBM manufactures specific products based on their NDC codes, the plaintiffs have not identified a single question from her deposition that they believe BBA failed to address. (Mem. in Support of Pls.' Mot. to Compel at 8.) And this quibble is frivolous, as BBA expressly admitted that BBM manufactures the products at issue in this litigation more than four months ago. (BBA's Answer to AMCC ¶ 314.)

At bottom, the information that the plaintiffs claim was withheld from them – namely, information on the sales and distribution of pharmaceutical products by BBM – is wholly irrelevant to the issues presently before the Court. As noted, the plaintiffs chose to abandon any claims they had against BBM in favor of pursuing claims against BBA. More than a year ago, BBA moved to dismiss those claims on the ground that the Court lacked personal jurisdiction over BBA. The question currently pending before the Court is whether BBA has sufficient contacts with the forum state to justify the exercise of personal jurisdiction. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) ("Each defendant's contacts with the forum State must be assessed individually."). The overwhelming and undisputed evidence shows that BBA has no contacts whatsoever with the Commonwealth of Massachusetts. (*See* Decl. of Charles A. DiNardo, Attach. to BBA Mem. in Support of Mot. to Dismiss AMCC);

19

Codrea Dep. at 60:5-62:18.)  As a result, there is no basis for exerting jurisdiction over BBA. And no information on the day-to-day operational activities of BBM – information that is outside the scope of BBA's corporate knowledge – has any impact on that issue.  *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1091 (1st Cir. 1992) ("Ordinarily, courts respect the legal independence of a corporation and its subsidiary when determining if a court's jurisdiction over the offspring begets jurisdiction over the parent.").

BBA fully complied with its obligations under Rule 30(b)(6).  BBA's designee answered every question with regard to the knowledge of BBA and provided all the information requested by the plaintiffs that was known to BBA.  The information that the plaintiffs claim to seek has no relevance to the issue before the Court or to this litigation, as the plaintiffs' claims against BBM have already been dismissed.  The plaintiffs have offered no evidence to refute these facts, which preclude any motion to compel.  As a result, the plaintiffs' motion should be denied.

## CONCLUSION

For the reasons stated herein, the plaintiffs' Motion to Compel B. Braun of America to Make Supplemental Rule 30(b)(6) Designation should be denied.

Dated: September 10, 2004                    Respectfully submitted,


                                             ____ s/ Colin R. Kass _____
                                             Daniel F. Attridge, P.C.
                                             Colin R. Kass
                                             KIRKLAND & ELLIS LLP
                                             655 Fifteenth Street, N.W., Suite 1200
                                             Washington, D.C. 20005
                                             Telephone:  (202) 879-5000
                                             Facsimile:  (202) 879-5200

                                             ***Counsel for B. Braun of America Inc.***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE ) | |
| LITIGATION ) | CIVIL ACTION: 01-CV-12257-PBS |
| ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | Judge Patti B. Saris |
| ALL ACTIONS ) | |

**APPENDIX OF UNREPORTED AUTHORITY IN SUPPORT OF**
**B. BRAUN OF AMERICA INC.'S OPPOSITION TO PLAINTIFFS'**
**MOTION TO COMPEL B. BRAUN OF AMERICA TO MAKE**
**SUPPLEMENTAL RULE 30(B)(6) DESIGNATION**

1. *Divot Golf Corp. v. Citizens Bank of Mass.*, No. 02-CV-10654, 2003 WL 61287 (D. Mass. Jan. 8, 2003)

2. *Yoon v. Celebrity Cruises, Inc.*, No. 97 CIV 3808, 1999 WL 135222 (S.D.N.Y. March 12, 1999)

3. *PRescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, No. 96 Civ 7590, 1998 WL 67672 (S.D.N.Y. Feb. 18, 1998)

4. *Porter v. Brancato*, No. 96-2208, 1997 WL 150050 (D. Kan. Feb. 24, 1997)

5. *SmithKline Beecham Corp. v. Apotex Corp.*, No. 99-CV-04304, 2004 WL 739959 (E.D. Pa. March 23, 2004)



Not Reported in F.Supp.2d                                                    Page 1
2003 WL 61287 (D.Mass.), RICO Bus.Disp.Guide 10,398
(Cite as: 2003 WL 61287 (D.Mass.))

**H**
Motions, Pleadings and Filings

United States District Court,
D. Massachusetts.

DIVOT GOLF CORPORATION f/k/a Brassie Golf
Corporation and Joseph R. Cellura,
Plaintiffs,
v.
CITIZENS BANK OF MASSACHUSETTS, et al.,
Defendants.

No. Civ.A.02-CV-10654-PB.

Jan. 8, 2003.

MEMORANDUM AND ORDER

SARIS, J.

INTRODUCTION

**\*1** The parties have filed cross-motions for sanctions under
Federal Rule of Civil Procedure 11 ("Rule 11"). After
hearing, defendants' motion is *ALLOWED* and plaintiffs'
motion is *DENIED*.

BACKGROUND

This case was originally filed in the Middle District of
Florida, Tampa Division. In Florida, defendants Citizens
Bank, Michael Bulman, and Patrick Joyce [FN1] filed a
motion to dismiss and a motion for Rule 11 sanctions. The
Florida court transferred the case to this court, without
ruling on defendants' motions to dismiss and for sanctions.

> FN1. Bulman and Joyce are loan officers at
> Citizens.

At a post-transfer status conference on May 13, 2002, this
Court denied defendants' motions without prejudice, and
ordered the plaintiffs to redraft the Complaint for clarity. On
June 13, 2002, plaintiffs filed an Amended Complaint. On
July 12, 2002 Citizens, Bulman, and Joyce again moved to
dismiss, and on August 5, 2002, they again moved for
sanctions. On August 19, 2002, plaintiffs cross-moved for
sanctions. On November 26, 2002, the Court issued an
Order allowing defendants' motion to dismiss. On December
19, 2002, the Court held a hearing on the cross-motions for
sanctions.

DISCUSSION
I. Defendants' Rule 11 Motion

A. Merits Analysis

Rule 11 states, in pertinent part:
  (b) Representations to Court. By submitting to the court
  (whether by signing, filing, submitting, or later
  advocating) a pleading, written motion, or other paper, an
  attorney or unrepresented party is certifying that to the
  best of the person's knowledge, information, and belief,
  formed after a reasonable inquiry under the
  circumstances, -
  (1) it is not being presented for any improper purpose,
  such as to harass or to cause unnecessary delay or
  needless increase in the cost of litigation;
  (2) the claims, defenses, and other legal contentions
  therein are warranted by existing law or by a nonfrivolous
  argument for the extension, modification, or reversal of
  existing law or the establishment of new law;
  (3) the allegations and other factual contentions have
  evidentiary support or, if specifically so identified, are
  likely to have evidentiary support after a reasonable
  opportunity for further investigation or discovery; and
  (4) the denials of factual contentions are warranted on the
  evidence or, if specifically so identified, are reasonably
  based on a lack of information or belief.
Fed.R.Civ.P. 11(b). Rule 11 "require[s] litigants to
'stop-and-think' before initially making legal or factual
contentions." *Id.,* advisory committee notes to 1993
Amendments.

Defendants Citizens, Bulman, and Joyce describe this suit as
"truly frivolous," "factually inaccurate," and "legally
meritless," and request sanctions. (Mem. of Law in Supp. of
Mot. for Sanctions (Docket No. 41) at 1.) The Court holds
that sanctions are appropriate, because plaintiffs' counsel
Douglas R. Dollinger failed his Rule 11 duty to make a
reasonable inquiry into the facts and law before filing the
Amended Complaint, despite being put on notice by
defendants of serious factual and legal deficiencies in the
original Complaint.

1. Plaintiffs' Repetition of Factual Misstatements

**\*2** The central claims in both the Complaint and the
Amended Complaint were under the Racketeer Influenced
and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962
*et seq..* The gravamen of the claims was that defendants
participated in a scheme (or, in RICO parlance, an
"enterprise") to seize control of Miller Golf, Inc. from
plaintiff Divot Golf Corporation. The linchpin of the alleged
scheme was Citizens' provision of a line of credit to Miller
Golf, replacing Fleet Bank's pre-existing line of credit. The
Amended Complaint alleges that the Citizens' line of credit
imposed new restrictions on Miller Golf's finances, and that



Not Reported in F.Supp.2d
2003 WL 61287 (D.Mass.), RICO Bus.Disp.Guide 10,398
**(Cite as: 2003 WL 61287 (D.Mass.))**

Page 2

defendants used these restrictions to subvert Divot's ownership of Miller Golf. [FN2]

> FN2. For example, paragraph 196(b) of the Amended Complaint (Docket No. 25) alleges that defendants "offered to substitute the Fleet Bank line of credit with one supplied by CITIZENS BANK, all the while knowing that such substitution ... would also provide Defendants with the means necessary to exercise economic control of MILLER so as to ultimately strip DIVOT of its ownership interest in MILLER." Paragraph 44 describes the Citizens line of credit's requirement of bank approval for loans, dividends, or advances to affiliates greater than $100,000, and paragraph 45 falsely alleges that prior to the line-of-credit substitution, "no such covenant or restriction existed."

But in fact, "comparison of the Citizens and Fleet lines of credit reveals that the Citizens line of credit was not more onerous or restrictive." (Memorandum and Order (Docket No. 54) at 12.) As the Court stated in its Memorandum and Order:

In April 1998, Citizens Bank and Bulman issued Miller Golf a $2 million line of credit that prevented Miller Golf from making "any loans, dividends or advances to affiliates greater than $100,000" or "[p]aying any dividends or mak [ing] any distributions ... to any officer, stockholder, or beneficial owner" without Citizens' approval. (Defs.' Ex. B ¶¶ 5.1(m), 5.2(c).) The Citizens line of credit replaced Fleet Bank's ("Fleet") existing line of credit, *which precluded Miller Golf from paying any dividends or distributions or making any loans or advances without Fleet's consent.* (Defs.' Ex. C ¶¶ 24, 26, 40.)

(Docket No. 54 at 5 (emphasis added).)

The Amended Complaint's misstatements regarding the two lines of credit are inexcusable. Plaintiffs' counsel cannot claim ignorance: indeed, the Citizens line-of-credit documentation was an exhibit to the original Complaint. (*See* Compl. (contained in the original case file, Docket No. 1) at Ex. C.) Moreover, in their initial motion to dismiss, defendants highlighted the disconnect between the Complaint's factual allegations and the actual lines of credit, and attached a copy of the Fleet line-of-credit documentation. (*See* Mem. of Law in Supp. of Motion to Dismiss (Docket No. 1) at Ex. A.) Nonetheless, the Amended Complaint again alleges that the more-restrictive Citizens line of credit was a critical component of the effort to undermine Divot Golf's control of Miller Golf.

The Amended Complaint's factual misstatements violate Rule 11's mandate that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3). The misstatements are even more egregious given their centrality to the RICO claims, and given that defendants had already shown them to be false.

2. Plaintiffs' Repetition of Legally Untenable Claims

*3 In their original motion to dismiss, defendants stressed that plaintiffs' RICO claims suffered from a number of fatal legal defects, including the failure to allege the requisite pattern of racketeering activity. *See generally H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 237-49 (1989)* (discussing RICO's pattern of racketeering requirement). As defendants stated:

Here, of course, no [RICO] predicate acts have been pled. But even if the alleged acts were so characterized, the allegations regarding the first enterprise would amount to nothing more than a single scheme, against a single victim, over a short period of time, with no intent of continuing criminal activity. *See Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank, 934 F.2d 976, 981 (8th Cir.1991)* (single transaction which involves only one victim and takes place over short period of time does not constitute pattern; complaint dismissed where the case involved, at most, a plan to defraud a single company in connection with a single set of loan agreements).

(Mem. of Law in Supp. of Motion to Dismiss (Docket No. 1) at 29.) By making this argument, defendants placed plaintiffs on notice of a potential infirmity in their RICO claims, one which plaintiffs' counsel should have researched prior to repeating the RICO claims in their Amended Complaint.

Had plaintiffs' counsel conducted such research, he would have found at least one First Circuit case on point, *Efron v. Embassy Suites (Puerto Rico), Inc., 223 F.3d 12 (1st Cir.2000).* In its Memorandum and Order, the Court discussed the lethal effect of this case on plaintiffs' claims:

A single endeavor of limited duration directed at gaining control over a single company does not amount to a RICO violation. *See Efron, 223 F.3d at 18-19* ("[T]he acts as alleged comprise a single effort, over a finite period of time, to wrest control of a particular partnership from a limited number of its partners. This cannot be a RICO violation."). The *Efron* case is instructive:

In essence, [plaintiff] alleges a scheme to diminish the value of [a] project in the short run, pressing plaintiff and two others to yield up their interest so that the schemers

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                        Page 3
2003 WL 61287 (D.Mass.), RICO Bus.Disp.Guide 10,398
(Cite as: 2003 WL 61287 (D.Mass.))

could own and control the whole project. Although
multiple related acts of deception were claimed to
underlay the faxes and mailings, all allegedly were aimed
at the single goal of transforming the ownership of the
[p]artnership during its early stages.... [T]he finite nature
of the racketeering activities alleged here, together with
their occurrence over a relatively modest period of time,
cannot, in our view, support a jury finding of a RICO
pattern under the "closed" continuity approach. Our own
precedent firmly rejects RICO liability where "the alleged
racketeering acts ... 'taken together ... comprise a single
effort' to facilitate a single financial endeavor."
223 F.3d at 18-19; *see also Schultz v. Rhode Island Hosp.
Trust Nat'l Bank, N.A.*, 94 F.3d 721, 732 (1st Cir.1996)
("[C]ourts have tended to find RICO 'patterns' only where
the defendant's conduct consists of 'multiple criminal
episodes' extending over long periods of time." (quoting
*Apparel Art Int'l v. Jacobson*, 967 F.2d 720, 724 (1st
Cir.1992).

**\*4** Here, the alleged enterprise engaged in efforts to wrest
control of Miller Golf from Divot lasting for at most one
year and a half. The activities had a finite nature--they
ended when Divot lost its Miller Golf stock through
foreclosure--and did not threaten recurrence. The scheme
had one victim, and only two or three specified predicate
acts of mail fraud. In short, the picture sketched by the
Amended Complaint does not adumbrate the long-term,
complex, multi-victim criminal conduct with which RICO
was concerned. *See Efron*, 233 F.3d at 19 (citing *H.J.
Inc.*, 492 U.S. at 242).

(Docket No. 54 at 14-16.) First Circuit case law firmly
forecloses RICO claims of the sort brought by plaintiffs.
Moreover, the First Circuit is not idiosyncratic on this point.
*See Efron*, 223 F .3d at 19 (stating "we find ourselves in
good company," and citing similar holdings from other
Circuit Courts of Appeals).

It is also troubling that Divot Golf filed this action despite a
general release executed in favor of Citizens, and the lack of
a reasoned basis for vitiating the release. (*See* Mem. of Law
in Supp. of Mot. to Dismiss (Docket No. 29) at Ex. L ¶ 17
(text of release); Memorandum and Order (Docket No. 54)
at 8, 10 & n. 2, 17.) As the Court stated in its Memorandum
and Order:

Plaintiffs argue that the release is invalid because it was
the product of fraud, namely, Citizens' false assertion that
Miller Golf was in default. However, to show the release
was the product of fraud, plaintiffs would need to show
that Divot reasonably relied on a false representation. *Cf.
Metro Life Ins. Co v. Ditmore*, 729 F.2d 1, 4 (1st
Cir.1984). Plaintiffs cannot show the requisite reliance, as
Divot, represented by counsel, believed the default to be
groundless and fabricated when Divot signed the release.

(Docket No. 54 at 17.)

Thus, the RICO claims in the Amended Complaint violate
Rule 11's requirement that claims be "warranted by existing
law or by a nonfrivolous argument for the extension,
modification, or reversal of existing law or the
establishment of new law." Fed.R.Civ.P. 11(b)(2). Again,
the Court views the Amended Complaint's RICO claims
more harshly given that defendants had earlier put plaintiffs
on notice of the fatal defects in these claims.

B. Sanctions

Rule 11 sanctions "shall be limited to what is sufficient to
deter repetition of such conduct or comparable conduct by
others similarly situated," but may include "all of the
reasonable attorneys' fees and other expenses incurred as a
direct result of the violation." Fed.R.Civ.P. 11(c)(2). Here,
defendants seek an award of $81,303.94, based on
$76,650.00 in attorneys' fees and $4,653.94 in costs
allegedly incurred by defendants in this action.

While attorneys' fees and costs is an appropriate sanction
here, the Court finds the requested amount too high, for
several reasons. First, the attorneys' fees and costs must be
limited to those incurred in connection with defendants'
post-transfer motions to dismiss and for sanctions. The
Court's finding of a Rule 11 violation is predicated on
plaintiffs' *repetition* of factual misstatements and untenable
claims in the post-transfer Amended Complaint, even after
defendants had put plaintiffs on notice of deficiencies in the
original Complaint. Moreover, Mr. Dollinger did not begin
serving as plaintiffs' counsel until after the original
Complaint was filed, and he cannot be blamed for the
original Complaint's flaws.

**\*5** Second, the number of attorney-hours spent briefing the
post-transfer motion to dismiss was excessive. Plaintiffs'
counsel's billing records indicate they spent in excess of 30
hours preparing this motion. But the core arguments in this
motion were presented in the pre-transfer motion to dismiss.
Even accounting for plaintiffs' counsel's need to review the
Amended Complaint and research First Circuit case law
after the transfer, the Court finds 25 attorney-hours is a
reasonable amount of time for briefing the post-transfer
motion to dismiss. Plaintiffs' counsel's billing records
indicate that they spent approximately five hours preparing
the post-transfer motion for sanctions. The Court finds this
reasonable. The total number of compensable attorney-hours
is 30.

Third, plaintiffs' billing rate of $375/hour--which, by
agreement with client, was applicable to all attorneys who



worked on the case, regardless of seniority--was too high for this matter. The Court shall apply a billing rate of $250/hour, a billing rate that is commensurate with the level of skill needed to adapt the pre-transfer motion to dismiss to the Amended Complaint.

Fourth, plaintiffs' claimed costs are too high. The plaintiffs' billing records show extraordinary post-transfer photocopying costs--including $988.40 for the month of July 2002--as well as costs for travel and meals. Given that the post-transfer briefing was not voluminous and occurred in defendants' home forum, the Court finds that $100 is a reasonable figure for costs.

With these considerations in mind, the Court calculates the applicable sanctions:

```
Attorneys' Fees:  30 hours x $250/hr =
$7,500.00
 Costs:
$100.00
------------------------------------------------
                                  TOTAL
$7,600.00
```

The next question is whom to sanction. "The person signing, filing, submitting, or advocating a document has a nondelegable responsibility to the court, and in most situations is the person to be sanctioned for a violation." Fed.R.Civ.P. 11, advisory committee notes to 1993 Amendments. Moreover, where, as here, a predicate for the sanctions is a violation of Rule 11(b)(2), "[m]onetary sanctions may not be awarded against a represented party." Fed.R.Civ.P. 11(c)(2)(A). Thus, the Court imposes the sanctions on Mr. Dollinger, plaintiffs' counsel and the signatory and oral advocate for the Amended Complaint.

II. Plaintiffs' Rule 11 Motion

Arguably, plaintiffs' Rule 11 motion itself runs afoul of Rule 11. The gist of the motion seems to be that defendants have violated Rule 11 by filing their post-transfer motions. To the contrary, the Court has granted both of defendants' motions. A fortiori, plaintiffs' Rule 11 motion must be denied.

### ORDER

Motion of Defendants Citizens Bank of Massachusetts, Michael Bulman, and Patrick Joyce for Sanctions (Docket No. 40) is *ALLOWED* . The Court imposes sanctions of $7,600.00 on plaintiffs' counsel Douglas R. Dollinger. Plaintiffs' Cross-Motion for Sanctions (Docket No. 50) is

*DENIED.*

2003 WL 61287 (D.Mass.), RICO Bus.Disp.Guide 10,398

Motions, Pleadings and Filings (Back to top)

• 1:02CV10654 (Docket) (Apr. 08, 2002)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



1999 WL 135222                                                                Page 1
1999 WL 135222 (S.D.N.Y.)
(Cite as: 1999 WL 135222 (S.D.N.Y.))

☞
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

IN SOOK YOON and MYONG SON YOON, Plaintiffs,
v.
CELEBRITY CRUISES, INC., Celebrity Cruise Services,
Ltd., Atkinson & Mullen
Travel, Inc. d/b/a/ Apple Vacations, and Uniglobe About to
Travel, Inc.,
Defendants.

No. 97 CIV. 3808(DC).

March 12, 1999.

Brody & Brody, Esqs., By Scott A. Brody, Esq., Jericho
Atrium, Jericho, for Plaintiffs.

Stiles & Wright, P.C., Celebrity Cruises, Inc., By Stephen
X. Wright, Esq., New York, for Defendant.

MEMORANDUM DECISION AND ORDER

CHIN, D.J.

*1 In this diversity case, plaintiffs seek damages in
connection with personal injuries allegedly sustained by In
Sook Yoon in a discotheque aboard the ship M/V Meridian
during a cruise from Philadelphia, Pennsylvania to
Bermuda.

Defendant Celebrity Cruises, Inc. ("Celebrity") moves to
dismiss the complaint for discovery abuses and for an award
of attorneys' fees pursuant to Rule 37(b) and (d) of the
Federal Rules of Civil Procedure. Plaintiffs cross-move for
an order compelling Celebrity to respond to plaintiffs'
discovery demands and/or precluding the information not
disclosed, and awarding attorneys' fees pursuant to Rule
37(a) and (c) of the Federal Rules of Civil Procedure. For
the reasons stated below, defendants' motion is granted in
part and denied in part and plaintiffs' cross-motion is denied.

BACKGROUND

On May 22, 1997, plaintiffs In Sook Yoon and her husband,
Myong Son Yoon, filed this action against defendants
Celebrity, Celebrity Cruise Services, Ltd. ("CCSL"),
Atkinson & Mullen Travel, Inc. d/b/a Apple Vacations ("A
& M"), and Uniglobe About to Travel, Inc. ("Uniglobe"),
alleging breach of contract, negligence, and loss of services
claims. Plaintiffs were represented by Thomas M.

O'Connor, Esq. of the law firm Bushell, Kleczka, Minasi &
O'Connor. Defendants, represented by Stephen X. Wright,
Esq. of the law firm Stiles & Wright, P.C., filed an answer
on July 2, 1997 denying the allegations and asserting
affirmative defenses.

A. *Plaintiffs' Alleged Failure to Comply*

1. *Defendant's Initial Requests for Discovery*

On June 30, 1997, defendant served on plaintiffs:
interrogatories, request for production of documents and
things, and notice of depositions. (Wright 6/30/98 Aff. ¶ 5
& Ex. 3). Plaintiffs failed to answer the interrogatories,
respond to the request for production, or appear for the
noticed depositions. (*Id* . ¶ 6). By letter dated November 4,
1997, defendant requested a premotion conference to file a
motion to dismiss because of plaintiffs' failure to comply
with discovery obligations, and because plaintiffs failed to
dismiss the claims against CCSL and A & M. (*Id.* ¶ 7 & Ex.
4). The Court scheduled a premotion conference for
December 12, 1997.

Two days prior to the premotion conference, plaintiffs
answered the interrogatories, responded to the request for
production of documents and things, and provided a
stipulation discontinuing the action against CCSL, A & M,
and Uniglobe. [FN1] (*Id.* ¶ 8). Celebrity contends, however,
that plaintiffs' answers to the interrogatories and responses
to request for production were incomplete. (*Id.* ¶ 8 & Ex. 5).

> FN1. On January 26, 1998, the Court so ordered
> notices of dismissal without prejudice against A &
> M and Uniglobe, and a notice of dismissal with
> prejudice in favor of CCSL. Celebrity therefore is
> the only remaining defendant.

In explaining the delay, O'Connor states in his affidavit that
due to a contractually shortened statute of limitations, his
firm had to commence this action quickly. (O'Connor Aff. ¶
3). According to O'Connor, Wright "fully understood that
discovery was not going forward while an attempt was
made to resolve the issue as to which [d]efendants were
going to remain in the lawsuit." (*Id.* ¶ 5). While a letter
dated October 21 reveals that Wright agreed to "refrain from
making a motion to dismiss on behalf of A & M" so that
O'Connor would have additional time to determine whether
there was a viable claim against A & M and Uniglobe,
Wright only agreed to so refrain until October 31, 1997. (*Id.*
Ex. A). Further, Wright clearly stated that he would "refrain
from making a motion concerning [p]laintiffs' failure to
comply with their discovery obligations until October 31,
1997." (*Id.*).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



### 2. December 12, 1997 Premotion Conference

**\*2** The Court held a premotion conference on December 12, 1997. At the conference, O'Connor agreed to: (1) furnish answers to interrogatories and respond to the request for production in compliance with the Local Civil Rules and the Federal Rules of Civil Procedure; [FN2] and (2) produce plaintiffs for deposition. (Wright 6/30/98 Aff. ¶ 9). The Court ordered all discovery to be completed by April 17, 1998.

> FN2. O'Connor contends that he has no recollection that this issue was discussed at the conference and submits a letter he received from Wright dated December 16, 1997 to support this contention. (O'Connor Aff. ¶ 6 & Ex. B).

#### (a) Interrogatories and Demands

Celebrity asserts that plaintiffs have failed to furnish compliant answers to the interrogatories [FN3] and respond to the request for production. (Wright 6/30/98 Aff. ¶ 10). O'Connor states that in letters dated January 16, 1998 and February 2, 1998, his firm fully responded to the requests identified in a letter O'Connor wrote dated December 16, 1997. (O'Connor Aff. ¶ 7 & Ex. B). O'Connor claims that Wright had not raised any complaints regarding plaintiffs' answers to interrogatories or response to demands prior to the instant motion. (Id. ¶ 7). Plaintiffs' new counsel does not object to supplementing plaintiffs' response if necessary.

> FN3. Celebrity claims, for example, that it has never received answers to interrogatories that are signed by plaintiffs. (Wright Aff. ¶ 10 n. 3).

#### (b) Depositions

Scheduling plaintiffs' depositions has been particularly difficult. During a February 19, 1998 conversation, the attorneys agreed that March 18 and 30 and April 3, 1998 were convenient for plaintiffs' depositions. (Wright 6/30/98 Aff. ¶ 11). In a letter dated February 20, 1998, defendant's attorney wrote to confirm the available dates requesting that plaintiffs' counsel choose one of the dates by February 27, 1998. (Id. Ex. 6). On March 26, 1998, "after several unsuccessful attempts to confirm [p]laintiffs' depositions for March 30, 1998," Wright sent a letter to O'Connor stating that unless advised otherwise, he would assume that plaintiffs would appear for the depositions March 30, 1998. (Id. ¶ 13). Without explanation, plaintiffs failed to appear for their depositions on March 30, 1998. (Id. ¶ 14).

After his February 19, 1998 conversation with Wright,

O'Connor wrote a letter dated February 25, 1998 to his clients, whom he could not reach by telephone. (O'Connor Aff. ¶ 9 & Ex. E). O'Connor did not learn until March 30, 1998 that he was having trouble contacting his clients because Ms. Yoon was "suffering from a serious illness." (Id. ¶ 10). Upon learning of Ms. Yoon's illness, O'Connor sent a letter dated March 30, 1998 to the Court requesting that the time for discovery be extended to July 15, 1998. (O'Connor Aff. Ex. F). The letter explained that Ms. Yoon "is currently suffering from transient ischemic attacks" ("TIAs"), which prevented her from travelling to New York for her deposition. The Court memo endorsed plaintiffs' letter granting the extension of time for discovery. Prior to receiving plaintiffs' March 30 letter, defendant's counsel wrote a letter dated April 2, 1998 to the Court requesting another premotion conference. [FN4]

> FN4. The Court rejects O'Connor's contention that Wright "sought to exploit" Ms. Yoon's illness by requesting a premotion conference on April 2, 1998. (O'Connor Aff. ¶ 11). While Wright may have received plaintiffs' March 30 letter on April 2, the same day he wrote to the Court, Wright's affidavit clearly states that he requested a premotion conference prior to receiving plaintiffs' March 30, 1998 letter. (Wright Aff. ¶ 15).

### 3. May 1, 1998 Premotion Conference

**\*3** The Court held another premotion conference on May 1, 1998. O'Connor's partner, Mark D. Kleczka, Esq., attended the conference. Kleczka stated that TIAs prevented Ms. Yoon from travelling to New York. Kleczka did not explain, however, the impact of the TIAs on Ms. Yoon, why Mr. Yoon failed to appear for his deposition, and why plaintiffs' counsel had not timely responded to Wright's correspondence. O'Connor asserts that Wright did not mention his own failure to comply with discovery requests. (O'Connor Aff. ¶ 12).

During the May 1, 1998 conference, the Court orally ordered plaintiffs' attorney to: (1) produce Mr. Yoon for deposition within two weeks of the conference; (2) provide the name of the physician treating Ms. Yoon for the TIAs and authorizations within two weeks of the conference; (3) provide defendant's attorney, by May 4, 1998, with information concerning Ms. Yoon's TIAs including restrictions, prognosis, and ability to be deposed; and (4) promptly respond to communications from defense counsel.

#### (a) Information Concerning Ms. Yoon's Condition

On May 4, 1998, plaintiffs' attorney agreed to send a letter

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.


to Wright about Ms. Yoon's condition by May 6, 1998. (Wright 6/30/98 Aff. ¶ 17). Defendant's attorney did not receive such a letter on May 6 and therefore wrote a letter to the Court dated May 7, 1998 informing the Court of plaintiffs' failure to comply with the Court's oral order of May 1. (Id. ¶ 17 & Ex. 11). Kleczka then sent a letter dated May 7, 1998 to defendant's attorney. (Id. Ex. 13). Plaintiffs' attorney explained that Ms. Yoon had suffered a stroke in May 1997, was treated for severe back pain in November and December 1997, "was in great discomfort and unable to function or travel," and had been examined for the TIA condition as well as for "a spinal cord and spinal fluid situation." (Id.). The letter further stated that Mr. Yoon was being treated for cancer. (Id.).

(b) *Outstanding Medical Authorizations*

Plaintiffs' attorney did not provide defendant's counsel with medical authorizations for Doctors Lu and Mohedan, two of the doctors mentioned in plaintiffs' May 7, 1998 letter. Doctor Lu treated Ms. Yoon for the severe back pain and Doctor Mohedan evaluated her for the TIA condition. O'Connor asserts that these authorizations were not furnished to defendant because plaintiffs are not claiming that these injuries resulted from the incident on which the instant suit is based. (O'Connor Aff. ¶ 13(b)).

(c) *Depositions*

In his May 7 letter, Kleczka agreed to produce Ms. Yoon for a deposition on May 13, 1998. (Wright 6/30/98 Aff. Ex. 13). Kleczka wrote a letter dated May 8, 1998 to the Court stating that Ms. Yoon was "prepared to appear for her deposition on May 13, 1998." (O'Connor Aff. Ex. H). Plaintiffs' counsel was not certain at that time, however, of Mr. Yoon's availability on that date. (Id. ¶ 14).

In his affidavit, Wright creates the impression that plaintiffs' counsel cancelled the May 13 deposition. The parties agree that they spoke on May 12, 1998 to confirm the date for Ms. Yoon's deposition. (Wright 6/30/98 Aff. ¶ 19; O'Connor Aff. ¶ 16). Wright asserts that during this conversation, "[p]laintiffs' attorney stated that June 10, 11, or 12, 1998 were convenient dates" for Ms. Yoon's deposition. (Wright 6/30/98 Aff. ¶ 19). According to O'Connor, however, it was Wright, not plaintiffs, who was unavailable for the May 13 deposition. (O'Connor Aff. ¶ 16). O'Connor states that both plaintiffs had planned to travel to New York for their depositions. (Id. ¶ 16). Wright contests this assertion and maintains that when he spoke with Kleczka on May 12, Kleczka "stated that he could not confirm that [Ms. Yoon] would appear for the taking of her deposition." (Wright Reply Aff. ¶ 4).

*4 Wright wrote a letter dated May 14, 1998, confirming that he would be available on June 10, 11, or 12, 1998 and requesting that plaintiffs' counsel select one of those dates by May 20, 1998. (Wright 6/30/98 Aff. ¶ 19 & Ex. 14). Wright asserts that plaintiffs' counsel did not respond to his letter. (Id. ¶ 20). Wright left messages for plaintiffs' counsel on May 27 and 29, 1998, which Kleczka did not return until the evening of May 29. (Wright Aff. ¶ 20). In his affidavit, O'Connor states that Kleczka's failure to return Wright's calls earlier was not willful or negligent, but because Kleczka's wife had gone into premature labor. (O'Connor Aff. ¶ 19). Kleczka had not been working normal business hours from May 11 to June 5, 1998 because he was attending to his wife and four children. (Id.).

According to Wright, on May 29, 1998, Kleczka stated that he would advise Wright of another date for depositions and the status of the medical authorizations. (Wright 6/30/98 Aff. ¶ 20). On June 10, 1998, having not received the promised response from plaintiffs' attorney, defendant's attorney advised the Court of plaintiffs' failure to comply with the Court's May 1, 1998 order.

(d) *Plaintiffs' New Counsel*

O'Connor stated in his affidavit that plaintiffs' interests would best be served by the retention of new counsel. (O'Connor Aff. ¶ 20). On July 6, 1998, the Court received a letter dated July 1, 1998 from Scott A. Brody, Esq. of the law firm Brody & Brody. With the letter, Brody included an executed Consent to Change Attorney, which the Court so ordered on July 7, 1998 "on the condition that the present [briefing] schedule remains the same."

B. *Defendant's Alleged Failure to Comply*

O'Connor wrote the Court a letter dated May 8, 1998, in which he described defendant's failure to comply with plaintiffs' discovery demands. (O'Connor Aff. Ex. I). O'Connor explained that plaintiffs served defendant with discovery demands on December 10, 1997 and January 16, 1998, but that defendant had not responded nor requested an extension to respond. O'Connor also complained that Wright had not indicated "when he will make his client available to be deposed or when the ship will be available for inspection." (Id. Ex. I).

In a May 11, 1998 letter, however, O'Connor stated that he remembered that defendant had informed him that the ship had been sold and thus was not available for inspection. (Id. Ex. J). In his May 13, 1998 letter to the Court, Wright stated that plaintiffs' had not noticed any depositions and that plaintiffs' counsel had been advised of the purchaser and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



planned itinerary of the ship. (O'Connor Aff. Ex. K).

### DISCUSSION

A. *Defendant's Motion to Dismiss*

A district court has broad discretion pursuant to Rule 37(b) of the Federal Rules of Civil Procedure to impose sanctions for discovery abuses. *Friends of Animals Inc. v. United States Surgical Corp., 131 F.3d 332, 334 (2d Cir.1997).* Any sanctions imposed by a court for failure to comply with discovery obligations, however, must be just and commensurate with the failure to comply. *See* Fed.R.Civ.P. 37(b)(2); *Monaghan v. SZS 33 Assocs., L.P.,* 148 F.R.D. 500 (S.D.N.Y.1993).

**\*5** A court may impose the drastic sanction of dismissing a complaint. *See, e.g., Friends of Animals, 131 F.3d 332* (affirming dismissal of complaint); *Davis v. Kauff, McClain & McGuire,* No. 96 Civ. 6850, 1998 WL 50220 (S.D.N.Y. Feb. 5, 1998) (dismissing complaint). This litigation-ending sanction is a severe remedy, however, "to be used only in extreme situations and then only when a court finds 'willfulness, bad faith, or any fault." ' *Bobal v. Rensselaer Polytechnic Inst., 916 F.2d 759, 764 (2d Cir.1990)* (citation omitted) (quoting *Salahuddin v. Harris, 782 F.2d 1127, 1132 (2d Cir.1986)), cert. denied, 499 U.S. 943 (1991); Monaghan,* 148 F.R.D. at 509 (stating that drastic sanctions such as dismissing an action "are generally appropriate only when there is some element of culpability ... that is, the party's failure must be willful, in bad faith, or through fault"); *see generally* Jodi Golinsky, Note, *The Second Circuit's Imposition of Litigation-Ending Sanctions for Failures to Comply With Discovery Orders,* 62 Brook. L.Rev. 585, 590-96 (1996) (discussing Rule 37 and Supreme Court precedent on the propriety of imposing litigation-ending sanctions for discovery abuse).

A litigant's culpability is most often demonstrated by "persistent refusal to comply with a discovery order." *Monaghan,* 148 F.R.D. at 509. Defendant cites *Bowmar Instrument Corp. v. Continental Microsystems, Inc.,* 497 F.Supp. 947 (S.D.N.Y.1980), and *Szilvassy v. United States,* 82 F.R.D. 752 (S.D.N.Y.1979), for the proposition that "noncompliance with a court order is not necessary before sanctions may be imposed" pursuant to Rule 37(d). In *Bowmar,* as defendant quotes, the court concluded that the defendants' failure to respond to discovery requests constituted "gross negligence and a willful disregard for the discovery rules," and justified entry of default judgment. *Bowmar,* 497 F.Supp. at 959. The *Szilvassy* court found that plaintiff's repeated failure to respond to discovery requests were severe enough to warrant dismissal. *Szilvassy,* 82 F.R.D. at 757.

Here, plaintiffs have persistently failed to comply with their discovery obligations. They failed to timely respond to defendant's June 30, 1997 requests, responding only after defendant was forced to write to the Court to request a premotion conference and only after the Court scheduled such a conference. They failed to schedule plaintiffs' depositions as counsel discussed on February 19, 1998. They failed to appear for their depositions on March 30, 1998, neglecting even to call. They failed to comply with this Court's May 1, 1998 oral order. And they failed to respond to defendant's counsel's May 14, 1998 letter. These failings have delayed the case and prejudiced defendant.

Nonetheless, the drastic remedy of dismissal is probably not appropriate in view of Ms. Yoon's apparent illness and the fact that plaintiffs' have made some effort to comply. Accordingly, plaintiffs will be given one more chance, and lesser sanctions will be imposed.

**\*6** Plaintiffs are hereby ORDERED to: (1) produce both plaintiffs for deposition by April 9, 1999; schedule such depositions and confirm the dates in a letter to the Court by March 26, 1999; inform the Court immediately after the depositions are completed; (2) provide defendant with answers to interrogatories that are signed by plaintiffs by March 26, 1999; and (3) pay to defendant attorneys' fees and costs in the amount of $2,500. Further, plaintiffs are hereby warned that the Court will not hesitate to impose further sanctions, including dismissal of the complaint, for failure to comply with this Memorandum Decision and Order.

B. *Plaintiff's Motion to Compel*

Prior to making a motion to compel discovery, the dissatisfied party must in good faith confer or attempt to confer with its adversary. Fed.R.Civ.P. 37(a)(2)(B). This "meet-and-confer" requirement mandates that the parties

> meet, in person or by telephone, and make a genuine effort to resolve the dispute by determining ... what the requesting party is actually seeking; what the discovering party is reasonably capable of producing that is responsive to the request; and what specific genuine issues, if any, cannot be resolved without judicial intervention.

*Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.,* No. 96 Civ. 7590, 1998 WL 67672, at \*2-3 (S.D.N.Y. Feb. 18, 1999) (quoting *Deckon v. Chidebere,* No. 93 Civ. 7845, 1994 WL 494885, at \*5 (S.D.N.Y. Sept. 9, 1994)); *Tri-Star Pictures, Inc. v. Unger,* 171 F.R.D. 94, 99 (S.D.N.Y.1997). Courts have excused a failure to meet and confer where (1) under the circumstances, the parties do not have time to attempt to reach an agreement; or (2) an attempt to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



compromise would have been clearly futile. *Prescient,* 1998 WL 67672, at *3.

On the record presented, the Court is not persuaded that plaintiffs have adequately conferred with defendant to warrant an order to compel discovery, and neither of the exceptions applies. First, plaintiffs have not included a certification with their motion that they have in good faith conferred or attempted to confer with defendant. Second, plaintiffs have not established that they have satisfied the meet-and-confer requirement. Plaintiffs cannot, for example, complain that defendant has not produced a witness for deposition if plaintiffs have not noticed a deposition. Further, defendant's cannot be expected to produce a proper witness pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure if plaintiffs do not "describe with reasonable particularity the matters on which examination is requested." Accordingly, plaintiffs' motion is denied in all respects.

### CONCLUSION

For the reasons set forth above, defendant's motion is denied in part and granted in part and plaintiffs' cross-motion is denied. Plaintiffs shall pay to defendant attorneys' fees and costs in the amount of $2,500. The parties shall complete all discovery by April 30, 1999 and appear for a pretrial conference on that day at 11 a.m. in Courtroom 11A at 500 Pearl Street.

*7 SO ORDERED.

1999 WL 135222 (S.D.N.Y.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



Ⴚ
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

PRESCIENT PARTNERS, L.P., Plaintiff,
v.
FIELDCREST CANNON, INC., Fieldcrest Cannon Sure
Fit, Inc., UTC Holdings, Inc.,
and Bert Shlensky, Defendants/Third Party Plaintiffs,
v.
Paula Riley, Third-Party Defendant.

**No. 96 Civ. 7590(DAB)JCF.**

Feb. 18, 1998.

<u>Ned W. Branthover</u>, <u>Kathryn Diaz</u>, Morgan & Finnegan,
LLP, New York City, Albert P. Allen, <u>Michael D. McCoy</u>,
Alston & Bird LLP, Charlotte, NC, <u>Theresa M. Gillis</u>,
Jones, Day, Reavis & Pogue, New York City, Brigitte
Duffy, <u>Joseph P. McConnell</u>, Morgan, Brown & Joy,
Boston, MA.

MEMORANDUM AND ORDER

<u>FRANCIS</u>, Magistrate J.

**\*1** The plaintiff PRescient Partners and third party
defendant Paula Riley (collectively, "PRescient") move for
an order under <u>Rule 37(a) of the Federal Rules of Civil
Procedure</u> compelling the defendants Fieldcrest Cannon,
Inc., Fieldcrest Cannon Sure Fit, Inc., UTC Holdings, Inc.,
and Bert Shlensky (collectively, the "defendants") to
produce various documents and objects requested by
PRescient in its first and second requests for production of
documents. PRescient also requests an award of attorneys'
fees and costs in connection with bringing this motion. In
response, the defendants argue that the movants failed to
confer with them before filing this motion as required by
<u>Rule 37(a)</u>. *See* <u>Fed.R.Civ.P. 37(a)(2)(B)</u>. The defendants
further request an award of their reasonable expenses
incurred in opposing this motion, including attorneys' fees.
*See* <u>Fed.R.Civ.P. 37(a)(4)(B)</u>.

In a letter supplementing this motion, PRescient also
requests an extension of time to subpoena a witness for a
deposition. Letter from Ned Branthover dated Dec. 3, 1997,
at 3. For the reasons that follow, the motion to compel and
the movants' request for attorneys' fees and costs are denied,
the defendants' request for costs is denied, and PRescient's
request for an extension of time to serve the subpoena is
denied.

*Background*

PRescient owns a patent for a device that stabilizes
slipcovers on upholstered furniture. On October 7, 1996,
PRescient commenced this action alleging, among other
claims, that the defendants infringed the patent and
conducted false patent marking when they sold a similar
device with their Sure Fit slipcovers and marketed the
device as the defendants' "new patented stayput." On
October 29, 1996, the defendants filed their answer, along
with counterclaims and a Third-Party Complaint against
Paula Riley, PRescient's principal.

PRescient served its first request for production of
documents on November 4, 1996, and the defendants served
their answer on December 11, 1996. Plaintiff's First Request
for Production of Documents and Things to Defendants
Fieldcrest Cannon, Inc.; Fieldcrest Cannon Sure Fit, Inc.
and Bert Schlensky, attached as Exh. 1 to Declaration of
Kathryn E. Diaz in Support of Plaintiff's Motion to Compel
Defendants to Produce Documents in Response to Plaintiff's
First and Second Requests, dated October 31, 1997 ("Diaz
Decl."); Answer to Plaintiff's First Request for Production,
attached as Exh. 3 to Diaz Decl. PRescient served its second
request for production on July 31, 1997, and the defendants
served their answer on October 13, 1997. Plaintiff's Second
Request for Production of Documents and Things to
Defendants Fieldcrest Cannon, Inc., Fieldcrest Cannon Sure
Fit, Inc., and Bert Schlensky, attached as Exh. 2 to Diaz
Decl.; Response to Plaintiff's Second Request for
Production, attached as Exh. 26 to Diaz Decl. After a
pretrial conference on October 16, 1997, PRescient filed its
motion to compel on October 31, 1997.

**\*2** On November 18, 1997, I denied PRescient's request to
enforce a subpoena on Federated Department Stores, Inc.
("Federated") and its subsidiary Macy's East, Inc. ("Macy's")
because the companies represented that (a) they lacked
documents responsive to the subpoena as modified by
agreement and (b) the only witness with knowledge no
longer worked for Federated or its affiliates. Order dated
Nov. 18, 1997. Discovery closed on November 28, 1997.
On December 1, 1997, the defendants produced what
appears to be Macy's marketing material advertising Sure
Fit slipcovers with "new patented stayputs." Letter from
Ned Branthover dated Dec. 3, 1997, at 3 & Exhs. A, D. This
indicated that Federated may have had material responsive
to the subpoena, thereby undercutting the rationale for my
November 18th denial of PRescient's request to enforce the
subpoena. In light of these documents, PRescient now
requests an extension of time to subpoena Loretta Groller,
who is said to be a former Macy's buyer with relevant
knowledge. Letter from Ned Branthover dated Dec. 3, 1997,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



at 3.

*Discussion*

A. *Motion to Compel*

PRescient claims that through depositions and other sources, it learned of twenty-three categories of items responsive to its first and second requests for production that the defendants did not produce. *See* Diaz. Decl. at 4-10. The items fall into five broad groupings: (1) physical samples of Sure Fit slipcover packages featuring the allegedly infringing stayputs and physical samples of stayput packages the defendants allegedly intended to sell separately from the slipcovers, (2) marketing materials mentioning stayputs, (3) meeting agendas, minutes, correspondence, and files kept by specified employees of the defendants, as well as computer databases related to PRescient or stayputs, (4) Sure Fit corporate organization charts for 1995, and (5) document retention or destruction programs for the defendant Fieldcrest Cannon. PRescient claims that the defendants failed to comply with Rules 34 and 26(e) of the Federal Rules of Civil Procedure by not producing all responsive items and by not supplementing its prior productions. *See* Fed.R.Civ.P. 26(e) and 34.

In response, the defendants argue that some listed items are not responsive to any previous request for production, some requested documents are privileged, PRescient's requests are overly broad and burdensome, and all responsive documents have been produced from its files and computers. Defendants' Response to Plaintiff's Motion to Compel ("Defendants' Response") at 2-6. The defendants also argue that PRescient failed to confer with them in an attempt to resolve this discovery dispute without court action, a prerequisite to filing a motion to compel. *See* Fed.R.Civ.P. 37(a)(2)(B). I find that PRescient did fail to fulfill this prerequisite and thus do not address the defendants' other arguments.

1. *The Meet-and-Confer Requirement*

Under Rule 37(a)(2)(B) of the Federal Rules of Civil Procedure, a motion to compel must include "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action...." Fed.R.Civ.P. 37(a)(2)(B). A conclusory statement in an affidavit asserting that the movant fulfilled the meet-and-confer requirement is insufficient. *Tri-Star Pictures, Inc. v. Unger,* 171 F.R.D. 94, 99 (S.D.N.Y.1997). Rather, the movant must detail the efforts to confer and explain why they proved fruitless. *See id.; Ballou v.*

*University of Kansas Medical Center,* 159 F.R.D. 558, 559-60 (D.Kan.1994). A "live exchange of ideas and opinions" is required. *Soto v. City of Concord,* 162 F.R.D. 603, 623 (N.D.Cal.1995). The meet-and-confer requirement mandates that parties actually
> *3 meet, in person or by telephone, and make a genuine effort to resolve the dispute by determining ... what the requesting party is actually seeking; what the discovering party is reasonably capable of producing that is responsive to the request; and what specific genuine issues, if any, cannot be resolved without judicial intervention.

*Deckon v. Chidebere,* No. 93 Civ. 7845, 1994 WL 494885, at *5 (S.D.N.Y. Sept.9, 1994) *see also Tri-Star Pictures,* 171 F.R.D. at 99.

Courts have excused the failure to meet-and-confer where temporal exigencies required speedy action and where efforts at informal compromise would have been clearly futile. *See Reidy v. Runyan,* 169 F.R.D. 486, 490 (E.D.N.Y.1997) (excusing failure to confer because compromise was unlikely given defendant's history of noncompliance with court orders); *Matsushita Electric Corporation v. 212 Copiers Corp.,* No. 93 Civ. 3243, 1996 WL 87245 at * 1 (S.D.N.Y. Feb.29, 1996) (conference would be futile in bitter litigation which included contempt citations directing the jailing of some defendants for noncompliance with court orders); *In re NASDAQ Market-Makers Antitrust Litigation,* No. 94 Civ. 3996, 1996 WL 187409 at *2 (S.D.N.Y. Apr.18, 1996) (excusing failure to confer in part because of imminence of deadlines for filing papers relating to class certification motion). Under ordinary circumstances however, the failure to meet and confer mandates denial of a motion to compel. *Schick v. Fragin,* Nos. 96 B 42902, 96 B 43969, 96/9218A, 1997 WL 465217 at *3 (Bankr.S.D.N.Y. Aug.12, 1997).

2. *Movants' Efforts*

In her declaration, PRescient's counsel states, "[W]e have conferred in good faith with Defendants in an effort to resolve the issues raised in the motion without court action." Diaz Decl. ¶ 3. In its reply brief, PRescient claims that
> [t]hroughout the discovery period--during the inspection of documents and things, on and off the record during depositions, through in-person and telephone conferences with Defendants' counsel, and through correspondence-- Plaintiff has sought this material. None of the missing items brought to the Court's attention in Plaintiff's brief are a surprise to Defendants.

Plaintiff's Reply in Support of Its Motion to Compel

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



("Plaintiff's Reply") at 2. In response, the defendants assert that PRescient never requested the items sought to be compelled, except that an August 19, 1997 letter generally requested a search of computer files and chronological files. Defendant's Response at 2 n. 1.

The August 19th letter simply requests the production of items. Letter from Ned Branthover to Michael McCoy dated Aug. 19, 1997, attached as Exh. 23 to Diaz Decl. It neither states PRescient's plans to file a motion to compel in the event of non-production nor otherwise indicates that the letter was intended to be an act of conferring in accordance with <u>Rule 37(a)</u>. Thus, it does not satisfy the duty to confer. *See <u>Soto, 162 F.R.D. at 622-23</u>* ("Sending a letter ... demanding compliance with a discovery request is not what this Court regards as an earnest attempt to 'meet and confer on the issues.'"); *<u>Ballou, 159 F.R.D. at 559-60</u>* ("One letter ... does not satisfy the duty to confer.").

*4 There is evidence that during various depositions, PRescient expressed general concerns that Sure Fit was not producing all documents responsive to the document requests. Letter from Kathryn Diaz to Albert Allan dated July 28, 1997, attached as Exh. 20 to Diaz Decl. (general concerns expressed during depositions); Letter from Kathryn Diaz to Albert Allan dated July 31, 1997, attached as Exh. 22 to Diaz Decl. (during deposition, PRescient expressed concerns that relevant documents contained in computer files were not produced). A letter from defendants' counsel suggests that the defendants responded to these concerns by stating that all responsive documents were already produced. Letter from Albert Allan to Ned Branthover dated August 22, 1997, attached as Exh. 24 to Diaz Decl. ("As I stated prior to Ms. Kramer's deposition ..., we have searched for and produced the documents responsive to your requests.").

As reflected by these letters, these conversations during depositions do not satisfy the requirements of <u>Rule 37(a)(2)(B)</u>. PRescient has not shown that the parties specifically discussed the twenty-three categories of items it seeks to have compelled, let alone shown that any negotiations that occurred were a good faith effort to resolve the dispute without court action. To satisfy the meet-and-confer requirement, PRescient had to provide an account of a "live exchange of ideas and opinions," including details such as the positions taken by each side, the extent to which the parties compromised their positions, and why the negotiations proved fruitless. *See, e.g., <u>Tri-Star Pictures, 171 F.R.D. at 99</u>.*

PRescient thus fails to fulfill the meet-and-confer prerequisite to a motion to compel. This failure is not

excusable due to temporal exigencies or because efforts at informal compromise would have been clearly futile. Accordingly, the motion to compel is denied, along with PRescient's request for an award of attorneys fees and costs in bringing this motion.

### B. *Defendants' Request for Costs*

The defendants request an award of their reasonable expenses incurred in opposing this motion, including attorneys' fees. <u>Rule 37(a)(4)(B) of the Federal Rules of Civil Procedure</u> provides that if a motion to compel is denied, the court

    shall, after affording an opportunity to be heard, require the moving party or the attorney filing the motion or both of them to pay to the party ... who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney's fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.

<u>Fed.R.Civ.P. 37(a)(4)(B)</u> Because the merits of PRescient's application have yet to be reached, it cannot be determined whether its position was substantially justified. In the event that the parties fail to resolve the dispute through informal conference and the motion to compel is resubmitted, I will reconsider the defendants' motion for costs and attorneys' fees.

### C. *Extension of Time to Subpoena*

*5 Discovery in this case closed on November 28, 1997. PRescient learned of the Macy's marketing material three days later, as a result of the defendants' December 1, 1997 production. On December 3, 1997, PRescient informed the Court that its process server had made several unsuccessful attempts to serve a subpoena on Loretta Groller, who it believes was the Macy's buyer when the store bought Sure Fit slipcovers using the allegedly infringing stayputs, and who appeared to be avoiding service. Letter from Ned Branthover dated Dec. 3, 1997, at 3. More than 60 days have passed since PRescient began attempting to serve Ms. Groller. This was an ample period in which to effect service, and I will therefore not grant any additional time to serve the subpoena.

### Conclusion

For the reasons set forth above, PRescient's motion to compel, its request for attorneys' fees and costs, and its request for an extension of time to serve a subpoena on Ms. Groller are denied. The defendants' motion for an award of costs and attorneys' fees is also denied.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



1998 WL 67672                                                        Page 4
1998 WL 67672 (S.D.N.Y.)
**(Cite as: 1998 WL 67672 (S.D.N.Y.))**


SO ORDERED.

1998 WL 67672 (S.D.N.Y.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



1997 WL 150050                                                    Page 1
1997 WL 150050 (D.Kan.)
**(Cite as: 1997 WL 150050 (D.Kan.))**

**H**
Only the Westlaw citation is currently available.


United States District Court, D. Kansas.

Rickey PORTER and Kathy Porter, Plaintiffs,
v.
Steven W. BRANCATO, et al., Defendants.

**No. CIV.A. 96-2208-KHV.**

Feb. 24, 1997.

Jeffrey P. Johnson, Kansas City, MO, for plaintiffs.

Stephen B. Small, Kansas City, MO, for Steven W. Brancato.

William Carr, Kansas City, MO, HAG Automotive Investments, Inc., Hendrick Management Corp., Hendrick Corp., Hendrick Management Co. Ltd. Partnership.

*MEMORANDUM AND ORDER*

VRATIL, District Judge.

**\*1** This matter comes before the Court on *Defendant Brancato's Motion In Limine* (Doc. # 35) and *Defendant Brancato's Rule 37 Motion Against Plaintiff* (Doc. # 36), each filed December 20, 1996. Both motions seek sanctions on account of plaintiff's failure to make disclosures required by Rule 26(a), Fed.R.Civ.P. Defendant's motion is without merit and is hereby overruled on the following grounds:

1. The Court ordered the Clerk to enter default against Brancato under Rule 55(a), Fed.R.Civ.P. *Scheduling Order* (Doc. # 8) entered August 27, 1997; see also *Pretrial Order* (Doc. # 32) entered November 18, 1996. As a result, plaintiffs had no obligation to make Rule 26(a) disclosures to him.

2. Defendant has not demonstrated compliance with D.Kan. 37.2 in bringing this motion.

3. Defendant's motion is both substantively deficient and untimely under the *Scheduling Order* (Doc. # 8) entered August 27, 1996, which provided in relevant part as follows:
Motions to compel discovery with accompanying memoranda and in compliance with D. Kan. Rule 7.1, 7.2, 7.3, 7.4, 7.5, 37.1 and 37.2 shall be filed and served within ten (10) days of the default or service of the response, answer or objection which is the subject of the

motions, unless the time for filing of such motions is extended for good cause shown, or the objection to the default, response, answer, or objection shall be waived. The Court generally will not entertain a discovery motion unless counsel for movants has conferred or made reasonable effort to confer with opposing counsel and filed a certificate of compliance in accordance with D. Kan. Rule 37.2. A "reasonable effort to confer" means more than mailing a letter to opposing counsel. It requires that counsel converse, confer, compare views, consult and deliberate.

IT IS THEREFORE ORDERED that *Defendant Brancato's Motion In Limine* (Doc. # 35) and *Defendant Brancato's Rule 37 Motion Against Plaintiff* (Doc. # 36), each filed December 20, 1996, be and hereby are overruled.

1997 WL 150050 (D.Kan.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
2004 WL 739959 (E.D.Pa.)
(Cite as: 2004 WL 739959 (E.D.Pa.))

Page 1

**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.

SMITHKLINE BEECHAM CORPORATION, Smithkline
Beecham, P.L.C., Beecham Group,
P.L.C. and Glaxosmithkline, P.L.C.
v.
APOTEX CORPORATION, Apotex, Inc. and Torpharm,
Inc.
v.
PENTECH PHARMACEUTICALS, INC. and Par
Pharmaceuticals, Inc.
SMITHKLINE BEECHAM CORPORATION, Smithkline
Beecham, P.L.C. and Beecham Group,
P.L.C.
v.
GENEVA PHARMACEUTICALS, INC. and Sumika Fine
Chemicals Co., Ltd.
SMITHKLINE BEECHAM CORPORATION, Smithkline
Beecham, P.L.C. and Beecham Group,
P.L.C.
v.
ZENITH GOLDLINE PHARMACEUTICALS, INC. and
Sumika Fine Chemicals Co ., Ltd.
SMITHKLINE BEECHAM CORPORATION, Smithkline
Beecham, P.L.C. and Beecham Group,
P.L.C.
v.
ALPHAPHARM PTY, LTD. and Sumika Fine Chemicals
Co., Ltd.
SMITHKLINE BEECHAM CORPORATION, and
Beecham Group, P.L.C.
v.
ANDRX PHARMACEUTICALS, INC. Andrx
Pharmaceuticals, L.L.C. Basf Corporation,
Basf Pharmachemikalien Gmbh & Co. KG and Knoll Ag.
SMITHKLINE BEECHAM CORPORATION, and
Beecham Group, P.L.C.
v.
TEVA PHARMACEUTICALS USA, INC.

**No. 99-CV-4304, 00-CV-4888, 01-CV-0159, 01-CV-2169,
99-CV-2926, 00-CV-5953, 02-
CV-1484, 00-CV-1393, 00-CV-6464, 01-CV-2602,
01-CV-1027, 01-CV-3364, 01-CV-
2981, 03-CV-3365.**

March 23, 2004.

Arthur Makadon, Jamie B. Bischoff, Sally A. Steffen,
Ballard Spahr Andrews & Ingersoll LLP, Philadelphia, PA,
Ford F. Farabow, Jr., Walter Y. Boyd, Jr., Finnegan,
Henderson, Farabow, Garrett & Dunner, Atlanta, GA,
Kenneth M. Frankel, Reston, VA, Richard B. Racine,
Robert D. Bajefsky, Finnegan, Henderson, Farabow, Garrett
& Dunner, Washington, DC, for Plaintiffs.

Alan H. Bernstein, Robert S. Silver, Michael J. Berkowitz,
Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd., Francis
P. Devine, III, Pepper Hamilton LLP, Philadelphia, PA,
Hugh L. Moore, Keith D. Parr, Richard P. Beem, Scott B.
Feder, Lord, Bissell & Brook, Chicago, IL, Timothy H.
Gilbert, Lenczner, Slaught, Royce, Smith, Griffing, Toronto
Ontario, Canada, for Defendants.

Jeffrey W. Brennan, Federal Trade Commission,
Washington, DC, for Movant.

Brian T. Feeney, Greenberg Traurig, LLP, Philadelphia, PA,
for Counter Defendant.

*MEMORANDUM AND ORDER*

SURRICK, J.

**\*1** Presently before the Court is the Alphapharm Pty. Ltd.'s
Motion to Compel and for Sanctions under Fed.R.Civ.P. 37
(Doc. No. 54, Civil Action No. 01-1027; Doc. No. 45, Civil
Action No. 01-3364). For the following reasons,
Alphapharm's Motion will be granted in part and denied in
part.

I. BACKGROUND [FN1]

> FN1. Additional background regarding this
> litigation is set forth in the Court's Memoranda and
> Orders dated September 29, 2001, September 30,
> 2002, October 31, 2002, and December 20, 2002.

These consolidated cases involve claims of patent
infringement made by SmithKline Beecham Corporation,
SmithKline Beecham, P.L.C., Beecham Group, P.L.C. and
GlaxoSmithKline, P.L.C. ("SmithKline"). The patents at
issue cover certain forms of paroxetine hydrochloride,
processes for making paroxetine hydrochloride, and uses of
paroxetine hydrochloride. SmithKline manufactures
paroxetine hydrochloride, and then tablets and sells that
product in the United States under the trademark Paxil®
("Paxil"). Paxil is an antidepressant drug used to treat a
variety of disorders, and is one of the most widely
prescribed prescription drugs in the United States. Many of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



the Defendants have made various counterclaims against SmithKline, including claims for unfair competition, patent misuse, and monopolization. Many of the Defendants also seek declaratory judgments that they will not infringe SmithKline's patents, and that the patents are invalid.

The dispute presently before the Court is over discovery. Alphapharm noticed SmithKline's deposition pursuant to Fed.R.Civ.P. 30(b)(6) and designated several categories on which Alphapharm desired testimony. Upon receipt of Alphapharm's notice of deposition, SmithKline designated several persons to testify on its behalf. However, SmithKline did not allow those persons to testify about certain matters. Alphapharm then moved to compel SmithKline to answer its questions and for sanctions. In their opposition to Alphapharm's motion to compel, SmithKline argues in part that Alphapharm is improperly trying to obtain legal contentions and expert testimony through Rule 30(b)(6) depositions. We will examine each of the disputed categories and assess SmithKline's reasons for refusing to provide the requested information. SmithKline is the party resisting discovery, and therefore it bears the burden of showing that the information requested is not discoverable. _Josephs v. Harris Corp., 677 F.2d 985, 992 (3d Cir.1982)_; _Harner v. Greyhound Lines, Inc.,_ No. 02-0088, 2003 WL 147774, at *2 (E.D.Pa. Jan.10, 2003).

## II. THE DISPUTED DISCOVERY REQUESTS

### A. Category 3

Category 3 of Alphapharm's deposition notice calls for testimony regarding the "[a]nalytical methods suitable for detecting and identifying crystalline forms of paroxetine hydrochloride." (Doc. No. 54, Ex. 1 at 3.) SmithKline prepared a witness to testify about this subject, but its witness refused to answer certain questions about whether or not SmithKline stands by statements in its patents. SmithKline argues that these questions improperly seek legal contentions and expert testimony. In lieu of a Rule 30(b)(6) deposition, SmithKline is willing to answer interrogatories and provide expert discovery concerning Category 3. Alphapharm argues that a Rule 30(b)(6) deposition is appropriate to discover the facts, opinions, and subjective beliefs within SmithKline's corporate knowledge as to the analytical techniques used to distinguish various forms of paroxetine hydrochloride, including those described in SmithKline's patent.

*2 SmithKline's argument requires us to examine the proper use of Rule 30(b)(6) depositions. A corporation can testify only through its agents. Deposing a corporation presents difficulties that Rule 30(b)(6) was enacted to resolve.

_Kanaji v. Phila. Child Guidance Ctr. of Children's Hosp.,_ No. 00-937, 2001 WL 708898, at *2 (E.D.Pa. June 20, 2001). Pursuant to Rule 30(b)(6), a party may name a corporation as a deponent and describe with reasonable particularity the matters on which that party wishes the corporation to testify. Fed. R. Civ. P. 30(b)(6). A corporation receiving such a notice must designate a person or persons to testify on its behalf, and the persons so designated must "testify as to matters known or reasonably available" to the corporation. _Id.; see also SmithKline Beecham Corp. v. Apotex Corp.,_ No. 98 C 3952, 2000 WL 116082, at *8 (N.D.Ill. Jan.24, 2000) ("Rule 30(b)(6) imposes a duty upon the named business entity to prepare its selected deponent to adequately testify not only on matters known by the deponent, but also on subjects that the entity should reasonably know.").

Alphapharm contends that it has a near absolute right to conduct depositions in lieu of serving written interrogatories. It relies on _Marker v. Union Fidelity Life Ins. Co.,_ 125 F.R.D. 121 (M.D.N.C.1989). In _Marker,_ the defendant objected to an interrogatory on the grounds that responding to it would be unduly burdensome. The plaintiff then noticed the defendant's deposition pursuant to Rule 30(b)(6) in an attempt to discover the information. The defendant produced a witness, but that witness was not prepared to answer the plaintiff's questions. In opposing the plaintiff's motion to compel, the defendant argued that its answer to the interrogatory negated the plaintiff's need for a deposition. The court rejected this argument, stating, "[n]othing in the Federal Rules of Civil Procedure gives a party the right to not respond or inadequately respond to a Rule 30(b)(6) deposition notice or subpoena request and elect to supply the answers in a written response to an interrogatory. An attempt to so limit a Rule 30(b)(6) deposition is not warranted." _Marker,_ 125 F.R.D. at 126. At least two courts within this district have cited _Marker_ for this proposition. _See Mellon Bank, N.A. v. Bank of Mid-Jersey,_ No. 91-3142, 1992 WL 80800, at *1 (E.D. Pa. Apr 14, 1992); _Ierardi v. Lorillard, Inc._ ., No. 90-7049, 1991 WL 158911, at *1 (E.D. Pa. Aug 13, 1991).

We think _Marker_ is distinguishable. In _Marker,_ the defendant did not intend to answer the plaintiff's interrogatories or participate in depositions. In this case, SmithKline intends to provide Alphapharm with the discovery it seeks, but contends that with respect to certain matters, interrogatories and expert discovery are more appropriate than depositions. The fact that SmithKline is willing to provide Alphapharm with the information it seeks (albeit not in the form Alphapharm prefers) distinguishes _Marker._ [FN2] In any event, since _Marker_ was decided, several courts have stated that in certain circumstances, a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



party may properly resist a Rule 30(b)(6) deposition on the grounds that the information sought is more appropriately discoverable through contention interrogatories. [FN3] *See SmithKline Beecham Corp. v. Apotex Corp.,* 2000 WL 116082, at *8-10 (ordering plaintiffs to answer contention interrogatories with respect to some topics, and to submit to Rule 30(b)(6) depositions with respect to others); *United States v. Taylor,* 166 F.R.D. 356, 363 n. 7 (M.D.N.C.1996) ("Whether a Rule 30(b)(6) deposition or a Rule 33(c) contention interrogatory is more appropriate will be a case by case factual determination."); *Exxon Research & Eng'g Co. v. United States,* 44 Fed. Cl. 597, 601 (Fed.Cl.1999) (holding that under the circumstances contention interrogatories were more appropriate than Rule 30(b)(6) depositions); *McCormick-Morgan, Inc. v. Teledyne Indus., Inc.,* 134 F.R.D. 275, 286 (N.D.Cal.) (stating that the question is "which device would yield most reliably and in the most cost-effective, least burdensome manner information that is sufficiently complete to meet the needs of the parties and the court in a case like this"), *overruled on other grounds by,* 765 F.Supp. 611 (N.D.Cal.1991).

> FN2. This fact also distinguishes *Mellon Bank* and *Ierardi,* because in both those cases the party resisting discovery did not intend to respond to interrogatories or participate in Rule 30(b)(6) depositions.

> FN3. Indeed, the magistrate judge who decided *Marker* recently issued an unpublished opinion in which he ordered that the plaintiff could provide the defendant with certain information through contention interrogatories in lieu of participating in Rule 30(b)(6) depositions. *See SmithKline Beecham Corp. v. Synthon Pharm., Ltd.,* No. 1:00CV01179, slip op. at 16 (M.D.N.C. Nov.19, 2001).

**\*3** We agree that in some circumstances, courts may order parties to answer contention interrogatories in lieu of participating in Rule 30(b)(6) depositions. Importantly, the Rules permit courts to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including [an order] ... that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery." Fed. R. Civ. P. 26(c); *see also* Fed. R. Civ. P. 1 (stating that the Rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action"). Whether contention interrogatories are more appropriate than Rule 30(b)(6) depositions "will be a case by case factual determination." *Taylor,* 166 F.R.D. at 363 n. 7. In making this determination

we will be guided by "which device would yield most reliably and in the most cost-effective, least burdensome manner information that is sufficiently complete to meet the needs of the parties and the court in a case like this." *McCormick-Morgan,* 134 F.R.D. at 286.

With these principals in mind, we now consider which discovery device is most appropriate with respect to the information Alphapharm seeks in Category 3. Although Alphapharm contends that it merely seeks the facts, opinions, and subjective beliefs of SmithKline, our review of the disputed questions reveals that Alphapharm was asking SmithKline's witness to take a legal position with respect to certain statements in SmithKline's patents. It would be very difficult for a non-attorney witness to answer such questions at a deposition. A better method would be for SmithKline to respond to interrogatories because then it would be able to receive input from both its attorneys and other persons familiar with its patents. *See Exxon Research,* 44 Fed. Cl. at 601 (holding that contention interrogatories were more appropriate than depositions to inquire about claim construction). Accordingly, we will require SmithKline to respond to Category 3 through interrogatories. [FN4]

> FN4. Alphapharm also complains that SmithKline's witness refused to answer questions about suitable analytical techniques for detecting and identifying crystalline forms of paroxetine hydrochloride. SmithKline claims in one of its patents that the different forms of paroxetine hydrochloride anhydrate can be differentiated from one another based on various analytical techniques. Alphapharm is interested in identifying those techniques. Alphapharm's inquiry appears to be related to claim construction. Interrogatories are a more appropriate form of discovery for issues related to claim construction. *See Exxon Research,* 44 Fed. Cl. at 601.

### B. Category 7

Category 7 of Alphapharm's deposition notice calls for testimony regarding "[t]he analytical distinctions of Form A over the prior art cited during prosecution of the '423 Form A patent." (Doc. No. 54, Ex. 1 at 3.) There appears to be some confusion among the parties with respect to SmithKline's willingness to prepare a witness to testify about this category. SmithKline contends that its witness was prepared to testify about Category 7, but that Alphapharm prematurely ended the deposition. However, SmithKline objects to Alphapharm's attempts to question its witness about its legal positions regarding its '423 patent



Slip Copy
2004 WL 739959 (E.D.Pa.)
(Cite as: 2004 WL 739959 (E.D.Pa.))

Page 4

application. Our review of the disputed questions reveals that Alphapharm was asking SmithKline's witness to state legal positions. A more appropriate way for Alphapharm to obtain SmithKline's legal position is through interrogatories. See Exxon Research, 44 Fed. Cl. at 601.

C. Category 8

*4 Category 8 of Alphapharm's deposition notice calls for testimony regarding the "[t]he bases for [SmithKline's] allegations in its complaints filed in these consolidated actions that Alphapharm infringes and will infringe the patents asserted in those complaints ." (Doc. No. 54, Ex. 1 at 3.) Alphapharm is trying to discover SmithKline's legal contentions. Interrogatories are a more appropriate method of discovery for this purpose. See In re: Indep. Serv. Org. Antitrust Litig., 168 F.R.D. 651, 654 (D.Kan.1996) (rejecting attempt to use a Rule 30(b)(6) deposition to discover the factual bases of the defendant's defenses and counterclaims because the information sought was discoverable through other, less burdensome means); Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co., No. 90 Civ. 7811(KC), 1993 WL 34678, at *3 (S.D.N.Y. Feb.4, 1993) (same).

D. Category 1

Category 1 of Alphapharm's deposition notice calls for testimony regarding "[t]he conditions under which particular forms of paroxetine, including without limitation paroxetine hydrochloride anhydrate, allegedly convert to paroxetine hydrochloride hemihydrate ." (Doc. No. 54, Ex. 1 at 3.) SmithKline prepared a witness to testify on this subject and that witness testified at length about the various ways in which paroxetine hydrochloride anhydrate can convert to paroxetine hydrochloride hemihydrate. However, SmithKline's witness was not prepared to testify about the conditions under which this conversion can occur inside the human body.

According to Alphapharm, SmithKline has taken the position that paroxetine hydrochloride can convert to a different form inside the body, and has publicly alleged infringement of its patents based on in vivo conversion. See, e.g., SmithKline Beecham Corp. v. Apotex Corp., 247 F.Supp.2d 1011, 1014-15 (N.D.Ill.2003) (discussing SmithKline's claim that its paroxetine hydrochloride hemihydrate patent could be infringed if paroxetine hyrochloride anhydrate converted to a different form inside a person's stomach). SmithKline does not dispute this assertion. However, SmithKline claims that questions about in vivo conversion of paroxetine hydrochloride require expert testimony, and that such testimony is premature. We

disagree. If SmithKline has concluded that its patents are infringed when paroxetine hydrochloride converts to a different form inside the body, it must have some basis for that belief, and Alphapharm is entitled to discover that information. See AMP Inc. v. Melox Inc., 227 U.S.P.Q. 172, 172 (N.D.Ill.1985) (stating that "the court doubts that no non-expert representative could testify [about the basis for plaintiff's infringement claims], since plaintiff's agents and representatives made the decision to file this lawsuit"). Accordingly, SmithKline is ordered to prepare a witness to testify to the matters described in Category 1.

E. Category 5

Category 5 of Alphapharm's deposition notice calls for testimony regarding the "[t]he mechanisms and natural history of 'universal' and 'local' seeding by paroxetine hydrochloride hemihydrate, including the potential as of today for obtaining paroxetine hydrochloride free of the hemihydrate." [FN5] (Doc. No. 54, Ex. 1 at 3.) SmithKline prepared a witness to testify on this subject, but that witness refused to answer a question about whether or not SmithKline sent any paroxetine hydrochloride hemihydrate to the United States in 1985. SmithKline contends that Alphapharm wants this information to show that SmithKline's clinical trials in the United States constituted a public use of its paroxetine hydrochloride hemihydrate invention under 35 U.S.C. § 102(b). SmithKline notes that another court has ruled that SmithKline's clinical trials did not constitute a public use of paroxetine hydrochloride hemihydrate. See SmithKline Beecham Corp. v. Apotex Corp., 286 F.Supp.2d 925, 932-38 (N.D.Ill.2001). However, Alphapharm was not a party to that litigation, and SmithKline does not argue that Alphapharm is bound by that determination. Alphapharm is entitled to discover facts relevant to whether SmithKline's paroxetine hydrochloride hemihydrate patent is invalid because of public use or prior art. See SmithKline Beecham Corp. v. Apotex Corp., 2000 WL 116082, at *10 (ordering SmithKline to produce a 30(b)(6) witness to testify on prior art bearing on the validity and enforceability of its patent). [FN6] Accordingly, SmithKline is ordered to prepare a witness to testify to the matters described in Category 5.

> FN5. "Seeding" refers to the spread of particles of paroxetine hydrochloride hemihydrate. SmithKline has taken the position in other litigation involving its Paxil patents that tiny bits of paroxetine hydrochloride hemihydrate can contaminate facilities that produce paroxetine hydrochloride anyhdrate, with the result that those facilities can no longer produce paroxetine hydrochloride anyhdrate. See SmithKline Beecham Corp. v.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
2004 WL 739959 (E.D.Pa.)
**(Cite as: 2004 WL 739959 (E.D.Pa.))**

Page 5

_Apotex Corp._, 247 F.Supp.2d at 1020-21.

FN6. We also reject SmithKline's argument that it should not have to prepare a witness to testify on Category 5 because it already produced to Alphapharm information regarding seeding generated during other litigation. SmithKline has not convinced the Court that the information it already produced to Alphapharm eliminates the need for a deposition on Category 5.

III. ALPHAPHARM'S MOTION FOR SANCTIONS

**\*5** Because we have denied in part Alphapharm's motion to compel, we find that SmithKline's opposition to that motion was substantially justified. Accordingly, we will deny Alphapharm's motion for sanctions. _See_ Fed. R. Civ. P. 37(a)(4).

An appropriate Order follows.

### ORDER

AND NOW, this 23rd day of March, 2004, upon consideration of Alphapharm Pty. Ltd.'s Motion to Compel and for Sanctions under Fed.R.Civ.P. 37 (Doc. No. 54, Civil Action No. 01-1027; Doc. No. 45, Civil Action No. 01-3364), it is ORDERED that:
    1. SmithKline is ORDERED to respond to Categories 3, 7, and 8 of Alphapharm's deposition notice through interrogatories.
    2. SmithKline is ORDERED to designate and prepare witnesses to testify on its behalf with respect to Categories 1 and 5 of Alphapharm's deposition notice.
    3. Alphapharm's Motion for Sanctions is DENIED.

IT IS SO ORDERED.

2004 WL 739959 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

• 2:03CV03365 (Docket) (May. 29, 2003)

• 2003 WL 22023358 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Federal tradecommission as Amicus Curiae Concerning Torpharm%7Ds Cross Motion for Entry of an Amended Order (Jan. 28, 2003)

• 2:02CV01484 (Docket) (Mar. 22, 2002)

• 2:01MJ01027 (Docket) (Dec. 17, 2001)

• 2:01M01027 (Docket) (Dec. 17, 2001)

• 2:01CV03364 (Docket) (Jul. 03, 2001)

• 2:01CV02981 (Docket) (Jun. 15, 2001)

• 2:01CV02602 (Docket) (May. 25, 2001)

• 2:01CR00159 (Docket) (Mar. 22, 2001)

• 2:01CV01027 (Docket) (Mar. 01, 2001)

• 2:01CV00159 (Docket) (Jan. 11, 2001)

• 2:00CV06464 (Docket) (Dec. 21, 2000)

• 2:00CV05953 (Docket) (Nov. 22, 2000)

• 2:00CV04888 (Docket) (Sep. 27, 2000)

• 2:00CV01393 (Docket) (Mar. 16, 2000)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

This is to certify that true and correct copies of the foregoing B. Braun of America Inc.'s Response to Plaintiffs' Motion to Compel B. Braun of America to Make Supplemental Rule 30(b)(6) Designation and Appendix of Unreported Authority in Support Thereof have been served on all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to Verilaw Technologies for posting and notification to all parties on this 10th day of September, 2004.

_____s/ Colin R. Kass_____
Daniel F. Attridge, P.C.
Colin R. Kass
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005
(202) 879-5000
Fax: (202) 879-5200

***Counsel for B. Braun of America Inc.***