## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE )
LITIGATION )

THIS DOCUMENT RELATES TO: )

ALL ACTIONS )

MDL No. 1456

CIVIL ACTION: 01-CV-12257-PBS

Judge Patti B. Saris

## MEMORANDUM IN SUPPORT OF B. BRAUN OF AMERICA INC.'S RENEWED MOTION TO DISMISS THE AMENDED MASTER CONSOLIDATED COMPLAINT AND RESPONSE TO PLAINTIFFS' SUPPLEMENT TO THEIR OPPOSITION THERETO

More than one year ago, on August 1, 2003, B. Braun of America Inc. ("BBA") filed its Motion to Dismiss the Amended Master Consolidated Class Action Complaint ("AMCC") on the grounds that it was not a proper party to the litigation and the Court lacked personal jurisdiction over BBA. In its motion and accompanying declaration of its corporate representative, BBA demonstrated that it has never manufactured, sold, or distributed any drug identified in the AMCC. BBA demonstrated that it has conducted no business in the Commonwealth of Massachusetts, and has entered into no business relationships or contracts within the forum. In short, BBA demonstrated that it had *no contacts* whatsoever with the forum such that personal jurisdiction could be established. Moreover, BBA demonstrated it had no relationships, agreements, or even communications with any publishers or pharmacy benefit managers alleged in the AMCC.

Yet, despite repeated notice that BBA was not a proper party to this litigation, the plaintiffs sought and were granted a reprieve from dismissal of their claims against BBA, pending the opportunity to conduct additional jurisdictional discovery. Now, more than one year after BBA filed its motion and six months after this Court granted the plaintiffs' request for additional time to conduct this jurisdictional discovery, the plaintiffs apparently concede that there are no independent grounds for the Court to assert personal jurisdiction. Indeed, the plaintiffs have neither challenged, disputed, controverted, nor cast doubt on a single fact set forth in BBA's Motion to Dismiss.

Instead, in an eleventh-hour attempt to avoid dismissal of their claims against BBA, the plaintiffs argue personal jurisdiction over BBA is established on the grounds that its subsidiary, B. Braun Medical Inc. ("BBM"), does business in the forum state. (Plaintiffs' Supplement to Their Opp. to BBA's Mot. to Dismiss AMCC (hereinafter "Pls.' Supp.") at 5-6.) Specifically,

the plaintiffs ask this Court to disregard corporate separateness and pierce the corporate veil of BBM to hale BBA into the forum on the grounds that BBA "share[s] officers and directors" with, and "receives financial reports" from, BBM. (Pls.' Supp. at 5-6.) The plaintiffs thus contend that a parent company is subject to the jurisdiction of any court where its subsidiary is found to do business if the parent and subsidiary share "at least" one common director, or the parent engages in any activities incident to its status as a shareholder of the subsidiary. (*Id.* at 5.) This argument simply has no basis in law.

Accordingly, the plaintiffs' latest attempt to accomplish by bare allegation that which they cannot accomplish by fact or law should be rejected, and BBA's Motion to Dismiss for lack of personal jurisdiction should be granted.

## FACTUAL BACKGROUND

In its August 1, 2003 Motion to Dismiss, BBA demonstrated that it is not a proper party to this litigation because it does not manufacture, distribute, or sell any of the drugs identified in the AMCC. (BBA's Mem. in Support of Mot. to Dismiss ("BBA Mem.") at 1-2; Decl. of Charles A. DiNardo, Attach. to BBA Mem. ("DiNardo Decl.") at 2.) Further, BBA demonstrated that it neither owns, leases, possess, uses or holds any property in Massachusetts. (DiNardo Decl. at 2.) Moreover, BBA demonstrated that it has no relationships or communications with any PBM or publisher identified in the AMCC. (*Id.*) Because BBA has no contacts with Massachusetts, and certainly no contacts that would form the basis for the plaintiffs' claims, BBA asserted that this Court has no grounds to exercise personal jurisdiction over BBA. (BBA Mem. at 1-2.)

In response, the plaintiffs claimed that they needed discovery to determine whether, in fact, there was a basis for exerting jurisdiction over BBA. (Pls.' Resp. to Def. Specific Mem. at 37-38.) On February 24, 2004, the Court granted the plaintiffs' request and allowed them six

2

months to engage in jurisdictional discovery before a decision would be reached on BBA's Motion to Dismiss. Specifically, the Court directed the plaintiffs to "respond to the issues of personal jurisdiction . . . by August 24, 2004." (Mem. and Order of Feb. 24, 2004 at 23.)

Despite this opportunity, for more than five months, the plaintiffs did nothing; the plaintiffs sent no document requests, interrogatories, or requests for admission to BBA relating to the jurisdictional issues. The plaintiffs did not send any notices of deposition to BBA or to any related third parties who might have information relevant to their jurisdictional arguments. In fact, the plaintiffs made no attempt – formal or informal – to obtain information from BBA regarding the jurisdictional issues until August 4, 2004. At that time, the plaintiffs served BBA with a Notice of Deposition pursuant to Federal Rule of Civil Procedure 30(b)(6).[1]

Although the Court's Order limited the plaintiffs' discovery to issues surrounding personal jurisdiction over BBA, the areas of inquiry identified in the plaintiffs' Notice of Deposition purported to seek information regarding not only BBA, but also BBM and a non-existent company that the plaintiffs called "B. Braun McGaw, Inc.," including information regarding the drugs manufactured by these companies, all contracts or agreements regarding the licensing, distribution, or marketing of drugs sold, advertised or marketed by these companies, and all documents relating to these areas of inquiry. (*See* Notice of 30(b)(6) Dep. at 3-4) (Attached hereto as Exhibit A.)

---

[1]  The plaintiffs' Notice of Deposition failed to provide adequate notice under Case Management Order ("CMO") No. 10 requiring 21 days' written notice of depositions. *See* Case Management Order No. 10, dated March 25, 2004, at ¶ 7 ("A party shall provide a 'three week deposition notice' under which such party provides *at least* 21 days notice for a proposed deposition."). Instead, the plaintiffs demanded that the deposition take place eight days after service of their Notice of Deposition. Despite this failure to abide by the Court's Order, BBA accommodated the plaintiffs' tardy request and agreed to make a witness available for deposition on August 17, 2004.

On August 11, 2004, BBA served the plaintiffs with written Objections to the areas of inquiry identified in their Notice of Deposition on the grounds that, among other things, they exceeded both the scope of the Court's February 24, 2004 Order and Rule 30(b)(6). (Corrected Obj. at 2-3) (Attached hereto as Exhibit B.)   In addition, BBA reiterated that it "neither manufactures nor sells any of the pharmaceuticals listed in Appendix A to the Amended Master Consolidated Class Action Complaint ("AMCC")" and that it was designating a 30(b)(6) witness solely to "allow[] limited discovery by the plaintiffs for the purpose of resolving BBA's motion to dismiss for lack of personal jurisdiction." (*Id*. at 1.)   At no time prior to the deposition did the plaintiffs respond to BBA's Objections (nor did they seek third-party discovery from BBM). Nevertheless, BBA produced its corporate representative, Assistant Secretary, Cathy Codrea, for deposition on August 17, 2004.[2]

During her deposition, Ms. Codrea reiterated the facts set forth in BBA's Motion to Dismiss, *i.e.*, that BBA conducts no business and has *no contacts* with Massachusetts:

> Q - So, it's your testimony that with regard to B. Braun of America, that it does not do any sales, advertising, marketing, distribution or manufacturing of AWPID's into Massachusetts?
>
> A - Yes, I'm not aware of any.

(Codrea Dep. at 60:22 - 61:5; *see also id*. at 46:5-8.)

                    **********

> Q - Does B. Braun of America have any sales representatives that are employed in Massachusetts?
>
> A - No. Let me restate, B. Braun of America is a company that holds stock. It does not operate a business. It does not have any employees. It holds stock.

---

[2]   The transcript of Ms. Codrea's August 17, 2004 deposition was submitted under seal by the plaintiffs. (Pls.' Supp., Exh. 1.)

(*Id*. at 61:10 - 61:17; *see also id*. at 61:18 - 62:11.) Likewise, Ms. Codrea testified that BBA has never manufactured, sold, or distributed any drug identified in the AMCC. (*Id*. at 45:18–46:4.)

Ms. Codrea also testified BBM is a wholly-owned subsidiary of BBA. (*Id*. at 27:9-10; *see also* 16:3-5; 22:18–23:1.) Moreover, as is common in most parent company-subsidiary relationships, Ms. Codrea testified BBA and BBM share *some* common officers and at least one common director. (*Id*. at 21:10-18; 23:9-21; 21:20 - 22:8; 23:22-24:10.) Notably, Ms. Codrea testified that officers of BBA do not – as officers of BBA – have *any* involvement in the operations or activities of BBM. (*Id*. at 30:2-22.) In addition, Ms. Codrea testified that there are no agreements between BBA and BBM regarding the licensing, distribution, advertising, or sale of any drug identified in the AMCC. (*Id*. at 58:14 - 59:7.)

Finally, and quite unremarkably, Ms. Codrea testified that BBA, as a shareholder of BBM, may "from time-to-time … invest capital" in BBM and receive annual audited financial statements from BBM. (*Id*. at 86:1-6; 27:11-20.)

The plaintiffs now contend that BBA is subject to the personal jurisdiction of the Court based on BBM's contacts with the forum. The plaintiffs therefore claim that the sharing of at least one common director, four common corporate officers, and the receipt of annual financial statements by a parent corporation from a subsidiary is sufficient to subject the parent corporation to the personal jurisdiction of a court. (Pls.' Supp. at 4-6.)

## ARGUMENT

## I.     The Plaintiffs Concede There Is No Independent Basis On Which To Assert Personal Jurisdiction Over BBA.

The plaintiffs bear the burden of proving that the Court possesses personal jurisdiction over BBA. *Rivera-Lopez v. Municipality of Dorado*, 979 F.2d 885, 887 (1st Cir. 1992); *see American Exp. Intern., Inc. v. Mendez-Capellan*, 889 F.2d 1175 (1st Cir. 1989). Here, despite

the opportunity to conduct jurisdictional discovery, the plaintiffs have neither set forth any affirmative facts establishing jurisdiction, nor refuted the facts set forth in BBA's Motion to Dismiss.

Indeed, the plaintiffs do not dispute that BBA has neither done business in Massachusetts, nor manufactured any of the products referenced in the AMCC. The plaintiffs do not dispute that BBA has never owned property, employed any persons, or engaged in any activity in the forum. Nor do the plaintiffs dispute that BBA has not entered into any business relationships, agreements, or contracts with any publisher or PBM identified in the AMCC. In short, the plaintiffs concede that BBA has no independent contacts with the forum such that this Court could assert personal jurisdiction.[3]

## II.     Plaintiffs' Piercing The Corporate Veil Argument Is Without Merit.

Although conceding BBA has no direct contacts with the forum, the plaintiffs now assert that the Court should assert jurisdiction over BBA based on the contacts of its subsidiary, BBM. To begin with, the plaintiffs overlook the Supreme Court's admonition that, in determining whether personal jurisdiction exists, "[e]ach defendant's contacts with the forum State must be

---

[3]   Moreover, based on the undisputed facts submitted by BBA, this Court lacks subject matter jurisdiction over the plaintiffs' claims because BBA does not manufacture the drugs the purchase of which forms the basis for the plaintiffs' claims. *See, e.g.*, *McInnis-Misenor v. Maine Medical Center*, 319 F.3d 63, 67 (1st Cir. 2003) ("A litigant bears the burden of showing 'that he personally has suffered some actual or threatened injury *as a result of the putatively illegal conduct of the defendant*, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision.'") (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)) (emphasis added). The Court previously granted a motion to dismiss brought by the Boehringer Defendants on the same basis. (*See* Mem. in Support of Mot. to Dismiss on Behalf of Boehringer Ingelheim Corporation, Ben Venue Laboratories, Inc., and Bedford Laboratories at 1 (arguing that "Plaintiffs have yet to allege an injury fairly traceable to [the] purchase of a single drug manufactured or distributed by any of the named Boehringer Defendants by any identified plaintiff" where the only Boehringer drug remaining in the AMCC "is not manufactured or distributed by any of the Boehringer Defendants named in this suit" but by a separate Boehringer entity that had not been named); Order of June 9, 2004 (granting motion to dismiss on the grounds that "it is undisputed that these companies did not manufacture Atrovent." ).)

6

assessed individually." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) (jurisdiction over parent corporation does not automatically establish jurisdiction over its subsidiary). Significantly, the plaintiffs disregard the First Circuit's ruling in *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992), that no jurisdiction exists over a parent corporation, such as BBA, merely based on the activities of its subsidiary.

Ignoring these precedents, the plaintiffs assert the Court should pierce the corporate veil to establish personal jurisdiction because BBA invests in BBM, shares a common place of business, and has some common officers and directors. (Pls.' Supp. at 4-6.) The plaintiffs therefore contend that a parent company is subject to the jurisdiction of any court where its subsidiary is found to do business if it shares at least some common officers or directors, or engages in any activities incident to its status as a stockholder in the subsidiary.

As a threshold matter, the plaintiffs have failed to show fraud or other exceptional circumstances such that piercing the corporate veil would be appropriate. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003) (stating piercing the corporate veil "is the rare exception, applied in the case of fraud or certain other exceptional circumstances"); *see also My Bread Baking Co. v. Cumberland Farms, Inc.*, 233 N.E.2d 748, 752 (Mass. 1968) (stating disregard of separate corporate forms is only warranted "in rare particular situations in order to prevent gross inequity"). Indeed, where courts have pierced the corporate veil, there is "an element of dubious manipulation and contrivance, finagling, such that corporate identities are confused and third parties cannot be quite certain with what they are dealing." *Evans v. Multicon Constr. Co.*, 574 N.E.2d 395, 400 (Mass. Ct. App. 1991). The plaintiffs can make no such showing here. This alone warrants the summary rejection of the plaintiffs' latest theory of jurisdiction.

7

Beyond this failure to prove any inequitable conduct, the plaintiffs' theory – based on BBA's ownership of BBM – runs counter to fundamental principles of corporate law. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities"); *see also Shaffer v. Heitner*, 433 U.S. 186 (1977) (holding that stock ownership of company present in the forum is insufficient to establish personal jurisdiction over nonresident stockholder). "[T]here is no authority for extending the doctrine [of piercing the corporate veil] so far that, as a categorical matter, all subsidiaries are deemed to be the same as the parent corporation." *Dole Food Co.*, 538 U.S. at 475-76. Yet this is precisely what the plaintiffs ask the Court to do here.

Indeed, the plaintiffs cite no evidence beyond BBA's ownership interest in BBM in support of their latest theory of jurisdiction. However, there is a presumption of separateness that can only be "overcome by *clear evidence* that the parent in fact controls the activities of the subsidiary." *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980) (emphasis added); *see also National Medical Care, Inc. v. Home Medical of America, Inc.*, No. 001225, 2002 WL 31187683, at \*4 (Mass. Super. Aug. 9, 2002) (same). To overcome this presumption, the plaintiffs must demonstrate that BBA exercises significant control over BBM which, under Massachusetts law, means "running the operations of a subsidiary in Massachusetts." *National Medical Care, Inc.*, 2002 WL 31187683, at \*4; s*ee also Escude Cruz*, 619 F.2d at 905 ("[C]ontrol incident to stock ownership does not justify ignoring the separateness" of two corporations).

Far from demonstrating "significant control," the plaintiffs fail to demonstrate that BBA exercises *any* control over the day-to-day operations or management of BBM. Instead, the plaintiffs submit conclusory allegations (without citation) regarding BBA's purported

8

"significant control" of BBM, including that BBA "actively and directly participates…in the conduct of BBM's business," that "BBA's officers and directors are directly involved in the day-to-day affairs and management of BBM," and that "BBA finances BBM's operations and receives regular reports regarding its business, as well as revenue." (Pls.' Supp. at 6.) These conclusory allegations are entirely unsupported and are, in fact, ***directly contradicted*** by the deposition testimony of BBA's corporate representative, Ms. Codrea. (*See* Codrea Dep. at 30:2-22, 86:1-6, 27:11-20; 58:14-59:7.) Indeed, Ms. Codrea testified that BBA officers do not have any involvement in the day-to-day management of BBM. (*Id.* at 30:2-22.) The plaintiffs can point to no testimony or other evidence supporting these allegations. Therefore, the plaintiffs' unsupported allegations (in the face of undisputed evidence to the contrary) are without merit and fail to demonstrate that BBA controls the day-to-day operations or management of BBM.

Moreover, the deposition testimony relied upon by the plaintiffs to show BBA's "significant control" of BBM does not advance their cause. Rather, the facts on which the plaintiffs rely are incident to nearly every parent-subsidiary relationship. Indeed, the facts on which the plaintiffs rely have been summarily rejected by the courts as grounds to pierce the corporate veil.[4]

*First*, the First Circuit has held the sharing of common officers and directors is not a basis for disregarding corporate separateness.[5]   *Escude Cruz*, 619 F.2d at 905 ("allegations of

---

[4]   In support of their allegation that BBA exercises significant control over BBM, the plaintiffs cite the testimony of Ms. Codrea to extract the following five undisputed facts: (1) BBM is a wholly-owned subsidiary of BBA; (2) "BBA provides financing to and invests in BBM"; (3) "BBA and BBM share the same principal place of business"; (4) "BBA and BBM share [some] officers and directors"; and (5) "BBA receives financial reports from BBM." (Pls.' Supp. at 5-6.)

[5]   The cases cited by the plaintiffs do not hold to the contrary. In *Cabot Safety Intermediate Corp. v. Arkon Safety Equip., Inc.*, 12 F. Supp. 2d 180, 181 (D. Mass. 1998), the court found that an "*exact* identity of officers" of two corporations was but one factor in assessing corporate control of subsidiary by parent company. Likewise, in
(Continued…)

interlocking directorates and stock ownership will not alone suffice" to disregard corporate separateness); *see also National Medical of America, Inc.*, 2002 WL 31187683, at *4 (same). This is true even if the parent company owns all of the stock of the subsidiary. *See Escude Cruz*, 619 F.2d at 905 ("The fact that the parent may own *all* of the stock of the subsidiary and even maintain control incident to stock ownership does not justify ignoring the separateness" of two corporations) (emphasis added).

*Second*, a common principal place of business is not a basis for disregarding corporate separateness, even if the corporations also share common officers and directors. *See Clark v. Leasecomm Corp.*, No. CA99-4177, 2000 WL 1512373, at *11 (Mass. Super. Aug. 21, 2000) (respecting corporate forms where parent and wholly-owned subsidiary shared common place of business and had common officers and directors).

*Third*, the receipt of financial reports incident to BBA's status as a shareholder in BBM does not establish the requisite "control." *See In re Acushnet River & New Bedford Harbor Proceedings*, 675 F. Supp. 22, 34 (D. Mass. 1987) (submission of various financial reports and quarterly forecasts to parent company by wholly owned subsidiary did not demonstrate "control as to justify the equitable remedy of piercing the veil").

In short, the plaintiffs have presented no evidence to assert that BBA exercises *any* control, much less "significant control," over the day-to-day operations and management of

---

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 233 N.E.2d 748, 752 (Mass. 1968), the corporations at issue shared identical officers and directors. Yet, in both *Cabot Safety* and *My Bread Baking Co.*, even the complete overlap of officers and directors was not dispositive of whether the subsidiary was in fact a sham such that piercing the corporate veil was justified. *See Cabot Safety*, 12 F. Supp. 2d at 181; *My Bread Baking Co.*, 233 N.E.2d at 620-21. Indeed, in both cases, the courts found additional factual allegations – none of which are alleged by the plaintiffs here – such as disregarding corporate formalities, fraudulent conduct, and direct evidence that the parent company exercised "pervasive" control over its subsidiary, which justified piercing the corporate veil.

BBM. Accordingly, the plaintiffs have offered no evidence to overcome the presumption of separateness such that the Court could disregard the corporate forms of the two entities.

The plaintiffs' allegation that there is a "confused intermingling" of BBA and BBM is similarly without merit. (Pls.' Supp. at 6.) Even when considered in combination, the plaintiffs' factual allegations fail to establish fraudulent or other misleading conduct necessary to demonstrate a "confused intermingling" of the two companies. In *Clark v. Leasecomm Corp.*, the court addressed many of the same facts alleged by the plaintiffs here. There, the plaintiffs alleged:

> [T]hat two corporations share[d] certain officers, directors, employees, and professional advisors, as well as corporate offices, that [the parent] controls the operations and management of [subsidiary] and that [the subsidiary] was formed and has been operated solely to carry out the purposes and objectives of its parent companies and their shareholders.

2000 WL 1512373, at \*10. The court held that these facts fell *"**well short** of those required to state a claim on a theory of piercing the corporate veil." Id.* at \*11 (emphasis added). The court added that there was no conduct by either corporation that could have led the plaintiffs, or anyone else, to be confused or misled as to which corporation was involved in the transactions at issue. *Id.*; *see also Evans*, 574 N.E.2d at 400 ('confused intermingling' requires a showing of conduct such that "third parties cannot be quite certain with what they are dealing").

Here, the plaintiffs offer no proof that BBA's conduct misled the plaintiffs. The plaintiffs instead rely on the fact that BBA and BBM share at least one common director, *some* common officers, and share a common principal place of business. As the court in *Clark* demonstrated, these facts fall well short of establishing a "confused intermingling" of corporate forms.

Therefore, the plaintiffs have presented no grounds to disregard corporate forms or pierce the corporate veil in order to assert personal jurisdiction over BBA.

11

**III.    Plaintiffs' Invocation of The Identity-of-Interest Doctrine Is Without Merit.**

The plaintiffs inexplicably assert that the application of the "identity-of-interest doctrine is proper" and somehow provides an independent basis to assert personal jurisdiction over a defendant. (Pls.' Supp. at 3-4.) The plaintiffs apparently contend that this judicially-crafted doctrine regarding the relation back of untimely amendments is a means to by-pass the constitutional predicate to personal jurisdiction. This argument, however, is simply a red herring, having no basis in law.

The very authority the plaintiffs cite in support of their theory indicates that the identity-of-interest doctrine "bears *only* on the requirement of Rule 15(c)(1)" and the relation back of untimely amendments. *Jimenez v. Toledo*, 604 F.2d 99, 103 (1st Cir. 1979) (emphasis added); *see also Young v. Lepone*, 305 F.3d 1, 13-15 (1st Cir. 2002) (same). It is not, however, a separate basis for asserting jurisdiction over a defendant. *See Schiavone v. Fortune*, 477 U.S. 21, 28 (1986) (stating that an "identity-of-interest" exception is merely a means by "which an amendment that substitutes a party in a complaint after the limitations period has expired will *relate back to the date of the filing of the original complaint"*); *see also Emery v. Wood Indus., Inc.*, No. 98-480, 2001 WL 951579, at *6 (D. N.H. Aug. 20, 2001) ("The identity of interests concept, a judicial gloss on Rule 15(c)(1), provides that the institution of the action serves as constructive notice of the action to the parties added after the limitations period expired.").

The plaintiffs do not – and cannot – cite any authority for the proposition that the identity-of-interest doctrine is a means to by-pass the constitutional predicate to personal jurisdiction, *i.e.*, a defendant's "minimum contacts" with the forum jurisdiction. *See, e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (holding constitutional due process requires that a defendant have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and

substantial justice") (internal citations omitted).  The plaintiffs have failed to demonstrate *any* contacts on the part of BBA with the Commonwealth of Massachusetts.  Accordingly, the plaintiffs have failed to demonstrate any grounds on which the Court may assert personal jurisdiction over BBA.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in its memorandum in support of BBA's Motion to Dismiss for lack of personal jurisdiction, plaintiffs' claims against BBA should be dismissed.

13

Dated: September 10, 2004                    Respectfully submitted,


                                             _____s/ Colin R. Kass_____
                                             Daniel F. Attridge, P.C.
                                             Colin R. Kass
                                             KIRKLAND & ELLIS LLP
                                             655 Fifteenth Street, N.W., Suite 1200
                                             Washington, D.C. 20005
                                             Telephone:  (202) 879-5000
                                             Facsimile:  (202) 879-5200

                                             ***Counsel for B. Braun of America Inc.***

14

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) <br> AVERAGE WHOLESALE PRICE ) <br> LITIGATION ) <br> ) <br> THIS DOCUMENT RELATES TO: ) <br> ) <br> ALL ACTIONS ) <br> _____ ) | MDL No. 1456 <br><br> CIVIL ACTION: 01-CV-12257-PBS <br><br> Judge Patti B. Saris |

## APPENDIX OF UNREPORTED AUTHORITY IN SUPPORT OF MEMORANDUM IN SUPPORT OF B. BRAUN OF AMERICA INC.'S RENEWED MOTION TO DISMISS THE AMENDED MASTER CONSOLIDATED COMPLAINT AND RESPONSE TO PLAINTIFFS' SUPPLEMENT TO THEIR OPPOSITION THERETO

1. *National Medical Care, Inc. v. Home Medical of America, Inc.*, No. 001225, 2002 WL 31187683 (Mass. Super. Aug. 9, 2002)

2. *Clark v. Leasecomm Corp.*, No. CA99-4177, 2000 WL 1512373 (Mass. Super. Aug. 21, 2000)

3. *Emery v. Wood Indus., Inc.*, No. 98-480, 2001 WL 951579 (D. N.H. Aug. 20, 2001)



**H**

Superior Court of Massachusetts.

NATIONAL MEDICAL CARE, INC. dba et al., [FN1]

> FN1. NMC Homecare, Inc., and Fresenius Medical Care Pharmacy Services, Inc.

v.

HOME MEDICAL OF AMERICA, INC. et al. [FN2], [FN3]

> FN2. Chartwell Care Givers of New York, Inc., formerly known as Home Medical of New York, Inc. and Home Care Concepts of America, Inc. (collectively referred to as "HMA"), National Century Financial Enterprises, Inc. ("NCFE"), NPF VI, Inc., Lance Poulsen, and Craig Porter, defendants.

> FN3. Fresenius Medical Care AG, and Bruce Blomstrom, third-party defendants.

No. 001225.
Aug. 9, 2002.

MEMORANDUM OF DECISION AND ORDER ON THIRD-PARTY DEFENDANT FRESENIUS MEDICAL CARE AG'S MOTION TO DISMISS

JULIAN T. HOUSTON, Justice.

INTRODUCTION

*1 This action arises out of claims brought in connection with the acquisition of assets the Defendants and Plaintiffs-in-Counterclaim, Home Medical of America ("HMA"), purchased from the Plaintiff, National Medical Care ("NMC"). In March of 2000, NMC sued HMA claiming, among other things, that they had failed to pay the full purchase price for the assets. In the fall of 2000, HMA filed counterclaims against NMC claiming NMC failed to disclose and misrepresented material facts relating to the financial condition of the assets it sold to HMA. The counterclaims named two additional companies as Defendants-in-Counterclaim: (1) NMC's parent company, Fresenius Medical Care Holdings, Inc. ("FMC Holdings"), a New York corporation with a principal place of business in Massachusetts; and (2) NMC's grandparent company, Fresenius Medical Care AG ("FMC AG"), a German company with a principal place of business in Bad Homburg, Germany. Third-party Defendant FMC AG has moved to dismiss the third-party complaint against it pursuant to Mass.R.Civ.P. 12(b)(2) on the grounds that this

court lacks personal jurisdiction. For the reasons set forth below, FMC AG's Motion to Dismiss for lack of personal jurisdiction is *ALLOWED*.

BACKGROUND

FMC AG is a publicly owned stock corporation organized and registered under the laws of Germany. It is the holding company for a business that provides dialysis care and manufactures dialysis products for patients throughout the world. FMC AG does not engage in any operations itself. All business operations are conducted by its subsidiaries. Two of these subsidiaries are FMC Holdings, a New York corporation with a principal place of business in Lexington, Massachusetts, and Fresenius Medical Care Deutschland GmbH, a German company with a principal place of business in Bad Homburg, Germany. [FN4]

> FN4. FMC Holdings is a Defendant-in-Counterclaim in this action as named in the caption.

FMC AG is not involved in the staffing, marketing, sales or pricing decisions of its subsidiaries, including FMC Holdings. Each subsidiary of FMC AG is responsible for developing and implementing its own budget consistent with FMC AG's overall budgetary goals. FMC Holdings is responsible for all business operations in the United States and Canada. FMC Holdings is primarily engaged in providing kidney dialysis services, clinical laboratory testing services and manufacturing and distributing products and equipment for dialysis treatment in North America. Other subsidiaries of FMC AG are responsible for all business operations in Asia Pacific, Europe (other than Germany), Africa, Latin America and the Near East.

FMC AG and FMC Holdings have maintained separate headquarters, minute books, accounting records, bank accounts, and budgets. FMC Holdings files its own tax returns in the United States, which are separate from the tax returns filed by FMC AG in Germany. FMC AG and FMC Holdings, however, share one officer, Ben Lipps ("Lipps"). Lipps, a Massachusetts resident, is the Chief Executive Officer of FMC AG, FMC Holdings, and NMC. Lipps is also Chairman of the Management Board of FMC AG, and on the Board of Directors of both FMC Holdings and NMC. In April of 1998, Lipps met with representatives of HMA to discuss the possible sale of NMC's home health care assets. During those negotiations, Ronald J. Kuerbitz, Senior Vice President and Secretary of FMC Holdings, and Vice President and Secretary of NMC, informed HMA that he had to review elements of the deal with FMC AG. HMA alleges that also during the negotiations, FMC AG's

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



ownership and backing of NMC was referred to numerous times.

*2 In January of 1998, FMC AG along with the other entities discussed the sale of NMC health care assets with Credit Suisse First Boston. Dr. Gerd Kirk ("Kirk"), Chairman of the Supervisory Board of FMC AG was also involved in the negotiations of the sale of NMC assets. In one correspondence between FMC AG and FMC Holdings the former used the address of FMC Holdings at 95 Hayden Avenue, Lexington, Massachusetts.

FMC AG owns all outstanding shares of common stock of FMC Holdings, but not preferred stock. The preferred stock is publicly owned. FMC Holdings conducts its operations through various subsidiaries, one of which is NMC. NMC is the direct party to the asset transaction at issue doing business as "Fresenius Medical Care North America." In March of 1999, FMC AG's CEO Udo Werle ("Werle") was quoted in an on-line money and investing website to have said FMC AG's improved financial performance was due to "favorable developments on the reimbursement front in North America, where a substantial portion of our revenue is generated." He said about FMC AG's future that, "[w]ith over 800 patients enrolled in disease state management projects we are leading this emerging trend in the U.S. Market ... We expect reimbursement rates in North America, our biggest market, to remain at the currently attractive level in the near-term."

## DISCUSSION
### Personal Jurisdiction

A plaintiff against whom a motion to dismiss under Mass.R.Civ.P. 12(b)(2) is filed, bears the burden of showing a proper basis for personal jurisdiction. *Good Hope Industries. Inc. v. Ryder Scott, Co.,* 378 Mass. 1, 2 (1979). In order to satisfy that burden, the plaintiff must show that: (1) the assertion of jurisdiction is authorized under the Massachusetts long-arm statute; and (2) if authorized, the exercise of jurisdiction is consistent with basic due process requirements mandated by the United States Constitution. *Id.* at 5-6. The plaintiff bears the burden of establishing specific facts on which to predicate jurisdiction over the defendant. *Nichols Associates, Inc. v. Starr,* 4 Mass.App.Ct. 91, 93-94 (1976).

### Long Arm Statute

The Massachusetts long-arm statute provides in relevant part that a non-resident defendant is subject to personal jurisdiction in Massachusetts if: (1) the defendant directly or by an agent transacts business in the state; and (2) the

plaintiff's claim arises out of that transaction of business. G.L.c. 223A, § 3(a); *Good Hope Industries, Inc.* 378 Mass. at 6. Massachusetts courts have broadly construed the phrase "transacting any business," and this court will apply it to any purposeful acts by an individual, whether personal, private, or commercial. See *Tatro v. Manor Care, Inc.,* 416 Mass. 763, 767 (1994); *Ross v. Ross,* 371 Mass. 439, 441 (1976). While "an isolated transaction without commercial consequences in Massachusetts" may be insufficient to establish jurisdiction, deliberate, non-fortuitous contacts "such that 'the possible need to invoke the benefits and protections of the forum's laws was reasonably foreseeable, if not foreseen, rather than a surprise,' " are sufficient. See *Tatro,* 416 Mass. at 767; *Good Hope Industries,* 378 Mass. at 9-11. Jurisdiction on the basis of "transacting business," under G.L.c. 223, § 3(a), will ordinarily not lie if: (1) the defendant maintains no office, telephone listing, mailing address or bank account in Massachusetts; (2) neither owns, rents nor uses any property in the State; (3) is not qualified to conduct business in the State, solicits no business in Massachusetts; (4) employs no individuals in the State; and (5) has never shipped or delivered any products to Massachusetts. See, e.g., *Droukas v. Divers Training Academy, Inc.,* 375 Mass. 149, 154 (1978); *Hems v. Wilhelm Loh Wetzlar Optical Machinery GmbH & Co. K.G.,* 26 Mass.App.Ct. 14, 17-18 (1988). See also, *Automatic Sprinkler Corporation of America v. Seneca Foods Corporation,* 361 Mass. 441, 444-45 (1972); *Buckeye Associates Limited v. Fila Sports, Inc.,* 616 F.Sup. 1484, 1492 (D.Mass.1985); *Accutest Corp. v. Accu Test Systems, Inc* 532 F.Sup. 416, 419-20 (D.Mass.1982). Compare *Bond Leather Co. Inc.,* 764 F.2d 928, 932 (1st. Cir.1985) (court found that four letters and a telephone call are sufficient to satisfy G.L. 223A, § 3(a)). Furthermore, neither the residence nor physical presence in Massachusetts of an officer of a corporation can constitute doing business. *Turner v. United Mineral Lands Corp.,* 308 Mass. 531, 537 (1941).

*3 Under G.L.c. 223A, § 3(a), a plaintiff is also required to demonstrate that its claims against the defendant "arise from" the defendant's transaction of business in Massachusetts. The Massachusetts Supreme Judicial Court ("SJC") has interpreted this language as establishing a "but for" test, under which "a claim arises from a defendant's transaction of business in the forum State if the claim was made possible by, or lies in the wake of, the transaction of business in the forum State." See *Tatro,* 416 Mass at 770-71. See also *Conn. Nat'l Bank v. Hoover Treated Wood Products, Inc.,* 37 Mass.App.Ct. at 231, 234-35 (1994).

### Constitutional Due Process

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



This court must further determine whether its exercise of personal jurisdiction would satisfy the due process clause of the Fourteenth Amendment, that requires that the defendant have "minimum contacts" with the forum state in order for the state to exercise jurisdiction over the defendant. See *Tatro*, 416 Mass. at 772-73; *Ross*, 371 Mass. at 441. A court may assert personal jurisdiction where the defendant has certain minimum contacts with the forum state such that the lawsuit does not "offend traditional notions of fair play and substantial justice." See *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). These minimum contacts must be such that the defendant could reasonably anticipate being brought into the court. *Burger King Corp. v. Rudzewick*, 471 U.S. 462, 747 (1985).

In order to satisfy this standard, the defendant must have "purposefully [availed itself] of the privilege of conducting activities in the forum state, thus invoking the benefits and protections of its laws" making the defendant's required presence before the state's court reasonably foreseeable. See *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The plaintiff has met its burden if the defendant's contacts with the forum were deliberate and not fortuitous, so that the defendant could reasonably foresee the possible need to invoke the benefits of the forum state. See *Good Hope Industries, Inc.*, 378 Mass. at 11.

FMC AG claims that it has not transacted any business in Massachusetts and therefore is not subject to the personal jurisdiction of this court. HMA contends both that: (1) FMC AG is transacting direct business in Massachusetts; and (2) that Lipps is running the three separate corporations as one entity therefore subjecting the parent and grandparent entities to liability via its subsidiaries. Upon a reading of the complaint together with the affidavits and exhibits submitted, the court finds that HMA has not met its burden in establishing FMC AG's minimum contacts in Massachusetts. FMC AG is not present in Massachusetts nor does it advertise or solicit business here. FMC AG does not maintain an office, telephone listing, or bank account in Massachusetts. FMC AG neither owns, rents nor uses any property in Massachusetts and employs only Lipps in Massachusetts as an overlapping executive. FMC AG has neither shipped nor delivered products to Massachusetts. Moreover, FMC AG's use of the mailing address of its subsidiary FMC Holdings in one intra-company correspondence unrelated to the sale of NMC's assets could not constitute minimum contacts. HMA has only established that FMC AG owns the common stock of its Massachusetts-based subsidiary who was a party to a transaction giving rise to the cause of action which is insufficient alone to support personal jurisdiction.

Piercing the Corporate Veil/Personal Jurisdiction

*4 The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary. *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 905 (1st Cir.1980), citing *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 (1925) (and other cases cited). There is a presumption of corporate separateness that must be overcome by clear evidence that the parent in fact controls the activities of the subsidiary. *Escude Cruz*, 619 F.2d at 905 (citations omitted). Only significant exercise of control by an out-of-state parent corporation over a subsidiary and significant intermingling of officers and directors between parent and subsidiary have served to establish jurisdiction in the State where the subsidiary is conducting its business operations. *Kleinerman v. Morse*, 26 Mass.App.Ct. 819, 823 (1989) (citations omitted).

A significant exercise of control has been interpreted as running the operations of a subsidiary in Massachusetts. *Id.* By contrast, ownership alone of the controlling stock of a subsidiary does not confer jurisdiction over an out-of-State parent corporation if the parent does not exercise control over the activities of the subsidiary. *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 618-19 (1968); *Kleinerman*, 26 Mass.App.Ct. at 823. Moreover, approval of a sale by a subsidiary is not enough to establish personal jurisdiction over an international holding company. See e.g., *Kramer Motors, Inc., v. British Leyland, Ltd.*, 628 F.2d 1175, 1177-78 (9th Cir.1980) (British parent's approval of a marketing scheme developed by its United States subsidiary does not subject parent to personal jurisdiction). See also *Alvarado Morales v. Digital Equip. Corp.*, 669 F.Supp. 1173, 1181 (D.P.R.1987) (a parent corporation's authority to approve or reject plans of its subsidiary does not establish that the parent plans, implements or in any way controls the subsidiary); *Huang v. Sentinel Government Securities*, 657 F.Supp. 485, 490 (S.D.N.Y.1987) (foreign parent's approval of subsidiary's entry into new business does not subject parent to personal jurisdiction).

In the case at bar, the evidence shows only that FMC AG as the grandparent corporation reviewed and approved the sale of its subsidiary, NMC's assets. The facts before the court do not support HMA's contention that Lipps operates FMC AG, FMC Holdings, and NMC as a collective corporation. FMC AG's relationship with its subsidiaries was fully disclosed to HMA prior to and during the transaction, even though FMC AG was not a party to the transaction. At all times, HMA was aware that FMC AG was the grandparent holding corporation for FMC Holdings which in turn was

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



Not Reported in N.E.2d
15 Mass.L.Rptr. 127, 2002 WL 31187683 (Mass.Super.)
**(Cite as: 2002 WL 31187683 (Mass.Super.))**

Page 4

the parent corporation for NMC. Furthermore, the complaint does not allege particular facts against FMC AG that would enable the court to conclude that FMC AG exercised pervasive control over either FMC Holdings or NMC.

**\*5** The court concludes that HMA has not met its burden in establishing that FMC AG conducts business in Massachusetts required to support the assertion of jurisdiction under the Massachusetts long-arm statute. The court further concludes that HMA has not met its burden in establishing that FMC AG exercised significant control over its Massachusetts-based subsidiary sufficient to pierce the corporate veil and hold the grandparent subject to personal jurisdiction.

### ORDER

For the above reasons, it is hereby *ORDERED* that the Third-party Defendant's Motion to Dismiss be *ALLOWED.*

15 Mass.L.Rptr. 127, 2002 WL 31187683 (Mass.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



2000 WL 1512373
12 Mass.L.Rptr. 267, 2000 WL 1512373 (Mass.Super.)
(Cite as: 2000 WL 1512373 (Mass.Super.))

Page 1

**C**

Superior Court of Massachusetts.

Larry A. CLARK & Others [FN1]

FN1. Elizabeth Landfield, Alegre Auto Sales, Inc., Emma J. Gamble, Wilma K. Hansen, Steve Pataki, and Lavair, Inc., on behalf of themselves and all others similarly situated.

v.

LEASECOMM CORPORATION & another. [FN2]

FN2. Microfinancial, Inc.

**No. CA99-4177-E.**

Aug. 21, 2000.

MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS
INTRODUCTION

FABRICANT.

**\*1** This class action challenges the practice of the defendant Leasecomm Corporation ("Leasecomm") in bringing suits for breach of its equipment leasing contracts in Massachusetts District Courts, pursuant to forum selection clauses in its lease agreements, under circumstances in which Massachusetts courts would not otherwise have jurisdiction over the lessees. The plaintiffs have also named Leasecomm's parent corporation, Microfinancial, Inc., based on a theory of agency. Presently before the Court are motions to dismiss filed by both defendants on a list of procedural and substantive grounds. For the reasons that will be explained, Leasecomm's motion will be allowed in part and denied in part, and Microfinancial's motion will be allowed.

BACKGROUND

The complaint [FN3] alleges as follows. Defendant Leasecomm is a Massachusetts Corporation and is a wholly owned subsidiary of defendant Microfinancial, Inc., also a Massachusetts Corporation. Leasecomm is in the business of "microticket" leasing; that is, it leases items of business equipment [FN4] with relatively low value, usually less than $5,000. Its typical customer, according to the complaint, is "a small businessperson or an individual attempting to start a small business."

FN3. The complaint that is presently before the Court is the Fourth Amended Complaint.

FN4. Examples of the equipment involved are security systems, credit card processing terminals, computers, and software.

Leasecomm operates through independent vendors who market the equipment to the customers and retain sole responsibility for delivering the leased property, furnishing any information or warranties, and providing any service or support. Leasecomm provides the vendors with standard form applications and lease contracts. Typically, "the vendor inserts the lease terms into the Agreement, has the customer sign the Agreement and application, and forwards these documents along with the customer's down payment to Leasecomm." Leasecomm signs the agreement, returns a copy to the lessee, and begins collecting monthly payments.

Leasecomm's standard form leasing agreement is headed, at the top of the front page in large capital letters, "Non Cancellable Equipment Lease Agreement." There follow the terms of the lease, including identification of the lessee and the equipment, and the amount and number of payments. About two thirds of the way down the front page appears the following language, in bold face type, underlined:

The parties hereby agree that this agreement is made in, governed by, to be performed in, and shall be construed in accordance with the laws of the Commonwealth of Massachusetts. They further consent and submit to the jurisdiction of the Courts of the Commonwealth of Massachusetts and expressly agree to such forum for the bringing of any suit, action or other proceeding arising out of their obligations hereunder and expressly waive any objection to venue in any such Courts and waive any right to a trial by jury so that trial shall be by and only to the Court. It is further agreed and understood that the corporate headquarters of Leasecomm Corporation is located within the venue of the District Court Department of the trial Court, within Middlesex County. [FN5]

FN5. Some the lease agreements contain minor variations in wording that are not relevant to the issues presented in the present motion.

**\*2** About one inch below this provision is a signature block for the lessee. Below that appears a personal guaranty with another signature block for an individual guarantor.

The complaint further alleges that Leasecomm has sued thousands of its customers in Massachusetts pursuant to the forum selection clause in its lease agreements, although "few customers reside or have a place of business in Massachusetts or any other New England state at the time of signing the lease agreement or at the time of being sued by Leasecomm in Massachusetts." Such use of the forum

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



selection clauses, according to the complaint, is not fair or reasonable, because "class members are individuals and small businesses for whom litigating in a distant forum is prohibitively costly, inconvenient, and time-consuming, particularly in view of the relatively small amounts at issue." Further, the clauses "are not negotiable," "Leasecomm's bargaining power and financial resources far exceed those of class members," and "class members have a number of meritorious defenses to the claims asserted against them by Leasecomm," some of which require witnesses who are beyond the subpoena power of Massachusetts courts. Some class members also have third-party claims against vendors, which should be litigated together with Leasecomm's claims, and cannot be raised in Massachusetts. In addition, "Leasecomm is well positioned to litigate in the home states of the lessees/guarantors, since it is already represented throughout the country by hundreds of attorneys who routinely domesticate Massachusetts judgments and pursue collections activities on behalf of Leasecomm."

The complaint further alleges that Leasecomm's conduct under the forum selection clause of its leases is unfair and deceptive, in that "it has the purpose and effect of preventing class members from defending lawsuits brought against them." In support of this assertion, the complaint alleges that Leasecomm's policy and practice is to enter into agreements only with lessees "at substantial distances from eastern Massachusetts," to do so only "where the value of the property, and hence the cost of the lease, is relatively low, usually not more than $5,000," and to accept "nearly all applicants, regardless of the lessee's credit history and ability to pay." These alleged facts, the complaint concludes, indicate that "Leasecomm's primary motivation is its ability to collect on a defaulted lease, as opposed to the lessee's ability to perform the lease."

The named plaintiffs are five individuals and the corporations through which two of them operate businesses. The individual plaintiffs live, respectively, in Louisiana, California, Florida, Iowa, and Oregon. The two corporate plaintiffs are organized, respectively, under the laws of California and Oregon. Each of the individuals operates, or at the time in issue did operate or was attempting to start, a business employing three or fewer employees. Each plaintiff entered into a lease agreement with Leasecomm, with each individual executing the agreement both as business operator and as personal guarantor. [FN6] Each thereafter stopped making payments under the lease agreement, in some cases after purporting to terminate it and attempting to return the equipment, due to dissatisfaction with the equipment or for other reasons. Each then became a defendant in an action brought by Leasecomm in a

Massachusetts District Court to collect the remaining amount due under the lease agreement.

> FN6. Plaintiff Clark denies having signed the lease agreement or having authorized anyone to sign for him, but appends to the complaint a copy of an agreement bearing signatures purporting to be his.

**\*3** The named plaintiffs in this action fall into three categories, based on the status of the proceedings in the actions brought by Leasecomm against them. The first category consists of defendants in suits brought by Leasecomm that are presently pending. The members of this group are Larry A. Clark ("Clark"), Elizabeth Landfield ("Landfield"), Alegre Auto Sales, Inc. ("Alegre"), a California corporation through which Landfield and her husband operate their business, and Emma J. Gamble ("Gamble").

Leasecomm sued Clark in the small claims division of the Waltham District Court on or about February 26, 1999. [FN7] The attorney who represents the plaintiffs in this action appeared for Clark, obtained transfer of the case from the small claims session to the regular civil docket, and then answered the complaint on August 25, 1999. [FN8] Among the affirmative defenses set forth in his answer are lack of personal jurisdiction, forum non conveniens, and that "[t]he agreement on which suit was brought is unconscionable, in whole or in part, and thus may not be enforced." The case remains pending in the Waltham District Court. On or about July 19, 1999, Leasecomm sued Landfield and Alegre in the Dedham District Court. In or about May of 1999, Leasecomm sued Gamble in the Woburn District Court. Each of these cases also remains pending.

> FN7. Details of the status of the District Court actions brought by Leasecomm against the plaintiffs appear not in the complaint, but in copies of pleadings and other materials filed in those actions, provided by the defendants as attachments to its motion. See *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir.1993) (on motion to dismiss court may consider "documents the authenticity of which are not disputed by the parties," including "official public records").

> FN8. The materials submitted in connection with the present motion include copies of the motion to transfer, dated August 10, 1999, with a cover letter requesting hearing on the motion on August 18, 1999, and the answer, dated August 25, 1999, submitted with a cover letter addressed to the "Clerk for Civil Business," but no document

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



reflecting any ruling on the motion to transfer. The Court infers that the motion to transfer was allowed on August 18, 1999, prior to the filing of the answer.

In this action these plaintiffs, on behalf of themselves and similarly situated class members, assert two counts, the first under the declaratory judgment act, G. L. c. 231A, § 1, *et seq.* and the second under G. L. c. 93A, § 11. [FN9] They seek a declaration invalidating the forum selection clause, an injunction requiring Leasecomm to stipulate to dismissal of the pending District Court actions and barring it from bringing further suits in Massachusetts District Courts under the forum selection clause, damages, attorneys fees and costs.

> FN9. Clark joins only in the declaratory judgment count, and not in the c. 93A claim.

The second category, consisting of parties who have settled Leasecomm's claims against them, has only one member, Plaintiff Wilma K. Hansen ("Hansen"). Leasecomm sued Hansen, along with co-lessee Darla Kummer, [FN10] in the Dedham District Court, on or about December 1, 1998. Soon thereafter, according to the allegations of the complaint, Hansen "received several telephone calls from Leasecomm collection agents" who told Hansen that "if she failed to pay the amount due Leasecomm would take her house and she might go to prison." Hansen paid the full amount Leasecomm claimed under the lease agreement, and on December 23, 1998, Leasecomm filed with the District Court a notice of voluntary dismissal with prejudice.

> FN10. Hansen's lease agreement identifies the lessee as "Diamond Tree Associates," with a check in a box marked "partnership." Signatures of both Hansen and Kummer appear in blocks for both lessees and guarantors. Under the signature of each in the blocks for lessees, in a space for "title," appears the word "owner."

Hansen, on behalf of herself and others who have settled claims brought by Leasecomm, also asserts counts under the declaratory judgment act and c. 93A. She seeks judgment "declaring that the settlements obtained by Leasecomm may be rescinded due to duress" and "awarding refunds to class members of amounts paid by them," conditioned on class members' assent to motions to vacate stipulations of dismissal in the cases against them, "such damages doubled or trebled," along with attorneys fees and costs.

*4 The third category encompasses persons against whom Leasecomm has recovered default judgments in its District

Court actions. In this category are plaintiffs Steve Pataki, and Lavair, Inc., the Oregon corporation through which he operates his business. Leasecomm sued Pataki and Lavair, Inc., in the Newton District Court in or about March of 1998. On July 6, 1998, Leasecomm obtained a default judgment in that action against both Pataki and Lavair.

These plaintiffs, on behalf of themselves and others similarly situated, assert the same two counts as the others. They seek judgment "declaring that the default judgments and judgments on the pleadings obtained by Leasecomm against class members are void," and "enjoining Leasecomm from opposing motions brought under Rule 60(b)(4) on behalf of class members to vacate" those judgments, and "awarding refunds to class members of all monies paid" as a result of those judgments, along with damages "doubled or trebled," attorneys fees and costs.

As to the defendant Microfinancial, Inc., the complaint alleges that Leasecomm is its "wholly owned operating subsidiary," that the two corporations share "certain officers, directors, employees, and professional advisors," as well as corporate offices, that it controls "the operations and management of Leasecomm," that Leasecomm was formed and has been operated "solely to carry out the purposes and objectives of its parent companies and their shareholders," that Leasecomm "was engaged in a common enterprise" with it, and that "Leasecomm acted as the agent of Microfinancial." Based on these allegations, all plaintiffs seek judgment "holding Microfinancial jointly and severally liable with Leasecomm" for all monetary amounts awarded.

Leasecomm moves to dismiss all counts of the complaint against it pursuant to M. R. Civ. P. 12(b)(6) and (9). With respect to the first category of plaintiffs, it urges dismissal due to the prior pending actions in the District Court. As to Hansen, Leasecomm contends that she has failed to state a claim on which relief may be granted, in that she has failed to allege facts that would warrant rescission of her settlement on the ground of duress; it points out also that Hansen has failed to join Kummer, whose interests may be adversely affected by rescission of the settlement, and who it contends is therefore a necessary party. As to Patacki and Lavair, Leasecomm contends that they fail to state a claim in that the only proper forum for their effort to invalidate the judgment against them is the District Court that issued it. Microfinancial joins in those arguments, and contends also that the complaint fails to state a claim against it, in that it fails to allege facts sufficient to support liability on a theory either of piercing the corporate veil or of agency.

DISCUSSION

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



2000 WL 1512373
12 Mass.L.Rptr. 267, 2000 WL 1512373 (Mass.Super.)
(Cite as: 2000 WL 1512373 (Mass.Super.))

Page 4

For purposes of a motion to dismiss pursuant to Mass. R. Civ. P. 12(b), the allegations of fact in the complaint must be treated as true and the plaintiff is entitled to all favorable inferences. *General Motors Acceptance Corp. v. Abington Casualty Ins. Co.,* 413 Mass. 583, 584, 602 N.E.2d 1085 (1992). Characterizations and conclusions of law, however, warrant no such consideration, and may be disregarded. See e.g. *Boston & M.R.R. v. County Com'rs of Middlesex County,* 239 Mass. 127, 131, 131 N.E. 283 (1921). A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *General Motors Acceptance Corp. v. Abington Casualty Ins. Co.,* 413 Mass. at 584, 602 N.E.2d 1085, quoting *Nader v. Citron,* 372 Mass. 96, 98, 360 N.E.2d 870 (1977), quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

I. The Claims of Plaintiffs Clark, Landfield, Alegre, and Gamble.

*5 Rule 12(b)(9) of the Massachusetts Rules of Civil Procedure establishes, as a defense to be raised by motion, the "pendency of a prior action in a court of the Commonwealth." The rule operates to codify "salutary and well established rules against claim splitting." *Keen v. Western New England College,* 23 Mass. App. Ct. 84, 87, 499 N.E.2d 310 (1986). Dismissal on the ground of prior pending action is proper where the prior action involves the same parties, and all issues raised in the present action are or could be raised in the prior action, either as affirmative claims or as defenses. See *Conant v. Kantrovitz,* 29 Mass. App. Ct. 998, 999, 563 N.E.2d 247 (1990); *Yentile v. Howland,* 26 Mass. App. Ct. 214, 216, 525 N.E.2d 689 (1988). Dismissal is not, however, mandatory in every instance where the rule may properly apply; the Court has some discretion to deny a motion to dismiss, even where proper grounds for dismissal under Rule 12(b)(9) are established. See *Hurwitz v. Bocian,* 41 Mass. App. Ct. 365, 368-369, 670 N.E.2d 408 (1996).

In this case, each member of the first group of plaintiffs is a party to a pending action brought by Leasecomm in the District Court. Although Microfinancial is not a party to the District Court cases, the plaintiffs' theory against Microfinancial is based, in essence, on an identity of interests, and of action, as between the two corporations; thus, as to each plaintiff in this case the parties here must be viewed as the same, for purposes of Rule 12(b)(9), as those in each District Court action.

The subject matter of each District Court case is Leasecomm's claim of breach of the lease agreement. In response to that claim, each plaintiff here, as defendant in that case, either has or could have raised as defenses the unreasonableness of the forum selection clause, lack of personal jurisdiction, and forum non conveniens. Thus, each of the substantive issues of fact or law that the plaintiffs seek to resolve in this case either is before the District Court, or could have been, had the plaintiffs in this case chosen to raise it there.

The affirmative causes of action raised by the plaintiffs here—declaratory judgment and G. L. c. 93A -- have not been presented in the District Court cases. The declaratory judgment claim could not be raised there, since the District Court would not have jurisdiction over that claim. See G. L. c. 231A, § 1 (listing courts authorized to grant declaratory judgments); *Brossi v. Fisher,* 1999 Mass. App. Div. 99, p. 2 (declaratory judgment as example of causes of action over which District Court still lacks jurisdiction after enactment of St.1996, c. 358). Such relief, however, is authorized by statute only "in any case in which an actual controversy has arisen and is specifically set forth in the pleadings." G. L. c. 231A, § 1. An actual controversy exists here only as long as the defenses raised, or that could be raised, to Leasecomm's District Court actions remain unresolved. Once the District Court determines whether the forum selection clause is enforceable against these plaintiffs, any actual controversy that may have existed in that regard will be over, and the plaintiffs' claim for declaratory judgment will be moot.

*6 In this respect, this case is remarkably similar to *Jacoby, et al. v. Babcock Artificial Kidney Center, Inc.,* 364 Mass. 561, 563-64, 307 N.E.2d 2 (1974), in which the Court affirmed dismissal of an action seeking a declaratory judgment that would have effectively determined the plaintiffs' liability in another action that was already pending between the same parties, arising from the same contractual relationship. Noting that "it is apparent from the record in this case that the entire controversy between these parties is already being adjudicated in a separate suit," the Court concluded that "[t]o provide declaratory relief in this situation would be to transgress the limits within which the remedy is proper" because "[a] court cannot declare rights as to matters involved in a prior pending action," quoting Anderson, *Actions for Declaratory Judgments* (2d Ed.) § 209 (1951). Analogizing to cases dismissing declaratory judgment claims for failure to exhaust administrative remedies, the Court explained that a rule against such claims serves to prevent disruption of pending court proceedings, as well as to protect parties and the courts from the burden of multiplicity of actions. It observed that "[t]he declaratory relief procedure was not intended to permit the same claim to be adjudicated in multiple suits." Here, as in *Jacoby,* the plaintiffs in this case are defendants in prior pending cases

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



2000 WL 1512373
12 Mass.L.Rptr. 267, 2000 WL 1512373 (Mass.Super.)
(Cite as: 2000 WL 1512373 (Mass.Super.))

Page 5

presenting disputes that are "in effect identical," _id._ at 563, 307 N.E.2d 2, with this one. These plaintiffs thus fail to state a proper claim for declaratory judgment.

As to the c. 93A claim, insofar as it seeks monetary relief, the District Court clearly does have jurisdiction. G. L. c. 93, § 11, 4th para. Thus the absence of this claim from the District Court actions appears to result solely from the choice of the defendants there, plaintiffs here, not to raise it by way of counterclaim in those cases. The claim for injunctive relief, however, presents a more difficult issue. In the same paragraph that authorizes damages claims in the District Court, section 11 of c. 93A provides that "[n]o rights to equitable relief shall be created under this paragraph." Thus, at least before the 1996 enactment of the experimental one-trial system for the District Courts in Middlesex and Norfolk Counties, 1996 Stat. c. 358, § 3, the relief available in the District Court for violations of c. 93A was clearly limited to damages, with injunctions available only in the Superior Court. Under the 1996 enactment, however, the District Courts in Middlesex and Norfolk Counties, which include all of the District Courts in which Leasecomm has sued these plaintiffs, "have the same equitable powers and jurisdiction as is provided for the Superior Court pursuant to chapter two hundred and fourteen of the General Laws for the purpose of the hearing and disposition of such cases." _Id._ The category of cases referred to is "civil actions otherwise subject to transfer, retransfer, removal and appeal," pursuant to G .L.c. 231, §§ 97-107; the fourth paragraph of section 11 of G. L. c. 93A explicitly places actions under that section within those provisions.

*7 The Appellate Division of the District Court has opined that section 3 of c. 358 "grants the District Court equitable powers in cases ordinarily within District Court jurisdiction, but ... does not expand District Court jurisdiction. The Superior Court retains exclusive jurisdiction of those statutory causes of action heretofore assigned to it." _Brossi v. Fisher,_ 1999 Mass. App. Div. 99, p. 2. Causes of action under c. 93A are not in that category since, as discussed _supra,_ the statute assigns them to both the District Court and the Superior Court. The statute does not affirmatively prohibit equitable relief in the District Court; rather, it merely disclaims any creation "under this paragraph" of rights to equitable relief in that Court. Read in light of the context of the time of its enactment, when the District Courts did not otherwise have equitable power, this provision may fairly be understood as merely expressing legislative acknowledgment of the existing allocation of roles between the courts, and of the lack of any intention to change that arrangement by virtue of this statutory enactment. Under this reading, no conflict appears between

this provision of c. 93A and the later enactment of St.1996, c. 358, § 3; the latter empowers District Courts in the affected counties to grant equitable relief in c. 93A cases, as in other cases normally within the District Court's jurisdiction.

Since the District Court could hear the c. 93A claims and grant full relief, these claims are compulsory counterclaims in the District Court actions, so that these plaintiffs' choice not to raise these claims in those actions effectively waives them. See Mass.R.Civ.P. 13(a) (making compulsory as counterclaim "[a]ny claim for relief the court has power to give which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim ..."), made applicable to the District Court pursuant to Mass. R. Civ. P. 1A, as amended effective July 1, 1996. Compare _Smith v. Caggiano,_ 12 Mass. App. Ct. 41, 46, 421 N.E.2d 473 (1981) (prior collection action in small claims session of District Court did not preclude class action in Superior Court under c. 93A because counterclaims not compulsory under small claims procedure, and because District Court would not have had jurisdiction over injunctive aspects of any counterclaim).

It thus appears that all viable claims asserted by the named plaintiffs in this action are, or would have been, available to them as counterclaims in the District Court actions. This case does, however, differ from the pending District Court actions in one potentially significant respect: the plaintiffs here seek to represent a class of persons similarly situated, whose numbers, according to the allegations of the complaint, may be in the thousands. The substantive issues the plaintiffs seek to raise, on behalf of themselves and class members, warrant consideration in a procedural context that will provide fair opportunity, as a practical matter, for their full presentation. See generally _Schuback v. Household Finance Corp.,_ 375 Mass. 133, 376 N.E.2d 140 (1978) (recognizing "distant forum abuse" as violation of c. 93A in context of consumer transactions). If the plaintiffs' factual allegations are true, as the Court must assume for purposes of this motion, it may well be, as the plaintiffs contend, that the only economically viable way to litigate the issues they seek to raise is by employing the economies of scale available in a class action. It is appropriate therefore, that these plaintiffs have an opportunity, in some forum, to pursue their effort to invoke the class action procedure. [FN11]

> FN11. These observations should not be understood as reflecting any conclusion on the propriety of class certification; that issue is not yet presented. This Court concludes only that the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



2000 WL 1512373
12 Mass.L.Rptr. 267, 2000 WL 1512373 (Mass.Super.)
(Cite as: 2000 WL 1512373 (Mass.Super.))

Page 6

plaintiffs should have an opportunity to put that issue before some court for determination.

**\*8** The question then arises whether such an opportunity is available in the District Court. As noted *supra,* since 1996 the Rules of Civil Procedure have applied to the District Court, as well as to the Superior Court. The 1996 amendment makes no exception for Rule 23, and the 1996 Reporter's Notes observe that "[w]ith the merger of the District Court civil rules into the <u>Mass.R.Civ.P., Rule 23</u> of the Mass.R.Civ.P. governing class actions is made applicable to District Court proceedings." It thus appears that class actions are generally available in the District Court.

Whether that procedure would be available to these plaintiffs, on counterclaims under c. 93A in the District Court actions against them, is less clear. The first paragraph of Section 11 of c. 93A expressly authorizes prosecution of claims under the statute through class actions in the Superior Court. However, the fourth paragraph of <u>section 11</u>, regarding claims made in the District Court, provides that "nor shall a person asserting such claim be able to assert any claim on behalf of other similarly injured and situated persons as provided in the preceding paragraph."

This distinction between Superior Court and District Court actions under c. 93A is hardly surprising when considered in the context of the enactment of the statute in 1967. Massachusetts had not yet adopted rules of civil procedure, so that class actions were governed solely by case law. E.g. <u>*Thorn v. Foy,* 328 Mass. 337, 338, 103 N.E.2d 416 (1952)</u>; <u>*Spear v. H.V. Greene Co.,* 246 Mass. 259, 266-67, 140 N.E. 795 (1923)</u>. The District Court lacked equitable powers, so that the kinds of disputes most likely to be suitable for class actions would not normally appear in the District Court. In this context, the provision in c. 93A for class actions in the Superior Court, but not in the District Court, may be understood not as circumscribing the scope of claims that might otherwise be made in the District Court, but as establishing broad remedial mechanisms for enforcement of the rights granted, while avoiding undue expansion of what was otherwise the normal role of the District Court. There is room for argument that the subsequent enactment of c. 358 of the Acts of 1996, together with the application of the Rules of Civil Procedure to the District Court, warrants a reinterpretation of this statutory provision.

As is apparent, however, it is at least unclear whether these plaintiffs could pursue their c. 93A counterclaims in the District Court as class representatives. That uncertainty, in light of the factual allegations referred to *supra,* weighs

against dismissal of this action on the ground of prior pending action. Accordingly, the motions to dismiss will be allowed as to this group of plaintiffs with respect to count I, but denied as to count II. [FN12]

> FN12. Transfer of the pending District Court cases to this Court pursuant to <u>G. L., c. 223, § 2B</u>, and consolidation with this case, could avoid any duplication or inconsistency.

II. The Claims of Plaintiffs Hansen, Pataki and Lavair, Inc.

The claims of the remaining plaintiffs raise, in addition to the same issues already discussed, certain additional concerns that compel dismissal. Each of these plaintiffs has allowed judgment to enter in the District Court, in one case by dismissal with prejudice based on settlement, and in the other case by default. Beyond dispute, each of these plaintiffs seeks to reopen proceedings previously concluded in the District Court, but to do so by order of this Court. Allowance of this effort would undermine not only important principles of finality, but also the proper relationship between departments of the Trial Court.

**\*9** Plaintiff Hansen, purporting to represent a class of persons who have settled suits brought by Leasecomm in the District Court, seeks to rescind her settlement, and obtain a refund of the amount she paid, on a theory of duress. A party seeking to void a contract on the basis of economic duress must show that "he has been the victim of a wrongful or unlawful threat or act, and ... such act or threat must be one which deprives the victim of his unfettered will. As a direct result of these elements, the party threatened must be compelled to make a disproportionate exchange of values ... Merely taking advantage of another's financial difficulty is not duress. Rather the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion." <u>*International Underwater Contractors, Inc. v. New England Telephone & Telegraph Co.,* 8 Mass. App. Ct. 340, 342, 393 N.E.2d 968 (1979)</u>.

The only facts alleged in the complaint on which Hansen bases her claim of duress are that Leasecomm filed suit against her in Massachusetts, and that its collection agents told her, in telephone conversations, that "if she failed to pay the amount due Leasecomm would take her house and she might go to prison." These allegations are legally insufficient to support a claim for rescission based on duress. Hansen's theories as to invalidity of the forum selection clause, lack of personal jurisdiction, and forum non conveniens, if they had been raised and successfully litigated in the District Court action, would have resulted in

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



judgment in her favor. That she may have had meritorious defenses, however, does not make Leasecomm's action in suing her wrongful or unlawful. "An indication that a party intends to pursue lawful legal proceedings if the other party fails to accept a pending settlement offer will not, normally, constitute duress." *Delaney v. Chief of Police of Wareham, 27 Mass. App. Ct. 398, 407-08, 539 N.E.2d 65 (1989)* (town's threat to proceed with discharge hearing if police officer did not settle did not constitute duress). Nor is there indication in the allegations of the complaint that Hansen accepted a disproportionate exchange of values. What Hansen obtained by making full payment was freedom from the economic burden of defending, as well as from any additional collection costs that would have accrued in connection with further litigation, for which she would have been liable if her defense were unsuccessful. The complaint provides no factual basis for any evaluation of that gain, as compared with the amount paid. Nor, perhaps more importantly, does the complaint include any allegations to indicate that Leasecomm in any way caused or contributed to whatever financial pressures may have influenced her to make payment rather than undertake the expense of defending its suit.

Having failed to allege facts sufficient to support a claim for rescission based on duress, Hansen is bound by the settlement, which resulted in dismissal of Leasecomm's claim against her with prejudice. That judgment precludes her from raising in this action any claim that she could have raised as a counterclaim in that case. See *Mass. R. Civ. P. 13(a).* Among these is her claim under c. 93A. As to Hansen's declaratory judgment claim, dismissal is required under *Rule 12(b)(6),* because no actual controversy remains between Hansen and Leasecomm regarding the validity of the forum selection clause; Hansen has fully met her obligations under the lease, so that she is no longer at any risk of its enforcement, and Leasecomm has dismissed its suit against her with prejudice. The motions to dismiss must therefore be allowed as to counts III and IV. [FN13]

> FN13. This conclusion eliminates any need to address Leasecomm's arguments that Hansen has failed to plead duress with particularity as required by *Mass.R.Civ.P. 9(b),* and that she has failed to join Kummer as a necessary party pursuant to *Mass.R.Civ.P. 12(b)(7)* and 19.

**\*10** The position of plaintiffs Pataki and Lavair, Inc. is similar, for present purposes, to that of Hansen. These defendants failed to respond to the District Court action against them, allowing judgment to enter by default. The relief they now seek would, in substance, vacate that Court's judgment, remove the default, and reopen in this Court the

same issues that were previously resolved through the default judgment. [FN14] Pursuant to *Mass. R. Civ. P. 60(b)(4),* a party seeking relief from a judgment may request such action by motion in the same case in which judgment was entered. The rule "does not limit the power of a court to entertain an independent action to relieve a party from a judgment." See *Colley v. Benson, Young, & Downs Ins. Agency, Inc.,* 42 Mass. App. Ct. 527, 528, 678 N.E.2d 440 (1997). Massachusetts courts have long held, however, that an independent action seeking relief from a judgment must be brought in the court that issued the judgment. See *Air Purchases, Inc. v. Mechanical Coordinators Corp.,* 21 Mass. App. Ct. 632, 633, 488 N.E.2d 1197 (1986) ("[a]uthority for the 'same court' proposition predates adoption of the Massachusetts Rules of Civil Procedure in 1974"). Thus, the only proper forum for Pataki and Lavair to seek relief from the default judgment is in the District Court that issued that judgment. After obtaining that relief, these parties would then be in a position to file an answer and counterclaim, asserting their affirmative defenses as well as their claims for affirmative relief under c. 93A. See e.g. *Brady v. Nynex Information Resources Co.,* 1997 Mass.Super. LEXIS 438, note 7. As long as the default judgment remains in effect, however, it precludes this effort to raise in this separate action these claims and defenses that could have been raised in the District Court.

> FN14. These plaintiffs emphasize that their requested relief does not include any direct action by this Court with respect to the District Court's judgment; their request, rather, is for an injunction directing the defendants to take or not take certain positions in contemplated future proceedings in the District Court. The distinction is one without a difference; regardless of its form, the relief requested would in substance undo the work previously done by the District Court. Cf. *Peterson v. Hopson,* 306 Mass. 597, 603, 29 N.E.2d 140 (1940) ("A judge should hesitate to undo his own work ... But until final judgment or decree there is no lack of power, and occasionally the power may properly be exercised").

These plaintiffs, like the first group, emphasize that the District Court cannot hear their declaratory judgment claim. Here again, the assertion is correct, but does not save the plaintiffs' complaint. The prior District Court judgment, as long as it remains in effect, bars the plaintiffs' declaratory judgment claim, because it eliminates any actual controversy between these parties. The issue these plaintiffs seek to resolve by declaratory judgment-- whether the forum selection clause may be enforced against them--has been fully resolved by that judgment, subject only to any action

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



2000 WL 1512373
12 Mass.L.Rptr. 267, 2000 WL 1512373 (Mass.Super.)
**(Cite as: 2000 WL 1512373 (Mass.Super.))**

the District Court might take to relieve the plaintiffs of its effect. Accordingly, Plaintiffs Pataki and Lavair fail to state a claim on which relief may be granted, and the motions to dismiss must be allowed as to counts V and VI.

III. The Claim Against Microfinancial.

As noted *supra,* the plaintiffs' claim against Microfinancial, Inc., derives entirely from the alleged conduct of Leasecomm; the plaintiffs allege no conduct of Microfinancial as any basis for liability. The only facts alleged in support of their theory of vicarious liability are that Leasecomm is Microfinancial's "wholly owned operating subsidiary," that the two corporations share "certain officers, directors, employees, and professional advisors," as well as corporate offices, that Microfinancial controls "the operations and management of Leasecomm," that Leasecomm was formed and has been operated "solely to carry out the purposes and objectives of its parent companies and their shareholders," that Leasecomm "was engaged in a common enterprise" with it, and that "Leasecomm acted as the agent of Microfinancial."

**\*11** As the plaintiffs effectively acknowledge in their opposition to this motion, these facts fall well short of those required to state a claim on a theory of piercing the corporate veil. See *Berger v. H P. Hood, Inc.,* 416 Mass. 652, 657, 624 N.E.2d 947 (1993) (corporate separateness may be disregarded "only where the corporation is a sham, or is used to perpetrate deception to defeat a public policy"); *Gurry v. Cumberland Farms, Inc.,* 406 Mass. 615, 625, 550 N.E.2d 127 (1990) ("corporations are to be regarded as separate entities where there is no compelling reason of equity 'to look beyond the corporate form for the purpose of defeating fraud or wrong' "); *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 619, 233 N.E.2d 748 (1968) (disregard of separate corporate entities warranted "in rare particular situations in order to prevent gross inequity," based on "failure (a) to make clear which corporation is taking action in a particular situation ..., or (b) to observe with care the formal barriers between the corporations with a proper segregation of the separate businesses"). The complaint in this case contains no allegation of any failure to observe corporate forms, any intermingling of funds or assets, or any conduct by either corporation that could have led these plaintiffs, or anyone else, to be confused or misled as to which corporation was involved in any transaction. Indeed, nothing in the complaint suggests that the plaintiffs had ever heard of Microfinancial before they initiated this litigation.

In their opposition to this motion, the plaintiffs emphasize a theory of agency, rather than of piercing the corporate veil.

The concepts are indeed distinct, but the mere conclusory assertion of an agency relationship is not enough to state a claim. As the case law recognizes, the kinds of facts that would support liability of a parent corporation as principal for the acts of a subsidiary as agent overlap closely with those that would support piercing the corporate veil. See *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. at 618, 233 N.E.2d 748 ("[a] corporation or other person controlling a corporation and directing, or participating actively in ... its operations may become subject to ... liability on principles of agency or of causation). The complaint in this case contains no allegation of any conduct by Microfinancial amounting to participation in the business of Leasecomm or the interactions between Leasecomm and these plaintiffs, nor is there any allegation of any contract or other arrangement by which Leasecomm dealt with the plaintiffs as agent for Microfinancial. Rather, the allegations, in substance, indicate no more than the relationship of corporate parent and subsidiary. Ultimate control is, of course, inherent in the nature of such a relationship, but the case law makes clear that such control does not render the parent liable for the conduct of the subsidiary. See *Gurry v. Cumberland Farms, Inc.,* 406 Mass. at 624, 550 N.E.2d 127 ("mere fact of common management and shareholders" insufficient to establish agency relationship). Thus, count VII must be dismissed for failure to state a claim on which relief may be granted.

ORDER

**\*12** For the foregoing reasons, it is hereby *ORDERED* that the Defendants Leasecomm Corporations's Motion to Dismiss is *ALLOWED* with respect to counts I, III, IV, V, and VI of the complaint, and *DENIED* with respect to count II. Defendant Microfinancial, Inc.'s Motion to Dismiss is *ALLOWED.*

12 Mass.L.Rptr. 267, 2000 WL 1512373 (Mass.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                     Page 1
2001 WL 951579 (D.N.H.), 50 Fed.R.Serv.3d 1180, 2001 DNH 155
**(Cite as: 2001 WL 951579 (D.N.H.))**

**H**
NOT FOR PUBLICATION

United States District Court, D. New Hampshire.

John EMERY, Plaintiff
v.
WOOD INDUSTRIES, INC., Test-Rite International Co.,
Ltd. (U.S.), Test-Rite
International Co., Ltd. (Taiwan), and Anonymous II, Inc.
(formerly Wood Wire
Product, Inc.), Defendants

**No. CIV. 98-480-M.**

Aug. 20, 2001.

ORDER

<u>MCAULIFFE</u>, District J.

*1 John Emery brings this action seeking damages for
severe injuries he sustained in an accident he says was
caused by a defective voltage meter. It appears that the
voltage meter in question has since been recalled by its
manufacturer.

Three companies bearing the name "Test-Rite" have been
named as defendants: Test-Rite Product Corp., a domestic
corporation; Test-Rite International Co., Ltd., also a
domestic corporation; and a Taiwanese corporation bearing
the same name--Test Rite International Co., Ltd. The
Taiwanese entity ("Test-Rite Taiwan") moves to quash
service of process, saying it was not properly served with a
copy of the complaint and summons. Alternatively, it moves
to dismiss the complaint, claiming it lacks sufficient
contacts with this forum to permit the court to exercise
personal jurisdiction over it. Finally, it says Emery's claims
are barred by the applicable statute of limitations. Emery
Objects.

Discussion

On January 27, 1996, Emery was severely injured when an
allegedly defective voltage meter he was using exploded.
Following the accident, the New Hampshire Fire Marshall's
office began an investigation. Emery says the investigating
officials denied him access to the voltage meter and,
therefore, precluded him from determining whether it was
defective and/or caused his injuries. Eventually, counsel for
Emery brought suit in state court seeking a judicial order
compelling the Fire Marshall's office to release the voltage
meter so Emery might subject it to scientific testing and

analysis. Testing of the meter took place in or about January
of 1998 and Emery's expert(s) concluded that it was
defectively designed and/or manufactured.

Approximately seven months later (well within the pertinent
limitations period), Emery filed this action against Woods
Industries, Inc., the company under whose name the voltage
meter was sold. Approximately four months after that,
Woods informed Emery that the meter had actually been
manufactured by a company known as "Test-Rite
International Co., Ltd." It provided Emery with two
addresses for the company--one in Illinois and one in
Taipei, Taiwan. Emery says he subsequently learned that
"Test-Rite International Co., Ltd." was listed as a Delaware
corporation and a company called "Test-Rite Product
Corporation" did business at the Illinois address. Emery
then filed a separate complaint against those entities (the
"domestic Test-Rite entities"), again within the pertinent
statute of limitations. That action was subsequently
consolidated with this one.

I. *Service of Process.*

In September of 1999, Emery says counsel for Test-Rite
International Co., Ltd. (the domestic company) informed
him that the voltage meter might have been manufactured
by a different entity: a Taiwanese company doing business
under the same name (i.e., the company referenced in this
order as Test-Rite Taiwan). Emery then sought to add
Test-Rite Taiwan as a defendant and serve it with a copy of
the complaint and summons. By order dated January 17,
2001, the court held that Emery had failed to properly effect
service and, therefore, granted the company's motion to
quash service. Nevertheless, the court concluded:

*2 Because Test-Rite [Taiwan] plainly has actual notice
of plaintiff's claims, and there is no suggestion of any
prejudice to Test-Rite [Taiwan] if plaintiff is afforded
additional time to effect service, plaintiff shall effect
service within ninety (90) days of the date of this order, in
accordance with applicable federal and international law.
<u>Emery v. Wood Industries, Inc., No. 98-480-M, 2001 DNH
016 at 9 (D.N.H. January 17, 2001)</u>.

The parties agree that Taiwan is not a party to the Hague
Convention. Consequently, pursuant to <u>Rules 4(h)(2) and
4(f)(2)(C)(ii) of the Federal Rules of Civil Procedure,</u>
Emery requested the Clerk of Court to effect service by
mailing a copy of the summons and complaint to Test-Rite
Taiwan, certified mail return receipt requested. Such service
is authorized by the Federal Rules, provided it is not
"prohibited by the law of the foreign country." <u>Fed.R.Civ.P.
4(f)(2)(C)</u>. In response to Test-Rite Taiwan's motion, Emery
has presented evidence suggesting that such service is not

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



prohibited by the laws of Taiwan. *See, e.g.,* Judicial Assistance-Taiwan, Exhibit A-1 to plaintiff's objection (also available at: http://travel.state.gov/taiwan_legal.html); Letter of Attorney Freddy Ti Pang, Exhibit D to plaintiff's objection.

Test-Rite Taiwan, on the other hand, while not denying that it received the copy of the complaint and summons issued by the Clerk of Court, has failed to produce evidence showing that such service is prohibited by the laws of Taiwan. The law upon which it does rely appears to relate to service made upon parties to litigation *in a Taiwanese court;* it does not seem to address the situation presented in this case--service upon a Taiwanese company of a complaint filed in a foreign country. Accordingly, Test-Rite Taiwan's motion to quash service is denied. *See generally Modern Computer Corp. v. Ma,* 862 F.Supp. 938, 946 (E.D.N.Y.1994) ("Based on the affidavits of the plaintiff's Taiwanese counsel, the Court finds that plaintiff has established a prima facie showing the service was proper under Taiwan law").

II. *Personal Jurisdiction.*

Test-Rite Taiwan next asserts that this court may not properly exercise personal jurisdiction over it. Emery objects, claiming he has made an adequate showing of Test-Rite Taiwan's contacts with this forum to warrant the exercise of personal jurisdiction over it.

A. *Statutory and Constitutional Prerequisites.*

It is well established that in a diversity case personal jurisdiction over a nonresident defendant is governed, at least in part, by the forum state's long-arm statute. *See Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc.,* 982 F.2d 686, 690 (1st Cir.1993). And, when personal jurisdiction is contested, the plaintiff bears the burden of establishing that the court has such jurisdiction. *See Sawtelle v. Farrell,* 70 F.3d 1381, 1387 (1st Cir.1995); *Kowalski v. Doherty, Wallace, Pillsbury & Murphy,* 787 F.2d 7, 8 (1st Cir.1986).

*3 Allegations of jurisdictional facts are construed in the plaintiff's favor, *see Buckley v. Bourdon,* 682 F.Supp. 95, 98 (D .N.H.1988), and, if the court proceeds based upon the written submissions of the parties without an evidentiary hearing, the plaintiff need only make a prima facie showing that jurisdiction exists. *See Kowalski,* 787 F.2d at 8; *Boit v. Gar-Tec Products, Inc.,* 967 F.2d 671, 674-75 (1st Cir.1992). Under those circumstances, "in reviewing the record before it, a court 'may consider pleadings, affidavits, and other evidentiary materials without converting the

motion to dismiss to a motion for summary judgment." ' *VDI Technologies v. Price,* 781 F.Supp. 85, 87 (D.N.H.1991) (quoting *Lex Computer & Management Corp. v. Eslinger & Pelton, P.C.,* 676 F.Supp. 399, 402 (D.N.H.1987)).

Before a court may exercise personal jurisdiction over a non-resident defendant, the plaintiff must show, first, that the forum state's long-arm statute confers jurisdiction over the defendant, and second, that the exercise of jurisdiction comports with constitutional due process standards (by establishing that the defendant has sufficient "minimum contacts" with the forum state). *See Kowalski,* 787 F.2d at 9-10. New Hampshire's corporate long-arm statute, N.H. RSA 293-A:15.10, authorizes jurisdiction over foreign corporations and unregistered professional associations to the full extent permitted by federal law. *See Sawtelle,* 70 F.3d at 1388. Stated another way, New Hampshire's corporate long-arm statute is coextensive with the outer limits of due process protection afforded by the federal constitution. Accordingly, the court need only determine whether the exercise of personal jurisdiction over a foreign defendant would comport with federal constitutional guarantees.

For a court to exercise personal jurisdiction over a foreign defendant in a manner consistent with the Constitution, the plaintiff must demonstrate that the defendant has "certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984). Before finding that a defendant has such "minimum contacts," however, the court must be satisfied that the defendant's conduct bears such a "substantial connection with the forum state" that the defendant "should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 473-75 (1985) (citing *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980)).

B. *General v. Specific Jurisdiction.*

A court may exercise either general or specific jurisdiction over a defendant. "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *United Elec. Workers v. 163 Pleasant Street Corp.,* 960 F.2d 1080, 1088 (1st Cir.1992). With the exception of a passing reference to general jurisdiction in a footnote in his objection, Emery does not seem to seriously contend that Test-Rite Taiwan engaged in "continuous and systematic activity" in New Hampshire.



Not Reported in F.Supp.2d                                                                              Page 3
2001 WL 951579 (D.N.H.), 50 Fed.R.Serv.3d 1180, 2001 DNH 155
(Cite as: 2001 WL 951579 (D.N.H.))

Accordingly, if the court may properly exercise personal jurisdiction over Test-Rite Taiwan, it must be specific jurisdiction.

**\*4** To assist trial courts in determining whether they might properly exercise specific jurisdiction, the Court of Appeals has formulated a three-part test:

First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state contacts. Second, the defendant's in-state activities must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*United Elec. Workers,* 960 F.2d at 1089. With those principles in mind, the court turns to Test-Rite Taiwan's motion to dismiss.

Test-Rite Taiwan is a trading company that does business in countries throughout the world, selling and distributing products made by various manufacturers. It holds a substantial (and perhaps controlling) number of shares of common stock in Test-Rite International Co., Ltd. (U.S.), a domestic holding company. That holding company, in turn, appears to exist for a single purpose: to hold the stock of Test-Rite Product Corporation, a domestic corporation engaged in the sale of numerous consumer products throughout the United States. Thus, Test-Rite Taiwan indirectly controls Test-Rite Product Corp. and sells goods to it for distribution in the United States. Test-Rite Taiwan does, however, have additional contacts with the United States. It also sells products directly to U.S. retail distributors, such as Staples and J .C. Penney. Finally, Test-Rite Taiwan sells products to companies like Woods Industries, which then affix their own names to the products (like the voltage meter at issue in this case) and sell them to U.S. consumers, either directly or through retail distribution chains such as Staples. Consequently, while Test-Rite Taiwan claims to have no *direct* contacts with this forum, it plainly sells its products in the United States and, more specifically, New Hampshire, through the corporations over which it exercises either direct or indirect control (Test-Rite International Co., Ltd. (U.S.) and Test-Rite Product Corp.), as well as through unaffiliated corporations, like Woods, Staples, and J.C. Penney.

At this stage of the proceeding, the court concludes that Emery has introduced sufficient evidence to make a prima facie showing that: (1) the claim underlying this litigation arises out of, or relates to, Test-Rite Taiwan's contacts with

this forum; (2) Test-Rite Taiwan's in-state activities represent a purposeful availment of the privilege of conducting activities in this state; and (3) the exercise of personal jurisdiction over Test-Rite Taiwan would be reasonable, in light of the Gestalt factors identified by the Court of Appeals (of course, the court's conclusion is without prejudice to Test-Rite Taiwan's right to again challenge the exercise of personal jurisdiction, once the record has been more fully developed [FN1]).

> FN1. In its current form, the record is sufficient (barely) to support the conclusion that Emery has carried his relatively modest burden and made a prima facie showing that the exercise of personal jurisdiction over Test-Rite Taiwan is proper. Test-Rite Taiwan's *precise* relationship with New Hampshire sellers and distributors of its products is, however, unclear. Whether, on a more fully developed record, it will appear that the court lacks personal jurisdiction over Test-Rite Taiwan is, of course, speculative. Parenthetically, however, the court notes that other courts in the United States (both state and federal) have exercised personal jurisdiction over Test-Rite Taiwan based upon its similar contacts with those forums. *See, e.g., Richard v. Wal-Mart Stores, Inc.,* 1997 WL 578710 (W.D.Va.1997). Those cases and others involving Test-Rite Taiwan also suggest that Test-Rite Taiwan has a sizeable distribution network in the United States, including the companies referenced above, as well as entities such as Wal-Mart and Home Depot stores, both of which sell products in New Hampshire.

### III. *Statute of Limitations and Federal Rule 15.*

**\*5** Test-Rite Taiwan says Emery amended his complaint and added it as a defendant after the applicable statute of limitations had lapsed. Consequently, it asserts that Emery's claims against it are time barred. Emery disagrees, arguing that he is entitled to the protections afforded by New Hampshire's "discovery rule." Specifically, he claims the pertinent statute of limitations was tolled for approximately two years, while the Fire Marshall's office retained the voltage meter. Prior to that, says Emery, he was unable to determine whether his injuries were caused by a defective product. Accordingly, he claims that until he was permitted to test the voltage meter in question, his "injury and *its causal relationship* to [defendant's] act or omission were not discovered and could not reasonably have been discovered." N.H.Rev.Stat. Ann. 508:4 I (emphasis supplied).

If his interpretation of New Hampshire's discovery rule is



Not Reported in F.Supp.2d
2001 WL 951579 (D.N.H.), 50 Fed.R.Serv.3d 1180, 2001 DNH 155
(Cite as: 2001 WL 951579 (D.N.H.))

Page 4

correct, Emery's addition of Test-Rite Taiwan as a defendant was accomplished within the limitations period. For purposes of this discussion, however, the court has assumed that the limitations period was not tolled and Emery's amended complaint against Test-Rite Taiwan was filed after the limitations period lapsed.

"When a plaintiff amends a complaint to add a defendant, but the plaintiff does so *subsequent* to the running of the relevant statute of limitations, then Rule 15(c)(3) controls whether the amended complaint may 'relate back' to the filing of the original complaint and thereby escape a timeliness objection." *Wilson v. U.S. Government,* 23 F.3d 559, 562 (1st Cir.1994) (emphasis in original). *See also Leonard v. Parry,* 219 F.3d 25 (1st Cir.2000). The relevant portions of Rule 15(c) provide as follows:

Relation Back of Amendments. An amendment of a pleading relates back to the date of the original pleading when ....

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ.P. 15(c).

Thus, in order to avail himself of the protections afforded by Rule 15(c)(3) and pursue his claims against Test-Rite Taiwan in this action, Emery must demonstrate three things: first, that the claims against Test-Rite Taiwan "arose out of the conduct" set forth in the original complaint against Test-Rite International Co., Ltd. (U.S.) and Test-Rite Product Corp.; second, that, within 120 days of the filing of the original complaint, Test-Rite Taiwan had notice of the institution of the action against it that it would not be prejudiced in maintaining a defense; [FN2] and, finally, that Test-Rite Taiwan knew or should have known that, but for a mistake concerning the naming of the domestic Test-Rite corporations as defendants in the original complaint, it would have been named as defendant.

> FN2. In this case, the default period of 120 days provided by Rule 4(m) applies, since Emery did not seek nor did the court sua sponte grant him

additional time to make service upon the original defendants. And, contrary to Emery's representations, Rule 4(m) *does* apply to service upon foreign *corporations. See* Fed.R.Civ.P. 4(m) (excluding from its scope service in a foreign country upon an individual and state or political subdivisions, but not excluding service upon foreign corporations). *See also* J.M. Wagstaffe, *Federal Civil Procedure,* para. 5:259 (2000) ("Compare--service on foreign corporations: Note that service on foreign *corporations* is not excluded from the 120-day time limit .") (emphasis in original).

**\*6** As to the first element--same underlying transaction--there is no dispute that it is plainly met. With regard to the notice requirement, Emery does not seriously advance any argument that Test-Rite Taiwan received actual notice of his claims 120 days of his filing suit against the domestic Test-Rite entities. [FN3] Instead, he claims that because Test-Rite Taiwan and the domestic Test-Rite entities are so closely related, the court may infer that Test-Rite Taiwan received notice of this suit when the domestic Test-Rite entities were served. Although Emery cites no authority to support his assertion, he is, presumably, relying on the "identity of interest" exception to Rule 15's notice requirement. *See generally Schiavone v. Fortune, a/k/a Time, Inc.,* 477 U.S. 21, 28 (1986); *Hernandez Jimenez v. Calero Toledo,* 604 F.2d 99, 102-03 (1st Cir.1979). As the court of appeals for this circuit has observed:

> FN3. Emery does say that Test-Rite Taiwan received actual notice of the suit when he first attempted to serve it with a copy of the complaint and summons. Importantly, however, those efforts to serve Test-Rite Taiwan were undertaken more than 120 days after Emery filed suit against the domestic Test-Rite entities. Consequently, they did not provide Test-Rite Taiwan with timely notice, as required by Rule 15(c), of this proceeding.

The identity of interests concept, a judicial gloss on Rule 15(c)(1), provides that the institution of the action serves as constructive notice of the action to the parties added after the limitations period expired, when the original and added parties are so closely related in business or other activities that it is fair to presume the added parties learned of the institution of the action shortly after it was commenced.

*Hernandez Jimenez,* 604 F.2d at 102-03 (citing 6 Wright & Miller, Federal Practice & Procedure § 1499 at 518-19; 3 Moore's Federal Practice, para. 15.15(4-2) at 15-231 n. 15).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



*See also* J.M. Wagstaffe, *supra*, at para. 8:474 ("Imputed notice: If there is sufficient agency or community of interest between the person served and the intended defendant, notice may be imputed to the intended defendant.").

On this record, the court is persuaded that Test-Rite Taiwan and the domestic Test-Rite entities share a community of interests and are sufficiently related to warrant application of the "identity of interest" principle. As noted above, Test-Rite Taiwan owns what appears to be a controlling interest in the domestic holding company operating under the identical name. That company, in turn, apparently has a single function: it holds the stock of Test-Rite Product Corp. And, aside from directly controlling one of the domestic Test-Rite entities and indirectly controlling the other, Test-Rite Taiwan has a direct business relationship with one of those defendants: it sells products to Test-Rite Product Corp. for resale in the United States. Consequently, as a result of Test-Rite Taiwan's substantial ownership interest in Test-Rite International Co., Ltd. (U.S.) and its close and ongoing relationship with Test-Rite Product Corp., it is reasonable to presume that it received notice of this suit shortly after the complaint and summons were served on those domestic corporations. The second element of Rule 15(c) is, therefore, met.

Finally, assuming Test-Rite Taiwan had actual or, at a minimum, constructive knowledge of this proceeding shortly after the related domestic entities were served, it is also reasonable to presume that it knew or should have known that, but for a mistake concerning the identity of the proper party, it would have been named as one of the original defendants. Emery's complaint against the domestic Test-Rite entities plainly seeks to impose liability on those responsible for the design, manufacture, distribution, and/or sale of the voltage meter in question. In fact, it named as one of the defendants a corporation that bears the same name as Test-Rite Taiwan: the domestic holding company. And, according to Emery's amended complaint, Test-Rite Taiwan was directly involved in the distribution of the allegedly defective product in the United States and, in particular, the State of New Hampshire. Accordingly, it is reasonable to presume that, upon learning of Emery's suit, Test-Rite Taiwan knew or should have know that the original action would have been brought against it, but for Emery's mistake concerning the identically named domestic Test-Rite entity. *See generally Leonard*, 219 F.3d at 28.

*7 In light of the foregoing, the court concludes that each of the essential elements of Rule 15(c) has been met and Emery's amended complaint against Test-Rite Taiwan relates back to the date on which he filed his timely claims against the domestic Test-Rite entities. Consequently, the court need not address Emery's claim that the New Hampshire statute of limitations was tolled until he received (from the Fire Marshall) the voltage meter in question and was able to subject it to scientific testing.

Conclusion

The means by which Emery served Test-Rite Taiwan with a copy of the summons and complaint in this proceedings complied with the requirements of federal law.

As to the question of personal jurisdiction over Test-Rite Taiwan, the court concludes that Emery has made a prima facie showing that the exercise of such jurisdiction is reasonable and proper. And, finally, the court concludes that Rule 15(c) applies to the circumstances of this case. Consequently, although it was (arguably) filed after the expiration of the applicable statute of limitations, Emery's amended complaint against Test-Rite Taiwan relates back to the date on which he filed his timely claims against the domestic Test-Rite entities. Test-Rite Taiwan's motion to quash service and to dismiss plaintiff's amended complaint (document no. 56) is, therefore, denied.

SO ORDERED.

2001 WL 951579 (D.N.H.), 50 Fed.R.Serv.3d 1180, 2001 DNH 155

END OF DOCUMENT

## CERTIFICATE OF SERVICE

This is to certify that true and correct copies of the foregoing Memorandum in Support of B. Braun of America Inc.'s Renewed Motion to Dismiss the Amended Master Consolidated Class Action Complaint and Response to Plaintiffs' Supplement to their Opposition Thereto and Appendix of Unreported Authority in Support Thereof have been served on all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to Verilaw Technologies for posting and notification to all parties on this 10th day of September, 2004.

_____ s/ Colin R. Kass_____

Daniel F. Attridge, P.C.
Colin R. Kass
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005
(202) 879-5000
Fax: (202) 879-5200

***Counsel for B. Braun of America Inc.***