# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| This Document Relates to ALL ACTIONS. | |

MDL No. 1456

Master File No. 01-CV-12257-PBS

Judge Patti B. Saris

## PLAINTIFF UFCW'S RESPONSE TO DEFENDANTS BRISTOL-MYERS SQUIBB COMPANY, ONCOLOGY THERAPEUTICS NETWORK CORP. AND APOTHECON, INC.'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS BY PLAINTIFFS AND MOTION FOR A PROTECTIVE ORDER AGAINST A DEPOSITION NOTICE

Defendants Bristol-Myers Squibb Company, Oncology Therapeutics Network Corp. and Apothecon, Inc. (collectively "BMS") seek to compel the production of non-existent or irrelevant documents from plaintiff United Food and Commercial Workers Union and Employers Midwest Health Benefits Fund ("UFCW"). First, BMS contends that UFCW's production of electronic documents is inadequate, although UFCW engaged in a search of the limited e-mail that exists with respect to the two management employees likely to possess responsive documents. Second, BMS argues that UFCW should produce data related to the cost of physician services, such as office visit costs, although such data has no relevance to any of the claims in this litigation, and despite the fact that BMS refuses to produce a witness pursuant to Fed. R. Civ. P. 30(b)(6) to address questions about the very same areas of inquiry. Because BMS' requests are overly

broad, unduly burdensome and seek irrelevant information, the motion to compel should be denied or, if granted, the motion for a protective order should be denied.[1]

## FACTS

In this litigation, UFCW has produced approximately 22,000 pages of documents and e-mails, transactional data for both brand name and generic drugs for the period 1991 to the present, and made available its administrator for two days of deposition under Rule 30(b)(6). (Declaration of Elizabeth A. Fegan ("Fegan Dec."), ¶ 2, exhibit 1). Moreover, its consultant Segal has produced approximately 3,500 pages relating to its work on behalf of UFCW. (Fegan Dec., ¶ 3). Counsel for UFCW and BMS have engaged in extensive and ongoing discussions in an effort to narrow and resolve all discovery issues. (Fegan Dec., ¶¶ 3-8). Indeed, as the issues relate to claims data, counsel for UFCW has permitted BMS' attorneys to speak informally with the UFCW's technical consultants to gain a complete understanding of the available electronic information and documents. (Declaration of Anthony Sievert ("Sievert Dec."), ¶ 2, exhibit 2).

With respect to UFCW's e-mail production, the Fund searched the computers of the two employees who are likely to possess relevant documents. (Sievert Dec., ¶¶ 3-5). Specifically, the e-mail files of Daniel Ryan, the Fund Administrator, and Janet Adachi, the Prescription Drug Program Manager, were searched for production. (*Id.*). These two individuals are the UFCW employees who are likely to possess e-mail relevant to the issues raised in this litigation. (*Id.*). Based on this search, the Fund produced 132 pages of e-mails and attached documents. (Sievert Dec., ¶ 6).

---

[1] Two of the UFCW-related issues discussed in BMS' motion – its requests for UFCW's documents concerning third party reimbursements and unredacted meeting minutes – have been resolved. Accordingly, UFCW's response is directed at only the remaining discovery issues presented by the motion with respect to UFCW.

Though an apparently small production, UFCW rarely relies upon e-mail for business purposes, few employees even have e-mail addresses, and those who do acquired them very recently.  Mr. Ryan testified that the only UFCW employees who have access to e-mail are "department heads and their assistants, nurses and the computer programmers."  (Transcript of Deposition of Daniel W. Ryan, ("Ryan Dep."), attached as exhibit 3, at 305:13-21; Sievert Dec., ¶ 3).  Moreover, the use of e-mail by any UFCW employees only began "maybe two or three years ago."  (Ryan Dep., at 305:13-17).

Subsequent to the production of prescription drug claims data, BMS has requested that UFCW produce transactional data related to the cost of physician office visits where physician-administered drugs are delivered.  (Fegan Dec., ¶ 4).   Plaintiffs objected on the basis of relevance, stating that "plaintiffs' claims in this litigation relate only to the price of the drug itself.  Therefore, we do not understand why you believe that ancillary charges related to office visits are relevant."  (Fegan Dec., ¶ 5).   When BMS persisted, plaintiffs served a Notice of 30(b)(6) Deposition, seeking to inquire as to BMS' knowledge of: (a) Medicare's and insurance companies' strategies for reimbursing physician-administered drugs together with related services, and (b) the actions BMS takes, in pricing its drugs, in response to these strategies.  (Notice of Rule 30(b)(6) Deposition, exhibit D to the Fegan Dec.).  Despite the fact that BMS insists that plaintiffs provide this irrelevant data, it refuses to produce a witness to provide any answers in the same areas of inquiry in response to the Rule 30(b)(6) notice.  (Fegan Dec., ¶ 8).  BMS cannot have it both ways.

**ARGUMENT**

**A.     UFCW Produced the E-Mail and Attached Documents from Its Two Employees Likely to Have Responsive Information To Defendants' Requests.**

On August 20, 2004, plaintiff produced the responsive e-mail in the possession of the two employees likely to possess relevant information. (Sievert Dec., ¶¶ 3-6). UFCW combed through the hard drives of Daniel Ryan, UFCW's Administrator, and Janet Adachi, the director of UFCW's prescription drug department. (Sievert Dec., ¶¶ 3-6). In total, plaintiffs produced 132 pages of electronic mail responsive to defendants' requests for production. (Sievert Dec., ¶ 6). In response to this production, BMS asserts without basis that this search was not conducted in good faith. (*See* BMS' Motion to Compel, at 7). It contends that the search of the two primary individuals involved in pharmaceutical pricing issues was insufficient, and that the documents produced should cover a broader time span than they do. (*See id.*).

BMS' argument misconstrues the exceedingly limited role that electronic mail has played in UFCW's operation throughout the Class Period. Given the deposition testimony in this case, it is unsurprising that UFCW's electronic mail production would be sparse, at least in comparison to the production of a massive corporation such as BMS. Indeed, Mr. Ryan testified that very few UFCW employees have ever had access to electronic mail. Indeed, electronic mail access was limited to UFCW's management, specifically including only "department heads and their assistants, nurses and the computer programmers." (Ryan dep., at 305:13-21). Accordingly, plaintiffs' search of the hard drives of the two management figures involved in pharmaceutical issues is clearly sufficient.

Likewise, BMS' claim that phantom electronic mail exists but has not been produced (or has been destroyed) has no basis in fact. Plaintiffs have produced the responsive electronic documents that are in the possession of Mr. Ryan and Ms. Adachi. Given UFCW's limited use

4

of electronic mail, it is again unsurprising that relatively few such documents exist to be produced. Further, not only do few UFCW employees have electronic mail access, the Fund has only recently used electronic mail in any form. Indeed, UFCW's use of electronic mail began "maybe two or three years" ago. (*See* Ryan Dep. at 305:13-17). Accordingly, BMS' assumptions and accusations about the existence of documents older than those produced by plaintiffs are simply false.

Finally, given the minimal likelihood of discovery of any further electronic mail, and the marginal value of that which has already been found, to the extent that the Court orders any additional electronic searches, BMS should bear the resulting expenses. In reviewing the landscape of electronic media now generally maintained by large corporations in place of paper documents, courts generally employ a test that should include consideration of the following factors:

1. The extent to which the request is specifically tailored to discover relevant information.
2. The availability of such information from other sources.
3. The total costs of production, compared to the amount in controversy.
4. The total costs of production, compared to the resources available to each party.
5. The relative ability of each party to control costs and its incentive to do so.
6. The importance of the issues at stake in this litigation.
7. The relative benefits to the parties of obtaining the information.

*Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 322 (S.D.N.Y. 2003). Similar factors have been taken into consideration by other courts in several cost-shifting analyses in electronic document discovery disputes. *See, e.g., Murphy Oil USA, Inc. v. Fluor Daniel, Inc.,* No. 99-3564, 2002 U.S. Dist. LEXIS 3196 (E.D. La. Feb. 19, 2002) (requiring movant to pay costs of deleted e-mail searches).

Here, application of these factors does not counsel in favor of additional electronic searches, nor in favor of requiring UFCW to bear the cost. To the extent that BMS seeks to force UFCW to restore documents on its hard drives, application of the *Zubulake* analysis to this case favors an order requiring defendants to pay the costs associated with any retrieval of additional electronic documents:

**1. The extent to which the request is specifically tailored to discover relevant information.** Importantly, the *Zubulake* court emphasized that this factor is the most important and appropriate one to analyze in determining how the costs of electronic discovery should be apportioned. Unlike the parties in *Zubulake*, BMS has failed to tailor its requests to seek specific information in any fashion. *See* 216 F.R.D. at 282 (describing results of preliminary search based upon identified terms offered by movant). Instead, BMS has suggested no protocols to narrow its requested searches or identified any specific categories of documents that it seeks through an electronic production. Moreover, having established through testimony that the Fund's reliance on e-mail for business purposes is minimal, it is unlikely that any additional e-mails would yield useful information. (Ryan Dep. at 305:13-21). Notably also, BMS has failed to point to any electronic documents that have thus far been produced that would provide any reason to suspect that UFCW's e-mail data may contain any relevant evidence. Thus, analysis of factor one favors requiring defendant to pay for any additional searches.

**2. The availability of such information from other sources.** Once again, BMS' failure to identify any specific information that it believes resides only in UFCW's e-mail system significantly hampers its position. Given the short length of time in which UFCW has maintained an e-mail system, and the few personnel with access to addresses, it is highly unlikely that additional searches of hard drives would produce significant information

unavailable elsewhere. Indeed, a comparison of the hard copy and electronic productions of documents to this point in the litigation bears out plaintiff's claims that the great bulk of relevant correspondence exists only in hard copy, all of which UFCW has already produced. Specifically, UFCW's hard copy document production included over 22,000 pages of documents from the entire Relevant Period. UFCW's 132 page e-mail production, on the other hand, necessarily covers only the period after UFCW began using e-mail two to three years ago. (Ryan Dep. at 305:13-17). Because the information sought by BMS' requests generally exists in hard copy and has been produced, this factor weighs in UFCW's favor.

**3. The total costs of production, compared to the amount in controversy.** Although BMS may contend that the number of potential computers on which additional e-mails may reside is small, the total cost of any restoration is as yet undetermined because of the lack of specificity in BMS' requests. Moreover, to the extent that BMS relies upon this factor to support its position, it simply concedes plaintiff's underlying argument that UFCW's minimal reliance upon e-mail renders such restorations largely unproductive relative to the cost.

**4. The total costs of production, compared to the resources available to each party.** BMS, a massive nationwide pharmaceutical corporation, clearly has the resources to fund its requested restoration and searches of UFCW's systems. UFCW, on the other hand, lacks the technical expertise and resources to perform such tasks. Accordingly, BMS can and should bear the costs of its own requested restoration of UFCW's e-mail documents.

**5. The relative ability of each party to control costs and its incentive to do so.** By ignoring the available evidence regarding UFCW's minimal reliance on e-mail during the Class Period, and by failing to tailor its demands in any reasonable fashion, BMS has amply demonstrated that it has no incentive to control costs. Moreover, by ignoring the lack of any

7

likelihood of discovery of relevant documents, BMS has shown its desire to send plaintiff down fruitless paths, demanding that it execute restoration of documents that are unlikely to be relevant to the litigation. Under these circumstances, BMS should bear the costs of its unreasonable search requests.

**6. The importance of the issues at stake in this litigation.** The *Zubulake II* court held that this factor "will only rarely come into play . . ." *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 289 (S.D.N.Y. 2003). While the issues in this case are vitally important to stemming the gross overcharges imposed on plaintiffs by defendants' gaming of the system, UFCW has already produced more than 22,000 documents in support of plaintiffs' position. What would likely be only a handful of documents from a costly restoration project and that would not shift or bear on the ultimate outcome of this case does not weigh in favor of production.

**7. The relative benefits to the parties of obtaining the information.** The relative benefits of a handful of e-mails would likely be small to either party. Accordingly, this factor is neutral.

A fair analysis of the *Zubulake* factors should result in a denial of defendant's motion to compel, or a requirement that BMS bear the cost of restoration. Accordingly, BMS request that additional e-mail searches be undertaken should be denied. If granted, BMS should pay the costs for any such searches.

**B. BMS' Request for Claims Data Related to The Cost of Physician Services Seeks Irrelevant Information.**

UFCW has produced more than 10 years worth of claims data describing drug purchases made by its members for pharmaceuticals throughout the Class Period. (Fegan Dec., ¶ 2). Indeed, UFCW's production encompasses the entire "J-Code" database reflecting reimbursements for drug purchases that were administered by a physician. This production

8

directly relates to plaintiffs' allegations that defendants "promote their drugs not based on lower prices, but by the use of reimbursement rates based on a fictitious and inflated AWP that allows purchasers and intermediaries (including providers and PBMs) to make inflated profits – and the Defendant Drug Manufacturers to increase their market share – at the expense of Plaintiffs and the Class." AMCC ¶ 6. Accordingly, the issue at hand is whether the AWP reported by the defendants is inflated, or instead is an accurate reflection of the price paid for a drug by a provider.

In an attempt to force UFCW to engage in yet further time consuming and costly production, BMS now seeks claims data relating to the prices charged by physicians for office visits. Although the Federal Rules generally permit liberal discovery, plaintiffs are shielded from requests that seek information related to matters irrelevant to the allegations raised in the complaint. *See, e.g.*, *Public. Serv. Co. of New Hampshire v. Hudson Light & Power Dep't*, 938 F.2d 338, 346 (1st Cir. 1991) (affirming district court's restrictions on irrelevant discovery requests). BMS can make no such showing that the costs of office visits or drug administration are relevant.

Indeed, BMS' only claim is based upon a widely discredited theory in which drug manufacturers try to connect fictional drug prices to ancillary office visit charges. BMS asserts that some payers permit physicians to make a profit from drug reimbursement to recoup losses due to undercharging for office visits. (*See* BMS Motion to Compel at 2). But the law provides separate compensation for these costs. *See* "Medicare Physician Fee Schedule: Practice Expense Payments to Oncologists Indicate Need for Overall Refinements," GAO-02-53 (October 31, 2001), attached hereto as exhibit 4 ("The first part of [Medicare's] resource-based fee schedule, implemented in 1992, was the physician work component, the payment for the physician's time

and effort to provide the service. Beginning in January 1999, resource-based payments were incorporated for the practice expense component, which compensates physicians for the costs incurred in operating their practices.").

Moreover, William J. Scanlon, the Director of Health Care Issues testified before the House of Representatives' Committee on Energy and Commerce's Subcommittee on Health and the Subcomittee on Oversight and Investigations, stating:

> Oncologists . . . argue that Medicare's payments for administering chemotherapy are inappropriately low and that excess Medicare drug payments [based on the inflated AWP] are needed to offset their losses. Yet oncology is one of the specialties to gain under the resource-based physician fee schedule. In our separate study on physicians' practice expense under Medicare's fee schedule, we will show that payments to oncologists were 8 percent higher than they would have been if the prior charge-based payment method had been maintained; the study will also show that oncologists' payments relative to their estimated practice expenses, which include chemotherapy administration, were close to the average for all specialties.

(GAO-01-1142T (September 21, 2001), at 8, attached as exhibit 5; *See also* Statement of Laura A. Dummit, Director of Health Care – Medicare Payment Issues, GAO-02-531T (March 14, 2002), at 9 (same), attached as exhibit 6). Indeed, even the Senior Manager for Professional Reimbursement Programs for Blue Cross Blue Shield of Illinois ("BCBS") testified – in response to defendants' questions -- that BCBS pays providers one fee for physician-administered drugs and another fee for the cost of administration and the office visit. BCBS confirmed that there is "no correlation" between the two charges, and confirmed that a change in the price of office visits would not affect the cost of a physician-administered drug (or AWP). (Fegan Dec., ¶ 10).

There are two additional fundamental flaws in BMS' theory underlying its claim of the relevance of ancillary fees charged by physicians when administering drugs. First, there can be no direct connection between drug prices and office visit charges, because the two fees are determined by independent entities. The drug manufacturer establishes the ingredient cost, while

10

the costs of service are determined by the physician.  Second, UFCW's claims data records alone would provide no evidence useful to support or oppose BMS' hypothesis.  BMS' motion to compel should thus be denied.

> **C.    If UFCW is Compelled to Produce Additional Office Visit Charge Data, BMS Should Be Compelled to Produce a 30(b)(6) Witness On The Same Topics.**

Although BMS seeks irrelevant information related to ancillary physician charges, it inexplicably refuses to offer a deponent to testify about the very same information.  UFCW issued a notice of deposition to BMS under Rule 30(b)(6), seeking to inquire as to the company's knowledge of (a) Medicare's and insurance companies' strategies for reimbursing physician-administered drugs together with related services and (b) the actions BMS takes, in pricing its drugs, in response to these strategies.  (Exhibit D to the Fegan Dec.).  Without any supporting reasoning, BMS states that the deposition notice is "silly" and a "punitive measure."  (*See* BMS Memorandum at 9-10).  To the extent that BMS believes that the bundling of services, and third-party payors' understanding of it, is relevant to this litigation, BMS should also be required to testify as to the issue.

Rule 30(b)(6) permits designated persons without personal knowledge to testify on behalf of a corporation on matters within the corporation's knowledge.  *McLellan Highway Corp. v. United States*, 95 F. Supp. 2d 1, 10 (D. Mass. 2000) (Woodlock, J.).  A party responding to a Rule 30(b)(6) deposition subpoena must identify knowledgeable individuals as corporate designees and make a reasonable attempt to ascertain information reasonably available to the organization.  *Big Top USA, Inc. v. The Wittern Group*, 183 F.R.D. 331, 339 (D. Mass. 1998) (Saris, J.).  "Producing an unprepared witness is tantamount to a failure to appear at a deposition."  *Calzaturficio S.C.A.R.P.A. v. Fabiano Shoe Co.,* 201 F.R.D. 33, 39 (D. Mass. 2001) (Collings, J.).

Thus, a party responding to a Rule 30(b)(6) deposition notice must prepare deponents "by having them review prior fact witness deposition testimony as well as documents and deposition exhibits." *Calzaturficio,* 201 F.R.D. at 37.  Deponents are still required to review the documents even if the documents are voluminous and must include those documents that are in the possession of their counsel.  *Id.* at 37, 39.

BMS contends that it has no witnesses with any knowledge about these practices, but rather that only its lawyers are aware of this claim.  If that is the case, however, BMS' Rule 30(b)(6) deponent should investigate the facts available to its attorneys and testify thereto.  Requiring the BMS deponent(s) to be educated in this way is due to the fact that the "individuals so deposed are required to testify to the knowledge of the corporation, not the individual." *Id.* at 36-37.  "Without having a witness or witnesses who can testify so as to bind the corporation, the deposing party is left at an unfair disadvantage, having no understanding of what the corporation's position is as to many areas of inquiry." *Id.* at 37.

Accordingly, to the extent that UFCW is required to provide data regarding non-drug charges, BMS should also be required to produce information related to its theory that non-drug provider charges are subsidized by inflated AWPs and BMS' request for a protective order should be denied.

WHEREFORE, plaintiffs respectfully request that this Court deny BMS' motion to compel the production of documents by UFCW. If BMS' motion to compel is granted as to the production of non-drug, office visit charges, plaintiffs respectfully request that this Court deny BMS' motion for a protective order, and grant such other relief as this Court deems appropriate.

Dated: September 15, 2004                          By:  ____/s/Edward Notargiacomo_____

                                                  Thomas M. Sobol
Edward Notargiacomo
One Main Street, 4th Floor
Cambridge, MA 02142

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Samuel Heins
Brian Williams
HEINS MILLS & OLSON, P.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Jeff Kodroff
John Macoretta
SPECTOR, ROSEMAN & KODROFF, P.C.
18181 Market Street, Suite 2500
Philadelphia, PA 19103

**CHAIRS OF LEAD COUNSEL COMMITTEE**

Kenneth A. Wexler
Elizabeth A. Fegan
THE WEXLER FIRM LLP

13

One North LaSalle
Suite 2000
Chicago, Illinois 60602

Marc H. Edelson
HOFFMAN & EDELSON
45 West Court Street
Doylestown, PA 18901

**MEMBERS OF LEAD COUNSEL COMMITTEE AND EXECUTIVE COMMITTEE**
Michael McShane
ALEXANDER, HAWES & AUDET LLP
300 Montgomery Street, Suite 400
San Francisco, CA 94104

Robert E. Piper, Jr.
PIPER & ASSOCIATES
624 Pierre Avenue
Shreveport, LA 71103

**MEMBERS OF EXECUTIVE COMMITEE**

Anthony Bolognese
BOLOGNESE & ASSOCIATES
One Penn Center
1617 JFK Boulevard
Suite 650
Philadelphia, PA 19103

Jonathan W. Cuneo
The Cuneo Law Group
317 Massachusetts Avenue, N.E.
Suite 300
Washington, D.C. 20002

Neal Goldstein
Freedman & Lorry, P.C.
400 Market Street, Suite 900
Philadelphia, PA 19106

Michael E. Criden
Hanzman & Criden, PA
Commerce Bank Center, Suite 400
220 Alhambra Circle
Coral Gables, FL 33134

Blake M. Harper
Kirk B. Hulett
Hulett Harper LLP
550 West C Street, Suite 21700
San Diego, CA 92101

Jonathan D. Karmel
KARMEL & GILDEN
221 N. LaSalle Street
Suite 1414
Chicago, IL 60601
Philadelphia, PA 19103

Diane M. Nast
RODA & NAST PC
801 Estelle Drive
Lancaster, PA 17601

Henry H. Rossbacher
ROSSBACHER & ASSOCIATES
811 Wilshire Boulevard
Suite 1650
Los Angeles, CA 90017-2666

Jonathan Shub
SHELLER, LUDWIG & BADEY
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102

Ira Neil Richards
TRUJILLO RODRIGUEZ &
RICHARDS, LLC
The Penthouse
226 West Ritten House Square
Philadelphia, PA 19103

Scott R. Shepherd
SHEPHERD & FINKLEMAN, LLC
117 Gayley Street, Suite 200
Media, PA 19063

                Mitchell A. Toups
                WELLER, GREEN, TOUPS &
                TERRELL L.L.P.
                2615 Calder Street, Suite 400
                P.O. Box 350
                Beaumont, TX 77704

                Damon Young
                Lance Lee
                YOUNG, PICKETT & LEE
                4122 Texas Boulevard
                P.O. Box 1897
                Texarkana, AR/TX 75504

                **ADDITIONAL ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE BY VERILAW**

      I, Edward Notargiacomo, hereby certify that I am one of plaintiffs' attorneys and that, on September 15, 2004, I caused copies of PLAINTIFF UFCW'S RESPONSE TO DEFENDANTS BRISTOL-MYERS SQUIBB COMPANY, ONCOLOGY THERAPEUTICS NETWORK CORP. AND APOTHECON, INC.'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS BY PLAINTIFFS AND MOTION FOR A PROTECTIVE ORDER AGAINST A DEPOSITION NOTICE to be served on all counsel of record by causing same to be posted electronically via Verilaw.


Dated: September 15, 2004                        ____/s/ Edward Notargiacomo___
                                                              Edward Notargiacomo