# EXHIBIT A



# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) <br> AVERAGE WHOLESALE PRICE ) <br> LITIGATION ) <br> ) <br> THIS DOCUMENT RELATES TO: ) <br> ) <br> ALL ACTIONS ) <br> ) <br> ) <br> ) | MDL No. 1456 <br><br> CIVIL ACTION: 01-CV-12257-PBS <br><br><br> Judge Patti B. Saris |

## B. BRAUN OF AMERICA INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL B. BRAUN OF AMERICA TO MAKE SUPPLEMENTAL RULE 30(B)(6) DESIGNATION



The plaintiffs have no reasonable basis for moving to compel B. Braun of America Inc. ("BBA") to engage in further discovery to prove that BBA is not properly a party to this litigation. Having squandered the time given by this Court to engage in jurisdictional discovery, the plaintiffs have no grounds for seeking to delay even further the dismissal of their meritless claims against BBA.

Moreover, despite their attempt to cast blame on BBA through this frivolous motion, the plaintiffs have not identified a single piece of information that is remotely relevant to the jurisdictional issues before the Court that was not fully addressed by BBA in its 30(b)(6) deposition. The instant motion is wholly without merit and should be rejected by this Court on the grounds that it is untimely and in bad faith, directly violates the Local Rules of this Court, and has been submitted solely in an attempt to justify the plaintiffs' utter failure to engage in the jurisdictional discovery allowed by the Court.

## FACTUAL BACKGROUND

In their September 6, 2002 Master Consolidated Class Action Complaint ("MCC"), the plaintiffs brought claims against B. Braun Medical Inc. ("BBM") based on the Average Wholesale Prices ("AWPs") established by industry publications for some of its drugs. That Complaint was dismissed as to BBM by the Court's Order of May 13, 2003 for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and 9(b). (Mem. and Order of May 13, 2003 at 45-47.) The plaintiffs were given thirty days to remedy the deficiencies in their allegations and to seek leave to file an amended complaint against these defendants. (*Id.* at 47.) The plaintiffs filed their proposed Amended Master Consolidated Class Action Complaint ("AMCC") on June 12, 2003. In the AMCC, which the Court allowed to be filed on June 18, 2003, the plaintiffs made no



attempt to reassert any claims against BBM. Instead, they brought claims only against a new party, B. Braun of America Inc.

BBA immediately objected, informing the plaintiffs that it was not a proper party to this litigation and did not manufacture, distribute, or sell any of the drugs identified in the AMCC. (Mem. in Support of BBA Mot. to Dismiss the AMCC ("BBA Mem.") at 1-2.) Further, as BBA has no contacts with the Commonwealth of Massachusetts, BBA moved to dismiss the AMCC for lack of personal jurisdiction. In response, the plaintiffs acknowledged that BBA is "the parent company of B. Braun Medical, Inc., the original B. Braun Defendant named by Plaintiffs" (Pls.' Resp. to Def. Spec. Mem. at 43), but they failed to address BBA's argument, supported by a declaration from its Senior Vice President, that it does not manufacture any of the drugs at issue and has no contacts that would subject it to the personal jurisdiction of this Court. (Decl. of Charles A. DiNardo, Attach. to BBA Mem., at 2.)

When BBA subsequently pointed out to the Court in its Reply that the claims against it must be dismissed because the plaintiffs had "offered absolutely no evidence" and "utterly failed to address" the merits of BBA's claim of lack of personal jurisdiction (BBA Reply in Support of Mot. to Dismiss AMCC at 1), the plaintiffs, for the first time, claimed that they needed "limited discovery into jurisdictional issues" in order to determine whether there was a basis for exerting jurisdiction over BBA. (Pls.' Reply to Def. Spec. Mem. at 35-36.) On February 24, 2004, the Court granted the plaintiffs' request and allowed them *six months* to engage in jurisdictional discovery before a decision would be reached on BBA's motion to dismiss. The Court expressly directed the plaintiffs to "respond to the issues of personal jurisdiction ... *by August 24, 2004*." (Mem. and Order of Feb. 24, 2004 at 23) (emphasis added).)

2



Having gotten their temporary reprieve from the dismissal of BBA from the AMCC, the plaintiffs proceeded to take *no further action*. For more than five months, the plaintiffs sent no document requests, interrogatories, or requests for admission to BBA relating to the jurisdictional issues. The plaintiffs did not send any notices of deposition to BBA or to any related third parties who might have information relevant to their jurisdictional arguments. In fact, the plaintiffs made *not a single attempt* to obtain information from BBA regarding the jurisdictional issues.

Then, shortly before their six-month deadline was about to expire, the plaintiffs made one half-hearted attempt to save their meritless claims against BBA by undertaking some jurisdictional discovery. On the evening of August 4, 2004, less than three weeks before the Court-imposed deadline to provide evidence to support their jurisdictional arguments, they sent to BBA's counsel notice of their intent to take a 30(b)(6) deposition of BBA *eight days later*, on August 12, 2004, identifying six areas of inquiry. (*See* Notice of 30(b)(6) Dep. at 3-4) (Attached hereto as Exhibit A.)

The plaintiffs' notice was made in direct violation of the Court's Order regarding the scheduling of discovery in this case. As the plaintiffs are well aware, Case Management Order ("CMO") No. 10 specifies that parties must provide each other "*at least* 21 days notice for a proposed deposition" and that a party has up to 45 days to produce 30(b)(6) witnesses. (CMO 10 ¶ ¶ 6-7 (emphasis added).) Having done nothing until the Court's deadline was only *twenty days* away, the plaintiffs had effectively precluded themselves from seeking to depose any BBA witnesses, through a 30(b)(6) deposition or otherwise. Nonetheless, without acknowledging their blatant violation of CMO 10, the plaintiffs sent their demand for a 30(b)(6) deposition to occur on eight days' notice.

3



Clearly, BBA had every right to demand compliance with CMO 10 and to refuse to prejudice itself with the burden of producing a 30(b)(6) witness in such a short period after the plaintiffs had squandered their six-month opportunity to take jurisdictional discovery. Had BBA justifiably refused to allow the plaintiffs to disregard CMO 10, they would have had no choice but to admit to the Court that, due solely to their own inactivity, they had gathered absolutely no evidence to refute BBA's showing that it is not properly a party to this litigation. However, hoping to bring this long-delayed process to a close and to facilitate a resolution of its motion to dismiss that has been pending for more than a year, BBA accommodated the plaintiffs' eleventh-hour demands and agreed to make a 30(b)(6) witness available on August 17, 2004 for the limited purpose of engaging in jurisdictional discovery of BBA.

On August 11, 2004, well before the scheduled deposition, BBA filed its Objections to the plaintiffs' Notice of Deposition. In those objections, BBA reiterated that it "neither manufactures nor sells any of the pharmaceuticals listed in Appendix A to the Amended Master Consolidated Class Action Complaint ("AMCC")" and that it was designating a 30(b)(6) witness solely to "allow[] limited discovery by the plaintiffs for the purpose of resolving BBA's motion to dismiss for lack of personal jurisdiction." (Corrected Obj. at 1) (Attached hereto as Exhibit B.) BBA further expressly objected to the Notice "to the extent it seeks information beyond 'matters known or reasonably available to' BBA, *such as matters concerning other entities but not BBA.*" (*Id.* at 2 (emphasis added).) BBA reiterated this objection to each of the specific Areas of Inquiry identified by the plaintiffs. (*Id.* at 4-7.) At no time prior to the deposition nor since have the plaintiffs responded or objected to the limitations placed on the scope of the deposition by BBA.

4



During the deposition, both the witness and counsel for BBA reiterated that the witness was present subject to BBA's objections and, as the designated representative of BBA, could provide only information that was known or reasonably available to BBA. In that role, the witness fully addressed each of the plaintiffs' inquiries and provided the plaintiffs with the knowledge of B. Braun of America Inc. When BBA's designee understandably was unable to provide information *unknown and unavailable to BBA*, the plaintiffs did not attempt to reach a resolution with BBA and did not seek the desired information through other means. Instead, without any notice to or discussion with BBA, the plaintiffs filed the instant motion to compel, claiming that the parties were unable to resolve their disputes and that BBA had single-handedly prevented them from obtaining the information they needed to address the jurisdictional issues pending before the Court for more than a year. The plaintiffs' motion is procedurally improper, was not brought in good faith, and lacks merit. As a result, the motion should be denied.

<div align="center">**ARGUMENT**</div>

**I.     The Plaintiffs' Motion to Compel Should be Denied as Violating the Court's Order to Complete All Jurisdictional Discovery by August 24, 2004.**

The Court allowed the plaintiffs six months to engage in discovery to refute BBA's well-supported argument that it is not properly a party to this litigation. That period expired on August 24, 2004. Through this motion, the plaintiffs improperly are seeking to extend that Court-imposed deadline. The plaintiffs have no reasonable explanation for their failure to engage in jurisdictional discovery in a timely fashion, and their dilatory conduct should not be rewarded.

As clearly established in BBA's Motion to Dismiss, the plaintiffs have no grounds for bringing claims against it in the MDL litigation. Despite the fact that the plaintiffs had offered

<div align="center">5</div>



absolutely no evidence to support their claim of jurisdiction over BBA, the Court allowed them six months of jurisdictional discovery before ruling on BBA's motion.

At the completion of that six-month period, it has only become even more obvious that the plaintiffs had no basis whatsoever for bringing claims against BBA, notwithstanding their express obligation to have engaged in a reasonable inquiry prior to filing the AMCC to ensure that their claims were well-grounded in fact. *See* Fed. R. Civ. P. 11(b) ("By presenting to the court . . . a pleading . . . an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . (3) the allegations and other factual contentions have evidentiary support . . . ."); *see also Divot Golf Corp. v. Citizens Bank of Mass.*, No. 02-CV-10654, 2003 WL 61287, at *1 (D. Mass. Jan. 8, 2003) ("Rule 11 'require[s] litigants to "stop-and-think" before initially making legal or factual contentions.'" (quoting Fed. R. Civ. P. 11 (b), advisory committee notes to 1993 Amendments)).

The plaintiffs have made no meaningful effort to engage in jurisdictional discovery of BBA or to seek relevant information from any other sources. For example, although the plaintiffs seem to believe that information regarding the business activities of B. Braun Medical Inc., a separate corporate entity that was dismissed from this litigation on May 13, 2003 and that the plaintiffs knowingly chose *not* to include in their AMCC, is somehow relevant to their claims against BBA, they failed to engage in discovery of B. Braun Medical Inc. itself.

Instead, the plaintiffs waited until the time allotted by the Court had effectively expired, attempted to discover information through BBA that it does not have and has no obligation to obtain, frivolously blamed BBA for the plaintiffs' own inactivity, and now improperly seek to continue this charade indefinitely. *See* Pls.' Mem. in Support of Mot. to Compel at 14 (seeking both to compel BBA to designate a second 30(b)(6) witness and "leave to file a second

6



supplement to their opposition to BBA's motion to dismiss the AMCC" at some indefinite time in the future).

Having wasted every opportunity given to them to develop some jurisdictional basis for their claims against BBA, the plaintiffs cannot be heard to complain. Their motion to compel, which is nothing more than a dilatory tactic to postpone the inevitable dismissal of BBA from this litigation, must be denied.

## II.   The Plaintiffs' Motion to Compel Should be Denied for Failure to Engage in Good-Faith Negotiations to Resolve Their Dispute Prior to Filing.

The plaintiffs' motion must be denied for failure to comply with Fed. R. Civ. P. 37(a)(2)(B) and Local Rule 37.1(a). Local Rule 37.1(a) expressly provides that, "[b]efore filing any discovery motion . . . counsel for each of the parties shall confer in good faith to narrow the areas of disagreement to the greatest possible extent. It shall be the responsibility of counsel for the moving party to arrange for the conference." Further, Local Rule 37.1(b) provides that a discovery motion, such as the instant motion to compel,

> shall include a certificate in the margin of the last page that the provisions of this rule have been complied with. The memorandum shall state with particularity the following:
>
> (1)   If a discovery conference was not held, the reasons why it was not;
>
> (2)   If a discovery conference was held, the time, date, location and duration of the conference; who was present for each party; the matters on which the parties reached agreement; and the issues remaining to be decided by the court;
>
> (3)   The nature of the case and the facts relevant to the discovery matters to be decided;
>
> (4)   Each interrogatory, deposition question, request for production, request for admission or other discovery matter raising an issue to be decided by the court, and the response thereto; and
>
> (5)   A statement of the moving party's position as to each contested issue, with supporting legal authority, which statement shall be set forth separately immediately following each contested item.

7



Local Rule 37.1(b).

Plaintiffs wholly failed to submit the certification required by Fed. R. Civ. P. 37(a)(2)(B) and Local Rule 37.1(b).   Instead, the plaintiffs improperly included in their motion a "Certification Pursuant to Local Rule 7.1," which states: "Pursuant to Local Rule 7.1(a)(2), the undersigned hereby certify that counsel for plaintiffs conferred with counsel for B. Braun of America, Inc. regarding the issues addressed in this motion, but were unable to resolve or narrow the issues." (Plaintiffs' Mot. to Compel at 2.) This certification is both woefully inadequate and a gross misrepresentation of events.

The failure to comply with Local Rule 37.1(b) is sufficient, in and of itself, to justify denying the plaintiffs' motion to compel. It carries additional significance in this instance, however, because the lack of detail in plaintiffs' Rule 7.1 certification forces BBA to guess what events the plaintiffs claim to be certifying. No discovery conference between the plaintiffs and BBA with regard to this 30(b)(6) deposition has ever taken place. No communications were made by the plaintiffs prior to the deposition – in writing, over the telephone, or in person – regarding BBA's objections to the scope of the deposition. And no communications have taken place between counsel for BBA and counsel for the plaintiffs since the completion of Ms. Codrea's deposition on August 17, 2004.

Thus, BBA can only assume that the plaintiffs are attempting to rely on some discussion between counsel that occurred during the deposition of Ms. Codrea as sufficient to qualify as a "good faith" conference regarding the discovery issues raised in their motion to compel. But such discussions between counsel regarding deposition questions cannot be sufficient to satisfy either Fed. R. Civ. P. 37(a)(2)(B) or Local Rule 37.1(b). As one Court has recognized:

> This 'meet-and-confer' requirement mandates that the parties 'meet, in person or by telephone, and make a genuine effort to resolve the dispute by determining . . .



> what the requesting party is actually seeking; what the discovering party is
> reasonably capable of producing that is responsive to the request; and what
> specific genuine issues, if any, cannot be resolved without judicial intervention.

*Yoon v. Celebrity Cruises, Inc.*, No. 97 CIV 3808, 1999 WL 135222, at *6 (S.D.N.Y. March 12,

1999) (quoting *PRescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, No. 96 Civ. 7590, 1998 WL

67672, at *2-3 (S.D.N.Y. Feb. 18, 1999)); *see also Tri-Star Pictures, Inc. v. Unger*, 171 F.R.D.

94, 100 (S.D.N.Y. 1997) (rejecting reliance on preliminary objections to document requests as

definitive statements of a refusal to comply and noting that "[d]isagreement . . . is an obvious

precursor to negotiated compromise, and thus, is a necessary component of the meet-and-confer

prerequisite to bringing a motion to compel"); *Porter v. Brancato*, No. 96-2208, 1997 WL

150050, at *1 (D. Kan. Feb. 24, 1997) ("A 'reasonable effort to confer' means more than mailing

a letter to opposing counsel. It requires that counsel converse, confer, compare views, consult

and deliberate.").

  At most, counsels' discussions during a deposition bring into relief the scope of the initial

disputes that need to be resolved. Numerous objections are raised during depositions that are not

resolved until trial, if ever. If such discussions on the record were a sufficient basis for a motion

to compel, there would be no point in having the meet-and-confer requirement. This is

highlighted by the current motion, where the following exchange is the closest counsel ever

came to conferring about their disputes over the scope of the deposition:

> Ms. Connolly: Okay. Well, I'm just going to note for the record that I don't
> believe you have complied with the notice and that we'll seek all relief
> from the court in connection –
>
> Mr. Attridge: What haven't we done? She's a representative of B. Braun of
> America and she's testified that she's prepared herself and she's talked to
> other people and reviewed documents. She's talked about what the
> limitations are in terms of the information that the company has.



Ms. Connolly: She hasn't educated herself on topics that were specifically identified in the notice in which she has already made clear are available to her for examination.

Mr. Attridge: No, it's – you don't understand rule 30(b)(6). You began –

Ms. Connolly: Well, I'm not interested in your education on Rule 30(b)(6). I've made my objection and I'm going to move on with the questions.

Mr. Attridge: Can you just tell me specifically what information you think she should have because I think you're dead wrong.

Ms. Connolly: Well, I think she should have information on which B. Braun entity manufactures each of those AWPID's.

Mr. Attridge: If B. Braun of America has that information, she will tell you about it. What she's told you, and you're just not listening, is that B. Braun of America doesn't make any drugs, okay.

Ms. Connolly: I'm saying that her failure to inquire from B. Braun Medical is in direct violation of the 30(b)(6) Notice.

Mr. Attridge: No, it's not because what Rule 30(b)(6) requires and what she has done is learn about information that B. Braun of America has, okay. That doesn't mean that B. Braun of America has to solicit other companies for information that they have in order to have your deposition. You're just wrong if you think the rule requires that.

Ms. Connolly: Well, I really don't care what your opinion is. I have put my objection on the record and I would like to move on with the questioning.

* * *

Mr. Attridge: Well, I don't want you to be complaining that you didn't have an opportunity to seek whatever answers or relief you want. I think you've gotten everything you're entitled to.

Ms. Connolly: Well, I think we should go on with the remainder of the topics and then we will re-visit what we're going to do from there.

Mr. Attridge: Okay.

(Codrea Dep. at 54:6 – 57:3 (Submitted as Pls.' Supp. to Their Opp. to BBA's Mot. to Dismiss AMCC, Exh. 1) (filed under seal).)

10



Clearly, counsels' exchange demonstrates that the parties have a dispute about whether a 30(b)(6) designee is required to testify about matters known to a subsidiary corporation that are not within the knowledge of the deponent corporation. But it also clearly establishes that plaintiffs' counsel did not want to confer about possible resolutions of the dispute and instead wished to move forward with the deposition. It also shows that counsel for BBA asked for clarification about the plaintiffs' concerns and endeavored to address them. But plaintiffs' counsel *expressly* stated that she wanted to "go on with the remainder of the topics *and then we will re-visit what we're going to do from there.*" (Codrea Dep. at 56:22 – 57:2.) In light of the fact that plaintiffs' counsel expressly stated that the parties would further discuss the resolution of their dispute after the completion of the deposition, this exchange cannot constitute a discovery conference sufficient to satisfy either Rule 37(a)(2)(b) or Local Rule 37.1(b).

Despite this statement by plaintiffs' counsel, no such discussion ever occurred, and plaintiffs never sought to engage in further discussions with BBA. Instead, the plaintiffs waited until the six months given by the Court had passed and then filed the instant motion to compel, with a certification that the parties had been unable to resolve their dispute. As one court has explained,

> [T]hese conversations during depositions do not satisfy the requirements of Rule 37(a)(2)(B). PRescient has not shown that the parties specifically discussed the twenty-three categories of items it seeks to have compelled, let alone shown that any negotiations that occurred were a good faith effort to resolve the dispute without court action. To satisfy the meet-and-confer requirement, PRescient had to provide an account of a 'live exchange of ideas and opinions,' including details such as the positions taken by each side, the extent to which the parties compromised their positions, and why the negotiations proved fruitless.

*PRescient Partners*, 1998 WL 67672, at *4. The plaintiffs made no effort to participate in such an exchange and certainly provided no indication to BBA that they intended to file a motion to compel based solely on the discussions between counsel during Ms. Codrea's deposition. This



cannot be sufficient to satisfy the plaintiffs' obligation under either Fed. R. Civ. P. 37(a)(2)(B) or Local Rule 37.1(b).    As a result, the plaintiffs' motion to compel should be denied as procedurally improper.

### III.    The Plaintiffs' Motion Should be Denied Because BBA Fulfilled Its Obligations Under Fed. R. Civ. P. 30(b)(6).

Even if the Court were willing to consider the plaintiffs' improper and untimely motion, it should be denied because it is wholly without merit.  As the transcript reveals, BBA's 30(b)(6) representative provided the plaintiffs with the full extent of BBA's knowledge as to every matter raised by the plaintiffs, a fact the plaintiffs do not dispute in their motion.  Rather, the plaintiffs complain that they were somehow prejudiced because Ms. Codrea could not provide them with information *unknown and unavailable to BBA.*

The obligations of a corporation responding to a notice of 30(b)(6) deposition are clear. The corporation "receiving such a notice must designate a person or persons to testify on its behalf, and the persons so designated must 'testify as to matters known or reasonably available' to the corporation." *SmithKline Beecham Corp. v. Apotex Corp.*, No. 99-CV-04304, 2004 WL 739959, at *2 (E.D. Pa. March 23, 2004) (quoting Fed. R. Civ. P. 30(b)(6)).    Ultimately, "[t]he testimony elicited at the Rule 30(b)(6) deposition represents the knowledge of the organization ..., not of the individual deponents." *McClellan Highway Corp. v. United States*, 95 F.Supp. 2d 1, 9 (D. Mass. 2000) (citing *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996)). Thus, if the corporation does not possess the information, then its obligations under Rule 30(b)(6) are at an end.  *See Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 38 (D. Mass. 2001) ("If the Fabiano sons reviewed the available documentation and still would not have been able to give complete answers on behalf of Fabiano . . . and there were no other available witnesses who could do so, then Fabiano's obligations under Rule 30(b)(6)

12



cease, since the rule requires testimony only as to 'matters known *or reasonably available* to the organization.'"); *Dravo Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 76 (D. Neb. 1995) ("If [the corporation] does not possess such knowledge as to so prepare Hartsock or another designate, then its obligations under Rule 30(b)(6) obviously cease, since the rule requires testimony only as to 'matters known or reasonably available to the organization.'").

In their Notice of Deposition, the plaintiffs identified six categories of information upon which they sought BBA's knowledge. The only Area of Inquiry that the plaintiffs have identified as not having been addressed to their satisfaction is "Area of Inquiry No. 3 – all AWPIDs manufactured, distributed, marketed or sold by the three B. Braun entities in plaintiffs' amended notice – with regard to BBM." (Mem. in Support of Pls.' Mot. to Compel at 8.) Thus, there is no dispute that BBA fulfilled its obligations with regard to the remaining Areas of Inquiry in the 30(b)(6) Notice, including Area of Inquiry No. 3 to the extent the plaintiffs sought information about BBA.[1]

BBA fully disclosed its knowledge with regard to Area of Inquiry No. 3. Specifically, BBA's designee testified that BBA "does not sell any products" (Codrea Dep. at 61:15-16), that "B. Braun of America does not manufacture any drugs" and has not done so from 1991 to the present (*id.* at 45:16-21), that BBA "does not distribute any drugs" (*id.* at 45:22-46:2), that BBA "does not sell any drugs" (*id.* at 46:3-4), that BBA "does not market or advertise any drugs" (*id.* at 46:5-8), and that she was not aware of any "sales, advertising, marketing, distribution, or manufacturing of AWPID's into Massachusetts" by BBA (*id.* at 61:1-5). As Ms. Codrea

---

[1]  Plaintiffs' suggestion that BBA "failed to appear" at the deposition because of the alleged inability of Ms. Codrea to address this Area of Inquiry to the plaintiffs' satisfaction (Mem. in Support of Pls.' Mot. to Compel at 7), is insupportable. In *United States v. Mass. Indus. Fin. Agency*, 162 F.R.D. 410, 412 (D. Mass. 1995), the court rejected a similar attempt to claim that a 30(b)(6) designee's "inability to fully testify on all the topics set forth in the notice was tantamount to a complete failure of the agency to appear."



explained, "B. Braun of America is a company that holds stock. It does not operate a business. It does not sell any products. It does not have any employees. It holds stock." (*Id.* at 61:13-17.)

Ms. Codrea also provided the plaintiffs with BBA's knowledge concerning "B. Braun McGaw, Inc." and B. Braun Medical Inc. With regard to the non-existent corporation that the plaintiffs call "B. Braun McGaw, Inc.," Ms. Codrea testified that it "is not a legal entity" (*id.* at 25:22-26:1), and that, as a result, she could not address any questions relating to "B. Braun McGaw, Inc." (*id.* at 46:13-15). With regard to BBM, Ms. Codrea explained that "B. Braun of America Inc. does not receive specific information on a drug-by-drug basis from B. Braun Medical Inc." (*id.* at 50:22-51:3), which meant that BBA "has no knowledge o[n] the drug-by-drug basis" that plaintiffs' counsel was seeking (*id.* at 54:3-5). Ms. Codrea fully disclosed all information known to BBA relating to these matters; as the designated representative of BBA, she could not do more. Moreover, to the extent the plaintiffs need confirmation that BBM, and not BBA, is the manufacturer of the products at issue, they need only turn to the Answer filed by BBA to the AMCC in April 2004, where BBA explicitly admits that BBM is the manufacturer of the products identified as the basis for the plaintiffs' claims against BBA. (BBA's Answer to AMCC ¶ 314.)

The plaintiffs offer two grounds for their claim that BBA failed to comply with the Notice of Deposition with regard to Area of Inquiry No. 3: (1) BBA refused to provide information that was not known to it but was known solely to its subsidiary, B. Braun Medical Inc.; and (2) Ms. Codrea refused to provide information relating to BBM as protected by the attorney-client privilege. Because BBA's uncontested objections to the Notice of Deposition limited the scope of the 30(b)(6) deposition specifically with regard to both of these areas of

14



inquiry and because BBA's position on both of these issues is legally correct, the plaintiffs' motion is without merit.

### A.   BBA Fully Complied With Its Obligations Under Rule 30(b)(6) and Provided All Information Known to It.

In its Objections to the plaintiffs' Notice of Deposition, BBA expressly stated that it "objects to the Notice of Deposition to the extent it seeks information beyond 'matters known or reasonably available' to BBA, such as matters concerning other entities but not BBA." (BBA's Corrected Obj. ¶ 7.)   The plaintiffs did not contest this objection prior to BBA's 30(b)(6) deposition.  BBA also expressly stated that it was designating a 30(b)(6) witness "subject to the following objections," including the above and an objection to disclosing any information protected by the attorney-client privilege.  (*Id.* at 1-2.)  BBA had no obligation to produce a 30(b)(6) witness to testify about the detailed activities of a subsidiary corporation, which is information outside the scope of BBA's knowledge.  *See, e.g., Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co.*, 201 F.R.D. 33, 38 (D. Mass. 2001) (If the corporate representatives "reviewed the available documentation" and there was no one at the corporation who knew the answers, then the corporation's "obligations under Rule 30(b)(6) cease."); *Dravo Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 76 (D. Neb. 1995) ("If [the corporation] does not possess such knowledge . . . then its obligations under Rule 30(b)(6) obviously cease . . . .'") .

Moreover, the plaintiffs cannot establish through controlling case law or rule that BBA was obligated to educate itself about the details of the operations of its subsidiary corporation in order to respond to the 30(b)(6) Notice.  The only support the plaintiffs offer for their claim is a single unpublished decision, *Twentieth Century Fox Film Corp. v. Marvel Enter., Inc.*, 2002 WL 1835439 (S.D.N.Y. Aug. 8, 2002), in which the Court notes that "[n]either the parties' research



nor my own has found any authority directly addressing the specific question of whether a corporation receiving a Rule 30(b)(6) notice is obligated to prepare its witness with both the entity's own knowledge and the knowledge of its subsidiaries and affiliates," *id.* at *3.[2]  But this unpublished opinion ignores the general principle, premised on the text of Rule 30(b)(6) itself, that a corporation's obligations "cease" when its designee provides information within its own knowledge. *See Calzatturficio S.C.A.R..P.A. s.p.a.*, 201 F.R.D. at 38; *Dravo Corp.*, 164 F.R.D. at 76.  In any event, one unpublished decision is hardly sufficient to justify a motion to compel, especially where, as here, the plaintiffs failed to seek the information directly from the subsidiary corporation through a third-party deposition.[3]

The plaintiffs' argument that BBA had an obligation to educate itself about the minute details of the operations of BBM completely disregards corporate distinctions.  Under the plaintiffs' theory, a party can submit a single 30(b)(6) notice to one of dozens of related corporations and thereby gather all the information known to all of the corporations, with no consideration for corporate separateness, the ease of gathering the information directly from the individual corporations, or the limited information known to any one of the corporations.  The

---

[2]  The plaintiffs also cite to *Green Constr. Co. v. Kansas Power and Light Co.*, 1990 WL 120925 (D. Kan. July 9, 1990), (Mem. in Support of Pls.' Mot. to Compel at 10), but that case is inapposite.  Although the Court did allow the 30(b)(6) deposition to go forward on "matters regarding Green Holdings' conduct with its other subsidiaries," *Green Constr.*, 1990 WL 120925, at *1, nothing in the decision indicated or directed that the 30(b)(6) designee would be required to obtain information from its subsidiaries or testify about information not known to the corporation being deposed.

[3]  The plaintiffs claim that, because BBA stated a willingness to produce documents obtained from its subsidiary corporation in response to the plaintiffs' specific requests for the production of documents, it must also have access to all other information known to BBM. (Mem. in Support of Pls.' Mot. to Compel at 10-11.)  Once again, the plaintiffs are misstating the facts.  As BBA made clear in its Objections and Responses to the plaintiffs' requests for the production of documents, BBA *requested* that BBM treat the document requests as if they were directed toward BBM; BBA did not "instruct" BBM to produce documents, as alleged by the plaintiffs. (*Id.* at 10; *see also* BBA's Obj. and Resp. to Ps.' Omnibus Req. for Prod. at 1.)  Other than the fact that BBA owns the stock of BBM, the plaintiffs have offered absolutely no basis for their claim that BBA has access to all information known to BBM, as would be required to satisfy the plaintiffs' apparent expectations of a 30(b)(6) designee.

16



plaintiffs' reconstruction of Rule 30(b)(6) would create an almost-insurmountable burden for any

corporation in any case, and an impossibility for BBA in this litigation, given the thirteen days it

had to prepare for this 30(b)(6) deposition.

### B.    BBA Did Not Improperly Invoke the Attorney-Client Privilege.

The plaintiffs also claim that BBA failed to comply with the Notice of Deposition by

refusing to divulge information protected by the attorney-client privilege. As Ms. Codrea and

counsel for BBA made clear, Ms. Codrea was designated to offer testimony regarding BBA's

knowledge of the Areas of Inquiry, and not to provide any information solely known to BBM.

When the plaintiffs attempted to circumvent this objection by seeking information known to Ms.

Codrea in her individual capacity – a basis upon which she was not called to testify – Ms. Codrea

informed the plaintiffs that she could not provide that information without also violating the

attorney-client privilege. Ms. Codrea was not refusing to provide information *known to BBA* on

the grounds that it was protected from disclosure by the attorney-client privilege; thus, the

plaintiffs have no basis for claiming that BBA was using the privilege to "hide" information

properly within the scope of the 30(b)(6) deposition.[4]

Further, the information sought from Ms. Codrea, such as the products sold by BBM in

each State and the role of employees in actions occurring long before Ms. Codrea began her

employment at BBM, was information known to her *solely* as a result of her role as in-house

---

[4]    The plaintiffs' cases are not to the contrary, but they deal with the situation of where in-house counsel for the
corporation being deposed was designated to speak on behalf *of that corporation. See, e.g., Sony Elec., Inc. v.
Soundview Tech., Inc.*, 217 F.R.D. 104, 109-110 (D. Conn. 2002) ("When general counsel is designated by a
party as one of its Rule 30(b)(6) witnesses the witness is required to testify about the business operations of the
corporation to the extent he is knowledgeable about the operations, irrespective of the fact that he also serves as
legal adviser for the corporation."). Ms. Codrea was not designated to testify on behalf of BBM, and BBM did
not waive its attorney-client privilege precluding disclosure of information given to Ms. Codrea for the purpose
of seeking legal advice.



counsel for BBM rendering legal advice relating to this litigation and other similar investigations.[5]  Although the facts may not be privileged if sought from another witness, asking Ms. Codrea to testify to these issues goes directly to the heart of the attorney-client privilege. *See Savoy v. Richard A. Carrier Trucking, Inc.*, 176 F.R.D. 10, 13 (D. Mass. 1997) ("As the Supreme Court has indicated, the attorney-client privilege 'exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.'") (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981)).  Clearly, a lawyer cannot be asked to disclose what information she has been provided for the purpose of rendering legal advice. *See id.* at 13 ("The shelter afforded by the attorney-client privilege, however, 'only protects disclosure of communications . . . .'" (quoting *Upjohn*, 449 U.S. at 395)).  Unless the information was obtained through means other than her legal work for that client, the attorney cannot disclose any facts relating to her client without revealing information *that was provided to counsel for the purpose of seeking legal advice.*

**C.     The Plaintiffs Have Not Been Deprived of Any Information Relevant to the Issue of this Court's Lack of Jurisdiction Over BBA.**

In the end, the plaintiffs' gripe is that they were not allowed to seek information not known or reasonably available to BBA and also not relevant to the jurisdictional issue presented by BBA's Motion to Dismiss.  None of this justifies the plaintiffs' Motion to Compel.  Specific information on the individual products manufactured and sold by BBM is well outside the

---

[5]   Although the plaintiffs assert that Ms. Codrea's testimony that she does not engage in non-legal work at BBM is "not credible" (Mem. in Support of Pls.' Mot. to Compel at 13), they have no basis for disputing the veracity of this testimony.



knowledge of BBA and has no bearing on the Court's lack of jurisdiction over BBA. As a result, BBA's 30(b)(6) designee had no obligation to offer any testimony with regard to this subject.

The plaintiffs' claims of gamesmanship by Ms. Codrea are not well taken. Plaintiffs' counsel's questions were often vague and confusing, intermingling BBA and BBM and seeking information that would not be known to any 30(b)(6) designee, such as the number of "regular meetings" attended at BBM by BBA officers and directors, some of whom, as Ms. Codrea explained, held positions in both corporations. Tellingly, other than quibbling that Ms. Codrea could not answer detailed questions whether BBM manufactures specific products based on their NDC codes, the plaintiffs have not identified a single question from her deposition that they believe BBA failed to address. (Mem. in Support of Pls.' Mot. to Compel at 8.) And this quibble is frivolous, as BBA expressly admitted that BBM manufactures the products at issue in this litigation more than four months ago. (BBA's Answer to AMCC ¶ 314.)

At bottom, the information that the plaintiffs claim was withheld from them – namely, information on the sales and distribution of pharmaceutical products by BBM – is wholly irrelevant to the issues presently before the Court. As noted, the plaintiffs chose to abandon any claims they had against BBM in favor of pursuing claims against BBA. More than a year ago, BBA moved to dismiss those claims on the ground that the Court lacked personal jurisdiction over BBA. The question currently pending before the Court is whether BBA has sufficient contacts with the forum state to justify the exercise of personal jurisdiction. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) ("Each defendant's contacts with the forum State must be assessed individually."). The overwhelming and undisputed evidence shows that BBA has no contacts whatsoever with the Commonwealth of Massachusetts. (*See* Decl. of Charles A. DiNardo, Attach. to BBA Mem. in Support of Mot. to Dismiss AMCC);

19

Codrea Dep. at 60:5-62:18.)  As a result, there is no basis for exerting jurisdiction over BBA. And no information on the day-to-day operational activities of BBM – information that is outside the scope of BBA's corporate knowledge – has any impact on that issue. *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1091 (1st Cir. 1992) ("Ordinarily, courts respect the legal independence of a corporation and its subsidiary when determining if a court's jurisdiction over the offspring begets jurisdiction over the parent.").

BBA fully complied with its obligations under Rule 30(b)(6).  BBA's designee answered every question with regard to the knowledge of BBA and provided all the information requested by the plaintiffs that was known to BBA.  The information that the plaintiffs claim to seek has no relevance to the issue before the Court or to this litigation, as the plaintiffs' claims against BBM have already been dismissed.  The plaintiffs have offered no evidence to refute these facts, which preclude any motion to compel.  As a result, the plaintiffs' motion should be denied.

## CONCLUSION

For the reasons stated herein, the plaintiffs' Motion to Compel B. Braun of America to Make Supplemental Rule 30(b)(6) Designation should be denied.

Dated: September 10, 2004                    Respectfully submitted,


                                             ____s/ Colin R. Kass_____
                                             Daniel F. Attridge, P.C.
                                             Colin R. Kass
                                             KIRKLAND & ELLIS LLP
                                             655 Fifteenth Street, N.W., Suite 1200
                                             Washington, D.C. 20005
                                             Telephone:  (202) 879-5000
                                             Facsimile:  (202) 879-5200

                                             *Counsel for B. Braun of America Inc.*



E-SERVED
09/10/04
06:22 PM ET
AWP-MDL NO. 1456

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY )     MDL No. 1456
AVERAGE WHOLESALE PRICE         )
LITIGATION                      )     CIVIL ACTION: 01-CV-12257-PBS
                                )
THIS DOCUMENT RELATES TO:       )
                                )     Judge Patti B. Saris
ALL ACTIONS                     )

APPENDIX OF UNREPORTED AUTHORITY IN SUPPORT OF
B. BRAUN OF AMERICA INC.'S OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL B. BRAUN OF AMERICA TO MAKE
SUPPLEMENTAL RULE 30(B)(6) DESIGNATION

1.  *Divot Golf Corp. v. Citizens Bank of Mass.*, No. 02-CV-10654, 2003 WL 61287 (D. Mass. Jan. 8, 2003)

2.  *Yoon v. Celebrity Cruises, Inc.*, No. 97 CIV 3808, 1999 WL 135222 (S.D.N.Y. March 12, 1999)

3.  *PRescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, No. 96 Civ. 7590, 1998 WL 67672 (S.D.N.Y. Feb. 18, 1998)

4.  *Porter v. Brancato*, No. 96-2208, 1997 WL 150050 (D. Kan. Feb. 24, 1997)

5.  *SmithKline Beecham Corp. v. Apotex Corp.*, No. 99-CV-04304, 2004 WL 739959 (E.D. Pa. March 23, 2004)





Not Reported in F.Supp.2d
2003 WL 61287 (D.Mass.), RICO Bus.Disp.Guide 10,398
(Cite as: 2003 WL 61287 (D.Mass.))

Page 1

**H**
Motions, Pleadings and Filings

United States District Court,
D. Massachusetts.

DIVOT GOLF CORPORATION f/k/a Brassie Golf
Corporation and Joseph R. Cellura,
Plaintiffs,
v.
CITIZENS BANK OF MASSACHUSETTS, et al.,
Defendants.

No. Civ.A.02-CV-10654-PB.

Jan. 8, 2003.

MEMORANDUM AND ORDER

SARIS, J.

INTRODUCTION

*1 The parties have filed cross-motions for sanctions under Federal Rule of Civil Procedure 11 ("Rule 11"). After hearing, defendants' motion is *ALLOWED* and plaintiffs' motion is *DENIED*.

BACKGROUND

This case was originally filed in the Middle District of Florida, Tampa Division. In Florida, defendants Citizens Bank, Michael Bulman, and Patrick Joyce [FN1] filed a motion to dismiss and a motion for Rule 11 sanctions. The Florida court transferred the case to this court, without ruling on defendants' motions to dismiss and for sanctions.

> FN1. Bulman and Joyce are loan officers at Citizens.

At a post-transfer status conference on May 13, 2002, this Court denied defendants' motions without prejudice, and ordered the plaintiffs to redraft the Complaint for clarity. On June 13, 2002, plaintiffs filed an Amended Complaint. On July 12, 2002 Citizens, Bulman, and Joyce again moved to dismiss, and on August 5, 2002, they again moved for sanctions. On August 19, 2002, plaintiffs cross-moved for sanctions. On November 26, 2002, the Court issued an Order allowing defendants' motion to dismiss. On December 19, 2002, the Court held a hearing on the cross-motions for sanctions.

DISCUSSION

I. Defendants' Rule 11 Motion

A. Merits Analysis

Rule 11 states, in pertinent part:
> (b) Representations to Court. By submitting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after a reasonable inquiry under the circumstances, -
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed.R.Civ.P. 11(b). Rule 11 "require[s] litigants to 'stop-and-think' before initially making legal or factual contentions." *Id.,* advisory committee notes to 1993 Amendments.

Defendants Citizens, Bulman, and Joyce describe this suit as "truly frivolous," "factually inaccurate," and "legally meritless," and request sanctions. (Mem. of Law in Supp. of Mot. for Sanctions (Docket No. 41) at 1.) The Court holds that sanctions are appropriate, because plaintiffs' counsel Douglas R. Dollinger failed his Rule 11 duty to make a reasonable inquiry into the facts and law before filing the Amended Complaint, despite being put on notice by defendants of serious factual and legal deficiencies in the original Complaint.

1. Plaintiffs' Repetition of Factual Misstatements

*2 The central claims in both the Complaint and the Amended Complaint were under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962 et seq.. The gravamen of the claims was that defendants participated in a scheme (or, in RICO parlance, an "enterprise") to seize control of Miller Golf, Inc. from plaintiff Divot Golf Corporation. The linchpin of the alleged scheme was Citizens' provision of a line of credit to Miller Golf, replacing Fleet Bank's pre-existing line of credit. The Amended Complaint alleges that the Citizens' line of credit imposed new restrictions on Miller Golf's finances, and that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



defendants used these restrictions to subvert Divot Golf's ownership of Miller Golf. [FN2]

> FN2. For example, paragraph 196(b) of the Amended Complaint (Docket No. 25) alleges that defendants "offered to substitute the Fleet Bank line of credit with one supplied by CITIZENS BANK, all the while knowing that such substitution ... would also provide Defendants with the means necessary to exercise economic control of MILLER so as to ultimately strip DIVOT of its ownership interest in MILLER." Paragraph 44 describes the Citizens line of credit's requirement of bank approval for loans, dividends, or advances to affiliates greater than $100,000, and paragraph 45 falsely alleges that prior to the line-of-credit substitution, "no such covenant or restriction existed."

But in fact, "comparison of the Citizens and Fleet lines of credit reveals that the Citizens line of credit was not more onerous or restrictive." (Memorandum and Order (Docket No. 54) at 12.) As the Court stated in its Memorandum and Order:

> In April 1998, Citizens Bank and Bulman issued Miller Golf a $2 million line of credit that prevented Miller Golf from making "any loans, dividends or advances to affiliates greater than $100,000" or "[p]aying any dividends or mak[ing] any distributions ... to any officer, stockholder, or beneficial owner" without Citizens' approval. (Defs.' Ex. B ¶¶ 5.1(m), 5.2(c).) The Citizens line of credit replaced Fleet Bank's ("Fleet") existing line of credit, *which precluded Miller Golf from paying any dividends or distributions or making any loans or advances without Fleet's consent.* (Defs.' Ex. C ¶¶ 24, 26, 40.)

(Docket No. 54 at 5 (emphasis added).)

The Amended Complaint's misstatements regarding the two lines of credit are inexcusable. Plaintiffs' counsel cannot claim ignorance: indeed, the Citizens line-of-credit documentation was an exhibit to the original Complaint. (See Compl. (contained in the original case file, Docket No. 1) at Ex. C.) Moreover, in their initial motion to dismiss, defendants highlighted the disconnect between the Complaint's factual allegations and the actual lines of credit, and attached a copy of the Fleet line-of-credit documentation. (See Mem. of Law in Supp. of Motion to Dismiss (Docket No. 1) at Ex. A.) Nonetheless, the Amended Complaint again alleges that the more-restrictive Citizens line of credit was a critical component of the effort to undermine Divot Golf's control of Miller Golf.

The Amended Complaint's factual misstatements violate Rule 11's mandate that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3). The misstatements are even more egregious given their centrality to the RICO claims, and given that defendants had already shown them to be false.

2. Plaintiffs' Repetition of Legally Untenable Claims

*3 In their original motion to dismiss, defendants stressed that plaintiffs' RICO claims suffered from a number of fatal legal defects, including the failure to allege the requisite pattern of racketeering activity. *See generally H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 237-49 (1989)* (discussing RICO's pattern of racketeering requirement). As defendants stated:

> Here, of course, no [RICO] predicate acts have been pled. But even if the alleged acts were so characterized, the allegations regarding the first enterprise would amount to nothing more than a single scheme, against a single victim, over a short period of time, with no intent of continuing criminal activity. *See Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank, 934 F.2d 976, 981 (8th Cir.1991)* (single transaction which involves only one victim takes place over short period of time does not constitute pattern; complaint dismissed where the case involved, at most, a plan to defraud a single company in connection with a single set of loan agreements).

(Mem. of Law in Supp. of Motion to Dismiss (Docket No. 1) at 29.) By making this argument, defendants placed plaintiffs on notice of a potential infirmity in their RICO claims, one which plaintiffs' counsel should have researched prior to repeating the RICO claims in their Amended Complaint.

Had plaintiffs' counsel conducted such research, he would have found at least one First Circuit case on point, *Efron v. Embassy Suites (Puerto Rico), Inc., 223 F.3d 12 (1st Cir.2000).* In its Memorandum and Order, the Court discussed the lethal effect of this case on plaintiffs' claims:

> A single endeavor of limited duration directed at gaining control over a single company does not amount to a RICO violation. *See Efron, 223 F.3d at 18-19* ("[T]he acts as alleged comprise a single effort, over a finite period of time, to wrest control of a particular partnership from a limited number of its partners. This cannot be a RICO violation."). The *Efron* case is instructive:
> In essence, [plaintiff] alleges a scheme to diminish the value of [a] project in the short run, pressing plaintiff and two others to yield up their interest so that the schemers



could own and control the whole project. Although multiple related acts of deception were claimed to underlay the faxes and mailings, all allegedly were aimed at the single goal of transforming the ownership of the [p]artnership during its early stages.... [T]he finite nature of the racketeering activities alleged here, together with their occurrence over a relatively modest period of time, cannot, in our view, support a jury finding of a RICO pattern under the "closed" continuity approach. Our own precedent firmly rejects RICO liability where "the alleged racketeering acts ... 'taken together ... comprise a single effort' to facilitate a single financial endeavor." 223 F.3d at 18-19; *see also Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.,* 94 F.3d 721, 732 (1st Cir.1996) ("[C]ourts have tended to find RICO 'patterns' only where the defendant's conduct consists of 'multiple criminal episodes' extending over long periods of time." (quoting *Apparel Art Int'l v. Jacobson,* 967 F.2d 720, 724 (1st Cir.1992).

*4 Here, the alleged enterprise engaged in efforts to wrest control of Miller Golf from Divot lasting for at most one year and a half. The activities had a finite nature--they ended when Divot lost its Miller Golf stock through foreclosure--and did not threaten recurrence. The scheme had one victim, and only two or three specified predicate acts of mail fraud. In short, the picture sketched by the Amended Complaint does not adumbrate the long-term, complex, multi-victim criminal conduct with which RICO was concerned. *See Efron,* 233 F.3d at 19 (citing *H.J. Inc.,* 492 U.S. at 242).

(Docket No. 54 at 14-16.) First Circuit case law firmly forecloses RICO claims of the sort brought by plaintiffs. Moreover, the First Circuit is not idiosyncratic on this point. *See Efron,* 223 F .3d at 19 (stating "we find ourselves in good company," and citing similar holdings from other Circuit Courts of Appeals).

It is also troubling that Divot Golf filed this action despite a general release executed in favor of Citizens, and the lack of a reasoned basis for vitiating the release. (*See* Mem. of Law in Supp. of Mot. to Dismiss (Docket No. 29) at Ex. L ¶ 17 (text of release); Memorandum and Order (Docket No. 54) at 8, 10 & n. 2, 17.) As the Court stated in its Memorandum and Order:

Plaintiffs argue that the release is invalid because it was the product of fraud, namely, Citizens' false assertion that Miller Golf was in default. However, to show the release was the product of fraud, plaintiffs would need to show that Divot reasonably relied on a false representation. *Cf. Metro Life Ins. Co. v. Ditmore,* 729 F.2d 1, 4 (1st Cir.1984). Plaintiffs cannot show the requisite reliance, as Divot, represented by counsel, believed the default to be groundless and fabricated when Divot signed the release.

(Docket No. 54 at 17.)

Thus, the RICO claims in the Amended Complaint violate Rule 11's requirement that claims be "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed.R.Civ.P. 11(b)(2). Again, the Court views the Amended Complaint's RICO claims more harshly given that defendants had earlier put plaintiffs on notice of the fatal defects in these claims.

B. Sanctions

Rule 11 sanctions "shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated," but may include "all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." Fed.R.Civ.P. 11(c)(2). Here, defendants seek an award of $81,303.94, based on $76,650.00 in attorneys' fees and $4,653.94 in costs allegedly incurred by defendants in this action.

While attorneys' fees and costs is an appropriate sanction here, the Court finds the requested amount too high, for several reasons. First, the attorneys' fees and costs must be limited to those incurred in connection with defendants' post-transfer motions to dismiss and for sanctions. The Court's finding of a Rule 11 violation is predicated on plaintiffs' *repetition* of factual misstatements and untenable claims in the post-transfer Amended Complaint, even after defendants had put plaintiffs on notice of deficiencies in the original Complaint. Moreover, Mr. Dollinger did not begin serving as plaintiffs' counsel until after the original Complaint was filed, and he cannot be blamed for the original Complaint's flaws.

*5 Second, the number of attorney-hours spent briefing the post-transfer motion to dismiss was excessive. Plaintiffs' counsel's billing records indicate they spent in excess of 30 hours preparing this motion. But the core arguments in this motion were presented in the pre-transfer motion to dismiss. Even accounting for plaintiffs' counsel's need to review the Amended Complaint and research First Circuit case law after the transfer, the Court finds 25 attorney-hours is a reasonable amount of time for briefing the post-transfer motion to dismiss. Plaintiffs' counsel's billing records indicate that they spent approximately five hours preparing the post-transfer motion for sanctions. The Court finds this reasonable. The total number of compensable attorney-hours is 30.

Third, plaintiffs' billing rate of $375/hour--which, by agreement with client, was applicable to all attorneys who

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



worked on the case, regardless of seniority--was too high for this matter. The Court shall apply a billing rate of $250/hour, a billing rate that is commensurate with the level of skill needed to adapt the pre-transfer motion to dismiss to the Amended Complaint.

Fourth, plaintiffs' claimed costs are too high. The plaintiffs' billing records show extraordinary post-transfer photocopying costs--including $988.40 for the month of July 2002--as well as costs for travel and meals. Given that the post-transfer briefing was not voluminous and occurred in defendants' home forum, the Court finds that $100 is a reasonable figure for costs.

With these considerations in mind, the Court calculates the applicable sanctions:

```
 Attorneys' Fees:  30 hours x $250/hr =
$7,500.00
 Costs:
$100.00
-----------------------------------------------
                               TOTAL
$7,600.00
```

The next question is whom to sanction. "The person signing, filing, submitting, or advocating a document has a nondelegable responsibility to the court, and in most situations is the person to be sanctioned for a violation." Fed.R.Civ.P. 11, advisory committee notes to 1993 Amendments. Moreover, where, as here, a predicate for the sanctions is a violation of Rule 11(b)(2), "[m]onetary sanctions may not be awarded against a represented party." Fed.R.Civ.P. 11(c)(2)(A). Thus, the Court imposes the sanctions on Mr. Dollinger, plaintiffs' counsel and the signatory of and oral advocate for the Amended Complaint.

II. Plaintiffs' Rule 11 Motion

Arguably, plaintiffs' Rule 11 motion itself runs afoul of Rule 11. The gist of the motion seems to be that defendants have violated Rule 11 by filing their post-transfer motions. To the contrary, the Court has granted both of defendants' motions. *A fortiori*, plaintiffs' Rule 11 motion must be denied.

ORDER

Motion of Defendants Citizens Bank of Massachusetts, Michael Bulman, and Patrick Joyce for Sanctions (Docket No. 40) is *ALLOWED* . The Court imposes sanctions of $7,600.00 on plaintiffs' counsel Douglas R. Dollinger. Plaintiffs' Cross-Motion for Sanctions (Docket No. 50) is

*DENIED.*

2003 WL 61287 (D.Mass.), RICO Bus.Disp.Guide 10,398

Motions, Pleadings and Filings (Back to top)

• 1:02CV10654 (Docket) (Apr. 08, 2002)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





1999 WL 135222                                                    Page 1
1999 WL 135222 (S.D.N.Y.)
(Cite as: 1999 WL 135222 (S.D.N.Y.))

☞
Only the Westlaw citation is currently available.


United States District Court, S.D. New York.

IN SOOK YOON and MYONG SON YOON, Plaintiffs,
v.
CELEBRITY CRUISES, INC., Celebrity Cruise Services,
Ltd., Atkinson & Mullen
Travel, Inc. d/b/a/ Apple Vacations, and Uniglobe About to
Travel, Inc.,
Defendants.

No. 97 CIV. 3808(DC).

March 12, 1999.

Brody & Brody, Esqs., By Scott A. Brody, Esq., Jericho
Atrium, Jericho, for Plaintiffs.

Stiles & Wright, P.C., Celebrity Cruises, Inc., By Stephen
X. Wright, Esq., New York, for Defendant.

MEMORANDUM DECISION AND ORDER

CHIN, D.J.

*1 In this diversity case, plaintiffs seek damages in
connection with personal injuries allegedly sustained by In
Sook Yoon in a discotheque aboard the ship M/V Meridian
during a cruise from Philadelphia, Pennsylvania to
Bermuda.

Defendant Celebrity Cruises, Inc. ("Celebrity") moves to
dismiss the complaint for discovery abuses and for an award
of attorneys' fees pursuant to Rule 37(b) and (d) of the
Federal Rules of Civil Procedure. Plaintiffs cross-move for
an order compelling Celebrity to respond to plaintiffs'
discovery demands and/or precluding the information not
disclosed, and awarding attorneys' fees pursuant to Rule
37(a) and (c) of the Federal Rules of Civil Procedure. For
the reasons stated below, defendants' motion is granted in
part and denied in part and plaintiffs' cross-motion is denied.

BACKGROUND

On May 22, 1997, plaintiffs In Sook Yoon and her husband,
Myong Son Yoon, filed this action against defendants
Celebrity, Celebrity Cruise Services, Ltd. ("CCSL"),
Atkinson & Mullen Travel, Inc. d/b/a Apple Vacations ("A
& M"), and Uniglobe About to Travel, Inc. ("Uniglobe"),
alleging breach of contract, negligence, and loss of services
claims. Plaintiffs were represented by Thomas M.

O'Connor, Esq. of the law firm Bushell, Kleczka, Minasi &
O'Connor. Defendants, represented by Stephen X. Wright,
Esq. of the law firm Stiles & Wright, P.C., filed an answer
on July 2, 1997 denying the allegations and asserting
affirmative defenses.

A. *Plaintiffs' Alleged Failure to Comply*

1. *Defendant's Initial Requests for Discovery*

On June 30, 1997, defendant served on plaintiffs:
interrogatories, request for production of documents and
things, and notice of depositions. (Wright 6/30/98 Aff. ¶ 5
& Ex. 3). Plaintiffs failed to answer the interrogatories,
respond to the request for production, or appear for the
noticed depositions. (*Id* . ¶ 6). By letter dated November 4,
1997, defendant requested a premotion conference to file a
motion to dismiss because of plaintiffs' failure to comply
with discovery obligations, and because plaintiffs failed to
dismiss the claims against CCSL and A & M. (*Id.* ¶ 7 & Ex.
4). The Court scheduled a premotion conference for
December 12, 1997.

Two days prior to the premotion conference, plaintiffs
answered the interrogatories, responded to the request for
production of documents and things, and provided a
stipulation discontinuing the action against CCSL, A & M,
and Uniglobe. [FN1] (*Id.* ¶ 8). Celebrity contends, however,
that plaintiffs' answers to the interrogatories and responses
to request for production were incomplete. (*Id.* ¶ 8 & Ex. 5).

> FN1. On January 26, 1998, the Court so ordered
> notices of dismissal without prejudice against A &
> M and Uniglobe, and a notice of dismissal with
> prejudice in favor of CCSL. Celebrity therefore is
> the only remaining defendant.

In explaining the delay, O'Connor states in his affidavit that
due to a contractually shortened statute of limitations, his
firm had to commence this action quickly. (O'Connor Aff. ¶
3). According to O'Connor, Wright "fully understood that
discovery was not going forward while an attempt was
made to resolve the issue as to which [d]efendants were
going to remain in the lawsuit." (*Id.* ¶ 5). While a letter
dated October 21 reveals that Wright agreed to "refrain from
making a motion to dismiss on behalf of A & M" so that
O'Connor would have additional time to determine whether
there was a viable claim against A & M and Uniglobe,
Wright only agreed to refrain until October 31, 1997. (*Id.*
Ex. A). Further, Wright clearly stated that he would "refrain
from making a motion concerning [p]laintiffs' failure to
comply with their discovery obligations until October 31,
1997." (*Id.*).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





1999 WL 135222
1999 WL 135222 (S.D.N.Y.)
(Cite as: 1999 WL 135222 (S.D.N.Y.))

Page 2

### 2. December 12, 1997 Premotion Conference

**\*2** The Court held a premotion conference on December 12, 1997. At the conference, O'Connor agreed to: (1) furnish answers to interrogatories and respond to the request for production in compliance with the Local Civil Rules and the Federal Rules of Civil Procedure; [FN2] and (2) produce plaintiffs for deposition. (Wright 6/30/98 Aff. ¶ 9). The Court ordered all discovery to be completed by April 17, 1998.

> FN2. O'Connor contends that he has no recollection that this issue was discussed at the conference and submits a letter he received from Wright dated December 16, 1997 to support this contention. (O'Connor Aff. ¶ 6 & Ex. B).

#### (a) Interrogatories and Demands

Celebrity asserts that plaintiffs have failed to furnish compliant answers to the interrogatories [FN3] and respond to the request for production. (Wright 6/30/98 Aff. ¶ 10). O'Connor states that in letters dated January 16, 1998 and February 2, 1998, his firm fully responded to the requests identified in a letter O'Connor wrote dated December 16, 1997. (O'Connor Aff. ¶ 7 & Ex. B). O'Connor claims that Wright had not raised any complaints regarding plaintiffs' answers to interrogatories or response to demands prior to the instant motion. (Id. ¶ 7). Plaintiffs' new counsel does not object to supplementing plaintiffs' response if necessary.

> FN3. Celebrity claims, for example, that it has never received answers to interrogatories that are signed by plaintiffs. (Wright Aff. ¶ 10 n. 3).

#### (b) Depositions

Scheduling plaintiffs' depositions has been particularly difficult. During a February 19, 1998 conversation, the attorneys agreed that March 18 and 30 and April 3, 1998 were convenient for plaintiffs' depositions. (Wright 6/30/98 Aff. ¶ 11). In a letter dated February 20, 1998, defendant's attorney wrote to confirm the available dates requesting that plaintiffs' counsel choose one of the dates by February 27, 1998. (Id. Ex. 6). On March 26, 1998, "after several unsuccessful attempts to confirm [p]laintiffs' depositions for March 30, 1998," Wright sent a letter to O'Connor stating that unless advised otherwise, he would assume that plaintiffs would appear for the depositions March 30, 1998. (Id. ¶ 13). Without explanation, plaintiffs failed to appear for their depositions on March 30, 1998. (Id. ¶ 14).

After his February 19, 1998 conversation with Wright,

O'Connor wrote a letter dated February 25, 1998 to his clients, whom he could not reach by telephone. (O'Connor Aff. ¶ 9 & Ex. E). O'Connor did not learn until March 30, 1998 that he was having trouble contacting his clients because Ms. Yoon was "suffering from a serious illness." (Id. ¶ 10). Upon learning of Ms. Yoon's illness, O'Connor sent a letter dated March 30, 1998 to the Court requesting that the time for discovery be extended to July 15, 1998. (O'Connor Aff. Ex. F). The letter explained that Ms. Yoon "is currently suffering from transient ischemic attacks" ("TIAs"), which prevented her from travelling to New York for her deposition. The Court memo endorsed plaintiffs' letter granting the extension of time for discovery. Prior to receiving plaintiffs' March 30 letter, defendant's counsel wrote a letter dated April 2, 1998 to the Court requesting another premotion conference. [FN4]

> FN4. The Court rejects O'Connor's contention that Wright "sought to exploit" Ms. Yoon's illness by requesting a premotion conference on April 2, 1998. (O'Connor Aff. ¶ 11). While Wright may have received plaintiffs' March 30 letter on April 2, the same day he wrote to the Court, Wright's affidavit clearly states that he requested a premotion conference prior to receiving plaintiffs' March 30, 1998 letter. (Wright Aff. ¶ 15).

### 3. May 1, 1998 Premotion Conference

**\*3** The Court held another premotion conference on May 1, 1998. O'Connor's partner, Mark D. Kleczka, Esq., attended the conference. Kleczka stated that TIAs prevented Ms. Yoon from travelling to New York. Kleczka did not explain, however, the impact of the TIAs on Ms. Yoon, why Mr. Yoon failed to appear for his deposition, and why plaintiffs' counsel had not timely responded to Wright's correspondence. O'Connor asserts that Wright did not mention his own failure to comply with discovery requests. (O'Connor Aff. ¶ 12).

During the May 1, 1998 conference, the Court orally ordered plaintiffs' attorney to: (1) produce Mr. Yoon for deposition within two weeks of the conference; (2) provide the name of the physician treating Ms. Yoon for the TIAs and authorizations within two weeks of the conference; (3) provide defendant's attorney, by May 4, 1998, with information concerning Ms. Yoon's TIAs including restrictions, prognosis, and ability to be deposed; and (4) promptly respond to communications from defense counsel.

#### (a) Information Concerning Ms. Yoon's Condition

On May 4, 1998, plaintiffs' attorney agreed to send a letter

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





1999 WL 135222                                                                    Page 3
1999 WL 135222 (S.D.N.Y.)
(Cite as: 1999 WL 135222 (S.D.N.Y.))

to Wright about Ms. Yoon's condition by May 6, 1998. (Wright 6/30/98 Aff. ¶ 17). Defendant's attorney did not receive such a letter on May 6 and therefore wrote a letter to the Court dated May 7, 1998 informing the Court of plaintiffs' failure to comply with the Court's oral order of May 1. (Id. ¶ 17 & Ex. 11). Kleczka then sent a letter dated May 7, 1998 to defendant's attorney. (Id. Ex. 13). Plaintiffs' attorney explained that Ms. Yoon had suffered a stroke in May 1997, was treated for severe back pain in November and December 1997, "was in great discomfort and unable to function or travel," and had been examined for the TIA condition as well as for "a spinal cord and spinal fluid situation." (Id.). The letter further stated that Mr. Yoon was being treated for cancer. (Id.).

(b) *Outstanding Medical Authorizations*

Plaintiffs' attorney did not provide defendant's counsel with medical authorizations for Doctors Lu and Mohedan, two of the doctors mentioned in plaintiffs' May 7, 1998 letter. Doctor Lu treated Ms. Yoon for the severe back pain and Doctor Mohedan evaluated her for the TIA condition. O'Connor asserts that these authorizations were not furnished to defendant because plaintiffs are not claiming that these injuries resulted from the incident on which the instant suit is based. (O'Connor Aff. ¶ 13(b)).

(c) *Depositions*

In his May 7 letter, Kleczka agreed to produce Ms. Yoon for a deposition on May 13, 1998. (Wright 6/30/98 Aff. Ex. 13). Kleczka wrote a letter dated May 8, 1998 to the Court stating that Ms. Yoon was "prepared to appear for her deposition on May 13, 1998." (O'Connor Aff. Ex. H). Plaintiffs' counsel was not certain at that time, however, of Mr. Yoon's availability on that date. (Id. ¶ 14).

In his affidavit, Wright creates the impression that plaintiffs' counsel cancelled the May 13 deposition. The parties agree that they spoke on May 12, 1998 to confirm the date for Ms. Yoon's deposition. (Wright 6/30/98 Aff. ¶ 19; O'Connor Aff. ¶ 16). Wright asserts that during this conversation, "[p]laintiffs' attorney stated that June 10, 11, or 12, 1998 were convenient dates" for Ms. Yoon's deposition. (Wright 6/30/98 Aff. ¶ 19). According to O'Connor, however, it was Wright, not plaintiffs, who was unavailable for the May 13 deposition. (O'Connor Aff. ¶ 16). O'Connor states that both plaintiffs had planned to travel to New York for their depositions. (Id. ¶ 16). Wright contests this assertion and maintains that when he spoke with Kleczka on May 12, Kleczka "stated that he could not confirm that [Ms. Yoon] would appear for the taking of her deposition." (Wright Reply Aff. ¶ 4).

*4 Wright wrote a letter dated May 14, 1998, confirming that he would be available on June 10, 11, or 12, 1998 and requesting that plaintiffs' counsel select one of those dates by May 20, 1998. (Wright 6/30/98 Aff. ¶ 19 & Ex. 14). Wright asserts that plaintiffs' counsel did not respond to his letter. (Id. ¶ 20). Wright left messages for plaintiffs' counsel on May 27 and 29, 1998, which Kleczka did not return until the evening of May 29. (Wright Aff. ¶ 20). In his affidavit, O'Connor states that Kleczka's failure to return Wright's calls earlier was not willful or negligent, but because Kleczka's wife had gone into premature labor. (O'Connor Aff. ¶ 19). Kleczka had not been working normal business hours from May 11 to June 5, 1998 because he was attending to his wife and four children. (Id.).

According to Wright, on May 29, 1998, Kleczka stated that he would advise Wright of another date for depositions and the status of the medical authorizations. (Wright 6/30/98 Aff. ¶ 20). On June 10, 1998, having not received the promised response from plaintiffs' attorney, defendant's attorney advised the Court of plaintiffs' failure to comply with the Court's May 1, 1998 order.

(d) *Plaintiffs' New Counsel*

O'Connor stated in his affidavit that plaintiffs' interests would best be served by the retention of new counsel. (O'Connor Aff. ¶ 20). On July 6, 1998, the Court received a letter dated July 1, 1998 from Scott A. Brody, Esq. of the law firm Brody & Brody. With the letter, Brody included an executed Consent to Change Attorney, which the Court so ordered on July 7, 1998 "on the condition that the present [briefing] schedule remains the same."

B. *Defendant's Alleged Failure to Comply*

O'Connor wrote the Court a letter dated May 8, 1998, in which he described defendant's failure to comply with plaintiffs' discovery demands. (O'Connor Aff. Ex. I). O'Connor explained that plaintiffs served defendant with discovery demands on December 10, 1997 and January 16, 1998, but that defendant had not responded nor requested an extension to respond. O'Connor also complained that Wright had not indicated "when he will make his client available to be deposed or when the ship will be available for inspection." (Id. Ex. I).

In a May 11, 1998 letter, however, O'Connor stated that he remembered that defendant had informed him that the ship had been sold and thus was not available for inspection. (Id. Ex. J). In his May 13, 1998 letter to the Court, Wright stated that plaintiffs' had not noticed any depositions and that plaintiffs' counsel had been advised of the purchaser and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



1999 WL 135222                                                                                            Page 4
1999 WL 135222 (S.D.N.Y.)
(Cite as: 1999 WL 135222 (S.D.N.Y.))

planned itinerary of the ship. (O'Connor Aff. Ex. K).

DISCUSSION
A. *Defendant's Motion to Dismiss*

A district court has broad discretion pursuant to Rule 37(b) of the Federal Rules of Civil Procedure to impose sanctions for discovery abuses. *Friends of Animals Inc. v. United States Surgical Corp.,* 131 F.3d 332, 334 (2d Cir.1997). Any sanctions imposed by a court for failure to comply with discovery obligations, however, must be just and commensurate with the failure to comply. *See* Fed.R.Civ.P. 37(b)(2); *Monaghan v. SZS 33 Assocs., L.P.,* 148 F.R.D. 500 (S.D.N.Y.1993).

*5 A court may impose the drastic sanction of dismissing a complaint. *See, e.g., Friends of Animals,* 131 F.3d 332 (affirming dismissal of complaint); *Davis v. Kauff, McClain & McGuire,* No. 96 Civ. 6850, 1998 WL 50220 (S.D.N.Y. Feb. 5, 1998) (dismissing complaint). This litigation-ending sanction is a severe remedy, however, "to be used only in extreme situations and then only when a court finds 'willfulness, bad faith, or any fault.' " *Bobal v. Rensselaer Polytechnic Inst.,* 916 F.2d 759, 764 (2d Cir.1990) (citation omitted) (quoting *Salahuddin v. Harris,* 782 F.2d 1127, 1132 (2d Cir.1986)), *cert. denied,* 499 U.S. 943 (1991); *Monaghan,* 148 F.R.D. at 509 (stating that drastic sanctions such as dismissing an action "are generally appropriate only when there is some element of culpability ... that is, the party's failure must be willful, in bad faith, or through fault"); *see generally* Jodi Golinsky, Note, *The Second Circuit's Imposition of Litigation-Ending Sanctions for Failures to Comply With Discovery Orders,* 62 Brook. L.Rev. 585, 590-96 (1996) (discussing Rule 37 and Supreme Court precedent on the propriety of imposing litigation-ending sanctions for discovery abuse).

A litigant's culpability is most often demonstrated by "persistent refusal to comply with a discovery order." *Monaghan,* 148 F.R.D. at 509. Defendant cites *Bowmar Instrument Corp. v. Continental Microsystems, Inc.,* 497 F.Supp. 947 (S.D.N.Y.1980), and *Szilvassy v. United States,* 82 F.R.D. 752 (S.D.N.Y.1979), for the proposition that "noncompliance with a court order is not necessary before sanctions may be imposed" pursuant to Rule 37(d). In *Bowmar,* as defendant quotes, the court concluded that the defendants' failure to respond to discovery requests constituted "gross negligence and a willful disregard for the discovery rules," and justified entry of default judgment. *Bowmar,* 497 F.Supp. at 959. The *Szilvassy* court found that plaintiff's repeated failure to respond to discovery requests were severe enough to warrant dismissal. *Szilvassy,* 82 F.R.D. at 757.

Here, plaintiffs have persistently failed to comply with their discovery obligations. They failed to timely respond to defendant's June 30, 1997 requests, responding only after defendant was forced to write to the Court to request a premotion conference and only after the Court scheduled such a conference. They failed to schedule plaintiffs' depositions as counsel discussed on February 19, 1998. They failed to appear for their depositions on March 30, 1998, neglecting even to call. They failed to comply with this Court's May 1, 1998 oral order. And they failed to respond to defendant's counsel's May 14, 1998 letter. These failings have delayed the case and prejudiced defendant.

Nonetheless, the drastic remedy of dismissal is probably not appropriate in view of Ms. Yoon's apparent illness and the fact that plaintiffs' have made some effort to comply. Accordingly, plaintiffs will be given one more chance, and lesser sanctions will be imposed.

*6 Plaintiffs are hereby ORDERED to: (1) produce both plaintiffs for deposition by April 9, 1999; schedule such depositions and confirm the dates in a letter to the Court by March 26, 1999; inform the Court immediately after the depositions are completed; (2) provide defendant with answers to interrogatories that are signed by plaintiffs by March 26, 1999; and (3) pay to defendant attorneys' fees and costs in the amount of $2,500. Further, plaintiffs are hereby warned that the Court will not hesitate to impose further sanctions, including dismissal of the complaint, for failure to comply with this Memorandum Decision and Order.

B. *Plaintiff's Motion to Compel*

Prior to making a motion to compel discovery, the dissatisfied party must in good faith confer or attempt to confer with its adversary. Fed.R.Civ.P. 37(a)(2)(B). This "meet-and-confer" requirement mandates that the parties
    meet, in person or by telephone, and make a genuine effort to resolve the dispute by determining ... what the requesting party is actually seeking; what the discovering party is reasonably capable of producing that is responsive to the request; and what specific genuine issues, if any, cannot be resolved without judicial intervention.
*Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.,* No. 96 Civ. 7590, 1998 WL 67672, at *2-3 (S.D.N.Y. Feb. 18, 1999) (quoting *Deckon v. Chidebere,* No. 93 Civ. 7845, 1994 WL 494885, at *5 (S.D.N.Y. Sept. 9, 1994)); *Tri-Star Pictures, Inc. v. Unger,* 171 F.R.D. 94, 99 (S.D.N.Y.1997). Courts have excused a failure to meet and confer where: (1) under the circumstances, the parties do not have time to attempt to reach an agreement; or (2) an attempt to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



compromise would have been clearly futile. *Prescient, 1998 WL 67672, at \*3.*

On the record presented, the Court is not persuaded that plaintiffs have adequately conferred with defendant to warrant an order to compel discovery, and neither of the exceptions applies. First, plaintiffs have not included a certification with their motion that they have in good faith conferred or attempted to confer with defendant. Second, plaintiffs have not established that they have satisfied the meet-and-confer requirement. Plaintiffs cannot, for example, complain that defendant has not produced a witness for deposition if plaintiffs have not noticed a deposition. Further, defendant's cannot be expected to produce a proper witness pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure if plaintiffs do not "describe with reasonable particularity the matters on which examination is requested." Accordingly, plaintiffs' motion is denied in all respects.

## CONCLUSION

For the reasons set forth above, defendant's motion is denied in part and granted in part and plaintiffs' cross-motion is denied. Plaintiffs shall pay to defendant attorneys' fees and costs in the amount of $2,500. The parties shall complete all discovery by April 30, 1999 and appear for a pretrial conference on that day at 11 a.m. in Courtroom 11A at 500 Pearl Street.

\*7 SO ORDERED.

1999 WL 135222 (S.D.N.Y.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





1998 WL 67672
1998 WL 67672 (S.D.N.Y.)
(Cite as: 1998 WL 67672 (S.D.N.Y.))

Page 1

℃
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

PRESCIENT PARTNERS, L.P., Plaintiff,
v.
FIELDCREST CANNON, INC., Fieldcrest Cannon Sure
Fit, Inc., UTC Holdings, Inc.,
and Bert Shlensky, Defendants/Third Party Plaintiffs,
v.
Paula Riley, Third-Party Defendant.

No. 96 Civ. 7590(DAB)JCF.

Feb. 18, 1998.

Ned W. Branthover, Kathryn Diaz, Morgan & Finnegan, LLP, New York City, Albert P. Allen, Michael D. McCoy, Alston & Bird LLP, Charlotte, NC, Theresa M. Gillis, Jones, Day, Reavis & Pogue, New York City, Brigitte Duffy, Joseph P. McConnell, Morgan, Brown & Joy, Boston, MA.

MEMORANDUM AND ORDER

FRANCIS, Magistrate J.

*1 The plaintiff PRescient Partners and third party defendant Paula Riley (collectively, "PRescient") move for an order under Rule 37(a) of the Federal Rules of Civil Procedure compelling the defendants Fieldcrest Cannon, Inc., Fieldcrest Cannon Sure Fit, Inc., UTC Holdings, Inc., and Bert Shlensky (collectively, the "defendants") to produce various documents and objects requested by PRescient in its first and second requests for production of documents. PRescient also requests an award of attorneys' fees and costs in connection with bringing this motion. In response, the defendants argue that the movants failed to confer with them before filing this motion as required by Rule 37(a). See Fed.R.Civ.P. 37(a)(2)(B). The defendants further request an award of their reasonable expenses incurred in opposing this motion, including attorneys' fees. See Fed.R.Civ.P. 37(a)(4)(B).

In a letter supplementing this motion, PRescient also requests an extension of time to subpoena a witness for a deposition. Letter from Ned Branthover dated Dec. 3, 1997, at 3. For the reasons that follow, the movants' motion to compel and the movants' request for attorneys' fees and costs are denied, the defendants' request for costs is denied, and PRescient's request for an extension of time to serve the subpoena is denied.

*Background*

PRescient owns a patent for a device that stabilizes slipcovers on upholstered furniture. On October 7, 1996, PRescient commenced this action alleging, among other claims, that the defendants infringed the patent and conducted false patent marking when they sold a similar device with their Sure Fit slipcovers and marketed the device as the defendants' "new patented stayput." On October 29, 1996, the defendants filed their answer, along with counterclaims and a Third-Party Complaint against Paula Riley, PRescient's principal.

PRescient served its first request for production of documents on November 4, 1996, and the defendants served their answer on December 11, 1996. Plaintiff's First Request for Production of Documents and Things to Defendants Fieldcrest Cannon, Inc.; Fieldcrest Cannon Sure Fit, Inc. and Bert Schlensky, attached as Exh. 1 to Declaration of Kathryn E. Diaz in Support of Plaintiff's Motion to Compel Defendants to Produce Documents in Response to Plaintiff's First and Second Requests, dated October 31, 1997 ("Diaz Decl."); Answer to Plaintiff's First Request for Production, attached as Exh. 3 to Diaz Decl. PRescient served its second request for production on July 31, 1997, and the defendants served their answer on October 13, 1997. Plaintiff's Second Request for Production of Documents and Things to Defendants Fieldcrest Cannon, Inc., Fieldcrest Cannon Sure Fit, Inc., and Bert Schlensky, attached as Exh. 2 to Diaz Decl.; Response to Plaintiff's Second Request for Production, attached as Exh. 26 to Diaz Decl. After a pretrial conference on October 16, 1997, PRescient filed its motion to compel on October 31, 1997.

*2 On November 18, 1997, I denied PRescient's request to enforce a subpoena on Federated Department Stores, Inc. ("Federated") and its subsidiary Macy's East, Inc. ("Macy's) because the companies represented that (a) they lacked documents responsive to the subpoena as modified by agreement and (b) the only witness with knowledge no longer worked for Federated or its affiliates. Order dated Nov. 18, 1997. Discovery closed on November 28, 1997. On December 1, 1997, the defendants produced what appears to be Macy's marketing material advertising Sure Fit slipcovers with "new patented stayputs." Letter from Ned Branthover dated Dec. 3, 1997, at 3 & Exhs. A, D. This indicated that Federated may have had material responsive to the subpoena, thereby undercutting the rationale for my November 18th denial of PRescient's request to enforce the subpoena. In light of these documents, PRescient now requests an extension of time to subpoena Loretta Groller, who is said to be a former Macy's buyer with relevant knowledge. Letter from Ned Branthover dated Dec. 3, 1997,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





1998 WL 67672
1998 WL 67672 (S.D.N.Y.)
(Cite as: 1998 WL 67672 (S.D.N.Y.))

Page 2

at 3.

*Discussion*

A. *Motion to Compel*

PRescient claims that through depositions and other sources, it learned twenty-three categories of items responsive to its first and second requests for production that the defendants did not produce. *See* Diaz. Decl. at 4-10. The items fall into five broad groupings: (1) physical samples of Sure Fit slipcover packages featuring the allegedly infringing stayputs and physical samples of stayput packages the defendants allegedly intended to sell separately from the slipcovers, (2) marketing materials mentioning stayputs, (3) meeting agendas, minutes, correspondence, and files kept by specified employees of the defendants, as well as computer databases related to PRescient or stayputs, (4) Sure Fit corporate organization charts for 1995, and (5) document retention or destruction programs for the defendant Fieldcrest Cannon. PRescient claims that the defendants failed to comply with Rules 34 and 26(e) of the Federal Rules of Civil Procedure by not producing all responsive items and by not supplementing its prior productions. *See* Fed.R.Civ.P. 26(e) and 34.

In response, the defendants argue that some listed items are not responsive to any previous request for production, some requested documents are privileged, PRescient's requests are overly broad and burdensome, and all responsive documents have been produced from its files and computers. Defendants' Response to Plaintiff's Motion to Compel ("Defendants' Response") at 2-6. The defendants also argue that PRescient failed to confer with them in an attempt to resolve this discovery dispute without court action, a prerequisite to filing a motion to compel. *See* Fed.R.Civ.P. 37(a)(2)(B). I find that PRescient did fail to fulfill this prerequisite and thus do not address the defendants' other arguments.

1. *The Meet-and-Confer Requirement*

Under Rule 37(a)(2)(B) of the Federal Rules of Civil Procedure, a motion to compel must include "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action...." Fed.R.Civ.P. 37(a)(2)(B). A conclusory statement in an affidavit asserting that the movant fulfilled the meet-and-confer requirement is insufficient. *Tri-Star Pictures, Inc. v. Unger,* 171 F.R.D. 94, 99 (S.D.N.Y.1997). Rather, the movant must detail the efforts to confer and explain why they proved fruitless. *See id.; Ballou v.*

*University of Kansas Medical Center,* 159 F.R.D. 558, 559-60 (D.Kan.1994). A "live exchange of ideas and opinions" is required. *Soto v. City of Concord,* 162 F.R.D. 603, 623 (N.D.Cal.1995). The meet-and-confer requirement mandates that parties actually

*3 meet, in person or by telephone, and make a genuine effort to resolve the dispute by determining ... what the requesting party is actually seeking; what the discovering party is reasonably capable of producing that is responsive to the request; and what specific genuine issues, if any, cannot be resolved without judicial intervention.

*Deckon v. Chidebere,* No. 93 Civ. 7845, 1994 WL 494885, at *5 (S.D.N.Y. Sept.9, 1994) *see also Tri-Star Pictures,* 171 F.R.D. at 99.

Courts have excused the failure to meet-and-confer where temporal exigencies required speedy action and where efforts at informal compromise would have been clearly futile. *See Reidy v. Runyan,* 169 F.R.D. 486, 490 (E.D.N.Y.1997) (excusing failure to confer because compromise was unlikely given defendant's history of noncompliance with court orders); *Matsushita Electric Corporation v. 212 Copiers Corp.,* No. 93 Civ. 3243, 1996 WL 87245 at * 1 (S.D.N.Y. Feb.29, 1996) (conference would be futile in bitter litigation which included contempt citations directing the jailing of some defendants for noncompliance with court orders); *In re NASDAQ Market-Makers Antitrust Litigation,* No. 94 Civ. 3996, 1996 WL 187409 at *2 (S.D.N.Y. Apr.18, 1996) (excusing failure to confer in part because of imminence of deadlines for filing papers relating to class certification motion). Under ordinary circumstances however, the failure to meet and confer mandates denial of a motion to compel. *Schick v. Fragin,* Nos. 96 B 42902, 96 B 43969, 96/9218A, 1997 WL 465217 at *3 (Bankr.S.D.N.Y. Aug.12, 1997).

2. *Movants' Efforts*

In her declaration, PRescient's counsel states, "[W]e have conferred in good faith with Defendants in an effort to resolve the issues raised in the motion without court action." Diaz Decl. ¶ 3. In its reply brief, PRescient claims that

[t]hroughout the discovery period—during the inspection of documents and things, on and off the record during depositions, through in-person and telephone conferences with Defendants' counsel, and through correspondence—Plaintiff has sought this material. None of the missing items brought to the Court's attention in Plaintiff's brief are a surprise to Defendants.

Plaintiff's Reply in Support of Its Motion to Compel

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.


("Plaintiff's Reply") at 2. In response, the defendants assert that PRescient never requested the items sought to be compelled, except that an August 19, 1997 letter generally requested a search of computer files and chronological files. Defendant's Response at 2 n. 1.

The August 19th letter simply requests the production of items. Letter from Ned Branthover to Michael McCoy dated Aug. 19, 1997, attached as Exh. 23 to Diaz Decl. It neither states PRescient's plans to file a motion to compel in the event of non-production nor otherwise indicates that the letter was intended to be an act of conferring in accordance with Rule 37(a). Thus, it does not satisfy the duty to confer. See *Soto, 162 F.R.D. at 622-23* ("Sending a letter ... demanding compliance with a discovery request is not what this Court regards as an earnest attempt to 'meet and confer on the issues.'"); *Ballou, 159 F.R.D. at 559-60* ("One letter ... does not satisfy the duty to confer.").

*4 There is evidence that during various depositions, PRescient expressed general concerns that Sure Fit was not producing all documents responsive to the document requests. Letter from Kathryn Diaz to Albert Allan dated July 28, 1997, attached as Exh. 20 to Diaz Decl. (general concerns expressed during depositions); Letter from Kathryn Diaz to Albert Allan dated July 31, 1997, attached as Exh. 22 to Diaz Decl. (during deposition, PRescient expressed concerns that relevant documents contained in computer files were not produced). A letter from defendants' counsel suggests that the defendants responded to these concerns by stating that all responsive documents were already produced. Letter from Albert Allan to Ned Branthover dated August 22, 1997, attached as Exh. 24 to Diaz Decl. ("As I stated prior to Ms. Kramer's deposition ..., we have searched for and produced the documents responsive to your requests.").

As reflected by these letters, these conversations during depositions do not satisfy the requirements of Rule 37(a)(2)(B). PRescient has not shown that the parties specifically discussed the twenty-three categories of items it seeks to have compelled, let alone shown that any negotiations that occurred were a good faith effort to resolve the dispute without court action. To satisfy the meet-and-confer requirement, PRescient had to provide an account of a "live exchange of ideas and opinions," including details such as the positions taken by each side, the extent to which the parties compromised their positions, and why the negotiations proved fruitless. See, e.g., *Tri-Star Pictures, 171 F.R.D. at 99.*

PRescient thus fails to fulfill the meet-and-confer prerequisite to a motion to compel. This failure is not excusable due to temporal exigencies or because efforts at informal compromise would have been clearly futile. Accordingly, the motion to compel is denied, along with PRescient's request for an award of attorneys fees and costs in bringing this motion.

### B. *Defendants' Request for Costs*

The defendants request an award of their reasonable expenses incurred in opposing this motion, including attorneys' fees. Rule 37(a)(4)(B) of the Federal Rules of Civil Procedure provides that if a motion to compel is denied, the court

> shall, after affording an opportunity to be heard, require the moving party or the attorney filing the motion or both of them to pay to the party ... who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney's fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.

Fed.R.Civ.P. 37(a)(4)(B) Because the merits of PRescient's application have yet to be reached, it cannot be determined whether its position was substantially justified. In the event that the parties fail to resolve the dispute through informal conference and the motion to compel is resubmitted, I will reconsider the defendants' motion for costs and attorneys' fees.

### C. *Extension of Time to Subpoena*

*5 Discovery in this case closed on November 28, 1997. PRescient learned of the Macy's marketing material three days later, as a result of the defendants' December 1, 1997 production. On December 3, 1997, PRescient informed the Court that its process server had made several unsuccessful attempts to serve a subpoena on Loretta Groller, who it believes was the Macy's buyer when the store bought Sure Fit slipcovers using the allegedly infringing stayputs, and who appeared to be avoiding service. Letter from Ned Branthover dated Dec. 3, 1997, at 3. More than 60 days have passed since PRescient began attempting to serve Ms. Groller. This was an ample period in which to effect service, and I will therefore not grant any additional time to serve the subpoena.

### *Conclusion*

For the reasons set forth above, PRescient's motion to compel, its request for attorneys' fees and costs, and its request for an extension of time to serve a subpoena on Ms. Groller are denied. The defendants' motion for an award of costs and attorneys' fees is also denied.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





1998 WL 67672                                                                                    Page 4
1998 WL 67672 (S.D.N.Y.)
**(Cite as: 1998 WL 67672 (S.D.N.Y.))**

SO ORDERED.

1998 WL 67672 (S.D.N.Y.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





1997 WL 150050
1997 WL 150050 (D.Kan.)
(Cite as: 1997 WL 150050 (D.Kan.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, D. Kansas.

Rickey PORTER and Kathy Porter, Plaintiffs,
v.
Steven W. BRANCATO, et al., Defendants.

No. CIV.A. 96-2208-KHV.

Feb. 24, 1997.

Jeffrey P. Johnson, Kansas City, MO, for plaintiffs.

Stephen B. Small, Kansas City, MO, for Steven W. Brancato.

William Carr, Kansas City, MO, HAG Automotive Investments, Inc., Hendrick Management Corp., Hendrick Corp., Hendrick Management Co. Ltd. Partnership.

*MEMORANDUM AND ORDER*

VRATIL, District Judge.

*1 This matter comes before the Court on *Defendant Brancato's Motion In Limine* (Doc. # 35) and *Defendant Brancato's Rule 37 Motion Against Plaintiff* (Doc. # 36), each filed December 20, 1996. Both motions seek sanctions on account of plaintiffs' failure to make disclosures required by Rule 26(a), Fed.R.Civ.P. Defendant's motion is without merit and is hereby overruled on the following grounds:

1. The Court ordered the Clerk to enter default against Brancato under Rule 55(a), Fed.R.Civ.P. *Scheduling Order* (Doc. # 8) entered August 27, 1997; see also *Pretrial Order* (Doc. # 32) entered November 18, 1996. As a result, plaintiffs had no obligation to make Rule 26(a) disclosures to him.

2. Defendant has not demonstrated compliance with D.Kan. 37.2 in bringing this motion.

3. Defendant's motion is both substantively deficient and untimely under the *Scheduling Order* (Doc. # 8) entered August 27, 1996, which provided in relevant part as follows:

Motions to compel discovery with accompanying memoranda and in compliance with D. Kan. Rule 7.1, 7.2, 7.3, 7.4, 7.5, 37.1 and 37.2 shall be filed and served within ten (10) days of the default or service of the response, answer or objection which is the subject of the

motions, unless the time for filing of such motions is extended for good cause shown, or the objection to the default, response, answer, or objection shall be waived. The Court generally will not entertain a discovery motion unless counsel for movants has conferred or made reasonable effort to confer with opposing counsel and filed a certificate of compliance in accordance with D. Kan. Rule 37.2. A "reasonable effort to confer" means more than mailing a letter to opposing counsel. It requires that counsel converse, confer, compare views, consult and deliberate.

IT IS THEREFORE ORDERED that *Defendant Brancato's Motion In Limine* (Doc. # 35) and *Defendant Brancato's Rule 37 Motion Against Plaintiff* (Doc. # 36), each filed December 20, 1996, be and hereby are overruled.

1997 WL 150050 (D.Kan.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





Slip Copy
2004 WL 739959 (E.D.Pa.)
(Cite as: 2004 WL 739959 (E.D.Pa.))

Page 1

**H**
Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.

SMITHKLINE BEECHAM CORPORATION, Smithkline
Beecham, P.L.C., Beecham Group,
P.L.C. and Glaxosmithkline, P.L.C.
v.
APOTEX CORPORATION, Apotex, Inc. and Torpharm,
Inc.
v.
PENTECH PHARMACEUTICALS, INC. and Par
Pharmaceuticals, Inc.
SMITHKLINE BEECHAM CORPORATION, Smithkline
Beecham, P.L.C. and Beecham Group,
P.L.C.
v.
GENEVA PHARMACEUTICALS, INC. and Sumika Fine
Chemicals Co., Ltd.
SMITHKLINE BEECHAM CORPORATION, Smithkline
Beecham, P.L.C. and Beecham Group,
P.L.C.
v.
ZENITH GOLDLINE PHARMACEUTICALS, INC. and
Sumika Fine Chemicals Co ., Ltd.
SMITHKLINE BEECHAM CORPORATION, Smithkline
Beecham, P.L.C. and Beecham Group,
P.L.C.
v.
ALPHAPHARM PTY, LTD. and Sumika Fine Chemicals
Co., Ltd.
SMITHKLINE BEECHAM CORPORATION, and
Beecham Group, P.L.C.
v.
ANDRX PHARMACEUTICALS, INC. Andrx
Pharmaceuticals, L.L.C. Basf Corporation,
Basf Pharmachemikalien Gmbh & Co. KG and Knoll Ag.
SMITHKLINE BEECHAM CORPORATION, and
Beecham Group, P.L.C.
v.
TEVA PHARMACEUTICALS USA, INC.

No. 99-CV-4304, 00-CV-4888, 01-CV-0159, 01-CV-2169,
99-CV-2926, 00-CV-5953, 02-
CV-1484, 00-CV-1393, 00-CV-6464, 01-CV-2602,
01-CV-1027, 01-CV-3364, 01-CV-
2981, 03-CV-3365.

March 23, 2004.

Arthur Makadon, Jamie B. Bischoff, Sally A. Steffen,
Ballard Spahr Andrews & Ingersoll LLP, Philadelphia, PA,
Ford F. Farabow, Jr., Walter Y. Boyd, Jr., Finnegan,
Henderson, Farabow, Garrett & Dunner, Atlanta, GA,
Kenneth M. Frankel, Reston, VA, Richard B. Racine,
Robert D. Bajefsky, Finnegan, Henderson, Farabow, Garrett
& Dunner, Washington, DC, for Plaintiffs.

Alan H. Bernstein, Robert S. Silver, Michael J. Berkowitz,
Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd., Francis
P. Devine, III, Pepper Hamilton LLP, Philadelphia, PA,
Hugh L. Moore, Keith D. Parr, Richard P. Beem, Scott B.
Feder, Lord, Bissell & Brook, Chicago, IL, Timothy H.
Gilbert, Lenczner, Slaught, Royce, Smith, Griffing, Toronto
Ontario, Canada, for Defendants.

Jeffrey W. Brennan, Federal Trade Commission,
Washington, DC, for Movant.

Brian T. Feeney, Greenberg Traurig, LLP, Philadelphia, PA,
for Counter Defendant.

*MEMORANDUM AND ORDER*

SURRICK, J.

**\*1** Presently before the Court is the Alphapharm Pty. Ltd.'s
Motion to Compel and for Sanctions under Fed.R.Civ.P. 37
(Doc. No. 54, Civil Action No. 01-1027; Doc. No. 45, Civil
Action No. 01-3364). For the following reasons,
Alphapharm's Motion will be granted in part and denied in
part.

I. BACKGROUND [FN1]

> FN1. Additional background regarding this
> litigation is set forth in the Court's Memoranda and
> Orders dated September 29, 2001, September 30,
> 2002, October 31, 2002, and December 20, 2002.

These consolidated cases involve claims of patent
infringement made by SmithKline Beecham Corporation,
SmithKline Beecham, P.L.C., Beecham Group, P.L.C. and
GlaxoSmithKline, P.L.C. ("SmithKline"). The patents at
issue cover certain forms of paroxetine hydrochloride,
processes for making paroxetine hydrochloride, and uses of
paroxetine hydrochloride. SmithKline manufactures
paroxetine hydrochloride, and then tablets and sells that
product in the United States under the trademark Paxil®
("Paxil"). Paxil is an antidepressant drug used to treat a
variety of disorders, and is one of the most widely
prescribed prescription drugs in the United States. Many of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





Slip Copy
2004 WL 739959 (E.D.Pa.)
(Cite as: 2004 WL 739959 (E.D.Pa.))

Page 2

the Defendants have made various counterclaims against SmithKline, including claims for unfair competition, patent misuse, and monopolization. Many of the Defendants also seek declaratory judgments that they will not infringe SmithKline's patents, and that the patents are invalid.

The dispute presently before the Court is over discovery. Alphapharm noticed SmithKline's deposition pursuant to Fed.R.Civ.P. 30(b)(6) and designated several categories on which Alphapharm desired testimony. Upon receipt of Alphapharm's notice of deposition, SmithKline designated several persons to testify on its behalf. However, SmithKline did not allow those persons to testify about certain matters. Alphapharm then moved to compel SmithKline to answer its questions and for sanctions. In their opposition to Alphapharm's motion to compel, SmithKline argues in part that Alphapharm is improperly trying to obtain legal contentions and expert testimony through Rule 30(b)(6) depositions. We will examine each of the disputed categories and assess SmithKline's reasons for refusing to provide the requested information. SmithKline is the party resisting discovery, and therefore it bears the burden of showing that the information requested is not discoverable. *Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir.1982); *Harner v. Greyhound Lines, Inc.*, No. 02-0088, 2003 WL 147774, at *2 (E.D.Pa. Jan.10, 2003).

II. THE DISPUTED DISCOVERY REQUESTS

A. Category 3

Category 3 of Alphapharm's deposition notice calls for testimony regarding the "[a]nalytical methods suitable for detecting and identifying crystalline forms of paroxetine hydrochloride." (Doc. No. 54, Ex. 1 at 3.) SmithKline prepared a witness to testify about this subject, but its witness refused to answer certain questions about whether or not SmithKline stands by statements in its patents. SmithKline argues that these questions improperly seek legal contentions and expert testimony. In lieu of a Rule 30(b)(6) deposition, SmithKline is willing to answer interrogatories and provide expert discovery concerning Category 3. Alphapharm argues that a Rule 30(b)(6) deposition is appropriate to discover the facts, opinions, and subjective beliefs within SmithKline's corporate knowledge as to the analytical techniques used to distinguish various forms of paroxetine hydrochloride, including those described in SmithKline's patent.

*2 SmithKline's argument requires us to examine the proper use of Rule 30(b)(6) depositions. A corporation can testify only through its agents. Deposing a corporation presents difficulties that Rule 30(b)(6) was enacted to resolve.

*Kanqji v. Phila. Child Guidance Ctr. of Children's Hosp.*, No. 00-937, 2001 WL 708898, at *2 (E.D.Pa. June 20, 2001). Pursuant to Rule 30(b)(6), a party may name a corporation as a deponent and describe with reasonable particularity the matters on which that party wishes the corporation to testify. Fed. R. Civ. P. 30(b)(6). A corporation receiving such a notice must designate a person or persons to testify on its behalf, and the persons so designated must "testify as to matters known or reasonably available" to the corporation. *Id.; see also SmithKline Beecham Corp. v. Apotex Corp.*, No. 98 C 3952, 2000 WL 116082, at *8 (N.D.Ill. Jan.24, 2000) ("Rule 30(b)(6) imposes a duty upon the named business entity to prepare its selected deponent to adequately testify not only on matters known by the deponent, but also on subjects that the entity should reasonably know.").

Alphapharm contends that it has a near absolute right to conduct depositions in lieu of serving written interrogatories. It relies on *Marker v. Union Fidelity Life Ins. Co.*, 125 F.R.D. 121 (M.D.N.C.1989). In *Marker*, the defendant objected to an interrogatory on the grounds that responding to it would be unduly burdensome. The plaintiff then noticed the defendant's deposition pursuant to Rule 30(b)(6) in an attempt to discover the information. The defendant produced a witness, but that witness was not prepared to answer the plaintiff's questions. In opposing the plaintiff's motion to compel, the defendant argued that its answer to the interrogatory negated the plaintiff's need for a deposition. The court rejected this argument, stating, "[n]othing in the Federal Rules of Civil Procedure gives a party the right to not respond or inadequately respond to a Rule 30(b)(6) deposition notice or subpoena request and elect to supply the answers in a written response to an interrogatory. An attempt to so limit a Rule 30(b)(6) deposition is not warranted." *Marker*, 125 F.R.D. at 126. At least two courts within this district have cited *Marker* for this proposition. *See Mellon Bank, N.A. v. Bank of Mid-Jersey*, No. 91-3142, 1992 WL 80800, at *1 (E.D. Pa. Apr. 14, 1992); *Ierardi v. Lorillard, Inc.*, No. 90-7049, 1991 WL 158911, at *1 (E.D. Pa. Aug.13, 1991).

We think *Marker* is distinguishable. In *Marker*, the defendant did not intend to answer the plaintiff's interrogatories or participate in depositions. In this case, SmithKline intends to provide Alphapharm with the discovery it seeks, but contends that with respect to certain matters, interrogatories and expert discovery are more appropriate than depositions. The fact that SmithKline is willing to provide Alphapharm with the information it seeks (albeit not in the form Alphapharm prefers) distinguishes *Marker*. [FN2] In any event, since *Marker* was decided, several courts have stated that in certain circumstances, a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





party may properly resist a Rule 30(b)(6) deposition on the grounds that the information sought is more appropriately discoverable through contention interrogatories. [FN3] *See SmithKline Beecham Corp. v. Apotex Corp.,* 2000 WL 116082, at *8-10 (ordering plaintiffs to answer contention interrogatories with respect to some topics, and to submit to Rule 30(b)(6) depositions with respect to others); *United States v. Taylor,* 166 F.R.D. 356, 363 n. 7 (M.D.N.C.1996) ("Whether a Rule 30(b)(6) deposition or a Rule 33(c) contention interrogatory is more appropriate will be a case by case factual determination."); *Exxon Research & Eng'g Co. v. United States,* 44 Fed. Cl. 597, 601 (Fed.Cl.1999) (holding that under the circumstances contention interrogatories were more appropriate than Rule 30(b)(6) depositions); *McCormick-Morgan, Inc. v. Teledyne Indus., Inc.,* 134 F.R.D. 275, 286 (N.D.Cal.) (stating that the question is "which device would yield most reliably and in the most cost-effective, least burdensome manner information that is sufficiently complete to meet the needs of the parties and the court in a case like this"), *overruled on other grounds by,* 765 F.Supp. 611 (N.D.Cal.1991).

> FN2. This fact also distinguishes *Mellon Bank* and *Jerardi,* because in both those cases the party resisting discovery did not intend to respond to interrogatories or participate in Rule 30(b)(6) depositions.

> FN3. Indeed, the magistrate judge who decided *Marker* recently issued an unpublished opinion in which he ordered that the plaintiff could provide the defendant with certain information through contention interrogatories in lieu of participating in Rule 30(b)(6) depositions. *See SmithKline Beecham Corp. v. Synthon Pharm., Ltd.,* No. 1:00CV01179, slip op. at 16 (M.D.N.C. Nov.19, 2001).

*3 We agree that in some circumstances, courts may order parties to answer contention interrogatories in lieu of participating in Rule 30(b)(6) depositions. Importantly, the Rules permit courts to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including [an order] ... that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery." Fed. R. Civ. P. 26(c); *see also* Fed. R. Civ. P. 1 (stating that the Rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action"). Whether contention interrogatories are more appropriate than Rule 30(b)(6) depositions "will be a case by case factual determination." *Taylor,* 166 F.R.D. at 363 n. 7. In making this determination

we will be guided by "which device would yield most reliably and in the most cost-effective, least burdensome manner information that is sufficiently complete to meet the needs of the parties and the court in a case like this." *McCormick-Morgan,* 134 F.R.D. at 286.

With these principals in mind, we now consider which discovery device is most appropriate with respect to the information Alphapharm seeks in Category 3. Although Alphapharm contends that it merely seeks the facts, opinions, and subjective beliefs of SmithKline, our review of the disputed questions reveals that Alphapharm was asking SmithKline's witness to take a legal position with respect to certain statements in SmithKline's patents. It would be very difficult for a non-attorney witness to answer such questions at a deposition. A better method would be for SmithKline to respond to interrogatories because then it would be able to receive input from both its attorneys and other persons familiar with its patents. *See Exxon Research,* 44 Fed. Cl. at 601 (holding that contention interrogatories were more appropriate than depositions to inquire about claim construction). Accordingly, we will require SmithKline to respond to Category 3 through interrogatories. [FN4]

> FN4. Alphapharm also complains that SmithKline's witness refused to answer questions about suitable analytical techniques for detecting and identifying crystalline forms of paroxetine hydrochloride. SmithKline claims in one of its patents that the different forms of paroxetine hydrochloride anhydrate can be differentiated from one another based on various analytical techniques. Alphapharm is interested in identifying those techniques. Alphapharm's inquiry appears to be related to claim construction. Interrogatories are a more appropriate form of discovery for issues related to claim construction. *See Exxon Research,* 44 Fed. Cl. at 601.

**B. Category 7**

Category 7 of Alphapharm's deposition notice calls for testimony regarding "[t]he analytical distinctions of Form A over the prior art cited during prosecution of the '423 Form A patent." (Doc. No. 54, Ex. 1 at 3.) There appears to be some confusion among the parties with respect to SmithKline's willingness to prepare a witness to testify about this category. SmithKline contends that its witness was prepared to testify about Category 7, but that Alphapharm prematurely ended the deposition. However, SmithKline objects to Alphapharm's attempts to question its witness about its legal positions regarding its '423 patent

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





Slip Copy
2004 WL 739959 (E.D.Pa.)
(Cite as: 2004 WL 739959 (E.D.Pa.))

Page 4

application. Our review of the disputed questions reveals that Alphapharm was asking SmithKline's witness to state legal positions. A more appropriate way for Alphapharm to obtain SmithKline's legal position is through interrogatories. See *Exxon Research,* 44 Fed. Cl. at 601.

## C. Category 8

*4 Category 8 of Alphapharm's deposition notice calls for testimony regarding the "[t]he bases for [SmithKline's] allegations in its complaints filed in these consolidated actions that Alphapharm infringes and will infringe the patents asserted in those complaints ." (Doc. No. 54, Ex. 1 at 3.) Alphapharm is trying to discover SmithKline's legal contentions. Interrogatories are a more appropriate method of discovery for this purpose. See *In re: Indep. Serv. Org. Antitrust Litig.,* 168 F.R.D. 651, 654 (D.Kan.1996) (rejecting attempt to use a Rule 30(b)(6) deposition to discover the factual bases of the defendant's defenses and counterclaims because the information sought was discoverable through other, less burdensome means); *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co.,* No. 90 Civ. 7811(KC), 1993 WL 34678, at *3 (S.D.N.Y. Feb.4, 1993) (same).

## D. Category 1

Category 1 of Alphapharm's deposition notice calls for testimony regarding "[t]he conditions under which particular forms of paroxetine, including without limitation paroxetine hydrochloride anhydrate, allegedly convert to paroxetine hydrochloride hemihydrate ." (Doc. No. 54, Ex. 1 at 3.) SmithKline prepared a witness to testify on this subject and that witness testified at length about the various ways in which paroxetine hydrochloride anhydrate can convert to paroxetine hydrochloride hemihydrate. However, SmithKline's witness was not prepared to testify about the conditions under which this conversion can occur inside the human body.

According to Alphapharm, SmithKline has taken the position that paroxetine hydrochloride can convert to a different form inside the body, and has publicly alleged infringement of its patents based on in vivo conversion. See, e.g., *SmithKline Beecham Corp. v. Apotex Corp.,* 247 F.Supp.2d 1011, 1014-15 (N.D.Ill.2003) (discussing SmithKline's claim that its paroxetine hydrochloride hemihydrate patent could be infringed if paroxetine hyrochloride anhydrate converted to a different form inside a person's stomach). SmithKline does not dispute this assertion. However, SmithKline claims that questions about in vivo conversion of paroxetine hydrochloride require expert testimony, and that such testimony is premature. We

disagree. If SmithKline has concluded that its patents are infringed when paroxetine hydrochloride converts to a different form inside the body, it must have some basis for that belief, and Alphapharm is entitled to discover that information. See *AMP Inc. v. Melox Inc.,* 227 U.S.P.Q. 172, 172 (N.D.Ill.1985) (stating that "the court doubts that no non-expert representative could testify [about the basis for plaintiff's infringement claims], since plaintiff's agents and representatives made the decision to file this lawsuit"). Accordingly, SmithKline is ordered to prepare a witness to testify to the matters described in Category 1.

## E. Category 5

Category 5 of Alphapharm's deposition notice calls for testimony regarding the "[t]he mechanisms and natural history of 'universal' and 'local' seeding by paroxetine hydrochloride hemihydrate, including the potential as of today for obtaining paroxetine hydrochloride free of the hemihydrate." [FN5] (Doc. No. 54, Ex. 1 at 3.) SmithKline prepared a witness to testify on this subject, but that witness refused to answer a question about whether or not SmithKline sent any paroxetine hydrochloride hemihydrate to the United States in 1985. SmithKline contends that Alphapharm wants this information to show that SmithKline's clinical trials in the United States constituted a public use of its paroxetine hydrochloride hemihydrate invention under 35 U.S.C. § 102(b). SmithKline notes that another court has ruled that SmithKline's clinical trials did not constitute a public use of paroxetine hydrochloride hemihydrate. See *SmithKline Beecham Corp. v. Apotex Corp.,* 286 F.Supp.2d 925, 932-38 (N.D.Ill.2001). However, Alphapharm was not a party to this litigation, and SmithKline does not argue that Alphapharm is bound by that determination. Alphapharm is entitled to discover facts relevant to whether SmithKline's paroxetine hydrochloride hemihydrate patent is invalid because of public use or prior art. See *SmithKline Beecham Corp. v. Apotex Corp.,* 2000 WL 116082, at *10 (ordering SmithKline to produce a 30(b)(6) witness to testify on prior art bearing on the validity and enforceability of its patent). [FN6] Accordingly, SmithKline is ordered to prepare a witness to testify to the matters described in Category 5.

> FN5. "Seeding" refers to the spread of particles of paroxetine hydrochloride hemihydrate. SmithKline has taken the position in other litigation involving its Paxil patents that tiny bits of paroxetine hydrochloride hemihydrate can contaminate facilities that produce paroxetine hydrochloride anyhdrate, with the result that those facilities can no longer produce paroxetine hydrochloride anyhdrate. See *SmithKline Beecham Corp. v.*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





Slip Copy                                                                                                          Page 5
2004 WL 739959 (E.D.Pa.)
(Cite as: 2004 WL 739959 (E.D.Pa.))

*Apotex Corp.*, 247 F.Supp.2d at 1020-21.

FN6. We also reject SmithKline's argument that it
should not have to prepare a witness to testify on
Category 5 because it already produced to
Alphapharm information regarding seeding
generated during other litigation. SmithKline has
not convinced the Court that the information it
already produced to Alphapharm eliminates the
need for a deposition on Category 5.

III. ALPHAPHARM'S MOTION FOR SANCTIONS

*5 Because we have denied in part Alphapharm's motion to
compel, we find that SmithKline's opposition to that motion
was substantially justified. Accordingly, we will deny
Alphapharm's motion for sanctions. *See* Fed. R. Civ. P.
37(a)(4).

An appropriate Order follows.

<div align="center">ORDER</div>

AND NOW, this 23rd day of March, 2004, upon
consideration of Alphapharm Pty. Ltd.'s Motion to Compel
and for Sanctions under Fed.R.Civ.P. 37 (Doc. No. 54, Civil
Action No. 01-1027; Doc. No. 45, Civil Action No.
01-3364), it is ORDERED that:
    1. SmithKline is ORDERED to respond to Categories 3,
7, and 8 of Alphapharm's deposition notice through
interrogatories.
    2. SmithKline is ORDERED to designate and prepare
witnesses to testify on its behalf with respect to
Categories 1 and 5 of Alphapharm's deposition notice.
    3. Alphapharm's Motion for Sanctions is DENIED.

IT IS SO ORDERED.

2004 WL 739959 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

• 2:03CV03365 (Docket) (May. 29, 2003)

• 2003 WL 22023358 (Trial Motion, Memorandum and
Affidavit) Memorandum of Law of Federal
tradecommission as Amicus Curiae Concerning
Torpharm%7Ds Cross Motion for Entry of an Amended
Order (Jan. 28, 2003)

• 2:02CV01484 (Docket) (Mar. 22, 2002)

• 2:01MJ01027 (Docket) (Dec. 17, 2001)

• 2:01M01027 (Docket) (Dec. 17, 2001)

• 2:01CV03364 (Docket) (Jul. 03, 2001)

• 2:01CV02981 (Docket) (Jun. 15, 2001)

• 2:01CV02602 (Docket) (May. 25, 2001)

• 2:01CR00159 (Docket) (Mar. 22, 2001)

• 2:01CV01027 (Docket) (Mar. 01, 2001)

• 2:01CV00159 (Docket) (Jan. 11, 2001)

• 2:00CV06464 (Docket) (Dec. 21, 2000)

• 2:00CV05953 (Docket) (Nov. 22, 2000)

• 2:00CV04888 (Docket) (Sep. 27, 2000)

• 2:00CV01393 (Docket) (Mar. 16, 2000)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



## CERTIFICATE OF SERVICE

This is to certify that true and correct copies of the foregoing B. Braun of America Inc.'s Response to Plaintiffs' Motion to Compel B. Braun of America to Make Supplemental Rule 30(b)(6) Designation and Appendix of Unreported Authority in Support Thereof have been served on all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to Verilaw Technologies for posting and notification to all parties on this 10th day of September, 2004.


_____ s/ Colin R. Kass _____
Daniel F. Attridge, P.C.
Colin R. Kass
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005
(202) 879-5000
Fax: (202) 879-5200

*Counsel for B. Braun of America Inc.*

EXHIBIT B



# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Daniel F. Attridge, P.C.
To Call Writer Directly:
202 879-5012
dattridge@kirkland.com

202 879-5000

www.kirkland.com

Facsimile:
202 879-5200

Dir. Fax: 202 654-9555

September 15, 2004

<u>By Messenger</u>

David Walsh
Henderson Legal Services/
Spherion Deposition Services
1120 G Street, NW
Suite 1010
Washington, DC 20005

Re:    <u>August 17, 2004 Deposition of Cathy Codrea, B. Braun of America Inc.</u>

Dear Mr. Walsh:

Enclosed please find the errata sheet and signature page for the transcript of the August 17, 2004 deposition of B. Braun of America Inc.'s Rule 30(b)(6) designee, Cathy Codrea.

At the time of the deposition, the transcript was designated as "Highly Confidential" under the parties' protective order. Having reviewed the transcript, B. Braun of America Inc. has determined that no confidential treatment is necessary, except for maintaining the "Highly Confidential" designation for Exhibits 8 and 9. Therefore, other than Exhibits 8 and 9 – which shall remain designated as "Highly Confidential" under the parties' protective order, the final deposition transcript should reflect no confidential designation.

Thank you for your prompt attention to this matter.

Sincerely,

Daniel F. Attridge, P.C.

Enclosures

cc:    All Counsel of Record via Verilaw

Chicago          London          Los Angeles          New York          San Francisco



Cathy Codrea                 Highly Confidential                August 17, 2004
                             Bethlehem, PA

2

```
1                             ERRATA
              In Re:  Pharmaceutical Industry
              Average Wholesale Price Litigation
2   CAPTION:_____

3   DATE: August 17, 2004

4   WITNESS: __Cathy Codrea_____

5       I wish to make the following changes, for the following

6   reasons:

7   PAGE  LINE                Insert "With"
8    7    17   CHANGE: before "B. Braun" REASON: Transcribing Error
9    16   11   CHANGE: Delete "America"  REASON: Transcribing Error
10   20   14   CHANGE: "Degoede" to "DeGoede" REASON: Spelling Error
11   22   8    CHANGE: "Hugel" to "Huegel" REASON: Spelling Error
12   24   7    CHANGE: "Hugel" to "Huegel" REASON: Spelling Error
13   24   19   CHANGE: "Hugel" to "Huegel" REASON: Spelling Error
14   26   2    CHANGE: Insert "of" after "Braun" REASON: Transcribing Error
                                      "Medical"
15   26   6    CHANGE: Delete comma after     REASON: Transcribing Error
                                      "stock"
16   27   1    CHANGE: Delete "are" after     REASON: Transcribing Error
17   32   17   CHANGE: "Hugel" to "Huegel" REASON: Spelling Error
18   38   17   CHANGE: "Hugel" to "Huegel" REASON: Spelling Error
19   39   2    CHANGE: "Hugel" to "Huegel" REASON: Spelling Error
20   50   14   CHANGE: "Companies" to "Products" REASON: Transcribing Error
21           CHANGE: _____ REASON: _____
22   ___ ___ CHANGE: _____ REASON: _____
```



Cathy Codrea      Highly Confidential      August 17, 2004
Bethlehem, PA

1

1

2   UNITED STATES OF AMERICA   )

3                              )

4   STATE OF PENNSYLVANIA     )

5

6          I, CATHY CODREA, the witness

7   herein, having read the foregoing testimony of

8   the pages of this deposition, do hereby certify

9   it to be a true and correct transcript, subject

10   to the corrections, if any, shown on the attached

11   page.

12                    oOo

13

14

15                 *Cathy Codrea*

16                CATHY CODREA

17      Notarial Seal
     Mary L. Scott-Perez, Notary Public
     City of Bethlehem, Lehigh County
18      My Commission Expires Jan. 29, 2007
     Member, Pennsylvania Association of Notaries

19

20   Subscribed and sworn to before me

21   this 13th day of September, 2004.

22   *Mary L. Scott-Perez*

EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL. No. 1456 |
| | CIVIL ACTION:  01-CV-12257-PBS |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | |

## PLAINTIFFS' SUPPLEMENT TO THEIR OPPOSITION TO B. BRAUN OF AMERICA'S MOTION TO DISMISS THE AMENDED MASTER CONSOLIDATED COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL B. BRAUN OF AMERICA TO MAKE SUPPLEMENTAL 30(B)(6) DESIGNATION

Plaintiffs, by their attorneys and pursuant to this Court's February 24, 2004 Order, respectfully submit the following Supplement to their opposition to B. Braun of America's ("BBA's") Motion to Dismiss the Amended Master Consolidated Complaint.  In addition, because of BBA's complete failure to investigate certain areas of inquiry identified in plaintiffs' Amended Notice of Rule 30(b)(6) Deposition of B. Braun of America, Inc. Regarding Jurisdictional Issues, and because of BBA's improper refusal to respond to questions on the basis of the attorney-client privilege, plaintiffs also move this Court for an order compelling BBA to make a supplemental 30(b)(6) designation, and for that deposition to occur at BBA's expense.

## I.    Introduction

On February 24, 2004, this Court ordered plaintiffs to "respond to the issues of personal jurisdiction and whether the service of B. Braun of America relates back to the service of B. Braun Medical, Inc. ("BBM")" by August 24, 2004.  In response to this Court's request, plaintiffs submit the following Supplement to their opposition to BBA's motion to dismiss the

Amended Master Consolidated Complaint ("AMCC"), which establishes that the service of BBA relates back to the service of B. Braun Medical, Inc. ("BBM"), as well as the basis upon which this Court may assert personal jurisdiction over BBA.

In addition, in order to gather further information on this Court's jurisdiction over BBA, and to inquire into BBA's claim that it is not the proper B. Braun party to this litigation, plaintiffs noticed the deposition of BBA pursuant to Fed. R. Civ. P. 30(b)(6) to inquire into "jurisdictional issues." That deposition was taken on August 17, 2004. Because BBA failed to conduct the due diligence necessary to testify as to matters known or reasonably available to BBA and because BBA, through its counsel, refused to answer questions regarding BBM simply because the BBA designee was also an attorney for BBM, plaintiffs were unable to discover the information they requested. Therefore, plaintiffs likewise move to compel BBA to make a supplemental 30(b)(6) designation for the areas of inquiry for which BBA either failed to inquire or refused to answer.

## II.   Supplement to Plaintiffs' Opposition to BBA's Motion to Dismiss AMCC

In its motion to dismiss the AMCC (filed Aug. 1, 2003), BBA contended that (a) BBA had not been properly served and (b) this Court did not have personal jurisdiction over BBA. In their opposition, plaintiffs stated that BBA had been properly served because, under the identity of interest doctrine, BBA had notice of the MCC through its subsidiary, BBM (who was named in the MCC). Specifically, plaintiffs contended that, under the judicially-created identity-of-interest doctrine, "a new party may be added 'when the original and added parties are so closely related in business or other activities that it is fair to presume the added parties learned of the institution of the action shortly after it was commenced.'" *Moses v. Joint Frost, M/V*, C.A. No. 91-11247-WF, 1993 U.S. Dist. LEXIS 5678, at *4 (D. Mass. Apr. 21, 1993) (Wolf, J.) (quoting

*Jimenez v. Toledo*, 604 F.2d 99, 102 (1st Cir. 1979)) (holding doctrine was satisfied where original party was alleged to have been "owned, operated, and controlled" by added party).[1] In addition, plaintiffs noted that "[t]he substitution of such [identity-of-interest] parties . . . is not significant when the change is merely formal and in no way alters the known facts and issues on which the action is based." *Young v. Lepone*, 305 F.3d 1, 15 (1st Cir. 2002) (citations omitted). Here, where the AMCC allegations against BBA are substantially similar to the MCC allegations against BBM, the assertion of the identity of interest doctrine is proper.

Moreover, this Court should extend personal jurisdiction over BBA as the parent corporation of BBM. Personal jurisdiction over a parent corporation is found based upon the acts of its subsidiary where there is "clear evidence that the parent in fact controls the activities of its subsidiary." *Cabot Safety Intermediate Corp. v. Arkon Safety Equip., Inc.*, 12 F. Supp. 2d 180, 181 (D. Mass. 1998) (citing *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980)). Specifically, Massachusetts courts have employed a two-prong test two determine whether the corporate form should be disregarded for personal jurisdiction purposes, taking into account:

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their representatives are acting.

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 233 N.E.2d 748, 752 (Mass. 1968). Under this test, "significant exercise of control by an out-of-State parent corporation over a subsidiary

---

[1]    For the Court's convenience, plaintiffs have provided copies of all unreported decisions in an attached Appendix.

and significant intermingling of officers and directors between parent and subsidiary have served to establish jurisdiction in the State where the subsidiary is conducting its business operations." *Kleinerman v. Morse,* 533 N.E.2d 221, 225 (Mass. App. 1989).   Accordingly, in *Cabot Safety,* the court pierced the corporate veil because the parent corporation owned all of the stock of its subsidiary, the companies' directors were identical and resided in the same place and the companies were involved in the same business. *See Cabot Safety*, 12 F. Supp. 2d at 181.

Likewise, this Court should find that it has personal jurisdiction over BBA because both prongs of the test are satisfied.

1.  BBA is a holding company. *See* Ex. ___ (Dep. of Cathy Codrea ("Codrea Tr."), at 8:3-4; 22:15-23:8).  Although it does not do any business itself, it operates through its subsidiaries. Ex. ___ (Ex. 7 to Codrea dep.); Ex. __ (Codrea Tr., at 83:17-86:15).  Its subsidiaries include BBM. Ex. ___ (*IVAX Corp. v. B. Braun of America, Inc.*, 286 F.3d 1309, 1311 n.1 (11th Cir. 2002)).  BBM manufactures at least some of the AWPIDs.[2] Ex. ___ (Codrea Tr., at 50:4-14).  BBA owns one hundred percent (100%) of BBM's stock. Ex. ___ (Codrea Tr., at 17:7-16; 26:15-27:10) and Ex. ___ (Exhibit 2 to Codrea deposition).

2.  BBA provides financing to and invests in its subsidiaries, including BBM, which manufactures at least some of the AWPIDs. *See* Ex. ___ (Codrea Tr., at 83:17-86:15); Ex. ___ (Ex. 7 to Codrea dep, Dun & Bradstreet report).

3.  BBA and BBM share the same principal place of business. *See* Ex. __ (Codrea tr., at 15:21-16:15; 17:4-16) and Ex. ___ (Exhibit 2 to Codrea deposition).

4.  BBA and BBM share officers and directors.  BBA's directors are Ludwig George Braun, Caroll H. Neubauer, and Professor Doctor Doctor Doctor Ungethum. Ex. ___ (Codrea Tr., at 21:7-18).   BBM's directors include at least Caroll H. Neubauer. *Id.* at 23:9-21.
    BBA's officers include Cathy Codrea (Assistant Secretary), Charles DiNardo, Peter Wood (Treasurer), Caroll Neubauer, and Bruce Hugel. Ex. ___ (Codrea Tr., at 21:20-22:14).  BBM's officers include Cathy Codrea (Assistant Secretary); Charles DiNardo (Secretary), Caroll Neubauer, and Bruce Hugel. *Id.* at 23:9-25:2.

---

[2]    As defined in plaintiffs' First Request for Production of Documents to All Defendants August 1, 2003, AWPID is defined as "AWP Inflated Drugs," and describes the drugs set forth in Appendix A of the AMCC. *See* Ex. ___ (Plaintiffs' First Request for Production of Documents to All Defendants, at 3).

5.      BBA receives financial reports from BBM.  Ex. ___ (Codrea Tr., at 27:11-28:5).

6.      As a shareholder in BBM, BBA in some manner receives revenues or profits from BBM.  Ex. ___ (Codrea Tr., at 28:6-29:14).

7.      There are employees of BBM who manage the day-to-day affairs of BBM who are likewise directors of BBA.  Ex. ___ (Codrea Tr., at 29:16-34:22).  One of these individuals includes Caroll H. Neubauer.  *Id.* at 35:1-8.

8.      Mr. Neubauer (a BBA officer, *see* #4, above) attends meetings at BBM.  Ex. ___ (Codrea Tr., at 36:1-38:14).  Mr. Hugel (a BBA office, *see* #4 above) attends meetings at BBM.  Ex. ___ (Codrea Tr., at 38:16-39:9).  Mr. DiNardo attends meetings at BBM.  Ex. ___ (Codrea Tr., at 39:10-41:22).[3]

As set forth above, there is a confused intermingling of the two companies' activities. Not only does BBA own all of BBM's stock, the two companies share virtually all of the same directors and officers.  Indeed, the two companies' principal places of business are located in the same building.  In addition, BBA actively and directly participates, through its representatives, in the conduct of BBM's business.  BBA's officers and directors are directly involved in the day-to-day affairs and management of BBM.  Moreover, BBA finances BBM's operations and receives regular reports regarding its business, as well as revenue.  As in *Cabot Safety*, these facts demonstrate both a "confused intermingling" of the corporate forms, as well as direct control by BBA over the activities of BBM.  *See Cabot Safety*, 12 F. Supp. 2d at 181.  These same facts establish that there is an identity of interest between BBA and BBM sufficient to establish that BBA was served with the AMCC under the identity of interest doctrine.  *Young*, 305 F.3d at 15.

## III.   **Motion to Compel**

To the extent that plaintiffs lack information about the applicability of the identity of interest doctrine or the propriety of asserting personal jurisdiction over BBA, that lack of

---

[3]      Because of Ms. Codrea's gamesmanship, who claimed that she did not know what "regular meetings" were, plaintiffs do not know how often Messrs. Neubauer, Hugel, or DiNardo attended BBM meetings.  *See* Ex. ___ (Codrea Tr., at 36:15-41:22).

knowledge is directly attributable to BBA's failure to comply with plaintiffs' Rule 30(b)(6) Notice and BBA's improper assertion of the attorney-client privilege.

The scope of discovery under Fed. R. Civ. P. 26(b)(1) is "very broad." *Cabana v. Forcier*, 200 F.R.D. 9, 17 (D. Mass. 2001). Rule 30(b)(6) requires a designated person with knowledge of specified topics to testify on behalf of a corporation on matters within the corporation's knowledge. *McLellan Highway Corp. v. United States*, 95 F.Supp.2d 1, 10 (D. Mass. 2002) (Woodlock, J.). A party responding to a Rule 30(b)(6) Deposition Notice must identify knowledgeable individuals as corporate designees who must make a reasonable attempt to ascertain *information reasonably available* to the organization. *Big Top USA, Inc. v. The Wittnern Group*, 183 F.R.D. 331, 339 (D. Mass. 1998) (Saris, J.). "Producing an unprepared witness is tantamount to a failure to appear at a deposition" *Calzaturificio S.C.A.R.P.A. v. Fabiano Shoe Co.*, 201 F.R.D. 33, 39 (D. Mass 2001) (Collings, J.).

Plaintiffs' Rule 30(b)(6) Notice to BBA, as amended, asked BBA to designate a representative to testify on six areas of inquiry:

> 1.    The state of incorporation, principal place of business, formation of, and any persons or entities that have more than a 10% ownership in the following companies:
> (a)    B. Braun of America, Inc.
> (b)    B. Braun McGaw, Inc.
> (c)    B. Braun Medical, Inc.
>
> 2.    The relationship, if any, between and among any of the companies identified in Area of Inquiry #1.
>
> 3.    All AWPIDs manufactured, distributed, marketed or sold by each of the companies identified in Area of Inquiry #1.
>
> 4.    All contracts or agreements regarding the licensing, distribution, or marketing of any AWPID between any of the companies identified in Area of Inquiry #1.

5.      Any and all sales, advertising, marketing, distribution, or manufacturing of AWPIDs in the State of Massachusetts by any of the companies identified in Area of Inquiry #1.

6       All documents relating to or reflecting any of the above Areas of Inquiry.

*See* Exs. ___ (Notice of Deposition) and ___ (Amended Notice).  In response to plaintiffs'

Notice, BBA designated Cathy L. Codrea, BBA's Assistant Secretary and Director (manager, not

board member) as well as BBM's Assistant General Counsel, Assistant Secretary, and Corporate

Compliance Officer.  *See* Ex. ___ (Codrea Tr., at 7:8-20).  Despite Ms. Codrea's roles at both

BBA and BBM, Ms. Codrea refused to answer any questions regarding Area of Inquiry No. 3 --

all AWPIDs manufactured, distributed, marketed or sold by the three B. Braun entities in

plaintiffs' amended notice -- with regard to BBM.  At first, Ms. Codrea claimed that she could

not determine whether AWPIDs were manufactured by BBM without having NDC codes in front

of her.  Thereafter, when plaintiffs' counsel provided her with a document showing the NDC

codes, Ms. Codrea refused to provide this information on the basis that she gathered the

responsive information in her role as an attorney and therefore *the underlying information* was

protected by the attorney-client privilege.  *See* Ex. ___ (Codrea Tr., at 46:16-48:16; 49:10-57:3).

Ms. Codrea similarly, when it suited her, refused to provide other factual information about

BBM (such as the identity of its distributors) on the basis of the attorney-client privilege.  *See*

Ex. ___ (Codrea Tr., at 64:10-66:14); *but see id.* at 67:9-70:1; 70:15-73:18 (testifying with

regard to some factual questions about BBM).   Both the refusal to answer on the basis that BBA

did not have to inquire into BBM's business and the refusal to answer on the basis of the

attorney-client privilege are improper.

**A.** **BBA Failed To Comply With Fed. R. Civ. P. 30(b)(6) and Designate**
   **A Witness With Knowledge About AWPIDs Manufactured by BBM**

BBA failed to comply with Fed. R. Civ. P. 30(b)(6) and designate a witness who would testify regarding AWPIDs manufactured by BBM.  Fed. R. Civ. P. 30(b)(6) provides that "the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf . . . . The persons so designated shall testify as to matters known or reasonably available to the organization."  Clearly BBA *could have* designated such a witness.  For example, although Ms. Codrea spoke to David Pieringer, BBM's Controller, to prepare for her deposition, she only inquired about Areas of Inquiry 1 and 2 with him.  Ex. ___ (Codrea Tr., at 12:2-7; 15:6-20).  Ms. Codrea could have spoken to Mr. Pieringer, or any other employee of BBM, regarding the Area of Inquiry No. 3.  BBA simply chose not to do so.[4]

"[T]he law is well-established that a 30(b)(6) deponent does have an affirmative obligation to educate himself as to the matters regarding the corporation."  *Calzaturficio S.C.A.R.P.A. v. Fabiano Shoe Co.*, 201 F.R.D. 33, 36 (D. Mass. 2001) (holding that even though records were in possession of corporation's professional accountant, 30(b)(6) witness should have educated himself on those documents, because they were "reasonably available" to the corporation).  Further, while acknowledging that there was no direct authority "addressing the specific question of whether a corporation receiving a Rule 30(b)(6) notice is obligated to prepare its witness with both the entity's own knowledge and the knowledge of its subsidiaries and affiliates," one federal court recently concluded that a corporation receiving a 30(b)(6) notice

---

[4]    Similarly, although Dun and Bradstreet provides a report for an entitled called B. Braun McGaw, Inc., *see* Ex. ___ (Exhibit 3 to Codrea dep.), Ms. Codrea was not familiar with such an entity and had no knowledge of its existence.  *See* Ex. ___ (Codrea Tr., at 18:22-21:6).  She likewise could not testify whether *all* of the entity formerly known as McGaw, Inc. had been merged into B. Braun Medical, Inc.  *Id.* at 79:10-82:18.

should question subsidiaries regarding the topics in the notice. *See Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 01 Civ. 3016 (AGS) (HBP), 2002 U.S. Dist. LEXIS 14682 (S.D.N.Y. Aug. 6, 2002). The Court reasoned that the duty of inquiry under Fed. R. Civ. P. 30(b)(6) was the same as the inquiry under Fed. R. Civ. P. 33 or 34, which require corporations to find information within their possession, custody, or control. In so holding, the Court explained that:

> I conclude that the same principle that is applied to interrogatories and document requests should also be applied to determine the scope of a party's obligation in responding to a Rule 30(b)(6) notice of deposition. There is no logical reason why the sources researched by a party in responding to a discovery request should be dependent on the particular discovery vehicle used; in all cases, the responding party should be obligated to produce the information under its control. Application of this principle to Rule 30(b)(6) discovery is not only consistent with the judicial interpretations of the other discovery provisions of the Federal Rules of Civil Procedure, it is also consistent with the purpose of Discovery – 'to make a trial less of a game of blind man's buff [*sic*] and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.'

*Id.* at \*\*13-14 (citations omitted). *See also Green Constr. Co. v. Kansas Power & Light Co.*, Case No. 87-2070-S, 1990 U.S. Dist. LEXIS 10669, at \*\* 2-4 (D. Kan. July 6, 1990) (allowing 30(b)(6) deposition to go forward, even though it required obtaining information from noticed party's subsidiaries, in order to resolve alter ego issue).

Indeed, BBA's position at Ms. Codrea's deposition that BBM documents were not "reasonably available" to BBA is inconsistent with the position BBA has taken with regard to producing documents in this litigation. Namely, BBA has instructed BBM to make available and produce documents responsive to plaintiffs' document requests. *See* Ex. ___ (B. Braun of America, Inc.'s Supplemental Objections and Responses to Plaintiffs' Interrogatories, at 2) ("BBA has requested that its separately incorporated subsidiary, B. Braun Medical, Inc.,

("BBM") make available and produce documents that information that would be responsive to the Document Request and Interrogatories as if they had been property directed to and served upon BBM, without wavier of BBA's position that it is not properly served before this Court."). There is no reason why BBA could not have done similarly in educating Ms. Codrea about the areas of inquiry in plaintiffs' 30(b)(6) Notice. Indeed, under analogous decisions by this Court, BBA was obligated to do so. *Calzaturficio*, 201 F.R.D. at 38 (holding in a different factual context that 30(b)(6) standard was same as standard under F.R.C.P. 34, requiring parties to produce documents in their control).

**B.      The Witness Designated by BBA Improperly Refused to Answer Questions On the Basis of the Attorney-Client Privilege**

As explained above, Ms. Codrea (together with her counsel) also refused to provide factual information regarding BBM on the basis of the attorney-client privilege. In explaining her basis for refusing to testify, Ms. Codrea and her attorney stated as follows:

> Ms. Codrea:   My sole capacity is legal counsel for B. Braun Medical, Inc. I always render legal advice for B. Braun Medical, Inc. That's my capacity. Everything I learn is with respect to being a lawyer at B. Braun Medical, Inc.

> Q:   So, it's your testimony that everything you do in connection with B. Braun Medical is giving legal advice?

> Ms. Codrea:   Everything –

> Mr. Attridge:   Objection as to form.

> Ms. Codrea:   Everything is in connection with my role as counsel and actually I'm here right now today as a representative for B. Braun of America Inc. not to answer questions of the attorney-client privilege with respect to B. Braun Medical, Inc. So, I would appreciate it if we would keep the questions related to my role as a representative for B. Braun America, Inc.

> Q:   Actually, I'm going to ask you questions about B. Braun Medical, Inc. because that is what the notice provides and I need to establish a record of your refusal to respond.

10

Mr. Attridge:   No, she's not refusing to respond and that's an inappropriate statement on your part.  She's here as a representative of B. Braun of America and if you have inquiries about that, you should make them.  But you shouldn't assume that you can ask someone who is a B. Braun Medical lawyer questions that invade the attorney-client privilege.

Ex. ___ (Codrea Tr., at 65:6-66:14).  Later on in the deposition, plaintiffs' counsel attempted to

inquire how or if Ms. Codrea has prepared to respond to Area of Inquiry Number Three with

regard to BBM.  She answered the question that "With respect to my capacity as legal counsel

for B. Braun Medical, Inc., I have a lot of knowledge in this area with respect to defending this

MDL litigation and subject to the attorney-client privilege, I cannot answer those specific

questions that I have educated myself on in order to help defend the company in this litigation."

*Id.* at 78:5-12.  Similarly, although she eventually agreed to identify this information with the

agreement that her testimony would not constitute a waiver of the attorney-client privilege, Ms.

Codrea contended for a good portion of the deposition that she could not identify by whom

certain individuals were employed on the basis of the attorney-client privilege.  *See* Ex. ___

(Codrea Tr., at 86:19-95:12; 96:6-18; 96:22-117:6).  Ms. Codrea's attorney likewise claimed

that:

> I think you have a narrower view of the privilege than one applies.
> The privilege can apply to work she's doing as a lawyer which is not
> restricted to legal advice.  It can relate to an exchange of facts for
> the purposes of legal advice.  It can relate to work product on
> connection with litigation, etc.  It's not limited to directly giving legal advice.

*Id.* at 95:16-96:2.

Ms. Codrea's (and her attorney's) assertions of privilege were improper.  The attorney-

client privilege "only protects disclosure of communications; it does not protect disclosure of the

underlying facts by those who communicated with the attorney."  *Savoy v. Richard A. Carrier*

*Trucking, Inc.*, 176 F.R.D. 10, 13 (D. Mass. 1997).  "For example, 'the client cannot be

compelled to answer the question 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.'" *Id.* (citations omitted). Specifically, although it is true that the attorney-client privilege applies in the corporate setting, "the attorney-client privilege attaches only when the attorney acts in that capacity. [Citation omitted.] It does not apply when in-house counsel is engaged in 'nonlegal work.'" *Borase v. M/A Com, Inc.*, 171 F.R.D. 10, 14 (D. Mass. 1997). While Ms. Codrea claimed that everything she did at BBM was rendering legal advice, such a claim is not credible. *See id.* ("Merely saying that he was so acting in a memorandum of law is patently insufficient to meet the burden. Neither can it be assumed."). In addition, "if an in house counsel has other nonlegal responsibilities, the party invoking the privilege has the burden of producing evidence in support of its contention that in-house counsel was engaged in giving legal advice and not in some other capacity at the time of the disputed conversations." *Id.* Because Ms. Codrea gave such evasive and often sarcastic answers to questions intended to establish the applicability of BBA's claimed privilege, BBA did not meet this burden.

Moreover, because BBA *chose* to designate a lawyer at its 30(b)(6) witness, BBA improperly hid information about BBM behind the attorney-client privilege. "When general counsel is designated by a party as one of its Rule 30(b)(6) witnesses, the witness is required to testify about the business operations of the corporation to the extent he is knowledgeable about the operations, irrespective of the fact that he also serves as legal advisor for the corporation." *Sony Elec., Inc. v. Soundview Techns. Inc.*, 217 F.R.D. 104, 109-10 (D. Conn. 2002) (citing *Primetime 24 Joint Venture v. Echostar Communcs. Corp.*, 2000 U.S. Dist. LEXIS 779, at *6 n.2 (S.D.N.Y. Jan. 28, 2000)). "Questions posed which elicit purely factual information that is not in

the possession of corporate officials and do not ask for the substance of communications between counsel and client are to be answered as they answers to these inquiries will not be disclosing legal advice of counsel." *Id.* at 110 (but holding that privilege was properly asserted because legal advice was sought). None of the questions posed by plaintiffs' counsel sought the contents of Ms. Codrea's legal advice; therefore, her refusals to answer were improper.

## IV.   Conclusion

Even the limited information plaintiffs have been able to obtain from BBA and BBM, and the authority set forth herein and in plaintiffs' original opposition to BBA's motion to dismiss, make clear both that BBA was properly served and that this Court has jurisdiction over BBA. To the extent that plaintiffs were unable to obtain this information, plaintiffs respectfully ask this Court to order BBA to designate a 30(b)(6) witness with full knowledge of the areas of inquiry in plaintiffs' 30(b)(6) Notice. *See Calzaturficio*, 201 F.R.D. at 41 ("Among the other remedies, the Court can require the corporate to re-designate its witnesses and mandate their preparation for re-deposition at the corporation's expense.") (citations omitted).

WHEREFORE plaintiffs respectfully request that this Court enter an order (a) denying BBA's motion to dismiss and (b) granting plaintiffs' motion to compel; and (c) all other relief that this Court deems just and proper.

DATED this 24th day of August, 2004.

By _____

Kenneth A. Wexler
Elizabeth Anne Fegan
The Wexler Firm [LLP]
One N. LaSalle Street
Suite 2000
Chicago, IL 60602
Telephone: 312/346-2222
Facsimile: 312/346-0022

Thomas M. Sobol (BBO # 471770)
Edward Notargiacomo (BBO
#567636)
Hagens Berman LLP
225 Franklin Street, 26th Floor
Boston, MA  02110
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Steve W. Berman
Sean R. Matt
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Samuel Heins
Brian Williams
Heins Mills & Olson, P.L.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 338-4605
Facsimile: (612) 338-4692

Jeff Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Alan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

EXHIBIT D

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL. No. 1456 |
| | CIVIL ACTION:  01-CV-12257-PBS |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO ALL ACTIONS | |

## MOTION TO ADD B. BRAUN MEDICAL, INC. AS A DEFENDANT

Plaintiffs, by their attorneys, respectfully request that this Court enter an order adding B. Braun Medical, Inc. ("BBM") as defendant in this action.  In support thereof, plaintiffs state as follows:

1.     On September 6, 2002, plaintiffs filed the Master Consolidated Complaint ("MCC"), naming BBM as a defendant.  On May 13, 2003 this Court dismissed BBM as a party without prejudice.  On December 5, 2003, plaintiffs filed the Amended Master Consolidated Complaint ("AMCC") and named B. Braun of America, Inc. ("BBA") as a defendant.  BBA is the parent corporation of BBM.  In the AMCC, BBM was inadvertently omitted as a defendant.

2.     While, as set forth in their contemporaneously-filed Supplement to their opposition to BBA's motion to dismiss the AMCC ("Supplement"), plaintiffs believe that BBA is a proper party to this litigation, during the recent deposition of BBA's 30(b)(6) designee, it became clear that BBM is a proper party to this litigation as well.  Namely, BBM manufactures at least some of the AWPIDs in the AMCC.[1]  Ex.1 (Codrea Tr., at 50:4-14).

---

[1]     As defined in Plaintiffs' Amended First Request for Production of Documents to Astrazeneca, Aventis, Dey, Fujisawa, Abbott, Baxter, Boehringer, Braun, BMS, GSK, Immunex,

3.     Rule 21 of the Federal Rules of Civil Procedure provides in pertinent part:

> Misjoinder of parties is not ground for dismissal of an action.
> Parties may be dropped or added by order of the court on motion
> of any party or of its own initiative at any stage of the action and
> on such terms as are just.

Fed. R. Civ. P. 21.  It is well settled in this District that "[a] party may resort to Rule 21 to add a

party who for some innocent reason has not been made a party to the action and whose presence

is necessary or desirable." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 825 F. Supp. 340,

344 (D. Mass. 1993).

4.     In addition, Rule 15 of the Federal Rules of Civil Procedure provides that a party

may be added by an amendment that relates back to the original pleading, where:

> the party to be brought in by amendment (A) has received such
> notice of the institution of the action that the party will not be
> prejudiced in maintaining a defense on the merits, and (B) knew or
> should have known that, but for a mistake concerning the identity
> of the proper party, the action would have been brought against the
> party.

*See* Federal Rule of Civil Procedure 15(c)(3).  Moreover, under the judicially-created identity-of-

interest doctrine, "a new party may be added 'when the original and added parties are so closely

related in business or other activities that it is fair to presume the added parties learned of the

institution of the action shortly after it was commenced.'" *Moses v. Joint Frost, M/V*, C.A. No.

91-11247-WF, 1993 U.S. Dist. LEXIS 5678, at *4 (D. Mass. Apr. 21, 1993) (Wolf, J.) (quoting

*Jimenez v. Toledo*, 604 F.2d 99, 102 (1st Cir. 1979)) (holding doctrine was satisfied where

---

Pharmacia, Schering-Plough and Watson dated June 19, 2003, AWPID is defined as "AWP
Inflated Drugs," and describes the drugs set forth in Appendix A of the AMCC. *See* Ex. 2
(Plaintiffs' Amended First Request for Production of Documents to Astrazeneca, Aventis, Dey,
Fujisawa, Abbott, Baxter, Boehringer, Braun, BMS, GSK, Immunex, Pharmacia, Schering-
Plough and Watson, at 3).

original party was alleged to have been "owned, operated, and controlled" by added party).[2] "The substitution of such [identity-of-interest] parties . . . is not significant when the change is merely formal and in no way alters the known facts and issues on which the action is based." *Young v. Lepone*, 305 F.3d 1, 15 (1st Cir. 2002) (citations omitted).

5.     As explained more fully in plaintiffs' Supplement, the AMCC allegations against BBA are substantially similar to the MCC allegations against BBM.  Moreover, because of the closely intertwined relationship between BBA and BBM, and the fact that BBM was named in the MCC, BBM should have had notice of the claims in the AMCC.  Indeed, BBA's 30(b)(6) designee (also BBM's Assistant General Counsel, Assistant Secretary, and Corporate Compliance Officer, *see* Ex. 1 (Codrea Tr., at 7:8-20)), stated that some of the drugs at issue in this litigation were manufactured by BBM and therefore, as an officer of both BBA and BBM, knew that BBM was one of the proper B. Braun parties to this litigation.  Therefore, BBM should have known that this action would be brought against it and will suffer no prejudice by being added.  Accordingly, pursuant to Rules 15 and 21, BBM should be added as a proper defendant.

WHEREFORE, for the reasons more fully set forth in plaintiffs' Supplement, plaintiffs respectfully seek leave to amend its complaint to add B. Braun Medical, Inc. as a defendant and relate the amendment back to the filing of the AMCC, and all other relief that this Court deems just and proper.

---

[2]     For the Court's convenience, plaintiffs have provided a copy of this unreported decision in an attached Appendix.

3

DATED this 24th day of August 2004.

By:_____

Thomas M. Sobol (BBO # 471770)
Edward Notargiacomo (BBO #567636)
Hagens Berman LLP
225 Franklin Street, 26th Floor
Boston, MA  02110
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Samuel Heins
Brian Williams
Heins Mills & Olson, P.L.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 338-4605
Facsimile: (612) 338-4692

Jeff Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

**CHAIRS OF LEAD COUNSEL
COMMITTEE**

Marc H. Edelson
Alan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Elizabeth Fegan Hartweg
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

**MEMBERS OF LEAD COUNSEL
COMMITTEE AND EXECUTIVE
COMMITTEE**

Michael McShane
Alexander, Hawes & Audet, LLP
300 Montgomery Street, Suite 400
San Francisco, CA 94104
Telephone: (415) 982-1886
Facsimile: (415) 576-1776

Robert E. Piper, Jr.
Piper & Associates
624 Pierre Avenue
Shreveport, LA 71103
Telephone: (318) 226-0826
Facsimile: (318) 424-9900

**MEMBERS OF EXECUTIVE
COMMITTEE**

Anthony Bolognese
Bolognese & Associates
One Penn Center
1617 JFK Boulevard, Suite 650
Philadelphia, PA 19103
Tel: (215) 814-6750
Fax: (215) 814-6764

Jonathan W. Cuneo
The Cuneo Law Group
317 Massachusetts Avenue, N.E.
Suite 300
Washington, D.C. 20002
Tel: (202) 789-3960
Fax: (202) 789-1813

Neal Goldstein (Of Counsel)
Freedman & Lorry, PC
400 Market Street, Suit 900
Philadelphia, PA 19106
Tel: (215) 925-8400
Fax: (215) 925-7516

Michael E. Criden
Hanzman & Criden, PA
Commerce Bank Center, Suite 400
220 Alhambra Circle
Coral Gables, FL  33134
Tel:  (305) 357-9000
Fax: (305) 357-9050

Blake M. Harper
Kirk B. Hulett
Hulett Harper LLP
550 West C Street, Suite 1700
San Diego, CA  92101
Tel:  (619) 338-1133
Fax: (619) 338-1139

Jonathan D. Karmel
Karmel & Gilden
221 N. LaSalle Street
Suite 1414
Chicago, IL  60601
Tel: (312) 641-2910
Fax: (312) 641-0781

Dianne M. Nast
Roda & Nast, PC
801 Estelle Drive
Lancaster, PA 17601
Tel: (717) 892-3000
Fax: (717) 892-1200

Henry H. Rossbacher
Rossbacher & Associates
811 Wilshire Boulevard,
Suite 1650
Los Angeles, CA 90017-2666
Tel:  (213) 895-6500
Fax:  (213) 895-6161

Jonathan Shub
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd fl
Philadelphia, PA  19102
Tel:  (215) 790-7300
Fax:  (215) 546-0942

Scott R. Shepherd
Shepherd & Finkleman, LLC
117 Gayley Street, Suite 200
Media, PA 19063
Tel:  (610) 891-9880
Fax:  (610) 891-9883

Lisa J. Rodriguez
Ira Neil Richards
Trujillo Rodriguez& Richards, LLC
The Penthouse
226 West Rittenhouse Square
Philadelphia, PA  19103
Tel:  (215) 731-9004
Fax:  (215) 731-9044

Mitchell A. Toups
Weller, Green, Toups & Terrell, L.L.P.
2615 Calder Street, Suite 400
P.O. Box 350
Beaumont, TX  77704
Tel: (409) 838-0101
Fax: 409-838-6780

Damon Young
Lance Lee
Young, Pickett & Lee
4122 Texas Boulevard
P.O. Box 1897
Texarkana, AR/TX  75504
Tel: (903) 794-1303
Fax: 903-792-5098; 903-794-5098

**ADDITIONAL ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on August 24, 2004, I caused copies of MOTION TO ADD B. BRAUN MEDICAL, INC. AS A DEFENDANT to be served by facsimile and Federal Express on:

      Daniel F. Attridge
      Kirkland & Ellis, LLP
      655 Fifteenth Street, NW
      Washington, DC  20005
      Facsimile:  (202) 879-5200

Dated: August 24, 2004

                                _____
                                Steve W. Berman

EXHIBIT E

Page 1

1      IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF MASSACHUSETTS
3
4                  - - -
5
6    In Re: PHARMACEUTICAL    : MDL DOCKET NO.
7    INDUSTRY AVERAGE WHOLESALE: CIVIL ACTION #
8    PRICE LITIGATION        : 01CV12257-PBS
9    ----------------------------------------
10   THIS DOCUMENT RELATES TO:
11   ALL ACTIONS
12   ----------------------------------------
13
14          Oral deposition of CATHY CODREA,
15   taken pursuant to notice, at the Radisson Hotel
16   Bethlehem, 437 Main Street, Bethlehem,
17   Pennsylvania, on Tuesday, August 17th, 2004,
18   beginning at approximately 11:00 a.m., before
19   David Walsh, Registered Professional Reporter and
20   Notary Public, there being present:
21                  - - -
22

Page 2

1    APPEARANCES:
2
3           THE WEXLER FIRM, LLP.
4           BY: JENNIFER FOUNTAIN CONNOLLY,
5           ESQUIRE
6           One North LaSalle Street, Suite 2000
7           Chicago, Illinois  60602
8           Phone: (312) 346-2222
9           Representing the Plaintiffs
10
11          KIRKLAND & ELLIS, LLP.
12          BY: DANIEL F. ATTRIDGE, ESQUIRE
13          655 Fifteenth Street, N.W.
14          Washington, D.C.  20005
15          Phone: (202) 879-5012
16          Representing B. Braun of America and
17          the Witness, Cathy Codrea
18
19
20
21
22

Page 3

1                 I N D E X
2                  - - -
3    WITNESS
4      CATHY CODREA
5    EXAMINATION                        PAGE
6      BY MS. CONNOLLY                   05
7                  - - -
8               E X H I B I T S
9                  - - -
10

11   NUMBER          DESCRIPTION          PAGE
12
13   Exhibit Codrea 001   Notice of Deposition..........10
14
15   Exhibit Codrea 002   Handwritten Sheet.............13
16
17   Exhibit Codrea 003   Dun and Bradstreet Express
18            Report.......................17
19
20   Exhibit Codrea 004   Purchases Made by Plaintiffs
21            of Drugs Manufactured or
22            Distributed by Braun..........42

Page 4

1    EXHIBITS CONTINUED:
2
3    NUMBER          DESCRIPTION          PAGE
4
5    Exhibit Codrea 005   Exhibit A to the Complaint....49
6
7    Exhibit Codrea 006   Declaration of Charles A.
8            DiNardo......................79
9
10   Exhibit Codrea 007   Dun and Bradstreet Express
11            Report.......................82
12
13   Exhibit Codrea 008   Bates # BBMDL-001891..........86
14
15   Exhibit Codrea 009   Bates # BBMDL-009658..........96
16
17
18
19
20
21
22

Page 5

1                    - - -
2            CATHY CODREA, having been duly
3    sworn, was examined and testified as follows:
4                    - - -
5            EXAMINATION
6                    - - -
7    BY MS. CONNOLLY:
8        Q.    Good morning.
9        A.    Good morning.
10       Q.    Can you state your full name for the
11   record please?
12       A.    Sure, Cathy L. Codrea.
13       Q.    And, Ms. Codrea, have you ever had
14   your deposition taken before?
15       A.    No, I have not.
16       Q.    Okay.
17           MR. ATTRIDGE:  Let me just put on the
18   record that Ms. Codrea is here today in response
19   to your deposition notice issued with respect to
20   B. Braun of American Inc. and she's here as the
21   corporate representative with respect to the
22   areas of inquiry in your amended notice and

Page 6

1    notice, subject to the objections which we've
2    served and filed.
3            And also to indicate that pursuant
4    to the protective order in the case we're going
5    to at least, for the time being, subject to
6    de-designation later, designate the entire
7    transcript as highly confidential given that it
8    appears likely from your areas of inquiry that
9    you'll be getting into areas that will be highly
10   confidential, okay?
11           MS. CONNOLLY:  Okay.
12   BY MS. CONNOLLY:
13       Q.    Just briefly, as far as how the
14   deposition will go, I anticipate it should be
15   relatively short.  But if I ask you any questions
16   that you don't understand, please just ask me to
17   restate them or rephrase them for you and I'd be
18   happy to do that.
19           If at anytime you need a break, just
20   let me know and I'd be happy to give that to you
21   as long as there is not a question pending.  If
22   there is a question pending, I'll just ask you to

Page 7

1    answer the question before we take the break.
2        A.    Okay.
3        Q.    Thank you.  Is there any medical
4    condition that would prohibit you from either
5    remembering fully or testifying truthfully this
6    morning?
7        A.    No.
8        Q.    Okay.  What is your current title?
9        A.    For B. Braun Medical Inc. I am the
10   assistant general counsel.  I'm also the
11   assistant secretary of the corporation.  And I
12   serve as the capacity of corporate compliance
13   officer as well.  Still within my capacity as
14   legal counsel.
15       Q.    Do you have any position within B.
16   Braun of America Inc.?
17       A.    B. Braun of America Inc. I'm the
18   name of director, but that is a title such as a
19   manager.  It's not a board member.
20       Q.    And in your capacity as a director,
21   are you director over a certain area of the

Page 8

1    company or part of the company or is that just a
2    designation of your seniority?
3        A.    It's just a designation.  B. Braun
4    of America is just a holding company.
5        Q.    Do you have any positions within any
6    other B. Braun entities?
7            MR. ATTRIDGE:  Objection as to form.  It's
8    unclear what you mean by B. Braun entities.
9            MS. CONNOLLY:  You can answer.  From
10   time-to-time your counsel will make objections.
11   Unless he instructs you not to answer, you can
12   answer the question.
13           MR. ATTRIDGE:  Well, I'll be telling the
14   witness what to do and not to do, not you.
15           MS. CONNOLLY:  You can answer the
16   question.
17           THE WITNESS:  With respect to other B.
18   Braun Medical Inc. subsidiaries, I believe I may
19   be, but I'm not sure, assistant secretary of
20   some, if not all of them.
21   BY MS. CONNOLLY:
22       Q.    Where could you find that

2 (Pages 5 to 8)

Page 9

1  information of the names of the B. Braun Medical
2  subsidiaries for which you are an assistant
3  secretary?
4       A.    I would check with our paralegal,
5  who keeps the corporate records.
6       Q.    And do you have any positions within
7  any subsidiaries of B. Braun of America other
8  than B. Braun Medical?
9       A.    No.  I'm not sure that there are any
10 other subsidiaries of B. Braun of America.
11      Q.    How long have you been assistant
12 general counsel of B. Braun Medical?
13      A.    Almost five years.
14      Q.    And how long have you been assistant
15 secretary?
16      A.    I don't know when I was given that
17 designation.
18      Q.    Do you know if it was less time or
19 more time than the time that you've been
20 assistant general counsel?
21      A.    It can't be more time.  I've been
22 with the company for almost five years.  I came

Page 10

1  in at that position.  Sometime thereafter I was
2  made assistant secretary.
3       Q.    What about corporate compliance
4  officer, how long have you been in that position?
5       A.    I guess it's not really a position
6  as much as it is a role.  Approximately one
7  year.
8       MS. CONNOLLY:  Can you mark this please.
9       MR. ATTRIDGE:  Are we using the company
10 name or the witnesses' sir name or anything like
11 that or just Exhibit 1.
12      MS. CONNOLLY:  If you have any preferences,
13 it doesn't matter to me.
14      MR. ATTRIDGE:  I don't have any
15 preferences.  I just know there are many, many
16 depositions in this case.
17      MS. CONNOLLY:  We can mark them BBA if
18 you'd like.
19      (Whereupon, the court reporter
20 marked Exhibit Codrea 001 for identification.)
21 BY MS. CONNOLLY:
22      Q.    The court reporter has handed you

Page 11

1  what's been marked as Exhibit Codrea 001.  Have
2  you ever seen that document before?
3       A.    Yes.
4       Q.    Can you briefly look at Exhibit A to
5  that document and tell me if you have been
6  designated as the person most knowledgeable with
7  knowledge of areas of inquiry one through six?
8       MR. ATTRIDGE:  Objection as to form.  There
9  is nothing in the rule that requires a
10 designation of the person most knowledgeable.
11 The rule has other provisions.  She has been
12 designated as the person under Rule 30(b)(6), but
13 there is nothing in the rule about her being the
14 most knowledgeable.
15 BY MS. CONNOLLY:
16      Q.    Can you tell me whether you've been
17 the person who has been designated as the six
18 areas of inquiry?
19      A.    Yes.
20      Q.    Are you prepared to testify
21 regarding these six areas of inquiry identified
22 in this notice?

Page 12

1       A.    Yes.
2       Q.    How did you prepare for your
3  deposition today?
4       A.    I reviewed the questions.  I spoke
5  with our keeper of the corporate records, with
6  another officer of B. Braun of America Inc., and
7  with our controller of B. Braun Medical Inc..
8       Q.    Can you identify for me by name the
9  keeper of corporate records with whom you spoke?
10      A.    Yes, William Mayer.
11      Q.    And how long did you speak with him?
12      A.    I'm not a very good teller of time.
13 I know I had several conversations with him to
14 make sure that the information that I had, I
15 understood and was accurate.  I would say maybe
16 half an hour.
17      Q.    Did you review any documents with
18 Mr. Mayer?
19      A.    No.
20      Q.    And if you can identify by name the
21 other officer of B. Braun of America with whom
22 you spoke?

3 (Pages 9 to 12)

Page 13

1     A.    Let me go back to reviewing
2  documents with Mr. Mayer. I did not review any
3  corporate documents, but I reviewed with him some
4  of the documentation he put together to help me
5  give you the answers today.
6     Q.    So, he prepared documents to assist
7  you with your deposition?
8     A.    No, I actually prepared them, but I
9  went over it with him.
10    Q.    And what were those documents that
11 you prepared?
12    A.    Just the answer to the first
13 question, so I wouldn't have to memorize dates.
14    MS. CONNOLLY: Okay. Can we mark this?
15    MR. ATTRIDGE: Yes, we have several other
16 copies.
17    MS. CONNOLLY: Can we mark this as Exhibit
18 Codrea 002 please.
19        (Whereupon, the court reporter
20 marked Exhibit Codrea 002 for identification.)
21 BY MS. CONNOLLY:
22    Q.    For the moment, I'm just going to

Page 14

1  set aside Exhibit Codrea 002 and we can get to it in
2  a few minutes. I just want to finish talking about the
3  people that you spoke to to prepare for your
4  deposition. The other officer of B. Braun of
5  America that you spoke to, who was that?
6     A.    Charles DiNardo.
7     Q.    And what is his position at B. Braun
8  of America?
9     A.    He's the chief corporate officer and
10 he's also the assistant secretary -- I'm sorry,
11 secretary.
12    Q.    And how long did you speak with him?
13    A.    Again, over a few conversations, I'm
14 not very good at putting all the time together, I
15 would say maybe half an hour to an hour.
16    Q.    Did you review any documents with
17 Mr. DiNardo?
18    A.    No, we just talked about the
19 questions.
20    Q.    Did you prepare any documents in
21 connection with your conversation with him?
22    A.    No.

Page 15

1     Q.    And which topics in Exhibit 1 did
2  you discuss with Mr. DiNardo?
3     A.    Specifically, I would say number
4  two, number four. I would say all of them
5  generally.
6     Q.    And who is the controller at B.
7  Braun Medical to whom you spoke in preparing for
8  your deposition?
9     A.    David Pieringer.
10    Q.    How long did you speak with him?
11    A.    Over I would say maybe 15 minutes.
12    Q.    Did you review any documents with
13 Mr. Pieringer?
14    A.    No.
15    Q.    Did you prepare any documents for
16 your discussion with Mr. Pieringer?
17    A.    No.
18    Q.    And which topics on Exhibit A did
19 you discuss with him?
20    A.    Number one, maybe number two.
21    Q.    Let's turn to the document you've
22 provided that's been marked as Exhibit Codrea 002.

Page 16

1  Let's just go through this by entity just to make
2  sure that I understand what these say. Under A
3  it says B. Braun of America Inc.. Is it correct
4  that Pennsylvania is the state of incorporation?
5     A.    Yes.
6     Q.    And the principal place of business
7  is in Bethlehem, Pennsylvania? The formation day
8  is October 29th, 1979. And are those -- what are
9  those entities that own greater than 10 percent
10 of its stock?
11    A.    That's one entity. It was just too
12 long for me to fit in on one line. I can't
13 pronounce the long word. It's B. Braun
14 Nordamerika America -- it's a German word. It
15 owns 100 percent of the common stock.
16    Q.    Okay. And with B. Braun McGaw, Inc.
17 you have indicated not applicable to all of those
18 questions. Why is that the case?
19    A.    It's not a legal entity to my
20 knowledge.
21    Q.    When you're saying it's not a legal
22 entity, are you making any sort of distinction

4 (Pages 13 to 16)

Page 17

1   between any other type of entity and saying legal
2   entity or you just believe it does not exist?
3       A.    It does not exist.
4       Q.    And then with regard to B. Braun
5   Medical Inc., the state of incorporation is
6   Pennsylvania; is that correct?
7       A.    Yes.
8       Q.    The principal place of business is
9   Bethlehem, Pennsylvania?
10      A.    Yes.
11      Q.    And the formation date is September
12  12th, 1979?
13      A.    Yes.
14      Q.    And B. Braun of America owns a 100
15  percent of its stock?
16      A.    Correct.
17            (Whereupon, the court reporter
18  marked Exhibit Codrea 003 for identification.)
19  BY MS. CONNOLLY:
20      Q.    All right.  Handing you what's
21  been --
22      MR. ATTRIDGE:  Let me object to this

Page 18

1   document because you haven't identified it by
2   source.
3   BY MS. CONNOLLY:
4       Q.    Okay, I'm handing you what's been
5   marked --
6       MR. ATTRIDGE:  This hasn't been produced to
7   us in the litigation, nor has it been requested
8   by you and produced by us.
9       MS. CONNOLLY:  I think I'll explain to her
10  how I got this document.
11      MR. ATTRIDGE:  Well, you can explain to me
12  why it is you haven't produced it to us and why
13  it is you think you can use a document in a
14  deposition that you haven't produced.
15      MS. CONNOLLY:  Are you instructing her not
16  to answer any questions about the document?
17      MR. ATTRIDGE:  No.  I'm telling you what
18  you're doing is inappropriate.
19      MS. CONNOLLY:  Well, I'm sorry you feel
20  that way.
21  BY MS. CONNOLLY:
22      Q.    The court reporter has handed you

Page 19

1   what's been marked as B. Braun of America Exhibit
2   3.  I will represent to you that this is a Dun
3   and Bradstreet report that I obtained from Dun
4   and Bradstreet's web site.
5           And what I wanted to ask you about
6   is that this is identifying an entity as you'll
7   see in the upper left-hand corner called B. Braun
8   slash McGaw, Inc..  Are you familiar with an
9   entity of that name?
10      A.    No, I'm not.
11      Q.    Do you have any knowledge whether an
12  entity of that name was ever in existence?
13      A.    I believe an entity by that name was
14  never in existence in any connection with B.
15  Braun Medical Inc..
16      Q.    What about B. Braun America Inc.?
17      A.    Same answer.
18      Q.    So, do you have any knowledge of the
19  formation of this company?
20      A.    No, I do not.
21      Q.    Do you have any knowledge of the
22  line of business in which it is engaged?

Page 20

1       A.    No, because I don't think it's a
2   legal entity.
3       Q.    If you will turn to page -- the page
4   numbers are on the top right of the document.  It
5   says page eight of 10.  And towards the bottom of
6   the page under the category that says"business
7   background"?
8       A.    I'm sorry, where?
9       Q.    Towards the bottom of the page it's
10  in bold and it says"business background".
11      A.    Okay.
12      Q.    And if you go down further there's a
13  date that says March 8th, 2002 and it identifies
14  William Degoede as president and CEO.  That first
15  paragraph says,"100 percent of the capital stock
16  is owned by the parent company".  Are you
17  familiar with any company by this name where B.
18  Braun of America owns a 100 percent of the
19  capital stock?
20      A.    No.
21      Q.    Do you have any explanation
22  whatsoever as to what the entity B. Braun slash

5 (Pages 17 to 20)

Cathy Codrea | Highly Confidential | August 17, 2004
Bethlehem, PA

Page 21

1 McGaw, Inc. is?
2 　　A.　I have no knowledge of it being a
3 legal entity.
4 　　Q.　Do you have any knowledge of the
5 entity whatsoever?
6 　　A.　No.
7 　　Q.　Does B. Braun of America have a
8 board of directors?
9 　　A.　Yes, it does.
10 　　Q.　Can you identify by name who the
11 board of directors are?
12 　　MR. ATTRIDGE:　Objection as to the scope of
13 the question as beyond the areas of inquiry, but
14 you may answer, if you know.
15 　　THE WITNESS:　I do know.　Probably not
16 exact name, but there's three directors:　Ludwig
17 George Braun, Caroll H. Neubauer, Professor
18 Doctor Doctor Doctor Ungethum.
19 BY MS. CONNOLLY:
20 　　Q.　And do you know who the officers of
21 B. Braun of America are?
22 　　MR. ATTRIDGE:　Same objection.

Page 22

1 　　THE WITNESS:　I may know off of memory
2 some, if not all.
3 BY MS. CONNOLLY:
4 　　Q.　Can you try to list the ones that
5 you remember?
6 　　A.　Myself, as assistant secretary,
7 Charles DiNardo, Peter Wood, Caroll Neubauer,
8 Bruce Hugel.　That's all I'm sure of.
9 　　Q.　And what is Mr. Wood's title?
10 　　A.　I believe treasurer.
11 　　Q.　And Ms. Neubauer's?
12 　　A.　I don't know the title.
13 　　Q.　And Mr. Hugel's?
14 　　A.　I don't know his exact title either.
15 　　Q.　You've identified on B. Braun of
16 America Exhibit 2 that the principal place of
17 business of B. Braun of America is Bethlehem,
18 Pennsylvania.　What sort of business is performed
19 there?
20 　　A.　No business.　It's a holding
21 company.　It holds stock in for incorporation.
22 Under the laws of Pennsylvania, you need to have

Page 23

1 a principal place of business.
2 　　Q.　And B. Braun of America is still an
3 active corporation, correct?
4 　　A.　It's a holding company.　It holds
5 shares of stock.
6 　　Q.　And it's still active?
7 　　A.　It's currently registered with the
8 Secretary of State of Pennsylvania.
9 　　Q.　Do you know who the directors of B.
10 Braun Medical are?
11 　　MR. ATTRIDGE:　Objection as to the scope of
12 the question as beyond the areas of inquiry, but
13 you may answer, if you know.
14 　　THE WITNESS:　I don't know all of their
15 names.　There's a number of them.
16 BY MS. CONNOLLY:
17 　　Q.　Can you try to identify the ones
18 that you remember please?
19 　　A.　Caroll H. Neubauer.　The others,
20 without checking corporate records, I would be
21 reluctant to make a guess.
22 　　Q.　And what about the officers of B.

Page 24

1 Braun Medical?
2 　　MR. ATTRIDGE:　Same objection, but you may
3 answer, if you know.
4 　　THE WITNESS:　Again, there are very
5 numerous officers.　I know myself, as assistant
6 secretary, Charles DiNardo as the secretary,
7 Caroll Neubauer is an officer, Bruce Hugel is an
8 officer.　Numerous other people that I don't want
9 to venture a guess without having a document in
10 front of me to recollect my memory.
11 BY MS. CONNOLLY:
12 　　Q.　Do you know the title that Ms.
13 Neubauer holds in B. Braun Medical?
14 　　A.　Not with a 100 percent accuracy.　If
15 I made a guess, I could be wrong.
16 　　MR. ATTRIDGE:　It is Mr. Neubauer by the
17 way.
18 BY MS. CONNOLLY:
19 　　Q.　I apologize.　And Mr. Hugel, do you
20 know his title in B. Braun Medical?
21 　　A.　Again, when I use corporate titles,
22 I always refer to a document.　I don't have them

6 (Pages 21 to 24)

Page 25

1   to memory and I would be reluctant to hesitate,
2   you know, reluctant to guess here.
3       Q.    And with regard to B. Braun McGaw,
4   Inc. I assume that because you don't believe it's
5   an entity that you don't, as you've indicated on
6   Exhibit 2, have the answers to the questions that
7   are identified in area of inquiry one, correct?
8       A.    Correct.
9       Q.    With regard to area of inquiry two,
10  the relationship, if any, between and among B.
11  Braun of America Inc., B. Braun McGaw, Inc. and
12  B. Braun Medical Inc., I would assume that based
13  on your prior testimony that you believe there's
14  no relationship between B. Braun of America Inc.,
15  B. Braun Medical Inc. and -- well, excuse me.
16  That there's no relationship between B. Braun of
17  America Inc. and B. Braun McGaw, Inc. because you
18  don't believe that B. Braun McGaw, Inc. exists,
19  correct?
20      MR. ATTRIDGE:  Objection as to form.  You
21  may answer.
22      THE WITNESS:  Correct.  B. Braun McGaw,

Page 26

1   Inc. is not a legal entity and, therefore, can
2   have no relationship with B. Braun America Inc.
3   BY MS. CONNOLLY:
4       Q.    And you would have the same answer
5   with regard to any relationship between B. Braun
6   McGaw, Inc. and B. Braun Medical, Inc.?
7       A.    Yes.
8       Q.    What is the legal relationship
9   between B. Braun of America Inc. and B. Braun
10  McGaw, Inc. -- excuse me, B. Braun Medical Inc.?
11      MR. ATTRIDGE:  Objection as to form.  Could
12  you re-ask the question.  It's confusing as to
13  which entities you're referring to.
14  BY MS. CONNOLLY:
15      Q.    What is the relationship between B.
16  Braun of America Inc. and B. Braun Medical Inc.?
17      A.    B. Braun America Inc. owns 100
18  percent of the common stock of B. Braun Medical
19  Inc..
20      Q.    Is B. Braun Medical Inc. a wholly
21  owned subsidiary of B. Braun America Inc.?
22      A.    100 percent of the shares of common

Page 27

1   stock are of B. Braun Medical Inc. are owned by
2   B. Braun of America Inc..
3       Q.    Do you know if B. Braun Medical Inc.
4   is a subsidiary of B. Braun of America Inc.?
5       A.    I believe you're asking me to make a
6   legal conclusion here.
7       Q.    If you don't know, you can just say
8   you don't know.
9       A.    Well, yes, B. Braun Medical Inc. is
10  a subsidiary of B. Braun of America Inc..
11      Q.    Does B. Braun of America receive any
12  type of regular reports from B. Braun Medical
13  Inc.?
14      A.    B. Braun of America Inc. may receive
15  financial reports.
16      Q.    What types of financial reports does
17  B. Braun of America receive from B. Braun Medical
18  Inc.?
19      A.    I have not seen those personally.  I
20  understand once a year they get audited reports.
21      Q.    What is the basis of your
22  understanding?

Page 28

1       A.    Conversation with David Pieringer.
2       Q.    Are you familiar with any other
3   types of regular reports that B. Braun of America
4   receives from B. Braun Medical?
5       A.    No, I'm not aware of anything else.
6       Q.    Does B. Braun of America receive any
7   revenues or profits from the operations of B.
8   Braun Medical?
9       A.    As a shareholder, whatever is set up
10  in the bylaws and normal corporate organizational
11  structure.  I cannot speak to that.
12      Q.    That information would be found
13  within the bylaws?
14      A.    No, no, I made a mistake.  It really
15  would not be.  What does any shareholder receive
16  with respect to profits from a business.
17      Q.    Are you aware of any document where
18  that is set forth with particularity with regard
19  to the relationship between B. Braun of America
20  and B. Braun Medical?
21      A.    Can you be more specific in your
22  question please?

Page 29

1     Q.    Well, corporations operate
2  differently.  Are you aware of any documents that
3  sets forth the manner in which revenues and/or
4  profits go from B. Braun Medical Inc. to B. Braun
5  of America Inc.?
6     A.    I'm not aware of any document that
7  would set that forth, no.
8     Q.    And you're not aware of the specific
9  manner in which profits or revenues flow from B.
10  Braun Medical Inc. to B. Braun of America inc.
11     MR. ATTRIDGE:  Objection as to the scope of
12  that as beyond the areas of inquiry, but you may
13  answer, if you know.
14     THE WITNESS:  I don't know.
15  BY MS. CONNOLLY:
16     Q.    Are any employees of B. Braun of
17  America involved in the day-to-day activities of
18  B. Braun Medical?
19     A.    B. Braun of America does not have
20  any employees.  It has officers and directors for
21  the corporate form.  It's a holding company.
22  It's not involved in any active operations

Page 30

1  whatsoever of any type of business.
2     Q.    Do any of B. Braun of America's
3  officers have involvement in the day-to-day
4  activities of B. Braun Medical?
5     A.    Not as officers of B. Braun of
6  America.
7     Q.    As individuals, do they have any
8  involvement in the day-to-day activities as B.
9  Braun -- in B. Braun Medical Inc.?
10     A.    In their individual capacity as
11  one --
12     Q.    In any capacity.
13     A.    If there would be an employee of B.
14  Braun Medical Inc. who is an officer of B. Braun
15  Medical Inc., they would have day-to-day
16  responsibilities for their role at B. Braun
17  Medical Inc.
18     Q.    And can you identify which
19  individuals would fit that description?
20     A.    The officers of B. Braun Medical
21  Inc..
22     Q.    So, is it your testimony that all

Page 31

1  officers -- excuse me.  You just said officers of
2  B. Braun Medical Inc.?
3     A.    Yes, are involved in the day-to-day
4  business operation of B. Braun Medical Inc.
5  because you said as individuals.
6     Q.    Right.  My question was whether any
7  officers of B. Braun America Inc. are involved in
8  the day-to-day activities of B. Braun Medical
9  Inc.?
10     A.    Not in their capacity --
11     MR. ATTRIDGE:  Objection as to form.  That
12  was not your question.  It's a new question.  It
13  is beyond the scope, but you may answer, if you
14  know.
15     THE WITNESS:  In their capacity as
16  individuals, no.  No one who is an officer or --
17  well, there's no employees.  No officer of B.
18  Braun of America Inc. is involved in the
19  day-to-day operations of any business.
20  BY MS. CONNOLLY:
21     Q.    So, there is no individual who is an
22  officer of B. Braun of America who also does

Page 32

1  day-to-day activities at B. Braun Medical?
2     MR. ATTRIDGE:  Objection as to form.
3  BY MS. CONNOLLY:
4     Q.    Do you understand my question?
5     A.    I'd like you to rephrase it, so
6  maybe I can answer it.
7     Q.    Are there any individuals who serve
8  as officers of B. Braun of America who also work
9  at B. Braun Medical in day-to-day capacity?
10     A.    There are some individuals who are
11  officers of B. Braun of America who are also
12  officers of B. Braun Medical Inc.
13     Q.    And who are those people?
14     A.    Again, it's outside the area of
15  inquiry.  I can go off of memory.  I will not
16  give you a complete answer because I'm not going
17  to guess.  Caroll Neubauer, Bruce Hugel, Charles
18  DiNardo.  Again, without referring to the
19  corporate records, I hesitate to go any further.
20     Q.    Are there any individuals who are
21  directors of B. Braun America who perform daily
22  activities at B. Braun Medical Inc.?

8 (Pages 29 to 32)

Page 33

1    MR. ATTRIDGE: Objection as outside the
2  scope. If you know, you can answer, but it is
3  outside the scope of your notice.
4    THE WITNESS: I think I forget the
5  question. I'm sorry, can I ask you to repeat
6  it.
7  BY MS. CONNOLLY:
8    Q.    Are there any individuals who are
9  directors at B. Braun America who are likewise
10 involved in the day-to-day activities at B. Braun
11 Medical?
12   MR. ATTRIDGE: Same objection.
13   THE WITNESS:   Individuals who are
14 directors of B. Braun of America in their
15 capacity as director of B. Braun of America are
16 not involved in the day-to-day business
17 activities of B. Braun Medical Inc..
18 BY MS. CONNOLLY:
19   Q.    So, is it your testimony that there
20 are no individuals at B. Braun Medical who are
21 likewise directors at B. Braun America who are
22 involved in the day-to-day activities at B. Braun

Page 34

1  Medical?
2    MR. ATTRIDGE: Objection as to form and to
3  outside the scope of the notice.
4    THE WITNESS:   And, no, that's not what you
5  asked me originally.
6  BY MS. CONNOLLY:
7    Q.    What I want to know is if there are
8  individuals who are directors at B. Braun of
9  America who likewise engage in day-to-day
10 activities at B. Braun Medical regardless of what
11 capacity they have at B. Braun of America?
12   MR. ATTRIDGE: Same objections.
13   THE WITNESS:   There are certain
14 individuals if they are employees of B. Braun
15 Medical Inc. who are involved in their capacity
16 at B. Braun Medical Inc. in managing the
17 day-to-day affairs of B. Braun Medical Inc..
18 BY MS. CONNOLLY:
19   Q.    And are any of those individuals
20 also directors of B. Braun of America?
21   MR. ATTRIDGE: Same objections.
22   THE WITNESS:   Yes.

Page 35

1  BY MS. CONNOLLY:
2    Q.    Who are those individuals?
3    A.    Caroll H. Neubauer.
4    Q.    Is that all?
5    A.    I believe so. Again, this is
6  outside the scope of the inquiry. You're asking
7  me questions on memory. I don't have a list of
8  officers and directors in front of me.
9    Q.    I disagree with you that it's beyond
10 the scope.
11   MR. ATTRIDGE: Well, which question does it
12 relate to, Ms. Connolly?
13   MS. CONNOLLY: The relationship between the
14 companies.
15   MR. ATTRIDGE: You say question two about
16 the relationship calls for an identification by
17 person of the officers and directors?
18   MS. CONNOLLY: Yes, it does.
19   MR. ATTRIDGE: I don't agree with that.
20 You asked for the relationship and she described
21 the relationship.
22 BY MS. CONNOLLY:

Page 36

1    Q.    Do any representatives of B. Braun
2  of America attend regular meetings at B. Braun
3  Medical?
4    A.    What do you mean by B. Braun of
5  America representative?
6    Q.    Well, since there are no employees,
7  I guess I mean an officer or director.
8    A.    Not in their capacity of B. Braun
9  America. For those few people who may also be an
10 officer or an employee of B. Braun Medical Inc.,
11 any meetings that are in that capacity for
12 B. Braun Medical Inc.. Again, B. Braun of
13 America Inc. is just a holding company. It does
14 not transact business. It does not do anything.
15   Q.    Do you have any knowledge of whether
16 Mr. Neubauer attends regular meetings at B. Braun
17 Medical?
18   A.    It's a very broad question. What do
19 you mean by regular meetings?
20   Q.    Does he attend regular meetings
21 there? What is it about my question you don't
22 understand?

9 (Pages 33 to 36)

Cathy Codrea                              Highly Confidential                            August 17, 2004
                                            Bethlehem, PA

Page 37

1    A.    Regular.
2    Q.    As opposed to spur of the moment.
3    Does he attend meetings on a weekly, monthly,
4    yearly basis at B. Braun Medical?
5    A.    I can't account to the regularity of
6    his meetings.  I don't keep his schedule.
7    Q.    Do you have any knowledge of whether
8    he attends any meetings at B. Braun Medical?
9    MR. ATTRIDGE:  Objection as to form and
10   outside the scope.  What inquiry are you on now?
11   MS. CONNOLLY:  Still on two.
12   MR. ATTRIDGE:  I disagree that this is
13   pertinent to two.
14   MS. CONNOLLY:  Are you instructing her not
15   to answer?
16   MR. ATTRIDGE:  No, I'm not, but I think
17   she's already answered it, but if you have
18   anything to add, you may.  The question is do you
19   have any knowledge of whether he, Mr. Neubauer,
20   attends any meetings of B. Braun Medical?
21   THE WITNESS:  Yes, he attends meetings at
22   B. Braun Medical Inc..

Page 38

1    BY MS. CONNOLLY:
2    Q.    Do you know how often he attends
3    meetings?
4    A.    No.
5    Q.    Do you know what type of meetings he
6    attends?
7    MR. ATTRIDGE:  Same objection.
8    THE WITNESS:  I don't keep his schedule.
9    BY MS. CONNOLLY:
10   Q.    Is it your testimony that you don't
11   know what type of meetings he attends?
12   MR. ATTRIDGE:  Same objections.  It's
13   outside the scope.
14   THE WITNESS:  It would be conjecture.
15   BY MS. CONNOLLY:
16   Q.    Do you have any knowledge of whether
17   Mr. Hugel attends regular meetings at B. Braun
18   Medical?
19   MR. ATTRIDGE:  Objection as to outside the
20   scope of the notice of inquiry.
21   THE WITNESS:  I don't keep his schedule
22   either.

Page 39

1    BY MS. CONNOLLY:
2    Q.    Do you know if Mr. Hugel attends any
3    meetings at B. Braun Medical?
4    A.    Yes.
5    Q.    What meetings does he attend?
6    A.    Again, I don't keep his schedule.
7    Q.    Do you know how often he attends
8    meetings at B. Braun Medical?
9    A.    No.
10   Q.    Do you know whether Mr. DiNardo
11   attends any regular meetings at B. Braun Medical?
12   MR. ATTRIDGE:  Same objection as to outside
13   the scope.
14   THE WITNESS:  And I don't know how you
15   interpret regular in any of your questions.
16   BY MS. CONNOLLY:
17   Q.    Do you know whether he attends
18   meetings on a yearly basis?
19   MR. ATTRIDGE:  Same objection as to scope.
20   THE WITNESS:  Are you asking about a
21   specific meeting on a yearly basis or does he
22   attend a regular meeting on a yearly basis or a

Page 40

1    regular meeting on a weekly basis?  I really have
2    no way I can answer your question and feel
3    confident in my answer to any of these people.
4    BY MS. CONNOLLY:
5    Q.    I'm asking whether you know if Mr.
6    DiNardo regularly attends any meetings at B.
7    Braun Medical on an annual basis?
8    MR. ATTRIDGE:  Objection as to scope and as
9    to form.
10   THE WITNESS:  That question does not make
11   sense for me to answer, I'm sorry.  Can you
12   rephrase it?
13   BY MS. CONNOLLY:
14   Q.    Do you know whether Mr. DiNardo
15   attends any meetings at B. Braun Medical that
16   occur on an annual basis?
17   MR. ATTRIDGE:  Same objections.
18   THE WITNESS:  I'm not going to guess what
19   you're getting at.  I do know that all of those
20   people attend certain meetings at certain times
21   to discuss certain matters.  Sometimes they try
22   to schedule them on a regular basis, sometimes

10 (Pages 37 to 40)

Page 41

1  it's impromptu, depending on what type of meeting
2  will bear structure on when and who they meet
3  with and where.
4  BY MS. CONNOLLY:
5      Q.     Do you know how often Mr. DiNardo
6  goes to B. Braun of Medical for meetings?
7      MR. ATTRIDGE:  Objection as to form and
8  beyond the scope of the notice.
9      THE WITNESS:  Mr. DiNardo does not go to
10 B. Braun Medical for meetings.  He's at B. Braun
11 Medical for meetings.  He is an officer and
12 employee of B. Braun Medical Inc..  So, in that
13 role, he will attend meetings.
14 BY MS. CONNOLLY:
15     Q.     Do you know how often he attends B.
16 Braun Medical Inc. meetings?
17     A.     No.
18     Q.     Do you know how many types of
19 meetings Mr. DiNardo attends at B. Braun Medical?
20     MR. ATTRIDGE:  Objection as to form and
21 beyond the scope of the notice.
22     THE WITNESS:  No.

Page 42

1  BY MS. CONNOLLY:
2      Q.     In preparing for this deposition,
3  did you become familiar with the definition of
4  AWPID's as set forth in the Exhibit A to this
5  deposition?
6      A.     I know what the definition is.
7      Q.     What do you believe the definition
8  is?
9      A.     Right here in number two it
10 says,"AWPID refers to all the drugs identified in
11 Exhibit A of the proposed Amended Master
12 Consolidated Class Action Complaint".
13     (Whereupon, the court reporter
14 marked Exhibit Codrea 004 for identification.)
15     MS. CONNOLLY:  I'm sorry, Dan, but for this
16 exhibit if you wouldn't mind sharing with her.  I
17 seem to be missing a copy of this exhibit.
18     MR. ATTRIDGE:  Wait a minute, this isn't
19 Exhibit A to the complaint.
20     MS. CONNOLLY:  Did we grab the wrong one?
21 Do you have the correct one?
22     MR. ATTRIDGE:  No, I just know that it's

Page 43

1  not.
2      MS. CONNOLLY:  Why do you know it's not?
3      MR. ATTRIDGE:  Because Exhibit A to the
4  Amended Master Consolidated Complaint is that
5  very long list of companies and NDC numbers and
6  products.
7      MS. CONNOLLY:  I think this is excerpted,
8  but anyway, we can still use this.
9      MR. ATTRIDGE:  Well, we can't because the
10 AWPID is something that you've given very
11 specific definition to with reference to a
12 document that you're not showing the witness.
13     MS. CONNOLLY:  Well, we can use this list.
14 You can have a standing objection that this is
15 not what is represented in Exhibit A, but we can
16 still use this list.
17     MR. ATTRIDGE:  Well, it is not what is in
18 Exhibit A.
19     MS. CONNOLLY:  Are you not going to let her
20 answer questions?
21     MR. ATTRIDGE:  Are you going to tell us
22 that it is Exhibit A to the complaint?

Page 44

1      MS. CONNOLLY:  Are you going to instruct
2  her not to answer the questions?
3      MR. ATTRIDGE:  No, you answer my question
4  first.  Let's play straight here.  You're showing
5  the witness the wrong document.  Let's be clear
6  about that, okay.
7      MS. CONNOLLY:  No, I'm showing the witness
8  a list of the drugs for which plaintiffs allege
9  that Braun has set an AWP for.  There's nothing
10 mysterious about this.  Are you going to point to
11 me specific products on this list that are not on
12 Exhibit A?
13     MR. ATTRIDGE:  Here's what I'll do for
14 you.  I mean I'll tell you that your notice of
15 inquiry defines the term AWPID with reference to
16 Exhibit A to the Amended Master Consolidated
17 Class Action Complaint.  That's what it does.
18 All the areas of inquiry relate to that Exhibit A
19 and you're not showing the witness Exhibit A.
20 You're showing the witness a different document.
21 I'm objecting to that.
22     MS. CONNOLLY:  Okay.  I would like to talk

11 (Pages 41 to 44)

Cathy Codrea                          Highly Confidential                     August 17, 2004
                                         Bethlehem, PA

Page 45

1  about the drugs that are on this list because I
2  believe they're the same.
3      MR. ATTRIDGE:  You may, but I'm telling you
4  your questions may be outside the scope of your
5  deposition notice because the document you're
6  showing the witness is not referenced in your
7  exhibit -- in your deposition notice.
8      MS. CONNOLLY:  That's fine.
9  BY MS. CONNOLLY:
10     Q.    Can you tell me whether any of the
11 drugs that are identified on Exhibit 4 are
12 manufactured by B. Braun of America?
13     A.    What is Exhibit 4, this?
14     Q.    Yes.
15     A.    I don't need to refer to any
16 exhibit.  B. Braun of America does not
17 manufacture any drugs.
18     Q.    And has never, including from 1991
19 to the present, manufactured any drugs; is that
20 correct?
21     A.    Correct.
22     Q.    And is it also correct that it does

Page 46

1  not distribute any drugs?
2      A.    Correct.
3      Q.    And that it does not sell any drugs?
4      A.    Correct.
5      Q.    And that it does not market or
6  advertise any drugs?
7      A.    To the best of my knowledge, that's
8  correct.
9      Q.    And since you do not believe that B.
10 Braun McGaw is a legal entity, I take it that you
11 do not believe that it manufactures any drugs as
12 well, correct?
13     A.    I believe that B. Braun McGaw, Inc.
14 is not a legal entity and, therefore, I cannot
15 speak to it.
16     Q.    Okay.  To your knowledge, are any of
17 the drugs that are identified in Exhibit 4
18 manufactured by anyone other -- excuse me, any B.
19 Braun entity other than B. Braun Medical Inc.?
20     A.    Your question is confusing to me and
21 this Exhibit 4 is confusing to me.  B. Braun
22 Medical Inc. manufactures some pharmaceutical

Page 47

1  products.  With respect to these specific names,
2  unless there's an NDC number associated with
3  them, I cannot even discuss them.
4      Q.    Is the Exhibit A to the AMCC that
5  you claim to have reviewed, did that have NDC
6  numbers on it?
7      A.    Yes, it did.
8      Q.    So, it's your testimony that without
9  NDC numbers, that you cannot identify which
10 pharmaceuticals are manufactured by B. Braun
11 Medical?
12     MR. ATTRIDGE:  Objection as to form.
13     THE WITNESS:  I think my testimony is this
14 document was not raised in the inquiry.  You're
15 asking me questions about a document that I'm not
16 prepared to discuss and I'm not going to guess.
17     A lot of the information I have
18 gained with respect to B. Braun Medical is in my
19 capacity as legal counsel and will be subject to
20 the attorney-client privilege in any event, but
21 I'm not prepared to speak about this document.
22 The only time I saw it was in my capacity as

Page 48

1  legal counsel for B. Braun Medical Inc. and I'm
2  not going to conjecture as to that.
3  BY MS. CONNOLLY:
4      Q.    So, it is your testimony that you
5  have no knowledge as to whether B. Braun Medical
6  Inc. manufactures the drugs that are identified
7  in Exhibit 4?
8      A.    No.  My testimony is you're asking
9  me information that I've gathered subject to the
10 attorney-client privilege and, therefore, I
11 cannot answer this question with respect to this
12 exhibit.
13     Q.    Just to be clear, you're refusing to
14 answer my question on the basis of the
15 attorney-client privilege?
16     A.    Right.
17     MR. ATTRIDGE:  And let me add to that as
18 not a document that was identified in the areas
19 of inquiry.  By the way, the second and third
20 pages of Exhibit 4, where did you get those?
21     MS. CONNOLLY:  I'm not sure.
22     MR. ATTRIDGE:  There's no bates number on

12 (Pages 45 to 48)

Page 49

1  it, that's why I'm asking.
2      MS. CONNOLLY:  Yeah, I'm not sure.  If you
3  don't mind, I'm going to take a break, if we can
4  go off the record.
5          (Off the record discussion and lunch
6  break.)
7          (Whereupon, the court reporter
8  marked Exhibit Codrea 005 for identification.)
9  BY MS. CONNOLLY:
10     Q.    The court reporter has handed you
11  what's been marked as Exhibit Codrea 005.  Have you
12  ever seen that document before?
13     MR. ATTRIDGE:  Objection as to form and
14  foundation.
15     THE WITNESS:  Yes, I have seen this.
16  BY MS. CONNOLLY:
17     Q.    And is that the document that you
18  used to prepare for your deposition regarding B.
19  Braun's manufacture or distribution, et cetera,
20  of AWPID's?
21     A.    Can you rephrase your question?
22     Q.    Is that the document that you used

Page 50

1  to prepare for your deposition in connection with
2  the areas of inquiry that relate to AWPID's?
3      A.    Yes.
4      Q.    Okay.  I don't have the document in
5  front of me, but if you could turn to -- it's
6  arranged alphabetically.  If you could turn to
7  where the AWPID's start for B. Braun.
8      A.    I think I've done that.
9      Q.    Based on what you have learned in
10  your preparation for this deposition, which B.
11  Braun entity manufactures the AWPID's identified
12  on Exhibit Codrea 005?
13     A.    B. Braun Medical Inc. manufactures
14  some pharmaceutical companies.  With respect to
15  the specific AWPID's, the drugs listed here, B.
16  Braun of America Inc. does not receive specific
17  information related on a drug-by-drug basis.
18     Q.    I'm sorry, what do you mean by B.
19  Braun of America does not receive information on
20  a drug-by-drug basis?
21     A.    I'm here as a representative today
22  for B. Braun of America Inc. and B. Braun of

Page 51

1  America Inc. does not receive specific
2  information on a drug-by-drug basis from B. Braun
3  Medical Inc..
4      Q.    So, is it your testimony that in
5  preparing for your deposition, that you did not
6  educate yourself on which B. Braun entity
7  manufactures the AWPID's identified in Exhibit 5?
8      MR. ATTRIDGE:  Objection as to form.
9      THE WITNESS:  My answer is B. Braun
10  Medical Inc. does manufacture drugs.  You're
11  asking me about all of these drugs listed here
12  which goes into the attorney-client privilege of
13  my consultation to B. Braun in my legal
14  capacity.  So, I cannot talk -- you asked me a
15  question that had a couple different ways of
16  interpretation.
17  BY MS. CONNOLLY:
18     Q.    Well, why don't you tell me what's
19  unclear about my question?
20     A.    You're asking about all these drugs
21  specifically with respect to a certain entity.
22  I'm saying B. Braun Medical Inc. does manufacture

Page 52

1  pharmaceutical products.  As far as all of these,
2  you're asking me information that I've gathered
3  outside of my capacity as representative for B.
4  Braun of America Inc..
5      Q.    So, just to make absolutely clear,
6  you will not testify today whether the documents
7  identified in Exhibit 5 are manufactured by B.
8  Braun Medical or any other B. Braun entity?
9      MR. ATTRIDGE:  Objection as to form.
10  Misstates her earlier testimony.
11     THE WITNESS:  My response is I am
12  testifying that B. Braun Medical Inc., yes, does
13  manufacture certain pharmaceutical products.
14  Some of which are probably represented here.
15  BY MS. CONNOLLY:
16     Q.    But with regard to specific
17  knowledge of those drugs, you're not going to
18  testify as to who manufactures those specific
19  drugs on Exhibit 5?
20     MR. ATTRIDGE:  Objection as to form.
21     THE WITNESS:  I think I need to confer
22  with counsel as far as the attorney-client

13 (Pages 49 to 52)

Page 53

1  privilege.
2      MS. CONNOLLY:  Okay.
3      MR. ATTRIDGE:  Let's go.
4          (Recess taken.)
5      MS. CONNOLLY:  Do you mind reading back my
6  last question.
7          (Whereupon, the court reporter read
8  back the last question.)
9      MR. ATTRIDGE:  And then you have my
10 objection.
11     THE WITNESS:  I'm here today as a
12 representative for B. Braun of America Inc. to
13 talk about the knowledge that B. Braun of America
14 Inc. has with respect to the questions that you
15 asked here.
16         B. Braun of America Inc. does not
17 manufacture any drugs, either on here or not.
18 There's something here that says B. Braun McGaw.
19 I talked about B. Braun McGaw, Inc. not being an
20 entity.  With respect to any information that you
21 may be asking specifically about B. Braun Medical
22 Inc., I'm not here today to talk to you about

Page 54

1  that, I'm here as a representative for B. Braun
2  of America Inc..  B. Braun of America Inc. does
3  not receive data on a drug-by-drug basis and has
4  no knowledge of the drug-by-drug basis specific
5  information that you're asking here.
6      MS. CONNOLLY:  Okay.  Well, I'm just going
7  to note for the record that I don't believe you
8  have complied with the notice and that we'll seek
9  all relief from the court in connection --
10     MR. ATTRIDGE:  What haven't we done? She's
11 a representative of B. Braun of America and she's
12 testified that she's prepared herself and she's
13 talked to other people and reviewed documents.
14 She's talked about what the limitations are in
15 terms of the information that the company has.
16     MS. CONNOLLY:  She hasn't educated herself
17 on topics that were specifically identified in
18 the notice in which she has already made clear
19 are available to her for examination.
20     MR. ATTRIDGE:  No, you don't
21 understand rule 30(b)(6).  You began --
22     MS. CONNOLLY:  Well, I'm not interested in

Page 55

1  your education on Rule 30(b)(6).  I've made my
2  objection and I'm going to move on with the
3  questions.
4      MR. ATTRIDGE:  Can you just tell me
5  specifically what information you think she
6  should have because I think you're dead wrong.
7      MS. CONNOLLY:  Well, I think she should
8  have information on which B. Braun entity
9  manufactures each of those AWPID's.
10     MR. ATTRIDGE:  If B. Braun of America has
11 that information, she will tell you about it.
12 What she's told you, and you're just not
13 listening, is that B. Braun of America doesn't
14 make any drugs, okay.
15     MS. CONNOLLY:  I'm saying that her failure
16 to inquire from B. Braun Medical is in direct
17 violation of the 30(b)(6) Notice.
18     MR. ATTRIDGE:  No, it's not because what
19 Rule 30(b)(6) requires and what she has done is
20 learn about information that B. Braun of America
21 has, okay.  That doesn't mean that B. Braun of
22 America has to solicit other companies for

Page 56

1  information that they have in order to have your
2  deposition.  You're just wrong if you think the
3  rule requires that.
4      MS. CONNOLLY:  Well, I really don't care
5  what your opinion is.  I have put my objection on
6  the record and I would like to move on with the
7  questioning.
8      MR. ATTRIDGE:  By the way, I'll tell if
9  you'd like to take this up with the Court right
10 here and now I'm available to do that because I
11 think your position is absolutely frivolous.
12     MS. CONNOLLY:  Well, that's fine.
13     MR. ATTRIDGE:  And I invite you to do that.
14     MS. CONNOLLY:  That's fine.  If you'd like
15 to get the Court on the phone, I'm happy to do
16 that.
17     MR. ATTRIDGE:  Well, I don't want you to be
18 complaining that you didn't have an opportunity
19 to seek whatever answers or relief you want.  I
20 think you've gotten everything you're entitled
21 to.
22     MS. CONNOLLY:  Well, I think we should go

14 (Pages 53 to 56)

Cathy Codrea                       Highly Confidential                       August 17, 2004
                                   Bethlehem, PA

Page 57

1   on with the remainder of the topics and then we
2   will re-visit what we're going to do from there.
3       MR. ATTRIDGE:  Okay.
4   BY MS. CONNOLLY:
5       Q.    Regarding topic four that is
6   identified in the notice, the contract agreements
7   regarding the licensing or distribution or
8   marketing of any AWPID between or among B. Braun
9   of America, B. Braun McGaw, or B. Braun Medical.
10  How did you familiarize yourself with this area
11  of inquiry?
12      A.    I spoke with Charles DiNardo and
13  also generally being an employee of B. Braun
14  Medical Inc. in my capacity as legal counsel, I
15  know what type generally of arrangements B. Braun
16  Medical Inc. enters into.
17      Q.    Is part of your role as assistant
18  general counsel at B. Braun Medical Inc. to
19  prepare these types of agreements?
20      MR. ATTRIDGE:  Objection as to form.
21  There's been no testimony that there are any
22  types of agreements that are referred to in

Page 58

1   number four of your deposition notice.
2   BY MS. CONNOLLY:
3       Q.    Can you answer the question?
4       A.    There are no contracts or agreements
5   regarding the licensing, distribution or
6   marketing of any AWPID between any of those
7   companies identified in your area of inquiry one,
8   A, B and C.
9       Q.    Okay.  I understand your testimony
10  is that B. Braun McGaw as an entity does not
11  exist?
12      A.    B. Braun McGaw comma Inc. as an
13  entity does not exist.
14      Q.    Are there any agreements between B.
15  Braun America and B. Braun Medical regarding the
16  licensing of AWPID's?
17      A.    No.
18      Q.    Are there any agreements between
19  those two entities regarding the distribution of
20  AWPID's?
21      A.    No.
22      Q.    Regarding the marketing of AWPID's?

Page 59

1       A.    No.
2       Q.    Are there any agreements between
3   those two entities regarding the advertising of
4   AWPID's?
5       A.    No.
6       Q.    Or the sale of AWPID's?
7       A.    No.
8       Q.    Regarding topic five, any and all
9   sales, advertising, marketing, distribution or
10  manufacturing of AWPID's in the Commonwealth of
11  Massachusetts by B. Braun of America, B. Braun
12  McGaw, Inc. or B. Braun Medical Inc..  How did
13  you familiarize yourself with this area of
14  inquiry?
15      A.    My own knowledge as assistant
16  general counsel with B. Braun Medical Inc.
17      Q.    How as assistant general counsel
18  have you become familiar with the sales,
19  advertising, marketing or distribution or
20  manufacturing of AWPID's in the Commonwealth of
21  Massachusetts?
22      A.    In my role as assistant general

Page 60

1   counsel for B. Braun Medical Inc. I am asked from
2   time-to-time to provide general legal advice with
3   respect to all areas of company, including the
4   marketing and sale of our products.
5       Q.    And in the course of rendering that
6   legal advice you have become knowledgeable about
7   whether the three companies identified in topic
8   five acknowledging that you have contended that
9   the McGaw entity does not exist, have sales
10  advertising, marketing, distribution or
11  manufacturing of AWPID's in Massachusetts?
12      A.    Let me be precise.  With respect to
13  my capacity as legal counsel for B. Braun Medical
14  Inc., I am aware of the types of businesses that
15  B. Braun Medical Inc. may involve itself with
16  respect to the sale of its products.
17          With respect to my capacity as
18  assistant secretary for B. Braun of America, Inc.
19  I am not aware of any sales, advertising,
20  marketing, distribution or manufacturing of any
21  drugs of any sort, anywhere, at anytime.
22      Q.    So, it's your testimony that with

15 (Pages 57 to 60)

Cathy Codrea                         Highly Confidential                    August 17, 2004
                                     Bethlehem, PA

Page 61

1   regard to B. Braun of America, that it does not
2   do any sales, advertising, marketing,
3   distribution, or manufacturing of AWPID's into
4   Massachusetts?
5       A.    Yes, I'm not aware of any.
6       Q.    Does B. Braun of America have any
7   product catalogues?
8       A.    Not that I'm aware of.  I've never
9   seen one.
10      Q.    Does B. Braun of America have any
11  sales representatives that are employed in
12  Massachusetts?
13      A.    No.  Let me restate, B. Braun of
14  America is a company that holds stock.  It does
15  not operate a business.  It does not sell any
16  products.  It does not have any employees.  It
17  holds stock.
18      Q.    Does B. Braun of America have a
19  collections department?
20      A.    No.
21      Q.    Does it contract out with anyone to
22  do collections on behalf of any of its

Page 62

1   subsidiaries?
2       A.    Not that I'm aware of.
3       Q.    Does B. Braun of America pay any
4   taxes to the Commonwealth of Massachusetts?
5       A.    No.
6       Q.    Does it own property in the
7   Commonwealth of Massachusetts?
8       A.    No.
9       Q.    Since it's your contention that B.
10  Braun of America is a holding company, I take it
11  that B. Braun of America does not advertise?
12      A.    Correct.
13      Q.    Has any officer or director of B.
14  Braun of America ever attended trade shows?
15      A.    Not on behalf of B. Braun of
16  America.  B. Braun of America, it just holds
17  stock.  It's a shareholder.  A shareholder that
18  invests in companies that do business.
19      Q.    And with regard to B. Braun McGaw, I
20  take it your testimony will be that to your
21  knowledge it does not engage in any sales,
22  advertising, marketing, distribution, or

Page 63

1   manufacturing of AWPID's in Massachusetts,
2   correct?
3       A.    B. Braun McGaw, Inc. to my knowledge
4   is not a legal entity and, therefore, I cannot
5   represent one thing or another about it.
6       Q.    With regard to B. Braun Medical
7   Inc., does it sell any AWPID's into the
8   Commonwealth of Massachusetts?
9       A.    Without violating the
10  attorney-client privilege, I think it's fair to
11  say that B. Braun Medical Inc. does sell certain
12  drug products of which some may be listed as
13  AWPID into the State of Massachusetts.
14      Q.    And does B. Braun Medical itself
15  have product catalogues?
16      A.    Yes, it does.
17      Q.    Do you know how those are
18  distributed?
19      A.    No, I'm not involved personally with
20  that.
21      Q.    Do you have any knowledge regarding
22  how B. Braun Medical pharmaceutical products and

Page 64

1   specifically AWPID's are shipped?
2       A.    How they're shipped?
3       Q.    Um-hmm.
4       A.    Shipped to who?
5       Q.    Well, I guess I mean to whom they're
6   shipped? The process that they're shipped by? Do
7   you know whether they are shipped to, for
8   example, wholesalers?
9       A.    We have distributors.
10      Q.    Do you know the identity of any of
11  those distributors?
12      A.    Only through my knowledge of legal
13  representation for B. Braun Medical.
14      Q.    So, you're not going to answer that
15  question today?
16      A.    I don't think I can.
17      Q.    Because of the attorney-client
18  privilege?
19      A.    Yes, because I work on contracts and
20  represent the company in those types of
21  negotiations.
22      MR. ATTRIDGE:  It is also outside the scope

16 (Pages 61 to 64)

Cathy Codrea                    Highly Confidential                    August 17, 2004
                                   Bethlehem, PA

Page 65

1  of your notice to B. Braun of America.
2  BY MS. CONNOLLY:
3      Q.    And is it your testimony that in the
4  course of gaining this knowledge that you were
5  either rendering or receiving legal advice?
6      A.    My sole capacity is legal counsel
7  for B. Braun Medical Inc.. I always render legal
8  advice for B. Braun Medical Inc.. That's my
9  capacity. Everything I learn is with respect to
10 being a lawyer at B. Braun Medical Inc.
11     Q.    So, it's your testimony that
12 everything that you do in connection with B.
13 Braun Medical is giving legal advice?
14     A.    Everything --
15     MR. ATTRIDGE:  Objection as to form.
16     THE WITNESS:   Everything is in connection
17 with my role as counsel and actually I'm here
18 right now today as a representative for B. Braun
19 of America Inc. not to answer questions of the
20 attorney-client privilege with respect to B.
21 Braun Medical Inc.. So, I would appreciate it if
22 we could keep the questions related to my role as

Page 66

1  representative for B. Braun of America Inc.
2  BY MS. CONNOLLY:
3      Q.    Actually, I'm going to ask you
4  questions about B. Braun Medical Inc. because
5  that is what the notice provides and I need to
6  establish a record of your refusal to respond.
7      MR. ATTRIDGE:  No, she's not refusing to
8  respond and that's an inappropriate statement on
9  your part. She's here as a representative of B.
10 Braun of America and if you have inquiries about
11 that, you should make them. But you shouldn't
12 assume that you can ask someone who is a B. Braun
13 Medical lawyer questions that invade the
14 attorney-client privilege.
15 BY MS. CONNOLLY:
16     Q.    Does B. Braun Medical have any sales
17 representatives who reside in the Commonwealth of
18 Massachusetts?
19     A.    I don't know that answer.
20     Q.    Does B. Braun America contract with
21 any sales representatives who either work or
22 reside in the Commonwealth of Massachusetts?

Page 67

1      A.    That we would contract with the
2  sales representatives?
3      Q.    Um-hmm.
4      MR. ATTRIDGE:  That was B. Braun America?
5      MS. CONNOLLY:  I'm sorry, B. Braun Medical.
6      MR. ATTRIDGE:  You asked B. Braun America.
7  Would you ask a new question.
8  BY MS. CONNOLLY:
9      Q.    Does B. Braun Medical contract with
10 any sales representatives who either work or
11 reside in the Commonwealth of Massachusetts?
12     MR. ATTRIDGE:  Objection as to form and
13 foundation. There is no indication that B. Braun
14 of America would know that.
15     THE WITNESS:   I don't know the answer
16 there.
17 BY MS. CONNOLLY:
18     Q.    Does B. Braun Medical call on any
19 customers in the Commonwealth of Massachusetts?
20     MR. ATTRIDGE:  Objection as to form and
21 foundation. There's no indication that B. Braun
22 of America would know that.

Page 68

1      THE WITNESS:   B. Braun Medical Inc. sells
2  products in all 50 states of the United States,
3  including Massachusetts. With respect to that,
4  I'm sure that it has sales representatives that
5  call on entities, providers of health care
6  services who have businesses in the State of
7  Massachusetts. Where those sales representatives
8  reside, I don't know. Whether we out source some
9  of those sales representatives in a contractual,
10 independent contract basis, I'm not prepared to
11 answer that question. It's not listed here
12 specifically, so I did not gather that
13 information from the company.
14 BY MS. CONNOLLY:
15     Q.    Do you know if B. Braun Medical pays
16 taxes to the Commonwealth of Massachusetts?
17     A.    If required by law --
18     MR. ATTRIDGE:  Same objections.
19     THE WITNESS:   I'm sure that if it's
20 required by law, B. Braun Medical Inc. is
21 complying with its legal requirements.
22 BY MS. CONNOLLY:

17 (Pages 65 to 68)

Cathy Codrea                           Highly Confidential                    August 17, 2004
                                       Bethlehem, PA

Page 69

1      Q.    Do you have any specific knowledge
2   of whether there are taxes that are required to
3   be paid by law to the Commonwealth of
4   Massachusetts for B. Braun Medical?
5         MR. ATTRIDGE:  Same objections.
6         THE WITNESS:  I'm not a tax attorney and,
7   no, I'm not -- I don't have actual knowledge of
8   what we pay taxes, to whom or when.
9   BY MS. CONNOLLY:
10     Q.    Do you have any knowledge regarding
11  whether B. Braun Medical owns property in the
12  Commonwealth of Massachusetts?
13        MR. ATTRIDGE:  Same objections.
14        THE WITNESS:  I have not inquired of
15  that.  It was not on any of the areas of inquiry
16  here.
17  BY MS. CONNOLLY:
18     Q.    Do you have any knowledge whether B.
19  Braun Medical advertises its products?
20        MR. ATTRIDGE:  Same objections.
21        THE WITNESS:  B. Braun Medical Inc. as an
22  operating company conducting business advertises

Page 70

1   products to sale, yes.  For sale to providers.
2   BY MS. CONNOLLY:
3      Q.    Do you have any knowledge regarding
4   in what manner it advertises its products?
5         MR. ATTRIDGE:  Objection as to form,
6   foundation and beyond the scope of your notice.
7         THE WITNESS:  My knowledge on advertising
8   of B. Braun Medical Inc. as pursuant to my
9   representation as legal counsel for B. Braun
10  Medical Inc..
11  BY MS. CONNOLLY:
12     Q.    So, you're not going to answer on
13  the basis of the attorney-client privilege?
14     A.    Correct.
15     Q.    Do you have any knowledge whether
16  any B. Braun Medical employees have attended
17  trade shows in the Commonwealth of Massachusetts?
18        MR. ATTRIDGE:  Objection as to form,
19  foundation, and beyond the scope of your notice.
20        THE WITNESS:  I don't know.  It's not
21  asked here and I could not think of every
22  question that you were going to ask me unless it

Page 71

1   was written here.  I'm prepared to talk about
2   these questions specifically, but anything
3   outside of that, I'm sorry, I'm not going to
4   guess at an answer.
5   BY MS. CONNOLLY:
6      Q.    Do you have knowledge on whether B.
7   Braun Medical distributes any pharmaceutical
8   products into the Commonwealth of Massachusetts?
9         MR. ATTRIDGE:  Objection as to form and
10  foundation and beyond the scope of your notice.
11        THE WITNESS:  I know that B. Braun Medical
12  Inc. distribute products.  I would assume -- I
13  can't answer that.  I'm not prepared to answer
14  that.  You're asking me about specific products
15  into a specific state and I don't know what those
16  arrangements are.
17  BY MS. CONNOLLY:
18     Q.    Do you have any knowledge on whether
19  the persons or entities to whom B. Braun Medical
20  sells its products are located in the
21  Commonwealth of Massachusetts?
22        MR. ATTRIDGE:  Same objections.

Page 72

1         THE WITNESS:  B. Braun Medical has a large
2   distribution group dealing with several hundreds
3   of distributors.  Where they sell, I'm not
4   prepared to sit here and make guesses to those
5   questions.
6   BY MS. CONNOLLY:
7      Q.    Do you have any knowledge of whether
8   B. Braun Medical makes payments to State or
9   Federal agencies located in the Commonwealth of
10  Massachusetts?
11        MR. ATTRIDGE:  Objection as to form,
12  foundation, and beyond the scope of your notice.
13        THE WITNESS:  I'm not going to conjecture
14  an answer there.  I'm sure if we have a legal
15  requirement to do something, that we're doing
16  that.
17  BY MS. CONNOLLY:
18     Q.    Do you have any knowledge whether B.
19  Braun Medical manufactures AWPID's in the
20  Commonwealth of Massachusetts?
21     A.    Yes.
22     Q.    Does it manufacture AWPID's in the

18 (Pages 69 to 72)

Cathy Codrea                          Highly Confidential                    August 17, 2004
                                       Bethlehem, PA

Page 73

1   Commonwealth of Massachusetts?
2       A.      No.
3       Q.      Does it contract to manufacture any
4   AWPID's in the Commonwealth of Massachusetts?
5       A.      Not that I'm aware.
6       Q.      Does B. Braun Medical package any
7   AWPID's in the Commonwealth of Massachusetts?
8       A.      No.
9       Q.      Does it do any private labeling in
10  the Commonwealth of Massachusetts?
11      A.      No.
12      Q.      Does B. Braun Medical do any other
13  businesses with regard to AWPID's in the
14  Commonwealth of Massachusetts that we have not
15  discussed?
16      MR. ATTRIDGE:  Objection as to form,
17  foundation, beyond the scope of your notice.
18      THE WITNESS:  I don't know.
19  BY MS. CONNOLLY:
20      Q.      Do you know if B. Braun of America
21  does any business in the Commonwealth of
22  Massachusetts that we have not discussed

Page 74

1   previously?
2       A.      B. Braun of America Inc. does not do
3   any business in the State of Massachusetts or any
4   other state.  It does not sell products.  It is a
5   shareholder that holds stock.
6       Q.      With regard to topic six, are there
7   any documents that you gathered to prepare for
8   this deposition?
9       A.      No.  I put together this to help me
10  answer inquiry number one.
11      Q.      You're referring to Exhibit 2?
12      A.      Exhibit 2, yes, sorry.
13      Q.      And with regard to the documents
14  that -- did you review any other documents other
15  than that in connection with familiarizing
16  yourself with these areas of inquiry?
17      A.      There really wasn't anything to
18  review.  From the perspective I wanted to ensure
19  I was accurate in answering number one.  I've
20  already testified that I spoke with Mr. Mayer.  I
21  reviewed this document with him against his
22  knowledge.  The relationship, I've already

Page 75

1   testified.  Shareholder, there's no documents to
2   review for me to gather information there.
3   Because neither B. Braun of America Inc., nor B.
4   Braun McGaw, Inc. are relevant to the rest of the
5   questions basically, there was nothing to review
6   in that regard.  B. Braun Medical Inc. I've
7   testified as to the knowledge that B. Braun of
8   America Inc. as a shareholder would get with
9   respect to B. Braun Medical Inc. with regard to
10  these other questions, but there is no
11  documentation to review.
12      Q.      So, in preparing Exhibit 2
13  specifically, you did not review any documents to
14  prepare that, it was based solely on your
15  interview?
16      A.      It was based on my interview.  Also,
17  there was a summary sheet that I just reviewed
18  and confirmed that this was correct, having this
19  information with respect to state of
20  incorporation, information date, entities for B.
21  Braun of America Inc. and for B. Braun Medical
22  Inc..

Page 76

1       Q.      And who prepared that summary sheet?
2       A.      William Mayer.
3       Q.      And just to clarify, other than the
4   financial reports that you previously testified
5   to, are you aware of any other documents that B.
6   Braun America receives from B. Braun Medical on a
7   regular basis?
8       A.      No, I'm not aware of anything else.
9       Q.      Did you inquire from anyone else on
10  whether there were documents that B. Braun of
11  America receives on a regular basis from B. Braun
12  Medical?
13      A.      Yes, I did.  I absolutely did.
14      Q.      And did all of these people tell you
15  that there were no documents that --
16      A.      I've testified to that, yes,
17  already.
18      Q.      With regard to topic three, all
19  AWPID's manufactured, distributed, marketed or
20  sold by B. Braun of America, B. Braun McGaw or B.
21  Braun Medical, did you make any effort to
22  familiarize yourself with this topic with regard

19 (Pages 73 to 76)

Cathy Codrea                           Highly Confidential                      August 17, 2004
                                        Bethlehem, PA

Page 77

1    to B. Braun Medical?
2         MR. ATTRIDGE:  Objection as to form,
3    foundation, and beyond the scope of the notice
4    directed to B. Braun of America.  You can testify
5    about information that's available to B. Braun of
6    America.
7         THE WITNESS:   Okay.  I think I have.  B.
8    Braun of America does receive, my understanding
9    is, an audited financial report that does not go
10   into the detail of the specific AWPID level.
11   BY MS. CONNOLLY:
12        Q.    And other than inquiring about the
13   types of documents that B. Braun of America
14   receives with regard to area of inquiry three,
15   did you do any other investigation of area of
16   inquiry three with regard to B. Braun Medical?
17        MR. ATTRIDGE:  Same objections.  There is a
18   mistake in premise in your question.  You're
19   asking her to assume that she's supposed to do
20   something other than inquire as to what
21   information B. Braun of America has and she
22   doesn't have to do that.  She's not supposed to

Page 78

1    do that.  That's why her answers reflect the
2    information available to B. Braun of America.
3    BY MS. CONNOLLY:
4         Q.    Can I have your testimony please?
5         A.    With respect to my capacity as legal
6    counsel for B. Braun Medical Inc., I have a lot
7    of knowledge in this area with respect to
8    defending this MDL litigation and subject to the
9    attorney-client privilege, I cannot answer those
10   specific questions that I have educated myself on
11   in order to help defend the company in this
12   litigation.
13        Q.    I'm not inquiring about how you have
14   prepared yourself to defend this litigation.  I'm
15   asking how you have prepared yourself for this
16   deposition and rather in preparing yourself for
17   this deposition, if you have prepared yourself
18   with regard to area of inquiry three in any other
19   manner other than inquiring about the types of
20   documents that B. Braun of America gets from B.
21   Braun Medical with regard to area of inquiry
22   three?

Page 79

1         A.    No.  As a representative for B.
2    Braun of America Inc., I followed the rule and
3    took a look at what I needed to do to be able to
4    respond to your question with respect to the
5    knowledge of B. Braun of America Inc..
6         MS. CONNOLLY:  Can you mark this please.
7              (Whereupon, the court reporter
8    marked Exhibit Codrea 006 for identification.)
9    BY MS. CONNOLLY:
10        Q.    The court reporter has handed you
11   what's been marked as Exhibit Codrea 006.  Have you
12   ever seen this document before?
13        A.    Yes, I have.
14        Q.    And you have reviewed it in the
15   course of working in this litigation, correct?
16        A.    Yes, correct.
17        Q.    I'd like to refer you to paragraph
18   six of Mr. DiNardo's affidavit and specifically
19   to the second sentence of that paragraph which
20   says,"in fact, however, BBA is not the successor
21   in interest to McGaw, rather McGaw was merged
22   into a different, separate corporate entity".

Page 80

1    Are you familiar with the corporate entity into
2    which McGaw was merged?
3         A.    Yes.
4         Q.    What is that entity?
5         A.    B. Braun Medical Inc.
6         Q.    So, was there any part of what was
7    formerly McGaw that became anything other than
8    what is now B. Braun Medical Inc.?
9         MR. ATTRIDGE:  Objection as to form and
10   foundation.
11        THE WITNESS:   Can you repeat that
12   question.
13        MS. CONNOLLY:  Sure.  Can you read it
14   back.
15              (Whereupon, the court reporter read
16   back the last question.)
17        THE WITNESS:  I don't believe so, but I
18   don't know the answer.  I've not read the
19   agreement between when the sales of stock were
20   sold from McGaw to B. Braun Medical Inc..  I
21   haven't read the agreement, so I don't know.
22   BY MS. CONNOLLY:

20 (Pages 77 to 80)

Cathy Codrea                    Highly Confidential                    August 17, 2004
                                Bethlehem, PA

Page 81

1    Q.   Are you referring to the stock
2  purchase agreement between B. Braun of America
3  and Imax?
4    A.   I'm referring to the acquisition
5  documents in which B. Braun Medical Inc. acquired
6  the shares of McGaw, Inc.. I was not involved in
7  that transaction and it occurred before I became
8  a corporate employee of B. Braun Medical Inc.
9    Q.   Do you have any knowledge of whether
10  the transaction you're referring to is, indeed,
11  the stock purchase agreement between B. Braun of
12  America Inc. and Imax?
13    MR. ATTRIDGE:  Objection as to form and
14  foundation and it's beyond the scope of your
15  deposition notice.
16    THE WITNESS:   And I've already testified
17  that I was not involved in that transaction. I
18  was not an employee of B. Braun Medical Inc. and
19  because it was not in the area of inquiry, I did
20  not re-familiarize myself with the structure of
21  any other agreement.
22  BY MS. CONNOLLY:

Page 82

1    Q.   If you could turn briefly to
2  paragraph five of this affidavit. The second
3  sentence says with regard to B. Braun McGaw,"in
4  fact, however, BBA has had no such subsidiary and
5  so far as BBA is aware, no such entity exists as
6  a corporation". Is it your testimony today that
7  likewise, B. Braun McGaw does not exist in any
8  other form other than a corporate form?
9    MR. ATTRIDGE:  Objection as to form and
10  foundation and beyond the scope of your
11  deposition notice.
12    THE WITNESS:   My testimony has been B.
13  Braun McGaw, Inc. is not a corporate entity.
14  BY MS. CONNOLLY:
15    Q.   Are you aware that it is any other
16  type of entity?
17    MR. ATTRIDGE:  Same objections.
18    THE WITNESS:   I'm not aware of it, no.
19         (Whereupon, the court reporter
20  marked Exhibit Codrea 007 for identification.)
21    MR. ATTRIDGE:  May I ask where you got
22  Deposition Exhibit Codrea 007?

Page 83

1    MS. CONNOLLY: Yes. I pulled it down from
2  Dun and Bradstreet's web site.
3    MR. ATTRIDGE:  May I ask why you haven't
4  produced it to us in this litigation?
5    MS. CONNOLLY: I'm not aware that it hasn't
6  been produced.
7    MR. ATTRIDGE:  It hasn't been and I'm
8  asking you why not?
9    MS. CONNOLLY: I don't know. I'm not
10  confident that it's been asked for.
11    MR. ATTRIDGE:  I'm confident that this is
12  something that ought to be produced and I object
13  to you asking questions about the subject matter
14  of this document having not produced it
15  previously.
16  BY MS. CONNOLLY:
17    Q.   If you could turn to page six of
18  Exhibit 7, and specifically to the last paragraph
19  on that page, which says,"the company designs,
20  manufactures and distributes principally
21  disposable medical products" and goes on from
22  there.

Page 84

1    And if you turn to page one of this
2  report it says B. Braun of America Inc.. So,
3  that is the company that it's referring to.
4    Is it your testimony here today that
5  that last paragraph on page six that continues
6  into page seven of Exhibit 7 is incorrect?
7    A.   Well, I've not had the opportunity
8  to read this, as this is the first time I have
9  seen it, but I will tell you that I think it is
10  incorrect. B. Braun of America Inc. does not
11  manufacture or sell any products. Again, it
12  holds stock. That is all it does. It is a
13  shareholder. Simple as that.
14    Dun and Bradstreet does from
15  time-to-time get things incorrect and now I've
16  seen two documents which are incorrect with
17  respect to my knowledge of the companies.
18    Q.   With regard to the next to the last
19  paragraph which begins with"active as a holding
20  company which through its subsidiaries" and it
21  goes on. Is it your testimony today that that
22  paragraph is likewise incorrect?

21 (Pages 81 to 84)

PAGE 22 REDACTED
INTENTIONALLY LEFT BLANK

PAGE 23 REDACTED
INTENTIONALLY LEFT BLANK

PAGE 24 REDACTED
INTENTIONALLY LEFT BLANK

PAGE 25 REDACTED
INTENTIONALLY LEFT BLANK

PAGE 26 REDACTED
INTENTIONALLY LEFT BLANK

PAGE 27 REDACTED
INTENTIONALLY LEFT BLANK

PAGE 28 REDACTED
INTENTIONALLY LEFT BLANK

PAGE 29 REDACTED
INTENTIONALLY LEFT BLANK

Cathy Codrea                     Highly Confidential                     August 17, 2004
                                 Bethlehem, PA

Page 117

1   ████████████████████████████████
2   ████████████████████████████
3   ████████████████████████████████
4   ████████████████████████ looks like they're the same
5   ████████████████
6       A.   Yes.
7       MS. CONNOLLY:  Okay.  I don't have any
8   further questions.
9       MR. ATTRIDGE:  We don't have any questions
10  at this time, but we do reserve the right for the
11  witness to read and review the transcript.
12              - - -
13          (Whereupon, the deposition concluded
14  at 2:15 p.m.)
15              - - -
16
17
18
19
20
21
22

Page 118

1
2       C E R T I F I C A T E
3
4       I hereby certify that the proceedings,
5   evidence and objections noted are contained fully
6   and accurately in the notes taken by me on this
7   hearing of the above-captioned case, and that
8   this is a correct transcription of same.
9
10
11
12   _____
13       DAVID WALSH, NOTARY PUBLIC
14      My Commission expires June 16, 2005
15
16
17
18
19
20
21
22

30 (Pages 117 to 118)