# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```
|  |  |
|---|---|
| In Re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) |  MDL No. 1456<br><br>Master File No. 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

)
) MDL No. 1456
)
) Master File No. 01-CV-12257-PBS
)
) Judge Patti B. Saris
```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```
)
This Document Relates to:                    ) Chief Mag. Judge Marianne B. Bowler
01-CV-12257-PBS                              )
                                            )
                                            )
```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

### DECLARATION OF ADEEL A. MANGI

Adeel A. Mangi, declares and says:

1.      I am associated with the firm of Patterson, Belknap, Webb & Tyler LLP, which serves as counsel to Johnson & Johnson, Centocor, Inc., Ortho Biotech Products L.P., McNeil-PPC, Inc., Janssen Pharmaceutica Products L.P., Johnson & Johnson Health Care Systems, Inc., Ortho McNeil Pharmaceuticals Inc., and Ortho Neutrogena in connection with the above captioned litigation.  I submit this declaration, which is based on my personal knowledge, in support of Defendants' Opposition to Plaintiffs' Emergency Motion for a Protective Order seeking to impose certain scheduling limits on third party depositions.

2.      I have been directly involved on behalf of defendants in the discussions with the third party payors that have been subpoenaed by defendants for documents and deposition testimony.

3.     Although the majority of defendants' third party subpoenas were served in November 2003, all of the third party payors who were subpoenaed refused to produce documents in response to those subpoenas until the Court decided plaintiffs' Motion for a Protective Order. These entities also generally refused to engage in any discussions with defendants' counsel regarding the scope of their productions during this time period.

4.     Defendants promptly initiated discussions with these third party payors regarding the scope of their productions as soon as plaintiffs' motion was denied in March 2004. Nonetheless, productions did not begin until May or June 2004. Accordingly, defendants could not even begin to schedule depositions of these third party payors until this summer and did so promptly after receiving document productions.

5.     I have been informed by other defense counsel that delays of a similar duration also occurred in obtaining productions from other important third parties, such as PBMs and pharmaceutical benefit consultants used by many third party payors.

6.     To date defendants have scheduled depositions with only a fraction of the subpoenaed third parties.   In each case, the depositions have been scheduled in order to accommodate the needs of the third party witnesses, within a timeframe that will allow defendants to use the discovery in opposition to plaintiffs' motion for class certification.

7.     Given the need to accommodate third party schedules, depositions are sometimes scheduled or cancelled on relatively short notice. Defendants have made every effort to keep plaintiffs' counsel apprised of these scheduling changes. Defendants began by promptly posting to Verilaw correspondence confirming firm deposition dates.

2

Defendants then agreed to exchange a calendar of third party depositions with plaintiffs on at least a weekly basis, and often more frequently as scheduling changes arise.

    8.    I declare under penalty of perjury that the foregoing is true and correct.

By: _____
Adeel A. Mangi

Dated: September 20, 2004

# EXHIBIT C



## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL. No. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO ALL ACTIONS | Chief Mag. Judge Marianne B. Bowler |

### PLAINTIFFS' CONSENT MOTION FOR AN EXTENSION OF TIME TO OPPOSE ASTRAZENECA'S MOTION FOR A PROTECTIVE ORDER LIMITING THE SCOPE OF CERTAIN THIRD PARTY SUBPOENAS

Plaintiffs hereby move, with the consent of AstraZeneca, for a three day extension of

time until September 17, 2004, to oppose the Motion for a Protective Order Limiting the Scope

of Certain Third Party Subpoenas. The parties have been discussing potential resolutions to this

dispute. No further extensions of time are anticipated.

Accordingly, Plaintiffs move for the entry of the proposed scheduling order attached

hereto.

### CERTIFICATION PURSUANT TO LOCAL RULE 7.1

Pursuant to Local Rule 7.1(a)(2), the undersigned hereby certify that counsel for

AstraZeneca consents to this motion.

Dated: September 14, 2004                    By: _____ /s/Edward Notargiacomo _____

Thomas M. Sobol
Edward Notargiacomo
One Main Street, 4th Floor
Cambridge, MA 02142

**LIAISON COUNSEL**

- 1 -



Steve W. Berman
Sean R. Matt
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Samuel Heins
Brian Williams
HEINS MILLS & OLSON, P.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Jeff Kodroff
John Macoretta
SPECTOR, ROSEMAN &
KODROFF, P.C.
18181 Market Street, Suite 2500
Philadelphia, PA 19103

**CHAIRS OF LEAD COUNSEL
COMMITTEE**

Kenneth A. Wexler
Elizabeth A. Fegan
THE WEXLER FIRM LLP
One North LaSalle
Suite 2000
Chicago, Illinois 60602

Marc H. Edelson
HOFFMAN & EDELSON
45 West Court Street
Doylestown, PA 18901

**MEMBERS OF LEAD
COUNSEL COMMITTEE AND
EXECUTIVE COMMITTEE**



Michael McShane
ALEXANDER, HAWES & AUDET
LLP
300 Montgomery Street, Suite 400
San Francisco, CA 94104

Robert E. Piper, Jr.
PIPER & ASSOCIATES
624 Pierre Avenue
Shreveport, LA 71103

**MEMBERS OF EXECUTIVE
COMMITEE**

Anthony Bolognese
BOLOGNESE & ASSOCIATES
One Penn Center
1617 JFK Boulevard
Suite 650
Philadelphia, PA 19103

Jonathan W. Cuneo
The Cuneo Law Group
317 Massachusetts Avenue, N.E.
Suite 300
Washington, D.C. 20002

Neal Goldstein
Freedman & Lorry, P.C.
400 Market Street, Suite 900
Philadelphia, PA 19106

Michael E. Criden
Hanzman & Criden, PA
Commerce Bank Center, Suite 400
220 Alhambra Circle
Coral Gables, FL 33134

Blake M. Harper
Kirk B. Hulett
Hulett Harper LLP
550 West C Street, Suite 21700
San Diego, CA 92101



Jonathan D. Karmel
KARMEL & GILDEN
221 N. LaSalle Street
Suite 1414
Chicago, IL 60601
Philadelphia, PA 19103

Diane M. Nast
RODA & NAST PC
801 Estelle Drive
Lancaster, PA 17601

Henry H. Rossbacher
ROSSBACHER & ASSOCIATES
811 Wilshire Boulevard
Suite 1650
Los Angeles, CA 90017-2666
Jonathan Shub
SHELLER, LUDWIG & BADEY
1528 Walnut Street
3rd Floor
Philadelphia, PA 19102

Ira Neil Richards
TRUJILLO RODRIGUEZ &
RICHARDS, LLC
The Penthouse
226 West Ritten House Square
Philadelphia, PA 19103

Lee Squitieri
SQUITIERI & FEARON
521 Fifth Avenue
26th Floor
New York, NY 10175

Scott R. Shepherd
SHEPHERD & FINKLEMAN, LLC
117 Gayley Street, Suite 200
Media, PA 19063



Mitchell A. Toups
WELLER, GREEN, TOUPS &
TERRELL L.L.P.
2615 Calder Street, Suite 400
P.O. Box 350
Beaumont, TX 77704

Damon Young
Lance Lee
YOUNG, PICKETT & LEE
4122 Texas Boulevard
P.O. Box 1897
Texarkana, AR/TX 75504

**ADDITIONAL ATTORNEYS
FOR PLAINTIFFS**



## CERTIFICATE OF SERVICE BY VERILAW

Docket No. MDL 1456

       I, Edward Notargiacomo, hereby certify that I am one of plaintiffs' attorneys and that, on September 14, 2004, I caused copies of PLAINTIFFS' CONSENT MOTION FOR AN EXTENSION OF TIME TO OPPOSE ASTRAZENECA'S MOTION FOR A PROTECTIVE ORDER LIMITING THE SCOPE OF CERTAIN THIRD PARTY SUBPOENAS to be served on all counsel of record by causing same to be posted electronically via Verilaw.

Dated: September 14, 2004                   /s/ Edward Notargiacomo   
                                                Edward Notargiacomo



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY          )          MDL No. 1456
AVERAGE WHOLESALE PRICE                 )
LITIGATION                                            )          CIVIL ACTION:
_____ )
                                                                     Judge Patti B. Saris

                                                                     Chief Mag. Judge Marianne B. Bowler

### [PROPOSED] SCHEDULING ORDER

IT IS HEREBY ORDERED that Plaintiffs shall be granted a three day extension until

September 17, 2004, to file any opposition to AstraZeneca's Motion for a Protective Order

Limiting the Scope of Certain Third Party Subpoenas.


DATED: _____                    _____
                                                                     Hon. Marianne B. Bowler
                                                                     United States Magistrate Judge

# EXHIBIT D

Russell Hailey                                          August 4, 2004
                        Nashville, TN

1

          IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS

2

3   In Re:  PHARMACEUTICAL     ) MDL DOCKET NO.
    INDUSTRY AVERAGE WHOLESALE) CIVIL ACTION NO.
4   PRICE LITIGATION,         ) 01CV12257-PBS
    ----------------------------------------------
5   THIS DOCUMENT RELATES TO:
    ALL ACTIONS
6   ----------------------------------------------
7
8
9
10
11
12          Deposition of:
13          J. RUSSELL HAILEY
14          Taken on behalf of the Defendants
15          August 4, 2004
16
17
18
19
20
21
22

                    Henderson Legal / Spherion
                        (202) 220-4158

J. Russell Hailey

August 4, 2004

Nashville, TN

23 (Pages 86 to 89)

---

86

1    Q. State it a different way. These
2  programs all centralized the
3  decision-making process from which drugs
4  are prescribed or dispensed would be of
5  plan. Is that correct?
6    A. That is correct.
7    Q. Okay. Let's turn back to Exhibit B
8  which is Bates stamped CVH 289. Mr.
9  Hailey, generally speaking, what does this
10  exhibit show?
11    A. Fee schedule.
12    Q. And what is a fee schedule?
13    A. Well, in return for the services
14  outlined in the agreement, a reimbursement
15  will be made as follows for these services.
16    Q. Were these administrative fees and
17  reimbursement rates set forth in this fee
18  schedule actually implemented?
19    A. Yes.
20    Q. Under the section 2 -- well,
21  withdraw that question.
22    Is it correct that section 2 of

---

87

1  this fee schedule specifies the rate at
2  which Coventry will reimburse Express
3  Scripts for drugs that are dispensed from
4  the pharmacies with which Express Scripts
5  have contracted?
6    A. Yes.
7    Q. Okay. And in that section the
8  agreement provides that Coventry shall
9  reimburse ESI for drugs dispensed from ESI
10  pharmacies at the lesser of AWP minus 12
11  percent or AWP minus 13 percent plus a
12  dispensing fee --
13    A. It's as --
14    Q. -- for --
15    A. It's as stated in the contract
16  here, these are the terms.
17    Q. Right. My question is in setting
18  the reimbursement amount to ESI at AWP
19  minus 12 percent or AWP minus 13 percent,
20  was it Coventry's understanding at the time
21  that it was providing some margin to ESI or
22  the pharmacies with respect to the drugs

---

88

1  dispensed to the Coventry members?
2    A. We would -- we assume there was
3  margin.
4    Q. Your assumption was at the time
5  that the reimbursement rate that you paid
6  to ESI exceeded the cost at which the
7  pharmacies acquired the drug. Correct?
8    A. Say that again now.
9    Q. Is it correct that your
10  understanding at the time was the amount of
11  reimbursement that you provided to ESI
12  exceeded the amounts that it cost the
13  pharmacy for the drugs that were being
14  reimbursed?
15    A. The -- we were paying enough money,
16  to answer the question, where no one was
17  losing money. That was the assumption.
18    Q. In other words, given the rates
19  that you utilized --
20    A. Correct.
21    Q. -- it was your understanding that
22  the pharmacies were acquiring the drugs at

---

89

1  something, at a price less than AWP minus
2  12 percent or AWP minus 13 percent?
3    A. That's our assumption, yes.
4    Q. Now turning back to the actual
5  terms of the provision, it states there
6  that the amount reimbursed shall be the
7  lesser of series of numbers including the
8  discount off the AWP, the maximum
9  reimbursable amount, and, quote, the
10  pharmacy's usual and customary price
11  charged to a retail customer, end quote.
12    A. Uh-huh.
13    Q. Why did the reimbursement formula
14  include a limitation as to the usual and
15  customary price charged to the retail
16  pharmacy?
17    A. Well, again, we're being
18  comprehensive with this definition. As an
19  example, if a brand drug, formulary brand
20  drug is written, and let's just use this
21  number, and the member pays a $20 copay,
22  then if a branded drug on the formulary, if

---

J. Russell Hailey

August 4, 2004

Nashville, TN

34 (Pages 130 to 133)

---

**130**

1  Coventry Health Care. Is it accurate that
2  that is your signature on behalf of
3  Coventry Health Care?
4      A. Yes.
5      Q. Mr. Hailey, what was the impetus
6  for this agreement?
7      A. Twofold. One is we wanted to get
8  better terms with the agreement, and
9  Caremark wanted an extension of the
10  contract beyond the original terms of the
11  first agreement.
12     Q. When you refer to better terms,
13  what are you referring to?
14     A. Well, we think we got better mail
15  order rates in this agreement than we had
16  in the previous agreement.
17     Q. Where are the improved mail order
18  rates reflected in this amendment?
19     A. Well, if you go to page 3, 8.5, we
20  were able for brand prescriptions through
21  the mail to be at AWP minus 21 percent
22  versus AWP minus 20 percent. If you go to

---

**131**

1  page 2, again, we were defining the MAC
2  through the mail going from AWP minus 55
3  percent to a guaranteed average of AWP
4  minus 64 percent.
5      Q. With respect to section 8.5, which
6  you said pertains to the mail order —
7      A. Can I add something?
8      Q. Sure.
9      A. The other thing we did is we put
10  some more performance parameters in the
11  contract to guarantee implementation of new
12  acquisitions that we did not have in the
13  original agreement. Okay, I'm sorry. Go
14  ahead.
15     Q. With respect to section 8.5, which
16  as I understand you to say, that for brand
17  name drugs dispensed through the mail order
18  pharmacy, this section provides that those
19  brand name drugs shall be reimbursed at AWP
20  minus 21 percent?
21     A. Correct.
22     Q. Was it your understanding at the

---

**132**

1  time that in reimbursing Caremark at AWP
2  minus 21 percent for brand name drugs, you
3  nevertheless were providing Caremark or its
4  pharmacies some margin on those drugs?
5      A. My assumption would be there would
6  be some margin, yes.
7      Q. With respect to section 8 of this
8  agreement, is it correct that this section
9  provides for more particularization with
10  respect to the manner in which Coventry
11  shall reimburse Caremark for the generics
12  distributed?
13     A. Yes.
14     Q. And under these provisions, is it
15  correct that the amount of reimbursement
16  that Coventry is agreeing to provide to
17  Caremark depends in part on whether or not
18  the generic product was listed on the MAC
19  schedule as of June 15th, 2002?
20     A. It's as we've got it stated in the
21  contract.
22     Q. Without reiterating all the terms

---

**133**

1  of the contract, is it fair to say that
2  this revision made it more complex, made
3  the reimbursement of generics by Coventry
4  to Caremark a more complex analysis?
5      A. Yes.
6      Q. How would one determine today how
7  much any particular generic drug was
8  reimbursed by Coventry at any particular
9  point in time?
10     A. Look at the claims payment history.
11     Q. Aside from looking at the claims
12  payment history, is there any other way to
13  determine the reimbursement methodology or
14  rate at which Coventry reimbursed Caremark
15  for generics under this agreement?
16     A. I guess I'm not, I'm sorry, I'm
17  just not clear on the question.
18     Q. It's not a complicated question,
19  it's as simple as you can get it.
20     A. Okay.
21     Q. Other than looking at the claims
22  data, is there any other way of determining

---

J. Russell Hailey

August 4, 2004

Nashville, TN

41 (Pages 158 to 161)

|  |  |
|---|---|
| **158** | **160** |
| 1   it is, that is the average wholesale price | 1   Q. To your knowledge, has any pharmacy |
| 2   of a particular drug. | 2   conspired with any manufacturer to inflate |
| 3   Q. What I'm trying to explore is what | 3   a drug's AWP? |
| 4   that means and what it means to Coventry. | 4   MR. MACORETTA: Objection. |
| 5   Now, let's walk through this. Coventry | 5   THE WITNESS: No. |
| 6   reimburses pharmacies at an amount less | 6   BY MR. HAAS: |
| 7   than AWP. Is that correct? | 7   Q. To your knowledge, has any doctor |
| 8   A. That's correct. | 8   conspired with any drug manufacturer to -- |
| 9   Q. And in doing so Coventry | 9   withdraw that question. |
| 10   understands and believes that the | 10   To your knowledge, has any doctor |
| 11   pharmacies are making some margin on the | 11   conspired with any drug manufacturer to |
| 12   drugs that they dispense. Is that correct? | 12   inflate any drug's AWP? |
| 13   A. That's correct. | 13   A. No. |
| 14   Q. So therefore in providing | 14   MR. MACORETTA: Objection. |
| 15   reimbursement that is less than AWP, is it | 15   BY MR. HAAS: |
| 16   not accurate that Coventry understands that | 16   Q. To your knowledge, has any PBM |
| 17   average wholesale price is not an average | 17   conspired with any drug manufacturer to |
| 18   of what the pharmacies are actually paying | 18   inflate a drug's AWP? |
| 19   for the drugs? | 19   MR. MACORETTA: Objection. |
| 20   MR. MACORETTA: Objection. | 20   THE WITNESS: No. |
| 21   THE WITNESS: Since we pay an AWP | 21   BY MR. HAAS: |
| 22   minus a percent discount, my assumption is | 22   Q. Have you seen the complaint that |

|  |  |
|---|---|
| **159** | **161** |
| 1   is that that's not the price, the quoted | 1   has been filed in this action? |
| 2   AWP is not the price they're paying. | 2   A. No. |
| 3   BY MR. HAAS: | 3   Q. Do you understand that the |
| 4   Q. All right. | 4   plaintiffs in this action are contending |
| 5   A. My assumption is, not knowing | 5   that the publication of AWPs have defrauded |
| 6   factually, but my assumption is that they | 6   payers that paid based upon AWP? |
| 7   pay some percent close to, it may be above | 7   MR. MACORETTA: Objection. |
| 8   WAC or it could be close to WAC, I'm not | 8   THE WITNESS: Time out. |
| 9   sure. | 9   MR. HAAS: Off the record. |
| 10   Q. But your assumption is somewhere -- | 10   (Break taken.) |
| 11   the amount that pharmacies are paying for | 11   MR. HAAS: Back on the record. Was |
| 12   drugs is somewhere around the wholesale | 12   there a question pending? |
| 13   acquisition cost? | 13   (Requested material read.) |
| 14   A. It's somewhere around that number. | 14   THE WITNESS: No, I don't. |
| 15   MR. MACORETTA: Objection. | 15   BY MR. HAAS: |
| 16   THE WITNESS: But I don't know that | 16   Q. Is it your position that drug |
| 17   factually. | 17   manufacturers have perpetuated a fraud on |
| 18   BY MR. HAAS: | 18   Coventry by publishing AWPs? |
| 19   Q. Has Coventry ever actually | 19   MR. MACORETTA: Objection. |
| 20   conducted any studies of the cost at which | 20   THE WITNESS: No. |
| 21   doctors or pharmacies acquire drugs? | 21   MR. HAAS: I have one more pile of |
| 22   A. No. | 22   documents I just need you to authenticate. |

# EXHIBIT E

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


-o0o-


IN RE:  PHARMACEUTICAL        )

INDUSTRY AVERAGE             )    MDL No. 1456

WHOLESALE PRICE             )

LITIGATION                  )    No.

------------------------    )    01-CV-12257-PBS

This Document Relates to    )

All Actions                 )

                            )

            Defendant.      )

_____    )


FRIDAY, JULY 23, 2004

DEPOSITION OF DALE KRAMER


        Deposition of DALE KRAMER, taken on behalf of

Plaintiffs, at One Kaiser Plaza, Oakland, California,

commencing at 1:09 p.m. on FRIDAY, July 23, 2004,

before LESIA J. MERVIN, CSR No. 4753, RMR, Certified

Realtime Reporter.

Dale Kramer                                                        July 23, 2004

Oakland, CA

10 (Pages 34 to 37)

34

1   called.
2       Q.  Benefits department.  Who's the head of
3   that department?
4       A.  I don't know.
5       Q.  Do you have an understanding,
6   Mr. Kramer, as to whether or not Kaiser reimburses
7   MedImpact for the amount paid to the pharmacies under
8   the point of service plan at the amount paid -- at the
9   same amount that MedImpact pays the pharmacy?
10      A.  I don't know that MedImpact pays the
11  pharmacies.  I think they just adjudicate and manage
12  the claim and Kaiser pays directly.
13      Q.  So to your understanding it's a complete
14  pass-through relationship?
15      A.  That's my understanding.
16      Q.  Do you have an understanding as to the
17  methodology by which the pharmacies charge Kaiser for
18  the drugs dispensed to its members under the point of
19  service plan?
20      A.  Yeah, I believe it's based on AWP.
21      Q.  Do you have an understanding of whether
22  Kaiser has any contractual relationship with the

35

1   pharmacies -- withdraw that.  Withdraw that question.
2       Do you have an understanding whether or
3   not MedImpact has a contractual relationship with the
4   pharmacies that participate in the point of service
5   program?
6       A.  I don't know the details, so I couldn't
7   say with certainty.
8       Q.  With respect to the reimbursement that
9   Kaiser has in fact paid to pharmacies under the point
10  of service plan, do you have any understanding as to
11  the range of discounts off of AWP that Kaiser has paid
12  to reimburse for branded drugs dispensed to its
13  members?
14      A.  I don't know the terms of the agreement.
15      Q.  Do you have an understanding as to
16  whether Kaiser itself, or MedImpact on behalf of
17  Kaiser, has developed MAC lists to govern the
18  reimbursement of generic drugs under the point of
19  service plan?
20      A.  I don't know for sure, but I would
21  assume so.
22      Q.  Who would -- withdraw that question.

36

1       Which department at Kaiser would be
2   responsible for developing MAC lists for the point of
3   service plan?  Would that be the benefits department
4   also?
5       A.  Pharmacy Benefits Department.
6       Q.  Is the Pharmacy Benefits Department
7   distinct from the Benefits Department?
8       A.  Yes.
9       Q.  Is it a separate department or is it a
10  subdepartment of that?
11      A.  Separate department.
12      Q.  To your knowledge, for the drugs that
13  are dispensed -- withdraw that question.  To your
14  knowledge, with respect to the drugs that are
15  administered to Kaiser members in doctors' offices
16  under the point of service plan, is it your
17  understanding that those drugs are reimbursed at some
18  amount based on AWP?
19      A.  I don't have any knowledge of how the
20  medical care arrangement works.
21      Q.  With respect to the reimbursement of
22  pharmaceuticals under the point of service plan at some

37

1   rates based upon AWP, is it your understanding of
2   Kaiser's understanding that Kaiser understood AWP in
3   that context to be a benchmark set at some fixed amount
4   above WAC?
5       MR. RHOAD:  Objection to form.
6       THE WITNESS:  Yes, I -- well, I believe that
7   Kaiser's understanding of AWP in this instance is the
8   same as my own, that it's a benchmark with a spread
9   above the actual cost.
10  BY MR. HAAS:
11      Q.  And even though Kaiser -- now I'm on
12  Kaiser's knowledge or understanding of this question.
13  Even though Kaiser's reimbursing the pharmacies at some
14  discount between five and 15 percent off of AWP, is it
15  Kaiser's understanding, nevertheless, that it is
16  affording some margin to the pharmacies for the drugs
17  dispensed to its members?
18      MR. RHOAD:  Eric, to be clear, you're
19  referring to the point of service business?
20      MR. HAAS:  Yes, referring now solely to the
21  point of service plan.
22      THE WITNESS:  Yes, we believe there is a

Dale Kramer

July 23, 2004

Oakland, CA

38

1   margin.
2   BY MR. HAAS:
3       Q.  Do you have any understanding in
4   reimbursing pharmacies for drugs dispensed to Kaiser's
5   members as to the amount of margin that the pharmacies
6   are earning on those drug sales?
7       A.  Yeah, it would be the difference between
8   the 20 to 25 percent, say, average 22 and a half
9   percent and whatever discount off WAC has been
10  negotiated.
11      Q.  Aside from the point of service plan, is
12  there any other plan that Kaiser offers that utilizes
13  AWP in determining or setting any amount of
14  reimbursement, either to providers or to pharmacies?
15      A.  No other plan that uses AWP.
16      Q.  Is a point of service plan offered only
17  in particular geographic areas, or is it offered
18  throughout the geographic area that Kaiser operates?
19      A.  Only within geographic areas where
20  Kaiser operates.
21      Q.  Is it correct that Kaiser operates now
22  in nine states?

39

1       A.  I believe so.
2       Q.  Setting aside individuals and employers,
3   by that I mean corporate employer groups, who are
4   Kaiser's customers or clients?
5           MR. RHOAD:  Objection to the form.
6           THE WITNESS:  Well, our biggest customers are
7   the federal government and CalPERS, and after that the
8   University of California, and after that a variety of
9   major corporations, people like IBM, General Motors,
10  etc.
11  BY MR. HAAS:
12      Q.  Does Kaiser represent any union benefit
13  funds?
14          MR. RHOAD:  Did you say union benefit funds?
15  BY MR. HAAS:
16      Q.  Yes.
17      A.  I don't know what that means.
18      Q.  Okay.  Does Kaiser represent any funds
19  that -- withdraw that question.
20          Let me ask it this way:  Is it -- are
21  you unfamiliar with the term "union benefit fund"?
22      A.  Yes.

40

1       Q.  Does Kaiser have any interaction or does
2   Kaiser do any business with unions?
3       A.  Yes.
4       Q.  Which unions?
5       A.  Probably a large number.  I can't tell
6   you.  I know retail clerks in Northern and Southern
7   California are our major customers.
8       Q.  Mr. Kramer, have you had the opportunity
9   to review the Complaint that has been filed in this
10  action?
11      A.  Yes.
12      Q.  Are you familiar with the named
13  plaintiffs in this action?
14      A.  Yes.
15      Q.  Are any of the named plaintiffs or have
16  at any point in time any of the named plaintiffs been
17  customers or clients of Kaiser?
18      A.  I don't know.
19      Q.  How does one go about determining that?
20      A.  We would have to check with, I guess,
21  our benefits department.
22      Q.  Who are Kaiser's major competitors?

41

1       A.  Everybody in the healthcare provider
2   business.
3       Q.  Does Kaiser compete with indemnity
4   insurance plans?
5       A.  Yes.
6       Q.  Does Kaiser complete with PPO plans?
7       A.  Yes.
8       Q.  As a matter of course, when Kaiser is
9   competing for a client, does Kaiser engage in a request
10  for proposal process whereby Kaiser submits responses
11  to requests issued by the potential clients?
12      A.  I know that happens with some clients.
13      Q.  Would you say that's the typical process
14  by which customers, clients, select a health plan
15  administered benefits to its members?
16          MR. RHOAD:  Eric, this is Robert Rhoad.
17  Obviously I want to give you some latitude here, but
18  this seems to be venturing off the -- or outside of the
19  scope of the deposition, as identified in your letter
20  of July 14, where it lists out five items as being
21  within the scope of the deposition.
22          MR. HAAS:  I appreciate your latitude,

Henderson Legal / Spherion
(202) 220-4158