UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
————————————————————————————  )
                              )
IN RE: PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE        )
LITIGATION                    )
————————————————————————————  )
                              )
THIS DOCUMENT RELATES TO:      )
                              )   MDL NO. 1456
                              )   CIVIL ACTION NO.
County of Suffolk v. Abbott   )   01-12257-PBS
Laboratories, et al.          )
Civ. Action No. 1:03-cv-10643 )
                              )
                              )
————————————————————————————  )
```

**MEMORANDUM AND ORDER**

September 30, 2004

Saris, U.S.D.J.

**I. INTRODUCTION**

Defendants have moved to dismiss the Amended Complaint filed

by the County of Suffolk in New York in this multi-district

litigation involving allegations of fraud against various

pharmaceutical companies.[1]  Suffolk alleges that Defendant

---

[1] The named Defendants are: Abbott Laboratories, Inc.;
Agouron Pharmaceuticals, Inc.; Amgen, Inc.; AstraZeneca
Pharmaceuticals L.P.; AstraZeneca US; Aventis Behring L.L.C.;
Aventis Pharmaceuticals Inc.; Barr Laboratories, Inc.; Bayer
Corporation; Berlex Laboratories, Inc.; Biogen, Inc.; Bristol-
Myers Squibb Company; Chiron Corporation; Eli Lilly and Company;
Forest Pharmaceuticals Inc.; Fujisawa Healthcare, Inc.;
Genentech, Inc.; Glaxo Wellcome, P.L.C.; GlaxoSmithKline P.L.C.;
Immunex Corporation; Ivax Corporation; Ivax Pharmaceuticals Inc.;
Janssen Pharmaceutical; Johnson & Johnson; MedImmune, Inc.; Merck
& Co., Inc.; Novartis Pharmaceuticals Corporation; Ortho McNeil
Pharmaceuticals; Ortho Biotech; Pfizer Inc.; Pharmacia
Corporation; Purdue Pharma, L.P.; Reliant Pharmaceuticals;
Sanofi-Synthelabo, Inc.; Schering-Plough Corp.; TAP
Pharmaceutical Products, Inc.; SmithKline Beecham Corporation;

pharmaceutical manufacturers have fraudulently inflated the published average wholesale prices ("AWP's") of their drugs, and that these fraudulent AWP's have caused the State to overpay retail pharmacists for Medicaid drugs.  Because New York bills the County for twenty-five percent of the State's Medicaid expenditures, the County claims it has been harmed by the fraudulent drug pricing.  Suffolk also alleges that Defendants filed false "Best Prices" reports with the federal government, thereby reducing the rebates paid by the pharmaceutical manufacturers to the State and, consequentially, from the State to Suffolk.  Suffolk has asserted federal racketeering claims under 18 U.S.C. § 1962(c), a claim for breach of contract as a third-party beneficiary of the contract between the federal government and each Defendant, an implied cause of action under the federal Best Prices statute, 42 U.S.C. § 1396r-8, as well as six claims under various state law theories.[2]

_____

Warrick Pharmaceuticals Corporation; and Wyeth.  The Amended Complaint also describes unknown "Doe" Defendants, in categories such as individuals, partnerships, sole proprietors, business entities, companies, corporations, independent pharmacies, dispensers, and other medical providers.  Although Suffolk is the only plaintiff in this action, other counties in New York have filed similar suits.

[2] Suffolk brings claims for violations of 18 U.S.C. § 1962(c) (Count I); violation of 42 U.S.C. § 1396r-8 (Count II); violation of New York Social Services Law § 367(A)(7)(d) (Count III); violation of New York Department of Health Regulations, N.Y. Comp. Codes R. & Regs. tit. 18 §§ 512.2(b)(4) and (5) (Count IV); violation of New York Social Services Law § 145-b (Count V); breach of the Best Prices rebate agreements (Count VI); unfair

Pointing out that Suffolk is only one of fifty-eight counties in New York State and that New York State itself has sued several manufacturers, Defendants collectively argue that Suffolk, as an indirect purchaser of the Medicaid drugs, has no standing to sue because its claim is entirely derivative of the State's, that counties are not third-party beneficiaries of the Best Prices contracts, and that the other claims fail substantively and under Federal Rule of Civil Procedure 9(b).

After hearing and review of the briefs, the Court **ALLOWS** the motion to dismiss Counts I, II, VI, and VIII and **DENIES** the remainder of the motion, subject to a forthcoming opinion addressing the issues raised in the individual briefs of twenty-two Defendants.

## II.   BACKGROUND

The Court assumes close familiarity with the discussion of the alleged AWP scheme in its prior opinions, which set forth the factual background of the allegations as well as the appropriate legal standards.  See, e.g., In re Pharm. Indus. Average Wholesale Price Litig., 263 F. Supp. 2d 172 (D. Mass. May 13, 2003) (Saris, J.) ("Pharm. I"); In re Pharm. Indus. Average Wholesale Price Litig., 309 F. Supp. 2d 165 (D. Mass. Jan. 9, 2004) (Saris, J.) ("Pharm. II"); In re Pharm. Indus. Average

---

trade practices in violation of New York General Business Law § 349 (Count VII); common law fraud (Count VIII); and unjust enrichment (Count IX).

Wholesale Price Litig., 307 F. Supp. 2d 190 (D. Mass. Jan. 9,
2004) (Saris, J.) ("Pharm. III"); In re Pharm. Indus. Average
Wholesale Price Litig., 307 F. Supp. 2d 196 (D. Mass. Feb. 24,
2004) (Saris, J.) ("Pharm. IV"); In re Pharm. Indus. Average
Wholesale Price Litig., 321 F. Supp. 2d 187 (D. Mass. June 10,
2004) ("Pharm. V").  The details of this particular dispute
involve aspects of New York's Medicaid system.

In New York, the State reimburses providers directly for
pharmaceuticals under its Medicaid system, N.Y. Soc. Serv. L. §
367-b (McKinney 2004) (transferring payment responsibility from
localities to State), and bills each county for twenty-five
percent of the costs associated with the citizens of that county
(Am. Compl. at ¶¶ 1, 315 (citing N.Y. Soc. Serv. L. § 368-a
(McKinney 2004))).[3]  Under the New York Medicaid statute,
physician-administered drugs are billed by the physician at "the
actual cost of the drugs to practitioners."  N.Y. Soc. Serv. L. §
367-a(9)(a).  Pharmacist-provided drugs for which no upper limit
has been set by the federal Centers for Medicare & Medicaid
Services (formerly known as the Health Care Financing
Administration) that are either multiple source prescription

---

[3]  Prior to the passage of N.Y. Soc. Serv. L. § 367-b in
1978, each local agency made payments for the Medicaid costs of
its citizens directly to providers.  N.Y. Hosp. – Westchester
Div. v. Krauskopf, 98 A.D.2d 667, 668 (N.Y. App. Div. 1983).
Defendants assert that under the current system, money owed to
the State is often set-off against money the State would have
paid the county under other programs, rather than paid directly.

drugs (i.e., generic drugs) or brand name prescription drugs are reimbursed at the lower of the providers' usual and customary charge to the general public or the Estimated Acquisition Cost ("EAC") of the drug, plus a reasonable dispensing fee.  N.Y. Soc. Serv. L. § 367-a(9)(b).  Estimated Acquisition Cost is defined as "the average wholesale price of a prescription drug . . . as reported by the prescription drug pricing service used by the department, less twelve percent . . . ."[4]  <u>Id.</u>  Suffolk alleges that New York law defines "average wholesale price" for multi-source drugs or biologicals as "equal to the lessor of the median AWP for all of the generic forms of the drug or biological, or the lowest brand name product AWP."  (Am. Compl. at ¶ 95.)  As a practical matter, "usual and customary" charge data is impossible to obtain, so reimbursement for drugs usually is based on the EAC of a drug, which in turn is based on the inflated AWP of that drug less the percentage discount.  (Am. Compl. at ¶¶ 71-73.)

New York is a participant in the federal "Best Prices" program, under which pharmaceutical manufacturers pay rebates to the states pursuant to rebate agreements between each manufacturer and the Secretary of Health and Human Services.  (Am. Compl. at ¶¶ 8, 76-80.)  <u>See also</u> 42 U.S.C. § 1396r-8

---

[4] For the time period from the start of the conduct leading to the claims until May 15, 2003, the reimbursement formula was AWP - 10%.  (Opp. at 7 n.8 (citing N.Y. Soc. Serv. L. § 367-a(9)(b)(ii) as amended by Act of May 15, 2003).)

(establishing Best Prices program); Pharm. V, 321 F. Supp. 2d at
195-97 (describing Best Prices program).

Suffolk claims that while the passage of Section 367-b in
1978 centralized administrative control over the claims paying
process, counties (called, along with certain cities, "social
services districts") still routinely play a role in recovering
Medicaid overpayments.  (Opp. at 10 n.9.)  Several public welfare
statutes explicitly empower counties to file suits for the cost
of medical treatment in certain situations.  See, e.g., N.Y. Soc.
Serv. L. § 104-b (McKinney 2004) (authorizing county to file a
lien on personal injury recovery of person receiving public
assistance); N.Y. Soc. Serv. L. § 369 (McKinney 2004) (allowing
county to file lien on interest in trust to recover cost of
medical assistance).  Additionally, New York Social Services Law
Section 145-b grants counties as well as the State the right to
recover treble damages for false statements made to obtain
payments from public funds authorized under the chapter of the
New York statutes concerning "Assistance and Care."  N.Y. Soc.
Serv. L. § 145-b (McKinney 2004).

### III.  DISCUSSION

#### A.  RICO

Suffolk pleads manufacturer-publisher enterprises similar to
those dismissed from the Amended Master Consolidated Complaint
("AMCC") action in Pharm. IV, 307 F. Supp. 2d at 203-05.  In one

paragraph, however, Suffolk's pleading differs from the AMCC, in that publishers are alleged to play more of a role in setting AWP's. Rather than simply listing AWP's reported to them by manufacturers, publishers receive "WACs [Wholesale Acquisition Cost Data] that are converted to AWPs." (Am. Compl. at ¶ 81.) This account is consistent with descriptions in recent briefs submitted by the plaintiffs in the AMCC action.

However, Suffolk does not plead this fact in relation to the RICO count (see Am. Compl. ¶¶ 332 - 55), and specifically pleads, as did the plaintiffs in the AMCC, that "[e]ach defendant has directly controlled the false and inflated AWPs that are reported in the *Redbook* . . . ." (Am. Compl. ¶ 343.) Suffolk also provides no details about the interaction between the publishers and the manufacturers sufficient to meet Federal Rule of Civil Procedure 9(b). Therefore, Suffolk's RICO claim is dismissed without prejudice for the reasons given in Pharm. IV, 307 F. Supp. 2d at 203-05.

**B.  Preemption**

The parties refer the Court to the briefing on the issue of preemption as argued in the motions to dismiss the AMCC. The issue was, therefore, resolved by Pharm. V, 307 F. Supp. 2d at 198-201, and Suffolk's claims are not preempted by 42 U.S.C. § 1396r-8.

C.  **Standing**

Defendants generally argue that Suffolk, although an injured party, lacks standing to pursue its claims because a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." McInnis-Misenor v. Me. Med. Ctr., 319 F.3d 63, 68 (1st Cir. 2003).

"Numerous courts, including the United States Supreme Court . . . have recognized that the type of secondary standing claimed by [plaintiff] here [(indirect standing)] is disfavored precisely because it can lead to double recovery, as well as because the necessary causal link between the actions of the primary violator and the party claiming injury is too remote." Jackson Nat'l Life Insur. Co. v. Ligator, 949 F. Supp. 200, 204 (S.D.N.Y. 1996).  Of special concern are the "difficulties inherent in calculation of the damages owed to a remotely injured party." Id. (citing Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 273 (1992)).

Defendants assert that the standing requirement of direct injury applies to all of Suffolk's claims.  The Second Circuit has held that "[t]hese principles [of RICO standing, proximate cause and direct injury requirement] also apply in general terms to the fraud and special duty causes of action asserted by plaintiffs under New York common law." Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 242-43 (2d

Cir. 1999) (finding that funds providing supplemental medical benefits lacked standing to sue cigarette company under New York common law of fraud and assumption of special duty because funds' injury was derivative of smokers' physical injuries).  However, the Second Circuit has also acknowledged that state statutes may reject common law proximate cause requirements and may provide the basis for allowing suit on such derivative claims.  See Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc., 344 F.3d 211, 219 (2d Cir. 2003) (finding that health care plan had standing to sue generally under New York General Business Law Section 349 despite not being a consumer, but certifying to the Court of Appeals the question of whether it may sue for damages resulting from injuries to consumers caused by smoking).

Suffolk pays money to and receives money from the State, following State requirements which set the applicable reimbursement rate, and it is therefore an indirectly-harmed party.  However, the main concerns motivating this standing requirement, the prevention of double-recoveries and the difficulty in allocating damages, are not at issue here, since by statute Suffolk has suffered twenty-five percent of the damages suffered by the State, and damage calculations could be made according to the payment formulae whether or not the State is a party.  Additionally, Social Services Law Section 145-b gives both counties and the State a right to sue, indicating that the

New York legislature was not overly-concerned with the issue of double-recovery.  Defendants have not asserted a challenge to standing under each state cause of action individually, but rather launched a general attack.  I will address standing under particular statutes later should the issue be raised.

### D.  <u>Implied Cause of Action Under the Best Prices Statute</u>

Suffolk argues that it has an implied cause of action under the federal Best Prices Statute, 42 U.S.C. 1396r-8.

The Supreme Court set forth the standards for implying a cause of action recently in <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001):

> Like substantive federal law itself, private causes of action to enforce federal law must be created by Congress.  The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.  Statutory intent on this latter point is determinative.

<u>Id.</u> at 286-87 (citations omitted).  <u>See also</u> <u>Rolland v. Romney</u>, 318 F.3d 42, 52 n.9 (1st Cir. 2003) (noting holding of some courts that <u>Sandoval</u>'s focus on intent replaces multi-factor test of <u>Cort v. Ash</u>, 422 U.S. 66 (1975), but not deciding the issue); <u>Bonano v. E. Caribbean Airline Corp.</u>, 365 F.3d 81, 84-85, 86 n.4 (1st Cir. 2004) (applying test of whether Congress intended to create both a right and a remedy without mentioning <u>Cort</u>, and noting that "[t]he Supreme Court's decision in <u>Sandoval</u> changed the legal landscape," moving away from <u>Cort</u>'s multi-factor test).

The terms of the statute may demonstrate statutory intent. "[F]or a statute to create private rights of action, 'its text must be phrased in terms of the class protected.'" Bonano, 365 F.3d at 85 (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284 (2002)). Additionally, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." Sandoval, 532 U.S. at 290. See also Bonano, 365 F.3d at 85 ("To cinch matters, the scheme of enforcement actually spelled out in the Act counsels persuasively against implying a private right of action.").

While Suffolk arguably falls within a class of entities for whose benefit the Best Prices Statute was enacted, as a governmental entity obliged to pay for prescription drugs, Suffolk does not point to any provisions demonstrating a Congressional intent to create a remedy. Suffolk argues that intent is shown in § 1396r-8(b)(3)(C)(ii), entitled "Penalties . . . False information," which states:

> Any manufacturer with an agreement under this section that knowingly provides false information is subject to a civil money penalty in an amount not to exceed $100,000 for each item of false information. Such civil money penalties are in addition to other penalties as may be prescribed by law.

42 U.S.C. § 1396r-8(b)(3)(C)(ii) (emphasis added). However, this provision merely shows that Congress intended not to exclude other remedies under federal and state law. See Pharm. V, 321 F. Supp. 2d at 199. It does not show an intent to imply remedies

11

for others.  Similarly, the fact that Medicare is a cooperative federal-state system that allows for extensive state enforcement, see Pharm. V, 321 F. Supp. 2d at 198, does not show an intent to imply a remedy in the Best Prices Statute specifically.  Finally, the Best Prices Statute contains an extensive remedial scheme, see Pharm. V, 321 F. Supp. 2d at 196, cementing the conclusion that Congress did not intend to create an implied private remedy for a county.

   **E.   Third-Party Beneficiary of the Rebate Agreements**

Suffolk brings a claim as a third-party beneficiary of the rebate agreements between the manufacturers and the Secretary of Health and Human Services.  The Model Rebate Agreement ("MRA") provides that federal law controls the interpretation of the contract, and "federal common law [generally] governs the contracts of the United States."  Roedler v. Dep't of Energy, 255 F.3d 1347, 1351 (Fed. Cir. 2001).  "This does not mean that state law is an irrelevancy.  In general, federal courts developing federal common law are free to borrow from state law, unless there is either a demonstrated need for a uniform national rule or a significant conflict between state law and some discernible federal policy."  McCarthy v. Azure, 22 F.3d 351, 356 (1st Cir. 1994).

"[T]he crux in third-party beneficiary analysis . . . is the intent of the parties."  McCarthy, 22 F.3d at 362.  The Court

"must approach this threshold with care since the law requires
'special clarity' to support a finding 'that the contracting
parties intended to confer a benefit' on a third party."
Intergen, 344 F.3d at 146 (quoting McCarthy, 22 F.3d at 362).
"The intended party need not be specifically or individually
identified in the contract, but must fall within a class clearly
intended by the parties to benefit from the contract."  Klamath,
204 F.3d at 1211.  "One way to ascertain such intent is to ask
whether the beneficiary would be reasonable in relying on the
promise as manifesting an intention to confer a right on him or
her."  Id.  "When the intent to benefit the third party is not
expressly stated in the contract, evidence thereof may be
adduced.  For determination of contractual and beneficial intent
when, as here, the contract implements a statutory enactment, it
is appropriate to inquire into the governing statute and its
purpose."  Roedler, 255 F.3d at 1352.

     Suffolk first contends that the issue of the intent of the
parties is fact-based and so inappropriate for resolution at the
motion to dismiss phase.  See, e.g., Newman & Schwartz v.
Asplundh Tree Expert Co., Inc., 102 F.3d 660, 662-63 (2d Cir.
1996) (reversing order dismissing third-party beneficiary claim
because "[t]he district court ought to have construed the facts
and the law in favor of N & S for purposes of the motion to
dismiss"); Schuerman v. United States, 30 Fed. Cl. 420, 422 (Fed.

Cl. 1994) (recharacterizing motion to dismiss as motion for
summary judgment).

However, to show the possibility of a fact dispute regarding
intent, Suffolk must first show a clear indication on the face of
the contract of an intent either to benefit Suffolk or to benefit
a class that includes Suffolk.  See Klamath, 204 F.3d at 1211.
See also id. at 1210 (where the party claiming third party
beneficiary status relied on the language of the contract,
leaving no facts in dispute, "[t]he plain language of the
Contract is sufficient to rebut the contention that the
Irrigators are intended third-party beneficiaries"); Intergen,
N.V. v. Grina, 344 F.3d 134, 147 (1st Cir. 2003) ("The critical
fact is that the purchase orders neither mention nor manifest an
intent to confer specific legal rights upon InterGen."); Town of
Moriah v. Cole-Layer-Trumble Co., 200 A.D.2d 879, 880 (N.Y. App.
Div. 1994) ("Both the contract itself and the surrounding
circumstances indicate that the promisee – the County – intended
to give plaintiff and the other towns in the County the benefit
of CLT's promised performance . . . .").  Absent such an
indication, the claims must be dismissed.[5]

There is no mention of counties anywhere in the MRA.  The
MRA is to be signed by the federal government and a manufacturer,

---

[5] The Court ordered the rebate agreements produced to
Suffolk, which has not disputed that the MRA is the same as the
actual agreements in all relevant points.

14

although it provides substantial benefits to the States and includes duties for the States to perform in order to obtain the benefits.  (See, e.g., MRA at II(b) (stating that the manufacturer must "make such rebate payments for each calendar quarter within 30 days after receiving from the State the Medicaid Utilization Information defined in this agreement")). The word "States" is defined as "the 50 states and the District of Columbia" (MRA at I(aa)), and "State Medicaid Agency" means "the agency designated by a State under Section 1902(a)(5) of the Act to administer or supervise the administration of the Medicaid program" (MRA at I(bb)).  The agreement also provides that the term "State Medicaid Agency . . . incorporate[s] any contractors which fulfill responsibilities pursuant to the agreement unless specifically provided . . .", but Suffolk has not alleged that it fulfills responsibilities "pursuant to the agreement."  While Suffolk reimburses the State for twenty-five percent of the costs, there is no allegation that this requirement is contained in the rebate agreements.

Suffolk maintains that it is still "within a class of parties intended to benefit from the contract," as a government entity that pays for drugs and obtains money from rebates. Suffolk points to the structure of the enabling statute and its legislative history, which shows that Section 1396r-8 is a "cost-saving statute, passed '[i]n response to increasing

Medicaid expenditures for prescription drugs . . . . " <u>Pharm. V</u>, 321 F. Supp. 2d at 195 (quoting <u>Pharm. Research & Mfrs. of Am. v. Walsh</u>, 538 U.S. 644, 649 (2003)).  Suffolk also notes that Medicaid depends on cooperative federalism, and the Best Prices Statute does not provide for exclusive federal enforcement.

While Suffolk is in a class of "government agencies paying for drugs under Medicaid," the MRA specifically defines "the 50 states" as the parties to be benefitted.  (MRA at I(aa).)  There is no "clear indication" that counties (as opposed to states) were in the class of intended beneficiaries from the vantage point of either the pharmaceutical manufacturers or the federal government or in the text of the MRA.

**F.   <u>Section 145-b (Count V)</u>**

New York Social Services Law Section 145-b provides:

1.(a) It shall be unlawful for any person, firm or corporation knowingly by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, <u>on behalf of himself or others</u>, to attempt to obtain or to obtain payment from public funds for services or supplies furnished or purportedly furnished pursuant to this chapter.
(b) . . . "[S]tatement or representation" includes, but is not limited to: a claim for payment made to the state . . .; an acknowledgment, certification, claim, ratification, or report of data which serves as the basis for a claim or a rate of payment . . . .
(c) . . . [A] corporation has attempted to obtain or has obtained public funds when . . . any public funds are used to reimburse or make prospective payment to an entity from which payment was attempted or obtained.
. . .

N.Y. Soc. Serv. L. § 145-b (emphasis added).

The language of this provision encompasses the AWP scheme alleged by Suffolk, that is, that a pharmaceutical company make a fraudulent statement regarding AWP in order to get a higher reimbursement rate for providers who purchase its drugs.  The scheme fits into 1(a) and (b) because Defendants attempted to obtain, "on behalf of" providers, payment from public funds through means of reporting of false data (the AWP's) that served as the basis for the claims of the providers.  Alternatively, under 1(c), Defendants arguably obtained public funds when public funds were used to reimburse providers, from whom Defendants obtained payment.  Defendants rely on New York v. Pharmacia Corp., et. al, Index Nos. 905-04, 905-03, 1150-03, slip op. at 10 (N.Y. Sup. Ct. June 1, 2004), a recent unpublished case from a trial court in New York holding that similar AWP allegations failed to state a claim under Section 145-b because under subsection (a), "there is no allegation that defendants received any public funds as a result of their actions."  The court did not address whether a fraudulent statement made "on behalf of others" to assist them in procuring funds was a violation or address arguments under subsection 1(c).  Plaintiffs assert a colorable claim under this statute with respect to the alleged AWP fraud.  Plaintiffs' Best Prices claim fails, however, because Suffolk has not provided any support for the notion that Section 145-b encompasses statements made to lower payments made to the

State, as opposed to statements made to receive payments from the State.

Defendants also argue that this provision, which was enacted in 1975, was preempted when the State took control of the administrative process of paying claims in 1978. Defendants cite to a 1980 letter from the State Comptroller stating that counties need not be concerned with auditing of provider claims, despite existing laws to the contrary, since the State was receiving the vouchers. See N.Y. State Comptroller, Op. No. 80-294 (Sep. 12, 1980). Putting aside the fact that the letter contains a disclaimer that it may not be applicable later in time, the Comptroller's letter says nothing about Section 145-b. Defendants admit that Section 369(1) states that "[a]ll provisions of this chapter not inconsistent with this title shall be applicable to medical assistance for needy persons and the administration thereof by the social services districts," N.Y. Soc. Serv. L. § 369(1), and there is no obvious conflict, given that Section 145-b explicitly gives both the State and the county the right to sue.

Finally, New York courts have held that under the prior system, pursuant to which the county paid providers directly, the language of Section 145-b (in conjunction with other statutes and regulations) allowed the State to bring a claim without joining the county. See, e.g., State v. Estate of Frankel, 410 N.Y.S.2d

18

321 (N.Y. App. Div. 1978) (rejecting argument that county must be joined to bar future claims against the defendants for the same money); State v. Belt Parkway Nursing Home, 407 N.Y.S.2d 800 (N.Y. App. Div. 1978) (holding that although the City of New York paid the providers, the State may recover).  This caselaw supports the notion that the party need not be the payer to have enforcement power where the right to recover is explicitly provided by statute, as in Section 145-b.

    **G.**  **Common Law Fraud**

Defendants move to dismiss the common-law fraud claim on two grounds: (1) Suffolk was or should have been aware of the AWP fraud; and (2) Suffolk cannot bring a claim because it is a third-party to the alleged misrepresentations, which were relied upon by the State of New York when the State set the reimbursement procedures with no input from Suffolk.

While the first argument presents a factual issue inappropriate for resolution at this stage, the second argument is a strong one.  In Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Serv. Fund & Annuity Fund v. Lollo, 148 F.3d 194, 196 (2d Cir. 1998), the Second Circuit held that "a plaintiff does not establish the reliance element of fraud for purposes of ERISA or New York law by showing only that a third party relied on a defendant's false statement."  Id.  But see N.B. Garments (Pvt.) Ltd. v. Kids Int'l Corp., No. 03-8041,

19

2004 U.S. Dist. LEXIS 3774, at *9-12 (S.D.N.Y. March 10, 2004)
("Further, the fact that the First and Second Departments have,
subsequent to the Second Circuit's decision in <u>Cement & Concrete</u>
<u>Workers</u>, altered their stance, and held in accord with the
<u>Eaton</u> line – even citing to the century old Court of Appeals
decisions, lends further support for the determination that New
York law has, since the 1800's, allowed for fraud claims based on
third-party reliance."). The Court dismisses the fraud claims.

### H. <u>Unjust Enrichment</u>

In New York, unjust enrichment "applies in situations where
no legal contract exists, 'but where the person sought to be
charged is in possession of money or property which in good
conscience and justice he should not retain, but should deliver
to another.'" <u>Indyk v. Habib Bank Ltd.</u>, 694 F.2d 54, 57 (2d Cir.
1982) (quoting <u>Matarese v. Moore-McCormack Lines</u>, 158 F.2d 631,
634 (2d Cir. 1946)).

> The essential inquiry in any action for unjust
> enrichment or restitution is whether it is against
> equity and good conscience to permit the defendant to
> retain what is sought to be recovered . . . .
> Generally, courts will look to see if a benefit has
> been conferred on the defendant under mistake of fact
> or law, if the benefit still remains with the
> defendant, if there has been otherwise a change of
> position by the defendant, and whether the defendant's
> conduct was tortious or fraudulent.

<u>Paramount Film. Distrib. Corp. v. State</u>, 30 N.Y.2d 415, 421 (N.Y.
1972) (citations omitted). "The enrichment may either be the
receipt of money or its equivalent or by being saved from expense

20

or loss." <u>Baratta v. Kozlowski</u>, 94 A.D.2d 454, 464 (N.Y. App.
Div. 1983).

Defendants do not address Suffolk's Best Prices unjust
enrichment claims, but rather argue only that Suffolk cannot
recover from the AWP fraud because it was doctors, not
manufacturers, who were benefitted by over-billing.  Leaving
aside the thorny issue of whether Suffolk may recover from
Defendants to the extent that the AWP fraud boosted their sales,
the Court notes that Suffolk's claim that Defendants were "saved
from expense" when they fraudulently underpaid Best Prices
rebates to the State, and consequentially Suffolk, suffices to
state a claim.[6]

I.    **Consumer Fraud Statute, Section 349**

New York General Business Law Section 349 provides:

(a) Deceptive acts or practices in the conduct of any
business, trade or commerce or in the furnishing of any
service in this state are hereby declared unlawful.

. . .

(h) In addition to the right of action granted to the
attorney general pursuant to this section, any person
who has been injured by reason of any violation of this
section may bring an action in his own name to enjoin
such unlawful act or practice, an action to recover his
actual damages or fifty dollars, whichever is greater,
or both such actions. The court may, in its discretion,
increase the award of damages to an amount not to
exceed three times the actual damages up to one

---

[6] While Defendants make reference to the issue of whether
Suffolk has standing, as mentioned earlier, Defendants fail to
argue the issue with any specificity to a particular cause of
action.

thousand dollars, if the court finds the defendant
willfully or knowingly violated this section. The court
may award reasonable attorney's fees to a prevailing
plaintiff.

N.Y. Gen. Bus. Law § 349 (McKinney 2004).

"A plaintiff under section 349 must prove three elements:
first, that the challenged act or practice was consumer-oriented;
second, that it was misleading in a material way; and third, that
the plaintiff suffered injury as a result of the deceptive act."
Stutman v. Chemical Bank, 731 N.E.2d 608, 611 (N.Y. 2000).
"[T]he deceptive practice must be 'likely to mislead a reasonable
consumer acting reasonably under the circumstances.'" Id. at 612
(citation omitted); see also Cruz v. NYNEX Info. Resources, 263
A.D.2d 285, 290-91 (N.Y. App. Div. 2000) (holding that alleged
unfair practices in distribution of Yellow Pages did not state a
claim under Section 349 because only businesses could advertise
in the Yellow Pages, not consumers, and so the practice was not
"consumer oriented"); Securitron Magnalock Corp. v. Schnabolk, 65
F.3d 256, 264-65 (2d Cir. 1995) (holding that public interest was
harmed where false statements of defendants in regard to safety
of lock system caused public safety agency to undertake
unnecessary investigations, caused unnecessary cancellations of
contracts, and diverted attention of public agency from normal
activities). "[R]eliance is not an element of a section 349
claim." Stutman, 731 N.E.2d at 612. "[A] party has standing
under Section 349 when its complaint alleges a 'consumer injury

- 22 -

or harm to the public interest,'" regardless of whether the plaintiff is a consumer. Blue Cross & Blue Shield of N.J., 344 F.3d at 218-19.

Defendants argue first that the reporting of AWP's was not "consumer oriented" within the meaning of Section 349. The Court disagrees. The Defendants made the representations (the AWP's) understanding that consumers would be making payments based on those representations. While government agencies also used the AWP's as the basis for reimbursement, this does not change the fact that the Defendants' conduct affected the public interest through harm to consumers. Additionally, harm to public agencies impacts the public interest. See Securitron, 65 F.3d at 264 (harm to public interest established by "interference with [public safety agency's] decisionmaking process" and distraction of agency by false reports).

Defendants also argue that the false Best Prices reports were not consumer oriented. This is a tougher claim, as there is caselaw to support either side. Compare Securitron, 65 F.3d at 264 (harm to public agencies constitutes harm to public interest) with Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 24-25 (N.Y. 1995) ("[P]laintiffs claiming the benefit of Section 349 . . . must charge conduct of the defendant that is consumer-oriented."). Having found that the Best Prices claims survive under an unjust enrichment theory, the Court need not decide this question now.

Defendants second argue that there can be no harm because the existence of the AWP spread was common knowledge.  This presents a factual issue inappropriate for resolution at this stage.

Defendants third argue that Suffolk cannot recover because Suffolk's injury is derivative of that of the State.  The Court may revisit the issue when the Court of Appeals answers the question of indirect standing under General Business Law Section 349 certified to it by the Second Circuit.  <u>See</u> <u>Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA</u>, 769 N.Y.S.2d 196 (2003) (accepting certification).  Accordingly, the Court declines to dismiss the claims.

### J.   <u>Other State Causes of Action</u>

Defendants have moved to dismiss the other state law causes of action.  As the briefing has been terse, and resolution will not affect the scope of litigation, the Court declines to address the remaining state law issues at this time.

### <u>ORDER</u>

Defendants' motion to dismiss Count I (RICO) is **<u>ALLOWED</u>** without prejudice to amendment.  Defendants' motion to dismiss Count II (implied cause of action under the federal Best Prices Statute), Count VI (breach of Best Prices rebate agreements), and Count VIII (fraud) is **<u>ALLOWED</u>**.  The remainder of the motion is **<u>DENIED</u>**.  The Court will address the individual, company-specific

motions to dismiss in separate orders.


                                          **S/PATTI B. SARIS**
                                          United States District Judge