# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | MDL No. 1456<br><br>Civil Action No.<br>01-CV-12257-PBS<br><br>Judge Patti B. Saris |

## DECLARATION OF HARVEY J. WEINTRAUB

I, HARVEY J. WEINTRAUB, declare as follows:

1. I am currently a consultant to Warrick Pharmaceuticals Corporation ("Warrick"). I have worked with Warrick since its inception in 1993. From 1953 to 1993, I worked for Schering Corporation ("Schering"). I have personal knowledge of the facts contained herein and submit this affidavit in support of the Schering-Plough Defendants' Opposition to Plaintiffs' Motion for Class Certification. If called to testify, I could testify competently as to the matters set forth herein.

2. Warrick is organized and exists under the laws of Delaware, with its principal place of business in Union, New Jersey. Warrick is a wholly owned subsidiary of Schering Corporation. Schering Corporation, in turn, is a wholly owned subsidiary of Schering-Plough Corporation.

3. Warrick and Schering are separate legal entities. Warrick does not operate or do business under the Schering name.

4. Warrick does not rely on the practices of Schering in setting its policies with regard to the pricing of drugs.

5. Warrick manufactures and distributes exclusively generic products. These are products that are bioequivalent to drugs that are no longer subject to patent protection. Many of Warrick's generic products were first researched and developed by Schering and were once single-source products marketed under a Schering brand name. For example, Warrick markets generic albuterol sulfate, which is the same chemical compound as Schering's Proventil®. Warrick also markets some generic products under licenses from other manufacturers.

6. Warrick maintains a sales force consisting of three sales directors. These sales directors do not market any Schering products.

7. The generic market in which Warrick operates differs greatly from the branded market. In the generic market, pharmacies generally stock only a single manufacturer's generic product and, therefore, dispense only that product. Once a pharmacy has stocked a generic manufacturer's product, it is difficult and costly to switch to another, in part because each generic product may have a different shape, color or logo, leading to customer discomfort, and in part due to physical issues dealing with inventory and computer codes. Pharmacies' propensity to stock only a single manufacturer's generic product is mirrored in the practices of wholesalers and generic distributors, who promote only one generic product.

8. Agreements for the sale of generic products typically include a right of first refusal, and the incumbent manufacturer therefore holds a significant advantage over a late entrant to the market.

9. Because generic manufacturers' customers generally stock a single product for each bioequivalent, and because these customers may command a significant share of the market, competition for each customer is intense. For example, Warrick has only about 80 customers, but through those relatively few customers it commands a major share of generic

albuterol sulfate market. Only a few of those 80 customers account for the major portion of Warrick's sales.

10. Warrick competes on a number of bases, including the breadth of its product portfolio, production capacity, customer service levels, and price. Warrick offers, or has offered in the past, customers certain discounts and rebates, including prompt pay discounts, line based rebates, market share rebates, and stocking allowances. Warrick typically meets, but does not beat, lower prices offered by competitors to significant customers.

11. Warrick reports reference pricing information to national pricing compendia. Warrick suggests an AWP, which it understands as a negotiation benchmark that has been used in the pharmaceutical industry for decades. Generally, Warrick has reported AWP upon the launch of its products at 10%-20% below the equivalent brand product's AWP, and that reported AWP has generally remained constant over time.

12. Warrick does not typically report a list price to wholesaler (or WAC) to national pricing compendia. Nor does Warrick set or use WAC in its internal record-keeping. Warrick's wholesale and retail customers are invoiced at wide range of different prices, and Warrick therefore does not have a single list price to report as WAC.

13. Warrick cannot report a single AWP that would have a uniform relationship to the multitude of changing prices at which it sells its drugs. Accordingly, Warrick has simply suggested an AWP at launch and has, in almost all instances, left it untouched for the life of the product.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Harvey J. Weintraub

Executed this 20th day of October 2004

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) <br> AVERAGE WHOLESALE PRICE ) <br> LITIGATION ) <br> ) <br> THIS DOCUMENT RELATES TO: ) <br> ALL ACTIONS ) <br> ) <br> ) | MDL No. 1456 <br><br> Civil Action No. <br>     01-CV-12257-PBS <br><br> Judge Patti B. Saris |

### DECLARATION OF DEBRA KANE

I, DEBRA KANE, declare as follows:

1. I am currently Senior Director of U.S. Managed Markets Finance of Defendant Schering Corporation ("Schering"). I have worked with Schering since 1988. I have personal knowledge of the facts contained herein and submit this affidavit in support of the Schering-Plough Defendants' Opposition to Plaintiffs' Motion for Class Certification. If called to testify, I could testify competently as to the matters set forth herein.

2. Schering is organized and exists under the laws of New Jersey, with its principal place of business in Kenilworth, New Jersey. Schering is a wholly owned subsidiary of Schering-Plough Corporation. Schering is also the parent corporation of Warrick Pharmaceuticals Corporation ("Warrick"), which is another defendant in this case.

3. Schering and Warrick are separate legal entities. Schering does not operate or conduct the business of Warrick. Schering does provide support services to Warrick for a fee.

4. Schering does not rely on the practices of Warrick in setting its policies with regard to the sale, pricing, and marketing of drugs.

5.  Schering is a research-based pharmaceutical company that develops, markets, and distributes brand name prescription and over-the-counter products worldwide. Schering's products focus on several key areas: allergic and inflammatory disorders, infectious diseases, oncology, cardiovascular disease, and central nervous system disorders. The eighteen Schering drugs at issue in this case span diverse therapeutic categories and include both single-source drugs protected by patent exclusivity (*e.g.*, Temodar) and multiple-source source drugs that face competition from bioequivalent products (*e.g.*, Proventil). They also include drugs reimbursable under Medicare Part B (*e.g.*, Intron A) and drugs sold to retail pharmacy and reimbursed by private payors (*e.g.*, Lotrisone).

6.  At least 85 percent of Schering's products are distributed through wholesalers. Other entities with which Schering contracts include HMOs, PBMs, group purchasing organizations, and chain pharmacies.

7.  Schering does not generally offer discounts on its pharmaceutical products to wholesalers with the exception of a 2% prompt pay discount. Schering does offer rebates on its products to managed care organizations like PBMs and contract pricing to indirect customers, such as some hospitals.

8.  Historically, Schering has reported reference pricing information, such as AWP, to national pricing compendia. Schering understands AWP to be a reference price that has been used in the pharmaceutical industry for decades. Historically, Schering reported AWP equal to 120% of its net direct price for each of its drugs.

9.  Net direct price is an undiscounted list price that Schering regularly reports to its customers and to the pricing compendia. Net direct is the actual price paid by most Schering direct customers. For example, if a pharmacy or wholesaler purchases product directly from Schering, it will generally pay net direct, subject only to a customary prompt pay discount.

10. In general, Schering sets net direct prices based on several factors, including its understanding of its competitors' pricing, product attributes, and product life cycle. Schering

does not consider the AWPs of its competitors in setting net direct prices or in suggesting AWPs to national pricing compendia.

I declare under penalty of perjury that the foregoing is true and correct.

_____
DEBRA KANE

FURTHER AFFIANT SAYETH NOT

SWORN TO AND SUBSCRIBED BEFORE ME
This 25th day of October 2004.

_____
NOTARY PUBLIC
STATE OF NEW JERSEY

**CHERYL L. VOCHT**
**Notary Public of New Jersey**
**My Commission Expires Sept. 9, 2006**

370779_1                                             3