# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL NO. 1456<br>) Civil Action N0. 01-12257-PBS<br>)<br>) Judge Patti B. Saris<br>) |
| THIS DOCUMENT RELATES TO THE AMENDED MASTER CONSOLIDATED CLASS ACTION | ) Chief Magistrate Judge Marianne B. Bowler<br>)<br>)<br>)<br>) |

## DECLARATION OF GORDON J. CALHOUN IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS PURSUANT TO SUBPOENA

4838-1450-8800.1

I, GORDON J. CALHOUN, declare as follows:

1.      I submit this declaration in opposition to the motion to compel production of documents pursuant to subpoena that the defendants in this action have filed against third party Health Net, Inc. ("Health Net"). I have personal knowledge of all of the facts stated in this declaration, and if called upon to testify thereto, I could and would do so competently of my own personal knowledge.

2.      I am an attorney at law admitted to practice before all courts of the State of California, before all federal district courts located in California, and before the United States Court of Appeals for the Ninth Circuit. I am a partner in the firm of Lewis Brisbois Bisgaard & Smith LLP ("LBBS"), which serves as legal counsel to Health Net in numerous matters, both litigated and non-litigated, pending in California. I am one of the attorneys at LBBS who is primarily responsible for providing Health Net with legal counsel and advice regarding the subpoena duces tecum dated April 30, 2004 that was served upon it by the defendants in this action (the "4/30/04 Subpoena"). A true and correct copy of the 4/30/04 Subpoena is included in Exhibit A to defendants' moving papers.

3.      The April 30, 2004 subpoena was issued following a meeting and conference with the moving parties' counsel in New York City on March 31, 2004 in response to an earlier overly-broad subpoena which also failed to comply with California privacy laws that protect confidential patient information against disclosure unless proper protective orders are in place and the persons whose records are sought have received notice so that they may assert additional objections to the requested disclosure of confidential, personal, medical information. During that meeting, Eric Haas, Esq. and Adeel Manji, Esq., acknowledged that the original subpoena was overly-broad and that appropriate protective orders were in the process of being requested. They stated that they

anticipated they would issue on behalf of their clients a new, narrower subpoena that would focus on the issues material to the issues in the AWP Litigation. A true and correct copy of a letter from my partner, Robert L. Slaughter III, to Mr. Haas dated April 28, 2004 is attached hereto as Exhibit 1.

4.      Contrary to representations made on March 31, 2004, when the amended subpoena issued, the scope was enormously broadened. Instead of seeking, categories of documents, itself burdensome and oppressive request for which no justification beyond "our counseling experts wanted has ever been provided, the April 30, 2004 subpoena demands production of over 500,000 categories of documents. Unlike the original subpoena, the April 30, 2004 subpoena sought information about patients receiving treatment for Human Immuno Deficiency Virus (HIV), acquired Immuno Deficiency Syndrom ("AIDS"), various forms of mental health diseases, sexually transmitted diseases ("STDs"), and other disease courses that the California Legislature and courts have recognized as especially deserving of protection of non-disclosure because of the documented catastrophic consequences of unauthorized disclosures of this type of information. Also, the requisite protections for Health Net Plan subscribers and participants protected by California law were in place. No notice was issued to each subscriber as required by California Statutory and case law. The only protective order sought expressly recognized that is applicable state law was more protective of patient privacy, additional protections would have to be obtained if required by controlling state law. Moving parties still have not undertaken to procure the necessary protective orders that would comprise one of several conditions precedent to Heath Net making production of the confidential, personal, medical information they seek.

5.      Following LBBS's receipt of the 4/30/04 Subpoena, it served defendants with a

written document dated May 4, 2004 stating Health Net's objections to the subpoena, and a true and correct copy of that document is attached to defendants' moving papers as Exhibit B. Shortly thereafter, LBBS resumed a lengthy series of oral and written communications with the office of defendants' attorneys of record, Patterson, Belknap, Webb & Tyler LLP ("PBWT"), in an effort to resolve the issues presented by the 4/30/04 Subpoena and Health Net's objections thereto. The attorneys from PBWT who participated in those communications were Eric Haas, Adeel Mangi and Jessica Golden Cortes, and the attorneys from LBBS who participated in those communications were my partners, Robert L. Slaughter III and Lance A. Selfridge, and me. Those communications continued until mid-November, 2004, at which time defendants filed their motion to compel production of documents.

6.     LBBS also proposed that Health Net provide the requesting parties with representative contracts between it and various third parties because most contracts, especially those into which Health Net has entered in recent years are very similar. Health Net has attempted to standardize its contracts for ease of administration.

7.     As to the issue of reimbursement for pharmaceuticals, the issue that PBWT stated was of central interest to its clients, there is virtually no variation between each contract. For pharmacy reimbursement, the formula is Average Wholesale Price ("AWP") – a negotiated percentage plus a dispensing fee. The negotiated percentage varies in some instances from contract to contract as does the dispensing fee. However, the percentage and fee are fixed for the duration of the contract and do not change as frequently as monthly as is the case with the published AWPs for the 361 pharmaceuticals listed in the April 30, 2004 subpoena. If the percentage negotiated confidentially with each pharmacy were disclosed, every pharmacy would demand the smallest

discount offered and the cost of health care delivery would increase. If Health Net's discounts were disclosed, it would be at a competitive disadvantage against not only existing competitors as to whom the pharmacies would not have this negotiating leverage but also any new entrants into the markets served by Health Net. In addition, PBWT's clients have been informed through sworn deposition testimony that the discount does not exceed 16 2/3% because Health Net's negotiators understood that the markup from acquisition cost to AWP was 16 2/3%. Health Net's persons most knowledgeable have testified that when Health Net negotiated with pharmacy companies, Health Net understood that those companies could only be expected to provide services to Health Net subscribers if the pharmacy companies could make a profit while doing so. Consequently, the discount from AWP, designed to provide those who pay for subscriber services quality care at a low cost, could not be equal to or greater than the 16 2/3% mark up. If the pharmacy companies could not make a profit by providing services to Health Net's subscribers, the subscribers would get no service or the pharmacy companies would have to find ways to cut corners so as to make a profit. In either case, Health Net would not be able to fulfill its mission of delivering to its subscribers quality health care at a low cost.

8.     In response to Health Net's offer to provide exemplar contracts, PBWT proposed that it needed a sample of thousands of contracts. In a letter dated June 14, 2004, a true and correct copy of which is attached to the moving papers as Exhibit C, PBWT outlined what its consultants said they needed to perform the analysis they wanted. Unfortunately, the samples demanded were so large that in many cases the sample size exceeded the universe of the particular demographic sought. In other words, PBWT's notion of what is an appropriate sample is so burdensome and oppressive that it exceeds every document that exists.

9.      PBWT also seeks every contract because particular pharmacy companies have negotiated changes from the templates provided. PBWT has never attempted to ascertain what the damages are or whether the changes have any relevance to the issues in the pending *Pharmaceutical Industry Average Wholesale Litigation*. The exemplar contracts are often dozens of pages in length and the portions that relate to reimbursement payments are limited to a few lines in each contract.

10.     From the outset of those communications, the LBBS attorneys emphasized to the PBWT attorneys that the twenty-six individual document requests contained in the 4/30/04 Subpoena, as applied to fifty-six fields of inquiry respecting 361 different pharmaceuticals, actually amounted to approximately half a million individual requests, and that those requests significantly invaded both the privacy interests of Health Net's members and the trade secrets of Health Net itself. Thus, in an effort to narrow the scope of the subpoena, the LBBS attorneys suggested that defendants begin their inquiry (1) by formulating informal questions regarding the subject matter of the subpoena, to be answered by Health Net; (2) by accepting a production of a representative sampling Health Net's contracts, on a rolling basis at defendants' request; and (3) by taking the depositions of Health Net's persons most knowledgeable with respect to the topics placed in issue by the subpoena. This is the same methodology LBBS used to resolve the objections made by another one of its clients to a substantially identical subpoena served in this action by the firm of Davis, Polk & Wardwell on behalf of other defendants.

11.     PBWT accepted LBBS' proposed methodology and soon propounded a list of informal questions to Health Net which were answered to the best of Health Net's ability in a 22-page letter dated July 16, 2004 that LBBS sent to PBWT (the "7/16/04 Letter"). That letter also set forth in detail Health Net's positions respecting the production of its claim data and contracts, both

of which were requested by the 4/30/04 Subpoena, and the letter remains to this date the most comprehensive written communication from LBBS to PBWT respecting the issues presented by the subpoena. A true and correct copy of the 7/16/04 Letter is attached hereto as Exhibit 2, because for reasons unknown, defendants did not include a copy of the letter with their moving papers.

12.   Health Net also began a rolling production of a representative sampling of its contracts with its pharmacy and physician vendors, and ultimately produced 1,504 pages of contracts. Those contracts revealed the formula by which Health Net sets its reimbursement rates for the pharmaceuticals it purchases, and that formula is generally set forth in the format of AWP minus a discount expressed as a percentage. Health Net redacted the actual percentage discount from the contracts before producing them to defendants, because of its concern that it would suffer competitive damage in the marketplace if those percentage discounts were revealed. At PBWT's request, Health Net has withheld any production of its claim data, pending resolution of the various issues presented by defendants' request for the claims data.

13.   Finally, Health Net produced three of its employees for deposition as persons most knowledgeable with respect to various issues presented by the 4/30/04 Subpoena. Two of those depositions took place in Sacramento, California and the third deposition took place in Shelton, Connecticut. During discussions with PBWT that preceded those depositions and during the depositions themselves, statements were made suggesting that one of the defendants' theories of defense is that the discount from AWP that health insurers employ in setting their reimbursement rates is intended to cancel out the difference between their wholesale acquisition costs and reimbursement rates for the pharmaceuticals they purchase. PBWT has never expressly stated why defendants want information regarding Health Net's rates of reimbursement for pharmaceuticals.

14.     During the course of the communications between PBWT and LBBS, Health Net reached certain agreements with defendants respecting the scope of its document production pursuant to the 4/30/04 Subpoena.  Significantly, defendants agreed to pay Health Net's costs of retrieving its claims data, and defendants also agreed to the use of a scrambler algorithm to obscure confidential patient information prior to production.  Defendants' agreements in these regards are reflected in Mr. Mangi's letter to Mr. Slaughter dated July 28, 2004, a copy of which is attached as Exhibit E to defendants' moving papers.  Mr. Selfridge's letter to Mr. Mangi dated December 1, 2004 also refers to defendants' agreement to use a scrambler algorithm, and a true and correct copy of that letter is attached hereto as Exhibit 3.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California on December 6, 2004.

_____
Gordon J. Calhoun

**EXHIBIT 1**

# LEWIS BRISBOIS BISGAARD & SMITH LLP

### ATTORNEYS AT LAW

221 NORTH FIGUEROA STREET, SUITE 1200, LOS ANGELES, CA 90012
PHONE: 213.250.1800 | FAX: 213.250.7900 | WEBSITE: www.lbbslaw.com

**ROBERT L. SLAUGHTER III**
DIRECT DIAL: 213.680.5028
E-MAIL: slaughter@lbbslaw.com

April 28, 2004

FILE NO.
25713-70

By Facsimile and First Class Mail

Erik Haas, Esq.
Patterson, Belknap, Webb & Tyler
1133 Avenue of the Americas
New York, New York 10036-6710

Re:   *In Re Pharmaceutical Average Wholesale Price Litigation*

Dear Mr. Haas:

Reference is made to the new subpoena issued by defendants in the above referenced litigation dated April 5, 2004, and your letter attached thereto dated April 7, 2004. The subpoena and your letter, which were personally delivered to my office on April 9, 2004, request a May 5, 2004 production of documents by, and a May 6, 2004 deposition of, Health Net, Inc. ("Health Net".) Your process server stated that it was necessary to "personally serve" me with the subpoena. I informed your process server that neither I nor my firm was authorized to accept service of the subpoena on behalf of Health Net. Nevertheless, after calling his office, your process server stated that he was instructed to leave the subpoena despite the fact that neither I nor the firm were authorized to accept service on behalf of Health Net.

Federal Rules of Civil Procedure, Rules 45(a) and (b)(1), however, require service be made by delivering a copy of the subpoena to the person being served, in this case, Health Net. As I have never conveyed that my firm is authorized to accept service on behalf of Health Net, and neither my firm nor I are representatives of Health Net, the attempt to serve Health Net by "dumping" the subpoena at my office was improper. The substitute service provisions of Federal Rule of Civil Procedure, Rule 4(e)(2) do not apply to subpoenas because Rule 45(a) requires delivery "to the person" being served. (*Doe v. Hersemann*, 155 F.R.D. 630 (N.D. IN. 1994) As such, the attempt to serve Health Net was ineffective.

When my partners and I met with you at your office on March 31, 2004 to discuss the scope of documents and information sought by a subpoena previously issued by defendants in November, 2003, you mentioned a new subpoena would be forthcoming that would substantially narrow the

| LOS ANGELES | SAN FRANCISCO | SAN DIEGO | COSTA MESA | SAN BERNARDINO | SACRAMENTO | NEW YORK | LAS VEGAS |
|---|---|---|---|---|---|---|---|
| 213.250.1800 | 415.362.2580 | 619.233.1006 | 714.545.9200 | 909.387.1130 | 916.564.5400 | 212.232.1300 | 702.893.3383 |

4841-4689-4336.1

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Haas, Esq.
April 28, 2004
Page 2

scope of information sought and lessen the attendant burden foisted upon Health Net in responding thereto. Unfortunately, both the temporal and substantive scope of the new subpoena have increased by an order of magnitude, as has the burden that will be required to respond.

As a matter of professional courtesy consistent with our prior mutual efforts to cooperate with efforts to conduct discovery in the above captioned action, and in order to advance the process, I write to advise you that Health Net will not be producing documents on May 5, 2004, nor a witness for deposition on May 6, 2004. Rather, on or before May 5, 2004, Health Net will, without waiving objections to the propriety of service, provide a response to the subpoena setting forth why it is substantively and procedurally deficient. I wanted to give you advance notice so that defendants need not incur costs of travel to attend a document production and deposition that will not occur as scheduled by the defectively served subpoena.

Should you have any questions about the foregoing, please contact me.

Very truly yours,

ROBERT L. SLAUGHTER III for
LEWIS BRISBOIS BISGAARD & SMITH LLP

RLS/jl

cc:    Gordon J. Calhoun, Esq.
       Dominic M. Pisani, Esq.

4841-4689-4336.1

**EXHIBIT 2**

# LEWIS BRISBOIS BISGAARD & SMITH LLP

### ATTORNEYS AT LAW

221 NORTH FIGUEROA STREET, SUITE 1200, LOS ANGELES, CA 90012
PHONE: 213.250.1800 | FAX: 213.250.7900 | WEBSITE: www.lbbslaw.com

LANCE A. SELFRIDGE
DIRECT DIAL: 213.680.5003
E-MAIL: lances@lbbslaw.com

July 16, 2004

FILE NO.
25713-070

BY U.S. MAIL & FACSIMILE (212) 336-7947

Erik Hass, Esq.
Adeel Mangi, Esq.
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036-6710

Re:   In re Pharmaceutical Industry Average Wholesale Price Litigation

Dear Messrs. Haas and Mangi:

On April 30, 2004, your office, on behalf of the defendants in the above-referenced litigation (the "AWP Litigation"), issued a subpoena duces tecum to my firm's client, Health Net, Inc. ("Health Net"). My office served Health Net's objections to the subpoena duces tecum, including objections on the grounds of patient privacy and trade secret protection, on June 1, 2004.

Our offices have been working cooperatively to reach a resolution of the many issues presented by the subpoena and by Health Net's objections. On May 18, 2004, Mr. Haas wrote to identify the salient questions presented by the plaintiffs' allegations in the AWP Litigation, which the defendants seek to rebut, in part, by means of their subpoena to Health Net. Health Net has agreed to answer those questions and, it expects, to provide persons most knowledgeable to testify at deposition with respect to the subject matter of those questions. Several telephone conferences between our offices then followed. Finally, on July 2, 2004, Mr. Mangi wrote to express his understanding of the disclosures our office had agreed to make on behalf of Health Net by today's date. I addressed certain concerns about the contents of Mr. Mangi's letter by means of my responsive letter of July 2, 2004.

| LOS ANGELES | SAN FRANCISCO | SAN DIEGO | ORANGE COUNTY | INLAND EMPIRE | SACRAMENTO | NEW YORK | LAS VEGAS | PHOENIX | TUCSON |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 213.250.1800 | 415.362.2580 | 619.233.1006 | 714.545.9200 | 909.387.1130 | 916.564.5400 | 212.232.1300 | 702.893.3383 | 602.385.1040 | 520.202.2565 |

4835-4809-3440.1

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 2

I write now to make the disclosures my office has agreed to make on behalf of Health Net, to the extent that the information developed to date allows us to make those disclosures. While much of the information you requested is contained in this letter, we are still in the process of obtaining certain other information. For the sake of simplicity, this letter follows the format of Mr. Mangi's letter of July 2, 2004. Thus, the issue of claims data is addressed first, followed by the issue of contract production, followed by informal responses to the questions Mr. Haas presented in his letter of May 18, 2004.

## **Claims Data**

The first issue related to claims data concerns the data platforms used by Health Net to store the claims data. The hardware platform is an IBM RS/6000 Model H80. The operating software is IBM AIX. The database engine software is Oracle. The data available on those platforms consist of claim record details that include cost and utilization information and other claim attributes such as member, pharmacy, drug and prescriber.

The second issue related to claims data is a good faith estimate of the costs of producing the data that is stored on the data platforms. As we have previously advised you, Health Net has estimated that it will take eight to ten weeks to retrieve the data sought by the defendants' subpoena duces tecum, after agreement is reached on the scope of production in light of patient privacy concerns. While these estimates are preliminary only at this point, Health Net estimates that the information technologies expense to retrieve the data would be approximately $25,000 and that the expense of data analysis would be approximately $5,000. Health Net has not yet been able to formulate an estimate for the lost opportunity costs it will incur by virtue of the unavailability of its employees to perform other work necessitated by its business. That estimate will be forthcoming. Health Net will of course expect to be compensated by the defendants for the amount of its documented costs of data retrieval in responding to the subpoena.

The third and last issue respecting the claims data concerns the confidentiality of the information sought by the defendants' subpoena duces tecum. As you know from the objections Health Net served to the defendants' subpoena, Health Net is obligated by law to respect the patient privacy rights of its members. Those privacy rights include not only rights granted by the Health Insurance Portability and Accountability Act (42 U.S.C. §§ 1320, et

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 3

seq.), which are the subject of the HIPAA-sensitive protective order in this litigation, but also those different rights granted by Art. 1, § 1 of the Constitution of the State of California, by California Insurance Code § 791.13 and other statutes, and to the extent applicable as an enforcement mechanism for those rights, by California Code of Civil Procedure § 1985.3, which are not the subject of the HIPAA-sensitive protective order.

Specifically, HIPAA provides, in 18 U.S.C. § 1320d(6), that:

The term "individually identifiable health information" means any information, including demographic information collected from an individual, that -

(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and

(B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and -

(i) identifies the individual; or

(ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

HIPAA also provides, in 18 U.S.C. § 1320d-6, that any "person who knowingly . . . discloses individually identifiably health information to another person" is guilty of a criminal offense and subject to punishment. Art. 1, § 1 of the California Constitution provides that "[a]ll people . . . have inalienable rights . . . [including] privacy." California Insurance Code section 791.13 provides, subject to certain exceptions not applicable here, that "[a]n insurance institution . . . shall not disclose any personal or privileged information about an individual collected or received in connection with an insurance transaction unless the disclosure is . . . with the written authorization of the individual. . . ." And California Code of Civil Procedure section 1985.3 provides individuals with significant procedural protections when their "personal records," which are defined to include records maintained by doctors, hospitals, pharmacies and insurance companies, are sought in discovery.

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 4

Much of the documentation sought by the defendants' subpoena duces tecum consists of patients' pharmaceutical records. Such documentation is therefore "individually identifiable health information" as defined by HIPAA. In addition, it constitutes "personal or privileged information about an individual collected or received in connection with an insurance transaction" as defined by California Insurance Code section 791.13. Needless to say, it is also subject to the right of privacy provided by Art. 1, § 1 of the California Constitution. Health Net cannot simply ignore the very significant rights provided to its patient members by those laws without risking both civil and criminal liability itself.

In a recent case decided on March 26, 2004 by the United States Court of Appeals for Seventh , Northwestern Memorial Hospital v. Ashcroft, the court upholds the district court's order quashing a subpoena that sought a limited number of redacted and "de-identified" medical records on, among other grounds, the court's determination that even if the medical records were redacted, and there were no possibility that the patient's identity might be revealed from the redacted records themselves, there would still be an impermissible invasion of privacy because revealing de-identified data would still cause a patient to feel that his or her privacy had been invaded. The court explains that even with the redaction of "individual identifiers," the risk of identification by persons who might be acquainted with a patient whose redacted medical records were revealed is too high in this age of skillful "googlers" to allow the discovery of such private and sensitive details. Finally, the court finds that principles of comity require federal courts to consider, in deciding whether to quash a subpoena seeking medical records, state law privileges such as California's constitutional right to privacy and physician-patient privilege, upon both of which doctors and patients rely strongly in the gathering and providing medical information. These substantive protections give rise to, among other things, a right of each patient to receive notice that his or her records are being sought by means of a subpoena to issued to a third party.

Applying the holding in Northwestern Memorial Hospital v. Ashcroft to the defendants' subpoena requires narrowing the scope of the defendants' document demands, particularly to the extent that the drugs identified in the subpoena are used to treat conditions that the patient would not like to have disclosed to the public. One way to narrow the scope of the document demands would be to rely on the "de-identification" criteria set forth in 45 C.F.R. § 164.514(b)(2)(i), the federal regulations promulgated under HIPAA. Information which must be removed from medical records in order to "de-identify" them under that regulation includes, but is not limited to:

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 5

1.  Names;
2.  All information pertaining to geographic subdivisions smaller than a state such
    as address, city, county and zip code information beyond the first three digits;
3.  All elements of dates (except year) for dates directly related to an individual
    including:
    a.  birth dates;
    b.  admission or discharge dates;
    c.  date of death;
    d.  all ages over age 89 and all elements of dates (including year)
        indicative of such age;
4.  Telephone numbers;
5.  Fax numbers;
6.  Electronic mail, URL or IP addresses;
7.  Social security numbers;
8.  Medical record numbers;
9.  Health plan beneficiary numbers;
10. Account numbers;
11. Certificate/license numbers;
12. Device identifiers and serial numbers;
13. Biometric identifiers;
14. Photographic images; and
15. Any other unique identifying number, characteristic or code.

The HIPAA-sensitive protective order thus raises two issues. First, while the
protective order provides some protection for HIPAA-sensitive documentation which may
be produced in this litigation, it does not provide the full range of protection provided by
HIPAA itself, because the protective order allows disclosure beyond that which HIPAA
allows. Second, the privacy rights existing under California law are not the subject of the
HIPAA-sensitive protective order, and have therefore not yet been addressed to any extent
in this litigation. Health Net is therefore legally obligated to assert its members' privacy
rights, both with respect to HIPAA and independent California law, until ordered to do
otherwise by a court of competent jurisdiction. This requires Health Net to withhold patient
identifier information with respect to all 361 drugs listed on Exhibit A to the defendants'
subpoena duces tecum.

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 6

In addition, Health Net has identified a number of medical conditions which implicate it members' privacy rights to a truly extraordinary degree.  Those conditions, listed in alphabetical order, are ADHD (attention deficit disorder), Alzheimer's disease, amenorrhea, angina, birth control, bladder control, cancer, cardiac conditions, Crohn's disease, depression, diabetes, dialysis, epilepsy, estrogen replacement, hemophilia, hepatitis, high blood pressure, HIV/AIDS, mental health, migraine headaches, muscle relaxation, pain, Parkinson's disease, prostate conditions, schizophrenia, sedation, smoking cessation, testosterone replacement, transplant rejection, and vaginal infections.  The patient privacy concerns implicated by most of those conditions are obvious; the conditions with respect to which the privacy concerns are less obvious were generally included because of the effect which they might have on a patient's employment if it became known that the patient suffered from one of those conditions.

Approximately half of the 361 drugs listed on Exhibit A to the defendants' subpoena duces tecum are used to treat one or more of the foregoing conditions.  Those drugs are as follows:

| Manufacturer | Drug | Condition(s) Treated |
| --- | --- | --- |
| Abbott | Acyclovir | HIV/AIDS |
| Abbott | Calcijex | Dialysis |
| Abbott | Depakote | Epilepsy |
| Abbott | Depakote SPR | Epilepsy |
| Abbott | Diazepam | Mental health |
| Abbott | Fentanyl CIT | Cancer; pain |
| Abbott | Leucovor | Cancer |
| Abbott | Lorazepam | Sedation |

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 7

| | | |
|---|---|---|
| Amgen | Aranesp | Cancer |
| Amgen | Epogen | Cancer |
| Amgen | Neulasta | Cancer |
| Amgen | Neupogen | Cancer |
| Apothecon | Fungizone (amphotercin b) | HIV/AIDS |
| AstraZeneca | Arimidex | Cancer |
| AstraZeneca | Atacand | High blood pressure |
| AstraZeneca | Atacand HCT | High blood pressure |
| AstraZeneca | Casodex | Cancer |
| AstraZeneca | Entocort EC | Crohn's disease |
| AstraZeneca | Nolvadex | Cancer |
| AstraZeneca | Seroquel | Schizophrenia |
| AstraZeneca | Toprol XL | High blood pressure |
| AstraZeneca | Zestril | High blood pressure |
| AstraZeneca | Zoladex | Cancer |
| AstraZeneca | Zomig | Migraine headache |
| AstraZeneca | Zomig ZMT | Migraine headache |
| Aventis | Amaryl | Cardiac conditions |

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 8

| | | |
|---|---|---|
| Aventis | Cardizem Cap | Cardiac conditions |
| Aventis | Cardizem Inj | Cardiac conditions |
| Aventis | Cardizem Tab | Cardiac conditions |
| Aventis | Taxotere | Cancer |
| Baxter | Bebulin VH | Hemophilia |
| Baxter | Brevibloc | Cardiac conditions |
| Baxter | Cisplatin | Cancer |
| Baxter | Doxorubicin | Cancer |
| Baxter | Recombinate | Hemophilia |
| Bayer Pharmaceutical | DTIC-DOME | Cancer |
| Bayer Pharmaceutical | Koate-HP | Hemophilia |
| Bayer Pharmaceutical | Kogenate FS | Hemophilia |
| Bayer Pharmaceutical | Mithracin | Cancer |
| B-M Squibb | Avapro | High blood pressure |
| B-M Squibb | Blenoxane | Cancer |
| B-M Squibb | Buspar | Depression |
| B-M Squibb | Cytoxan | Cancer |
| B-M Squibb | Etopophos | Cancer |

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 9

| B-M Squibb | Glucophage | Diabetes |
| B-M Squibb | Glucovance | Diabetes |
| B-M Squibb | Ividex EC | Cancer |
| B-M Squibb | Monopril | High blood pressure |
| B-M Squibb | Paraplatin Inj | Cancer |
| B-M Squibb | Rubex | Cancer |
| B-M Squibb | Serzone | Depression |
| B-M Squibb | Taxol | Cancer |
| B-M Squibb | Vepesid | Cancer |
| Cerenex | Amerge | Migraine headache |
| Cerenex | Imitrex | Migraine headache |
| Cerenex | Zofran | Cancer |
| Fujisawa | Nebupent or Pentam 300 | HIV/AIDS |
| Fujisawa | Prograf | Transplant rejection |
| Fujisawa | Vinblastine Sulfate | Cancer |
| Gensia | Amphotercin B | HIV/AIDS |
| Gensia | Etoposide | Cancer |
| Gensia | Leucovorin Calcium | Cancer |

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 10

| | | |
|---|---|---|
| GlaxoSmithKline | Agenerase | HIV/AIDS |
| GlaxoSmithKline | Agenerase SOL | HIV/AIDS |
| GlaxoSmithKline | Alkeran | Cancer |
| GlaxoSmithKline | Amerge | Migraine headache |
| GlaxoSmithKline | Combivir | HIV/AIDS |
| GlaxoSmithKline | Daraprim | HIV/AIDS |
| GlaxoSmithKline | Epivir | HIV/AIDS |
| GlaxoSmithKline | Epivir HBV | HIV/AIDS |
| GlaxoSmithKline | Imitrex | Migraine headache |
| GlaxoSmithKline | Kytril | Cancer |
| GlaxoSmithKline | Lamictal | Epilepsy |
| GlaxoSmithKline | Lanoxin | Cardiac conditions |
| GlaxoSmithKline | Lanoxin Ped | Cardiac conditions |
| GlaxoSmithKline | Leukeran | Cancer |
| GlaxoSmithKline | Mepron | HIV/AIDS |
| GlaxoSmithKline | Myleran | Cancer |
| GlaxoSmithKline | Navelbine | Cancer |
| GlaxoSmithKline | Paxil | Depression |

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 11

| GlaxoSmithKline | Paxil CR | Depression |
| GlaxoSmithKline | Purinethol | Cancer |
| GlaxoSmithKline | Relenza | HIV/AIDS |
| GlaxoSmithKline | Retrovir | HIV/AIDS |
| GlaxoSmithKline | Thioguanine | Cancer |
| GlaxoSmithKline | Trizvir | HIV/AIDDS |
| GlaxoSmithKline | Wellbutrin | Depression |
| GlaxoSmithKline | Ziagen | HIV/AIDS |
| GlaxoSmithKline | Zofran | Cancer |
| GlaxoSmithKline | Zyban | Smoking cessation |
| Immunex | Leucovorin Calcium | Cancer |
| Immunex | Leukine | Cancer |
| Immunex | Methotrexate Sodium | Cancer |
| Immunex | Novantrone | Cancer |
| Immunex | Thioplex | Cancer |
| J&J Group (Janssen Pharmaceutica) | Duragesic | Cancer |
| J&J Group (Janssen Pharmaceutica) | Reminyl | Alzheimer's disease |

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 12

| | | |
|---|---|---|
| J&J Group (Janssen Pharmaceutica) | Risperdal | Schizophrenia |
| J&J Group (McNeil-PPC) | Flexeril | Muscle relaxation |
| J&J Group (Ortho Biotech Products) | Procrit | Cancer |
| J&J Group (Ortho McNeil Pharmaceutical) | Elmiron | Bladder control |
| J&J Group (Ortho McNeil Pharmaceutical) | Haldol | Schizophrenia |
| J&J Group (Ortho McNeil Pharmaceutical) | Haldol Decan | Schizophrenia |
| J&J Group (Ortho McNeil Pharmaceutical) | Mycelex | HIV/AIDS |
| J&J Group (Ortho McNeil Pharmaceutical) | Parafon Fort | Pain |
| J&J Group (Ortho McNeil Pharmaceutical) | Regranex | Diabetic ulcerc |
| J&J Group (Ortho McNeil Pharmaceutical) | Terazol 3 | Vaginal infections |
| J&J Group (Ortho McNeil Pharmaceutical) | Terazol 7 | Vaginal infections |
| J&J Group (Ortho McNeil Pharmaceutical) | Testoderm | Testosterone replacement |

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 13

| | | |
|---|---|---|
| J&J Group (Ortho McNeil Pharmaceutical) | Tolectin | Pain |
| J&J Group (Ortho McNeil Pharmaceutical) | Tolectin DS | Pain |
| J&J Group (Ortho McNeil Pharmaceutical) | Topamax | Epilepsy |
| J&J Group (Ortho McNeil Pharmaceutical) | Tylenol/Cod | Pain |
| J&J Group (Ortho McNeil Pharmaceutical) | Tylox | Pain |
| J&J Group (Ortho McNeil Pharmaceutical) | Ultracet | Pain |
| J&J Group (Ortho McNeil Pharmaceutical) | Ultram | Pain |
| J&J Group (Ortho McNeil Pharmaceutical) | Urispas | Bladder control |
| J&J Group (Ortho McNeil Pharmaceutical) | Vascor | Cardiac conditions |
| J&J Group (Ortho Neutrogena) | Monistat | Vaginal infections |
| Novartis | Clozaril | Schizophrenia |
| Novartis | Combipatch | Estrogen replacement |
| Novartis | Exelon | Alzheimer's disease |

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 14

| | | |
|---|---|---|
| Novartis | Fermara | Cancer |
| Novartis | Lamphrene | Epilepsy |
| Novartis | Lotensin | High blood pressure |
| Novartis | Lotensin HCY | High blood pressure |
| Novartis | Lotrel | High blood pressure |
| Novartis | Parlodel | Amenorrhea |
| Novartis | Ritalin | ADHD |
| Novartis | Ritalin LA | ADHA |
| Novartis | Starlix | Diabetes |
| Novartis | Tegretol | Epilepsy |
| Novartis | Tegretol XR | Epilepsy |
| Novartis | Trileptal | Epilepsy |
| Novartis | Vivelle | Estrogen replacement |
| Novartis | Vivelle-DOT | Estrogen replacement |
| Pfizer | Accupril | High blood pressure |
| Pfizer | Accuretic | High blood pressure |
| Pfizer | Cardura | Prostate conditions |
| Pfizer | Celontin | Epilepsy |

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 15

| | | |
|---|---|---|
| Pfizer | Dilantin | Epilepsy |
| Pfizer | Dilantin-125 | Epilepsy |
| Pfizer | Estrostep FE | Birth control |
| Pfizer | Femhrt 1/5 | Estrogen replacement |
| Pfizer | Minizide | High blood pressure |
| Pfizer | Nardil | Depression |
| Pfizer | Neurontin | Epilepsy |
| Pfizer | Nitrostat | Angina |
| Pfizer | Renese | High blood pressue |
| Pfizer | Rescriptor | HIV/AIDS |
| Pfizer | Viracept | HIV/AIDS |
| Pfizer | Zarontin | Epilepsy |
| Pfizer | Zoloft | Depression |
| Pharmacia | Adriamycin PFS | Cancer |
| Pharmacia | Adriamycin RDF | Cancer |
| Pharmacia | Adrucil | Cancer |
| Pharmacia | Amphocin | HIV/AIDS |
| Pharmacia | Amphotercin B | HIV/AIDS |

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 16

| | | |
|---|---|---|
| Pharmacia | Bieomycin Sulfate | Cancer |
| Pharmacia | Cytarbine (Cytosar-U) | Cancer |
| Pharmacia | Depo-Testosterone | Testosterone replacement |
| Pharmacia | Etoposide | Cancer |
| Pharmacia | Neosar | Cancer |
| Pharmacia | Toposar | Cancer |
| Pharmacia | Vincasar PFS | Cancer |
| Schering | Eulexin | Cancer |
| Schering | Integrilin | Angina |
| Schering | Intron-A | Hepatitis |
| Schering | Peg-Intron | Hepatitis |
| Schering | Rebetol | Hepatitis |
| Schering | Temodar | Cancer |
| Sicor | Doxorubicin | Cancer |
| Sicor | Etoposide | Cancer |
| Sicor | Leucovorin Calcium | Cancer |
| Sicor | Pentamidine Isethionate | HIV/AIDS |
| Warick | ISMN | Cardiac conditions |

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 17

| | | |
|---|---|---|
| Watson | Diazepam | Sedation |
| Watson | Estradiol | Estrogen replacement |
| Watson | Fluphenzamine HCL | Depression |
| Watson | Imipramine HCL | Depression |
| Watson | Lorezapam | Sedation |
| Watson | Nadolol | Cardiac conditions |
| Watson | Propanolol | Cardiac conditions |
| Watson | Verapamil | Cardiac conditions |

Health Net desires to provide the defendants with the maximum amount of information sought by their subpoena duces tecum, without violating either HIPAA, Art. 1, § 1 of the California Constitution, California Insurance Code § 791.13, other substantive statutes and applicable law, or California Code of Civil Procedure § 1985.3. Health Net will accordingly produce to defendants, with respect to each of the 361 drugs identified on Exhibit A to defendants' subpoena, and upon the making of suitable arrangements for payment of its expenses of production as discussed above, all claims data in its possession respecting all of the fields stated in Eric Haas' letter of April 7, 2004, except for those seeking patient identifier information, which are as follows:  Subscriber number, group number, billing unit, group name, patient age, patient gender, member relationship, provider number, provider tax ID, pharmacy name, pharmacy number, patient ID, and claim adjustment number.  For the foregoing reasons, Health Net believes, notwithstanding the existence of the HIPAA-sensitive protective order, that it would violate one or more of the foregoing laws if it produced claims data with respect those stated fields.

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 18

## Contract Production

In his letter of July 2, 2004, Mr. Mangi noted that the "defendants seek the production of a representative sample of contracts showing all reimbursement methodologies used by Health Net." To that end, I have obtained representative samples of the following types of contracts: A reimbursement agreement between Health Net and a drug manufacturer; a rebate agreement between Health Net and a drug manufacturer; a pharmaceutical discount agreement between Health Net and a drug manufacturer; a managed care organization services agreement between Health Net and a drug manufacturer; a pharmaceutical services agreement between Health Net and a retail pharmacy; a mail service pharmacy agreement between Health Net and a mail service pharmacy; and a pharmacy claims services processing agreement between Health Net and a pharmacy claims processing company. As you requested, copies of those contracts will be produced to you next week.

The foregoing contracts show the reimbursement methodologies used by Health Net. As we have previously discussed, however, Health Net has acquired various other managed care companies since 1991, the inception date specified for production in the defendants' subpoena duces tecum. Because the record keeping practices of those other companies were not under Health Net's control before Health Net acquired those companies, it has not yet been possible to locate any contracts executed by any such acquired companies prior to the dates of their acquisition by Health Net. Efforts to obtain any such contracts executed by acquired companies which may still be in existence are continuing. Please be assured, however, that the acquired companies were subject to the reimbursement methodologies used by Health Net after the dates of their acquisitions.

Health Net does not share the sanguine assertion in Mr. Mangi's letter of July 2, 2004 that the financial information contained in Health Net's contracts "is fully safeguarded by the protective order in this case." Notwithstanding the existence of the protective order, the financial information in Health Net's contracts will be shared among the various parties to this litigation, including companies with whom Health Net has negotiated differing reimbursement arrangements. Such sharing of financial information will necessarily compromise Health Net's competitive advantage vis-a-vis those companies with which it has negotiated more favorable reimbursement arrangements. Those companies will inevitably question why Health Net did not accord them the same financial consideration as other companies. In addition, you have not yet articulated any compelling reason why the

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 19

defendants need to discover the intimate financial details of Health Net's reimbursement arrangements with the companies with which it contracts. Mr. Mangi's letter of July 2, 2004 is notably silent in that regard.

Accordingly, in an effort to satisfy whatever legitimate need for financial information that the defendants may have in light of Health Net's foregoing concerns, Health Net will provide you with the financial data for a representative sampling of the companies with which it contracts. In order to protect its own demonstrated need for commercial discretion, Health Net will not divulge the names of those companies.

**Informal Responses**

The questions posed by Mr. Haas in his letter of May 18, 2004 and Health Net's answers to those questions follow. To the extent the defendants require further information in response to these questions, Health Net will supply answers to additional questions to clarify the responses contained in this letter if you believe that would be useful before the identification of persons most knowledgeable to testify in deposition. In that regard, please identify with specificity the subject matter of any such proposed deposition testimony, in order to facilitate the designation of any such witnesses.

Question No. 1.   What is your understanding of the term "AWP" or "Average Wholesale Price"? In particular, query whether you understood the term to be (a) the average of actual acquisition costs, or alternatively, (b) a benchmark set at a markup over "WAC" or the "Wholesale Acquisition Cost" without reference to actual costs.

Answer to Question No. 1.   Health Net understands the term "AWP" or "Average Wholesale Price" to be a benchmark set at a markup over "WAC" or "Wholesale Acquisition Cost" without reference to actual costs.

Question No. 2.   What methodologies (e.g., capitation, usual and customary charges, AWP-based formula) did you utilize to determine the amounts to pay or reimburse health care providers (e.g., doctors, hospitals, clinics, home health care) and pharmacies (either directly or through PBMs) for drugs administered and dispensed? To the extent you calculated a reimbursement utilizing formulae referencing AWP, what were those formulae

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 20

(e.g., AWP, AWP-10%, AWP-20%) and what was the reason for offering the different formulae to different providers and pharmacies? To the extent you use capitation, what percentage of your physician payments are based on capitation?

Answer to Question 2.    Health Net uses AWP-based formulae to reimburse pharmacies for dispensing prescription medication to Health Net members. The formulae adopt differing discounts depending on factors such as the size of the pharmacy chain, the volume of Health Net prescriptions the chain processes, whether the chain is a retail pharmacy or a mail order pharmacy, the extent to which the chain can assure patient access, and the negotiating ability of the parties. Health Net is attempting to compile further information in answer to this question.

Question No. 3. Did you understand that drug manufacturers provided health care providers or pharmacies with discounts, rebates and other incentives that were not reported in pricing compendia or otherwise disclosed to the public? When utilizing AWP to calculate reimbursement, did you understand that the published AWP was not adjusted to account for such discounts, rebates and other incentives? Did you understand that such discounts, rebates and other incentives lowered the providers' and pharmacies' effective acquisition price to amounts below WAC?

Answer to Question No. 3.    Health Net understands that pharmacies can obtain discounts, rebates or other incentives from drug manufacturers. Health Net is not familiar with the details or extent of any such discounts, rebates or other incentives, but it does understand that they are not reported in pricing compendia or otherwise disclosed to the public. Health Net is informed and believes that the published AWP was not adjusted to account for those discounts, rebates and other incentives, and that they would naturally lower the pharmacies' acquisition costs for prescription medications. Health Net is attempting to compile further information in answer to this question.

Question No. 4.    Did you set drug reimbursement for drugs administered and dispensed based on competitive negotiations with health care providers, pharmacies and PBMs? For physician-administered drugs, to what extent do your negotiations expressly deal with the distinction between (a) the reimbursement of the drug itself and (b) the reimbursement for the medical provider's administration service?

4835-4809-3440.1

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 21

Answer to Question No. 4.    Health Net did not negotiate specific drug reimbursements with pharmacies or PBMs. Health Net is attempting to compile further information in answer to this question.

Question No. 5.  To what extent are your negotiations over reimbursement rates with providers over drugs and drug-related services influenced by Medicare's reimbursement rates?  With respect to negotiations with doctors concerning reimbursement for drugs administered in-office, have doctors consistently taken the position that reimbursement for drugs must exceed the reimbursement received for drugs under Medicare?

Answer to Question No. 5.  Health Net is attempting to compile information in order to answer to this question.

Question No. 6.  Did you contemplate that health care providers and pharmacies would earn a margin on drugs administered and dispensed? Was it your understanding that such margin depended, in part, on the difference between the reimbursement you paid and the actual acquisition costs for the drugs, net of any incentives provided by the drug manufacturers? That is, did you understand that the amounts you reimbursed or paid for drugs exceeded the amounts the health care providers or pharmacies paid for the drugs?

Answer to Question No. 6.  Health Net was aware that because AWP is an arbitrarily set price, and that pharmacies can obtain discounts from their wholesalers, basing the reimbursement rate on AWP allows pharmacies to retain a margin on drugs administered and dispensed.

Question No. 7.  Do you provide different reimbursement rates for subject drugs when they are administered in providers' offices rather than hospitals? If so, why, and what are the differences in the rates?

Answer to Question No. 7.  Health Net is attempting to compile information in order to answer to this question.

Question No. 8.  Is it your position that drug manufacturers colluded with pharmacy benefit managers ("PBMs") to inflate the amount you paid or reimbursed for pharmacy-dispensed drugs?

LEWIS BRISBOIS BISGAARD & SMITH LLP

Erik Hass, Esq.
Adeel Mangi, Esq.
July 16, 2004
Page 22

Answer to Question No. 8.  No, because it is not clear what factor or factors have caused the significant increase in the AWP in recent years.

Question No. 9.  What PBMs, if any, acted as your agent in negotiating rebates from manufacturers and reimbursement or payment to pharmacies?  What proportion of those rebates were passed onto you?  Have PBMs advertised or touted to you their ability to use their market power to negotiate favorable rebates, reimbursement or payments with manufacturers and pharmacies? Did you contemplate that PBMs would earn a margin on the difference between what they charge you for drugs and what they reimburse pharmacies for those drugs?

Answer to Question No. 9.  Health Net uses its own, internal PBM, which negotiates contracts for medication rebates directly with drug manufacturers, and which negotiates reimbursement rates directly with pharmacies. As a result, all rebates are retained by Health Net.  Health Net uses external PBMs only for claim processing, so external PBMs do not advertise their market power to Health Net, nor do they earn anything based on charges to Health Net for drugs.

Question No. 10.  Is it your position that drug manufacturers engaged in a pattern of fraudulent conduct to artificially inflate the AWPs for their drugs that caused you to substantially overpay for those drugs?

Answer to Question No. 10.  No, because it is not clear what factor or factors have caused the significant increase in the AWP in recent years.

Very truly yours,

*Lance A. Selfridge*

Lance A. Selfridge, of
LEWIS BRISBOIS BISGAARD & SMITH LLP

LAS:fm

cc:     Gordon J. Calhoun, Esq.
        Robert L. Slaughter III, Esq.

4835-4809-3440.1

**EXHIBIT 3**

# LEWIS BRISBOIS BISGAARD & SMITH LLP

### ATTORNEYS AT LAW

221 NORTH FIGUEROA STREET, SUITE 1200, LOS ANGELES, CA 90012
PHONE: 213.250.1800 | FAX: 213.250.7900 | WEBSITE: www.lbbslaw.com

LANCE A. SELFRIDGE                                  December 1, 2004                          FILE NO.
DIRECT DIAL: 213.680.5003                                                                     25713-070
E-MAIL: lances@lbbslaw.com

BY U.S. MAIL & FACSIMILE    (212) 336-7947

Adeel A. Mangi, Esq.
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036-6710

        Re:    _In re Pharmaceutical Industry Average Wholesale Price Litigation_

Dear Mr. Mangi:

        This letter responds to your letter dated November 3, 2004.

        With respect to the claims data, we seem to have reached agreement that a scrambler algorithm may be used to mask confidential patient information. Unfortunately, you apparently will not agree that a scrambler algorithm may be used to mask the identity of the vendors with whom Health Net contracts. We find your refusal to do so both curious and unhelpful, since you were the party who proposed the use of scrambler algorithm methodology in the first place, and since we readily agreed to it. In any event, we understand that you have now applied to court for resolution of the claims data issue. In the meantime, Health Net will honor your request not to collect any claims data until this issue is resolved. When Health Net does produce its claims data, it will hold the defendants to their legal obligation to pay the actual costs of recovering ancient data from its obsolete systems. See, Rowe Entertainment, Inc. v. William Morris Agency, Inc., 205 F.R.D. 421 (S.D.N.Y. 2002); Zubulake v. UBS Warburg LLC, 217 F.R.D. 309 (S.D.N.Y. 2003). An estimate of that cost is not yet available.

        With respect to the document production, Health Net will continue its efforts to identify and produce any missing pages. Please note that it is not clear that any pages are in fact missing, in that this may be simply a page numbering issue. In any event, as we have previously advised you, we do not believe that Health Net is prohibited from producing its documents with watermarks.

        Finally, we are disappointed that you have chosen to be as confrontational and unyielding as you have in this matter. Health Net has made repeated efforts to compromise its objections with the

| LOS ANGELES | SAN FRANCISCO | SAN DIEGO | ORANGE COUNTY | INLAND EMPIRE | SACRAMENTO | NEW YORK | LAS VEGAS | PHOENIX | TUCSON |
|---|---|---|---|---|---|---|---|---|---|
| 213.250.1800 | 415.362.2580 | 619.233.1006 | 714.545.9200 | 909.387.1130 | 916.564.5400 | 212.232.1300 | 702.893.3383 | 602.385.1040 | 520.202.2565 |

4837-4463-9488.1

LEWIS BRISBOIS BISGAARD & SMITH LLP

Adeel A. Mangi, Esq.
December 1, 2004
Page 2

defendants you represent, but its efforts have been met only with your repeated demands for further concessions. Another one of our clients was served with an identical subpoena in this same litigation on behalf of other defendants represented by Davis, Polk & Wardwell. We objected to that subpoena on similar grounds and then proposed the same methodology of informal questions, voluntary document production, and voluntary depositions that we have proposed for the resolution of Health Net's objections to your subpoena. We amicably resolved the objections to that other subpoena in the manner we proposed, and the matter was closed several months ago, despite the fact that the other subpoena was served much more recently than yours. In this case, you seem never to be satisfied with Health Net's ongoing efforts to compromise. We can only wonder if the difficulty in this case is one of style rather than substance.

Very truly yours,

*Lance A. Selfridge*

Lance A. Selfridge, of
LEWIS BRISBOIS BISGAARD & SMITH LLP

LAS:fm

cc:     Gordon J. Calhoun, Esq.
        Robert L. Slaughter III, Esq.