UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) ) ) ) ) ) ) ) ) ) | MDL No. 1456<br><br>CIVIL ACTION:  01-CV-12257-PBS<br><br>Judge Patti B. Saris<br><br>Chief Magistrate Judge Marianne B. Bowler |

**PLAINTIFFS' REPLY TO BRISTOL-MYERS SQUIBB'S INDIVIDUAL MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION**

**[REDACTED VERSION]**

## I. INTRODUCTION

The individual memorandum filed by Defendant Bristol-Myers Squibb ("BMS") presents two primary arguments: (i) any individual defenses that BMS may want to advance would get lost in some unspecified "confusion" engendered by a case that includes other defendants; and (ii) BMS has not inflated prices in any way. Each of these arguments is meritless and does not serve as a reason to deny certification of class claims against BMS (or any other defendant).

There is nothing about these proceedings that precludes BMS from advancing any and all arguments that it believes will absolve it of any liability. Indeed, the Court has consistently permitted Defendants to submit additional individual briefs on supposed defendant-specific issues,[1] and BMS has taken advantage of these opportunities to submit separate briefing. Moreover, it is commonplace – especially in cases involving market-wide pricing – for numerous defendants to be included within the same action and same class definition. BMS submits no persuasive authority to the contrary.

Turning to BMS's arguments that it does not inflate prices, this is clearly a merits-based argument that should not be considered in evaluating Plaintiffs' class certification motion. *See, e.g., Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000). And to the extent that BMS advances the arguments to "prime the pump," Plaintiffs' submit that BMS's conduct is just as reprehensible and actionable as the conduct engaged in by other Defendants, as BMS's own documents and admissions demonstrate. In any event, the more appropriate vehicle for BMS to use to bring its merits-based arguments is a summary-judgment motion and not at the present time in opposition to class certification. Indeed, one wonders why if BMS is so innocent it does not simply stipulate to certification and then move for summary judgment, thereby prevailing as to the whole Class.

---

[1] Even though Defendants have frequently used those opportunities to make arguments that were common to all Defendants and far from unique.

1534.16 0143 MTN.DOC

## II. ARGUMENT

A. **Cases Involving Market Pricing Often Involve Many Defendants And Complex Concepts, And BMS Will Not Be Precluded From Making Its Own Arguments On These Points**

BMS contends that it will be prohibited from bringing so-called "unique defenses" if called upon to defend against class claims along with other companies in the same proceeding. BMS Br. at 6. Tellingly, BMS fails to explain exactly *how* it will be precluded from presenting its purported defenses, choosing instead to conclusorily exclaim that its defenses "will be lost in the morass of multiple defendants competing for the jury's attention with respect to thousands of NDCs for hundreds of drugs." BMS Br. at 6. BMS fails to cite any legal authority supporting this assertion, because no such authority exists.

Defendants are often called upon to answer for wrongful conduct in a single class action involving multiple defendants. Indeed, courts manage such cases frequently, even in actions involving complex industries, a plethora of defendants and individual products. For example, eleven actions involving over 400 retail pharmacies asserting claims against 25 pharmaceutical manufacturers, eight wholesalers, and a mail order pharmacy were at issue in *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 U.S. Dist. Lexis 7146 (N.D. Ill. May 26, 1994). Notwithstanding this broad array of defendants, drugs and issues, the court certified a class and, in doing so, rejected an argument nearly identical to that advanced by BMS and other Defendants here that the complexity of the industry and individual practices vitiate class treatment:

> According to the defendants, individual issues regarding the extent that each class member was impacted by the alleged conspiracy predominate over questions of law or fact common to the class. The defendants also contend that the heterogeneous nature of "brand name prescription drugs" presents an "insuperable impediment" to a common proof of impact, and further assert that there is no realistic basis for class-wide proof of damages.
>
> Defendants' arguments are unavailing. Clearly common issues of fact and law abound as to the defendants' conduct, that is, whether the defendants conspired to fix prices. We note that arguments similar to those posited by the defendants regarding the

> individualized nature of the industry, have been considered and rejected by courts ruling on class certification:
>
>> We are likewise unpersuaded by defendants' argument that the nature of the folding carton industry makes it impossible for common issues to predominate. First, contentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected. Courts have consistently found the conspiracy issue the overriding, predominant question. (citation omitted). . . . Even if the folding carton industry were as defendants have portrayed it, "the highly individualized nature of work in the [folding carton] industry does not necessarily preclude the possibility of a common conspiracy among the defendants to limit price competition among them." (citation omitted).

*In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 U.S. Dist. Lexis 16658, at *11-12 (N.D. Ill. Nov. 15, 1994).

Similarly, in *In re Commercial Tissue Prod.*, 183 F.R.D. 589, 595 (N.D. Fla. 1998), the court explained that individual price negotiations among many industry players did not vitiate predominance where the negotiations started from a minimum baseline range of prices. Thus, the individual practices of each defendant and others in the distribution chain did not swamp common issues and did not provide a reason to divide the case into separate actions for each defendant:

> The heart of defendants' argument is that the individual questions of fact and law predominate over the general questions of law and fact because the price paid by each distributor was determined through an elaborate system of individualized negotiations, contracts and rebates. To determine any classwide impact, argue the defendants, you must first prove the impact, if any, on each of the class members. Because pricing in the industry is allegedly so individualized, the plaintiffs will be unable to show any consistent classwide relationship between the acts of the defendants and the prices paid by class members. Or at the very least, argue the defendants, proving such impact will require infinite mini-trials concerning the price actually paid by each class member.
>
> While defendants' argument is attractive at first blush, closer analysis reveals its flaws. First, many cases have held that even if there is considerable individual variety in pricing because of individual price negotiations, class plaintiffs may succeed in proving classwide impact by showing that the minimum baseline

for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised (or slowed in its descent) by the collusive actions of the defendants. *See, e.g.*, *In re Catfish Litigation*, 826 F. Supp. 1019 (N.D. Miss. 1993); *In re Infant Formula Antitrust Litigation*, 1992 WL 503465, at *5 (Jan. 13, 1992). ("Contentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected. Courts have consistently found the conspiracy issue the overriding, predominant question"); *In re Domestic Air Transp.*, 137 F.R.D. 677, 689 (N.D.Ga.1991) (inflated fares resulted in artificial "base" price which became benchmark for discounted or negotiated fares); *Hedges Enterprises, Inc. v. Continental Group, Inc.*, 81 F.R.D. 461, 475 (E.D.Pa.1979) (despite negotiated or discounted prices, artificial minimum became "base" price). In the instant case, as in the *Corrugated Carton, NASDAQ, Plywood, Glassine* and *Small Bags* cases, the plaintiffs allege that any individual price negotiations for commercial tissue products began from price lists or guidelines which plaintiffs allege were artificially and unlawfully inflated by the conspiracy. Thus defendants' argument that diversity of pricing destroys predominance is unavailing. [*Id.*]

And the court certified a class in *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996), where there were 30 actions consolidated by the MDL Panel before one court, 33 named defendants (out of some 492 market makers) and 1,659 securities for which plaintiffs alleged that defendants conspired to fix spreads. *Id.* at 499-500. *See also In re Initial Pub. Offering Sec. Litig.*, 2004 U.S. Dist. Lexis 20497 (S.D.N.Y. Oct. 13, 2004) (defendants comprised of 55 underwriters, 310 issuers and hundreds of individuals associated with those issuers); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002) (defendants too numerous to count); *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) (approximately 13 defendants), *cert denied*, 538 U.S. 977 (2003). And these are just a few of many examples.

Not surprisingly, then, Defendants' hoary cases are distinguishable. *See Cohen v. District of Columbia Nat'l Bank*, 59 F.R.D. 84 (D.C.C. 1972) (unlike here, where Plaintiffs purchased the drugs of all Defendants, each plaintiff had dealings with only one bank defendant); *City of New York v. Int'l Pipe & Ceramics Corp.*, 410 F.2d 295 (2d Cir. 1969) (confusion engendered by attempted intervention of 27 governmental entities; also the opinion was issued in an era before a substantial body of class action law had developed); *Van-S-Aviation Corp. v.*

*Louisiana Aircraft, Inc.*, 1974 U.S. Dist. Lexis 8703, at *7 (S.D. Fla. May 2, 1974) (the sole plaintiff did not have any dealings with most of the defendants and could not demonstrate that its injuries were typical of the alleged complaints, experiences or competitive injuries that may have been experienced by other aircraft dealers throughout the United States).

In sum, BMS's argument is a red herring. As the above authorities demonstrate, claims against multiple defendants can be managed efficiently as a class action. Further, if BMS is indeed not guilty of violating RICO and relevant state laws – a *very* doubtful proposition given the evidence against it (*see infra*) – one would think that BMS would want to contrast for the jury its purported "shining example" with the wrongdoing of the other Defendants in the same case. Lastly, the Court on several occasions has authorized Defendants to file separate briefing to advance purportedly individual issues. BMS will have ample opportunity to make any purportedly "unique" arguments with respect to its course of conduct and the 20 BMS drugs at issue in this litigation – just like it has now done in opposition to class certification.

**B.     Plaintiffs' Proof Will Focus On Each Defendant And Each Drug**

BMS's concern about being grouped with the others into a "composite defendant," BMS Br. at 7, is also unavailing because it misconstrues the nature of Plaintiffs' proof. This is not a case in which BMS will be apportioned liability based on a market-share theory. Rather, BMS's liability will be specifically linked to its ***own wrongdoing*** with respect to its ***own drugs***. So, for example, BMS will not be liable for AWP inflation committed by fellow Defendant GSK *vis-à-vis* GSK drugs. Therefore, although the five "fast track" Defendants are included within the same class definitions, liability and damages will be both defendant- and drug-specific.

**C.     BMS Makes Inappropriate Merits Arguments That Are, In Any Event, Contradicted By The Evidence**

BMS also argues that, unlike other Defendants, BMS does not report AWPs and therefore has not inflated any pricing. BMS Br. at 4. At bottom, BMS is simply making a merits-based argument that should ***not*** be considered at the class certification stage. *See Waste Mgmt.*

1534.16 0143 MTN.DOC

*Holdings, Inc. v. Mowbray*, 208 F.3d at 298 (in evaluating whether to certify, the court does not determine whether plaintiffs will prevail on the merits) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)).

In any event, BMS's so-called "unique" defense that it reports WLP instead of AWP is no defense at all because WLP is the functional equivalent of AWP adjusted by a certain percentage. Professor Schondelmeyer explains that:

> The AWP is set directly, and published, by most drug manufacturers with an effective date and remains in effect until a change in price is published. Some drug manufacturers argue that they do not set the AWP, but instead either the wholesaler or the drug price databases set the AWP. Even when the AWP is actually calculated by a wholesaler or a drug price database, these sources typically calculate the AWP as a fixed percentage above WAC [Wholesale Acquisition Cost[2]] (i.e., currently is typical for the AWP to be 20 or 25 percent above WAC for brand name drugs) so that, in effect, by setting the WAC the drug manufacturer also sets the AWP for a drug product.

Declaration of Stephen W. Schondelmeyer in Support of Plaintiffs' Motion for Class Certification, ¶ 79. Dr. Rosenthal likewise explains that "[e]ither by submission of AWP or a number from which AWP is derived, all manufacturers control AWP." Written Tutorial of Dr. Meredith Rosenthal at 11; *see also id.* ("Other companies, like BMS, send to the publisher another form of list price (WAC) or 'Direct Price,' from which the publisher derives AWP using a known formula. … In the situations, the publisher marks up the wholesale price by 20% or 25% (depending upon the manufacturer), sends the AWP to BMS for approval and it is approved by BMS for publication.").

Dr. Hartman agrees:

> AWP plays the role of the benchmark price in the industry, from which discounts and rebates are negotiated between manufacturers and direct and indirect purchasers. … It is closely, indeed usually formulaically, related to another list price, the Wholesale Acquisition Cost (WAC). By industry practice, AWP is equal to 120% or 125% of WAC (the choice of mark-up depends upon the manufacturer). Because the two list prices are usually related by a

---

[2] BMS refers to WAC as "WLP."

> constant ratio, they convey the same information to purchasers and other entities that rely on published price data. That is, AWP and WAC are interchangeable as the basis for beginning to negotiate allowable reimbursement rates. For example, a third-party payer might agree to reimburse a retailer for brand name drugs at AWP minus 10% or, equivalently, at WAC plus 8%; the negotiated reimbursement rate or allowable amount will be exactly the same.
> …

Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification ("Hartman Decl."), Attachment D at ¶ 2 (footnotes omitted).



---

[3] ▮▮▮ *See, e.g.*, Ex. 1 ▮▮▮ All exhibits referenced in this memorandum are attached to the Declaration of Steve W. Berman In Support of Plaintiffs' Reply To Bristol-Myers Squibb's Individual Memorandum In Opposition To Class Certification unless otherwise indicated. *See* Ex. 2 ▮▮▮ Ex. 3 ▮▮▮. ▮▮▮ *See, e.g.*, Ex. 4 ▮▮▮ Ex. 5 ▮▮▮.

[4] ▮▮▮

[redacted][5] [redacted][6] [redacted][7] [redacted][8] [redacted][9] [redacted][10] [redacted] *Id* [redacted][11] [redacted][12]

In sum, when the time is appropriate to debate the merits of BMS's actions, Plaintiffs – and BMS's own documents – will have much to say.

---

[5] Hartman Decl., Table 2.B. [redacted]. *See* Hartman Decl., Table 3.

[6] Hartman Decl., Table 2.B.

[7] Ex. 6 [redacted]

[8] *Id.* [redacted]

[9] Ex. 7 [redacted]

[10] Ex. 8 [redacted]

[11] Ex. 9 [redacted]

[12] Ex. 10 [redacted] *See also* Ex. 11 [redacted]

### III. CONCLUSION

For the foregoing reasons, and for those reasons set forth in Plaintiffs' opening brief and general reply brief, a class should be certified against BMS.

DATED: December 17, 2004.   By    /s/ Steve W. Berman
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
    Hagens Berman LLP
    One Main Street, 4th Floor
    Cambridge, MA  02142
    Telephone: (617) 482-3700
    Facsimile: (617) 482-3003
    **LIAISON COUNSEL**

    Steve W. Berman
    Sean R. Matt
    Hagens Berman LLP
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594

    Elizabeth A. Fegan
    Hagens Berman LLP
    60 W. Randolph Street, Suite 200
    Chicago, IL  60601
    Telephone: (312) 762-9235
    Facsimile: (312) 762-9286

    Jeffrey Kodroff
    John Macoretta
    Spector, Roseman & Kodroff, P.C.
    1818 Market Street, Suite 2500
    Philadelphia, PA  19103
    Telephone: (215) 496-0300
    Facsimile: (215) 496-6611

Samuel D. Heins
Alan I. Gilbert
Brian L. Williams
Susan E. MacMenamin
Heins, Mills & Olson, P.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone: (612) 338-4605
Facsimile: (612) 338-4692
**CHAIRS OF LEAD COUNSEL COMMITTEE**

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer F. Connolly
The Wexler Firm
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
**MEMBERS OF LEAD COUNSEL COMMITTEE AND EXECUTIVE COMMITTEE**

- 11 -

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing **PLAINTIFFS' REPLY TO BRISTOL-MYERS SQUIBB'S INDIVIDUAL MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION** to be electronically filed with the Court pursuant to the December 16, 2004 Order and to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on December 17, 2004 a copy to Verilaw Technologies for posting and notification to all parties.

By **/s/ Steve W. Berman**
Steve W. Berman
**HAGENS BERMAN LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292