## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL. NO. 1456 |
| THIS DOCUMENT RELATES TO: | Civil Action No.  01-CV-12257- PBS |
| County of Suffolk v. Abbott Laboratories, Inc., et al., E.D.N.Y. Case No. CV-03-229 | Judge Patti B. Saris |

## COUNTY OF SUFFOLK'S SECOND MOTION TO COMPEL THE PRODUCTION OF DISCOVERY FROM THE SCHERING-PLOUGH CORPORATION

Suffolk County files this motion for entry of an order directing Schering-Plough Corporation ("Schering") to produce documents relating to its participation in a lawsuit commenced by the State of Texas alleging that Schering and Warrick among others reported fraudulent AWP's to the Texas Medicaid program (the "Texas Action"). Suffolk requests that this motion be heard on January 27, 2005, when its motion to compel electronic discovery from Schering is already scheduled. *See* Notice entered January 10, 2005, attached hereto as Exhibit A.

On November 9, 2004, Suffolk served on Schering its Third Request for Production of Documents, seeking all "Documents, testimony (including but not limited to deposition and hearing transcripts), communications, expert reports or other materials produced by You in response to any/or related in any way to the litigation captioned *The State of Texas ex. rel. Ven-A-Care of the Florida Keys, Inc. v. Warrick Pharmaceuticals, Schering-Plough Corp. et al.*, No. GV002327 in the 53rd Judicial District of Travis County, Texas."

The following day, on November 10, 2004, counsel for Suffolk, Joanne M. Cicala, proposed to Schering's counsel that Schering need not actually re-produce to Suffolk that which it produced to Texas, if Schering would consent to Suffolk's independent access of those materials. Specifically, "in the interest of efficiency and cost-savings, we propose that instead of creating a duplicate production for us, you instead consent to our accessing these documents in Austin." *See* November 10, 2004 Letter from Joanne M. Cicala to Darcy W. Shearer, attached hereto at Exhibit B. Suffolk Counsel noted that "we have spoken with representatives of the Texas Attorney General who agreed to this approach". *Id.* Suffolk offered to be made a party to the protective order entered in the Texas Action, to protect Schering's confidential information. *Id.* By taking these steps, Schering would not have the burden and expense of making a duplicative production of the Texas Schering documents to Suffolk.

By a letter dated November 15, 2004, Schering rejected this solution taking the position that since discovery had been stayed as to Warrick by Judge Saris' Memorandum and Order dated October 26, 2004 and that the "documents [Suffolk] now seek[s] to review are related solely to Warrick Pharmaceuticals," Schering had no obligation to produce any of them. *See* November 15, 2004 Letter from Darcy W. Shearer to Joanne M. Cicala, attached hereto at Exhibit C.

Suffolk counsel explained in phone calls and letters that the documents it sought were not those produced by Warrick in Texas, but rather those produced by Schering in Texas. *See, for example,* January 17, 2005 letter from Joanne M. Cicala to Darcy W. Shearer, attached as Exhibit D. Suffolk noted that Schering was producing documents to it in this action and that its position regarding the Texas matter was arbitrary and unsupportable given that Schering was a named

defendant in the Texas Action (*see*, State of Texas' Seventh Amended Petition at ¶ 1.2, attached hereto at Exhibit E) and certainly produced documents there.

Moreover, Schering is a party to the settlement agreement, which ended the Texas Action. Schering's August 3, 2004 10-Q, affirmatively states that Schering settled the Texas Action for $27 million on May 3, 2004. *See* August 3, 2004 Schering-Plough Corporation Form 10-Q, relevant excerpts attached hereto at Exhibit F at pg. 50. In that same 10-Q, Schering describes Warrick as Schering's "generics subsidiary." *Id.* The two companies share leadership, offices, and attorneys. *See* Seventh Amended Petition (Exhibit E) at ¶ 9.3.

Avoiding the point, in its most recent correspondence Schering now states that "the documents [Suffolk] seek[s] to review in the Texas action relate solely to drugs manufactured by Warrick." *See* January 19, 2005 Letter from Darcy W. Shearer to Joanne Cicala, attached here to as Exhibit G. Rank *ipse dixit*, the statement is highly suspect given that the Texas complaint plainly refers to drugs manufactured by both Schering and Warrick, *See* Seventh Amended Petition (Exhibit E) at ¶¶ 7.6 and 8.11. And, of course, all of this is apart from the question whether Warrick, with just a very small number of employees, actually "manufactures" anything.[1] *Id.* at ¶ 9.3.

If Schering's position is that it produced no documents in Texas, then it should just say so. Absent that, Suffolk moves for entry of the attached proposed order directing Schering to produce to Suffolk all those documents requested in Suffolk's Third Request for Production, specifically all documents produced by Schering in the Texas Action. Suffolk further moves for an order prohibiting Schering from opposing Suffolk's petition to become a party to the

---

[1] Indeed, the State of Texas sought to pierce Warrick's corporate veil in the Texas action, alleging that Warrick was essentially a marketing division for generic products within the Schering corporation. *See* Seventh Amended Petition (Exhibit E) at ¶ 9.3.

protective order in the Texas Action if such is necessary.  A draft proposed order is annexed hereto.

<div align="center">**Certification Pursuant to Local Rule 7.1**</div>

Pursuant to Local Rule 7.1(a), the undersigned counsel certify that counsel for Plaintiff County of Suffolk discussed the subject of this motion in correspondence dated November 10, 2004, a phone call on January 13, 2005 and a letter on January 17, 2005 in an attempt to resolve the issues addressed. Schering did not alter its position and in a letter dated January 19, 2005 reaffirmed that it would not produce the requested discovery.  Accordingly, Suffolk is unable to resolve the issue other than through the filing of this second motion to compel.

Dated:  January 20, 2005

Respectfully submitted,

KIRBY McINERNEY & SQUIRE, LLP


By:      /s/ Joanne M. Cicala
        Joanne M. Cicala
        Aaron D. Hovan
830 Third Avenue
New York, N.Y.  10022
(212) 371-6600

COUNSEL    FOR    PLAINTIFF    THE
COUNTY OF SUFFOLK

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL. NO. 1456 |
| THIS DOCUMENT RELATES TO: | Civil Action No.  01-CV-12257- PBS |
| *County of Suffolk v. Abbott Laboratories, Inc., et al.,* E.D.N.Y. Case No. CV-03-229 | Judge Patti B. Saris |

**[PROPOSED] ORDER GRANTING COUNTY OF SUFFOLK'S MOTION TO COMPEL THE PRODUCTION OF DISCOVERY FROM THE SCHERING PLOUGH DEFENDANTS**

Having considered each of the parties' submissions with respect to the County of Suffolk's Second Motion To Compel The Production Of Discovery from Schering-Plough Corporation, the Court hereby grants the motion.

It is hereby ordered that Schering-Plough Corporation shall produce immediately to Suffolk all documents, testimony (including, but not limited to, deposition and hearing transcripts), communications, expert reports or other materials produced by Schering-Plough Corporation in response to any/or related in any way to the litigation captioned *The State of Texas ex. rel. Ven-A-Care of the Florida Keys, Inc. v. Warrick Pharmaceuticals, et al.*, No. GV002327 in the 53rd Judicial District of Travis County, Texas.

It is further ordered that Schering-Plough Corporation shall not oppose any application made by the County of Suffolk to the courts of the State of Texas to gain

access to the documents produced in *The State of Texas ex. rel. Ven-A-Care of the Florida Keys, Inc. v. Warrick Pharmaceuticals, et al.*, No. GV002327.

Dated:_____                                       _____
                                                                         Hon. Marianne B. Bowler
                                                                         United States Magistrate Judge

## Certificate of Service

I certify that on January 20, 2005 a true and correct copy of the foregoing County Of Suffolk's Second Motion To Compel The Production Of Discovery From The Schering-Plough Corporation was served on all Counsel of Record by electronic service pursuant to Case Management Order No. 2 by sending a copy to Verilaw Technologies for posting and notification to all parties.

/s/ Michael B. Coons
Michael B. Coons

# Exhibit A

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CITIZENS FOR CONSUMER
JUSTICE, ET AL,

      Plaintiffs,

            CA. NO. 01-12257-PBS

      v.

ABBOTT LABORATORIES,
ET AL,
      Defendants.

### <u>NOTICE</u>

January 10, 2005

**BOWLER, U.S.M.J.**

PLEASE TAKE NOTICE that a **hearing on docket entry ## 1175, 1189 (Defendants'**

**Motion to Compel Third Party Health Net, Inc. to Produce Documents Pursuant to**

**Subpoena and County of Suffolk's Motion to Compel the Production of Electronic**

**Discovery from the Schering Plough Defendants) at 11:00 a.m., Thursday, January 27,**

**2005,** in courtroom # 25 on the 7th floor of the United States Courthouse, 1 Courthouse Way,

Boston, Massachusetts.

            /s/ Marianne B. Bowler
            **MARIANNE B. BOWLER**
            United States Magistrate Judge

To:   ALL COUNSEL OF RECORD

**\*PLEASE NOTE: All persons entering the courthouse are required to show two forms of
photo identification.**

# Exhibit B

# KIRBY McINERNEY & SQUIRE, LLP

TELEPHONE (212) 371-6600
(212) 317-2300
FACSIMILE (212) 751-2540

*830 Third Avenue*
*New York City 10022*

IRVING MALCHMAN, OF COUNSEL

**VIA FACSIMILE (617-951-7050)**

November 10, 2004

Darcy Shearer, Esq.
Ropes & Gray
One International Place
Boston, MA 02110

Re:   *Suffolk v. Abbott Labs (Schering Discovery) (Our file No. 549.01)*

Dear Darcy,

I write regarding our Third Request for Production of Documents to Schering/Warrick, served yesterday.  This request asks that Schering produce to us that which it produced to the State of Texas in the Ven-a-Care matter.

In the interest of efficiency and cost-savings, we propose that instead of creating a duplicative production for us, you instead consent to our accessing these documents in Austin.  Our firm has a presence in Texas, and we have spoken with representatives of the Texas Attorney General who have agreed to this approach.  We would be happy, of course, to subscribe to the Texas protective order if appropriate.

Our suggestion in this regard will save time and money for all involved. Please advise us of your position on this subject by Wednesday, November 17, 2004.

Very truly yours,

Joanne M. Cicala

cc:   Aaron Hovan, Esq.
James P. Carroll, Esq.
Michael Coons, Esq.

# Exhibit C



ROPES & GRAY LLP
ONE INTERNATIONAL PLACE    BOSTON, MA 02110-2624    617-951-7000    F 617-951-7050
BOSTON    NEW YORK    SAN FRANCISCO    WASHINGTON, DC

November 15, 2004

Darcy W. Shearer
(617) 951-7489
dshearer@ropesgray.com

## BY FACSIMILE

Joanne M. Cicala
Kirby McInerney & Squire LLP
830 Third Avenue
New York, NY 10022
Fax: 212-751-2540

Re: In re Pharmaceutical Average Wholesale Price Litigation, MDL No. 1456 (County of
Suffolk v. Abbott Laboratories, Inc., et al.)

Dear Ms. Cicala:

I write in response to your letter of November 10, 2004 and to update you on the availability of
the Claritin MDL documents for your review.

Plaintiffs' Third Request for Production of Documents requests the production of all documents
produced to the State of Texas in the Ven-a-Care matter. You now propose that, in the interests
of efficiency and cost-savings, we consent to your review of these documents in Austin.

As you are aware, Judge Saris' Memorandum and Order dated October 26, 2004 stated that "all
discovery shall be stayed with respect to . . . Warrick Pharmaceuticals." The documents you
now seek to review are related solely to Warrick Pharmaceuticals. In light of the stay of
discovery, Warrick does not consent to your review of these documents at this time. Subject to
and without waiving any objections Schering and/or Warrick may file in response to Suffolk
County's Third Request, in the event the stay of discovery is lifted, we will reconsider your
request.

As stated in my letter of November 2, 2004, pursuant to CMOs No. 9 and 11, Schering will make
available for inspection the requested Claritin related MDL documents. These documents are
now collected and available for review by your team at our offices located at One International

9584520_1.DOC

Joanne M. Cicala                                   - 2 -                                   November 15, 2004

Place, Boston, MA 02110. There are approximately one hundred boxes of documents available
for inspection. Please contact me at your convenience to schedule an inspection of these
documents.

Very truly yours,

Darcy W. Shearer

Darcy W. Shearer

cc:   John T. Montgomery
      Steven A. Kaufman
      Eric P. Christofferson

# Exhibit D

# KIRBY McINERNEY & SQUIRE, LLP

TELEPHONE (212) 371-6600
(212) 317-2300
FACSIMILE (212) 751-2540

*830 Third Avenue
New York City 10022*

IRVING MALCHMAN, OF COUNSEL

## VIA FAX AND FIRST CLASS MAIL

January 17, 2005

Darcy W. Shearer, Esq.
Ropes & Gray LLP
One International Place
Boston, MA 02110-2624

Re: *County of Suffolk v. Abbott Labs, et al. (Our file 549.01)*
*Discovery from Schering*

Dear Darcy:

I am writing to follow up on your discussion of January 13, 2005 with my associate Michael Coons, regarding access for our client, the County of Suffolk ("Suffolk") to the documents produced by your clients Schering Plough Corporation ("Schering") and Warrick Pharmaceuticals ("Warrick") in the action entitled *Texas v. Warrick Pharmaceuticals Corporation, et. al.,* No. CV002237 (the "Texas action").

Our client wishes to review the documents produced by your clients in the Texas action. The State of Texas' Office of the Attorney General told us that it would consent to Suffolk signing onto the Texas protective order in order for us to do this. However, during your phone conversation with Mr. Coons you took the position that because discovery has been stayed as to Warrick in the Suffolk action, you would neither produce to us the Texas documents, nor consent to Suffolk signing on to the Texas protective order.

While we can understand your position, we believe it is ultimately untenable, and will only lead to greater motion practice and expense, particularly as it concerns the Schering Texas production. As you are aware, Schering was a named defendant in the Texas action. Suffolk is currently receiving discovery from Schering, and it is entirely within Suffolk's right to demand any materials from Schering produced by it in the Texas action, as well as any relevant materials in Schering's possession relating to Warrick. There is no legitimate basis to deny Suffolk access now to the Schering Texas production.

KIRBY MCINERNEY & SQUIRE, LLP

Darcy W. Shearer, Esq.
January 17, 2005
Page Two

Access to any Warrick Texas production also should be granted. Warrick is a wholly owned subsidiary of Schering, Warrick has a very limited staff, and all of Warrick's products are produced by Schering. The State of Texas concluded and alleged that there is ultimately no difference between Schering and Warrick. We believe Judge Covington will come to the same conclusion, when presented with Suffolk's petition to become a party to the Texas protective order.

Clearly, permitting us access to the Texas documents is the most efficient way to resolve this. Please let us know by close of business Thursday, January 20, 2005 if you will reconsider your position *in toto*, or at minimum with regard to the Schering Texas production.

Sincerely,

Joanne M. Cicala

cc:     Michael Coons, Esq.

# Exhibit E

No. GV002327

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| *ex rel.* | § | |
| VEN-A-CARE OF THE | § | |
| FLORIDA KEYS, INC. | § | |
| | § | |
| *Plaintiffs,* | § | TRAVIS COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| WARRICK PHARMACEUTICALS | § | |
| CORPORATION, SCHERING-PLOUGH | § | |
| CORPORATION, SCHERING | § | |
| CORPORATION | § | |
| ROXANE LABORATORIES, INC. | § | 53rd JUDICIAL DISTRICT |
| | § | |
| *Defendants.* | § | |

## SEVENTH AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

The State of Texas, by and through the Attorney General of Texas, Greg Abbott, brings this cause of action. These claims are asserted pursuant to the Texas Medicaid Fraud Prevention Act, V.T.C.A. Human Resources Code Chapter 36 ("the Act" or "TMFPA") and common law. Pursuant to §36.107(a) of the Act, the State of Texas has primary responsibility for prosecuting this action. Private Person Plaintiff/Relator Ven-A-Care of the Florida Keys, Inc. ("VAC" or "Ven-A-Care") originally provided information to the State of Texas which is the basis for this suit and is included as a named party plaintiff in this case.

## STATEMENT TO THE COURT ONLY

The Dey/Merck Defendants prominent in Plaintiffs' Sixth Amended Petition are not specifically named in this pleading because a compromise settlement with these parties is imminent. However, by the omission of naming of these parties in this pleading, Plaintiffs DO NOT intend to non-suit them. Separate agreed orders will be submitted at a later time to accomplish that purpose. Until that time, in order to preserve claims against the Dey/Merck

FILED 3: ..
2003 JUN -4 PH 3: 29

.... R.....
...... TEXAS
TRAVIS COUNTY, TEXAS

Defendants, Plaintiffs incorporate by reference the allegations against Dey/Merck as contained in Plaintiffs' Sixth Amended Petition.

## I. DEFENDANTS

The Defendants complained of and sued in this action are:

1.1     Warrick Pharmaceuticals Corporation ("Warrick") allegedly is a corporation organized under the laws of Delaware with its principal offices in Reno, Nevada. Discovery in this matter has revealed that Warrick's principal offices and operations are actually in the state of New Jersey. At all times material to this civil action, Warrick has transacted business in the State of Texas by, including but not limited to, selling and distributing to purchasers in the State of Texas pharmaceutical products that are the subject of this action, but does not maintain a regular place of business in this state or a designated agent for service of process

1.2     Schering-Plough Corporation ("Schering-Plough") is a corporation organized under the laws of New Jersey with its principal offices in Madison, New Jersey. At all times material to this civil action, Schering-Plough and its subsidiaries have transacted business in the State of Texas by, including but not limited to, selling and distributing to purchasers in the State of Texas pharmaceutical products that are the subject of this action and out of which this action arises.[1]

1.3     Schering Corporation ("Schering") is a corporation organized under the laws of New Jersey with its principal offices located at 1 Giralda Farms, P.O. Box 1000, Madison, New Jersey 07940

1.4     Defendant Warrick has indicated in other pleadings to this Court that Schering-Plough is a stock holding company and that Schering is the direct parent corporation of Warrick. Schering and Schering-Plough are the actual manufacturers, marketers, sellers, and/or suppliers of the products involved in this litigation and are Warrick's actual parent(s) or shareholder(s).

---

[1]     Schering Laboratories is described as "the U.S. pharmaceutical arm of Schering-Plough Corporation," and appears to be the operating unit of Schering-Plough through which Schering-Plough conducts much of its pharmaceutical business. It is unclear at this point whether Schering Laboratories exists as a separate corporate entity. Schering Laboratories is not registered with the Secretary of State for the State of Texas.

Therefore, the State includes Schering and Schering-Plough ("Schering/Schering-Plough") in this pleading.

1.5     Roxane Laboratories, Inc. ("Roxane") is a corporation organized under the laws of Delaware with its principal offices in Columbus, Ohio, and is a subsidiary of Boehringer Ingelheim Pharmaceuticals, Inc.. At all times material to this civil action, Roxane has transacted business in the State of Texas by, including but not limited to, selling and distributing to purchasers in the State of Texas pharmaceutical products that are the subject of this action, but does not maintain a regular place of business in this state or a designated agent for service of process.

(All of the above named Defendants have answered and appeared in this cause.)

## II. RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

2.1     The Defendants specified in paragraphs 1.1 to 1.5 are sometimes referred to herein collectively as the "Defendants" or "Defendant Drug Companies." Any and all acts alleged herein to have been committed by any or all of the Defendant Drug Companies were committed by said Defendants' officers, directors, employees, representatives or agents who at all times acted on behalf of their respective Defendant(s).

2.2     The Defendants identified in paragraphs 1.1 to 1.3 inclusive are all related entities sharing common elements of management, finances, control, supervision, reporting and thus are mutually, jointly and severally liable under legal theories of Respondeat superior and the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

## III. DISCOVERY CONTROL PLAN

3.1     Plaintiff, the State of Texas, designates this case as a Level 3 case requiring a discovery control plan tailored to the circumstances of this specific suit.

## IV. PRELIMINARY STATEMENT AND NATURE OF THE ACTION

4.1    This is an action under the common law and the Texas Medicaid Fraud Prevention Act (hereinafter sometimes referred to as "TMFPA") for restitution, damages, pre-judgment interest, civil penalties of not less than $1,000.00 or more than $10,000.00 for each unlawful act, two (2) times the value of the payments, and recovery of costs, attorneys' fees, and expenses of the Attorney General of the State of Texas and Ven-A-Care against Defendants as well as any and all other monetary amounts as may be allowed at law or in equity under Section 36.052.

4.2    The Defendants knowingly and intentionally made false representations of prices and costs for certain of their inhalation drugs directly or indirectly to the Texas Medicaid Program. The Defendants knew that the Texas Medicaid Program intended to base its payments of claims for the specified drugs on estimations of acquisition costs incurred by physicians, pharmacies, and other providers submitting claims for payment. The Texas Medicaid Program relied on the false and misleading prices and costs reported by the Defendants and thus was defrauded into paying reimbursement in excessive amounts.

4.3    The Defendants, both directly and through sales visits and presentations, telemarketing, and other forms of contact, as well as indirectly through various pharmacy inventory software distributed by wholesalers and other pharmacy inventory software, as part of an unlawful combination, marketed their specified products to pharmacies, in part through financial inducements, including but not limited to: false price markups, the difference between actual cost and reimbursement (the "Spread"), discounts, rebates, chargebacks, free goods, and other financial incentives. As specified more fully hereinafter, such conduct constitutes common law fraud as well as fraud under the TMFPA, Chapter 36, Tex. Hum. Res. Code. The Defendants were in a position to mislead the Texas Medicaid Program, in part, because other

drug manufacturers typically reported truthful prices for brand drugs marketed under patent protection that are not the subject of this action. The Defendants thus wrongfully exploited and defrauded the Texas Medicaid Program by inducing it to pay the claims of pharmacies, at grossly inflated amounts that far exceeded a reimbursement based upon a reasonable estimate of acquisition costs of those Defendants' pharmaceuticals to pharmacies, wholesalers and distributors.

(Amendment Responsive to Special Exception)

Plaintiffs seek redress and recovery under the TMFPA as well as under principles of Common Law Fraud as an alternative claim under T.R.C.P. Rule 48. The Defendants Warrick, Schering-Plough and Schering, acting sometimes in combination and other times individually did the following:

 (a) Made material representations to the TVDP as to prices and costs of drugs which information was used to calculate reimbursement for those drugs.

 (b) Reported drug prices and costs which were false and misleading.

 (c) Knowingly reported such false, misleading and material information to TVDP and other price and cost reporting services as well as creating "dummy prices" and invoices which were misleading and concealing of true information.

 (d) Committed these acts and omissions with the intent and knowledge that TVDP would use and rely on directly reported information and would be further misled if price and cost information reported to national pricing services was accessed as verification of directly reported information, when the TVDP made its decisions concerning reimbursement amounts to be paid for the drugs at issue.

 (e) That the false information supplied by Defendants was relied upon and was used to authorize Medicaid drug reimbursement payments greatly in excess of what

should have been paid had Defendants provided non-fraudulent drug price/cost information as required by common law fraud principles and by state and federal Medicaid law and regulations.

(f)    The foregoing acts and omissions caused monetary loss and damage to the Medicaid program in Texas in amounts set forth in the "Damages" paragraphs of this pleading.

4.4    (Amended in response to Special Exceptions.) Defendants also combined and otherwise acted in concert, amongst themselves, their wholesalers, their distributors, their customers, or their competitors, and as part of an illegal combination to defraud the Medicaid program in Texas of millions of dollars in payments by supplying falsely inflated price information on certain drugs. By definition under relevant Texas Statute Law, Tex. Penal Code Ann. § 71.01 a combination means three or more persons (companies) who collaborate to bring about an unlawful result although:

(1)    participants may not know each other's identity;

(2)    membership in the combination may change from time to time; and

(3)    participants may stand in a wholesaler-retailer or other arm's length relationship.

It is not essential to the existence of such an illicit combination that the members thereof consciously agree and intentionally conspire in joint enterprise. Pleading in the alternative as allowed under T.R.C.P. 48 it is alleged that the named Defendants in this case acted intentionally in combination with each other (Warrick, Schering-Plough and Schering) and even though outside of a direct or indirect agreement and conspiracy, with other persons and companies in the generic pharmaceutical industry to create, maintain and promote a system of reporting and marketing which would reward these Defendants as well as others for going along in

combination to perpetuate the schemes described in detail herein. Not all of these "other persons and companies" are known and not all can be known at this time.

The other companies who are known to have acted in combination with Warrick and/or Schering-Plough and or Schering are:

(a)     Wholesalers: McKesson, Bergen-Brunswig, Cardinal, AmeriSource, Fox Meyer, and Bindley Western

(b)     Regional Wholesalers: Walsh and Morris & Dickson

(c)     Institutional Purchasers: RDI (Respiratory Distributors, Inc.), Apria, Caremark and Gerimed (AKA I.V. Med)

(d)     Generic Wholesalers: J.J. Balan, ANDA and Harvard

(e)     Price Publishing Services:  First Data Bank, Medi-Span and Red Book

The other companies who are known to have acted in combination with Roxane are:

(a)     Cardinal, McKesson, Bergen-Brunswig, and AmeriSource

(b)     Morris & Dickson

(c)     Apria, RDI (Respiratory distributors, Inc.), and Gerimed (AKA I.V.Med)

(d)     First Data Bank, Medi-Span and Red Book

Some or many of these identified companies may not have been aware that their conduct in being a part of such combination was allowing or facilitating violations of the TMFPA. Whether or not the other members of such combination acted with intent to violate any law is irrelevant to the claims asserted herein against the named Defendants. For example some wholesalers did agree or acquiesce to use invoices and billing records which did not overtly disclose and reflect multiple conditions and terms which caused the actual price/cost of drugs to be much less than what was reflected on invoices and billing records. These other members of such combination may or may not have engaged in the conduct actionable under the TMFPA and

without question they, whoever they are, have not been sued in this case. The liability of the named Defendants herein is neither dependent upon nor contingent upon liability of other members of the combination. The Defendants' creation, maintenance and promotion of the combination of persons and companies nurtured the scheme of creating the large "spread" on the reimbursement of the subject Medicaid drugs. The relevance and importance of the existence of the combination is to show that the named Defendants were knowing and willing participants in the creation and promotion of this combination which caused Texas Vendor Drug Program to be defrauded.

4.5     (Amended in Response to Special Exception)  As is usually true of illegal combinations, the named Defendants in this case did not enter into a formalized written and dated combination agreement. However, the actions they took speak even more eloquently of their intent to defraud the Texas Medicaid Program operated by the Texas Vendor Drug Program (TVDP) and the taxpayers in the State of Texas and nationwide who fund the various Medicaid pharmaceutical benefit programs. Such activities began before 1994 and continue in some forms to the present date. The officers, managers, sales force and other employees of the named Defendants Warrick, Schering-Plough and Schering herein entered into an agreement or combination among themselves as follows:

(a)     By reporting false drug prices to the TVDP.

(b)     By failing and purposefully refusing to timely update and report declining drug prices.

(c)     By purposefully omitting and refusing to provide truthful drug prices which were specifically requested by category.

(d)     By reporting false drug prices to TVDP and to recognized industry price reporting services with the intent (and result) of creating an illegal "spread" which caused the payment of

inflated and excessive reimbursement amounts for each company's relevant drugs named in this pleading.

(e)    By directly and indirectly causing their own sales and marketing force employees, as well as independent contractor telemarketers, to "market the spread" by advertising and urging pharmaceutical vendors to purchase and dispense their particular brand of drugs based upon the illegally inflated and excessive reimbursement amounts made possible by the combined actions of the Defendants and others in the industry.   Some or all of these acts and omissions also constitute common law fraud as well as violations of TMFPA.

4.6.    (Amended in Response to Special Exception)  The Defendants created, promoted and fostered a complex scheme using undisclosed chargebacks, rebates, discounts, instant rebates, price protection, stock adjustments and contract prices which had no true and bona fide business purpose other than to enable the use of arbitrary pricing on invoices and other ostensible purchase records and documents which concealed the true sales prices and acquisition costs. In fact, these false invoices only revealed "Dummy Prices" and other incorrect and misleading financial information which would hinder or prevent the discovery of true price/cost information by persons and organizations which might need to investigate, survey or audit invoices in search of true price/cost information.  By causing their various customers to accept and acquiesce in these extraordinary invoicing practices, these Defendants created and maintained various combinations with other companies as identified in paragraph 4.4 who participated in the combination(s) but who may have been completely unaware and unconcerned about the reasons for or and results of these extraordinary invoicing methods and procedures.

4.7    (Amended in Response to Special Exception)  With regard to the Defendants Warrick, Schering-Plough and Schering and their efforts to deal with activities of Dey, Inc. and its affiliates (all parties who were originally Defendants in this case but who have now settled), it

**Seventh Amended Petition**

is alleged that the Defendants, acting through their authorized officers and employees, engaged in a game of one-upsmanship in that when one would report fraudulent prices to authorities so as to create a more attractive profit spread on Medicaid reimbursement prices, the other would compound its fraudulent actions by reporting an increasingly inflated price in order to "out-fraud" the other. These activities have been documented in documents and deposition testimony pertaining to both Dey and Warrick.

4.8     Defendants Warrick, Schering and Roxane made conscientious efforts in their business operations avoid reporting truthful price/cost information. Furthermore, their legal obligations to truthfully and candidly report such information to Medicaid authorities in Texas and elsewhere and to price reporting services was intentionally subverted or ignored. Thus, the Defendants were able to further the combinations by limiting disclosure or deleting the publication or reporting of such information. Also, certain of Roxane's employees whose job it was to report price/cost information and to comply with all legal requirements, including those of the State of Texas, were intentionally instructed: (a) to provide incorrect or incomplete price/cost information or (b) to fail to supply all requested and required price/cost information and updates about changes in such data.

## V.  JURISDICTION & VENUE

5.1     Jurisdiction over the subject matter is founded in part upon the TMFPA, which prohibits, and provides exclusive remedies to redress, the conduct of the Defendants and which provides for this action to be brought by the State of Texas and by Private Person Plaintiff, Ven-A-Care.

5.2     Venue is proper in Travis County pursuant to Texas Human Resources Code §36.052(d) in that many of the unlawful acts committed by the Defendants were committed in Travis County including the making of false statements and misrepresentations of material fact

to the State of Texas, its departments, agencies, instrumentalities, contractors and to the Texas Medicaid Program.

5.3    A copy of pleadings and written disclosure of substantially all material evidence and information Ven-A-Care possesses were served on the State pursuant to §36.102 of the Act before the Original Petition was filed.

5.4    The Private Person Plaintiff is the original source of the information and has direct and independent knowledge of the information on which these allegations are based within the meaning of §36.113(b) of the Act and has voluntarily provided the information to the State of Texas before filing pleadings which are based upon the information provided by the Private Person Plaintiff to the State of Texas.

5.5    Additionally, venue is proper against these Defendants in Travis County as all or a substantial portion of the events giving rise to the instant claims occurred in Travis County. TEX. CIV. PRAC. & REM. CODE §§ 15.001, 15.002 (Vernon 2001).

## VI.  BACKGROUND: HOW PHARMACEUTICAL CLAIMS ARE PAID UNDER THE MEDICAID PROGRAM IN TEXAS

6.1    The Texas Medicaid Program pays for the use of approved pharmaceuticals provided to Medicaid recipients by eligible providers, including pharmacies. The Vendor Drug Program (TVDP) of the Texas Department of Health ("TDH")[2] administers this program. Providers can only obtain reimbursement through the Vendor Drug Program for products listed on the Texas Drug Code Index. 25 TEX. ADMIN. CODE § 35.201. To have its particular pharmaceutical products listed on the index, a drug company or manufacturer must file and have approved an application for its products with the Texas Department of Health. 25 TEX. ADMIN. CODE § 35.801. Section 2 of the application requires the manufacturer to report, for each drug submitted, the suggested wholesale price to pharmacies, the price at which the drug is sold to wholesalers and distributors, the direct price to pharmacies, the price to chain

---

[2]    The Vendor Drug Program has recently been transferred to the Texas Health and Human Services Commission.

warehouses and the price at which the drug is sold to any other special purchasing groups. Additionally, the form contains a separate question in section 4 inquiring as to whether the drug company sells the drug to wholesalers or distributors. The application requires that a manufacturer certify that the information it has provided is correct and that it will provide correct information regarding subsequent changes in pricing of the product within 15 days of such changes occurring. Further, in approving the application, TDH expressly requires that supplemental updated price information be provided timely.

6.2     TDH bases its reimbursement schedule on the prices reported by the manufacturer on the application and subsequent price changes supplied by the manufacturer. Reimbursement to a pharmaceutical provider (i.e., a pharmacy or physician) is based on TDH's best estimate of acquisition cost, referred to as ("EAC"). 1 TEX. ADMIN. CODE § 355.8541 (1).

6.3     When a manufacturer reports false pricing information to TVDP, the calculation of estimated acquisition cost ("EAC") is inflated and thus the reimbursement schedule is also inflated. These circumstances result in drug reimbursement overpayments to drug providers by the State.

## VII. ACTIONABLE CONDUCT OF DEFENDANTS

7.1     The Defendants knew that reporting false drug prices and costs would cause the Texas Medicaid Program to be unable to reasonably estimate acquisition costs and it would thus pay excessive reimbursement to the Defendants' Medicaid provider customers. Notwithstanding this knowledge, the Defendants reported false or misleading price, cost, or sales information to the Texas Medicaid program in order to cause it to pay claims for their specified pharmaceuticals in amounts that exceeded the prices at which the Defendants actually sold their products and exceeded a reasonable estimation of acquisition cost. This reporting of false information created a "spread" between the amount reimbursed by Medicaid and a reasonable estimate of the acquisition cost of a drug. The "spread" financially benefitted their Texas Medicaid provider customers and thus induced them to order, prescribe, dispense, or administer the Defendants' specified pharmaceuticals. The specific allegations of Common Law Fraud contained in

preceding paragraph 4.3 are incorporated by reference and are specifically asserted against the Defendant Roxane.

7.2     The Defendants were each fully capable of making truthful representations about prices and costs of the specified pharmaceuticals and did so when it was economically beneficial to them, such as when they reported Average Manufacturers' Prices and Best Prices to the federal government under the Medicaid rebate program mandated by the Omnibus Budget Reconciliation Act of 1990 ("OBRA'90").

7.3     Notwithstanding the Defendants' knowledge that they were required to provide truthful price information vital to Texas Medicaid's ability to estimate the acquisition cost, the Defendants each knowingly or intentionally reported false price information about the specified pharmaceuticals.

7.4     The Defendants acted knowingly or intentionally in making false statements and misrepresentations of material fact when reporting false prices or costs to the Texas Medicaid program in one or more of the following ways:

A.      Reporting false prices on initial applications to have specified pharmaceuticals covered by Texas Medicaid;

B.      Concealing or otherwise failing to disclose decreases in the prices or costs of the specified pharmaceuticals;

C.      Concealing or otherwise failing to disclose transactions that decrease the cost, and thereby the price, of the specified pharmaceuticals such as discounts, rebates, off-invoice pricing, free goods, cash payments, chargebacks, or other financial incentives;

D.      Reporting that the price or cost of a specified pharmaceutical was increasing when it in fact was increasing in a lesser proportion, or remained the same, or was decreasing;

E.      Reporting that the price or cost of a specified pharmaceutical was the same when in fact it was falling; and

Seventh Amended Petition

F.    Reporting that specified pharmaceuticals were not sold to a specific sector or segment of the market (also known as a "class of trade") when in fact they were, regularly and in significant quantities concealing or failing to disclose such facts.

These acts and omissions were committed by the named Defendants of their own volition and in combination with each other and with other segments of the pharmaceutical industry, knowing that Medicaid officials would rely upon such false information and thus constitute violations of Texas Medicaid Fraud Prevention laws as well as constituting common law fraud.

7.5    Between 1990 and the present, Defendants Schering and/or Schering-Plough also directly marketed and sold "Warrick" products[3] through Schering/Schering-Plough's "third party home healthcare solution business", "Production Planning" and/or "Managed Care" divisions, and possibly through other divisions and/or personnel. Schering/Schering-Plough marketed and sold these "Warrick" drugs to customers at prices far below the false prices of the drugs reported by Schering/Schering-Plough and/or Warrick for reimbursement purposes. As a result, customers purchasing these "Warrick" drugs from Schering/Schering-Plough knew they would receive, and did receive, windfall reimbursements as a direct result of the misrepresentations made by Schering/Schering-Plough and/or Warrick to reimbursers, including the Texas Medicaid Program.

7.6    To accomplish this scheme, between 1990 and the present Schering/Schering-Plough sold identical products deriving from the exact same New Drug Application(s), but marketed the drugs differently. Schering/Schering-Plough marketed its drug "Proventil" as a brand with few, if any, discounts and marketed the same Proventil drug under a "Warrick" label and NDC number as a "generic" upon which it offered deep discounts while reporting false price information to Texas. In both instances the two differently labeled product types were made at the same location, and in all chemical and regulatory respects brand products approved by the FDA under a New Drug Application. The only difference between the two types of products

---

[3] Some, if not all, of these drugs are at issue in this litigation and are listed in the attached Exhibit A, incorporated herein by reference.

Seventh Amended Petition

was that the "Warrick" products (also referred to as the "brand, generic" in Schering/Schering-Plough/Warrick documents) were marketed and sold at significantly lower prices than the Schering/Schering Plough Proventil products; thereby providing the purchasers of the "Warrick" drugs with large spreads and large windfall reimbursements as described herein. Schering/Schering Plough used the Warrick label and NDC number to implement a marketing program which induced customers to choose Warrick's albuterol, which was in fact Schering's Proventil, over competing products based upon the large windfall reimbursements the customers would receive.

## VIII.  THE ACTIONS OF DEFENDANTS CONSTITUTE "UNLAWFUL ACTS" AND VIOLATE THE TEXAS MEDICAID FRAUD PREVENTION ACT

8.1     At various times on or after September 1, 1995, and continuing through the present date, Defendants knowingly or intentionally reported to the State of Texas' Medicaid Program false prices for the pharmaceuticals described in the attached Exhibit "A."

8.2     Defendants have repeatedly and continuously violated the TMFPA.  The Act specifies 10 separate acts which are declared to be unlawful.  At least four of those unlawful acts were committed by the Defendants in this case on numerous occasions.  The Act prohibits a person from knowingly or intentionally making or causing to be made a false statement or misrepresentation of material fact on an application for a contract, benefit, or payment under the Medicaid Program; or that is intended to be used to determine a person's eligibility for a payment under the Medicaid Program.  TEX. HUM. RES. CODE § 36.002(1).  The Act further prohibits a person from knowingly or intentionally concealing or failing to disclose an event that permits a person to receive a benefit or payment that is not authorized, or that permits a person to receive a benefit or payment that is greater than the benefit or payment that is authorized.  TEX. HUM. RES. CODE §36.002(2).  Additionally, the Act prohibits a person from knowingly or intentionally making or causing to be made a false statement or misrepresentation of fact

concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid Program. TEX. HUM. RES. CODE §36.002(4). The act also prohibits a person from knowingly or intentionally entering into an agreement combination or conspiracy to defraud the State by obtaining or aiding another to obtain unauthorized Medicaid payments or benefits §36.002(9).

8.3     The Defendants have knowingly or intentionally communicated false price or cost statements or other material misrepresentations or omissions on the Application for Addition of Drugs to the Texas Drug Code Index for certain drugs manufactured by Defendants and subsequent price updates provided by the Defendants in violation of §36.002(4) of the Act. Further, in violation of §36.002(1) of the Act, the Defendants failed to disclose the truthful prices paid by providers and concealed the existence of kickbacks, inducements, discounts, rebates, chargebacks, off invoice pricing, free goods, or grants which reduced the price paid by the Defendants' customers for certain drugs.

8.4     (Amended in Response to Special Exception)  Also, in violation of § 36.002(9), the Defendants knowingly or intentionally entered into a combination with wholesalers or Group Purchasing Organizations ("GPO's") or Prescription Benefit Managers or Pharmaceutical/Pharmacy Benefit Managers ("PBM's") or pharmacies (including chain pharmacies) to defraud the State of Texas by obtaining or aiding another person in obtaining unauthorized payments or benefits from the Medicaid program by misrepresenting the prices paid to manufacturers by wholesalers and the prices paid by pharmacies (including chain pharmacies) to manufacturers, as well as by concealing the remunerations paid by manufacturers to GPO's or PBM's. The facts set forth in preceding paragraphs 4.4, 4.5 and 4.6 are incorporated by reference to specify the allegations of a combination under § 36.002(a).

8.5     (Amended in Response to Special Exception)  Pleading more specifically, and in addition to the foregoing, the Plaintiff and Relator would allege and show as follows with respect to other entities and sectors of the pharmaceutical industry who participated directly or indirectly in the combination mentioned previously:

1.     The named Defendants entered into a combination and course of dealings with the following as limited by paragraph 4.4:

(a) National Full Line Wholesalers;  McKesson, Bergen, Brunswig, Cardinal, AmeriSource, FoxMeyer, Bindley Western.

(b) Regional Full Line Wholesalers (which conducted business and sold the Relevant Drugs of the named Defendants within the State of Texas); Walsh, Behrens, and Morris & Dickson.

(c) Institutional Purchasers; Gerimed, RDI (Respiratory Distributors, Inc), Apria, Accurate Pharmacy, Caremark, Rx Med, MHA (Managed Healthcare Associates).

These other identified companies are not named as Defendants in this suit and no relief or recovery is sought against them herein at this time.  These companies were named in response to a demand made by Defendants herein in Special Exceptions.  The named Defendants already knew the identity of these other companies because Defendants are the very ones who created the schemes resulting in the combinations which perpetuated the schemes to violate the TMFPA. As part of the combination created by the named Defendants, these wholesalers and institutional purchasers were doing what the Defendants asked them to do or what they obviously were required to do to keep the business of the drug manufacturers.  The state of mind and actual knowledge of the wholesalers and institutional purchasers is irrelevant and immaterial to the liability and culpability of the Defendants and the proof relating to their actions only goes to show that they were cogs in the illicit wheel created by the named Defendants.  With respect to

each wholesaler with which any Defendant joined in combination, such universe of companies is finite and limited exclusively to those wholesalers with whom each respective Defendant sold its drugs or delivered drugs pursuant to contract. Thus, these wholesalers can be identified with certainty and limitation by each Defendants' own sales history records.

The foregoing wholesaler entities participated in informing and educating their respective pharmacy customers of each and every AWP for the Relevant Drugs. Furthermore, these wholesalers also published information which would reveal the difference between the stated AWP and/or reimbursement on the one hand and, the given pharmacy customer's cost on each of the respective generic products on the other hand. This difference is known as "spread"; "MAC spread", "Gross Profit", "Gross Margin" (among other phrases and terms used within the industry). This information enables virtually all pharmacies within the State of Texas to quickly and easily understand which generic drug will be most profitable to dispense in consideration of the reimbursement level set given the false prices reported.

Based upon documents obtained from the records of Schering/Warrick, it appears that Bindley Western, at one point in time asked to be released from contractual obligations to deal with invoices containing arbitrary, artificially inflated and false price information which served no legitimate business purpose and which caused unnecessary, costly and meaningless bookkeeping and accounting work to be done. Instead, Bindley Western asked to receive invoices in the future which more accurately represented the actual transactions reflected by the respective invoices.

8.6    To the extent that any of the aforementioned full line wholesalers, both regional and national, also offer what is known as "autosubstitution" and or "select", "source" programs which mandate the exclusive dispensing of a particular product within each therapeutic class by those wholesalers' pharmacy customers, these wholesalers choose the generic product which will

have a large "spread" and be most profitable to their customers pursuant to feedback and demand from such customers as a result of the tactics of the Defendants and others as described herein.

These companies were required or invited to participate in the schemes and combinations involving; disseminating reimbursement information, the exclusive use within a therapeutic class of a single generic product (based in part on profitability), dummy pricing, false and fraudulent invoices, hidden discounts, chargebacks, rebates, free goods, price protection plans, or accounting gimmicks to conceal true and accurate price/cost information.

·8.7     With respect to Distributors (a/k/a "Generic Wholesalers") of generic drugs, it is alleged that such Distributors/wholesalers likewise participated in a course of dealings which enabled the combination with named Defendants and which facilitated and enabled the "marketing of the spread" to pharmacies by use of Distributors, agents, employees, or independent contractor telemarketing companies and through telemarketing, sales calls and advertising (both electronically and by print).

Distributors/wholesalers which participated in these activities include Major, J. J. Balan, ANDA, Harvard, Genetco and others known collectively within the Warrick organization as the "Care Group" and "Premier Group".

These distributors/wholesalers are not named as Defendants in this suit and no relief or recovery is sought at this time against them herein. They were named in response to a demand made by Defendants herein in Special Exceptions. The named Defendants already knew the identity of these other companies because Defendants are the very ones who created the schemes resulting in the combinations which perpetuated the schemes to violate the TMFPA. As part of the combination created by the named Defendants, these distributors were merely doing what the Defendants asked them to do or what they obviously were required to do to keep the business of the drug manufacturers. The state of mind and actual knowledge of the distributors is irrelevant

and immaterial to the liability and culpability of the Defendants and the proof relating to their actions only goes to show that they were cogs in the illicit wheel created by the named Defendants.

8.8     The Defendants Warrick and Schering entered into specific agreements and contracts with one or more telemarketing companies, including TMS (a/k/a Access Worldwide) a company located in the State of Florida, but doing business by making telephonic contacts in the State of Texas and other states. As part of telephone sales pitches, telemarketers would advertise and promote Warrick and Schering products in part by marketing the spread and urging purchases of these products based upon the large and profitable spread between the true net price the pharmacies would pay for the drugs and the high reimbursement amount; those pharmacies would receive; known as the "profit message" and/or ROI; among other phrases.

8.9     The Defendant Schering employed a group known as its Managed Care Sales Force and this group of marketers had as a part of their job responsibilities, the duty to call upon decision makers for Healthcare Management/Maintenance Organization, Pharmaceutical Benefits Manager, Hospitals and other Managed Care Organizations to explain the perspective of generic drug profitability on behalf of Schering and Warrick's. Thus, employees and agents of Schering combined with Warrick to market the spread on Warrick products and to "bundle" Warrick and Schering products in a manner which was fraudulent and illegal.

8.10    In the TMFPA, The Texas Legislature has specified actions and omissions, conduct and combinations which are illegal and give rise to civil and criminal liability and penalties which can be imposed against drug manufacturers such as the named Defendants who themselves voluntarily chose to place their respective products into the Texas Medicaid Vendor Drug Program and thus submitted to and agreed to be bound by these rules and laws. This is a statute of absolute strict liability. There are no stated and enumerated defenses and none are

allowed.  There are no references to common law defenses or allowances for mitigation.  With a finding of any violation of the statute, liability is strictly imposed absolutely and the only remaining question is the amount of damages, penalties, fees and expenses to be assessed.  This is precisely the same as the very similar Texas Deceptive Trade Practices Act as originally enacted in 1973.  In its original form and before subsequent changes and amendments were added by later legislative enactment, there were no defenses to the liability strictly imposed by the DTPA and likewise there are no defenses to the strict liability imposed by the TMFPA.

8.11    (Amended based upon Court instruction to list all drugs, in addition to "damages drugs" which will be used to offer proof at trial)

The Primary drugs which evidence the differing motivations for sometimes, but not always reporting manipulated and misleading prices by Defendants are as follows:

Warrick:        Cimetidine, Perphenazine, Albuterol tablets and Albuterol syrup

Schering:       Proventil

Roxane:         Haloperidol tablets, Mehotrexate tablets, Roxicet tablets, Mexiletine HCL capsules; Dexamethasone tablets,Meperidine, Azathioprine, Cyclophosphamide, Combivent, Lorazepam  Intensol, Hydromorphone, Prednisone, Propranolol, Torecan,  Azathioprine, Diclofenac Sodium, Hydroxyurea and Lithium Carbonate.

Evidence concerning other drugs is relevant, probative and admissible for at least three different reasons.  Defendants were motivated to misrepresent price information when they could profit from such conduct by making one of their drugs more likely to be purchased due to the promise of higher reimbursement.  This opportunity routinely and normally arose in the marketing of certain drugs such as those listed in this paragraph.  This is the situation where creating the largest "spread" worked its illegal magic.  To the contrary, in the case of drugs where competitive pressures did not drive the misrepresentation of pricing, the tendency was to

report prices which were correct and not misleading.  An additional result of this situation was that Medicaid programs and officials were lulled into a false sense of security because sometimes many prices reported by a manufacturer would be fair and reasonable.

Therefore evidence that a drug manufacturer routinely reported non-misleading prices for certain drugs and misleading prices for other drugs is admissible:

1.    Under T.R.E. 404 (b) as proof of motive, opportunity, intent, plan, knowledge and absence of mistake or accident.

2.    Under T.R.E. 406 as proof of routine practice to consistently act illegally where profit resulted yet legally where the profit motive was less compelling and to show that such company was able to comply with the law and did know how to report prices that were not misleading where the motive to act illegally was lessened or missing.

3.    Under T.M.R.P.A. § 36.052 (b)(1) through (5) for assessment of a civil penalty.

## IX.  THE COURT SHOULD DISREGARD THE CORPORATE FICTION FOR WARRICK, SCHERING, AND SCHERING-PLOUGH.

9.1    The corporate fiction may be disregarded when the corporate form has been used as part of a basically unfair device to achieve an inequitable result, specifically when the corporate fiction is used to perpetrate a fraud, as a mere tool or business conduit of another corporation, as a means of evading existing legal obligations, to achieve or perpetrate a monopoly, to circumvent a statue, or to protect crime or justify a wrong. *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986), *superseded on other grounds by* Tex. Bus. Corp. Act Ann. art. 2.21 A (Vernon 2002).

9.2    (Amended in Response to Special Exception)  In addition to its own acts for which it is liable, Schering/Schering-Plough Corporation as the parent, owner and primary, if not

exclusive, shareholder of Warrick Pharmaceuticals, Inc., is liable for the conduct of any and all agents of Warrick Pharmaceuticals Inc.  Schering/Schering-Plough is liable for Warrick's wrongful activities under the equitable doctrines of joint business enterprise, single business enterprise, and alter ego.  Each of these theories is advanced in the alternative.  The facts set forth in paragraphs 4.3, 4.4, 4.5, 4.6, 4.7, 4.8, 7.5, 7.6, 8.2, 8.3, 8.4 and 8.5 are herein incorporated by reference to identify allegations asserted against Defendant Schering Corporation.

     9.3    The following allegations support piercing the corporate veil for the "Schering" entities under any or all of these theories.  Warrick could not exist without Schering/Schering-Plough.  Warrick has only a handful of employees, yet Warrick generates annual sales of over $150M.  Warrick depends upon Schering/Schering-Plough's manufacturing, distribution, accounting and administrative departments for all of these internal functions.  Warrick apparently does not even employ persons with those traditional business responsibilities.  The only personnel Warrick allegedly employs are those who market and sell Schering/Schering-Plough's generic products.  Warrick's business offices are within the offices of Schering/Schering-Plough.  Warrick does not conduct its corporate business in Reno, Nevada as its letterhead represents.  Instead, Schering/Schering-Plough and Warrick operate from the same office space in New Jersey, use the same computer systems, telephone systems, employees, and centralized departments, and apparently use each other's letterhead interchangeably.

     9.4    The companies are so closely aligned that in deposition, even the founder of Warrick did not know whether his "Warrick" consulting contract is with Warrick or Schering/Schering- Plough.  These companies are not operated as separate entities, but rather integrate their resources to achieve a common business purpose to sell Schering/Schering-Plough's generic products.  Whether express or implied, Warrick and Schering/Schering-Plough

agreed that Warrick would act as Schering/Schering-Plough's marketing unit for generic products, with the common purpose of selling more of Schering/Schering-Plough's and Warrick's products and with Schering/Schering-Plough's having at least an equal right to direct and control the operation of the enterprise.

9.5    Also, Schering/Schering-Plough's brand version of Albuterol Sulfate, Proventil, was sold in conjunction with Warrick's generic Albuterol Sulfate. When Warrick's customers purchased enough Warrick generic Albuterol Sulfate, Warrick would then give that customer a credit to obtain Proventil. These companies acted as one rather than as two independent drug manufacturers.

9.6    Furthermore, Schering/Schering-Plough may have purposefully under capitalized Warrick in light of the nature and risk of its business in order to avoid financial responsibility and allow Schering/Schering-Plough to break the law without suffering the consequences. Allowing the corporate structure to protect Schering/Schering-Plough from these wrongful acts would lead to injustice. In light of the above allegations, Warrick and Schering/Schering-Plough should be treated as one entity for liability purposes in order to insure Plaintiff can fully and completely recover any judgment rendered in its favor in this matter. Also, Schering/Schering-Plough sells Warrick products to large market segments with full knowledge of the false price representations, and, therefore, benefits from them.

## X. DAMAGES

10.1    Pursuant to the terms of the Medicaid Fraud Prevention Act, each Defendant is liable to the State of Texas for the value of any payment . . . provided under the Medicaid program, directly or indirectly, as a result of the unlawful act. Tex. Hum. Res. Code Ann. §36.052 (1). Additionally, each Defendant is liable for interest on the value of the payment, civil

penalties ranging from $1,000 to $10,000 for each unlawful act, and two times the value of the payment. *Id.* at (2), (3), & (4). Therefore, the Defendants are liable for the following amounts:[4]

    1.    Schering/Schering-Plough/Warrick Pharmaceuticals Corporation

| | |
|---|---|
| A. Value of Payments | $ 32,147,022 |
| B. Statutory Double Damages | $ 64,294,044 |
| C. Minimum Civil Penalties | $ 9.125.000 |
| Total (not including interest) | $105,566,066 |

    2.    Roxane Laboratories, Inc.

| | |
|---|---|
| A. Value of Payments | $ 3,277,513 |
| B. Statutory Double Damages | $ 6,555,026 |
| C. Minimum Civil Penalties | $ 5.475.000 |
| Total (not including interest) | $ 15,307,539 |

    Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under § 36.052, whether specified in this pleading or not. By agreement of counsel on June 4, 2003, Defendants withdrew their request to require Plaintiffs to specify a maximum amount being sought as civil penalties. Therefore, Plaintiffs will seek an amount as civil penalties which will be justified and appropriate under the facts relevant to this issue and under the laws as determined by the Court.

    (Amended to respond to Special Exception. Specific and maximum monetary damages pled in the alternative under T.R.C.P. 48 and to make specific those damage allegations alleged in general terms in paragraphs 10.1 and 10.2)

---

4    These calculations are based upon utilizations for periods ending at the end of 2002. These calculations will be updated and increased as additional information becomes available prior to trial consistent with the court's orders. The civil penalty figures are only minimum

10.2    Alternatively, the Defendants are liable to the State for common law fraud in an amount that exceeds the minimum jurisdictional limits of this Court, including, but not limited to actual damages, pre-judgment interest, attorney fees, and punitive damages in an amount not to exceed the amounts set forth as follows:

As monetary damages for the alternative claims based upon common law fraud and as a T.R.C.P. Rule 48 alternative measure of damages under the TMFPA the Plaintiffs seek the following elements of monetary damages:

A.    The difference between the reimbursement amount paid by TVDP for the relevant drugs, on the one hand and the amount that would have been paid but for false price/cost reporting on the other hand.

B.    Two times the amount found by the trier of fact in section A, as per TMFPA § 36.052(a)(4).  (To the Court Only)

C.    Prejudgment interest at 10% per annum.  (To the Court Only)

D.    A civil penalty to be assessed by the trier of fact using the guidelines at § 36.052 (b) (1)-(5) inclusive.

By agreement of counsel on June 4, 2003, Defendants withdrew their request to require Plaintiffs to specify a maximum amount being sought as civil penalties.  Therefore, Plaintiffs will seek an amount as civil penalties which will be justified and appropriate under the facts relevant to this issue and under the laws as determined by the Court.

E.    Reasonable and necessary attorney fees, costs and expenses of litigation of the State and Relator in an amount not to exceed $15,000,000.00.  This amount includes fees to be set and awarded by the Court pursuant to TMFPA § 36.110(c).

---

amounts available under TMFPA and at trial, the State may seek recovery of maximum penalties

10.3    The TMFPA is a statute of absolute strict liability and there are no defenses available for any violation of its provisions and in particular any violation of any part of Section 36.002. Likewise, as a matter of law the defenses of laches and limitations are not available as against the State of Texas, as a Sovereign.

10.4    In order for the trier of fact to be apprised of relevant and probative information upon which to assess a finding of an appropriate civil penalty, the jury will need to receive and hear evidence relating to TMFPA § 36.052 (b) (1)-(4) inclusive.  Specifically the trier of fact must receive evidence on the following topics:

(1)    previous and other violations of the law;

(2)    the seriousness of the unlawful act "…including the nature, circumstances, extent, and gravity of the unlawful act;"

(3)    health and safety of the public; and

(4)    whether the person acted in bad faith when engaged in the conduct that formed the basis of the unlawful act.

The trier of fact must have a complete and accurate understanding of the total conduct of Defendants in all dealings with TVDP to show that the Relevant Drugs were not an unusual or isolated error of judgment but rather a systematic and calculated plan to defraud the system at every opportunity.  Therefore, other drugs placed by the Defendants into the formulary of the TVDP which had relatively small utilization in the State of Texas and which therefore are not the subject of large monetary damages are nonetheless probative evidence of other violations; the seriousness of conduct; the nature, circumstances, extent and gravity as well as evidence of bad faith of the Defendants.  The trier of fact should be presented with complete and accurate information of how the Defendants dealt with pricing and price reporting issues relating to

---

allowed by law under § 36.052.

government reimbursement programs to understand that the prices the Defendants reported to the TVDP for the Relevant Drugs were not the result of an unusual or isolated error in judgment or mistake, but were the result of a systematic and calculated plan to defraud the system at every opportunity. These are the other drugs for which damages are not sought in this case, but about which evidence will be offered to show the jury the Defendants' plan or scheme. These are primarily those drugs listed in paragraph 8.11.

## XI.  JURY DEMAND

11.1    The State respectfully requests a trial by jury pursuant to Texas Rules of Civil Procedure 216.

## XII.  PRAYER

12.1    The State asks that it recover from the Defendants restitution of payments, statutory additional double damages, pre-judgment interest, attorneys fees, costs, and expenses and civil penalties as provided in TEX. HUM. RES. CODE ANN., Chapter 36, or actual damages, pre-judgment interest, attorney fees and punitive damages under common law.  Plaintiff and Relator invoke in the broadest sense all relief possible at law or equity under Texas Human Resources Code, Chapter 36 without qualification or limitation. The State asks that citation and notice be issued immediately to the defendants identified herein who have not already answered and appeared in this action and that they be served with process and that upon trial of this case that judgment be entered in favor of the State and against the named defendants in at the amounts set forth.  The Relator further asks that it be awarded its costs and expenses; a reasonable attorney fee; and the maximum Relator's share provided for under the TMFPA.  The State prays for such other and further relief to which it may show itself entitled either at law or in equity.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY McBEE
First Assistant Attorney General

JEFFREY S. BOYD
Deputy Attorney General for Litigation

LOWELL A. KEIG
Chief, Elder Law and Public Health Division

PATRICK O'CONNELL
Chief, Civil Medicaid Fraud Section
P. O. Box 12548
Austin, Texas  78711-2548

JOSEPH V. CRAWFORD
Wright & Greenhill, P.C.
State Bar No. 05030600
221 West 6th Street, Suite 1800
Austin, Texas 78701-3495
(512) 476-4600
FAX:  (512) 476-5382

ATTORNEYS FOR THE STATE OF TEXAS

*John E. Clark by Permission Joe*

JOHN E. CLARK
State Bar No: 04287000
Goode Casseb Jones
Riklin Choate & Watson
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
Telephone: 210-733-6030
Facsimile: 210-733-0330

JAMES J. BREEN
Florida Bar No. 297178
ALISON W. SIMON
Florida Bar No. O109568
The Breen Law Firm, P.A.
P.O. Box 297470
Pembroke Pines, Florida 33029-7470
Phone: (954) 499-1171
Facsimile: (954) 499-1173

SHERRIE R. SAVETT
Pennsylvania Bar No. 17646
SUSAN SCHNEIDER THOMAS
Pennsylvania Bar No. 32799
JEANNE A. MARKEY
Pennsylvania Bar No. 40175
JOY P. CLAIRMONT
Pennsylvania Bar No. 82775
GARY AZORSKY
Pennsylvania Bar No. 38924
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Fax: (215) 875-4636
ATTORNEYS FOR RELATOR,
VEN-A-CARE OF THE FLORIDA KEY, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on the following counsel of record via U.S. Mail, certified, return receipt requested, facsimile transmission, or hand delivery on this the _____ day of _____, 2003:

Mr. Steven A. Fleckman
Ms. Jessica McGlynn
Fleckman & McGlynn
515 Congress Avenue, Suite 1800
Austin, Texas 78701
COUNSEL FOR DEY, INC.
*CM/RRR*

Mr. Steve McConnico
Mr. Eric Hagenswold
Scott, Douglas & McConnico, LLP
600 Congress Avenue, 15th Floor
Austin, Texas 78701-2589
COUNSEL FOR ROXANE
LABORATORIES, INC.
*CM/RRR*

Mr. Paul F. Doyle and Mr. Neil Merkl
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178-0002
COUNSEL FOR DEY, INC.
CM/RRR

Mr. Stephen Hudspeth
Coudert Brothers
1114 Avenue of the Americas
New York, New York 10036-7703
COUNSEL FOR DEY, INC.
*CM/RRR*

Mr. C. Michael Moore
Locke, Liddell & Sapp, LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-8001
COUNSEL FOR WARRICK
PHARMACEUTICALS CORPORATION
*CM/RRR*

Mr Gary Azorsky
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
COUNSEL FOR RELATORS
*CM/RRR*

Mr. James J. Breen
The Breen Law Firm P.A.
8201 Peters Road, Suite 1000
Plantation, Florida 33324
COUNSEL FOR RELATORS
*CM/RRR*

Mr. John E. Clark
Goode, Casseb, Jones, et. al.
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
COUNSEL FOR RELATORS
*CM/RRR*

JOSEPH V. CRAWFORD
Wright & Greenhill, P.C.

Seventh Amended Petition

# EXHIBIT A
## TO THE SEVENTH AMENDED PETITION

| Manufacturer | Product | Size | NDC No. |
|---|---|---|---|
| Warrick | Albuterol Sulfate .083% | 3ml 25s | 59930-1500-08 |
| Warrick | Albuterol Sulfate .083% | 3ml 60s | 59930-1500-06 |
| Warrick | Albuterol Sulfate 0.5% | 20ml | 59930-1515-04 |
| Warrick | Albuterol 90 mcg Aerosol Inhaler | 17gm | 59930-1560-01 |
| Warrick | Albuterol 90 mcg Aerosol Refill | 17gm | 59930-1560-02 |
| Dey | Albuterol Sulfate .083% | 25s | 49502-0697-03 |
| Dey | Albuterol Sulfate .083% | 30s | 49502-0697-33 |
| Dey | Albuterol Sulfate .083% | 60s | 49502-0697-60 |
| Dey | Albuterol Sulfate 5mg/ml Solution | 20ml | 49502-0105-01 |
| Dey | Albuterol Sulfate 5mg/ml Solution | 20ml | 49502-0196-20 |
| Dey | Acetylcysteine Solution 10% | 4ml | 49502-0181-04 |
| Dey | Acetylcysteine Solution 10% | 10ml | 49502-0181-10 |
| Dey | Acetylcysteine Solution 10% | 30ml | 49502-0181-30 |
| Dey | Acetylcysteine Solution 20% | 4ml | 49502-0182-04 |
| Dey | Acetylcysteine Solution 20% | 10ml | 49502-0182-10 |
| Dey | Acetylcysteine Solution 20% | 30ml | 49502-0182-30 |
| Dey | Acetylcysteine Solution 20% | 100ml | 49502-0182-00 |
| Dey | Cromolyn Sodium 2ml | 60s | 49502-0689-02 |
| Dey | Cromolyn Sodium 2ml | 120s | 49502-0689-12 |
| Dey | Ipratropium Bromide 2.5ml | 25s | 49502-0685-03 |
| Dey | Ipratropium Bromide 2.5ml | 30s | 49502-0685-33 |
| Dey | Ipratropium Bromide 2.5ml | 60s | 49502-0685-60 |
| Dey | Albuterol 90mcg Aerosol Inhaler | 17gm | 49502-0333-17 |
| Dey | Albuterol 90mcg Aerosol Inhaler | 17gm | 49502-0303-17 |
| Dey | Albuterol 90mcg Aerosol Refill | 17gm | 49502-0303-27 |

| Manufacturer | Product | Size | NDC No. |
|---|---|---|---|
| Roxane | Ipratropium Bromide .02% | 2.5ml 25s | 00054-8402-11 |
| Roxane | Ipratropium Bromide .02% | 2.5ml 30s | 00054-8402-13 |
| Roxane | Ipratropium Bromide .02% | 2.5ml 60s | 00054-8402-21 |

# Exhibit F

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 CNN8dQnQQe2iiQnMcRCdBYUmwdRkHwjLskdDXAoEcXqfVbVia6QRQIWPdxA7MVNA
 JWsM3YbzIWJsef9Bd2GJSQ==

<SEC-DOCUMENT>0000950123-04-009184.txt : 20040803
<SEC-HEADER>0000950123-04-009184.hdr.sgml : 20040803
<ACCEPTANCE-DATETIME>20040803172244
ACCESSION NUMBER:          0000950123-04-009184
CONFORMED SUBMISSION TYPE:    10-Q
PUBLIC DOCUMENT COUNT:        8
CONFORMED PERIOD OF REPORT:   20040630
FILED AS OF DATE:             20040803

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:            SCHERING PLOUGH CORP
                CENTRAL INDEX KEY:                 0000310158
                STANDARD INDUSTRIAL CLASSIFICATION: PHARMACEUTICAL PREPARATIO
                IRS NUMBER:                        221918501
                STATE OF INCORPORATION:            NJ
                FISCAL YEAR END:                   1231

        FILING VALUES:
                FORM TYPE:         10-Q
                SEC ACT:           1934 Act
                SEC FILE NUMBER:   001-06571
                FILM NUMBER:       04949392

        BUSINESS ADDRESS:
                STREET 1:          ONE GIRALDA FARMS
                CITY:              MADISON
                STATE:             NJ
                ZIP:               07940-1000
                BUSINESS PHONE:    9738227000
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-Q
<SEQUENCE>1
<FILENAME>y99638e10vq.txt
<DESCRIPTION>FORM 10-Q
<TEXT>
<PAGE>

FORM 10-Q
UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D. C. 20549

QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended JUNE 30, 2004

COMMISSION FILE NUMBER 1-6571

SCHERING-PLOUGH CORPORATION
(Exact name of registrant as specified in its charter)

New Jersey
(State or other jurisdiction of
incorporation)
2000 Galloping Hill Road
Kenilworth, NJ
(Address of principal executive
offices)
07033
(Zip Code)

22-1918501
(I.R.S. Employer Identification No.)
(908) 298-4000
(Registrant's telephone number,
including area code)

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months, and (2) has been subject to such filing requirements
for the past 90 days.

                            YES [X] NO [ ]

Indicate by check mark whether the registrant is an accelerated filer (as
defined in Rule 12b-2 of the Exchange Act). YES [X] NO [ ]

Common Shares Outstanding as of June 30, 2004:  1,472,377,983

<PAGE>

PART I. FINANCIAL INFORMATION

Item 1. Financial Statements

                SCHERING-PLOUGH CORPORATION AND SUBSIDIARIES
                    STATEMENTS OF CONSOLIDATED OPERATIONS
                               (UNAUDITED)
                 (Amounts in millions, except per share figures)

<TABLE>
<CAPTION>

|  | Three Months Ended June 30, | | S |
| --- | --- | --- | --- |
|  | 2004 | 2003 | 20 |
| <S> | <C> | <C> | <C> |
| Net sales | $ 2,147 | $ 2,308 | $ 4, |
| Cost of sales | 790 | 784 | 1, |
| Selling, general and administrative | 979 | 938 | 1, |
| Research and development | 451 | 369 |  |
| Other expense (income), net | 43 | (4) |  |
| Special charges | 42 | 20 |  |
| Equity (income)/loss from cholesterol joint venture | (77) | (26) |  |
| (Loss)/income before income taxes | (81) | 227 |  |
| Income taxes benefit/(expense) | 16 | (45) |  |
| Net (loss)/income | $ (65) | $ 182 | $ |
| Diluted (loss)/earnings per common share | $ (.04) | $ .12 | $ |
| Basic (loss)/earnings per common share | $ (.04) | $ .12 | $ |

or customers - regardless of cause, including war, terrorism, riot, civil insurrection or social unrest; and natural or man-made disasters, including famine, flood, fire, earthquake, storm or disease.

- -    Changes in tax laws including changes related to taxation of foreign earnings.

- -    Changes in accounting standards promulgated by the American Institute of Certified Public Accountants, the Financial Accounting Standards Board or the SEC, or the Public Company Accounting Oversight Board that would require a significant change to Schering-Plough's accounting practices.

For further details and a discussion of these and other risks and uncertainties that may impact Schering-Plough's forward looking statements, see Schering-Plough's past and future SEC filings.

Item 3. Quantitative and Qualitative Disclosures about Market Risk

The Company is exposed to market risk primarily from changes in foreign currency exchange rates and, to a lesser extent, from interest rates and equity prices. Refer to "Management's Discussion and Analysis of Operations and Financial Condition" in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2003 for additional information.

Item 4. Controls and Procedures

Management, including the chief executive officer and the chief financial officer, has evaluated the Company's disclosure controls and procedures as of the end of the quarterly period covered by this Form 10-Q and has concluded that the Company's disclosure controls and procedures are effective. They also concluded that there were no changes in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

48

<PAGE>

PART II. OTHER INFORMATION

Item 1. Legal Proceedings

Legal proceedings involving the Company are described in the 2003 10-K and the 2004 first quarter 10-Q, together referred to as the "Reports" in this Legal Proceedings Item. Unless specifically indicated below, matters described in the Reports are still pending. The following description should be read together with the Reports. It covers material developments to previously reported proceedings and new legal proceedings involving the Company that arose since the April 28, 2004 filing date of the 2004 first quarter 10-Q.

Patent Matters. PRIME PAC PRRS Patent. In January 2000, a jury found that the Company's PRIME PAC PRRS (Porcine Respiratory and Reproductive Syndrome) vaccine infringed a patent owned by Boehringer Ingelheim Vetmedica, Inc ("Boehringer Ingelheim"). An injunction was issued in August 2000 barring further sales of the Company's vaccine. On June 3, 2004, a jury in the United States District Court for the district of New Jersey awarded Boehringer Ingelheim $6.9 million plus interest in this matter.

DR. SCHOLL'S FREEZE AWAY Patent. On July 26, 2004, OraSure Technologies filed an action in the U.S. District Court for the Eastern District of Pennsylvania alleging patent infringement by Schering-Plough Healthcare Products by its sale of DR. SCHOLL'S FREEZE AWAY wart removal product. The FREEZE AWAY product was

launched in March 2004. As of June 30, 2004, net sales of this product totaled
$8.4 million.

Investigations. Pennsylvania Investigation. On July 30, 2004, Schering-Plough
Corporation, the U.S. Department of Justice and the U.S. Attorney's Office for
the Eastern District of Pennsylvania announced settlement of the previously
disclosed investigation by that Office.

Under the settlement, Schering Sales Corporation, an indirect wholly owned
subsidiary of Schering-Plough Corporation, will plead guilty to a single federal
criminal charge concerning a payment to a managed care customer. As a result,
Schering Sales Corporation will be excluded from participating in federal
healthcare programs. The settlement will not affect the ability of
Schering-Plough Corporation to participate in those programs.

The aggregate settlement amount is $345.5 million in fines and damages,
comprised of a $52.5 million fine to be paid by Schering Sales Corporation, and
$293 million in civil damages to be paid by Schering-Plough Corporation.
Schering-Plough Corporation will be credited with $53.6 million that was
previously paid in additional Medicaid rebates against the civil damages amount,
leaving a net settlement amount of $291.9 million. Of that amount, $177.5
million of the total settlement will be paid in 2004, and the remaining portion
will be paid by March 4, 2005. Interest will accrue on the unpaid balance at the
rate of 4 percent.

The payments will be funded by cash from operations, borrowings and/or proceeds
from the issuance of securities. There will be no impact on 2004 full year
results related to the Pennsylvania settlement.

Under the settlement, Schering-Plough Corporation also entered into a five year
corporate integrity agreement with the Office of the Inspector General of the
Department of Health and Human Services, under which Schering-Plough Corporation
agreed to implement specific measures to promote

49

<PAGE>

compliance with regulations on issues such as marketing. Failure to comply can
result in financial penalties.

Details of the initiation and progress of the investigation can be found in the
Company's prior 10-K and 10-Q reports beginning with the 10-K for 1999.

The Company cannot predict the impact of this settlement, if any, on other
outstanding investigations.

Pricing Matters. During 2000, Warrick Pharmaceuticals (Warrick), the Company's
generics subsidiary, was sued by the state of Texas. In 2002, the Company and
its subsidiary, Schering Corporation, were added as defendants. The lawsuit
alleges that Warrick supplied the state with false reports of wholesale prices,
which caused the state to pay Medicaid claims on prescriptions of Warrick's
albuterol sulfate solution and inhaler at a higher-than-justified level. On May
3, 2004, the Company announced that it has reached an agreement with the
attorney general's office of the State of Texas to settle the matter for a total
of $27 million.

Securities and Class Action Litigation. On March 31, 2003, the Company was
served with a putative class action complaint filed in the U.S. District Court
in New Jersey alleging that the Company, Richard Jay Kogan (who resigned as
Chairman of the Board November 13, 2002, and retired as Chief Executive Officer,
President and Director of the Company April 20, 2003) and the Company's Employee
Savings Plan (Plan) administrator breached their fiduciary obligations to

certain participants in the Plan. In May 2003, the Company was served with a second putative class action complaint filed in the same court with allegations nearly identical to the complaint filed March 31, 2003. On October 6, 2003, a consolidated amended complaint was filed, which names as additional defendants seven current and former directors and other corporate officers. The Court dismissed this complaint on June 29, 2004. On July 16, 2004, the plaintiffs filed a Notice of Appeal.

SEC Inquiries and Related Litigation. On June 9, 2004, the SEC and the Company announced settlement of the SEC's enforcement proceeding regarding the books and records and internal controls provisions of the Foreign Corrupt Practices Act relating to payments of approximately $76,000 made between February 1999 and March 2002 by one of the Company's foreign subsidiaries, Schering-Plough Poland, to a charitable organization called the Chudow Castle Foundation. Without admitting or denying the allegations in the complaint, the Company paid a $500,000 civil penalty; consented to the issuance of a Commission Order requiring the Company to cease and desist from committing or causing violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934; and agreed to retain an independent consultant to review the Company's policies and procedures regarding compliance with the Foreign Corrupt Practices Act and to implement any changes recommended by the consultant.

On September 9, 2003, the SEC and the Company announced settlement of the SEC enforcement proceeding against the Company and Richard Jay Kogan, former Chairman and Chief Executive Officer, regarding meetings held with investors the week of September 30, 2002, and other communications. Without admitting or denying the allegations, the Company agreed not to commit future violations of Regulation FD and related securities laws and paid a civil penalty of $1 million. Mr. Kogan paid a civil penalty of $50 thousand.

The federal putative class actions filed against the Company and Mr. Kogan regarding the meetings held with investors the week of September 30, 2002, and other communications were consolidated and, pursuant to that consolidation, an amended complaint dated March 13, 2003, was filed, alleging violations of Sections 10(b), 20(a) and 20(A) of the Securities Exchange Act of 1934 relating to the

50

<PAGE>

alleged disclosures made during the meetings mentioned in the paragraph above. The Company filed a motion to dismiss these class actions May 6, 2003, and the plaintiffs have sought leave of the court, and thereafter filed a second amended complaint. On June 29, 2004, the Court dismissed the second amended complaint.

On September 25, 2003, a lawsuit was filed in New Jersey Superior Court, Union County, against Richard Jay Kogan and the Company's outside Directors alleging breach of fiduciary duty, fraud and deceit and negligent misrepresentation, all relating to the alleged disclosures made during the meetings mentioned above. The Company removed this case to federal court. A motion to remand to state court and the Company's motion to dismiss are pending.

Environmental Matters. On November 20, 2003, we received a General Notice of Potential Liability from EPA addressed to Arno/Scholl's Adhesive Tapes, Inc., a former subsidiary of the Company, relating to the Lake Culmet Cluster Site in Chicago, Illinois. There are several hundred other potentially responsible parties for the site. The Company believes it was named erroneously and that another unrelated company should be responsible for any clean-up obligations at this site. The Company is working with the government to have the matter resolved.

The New Jersey Department of Environmental Protection sent Schering-Plough a

incorporated by reference in Registration Statements No. 2-83963, No. 33-19013, No. 33-50606, No. 33-30331, No. 333-87077, No. 333-91440, No. 333-104714, No. 333-105567, No. 333-105568 and No. 333-112421 on Form S-8, Post Effective Amendment No. 1 to Registration Statement No. 2-84723 on Form S-8, Post Effective Amendment No. 1 to Registration Statement No. 333-105567 on Form S-8, Post Effective Amendment No. 1 to Registration Statement No. 2-80012 on Form S-3, Post Effective Amendment No. 1 to Registration Statement No. 2-77740 on Form S-3, Post Effective Amendment No. 1 to Registration Statement No. 333-102970 on Form S-3 and Registration Statements No. 333-12909, No. 333-853, No. 333-30355, No. 333-102970, No. 333-110690 and No. 333-113222 on Form S-3.

We also are aware that the aforementioned report, pursuant to Rule 436(c) under the Securities Act of 1933, is not considered a part of the Registration Statements prepared or certified by an accountant or a report prepared or certified by an accountant within the meaning of Sections 7 and 11 of that Act.

/s/ Deloitte & Touche LLP

Parsippany, New Jersey


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-31.1
<SEQUENCE>5
<FILENAME>y99638exv31w1.txt
<DESCRIPTION>CERTIFICATION
<TEXT>
<PAGE>

                                                              Exhibit 31.1


CERTIFICATION

I, Fred Hassan, Chairman of the Board, Chief Executive Officer and President, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Schering-Plough Corporation (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

     a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) [paragraph omitted pursuant to SEC Release Nos. 33-8238 and 34-47986];

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

<PAGE>

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: August 3, 2004

/s/ Fred Hassan
- -----------------------------------------
    Fred Hassan
Chairman of the Board, Chief Executive Officer and President


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-31.2
<SEQUENCE>6
<FILENAME>y99638exv31w2.txt
<DESCRIPTION>CERTIFICATION
<TEXT>
<PAGE>

                                                              Exhibit 31.2


CERTIFICATION

I, Robert J. Bertolini, Executive Vice President and Chief Financial Officer, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Schering-Plough Corporation (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) [paragraph omitted pursuant to SEC Release Nos. 33-8238 and 34-47986];

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

&lt;PAGE&gt;

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: August 3, 2004

/s/ Robert J. Bertolini
- ---------------------------------------
    Robert J. Bertolini
Executive Vice President and Chief Financial Officer


&lt;/TEXT&gt;
&lt;/DOCUMENT&gt;
&lt;DOCUMENT&gt;
&lt;TYPE&gt;EX-32.1
&lt;SEQUENCE&gt;7
&lt;FILENAME&gt;y99638exv32w1.txt
&lt;DESCRIPTION&gt;CERTIFICATION
&lt;TEXT&gt;
&lt;PAGE&gt;

Exhibit 32.1

CERTIFICATION

I, Fred Hassan, Chairman of the Board, Chief Executive Officer and President of
Schering-Plough Corporation, certify, pursuant to Section 906 of the
Sarbanes-Oxley Act of 2002, that:

(1)   the Quarterly Report on Form 10-Q for the quarterly period ended June 30,
      2004 (the "Periodic Report") which this statement accompanies fully
      complies with the requirements of Section 13(a) of the Securities Exchange
      Act of 1934 (15 U.S.C. 78m); and

(2)   information contained in the Periodic Report fairly presents, in all
      material respects, the financial condition and results of operations of
      Schering-Plough Corporation.

Dated: August 3, 2004

/s/ Fred Hassan
- --------------------------
Fred Hassan
Chairman of the Board,
Chief Executive Officer
and President


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-32.2
<SEQUENCE>8
<FILENAME>y99638exv32w2.txt
<DESCRIPTION>CERTIFICATION
<TEXT>
<PAGE>

Exhibit 32.2


CERTIFICATION

I, Robert J. Bertolini, Executive Vice President and Chief Financial Officer of
Schering-Plough Corporation, certify, pursuant to Section 906 of the
Sarbanes-Oxley Act of 2002, that:

(1)   the Quarterly Report on Form 10-Q for the quarterly period ended June 30,
      2004 (the "Periodic Report") which this statement accompanies fully
      complies with the requirements of Section 13(a) of the Securities Exchange
      Act of 1934 (15 U.S.C. 78m); and

(2)   information contained in the Periodic Report fairly presents, in all
      material respects, the financial condition and results of operations of
      Schering-Plough Corporation.

Dated: August 3, 2004

/s/ Robert J. Bertolini
- -----------------------------
    Robert J. Bertolini
Executive Vice President and
Chief Financial Officer

```
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

# Exhibit G

# ROPES & GRAY

ROPES & GRAY LLP
ONE INTERNATIONAL PLACE    BOSTON, MA 02110-2624   617 951-7000   F 617 951-7050
BOSTON    NEW YORK    SAN FRANCISCO    WASHINGTON, DC

January 19, 2005

Darcy W. Shearer
(617) 951-7489
dshearer@ropesgray.com

## BY FACSIMILE

Joanne M. Cicala
Kirby McInerney & Squire LLP
830 Third Avenue
New York, NY 10022
Fax: 212-751-2540

Re: In re: Pharmaceutical Average Wholesale Price Litigation, MDL No. 1456 (County of
Suffolk v. Abbott Laboratories, Inc., et al.)

Dear Ms. Cicala:

I write in response to your letter of January 17, 2005 requesting access to documents produced in
the action entitled Texas v. Warrick Pharmaceuticals Corporation, et al., Civ. No. 00-2237 (the
"Texas Action").

As we discussed last fall when you first requested that we agree to allow you access to these
documents, it is our position that Judge Saris' Memorandum and Order dated October 26, 2004
stating that "all discovery shall be stayed with respect to . . . Warrick Pharmaceuticals" makes
any request for production of these documents contrary to Court order. The documents you seek
to review relate solely to drugs manufactured by Warrick Pharmaceuticals. Unless and until the
stay of discovery is lifted by the Court, Warrick will not consent to your review of these
documents.

As stated in CMO No. 9, Suffolk is not entitled to documents relating to drugs that are not
identified in the operative complaint filed by Suffolk or documents produced by a defendant that
are not otherwise relevant to the claims asserted against that defendant in the operative complaint
filed by such plaintiff. Contrary to the assertions in your letter, it is not within Suffolk's rights
under the CMO to demand production of documents produced by Schering in the Texas action
unless they relate to the claims asserted against Schering in your complaint. The documents you
seek to review are not related to your claims pending against Schering, but solely to those claims
brought against Warrick. The Court is currently considering a Motion to Dismiss all claims
against Warrick and has stayed discovery in the interim.

9632624_1.DOC

Joanne M. Cicala                    - 2 -                    January 19, 2005

In the event the Court denies the Motion to Dismiss and lifts the stay of discovery as to Warrick, and subject to and without waiving any objections Schering and/or Warrick may file in response to Suffolk County's Third Request, we will reconsider your request that we consent to Suffolk signing on to the Texas protective order.

Very truly yours,

Darcy W. Shearer

Darcy W. Shearer

cc:    John T. Montgomery
       Steven A. Kaufman
       Eric P. Christofferson