Page 1

```
 1      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2         IN THE UNITED STATES DISTRICT COURT
 3          FOR THE DISTRICT OF MASSACHUSETTS
 4      ----------------------------x
        In Re: PHARMACEUTICAL          )
 5      INDUSTRY AVERAGE WHOLESALE      )
        PRICE LITIGATION                )
 6      ----------------------------x
        THIS DOCUMENT RELATES TO        )
 7      ALL ACTIONS                     )
        ----------------------------x
 8                      August 18, 2004
 9                        9:36 a.m.
10
11          30(b)(6) Deposition of Johnson &
12      Johnson Health Care Services by its
13      representative, CHRISTOPHER MAFFIE, held
14      at the offices of Patterson, Belknap, Webb
15      & Tyler LLP, 1133 Avenue of the Americas,
16      New York, New York, pursuant to notice,
17      before Cary N. Bigelow, RPR, a Notary
18      Public of the State of New York.
19
20
21
22
```

Page 2

```
 1   A P P E A R A N C E S:

 2

 3       SPECTOR, ROSEMAN & KODROFF, P.C.

 4       Attorneys for Plaintiffs

 5            1818 Market Street, Suite 2500

 6            Philadelphia, Pennsylvania 19103

 7       BY:   JOHN A. MACORETTA, ESQ.

 8            JENNIFER ENCK, ESQ.

 9

10       PATTERSON, BELKNAP, WEBB & TYLER LLP

11       Attorneys for Johnson & Johnson;
         Centocor Inc.; Ortho Biotech Products, L.P.

12            1133 Avenue of the Americas

13            New York, New York 10036

14       BY:   ANDREW D. SCHAU, ESQ.

15            ESTELLA SCHOEN, ESQ.

16

17        (Appearing Telephonically)

18       HUGHES, HUBBARD & REED LLP

19       Attorneys for Merck

20            1775 I Street, N.W.

21            Washington, D.C. 20006-2401

22       BY:   ERIC S. PARNES, ESQ.
```

1    ------------------ I N D E X ------------------

2    WITNESS              EXAMINATION BY               PAGE

3    CHRISTOPHER MAFFIE  MR. MACORETTA                 11

4

5    ------------------ EXHIBITS ------------------

6     HCS                                              FOR ID.

7    Exhibit Maffie 001, deposition notice            32

8

9    Exhibit Maffie 002, three-page document          60

10                       headed "Purchases Made by Plaintiffs

11                       or Drugs Manufactured/Distributed by

12                       the Johnson & Johnson Group,"

13     .

14   Exhibit Maffie 003, documents bearing            47

15                       production Nos. MDL-OMP0006741

16                       through MDL-OMP0006746

17

18   Exhibit Maffie 004, document bearing             101
                         production No. MDL-OMP0000932,

19

20   Exhibit Maffie 005, document bearing             123

21                       production Nos. MDL-HCS0043522

22                       through MD-HCS00034523

Christopher Maffie                    Highly Confidential                    August 18, 2004
                                      New York, NY

Page 4

1    ------------------- EXHIBITS -------------------

2      HCS                                              FOR ID.

3

4    Exhibit Maffie 006, document bearing             140

5                        production No. MDL-HCS00032821

6

7    Exhibit Maffie 007, documents bearing            162

8                        production Nos. MDL-HCS00001900

9                        through MDL-HCS00001902

10

11   Exhibit Maffie 008, documents bearing            166

12                       production Nos. MDL-HCS00043591

13                       through MDL-HCS00043592

14

15   Exhibit Maffie 009, documents bearing            169

16                       production Nos. MDL-HCS00042797

17                       through MDL-HCS00042799

18

19   Exhibit Maffie 010, documents bearing            172

20                       production Nos. MDL-HCS00021027

21                       through MDL-HCS00021028

22

```
 1  ------------------- EXHIBITS -------------------

 2    HCS                                        FOR ID.

 3

 4  Exhibit Maffie 011, document bearing           199

 5                      production No. MDL-HCS00063558

 6

 7  Exhibit Maffie 012, documents bearing          203

 8                      production Nos. MDL-HCS00036263

 9                      through MDL-HCS00036264

10

11  Exhibit Maffie 013, documents bearing          224

12                      production Nos. MDL-HCS00036203

13                      through MDL-HCS00036210

14

15  Exhibit Maffie 014, documents bearing          230

16                      production Nos. MDL-HCS00063559

17                      through MDL-HCS00063562

18

19  Exhibit Maffie 015, document bearing           233

20                      production No. MDL-HCS00018350

21

22
```

Highly Confidential
                                New York, NY

Page 6

```
 1    ------------------- EXHIBITS -------------------

 2      HCS                                         FOR ID.

 3

 4    Exhibit Maffie 016, document bearing          242

 5                        production No. MDL-HCS00020627

 6

 7    Exhibit Maffie 017, documents bearing         245

 8                        production Nos. MDL-HCS00021797

 9                        through MDL-HCS00021798

10

11    Exhibit Maffie 018, two-page document         248

12                        headed "Rebate Summary"

13

14    Exhibit Maffie 019, documents bearing         250

15                        production Nos. MDL-HCS000442859

16                        through MDL-HCS000442863

17

18    Exhibit Maffie 020, documents bearing         252

19                        production Nos. MDL-HCS00019739

20                        through MDL-HCS00019746

21    Exhibit Maffie 021, two-page document         260

22                        headed "Executive Summary"
```

```
 1   ------------------- EXHIBITS -------------------

 2     HCS                                             FOR ID.

 3

 4   Exhibit Maffie 022, four-page executive             263

 5                       payment summary

 6

 7   Exhibit Maffie 023, five-page document              264

 8                       headed "Duragesic CAM Sales

 9

10   Exhibit Maffie 024, five-page document              265

11                       headed "OMP 3Q98"

12

13   Exhibit Maffie 025, 10-page portion of              267

14                       spreadsheet

15

16   Exhibit Maffie 026, 10-page portion of              267

17                       spreadsheet

18

19   Exhibit Maffie 027, 10-page portion of              268

20                       spreadsheet

21

22
```

Christopher Maffie                     Highly Confidential                     August 18, 2004
                                        New York, NY

Page 8

```
 1    ------------------- EXHIBITS -------------------

 2     HCS                                              FOR ID.

 3

 4    Exhibit Maffie 028, five-page document            269

 5                        headed "Innovatix-4 Q98 OMP Sales by

 6                        Member"

 7

 8    Exhibit Maffie 029, four-page document            271

 9                        headed "OBI-3Q98"

10

11    Exhibit Maffie 030, 10-page document              273

12                        headed "1991_April"


13    Exhibit Maffie 031, 11-page document              275

14                        headed "1992_CBHIST"

15

16    Exhibit Maffie 032, documents bearing             277

17                        production Nos. MDL-OBI00037018

18                        through MDL-OBI00037083

19

20    Exhibit Maffie 033, documents bearing             280

21                        production Nos. MDL-OBI00036969

22                        through MDL-OBI00036983
```

Page 9

1    ------------------ EXHIBITS ------------------

2      HCS                                          FOR ID.

3

4    Exhibit Maffie 034, documents bearing          285

5                        production Nos. MDL-OBI00036179

6                        through MDL-OBI00036202

7

8    Exhibit Maffie 035, documents bearing          294

9                        production Nos. MDL-OMP0005583

10                        through MDL-OMP0005599

11

12   Exhibit Maffie 036, document bearing           297

13                        production No. MDL-HCS00050812

14

15   Exhibit Maffie 037, documents bearing          298

16                        production Nos. MDL-HCS00038605

17                        through MDL-HCS00038607

18

19   Exhibit Maffie 038, documents bearing          301

20                        production Nos. MDL-HCS00004102

21                        through MDL-HCS00004105

22

Page 10

```
 1     ------------------- EXHIBITS -------------------

 2       HCS                                          FOR ID.

 3

 4     Exhibit Maffie 039, seven-page document           308

 5                         headed "PROCRIT (Epoetin alfa) vs

 6                         darbepoetin alfa: A Side-by-Side

 7                         Specialty Distribution Comparison"

 8

 9     Exhibit Maffie 040, documents bearing             311

10                         production Nos. MDL-HCS00003359

11                         through MDL-HCS00003361

12

13

14

15

16

17

18

19

20

21

22
```

Highly Confidential
                                   New York, NY

```
 1              IT IS HEREBY STIPULATED AND AGREED,

 2         by and between the attorneys for the

 3         respective parties herein, that filing and

 4         sealing be and the same are hereby waived.

 5              IT IS FURTHER STIPULATED AND AGREED

 6         that all objections, except as to the form

 7         of the question, shall be reserved to the

 8         time of the trial.

 9              IT IS FURTHER STIPULATED AND AGREED

10         that the within deposition may be sworn to

11         and signed before any officer authorized to

12         administer an oath, with the same force and

13         effect as if signed and sworn to before the

14         Court.

15    C H R I S T O P H E R   M A F F I E,   called as

16         a  witness, having been duly sworn by a

17         Notary Public, was examined and testified

18         as follows:

19    EXAMINATION BY

20    MR. MACORETTA:

21         Q.   Mr. Maffie, good morning.  We met a

22    minute ago.  I am John Macoretta here for the
```

 1      Q.    It doesn't matter how far you are

 2   below the national market share, you are going

 3   to get the same transition discount?

 4      A.    It is spelled out in the contract as

 5   the transition rebate is whatever it is, X

 6   percent, and it stays that way for a specific

 7   period of time and then it goes away after that.

 8      Q.    By the way, when we say X percent for

 9   a rebate, we are talking X percent of total

10   purchases by that customer?

11      A.    We typically refer to the percent off

12   of our list price, distributor list price.

13      Q.    What do you do, you take the total

14   units of sales and multiply it by your list

15   price to get to that or --

16      A.    Exactly.  We use the distributor list

17   price at the beginning of the quarter and we --

18   and whatever the discount is, if it is $100, 10

19   percent discount, the rebate is $10 on every

20   unit.

21      Q.    So you just take your discount and

22   multiply by however many units the PBM tells you

 1    here or reports it to you and then you do

 2    whatever analysis you do?

 3         A.    Yes.

 4         Q.    Performance tiers, could you explain

 5    to me what performance tiers are?

 6         A.    Those are -- I used the term tiers in

 7    my earlier answer.  Typically what we will have

 8    in contracts is, whether they are national

 9    market share based or not, there will be -- an

10    example will be if you were at national market

11    share, you get a certain rebate.  If you are

12    five points higher than national market share,

13    you may get a higher rebate.

14         Q.    So that would be next tier?

15         A.    Next tier, so as market share grows,

16    there are tiers built in at certain market share

17    thresholds that allow for higher rebates.

18         Q.    I take it where those tiers split is

19    something that is negotiated with the customer

20    as part of the contract price?

21         A.    Yes.

22         Q.    Is there some sort of standardized

```
 1    tier formula at Johnson & Johnson, HCS?

 2        A.    No.

 3        Q.    The lowest price is the next category

 4    there.

 5              Is there some discount related to

 6    lowest price which you may offer?

 7        A.    No.   That -- I don't know what's

 8    implied by that in looking at this document.

 9        Q.    Admin fee, slash, other fees, we

10    talked a little bit -- well, do you know what

11    that means, admin fees, slash, other fees?

12        A.    I can tell you how I have used the

13    term when I use admin fees, slash, other fees.

14              In the event that a fee does not

15    qualify under the safe harbor as an admin fee,

16    it would be included on that line, we call them

17    admin fees or other fees.

18        Q.    Explain what you mean by the safe

19    harbor.

20        A.    There is a GPO safe harbor regulation,

21    and I don't know the right statute number but --

22        Q.    You don't have to, that's not your
```

Highly Confidential
                                New York, NY

1    job.

2        A.    But that outlines the requirements for

3    or spells out the criteria for an admin fee that

4    would be acceptable, and we have guidance from

5    our law department on what we should follow

6    there.  So if something falls outside of those

7    guidelines, we will consider it a fee, but not

8    an administrative fee, so --

9        Q.    Let me -- sorry, finish your answer.

10       A.    That's okay, that was it.

11       Q.    Let me back up one level.

12             Why is it important as to whether or

13   not something qualifies as an admin fee or not?

14       A.    It has to do with how we report

15   pricing to the government.

16       Q.    Meaning that admin fees are not

17   reported as adjustments to price?

18       A.    Admin fees are not considered

19   discounts.

20       Q.    Or rebates, so that has a Medicaid

21   best price implication, right?

22       A.    Yes.

 1        Q.    Does it have implications for other

 2    kinds of government reporting?

 3        A.    It does.  We not only disclose best

 4    price, but we make disclosures for federal

 5    supply schedule contracts, so there are a few

 6    other -- any disclosure we make to the

 7    government, those administration fees are

 8    important to spell it out.

 9        Q.    Just so we are clear, if something is

10    considered an admin fee, it's not going to be

11    involved in the best price calculation, right?

12        A.    It is excluded.

13        Q.    What if something is an other fee?

14        A.    It's included as a discount.

15        Q.    Okay.  Can you give me an example of

16    what other fees would be that wouldn't be within

17    the safe harbor you just described?

18        A.    Well, in the example here in this

19    document, there is something that says, you

20    know, 4.2 percent range for PBMs only.  4.2

21    percent is above the safe harbor, it guides us

22    to 3 percent, so we would have to consider that

Highly Confidential
                                      New York, NY

 1    4.2 percent a discount, not an admin fee,

 2    because it is above 3 percent.

 3         Q.    Whatever the admin fees consist of, if

 4    they are more than 3 percent, they are not in

 5    the safe harbor?

 6         A.    Right.

 7         Q.    But whether or not an admin fee is

 8    within the safe harbor, it also depends on what

 9    the fee is for, right?

10         A.    Yes.

11         Q.    And I am asking you, other than the

12    fact that some fee is above 3 percent, what

13    would be an other fee?

14         A.    The other fee -- other discounts --

15    actually, there is a second line here, so there

16    is really nothing.  Basically, the fee didn't

17    meet the requirements of an admin fee.

18         Q.    What are the requirements of an admin

19    fee?  Let's do it that way.

20               I am asking you for your

21    understanding.  I understand there is a

22    regulation and --

```
 1         A.    My understanding -- the regulation

 2   guides you that the fee has to be paid to

 3   someone acting as a purchasing agent, is my

 4   understanding.  If they are not acting as an

 5   agent on behalf of the purchaser, then they are

 6   not eligible for an administration fee.

 7              The fee has to be limited to -- it

 8   should not be above 3 percent is another thing,

 9   and -- so that is my understanding from the

10   documents.

11              So those two parameters dictate

12   whether the fee is eligible or can be considered

13   an admin fee or not, and also there is another

14   requirement, as it relates to PBMs, if a PBM has

15   a mail order business and in the mail order

16   business they take possession of the product,

17   that since you take possession of the product,

18   the fee might -- it might have met -- it might

19   have met the first criteria of being less than 3

20   percent, but they were not acting as an agent in

21   that capacity, because they were now the

22   purchaser of the product, so we would need to
```

Highly Confidential
                                  New York, NY

1    separate out their mail order business from

2    their retail business and consider any fees paid

3    on the mail order business a discount.

4         That's another example of where, what

5    the other fee might be.

6         Q.    Is there a requirement that whoever is

7    getting the fee actually do something to earn

8    it?

9         MR. SCHAU:  Object to form.

10        A.    Can you repeat that or restate that

11   for me?

12        Q.    Sure.

13        For something to be an admin fee, it

14   has to go through an agent, has to be less than

15   3 percent.  Does that fee have to represent a

16   specific service or function provided by whoever

17   is getting it?

18        A.    Typically we do look at what's being

19   provided as a barometer to determine how much an

20   administration fee we will pay, so data, the

21   information is one thing that we look at when we

22   look at how much of the fee we would be willing

```
 1    to pay.

 2         Q.    That's something that you look at, but

 3    is there some requirement within a safe harbor

 4    or something else that says we have to -- you

 5    have to do something to get the fee?

 6         A.    No.

 7         Q.    Are there internal policies at HCS

 8    dictating what can and can't be an

 9    administrative fee or relating to administrative

10    fees generally?

11              MR. SCHAU:   You mean outside of the

12         government guidance?

13         Q.    Yes.

14         A.    Can you rephrase the question?

15         Q.    Do you have internal HCS policies

16    regarding admin fees?

17         A.    Yes, we do.

18         Q.    What do those policies relate to

19    specifically?  I am sure they say somewhere to

20    follow the government guidance, right?

21         A.    Yes.

22         Q.    Other than that, are there other
```

```
 1    policies?

 2        A.    The document that I am thinking of is

 3    the administrative fee position statement that

 4    basically outlines the requirements of the safe

 5    harbor regulation and spells out for us what is

 6    considered an acceptable basis for considering a

 7    fee, an administration fee, or also in providing

 8    guidance on what to do if it doesn't meet the

 9    criteria, so that's about a page and a half

10    document.

11        Q.    What's that called?

12        A.    That's called the managed markets or

13    managed care council position statement on

14    administration fees.

15        Q.    So that is something created by the

16    managed care council?

17        A.    Yes.

18        Q.    Before you sign a contract with an

19    administrative fee in it, does somebody have to

20    review that, that element of the contract, to

21    decide whether the administration fees are

22    appropriate?
```

Highly Confidential
New York, NY

1        A.    Yes.

2        Q.    Who is that?

3        A.    We work with -- we have attorneys at

4    Health Care Systems that are contract attorneys,

5    so the contract attorneys review all of the

6    contracts that we develop and if needed, they

7    obtain additional -- they take care of providing

8    the legal due diligence, so we kind of hand that

9    to them and let them complete their analysis.

10       Q.    Is there something called health care

11   compliance as well?

12       A.    Yes.

13       Q.    What is that?  Is that a group or a

14   unit within J&J?

15       A.    Are you asking me about -- are you

16   asking me about is there a health care

17   compliance team?

18       Q.    Yes.

19       A.    Because health care compliance is so

20   big that it is very broad and --

21       Q.    Is there some team, a group of people

22   that is called health care compliance?

Page 116

```
 1        A.    At Health Care Systems there is a --
 2    what is the title?  The title is escaping me.
 3              There is a compliance team at Health
 4    Care Systems, so my answer is yes.
 5        Q.    Are they involved in generally
 6    reviewing administrative fees?
 7        A.    The compliance team generally does
 8    not.  The legal, the contract attorney will
 9    review that information.
10        Q.    I am trying to understand, as to
11    administrative fees, what type of services does
12    HCS pay administrative fees for?
13        A.    It's going to vary -- can you be more
14    specific?  Are you talking about PBMs or --
15        Q.    Who else do you pay admin fees to
16    other than PBMs?
17        A.    We would pay admin fees to GPOs,
18    whether they service hospitals, long-term care
19    facilities, and to PBMs, those are the primary
20    categories.
21        Q.    Let's limit that to PBMs, then.
22              What type of services do you get for
```

Highly Confidential
New York, NY

1    those admin fees?

2         A.    Typically, they are providing, you

3    know, as an intermediary, as an agent on behalf

4    of all their members, they are managing the

5    formulary for those members, so the access to

6    that membership into that overall formulary, and

7    the work they do to consolidate that and allow

8    us to sort of plug into their membership is one

9    thing that we get by contracting with them, so

10   the administration fee is in support of all the

11   work they do to build and support that

12   infrastructure, right, and provide us access to

13   their members.

14        Q.    To build and manage the formulary?

15        A.    All of the formulary work they do,

16   exactly.

17             Other things they can do is provide

18   data and information about their membership.

19        Q.    Anything else that you are paying

20   administrative fees for?

21        A.    Those are primarily -- the primary

22   points of interest is access to membership.

Page 118

```
 1        Q.    Is it the case that sometimes they

 2   also provide you data on prescriptions and

 3   members as well?

 4        A.    Yes.  And it varies, but yeah, they do

 5   provide reporting and information.  Some do,

 6   some don't.

 7        Q.    Is that something you pay extra for

 8   usually?

 9        A.    Well, it's one of the factors in

10   considering what we would be willing to pay as

11   far as an administration fee, how much we'd pay.

12        Q.    Internally at HCS, is there some

13   method for evaluating what that data is worth?

14        A.    We don't have a structured protocol.

15        Q.    Are there some guidelines you use for

16   that or --

17        A.    We don't have written guidelines.

18        Q.    Are there general guidelines?

19              I presume they say, well, we want 2

20   percent access to formulary rebate but we will

21   take -- if you give us a 3 percent rebate, we

22   will provide you data or something like that?
```

```
 1              Is that the discussion?

 2              MR. SCHAU:  Object to form.

 3      Q.    You can answer that, if you understand

 4    it.

 5      A.    Why don't you restate that, then?

 6      Q.    Sure.

 7              At some point do you consider paying

 8    an additional administrative fee if you are

 9    going to receive some data?

10      A.    I would say -- my response is we would

11    evaluate what we're getting from the PBMs or

12    what they are sort of -- what services they are

13    providing.  If it's just general formulary

14    management, really nothing else in the data,

15    obviously, we are going to be looking to keep

16    that -- we are not going to be willing to pay as

17    much as if we were getting data and information,

18    so it's sort of a -- it's -- that's the concept

19    that we assess and there's other factors that

20    come into play about, you know, there are

21    minimums that they are willing to accept as part

22    of the negotiation, but we try to keep a fair
```

Page 180

```
 1              (Record read.)

 2        A.     Not that I recall.  What I recall is

 3   requiring in our, where we do address that issue

 4   in our new contract, new contract templates,

 5   putting in some requirements around reporting to

 6   their -- to the client plans how much in total

 7   payments they have received from Johnson &

 8   Johnson, both in administrative fees and

 9   rebates.

10              So we ask them, require in our

11   contracts to do that disclosure.

12        Q.     So they are required to disclose how

13   much money they are getting from Johnson &

14   Johnson, they are not required to give any of

15   that money to their customers, at least under

16   your agreement with them?

17        A.     You know, I would have to double-check

18   the contract, if it is a requirement of the

19   agreement or not to pass on all of the rebates

20   or whether we don't address the issue.  I would

21   have to double-check it.

22        Q.     We have some contracts we are going to
```

1    look at in a little while.

2         You said new contract templates?

3    A.    Mm-hmm.

4    Q.    JJHCS has recently created new

5    contracting templates?

6    A.    We recently created a new contracting

7    template.

8    Q.    What is recently?

9    A.    This year, 2004.

10   Q.    Has that been enacted in any

11   contracts?

12   A.    Yes.

13   Q.    Presumably the new contract that we

14   just looked at, Advance.

15   A.    You are referring to which Advance

16   contract?

17   Q.    What contracts have the new template

18   been used in?

19   A.    The contracts we have been entering

20   into over the last couple of months.

21   Q.    Who would that be, do you recall?

22   A.    Offhand --

1            THE WITNESS:  I have a question.

2            Is that relevant to the time period we

3        are discussing, 2000 and before?

4            MR. SCHAU:  He is entitled to that.

5        A.    Any new contracts we have written

6    recently.  I know we have had a proposal with

7    Advance Caremark and the terms of the proposed

8    agreement, even though it is not signed, are

9    based on the new agreements, based on the new

10   terms, but basically everything since probably

11   the April-May time frame we have been using the

12   new template.

13           We can get you that information, but I

14   don't recall off the top of my head.

15       Q.    This requirement that the PBM disclose

16   all monies it receives from Johnson & Johnson,

17   is that a fair way to characterize that in the

18   new template?

19       A.    Repeat that again?

20       Q.    In the new template there is a

21   requirement that the PBM disclose all monies it

22   receives from Johnson & Johnson to its members;

```
 1    is that correct?

 2         A.    Yes, we require them to disclose all

 3    the money they receive.

 4         Q.    This disclosure requirement, was that

 5    something which was added in the new template?

 6         A.    Yes.

 7         Q.    Why did you feel the need to add that?

 8         A.    To add clarity around expectations and

 9    obligations on what we expect the PBM to be

10    doing.

11         Q.    The new contract template, was that

12    something which was discussed at the managed

13    care council?

14         A.    Yes.

15         Q.    So are there documents talking about

16    these are the new provisions, this is why we

17    should implement them, this is the good or bad

18    of them, any discussion about that?

19         A.    Yes.

20         Q.    Other than the disclosure requirement

21    we were just talking about, what else is new in

22    the new contract templates?
```

```
 1          A.      I am thinking how to break it down.

 2                  Our contracts are broken down into

 3      sections.  They include definitions, product and

 4      exhibits, I will call it general terms and

 5      conditions as well as payment terms and

 6      conditions, and we basically modernized it to

 7      reflect the current thinking from the law

 8      department of what a template should look like

 9      and got input from business folks as well to

10      address certain things that may not have been

11      addressed and to add clarity and consistency to

12      what we were doing, so basically an improvement

13      over the old template.

14                  We added definitions, we added some

15      terms clarifying payment and rebates, we added

16      some of those disclosure requests that I

17      mentioned earlier around the PBM to disclose all

18      of the funds received from the manufacturer to

19      their client plans and sharing that information,

20      and some, I will call it general legal

21      provisions of the contract.

22          Q.      Let me jump back to rebates payments
```

Highly Confidential
New York, NY

```
 1    for a moment.

 2            Under your contracts, does Johnson &

 3    Johnson have the right to conduct any type of

 4    audit of the PBM relating to how much the PBM is

 5    submitting for a rebate claim?

 6        A.    Yes.

 7        Q.    Have you ever done that?

 8        A.    Yes.

 9        Q.    Have you done it since you have been

10    there at least once for each of the largest

11    three PBMs?

12        A.    We have.

13        Q.    Speaking generally, I want to talk a

14    little more generally now about how drugs -- how

15    you decide what drugs are to be contracted and

16    what the terms are.

17            This morning you told me the decision

18    as to whether the drug is going to be contracted

19    or not rests pretty much solely with the

20    operating company, right?

21        A.    Yes.  The determination of whether or

22    not the contract for a product with health plans
```

Page 186

```
 1    and PBMs is the operating company decision, and

 2    I distinguish that -- I say that sort of the way

 3    that that's the strategy.

 4            The strategy is do I want or not want

 5    a contract for this brand within health plans

 6    and PBMs, which can be separate from an

 7    individual instance of a particular contracting

 8    opportunity, there may or may not be an option

 9    in the contract for.

10    Q.    So even if the strategy isn't in the

11    contract, some opportunity may come up or --

12    A.    No, you are --

13    Q.    Maybe I am not understanding the

14    distinction.

15    A.    I am just clarifying that there is a

16    strategy component to what happens early or

17    upstream where the operating companies determine

18    whether or not they want a contract for this

19    product within a particular customer segment.

20    Q.    When we say contract, we are talking

21    mostly, at least with PBMs, to the offering

22    rebates; is that right?
```

1       A.      Yes.

2       Q.      Then is it the operating company that

3    decides what type of rebates or how much of a

4    rebate it wants to offer?

5       A.      Yes.

6       Q.      Is HCS involved in that process?

7       A.      We are involved in that process.

8       Q.      Are there any kind of general

9    guidelines or policies as to the levels of

10   rebates or the amounts of rebates that should be

11   offered?

12      A.      In some cases yes, in some cases no.

13   That depends on the operating company.  Some

14   operating companies have them, some don't.

15      Q.      So there is no HCS guideline or

16   policy?

17      A.      No.

18      Q.      The broad question, how do you decide

19   how much of a rebate to offer, the answer is

20   that that is up to the operating company?

21      A.      Yes.

22      Q.      And how the operating company does it,

Christopher Maffie                    Highly Confidential                    August 18, 2004
                                     New York, NY

Page 188

1    that varies from operating company to operating

2    company?

3         A.    Yes.

4         Q.    Typically, how often is that rebate

5    amount revisited, meaning is it once a year you

6    decide we should change the amount of rebates

7    offered, is it once every three years, does it

8    vary from drug to drug or --

9         A.    It varies based on the situation and

10   from product to product.

11        Q.    Is it fair to say that pretty much all

12   of the rebates are based on some national market

13   share calculation?

14        A.    No.

15        Q.    For PBMs.

16        A.    For PBMs, no.  It varies product by

17   product.

18        Q.    Are they all based on some market

19   share calculation?

20        A.    No.  It varies.

21        Q.    What else would they be based on?

22        A.    Some of those -- as I believe we

Page 189

```
 1    discussed earlier, some of the contracts may

 2    have just a formulary rebate with no market

 3    share requirements built in, and that's a

 4    combination of maybe the product strategy to

 5    contract that way, or the dynamic at a

 6    particular account leads us down the path of

 7    that's the way we structure the offer.  But in

 8    many cases there are market share and market

 9    share requirements and in most cases they are

10    national market share based when there are

11    market share requirements.

12         Q.    Do you have any drugs you contract for

13    that have generic competition?

14         A.    Yes.

15         Q.    Is that the exception rather than the

16    rule or --

17              MR. MACORETTA:  Let me strike that.

18         Q.    Is there some policy regarding whether

19    or not you are going to contract for drugs that

20    have generic competitors or not?

21         A.    No.

22         Q.    Just like the decision as to what
```

Page 190

```
 1    drugs we are going to offer for contract, it is

 2    up to the operating company, I presume it is

 3    their decision as whether they are not going to

 4    contract for it anymore?

 5         A.    Yes.

 6         Q.    Generally, what percentage of total

 7    rebates on a drug are given to PBM customers as

 8    opposed to some other customers?

 9         A.    I don't know -- maybe you could

10    restate the question or -- I am not sure what

11    you are asking me.

12         Q.    As a general matter, what percentage

13    of rebates paid by Johnson & Johnson go to PBMs

14    as opposed to something else?  Is it 50 percent

15    of the rebate dollars?

16              I understand you are not going to give

17    me an exact percentage.

18         A.    First of all, the way I will respond

19    is this:  It varies based on drug to drug, it

20    varies based on where I have contracts.

21              Case in point, if there is -- if the

22    world consisted of three PBMs and three health
```