1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF MASSACHUSETTS

3

4       -----------------------------)       **CERTIFIED COPY**

        In Re: PHARMACEUTICAL        )

5                                    )

        INDUSTRY AVERAGE WHOLESALE   ) MDL No. 1456

6                                    )

        PRICE LITIGATION             ) CIVIL ACTION NO.

7                                    )  01-CV-12257-PBS

                                     )

8       -----------------------------)

9       HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

10

11          DEPOSITION OF WILLIAM C. PEARSON

12              New York, New York

13          Friday, January 7, 2005

14

15          Deposition of WILLIAM C. PEARSON,

16      held at the offices of Patterson, Belknap,

17      Webb & Tyler LLP, 1133 Avenue of the

18      Americas, New York, New York, pursuant to

19      Notice, before Frank J. Bas, a Registered

20      Professional Reporter and Notary Public of

21      the State of New York.

22

```
                                                          2
 1   A P P E A R A N C E S:

 2

         HOFFMAN & EDELSON, LLC
 3       Attorneys for Plaintiffs
 4            45 West Court Street
 5            Doylestown, Pennsylvania 18901
 6       BY:  ALLAN M. HOFFMAN, ESQ.
 7

         (Appearing Telephonically)
 8       HOGAN & HARTSON LLP
 9       Attorneys for Amgen, Inc.
10            1111 South Calvert Street
11            Suite 1600
12            Baltimore, Maryland 21202
         BY:  STEVEN BARLEY, ESQ.
13            JOSEPH H. YOUNG, ESQ.
14

15       PATTERSON, BELKNAP, WEBB & TYLER LLP
16       Attorneys for Johnson & Johnson;
17       Centocor Inc.; Ortho Biotech Products, L.P.
18            1133 Avenue of the Americas
19            New York, New York 10036
20       BY:  ANDREW SCHAU, ESQ.
21            ADEEL A. MANGI, ESQ.
22
```

William C. Pearson          Highly Confidential          January 7, 2005
                              New York, NY

```
                                                                3
  1

  2                           I N D E X

  3   Witness: WILLIAM C. PEARSON                           Page

  4          (By Mr. Hoffman)                                 6

  5          (By Mr. Schau)                                  314

  6

  7   DIRECTIONS:   Page 290, 295

  8   RULINGS:   (None)

  9   MOTIONS:   (None)

 10

 11                          REQUESTS

 12   Copy of response e-mail to Mr. Reedy..........191

 13   What the range of Medicare sales of

 14   Procrit were during period 1993-2001..........254

 15   Any documents that tell what years

 16   Epogen was the basis of the AWP

 17   Reimbursement for Procrit....................277

 18   Copy of subpoena relating to a claim

 19   By the government that Ortho Biotech

 20   Has abused the AWP system....................292

 21

 22
```

William C. Pearson     Highly Confidential     January 7, 2005
New York, NY

4

```
 1                    E X H I B I T S

 2

 3    Exhibit Pearson 001  Notice of Deposition.........8

 4

 5    Exhibit Pearson 002  document Bates-numbered

 6                         MDL-OBI 00006641 through 6698,

 7                         entitled Shaping the Reimbursement

 8                         Environment For Procrit..........164

 9

10    Exhibit Pearson 003  document Bates-numbered MDL-OBI

11                         00056042 through 45 headed Pricing

12                         and Reimbursement Opportunities...165

13

14    Exhibit Pearson 004  document Bates-numbered MDL-OBI

15                         00007628 through 54..............188

16

17    Exhibit Pearson 005  document Bates-numbered

18                         MDL-OBI00015367...................195

19

20    Exhibit Pearson 006  document, ASP analysis...........195

21

22
```

William C. Pearson               Highly Confidential               January 7, 2005
                                   New York, NY

5

```
 1                      E X H I B I T S

 2

 3   Exhibit Pearson 007   document Bates-numbered

                           MDL-OBI00007575, AWP update

 4                         December 17, 2001.................249

 5

 6   Exhibit Pearson 008   e-mail string, Bates-numbered

                           MDL-JJ00015702 through 703........254

 7

 8   Exhibit Pearson 009   document Bates-numbered MDL-OBI00055456

 9                         through 55476, spreadsheet.......260


10   Exhibit Pearson 010   titled Changing the Game,

11                         Johnson & Johnson PBM Strategy Core Team

12                         Kick-off Meeting, June 5, 2001....278

13

14   Exhibit Pearson 011   document Bates-numbered

15                         MDL-OBI00053884...................287

16

17   Exhibit Pearson 012   document Bates-numbered

18                         MDL-OBI00014349 through 50........296

19

20   Exhibit Pearson 013   for identification,

21                         e-mail chain.....................312

22
```

William C. Pearson          Highly Confidential          January 7, 2005
                              New York, NY

6

1    (Time noted: 9:51 a.m.)

2    W I L L I A M   C.   P E A R S O N, stating his

3    business address as Ortho Biotech Products, L.P.,

4    430 Route 22 East, Bridgewater, New Jersey,

5    having been duly sworn by the Notary Public

6    (Frank J. Bas), was examined and testified as

7    follows:

8    EXAMINATION BY

9    MR. HOFFMAN:

10        Q.    Good morning, Mr. Pearson.  My name

11   is Allan Hoffman and I'm an attorney for the

12   plaintiffs in this case.  Have you ever been

13   deposed before?

14        A.    Yes.

15        Q.    And in what -- what was the nature of

16   the litigation in which you were -- how many

17   times have you been deposed before?

18        A.    Once.

19        Q.    And what was the nature of that

20   litigation?

21        A.    It was in regards to the litigation

22   with Amgen.

William C. Pearson          Highly Confidential          January 7, 2005
                              New York, NY

7

```
1         Q.    With Amgen?

2         A.    Yes.

3         Q.    Over the license agreement?

4         A.    Yes.

5         Q.    Since you've been deposed before,

6    I'll just go over some ground rules, some

7    instructions to bear in mind during this

8    deposition so that we have as clear a record as

9    possible and we don't talk over each other.

10              First off, because we have a court

11   reporter who is taking down your testimony, you

12   have to give oral responses, no shrugs or nodding

13   of the head.  Do you understand that?

14        A.    Yes.

15        Q.    Also, you're here under oath, and you

16   understand that you're susceptible to all the

17   penalties of perjury should you lie under oath.

18   Do you understand that?

19        A.    Yes.

20        Q.    If you don't hear a question, please

21   tell me and I'll repeat it.  Is that okay?

22        A.    Yes.
```

8

```
 1          Q.    If you don't understand a question,
 2    please tell me and I'll rephrase it.  Do you
 3    understand that?
 4          A.    Yes.
 5          Q.    If at any time you feel you want to
 6    take a break, just let me know, we'll stop and
 7    you can get up and do whatever you need to do.
 8    Is that okay?
 9          A.    Yes.
10          Q.    Otherwise I'll assume that you've
11    heard and understood all of my questions and that
12    you've answered them truthfully.  Okay?
13          A.    Yes.
14                MR. HOFFMAN:  Frank, let's mark this
15    as Exhibit Pearson 001.
16                (Exhibit Pearson 001, for
17    identification, Notice of Deposition.)
18          Q.    Mr. Pearson, I've put before you what
19    the court reporter has marked as Exhibit
20    Pearson 001, and it's entitled Notice of
21    Deposition.  Do you understand that?
22          A.    Yes.
```

224

1     direction from Amgen to do that.

2          Q.    Did you ever follow up on those

3     anecdotal reports?

4          A.    What do you mean follow up?

5          Q.    I mean did you ever follow up to find

6     out whether or not they were true?

7          A.    Well, you know, I asked the people

8     within our sales force if they were true -- and

9     of course, you know, again anecdotal reports --

10    that if they were true.

11         Q.    Right.  If you were getting reports

12    from doctors that it was being promoted that way,

13    did the doctors offer to give you any documents

14    which showed that?

15              MR. SCHAU:  Objection, foundation.

16         A.    They didn't offer any documents to

17    me, no.

18         Q.    Did anyone from OBI ask for documents

19    which showed that?

20              MR. SCHAU:  Objection, foundation.

21         A.    Did they ask?  I don't know that.

22         Q.    So as far as you know, the only thing

225

1    that was done was people at OBI asked its sales

2    force to confirm whether or not that was

3    happening out in the field?

4         A.    We heard reports from physicians that

5    it was happening out in the field. We didn't ask

6    our sales force to go out and ask those

7    questions, but we had those comments coming back

8    in.

9         Q.    Did anybody go out to those

10   physicians and interview them and find out in

11   more detail what was going on?

12        A.    Our representatives certainly talked

13   with those physicians, but we didn't send out

14   people to interview those physicians.

15        Q.    Did the knowledge that was coming

16   back from the sales force, was that -- were memos

17   drafted, were any reports drafted to provide

18   information back to management at OBI what was

19   going on?

20        A.    Reports drafted?

21        Q.    Yes.

22        A.    Again, we had reporting of the

226

1    anecdotal reports, that that information came

2    back in.

3         Q.    It seems like this would have been a

4    serious issue to OBI, if Aranesp was out there,

5    if Amgen is out there pushing Aranesp based on

6    its reimbursement level?

7         A.    Well, we were concerned about

8    changing the overall reimbursement methodology.

9    You know, we did not want to get into a

10   situation, talking about what we thought Amgen

11   was doing.  We wanted to meet with the government

12   to change the reimbursement methodology.

13             We felt like it needed to be moved

14   away from an AWP-based reimbursement methodology.

15   The federal government, CMS, wanted to move away

16   from an AWP-based reimbursement methodology.  We

17   were all on the same page of wanting to change

18   the system.

19        Q.    In what contexts were the discussions

20   that one of OBI's options was to raise the AWP?

21        A.    What context?

22        Q.    Was it a -- what committee was

William C. Pearson  Highly Confidential  January 7, 2005
New York, NY

227

1   meeting on the issue?

2        A.    I really don't know.  It could have

3   been anyone.  You know, it could have been

4   someone throwing an idea out that says okay, we

5   can raise AWP.  A lot of ideas were put out on

6   the table during meetings.  It doesn't mean that

7   they're valid ideas.  It doesn't mean that those

8   ideas were acted upon.  But you asked if those

9   ideas were ever raised?  Yes, those ideas were

10  raised but they were never acted upon.

11       Q.    Were any analysis made on those ideas

12  or debating of those ideas?

13       A.    Yes, could have been.  I just don't

14  recall specifically.  But you know, we looked at

15  that action.  We didn't act on it.

16       Q.    Other than, I think, economic

17  message, did OBI believe that Aranesp had other

18  advantages over Procrit?

19            MR. SCHAU:  Objection to form.

20       A.    I personally never believed that

21  Aranesp had an advantage over Procrit.  I always

22  thought that Procrit was the best product.

William C. Pearson     Highly Confidential     January 7, 2005
                        New York, NY

228

1    Aranesp was promoted based on the convenience of

2    the product with every other week dosing, but I

3    never felt like it was a better product.  I

4    always felt clinically that Procrit was the best

5    product.

6         Q.    You've never seen any documents that

7    Amgen's sales reps gave to physicians promoting

8    or comparing the amount of profit one could get

9    from Aranesp versus Procrit?

10        A.    I could have seen documents.  I would

11   hesitate to say I've never seen documents, but

12   I've never seen any corporate directives or

13   documents that have been given out by Amgen.

14        Q.    What kind of documents did you see?

15        A.    You know, documents that showed the

16   economic incentive on Aranesp.

17        Q.    Did it look like it was created, you

18   know, by a marketing department?

19        A.    No, it did not.

20        Q.    It looked like it was just an -- an

21   individual had done it?

22        A.    Yes, it did.

William C. Pearson          Highly Confidential          January 7, 2005
                              New York, NY

232

1    these discounts and rebates, you were actually

2    getting a better economic deal than you are from

3    Aranesp?

4         A.    It depended on the situation.  Most

5    of the time, as you can witness by looking at the

6    market share in the oncology clinics, in the

7    oncology clinics we lost substantial market

8    share.  And the reason we lost substantial market

9    share was because a contractual offering from

10   Amgen on Aranesp, and Neupogen and Neulasta, was

11   a better offering than on Procrit.

12        Q.    And what were the reasons why you

13   couldn't come up with a better offer than Amgen

14   had?

15        A.    I'm sorry?  Why we could not?

16        Q.    Yes.

17        A.    Again, the total value of Procrit to

18   that practice was not as large as the total value

19   of Aranesp, Neupogen and Neulasta.

20        Q.    Could that have been countered by

21   giving larger rebates or discounts?

22        A.    You could never win.  If you bought

William C. Pearson          Highly Confidential          January 7, 2005
                                New York, NY

233

1    $100,000 of Procrit, and if you bought $200,000

2    of Aranesp, Neupogen and Neulasta, if we gave a

3    5 percent discount and they gave a 5 percent

4    discount, the total value on 200,000 is greater

5    than 5 percent on 100,000.

6              If we went to 6 percent, they went to

7    6 percent.  Again, the total bundle was larger.

8              You could never win it.

9         Q.   So as a result of not being able to

10   win it, OBI changed its marketing strategy to

11   emphasize what?

12             MR. SCHAU:  Objection, foundation.

13        Q.   You said that there was a clinical

14   message.  I understand that.

15        A.   Right.  Clinical was very important.

16   Let me go back and touch on that.  We continued

17   to stress the need to sell the product first.  We

18   believed that the patient was important.  We

19   believed that the clinical benefit was important.

20   So we stressed that first.

21             We wanted to move away from, as much

22   as possible, from a contractual message.  But

William C. Pearson          Highly Confidential          January 7, 2005
                              New York, NY

234

1    having said that, we knew that we had to contract

2    with these clinics.  We conducted other clinical

3    trials comparing Procrit to Aranesp.  Some of

4    that data was recently launched in 2004 showing

5    the clinical benefits that Procrit would have

6    over Aranesp.

7              I mean if you're an oncology patient

8    and you're on chemotherapy, you want to receive

9    the best drug.  We thought that Procrit was the

10   best drug for the patient, so we continued to

11   stress that throughout the clinic.  With the

12   physicians, and with the nurses.  We felt like it

13   was the best product.

14             Stay with me for a second, okay?  I

15   heard your question.

16             We continued to contract.  Okay?

17   Even though we couldn't win, we continued to try

18   to discount, to get as close as possible to meet

19   the competition.  But we couldn't -- we could not

20   win a discounting war.  We continued to meet with

21   CMS, in terms of reimbursement, to try to get the

22   reimbursement methodology changed.

William C. Pearson        Highly Confidential        January 7, 2005
New York, NY

235

1                    Reimbursement methodology, meeting

2      with CMS, was the primary focus.  We felt like an

3      AWP -- AWP-based reimbursement methodology was

4      faulty.  We felt like the government could save

5      money by changing the methodology.

6                    CMS agreed with us.  They were trying

7      to work through and resolve all those issues.

8      They're still trying to do it today.

9                    In fact, in meeting with CMS, they

10     moved to what they call equitable payment.  And

11     I'm sure you've read that in these documents, and

12     in functional equivalents.  As we looked at

13     converting so many units of Procrit to so many

14     micrograms of Aranesp, they tried to look at the

15     clinical data to establish what an appropriate

16     conversion factor would be to offer equitable

17     payment.  In fact, they established and

18     implemented functional equivalence or equitable

19     payment in the hospital marketplace, to ensure

20     that Aranesp did not have a reimbursement

21     advantage.

22                    In fact, there was a lot of

236

1    discussion about doing that in the Medicare

2    carrier Part B side.  One Medicare carrier moved

3    to that.  Dr. Stone out in Utah implemented the

4    least costly alternative.  And that's what we

5    wanted to see them do across the system.

6              In fact, that was soon rescinded and

7    Dr. Stone is no longer in that position.  But we

8    were encouraging CMS to move in that.

9              So strategically our focus was to

10   work with CMS, to work with the government, to

11   have equitable payment across all payor types.

12   We did not want an economic advantage anywhere in

13   the marketplace.

14        Q.   Explain to me why OBI began to

15   emphasize the lower cost of the product, and how

16   they did it.

17        A.   Well, as I mentioned before, we could

18   not win a discounting war.  Okay?  We did not

19   want to compete based on price.

20              When Aranesp was introduced in

21   Europe, the reimbursement system there

22   established a conversion ratio of 200 to 1, that

237

1    200 units of Procrit would equal 1 microgram of

2    Aranesp.  The pricing in Europe was different

3    than the pricing in the U.S. for Aranesp.

4              And so we were recommending that CMS

5    consider the same conversion ratio.

6              In fact, the promotional materials

7    for Aranesp in Europe were at a ratio of 200 to

8    1.  We showed those materials to CMS.  We tried

9    to demonstrate exactly how many units you needed

10   to get a response in hemoglobin in, and what

11   would be a similar response with Aranesp in

12   establishing a conversion ratio.

13             CMS reviewed the documents that Amgen

14   had submitted to the FDA.  In fact, some of the

15   original nephrology documents by the FDA reviewer

16   said the conversion ratio was 260 to 1, very

17   close to the conversion ratio established in

18   Europe at 200 to 1.

19             In fact, when equitable payment was

20   introduced in the hospital and marketplace, that

21   is the ratio that CMS used.

22             We also used the approved dosing in

238
1    the Aranesp package insert to look at how many

2    units were necessary for one week, get a response

3    according to label, and compare it label to

4    label, and label to the most commonly used dose

5    to establish conversion ratio.

6             Again, we were asking for a

7    conversion ratio of 200 to 1.  They had initially

8    established a conversion ratio of 260 to 1.

9             We had met with them year after year

10   to discuss this.  In fact, the second year they

11   changed the conversion ratio from 260 to 1 to 330

12   to 1, and in this last year they kept it at 330

13   to 1.

14        Q.    What did the dosage -- how did that

15   factor into this, the dosage sizes?

16        A.    How did it factor into it?  Frequency

17   of dosing or the dosing?

18        Q.    The frequency of dosing.

19        A.    Well, their original package insert

20   was 2.25 micrograms per kilogram, and if you took

21   the average weight of an oncology patient, and

22   multiplied it by 2.25 micrograms, it came to

313

```
 1    don't mind.

 2          Q.    Okay, sure.

 3                (Witness reviews document.)

 4          A.    Okay.

 5          Q.    And again, it says here Ms. Piech is

 6    the executive director of health economics and

 7    pricing for PGSM.

 8          A.    Yes.

 9          Q.    We talked about Ms. Piech earlier.

10    In this document at the top she says, in the

11    second line in parenthesis, "I'm not sure how a

12    survey of wholesalers could produce a higher

13    spread, since branded companies typically set and

14    publish, provide their WACs and AWPs."  Do you

15    see that?

16          A.    Yes, I do.

17          Q.    And that's consistent with your

18    earlier testimony, isn't that true?

19          A.    That's correct.

20          Q.    How often did you interact with

21    Ms. Piech?

22          A.    At that point in time not very
```

William C. Pearson      Highly Confidential      January 7, 2005
                    New York, NY

314

1   frequently.

2       Q.    Since then do you do it more

3   frequently?

4       A.    Yes.

5       Q.    Why is that?

6       A.    Because she moved from PGSM to

7   Ortho Biotech.

8       Q.    What is her position at

9   Ortho Biotech?

10      A.    As I had testified earlier, she's in

11  clinical outcomes.

12            MR. HOFFMAN:  Okay.  I have no

13  further questions.

14  EXAMINATION BY

15  MR. SCHAU:

16      Q.    Mr. Pearson, in honor of your

17  forthcoming retirement, I'll ask you very few

18  questions.

19            Procrit was launched in 1991; is that

20  right?

21      A.    That's correct.

22      Q.    From the time that Procrit was

315

1    launched through to date, has OBI ever had a

2    policy of allowing its sales representatives to

3    promote Procrit based on profit potential or

4    margin?

5          A.    No.

6          Q.    Is the same true for Sporanox,

7    Duragesic and Leustatin?

8          A.    Yes.

9          Q.    From the time that OBI first

10   developed a policy regarding reimbursement and

11   the discussion of reimbursement, has that policy

12   always been that Ortho Biotech's sales

13   representatives were prohibited from promoting

14   Procrit based on profit potential or margin?

15               MR. HOFFMAN: Objection.

16         A.    Yes.

17         Q.    Is that also true of Sporanox,

18   Duragesic and Leustatin?

19         A.    Yes.

20         Q.    Why are physicians interested in

21   reimbursement?

22         A.    Because physicians want to ensure

William C. Pearson          Highly Confidential          January 7, 2005
                            New York, NY

316

1    that they don't lose money when they utilize a

2    product.

3              MR. SCHAU:  That's all I have.  Thank

4    you.

5              MR. HOFFMAN:  No further questions.

6              (Whereupon, at 4:33 p.m., the

7    deposition was concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22