Page 1

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
3
4      ----------------------------x
       In Re: PHARMACEUTICAL              )
5      INDUSTRY AVERAGE WHOLESALE   ) MDL No. 1456
       PRICE LITIGATION                   ) CIVIL ACTION NO.
6                                         )  01-CV-12257-PBS
       ----------------------------)
7      THIS DOCUMENT RELATES TO     )
       ALL ACTIONS                  )
8      ----------------------------x
9
10
11          39(b)(6) DEPOSITION OF JOHN HOFFMAN
12                  New York, New York
13                Friday, March 26, 2004
14                      9:30 a.m.
15          30(b)(6) deposition of JOHN HOFFMAN,
16      held at the offices of Patterson, Belknap,
17      Webb & Tyler LLP, 1133 Avenue of the
18      Americas, New York, New York, pursuant to
19      Notice, before Frank J. Bas, a Registered
20      Professional Reporter and Notary Public of
21      the State of New York.
22

```
 1   A P P E A R A N C E S:

 2

 3        SPECTOR, ROSEMAN & KODROFF, P.C.

 4        Attorneys for Plaintiffs

 5             1818 Market Street, Suite 2500

 6             Philadelphia, Pennsylvania 19103

 7        BY:   JOHN A. MACORETTA, ESQ.

 8             215-496-0300

 9

10        HOFFMAN & EDELSON, LLC

11        Attorneys for Plaintiffs

12             45 West Court Street

13             Doylestown, Pennsylvania 18901

14        BY:   ALLAN M. HOFFMAN, ESQ.

15

16        (Appearing Telephonically)

17        HOGAN & HARTSON LLP

18        Attorneys for Amgen Inc.

19             875 Third Avenue

20             New York, New York 10022

21        BY:   STEVEN BARLEY, ESQ.

22             212-918-3000
```

Page 3

```
 1   A P P E A R A N C E S (cont'd):
 2        PATTERSON, BELKNAP, WEBB & TYLER LLP
 3        Attorneys for Johnson & Johnson;
 4        Centocor Inc.; Ortho Biotech Products, L.P.
 5             1133 Avenue of the Americas
 6             New York, New York 10036
 7        BY:   ERIK HAAS, ESQ.
 8             DEBORAH STEINBERGER, ESQ.
 9             212-336-2000
10
          (Appearing Telephonically)
11        PERKINS COIE, LLP
12        Attorneys for Immunex Corporation
               1201 Third Avenue, Suite 4800
13             Seattle, Washington 98101
14        BY:   CHARLES C. SIPOS, ESQ.
15             206-583-8888
16
17        (Appearing Telephonically)
          MORGAN, LEWIS & BOCKIUS, LLP
18        Attorneys for Pharmacia and Pfizer
19             1701 Market Street
20             Philadelphia, Pennsylvania 19103
21        BY:   KIMBERLY HEUER, ESQ.
22             215-496-0300
```

Page 4

```
 1    A P P E A R A N C E S  (Cont'd.):

 2

 3          JONES DAY

 4          Attorneys for Defendant Abbott Laboratories

 5               222 East 41st Street

 6               New York, New York 10017

 7     BY:    TONI-ANN CITERA, ESQ.

 8               215-496-0300

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

1                         I N D E X

2

3      WITNESS                                    PAGE

4      JOHN HOFFMAN

5             By Mr. Macoretta                8, 259, 264

6             By Mr. Haas                      255, 263

7

8      DIRECTIONS: PAGE  49, 51

9      RULINGS: (None)

10     MOTIONS: PAGE  174

11

12                    E X H I B I T S

13     Exhibit Centocor 001    Notice of

14                             Deposition................10

15     Exhibit Centocor 002    collection of pages.......48

16     Exhibit Centocor 003    document Bates-numbered

17                             MDL-CEN00044499 through

                               44504, e-mails and attached

18                             interoffice memorandum... 92

19     Exhibit Centocor 004    document Bates-numbered

                               WKH 01029 through 01030,

20                             letters from Centocor

                               to First Data Bank and

21                             Medi-Span announcing an

22                             AWP price for Remicade... 124

John Hoffman                  Highly Confidential - Attorneys' Eyes Only                  March 26, 2004
                                         New York, NY

Page 6

1                  E X H I B I T S   (Cont'd.):

2

3   Exhibit Centocor 005   document Bates-numbered

4                          MDL-CEN00013965, 13969,

5                          14002, 14004, and 14008,

6                          letters from Centocor re:

7                          Price increase for Remicade..127

8   Exhibit Centocor 006   document Bates-numbered

9                          MDL-CEN00021066, chain

10                         of e-mails................. 142

11  Exhibit Centocor 007   document Bates-numbered

12                         MDL-CEN00030466 through 0467,

13                         interoffice memo dated March 16,

14                         1998 and attached analysis...154

15  Exhibit Centocor 008   document Bates-numbered

16                         MDL-CEN00004003 through 4008,

17                         documents from Michael Ziskind's

18                         files....................... 162

19  Exhibit Centocor 009   document Bates-numbered

20                         MDL-CEN00002717 through 2878,

21                         cA2 Marketing Plan........... 168

22

```
 1              E X H I B I T S  (Cont'd.):

 2

 3   Exhibit Centocor 010  document Bates-numbered

 4                         MDL-CEN00003478 through 3499,

 5                         Office-Based Infusion Guide.... 230

 6   Exhibit Centocor 011  document Bates-numbered

 7                         MDL-CEN00032737 through 32808,

 8                         entitled A Cost Analysis of

 9                         Office-Based Non-Chemotherapy

10                         Infusion Therapy Services,

11                         dated August 12, 2002.......... 256

12

13

14

15

16

17

18

19

20

21

22
```

```
 1    (time noted: 9:43 a.m.)

 2    J O H N   H O F F M A N,

 3          stating his business address as Centocor,

 4          Inc., 800 Ridgeview Drive, Horsham,

 5          Pennsylvania 19044, having been duly sworn

 6          by the Notary Public (Frank J. Bas), was

 7          examined and testified as follows:

 8    EXAMINATION BY

 9    MR. MACORETTA:

10          Q.    Mr. Hoffman, good morning.

11          A.    Good morning.

12          Q.    My name is John Macoretta, I'm here

13    on behalf of the plaintiffs in this litigation.

14    First of all, have you ever given a deposition

15    before?

16          A.    No.

17          Q.    Okay.  Let me just talk to you a

18    little bit about the procedure before we get

19    started.

20                MR. HAAS:  John, just before we get

21          too far into it, I'll just make a statement

22          for the record.
```

```
 1                    MR. MACORETTA:  Sure.

 2                    MR. HAAS:  Mr. Hoffman is here

 3          pursuant to an amended notice of

 4          Rule 30(b)(6) Deposition dated December 3,

 5          2003.

 6                    The areas of inquiry specified in

 7          Exhibit A of the Amended Notice of Rule

 8          30(b)(6) Depositions calls for testimony of

 9          a highly confidential nature, and Centocor

10          therefore designates the transcript in this

11          matter Highly Confidential-Attorneys' Eyes

12          Only, under the protective order entered

13          into this case.

14                    MR. MACORETTA:  Okay.

15     BY MR. MACORETTA:

16          Q.    Mr. Hoffman, as undoubtedly your

17     counsel has explained, I'll ask you some

18     questions, you'll answer them today.  While I can

19     see you nod your head, the court reporter can't

20     take that down, so you have to say yes or no or

21     whatever you're going to say.  Okay?

22          A.    Yes, sir.
```

```
 1    rest.

 2         Q.    By the way, the spreads on this chart

 3    actually range from 19 percent to 73.8 percent,

 4    don't they?

 5              MR. HAAS:  Objection to form.

 6         Q.    You could answer that.

 7         A.    Yes.  But the majority of them are

 8    between 20 and 30.

 9         Q.    I'm looking now to the next page,

10    147, which is Average Wholesale Price Goals.  The

11    first one says set AWP consistent with end user

12    pricing sensitivity.  What does end user mean

13    there?

14              MR. HAAS:  Objection to form,

15         foundation.  You can answer.

16         A.    My guess there would be patients, in

17    terms of what they could afford from a co-pay

18    standpoint.

19         Q.    And the next bullet point, "Set

20    AWP to provide adequate margin for infusers."

21              What does adequate margin mean?  What

22    does adequate margin mean on that page?
```

Highly Confidential - Attorneys' Eyes Only
                                  New York, NY

1          MR. HAAS:   Objection to form,

2      foundation.

3      A.    Consistent with what I think we've

4  tried to reflect throughout the rest of the

5  document, it is to provide enough difference

6  between the acquisition price and the

7  reimbursement to appropriately reimburse the

8  physicians for the costs and risks associated

9  with the therapy.

10     Q.    By the way, this says set AWP,

11  doesn't it?  As opposed to recommend AWP?

12          MR. HAAS:   Objection, the document

13      speaks for itself.

14     Q.    Can you point --

15          MR. MACORETTA:   Strike that.

16     Q.    Can you point to anywhere in this

17  document where it references recommending or

18  encouraging an AWP as opposed to actually setting

19  the AWP?  Take as much time as you want to look

20  at it.

21          (Witness reviews document.)

22          MR. HAAS:   Note my objection to form.

```
 1              (Witness reviews documents.)

 2       A.    No, I can't.

 3       Q.    Okay.  As part of its efforts to

 4  ensure that Remicade users were comfortable

 5  infusing Remicade in the office, Centocor

 6  developed something called the practice

 7  management program?

 8              MR. HAAS:  Objection to form.

 9              MR. MACORETTA:  Strike that.

10       Q.    Did Centocor at one point develop

11  something called the practice management program?

12       A.    Yes.

13       Q.    Are you familiar with that?

14       A.    Yes.

15       Q.    Can you explain to me what that is?

16       A.    Yes.

17       Q.    Please do.

18       A.    As I mentioned before, our market

19  research and knowledge of the physicians that we

20  were going to be launching the product to, and

21  knowledge of the payer world that we were going

22  to be entering into, indicated that there were
```

Page 227

```
 1    significant complexities associated with not only

 2    setting up initially in-office infusion in a

 3    physician office, but on an ongoing basis making

 4    sure that the billing, coding, reimbursement,

 5    scheduling, handling of infusion reactions, all

 6    of the things associated with setting up for --

 7    setting up for delivering, and then getting

 8    reimbursed for an infusion, so we established

 9    these programs to provide education and tools to

10    physicians to help them not only get over some of

11    those disincentives and obstacles that they had,

12    but also to be able to deliver those infusions in

13    a more effective and efficient manner on an

14    ongoing basis.

15         Q.    Is it fair to say that one goal of

16    the practice management program was to convince

17    physicians that there was an economic incentive

18    to prescribe Remicade?  Or infuse it in their

19    office, I should say?

20         A.    No, I wouldn't characterize it that

21    way.  I would represent that the economic

22    feasibility associated with the decision to
```

Page 228

 1    deliver in-office infusions needed to be

 2    assessed, and that's what the purpose of these

 3    programs and tools were, was being able to assess

 4    that economic impact and determine whether it was

 5    going to be a profit or a loss, and then move

 6    forward with a decision on an individual

 7    physician basis, based on their particular

 8    situation.

 9         Q.    But certainly part of the goal of the

10    program is to demonstrate how it was possible

11    that in-office infusion could be a profit to the

12    physicians?

13              MR. HAAS:  Objection.

14         A.    As I mentioned, the goal was not to

15    show that it could be profitable.  The goal was

16    to overcome the disincentives that we were told

17    by physicians existed as an obstacle to deciding

18    to begin infusing in-office.

19         Q.    And one of those disincentives was

20    that the cost of providing in-office infusion

21    outweighed the benefit of it, right?

22         A.    Potentially.

```
 1          Q.    Okay.   So if overcoming the
 2    disincentive of the cost outweighing the
 3    benefit -- strike that.
 4               Doesn't overcoming the disincentive
 5    of the cost outweighing the benefit mean showing
 6    how the benefit outweighs the cost?
 7               MR. HAAS:  Objection to form.
 8          A.    I'm sorry, can you restate the
 9    question that's out there?
10               MR. MACORETTA:  You know what, strike
11          that.   That's fine.   We'll try something
12          else.
13          Q.    What would you say the drug that
14    principally competed with Remicade was?
15    From 1998 through the present?  Drug or drugs.
16          A.    There are multiple drugs.
17    Methotrexate, and various other DMARDS, are
18    considered first line therapy, and many payers
19    and physicians require that they be used first.
20    And then when the decision is made to use a
21    biologic, the primary competitor has been Enbrel.
22          Q.    And Enbrel is self administered by
```

```
 1    the patient, right?

 2         A.    In most cases.

 3         Q.    So one important distinction between

 4    Remicade and Enbrel is that Enbrel in most cases

 5    is administered by the patient, Remicade requires

 6    an infusion in an infusion setting?

 7               MR. HAAS:  Objection to form.

 8         Q.    Is that a fair statement?

 9               MR. HAAS:  Objection to form.

10         A.    It's one of the differences, yes.

11         Q.    I understand that.  I show you what

12    we're going to mark as Exhibit Centocor 010?

13               (Exhibit Centocor 010, for

14               identification, document Bates-numbered

15               MDL-CEN00003478 through 3499, Office-Based

16               Infusion Guide.)

17               MR. MACORETTA:  Off the record.

18               (Recess.)

19

20    BY MR. MACORETTA:

21         Q.    Let's go back on the record.

22    Mr. Hoffman, we've just marked as Centocor
```

```
 1              MR. HAAS:  I'll just clarify for the
 2         record that he was flipping through the
 3         pages.  If you want him to go through the
 4         entire document to respond to your question,
 5         he could take that time.
 6              MR. MACORETTA:  No, that's fine.
 7         Q.   Is there any effort to quantify, in
 8    dollar terms, anywhere in here the costs of
 9    providing in-office infusion?
10              MR. HAAS:  The same objection.
11         Q.   You can answer.
12         A.   No.  And I asked that question, and
13    the thought process behind that was that because
14    salaries of nurses, et cetera, cost of space
15    varied so much geographically, et cetera, it was
16    too difficult to put a specific amount in there.
17    Instead the worksheet on page 5 provides the
18    considerations that needed to be taken into
19    account when looking at all of the other things
20    that might contribute to those costs.
21         Q.   But no actual attempt to quantify
22    those costs was made because it was determined to
```

```
 1   be too complicated?

 2        A.    Yes.  And too variable.

 3        Q.    Does it say that anywhere in here;

 4   that all of these costs are too complicated and

 5   variable to put a dollar figure on?

 6        A.    No, we didn't think it would be a

 7   good idea to give physicians something that said

 8   it was too complicated for them to understand.

 9        Q.    So you gave them a document that

10   showed how much revenue they could bring in, but

11   it didn't show them how much their costs would

12   be, right?

13              MR. HAAS:  Objection, argumentative.

14        Q.    You can answer that.

15        A.    We didn't try to assume what their

16   costs were for them.

17        Q.    Okay.

18        A.    We tried to give them a list of all

19   the considerations they need to take into account

20   in making that decision for themselves.

21        Q.    And the purpose of this was to help

22   them analyze the financial implications of doing
```

Highly Confidential - Attorneys' Eyes Only
                                   New York, NY

 1    in-office infusion, right?

 2         A.    That was part of it.  As well as to

 3    help figure out how to do coding, et cetera.

 4         Q.    Of course, at the end of the day,

 5    Centocor's overall purpose was to get as many

 6    physicians as possible to do in-office infusions,

 7    wasn't it?

 8              MR. HAAS:  Objection to form.

 9         A.    Centocor's goal was to support

10    in-office infusion, because we strongly believed

11    then, and we strongly believe now, that in-office

12    infusion is the most appropriate site of care for

13    delivering Remicade therapy.  It is the best

14    place for the patient, because they have the

15    highest level of comfort, and they have the

16    consistency of being treated by their own

17    physician, and his or her staff.  It is the best

18    place for the physician, because he or she

19    maintains control and constant monitoring of the

20    patient.  And it's also the best for the payer,

21    because historically the costs associated with

22    in-office infusion are significantly lower than

Highly Confidential - Attorneys' Eyes Only
                          New York, NY

```
 1    the costs associated with hospital outpatient

 2    departments.

 3         Q.    Of course, none of those points you

 4    just mentioned were discussed at all in the -- in

 5    this Office-Based Infusion Guide, right?

 6         A.    I don't believe that they're relevant

 7    to the -- to the financial impact assessment,

 8    from a physician perspective.

 9         Q.    You would agree with me that a doctor

10    would only do in-office infusion if it was going

11    to be profitable for him, wouldn't you?

12              MR. HAAS:  Objection to form.

13         A.    I don't think you can make that

14    blanket statement.  I am aware of anecdotal

15    stories of physicians who do infusions and lose

16    money on those infusions.

17         Q.    Was Centocor's marketing strategy

18    based on the assumption that physicians would

19    perform in-office infusions even though they were

20    going to lose money on them?

21              MR. HAAS:  Objection to form.

22         A.    No, I don't think anyone would
```

 1   introduce or develop a marketing plan and

 2   introduce a product or service to people who were

 3   going to do it in a situation where they were

 4   going to lose money.

 5        Q.   No, in fact, it would be much better

 6   if you could introduce a product or service in a

 7   situation where if someone could use it and

 8   actually make money, wouldn't it?

 9             MR. HAAS:  Objection to form.

10        A.   As I said earlier, the decision to

11   add any additional billable service to a

12   practice, whether that's lab testing, whether

13   it's x-rays, et cetera, you know, is being made

14   from numerous considerations, but in many cases

15   the primary one being the ability to increase

16   billable revenue.

17        Q.   Okay.

18        A.   By the way, I'm just flipping back,

19   if you look at page 4, we do say in here about

20   the provision of high-quality care and patient

21   convenience, and supervision of the patient,

22   et cetera.

1          Q.    But other than saying it here, the

2     rest of this book talks about how much money it's

3     going to cost, or how much money you can make;

4     there's no other discussion in here about

5     high-quality care, patient convenience,

6     supervision or autonomy, is there?

7          A.    The purpose of this particular guide

8     was, if you look at how we trained our sales

9     people to address this, is they first and

10    foremost and always sold the clinical benefits of

11    in-office infusion first.

12              If when some physicians were sold on

13    that but then they raised issues about the costs

14    and risks associated, and uncertainty associated

15    with investing in that capability, we wanted to

16    have this tool available to help address those

17    risks, and allow them to provide the therapy to

18    their patients.

19         Q.    The financial impact worksheet on

20    page 8, was that also available at Centocor's Web

21    site at some point?

22         A.    Yes, I believe it was.

Page 243

```
 1          Q.    Were you involved at all in the

 2    decision to make that available in Centocor's Web

 3    site?

 4          A.    No, I wasn't.

 5          Q.    That's not currently on Centocor's

 6    Web site, is it?

 7          A.    No, it's not.

 8          Q.    Were you involved in the decision to

 9    take it off Centocor's Web site?

10          A.    No, I was not.

11          Q.    Do you know who made that decision to

12    take it off Centocor's Web site?

13          A.    I believe our senior management made

14    that decision.

15          Q.    Do you know what the reasoning for

16    that decision was?

17          A.    Yes.

18          Q.    What was that reason?

19          A.    In, I believe it was 2002, given the

20    increased scrutiny over certain things in the

21    entire pharmaceutical industry, Johnson & Johnson

22    and Centocor decided to take a very cautious
```