# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | MDL No. 1456 |
| | ) | CIVIL ACTION:  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) ) ) | Judge Patti B. Saris |
| | ) | Chief Magistrate Judge Marianne B. Bowler |
| | ) ) | **[FILED UNDER SEAL]** |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SANCTIONS BASED ON DEFENDANTS' SUBMITTAL OF SUR-REPLY DECLARATION OF STEVEN J. YOUNG

## [REDACTED VERSION]

## TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ...................................................................................................1

II.  FACTS ...................................................................................................................2

    A.  Young's Opinions Regarding the Basis for AWP Reimbursement
        Are Based on a Misleading Record ...........................................................3

        1.  Young's conclusion that commercial payor contracts do not
            reference AWP is false..................................................................4

        2.  Evidence gathered by defendants after Young's sur-reply refutes
            Young's opinion but was not supplied to the Court ......................5

        3.  Mr. Young incorrectly asserts that commercial payor reliance
            upon J-codes in their claims data makes it impossible to reference
            the appropriate NDCs and AWPS of the specific injectable drugs .............6

III.  ARGUMENT ..........................................................................................................9

IV.  CONCLUSION......................................................................................................16

# TABLE OF AUTHORITIES

## CASES

*Aoude v. Mobil Oil Corp.,*
  892 F.2d 1115 (1st Cir. 1989)................................................................10, 11, 12

*Choina v. E.I. du Pont de Nemours & Co.,*
  1996 U.S. Dist. Lexis 5511 (E.D. La. Apr. 24, 1996) .......................................11

*In re E.I. du Pont de Nemours & Co.,*
  918 F. Supp. 1524 (M.D. Ga. 1995) ..................................................................11

*In re E.I. duPont de Nemours & Co.-Benlate Litig.,*
  99 F.3d 363 (11th Cir. 1996) .............................................................................11

*Hull v. Municipality of San Juan,*
  230 F. Supp. 2d 239 (D.P.R. 2002), *aff'd in part and rev'd
  in part on other grounds*, 356 F.3d 98 (1st Cir. 2004)...........................9, 10, 11

*Hull v. Municipality of San Juan,*
  356 F.3d 98 (1st Cir. 2004).....................................................9, 10, 12, 13

*Premier Homes & Land Corp. v. Cheswell, Inc.,*
  240 F. Supp. 2d 97 (D. Mass. 2002) ...........................................................10, 13

*Schmidt v. Ford Motor Co.,*
  112 F.R.D. 216 (D. Colo. 1986) ...............................................................13, 14, 16

*Wojcicki v. Caragher,*
  18 Mass. L. Rep. 581, 2004 Mass. Super. Lexis 594 (2004)................................14, 15, 16

## I.    INTRODUCTION

Plaintiffs have moved to strike the Sur-Reply Declaration of Steven J. Young ("Young Sur-Reply" or "YSR"), demonstrating its inadequacy under the Federal Rules of Evidence.  But as plaintiffs also showed in their supporting memorandum, the Young Sur-Reply is not only inadequate; it is deceitful as well.  Accordingly, it is not enough merely to strike the Young Sur-Reply.  Rather, plaintiffs respectfully urge that sanctions be imposed on the defendants for their fraud on this Court.

In his sur-reply, Young spends dozens of pages and submits binders full of documents attempting to show that AWP is not the basis for reimbursement in the physician-administered arena outside Medicare Part B.  However, this assertion is contradicted by evidence available to Young, which neither he nor defendants have shown to the Court.  In his sur-reply, Young also claims that the use of J-Codes to identify drugs administered by physicians makes it impossible to determine which transactions are based upon AWP.  Again, Young failed to disclose discovery materials directly contradicting this analysis.  As a result, these misleading statements have tainted both the Court's consideration of the Class motion and that of Dr. Berndt.[1]

Because of the gravity of defendants' misrepresentations via Mr. Young's declaration, plaintiffs ask specifically that the following sanctions be imposed.  First, any portion of defendants' opposition that cites to Mr. Young, including but not limited to the Young Sur-Reply and his first declaration, should be stricken.  With appropriate sanction, the basis for much of defendants' opposition is removed.  Given that the Court has plenary power to redress fraud on these proceedings, the sanction is judicious.  Second, Mr. Young should not be permitted to

---

[1] Dr. Berndt repeatedly cited to Young's sur-reply and found, based largely on Young's assertions, that the record was "unsettled" as to the basis for reimbursement for physician-administered drugs outside the Part B context.  Berndt Report at ¶ 98.  And defendants' use Berndt's conclusion as a basis to oppose certification of this class.  *See* Track One Defendants' Comments on the Report of Dr. Ernst R. Berndt at 11, 13.

appear as an expert witness or otherwise in these proceedings on behalf of the defendants.  Third,
the Court should order defendants to pay the attorneys' fees and other costs that plaintiffs'
attorneys have accrued in responding to the misrepresentations and omissions made in Mr.
Young's Sur-Reply and in preparing the instant motion for sanctions.  Fourth, all references to
Young in Dr. Berndt's report should be stricken.

## II.    FACTS

The bulk of Young's sur-reply materials address the issue of physician-administered
contracts.  In his original declaration, Young claimed that physicians were not reimbursed based
upon AWP.  He did so by purporting to have analyzed payor-physician contracts produced in this
litigation.  However, when the full record regarding those contracts was searched, it turned out
that AWP was the basis for reimbursement in the same contracts he proffered.  *See* Hartman
Rebuttal Decl., ¶ 21(c) at pp. 22-23.[2]  Thus, the primary thrust of Young's opposition to the
physician-administered non-Part B Class was severely damaged by plaintiffs' reply.

Defendants then filed and served the Young Sur-Reply on January 21, 2005.  The sheer
volume of the declaration and related materials speaks to the deliberateness with which
defendants approached their submittal to the Court.  Though defendants were given 20 pages in
sur-reply, they took 98 pages for the declaration itself, appended 35 additional pages of text,
added 100-plus pages of charts, and supplemented with 20 binders of materials.  It can only be
inferred that these sophisticated defendants, aided by their equally sophisticated lawyers,
submitted exactly what they intended to submit.

---

[2] Attaching fee schedule from BCBS of Kansas using AWP as the only basis for reimbursement.

Sophistication notwithstanding, defendants turned to sophistry, as what defendants submitted was a sur-reply infected with misrepresentations and serious omissions.  These misrepresentations and omissions fall mostly into two categories.  The first category supports defendants' erroneous assertion that AWP does not serve as a basis for reimbursement rates negotiated by commercial payors for physician-administered drugs.  The second category supports defendants' erroneous assertion that AWPs (which are NDC-specific) could not be relied upon by commercial payors for reimbursement relative to physician-administered drugs because physicians submit reimbursement claims based upon J-codes, not NDCs.

At great expense in terms of attorney time and distraction from other aspects of this case, including preparation for the hearing on class certification, plaintiffs analyzed Mr. Young's statements, compared them to the record, and prepared an analysis of some of the highlights of the misrepresentations found in the Young Sur-Reply.  What follows is the substance of that analysis.

**A.    Young's Opinions Regarding the Basis for AWP Reimbursement Are Based on a Misleading Record**

A careful analysis of the record indicates that Young has deliberately distorted what was available to him in order to provide opinions favorable to defendants.  Although Young manipulated data in his original materials, the level of obfuscation, if not downright deceit, in his sur-reply is shocking.  Certainly it requires that his materials be stricken, if not more serious sanctions imposed against defendants for submitting those materials.

1.     **Young's conclusion that commercial payor contracts do not reference AWP is false**

A major thrust of Young's sur-reply is the claim that payors do not reimburse based on AWP.  Young asserts that out of 206 contracts only nine reference AWP.[3]  To reach this conclusion, Young attaches binders full of contracts – yet few of the contracts actually include the actual fee schedules.  Those fee schedules *do* reference AWP and were available to Young, but he either was sloppy and did not discover them, or deliberately omitted them from his analysis.  Listed below are just a few examples of such documents that Young does not cite and which contradict his conclusions that each of these payors he discusses in his opinion did not use AWP.  In each instance, Young cited to binders of material as to each payor, but excluded the material below that refutes his opinions:

1.   A contract between Blue Cross Blue Shield of Tennessee and a specialist physician includes an attachment that outlines reimbursement in accordance with their ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (FCC 000485-96 at FCC 000495).  Attached as Exhibit A (emphasis added).[4]

2.   An amendment to a contract agreement between Unicare Life & Health Insurance and Texas Cancer Care states, ***"Pharmacy (including infusion therapy drugs): maximum allowable reimbursement*** ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (TCC 000473-90 at TCC 000474).  Attached as Exhibit B (emphasis added).

3.   An appendix to a contract agreement between United Healthcare of Texas and Southwest Physician Associates states that the fee maximum for pharmaceuticals will be ▮▮▮▮▮▮▮▮▮ (TCC 000981-1000 at TCC 001000).  Attached as Exhibit C (emphasis added).

4.   A contract agreement between Better Health Plans, Inc. and a "Consulting Physician" includes an amendment that states, ***Health Plan shall compensate Consulting Physician*** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ***These drugs shall be billed with the appropriate NDC codes"*** (FCC 000595-614 at FCC 000613).  Attached as Exhibit D (emphasis added).

---

[3] YSR at Ex. 2.

[4] All exhibits referenced in Plaintiffs' Memorandum unless otherwise indicated are attached to the Rebuttal Declaration of Dr. Raymond S. Hartman in Response to Sur-reply of Steven Young ("HRebuttal").

5. Five additional contracts involving Premera Blue Cross, which expressly use AWP as a reimbursement point.[5] Among these documents are contracts with Medco and Caremark that specify by AWP the level of reimbursement for ███████ ██████████████████████████████[6]

None of this material was supplied to the Court or referenced by Young. Even when cited by Mr. Young, his evaluations of contracts are unreliable. This is graphically illustrated in a chart showing ten different physician contracts and/or amendments produced to plaintiffs and cited by Young as *not* being based on AWP. The chart shows that these contracts are in fact expressly based on or reflect AWP pricing.[7] Another example arises from Young's analysis of contracts in his Exhibit 2. Of these contracts, 8% pre-date the class period, and 49% refer to fee schedules *not* included; hence it is impossible to draw a conclusion they do not reference AWP without publishing the rate schedules.[8]

In sum, what Young has done is to proffer conclusions by offering the Court bits of evidence while ignoring or conceding critical evidence that contradicts his conclusion.

**2.** **Evidence gathered by defendants after Young's sur-reply refutes Young's opinion but was not supplied to the Court**

Defendants continue to gather evidence relating to their opposition to class certification. Some of these materials directly contradict statements made by Mr. Young. For example, defendants subpoenaed documents from Premera Blue Cross, a health insurer in the Pacific Northwest. The contracts between Premera and physicians provide for reimbursement based on AWP.[9] The contract between a major PBM, Medco and Premera not only is based on AWP, but

---

[5] HRebuttal ¶ 5, Ex. E.

[6] *See* Ex. E at PBC 0239.

[7] *See* HRebuttal at ¶ 5, p. 6; Ex. F.

[8] HRebuttal at ¶ 4, pp. 2-3.

[9] Ex. E at PBC 00203. *See also* Ex. E at PBC 00203, Premera contract with Cancer Care Northwest expressly tying reimbursement to AWP.

specifies a discount off AWP for every single injectible drug.  The Premera contract with

Caremark provides that drugs will be reimbursed at AWP, new drugs at AWP – 14%, and

specifies the AWP discount for every single injectible drug.[10]

Defendants and Young did not bring this evidence to the Court's or Dr. Berndt's attention

despite the fact it is highly relevant and contradictory to Young's opinions.

### 3.    Mr. Young incorrectly asserts that commercial payor reliance upon J-codes in their claims data makes it impossible to reference the appropriate NDCs and AWPs of the specific injectible drugs

As both Dr. Hartman and Dr. Rosenthal demonstrated, due to the nature of claims data in

this case, it is readily possible to identify at the claims stage of this case those transactions that

are AWP based.  Young recognizes that this defeats his prior arguments on this point.  So, in his

sur-reply, Young employs an additional strategy of obfuscation.  Specifically, he takes insurance

claims for physician services within a given J-code or Q-code and presents the raw data on

reimbursement amounts, which essentially fill the graph.  For example, in his sur-reply, he

performs this exercise in his Exhibit 3.02 for BCBSTN (Blue Cross Blue Shield of Tennessee)

for Procrit-Q0136; in his Exhibit 3.03 for BCBSTN for Remicade J1745; and in Exhibit 3.04 for

Taxol J-9265.  He produced analogous scatter plots in Exhibit 15 of his Rebuttal Declaration on

this matter.

The apparent aim of these presentations is to misdirect any reader (in ¶¶ 43-45) into

thinking that a commercial payor simply has no idea how the drug reimbursement rates requested

in a submitted claim can be evaluated or audited by that commercial payor against the relevant

reimbursement fee schedules used by that payor or used by Medicare Part B (which references

AWP).  Mr. Young states (¶¶ 44-45):  "A health plan does not even know which manufacturers'

---

[10] Ex. E at PBC 00215-18 and further provides that new drugs will be reimbursed at AWP – 14%.

- 6 -

product they are reimbursing when a claim is submitted related to a multi-source drug under a J-Code; [and] Medicare also uses J-codes to reimburse all physician-administered drugs under Part B.  Therefore, each of these issues applies equally to physician-administered drug reimbursements under Medicare Part B."

Mr. Young's contention is wrong.  All commercial payors have fee schedules that allow the payor to translate J-codes in a given claim into the relevant NDCs administered by the physician.  The discovery materials and Mr. Young's own supporting materials make clear that commercial payors can disaggregate the dosage and presentation (*i.e.*, the NDC) of the relevant drug administered by the physician and claimed by the physician for reimbursement by the payor.  For example, in the September 14, 2004 deposition of Paula Pfankuch, the representative for Health Care Service Corporation (*i.e.*, Blue Cross Blue Shield of Illinois – BCBS-IL), she states in her transcript:

> Q:    Okay.  So then for drugs administered in a physician setting, they were subject to the fee schedule?
>
> A:    Yes, they are.
>
> Q:    That's the underlying Medicare base fee schedule?
>
> A:    Yes.
>
> Q:    Okay.  And then how was that fee schedule derived?
>
> A:    That fee schedule is based currently on the dollars that Medicare publishes for those J codes, and we use a percentage of the Medicare allowable.
>
> Q:    And how long has that been the methodology which you've used?
>
> A:    I believe that's been in place since 1999.
>
> Q:    And how did you reimburse for drugs administered by a physician before 1999?

- 7 -

A:  ***Prior to 1999 the full service units – those are our claim payment areas – utilized the AWP as published in the Red Book.***  I would like to clarify for that last statement that it was a percentage of the AWP published in the Red Book.

Q:  Okay.  And can you tell me what Blue Cross Blue Shield of Illinois understood AWP, or average wholesale price, to be?

A:  Simply the average wholesale price.

Q:  And the average wholesale price, what do you mean by that?

A:  Our understanding of it is very limited, at least within the professional reimbursement area.  It is simply a term that we would look to for pricing.  There is not a tremendous amount of knowledge about AWP specifically other than it seems to be the industry standard for the baseline reimbursement for physician-administered drugs.
[Pfankuch Dep. at 25-26 (emphasis added).]

The following documents also show that the use of J-codes in pharmaceutical reimbursement contracts is common and routine and is derived from AWPs.  Each of these documents provides an example where covered pharmaceuticals are identified in terms of J-codes and the reimbursement of those codes is set in relation to AWP.  Although Mr. Young has cited numerous documents from some of these entities and others, he does ***not*** cite a single document listed below, all of which were available to him.

a.  A Blue Cross Blue Shield of Texas Physician Contract with Specialty Injectable Drug Program showing J and Q code pricing in ██████████████████ (TCC 00035-000361).  Ex. H to HRebuttal Decl.

b.  A Letter from Baptist & Physicians IDS announcing reimbursement for administered plans of HCPCS J codes at AWP (FCC 000299).  Ex. I to HRebuttal Decl.

c.  An AmCare Health Plans of Texas, Inc. Specialty Care Physicians Services Agreement that provides that HCPCS

- 8 -

codes will be reimbursed ▮▮▮▮▮▮ (TCC 000249-000286 at 000267).  Ex. J to HRebuttal Decl.

d.      An amendment to a provider group agreement between Beech Street Corporation and Southwest Physicians Associates that provides a fee schedule that calls for J codes to be reimbursed at the lesser of billed charges or ▮▮▮▮▮▮ per Red Book current version (TCC 000365-000386 at 000369).  Ex. K to HRebuttal Decl.

e.      Letter with amendments to oncology clinic from Aetna providing all J-codes to be reimbursed at ▮▮▮▮▮▮ (SPH 002023-002026 at 002025).  Ex. L to HRebuttal Decl.

This testimony and documentation further demonstrates Young's distortion of the evidence.

## III.    ARGUMENT

Sanctions are appropriate for the deliberate creation of a misleading record that constitutes fraud on the Court.  The Young Sur-Reply is characterized by more than an honest error here or there.  It is marked by a pattern of serious misrepresentations and omissions. Mr. Young is offered as the mouthpiece for very sophisticated, knowledgeable parties and counsel who must know, not only from the evidence but from their experience, that much of what Mr. Young says on defendants' behalf is false, or at best, a half-truth.  Moreover, defendants obviously know that these falsehoods have the potential to affect the outcome of the class certification proceedings and other important aspects of this case.

"Fraud consists of a concealment of material fact or a reckless misrepresentation to induce another person to act."  *Hull v. Municipality of San Juan*, 230 F. Supp. 2d 239, 242 (D.P.R. 2002), *aff'd in part and rev'd in part on other grounds*, 356 F.3d 98 (1st Cir. 2004) (citation omitted).  "A 'fraud on the court' occurs where it can be demonstrated, clearly and

convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (citations omitted); *Hull v. Municipality of San Juan*, 356 F.3d 98, 102 (1st Cir. 2004) (citation omitted); *Hull*, 230 F. Supp. 2d at 242 (citation omitted); *Premier Homes & Land Corp. v. Cheswell, Inc.*, 240 F. Supp. 2d 97, 99 (D. Mass. 2002).

Further, as the First Circuit has acknowledged, "[b]ecause corrupt intent knows no stylistic boundaries, fraud on the court can take many forms." *Hull*, 230 F. Supp. 2d at 242 (citation omitted).  "[I]t need not be a concoction between attorney and client.  What is critical is the mischievous doing, whether it comes from the party, the attorney, both *or **in combination with a third party**.*" *Id.* (emphasis added).

In addressing the court's powers to address such "odious machinations" as where a party fabricates documentary evidence and then files it, the First Circuit has noted that district courts have "plenary powers" to "'manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Aoude*, 892 F.2d at 1119 (citation omitted).  It also has noted that "[t]he Civil Rules neither completely describe, nor purport to delimit, the district courts' powers." *Id.* (citations omitted).  Thus, "a federal district judge can order dismissal ***or default*** where a litigant has stooped to the level of fraud on the court." *Id.* (emphasis added) (citing, *inter alia*, *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 11-12 (1st Cir. 1985) (affirming district court's entry of default judgment under court's inherent powers in response to defendant's abusive litigation practices)); *Aoude*, 892 F.2d at 1118 ("[A] federal district court possesses the inherent power to deny the court's processes to one who defiles the judicial system by

- 10 -

committing a fraud on the court."); *see also Hull*, 230 F. Supp. 2d at 248-49 ("When evidence of

a fraud on the court is adduced prior to trial, the district court may fashion an appropriate pre-

trial remedy to cure the effect of any misconduct. . . .  The choice of remedy is committed to the

broad discretion of the trial court.  In order to properly protect the sanctity of the judicial process,

the remedy may include dismissing the action.") (citations omitted).[11]  The standard of review

for the imposition of sanctions for fraud on the court, even for entry of an order of dismissal or

default against the offending party, is abuse of discretion.  *Aoude*, 892 F.2d at 1117.

Here, the evidence of fraud on this Court is clear and convincing.  The plaintiffs' analysis

of the falsehoods in the Young Sur-Reply, as set forth above, is detailed.  In turn, those details

show that defendants were determined to have the Court believe that AWP does not serve as a

basis for reimbursement rates negotiated by commercial payors for physician-administered

drugs, no matter what the evidence truly shows.  They were equally determined to have the Court

believe that AWPs could not be relied upon by commercial payors for reimbursement relative to

physician-administered drugs, again, no matter what the evidence truly shows.  These deceits

betray a single-minded goal:  to stand in the way of class certification, and to win this case, at all

costs, and by any tactic, fair or foul.

---

[11] *See also Choina v. E.I. du Pont de Nemours & Co.*, 1996 U.S. Dist. Lexis 5511 (E.D. La. Apr. 24, 1996).  In *Choina*, the court referred to a prior finding that an expert had committed fraud on the court by falsifying report data.  *Id.,* at *1.  For this, the Court overturned the jury verdict in favor of the plaintiff (who had proffered the expert data) and ordered a new trial.  *Id.*  Additionally, the court permitted the plaintiff to offer testimony from a new expert at the new trial, but only on the condition that plaintiff would reimburse defendant for all reasonable costs incurred by the defendant as a result of the addition of plaintiff's new expert witness.  *Id.*, at *2.  The plaintiff did not challenge the rulings, and the case offered no analysis of these previous rulings.

And in another case involving du Pont, the district court in *In re E.I. du Pont de Nemours & Co.*, 918 F. Supp. 1524, 1556 (M.D. Ga. 1995), sanctioned duPont, which had perpetrated pre-trial discovery fraud on the court and the plaintiffs involving expert witnesses, by ordering it to pay to the court registry almost $115,000,000.  (The sanctions came after the case had been voluntarily dismissed based on a settlement reached by the parties.)  That decision was later reversed because the district court had not afforded du Pont the due process attendant to sanctions for criminal contempt, which the court of appeals deemed the sanctions in substance if not in form.  While the court of appeals reversed the result based on procedural grounds, it did not disturb the district court's findings.  *In re E.I. duPont de Nemours & Co.-Benlate Litig.*, 99 F.3d 363 (11th Cir. 1996).  Apparently, there was a subsequent voluntary resolution where duPont paid millions of dollars (and its attorneys hundreds of thousands of dollars) in sanctions without admitting wrongdoing.

- 11 -

This is not unlike the situations in the authorities cited above, where even more drastic sanctions were imposed than those urged by plaintiffs here.  In *Aoude*, the plaintiff fabricated a purchase agreement and attached it to his complaint, which was initially filed in state court.  892 F.2d at 1116-17.  When the action was removed to this Court, the plaintiff continued to rely upon the complaint and its false exhibit.  *Id.* at 1117.  The plaintiff eventually moved to amend his complaint to substitute the actual sales agreement, but not until after the legal process had ground on for some time.  *Id.*  The defendant moved to dismiss the action and a later one filed by the plaintiff, citing the plaintiff's fraudulent practices.  *Id.*  This Court granted the motion, dismissing both actions.  *Id.*  As the court of appeals put it in affirming, "Appellant chose to play fast and loose with [Appellee] and with the district court. . . .  [Appellee], having undergone extra trouble and expense, had a legitimate claim to dismissal; and the court, jealous of its integrity and concerned about deterrence, was entitled to send a message, loud and clear."  *Id.* at 1122.

In *Hull*, the First Circuit affirmed dismissal of one plaintiff's case because that plaintiff had lied about his medical history in discovery.  The party "failed to disclose [] prior injuries when specifically asked for such information during his deposition and that the omissions were material."  356 F.3d at 101.  Then he persisted with the deceit,[12] both in follow-up testimony and in answers to interrogatories.  *Id.*  Moreover, as here, the offending party "was not a neophyte."

---

[12] Here, defendants are well aware that the jig is up on the misrepresentations they have made to this Court.  Plaintiffs, in their motion to strike, have dissected the Young Sur-Reply and shown it for what it is.  Yet defendants have not withdrawn it, instead willfully hoping that this Court will act on the basis of their falsehoods.  The Court should not hesitate to act under these circumstances, especially where the defendants and their counsel are such sophisticates, and especially where the defendants and their counsel know the evidence and industry practices so well.  "'Tampering with the administration of justice in the manner indisputably shown here involves more than an injury to a single litigant.  It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. . . .'"  *Aoude*, 892 F.2d at 1119 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)).  As the First Circuit said in *Aoude*, "it [is] surpassingly difficult to conceive of a more appropriate use of a court's inherent power than to protect the sanctity of the judicial process – to combat those who would dare to practice unmitigated fraud upon the court itself."  *Id.*

- 12 -

*Id.*  He worked in insurance (as did his wife, as the court pointed out) and structured settlements, and he had visited the doctor and hospital repeatedly for his prior injuries.  *Id.*  This is analogous to the instant situation, where the defendants are all knowledgeable players in the subject industry, and where they and their top-flight attorneys are well-familiar with the evidence in this case.  If dismissal of the offending party's case was justified in *Hull*, then surely the lesser sanctions sought in this case, with its significantly higher stakes, are justified even more so.

Likewise, the sanctions urged by plaintiffs here are in line with those imposed by this Court in *Premier Homes*, where a party had fabricated a document and submitted it to the Court (along with other papers upon removal of the case from state court) with the purpose of gaining an advantage in his dispute.  240 F. Supp. 2d at 98.  There, this Court granted the opposing party's motion to dismiss after the offending party had withdrawn its opposition, and it ordered payment of considerable attorneys' fees and consultants' fees.  *Id.* at 99-100.  As this Court wrote, "At bottom, the court retains the inherent power to take such steps as are necessary to deter abuse of the judicial process, including dismissal of the action and levying of an appropriate monetary sanction."  *Id.* at 99.

The sanctions sought here are also in line with what was ordered in *Schmidt v. Ford Motor Co.*, 112 F.R.D. 216 (D. Colo. 1986).  In that case, the court considered whether to dismiss an action under its inherent, discretionary powers in part because an expert had lied in his deposition and had lied to the opposing expert in informal conversations.  *Id.* at 220.  While the court acknowledged that it had the "'inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice,'" it declined to use that power to dismiss the case.  *Id.* (citation omitted).  The court did, however, order that the expert witness be "stricken as a witness in th[e]

- 13 -

case." *Id.* at 221. And it further ordered that the expert was "expressly prohibited from testifying as an expert witness in any case henceforth in the United States District Court for the District of Colorado." *Id.* Finally, the court ruled that a copy of its order should be mailed to the Supreme Court of Colorado for whatever action that court might deem appropriate. *Id.* These sanctions further illustrate the broad range of options available to a court which is persuaded to take action.

Last, there is good authority in the state system for the sanctions sought here. In the recent case of *Wojcicki v. Caragher*, 18 Mass. L. Rep. 581, 2004 Mass. Super. Lexis 594 (2004), the Superior Court of Massachusetts ordered sanctions directly against a defendant's physician-expert who had given false and misleading testimony in a medical malpractice case. There, the expert gave misleading testimony at trial regarding a medical study. 2004 Mass. Super. Lexis 594, at *5-8.

After the defendant won at trial, the plaintiff, believing that the expert had made misrepresentations on the witness stand, moved for a new trial and sanctions. *Id.*, at *9-10. The court held a hearing on the motion for a new trial and ordered that the expert appear for a deposition so that the basis for his testimony could be explored. *Id.*, at *10-11.

The expert maintained at his deposition that he had not testified misleadingly at trial. *Id.*, at *11-13. Later, there was another hearing on the motion for a new trial and for costs, including attorneys' fees. *Id.*, at *15. The court allowed the motion and made (apparently oral) findings that the expert had given false testimony both at trial and at his deposition. *Id.*, at *15-16. The court then afforded the expert "an opportunity to be heard before issuing a decision questioning his credibility and before determining what, if any, action the Court would take with respect to his trial and deposition testimony." *Id.*, at *17.

- 14 -

At a later hearing requested by the expert,[13] the expert offered yet more evidence to support his earlier statements.  But the evidence did not help his cause, nor did a supplemental affidavit submitted by another witness denying his account of a conversation the expert had supposedly had with her.  *Id.*, at *18-19.  Yet more proceedings ensued, but the expert could never overcome the evidence of his deceitfulness.  Accordingly, citing its "inherent power to impose sanctions," which power was "derived from the inherent power of a court to do what is necessary to secure the administration of justice" – in other words, citing the same power as this Court and the First Circuit have cited previously – the court sanctioned both the defendant and the expert personally.  *Id.*, at *24-34.  Noting that the new trial would require duplication of services and expenses, that the post-trial proceedings had caused the plaintiff to incur fees and costs, and that the plaintiff was entitled to be compensated accordingly, the court ordered defendant to pay those costs, including attorneys' fees, though a date part-way through the post-trial proceedings.  *Id.*, at *31.

In addition, the court ordered the expert himself to pay the plaintiffs' fees and costs for the balance of the post-trial proceedings.  *Id.*  Though the court could not find any authority "directly addressing the issue whether the Court has inherent authority to impose a sanction on a non-party witness," the court found that such authority existed under the circumstances of the case.  *Id.*  The court noted that the expert had asked for further proceedings, had entered an appearance in those proceedings, and had "received fair notice of the charges and a reasonable opportunity to be heard."  *Id.*, at *33 (citation omitted).  This justified the entry of sanctions not only against the defendant but against the expert personally.

---

[13] Certainly this Court could order proceedings to inquire further into the misrepresentations made in, and other circumstances surrounding, the Young Sur-Reply.  Plaintiffs stand ready to do their part to create more of a record on this matter, including by way of focused discovery, should the Court wish to see further evidence in any regard.

While here, plaintiffs do not urge at the present time that monetary sanctions be levied against Mr. Young personally, they have asked, *inter alia*, that Mr. Young not be permitted to testify in this matter any further as an expert for the defendants.  Further, they have asked that henceforth Mr. Young not be permitted to testify as an expert before this Court for any party.  Surely the Court has the power to impose those sanctions, as illustrated by the district court's order in *Schmidt*.  Furthermore, *Wojcicki* is yet one more authority which supports the imposition of the other sanctions sought by the plaintiffs in their instant motion.

In sum, what defendants and Mr. Young have done is serious.  They are well aware that this case involves a field in which many of the practices and protocols are specialized and esoteric.  They are attempting to exploit this characteristic of the case by proffering a supposed expert in the field, someone whom the Court is supposed to be able to trust because of his immense experience in health care.  This makes the Young Sur-Reply all the more pernicious.  It is not benign at all, but rather it is a Trojan horse designed to inject into this process a collection of deceits and half-truths.  In other words, the Young Sur-Reply was designed to mislead the Court to the defendants' advantage – it was designed to produce a win, no matter what the truth is.  This is classic fraud on the court, and it ought not to be tolerated.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court should sanction the defendants as it deems appropriate, but at a minimum in the manners urged by the plaintiffs.

- 16 -

DATED: March 14, 2005

By___/s/ Steve W. Berman_____
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

- 17 -

Kenneth A. Wexler
Jennifer F. Connolly
The Wexler Firm, LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Samuel D. Heins
Alan I. Gilbert
Susan E. MacMenamin
Heins, Mills & Olson, P.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone: (612) 338-4605
Facsimile: (612) 338-4692
**CO-LEAD COUNSEL FOR
PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SANCTIONS BASED ON DEFENDANTS' SUBMITTAL OF SUR-REPLY OF STEVEN J. YOUNG** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on March 14, 2005, a copy to Verilaw Technologies for Posting and notification to all parties

By  **/s/ Steve W. Berman**
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292

- 19 -