## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

)
)
)
)
)

MDL No. 1456

CIVIL ACTION: 01-CV-12257-PBS

THIS DOCUMENT RELATES TO
ALL CLASS ACTIONS

)
)
)
)
)
)

Judge Patti B. Saris
Chief Magistrate Judge Marianne B. Bowler

### <u>CLASS PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO</u>
### <u>STRIKE THE SUR-REPLY DECLARATION OF STEVEN J. YOUNG</u>

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................1

II.     FACTS ...................................................................................................................2

III.    ARGUMENT .........................................................................................................3

        A.      Young Is Not Qualified to Render the Opinions Offered and Has Not
                Followed Any Methodology Allowable Under Fed. R. Evid. 702 .........................3

        B.      Young's Sur-reply Violates Fed. R. Evid. 702 ........................................................4

        C.      Young's Opinions Are Not Reliable Due to His Distortion of the Record ............7

                1.      Young's Conclusion That Commercial Payor Contracts Do Not
                        Reference AWP is False ..............................................................................7

                2.      Young's Conclusions Based on a Misleading Sample of Contracts
                        is Contradicted by Other More Reliable Evidence .......................................9

        D.      Mr. Young Incorrectly Asserts that Commercial Payor Reliance Upon
                J-Codes in Their Claims Data Makes It Impossible to Reference the
                Appropriate NDCs and AWPS of the Specific Injectible Drugs ...........................11

        E.      Young's 98-Page Sur-Reply Citing to Hundreds of New Pages of
                Material Is Improper ..............................................................................................15

IV.     CONCLUSION .....................................................................................................16

# TABLE OF AUTHORITIES

## CASES

*In re Aluminum Phosphate Antitrust Litig.*,
  893 F. Supp. 1497 (D. Kan. 1995) ........................................................................................6

*Ares-Serono, Inc. v. Organon Int'l B.V.*,
  153 F.R.D. 4 (D. Mass. 1993) ..............................................................................................3

*Black v. TIC Inv. Corp.*,
  900 F.2d 112 (7th Cir. 1990) ..............................................................................................15

*Boustead v. Barancid*,
  151 F.R.D. 102 (E.D. Wis. 1993) ........................................................................................15

*Center Dev. Venture v. Kinney Shoe Corp.*,
  757 F. Supp. 34 (E.D. Wis. 1991) ........................................................................................15

*Chapman v. Bernard's, Inc.*,
  167 F. Supp. 2d 406 (D. Mass. 2001) ....................................................................................6

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*,
  754 F.2d 404 (1st Cir. 1985) ..............................................................................................15

*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993) ..............................................................................................................5

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ................................................................................................6

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ..............................................................................................................6

*Hartley v. Wisconsin Bell, Inc.*,
  930 F. Supp. 349 (E.D. Wis. 1996), *aff'd*, 124 F.3d 887 (7th Cir. 1997) .........................15

*United States v. Medeiros*,
  710 F. Supp. 106 (M.D. Pa.), *aff'd*, 884 F.2d 75 (3d Cir. 1989) ........................................15

## RULES

Fed. R. Civ. P. 26 ..................................................................................................................2

Fed. R. Evid. 702 ...........................................................................................................*passim*

- ii -

## I.    INTRODUCTION

This Court should strike the Sur-Reply Declaration of Steven J. Young ("Young") for the following reasons. As demonstrated in plaintiffs' motion to strike his original declaration, Young (a) refuses to disclose the "experience" that is the sole basis for his opinion, (b) is not an economist or statistician and has never negotiated a physician-administered contract and therefore is not an expert on such contracts or whether they can be analyzed on a class-wide basis, and (c) his opinion is in reality a thinly veiled effort of defense counsel to use Young to "summarize" carefully selected bits of evidence and draw conclusions from that evidence. Such a summarization is not the role of an expert and certainly not Young, who is not only not qualified, but as demonstrated below, has marshaled the evidence presented in a completely misleading fashion.

The deficiencies in Young's original analysis are magnified in the sur-reply. Not only does Young continue to summarize evidence, but in doing so he has attempted to mislead the Court. For example, Young spends dozens of pages in his sur-reply, and submits binders full of contracts, purporting to show that in the physician-administered arena outside the Medicare Part B context, AWP is not used as a basis for reimbursement. However, this assertion is contradicted by the evidence available to Young, which he has not shown to the Court. As demonstrated below, Young, by omitting such evidence, has offered opinions based on a misleading record. His declaration is therefore so flawed as to be unreliable under Fed. R. Evid. 702. Further, as demonstrated below, the remainder of Young's opinions, as to the use of AWP as a reimbursement benchmark in the physician-administered context, are also unreliable for the same reasons and should be stricken as well.

- 1 -

Finally, Young's sur-reply should be stricken as an abuse of the proper scope of a sur-reply. Defendants were given 20 pages in sur-reply. Young's sur-reply is 98 pages, with 35 pages of additional text, with over another 100 pages of charts, supplemented by 20 binders. It addresses almost exclusively physician-administered drugs, a subject covered in a few short paragraphs in his original declaration. This flood of new evidence on the same topic should have been included in defendants' opposition and thus goes far beyond the scope of a sur-reply. Young does not get a "do over" by way of a sur-reply in order to bolster his earlier opinions and his attempt to do so should be stricken.

## II.   FACTS

Defendants filed Mr. Young's sur-reply declaration on January 21, 2005. With his "attachments," it is 98 pages long. In those 98 pages, Mr. Young does nothing to shore up his qualifications as an expert. Further, he makes no new effort to comply with the expert disclosure provisions of Fed. R. Civ. P. 26. In short, his inability to qualify as an expert is as manifest as it was when class plaintiffs wrote their motion to strike his first declaration.

The bulk of Young's material addresses the issue of physician-administered contracts. In his original declaration, Young claimed that physicians were not reimbursed based upon AWP. He did so by purporting to have analyzed payor-physician contracts produced in this litigation. However, when the full record regarding those contracts was searched, it turned out that AWP was the basis for reimbursement in the same contracts he proffered. *See* Hartman Rebuttal Decl., ¶ 21(c) at pp. 22-23.[1] Thus, the primary thrust of Young's opposition to the physician-administered non-Part B Class was severely damaged by plaintiffs' reply.

---

[1] Attaching fee schedule from BCBS of Kansas using AWP as the only basis for reimbursement.

To heal this wound, Young spends almost 90 pages directed solely to the issue of physician-administered contracts citing to some 20 binders of material not previously tendered to the Court.

### III.   ARGUMENT

**A.   Young Is Not Qualified to Render the Opinions Offered and Has Not Followed Any Methodology Allowable Under Fed. R. Evid. 702**

This Court possesses the inherent authority to disqualify or strike experts' testimony under certain circumstances. *Ares-Serono, Inc. v. Organon Int'l B.V.*, 153 F.R.D. 4, 6 (D. Mass. 1993). Such circumstances include the ones present here, where defendants rely on a supposed expert who is not qualified to attack statistical and econometric analyses prepared by credentialed and experienced experts on the issue of the applicability of class-wide proof, and where the supposed expert merely summarizes certain evidence and then makes analytic leaps and factual over-generalizations not tied specifically to his experiences in the health care industry. Fed. R. Evid. 702 allows expert testimony in the nature of "scientific, technical or other specialized knowledge" through a witness qualified by "knowledge, skill, experience or training...." The question before this Court is whether plaintiffs, through expert testimony, can prove class-wide impact using plausible techniques. Dr. Hartman proposes to do so using well-recognized economic techniques, including regression and covariant analysis. Young is not qualified by education, training or experience to render any opinion on this topic. His only hope of offering himself as an expert is to proclaim his "experience" qualifies him as an expert since he has no training in the sciences relevant to Dr. Hartman's analysis.

However, experience will not save Young as the sur-reply deals almost exclusively in an area where he has no experience:

- 3 -

> Q.   Have you ever been hired to consult with a health plan in connection with their reimbursement for any injectibles pharmaceutical product.
>
> A.   No, I have not.

Young Transcript, pp. 53-55.

Having offered no other qualification as to any special expertise he offers to the Court, Young has not qualified himself to offer an opinion in this case.[2]

## B.   Young's Sur-reply Violates Fed. R. Evid. 702

Fed. R. Evid. 702 provides that an expert can testify if the testimony is (1) based upon sufficient facts or data, (2) is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to this case.  As demonstrated below none of the foregoing requirements of Rule 702 has been met.

The core of Young's sur-reply is his analysis of "documents provided in discovery" and his discussion of "various information provided in discovery."  Young Sur-Reply ("YSR") at Attachment D, ¶ 1.  His opinion is in essence Young's "interpretation" of that discovery.  YSR ¶ 4 is typical of Young's methodology in which he makes a sweeping generalization without citation to the record and states "the discovery in this matter shows that."  Virtually the entire sur-reply is Young's review of discovery and his conclusions as to what discovery shows.

However, unlike Dr. Hartman who used discovery to show that the facts tended to confirm that he could use reliable and well-established economic techniques to model class-wide impact and damages, Young not once opines that his review of discovery analysis is grounded in sufficient facts to form reliable conclusions concerning the behavior of a class of approximately 20,000 third-party payors.  His analysis of some 206 contracts is not based upon sufficient facts

---

[2] Young still continues to refuse to disclose his purported industry-based experience.

or data to form conclusions as to an entire industry.[3]  Nor does Young anywhere in his opinion

identify the reliable principles for his analysis as required by Fed. R. Evid. 702(2).  For example,

in his opinion that payors did not view AWP as a signal for acquisition costs (YSR, ¶ 4), Young

bases this solely on what "discovery shows" (YSR, p.3)  There is no basis for concluding that his

analysis of what discovery "shows" is a reliable principle for providing special knowledge to the

Court particularly where the witness admitted he has no experience with reimbursement for

injectibles.  *Id.*  In his next opinion, Young states, the basis for reimbursement must be based on

an analysis of the entire fee schedule.  YSR, ¶ B, p. 3.  Yet this is a simply take-my-word-for-it

opinion.  Young makes no attempt to satisfy any element of Rule 702 in this opinion.  He does

not cite to studies, articles or journals accepting the analytical technique as a reliable basis for

opinion testimony.  Also, by way of example, throughout his sur-reply, he makes sweeping

statements concerning an entire industry based upon conclusions from two pages of a deposition

transcript.  (*See, e.g.*, YSR, pp. 7-8 at notes 12-13, where Young forms a conclusion as to an

entire industry based on citation to two depositions and one document.)  This pattern of

fragmentary support for sweeping conclusions is repeated throughout his sur-reply.  It would

take the 90-plus pages he used to list every similar opinion where he offers sweeping opinions

based upon a few facts taken from discovery.  The Court, however, can readily conclude that

these opinions do not come close to meeting Fed. R. Evid. 702.

The fundamental requirement of expert testimony is that an expert's opinion be

"ground[ed] in the methods and procedures of science" and not "subjective belief or unsupported

speculation."  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590 (1993).  Thus courts examine

experts' testimony carefully to see if the opinion is based upon known scientific technique.  *See,*

---

[3] YSR at Ex. 2 identifying a review of 206 contracts.

- 5 -

*Chapman v. Bernard's, Inc.*, 167 F. Supp. 2d 406, 419-20 (D. Mass. 2001). Young has offered no evidence of any reliable scientific technique that supports his review of taking a few bits of discovery as a basis for offering opinions as to an entire industry and his opinion therefore must be stricken.

Saying "Trust me; I know these things" is insufficient. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (reminding that court is not required to admit opinion evidence where connection of opinion evidence to existing data is made merely on the basis of the expert's say so); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert* [the Supreme Court case], that's not enough."); *see also In re Aluminum Phosphate Antitrust Litig.*, 893 F. Supp. 1497, 1506 (D. Kan. 1995) (citing with approval case where court refused to permit expert witness to offer certain opinions because expert had been called upon not "to supply specialized knowledge but to speculate and hypothesize," and where opinion was based on surmise; court likewise rejected "expert" opinion where proposed expert was called upon "to plug evidentiary holes in plaintiffs' case, to speculate, and to surmise") (citation omitted). Here, Mr. Young never explains how it is that his experience qualifies him to make the sort of extrapolations he attempts in his sur-reply. Without compelling explanation, his "expert" papers should be rejected.

Unlike Dr. Hartman, who cites a body of case law, papers, abstracts and peer-reviewed articles that support his economic approaches, Young cites to no such authority. The entire declaration is simply Young on the meaning of bits of evidence without even an attempt to claim such evidence gathering is the product of reliable principles and methods. This approach is unprecedented and does not comport with Fed. R. Evid. 702.

- 6 -

**C.   Young's Opinions Are Not Reliable Due to His Distortion of the Record**

However, most importantly, Young fails to demonstrate that "he has applied the

principles and methods *reliably* to the facts of this case." Fed. R. Evid. 702.  Indeed a careful

analysis of the record indicates that Young has deliberately distorted what was available to him

in order to provide opinions favorable to defendants.  Although Young manipulated data in his

original materials, the level of obfuscation, if not downright deceit in his sur-reply is shocking.

Certainly it requires that his materials be stricken, if not more serious, sanctions imposed against

Young.

**1.    Young's Conclusion That Commercial Payor Contracts Do Not Reference AWP is False**

A major thrust of Young's sur-reply is the claim that payors do not reimburse based on

AWP.  Young asserts that out of 206 contracts only nine reference AWP.[4]  To reach this

conclusion Young attaches binders full of contracts – yet few of the contracts actually include

the actual fee schedules.  Those fee schedules *do* reference AWP and were available to Young,

but he either was sloppy and did not discover them, or deliberately omitted them from his

analysis.  Listed below are just a few examples of such documents that Young does not cite and

which contradict his conclusions that each of these payors he discusses in his opinion did not use

AWP.  In each instance, Young cited to binders of material as to each payor, but excluded the

material below that refutes his opinions:

> 1. A contract between Blue Cross Blue Shield of Tennessee and a specialist physician includes an attachment that outlines reimbursement in accordance with their *"Maximum Allowable Fee Schedule is based on Average Wholesale Price*

---

[4] YSR at Ex. 2.

- 7 -

*(AWP)"* (FCC 000485-96 at FCC 000495). Attached as Exhibit A (emphasis added).[5]

2. An amendment to a contract agreement between Unicare Life & Health Insurance and Texas Cancer Care states, *"Pharmacy (including infusion therapy drugs): maximum allowable reimbursement based on average wholesale price (AWP) according to UNICARE selected published market data, including, but not limited to, sources such as the Drug Topics Red Book"* (TCC 000473-90 at TCC 000474). Attached as Exhibit B (emphasis added).

3. An appendix to a contract agreement between United Healthcare of Texas and Southwest Physician Associates states that the fee maximum for pharmaceuticals will be *"100% of AWP"* (TCC 000981-1000 at TCC 001000). Attached as Exhibit C (emphasis added).

4. A contract agreement between Better Health Plans, Inc. and a "Consulting Physician" includes an amendment that states, *"Health Plan shall compensate Consulting Physician at 90% of the Average Wholesale Price (AWP) for all drugs. These drugs shall be billed with the appropriate NDC codes"* (FCC 000595-614 at FCC 000613). Attached as Exhibit D (emphasis added).

5. Five additional contracts involving Premera Blue Cross which expressly use AWP as a reimbursement point.[6] Among these documents are contracts with Medco and Caremark that specify by AWP the level of reimbursement for *each* injectible drug. Typically AWP -- 16%.[7]

None of this material was supplied to the Court or referenced by Young. Even when cited by Mr. Young, his evaluations of contracts are unreliable. This is graphically illustrated in a chart showing ten different physician contracts and/or amendments produced to plaintiffs and cited by Young as *not* being based on AWP. The chart shows that these contracts are in fact based on or reflect AWP pricing.[8] Another example arises from Young's analysis of contracts in his Exhibit 2. Of these contracts, 8% pre-date the class period, and 49% refer to fee schedules

---

[5] All exhibits referenced in Plaintiffs' Memorandum unless otherwise indicated are attached to the Rebuttal Declaration of Dr. Raymond S. Hartman in Response to Sur-reply of Steven Young ("HRebuttal").

[6] HRebuttal at ¶ 5, Ex. E.

[7] *See* Ex. E at PBC 0239.

[8] *See* HRebuttal at ¶ 5, p. 6; Ex. F.

- 8 -

*not* included; hence it is impossible to draw a conclusion they do not reference AWP without publishing the rate schedules.[9]

In sum, what Young has done is to proffer conclusions by offering the Court bits of evidence. The totality of evidence available to Young and defendants contradicts his conclusions, which in turn renders his opinion so unreliable as to require rejection.

### 2. Young's Conclusions Based on a Misleading Sample of Contracts is Contradicted by Other More Reliable Evidence

As noted, Young's opinions, that he would have the Court apply to a class of approximately 20,000 third-party payors, are based upon an analysis of 206 contracts, some of which predate the class period, some are not in effect "contracts" but refer simply to medical procedures, and half of which provide *no* information about payment rates.[10] Thus, when these errors are accounted for, at best, less than 100 contracts could even qualify to form the basis for his opinion. This limited group of contracts cannot satisfy the reliability standard of Fed. R. Evid. 702 for drawing conclusions as to an entire industry.

In lieu of this tiny sample, available to Young were actual surveys of the business practices of payors with respect to physician-administered contracts. Those surveys, which were not based on selecting bits of evidence, covered large groups of payors and are the type of material an expert could rely on, along with other evidence, in forming an opinion. And there is no evidence those surveys were biased in their approach to analyzing the evidence or selecting which contracts to present. The conclusions of these more comprehensive surveys are opposite to Young's.[11]

---

[9] HRebuttal at ¶ 4, pp. 2-3.

[10] *See* HRebuttal ¶ 6, p. 7 (referencing Ex. G and listing errors in Young's analysis).

[11] *See* HRebuttal, ¶ 5.

- 9 -

The more complete survey analyses that are available demonstrate that *AWP is the reference point for reimbursement rates* (regardless of whether they are called "maximum allowable amounts," "usual and customary amounts," "reasonable, equitable fee schedules (REF)," "actual amount," "billed amount," or "compensation schedules") *for commercial payors for physician-administered drugs.* Mr. Young is aware of these survey analyses; he includes them as back-up materials to his Sur-reply. One survey was conducted by Dyckman & Associates[12] for the Medicare Payment Advisory Commission, or MedPAC; the other by the University of Chicago and the Health Policy Institute of Georgetown University[13] for MedPAC. Both studies were relied upon by MedPAC at some length in their June 2003 Report to the U.S. Congress.

The survey conducted by Dyckman & Associates surveyed 33 large private health plans including Blue Cross Blue Shield plans and national managed care plans whose covered lives represented over one fifth of those with private insurance in the United States (40 million lives). The study conducted by NORC at the University of Chicago (in conjunction with the Health Policy Institute at Georgetown) surveyed a range of stakeholders in the market for physician-administered pharmaceuticals. *Each study indicates that average wholesale price (AWP) is used consistently as the basis for reimbursement of physician-administered drugs in the private sector.*[14]

The Dyckman survey consisted of a set of open-ended questions posed to representatives from the health plans. One was, "How do you set prices for physician-administered drugs?"

---

[12] http://www.medpac.gov/publications/contractor_reports/Aug03_DrugsPay(cont)Rpt.pdf

[13] http://www.medpac.gov/publications/contractor_reports/Aug03_DrugsDist(cont)Rpt.pdf

[14] HRebuttal ¶ 7, pp. 7-9 (emphasis in original).

*Each respondent reported that AWP was one component of their reimbursement formula.*
Exhibit 2, on page three of the report, showed that *32 respondents reimbursed physician-administered drugs as a direct function of AWP, while one respondent used a more complex formula that included AWP. Id.* (emphasis in original).

The NORC survey involved a semi-structured interview with respondents including four oncologists, two health plans, two pharmacy benefits managers, three specialty pharmacy companies, one wholesaler, one group purchasing organization, and three consultants. In the key findings with regard to private insurer reimbursement of physician-administered cancer drugs, the authors identified four types of drug prices typically used as the basis for reimbursement (page 12). The first is based on actual or "dead" acquisition cost, which is said to be the actual amount the physician (or sometime third-party payors) paid for the drugs. The second is AWP. The third is wholesale acquisition cost, which is formulaically related to AWP. The fourth is Medicare allowable cost, which is also based on AWP. The report goes on to say that "*most private payers have followed Medicare's lead and pay physicians based on AWP.*" *Id.* (emphasis in original).

Both surveys thus contradict Mr. Young's assertion that commercial payors do not reference AWP when negotiating reimbursement rates for physician-administered drugs. These surveys, combined with the error analysis, further demonstrate the unreliability of Young's opinions. *Id.*

**D.**   **Mr. Young Incorrectly Asserts that Commercial Payor Reliance Upon J-Codes in Their Claims Data Makes It Impossible to Reference the Appropriate NDCs and AWPs of the Specific Injectable Drugs**

As both Dr. Hartman and Dr. Rosenthal demonstrated, due to the nature of claims data in this case, it is readily possible to identify at the claims stage of this case those transactions that

- 11 -

are AWP based. Young recognizes that this defeats his prior arguments on this point. So, in his sur-reply, Young employs an additional strategy of obfuscation. Specifically, he takes insurance claims for physician services within a given J-code or Q-code and presents the raw data on reimbursement amounts, which essentially fill the graph. For example, in his sur-reply, he performs this exercise in his Exhibit 3.02 for BCBSTN (Blue Cross Blue Shield of Tennessee) for Procrit-Q0136; in his Exhibit 3.03 for BCBSTN for Remicade J1745; and in Exhibit 3.04 for Taxol J-9265. He produced analogous scatter plots in Exhibit 15 of his Rebuttal Declaration in this matter.

The apparent aim of these presentations is to misdirect any reader (in ¶¶ 43-45) into thinking that a commercial payor simply has no idea how the drug reimbursement rates requested in a submitted claim can be evaluated or audited by that commercial payor against the relevant reimbursement fee schedules used by that payor or used by Medicare Part B (which references AWP). Mr. Young states (¶¶ 44-45): "A health plan does not even know which manufacturers' product they are reimbursing when a claim is submitted related to a multi-source drug under a J-Code; [and] Medicare also uses J-codes to reimburse all physician-administered drugs under Part B. Therefore, each of these issues applies equally to physician–administered drug reimbursements under Medicare Part B."

Mr. Young's contention is wrong. All commercial payors have fee schedules that allow the payor to translate J-codes in a given claim into the relevant NDCs administered by the physician. The discovery materials and Mr. Young's own supporting materials make clear that commercial payors can disaggregate the dosage and presentation (*i.e.*, the NDC) of the relevant drug administered by the physician and claimed by the physician for reimbursement by the payor. For example, in the September 14, 2004 deposition of Paula Pfankuch, the representative

- 12 -

for Health Care Service Corporation (*i.e.*, Blue Cross Blue Shield of Illinois – BCBS-IL), she states in her transcript:

> Q:   Okay.  So then for drugs administered in a physician setting, they were subject to the fee schedule?
>
> A:   Yes, they are.
>
> Q:   That's the underlying Medicare base fee schedule?
>
> A:   Yes.
>
> Q:   Okay.  And then how was that fee schedule derived?
>
> A:   That fee schedule is based currently on the dollars that Medicare publishes for those J codes, and we use a percentage of the Medicare allowable.
>
> Q:   And how long has that been the methodology which you've used?
>
> A:   I believe that's been in place since 1999.
>
> Q:   And how did you reimburse for drugs administered by a physician before 1999?
>
> A:   ***Prior to 1999 the full service units – those are our claim payment areas – utilized the AWP as published in the Red Book.***  I would like to clarify for that last statement that it was a percentage of the AWP published in the Red Book.
>
> Q:   Okay.  And can you tell me what Blue Cross Blue Shield of Illinois understood AWP, or average wholesale price, to be?
>
> A:   Simply the average wholesale price.
>
> Q:   And the average wholesale price, what do you mean by that?
>
> A:   Our understanding of it is very limited, at least within the professional reimbursement area.  It is simply a term that we would look to for pricing.  There is not a tremendous amount of knowledge about AWP specifically other than it seems to be the industry standard for the baseline

- 13 -

> reimbursement for physician-administered drugs."
> [Pfankuch Dep. at 25-26 (emphasis added).]

The following documents also show that the use of J-codes in pharmaceutical

reimbursement contracts is common and routine and is derived from AWPs. Each of these

documents provides an example where covered pharmaceuticals are identified in terms of

J-codes and the reimbursement of those codes is set in relation to AWP. Although Mr. Young

has cited numerous documents from some of these entities and others, he does *not* cite a single

document listed below, all of which were available to him.

      a.     A Blue Cross Blue Shield of Texas Physician Contract with
Specialty Injectable Drug Program showing J and Q code
pricing in terms of AWP-25% or AWP-15% (TCC 00035-
000361). Ex. H to HRebuttal Decl.

      b.     A Letter from Baptist & Physicians to IDS Provider
announcing reimbursement for administered plans of
HCPCS J codes at AWP (FCC 000299). Ex. I to HRebuttal
Decl.

      c.     An AmCare Health Plans of Texas, Inc. Specialty Care
Physicians Services Agreement that provides that HCPCS
codes will be reimbursed at AWP+10% (TCC 000249-
000286 at 000267). Ex. J to HRebuttal Decl.

      d.     An amendment to a provider group agreement between
Beech Street Corporation and Southwest Physicians
Associates that provides a fee schedule that calls for J
codes to be reimbursed at the lesser of billed charges or
100% of AWP per Red Book current version (TCC
000365-000386 at 000369). Ex. K to HRebuttal Decl.

      e.     Letter with amendments to oncology clinic from Aetna
providing all J-codes to be reimbursed at 100% of AWP
(SPH 002023-002026 at 002025). Ex. L to HRebuttal
Decl.

This testimony and documentation further undermine the reliability and worth of

Young's analysis. To correct Young's misinformation, which unfortunately infected

- 14 -

Dr. Berndt's analysis since it came in unrebutted, Dr. Hartman explains how J-codes can be tied to AWP and how aggregate damages can be calculated for this class. HRebuttal at Section IV, pp. 18-22.

### E.     Young's 98-Page Sur-Reply Citing to Hundreds of New Pages of Material Is Improper

In their original opposition, despite Young's 150-page-plus submission and platoon of binders, he and defendants paid scant attention to the issue of physician-administered drugs. What attention they did provide was rebuffed by Dr. Hartman who pointed out the errors in Young's analysis, including the use of AWP by payors who Young said did not use AWP. *See* Hartman Reply, Decl., ¶ 21(c) at pp. 22-23. Stung by the reply, in sur-reply, Young engages in a 90-plus-page analysis citing new evidence that if germane, should have been in his original opposition. Courts have condemned such ambush tactics. *See*, for example, *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990) (where new evidence is presented in reply to motion for summary judgment, district court should not consider new evidence without giving opportunity to respond); *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F. Supp. 404, 410 (1st Cir. 1985) (same); *Center Dev. Venture v. Kinney Shoe Corp.*, 757 F. Supp. 34, 36 (E.D. Wis. 1991); *United States v. Medeiros*, 710 F. Supp. 106, 110 (M.D. Pa.), *aff'd*, 884 F.2d 75 (3d Cir. 1989); *Hartley v. Wisconsin Bell, Inc.*, 930 F. Supp. 349, 352-53 (E.D. Wis. 1996) (court struck new evidence attached to summary-judgment reply brief), *aff'd*, 124 F.3d 887 (7th Cir. 1997); *Boustead v. Barancid*, 151 F.R.D. 102, 106 (E.D. Wis. 1993) (same).

The Young sur-reply goes beyond the scope of a proper sur-reply and should be stricken for that reason as well.

## IV.   CONCLUSION

For the reasons stated herein, the Young sur-reply should be stricken.

DATED:  March 10, 2005

By _____

Thomas M. Sobol (BBO#471770)
Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

- 16 -

Kenneth A. Wexler
Jennifer F. Connolly
The Wexler Firm, LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Samuel D. Heins
Alan I. Gilbert
Susan E. MacMenamin
Heins, Mills & Olson, P.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone: (612) 338-4605
Facsimile: (612) 338-4692
**CO-LEAD COUNSEL FOR
PLAINTIFFS**

- 17 -

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **CLASS PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO STRIKE THE SUR-REPLY DECLARATION OF STEVEN J. YOUNG** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on March 10, 2005, a copy to Verilaw Technologies for Posting and notification to all parties

By_____

Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
(206) 623-7292

- 18 -