# MOTION TO RENEW EXHIBIT A



E. SERVED
01/20/05
9:32 PM ET
MDL No. 1456

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

THIS DOCUMENT RELATES TO:

*County of Suffolk v. Abbott Laboratories, Inc.,
et al.,*
E.D.N.Y. Case No. CV-03-229

MDL. NO. 1456

Civil Action No. 01-CV-12257- PBS

Judge Patti B. Saris

## COUNTY OF SUFFOLK'S SECOND MOTION TO COMPEL THE PRODUCTION OF DISCOVERY FROM THE SCHERING-PLOUGH CORPORATION

Suffolk County files this motion for entry of an order directing Schering-Plough Corporation ("Schering") to produce documents relating to its participation in a lawsuit commenced by the State of Texas alleging that Schering and Warrick among others reported fraudulent AWP's to the Texas Medicaid program (the "Texas Action"). Suffolk requests that this motion be heard on January 27, 2005, when its motion to compel electronic discovery from Schering is already scheduled. *See* Notice entered January 10, 2005, attached hereto as Exhibit A.

On November 9, 2004, Suffolk served on Schering its Third Request for Production of Documents, seeking all "Documents, testimony (including but not limited to deposition and hearing transcripts), communications, expert reports or other materials produced by You in response to any/or related in any way to the litigation captioned *The State of Texas ex. rel. Ven-A-Care of the Florida Keys, Inc. v. Warrick Pharmaceuticals, Schering-Plough Corp. et al.*, No. GV002327 in the 53rd Judicial District of Travis County, Texas."



The following day, on November 10, 2004, counsel for Suffolk, Joanne M. Cicala, proposed to Schering's counsel that Schering need not actually re-produce to Suffolk that which it produced to Texas, if Schering would consent to Suffolk's independent access of those materials. Specifically, "in the interest of efficiency and cost-savings, we propose that instead of creating a duplicate production for us, you instead consent to our accessing these documents in Austin." *See* November 10, 2004 Letter from Joanne M. Cicala to Darcy W. Shearer, attached hereto at Exhibit B. Suffolk Counsel noted that "we have spoken with representatives of the Texas Attorney General who agreed to this approach". *Id.* Suffolk offered to be made a party to the protective order entered in the Texas Action, to protect Schering's confidential information. *Id.* By taking these steps, Schering would not have the burden and expense of making a duplicative production of the Texas Schering documents to Suffolk.

By a letter dated November 15, 2004, Schering rejected this solution taking the position that since discovery had been stayed as to Warrick by Judge Saris' Memorandum and Order dated October 26, 2004 and that the "documents [Suffolk] now seek[s] to review are related solely to Warrick Pharmaceuticals," Schering had no obligation to produce any of them. *See* November 15, 2004 Letter from Darcy W. Shearer to Joanne M. Cicala, attached hereto at Exhibit C.

Suffolk counsel explained in phone calls and letters that the documents it sought were not those produced by Warrick in Texas, but rather those produced by Schering in Texas. *See, for example,* January 17, 2005 letter from Joanne M. Cicala to Darcy W. Shearer, attached as Exhibit D. Suffolk noted that Schering was producing documents to it in this action and that its position regarding the Texas matter was arbitrary and unsupportable given that Schering was a named



defendant in the Texas Action (*see*, State of Texas' Seventh Amended Petition at ¶ 1.2, attached hereto at Exhibit E) and certainly produced documents there.

Moreover, Schering is a party to the settlement agreement, which ended the Texas Action. Schering's August 3, 2004 10-Q, affirmatively states that Schering settled the Texas Action for $27 million on May 3, 2004. *See* August 3, 2004 Schering-Plough Corporation Form 10-Q, relevant excerpts attached hereto at Exhibit F at pg. 50. In that same 10-Q, Schering describes Warrick as Schering's "generics subsidiary." *Id.* The two companies share leadership, offices, and attorneys. *See* Seventh Amended Petition (Exhibit E) at ¶ 9.3.

Avoiding the point, in its most recent correspondence Schering now states that "the documents [Suffolk] seek[s] to review in the Texas action relate solely to drugs manufactured by Warrick." *See* January 19, 2005 Letter from Darcy W. Shearer to Joanne Cicala, attached here to as Exhibit G. Rank *ipse dixit*, the statement is highly suspect given that the Texas complaint plainly refers to drugs manufactured by both Schering and Warrick, *See* Seventh Amended Petition (Exhibit E) at ¶¶ 7.6 and 8.11. And, of course, all of this is apart from the question whether Warrick, with just a very small number of employees, actually "manufactures" anything.[1] *Id.* at ¶ 9.3.

If Schering's position is that it produced no documents in Texas, then it should just say so. Absent that, Suffolk moves for entry of the attached proposed order directing Schering to produce to Suffolk all those documents requested in Suffolk's Third Request for Production, specifically all documents produced by Schering in the Texas Action. Suffolk further moves for an order prohibiting Schering from opposing Suffolk's petition to become a party to the

---

[1] Indeed, the State of Texas sought to pierce Warrick's corporate veil in the Texas action, alleging that Warrick was essentially a marketing division for generic products within the Schering corporation. *See* Seventh Amended Petition (Exhibit E) at ¶ 9.3.

3



E-SERVED
01/20/05
09:32 PM ET
AMP-MDL No. 1456

protective order in the Texas Action if such is necessary.   A draft proposed order is annexed hereto.

### Certification Pursuant to Local Rule 7.1

Pursuant to Local Rule 7.1(a), the undersigned counsel certify that counsel for Plaintiff County of Suffolk discussed the subject of this motion in correspondence dated November 10, 2004, a phone call on January 13, 2005 and a letter on January 17, 2005 in an attempt to resolve the issues addressed. Schering did not alter its position and in a letter dated January 19, 2005 reaffirmed that it would not produce the requested discovery.   Accordingly, Suffolk is unable to resolve the issue other than through the filing of this second motion to compel.

Dated:  January 20, 2005

Respectfully submitted,

KIRBY McINERNEY & SQUIRE, LLP

By:   ___/s/ Joanne M. Cicala___
      Joanne M. Cicala
      Aaron D. Hovan
830 Third Avenue
New York, N.Y.  10022
(212) 371-6600

COUNSEL   FOR   PLAINTIFF   THE COUNTY OF SUFFOLK

4



E-SERVED
01/20/05
09:32 PM ET
MDL NO. 1456

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL. NO. 1456 |
| THIS DOCUMENT RELATES TO: | Civil Action No.  01-CV-12257- PBS |
| *County of Suffolk v. Abbott Laboratories, Inc., et al.,* E.D.N.Y. Case No. CV-03-229 | Judge Patti B. Saris |

## [PROPOSED] ORDER GRANTING COUNTY OF SUFFOLK'S MOTION TO COMPEL THE PRODUCTION OF DISCOVERY FROM THE SCHERING PLOUGH DEFENDANTS

Having considered each of the parties' submissions with respect to the County of Suffolk's Second Motion To Compel The Production Of Discovery from Schering-Plough Corporation, the Court hereby grants the motion.

It is hereby ordered that Schering-Plough Corporation shall produce immediately to Suffolk all documents, testimony (including, but not limited to, deposition and hearing transcripts), communications, expert reports or other materials produced by Schering-Plough Corporation in response to any/or related in any way to the litigation captioned *The State of Texas ex. rel. Ven-A-Care of the Florida Keys, Inc. v. Warrick Pharmaceuticals, et al.*, No. GV002327 in the 53rd Judicial District of Travis County, Texas.

It is further ordered that Schering-Plough Corporation shall not oppose any application made by the County of Suffolk to the courts of the State of Texas to gain



access to the documents produced in *The State of Texas ex. rel. Ven-A-Care of the Florida Keys, Inc. v. Warrick Pharmaceuticals, et al.*, No. GV002327.


Dated:_____

                                    _____

                                    Hon. Marianne B. Bowler
                                    United States Magistrate Judge



## Certificate of Service

I certify that on January 20, 2005 a true and correct copy of the foregoing County Of Suffolk's Second Motion To Compel The Production Of Discovery From The Schering-Plough Corporation was served on all Counsel of Record by electronic service pursuant to Case Management Order No. 2 by sending a copy to Verilaw Technologies for posting and notification to all parties.

/s/ Michael B. Coons
Michael B. Coons



# Exhibit A



# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CITIZENS FOR CONSUMER
JUSTICE, ET AL,

     Plaintiffs,

       v.                              CA. NO. 01-12257-PBS

ABBOTT LABORATORIES,
ET AL,
      Defendants.

## _NOTICE_

January 10, 2005

BOWLER, U.S.M.J.

    PLEASE TAKE NOTICE that a **hearing on docket entry ## 1175, 1189 (Defendants' Motion to Compel Third Party Health Net, Inc. to Produce Documents Pursuant to Subpoena and County of Suffolk's Motion to Compel the Production of Electronic Discovery from the Schering Plough Defendants) at 11:00 a.m., Thursday, January 27, 2005,** in courtroom # 25 on the 7th floor of the United States Courthouse, 1 Courthouse Way, Boston, Massachusetts.

                                  /s/ Marianne B. Bowler
                               **MARIANNE B. BOWLER**
                               United States Magistrate Judge

To:    ALL COUNSEL OF RECORD

**\*PLEASE NOTE: All persons entering the courthouse are required to show two forms of photo identification.**



# Exhibit B



# KIRBY McINERNEY & SQUIRE, LLP

TELEPHONE (212) 371-6600
(212) 317-2300
FACSIMILE (212) 751-2540

*830 Third Avenue*
*New York City  10022*

IRVING MALCHMAN, OF COUNSEL

**VIA FACSIMILE (617-951-7050)**

November 10, 2004

Darcy Shearer, Esq.
Ropes & Gray
One International Place
Boston, MA 02110

> Re:   ***Suffolk v. Abbott Labs (Schering Discovery) (Our file No. 549.01)***

Dear Darcy,

    I write regarding our Third Request for Production of Documents to Schering/Warrick, served yesterday.  This request asks that Schering produce to us that which it produced to the State of Texas in the Ven-a-Care matter.

    In the interest of efficiency and cost-savings, we propose that instead of creating a duplicative production for us, you instead consent to our accessing these documents in Austin.  Our firm has a presence in Texas, and we have spoken with representatives of the Texas Attorney General who have agreed to this approach.  We would be happy, of course, to subscribe to the Texas protective order if appropriate.

    Our suggestion in this regard will save time and money for all involved. Please advise us of your position on this subject by Wednesday, November 17, 2004.

Very truly yours,

Joanne M. Cicala

cc:   Aaron Hovan, Esq.
     James P. Carroll, Esq.
     Michael Coons, Esq.



# Exhibit C

01/19/2005  15:43    2144688498                    KIRBYMCINERNY                      PAGE   0
11/15/2004 15:55 FAX 212 751 2540      KIRBY McINERNEY & SQUIRE → JOANNE CICALLA       002
11/15/2004 15:50 FAX                                                                   002/00





**ROPES & GRAY LLP**

ROPES & GRAY LLP
ONE INTERNATIONAL PLACE    BOSTON, MA 02110-2624    617-951-7000    F 617-951-7050
BOSTON    NEW YORK    SAN FRANCISCO    WASHINGTON, DC

November 15, 2004

Darcy W. Shearer
(617) 951-7489
dshearer@ropesgray.com

**BY FACSIMILE**

Joanne M. Cicala
Kirby McInerney & Squire LLP
830 Third Avenue
New York, NY 10022
Fax: 212-751-2540

Re: In re Pharmaceutical Average Wholesale Price Litigation, MDL No. 1456 (County of
Suffolk v. Abbott Laboratories, Inc., et al.)

Dear Ms. Cicala:

I write in response to your letter of November 10, 2004 and to update you on the availability of
the Claritin MDL documents for your review.

Plaintiffs' Third Request for Production of Documents requests the production of all documents
produced to the State of Texas in the Ven-a-Care matter. You now propose that, in the interests
of efficiency and cost-savings, we consent to your review of these documents in Austin.

As you are aware, Judge Saris' Memorandum and Order dated October 26, 2004 stated that "all
discovery shall be stayed with respect to . . . Warrick Pharmaceuticals." The documents you
now seek to review are related solely to Warrick Pharmaceuticals. In light of the stay of
discovery, Warrick does not consent to your review of these documents at this time. Subject to
and without waiving any objections Schering and/or Warrick may file in response to Suffolk
County's Third Request, in the event the stay of discovery is lifted, we will reconsider your
request.

As stated in my letter of November 2, 2004, pursuant to CMOs No. 9 and 11, Schering will make
available for inspection the requested Claritin related MDL documents. These documents are
now collected and available for review by your team at our offices located at One International

9584520_1.DOC

01/19/2005   15:43        2144688498                    KIRBYMCINERNY                           PAGE
11/15/2004 15:56 FAX 212 751 2540        KIRBY McINERNEY & SQUIRE → JOANNE CICALLA        003
11/15/2004 15:50 FAX                                                                      008/00

Joanne M. Cicala                          - 2 -                    November 15, 2004

Place, Boston, MA 02110.  There are approximately one hundred boxes of documents available for inspection.   Please contact me at your convenience to schedule an inspection of these documents.

Very truly yours,

Darcy W. Shearer

cc:    John T. Montgomery
       Steven A. Kaufman
       Eric P. Christofferson



# Exhibit D

01/17/2005  16:45     2144688498          KIRBYMCINERNY                    PAGE

E-SERVED
01/20/05
09:32 PM ET
MDL NO. 456

# KIRBY McINERNEY & SQUIRE, LLP

TELEPHONE (212) 371-6600
(212) 317-2300
FACSIMILE (212) 751-2540

*830 Third Avenue*
*New York City 10022*

IRVING MALCHMAN, OF COUNSEL

## VIA FAX AND FIRST CLASS MAIL

January 17, 2005

Darcy W. Shearer, Esq.
Ropes & Gray LLP
One International Place
Boston, MA 02110-2624

Re: *County of Suffolk v. Abbott Labs, et al. (Our file 549.01)*
   *Discovery from Schering*

Dear Darcy:

I am writing to follow up on your discussion of January 13, 2005 with my associate Michael Coons, regarding access for our client, the County of Suffolk ("Suffolk") to the documents produced by your clients Schering Plough Corporation ("Schering") and Warrick Pharmaceuticals ("Warrick") in the action entitled *Texas v. Warrick Pharmaceuticals Corporation, et. al.*, No. CV002237 (the "Texas action").

Our client wishes to review the documents produced by your clients in the Texas action. The State of Texas' Office of the Attorney General told us that it would consent to Suffolk signing onto the Texas protective order in order for us to do this. However, during your phone conversation with Mr. Coons you took the position that because discovery has been stayed as to Warrick in the Suffolk action, you would neither produce to us the Texas documents, nor consent to Suffolk signing on to the Texas protective order.

While we can understand your position, we believe it is ultimately untenable, and will only lead to greater motion practice and expense, particularly as it concerns the Schering Texas production. As you are aware, Schering was a named defendant in the Texas action. Suffolk is currently receiving discovery from Schering, and it is entirely within Suffolk's right to demand any materials from Schering produced by it in the Texas action, as well as any relevant materials in Schering's possession relating to Warrick. There is no legitimate basis to deny Suffolk access now to the Schering Texas production.

WEBSITE: KMSLAW.COM          E-MAIL: KMS@KMSLAW.COM

01/17/2005  16:45    2144688498          KIRBYMCINERNY                    PAGE

E-SERVED
01/20/05
09:32 PM ET
MDP-MDL No. 14

KIRBY McINERNEY & SQUIRE, LLP

Darcy W. Shearer, Esq.
January 17, 2005
Page Two

Access to any Warrick Texas production also should be granted. Warrick is a wholly owned subsidiary of Schering, Warrick has a very limited staff, and all of Warrick's products are produced by Schering. The State of Texas concluded and alleged that there is ultimately no difference between Schering and Warrick. We believe Judge Covington will come to the same conclusion, when presented with Suffolk's petition to become a party to the Texas protective order.

Clearly, permitting us access to the Texas documents is the most efficient way to resolve this. Please let us know by close of business Thursday, January 20, 2005 if you will reconsider your position *in toto*, or at minimum with regard to the Schering Texas production.

Sincerely,

Joanne M. Cicala

cc:    Michael Coons, Esq.



# Exhibit E



No. GV002327

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| *ex rel.* VEN-A-CARE OF THE FLORIDA KEYS, INC. | § | |
| | § | |
| *Plaintiffs,* | § | TRAVIS COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| WARRICK PHARMACEUTICALS CORPORATION, SCHERING-PLOUGH CORPORATION, SCHERING CORPORATION ROXANE LABORATORIES, INC. | § | |
| | § | |
| *Defendants.* | § | 53rd JUDICIAL DISTRICT |

## SEVENTH AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

The State of Texas, by and through the Attorney General of Texas, Greg Abbott, brings this cause of action. These claims are asserted pursuant to the Texas Medicaid Fraud Prevention Act, V.T.C.A. Human Resources Code Chapter 36 ("the Act" or "TMFPA") and common law. Pursuant to §36.107(a) of the Act, the State of Texas has primary responsibility for prosecuting this action. Private Person Plaintiff/Relator Ven-A-Care of the Florida Keys, Inc. ("VAC" or "Ven-A-Care") originally provided information to the State of Texas which is the basis for this suit and is included as a named party plaintiff in this case.

## STATEMENT TO THE COURT ONLY

The Dey/Merck Defendants prominent in Plaintiffs' Sixth Amended Petition are not specifically named in this pleading because a compromise settlement with these parties is imminent. However, by the omission of naming of these parties in this pleading, Plaintiffs DO NOT intend to non-suit them. Separate agreed orders will be submitted at a later time to accomplish that purpose. Until that time, in order to preserve claims against the Dey/Merck

FILED
2003 JUN -4  PM 3: 29

Seventh Amended Petition                                                                 Page 1



Defendants, Plaintiffs incorporate by reference the allegations against Dey/Merck as contained in Plaintiffs' Sixth Amended Petition.

## I. DEFENDANTS

The Defendants complained of and sued in this action are:

1.1    Warrick Pharmaceuticals Corporation ("Warrick") allegedly is a corporation organized under the laws of Delaware with its principal offices in Reno, Nevada. Discovery in this matter has revealed that Warrick's principal offices and operations are actually in the state of New Jersey. At all times material to this civil action, Warrick has transacted business in the State of Texas by, including but not limited to, selling and distributing to purchasers in the State of Texas pharmaceutical products that are the subject of this action, but does not maintain a regular place of business in this state or a designated agent for service of process

1.2    Schering-Plough Corporation ("Schering-Plough") is a corporation organized under the laws of New Jersey with its principal offices in Madison, New Jersey. At all times material to this civil action, Schering-Plough and its subsidiaries have transacted business in the State of Texas by, including but not limited to, selling and distributing to purchasers in the State of Texas pharmaceutical products that are the subject of this action and out of which this action arises.[1]

1.3    Schering Corporation ("Schering") is a corporation organized under the laws of New Jersey with its principal offices located at 1 Giralda Farms, P.O. Box 1000, Madison, New Jersey 07940

1.4    Defendant Warrick has indicated in other pleadings to this Court that Schering-Plough is a stock holding company and that Schering is the direct parent corporation of Warrick. Schering and Schering-Plough are the actual manufacturers, marketers, sellers, and/or suppliers of the products involved in this litigation and are Warrick's actual parent(s) or shareholder(s).

---

1        Schering Laboratories is described as "the U.S. pharmaceutical arm of Schering-Plough Corporation," and appears to be the operating unit of Schering-Plough through which Schering-Plough conducts much of its pharmaceutical business. It is unclear at this point whether Schering Laboratories exists as a separate corporate entity. Schering Laboratories is not registered with the Secretary of State for the State of Texas.



Therefore, the State includes Schering and Schering-Plough ("Schering/Schering-Plough") in this pleading.

1.5     Roxane Laboratories, Inc. ("Roxane") is a corporation organized under the laws of Delaware with its principal offices in Columbus, Ohio, and is a subsidiary of Boehringer Ingelheim Pharmaceuticals, Inc.. At all times material to this civil action, Roxane has transacted business in the State of Texas by, including but not limited to, selling and distributing to purchasers in the State of Texas pharmaceutical products that are the subject of this action, but does not maintain a regular place of business in this state or a designated agent for service of process.

(All of the above named Defendants have answered and appeared in this cause.)

## II. RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

2.1     The Defendants specified in paragraphs 1.1 to 1.5 are sometimes referred to herein collectively as the "Defendants" or "Defendant Drug Companies." Any and all acts alleged herein to have been committed by any or all of the Defendant Drug Companies were committed by said Defendants' officers, directors, employees, representatives or agents who at all times acted on behalf of their respective Defendant(s).

2.2     The Defendants identified in paragraphs 1.1 to 1.3 inclusive are all related entities sharing common elements of management, finances, control, supervision, reporting and thus are mutually, jointly and severally liable under legal theories of Respondeat superior and the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

## III. DISCOVERY CONTROL PLAN

3.1     Plaintiff, the State of Texas, designates this case as a Level 3 case requiring a discovery control plan tailored to the circumstances of this specific suit.



E-SERVED
01/20/05
9:32 PM ET
MDL No.

## IV. PRELIMINARY STATEMENT AND NATURE OF THE ACTION

4.1    This is an action under the common law and the Texas Medicaid Fraud Prevention Act (hereinafter sometimes referred to as "TMFPA") for restitution, damages, pre-judgment interest, civil penalties of not less than $1,000.00 or more than $10,000.00 for each unlawful act, two (2) times the value of the payments, and recovery of costs, attorneys' fees, and expenses of the Attorney General of the State of Texas and Ven-A-Care against Defendants as well as any and all other monetary amounts as may be allowed at law or in equity under Section 36.052.

4.2    The Defendants knowingly and intentionally made false representations of prices and costs for certain of their inhalation drugs directly or indirectly to the Texas Medicaid Program. The Defendants knew that the Texas Medicaid Program intended to base its payments of claims for the specified drugs on estimations of acquisition costs incurred by physicians, pharmacies, and other providers submitting claims for payment. The Texas Medicaid Program relied on the false and misleading prices and costs reported by the Defendants and thus was defrauded into paying reimbursement in excessive amounts.

4.3    The Defendants, both directly and through sales visits and presentations, telemarketing, and other forms of contact, as well as indirectly through various pharmacy inventory software distributed by wholesalers and other pharmacy inventory software, as part of an unlawful combination, marketed their specified products to pharmacies, in part through financial inducements, including but not limited to:  false price markups, the difference between actual cost and reimbursement (the "Spread"), discounts, rebates, chargebacks, free goods, and other financial incentives. As specified more fully hereinafter, such conduct constitutes common law fraud as well as fraud under the TMFPA, Chapter 36, Tex. Hum. Res. Code. The Defendants were in a position to mislead the Texas Medicaid Program, in part, because other

Seventh Amended Petition

Page 4



drug manufacturers typically reported truthful prices for brand drugs marketed under patent protection that are not the subject of this action. The Defendants thus wrongfully exploited and defrauded the Texas Medicaid Program by inducing it to pay the claims of pharmacies, at grossly inflated amounts that far exceeded a reimbursement based upon a reasonable estimate of acquisition costs of those Defendants' pharmaceuticals to pharmacies, wholesalers and distributors.

(Amendment Responsive to Special Exception)

Plaintiffs seek redress and recovery under the TMFPA as well as under principles of Common Law Fraud as an alternative claim under T.R.C.P. Rule 48. The Defendants Warrick, Schering-Plough and Schering, acting sometimes in combination and other times individually did the following:

(a)   Made material representations to the TVDP as to prices and costs of drugs which information was used to calculate reimbursement for those drugs.

(b)   Reported drug prices and costs which were false and misleading.

(c)   Knowingly reported such false, misleading and material information to TVDP and other price and cost reporting services as well as creating "dummy prices" and invoices which were misleading and concealing of true information.

(d)   Committed these acts and omissions with the intent and knowledge that TVDP would use and rely on directly reported information and would be further misled if price and cost information reported to national pricing services was accessed as verification of directly reported information, when the TVDP made its decisions concerning reimbursement amounts to be paid for the drugs at issue.

(e)   That the false information supplied by Defendants was relied upon and was used to authorize Medicaid drug reimbursement payments greatly in excess of what

Seventh Amended Petition



should have been paid had Defendants provided non-fraudulent drug price/cost information as required by common law fraud principles and by state and federal Medicaid law and regulations.

(f)     The foregoing acts and omissions caused monetary loss and damage to the Medicaid program in Texas in amounts set forth in the "Damages" paragraphs of this pleading.

4.4     (Amended in response to Special Exceptions.) Defendants also combined and otherwise acted in concert, amongst themselves, their wholesalers, their distributors, their customers, or their competitors, and as part of an illegal combination to defraud the Medicaid program in Texas of millions of dollars in payments by supplying falsely inflated price information on certain drugs. By definition under relevant Texas Statute Law, Tex. Penal Code Ann. § 71.01 a combination means three or more persons (companies) who collaborate to bring about an unlawful result although:

     (1)     participants may not know each other's identity;

     (2)     membership in the combination may change from time to time; and

     (3)     participants may stand in a wholesaler-retailer or other arm's length relationship.

It is not essential to the existence of such an illicit combination that the members thereof consciously agree and intentionally conspire in joint enterprise. Pleading in the alternative as allowed under T.R.C.P. 48 it is alleged that the named Defendants in this case acted intentionally in combination with each other (Warrick, Schering-Plough and Schering) and even though outside of a direct or indirect agreement and conspiracy, with other persons and companies in the generic pharmaceutical industry to create, maintain and promote a system of reporting and marketing which would reward these Defendants as well as others for going along in



combination to perpetuate the schemes described in detail herein. Not all of these "other persons and companies" are known and not all can be known at this time.

The other companies who are known to have acted in combination with Warrick and/or Schering-Plough and or Schering are:

    (a)    Wholesalers:  McKesson, Bergen-Brunswig, Cardinal, AmeriSource, Fox Meyer, and Bindley Western

    (b)    Regional Wholesalers:  Walsh and Morris & Dickson

    (c)    Institutional Purchasers:  RDI (Respiratory Distributors, Inc.), Apria, Caremark and Gerimed (AKA I.V. Med)

    (d)    Generic Wholesalers:  J.J. Balan, ANDA and Harvard

    (e)    Price Publishing Services:    First Data Bank, Medi-Span and Red Book

The other companies who are known to have acted in combination with Roxane are:

    (a)    Cardinal, McKesson, Bergen-Brunswig, and AmeriSource

    (b)    Morris & Dickson

    (c)    Apria, RDI (Respiratory distributors, Inc.), and Gerimed (AKA I.V.Med)

    (d)    First Data Bank, Medi-Span and Red Book

Some or many of these identified companies may not have been aware that their conduct in being a part of such combination was allowing or facilitating violations of the TMFPA. Whether or not the other members of such combination acted with intent to violate any law is irrelevant to the claims asserted herein against the named Defendants. For example some wholesalers did agree or acquiesce to use invoices and billing records which did not overtly disclose and reflect multiple conditions and terms which caused the actual price/cost of drugs to be much less than what was reflected on invoices and billing records. These other members of such combination may or may not have engaged in the conduct actionable under the TMFPA and



without question they, whoever they are, have not been sued in this case. The liability of the named Defendants herein is neither dependent upon nor contingent upon liability of other members of the combination. The Defendants' creation, maintenance and promotion of the combination of persons and companies nurtured the scheme of creating the large "spread" on the reimbursement of the subject Medicaid drugs. The relevance and importance of the existence of the combination is to show that the named Defendants were knowing and willing participants in the creation and promotion of this combination which caused Texas Vendor Drug Program to be defrauded.

4.5     (Amended in Response to Special Exception) As is usually true of illegal combinations, the named Defendants in this case did not enter into a formalized written and dated combination agreement. However, the actions they took speak even more eloquently of their intent to defraud the Texas Medicaid Program operated by the Texas Vendor Drug Program (TVDP) and the taxpayers in the State of Texas and nationwide who fund the various Medicaid pharmaceutical benefit programs. Such activities began before 1994 and continue in some forms to the present date. The officers, managers, sales force and other employees of the named Defendants Warrick, Schering-Plough and Schering herein entered into an agreement or combination among themselves as follows:

(a)     By reporting false drug prices to the TVDP.

(b)     By failing and purposefully refusing to timely update and report declining drug prices.

(c)     By purposefully omitting and refusing to provide truthful drug prices which were specifically requested by category.

(d)     By reporting false drug prices to TVDP and to recognized industry price reporting services with the intent (and result) of creating an illegal "spread" which caused the payment of

Page 8

Seventh Amended Petition



/

inflated and excessive reimbursement amounts for each company's relevant drugs named in this pleading.

(e)     By directly and indirectly causing their own sales and marketing force employees, as well as independent contractor telemarketers, to "market the spread" by advertising and urging pharmaceutical vendors to purchase and dispense their particular brand of drugs based upon the illegally inflated and excessive reimbursement amounts made possible by the combined actions of the Defendants and others in the industry.  Some or all of these acts and omissions also constitute common law fraud as well as violations of TMFPA.

4.6.     (Amended in Response to Special Exception)  The Defendants created, promoted and fostered a complex scheme using undisclosed chargebacks, rebates, discounts, instant rebates, price protection, stock adjustments and contract prices which had no true and bona fide business purpose other than to enable the use of arbitrary pricing on invoices and other ostensible purchase records and documents which concealed the true sales prices and acquisition costs.  In fact, these false invoices only revealed "Dummy Prices" and other incorrect and misleading financial information which would hinder or prevent the discovery of true price/cost information by persons and organizations which might need to investigate, survey or audit invoices in search of true price/cost information.  By causing their various customers to accept and acquiesce in these extraordinary invoicing practices, these Defendants created and maintained various combinations with other companies as identified in paragraph 4.4 who participated in the combination(s) but who may have been completely unaware and unconcerned about the reasons for or and results of these extraordinary invoicing methods and procedures.

4.7     (Amended in Response to Special Exception)  With regard to the Defendants Warrick, Schering-Plough and Schering and their efforts to deal with activities of Dey, Inc. and its affiliates (all parties who were originally Defendants in this case but who have now settled), it



is alleged that the Defendants, acting through their authorized officers and employees, engaged in a game of one-upsmanship in that when one would report fraudulent prices to authorities so as to create a more attractive profit spread on Medicaid reimbursement prices, the other would compound its fraudulent actions by reporting an increasingly inflated price in order to "out-fraud" the other. These activities have been documented in documents and deposition testimony pertaining to both Dey and Warrick.

4.8    Defendants Warrick, Schering and Roxane made conscientious efforts in their business operations avoid reporting truthful price/cost information. Furthermore, their legal obligations to truthfully and candidly report such information to Medicaid authorities in Texas and elsewhere and to price reporting services was intentionally subverted or ignored. Thus, the Defendants were able to further the combinations by limiting disclosure or deleting the publication or reporting of such information. Also, certain of Roxane's employees whose job it was to report price/cost information and to comply with all legal requirements, including those of the State of Texas, were intentionally instructed: (a) to provide incorrect or incomplete price/cost information or (b) to fail to supply all requested and required price/cost information and updates about changes in such data.

## V.   JURISDICTION & VENUE

5.1    Jurisdiction over the subject matter is founded in part upon the TMFPA, which prohibits, and provides exclusive remedies to redress, the conduct of the Defendants and which provides for this action to be brought by the State of Texas and by Private Person Plaintiff, Ven-A-Care.

5.2    Venue is proper in Travis County pursuant to Texas Human Resources Code §36.052(d) in that many of the unlawful acts committed by the Defendants were committed in Travis County including the making of false statements and misrepresentations of material fact



to the State of Texas, its departments, agencies, instrumentalities, contractors and to the Texas Medicaid Program.

5.3    A copy of pleadings and written disclosure of substantially all material evidence and information Ven-A-Care possesses were served on the State pursuant to §36.102 of the Act before the Original Petition was filed.

5.4    The Private Person Plaintiff is the original source of the information and has direct and independent knowledge of the information on which these allegations are based within the meaning of §36.113(b) of the Act and has voluntarily provided the information to the State of Texas before filing pleadings which are based upon the information provided by the Private Person Plaintiff to the State of Texas.

5.5    Additionally, venue is proper against these Defendants in Travis County as all or a substantial portion of the events giving rise to the instant claims occurred in Travis County. TEX. CIV. PRAC. & REM. CODE §§ 15.001, 15.002 (Vernon 2001).

## VI. BACKGROUND: HOW PHARMACEUTICAL CLAIMS ARE PAID UNDER THE MEDICAID PROGRAM IN TEXAS

6.1       The Texas Medicaid Program pays for the use of approved pharmaceuticals provided to Medicaid recipients by eligible providers, including pharmacies. The Vendor Drug Program (TVDP) of the Texas Department of Health ("TDH")[2] administers this program. Providers can only obtain reimbursement through the Vendor Drug Program for products listed on the Texas Drug Code Index. 25 TEX. ADMIN. CODE § 35.201. To have its particular pharmaceutical products listed on the index, a drug company or manufacturer must file and have approved an application for its products with the Texas Department of Health. 25 TEX. ADMIN. CODE § 35.801. Section 2 of the application requires the manufacturer to report, for each drug submitted, the suggested wholesale price to pharmacies, the price at which the drug is sold to wholesalers and distributors, the direct price to pharmacies, the price to chain

---

[2]     The Vendor Drug Program has recently been transferred to the Texas Health and Human Services Commission.



warehouses and the price at which the drug is sold to any other special purchasing groups. Additionally, the form contains a separate question in section 4 inquiring as to whether the drug company sells the drug to wholesalers or distributors. The application requires that a manufacturer certify that the information it has provided is correct and that it will provide correct information regarding subsequent changes in pricing of the product within 15 days of such changes occurring. Further, in approving the application, TDH expressly requires that supplemental updated price information be provided timely.

6.2    TDH bases its reimbursement schedule on the prices reported by the manufacturer on the application and subsequent price changes supplied by the manufacturer. Reimbursement to a pharmaceutical provider (i.e., a pharmacy or physician) is based on TDH's best estimate of acquisition cost, referred to as ("EAC"). 1 TEX. ADMIN. CODE § 355.8541 (1).

6.3    When a manufacturer reports false pricing information to TVDP, the calculation of estimated acquisition cost ("EAC") is inflated and thus the reimbursement schedule is also inflated. These circumstances result in drug reimbursement overpayments to drug providers by the State.

## VII. ACTIONABLE CONDUCT OF DEFENDANTS

7.1    The Defendants knew that reporting false drug prices and costs would cause the Texas Medicaid Program to be unable to reasonably estimate acquisition costs and it would thus pay excessive reimbursement to the Defendants' Medicaid provider customers. Notwithstanding this knowledge, the Defendants reported false or misleading price, cost, or sales information to the Texas Medicaid program in order to cause it to pay claims for their specified pharmaceuticals in amounts that exceeded the prices at which the Defendants actually sold their products and exceeded a reasonable estimation of acquisition cost. This reporting of false information created a "spread" between the amount reimbursed by Medicaid and a reasonable estimate of the acquisition cost of a drug. The "spread" financially benefitted their Texas Medicaid provider customers and thus induced them to order, prescribe, dispense, or administer the Defendants' specified pharmaceuticals. The specific allegations of Common Law Fraud contained in

Page 12



preceding paragraph 4.3 are incorporated by reference and are specifically asserted against the Defendant Roxane.

7.2    The Defendants were each fully capable of making truthful representations about prices and costs of the specified pharmaceuticals and did so when it was economically beneficial to them, such as when they reported Average Manufacturers' Prices and Best Prices to the federal government under the Medicaid rebate program mandated by the Omnibus Budget Reconciliation Act of 1990 ("OBRA'90").

7.3    Notwithstanding the Defendants' knowledge that they were required to provide truthful price information vital to Texas Medicaid's ability to estimate the acquisition cost, the Defendants each knowingly or intentionally reported false price information about the specified pharmaceuticals.

7.4    The Defendants acted knowingly or intentionally in making false statements and misrepresentations of material fact when reporting false prices or costs to the Texas Medicaid program in one or more of the following ways:

A.    Reporting false prices on initial applications to have specified pharmaceuticals covered by Texas Medicaid;

B.    Concealing or otherwise failing to disclose decreases in the prices or costs of the specified pharmaceuticals;

C.    Concealing or otherwise failing to disclose transactions that decrease the cost, and thereby the price, of the specified pharmaceuticals such as discounts, rebates, off-invoice pricing, free goods, cash payments, chargebacks, or other financial incentives;

D.    Reporting that the price or cost of a specified pharmaceutical was increasing when it in fact was increasing in a lesser proportion, or remained the same, or was decreasing;

E.    Reporting that the price or cost of a specified pharmaceutical was the same when in fact it was falling; and



F.    Reporting that specified pharmaceuticals were not sold to a specific sector or segment of the market (also known as a "class of trade") when in fact they were, regularly and in significant quantities concealing or failing to disclose such facts.

These acts and omissions were committed by the named Defendants of their own volition and in combination with each other and with other segments of the pharmaceutical industry, knowing that Medicaid officials would rely upon such false information and thus constitute violations of Texas Medicaid Fraud Prevention laws as well as constituting common law fraud.

7.5    Between 1990 and the present, Defendants Schering and/or Schering-Plough also directly marketed and sold "Warrick" products[3] through Schering/Schering-Plough's "third party home healthcare solution business", "Production Planning" and/or "Managed Care" divisions, and possibly through other divisions and/or personnel. Schering/Schering-Plough marketed and sold these "Warrick" drugs to customers at prices far below the false prices of the drugs reported by Schering/Schering-Plough and/or Warrick for reimbursement purposes. As a result, customers purchasing these "Warrick" drugs from Schering/Schering-Plough knew they would receive, and did receive, windfall reimbursements as a direct result of the misrepresentations made by Schering/Schering-Plough and/or Warrick to reimbursers, including the Texas Medicaid Program.

7.6    To accomplish this scheme, between 1990 and the present Schering/Schering-Plough sold identical products deriving from the exact same New Drug Application(s), but marketed the drugs differently. Schering/Schering-Plough marketed its drug "Proventil" as a brand with few, if any, discounts and marketed the same Proventil drug under a "Warrick" label and NDC number as a "generic" upon which it offered deep discounts while reporting false price information to Texas. In both instances the two differently labeled product types were made at the same location, and in all chemical and regulatory respects brand products approved by the FDA under a New Drug Application. The only difference between the two types of products

---

[3] Some, if not all, of these drugs are at issue in this litigation and are listed in the attached Exhibit A, incorporated herein by reference.

Seventh Amended Petition



was that the "Warrick" products (also referred to as the "brand, generic" in Schering/Schering-Plough/Warrick documents) were marketed and sold at significantly lower prices than the Schering/Schering Plough Proventil products; thereby providing the purchasers of the "Warrick" drugs with large spreads and large windfall reimbursements as described herein. Schering/Schering Plough used the Warrick label and NDC number to implement a marketing program which induced customers to choose Warrick's albuterol, which was in fact Schering's Proventil, over competing products based upon the large windfall reimbursements the customers would receive.

## VIII.   THE ACTIONS OF DEFENDANTS CONSTITUTE "UNLAWFUL ACTS" AND VIOLATE THE TEXAS MEDICAID FRAUD PREVENTION ACT

8.1     At various times on or after September 1, 1995, and continuing through the present date, Defendants knowingly or intentionally reported to the State of Texas' Medicaid Program false prices for the pharmaceuticals described in the attached Exhibit "A."

8.2     Defendants have repeatedly and continuously violated the TMFPA.  The Act specifies 10 separate acts which are declared to be unlawful.  At least four of those unlawful acts were committed by the Defendants in this case on numerous occasions.  The Act prohibits a person from knowingly or intentionally making or causing to be made a false statement or misrepresentation of material fact on an application for a contract, benefit, or payment under the Medicaid Program; or that is intended to be used to determine a person's eligibility for a payment under the Medicaid Program.  TEX. HUM. RES. CODE § 36.002(1).  The Act further prohibits a person from knowingly or intentionally concealing or failing to disclose an event that permits a person to receive a benefit or payment that is not authorized, or that permits a person to receive a benefit or payment that is greater than the benefit or payment that is authorized.  TEX. HUM. RES. CODE §36.002(2).  Additionally, the Act prohibits a person from knowingly or intentionally making or causing to be made a false statement or misrepresentation of fact

Page 15

Seventh Amended Petition



concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid Program. TEX. HUM. RES. CODE §36.002(4). The act also prohibits a person from knowingly or intentionally entering into an agreement combination or conspiracy to defraud the State by obtaining or aiding another to obtain unauthorized Medicaid payments or benefits §36.002(9).

8.3     The Defendants have knowingly or intentionally communicated false price or cost statements or other material misrepresentations or omissions on the Application for Addition of Drugs to the Texas Drug Code Index for certain drugs manufactured by Defendants and subsequent price updates provided by the Defendants in violation of §36.002(4) of the Act. Further, in violation of §36.002(1) of the Act, the Defendants failed to disclose the truthful prices paid by providers and concealed the existence of kickbacks, inducements, discounts, rebates, chargebacks, off invoice pricing, free goods, or grants which reduced the price paid by the Defendants' customers for certain drugs.

8.4     (Amended in Response to Special Exception) Also, in violation of § 36.002(9), the Defendants knowingly or intentionally entered into a combination with wholesalers or Group Purchasing Organizations ("GPO's") or Prescription Benefit Managers or Pharmaceutical/Pharmacy Benefit Managers ("PBM's") or pharmacies (including chain pharmacies) to defraud the State of Texas by obtaining or aiding another person in obtaining unauthorized payments or benefits from the Medicaid program by misrepresenting the prices paid to manufacturers by wholesalers and the prices paid by pharmacies (including chain pharmacies) to manufacturers, as well as by concealing the remunerations paid by manufacturers to GPO's or PBM's. The facts set forth in preceding paragraphs 4.4, 4.5 and 4.6 are incorporated by reference to specify the allegations of a combination under § 36.002(a).



8.5     (Amended in Response to Special Exception)  Pleading more specifically, and in addition to the foregoing, the Plaintiff and Relator would allege and show as follows with respect to other entities and sectors of the pharmaceutical industry who participated directly or indirectly in the combination mentioned previously:

1.     The named Defendants entered into a combination and course of dealings with the following as limited by paragraph 4.4:

(a) National Full Line Wholesalers;  McKesson, Bergen, Brunswig, Cardinal, AmeriSource, FoxMeyer, Bindley Western.

(b) Regional Full Line Wholesalers (which conducted business and sold the Relevant Drugs of the named Defendants within the State of Texas); Walsh, Behrens, and Morris & Dickson.

(c) Institutional Purchasers; Gerimed, RDI (Respiratory Distributors, Inc), Apria, Accurate Pharmacy, Caremark, Rx Med, MHA (Managed Healthcare Associates).

These other identified companies are not named as Defendants in this suit and no relief or recovery is sought against them herein at this time.  These companies were named in response to a demand made by Defendants herein in Special Exceptions.  The named Defendants already knew the identity of these other companies because Defendants are the very ones who created the schemes resulting in the combinations which perpetuated the schemes to violate the TMFPA. As part of the combination created by the named Defendants, these wholesalers and institutional purchasers were doing what the Defendants asked them to do or what they obviously were required to do to keep the business of the drug manufacturers.  The state of mind and actual knowledge of the wholesalers and institutional purchasers is irrelevant and immaterial to the liability and culpability of the Defendants and the proof relating to their actions only goes to show that they were cogs in the illicit wheel created by the named Defendants.  With respect to



each wholesaler with which any Defendant joined in combination, such universe of companies is finite and limited exclusively to those wholesalers with whom each respective Defendant sold its drugs or delivered drugs pursuant to contract. Thus, these wholesalers can be identified with certainty and limitation by each Defendants' own sales history records.

The foregoing wholesaler entities participated in informing and educating their respective pharmacy customers of each and every AWP for the Relevant Drugs. Furthermore, these wholesalers also published information which would reveal the difference between the stated AWP and/or reimbursement on the one hand and, the given pharmacy customer's cost on each of the respective generic products on the other hand. This difference is known as "spread"; "MAC spread", "Gross Profit", "Gross Margin" (among other phrases and terms used within the industry). This information enables virtually all pharmacies within the State of Texas to quickly and easily understand which generic drug will be most profitable to dispense in consideration of the reimbursement level set given the false prices reported.

Based upon documents obtained from the records of Schering/Warrick, it appears that Bindley Western, at one point in time asked to be released from contractual obligations to deal with invoices containing arbitrary, artificially inflated and false price information which served no legitimate business purpose and which caused unnecessary, costly and meaningless bookkeeping and accounting work to be done. Instead, Bindley Western asked to receive invoices in the future which more accurately represented the actual transactions reflected by the respective invoices.

8.6     To the extent that any of the aforementioned full line wholesalers, both regional and national, also offer what is known as "autosubstitution" and or "select", "source" programs which mandate the exclusive dispensing of a particular product within each therapeutic class by those wholesalers' pharmacy customers, these wholesalers choose the generic product which will



have a large "spread" and be most profitable to their customers pursuant to feedback and demand from such customers as a result of the tactics of the Defendants and others as described herein.

These companies were required or invited to participate in the schemes and combinations involving; disseminating reimbursement information, the exclusive use within a therapeutic class of a single generic product (based in part on profitability), dummy pricing, false and fraudulent invoices, hidden discounts, chargebacks, rebates, free goods, price protection plans, or accounting gimmicks to conceal true and accurate price/cost information.

8.7    With respect to Distributors (a/k/a "Generic Wholesalers") of generic drugs, it is alleged that such Distributors/wholesalers likewise participated in a course of dealings which enabled the combination with named Defendants and which facilitated and enabled the "marketing of the spread" to pharmacies by use of Distributors, agents, employees, or independent contractor telemarketing companies and through telemarketing, sales calls and advertising (both electronically and by print).

Distributors/wholesalers which participated in these activities include Major, J. J. Balan, ANDA, Harvard, Genetco and others known collectively within the Warrick organization as the "Care Group" and "Premier Group".

These distributors/wholesalers are not named as Defendants in this suit and no relief or recovery is sought at this time against them herein. They were named in response to a demand made by Defendants herein in Special Exceptions. The named Defendants already knew the identity of these other companies because Defendants are the very ones who created the schemes resulting in the combinations which perpetuated the schemes to violate the TMFPA. As part of the combination created by the named Defendants, these distributors were merely doing what the Defendants asked them to do or what they obviously were required to do to keep the business of the drug manufacturers. The state of mind and actual knowledge of the distributors is irrelevant



and immaterial to the liability and culpability of the Defendants and the proof relating to their actions only goes to show that they were cogs in the illicit wheel created by the named Defendants.

8.8    The Defendants Warrick and Schering entered into specific agreements and contracts with one or more telemarketing companies, including TMS (a/k/a Access Worldwide) a company located in the State of Florida, but doing business by making telephonic contacts in the State of Texas and other states. As part of telephone sales pitches, telemarketers would advertise and promote Warrick and Schering products in part by marketing the spread and urging purchases of these products based upon the large and profitable spread between the true net price the pharmacies would pay for the drugs and the high reimbursement amount; those pharmacies would receive; known as the "profit message" and/or ROI; among other phrases.

8.9    The Defendant Schering employed a group known as its Managed Care Sales Force and this group of marketers had as a part of their job responsibilities, the duty to call upon decision makers for Healthcare Management/Maintenance Organization, Pharmaceutical Benefits Manager, Hospitals and other Managed Care Organizations to explain the perspective of generic drug profitability on behalf of Schering and Warrick's. Thus, employees and agents of Schering combined with Warrick to market the spread on Warrick products and to "bundle" Warrick and Schering products in a manner which was fraudulent and illegal.

8.10    In the TMFPA, The Texas Legislature has specified actions and omissions, conduct and combinations which are illegal and give rise to civil and criminal liability and penalties which can be imposed against drug manufacturers such as the named Defendants who themselves voluntarily chose to place their respective products into the Texas Medicaid Vendor Drug Program and thus submitted to and agreed to be bound by these rules and laws. This is a statute of absolute strict liability. There are no stated and enumerated defenses and none are



allowed. There are no references to common law defenses or allowances for mitigation. With a finding of any violation of the statute, liability is strictly imposed absolutely and the only remaining question is the amount of damages, penalties, fees and expenses to be assessed. This is precisely the same as the very similar Texas Deceptive Trade Practices Act as originally enacted in 1973. In its original form and before subsequent changes and amendments were added by later legislative enactment, there were no defenses to the liability strictly imposed by the DTPA and likewise there are no defenses to the strict liability imposed by the TMFPA.

8.11   (Amended based upon Court instruction to list all drugs, in addition to "damages drugs" which will be used to offer proof at trial)

The Primary drugs which evidence the differing motivations for sometimes, but not always reporting manipulated and misleading prices by Defendants are as follows:

Warrick:   Cimetidine, Perphenazine, Albuterol tablets and Albuterol syrup

Schering:   Proventil

Roxane:   Haloperidol tablets, Mehotrexate tablets, Roxicet tablets, Mexiletine HCL capsules; Dexamethasone tablets,Meperidine, Azathioprine, Cyclophosphamide, Combivent, Lorazepam Intensol, Hydromorphone, Prednisone, Propranolol, Torecan, Azathioprine, Diclofenac Sodium, Hydroxyurea and Lithium Carbonate.

Evidence concerning other drugs is relevant, probative and admissible for at least three different reasons. Defendants were motivated to misrepresent price information when they could profit from such conduct by making one of their drugs more likely to be purchased due to the promise of higher reimbursement. This opportunity routinely and normally arose in the marketing of certain drugs such as those listed in this paragraph. This is the situation where creating the largest "spread" worked its illegal magic. To the contrary, in the case of drugs where competitive pressures did not drive the misrepresentation of pricing, the tendency was to



report prices which were correct and not misleading. An additional result of this situation was that Medicaid programs and officials were lulled into a false sense of security because sometimes many prices reported by a manufacturer would be fair and reasonable.

Therefore evidence that a drug manufacturer routinely reported non-misleading prices for certain drugs and misleading prices for other drugs is admissible:

1.    Under T.R.E. 404 (b) as proof of motive, opportunity, intent, plan, knowledge and absence of mistake or accident.

2.    Under T.R.E. 406 as proof of routine practice to consistently act illegally where profit resulted yet legally where the profit motive was less compelling and to show that such company was able to comply with the law and did know how to report prices that were not misleading where the motive to act illegally was lessened or missing.

3.    Under T.M.R.P.A. § 36.052 (b)(1) through (5) for assessment of a civil penalty.

## IX. THE COURT SHOULD DISREGARD THE CORPORATE FICTION FOR WARRICK, SCHERING, AND SCHERING-PLOUGH.

9.1    The corporate fiction may be disregarded when the corporate form has been used as part of a basically unfair device to achieve an inequitable result, specifically when the corporate fiction is used to perpetrate a fraud, as a mere tool or business conduit of another corporation, as a means of evading existing legal obligations, to achieve or perpetrate a monopoly, to circumvent a statue, or to protect crime or justify a wrong. *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986), *superseded on other grounds by* Tex. Bus. Corp. Act Ann. art. 2.21 A (Vernon 2002).

9.2    (Amended in Response to Special Exception)  In addition to its own acts for which it is liable, Schering/Schering-Plough Corporation as the parent, owner and primary, if not



exclusive, shareholder of Warrick Pharmaceuticals, Inc., is liable for the conduct of any and all agents of Warrick Pharmaceuticals Inc. Schering/Schering-Plough is liable for Warrick's wrongful activities under the equitable doctrines of joint business enterprise, single business enterprise, and alter ego. Each of these theories is advanced in the alternative. The facts set forth in paragraphs 4.3, 4.4, 4.5, 4.6, 4.7, 4.8, 7.5, 7.6, 8.2, 8.3, 8.4 and 8.5 are herein incorporated by reference to identify allegations asserted against Defendant Schering Corporation.

9.3    The following allegations support piercing the corporate veil for the "Schering" entities under any or all of these theories. Warrick could not exist without Schering/Schering-Plough. Warrick has only a handful of employees, yet Warrick generates annual sales of over $150M. Warrick depends upon Schering/Schering-Plough's manufacturing, distribution, accounting and administrative departments for all of these internal functions. Warrick apparently does not even employ persons with those traditional business responsibilities. The only personnel Warrick allegedly employs are those who market and sell Schering/Schering-Plough's generic products. Warrick's business offices are within the offices of Schering/Schering-Plough. Warrick does not conduct its corporate business in Reno, Nevada as its letterhead represents. Instead, Schering/Schering-Plough and Warrick operate from the same office space in New Jersey, use the same computer systems, telephone systems, employees, and centralized departments, and apparently use each other's letterhead interchangeably.

9.4    The companies are so closely aligned that in deposition, even the founder of Warrick did not know whether his "Warrick" consulting contract is with Warrick or Schering/Schering- Plough. These companies are not operated as separate entities, but rather integrate their resources to achieve a common business purpose to sell Schering/Schering-Plough's generic products. Whether express or implied, Warrick and Schering/Schering-Plough



agreed that Warrick would act as Schering/Schering-Plough's marketing unit for generic products, with the common purpose of selling more of Schering/Schering-Plough's and Warrick's products and with Schering/Schering-Plough's having at least an equal right to direct and control the operation of the enterprise.

9.5   Also, Schering/Schering-Plough's brand version of Albuterol Sulfate, Proventil, was sold in conjunction with Warrick's generic Albuterol Sulfate. When Warrick's customers purchased enough Warrick generic Albuterol Sulfate, Warrick would then give that customer a credit to obtain Proventil. These companies acted as one rather than as two independent drug manufacturers.

9.6   Furthermore, Schering/Schering-Plough may have purposefully under capitalized Warrick in light of the nature and risk of its business in order to avoid financial responsibility and allow Schering/Schering-Plough to break the law without suffering the consequences. Allowing the corporate structure to protect Schering/Schering-Plough from these wrongful acts would lead to injustice. In light of the above allegations, Warrick and Schering/Schering-Plough should be treated as one entity for liability purposes in order to insure Plaintiff can fully and completely recover any judgment rendered in its favor in this matter. Also, Schering/Schering-Plough sells Warrick products to large market segments with full knowledge of the false price representations, and, therefore, benefits from them.

## X. DAMAGES

10.1   Pursuant to the terms of the Medicaid Fraud Prevention Act, each Defendant is liable to the State of Texas for the value of any payment . . . provided under the Medicaid program, directly or indirectly, as a result of the unlawful act. Tex. Hum. Res. Code Ann. §36.052 (1). Additionally, each Defendant is liable for interest on the value of the payment, civil



penalties ranging from $1,000 to $10,000 for each unlawful act, and two times the value of the payment. *Id.* at (2), (3), & (4). Therefore, the Defendants are liable for the following amounts:[4]

1.   Schering/Schering-Plough/Warrick Pharmaceuticals Corporation

|   | | |
|---|---|---|
| A. Value of Payments | $ 32,147,022 | |
| B. Statutory Double Damages | $ 64,294,044 | |
| C. Minimum Civil Penalties | $ 9,125,000 | |
| Total (not including interest) | $105,566,066 | |

2.   Roxane Laboratories, Inc.

|   | | |
|---|---|---|
| A. Value of Payments | $ 3,277,513 | |
| B. Statutory Double Damages | $ 6,555,026 | |
| C. Minimum Civil Penalties | $ 5,475,000 | |
| Total (not including interest) | $ 15,307,539 | |

Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under § 36.052, whether specified in this pleading or not. By agreement of counsel on June 4, 2003, Defendants withdrew their request to require Plaintiffs to specify a maximum amount being sought as civil penalties. Therefore, Plaintiffs will seek an amount as civil penalties which will be justified and appropriate under the facts relevant to this issue and under the laws as determined by the Court.

(Amended to respond to Special Exception. Specific and maximum monetary damages pled in the alternative under T.R.C.P. 48 and to make specific those damage allegations alleged in general terms in paragraphs 10.1 and 10.2)

---

4     These calculations are based upon utilizations for periods ending at the end of 2002. These calculations will be updated and increased as additional information becomes available prior to trial consistent with the court's orders. The civil penalty figures are only minimum



10.2   Alternatively, the Defendants are liable to the State for common law fraud in an amount that exceeds the minimum jurisdictional limits of this Court, including, but not limited to actual damages, pre-judgment interest, attorney fees, and punitive damages in an amount not to exceed the amounts set forth as follows:

As monetary damages for the alternative claims based upon common law fraud and as a T.R.C.P. Rule 48 alternative measure of damages under the TMFPA the Plaintiffs seek the following elements of monetary damages:

A.   The difference between the reimbursement amount paid by TVDP for the relevant drugs, on the one hand and the amount that would have been paid but for false price/cost reporting on the other hand.

B.   Two times the amount found by the trier of fact in section A, as per TMFPA § 36.052(a)(4).  (To the Court Only)

C.   Prejudgment interest at 10% per annum.  (To the Court Only)

D.   A civil penalty to be assessed by the trier of fact using the guidelines at § 36.052 (b) (1)-(5) inclusive.

By agreement of counsel on June 4, 2003, Defendants withdrew their request to require Plaintiffs to specify a maximum amount being sought as civil penalties.  Therefore, Plaintiffs will seek an amount as civil penalties which will be justified and appropriate under the facts relevant to this issue and under the laws as determined by the Court.

E.   Reasonable and necessary attorney fees, costs and expenses of litigation of the State and Relator in an amount not to exceed $15,000,000.00.  This amount includes fees to be set and awarded by the Court pursuant to TMFPA § 36.110(c).

amounts available under TMFPA and at trial, the State may seek recovery of maximum penalties



10.3    The TMFPA is a statute of absolute strict liability and there are no defenses available for any violation of its provisions and in particular any violation of any part of Section 36.002. Likewise, as a matter of law the defenses of laches and limitations are not available as against the State of Texas, as a Sovereign.

10.4    In order for the trier of fact to be apprised of relevant and probative information upon which to assess a finding of an appropriate civil penalty, the jury will need to receive and hear evidence relating to TMFPA § 36.052 (b) (1)-(4) inclusive. Specifically the trier of fact must receive evidence on the following topics:

    (1)    previous and other violations of the law;

    (2)    the seriousness of the unlawful act "...including the nature, circumstances, extent, and gravity of the unlawful act;"

    (3)    health and safety of the public; and

    (4)    whether the person acted in bad faith when engaged in the conduct that formed the basis of the unlawful act.

    The trier of fact must have a complete and accurate understanding of the total conduct of Defendants in all dealings with TVDP to show that the Relevant Drugs were not an unusual or isolated error of judgment but rather a systematic and calculated plan to defraud the system at every opportunity. Therefore, other drugs placed by the Defendants into the formulary of the TVDP which had relatively small utilization in the State of Texas and which therefore are not the subject of large monetary damages are nonetheless probative evidence of other violations; the seriousness of conduct; the nature, circumstances, extent and gravity as well as evidence of bad faith of the Defendants. The trier of fact should be presented with complete and accurate information of how the Defendants dealt with pricing and price reporting issues relating to

allowed by law under § 36.052.



government reimbursement programs to understand that the prices the Defendants reported to the TVDP for the Relevant Drugs were not the result of an unusual or isolated error in judgment or mistake, but were the result of a systematic and calculated plan to defraud the system at every opportunity. These are the other drugs for which damages are not sought in this case, but about which evidence will be offered to show the jury the Defendants' plan or scheme. These are primarily those drugs listed in paragraph 8.11.

## XI.  JURY DEMAND

11.1   The State respectfully requests a trial by jury pursuant to Texas Rules of Civil Procedure 216.

## XII.  PRAYER

12.1   The State asks that it recover from the Defendants restitution of payments, statutory additional double damages, pre-judgment interest, attorneys fees, costs, and expenses and civil penalties as provided in TEX. HUM. RES. CODE ANN., Chapter 36, or actual damages, pre-judgment interest, attorney fees and punitive damages under common law.  Plaintiff and Relator invoke in the broadest sense all relief possible at law or equity under Texas Human Resources Code, Chapter 36 without qualification or limitation. The State asks that citation and notice be issued immediately to the defendants identified herein who have not already answered and appeared in this action and that they be served with process and that upon trial of this case that judgment be entered in favor of the State and against the named defendants in at the amounts set forth.  The Relator further asks that it be awarded its costs and expenses; a reasonable attorney fee; and the maximum Relator's share provided for under the TMFPA.  The State prays for such other and further relief to which it may show itself entitled either at law or in equity.



Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY McBEE
First Assistant Attorney General

JEFFREY S. BOYD
Deputy Attorney General for Litigation

LOWELL A. KEIG
Chief, Elder Law and Public Health Division

PATRICK O'CONNELL
Chief, Civil Medicaid Fraud Section
P. O. Box 12548
Austin, Texas  78711-2548

JOSEPH V. CRAWFORD
Wright & Greenhill, P.C.
State Bar No. 05030600
221 West 6th Street, Suite 1800
Austin, Texas 78701-3495
(512) 476-4600
FAX:  (512) 476-5382

ATTORNEYS FOR THE STATE OF TEXAS



JOHN E. CLARK
State Bar No: 04287000
Goode Casseb Jones
Riklin Choate & Watson
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
Telephone: 210-733-6030
Facsimile: 210-733-0330

JAMES J. BREEN
Florida Bar No. 297178
ALISON W. SIMON
Florida Bar No. O109568
The Breen Law Firm, P.A.
P.O. Box 297470
Pembroke Pines, Florida 33029-7470
Phone: (954) 499-1171
Facsimile: (954) 499-1173

SHERRIE R. SAVETT
Pennsylvania Bar No. 17646
SUSAN SCHNEIDER THOMAS
Pennsylvania Bar No. 32799
JEANNE A. MARKEY
Pennsylvania Bar No. 40175
JOY P. CLAIRMONT
Pennsylvania Bar No. 82775
GARY AZORSKY
Pennsylvania Bar No. 38924
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Fax: (215) 875-4636
ATTORNEYS FOR RELATOR,
VEN-A-CARE OF THE FLORIDA KEY, INC.



E-SERVED
01/20/05
09:32 PM ET
MDL No. 456

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on the following counsel of record via U.S. Mail, certified, return receipt requested, facsimile transmission, or hand delivery on this the _____ day of _____, 2003:

Mr. Steven A. Fleckman
Ms. Jessica McGlynn
Fleckman & McGlynn
515 Congress Avenue, Suite 1800
Austin, Texas 78701
COUNSEL FOR DEY, INC.
*CM/RRR*

Mr. Paul F. Doyle and Mr. Neil Merkl
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178-0002
COUNSEL FOR DEY, INC.
CM/RRR

Mr. C. Michael Moore
Locke, Liddell & Sapp, LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-8001
COUNSEL FOR WARRICK
PHARMACEUTICALS CORPORATION
*CM/RRR*

Mr. James J. Breen
The Breen Law Firm P.A.
8201 Peters Road, Suite 1000
Plantation, Florida 33324
COUNSEL FOR RELATORS
*CM/RRR*

Mr. Steve McConnico
Mr. Eric Hagenswold
Scott, Douglas & McConnico, LLP
600 Congress Avenue, 15th Floor
Austin, Texas 78701-2589
COUNSEL FOR ROXANE
LABORATORIES, INC.
*CM/RRR*

Mr. Stephen Hudspeth
Coudert Brothers
1114 Avenue of the Americas
New York, New York 10036-7703
COUNSEL FOR DEY, INC.
*CM/RRR*

Mr Gary Azorsky
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
COUNSEL FOR RELATORS
*CM/RRR*

Mr. John E. Clark
Goode, Casseb, Jones, et. al.
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
COUNSEL FOR RELATORS
*CM/RRR*


JOSEPH V. CRAWFORD
Wright & Greenhill, P.C.



E-SERVED
01/20/05
09:32 PM ET
RMP-MDL No.1456

## EXHIBIT A
## TO THE SEVENTH AMENDED PETITION

| Manufacturer | Product | Size | NDC No. |
|---|---|---|---|
| Warrick | Albuterol Sulfate .083% | 3ml 25s | 59930-1500-08 |
| Warrick | Albuterol Sulfate .083% | 3ml 60s | 59930-1500-06 |
| Warrick | Albuterol Sulfate 0.5% | 20ml | 59930-1515-04 |
| Warrick | Albuterol 90 mcg Aerosol Inhaler | 17gm | 59930-1560-01 |
| Warrick | Albuterol 90 mcg Aerosol Refill | 17gm | 59930-1560-02 |
| Dey | Albuterol Sulfate .083% | 25s | 49502-0697-03 |
| Dey | Albuterol Sulfate .083% | 30s | 49502-0697-33 |
| Dey | Albuterol Sulfate .083% | 60s | 49502-0697-60 |
| Dey | Albuterol Sulfate 5mg/ml Solution | 20ml | 49502-0105-01 |
| Dey | Albuterol Sulfate 5mg/ml Solution | 20ml | 49502-0196-20 |
| Dey | Acetylcysteine Solution 10% | 4ml | 49502-0181-04 |
| Dey | Acetylcysteine Solution 10% | 10ml | 49502-0181-10 |
| Dey | Acetylcysteine Solution 10% | 30ml | 49502-0181-30 |
| Dey | Acetylcysteine Solution 20% | 4ml | 49502-0182-04 |
| Dey | Acetylcysteine Solution 20% | 10ml | 49502-0182-10 |
| Dey | Acetylcysteine Solution 20% | 30ml | 49502-0182-30 |
| Dey | Acetylcysteine Solution 20% | 100ml | 49502-0182-00 |
| Dey | Cromolyn Sodium 2ml | 60s | 49502-0689-02 |
| Dey | Cromolyn Sodium 2ml | 120s | 49502-0689-12 |
| Dey | Ipratropium Bromide 2.5ml | 25s | 49502-0685-03 |
| Dey | Ipratropium Bromide 2.5ml | 30s | 49502-0685-33 |
| Dey | Ipratropium Bromide 2.5ml | 60s | 49502-0685-60 |
| Dey | Albuterol 90mcg Aerosol Inhaler | 17gm | 49502-0333-17 |
| Dey | Albuterol 90mcg Aerosol Inhaler | 17gm | 49502-0303-17 |
| Dey | Albuterol 90mcg Aerosol Refill | 17gm | 49502-0303-27 |



| Manufacturer | Product | Size | NDC No. |
|---|---|---|---|
| Roxane | Ipratropium Bromide .02% | 2.5ml 25s | 00054-8402-11 |
| Roxane | Ipratropium Bromide .02% | 2.5ml 30s | 00054-8402-13 |
| Roxane | Ipratropium Bromide .02% | 2.5ml 60s | 00054-8402-21 |



# Exhibit F

E-SERVED
01/20/05
09:32 PM ET
MP-MDL NO.456

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 CNN8dQnQQe2iiQnMcRCdBYUmwdRkHwjLskdDXAoEcXqfVbVia6QRQIWPdxA7MVNA
 JWsM3YbzIWJsef9Bd2GJSQ==

<SEC-DOCUMENT>0000950123-04-009184.txt : 20040803
<SEC-HEADER>0000950123-04-009184.hdr.sgml : 20040803
<ACCEPTANCE-DATETIME>20040803172244
ACCESSION NUMBER:		0000950123-04-009184
CONFORMED SUBMISSION TYPE:	10-Q
PUBLIC DOCUMENT COUNT:		8
CONFORMED PERIOD OF REPORT:	20040630
FILED AS OF DATE:		20040803

FILER:

	COMPANY DATA:
		COMPANY CONFORMED NAME:			SCHERING PLOUGH CORP
		CENTRAL INDEX KEY:			0000310158
		STANDARD INDUSTRIAL CLASSIFICATION:	PHARMACEUTICAL PREPARATIC
		IRS NUMBER:				221918501
		STATE OF INCORPORATION:			NJ
		FISCAL YEAR END:			1231

	FILING VALUES:
		FORM TYPE:		10-Q
		SEC ACT:		1934 Act
		SEC FILE NUMBER:	001-06571
		FILM NUMBER:		04949392

	BUSINESS ADDRESS:
		STREET 1:		ONE GIRALDA FARMS
		CITY:			MADISON
		STATE:			NJ
		ZIP:			07940-1000
		BUSINESS PHONE:		9738227000
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-Q
<SEQUENCE>1
<FILENAME>y99638e10vq.txt
<DESCRIPTION>FORM 10-Q
<TEXT>
<PAGE>

FORM 10-Q
UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D. C. 20549

QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended JUNE 30, 2004

COMMISSION FILE NUMBER 1-6571

SCHERING-PLOUGH CORPORATION
(Exact name of registrant as specified in its charter)

http://www.sec.gov/Archives/edgar/data/310158,



New Jersey
(State or other jurisdiction of
incorporation)
2000 Galloping Hill Road
Kenilworth, NJ
(Address of principal executive
offices)
07033
(Zip Code)

22-1918501
(I.R.S. Employer Identification No.)
(908) 298-4000
(Registrant's telephone number,
including area code)

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months, and (2) has been subject to such filing requirements
for the past 90 days.

YES [X] NO [ ]

Indicate by check mark whether the registrant is an accelerated filer (as
defined in Rule 12b-2 of the Exchange Act). YES [X] NO [ ]

Common Shares Outstanding as of June 30, 2004:  1,472,377,983

<PAGE>

PART I. FINANCIAL INFORMATION

Item 1. Financial Statements

SCHERING-PLOUGH CORPORATION AND SUBSIDIARIES
STATEMENTS OF CONSOLIDATED OPERATIONS
(UNAUDITED)
(Amounts in millions, except per share figures)

<TABLE>
<CAPTION>

|  | Three Months Ended June 30, | | |
|---|---|---|---|
|  | 2004 | 2003 | 2( |
| <S> | <C> | <C> | <C> |
| Net sales | $ 2,147 | $ 2,308 | $ 4, |
| Cost of sales | 790 | 784 | 1, |
| Selling, general and administrative | 979 | 938 | 1, |
| Research and development | 451 | 369 |  |
| Other expense (income), net | 43 | (4) |  |
| Special charges | 42 | 20 |  |
| Equity (income)/loss from cholesterol joint venture | (77) | (26) |  |
| (Loss)/income before income taxes | (81) | 227 |  |
| Income taxes benefit/(expense) | 16 | (45) |  |
| Net (loss)/income | $ (65) | $ 182 | $ ( |
| Diluted (loss)/earnings per common share | $ (.04) | $ .12 | $ ( |
| Basic (loss)/earnings per common share | $ (.04) | $ .12 | $ ( |

or customers – regardless of cause, including war, terrorism, riot, civil insurrection or social unrest; and natural or man-made disasters, including famine, flood, fire, earthquake, storm or disease.

- – Changes in tax laws including changes related to taxation of foreign earnings.

- – Changes in accounting standards promulgated by the American Institute of Certified Public Accountants, the Financial Accounting Standards Board or the SEC, or the Public Company Accounting Oversight Board that would require a significant change to Schering-Plough's accounting practices.

For further details and a discussion of these and other risks and uncertainties that may impact Schering-Plough's forward looking statements, see Schering-Plough's past and future SEC filings.

Item 3. Quantitative and Qualitative Disclosures about Market Risk

The Company is exposed to market risk primarily from changes in foreign currency exchange rates and, to a lesser extent, from interest rates and equity prices. Refer to "Management's Discussion and Analysis of Operations and Financial Condition" in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2003 for additional information.

Item 4. Controls and Procedures

Management, including the chief executive officer and the chief financial officer, has evaluated the Company's disclosure controls and procedures as of the end of the quarterly period covered by this Form 10-Q and has concluded that the Company's disclosure controls and procedures are effective. They also concluded that there were no changes in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

48

<PAGE>

PART II. OTHER INFORMATION

Item 1. Legal Proceedings

Legal proceedings involving the Company are described in the 2003 10-K and the 2004 first quarter 10-Q, together referred to as the "Reports" in this Legal Proceedings Item. Unless specifically indicated below, matters described in the Reports are still pending. The following description should be read together with the Reports. It covers material developments to previously reported proceedings and new legal proceedings involving the Company that arose since the April 28, 2004 filing date of the 2004 first quarter 10-Q.

Patent Matters. PRIME PAC PRRS Patent. In January 2000, a jury found that the Company's PRIME PAC PRRS (Porcine Respiratory and Reproductive Syndrome) vaccine infringed a patent owned by Boehringer Ingelheim Vetmedica, Inc ("Boehringer Ingelheim"). An injunction was issued in August 2000 barring further sales of the Company's vaccine. On June 3, 2004, a jury in the United States District Court for the district of New Jersey awarded Boehringer Ingelheim $6.9 million plus interest in this matter.

DR. SCHOLL'S FREEZE AWAY Patent. On July 26, 2004, OraSure Technologies filed an action in the U.S. District Court for the Eastern District of Pennsylvania alleging patent infringement by Schering-Plough Healthcare Products by its sale of DR. SCHOLL'S FREEZE AWAY wart removal product. The FREEZE AWAY product was

http://www.sec.gov/Archives/edgar/data/310158/

E-SERVED
01/20/05
09:32 PM ET
MDL No. 456

launched in March 2004. As of June 30, 2004, net sales of this product totaled $8.4 million.

Investigations. Pennsylvania Investigation. On July 30, 2004, Schering-Plough Corporation, the U.S. Department of Justice and the U.S. Attorney's Office for the Eastern District of Pennsylvania announced settlement of the previously disclosed investigation by that Office.

Under the settlement, Schering Sales Corporation, an indirect wholly owned subsidiary of Schering-Plough Corporation, will plead guilty to a single federal criminal charge concerning a payment to a managed care customer. As a result, Schering Sales Corporation will be excluded from participating in federal healthcare programs. The settlement will not affect the ability of Schering-Plough Corporation to participate in those programs.

The aggregate settlement amount is $345.5 million in fines and damages, comprised of a $52.5 million fine to be paid by Schering Sales Corporation, and $293 million in civil damages to be paid by Schering-Plough Corporation. Schering-Plough Corporation will be credited with $53.6 million that was previously paid in additional Medicaid rebates against the civil damages amount, leaving a net settlement amount of $291.9 million. Of that amount, $177.5 million of the total settlement will be paid in 2004, and the remaining portion will be paid by March 4, 2005. Interest will accrue on the unpaid balance at the rate of 4 percent.

The payments will be funded by cash from operations, borrowings and/or proceeds from the issuance of securities. There will be no impact on 2004 full year results related to the Pennsylvania settlement.

Under the settlement, Schering-Plough Corporation also entered into a five year corporate integrity agreement with the Office of the Inspector General of the Department of Health and Human Services, under which Schering-Plough Corporation agreed to implement specific measures to promote

49

<PAGE>

compliance with regulations on issues such as marketing. Failure to comply can result in financial penalties.

Details of the initiation and progress of the investigation can be found in the Company's prior 10-K and 10-Q reports beginning with the 10-K for 1999.

The Company cannot predict the impact of this settlement, if any, on other outstanding investigations.

Pricing Matters. During 2000, Warrick Pharmaceuticals (Warrick), the Company's generics subsidiary, was sued by the state of Texas. In 2002, the Company and its subsidiary, Schering Corporation, were added as defendants. The lawsuit alleges that Warrick supplied the state with false reports of wholesale prices, which caused the state to pay Medicaid claims on prescriptions of Warrick's albuterol sulfate solution and inhaler at a higher-than-justified level. On May 3, 2004, the Company announced that it has reached an agreement with the attorney general's office of the State of Texas to settle the matter for a total of $27 million.

Securities and Class Action Litigation. On March 31, 2003, the Company was served with a putative class action complaint filed in the U.S. District Court in New Jersey alleging that the Company, Richard Jay Kogan (who resigned as Chairman of the Board November 13, 2002, and retired as Chief Executive Officer, President and Director of the Company April 20, 2003) and the Company's Employee Savings Plan (Plan) administrator breached their fiduciary obligations to

http://www.sec.gov/Archives/edgar/data/310158/

E-SERVED
01/20/05
09:32 PM ET
BMP-MDL No. 1456

certain participants in the Plan. In May 2003, the Company was served with a second putative class action complaint filed in the same court with allegations nearly identical to the complaint filed March 31, 2003. On October 6, 2003, a consolidated amended complaint was filed, which names as additional defendants seven current and former directors and other corporate officers. The Court dismissed this complaint on June 29, 2004. On July 16, 2004, the plaintiffs filed a Notice of Appeal.

SEC Inquiries and Related Litigation. On June 9, 2004, the SEC and the Company announced settlement of the SEC's enforcement proceeding regarding the books and records and internal controls provisions of the Foreign Corrupt Practices Act relating to payments of approximately $76,000 made between February 1999 and March 2002 by one of the Company's foreign subsidiaries, Schering-Plough Poland, to a charitable organization called the Chudow Castle Foundation. Without admitting or denying the allegations in the complaint, the Company paid a $500,000 civil penalty; consented to the issuance of a Commission Order requiring the Company to cease and desist from committing or causing violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934; and agreed to retain an independent consultant to review the Company's policies and procedures regarding compliance with the Foreign Corrupt Practices Act and to implement any changes recommended by the consultant.

On September 9, 2003, the SEC and the Company announced settlement of the SEC enforcement proceeding against the Company and Richard Jay Kogan, former Chairman and Chief Executive Officer, regarding meetings held with investors the week of September 30, 2002, and other communications. Without admitting or denying the allegations, the Company agreed not to commit future violations of Regulation FD and related securities laws and paid a civil penalty of $1 million. Mr. Kogan paid a civil penalty of $50 thousand.

The federal putative class actions filed against the Company and Mr. Kogan regarding the meetings held with investors the week of September 30, 2002, and other communications were consolidated and, pursuant to that consolidation, an amended complaint dated March 13, 2003, was filed, alleging violations of Sections 10(b), 20(a) and 20(A) of the Securities Exchange Act of 1934 relating to the

50

<PAGE>

alleged disclosures made during the meetings mentioned in the paragraph above. The Company filed a motion to dismiss these class actions May 6, 2003, and the plaintiffs have sought leave of the court, and thereafter filed a second amended complaint. On June 29, 2004, the Court dismissed the second amended complaint.

On September 25, 2003, a lawsuit was filed in New Jersey Superior Court, Union County, against Richard Jay Kogan and the Company's outside Directors alleging breach of fiduciary duty, fraud and deceit and negligent misrepresentation, all relating to the alleged disclosures made during the meetings mentioned above. The Company removed this case to federal court. A motion to remand to state court and the Company's motion to dismiss are pending.

Environmental Matters. On November 20, 2003, we received a General Notice of Potential Liability from EPA addressed to Arno/Scholl's Adhesive Tapes, Inc., a former subsidiary of the Company, relating to the Lake Culmet Cluster Site in Chicago, Illinois. There are several hundred other potentially responsible parties for the site. The Company believes it was named erroneously and that another unrelated company should be responsible for any clean-up obligations at this site. The Company is working with the government to have the matter resolved.

The New Jersey Department of Environmental Protection sent Schering-Plough a

http://www.sec.gov/Archives/edgar/data/310158/

E-SERVED
01/20/05
09:32 PM ET
MDL NO. 1456

incorporated by reference in Registration Statements No. 2-83963, No. 33-19013, No. 33-50606, No. 333-30331, No. 333-87077, No. 333-91440, No. 333-104714, No. 333-105567, No. 333-105568 and No. 333-112421 on Form S-8, Post Effective Amendment No. 1 to Registration Statement No. 2-84723 on Form S-8, Post Effective Amendment No. 1 to Registration Statement No. 333-105567 on Form S-8, Post Effective Amendment No. 1 to Registration Statement No. 2-80012 on Form S-3, Post Effective Amendment No. 1 to Registration Statement No. 2-77740 on Form S-3, Post Effective Amendment No. 1 to Registration Statement No. 333-102970 on Form S-3 and Registration Statements No. 333-12909, No. 333-853, No. 333-30355, No. 333-102970, No. 333-110690 and No. 333-113222 on Form S-3.

We also are aware that the aforementioned report, pursuant to Rule 436(c) under the Securities Act of 1933, is not considered a part of the Registration Statements prepared or certified by an accountant or a report prepared or certified by an accountant within the meaning of Sections 7 and 11 of that Act.

/s/ Deloitte & Touche LLP

Parsippany, New Jersey


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-31.1
<SEQUENCE>5
<FILENAME>y99638exv31w1.txt
<DESCRIPTION>CERTIFICATION
<TEXT>
<PAGE>

Exhibit 31.1


CERTIFICATION

I, Fred Hassan, Chairman of the Board, Chief Executive Officer and President, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Schering-Plough Corporation (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

     a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) [paragraph omitted pursuant to SEC Release Nos. 33-8238 and 34-47986];

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

<PAGE>

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: August 3, 2004

/s/ Fred Hassan
- --------------------------------------------
    Fred Hassan
Chairman of the Board, Chief Executive Officer and President


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-31.2
<SEQUENCE>6
<FILENAME>y99638exv31w2.txt
<DESCRIPTION>CERTIFICATION
<TEXT>
<PAGE>

                                                          Exhibit 31.2


CERTIFICATION

I, Robert J. Bertolini, Executive Vice President and Chief Financial Officer, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Schering-Plough Corporation (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;



3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) [paragraph omitted pursuant to SEC Release Nos. 33-8238 and 34-47986];

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

<PAGE>

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: August 3, 2004

/s/ Robert J. Bertolini
- --------------------------------------
    Robert J. Bertolini
Executive Vice President and Chief Financial Officer


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-32.1
<SEQUENCE>7
<FILENAME>y99638exv32w1.txt
<DESCRIPTION>CERTIFICATION
<TEXT>
<PAGE>



Exhibit 32.1

CERTIFICATION

I, Fred Hassan, Chairman of the Board, Chief Executive Officer and President of Schering-Plough Corporation, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    the Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2004 (the "Periodic Report") which this statement accompanies fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78m); and

(2)    information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of Schering-Plough Corporation.

Dated: August 3, 2004

/s/ Fred Hassan
- -------------------------
Fred Hassan
Chairman of the Board,
Chief Executive Officer
and President


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-32.2
<SEQUENCE>8
<FILENAME>y99638exv32w2.txt
<DESCRIPTION>CERTIFICATION
<TEXT>
<PAGE>

Exhibit 32.2


CERTIFICATION

I, Robert J. Bertolini, Executive Vice President and Chief Financial Officer of Schering-Plough Corporation, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    the Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2004 (the "Periodic Report") which this statement accompanies fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78m); and

(2)    information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of Schering-Plough Corporation.

Dated: August 3, 2004

/s/ Robert J. Bertolini
- -------------------------
    Robert J. Bertolini
Executive Vice President and
Chief Financial Officer

1/20/2005 7:17 PM

http://www.sec.gov/Archives/edgar/data/310158/



```
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```



# Exhibit G

01/19/2005 10:19 FAX                                                         ☒002,



RORES & GRAY LLP
ONE INTERNATIONAL PLACE     BOSTON, MA 02110 2624     617 951 3000     617 951-7050
BOSTON     NEW YORK     SAN FRANCISCO     WASHINGTON, DC

January 19, 2005                                    Darcy W. Shearer
                                                    (617) 951-7489
                                                    dshearer@ropesgray.com

**BY FACSIMILE**

Joanne M. Cicala
Kirby McInerney & Squire LLP
830 Third Avenue
New York, NY 10022
Fax: 212-751-2540

Re: In re Pharmaceutical Average Wholesale Price Litigation, MDL No. 1456 (County of
    Suffolk v. Abbott Laboratories, Inc., et al.)

Dear Ms. Cicala:

I write in response to your letter of January 17, 2005 requesting access to documents produced in
the action entitled Texas v. Warrick Pharmaceuticals Corporation, et al., Civ. No. 00-2237 (the
"Texas Action").

As we discussed last fall when you first requested that we agree to allow you access to these
documents, it is our position that Judge Saris' Memorandum and Order dated October 26, 2004
stating that "all discovery shall be stayed with respect to . . . Warrick Pharmaceuticals" makes
any request for production of these documents contrary to Court order. The documents you seek
to review relate solely to drugs manufactured by Warrick Pharmaceuticals. Unless and until the
stay of discovery is lifted by the Court, Warrick will not consent to your review of these
documents.

As stated in CMO No. 9, Suffolk is not entitled to documents relating to drugs that are not
identified in the operative complaint filed by Suffolk or documents produced by a defendant that
are not otherwise relevant to the claims asserted against that defendant in the operative complaint
filed by such plaintiff. Contrary to the assertions in your letter, it is not within Suffolk's rights
under the CMO to demand production of documents produced by Schering in the Texas action
unless they relate to the claims asserted against Schering in your complaint. The documents you
seek to review are not related to your claims pending against Schering, but solely to those claims
brought against Warrick. The Court is currently considering a Motion to Dismiss all claims
against Warrick and has stayed discovery in the interim.

9632624_1.DOC

01/19/2005 10:19 FAX                                                                                    ☒003/



Joanne M. Cicala                        - 2 -                           January 19, 2005

In the event the Court denies the Motion to Dismiss and lifts the stay of discovery as to Warrick, and subject to and without waiving any objections Schering and/or Warrick may file in response to Suffolk County's Third Request, we will reconsider your request that we consent to Suffolk signing on to the Texas protective order.

Very truly yours,

Darcy W. Shearer

cc:     John T. Montgomery
        Steven A. Kaufman
        Eric P. Christofferson

70,57674_1.DOC





ROPES & GRAY LLP
ONE INTERNATIONAL PLACE   BOSTON, MA 02110-2624   617-951-7000   F 617-951-7050
BOSTON   NEW YORK   SAN FRANCISCO   WASHINGTON, DC

January 25, 2005

Eric P. Christofferson
(617) 951-7976
eric.christofferson@ropesgray.com

**BY FEDERAL EXPRESS**

Joanne M. Cicala, Esq.
Kirby McInerney & Squire LLP
830 Third Avenue
New York, NY 10022

Re: In re Pharmaceutical Industry Average Wholesale Price Litigation

Dear Ms. Cicala:

Please find enclosed Schering-Plough's Opposition to County of Suffolk's Second Motion to Compel the Production of Discovery, as well as the attached exhibits. Please note that we were unable to file this Opposition with the Court because Suffolk's Motion was not filed with the Court.

Very truly yours,

Eric P. Christofferson

Enclosures

cc:   All Counsel of Record (via Verilaw)

9637430_1.DOC

# MOTION TO RENEW EXHIBIT B



E-SERVED
01/25/05
11:05 AM ET
MDL No. 1456

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVREAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
|  | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: *County of Suffolk v. Abbott Labs, Inc., et al.,* (E.D.N.Y. No. CV-03-229) | Judge Patti B. Saris |
|  | Chief Magistrate Judge Marianne B. Bowler |

## <u>SCHERING-PLOUGH'S OPPOSITION TO COUNTY OF SUFFOLK'S SECOND MOTION TO COMPEL THE PRODUCTION OF DISCOVERY</u>

Schering-Plough Corporation ("Schering") respectfully submits this Opposition to County of Suffolk's Second Motion to Compel the Production of Discovery, which motion is a rather obvious attempt to circumvent Judge Saris's Order that stayed discovery as to Warrick Pharmaceuticals Corporation ("Warrick"), for which reason -- among others -- it should be denied.

On October 26, 2004, Judge Saris issued a Memorandum and Order (the "Order") in which she stated that "all discovery shall be stayed with respect to . . . Warrick Pharmaceuticals . . ." because the County of Suffolk ("Suffolk") had theretofore failed to demonstrate a "good faith basis" for its claims against Warrick (and several others). *See* Order at 4, attached hereto as Ex. A. The stay of discovery as to Warrick prevents discovery into the merits of Suffolk's claims against Warrick, which Judge Saris found insufficient to justify discovery unless and until Suffolk could make a showing of good faith that it has so far been unable to make.[1]

---

[1] Suffolk has made submissions attempting to rectify its defective pleadings, which Warrick and other Defendants have opposed. Judge Saris not ruled on the sufficiency of these additional submissions, and, until she does, her order staying discovery remains in effect.



Notwithstanding Judge Saris's Order, Suffolk subsequently demanded that Schering, [2] the parent of Warrick, produce documents relating to Warrick that Schering had produced in *The State of Texas ex rel. Ven-A-Care of the Florida Keys, Inc. v. Warrick Pharmaceuticals, Schering-Plough Corp. et al.* (the "Texas Litigation"). Schering objected because all but at most a handful of documents produced in that case relate solely to Warrick, and the handful that might not relate solely to Warrick are interspersed among the more than 400,000 pages of documents that do. *See* Decl. of John McDonald, attached hereto as Ex. B. Finding these few needles in a gigantic haystack would be disproportionate to their value to Suffolk. Of the more than 400,000 pages of documents produced in the Texas Litigation, only a minimal number were produced that might not have related exclusively to Warrick or Warrick products. *See id.* There would be no way of knowing whether those few documents would be relevant to Suffolk's claims against Schering without Schering's wading through more than 150 boxes of documents and sifting through more than 400,000 pages to locate and review them. Such an undertaking for documents that Suffolk has no reason to believe would be helpful to its case would be unreasonable, unduly burdensome and expensive, and disproportionate to the value of the documents to Suffolk. *See* Fed. R. Civ. P. 26(g)(2)(C).

The discovery sought violates Judge Saris's order because the claims to which it is directed -- the claims against Warrick -- are not subject to discovery at this time, regardless to whom the request might nominally be made.

---

[2] Schering has made available discovery relating to Suffolk's claims against Schering, including 71 boxes of materials that were presented to, and reviewed by, Suffolk.



Wherefore, Suffolk's Second Motion should be DENIED.

THE SCHERING-PLOUGH GROUP
By its attorneys,


/s/ John T. Montgomery
John T. Montgomery (BBO#352220)
Brien T. O'Connor (BBO#546767)
Steven A. Kaufman (BBO#262230)
Darcy W. Shearer (BBO#656503)
Eric P. Christofferson (BBO#654087)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000


Dated: January 25, 2005



## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2005, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456

/s/ Eric P. Christofferson

Eric P. Christofferson

-4-



# EXHIBIT A



E-SERVED
01/25/05
1:05 AM ET
MDL No.
10:13 AM E
MDL No.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | )<br>)<br>)<br>)<br>) |
| THIS DOCUMENT RELATES TO: | )<br>) |
| County of Suffolk v. Abbott Laboratories, et al.<br>Civ. Action No. 1:03-cv-10643 | )<br>)<br>)<br>)<br>)<br>) |

MDL NO. 1456
CIVIL ACTION NO.
01-12257-PBS

## MEMORANDUM AND ORDER

### October 26, 2004

Saris, U.S.D.J.

### I.   INTRODUCTION

Twenty-two pharmaceutical-manufacturer Defendants have filed individual memoranda in support of their motion to dismiss Suffolk County's Amended Complaint.   The cross-cutting issues were addressed in In re Pharm. Indus. Average Wholesale Price Litig., ___ F. Supp. 2d ___ (D. Mass. Sept. 30, 2004).  As all federal claims have been dismissed, this Order addresses the company-specific issues with respect to the remaining state law claims.   The surviving claims include the allegations that (1) Defendants fraudulently misstate their average wholesale prices ("AWP's") in violation of New York Social Services Law Section 145-b (Count V); (2) Defendants violate the New York consumer protection law, N.Y. Gen. Bus. Law § 349, with respect to both



AWP and Best Prices schemes (Count VII); and (3) Defendants were unjustly enriched by the AWP and Best Prices schemes (Count IX).[1]

## II.  DISCUSSION

### A.  Standard

Defendants move to dismiss the AWP and Best Prices claims under Federal Rule of Civil Procedure 9(b).  Count V asserts a claim under New York Social Services Law Section 145-b, which applies to "false statement[s]," "deliberate concealment[s]," or "other fraudulent scheme[s] or device[s]."  Rule 9(b) applies to this claim.  See United States v. Karvelas, 360 F.3d 220, 227-28 (1st Cir. 2004) (holding that Rule 9(b) applies to False Claims Act because liability depends on presentation of a false or fraudulent claim and a mental state of at least reckless disregard of the truth).

Count VII pleads a violation of New York General Business Law Section 349.  While most courts have held that Rule 9(b) does not apply to all claims under this statute, most courts have also held that it is appropriate to require "specificity" in pleading a violation of Section 349.  See, e.g., Pelman v. McDonald's Corp., 237 F. Supp. 2d 512, 526 (S.D.N.Y. 2003); Lava Trading Inc. v. Hartford Fire Ins. Co., 326 F. Supp. 2d 434, 438 (S.D.N.Y. 2004); Petitt v. Celebrity Cruises, Inc., 153 F. Supp.

---

[1] Other remaining Counts are for implied causes of action under New York Medicaid statutes and regulations (Counts III and IV).

2



2d 240, 264-65 (S.D.N.Y. 2001); see generally Gaidon v. Guardian
Life Ins. Co. of Am., 94 N.Y.2d 330, 343 (N.Y. 1999) (holding
Section 349 claims are "critically different" from fraud claims,
for Section 349 is directed to protecting the consuming public).
But cf. Volunteer Firemen's Ins. Servs., Inc. v. McNeil & Co.,
Inc., 221 F.R.D. 388, 393-94 (W.D.N.Y. 2004) (applying Rule 9(b)
to false advertising and Section 349 claims where the complaint
described a fraudulent scheme, without deciding whether Rule 9(b)
applies in all cases).  While an intermediate pleading standard
may no longer be viable, see Swierkiewicz v. Sorema, N.A., 534
U.S. 506, 513-14 (2002), "the complaint should at least set forth
minimal facts as to who did what to whom, when, where, and why –
although why, when why means the actor's state of mind, can be
averred generally," Educadores Puertorriqueños en Acción v.
Hernandez, 367 F.3d 61, 68 (1st Cir. 2004).  Also, barebones
assertions will not suffice even under Rule 8(a).

Rule 9(b) does not apply to the remaining claims, unjust
enrichment and implied causes of action, since these do not
require a pleading of fraud or mistake.

B.   AWP Claims

The Court dismisses Suffolk's AWP claims under Section 145-b
and Section 349 against defendants Novartis, Purdue, and Ivax
because there are no factual allegations regarding a spread,
internal documents or government investigations from which an
inference of fraud can reasonably be made.

3



For the remaining Defendants, Suffolk has alleged both the published AWP for a drug and what Suffolk believes is an accurate estimate of the actual average wholesale price of that drug. Suffolk explains that this information is based on "Suffolk's own investigations of pricing data." (Am. Compl. at ¶ 122.)

The so-called "Suffolk 13" companies complain vigorously that they should not be dragged into this multi-district litigation morass. They insist that the allegations concerning the spread are not particular enough because Suffolk has not disclosed the basis for its calculation and there are no other allegations (e.g., government investigations or the company's own internal documents) to support a claim of fraudulent pricing. See Karvelas, 360 F.3d at 231 n.11. I will defer ruling on the motions to dismiss of the Suffolk 13 and those other Defendants for whom Suffolk has not alleged specific facts beyond a spread. In complying with the automatic disclosure requirements, Suffolk shall disclose within three weeks all documents upon which it relied in calculating the spreads, and provide, in writing, a more definite statement of its method of calculation pursuant to Federal Rule of Civil Procedure 12(e). If there is a good faith basis for calculating a spread, the Court will deny the motion to dismiss. Any challenge to the method of calculation shall be made within fourteen days of this disclosure. In the interim, all discovery shall be stayed with respect to the Suffolk 13 and Defendants Amgen, Inc., Chiron Corporation, Fujisawa

4



Pharmaceutical Company, Ltd., Johnson & Johnson, Warrick

Pharmaceuticals, and Wyeth.

C.   Best Price Claims

Suffolk has asserted state-law claims concerning allegedly
fraudulent Best Prices that Defendant manufacturers reported to
the states.  Defendants argue that these claims should be
dismissed for failure to comply with Rules 8(a) and 9(b).  With
respect to most companies, Suffolk has not tied the Best Prices
claims to any particular drugs, discounts or other company-
specific practices which would support an inference of
misrepresenting Best Prices.  Therefore, the allegations fall
woefully short under Rules 8(a) and 9(b).

Suffolk argues that it does not have access to Best Prices
information because the data is uniquely within Defendants'
control.  See United States ex rel. Franklin v. Parke-Davis, 142
F. Supp. 2d 39 (D. Mass. 2001).  While that may be true,
Plaintiff still must allege sufficient facts regarding the
circumstances of the fraudulent rebate scheme with respect to
each Defendant.  (See ¶¶ 81-93.)  The fact that a manufacturer
may have reported a fraudulent AWP, without more, will not
suffice to plead a Best Prices fraud.

Suffolk has failed to make "a short and plain statement of
the claim showing that the pleader is entitled to relief."  Fed.
R. Civ. P. 8(a).  With the exception of Bayer Corporation, the

5



GSK Defendants, Abbott Laboratories, Inc., Pfizer Inc., TAP
Pharmaceutical Products, Inc., and Schering-Plough.  Plaintiff
has failed to set forth at least minimal facts with respect to
(1) the allegedly fraudulent or false price reported to the state
for any specific drug; or (2) any information showing a company-
wide scheme to misstate Best Prices.  _Educadores_, 367 F.3d at 66-
67.  There are insufficient facts alleged to state a claim
showing entitlement to relief under any state causes of action.

    D.  <u>Miscellaneous</u>

    The claims against Aventis Pharmaceuticals Inc. are
dismissed for failure to plead a drug sold by Aventis
Pharmaceuticals Inc., as opposed to Aventis Behring L.L.C.

    The parties agree that Suffolk's AWP claims against Bayer
for Cipro are not barred by the settlement agreements.  Suffolk's
Best Prices claims for Cipro from the time period from Third
Quarter 1995 to Third Quarter 2000 are barred.

    Suffolk's claims against Sanofi and Pharmacia are dismissed
without prejudice to refiling to clarify the corporate structure
and which Defendant is responsible for which drugs.

    All claims against unnamed defendants, and all claims
relating to unnamed drugs, are dismissed, as these fail to
provide notice to the defendants.

<u>ORDER</u>

6



The Court **ALLOWS** (1) the motion to dismiss all claims against defendants Aventis Pharmaceutical Inc., Purdue Pharma, L.P., Novartis Pharmaceuticals Corporation, Ivax Corporation and Ivax Pharmaceuticals Inc., Sanofi-Synthelabo, Inc., and Pharmacia Corporation; and (2) the motion to dismiss the Best Prices claims against defendants Agouron Pharmaceuticals, Inc., Amgen, Inc., AstraZeneca Pharmaceuticals L.P., AstraZeneca US, Aventis Behring L.L.C., Barr Laboratories, Inc., Berlex Laboratories, Inc., Biogen, Inc., Bristol-Myers Squibb Company, Chiron Corporation, Eli Lilly and Company, Fujisawa Pharmaceutical Company, Ltd., Genentech, Inc., Immunex Corporation, Janssen Pharmaceutical, Johnson & Johnson, MedImmune, Inc., Merck & Co., Inc., Ortho Biotech, Ortho McNeil Pharmaceuticals, Reliant Pharmaceuticals, Warrick Pharmaceuticals, and Wyeth.

The Court **DENIES** the remainder of the motion.


S/PATTI B. SARIS
United States District Judge


7



# EXHIBIT B



E-SERVED
01/25/05
11:05 AM ET
AWP-MDL No. 16

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) |
|  | MDL No. 1456 |
|  | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) ) ) ) ) ) ) |
|  | Judge Patti B. Saris |
|  | Chief Magistrate Judge Marianne B. Bowler |

## DECLARATION OF JOHN P. MCDONALD IN SUPPORT OF SCHERING-PLOUGH'S OPPOSITION TO COUNTY OF SUFFOLK'S SECOND MOTION TO COMPEL

John P. McDonald declares as follows:

1. I am a partner with the firm of Locke Liddell & Sapp LLP, and I represented Schering-Plough Corporation, Schering Corporation and Warrick Pharmaceuticals Corporation in *The State of Texas ex rel. Ven-A-Care of the Florida Keys, Inc. v. Warrick Pharmaceuticals, Schering-Plough Corp. et al.*, No. GV002327 in the 53rd Judicial District of Travis County, Texas (the "Texas Litigation"). I submit this declaration of my own personal knowledge in support of Schering-Plough's Opposition to County of Suffolk's Second Motion to Compel the Production of Discovery.

2. The claims for which the State of Texas and the relator sought recovery in the Texas Litigation related exclusively to Warrick Pharmaceuticals Corporation ("Warrick") and Warrick's products.

3. In response to discovery requests in the Texas Litigation, Schering-Plough Corporation, Schering Corporation, and Warrick made available for inspection over 150 boxes -- more than 400,000 pages -- of documents.



4.     It is my belief that the amount of documents produced in the Texas Litigation that do not relate exclusively to Warrick or Warrick products is minimal.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____/s/ John P. McDonald_____
John P. McDonald

Dated:  January 24, 2005



## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 25, 2005, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456

/s/ Eric P. Christofferson

Eric P. Christofferson

# MOTION TO RENEW EXHIBIT C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**


**Docket No. 01-12257-PBS**

In re: **Pharmaceutical**         .
    **Industry Wholesale Price** .
    **Litigation**                 .
                       .
                       .

. . . . . . . . . . . . . .

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
HELD ON JANUARY 27, 2005


APPEARANCES:

For County of Suffolk:  Joanne Cicala, Esquire, Kirby, McInerney & Squire, 830 3rd. Avenue, 10th Floor, New York, NY  10022, (212) 371-6600.

For Defendants:  Adil Mangi, Esquire, Patterson, Belknap, Webb & Tyler, LLP, 1133 Avenue of the Americas, New York, NY  10036-6710, (212) 336-2000.

For Health Net:  Kevin McGinty, Esquire, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, One Financial Center, Boston, MA 02111, (617) 542-2241.

For Health Net:  Lance Selfridge, Esquire, Lewis Brisbois Bisgard & Smith, LLP, 221 North Figueroa Street, St. 1200, Los Angeles, CA  90012.

For Schering-Plough Corp.:  Eric Christofferson, Esquire, Ropes & Gray, LLP, One International Place, Boston, MA  02110, (617) 951-7385.

For the Class MDL Plaintiffs:  Edward Notargiacomo, Esquire, Hagens, Berman, LLP, One Main Street, 4th Floor, Cambridge, MA 02142, (617) 374-3738.

---

For Aventis Behring, LLC:  Michael DeMarco, Esquire,
Kirckpatrick & Lockhart, Nicholson Graham, LLP, 75 State Street,
Boston, MA   02109, (617) 951-9111.

For Aventis:  James Muehlberger, Esquire, Shook, Hardy & Bacon,
2555 Grand Blvd., Kansas City, MO   64108, (816) 474-6550.

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

2

1

**I N D E X**

2  Proceedings                                                    3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Maryann V. Young*
**Certified Court Transcriber**
**(508) 384-2003**

3

1                        P R O C E E D I N G S

2          THE CLERK:  Today is Thursday, January 27, 2005.  The

3    case of Citizens for Consumer Justice, et al v. Private

4    Laboratories, et al, Criminal Action No. 01-12257 will now be

5    heard before this Court.  Will counsel please identify

6    themselves for the record?

7          MR. MANGI:  Your Honor, Adil Mangi from Patterson,

8    Belknap, Webb & Tyler for defendants. I'll be arguing the

9    motion to compel Health Net.

10         THE COURT:  Thank you.

11         MS. CICALA:  Good morning, your Honor.  Joanne Cicala

12   from Kirby McInerny & Squire, for plaintiff, the County of

13   Suffolk, here on the discovery motion.

14         MR. McGINTY:  Good morning, your Honor.  Kevin

15   McGinty from Mintz Levin for Health Net, respondent to the

16   motion to compel.

17         MR. SELFRIDGE:  Good morning, your Honor. Lance

18   Selfridge from Lewis Brisbois Bisgard & Smith in Los Angeles

19   also here on behalf of Health Net.  I understand that

20   Mr. McGinty has a motion for pro hac vice admission for me.

21         THE COURT:  Okay. And that motion will be allowed.

22         MR. SELFRIDGE:  Thank you, your Honor.

23         THE COURT:  Has it been filed or are you just--

24         MR. McGINTY:  I have it here, your Honor, with the

25   filing fee as well.

4

1        THE COURT:  Okay.  Oh, we always want the money.

2        MR. McGINTY:  Yes.  I've learned from said experience

3   so, I will hand it up now.

4        THE COURT:  All right, that's fine.

5        MR. SELVICH:  Thank you, your Honor.

6        THE COURT:  You're welcome.

7        MR. CHRISTOFFERSON:  Good morning, your Honor.  Eric

8   Christofferson from Ropes & Gray, on behalf of Schering-Plough

9   Corporation.

10        THE COURT:  Thank you, very much.

11        MR. NOTARGIACOMO:  Good morning, your Honor. Edward

12   Notargiacomo from Hagens, Berman on behalf of the Class MDL

13   plaintiffs.  I don't have any particular motion.  I'm just here

14   in case there are questions that need to be answered.

15        THE COURT:  Mr. DeMarco, do you want to be noted on

16   the record.

17        MR. DeMARCO:  And, your Honor, I am Michael DeMarco

18   as you know, and I'm here with my colleague Jim Muehlberger.

19        MR. MUEHLBERGER:  Good morning, your Honor.

20        THE COURT:  Good morning.

21        MR. DeMARCO:  I'm with Kirckpatrick & Lockhart,

22   Nicholson Graham.  And Jim is with Shook, Hardy & Bacon from

23   Kansas City and he represents Aventis, an interested party, the

24   defendant in the class action.

25        THE COURT:  All right.  Well, we'll take the two, the

1   motions in the order in which they were filed.  So the first

2   is docket entry number 1175, which is defendants' motion to

3   compel third party Health Net to produce with opposition.

4         MR. MANGI:  Thank you, your Honor.  As your Honor is

5   aware, Judge Saris allowed the defendants to proceed with

6   discovery of a sample of health insurers in the industry.

7   Health Net is a key part of that industry sample.  Primarily

8   because of their geographical reach, they operate on both

9   coasts, both coasts, but also because they have an internal PBF

10  which renders them particularly of interest to defendants.

11  This motion is before your Honor on two specific issues.

12        First of all, Health Net has produced about half a

13  box of documents.  That came after about a year worth of

14  negotiation on the subpoena and the scope of production.  But

15  all of the documents that were produced were redacted.  In

16  fact, they were redacted of all terms that would be useful to

17  defendants in this case.  All reimbursement methodologies were

18  redacted.  All dispensing fees or administration fees were

19  redacted.  The same for financial terms, even the names of

20  contracting parties, - (inaudible #11:04:07) - were essentially

21  shell contracts, worthless paper or templates.  That's the

22  first and the primary issue for this motion.

23        The second is there were certain very limited

24  documents that were identified by Health Net's witnesses at

25  depositions as being central to this case.  We sought their

6

1   production after the deposition, and again these were very

2   specific categories of documents, and Health Net has refused to

3   produce them without giving any reason for that refusal.   Now,

4   on the issue of redactions, Health Net's only reason for not

5   producing these documents in their unredacted form, and again

6   it's half a box so far, is that they have confidential

7   information and Health Net's taken that position despite the

8   fact that their protective order is in place.   So what Health

9   Net is seeking here is unique status in this litigation.   All

10  the other health plans that are part of the industry sample

11  have produced their documents in unredacted form providing all

12  of this information, the methodology, the dispensing fees, and

13  so on, the defendants seek.   Health Net claims that they should

14  be given unique status and allowed to keep their information

15  confidential and that the protective order is not sufficient.

16          Now, I will point out that Judge Saris in CMO 10

17  already made a ruling on the issue of redaction and said in

18  that order, which is appended to our the papers, the redaction

19  should only be allowed on the grounds of privilege.   Now, that

20  order was by its terms addressed to parties, but the logic is

21  equally applicable here, given that the same protective orders

22  protect the interest of third parties as parties.   Now, Health

23  Net in their papers have made a lot of human cry about the

24  relevance of these methodologies.   We've discussed that with

25  them on numerous occasions.   We've even sent them letters, many

1    letters, expressing why the information is relevant, but I'll

2    address it here very briefly by giving just a few examples.   As

3    your Honor is aware, the plaintiff's in the MDL, are now

4    focused on a theory performed by the expert Dr. Hartman which

5    pertains to the expectations of pairs alleging a common

6    expectation of cost classes of trade.   The only way the

7    defendants can test that theory is by reference to the

8    methodologies that are actually being used.   If they're

9    different methodologies, different classes of trade or even

10   different entities within classes of trade, defeats those

11   common expectations.   Similarly, another issue that's going to

12   be critical to the merits is the defendant's position that

13   these contracts have to be looked at on an overall basis.   You

14   have to look at the bundle of services that are being provided

15   and the bundle of payments that's being given.   You can't

16   compare the bundle if you don't know what the terms are.   You

17   can't compare methodology and dispensing fee and see their

18   interrelationship of all the terms, if you don't know what any

19   of those terms are.   And there are numerous other factors that

20   show the relevance of this.   As your Honor's aware, we've put

21   in experts' submissions that have scattered thoughts showing

22   different reimbursements for different drugs.   Health Net has

23   testified about different methodologies they use.   Fee

24   schedules, for example, you can only assess them if you know

25   what they're based on.   So that information is simply central

8

1    to our claims.

2           Now, the only law that Health Net has cited for their

3    position which we consider unique is the Vitamins case from the

4    Southern District of Ohio, but as we point out in our reply

5    papers that that case has no application here.  The court there

6    expressed concern over confidentiality, but that was because

7    the party there that was seeking the discovery was a direct

8    competitor of the party that was making production.  Here,

9    there is no such relationship between the defendant

10   manufacturers and Health Net.  Moreover, the issue of

11   confidentiality was not dispositive in the Vitamins case.  The

12   court expressly said so, and in fact, invited the party to

13   reserve the subpoena.  They didn't rule on the subpoena in

14   Vitamins because it was premature.  There were motions to

15   dismiss pending.  The court said if you win the motion to

16   dismiss, the issue goes away, so let's wait and see what

17   happens there.  So again, they're seeking entirely unique

18   status here.

19          Secondly, that issue of redactions also feeds into

20   claims data.  We've sought claims data from Health Net as we

21   had from numerous insurers.  We've already used a lot of that

22   claims data, and with all health insurers, we've offered to pay

23   for it.  Health Net here raises a few additional arguments

24   which we submit are just red herrings.  They raise the HIPA

25   statute.  There is a precise HIPA regulation on point that

1   allows disclosure where there's a subpoena and a HIPA

2   compliant protective order in place.  The defendant's haven't

3   even stood on that.  We've said okay, you can redact or rather

4   you can replace patient identifying information with dummy

5   numbers as long as they're consistent so we can carry out our

6   analysis.  So we don't care what the names of the individual

7   patients are.  We just want to be able to relate them to the

8   claims so we can study what was paid in relation to specific--

9            THE COURT:  What's wrong with doing that, counsel?

10           MR. McGINTY:  In fact, your Honor, if it is possible

11  to run some kind of algorithm as they suggest that would

12  scramble the patient identifiable information, I expect that

13  it's probably not going to be a problem.  As counsel indicated,

14  the problem really comes with embedded in claims data is the

15  confidential business information concerning dollar value of

16  reimbursement terms.

17           THE COURT:  Okay, so the--

18           MR. MANGI:  Your Honor, the only thing I'll add on

19  claims data is that Health Net, in two letters that are before

20  your Honor have already agreed that the scrambled algorithm

21  which we've used with other insurers already and it works fine,

22  will satisfy all of their patient confidentiality concerns, so

23  that issue we submit is straightforward.

24           Now, the other aspect of this motion pertains to

25  documents identified at deposition.  After the depositions, we

1   sent a letter to Health Net on October 15, 2004 identifying

2   the specific documents that the witnesses talked about.  These

3   again are very specific.  Some of them are as a simple as

4   missing pages with bates numbers to be provided.  Somehow, they

5   dropped out of the production.  Please give them to us, have

6   nothing in response despite numerous letters.  Some of them are

7   slightly more substantive.  For example, in narrowing our

8   production, and as I mentioned, Health Net's only produced half

9   a box because we narrowed it so extensively.  We only sought

10  representative samples of contracts rather than all contracts.

11  We told Health Net that we would test the representative nature

12  of the sample at depositions in relation to, for example, the

13  retail pharmacy contracts between Health Net or the internal

14  PBM and the pharmacies.  Health Net gave us one 2004 template

15  contending it was representative of all their contracts since

16  1991.  Other health plans, some have produced five, some have

17  produced five boxes.  One is rarely going to do.  We asked the

18  witness at deposition is this representative?  He said, no,

19  it's not.  Now, their contracts are again very specific.

20  There's a mail order contract that was referenced.  We asked for

21  it.  They mentioned the production of documents in a related

22  AWP litigation, already produced.  We asked for those.

23          THE COURT:  Just one second.  Mr. Keefe, did you lose

24  something?

25          MR. KEEFE:  I think I misplaced a hat somewhere, your

1  Honor.

2          THE COURT:  What's it look like?

3          MR. KEEFE:  It's just a black hat.

4          THE COURT:  If we find it, we'll know who it belongs

5  to.

6          MR. KEEFE:  Your Honor, in my condition, I need it.

7  It must be out in the hall.  Thank you, Judge.

8          MR. MANGI:  So as I was saying your Honor, these are

9  very specific documents that we've asked for.  There's no

10 burden issue, but yet, Health Net has refused to produce them

11 and has provided no reason for their refusal to do so.  They're

12 specific additional issues raised in Health Net's papers but

13 I'll address them if counsel raises them today.

14          Thank you, your Honor.

15          THE COURT:  All right.  Your brother makes it sound

16 very simple.

17          MR. McGINTY:  It always is at first look.  One thing

18 that counsel for the defendants I think has omitted to discuss

19 is the significant threshold issue about whether this Court

20 even has jurisdiction over this particular subpoena.  As noted

21 in the papers, admitted by the defendants, there is a conflict

22 between various courts as to the scope of 28 U.S.C. Section

23 1407 and whether or not that empowers this court as the

24 transferee court in an MBL proceeding to consider manners

25 concerning the enforcement of a subpoena under Rule 45.  It's

12

1    undisputed that Rule 45 says that motions for enforcement or

2    motions to quash any motion concerning the scope of a Rule 45

3    subpoena, that the power there is best to be heard by the court

4    that issued the subpoena, in this case, the court in

5    California, and what the defendants argues is that Section 1407

6    by virtue of its consolidation procedures gives this court

7    power that essentially trumps Rule 45, and they cite a couple

8    of cases for that proposition.  We cite the _Visics_ (ph) case,

9    which says that Rule 45 controls, and we submit to you that the

10   case that we cite is probably better authority because it

11   comports with sound statutory construction principles.  The

12   provision at issue in Section 1407 is this, there is a portion

13   of that statute which says that the judge or judges to whom MDL

14   actions are assigned, may assign the powers of the district

15   judge in any district for the purpose of conducting pretrial

16   depositions in such coordinated or consolidated pretrial

17   proceedings.  Now, that's very clean language.  It only refers

18   to depositions.  That's the only discovery matter specifically,

19   you know, assigned to the transferee court, and the most basic

20   cannon of statutory construction says that you read a statute

21   the way it's written.  Congress is presumed to know the meaning

22   of the, of the terms of the statute.  It, it's not a stretch to

23   say that Congress knows what the term deposition means.

24   Congress is responsible for the content of Rules of Civil

25   Procedure, so they're presumed to know what--

13

1          THE COURT:  And a lot of other things.

2          MR. McGINTY:  But they presume to know what Rule 45

3   says.

4          THE COURT:  Including the fact that we don't get a

5   raise.

6          MR. McGINTY:  That too, unfortunately.  The mission

7   to refer to matters of, in depositions can only be taken to be

8   purposeful, and, and the way that the authority say about the

9   defendants gets around that is they appeal to some general

10  policy argument concerning the nature of a 1407 proceeding

11  saying well, it says that coordinated or consolidated pretrial

12  proceedings shall be conducted by a judge or judge to whom such

13  actions are assigned.  Gee, you know, that's if there's a

14  policy for them to get everything, but if that's true, why have

15  the separate reference to depositions at all.  If that

16  consolidation language is good enough to give this Court

17  control over Rule 45 matters, you wouldn't need to refer to

18  depositions at all.  So the question is why--

19          THE COURT:  Well, does it not refer to depositions

20  that can be going on in another district where disputes arise?

21          MR. McGINTY:  That's, I think that's the purpose,

22  your Honor, is that Rule 30 of the Rules of Civil Procedure has

23  very specific provisions referenced in the Visics' case,

24  30(B)(4).  It says that any time during a deposition on motion

25  of a party or of the deponent and upon a showing of, you know,

14

1    that the examination is being conducted in bad faith, et

2    cetera, et cetera, et cetera, the court in which the action is

3    pending or the court in the district where the deposition is

4    being taken may order the officer conducting the examination to

5    cease forthwith or may limit the scope or manner or whatever.

6    What this essentially says is that depositions being a special

7    case where stuff happens, if you need to suspend and get a

8    ruling, Section 1407 says you go to the transferee court.

9    That's the purpose of having a specific reference to

10   depositions in Section 1407.  Otherwise, there's no reference

11   to any other kind of discovery, Rule 45 should control, and as

12   a third party, not a party to the case, Health Net is the third

13   party stranger to this case, resident out in California

14   producing documents in site two within California should be

15   subject to the jurisdiction of the California court.  And it

16   makes sense for a number of reasons, in particular, for issues

17   that had been raised in this motion although I think have

18   been--

19        THE COURT:  Well, it makes no sense in terms of the

20   fact that the judge in California knows absolutely nothing

21   about the case.

22        MR. McGINTY:  Well, I think that's the, that's the--

23        THE COURT:  Particularly in a complex case.

24        MR. McGINTY:  Well, that's always going to be the

25   case, your Honor.  I mean cases can be incredibly complex

1   without being an MDL proceeding, yet Rule 45 nonetheless gives

2   the local court the authority to determine the propriety of the

3   discovery that's being sought.

4            THE COURT:   Okay, I'll hear from your brother just on

5   this issue of jurisdiction.

6            MR. MANGI:   Your Honor, I admire my learned friend's

7   efforts to create an issue on the jurisdictional point, but

8   it's one that doesn't exist.   The case law is discussed

9   extensively in our reply papers, and I'm happy to hand up the

10  pages if your Honor would like them.   There are numerous cases

11  that address this precise issue.   It's come up many times and

12  all of them uniformly hold that the MDL court has jurisdiction,

13  and, in fact, exclusive jurisdiction over these matters.

14  What's more, they go into the logic for that as your Honor just

15  pointed out, judicial economy demands that the judge most

16  familiar with the litigation hear these disputes.   The district

17  for example pointed to that precise factor in the Boise case.

18  Similarly, the, Poe case in the District of DC said it would

19  make no sense if depositions were heard in one place, documents

20  in another.   All these cases, and there are plenty more,

21  there's Factor A from the Northern District of Illinois,

22  Sunrise Securities from the Eastern District of Pennsylvania,

23  Dupont Plaza from Puerto Rico, even Wright & Miller have spoken

24  to this point.   All of them uniformly stand--

25            THE COURT:   Dupont Plaza is a First Circuit Case, so

1   yes.

2   　　　　MR. MANGI:  -- that the MDL court has jurisdiction.

3   Now, the Visics case that, that my learned friend relies on,

4   that court explicitly distinguished this situation.  They

5   applied their ruling only to cases where the docket, where the

6   subpoena was for documents only.  They expressly distinguished

7   cases where the subpoena was for documents and a deposition,

8   which is what we have here.  So Visics, even in its own terms

9   doesn't apply and what's more, Visics was expressly rejected in

10  Poe, which is the leading case and it's never been cited again.

11  So we would suggest that the weight of the authority on this

12  issue and the weight of, of shear logic is, is simple.

13  　　　　THE COURT:  Do you have a copy of the reply brief--

14  　　　　MR. MANGI:  Yes, your Honor.

15  　　　　THE COURT:  -- if it's handy.  I have it.

16  　　　　MR. MANGI: I have a, a highlighted copy that I'm

17  happy to hand up if your Honor would, would ignore the

18  highlighting.

19  　　　　THE COURT:  I'm colored blind.  Just one point.  I

20  remember looking at it, but there was one point that I wanted

21  to--.

22  　　　　All right, well, let's move on to the substantive

23  portion of it.

24  　　　　MR. McGINTY:  I'd like to focus now on the, the

25  portion of the, of the request that seeks confidential

1    competitive business information, namely, specific

2    reimbursement terms, and I'd like to, to I think clarify some

3    things that, that perhaps might not have been addressed in, in

4    the defendants' presentation.  First of all, it's fair in a

5    point to say that the defendants are entitled to, to learn

6    about methodologies.  A methodology would be to say, do you

7    reimburse someone on a captitated basis?  In other words, you

8    give them X dollars per member.  Do you reimburse them based on

9    some Mac type schedule where you have a separate, you have

10   price list for the drugs?  Do you reimburse them on a formula

11   that says AWP minus a stated percentage plus a dispensing fee?

12   That's methodology, that's what they're, that's what they're,

13   they're certainly entitled to get is methodology.  What Health

14   Net is talking about is the actual price.  It matters

15   competitively for Health Net that there is a difference, a

16   competitive difference between them and other, other plans with

17   whom they compete, whether it's just to, to use number

18   randomly, whether it's AWP minus 12.5% versus AWP minus 13% or

19   15% or whatever.  What we're saying is they can find, we can,

20   they're entitled to find and we've given them the information

21   which shows to them that it is in these exemplar contracts AWP,

22   AWP minus a percent.  We just don't tell them what the

23   percentage is, and that's what we think is entitled to be

24   protected here.  It's not clear to us why that precise

25   percentage is needed to be disclosed.  What is clear is that it

1   is going to be a competitive disadvantage for Health Net,

2   that, you know, Health Net believes that it does a good deal

3   striking, good job striking competitive deals and what is a

4   great competitive realm.  In fact, the defendants in their own

5   tutorial to this Court on these issues says these are complex

6   negotiations between multiple entities.  There's

7   competitiveness at each level of the chain and Health Net is

8   able to price its services to its clients because it negotiates

9   these deals and it potentially loses that advantage if other

10  people know what they're able to extract from the providers

11  with whom they contract.

12          THE COURT:  Well, there is a protective order here.

13          MR. McGINTY:  Well, it's, the protective order is

14  certainly there, but I think it's at best an imperfect

15  protection, certainly one that has to get a third party

16  stranger to this dispute.  Plus, I know that at one of the

17  tutorials, notwithstanding the existence of this protective

18  order, it's my understanding that the reimbursement rate that

19  Express Scripts uses to pay to CVS was actually disclosed in

20  open court, and there's no, there's no dispute that there's a

21  likelihood that this sort of information can come out at trial,

22  notwithstanding the protective order.  So, while the--

23          THE COURT:  Well, that's an issue for trial down the

24  road, that's--

25          MR. McGINTY:  But that's, I guess the question is

1  that assuming that it is, it is, it is possible for the

2  purposes of allowing the defense to mount an adequate defense

3  to give them methodology without giving them precise pricing,

4  why expose Health Net to the competitive risk, and, all we're

5  saying is there needs to be an appropriate balancing here.

6  Parenthetically, your Honor, you know, the only reason we're

7  here is to strike this balance.   There's the--

8       THE COURT:  Well, are you proposing an alternative of

9  what you're willing to produce?

10       MR. McGINTY:  Well, first of all, as a, the point I

11  think I was about to make was that with respect to the

12  documents that that they asked for after the deposition that

13  have not been produced, the only reason they have not been

14  produced is that until these issues are resolved, there's no

15  purpose in producing them, so that certainly if, if they are

16  resolved, we'll hand them over at that point.  But I think your

17  Honor, that our argument is, is that what we've given which

18  shows them the methodology but not the precise pricing is

19  giving them what they need and this is an appropriate

20  disclosure.  They have the methodology.  They say that's what

21  they're entitled to.  We're not sure why there should be

22  anything more produced on that point, and I think that the

23  Vitamins case is, is not distinguishable on the grounds that

24  counsel presents.  Yes, the posture of the case was that it was

25  early in the case while motion to dismiss was pending, but what

20

1   was going on there is what should go on whenever there is this

2   type of discovery dispute.  It's a balance, and in that posture

3   of the case, the court is saying the need for it at this stage

4   is low.  The risk is considerable to the producing third party,

5   we're going to exercise our discretion to strike that balance

6   now against the production of the documents, reserving frankly

7   the question about what, how the balance would be struck later

8   on in the case, but certainly the principle holds.  And, I

9   think where we come out on this is that defendants haven't

10  offered a compelling argument why the balance should be struck

11  here to require us to to disclose information which is going to

12  put us--

13          THE COURT:  It, it may not be compelling to you--

14          MR. McGINTY:  -- at this stage.

15          THE COURT:  -- but I'm inclined to think it's

16  compelling to me at this point.  But, anything else?

17          MR. McGINTY:  I mean, the other, I think one other

18  point just to address the issue about why it should be

19  important to get the precise pricing is the notion that things

20  are going to, you know, things change over time and, of course,

21  contracts are set for a fixed term.  And during a contract

22  term, it's always going to be AWP minus whatever percentage it

23  is that these contracts are not indexed.  Certainly if they

24  want to see earlier versions of contracts, we can show them

25  that the methodology was used and maybe even tell them that,

1    about the magnitude of any changes in the discount that was

2    used over time, but the precise pricing isn't going to be

3    necessary to address that point.

4                THE COURT:   Two minutes--

5                MR. MANGI:   Your Honor--

6                THE COURT:   -- on why you need the precise pricing.

7                MR. MANGI:   Absolutely.  Your Honor, the fact that

8    AWP maybe used in some of Health Net's contracts doesn't give

9    defendants any information that's not available in the public

10   domain.  Some insurers use AWP for some of their contracts, as

11   does Health Net.  Health Net also uses other methodologies,

12   such as capitation in some cases.  But, the key parts, and I'll

13   try not to repeat myself, is that one can only carry out useful

14   analysis using the actual numbers, and I'll take just one

15   example leaving aside the four I discussed, and go back to the

16   bundling point.  These contracts are competitive bargains in

17   the marketplace.  I completely agree with my brother on that,

18   but the only way you can assess that is by looking at the

19   terms.  If for example there's a lower amount being paid in

20   reimbursement, there'll be a higher amount being in the

21   dispensing fee.  There'll be other terms of the contract that

22   may come in and be relevant, the financial terms that'll modify

23   those accounts, the expectation theory.  There's no way to

24   counter that unless you know the exact terms.  If I know that

25   they use AWP in some contracts, that doesn't tell me anything

22

1    about whether Dr. Hartman's expectation is valid or not.

2    There's simply no way if you look at even at the tutorial,

3    which is public.  Defendants use some scatter clause showing

4    claims data and precise reimbursement points.  You can't make

5    those points with only methodologies.

6         The only other point, your Honor, that I'll make

7    briefly is in terms of the other documents.  As your Honor

8    knows, this subpoena was issued in, in November of, of 2000.

9    These additional documents that were sought after subpoena,

10   most of them were nothing new.  They were stuff we'd asked for

11   originally.  The witness just testified about them.  So I would

12   request that if your Honor is inclined to grant these motions,

13   your Honor also provide a specific timeframe as we requested in

14   our proposed order so we can get all of these documents

15   together in time for summary judgment.

16        Thank you, your Honor.

17        THE COURT:  All right, I'll move on.

18        MR. McGINTY:  I'm, I'm sorry.

19        THE COURT:  Just seconds.  Do you want a quick

20   response or--

21        MR. McGINTY:  Actually, one, one point which I think

22   is not a matter of great dispute but I did at least want to, to

23   raise here is that we had, we had raised in our papers the

24   notion that, that some of what they're seeking with respect to

25   claims data is very expensive to try to recover because it's

23

1   archived, and it's my understanding the defendants have

2   conceded that they would be obligated to pay for that.   We

3   think that any order requiring the production of that data

4   should provide the defendants will bear the reasonable cost of

5   recovering the archived data.

6          MR. MANGI:   Your Honor, we stated we'd pay for it

7   before we even asked for it.

8          THE COURT:   All right.   All right, moving on to your

9   motion.   I'll--

10          MS. CICALA:   Thank you, your Honor.

11          THE COURT:   I'll hear the argument on both motions,

12   take a brief recess, and then give you a ruling from the bench.

13          MS. CICALA:   Thank you, your Honor.   Just a point of

14   clarification.   Suffolk County had filed a second motion to

15   compel against Schering-Plough.   We served that on defendants

16   on January 20th.   They responded on the 25th.   It was not

17   regrettably filed with the court until yesterday.   I don't know

18   if your Honor is expecting to hear argument on that today. I am

19   prepared to proceed if you would like.   I can't speak for

20   defense counsel on that, but I'll leave it to your Honor.

21          THE COURT:   Well no, because I don't have it.   This

22   docket was just, the docket that I had yesterday, didn't have

23   it on it.   This docket was just printed out this morning and--

24          MS. CICALA:   It concerns a narrow issue of, regarding

25   production of sharing documents related to their Texas

24

1   litigation.

2           THE COURT:  For the record, for the record it's

3   docket entry number 1300.

4           MS. CICALA:  Thank you.

5           THE COURT:  Well, we'll see.  I mean, if your brother

6   is prepared to address it as well.

7           MR. McGINTY:  Your Honor, we are prepared to address

8   it if you'd like to hear the motion.

9           THE COURT:  Well, then we might as well.

10          MS. CICALA:  Thank you, your Honor.  Should we do

11  them one at a time, however?

12          THE COURT:  Please.

13          MS. CICALA:  Okay.  The first motion filed by Suffolk

14  concerns the form of the discovery being produced to it by

15  Schering-Plough.  And specifically, Suffolk seeks Schering's

16  compliance with that part of CMO 10 that directs any of the

17  parties to produce any documents available in electronic

18  format, shall be so provided in that format.  Suffolk began

19  it's review of Schering documents in Boston a couple of months

20  ago, and in the course of that review, confirmed that those

21  same documents it was reviewing in hard copy were available

22  electronically.  However, Schering refused to produce them to

23  us electronically on the basis that the liaison counsel and the

24  MDL had negotiated with Schering that the documents would be

25  produced in hard copy.  We were not privy to those discussions

1    and did not elect to receive documents in hard copy.  For most

2    of these, our preference is to receive them electronically, and

3    we would like to be able to do that.

4            THE COURT:  Well, if they're available in hard, in

5    electronic form, why can't they have it that way?

6            MR. CHRISTOFFERSON:  Thank you, your Honor.  I think

7    the answer to this question lies in Case Management Order No.

8    9, which preceded Case Management Order No. 10.  It, it is true

9    as counsel for Suffolk has suggested, that Schering had

10   hundreds of thousands of documents, responsive paper documents

11   scanned into electronic format at a cost of nearly $300,000 to

12   Schering.  Case Management Order No. 9 requires liaison counsel

13   to coordinate discovery for plaintiffs from cases that were

14   brought by government entities, including Suffolk.  Schering

15   offered to provide those responsive documents to lead

16   plaintiffs in electronic format if they would agree to share in

17   the cost.  The lead plaintiffs declined that offer and

18   requested that we produce those documents in paper form, which

19   we did.  Case Management Order No. 9 also requires defendants,

20   Schering, to make available to Suffolk those documents that

21   were made available to the lead plaintiffs to the extent that

22   those documents relate to drugs identified in Suffolk's

23   complaint.  Schering made available those documents to Suffolk.

24   Suffolk has reviewed those documents and those were documents

25   that were related to Suffolk's complaint, the drug identified

1   in Suffolk's complaint.  Suffolk has reviewed the documents

2   and, contrary to their assertions, under the Case Management

3   Orders, Schering is not required to make additional and

4   separately negotiated productions to Suffolk.  Notwithstanding

5   the reliance on Case Management Order No. 10, Case Management

6   Order No. 10 did not supplant or revise the language regarding

7   discovery coordination in Case Management Order No. 9.  The

8   whole point of this Case Management Order is to avoid

9   unnecessary and duplicative discovery requests and negotiations

10  and the associated costs.  Suffolk now apparently wants to

11  substitute themselves into the position of lead plaintiffs, but

12  that's not a decision that either Schering or Suffolk can make.

13  Schering has made the documents available to Suffolk.  Suffolk

14  has reviewed those documents, and nothing more is required of

15  Schering.

16          THE COURT:  I'm inclined to agree.

17          MS. CICALA:  Your Honor, I, I don't, I, I'm unsure

18  what my brother refers to when he refers to us being lead

19  plaintiffs.  I mean, Suffolk has an independent case.  It's not

20  part of the class case.  It was not consulted so, first of all,

21  I don't understand why Suffolk should be bound--

22          THE COURT:  But I think everybody has to play by the

23  same rules here.  I mean, the idea is to keep the cost down.

24          MS. CICALA:  Absolutely agreed, your Honor. Had

25  Suffolk the opportunity, had liaison counsel in any way

27

1   consulted with Suffolk before making a unilateral decision

2   with regard to how it sought to collect the sharing materials,

3   then I would not be standing before you.  But regrettably, and

4   we have a motion that continues to be subjudice on this issues,

5   regrettably, Suffolk was not privy, was not included in any of

6   those discussions.  Then perhaps the issue should be--

7              THE COURT:  Well I think your issue--

8              MS. CICALA:  -- addressed between--

9              THE COURT:  -- is with liaison counsel.

10             MS. CICALA:  So it would seem, your Honor.  If I may

11  say one more thing though.  However, on the issue of cost and

12  efficiency, I cannot understand how there is any excessive cost

13  or inefficiency in Schering delivering to us electronically

14  that which is available electronically.  The, there's no, we're

15  talking about a punch, you know, a click of a button, a copying

16  of a CD, as opposed to copying papers and transmitting boxes

17  which is certainly under any scenario, far less efficient.

18             THE COURT:  Well, it sets a precedent.  That's the

19  only problem.

20             MS. CICALA:  I'm afraid that the precedent that may

21  be set here, however, your Honor, is that Suffolk County and my

22  other clients, frankly, I also represent the City of New York

23  and the counties of Rockland, Westchester, Onijaga (ph), and

24  numerous other counties who are about to join in this

25  litigation who have separately retained us, that each of these

28

1   important governmental entities, the City of New York, for

2   example is one of the largest Medicaid payers in this country,

3   shall be prejudiced by the fact that liaison counsel in this

4   matter has not conducted itself as liaison counsel.  I'm sorry

5   to have to say this, should be conducting itself, i.e.,

6   coordinating with those parties for whom has been charged to

7   coordinate.  Now, if the issue is that I need to address that

8   more strenuously with liaison counsel and this Court, then that

9   will be our route.

10          THE COURT:  All right, briefly.

11          MR. CHRISTOFFERSON:  Your Honor, just briefly, if I,

12  if I may.  I think the bad precedent that may be set here is

13  precedent that is, that is negative towards the defendants

14  because Schering spent over, nearly $300,000 preparing these

15  trial preparation materials.  There's a large amount of sum

16  cost that have gone into that process and if now simply just by

17  asking and not following the Case Management Orders the other

18  counties and other plaintiffs are allowed access to those

19  documents, it is a windfall for them and a loss to Schering.

20          THE COURT:  All right,

21          COUNSEL:  Your Honor-

22          THE COURT:  -- now I'll hear you on the other.

23          COUNSEL:  -- if I could just briefly as counsel for

24  liaison counsel just speak to what's been said.  I, I do take

25  offense to the fact the statement that liaison counsel has not

1    conducted themselves in a manner which is appropriate for

2    liaison counsel to conduct themselves.  At the time, I haven't

3    been privy to all of the negotiations with respect to Schering-

4    Plough, but when we negotiated with Schering-Plough, we did so

5    in what we thought was the most efficient manner.  There are

6    plaintiffs who came in, you know, either during or after those

7    negotiations took place.  We were not purporting to negotiate

8    on behalf of absent plaintiffs who come in afterwards.  It's

9    not clear to me that Suffolk even had document requests pending

10   at the time that that negotiation was had.  And let me just

11   tell you about where we ended up with respect to Schering's

12   documents and the reason we did what we did.  Schering

13   indicated the volume of documentation that they had available

14   in paper.  We knew from our investigation of the case and from

15   experience that a lot of that paper was going to be useless to

16   us, and turning that into electronic format would be even more

17   useless.  It would be a waste of time and money for all

18   involved.  So our approach to this entire thing is when they

19   tell us we have 600 boxes available in a warehouse down in New

20   Jersey, we send a team of lawyers to go down there and cull

21   through that 600 boxes and pick out however many boxes, a

22   subset of those boxes that are relevant to the case, and we had

23   those documents copied in paper format and sent to our offices

24   and had them distributed widely amongst the co-lead counsel who

25   are working on our case, and analyzed and are not in one

30

1    specific format or place that are able, you know, they're

2    sharing 600, what, what have you.  That's how we've tried to

3    cut things back.  We didn't think it made sense to wholesale

4    copy things.  Believe me, I was in one of those warehouses for

5    two to three days, and there was a lot of stuff that no one

6    wants, and it didn't make sense to do it any other way.

7             THE COURT:  All right.  Do you want to be heard on

8    1300?

9             MS. CICALA:  Yes, thank you, your Honor. Suffolk's

10   second motion concerns a document request it served on

11   Schering-Plough seeking production of all documents and

12   materials, including deposition transcripts and so forth, that

13   Schering produced to the State of Texas in its litigation with

14   the State of Texas.  Schering's objection to our request is

15   that the production, well, initially Schering said that there

16   were not documents in there that concerned Schering, and now

17   they have acknowledged that there are documents within the

18   Texas production that involved Schering or were Schering

19   produced documents, but Schering says it would be burdensome

20   for them to go through the Texas production to identify the

21   Schering documents.  I think I can solve that problem.  I have

22   a relationship with the Texas attorney general who's

23   cooperating with the City of New York and the County of Suffolk

24   and all of my other clients.  They will provide us access to

25   the documents.  We will do Schering's work for it.  It needn't

1   be bothered in the slightest with this production.   Schering

2   has produced to Suffolk here.   They've acknowledged that they

3   should be.   The production has not been confined to Claritin.

4   We have received from Schering the documents that it produced

5   to the House Energy Committee.   So they have produced a broader

6   production here, so there can be no reasonable objection to us

7   receiving that which they produced to Texas, particularly where

8   we're willing to do the work, and of course include them in

9   whatever we receive from Texas so that there's nothing

10  inappropriate and that we don't go into warrant witnesses, so,

11  so for example.

12          THE COURT:   Do you need a special agreement in place

13  to do this, or?

14          MS. CICALA:   With Texas?

15          THE COURT:   Yes.

16          MS. CICALA:   To the extent we need to be singed on to

17  the Texas protective order, the Texas AG has agreed that we,

18  that they will facilitate that process for us.   We've asked

19  Schering to not object to our signing on to the Texas

20  protective order.   I would certainly include Schering in all my

21  communications with the Texas AG with regard to these documents

22  and copy them on any documents I receive from the Texas AG.

23  This needn't burden Schering in the slightest.

24          THE COURT:   Problem with it?

25          MR. CHRISTOFFERSON:   Yes, your Honor.   Thank you. I,

32

1   I'm not sure--

2           THE COURT:  Too good to be true.

3           MR. CHRISTOFFERSON:  Your Honor, I'm not sure if

4   you'd like a copy, I brought extra copies of opposition if

5   you'd like me to hand them up to you, or you'd rather it—

6           THE COURT:  No, just argue it to me.

7           MR. CHRISTOFFERSON:  Okay. Respectfully, your Honor,

8   I think that counsel for Suffolk is missing the point here. It

9   is true that pursuant to discovery requests in this litigation,

10  Schering has made available to the lead plaintiffs in this case

11  relevant documents from this Texas litigation.  That entire

12  case though concerns generic products, including products

13  manufactured and marketed by Warrick.  There were no claims in

14  that case that Schering did anything wrong with respect to any

15  of its drugs.  The discovery produced by Schering and Warrick

16  in that case overwhelmingly related to Warrick and Warrick

17  products, and there was lots of discovery in that case, nearly

18  400,000 pages worth.  Although Ropes & Gray did not represent

19  Schering and Warrick in that action, local counsel, who has

20  submitted a declaration in support of our opposition, informs

21  us that there might have been some minimal amount of documents

22  produced in that production that did not relate exclusively to

23  Warrick or Warrick related products, and that may have had some

24  bearing on Schering.  Judge Saris, however, has issued a stay

25  on discovery by Suffolk into claims, its claims against

1   Warrick.  So, all the documents produced in the Texas

2   litigation, except for some minimal amount, relate to claims

3   into which discovery is stayed.  The only remaining question

4   would be whether these minimal needles in a giant haystack of

5   documents are even relevant to Schering, to Suffolk's claims

6   against Schering.  We don't know the answer to that and could

7   not know the answer to that without ourselves reviewing the

8   entire production.  The suggestion that Suffolk go and do our

9   "work" for us, does not solve the problem, because then they

10  would have access to lots of documents, almost 400,000 pages

11  worth, that relate only to their claims into which discovery

12  has been stayed.  It's simply unreasonable and unduly

13  burdensome for them to require Schering to sift through

14  hundreds of thousands of pages of documents to find a few that

15  may or may not be relevant to Suffolk's claims.  In other

16  words, the burden that Schering would have to bear is grossly

17  disproportionate to the value that Suffolk would gain from some

18  few potentially relevant documents.  The discovery here

19  violates Judge Saris' order because the claims to which it is

20  directed, the claims against Warrick have been stayed and are

21  not subject to discovery at this time, regardless of to whom

22  the request might now only be made.

23          THE COURT:  Why should I grant this with the stay in

24  place?

25          MS. CICALA:  The stay is against, is at to Warrick.  I

34

1   absolutely agree.  We don't seek any Warrick documents.  We

2   don't seek any deposition testimony from any Warrick witnesses.

3   We seek documents produced in Texas by Schering, which exist.

4   We seek Schering deposition transcripts, which exist.  The

5   Texas AG has those documents identified as Schering documents

6   and those transcripts identified as Schering witnesses.  I'm

7   not looking for anything that's stamped with a Warrick bates

8   number at this time.  I'm talking about Schering documents and

9   Schering witnesses.  So, in that regard, this in no way

10  violates Judge Saris' order.  The issue devolves to burden and

11  we can relieve them of the burden by receiving only that which

12  is stamped Schering-Plough and only for witnesses that were

13  produced by Schering-Plough.

14        MR. CHRISTOFFERSON:  Your Honor, if I may respond

15  just briefly?  I think again counsel is missing the point.  It,

16  it doesn't matter to whom, you know, whether Schering as

17  Schering produced the documents.  The documents that Schering

18  produced overwhelming related to Warrick and Warrick's

19  products.  You would have to, she would have to then figure out

20  which of those documents were actually relevant to their

21  claims, and according to the, the information that you received

22  from local counsel, those documents are minimal, minimal and it

23  would only be a handful.  So whether Schering is required to go

24  through and wade through and find a handful of documents or

25  someone else, I guess the, the attorney general would find

35

1   documents and then, you know, send them back to Suffolk.

2   Either way, it's going to require an amazing amount of effort

3   that is frankly disproportionate to the value.

4           MR. DeMARCO:   Your Honor--

5           THE COURT:   Mr. DeMarco?

6           MR. DeMARCO:   -- just briefly.   There's another

7   feature to this that my colleague, Mr. Muehlberger would like

8   to discuss with respect to other defendant in this aspect of

9   discovery.

10          MR. MUEHLBERGER:   Your Honor, very briefly, this is

11  the first I've heard about the, possibly the County of Suffolk

12  signing on to the Texas Attorney General protective order.   But

13  there are witnesses in that case, for instance plaintiffs'

14  expert in the MDL, Dr. Schondlemyer, as I understand it was

15  also an expert witness who rendered a report and I understand

16  also testified in deposition in the Texas AG case, which we

17  have not been privy to and not been allowed to see because of

18  the Texas AG order in place, and so what I simply raise, to the

19  extent the Court is inclined to consider to allow the County of

20  Suffolk to sign on the Texas Attorney General protective order,

21  defendants be allowed to consider that issue and perhaps file

22  something on the record to protect their interest and make sure

23  everybody is on the same playing field.

24          THE COURT:   All right. I'll take a brief recess, come

25  back at quarter of twelve.

1          (Recess, reconvene 11:51:16 a.m.)

2          (Court called into session)

3          THE COURT:  All right, please be seated.  All right.

4    On docket entry No. 1175, the motion is allowed subject to the

5    enforcement of the confidentiality order.  I'd like to set a

6    deadline, so tell me what you think is a reasonable time for

7    production.

8          MR. McGINTY:  Your Honor, I would suggest that that

9    deadline should be 90 to 120 days. These documents by and large

10   are located in Sacramento.  They will have to be reviewed.

11   They will have to be vetted for privilege, and it's going to

12   take some time to do that.  In addition, many of these

13   documents are in electronic format and, as it stands right now,

14   I'm unaware of what, if any, systems are in place in order to

15   access some of those documents.  So we should have a

16   significant amount of time.

17         THE COURT:  Well, I could give you 90 days, but what

18   about phasing it as things become available?

19         MR. McGINTY:  Your Honor, we have no objection to

20   that, and as a matter of fact, in the productions that have

21   been taking place at this point, we have been producing on a

22   rolling basis that by agreement with Mr. Mangi's office.  So, I

23   would not object to that.

24         THE COURT:  Okay.

25         MR. MANGI:  May I be heard, your Honor?

1          THE COURT:  All right.

2          MR. MANGI:  Your Honor, very briefly, there, there's

3  separate components to this motion.  First producing an

4  un-redacted copy of what they've already produced, that takes

5  no time.  Just take off the tape, and copy it again.  So we

6  submit that should be produced within 14 days.  The second

7  component is a production of claims data.

8          THE COURT:  Can you do that within 14 days?

9          MR. McGINTY:  I do not know, your Honor, whether that

10  can be done that quickly.  I would suggest that the order the

11  Court was intending to enter is probably the right one.

12          THE COURT:  Well--

13          MR. McGINTY:  But we will--

14          THE COURT:  -- what I'd like to do is say 90 days,

15  but let's set a tentative schedule for the phases.  So if you

16  could do this within four, the first 14--

17          MR. McGINTY:  Yes, your Honor.  As I, as I have, have

18  indicated, we are willing to produce on a rolling basis, as

19  we're able to do it.  I think that the outside limit of 90

20  days, should, should stay in place, but I will represent to the

21  Court and to Mr. Mangi that we will produce on a rolling basis

22  as we are able to do that.

23          THE COURT:  But let's see if we can set a schedule

24  for that rolling basis.

25          MR. MANGI:  Your Honor, if, if I may just speak to

38

1   the two other components of this?  The second component is

2   claims data.  Health Net has represented to us in numerous

3   letters that are appended to our motion they can produce claims

4   data within six to eight weeks of start.  Given that summary

5   judgment is, is fast up and coming in this case, we would

6   request that they be held to that schedule.  And the third

7   component of it, are these additional documents.  Again your

8   Honor, these are very specific documents.  They won't be more

9   than that high.  There are no privilege issues.  Most of them

10  are just contracts.  Ninety days, we would submit, is entirely

11  unrealistic and we would submit that certainly the un-redacted

12  production in 14 days, original--

13          THE COURT:  All right, un-redacted production, 14

14  days.

15          MR. MANGI:  The claims data within, they ask for six

16  to eight weeks, we'll say eight weeks is fine.

17          THE COURT:  All right.

18          MR. MANGI:  And the additional documents--

19          THE COURT:  So, six to eight weeks, so will give you

20  the 60 days on that.

21          MR. MANGI:  And these additional documents, your

22  Honor, which is again as I mentioned, just a handful, we would

23  suggest those could be produced within a month.  I mean, the

24  subpoena has been out there since November or 03.

25          THE COURT:  All right, within 30 days.

1    MR. McGINTY:  Your Honor, if I may.  The

2  representation that was previously made to Mr. Mangi's office

3  was that it would, it would take eight weeks after we had

4  systems in place in order to locate and access the documents.

5  Eight weeks is two, is two months.  It's 60 days essentially.  I

6  would request that the Court stand upon the original intent of

7  90 days because it's going to take us eight weeks after we get

8  the systems in place and, and there's an, an unknown amount of

9  time to get that done.  I think 90 days is a much more

10  reasonable estimate for, for producing--

11    THE COURT:  For final completion.

12    MR. McGINTY:  Yes, your Honor.

13    THE COURT:  But phased in as we've said here today.

14    MR. MANGI:  Your Honor, on claims data, we got claims

15  data from other defendants within four days, within five days.

16  This, this eight weeks is outlandish to begin with, but that's

17  the maximum we can work with to be able to use this data for

18  summary judgment.

19    THE COURT:  Yes, I mean I had, haven't thought of the

20  summary judgment issue since I'm not dealing with that so, I'm

21  inclined to say 60 not 80, not 90.

22    MR. McGINTY:  Your Honor, may I inquire because I am

23  unaware.  When is the summary judgment motion scheduled to be

24  heard?

25    THE COURT:  Well, to be heard, I don't know.

40

1          MR. McGINTY:  When is it scheduled to be briefed?

2          MR. MANGI:  Your Honor, I believe summary judgment is

3  in, is in May.  Is that correct?

4          UNIDENTIFIED:  Yes.

5          THE COURT:  Well--

6          MR. MANGI:  Your Honor, plus on, on the other claims

7  data--

8          THE COURT:  You know, at the end of the 60 days, if

9  it's not done, we'll deal with it.  But let's, let's shoot for

10  60, rather than 90.

11          MR. MANGI:  Your Honor, the, the only remaining issue

12  on, there was one minor lingering issue which is that of Health

13  Net has put these water marks on their documents.  They're

14  expressly forbidden in CMO 10.  They obscure text.  Judge Saris

15  explicitly forbade them.  We told them that.  They still did

16  it.  We ask for clarification on that matter also.  It's in our

17  proposed order.

18          MR. McGINTY:  Your Honor, there are water marks on

19  the documents.  I've seen every one of them.  Not one of them

20  obscures text.  They are a gray background, rather than an

21  overlay.  I'm personally unaware of what Judge Saris has

22  ordered.

23          THE COURT:  Are these watermarks already on the

24  documents?

25          MR. McGINTY:  They are already on the documents that

41

1    have already been produced.

2         MR. MANGI:  Your Honor, they're, they're highly

3    confidential 1456, all over the page.  They can just be put on

4    the bottom right like every other document in the case.

5         MR. McGINTY: They, they are, they are again, your

6    Honor, I've seen, I have personally seen each and every page of

7    these.  They, they are not all over the page.  They are in the

8    center.  They are a gray background. They do not obscure any

9    text.

10        THE COURT:  Well, if they obscure something, then you

11   have to produce it a second time in a non-obscure form.

12        MR. MANGI:  Your Honor, counsel's point is that they

13   are in grayscale.  The color of grayscale varies by the

14   photocopy.  Judge Saris said put them where, outside the text.

15        THE COURT:  You know, I don't want to deal with this.

16   Work it out.

17        MR. MANGI:  Your Honor--

18        THE COURT:  Work it out.  Get together.  Work it out

19   so everybody can read everything.

20        MR. MANGI:  Thank you, your Honor.

21        MR. McGINTY:  Your Honor, for my edification, I

22   perhaps didn't make my notes as as completely clear as they

23   should be.  May I ask if the Court would summarize what the

24   order, what the order is?

25        THE COURT: Get a copy of the transcript.

42

1          MR. McGINTY: Is there one, is there a trans--

2          THE COURT:  Well, they'll have to be prepared.

3          MR. MANGI:  I have good notes.  I'll be happy to

4    discuss--

5          THE COURT:  Okay, outline how you believe--

6          MR. MANGI:  Absolutely.

7          THE COURT: -- I've stated.

8          MR. MANGI:  Your Honor, the production, the documents

9    that have already been produced, your Honor has said that they

10   should be produced in their un-redacted form, presumably

11   including missing pages, within 14 days.

12         THE COURT:  Slow, slow down so that he can take it

13   down.

14         MR. McGINTY:  A little slower, Adil, please.

15         MR. MANGI:  Oh, I apologize.

16         THE COURT:  Wait, let him get this--

17         MR. McGINTY: I, I got that.

18         THE COURT:  You got that.

19         MR. McGINTY:  But a little slower next time.

20         MR. MANGI:  I personally wrote a big 14.  The, the

21   additional documents that are identified in our October 15,

22   2004 letter, which follow depositions, your Honor has ordered

23   the production of those documents within 30 days.  And the

24   production of claims data, your Honor has ordered within 60

25   days.

43

1          THE COURT:  Clear enough?

2          MR. McGINTY:  Yes, your Honor, simply that that 60

3    days subject to reevaluation depending on what the technical

4    issues are.

5          THE COURT:  I'll listen to you.  You know, you get to

6    that point, you file a motion, I'll hear you.

7          MR. McGINTY: Okay.

8          THE COURT:  But, you know, always try and talk with

9    each other and see if you can try and work things out, and, you

10   know, as to the watermarks, see if you can work this issue out.

11   I mean this is--

12         MR. McGINTY:  We, we do speak to each other, your

13   Honor, regularly.  I'm sure that as reasonable people, we can

14   resolve that.

15         THE COURT:  All right, as to docket entry No. 1189,

16   the motion is denied.  I'm afraid you are bound by what liaison

17   counsel has done in the past, and I think you have to talk to

18   liaison counsel and make that clear.

19              As to 1300, it's denied without prejudice at this

20   time, having heard from Mr. DeMarco's co-counsel.  I'll give

21   everybody else 14 days to weigh in on this if they want to file

22   anything.

23         MS. CICALA:  Thank you, your Honor.

24         THE COURT:  All right, and then when you, when we get

25   everything, we can set up another hearing date

44

1              MS. CICALA: Thank you.

2              MR. CHRISTOFFERSON:  Your Honor, just a quick point

3    of clarification, are you inviting further submissions by, by

4    Schering & Suffolk or just, you know, other defendants?

5              THE COURT:  Well, you've, did, I mean, did you really

6    get much of chance to respond?

7              MR. CHRISTOFFERSON:  We, we did file--

8              THE COURT:  You're satisfied.  I mean--

9              MR. CHRISTOFFERSON:  Okay.  Thank you, your Honor.

10             THE COURT: If anybody else wants to respond, only

11   because it was just yesterday.  Okay.

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

March 6, 2005

_____

Maryann V. Young_____

Maryann V. Young
Certified Court Transcriber
(508) 384-2003

# MOTION TO RENEW EXHIBIT D

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL. NO. 1456 |
| THIS DOCUMENT RELATES TO: | Civil Action No. 01-CV-12257- PBS |
| *County of Suffolk v. Abbott Laboratories, Inc., et al.,* E.D.N.Y. Case No. CV-03-229 | Judge Patti B. Saris |

## [PROPOSED] ORDER GRANTING COUNTY OF SUFFOLK'S MOTION TO COMPEL THE PRODUCTION OF DISCOVERY FROM THE SCHERING PLOUGH DEFENDANTS

Having considered each of the parties' submissions with respect to the County of Suffolk's Second Motion To Compel The Production Of Discovery from Schering-Plough Corporation, the Court hereby grants the motion.

It is hereby ordered that Schering-Plough Corporation shall produce immediately to Suffolk all documents, testimony (including, but not limited to, deposition and hearing transcripts), communications, expert reports or other materials produced by Schering-Plough Corporation in response to any/or related in any way to the litigation captioned *The State of Texas ex. rel. Ven-A-Care of the Florida Keys, Inc. v. Warrick Pharmaceuticals, et al.*, No. GV002327 in the 53rd Judicial District of Travis County, Texas.

It is further ordered that Schering-Plough Corporation shall not oppose any application made by the County of Suffolk to the courts of the State of Texas to gain

access to the documents produced in *The State of Texas ex. rel. Ven-A-Care of the Florida Keys, Inc. v. Warrick Pharmaceuticals, et al.*, No. GV002327.

Dated:_____

_____
Hon. Marianne B. Bowler
United States Magistrate Judge