# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) |
|  | MDL No. 1456 |
|  | CIVIL ACTION:  01-CV-12257-PBS |
|  | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) ) ) ) |
|  | **REDACTED VERSION** |

<br/>

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

## TABLE OF CONTENTS

**PAGE**

I.    PRELIMINARY STATEMENT .........................................................................1

II.   THE STANDARDS FOR APPLYING RULE 23:  RESOLVING ANY
      DOUBTS IN FAVOR OF CERTIFICATION, THE COURT CONDUCTS A
      RIGOROUS ANALYSIS WITHOUT MAKING MERITS-BASED DECISIONS ..........4

III.  PLAINTIFFS' ALLEGATIONS AND EVIDENCE........................................................5

      A.    AWP Is Used by Medicare for Reimbursement Purposes ......................................6

      B.    AWPs Have Become the Reimbursement Benchmark for All Drugs ....................7

      C.    Each of the Defendants Supplied Directly or Indirectly AWPs to Publishers.......10

            1.    AstraZeneca ...........................................................................11

            2.    The BMS Group (Bristol-Myers, Oncology Therapeutics and
                  Apothecon)...............................................................................12

            3.    The GSK Group (GlaxoSmithKline, SmithKline Beecham,
                  Glaxo Wellcome) .....................................................................12

            4.    The J&J Group (J&J, Centocor, Janssen, NcNeil, Ortho) ........................13

            5.    The Schering Group (Schering Plough & Warrick) .................................14

      D.    Each Defendant Reported AWPs That Were Fraudulently Inflated.....................15

IV.   THE COURT SHOULD CERTIFY THE CASE AS A  CLASS ACTION
      UNDER RULE 23(b)(3) ......................................................................17

      A.    Plaintiffs and This Case Satisfy the Requirements of Rule 23(a)...........................17

            1.    The Class is so numerous that joinder of all members is
                  impracticable..............................................................................17

            2.    There are questions of law and fact common to all Class
                  members.....................................................................................18

            3.    Plaintiffs' claims are typical of those of the Class...................................20

            4.    Plaintiffs will fairly and adequately protect the interests of the
                  Class.........................................................................................24

                  a.    Plaintiffs' counsel are qualified ....................................................24

                  b.    Plaintiffs' interests do not conflict with the interests of
                        the Class...........................................................................24

B.   Plaintiffs and the Class Satisfy the Requirements of Rule 23(b)(3) .....................25

    1.   Common questions predominate over individual issues in
        connection with Plaintiffs' RICO claim ...................................................27

    2.   All issues related to Defendants' conduct of an enterprise are
        common to all Class members .................................................................29

    3.   Common issues that relate to Defendants' engagement in a pattern
        of racketeering activity predominate over any individual issues ..............29

        a.   Defendants' "pattern" of activity implicates no individual
            issues at all .................................................................................29

        b.   Plaintiffs will prove Defendants' racketeering acts through
            evidence common to all Class members ........................................30

    4.   Plaintiffs' and Class members' injuries that resulted from
        Defendants' mail and wire fraud can be calculated using evidence
        that is common to all Class members .......................................................32

        a.   Proximate cause can be proven with evidence that is
            common to all Class members ......................................................32

        b.   Dr. Hartman has proposed standard, formulaic
            methodologies that use Defendants' pricing data to
            calculate Class members' injuries or appropriate
            equitable relief ............................................................................34

    5.   Even if individual causation issues were present, certification of
        the RICO claim is appropriate .................................................................35

    6.   Common questions predominate over individual questions in
        connection with Plaintiffs' state law claims .............................................36

    7.   The Court should apply each Defendant's home state Consumer
        Protection Law to all Class members, because each state has "The
        Most Significant Relationship" to the state law claims of all Class
        members under Massachusetts' choice of law rules ..................................38

        a.   Massachusetts' "functional approach" governs the choice
            of law inquiry ..............................................................................38

        b.   The applicable factors of RESTATEMENT Section 145 favor
            applying home state law to the Class claims ................................39

        c.   The applicable factors of RESTATEMENT Section 6 favor
            applying home state law to the Class claims ................................40

    8.   Even if multiple state laws are applied, common issues of law
        and fact predominate, notwithstanding minor variations in state law .......41

C.      A Class Action Is Superior to the Adjudication of Hundreds or
        Thousands of Separate Individual Cases ................................................................45

        a.      A class action is superior to thousands of lawsuits or
                no lawsuits for small claimants........................................................45

        b.      The Class is manageable and its size favors certification..............48

        c.      The Class case can be tried in an efficient manner.......................49

V.      CONCLUSION.............................................................................................................49

1534.16 0107 BSC.DOC

# TABLE OF AUTHORITIES

## CASES

*Abelson v. Strong*,
 1987 U.S. Dist. Lexis 7515 (D. Mass. Jul. 30, 1987) .......................................................21

*Amchem Products v. Windsor*,
 521 U.S. 591 (1997)........................................................................................................25

*In re American Honda Motor Co., Dealerships Realtors Litig.*,
 941 F. Supp. 528 (D. Md. 1996) ...............................................................................32, 35

*Andrews v. Bechtel Power Corp.*,
 780 F.2d 124 (1st Cir. 1985) ...........................................................................................17

*In re Antibiotic Antitrust Actions*,
 333 F. Supp. 278 (S.D.N.Y. 1971),
 *amended*, 333 F. Supp. 291 (S.D.N.Y.), *mandamus denied*,
 449 F.2d 119 (2d Cir. 1971)..............................................................................................4

*In re Bendectin Litig.*,
 857 F.2d 290 (6th Cir. 1988) .....................................................................................38, 41

*Bond v. Fleet Bank (RI), N.A.*,
 2002 U.S. Dist. Lexis 22324 (D.R.I. Oct. 10, 2002)........................................................17

*In re Brand Name Prescription Drugs Antitrust Litig.*,
 1994 U.S. Dist. Lexis 16658 (N.D. Ill. Nov. 18, 1994) ................................................4, 48

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*,
 288 F.3d 1012 (7th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003)................................44

*Burstein v. Applied Extrusion Techs.*,
 153 F.R.D. 488 (D. Mass. 1994).......................................................................................20

*Bushkin Assocs., Inc. v. Raytheon Co.*,
 393 Mass. 622 (1985) ......................................................................................................38

*Bussie v. Allmerica Fin. Corp.*,
 50 F. Supp. 2d 59 (D. Mass. 1999) ..................................................................................43

*In re Cardizem CD Antitrust Litig.*,
 200 F.R.D. 297 (E.D. Mich. 2001) ...............................................................................4, 22

*In re Cardizem CD Antitrust Litig.*,
 200 F.R.D. 326 (E.D. Mich. 2001) .....................................................................................5

*Carnegie v. Household Int'l, Inc.*,
 2004 U.S. App. Lexis 14635 (7th Cir. 2004)........................................................... *passim*

*Castano v. American Tobacco Co.*,
   84 F.3d 734 (5th Cir. 1996) ...................................................................................44

*Cosme v. Whitin Machine Works*,
   417 Mass. 643 (1994) ................................................................................38, 39, 40

*Curtis v. Commissioner, Me. Dep't of Human Servs.*,
   159 F.R.D. 339 (D. Me. 1994) ................................................................................24

*Deadwyler v. Volkswagen of Am., Inc.*,
   1986 U.S. Dist. Lexis 28449 (W.D.N.C. 1986) ......................................................43

*In re Domestic Air Transp. Antitrust Litig.*,
   137 F.R.D. 677 (N.D. Ga. 1991) ............................................................................21

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
   177 F.R.D. 54 (D. Mass. 1997) ...................................................................... *passim*

*Dunfey v. Roger Williams Univ.*,
   824 F. Supp. 18 (D. Mass. 1993) ...........................................................................40

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) ...............................................................................................48

*Eisenberg v. Gagnon*,
   766 F.2d 770 (3d Cir. 1985) .....................................................................................4

*In re Folding Carton Antitrust Litig.*,
   75 F.R.D. 727 (N.D. Ill. 1977) ...............................................................................49

*Fraser v. Major League Soccer, L.L.C.*,
   180 F.R.D. 178 (D. Mass. 1998) ............................................................................20

*Garner v. Healy*,
   184 F.R.D. 598 (N.D. Ill. 1999) ............................................................................42

*George Lussier Enters. v. Subaru of New England, Inc.*,
   2001 U.S. Dist. Lexis 12054 (D.N.H. 2001) ..........................................18, 19, 27, 47

*Goda v. Abbott Labs., Inc.*,
   1997 WL 156541 (D.C. Super. 1997) ........................................................................4

*Grace v. Perception Tech. Corp.*,
   128 F.R.D. 165 (D. Mass. 1989) ............................................................................46

*Guckenberger v. Boston Univ.*,
   957 F. Supp. 306 (D. Mass. 1997) ....................................................................17, 20

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ................................................................................37

*Hawkins v. Commissioner,*
    2004 U.S. Dist. Lexis 807 (D.N.H. Jan. 23, 2004) ............................................5

*Holmes v. Securities Investor Protection Corp.,*
    503 U.S. 258 (1992).......................................................................................28, 32

*Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris, Inc.,*
    29 F. Supp. 2d 801 (N.D. Ohio 1998)................................................................32

*Kirby v. Cullinet Software, Inc.,*
    116 F.R.D. 303 (D. Mass. 1987).........................................................................4

*Klay v. Humana, Inc.,*
    2004 U.S. App. Lexis 18494 (11th Cir. Sept. 1, 2004)............................ *passim*

*In re Kirschner Med. Corp. Sec. Litig.,*
    139 F.R.D. 74 (D. Md. 1991)............................................................................42

*Klaxon v. Stentor Electric Mfg. Co.,*
    313 U.S. 487 (1941)..........................................................................................38

*Krell v. Prudential Ins. Co. of Am.,*
    148 F.3d 283 (3d Cir. 1998)..............................................................................44

*Lessard v. Metropolitan Life Ins. Co.,*
    103 F.R.D. 608 (D. Me. 1984) ............................................................................4

*Libertad v. Welch,*
    53 F.3d 428 (1st Cir. 1995)...........................................................................28, 32

*Lobo Exploration Co. v. Amoco Prod. Co.,*
    991 P.2d 1048 (Okla. Ct. App. 1999) ...............................................................42

*In re Lorazepam & Clorazepate Antitrust Litig.,*
    202 F.R.D. 12 (D.D.C. 2001).....................................................................3, 4, 22

*In re Lupron Mktg. & Sales Practices Litig.,*
    295 F. Supp. 2d 148 (D. Mass. 2003) .................................................... *passim*

*In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig.,*
    2004 U.S. Dist. Lexis 7789 (D. Minn. Apr. 28, 2004) ....................................38

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.,*
    100 F.R.D. 468 (D. Mass. 1984)........................................................................21

*Margaret Hall Found. v. Atlantic Fin. Mgmt.,*
    1987 U.S. Dist. Lexis 7528 (D. Mass. Jul. 30, 1987) .................................21, 25

*Massachusetts Ass'n of Older Americans v. Spirito,*
    92 F.R.D. 129 (D. Mass. 1981)........................................................................18

*McCuin v. Secretary of Health & Human Servs.*,
    817 F.2d 161 (1st Cir. 1987) ............................................................................................... 17

*McMahon Books, Inc. v. Willow Grove Assocs.*,
    108 F.R.D. 32 (E.D. Pa. 1985) ............................................................................................ 27

*Milberg v. Lawrence Cedarhurst Fed. Sav. & Loan Ass'n*,
    68 F.R.D. 49 (E.D.N.Y. 1975) ........................................................................................... 25

*Mowbray v. Waste Mgmt. Holdings, Inc.*,
    189 F.R.D. 194 (D. Mass. 1999) ........................................................................... 17, 41, 42

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ................................................................................. 25, 27

*Neder v. United States*,
    527 U.S. 1 (1999) ................................................................................................................ 29

*In re New England Mut. Life Ins. Co. Sales Practices Litig.*,
    183 F.R.D. 33 (D. Mass. 1998) .................................................................................... 18, 21

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    191 F.R.D. 369 (S.D.N.Y. 2000) ....................................................................................... 20

*In re Pharm. Indus. Average Wholesale Price Litig. ("AWP I")*,
    263 F. Supp. 2d 172 (D. Mass. 2003) ................................................................................ 28

*In re Pharm. Indus. Average Wholesale Price Litig. ("AWP II")*,
    307 F. Supp. 2d 196 (D. Mass. 2004) ................................................................................ 32

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ..................................................................................................... 46, 47

*Priest v. Zayre Corp.*,
    118 F.R.D. 552 (D. Mass. 1988) ........................................................................................ 20

*In re Prudential Ins. Co. of America Sales Practices Litig.*,
    962 F. Supp. 450 (D.N.J. 1997) ................................................................................... 43, 48

*Queeno v. Cote*,
    1999 Mass. Super. Lexis 506 (Mass. Sup. Ct. 1999) ......................................................... 40

*Randle v. SpecTran*,
    129 F.R.D. 386 (D. Mass. 1988) ................................................................................. 20, 38

*In re Relafen Antitrust Litig.*,
    221 F.R.D. 260 (D. Mass. 2004) ................................................................................. 17, 22

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ........................................................................................................... 29

*Rice v. Dow Chem. Co.*,
   124 Wn.2d 205, 875 P.2d 1213 (Wash. 1994)...................................................................40

*Robinson v. Metropolitan North Commuter R.R.*,
   267 F.3d 147 (2d Cir. 2001)...............................................................................................36

*Romani v. Cramer, Inc.*,
   992 F. Supp. 74 (D. Mass. 1998) ..................................................................................39, 41

*Rosario v. Livaditis*,
   963 F.2d 1013 (7th Cir. 1992) ...........................................................................................27

*In re Sch. Asbestos Litig.*,
   789 F.2d 996 (3d Cir. 1986)..............................................................................................43

*Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*,
   94 F.3d 721 (1st Cir. 1996)................................................................................................29

*In re Screws Antitrust Litig.*,
   91 F.R.D. 52 (D. Mass. 1981).......................................................................................17, 21

*Sedima, S. P. R. L. v. Imrex Co.*,
   473 U.S. 479 (1985).........................................................................................................28

*Shaw v. Toshiba Am. Info. Sys.*,
   91 F. Supp. 2d 942 (E.D. Tex. 2000) ................................................................................43

*Simon v. Phillip Morris*,
   124 F. Supp. 2d 46 (E.D.N.Y. 2000) ................................................................................44

*Smilow v. Southwestern Bell Mobile Sys.*,
   323 F.3d 32 (1st Cir. 2003)...................................................................................... *passim*

*Sosna v. Iowa*,
   419 U.S. 393 (1975).........................................................................................................24

*Stathis v. National Car Rental Sys.*,
   109 F. Supp. 2d 55 (D. Mass. 2000) .................................................................................39

*Stetser v. TAP Pharm. Prods., Inc.*,
   2004 N.C. App. Lexis 1200 (N.C. Ct. App. 2004) .............................................................42

*In re Sugar Indus. Antitrust Litig.*,
   73 F.R.D. 322 (E.D. Pa. 1976)..........................................................................................48

*In re Sumitomo Copper Litig.*,
   182 F.R.D. 85 (S.D.N.Y. 1998) .........................................................................................22

*In re Synthroid Mktg. Litig.*,
   188 F.R.D. 287 (N.D. Ill. 1999) ........................................................................................22

*In re Synthroid Mktg. Litig.,*
    188 F.R.D. 295 (N.D. Ill. 1999) ............................................................ *passim*

*Systems Mgmt. v. Loiselle,*
    303 F.3d 100 (1st Cir. 2002) ............................................................3, 29

*Tardiff v. Knox County,*
    365 F.3d 1 (1st Cir. 2004) ............................................................5, 25

*In re Telectronics Pacing Sys., Inc.,*
    172 F.R.D. 271 (S.D. Ohio 1997) ............................................................43

*In re Terazosin Hydrochloride Antitrust Litig.,*
    220 F.R.D. 672 (S.D. Fla. 2004) ............................................................34

*Tingley Sys., Inc. v. CSC Consulting, Inc.,*
    152 F. Supp. 2d 95 (D. Mass.  2001) ............................................................39

*In re Visa Check/MasterMoney Antitrust Litig.,*
    280 F.3d 124 (2d Cir. 2001) ............................................................20, 36, 48

*In re Warfarin Sodium Antitrust Litig.,*
    212 F.R.D. 231 (D. Del. 2002) ............................................................3, 22, 38, 45

*Waste Mgmt. Holdings, Inc., v. Mowbray,*
    208 F.3d 288 (1st Cir. 2000) ............................................................ *passim*

## STATUTES

42 C.F.R. § 405.517 ............................................................................................6

15 U.S.C. § 45(a)(l) ............................................................................................37

## I.        PRELIMINARY STATEMENT

In their Consolidated Amended Class Action Complaint (the "AMCC"), Plaintiffs set forth the scheme that Defendants[1] used to manipulate and inflate the spread between the Average Wholesale Price ("AWP") and the cost to doctors, Pharmacy Benefit Managers ("PBMs"), retailers and other providers of the drugs manufactured by these Defendants that are identified in AMCC Appendix A.[2]  By illegally manipulating AWPs during the relevant period, Defendants used the scheme to put hundreds of millions, if not billions, of extra dollars in their pockets at the expense of those in the proposed Class – patients and third-party payors.  The AWPs that Defendants caused to be published – and upon which Plaintiffs and the Class members based their payments – were fictional.  Those fictional inflated AWPs created a larger profit spread that funneled hidden profits to those in the distribution chain – doctors, PBMs and pharmacies.

A class is appropriate in this case due to the course of conduct at issue that involves three critical and common elements that bind the Class members together:  (1) use of AWPs as the "industry pricing standard" in virtually all transactions involving drugs covered by Medicare Part B and in all contracts between PBMs and third-party payors; (2) each Defendant's practice of causing the publication of AWPs that were inflated by virtue of rebates, chargebacks, discounts and other financial arrangements that were not reflected in the published AWPs; and (3) Plaintiffs' and Class members' payment of sums directly tied to the inflated AWPs.  Resolution of these common elements from which liability and damage determinations can be made on a Class-wide basis is superior to any alternative and will result in achieving substantial justice.

A class action is also the most efficient manner and, pragmatically speaking probably the only way for most Class members to recover from Defendants the money lost to Defendants' scheme.  For the Medicare Part B Class in particular, the class mechanism is the only feasible method of recovery.  Even if certain Class members have the means to bring their own cases,

---

[1] "Defendants" as used herein refers to the fast-track Defendants.

[2] Such drugs are referred to as "AWPIDs."

Judge Posner recently explained that resolution of at least some issues on a Class-wide basis would further the litigation and is particularly appropriate in that "17 million suits" would "hardly be an improvement to [a] single class action" involving at least some common issues. *Carnegie v. Household Int'l, Inc.*, 2004 U.S. App. Lexis 14635, at *9-10 (7th Cir. 2004).  The same is certainly true here as well.

The requirements of Fed. R. Civ. P. 23(a) are easily satisfied here.[3]  The documentary and testimonial evidence applies exclusively or predominantly across the entirety of the Classes. Virtually all elements of Plaintiffs' and the Class members' claims involve use of the same proof of Defendants' conduct, including the role of each Defendant in the creation and publication of AWPs and the schemes used to inflate those AWPs, and Plaintiffs' and Class members' payments based upon inflated AWPs.  Defendants' conduct is uniformly applied to all Class members.  Defendants did not, for example, publish different sets of AWPs for different Class members.  Rather, their scheme was uniformly directed at Plaintiffs and the Class.  In such circumstances, Rule 23(a)'s requirements of numerosity, common issues and the typicality of plaintiffs and the class' claims are satisfied.

Rule 23(b)(3) is also easily satisfied because "a sufficient constellation of common issues binds class members together," and these common issues predominate.  *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000).  The issues surrounding publication of AWPs, inflation of AWPs and payment based upon AWPs certainly present a constellation of common issues.  Liability under RICO will be proven through common evidence demonstrating that Defendants conducted an enterprise through a pattern of racketeering activity.  *In re Lupron*

---

[3] Plaintiffs reserve the right to modify the class definitions on reply based upon Defendants' opposition.  To avoid the need for such an occurrence, Plaintiffs served interrogatories on Defendants to elicit, in advance of filing this motion, any factual or legal basis for opposing class certification.  *See* Declaration of Steve W. Berman in Support of Motion for Class Certification ("Berman Decl., ¶ __").  The answers were largely non-responsive, thus necessitating that new arguments and fact material will likely be inserted for the first time on reply.  *See* Berman Decl., Exs. 1-6 (highlighted portions in particular).  (All exhibits referenced hereinafter are attached to the Berman Decl. unless otherwise indicated.)

*Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 161, 163-75 (D. Mass. 2003).  Individual questions of reliance are not a bar to certification, because, in the First Circuit, reliance is not an element of a civil RICO claim that is premised on mail or wire fraud.  *Systems Mgmt. v. Loiselle*, 303 F.3d 100, 104 (1st Cir. 2002).  Injury and damages will be shown by evidence applicable to the Class.  Plaintiffs have submitted the Declaration of Raymond S. Hartman in Support of their motion for Certification of the Class ("Hartman Decl.").  Dr. Hartman, an expert economist, clearly explains that Class-wide data is available to demonstrate that Defendants' unlawful scheme injured all Class members.  That injury can be calculated and proven on a Class-wide basis, and standard formulaic methodologies deployed to calculate damages to the Class.[4]

Plaintiffs' consumer protection and civil conspiracy claims arise from the same common set of facts that mandate certification of Plaintiffs' RICO claims.  As Judge Stearns in *Lupron* observed, under "[m]ail and wire fraud, the predicate acts underlying plaintiffs' RICO claims, are by definition unfair and deceptive acts.  If plaintiffs are able to prove any one or more of their RICO claims, their ability to satisfy the elements of a consumer protection act claim under any of the referenced statutes will follow almost as a matter of course."  *Lupron*, 295 F. Supp. 2d at 181.  Moreover, the Court explained that the consumer protection statutes alleged in the Complaint were "essentially similar in that they authorize a cause of action against a commercial defendant who is accused of deceptive acts or fraudulent practices."  *Id.* at 180-81.  The uniformity of the consumer protection statutes militates in favor of class certification.

For these reasons, courts faced with similar issues in prescription drug and consumer litigation have readily certified classes, and this Court should do so here.[5]

---

[4] Hartman Decl., Section IV, ¶¶ 20-38.  Also submitted is the Declaration of Dr. Steven W. Schondelmeyer ("Schondelmeyer Decl.").  Schondelmeyer, a pharmaceutical economist, also opines as to the ability to establish causation and damages on a Class-wide basis, and to the existence of common issues that bind the Class together, including the role of AWP as a uniform pricing benchmark and payments by Class members tied to AWP.  Schondelmeyer Decl., ¶¶ 95-98.

[5] *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 248 (D. Del. 2002) ("Several other courts have recently certified nationwide or multi-state classes under federal and state laws in actions alleging overpayment for prescription drugs."); *In re Lorazepam &*

- 3 -

## II.  THE STANDARDS FOR APPLYING RULE 23:  RESOLVING ANY DOUBTS IN FAVOR OF CERTIFICATION, THE COURT CONDUCTS A RIGOROUS ANALYSIS WITHOUT MAKING MERITS-BASED DECISIONS

Class actions have long been recognized by the courts as an essential tool for adjudication of cases involving multiple claims that are susceptible of similar factual and/or legal inquiries, and for which individual recovery might be too modest to warrant prosecution of the case on an individual basis.  The policies underlying the need for class action litigation require that certification under Rule 23 be "liberally construed."  *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984) ("Rule 23(a) should be liberally construed in order not to undermine the policies underlying the class action rule."); *see also Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 41-42 (1st Cir. 2003) (classes of consumers "are especially likely to satisfy the predominance requirement"); *see also Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) (citations omitted) ("The interests of justice require that in a doubtful case, … any error, if there is to be one, should be committed in favor of allowing a class action.").

On a motion for class certification, "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23."  *Smilow*, 323 F.3d at 38 (denial of class certification reversed) (citing *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982)). However, in doing so, the court does ***not*** determine whether plaintiffs will prevail on the merits. *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d at 298 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)); *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 307 (D. Mass.

---

*Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001) (conspiracy to prevent competition and raise price of drugs); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 334 (E.D. Mich. 2001) (certifying class of consumers and health benefit providers); *In re Synthroid Mktg. Litig.*, 188 F.R.D. 295 (N.D. Ill. 1999) (drug manufacturer alleged to have suppressed information in order to protect generic drug competition); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 U.S. Dist Lexis 16658 (N.D. Ill. Nov. 18, 1994) (class certified against over 30 prescription drug manufacturers regarding pricing, sales and marketing of hundreds of brand name prescription drugs); *see also Goda v. Abbott Labs., Inc.*, 1997 WL 156541 (D.C. Super. 1997) (attached to Berman Decl. as Ex. 6A); *In re Antibiotic Antitrust Actions*, 333 F. Supp. 278 (S.D.N.Y. 1971) (certifying class of consumers of antibiotics), *amended*, 333 F. Supp. 291 (S.D.N.Y.), *mandamus denied*; 449 F.2d 119 (2d Cir. 1971).

- 4 -

1987) ("A motion for class certification is not the appropriate point at which to resolve the merits of the plaintiffs' claim.") (citing *Eisen*).

Instead, in weighing whether the Rule 23 factors are satisfied, the Court "must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings v. Mowbray*, 208 F.3d at 298. In other words, the court undertakes "an analysis of the issues and the nature of required proof at trial to determine whether the matters in dispute and the nature of plaintiffs' proofs are principally individual in nature or ***are susceptible of common proof*** equally applicable to all class members." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 334 (E.D. Mich. 2001) (emphasis added) (quoting *Little Caesar Enter., Inc. v. Smith*, 172 F.R.D. 236, 241 (E.D. Mich. 1997)); *see also In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 265 (D. Mass. 2004) (Young, J.) (the "analysis should not involve a 'preliminary hearing into the merits,' . . . but rather an inquiry into 'whether the requirements of Rule 23 are met'") (quoting *Eisen*); *Hawkins v. Commissioner*, 2004 U.S. Dist. Lexis 807, at *6 (D.N.H. Jan. 23, 2004) ("the court focuses on the requirements of Rule 23, and the factual issues raised by those requirements, [but] not on the merits of the plaintiffs' claims"). Further, the existence of common disputed issues "weighs in favor of class action status." *Tardiff v. Knox County*, 365 F.3d 1, 5 (1st Cir. 2004).

In this case, the record supports certification of the Class pursuant to Rule 23(b)(3). By proving their own case, the named Plaintiffs will succeed in proving absent Class members' claims against each Defendant.

### III.   PLAINTIFFS' ALLEGATIONS AND EVIDENCE

Plaintiffs review below the AMCC's allegations that establish Class-wide issues, and we sample the type of evidence Plaintiffs can present at trial to demonstrate how those common issues can be proven on a Class-wide basis. The recitation highlights the predominance of common issues, typicality of claims and the superiority of the class action as a vehicle for resolving these claims.

A.      **AWP Is Used by Medicare for Reimbursement Purposes**

In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care.  ¶ 142.[6]  The Medicare Program generally does not cover the cost of prescription drugs that a Medicare beneficiary self-administers (*e.g.*, by swallowing the drug in liquid or pill form).  However, Medicare Part B provides reimbursement for approximately 450 drugs, including injectables administered directly by a doctor, certain oral anti-cancer drugs, and drugs furnished under a durable medical equipment benefit.  ¶ 144; Schondelmeyer Decl., ¶ 40.

In determining the amount it will pay, Medicare calculates the "allowed" amount for the drug.  During the period 1992 through 1997, Medicare's reimbursement for Covered Drugs was set at the lesser of the estimated acquisition cost or national average wholesale price ("AWP").  For generic drugs (where more than one company sells a certain drug, sometimes called multiple-source drugs), payment was based on the lower of the estimated acquisition cost or wholesale price that was defined as the median price for all sources of the generic form of the drug.  This payment methodology was set forth in 42 C.F.R. § 405.517, a regulation first published in the Federal Register on November 25, 1991 and which became effective on or about January 1, 1992.  ¶ 145; Hartman Decl., Attachment D, ¶ 8.

The estimated acquisition cost for a drug could be determined by the Medicare Program "based on surveys of the actual invoice prices paid for the drug."  However, historically it has been the AWP published in the *Red Book* or other compendia that has been used as a ceiling for Medicare reimbursement.  ¶ 146; Hartman Decl., Attachment D, ¶ 8; Schondelmeyer Decl., ¶ 41.  On January 1, 1998, 42 C.F.R. § 405.517 was amended to reimburse based upon the lower of the billed charge on the Medicare claim form or 95 percent of AWP.  ¶ 147; Hartman Decl., Attachment D, ¶ 8.

---

[6] References to paragraphs herein refer to the paragraphs in the AMCC unless otherwise noted.

In practice, reimbursement for prescription drugs under Part B in the Medicare Program has been based upon AWP and reliance on AWP has been a constant.  Hartman Decl., Attachment D, ¶¶ 7, 8 (█████████████████████████████████████████████████);  Schondelmeyer Decl., ¶ 41 (fiscal intermediaries set the payment limits as reported by the publishers).

Medicare Part B reimburses medical providers 80% of the allowable amount for a drug.  The remaining 20% is paid by the Medicare Part B beneficiary, and is called the "co-payment" amount.  All medical providers are required by law to bill the 20% co-payment and make attempts beyond merely billing to collect that amount.[7]  Hartman Decl., Attachment D, ¶ 5.

## B.      AWPs Have Become the Reimbursement Benchmark for All Drugs

The use of AWPs as a pricing benchmark has extended beyond the Medicare Part B context, and AWPs are now used by virtually all participants in the pharmaceutical distribution chain as the basis for reimbursement in their contracts with third-party payors.  ¶ 171; Hartman Decl., Attachment D, ¶¶ 29-33; Schondelmeyer Decl., ¶ 56 (████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).  The evidence gathered during Class certification discovery fully supports these expert conclusions and provides common proof that supports Plaintiffs' Class-wide allegations that AWP is the pricing standard common to Class members' drug purchasing transactions.  Hartman Decl., Attachment D, ¶ 33; Schondelmeyer Decl., ¶¶ 47 (for Medicare Part B co-payors), ¶ 56 (third-party payors use of AWP).

For example, in a "Pharmacy Industry Overview" presentation by Advance PCS, one of the major PBMs, the presenter described the use of AWP as follows:

---

[7] Defendants have in the course of this litigation asserted as a defense that everyone knew AWP was not a real price, yet for Medicare Part B AWP was the statutorily required reimbursement benchmark.  A co-payor, either an individual or a third-party payor, thus had no choice but to pay for covered drugs based on AWP once that AWP was published.



-  [8]

The presentation then includes a series of graphs that depict the use of AWP at each step of the distribution chain – demonstrating the Class-wide impact of AWPs and inflated AWPs.



This chart showing the prevalence of AWP in each step of the distribution chain for a brand name drug is fully supported by an analysis of contracts between PBMs and health plans, which all uniformly use AWP as a pricing standard.  Hartman Decl., Attachment D, ¶¶ 29-33.  The uniform use of AWP as a contract term is fully consistent with BMS' observation that [9]

---

[8] Ex. 7 (BMS/AWP/000125481 at 125509).

[9] Ex. 8 (BMS/AWP/000100778).  BMS and other Defendants will argue that they do not "set" AWP as stated in this presentation.  But industry insiders like AdvancePCS know otherwise.  Plaintiffs are confident that we will show that no one from BMS voiced opposition to this description during the presentation.

Documents produced by Defendants also recognize that  For single source products,

[10] Internal BMS charts depict the flow of drugs in the pharmacy network with the observation that managed care organizations reimburse pharmacies at [12] [13] and [13] *Id.* By way of further example, an exhibit produced by a health insurer, Coventry Health Care, further documents how AWP is the pricing standard utilized in the industry. All of Coventry's one hundred-plus agreements with national retail pharmacies, including large chains like CVS, Eckerd, and Rite Aid, are expressly based upon [14]

Plaintiffs' contracts with PBMs are typical of such AWP reimbursement-based contracts. For example, UFCW's contract with Medco provided for reimbursement at [blank] for brand name drugs.[15] Medco's form contracts utilize AWP as a pricing standard, as do those of the other major PBMs.[16] When providing costing options to Plaintiffs, Medco expressly relied on AWP for each drug.[17] Virtually all PBM contracts utilize AWP as a reimbursement benchmark.[18]

---

[10] Ex. 9 (BMS/AWP/000101005 at 101009).

[11] *Id.* at 101010.

[12] Ex. 10 (BMS/AWP/00193520-21).

[13] Ex. 11 (BMS/AWP/000192746 at 749).

[14] Ex. 12 (CVH 000028-31).

[15] Ex. 13 (MHS A_0000001 at 10); *see also* Affidavit of Daniel Ryan, ¶ 6, Affidavit of Arthur Steinberg, ¶ 6; Declaration of John Bell, ¶ 6 (each describing the AWP-based nature of their Health and Welfare Fund's contracts).

[16] *See, e.g.*, Ex. 14 (MHS A_0000310 at 322-23); Ex. 15 (MHS A_0000742-47) (describing use of AWP as a reimbursement standard).

[17] Ex. 16 (MHS A_0000849, 852, 856).

[18] *See, e.g.*, Ex. 17 (CMK-AWP 003423 at 449) (AdvancePCS); Ex. 18 (CMK-AWP 002938 at 52) (Caremark); Ex. 19 (ESI-277-00000117 at 135-36 (ESI); Ex. 20 (ESI-277-00000253 at 269-70) (ESI).

Based on his review of this type of evidence and industry literature, Dr. Hartman concludes that 

[19]

Similarly, based upon his unparalleled expertise in pharmaceutical pricing and distribution, Dr. Schondelmeyer concludes:

Schondelmeyer Decl., ¶ 97.

For private payors, Dr. Schondelmeyer concluded that

or as Dr. Schondelmeyer states elsewhere,

Schondelmeyer Decl., ¶ 56.[20]

Thus, the ubiquity of AWP as a pricing benchmark fully aligns the record proof with the Class definition because the Class definition also uses AWP as a pricing benchmark, *i.e.*, the Class is defined as those who reimburse for drugs based on contracts which use AWP as a pricing standard.

**C.    Each of the Defendants Supplied Directly or Indirectly AWPs to Publishers**

Plaintiffs allege and will offer proof applicable to the claims of the entire Class that each of the Defendants supplies AWPs directly or indirectly to the publishers.  This occurs in one of two ways:  either a Defendant sends an AWP or "suggested" AWP directly to a publisher, or a Defendant sends a wholesale list price ("WLP"), wholesale acquisition cost ("WAC") or Direct Price ("DP") to the publisher, and the publisher marks that price up by either 20% or 25% to

---

[19] Hartman Decl., Attachment D, ¶ 38 and ¶¶ 29-33.

[20] WAC is formulaically related to AWP, and because the two are usually related by a constant ratio, they convey the same information to purchasers.  Hartman Decl., Attachment D, ¶ 2.

- 10 -

achieve the reported AWP.[21]  In the latter, the publisher then confirms with the manufacturer the AWP as marked up prior to publication.  Plaintiffs will present common proof as to each Defendant's role in establishing AWP.  Further, each Defendant acted in the same fashion with respect to setting AWPs for each of its own drugs in the AMCC.  In other words, proof of how AWPs for each Defendant's drugs were established will be the same for each drug manufactured by that Defendant.  Examples of that proof follow.

1.      **AstraZeneca**

AstraZeneca historically determined and directly communicated to the publishers changes to WAC and AWP prices for its drugs.[22]  For example, in one 1995 memorandum, AstraZeneca's Market Strategy & Contract Operations Department recommended that a particular price increase occur:



[Emphasis added.]

Additionally, AstraZeneca utilized the services of third-party consultants to act as intermediaries with the various industry compendia in reporting prices and authorized consultants

---

[21] Schondelmeyer Decl. ¶ 79 (explaining how in ███████████████████████ ████████).

[22] *See* Ex. 21 (AZ0427855); and Ex. 22 (AZ0449541-45) (Highly Confidential) (nothing that Freeberry will notify pricing services of Casodex and Nolvadex price increases); Ex. 23 (AZ0445417-24) (Highly Confidential) (████████████████████ to FDB regarding Atacand).

[23] *See* Ex. 24 (AZ 0080413-17) (Highly Confidential).

- 11 -

███████████████████████████████████████[24] At other times,

AstraZeneca sent AWPs directly to the publishers.[25]

### 2. The BMS Group (Bristol-Myers, Oncology Therapeutics and Apothecon)

BMS did not send AWPs directly to the publishers. Instead, for each of the BMS'

AWPIDs, it sent to the publishers a wholesale list price or direct price.[26] The publishers then

sent back to BMS the AWP calculated off BMS' provided price seeking BMS' approval of the

proposed markup, which was either 20% or 25% depending upon the type of drug or timeframe.

Thus, by sending prices to the publishers with knowledge of their markup factor and approval of

that factor, BMS controlled its AWPs, and did so in the same fashion for all AWPIDs.

### 3. The GSK Group (GlaxoSmithKline, SmithKline Beecham, Glaxo Wellcome)

It is clear from GSK's own documents that GSK either set the AWP for its drugs or

furnished data from which an AWP could be calculated. GSK had its consultant regularly

prepare letters to notify publishers of AWP increases. For example: ███████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

Demonstrating its control over its AWP, GSK then wrote ████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[24] *See* Ex. 25 (AZ 0036643) (Highly Confidential). *See also* Ex. 26 (AZ0036585) (Highly Confidential) (model letter to be used to notify industry compendia of AstraZeneca price increases).

[25] *See, e.g.*, Ex. 27 (WKH 01101); Ex. 28 (RB 01099); Ex. 29 (WKH 01116); Ex. 30 (WKH 01123); Ex. 31 (RB 01076).

[26] *See, e.g.*, Ex. 32 (BMS/AWP/0011250-51). The publisher then applied an agreed markup to that price. *See* Ex. 33 (AWP 0011247) (BMS directing the markup be 25%, up from 20.5%); Ex. 34 (BMS/AWP/0030822) (same). The publisher would then send a fax calculating AWPs off of BMS' list price back to BMS for approval. *See, e.g.*, Ex. 35 (BMS/AWP/0005332-34) (transmitting AWPs for various drugs (partial illegibility due to production quality)); Ex. 36 (BMS/AWP/0005339-45) (sending data on series of drugs).

During certain periods, GSK sent publishers the WAC for its drugs knowing that the publishers would set AWP at 25% over WAC.[27]  GSK would then send the AWP directly to wholesalers.[28]  Plaintiffs will proceed by way of similar proof for each of GSK's AWPIDs.

### 4.     The J&J Group (J&J, Centocor, Janssen, NcNeil, Ortho)

The J&J companies dictated AWP prices for its drugs published in industry compendia for J&J drugs.  J&J entities sent suggested AWPs to the publishers that were then adopted.[29]  For example, in a 1998 Centocor letter sent to the various industry publishers, Centocor announced the AWP for Remicade, and it was accepted and published by the compendia.[30]  Every time Centocor increased its price, the publishers accepted and published the exact recommended AWP without question.[31]  Centocor was so certain that its recommended AWP was going to be accepted by the publishers that it never even held an internal discussion about what would happen if the publishers did not adopt the suggested AWP.[32]  Tom Hiriak, a 30(b)(6) designee, similarly testified that every AWP provided to publishers for Procrit was published without question.[33]  Likewise, Janssen's William Parks testified that, with the exception of First Data Bank beginning in March 2002, all of Janssen's suggested AWPs were accepted and published as submitted.[34]  Janssen specifically used the AWP in announcing price increase to customers, thus embracing its use in pricing decisions.[35]  Plaintiffs will also introduce faxes from publishers

---

[27] Ex. 36A (GSK-MDL-2N01-016494-99); Schondelmeyer Decl., ¶ 79.

[28] Ex. 37 (GSK-MDL-KY01-001827); Ex. 38 (RB 01230); Ex. 39 (WKH 01229); Ex. 40 (RB 01185); Ex. 41 (RB 01109) (transmitting WAC knowing AWP would be "+20"); Ex. 42 (WKH 01160).

[29] Ex. 43 (MDL-CEN00004040), Ex. 44 (MDL-CEN00013717), Ex. 45 (MDL-CEN00014234), Ex. 46 (MDL-CEN00004025) (publisher accepting suggested AWP); Ex. 47 (MDL-CEN 00013969).

[30] Ex. 48 (WKH01029); Ex. 49 (Hoffman (Centocor) Tr. at 124:18-22, 125:1-9).

[31] Ex. 49 (Hoffman (Centocor) Tr. at 134:14-18).

[32] *Id.* at 136:20-22, 137:1-2.

[33] Ex. 50 (Hiriak (OBP) Tr. at 214-15).

[34] Ex. 51 (Parks (Janssen) Tr. at 71-72).

[35] Ex. 52 (MDL-JAN 00002925-26); Ex. 53 (MDL-JAN 00002915-916).

seeking Johnson & Johnson's approval of AWPs.[36]  In these instances the publishers had "calculated" and sent AWPs to J&J entities after receiving suggested pricing and information from them.[37]

 **5.**  **The Schering Group (Schering Plough & Warrick)**

 Plaintiffs will present common proof that the Schering Group acted in a uniform fashion with respect to publication of AWPs.  Unlike some manufacturers that set a WAC or WLP to be marked up by the publishers, Warrick sent to the publishers the exact AWP it wished to be published.[38]  Schering acted in the same fashion by sending directly to First DataBank its "NDP" and "AWP."[39]

 Schering also directly used its AWP to market the spread.  A common technique used by Schering in this regard was to directly offer "Net Direct" prices far below AWPs while making explicit reference to the AWP.[40]  The following is an example of hundreds of such communications that market the AWP spread:



 PBMs received substantial discounts on all products off of AWP as evidenced in the following document which is typical of many such Schering documents:[42]

---

[36] *See, e.g.*, Ex. 54 (MDL-OB100004515-17).

[37] Ex. 55 (MDL-MS C00001944).

[38] *See, e.g.*, Ex. 56 (WAR0007632); Ex. 57 (WAR0007610).

[39] *See, e.g.*, Ex. 58 (FDB-AWP 04045-49); Ex. 59 (FDB-AWP 04018-22); Ex. 60 (FDB-AWP 03916-917); Ex. 61 (FDB-AWP 03906-910); Ex. 62 (FDB-AWP 03876-77).

[40] *See, e.g.*, Ex. 63 (SPW003702) (offering AWP of ▮▮▮▮ and a net price of ▮▮▮▮ creating a spread of ▮▮▮, AWP ▮▮▮▮, net price of ▮▮▮▮ creating a spread of ▮▮); Ex. 64 (SPW007298) (AWP ▮▮▮▮, net ▮▮▮▮ creating a spread of ▮▮).

[41] The spreads created here are:  208%, 578% and 585% respectively.

[42] Ex. 65 (WAR0044386); *see also* Ex. 66 (WAR0044503).



Schering also offered other types of rebates to PBMs lowering their acquisition price and thereby inflating the AWP.[44]

## D.   Each Defendant Reported AWPs That Were Fraudulently Inflated

Plaintiffs allege that each of the Defendants reported AWPs that were fraudulent in that they failed to account for rebates, volume discounts, free goods, and other arrangements that lowered the cost to providers.  (AstraZeneca, ¶¶ 234-49; BMS, ¶¶ 329-48; GSK, ¶¶ 379-415; J&J, ¶¶ 438-45; Schering, ¶¶ 478-90.)  Plaintiffs can prove this manipulation using expert and factual proof that is common to the Class.  For the purposes of this motion, using Defendants' own data, Dr. Hartman is able to calculate the difference between the AWP and the pricing benchmark that would have been used "but for" Defendants' AWP scheme for each of Defendants' drugs.  Hartman Decl., ¶¶ 20-25, 34-37.  This "but for" analysis will be used at trial to prove the existence of actionable spreads for each Defendant's AWPIDs.  Dr. Hartman's methodology, which applies equally to Plaintiffs and each Class member, will be corroborated by proof from Defendants' own records of the scheme.[45]  By way of example, Dr. Hartman's

---

[43] The spreads created here are:  939%, 647%, 403%, 589% and 1,001%, respectively.

[44] Ex. 67 (SW006854); *see also* Ex. 68 (SPW007578) (AWP ■■■, net price ■■■, spread of ■■■); Ex. 69 (SPW011758) (AWP ■■■, net price ■■■, spread of ■■■); Ex. 70 (SPW011723) (AWP ■■■, spread of ■■■); Ex. 71 (SPW011448) (AWP ■■■, Direct Price ■■■, spread of ■■■).

[45] The types of proof that will be introduced are summarized in the Berman Declaration.  The Defendant-specific information in the Berman Declaration is simply a ***short*** summary of proof applicable to just a ***few*** drugs.

analysis show spreads on AstraZeneca's injectable drug, Zestril,[46]



---

[46] Zestril is used to treat hypertension, congestive heart failure and diabetes, the former two conditions being found more frequently in elderly patients.

[47] Hartman Decl., Table 2.A, p. 1.

[48] Prilosec is a pump inhibitor for acid-related disease.

[49] *See* Hartman Decl., Table 2.A.

[50] Hartman Decl., Table 2.B.  Cytoxan is used in the treatment of leukemia and other forms of cancer.

[51] Hartman Decl., Table 2.B.

[52] Hartman Decl., Table 2.B.

[53] Hartman Decl., ¶ 2.C.

[54] *See* Berman Decl., ¶ 5.

- 16 -

## IV.    THE COURT SHOULD CERTIFY THE CASE AS A
## CLASS ACTION UNDER RULE 23(b)(3)

**A.    Plaintiffs and This Case Satisfy the Requirements of Rule 23(a)**

Rule 23(a) of the Federal Rules of Civil Procedure requires a party seeking class certification to satisfy four prerequisites:  (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation.  *Smilow*, 323 F.3d at 32; *Guckenberger v. Boston Univ.*, 957 F. Supp. 306 (D. Mass. 1997) (Saris J.).

Plaintiffs also must show that they satisfy at least one of the conditions of Rule 23(b). Under Rule 23(b)(3), certification is appropriate if:  (i) common questions of law or fact predominate over questions affecting the individual class members only; and (ii) class treatment is superior to other methods available for adjudicating the controversy.  *Mowbray v. Waste Mgmt. Holdings, Inc.*, 189 F.R.D. at 194, 196-97 (D. Mass. 1999); *In re Screws Antitrust Litig.*, 91 F.R.D. 52, 55 (D. Mass. 1981).  Plaintiffs seek certification under Rule 23(b)(3).

**1.    The Class is so numerous that joinder of all members is impracticable**

Rule 23(a)(1) requires that the proposed Class be so numerous that joinder of all members is impracticable.  Joinder need not be impossible; the rule only requires that the difficulty or inconvenience of joining all members make use of the class action appropriate.  *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 264 (D. Mass. 2004).  *Bond v. Fleet Bank (RI), N.A.*, 2002 U.S. Dist. Lexis 22324, at *12-13 (D.R.I. Oct. 10, 2002) ("Impracticability of joinder means only that it is difficult or inconvenient to join all class members, not that it is impossible to do so.").  Precise quantification of class members is not necessary, and a court may make common sense assumptions to support a finding of numerosity.  *McCuin v. Secretary of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987); *see also Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 131-32 (1st Cir. 1985) (court can consider economy, geographic dispersion and ability of individual members to bring suit); Alba Conte, Esq. & Herbert B. Newberg, Esq., 6 NEWBERG ON CLASS ACTIONS § 18:2-18:4 (4th ed. 2002).

This case easily satisfies the numerosity requirement.  As to the Part B Class, according to one estimate, there are 40 million Medicare beneficiaries.[55]  It is clear that many in this population have paid for Part B covered drugs and that the Medicare Part B Class, consisting of elderly patients and third-party payors is numerous.  Likewise, numerosity of the Third-Party Payor Class also cannot seriously be disputed.[56]

### 2.    There are questions of law and fact common to all Class members

Rule 23(a)(2) requires that there be questions of law or fact common to the class.  The "commonality" requirement of Rule 23(a)(2) "is a 'low hurdle' easily surmounted."  *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997) (citations omitted).  It requires only that there be a single question of law or fact that is common to all class members.  *George Lussier Enters. v. Subaru of New England, Inc.*, 2001 U.S. Dist. Lexis 12054, at *11 (D.N.H. 2001).

In determining the existence of common questions of law and fact, courts in this Circuit have considered dispositive a defendant's course of conduct toward the proposed class.  *See In re New England Mut. Life Ins. Co. Sales Practices Litig.*, 183 F.R.D. 33, 39 (D. Mass. 1998) (finding commonality based on defendant's alleged deceptive practices in the sale of life insurance policies where "claims of the class members are based on allegations of a common course of allegedly fraudulent conduct"); *Duhaime*, 177 F.R.D. 54 (same); *Massachusetts Ass'n of Older Americans v. Spirito*, 92 F.R.D. 129, 131 (D. Mass. 1981) (finding commonality among proposed class of Medicare recipients who were allegedly subjected to illegal delays and harassment because even though "there may be differences in the facts relating to the alleged delays for individual applicants, the pattern of conduct of defendant is at issue" and "[t]he

---

[55] Ex. 109 (BMS/AWP/000151795).  Part B drug expenditures grew from $3.3 billion in 1998 to $8.4 billion in 2002, a three-fold increase in four years.  Schondelmeyer Decl., ¶ 40. Roughly $2.2 billion in co-payments would have been made in this period.

[56] Plaintiffs' estimate based on information from other drug pricing litigation that there are 11,000 members of this Class including third-party insurers, health and welfare plans and self-insurers.

- 18 -

existence of common questions of law alone" is sufficient to satisfy the requirements of

subdivision (a)(2)); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 685-86 (S.D.

Fla. 2004) (where complaint alleges standardized course of conduct commodity generally

satisfied).[57]

The case satisfies the commonality test.  The allegations and proof (summarized above)

focus on the existence, scope, duration and efficacy of Defendants' scheme, as well as the steps

Defendants took to increase their sales and market share through the use of an AWP-based

reimbursement system.  The liability proof will place the actions of the Defendants at center

stage – proof common to all of the thousands of Class members.  Among the questions of law

and fact that are common to the proposed Class are:

     a.     Whether each Defendant engaged in a fraudulent and/or deceptive scheme of improperly inflating the AWPs for the Drugs identified in Appendix A;

     b.     Whether Defendants artificially inflated the AWPs for these drugs;

     c.     Whether in carrying out the scheme it was the policy and practice of Defendants to prepare marketing and sales materials that contained comparisons of the published AWPs and the spreads available;

     d.     Whether in carrying out the scheme Defendants paid financial inducements to providers and other intermediaries, with the effect of lowering their costs for AWPIDs and thereby inflating AWPs;

     e.     Whether Defendants engaged in a pattern and practice of paying kickbacks, disguised as free goods, rebates, consulting fees, junkets and education grants to providers and other intermediaries thereby lowering their AWPs;

     f.     Whether AWPs are used as a benchmark for negotiating payments by Third-Party Payors for the AWPIDs;

     g.     Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class members to make inflated payments for the AWPIDs;

     h.     Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiffs and the Class members;

---

[57] RICO violations are particularly amenable to finding commonality of issues given that they involve common proof of the existence, scope, and effect of the alleged conspiracy, especially where, like here, the conduct was designed to affect all Plaintiffs in a similar fashion.  *George Lussier Enters.*, 2001 U.S. Dist. Lexis 12054, at *51.

i. Whether Defendants formed enterprises for the purpose of carrying out the AWP Scheme;

j. Whether Defendants used the U.S. mails and interstate wire facilities to carry out the AWP Scheme;

k. Whether Defendants' conduct violated RICO; and

l. Whether Defendants are liable to Plaintiffs and the Class members for damages for conduct actionable under the various state consumer protection statutes.

These common questions satisfy Rule 23(a)(2)'s requirement that questions of law or fact be common to the Class.

### 3. Plaintiffs' claims are typical of those of the Class

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The typicality requirement of Rule 23(a)(3) is met when the claims of the representative Plaintiffs arise from the same course of conduct that gives rise to the claims of the other class members, and where the claims are based upon similar legal theories. *Priest v. Zayre Corp.*, 118 F.R.D. 552, 553 (D. Mass. 1988) (quoting *In re Elscint, Ltd. Secs. Litig.*, Civ. No. 85-2622-K, slip op. at 18 (D. Mass. June 22, 1987)); *Randle v. SpecTran*, 129 F.R.D. 386, 391 (D. Mass. 1988); *Duhaime*, 177 F.R.D. at 63; *In re New England*, 183 F.R.D. at 39; *Fraser v. Major League Soccer, L.L.C.*, 180 F.R.D. 178, 181 (D. Mass. 1998); *Burstein v. Applied Extrusion Techs.*, 153 F.R.D. 488, 491 (D. Mass. 1994); *see also* 1 NEWBERG ON CLASS ACTIONS § 3.13 (4th ed. 2002) (the typicality requirement is usually met "when it is alleged that the same unlawful conduct was directed at or affected both the named Plaintiffs and the class sought to be represented").

"Typicality does not require that the situations of the named representatives and the class members be identical." *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 133 (2d Cir. 2001); *Guckenberger*, 957 F. Supp. at 327. The named Class Plaintiffs need not share a complete identity of facts with absent Class members to demonstrate typicality; it is sufficient for

- 20 -

the claims of the named Plaintiffs to arise from the same course of conduct as those of the absent Plaintiffs.  As the court in *M. Berenson* noted, "[t]ypicality refers to the nature of the claim of the class representatives, and not to the specific facts from which the claim arose or relief is sought." *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 100 F.R.D. 468, 470 (D. Mass. 1984) (citation omitted); *see also Duhaime*, 177 F.R.D. 54 (finding typicality in case involving deceptive scheme to induce Plaintiffs to purchase life insurance policies even though Plaintiffs were deceived by different members of the sales force in slightly different ways, because, as a general matter, Plaintiffs were subjected to the same deceptive sales techniques); *In re New England*, 183 F.R.D. 33 (same); *In re Screws Antitrust Litig.*, 91 F.R.D. at 56 (finding typicality in antitrust litigation involving the price of standard screws even though the quantity of screws purchased by each plaintiff differed).[58]

Disparity in damages is not a factor courts consider in analyzing whether a named plaintiff's claim is typical of those of the proposed Class.[59]  *Id.* ("mere disparity in damage awards will not destroy" typicality).  Claims involving overcharges on prescription drugs

---

[58] Courts in this District have consistently refused to deny class certification where the named plaintiffs may have been subject to unique defenses such as lack of reliance, statute of limitations, or compulsory counterclaims.  *See, e.g.*, *Margaret Hall Found. v. Atlantic Fin. Mgmt.*, 1987 U.S. Dist. Lexis 7528, at *7 (D. Mass. Jul. 30, 1987) ("possible statute of limitations defenses, like possible nonreliance defenses, do not vitiate typicality"); *Lessard*, 103 F.R.D. at 611 (holding that named plaintiff is not atypical because she may be subject to compulsory counterclaims).  As the *Abelson* court noted, "the burden on plaintiffs in proving typicality is not 'very substantial.'"  *Abelson v. Strong*, 1987 U.S. Dist. Lexis 7515, at *8 (D. Mass. Jul. 30, 1987) (citations omitted).  And, as the court in *Synthroid Mktg.* held, it is only when a unique defense "will consume the merits of a case that a class should not be certified." 188 F.R.D. at 291.  Defendants can make no such showing here.

[59] *See, e.g.*, *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 699 (N.D. Ga. 1991) (typicality requirement satisfied, notwithstanding fact that the 12.5 million class members purchased tickets for an enormous number of different routes, at diverse times, at a multitude of varying prices, and on diverse terms); *see also* Alba Conte, Esq. & Herbert B. Newberg, 1 NEWBERG ON CLASS ACTIONS § 3.13 (4th ed. 2002) (explaining that "differences in the methods of purchase of kinds of products purchased among class members have been held not to a bar a finding of typical claims" in price-fixing actions, and that "in class actions charging Defendants with a conspiracy to fix prices, the claims of the named plaintiff were held typical of the claims of the class members despite variations in the manner in which members of the class purchased from the Defendants, variations in the kinds of products purchased, differences in price, and other factors").

"generally satisfy Rule 23(a)(3)'s typicality requirement, even if members purchase different quantities and pay different prices." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 304 (E.D. Mich. 2001) (antitrust conspiracy to delay entry of generic drug onto the market) (citing cases); *see also In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. at 248 ("[s]everal other courts have recently certified nationwide or multi-state classes under federal and state laws in actions alleging overpayment for prescription drugs") (citing cases).

Indeed, it is well settled that "factual differences in the . . . size or manner of purchase . . . and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class." *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y. 1998) (citing *Green v. Wolf Corp.*, 406 F.2d 291, 299-301 (2d Cir. 1968)); *see also In re Lorazepam & Clorazepate*, 202 F.R.D. at 28; *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 336-37. Thus, the crux of the typicality analysis remains whether the Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent Plaintiffs. That burden has been met in this case. *See*, *e.g.*, *In re Relafen*, 221 F.R.D. at 264.

In the present action, Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent Class members.

First, there are Plaintiffs who purchased Part B covered drugs and/or who made a 20% co-pay. ¶¶ 32-35.[60] These Plaintiffs were impacted in the exact same fashion as any other Medicare Part B co-payor. For example, to the extent Plaintiffs prove that the AWPs for Part B covered drugs were inflated, Plaintiffs' proof with respect to that inflated AWP will be no different for the named Plaintiffs than that of any other Part B Class member. Proof at trial as to the Part B Class will be as follows:

---

[60] *See*, *e.g.*, Affidavit of Citizen Action New York, ¶ 4; Affidavit of New York Statewide Senior Action Counsel, ¶ 4, Affidavit of Wisconsin Citizen Action, ¶ 5; Affidavit of Daniel Ryan, Fund Administrator of United Fund and Commercial Workers Unions & Employees Midwest Health Benefits Fund, ¶¶ 4-5 (describing co-payments made for members covered under Medicare Part B).

(1)    Each Defendant posted or caused to be posted an AWP for a Part B covered drug whose AWP-based reimbursement was fixed by regulation;

(2)    Throughout the Class Period and due to a series of discounts, promotions, rebates, and other inducements which are not reflected in the published AWP, the real AWP as measured by ASP for the drug was lower;

(3)    Plaintiffs' co-pay under Medicare was 20% of the inflated AWP, and should have been 20% of the real AWP or the ASP; and

(4)    Plaintiffs will prove that the AWP inflation scheme was deceptive in violation of state law and caused class members damage.

Similarly, the claims of the Third-Party Payor Class and the Class Representatives are typical as well.  For example, each Plaintiff's and Class members' plan during all or part of the Class Period utilized the services of a PBM in purchasing drugs,[61] and each plan had a contract that utilized AWP as a reimbursement benchmark.[62]

The Plaintiffs' contracts' use of AWP as a pricing mechanism is typical of the Third Party/Co-Payor Class members' use of AWP, and Plaintiffs and Third-Party Payor Class members are thus perfectly aligned in this regard.  First, the proposed Class by definition includes only those entities whose "contracts" used AWP as a "pricing standard."  So by definition the Class is linked to Plaintiffs' claims.  Second, Plaintiffs will offer proof at trial that AWP is used as a standard pricing benchmark in the private payor market.  Hartman Decl., Attachment D, ¶ 29-33; Schondelmeyer Decl., ¶ 96.  This testimony is consistent with the contracts themselves, and other evidence gathered in class certification discovery.  Hartman

---

[61] *See, e.g.*, Ex. 111 (ESI 277-00000086, at 86, 104-05) (a model Express Scripts contract tying payment for generics and brand name drugs to AWP); *see* Ex. 112 (CMK-AWP 001666) (contract between Plaintiff Twin Cities Bakery Workers Health & Welfare Fund ("TCBW") and Caremark, basing mail order brand name pricing on ███████████; retail purchases at ████████); Affidavit of William K. Ecklund, Esq. (TCBW), at ¶ 6B.

[62] *See, e.g.*, Affidavit of Arthur Steinberg, Philadelphia Federation of Teachers Health & Welfare Fund, ¶ 6(a)-(e).

- 23 -

Decl., Attachment D, ¶ 33.  Thus, typicality is established for the Third-Party Payor Class and RICO Class.

### 4.       Plaintiffs will fairly and adequately protect the interests of the Class

Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class."  This requirement is satisfied when (1) the class representative's attorneys are qualified, and (2) the class representative has no interests conflicting with the class. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Curtis v. Commissioner, Me. Dep't of Human Servs.*, 159 F.R.D. 339, 341 (D. Me. 1994).

### a.       Plaintiffs' counsel are qualified

The attorneys seeking to represent the Class in this case include qualified lawyers experienced in the successful prosecution of class actions.  To support the determinations required to be made by this Court under Fed. R. Civ. P. 23(a)(4) and 23(g), the firms seeking appointment as Class Counsel – those appointed to leadership positions of Plaintiffs' counsel in the Court's Case Management Order – each submit a declaration with this motion, setting forth their experience and expertise in class actions.[63]  These firms and their co-counsel stand ready, willing and able to devote the resources necessary to litigate this case vigorously and to see it through to the best possible resolution.

### b.       Plaintiffs' interests do not conflict with the interests of the Class

Neither the proposed Class Representatives nor their counsel have any interests that are antagonistic to those of the absent Class members.  The central issues in this case – the existence, unlawfulness and effect of Defendants' scheme to manipulate the AWP of the drugs at issue – are common to the claims of Plaintiffs and the other members of the Class.  Each representative Plaintiff, like each absent Class member, has a strong interest in proving Defendants' scheme,

---

[63] These firms are Hagens Berman LLP (www.hagens-berman.com) (firm resume attached to Berman Decl. as Ex. 113); Spector, Roseman & Kodroff (www.srk-law.com); Heins, Mills & Olson, PC (www.heinsmills.com); Hoffman & Edelson (www.hofedlaw.com) and The Wexler Firm (www.wexlerfirm.com).

establishing its unlawfulness, and demonstrating the impact of the illegal conduct.  As Plaintiffs

prove their own claims, they also will be proving the claims of thousands of absent Class

members.  There is no conflict between the Plaintiffs and the absent Class members, so Plaintiffs

satisfy the requirements of Rule 23(a)(4).

**B.       Plaintiffs and the Class Satisfy the Requirements of Rule 23(b)(3)**

To certify a class under Rule 23(b)(3), Plaintiffs must show that common issues of law or

fact predominate over individual issues, and that a single class action is superior to hundreds or

thousands of individual cases.  *See Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997);

*Tardiff v. Knox County*, 365 F.3d 1 (1st Cir. 2004).

To establish predominance under Rule 23(b)(3), the end payor Plaintiffs must

demonstrate that the proposed Class is "sufficiently cohesive to warrant adjudication by

representation."  *Amchem*, 521 U.S. at 623.  The First Circuit has held that this requirement is

satisfied where, ***notwithstanding individualized concerns***, "a sufficient constellation of common

issues binds class members together."  *Waste Mgmt. Holdings v. Mowbray*, 208 F.3d at 296

(emphasis added); *accord Smilow*, 323 F.3d at 39 ("After all, Rule 23(b)(3) requires merely that

common issues predominate, not that all issues be common to the class.").  There is no

mechanical test to determine whether common issues predominate.  *Waste Mgmt. Holdings v.

Mowbray*, 208 F.3d at 296 (predominance cannot be reduced to a mechanical, single-issue test);

*Margaret Hall Found., Inc.*, 1987 U.S. Dist. Lexis 7528, at *13 (predominance not determined

by any rote formula).  Instead, as the court concluded in *Margaret Hall*, "a determination of

predominance requires a common sense judgment regarding what the case is really about, and

whether it would be more efficient to try the case as a class suit."  *Id*.  "The predominance

requirement is satisfied unless it is clear that individual issues will overwhelm the common

questions and render the class action valueless."  *In re NASDAQ Market-Makers Antitrust Litig.*,

169 F.R.D. 493, 517 (S.D.N.Y. 1996); *Milberg v. Lawrence Cedarhurst Fed. Sav. & Loan Ass'n*,

68 F.R.D. 49, 52 (E.D.N.Y. 1975).

Two recent First Circuit decisions address the predominance requirement of Rule 23(b)(3).  In *Waste Mgmt. Holdings v. Mowbray*, the Court affirmed (now Chief) District Judge Young's order certifying a group of warranty holders.  The defendants argued that varying state laws and in particular the application of different statute of limitations precluded a finding of predominance.  The laws of at least eight different states were involved.  The Court rejected this contention noting that under the various state laws the "factual proffer will be largely the same"; hence, a sufficient constellation of common issues to satisfy (b)(3) was present.  Furthermore, in evaluating certain hypothetical arguments advanced by defendants regarding possible differences among class members, the court advised that courts should reject "arguments woven entirely out of gossamer strands of speculation and surmise."  208 F.3d at 298-99.

In *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d. 32 (lst Cir. 2003), the court reversed an order decertifying a class of Cellular One customers.  In response to Cellular One's claim that individual waiver determinations might too individualize the case, Circuit Judge Lynch wrote:

> The courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members. . . .  Instead, where common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes. . . .  After all, Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class.  [*Smilow*, 323 F.3d at 39.[64]]

A recent Eleventh Circuit decision is also instructive on the predominance requirement.  In *Klay v. Humana, Inc.*, 2004 U.S. App. Lexis 18494 (11th Cir. Sept. 1, 2004), the court certified RICO claims of 600,00 doctors, finding that RICO claims arising from a common course of conduct directed at plaintiffs and the class, through a common corporate policy were particularly appropriate for certification.  *Id.*, at *36-37.  Here too plaintiff's RICO claims arise

---

[64] Circuit Judge Lynch also observed that "class certification prerequisites should be construed in light of the underlying objectives of class actions," and made the observation that the "core purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation."  *Id.* at 22-23.

- 26 -

from a common policy of publishing and then pushing for market share purposes inflated AWPs, and this common policy was directed to the class as a whole and not to any one individual member of the class.

At this stage, Plaintiffs need only show that, for each of their claims, Plaintiffs can prove their elements through recourse primarily to evidence that is common to the Class, and not specific to individual Class members.  *Id*.; *see also In re NASDAQ*, 169 F.R.D. at 517.

Plaintiffs meet the predominance test.  As shown in the commonality discussion above, the claims all arise from Defendants' unlawful scheme to manipulate and inflate the AWP. Plaintiffs can and will prove each element of each of their claims exclusively or predominantly with evidence common to the Class.

### 1.   Common questions predominate over individual issues in connection with Plaintiffs' RICO claim

In cases involving RICO claims, issues of fact are overwhelmingly common to all class members, because the elements of RICO liability focus generally on the actions of the Defendants, not the individual circumstances of their victims.  *See George Lussier Enters.*, 2001 U.S. Dist. Lexis 12054; *McMahon Books, Inc. v. Willow Grove Assocs.*, 108 F.R.D. 32, 38-39 (E.D. Pa. 1985).  "The fact that there is some factual variation among the class grievances will not defeat a class action." *Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992).  Courts regularly certify classes in cases alleging RICO violations and find that common issues predominate over individual issues.  *See*, *e.g.*, *In re Synthroid Mktg. Litig.*, 188 F.R.D. 295 (certifying class in case alleging RICO and consumer fraud claims).

The facts in *Synthroid* are very similar to those in this case.  *Synthroid* is a RICO and consumer fraud case in which plaintiffs alleged that defendants engaged in mail and wire fraud by misrepresenting and concealing information as part of a scheme to increase the price of Synthroid, a thyroid drug.  Defendants argued – as Defendants likely will argue here – that the

- 27 -

court should deny class certification because individual issues predominated over common

issues.  The court rejected defendants' arguments, and certified the RICO class:

> According to the defendants, individual issues predominate because, to prove their claims, the plaintiffs must make "individualized inquiries into the decisions of consumers, physicians and pharmacists to purchase, prescribe and dispense Synthroid. . ."

*Id*. at 299.  But the court pointed out that plaintiffs:

> allege[d] standardized conduct by the Defendants involving suppression of medical information, including a study, and misrepresentations regarding the bioequivalency of Synthroid and other levothyroxine drugs.

* * *

> ***The question of liability, therefore, will turn on whether the defendants engaged in the alleged conduct, consisting primarily of the uniform suppression of material information, not on the individual decisions and circumstances of countless people along the chain of distribution of Synthroid***.

*Id*. at 299-300 (emphasis added).  As detailed below, the question of liability in this case

similarly will turn on whether the Defendants engaged in the alleged standardized conduct of

artificially inflating AWPs, a claim involving misrepresentation and concealment, and consistent

with *Synthroid*, this Court should certify the Class.

To prove their RICO claims, Plaintiffs must show that Defendants:  (1) conducted, (2) an

enterprise, (3) through a pattern, and (4) of racketeering activity.  *Sedima, S. P. R. L. v. Imrex

Co.*, 473 U.S. 479, 496 (1985).  Plaintiffs also must show that the racketeering activity (*i.e.*, the

predicate acts) was the proximate cause of an injury to Plaintiffs' business or property.  *Libertad

v. Welch*, 53 F.3d 428, 436 (1st Cir. 1995); *Holmes v. Securities Investor Protection Corp.*, 503

U.S. 258, 266 n.11 (1992).  As detailed below, Plaintiffs can prove each of these elements with

evidence that is common to all Class members.  Therefore, RICO common issues predominate

over individual issues, and the Court should certify the Class.[65]

_____

[65] As the Court noted in *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 189 (D. Mass. 2003) ("*AWP I*"), in the First Circuit reliance is not an element of civil RICO

- 28 -

### 2. All issues related to Defendants' conduct of an enterprise are common to all Class members

To prevail on their RICO claims, Plaintiffs must prove that each Defendant conducted the enterprises alleged in the AMCC.  This issue raises no individual issues of law or fact.  Conduct of an enterprise means taking "***some*** part in directing the enterprise's affairs and proof of this element will come from defendants' documents and testimony and applies equally to the claims of all class members."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  Any questions about whether the enterprises existed, or whether Defendants conducted the enterprises, are questions about what Defendants did or did not do, and the answers to those questions are the same for all Class members.  Therefore, common issues predominate for the first two RICO elements.

### 3. Common issues that relate to Defendants' engagement in a pattern of racketeering activity predominate over any individual issues

#### a. Defendants' "pattern" of activity implicates no individual issues at all

To engage in a "pattern of racketeering activity," a defendant must commit at least two related acts of racketeering activity within ten years.  *Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 731-32 (1st Cir. 1996).  Proof at trial of the "pattern" element will focus solely on Defendants' behavior, and on the issue of whether Defendants committed at least two related acts within a ten-year period.  Evidence demonstrating Defendants' commission of at least two predicate acts within the prescribed period is the same for all Class members.  Therefore, no individualized pattern-related issues exist, and common issues predominate over individual issues for RICO's "pattern" element.  Instructive in this regard is *Humana*, holding that where the gravamen of the RICO claims is a "pattern of racketeering activities" that stem from a corporate policy directed to the class as a whole individual determinations were not the

---

premised on mail or wire fraud.  *Systems Mgmt. v. Loiselle*, 303 F.3d 100, 104 (1st Cir. 2002). *See also Neder v. United States*, 527 U.S. 1, 24-25 (1999) ("The common-law requirements of 'justifiable reliance' and 'damages' . . . plainly have no place in the federal [mail and wire] fraud statutes.").  Therefore, reliance is not an issue that need be addressed in this class certification determination.

crux of the case and certification was appropriate.  The Court noted the fact that the corporate

policies were in fact predominant issues was demonstrated by the need to have the same

corporate policies "re-proven by every plaintiff if each defendant's claims were tried separately."

2004 U.S. App. Lexis 18494, at *32.  The Court held "[i]t is ridiculous to expect 600,000 doctors

across the nation to repeatedly prove these complicated and overwhelming facts."  *Id.*, at *42.

The same reasoning applies here, each of the thousands of plaintiffs would have to prove each

defendant's role in publishing the AWP, the practice of inflating that AWP and payment based

on an inflated AWP.

> **b.      Plaintiffs will prove Defendants' racketeering acts through evidence
> common to all Class members**

Plaintiffs allege that Defendants engaged in the predicate acts of mail and wire fraud,

specifically that Defendants disseminated fraudulent information to the industry in furtherance of

their scheme.  "Mail and wire fraud requires proof that (1) defendants knowingly devised or

participated in a scheme to defraud, (2) to obtain money or property by means of false or

fraudulent pretenses, representations and promises, and (3) that the mails or interstate wire

facilities were used in carrying out the scheme."  *Lupron*, 295 F. Supp. 2d at 165 (citing *Neder*,

527 U.S. at 20).  Common issues generally predominate over individual issues in mail and wire

fraud cases, because the elements of mail and wire fraud focus on Defendants' – not Plaintiffs' –

conduct.  "[A] RICO claim based on mail and wire fraud 'focuses on the defendant's conduct in

devising or intending to devise a scheme to defraud, not the individual experiences of each

defrauded person.'"  *In re Synthroid*, 188 F.R.D. at 300 (citations omitted).  Plaintiffs will prove

each of the mail and wire fraud elements with evidence that is common to all Class members.

As to the first mail and wire fraud element, the question of whether Defendants

knowingly devised or participated in a scheme to defraud,[66] the *Lupron* Court acknowledged that

---

[66]   Of course Plaintiffs believe that the answer to this question is "yes."  As cited above, the
*Lupron* Court cited the Amended Complaint and explained that "[d]efendants trumpeted a lie by
publishing the inflated AWPs, knowing (and intending) them to be used as instruments of fraud.
Whether one views the defendants' actions as involving the dissemination of information that

the inquiry will involve proof of "false statements or assertions . . . that were either known to be untrue when made or made with reckless indifference to their truth and that were made with the intent to defraud.  They include actual, direct false statements as well as half-truths and the knowing concealment of facts."  *Lupron*, 295 F. Supp. 2d at 165 (quoting *First Circuit Pattern Jury Instructions: Criminal*, § 4.12 (1996)).  Plaintiffs have already described just a sampling of the common evidence of Defendants' facts adduced to support these claims.  *See supra* at III A-D.  This evidence will be identical for each and every Class member to prove at trial.

The same is true for the second mail and wire fraud element:  whether Defendants' scheme was to obtain money or property by false pretenses.  Similar common evidence will be proffered at trial, and the evidence will focus on Defendants' behavior and therefore apply equally to the claims of all Class members.

The third and final element of mail and wire fraud – whether Defendants used mail or interstate wire facilities to carry out their scheme – similarly raises no individual issues of fact or law.  Common evidence will be used to show that Defendants did use the mails or wires to carry out their scheme to sell more drugs through inflated AWPs.  This element here is easily satisfied by use of proof of transmission of false AWPs to publishers, Medicare, Medicaid and to those in the reimbursement chain.  *See also Lupron*, 295 F. Supp. 2d at 171.  Whatever the evidence shows about the way that Defendants carried out their scheme – whether by mail and wires or, as Judge Stearns noted, with bicycle messengers – that proof will be common to all Class members.  Thus, all three of the elements of mail and wire fraud will be proven with evidence that is common to all Class members, and common issues predominate over individual issues.

---

was wholly false, or false because of an incomplete depiction of the truth, they are actionable under the mail and wire fraud statutes."  *Lupron*, 295 F. Supp. 2d at 167-68.

### 4. Plaintiffs' and Class members' injuries that resulted from Defendants' mail and wire fraud can be calculated using evidence that is common to all Class members

To prove their RICO claim, Plaintiffs must also show that they were injured, and that Defendants' mail and wire fraud was the proximate cause of the injury. *Libertad v. Welch*, 53 F.3d at 436; *Holmes*, 503 U.S. at 266 n.11. Plaintiffs will prove both injury and proximate cause with evidence that is common to all members of the Class.

First, the record evidence adduced to date shows that the injury to Class members in the form of the payment of higher prices was not only foreseeable, but also the intended consequence of Defendants' scheme.[67] Second, Plaintiffs have proffered the testimony of Dr. Hartman, who has analyzed the record developed thus far in this case and opines that, based on standard economic principles and analysis, it is possible and appropriate to prove causation and damages with evidence common to the Class. His Declaration analyzes in detail various ways to determine causation and damages on a Class-wide basis. Hartman Decl., ¶ 11(e) and Section IV, ¶¶ 20-38; and Attachment E.

### a. Proximate cause can be proven with evidence that is common to all Class members

"RICO requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Lupron*, 295 F. Supp. 2d at 174-75 (quoting *Holmes*, 503 U.S. at 268). A proximate cause need only be a substantial cause of a succession of events that in a logical sequence ultimately causes a plaintiff injury. *In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 206 (D. Mass. 2004); *Massachusetts Superior Court Civil Jury Instructions*, § 2.1.8 (1998); *see also Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris, Inc.*, 29 F. Supp. 2d 801, 822 (N.D. Ohio 1998) (evidence showed that damages to third party medical payers was natural and foreseeable under RICO); *In re American Honda Motor Co., Dealerships Realtors Litig.*, 941 F. Supp. 528 (D. Md. 1996) ("If plaintiffs have alleged a

---

[67] *See* factual discussion *supra* at III D; Hartman Decl., Attachment E; *see also* AMCC, ¶ 400.

sufficiently direct injury resulting from [defendants'] bribery scheme, they have satisfied
proximate causation requirement, difficulties of quantification and allocation notwithstanding.).
As the *Lupron* Court held when it rejected the proximate cause arguments that Defendants made
in their motion to dismiss:  "Here it was Defendants who instigated both the culpable and the
innocent intermediaries [*i.e.*, *Red Book* and some of the physicians] to commit acts that were not
only foreseeable but intended."  *Lupron*, 295 F. Supp. 2d at 175.[68]

Dr. Hartman agrees with this conclusion and explains that Defendants' AWP inflation
was the primary cause that led to Plaintiffs' and the Class's injuries.  In this regard, Dr. Hartman
concludes that a course of conduct designed to artificially inflate the AWP of a given drug will
inflate the reimbursement rates for all or substantially all Class members.  Hartman Decl., ¶¶ 10-
11; 36(c)-38; Tables 2 & 3.

The evidence that Plaintiffs can and will use to prove causation is common to all Class
members.  For example, Plaintiffs will use published AWPs and pricing data that Defendants
produced to Plaintiffs to show that the AWPs created by Defendants were inflated and that Class
members paid for drugs based on the inflated AWPs.  Hartman Decl., ¶ 11; Attachment D, ¶ 3.
Dr. Hartman states:  ██████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████  Hartman Decl., ¶ 24.  Thus, Defendants' activities injured all
Class members.  *Id.*  All of this causation evidence involves proof that is common to all of the
Class members. The evidence raises no issues of individual fact or law. Therefore, common
issues regarding causation predominate over any individual issues.

---

[68] *See also* Ex. 101 (observing that "private insurers" and "out of pocket payors" were ████████
████████████ as a result of an increase in AWP).

      **b.**     **Dr. Hartman has proposed standard, formulaic methodologies that use Defendants' pricing data to calculate Class members' injuries or appropriate equitable relief**

Dr. Hartman has identified standard formulaic methodologies – each of which uses data that is common to all Class members – that can be used to calculate the monetary relief (in both law and equity) sufficient to compensate Class members for the fraud committed by Defendants. Hartman Decl., ¶ 11(g), Section IV, ¶¶ 20-36. All of these methodologies are "standard formulaic methodologies" that have been used regularly in many other cases. These methodologies are based on a review of Defendants' data and discovery produced to date. Hartman Decl., ¶ 11(c). Such analysis is preliminary in nature but is sufficient to show these methodologies exist to calculate damages here. Hartman Decl., ¶ 11.

The methodology that Dr. Hartman uses is a "but for analysis." Hartman Decl., ¶¶ 21-33. This methodology, which is a standard approach in economic analysis, determines what the AWP would have been if "unaffected by a fraudulent pricing scheme." Hartman Decl., ¶ 20-24. This establishes causation on a class-wide basis. As the court held in *Humana*, "Plaintiffs need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis." *Humana*, 2004 U.S. App. Lexis 18494, at *40 (citing *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 698 (S.D. Fla. 2004)).[69] Plaintiffs have met their burden here by virtue of Dr. Hartman's analysis. Dr. Hartman can then calculate aggregate damages to the Class. *Id.*, ¶ 25. Alternatively, he can use the same analysis to calculate the unlawful spread on a drug-by-drug basis, leaving it up to Class members to show in an administrative claims process that they had a transaction in that drug based on AWP. Hartman Decl., ¶¶ 25-27, 38; Tables 2 & 3.

More specifically, the damages can be determined as follows. First, Dr. Hartman can calculate the aggregate damages or drug-specific damages to all Class members, using formulaic

---

[69] In *Terazosin*, the court found Dr. Hartman's analysis to provide a reasonable basis for concluding that class-wide injury could be shown on a class-wide basis. 220 F.R.D. at 699.

methodologies and evidence common to all Class members.  Hartman Decl., ¶ 38.  Dr. Hartman

can also calculate damages on an NDC-by-NDC basis for any quarter in the Class by drug and

by Class member or groups of Class members.  Hartman Decl., ¶ 34, Table 2, and ¶ 38.  He has

also demonstrated how aggregate damages can be calculated per drug.  Hartman Decl., ¶ 37;

Table 3.[70]  Based on this model, Plaintiffs will ask the jury to award that sum as a judgment

against Defendants.  After the judgment is entered and the jury discharged, the parties will

establish an administrative claims process to allocate the judgment amount among the Class

members.  *See* Plaintiffs' Trial Plan, Appendix C.  Thus, individual damages will be determined

in the administrative claims process, as they are in every class action.

 As demonstrated, each of Dr. Hartman's proposed methodologies uses data common to

all Class members; no individual issues are implicated.  Therefore, common issues relating to

damages predominate over individual issues.[71]

  **5. Even if individual causation issues were present, certification of the RICO claim is appropriate**

 As demonstrated above, Dr. Hartman can prove causation and damages using economic

models.  Plaintiffs anticipate that Defendants will claim that he cannot do so, but such an

argument will not defeat class certification.

 As Judge Posner recently wrote in *Carnegie v. Household Int'l, Inc.*, 2004 U.S. App.

Lexis 14635 (7th Cir. 2004), where the Seventh Circuit affirmed certification of a RICO class:

> ***The separation of liability and injury issues is illustrated by the suggestion in Moore v. PaineWebber, Inc., 306 F.3d 1247, 1255-56 (2d Cir. 2002), that in a suit charging "uniform misrepresentations" the question whether they were indeed misrepresentations would be appropriate for class treatment***, with

---

[70] Calculating Aggregate Damages for BMS' Vepesid at $158,161,666 and Schering's Theophylline 200 mg at $11,861,834.

[71] The only individual issue that may arise is the allocation of the aggregate amount of Class recovery to individual Class members.  That is an issue in *every* case, and courts unanimously have held that it is not an impediment to class certification.  *Humana*, 2004 U.S. App. Lexis 18494, at *39-43; *In re American Honda Motor Co., Dealerships Realtors Litig.*, 941 F. Supp. at 544.

the question of reliance, and damages suffered, by individual class members left for satellite proceedings. *See also In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283 (3d Cir. 1998).

* * *

The question whether RICO was violated can be separated from the question whether particular intended victims were injured, and thus can – or so a district court could determine without being thought to have abused its discretion – be resolved in a single proceeding with the issue of injury parceled out to satellite proceedings, as is frequently done in class action tort litigation, *see*, *e.g.*, *Exxon Co. v. Sofec, Inc.*, 54 F.3d 570, 575-76 (9th Cir. 1995); *In re Bendectin Litigation*, 857 F.2d 290, 308-13 (6th Cir. 1988).

*Id.*, at *14-16 (citations omitted) (emphasis added).[72]

Judge Posner held that even if causation is individualized, certification of the RICO claim is still appropriate because questions as to whether RICO was violated "can be separated from the question of whether particular intended victims were injured …." *Id.*, at *10. Individual issues of injury can be "parceled out to satellite proceedings, as if frequently done in class action tort litigation." *Id.* This procedure could also be utilized here, but need not be given Dr. Hartman's ability to demonstrate causation and damages on a Class-wide basis.

### 6.     Common questions predominate over individual questions in connection with Plaintiffs' state law claims

Judge Stearns has held in *Lupron* that "[m]ail and wire fraud, the predicate acts underlying plaintiffs' RICO claims, are by definition unfair and deceptive acts. If Plaintiffs are able to prove any one or more of their RICO claims, their ability to satisfy the elements of a consumer protection act claim under any of the referenced statutes will follow almost as a matter of course." *Lupron*, 295 F. Supp. 2d at 181. Plaintiffs have explained above how they will prove their RICO claims with evidence that is common to all Class members, and their ability to

---

[72] *See also* Fed. R. Civ. P. 23(c)(4); *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001); *Robinson v. Metro North Commuter R.R.*, 267 F.3d 147, 168-69 (2d Cir. 2001).

- 36 -

prove their consumer protection claims on a Class-wide basis "will follow almost as a matter of course."

Even putting aside the relationship between Plaintiffs' RICO claims and their consumer protection claims, Plaintiffs will prove each and every element of their consumer protection claims with evidence that is the same for every member of the Class.  As is demonstrated in greater detail below, every state has adopted a consumer protection statute that prohibits unfair and deceptive practices.  These statutes are predominantly modeled after Section Five of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(l), and/or related models developed by the FTC and the Commissioners on Uniform State Laws.  Plaintiffs seek certification of claims under the consumer protection statutes of Defendants' domiciles or, in the alternative, of all fifty states.  These statutes are similar enough to withstand any argument by Defendants that different consumer protection statutes raise different legal issues.  *See*, *e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022-23 (9th Cir. 1998) (holding that in the context of nationwide class claims "the idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims").

Common issues relating to proof of Defendants' violation of consumer protection statutes and the law of civil conspiracy predominate over any individual issues.  Plaintiffs will prove that Defendants acted unfairly or deceptively by showing, among other things, how Defendants fictionalized the published AWP of the AWPIDs, and how Defendants offered chargebacks, rebates and other incentives to reduce the real acquisition price while maintaining the inflated AWP without disclosing it to consumers.  All of these unfair and deceptive acts affected all Class members the same way:  the acts forced them to pay or reimburse more for AWPIDs than they would have had to pay absent Defendants' deceptive misconduct.  *See* Hartman Decl., ¶¶ 21-39. They also will show that they and all Class members were injured as a result of Defendants' deceptive acts.  *See* above.  Thus, Plaintiffs satisfy the predominance requirement of Rule 23(b)(3) as to the State law claims.

**7.    The Court should apply each Defendant's home state Consumer Protection Law to all Class members, because each state has "The Most Significant Relationship" to the state law claims of all Class members under Massachusetts' choice of law rules**

Defendants will no doubt argue that, to adjudicate Plaintiffs' state law consumer protection and conspiracy claims, the Court would have to engage in a complicated analysis of the consumer protection laws of each of the fifty states, which would create individual issues that predominate over the issues common to all Class members.  Defendants are mistaken. Massachusetts' choice of law rules favor application of the consumer protection law of a single state:  the state of each Defendant's principal place of business.  Each home state is the center of gravity for the pricing and marketing decisions for the drugs at issue, and many courts have applied the law of a Defendant's home state to the claims of all class members nationwide when the wrongful conduct emanated from the Defendant's headquarters.[73]

**a.    Massachusetts' "functional approach" governs the choice of law inquiry**

This Court can apply the choice of law rules of the forum state, Massachusetts, to determine whose law governs the claims of the proposed Class.  *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).  Massachusetts' choice of law rule is a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole."  *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985).

Massachusetts' functional approach involves "assessing various choice-influencing considerations, including those provided in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971), and those suggested by various commentators" (*Cosme v. Whitin Mach. Works*, 417 Mass. 643, 646 (1994) (internal quotation marks, citations omitted)), to determine whose law bears the most "significant relationship" to the claims and issues presented.  *Id.* at 646 & n.3,

---

[73]  *See, e.g., In re Bendectin Litig.*, 857 F.2d 290, 303-05 (6th Cir. 1988) (approving district court's choice of law from the state of manufacturer); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. at 251-52; *In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig.*, 2004 U.S. Dist. Lexis 7789, at *15-16 (D. Minn. Apr. 28, 2004); *Randle v. Spectran*, 129 F.R.D. 386, 393 (D. Mass. 1988).

- 38 -

647; *see*, *e.g.*, *Tingley Sys., Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95, 114-15 (D. Mass. 2001) (undertaking "most significant relationship" analysis, and finding Massachusetts, where defendant was located and engaged in alleged misconduct, most significantly related to the claims); *Stathis v. National Car Rental Sys.*, 109 F. Supp. 2d 55, 56-58 (D. Mass. 2000) (conducting Massachusetts' "most significant relationship" test in tort action, and applying Maine law); *Romani v. Cramer, Inc.*, 992 F. Supp. 74, 76-79 (D. Mass. 1998) (applying Massachusetts' functional approach, and finding Connecticut law to have more significant relationship to plaintiff's claim).

> **b.     The applicable factors of RESTATEMENT Section 145 favor applying home state law to the Class claims**

Massachusetts courts rely on Section 145 of the RESTATEMENT (SECOND) CONFLICT OF LAWS (the "RESTATEMENT") for the general principles courts consider in applying the functional choice of law approach to the tort claims here.  *E.g.*, *Cosme*, 417 Mass. at 646.  The factors comprising Section 145 are:  (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.  *Id.* & n.3; RESTATEMENT § 145(2).  Section 145 disclaims any intent that these factors be rigidly or dogmatically applied:  "These contacts are to be evaluated according to their relative importance with respect to the particular issue." RESTATEMENT § 145(2); *Cosme*, 417 Mass. at 647 & n.3 (quoting the RESTATEMENT).

The most relevant factors, the place where the conduct causing the injury, and where the relationship of the parties is centered ((b) and (d) above, respectively), strongly support the application of each of the home state's law to the proposed Class' consumer protection claims. Each of the Defendants engaged in their home state's illegal conduct upon which Plaintiffs and Class members base their claims.  For example, New Jersey is the place where Schering Group maintains its world headquarters.  The base of operations for their illegal activities – including

- 39 -

marketing and pricing decisions – is New Jersey.  *See Cosme*, 417 Mass. at 649 (Massachusetts

has dominant interest in applying its law, where the defendant resided in Massachusetts and

engaged in the conduct giving rise to plaintiff's injury in Massachusetts); *cf. Rice v. Dow Chem.*

*Co.*, 124 Wn.2d 205, 214, 875 P.2d 1213 (Wash. 1994) (refusing to apply forum law where

Washington was ***not*** asserted to be the state of defendant's main headquarters or incorporation,

or the place the product was designed and tested, or the place product labeling was designed).

The same analysis applies to each of the Defendants.  Under this analysis, the consumer

protection and conspiracy counts would be subclassed by each Defendant's home state.[74]

       **c.**     **The applicable factors of RESTATEMENT Section 6 favor applying home state law to the Class claims**

Section 6 of the RESTATEMENT also demonstrates that home state law should be

applicable here.  *See Cosme*, 417 Mass. at 647 (RESTATEMENT § 145 "require[s] an examination

of the relevant issue in accordance with the principles provided in § 6 of the RESTATEMENT");

*Dunfey v. Roger Williams Univ.*, 824 F. Supp. 18, 20 (D. Mass. 1993) (applying § 188 and § 6 in

contract-based dispute).  Section 6, incorporated by reference into RESTATEMENT Sections 145

and 188, sets forth a fundamental cannon of choice of law analysis:  the goal of achieving

"certainty, predictability, and uniformity of result."  RESTATEMENT §§ 6(2)(f), 145, 188.

Applying home state law here best facilitates certain, predictable, and uniform resolution

of the claims asserted in this litigation.  Indeed, the Defendants' own interests in certainty,

predictability and uniformity are best served by applying the law of their home state, where they

chose to center their operations, and is the nexus for the misconduct underlying this lawsuit.

Additionally, Defendants have every reason to expect that home state law, where they maintain

their headquarters and principal places of business, governs their conduct.  *See* RESTATEMENT

§ 6(d) (courts may consider "the protection of justified expectations" in resolving choice of law

---

[74] Each Subclass would consist of all members of the general Class who purchased an
AWPID from a given Defendant and would be based on the consumer protection law of that
state.

issues).  Moreover, applying home state law facilitates class certification, thereby ensuring a certain and uniform result for all Plaintiffs and Class members.

Additional factors set forth in RESTATEMENT § 6 also militate in favor of applying home state law.  These include "the relevant policies of other interested states and the relative interests of those states," and the "ease in the determination and application of the law to be applied." RESTATEMENT § 6(c), (g).  It is a fundamental policy of every state to protect its citizens from the wrongdoing alleged in the operative AMCC.  But a state's generalized interest in protecting its citizens is insufficient to outweigh another state's superior interest – such as that of each home state here – in regulating the conduct of resident defendants whose actions affect others both within and outside that state's border.  *Romani*, 992 F. Supp. at 79.  This approach was also adopted by the Court in *In re Bendectin Litig.*, 857 F.2d at 303-05, where the court approved use of the defendants' home state law as a more logical result than the law of plaintiff's domicile which may be transitory:

> We, however, see the law of the state of manufacture of the product as being more significant in this type of case than that of the state where an individual plaintiff happens to live.  Merrell Dow manufactured and distributed a uniform drug internationally. The company issued a uniform set of warnings and instructions for use.  The regulations governing the labeling, research, and distribution of the drug were governed either by Ohio law or by the federal Food, Drug and Cosmetic Act.  Standards against which defendant's wrongful or negligent conduct may be measured are also set by Ohio and federal law.

The *Bendectin* logic applies here where each home state has a significant interest in regulating corporate acts that originate in its state.

## 8. Even if multiple state laws are applied, common issues of law and fact predominate, notwithstanding minor variations in state law

The fact that there may be some variations in the applicable state law is not an insurmountable obstacle to class certification.  Instead, as this court has recognized, class certification is appropriate unless variations in state law "swamp" common issues.  *Mowbray v.*

- 41 -

*Waste Mgmt. Holdings, Inc.*, 189 F.R.D. at 199.[75]  As in *Mowbray v. Waste Mgmt. Holdings*, the Court need not address the issue because there is no significant conflict relative to the state law specified in Counts IV (consumer protection) and IX (conspiracy).  *Id.* at 199-201.

All jurisdictions recognize the tort of civil conspiracy, and the elements of the cause of action in each state substantially overlap and, in a majority of instances, are nearly identical.  The common core elements of a civil conspiracy are (i) an agreement between two or more co-conspirators, (ii) to accomplish an unlawful act or to accomplish a lawful act in an unlawful manner, (iii) such that injury results.  *See, e.g., Queeno v. Cote*, 1999 Mass. Super. Lexis 506, at *8 (Mass. Sup. Ct. 1999); *Stetser v. TAP Pharm. Prods., Inc.*, 2004 N.C. App. Lexis 1200, at *30-34 (N.C. Ct. App. 2004).[76]  Although some states require that an overt act be committed or that the co-conspirators intended to cause injury, *see, e.g.*, *Stetser*, 2004 N.C. App. Lexis 1200, at *31-34, such nuances in approach are not material for purposes of this litigation, because Plaintiffs allege the existence of both overt acts in furtherance of the scheme and intent to injure. Consequently, Plaintiffs' civil conspiracy claim will not present material state law variations that serve to "swamp" common issues.  *Mowbray*, 189 F.R.D. at 199.

Likewise, all jurisdictions recognize the basic prohibition against deceptive practices such that they share a common core, as reflected in the comprehensive survey set forth in Appendix B.  Indeed, as Judge Stearns recognized in *Lupron*, "[i]f plaintiffs are able to prove any one or more of their RICO claims, their ability to satisfy the elements of a consumer protection act claim under any of the referenced statutes will follow almost as a matter of

---

[75] In fact, courts often defer choice of law determinations at the class certification stage.  *See Synthroid*, 188 F.R.D. at 302; *Garner v. Healy*, 184 F.R.D. 598, 605 & n.8 (N.D. Ill. 1999); *see also Lobo Exploration Co. v. Amoco Prod. Co.*, 991 P.2d 1048, 1051 (Okla. Ct. App. 1999) ("*Shutts* contains no language requiring resolution of conflict of laws questions prior to certifying a class.  To the contrary, the Supreme Court remanded the case without disturbing its class action status."); *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 80 (D. Md. 1991).

[76] The salient elements of civil conspiracy in each state are set forth in Appendix A.

course." 295 F Supp. 2d at 181.[77]  In this regard the Ninth Circuit in *Hanlon* concluded that the

laws of the several states were not "sufficiently anomalous to deny class certification."  *Hanlon*,

150 F.3d at 1022.  They were not even sufficiently anomalous to warrant the creation of

subclasses.  *Id.* at 1021.  As the court found:

> In this case, although some class members may possess slightly
> differing remedies based on state statute or common law, the
> actions asserted by the class representatives are not sufficiently
> anomalous to deny class certification.  On the contrary, to the
> extent distinct remedies exist, they are local variants of a generally
> homogenous collection of causes which include products liability,
> breaches of express and implied warranties, and "lemon laws."
> Individual claims based on personal injury or wrongful death were
> excluded from the class.  Thus, the idiosyncratic differences
> between state consumer protection laws are not sufficiently
> substantive to predominate over the shared claims.  [*Id.* at 1022-
> 23.]

Numerous other courts have also recognized that differences in state law can be

appropriately managed when the core facts are common to the class.  *See*, *e.g.*, *Bussie v.*

*Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 71 (D. Mass. 1999) ("Potential choice of law issues do

not preclude a predominance finding …. [A]ny variations of law that might have applied to

certain of the plaintiffs' state law claims would neither compromise the capacity of counsel to

prosecute the claims on behalf of the Class or defeat the predominance required by Rule

23(b)(3)."); *Duhaime*, 177 F.R.D. at 64 ("Insofar as the class members assert claims for fraud or

misrepresentation under various state laws, the differences among these laws do not appear to be

so great as to undermine the predominance of the common questions of law or fact.").[78]  The

Court need not find complete uniformity of state law, only that there are no material conflicts

---

[77] The court was referencing the consumer acts in New York, Florida, Virginia, Missouri, South Dakota, Montana, California, Pennsylvania, Nebraska, Louisiana, Tennessee, Connecticut and New Jersey.  *Id.* at 181 n.35.

[78] *See also In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986); *Shaw v. Toshiba Am. Info. Sys.*, 91 F. Supp. 2d 942, 956-57 (E.D. Tex. 2000); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. at 525; *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 290 (S.D. Ohio 1997); *Deadwyler v. Volkswagen of Am., Inc.,* 1986 U.S. Dist. Lexis 28449 (W.D.N.C. 1986).

among the laws so that they can be divided into a small number of sub-groups.  *See Simon v. Phillip Morris*, 124 F. Supp. 2d 46, 77 (E.D.N.Y. 2000).  Accordingly, common issues of law and fact remain the predominant focus of this litigation, notwithstanding the potential application of multiple states' laws."[79]

Alternatively, if the Court concludes that variations in state law require subclasses, those are easily created.  *See*, *e.g.*, *Krell v. Prudential Ins. Co. of Am.*, 148 F.3d 283, 315 (3d Cir. 1998) ("Courts have expressed a willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit.")  Essentially, all of the deceptive trade practice statutes have similar substantive provisions that fall into the following four groups:

(1)     States that broadly prohibit any "unfair or deceptive act or practice," either with no further specificity or with an "including but not limited to" laundry list of specific practices that are prohibited;

(2)     States that limit claims to a laundry list of specific practices including representing that the product has qualities, uses, or benefits that it in fact does not;[80]

(3)     States that have adopted either (1) or (2), but have added a scienter requirement, *e.g.*, that the defendant "knowingly" engage in the deceptive practice;[81] and

_____

[79] In contrast to cases such as *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012 (7th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003), Plaintiffs here do not seek redress for an allegedly defective product, *i.e.*, Plaintiffs do not suggest that the AWPIDs are defective or unsafe.  Instead, this litigation focuses exclusively on whether end-payors were overcharged as a result of Defendants' AWP inflation scheme.  Causes of action arising from such violations are far more amenable to class treatment than claims arising from a defective product.  *See, e.g., Cardizem CD*, 200 F.R.D. at 337; *compare Bridgestone/Firestone*, 288 F.3d 1012 (defective automobile tires); *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) (cigarettes as defective product).  Therefore, authorities rejecting multi-state certification have no bearing here.

[80] The states that fall into these first two categories are:  Alabama, Arkansas, Alaska, California, Connecticut, Colorado, Delaware, District of Columbia, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia and Wisconsin.  *See* Appendix B.

- 44 -

(4)     States that have adopted either (1) or (2), but have added an individual reliance requirement.[82]

It is not necessary to create subclasses for those members residing in states that (i) broadly prohibit unfair and deceptive practices or (ii) prohibit a list of specific practices, because Plaintiffs' allegations establish violations of both general types of statutes.  However, the Court may wish to create three subclasses by segregating the class members who must prove scienter or reliance.  These subclasses would be defined as follows:  (i) those jurisdictions that require a showing of scienter without more (Arkansas, Colorado, Kansas, Nevada, Oklahoma, Oregon, South Dakota, and Utah); (ii) those jurisdictions that require a showing of scienter and proof of individual reliance (Indiana and Wyoming); and (iii) those jurisdictions that require a showing of individual reliance but not scienter (Arizona and Georgia).[83]

In sum, as with Plaintiffs' civil conspiracy count, Plaintiffs' consumer fraud claims will not present material state law variations that serve to "swamp" common issues.  *Mowbray*, 189 F.R.D. at 199.

**C.     A Class Action Is Superior to the Adjudication of Hundreds or Thousands of Separate Individual Cases**

        **a.     A class action is superior to thousands of lawsuits or no lawsuits for small claimants**

The superiority analysis of Rule 23(b) requires that the Court examine whether the class action is superior to other methods of adjudication.  Fed. R. Civ. P. 23(b)(3).  "This provision is intended to permit class actions that would 'achieve economies of time, effort and expense, and

---

[81]   These states are Arkansas, Colorado, Indiana, Kansas, Nevada, Oklahoma, Oregon, South Dakota, Utah, and Wyoming.  *See* Appendix B.  Note, however, that in Arkansas, Kansas, Oklahoma, Oregon and Utah, scienter is required for only some of the claims under the statute at issue.

[82]   These states are Arizona, Georgia, Indiana, and Wyoming.  *See* Appendix B.

[83]   Defendants may point out that the quantum of damages awardable under state consumer protection acts may vary somewhat from state to state, but such differences go to damages calculations and therefore do not defeat certification.  *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. at 251.

- 45 -

promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"  *Duhaime*, 177 F.R.D. at 65 (quoting *Amchem*, 521 U.S. at 615).  As the *Duhaime* court recognized, there are four factors a court must consider in assessing whether a class action is superior to individual litigation:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

177 F.R.D. at 65 (citing Fed. R. Civ. P. 23(b)).  All of these factors favor Class treatment in this case.

Nearly all of the Part B Class members in this case – particularly the millions of older Medicare Part B patients afflicted with cancer or other serious diseases who paid for part of their prescriptions – have claims that are so small that it would cost them much more to litigate an individual case than they could ever hope to recover in damages.[84]  Similarly, the thousands of Taft Hartley Funds in the Class do not have the resources to devote to presentation of this case on an individual basis.[85]  Therefore, the Class members' interest in individually controlling the prosecution of separate actions is low.  *See Grace v. Perception Tech. Corp.*, 128 F.R.D. 165, 171 (D. Mass. 1989) ("the benefits to the large number of class members, many of whose claims are so small that their size does not provide the impetus to bring individual actions, clearly outweigh any problems which may arise in the management of the class action") (quoting *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303 (D. Mass. 1987)).  As the Supreme Court has recognized, "[c]lass actions also may permit the plaintiffs to pool claims which would be uneconomical to litigate individually. . . . [M]ost of the plaintiffs would have no realistic day in court if a class action were not available."  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809

---

[84] *See, e.g.*, Affidavit of Vermont Public Research Group, ¶ 8.

[85] *See, e.g.*, Ecklund Aff., ¶ 9, Steinberg Aff., ¶ 9; Ryan Aff., ¶¶ 8-9; Brecht Aff., ¶ 8..

(1985).  The very size of the class favors class certification:  "[T]he more claimants there are, the more likely a class action is to yield substantial economics in litigation."  *Carnegie*, 2004 U.S. App. Lexis 14635, at *9.  And although there are certainly Third-Party Payors who are large, many are not and could not afford the burden of litigating against the well-financed pharmaceutical industry.  *See Humana*, 2004 U.S. App. Lexis 18494, at *74 (this is especially true when the defendants are corporate behemoths with a demonstrated willingness and proclivity for … burying their opponents in paperwork and filings).[86]

The second and third superiority factors (*i.e.*, the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class, and the desirability or undesirability of concentrating the litigation of the claims in the particular forum) also militate in favor of class certification.  Numerous class action lawsuits based on the same facts at issue here have been filed against Defendants.  Through the MDL process, many of those cases were transferred to this Court and are part of this consolidated litigation.  That the Judicial Panel on Multidistrict Litigation chose this Court to be the transferee court is one indication that having a single case – as opposed to multiple cases – makes sense.  Concentrating the litigation in this forum is also logical for other reasons.  First, through handling a great deal of jurisdictional briefing and Defendants' serial motions to dismiss, this Court has become familiar with the factual and legal issues.  *George Lussier Enters.*, 2001 U.S. Dist. Lexis 12054, at *20 ("[G]iven the court's familiarity with the legal issues raised by this case, it is desirable to concentrate the litigation of plaintiffs' claims in this court.").  *Humana*, 2004 U.S. App. Lexis 18494, at *75-76.  Second, the only alternative to a class action would be hundreds or thousands of individual lawsuits.  Third, prosecuting the same claims against the same Defendants based on the same standard sales and marketing practices in multiple individual lawsuits "would be

---

[86] The Court can certainly observe the deep pockets and extensive filings by defendants in this case.  These same defendants have issued subpoenas to squadrons of third parties and class members and are using multiple law firms and lawyers to cover these depositions.  Few plaintiffs could afford to litigate against these corporate heavyweights.

- 47 -

grossly inefficient as the parties, witnesses, and courts would be forced to endure duplicative litigation." *Id.*, at *19. Moreover, "[i]ndividual litigation would be costly, time consuming, and could potentially result in inconsistent judgments." *Id.*; *see also Carnegie*, 2004 U.S. App. Lexis 14635, at *9-10, *Humana*, 2004 U.S. App. Lexis 18494, at *80.

> ### b.    The Class is manageable and its size favors certification

The final superiority factor – manageability – focuses on the "practical problems that may render the class action format inappropriate for a particular suit." *Eisen*, 417 U.S. at 164. The question is whether multiple individual lawsuits would be more manageable than a class action. *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 962 F. Supp. at 524-25. Refusal to certify a class solely on grounds of manageability is disfavored and "should be the exception rather than the rule." *Visa Check/MasterMoney*, 280 F.3d at 140 (citing cases on this point); *see also In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 356 (E.D. Pa. 1976) ("denial of class certification because of suspected manageability problems is disfavored"). Here, Plaintiffs cannot foresee any manageability problems. As the Seventh Circuit recently held the "more claimants there are, the more likely a class action is to yield substantial economies in litigation." *Carnegie*, 2004 U.S. App. Lexis 14635, at *9. *Humana*, 2004 U.S. App. Lexis 18494, at *80 (resolution in single class action would greatly foster judicial efficiency and avoid unnecessary, repetitious litigation).

Further, a class action in this case is clearly superior to multiple individual lawsuits, many of which would not even be economically feasible. Neither the parties nor the judicial system would benefit from redundant litigation in these matters. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 U.S. Dist. Lexis 16658, at *15 (N.D. Ill. Nov. 18, 1994) ("we fail to see the logic in defendants' contention that 50,000 individual actions are less complex than a single class action"); *Humana*, 2004 U.S. App. Lexis 18494, at *80-85. Class treatment of Plaintiffs' claims is the best and most efficient way to litigate these matters against Defendants. Recently, Circuit Judge Lynch also observed that "class certification prerequisites

- 48 -

should be construed in light of the underlying objectives of class actions," and made the observation that the "core purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation." *Smilow*, 323 F.3d at 41.  Moreover, "[t]he public at large likewise will benefit from a class action and expeditious adjudication of the issues involved, since class actions reinforce the regulatory scheme by providing an additional deterrent beyond that afforded either by public enforcement or by single-party private enforcement."  *In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 733 (N.D. Ill. 1977) (citations and quotations omitted).

### c.     The Class case can be tried in an efficient manner

*Waste Mgmt. Holdings v. Mowbray* instructs that, in making its Rule 23 analysis, the court must make some production as to how the specific issues will play out in order to determine if the required proofs are susceptible to common proof or must be individual in nature. 208 F.3d at 298.  The foregoing discussion demonstrates the existence of common proofs.  In addition, Plaintiffs submit in Appendix C a proposed Trial Plan that demonstrates that the issues are capable of resolution based upon common proof.[87]

### V.     CONCLUSION

This Court should certify the proposed Class because Plaintiffs have demonstrated that they have satisfied all of the elements of Rule 23(a).  The Class members are too numerous to make joinder practicable (23(a)(1)); there are many factual and legal issues common to all members of the Class (23(a)(2)); the Class Representatives' claims are typical of those of the absent Class members because their claims arise from the same course of conduct that gives rise to the claims of the other Class members (23(a)(3)); and the Plaintiffs are adequate representatives because they have no conflicts with the other Class members and because their counsel are experienced class action lawyers (23(a)(4)).  In addition, Rule 23(b) is satisfied because common issues predominate over individual issues.  Plaintiffs have shown that they can

---

[87] The issues of trial plan are also addressed in the Hartman Decl., ¶¶ 37-38, Attachment E.

prove each of the elements of their RICO and consumer protection claims with evidence that is common to all Class members, and a class action is more efficient and economical than hundreds of repetitive individual lawsuits.  The class action mechanism is not only the best and most efficient way to adjudicate the Class members' claims in this case, it is also the only viable method of doing so.

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion to certify the Class pursuant to Fed. R. Civ. P. 23(b)(3).

DATED:  September 3, 2004   By_____

        Thomas M. Sobol (BBO#471770)
        Edward Notargiacomo (BBO#567636)
        Hagens Berman LLP
        One Main Street, 4th Floor
        Cambridge, MA  02142
        Telephone: (617) 482-3700
        Facsimile: (617) 482-3003
        **LIAISON COUNSEL**

        Steve W. Berman
        Sean R. Matt
        Robert Gaudet
        Hagens Berman LLP
        1301 Fifth Avenue, Suite 2900
        Seattle, WA  98101
        Telephone: (206) 623-7292
        Facsimile: (206) 623-0594

        Eugene A. Spector
        Jeffrey Kodroff
        Spector, Roseman & Kodroff, P.C.
        1818 Market Street, Suite 2500
        Philadelphia, PA  19103
        Telephone: (215) 496-0300
        Facsimile: (215) 496-6611

Samuel Heins
Heins, Mills & Olson, P.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone: (612) 338-4605
Facsimile: (612) 338-4692
**CHAIRS OF LEAD COUNSEL
COMMITTEE**

Marc H. Edelson
Allen Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Elizabeth A. Fegan
The Wexler Firm
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
**MEMBERS OF LEAD COUNSEL
COMMITTEE AND EXECUTIVE
COMMITTEE**

1534.16 0107 BSC.DOC

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **[REDACTED VERSION] PLAINTIFFS' MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on July 14, 2005, a copy to Verilaw Technologies for Posting and notification to all parties

By **/s/ Steve W. Berman**

Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
(206) 623-7292