1

```
1        THE UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF MASSACHUSETTS

          MDL DOCKET NO. 01CV12257-PBS

3

4     * * * * * * * * * * * * * * * * * * * * * * * * * * * *

      IN RE:  PHARMACEUTICAL

5     INDUSTRY AVERAGE WHOLESALE

6     PRICE LITIGATION

      * * * * * * * * * * * * * * * * * * * * * * * * * * *

7     THIS DOCUMENT RELATES TO:

8     ALL ACTIONS

      * * * * * * * * * * * * * * * * * * * * * * * * * * *

9            C O N F I D E N T I A L

10               VOLUME: I

11    DEPOSITION of RAYMOND S. HARTMAN, Ph.D., a

      witness called on behalf of the Defendants

12    pursuant to the Federal Rules of Civil

13    Procedure, before Judith McGovern

14    Williams, Certified Shorthand Reporter,

15    Registered Professional Reporter,

16    Certified Realtime Reporter, and Notary

17    Public in and for the Commonwealth of

18    Massachusetts, at the offices of Ropes &

19    Gray, One International Place, Boston,

20    Massachusetts  02110, on Thursday,

21    October 7, 2004, commencing at 10:16 a.m.

22
```

2

1    APPEARANCES:

2

3    HAGENS BERMAN L.L.P.

4      Thomas M. Sobol, Esquire

5      One Main Street, 4th Floor

6      Cambridge, Massachusetts   02142

7      617-482-3700

8      tom@hagens-berman.com

9      on behalf of the Plaintiffs

10

11   HOGAN & HARTSON L.L.P.

12     Steven M. Edwards, Esquire

13     Hoa T.T. Hoang, Esquire

14     875 Third Avenue

15     New York, New York   10022

16     212-918-3506

17     smedwards@hhlaw.com

18     htthoang@hhlaw.com

19     on behalf of the Defendant

20     Bristol-Myers Squibb

21

22

9

1                    P R O C E E D I N G S

2                          -  -  -

3                RAYMOND S. HARTMAN, first having

4       been duly sworn, testified as follows in

5       answer to direct examination by

6       MR. EDWARDS:

7                          -  -  -

8    Q.   State your name, please.

9    A.   Raymond S. Hartman.

10   Q.   What is your address?

11   A.   My business address is Greylock McKinnon

12        Associates, One Memorial Drive, Cambridge,

13        Mass.  02142.

14   Q.   What is your home address?

15   A.   52 Greylock Road, Newton, Massachusetts

16        02465.

17   Q.   And by whom are you employed?

18   A.   I am self-employed, but I work with

19        Greylock McKinnon Associates and with a

20        variety of other firms.

21   Q.   Who owns Greylock McKinnon & Associates?

22   A.   I do.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

1   Q.   Anybody else?

2   A.   No.

3   Q.   What have you been retained to do in this

4        case?

5   A.   I was retained by counsel to the

6        plaintiffs of the class in this case to

7        review the Complaint and the allegations

8        and to render an opinion if those

9        allegations were to be true whether there

10       would have been causation and impact,

11       classwide impact, injury, and damages, and

12       whether the extent of those damages could

13       be measured by standard formulaic

14       methodologies used by economists.

15  Q.   Is that the extent of your retention in

16       connection with this case?

17  A.   I would say broadly speaking that to date

18       has been what I have been asked to do.  I

19       may be asked to do other things.

20  Q.   Do you have any idea what you may be asked

21       to do?

22  A.   No.

123

1    disagree with that, if that's what you are

2    going to turn to.

3            The -- I haven't read closely

4    enough his opinions as to how it differs,

5    the extent to which it differs, but it is

6    going to differ across classes of trade.

7    I am -- I am taking the average of those

8    averages across classes of trade.  I am

9    taking an average for all units sold,

10   which summarizes again the average of the

11   averages, and I'm relating the -- I am

12   taking that as a measure of a real

13   transaction price, and estimating a WAC --

14   a -- I am sorry -- a but-for ASP related

15   to that.  And so the application, there is

16   not to be multiple AWPs.  There is going

17   to be an AWP as a signal for the average

18   ASP, and then we know that ASPs will vary

19   among classes of trade.

20  Q.   Your basic approach, as I understand it,

21   is to compare actual spreads to but-for

22   spreads to determine whether there was

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 7, 2004
AM Session                              Boston, MA

124

1          injury?  Is that correct?

2     A.   The -- briefly put, that is correct.

3     Q.   And injury is another way of saying

4          causation?  Is that correct?

5     A.   Causation and impact are classwide.

6          Injury is the result of that impact or

7          causation.

8     Q.   Two sides of the same coin?

9     A.   Well, I -- it's --

10    Q.   If there is no causation, you wouldn't

11         have injury?  Right?

12    A.   Well, if there is no allegations of any

13         kind of violations and there was no

14         illegality, you would have no impact or no

15         injury.  So I agree with that.

16    Q.   Now the but-for spread in your analysis

17         would be the difference between ASP and

18         the but-for AWP?  Is that correct?

19    A.   The measure of the but-for spread would be

20         based upon the -- a relationship to ASP,

21         as -- as expected, reasonably expected, by

22         the information available.  If we're

Raymond S. Hartman, Ph.D.  Confidential - Attorneys' Eyes Only      October 7, 2004
AM Session                          Boston, MA

125

1          talking about efficient markets the --

2          what information was available to people

3          generally, the -- it was -- the -- that is

4          the relationship for the but-for spread,

5          the but-for relationship, between AWP and

6          ASP.

7      Q.  And the way you calculate the but-for

8          spread is you develop what you call an

9          expectation yardstick and you apply that

10         to the ASP to arrive at a but-for AWP?  Is

11         that fair?

12     A.  In the illustrative presentation in my

13         declaration, that is true.  In the actual

14         damage analysis, I will do more to

15         quantify what -- what the but-for spread

16         is for drugs or for these drug

17         manufacturers during that period of time

18         not subject to the allegations or for

19         drugs and manufacturers during the class

20         period not subject to the allegations and

21         any other studies that are available.

22     Q.  And I believe you testified a moment ago

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                          Boston, MA

126

```
1         that the ASP that you use in your

2         formulaic methodology is an ASP that cuts

3         across customer classes?

4    A.   For the purposes of what I have done here

5         in this illustration, it is, yes.  It is

6         the ASP over all.

7    Q.   And that is not a proper way to do it, is

8         it?

9                   MR. SOBOL:  Objection to the

10        form.

11   Q.   I mean don't you have doubts about

12        applying that methodology?

13   A.   No.

14   Q.   In other words, what you are saying is if

15        a pharmacy is paying $20 and a hospital is

16        paying $10, then you would calculate an

17        ASP of $15 even though the class members

18        are purchasing drugs from pharmacies, not

19        hospitals?  Is that what you're doing

20        here?

21   A.   Could you repeat the question?

22                   (The pending question was then
```

Henderson Legal / Spherion
(202) 220-4158

173

```
1                    AFTERNOON SESSION

2

3              (RAYMOND S. HARTMAN, Resumed.)

4              DIRECT EXAMINATION, Continued

5

6       BY MR. EDWARDS:

7    Q.  Before we left off we were talking about

8         your methodology, and I believe in your

9         declaration you state that you intend to

10        calculate but-for spreads by using

11        yardsticks based on market expectations?

12   A.  Based on market results that prevailed and

13        informed consumer expectations, third-party

14        payer expectations absent the A to BP scheme

15        during periods of time for drugs that were

16        not subject to that.

17   Q.  You have calculated yardsticks for market

18        expectations?  Better way of putting it.

19   A.  Are you asking whether I have or whether I

20        will?

21   Q.  Well, I thought you had already done it.

22   A.  Well, I've done some illustrative versions
```

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

174

1      of the kinds of information that one would

2      use, but I wouldn't say those are the final

3      yardsticks.  As I've said explicitly

4      therein, that they would need to be refined

5      through 30(b)(6) depositions and talking to

6      the people, a variety of people to help

7      clarify what those expectations were.

8   Q.  Are you saying that it's doubtful that

9      you'll use any of these yardsticks at trial?

10  A.  It's there -- they appear in my declaration.

11     They may be the final yardsticks that I do

12     rely on, but I'm certainly going to refine

13     them as best I can with whatever discovery

14     materials become available.

15  Q.  And your yardstick spreads reflect industry

16     expectations regarding price ratios and

17     relationships absent operation of the AWP

18     scheme; is that correct?

19  A.  They will.

20          (Discussion off the record.)

21  Q.  Why don't you take a look at Paragraph 21 of

22     your declaration.

Henderson Legal / Spherion
(202) 220-4158

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

175

1                    (Witness reviews document.)

2                         MR. EDWARDS:  Will the person who

3              just got on the phone identify themselves,

4              please?

5                         MR. PALERMO:  Yeah.  It's Chris

6              Palermo for Defendant Day.

7                         MR. EDWARDS:  Okay.

8        A.    I've looked at that paragraph.

9        Q.    As I understand it, you intend to develop

10             these yardsticks by using survey information

11             and by comparing AWPs and ASPs for drugs

12             unaffected by the scheme; is that correct?

13             Or the alleged scheme, I should say.

14       A.    I'm going to be using that and other --

15             whatever other information helps me inform

16             my yardsticks.

17       Q.    Well, are there other devices that you're

18             presently aware of that you intend to use

19             for this purpose?

20       A.    Other devices?  I'm not quite sure I

21             understand what you mean by that.

22       Q.    Well, other methods.  I mean, you've

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only     October 7, 2004
PM Session                              Boston, MA

176

1       mentioned two things in your declaration,

2       survey information --

3  A.  Uh-huh.

4  Q.  -- and comparisons, drugs affected by the

5       scheme to drugs not affected by the

6       scheme --

7  A.  Right.

8  Q.  -- correct?

9  A.  Right.

10  Q.  Is there anything else that you've thought

11      of at this point?

12  A.  I mention in Paragraph 29, in the bottom

13      paragraph of Page 21, as I've introduced the

14      notion of the yardsticks and discussed what

15      I have put together to date for this

16      illustration, I say, ."Of course, finally

17      yardstick spreads to be used to determine

18      injury and damages during the damages phase

19      would take these yardsticks as points of

20      departure and refine them through 30(b)(6)

21      depositions regarding the date provided by

22      drug manufacturers and appropriate

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 7, 2004
PM Session                          Boston, MA

177

1       personnel, third-party payers."

2              So I plan to do my own survey work to

3       the extent that I can and my own discovery

4       work with people whose expectations we're

5       talking about.

6   Q.  Well, have you identified at this point any

7       drugs that were not affected by the alleged

8       scheme?

9   A.  The alleged scheme and the class period

10      begin in 1991, so any drugs prior to that

11      period would be candidates for an

12      examination.  As to particular manufacturers

13      that are not listed, I've yet to really look

14      closely on who those manufacturers might be

15      and what the drugs may be, but I plan to do

16      that.

17  Q.  So the answer to my question is no, you have

18      not identified any drugs or manufacturers

19      unaffected by the alleged scheme?

20  A.  No.  My answer is yes.  I said all of the

21      manufacturers here prior to the time of the

22      alleged scheme, the class period beginning

178

1        January '91 I will look at the defendants'

2        data to the extent that it's available in

3        the '80s.

4    Q.  And so if that data shows that spreads prior

5        to 1991, in fact, were larger than spreads

6        after 1991, then there has been no impact?

7    A.  I have -- I've got to look at all the

8        information that is available to me and draw

9        my conclusions of what the appropriate

10       yardsticks will be.

11   Q.  I take it what you're saying is that you

12       don't think you'll be able to identify any

13       comparables for the class period?

14   A.  That's not true.

15   Q.  Okay.

16   A.  I haven't tried yet.

17   Q.  Is it the case that the drugs you would use

18       for that sort of a comparison, a comparison

19       within the class period, would have to be

20       drugs manufactured by companies other than

21       the defendants in this case?

22   A.  The selection of the manufacturers and the

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

179

1          selections of the drugs will be based on

2          evidence that I have -- I assume is

3          forthcoming as to the scheme itself and how

4          the scheme was implemented and which I've

5          been asked to accept those allegations.  And

6          so that it is my understanding there's going

7          to be evidence about which drugs and which

8          manufacturers from whence I can make some

9          judgment of whether there are some

10         manufacturers or there are some drugs for

11         the manufacturers that are listed here that

12         may not have been subject to that -- to the

13         scheme.

14    Q.   Well, would the comparable drugs that we're

15         talking about have to be drugs that are

16         subject to patent protection and do not

17         compete with drugs that are part of the

18         alleged scheme?

19    A.   You will notice that I've identified

20         yardsticks for single-source branded drugs.

21         I have identified yardsticks for multi-

22         source branded drugs and for physician

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only   October 7, 2004
PM Session                                   Boston, MA

180

1     administered drugs and for generic drugs and

2     so that whatever specific drugs I can find

3     that will help inform the survey information

4     that -- substantial survey information

5     that's already done would be looking at

6     drugs that would fit into those categories

7     and face the kinds of competition that

8     patented -- you're asking about patented

9     drugs -- that patented therapeutic

10    substitutes would face within a particular

11    type of disease management regime.

12  Q.  Yeah, but I'm talking about for the period

13    of time, that is, the class period of this

14    case --

15  A.  Uh-huh.

16  Q.  -- and I'm talking about drugs that you say

17    would be unaffected by the alleged scheme --

18  A.  That I would say --

19  Q.  -- that you say you would use as a basis for

20    developing yardsticks.  Are you with me so

21    far?

22  A.  It's not that I would say, that it would be

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 8, 2004
Volume II                          Boston, MA

411

1   Q.    The first Complaint was filed I think in

2         around October 2001.

3                   (Pause.)

4                   (The witness viewing Hartman

5         Exhibit No. 002.)

6   A.    Looking for data of one of the fast track

7         defendants' drugs in table 3A, Vepesid,

8         conditioned on the types of issues that we

9         talked about yesterday about identifying

10        the portion that was sold to hospitals,

11        et cetera, it is still the case that the

12        spreads were well above the yardstick

13        spreads through the end of 2002, and so I

14        would look to the spreads.   They're

15        relative to quarter 2 of 2000, quarter 1

16        -- quarter 3 of 2001, they have declined

17        some.   On average, they have declined some

18        from '98 and '99.   But they have by no

19        means achieved a level that would say that

20        the -- that these overcharges on this

21        inflation has been squeezed out of the

22        system.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

412

1   Q.   Do you plan to use post Complaint spreads

2        as a benchmark in this case?

3   A.   I would not think so.

4   Q.   Why not?

5   A.   Because the filing of the Complaint -- I

6        have seen -- if I see evidence the filing

7        of the Complaint led to a dissipation or

8        elimination of the AWP inflation scheme

9        that may qualify my answer, but I have

10       seen no evidence to that to date nor have

11       I been directed by counsel to make any

12       such assumption.

13  Q.   Well, if the spreads during the class

14       period were the same as the spreads during

15       a nonfraudulent benchmark period, what

16       conclusion would you draw from that?

17  A.   If the spreads were the same during --

18       from 1991, say, through 2000, relative to

19       1984 through 1990, if they were the same,

20       I would draw a conclusion that the scheme,

21       while impacting the AWPs, had little or no

22       -- caused little or no economic injury.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                    October 8, 2004
Volume II                              Boston, MA

413

1    Q.   Are you saying that you are only going to

2         use the period prior to the class period

3         for benchmarking purposes?

4              MR. SOBOL:   Objection.

5    Q.   You are not going to use the period after

6         the class period?

7              MR. SOBOL:   Objection.  Asked

8         and answered.

9    A.   I have been directed by counsel in

10        paragraph 6 to assume -- the three class

11        periods are so identified.

12             I am sorry.  Did I say three

13        class periods?

14             The three classes are so

15        identified.  And the class period is

16        identified as January 1991 to the present.

17        And that's what I'm -- that's what I'm

18        taking.

19   Q.   So it is your testimony as an economist

20        that the fraud continued even after the

21        Complaint was filed?

22             MR. SOBOL:   Objection.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

500

1       from the sticker price is, well, it must

2       be close to $18,000.  In that case, it is

3       a sucker price.  It is not a sticker

4       price.  And what is happening here is you

5       need to know that information.

6            And what I am saying is these

7       people don't know that information.  If

8       they did know that information, and if I

9       knew that information negotiating a price,

10      I would be able to use it to get a better

11      reduction off of AWP for the drugs.

12           When I am filling out the

13      percentage -- when I am filling in this

14      client proposal here, and I know what the

15      ASP is, I'm going to say, "13 percent?

16      Give me a break.  I want 60 percent off of

17      that AWP."

18           MR. SOBOL:  May the record

19      reflect the exhibit you were referring to.

20           THE WITNESS:  I was referring to

21      page 2067 of the ESI Pharmacy Benefit

22      Program Pricing Proposal for client X date

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                        Boston, MA

501

1        X, Bates numbered range ESI 27700002066 to

2        2077.

3        BY MR. EDWARDS:

4   Q.   You say that one of the things that you're

5        going to do is you're going to compare

6        discounts below AWP that were negotiated

7        during time periods that were affected by

8        the alleged fraud with discounts below AWP

9        that were negotiated during time periods

10       not affected by the alleged fraud?  Fair?

11              MR. SOBOL:  Objection.  Asked

12       and answered.

13  A.   It is unfair.  I'm going to compare

14       relationships between AWP and ASP, which

15       is a sum of all price offsets prior to the

16       alleged fraud and compare those that

17       actually occurred during the fraud to

18       those that either occurred prior to or

19       occurred during the period of the alleged

20       scheme but were drugs manufactured by

21       nondefendants or were drugs manufactured

22       by defendants that lawyers -- that counsel

502

```
 1           indicates to me were not subject to the

 2           scheme.

 3    Q.     You say you are going to compare what

 4           happened during periods affected by the

 5           alleged fraud to what happened during

 6           periods that were not affected by the

 7           alleged fraud?

 8    A.     I'm --

 9    Q.     Is that fair?

10    A.     What is fair to say is I'm going to

11           compare spreads and what happened to

12           pricing during the periods of alleged

13           fraud to yardsticks for what would have

14           happened during the alleged fraudulent

15           period absent the AWP scheme.

16    Q.     And what would your conclusion be if in

17           comparing those two time periods you came

18           across a particular drug for which the AWP

19           was identical and the discount below AWP

20           in the contract was identical?

21    A.     So you are -- to understand the question

22           right now, the -- as I have looked at --
```

503

```
 1        and we're talking about contracts.  I'm

 2        not sure which contract we are talking

 3        about.  PBM contracts with third-party

 4        payers?

 5    Q.  We can talk about PBM contracts.  Just to

 6        simplify it, period A is the fraud period.

 7        Period B is the nonfraud period.  And

 8        let's say we have got an AWP for a

 9        particular drug of $100.

10    A.  And when you say AWP for a particular

11        drug, you mean an NDC for that drug?

12    Q.  Sure.  An NDC for that drug with a

13        reported AWP of $100 and in both cases the

14        contract with the PBM calls for

15        reimbursement at AWP minus 15 percent.

16        What conclusion would you draw from that

17        scenario?

18    A.  So to be, perfectly understand what you're

19        asking, I'm looking at an actual spread,

20        and from -- and that -- and in that actual

21        spread involves both an AWP and an ASP,

22        and I go to my yardstick, which is a
```

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                   Boston, MA

504

1       relationship of the but-for AWP to that

2       ASP, both the same ASP, for that NDC of

3       that manufacturer, and so that the but-for

4       is from period B; the actual is from

5       period A, as you are saying the fraud, the

6       subject of the fraud; and for that

7       particular NDC, do we want to say in a

8       particular year, in a particular quarter,

9       or for the --

10              Two things.  If it turns out

11      that the AWP is not inflated relative to

12      what the but-for relationship should be,

13      then the impact, the injury, and the

14      damages -- not the impact -- the injury

15      and damages flowing from the scheme for

16      that NDC for that -- for that contract

17      would be zero.

18              However, I have seen -- the

19      second important point is I have not seen

20      -- I certainly haven't looked at all the

21      contracts, but I have seen no contract to

22      date where the AWP in the spread is broken

505

1    out by NDC.  It is just an aggregate over

2    everything and all types of drugs, and I

3    would need to take into account that fact.

4    I mean your hypothetical is not -- is

5    counter to the evidence to the way

6    contracts are written.

7  Q.  Do you have any understanding of the

8    extent to which RFPs are used in

9    connection with the negotiation of

10   contracts between payers and PBMs?

11  A.  I would assume that they -- if -- if they

12   weren't used, they should be used.

13  Q.  And if they are used, does that have any

14   impact on your opinion?

15          MR. SOBOL:  Objection.

16  A.  We're talking about events that have

17   occurred over the past 15 years that have

18   led to my conclusion about the

19   corroboration of the allegations, and all

20   of those negotiations in my understanding

21   were subject to RFP -- well, a lot of them

22   were subject to RFPs.  Certainly large