**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE:  PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL NO. 1456<br><br>CIVIL ACTION: 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS | ) ) ) ) ) | Judge Patti B. Saris |

**GLAXOSMITHKLINE'S MOTION FOR**
**PROTECTIVE ORDER TO PROHIBIT THE DEPOSITIONS**
**OF ATTORNEYS URSULA BARTELS AND ADRIANNA CARTER**

Pursuant to Fed. R. Civ. P. 26(c)(2) and Case Management Order No. 10, defendant

SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK") hereby respectfully moves

for a protective order prohibiting the depositions of Ursula Bartels, Esq., former Vice President

and Associate General Counsel of SmithKline Beecham ("SKB"), and Adrianna Carter, Esq.,

Vice President and Associate General Counsel of GSK.  Deposing opposing counsel is an

extreme measure permitted by the courts only when necessary, and only to the extent the

information sought is not privileged.  Plaintiffs cannot meet the heavy burden of showing there is

no other way to obtain the information they purport to need from Ms. Bartels and Ms. Carter or

that the information they seek from these attorneys is crucial to their case.  Plaintiffs have known

of and received extensive discovery on the subject of the "General Counsel" correspondence

giving rise to their purported "need" to depose Ms. Bartels and Ms. Carter since the filing of

their Master Consolidated Class Action Complaint in September 2002.  At this advanced stage of

the case, the only information plaintiffs could possibly hope to obtain from Ms. Bartels and Ms.

Carter is information protected by the attorney-client privilege and the work product doctrine

that they are not entitled to in any event.

Given that plaintiffs have had abundant opportunity to obtain non-privileged facts about the issues they wish to examine with Ms. Bartels and Ms. Carter through their receipt of key documents and examination of witnesses, this Court should issue a protective order prohibiting the depositions of Ms. Bartels and Ms. Carter.  Permitting plaintiffs to depose Ms. Bartels and Ms. Carter inevitably will lead to costly and burdensome additional litigation concerning what is and is not privileged, and unnecessarily will disrupt and delay proceedings in this case.

## RELEVANT BACKGROUND

On February 6, 1995, Timothy Proctor, then Senior Vice President and General Counsel of Glaxo, Inc. ("Glaxo"), wrote to J. Charles Wakerley, Esq., then Senior Vice President and General Counsel to SKB, relaying Glaxo's intention to file a complaint with the FDA Division of Drug, Marketing, Advertising and Communications ("DDMAC") and other government agencies about what Glaxo perceived to be the improper advertising and marketing of Kytril Injection.[1] See Ex. A.  Among other things, Mr. Proctor advised Mr. Wakerley that Glaxo sales representatives had reported that SKB sales representatives were allegedly promoting Kytril using "homemade" materials that allegedly included unsubstantiated Kytril vs. Zofran cost comparisons, cost effectiveness claims and references to how entities could increase their "profits" from Medicare by utilizing Kytril.  Mr. Proctor provided Mr. Wakerley with copies of the "homemade" materials Glaxo had collected, and invited a dialogue with SKB to resolve the concerns raised in the letter.

Ms. Bartels, then Vice President and Associate General Counsel of SKB, responded to Mr. Proctor's letter, through communications primarily with Ms. Carter, then Assistant General Counsel of Glaxo.  See Ex. B.  On February 7, 1995, to confirm a conversation with Ms. Carter,

---

[1] Prior to the 2000 merger between Glaxo Wellcome ("GW") and SmithKline Beecham ("SKB") that formed GSK, GW and its predecessor, Glaxo, Inc., sold Zofran and SKB sold Kytril.  In connection with the merger, GSK divested Kytril.

Ms. Bartels wrote a letter to Ms. Carter indicating that, in connection with the "homemade" materials identified by Mr. Proctor, SKB wished to know (1) the location where these materials were allegedly left, (2) the name of the healthcare professional to whom they were allegedly delivered, (3) the date when the materials were delivered or retrieved, and (4) the name of the SKB representatives involved, if known. Id. In a subsequent letter to Mr. Proctor, dated February 22, 1995, Ms. Bartels reiterated her request for further information about the alleged SKB "homemade" promotional materials, and called Mr. Proctor's attention to an example of a "homemade" cost comparison document that SKB representatives alleged Glaxo representatives had distributed to physicians. See Ex. C, at p. 2.

On April 25, 1995, Ms. Carter responded to Ms. Bartels in writing, asking for further information from Ms. Bartels about the allegedly "homemade" Glaxo cost comparison piece, including "the place and date when the material was left, along with the and [sic] name of the individual who allegedly left the piece." See Ex. D, at p. 2. Ms. Carter also provided, where available, the name of the city where each SKB promotional piece attached to Mr. Proctor's initial letter was discovered and, to the extent known, the name of the SKB representative responsible for leaving the materials behind, and she identified several more allegedly "homemade" SKB promotional materials. Id. After further communications, on or about July 24, 1995, Ms. Bartels confirmed in a letter to Ms. Carter that the matters at issue had been resolved. See Ex. E, at p. 2.

Plaintiffs obtained copies of this correspondence (and the attachments thereto) between Glaxo and SKB before they filed their first complaint in this case, and immediately made it a focal point of their allegations against GSK. See, e.g., Master Consolidated Class Action Complaint, ¶¶ 283-87. Through discovery, they obtained several copies of alleged "homemade"

3

promotional materials on Zofran and Kytril, internal non-privileged memoranda about those

materials, and testimony from GSK personnel on those materials and on the subject of marketing

the so-called reimbursement spread. After almost two years of discovery, plaintiffs first noticed

the deposition of Ms. Carter for July 14, 2004. See Ex. F (Letter from Thomas M. Sobol, Esq. to

Mark D. Seltzer, Esq., with Notice of Deposition, dated June 22, 2004). GSK promptly objected,

and put plaintiffs on notice of their ability and obligation to obtain non-privileged information on

these matters from other sources before taking a deposition of in-house counsel that would

jeopardize GSK's entitlement to the protection of the attorney-client and work product

privileges. See Ex. G (Letter from Mark Seltzer, Esq. to Thomas M. Sobol, Esq., dated June 29,

2004). Plaintiffs withdrew their request but nevertheless renewed their notice of the depositions

of Ms. Carter and Ms. Bartels on February 9, 2005. GSK again objected and plaintiffs again

withdrew their request. Over the course of these exchanges, GSK made available and plaintiffs

deposed numerous additional witnesses about alleged "homemade" promotional materials and

policies against marketing the reimbursement spread.[2]

On July 12, 2005, plaintiffs once again "re-noticed" the depositions of Ms. Carter and

Ms. Bartels, claiming they still need to explore the background and content of the letters between

Glaxo and SKB concerning the alleged "homemade" promotional materials that were attached to

certain of the letters. Specifically, plaintiffs wish to know:

- Who prepared, reviewed and received each of these letters;

- Where did the documents and information contained in or
  attached to each of the letters come from;

- Who spoke to whom;

_____

[2] Among many others, plaintiffs have deposed the former Vice President of Operations at Glaxo, and various Zofran
Product Directors, Senior Product Managers and Associate Product Managers, all of whom were examined, or could
have been examined, about the potential existence of "homemade" promotional materials in the field and policies
against the use of such materials and marketing the reimbursement spread during the time period in question.

- What other communications were made surrounding these letters and what was the purpose of the surrounding communications;

- What was the basis for each company's position that the others' conduct was improper;

- What did the companies learn concerning the accuracy of each others' allegations; and

- What steps did each company take, if any, to prevent the improper conduct from recurring.

See Ex. H (Renotice of Deposition of Former GSK Employees, dated July 12, 2005); Ex. I, at p. 2 (Letter from David Nalven, Esq. to Thomas H. Lee II, Esq., Mark D. Seltzer, Esq. and Seth B. Kosto, Esq., dated July 12, 2005). They also would examine Ms. Bartels and Ms. Carter on their "consideration and communication of company policies against spread marketing." Id., at p. 3.

Plaintiffs have refused to withdraw their request for the depositions of Ms. Bartels and Ms. Carter. Accordingly, GSK now moves for a protective order preventing the depositions from going forward.

## ARGUMENT

Under Fed. R. Civ. P. 26(c), a party from whom discovery is sought may move the court, upon "good cause shown" for a protective order to prevent "annoyance, embarrassment, oppression, or undue burden or expense, including . . . (1) that the disclosure or discovery not be had . . . [and] (4) that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters." The "mere request to depose an opposing counsel constitutes 'good cause' for obtaining a protective order, 'unless the party seeking the deposition can show both the propriety and need for the deposition.'" Dunkin' Donuts, Inc. v. Mandorico, Inc., 181 F.R.D. 208, 210 (D.P.R. 1998) (internal citations omitted). While a protective order to prohibit the taking of a deposition altogether does not issue "absent extraordinary circumstances .

. . 'a request to take the deposition of a party's attorney . . . constitutes a circumstance justifying departure from the normal rule.'" Id. (internal citation omitted). Federal courts "have not looked with favor upon attempts to depose opposing counsel," and "have held that deposing an opponent's attorney is a drastic measure and is frequently improper." Id. at 209.

Plaintiffs bear the burden of demonstrating that the depositions of Ms. Bartels and Ms. Carter are proper and necessary. Id. at 210. The deposition of opposing counsel is warranted only where the party seeking it shows that:

> (1) no other means exist to obtain the information than to depose opposing counsel;
>
> (2) the information sought is relevant and non-privileged; and
>
> (3) the information is crucial to the preparation of the case.

Id. (citing Shelton v. American Motors Corp., 805 F.2d 1323, 1327 (8th Cir. 1986)). Since plaintiffs cannot show that there have been no other means to obtain the information they seek than to depose Ms. Bartels and Ms. Carter, and since much of the information that Ms. Bartels and Ms. Carter possess is privileged or otherwise not "crucial" to plaintiffs' case, this Court should grant GSK's motion for a protective order.

## A. The Depositions Of Ms. Bartels And Ms. Carter Are Not Warranted Because The Plaintiffs Have Obtained The Non-Privileged Information They Seek From Other Sources.

Plaintiffs do not need to depose Ms. Bartels and Ms. Carter because they have had ample opportunity to obtain the information they seek through other means. Over the course of this litigation, and particularly over the course of the past year, plaintiffs have served comprehensive interrogatories and requests for admissions, received and reviewed hundreds of thousands of pages of documents, including non-privileged internal memoranda and other documents on the specific subject of alleged Zofran and Kytril "homemade" materials, how those materials were

6

collected and identified, and actions to be taken in response.  Plaintiffs also have taken dozens of

depositions of Glaxo and SKB personnel, including those who have given testimony on the

alleged "homemade" promotional materials Ms. Bartels and Ms. Carter referred to in the

correspondence, and the companies' policies against marketing the spread.[3]  Since they now

know, or should know, all the relevant, non-privileged information there is to know on these

subjects, plaintiffs should not be permitted to depose Ms. Bartels and Ms. Carter.  See, e.g.,

Bogosian v. Woloohojian Realty Corp., 323 F.3d 55, 67 (1st Cir. 2003).  In Bogosian, the First

Circuit affirmed the district court's decision to quash plaintiff's subpoena against opposing

counsel where, after a prolonged period of discovery, plaintiff "made no showing that she was

unable to obtain the evidence from other sources," the testimony she sought "could have been

obtained from any number of witnesses other than [opposing counsel]" and would have been

"cumulative, since [plaintiff] herself had adduced other evidence" on the issue.  Id.

   The Dunkin' Donuts case also is instructive on this point.  There, the defendant, who

alleged the plaintiff had wrongfully terminated his franchise agreement, filed a motion to compel

the deposition of opposing counsel on the view that he would "know best" the reasons for the

termination.  181 F.R.D. at 211.  In response, the plaintiff sought a protective order under Rule

26(c) to prevent the deposition.  Id.  The court granted the plaintiff's motion and issued an order

prohibiting the deposition, finding that while opposing counsel may have possessed the

information sought, "deposing him is not the only practical means available of obtaining this

information."  Id. at 212.  Applying the widely-followed test set forth in Shelton, 805 F.2d at

1327, the court required the defendant to depose other executives likely to know why the

---

[3] As recently as July 26, 2005, plaintiffs' counsel questioned Ken Marshall, a Zofran Product Manager from mid-1992 to mid-1995, who communicated regularly with sales representatives about developments in the field, at length about the circumstances surrounding the identification of the alleged "homemade" promotional materials attached to the February 6 letter from Mr. Proctor to Mr. Wakerley, and internal non-privileged memoranda commenting on a draft of the letter to SKB concerning those materials.  See, e.g., Ex. J (Deposition of Ken Marshall, 7/26/05), at 136:18 – 140:7.

defendant was terminated, and to utilize other methods of discovery such as written

interrogatories and requests for admissions.  Id.  Many other courts have reached similar

conclusions.  See, e.g., Epling v. UCB Films, 204 F.R.D. 691, 695 (D. Kan. 2001) (prohibiting

deposition of opposing in-house counsel and ordering plaintiff to use other discovery methods;

non-privileged information from conferences in which counsel participated could be obtained

from other individuals who were present); Massachusetts Mut. Life Ins. v. Cerf, 177 F.R.D. 472,

481 (N.D. Cal. 1998) (prohibiting deposition of predecessor counsel who did not possess "any

relevant non-privileged information that cannot be acquired from other sources"); N.F.A. Corp.

v. Riverview Narrow Fabrics, Inc., 117 F.R.D. 83, 86 (M.D.N.C. 1987) (prohibiting deposition

of opposing counsel; defendant failed to explain "why the deposition of plaintiff's president

concerning the matter would not be sufficient").

   The depositions plaintiffs seek are superfluous and unwarranted because plaintiffs

already have the correspondence, with the attachments thereto, and other non-privileged

documents bearing on the issues that they apparently wish to further explore with Ms. Bartels

and Ms. Carter.  See, e.g., Stalling v. Union Pac. R.R. Co., 2004 U.S. Dist. LEXIS 863, *6-9

(N.D. Ill. Jan. 23, 2004) (quashing deposition of opposing counsel where plaintiffs' intent was to

"explore further" issues available in materials already produced by the defendant);

Massachusetts Mut. Life Ins., 177 F.R.D. at 481 (prohibiting deposition of attorney where

plaintiff insurer already had relevant information pertaining to attorney's communications with

its claims representatives); Doubleday v. Ruh, 149 F.R.D. 601, 613-14 (E.D. Cal. 1993)

(disallowing deposition of district attorney where the prosecutorial file was "not only a good

alternate means, but may also be more complete and accurate").  As they appear to concede,

plaintiffs have obtained non-privileged information on these issues from other witnesses,

observing that "several employees of GSK and its predecessors have testified adamantly that each of the predecessor companies had a strict policy against sales staff engaging in spread marketing," and citing the testimony of the former Vice President for Commercial Operations at Glaxo, who stated, "I emphatically ensured that it was enforced, or at least we had a policy to ensure that it was enforced." See Ex. I, at p. 3.

Plaintiffs' insistence that they now must depose Ms. Bartels and Ms. Carter indicates that what they seek from these attorneys is privileged information they have not been able to obtain from other sources and that they are not entitled to in any event. See Ex. I, at p. 3 ("GSK witnesses have been directed not to testify concerning any directions provided by [Ms. Bartels and Ms. Carter] or any communications with them"). It is noteworthy that plaintiffs have had several opportunities to "fully explore those matters upon which they wished to inquire of defendant's counsel with the witnesses they did depose. It is certainly not too much to expect the plaintiffs to make a reasonable effort to seek information from the sources they chose to pursue." Boughton v. Cotter Corp., 65 F.3d 823, 830-31 (10th Cir. 1995) (affirming decision by district court to issue a protective order prohibiting deposition of opposing counsel). Plaintiffs should have taken advantage of the countless opportunities they have had to explore the non-privileged facts surrounding these subjects, and the letters between Ms. Bartels and Ms. Carter themselves, with the many witnesses they have deposed to date.

Plaintiffs' assertion that "the appropriate course is to proceed with the depositions and address questions of privilege as they arise," Ex. I, at p. 4, is impractical and if accepted, would lead to great disruption and burdensome delays. See, e.g., N.F.A. Corp., 117 F.R.D. at 84-85 ("In addition to disrupting the adversarial system, [depositions of attorneys] have a tendency to lower the standards of the profession, unduly add to the costs and time spent in litigation,

personally burden the attorney in question, and create a chilling effect between the attorney and client."). Thus, to the extent plaintiffs seek non-privileged information from Ms. Bartels and Ms. Carter about the alleged "homemade" promotional materials referenced in the correspondence between Glaxo and SKB, and policies adopted and enforced by Glaxo and SKB on legally permissible marketing practices, it is clear they already should have obtained that information using other discovery methods and the depositions they have taken to date. Since the plaintiffs have not availed themselves of other mechanisms for obtaining the non-privileged information that they seek from Ms. Bartels and Ms. Carter, the depositions should be prohibited.

**B.     Much Of What Plaintiffs Seek From The Depositions Of Ms. Bartels and Ms. Carter Is Protected From Disclosure By The Attorney-Client Privilege And The Work Product Doctrine.**

The areas that plaintiffs would explore during the depositions of Ms. Bartels and Ms. Carter implicate, in large part, attorney-client communications which are absolutely privileged, or attorney work product that plaintiffs are not entitled to discover without a showing of extreme hardship. See Fed. R. Civ. P. 26. For example, plaintiffs specifically will ask about discussions between Ms. Carter and Ms. Bartels and their respective clients, including "where did the documents and information contained in or attached to each of the letters come from," "who spoke to whom," "what other communications were made surrounding these letters" and "what was the purpose of the surrounding communications," and "what did the companies learn concerning the accuracy of each others' allegations." Ex. I, at p. 2. Plaintiffs also would specifically seek to discover the attorneys' mental impressions, including "what was the basis for each company's position," and "what steps did each company take, if any, to prevent improper conduct from recurring." Id.

These requests, while purporting to seek business facts, in fact attempt to discover communications between Ms. Carter and Glaxo personnel, and between Ms. Bartels and SKB

personnel, that are protected by the attorney-client privilege. See Dunkin' Donuts, 181 F.R.D. at 212 (attorney was not a "fact witness who should be deposed"); see also Sparton Corp. v. United States, 44 Fed. Cl. 557, 564 (Fed. Cl. 1999) (deposing government attorney about "his rationale" for relying upon certain materials in preparing to negotiate a settlement and his "communications with government employees and contractors" would "inappropriately compromise the privacy within which the government expects to develop its legal theories and strategy"). It is clear that in performing this work, Ms. Bartels and Ms. Carter were acting as attorneys gathering facts for the purpose of providing legal advice, not as business advisors. See, e.g., Epling, 204 F.R.D. at 693 (issuing protective order prohibiting deposition of in-house counsel operating in his capacity as an attorney); Caterpillar, Inc. v. Friedemann, 164 F.R.D. 76, 78 (D. Or. 1995) (issuing protective order prohibiting deposition of in-house counsel for the defendant who had gathered information concerning plaintiff's consultation with a business adversary of the defendant). They obtained the information plaintiffs now seek while investigating claims that their clients had allegedly engaged in certain sales and marketing practices that had the potential of exposing SKB and Glaxo to possible sanctions, and for the purpose of providing legal advice to their clients concerning legally permissible marketing practices. Ms. Carter's communications with Glaxo personnel, and Ms. Bartels' communications with SKB personnel, are not discoverable.[4]

The mental impressions, conclusions, opinions and legal theories of Ms. Carter and Ms. Bartels on these matters are also protected from examination by the plaintiffs. Plaintiffs' claim that the work product doctrine "protects only those activities undertaken 'because of actual or

---

[4] While plaintiffs state that "particular scrutiny" applies when it is in-house counsel that asserts the attorney-client privilege, Ex. I, at p. 2, the case they cite in support of this position, Borase v. M/A Com, Inc., 171 F.R.D. 10 (D. Mass. 1997), says nothing of the sort. In that case, this Court simply reaffirmed that "the attorney client privilege attaches only when the attorney acts in that capacity" and "does not apply when in-house counsel is engaged in non-legal work." Id. at 14 (internal citations omitted). Nevertheless, this Court observed in Borase that even "client communications intended to keep the attorney apprised of business matters may be privileged if they embody 'an implied request for legal advice based thereon.'" Id. (internal citation omitted).

impending litigation,'" Ex. I, at p. 2, misconstrues the law of this Court and the First Circuit.  In

one case they cite, In re Lernout & Hauspie Securities Lit., 222 F.R.D. 29 (D. Mass. 2004), this

Court stated that to meet the applicable standard, "litigation need not be imminent . . . as long as

the primary motivating purpose behind the creation of the document was to aid in possible future

litigation." Id. at 36 (quoting In re Grand Jury Subpoena, 220 F.R.D. 130, 148 (D. Mass. 2004)

(internal citation omitted)).  In the other case they cite, State of Maine v. United States Dept. of

the Interior, 298 F.3d 60 (1st Cir. 2003), the First Circuit expressly defined protected work

product to include documents that "can fairly be said to have been prepared or obtained because

of the prospect of litigation," including "documents which, although prepared because of

expected litigation, are intended to inform a business decision influenced by the prospects of

litigation." Id. at 68 (quoting United States v. Adlman, 134 F.3d 1194, 1197-1202 (2d Cir.

1998)).  It is evident from the correspondence between Ms. Carter and Ms. Bartels that they

conducted their investigations and formed mental impressions and opinions concerning the use

of alleged "homemade" promotional materials not in the ordinary course of business, but because

of the prospect of litigation and potential liability and to inform their clients' business decisions

on marketing so as to avoid future litigation or potential liability.  The underlying work product

of Ms. Carter and Ms. Bartels in connection with the issues addressed in the letters exchanged by

SKB and Glaxo is protected from exploration by plaintiffs.

Contrary to plaintiffs' assertions, SKB and Glaxo have not waived the protection of the

attorney-client privilege and work product doctrine on the subject of "spread marketing." While

Ms. Bartels and Ms. Carter did disclose certain facts in their letters to one another, these facts

were not privileged or protected by the work product doctrine – thus, their disclosure did not

waive any privilege.  See, e.g., Rupert v. United States, 225 F.R.D. 154 (E.D. Pa. 2004) (detailed

factual memorandum of positions taken by the parties that was disclosed by the IRS was not

privileged and did not effect a waiver).  Plaintiffs' reliance on <u>Permian Corp. v. United States</u>,

665 F.2d 1214, 1221 (D.C. Cir. 1981), is not inconsistent with this conclusion.  In <u>Permian</u>, the

court found a waiver of attorney-client privilege when the plaintiff attempted to shield from

production to the Department of Energy documents it had already produced to the SEC.  Here,

GSK has disclosed to the plaintiffs just what SKB and Glaxo disclosed to one another, and has

not attempted to use as a shield in this litigation what it may have used as a sword in the past.

As the First Circuit held in <u>In re Keeper of the Records of XYZ Corp. v. United States</u>,

348 F.3d 16, 24 (1st Cir. 2003):

> [T]he extrajudicial disclosure of attorney-client communications, not thereafter used by the client to gain adversarial advantage in judicial proceedings, cannot work an implied waiver of all confidential communications on the same subject matter. . . . There is a qualitative difference between offering testimony at trial or asserting an advice of counsel defense in litigation, on the one hand, and engaging in negotiations with business associates, on the other hand. . . . [A] rule that would allow broad subject matter waivers to be implied from such communications would provide perverse incentives:  parties would leave attorneys out of commercial negotiations for fear that their inclusion would later force wholesale disclosure of confidential information.[5]

Extrajudicial exchanges between Ms. Bartels and Ms. Carter, made in the context of negotiating

a settlement of their disagreements, did not constitute a waiver of privilege.  In <u>American Optical</u>

<u>Corp. v. Medtronic, Inc.</u>, 56 F.R.D. 426 (D. Mass. 1972), this Court observed:

> Negotiated settlements are to be encouraged, and bargaining and argument precede such settlements.  Clients and lawyers should not have to fear that positions on legal issues taken during

---

[5] Plaintiffs cite <u>In re Keeper of the Records of XYZ Corp.</u> in arguing that GSK has asserted an "advice of counsel" defense that waived its attorney-client and work product privileges simply by taking the position that "its conduct was lawful."  <u>See</u> Ex. I, pp. 3-4.  This view of the "advice of counsel" defense is misguided and impractical.  It would force every defendant in civil litigation to choose between taking the position that it violated the law or waiving its attorney-client and work product privileges.  Contrary to plaintiffs' assertions, GSK has not claimed that its marketing practices were "lawyer directed."  <u>Id.</u> at 4.

13

> negotiations waive the attorney client privilege so that the private
> opinions drafted by an attorney for his client become discoverable.

Id. at 431-32 (rejecting argument that defendant waived privileges during negotiations with the

plaintiff by giving the plaintiff a detailed explanation of its position prior to litigation); see also

Ken's Foods, Inc. v. Ken's Steak House, 213 F.R.D. 89, 97 (D. Mass. 2002) (following

American Optical and finding that disclosure of memorandum within the context of settlement

negotiations provided "no basis for extending the waiver beyond the document itself").

Testimony by employees of GSK and its predecessors that GSK and each of its

predecessor companies maintained strict policies against "spread marketing" also did not waive

any privilege, because the fact that such policies existed is not privileged or protected by the

work product doctrine.  See, e.g., Command Transportation v. Y.S. Line (U.S.A.), 116 F.R.D.

94, 97 (D. Mass. 1987) (for waiver of attorney-client privilege to occur, "the specific content of

the privileged communication must be disclosed").  It was not inconsistent for these witnesses to

testify about underlying facts which are not privileged, but to assert the attorney-client privilege

as to their discussions with Ms. Carter and Ms. Bartels, for example, seeking legal advice under

those policies.  That plaintiffs may find communications between Glaxo personnel and Ms.

Carter, or between SKB personnel and Ms. Bartels, to be helpful does not waive the privilege.

See, e.g., Sorenson v. H & R Block, Inc., 197 F.R.D. 206, 208 (D. Mass. 2000).

Because plaintiffs have, or could have obtained, non-privileged information on this

subject from other sources, and most of what plaintiffs seek from Ms. Bartels and Ms. Carter is

privileged and beyond the scope of discovery in any event, the depositions should be prohibited.

This course of action would be the most effective way to ensure that Ms. Bartels and Ms. Carter

are not forced to reveal attorney-client confidences and their work product.  See, e.g., West

Peninsular Title Co. v. Palm Beach County, 132 F.R.D. 301 (S.D. Fla. 1990) (granting motion

14

for protective order barring depositions of defendants' attorneys in order to protect against the risk that a deposition question may cause counsel to discuss privileged matters).

### C.      To The Extent Ms. Bartels And Ms. Carter Possess Non-Privileged Information, It Is Not "Crucial" To Plaintiffs' Case Preparation.

Plaintiffs cannot show that the information they wish to obtain from Ms. Bartels and Ms. Carter is "crucial" to the preparation of their case.  Plaintiffs already possess copies of the correspondence between Ms. Bartels and Ms. Carter, and have had access through other means of discovery to relevant non-privileged facts relating to their allegations.  Cf. Carey v. Textron, Inc., 224 F.R.D. 530, 531 (D. Mass. 2004) (limited deposition of counsel was warranted only because the "crucial piece of evidence" in the case disappeared, counsel was possibly the only person to have examined it, and defendant credibly could argue the defense of spoliation).  Moreover, on its face the correspondence demonstrates that Ms. Bartels and Ms. Carter do not possess firsthand knowledge of the events surrounding the alleged distribution of "homemade" sales materials.  See, e.g., Massachusetts Mut. Life Ins., 177 F.R.D. at 481-82 (deposition of defendant's former attorney was not "crucial" to the case where he possessed only secondhand knowledge of the information sought).  To the extent Ms. Bartels and Ms. Carter possess relevant non-privileged information, plaintiffs cannot show that it is "crucial" that they obtain that information from opposing counsel.  Accordingly, plaintiffs should not be permitted to depose Ms. Bartels and Ms. Carter.

### CONCLUSION

For the foregoing reasons, this Court should grant this motion and issue a Protective Order precluding the depositions of Ursula Bartels and Adrianna Carter.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), GSK hereby requests oral argument on this Motion for a

Protective Order.

|  | Respectfully submitted,<br><br>By: /s/ **Seth B. Kosto**<br>    Mark D. Seltzer<br>    Mona M. Patel<br>    Seth B. Kosto<br>    Holland & Knight LLP<br>    10 St. James Avenue<br>    Boston, MA 02116<br>    Telephone: (617) 523-2700<br>    Facsimile: (617) 523-6850<br><br>    Mark Lynch<br>    Geoffrey Hobart<br>    Matthew J. O'Connor<br>    Covington & Burling<br>    1201 Pennsylvania Avenue<br>    Washington, DC 20004<br>    Telephone: (202) 662-6000<br>    Facsimile: (202) 662-6291<br><br>    Frederick G. Herold<br>    Dechert LLP<br>    975 Page Mill Road<br>    Palo Alto, CA 94304<br>    Telephone: (650) 813-4930<br>    Facsimile: (650) 813-4848<br><br>    Thomas H. Lee II<br>    Dechert LLP<br>    4000 Verizon Tower<br>    1717 Arch Street<br>    Philadelphia, PA 19103-2793<br>    Telephone:  (215) 994-2994<br>    Facsimile: (215) 994-2222<br><br>    *COUNSEL FOR*<br>    *SMITHKLINE BEECHAM CORP.,*<br>    *D/B/A GLAXOSMITHKLINE* |
|---|---|
| Dated:  August 3, 2005 |  |

16

## LOCAL RULES 7.1(A)(2) AND  37.1 (B) CERTIFICATION

I hereby certify that I have complied with Local Rules 7.1(A)(2) and 37.1(B) by conferring with David S. Nalven and Thomas M. Sobol, counsel for the plaintiffs, in good faith attempts to resolve or narrow, to the greatest possible extent, the areas of disagreement set forth in the Motion for Protective Order to Prohibit the Depositions of Attorneys Ursula Bartels and Adrianna Carter.  On June 29, 2004, I sent a letter to Mr. Sobol in an attempt to resolve all of the issues raised in this Motion for Protective Order.  Nearly a year later, on June 22, 2005, Mr. Nalven and I conferred by telephone about all of the issues raised in this Motion for Protective Order and were unable to reach agreement.  On July 26, 2005, at or around 2:00 p.m., Mr. Nalven and I conferred in person for approximately thirty minutes on these and other discovery matters, but were unable to resolve any of the issues raised in this Motion for Protective Order.

**/s/  Mark D. Seltzer**

Dated:  August 3, 2005

## CERTIFICATE OF SERVICE

Docket No. MDL 1456

I, Seth B. Kosto, hereby certify that I am one of GSK's attorneys and that, on August 3, 2005, I caused copies of the within Motion for Protective Order to Prohibit the Depositions of Attorneys Ursula Bartels and Adrianna Carter to be served via VeriLaw on all counsel of record.

**/s/ Seth B. Kosto**

Dated:  August 3, 2005

# 3044832_v8