# EXHIBIT G



## HOLLAND & KNIGHT LLP

10 St. James Avenue
Boston, Massachusetts 02116

617-523-2700
617-523-6850 Fax
www.hklaw.com

Annapolis
Atlanta
Bethesda
Boston
Bradenton
Chicago
Fort Lauderdale
Jacksonville
Lakeland
Los Angeles
Miami
New York
Northern Virginia
Orlando
Portland
Providence
St. Petersburg

San Antonio
San Francisco
Seattle
Tallahassee
Tampa
Washington, D.C.
West Palm Beach

International Offices:
Caracas*
Helsinki
Mexico City
Rio de Janeiro
São Paulo
Tel Aviv*
Tokyo

*Representative Office

June 29, 2004

MARK D. SELTZER
(617) 854-1460
mark.seltzer@hklaw.com

**VIA FACSIMILE**

Thomas M. Sobol, Esq.
Hagens Berman LLP
One Main Street, 4th Floor
Cambridge, MA 02142

    Re:   In Re Pharmaceutical Industry Average Wholesale Price
           Litigation MDL No. 1456

Dear Tom:

I am writing in response to your letter and email of June 24, 2004 concerning the scheduling of various depositions.

Throughout the course of this matter, we have consistently accommodated the schedules of Plaintiffs and their counsel in finding dates that are mutually acceptable for depositions taken by all parties. In accordance with that history, after receiving your deposition notices on June 22nd, we immediately inquired as to the availability of the deponents. Although I did not know the availability of all of the deponents, the following day, I sent you the information we had as of that time. In fact, of the four deponents referenced in my June 24th email to you, I confirmed two of the dates you proposed (Peter Kaylid (formerly Khalid) and Ginny Murnen (formerly White)) and proposed dates for two other deponents (Al Goeken and Stephen Stefano). Contrary to your email stating that you had not scheduled a deposition on July 28th due to a business conflict, you had proposed the Rich Franco deposition for that day. Thus, we are hopeful that July 28th is acceptable for Mr. Stefano's deposition, where Mr. Stefano will serve as both a 30(b)(6) and a fact witness. Ron Sorrentino, who was on vacation at the time we received your notice, is available on July 30th.



Of the remaining deponents, six are former GSK employees. These deponents are under no obligation to appear in Boston, but have agreed to make themselves available near their current residences without requiring you to issue subpoenas. We have been able to confirm the following dates and locations:

- George Esgro   August 10, 2004   Thousand Oaks, CA
- George Morrow   August 24, 2004   Thousand Oaks, CA

We are still attempting to confirm dates and locations for the depositions of Mike Yasick, Carl Pezal, George Abercrombie and Rich Franco. We will provide the information as soon as we receive it.

**Deposition Locations for GSK Employees**

The current GSK employees referenced above, consistent with the Federal Rules of Civil Procedure, will be made available for deposition in RTP, North Carolina. Given that a subpoena to appear for a deposition must issue in the district in which it is to be taken, yet a subpoena cannot be served beyond 100 miles of the deposition's location, these GSK employees who reside in North Carolina cannot be compelled to come to Massachusetts for a deposition. Fed. R. Civ. P. 45(a)(2); 45(b)(2); see also *Buzzeo v. Board of Educ., Hempstead*, 178 F.R.D. 390, 392 (E.D.N.Y. 1998) (citing *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 155 (S.D.N.Y. 1997)) (depositions of non-resident *parties*, should be conducted at defendant's place of residence or principal place of business); *Gulf Union Ins. Co. v. M/V Lacerta*, 1992 WL 51532, at *5 (S.D.N.Y. 1992) ("plaintiff is generally required to 'bear any reasonable burdens of inconvenience that the action presents"). Rather than litigating this issue, if you are unavailable on the dates above, or if the location is problematic for you, perhaps your co-counsel could assist on these depositions.

**Deposition of GSK's In-House Counsel**

GSK will not make Adrianna Carter, one of GSK's in-house attorneys, available for deposition on July 14th. Any information Ms. Carter would provide beyond recounting the facts already set forth in certain letters she wrote on behalf of the former GlaxoWellcome to the former SmithKline Beecham would be protected by the attorney-client privilege and/or work product doctrine. It is precisely because of the inevitable disclosure of privileged information that would occur if a party's attorney is forced to testify that federal courts look with disfavor upon depositions of in-house counsel. *E.g. Shelton v. American Motors Corp.*, 805 F.2d 1323, 1327 (8th

Thomas M. Sobol, Esq.
June 29, 2004
Page 3

Cir. 1987); *Dunkin' Donuts, Inc. v. Mandorico, Inc.*, 181 F.R.D. 208, 209 (D.P.R. 1998).

Plaintiffs cannot meet their weighty burden of establishing the necessity of Ms. Carter's testimony to overcome the limitations upon deposing a party's attorney. Other means of acquiring the same factual information exist and, most importantly, the testimony would be privileged. *E.g. Shelton v. American Motors Corp.*, 805 F.2d 1323, 1327-28 (8th Cir. 1987) (reversing default judgment ordered because of in-house counsel's failure to testify where plaintiff failed to make showing that: "1. no other means exist to obtain the information . . . 2. the information sought is relevant and nonprivileged; and 3. the information is crucial to the case." (*citations omitted*)). Given that Plaintiffs cannot establish the necessity of Ms. Carter's testimony, it is our sincere hope that you will agree to withdraw the July 14th deposition notice to Ms. Carter. If Plaintiffs refuse to do so, we will be forced to move for a protective order. *Dunkin' Donuts*, 181 F.R.D. at 210 (absent showing of propriety and need, "mere request to depose an opposing counsel constitutes 'good cause' for obtaining a protective order.").

In order to finalize these matters, and to satisfy our meet and confer obligations under the local rules with respect to the Adrianna Carter deposition, I would like to schedule a conference call for Thursday, July 1 at 11 a.m. Please let me know if that time works for you. I look forward to hearing from you.

                              Your sincerely,

                              Mark D. Seltzer

cc: All counsel via Verilaw

# 2050223_v4

# EXHIBIT H



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) MDL NO. 1456 ) ) CIVIL ACTION: 01-CV-12257-PBS ) |
| THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS | ) Judge Patti B. Saris ) ) |

## RENOTICE OF DEPOSITION OF FORMER GSK EMPLOYEES

TO ALL COUNSEL OF RECORD VIA VERILAW:

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30, plaintiffs will take the deposition upon oral examination of the following persons. The depositions will take place at the offices of Hagens Berman LLP, One Main Street, Cambridge, Massachusetts, 02142 on the dates listed below, and will continue from day to day thereafter until completed.

The depositions will be taken by stenographic or videographic means before a notary public or another officer authorized by law to administer oaths. You are invited to attend and participate.

| | | |
|---|---|---|
| Adrianna Carter | August 11, 2005 | 9:00 a.m. |
| Ursula Bartels | August 12, 2005 | 9:00 a.m. |



Respectfully yours,

By  /s/ **David S. Nalven**
Thomas M. Sobol
David S. Nalven
Edward Notargiacomo
Hagens Berman Sobol Shapiro LLP
One Main Street
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

*LIAISON AND CO-LEAD COUNSEL*

Dated: July 12, 2005

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Notice Of Deposition was served on July 12, 2005, upon all counsel of record electronically by Verilaw.

By:  /s/ **David S. Nalven**
David S. Nalven
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142

2

# EXHIBIT I



**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**

July 12, 2005

BY FAX

Thomas H. Lee II, Esq.
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793

Mark D. Seltzer, Esq.
Seth B. Kosto, Esq.
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116

      Re:    In Re Pharmaceutical Industry AWP Litigation
                 MDL No. 1456

      I am writing concerning plaintiffs' prior notices of deposition which noticed the depositions of, among others, Adrianna Carter and Ursula Bartels. You have taken the position that because these witnesses are former in-house counsel for GSK's predecessors, Glaxo and SmithKline Beecham, any information they have is insulated from disclosure by the attorney-client privilege or attorney work-product doctrine and that they need not be produced. I believe your position is incorrect or, at minimum, too broad.

      GSK's documents and employee testimony make clear that Ms. Carter and Ms. Bartels have information concerning spread marketing policies and activity practiced by both companies. Based on the evidence developed to date, it appears that each was involved in business decision-making and internal and external business communications on these issues. While they may hold information that is privileged, they also hold information that is plainly subject to disclosure, either because it was not privileged in the first place or because the privilege has been waived. Accordingly, plaintiffs request that GSK reconsider its position and produce the witnesses.

      Let me use this opportunity to offer two examples of subject areas in which the attorney-client privilege or work product doctrine do not apply to these witnesses' testimony. In offering these examples, I do not intend to suggest that there are no other areas about which plaintiffs are intend to inquire, but only to demonstrate that GSK's blanket assertion of privilege is untenable.

ATTORNEYS AT LAW         SEATTLE   LOS ANGELES   CAMBRIDGE   PHOENIX   CHICAGO
617.482.3700   617.482.3003
www.hbsslaw.com

Thomas H. Lee II, Esq.
Mark D. Seltzer, Esq.
Seth B. Kosto, Esq.
July 12, 2005
Page 2

   In an exchange of letters during the winter and spring of 1995, Glaxo and SmithKline Beecham, then competitors, accused each other of the very spread marketing activity that plaintiffs now allege was committed by the GSK predecessors, and supplied each other with proof of their accusations. In its opening salvo, Glaxo presented evidence it had uncovered and accused SmithKline Beecham sales representatives of using written cost comparisons showing relative profitability of Zofran and Kytril to demonstrate "how institutions can increase their 'profits' from Medicare" and charged that such conduct "raises significant fraud and abuse concerns." In response, SmithKline Beecham accuses Glaxo of engaging in identical conduct, presenting similar cost comparison materials used by Glaxo representatives that it uncovered showing how oncologists could profit from Medicare reimbursement by purchasing Zofran. Smithkline further points out that Glaxo's decision to increase the AWP and simultaneously lower the actual acquisition cost by offering a rebate increases "the amount of reimbursement available to physicians from Medicare and other third party payors who whose reimbursement is based on AWP." Glaxo's rebuttal acknowledges that despite the increase in AWP, physicians and other healthcare professionals would not actually pay more, but claims that the rebates were not illegal. Glaxo also concedes that its sales representatives were also "explaining the relationship between price and Medicare reimbursement for Zofran to physicians."

   The need for discovery concerning these letters is manifest. To begin with, a basic authentication inquiry is needed: who prepared, reviewed, and received each of these letters; where did the documents and information contained in or attached to each of the letters come from? Beyond that, questions to test the assertion of privilege are permitted: who spoke to whom; what other communications were made surrounding these letters (the letters refer to an intervening telephone conversation); what was the purpose of the surrounding communications? And, assuming there is no privilege substantive inquiry calculated to lead to the discovery of admissible evidence will be pursued: what was the basis for each company's position that the others' conduct was improper; what did the companies learn concerning the accuracy of each others' allegations; what steps did each company take, if any, to prevent the improper conduct from recurring?

   It is hard to see how testimony concerning these basic facts is insulated from disclosure by the attorney-client privilege or the attorney work doctrine. The attorney-client privilege protects communications made between an attorney and a client only for the sake of obtaining legal advice; it does not apply to communications concerning the gathering of business facts, even when the fact gathering is undertaken by an attorney. *Vijay Borase v. M/A COM, Inc.*, 171 F.R.D. 10, 14 (D. Mass. 1997); *see Mission Nat'l Insurance Co. v. Lilly*, 112 F.R.D. 160, 163-64 (D. Minn. 1986) (where investigation by in-house counsel included non-legal opinions, as opposed to legal or trial matters, it was "ordinary business . . . outside the scope of the asserted privileges."). Privilege assertions are subject to particular scrutiny when asserted on behalf of in-house counsel. *See, e.g., Vijay Borase* at 14 (citing *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 69 F.3d 867, 884 (1st Cir. 1995)). There is little in the letters to suggest that

Thomas H. Lee II, Esq.
Mark D. Seltzer, Esq.
Seth B. Kosto, Esq.
July 12, 2005
Page 3

the activities undertaken in connection with the 1995 exchange involved the tendering of legal advice.

Similarly, the work-product doctrine protects only those activities undertaken "because of actual or impending litigation." *In re Lernout & Hauspie Secs. Litig.*, 222 F.R.D. 29, 36 (D. Mass. 2004) (citing *Maine v. US DOI,* 298 F.3d 60 (1st Cir. 2003). Ms. Bartels' letter dated February 22, 1995 puts to rest any suggestion that the parties intended to take their complaints to the courts, stating "permit me to say that we appreciate your bringing these matters to our attention. We are in agreement that self-policing is in the best interest of the industry." It is clear that the exchange concerns a business dispute between competitors, not assertion of legal claims.

Finally, to the extent that any insulation from disclosure attaches to the respective companies' activities surrounding these letters, the disclosures made by the competing companies in trading accusations effectively waived any privilege that might attach to testimony concerning the source of the information which formed the basis for the accusations. *See Permian Corp. v. United States*, 665 F.2d 1214, 1221 (D.C. Cir. 1981) ("a client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality has already been compromised for his own benefit").

Another area for prospective inquiry concerns the establishment and execution of each company's purported policies against spread marketing and good faith reliance on industry practice. As you know, several employees of GSK and its predecessors have testified adamantly that each of the predecessor companies had a strict policy against sales staff engaging in spread marketing. For example, George Abercrombie, former Glaxo Senior Vice President for Commercial Operations, testified that "during my tenure as senior vice president, it was one that I recall I did everything to, I mean, I emphatically ensured that it was enforced, or at least we had a policy to ensure that it was enforced." *Abercrombie Dep.* at 116. But the witnesses have been virtually mute on when these purported policies were established, what business purposes they served, or how they were to be carried out. To add insult to injury, no one has been able to identify where, if at all, this purported policy was put in writing. We know that Ms. Carter and Ms. Bartels were involved in consideration and communication of these issues, but GSK witnesses have been directed not to testify concerning any directions provided by them or communications with them. These facts go to the heart not only of plaintiffs' claims, but also GSK's defenses to these claims and affirmative defenses such as good faith, industry practice, and others. GSK assertion of anti-spread marketing policies and affirmative defenses concerning lawfulness of conduct place the actions and communications of Ms. Carter and Ms. Bartels concerning these subjects in issue.

GSK cannot seek to defend itself by claiming that it believed its conduct was lawful and committed in good faith while shielding the from disclosure the rationale, execution, and

Thomas H. Lee II, Esq.
Mark D. Seltzer, Esq.
Seth B. Kosto, Esq.
July 12, 2005
Page 4

communications concerning that policies upon which that conduct was based. By asserting defenses in the middle of which are counsel communications, GSK has impliedly waived any privilege that may have applied to these communications. *See In re Keeper of the Records of XYZ Corp. v. United States,* 348 F.3d 16, 24 (1st Cir. 2003) (when party asserting privilege places the protected information in issue, to allow privilege to shield disclosure of that information would be unfair to the opposing party.) It is manifestly unfair for GSK to use the attorney-client privilege to "kidnap the truth seeking process." *Id.* If GSK seeks to use its purportedly lawyer directed conduct as a sword, it may not use privilege as a shield against its scrutiny.

Of course, at this point, with the facts surrounding the generation of the 1995 letters and other undertakings by Ms. Carter and Ms. Bartels undiscovered, I am not in a position to make a thorough or complete argument, nor am I required to do so. It is GSK's burden, not plaintiffs', to establish that the attorney-client privilege and attorney work product doctrine shield all relevant communications and activities involving Ms. Carter and Ms. Bartels. *Amgen, Inc. v. Hoechst Marion Roussel, Inc.,* 190 F.R.D. 287, 289 (D. Mass. 2000). Without knowing the precise avenues through which Ms. Carter and Ms. Bartels received and communicated their information – and without their depositions that is impossible to know – plaintiffs can only suggest why we believe GSK's refusal to produce these witnesses is in error.

In our initial discussions on these depositions, you indicated that GSK was inclined to seek a protective order. I hope this letter has convinced you that the appropriate course is to proceed with the depositions and address questions of privilege as they arise. *See Moloney v. United States,* 204 F.R.D. 16, 20 (D. Mass. 2001) (quoting with approval 6 *Moore's Federal Practice, 24* § 26.90[1] (Matthew Bender 3d ed.)) (blanket assertions will not suffice to invoke privilege).

As I discussed with Tom Lee today, with this letter, plaintiffs are renoticing the depositions of Ms. Carter and Ms. Bartels for August 11 and 12, 2005, respectively. Please let me know whether those dates are agreeable to you, whether you are prepared to offer other firm dates, or whether GSK will present the issue to the court.

Very truly yours,

David S. Nalven

# EXHIBIT J

```
 1                    "ROUGH COPY"
 2                    CONFIDENTIAL
 3           UNITED STATES DISTRICT COURT
 4            DISTRICT OF MASSACHUSETTS
 5                   MDL No. 1456
 6                 No. 01-CV-12257-PBS
 7   ----------------------------x
 8   IN RE:   PHARMACEUTICAL
 9   INDUSTRY AVERAGE WHOLESALE
10   PRICE LITIGATION
11   ----------------------------x
12
13             Deposition of KEN MARSHALL
14            (Taken by the MDL Plaintiffs)
15               Durham, North Carolina
16                  July 26, 2005
17
18   Reported by:    Marisa Munoz-Vourakis
19                   RMR, CRR and Notary Public
20
21
22
23
24
25
```

```
 1    APPEARANCE OF COUNSEL:
 2    For the MDL Plaintiffs:
 3            David S. Nalven, Esq.
 4            HAGENS BERMAN LLP
 5            One Main Street, 4th Floor
 6            Cambridge, MA 02142
 7            617-482-3700
 8
 9    For the Defendant GlaxoSmithKline:
10
11            Mark D. Seltzer, ESQ.
12            HOLLAND & KNIGHT LLP
13            10 St. James Avenue
14            Boston, MA 02116
15            617-523-2700
16
17    For Aventis Pharmaceuticals, Inc.:
18            @Carlos Enrique Provencio, Esq. (By Telephone)
19            SHOOK, HARDY & BACON L.L.P.
20            600 14th Street, N.W., Suite 800
21            Washington, DC 20005-2004
22            202-639-5606
23    Also Present:   CHRISTINA M. KORMAN
24                    Litigation Paralegal III - GlaxoSmithKline
25
```

```
 1   responsible was Mr. Cory?
 2        A.    And I'm not even sure that a product manager
 3   is responsible for a price increase.
 4        Q.    Well, sure by the terms of developing the
 5   recommendation?
 6        A.    They may get asked opinions on that but they
 7   don't really put forward the recommendation at the PM
 8   level.  It's usually the director level in conjunction
 9   with pricing group.
10        Q.    Let me ask you to take a look at page four of
11   Exhibit 26 that is the last page.  It's a document
12   entitled AWP history report.
13              What is this report?
14        A.    I don't know.
15        Q.    Have you seen it before, a report in this
16   form?
17        A.    No.
18        Q.    Mr. Marshall, with respect to the improper
19   marketing activities undertaken by Kytril sales and
20   marketing staff were you aware in January 1995 of a
21   request made by or to the Glaxo legal department to
22   contact the SmithKline Beecham legal department concerning
23   the marketing activities that you had identified?
24              MR. SELTZER:  Objection to the form of
25         the question, the characterization in the
```

```
 1          record.
 2     A.   Yeah I'm not sure that I can conclude that it
 3  was an improper marketing initiative.  We had a few things
 4  from representatives and --
 5     Q.   Well, you thought it was improper at the time?
 6     A.   Those couple of documents that I saw from the
 7  various reps, yeah I thought those were improper.
 8     Q.   And were you aware that in or about February
 9  of 1995, Glaxo Wellcome legal staff contacted a SmithKline
10  Beecham to convey the concerns that you had identified?
11     A.   No, I was not aware that they did that.
12     Q.   @@.
13     Q.   You know @Adriana Carter?
14     A.   Yes.
15     Q.   You worked with her?
16     A.   Yes.
17     Q.   Was Adriana Carter a person on your -- I'm
18  sorry -- you used the term?
19     A.   Copy approval team.
20     Q.   Copy approval team?
21     A.   Yes.
22     Q.   So was she the person in legal who was your
23  contact in general for vice on legal issues?
24     A.   Not in general, but on promotional activities.
25     Q.   And she was on your copy approval team?
```

138

1   A.   She was on the team.
2   Q.   And did you have any communications with
3   Ms. Carter concerning the marketing activities that you
4   had gathered information about by Kytril sales reps and
5   Kytril marketing?
6       MR. SELTZER: Without disclosing the
7       contents of those discussions.
8   A.   Yeah, not that I recall. I think we talked
9   about it earlier if I got something I would on occasion
10  send it to the team. But I don't remember specific
11  conversations that I would have gone to @Adriana about.
12  Q.   And you are not aware of any communications
13  from Ms. Carter or anybody else in the Glaxo legal team to
14  SmithKline Beecham conveying the concerns or concerns like
15  the concerns that you had identified?
16  A.   Not that I recall.
17  Q.   Was there anyone on the Zofran product team
18  who was assigned or directed to work with legal counsel in
19  connection with the information that you had gathered
20  concerning Kytril marketing activities. No, I don't think
21  so.
22  Q.   I've marked a document that we identified as
23  Exhibit 27.
24       Mr. Marshall, Exhibit 27 is a letter from
25  Timothy Proctor, senior vice president general counsel and

139

1  secretary of Glaxo to J. Charles Wakerly, general counsel
2  US for SmithKline Beecham, dated February 6, 1995.
3              (The document referred to was marked
4         Exhibit No. 27 for identification.)
5      Q.    Do you have that before you?
6      A.    I do.
7      Q.    And looking at Exhibit 27 and its attachments,
8  does it refresh your recollection that Glaxo legal staff
9  had contacted SmithKline Beecham concerning the marketing
10 activities you had identified and gathered information
11 concerning?
12     A.    No, not really.
13     Q.    Did the attachments look familiar to you?
14     A.    Some of them do, yeah, the first few that I
15 see look like the pieces that they used to launch with. I
16 don't know if there are dates on those things but I think
17 that was one of their launch platforms. At least I
18 remember the graphic.
19     Q.    And some of the attachments are comparative
20 spread information that you had received from the field is
21 that correct?
22     A.    I haven't gotten that far yet because these
23 look like more traditional home office approved types of
24 materials, these first few. I haven't gotten to anything
25 just kind of leaving through it that looks like the spread

1   stuff you have been referring to.  Okay, now I have.  Okay
2   other specific ones?
3        Q.      Based on your review of Exhibit 27, does that
4   refresh you as to any action that Glaxo took in connection
5   with the information that you had gathered from the field
6   concerning Kytril marketing practices?
7        A.      No.
8        Q.      Mr. Marshall let me ask you to take a look at
9   Exhibit 28.  Take a moment to review it and then if you
10  can identify it for the record.@
11              Are you the author of Exhibit 28?
12       A.      Yeah, that looks like it's from me.
13              (The document referred to was marked
14          Exhibit No. 28 for identification.)
15       Q.      In May of 1994, did you participate in Kytril
16  update meetings?
17       A.      It looks like it, yeah, I mean I don't recall
18  having this Kytril update meeting but it's like notes from
19  an update meeting.
20       Q.      Are these the minutes of the meeting that you
21  circulated to the attendees at the meeting?
22       A.      I mean I don't recall what they are to be
23  honest, but that's what it appears to be.
24       Q.      Turning to -- let me ask you this:  In May of
25  1994, this is approximately two months after the launch of