negotiations with PBMs, and five of the six named union benefit
funds in this action used such consultants.  (Young ¶ 64; Navarro
¶ 59.)

By 1999, 90% of HMOs contracted with a PBM, and today 95% of
all patients with drug coverage obtain benefits through a PBM.
(Young ¶ 104.)  In 2001, PBMs handled 1.5 billion of the 3
billion prescriptions filled and 80% of the money spent on
prescriptions.  (Schondelmeyer ¶ 76; Hartman Decl. attach. C ¶
22.)  The top three PBMs alone handled 1 billion of the
prescriptions.  (Schondelmeyer ¶ 76.)

Using ordinary discounts, rebates, and chargeback policies,
brand-name pharmaceutical manufacturers have offered a variety of
price reductions to PBMs in return for favorable placement on a
client's formulary, the attainment of market share or volume
targets, or the realization of other contractually specified
goals.  (Berndt ¶ 15.)

Turning to the nitty-gritty, in a typical transaction, a PBM
will charge its client TPP an administrative fee (in the
neighborhood of $.30 to $.40), a dispensing fee (around $2.50),
and a drug price based on a percentage of AWP (e.g., AWP minus
13%).  (Rosenthal 15-16.)  The PBM, which has a contract with a
pharmacy network, then pays the pharmacy the dispensing fee
($2.50), sometimes an administrative fee, and a lower drug
reimbursement (AWP minus 15%; or, more typically, the same price

21

expressed as a percentage over WAC).  (Rosenthal 15-17.)   The PBM

pockets the difference between what it receives from its client

and what it pays the pharmacy (here, 2% of AWP plus the

administrative fee if not paid to the pharmacy).  (Rosenthal 16;

Hartman Decl. attach. E ¶ 12.)  In simplified form, a typical

transaction, as described by Advance PCS, a PBM, looks like this:



(Rosenthal Tutorial Ex. 23.)

The PBM-insurer contract determines whether a rebate that a

manufacturer gives a PBM (based on sales or formulary placement)

is passed through to the insurer and whether data about the size

22

of the rebate is available to the insurer.[13]  Some contracts provide that part of the rebates will be passed through to the insurer.  Industry sources report that PBM clients typically receive 70% to 90% of the manufacturer rebates, or an average of $1.00 per claim, although the percentage varies from 0% to 100%. (Berndt ¶¶ 158, 160.)  Many contracts provide that none of the rebate will be passed through but give the insurer the right to audit the PBM.   (Navarro ¶¶ 43-44.)  Other contracts provide that the amount of the rebate will be kept confidential from the insurer.

These rebates sometimes form a larger share of PBMs' revenue than do administrative fees from insurers or self-insured employers.  (Schondelmeyer ¶ 76.)  Manufacturers generally give larger rebates for drugs for which there are competitors, since the PBM may threaten to include only a competitor drug on the formulary if it does not receive a rebate.

Typically, a PBM attempts to restrict its plan's beneficiaries to a certain network of pharmacies.  (Navarro ¶¶ 28-30.)  By doing so, the PBM is able to stimulate competition among pharmacies that want to be included in its network, and in that way drive drug prices down.  A PBM may negotiate several contracts with its pharmacy network to coincide with several

---

[13]  Employers may also contract directly with manufacturers for the provision of rebates, bypassing PBMs.  (Navarro ¶ 77 (citing example of John Deere).)

23

different plans offered to employers.  At various times in the class period, large HMOs, such as Kaiser Permanente, owned and operated their own networks of pharmacies.  (Bell 45.)

### ii.  **Pharmacies**

The contract between a PBM and a pharmacy network dictates the terms by which the PBM pays for drugs.  The contract usually specifies that the payment will be at the lowest of several alternatives, but according to plaintiffs the vast majority of transactions are made at AWP minus a discount, which typically is about 15% on branded pharmaceuticals and 13% to 25% on generics.  (Rosenthal 16.)  The reimbursement paid also varies by pharmacy, since pharmacies in geographic areas with little competition have more leverage to demand higher reimbursement.  (Navarro ¶¶ 29-30.)

In the brand-name context, a pharmacy contracts with a manufacturer, sometimes using a wholesaler as an intermediary (although this is less common for large pharmacy chains), for the purchase of drugs.  The invoice price usually refers to WAC, rather than to AWP, and pharmacies typically acquire the drug at or around WAC.  (Young ¶ 52.)  It is important for the manufacturer to sell to the wholesaler at a price that allows both for the wholesaler's take (usually 2%) and for the pharmacy to earn a profit from selling to TPPs and consumers at AWP minus 13% to 18%.  (Berndt ¶¶ 22, 24-27.)  Therefore, according to

24

plaintiffs, insurers generally expect that retailers are
purchasing the self-administered, brand-name drugs at a range of
AWP minus 16% to 33% (net of rebates).  (Hartman Decl. ¶ 33.)   In
most situations, the pharmacy has little ability to refuse to
carry a drug, because there are no competitor drugs.  As Dr.
Berndt stated,

> In most cases, the retail pharmacy cannot freely
> substitute between different patient-protected single-
> source brands, unless explicit permission is first
> obtained from the prescribing physician.  This
> inability to stimulate price competition among single-
> source brands means that when negotiating with [a]
> branded manufacturer, the pharmacies have little
> bargaining power, and are essentially price takers.

(Berndt ¶ 42.)

Pharmacies play a greater role in determining the spread for
generic self-administered drugs than for brand-name drugs because
a pharmacy has far greater leverage over drug choice in the
former category.  The multi-source arena differs from the single-
source arena in that several manufacturers are producing the same
product, usually in one name-brand form and several generic
forms.  The pharmacy is in the driver's seat, choosing which
manufacturer's version of the compound to sell.  Although
reimbursement for recently launched generics references AWP, PBMs
and insurers often use MAC pricing generally on their
formularies.  The MAC price is a single, set price that the PBM
or insurer announces it will pay, and it is often based on the
median or mean of the AWPs of several different manufacturers'

25

versions of a drug.  The pharmacy then decides which version of
the generic to use.  (Berndt ¶¶ 41, 56.)  Sometimes TPPs use the
public sector MACs used for Medicaid.  A substantial portion of
commercial payors have developed their own MAC lists and
schedules that are proprietary and kept confidential.  (Id. ¶
58.)

    Generic manufacturers compete to provide the generic version
of a drug used by a particular pharmacy or pharmacy chain.  A
recent study demonstrates the continuing profitability to
pharmacies of dispensing generic drugs -- with gross margins
growing rapidly for new multi-source drugs after 1997.  (Berndt
¶¶ 40-41.)  In the multi-source context, large spreads between
the actual acquisition cost and AWP are common.  (Berndt ¶ 47;
Schondelmeyer ¶ 92.)  Some of the highest spreads alleged in the
SAMCC are from the multi-source context:

| Defendant | Multi-source Drug | RedBook AWP | DOJ Determined Actual AWP | Percentage Spread |
|---|---|---|---|---|
| Abbott | Sodium Chloride | $670.89 | $ 3.22 | 20,735% |
| Baxter | Dextrose | $928.51 | $ 2.25 | 41,167% |
| Baxter | Sodium Chloride | $928.51 | $ 1.71 | 54,199% |
| Boehringer Group | Leucovorin Calcium | $184.40 | $ 2.76 | 6,581% |
| B. Braun | Sodium Chloride | $ 11.33 | $ 1.49 | 660% |

26

| BMS Group | Etoposide (Vepesid) | $136.49 | $34.30 | 298% |
|---|---|---|---|---|
| Dey | Albuterol Sulfate | $ 30.25 | $ 9.17 | 230% |
| Immunex | Leucovorin Calcium | $137.94 | $14.58 | 846% |
| Pharmacia | Etoposide | $157.65 | $ 9.47 | 1,565% |
| Sicor Group | Tobramycin Sulfate | $342.19 | $ 6.98 | 4,802% |
| Watson | Vancomycin HCL | $ 70.00 | $ 3.84 | 1,567% |

(SAMCC ¶ 187.)   Because a TPP typically saves substantial money

by paying for generics instead of brand-names, "the third party

payor is less likely to quibble over whether the pharmacy is

pocketing a larger margin for generics than for brands."   (Berndt

¶ 52.)

### b.   Physician-Administered Drugs

Fewer players are at the table in a typical private sector

transaction for a physician-administered drug.[14]   A typical

transaction involves a patient with cancer, or another serious

disease requiring long-term care, arriving at her doctor's office

to receive an injection.   The doctor administers the injection of

the oncology drug, often with separate drugs to counteract the

---

[14] It is not clear how many physician-administered drugs are
involved.   Plaintiffs claim there are fifteen physician-
administered drugs and seventeen Medicare Part B drugs.
Defendants state that there are thirty-five physician-
administered drugs but they do not disclose how many are covered
by Medicare Part B.

27

side effects of the oncology drug.  The doctor has purchased the
oncology drug either directly from the manufacturer or through an
intermediary physician group purchasing organization.  The doctor
bills the patient's insurance plan according to its formulary
(usually found on a fee schedule).  The plan reviews the claim (a
process that costs around $45 per claim) and then pays the
doctor.  (Berndt ¶ 195.)  According to plaintiffs' experts
Hartman and Rosenthal, payments to physicians for physician-
administered drugs and related services are predominantly based
on AWP.  (Rosenthal 10.)  Defendants' expert Young disagrees,
opining that the payments are negotiated as part of the overall
physician fee schedule involving both drugs and services and that
TPPs do not consider the providers' acquisition costs to be
relevant.  Dr. Berndt views the record as "unsettled" on this
point.  (Berndt ¶ 98.)

In the SAMCC, plaintiffs quote dozens of documents from
defendants demonstrating an aggressive marketing of the spread to
doctors (e.g., ¶ 347 ("Currently, physician practice can take
advantage of the growing disparity between Vepesid's list price
(and, subsequently, the Average Wholesale Price) and the actual
acquisition cost when obtaining reimbursement . . . .") (quoting
the BMS Group)), including many charts demonstrating how much
better the spreads were on a particular defendant's drugs than on
its competitors' (e.g, ¶¶ 238, 239 ("[O]ffices . . . can increase

28

their profit margin greatly by purchasing ZOLADEX") (quoting AstraZeneca)) with titles such as "Profit Maximization – It's in the Bag" (accompanying a medicine marketed in a premixed bag) (¶ 398 (quoting the GSK Group)).

There are several salient differences between the physician-administered and self-administered contexts.  First, no pharmacies, retail or mail-order, generally are involved in the physician-administered context because the physician dispenses and administers the drug.  While specialty pharmacies have recently begun to provide specialized delivery and administration services on a "high cost and high touch" basis (Berndt ¶ 100), these pharmacies make up a small percentage of the market, and their significance during the majority of the class period is unclear.  (Young ¶ 32; Berndt ¶¶ 99, 103, 188.)  Rebates to specialty pharmacies are rare because many physician-administered drugs are single-source and are the only products in their therapeutic classes.  (Berndt ¶ 103.)

Second, PBMs are generally not involved in this arena, both because the administration of claims ordinarily requires individualized, specialized attention rather than rote processing, and because the percentage of the drug market involving physician-administered drugs is relatively small (no more than 11% of total prescription costs in 2002, and less than that previously).  (Berndt ¶¶ 100, 137, 187.)

29

Third, the amounts of money involved tend to be higher per transaction, often in the neighborhood of $5,000 to $250,000 per patient per year.  (Rosenthal 10.)   Therefore, the total amount of co-insurance payments by consumers may be significant.

Because doctors are involved as both retailers and as prescribing physicians, manufacturers, realizing the purchasing power of physicians, provide them with rebates, leading to large profits for the doctors on the prescription and administration of certain drugs.  These profits now allegedly comprise a large percentage of these doctors' income; according to Hartman, two-thirds of the income of practice-based oncologists comes from the mark-up on injectable drugs.  (Hartman Rebuttal ¶ 68.)   Some experts have commented that "the financial incentives created by this profitability played a large and problematic role in prescribing decisions" from 1998-2003 because "prescribers responded to these high margins by tending towards administering more (and more expensive) drugs than might be medically necessary or optimal for the health of the patient."  (Schondelmeyer ¶ 45 (citing expert panel members cited in Stephen W. Schondelmeyer & Marian V. Wrobel, Medicare and Medicaid Drug Pricing: Strategy to Determine Market Prices 7 (2004).)

Because physician-administered drug reimbursement has been based on a five-digit "J-Code" system, which does not differentiate for strength, dosage and packaging (unlike NDCs),

30

the issue of pricing transparency becomes an "order of magnitude

larger" in this context.   (Berndt ¶ 199).

> In summary, when medical benefit expenditure data are
> poorly monitored and "tracking patient data is nearly
> impossible", and when this is widely known,
> possibilities for mischief and abuse arise.    That
> appears to be the case for physician-administered drugs
> adjudicated under the medical benefit.

(Berndt ¶ 191.)

Approximately 70% of physician-administered drugs are

administered and reimbursed as a medical service rather than as a

prescription benefit, typically resulting in higher reimbursement

because of the difficulty of separating costs.   (Berndt ¶¶ 104,

108.)   Because doctors must incur the costs of administration and

inventory for these drugs, most plans provide for an

administration fee separate from the cost of the drug.

## IV.   RULE 23 STANDARD

Rule 23(a) sets forth several prerequisites to a class

action.   A class may be certified only if:

> (1) the class is so numerous that joinder of all
> members is impracticable; (2) there are questions of
> law or fact common to the class; (3) the claims or
> defenses of the representative parties are typical of
> the claims or defenses of the class; and (4) the
> representatives will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. P. 23(a).   Plaintiffs seek to certify a class

pursuant to Rule 23(b)(3), which provides that an action may be

maintained only if, additionally,

> the court finds that the questions of law or fact

31

common to the members of the class predominate over any
questions affecting only individual members, and that a
class action is superior to other available methods for
the fair and efficient adjudication of the controversy.
The matters pertinent to the findings include: (A) the
interest of members of the class in individually
controlling the prosecution or defense of separate
actions; (B) the extent and nature of any litigation
concerning the controversy already commenced by or
against members of the class; (C) the desirability or
undesirability of concentrating the litigation of the
claims in the particular forum; (D) the difficulties
likely to be encountered in the management of a class
action.

Fed. R. Civ. P. 23(b)(3).

A court may certify a class on certain issues, like

liability. See Fed. R. Civ. P. 23(c)(4)(A). The need for

individualized damage proceedings does not ordinarily defeat

predominance where there are still disputed common issues as to

liability. Tardiff v. Knox County, 365 F.3d 1, 6-7 (1st Cir.

2004). "Failing some practical solution allowing full resolution

of all class damage claims in a single case, the court could

enter a judgment of liability, leaving class members to pursue

damage claims in separate law suits." Id.; see also In re Visa

Check/MasterMoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir.

2001) (listing solutions to individual damage issues, such as

"bifurcating liability and damage trials with the same or

different juries . . . [and] decertifying the class after the

liability trial and providing notice to class members concerning

how they may proceed to prove damages").

A district court must determine whether a proposed class

32

meets the exacting prerequisites established by Rule 23.  Smilow
v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir.
2003).  In "determinating the propriety of a class action, the
question is not whether the plaintiff or plaintiffs have stated a
cause of action or will prevail on the merits, but rather whether
the requirements of Rule 23 are met."  Mowbray, 208 F.3d at 298
(quoting Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)
(internal citation omitted)).  However, "a district court must
formulate some prediction as to how specific issues will play out
in order to determine whether common or individual issues
predominate in a given case."  Mowbray, 208 F.3d at 298; see also
Tardiff, 365 F.3d at 4-5 ("It is sometimes taken for granted that
the complaint's allegations are necessarily controlling; but
class action machinery is expensive and in our view a court has
the power to test disputed premises early on if and when the
class action would be proper on one premise but not another.").

## V.   CLASS ONE: PHYSICIAN-ADMINISTERED DRUGS

The first proposed nationwide class encompasses physician-
administered drugs paid for by (1) consumers making co-insurance
payments pursuant to Medicare Part B; (2) TPPs providing private
supplemental (MediGap) insurance to cover all or part of the
Medicare Part B co-payments; (3) consumers making co-insurance
payments for physician-administered drugs pursuant to private
plans provided by TPPs; and (4) TPPs paying for these drugs

outside the Medicare context.  Plaintiffs allege that defendants

caused the class injury by fraudulently inflating AWPs in

violation of state consumer protection laws.[15]

**A.   PHYSICIAN-ADMINISTERED CLASS OF MEDICARE PART B
      BENEFICIARIES**

With respect to the physician-administered class, the Court

first addresses the claims of the proposed class of Medicare Part

B beneficiaries who themselves make co-payments.

**1.   _Numerosity_**

Plaintiffs state that there are an estimated 40 million

Medicare beneficiaries, many of whom have co-paid for drugs

_____

[15]  Plaintiffs propose certifying a class under the
following laws:  Ala. Code § 8-19-5(27); Alaska Stat. §
45.50.471; Ariz. Rev. Stat. § 44-1522, subd. A; Ark. Code § 4-88-
107(a); Cal. Civ. Code § 1770, Cal. Bus. & Prof. Code § 17200;
Colo. Rev. Stat. § 6-1-105(1); Conn. Gen. Stat. § 42-110b(a); 6
Del. Code § 2513(a); D.C. Code § 28-3904; Fla. Stat. Ann. §
501.204(1); Ga. Code Ann. § 10-1-393(a); Haw. Rev. Stat. § 481A-
3(a); Idaho Code § 48-603; 815 Ill. Comp. Stat. 505/2; Ind. Code
§ 24-5-0.5-3(a); Iowa Code § 714.16.2(a); Kan. Stat. Ann. § 50-
626(a); Ky. Rev. Stat. § 367.170(1); La. Rev. Stat. § 51:1405;
Me. Rev. Stat. tit. 5, § 207; Md. Com. Law Code §§ 13-303, 13-
301; Mass. Gen. L. ch. 93A, § 2; Mich. Comp. Laws § 445.903;
Minn. Stat. § 325D.44; Miss. Code Ann. § 75-24-5(1); Mo. Rev.
Stat. § 407.020.1; Mont. Code § 30-14-103; Neb. Rev. Stat. § 59-
1602; Nev. Rev. Stat. § 598.0915; N.H. Rev. Stat. § 358-A:2; N.J.
Rev. Stat. § 56:8-2; N.M. Stat. § 57-12-3; N.Y. Gen. Bus. Law §
349(a); N.C. Gen. Stat. § 75-1.1(a); N.D. Cent. Code § 51-15-02;
Ohio Rev. Code § 1345.02(a); Okla. Stat. tit. 15, §§ 752(13); Or.
Rev. Stat. § 646.608(1); Pa. Stat. tit. 73, § 201-2(4); R.I. Gen.
Laws §§ 6-13.1-2, 6-13.1-1(5)(xiii) and (xiv); S.C. Code § 39-5-
20(a); S.D. Codified Laws § 37-24-6; Tenn. Code Ann. § 47-18-
104(a); Tex. Bus. & Com. Code § 17.46(a); Utah Code § 13-11-4(1);
Vt. Stat. tit. 9, § 2453; Va. Code § 59.1-200; Wash. Rev. Code §
19.86.020; W. Va. Code § 46A-6-104; Wis. Stats. § 100.18(1); and
Wyo. Stat. § 40-12-105(a).  (Mem. in Support, App. B.)

covered by Medicare.  Defendants have not challenged the numerosity requirement.

### 2. Commonality

"A class has sufficient commonality 'if there are questions of fact and law which are common to the class.'" Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998) (quoting Rule 23(a)(2)).  "The threshold of 'commonality' is not high.  Aimed in part at 'determining whether there is a need for combined treatment and a benefit to be derived therefrom,' the rule requires only that resolution of the common questions affect all or a substantial number of the class members."  Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 472 (5th Cir. 1986).

> All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

Hanlon, 150 F.3d at 1019.  "The test or standard for meeting the Rule 23(a)(2) prerequisite is qualitative rather than quantitative; that is, there need be only a single issue common to all members of the class.  Therefore, this requirement is easily met in most cases."  1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.10 (4th ed. 2002).

Here, there are numerous common factual issues: whether the AWPs and/or WACs for the AWPIDs were misrepresented, whether that misrepresentation was intentional, whether it was done with a

35

fraudulent intent, and whether it proximately caused harm to consumers.  Defendants have not challenged the commonality requirement.

### 3.    **Typicality and Standing**

Defendants challenge plaintiffs' claim that the named plaintiffs are typical representatives for the Medicare Part B class, arguing that no named individual plaintiff purchased drugs under Medicare Part B, that association plaintiffs are inadequate representatives because they cannot recover damages, and that the United Food and Commercial Workers Unions & Employees Midwest Health Benefits Fund ("UFCW") as a co-insurer under Medicare Part B is subject to unique defenses.  Plaintiffs concede that no individual class member has paid for drugs under Medicare Part B, but argue that the associations and UFCW possess claims typical of the class.[16]

Rule 23(a)(3) provides that a class action may be maintained only if the claims of the representative parties are typical of the claims of the class.

> Typicality determines whether a sufficient relationship
> exists between the injury to the named plaintiff and
> the conduct affecting the class, so that the court may
> properly attribute a collective nature to the
> challenged conduct.  In other words, when such a
> relationship is shown, a plaintiff's injury arises from

───────────

[16]   In the SAMCC, plaintiffs name two individual plaintiffs who purchased drugs under the Together Rx Card Program, but do not allege that these individuals purchased physician-administered drugs or paid based on AWP.

or is directly related to a wrong to a class, and that
wrong includes the wrong to the plaintiff. Thus, a
plaintiff's claim is typical if it arises from the same
event or practice or course of conduct that gives rise
to the claims of other class members, and if his or her
claims are based on the same legal theory.

In re Am. Med. Sys., Inc., 75 F.3d 1069, 1082 (6th Cir. 1996)

(quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class

Actions § 3.13 (3d ed. 1992)) (holding that district court erred

by failing to probe issue of whether class representatives'

claims were typical even of "each other, let alone a class"); see

also In re Terazosin Hydrochloride Antitrust Litig., 220 F.R.D.

672, 686 (S.D. Fla. 2004) (finding that representatives were

typical of plaintiffs all subject to overcharge for drug even

though members paid for overcharge in different ways).  "The

typicality requirement 'is designed to align the interests of the

class and the class representatives so that the latter will work

to benefit the entire class through the pursuit of their own

goals.'"  In re Warfarin Sodium Antitrust Litig., 391 F.3d 516,

531 (3d Cir. 2004) (citation omitted).  "Typicality, as with

commonality, does not require 'that all putative class members

share identical claims.'"  Id. at 531-32 (citation omitted).

"Although [the plaintiffs] may not have suffered identical

damages, that is of little consequence to the typicality

determination when the common issue of liability is shared."  In

re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 28

(D.D.C. 2001) (quoting Lewis v. Nat'l Football League, 146 F.R.D.

5, 9 (D.D.C. 1992)) (finding representatives' claims typical despite the fact that some class members bought directly whereas others bought from agents or wholesalers at various rates in multitude of contracts).

No individual Medicare Part B consumer-patients have been proposed as class representatives, so the key question is whether an association with members who are patients meets the typicality requirement.  In affidavits, association plaintiffs claim that their members make co-payments under Medicare Part B.  (See, e.g., Aff. of N.Y. Statewide Senior Action Counsel ¶ 4; Aff. of Citizen Action of N.Y. ¶ 4.)  In the SAMCC, each association seeks only injunctive and declaratory relief and does not seek monetary relief on behalf of its members.  Defendants do not challenge the standing of the associations to seek equitable relief,[17] but do contend that they cannot adequately represent class members asserting damage claims.

"[S]tanding . . . frequently appear[s] as [a] threshold requirement[] for the maintenance of federal class actions and must be considered in addition to the requirements of Rule 23 when deciding whether a particular action may be certified."  7AA Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 1785.1 (3d ed. 2005); see also Prado-

---

[17]     Defendants challenge the standing of one association to seek any relief because at a deposition, the deponent could not provide members' names.  However, defendants do not challenge the standing of the other associations on this ground.

38

Steiman v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000) ("[I]t is
well settled that prior to the certification of a class, and
technically speaking before undertaking any formal typicality or
commonality review, the district court must determine that at
least one named class representative has Article III standing to
raise each class subclaim."); Bano v. Union Carbide Corp., 361
F.3d 696, 713-16 (2d Cir. 2004) (rejecting claims of association
to be class representative on standing grounds).  Cf. Payton v.
County of Kane, 308 F.3d 673, 680 (7th Cir. 2002) ("[There is a]
long-standing rule that, once a class is properly certified,
statutory and Article III standing requirements must be addressed
with reference to the class as a whole, not simply with reference
to the individual named plaintiffs.").

      Generally speaking, associations do not have standing to
seek monetary damages for injuries to their members.  To
establish standing on behalf of its members, each association
must show:

      (a) its members would otherwise have standing to sue in
      their own right; (b) the interests it seeks to protect
      are germane to the organization's purpose; and (c)
      neither the claim asserted nor the relief requested
      requires the participation of individual members in the
      lawsuit.

United Food & Commercial Workers Union Local 751 v. Brown Group,
Inc., 517 U.S. 544, 553 (1996) (quoting Hunt v. Wash. State Apple
Adver. Comm'n, 432 U.S. 333, 343 (1977)).  Most courts have held
that associations do not have standing to seek damages on behalf

39

of their members where both the fact and stated extent of injury would require individualized proof. See Bano, 361 F.3d at 715 ("[W]e know of no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members."); Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 650 n.5 (2d Cir. 1998) ("An association generally cannot seek relief in damages for injuries to its members because unless the alleged injury is common to its entire membership, and shared by all to an equal degree, both the fact and extent of injury would require individualized proof." (citation omitted)); Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R., 906 F.2d 25, 35-36 (1st Cir. 1990) (holding that an association has no standing to sue on behalf of its members when seeking monetary relief to compensate its members' injuries).

The key question, then, is whether an association may serve as a class representative for class members seeking to recover monetary damages.  Allowing an association to be a class representative presents substantial advantages in cases like this one, in that associations likely have the motivation and resources to continue to act as representatives through the course of a multi-year litigation, as compared to elderly cancer patients, whose declining health may impair their ability to participate actively.  Nonetheless, in Bano, the Second Circuit rejected this argument, stating: