## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ ) | |
| IN RE PHARMACEUTICAL INDUSTRY ) | |
| AVERAGE WHOLESALE PRICE ) | MDL NO. 1456 |
| LITIGATION ) | Civil Action No. 01-12257-PBS |
| _____ ) | |
| ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO THE ) | |
| AMENDED MASTER CONSOLIDATED ) | Chief Mag. Judge Marianne B. Bowler |
| CLASS ACTION ) | |
| _____ ) | |

**JOHNSON & JOHNSON AND ORTHO BIOTECH PRODUCTS L.P.'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO
COMPEL THE JOHNSON & JOHNSON GROUP TO PRODUCE DOCUMENTS AND
FOR AN EXTENSION OF DISCOVERY AND IN SUPPORT OF JOHNSON &
JOHNSON AND ORTHO BIOTECH PRODUCT L.P.'S
<u>CROSS MOTION FOR SANCTIONS</u>**

**Table of Contents**

**Page**

Preliminary statement ...................................................................................................................1

DISCUSSION ................................................................................................................................3

1.    The License Arbitration Did Not Concern Claims Of AWP Inflation Or Marketing
      The Spread And Is Not Relevant To The AWP Litigation...................................................3

2.    OBP Did Not Conceal Anything From Plaintiffs, Who Have Long Been Familiar
      With The License Arbitration .............................................................................................5

   (i)    OBP's Counsel Promptly And Accurately Responded  To All Queries About The License
   Arbitration.............................................................................................................................5

   (ii)   Plaintiffs Have Long Had A Detailed Familiarity with the Arbitration .............................8

3.    Plaintiffs Waived Any Challenge to OBP's Longstanding and Legitimate Objection
      to the Production of All Rebate and Discount Documents ...................................................9

4.    Plaintiffs Breached the Local Rules Requiring Conferral Prior to Filing of
      Discovery Motions ...........................................................................................................11

Cross motion for sanctions...........................................................................................................12

Conclusion ...................................................................................................................................16

# Table Of Authorities

Page(s)

## Cases

Duxbury v. Ortho Biotech, Inc., No. 52348-1-I, 2004 WL 938588, at *1
(Wash. Ct. App. May 3, 2004).......................................................................8

Prozina Shipping Co. Ltd. v. Thirty-Four Automobiles, 179 F.R.D. 41
(D. Ma. 1998)............................................................................................13

Syrjala v. Total Healthcare Solutions, Inc., 186 F.R.D. 251
(D. Ma. 1999)............................................................................................12

## Statutes

Local Rules of the United States District Court for the District of Massachusetts
7.1(a)(2) and 37.1(a). ................................................................................11

Johnson & Johnson and Ortho Biotech Products L.P. (collectively "OBP") respectfully submit this Memorandum of Law in Opposition to Plaintiffs' Motion to Compel the Johnson & Johnson Group to Produce Documents and for an Extension of Discovery and in Support of OBP's Cross-Motion for Sanctions.

## PRELIMINARY STATEMENT

Plaintiffs have been engaged in discovery from OBP since October 2002.  Since that time, they have reviewed tens of thousands of pages of documents, analyzed reams of financial data, and taken fourteen depositions of current and former OBP employees.  That discovery has established firmly that OBP always had a policy in place prohibiting "marketing of the spread"[1]; that OBP has never manipulated the spread; and that margins on OBP's drugs have always been modest.

Faced with this record and looming summary judgment, plaintiffs now seize upon a pretense to try and expand the claims at issue and extend discovery beyond the August 31 cut-off, arguing that OBP has intentionally concealed relevant documents from an earlier arbitration. This claim fails for at least four reasons:  (1) The earlier arbitration had nothing to do with AWP or spread; (2) OBP did not conceal the arbitration and, indeed, discussed the arbitration with plaintiffs over a year ago; (3) plaintiffs have long been familiar with the details of that case; and (4) insofar as any relevant documents regarding AWP or the spread were produced by happenstance in that arbitration, OBP *already* agreed to produce them and has done so.

Plaintiffs' only substantive response is that there may be additional documents produced in the earlier arbitration reflecting rebates and discounts offered to customers, and so they are entitled to all such documents and all submissions to the arbitrator.  This argument is

---

[1] Plaintiffs use the term "marketing the spread" to refer to the promotion to physicians of the difference between the physicians' acquisition costs and any AWP-based reimbursement.

wholly without merit.  OBP told plaintiffs as early as January 2004 that it would only produce documents and data <u>sufficient to determine</u> all rebates and discounts offered.  That was the same position taken by OBP's affiliates.  Plaintiffs did not object that position or insist that OBP (or its affiliates) produce <u>all</u> documents that mentioned a rebate or discount regardless of the burden or duplication of content.  OBP then produced documents, data, and witnesses detailing the rebates and discounts offered over time.  OBP also produced summary documents on rebates and discounts from the arbitration.  It is indefensible for plaintiffs now to assert, on the eve of the close of discovery and after all collections and productions have been completed, that OBP should produce all documents referencing any incentive, particularly since plaintiffs concede they have not sought and are not seeking that documentation from OBP's affiliates.  Plaintiffs have provided no justification for imposing on OBP the immense cost of reviewing millions of pages from an inactive litigation file to locate documents that merely duplicates previously produced rebate and discount data.

Not only is plaintiffs' motion premised on demonstrably false pretenses, it is also procedurally infirm.  Plaintiffs failed to conduct a meet and confer prior to filing this motion and have filed a misleading certification pursuant to Local Rule 7.1.  In fact, plaintiffs provided no advance notice that they intended to file this motion and sought no meet and confer.  Indeed, OBP was surprised by this motion given that (a) OBP already had agreed to review documents from the arbitration and produce any documents regarding AWP, spread or marketing of the spread and (b) OBP's affiliates had consented to voluntarily extend the discovery cut-off in discrete respects when plaintiffs provided a good faith request to do so.  This is precisely the type of motion practice the Local Rules were designed to prevent and plaintiffs' intentional failure to comply with the rules is grounds for sanctions.

## DISCUSSION

The heart of plaintiffs' motion is simply stated: that OBP and Amgen were involved in a previous arbitration that is "highly relevant" to this case; that OBP and Amgen have spent the last two and half years engaged in "intentional efforts to mislead, conceal and withhold from plaintiffs" information about that arbitration and documents produced therein; and that OBP has engaged in such undue delay in responding to discovery demands about the arbitration so as to merit an extension of discovery. Every aspect of this claim is demonstrably untrue.

**1.      The License Arbitration Did Not Concern Claims Of
          AWP Inflation Or Marketing The Spread And Is Not
          Relevant To The AWP Litigation**

Plaintiffs contend that the confidential arbitration between OBP and Amgen concerned the same issues in dispute here, and that OBP should have produced documents from that case in response to its document demands. These contentions are unsustainable.

The arbitration in question stemmed from Amgen's efforts to terminate a license agreement it had entered into with OBP, whereby Amgen retained the right to sell the drug epoetin alfa for use in the dialysis sector (and did so under the brand name Epogen) and licensed OBP to sell epoetin alfa to all other market sectors (which OBP did under the brand name Procrit). Amgen's claimed basis for terminating OBP's license was the assertion that OBP failed to take sufficient steps to ensure that Procrit was not administered to dialysis patients. ***Notably, Amgen asserted no claims in the course of that arbitration concerning AWP pricing, AWP manipulation or any marketing of the spread***; and plaintiffs do not dispute this. Indeed, as plaintiffs are aware, OBP's search of the arbitration hearing transcripts found no references to AWP or Average Wholesale Price whatsoever. <u>See</u> Declaration of Erik Haas ("Haas Decl.") ¶¶ 12-13.

- 3 -

In stands to reason that the arbitration did not involve allegations of AWP manipulation and marketing the spread because reimbursement for epoetin alfa in the dialysis sector is fixed by statute at a specified dollar amount, ***and is not based on AWP***.[2]  Amgen's claims in the arbitration were simply that OBP sales representatives were promoting their drug to dialysis centers as well as in their contractually agreed indications.  (Haas Decl. ¶ 13).

OBP disputed Amgen's claims and the case proceeded to arbitration.  Prior to the actual hearing, millions of pages of documents were exchanged by the parties and extensive discovery took place.  After the hearing, Amgen's request for termination of OBP's license was denied by the arbitrator.  (Haas Decl. ¶ 14).

Despite being aware of this background, plaintiffs contend that OBP should have produced <u>all</u> the submissions made to the arbitrator and the millions of pages produced in the arbitration in response to plaintiffs' demands for documents concerning ***AWP-related litigations***. Specifically, plaintiffs point to requests numbered 3 and 5, which seek documents from litigations wherein it was alleged that OBP "[m]isstated, or otherwise manipulated the AWP for any AWPID…."  <u>See</u> Memorandum of Law in Support of Plaintiffs' Motion to Compel the Johnson & Johnson Group to Produce Documents and For an Extension of Discovery ("Plaintiffs' Br.") at 5.  They also point to request no. 22 in their second document demands calling for "all documents produced by you in any litigation…related to the use of AWP in Medicare, Medicaid, or private reimbursement."  (<u>Id</u>.)

---

[2] Plaintiffs' counsel seeks to mislead the court with carefully phrased claim that "OB[P]'s documents and testimony show that in the dialysis sector, at least some Procrit is reimbursed based on AWP."  In fact, it is undisputed that well over 90% of dialysis patients are Medicare beneficiaries and their epoetin alfa usage (whether Procrit or Epogen) is reimbursed under the ESRD program at a fixed statutory amount, which has been $10 per 1000 units for most of the class period.  Insofar as there may be reimbursement of dialysis use of Procrit by private payors it is *de minimis*, and there is no evidence to suggest even that reimbursement is based on AWP.  Moreover, there is no suggestion that amount of reimbursement was ever used by any OBP or Amgen sales representatives as a marketing tool to dialysis centers.

For the reasons detailed above, there were no such AWP-related allegations asserted in the license arbitration between Amgen and Ortho. Simply put, the documents from that arbitration are not responsive to plaintiffs' demands and it would be unduly burdensome for OBP to collect, review and produce millions of pages of irrelevant documents from those inactive litigation files.

## 2.     OBP Did Not Conceal Anything From Plaintiffs, Who Have Long Been Familiar With The License Arbitration

In an effort to adjourn the court-ordered discovery cut-off, plaintiffs purport to have just uncovered a grand conspiracy between OBP and Amgen to mislead plaintiffs about the license arbitration and conceal highly relevant documents purportedly secreted therein. This argument fails for at least two reasons.

### (i)     OBP's Counsel Promptly And Accurately Responded To All Queries About The License Arbitration

Plaintiffs make broad and indignant assertions that they were mislead and that OBP delayed disclosures, but fail to point to a single misleading representation made by OBP's counsel or a single concrete instance of delay. As detailed in plaintiffs' own moving brief, plaintiffs' counsel asked OBP's counsel about the arbitration at the very first OBP deposition in July 2004. In response, OBP's counsel provided a detailed and accurate description of the arbitration and explained why it was not relevant to this case. If dissatisfied in any way, plaintiffs' counsel was free to explore the topic further with OBP's corporate representative who was under deposition, but elected not to do so.[3] Similarly, plaintiffs were free to explore the

---

[3] Ironically, plaintiffs' counsel now faults that witness, Thomas Hiriak, for not volunteering information about that arbitration even though he was asked no questions about it. Indeed, in the sections of the deposition transcript plaintiffs cite, Mr. Hiriak was asked only (1) whether there were any OBP documents marketing the spread, in response to which Mr. Hiriak stated that OBP has always had a policy prohibiting marketing of the spread so there are no such documents (Hiriak Tr. at 119-120); and (2) whether there were OBP documents discussing incentives, in response to which Mr. Hiriak confirmed that OBP does carry out such internal analysis of rebates and discounts (Hiriak Tr. at 635-638).

arbitration with OBP's second witness William Pearson, who testified that he had been deposed in connection with the arbitration, but chose not to explore the topic.  Instead plaintiffs' counsel sat quiet for months,  took limited discovery, and made no inquiries regarding the arbitration. Then, in the last two months of a thirty-five month discovery process, plaintiffs noticed eleven more depositions.  (Haas Decl. ¶ 16).

During that last moment flurry of depositions, plaintiffs' counsel freely explored the issues at stake in the arbitration.  Simultaneously, plaintiffs' counsel questioned OBP's counsel as to whether documents produced in the arbitration were relevant to the allegations in this litigation.  Counsel for OBP responded immediately clarifying that this was not the case and again explaining the nature of the claims asserted in the arbitration.  Id. ¶ 17 & Exh. 2.[4]

On June 30, 2005 counsel for plaintiffs wrote back to counsel for OBP requesting confirmation that "Amgen has made no allegations regarding the marketing, and/or promoting of Procrit based on a spread between acquisition cost and reimbursement in Amgen's reserved market in any litigation/arbitration/mediation or other legal proceeding from 1991 to present." See Haas Decl. ¶ 18 & Exh. 3.  Counsel for OBP confirmed that by letter on July 1, 2005 using the exact language provided by plaintiffs.  OBP's counsel also advised plaintiffs' counsel that OBP had contacted Amgen's counsel and confirmed that they agreed with OBP's position. Counsel for OBP then considered the issue resolved, since plaintiffs had sought and received a written confirmation regarding the irrelevance of the arbitration in the precise language sought. See Haas Decl. ¶ 19 & Exh. 4.

Nonetheless, plaintiffs returned again insisting that OBP search the arbitration files.  At that point, to avoid the expense of a protective order motion, OBP agreed to search the

---

[4] All exhibits referenced herein are appended to the Haas Decl.

- 6 -

millions of pages produced in the arbitration for documents about AWP, the spread or marketing

of the spread. OBP's counsel sent plaintiffs an email explaining the search would capture any

documents sought and offered to discuss the issue further. Counsel for plaintiffs did not direct

counsel for OBP to halt the search and did not propose any alternative parameters. Indeed,

plaintiffs did not respond at all, but stood by and awaited the results. See Haas Decl. ¶ 20 &

Exh. 5.

Receiving no response from plaintiffs' counsel, OBP then started reviewing the

millions of pages of arbitration documents for "hits." On August 10, 2005 OBP produced the

first responsive documents and stated that additional documents would be produced as they were

reviewed. *On August 16, 2005, with no warning, plaintiffs served this motion.* Nonetheless,

OBP produced the remaining documents it had culled after a continuing review on August 19,

2005. As expected, only a tiny percentage of the millions of documents produced in the

arbitration were found relevant and were similar in kind to documents already produced.

Moreover, none of the documents produced indicated any marketing of the spread by OBP.[5]  See

Haas Decl. ¶ 21 & Exh. 6.

In sum, plaintiffs elected to wait until the eve of the close of discovery before

pressing their claim that the arbitration was somehow relevant to this case. They then stood by

while OBP searched those millions of pages pursuant to specified search parameters. Without

even waiting the complete results, they then filed this motion. Even if the arbitration contained

---

[5] Plaintiffs darkly speculate at various points in their brief as to why the relative volume of pre-1998 documents produced by OBP is lower than the volume of post 1998 documents. Plaintiffs are correct that part of the answer lies in document retention policies (and their apparent back handed claim at page 8 of their brief that OBP should have held all documents as a result of government investigations into other unrelated companies even though those had nothing to do with OBP is ludicrous). But another reason is that OBP has never marketed the spread and pre-2001 had no competition, so was not doing even the internal economic calculations that are captured by plaintiffs' document demands for the later period. Plaintiffs did not request clinical marketing documents, which make up the bulk of pre-1998 marketing material.

any relevant and non-duplicative documents – and clearly based upon the searches performed it does not – any delay in addressing issues relevant to the arbitration is plaintiffs' alone.[6] (Haas Decl. ¶¶ 20, 21).

> (ii)   **Plaintiffs Have Long Had A Detailed Familiarity with the Arbitration**

Plaintiffs' assertion that details regarding the arbitration were somehow concealed from their counsel are also remarkable for another reason – plaintiffs are working with a litigation consultant who has spent *years* litigating issues surrounding the license arbitration.

The consultant in question is a former OBP employee, Mark Duxbury.  Mr. Duxbury previously filed suit against OBP for wrongful termination, alleging he was dismissed for selling into the dialysis sector despite being instructed to do so.  In other words, Mr. Duxbury alleged he was terminated for participating in the same purported conducted that formed the basis of the arbitration at issue here.  As part of that wrongful termination suit, moreover, Mr. Duxbury sought and received access to numerous documents and briefs from the arbitration and also submitted detailed affidavits concerning the litigation.  (Haas Decl. ¶ 10).  Eventually, however, OBP was granted summary judgment dismissing the suit.  See Duxbury v. Ortho Biotech, Inc., No. 52348-1-I, 2004 WL 938588, at *1 (Wash. Ct. App. May 3, 2004) (affirming summary judgment dismissing the action).

Mr. Duxbury nonetheless persevered, filing a *qui tam* action in November 2003, which sought to connect OBP's purported promotion for dialysis (as alleged in the Amgen arbitration and his wrongful termination case) to claims related to AWP manipulation and marketing of the spread.  See ex rel. Duxbury v. Ortho Biotech Products L.P. (1:03-cv-12189-

---

[6] OBP notes that plaintiffs make numerous allegations claiming that various statement made by OBP's counsel Mr. Andrew Schau were false or misleading.  For the record, OBP strongly denies this unfounded and offensive suggestion.  Mr. Schau accurately described the scope of the arbitration at plaintiffs' counsel's request and the written record of those communications speaks for itself.

RWZ).  The federal government declined to intervene in Mr. Duxbury's *qui tam* suit.  Notably, *Mr. Duxbury is represented in that suit by plaintiffs' counsel here.*

Further still, Mr. Duxbury has extended his relationship with plaintiffs' counsel to this case.  Mr. Duxbury is working as a "litigation consultant" for plaintiffs' counsel, attending depositions and assisting plaintiffs' counsel.  See Declaration of Lyndon Tretter appended hereto.  Given Mr. Duxbury's first hand knowledge of the allegations in the arbitration between Amgen and Ortho, and his intimate relationship with plaintiffs' litigation counsel, plaintiffs' claimed ignorance of the arbitration as a basis for extending discovery here is not sustainable.  Indeed, it appears plaintiffs are seeking access to the arbitration documents in a misguided effort to breathe life into Mr. Duxbury's *qui tam* suit.

3.   **Plaintiffs Waived Any Challenge to OBP's Longstanding and Legitimate Objection to the Production of All Rebate and Discount Documents**

Since OBP already has produced all documents regarding AWP, spread or marketing of the spread from the license arbitration, plaintiffs' argument here collapses into a claim that they are entitled to any document or submission from any OBP inactive litigation file that mentions any discounts or rebates offered to any customer.[7]  This argument is indefensible.

As an initial matter, plaintiffs have long had notice of OBP's position regarding the production of duplicative rebate and discount data, and have waived any objection to the scope of OBP's production.  Plaintiffs served their first document demands upon OBP in December 2003.  Those requests included a Request No. 14 seeking, along other things, "all

---

[7] The breadth of plaintiffs' demand is breathtaking.  For example, just one portion of their proposed order seeks the production *within ten days* of documents that "include, but are not limited to, any sales, marketing and/or pricing materials referring or relating to reimbursement, AWP, discounts, incentives, rebates, or other remuneration offered to customers or potential customers, as well as any affidavits, declarations, exhibit lists, expert reports, deposition testimony and accompanying exhibits, trial testimony and accompanying exhibits or other legal materials used in the legal proceeding."  See Plaintiffs' Proposed Order at ¶ 2.

documents relating to any actual, proposed or prospective…discount programs, rebates, incentives…" for Procrit.  OBP responded on January 16, 2004 as follows:

> **Response to Request 14:** OBP objects to this request as vague, overly broad and unduly burdensome to the extent that it seeks "[a]ll documents" regarding "any actual, proposed, or prospective AWP announcements, price changes, discount programs, rebates, incentives, penalties, or lists."   OBP further objects to this request as duplicative of Request No. 6.
> Subject to all foregoing general and specific objections and to the Preliminary Statement, OBP will produce relevant, responsive and non-privileged documents, if any, concerning any change in Procrit's AWP or WAC, and documents sufficient to determine any discounts, rebates, incentives or penalties concerning Procrit. [Emphasis Added].

See Haas Decl. ¶ 23 & Exh. 7

Plaintiffs' counsel raised no objection to this limitation and indeed, the parameters of production as defined formed the basis for the collection and document production efforts that followed over the next year and a half.  That production included reams of data produced electronically, which included all available data on every rebate or discount OBP has ever provided, as well as all contracts for rebates and discounts OBP has ever entered into.  To the extent centralized electronic systems did not house data for earlier years, OBP searched hard copy files and also the arbitration files, and produced financial data for that earlier period including excel spreadsheets and Microsoft access databases.  See Haas Decl. ¶ 24 & Exh. 8.

The first time plaintiffs' counsel took issue with OBP's approach was in the summer of 2005, when they suddenly claimed a right to every document mentioning any rebate or discount.  OBP's counsel then reiterated OBP's long standing position to plaintiffs' counsel, stating:

> Moreover, your request appears to assume that OBP is obliged to produce to you every document that in any way "refer, concern or relate to" OBP's "discounts, rebates, credits and/or any other remuneration offered and/or provided by J&J, OBP, OBP's sales

- 10 -

> representatives and/or any third parties to customers and/or
> potential customers." That request is breathtakingly overbroad,
> and vastly exceeds the scope of production that the parties agreed
> to. As you know, and as reflected OBP's Responses to Plaintiffs'
> Requests for Production of Documents, OBP agreed to produce
> documents and data "sufficient to determine" any discounts,
> rebates, incentives or penalties concerning Procrit. OBP has
> complied with its discovery obligations in good faith and will not
> agree now to your last-minute attempt to enlarge the scope of
> discovery.

See Haas Decl. ¶ 25 & Exh. 9.

Plaintiffs did not respond to or dispute this assertion until they filed this motion seeking production of "all documents" regarding any discount or rebate ever given by OBP to any customer regardless of duplication. (Haas Decl. ¶ 26).

Moreover, plaintiffs have provided no logical justification for their position. If plaintiffs' allegation is that the provision of a rebate or discount or somehow improper, they have details on every rebate or discount OBP has offered and can make the argument. The provision of additional documents confirming the existence of the very same rebates and discounts will not alter or strengthen plaintiffs' argument; but producing those duplicative documents will greatly burden OBP as it will require the search of millions of pages of documents from the arbitration. And this is to say nothing of the burden of duplicative depositions, given that OBP has already produced corporate representative and fact witnesses to testify about all rebates and discounts offered.

**4.    Plaintiffs Breached the Local Rules Requiring
         Conferral Prior to Filing of Discovery Motions**

The Local Rules of this Court include provisions designed to control unnecessary motion practice. Specifically, the Local Rules require that a party arrange a meet and confer with opposing counsel and seek to resolve or narrow disputed issues prior to filing a motion. See Local Rules of the United States District Court for the District of Massachusetts 7.1(a)(2) and

- 11 -

37.1(a).  The moving party is also required to certify in their moving papers that such a conferral has taken place.  Id.

Here, counsel for plaintiffs did not even attempt to arrange a meet and confer prior to filing this motion.  Indeed, OBP was surprised by the motion, given that plaintiffs and OBP had already agreed upon a scope of production from the arbitration and that production had commenced on a rolling basis.  This failure is particularly egregious given that the Johnson & Johnson companies have shown flexibility in the past when presented with a good faith basis for an extension.  For example, OBP's sister company Centocor has agreed to let plaintiffs' counsel take select depositions after August 31, 2005 where scheduling difficulties made that necessary.  Here, plaintiffs' actions preempted any discussion.  (Haas Decl. ¶ 3).   As such, plaintiffs' purported certification of compliance filed with their motion papers is grossly misleading.

OBP asked plaintiffs' counsel to point to any instances where they held a meet and confer or told counsel for OBP they planned to file a motion to compel.  Plaintiffs' counsel was unable to point to a single instance.  They referenced only multiple discussions about the relevance of the license arbitration documents (that these conversations took place is undisputed) and a passing conversation at a deposition where they complained about the speed of production of documents from the arbitration mentioning AWP or spread that OBP had agreed to produce on a rolling basis.  At no time did plaintiffs' counsel inform counsel for OBP that a motion to compel seeking all documents encompassed by their current motion was contemplated or that an extension of discovery would be sought.  (Haas Decl. ¶ 4).

## CROSS MOTION FOR SANCTIONS

Unlike OBP's attempt to hold a meet and confer prior to filing this cross-motion, Plaintiffs' failure to hold a meet and confer prior to filing their motion and the demonstrable lack

of any basis for their claims provides sufficient basis for an order of sanctions. <u>See</u> <u>e.g.</u>, <u>Syrjala v. Total Healthcare Solutions, Inc.</u>, 186 F.R.D. 251, 254 (D. Ma. 1999) (awarding sanctions against attorney for violating Local Rule 37.1 by filing a premature motion for a protective order without giving opposing counsel the opportunity for a discovery conference); <u>Prozina Shipping Co. Ltd. v. Thirty-Four Automobiles</u>, 179 F.R.D. 41 (D. Ma. 1998) ("Given the cavalier nature of the plaintiff's motion filed without regard to Local Rule 37.1, and without any serious attempt to offer particular facts in its support, I invite the claimants to file a Rule 37(a)(4) motion for their expenses and attorneys fees incurred in opposing the motion….").

Here, plaintiffs counsels' actions are exacerbated by the unreasonable positions they adopted when OBP sought a meet and confer on these issues in connection with its cross motion for sanctions and again sought to resolve this discovery dispute. All evidence to date in this case has confirmed that OBP has always had a policy prohibiting marketing of the spread; and there is not a scintilla of evidence to the contrary. Nonetheless, seeking to allay any concerns felt by plaintiffs' counsel, OBP reiterated its long standing offer to search the arbitration documents and transcripts, offering (i) expanding the query to include additional search terms reasonably tailored to retrieve any documents relevant to plaintiffs' allegations of "marketing the spread," (ii) review the documents generated and to produce documents responsive to plaintiffs' allegations, and (iii) to the extent any responsive documents are located, provide plaintiffs with the opportunity to depose OBP witnesses concerning such documentation after the discovery cut off date. (Haas Decl. ¶ 5).

Plaintiffs counsel initially agreed to this proposal, but the following day, provided a list of search terms that was not tailored to retrieve documents relevant to plaintiffs' allegations of marketing the spread. Rather, like plaintiffs' present motion, plaintiffs demanded that OBP

retrieve any documents containing terms specified on a list that included such terms as "incentive," "economic" or "reimbursement", which likely would generate thousand of pages of documents of irrelevant materials.  (Haas Decl. ¶ 6)

OBP made a counterproposal that was consistent with our agreement to search for documents pertaining to the so-called "marketing the spread."  This included numerous search terms targeted at that issue such as "margin" or "profit."  And OBP sent to plaintiffs' counsel a draft stipulation to withdraw the Motion to Compel and Adjourn in exchange for OBP's agreement to conduct the supplemental searches.  See Haas Decl. ¶ 7 & Exh. 1.

OBP then held numerous conversations with plaintiffs' counsel throughout the day seeking to resolve this dispute.  No agreement was reached as a consequence of plaintiffs' counsel's insistence: (1) on the inclusion of search terms such as "incentive," "reimburse" and "money" that are not tailored to retrieve documents relevant to plaintiffs' allegations of marketing the spread and are grossly overbroad; (2) that the production encompass even documents that did not reference any AWP-based spread, even though plaintiffs allegations and class definitions in this case are explicitly limited to AWP based spread and reimbursement. (Haas Decl. ¶ 8).

Notably, throughout all of these discussions, plaintiffs' counsel was unable to offer any good faith basis whatsoever to support the assertion that (a) the files he demanded OBP produce contained any documents concerning plaintiffs' allegations of manipulating AWP or marketing the spread, or (b) OBP had ever manipulated AWP or marketed the spread.  Indeed, even though plaintiffs had retained a "consultant" with knowledge of the files that they sought to search, plaintiffs' counsel was not willing to even make a proffer of the basis for his assertion that the files contained relevant documentation.  In fact, all fourteen of the OBP current and

former employees deposed by plaintiffs have testified that OBP always had a policy prohibiting marketing of the spread, and the depositions taken as recently as last week confirmed OBP's representation that the files would not contain relevant materials (Haas Decl. ¶ 9)  Plaintiffs' position is clearly little more than an ill-conceived fishing expedition with no regard for the burden on OBP of searching through potentially thousands of "hits" resulting from grossly overbroad search terms from a litigation that has nothing to do with the issues in this case – a position so grossly egregious as to further merit sanctions.

Accordingly, OBP cross-moves for sanctions here given that: (1) Plaintiffs filed this motion in breach of Local Rules requiring a meet and confer; (2) Falsely claimed that defendants had intentionally misled them and concealed relevant evidence; (3) Falsely claimed a lack of familiarity with the details of the arbitration; (4) Seek documents for use in an unrelated litigation; (5) Filed this motion on frivolous grounds, seeking documents that have either already been produced or which are duplicative of documents and data already produced. (6) Rebuffed OBP's reasonable efforts to resolve this dispute as presented during a meet & confer relevant to OBP's cross-motion for sanctions.

## CONCLUSION

For the above cited reasons, OBP respectfully requests that plaintiffs' motion be denied and that OBP's cross-motion for sanctions be granted.

Respectfully submitted,

_/s/ Erik Haas_

Andrew D. Schau (admitted *pro hac vice*)
Erik Haas (admitted *pro hac vice*)
Adeel A. Mangi (admitted *pro hac vice*)
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
(212) 336-2000

*Attorneys for Defendants Johnson &*
*Johnson and Ortho Biotech Products L.P.*

Dated:  August 31, 2005

**CERTIFICATE OF SERVICE**

I certify that on August 31, 2005, a true and correct copy of the forgoing

JOHNSON & JOHNSON AND ORTHO BIOTECH PRODUCTS L.P.'S MEMORANDUM OF

LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL THE JOHNSON &

JOHNSON GROUP TO PRODUCE DOCUMENTS AND FOR AN EXTENSION OF

DISCOVERY AND IN SUPPORT OF ORTHO BIOTECH PRODUCT L.P.'S CROSS

MOTION FOR SANCTIONS  was served on all counsel of record by electronic service pursuant

to Paragraph 11 of Case Management Order No. 2 by sending a copy to Verilaw Technologies

for posting and notification to all parties.


                                                           ___ /s/ Erik Haas_____
                                                                Erik Haas

Westlaw.

Not Reported in P.3d
Not Reported in P.3d, 121 Wash.App. 1030, 2004 WL 938588 (Wash.App. Div. 1)
(Cite as: 2004 WL 938588 (Wash.App. Div. 1))

Page 1

**H**
NOTE: UNPUBLISHED OPINION, SEE RCWA 2.06.040

Court of Appeals of Washington,
Division 1.
Mark E. DUXBURY, Appellant,
v.
ORTHO BIOTECH, INC. and Ortho Biotech
Products, L.P., Respondents.
No. 52348-1-I.

May 3, 2004.

Appeal from Superior Court of King County; Hon. Bruce W. Hilyer.

Paul Eugene Simmerly, Attorney at Law, Bellevue, WA, for Appellant.

Daniel W. Ferm, Williams, Kastner & Gibbs PLLC, Rashelle C. Tanner, Crista Ministries, Sheryl Denise Johnso Willert, Attorney at Law, Seattle, WA, for Respondents.

UNPUBLISHED OPINION

ELLINGTON, J.

*1 A claim of wrongful discharge in violation of public policy must be supported by evidence that the dismissal was caused by conduct linked to public policy. Mark Duxbury contends that in 1995, he gave truthful testimony in a deposition, the testimony proved damaging to his employer, and in 1998, he was terminated as a result. The record does not establish a question of fact about that causal connection. We affirm summary judgment of dismissal.

FACTS

Background

Amgen, Inc. is the manufacturer of epoetin alfa, a drug that stimulates production of red blood cells in patients with chronic renal failure. In the early 1980s, Amgen granted an exclusive license to Ortho Biotech, Inc. to market epoetin alfa under the brand name Procrit. In the United States, Ortho was authorized to market Procrit only for use with non-dialysis patients; Amgen retained exclusive rights to market the drug for treatment of dialysis patients. Amgen markets the drug as Epogen.

The product license agreement contained an arbitration provision, and proceedings have apparently been ongoing on various issues since 1989. During the early 1990s, Ortho allegedly violated its product license agreement with Amgen by marketing Procrit for treatment of dialysis patients, and in 1993, Amgen sought to terminate its agreement with Ortho.

Arbitration proceedings on this issue lasted more than seven years. Eventually, Amgen was awarded $150 million in damages against Ortho. In related litigation, wholesale drug distributor Charise Charles, Ltd. filed suit against Amgen in Florida, after Amgen halted sales of Epogen to Charise Charles on grounds Charise Charles aided Ortho in violating the product license agreement by selling Procrit to independent dialysis centers.

Duxbury's Employment

Mark Duxbury was hired by Ortho as a product specialist (sales representative) in 1992. In this position, and later as a key account specialist, Duxbury was responsible for marketing Procrit in the Northwest. Between 1992 and 1994, Duxbury maintained an exemplary sales record and received several awards. His administrative skills, however, were in the 'needs improvement' category.

In August 1995, Duxbury and several other Ortho employees were subpoenaed to testify in the litigation between Amgen and Charise Charles.

In April 1996, Duxbury's supervisor, Michael Barton, was asked to investigate complaints that Duxbury had engaged in inappropriate, sexist behavior. Barton concluded there were 'some real issues here,' [FN1] and designed a training program for Duxbury. At around the same time, in a work session to evaluate Barton's leadership skills as district manager, Barton's supervisor suggested he fire Duxbury. Barton refused. Soon afterward, Barton was demoted; he later left the company. Barton later testified his demotion and departure had nothing to do with his refusal to fire Duxbury.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in P.3d
Not Reported in P.3d, 121 Wash.App. 1030, 2004 WL 938588 (Wash.App. Div. 1)
(Cite as: 2004 WL 938588 (Wash.App. Div. 1))

FN1. Clerk's Papers at 1113.

In October, 1996, Duxbury was directed to correct his last four expense reports. A new supervisor, Keith Wood, gave Duxbury a 'needs improvement' rating overall. Wood described Duxbury's administrative and organizational skills as 'unacceptable.' [FN2] Soon thereafter, Wood and Duxbury were refused entry at a client medical center. Wood issued Duxbury a written warning for that and other performance problems, including continued noncompliance with company policies concerning expense and activity reports.

FN2. Clerk's Papers at 538.

**2** Duxbury's next supervisor, John Woodhouse, notified Duxbury in April 1998 of numerous deficiencies in his performance, particularly in administrative areas, and enumerated eight areas in which Duxbury was required to improve by the time of his performance review at the end of June. A month later, Woodhouse wrote Duxbury that his failure to properly organize a promotional event was unacceptable. Duxbury's sales performance had also fallen, and Woodhouse set goals for improvement over the next few months. Although he disputes certain details, Duxbury admits his administrative skills were a continuing problem. He denies that his sales were significantly below average.

In mid-July, 1998, a regular customer, Western Washington Cancer Center, informed Woodhouse that Duxbury was no longer welcome on the premises because of repeated sexual and racial comments. The client also described administrative difficulties with Duxbury's handling of its account. Duxbury disputes the details of this complaint, but admits he told a 'Viagra' joke, and that the client's representative was offended. Several days later, Duxbury resigned in lieu of termination. [FN3]

FN3. The record contains evidence regarding personal pressures on Duxbury during these years. It serves no purpose to recite that evidence here.

Duxbury's Testimony

As indicated above, Duxbury was subpoenaed to testify in the Charise Charles lawsuit in 1995. Following his termination, Duxbury contacted Amgen, and provided testimony about Ortho's business practices on several occasions. He gave a

second deposition in the Charise Charles suit in December 1998, depositions in the Amgen/Ortho arbitration in August and October, 2001, and testified in the arbitration hearing in January, 2002.

Wrongful Termination Suit

Duxbury filed this suit against Ortho in July, 2001, alleging wrongful discharge, breach of contract, tort of outrage, and infliction of emotional distress. Following discovery, Duxbury moved for partial summary judgment on several issues, and Ortho moved for summary judgment of dismissal. The court denied Duxbury's motion, granted Ortho's motion, and dismissed Duxbury's claims. Duxbury appeals. [FN4]

FN4. Duxbury does not address tort of outrage or contract issues in his brief on appeal. As to infliction of distress, he asserts only that emotional distress damages are recoverable in an action for wrongful termination. We therefore address only the merits of the wrongful termination claim.

DISCUSSION

Preliminary Rulings

Protective Order. Discovery in this case included Ortho's internal personnel files and communications, corporate business records, proprietary product information, and materials from the ongoing Amgen/Ortho arbitration, which were themselves subject to a protective order. Duxbury refused to stipulate to a similar order, and asserted his right to provide information to federal regulators or to the media. On Ortho's motion, the court entered a protective order:

Any documents produced by either party in this action which are, in good faith, determined by the producing party to contain confidential or proprietary information, including without limitation, personally sensitive information of a non-public nature, may be designated as confidential, and so marked. [FN5]

FN5. Clerk's Papers at 173.

Under the order, documents designated as confidential were not to be disclosed except to the parties and their counsel, and were to be filed under seal; any party could seek to remove the confidentiality designation of a particular document or seek to modify the order.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in P.3d                                                                    Page 3
Not Reported in P.3d, 121 Wash.App. 1030, 2004 WL 938588 (Wash.App. Div. 1)
(Cite as: 2004 WL 938588 (Wash.App. Div. 1))

*3 Duxbury contends the protective order was not justified under CR 26(c), that the documents submitted by Ortho did not contain trade secrets or other confidential information, and that the order was unduly restrictive as to the use of documents during depositions. Given the nature of the discovery, we see no error in the order. If Duxbury believed Ortho lacked a good faith basis for protecting a particular document, he had the right to seek a ruling on the document. He did not. He also had the right to seek a modification of the order. He never did. Further, he offers no argument that the protective order prejudiced his case.

When Duxbury violated the protective order by filing documents without placing them under seal, the court imposed $2,600 in sanctions. When Ortho later committed the same violation, Duxbury sought similar sanctions against Ortho. The court explained its reasoning for denying the motion:

> The protective order in this case was issued at the request of, ... and to protect the interests of, defendants. Given the history of this case, it is apparent to the court that this motion is intended to offset the sanctions previously ordered against plaintiff rather than to protect any legitimate interest of the plaintiff. The appropriate remedy for this violation of the court's order is that defendants, who were given notice and had a reasonable opportunity to cure their failure to take advantage of an order entered at their request, lose the order's protection regarding those documents previously filed that were not sealed. [FN6]

FN6. Id. at 1789-90.

These were tenable grounds for denying Duxbury's motion for sanctions. The court did not abuse its discretion.

Order Striking Declaration Content. Ortho moved to strike portions of declarations submitted by Duxbury during the summary judgment exchange. The court granted the motion. The stricken materials included portions of Duxbury's declaration in opposition to summary judgment, the entirety of Duxbury's declaration in strict reply to Ortho's response to his motion for partial summary judgment, and portions of the declarations of former Ortho employees Tom Fedorka, Renee Matson, and Oliver Medlock. For the most part, material was stricken as speculative, conclusory, argumentative, hearsay, or not within the declarant's personal knowledge.

Duxbury contends the declarants had personal knowledge. For example, regarding his own recitation of a witness's testimony in the arbitration proceedings, he argues, 'Certainly Duxbury could have witnessed or read Ms. Webb's testimony.' [FN7] Similarly, he contends he can recite the contents of pleadings and rulings in the arbitration because he has read them. Even information arguably within a declarant's personal knowledge, however, must be supported by a sufficient foundation, [FN8] and no such foundation appears in the declarations themselves. Duxbury contends Ortho should have addressed the issue by way of voir dire of the declarants. But showing a sufficient foundation is the burden of the proponent of evidence. [FN9] Ortho has no obligation to create a foundation for Duxbury's evidence, and in any case, Duxbury does not explain how Ortho would voir dire an affidavit submitted on summary judgment.

FN7. Brief of Appellant at 27-30.

FN8. ER 602.

FN9. See CR 56(e) (declarations opposing summary judgment must be made upon personal knowledge and must show the declarant's competence to testify to the contents).

*4 We have reviewed the record. The stricken portions of Duxbury's declarations contain numerous assertions that are hearsay, speculation, argument, and/or lack any foundation. [FN10] The same is true of the other stricken material. The court did not abuse its discretion.

FN10. Duxbury's own declarations describe documents, testimony given and statements made by others, ascribe motives and knowledge to others, and make arguments.

Wrongful Discharge Claim

The gravamen of this action is Duxbury's contention that he was discharged in retaliation for testifying, and that such a discharge violated public policy. A discharge is wrongful and gives rise to a tort action if it contravenes a clear mandate of public policy. [FN11] The cause of action has four elements: (1) existence of a clear public policy; (2) proof that discouraging the conduct in which the plaintiff engaged would jeopardize the public policy; (3) proof that the public policy-linked conduct caused the employee's dismissal; and (4) the absence of an

Not Reported in P.3d
Not Reported in P.3d, 121 Wash.App. 1030, 2004 WL 938588 (Wash.App. Div. 1)
(Cite as: 2004 WL 938588 (Wash.App. Div. 1))

overriding justification for the dismissal. [FN12] The public policy exception to at-will employment is construed narrowly to guard against frivolous lawsuits . [FN13] What qualifies as a clear mandate of public policy is a question of law. [FN14]

> FN11. *Thompson v. St. Regis Paper Co.,* 102 Wn.2d 219, 232, 685 P . 2d 1081 (1984).

> FN12. *Gardner v. Loomis Armored, Inc.,* 128 Wn.2d 931, 941, 913 P . 2d 377 (1996).

> FN13. *Id.* at 936 (citing *Thompson,* 102 Wn.2d at 232).

> FN14. *Thompson,* 102 Wn.2d at 232.

Wrongful discharge actions have generally been allowed in four situations:

> '(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing.' [FN15]

> FN15. *Gardner,* 128 Wn.2d at 936 (citing *Dicomes v. State,* 113 Wn.2d 612, 618, 782 P.2d 1002 (1989)).

Duxbury alleges that in response to the 1995 deposition subpoena in the Charise Charles case, he testified truthfully, and Ortho fired him in 1998 because of that testimony. [FN16] Essentially, he argues that responding to a subpoena is a public duty, and that if an employee must suffer threat of discharge in retaliation for giving truthful testimony, a strong public policy is jeopardized. [FN17]

> FN16. Duxbury also contends that, pursuant to subpoena, he provided documents adverse to Ortho, and that these documents were another reason for his termination. So far as we can ascertain, the summary judgment record does not contain those documents. Duxbury asserts they were attached to his (unverified) complaint, which is in the record on appeal. The documents describe a deliberate effort to market Procrit in the dialysis market. Duxbury states he supplied documents not to Charise Charles, but to Ortho's attorneys, and that he was not asked

about them in the 1995 deposition.

> FN17. Duxbury also contends his testimony was protected as 'whistleblowing.' But reporting a private contract violation is not whistleblowing. See *Dicomes v. State,* 113 Wn.2d 612, 618, 782 P .2d 1002 (1989) (no whistleblower protection where conduct reported not unlawful); *Wlasiuk v. Whirlpool Corp.,* 81 Wn.App. 163, 179, 914 P.2d 102 (1996) (same).

In general, we agree with this proposition. In *Blinka v. Washington State Bar Association,* [FN18] we recognized that 'CR 45 and the laws against perjury provide the foundation for a public policy prohibiting adverse employment action for responding to a subpoena or refusing to give false testimony.' Assuming this is so, however, the question is whether Duxbury has presented evidence suggesting his testimony was the cause of his discharge.

> FN18. 109 Wn.App. 575, 585, 36 P.2d 1094 (2001), *review denied,* 146 Wn.2d 575 (2002).

Duxbury testified in 1995. He was not fired until 1998. Lack of proximity in time between the activity for which an employee alleges he was discharged, and the time of termination, indicates a lack of causal nexus. [FN19]

> FN19. *Francom v. Costco Wholesale Corp.,* 98 Wn.App. 845, 862-63, 991 P.2d 1182 (2000); *Wilmot v. Kaiser Aluminum,* 118 Wn.2d 46, 69, 821 P.2d 18 (1991).

Duxbury explains this time lapse by pointing out that the Amgen/Ortho litigation took seven years. He argues that the significance of his testimony in the Amgen/Charise Charles litigation may not have been recognized by Ortho until later in the multi-million dollar Amgen/Ortho case, at which point the company sought to distance itself from testimony of disgruntled employees. Eventually, he argues, Ortho 'had to get rid of Mr. Duxbury' or appear to be 'endorsing his testimony.' [FN20]

> FN20. Brief of Appellant at 19.

**\*5** The summary judgment record does not support this theory. We have only four pages from Duxbury's 1995 deposition. In that excerpt, he testified that a doctor at a kidney center, who was planning to purchase Procrit for use with dialysis patients, asked

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in P.3d                                                                    Page 5
Not Reported in P.3d, 121 Wash.App. 1030, 2004 WL 938588 (Wash.App. Div. 1)
(Cite as: 2004 WL 938588 (Wash.App. Div. 1))

Duxbury whether there was any difference between Procrit and Epogen for purposes of 'reimbursability.' [FN21] Duxbury testified he told the doctor it was his understanding that because the drug is the same, the federal government makes no distinction between the two products, so Procrit was eligible for reimbursement regardless of its use.

FN21. Clerk's Papers at 501.

Duxbury further testified he was aware of Ortho's 'absolutely strict' position that the dialysis market was 'out-of-bounds,' and that his manager was 'adamant' that Procrit was not to be promoted for dialysis use ('This was a big topic of conversation.'). [FN22] Duxbury stated he was nervous about admitting to his manager that he had been in a dialysis facility, 'except for the fact that there were non-dialysis patients being treated there.' [FN23]

FN22. Id.

FN23. Id.

Marketing for non-dialysis use was Duxbury's job, and the conversation he described does not indicate Ortho was marketing Procrit for dialysis patients. A physician with both non-dialysis and dialysis patients would presumably know the same drug was marketed under different names for each population and might reasonably be expected to ask questions, or even to ignore the licensing agreement. Nothing in the 1995 testimony is obviously harmful to Ortho.

Duxbury has several times stated as much. In later depositions in the Amgen arbitration, he said: 'I don't believe my {1995} testimony was damaging.' [FN24] He stated he had no reason to believe that Ortho was unhappy with his 1995 testimony, and said 'I don't think that I said anything that was particularly damaging to the company.' [FN25] Asked why he believed the 1995 deposition was the cause of his termination, he said that just the fact he 'was deposed at all was a problem,' [FN26] and that the timing of later events led him to believe his termination was connected to the deposition.

FN24. Id. at 90.

FN25. Id. at 809.

FN26. Id.

In his declaration in opposition to summary judgment below, however, Duxbury gives a markedly different description of his 1995 deposition. He declares he testified to a direct violation of the license agreement: to wit, that at his manager's request, he solicited dialysis business from clients who used Procrit almost exclusively for dialysis patients, and witnessed accounting practices designed to disguise these sales. Duxbury claims his 1995 testimony was similar to his later testimony in the Ortho/Amgen arbitration.

If so, it is difficult to see how Duxbury could have repeatedly described his 1995 testimony as not damaging. And if so, it is a mystery why Duxbury did not supply that part of his 1995 testimony for the record in this case, because the excerpt we have does not say what Duxbury now describes. Instead, it contradicts what he describes. In the excerpt before us, Duxbury emphasized his manager's strict insistence on compliance with the licensing agreement, and he neither stated nor implied that his manager directed him to violate the license agreement or set up reimbursement accounts to disguise such violations. [FN27] And finally, if the 1995 testimony was as Duxbury now describes it, he does not explain why Ortho needed three years to realize its damaging nature.

FN27. In a declaration submitted in opposition to Ortho's protective order, Duxbury gave further details of violations of the license agreement. According to Duxbury, Charise Charles received substantial discounts on purchases of Procrit, which it passed on to its customers in the form of reimbursements, thereby creating a competitive edge for Ortho's Procrit compared to Amgen's dialysis product, Epogen. Charise Charles made a practice of setting up billing accounts in the name of the physician, rather than the care center, to avoid creating records of sales to dialysis centers. Duxbury declares that at the direction of his manager, he set up an account for the physician he mentioned in the 1995 deposition, carefully following instructions from Charise Charles personnel. Duxbury states the physician used Procrit to treat both dialysis and non-dialysis patients, and received a substantial rebate from Ortho. When this came to light in the Amgen/Ortho litigation, it 'became extremely damaging.' Clerk's Papers at 142. This declaration was not part of the summary judgment record.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in P.3d
Not Reported in P.3d, 121 Wash.App. 1030, 2004 WL 938588 (Wash.App. Div. 1)
(Cite as: 2004 WL 938588 (Wash.App. Div. 1))

**\*6** Duxbury nonetheless contends his 1995 testimony was ultimately damaging to Ortho. As evidence of this, he points out that in the Amgen/Charise Charles case, Amgen sought to use certain depositions from the Amgen/Charise Charles case, among them his own, from 1995. [FN28] He also points to the fact that he later gave testimony adverse to Ortho in the Amgen/Ortho litigation, pointing to Ortho's post-arbitration submission of proposed findings.

> FN28. Duxbury claims this motion was granted. It was not.

The motion papers supplied to us do not reveal the contents of the excerpt of the 1995 deposition Amgen later sought to use, and Duxbury has not supplied any record of his later testimony. But the proposed arbitration findings are in our record. Ortho proposed findings that several 'former disgruntled Ortho sales representatives' testified that Ortho had an unwritten policy to promote Procrit for dialysis, but that these witnesses all reaffirmed that Ortho's policy was to prohibit marketing for dialysis, and that none pointed to a single instance where Ortho directed them to promote Procrit for dialysis. [FN29] The proposed findings also state that 'at the direction of his manager, Mark Duxbury promoted Procrit to the nephrologist-owner of {a dialysis center}, but Duxbury acknowledged that the nephrologist also had pre-dialysis patients.' [FN30]

> FN29. Clerk's Papers at 969-71.

> FN30. *Id.* at 970.

Given the function of proposed findings, it is likely that Duxbury's testimony in the Amgen arbitration was at least as harmful to Ortho as Ortho's proposed findings suggest. At some point, therefore, it appears Duxbury did testify his manager directed him to promote Procrit in a way that would violate the agreement. [FN31]

> FN31. The record does not contain the license agreement.

But that testimony was given long after Duxbury was fired. His 1995 testimony was not to the same effect. The damaging nature of the later testimony does not establish the damaging nature of the 1995 testimony. To establish a causal connection and overcome the three year lapse, Duxbury had to show a basis for a reasonable inference of causational nexus. If, as he now says, his 1995 testimony was obviously damaging, the three-year lapse cannot be explained. If, in the alternative, the damaging nature of his testimony was only later realized, Duxbury must show some basis for the connection between this realization and his termination. He does not.

The record is remarkable mainly for what is missing: obviously damaging content in the 1995 deposition; the absence of any of the later testimony; and the absence of any evidence that might explain why Ortho would wait three years before retaliating against Duxbury for his testimony pursuant to the 1995 subpoena.

Duxbury disputes many of Ortho's complaints about his performance. But he does not dispute engaging in gravely inappropriate behavior that offended a major client. He does not dispute consistently poor performance of administrative duties. And he repeatedly denied his 1995 testimony was damaging. Duxbury points to no evidence suggesting a nexus between that testimony and his termination in 1998, and the inferences he urges upon us are so attenuated as to amount to speculation. [FN32]

> FN32. While Duxbury does not directly argue he was fired because Ortho feared he might be subpoenaed again and might then 'spill the beans,' we note such a theory is equally speculative. If Duxbury's description of Ortho's practices is accurate, Ortho had a similar motive to fire a large number of employees nationwide. Yet according to the record, only three of Ortho's seven 'disgruntled former employees' had been fired (including Duxbury).

**\*7** In sum, the record is insufficient to raise a question of fact that Duxbury was terminated in 1998 in retaliation for his testimony in 1995. The trial court did not err in granting summary judgment. [FN33]

> FN33. Duxbury contends the trial court erred in denying his motion for partial summary judgment eliminating certain factual matters from trial. Specifically, Duxbury asked the court to rule that (1) his sales performance while at Ortho always exceeded the regional average, such that at trial, Ortho should not be allowed to refer to Duxbury's sales performance in any negative way; (2) Duxbury never committed an act of sexual or racial harassment or misconduct while employed by Ortho; (3) Michael

Not Reported in P.3d                                                                                              Page 7
Not Reported in P.3d, 121 Wash.App. 1030, 2004 WL 938588 (Wash.App. Div. 1)
**(Cite as: 2004 WL 938588 (Wash.App. Div. 1))**

> Barton was directed to terminate Duxbury in
> April 1996; and (4) the criticisms of John
> Woodhouse about an event Duxbury helped
> organize were fabricated. Assuming
> Duxbury had submitted sufficient evidence
> of causation, these were contested fact
> issues. Given our disposition on appeal, the
> issues are moot.

Not Reported in P.3d, 121 Wash.App. 1030, 2004
WL 938588 (Wash.App. Div. 1)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.