## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) |
| | MDL NO. 1456 Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) ) ) ) ) |
| | Hon. Patti B. Saris |
| | Chief Mag. Judge Marianne B. Bowler |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO QUASH SUBPOENAS AND FOR A PROTECTIVE ORDER FILED BY THIRD PARTY HEALTH PLANS BLUE CROSS AND BLUE SHIELD OF VERMONT, CAREFIRST BLUE CROSS BLUE SHIELD, HAWAII MEDICAL SERVICE ASSOCIATION, EXCELLUS BLUE CROSS BLUE SHIELD, MUTUAL OF OMAHA INSURANCE COMPANY AND BLUE CROSS BLUE SHIELD OF MASSACHUSETTS**

## Table of Contents

**Page**

Preliminary Statement..................................................................................................1

Statement of Facts.....................................................................................................2

Discussion..................................................................................................................4

I.    The Plans' Arguments Based on Their Purported Absent Class Member Status
Are Unavailing.........................................................................................................4

    (1)    This Court Has Already Rejected The Plans' Absent Class Member Argument ....4

    (2)    The Plans' Arguments Based on Absent Class Member Status Are Without
Merit....................................................................................................................5

        (i)   Defendants' Subpoenas Are Relevant To Common Questions ......................6

        (ii)  Defendants' Subpoenas Were Tendered In Good Faith ................................7

        (iii) Production Sought From The Plans Is Focused And The Court Has
Previously Deemed Even Broader Discovery Of Health Plans Permissible
And Not Burdensome ...................................................................................8

        (iv) The Subpoenaed Information Cannot Be Obtained From Other Sources......10

II.   The Court's Class Certification Order Does Not Absolve the Plans of Their
Production Obligations ............................................................................................11

III.  The August 31, 2005 Track 1 Defendants' Discovery Cut-Off Does Not Bar
Discovery From the Plans........................................................................................12

Conclusion ...............................................................................................................13

## Table of Authorities

**Page(s)**

**Cases**

*Brennan v. Midwestern United Life Insurance Co.*, 450 F.2d 999 (7th Cir. 1971) .........6, 8

*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977).............................................................6

*Easton & Co. v. Mutual Benefit Life Insurance Co.*, Civ. Nos. 91-4012, 92-2095,
   1994 WL. 248172 (D.N.J. May 18, 1994) .................................................................6, 7

*Krueger v. New York Tel. Co.*, 163 F.R.D. 446, 451 (S.D.N.Y. 1995)...............................7

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, No. 97 Civ.
   4550, 97 Civ. 4676, 1998 WL. 241279 (S.D.N.Y. May 12, 1998).............................6

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 103 F.R.D. 635 (D. Mass.
   1984) ...........................................................................................................................6

Defendants to the Amended Master Consolidated Class Action Complaint

("Defendants") hereby file this Memorandum of Law in Opposition to the Motion to Quash

Subpoenas and for a Protective Order filed by third party health plans Blue Cross and Blue

Shield Of Vermont, Carefirst Blue Cross Blue Shield, Hawaii Medical Service Association,

Excellus Blue Cross Blue shield, Mutual Of Omaha Insurance Company and Blue Cross Blue

Shield Of Massachusetts (collectively, the "Plans").[1]

## PRELIMINARY STATEMENT

The Plans complain about defendants' "never ending series of depositions and

ever-growing accumulation of documents."[2]  The Plans, however, have not produced a single

document or witness between them.  Indeed, they have steadfastly refused to comply with the

subpoenas even though most of them have been outstanding for over a year.

During that year, and even prior to it, this Court ruled on a series of motions

regarding discovery from third-party health plans.  In those decisions, the Court rejected the very

arguments that the Plans now reiterate: that they are exempt from discovery as absent class

members, that sufficient discovery has been secured from other plans, and that compliance with

the subpoenas would be burdensome.   The Plans' remaining arguments – that the Court's class

certification order and the Track 1 defendants' discovery cut-off render them immune from

discovery – fare no better.  The class certification order does not alter the fact that this case has

always been and remains squarely about what the industry knew and when, and the Plans are a

---

[1] The Plans' motion and this opposition properly relate to the Amended Master Consolidated Class Action compliant.  However, because the Plan's moving papers were captioned "This Document Relates to All Actions" defendants have followed that format here.

[2] See Non-Parties and Absent Class members Blue Cross And Blue Shield Of Vermont, Carefirst Bluecross Blueshield, Hawaii Medical Service Association, Excellus Bluecross Blueshield, Mutual Of Omaha Insurance Company and Blue Cross Blue Shield Of Massachusetts' Motion and Incorporated Memorandum of Law in Support of motion to Quash Subpoenas And For a Protective Order (the "Plans' Memo") at 2.

1197667v4

key piece of the puzzle.  Indeed, one of the Plans, Blue Cross Blue Shield of Massachusetts, is a major Massachusetts insurer and all but one of them are Blue Cross Blue Shield plans, entities that were the focus of a study by Dyckman & Associates that analyzed reimbursements for drugs and lies at the heart of plaintiffs' liability case.  Moreover, the subpoenas on the Plans were all served well before the Track 1 defendants' discovery cut-off – in most cases over a year before it – and were served on behalf of all defendants.

The Plans at issue have been among the most recalcitrant of all the third parties subpoenaed in this litigation.  They now seek to be rewarded for their obstinacy, arguing that other health plans have made "sufficient" productions or that events that occurred during the time they have been obstructing discovery somehow moot defendants' need for discovery.  The Court should reject these pretences and hold the Plans to the same standard as the other third parties subpoenaed in this litigation – denying their motion and requiring them to produce documents and witnesses in response to defendants' subpoenas.

## STATEMENT OF FACTS

The Plans were subpoenaed by defendants on August 10, 2004, September 15, 2004 and July 5, 2005 seeking the productions of documents and deposition testimony.[3] Previously, in recognition of the need for this type of discovery, Judge Saris had denied a motion by the class plaintiffs seeking a protective order barring discovery from health plans on the grounds that they are absent class members, and ordered that such discovery could proceed.  *See* Exhibit 1.[4]

---

[3] Blue Cross Blue Shield of Massachusetts, CareFirst Blue Cross Blue Shield, Hawaii Medical Service Association, and Excellus Blue Cross Blue Shield were served in August 10, 2004.  Blue Cross and Blue Shield of Vermont was served September 15, 2004.  Mutual of Omaha was served on July 5, 2005.  See Exhibit A to the Plans' Memorandum of Law.

[4] All exhibits are appended to the supporting declaration of Adeel A. Mangi ("Mangi Dec.").

After service of the 2004 subpoenas, defendants engaged in prolonged negotiations with the Plans, whereby defendants sought to narrow the productions sought, assuage any concerns over the logistics of production, and facilitate the taking of timely depositions. Despite countless discussions and protracted delay, not one of the Plans has produced a single document or witness in response to the subpoenas.

In the interim, this Court ruled on a series of motions directed to other health plans. Specifically, this Court ordered Aetna, Cigna and Humana to produce witnesses for deposition pursuant to subpoena, and it ordered Health Net to produce responsive documents and data. *See* Ex. 2 (order compelling Aetna, Cigna and Humana) and Ex. 3 (transcript reflecting order compelling Health Net). The Court directed that the depositions of Aetna, Cigna and Humana could proceed on the same issues that defendants hope to address with the Plans. Health Net was ordered to produce the same types of documents and data that the Plans are refusing to produce here (as well as additional documents relating to self administered drugs).

On June 1, 2005 defendants sent the Plans a letter memorializing a narrowed scope of production that was then offered in an attempt to accommodate the Plans and get them to finally start production. *See* Ex. 4. These narrowed terms were substantially identical to those listed in the subpoena issued soon thereafter to Mutual of Omaha, which focused on physician administered drugs. The Plans, however, adamantly refused to change their position.

On August 8, 2005 defendants sent the Plans a motion to compel in draft form, offering to discuss and hold a meet and confer prior to filing the motion. *See* Ex. 5. In the course of the meet and confer session, counsel for the Plans relented in part and the discussions moved on to the logistics of production. On September 22, 2005, however, counsel for the Plans wrote to the defendants stating that the Plans were reverting to their previous position in view of,

- 3 -

*inter alia*, the Court's class certification order.  As before, the Plans stated that would not

produce any witnesses or documents pursuant to the subpoenas.  *See* Ex. 6.  Counsel for

defendants wrote back to plaintiffs, explaining why the Plans' positions were incorrect but

agreeing that the issues in dispute were ripe for adjudication.  *See* Ex. 7.

## DISCUSSION

The Plans pin their hopes mainly on an argument this court has previously

considered and rejected:  that health insurers should be shielded from compliance with the

subpoenas served upon them because they are absent class members.  The Plans also make two

other arguments: that the Court's class certification order of August 16, 2005 absolves them of

any production responsibilities; and that discovery against the Plans is barred by the August 31,

2005 Track 1 defendants' discovery cut-off.  All three arguments are without merit.

**I.      The Plans' Arguments Based on Their Purported
          Absent Class Member Status Are Unavailing**

**(1)      This Court Has Already Rejected The Plans'
           Absent Class Member Argument**

In December 2004, plaintiffs in the MDL moved to quash defendants' subpoenas

served on third-party health insurers on the grounds that they were absent class members.  This

issue was fully briefed by all parties.  *See* Exs. 8-10 (memoranda of law).  In their opposition

brief, defendants emphasized and discussed in detail the relevance of the discovery sought to

both class certification and the merits.  *See* Ex. 9 at 2-4.[5]  The motion was then argued orally

before Judge Saris on March 8, 2004.  Judge Saris ruled from the bench, rejecting plaintiffs'

---

[5] This disproves the Plans' bald claim that "the issue presented to the Court and the purported motivation
for discovery upon absent class members was to establish the types of plans that exist for class
certification purposes."  (Plans' Memo at 3).

motion and ordering that health insurer discovery proceed.  Judge Saris later issued a written

order dated April 26, 2004 memorializing that order.  *See* Exhibit 1.

>    The Plans offer no reason why the Court should revisit its ruling.  They instead

selectively quote from incomplete sentences of the March 8 hearing transcript where Judge Saris

discussed ERISA preemption to suggest Judge Saris placed defined limits on how many

subpoenas could be issued or what topics they could address.  Judge Saris imposed no such

limitations on this discovery and the clear terms of the written order reflect that.  *See* Exhibit 1.

Judge Saris also spoke very directly at the March 8 hearing to the permissibility of this discovery

(Ex. 11, March 8, 2005 transcript at 49):

> THE COURT: …While I certainly will grant that [protective order
> motion] with respect to anybody who's sick and receiving drugs
> directly as part of a Medicare Part B, I think the plans  themselves
> are able to protect themselves….There's nothing that I can imagine
> that would be a problem with that.
> MR. WISE:  It's not in our interest to be burdensome to that
> community.  What we want to do is just develop enough
> information so we can present a sample of what --
> THE COURT:  I think that's appropriate because I remember
> looking at the case law on it.

>    Accordingly, this Court's prior ruling disposes of the Plan's arguments on this

point.

### (2)   The Plans' Arguments Based on Absent Class Member Status Are Without Merit

>    Should the Court nonetheless be inclined to consider the Plans' arguments on the

merits, the result will be no different.  As an initial matter, the Plans' contentions are

contradictory.  On the one hand the Plans argue they are absent class members, while on the

other they argue they are not Massachusetts payors and, as such, fall outside the class and are

therefore irrelevant to this case.  Even leaving that contradiction aside, and even if they do

1197667v4

qualify as absent class members, the Plans are still not immune from discovery.  This Court has

held that discovery of absent class members is entirely appropriate if certain conditions are met:

> [T]he overwhelming majority of courts which have considered the
> scope of discovery against absentees have concluded that such
> discovery is available, at least when the information requested is
> relevant to the decision of common questions, when the
> interrogatories or document requests are tendered in good faith and
> are not unduly burdensome, and when the information is not
> available from the representative parties.

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 103 F.R.D. 635, 637 (D. Mass. 1984).

(citing *Dellums v. Powell*, 566 F.2d 167, 187 (D.C. Cir. 1977)).[6]

Defendants' subpoenas satisfy each of those conditions:  The demands (i) seek

information relevant to the resolution of common questions, (ii) were tendered in good faith;

(iii) are not unduly burdensome, and (iv) seek disclosure of information that is not available from

other sources.

### (i)     Defendants' Subpoenas Are Relevant To Common Questions

By their subpoenas, defendants seek disclosures concerning the fundamental

questions at issue in this litigation, e.g., the methodologies used by third-party payors to

reimburse prescription drug purchases and information regarding payors' expectations and

knowledge regarding the relationship, if any, between a drug's acquisition price and its AWP.

Indeed, the subpoenas squarely seek evidence relevant to the common questions alleged in the

AMCC:

- Whether AWPs are used as a benchmark for negotiating payments by Third-Party
  Payors for subject drugs.  (AMCC ¶ 601(h))

---

[6] *Accord Brennan v. Midwestern United Life Ins. Co.*, 450 F.2d 999, 1005 (7th Cir. 1971); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, No. 97 Civ. 4550, 97 Civ. 4676, 1998 WL 241279, at *2 (S.D.N.Y. May 12, 1998); *Easton & Co. v. Mutual Benefit Life Ins. Co.*, Civ. Nos. 91-4012, 92-2095, 1994 WL 248172, at *3 (D.N.J. May 18, 1994).

- 6 -

- Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class Members to make inflated payments for subject drugs.  (AMCC ¶ 601(i))

- Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiffs and the Class members (AMCC ¶ 601(j))

- Whether Defendants are liable to Plaintiffs and the Class members for damages for conduct actionable under the various state consumer protection statutes (AMCC ¶ 601(n))

Defendants fully expect the disclosures to establish that the Plans were not deceived by the reporting of AWP and, in fact, that different Plans followed different reimbursement methodologies, some based on AWP and some not, all determined by market forces, and without any uniform expectations as to the relationship between AWP and acquisition cost.

Accordingly, the discovery is relevant to, and potentially dispositive of, plaintiffs' fraud theory on the merits.  *Easton & Co.*, 1994 WL 248172, at *4 ("these issues of individual reliance are relevant to the ultimate determination of liability under the 'fraud on the market' theory . . .  [and therefore] the requested discovery is relevant to the determination of common questions").  *See also Krueger v. New York Tel. Co.*, 163 F.R.D. 446, 451 (S.D.N.Y. 1995) ("the issues of liability on which defendants seek to depose the [absent class members] is a class-wide issue going to the heart of the plaintiffs' claim . . . and therefore properly the subject of defendants' discovery").

### (ii)    Defendants' Subpoenas Were Tendered In Good Faith

The Plans do not explicitly claim that defendants' have acted in bad faith.  They do, however, "wonder if Defendants in this case are conducting such discovery to somehow preclude a significant portion of the market from participating in a later judgment or settlement." (Plans' Memo at 10).  They support this inference by referring to a letter from defendants offering to discuss the possibility of written declarations in lieu of deposition testimony.  *Id.*

- 7 -

These questions as to defendants' motives make little sense.  First, defendants have made very clear the rationale behind the discovery sought and how it is relevant to plaintiffs' claims, not to limiting any individual health plan's potential damages.  Second, the offer to discuss written declarations in lieu of testimony was made at the Plans' request.  *See* Mangi Dec. ¶ 3.  Defendants then explored the possibility of such declarations regarding the Plans' knowledge of the central issues in the case.  This is reflected in the very letter from defendants that the Plans' cite:

> In our November 5 call, we also discussed the possibility of each Entity providing defendants with a declaration in lieu of producing witnesses for deposition.  As discussed, defendants are willing to consider this possibility, subject to further information on the terms of such declaration.  At your request, below is a list detailing the core assertions relevant to this litigation that defendants would seek to establish through discovery from each Entity.

See Ex. C. to Plan's Memo at 2.  In the end, the Plans did not provide declarations and defendants decided depositions were required.

In sum, defendants here made targeted demands and, thereafter, took reasonable measures to ensure that the recipients are not unduly burdened.  As such, there is no basis for preventing full discovery from proceeding.  *See Brennan*, 450 F.2d at 1005 (allowing discovery after concluding that "there is nothing in the record to suggest that the discovery procedures were used as a tactic to take undue advantage of the class members or as a stratagem to reduce the number of claimants").

**(iii)    Production Sought From The Plans Is Focused And The Court Has Previously Deemed Even Broader Discovery Of Health Plans Permissible And Not Burdensome**

The Plans fare no better on their claim that the requests are unduly burdensome.  Defendants have pared down their initial requests.  Indeed, after the close of briefing on class certification, defendants conveyed an even narrower list of merits-tailored production demands.

- 8 -

*See* Ex. 4 (Letter from defendants dated June 1, 2005). The same sharply narrowed demands are listed in defendants' subpoena to Mutual of Omaha.[7]

Discovery from Blue Cross Blue Shield Plans is crucial because plaintiffs' liability theory relies in substantial part on a survey of those plans conducted by Dyckman & Associates entitled "Survey of Health Plans Concerning Physician Fees and Payment Methodologies."[8] As detailed in their expert reports and class certification submissions, plaintiffs rely on that study for their claims regarding the extent of usage of and knowledge regarding the AWP benchmark. The most effective way for defendants to counter plaintiffs' unwarranted conclusions from that study is through discovery from Blue Cross Blue Shield entities such as the Plans.

Additionally, defendants have also offered to pay any cost associated with electronic data pulls or the copying of documents. The Court has already recognized that production requests of an even greater magnitude (which included all this discovery plus an equivalent amount of discovery on self-administered drugs) does not pose the sort of burden that would obviate the obligation to produce relevant documents. *See* Ex. 3. Similarly, the production of witnesses for deposition poses no unreasonable burden. Defendants will travel to the witnesses' location and no third-party health plan witness' deposition to date has lasted more than one day.

---

[7] These offer to narrow demands establish the falsehood of the Plans' charge that "Defendants seek all documents and information relating or referring to over 100 drugs, and any other document that refers to the pricing and payment of drugs claims, rebates, as well as the individual claims data itself." (Plans' Memo at 9).

[8] This study is publicly available on the MEDPAC website. *See* http://www.medpac.gov/

(iv)     **The Subpoenaed Information Cannot Be**
         **Obtained From Other Sources**

The Plans contend that defendants should content themselves with discovery from the named plaintiffs. The Plans ignore the obvious fact, however, that none of the named plaintiffs are health insurers. They are advocacy groups and union benefit funds, and the record in this case has already established that discovery from named plaintiffs is no substitute for discovery from health insurers. Indeed, it is the health plan discovery to date that forced plaintiffs to abandon their initial position in this litigation (that AWP is supposed to be a real average of wholesale prices) and was the focus of all parties' submissions on class certification. The named plaintiffs, by contrast, do not even contract directly with physicians for drug reimbursement.

The Plans also expend much energy on claims that defendants have already deposed numerous other health plans and therefore that any discovery from them would be unnecessary and duplicative. This claim makes little sense. The Plans were a critical part of the initial industry sample identified by defendants. They are a group of diverse health plans from around the country and all but one of them are Blue Cross Blue Shield plans, discovery from whom is particularly essential given plaintiffs' reliance on the Dyckman study. The Plans obstinate refusal to comply with subpoenas while other health insurers did so should not be rewarded now with an exemption from production. Moreover, the recent class certification decision, far from making this discovery less important, has only emphasized the need for more discovery from health plans. Indeed, Judge Saris observed that there was a continuing dispute between parties' experts over the basis of payments to physicians for physician-administered drugs and related services. *See* August 16, 2005 Class Certification Order at 28. Judge Saris noted that even the Court's Independent Expert "views the record as 'unsettled' on this point." *Id.*

- 10 -

(citing Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris). Through their subpoena, defendants seek to supplement and build the record on precisely these types of areas, and this can only be done through discovery from third parties such as the Plans.

## II.   The Court's Class Certification Order Does Not Absolve the Plans of Their Production Obligations

The Plans claim that since Judge Saris certified only a Massachusetts class of third party payors, they should no longer be obliged to make productions of documents or witnesses. As an initial matter, this ignores the glaring fact that one of the Plans, Blue Cross Blue Shield of Massachusetts, is a major Massachusetts insurer. Indeed, that plan was also the Medicare Part B Carrier for Massachusetts from 1991 to 1997. There is no basis for any claims that this insurer should be exempt from discovery. Even as to the other Plans, however, this argument is unsustainable for three reasons.

First, this case has always been and remains squarely about industry knowledge regarding the AWP benchmark and how it is used in reimbursement. Indeed, plaintiffs' entire case is now postulated on theories regarding the purported "expectations" of third-party payors. And plaintiffs rely squarely for their merits claims on a nation-wide survey of Blue Cross Blue Shield insurers such as, and likely including, the Plans. As discussed above, the only way to effectively disprove these claims is through discovery establishing the realities of industry knowledge and practices.

Second, the Court's order may be subject to appeal, and the Court's scheduling order provides that summary judgment briefs are due thirty days after an appellate decision. *See* Case Management Order 13 attached as Exhibit 12. This schedule mandates that any discovery must be carried out now, as there will be no time between an appellate determination and summary judgment for further discovery.

- 11 -

1197667v4

Third, even the non-Massachusetts Plans likely have some Massachusetts coverage for members who are traveling or have moved. Indeed, the Plans apparently concede this when arguing that they should be protected as potential absent class members. *See* Plans' Memo at 9-11.

## III. The August 31, 2005 Track 1 Defendants' Discovery Cut-Off Does Not Bar Discovery From the Plans

In Case Management Order 13, the Court ordered that fact discovery regarding the Track 1 defendants would have to be completed by August 31, 2005. This does not absolve the Plans of their production responsibilities, however, because they were all served with subpoenas long – in most cases over a year – before the discovery cut-off.[9] Indeed, as discussed above, defendants even prepared a motion to compel before the discovery cut-off and held off on filing it only because the Plans agreed to produce. Moreover, and in any event, the discovery cut-off specified in Case Management Order 13 applied by its own terms only to discovery regarding the Track 1 defendants. Track 2 discovery is only now getting underway and the subpoenas served on the Plans were served on behalf of all defendants.

---

[9] *See* fn. 3 *supra*.

- 12 -

## CONCLUSION

For the above reasons, defendants respectfully request that the Court deny the

Plans' motion and order that the Plans timely produce documents and witnesses in response to

defendants' subpoenas.

Dated:        New York, New York
              October 11, 2005

                                        Respectfully submitted,


                                        _____
                                                /s/ Andrew D. Schau
                                        Andrew D. Schau (admitted *pro hac vice*)
                                        Erik Haas (admitted *pro hac vice*)
                                        Adeel A. Mangi (admitted *pro hac vice*)
                                        PATTERSON, BELKNAP, WEBB & TYLER LLP
                                        1133 Avenue of the Americas
                                        New York, NY  10036-6710
                                        (212) 336-2000

                                        *Attorneys for defendants Johnson &*
                                        *Johnson, Johnson & Johnson Health Care*
                                        *Systems, Inc., Ortho McNeil*
                                        *Pharmaceutical, Ortho-Neutrogena Inc.,*
                                        *Centocor Inc. Ortho Biotech Products L.P.,*
                                        *Janssen Pharmaceutica L.P. and McNeil-*
                                        *PPC on behalf of all defendants to the*
                                        *Amended Master Consolidated Class Action*
                                        *Complaint*

- 13 -

## CERTIFICATE OF SERVICE

I certify that on October 11, 2005, a true and correct copy of the foregoing Defendants' Memorandum Of Law In Opposition To Motion To Quash Subpoenas And For A Protective Order Filed By Third Party Health Plans Blue Cross Blue Shield Of Massachusetts, Carefirst Blue Cross Blue Shield, Hawaii Medical Service Association, Excellus Blue Cross Blue Shield, Blue Cross Blue Shield Of Vermont and Mutual Of Omaha Insurance Company was served on all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to Verilaw Technologies for posting and notification to all parties.  I further certify that on October 11, 2005, a copy was served on counsel for third party health Blue Cross Blue Shield Of Massachusetts, Carefirst Blue Cross Blue Shield, Hawaii Medical Service Association, Excellus Blue Cross Blue Shield, Blue Cross Blue Shield Of Vermont and Mutual Of Omaha Insurance Company via Federal Express.

_/s/ Andrew D. Schau_
Andrew D. Schau

1197667v4



Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 248172 (D.N.J.)
**(Cite as: 1994 WL 248172 (D.N.J.))**

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.
EASTON & CO., Plaintiff,
v.
MUTUAL BENEFIT LIFE INSURANCE CO.;
Henry E. Kates; Shearson Lehman Brothers, Inc.;
and Ernst and Young,
Defendants.
EASTON & CO., Plaintiff,
v.
SHEARSON LEHMAN BROTHERS, INC.,
Defendant.
**CIV. Nos. 91-4012 (HLS), 92-2095 (HLS).**

May 18, 1994.

**SECOND AMENDED OPINION**

PISANO, United States Magistrate Judge:

**INTRODUCTION**
**\*1** This matter comes before the court upon the motion of plaintiff Easton & Co. ("Easton") for a protective order precluding defendants Ernst & Young and Shearson Lehman Brothers ("Shearson") from taking discovery of absent class members. Oral argument was heard on February 14, 1994.

**BACKGROUND**
Easton, a broker and securities dealer, purchased bonds issued on or about May 3, 1991 by the DeKalb Georgia Housing Authority (the "DeKalb Bonds"). Mutual Benefit Life Insurance Co. ("Mutual") guaranteed the interest payments on the DeKalb Bonds. Defendant Henry Kates was the President, CEO, and a director of Mutual until July 16, 1991. Defendant Ernst & Young, a partnership of certified accountants which acted as Mutual's auditor, issued opinion letters for Mutual. Lehman Brothers, a division of Shearson, was the lead underwriter and seller of the DeKalb Bonds. Shearson prepared and disseminated to the investment public an Official Statement regarding the DeKalb Bonds.

On September 7, 1991, plaintiff filed a complaint

("*Easton I*") against Mutual, Henry Kates, Shearson, and Ernst & Young, claiming that the defendants knowingly disseminated inaccurate and misleading written statements regarding Mutual's guarantee and the investment risks associated with the DeKalb bonds. Specifically, Easton asserts that the defendants knew of Mutual's precarious financial situation, but failed to disclose the information in the Official Statement offering the DeKalb Bonds for sale. The *Easton I* complaint alleges that defendants violated section 10(b) of the Securities and Exchange Act of 1934 and 15 U.S.C. § 78j(b). Easton also asserts a state law negligent misrepresentation claim.

Easton filed *Easton I* on behalf of a class comprised of:
   all persons and entities who purchased DeKalb, Georgia Housing Authority Multifamily Housing Revenue Refunding Bonds (North Hill Ltd. Project), Series 1991, due November 30, 1994 (the "DeKalb Georgia Bonds") from May 3, 1991 through July 1991. Excluded from the class are defendants, subsidiaries and affiliates of the corporate and partnership defendants, and their respective principals, officers and directors, and the individual defendant and members of his immediate family, and the affiliates, heirs, successors or assignees.
(Pl.'s Br. in Supp. of Class Certification at 22).

On May 18, 1992, Easton filed a second class action (*Easton II* ) naming only Shearson as a defendant. The *Easton II* complaint alleges that: 1) Shearson orally misrepresented that Mutual-backed bonds were rated AA or AAA and were a safe, conservative investment; 2) Shearson knew, or recklessly disregarded, facts showing that Mutual was experiencing financial difficulties and was rapidly moving toward insolvency, thus making Mutual's guarantees of the bonds worthless and the bonds a risky investment; and 3) had Easton and the class known of Mutual's financial position, they never would have purchased the Mutual-backed bonds.

   **\*2** Easton filed the complaint in *Easton II* on behalf of:
   all persons and entities who purchased any bond guaranteed by Mutual ... from Shearson during the period April 19, 1991 through July 16, 1991, excluding Shearson, Mutual, or their subsidiaries, affiliates, principals, officers and directors and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 248172 (D.N.J.)
(Cite as: 1994 WL 248172 (D.N.J.))

their heirs, successors or assignees.
(Pl.'s Br. in Supp. of Class Certification at 22).

On November 4, 1992, Judge Sarokin entered an order consolidating *Easton I* and *Easton II*. On February 9, 1993, Judge Sarokin issued an Opinion certifying *Easton I* to proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure. Prior to this time, Shearson had agreed to certification of an *Easton II* class consisting of all fixed-rate bondholders.

On June 1, 1993, the Court entered an Order approving the proposed notices of pendency of the class actions and directed that the notices be provided to potential class members. The notices approved by the court informed class members that they need not take any action to be included in the class action, but gave them an opportunity to "opt-out" of the class by August 31, 1993. None of the class members elected to be excluded. Easton represents that there are 160 *Easton I* and *Easton II* class members.

On August 13, 1993 and November 16, 1993, respectively, Ernst & Young and Shearson served fifteen interrogatories and a single document request on the class members. The defendants do not dispute that the questions generally relate to the individual circumstances of each class member's purchase of the bonds and resulting damages. The information defendants seek includes:

(1) the number of bonds purchased;

(2) the price at which the bonds were purchased;

(3) the name of the broker used for each purchase;

(4) the dates and amounts for which the bonds were sold;

(5) the person to whom they were sold;

(6) the broker(s) used in connection with the purchase/sale;

(7) all advice, information, and/or documents received, reviewed, or relied upon in connection with the bond purchases;

(8) whether class members regularly read *The Wall Street Journal;*

(9) when class members learned of Mutual's financial difficulties;

(10) prior investment history of each absent class member from January 1987 through July 1991, including a listing of up to fifteen purchases of securities items identified by name, price, and date.

(Pl.'s Br. in Supp. of Protective Order at 6).

The instructions to defendants' discovery requests inform class members that they will risk dismissal of their claims if they fail to respond or if their responses are insufficient.

On December 23, 1993 Easton filed the instant motion for a protective order precluding the class members from answering Shearson and Ernst & Young's interrogatories. On January 7, 1994, Shearson and Ernst & Young filed separate submissions in opposition to Easton's motion. Oral argument was heard on February 14, 1994.

## DISCUSSION

*3 It is fairly well-settled that, where warranted, discovery may be taken of absent class members during the course of class action litigation under Rule 23. In *Brennan v. Midwestern United Life,* 450 F.2d 999, 1005 (7th Cir.1971), the court explained that:

If discovery from the absent members is necessary or helpful to the proper presentation and correct adjudication of the principal suit, [there is] no reason why it should not be allowed, so long as adequate precautionary measures are taken to insure that the absent class members are not misled or confused.

The guidelines first discussed in *Brennan* were modified by later cases, notably *Clark v. Universal Builders,* 501 F.2d 324 (7th Cir.1974) and *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546 (11th Cir.1986), *cert. denied,* 479 U.S. 883 (1986). One court, which undertook a survey of the various federal decisions following *Brennan,* concluded that:

[t]he majority of courts considering the scope of discovery against absent class members have granted discovery via interrogatories or document requests (1) where the information requested is relevant to the decision of common questions, (2) when the discovery requests are tendered in good faith and are not unduly burdensome, and (3) when the information is not available from the class representative parties.

*Transamerican Refining Corp. v. Dravo,* 139 F.R.D. 619, 621 (S.C.Tex.1991) (citing *Dellums v. Powell,* 566 F.2d 167 (D.C.Cir.1977); *United States v. Trucking Employers, Inc.,* 72 F.R.D. 101 (D.D.C.1976); and *Brennan* ). A fourth requirement

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 248172 (D.N.J.)
(Cite as: 1994 WL 248172 (D.N.J.))

was referred to in *Clark:* that the discovery not seek information on matters already known to defendants. *Clark,* 501 F.2d 324, 341 n. 24

Easton essentially argues that the discovery currently at issue is irrelevant to the decision of common questions. The interrogatories focus on the reliance of the class members as individuals upon the alleged misrepresentations. Easton maintains that questions of individual reliance are irrelevant to the determination of class-wide issues relating to the liability of the defendants. According to Easton, this determination focuses on the "fraud on the market" theory.

The Supreme Court has explained that:
> The fraud on the market theory is based on the hypothesis that ... the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic v. Levinson,* 485 U.S. 224, 241-42 (1988). In *Basic,* the Supreme Court held that when a plaintiff asserts a "fraud on the market" theory of liability, a presumption of causation arises. *Id.*

*4 However, the presumption of causation is rebuttable. *Id.* at 250. *Blackie v. Barrack,* 524 F.2d 891, 906 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57 (1976), set forth the manner in which a defendant may rebut the presumption of causation in a "fraud on the market" case:
> (1) by disproving materiality, or by proving that despite materiality, an insufficient number of traders relied on the deception so as to inflate the price; or (2) by proving that an individual plaintiff purchased despite knowledge of the falsity of a representation, or that he would have, had he known of it.

Therefore, as summarized in *Jaroslawicz v. Engelhard Corp.,* 724 F.Supp. 294, 301 (D.N.J.1989), "defendants may rebut fraud-on-the-market reliance as to the class, or as to each class member."

Defendants assert that, because they may rebut reliance as to the class and as to each class member, the discovery at issue is relevant to the common question of whether the market was actually

defrauded. Defendants explain that if the discovery shows that a significant number of class members who were purchasers in the market had information about Mutual's decline from sources other than Lehman, it would tend to prove that the market was not defrauded, and thus the benefit of the "fraud on the market" presumption would be unavailable on a common basis to any of the class members, including individuals who might not themselves have learned of Mutual's problems. (Shearson's Br. in Opp'n to Protective Order at 10-11).

In a case very similar to the one at hand, *In re SciMed Life Securities Litigation,* Civ. No. 3-91-575, 1992 WL 413867, at *3 (D.Minn. Nov. 20, 1992), the court permitted discovery of plaintiffs' investment history and background. As in the present case, the *SciMed* class of stock purchasers sought to assert a "fraud on the market" theory of liability. The plaintiffs objected to discovery relating to their investment background and history. *Id.* at *2. The defendants argued that the information was highly relevant to the plaintiffs' reliance-based claims. *Id.*

Citing *Blackie,* the court noted that the presumption of reliance raised by the "fraud on the market" theory may be rebutted as to individual plaintiffs. *Id.* at *3. The court also noted that, as in the present case, the plaintiffs had asserted common law actions of fraud and negligent misrepresentation, which require showings of actual reliance. *Id.* (citing *Rosenberg v. Digilog, Inc.,* 648 F.Supp. 40 (E.D.Pa.1985)). The *SciMed* court concluded that the need for the defendants to conduct discovery concerning the plaintiffs' entire investment history and background was important, and ordered compliance with the majority of the requested discovery. [FN1] *Id.*

The requests for discovery in the instant case are similar to those permitted in *SciMed.* As defendants admit, the discovery is relevant to issues of individual reliance. However, these issues of individual reliance are relevant to the ultimate determination of liability under the "fraud on the market" theory, the theory of liability which plaintiffs raise as a class. Therefore, the requested discovery is relevant to the determination of common questions.

*5 Easton also claims that the requested discovery is unduly burdensome and amounts to an impermissible "opt-in" requirement of class members. Easton bases this argument on case law emphasizing that class members should not be made to take affirmative steps to remain in a class. *See Clark v. Universal Builders, Inc.* 501 F.2d 324 (7th Cir.1974); *Cox v.*

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 248172 (D.N.J.)
**(Cite as: 1994 WL 248172 (D.N.J.))**

*American Cast Iron Pipe Co.,* 784 F.2d 1546 (11th Cir.1986), *cert. denied,* 479 U.S. 883 (1986); *B & B Investment Club v. Kleinert's,* 62 F.R.D. 140 (E.C.Pa.1974); *Wainwright v. Kraftco,* 54 F.R.D. 532 (N.D.Ga.1972). However, in the cases plaintiff cites, rejection of the disputed discovery was routinely based on the failure of the discovery to comport with guidelines first discussed in *Brennan.*

In *Clark,* the Seventh Circuit found that the requested discovery was abusive in that it required the civil rights plaintiffs to acquire technical and legal advice in order to understand the questions and formulate responses, *Clark,* 501 F.2d at 340-41 n. 24. Moreover, the court found that the *Clark* defendants made no showing that the requested information was necessary to trial preparation, in contravention of the guidelines set forth in *Brennan. Id.* at 340.

Similarly, *Cox* did not hold that propounding interrogatories on absent class members is impermissible *per se.* In *Cox,* the Eleventh Circuit reversed a district court ruling dismissing the claims of absent class members who had failed to answer interrogatories. The interrogatories had been prefaced with a warning that failure to answer the interrogatories could result in dismissal from the class action suit. *Cox,* 784 F.2d at 1556. The Court of Appeals observed that dismissal is the most severe of sanctions and is to be used only where noncompliance results from willful or bad faith disregard. *Id.* The Court of Appeals found that, because "the lower court made no finding of any bad faith resistance to discovery orders and, further, left no indication on the record that it considered and rejected sanctions less severe than dismissal," the district court erred in dismissing the claims. *Id.*

The Eleventh Circuit declined "to approve the use of the discovery sanction of dismissal against passive class members in a class action suit even to the extent that it may be permitted by *Brennan* and *Clark.*" *Id.* at 1556- 57. However, the court discussed the guidelines set forth in *Brennan* and *Clark* and specifically found that the disputed interrogatories failed to satisfy those guidelines because they were an improper attempt to reduce class size and were of questionable necessity. *Id.* at 1556.

As drafted, the discovery in the instant case is not abusive. Class members need not obtain counsel to answer the interrogatories and document requests. However, the discovery may be made less burdensome. The discovery is prefaced by warnings that failure to respond completely and accurately could result in dismissal of individual claims. As noted in *Cox,* dismissal is the most severe of sanctions. The threat of dismissal need not be raised at this juncture, where there is no indication that class members will fail to comply with the discovery requests. Therefore, as a precaution against unnecessary intimidation of class members, the court directs that defendants re-draft the discovery requests to exclude the warnings regarding dismissal.

*6 Moreover, based upon the representations of defense counsel at oral argument, the court finds that the discovery requests could be streamlined by incorporating information already available to defendants. At oral argument, the court proposed that the discovery be re-drafted in the form of a questionnaire informing an individual class member of the securities purchased by him or her, as well as the dates, prices, and brokers correlating to those purchases. (Tr. of 2/14/94 at 26:13 to 27:4). Mr. Charles M. Lizza, counsel for Shearson, admitted that producing such a questionnaire would be possible. (Tr. at 27:6-8). In keeping with *Clark's* directive that discovery not seek information on matters already known to defendants, the court orders defendants to redraft the discovery requests as questionnaires providing, to the extent possible, the following information: (1) the securities purchased by the individual class member; (2) the dates of such purchases; (3) the prices paid for such securities; (4) the brokers involved in such transactions.

## CONCLUSION

Easton's motion for a protective order precluding discovery of absent class members is denied. The discovery requests propounded by defendants Shearson and Ernst & Young shall be re-drafted in the manner prescribed by the court.

> FN1. The *SciMed* court found that the defendants did not need the plaintiffs' financial statements or tax returns to adequately assess plaintiffs' investment history and background. *Id.* at *3. The court ordered the plaintiffs to comply with requests for customer agreements, account statements, margin agreements, prospectus and official statements, correspondence concerning securities purchases, and documents concerning purchases and sales of securities. *Id.*

Not Reported in F.Supp., 1994 WL 248172 (D.N.J.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 248172 (D.N.J.)
**(Cite as: 1994 WL 248172 (D.N.J.))**

Page 5

**Motions, Pleadings and Filings (Back to top)**

• 2:92cv02095_____(Docket)
(May. 18, 1992)

• 2:91cv04012_____(Docket)
(Sep. 17, 1991)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                           Page 1
Not Reported in F.Supp., 1998 WL 241279 (S.D.N.Y.)
**(Cite as: 1998 WL 241279 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Laborers Local 17 Health and Benefit Fund et al., On
Behalf of Themselves and
All others Similarly Situated, Plaintiffs,
v.
PHILIP MORRIS, INC. et al., Defendants.
United Federation of Teachers Welfare Fund et al.,
On behalf of Themselves and
All Others Similarly Situated, Plaintiffs,
v.
PHILIP MORRIS, INC. et al., Defendants.
**No. 97CIV.4550(SAS)(MHD),
97CIV.4676(SAS)(MHD).**

May 12, 1998.

Perry Weitz, Esq., Arthur M. Luxenberg, Esq.,
Steven E. Fineman, Esq., Karen J. Mandel, Esq.,
Weitz & Luxenberg, P.C., New York.

Melvyn I. Weiss, Esq., David J. Bershad, Esq.,
Michael C. Spencer, Esq., Kenneth J. Vianale, Esq.,
Milberg Weiss Bershad Hynes & Lerach LLP, New
York.

MEMORANDUM & ORDER

DOLINGER, Magistrate J.

**\*1** Plaintiffs, consisting of nine employee benefit
trust funds, have filed these parallel class-action
lawsuits to seek relief for purported fraud and other
tortious conduct by the six principal domestic
cigarette manufacturers and related defendants.
[FN1] The gist of the case is found in the plaintiffs'
assertion that, for many decades, defendants
concealed crucial information about the dangers of
cigarette smoking and other exposure to tobacco
products, and that, as a result, the plaintiff funds and
other, similarly situated funds were required to pay
gargantuan medical benefits to treat tobacco-related
illnesses suffered by fund beneficiaries. (*See* Compl.
¶ ¶ 1-8). The implication is that, had the pertinent
information been disclosed, the funds would have
undertaken different, and perhaps more aggressive,

anti-smoking programs and perhaps other steps to
limit such costs. The relevant injury, then, is to the
"plaintiffs' infrastructure and financial stability."
(*Laborers Local 17 v. Philip Morris, Inc.,* March 25,
1998 Op. at 26).

> FN1. The claims encompass both common
> law torts, including fraud, and asserted
> violations of the Racketeer Influenced and
> Corrupt Organizations Act ("RICO"), 18
> U.S.C. § 1961 *et seq.* The RICO claims are
> premised on an asserted pattern of wire or
> mail fraud. (*See* Plaintiffs' RICO Statement,
> dated Sept. 12, 1997, at 1-2).

The parties have commenced discovery that is
directed to plaintiffs' recently filed motions for class
certification. [FN2] Although merits discovery has
not been stayed, it is the understanding of the parties,
with the acquiescence of the court, that such
discovery should be held in abeyance at present, at
least until pending motions to remand a number of
parallel suits have been disposed of by Judge
Sotomayor.

> FN2. Plaintiffs seek certification under
> Fed.R.Civ.P. 23(b)(2) and (3).

At a discovery conference conducted on May 6,
1998, counsel for the parties presented a number of
discovery issues, all but one of which the court
disposed of on the record. The one exception pertains
to defendants' request that we authorize them to
conduct discovery of absent class members.

Defendants claim that such discovery, in the form of
interrogatories, document requests and depositions, is
necessary in order to permit them to explore the
degree of commonality, or lack thereof, among class
members on the issue of reliance and, apparently, the
extent and nature of their injury. Defendants argue
that such information is required to assist them in
resisting the class certification motion, specifically
with regard to the existence of common questions,
the predominance of such questions and the typicality
of the named plaintiffs' claims.

The courts have frequently noted the "inevitable
tension in the discovery of nonrepresentative class
members because of the conflict between 'the
competing interests of the absent class members in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 241279 (S.D.N.Y.)
**(Cite as: 1998 WL 241279 (S.D.N.Y.))**

remaining passive and the defendant in having the ability to ascertain necessary information for its defense.' " *Redmond v. Moody's Investor Service,* 1995 WL 276150, at *1 (S.D.N.Y. May 10, 1995)(quoting *Robertson v. National Basketball Ass'n,* 67 F.R.D. 691, 697 (S.D.N.Y.1975)). Such discovery is not *per se* unavailable, although it is generally disfavored and will therefore not be permitted unless (1) the defendant demonstrates a clear need for the information for trial of those aspects pertinent to the class claims, (2) the court is satisfied that the discovery requests are narrowly tailored to their purpose and (3) the discovery is not intended to, and will not, impose undue burdens on the absent class members. *See, e.g., Krueger v. New York Telephone Co.,* 163 F.R.D. 446, 450- 51 (S.D.N.Y.1995)(citing cases). The requirement of tailoring has also led a number of courts to deem document requests and interrogatories as preferable to depositions of class members. *See, e.g., Redmond,* 1995 WL 276150, at *1; *Krueger,* 163 F.R.D. at 452.

**\*2** In this case defendants argue that they need to explore the knowledge of individual class members as to smoking hazards during the pertinent period, the steps that those members took in reliance on that knowledge, and the extent to which they were misled by the alleged withholding of defendants' scientific data, that is, what the members did or failed to do because of their ignorance of the assertedly withheld information. All of this discovery is said to be needed in order to contest plaintiffs' class-action motion, presumably on the basis that the extent of each class member's knowledge and reliance is unique to that member, and hence that individual issues predominate over issues common to the purported class. Defendants also suggest that they may seek to contest the typicality of the named plaintiffs' claims.

In assessing defendants' assertion of need, we note that there are already nine named plaintiff funds from which defendants may obtain discovery of this nature. If, as appears altogether likely, each fund relied to a differing degree on the absence of the allegedly withheld information about the dangers of smoking, those differences may be apparent from discovery of those plaintiffs. We also note that, as defined by plaintiffs, the common issues on which they rely for certification are almost all concerned with the activities of the defendants rather than of the plaintiffs. (*See* Mem. in Supp. of Class Cert., dated March 16, 1998, at 5-6). This suggests that, insofar as relevant to the question of the predominance of common issues, there will not be much dispute between plaintiffs and defendants that the precise

degree to which each class member relied will differ. [FN3]

> FN3. In fairness to defendants, however, at oral argument plaintiffs' counsel declined to concede that the precise form and extent of reliance varies among class members.

In response, defendants assert that the nine plaintiffs do not constitute a sufficiently large universe to develop the necessary data. Moreover, they may also be heard to argue that the extent of the difference in reliance among class members will be relevant in assessing both the appropriateness of class certification and the choice of the current class representatives as typical of the class.

Defendants' argument about the need for a larger universe for discovery purposes is made in conclusory terms and without any specifics or evidentiary grounding. Moreover, defendants seek both written discovery--interrogatories and document production--and a deposition campaign that, by defendants' terms, would yield as many as fifty depositions of absent class members _[FN4], in addition to their planned discovery of the nine class representatives and others, [FN5] and they do so without concrete explanation for the size of this proposed expedition.

> FN4. Defendants have proposed taking discovery from as many as fifteen non-plaintiff members of the *Laborers* class and ten members of the *United Federation* class. Since their counsel asserted at oral argument that they seek depositions of both an administrator and a board member from each plan, they are asking in effect for as many as fifty depositions of non-party class members.

> FN5. Defendants outlined a proposed general discovery plan for class certification in a March 31, 1998 letter to plaintiffs' counsel, and they have attached a copy to their May 6, 1998 motion papers as Exhibit E.

Despite the generality of defendants' presentation, it is not entirely unpersuasive. There is no question that plaintiffs allege conduct by defendants that was common to all of the plaintiffs, that is, the withholding of data and misrepresentations to the public at large. Nonetheless, the balance of the case concerns the class members' reactions to that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 241279 (S.D.N.Y.)
**(Cite as: 1998 WL 241279 (S.D.N.Y.))**

conduct, and those responses are likely to have varied. If so, opposition to the certification motion will likely focus on both the degree of such variation and its significance for adjudicating plaintiffs' claims. It is also plausible that, in seeking to block certification, defendants will legitimately desire to delve into the typicality of the named plaintiffs' claims.

**\*3** Given this focus, the discovery related to the certification motion will also center on reliance issues and perhaps on the significant distinctions, if there be any, between the relevant circumstances of the nine plaintiffs and the other class members. In view of that conclusion, we cannot say that the interest of the defendants in obtaining some information pertinent to these matters from some of the non-plaintiff class members is unjustified  [FN6] or reflective of any bad-faith motives. Moreover, since the class members here are not the typical members of a plaintiff class--individuals with small claims and presumably limited means--but rather are organized entities providing financial and other benefits to members of their constituencies under pre-existing collective bargaining agreements, there is less concern that some controlled discovery will be unduly burdensome or imperil the maintenance of the class. *See, e.g., Town of New Castle v. Yonkers Contracting Co. ., Inc.,* 1991 WL 159848, at \*2 (S.D.N.Y. Aug.13, 1991); *Robertson,* 67 F.R.D. at 699.

> FN6. I note that defendants' argument about typicality could be made in any case, and thus could be viewed as proving too much, since it would justify discovery of class members in virtually all cases. That said, we note that in many cases there will be little, if any, real question about the named plaintiffs' typicality, or else the facts pertinent to that question will be readily apparent from the face of the complaint or discovery directed solely to the named plaintiffs. That is not the case here, since the uniqueness of each fund's pertinent activities is neither self-evident nor likely to be learned solely from the plaintiff funds.

There does remain, however, a serious question as to the extent and scope of any discovery to be undertaken by the defendants. As noted, their current plans are both generally stated and seemingly very broad in scope. We are not prepared, at this stage and on the current record, to approve the extent of the discovery that they seek.

For present purposes, defendants may select a total of ten class members from the lists either already provided or soon to be provided by the plaintiffs, and may request documents from those members reflecting such matters as the nature of the class member's constituency (that is, the type of work done by the beneficiaries of the fund), the nature of the fund's activities that were purportedly affected by the defendants' alleged misconduct, and the degree and nature of the alleged effect, as well as any indication that the fund was already aware of the information purportedly withheld by defendants. Whether follow-up discovery from these members, particularly the use of narrative interrogatories or short depositions, will be permitted in preparation for opposing the class certification motion will depend on whether defendants can make a showing that specific further inquiry is warranted.

CONCLUSION

For the reasons noted, we approve a limited document request by defendants directed to ten non-plaintiff members for the purpose of preparing to respond to the certification motion. Our analysis is limited to that purpose, and is not intended to suggest any views as to the propriety of discovery addressed to class members concerning the merits of the case.

SO ORDERED.

Not Reported in F.Supp., 1998 WL 241279 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

*        1:97cv04676                    (Docket)
(Jun. 25, 1997)

*        1:97cv04550                    (Docket)
(Jun. 19, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.