# EXHIBIT 5

**From:** Mangi, Adeel A. (x2563)
**Sent:** Monday, August 08, 2005 6:28 PM
**To:** 'Mark R. Ireland'
**Subject:** Draft Motion to Compel

  

Motion.pdf (30 KB)   brief.pdf (61 KB)

                    Mark:
Further to my last email, attached is a draft motion to compel we intend to file against
your clients on August 11.  As a courtesy and in a final effort to resolve this dispute
without litigation, I am providing you with this draft prior to filing.  If your clients
are willing to make the productions sought please let me know by 5 pm on August 10.  I
will be on the road but will be checking email.

Best regards
Adeel

-----Original Message-----
From: Mark R. Ireland [mailto:MRIreland@rkmc.com]
Sent: Tuesday, July 19, 2005 5:57 PM
To: aamangi@pbwt.com
Subject: AWP: Mutual of Omaha


>>>>  Please read the confidentiality statement below  <<<<

Attached is a copy of a letter that was both faxed and mailed to you
today regarding the third party subpoena served upon Mutual of Omaha.

I look forward to speaking with you regarding the scope of the
subpoena.

Mark Ireland
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota 55402
(612) 349-8480


_____

Information contained in this e-mail transmission is privileged,
confidential and covered by the Electronic Communications
Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute,
or reproduce this transmission.

If you have received this e-mail transmission in error, please
notify us immediately of the error by return email and please
delete the message from your system.

Pursuant to requirements related to practice before the U. S.
Internal Revenue Service, any tax advice contained in this
communication (including any attachments) is not intended
to be used, and cannot be used, for purposes of (i) avoiding
penalties imposed under the U. S. Internal Revenue Code

or (ii) promoting, marketing or recommending to another
person any tax-related matter.

Thank you in advance for your cooperation.

Robins, Kaplan, Miller & Ciresi L.L.P.
http://www.rkmc.com

# EXHIBIT 6

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

SUITE 1200
1801 K STREET, N.W.
WASHINGTON, D.C. 20006-1307
TEL: 202-775-0725  FAX: 202-223-86
www.rkmc.com

ATTORNEYS AT LAW

THOMAS J. POULIN
(202) 736-2748
tpoulin@rkmc.com

September 22, 2005

**VIA FACSIMILE AND U.S. MAIL**

Adeel A. Mangi, Esq.
Patterson, Belknap, Webb and Tyler LLP
1183 Avenue of the Americas
New York, NY  10036-6710

Re:    **In re Pharmaceutical Industry Average Wholesale Price Litigation
MDL No. 1456**

Dear Adeel:

I am following up on our discussion on September 20, 2005, regarding the subpoenas you seek to enforce against our six Third Party Health Plan absent class members and non-party clients.[1]  I raised a number of what we feel are compelling reasons why you should consider withdrawing these subpoenas.

1.  The Court's August 16, 2005 Order denying class certification of a nationwide class of third party payers.  In light of the class certification decision in which only a limited subset of Third Party Payers in Massachusetts are now members of the class, it would appear that the subpoenas issued to our non-Massachusetts Third Party Health Plan clients should be withdrawn, as well as to BCBS Massachusetts for other reasons noted below.

I also note that the Defendants already have filed Rule 23(f) petitions to the First Circuit to review Judge Saris' class certification decision.  Given the current uncertainty over how the make-up of the class will look like after the First Circuit has ruled, at a minimum, we would ask that you withdraw your subpoenas without prejudice to re-issuance.  Thus, if in the future of this litigation you can demonstrate need for additional discovery beyond what you already have, you can re-visit the subpoenas at that time.

---

[1]  These clients are Blue Cross Blue Shield of Hawaii, Blue Cross Blue Shield of Vermont, Blue Cross Blue Shield of Massachusetts; CareFirst Blue Cross Blue Shield, Excellus Blue Cross Blue Shield and Mutual of Omaha.  We also represent Blue Cross Blue Shield of Minnesota, which to my knowledge is not currently the subject of any type of subpoena enforcement efforts on your part.

DC1 45675543.1

ATLANTA · BOSTON · LOS ANGELES · MINNEAPOLIS · NAPLES · SAINT PAUL · WASHINGTON, D.C.

Adeel A. Mangi, Esq.
September 22, 2005
Page 2

2. The defendants have attained their "sample" discovery of non-parties or absent class members. I would also note that the "sample" discovery of absent class members which the Court allowed to go forward would appear to have run its course, particularly considering that numerous non-parties and absent class members have either produced documents and or deponents for deposition testimony. As such, even the discovery of absent class member Blue Cross Blue Shield of Massachusetts is not warranted. Our view is that this is plain harassment of absent class members, given that defendants' have attempted to preclude our clients from participating in a later judgment or settlement by offering to forego lengthy depositions by submitting extremely broad declarations. These declarations would require our clients to concede any liability and damages. See November 11, 2004 letter from your firm.

3. Discovery closed August 31, 2005. Given that briefing on class issues are complete, there is no justification for burdening our clients with discovery at this time. I note that at least one defendant, AstraZeneca, has complained to the Court that the class Plaintiffs are improperly seeking to extend discovery beyond the August 31, 2005 deadline. I refer you to AstraZeneca's Memorandum of Law that opposes Plaintiffs' motion to compel the deposition of David Brennan dated September 15, 2005. If discovery is not proper as to defendants' production, then it must be improper as against absent class members and non-parties.

I also offered that if you would agree to withdraw all of the subpoenas at this time, in an effort to be cooperative, we would agree that the withdrawal would be without prejudice as to re-issuance (and without prejudice as to any objections on our part). If there is to be a re-issuance, I would agree to accept service at that time. Finally, in the event you would not agree to our reasonable approach, we would need to file a motion to quash and for protective order.

Sincerely,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

Thomas J. Poulin

TJP/lac

cc:   W. Scott Simmer
      Annamarie A. Daley
      Christopher P. Sullivan

# EXHIBIT 7

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

September 23, 2005

By Email Attachment

Adeel A. Mangi
(212) 336-2563
Direct Fax  (212) 336-7947
aamangi@pbwt.com

Thomas J. Poulin
Robins, Kaplan, Miller & Ciresi LLP
Suite 1200
1801 K Street, N.W.
Washington D.C. 20006

Re:    **In re AWP Litigation**

Dear Tom:

I am writing in response to your letter of yesterday and further to our recent discussions regarding the response of your clients to subpoenas issued in this litigation. As you know, your clients had previously refused to make productions or produce witnesses for deposition. After we sent you a draft motion to compel and held a meet and confer last month, your clients agreed to make productions of documents and witnesses. As we have recently discussed, your clients have now taken the position that the court's recent order on class certification absolves them of production responsibilities. We disagreed, for reasons including the following, which are in responsive order to the points raised in your letter:

(1) The Court's class certification order does not change the fact that this case is about industry knowledge, and that knowledge is critical to disproving the claims of even a MA class. Indeed, plaintiffs have expressed their intention to rely on a survey of Blues such as your clients. Moreover, the court's Order is under appeal and there will be an insufficient period of time between resolution of the appeals and summary judgment to allow us to reissue discovery at that time. Finally, even your clients cover for out-of-state claims. And one of your clients (Blue Cross Blue Shield of Massachusetts) is a major MA insurer. Indeed, your own letter seems to anticipate your clients "participating in a later judgment or settlement."

(2) Your clients are an intrinsic part of the industry sample defendants seek discovery from. The fact that they have resisted discovery and have delayed their responses does not alter that fact. We certainly dispute the characterization of this discovery process as "harassment" of absent class members and remind you that a motion by plaintiffs seeking to quash these subpoenas on the basis of their being directed to absent class members was denied. We are surprised that you interpret past efforts to accommodate your requests to narrow the scope of discovery sought in this manner.

Thomas J. Poulin
September 23, 2005
Page 2

      (3) The August 31, 2005 close of discovery applied to discovery from the Track 1 defendants as is stated in CMO 13. This deadline does not apply to Track 2 defendants or third parties. And I remind you, these subpoenas were served on behalf of all defendants.

      For these reasons, defendants are unable to withdraw the subpoenas as you request. We agree, however, that meet and confer obligations have been satisfied and that this issue is ripe for resolution by Magistrate Judge Bowler. I reiterate, as detailed in our draft motion to compel, that the MDL court has ruled it is the appropriate venue for litigation regarding these subpoenas. See Motion to Compel Health Net etc. Accordingly, we will be moving or cross-moving to compel before Magistrate Judge Bowler as appropriate.

      If you have any questions, please call.

                      Sincerely,

                      Adeel A. Mangi

1217533v1

# EXHIBIT 8



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) MDL No. 1456 |
| | ) CIVIL ACTION: 01-CV-12257 PBS |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) ) ) Judge Patti B. Saris ) |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER REGARDING SUBPOENAS TO PUTATIVE CLASS MEMBERS



# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................1

II.   FACTUAL BACKGROUND ................................................................................2

III.  ARGUMENT .......................................................................................................6

    A.    The Court Must Approve Discovery Of Absent Class Members ................6

    B.    Defendants Cannot Meet The Heavy Burden Of Demonstrating That The Discovery
        They Seek Of The Health Plans Should Be Permitted ..................................7

        1.    Defendants Cannot Demonstrate that Discovery of the Health Plans is
            Absolutely Necessary and Cannot be Obtained from Other Sources ...............9

        2.    Defendants Cannot Demonstrate that their Subpoenas are Not Overbroad
            and Oppressive .................................................................................11

        3.    There are No Safeguards in Place with Regard to Defendants'
            Communications with These Absent Class Members ....................................13

IV.   CONCLUSION ..................................................................................................15



## I.    INTRODUCTION

This motion requests that the Court remedy certain ongoing discovery violations by defendants in this case.  Contrary to clear federal authority, defendants are seeking to conduct document discovery of numerous absentee class members *as a matter of course* – that is, without *first* seeking this Court's approval and being required to present cogent and compelling justifications for their inquiries.  Almost all federal courts strictly forbid such a practice. Moreover, defendants have also begun unilaterally scheduling depositions of absentee class members as a matter of course, which constitutes an even more egregious violation of discovery rules.

Defendants have served 29 subpoenas on Health Plans who are absent class members. The subpoenas are invasive, seeking a dizzying array of information in 26 requests that will have no bearing on the case and impose undue burdens on the Health Plans.  For example, Request No. 11 in the subpoena to AARP Health Care Options demands "[a]ll communications [with] providers or pharmacies relating to reimbursement, payment or prices of any subject drug," which would call for the production of every single reimbursement request received from, and payment made to, all doctors and pharmacies over an eleven-year period for every employer, fund and, conceivably, individual to whom this absent class member provides medical or health insurance benefits.

Defendants' subpoenas to the Health Plans run afoul of class action concepts because they require affirmative conduct on the part of companies that are absent and may never be parties to the action.  The MANUAL FOR COMPLEX LITIGATION recognizes that discovery of absent class members "should be permitted only to the extent necessary and should be carefully limited to ensure that it serves a legitimate purpose and is not used to harass either the class representatives or the class members."  MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.232 at 231 (1995) (hereafter "MANUAL").  Thus, discovery of putative class members is generally not



permitted without leave of court. *See Kamm v. California City Dev. Co.*, 509 F.2d 205, 209 (9th Cir. 1975); *Baldwin & Flynn v. National Safety Assocs.*, 149 F.R.D. 598, 600 (N.D. Cal. 1993). If any discovery is to be permitted at all, "*it should be sharply limited and allowed only on a strong showing of justification.*" MANUAL, § 30.232 at 232 (quoting 8 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 2171 (2d ed. 1994)) (emphasis added). Accordingly, courts generally require that the proposed discovery (i) be *absolutely necessary, see, e.g., Enterprise Wall Paper Mfg. Co. v. Bodman*, 85 F.R.D. 325, 327 (S.D.N.Y. 1980); (ii) be *unavailable elsewhere, see, e.g., Clark v. Universal Builders, Inc.*, 501 F.2d 324, 340-41 (7th Cir. 1974), and (iii) will not subject absent class members to *undue harassment* or excessive taxing of their resources, *see, e.g., Robertson v. National Basketball Assoc.*, 67 F.R.D. 691, 700 (S.D.N.Y. 1975). As detailed below, defendants cannot meet a single one of these requirements, let along do so with the "strong showing" that is required.

Plaintiffs now seek both retroactive and proscriptive relief and request that the Court issue an order that: (i) quashes all of defendants' currently pending subpoenas/subpoenas duces tecum addressed to, or served on, absent class members; (ii) requires defendants to make a full accounting of all communications that they have had with each putative class member in regard to these subpoenas (or any other matter related to the litigation); and (iii) declares that, before pursuing any further discovery of absent class members, defendants must in good faith meet and confer with plaintiffs' counsel and, failing agreement on the scope of any such discovery, present a proposal for the Court's consideration.

## II.    FACTUAL BACKGROUND

Defendants have recently served 43 subpoenas on "Third-Parties" in this action in approximately 19 different federal districts. These Third-Parties can be segregated into four categories: (i) Medical Plan Processors and Benefit Consultants; (ii) Claims Administrators; (iii) Medical Plan Auditors; and (iv) Health Plans. The names and addresses of each Third-Party are set forth in Exhibit A to the Declaration of Thomas Sobol in Support of Plaintiffs' Motion for a



Protective Order ("Sobol Declaration") hereto.  Exhibit B to the Sobol Declaration contains a copy of four subpoenas, one from each of the three categories.

The information that defendants seek from each category of subpoenaed Third-Party is summarized as follows:[1]

### Medical Plan Processors and Benefit Consultants

- All contracts with Health Plans that relate to prescription drug benefits.
- Reports and recommendations provided to Health Plans and related to PBMs.
- All documents related to AWPs.
- Organizational charts.

### Claims Administrators

- Contracts with Plans.
- All documents related to claims processing policies and procedures.
- Benefit interpretive guidelines.
- All documents related to AWPs.
- Organizational charts.

### Medical Plan Auditors

- All documents relating to any PBM audit report conducted for any Health Plan.
- All correspondence with a Health Plan regarding reimbursement for pharmaceuticals.
- All promotional literature relating to PBM audits.
- All documents relating to AWPs.
- Organizational charts.

---

[1] Defendants' subpoenas are broader than this summary indicates, and plaintiffs' intent here is to highlight only the more salient categories of information that defendants seek.  Of course, the Court can review each individual demand for documents by reviewing the subpoenas attached at Exhibit B to the Sobol Declaration.



E.SERVED
12/03/03
04:46 PM ET
AWP-MDL No.1456

*Health Plans*

- All documents relating to AWPs; the setting of reimbursement and payment rates; costs and reimbursement to providers; and purported awareness of the difference between costs and reimbursement.

- All documents related to processing policies and procedures.

- All documents related to all payments made based in whole or in part on AWP and all communications relating to reimbursements.

- All documents related to the decision to rely on drug pricing information from a publisher.

- Documents from any publisher.

- All documents related to AWP's; the difference between AWP and payments made; and AMP, WAC, MAC, EAC, Best Price.

- All documents related to contractual relationships with PBMs, third-party administrators, consultants, and auditors.

- All documents related to subject drugs.

- All documents that identify persons involved in contractual relationships with PBMs.

- All documents regarding Plan profit analyses.

- All documents relating to internal and external investigations, studies, analyses or audits regarding drug pricing or reimbursement or payment amounts or rates for any subject drug.

- All filings with any state or federal governmental entity and relating to AWP.

- All documents from CMS, HHS, or any other federal agency regarding the pricing of drugs.

- All documents produced in any litigation, government investigation, or inquiry related to the use of AWP in Medicare, Medicaid or private reimbursement.

- Organizational charts.

The majority of these subpoenas – 29 – have been directed to the Health Plans, who fall within the proposed class definition in this case:[2]

---

[2] Plaintiffs have reserved their right to modify the Class Definition based on class related discovery and/or merits discovery.



*AWP Payor Class:*

All persons or entities who, for purposes other than resale and during the Class Period, paid any portion of the purchase for a prescription drug manufactured by a Defendant Drug Manufacturer (as identified in Appendix A) at a price calculated by reference to the published AWP during the Class Period.

*Sub-Class:  The PBM Third-Party Payor Class:*

All Third-Party Payors that, during the Class Period, contracted with a PBM to provide to its participants a prescription drug manufactured by a Defendant Drug Manufacturer and identified in Appendix A.

AMCC ¶ 595.  The Health Plans subpoenaed by defendants are members of this putative class, that is, they make drug purchases based on a price calculated by reference to the published AWP. And it is highly likely that they are also members of the putative sub-class because most Health Plans contract with a PBM to provide their participants with prescription drugs manufactured by a defendant.

Thus, defendants' Health Plan subpoenas seek discovery of absent class members. Shortly after defendants served their initial round of Third-Party subpoenas, plaintiffs' counsel contacted defendants with concerns about (i) the scope of the drugs covered by the subpoenas (given the Court's prior rulings limiting discovery to a handful of drugs); and (ii) the fact that much of the discovery sought was directed to absent class members and that defendants had chosen to seek the discovery without first obtaining approval of the Court, as required. Sobol Declaration at Exhibit C.  In response, defendants alleviated the first concern by clarifying that, with respect to discovery related to specific drugs, the subpoenas covered only those drugs for which the Court had authorized discovery.  However, as to counsel's second concern, defendants denied, without explanation, that they were taking discovery of absent class members and, in any event, indicated that they would unilaterally proceed with the discovery without first providing the Court with an opportunity to consider whether discovery into absent class members was appropriate.  Sobol Declaration at Exhibit D.  Hence, the necessity of this motion.

- 5 -



## III.    ARGUMENT

### A.    The Court Must Approve Discovery Of Absent Class Members

Courts have rather uniformly held that absent class members are not amenable to discovery as a matter of course. The Supreme Court has held that under the intent of CR 23, absent class members are "passive beneficiaries" to litigation, and are entitled to sit back and await results without undue involvement or bother. *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552 (1974); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810-11 (1985) ("Unlike a defendant in a normal civil suit, an absent class-action plaintiff is not required to do anything. He may sit back and allow the litigation to run its course, content in knowing there are safeguards provided for his protection.").

Not surprisingly, then, courts have recognized that "[t]he use of discovery devices against nonrepresentative class members raises the troublesome conflict between 'the competing interests of the absent class members in remaining passive and the defendant in having the ability to ascertain necessary information for its defense.'" *Robertson v. National Basketball Ass'n*, 67 F.R.D. 691, 699 (S.D.N.Y. 1975) (citing Comment, *Making the Class Determination in Rule 23(b)(3) Class Actions*, 42 FORDHAM L. REV. 791, 811 (1974)). Courts have recognized that the very nature of Rule 23 affords absent class members some protections from the burdensome aspects of the litigation:

> The class action . . . is designed to provide a fair and efficient procedure for handling claims . . . where it is fair to conclude that the representative parties will fairly and adequately protect the interests of the class. It is not intended that members of the class should be treated as if they were parties plaintiffs subject to the normal discovery procedures, because if that were permitted, then the reason for the rule would fail.

*Fischer v. Wolfinbarger*, 55 F.R.D. 129, 132 (W. Ky. 1971); *see also Wainwright v. Kraftco Corp.*, 54 F.R.D. 532, 534 (N.D. Ga. 1972) ("The usefulness of Rule 23 would end if class members could be subjected to Rule 33 and forced to spend time, and perhaps engage legal counsel, to answer detailed interrogatories.").

- 6 -



ESERVED 12/03/03 04:46 PM ET AWP-MDL No.1456

As a result of these concerns, discovery of putative class members is generally not permitted without leave of court. *See Kamm v. California City Development Co.*, 509 F.2d 205, 209 (9th Cir. 1975); *Baldwin & Flynn v. National Safety Assocs.*, 149 F.R.D. 598, 600 (N.D. Cal. 1993) ("Defendants must have leave of court to take depositions of members of a putative class, other than the named class members – after first showing that discovery is both necessary and for a purpose other than taking undue advantage of class members."). The MANUAL FOR COMPLEX LITIGATION recognizes that discovery of absent class members "should be permitted only to the extent necessary and should be carefully limited to ensure that it serves a legitimate purpose and is not used to harass either the class representatives or the class members." MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.232 at 231 (1995) (hereafter "MANUAL").

Indeed, there appears to be no controversy in the case law over whether the Court must approve *ex ante* discovery directed to absent class members, if any discovery is permitted at all. Nonetheless, defendants chose to flaunt this rule and brazenly proceed – over plaintiffs' objections – to prosecute discovery demands against the Health Plans without first obtaining leave of Court. As demonstrated in the following section, defendants chose to ignore the Court's authority over class discovery initiatives because defendants likely recognized that they would be unable to meet the stringent burden of demonstrating that the discovery sought is absolutely necessary, cannot be obtained from any other source, and is not harassing or oppressive. Thus, defendants made a calculated decision to simply bypass the Court and ram ahead, a decision that was grossly inappropriate under the law.

**B. Defendants Cannot Meet The Heavy Burden Of Demonstrating That The Discovery They Seek Of The Health Plans Should Be Permitted**

As the MANUAL recognizes, pre-certification discovery should be "directed at the named plaintiffs," discovery from absent class members is susceptible as "being used . . . as a device to harass and embarrass," and that such discovery "should be necessary ***only in unusual circumstances***." MANUAL, § 30.12 at 216 (emphasis added). The MANUAL further recognizes

that, "[i]f discovery from absent members of the class is permissible at all, *it should be sharply limited and allowed only on a strong showing of justification*." MANUAL, § 30.232 at 232 (quoting 8 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 2171 (2d ed. 1994)) (emphasis added).

The teaching of the MANUAL mirrors case law on the subject. First, courts should not permit parties to obtain discovery from absent class members unless they are able to "make a strong showing" of the reasons why the discovery was *absolutely necessary*. *Enterprise Wall Paper Mfg. Co. v. Bodman*, 85 F.R.D. 325, 327 (S.D.N.Y. 1980). Second, courts allowing such discovery require that the party seeking discovery establish that the discovery sought is *unavailable elsewhere*. *Clark v. Universal Builders, Inc.*, 501 F.2d 324, 340-41 (7th Cir. 1974) ("The burden is heavy to justify asking questions by interrogatories, even heavier to justify depositions."). Third, the court must ensure that the discovery will not subject absent class members to *undue harassment* or excessive taxing of their resources. *Robertson*, 67 F.R.D. at 700; *see also United States v. Trucking Employers, Inc.*, 72 F.R.D. 101, 104 (D.D.C. 1976) (string citations omitted); *see also Clark*, 501 F.2d at 340 (there must be a "showing that the information . . . is not designed 'as a tactic to take undue advantage of the class members or as a stratagem to reduce the number of claimants.'").

In *Krueger v. New York Tel. Co.*, 163 F.R.D. 446 (S.D.N.Y. 1995), the court adopted an even more restrictive standard for obtaining discovery from absent class members. It required parties seeking such discovery to first demonstrate: (i) that it was necessary for purposes of trial on issues common to the class; (ii) that it was not undertaken with the purpose or effect of harassment, or of altering the membership of the class; and (iii) that it was narrowly restricted to information directly relevant to issues to be tried "with respect to class action aspects of the case." *Id.* at 450; *see also Redmond v. Moody's Investor Serv.*, 1995 U.S. Dist. Lexis 6277, at *3 (S.D.N.Y. May 10, 1995) ("the burden on the defendant to justify discovery of absent class members by means of deposition is particularly heavy") (citations omitted).

- 8 -



Like defendants have done here, defendants in *In re Visa Check/MasterMoney Antitrust Litigation* served 23 subpoenas on absent class members (retailers) without prior court permission. Magistrate Mann granted the class plaintiffs' motion to quash, holding that defendants had failed to make the "requisite 'strong showing' to warrant subjecting the putative class members to the pretrial discovery at issue . . . ." Memorandum and Order at 2 (S.D.N.Y. May 7, 1999) (attached at Exhibit E to the Sobol Declaration). In doing so, the Magistrate rejected defendants' purported need for the discovery to test typicality, adequacy and the commonality of issues, commenting that "if such . . . conclusory claim[s] were sufficient to warrant discovery of absent class members, then discovery of putative class members would be routinely allowed in the pre-certification context. Such a result was clearly not contemplated by the case law in this Circuit." *Id.*

Under these rigorous standards, defendants are not entitled to the discovery that they seek.

### 1.   Defendants Cannot Demonstrate that Discovery of the Health Plans is Absolutely Necessary and Cannot be Obtained from Other Sources

Defendants have made *no* showing that the discovery they seek is absolutely necessary, let alone the "strong showing" required of them. *Bodman*, 85 F.R.D. at 327. To this end, defendants must demonstrate that their requests are "narrowly restricted to information directly relevant to issues to be tried "with respect to class action aspects of the case." *Krueger*, 163 F.R.D. at 450. Of course, because they have not applied for Court permission to conduct this discovery, defendants have not met this burden.

Furthermore, defendants have failed to demonstrate that the information they seek cannot be obtained from *other* parties without inconveniencing the absent class members. Indeed, defendants have *alternative* sources of obtaining most if not all of the information that they now seek from the Health Plans.



First, many of the documents requested in the subpoenas – almost half – overlap with the documents that defendants have requested from the named plaintiffs, thus demonstrating that much of what defendants seek will be provided by the named plaintiffs.  *Compare* RFP[3] 1 *with* AARP[4] 18; RFP 2 *with* AARP 19; RFP 4 *with* AARP 16; RFP 5 *with* AARP 1; RFP 6 *with* AARP 17; RFP 7 *with* AARP 2; RFP 8 *with* AARP 13; RFP 9 *with* AARP 9; RFP 10 *with* AARP 23 and 24; RFP 11 *with* AARP 21; RFP 18 and 19 *with* AARP 4 and 6.[5]  Indeed, in some instances, the requests are identical.

Second, *all* of the PBM-related information that defendants seek in the subpoenas, *see* AARP 18 and 19, can be obtained by subpoenaing the four major PBMs identified in the AMCC, instead of the Health Plan putative class members.  Yet, despite issuing 43 supboenas in 19 district courts, defendants have *not* issued subpoenas to the four PBMs with whom defendants have formed association-in-fact RICO enterprises.  Perhaps defendants are loath to subpoena their co-conspirators, but this should not be a reason to burden absent class members.[6]

Third, defendants demand that these absent class members produce "all documents created by or received from CMS, United States Department of Health and Human Services, The Health and Human Services Office of the Inspector General, the General Accounting Office, Congress, or any other federal institution, agency, department, or office regarding the pricing of prescription drugs," *see* AARP 23, *yet defendants themselves can obtain these documents from the listed federal agencies.*[7]

---

[3] "RFP" is used to designate Defendants' First Request for Production of Documents to Plaintiff Funds, a copy of which is attached as Exhibit F to the Sobol Declaration.

[4] "AARP" is used to designate the requests found in the subpoena that defendants served on AARP Health Options that appears in Exhibit B to the Sobol Declaration.

[5] Defendants have held meet-and-confers with plaintiffs' counsel with regard to the requests for production directed at the named plaintiffs, and these efforts have, in some instances, produced a narrowing of some of the RFPs.

[6] To assist defendants in this endeavor, plaintiffs will be serving subpoenas on the four major PBMs.

[7] Moreover, as part of their Rule 26(a) disclosures, plaintiffs initially produced thousands of pages of documents published by these governmental agencies.



Fourth, defendants can obtain much of the information sought in the Medical Plan subpoenas from the Medical Plan Processors and Benefit Consultants, Claims Administrators and the Medical Plan Auditors, third-parties whom defendants have *already* subpoenaed.[8]  These are not class members.

Because defendants cannot demonstrate that the highly invasive discovery that defendants seek from the Health Plans is both absolutely necessary and cannot be obtained from other sources, the Court should quash the Health Plan subpoenas.

### 2.   Defendants Cannot Demonstrate that their Subpoenas are Not Overbroad and Oppressive

As noted, defendants must ensure that their subpoenas will not subject absent class members to undue harassment or excessive taxing of their resources, *Robertson*, 67 F.R.D. at 700, yet defendants will not be able to meet this burden.  The subpoenas to the Health Plans are, in so many respects, breathlessly overbroad.  Applying to documents created over an eleven-year period and to every employer, fund and, conceivably, individual to whom these Third-Parties provided and currently provide medical or health insurance benefits, defendants' subpoenas demand, for instance, every shred of paper and data related to (i) AWPs and other drug pricing conventions such as AMP, WAC, MAC, EAC and Best Price, as well as "any other drug pricing, payment or reimbursement information for any subject drug" (*see, e.g.,* AARP 1, 17); (ii) "PBMs, third party administrators, benefit consultants, auditors, wholesalers, manufacturers, independent practice associations, pharmacies or providers insofar as they cover subject drugs . . ." (*see, e.g.,* AARP 18); (iii) "any profit analysis you have performed or received relating to your reimbursement or payment for any subject drug" (*see, e.g.,* AARP 20); and (iv) "any internal or external, formal or informal, investigations, studies, research, assessments, analyses, reviews or

---

[8] Plaintiffs hasten to add that this statement should not be construed as a waiver of any objection that a named plaintiff or absent class member may have to the production of confidential information by these Third-Parties that has no relevance to the issues in this litigation like, for example, audits conducted of Health Plan assets generally.

- 11 -



audits regarding drug pricing or reimbursement or payment amounts or rates for any subject drug" (*see, e.g.,* AARP 21).

Unfortunately, it gets worse. Defendants also demand "[a]ll documents reflecting any payments made by you that were based in whole or in part on the AWP of any subject drug" (*see, e.g.,* AARP 10). This demand, alone, calls for the production of each and every drug reimbursement transaction that a Health Plan processed, where such transaction was based in whole or in part on AWP. Moreover, it would require the production of every individual claim file. And, perhaps most egregiously of all, defendants demand that each Health Plan produce "[a]ll communications [with] providers or pharmacies relating to reimbursement, payment or prices of any subject drug," *see* AARP 11, which would call for the production of every single reimbursement request received from, and payment made to, all doctors and pharmacies. *See also* AARP 6 ("For the period 1991 to the present, all documents relating to or reflecting the amounts you reimburse providers for any subject drug."). What could possibly justify such a ridiculously onerous demand? Nothing does. And these are only examples.

Compounding this already substantial burden on the absent class members, defendants have advised that the drug-specific discovery being pursued now is only the beginning, and that defendants may come back with additional subpoena demands later. For instance, the cover letter accompanying the subpoena to AARP Health Care Options provides:

> These 11 drugs are part of a much larger group of drugs identified in plaintiffs' complaint. The longer list is reproduced as Exhibit A to the request. Depending upon the outcome of certain pending motions, it may be necessary to seek discovery on more of the drugs listed on Exhibit A at a future date.

*See* Exhibit B to the Sobol Declaration.

Defendants' subpoenas call for the production of literally mountains of documents and are therefore oppressive, providing yet another reason why the subpoenas should be quashed.

- 12 -



**3.**     **There are No Safeguards in Place with Regard to Defendants' Communications with These Absent Class Members**

Courts are aware of the potential abuse that could occur if defendants were allowed to freely communicate with putative class members. As a result, defendants are not given *carte blanche* to say whatever they like: "[c]lass actions serve an important function in our system of civil justice. They present, however, opportunities for abuse as well as problems for courts and counsel in the management of cases. Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99-100 (1981). Hence, several types of communications with potential class members are inappropriate:

> Communications found violative of the principles of Rule 23 include misleading communications to the class members concerning the litigation. Communications that misrepresent the status or effect of the pending action also have been found to have a potential for confusion and/or to adversely affect the administration of justice. . . . Courts have also condemned attempts in a communication to affect a class member's decision to participate in the litigation, or to undermine a class plaintiff's cooperation with confidence in class counsel.

*Hampton Hardware v. Cotter & Co.*, 156 F.R.D. 630, 632 (N.D. Tex. 1994) (citing *Gulf Oil*, 452 U.S. at 101, n.12; *In re School Asbestos Litig.*, 842 F.2d 671, 682 n.23 (3rd Cir. 1988)).[9]

In *Babbitt v. Albertson's, Inc.*, counsel for defendant interviewed putative class members before certification in order to evaluate and defend against the lawsuit. 1993 U.S. Dist. Lexis 18801, at *21 (N.D. Cal. Jan. 28, 1993). Citing to *Gulf Oil*, the *Babbitt* court denied the plaintiff's motion for sanctions and a protective order, finding that defense counsel's

---

[9] *See also In re Winchell's Donut Houses, L.P. Sec. Litig.*, 1988 Del. Ch. Lexis 159, at *3 (Del. Ch. Dec. 12, 1988) ("Surely, a defendant may not, in its communications with class members prior to certification, deceive or mislead class members."); *Pollar v. Judson Steel Corp.*, 1984 U.S. Dist. Lexis 19765, at *1 (N.D. Cal. 1984) (where defendant placed an advertisement which was found to be in violation of the "intent and terms" of the federal class actions because the advertisements did not disclose the pendency of the class action, attempted to solicit information from potential class members, and threatened confusion regarding and prejudice of the potential class members' rights in the litigation); 3 NEWBERG ON CLASS ACTIONS § 15.14 (1992) ("When communications can be shown to be abusive, the defendants may be ordered to retract their statements and are subject to other sanctions. Solicitation of exclusions also poses ethical problems.").



communications were not inappropriate.  Key to the court's finding, however, was that ***defense counsel had provided specific disclosures in its communication***:

> [T]hese attorneys uniformly communicated the same information to employees before conducting interviews:  (1) that he/she was an attorney retained to defend Albertson's in the pending action, (2) that he/she was investigating facts in order to evaluate and defend the action, (3) that the interviewee was under no obligation to talk to talk to him/her, (4) that no adverse action would be taken against any interviewee who chose not to talk, and (5) that no interviewee would benefit by choosing to talk to him/her.  [*Id.*, at *17]

Not only are the above disclosures missing from defendants' subpoenas, the subpoenas contain no disclosures at all.  Even though defendants will be gathering information from the Health Plans that may be used to defeat the claims of these absent class members, the subpoeanas provide absolutely *no* information to the class with respect to their rights in the litigation.  In addition, there are no safeguards in place under which the Court or plaintiffs' counsel can regulate or monitor further communications by defense counsel with absent class members in response to these subpoenas.  As is typically the case, a subpoenaed party contacts the attorney who issued the subpoenas to discuss the nature and scope of the requests, and how best to comply.  Indeed, defense counsel have already stated that they "expect to discuss these subpoenas directly with counsel for the various Third Parties, in an attempt to minimize the burden of our requests to the extent possible."  Nov. 14, 2003 Wise Letter, Exhibit D to the Sobol Declaration.  During the course of these conversations, which are inappropriate direct communications with absent class members, the potential is great for defense counsel to impart misinformation and otherwise engage in conversations and solicit information aimed at defeating the putative class member's claims.  Indeed, the potential for abuse is even greater at this stage in the proceedings, where the Court has yet to rule on class certification or approve the dissemination of an appropriate, Court-approved class notice that advises the class of the litigation and their rights therein.



In light of these points, the Court should require defendants to make a full accounting of all communications that they have had with each putative class member in regard to these subpoenas and any other matter related to the litigation. With regard to any discovery that defendants wish to obtain from absent class members in the future, the Court should require that defendants adhere to a procedure that safeguards the rights of absent class members and otherwise respects Rule 23 and abides by the guidelines for discovery of absent class members as set forth in the authorities cited above. To this end, plaintiffs suggest the following procedure: (i) defendants submit a proposal for plaintiffs' counsel's consideration; (ii) the parties meet and confer in good faith in an attempt to resolve or minimize any differences of opinion that may exist with respect to defendants' proposal;[10] and (iii) if no agreement is reached on all issues, defendants present the remaining issues by motion to the Court for the Court's evaluation, justifying the need for such discovery in accordance with the applicable legal standards set forth *infra*.

## IV.   CONCLUSION

"If discovery from absent members of the class is permissible at all, *it should be sharply limited and allowed only on a strong showing of justification*." MANUAL, § 30.232 at 232 (quoting 8 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 2171 (2d ed. 1994)) (emphasis added). The subpoenas that defendants have served on the Health Plans are far from "sharply limited." Moreover, defendants have not demonstrated a "strong showing" justifying the discovery that they seek. The subpoenas are unnecessary; seek information that can be obtained from non-class members; are burdensome and harassing; and do not contain appropriate disclosures and information about this lawsuit. In addition to burdening absent class members, the needless discovery demanded by defendants will significantly hinder the effective prosecution of this class action by inserting extraneous, time- and resource-wasting issues, with

---

[10] Plaintiffs, of course, remain willing to work in good faith with defendants on this issue, as they did prior to being summarily rebuffed by defendants at the time that plaintiffs originally communicated their concerns about the service of subpoenas on absent class members.



no offsetting benefits. The Court should quash the subpoenas, order defendants to make a full and accurate accounting of all communications with these absent class members, and order defendants to present to plaintiffs' counsel any further proposals to conduct discovery of absent class members and, failing agreement on the scope of any such discovery, present a proposal for the Court's consideration.

DATED:      December 3, 2003            By _____
                                          Thomas M. Sobol (BBO # 471770)
                                          Edward Notargiacomo (BBO #567636)
                                          Hagens Berman LLP
                                          225 Franklin Street, 26th Floor
                                          Boston, MA 02110
                                          Telephone: (617) 482-3700
                                          Facsimile: (617) 482-3003

                                       **LIAISON COUNSEL**

                                          Steve W. Berman
                                          Sean R. Matt
                                          Hagens Berman LLP
                                          1301 Fifth Avenue, Suite 2900
                                          Seattle, WA 98101
                                          Telephone: (206) 623-7292
                                          Facsimile: (206) 623-0594

                                          Samuel Heins
                                          Brian Williams
                                          Heins Mills & Olson, P.L.C.
                                          3550 IDS Center
                                          80 South Eighth Street
                                          Minneapolis, MN 55402
                                          Telephone: (612) 338-4605
                                          Facsimile: (612) 338-4692

                                          Jeff Kodroff
                                          John Macoretta
                                          Spector, Roseman & Kodroff, P.C.
                                          1818 Market Street, Suite 2500
                                          Philadelphia, PA 19103
                                          Telephone: (215) 496-0300
                                          Facsimile: (215) 496-6611

                                       **CHAIRS OF LEAD COUNSEL**
                                       **COMMITTEE**

- 16 -



Marc H. Edelson
Alan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Elizabeth Fegan Hartweg
The Wexler Firm
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

**MEMBERS OF LEAD COUNSEL
COMMITTEE AND EXECUTIVE
COMMITTEE**

Michael McShane
Alexander, Hawes & Audet, LLP
300 Montgomery Street, Suite 400
San Francisco, CA 94104
Telephone: (415) 982-1886
Facsimile: (415) 576-1776

Robert E. Piper, Jr.
Piper & Associates
624 Pierre Avenue
Shreveport, LA 71103
Telephone: (318) 226-0826
Facsimile: (318) 424-9900

**MEMBERS OF EXECUTIVE
COMMITTEE**

Anthony Bolognese
Bolognese & Associates
One Penn Center
1617 JFK Boulevard, Suite 650
Philadelphia, PA 19103
Tel: (215) 814-6750
Fax: (215) 814-6764



Jonathan W. Cuneo
The Cuneo Law Group
317 Massachusetts Avenue, N.E.
Suite 300
Washington, D.C. 20002
Tel: (202) 789-3960
Fax: (202) 789-1813

Neal Goldstein (Of Counsel)
Freedman & Lorry, PC
400 Market Street, Suit 900
Philadelphia, PA 19106
Tel: (215) 925-8400
Fax: (215) 925-7516

Michael E. Criden
Hanzman & Criden, PA
Commerce Bank Center, Suite 400
220 Alhambra Circle
Coral Gables, FL  33134
Tel:  (305) 357-9000
Fax: (305) 357-9050

Blake M. Harper
Kirk B. Hulett
Hulett Harper LLP
550 West C Street, Suite 1700
San Diego, CA  92101
Tel:  (619) 338-1133
Fax: (619) 338-1139

Jonathan D. Karmel
Karmel & Gilden
221 N. LaSalle Street
Suite 1414
Chicago, IL  60601
Tel: (312) 641-2910
Fax: (312) 641-0781

Dianne M. Nast
Roda & Nast, PC
801 Estelle Drive
Lancaster, PA 17601
Tel: 717-892-3000
Fax: 717-892-1200

Henry H. Rossbacher
Rossbacher & Associates
811 Wilshire Boulevard,
Suite 1650
Los Angeles, CA 90017-2666

- 18 -



Tel:  (213) 895-6500
Fax:  (213) 895-6161

Jonathan Shub
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd fl
Philadelphia, PA  19102
Tel: (215) 790-7300
Fax: (215) 546-0942

Scott R. Shepherd
Shepherd & Finkleman, LLC
117 Gayley Street, Suite 200
Media, PA 19063
Tel:  (610) 891-9880
Fax:  (610) 891-9883

Lisa J. Rodriguez
Ira Neil Richards
Trujillo Rodriguez& Richards, LLC
The Penthouse
226 West Rittenhouse Square
Philadelphia, PA  19103
Tel:  (215) 731-9004
Fax:  (215) 731-9044

Mitchell A. Toups
Weller, Green, Toups & Terrell, L.L.P.
2615 Calder Street, Suite 400
P.O. Box 350
Beaumont, TX  77704
Tel: (409) 838-0101
Fax: 409-838-6780

Damon Young
Lance Lee
Young, Pickett & Lee
4122 Texas Boulevard
P.O. Box 1897
Texarkana, AR/TX  75504
Tel: (903) 794-1303
Fax: 903-792-5098; 903-794-5098

**ADDITIONAL ATTORNEYS FOR
PLAINTIFFS**

# EXHIBIT 9



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| In Re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) |
| THIS DOCUMENT RELATES TO: (All Actions) | |

MDL No. 1456

Master File No. 01-CV-12257-PBS

Judge Patti B. Saris

## DEFENDANTS' MEMORANDUM IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER



## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................ii

INTRODUCTION ............................................................................................1

BACKGROUND ..............................................................................................4

    A.    Plaintiffs and the Putative Class...........................................................4

    B.    Health Plans ......................................................................................5

    C.    The Reimbursement Roles of Funds and Health Plans Differ Markedly................5

    D.    Defendants' Good Faith Subpoenas ......................................................6

ARGUMENT....................................................................................................8

DEFENDANTS ARE ENTITLED TO DISCOVERY FROM HEALTH PLANS........................8

    A.    Defendants' Subpoenas Go To Common Questions.................................9

    B.    Defendants' Subpoenas Were Tendered In Good Faith .......................10

    C.    The Demanded Disclosures Are Not Unduly Burdensome ..................11

    D.    The Subpoenaed Information Cannot Be Obtained From Other Sources.............13

    E.    "Pre-Authorization" Is Not Required ................................................14

CONCLUSION................................................................................................16



E. SERVED
01/09/04
03:19 PM ET
MDL No. 1456

# TABLE OF AUTHORITIES

## CASES

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) .............................. 9, 15

*Baldwin & Flynn v. National Safety Associates*, 149 F.R.D. 598
    (N.D. Ca. 1993) ........................................................................................... 15

*Brennan v. Midwestern United Life Insurance Co.*, 450 F.2d 999
    (7th Cir. 1971) ...................................................................................... 9, 11

*Clark v. Universal Builders, Inc.*, 501 F.2d 324 (7th Cir. 1974) ..................................... 12

*Easton & Co. v. Mutual Benefit Life Insurance*, Civ. Nos. 91-4012, 92-2095,
    1994 WL 248172 (D.N.J. May 18, 1994) .......................................................... 8, 9, 10

*Kamm v. California City Development Co.*, 509 F.2d 205
    (9th Cir. 1975) ........................................................................................... 15

*Krueger v. New York Telephone Co.*, 163 F.R.D. 446 (S.D.N.Y. 1995) .......................... 10

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, No. 97 Civ.
    4550, 97 Civ. 4676, 1998 WL 241279 (S.D.N.Y. May 12, 1998) ........................ 9, 12

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 103 F.R.D. 635
    (D. Mass. 1984) ...................................................................................... 8, 9, 15

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) .............................................. 9, 15

*Robertson v. National Basketball Association*, 67 F.R.D. 691
    (S.D.N.Y. 1975) ..................................................................................... 12, 15

*Wainwright v. Kraftco Corp.*, 54 F.R.D. 532 (N.D. Ga. 1972) ................................. 12, 15

956794v6



# INTRODUCTION

The Amended Master Consolidated Complaint ("AMCC") alleges a fraud of enormous scope on the diverse universe of payors for prescription drugs, ranging from individual senior citizens covered by Medicare Part B to the biggest and most sophisticated corporations in the business of providing health care insurance ("Health Plans").  Yet, when defendants seek to defend against these allegations by taking discovery from a limited number of Health Plans, plaintiffs intervene in an opportunistic effort to prevent defendants from obtaining essential discovery.  The case law clearly supports defendants' right to good faith discovery from a representative number of Health Plans on issues that are central to plaintiffs' class allegations and the merits of their claims.[1]

The central allegation of the AMCC is the assertion that all pharmaceutical payors, including Health Plans, were duped into believing that AWPs were an actual average of the prices that doctors and pharmacies paid for drugs, thereby causing the putative class members to reimburse or purchase at a higher rate than they otherwise would have.  (AMCC, ¶¶ 1-5).  The class action allegations assert that all members of the alleged class are similarly situated in being subjected to defendants' "common thread of fraud and other misconduct." (AMCC, ¶¶ 600-601).

Defendants' discovery is intended to gather evidence that will show that the AMCC is based on a false premise.  First, there are critical differences among the many thousands of varied members of the putative class relating to, among other things, reimbursement methodologies for prescription drugs and the putative class members'

---

[1] The subpoenas were served by, and this motion is filed on behalf of, the following defendants: AstraZeneca, Bristol-Myers Squibb, Centocor, GlaxoSmithKline, and Immunex.

956794v6



understanding of AWP.  In particular, defendants' expect that the requested discovery will provide evidence that these Health Plans:

- **employed** myriad reimbursement approaches;

- **knew** that AWP did not equal the actual price paid by doctors, hospitals, pharmacies, or PBMs;

- **knew** that the Wholesalers Acquisition Cost ("WAC") or its equivalent was, in many cases, a published list price, and that AWP was a markup over WAC and, further, that AWP-based reimbursement was intended to compensate health care providers for other unreimbursed or under-reimbursed costs, such as storage costs, wastage, spoilage, dispensing costs, etc.;

- **knew** that manufacturers responded to market forces by offering rebates, discounts, and other lawful adjustments and incentives;

- **knew** that price reporting services (such as Red Book and First Data Bank) did not adjust WAC or AWP for such factors;

- **could have** based and conditioned reimbursement on proof of the actual price paid but **elected** not to do so for a variety of reasons including administrative simplicity and the disadvantages of pass-through reimbursement;

- **knew** that, by basing reimbursement on AWP, the Plans enabled doctors and others to earn a margin on the drug they administered or dispensed; and

- **negotiated and contracted** with doctors, doctors' groups, hospitals, GPOs, and PBMs concerning the amount of that margin, often by basing reimbursement on a percentage of AWP but not such a low percentage that the overall compensation to the health care provider deterred their participation.

Such evidence – showing, in effect, that Health Plans, a large segment of the putative class, were not misled as to the meaning of AWP, and in fact had valid reasons when they chose to reimburse providers in excess of their direct costs – would be dispositive of plaintiffs' substantive allegations.  Further, the individualized negotiations and resulting differences in contractual arrangements by Health Plans – together with the myriad different reimbursement arrangements of the named plaintiff benefit Funds and other putative class members – will defeat class certification.  Defendants thus seek discovery from Health Plans, not merely because it is



relevant, but because it is crucial. Plaintiffs oppose it, not because it is irrelevant and burdensome, but because it is fatal, as to the merits and as to class certification.[2]

Plaintiffs' main argument is that discovery of the Health Plans should not be allowed because it would burden absent putative class members. This argument fails. The subpoenaed Health Plans are large, sophisticated entities, with ample resources, including experienced counsel. Such entities are not immune from discovery because they are part of a putative class. Indeed, there is no other way for defendants to explore the diversity of the arrangements for prescription drug reimbursement within the marketplace. As the Court noted during the November Hearing: "Normally you don't subpoena class members. This is a little different, this is industry wide. Maybe there's some other ways of doing it. I'm always worried about harassing individual people, but these people are huge third-party payors." (Tr. of 11/21/03 Hr'g, p. 117).

The Court's comment correctly acknowledges (i) the propriety of absent class member discovery where required to respond to allegations of an industry-wide fraud on a large and heterogeneous class of sophisticated entities, and (ii) the vast difference between individuals with small claims and corporations with large ones. Courts in this Circuit and elsewhere allow good faith discovery of class members that goes to common issues (*e.g.*, whether the market was duped) and is not unduly burdensome. Such discovery is particularly appropriate when, as here, the subpoenaed class members each stand to gain a significant recovery if they were to prevail,

---

[2] Defendants' belief that Health Plans fully understood that AWPs did not represent an actual average of actual wholesale prices is confirmed by a survey of Health Plans conducted for MedPac, the Medicare Payment Advisory Committee. The authors of that survey concluded, among other things, that "[t]here is a general understanding among health plans that physicians purchase drugs at prices that are below 95% of AWP and, given that health plan prices are generally at or above this rate, the sale of drugs is a profit center for physicians." Zachary Dyckman, Ph.D. & Peggy Hess, MHA, Health Plan Payment for Physician-Administered Drugs, *available at* http://medpac.gov/publications/Contractor_reports/Aug03_DrugsPay(cont)Rpt.pdf (July 2003).

956794v6



and the discovery is unavailable elsewhere.  With all of the necessary conditions satisfied, the Court should deny plaintiffs' motion for a protective order.

## BACKGROUND

### A.   Plaintiffs and the Putative Class

There are eleven named plaintiffs in this action.  Five are associations and six are health and welfare union benefit fund plans ("Funds").  The associations purport to sue on behalf of all consumers who allegedly purchased one or more of defendants' products based on AWP. The Funds contracted for the health and welfare benefits of their own union participants or beneficiaries.  None of the named plaintiffs are in the business of providing drug benefits or health insurance to third parties.

These eleven plaintiffs purport to sue on behalf of a single, sprawling class that includes an incredibly large subclass of third-party payors.  The class purportedly consists of *all* persons or entities that paid any amount for "a prescription drug manufactured by a Defendant Drug Manufacturer . . . at a price calculated by reference to the published AWP during the Class Period." (AMCC, ¶ 595).  This putative class encompasses individuals and entities that paid for drugs administered in a physician's office ("physician-administered drugs", *e.g.*, injections) and those prescribed by a physician and self-administered by the patient ("self-administered drugs", *e.g.*, pills).  The putative sub-class alleged in the AMCC includes all entities that "contracted with a PBM to provide to its participants a prescription drug manufactured by a Defendant Drug Manufacturer." *Id.*[3]  Accordingly, individual payors are only a small portion of the putative class.  A vastly greater portion consists of a wide variety of sophisticated institutions.

---

[3] The AMCC also alleges a separate, "Together Rx" class that defendants do not address herein as its allegations are not currently subject to discovery.

956794v6



E-SERVED 01/09/04 03:19 PM ET AWP-MDL No.1456

**B. Health Plans**

Health Plans include a variety of sophisticated entities such as Health Maintenance Organizations ("HMOs"), Indemnity Insurance Plans, and Preferred Provider Organizations ("PPOs"). Unlike the named plaintiffs, Health Plans are in the business of providing health care insurance to individuals and employer groups. The various types of Health Plans generally are distinguishable based upon (i) the extent of coverage for treatment administered outside a preferred or defined network, and (ii) the level of patient cost sharing.[4]

**C. The Reimbursement Roles of Funds and Health Plans Differ Markedly**

Contrary to plaintiffs' claims, discovery from the six named Funds is no substitute for discovery from Health Plans. While both types of entities provide reimbursement for drugs administered to or by their members, defendants believe that discovery will show that Funds and Health Plans are very different types of entities, with very different roles with respect to drug reimbursement. Although the Funds will ultimately be bound by the knowledge and actions of their agents, plaintiffs' counsel appear to have selected them (and the associations) precisely because they have little direct exposure to information about AWP.

Because they are in the business of providing coverage for medical and drug benefits, Health Plans tend to represent far more "lives" or individual patients than Funds. As a consequence, Health Plans typically have more buying power and devote far more resources and personnel to determining and negotiating reimbursement rates. Funds tend to delegate that

---

[4] At one end of the spectrum is the HMO, which offers a proprietary healthcare network to enrollees for a pre-paid monthly premium. While typically the patient cost sharing amounts under HMO plans are low, enrollees may not go outside the HMO network except in cases of emergent or urgent care needs. A PPO is a plan that offers lower patient cost sharing when the patient utilizes a network of preferred independent healthcare providers. Patients can choose to go outside of this provider network, but will pay higher cost sharing amounts. Indemnity insurance refers to a plan where patients have the greatest flexibility in terms of the healthcare providers they may utilize, but bear the highest level of cost sharing. Under indemnity insurance, patients usually pay a percentage of medical costs (*i.e.*, coinsurance).

responsibility to agents or, indeed, to Health Plans such as the ones at issue here.  This is especially true with respect to physician-administered drugs.  Funds thus tend to be one step removed from the negotiations of the underlying amount of reimbursement that health care providers are paid for their drugs and services.

The six plaintiff Funds appear to be no exception to this general rule.  Based on their paltry document productions to date, the six plaintiff Funds appear to have had very little or no direct involvement in or knowledge of the determination of the reimbursement rates for the physician-administered drugs administered to their members.  Plaintiffs have produced few documents regarding the negotiation of reimbursement rates, and no contracts with physicians, hospitals, or other health care providers.  In short, plaintiffs have produced no documentation concerning the issues central to their claims, *e.g.*, (i) what payors understood AWP to mean, and (ii) why AWP was or was not used to determine reimbursement.

Thus, plaintiffs' own productions establish defendants' need for discovery from Health Plans and other entities that are actively involved in, and therefore would have information relevant to, the negotiation of drug reimbursement.

### D.    Defendants' Good Faith Subpoenas

Pursuant to the Court's May 13, 2003, order to proceed with discovery on merits and class certification issues on certain drugs, defendants compiled a list of forty Health Plans from among the thousands of plans operating in the United States.  The targeted Health Plans were intended to represent a cross section of the industry, in terms of geographic diversity, size, and type of plan.

Defendants primarily seek evidence of the Plans' understanding of the term AWP and the methodology used to set drug reimbursement.  Without an understanding of the particular documentation and information maintained by any particular plan, defendants styled

6



the requests somewhat broadly with the view that they would negotiate with each respondent to address their individual concerns and the responsive information available.

Since serving the subpoenas, defendants have been contacted by legal counsel for thirty-seven of the forty Health Plans.  In each instance, defendants have volunteered to work with Plan counsel to narrow the production so as not to unduly burden or interfere with the operations of the Plan, and, at the same time, to obtain the information required to respond to plaintiffs' claims.  To simplify the process, defendants explained that the requests were intended to secure documents concerning six general areas:

- the many methodologies used to reimburse for drugs, some of which are based on AWP and some not, and that AWP formulae are used for practical reasons such as administrative simplicity.  (Document requests 2, 3 and 4);

- the Health Plans' understanding (a) of the term "AWP" (including the extent of private payors' knowledge that AWP does not equal the actual acquisition price) and (b) that doctors (and PBMs) earn a spread on drugs administered (or purchased by the plan beneficiaries).  (Document requests 1, 5, 7, 8, 11, 16, and 18);

- the extent of Health Plans' knowledge that servicing fees (*e.g.*, administration fees for doctors) are inadequate to cover overhead costs and that drug reimbursement is intended to include a subsidy.  (Document requests 2, 4, 8, 11, and 16);

- the PBMs with which Health Plans have contractual relationships and, with respect to those PBMs, the methodologies used by the PBM to calculate amounts due to pharmacies and from the Plans for drugs provided to the Plan beneficiaries.  (Document requests 2, 10, 16, 18);

- that Health Plans (historically) have provided lower reimbursement for a drug when administered in doctors' offices versus in hospitals.  (Document requests 20 and 21); and

- private payor communications with the government regarding the above points.  (Document requests 22, 23 and 24).[5]

---

[5] Although defendants' discovery requests include requests for documents relating to PBMs, defendants do not concede that plaintiffs' PBM claims have been adequately plead or are properly the subject of discovery.  *See* Consolidated Memorandum in Support of Defendants' Motion to Dismiss the Amended Master Consolidated Class Action Complaint (filed August 1, 2003).  In fact, Plaintiffs' recent "modifications" to the AMCC make the fatal deficiencies of plaintiffs' PBM claims strikingly clear.  *See* Defendants' Response to Notice of Filing Modified Amended Master Consolidated Class Action Complaint (filed December 19, 2003).

956794v6



Defendants also have provided the Plans with copies of the public AMCC, the parties'

correspondence concerning plaintiffs' motion for a protective order, plaintiffs' protective order

motion, and the transcript of the November 21, 2003 conference where plaintiffs first objected to

defendants' subpoenas.

The reaction of the Plans to defendants' efforts to address their concerns has been

largely positive, with a number of plans expressing appreciation for defendants' efforts.

Notably, not one of the subpoenaed entities has elected to join plaintiffs' motion for a protective

order. At plaintiffs' urging, however, all the Plans have advised defendants that they will not

produce documents until after the resolution of plaintiffs' motion, which may make it virtually

impossible for the defendants who are engaged in discovery to secure the discovery required to

defend this case in advance of the scheduled March 2004 discovery cut-off.

## ARGUMENT

### DEFENDANTS ARE ENTITLED
### TO DISCOVERY FROM HEALTH PLANS

Defendants are entitled to proceed with their discovery of the subpoenaed Health

Plans, even though they are putative class members. As this Court has explained, Rule 26 of the

Federal Rules of Civil Procedure requires "the scope of discovery [to] be liberally construed so

as to provide both parties with information essential to proper litigation of all the facts." *M.*

*Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 103 F.R.D. 635, 637 (D. Mass. 1984). The

discovery of the subpoenaed Health Plans is necessary to respond to plaintiffs' allegations that

defendants perpetrated a fraud on the entire health care industry, and therefore "essential" to the

proper defense of this litigation. *See Easton & Co. v. Mutual Benefit Life Ins.*, Civ. Nos. 91-

4012, 92-2095, 1994 WL 248172, at *4 (D.N.J. May 18, 1994) (allowing discovery of absent



class members where it "would tend to prove that the market was not defrauded, and thus the benefit of the 'fraud on the market' presumption would be unavailable").

Contrary to plaintiffs' contentions, moreover, the subpoenaed Health Plans' status as absent class members does not exempt them from discovery.[6]  Rather, this Court has held that discovery of absent class members is entirely appropriate if certain conditions are met:

> [T]he overwhelming majority of courts which have considered the scope of discovery against absentees have concluded that such discovery is available, at least when the information requested is relevant to the decision of common questions, when the interrogatories or document requests are tendered in good faith and are not unduly burdensome, and when the information is not available from the representative parties.

*M. Berenson Co.*, 103 F.R.D. at 637 (citing *Dellums v. Powell*, 566 F.2d 167, 187 (D.C. Cir. 1977)).[7]  Defendants' subpoenas satisfy each of those conditions:  The demands (i) seek information relevant to the resolution of common questions, (ii) were tendered in good faith, (iii) are not unduly burdensome, and (iv) seek disclosure of information that is not available from other sources.

### A.   Defendants' Subpoenas Go To Common Questions

By their subpoenas, defendants seek disclosures concerning some of the fundamental questions at issue in this litigation – the methodologies used by third-party payors to

---

[6]  The cases plaintiffs cite to support their contention that absent class members are exempt from discovery do not even address the issue.  In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the issue was whether the statute of limitations in a class action was tolled as to unnamed plaintiffs who sought to join the class after the statute of limitations had run.  The Court held that the unnamed plaintiffs were considered a part of the class, and therefore, were considered to be within the limitations period.  *Id.* at 551-52.  In *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), the Court explicitly stated that it was not addressing the issue of whether discovery of absent class members would be permitted, holding that the issue "is best left to a case which presents them in a more concrete way." *Id.* at 810 n.2.

[7]  *Accord, Brennan v. Midwestern United Life Ins. Co.*, 450 F.2d 999, 1005 (7th Cir. 1971); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, No. 97 Civ. 4550, 97 Civ. 4676, 1998 WL 241279, at *2 (S.D.N.Y. May 12, 1998); *Easton & Co. v. Mutual Benefit Life Ins. Co.*, Civ. Nos. 91-4012, 92-2095, 1994 WL 248172, at *3 (D.N.J. May 18, 1994).



reimburse prescription drug purchases and whether payors who based reimbursement on AWP knew that AWP was not an average of wholesalers' prices. Indeed, the subpoenas squarely seek evidence relevant to the common questions alleged in the AMCC:

- Whether AWPs are used as a benchmark for negotiating payments by Third-Party Payors for subject drugs. (AMCC ¶ 601(h))
- Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class Members to make inflated payments for subject drugs. (AMCC ¶ 601(i))
- Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiffs and the Class members (AMCC ¶ 601(j))
- Whether Defendants are liable to Plaintiffs and the Class members for damages for conduct actionable under the various state consumer protection statutes (AMCC ¶ 601(n))

Defendants fully expect the disclosures to establish that Health Plans were not deceived by the reporting of AWP and, in fact, that the Health Plans followed myriad different reimbursement approaches, some based on AWP and some not, knowing full well that AWP did not equal actual acquisition cost.

Accordingly, the discovery is relevant to, and likely dispositive of, plaintiffs' fraud theory. *Easton & Co.*, 1994 WL 248172 at *4 ("these issues of individual reliance are relevant to the ultimate determination of liability under the 'fraud on the market' theory . . . [and therefore] the requested discovery is relevant to the determination of common questions"). *See also Krueger v. New York Tel. Co.*, 163 F.R.D. 446, 451 (S.D.N.Y. 1995) ("the issues of liability on which defendants seek to depose the [absent class members] is a class-wide issue going to the heart of the plaintiffs' claim . . . and therefore properly the subject of defendants' discovery").

**B.     Defendants' Subpoenas Were Tendered In Good Faith**

There is no legitimate dispute that defendants' subpoenas were tendered in good faith. Seeking only those disclosures necessary to defend plaintiffs' allegations, defendants

956794v6



made targeted demands and, thereafter, took reasonable measures to ensure that the recipients are not unduly burdened.

Defendants limited the number of subpoenas to a small yet representative sample of the thousands of Health Plans currently operating in the United States. Defendants tailored the individual demands to the central issues of this case. Working with the subpoenaed Health Plans, defendants have proposed narrowed responses to those demands. Because this conduct precludes plaintiffs from showing that defendants sought to harass or dissuade absent class members from joining the litigation, the requested discovery should be allowed. *Brennan*, 450 F.2d at 1005 (allowing discovery after concluding that "there is nothing in the record to suggest that the discovery procedures were used as a tactic to take undue advantage of the class members or as a stratagem to reduce the number of claimants").

**C.    The Demanded Disclosures Are Not Unduly Burdensome**

Plaintiffs complain that defendants' requests are "breathlessly overbroad" and impose an undue burden on the Health Plans. This is simply not the case.

Plaintiffs correctly state that, in assessing the propriety of absent class member discovery, courts look to protect individuals, particularly those without legal counsel or significant resources, from being confused or even manipulated by unscrupulous defendants. Those concerns do not exist where, as here, the absent class members are sophisticated corporate entities with their own legal representation. As one court explained when it permitted discovery of absent class members that were Funds:

> [S]ince the class members here are not the typical members of a plaintiff class – individuals with small claims and presumably limited means – but rather are organized entities providing financial and other benefits to members of their constituencies under pre-existing collective bargaining agreements, *there is less concern that some controlled discovery will be unduly burdensome or imperil the maintenance of the class.*

956794v6



E-SERVED
01/09/04
03:19 PM ET
AWP-MDL No. 1456

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, No. 97 Civ. 4550, 97 Civ. 4676, 1998 WL 241279, at *3 (May 12, 1998) (emphasis added).  Further proving this point, *all* of the cases cited by plaintiffs where the court barred discovery as overly burdensome involved individuals who likely would not fully appreciate the legal significance of their status, or the consequences of decisions they may make in the class action.[8]  The subpoenaed Health Plans are not similarly prejudiced.[9]

To the contrary, the Health Plans are sophisticated organizations represented by counsel that are fully capable of objecting to any demands that they view as unduly burdensome or otherwise overly broad.  In fact, defendants' have worked with counsel for the Health Plans to narrow the demands in response to their objections and concerns.[10]

Those courts that have intercepted discovery against absent class members have often been concerned that the burden would outweigh the small monetary recovery that each individual class member stands to gain, and that such a situation would be unfair to the selected few and would tend to undercut the purpose of Rule 23 to provide an efficient remedy where individual action would not be cost-justified.  That concern hardly applies here, where plaintiffs' calculations suggest that each of the subpoenaed Health Plans stands to recover millions of dollars if plaintiffs are successful in this action.

---

[8]  *See Wainwright v. Kraftco Corp.*, 54 F.R.D. 532 (N.D. Ga. 1972) (absent class members were individual board of education members); *Clark v. Universal Builders, Inc.*, 501 F.2d 324 (7th Cir. 1974) (absent class members were individual home purchasers); *Robertson v. Nat'l Basketball Ass'n*, 67 F.R.D. 691 (S.D.N.Y. 1975) (absent class members were individual basketball players).

[9]  Thus, plaintiffs' request for "safeguards" to "protect" the subpoenaed Health Plans (Pls' Mem., p. 14), should be rejected.

[10]  Ironically, while plaintiffs cast aspersions on defendants' disclosure in its subpoenas of the entire list of drugs identified in the AMCC, certain of the subpoenaed Health Plans have thanked defendants for providing advance notice of the possible expansion of discovery.

956794v6



**D.    The Subpoenaed Information Cannot Be Obtained From Other Sources**

Plaintiffs' assertion that the disclosures sought from the subpoenaed Health Plans could just as readily be obtained from the six named Funds is flatly wrong and belied by plaintiffs' production to date.

As discussed above, Funds and Health Plans are very different entities that play very different roles in the reimbursement of drugs used by their members.  It stands to reason, therefore, that these entities have very different perspectives and knowledge regarding drug pricing and reimbursement.  For example, Health Plans typically negotiate reimbursement rates directly with physician groups, whereas Funds typically do not.  Thus, the former has information concerning those negotiations and the latter does not.  The Funds' lack of involvement in negotiations with health care providers is borne out by their meager responses to defendants' document requests – the Funds have produced no documents concerning the determination of reimbursement for physician-administered drugs or, for that matter, any documents bearing on their understanding of AWP.

Plaintiffs also claim that the documents within the possession of PBMs would cover all of defendants' PBM-related discovery requests.  Again, this is not the case.  While PBMs presumably would have contracts with Health Plans and correspondence between PBMs and Health Plans, they would not have the internal Health Plan documents that would demonstrate the Health Plans' understanding of the key issues in negotiations with PBMs, including the significance of AWP.  It is the knowledge of the putative class members, not PBMs, that is critical to defendants' ability to disprove plaintiffs' sweeping allegations of deception.

Plaintiffs similarly object to defendants' request for documents created or received by a government agency regarding AWP by blithely asserting that defendants can

13



obtain reports and other documents directly from the government.  Plaintiffs again miss the point.  There are innumerable government reports that discuss the fact that AWP is not an actual average of wholesaler's prices and that the Government's policy of reimbursing drugs under Medicare Part B based on AWP had the effect of generating profits for physicians.  Many of these documents are publicly available.  Defendants do not seek these documents from the Health Plans in order to show that they exist, but rather to show *that the entire health insurance industry was aware of this body of literature and, therefore, was well-aware of the realities of AWP, and yet, for their own reasons, chose to use it in many cases as a benchmark for reimbursement*.  Obtaining the documents from the Government is no substitute for obtaining the documents directly from the Plans.

Finally, plaintiffs claim in conclusory fashion that defendants can "obtain much of the information sought in the Medical Plan subpoenas from the Medical Plan Processors and Benefit Consultants, Claims Administrators and Medical Plan Auditors."  As discussed above, no third party is likely to have documents that go to what the Health Plans knew about AWP; nor will they enable defendants to establish the myriad variations in the relationships between class members and providers and PBMs.

**E.    "Pre-Authorization" Is Not Required**

Plaintiffs complain mightily that defendants failed to seek the Court's prior approval before issuing subpoenas to selected putative class member Plans.  (Pls' Mem., pp. 1-2, 6-7)  Presumably foreseeing that their attempt to block defendants' subpoenas will fail, plaintiffs seek to impose, on a going forward basis, a three-step protocol whereby defendants would be required to seek plaintiffs' approval or a court order before proceeding with discovery.  (Pls' Mem., p. 15)  This proposed pre-authorization protocol is contrary to the Federal Rules and the precedent of this Court, is unwarranted, and is unworkable.

14



As this Court advised plaintiffs at the November 21, 2003 hearing, any objection to the propriety of a party's subpoenas should be made by a properly noticed protective order motion. (Tr. of 11/21/03 Hr'g, p. 116)  Indeed, plaintiffs have not cited any case where a party's subpoena was quashed for failing to seek prior authorization.  To the contrary, this Court has allowed outstanding subpoenas on absent class members to proceed without regard to whether pre-authorization was sought.  *M. Berenson Co.*, 103 F.R.D. at 637.

The primary case on which plaintiffs rely for their pre-authorization proposal is readily distinguishable.  *See Baldwin & Flynn v. Nat'l Safety Assocs.*, 149 F.R.D. 598 (N.D. Ca. 1993).  In *Baldwin* the defendants sought to take the depositions of approximately half of the absent class members for the purposes of class certification issues.  The court found that the depositions only would provide "minor additions to the overwhelming volume of evidence" (including "ample documentation of written and scripted materials") that the defendants already had obtained.  *Id.* at 601.  The court refused to allow the additional discovery since it was not required for the determination of class issues, which it concluded did not require the same degree of proof as determination on the merits.  *Id.*  The discovery was not denied for failure to seek pre-authorization.[11]  Indeed, in a majority of cases cited by the plaintiffs, it is clear that the defendants did not seek pre-approval, and the courts do not even address this alleged "deficiency."  *Wainwright v. Kraftco Corp.*, 54 F.R.D. 532 (N.D. Ga. 1972); *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985); *Robertson v. Nat'l Basketball Ass'n*, 67 F.R.D. 691 (S.D.N.Y. 1975).

---

[11]  *Kamm v. California City Development Co.*, 509 F.2d 205 (9th Cir. 1975), is also distinguishable. *Kamm* involved a plaintiff class that was seeking additional discovery, which is not instructive to the issue of whether absent class member discovery should be permitted.  Plaintiffs in Kamm argued the District Court erred in using only the public record of a related state court action in making its determination that a class action was not the proper method of adjudicating the case.  The appellate court held that this was not an abuse of discretion and affirmed the denial of the request for further discovery.

956794v6



Plaintiffs' assertion that defendants should have sought pre-approval is a red herring, and their proposal to implement a pre-authorization protocol on a going-forward basis is nothing more than a delaying tactic.

### CONCLUSION

For all of the above reasons, Defendants respectfully request that the Court deny plaintiffs' motion for a protective order and allow discovery of the forty Health Plans to proceed.

Respectfully submitted,

By:     [signature on file with the Court]

Nicholas C. Theodorou (BBO #49673)
Lucy Fowler (BBO # 647929)
FOLEY HOAG LLP
115 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

- and –

Andrew D. Schau (admitted *pro hac vice*)
Erik Haas (admitted *pro hac vice*)
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
(212) 336-2000

956794v6



## CERTIFICATE OF SERVICE

I certify that on January 9, 2004, a true and correct copy of the forgoing

Memorandum in Opposition to Plaintiffs' Motion for a Protective Order was served on all

counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order

No. 2 by sending a copy to Verilaw Technologies for posting and notification to all parties.


[signature on file with the Court]
Andrew D. Schau

17