1 undisputed that Rule 45 says that motions for enforcement or

2 motions to quash any motion concerning the scope of a Rule 45

3 subpoena, that the power there is best to be heard by the court

4 that issued the subpoena, in this case, the court in

5 California, and what the defendants argues is that Section 1407

6 by virtue of its consolidation procedures gives this court

7 power that essentially trumps Rule 45, and they cite a couple

8 of cases for that proposition.  We cite the Visics (ph) case,

9 which says that Rule 45 controls, and we submit to you that the

10 case that we cite is probably better authority because it

11 comports with sound statutory construction principles.  The

12 provision at issue in Section 1407 is this, there is a portion

13 of that statute which says that the judge or judges to whom MDL

14 actions are assigned, may assign the powers of the district

15 judge in any district for the purpose of conducting pretrial

16 depositions in such coordinated or consolidated pretrial

17 proceedings.  Now, that's very clean language.  It only refers

18 to depositions.  That's the only discovery matter specifically,

19 you know, assigned to the transferee court, and the most basic

20 cannon of statutory construction says that you read a statute

21 the way it's written.  Congress is presumed to know the meaning

22 of the, of the terms of the statute.  It, it's not a stretch to

23 say that Congress knows what the term deposition means.

24 Congress is responsible for the content of Rules of Civil

25 Procedure, so they're presumed to know what--

13

1    THE COURT:  And a lot of other things.

2        MR. McGINTY:  But they presume to know what Rule 45

3    says.

4        THE COURT:  Including the fact that we don't get a

5    raise.

6        MR. McGINTY:  That too, unfortunately.  The mission

7    to refer to matters of, in depositions can only be taken to be

8    purposeful, and, and the way that the authority say about the

9    defendants gets around that is they appeal to some general

10   policy argument concerning the nature of a 1407 proceeding

11   saying well, it says that coordinated or consolidated pretrial

12   proceedings shall be conducted by a judge or judge to whom such

13   actions are assigned.  Gee, you know, that's if there's a

14   policy for them to get everything, but if that's true, why have

15   the separate reference to depositions at all.  If that

16   consolidation language is good enough to give this Court

17   control over Rule 45 matters, you wouldn't need to refer to

18   depositions at all.  So the question is why--

19       THE COURT:  Well, does it not refer to depositions

20   that can be going on in another district where disputes arise?

21       MR. McGINTY:  That's, I think that's the purpose,

22   your Honor, is that Rule 30 of the Rules of Civil Procedure has

23   very specific provisions referenced in the _Visics'_ case,

24   30(B)(4).  It says that any time during a deposition on motion

25   of a party or of the deponent and upon a showing of, you know,

1  that the examination is being conducted in bad faith, et

2  cetera, et cetera, et cetera, the court in which the action is

3  pending or the court in the district where the deposition is

4  being taken may order the officer conducting the examination to

5  cease forthwith or may limit the scope or manner or whatever.

6  What this essentially says is that depositions being a special

7  case where stuff happens, if you need to suspend and get a

8  ruling, Section 1407 says you go to the transferee court.

9  That's the purpose of having a specific reference to

10  depositions in Section 1407.  Otherwise, there's no reference

11  to any other kind of discovery, Rule 45 should control, and as

12  a third party, not a party to the case, Health Net is the third

13  party stranger to this case, resident out in California

14  producing documents in site two within California should be

15  subject to the jurisdiction of the California court.  And it

16  makes sense for a number of reasons, in particular, for issues

17  that had been raised in this motion although I think have

18  been--

19        THE COURT:  Well, it makes no sense in terms of the

20  fact that the judge in California knows absolutely nothing

21  about the case.

22        MR. McGINTY:  Well, I think that's the, that's the--

23        THE COURT:  Particularly in a complex case.

24        MR. McGINTY:  Well, that's always going to be the

25  case, your Honor.  I mean cases can be incredibly complex

15

1   without being an MDL proceeding, yet Rule 45 nonetheless gives

2   the local court the authority to determine the propriety of the

3   discovery that's being sought.

4           THE COURT:  Okay, I'll hear from your brother just on

5   this issue of jurisdiction.

6           MR. MANGI:  Your Honor, I admire my learned friend's

7   efforts to create an issue on the jurisdictional point, but

8   it's one that doesn't exist.  The case law is discussed

9   extensively in our reply papers, and I'm happy to hand up the

10  pages if your Honor would like them.  There are numerous cases

11  that address this precise issue.  It's come up many times and

12  all of them uniformly hold that the MDL court has jurisdiction,

13  and, in fact, exclusive jurisdiction over these matters.

14  What's more, they go into the logic for that as your Honor just

15  pointed out, judicial economy demands that the judge most

16  familiar with the litigation hear these disputes.  The district

17  for example pointed to that precise factor in the Boise case.

18  Similarly, the, Poe case in the District of DC said it would

19  make no sense if depositions were heard in one place, documents

20  in another.  All these cases, and there are plenty more,

21  there's Factor A from the Northern District of Illinois,

22  Sunrise Securities from the Eastern District of Pennsylvania,

23  Dupont Plaza from Puerto Rico, even Wright & Miller have spoken

24  to this point.  All of them uniformly stand--

25          THE COURT:  Dupont Plaza is a First Circuit Case, so

16

1    yes.

2          MR. MANGI:  -- that the MDL court has jurisdiction.

3    Now, the Visics case that, that my learned friend relies on,

4    that court explicitly distinguished this situation.  They

5    applied their ruling only to cases where the docket, where the

6    subpoena was for documents only.  They expressly distinguished

7    cases where the subpoena was for documents and a deposition,

8    which is what we have here.  So Visics, even in its own terms

9    doesn't apply and what's more, Visics was expressly rejected in

10   Poe, which is the leading case and it's never been cited again.

11   So we would suggest that the weight of the authority on this

12   issue and the weight of, of shear logic is, is simple.

13          THE COURT:  Do you have a copy of the reply brief--

14          MR. MANGI:  Yes, your Honor.

15          THE COURT:  -- if it's handy.  I have it.

16          MR. MANGI: I have a, a highlighted copy that I'm

17   happy to hand up if your Honor would, would ignore the

18   highlighting.

19          THE COURT:  I'm colored blind.  Just one point. I

20   remember looking at it, but there was one point that I wanted

21   to--.

22          All right, well, let's move on to the substantive

23   portion of it.

24          MR. McGINTY:  I'd like to focus now on the, the

25   portion of the, of the request that seeks confidential

17

1  competitive business information, namely, specific

2  reimbursement terms, and I'd like to, to I think clarify some

3  things that, that perhaps might not have been addressed in, in

4  the defendants' presentation.  First of all, it's fair in a

5  point to say that the defendants are entitled to, to learn

6  about methodologies.  A methodology would be to say, do you

7  reimburse someone on a captitated basis?  In other words, you

8  give them X dollars per member.  Do you reimburse them based on

9  some Mac type schedule where you have a separate, you have

10 price list for the drugs?  Do you reimburse them on a formula

11 that says AWP minus a stated percentage plus a dispensing fee?

12 That's methodology, that's what they're, that's what they're,

13 they're certainly entitled to get is methodology.  What Health

14 Net is talking about is the actual price.  It matters

15 competitively for Health Net that there is a difference, a

16 competitive difference between them and other, other plans with

17 whom they compete, whether it's just to, to use number

18 randomly, whether it's AWP minus 12.5% versus AWP minus 13% or

19 15% or whatever.  What we're saying is they can find, we can,

20 they're entitled to find and we've given them the information

21 which shows to them that it is in these exemplar contracts AWP,

22 AWP minus a percent.  We just don't tell them what the

23 percentage is, and that's what we think is entitled to be

24 protected here.  It's not clear to us why that precise

25 percentage is needed to be disclosed.  What is clear is that it

*Maryann V. Young*
**Certified Court Transcriber**
(508) 384-2003

18

1    is going to be a competitive disadvantage for Health Net,

2    that, you know, Health Net believes that it does a good deal

3    striking, good job striking competitive deals and what is a

4    great competitive realm.  In fact, the defendants in their own

5    tutorial to this Court on these issues says these are complex

6    negotiations between multiple entities.  There's

7    competitiveness at each level of the chain and Health Net is

8    able to price its services to its clients because it negotiates

9    these deals and it potentially loses that advantage if other

10   people know what they're able to extract from the providers

11   with whom they contract.

12          THE COURT:  Well, there is a protective order here.

13          MR. McGINTY:  Well, it's, the protective order is

14   certainly there, but I think it's at best an imperfect

15   protection, certainly one that has to get a third party

16   stranger to this dispute.  Plus, I know that at one of the

17   tutorials, notwithstanding the existence of this protective

18   order, it's my understanding that the reimbursement rate that

19   Express Scripts uses to pay to CVS was actually disclosed in

20   open court, and there's no, there's no dispute that there's a

21   likelihood that this sort of information can come out at trial,

22   notwithstanding the protective order.  So, while the--

23          THE COURT:  Well, that's an issue for trial down the

24   road, that's--

25          MR. McGINTY:  But that's, I guess the question is

*Maryann V. Young*
**Certified Court Transcriber**
**(508) 384-2003**

19

1  that assuming that it is, it is, it is possible for the

2  purposes of allowing the defense to mount an adequate defense

3  to give them methodology without giving them precise pricing,

4  why expose Health Net to the competitive risk, and, all we're

5  saying is there needs to be an appropriate balancing here.

6  Parenthetically, your Honor, you know, the only reason we're

7  here is to strike this balance.  There's the--

8      THE COURT:  Well, are you proposing an alternative of

9  what you're willing to produce?

10      MR. McGINTY:  Well, first of all, as a, the point I

11 think I was about to make was that with respect to the

12 documents that that they asked for after the deposition that

13 have not been produced, the only reason they have not been

14 produced is that until these issues are resolved, there's no

15 purpose in producing them, so that certainly if, if they are

16 resolved, we'll hand them over at that point.  But I think your

17 Honor, that our argument is, is that what we've given which

18 shows them the methodology but not the precise pricing is

19 giving them what they need and this is an appropriate

20 disclosure.  They have the methodology.  They say that's what

21 they're entitled to.  We're not sure why there should be

22 anything more produced on that point, and I think that the

23 Vitamins case is, is not distinguishable on the grounds that

24 counsel presents.  Yes, the posture of the case was that it was

25 early in the case while motion to dismiss was pending, but what

20

1    was going on there is what should go on whenever there is this

2    type of discovery dispute.  It's a balance, and in that posture

3    of the case, the court is saying the need for it at this stage

4    is low.  The risk is considerable to the producing third party,

5    we're going to exercise our discretion to strike that balance

6    now against the production of the documents, reserving frankly

7    the question about what, how the balance would be struck later

8    on in the case, but certainly the principle holds.  And, I

9    think where we come out on this is that defendants haven't

10   offered a compelling argument why the balance should be struck

11   here to require us to to disclose information which is going to

12   put us--

13                THE COURT:  It, it may not be compelling to you--

14                MR. McGINTY:  -- at this stage.

15                THE COURT:  -- but I'm inclined to think it's

16   compelling to me at this point.  But, anything else?

17                MR. McGINTY:  I mean, the other, I think one other

18   point just to address the issue about why it should be

19   important to get the precise pricing is the notion that things

20   are going to, you know, things change over time and, of course,

21   contracts are set for a fixed term.  And during a contract

22   term, it's always going to be AWP minus whatever percentage it

23   is that these contracts are not indexed.  Certainly if they

24   want to see earlier versions of contracts, we can show them

25   that the methodology was used and maybe even tell them that,

*Maryann V. Young*
**Certified Court Transcriber**
(508) 384-2003

21

1    about the magnitude of any changes in the discount that was

2    used over time, but the precise pricing isn't going to be

3    necessary to address that point.

4                    THE COURT:  Two minutes--

5            MR. MANGI:  Your Honor--

6                    THE COURT:  -- on why you need the precise pricing.

7            MR. MANGI:  Absolutely.  Your Honor, the fact that

8    AWP maybe used in some of Health Net's contracts doesn't give

9    defendants any information that's not available in the public

10   domain.  Some insurers use AWP for some of their contracts, as

11   does Health Net.  Health Net also uses other methodologies,

12   such as capitation in some cases.  But, the key parts, and I'll

13   try not to repeat myself, is that one can only carry out useful

14   analysis using the actual numbers, and I'll take just one

15   example leaving aside the four I discussed, and go back to the

16   bundling point.  These contracts are competitive bargains in

17   the marketplace.  I completely agree with my brother on that,

18   but the only way you can assess that is by looking at the

19   terms.  If for example there's a lower amount being paid in

20   reimbursement, there'll be a higher amount being in the

21   dispensing fee.  There'll be other terms of the contract that

22   may come in and be relevant, the financial terms that'll modify

23   those accounts, the expectation theory.  There's no way to

24   counter that unless you know the exact terms.  If I know that

25   they use AWP in some contracts, that doesn't tell me anything

22

1 about whether Dr. Hartman's expectation is valid or not.

2 There's simply no way if you look at even at the tutorial,

3 which is public.  Defendants use some scatter clause showing

4 claims data and precise reimbursement points.  You can't make

5 those points with only methodologies.

6      The only other point, your Honor, that I'll make

7 briefly is in terms of the other documents.  As your Honor

8 knows, this subpoena was issued in, in November of, of 2000.

9 These additional documents that were sought after subpoena,

10 most of them were nothing new.  They were stuff we'd asked for

11 originally.  The witness just testified about them.  So I would

12 request that if your Honor is inclined to grant these motions,

13 your Honor also provide a specific timeframe as we requested in

14 our proposed order so we can get all of these documents

15 together in time for summary judgment.

16      Thank you, your Honor.

17      THE COURT:  All right, I'll move on.

18      MR. McGINTY:  I'm, I'm sorry.

19      THE COURT:  Just seconds.  Do you want a quick

20 response or--

21      MR. McGINTY:  Actually, one, one point which I think

22 is not a matter of great dispute but I did at least want to, to

23 raise here is that we had, we had raised in our papers the

24 notion that, that some of what they're seeking with respect to

25 claims data is very expensive to try to recover because it's

23

1   archived, and it's my understanding the defendants have

2   conceded that they would be obligated to pay for that.  We

3   think that any order requiring the production of that data

4   should provide the defendants will bear the reasonable cost of

5   recovering the archived data.

6          MR. MANGI:  Your Honor, we stated we'd pay for it

7   before we even asked for it.

8          THE COURT:  All right.  All right, moving on to your

9   motion.  I'll--

10         MS. CICALA:  Thank you, your Honor.

11         THE COURT:  I'll hear the argument on both motions,

12  take a brief recess, and then give you a ruling from the bench.

13         MS. CICALA:  Thank you, your Honor.  Just a point of

14  clarification.  Suffolk County had filed a second motion to

15  compel against Schering-Plough.  We served that on defendants

16  on January 20th.  They responded on the 25th.  It was not

17  regrettably filed with the court until yesterday.  I don't know

18  if your Honor is expecting to hear argument on that today.  I am

19  prepared to proceed if you would like.  I can't speak for

20  defense counsel on that, but I'll leave it to your Honor.

21         THE COURT:  Well no, because I don't have it.  This

22  docket was just, the docket that I had yesterday, didn't have

23  it on it.  This docket was just printed out this morning and--

24         MS. CICALA:  It concerns a narrow issue of, regarding

25  production of sharing documents related to their Texas

1    litigation.                                                        24

2            THE COURT:  For the record, for the record it's

3    docket entry number 1300.

4            MS. CICALA:  Thank you.

5            THE COURT:  Well, we'll see.  I mean, if your brother

6    is prepared to address it as well.

7            MR. McGINTY:  Your Honor, we are prepared to address

8    it if you'd like to hear the motion.

9            THE COURT:  Well, then we might as well.

10           MS. CICALA:  Thank you, your Honor.  Should we do

11   them one at a time, however?

12           THE COURT:  Please.

13           MS. CICALA:  Okay.  The first motion filed by Suffolk

14   concerns the form of the discovery being produced to it by

15   Schering-Plough.  And specifically, Suffolk seeks Schering's

16   compliance with that part of CMO 10 that directs any of the

17   parties to produce any documents available in electronic

18   format, shall be so provided in that format.  Suffolk began

19   it's review of Schering documents in Boston a couple of months

20   ago, and in the course of that review, confirmed that those

21   same documents it was reviewing in hard copy were available

22   electronically.  However, Schering refused to produce them to

23   us electronically on the basis that the liaison counsel and the

24   MDL had negotiated with Schering that the documents would be

25   produced in hard copy.  We were not privy to those discussions

25

1    and did not elect to receive documents in hard copy.  For most

2    of these, our preference is to receive them electronically, and

3    we would like to be able to do that.

4         THE COURT:  Well, if they're available in hard, in

5    electronic form, why can't they have it that way?

6         MR. CHRISTOFFERSON:  Thank you, your Honor.  I think

7    the answer to this question lies in Case Management Order No.

8    9, which preceded Case Management Order No. 10.  It, it is true

9    as counsel for Suffolk has suggested, that Schering had

10   hundreds of thousands of documents, responsive paper documents

11   scanned into electronic format at a cost of nearly $300,000 to

12   Schering.  Case Management Order No. 9 requires liaison counsel

13   to coordinate discovery for plaintiffs from cases that were

14   brought by government entities, including Suffolk.  Schering

15   offered to provide those responsive documents to lead

16   plaintiffs in electronic format if they would agree to share in

17   the cost.  The lead plaintiffs declined that offer and

18   requested that we produce those documents in paper form, which

19   we did.  Case Management Order No. 9 also requires defendants,

20   Schering, to make available to Suffolk those documents that

21   were made available to the lead plaintiffs to the extent that

22   those documents relate to drugs identified in Suffolk's

23   complaint.  Schering made available those documents to Suffolk.

24   Suffolk has reviewed those documents and those were documents

25   that were related to Suffolk's complaint, the drug identified

26

1    in Suffolk's complaint.  Suffolk has reviewed the documents

2    and, contrary to their assertions, under the Case Management

3    Orders, Schering is not required to make additional and

4    separately negotiated productions to Suffolk.  Notwithstanding

5    the reliance on Case Management Order No. 10, Case Management

6    Order No. 10 did not supplant or revise the language regarding

7    discovery coordination in Case Management Order No. 9.  The

8    whole point of this Case Management Order is to avoid

9    unnecessary and duplicative discovery requests and negotiations

10   and the associated costs.  Suffolk now apparently wants to

11   substitute themselves into the position of lead plaintiffs, but

12   that's not a decision that either Schering or Suffolk can make.

13   Schering has made the documents available to Suffolk.  Suffolk

14   has reviewed those documents, and nothing more is required of

15   Schering.

16        THE COURT:  I'm inclined to agree.

17        MS. CICALA:  Your Honor, I, I don't, I, I'm unsure

18   what my brother refers to when he refers to us being lead

19   plaintiffs.  I mean, Suffolk has an independent case.  It's not

20   part of the class case.  It was not consulted so, first of all,

21   I don't understand why Suffolk should be bound--

22        THE COURT:  But I think everybody has to play by the

23   same rules here.  I mean, the idea is to keep the cost down.

24        MS. CICALA:  Absolutely agreed, your Honor.  Had

25   Suffolk the opportunity, had liaison counsel in any way

27

1   consulted with Suffolk before making a unilateral decision

2   with regard to how it sought to collect the sharing materials,

3   then I would not be standing before you.  But regrettably, and

4   we have a motion that continues to be subjudice on this issues,

5   regrettably, Suffolk was not privy, was not included in any of

6   those discussions.  Then perhaps the issue should be--

7              THE COURT:  Well I think your issue--

8              MS. CICALA:  -- addressed between--

9              THE COURT:  -- is with liaison counsel.

10             MS. CICALA:  So it would seem, your Honor.  If I may

11  say one more thing though.  However, on the issue of cost and

12  efficiency, I cannot understand how there is any excessive cost

13  or inefficiency in Schering delivering to us electronically

14  that which is available electronically.  The, there's no, we're

15  talking about a punch, you know, a click of a button, a copying

16  of a CD, as opposed to copying papers and transmitting boxes

17  which is certainly under any scenario, far less efficient.

18             THE COURT:  Well, it sets a precedent.  That's the

19  only problem.

20             MS. CICALA:  I'm afraid that the precedent that may

21  be set here, however, your Honor, is that Suffolk County and my

22  other clients, frankly, I also represent the City of New York

23  and the counties of Rockland, Westchester, Onijaga (ph), and

24  numerous other counties who are about to join in this

25  litigation who have separately retained us, that each of these

28

1    important governmental entities, the City of New York, for

2    example is one of the largest Medicaid payers in this country,

3    shall be prejudiced by the fact that liaison counsel in this

4    matter has not conducted itself as liaison counsel. I'm sorry

5    to have to say this, should be conducting itself, i.e.,

6    coordinating with those parties for whom has been charged to

7    coordinate. Now, if the issue is that I need to address that

8    more strenuously with liaison counsel and this Court, then that

9    will be our route.

10          THE COURT: All right, briefly.

11          MR. CHRISTOFFERSON: Your Honor, just briefly, if I,

12    if I may. I think the bad precedent that may be set here is

13    precedent that is, that is negative towards the defendants

14    because Schering spent over, nearly $300,000 preparing these

15    trial preparation materials. There's a large amount of sum

16    cost that have gone into that process and if now simply just by

17    asking and not following the Case Management Orders the other

18    counties and other plaintiffs are allowed access to those

19    documents, it is a windfall for them and a loss to Schering.

20          THE COURT: All right,

21          COUNSEL: Your Honor-

22          THE COURT: -- now I'll hear you on the other.

23          COUNSEL: -- if I could just briefly as counsel for

24    liaison counsel just speak to what's been said. I, I do take

25    offense to the fact the statement that liaison counsel has not

29

1  conducted themselves in a manner which is appropriate for

2  liaison counsel to conduct themselves.  At the time, I haven't

3  been privy to all of the negotiations with respect to Schering-

4  Plough, but when we negotiated with Schering-Plough, we did so

5  in what we thought was the most efficient manner.  There are

6  plaintiffs who came in, you know, either during or after those

7  negotiations took place.  We were not purporting to negotiate

8  on behalf of absent plaintiffs who come in afterwards.  It's

9  not clear to me that Suffolk even had document requests pending

10  at the time that that negotiation was had.  And let me just

11  tell you about where we ended up with respect to Schering's

12  documents and the reason we did what we did.  Schering

13  indicated the volume of documentation that they had available

14  in paper.  We knew from our investigation of the case and from

15  experience that a lot of that paper was going to be useless to

16  us, and turning that into electronic format would be even more

17  useless.  It would be a waste of time and money for all

18  involved.  So our approach to this entire thing is when they

19  tell us we have 600 boxes available in a warehouse down in New

20  Jersey, we send a team of lawyers to go down there and cull

21  through that 600 boxes and pick out however many boxes, a

22  subset of those boxes that are relevant to the case, and we had

23  those documents copied in paper format and sent to our offices

24  and had them distributed widely amongst the co-lead counsel who

25  are working on our case, and analyzed and are not in one

30

1  specific format or place that are able, you know, they're

2  sharing 600, what, what have you.  That's how we've tried to

3  cut things back.  We didn't think it made sense to wholesale

4  copy things.  Believe me, I was in one of those warehouses for

5  two to three days, and there was a lot of stuff that no one

6  wants, and it didn't make sense to do it any other way.

7          THE COURT:  All right.  Do you want to be heard on

8  1300?

9          MS. CICALA:  Yes, thank you, your Honor. Suffolk's

10  second motion concerns a document request it served on

11  Schering-Plough seeking production of all documents and

12  materials, including deposition transcripts and so forth, that

13  Schering produced to the State of Texas in its litigation with

14  the State of Texas.  Schering's objection to our request is

15  that the production, well, initially Schering said that there

16  were not documents in there that concerned Schering, and now

17  they have acknowledged that there are documents within the

18  Texas production that involved Schering or were Schering

19  produced documents, but Schering says it would be burdensome

20  for them to go through the Texas production to identify the

21  Schering documents.  I think I can solve that problem.  I have

22  a relationship with the Texas attorney general who's

23  cooperating with the City of New York and the County of Suffolk

24  and all of my other clients.  They will provide us access to

25  the documents.  We will do Schering's work for it.  It needn't

31

1  be bothered in the slightest with this production.  Schering

2  has produced to Suffolk here.  They've acknowledged that they

3  should be.  The production has not been confined to Claritin.

4  We have received from Schering the documents that it produced

5  to the House Energy Committee.  So they have produced a broader

6  production here, so there can be no reasonable objection to us

7  receiving that which they produced to Texas, particularly where

8  we're willing to do the work, and of course include them in

9  whatever we receive from Texas so that there's nothing

10  inappropriate and that we don't go into warrant witnesses, so,

11  so for example.

12          THE COURT:  Do you need a special agreement in place

13  to do this, or?

14          MS. CICALA:  With Texas?

15          THE COURT:  Yes.

16          MS. CICALA:  To the extent we need to be singed on to

17  the Texas protective order, the Texas AG has agreed that we,

18  that they will facilitate that process for us.  We've asked

19  Schering to not object to our signing on to the Texas

20  protective order.  I would certainly include Schering in all my

21  communications with the Texas AG with regard to these documents

22  and copy them on any documents I receive from the Texas AG.

23  This needn't burden Schering in the slightest.

24          THE COURT:  Problem with it?

25          MR. CHRISTOFFERSON:  Yes, your Honor.  Thank you. I,

32

1    I'm not sure--

2              THE COURT:  Too good to be true.

3              MR. CHRISTOFFERSON:  Your Honor, I'm not sure if

4    you'd like a copy, I brought extra copies of opposition if

5    you'd like me to hand them up to you, or you'd rather it—

6              THE COURT:  No, just argue it to me.

7              MR. CHRISTOFFERSON:  Okay. Respectfully, your Honor,

8    I think that counsel for Suffolk is missing the point here. It

9    is true that pursuant to discovery requests in this litigation,

10   Schering has made available to the lead plaintiffs in this case

11   relevant documents from this Texas litigation.  That entire

12   case though concerns generic products, including products

13   manufactured and marketed by Warrick.  There were no claims in

14   that case that Schering did anything wrong with respect to any

15   of its drugs.  The discovery produced by Schering and Warrick

16   in that case overwhelmingly related to Warrick and Warrick

17   products, and there was lots of discovery in that case, nearly

18   400,000 pages worth.  Although Ropes & Gray did not represent

19   Schering and Warrick in that action, local counsel, who has

20   submitted a declaration in support of our opposition, informs

21   us that there might have been some minimal amount of documents

22   produced in that production that did not relate exclusively to

23   Warrick or Warrick related products, and that may have had some

24   bearing on Schering.  Judge Saris, however, has issued a stay

25   on discovery by Suffolk into claims, its claims against

33

1    Warrick.  So, all the documents produced in the Texas

2    litigation, except for some minimal amount, relate to claims

3    into which discovery is stayed.  The only remaining question

4    would be whether these minimal needles in a giant haystack of

5    documents are even relevant to Schering, to Suffolk's claims

6    against Schering.  We don't know the answer to that and could

7    not know the answer to that without ourselves reviewing the

8    entire production.  The suggestion that Suffolk go and do our

9    "work" for us, does not solve the problem, because then they

10   would have access to lots of documents, almost 400,000 pages

11   worth, that relate only to their claims into which discovery

12   has been stayed.  It's simply unreasonable and unduly

13   burdensome for them to require Schering to sift through

14   hundreds of thousands of pages of documents to find a few that

15   may or may not be relevant to Suffolk's claims.  In other

16   words, the burden that Schering would have to bear is grossly

17   disproportionate to the value that Suffolk would gain from some

18   few potentially relevant documents.  The discovery here

19   violates Judge Saris' order because the claims to which it is

20   directed, the claims against Warrick have been stayed and are

21   not subject to discovery at this time, regardless of to whom

22   the request might now only be made.

23            THE COURT:  Why should I grant this with the stay in

24   place?

25            MS. CICALA:  The stay is against, is at to Warrick. I

34

1    absolutely agree.  We don't seek any Warrick documents.  We

2    don't seek any deposition testimony from any Warrick witnesses.

3    We seek documents produced in Texas by Schering, which exist.

4    We seek Schering deposition transcripts, which exist.  The

5    Texas AG has those documents identified as Schering documents

6    and those transcripts identified as Schering witnesses.  I'm

7    not looking for anything that's stamped with a Warrick bates

8    number at this time.  I'm talking about Schering documents and

9    Schering witnesses.  So, in that regard, this in no way

10   violates Judge Saris' order.  The issue devolves to burden and

11   we can relieve them of the burden by receiving only that which

12   is stamped Schering-Plough and only for witnesses that were

13   produced by Schering-Plough.

14          MR. CHRISTOFFERSON:  Your Honor, if I may respond

15   just briefly?  I think again counsel is missing the point.  It,

16   it doesn't matter to whom, you know, whether Schering as

17   Schering produced the documents.  The documents that Schering

18   produced overwhelming related to Warrick and Warrick's

19   products.  You would have to, she would have to then figure out

20   which of those documents were actually relevant to their

21   claims, and according to the, the information that you received

22   from local counsel, those documents are minimal, minimal and it

23   would only be a handful.  So whether Schering is required to go

24   through and wade through and find a handful of documents or

25   someone else, I guess the, the attorney general would find

35

1    documents and then, you know, send them back to Suffolk.

2    Either way, it's going to require an amazing amount of effort

3    that is frankly disproportionate to the value.

4             MR. DeMARCO:  Your Honor--

5             THE COURT:  Mr. DeMarco?

6             MR. DeMARCO:  -- just briefly.  There's another

7    feature to this that my colleague, Mr. Muehlberger would like

8    to discuss with respect to other defendant in this aspect of

9    discovery.

10            MR. MUEHLBERGER:  Your Honor, very briefly, this is

11   the first I've heard about the, possibly the County of Suffolk

12   signing on to the Texas Attorney General protective order.  But

13   there are witnesses in that case, for instance plaintiffs'

14   expert in the MDL, Dr. Schondlemyer, as I understand it was

15   also an expert witness who rendered a report and I understand

16   also testified in deposition in the Texas AG case, which we

17   have not been privy to and not been allowed to see because of

18   the Texas AG order in place, and so what I simply raise, to the

19   extent the Court is inclined to consider to allow the County of

20   Suffolk to sign on the Texas Attorney General protective order,

21   defendants be allowed to consider that issue and perhaps file

22   something on the record to protect their interest and make sure

23   everybody is on the same playing field.

24            THE COURT:  All right.  I'll take a brief recess, come

25   back at quarter of twelve.

36

1    (Recess, reconvene 11:51:16 a.m.)

2    (Court called into session)

3        THE COURT:  All right, please be seated.  All right.

4    On docket entry No. 1175, the motion is allowed subject to the

5    enforcement of the confidentiality order.  I'd like to set a

6    deadline, so tell me what you think is a reasonable time for

7    production.

8        MR. McGINTY:  Your Honor, I would suggest that that

9    deadline should be 90 to 120 days. These documents by and large

10   are located in Sacramento.  They will have to be reviewed.

11   They will have to be vetted for privilege, and it's going to

12   take some time to do that.  In addition, many of these

13   documents are in electronic format and, as it stands right now,

14   I'm unaware of what, if any, systems are in place in order to

15   access some of those documents.  So we should have a

16   significant amount of time.

17       THE COURT:  Well, I could give you 90 days, but what

18   about phasing it as things become available?

19       MR. McGINTY:  Your Honor, we have no objection to

20   that, and as a matter of fact, in the productions that have

21   been taking place at this point, we have been producing on a

22   rolling basis that by agreement with Mr. Mangi's office.  So, I

23   would not object to that.

24       THE COURT:  Okay.

25       MR. MANGI:  May I be heard, your Honor?

37

1          THE COURT:  All right.

2          MR. MANGI:  Your Honor, very briefly, there, there's

3  separate components to this motion.  First producing an

4  un-redacted copy of what they've already produced, that takes

5  no time.  Just take off the tape, and copy it again.  So we

6  submit that should be produced within 14 days.  The second

7  component is a production of claims data.

8          THE COURT:  Can you do that within 14 days?

9          MR. McGINTY:  I do not know, your Honor, whether that

10  can be done that quickly.  I would suggest that the order the

11  Court was intending to enter is probably the right one.

12          THE COURT:  Well--

13          MR. McGINTY:  But we will--

14          THE COURT:  -- what I'd like to do is say 90 days,

15  but let's set a tentative schedule for the phases.  So if you

16  could do this within four, the first 14--

17          MR. McGINTY:  Yes, your Honor.  As I, as I have, have

18  indicated, we are willing to produce on a rolling basis, as

19  we're able to do it.  I think that the outside limit of 90

20  days, should, should stay in place, but I will represent to the

21  Court and to Mr. Mangi that we will produce on a rolling basis

22  as we are able to do that.

23          THE COURT:  But let's see if we can set a schedule

24  for that rolling basis.

25          MR. MANGI:  Your Honor, if, if I may just speak to

38

1   the two other components of this?  The second component is

2   claims data.  Health Net has represented to us in numerous

3   letters that are appended to our motion they can produce claims

4   data within six to eight weeks of start.  Given that summary

5   judgment is, is fast up and coming in this case, we would

6   request that they be held to that schedule.  And the third

7   component of it, are these additional documents.  Again your

8   Honor, these are very specific documents.  They won't be more

9   than that high.  There are no privilege issues.  Most of them

10  are just contracts.  Ninety days, we would submit, is entirely

11  unrealistic and we would submit that certainly the un-redacted

12  production in 14 days, original--

13          THE COURT:  All right, un-redacted production, 14

14  days.

15          MR. MANGI:  The claims data within, they ask for six

16  to eight weeks, we'll say eight weeks is fine.

17          THE COURT:  All right.

18          MR. MANGI:  And the additional documents--

19          THE COURT:  So, six to eight weeks, so will give you

20  the 60 days on that.

21          MR. MANGI:  And these additional documents, your

22  Honor, which is again as I mentioned, just a handful, we would

23  suggest those could be produced within a month.  I mean, the

24  subpoena has been out there since November or 03.

25          THE COURT:  All right, within 30 days.

1          MR. McGINTY:  Your Honor, if I may.  The

2  representation that was previously made to Mr. Mangi's office

3  was that it would, it would take eight weeks after we had

4  systems in place in order to locate and access the documents.

5  Eight weeks is two, is two months.  It's 60 days essentially. I

6  would request that the Court stand upon the original intent of

7  90 days because it's going to take us eight weeks after we get

8  the systems in place and, and there's an, an unknown amount of

9  time to get that done.  I think 90 days is a much more

10  reasonable estimate for, for producing--

11          THE COURT:  For final completion.

12          MR. McGINTY:  Yes, your Honor.

13          THE COURT:  But phased in as we've said here today.

14          MR. MANGI:  Your Honor, on claims data, we got claims

15  data from other defendants within four days, within five days.

16  This, this eight weeks is outlandish to begin with, but that's

17  the maximum we can work with to be able to use this data for

18  summary judgment.

19          THE COURT:  Yes, I mean I had, haven't thought of the

20  summary judgment issue since I'm not dealing with that so, I'm

21  inclined to say 60 not 80, not 90.

22          MR. McGINTY:  Your Honor, may I inquire because I am

23  unaware.  When is the summary judgment motion scheduled to be

24  heard?

25          THE COURT:  Well, to be heard, I don't know.

40

1    MR. McGINTY:  When is it scheduled to be briefed?

2    MR. MANGI:  Your Honor, I believe summary judgment is

3  in, is in May.  Is that correct?

4    UNIDENTIFIED:  Yes.

5    THE COURT:  Well--

6    MR. MANGI:  Your Honor, plus on, on the other claims

7  data--

8    THE COURT:  You know, at the end of the 60 days, if

9  it's not done, we'll deal with it.  But let's, let's shoot for

10  60, rather than 90.

11    MR. MANGI:  Your Honor, the, the only remaining issue

12  on, there was one minor lingering issue which is that of Health

13  Net has put these water marks on their documents.  They're

14  expressly forbidden in CMO 10.  They obscure text.  Judge Saris

15  explicitly forbade them.  We told them that.  They still did

16  it.  We ask for clarification on that matter also.  It's in our

17  proposed order.

18    MR. McGINTY:  Your Honor, there are water marks on

19  the documents.  I've seen every one of them.  Not one of them

20  obscures text.  They are a gray background, rather than an

21  overlay.  I'm personally unaware of what Judge Saris has

22  ordered.

23    THE COURT:  Are these watermarks already on the

24  documents?

25    MR. McGINTY:  They are already on the documents that

41

1  have already been produced.

2          MR. MANGI:  Your Honor, they're, they're highly

3  confidential 1456, all over the page.  They can just be put on

4  the bottom right like every other document in the case.

5          MR. McGINTY: They, they are, they are again, your

6  Honor, I've seen, I have personally seen each and every page of

7  these.  They, they are not all over the page.  They are in the

8  center.  They are a gray background. They do not obscure any

9  text.

10          THE COURT:  Well, if they obscure something, then you

11  have to produce it a second time in a non-obscure form.

12          MR. MANGI:  Your Honor, counsel's point is that they

13  are in grayscale.  The color of grayscale varies by the

14  photocopy.  Judge Saris said put them where, outside the text.

15          THE COURT:  You know, I don't want to deal with this.

16  Work it out.

17          MR. MANGI:  Your Honor--

18          THE COURT:  Work it out.  Get together.  Work it out

19  so everybody can read everything.

20          MR. MANGI:  Thank you, your Honor.

21          MR. McGINTY:  Your Honor, for my edification, I

22  perhaps didn't make my notes as as completely clear as they

23  should be.  May I ask if the Court would summarize what the

24  order, what the order is?

25          THE COURT: Get a copy of the transcript.

*Maryann V. Young*
**Certified Court Transcriber**
(508) 384-2003

42

1      MR. McGINTY: Is there one, is there a trans--

2      THE COURT:  Well, they'll have to be prepared.

3      MR. MANGI:  I have good notes.  I'll be happy to

4  discuss--

5      THE COURT:  Okay, outline how you believe--

6      MR. MANGI:  Absolutely.

7      THE COURT: -- I've stated.

8      MR. MANGI:  Your Honor, the production, the documents

9  that have already been produced, your Honor has said that they

10  should be produced in their un-redacted form, presumably

11  including missing pages, within 14 days.

12      THE COURT:  Slow, slow down so that he can take it

13  down.

14      MR. McGINTY:  A little slower, Adil, please.

15      MR. MANGI:  Oh, I apologize.

16      THE COURT:  Wait, let him get this--

17      MR. McGINTY:  I, I got that.

18      THE COURT:  You got that.

19      MR. McGINTY:  But a little slower next time.

20      MR. MANGI:  I personally wrote a big 14.  The, the

21  additional documents that are identified in our October 15,

22  2004 letter, which follow depositions, your Honor has ordered

23  the production of those documents within 30 days.  And the

24  production of claims data, your Honor has ordered within 60

25  days.

43

1      THE COURT:  Clear enough?

2      MR. McGINTY:  Yes, your Honor, simply that that 60

3  days subject to reevaluation depending on what the technical

4  issues are.

5      THE COURT:  I'll listen to you.  You know, you get to

6  that point, you file a motion, I'll hear you.

7      MR. McGINTY:  Okay.

8      THE COURT:  But, you know, always try and talk with

9  each other and see if you can try and work things out, and, you

10  know, as to the watermarks, see if you can work this issue out.

11  I mean this is--

12      MR. McGINTY:  We, we do speak to each other, your

13  Honor, regularly.  I'm sure that as reasonable people, we can

14  resolve that.

15      THE COURT:  All right, as to docket entry No. 1189,

16  the motion is denied.  I'm afraid you are bound by what liaison

17  counsel has done in the past, and I think you have to talk to

18  liaison counsel and make that clear.

19      As to 1300, it's denied without prejudice at this

20  time, having heard from Mr. DeMarco's co-counsel.  I'll give

21  everybody else 14 days to weigh in on this if they want to file

22  anything.

23      MS. CICALA:  Thank you, your Honor.

24      THE COURT:  All right, and then when you, when we get

25  everything, we can set up another hearing date

44

1      MS. CICALA: Thank you.

2      MR. CHRISTOFFERSON:  Your Honor, just a quick point

3   of clarification, are you inviting further submissions by, by

4   Schering & Suffolk or just, you know, other defendants?

5      THE COURT:  Well, you've, did, I mean, did you really

6   get much of chance to respond?

7      MR. CHRISTOFFERSON:  We, we did file--

8      THE COURT:  You're satisfied.  I mean--

9      MR. CHRISTOFFERSON:  Okay.  Thank you, your Honor.

10      THE COURT: If anybody else wants to respond, only

11   because it was just yesterday.  Okay.

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

Maryann V. Young
Certified Court Transcriber
(508) 384-2003

45

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

March 6, 2005

Maryann V. Young