# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456<br>Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | Hon. Patti B. Saris<br><br>Chief Mag. Judge Marianne B. Bowler |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
MOTION BY JOHNSON & JOHNSON, CENTOCOR, INC., KENNETH WEGNER,
COLIN KONSCHAK, GRACE LEONE, TRINA GILLIES, JIM BIVONA AND BRETT
BEITER TO QUASH SUBPOENAS AND FOR A PROTECTIVE ORDER
PROHIBITING PLAINTIFFS FROM TAKING DISCOVERY OF FORMER
CENTOCOR EMPLOYEES SUBPOENAED AFTER THE DISCOVERY CUT OFF**

Johnson & Johnson, Centocor, Inc., Kenneth Wegner, Colin Konschak, Grace Leone, Trina Gillies, Jim Bivona and Brett Beiter respectfully submit this reply memorandum in further support of their motion to quash subpoenas and for a protective order prohibiting plaintiffs from deposing and seeking document production from six former Centocor employees whom plaintiffs did not subpoena until after the August 31, 2005 discovery cut-off specified in CMO 13.

**ARGUMENT**

Plaintiffs advance four arguments why the subpoenas should not be quashed. First, they say that they served a deposition notice before the cut-off. Second, they claim the depositions are not subject to the discovery cut-off because they are not meant for discovery, but rather to preserve testimony for trial. Third, they claim CMO 13 may not be enforced without a showing of harm. Fourth, they accuse Centocor of manipulating the discovery process in order to obtain an unfair advantage. Each of these four arguments is without merit.

**1.      Plaintiffs' Cannot Justify their Failure to Serve Timely Subpoenas
         Calling for Depositions Prior to Expiration of the Discovery Cut-Off**

CMO 13 identifies August 31, 2005 as the "close" of discovery. Plaintiffs do not deny that they failed to subpoena Centocor's former employees before this deadline. Rather, plaintiffs claim the subpoenas should be deemed timely because they served Centocor with notice of their intention to take the depositions on August 10, 2005. Of course, notice to Centocor is not the issue. Centocor's former employees are not parties and their testimony cannot be compelled by notice to their former employer. As non-parties, they must be served with subpoenas under Rule 45.

As we noted in our initial memorandum, where as here discovery requires service of a subpoena, the courts are uniform in holding that the subpoenas must be **served** and the depositions must be **completed** by the discovery cut-off.  *See* Initial Memo. at 3-5.[1]

Plaintiffs seek to blame Centocor for the delay in service, saying they were not told that the witnesses had left Centocor's employ until August 23, 2005.  This argument is misplaced.  Plaintiffs have known the identity of these witnesses since November 2004 or earlier.  (Declaration of Adeel A. Mangi ("Mangi Dec.") ¶¶ 2-5).  Yet despite this knowledge, plaintiffs took no actions for months and did not serve even the notice of deposition until August 10, 2005.  August 10 was **the last possible day** before the August 31 cut-off on which to serve deposition notices or subpoenas, because CMO 10 requires the parties to "provide at least 21 days notice of a proposed deposition."

Plaintiffs should have anticipated that some of the employees listed in the August 10 notice might have left the company.  By waiting until the last possible moment to serve notice of whom they intended to depose, plaintiffs' took a calculated risk that some of the individuals listed in the notice would need to be subpoenaed and that the time to provide 21 days notice would lapse before the close of discovery.  *See Integra Lifesciences I Ltd. v. Merck KGaA*, 190 F.R.D. 556, 559 (S.D.Cal. 1999) ("Where a party makes a tactical decision during discovery to refrain from deposing a non-party witness who is beyond the subpoena power of the court, but who has relevant information to offer in the case, that party takes the risk that the testimony will not be presented at trial if the witness does not voluntarily appear.").  Moreover, by waiting until

---

[1] *See also* Whittaker *Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984) ("The purpose of a discovery cutoff date is to protect the parties from a continuing burden of producing evidence and to assure them adequate time to prepare immediately before trial.") and *Toone v. Federal Express Corp.*, No. Civ. A. 96-2450, 1997 WL 446257, at *8 (D.D.C. June 30, 1997) (plaintiff's interpretation of the scheduling order which would permit responses to discovery requests after the deadline held "unreasonable").

the last minute, plaintiffs "slept on their rights and thus waived any deposition." *Breffka v. M/V/ Glorious Success*, No. 01CIV10599, 2002 WL 31415624, at *3 (S.D.N.Y. Oct. 28, 2002) (cited in movants; opening papers); *see also Bondpro Corp. v. Siemens Westinghouse Power Corp.*, No 04-C-0026-C, 2005 WL 256488, at *1 (W.D. Wis. Jan. 31, 2005) (deposition notice held untimely where defendant had "long known" that witness possessed relevant information); *Four M Corp. v. Guiliano*, No. 89 Civ. 5275, 1991 WL 4480, at *1 (S.D.N.Y. March 27, 1991) (denying defendants' attempt to take non party deposition where "defendants were on notice as to the issue [on which they sought discovery] well before the cut-off").

Plaintiffs next argue that the depositions would not violate CMO 13 because CMO 13 nowhere states that discovery must be "completed" by August 31. This argument ignores the plain wording of the order, which states: "August 31, 2005 – Close of Fact Discovery." It is nonsensical to argue that CMO 13 means that discovery must be "closed" but need not be "completed" by August 31. Indeed, the apparent purpose of the order was to provide a certain end point for discovery before the filing of expert reports on October 1.[2] Plaintiffs' argument also overlooks this Court's Local Rule 16.1(f) which provides that "Unless the judge determines otherwise, the scheduling order shall included specific deadlines or general time frameworks for . . . the **completion** of depositions") (emphasis added).

**2.      Plaintiffs Are Seeking Discovery Depositions and Should Have Completed Them Within the Discovery Period**

Plaintiffs next argue that depositions are exempt from CMO 13 because they weren't noticed for purposes of discovery, but were instead noticed as "trial depositions." This argument fails for two reasons.

---

[2] Plaintiffs failed to meet that deadline as well, which failure is the subject of a separate motion.

First, most courts hold that *all* depositions, including so-called "trial depositions," must be completed by the discovery cut-off. *See Bondpro Corp. v. . Siemens Westinghouse Power Corp.*, No. 04-C-0026-C, 2005 WL 256488, at *1 (W.D. Wis. Jan. 31, 2005) (trial depositions must be procured during the time set forth to conduct discovery otherwise "there would be no motivation to conduct discovery of the 'unavailable' witnesses during the discovery period."); *Integra Lifesciences I, Ltd. v. Merck KGaA*, 190 F.R.D. 556, 559 (S.D. Cal. 1999) ("Based on the lack of distinction in the Federal Rules between trial and discovery depositions, it has been held that there is no difference between the two, and that if a party wishes to introduce deposition testimony at trial, that testimony should procured [sic] during the time set by the court to conduct discovery absent exceptional circumstances."); *Henkel v. XIM Products, Inc.*, 133 F.R.D. 556, 557 (D. Minn. 1991) (holding that the pretrial schedule governs the time for taking "all depositions," including depositions to preserve testimony for trial because otherwise "management of litigation by the court would be made extremely difficult").

Second, and in any event, the depositions plaintiffs seek are not true "trial depositions" because plaintiffs are not proposing to take them in order to preserve testimony for trial. The distinction between trial and discovery depositions is discussed at some length in *RLS Associates, LLC v. United Bank of Kuwait PLC*, 2005 WL 578917 (S.D.N.Y.) (attached to plaintiffs' memorandum). It is clear from the discussion in that case that the depositions plaintiffs are seeking here do not qualify as trial depositions.

The defendant in *RLS Associates, LLC* applied to take the video-taped deposition of its own former employee because that employee had "key information" relevant to its defense, resided outside the United States, and was unwilling to travel to the United States in order to testify at trial. Plaintiff opposed the application because it was made after the close of discovery.

4

The court granted defendant's application because it determined that the deposition was not being taken for purposes of discovery. Indeed, the court noted that defendant had "no reason" to take the deposition during the discovery period because the deponent at that time "was still an employee" and defendant "knew the substance of his testimony, and intended to present him as a live witness at trial." Those circumstances changed when the employee left the company and moved to another country. The Court allowed the deposition to go forward because, in light of the change in circumstances, it was "clear" that the deposition was intended "to serve the purpose of testimony preservation rather than discovery."

Similar circumstances are not present in this case. Plaintiffs acknowledge that they have not debriefed Centocor's former employees so they cannot possibly know the substance of what these individuals will say if they are deposed. Indeed, plaintiffs' counsel admitted that he wanted the depositions in order to "explore" the perspective of Centocor's sales level employees. Counsel further indicated that he might be satisfied after taking two of the noticed depositions, depending on what the witnesses had to say. And the subpoenas seek the production of documents as well as testimony. (Mangi Dec. ¶ 5.) It is thus clear that plaintiffs are not seeking to preserve testimony for trial but are instead seeking to take classic discovery depositions. Even the cases cited by plaintiffs are clear that such depositions are not permitted after the close of discovery:

> [I]n determining whether a deposition is a discovery deposition or a trial deposition, judges may consider several factors, one factor being the purpose for which the deposition is taken. In most cases the circumstances will make the judicial decision fairly obvious. For example, attorneys normally do not depose their own witnesses, or "friendly" witnesses, for purposes of discovery. As the Court noted in the *Charles* case, the attorneys already know what these witnesses will say when they testify. . . . ***Thus, when requests for "trial depositions" are presented which reflect these types of circumstances, the expressed need to preserve the***

> *testimony of the witnesses may be viewed much differently, for*
> *example, than an expressed need to preserve the testimony of an*
> *opposing party, or an un-friendly witness. The former are more*
> *likely to be true requests for "trial depositions," while the latter*
> *are more likely to be discovery depositions attempting to pose as*
> *trial depositions.*

*Estenfelder v. Gates Corp.* 199 F.R.D. 351, 355 (D. Colo. 2001) (citing *Charles v. Wade*, 665

F.2d 661 (5th Cir. 1982)) (emphasis added).

**3.     No Showing of Additional Harm is Required Where**
**Plaintiffs' Are in Breach of a Discovery Cut-Off**

CMO 13 is an order of the court and must be obeyed. As discussed in our initial

memorandum, violation merits a protective order, and no further showing of harm is required.

*See* Initial Memo. at 3-5. *See also Rosario-Diaz v. Gonazelz,* 140 F.3d 312, 315 (1st Cir. 1998)

("a litigant who ignores a case-management deadline does so at his peril."); *Mendez v. Banco*

*Popular de P.R.,* 900 F.2d 4, 7 (1st Cir. 1990) ("If [a district judge] sets a reasonable due date,

parties should not be allowed casually to flout it or painlessly to escape the foreseeable

consequences of non-compliance."); *Odie v. General Motors Corp.*, 131 F.R.D. 365, 367 (D.

Mass. 1990) (granting defendant's motion for a protective order and sanctions, "which would not

have been necessary if the plaintiff's attorney had obeyed the Scheduling Order" and the time

constraints for serving discovery requests and deposition notices).[3]

**4.     Plaintiffs Claim Of Discovery Manipulation Is False**
**And Designed To Mask Their Tardiness**

Plaintiffs' last argument is that discovery should be extended because Centocor's

counsel allegedly misled them about when Centocor's former employees were first represented

by counsel. As set forth in the accompanying declaration of Centocor's counsel, plaintiffs'

---

[3] *Anderson v. Cryovac*, 805 F.2d 1 (1st Cir. 1986), cited by plaintiffs as authority for an additional "harm"
requirement, involved consideration of First Amendment issues in the context of a newspapers' access to
materials subject to a confidentiality order. That case has no bearing on the issues before this Court.

accusations are unfounded.  Counsel's statements concerning their representation of Centocor's former employees were completely truthful and plaintiffs were not misled.  (Mangi Dec., ¶¶ 6-7.)

## CONCLUSION

For the above-stated reasons, movants respectfully request that the Court issue an order quashing the subpoenas at issue and enter a protective order prohibiting plaintiffs from taking discovery of Centocor's former employees.


/s/ Andrew D. Schau

William F. Cavanaugh, Jr. (admitted pro hac vice)
Andrew D. Schau (admitted pro hac vice)
Erik Haas (admitted pro hac vice)
Adeel A. Mangi (admitted pro hac vice)
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
(212) 336-2000

*Attorneys for Defendants Johnson & Johnson, Centocor, Inc., Kenneth Wegner, Colin Konschak, Grace Leone, Trina Gillies, Jim Bivona and Brett Beiter*


Dated:  October 14, 2005

## CERTIFICATE OF SERVICE

I certify that on October 14, 2005, a true and correct copy of the forgoing Reply Memorandum Of Law In Further Support Of Motion By Johnson & Johnson, Centocor Inc., Kenneth Wegner, Colin Konschak, Grace Leone, Trina Gillies, Jim Bivona and Brett Beiter To Quash Subpoenas And For A Protective Order Prohibiting Plaintiffs From Taking Discovery Of Former Centocor Employees Subpoenaed After The Discovery Cut Off was served on all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to Verilaw Technologies' successor entity LexisNexis File & Serve for posting and notification to all parties.

_____/s/ Andrew D. Schau_____

Andrew D. Schau (admitted pro hac vice)
Erik Haas (admitted pro hac vice)
Adeel A. Mangi (admitted pro hac vice)
PATTERSON, BELKNAP, WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
(212) 336-2000

*Attorneys for Defendants Johnson &
Johnson, Centocor Inc., Kenneth Wegner,
Colin Konschak, Grace Leone, Trina Gillies,
Jim Bivona and Brett Beiter*

Dated:  October 14, 2005



Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 446257 (D.D.C.)
**(Cite as: 1997 WL 446257 (D.D.C.))**

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
Victor M. TOONE, Plaintiff,
v.
FEDERAL EXPRESS CORPORATION, Defendant.
**No. Civ. A. 96-2450(RCL).**

July 30, 1997.

**MEMORANDUM OPINION**

LAMBERTH, District Judge.

*1 On April 4, 1997, the above-captioned case was re-assigned to the undersigned member of this Court from the late Honorable Charles R. Richey. Before the Court are the defendant's motion for summary judgment, the plaintiff's motion to compel the defendant's answers to request for admissions, and the plaintiff's motion for an order prohibiting the defendant from interfering with witness interviews. For the reasons discussed below, the defendant's summary judgment motion shall be granted, and the plaintiff's discovery motions shall be denied.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**I.**
**Introduction**

The plaintiff, a former Operations Manager for a Federal Express Station in the District of Columbia, has sued Federal Express for race discrimination under Title VII and 42 U.S.C. § 1981; the plaintiff is Black. He also has brought a common law claim for breach of employment contract. The defendant has moved for summary judgment on all of the plaintiff's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**II.**
**Relevant Facts [FN1]**

FN1. The facts below are either undisputed or have been assumed true in the plaintiff's favor solely for purposes of this motion.

The plaintiff was employed by Federal Express ("FedEx") from October 1984 to April 1995. In 1991, the plaintiff became Operations Manager at a FedEx site in the Capital District. On April 27, 1994, while coordinating the morning sort of FedEx packages, the plaintiff said in reference to, and in the presence of, a subordinate, "I hate a drunk dike bitch." *Deposition of Victor M. Toone ("Toone Dep.")* at 127:11.

In response, on July 21, 1994, Senior Manager Roger W. Brown, issued the plaintiff a warning letter that stated, in part,
"There is no excuse for anyone especially a manager in this Corporation to refer to another employee as you referenced [the subordinate] ... THIS TYPE OF ACTION WILL NOT BE TOLERATED. Further occurrences of this nature will result in more stringent disciplinary action up to and including removal from your management position." *Exh. 5 to Toone Dep.* (emphasis in original).

In October 1994, only three months after receiving this warning letter, the plaintiff submitted a verification of employment ("VOE") form to his mortgage lender without his supervisor's signature, even though he knew FedEx required such a signature. *Plaintiff's 108(h) Statement* at ¶ 31. Instead, the plaintiff signed the form with the name of a non-management employee, Adrienne Hall, without that employee's prior authorization. *Id.; Deposition of Adrienne Hall* at 68-69.

The plaintiff argues that his forgery of a non-management employee's signature on the VOE form was excusable, because at the time, (1) there were "only days remaining before settlement," (2) he feared "the consequences of failing to obtain a loan prior to settlement," and (3) he was "unsure as to whether he could obtain [his supervisor's] immediate signature on the VOE form." *Plaintiff's 108(h) Statement* at ¶ ¶ 28-31.

*2 In April 1995, the plaintiff's mortgage lender sent a copy of the completed VOE form back to FedEx, whereupon the plaintiff's supervisor, Naomi Powell, discovered Hall's signature. *Defendant's 108(h) Statement* at ¶ ¶ 27- 29. Powell began an investigation, because she knew that Hall was not a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 446257 (D.D.C.)
**(Cite as: 1997 WL 446257 (D.D.C.))**

manager, and only managers may sign VOE forms. *Id.* at ¶ 33. After Hall told Powell that it was not her signature on the VOE form, Powell spoke with the plaintiff who then admitted that he had signed Hall's name to the VOE form. *Id.* at ¶ 34; Plaintiff's *108(h) Statement* at ¶ ¶ 48-49.

On April 10, 1995, Powell spoke with Pat Washington, the station personnel representative, about the appropriate form of discipline for the plaintiff. *Defendant's 108(h) Statement* at ¶ 40. They talked about whether the discipline should take the form of a warning letter, termination, an investigative suspension, and/or a demotion/transfer to another location. *Id.; Plaintiff's 108(h) Statement* at ¶ 59.

On April 11, 1995, Powell suspended the plaintiff for three days, pending further investigation of his "gross leadership failure." *Defendant's 108(h) Statement* at ¶ 43; *Exh. 8 to Toone Dep.* On that same day, Powell held a three-way telephone conference with John Formisano, the Managing Director of the Capital District, and Larry Southerland, the Personnel Manager. *Defendant's 108(h) Statement* at ¶ 54. They discussed what the appropriate form of discipline should be--a warning letter, a demotion, or a termination. *Id.* at ¶ 56.

On April 12, 1995, Southerland and Formisano recommended to Powell that the plaintiff be terminated. *Id.* at ¶ 66; *Plaintiff's 108(h) Statement* at ¶ 208. [FN1] Powell met with the plaintiff on April 14, 1995 and informed him of his termination. *Defendant's 108(h) Statement* at ¶ 70. She also handed the plaintiff a termination letter that stated, in part:

"After a thorough investigation of the facts, it has been determined that there was willful falsification of the content of the employment verification form through the unauthorized use of your subordinate's (CSA) name. To sign your employee's name to a document for personal gain demonstrates a low degree of ethics and a lack of integrity ... As a manager for Federal Express, it is incumbent upon you to demonstrate the highest standard of conduct and personal integrity. Your handling of this matter puts your judgment and integrity in question. To have this happen on the heels of another incident that occurred less than a year ago is considered gross leadership failure (Warning Letter dated July 21, 1994.) In lieu of this, it has been decided to terminate your employment with Federal Express." *Id.* (citing *Exh. 9 to Toone Dep.*).

The plaintiff appealed his termination through FedEx's Guaranteed Fair Treatment Procedure ("GFTB"). *Plaintiff's 108(h) Statement* at ¶ 64. Formisano handled the first stage of the plaintiff's appeal, and he upheld the plaintiff's termination. *Id.* at ¶ ¶ 62, 65, 76. In a letter to the plaintiff dated April 26, 1995, Formisano stated, "After careful review of the facts it is my decision to uphold your Manager's decision to terminate your employment for violations of the Acceptable Conduct Policy." *Plaintiff's Ex. 24.*

**\*3** The plaintiff next appealed his termination to William Schoeffield, the Vice President of the Eastern Region, who also upheld the discharge. *Plaintiff's 108(h) Statement* at ¶ ¶ 80, 87. The plaintiff last appealed to the FedEx Appeals Board in Memphis. *Id.* at ¶ 90. It, too, upheld his termination. *Id.* at ¶ 91.

### III.
### The Plaintiff's Race Discrimination Claims
A. *The Plaintiff Has Established His Prima Facie Case of Race Discrimination under Title VII and 42 U.S.C. § 1981.*

To avoid summary judgment in an employment discrimination case, the plaintiff generally must satisfy the tripartite analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and reaffirmed in *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). [FN3] Initially, the plaintiff must establish his *prima facie* case.

To establish a *prima facie* case of racial discrimination in a wrongful termination case, the plaintiff must prove by a preponderance of the evidence "(1) membership in a protected class ... (2) performance at or near the employer's legitimate expectations, (3) discharge, and (4) replacement by a person of equal or lesser ability who is not a member of a protected class, or, alternatively, the position remains open after termination." *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1512 (D.C.Cir.1995). This burden "is not onerous." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Assuming the plaintiff establishes his *prima facie* case, the second step of the tripartite analysis requires the defendant to articulate-- but not prove-- that it discharged the plaintiff "for a legitimate, nondiscriminatory reason." *Hicks,* 509 U.S. at 507

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 3
Not Reported in F.Supp., 1997 WL 446257 (D.D.C.)
**(Cite as: 1997 WL 446257 (D.D.C.))**

(quotation omitted).

At the third step of the analysis, the plaintiff must proffer evidence from which a rational factfinder could infer that the defendant intentionally discriminated against him because of his race. In order to meet this burden, the plaintiff must cite to "significantly probable," admissible evidence showing that the defendant's articulated reason for his discharge was a pretext for discrimination. *See Hicks*, 509 U.S. at 515-16 (holding that "pretext" means "pretext for discrimination"); *Schuler v. Chronicle Broadcasting Co.*, 793 F.2d 1010, 1011 (9th Cir.1986) ("The plaintiff [opposing summary judgment] must ... offer specific and significantly probative evidence that the employer's alleged purpose is a pretext for discrimination."). The plaintiff's evidence must create a genuine issue "*both* that the reason [offered for his termination] was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515 (1993). [FN4] The D.C. Circuit recently held that a plaintiff meets this burden "if the record indicates that the plaintiff presented sufficient evidence to cause a reasonable factfinder to find that the plaintiff had a *prima facie* case, and that the employer's proffered nondiscriminatory reasons for its actions were not credible[.]" *Aka v. Washington Hosp. Ctr.*, --- F.3d ----, ----, No. 96-7089, slip op. at 9 (D.C.Cir. June 20, 1997).

**\*4** The defendant argues that the plaintiff was not meeting its legitimate expectations (i.e., that he was not % 7F'qualified'DD') because of his two *admitted* acts of misconduct, and therefore the plaintiff has not established the second element of his *prima facie* case. The Court agrees that the plaintiff's misconduct was egregious and that FedEx had legitimate expectations that the plaintiff would not engage in such conduct. When ruling on a summary judgment motion, however, the Court must be careful not to focus prematurely on the defendant's articulated reason for the termination. *See MacDonald v. Eastern Wyoming Mental Health Center*, 941 F.2d 1115, 1119 (10th Cir.1991) (holding that a court should not "consider a defendant's proffered reasons for discharge in assessing the existence of a prima facie case"). Short-circuiting the analysis of the defendant's articulated reason at the *prima facie* stage frustrates a plaintiff's ability to establish that this reason was a pretext for discrimination; if a plaintiff's failure to overcome the reasons offered by the defendant for discharge defeats the plaintiff's prima facie case, the court is then not required to consider plaintiff's evidence on this critical issue.

For example, even though it is undisputed that the plaintiff committed misconduct and that FedEx legitimately could expect him not to engage in such conduct, a jury still could find him to be a victim of race discrimination if FedEx has not fired, or would not fire, similarly-situated non-Blacks. Dismissing the plaintiff's case because he was not qualified, therefore, would evade examination of the central question in this case--but for the plaintiff's race, would he have been fired, as opposed to subjected to some milder form of discipline? Accordingly, as long as the plaintiff has produced evidence of his objective qualifications for the operations manager position, he has satisfied the "qualification" component of his *prima facie* case.

Here, the plaintiff has submitted evidence showing that he was employed by FedEx for eleven years, he earned a promotion to a management position, he received compliments from customers, he received several commendations for his work, the station which he managed performed well, he never received a negative overall performance evaluation, and he consistently received favorable performance comments from the employees he supervised. *See Plaintiff's 108(h) Statement* at ¶ ¶ 1-17. Thus, for purposes of his *prima facie* case, the plaintiff possessed the objective professional qualifications to hold the position of operations manager when he was terminated.

The defendant further argues that the plaintiff has not established the fourth element of his *prima facie* case because he allegedly was not replaced by a non-Black. While the plaintiff has submitted evidence showing that he was replaced by a white operations manager, Ken Clemence, the defendant counters that Clemence, who already was an operations manager, was brought over from another FedEx station, and that Clemence never was replaced at that other location which is now run autonomously. The defendant, however, has cited no authority to support the proposition that a plaintiff needs to show that his non-Black replacement also was replaced by a non-Black to make out a *prima facie* case of discrimination. Therefore, the plaintiff has established his *prima facie* case.

B. *The Defendant Has Articulated a Legitimate, Non-Discriminatory Reason for the Plaintiff's Termination.*

**\*5** The defendant has satisfied its burden of articulation. It has submitted evidence that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 446257 (D.D.C.)
**(Cite as: 1997 WL 446257 (D.D.C.))**

plaintiff was terminated for two instances of misconduct (so-called "leadership failures") in a twelve month period. Thus, the remaining question is whether the issue that the articulated reason was a pretext for discrimination. He has not.

*C. The Plaintiff Has Not Submitted Direct Evidence of Discrimination, and therefore Cannot Bypass the McDonnell Douglas Tripartite Analysis.*

For a few weeks in the late 1980's, John Formisano served as the acting Managing Director of the Capital District. *Plaintiff's 106(h) Statement* at ¶ 99. During this time, Formisano visited the FedEx station of Hugh Boggs, a white manager, and allegedly told him, "This is an awful dark place down here. Is this usual? ... This is a different atmosphere then what I'm accustomed to. We're going to need to make some changes." *Id.* at ¶ 104-05. Formisano's use of the word "dark" allegedly referred to the racial composition (predominantly Black) of the stations.

Around the same time, Formisano allegedly visited another white manager's station (Doyal Finley's) and said to him, "You've let this place get kind of dark, haven't you? If I ever come here permanently, you will have to leave so that we can lighten this place up." *Id.* at ¶¶ 110-11. [FN6]

The plaintiff argues that he can bypass the three-part, *McDonnell Douglas* analysis discussed above because of this purported "direct" evidence of discrimination. The plaintiff is mistaken, however, because the tripartite analysis is bypassed only "when a plaintiff presents direct evidence of discrimination *that is sufficient in itself to sustain the plaintiff's burden.*" BARBARA LINDEMANN AND PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 3D at 37 (1996) (emphasis added). The plaintiff has not submitted such evidence.

Although the Court assumes for purposes of this motion that Formisano participated in the decision to terminate the plaintiff, it is undisputed that Formisano made these allegedly racist comments at least six years before, and outside the context of the plaintiff's termination. Therefore, the comments are not direct evidence, because they would not be sufficient in themselves to prove that the plaintiff was fired because of his race. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) (discriminatory "statements by decisionmakers unrelated to the decisional process" are not direct evidence of discrimination). Because the plaintiff

has satisfied his *prima facie* case and the defendant has articulated a legitimate, non-discriminatory reason for his discharge, the plaintiff can survive summary judgment only if he has created a genuine issue that the articulated reason was a pretext for race discrimination.

*D. The Plaintiff Has Not Created a Genuine Issue that His Termination for Misconduct Was a Pretext for Discrimination, and therefore Summary Judgment is Warranted.*

**\*6** The plaintiff has admitted, under oath, that his direct supervisor, Powell, was not biased against him because of his race. *See Toone Dep.* 137:10-20. Instead, he claims he was fired solely because of the alleged discriminatory animus of Formisano, who participated in the termination decision. Aside from the racist comments that Formisano allegedly uttered at least six years before the plaintiff's termination, the plaintiff has proffered evidence of five white employees who purportedly were similarly-situated, but whom Formisano did not terminate. [FN7]

To show that he was similarly-situated, the plaintiff must "demonstrate that all of the relevant aspects of [his] employment situation were nearly identical to those of [the white employees]." *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C.Cir.1995) (internal quotation omitted). As discussed below, none of these employees meet this "nearly identical" standard, and therefore summary judgment for the defendant is warranted.

The plaintiff first points to Leslie Frye, a white customer service agent. She allegedly submitted a VOE form that listed her salary as double what it actually was and contained the unauthorized signature of her supervisor. She was not terminated.

Frye's situation is distinguishable from the plaintiff's, because (1) she was not a manager [FN8] and (2) aside from the plaintiff's speculation, there is no evidence in the record that Formisano was involved in the investigation or decision-making process regarding Frye. [FN9]

The plaintiff next points to Greg Thomas, a white manager at a station in Hagerstown, Maryland. The plaintiff claims that Thomas falsified courier time cards in order to create the illusion of increased productivity in the delivery of packages. He further claims that Formisano did not discipline Thomas, even though he put a stop to Thomas' time card practice.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 446257 (D.D.C.)
(Cite as: 1997 WL 446257 (D.D.C.))

Page 5

Thomas' situation is distinguishable, because his time card practice was a one-time incident, unlike the plaintiff's two, temporally-related instances of misconduct; thus, their situations are not "nearly identical." Moreover, the plaintiff's claim that Thomas was not disciplined for the time card practice is not supported by the record. The deposition testimony the plaintiff cites in support of this assertion (*Formisano Dep.* at 105:14 to 106:2) references only the contents of Thomas's personnel file, not whether he was disciplined for allegedly falsifying time cards.

The plaintiff next cites to Ben Kincade, a white operations manager in the Capital District. According to the plaintiff, Kincade was warned on separate occasions about altering an employee's time card, viewing personal and confidential information on the FedEx computer system, manipulating time card coding, falsifying information related to the delivery of packages, and violating the sexual harassment policy. *Plaintiff's 108(h) Statement* at ¶ ¶ 185-87, 189. Kincade, however, was permitted to demote to a courier position. *Id.* at ¶ 188.

*7 Kincade's situation is distinguishable, because it is undisputed that Formisano did not participate in the issuance of any of the warning letters to Kincade or in Kincade's demotion. *See Formisano Dec.* at ¶ 14. [FN10] Thus, the plaintiff and Kincade are not similarly-situated.

The plaintiff next refers the Court to Steve Rossman, a white operations manager, who was accused by his employees of altering their computerized evaluation of his performance. *Plaintiff's 108(h) Statement* at ¶ ¶ 165-67. The plaintiff claims that Formisano allowed Rossman to continue working during the investigation of this accusation, instead of suspending him, and that Rossman was not terminated until a Black manager replaced Formisano as the Managing Director of the Capital District.

Rossman's situation is distinguishable, because he committed only one instance of misconduct, unlike the plaintiff's two. Moreover, assuming *arguendo* that Rossman and the plaintiff were similarly-situated, Rossman was terminated, just like the plaintiff; he simply was re-assigned to another station for a short time, pending an investigation into his conduct. Additionally, the defendant has submitted undisputed evidence that Formisano concurred with Rossman's manager's termination decision. *See Formisano Dec.* at ¶ 12. While

Formisano did not effect Rossman's termination because it took place after Formisano was replaced as Managing Director for the Capital District, his undisputed concurrence in the termination decision shows that he treated Rossman and the plaintiff similarly.

Finally, the plaintiff points to Steve Mosedale, a white operations manager, who allegedly engaged in three incidents of leadership failure within a three month period, but who was not terminated. These three incidents, however, occurred in 1993, over a year *before* Formisano became Managing Director of the Capital District. *Plaintiff's 108(h) Statement* at ¶ 176-79; *Defendant's 108(h) Statement* at ¶ 9. Thus, Mosedale and the plaintiff were not in "nearly identical" situations.

Because the plaintiff has submitted inadequate comparative evidence of discrimination, his entire lawsuit hinges upon Formisano's allegedly racist comments which occurred at least six years prior to the plaintiff's termination and which were not causally-related to the termination. Without more, this evidence would not be sufficient to discredit FedEx's proffered reason for his termination in the mind of a reasonable factfinder. Accordingly, the defendant is entitled to summary judgment on the plaintiff's <u>Title VII</u> and <u>§ 1981</u> claims.

### IV.
### The Plaintiff's Breach of Contract Claim

In his opposition, the plaintiff indicated that he does not oppose the defendant's motion for summary judgment on his breach of contract claim, so long as he receives certain documents from the defendant. *See Plaintiff's Opposition* at pp. 11-12, n. 7, 33, n. 19. To date, the plaintiff has not filed a motion to compel production of any documents, and the time for filing discovery motions has long since passed. Thus, the plaintiff has abandoned his breach of contract claim, and summary judgment on that claim is appropriate.

### V.
### Conclusion

*8 For all the foregoing reasons, the defendant's motion for summary judgment is granted.

### PLAINTIFF'S MOTION TO COMPEL RESPONSES TO REQUEST FOR ADMISSIONS

According to Judge Richey's initial scheduling order of December 6, 1996, all discovery was to be completed by February 19, 1997. The plaintiff served (by mail) a set of request for admissions on February 19. The defendant objected to the request

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 6
Not Reported in F.Supp., 1997 WL 446257 (D.D.C.)
**(Cite as: 1997 WL 446257 (D.D.C.))**

based on its interpretation of the scheduling order as requiring discovery to be completed by February 19, which includes the 30-day time period they would have to respond to the request for admissions.

While the plaintiff argues that the defendant's interpretation of the scheduling order is "unreasonable," if the Court were to adopt the plaintiff's interpretation, then the defendant could have responded to the request for admissions on the day of the original trial date (March 24). Moreover, if a discovery dispute had arisen as to the adequacy of the defendant's responses, there would have been no time for the parties to resolve the dispute prior to trial. Thus, the plaintiff's interpretation of Judge Richey's scheduling order is unreasonable.

The plaintiff waited until the eleventh hour to serve discovery which could not be completed prior to discovery cut-off. He never filed a motion to extend the discovery cut-off date or a motion to shorten the time for the defendant to respond to the request for admissions. Therefore, his motion to compel must be denied.

Additionally, the plaintiff has not argued that the defendant's failure to respond to his request for admissions interfered with his ability to oppose the defendant's summary judgment motion. Thus, because the Court has granted the defendant's summary judgment motion, the plaintiff's motion to compel also is denied as moot.

### PLAINTIFF'S MOTION FOR ORDER PROHIBITING DEFENDANT FROM INTERFERING WITH WITNESS INTERVIEWS

The plaintiff argues that FedEx has instructed its employees either not to speak to the plaintiff or his counsel, or to refer any inquires from the plaintiff or his counsel to FedEx's legal department. The plaintiff claims that this order has disrupted his ability to gather relevant evidence and violates Title VII's anti-retaliation provision by forcing FedEx employees to risk their good standing with the company in order to assist the plaintiff. The plaintiff has asked for an order prohibiting FedEx from requiring its employees who are not "controlling" the litigation to obtain the permission of FedEx in order to cooperate with the plaintiff or his counsel.

As with the plaintiff's motion to compel, the plaintiff does not contend that summary judgment would be improper because he has been denied certain discovery. Indeed, the plaintiff filed this motion

almost a month after the discovery period had closed. Thus, because the Court has granted the defendant's summary judgment motion, this motion also is moot.

A separate order shall issue this date.

### ORDER AND FINAL JUDGMENT
*9 For the reasons set forth in the Court's accompanying memorandum opinion, it is hereby

ORDERED that the defendant's motion for summary judgment is GRANTED; and it is

FURTHER ORDERED that the plaintiff's motion to compel responses to request for admissions is DENIED; and it is

FURTHER ORDERED that the plaintiff's motion for order prohibiting defendant from interfering with witness interviews is DENIED; and it is

FURTHER ORDERED that the Clerk of the Court shall enter final judgment herein for the defendant, dismissing this action with prejudice.

SO ORDERED.

> FN2. Naomi Powell, Pat Washington and Larry Southerland are Black. John Formisano is white.

> FN3. The burdens of persuasion and production for a claim under 42 U . S.C. § 1981 are the same for a claim alleging discriminatory treatment in violation of Title VII. *See Mungin v. Katten Muchin & Zavis,* 116F.3d 1549, ----, No. 96-7152, slip op. at 8 (D.C.Cir. July 8, 1997).

> FN4. *See also id.* at 517-19 (holding that "*McDonnell Douglas* does *not* say ... that all the plaintiff need do is disprove the employer's asserted reason.... It is not enough, in other words, to disbelieve the employer; the fact-finder must *believe* the plaintiff's explanation of intentional discrimination.") (emphases in original).

> FN5. The plaintiff contends that, since he was fired, the defendant has offered different rationales for his termination. Among other things, the plaintiff points to a letter he received from Schoeffield, the FedEx the Vice President who handled the second stage of his internal appeal.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 446257 (D.D.C.)
(Cite as: 1997 WL 446257 (D.D.C.))

Schoeffield's letter of May 11, 1995 states, in relevant part,

"Review of your case shows that you falsified your VOE request with regard to salary information and exhibited gross leadership failure by signing another employee's name on it. This is your second misconduct issue in less than one year, and we are in agreement with management's decision to terminate your employment with Federal Express." *Plaintiff's Exh. 27.*

The plaintiff argues that the May 11 letter shows that FedEx has changed its reasons for his discharge, because FedEx previously had not said that he was fired for falsifying salary information and has not articulated this reason since.

The plaintiff's argument mischaracterizes the undisputed facts. The plaintiff admits that he called a subordinate a "drunk dike bitch." He further admits that he forged a signature on a VOE form six months later. It is undisputed that the defendant considered both of these instances of misconduct to be "leadership failures," regardless of how accurate the plaintiff stated his salary on the VOE form. Indeed, the very evidence upon which the plaintiff has proffered sufficient evidence to create a genuine plaintiff relies-- Schoeffield's letter--plainly states that the plaintiff "exhibited gross leadership failure *by signing another employee's name on [the VOE form].*" (emphasis added). Thus, the undisputed evidence shows that defendant consistently has maintained that it fired the plaintiff for two temporally-related leadership failures.

The fact that, at the second stage of the internal appeal process, Schoeffield (who indubitably played no role in the plaintiff's discharge) may have suggested an additional reason for the plaintiff's termination does not undermine the defendant's articulated reason of two leadership failures in one year's time. The plaintiff's disagreement with one of the reasons that may have justified his termination cannot create a genuine issue for trial, unless he can create a genuine dispute as to *all* of the reasons. *See Russell v. ACME-Evans Co.,* 51 F.3d 64, 69 (7th Cir.1995) ( "The fact that some of [the defendant's articulated] reasons were successfully called into question by [the plaintiff's] deposition or affidavit does not defeat summary judgment if at least one

reason for each of the [challenged] actions stands unquestioned."); *accord Mungin, supra,* slip op. at 15 n. 3 (holding that a law firm was entitled to judgment as a matter of law, even assuming that the jury did not credit one of the firm's proffered reasons for not considering the plaintiff for partnership; plaintiff offered no evidence that would have permitted a reasonable jury to disbelieve the other proffered reason). As discussed below, the plaintiff has not created a genuine issue that he was fired for the two leadership failures.

FN6. The plaintiff points out that Formisano "directly was involved in the decision to terminate Mr. Finley" ten days after the plaintiff was fired. *Plaintiff's 108(h) Statement* at ¶ 114. This assertion is based on paragraph 15 of Finley's declaration which bluntly states, "Mr. Formisano was directly involved in the decision to terminate my employment." This declaration testimony is inadmissible because it lacks evidentiary foundation. Finley fails to mention how he knows Formisano was involved in his termination decision and to what extent Formisano was involved. Moreover, Finley fails to proffer any reason for his termination. Thus, assuming Formisano made the racist comment and the veiled threat to fire Finley, there is no evidence in the record from which a reasonable factfinder could infer that Formisano acted on that threat over six years later.

FN7. The plaintiff argues that additional evidence of Formisano's discriminatory animus consists of his alleged failure to provide adequate support for a so-called Minority Advisory Council (a group of FedEx employees whose goal was to promote minorities to management) and his alleged failure to hire minority managers during his tenure as director of the Bostonian district.

The plaintiff's failure-to-hire minorities allegation is based solely on hearsay and lacks foundation, and therefore is not probative of discriminatory animus. *See Plaintiff's 108(h) Statement* at ¶ 123 (citing declaration testimony of Hugh Boggs at ¶ 12 in which he states that unidentified members of the Minority Advisory Council

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 446257 (D.D.C.)
(Cite as: 1997 WL 446257 (D.D.C.))

"often discussed the fact that there were no Black Senior under Formisano in the Bostonian district"). Indeed, the admissible evidence on point suggests that three Black managers had been developed and promoted within the Bostonian district under Formisano's leadership. *See Formisano Dec*. at ¶ 8.

With regard to Formisano's alleged lack of support to the Minority Advisory Council, the plaintiff cites the deposition testimony of Regina Marie Allen who testified that "[t]o her knowledge," Formisano did not provide certain kinds of support to the Council. *See Plaintiff's 108(h) Statement* at ¶ 124 (citing *Allen Dep.* at 44:6-13). The plaintiff, however, has laid no foundation as to Allen's identity and how she would know what kind or amount of support Formisano provided the Council. Thus, he has failed to show how this deposition testimony is probative of Formisano's alleged discriminatory animus.

FN8. The plaintiff argues that the manager-non-manager distinction is irrelevant, because the Acceptable Conduct Policy, pursuant to which he was terminated, explicitly applies to "[a]ll Federal Express employees." But just because FedEx's rules apply to all employees, it does not follow that FedEx must treat a manager's violation of those rules as it would a non-manager's violation. Indeed, at deposition, the plaintiff conceded that the conduct of a FedEx manager is held to a higher standard than the conduct of non-management employees. *See Toone Dep.* at 129:5-9. While the plaintiff may feel it is unfair to subject managers to greater scrutiny under the Acceptable Conduct Policy, his disagreement with the wisdom of that unwritten policy does not create a genuine issue for trial.

FN9. The plaintiff has proffered evidence that Formisano was copied on some correspondence regarding Frye. *Plaintiff's 108(h) Statement* at ¶¶ 146, 150. This fact does not create a genuine issue that Formisano actually dealt with Frye, especially in light of Formisano's unequivocal denial of participation. *See Formisano Dec.* at ¶ 10.

FN10. While the plaintiff points out that Formisano was copied on two of the warning letters (*see Plaintiff's 108(h) Statement* at ¶¶ 191-92), he has not created a genuine issue that Formisano participated in the discipline of Kincade, let alone, that he was even aware of Kincade's misconduct.

Not Reported in F.Supp., 1997 WL 446257 (D.D.C.)

**Motions, Pleadings and Filings** (Back to top)

•      1:96cv02450      (Docket) (Oct. 23, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31415624 (S.D.N.Y.)
**(Cite as: 2002 WL 31415624 (S.D.N.Y.))**

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
BREFFKA & HEHNKE GMBH & CO., as
underwriters of Stemcor USA, Inc. and/or Fetasa
Tijuana SA DE C.V., as subrogees, Plaintiffs,
v.
M/V/ GLORIOUS SUCCESS, her engines, boilers,
tackle etc.; Pan Ocean Shipping
Co. Ltd.; Hanseatic Maritime Phillipines Corp. and
Mitsui O.S.K. Lines Ltd.,
Defendants.
No. 01CIV10599JFKMHD.

Oct. 28, 2002.

Plaintiff in cargo case moved to compel further document production, interrogatory answers and depositions from defendants. The District Court, Michael H. Dolinger, United States Magistrate Judge, held that: (1) defendants did not have to produce vessel's ventilation log or survey report; (2) where defendants did not produce temperature records for hold, pursuant to plaintiffs' discovery request, defendants had to provide affidavit by person with personal knowledge of facts attesting to lack of equipment on vessel that would provide temperature readings for hold; (3) although defendants allegedly failed to produce requested temperature records for hold to plaintiffs in cargo case, order precluding defendants from offering any evidence of temperatures in hold and imposing an adverse inference with respect to temperatures was not warranted; (4) defendants had to produce documents, including vessel's engine log, records of other cargo claims from voyage, correspondence and notes pertaining to voyage, and classification society file for vessel within three weeks or serve and file affidavit by representative with knowledge of facts attesting that documents were not available to defendants; (5) defendants did not have to answer untimely fact interrogatories, but they needed to respond to contention interrogatories; (6) since captain of vessel was no longer employed by defendants, no basis existed for compelling

defendants to produce him for deposition; and (7) plaintiffs waived right to require production of vessel's chief mate for deposition.

Motion granted in part, and denied in part.

West Headnotes

**[1] Federal Civil Procedure** 🔑1581
170Ak1581 Most Cited Cases
Ventilation log of vessel did not have to be produced to plaintiffs in cargo case, in light of defendants' representation that they had produced all documentation available to them that was responsive to request; if plaintiffs had doubts about completeness of production, they could have deposed knowledgeable employee concerning defendant's document retention practices and search for document before close of discovery.

**[2] Federal Civil Procedure** 🔑1594
170Ak1594 Most Cited Cases
Survey report did not need to be produced to plaintiffs in cargo case following completion of fact discovery, in light of defendant's representation that such document did not exist.

**[3] Federal Civil Procedure** 🔑1636.1
170Ak1636.1 Most Cited Cases
In cargo case, where defendants did not produce temperature records for vessel's hold, pursuant to plaintiffs' discovery request, defendants had to provide affidavit by person with personal knowledge of facts attesting to lack of equipment on vessel that would provide temperature readings for hold.

**[4] Federal Civil Procedure** 🔑1636.1
170Ak1636.1 Most Cited Cases
Although defendants allegedly failed to produce requested temperature records for hold to plaintiffs in cargo case, order precluding defendants from offering any evidence of temperatures in hold and imposing an adverse inference with respect to temperatures was not warranted.

**[5] Federal Civil Procedure** 🔑1581
170Ak1581 Most Cited Cases
Defendants in cargo case were required to produce requested documents to plaintiff, including vessel's engine log, records of other cargo claims from voyage, correspondence and notes pertaining to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31415624 (S.D.N.Y.)
(Cite as: 2002 WL 31415624 (S.D.N.Y.))

voyage, and classification society file for vessel within three weeks or serve and file affidavit by representative with knowledge of facts attesting that documents were not available to defendants.

**[6] Federal Civil Procedure** 🔑**1506**
170Ak1506 Most Cited Cases

**[6] Federal Civil Procedure** 🔑**1512**
170Ak1512 Most Cited Cases
Defendants in cargo case did not have to answer set of interrogatories that sought list of individuals with knowledge of facts, but they did need to respond to plaintiffs' contention interrogatories; that fact interrogatories, which were served only two and one-half weeks before end of fact discovery, were untimely, and it was too late to depose any individuals identified in list.

**[7] Federal Civil Procedure** 🔑**1323.1**
170Ak1323.1 Most Cited Cases
Since captain of vessel involved in cargo case was no longer employed by defendants, no basis existed for compelling defendants to produce him for deposition.

**[8] Federal Civil Procedure** 🔑**1342.1**
170Ak1342.1 Most Cited Cases
Plaintiffs in cargo case waived right to compel deposition of vessel's chief mate, by not taking any steps to depose him during fact discovery period despite being made aware of his schedule on two occasions.

*MEMORANDUM & ORDER*

DOLINGER, Magistrate J.

**\*1** Five days after the close of fact discovery, plaintiffs have moved to compel further document production, interrogatory answers and depositions from defendants. For the reasons that follow, the motion is granted in part and denied in part.

The court has conducted a number of conferences, both in person and by telephone, to address a series of problems encountered by the parties-- principally defendants--in obtaining discovery in this cargo case. The deadline for completion of fact discovery throughout remained September 27, 2002, despite extensive delays in production by plaintiffs. During this process, we have also called upon plaintiffs' counsel to indicate the posture of his clients' discovery efforts, to ensure that any lingering disputes that plaintiffs may have had with respect to

defendants' performance be addressed. (*See, e.g.,* Aug. 21, 2002 Tr. at 13).

Although counsel alluded on one occasion in the vaguest of terms to the need to complete production of documents and depose a witness (*id.*), he waited until a telephone conference on September 30, 2002 to indicate for the first time that he was still seeking document production and had not taken depositions of the defendants, assertedly because of derelictions on the part of his adversaries. In response we authorized him to file a motion to compel, which he did two days later. Plaintiffs now complain that they have been denied several categories of documents and have not been afforded depositions of certain individuals connected to the vessel at issue in the case. They also note a recently served set of interrogatories, to which defendants have objected.

Defendants have opposed the motion. They contend that they have produced all of the pertinent documents in their possession, that the interrogatories are untimely and that plaintiffs never pursued depositions despite early notification of the location and schedules of the one available crew member in whom they had expressed interest.

Plaintiffs' motion is plainly deficient in that their counsel does not represent that he sought to resolve his current disputes with defendants in a timely fashion, or indeed at all. In fact, we view the timing and substance of this motion as of a piece with plaintiffs' prior performance in discovery, the deficiencies of which we have previously noted. (*See, e.g.,* Endorsed Order dated Sept. 19, 2002; Aug. 21, 2002 Tr. at 13-14). Nonetheless, there are a few items of information that defendants can presumably supply even at this late stage that may be helpful to plaintiffs and will not unduly disrupt the current schedule, which calls for the close of expert discovery by November 15, 2002 and submission of a joint pre-trial order by December 2, 2002.

[1] We first address documents. Plaintiffs ask for production of a ventilation log. Defendants represent, as they have long before, that they have produced all documentation available to them that is responsive to this request. (Affidavit of Edward A. Keane, Esq., sworn to Oct. 15, 2002, at ¶ ¶ 18- 19 & Ex. J). Nothing further is required at this point. We also note that if plaintiffs had some doubts about the completeness of this production, they were free to depose a knowledgeable employee of Hanseatic concerning document retention practices and the search for this specific document.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31415624 (S.D.N.Y.)
(Cite as: 2002 WL 31415624 (S.D.N.Y.))

**\*2** Plaintiffs also demand the general arrangement plan for the vessel. Hanseatic has offered this document to plaintiffs (*id.* at ¶ 20), and there is accordingly no basis for further relief. Defendant has also made available the ventilation plan and the capacity plan, thus mooting other current demands of the plaintiffs. (*Id.*).

Additional documents now sought by plaintiffs were apparently made available as long ago as July 2002. (*Id.* at ¶ 21). Again, there is no occasion for ordering additional relief with respect to such items.

[2] Plaintiffs also seek production of an Anchorage survey report, despite being told that none existed. (*See id.* at ¶ 22 & Ex. K). Hanseatic reiterates that representation in response to the motion (*id.* at ¶ ¶ 22, 24; *see also* Affidavit of Christopher H. Mansuy, Esq., sworn to Oct. 15, 2002, at ¶ 8), and under the circumstances no further relief is warranted.

[3] Plaintiffs further complain about the non-production of temperature records for the hold during the journey from Anchorage to Ensenada. Their attorney claims that a surveyor had the specific temperatures listed on a sheet of paper, which counsel now proffers on his motion, and on that basis he disputes Hanseatic's contention that there was no equipment on board that would provide such readings. (*Compare* Declaration of Steven P. Caulkins, Esq., executed Oct. 1, 2002, at ¶ 12 & Ex. 13 *with* Keane Aff. at ¶ 25).

[4] Had plaintiffs mentioned this contention before September 30, 2002, the matter could presumably have been resolved in an orderly fashion. In any event, we will direct that Hanseatic provide an affidavit by a person with personal knowledge of the facts attesting to the lack of such equipment on the vessel, if that be the case, as their attorney represents. This is to be done within two weeks. At the same time we deny plaintiffs' unwarranted request for an order precluding defendants from offering any evidence of temperatures in the hold and imposing an adverse inference with respect to temperatures. (*See* Reply Declaration of Steven P. Caulkins, Esq., executed Oct. 22, 2002, at ¶ 5).

[5] The balance of plaintiffs' requests for documents seek the engine log, records of other cargo claims from this voyage, correspondence and notes pertaining to this voyage, and the classification society file for the vessel. (*Id.* at ¶ 4). Since defendants have not specifically addressed these items, we direct that they produce these documents within three weeks or serve and file an affidavit by a representative with knowledge of the facts attesting that the documents are not available to defendants.

[6] Plaintiffs also seek an order compelling answers to a set of interrogatories that they served on or after September 9, 2002. The interrogatories seek *inter alia* a list of all individuals with knowledge of the facts. (Caulkins Decl., Ex. 14). They also pose contention interrogatories concerning the affirmative defenses asserted by defendants. (*Id.*).

**\*3** The fact interrogatories are untimely since they were served only two and one-half weeks before the end of fact discovery. Also, insofar as they seek identification of people with knowledge, we can only infer that plaintiffs are well aware by now of the identity of such individuals. In any event, it is too late to depose them now. Insofar as plaintiffs' counsel suggests that he is simply seeking a list of potential trial witnesses, that information will have to be conveyed by defendants in the course of the preparation of the joint pre-trial order. Finally, we direct that defendants respond within thirty days to plaintiffs' contention interrogatories.

[7][8] Plaintiffs also complain now about the purported failure of Hanseatic to provide a deposition of the captain and the chief mate of the vessel. In fact, defendant advised plaintiff last Spring that the master was no longer employed (Keane Aff., Ex. C), and then by letter dated June 19, 2002 also provided the sailing schedule for the chief mate, who was on the high seas constantly except for a limited number of days in specified overseas ports. (*Id.,* Ex. E). Although defendant offered at the time to arrange a deposition at the vessel, plaintiffs' counsel never responded. Significantly, when defendant's counsel mentioned at the August 21, 2002 conference that plaintiff had not sought to schedule such a deposition, plaintiff's attorney professed not to have seen the letter (*see* Keane Aff., Ex. G), [FN1] but after defendant again sent him the mate's schedule on August 23 (*id.,* Ex. G), he still took no action to arrange for a deposition.

> FN1. Counsel admitted that his partner had seen the document, but had apparently lost it. (*Id.*).

Since the captain is not employed by defendant, there is no basis for compelling a deposition of him. As for the chief mate, plaintiffs have slept on their rights and thus waived any deposition.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31415624 (S.D.N.Y.)
**(Cite as: 2002 WL 31415624 (S.D.N.Y.))**

Page 4

 Having reviewed the balance of the motion papers, we see no other discovery that plaintiffs have timely pursued and are entitled to at this stage. Accordingly, the balance of their motion is denied.


 **Motions, Pleadings and Filings (Back to top)**

• 1:01CV10599 (Docket) (Nov. 21, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                         Page 1
Not Reported in F.Supp.2d, 2005 WL 256488 (W.D.Wis.)
**(Cite as: 2005 WL 256488 (W.D.Wis.))**

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Wisconsin.
BONDPRO CORPORATION, Plaintiff,
v.
SIEMENS WESTINGHOUSE POWER
CORPORATION, Defendant.
**No. 04-C-0026-C.**

Jan. 31, 2005.
David T. Schultz, Attorney at Law, Minneapolis,
MN, for Defendant.

ORDER

CRABB, J.

**\*1** Defendant Siemens Westinghouse Power
Corporation has requested an expedited hearing on its
motion for leave to take a trial preservation
deposition of Mechanical Dynamics & Analysis,
LLC, ("MDA") a witness who defendant asserts has
relevant evidence but is unavailable to testify at trial
because it is located more than 100 miles away. The
motion relates to a January 19, 2005 notice of
deposition that was served on MDA on January 20,
2005 and that was one of the subjects of an omnibus
order on discovery entered on January 25, 2005 by
Magistrate Judge Stephen Crocker. The deposition of
MDA was noticed for February 1, 2005. The
magistrate judge ruled that defendant's subpoena for
the taking of MDA's deposition was untimely
because it was beyond the discovery cutoff of
January 7, 2005, as set forth in the preliminary
pretrial conference order. In their motion, defendant
asks this court to reconsider that ruling and allow the
deposition to go forward as scheduled. Defendant
asserts that it seeks to take MDA's deposition for the
purpose of "trial preservation," not discovery, and
therefore the matter falls outside the scope of the
January 7, 2005 discovery cutoff.

Defendant's motion will be denied. I agree with
those courts that have held that, absent exceptional
circumstances, a party who wishes to introduce

deposition testimony at trial should procure that
testimony during the time set by the court to conduct
discovery. *See, e.g., Integra Lifesciences I, Ltd., v.
Merck KgaA, 190 F.R.D. 556, 559 (S.D.Cal.1999);
Henkel v. XIM Products, Inc., 133 F.R.D. 556, 557
(D.Minn.1991).* Otherwise, "nothing would keep the
parties from waiting until after the close of discovery
to take all these 'trial' depositions," meaning that
there would be no motivation to conduct discovery of
"unavailable" witnesses during the discovery period.
*Integra Lifesciences, 190 F.R.D. at 559.*

No compelling circumstances exist to allow
defendant to depose MDA at this late juncture in this
case. Defendant has long known that MDA has
relevant information and that it is outside the
subpoena power of the court. In fact, it had scheduled
a deposition of MDA to occur before the discovery
cut-off, but cancelled that deposition in exchange for
a declaration from MDA that MDA signed on the
condition that no future deposition or trial testimony
would be sought. When defendant abandoned its
previous attempt to depose MDA, it took the risk that
it would not be able to procure its appearance at trial
and that it would not be able to present MDA's
testimony. If defendant was unsure whether it would
later be able to take MDA's trial preservation
depositions after the discovery cutoff set forth in the
pretrial conference order, it could have sought
guidance from the court before the cutoff.

ORDER
Accordingly, defendant's motion for leave to take a
trial preservation deposition of MDA and its request
for an expedited hearing on that motion are both
DENIED.

Not Reported in F.Supp.2d, 2005 WL 256488
(W.D.Wis.)

**Motions, Pleadings and Filings (Back to top)**

•                    3:04C00026                    (Docket)
(Jan. 16, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1991 WL 44840 (S.D.N.Y.)
**(Cite as: 1991 WL 44840 (S.D.N.Y.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
FOUR M CORPORATION, Plaintiff and
Counterclaim-Defendant,
v.
Francis J. GUILIANO, Defendant and Counterclaim-
Plaintiff.
**No. 89 Civ. 5275 (KTD).**

March 27, 1991.

*MEMORANDUM AND ORDER*

NAOMI REICE BUCHWALD, United States
Magistrate Judge.

*1 Plaintiff has moved to quash a subpoena *duces
tecum* to the Keeper of the Records of Stone
Container Corporation and a deposition subpoena to
Roger Stone on the ground that both were served
after the discovery cut-off. Defendant, however,
asserts that plaintiff should not be able to rely on an
untimeliness argument since plaintiff withheld
documents until after the discovery cut-off which
revealed for the first time the necessity for the
discovery now sought. While defendant maintains
that the "withheld information" was not previously
available, plaintiff's reply papers, and the exhibits
annexed thereto, reveal that there was sufficient
information available to defendant prior to the
discovery cut-off to demonstrate a basis for the Stone
discovery. Thus, while the documents produced
more recently could be considered more explicit,
defendants were on notice as to the issue of contact
between Dennis Mehiel and Roger Stone of the Stone
Container Corporation well before the cut-off.
Accordingly, defendant's decision not to seek third-
party discovery from the Stone Container
Corporation during the discovery period will not be
disturbed.

IT IS SO ORDERED.

Not Reported in F.Supp., 1991 WL 44840
(S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

•          1:89cv05275          (Docket)
(Aug. 03, 1989)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 578917 (S.D.N.Y.), 66 Fed. R. Evid. Serv. 924
**(Cite as: 2005 WL 578917 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
RLS ASSOCIATES, LLC, Plaintiff,
v.
THE UNITED BANK OF KUWAIT PLC,
Defendant.
**No. 01 Civ. 1290(CSH).**

March 11, 2005.

*MEMORANDUM OPINION AND ORDER*

HAIGHT, Senior J.

*1 RLS Associates, LLC ("RLS") brings suit against United Bank of Kuwait PLC ("UBK" or "the Bank") for breach of a contractual agreement to pay a post-termination fee and for unjust enrichment. Presently before me are two motions, both by the Bank. The first is for an order requiring RLS to file an original bond to secure costs and attorneys' fees, pursuant to Local Civil Rule 54.2. I consider that motion in Part I of this opinion. The Bank's second motion is a request to depose Bruno Martorano by videoconference for the purpose of securing his testimony for trial. This motion is considered in Part II. For reasons stated below, defendant's first motion is denied, and its second motion is granted.

**I**

UBK seeks an order from this court directing RLS to post a bond to secure the costs of the Bank. In this district, such orders are governed by Local Civil Rule 54.2, which provides:

The court, on motion or on its own initiative, may order any party to file an original bond for costs or additional security for costs in such an amount and so conditioned as it may designate. For failure to comply with the order the court may make such orders in regard to non-compliance as are just, and among others the following: an order striking out pleadings or staying further proceedings until the bond is filed or dismissing the action or rendering a judgment by default against the non-complying party.

While there are no set guidelines for applying Rule 54.2, courts generally consider the following factors in determining whether to require a party to file a bond in pursuant to the rule: "(1) the financial condition and ability to pay of the party who would post the bond; (2) whether that party is a non-resident or foreign corporation; (3) the merits of the underlying claims; (4) the extent and scope of discovery; (5) the legal costs expected to be incurred; and (6) compliance with past court orders." *Pfizer, Inc. v. Y2K Shipping & Trading, Inc.,* 207 F.R.D. 23, 24 (E.D.N.Y.2001), *citing Johnson v. Kassovitz,* No. 97 Civ. 5789, 1998 WL 655534, *1 (S.D.N.Y. Sept. 24, 1998); *see also Selletti v. Carey,* 173 F.R.D. 96, 100-101 (S.D.N.Y.1997); *Bressler v. Liebman,* No. 96 Civ. 9310, 1997 WL 466553, at *3 (S.D.N.Y. Aug. 14, 1997); *Livnat v. Lavi,* No. 96 Civ. 4967, 1997 WL 563799, at *3 (S.D.N.Y. Sept. 9, 1997); *Beverly Hills Design Studio v. Morris,* 126 F.R.D. 33, 36 (S.D.N.Y.1989).

At the outset, three of these factors appear to militate *against* requiring a bond. Plaintiff is not a non-resident or foreign corporation, there is no history of noncompliance with prior orders, and the extent and scope of discovery in this case, while perhaps extensive, is not particularly unusual in its magnitude. The Bank does not dispute any of these factors. I now consider what remains.

*A. Plaintiff's ability to pay*

According to defendant's counsel, Loren F. Selznick, Esq., during a telephone exchange with plaintiff's counsel, Michael H. Smith, Esq ., Smith represented that he could "see no downside" for his client to continue this litigation. Allegedly, Smith informed Selznick that if UBK ultimately prevailed in this case, and consequently moved for attorneys' fees and costs (which UBK alleges to be substantial), UBK would never be able to recover due to RLS's lack of funds. [FN1]

> FN1. A partial exchange outlined in Selznick's declaration reads as follows:
> Smith: You will never recover any amount from RLS.
> Selznick: Why?
> Smith: Doesn't have it. Your recovery against him is worthless.
> Declaration of Loren F. Selznick, Oct. 26,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 578917 (S.D.N.Y.), 66 Fed. R. Evid. Serv. 924
**(Cite as: 2005 WL 578917 (S.D.N.Y.))**

2004, at ¶ 4.

**\*2** Attorneys' fees are of particular concern in this case, since both parties agree that the Consultancy Agreements which form the subject matter of this action contain a choice of law provision that they "shall be governed by and construed in accordance with the laws of England," an incorporation which includes the general rule under English law "that fees are awarded to the prevailing party." *See RLS Assocs., LLC v. The United Bank of Kuwait PLC,* No. 01 Civ. 1290(CSH), 2003 WL 22801918, at \*1 (S.D.N.Y. Nov. 24, 2003). I shall revisit this issue in Part I.C of this opinion, *infra,* and assume for now that attorneys' fees must play a role in the bond analysis.

Concern arising from this telephone conversation led Selznick to commission two firms, Dun & Bradstreet and C.F. Anderson, to investigate the financial condition of RLS. Both firms reported an inability to locate any assets belonging to RLS. *See* Declaration of Loren F. Selznick, Oct. 26, 2004, Exs. 2 & 3.

Smith denies making the statements Selznick attributes to him. According to Smith, when told that UBK's legal fees at the time were approximately $450,000, he answered, "RLS' fees did not come close to that," and that plaintiff "does not have that kind of money." Affidavit of Michael H. Smith, Nov. 19, 2004, at ¶ 25. He also disputes Selznick's claim that UBK could recover attorneys' fees connected to its appellate litigation and its motion for summary judgment. *Id.* Finally, Smith submits that Selznick's disclosure of their telephone exchange was improper based on Fed.R.Evid. Rule 408, which makes inadmissible, in certain contexts, evidence of settlement negotiations.

I do not find that Rule 408 makes Selznick's disclosure improper. Rule 408 makes evidence of settlement negotiations inadmissible "to prove liability for or invalidity of the claim or its amount." However, the rule does not exclude evidence offered "for another purpose, such as proving bias or prejudice of a witness," etc. Though it is true that demonstrating inability to pay "does not appear on the short list of permissible other purposes within Rule 408, that list is merely suggestive, and is not intended to be exclusive." *EMI Catalogue P'ship v. CBS/Fox Co.,* No. 86 Civ. 1149(PLK), 1996 U.S. Dist. Lexis 7240, at \*6 (S.D.N.Y. May 24, 1996). I find Selznick's admission of her conversation with Smith to be within the confines of acceptable "other purposes" in Rule 408. And even accepting Smith's

version of what had been said, he did assert, when faced with potential legal costs of $450,000, that his client "does not have that kind of money."

Moreover, it is telling that RLS offers nothing to refute the findings of UBK's two investigatory firms, which reported that RLS has no assets that could be located.

In light of these circumstances, I find that UBK has an understandable concern regarding RLS's real ability to pay any eventual attorneys' fees or costs, should UBK prevail in this case. [FN2] In the ordinary instance, this weighs in favor of an order for a bond. *See e.g., Atlanta Shipping Corp., Inc. v. Chemical Bank,* 818 F.2d 240, 251 (2d Cir.1987) (upholding lower court bond order based, in part, on plaintiff's status as "debtor in bankruptcy" and a perceived "high risk" that plaintiff would be "unable to pay the defendant's costs should defendant prevail"); *Selletti v. Carey,* 173 F.R.D. 96, 101 (S.D.N.Y.1997), *aff'd,* 173 F.3d 104 (2d Cir.1999) (holding, based in part upon a finding that plaintiff's "only identifiable asset is a small parcel of land valued at $500," that "there is a serious risk that [plaintiff] will be unable to pay the reasonable costs to which the defendants may be entitled should they prevail"); *Bressler,* 1997 WL 466553, at \*4 (ordering bond upon assertion of plaintiff's counsel that plaintiff "didn't have a dime," an assertion "whether flippant or serious," which justified "the imposition of a bond requirement against Marino as well as Bressler on the basis of his professed inability to satisfy any sanctions that might be ordered").

> FN2. However, I also note that nothing in this opinion should be construed as an indication of my ultimate opinion on the merits of underlying case itself. *See* Part I.B, *infra.*

*B. Merits claims*

**\*3** RLS opposes UBK's request for a bond order on the grounds that UBK has not shown that RLS's claims are of "dubious merit." *Pfizer, Inc.,* 207 F.R.D. at 25. Indeed, UBK did not attempt a merits-based argument in its initial memorandum in support of a bond order, and its terse argument in its reply brief is inconclusive. There are substantive issues in the underlying action that have not yet been resolved, and to which I currently intimate no opinion. For instance, on the issue of whether RLS's principal, Richard Swomley, made statements which the Bank reasonably believed were prejudicial to its interests, I

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reiterate my prior holding that "this issue is a fact-intensive question appropriate for jury resolution." *RLS Assocs., LLC v. The United Bank of Kuwait PLC,* No. 01 Civ. 1290(CSH), 2003 WL 22251332, at *7 (S.D.N.Y. Sept. 30, 2003). Defendant has not established that plaintiff's claims are of dubious merit. This weighs against a bond order.

### C. Legal Costs Expected to be Incurred

Finally, the parties dispute the amount of the bond RLS would be required to post. In its notice of motion, UBK requests the amount be set at $569,000, based upon the $489,000 it has already expended, and $80,000 more it expects it will cost to bring the case to trial.

RLS makes several arguments in opposition. It contends, first, that attorneys' fees under UK law should not be considered part of "costs" under Rule 54.2, and second, that UBK's failure to break down or analyze its attorneys' fee claims in any fashion requires the Court to make premature findings in a complex area of UK law. *See generally, Bensen v. Am. Ultramar Ltd.,* No. 92 Civ. 4420, 1997 WL 317343 (S.D.N.Y. June 12, 1997). Third, RLS asserts that most of the amount UBK has already expended in this case is attributable to UBK's own "scorched earth" litigation tactics.

While Rule 54.2 speaks only of "costs," costs in this context may include attorneys' fees when recoverable by a statute. *See, e.g., Selletti,* 173 F.3d at 106 (holding that defendants' costs and attorneys' fees are potentially recoverable under the Copyright Act). Underlying the question whether Rule 54.2 allows recovery of attorneys' fees based on UK law is whether the English rule is of any moment at all in an American court--a question which I chose not to address in my most recent opinion. *See* 2003 WL 22801918, at *2 ("[A]ssuming without deciding that defendant's contentions about the applicability and effect of English law are correct ...").

Other courts have ruled in circumstances similar to the present case, that under New York choice of law principles, English laws allowing recovery of attorneys' fees by the prevailing party are applicable. *See Katz v. Berisford Int'l PLC,* No. 96 Civ. 8695(JGK), 2000 WL 959721 (S.D.N.Y. July 10, 2000); *Csaky v. Meyer,* No. 94 Civ. 8117, 1995 WL 494574 (S.D.N.Y. Aug. 18, 1994); *Browne v. Prentice Dry Goods, Inc.,* No. 84 Civ. 8081(PKL), 1986 WL 6496 (S.D.N.Y. June 5, 1986), at *3 ("While it is true that under the so-called 'American

Rule' attorneys' fees are not awarded to the successful litigant, this does not mean that an award of attorneys' fees under the 'English Rule,' followed by Argentina, is repugnant to the policy of New York State.").

*4 Having found that the English rule on attorneys' fees is consistent with New York choice of law principles and prior precedent, I see no reason why the English rule cannot be applied under Local Rule 54.2. *Accord J. Barbour & Sons, Ltd. v. Taftco, Inc.,* Civ. A. No. 87-2609, 1989 WL 49518 (E.D.Pa. May 8, 1989).

On the other hand, RLS is correct to point out that it would be much too simplistic to assume that UBK is entitled to all of its attorneys' fees as a matter of UK law. Regardless of the final outcome of this case, attorneys fees will have to be carefully determined in accordance with British law.

A balancing of the relevant factors persuades the Court that in this case, UBK has shown that in principle it is entitled to the protection of a bond to be posted by RLS. As noted, on the present record UBK has a justified concern about RLS's financial ability to pay UBK's costs if UBK prevails after trial. Moreover, since the English Rule applies, attorney's fees are included in the recoverable costs, and so the amount involved is potentially significant. Nor can it be said that UBK's denials of contractual liability to RLS are frivolous.

Contrary to RLS's argument, there is authority for the proposition that a party's apparent financial inability to pay prospective costs is sufficient in and of itself to justify an order requiring the posting of a cost bond under Rule 54.2. Judge Leisure reached that conclusion in *Knight v. H.E. Yerkes and Assocs., Inc.,* 675 F.Supp. 139 (S.D.N.Y.1987), the first case UBK's brief cites on the point, which RLS's brief does not criticize or distinguish. In *Knight,* the record demonstrated that the ability of a plaintiff resident in Thailand to pay the defendant's anticipated recoverable costs in taking depositions abroad was problematic. Without discussing the merits of the case or any other factor, Judge Leisure ordered that the plaintiff post a cost bond under Local Rule 39, the precursor to Rule 54.2, stating succinctly that "[a]gainst this background, the Court believes that there is a substantial risk that plaintiff would be unable to pay defendant's costs should defendant prevail, and that plaintiff should therefore be required to file a bond for costs." *Id.* at 142. I reach the same conclusion in this case.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 578917 (S.D.N.Y.), 66 Fed. R. Evid. Serv. 924
**(Cite as: 2005 WL 578917 (S.D.N.Y.))**

While UBK's entitlement in principle to a cost bond is thus established, it remains to consider what the amount should be in practice. UBK prays for a bond in the amount of $569,000, that being the total of $489,000 in legal fees and expenses UBK says has been incurred in the litigation to date, plus "at least $80,000" to cover the anticipated expenses of the trial. But I am not prepared to accept this amount automatically as the amount that would be recoverable as costs under the English Rule, and consequently determinative of the amount of the cost bond.

Judge Buchwald's thoughtful and thorough discussion of the English Rule in *Bensen, 1997 WL 317343, at *7,* is instructive. Citing and quoting several law journal articles, Judge Buchwald observed that

> *5 the rule is not just a simple fee-shifting provision.... While the English rule is typically described as a "loser pays" system, the application of the cost-shifting principle is much more complicated than the simple phrase "loser pays" implies.... [E]ven if the losing party has the wherewithal to pay, there is a significant difference between the costs incurred and the recovery assessed by the "taxing master." The loser should not be expected to pay more than the minimum expenses necessarily incurred by the winner, whereas the prevailing counsel can charge his client the maximum fee.

(citations and internal quotation marks omitted). This discussion quite strongly suggests that the invoices for legal services and expenses rendered by its counsel to UBK might not be, indeed probably would not be, assessed in their full amounts against RLS by an English "taxing master" (a title with Dickensian resonance), unless the taxing master was satisfied that those charges constituted "the minimum expenses necessarily incurred by" UBK, the prospective winner.

In these circumstances, if UBK wishes to press its application for a cost bond, it must demonstrate that under the contractually governing United Kingdom law and practice, an English taxing master (or other competent authority) would probably award UBK as the prevailing party its attorney's fees and expenses in the amount specified in the cost bond to be posted in this Court. Neither this Court not American counsel for the parties are competent to express a view on that subject. UBK must support its suggested bond amount by an affidavit or affidavits from English solicitors or barristers. If such submissions are filed

and served, RLS will be given a reasonable opportunity to file and serve opposing affidavits by English experts, if so advised.

It follows that UBK's motion for an order pursuant to Local Rule 54.2 is denied on the present record, without prejudice to renewal upon presentation of the further proof described *infra.* [FN3]

> FN3. I note in passing that there is apparently an alternative basis upon which UBK could have sought a cost bond. In *J. Barbour & Sons, Ltd. v. Taftco, Inc.,* No. Civ.A. 87-2609, 1989 WL 49518 (E.D .Pa. May 8, 1989), the clothing distribution contract between the parties provided that the contract would be governed by English law. The court granted plaintiff's motion for an order directing the financially stressed defendant to post a cost bond because "[a]n English statute provides that a plaintiff or counterclaiming defendant should post a security bond when it appears that the party would be unable to pay the other party's costs (including attorney's fees)." *Id.,* at *3. In the case at bar, RLS and UBK having contractually selected UK law as the governing law, it would seem that UBK could have relied upon the English statute to which the district court referred in *Barbour*. But I need not pursue that possibility further because Local Rule 54.2 is equally available to UBK and is not in derogation of UK law.

## II

Defendant's second motion concerns the testimony of Bruno Martorano, formerly a senior officer of Ahli United Bank B.S.C., the parent company of UBK, and a Director of the IIBU Fund II PLC. Defendant alleges that as the former Deputy Chief Officer of the Bank, Martorano was witness to key information concerning plaintiff's cause of action, and therefore would be a critical witness in its defense. Martorano is no longer employed by the bank or its parent company. He now works and resides in Dubai, United Arab Emirates. According to UBK, Martorano is unwilling to travel to New York in order to provide live testimony under oath. However, he has agreed to be deposed by way of videoconference in order to secure his trial testimony.

During the October telephone conference, it became clear that prior to taking Martorano's video testimony, the Bank would have to establish by what authority under the rules I could direct such

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 578917 (S.D.N.Y.), 66 Fed. R. Evid. Serv. 924
**(Cite as: 2005 WL 578917 (S.D.N.Y.))**

Page 5

deposition to take place. That authority, as the Bank notes in its motion papers, is found in Fed.R.Civ.P. 32, which states in pertinent part:

*6 (a) Use of Depositions. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:

...

(B) that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition; or

...

(D) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena; or

(E) upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.

Ostensibly, Rule 32 is a discovery rule, which has its roots in Fed.R.Civ.P. 26(d). *See United States v. Int'l Bus. Machs. Corp.*, 90 F.R.D. 377, 381 n. 7 (S.D.N.Y.1981). One could argue, therefore, that UBK's requested deposition is barred by the expiration of the discovery deadline. Indeed, some courts have held as much. *See e.g., Henkel v. XIM Products, Inc.*, 133 F.R.D. 556 (D.Minn.1991); and *Integra Lifesciences I, Ltd. v. Merck KGaA*, 190 F.R.D. 556 (S.D.Cal.1999). However, the majority of courts considering this issue have made what can only be described as a federal common law distinction between "discovery depositions" and "trial depositions" (or alternatively, "preservation depositions"), and have held the latter category permissible even after the discovery deadline had passed.

For instance, in *Estenfelder v. Gates Corp.*, 199 F.R.D. 351 (D.Colo.2001), a highly instructive and useful opinion on this subject, defendant sought to take preservation depositions of four of its former employees who resided in Europe. Like Martorano in the present case, each of the would-be deponents in that case no longer worked at the defendant corporation, each resided in a foreign continent, and none could be compelled through subpoena to attend trial. Like the present case, the deadline for discovery had passed by the time defendant made its motion. Noting that "courts cannot ignore a party's need to *preserve* testimony for trial, as opposed to the need to *discover* evidence, simply because the period for discovery has expired," *id. at 355* (emphasis in original), the court granted defendant's motion. It even went so far as to note, "some discovery may occur during a deposition which is conducted for purposes of preserving the testimony of a witness, but if the primary purpose of the deposition is to preserve testimony for trial, the deposition should not be disallowed simply because of that potential eventuality." *Id.*

*7 There is also precedent in this circuit for the taking of preservation depositions. In *Manley v. Ambase Corp.*, 337 F.3d 237, 247 (2d Cir.2003), the Second Circuit permitted parties to depose defendant's former chairman "once as part of the discovery process and again pursuant to a *de bene esse* proceeding ordered by the court when it appeared that the eighty-year old California resident would not travel to New York for trial," the latter deposition being one taken "in anticipation of a future need." *See* Black's Law Dictionary 408 (7th ed.1999).

In this case, it is clear that defendant's proposed deposition of Martorano would serve the purpose of testimony preservation rather than discovery. Martorano was in senior management at UBK's parent company prior to his departure. While he was still an employee, there was no reason for the Bank to depose Martorano, as it knew the substance of his testimony, and intended to present him as a live witness at trial. Defendant attests that Martorano has key information regarding the circumstances of plaintiff's case, and remains a critical witness. The only reason it seeks to depose him is that he has now left the Bank and works in Dubai, and is unwilling to travel to New York for live in-court testimony.

Plaintiff's position is that Rule 32 has been, in effect, superceded by a 1996 amendment to Fed.R.Civ.P. Rule 43(a) which provides that "[t]he court may, for good cause shown in compelling circumstances and upon appropriate safeguards, permit presentation of testimony in open court by contemporaneous transmission from a different location." [FN1] Prior to 1996, the rules did not provide for a witness to testify via live video.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 578917 (S.D.N.Y.), 66 Fed. R. Evid. Serv. 924
**(Cite as: 2005 WL 578917 (S.D.N.Y.))**

FN1. More accurately, RLS's position is that Martorano should *only* testify by personal appearance a trial. However, plaintiffs' further position is that should the Court allow Martorano to testify by anything other than personal appearance, it should only be by way of live video testimony.

Certainly, there are policy reasons why live, in court testimony would be preferred over prerecorded testimony. *See Int'l Bus. Machs. Corp.,* 90 F.R.D. at 381 ("There is a strong preference for live testimony being recognized by the courts, as it provides the trier of fact the opportunity to observe the demeanor of the witness ."). However, it is clear that Rules 43(a) and 32(a) are meant to compliment each other; and depending on the nature of the case and the circumstances involved, one procedure may be preferred over another. In fact, the Advisory Committee Notes to the 1996 Amendment of Rule 43(a) states that "[o]rdinarily depositions, including video depositions, *provide a superior means of securing the testimony of a witness* who is beyond the reach of a trial subpoena" (emphasis added); superior, that is, to a contemporaneous transmission of a witness's testimony.

In the present case, a contemporaneous transmission of Martorano's testimony would be highly inconvenient, due to the large time difference between New York and Dubai. The greater distance between court and witness also leads to a greater likelihood of technical problems arising, which would interfere with the flow of the trial and cause unnecessary delays--problems which might better be handled in a deposition rather than during trial.

**\*8** Under these circumstances, I grant defendant's motion to obtain the deposition testimony of Martorano by way of videoconference. Counsel for both parties are directed to confer with each other and make arrangements with regard to an appropriate time and place within which to conduct the deposition, as well as proper administration and procedure by which the deposition shall ensue. I do not doubt that they will make such arrangements in good faith.

Counsel are directed to advise the Court by letter, not later than April 15, 2005, with respect to the present status of the case, with particular emphasis on its readiness for trial.

It is SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 578917 (S.D.N.Y.), 66 Fed. R. Evid. Serv. 924

**Motions, Pleadings and Filings** (Back to top)

• 2003 WL 23671533 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Application for Attorneys Fees (Oct. 20, 2003)

• 2003 WL 23671531 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Jul. 02, 2003)

• 2003 WL 23671530 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for Summary Judgment (May. 16, 2003)

• 2003 WL 23671532 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment as to Liability (May. 16, 2003)

• 2002 WL 32595510 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Motion to Reargue (Aug. 14, 2002)

• 2002 WL 32595508 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for Reconsideration and Partial Stay (Jul. 31, 2002)

• 2002 WL 32595506 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Application for Fees and Costs (Mar. 26, 2002)

• 2001 WL 34611464 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Motion to Vacate Default Judgment (Aug. 03, 2001)

• 2001 WL 34611462 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for Relief from Default and Stay of Inquest (Jul. 20, 2001)

•                    1:01cv01290                    (Docket) (Feb. 21, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.