543.    Watson was well aware that payors relied on the AWP, and was sensitive to avoid alerting payors to Watson's AWP manipulation. In the context of a pricing study, a Schein executive noted that "it would be great to get a read from some HCFA personnel regarding what level of price will set off alarms with reimbursement." (MDLW25216) (Highly Confidential).

544.    In that same document, Watson acknowledges that AWP manipulation is the key to its customers' profits "if through reimbursement we can maintain or increase the money a unit makes on using this product does the price even matter?" (MDLW25216) (Highly Confidential).

**5.    Specific Watson AWPs Documented by the DOJ**

545.    In a report published by the DHHS (AB-00-86), the DOJ documented at least 12 instances where the published AWPs for various dosages drugs manufactured by Watson were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by Watson in the *Red Book*.

| Drug | Watson's 1998-2001 *Red Book* AWPs | DOJ Determined Actual AWP | Difference | Spread |
|------|-----------------------------------|---------------------------|------------|--------|
| Dexamethasone Acetate | $46.45 (1998) | $11.50 | $34.95 | 304% |
| Dexamethasone Sodium Phosphate | $93.04 (2001) | $1.08 | $91.96 | 851% |
| Diazepam | $18.15 (2000) | $2.50 | $15.65 | 626% |
| Gentamicin Sulfate | $114.10 (1999) | $1.18 | $112.92 | 957% |
| Iron Dextran | $377.04 (2001) | $24.69 | $352.35 | 1,427% |
| Testosterone Ethanate | $42.10 (2001) | $13.39 | $28.71 | 214% |
| Vancomycin HCL | $70.00 (1998) | $3.84 | $60.16 | 1,567% |

(P006299-P006316).

**6.    Inflated Watson AWPs From Watson's Price Lists**

546.    In response to government subpoenas, Watson produced numerous price lists setting forth spreads between AWP and prices offered to wholesalers, providers and other

intermediaries. A review of those lists indicates that Watson has consistently offered drugs to its customers at prices significantly below the published AWP, and that the spread was of great importance to Watson's customers. It is not practical to repeat every one of those drugs and the spread offered to specific customers. However, set forth below in Table 1 are a number of those drugs (not already referenced above) and the substantial spread offered to Watson customers.

547. Table 1 is an analysis of certain dosages of Schein drugs from a chart titled Schein Product Status Report, February 1996. (MDLW01237).

**Table 1**

| Drug | AWP | WAC | % Spread |
|------|-----|-----|----------|
| Fluphenazine HCL 1mg | $46.08 | $15.71 | 193% |
| Gemfibrozil 600mg | $55.65 | $7.95 | 600% |
| Imipramine HCL 10mg | $4.45 | $1.32 | 237% |
| Nadolol 20mg | $85.32 | $42.95 | 98% |
| Perphenazine 2mg | $42.53 | $19.76 | 115% |

548. As set forth above, Watson's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Plaintiffs and the Class.

### 7.    Watson Provided Free Goods and Other Incentives

549. In addition to marketing the spread, Watson has utilized other inducements to stimulate sales of its drugs. These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price. In one instance in May 2000, Schein offered "Priority Customers" an additional 5% discount on Ferrlecit "off invoice" for all purchases made that month. (MDLW15896.) By utilizing "off-invoice" inducements, Watson provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

550. As set forth above, Watson's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates

and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

### 8.    Watson Concealed Its AWP Manipulation

551.    Watson deliberately acted to conceal its fraudulent reporting and marketing of the AWP spread. For example, as noted above, Watson reported its AWP to various industry compendia, but disclosed WAC, direct price and average sale price to only a very few, if any, outside entities. (MDLW25204) (Highly Confidential). Also as noted above, Watson needed to keep the AWP high, but at a level that would not "set off alarms with reimbursement" (MDLW25216). Watson effectively hid the AWP spread from Plaintiffs and the Class.

## VI.    DIRECT DAMAGE SUSTAINED BY PLAINTIFFS AND THE MEMBERS OF THE AWP CLASS

552.    Plaintiffs and other Third-Party Payors who are members of the class reimburse health care providers for pharmaceuticals based upon the published AWP for brand name drugs and based upon MAC, for generic drugs, which in turn is derived from AWP. Accordingly, plaintiffs and Third-Party Payors are directly damaged by fraudulent AWP pricing schemes for drugs covered by employee health and benefit plans. By virtue of the fact that AWP is the reimbursement benchmark for pricing of the AWPIDs at issue, such injury occurs in all aspects of the distribution chain for the AWPIDs, including the PBM segment, non-PBM purchases, Part B covered drugs and non-Part B covered drugs.

## VII.    CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME

553.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves Classes comprised of:

> **Physician-Administered Drugs Class (Medicare Part B Co-Pay and Private System Physician-Administered Drugs)**
>
> All persons or entities in the United States and its territories who (i) paid all or a portion of the co-insurance under Medicare Part B for an AWPID during the Class Period, and/or (ii) reimbursed another for a physician-administered AWPID under a contract that

expressly uses AWP as a pricing standard, along with all individual persons who paid coinsurance (*i.e.*, co-pays proportional to the reimbursed amount) under such contracts for such AWPIDs, during the Class Period. Excluded from the Class are those who make flat co-pays and those whose co-pay was reimbursed by an insurer or other third party.

### Self-Administered and Specialty Pharmacy Drugs Class (Third-Party and Co-Payor Class for Self-Administered Drugs)

All persons or entities in the United States and its territories who reimbursed another for any self-administered AWPID, or for any AWPID which was distributed through a specialty pharmacy, under a contract that expressly uses AWP as a pricing standard, along with all individual persons who paid coinsurance (*i.e.*, co-pays proportional to the reimbursed amount) under such contracts for such AWPIDs. Excluded from the Class are those who make flat co-pays and those whose co-pay was reimbursed by an insurer or other third party.

The foregoing class is further subdivided into the following subclasses:

(a)    brand name sub-class; and

(b)    generic drug sub-class

### RICO Class for Self-Administered and Specialty Drugs

All persons or entities in the United States and its territories who reimbursed another for any self-administered AWPID, or for any AWPID which was distributed through a specialty pharmacy, under a contract with Caremark, AdvancePCS, Express Scripts and/or Medco (or their predecessors), which contract expressly uses AWP as pricing standard, along with all individual persons who paid coinsurance (*i.e.*, co-pays proportional to the reimbursed amount) under such contracts for such AWPIDs. Excluded from the Class are those who make flat co-pays and those whose co-pay was reimbursed by an insurer or other third party.

The foregoing class is further subdivided into the following subclasses:

(a)    brand name sub-class; and

(b)    generic the sub-class

554.    Plaintiffs also seek certification of each of the classes pursuant to Fed. R. Civ. P.

23 (b)(2) for Count III of the TAMCAC, in that 23 (b)(2) certification is appropriate as this

Count seeks purely declaratory and injunctive relief. The class representatives for this Count are each of the plaintiffs, including the organizational plaintiffs.

555.    The Class Period is January 1991 to the present.

556.    Excluded from these classes are the defendants herein; any subsidiaries or affiliates of defendants; the officers and directors of defendants during the Class Period; members of the Individual Defendants' immediate families; any person, firm, trust, corporation, officer, director or any individual or entity in which any defendant has a controlling interest or which is related to, or affiliated with, any of the defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party and governmental entities with respect to claims asserted for governmental damages.

557.    The Classes consist of numerous individuals and entities throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a) (1). The disposition of the claims of the Class Members in a single class action will provide substantial benefits to all parties and to the Court.

558.    The claims of the representative Plaintiffs are typical of the claims of the Class, as required by Rule 23(a) (3), in that the representative Plaintiffs include people and entities who, like all Class Members, purchased the AWPIDs at inflated prices based on AWPs. Such representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct because, among other things, they paid prices for these drugs that were higher than they would have been but for Defendants' improper actions and have had medical providers make pharmacy decisions based on economic factors as opposed to purely medical factors.

559.    The factual and legal bases of each Defendant's misconduct are common to the Class Members and represent a common thread of fraud and other misconduct resulting in injury to Plaintiffs and members of the Class.

THIRD AMENDED MASTER CONSOLIDATED        - 201 -
CLASS ACTION COMPLAINT
1534.16 0301 BSC.DOC

560.    There are many questions of law and fact common to Plaintiffs and the Class, and those questions predominate over any questions that may affect individual Class Members, within the meaning of and fulfilling Rules 23(a) (2) and 23(b)(2) and (3).  Common questions of law and fact include, but are not limited to, the following:

a.    Whether Defendants engaged in a fraudulent and/or deceptive scheme of improperly inflating the AWPs for the Drugs identified in Appendix A used by Plaintiffs and Class Members as the basis for reimbursement;

b.    Whether Defendants artificially inflated the AWPs for these drugs;

c.    Whether it was the policy and practice of Defendants to prepare marketing and sales materials that contained comparisons of the published AWPs and the spreads available;

d.    Whether Defendants provided free samples of the AWPIDs to providers, and whether Defendants instructed them to bill Plaintiffs and the Class for those free samples;

e.    Whether Defendants' provision of free samples to providers, with the intent that the providers bill Plaintiffs and the Class for the free samples, was unlawful;

f.    Whether Defendants paid financial inducements to providers and other intermediaries, with the effect of lowering their costs for AWPIDs;

g.    Whether Defendants engaged in a pattern and practice of paying illegal kickbacks, disguised as free goods, rebates, consulting fees, junkets and education grants to providers and other intermediaries;

h.    Whether AWPs are used as a benchmark for negotiating payments by Third-Party Payors for the AWPIDs;

i.    Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class Members to make inflated payments for the AWPIDs;.

j.    Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiffs and the Class members;

      k.      Whether Defendants formed enterprises for the purpose of carrying out the AWP Scheme;

      l.      Whether Defendants used the U.S. mails and interstate wire facilities to carry out the AWP Scheme;

      m.      Whether Defendants' conduct violated RICO;

      n.      Whether Defendants are liable to Plaintiffs and the Class members for damages for conduct actionable under the various state consumer protection statutes.

561.    Plaintiffs will fairly and adequately represent and protect the interests of the Class, as required by Rule 23(a)(4). Plaintiffs have retained counsel with substantial experience in prosecuting nationwide consumer class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the Class.

562.    Plaintiffs and members of the Class have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the Courts and the litigants, and promotes consistency and efficiency of adjudication. Additionally, Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Class and require Court imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby making appropriate equitable relief to the Class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

## COUNT I[10]

## VIOLATIONS OF 18 U.S.C. § 1962(C)

### (AGAINST DEFENDANT DRUG MANUFACTURERS IDENTIFIED HEREIN FOR UNLAWFUL CONDUCT ASSOCIATED WITH AWPID DRUGS)

563.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

564.    This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against the Defendant Drug Manufacturers on behalf of the AWP classes with respect to all AWPID drugs not purchased through use of a PBM and includes drugs covered under Medicare Part B and those outside of Part B coverage. The pricing of all such AWPIDs was directly tied to the published AWPs

565.    Plaintiffs, the members of Classes, and the Defendant Drug Manufacturers are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

566.    The following publishers of pharmaceutical industry compendia that periodically publish the AWPs, both in printed and electronic media, for various dosages of drugs are each "persons," as that term is defined in 18 U.S.C. § 1961(3):  (a) **Thomson Medical Economics** ("Thomson Medical") is a division of Thomson Corporation, a Delaware corporation with its principal place of business located at One Station Place, Stamford, Connecticut, and it is the publisher of the *Drug Topics Red Book* (the "*Red Book*"); (b) **First DataBank, Inc.,** ("First DataBank") a Missouri corporation, with its principal place of business at 1111 Bayhill Drive, San Bruno, California, and it is the publisher of drug pricing information including, but not limited to, *American Druggist First Databank Annual Directory of Pharmaceuticals* and

---

[10] This Amended Complaint does not contain certain material struck or dismissed by the Court in its May 13, 2003 Memorandum and Order. For instance, many association plaintiffs and several RICO counts that were included in the MCC have not been included in this amended complaint in order to reduce the volume of an already lengthy pleading. However, plaintiffs incorporate by this reference, into this Complaint, material struck or dismissed by the Court in order to, if necessary, preserve appellate rights. Plaintiffs acknowledge that these allegations would be dismissed if reasserted.

*Essential Directory of Pharmaceuticals*, commonly referred to as the *Blue Book*; (c) and **Facts &**
**Comparisons, Inc.,** ("Facts & Comparisons") a division of Lippincott Williams & Wilkins, Inc.,
a Pennsylvania corporation which acquired all drug information reference products formerly
published by Medi-Span, Inc. and which currently makes available drug pricing information,
including, but not limited to, the Medi-Span *Master Drug Data Base*.  These entities are
sometimes collectively referred to herein as "the Publishers."

567.    At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendant Drug
Manufacturers conducted the affairs of certain association-in-fact enterprises identified herein,
the affairs of which affected interstate commerce through a pattern of racketeering activity.

### The Manufacturer-Publisher Enterprises

568.    For purposes of this claim, certain RICO "enterprises" are associations-in-fact
consisting of (a) one of the Publishers that reported AWPs for AWPIDs, and (b) a Defendant
Drug Manufacturer, including its directors, employees and agents.  These associations-in-fact are
sometimes collectively referred to herein as the "Manufacturer-Publisher Enterprises."  Each of
the Manufacturer-Publisher Enterprises is an ongoing and continuing business organization
consisting of both corporations and individuals that are and have been associated for the common
or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price
information, which all too often includes disseminating false and misleading AWPs, (b) selling,
purchasing, and administering AWPIDs to Plaintiffs and Class members, and (c) deriving profits
from these activities.  Each of the enterprises had a common purpose of perpetuating use of
AWPs as a benchmark for reimbursement in the pharmaceutical industry, generally, and
specifically for the drugs of that defendant.  The manufacturing defendants have this as a purpose
because without the AWP scheme, they would not be able to push the spread.  The publishers
agree to this scheme, because if they did not, the manufacturers could easily revert to the other
methods of publishing prices or the publishers would have to independently investigate the AWP

at significant expense. The Publishers also have an economic incentive to merely report the AWPs provided to them by the manufacturers, because to do otherwise would require the Publishers to spend money to extensively survey actual sales prices in the market. By simply republishing what is submitted to them by the drug manufacturers, the Publishers save on expenses and consequently reap greater profits. Thus, each of the Manufacturer-Publisher Enterprises has a common purpose of perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry.

569.    Each of the Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the Defendant Drug Manufacturer and the specific Publisher that are its associates. As to each of the Manufacturer-Publisher Enterprises, there is a common communication network by which the Defendant Drug Manufacturer and the specific Publisher share information on a regular basis. Typically this communication occurs by use of the wires and mails in which a manufacturer will instruct a publisher to list a certain AWP. As to each of the Manufacturer-Publisher Enterprises, the Defendant Drug Manufacturer and the specific Publisher functioned as a continuing unit. At all relevant times, each of the Manufacturer-Publisher Enterprises was operated by the specific Defendant Drug Manufacturer for criminal purposes, namely, carrying out the AWP Scheme.

570.    At all relevant times, each one of the Publishers was aware of the Defendants Drug Manufacturers' AWP Scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme. Each of the publishing manufacturers is aware that the published AWPs are inflated. This awareness comes from the following sources: First, at some point prior to 1992 the publishers in many instances obtained AWPs themselves by survey. From their surveys of those in the distribution chain, they were and are aware that the reported AWPs were not accurate. Second, as various congressional bodies and government agencies

reported on AWP inflation, the Publishers did not change or challenge the self-reported AWPs, but continued blindly accepting the requested AWPs. Third, when the State of Texas began prosecuting Dey for its AWP practices, and when other states began focusing on Dey, the Publishers stopped accepting Dey's reported AWPs and published a different, far lower AWP. They withdraw from the Dey enterprise due to fear that they would be sued if they continued to publish Dey's false AWPs. This prompted a lawsuit by Dey alleging that the Publishers were treating Dey differently than they were treating all other manufacturers. In other words, Dey was complaining of the others being allowed to continue the scheme while it could not.

571.    The foregoing evidences the Publishers willing participation in the enterprise; their common purpose in the AWP scheme; and their agreement to a structure wherein the manufacturers made decisions as to what AWPs would be reported. This structure was the basis in which each of the enterprises was structured and its affairs conducted. The only exception occurred when the Publishers, fearing litigation, refused to accept Dey's instructions. The Publishers were willing participants in the scheme because if the truth were revealed the entire AWP reporting system would collapse.

572.    For purposes of this count, the Manufacturer-Publisher Enterprises are identified as follows:

(a)    *The Abbott Manufacturer-Publisher Enterprises:* The Abbott Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Abbott, and Abbott, including its directors, employees and agents: (1) the Abbott-Thomson Medical Enterprise; (2) the Abbott-First DataBank Enterprise; and (3) the Abbott-Facts & Comparisons Enterprise. Each of the Abbott Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared

purposes of (a) publishing or otherwise disseminating false and misleading AWPs,
(b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class
members and to participants in those Plaintiffs and Class members that comprise health
and welfare plans, and (c) deriving profits from these activities. Each of the Abbott
Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual
relationships, financial ties, and continuing coordination of activities between Abbott and
Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons.
As to each of these Abbott Manufacturer-Publisher Enterprises, there is a common
communication network by which Abbott and Thomson Medical, Abbott and First Data
Bank, and Abbott and Facts & Comparisons share information on a regular basis. As to
each of these Abbott-Manufacturer-Publisher Enterprises, Abbott and Thomson Medical,
Abbott and First Data Bank, and Abbott and Facts & Comparisons functioned as
continuing but separate units. At all relevant times, each of the Abbott Manufacturer-
Publisher Enterprises was operated and conducted by Abbott for criminal purposes,
namely, carrying out the AWP Scheme.

(b) *The Amgen Manufacturer-Publisher Enterprises:* The Amgen
Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of
each of the Publishers that reported the AWPID AWPs that were provided to them by
Amgen, and Amgen, including its directors, employees and agents: (1) the Amgen-
Thomson Medical Enterprise; (2) the Amgen-First DataBank Enterprise; and (3) the
Amgen-Facts & Comparisons Enterprise. Each of the Amgen Manufacturer-Publisher
Enterprises is an ongoing and continuing business organization consisting of both
corporations and individuals that are and have been associated for the common or shared
purposes of (a) publishing or otherwise disseminating false and misleading AWPs,
(b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class

members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Amgen Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Amgen and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons. As to each of these Amgen Manufacturer-Publisher Enterprises, there is a common communication network by which Amgen and Thomson Medical, Amgen and First Data Bank, and Amgen and Facts & Comparisons share information on a regular basis. As to each of these Amgen-Manufacturer-Publisher Enterprises, Amgen and Thomson Medical, Amgen and First Data Bank, and Amgen and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Amgen Manufacturer-Publisher Enterprises was operated and conducted by Amgen for criminal purposes, namely, carrying out the AWP Scheme.

(c)     *The AstraZeneca Manufacturer-Publisher Enterprises:* The AstraZeneca Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by AstraZeneca, and AstraZeneca, including its directors, employees and agents: (1) the AstraZeneca -Thomson Medical Enterprise; (2) the AstraZeneca -First DataBank Enterprise; and (3) the AstraZeneca -Facts & Comparisons Enterprise. Each of the AstraZeneca Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from

these activities. Each of the AstraZeneca Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between AstraZeneca and Thomson Medical, AstraZeneca and First DataBank, and AstraZeneca and Facts & Comparisons. As to each of these AstraZeneca Manufacturer-Publisher Enterprises, there is a common communication network by which AstraZeneca and Thomson Medical, AstraZeneca and First Data Bank, and AstraZeneca and Facts & Comparisons share information on a regular basis. As to each of these AstraZeneca -Manufacturer-Publisher Enterprises, AstraZeneca and Thomson Medical, AstraZeneca and First Data Bank, and AstraZeneca and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the AstraZeneca Manufacturer-Publisher Enterprises was operated and conducted by AstraZeneca for criminal purposes, namely, carrying out the AWP Scheme.

(d)     *The Aventis Group Manufacturer-Publisher Enterprise:* The Aventis Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Aventis Group, and Aventis Group, including its directors, employees and agents: (1) the Aventis Group -Thomson Medical Enterprise; (2) the Aventis Group-First DataBank Enterprise; and (3) the Aventis Group-Facts & Comparisons Enterprise. Each of the Aventis Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Aventis Group Manufacturer-Publisher Enterprises has a

systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Aventis Group and Thomson Medical, Aventis Group and First DataBank, and Aventis Group and Facts & Comparisons. As to each of these Aventis Group Manufacturer-Publisher Enterprises, there is a common communication network by which Aventis Group and Thomson Medical, Aventis Group and First Data Bank, and Aventis Group and Facts & Comparisons share information on a regular basis. As to each of these Aventis Group-Manufacturer-Publisher Enterprises, Aventis Group and Thomson Medical, Aventis Group and First Data Bank, and Aventis Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Aventis Group Manufacturer-Publisher Enterprises was operated and conducted by Aventis Group for criminal purposes, namely, carrying out the AWP Scheme.

(e) *The Baxter Manufacturer-Publisher Enterprises:* The Baxter Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Baxter, and Baxter, including its directors, employees and agents: (1) the Baxter-Thomson Medical Enterprise; (2) the Baxter-First DataBank Enterprise; and (3) the Baxter Facts & Comparisons Enterprise. Each of the Baxter Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class 1 members and to participants in those Plaintiffs and Class 1 members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Baxter Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Baxter and

Thomson Medical, Baxter and First DataBank, and Baxter and Facts & Comparisons. As to each of these Baxter Manufacturer-Publisher Enterprises, there is a common communication network by which Baxter and Thomson Medical, Baxter and First Data Bank, and Baxter and Facts & Comparisons share information on a regular basis. As to each of these Baxter-Manufacturer-Publisher Enterprises, Baxter and Thomson Medical, Baxter and First Data Bank, and Baxter and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Baxter Manufacturer-Publisher Enterprises was operated and conducted by Baxter for criminal purposes, namely, carrying out the AWP Scheme.

(f)     *The Bayer Manufacturer-Publisher Enterprises:* The Bayer Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Bayer, and Bayer, including its directors, employees and agents: (1) the Bayer-Thomson Medical Enterprise; (2) the Bayer-First DataBank Enterprise; and (3) the Bayer-Facts & Comparisons Enterprise. Each of the Bayer Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Bayer Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Bayer and Thomson Medical, Bayer and First DataBank, and Bayer and Facts & Comparisons. As to each of these Bayer Manufacturer-Publisher Enterprises, there is a common communication network

by which Bayer and Thomson Medical, Bayer and First Data Bank, and Bayer and Facts & Comparisons share information on a regular basis. As to each of these Bayer Manufacturer-Publisher Enterprises, Bayer and Thomson Medical, Bayer and First Data Bank, and Bayer and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Bayer Manufacturer-Publisher Enterprises was operated and conducted by Bayer for criminal purposes, namely, carrying out the AWP Scheme.

(g)     *The Boehringer Group Manufacturer-Publisher Enterprises:* The Boehringer Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Boehringer Group, and Boehringer Group, including its directors, employees and agents: (1) the Boehringer Group-Thomson Medical Enterprise; (2) the Boehringer Group-First DataBank Enterprise; and (3) the Boehringer Group-Facts & Comparisons Enterprise. Each of the Boehringer Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Boehringer Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Boehringer Group and Thomson Medical, Boehringer Group and First DataBank, and Boehringer Group and Facts & Comparisons. As to each of these Boehringer Group Manufacturer-Publisher Enterprises, there is a common communication network by which Boehringer Group and Thomson Medical, Boehringer Group and First Data Bank,

and Boehringer Group and Facts & Comparisons share information on a regular basis. As to each of these Boehringer Group Manufacturer-Publisher Enterprises, Boehringer Group and Thomson Medical, Boehringer Group and First Data Bank, and Boehringer Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Boehringer Group Manufacturer-Publisher Enterprises was operated and conducted by Boehringer Group for criminal purposes, namely, carrying out the AWP Scheme.

(h)     *The Braun Manufacturer-Publisher Enterprises:* The Braun Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Braun, and Braun, including its directors, employees and agents: (1) the Braun-Thomson Medical Enterprise; (2) the Braun-First DataBank Enterprise; and (3) the Braun-Facts & Comparisons Enterprise. Each of the Braun Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Braun Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Braun and Thomson Medical, Braun and First DataBank, and Braun and Facts & Comparisons. As to each of these Braun Manufacturer-Publisher Enterprises, there is a common communication network by which Braun and Thomson Medical, Braun and First Data Bank, and Braun and Facts & Comparisons share information on a regular basis. As to each of these Braun

Manufacturer-Publisher Enterprises, Braun and Thomson Medical, Braun and First Data Bank, and Braun and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Braun Manufacturer-Publisher Enterprises was operated and conducted by Braun for criminal purposes, namely, carrying out the AWP Scheme.

(i)     *The BMS Group Manufacturer-Publisher Enterprises:*  The BMS Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by BMS Group, and BMS Group, including its directors, employees and agents:  (1) the BMS Group-Thomson Medical Enterprise; (2) the BMS Group-First DataBank Enterprise; and (3) the BMS Group-Facts & Comparisons Enterprise.  Each of the BMS Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the BMS Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between BMS Group and Thomson Medical, BMS Group and First DataBank, and BMS Group and Facts & Comparisons.  As to each of these BMS Group Manufacturer-Publisher Enterprises, there is a common communication network by which BMS Group and Thomson Medical, BMS Group and First Data Bank, and BMS Group and Facts & Comparisons share information on a regular basis.  As to each of these BMS Group Manufacturer-Publisher Enterprises, BMS Group and Thomson Medical, BMS Group and First Data Bank, and BMS Group and Facts & Comparisons

functioned as continuing but separate units. At all relevant times, each of the BMS Group Manufacturer-Publisher Enterprises was operated and conducted by BMS Group for criminal purposes, namely, carrying out the AWP Scheme.

(j)     *The Dey Manufacturer-Publisher Enterprises:* The Dey Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Dey, and Dey, including its directors, employees and agents: (1) the Dey-Thomson Medical Enterprise; (2) the Dey-First DataBank Enterprise; and (3) the Dey-Facts & Comparisons Enterprise. Each of the Dey Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Dey Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Dey and Thomson Medical, Dey and First DataBank, and Dey and Facts & Comparisons. As to each of these Dey Manufacturer-Publisher Enterprises, there is a common communication network by which Dey and Thomson Medical, Dey and First Data Bank, and Dey and Facts & Comparisons share information on a regular basis. As to each of these Dey Manufacturer-Publisher Enterprises, Dey and Thomson Medical, Dey and First Data Bank, and Dey and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Dey Manufacturer-Publisher Enterprises was operated and conducted by Dey for criminal purposes, namely, carrying out the AWP Scheme.

(k)    *The Fujisawa Group Manufacturer-Publisher Enterprises:*  The Fujisawa Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Fujisawa Group, and Fujisawa Group, including its directors, employees and agents:  (1) the Fujisawa Group-Thomson Medical Enterprise; (2) the Fujisawa Group-First DataBank Enterprise; and (3) the Fujisawa Group-Facts & Comparisons Enterprise. Each of the Fujisawa Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Fujisawa Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Fujisawa Group and Thomson Medical, Fujisawa Group and First DataBank, and Fujisawa Group and Facts & Comparisons.  As to each of these Fujisawa Group Manufacturer-Publisher Enterprises, there is a common communication network by which Fujisawa Group and Thomson Medical, Fujisawa Group and First Data Bank, and Fujisawa Group and Facts & Comparisons share information on a regular basis.  As to each of these Fujisawa Group Manufacturer-Publisher Enterprises, Fujisawa Group and Thomson Medical, Fujisawa Group and First Data Bank, and Fujisawa Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Fujisawa Group Manufacturer-Publisher Enterprises was operated and conducted by Dey for criminal purposes, namely, carrying out the AWP Scheme.

(l)     *The GSK Group Manufacturer-Publisher Enterprises:*  The GSK Group
Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of
each of the Publishers that reported the AWPID AWPs that were provided to them by
GSK Group, and GSK Group, including its directors, employees and agents:  (1) the GSK
Group-Thomson Medical Enterprise; (2) the GSK Group-First DataBank Enterprise; and
(3) the GSK Group-Facts & Comparisons Enterprise.  Each of the GSK Group
Manufacturer-Publisher Enterprises is an ongoing and continuing business organization
consisting of both corporations and individuals that are and have been associated for the
common or shared purposes of (a) publishing or otherwise disseminating false and
misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual
Plaintiffs and Class members and to participants in those Plaintiffs and Class members
that comprise health and welfare plans, and (c) deriving profits from these activities.
Each of the GSK Group Manufacturer-Publisher Enterprises has a systemic linkage
because there are contractual relationships, financial ties, and continuing coordination of
activities between GSK Group and Thomson Medical, GSK Group and First DataBank,
and GSK Group and Facts & Comparisons.  As to each of these GSK Group
Manufacturer-Publisher Enterprises, there is a common communication network by
which GSK Group and Thomson Medical, GSK Group and First Data Bank, and GSK
Group and Facts & Comparisons share information on a regular basis.  As to each of
these GSK Group Manufacturer-Publisher Enterprises, GSK Group and Thomson
Medical, GSK Group and First Data Bank, and GSK Group and Facts & Comparisons
functioned as continuing but separate units.  At all relevant times, each of the GSK Group
Manufacturer-Publisher Enterprises was operated and conducted by GSK Group for
criminal purposes, namely, carrying out the AWP Scheme.

(m)     *The Hoffman-La Roche Manufacturer-Publisher Enterprises:* The
Hoffman-La Roche Group Manufacturer-Publisher Enterprises are three separate
associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs
that were provided to them by Hoffman-La Roche, and Hoffman-La Roche, including its
directors, employees and agents: (1) the Hoffman-La Roche-Thomson Medical
Enterprise; (2) the Hoffman-La Roche-First DataBank Enterprise; and (3) the Hoffman-
La Roche-Facts & Comparisons Enterprise. Each of the Hoffman-La Roche
Manufacturer-Publisher Enterprises is an ongoing and continuing business organization
consisting of both corporations and individuals that are and have been associated for the
common or shared purposes of (a) publishing or otherwise disseminating false and
misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual
Plaintiffs and Class members and to participants in those Plaintiffs and Class members
that comprise health and welfare plans, and (c) deriving profits from these activities.
Each of the Hoffman-La Roche Group Manufacturer-Publisher Enterprises has a systemic
linkage because there are contractual relationships, financial ties, and continuing
coordination of activities between Hoffman-La Roche and Thomson Medical, Hoffman-
La Roche and First DataBank, and Hoffman-La Roche and Facts & Comparisons. As to
each of these Hoffman-La Roche Manufacturer-Publisher Enterprises, there is a common
communication network by which Hoffman-La Roche and Thomson Medical, Hoffman-
La Roche and First Data Bank, and Hoffman-La Roche and Facts & Comparisons share
information on a regular basis. As to each of these Hoffman-La Roche Manufacturer-
Publisher Enterprises, Hoffman-La Roche and Thomson Medical, Hoffman-La Roche
and First Data Bank, and Hoffman-La Roche and Facts & Comparisons functioned as
continuing but separate units. At all relevant times, each of the Hoffman-La Roche

Manufacturer-Publisher Enterprises was operated and conducted by Hoffman-La Roche
for criminal purposes, namely, carrying out the AWP Scheme.

      (n)    *The Immunex Manufacturer- Publisher Enterprises:*  The Immunex
Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of
each of the Publishers that reported the AWPID AWPs that were provided to them by
Immunex, and Immunex, including its directors, employees and agents: (1) the
Immunex-La Roche-Thomson Medical Enterprise; (2) the Immunex-First DataBank
Enterprise; and (3) the Immunex-Facts & Comparisons Enterprise.  Each of the Immunex
Manufacturer-Publisher Enterprises is an ongoing and continuing business organization
consisting of both corporations and individuals that are and have been associated for the
common or shared purposes of (a) publishing or otherwise disseminating false and
misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual
Plaintiffs and Class members and to participants in those Plaintiffs and Class members
that comprise health and welfare plans, and (c) deriving profits from these activities.
Each of the Immunex Manufacturer-Publisher Enterprises has a systemic linkage because
there are contractual relationships, financial ties, and continuing coordination of activities
between Immunex and Thomson Medical, Immunex and First DataBank, and Immunex
and Facts & Comparisons.  As to each of these Immunex Manufacturer-Publisher
Enterprises, there is a common communication network by which Immunex and
Thomson Medical, Immunex and First Data Bank, and Immunex and Facts &
Comparisons share information on a regular basis.  As to each of these Immunex
Manufacturer-Publisher Enterprises, Immunex and Thomson Medical, Immunex and First
Data Bank, and Immunex and Facts & Comparisons functioned as continuing but
separate units.  At all relevant times, each of the Immunex Manufacturer-Publisher

Enterprises was operated and conducted by Immunex for criminal purposes, namely, carrying out the AWP Scheme.

(o)     *The Johnson & Johnson Group Manufacturer-Publisher Enterprise:*  The Johnson & Johnson Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Johnson & Johnson Group, and Johnson & Johnson Group, including its directors, employees and agents: (1) the Johnson & Johnson Group-La Roche-Thomson Medical Enterprise; (2) the Johnson & Johnson Group-First DataBank Enterprise; and (3) the Johnson & Johnson Group-Facts & Comparisons Enterprise.  Each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Johnson & Johnson Group and Thomson Medical, Johnson & Johnson Group and First DataBank, and Johnson & Johnson Group and Facts & Comparisons.  As to each of these Johnson & Johnson Group Manufacturer-Publisher Enterprises, there is a common communication network by which Johnson & Johnson Group and Thomson Medical, Johnson & Johnson Group and First Data Bank, and Johnson & Johnson Group and Facts & Comparisons share information on a regular basis.  As to each of these Johnson & Johnson Group Manufacturer-Publisher Enterprises, Johnson & Johnson Group and Thomson Medical,

Johnson & Johnson Group and First Data Bank, and Johnson & Johnson Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises was operated and conducted by Johnson & Johnson Group for criminal purposes, namely, carrying out the AWP Scheme.

(p)     *The Pfizer Manufacturer-Publisher Enterprises:*  The Pfizer Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Pfizer, and Pfizer, including its directors, employees and agents:  (1) the Pfizer-La Roche-Thomson Medical Enterprise; (2) the Pfizer-First DataBank Enterprise; and (3) the Pfizer-Facts & Comparisons Enterprise.  Each of the Pfizer Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Pfizer Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pfizer and Thomson Medical, Pfizer and First DataBank, and Pfizer and Facts & Comparisons.  As to each of these Pfizer Manufacturer-Publisher Enterprises, there is a common communication network by which Pfizer and Thomson Medical, Pfizer and First Data Bank, and Pfizer and Facts & Comparisons share information on a regular basis.  As to each of these Pfizer Manufacturer-Publisher Enterprises, Pfizer and Thomson Medical, Pfizer and First Data Bank, and Pfizer and Facts & Comparisons functioned as continuing

but separate units. At all relevant times, each of the Pfizer Manufacturer-Publisher Enterprises was operated and conducted by Pfizer for criminal purposes, namely, carrying out the AWP Scheme.

(q)     *The Pharmacia Group Manufacturer-Publisher Enterprises:* The Pharmacia Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Pharmacia Group, and Pharmacia Group, including its directors, employees and agents: (1) the Pharmacia Group-Thomson Medical Enterprise; (2) the Pharmacia Group-First DataBank Enterprise; and (3) the Pharmacia Group-Facts & Comparisons Enterprise. Each of the Pharmacia Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Pharmacia Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pharmacia Group and Thomson Medical, Pharmacia Group and First DataBank, and Pharmacia Group and Facts & Comparisons. As to each of these Pharmacia Group Manufacturer-Publisher Enterprises, there is a common communication network by which Pharmacia Group and Thomson Medical, Pharmacia Group and First Data Bank, and Pharmacia Group and Facts & Comparisons share information on a regular basis. As to each of these Pharmacia Group Manufacturer-Publisher Enterprises, Pharmacia Group and Thomson Medical, Pharmacia Group and First Data Bank, and Pharmacia Group and

Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Pharmacia Group Manufacturer-Publisher Enterprises was operated and conducted by Pharmacia Group for criminal purposes, namely, carrying out the AWP Scheme.

(r)   *The Schering-Plough Group Manufacturer-Publisher Enterprises:*  The Schering-Plough Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Schering-Plough Group, and Schering-Plough Group, including its directors, employees and agents: (1) the Schering-Plough Group-Thomson Medical Enterprise; (2) the Schering-Plough Group-First DataBank Enterprise; and (3) the Schering-Plough Group-Facts & Comparisons Enterprise. Each of the Schering-Plough Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Schering-Plough Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Schering-Plough Group and Thomson Medical, Schering-Plough Group and First DataBank, and Schering-Plough Group and Facts & Comparisons. As to each of these Schering-Plough Group Manufacturer-Publisher Enterprises, there is a common communication network by which Schering-Plough Group and Thomson Medical, Schering-Plough Group and First Data Bank, and Schering-Plough Group and Facts & Comparisons share information on a regular basis.

As to each of these Schering-Plough Group Manufacturer-Publisher Enterprises, Schering-Plough Group and Thomson Medical, Schering-Plough Group and First Data Bank, and Schering-Plough Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Schering-Plough Group Manufacturer-Publisher Enterprises was operated and conducted by Schering-Plough Group for criminal purposes, namely, carrying out the AWP Scheme.

(s) *The Sicor Group Manufacturer-Publisher Enterprises:* The Sicor Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Sicor Group, and Sicor Group, including its directors, employees and agents: (1) the Sicor Group-Thomson Medical Enterprise; (2) the Sicor Group-First DataBank Enterprise; and (3) the Sicor Group-Facts & Comparisons Enterprise. Each of the Sicor Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Sicor Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sicor Group and Thomson Medical, Sicor Group and First DataBank, and Sicor Group and Facts & Comparisons. As to each of these Sicor Group Manufacturer-Publisher Enterprises, there is a common communication network by which Sicor Group and Thomson Medical, Sicor Group and First Data Bank, and Sicor Group and Facts & Comparisons share information on a regular basis. As to each

of these Sicor Group Manufacturer-Publisher Enterprises, Sicor Group and Thomson Medical, Sicor Group and First Data Bank, and Sicor Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Sicor Group Manufacturer-Publisher Enterprises was operated and conducted by Sicor Group for criminal purposes, namely, carrying out the AWP Scheme.

(t)     *The TAP Group Manufacturer-Publisher Enterprises:* The TAP Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by The TAP Group, and The TAP Group, including its directors, employees and agents: (1) the TAP Group-Thomson Medical Enterprise; (2) the TAP Group-First DataBank Enterprise; and (3) the TAP Group-Facts & Comparisons Enterprise. Each of the TAP Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the TAP Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the TAP Group and Thomson Medical, the TAP Group and First DataBank, and the TAP Group and Facts & Comparisons. As to each of these TAP Group Manufacturer-Publisher Enterprises, there is a common communication network by which the TAP Group and Thomson Medical, the TAP Group and First Data Bank, and the TAP Group and Facts & Comparisons share information on a regular basis. As to each of these TAP Group Manufacturer-Publisher Enterprises, the TAP Group and

Thomson Medical, the TAP Group and First Data Bank, and the TAP Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the TAP Group Manufacturer-Publisher Enterprises was operated and conducted by the TAP Group for criminal purposes, namely, carrying out the AWP Scheme.

      (u)     *The Watson Manufacturer-Publisher Enterprises:*  The Watson Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Watson, and Watson, including its directors, employees and agents:  (1) the Watson-Thomson Medical Enterprise; (2) the Watson-First DataBank Enterprise; and (3) the Watson-Facts & Comparisons Enterprise.  Each of the Watson Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Watson Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Watson and Thomson Medical, Watson and First DataBank, and Watson and Facts & Comparisons.  As to each of these Watson Manufacturer-Publisher Enterprises, there is a common communication network by which Watson and Thomson Medical, Watson and First Data Bank, and Watson and Facts & Comparisons share information on a regular basis.  As to each of these Watson Manufacturer-Publisher Enterprises, Watson and Thomson Medical, Watson and First Data Bank, and Watson and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Watson

Manufacturer-Publisher Enterprises was operated and conducted by Watson for criminal purposes, namely, carrying out the AWP Scheme.

      (v)    *The Warrick Manufacturer-Publisher Enterprises*:  The Warrick Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Warrick, and Warrick, including its directors, employees and agents:  (1) the Warrick-Thomson Medical Enterprise; (2) the Warrick-First DataBank Enterprise; and (3) the Warrick-Facts & Comparisons Enterprise.  Each of the Warrick Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Warrick Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Warrick and Thomson Medical, Warrick and First DataBank, and Warrick and Facts & Comparisons.  As to each of these Warrick Manufacturer-Publisher Enterprises, there is a common communication network by which Warrick and Thomson Medical, Warrick and First Data Bank, and Warrick and Facts & Comparisons share information on a regular basis.  As to each of these Warrick Manufacturer-Publisher Enterprises, Warrick and Thomson Medical, Warrick and First Data Bank, and Warrick and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Warrick Manufacturer-Publisher Enterprises was operated and conducted by Warrick for criminal purposes, namely, carrying out the AWP Scheme.

**The Defendant Drug Manufacturers' Use of the U.S. Mails and Interstate Wire Facilities**

573.     Each of the Manufacturer-Publisher Enterprises engaged in and affected interstate commerce because they engage in the following activities across state boundaries:  The transmission and publication of false and misleading information concerning AWPs; the sale, purchase and/or administration of AWPIDs; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission and/or receipt of invoices, statements and payments related to the use or administration of AWPIDs.

574.     During the Class Period, the Defendants Drug Manufacturers' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

575.     The nature and pervasiveness of the Defendant Drug Manufacturers' AWP Scheme, which was orchestrated out of the corporate headquarters of the Defendant Drug Manufacturers, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the various local district managers overseeing the sales force(s), the numerous pharmaceutical sales representatives who, in turn, directly communicated with providers and employees who communicated with the Publishers.

576.     Many of the precise dates of Defendant Drug Manufacturers' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records.  Indeed, an essential part of the successful operation of the AWP Scheme alleged herein depended upon secrecy, and as alleged above, the Defendant Drug Manufacturers took deliberate steps to conceal their wrongdoing.  However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the AWP Scheme and do so below.

577.    The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities to perpetrate the AWP Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

(a)    Marketing materials about the AWPs for AWPIDs and the available spread, which were sent by the Defendant Drug Manufacturers to health care providers located across the country;

(b)    Written representations of the AWPs made by the Defendant Drug Manufacturers to the Publishers, which were made at least annually and in many cases several times during a single year;

(c)    Documents providing information or incentives designed to lessen the prices that health care providers paid for AWPIDs and/or to conceal those prices or the AWP Scheme alleged here;

(d)    Written communications, relating to rebates, kickbacks, or other financial inducements included, but not limited to, checks, as detailed herein;

(e)    Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

(f)    Written and oral communications with health insurers and patients, including Plaintiffs and members of the Class, inducing payments for the drugs that were made in reliance on AWPs; and

(g)    Receipts of money sent on tens of thousands of occasions through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Defendant Drug Manufacturers' AWP Scheme.

(h)     In addition to the above-referenced RICO predicate acts, it was foreseeable to the Defendant Drug Manufacturers that the Publishers would distribute their publications containing false AWPs through the U.S. mails and by interstate wire facilities. Further, the Defendant Drug Manufacturers' corporate headquarters have, in furtherance of the AWP Scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions. These uses of the U.S. mails include some of the documents referenced in this Amended Complaint.

**Conduct of the RICO Enterprises' Affairs**

578.    During the Class Period, the Defendant Drug Manufacturers have exerted control over their Manufacturer-Publisher Enterprises and, in violation of Section 1962(c) of RICO, the Defendant Drug Manufacturers have conducted or participated in the conduct of the affairs of those RICO enterprises, directly or indirectly, in the following ways:

(a)     Each of the Defendant Drug Manufacturers has directly controlled the price for its AWPIDs;

(b)     Each of the Defendant Drug Manufacturers has directly controlled the AWPs that are reported by the Publishers;

(c)     Each of the Defendant Drug Manufacturers has directly controlled the creation and distribution of marketing, sales, and other materials used to inform health care providers nationwide of the profit potential of its AWPIDs;

(d)     Each of the Defendant Drug Manufacturers has controlled and participated in the affairs of its Manufacturer-Publisher Enterprises by using a fraudulent scheme to manufacture, market and sell its AWPIDs on the basis of AWPs that each of the Defendant Drug Manufacturers provides to the Publishers;

(e)     Each of the Defendant Drug Manufacturers intended that each of the Publishers would (and did) distribute their publications containing false AWPs through the U.S. mails and by interstate wire facilities; and

(f)     Each of the publishers has allowed these Defendants to exert control over their organizations knowing that the AWPs were inflated and were not real numbers. Each publisher did so because the reporting of AWPs was, and is, a major part of its business.

579.     Each of the Manufacturer-Publisher Enterprises had a hierarchical decision-making structure headed by the respective Defendant Drug Manufacturer. The Defendant Drug Manufacturers issued instructions on how its AWPs were to be reported and each publisher accepted those instructions despite knowing of their falsity.

580.     In violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers have conducted the affairs of each of the Manufacturer-Publisher Enterprises with which they associated by reporting fraudulently inflated AWPs for AWPIDs that were then published by the Publishers and disseminated nationwide.

**The Defendant Drug Manufacturers' Pattern of Racketeering Activity**

581.     Each of the Defendant Drug Manufacturers have conducted and participated in the affairs of their above-referenced Manufacturer-Publisher Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The Defendant Drug Manufacturers' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their AWP Scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the

Defendant Drug Manufacturers intended to defraud Plaintiffs, members of the Classes and other intended victims of the AWP Scheme.

582.    The Defendants Drug Manufacturers' fraudulent and unlawful AWP Scheme consisted, in part, of deliberately overstating the AWPs for their AWPIDs, thereby creating a "spread" based on the inflated figure in order to induce others to advocate and favor that Defendant Drug Manufacturer's AWPIDs. Further, others would bill their clients for the Defendant Drug Manufacturers' AWPIDs based on the inflated AWPs, which did not reflect the true price paid for the AWPIDs.

583.    The AWP Scheme was calculated and intentionally crafted to ensure that Plaintiffs and members of the Classes would be over-billed for the drugs. In designing and implementing the AWP Scheme, at all times the Defendant Drug Manufacturers were cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the Defendant Drug Manufacturers in setting the AWPs, as reported by the Publishers.

584.    Each of the plaintiffs, to the extent they purchased drugs outside of the PBM context, made purchases with the price being tied to AWP.

585.    By intentionally and artificially inflating the AWPs, and by subsequently failing to disclose such practices to the individual patients, health plans and their insurers, the Defendant Drug Manufacturers engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

586.    The Defendant Drug Manufacturers' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and members of the Classes. Each separate use of the U.S. mails and/or interstate wire facilities employed by the Defendant Drug Manufacturers was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Classes. Each of the Defendant Drug

Manufacturers has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular Manufacturer-Publisher Enterprises.

**The Defendant Drug Manufacturers' Motive**

587.    The Defendant Drug Manufacturers' motive in creating and operating the AWP Scheme and conducting the affairs of the Manufacturer-Publisher Enterprises described herein was to fraudulently obtain sales of and profits from their AWPIDs.

588.    The AWP Scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the Defendant Drug Manufacturers' AWPIDs. Thus, each of the Defendant Drug Manufacturers used the AWP Scheme to sell more of its drugs, thereby fraudulently gaining sales and market share and profits.

**Damages Caused by the Defendant Drug Manufacturers' AWP Scheme**

589.    The Defendant Drug Manufacturers' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Classes to be injured in their business or property because Plaintiffs and members of the Classes have paid many hundreds of millions of dollars in inflated reimbursements or other payments for AWPIDs.

590.    The Defendant Drug Manufacturers sent billing statements through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their AWP Scheme. Plaintiffs and members of the Classes have made inflated payments for AWPIDs based on and/or in reliance on reported and false AWPs.

591.    Under the provisions of Section 1964(c) of RICO, the Defendant Drug Manufacturers are jointly and severally liable to Plaintiffs and members of the Classes for three times the damages that Plaintiffs and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II

## VIOLATIONS OF 18 U.S.C. § 1962(C)

## (AGAINST DEFENDANT DRUG MANUFACTURERS IDENTIFIED HEREIN)

592.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

593.    This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against the Defendant Drug Manufacturers identified below on behalf of AWP Classes by the AWP Class representatives.

594.    Plaintiffs, the members of Classes, and the Defendant Drug Manufacturers are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

595.    The following pharmacy benefit managers (collectively "PBMs") are each "persons," as that term is defined in 18 U.S.C. § 1961(3):  (a) **AdvancePCS** ("Advance PCS"), a Delaware corporation with its principal place of business located at 750 West John Carpenter Freeway, Suite 1200, Irving, Texas; Advance PCS is the largest PBM in the United States and currently serves more than 75 million health plan members; (b) **Caremark, Rx, Inc.** ("Caremark Rx"), a Delaware corporation with its principal place of business located at 300 Galloria Tower, Suite 1000, Birmingham, Alabama; Caremark Rx is one of the largest pharmaceutical services companies in the United States with net revenues of approximately $5.6 billion in 2001; (c) **Express Scripts, Inc.** ("Express Scripts"), a Delaware corporation with its principal place of business located at 13900 Riverpoint Drive, Maryland Heights, Missouri; Express Scripts is the third largest PBM in North America; and (d) **Medco Health Solutions, Inc.** ("Medco Health"), a successor-in-interest to Merck-Medco Managed Care, L.L.C., is a Delaware corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey; since its acquisition in 1993, Medco Health has been a wholly-owned subsidiary of Defendant Drug Manufacturer Merck.

**The Manufacturer-PBM RICO Enterprises**

596.    For purposes of this claim, the RICO "enterprises" are associations-in-fact consisting of (a) one of the PBMs that administered purchases of a Defendant Drug Manufacturer's brand name drugs and billed its members on the basis of the Defendant Drug Manufacturer's reported AWPs, and (b) a Defendant Drug Manufacturer, including its directors, employees and agents.  These associations-in-fact are collectively referred to herein as the "Manufacturer-PBM Enterprises."

597.    Each of the Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Classes that comprise health and welfare plans, and deriving profits from these activities.

598.    Each of the Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the Defendant Drug Manufacturer and the specific PBM that are associates.  As to each of the Manufacturer-PBM Enterprises, there is a common communication network by which the Defendant Drug Manufacturer and the specific PBM share information on a regular basis.  As to each of the Manufacturer-PBM Enterprises, the Defendant Drug Manufacturer and the specific PBM functioned as a continuing unit.  At all relevant times, each of the Manufacturer-PBM Enterprises was operated by the specific Defendant Drug Manufacturer for criminal purposes, namely, carrying out the AWP Scheme.

599.    Each manufacturer-PBM enterprise had a common purpose of perpetuating use of AWPs as a benchmark for reimbursement in the pharmaceutical industry.  The manufacturing defendants had this as a purpose, because without the use of inflated AWPs as an industry price setting benchmark, they would not be able to push the spread to those in the distribution chain.

The PBMs share this common purpose, because they are subject to a great deal of control from the manufacturers. PBMs are now turning to drug manufacturers for hidden profit-making schemes, because PBM clients are no longer allowing PBMs to collect as much for claims administration. Thus, as a result, PBMs have, with the knowing and willful participation and assistance of the drug manufacturers, engaged in hidden profit-making schemes falling into three general categories: (i) garnering rebates and other "soft dollars" from drug manufacturers that the PBM Defendants, to a large extent, keep without disclosing to their health plans the true amounts of the rebates; (ii) pocketing secret spreads between actual drug costs and the prices charged to health plans and their members; and (iii) keeping secret discounts provided by the drug manufacturers in association with the PBMs' mail order operations.

600.    The existence and magnitude of PBM rebates and accompanying profits at the expense of PBM clients is acknowledged within the PBM industry. For example, a recent industry report observed:

> [R]ebates paid to the PBMs by pharmaceutical companies continue to increase, as evidenced by the increasing PBM profits . . . . [T]his should hold true so long as the PBMs add value [apparently to the drug makers] by moving market share within drug classes.

601.    Thus, PBMs were willing participants in the enterprise, and each participant in the enterprise shared many common purposes.

602.    Further, as a result of their reliance on the manufacturers, PBMs took instructions and commands from the manufacturers regarding the use of AWP, not only so that they could keep part of the spread, but also so as to continue to earn from the manufacturers: (i) *Access rebates* for placement of products on the PBMs' formulary; (ii) *Market share rebates* for garnering higher market share than established targets; (iii) *Administrative fees* for assembling data to verify market share results; and (iv) *Other fees and grants* in an effort to promote products.

603.    In order to garner all of these fees from the drug manufacturers, the PBMs each meet on a frequent basis to discuss drug prices, spreads, marketing opportunities and coordination of all of the above.

604.    There is a common communication network between each PBM and each manufacturer for the purpose of implementing the AWP spread scheme and for the exchange of financial rewards for the PBMs activities that benefit the drug company manufacturers.

605.    At all relevant times, each one of the PBMs was aware of the Defendants Drug Manufacturers' AWP Scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.

606.    For purposes of this count, the Manufacturer-PBM Enterprises are identified as follows:

(a)    *The Abbott Manufacturer-PBM Enterprises:* The Abbott Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Abbott's AWPIDs and billed its members on the basis of Abbott's reported AWPs, and Abbott, including its directors, employees and agents: (1) the Abbott-AdvancePCS Enterprise; (2) the Abbott-Caremark Rx Enterprise; (3) the Abbott-Express Scripts Enterprise; and (4) the Abbott-Medco Health Enterprise. Each of the Abbott Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Abbott Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and Abbott and Medco Health. As to each of these Abbott

Manufacturer-PBM Enterprises, there is a common communication network by which Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and Abbott and Medco Health share information on a regular basis. As to each of these Abbott-Manufacturer-PBM Enterprises, Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and Abbott and Medco Health functioned as continuing but separate units. At all relevant times, each of the Abbott Manufacturer-PBM Enterprises was operated and conducted by Abbott for criminal purposes, namely, carrying out the AWP Scheme.

(b)     *The Amgen Manufacturer-PBM Enterprises:*  The Amgen Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Amgen's AWPIDs and billed its members on the basis of Amgen's reported AWPs, and Amgen, including its directors, employees and agents: (1) the Amgen-AdvancePCS Enterprise; (2) the Amgen-Caremark Rx Enterprise; (3) the Amgen-Express Scripts Enterprise; and (4) the Amgen-Medco Health Enterprise. Each of the Amgen Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Amgen Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and Express Scripts, and Amgen and Medco Health. As to each of these Amgen Manufacturer-PBM Enterprises, there is a common communication network by which Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and Express Scripts, and Amgen and Medco Health share information on a regular basis. As to each of these

Amgen-Manufacturer-PBM Enterprises, Amgen and AdvancePCS, Amgen and Caremark
Rx, Amgen and Express Scripts, and Amgen and Medco Health functioned as continuing
but separate units. At all relevant times, each of the Amgen Manufacturer-PBM
Enterprises was operated and conducted by Amgen for criminal purposes, namely,
carrying out the AWP Scheme.

      (c)    *The AstraZeneca Manufacturer-PBM Enterprises:* The AstraZeneca
Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each
of the PBMs that administered purchases of AstraZeneca's AWPIDs and billed its
members on the basis of AstraZeneca's reported AWPs, and AstraZeneca, including its
directors, employees and agents: (1) the AstraZeneca-AdvancePCS Enterprise; (2) the
AstraZeneca-Caremark Rx Enterprise; (3) the AstraZeneca-Express Scripts Enterprise;
and (4) the AstraZeneca-Medco Health Enterprise. Each of the AstraZeneca
Manufacturer-PBM Enterprises is an ongoing and continuing business organization
consisting of both corporations and individuals that are and have been associated for the
common or shared purposes of selling, purchasing, prescribing and administering
AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.
Each of the AstraZeneca Manufacturer-PBM Enterprises has a systemic linkage because
there are contractual relationships, financial ties, and continuing coordination of activities
between AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca
and Express Scripts, and AstraZeneca and Medco Health. As to each of these
AstraZeneca Manufacturer-PBM Enterprises, there is a common communication network
by which AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca
and Express Scripts, and AstraZeneca and Medco Health share information on a regular
basis. As to each of these AstraZeneca-Manufacturer-PBM Enterprises, AstraZeneca and
AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca and Express Scripts, and

AstraZeneca and Medco Health functioned as continuing but separate units. At all relevant times, each of the AstraZeneca Manufacturer-PBM Enterprises was operated and conducted by AstraZeneca for criminal purposes, namely, carrying out the AWP Scheme.

(d)     *The Aventis Group Manufacturer-PBM Enterprise:* The Aventis Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Aventis Group's AWPIDs and billed its members on the basis of Aventis Group's reported AWPs, and Aventis Group, including its directors, employees and agents: (1) the Aventis Group-AdvancePCS Enterprise; (2) the Aventis Group-Caremark Rx Enterprise; (3) the Aventis Group-Express Scripts Enterprise; and (4) the Aventis Group-Medco Health Enterprise. Each of the Aventis Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Aventis Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health. As to each of these Aventis Group Manufacturer-PBM Enterprises, there is a common communication network by which Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health share information on a regular basis. As to each of these Aventis Group-Manufacturer-PBM Enterprises, Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Aventis Group

Manufacturer-PBM Enterprises was operated and conducted by Aventis Group for criminal purposes, namely, carrying out the AWP Scheme.

(e) *The Baxter Manufacturer-PBM Enterprises:* The Baxter Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Amgen's AWPIDs and billed its members on the basis of Baxter's reported AWPs, and Baxter, including its directors, employees and agents: (1) the Baxter-AdvancePCS Enterprise; (2) the Baxter-Caremark Rx Enterprise; (3) the Baxter-Express Scripts Enterprise; and (4) the Baxter-Medco Health Enterprise. Each of the Baxter Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Baxter Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health. As to each of these Baxter Manufacturer-PBM Enterprises, there is a common communication network by which Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health share information on a regular basis. As to each of these Baxter-Manufacturer-PBM Enterprises, Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health functioned as continuing but separate units. At all relevant times, each of the Baxter Manufacturer-PBM Enterprises was operated and conducted by Baxter for criminal purposes, namely, carrying out the AWP Scheme.

(f)     *The Bayer Manufacturer-PBM Enterprises:*  The Bayer Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Bayer's AWPIDs and billed its members on the basis of Bayer's reported AWPs, and Bayer, including its directors, employees and agents: (1) the Bayer-AdvancePCS Enterprise; (2) the Bayer-Caremark Rx Enterprise; (3) the Bayer-Express Scripts Enterprise; and (4) the Bayer-Medco Health Enterprise.  Each of the Bayer Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Bayer Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health.  As to each of these Bayer Manufacturer-PBM Enterprises, there is a common communication network by which Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health share information on a regular basis.  As to each of these Bayer-Manufacturer-PBM Enterprises, Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Bayer Manufacturer-PBM Enterprises was operated and conducted by Bayer for criminal purposes, namely, carrying out the AWP Scheme.

(g)     *The Boehringer Group Manufacturer-PBM Enterprise:*  The Boehringer Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Boehringer Group's AWPIDs and billed its members on the basis of Boehringer Group's reported AWPs, and Boehringer Group,

including its directors, employees and agents: (1) the Boehringer Group-AdvancePCS Enterprise; (2) the Boehringer Group-Caremark Rx Enterprise; (3) the Boehringer Group-Express Scripts Enterprise; and (4) the Boehringer Group-Medco Health Enterprise. Each of the Boehringer Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Boehringer Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Boehringer Group and AdvancePCS, Boehringer Group and Caremark Rx, Boehringer Group and Express Scripts, and Boehringer Group and Medco Health. As to each of these Boehringer Group Manufacturer-PBM Enterprises, there is a common communication network by which Boehringer Group and AdvancePCS, Boehringer Group and Caremark Rx, Boehringer Group and Express Scripts, and Boehringer Group and Medco Health share information on a regular basis. As to each of these Boehringer Group-Manufacturer-PBM Enterprises, Boehringer Group and AdvancePCS, Boehringer Group and Caremark Rx, Boehringer Group and Express Scripts, and Boehringer Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Boehringer Group Manufacturer-PBM Enterprises was operated and conducted by Boehringer Group for criminal purposes, namely, carrying out the AWP Scheme.

(h)     *The Braun Manufacturer-PBM Enterprise:* The Braun Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Braun's AWPIDs and billed its members on the basis of Braun's reported AWPs, and Braun, including its directors, employees and agents: (1)

the Braun-AdvancePCS Enterprise; (2) the Braun-Caremark Rx Enterprise; (3) the Braun-Express Scripts Enterprise; and (4) the Braun-Medco Health Enterprise. Each of the Braun Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Braun Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Braun and AdvancePCS, Braun and Caremark Rx, Braun and Express Scripts, and Braun and Medco Health. As to each of these Braun Manufacturer-PBM Enterprises, there is a common communication network by which Braun and AdvancePCS, Braun and Caremark Rx, Braun and Express Scripts, and Braun and Medco Health share information on a regular basis. As to each of these Braun-Manufacturer-PBM Enterprises, Braun and AdvancePCS, Braun and Caremark Rx, Braun and Express Scripts, and Braun and Medco Health functioned as continuing but separate units. At all relevant times, each of the Braun Manufacturer-PBM Enterprises was operated and conducted by Braun for criminal purposes, namely, carrying out the AWP Scheme.

(i)     *The BMS Group Manufacturer-PBM Enterprises:* The BMS Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of BMS Group's AWPIDs and billed its members on the basis of BMS Group's reported AWPs, and BMS Group, including its directors, employees and agents: (1) the BMS Group-AdvancePCS Enterprise; (2) the BMS Group-Caremark Rx Enterprise; (3) the BMS Group-Express Scripts Enterprise; and (4) the BMS Group-Medco Health Enterprise. Each of the BMS Group

Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the BMS Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health. As to each of these BMS Group Manufacturer-PBM Enterprises, there is a common communication network by which BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health share information on a regular basis. As to each of these BMS Group-Manufacturer-PBM Enterprises, BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the BMS Group Manufacturer-PBM Enterprises was operated and conducted by BMS Group for criminal purposes, namely, carrying out the AWP Scheme.

(j)     *The Fujisawa Group Manufacturer-PBM Enterprise:* The Fujisawa Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Fujisawa Group's AWPIDs and billed its members on the basis of Fujisawa Group's reported AWPs, and Fujisawa Group, including its directors, employees and agents: (1) the Fujisawa Group-AdvancePCS Enterprise; (2) the Fujisawa Group-Caremark Rx Enterprise; (3) the Fujisawa Group-Express Scripts Enterprise; and (4) the Fujisawa Group-Medco Health Enterprise. Each of the Fujisawa Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have

been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Fujisawa Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health. As to each of these Fujisawa Group Manufacturer-PBM Enterprises, there is a common communication network by which Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health share information on a regular basis. As to each of these Fujisawa Group-Manufacturer-PBM Enterprises, Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Fujisawa Group Manufacturer-PBM Enterprises was operated and conducted by Fujisawa Group for criminal purposes, namely, carrying out the AWP Scheme.

(k)     *The GSK Group Manufacturer-PBM Enterprises:* The GSK Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of GSK Group's AWPIDs and billed its members on the basis of GSK Group's reported AWPs, and GSK Group, including its directors, employees and agents: (1) the GSK Group-AdvancePCS Enterprise; (2) the GSK Group-Caremark Rx Enterprise; (3) the GSK Group-Express Scripts Enterprise; and (4) the GSK Group-Medco Health Enterprise. Each of the GSK Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and