UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL No. 1456<br><br>CIVIL ACTION:  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) ) ) ) ) | Judge Patti B. Saris |

**PLAINTIFFS' OPPOSITION TO TRACK ONE DEFENDANTS' MOTION TO
PRECLUDE PLAINTIFFS' EXPERT EVIDENCE ON LIABILITY
OR FOR OTHER SANCTIONS**

On August 31, 2005, and well in advance of the October 1 due date for expert liability report disclosure, Plaintiffs moved the Court for an order extending that disclosure date and associated discovery dates (the "Motion to Extend").  Six weeks later, and two days *after* the Court issued its October 11 order setting Plaintiffs' motion for hearing, the Track One Defendants moved for an order precluding Plaintiffs from introducing expert evidence on liability or for an unspecified monetary sanction.  Because Plaintiffs' motion was timely filed, Defendants' motion should be denied.  Moreover, if any sanctions are to be considered in association with this issue, it is Defendants who should be sanctioned for their discovery abuses that led to the need to extend the expert disclosure due date.

**A.    Plaintiffs Properly Moved For An Extension Of The Expert Disclosure Date Well Before The Report Due Date**

Defendants argue that Plaintiffs should be sanctioned for not producing expert reports on October 1, 2005, accusing Plaintiffs of "casually" "flout[ing]" that due date.  Defs. Mtn. at 3. But the record demonstrates that this is simply untrue.  Anticipating that Plaintiffs' expert would not be able to complete his report until Defendants produced relevant data, Plaintiffs reached out

to defense counsel well in advance of October and requested Defendants' agreement to modify the expert discovery schedule to accommodate the delay in Defendants' production. Defendants refused to agree, failing to articulate any purported basis for why a modification in the expert discovery schedule would pose any burdens on the Court and litigants. Declaration of Steve W. Berman in Support of Plaintiffs' Opposition to the Track One Defendants' Motion to Preclude Plaintiffs' Expert Evidence on Liability or for Other Sanctions ("Berman Decl.") at ¶ 12. On August 31 and a full month before the October 1 expert report deadline, Plaintiffs dutifully filed their Motion to Extend. Thus, Plaintiffs did what any reasonable litigant mindful of an impending deadline that cannot be met would do: they moved with dispatch to modify the schedule. As detailed more fully below, the only casual flouting perpetrated here is Defendants' repeated discovery abuses that are the direct and proximate cause of Plaintiffs' Motion to Extend, and not Plaintiffs' actions in proactively seeking to extend the expert discovery schedule. Had Defendants simply produced all of the data requested by Plaintiffs, an extension in the discovery schedule would have been unnecessary.

**B.  Defendants' Intransigence And Delays Necessitated Plaintiffs' Motion To Extend; Consequently, Their Untimely Motion For Sanctions Is Entirely Unfounded**

   **1.  Gaps still remain in Defendants' production of transaction data, and these gaps must be filled before Dr. Hartman can complete his expert report**

To put into context the problems caused by Defendants' delay, it is necessary to briefly review the nature of the work that Plaintiffs' expert, Dr. Ray Hartman is doing. Dr. Hartman is charged with ascertaining whether and to what extent the class was injured by Defendants' fraudulent pricing. His analysis, which employs widely-used economic tools, including data collection, econometrics, algebra and mathematics, comprises a multi-step process summarized as follows:

- Using industry price compendia and other available data sources, Dr. Hartman is ascertaining the spreads between AWP and the Average Sales Price ("ASP") for drugs unaffected by the scheme. These spreads may be used as "yardsticks" for the difference between AWP and ASP on drugs where no inflation was present.

- Using data derived from a detailed analysis of Defendants' invoice and accounting data, Dr. Hartman is ascertaining the spreads between AWP and ASP for the drugs subject to this litigation.

- Dr. Hartman is comparing the spreads of drugs in this litigation against the "yardstick" spreads. The comparison will yield relevant information for purposes of determining whether and to what extent the affected drugs' prices were inflated by the fraudulent scheme.

- As part of his economic analysis, Dr. Hartman may use the "yardstick" spreads as a comparison to determine the spread that would have been used for the affected drugs but-for the wrongful scheme.

- Using mathematical and algebraic formulae, Dr. Hartman will make this analysis for each affected drug and, applying actual sales figures and prices, determine the overall class-wide injury and damage for each drug.

Berman Decl. at ¶ 2.

Key to this process is taking detailed data from Defendants and calculating ASPs for the subject drugs. This task requires processing hundreds of thousands of data items for each drug in order to back out rebates, chargebacks, discounts, bundled offers and other items used by Defendants to reduce ASP below AWP. As Plaintiffs explained in their Motion to Extend expert discovery, Plaintiffs attempted to expedite the process of determining ASPs by requesting that Defendants provide Plaintiffs with the ASPs of the subject drugs. This was the most logical, time-saving and resource-conserving manner in which to obtain ASP information because Defendants calculated average prices for internal reporting purposes and, beginning in 2005, for submission to Medicare. Defendants refused to provide this information, and the Court denied Plaintiffs' subsequent motion to compel. Consequently, Plaintiffs have sought from Defendants the constituent pieces of transaction data necessary to independently calculate ASPs. The detailed transaction data required and sought is extensive and includes:

(a) All sales transaction data (as well as any discounts or any other price adjustments or offsets contained in the transaction data), including (i) price, (ii) number of units sold, (iii) transaction date, (iv) information sufficient to identify the type of transaction (*e.g*., a sale, a return, etc.), (v) information sufficient to identify the product (*e.g*., NDC, product description, form, strength, etc.), (vi) information sufficient to identify the customer, (vii) class of trade designations, and (viii) information sufficient to identify whether the units sold were intended for repackaging, along with the name of the repackager to which the units were sold.

(b) All chargeback transactions, including (i) amount, (ii) date of credit, (iii) information sufficient to identify the customer, class of trade designations, and wholesaler to which the chargeback was paid, and (iv) the underlying contract price paid by the ultimate customer.

(c) All rebate transactions, including (i) amount, (ii) date of rebate, (iii) information sufficient to identify the type of rebate, (iv) information sufficient to identify the customer, and (v) class of trade designations.

(d) All administrative fee transactions, including (i) amount, (ii) date of payment, (iii) information sufficient to identify the type of administrative fee, (iv) information sufficient to identify the customer, and (v) class of trade designation.

Berman Decl. at ¶ 4.

Much of this data has been produced, although Plaintiffs had to repeatedly prod Defendants into doing so. This has been a cumbersome process as the data was provided by most of the Defendants in a non-useable form or was incomplete. Rule 30(b)(6) depositions and/or informal exchanges of information occurred to try and fill the data gaps between what was produced and what was needed to calculate ASPs. Defendants were told exactly what Plaintiffs were attempting to accomplish. Notwithstanding this considerable effort, there are still gaps in the data that are preventing Dr. Hartman from completing his report. Berman Decl. at ¶ 5. The following table summarizes those gaps by Defendant:

| Track One Defendant | Missing Data |
|---|---|
| AstraZeneca | Direct sales data, chargeback and rebate data after 2002 for all Zoladex NDCs. |
| BMS | Pre-1993 and post 2002 direct sales and chargeback data. |

1534.16 0225 MTN.DOC                                4

|  | OTN direct sales data are lacking customer category and customer name fields.<br><br>Rebate data for physician-administered drugs has not been provided in a readily useable manner, and BMS has refused to provide rebate accruals that the company utilized for SEC reporting purposes.[1] |
|---|---|
| GSK | Pre-1997 and post-2002 direct sales, chargeback and rebate data for Alkeran, Imitrex, Lanoxin, Myleran, Navelbine, Retrovir and Zovirax.<br><br>Post-2003 data for Ventolin and Zofran.[2] |
| Johnson & Johnson | Post-2003 data for all drugs.<br><br>More detailed descriptions and explanations of the pre-1994Q4 Procrit files and fields within the files is needed.<br><br>Customer class information for Remicade direct sales. |

Berman Decl. at ¶ 6.

As noted, there are time gaps in the data that need to be filled because, to varying degrees, Defendants had objected to the scope of Plaintiffs' originally designated proposed Class Period of January 1, 1991, to the present. Consequently, no Defendant had produced transaction data for this entire time period. The Court's August 16 Track One Class Certification order confirmed that the Class Period would indeed be January 1, 1991, to the present, and Plaintiffs have asked Defendants to supplement their data productions. Berman Decl. at ¶ 7. But because

---

[1] Historically, BMS did not track actual rebate payment data for physician-administered drugs in a centralized database. Instead, rebate payments were recorded onto a variety of computerized spreadsheets, and the payments were commonly made for multiple drugs without any convenient methodology to determine what portion of the particular rebate payment was associated with a single drug. Although BMS produced a plethora of spreadsheets in electronic format, piecing together the rebates paid by drug for each quarter is a monumental task. The BMS finance department did, however, periodically project rebate payments. These projections were called accruals. Given the complexity of accounting for rebates actually paid, Plaintiffs have repeatedly asked BMS to produce the finance accruals, and it has demurred. Berman Decl. at ¶ 8.

[2] Berman Decl. at ¶ 9.

Plaintiffs had always sought data for the entire time period, Defendants should have made complete transaction data productions long ago.

### 2. Defendants have refused to produce relevant IMS Health data needed for Dr. Hartman to complete his report

In addition to the transaction data reviewed above, Plaintiffs have long sought market share and other data compiled by IMS Health in Defendants' possession or otherwise available to Defendants through their subscriptions to the IMS service. Plaintiffs' original request for this information dates back to March 31, 2004.[3] Defendants refused to produce the information, and Plaintiffs refined the IMS requests in two separate sets of requests served this past July and August, respectively. Included in the IMS requests are requests for drug comparator data for use in designating the "yardsticks" that Dr. Hartman will employ in his analysis, as well as so-called "Method of Payment Data" that, among other things, separates sales attributable to Medicare beneficiaries, Medicaid recipients, third-party payors and cash payors. Segregating sales in this manner is necessary in order for Dr. Hartman to build his model. Berman Decl. at ¶ 10.

Rather than produce the IMS information in a timely manner, Defendants have played dodge ball and objected, stringing out the meet and confer process and have still not produced complete information, *even though they were advised early on that Dr. Hartman needed the information to complete his analysis*. Indeed, Defendants have engaged in a classic game of "run out the clock" with respect to these requests. For example, J&J took the position that it would not produce the IMS data until it saw what drugs were included in the amended complaint that Plaintiffs filed last week, and has still not been specific about what it now intends to produce in response to the July 2005 requests. Declaration of Robert F. Lopez in Support of Motion to

---

[3] Request for Production No. 30, from Plaintiffs' March 31, 2004, Omnibus Requests for Production and Interrogatories sought "[a]ll documents concerning communications between you and IMS Health (or any similar entity providing pharmaceutical database information) concerning or relating to any of your AWPIDs."

Compel Production of IMS Data and Reports ("Lopez Decl.") at ¶ 4. Several Defendants objected to the scope of drugs specified in the requests, Lopez Decl. at ¶ 3, even though they know from reviewing Dr. Hartman's interim report produced before the class certification hearing that his modeling would consider drugs not targeted in this case. Moreover, there is no burden to producing the information sought, as many Defendants either have the data already in their possession or can make *ad hoc* calls on IMS databases to which Defendants subscribe. BMS in particular has an employee who can access relevant IMS reports from his desktop computer. Lopez Decl. at ¶ 6. And after several negotiating rounds regarding the August IMS requests, Defendants banded together and advised last week that none of them would produce the information sought in those requests. Lopez Decl. at ¶ 5.

Given Defendants' obstruction, Plaintiffs were forced to file last week a motion to compel the IMS data. Plaintiffs incorporate by reference here the more detailed statements and arguments made in that motion. Defendants' dilatory and obstructionist maneuvering with respect to the IMS requests alone illuminates the hypocrisy of their motion for sanctions.[4]

### 3. Notwithstanding Defendants' intransigence, Plaintiffs have worked diligently to obtain the information necessary for Dr. Hartman to complete his report

Negotiating the transaction and IMS data requests with Defendants, waiting to receive the data that Defendants have been willing to produce, taking Rule 30(b)(6) depositions on data issues, and then processing what is still *incomplete* data are tasks that have taken the better part

---

[4] Examples of Defendants' obstruction in other discovery areas are legion, making their instant motion for sanctions even more distasteful. For instance, Defendants have repeatedly violated CMO No. 10's requirement that document productions be completed within 60 days of the service of document requests. CMO No. 10 at 2. Their violations of this Court mandate have adversely impacted the discovery schedule across-the-board, as the Court undoubtedly established the schedule under the assumption that Defendants would comply with CMO No. 10. Another illustration of gamesmanship is found in J&J's refusal to produce documents relating to legal proceedings between its subsidiary OBI and Amgen regarding the sales and marketing of Procrit to dialysis customers. For most of the discovery period, J&J represented that the dispute had nothing to do with AWP or the spread between reimbursement and acquisition cost. Plaintiffs kept pressing, and J&J finally revealed – in July 2005 and on the eve of the close of discovery – that the dispute did in part relate to incentives that OBI offered customers. But J&J still refused to produce all of the relevant documents, necessitating a motion to compel. An agreement was eventually reached, but only after Plaintiffs filed their motion.

of the last year.  Plaintiffs have worked diligently to obtain the transaction data that Dr. Hartman needed to process his analysis, and Dr. Hartman has done as much as he could with the incomplete data that has been produced.  Indeed, Plaintiffs have paid Dr. Hartman and his associates over $1,000,000 for this extensive work, which continues.  Berman Decl. at ¶ 11.

In contrast, what have Defendants done?  Not only have Defendants strung out this process, in some instances they have outright refused to produce the required information and then filed an ill-advised motion for sanctions some six weeks after October 1.  Defendants could have avoided all of this work and the delays about which they now complain by simply producing the information.  But Defendants chose another path – that of evasion and obstruction – and they did so deliberately in order to impede the completion of Dr. Hartman's report and run up the costs to Plaintiffs of this litigation.  Defendants should not now be heard to complain of the result of their actions.  Dr. Hartman needs more time to complete the report, a necessity that is a direct result of Defendants' abuse of this process.  ***If anyone should be sanctioned over these events, it is Defendants***.

C.  **Defendants Will Not Be Prejudiced By Adjustments To The Expert Discovery Schedule**

   1.  **There is no conceivable burden**

Defendants exclaim that a later disclosure of Plaintiffs' expert liability reports "has been both prejudicial and wasteful of the Defendants' resources."  Def. Mtn. at 2.  Close scrutiny of Defendants' motion, however, reveals that Defendants fail to specify how they have been prejudiced; they merely make the assertion with presenting any specific supporting facts.

Far from being "prejudicial and wasteful," an adjustment in the expert discovery schedule will not cause Defendants any burden, let alone undue burden.  The Court has not established a trial date, and will not even consider motions for summary judgment until 30 days after the Court

of Appeals issues a decision on the Court's class certification order.  *See* Case Management Order No. 13.  If the First Circuit accepts review, which Plaintiffs' have opposed, the First Circuit's decision is not likely to be issued until late 2006.  Thus, extending expert witness discovery will not delay Defendants' ability to bring motions for summary judgment or adversely impact any other pre-trial matters.  Any suggestion by Defendants to the contrary is specious.  ***Indeed, it is surprising that Defendants are even pushing for the reports at this time given that the Court has not made a final Track One class certification decision delineating the drugs for which claims will be certified***.  Moreover, if Defendants were so concerned about potential prejudice, why did they wait six weeks after October 1 to file their motion?  If they were so concerned about potential prejudice, why have they not produced in a timely fashion the data needed for Dr. Hartman to complete his report?  Defendants' own conduct in refusing to provide needed discovery and in filing their sanctions motion only after the Court set for hearing Plaintiffs' Motion to Extend demonstrates quite clearly that Defendants are not "greatly concerned with any prejudice [they] might suffer."  *Potlach Corp. v. United States*, 679 F.2d 153, 156 (9th Cir. 1982) (reversing for abuse of discretion district court order excluding party's expert report when, *inter alia*, opposing party had delayed provision of discovery).

### 2. Defendants' cases do not support them

Ignoring their own dilatory conduct, Defendants cite cases in which courts have sanctioned a party for repeatedly missing deadlines and otherwise engaging in discovery abuse. But these cases are wholly inapposite, as even a cursory examination reveals:

- In *Odie v. General Motors Corp.*, 131 F.R.D. 365, 366 (D. Mass. 1990), the Court imposed sanctions because the plaintiffs' actions forced the defendant to file a motion for a protective order.  Here, Defendants have not been "forced" to file any motions and merely chose to bring this motion for sanctions instead of simply providing the discovery that is long overdue.

- In a "show of indifference," the offending party in *Rosario-Diaz v. Gonzalez*, 140 F.3d 312 (1st Cir. 1998), ignored by eight months the deadline to file an answer and then filed pre-trial summary judgment motions two months after the motions deadline. *Id.* at 314-15. No such parallel can be drawn here.

- In *Tower Ventures, Inc. v. Westfield*, 296 F.3d 43 (1st Cir. 2002), the district court had granted a motion to extend the discovery deadline, even though the motion was filed a month after the initial deadline had come and gone. The plaintiff then ignored the new deadline, along with the summary judgment motion due date, causing the Court to issue, 81 days after the revised discovery deadline, an order to show cause why the action should not be dismissed. *Id.* at 44. Dismissal ensued and was upheld by the First Circuit given that the plaintiff had "cavalierly flout[ed]" the court's scheduling orders. *Id.* at 46. In contrast, Plaintiffs have ignored no deadlines here, let alone done so repeatedly.

- The plaintiff in *Young v. Gordon*, 330 F.3d 76 (1st Cir. 2003), had repeatedly ignored multiple discovery deadlines and orders to compel, including failing to appear for a court-mandated deposition date. *Id.* at 79. Again, Plaintiffs here have not acted in even a remotely similar manner.

- In *Sheppard v. Glock, Inc.*, 176 F.R.D. 471 (E.D. Pa. 1997), *aff'd*, 142 F.3d 429 (3d Cir. 1998), the plaintiff moved for an extension of the expert report deadline ***after*** that deadline had passed, *id.* at 472, did not produce those materials until just three weeks before the scheduled trial, *id.* at 474, had ignored various other discovery deadlines, *id.* at 475, and had not been "forthright" in representations to the court. *Id.* at 476. *Glock* is a far cry from the record in this matter, where trial is not imminent, and where Plaintiffs filed their Motion to Extend well before the due date and have not ignored discovery deadlines or otherwise made misrepresentations to the Court.

- In *Softel v. Dragon Med. & Sci. Comms., Inc.*, 118 F.3d 955 (2d Cir. 1997), the offending party changed their expert near the close of discovery and failed to advise the court earlier that delays associated with producing the expert report were due to a months-long fee dispute with the prior expert. *Id.* at 961. No such events have occurred here.

- And in *Exxon Corp. v. Halcon Shipping Co., Ltd.*, 156 F.R.D. 589 (D.N.J. 1994), Exxon had repeatedly violated scheduling orders and then sought to introduce a new expert and new theory on the eve of trial. Again, Plaintiffs here have not ignored any due dates, and this case is no where near trial.

Thus, Defendants' cases are very different from the situation at hand where Plaintiffs, far from ignoring a Court deadline, reached out to Defendants in an effort to make an agreement on changing the expert schedule, were rebuffed despite the fact that Defendants' production delays

caused the need for an extension in that schedule, and then dutifully filed the Motion to Extend a full 30-days before the report deadline.  The fact that the Court was unable to hold a hearing prior to October 1 but will consider the motion on November 8 should not be used as means to penalize Plaintiffs.[5]

### D.     The Court Should Reject Defendants' Alternative Request For Monetary Sanctions

In the event that the Court disregards, as it should, Defendants' unsupported request to exclude expert testimony proffered by Plaintiffs, Defendants alternatively request that the Court levy an unspecified monetary sanction "calculated to compensate Defendants for the costs incurred as a result of Plaintiffs' conduct[.]"  Defs. Mtn. at 4.  What costs?  Defendants do not specify, by sworn declaration or otherwise, the costs that they have allegedly incurred.  Instead, they merely advance the conclusory assertion that "Defendants reserved the time of their experts, and marshaled their own resources, to spend much of October considering Plaintiffs' reports and preparing responsive reports."  Defs. Mtn. at 1.  All this really states is that Defendants and their experts were simply *waiting* for Plaintiffs' report before reacting thereto, which logically means that they were *not* incurring any costs.  In fact, in the discussion over whether Defendants would agree to a modification of the schedule, Defendants *never* once objected on the basis that modifying the schedule would cause them to incur additional costs.  Berman Decl. at ¶ 12.  The only costs that Defendants have incurred are associated with this ill-conceived, hastily prepared and unsupported motion, which should be rejected.

---

[5] In stating this, Plaintiffs do not in any way blame the Court for this delay.  Plaintiffs well understand that this Court has a very busy docket.  Indeed, out of respect for this Court's docket, Plaintiffs have gone the "extra mile" to resolve disputes before filing motions.

**E.     Due To Defendants' Continued Delays, Plaintiffs Must Now Alter Their Request For An Extension**

Although Defendants accuse Plaintiffs of failing to tell them when they intend to file the expert reports, Defs. Mtn. at 1, Plaintiffs' motion – filed almost six weeks before the instant sanctions motion – asked the Court to extend the deadline to December 15, 2005.  But since Plaintiffs filed their motion on August 31, Defendants have continued to refuse to produce the IMS Health Data, and Dr. Hartman has determined that much of the transaction data produced by Defendants *is still incomplete*.  As a result, Plaintiffs must now modify their request for an extension of the due date for the filing of expert liability reports from December 15, 2005, to January 15, 2006.  Under this revision, Defendants' expert liability reports would then be due on February 15, 2006.  Expert depositions would be completed on or before April 15, which will likely coincide with the Court's issuance of a final Track One class certification order.[6]  Plaintiffs also respectfully request that the Court admonish Defendants to cease bad faith maneuvers, including the withholding of discovery and the filing of frivolous sanctions motions, and to immediately fill the transaction data gaps and produce the requested IMS Health data so that Plaintiffs' experts can complete their liability reports.

**F.     Conclusion**

Defendants' motion should be resoundingly denied in all respects.  Excluding evidence is an "extreme" sanction.  *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977), *overruled on other grounds*, *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985), *aff'd*, 482 U.S. 656 (1987).  The record presented on this motion certainly does not justify the imposition of such an extreme measure, particularly given Defendants' misconduct and

---

[6] The Court's Track One Class Certification order provided a schedule for further evaluation of Track One class issues, including the filing of an amended complaint adding additional proposed class representatives, discovery of those representatives, consideration of additional arguments regarding typicality and then issuance of a final Track One class decision.  Under this particular schedule, the Court will likely not be able to issue that decision until March or April, 2006.

failure to demonstrate any undue burden.  *See, Potlach Corp.*, 679 F.2d at 156.  Plaintiffs are even more anxious than Defendants to complete Track One expert discovery and Track One pre-trial preparations, given (i) the resources that Plaintiffs have invested in Dr. Hartman's work, (ii) continued discovery and evaluation of new class representatives, (iii) the ongoing First Circuit appeal, and (iv) the need to focus on amending the complaint to augment the Track Two class representatives while conducting discovery of the Track Two Defendants.  But Track One expert discovery cannot be completed until Defendants stop playing games and produce the information necessary for Plaintiffs' experts to prepare their reports.

DATED:  October 25, 2005.

By    /s/ **Steve W. Berman**
   Thomas M. Sobol (BBO#471770)
   Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

       Eugene A. Spector
       Jeffrey Kodroff
       Spector, Roseman & Kodroff, P.C.
       1818 Market Street, Suite 2500
       Philadelphia, PA  19103
       Telephone: (215) 496-0300
       Facsimile: (215) 496-6611

       Marc H. Edelson
       Allan Hoffman
       Hoffman & Edelson
       45 West Court Street
       Doylestown, PA  18901
       Telephone: (215) 230-8043
       Facsimile: (215) 230-8735

       Kenneth A. Wexler
       Jennifer F. Connolly
       The Wexler Firm LLP
       One North LaSalle Street, Suite 2000
       Chicago, IL  60602
       Telephone: (312) 346-2222
       Facsimile: (312) 346-0022

       Samuel D. Heins
       Alan I. Gilbert
       Susan E. MacMenamin
       Heins, Mills & Olson, P.C.
       3550 IDS Center
       80 South Eighth Street
       Minneapolis, MN  55402
       Telephone: (612) 338-4605
       Facsimile: (612) 338-4692
       **CO-LEAD COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **PLAINTIFFS' OPPOSITION TO TRACK ONE DEFENDANTS' MOTION TO PRECLUDE PLAINTIFFS' EXPERT EVIDENCE ON LIABILITY OR FOR OTHER SANCTIONS** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on October 25, 2005, a copy to LexisNexis File & Serve for Posting and notification to all parties

By  **/s/ Steve W. Berman**
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292