UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) ) ) ) ) |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | |

MDL No. 1456

CIVIL ACTION:  01-CV-12257-PBS

Judge Patti B. Saris

**DECLARATION OF STEVE W. BERMAN IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO TRACK ONE DEFENDANTS' MOTION TO
PRECLUDE PLAINTIFFS' EXPERT EVIDENCE
<u>ON LIABILITY OR FOR OTHER SANCTIONS</u>**

I, Steve W. Berman duly declares as follows:

1.  I am one of the attorneys for Plaintiffs in this matter.

2.  In this litigation, Plaintiffs have retained Dr. Ray Hartman to ascertain whether and to what extent the class was injured by Defendants' fraudulent pricing.  Dr. Hartman's analysis, which employs widely-used economic tools, including data collection, econometrics, algebra and mathematics, comprises a multi-step process summarized as follows:

- Using industry price compendia and other available data sources, Dr. Hartman is ascertaining the spreads between AWP and the Average Sales Price ("ASP") for drugs unaffected by the scheme.  These spreads may be used as "yardsticks" for the difference between AWP and ASP on drugs where no inflation was present.

- Using data derived from a detailed analysis of Defendants' invoice and accounting data, Dr. Hartman is ascertaining the spreads between AWP and ASP for the drugs subject to this litigation.

- Dr. Hartman is comparing the spreads of drugs in this litigation against the "yardstick" spreads.  The comparison will yield relevant information for purposes of determining whether and to what extent the affected drugs' prices were inflated by the fraudulent scheme.

- As part of his economic analysis, Dr. Hartman may use the "yardstick" spreads as a comparison to determine the spread that would have been used for the affected drugs but-for the wrongful scheme.

- Using mathematical and algebraic formulae, Dr. Hartman will make this analysis for each affected drug and, applying actual sales figures and prices, determine the overall class-wide injury and damage for each drug.

3.      Dr. Hartman prepared an analysis that was reviewed by the Court in connection with Plaintiffs' motion for class certification. Given that discovery was incomplete at that time and continuing, Dr. Hartman's class certification analysis was understandably preliminary, containing explanations of the extensive work that remained to be accomplished. In particular, Plaintiffs have been attempting to obtain for Dr. Hartman remaining transaction data that Defendants have not produced, in addition to data compiled by IMS Health and in Defendants' possession or otherwise available to Defendants through subscriptions to the IMS Health service.

4.      A centerpiece of Dr. Hartman's work is taking detailed data from Defendants and calculating ASPs for the subject drugs. This task requires processing hundreds of thousands of data items for each drug in order to back out rebates, chargebacks, discounts, bundled offers and other items used by Defendants to reduce ASP below AWP. As Plaintiffs explained in their Motion to Extend expert discovery, Plaintiffs attempted to expedite the process of determining ASPs by requesting that Defendants provide Plaintiffs with the ASPs of the subject drugs. This was the most logical, time-saving and resource-conserving manner in which to obtain ASP information because Defendants calculated average prices for internal reporting purposes and, beginning in 2005, for submission to Medicare. Defendants refused to provide this information, and the Court denied Plaintiffs' subsequent motion to compel. Consequently, Plaintiffs have sought from Defendants the constituent pieces of transaction data necessary to independently calculate ASPs. The detailed transaction data required and sought is extensive and includes:

(a) All sales transaction data (as well as any discounts or any other price adjustments or offsets contained in the transaction data), including (i) price, (ii) number of units sold, (iii) transaction date, (iv) information sufficient to identify the type of transaction (*e.g.*, a sale, a return, etc.), (v) information sufficient to identify the product (*e.g.*, NDC, product description, form, strength, etc.), (vi) information sufficient to identify the customer, (vii) class of trade designations, and (viii) information sufficient to identify whether the units sold were intended for repackaging, along with the name of the repackager to which the units were sold.

(b) All chargeback transactions, including (i) amount, (ii) date of credit, (iii) information sufficient to identify the customer, class of trade designations, and wholesaler to which the chargeback was paid, and (iv) the underlying contract price paid by the ultimate customer.

(c) All rebate transactions, including (i) amount, (ii) date of rebate, (iii) information sufficient to identify the type of rebate, (iv) information sufficient to identify the customer, and (v) class of trade designations.

(d) All administrative fee transactions, including (i) amount, (ii) date of payment, (iii) information sufficient to identify the type of administrative fee, (iv) information sufficient to identify the customer, and (v) class of trade designation.

5. Much of this data has been produced, although Plaintiffs had to repeatedly prod Defendants into doing so. This has been a cumbersome process as the data was provided by most of the Defendants in a non-useable form or was incomplete. Rule 30(b)(6) depositions and/or informal exchanges of information occurred to try and fill the data gaps between what was produced and what was needed to calculate ASPs. Defendants were told exactly what Plaintiffs were attempting to accomplish. Notwithstanding this considerable effort, there are still gaps in the data that are preventing Dr. Hartman from completing his report.

6. The following table summarizes those gaps by Defendant:

| Track One Defendant | Missing Data |
|---|---|
| AstraZeneca | Direct sales data, chargeback and rebate data after 2002 for all Zoladex NDCs. |
| BMS | Pre-1993 and post 2002 direct sales and chargeback data.<br><br>OTN direct sales data are lacking customer category and customer name fields. |

|  | Rebate data for physician-administered drugs has not been provided in a readily useable manner, and BMS has refused to provide rebate accruals that the company utilized for SEC reporting purposes. |
|---|---|
| GSK | Pre-1997 and post-2002 direct sales, chargeback and rebate data for Alkeran, Imitrex, Lanoxin, Myleran, Navelbine, Retrovir and Zovirax. Post-2003 data for Ventolin and Zofran. |
| Johnson & Johnson | Post-2003 data for all drugs. More detailed descriptions and explanations of the pre-1994Q4 Procrit files and fields within the files is needed. Customer class information for Remicade direct sales. |

7. Elements of this table deserve further explication. As noted, there are time gaps in the data that need to be filled because, to varying degrees, Defendants had objected to the scope of Plaintiffs' originally designated proposed Class Period of January 1, 1991, to the present. Consequently, no Defendant had produced transaction data for this entire time period. The Court's August 16 Track One Class Certification order confirmed that the Class Period would indeed be January 1, 1991, to the present, and Plaintiffs have asked Defendants to supplement their data productions.

8. In regard to BMS rebate data, BMS historically did not track actual rebate payment data for physician-administered drugs in a centralized database. Instead, rebate payments were recorded onto a variety of computerized spreadsheets, and the payments were commonly made for multiple drugs without any convenient methodology to determine what portion of the particular rebate payment was associated with a single drug. Although BMS produced a plethora of spreadsheets in electronic format, piecing together the rebates paid by

drug for each quarter is a monumental task. The BMS finance department did, however, periodically project rebate payments. These projections were called accruals. Given the complexity of accounting for rebates actually paid, Plaintiffs have repeatedly asked BMS to produce the finance accruals. BMS has refused to do so.

9. With regard to GSK data gaps, it should be noted that it was not initially apparent which drugs Dr. Hartman would use in his "yardstick" analysis. Consequently, Plaintiffs did not initially press for pre-1997 and post-2002 transaction data for Alkeran, Imitrex, Lanoxin, Myleran, Navelbine, Retrovir and Zovirax but are now.

10. As explained in my declaration in support of Plaintiffs' Motion to Extend the expert discovery schedule, Plaintiffs have long sought market share and other data compiled by IMS Health in Defendants' possession or otherwise available to Defendants through their subscriptions to the IMS service. Plaintiffs' original request for this information dates back to March 31, 2004. Defendants refused to produce the information, and Plaintiffs refined the IMS requests in two separate sets of requests served this past July and August, respectively. Included in the IMS requests are requests for drug comparator data for use in designating the "yardsticks" that Dr. Hartman will employ in his analysis, as well as so-called "Method of Payment Data" that, among other things, separates sales attributable to Medicare beneficiaries, Medicaid recipients, third-party payors and cash payors. Segregating sales in this manner is necessary in order for Dr. Hartman to build his model.

11. Negotiating the transaction and IMS data requests with Defendants, waiting to receive the data that Defendants have been willing to produce, taking Rule 30(b)(6) depositions on data issues, and then processing what is still *incomplete* data are tasks that have taken the better part of the last year. Plaintiffs have worked diligently to obtain the transaction data that

Dr. Hartman needed to process his analysis, and Dr. Hartman has done as much as he could with the incomplete data that has been produced. Indeed, Plaintiffs have paid Dr. Hartman and his associates over $1,000,000 for this extensive work, which continues.

12. Anticipating that Plaintiffs' expert would not be able to complete his report until Defendants produced relevant data, Plaintiffs reached out to defense counsel well in advance of October and requested Defendants' agreement to modify the expert discovery schedule to accommodate the delay in Defendants' production. Defendants refused to agree, failing to articulate any purported basis for why a modification in the expert discovery schedule would pose any burdens on the Court and litigants. Furthermore, in the discussion over whether Defendants would agree to a modification of the schedule, Defendants *never* once objected on the basis that modifying the schedule would cause them to incur additional costs.

Further the declarant sayeth not. I certify under penalty of perjury that the foregoing is true and correct. Executed this the 25th day of October, 2005.

                                              **/s/ Steve W. Berman**
                                              STEVE W. BERMAN

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **DECLARATION OF STEVE W. BERMAN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO TRACK ONE DEFENDANTS' MOTION TO PRECLUDE PLAINTIFFS' EXPERT EVIDENCE ON LIABILITY OR FOR OTHER SANCTIONS** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on October 25, 2005, a copy to LexisNexis File & Serve for posting and notification to all parties

By   **/s/ Steve W. Berman**
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292