UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY ) <br> AVERAGE WHOLESALE PRICE             ) <br> LITIGATION                                                 ) <br> _____) <br> THIS DOCUMENT RELATES TO:          ) <br>                                                                   ) <br> ALL ACTIONS                                             ) <br>                                                                   ) <br> _____) | MDL No. 1456 <br> Master File No. 01-CV-12257-PBS <br><br> **Declaration of Michael J. Prame in Support of UnitedHealthcare, Inc. and United HealthCare Insurance Company's Consolidated Memorandum of Law in Opposition to Defendants' Motion to Compel** |

Pursuant to section 1746 of Title 28 of the United States Code, I, MICHAEL J. PRAME, declare as follows:

1. I am an attorney and principal with the firm Groom Law Group, Chartered, counsel for UnitedHealthcare, Inc. and United HealthCare Insurance Company (collectively "United") in the above-captioned matter.

2. I submit this Declaration in support of United's Consolidated Memorandum of Law in Opposition to Defendants' Motion to Compel.

3. Defendants first served subpoenas on United in November 2003. In accordance with Rule 45, Fed. R. Civ. P., United timely served objections to the subpoenas on December 2 and 3, 2003.

4. After the Court established an expedited discovery schedule for the "Track 1" Defendants in this matter, set forth in Case Management Order No. 10 ("CMO 10"), the Track 1 Defendants issued new subpoenas on United on April 5, 2004. True and correct copies of the subpoenas are attached as Exhibits A and B.

5.   On April 22, 2004, United timely submitted objections to Defendants' second set of subpoenas and did so on the basis that, among other things, Defendants' demands were overbroad, unduly burdensome, and oppressive. True and correct copies of United's objections are attached as Exhibits C and D.

6.   Immediately after serving the objections, United negotiated with Defendants' counsel in a good faith effort to resolve the objections to the subpoena. From May through June 2004, United and Defendants conferred extensively regarding Defendants' subpoenas. Given the scope of the subpoenas, a number of business units within each United affiliate had to be consulted in connection with the parties' negotiations.

7.   In August 2004, United and Defendants agreed that, in response to Defendants' subpoena requests, United would produce the following documents for the period January 1, 1997 through December 31, 2003:

   1. **Provider Contracts** - a geographically diverse sample of over 75 contracts between United and physicians, physician groups and hospitals.

   2. **Certificates of Coverage** - UnitedHealthcare, Inc.'s template Certificates of Coverage and prescription drug riders for each of the years. In addition, in connection with the AARP programs, United HealthCare Insurance Company agreed to produce a random sample of five certificates of coverage from each of the six general categories of health care plans that were in force and provided drug benefits during some or all of the period 1997 through 2003.

   3. **Group Contracts** - a geographically diverse sample of ten group insurance contracts entered into each year (i.e., a total of 70).

   4. **Lupron Production** - the affidavits and documents that UnitedHealthcare of New Jersey, Inc. produced in *Walker v. TAP*

>   *Pharmaceutical Products Inc., et al.*, Superior Court of New Jersey, Law Division (Cape May County), Docket No. CPM-L-682-01, in response to a subpoena served by TAP Pharmaceutical Products Inc.
>
>   5.   **PBM Agreements** -- UnitedHealthcare, Inc. and United HealthCare Insurance Company's pharmacy benefit management agreements with Diversified Pharmaceutical Services, Inc., Medco Health Solutions, Inc. (f/k/a Merck-Medco Managed Care, L.L.C.) and Express Scripts, Inc.

These terms of United's production agreement with Defendants are set forth in a July 30, 2004 letter to Defendants' counsel and in August 2004 e-mails to counsel, true and correct copies of which are attached as Exhibit E and F.

8.   The production of the provider contracts was particularly time-consuming and burdensome because Defendants (1) refused to allow United to produce the unsigned computer generated versions of the contracts and, instead, insisted that copies of the actual signed contracts be produced; (2) insisted that the production include examples of contracts with three different types of providers (physicians, physician groups and hospitals); and (3) insisted that the production of provider contracts include examples describing how Medicare/Medicaid providers were reimbursed for physician-administered drugs. The originals of the signed provider contracts are not centrally stored, but rather are maintained at United's local health plans around the country. Thus, to complete the production, United employees nationwide were required to set aside their normal business functions to identify provider contracts dating back to 1997 (many of which were archived offsite) that satisfied the criteria dictated by Defendants.

9.   As noted above, United also agreed to produce copies of the materials that United had produced in the *Walker* case that involved the drug Lupron. As part of the

3

production, United included copies of documents, including certain provider contracts, that had been redacted in accordance with the terms of a protective order entered in that lawsuit. These redacted documents from the *Walker* case are the only documents that United has produced in redacted form in this case.

10. During August through October 2004, United personnel spent more than 250 hours identifying, collecting, and producing the documents described in paragraph 7. The production consisted of over 25,000 pages of materials.

11. In the fall of 2004, United and Defendants also discussed Defendants' requests for (1) medical and pharmacy claims data from January 1, 1997 through December 31, 2003 for the drugs at issue in this matter; and (2) deposition testimony on a variety of issues. As to claims data, United informed Defendants by letter dated October 13, 2004 that it would take United personnel approximately 900 hours over a three to six month period to produce the medical and pharmacy claims data Defendants' had requested. A true and correct copy of the October 13, 2004 letter is attached as Exhibit G. Defendants never responded to United's letter regarding the possible production of claims data.

12. With respect to depositions, United informed Defendants by letter dated August 27, 2004 that, due to the wide range of topics on which Defendants sought to depose United personnel for the period 1997 through 2003, United believed that as many as ten different employees may be needed to testify. A true and correct copy of the August 27, 2004 letter is attached as Exhibit H.

13. On October 19, 2004, Defendants wrote to United regarding the possibility of United providing a declaration in lieu of depositions. A true and correct copy of Defendants' October 19, 2004 letter is attached as Exhibit I. After sending a November 1, 2004 e-mail regarding the possible declaration, Defendants did not pursue depositions or a declaration from United.

14. United completed its production of documents in November 2004. United did not hear back from Defendants for seven months. On May 27, 2005, Defendants' counsel, Ms. Jessica Golden Cortes, wrote to United's counsel to request the production of the following for the period 1997 through 2002:

> 1. **Fee Schedules** - all fee schedules disclosing the amounts to be paid to physicians for services rendered (including the administration of drugs).
>
> 2. **Medical Claims Data** - data for medical claims submitted by physicians and hospitals in one east coast and one west coast market for the drugs at issue in the lawsuit.
>
> 3. **Rebate Reports** – reports showing the rebates paid to United by pharmacy benefit managers or pharmaceutical manufacturers.
>
> 4. **MAC Lists** - lists of the maximum allowable cost pertaining to retail pharmacy reimbursement for generic drugs.
>
> 5. **Other Documents** –
>
>    a. Documents addressing:
>
>       1. whether United understood that healthcare providers earned a margin on the drugs that the providers administered; or
>
>       2. the reimbursement or cost for drugs administered in a hospital compared to drugs administered in a physician's office.

  b. Claims processing manuals corresponding to the medical claims data produced.

  c. Documents produced by United in other litigation, government investigation or inquiry related to AWP.

6. **Depositions** – depositions regarding the documents and data requested by Defendants on May 27, 2005.

A true and correct copy of the May 27, 2005 letter is attached as Exhibit J. Defendants' letter also included a request for provider contracts, but Defendants subsequently withdrew that request on July 7, 2005.

15. Even though Defendants had failed to pursue discovery from United between November 2004 and May 27, 2005, United conferred extensively with Defendants in an attempt to determine whether an agreement could be reached concerning any further discovery from United.

16. During the course of these discussions, counsel for Defendants, Ms. Cortes, advised United on several occasions that the discovery period for fact discovery from United was set to close on August 31, 2005.

17. On July 22, 2005, United informed Defendants that, while United remained willing to continue discussions, it did not appear that an agreement would be reached regarding the scope of the additional documents and testimonial discovery sought by Defendants. As such, United advised Defendants that it would not be producing any additional materials and that United stood by its previously asserted objections to the subpoenas. A true and correct copy of United's July 22, 2005 letter is attached to this Declaration as Exhibit K.

18.     Thereafter, United was not contacted by Defendants prior to the cut-off of discovery on August 31, 2005.  It was not until September 13, 2005 that United learned from Defendants' counsel, Mr. Adeel Mangi, that Defendants were preparing a motion to compel against United.  Because Mr. Mangi was not involved in United's discussions with Ms. Cortes in June and July, United was required, in satisfying the "meet and confer" requirement for motions, to start over at square one with Mr. Mangi regarding Defendants' May 27, 2005 requests.  After participating in the meet and confer, United concluded that, despite their good faith efforts, United and Defendants would not be able to reach an agreement regarding additional discovery from United because Defendants' May 27, 2005 requests were unduly burdensome, unreasonably cumulative, overbroad and untimely.

19.     United estimates that, between 1997 and 2003, it had approximately 70,000 separate fee schedules in place.  The fee schedules reflect not only the amounts to be paid to healthcare providers for drug administration, but also the terms of payment for any service to be provided by the healthcare provider.  Accordingly, the fee schedules comprise billions of rows of computer code in United's computer systems.  United personnel are not able to assure that United's computer systems have sufficient bandwidth to export that amount of computer code.  Even if sufficient computer bandwidth exists, United estimates that it would take 20 full time employees 4 months to complete a production of provider fee schedules.

20.     As part of Defendants' additional requests, Defendants have asked for medical claims data from sample markets for the period 1997 through 2003.  On July 12,

2005, United provided Defendants with the following time and cost estimates to produce medical claims data for Arizona and Massachusetts members:

1. **Medical claims data for the period May 1, 2002 through December 31, 2003** – This medical claims data is stored on United's live computer system. United estimates that it would take approximately 115 staff hours over three to eight weeks, plus an estimated $2,500 in computer resource/data center utilization fees (CPU, short-term disk storage, tape mounts) to identify, extract and produce the claims data for the two markets for the period May 1, 2002 through December 31, 2003.

2. **Medical claims data for the period August 1998 through April 30, 2002.** Medical claims data for claims adjudicated between August 1, 1998 and April 30, 2002 has been removed from the live computer system and is now archived on tapes. United estimates that it would take approximately 170 staff hours over three to eight weeks, plus an estimated $5,000 in computer resource/data center utilization fees to identify, extract and produce the claims data for the two markets for the period August 1, 1998 through April 30, 2002.

3. **Medical claims data for the period January 1, 1997 through July 30, 1998.** Medical claims data for claims adjudicated between January 1, 1997 through July 31, 1998 is separately archived and past experiences in trying to identify, extract and produce claims data from these archives is limited. United estimates that it would take approximately 160 staff hours over three to eight weeks, plus an estimated $2,500 in computer resource/data center utilization fees to identify, extract and produce the claims data for the period January 1, 1997 through July 30, 1998.

A true and correct copy of United's July 12, 2005 letter is attached as Exhibit L to this Declaration.

21.     As set forth in Mr. Mangi's September 30, 2005 correspondence (true and correct copy attached as Exhibit M), Defendants presently are seeking testimony on 11 broad topics (e.g., United's understanding, use and knowledge of AWP and WAC; the substance of United's negotiation with health care providers; United's knowledge of government studies, reports and communications regarding actual acquisition costs for

drugs; all documents produce by United in response to the subpoena). The time period to covered during the depositions (1997-2003) is also extremely brood. To provide accurate testimony on that number of topics over that period of time, United estimates that it could have to identify eight or more employees or former employees to testify.

22. United has repeatedly informed Defendants that United does not have a single manual that describes how medical claims are processed. Defendants' demand, at minimum, would require United to look back over its records from 1997 through 2003 for written policies that describe how claims for physician administered drugs are paid.

23. United understands that the lawsuit no longer involves drugs dispensed at a retail pharmacy, but rather is limited to physician administered drugs. *See In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 66 (D. Mass. Aug. 16, 2005). Thus, Defendants' further requests for documents concerning United' retail pharmacy programs (*i.e.*, rebate reports of amounts paid by United by pharmacy benefit managers and MAC lists pertaining to retail pharmacy reimbursement for generic drugs) no longer relate to the factual issues before the Court. Moreover, United also understands that Defendants already have obtained a sample of the MAC lists maintained by pharmacy benefit managers nationwide (including those with whom United has contracted).

24. Attached as Exhibit N to this Declaration is a true and correct copy of the unpublished opinion styled *Anderson v. Bungee Int'l Mfg. Corp.*, No. 96 Civ. 0186, 1999 WL 219904 (S.D.N.Y. Apr. 14, 1999).

25. Attached as Exhibit O to this Declaration is a true and correct copy of the unpublished opinion styled *In re Health Mgmt., Inc.*, No. CV 96-0889 (ADS), 1999 WL 33594132 (E.D.N.Y. Sept. 25, 1999).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 26, 2005          /s/ Michael J. Prame