# EXHIBIT O

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33594132 (E.D.N.Y.)
(Cite as: 1999 WL 33594132 (E.D.N.Y.))

Page 1

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
In re HEALTH MANAGEMENT, INC.,
No. CV 96-0889(ADS).

Sept. 25, 1999.

After filing complaint on behalf of all persons who purchased corporation's common stock during a specified period, alleging various violations of securities laws by corporation, its outside auditor, and certain of its officers and/or directors, plaintiffs served national professional organization of certified public accountants, a nonparty, with a subpoena duces tecum requesting documents relating to communications between auditor and organization's quality control inquiry committee (QCIC) concerning audit that auditor conducted of corporation's financial statements. Following the deposition of plaintiffs' audit expert, plaintiffs moved to compel production of documents. Auditor and organization objected. The District Court, Arlene R. Lindsay, United States Magistrate Judge, 1999 WL 33594423, denied motion, and plaintiffs appealed. The District Court, Spatt, J., held that: (1) magistrate judge's decision to deny plaintiffs' motion to compel on grounds of untimeliness was not clearly erroneous or an abuse of discretion; (2) the self-evaluative privilege applied to documents relating to the QCIC inquiry; and (3) auditor's brief and limited questioning of plaintiffs' audit expert regarding the QCIC documents during expert's deposition did not waive the self-evaluative privilege.

Affirmed.

West Headnotes

[1] Witnesses ☞16
410k16 Most Cited Cases
Magistrate judge's decision to deny plaintiffs' motion to compel production of documents on grounds of untimeliness, as against nonparty, was not clearly erroneous or an abuse of discretion; nonparty initially responded to plaintiffs' subpoena duces tecum by providing both documents and a privilege log identifying other documents that it withheld based on the self-evaluative privilege, and it was not until 16 months after receiving nonparty's response and five months after the close of factual discovery that plaintiffs moved to compel. Fed.Rules Civ.Proc.Rules 37, 72(a), 28 U.S.C.A.

[2] Federal Civil Procedure ☞1633
170Ak1633 Most Cited Cases
Magistrate judge's decision to deny plaintiffs' motion to compel production of documents on grounds of untimeliness, as against defendant, was not clearly erroneous or an abuse of discretion; in response to plaintiffs' letter claiming that defendant failed to produce certain documents, defendant stated that the documents were privileged and thus not discoverable, fact discovery closed 10 months after defendant's response, and plaintiffs had sufficient opportunity to request the documents before the discovery deadline, but failed to do so. Fed.Rules Civ.Proc.Rules 37, 72(a), 28 U.S.C.A.

[3] Witnesses ☞184(1)
410k184(1) Most Cited Cases
Self-evaluative privilege applied to documents relating to inquiry conducted by quality control inquiry committee (QCIC) of national professional organization of certified public accountants; QCIC process involved self-evaluation by defendant-outside auditor.

[4] Witnesses ☞219(1)
410k219(1) Most Cited Cases
Defendant-auditor's brief and limited questioning of plaintiffs' audit expert regarding documents generated during auditor's communications with quality control inquiry committee (QCIC) of national professional organization of certified public accountants did not waive auditor's self-evaluative privilege with respect to the QCIC documents; questions amounted to generic background inquiries, auditor's counsel did not probe at length into the substance of the QCIC investigation so as to prejudice plaintiffs, and questions were posed at a deposition, not at trial in front of a jury.

Kaplan, Kilsheimer & Fox LLP, New York, NY, By: Federic S. Fox, Joel B. Strauss, Janine R. Azriliant, for Plaintiffs, of counsel.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:01-cv-12257-PBS   Document 1801-16   Filed 10/26/05   Page 3 of 9

Not Reported in F.Supp.2d                                                                                                        Page 2
Not Reported in F.Supp.2d, 1999 WL 33594132 (E.D.N.Y.)
(Cite as: 1999 WL 33594132 (E.D.N.Y.))

Zwerling, Schacter & Zwerling, LLP, New York, NY, By: Jeffrey C. Zwerling, Hillary Sobel, for Plaintiffs, of counsel.

Willkie Farr & Gallagher, New York, NY, By: Michael R. Young, Nicole A. Anderson, for defendant BDO Seidman, LLP, of counsel.

Edwards & Angell, New York, NY, By: Ira G. Greenberg, American Institute of Certified Public Accountants, New York, NY, By: Richard I. Miller, for Defendant BDO Seidman, LLP, of counsel.

Willkie Farr & Gallagher, Public Accountants, New York, NY, By: Kelly M. Hnatt, Allison J. Ross, for Non-Party The American Institute of Certified, of counsel.

Wolf & Wolf, Hauppauge, NY, By: Edward Wolf, for Defendant Clifford E. Hotte, of counsel.

Poli & Lamura, Northport, NY, By: John G. Poli, Barry J. Casper, Lawrence Kushnick, for Defendant Virginia Belloise, of counsel.

Sullivan & Gallion, New York, NY, By: Edward R. Gallion, for Defendant Drew W. Bergman, of counsel.

*MEMORANDUM DECISION AND ORDER*

SPATT, J.

*1 This action arises from a consolidated complaint ("the complaint") by the plaintiffs on behalf of all persons who purchased the common stock of Health Management, Inc. ("Health Management") from August 25, 1994 through February 27, 1996 (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § § 78j(b), 78t(a) ("section 10[b]" and "Section 20[a]", respectively), and Rule 10b-5 promulgated by the Securities and Exchange Commission, 15 C.F.R.240.10b-5 ("Rule 10b-5"), against Health Management, its outside auditor, BDO Seidman, LLP ("BDO'), and certain of its officers and/or directors--specifically, Irwin Hirsh ("Hirsh"), Lloyd N. Myers ("Myers"), Clifford E. Hotte ("Hotte"), Drew W. Bergman ("Bergman"), and Virginia Belloise ("Belloise") (collectively, the "Individual Defendants").

At issue are the plaintiffs' objections to the Order of United States Magistrate Judge Arlene R. Lindsay dated April 15, 1999, denying the plaintiffs' motion to compel production of certain documents relating to communications between the defendant BDO, the nonparty American Institute of Certified Public Accountants ("AICPA"), and the AICPA's Quality Control Inquiry Committee (the "QCIC").

I. BACKGROUND

Familiarity with the Court's prior decisions is presumed, and will not be reiterated here. Briefly stated, the circumstances leading up to Magistrate Judge Lindsay's Order are as follows.

A. The AICPA

The AICPA is a national professional organization of approximately 330,000 members in which membership is voluntary. *See generally* In re Ambassador Group, Inc., 879 F.Supp. 237, 245 (E.D.N.Y.1994) (discussing AICPA). Among the objectives of the AICPA are "to promote uniform certification and licensing standards for accountants; to protect the CPA designation; to encourage public confidence in the integrity, objectivity, competence, and professionalism of members, and to serve as the national representative of CPAs to the government and other organizations." *Codes of Professional Responsibility: Ethics Standards in Business, Health, and Law* 9 (Rena Gorlin ed., 4th ed.1999). The AICPA formulates and monitors codes of professional conduct to provide guidance and rules to members in the performance of their professional responsibilities. Additionally, the AICPA promulgates generally accepted auditing standards for the conduct of auditors in the performance of examinations. *See generally* SEC v. Price Waterhouse, 797 F.Supp. 1217, 1222-23 (S.D.N.Y.1992) (discussing AICPA).

Member accounting firms which audit public companies are required to participate in the self-regulatory practices of the Securities and Exchange Commission Practice Section ("SECPS") of the Division for CPA firms of the AICPA, which ensures that accounting firms auditing SEC registrants have adequate quality control standards. The regulations require accounting firms to adhere to AICPA's Quality Control Standards and to submit their audits to peer review every three years. The role of the QCIC is to determine whether alleged audit failures indicate breakdowns in a firm's quality control system. (*See* BDO Exhibit F: materials describing QCIC's functions).

*2 Member firms are required to report to the QCIC

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:01-cv-12257-PBS   Document 1801-16   Filed 10/26/05   Page 4 of 9

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33594132 (E.D.N.Y.)
**(Cite as: 1999 WL 33594132 (E.D.N.Y.))**

Page 3

"all litigation or regulatory proceedings involving audits of public companies or regulated financial institutions within 30 days of receiving a complaint." (*See* BDO Exhibit F: materials describing QCIC's functions). Thereafter, the QCIC confidentially reviews the firm's policies and procedures to ensure that the firm will take measures to improve its controls and compliance with them. The "primary objective of the Section is to improve quality [of audit practice], a future-oriented objective best achieved through the voluntary cooperation of member firms in undertaking corrective action when deficiencies are found ... Public disclosure of matters related to pending litigation, may in fact inhibit improvement...." SECPS Reference Manual § 1000.36(4). Thus, the aim of the QCIC is not to punish member firms but rather to improve future performances, although sanctions for failure to meet membership requirements may be imposed. *Id.*

B. The AICPA Documents at Issue

On October 10, 1997, the plaintiffs served the nonparty AICPA with a subpoena duces tecum requesting documents concerning its review or investigation of the 1995 audit BDO conducted of Health Management's 1995 financial statements. On October 30, 1997, the AICPA responded to the subpoena by producing some of the documents requested, and by objecting to the production of other documents relating to the communications by and between BDO and AICPA and/or QCIC, on the basis of the "self-evaluative" privilege. In this regard, AICPA asserted that the "self-evaluative" privilege applied because the documents at issue were prepared during an assessment of BDO's audit of Health Management, in an effort to improve the quality of the firm and the accounting industry. The plaintiffs did not contest AICPA's claim of privilege at that time.

C. The BDO Documents at Issue

After receiving the AICPA's responses to its subpoena on October 24, 1997, the plaintiffs wrote to the defendant BDO on October 29, 1997, stating that various QCIC documents over which the AICPA had asserted the self-evaluative privilege were not listed on BDO's privilege log. BDO responded on November 21, 1997, maintaining that the plaintiffs had not sought the documents in the original discovery requests served on BDO. In addition, BDO claimed that the documents were covered by the self-evaluative privilege, and even if the documents had been requested, BDO would not have provided them to the plaintiffs. The plaintiffs took no action to compel production of these documents at that time.

D. The Plaintiffs' Motion to Compel

After a protracted discovery period, which included several requests for extensions, factual discovery in this case was finally closed on September 30, 1998. With the exception of a single deposition, expert testimony was completed on March 17, 1999.

At an expert deposition held on December 16, 1998, counsel for the defendants attempted to question the plaintiffs' audit expert, Victor Moore, about the QCIC investigation. Specifically, BDO's counsel asked the witness the following:

*3 Q: How about the quality control inquiry committee of the AICPA; they conducted an investigation, did they not?
MR. STRAUSS: Objection to form.
A: I'm not aware of that.
Q: Nobody made that information available to you?
A: I'm not aware of it.
Q: And [QCIC] frequently conducts investigations where there are instances of financial misreporting?
A. It can, yes.
Q: And nobody told you the conclusion of QCIC, did they?
A: I'm not aware of it.
Q: Would it cause you to change your opinion if QCIC had concluded that there was no basis to conclude that BDO Seidman did anything wrong?
A: Not necessarily
Q: Would it be something you would want to take into consideration?
A: That would not--that in and of itself, that would not be convincing evidence.
Q: I didn't ask you if it was convincing. I asked you if it was something you would want to take into consideration.
A: Possibly.

\* \* \*

Q: So far we've got your professional opinion being at odds with the conclusions of the U.S. Attorney's Office, your professional opinion being at odds with the conclusions of [QCIC], and your professional conclusions being at odds with the conclusions of the Stetler investigation; correct?
MR. STRAUSS: Objection to the form and mischaracterizes the testimony.
Q: Is that correct?
A: Essentially, yes.
(Moore Dep., 335-37, and 343-44).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:01-cv-12257-PBS   Document 1801-16   Filed 10/26/05   Page 5 of 9

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 1999 WL 33594132 (E.D.N.Y.)
(Cite as: 1999 WL 33594132 (E.D.N.Y.))

As a result of this line of questioning, the plaintiffs wrote to Magistrate Judge Lindsay on February 23, 1999, asking the Court to compel BDO to produce "all documents concerning any investigation of the inquiry by the AICPA concerning BDO's audit of [Health Management's] 1995 financial statements." This request was made more than two months after the deposition which prompted it, almost five months after the conclusion of factual discovery, and almost a year and half after BDO first asserted the privilege. In support of their request, the plaintiffs alleged that AICPA furnished documents to BDO, which, in turn, refused to provide those documents to the plaintiffs. In response, AICPA maintained that any QCIC documents possessed by BDO were a result of BDO's participation in the QCIC process, and thus were privileged.

E. Judge Lindsay's April 15, 1999 Order

By Order dated April 15, 1999, Magistrate Judge Lindsay denied the plaintiffs' motion to compel. The Magistrate Judge found that the plaintiffs unduly delayed filing the motion to compel. In addition, Judge Lindsay determined that BDO did not waive its self-evaluative privilege, assuming the privilege applied, when BDO posed limited and brief questions to Moore regarding the QCIC investigation during the deposition.

F. The Plaintiffs' Objections to Judge Lindsay's Order

The plaintiffs raise three arguments in support of their contention that Judge Lindsay was clearly erroneous in her denial of the motion to compel. First, the plaintiffs argue that Judge Lindsay erred in finding that the motion to compel was untimely, and point out that discovery had not yet closed as to all matters when they made the motion. In this regard, the plaintiffs note that although fact discovery had closed on September 30, 1998, expert discovery was not completed until March 1999. Regardless, the plaintiffs contend that a motion to compel may be filed after the conclusion of discovery. Second, the plaintiffs claim that neither BDO nor AICPA may assert the self-evaluative privilege. Alternatively, the plaintiffs allege that BDO waived any privilege during its questioning of Moore at the deposition. Third, the plaintiffs argue that even if BDO did not waive the privilege, they nevertheless are entitled to the documents because disclosure would not curtail the strong public interest in ensuring continued self-evaluation.

*4 The defendant BDO and the nonparty AICPA assert that the documents concerning AICPA's quality control review of BDO's audit of Health Management's 1995 financial statements are protected from discovery by the self-evaluative privilege. BDO and AICPA argue that the public interest in maintaining quality accounting practices would be chilled by discovery, which warrants that the QCIC documents remain confidential. They also maintain that Judge Lindsay properly denied the motion to compel on grounds of untimeliness.

II. DISCUSSION

A. Discovery Orders: Standard of Review

The parties agree that Fed.R.Civ.P. 72 governs this Court's review of Magistrate Judge Lindsay's Order denying the plaintiff's motion to compel the QCIC documents. Rule 72(a) provides, in relevant part:
(a) Nondispositive Matters: A magistrate judge to whom a pretrial matter not dispositive of a claim or defense of a party is referred to hear and determine shall promptly conduct such proceedings as are required and when appropriate enter into the record a written order setting forth the disposition of the matter.... The district judge to whom the case is assigned shall consider ... objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law.
Fed. R. Civ. P 72(a); *see also* 28 U.S.C. § 636(b)(1)(A) (providing for the same deferential standard of review of nondispositive matters).

Pursuant to Fed.R.Civ.P. 72(a), "[a] magistrate [judge] ... may issue orders regarding nondispositive pretrial matters." The plaintiffs' are appealing a pre-trial discovery ruling, which is nondispositive of the litigation. "Matters that are non-dispositive of the litigation are subject to a 'clearly erroneous' standard of review, as set forth in Rule 72(a). Accordingly, because the discovery dispute concerns a non-dispositive pre-trial matter, this Court exercises the "clearly erroneous" standard of review. *See Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir.1990), *cert. denied*, 498 U.S. 846, 111 S.Ct. 132, 112 L.Ed.2d 100 (1990); *Sheppard v. Beerman,* 1999 WL 441474, *1 (E.D.N.Y. May 28, 1999).

The Supreme Court has held that a ruling is "clearly erroneous" only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

Case 1:01-cv-12257-PBS  Document 1801-16  Filed 10/26/05  Page 6 of 9

Not Reported in F.Supp.2d                                                                                                          Page 5
Not Reported in F.Supp.2d, 1999 WL 33594132 (E.D.N.Y.)
(Cite as: 1999 WL 33594132 (E.D.N.Y.))

*Anderson v. Bessemer City, North Carolina*, 470 U.S. 564, 565, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (quoting *United States v. Gypsum Co.*, 333 U.S. 364, 395 [1948] ). Stated another way, a Magistrate Judge's resolution of a discovery dispute "should be afforded substantial deference and be overturned only if found to be an abuse of discretion." *Palmer v. Readers Digest Assoc.*, No. 84 Civ. 8397, 1995 WL 686737, *1 (S.D.N.Y. Nov.20, 1995) (quoting *Nikkal Industries, Ltd. v. Salton, Inc.*, 689 F.Supp. 187, 189 [S.D.N.Y.1988] ); *see also Lowrance v. Achtyl*, 20 F.3d 529, 534 (2d Cir.1994) (Magistrate Judge's management of discovery is accorded "great deference"); *Nova Biomedical Corp. v. i-Stat Corp.*, 182 F.R.D. 419, 422 (S.D.N.Y.1998) (noting Magistrate Judge's broad discretion); *Magee v. Paul Revere Life Ins. Co.*, 178 F.R.D. 33, 36 (E.D.N.Y.1998) (applying deferential standard of review); *Rivera v. New York City Housing Authority*, No. 94 Civ. 4366, 1998 WL 193230, *1 (S.D.N.Y. April 21, 1998) ("It is well settled that a magistrate judge's resolution of a discovery dispute should be afforded substantial deference and should be overturned only if found to be an abuse of discretion.").

*5 This Court reviews Judge Lindsay's Order denying the plaintiff's motion to compel under these standards.

B. Undue Delay

The first issue to be resolved concerns Judge Lindsay's finding of undue delay by the plaintiffs.

The ability of courts to avoid undue delay is essential to " 'assur[e] that justice for all litigants be neither delayed nor impaired." ' *Outley v. City of New York*, 837 F.2d 587, 589 (2d Cir.1988) (quoting *Winston v. Prudential Lines*, 415 F.2d 619, 621 [2d Cir.1969] ). Thus, "[i]f the moving party has unduly delayed, [a] court may conclude that the motion is untimely." 8a Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § (1994 & Supp.1999); *Gault v. Nabisco Biscuit Co.*, CV-S-97-0613HDMRJJ, Feb. 24, 184 F.R.D. 620, 1999 WL 182205 (D.Nev.) (finding untimely a motion to compel filed by plaintiff after the discovery cut-off date and after the defendant's filing of a motion for summary judgment).

Fed.R.Civ.P. 37 provides no deadline for the filing of a motion to compel. However, Courts have held that where a plaintiff is aware of the existence of documents before the close of discovery and issues discovery requests subsequent to the discovery deadline, the discovery requests should be denied. *See McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 588 (W.D.N.Y.1995); *see also Schweitzer v. Mulvehill*, No. 95 Civ. 10743(MGC) (MHD), 1999 WL 14016, *2-3 (S.D.N.Y. Jan. 13, 1999) (deposition of non-party is considered "fact discovery," which was precluded because discovery deadline had passed); *Goldstein v. New Penn Motor Exp., Inc.*, No. 96 Civ. 9501(MBM) (HGP), 1998 WL 63406, *1 (S.D.N.Y. Feb. 1, 1998) (deposition subpoena to a non-party is a discovery device provided by the Federal Rules of Civil Procedure, that was not timely utilized); *Bailey v. Broder*, No. 94 Civ. 2394(CSH)(SEG), 1997 WL 752423, *2-4 (S.D.N.Y. Dec. 5, 1997) (deposition subpoenas issued to non-parties, long after the discovery deadline, are viewed as inappropriate and are vacated); *Arkwright Mutual Ins. v. National Union Fire*, No. 90 Civ. 7811, 1995 WL 66405 (S.D.N.Y. Feb.15, 1995) (denying the defendant's application for leave to take depositions after the deadline for non-causation discovery); *Four M Corp. v. Guiliano*, 89 Civ. 5275, WL 44840 (S.D.N.Y. Mar. 27, 1991) (granting motion to quash discovery subpoenas on the grounds that they were served after the discovery cut-off and defendants were on notice as to the information prior to the deadline); *Slomiak v. Bear Sterns & Co.*, 83 Civ. 1542, WL 410 (S.D.N.Y. Mar. 12, 1985) (asserting that court refused to compel discovery after the deadline, particularly where plaintiff's counsel knew of the witnesses and the relevancy of their testimony prior to the deadline). In addition, "[d]iscovery of information in a lawsuit, whether from parties or non-parties, is still discovery, and it is subject to this Court's supervision, discovery orders and deadlines." *Anderson v. Bungee Int'l Manufacturing Corp*, No. 96 Civ. 0186, WL 219904 (S.D.N.Y. April 14, 1999).

*6 [1][2] In light of these cases, the Court finds that Judge Lindsay's decision to deny the plaintiffs' motion to compel on grounds of untimeliness was not clearly erroneous or an abuse of discretion.

As discussed above, on October 10, 1997, the plaintiffs served a non-party subpoena duces tecum on the AICPA seeking QCIC documents regarding BDO's audit of HMI's 1995 financial statements. When the AICPA responded to the subpoena on October 30, 1997, it provided both particular documents and a privilege log identifying other documents that it withheld based on the self-evaluative privilege. It was not until February 23, 1999, sixteen months after receiving AICPA's

Case 1:01-cv-12257-PBS   Document 1801-16   Filed 10/26/05   Page 7 of 9

Not Reported in F.Supp.2d                                                                                                              Page 6
Not Reported in F.Supp.2d, 1999 WL 33594132 (E.D.N.Y.)
(Cite as: 1999 WL 33594132 (E.D.N.Y.))

response and five months after the close of factual discovery, that the plaintiffs moved to compel.

The plaintiffs' explanations for their failure to file the motion prior to the discovery deadline do not alter this conclusion. For these reasons, this Court denies the motion to compel as against the AICPA.

The plaintiffs engaged in similar delay with regard to the BDO documents. The plaintiffs wrote to BDO on October 29, 1997, claiming that BDO failed to produce certain documents relating to the QCIC inquiry. On November 21, 1997, BDO responded that the documents in question were privileged and thus not discoverable. Fact discovery closed on September 30, 1998, ten months after BDO's response, and therefore, the plaintiffs had sufficient opportunity to request the documents prior to the discovery deadline. The Court determines that Judge Lindsay's finding of undue delay under these circumstances was not clearly erroneous or an abuse of discretion.

The plaintiffs now claim that the "QCIC inquiry was used as a weapon to attack the credibility of plaintiffs' expert." (Plaintiff's Mem. of Law, at 4). In addition, the plaintiffs maintain that BDO was playing "hide and seek" with the QCIC documents. However, BDO was not "hiding" the documents; rather BDO stated in November of 1997 that the documents were privileged. The plaintiffs did not object to BDO's assertion of privilege until sixteen months later, in February 1999.

Further, the plaintiffs argue that neither BDO nor AICPA would be prejudiced by the production of the documents five months after the close of discovery and on the eve of this case being deemed ready for trial. However, this Court is obligated "to secure the just, speedy and inexpensive determination of every action." Fed.R.Civ.P. 1. Production of the documents this late after the close of discovery would cause an inappropriate and needless delay.

C. The Privilege of Self-Evaluation or Self-Critical Analysis

The Magistrate Judge did not directly address the issue whether the privilege applied in the circumstances of this case, but stated that BDO had not waived the privilege, assuming that it applied.

[3] Regardless, the Court concludes that the self-evaluative privilege does apply to the documents relating to the QCIC inquiry and, as, the Magistrate Judge determined, BDO has not waived that privilege. In the Court's opinion, the privilege applies here, where the QCIC process involves self-evaluation by the defendant BDO.

*7 A privilege of self-critical analysis or a self-evaluative privilege serves the public interest by encouraging self-improvement through uninhibited self-analysis and evaluation. See *Spencer v. Sea-Land Service, Inc.*, --- F.Supp.2d ----, 1999 WL 619637 (S.D.N.Y. Aug.16, 1999); *Lasky v. American Broadcasting Cos., Inc.*, 5 Fed. R. Serv.3d 1366, 1986 WL 9223 (S.D.N.Y.1986) (recognizing self-evaluative privilege in cases of violations of securities laws, medical malpractice, violations of civil rights and libel); *New York Stock Exchange, Inc. v. Sloan*, 22 Fed. R. Serv.2d 500 (S.D.N.Y.1976). The privilege applies only to the analysis or evaluation itself, not to the facts upon which the evaluation is based, see *Burka v. New York City Transit Authority*, 110 F.R.D. 660, 667 (S.D.N.Y.1986) (discussing Government's deliberative privilege), and must be balanced against the party's need for discovery fully and fairly to determine the issues. *Gray v. Board of Higher Education of the City of New York*, 692 F.2d 901, 904-906 (2d Cir.1982).

D. Waiver

[4] The Court agrees with Judge Lindsay's finding that BDO did not waive the self-evaluative privilege under the circumstances of this case.

The party seeking to assert a claim of privilege bears the burden of demonstrating that it has not been waived. See *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 184 F.R.D. 49, 52 (S.D.N.Y.1999) (citing *Von Bulow v. Von Bulow*, 811 F.2d 136, 144 [2d Cir.1987]; *Smith v. Conway Org.*, 154 F.R.D. 73, 77 [S.D.N.Y.1994]; *Nikkal Indus., Ltd. v. Salton, Inc.*, 689 F.Supp. 187, 191 [S.D.N.Y.1988] ). The Second Circuit "[has] held that the scope of any waiver by virtue of disclosure [is] to be defined by the so-called 'fairness doctrine,' which 'aims to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information." ' *In re Kidder, Peabody Sec. Litig.*, 168 F.R.D. 459, 469 (S.D.N.Y.1996) (quoting *In re von Bulow*, 828 F.2d at 101); see also *Alpex Computer Corp. v.. Nintendo Co., Ltd.*, No. 86 CIV. 1749, WL 330381 (S.D.N.Y. July 11, 1994) ("Courts should simply take care to extend the scope of the waiver only so far as necessary to ensure fairness to the litigants.").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

If the privilege-holder uses the document offensively or in some fundamentally unfair manner, a waiver may occur. *See Granite Partners*, 184 F.R.D. at 54. Prejudice arises and thus "a waiver may be invoked where 'a litigant makes selective use of privileged materials, for example, by releasing only those portions of the material that are favorable to his position, while withholding unfavorable portions.' " *Id.* (quoting *Tribune Co. v. Purcigliotti*, No. 93 Civ. 7222, WL 10924, * 5 [S.D.N.Y. Jan. 10, 1997]); *see also United States v. Nobles*, 422 U.S. 225, 239-240, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *Von Bulow*, 828 F.2d at 101-03 (citing cases); *cf. In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235-36 (2d Cir.1993) (voluntary submission of work product to SEC provides a benefit, and waiver of privilege may not be selectively used to strategic advantage). A partial disclosure during litigation for the advantage of one party may yield a complete subject matter waiver as to all communications regarding that subject area whereas extrajudicial or non-prejudicial disclosure, may only constitute a narrow waiver or no waiver at all. *See Tribune*, 1997 WL 10924, *5. "Because unfairness to the party seeking disclosure plays a central role in determination of the scope of the subject matter waiver, that party must demonstrate the specific prejudice it would suffer in the absence of the waiver." *Bank Brussels v. Credit Lyonnais (Suisse)*, Nos. 93 CIV. 9876 and 94 Civ. 1317, 1995 WL 598971 (S.D.N.Y. Oct.11, 1995); *Strategem Development Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535, 545 (S.D.N.Y.1994).

*8 The plaintiffs argue that BDO waived the protection afforded by the privilege when the defendants raised questions concerning the QCIC inquiry at the Moore deposition. The Court finds that the questions posed by the defendant's counsel did not constitute a waiver of the self-evaluative privilege. The questions can be summarized as follows: (1) whether Moore knew of the QCIC investigation of BDO's audit and whether anyone informed him of the results of the inquiry; (2) whether knowledge of the findings of the QCIC investigation would modify Moore's opinion regarding BDO's audit of Health Management.

The Court finds that these brief and limited questions were merely generic background inquiries; counsel did not probe at length into the substance of the QCIC investigation so as to prejudice the plaintiffs. Rather, the defendant's most suggestive question was phrased as the following hypothetical: "Would it cause you to change your opinion if the QCIC had concluded that there was no basis to conclude that BDO Seidman did anything wrong?" (Moore Dep., 336-37). Significantly, such questions were posed at a deposition, and not at trial in front of a jury. For these reasons, the Court agrees with Judge Lindsay's conclusion that the "[d]efendants did not divulge any of the information actually relied upon by the QCIC, nor do they even purport to identify the investigations outcome."

The last question concerning the QCIC posed in the deposition was as follows: "Q: So far we've got ... your professional opinion being at odds with the conclusions of the quality control inquiry committee of the AICPA...." (Dep. of Moore, Dec. 16, 1998, at 343-44). Although not phrased as a hypothetical, the question still does not prejudice the plaintiffs so that "the fairness doctrine" warrants disclosure of the documents. This Court disagrees with the plaintiffs that the defendant used the substance of the documents as a sword while at the same time invoking the privilege as a shield to prevent disclosure. In the Court's view, the only prejudice that appears to ensue is that prejudice which follows whenever a party is deprived of documents that it would prefer to possess. *See Byrnes v. IDS Realty Trust*, 85 F.R.D. 679, 689 (S.D.N.Y.1980) (finding that no prejudice resulted by disclosure of privileged information to the SEC in a separate proceeding).

The two cases the plaintiffs rely on are distinguishable in that they involved a significantly more aggressive use of the privileged materials than occurred here. To illustrate, *In re Kidder Peabody Sec. Litig.*, involved the retention of outside counsel to conduct an internal investigation after discovering trading losses. 168 F.R.D. 459 (S.D.N.Y.1996). The investigation generated a report outlining the findings reached by counsel regarding a scheme in government securities performed by one of Kidder's traders, which Kidder disseminated to the public. Shareholders in a derivative action against the firm sought attorney notes and memoranda relied on to produce the report. The Second Circuit held that Kidder waived its attorney-client privilege by placing the substance of the report at issue. Kidder not only released the report, which contained explicit paraphrases to interviews, but also made repeated and extensive use of the report in the litigation, as well as arbitrations and investigations conducted by the SEC and the United States Attorney. Also, in at least one instance a court had explicitly relied in the substance of the report to rule in favor of Kidder's parent company. *See In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459 (S.D.N.Y.1996).

*9 Similarly, in *In re Subpoena duces Tecum Served on Willkie Farr & Gallagher*, No. M8-85 (JSM), 1997 WL 118369 (S.D.N.Y. March 14, 1997), the defendant in a securities fraud class action moved for an order compelling the non-party law firm, Willkie Farr & Gallagher ("Willkie") to produce documents relating to an investigation Willkie conducted of the defendant, Sensormatic Electronics Corporation ("Sensormatic"). There, the District Court found that Sensormatic waived its attorney-client privilege by providing the results of an investigation conducted by Willkie, Farr to Ernst & Young in order to receive an unqualified audit opinion. The Court concluded that a waiver of the underlying documents had occurred, because Sensormatic filed a motion to dismiss based on Ernst & Young's audit, which relied on Willkie's investigation, showing that the irregularities in the financial statement were not material. This motion to dismiss placed the results of Willkie's investigation at issue, and the District Court held that the plaintiffs suffered prejudice to the extent that Sensormatic relied on the results of the audit to disclaim liability.

The facts of this case are distinguishable. BDO's narrow and brief questioning of Moore regarding the QCIC documents was not used for purposes of any dispositive motion. In addition, BDO asserts that it will not seek to use the QCIC documents during the course of this litigation. If BDO attempts to use the documents to its advantage during the course of trial, the plaintiffs may renew their objection at such time.

Accordingly, this Court determines that Judge Lindsay's Order was not clearly erroneous or contrary to law.

III. CONCLUSION

Having reviewed the parties' submissions and the Order of United States Magistrate Judge Arlene R. Lindsay dated April 15, 1999, and for the reasons set forth above, it is hereby

ORDERED, that the Order of United States Magistrate Judge Arlene R. Lindsay, dated on April 15, 1999, denying the plaintiff's motion to compel, is affirmed in all respects.

SO ORDERED.

Not Reported in F.Supp.2d, 1999 WL 33594132 (E.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 9:96cv00889 _____(Docket) (Feb. 29, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.