Exhibit D

J5400-864

| SERIAL NO. | 535 | | |
|---|---|---|---|
| SERVED | | | |
| RECEIVED | | | |
| FILED | | | |

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Docket No. 01-12257-PBS

In re: Pharmaceutical
     Industry Wholesale Price
     Litigation

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
HELD ON JANUARY 27, 2005

APPEARANCES:

For County of Suffolk: Joanne Cicala, Esquire, Kirby, McInerney
& Squire, 830 3rd. Avenue, 10th Floor, New York, NY 10022, (212)
371-6600.

For Defendants: Adil Mangi, Esquire, Patterson, Belknap, Webb &
Tyler, LLP, 1133 Avenue of the Americas, New York, NY 10036-
6710, (212) 336-2000.

For Health Net: Kevin McGinty, Esquire, Mintz, Levin, Cohn,
Ferris, Glovsky & Popeo, PC, One Financial Center, Boston, MA
02111, (617) 542-2241.

For Health Net: Lance Selfridge, Esquire, Lewis Brisbois
Bisgard & Smith, LLP, 221 North Figueroa Street, St. 1200, Los
Angeles, CA 90012.

For Schering-Plough Corp.: Eric Christofferson, Esquire, Ropes
& Gray, LLP, One International Place, Boston, MA 02110, (617)
951-7385.

For the Class MDL Plaintiffs: Edward Notargiacomo, Esquire,
Hagens, Berman, LLP, One Main Street, 4th Floor, Cambridge, MA
02142, (617) 374-3738.

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

For Aventis Behring, LLC:  Michael DeMarco, Esquire,
Kirckpatrick & Lockhart, Nicholson Graham, LLP, 75 State Street,
Boston, MA  02109, (617) 951-9111.

For Aventis:  James Muehlberger, Esquire, Shook, Hardy & Bacon,
2555 Grand Blvd., Kansas City, MO  64108, (816) 474-6550.

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

MARYANN V. YOUNG
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**I N D E X**

Proceedings                                                          3

2

3

# P R O C E E D I N G S

1
2    THE CLERK:  Today is Thursday, January 27, 2005.  The
3  case of Citizens for Consumer Justice, et al v. Private
4  Laboratories, et al, Criminal Action No. 01-12257 will now be
5  heard before this Court.  Will counsel please identify
6  themselves for the record?
7    MR. MANGI:  Your Honor, Adil Mangi from Patterson,
8  Belknap, Webb & Tyler for defendants. I'll be arguing the
9  motion to compel Health Net.
10    THE COURT:  Thank you.
11    MS. CICALA:  Good morning, your Honor.  Joanne Cicala
12  from Kirby McInerny & Squire, for plaintiff, the County of
13  Suffolk, here on the discovery motion.
14    MR. McGINTY:  Good morning, your Honor.  Kevin
15  McGinty from Mintz Levin for Health Net, respondent to the
16  motion to compel.
17    MR. SELFRIDGE:  Good morning, your Honor. Lance
18  Selfridge from Lewis Brisbois Bisgard & Smith in Los Angeles
19  also here on behalf of Health Net.  I understand that
20  Mr. McGinty has a motion for pro hac vice admission for me.
21    THE COURT:  Okay. And that motion will be allowed.
22    MR. SELFRIDGE:  Thank you, your Honor.
23    THE COURT:  Has it been filed or are you just--
24    MR. McGINTY:  I have it here, your Honor, with the
25  filing fee as well.

*Maryann V. Young*
**Certified Court Transcriber**
**(508) 384-2003**

4

1      THE COURT:  Okay.  Oh, we always want the money.

2      MR. McGINTY:  Yes.  I've learned from said experience

3  so, I will hand it up now.

4      THE COURT:  All right, that's fine.

5      MR. SELVICH:  Thank you, your Honor.

6      THE COURT:  You're welcome.

7      MR. CHRISTOFFERSON:  Good morning, your Honor.  Eric

8  Christofferson from Ropes & Gray, on behalf of Schering-Plough

9  Corporation.

10      THE COURT:  Thank you, very much.

11      MR. NOTARGIACOMO:  Good morning, your Honor. Edward

12  Notargiacomo from Hagens, Berman on behalf of the Class MDL

13  plaintiffs.  I don't have any particular motion.  I'm just here

14  in case there are questions that need to be answered.

15      THE COURT:  Mr. DeMarco, do you want to be noted on

16  the record.

17      MR. DeMARCO:  And, your Honor, I am Michael DeMarco

18  as you know, and I'm here with my colleague Jim Muehlberger.

19      MR. MUEHLBERGER:  Good morning, your Honor.

20      THE COURT:  Good morning.

21      MR. DeMARCO:  I'm with Kirckpatrick & Lockhart,

22  Nicholson Graham.  And Jim is with Shook, Hardy & Bacon from

23  Kansas City and he represents Aventis, an interested party, the

24  defendant in the class action.

25      THE COURT:  All right.  Well, we'll take the two, the

5

1   motions in the order in which they were filed.  So the first

2   is docket entry number 1175, which is defendants' motion to

3   compel third party Health Net to produce with opposition.

4          MR. MANGI:  Thank you, your Honor.  As your Honor is

5   aware, Judge Saris allowed the defendants to proceed with

6   discovery of a sample of health insurers in the industry.

7   Health Net is a key part of that industry sample.  Primarily

8   because of their geographical reach, they operate on both

9   coasts, both coasts, but also because they have an internal PBF

10  which renders them particularly of interest to defendants.

11  This motion is before your Honor on two specific issues.

12          First of all, Health Net has produced about half a

13  box of documents.  That came after about a year worth of

14  negotiation on the subpoena and the scope of production.  But

15  all of the documents that were produced were redacted.  In

16  fact, they were redacted of all terms that would be useful to

17  defendants in this case.  All reimbursement methodologies were

18  redacted.  All dispensing fees or administration fees were

19  redacted.  The same for financial terms, even the names of

20  contracting parties, - (inaudible #11:04:07) - were essentially

21  shell contracts, worthless paper or templates.  That's the

22  first and the primary issue for this motion.

23          The second is there were certain very limited

24  documents that were identified by Health Net's witnesses at

25  depositions as being central to this case.  We sought their

6

1    production after the deposition, and again these were very

2    specific categories of documents, and Health Net has refused to

3    produce them without giving any reason for that refusal.  Now,

4    on the issue of redactions, Health Net's only reason for not

5    producing these documents in their unredacted form, and again

6    it's half a box so far, is that they have confidential

7    information and Health Net's taken that position despite the

8    fact that their protective order is in place.  So what Health

9    Net is seeking here is unique status in this litigation.  All

10   the other health plans that are part of the industry sample

11   have produced their documents in unredacted form providing all

12   of this information, the methodology, the dispensing fees, and

13   so on, the defendants seek.  Health Net claims that they should

14   be given unique status and allowed to keep their information

15   confidential and that the protective order is not sufficient.

16        Now, I will point out that Judge Saris in CMO 10

17   already made a ruling on the issue of redaction and said in

18   that order, which is appended to our the papers, the redaction

19   should only be allowed on the grounds of privilege.  Now, that

20   order was by its terms addressed to parties, but the logic is

21   equally applicable here, given that the same protective orders

22   protect the interest of third parties as parties.  Now, Health

23   Net in their papers have made a lot of human cry about the

24   relevance of these methodologies.  We've discussed that with

25   them on numerous occasions.  We've even sent them letters, many

7

1   letters, expressing why the information is relevant, but I'll
2   address it here very briefly by giving just a few examples.  As
3   your Honor is aware, the plaintiff's in the MDL, are now
4   focused on a theory performed by the expert Dr. Hartman which
5   pertains to the expectations of pairs alleging a common
6   expectation of cost classes of trade.  The only way the
7   defendants can test that theory is by reference to the
8   methodologies that are actually being used.  If they're
9   different methodologies, different classes of trade or even
10  different entities within classes of trade, defeats those
11  common expectations.  Similarly, another issue that's going to
12  be critical to the merits is the defendant's position that
13  these contracts have to be looked at on an overall basis.  You
14  have to look at the bundle of services that are being provided
15  and the bundle of payments that's being given.  You can't
16  compare the bundle if you don't know what the terms are.  You
17  can't compare methodology and dispensing fee and see their
18  interrelationship of all the terms, if you don't know what any
19  of those terms are.  And there are numerous other factors that
20  show the relevance of this.  As your Honor's aware, we've put
21  in experts' submissions that have scattered thoughts showing
22  different reimbursements for different drugs.  Health Net has
23  testified about different methodologies they use.  Fee
24  schedules, for example, you can only assess them if you know
25  what they're based on.  So that information is simply central

8

1  to our claims.

2      Now, the only law that Health Net has cited for their

3  position which we consider unique is the Vitamins case from the

4  Southern District of Ohio, but as we point out in our reply

5  papers that that case has no application here.  The court there

6  expressed concern over confidentiality, but that was because

7  the party there that was seeking the discovery was a direct

8  competitor of the party that was making production.  Here,

9  there is no such relationship between the defendant

10  manufacturers and Health Net.  Moreover, the issue of

11  confidentiality was not dispositive in the Vitamins case.  The

12  court expressly said so, and in fact, invited the party to

13  reserve the subpoena.  They didn't rule on the subpoena in

14  Vitamins because it was premature.  There were motions to

15  dismiss pending.  The court said if you win the motion to

16  dismiss, the issue goes away, so let's wait and see what

17  happens there.  So again, they're seeking entirely unique

18  status here.

19      Secondly, that issue of redactions also feeds into

20  claims data.  We've sought claims data from Health Net as we

21  had from numerous insurers.  We've already used a lot of that

22  claims data, and with all health insurers, we've offered to pay

23  for it.  Health Net here raises a few additional arguments

24  which we submit are just red herrings.  They raise the HIPA

25  statute.  There is a precise HIPA regulation on point that

9

1    allows disclosure where there's a subpoena and a HIPA

2    compliant protective order in place.   The defendant's haven't

3    even stood on that.   We've said okay, you can redact or rather

4    you can replace patient identifying information with dummy

5    numbers as long as they're consistent so we can carry out our

6    analysis.   So we don't care what the names of the individual

7    patients are.   We just want to be able to relate them to the

8    claims so we can study what was paid in relation to specific--

9              THE COURT:  What's wrong with doing that, counsel?

10             MR. McGINTY:   In fact, your Honor, if it is possible

11   to run some kind of algorithm as they suggest that would

12   scramble the patient identifiable information, I expect that

13   it's probably not going to be a problem.   As counsel indicated,

14   the problem really comes with embedded in claims data is the

15   confidential business information concerning dollar value of

16   reimbursement terms.

17             THE COURT:  Okay, so the--

18             MR. MANGI:  Your Honor, the only thing I'll add on

19   claims data is that Health Net, in two letters that are before

20   your Honor have already agreed that the scrambled algorithm

21   which we've used with other insurers already and it works fine,

22   will satisfy all of their patient confidentiality concerns, so

23   that issue we submit is straightforward.

24             Now, the other aspect of this motion pertains to

25   documents identified at deposition.   After the depositions, we

10

1   sent a letter to Health Net on October 15, 2004 identifying

2   the specific documents that the witnesses talked about.  These

3   again are very specific.  Some of them are as a simple as

4   missing pages with bates numbers to be provided.  Somehow, they

5   dropped out of the production.  Please give them to us, have

6   nothing in response despite numerous letters.  Some of them are

7   slightly more substantive.  For example, in narrowing our

8   production, and as I mentioned, Health Net's only produced half

9   a box because we narrowed it so extensively.  We only sought

10  representative samples of contracts rather than all contracts.

11  We told Health Net that we would test the representative nature

12  of the sample at depositions in relation to, for example, the

13  retail pharmacy contracts between Health Net or the internal

14  PBM and the pharmacies.  Health Net gave us one 2004 template

15  contending it was representative of all their contracts since

16  1991.  Other health plans, some have produced five, some have

17  produced five boxes.  One is rarely going to do.  We asked the

18  witness at deposition is this representative?  He said, no,

19  it's not.  Now, their contracts are again very specific.

20  There's a mail order contract that was referenced.  We asked for

21  it.  They mentioned the production of documents in a related

22  AWP litigation, already produced.  We asked for those.

23          THE COURT:  Just one second.  Mr. Keefe, did you lose

24  something?

25          MR. KEEFE:  I think I misplaced a hat somewhere, your

1  Honor.

2          THE COURT:  What's it look like?

3          MR. KEEFE:  It's just a black hat.

4          THE COURT:  If we find it, we'll know who it belongs

5  to.

6          MR. KEEFE:  Your Honor, in my condition, I need it.

7  It must be out in the hall.  Thank you, Judge.

8          MR. MANGI:  So as I was saying your Honor, these are

9  very specific documents that we've asked for.  There's no

10  burden issue, but yet, Health Net has refused to produce them

11  and has provided no reason for their refusal to do so.  They're

12  specific additional issues raised in Health Net's papers but

13  I'll address them if counsel raises them today.

14          Thank you, your Honor.

15          THE COURT:  All right.  Your brother makes it sound

16  very simple.

17          MR. McGINTY:  It always is at first look.  One thing

18  that counsel for the defendants I think has omitted to discuss

19  is the significant threshold issue about whether this Court

20  even has jurisdiction over this particular subpoena.  As noted

21  in the papers, admitted by the defendants, there is a conflict

22  between various courts as to the scope of 28 U.S.C. Section

23  1407 and whether or not that empowers this court as the

24  transferee court in an MBL proceeding to consider manners

25  concerning the enforcement of a subpoena under Rule 45.  It's

12

1  undisputed that Rule 45 says that motions for enforcement or

2  motions to quash any motion concerning the scope of a Rule 45

3  subpoena, that the power there is best to be heard by the court

4  that issued the subpoena, in this case, the court in

5  California, and what the defendants argues is that Section 1407

6  by virtue of its consolidation procedures gives this court

7  power that essentially trumps Rule 45, and they cite a couple

8  of cases for that proposition.  We cite the Visics (ph) case,

9  which says that Rule 45 controls, and we submit to you that the

10  case that we cite is probably better authority because it

11  comports with sound statutory construction principles.  The

12  provision at issue in Section 1407 is this, there is a portion

13  of that statute which says that the judge or judges to whom MDL

14  actions are assigned, may assign the powers of the district

15  judge in any district for the purpose of conducting pretrial

16  depositions in such coordinated or consolidated pretrial

17  proceedings.  Now, that's very clean language.  It only refers

18  to depositions.  That's the only discovery matter specifically,

19  you know, assigned to the transferee court, and the most basic

20  cannon of statutory construction says that you read a statute

21  the way it's written.  Congress is presumed to know the meaning

22  of the, of the terms of the statute.  It, it's not a stretch to

23  say that Congress knows what the term deposition means.

24  Congress is responsible for the content of Rules of Civil

25  Procedure, so they're presumed to know what--

13

1        THE COURT:  And a lot of other things.

2        MR. McGINTY:  But they presume to know what Rule 45

3   says.

4        THE COURT:  Including the fact that we don't get a

5   raise.

6        MR. McGINTY:  That too, unfortunately.  The mission

7   to refer to matters of, in depositions can only be taken to be

8   purposeful, and, and the way that the authority say about the

9   defendants gets around that is they appeal to some general

10  policy argument concerning the nature of a 1407 proceeding

11  saying well, it says that coordinated or consolidated pretrial

12  proceedings shall be conducted by a judge or judge to whom such

13  actions are assigned.  Gee, you know, that's if there's a

14  policy for them to get everything, but if that's true, why have

15  the separate reference to depositions at all.  If that

16  consolidation language is good enough to give this Court

17  control over Rule 45 matters, you wouldn't need to refer to

18  depositions at all.  So the question is why--

19       THE COURT:  Well, does it not refer to depositions

20  that can be going on in another district where disputes arise?

21       MR. McGINTY:  That's, I think that's the purpose,

22  your Honor, is that Rule 30 of the Rules of Civil Procedure has

23  very specific provisions referenced in the Visics' case,

24  30(B)(4).  It says that any time during a deposition on motion

25  of a party or of the deponent and upon a showing of, you know,

14

1  that the examination is being conducted in bad faith, et

2  cetera, et cetera, et cetera, the court in which the action is

3  pending or the court in the district where the deposition is

4  being taken may order the officer conducting the examination to

5  cease forthwith or may limit the scope or manner or whatever.

6  What this essentially says is that depositions being a special

7  case where stuff happens, if you need to suspend and get a

8  ruling, Section 1407 says you go to the transferee court.

9  That's the purpose of having a specific reference to

10  depositions in Section 1407.  Otherwise, there's no reference

11  to any other kind of discovery, Rule 45 should control, and as

12  a third party, not a party to the case, Health Net is the third

13  party stranger to this case, resident out in California

14  producing documents in site two within California should be

15  subject to the jurisdiction of the California court.  And it

16  makes sense for a number of reasons, in particular, for issues

17  that had been raised in this motion although I think have

18  been--

19          THE COURT:  Well, it makes no sense in terms of the

20  fact that the judge in California knows absolutely nothing

21  about the case.

22          MR. McGINTY:  Well, I think that's the, that's the--

23          THE COURT:  Particularly in a complex case.

24          MR. McGINTY:  Well, that's always going to be the

25  case, your Honor.  I mean cases can be incredibly complex

15

1   without being an MDL proceeding, yet Rule 45 nonetheless gives

2   the local court the authority to determine the propriety of the

3   discovery that's being sought.

4          THE COURT:  Okay, I'll hear from your brother just on

5   this issue of jurisdiction.

6          MR. MANGI:  Your Honor, I admire my learned friend's

7   efforts to create an issue on the jurisdictional point, but

8   it's one that doesn't exist.  The case law is discussed

9   extensively in our reply papers, and I'm happy to hand up the

10  pages if your Honor would like them.  There are numerous cases

11  that address this precise issue.  It's come up many times and

12  all of them uniformly hold that the MDL court has jurisdiction,

13  and, in fact, exclusive jurisdiction over these matters.

14  What's more, they go into the logic for that as your Honor just

15  pointed out, judicial economy demands that the judge most

16  familiar with the litigation hear these disputes.  The district

17  for example pointed to that precise factor in the Boise case.

18  Similarly, the, Poe case in the District of DC said it would

19  make no sense if depositions were heard in one place, documents

20  in another.  All these cases, and there are plenty more,

21  there's Factor A from the Northern District of Illinois,

22  Sunrise Securities from the Eastern District of Pennsylvania,

23  Dupont Plaza from Puerto Rico, even Wright & Miller have spoken

24  to this point.  All of them uniformly stand--

25         THE COURT:  Dupont Plaza is a First Circuit Case, so

16

1    yes.

2            MR. MANGI:  -- that the MDL court has jurisdiction.

3    Now, the Visics case that, that my learned friend relies on,

4    that court explicitly distinguished this situation.  They

5    applied their ruling only to cases where the docket, where the

6    subpoena was for documents only.  They expressly distinguished

7    cases where the subpoena was for documents and a deposition,

8    which is what we have here.  So Visics, even in its own terms

9    doesn't apply and what's more, Visics was expressly rejected in

10   Poe, which is the leading case and it's never been cited again.

11   So we would suggest that the weight of the authority on this

12   issue and the weight of, of shear logic is, is simple.

13           THE COURT:  Do you have a copy of the reply brief--

14           MR. MANGI:  Yes, your Honor.

15           THE COURT:  -- if it's handy.  I have it.

16           MR. MANGI: I have a, a highlighted copy that I'm

17   happy to hand up if your Honor would, would ignore the

18   highlighting.

19           THE COURT:  I'm colored blind.  Just one point.  I

20   remember looking at it, but there was one point that I wanted

21   to--.

22           All right, well, let's move on to the substantive

23   portion of it.

24           MR. McGINTY:  I'd like to focus now on the, the

25   portion of the, of the request that seeks confidential

17

1  competitive business information, namely, specific

2  reimbursement terms, and I'd like to, to I think clarify some

3  things that, that perhaps might not have been addressed in, in

4  the defendants' presentation.  First of all, it's fair in a

5  point to say that the defendants are entitled to, to learn

6  about methodologies.  A methodology would be to say, do you

7  reimburse someone on a captitated basis?  In other words, you

8  give them X dollars per member.  Do you reimburse them based on

9  some Mac type schedule where you have a separate, you have

10  price list for the drugs?  Do you reimburse them on a formula

11  that says AWP minus a stated percentage plus a dispensing fee?

12  That's methodology, that's what they're, that's what they're,

13  they're certainly entitled to get is methodology.  What Health

14  Net is talking about is the actual price.  It matters

15  competitively for Health Net that there is a difference, a

16  competitive difference between them and other, other plans with

17  whom they compete, whether it's just to, to use number

18  randomly, whether it's AWP minus 12.5% versus AWP minus 13% or

19  15% or whatever.  What we're saying is they can find, we can,

20  they're entitled to find and we've given them the information

21  which shows to them that it is in these exemplar contracts AWP,

22  AWP minus a percent.  We just don't tell them what the

23  percentage is, and that's what we think is entitled to be

24  protected here.  It's not clear to us why that precise

25  percentage is needed to be disclosed.  What is clear is that it

18

1   is going to be a competitive disadvantage for Health Net,

2   that, you know, Health Net believes that it does a good deal

3   striking, good job striking competitive deals and what is a

4   great competitive realm.  In fact, the defendants in their own

5   tutorial to this Court on these issues says these are complex

6   negotiations between multiple entities.  There's

7   competitiveness at each level of the chain and Health Net is

8   able to price its services to its clients because it negotiates

9   these deals and it potentially loses that advantage if other

10  people know what they're able to extract from the providers

11  with whom they contract.

12         THE COURT:  Well, there is a protective order here.

13         MR. McGINTY:  Well, it's, the protective order is

14  certainly there, but I think it's at best an imperfect

15  protection, certainly one that has to get a third party

16  stranger to this dispute.  Plus, I know that at one of the

17  tutorials, notwithstanding the existence of this protective

18  order, it's my understanding that the reimbursement rate that

19  Express Scripts uses to pay to CVS was actually disclosed in

20  open court, and there's no, there's no dispute that there's a

21  likelihood that this sort of information can come out at trial,

22  notwithstanding the protective order.  So, while the--

23         THE COURT:  Well, that's an issue for trial down the

24  road, that's--

25         MR. McGINTY:  But that's, I guess the question is

*Maryann V. Young*
**Certified Court Transcriber**
(508) 384-2003

19

1   that assuming that it is, it is, it is possible for the

2   purposes of allowing the defense to mount an adequate defense

3   to give them methodology without giving them precise pricing,

4   why expose Health Net to the competitive risk, and, all we're

5   saying is there needs to be an appropriate balancing here.

6   Parenthetically, your Honor, you know, the only reason we're

7   here is to strike this balance.   There's the--

8           THE COURT:  Well, are you proposing an alternative of

9   what you're willing to produce?

10          MR. McGINTY:  Well, first of all, as a, the point I

11  think I was about to make was that with respect to the

12  documents that that they asked for after the deposition that

13  have not been produced, the only reason they have not been

14  produced is that until these issues are resolved, there's no

15  purpose in producing them, so that certainly if, if they are

16  resolved, we'll hand them over at that point.  But I think your

17  Honor, that our argument is, is that what we've given which

18  shows them the methodology but not the precise pricing is

19  giving them what they need and this is an appropriate

20  disclosure.  They have the methodology.  They say that's what

21  they're entitled to.  We're not sure why there should be

22  anything more produced on that point, and I think that the

23  Vitamins case is, is not distinguishable on the grounds that

24  counsel presents.  Yes, the posture of the case was that it was

25  early in the case while motion to dismiss was pending, but what

20

1  was going on there is what should go on whenever there is this

2  type of discovery dispute.  It's a balance, and in that posture

3  of the case, the court is saying the need for it at this stage

4  is low.  The risk is considerable to the producing third party,

5  we're going to exercise our discretion to strike that balance

6  now against the production of the documents, reserving frankly

7  the question about what, how the balance would be struck later

8  on in the case, but certainly the principle holds.  And, I

9  think where we come out on this is that defendants haven't

10  offered a compelling argument why the balance should be struck

11  here to require us to to disclose information which is going to

12  put us--

13            THE COURT:  It, it may not be compelling to you--

14            MR. McGINTY:  -- at this stage.

15            THE COURT:  -- but I'm inclined to think it's

16  compelling to me at this point.  But, anything else?

17            MR. McGINTY:  I mean, the other, I think one other

18  point just to address the issue about why it should be

19  important to get the precise pricing is the notion that things

20  are going to, you know, things change over time and, of course,

21  contracts are set for a fixed term.  And during a contract

22  term, it's always going to be AWP minus whatever percentage it

23  is that these contracts are not indexed.  Certainly if they

24  want to see earlier versions of contracts, we can show them

25  that the methodology was used and maybe even tell them that,

21

1  about the magnitude of any changes in the discount that was

2  used over time, but the precise pricing isn't going to be

3  necessary to address that point.

4       THE COURT:  Two minutes--

5       MR. MANGI:  Your Honor--

6       THE COURT:  -- on why you need the precise pricing.

7       MR. MANGI:  Absolutely.  Your Honor, the fact that

8  AWP maybe used in some of Health Net's contracts doesn't give

9  defendants any information that's not available in the public

10 domain.  Some insurers use AWP for some of their contracts, as

11 does Health Net.  Health Net also uses other methodologies,

12 such as capitation in some cases.  But, the key parts, and I'll

13 try not to repeat myself, is that one can only carry out useful

14 analysis using the actual numbers, and I'll take just one

15 example leaving aside the four I discussed, and go back to the

16 bundling point.  These contracts are competitive bargains in

17 the marketplace.  I completely agree with my brother on that,

18 but the only way you can assess that is by looking at the

19 terms.  If for example there's a lower amount being paid in

20 reimbursement, there'll be a higher amount being in the

21 dispensing fee.  There'll be other terms of the contract that

22 may come in and be relevant, the financial terms that'll modify

23 those accounts, the expectation theory.  There's no way to

24 counter that unless you know the exact terms.  If I know that

25 they use AWP in some contracts, that doesn't tell me anything

22

1    about whether Dr. Hartman's expectation is valid or not.

2    There's simply no way if you look at even at the tutorial,

3    which is public.  Defendants use some scatter clause showing

4    claims data and precise reimbursement points.  You can't make

5    those points with only methodologies.

6         The only other point, your Honor, that I'll make

7    briefly is in terms of the other documents.  As your Honor

8    knows, this subpoena was issued in, in November of, of 2000.

9    These additional documents that were sought after subpoena,

10   most of them were nothing new.  They were stuff we'd asked for

11   originally.  The witness just testified about them.  So I would

12   request that if your Honor is inclined to grant these motions,

13   your Honor also provide a specific timeframe as we requested in

14   our proposed order so we can get all of these documents

15   together in time for summary judgment.

16         Thank you, your Honor.

17         THE COURT:  All right, I'll move on.

18         MR. McGINTY:  I'm, I'm sorry.

19         THE COURT:  Just seconds.  Do you want a quick

20   response or--

21         MR. McGINTY:  Actually, one, one point which I think

22   is not a matter of great dispute but I did at least want to, to

23   raise here is that we had, we had raised in our papers the

24   notion that, that some of what they're seeking with respect to

25   claims data is very expensive to try to recover because it's

23

1    archived, and it's my understanding the defendants have

2    conceded that they would be obligated to pay for that.  We

3    think that any order requiring the production of that data

4    should provide the defendants will bear the reasonable cost of

5    recovering the archived data.

6           MR. MANGI:  Your Honor, we stated we'd pay for it

7    before we even asked for it.

8           THE COURT:  All right.  All right, moving on to your

9    motion.  I'll--

10          MS. CICALA:  Thank you, your Honor.

11          THE COURT:  I'll hear the argument on both motions,

12   take a brief recess, and then give you a ruling from the bench.

13          MS. CICALA:  Thank you, your Honor.  Just a point of

14   clarification.  Suffolk County had filed a second motion to

15   compel against Schering-Plough.  We served that on defendants

16   on January 20th.  They responded on the 25th.  It was not

17   regrettably filed with the court until yesterday.  I don't know

18   if your Honor is expecting to hear argument on that today. I am

19   prepared to proceed if you would like.  I can't speak for

20   defense counsel on that, but I'll leave it to your Honor.

21          THE COURT:  Well no, because I don't have it.  This

22   docket was just, the docket that I had yesterday, didn't have

23   it on it.  This docket was just printed out this morning and--

24          MS. CICALA:  It concerns a narrow issue of, regarding

25   production of sharing documents related to their Texas

24

1  litigation.

2         THE COURT:  For the record, for the record it's

3  docket entry number 1300.

4         MS. CICALA:  Thank you.

5         THE COURT:  Well, we'll see.  I mean, if your brother

6  is prepared to address it as well.

7         MR. McGINTY:  Your Honor, we are prepared to address

8  it if you'd like to hear the motion.

9         THE COURT:  Well, then we might as well.

10        MS. CICALA:  Thank you, your Honor.  Should we do

11 them one at a time, however?

12        THE COURT:  Please.

13        MS. CICALA:  Okay.  The first motion filed by Suffolk

14 concerns the form of the discovery being produced to it by

15 Schering-Plough.  And specifically, Suffolk seeks Schering's

16 compliance with that part of CMO 10 that directs any of the

17 parties to produce any documents available in electronic

18 format, shall be so provided in that format.  Suffolk began

19 it's review of Schering documents in Boston a couple of months

20 ago, and in the course of that review, confirmed that those

21 same documents it was reviewing in hard copy were available

22 electronically.  However, Schering refused to produce them to

23 us electronically on the basis that the liaison counsel and the

24 MDL had negotiated with Schering that the documents would be

25 produced in hard copy.  We were not privy to those discussions

25

1  and did not elect to receive documents in hard copy.  For most

2  of these, our preference is to receive them electronically, and

3  we would like to be able to do that.

4          THE COURT:  Well, if they're available in hard, in

5  electronic form, why can't they have it that way?

6          MR. CHRISTOFFERSON:  Thank you, your Honor.  I think

7  the answer to this question lies in Case Management Order No.

8  9, which preceded Case Management Order No. 10.  It, it is true

9  as counsel for Suffolk has suggested, that Schering had

10  hundreds of thousands of documents, responsive paper documents

11  scanned into electronic format at a cost of nearly $300,000 to

12  Schering.  Case Management Order No. 9 requires liaison counsel

13  to coordinate discovery for plaintiffs from cases that were

14  brought by government entities, including Suffolk.  Schering

15  offered to provide those responsive documents to lead

16  plaintiffs in electronic format if they would agree to share in

17  the cost.  The lead plaintiffs declined that offer and

18  requested that we produce those documents in paper form, which

19  we did.  Case Management Order No. 9 also requires defendants,

20  Schering, to make available to Suffolk those documents that

21  were made available to the lead plaintiffs to the extent that

22  those documents relate to drugs identified in Suffolk's

23  complaint.  Schering made available those documents to Suffolk.

24  Suffolk has reviewed those documents and those were documents

25  that were related to Suffolk's complaint, the drug identified

1   in Suffolk's complaint. Suffolk has reviewed the documents

2   and, contrary to their assertions, under the Case Management

3   Orders, Schering is not required to make additional and

4   separately negotiated productions to Suffolk. Notwithstanding

5   the reliance on Case Management Order No. 10, Case Management

6   Order No. 10 did not supplant or revise the language regarding

7   discovery coordination in Case Management Order No. 9. The

8   whole point of this Case Management Order is to avoid

9   unnecessary and duplicative discovery requests and negotiations

10   and the associated costs. Suffolk now apparently wants to

11   substitute themselves into the position of lead plaintiffs, but

12   that's not a decision that either Schering or Suffolk can make.

13   Schering has made the documents available to Suffolk. Suffolk

14   has reviewed those documents, and nothing more is required of

15   Schering.

16         THE COURT: I'm inclined to agree.

17         MS. CICALA: Your Honor, I, I don't, I, I'm unsure

18   what my brother refers to when he refers to us being lead

19   plaintiffs. I mean, Suffolk has an independent case. It's not

20   part of the class case. It was not consulted so, first of all,

21   I don't understand why Suffolk should be bound--

22         THE COURT: But I think everybody has to play by the

23   same rules here. I mean, the idea is to keep the cost down.

24         MS. CICALA: Absolutely agreed, your Honor. Had

25   Suffolk the opportunity, had liaison counsel in any way

27

1  consulted with Suffolk before making a unilateral decision

2  with regard to how it sought to collect the sharing materials,

3  then I would not be standing before you.  But regrettably, and

4  we have a motion that continues to be subjudice on this issues,

5  regrettably, Suffolk was not privy, was not included in any of

6  those discussions.  Then perhaps the issue should be--

7        THE COURT:  Well I think your issue--

8        MS. CICALA:  -- addressed between--

9        THE COURT:  -- is with liaison counsel.

10        MS. CICALA:  So it would seem, your Honor.  If I may

11  say one more thing though.  However, on the issue of cost and

12  efficiency, I cannot understand how there is any excessive cost

13  or inefficiency in Schering delivering to us electronically

14  that which is available electronically.  The, there's no, we're

15  talking about a punch, you know, a click of a button, a copying

16  of a CD, as opposed to copying papers and transmitting boxes

17  which is certainly under any scenario, far less efficient.

18        THE COURT:  Well, it sets a precedent.  That's the

19  only problem.

20        MS. CICALA:  I'm afraid that the precedent that may

21  be set here, however, your Honor, is that Suffolk County and my

22  other clients, frankly, I also represent the City of New York

23  and the counties of Rockland, Westchester, Onijaga (ph), and

24  numerous other counties who are about to join in this

25  litigation who have separately retained us, that each of these

28

1    important governmental entities, the City of New York, for

2    example is one of the largest Medicaid payers in this country,

3    shall be prejudiced by the fact that liaison counsel in this

4    matter has not conducted itself as liaison counsel.  I'm sorry

5    to have to say this, should be conducting itself, i.e.,

6    coordinating with those parties for whom has been charged to

7    coordinate.  Now, if the issue is that I need to address that

8    more strenuously with liaison counsel and this Court, then that

9    will be our route.

10            THE COURT:  All right, briefly.

11            MR. CHRISTOFFERSON:  Your Honor, just briefly, if I,

12   if I may.  I think the bad precedent that may be set here is

13   precedent that is, that is negative towards the defendants

14   because Schering spent over, nearly $300,000 preparing these

15   trial preparation materials.  There's a large amount of sum

16   cost that have gone into that process and if now simply just by

17   asking and not following the Case Management Orders the other

18   counties and other plaintiffs are allowed access to those

19   documents, it is a windfall for them and a loss to Schering.

20            THE COURT:  All right,

21            COUNSEL:  Your Honor-

22            THE COURT:  -- now I'll hear you on the other.

23            COUNSEL:  -- if I could just briefly as counsel for

24   liaison counsel just speak to what's been said.  I, I do take

25   offense to the fact the statement that liaison counsel has not

29

1   conducted themselves in a manner which is appropriate for

2   liaison counsel to conduct themselves.  At the time, I haven't

3   been privy to all of the negotiations with respect to Schering-

4   Plough, but when we negotiated with Schering-Plough, we did so

5   in what we thought was the most efficient manner.  There are

6   plaintiffs who came in, you know, either during or after those

7   negotiations took place.  We were not purporting to negotiate

8   on behalf of absent plaintiffs who come in afterwards.  It's

9   not clear to me that Suffolk even had document requests pending

10  at the time that that negotiation was had.  And let me just

11  tell you about where we ended up with respect to Schering's

12  documents and the reason we did what we did.  Schering

13  indicated the volume of documentation that they had available

14  in paper.  We knew from our investigation of the case and from

15  experience that a lot of that paper was going to be useless to

16  us, and turning that into electronic format would be even more

17  useless.  It would be a waste of time and money for all

18  involved.  So our approach to this entire thing is when they

19  tell us we have 600 boxes available in a warehouse down in New

20  Jersey, we send a team of lawyers to go down there and cull

21  through that 600 boxes and pick out however many boxes, a

22  subset of those boxes that are relevant to the case, and we had

23  those documents copied in paper format and sent to our offices

24  and had them distributed widely amongst the co-lead counsel who

25  are working on our case, and analyzed and are not in one

30

1  specific format or place that are able, you know, they're

2  sharing 600, what, what have you.  That's how we've tried to

3  cut things back.  We didn't think it made sense to wholesale

4  copy things.  Believe me, I was in one of those warehouses for

5  two to three days, and there was a lot of stuff that no one

6  wants, and it didn't make sense to do it any other way.

7          THE COURT:  All right.  Do you want to be heard on

8  1300?

9          MS. CICALA:  Yes, thank you, your Honor. Suffolk's

10  second motion concerns a document request it served on

11  Schering-Plough seeking production of all documents and

12  materials, including deposition transcripts and so forth, that

13  Schering produced to the State of Texas in its litigation with

14  the State of Texas.  Schering's objection to our request is

15  that the production, well, initially Schering said that there

16  were not documents in there that concerned Schering, and now

17  they have acknowledged that there are documents within the

18  Texas production that involved Schering or were Schering

19  produced documents, but Schering says it would be burdensome

20  for them to go through the Texas production to identify the

21  Schering documents.  I think I can solve that problem.  I have

22  a relationship with the Texas attorney general who's

23  cooperating with the City of New York and the County of Suffolk

24  and all of my other clients.  They will provide us access to

25  the documents.  We will do Schering's work for it.  It needn't

31

1   be bothered in the slightest with this production.   Schering

2   has produced to Suffolk here.   They've acknowledged that they

3   should be.   The production has not been confined to Claritin.

4   We have received from Schering the documents that it produced

5   to the House Energy Committee.   So they have produced a broader

6   production here, so there can be no reasonable objection to us

7   receiving that which they produced to Texas, particularly where

8   we're willing to do the work, and of course include them in

9   whatever we receive from Texas so that there's nothing

10   inappropriate and that we don't go into warrant witnesses, so,

11   so for example.

12          THE COURT:   Do you need a special agreement in place

13   to do this, or?

14          MS. CICALA:   With Texas?

15          THE COURT:   Yes.

16          MS. CICALA:   To the extent we need to be singed on to

17   the Texas protective order, the Texas AG has agreed that we,

18   that they will facilitate that process for us.   We've asked

19   Schering to not object to our signing on to the Texas

20   protective order.   I would certainly include Schering in all my

21   communications with the Texas AG with regard to these documents

22   and copy them on any documents I receive from the Texas AG.

23   This needn't burden Schering in the slightest.

24          THE COURT:   Problem with it?

25          MR. CHRISTOFFERSON:   Yes, your Honor.   Thank you. I,

32

1    I'm not sure--

2          THE COURT:  Too good to be true.

3          MR. CHRISTOFFERSON:  Your Honor, I'm not sure if

4    you'd like a copy, I brought extra copies of opposition if

5    you'd like me to hand them up to you, or you'd rather it—

6          THE COURT:  No, just argue it to me.

7          MR. CHRISTOFFERSON:  Okay. Respectfully, your Honor,

8    I think that counsel for Suffolk is missing the point here. It

9    is true that pursuant to discovery requests in this litigation,

10   Schering has made available to the lead plaintiffs in this case

11   relevant documents from this Texas litigation.  That entire

12   case though concerns generic products, including products

13   manufactured and marketed by Warrick.  There were no claims in

14   that case that Schering did anything wrong with respect to any

15   of its drugs.  The discovery produced by Schering and Warrick

16   in that case overwhelmingly related to Warrick and Warrick

17   products, and there was lots of discovery in that case, nearly

18   400,000 pages worth.  Although Ropes & Gray did not represent

19   Schering and Warrick in that action, local counsel, who has

20   submitted a declaration in support of our opposition, informs

21   us that there might have been some minimal amount of documents

22   produced in that production that did not relate exclusively to

23   Warrick or Warrick related products, and that may have had some

24   bearing on Schering.  Judge Saris, however, has issued a stay

25   on discovery by Suffolk into claims, its claims against

33

1    Warrick.  So, all the documents produced in the Texas

2    litigation, except for some minimal amount, relate to claims

3    into which discovery is stayed.  The only remaining question

4    would be whether these minimal needles in a giant haystack of

5    documents are even relevant to Schering, to Suffolk's claims

6    against Schering.  We don't know the answer to that and could

7    not know the answer to that without ourselves reviewing the

8    entire production.  The suggestion that Suffolk go and do our

9    "work" for us, does not solve the problem, because then they

10   would have access to lots of documents, almost 400,000 pages

11   worth, that relate only to their claims into which discovery

12   has been stayed.  It's simply unreasonable and unduly

13   burdensome for them to require Schering to sift through

14   hundreds of thousands of pages of documents to find a few that

15   may or may not be relevant to Suffolk's claims.  In other

16   words, the burden that Schering would have to bear is grossly

17   disproportionate to the value that Suffolk would gain from some

18   few potentially relevant documents.  The discovery here

19   violates Judge Saris' order because the claims to which it is

20   directed, the claims against Warrick have been stayed and are

21   not subject to discovery at this time, regardless of to whom

22   the request might now only be made.

23          THE COURT:  Why should I grant this with the stay in

24   place?

25          MS. CICALA:  The stay is against, is at to Warrick.  I

34

1  absolutely agree. We don't seek any Warrick documents. We

2  don't seek any deposition testimony from any Warrick witnesses.

3  We seek documents produced in Texas by Schering, which exist.

4  We seek Schering deposition transcripts, which exist. The

5  Texas AG has those documents identified as Schering documents

6  and those transcripts identified as Schering witnesses. I'm

7  not looking for anything that's stamped with a Warrick bates

8  number at this time. I'm talking about Schering documents and

9  Schering witnesses. So, in that regard, this in no way

10  violates Judge Saris' order. The issue devolves to burden and

11  we can relieve them of the burden by receiving only that which

12  is stamped Schering-Plough and only for witnesses that were

13  produced by Schering-Plough.

14          MR. CHRISTOFFERSON: Your Honor, if I may respond

15  just briefly? I think again counsel is missing the point. It,

16  it doesn't matter to whom, you know, whether Schering as

17  Schering produced the documents. The documents that Schering

18  produced overwhelming related to Warrick and Warrick's

19  products. You would have to, she would have to then figure out

20  which of those documents were actually relevant to their

21  claims, and according to the, the information that you received

22  from local counsel, those documents are minimal, minimal and it

23  would only be a handful. So whether Schering is required to go

24  through and wade through and find a handful of documents or

25  someone else, I guess the, the attorney general would find

35

1   documents and then, you know, send them back to Suffolk.

2   Either way, it's going to require an amazing amount of effort

3   that is frankly disproportionate to the value.

4           MR. DeMARCO:  Your Honor--

5           THE COURT:  Mr. DeMarco?

6           MR. DeMARCO:  -- just briefly.  There's another

7   feature to this that my colleague, Mr. Muehlberger would like

8   to discuss with respect to other defendant in this aspect of

9   discovery.

10          MR. MUEHLBERGER:  Your Honor, very briefly, this is

11  the first I've heard about the, possibly the County of Suffolk

12  signing on to the Texas Attorney General protective order.  But

13  there are witnesses in that case, for instance plaintiffs'

14  expert in the MDL, Dr. Schondlemyer, as I understand it was

15  also an expert witness who rendered a report and I understand

16  also testified in deposition in the Texas AG case, which we

17  have not been privy to and not been allowed to see because of

18  the Texas AG order in place, and so what I simply raise, to the

19  extent the Court is inclined to consider to allow the County of

20  Suffolk to sign on the Texas Attorney General protective order,

21  defendants be allowed to consider that issue and perhaps file

22  something on the record to protect their interest and make sure

23  everybody is on the same playing field.

24          THE COURT:  All right.  I'll take a brief recess, come

25  back at quarter of twelve.

36

1     (Recess, reconvene 11:51:16 a.m.)

2     (Court called into session)

3          THE COURT:  All right, please be seated.  All right.

4     On docket entry No. 1175, the motion is allowed subject to the

5     enforcement of the confidentiality order.  I'd like to set a

6     deadline, so tell me what you think is a reasonable time for

7     production.

8          MR. McGINTY:  Your Honor, I would suggest that that

9     deadline should be 90 to 120 days. These documents by and large

10    are located in Sacramento.  They will have to be reviewed.

11    They will have to be vetted for privilege, and it's going to

12    take some time to do that.  In addition, many of these

13    documents are in electronic format and, as it stands right now,

14    I'm unaware of what, if any, systems are in place in order to

15    access some of those documents.  So we should have a

16    significant amount of time.

17         THE COURT:  Well, I could give you 90 days, but what

18    about phasing it as things become available?

19         MR. McGINTY:  Your Honor, we have no objection to

20    that, and as a matter of fact, in the productions that have

21    been taking place at this point, we have been producing on a

22    rolling basis that by agreement with Mr. Mangi's office.  So, I

23    would not object to that.

24         THE COURT:  Okay.

25         MR. MANGI:  May I be heard, your Honor?

37

1          THE COURT:  All right.

2          MR. MANGI:  Your Honor, very briefly, there, there's

3    separate components to this motion.  First producing an

4    un-redacted copy of what they've already produced, that takes

5    no time.  Just take off the tape, and copy it again.  So we

6    submit that should be produced within 14 days.  The second

7    component is a production of claims data.

8          THE COURT:  Can you do that within 14 days?

9          MR. McGINTY:  I do not know, your Honor, whether that

10   can be done that quickly.  I would suggest that the order the

11   Court was intending to enter is probably the right one.

12         THE COURT:  Well--

13         MR. McGINTY:  But we will--

14         THE COURT:  -- what I'd like to do is say 90 days,

15   but let's set a tentative schedule for the phases.  So if you

16   could do this within four, the first 14--

17         MR. McGINTY:  Yes, your Honor.  As I, as I have, have

18   indicated, we are willing to produce on a rolling basis, as

19   we're able to do it.  I think that the outside limit of 90

20   days, should, should stay in place, but I will represent to the

21   Court and to Mr. Mangi that we will produce on a rolling basis

22   as we are able to do that.

23         THE COURT:  But let's see if we can set a schedule

24   for that rolling basis.

25         MR. MANGI:  Your Honor, if, if I may just speak to

38

1   the two other components of this?  The second component is

2   claims data.  Health Net has represented to us in numerous

3   letters that are appended to our motion they can produce claims

4   data within six to eight weeks of start.  Given that summary

5   judgment is, is fast up and coming in this case, we would

6   request that they be held to that schedule.  And the third

7   component of it, are these additional documents.  Again your

8   Honor, these are very specific documents.  They won't be more

9   than that high.  There are no privilege issues.  Most of them

10  are just contracts.  Ninety days, we would submit, is entirely

11  unrealistic and we would submit that certainly the un-redacted

12  production in 14 days, original--

13          THE COURT:  All right, un-redacted production, 14

14  days.

15          MR. MANGI:  The claims data within, they ask for six

16  to eight weeks, we'll say eight weeks is fine.

17          THE COURT:  All right.

18          MR. MANGI:  And the additional documents--

19          THE COURT:  So, six to eight weeks, so will give you

20  the 60 days on that.

21          MR. MANGI:  And these additional documents, your

22  Honor, which is again as I mentioned, just a handful, we would

23  suggest those could be produced within a month.  I mean, the

24  subpoena has been out there since November or 03.

25          THE COURT:  All right, within 30 days.

39

1        MR. McGINTY:  Your Honor, if I may.  The

2  representation that was previously made to Mr. Mangi's office

3  was that it would, it would take eight weeks after we had

4  systems in place in order to locate and access the documents.

5  Eight weeks is two, is two months.  It's 60 days essentially. I

6  would request that the Court stand upon the original intent of

7  90 days because it's going to take us eight weeks after we get

8  the systems in place and, and there's an, an unknown amount of

9  time to get that done.  I think 90 days is a much more

10  reasonable estimate for, for producing--

11        THE COURT:  For final completion.

12        MR. McGINTY:  Yes, your Honor.

13        THE COURT:  But phased in as we've said here today.

14        MR. MANGI:  Your Honor, on claims data, we got claims

15  data from other defendants within four days, within five days.

16  This, this eight weeks is outlandish to begin with, but that's

17  the maximum we can work with to be able to use this data for

18  summary judgment.

19        THE COURT:  Yes, I mean I had, haven't thought of the

20  summary judgment issue since I'm not dealing with that so, I'm

21  inclined to say 60 not 80, not 90.

22        MR. McGINTY:  Your Honor, may I inquire because I am

23  unaware.  When is the summary judgment motion scheduled to be

24  heard?

25        THE COURT:  Well, to be heard, I don't know.

40

1          MR. McGINTY:  When is it scheduled to be briefed?

2          MR. MANGI:  Your Honor, I believe summary judgment is

3  in, is in May.  Is that correct?

4          UNIDENTIFIED:  Yes.

5          THE COURT:  Well--

6          MR. MANGI:  Your Honor, plus on, on the other claims

7  data--

8          THE COURT:  You know, at the end of the 60 days, if

9  it's not done, we'll deal with it.  But let's, let's shoot for

10  60, rather than 90.

11          MR. MANGI:  Your Honor, the, the only remaining issue

12  on, there was one minor lingering issue which is that of Health

13  Net has put these water marks on their documents.  They're

14  expressly forbidden in CMO 10.  They obscure text.  Judge Saris

15  explicitly forbade them.  We told them that.  They still did

16  it.  We ask for clarification on that matter also.  It's in our

17  proposed order.

18          MR. McGINTY:  Your Honor, there are water marks on

19  the documents.  I've seen every one of them.  Not one of them

20  obscures text.  They are a gray background, rather than an

21  overlay.  I'm personally unaware of what Judge Saris has

22  ordered.

23          THE COURT:  Are these watermarks already on the

24  documents?

25          MR. McGINTY:  They are already on the documents that

41

1    have already been produced.

2          MR. MANGI:  Your Honor, they're, they're highly

3    confidential 1456, all over the page.  They can just be put on

4    the bottom right like every other document in the case.

5          MR. McGINTY: They, they are, they are again, your

6    Honor, I've seen, I have personally seen each and every page of

7    these.  They, they are not all over the page.  They are in the

8    center.  They are a gray background. They do not obscure any

9    text.

10         THE COURT:  Well, if they obscure something, then you

11   have to produce it a second time in a non-obscure form.

12         MR. MANGI:  Your Honor, counsel's point is that they

13   are in grayscale.  The color of grayscale varies by the

14   photocopy.  Judge Saris said put them where, outside the text.

15         THE COURT:  You know, I don't want to deal with this.

16   Work it out.

17         MR. MANGI:  Your Honor--

18         THE COURT:  Work it out.  Get together.  Work it out

19   so everybody can read everything.

20         MR. MANGI:  Thank you, your Honor.

21         MR. McGINTY:  Your Honor, for my edification, I

22   perhaps didn't make my notes as as completely clear as they

23   should be.  May I ask if the Court would summarize what the

24   order, what the order is?

25         THE COURT: Get a copy of the transcript.

42

1        MR. McGINTY: Is there one, is there a trans--

2        THE COURT: Well, they'll have to be prepared.

3        MR. MANGI: I have good notes. I'll be happy to

4   discuss--

5        THE COURT: Okay, outline how you believe--

6        MR. MANGI: Absolutely.

7        THE COURT: -- I've stated.

8        MR. MANGI: Your Honor, the production, the documents

9   that have already been produced, your Honor has said that they

10  should be produced in their un-redacted form, presumably

11  including missing pages, within 14 days.

12       THE COURT: Slow, slow down so that he can take it

13  down.

14       MR. McGINTY: A little slower, Adil, please.

15       MR. MANGI: Oh, I apologize.

16       THE COURT: Wait, let him get this--

17       MR. McGINTY: I, I got that.

18       THE COURT: You got that.

19       MR. McGINTY: But a little slower next time.

20       MR. MANGI: I personally wrote a big 14. The, the

21  additional documents that are identified in our October 15,

22  2004 letter, which follow depositions, your Honor has ordered

23  the production of those documents within 30 days. And the

24  production of claims data, your Honor has ordered within 60

25  days.

43

1       THE COURT:  Clear enough?

2       MR. McGINTY:  Yes, your Honor, simply that that 60

3  days subject to reevaluation depending on what the technical

4  issues are.

5       THE COURT:  I'll listen to you.  You know, you get to

6  that point, you file a motion, I'll hear you.

7       MR. McGINTY:  Okay.

8       THE COURT:  But, you know, always try and talk with

9  each other and see if you can try and work things out, and, you

10  know, as to the watermarks, see if you can work this issue out.

11  I mean this is--

12       MR. McGINTY:  We, we do speak to each other, your

13  Honor, regularly.  I'm sure that as reasonable people, we can

14  resolve that.

15       THE COURT:  All right, as to docket entry No. 1189,

16  the motion is denied.  I'm afraid you are bound by what liaison

17  counsel has done in the past, and I think you have to talk to

18  liaison counsel and make that clear.

19       As to 1300, it's denied without prejudice at this

20  time, having heard from Mr. DeMarco's co-counsel.  I'll give

21  everybody else 14 days to weigh in on this if they want to file

22  anything.

23       MS. CICALA:  Thank you, your Honor.

24       THE COURT:  All right, and then when you, when we get

25  everything, we can set up another hearing date

44

1      MS. CICALA: Thank you.

2      MR. CHRISTOFFERSON:  Your Honor, just a quick point

3  of clarification, are you inviting further submissions by, by

4  Schering & Suffolk or just, you know, other defendants?

5      THE COURT:  Well, you've, did, I mean, did you really

6  get much of chance to respond?

7      MR. CHRISTOFFERSON:  We, we did file--

8      THE COURT:  You're satisfied.  I mean--

9      MR. CHRISTOFFERSON:  Okay.  Thank you, your Honor.

10     THE COURT: If anybody else wants to respond, only

11 because it was just yesterday.  Okay.

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

*Maryann V. Young*
**Certified Court Transcriber**
(508) 384-2003

45

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

_____          March 6, 2005
Maryann V. Young