```
1    A.    No; until he went to work at another

2          organization.

3    Q.    What is the name of that organization?

4    A.    Nuvo/Cybsonics.

5    Q.    You're going to have to spell that one for us,

6          I think.

7    A.    I think it's N-u-v-o, slash, C-y-b-s-o-n-i-c-s.

8    Q.    Can we just call that Nuvo?

9    A.    Yes.

10   Q.    And when did he start working for Nuvo?

11   A.    I can't tell you exact dates.

12   Q.    Let me ask you this.  The insurance that you

13         had through Nuvo, did that go up until you got

14         the Access insurance?

15   A.    No.

16   Q.    Was there a name of a company that you had the

17         Nuvo insurance through?  Was there an insurance

18         company that you recall?

19   A.    I believe it was Blue Cross/Blue Shield.

20   Q.    Okay, and did that cover major medical,

21         doctors' visits?

22   A.    Yes.

23   Q.    Did it cover hospital stays?

24   A.    Yes.

25   Q.    And physician-administered drugs?
```

**11/15/2005  Hopkins, Rebecca A. (ROUGH DRAFT)**

```
1    A.    Yes.

2    Q.    And drugs you get at the pharmacy?

3    A.    Yes.

4    Q.    And what kind of payments did you have to make

5          under that insurance?

6    A.    Co-pays.

7    Q.    What type of co-pays?  Flat co-pays?

8    A.    Flat co-pays, yes.

9    Q.    All right, now, after the insurance you got

10         through Nuvo, what insurance did you have?

11   A.    Cobra.

12   Q.    Okay, again, with Blue Cross/Blue Shield of

13         Pennsylvania?

14   A.    I would assume.

15   Q.    Do you assume, or do you recall whether it was?

16   A.    I don't recall.

17   Q.    You don't, okay.

18               MR. LEVY:  Do you need a break?

19               THE WITNESS:  No.

20                    - - - -

21   (Exhibit 2 and Exhibit 3 marked for identification.)

22                    - - - -

23               MR. SWEENEY:  We marked as Exhibit 2

24         a document that was produced by Ms. Hopkins.

25         It's Hopkins 0255.  It appears to be an Aerotek
```

**11/15/2005  Hopkins, Rebecca A. (ROUGH DRAFT)**

```
1    Q.    Okay, going back to Azithromycin for the
2          moment, how was that administered to you?  Do
3          you recall?
4    A.    Azithromycin, is that the one that starts with
5          a Z?
6    Q.    A-z-i-t-h-r-o-m-y-c-i-n.  It's the first on the
7          list on Page 52.
8    A.    That would have been intravenous.
9    Q.    Okay, do you know how much your provider
10         charged you for Azithromycin?
11   A.    No, I do not.
12   Q.    Do you know how much you paid for Azithromycin?
13   A.    No, I do not.
14   Q.    Okay, do you have any documents that reflect
15         any payments you made for Azithromycin?
16   A.    I have itemized documents from the hospitals,
17         but I've never gone down through them to see --
18   Q.    Okay.
19   A.    -- what they charged the hospital or what the
20         hospital charged me.
21   Q.    Did you do a search through your records for
22         documents to be produced to us for this
23         litigation?
24   A.    No.
25   Q.    Did you provide any documents to your lawyers
```

```
 1            to be provided to us in this litigation?
 2    A.    I provided documents to my lawyers, yes.
 3    Q.    Okay, and what documents did you provide to
 4          your lawyers?
 5    A.    Bills, canceled checks, itemized billings from
 6          the hospitals, prescription scripts.
 7    Q.    How did you decide what to give to your lawyers
 8          and what not to give to your lawyers?
 9                MR. LEVY:  I instruct the witness not
10          to answer any question that the answer would
11          require you to disclose communications that
12          you've had with your attorneys.
13                You can discuss what it is that you
14          collected or looked at.  You can discuss the
15          fact of what you have, but you cannot reveal
16          any information about instructions or
17          communications from your attorneys about what
18          documents to provide them, what documents not
19          to provide, if any instructions like that even
20          occurred.
21    BY MR. SWEENEY:
22    Q.    Okay, how did you decide what to give to your
23          lawyers?
24    A.    Primarily dates.  I looked at the dates of a
25          lot of things.
```

**11/15/2005  Hopkins, Rebecca A. (ROUGH DRAFT)**

```
 1    Q.   And what was the relevancy of the dates?
 2    A.   Well, if it was '88, I didn't bother sending
 3         it.
 4    Q.   Okay, did you give them all your medical
 5         records and documents reflecting payments for
 6         drugs between 1991 and the present?
 7    A.   No.
 8    Q.   So you have other documents at home relating to
 9         that that you haven't given to them?
10    A.   I have more documents at home.
11    Q.   Okay, why didn't you give them the other
12         documents --
13                   MR. LEVY:  Don't answer that
14         question--
15    BY MR. SWEENEY:
16    Q.   -- the ones that you didn't give them?
17                   MR. LEVY:  Don't answer that question
18         if it's as a result of you discussing something
19         with your attorney.
20    A.   I have many, many documents at home.  I gave
21         them about half of what I have.
22    BY MR. SWEENEY:
23    Q.   And what does the other half consist of?  What
24         kind of documents?
25    A.   Bills, canceled checks, insurance information,
```

**11/15/2005  Hopkins, Rebecca A. (ROUGH DRAFT)**

```
 1          prescriptions.
 2     Q.   Okay, is there any particular reason why you
 3          didn't give them the rest of the information?
 4     A.   Some of it is not necessarily located at this
 5          time.  I know I've got things still in boxes.
 6          I just haven't --
 7     Q.   In boxes at home?
 8     A.   Ah-huh.
 9     Q.   Okay, you didn't go and look in those boxes?
10     A.   I didn't go and look in all the boxes.
11     Q.   How many boxes have you got?
12     A.   Many, seven, eight.
13     Q.   Okay, how many boxes did you look at?
14     A.   I went to information that was easily
15          accessible first.
16     Q.   And why was it easily accessible?
17     A.   It hadn't necessarily been boxed up again,
18          boxed away.
19     Q.   What's your understanding of the claims you've
20          brought against the Defendants in this action?
21     A.   My understanding?
22     Q.   Yes, ma'am.
23     A.   Can you rephrase the question, please?
24     Q.   Do you have an understanding of the nature of
25          the claims that you brought against the various
```

**11/15/2005  Hopkins, Rebecca A. (ROUGH DRAFT)**

```
 1            physician.  The Tamoxifen, of course, was a
 2            pill I would take while at home.
 3                   Then when I'd go to Cleveland Clinic,
 4            I was more in the doctor's office, and it was
 5            more personable and less time consuming.  I was
 6            only there for a couple hours.  And at the
 7            doctor's office, it was more one on one.
 8    Q.      Anything else?
 9    A.      No.
10    Q.      Okay, why don't we look back at the Complaint
11            again, Paragraph 52.
12    A.      Okay.
13    Q.      Now, looking at these various drugs that it
14            says here were administered to you --
15                   MR. LEVY:  You are looking at
16            Paragraph 52?
17                   MR. SWEENEY:  Paragraph 52.
18                   MR. LEVY:  You need to go to Page 22.
19                   THE WITNESS:  Okay, yes.
20    BY MR. SWEENEY:
21    Q.      The Azithromycin that was administered to you,
22            do you know that that was manufactured by
23            Pfizer?
24    A.      I have no idea who manufactured it.
25    Q.      Is that true for all these drugs, that you
```

**11/15/2005  Hopkins, Rebecca A. (ROUGH DRAFT)**

```
 1          don't know who manufactured any of the

 2          medications that were given to you?

 3     A.   True.

 4               MR. SWEENEY:  Okay, off the record.

 5                    - - - -

 6          (There was a discussion off the record.)

 7                    - - - -

 8           (Exhibit 10 marked for identification.)

 9                    - - - -

10     BY MR. SWEENEY:

11     Q.   We've marked as Exhibit 10 some documents that

12          appear to come from the Cleveland Clinic

13          Foundation, document numbers are Hopkins 0016

14          through Hopkins 0046.

15               Can you tell me how you got these

16          documents?

17     A.   The CAT scan?

18     Q.   All the documents that are in here, all of

19          these pages, how did you get those?  Where did

20          you receive them from?

21     A.   The doctors would send us the copy of the CAT

22          scans.  Is that what you're asking?

23     Q.   Well, there's more in here than just CAT scans.

24          I mean, this is your medical records, and it

25          reflects the appointments that you had with
```

**11/15/2005  Hopkins, Rebecca A. (ROUGH DRAFT)**

```
1            these before?
2      A.    I don't believe so.  These are itemized of the
3            drugs that I used, and I don't believe.
4      Q.    This relates to the chemo?
5      A.    Ah-huh.  The Etoposide, E-t-o-p-o-s-i-d-e, and
6            Bleomycin.
7      Q.    Who was the doctor who treated you for that?
8      A.    Doctor Ronald Hempling.
9      Q.    And were you satisfied with his services?
10     A.    Yes.
11     Q.    And do you believe he prescribed you any drugs
12           for the purposes of financial gain?
13     A.    No, I don't believe so.
14     Q.    Okay, do you know how the charge for the --
15           look at the first page about seven lines down.
16           There's a charge for Bleomycin 15 units.  Do
17           you know how that charge was calculated?
18     A.    How they determined 15 units?
19     Q.    How they determined how much to charge you.
20     A.    No, I do not know.
21     Q.    Did you pay for this out of pocket?
22     A.    Yes.  If you look down at the fifth line --
23           fourth line from the bottom, it says payments,
24           patient, $3,067.
25     Q.    All right, and how did you pay for that?  By
```

# EXHIBIT 29

T H E │ W E X L E R │ F I R M ᴸᴸᴾ



November 2, 2005

**_Via Facsimile and_**
**_Via LexisNexis File & Serve_**

H.B. Roback
Covington & Burling
1201 Pennsylvania Ave., N.W.
Washington, DC 20004

> Re:   *In re: Pharmaceutical Industry Average Wholesale Price Litigation*
> MDL No. 1456 (D. Mass.)

Dear H.B.:

Please be advised that plaintiffs are withdrawing Cynthia Byrski as a proposed class representative. We will officially remove her from the complaint upon filing our next amended complaint.

Please feel free to call with any questions.

Very truly yours,

Jennifer Fountain Connolly

JFC:lmv

cc:   All counsel via LexisNexis File & Serve

Contact Information:   **Jennifer Fountain Connolly**
**312 261 6195 Direct Dial**
**jfconnolly@wexlerfirm.com**

One North LaSalle Street
Suite 2000
Chicago, Illinois 60602

312 346 2222
312 346 0022 fax
www.wexlerfirm.com

# EXHIBIT 30

## Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

November 11, 2005

By Fax and Email

Niraj J. Parekh
(212) 336-2641
Direct Fax (212) 336-7968
njparekh@pbwt.com

Allan M. Hoffman, Esq.
Hoffman & Edelson, LLC
45 West Court Street
Doylestown, PA 18901

Re:    <u>In re AWP Litigation</u>

Dear Allan:

   Further to the voicemail I just received from you, this confirms that plaintiffs are withdrawing Kathleen Weaver-Zech as a purported class representative. Additionally, you stated that you are still unable to confirm deposition dates for the estate of William Barnewolt and Mardolyn Vescovi.

   It is now 5 p.m. on Friday, November 11. We have been attempting since November 3 to schedule dates for these individual class representatives. These depositions have to be completed per court order by Wednesday, November 16, but you have not confirmed dates despite our best efforts, which have included numerous letters, emails and phone calls.

   Please be advised that if these witnesses are not made available for deposition before November 16, we will be moving to strike them as purported class representatives. If you do succeed in confirming dates at this late stage we will attempt to accommodate you by making last minute travel, hotel and conference room arrangements, but insist on a minimum of 24 hours notice in writing to be delivered on a weekday during working hours. Given the circumstances created by your failure to timely confirm dates, we also ask that you now make all witnesses available in Chicago.

           Sincerely,

           Niraj J. Parekh

cc: All Counsel of Record (via LexiaNexis)

# EXHIBIT 31

THE|WEXLER|FIRM LLP



7452668

Nov 16 2005
5:56PM

November 16, 2005

_**Via Facsimile & LexisNexis File & Serve**_

Mr. Niraj J. Parekh
Patterson Belknap Webb & Tyler
1133 Avenue of the Americas
New York, NY  10036-6710

      Re:     _In re: Pharmaceutical Industry Average Wholesale Price Litigation_
              MDL No. 1456 (D. Mass.)

Dear Mr. Parekh:

I write to address a few points in your November 15 letter.

First, with regard to Mardolyn Vescovi, plaintiffs will be withdrawing her as a proposed class representative.   Plaintiffs' next version of the Complaint will reflect this withdrawal.

With regard to Ms. Barnewolt, in addition to failing to address Scott Wise's failure to respond to my initial letters setting forth her availability, you neglect to include in your chronology that, after confirming a date for Ms. Barnewolt's deposition, _defendants_ stated that they could not proceed with that date and therefore withdrew dates that were previously confirmed amongst counsel as well as with our client. Defendants then only proposed November 16, one day before Judge Saris' deadline, as the only available date for Ms. Barnewolt's deposition.   Again, this was a problem of defendants', not plaintiffs', making. Indeed, your claim that defendants have been flexible in scheduling while my colleague, Allan Hoffman, has not, is belied by the fact that defendants asked us to contact our clients with confirmed deposition dates and then canceled those dates.

Your offer to fly to Chicago to take Ms. Barnewolt's deposition today is, as you knew when you wrote your November 15 letter, a hollow one. Defendants should not be surprised that Ms. Barnewolt is unavailable for a single date and time after defendants ignored nine separate dates when Ms. Barnewolt was available and then withdrew a previously confirmed date.

---

Contact Information:      **Jennifer Fountain Connolly**      One North LaSalle Street      312 346 2222
                                  **312 261 6195 Direct Dial**         Suite 2000                    312 346 0022 fax
                                    jfconnolly@wexlerfirm.com      Chicago, Illinois 60602      **www.wexlerfirm.com**

T H E │ **W E X L E R** │ F I R M ᴸᴸᴾ

Mr. Niraj J. Parekh
November 16, 2005
Page 2

Very truly yours,

Jennifer Fountain Connolly

JFC:lmv

# EXHIBIT 32



RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Defendant
TAP Pharmaceutical Products Inc.

| | |
|---|---|
| BERNARD WALKER, individually, and on behalf of those similarly situated, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, CAPE MAY COUNTY DOCKET NO. CPM-682-01 |
| Plaintiff, | |
| vs. | CIVIL ACTION |
| TAP PHARMACEUTICAL PRODUCTS INC., ABBOTT LABORATORIES AND TAKEDA CHEMICAL INDUSTRIES, LTD., | ORDER |
| Defendants. | |

This matter having been brought before the Court upon TAP Pharmaceutical Products Inc.'s ("TAP") Motion on Short Notice to Preclude Plaintiff from Unilaterally Changing the Class Definition, filed on June 28, 2004 ("TAP's Motion"), and the Court having considered the papers filed in support of and in opposition to TAP's Motion, and the Court having heard oral argument on July 15, 2004, and for the reasons set forth in the Court's Memorandum of Decision on Motion Pursuant to Rule 1:6-2(f), dated August 10, 2004, and for good cause shown,

IT IS ON THIS _16th_ day of _Sept_ , 2004, ORDERED as follows:

1.    As is set forth in the Court's Order Granting Plaintiff's Motion for
Class Certification Pursuant to Rule 4:32, dated August 29, 2003, the  definition of the
Class certified on August 29, 2003 (the "Class Definition"), is:

> All persons and entities in New Jersey who paid any portion of the cost of
> Lupron® from 1991 to the present which cost was based, in whole or in part on
> the AWP for Lupron (and/or Zoladex). Excluded from the Class are Defendants,
> any entity in which Defendants have a controlling interest, and their legal
> representatives, heirs, successors and any governmental entities.

2.    For purposes of all proceedings in this case, including but not
limited to trial, the words "New Jersey" in the Class Definition are intended to, and do,
limit the Class to New Jersey residents, and the time and place that Lupron® was
purchased are controlling factors with respect to who is a Class member. To the extent
that they paid any portion of the cost of Lupron® from 1991 to the present which cost
was based, in whole or in part, on the Average Wholesale Price ("AWP") for Lupron®
(and/or Zoladex®), the following constitute the members of the Class:

>   a.    If the doctor and patient were residents of New Jersey at the
>         time of the sale of Lupron® to the patient, the patient is a
>         member of the Class unless he or she has exercised his or
>         her right to opt out of the class. The patient's claim for
>         compensatory damages is limited to that portion of the
>         amount that the patient actually paid for Lupron® that is
>         alleged to constitute an overpayment for Lupron®.
>
>   b.    If the patient was a resident of New Jersey at the time of the
>         sale of Lupron® to the patient and the sale of Lupron® took
>         place outside of New Jersey, the patient is a member of the
>         Class unless he or she has exercised his or her right to opt
>         out of the class.  The patient's claim for compensatory
>         damages is limited to that portion of the amount that the
>         patient actually paid for Lupron® that is alleged to
>         constitute an overpayment for Lupron®.

2

c. A New Jersey Insurer, Trust or Medical Plan with an office or offices in New Jersey at the time of the sale and which paid all or part of the cost of the sale of Lupron® administered to a New Jersey resident is a member of the Class unless it has exercised its right to opt out of the Class. The claim of the New Jersey Insurer, Trust or Medical Plan for compensatory damages is limited to that portion of the amount that the Insurer, Trust or Medical Plan actually paid for Lupron® that is alleged to constitute an overpayment for Lupron®.

d. A New Jersey Insurer, Trust or Medical Plan with an office or offices in New Jersey at the time of the sale and which paid all or part of the cost of the sale of Lupron® administered to a non-resident of New Jersey is a member of the Class unless it has exercised its right to opt out of the Class. The claim of the New Jersey Insurer, Trust or Medical Plan for compensatory damages is limited to that portion of the amount that the Insurer, Trust or Medical Plan actually paid for Lupron® that is alleged to constitute an overpayment for Lupron®.

3. No persons and entities other than those listed in ¶2(a) through (d) are members of the Class.

4. No claims for compensatory damages other than those listed in ¶2(a) through (d) may be asserted by members of the Class.

5. The Court finds that claims for damages based upon principles of subrogation as between insured and insurer are not applicable in this case. The Court further finds that any claim of an insurer is not derivative of any claim by an insured.

IT IS FURTHER ORDERED THAT counsel for TAP shall serve a copy of this Order upon all counsel of record within seven days of receipt of the entered order.

_Joseph C Viselli_
_____
Hon. Joseph C. Visalli, J.S.C.

* This Order has been signed having Considered plaintiff's
Oral objection raised in a telephone Conference of Sept 15, 2004.
I am satisfied that this Order Tracks the Decision of Aug 19, 2004
& represents that Decision, Plaintiff's objection is dismissed.

3457362.1

3

8/23/04

# EXHIBIT 33

**11/17/2005  Randle, Glenn (ROUGH DRAFT)**

1

```
1                    (Witness sworn.)
2    BY MR. CHRISTOFFERSON:
3         Q.   Before we begin, is there anyone else on
4    this call?  I didn't hear any beeps, but I figured I
5    would check.
6              All right.  We will proceed without them,
7    whoever they may be.
8              Could you please state your full name for
9    the record.
10        A.   Glenn Randle.
11        Q.   And what is your current address?
12        A.   8304 Adirondack Trail, Austin, Texas.
13        Q.   Have you ever been deposed before,
14   Mr. Randle?
15        A.   Yes.
16        Q.   And when was that?
17        A.   Probably been ten years or so ago.
18        Q.   What was the case in which you were
19   deposed?
20        A.   I was a trustee for a friend of mine, a
21   trust.
22        Q.   A personal trust?
23        A.   Yeah, uh-huh.
24        Q.   And where was that?
25        A.   Austin.
```

1    fund?

2         A.    Well, just, you know, Southern Benefits as

3    a third-party administrator, an attorney, Jan

4    Jennings here.

5         Q.    We were talking earlier about how it's a

6    multiemployer plan.

7         A.    Uh-huh.

8         Q.    And I believe you said it's a national

9    plan?

10        A.    Yes.  You know, the term is international.

11        Q.    International.

12        A.    With the sheet metal workers, they have

13   employees in Canada, but they're not a part of this

14   fund currently to my knowledge.

15        Q.    Are there member employers located in

16   every state in the United States?

17        A.    Restate that question.

18        Q.    Are any of the member unions that are

19   participants in the fund -- strike that.

20              Are there any unions that participate in

21   this fund located in Massachusetts?

22        A.    Yes, you know the retirees in the SMW plus

23   are as we stated retirees living there.  Now, as far

24   as active participants, I'm not sure what level

25   employer and employee, but SMW plus definitely.

```
1          Q.    Do you have documentation, does the fund

2    have documentation of where its beneficiaries -- let

3    me just ask, do you call them beneficiaries or

4    participants?

5          A.    Participants.

6          Q.    Participants.  Do you have any

7    documentation about where the participants live?

8          A.    You know, the claims paid in the recent

9    past have been filed by chronological order.  They

10   all, of course, have the addresses on them, so that

11   information is available with the laborious process.

12   Our third-party administrator is installing new

13   software that will instantaneously identify

14   locations of the employees, but to date it's not

15   been kept that way.

16         Q.    Just for the record, defendants would

17   request that any documentation relating to the

18   residence of any of the participants specifically

19   with respect to the state of Massachusetts be

20   produced.

21              MS. CONNOLLY:  I'll just state for the

22   record that they're in the process of going through

23   some of that, and we will take your request under

24   advisement, but obviously producing documents

25   related to the residence of all their participants
```

1    Schering-Plough or Warrick drugs?

2         A.   Well, it's very possible and likely that

3    they have.  The report back to me has not identified

4    particular manufacturers or, you know, just the fact

5    that drugs had been used by the participants fell in

6    the class.

7         Q.   In preparation for your deposition today,

8    did you ask anyone what the current status of that

9    survey of these records is?

10        A.   Yes, I've visited with Teresa to -- not

11   Teresa, Sharon Faulkner is the lady that heads up

12   this software conversion, and she told me that it

13   was ongoing and that this information would be more

14   easily obtained in that conversion that they're

15   doing.

16        Q.   And did Ms. Faulkner or anyone else tell

17   you that the Fund has identified any drugs

18   manufactured by Schering-Plough or Warrick

19   pharmaceuticals?

20        A.   No, we didn't have that discussion in that

21   detail.

22        Q.   If you could, please, turn to Exhibit 6.

23   You testified earlier that the Fund through the plan

24   administrator maintains records of the claims that

25   it pays under the wraparound plus program?

# EXHIBIT 34



7534265
Nov 29 2005
4:41PM

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE )
LITIGATION )

)

THIS DOCUMENT RELATES TO ALL )
CLASS ACTIONS )

)

MDL No. 1456

CIVIL ACTION:  01-CV-12257-PBS

Judge Patti B. Saris

## PLAINTIFFS' MOTION FOR LEAVE TO JOIN PIPEFITTERS LOCAL 537 TRUST FUNDS AS A PLAINTIFF AND PROPOSED CLASS REPRESENTATIVE

Plaintiffs move the Court for leave to join as an additional Plaintiff and proposed Class 3

representative Pipefitters Local 537 Trust Funds ("Pipefitters Local").  In support of this motion,

Plaintiffs state as follows.

Consistent with the Court's Memorandum and Order Re: Motion for Class Certification

("Class Order"), on October 17 Plaintiffs filed a Third Amended Master Consolidated Class

Action Complaint ("TAC") that identified additional Class 1, 2 and 3 representatives (seven for

Class 1, two for Class 2 and 22 for Class 3).[1]  None of the newly proposed representatives for

Class 3 resides in Massachusetts nor made any payments for subject drugs in Massachusetts.

Consequently, the Track One Defendants are now objecting to the proposed Plaintiffs identified

in the TAC because they are not from Massachusetts and did not make any AWP-based

payments in the state, even though the Class Order does not mandate either condition as a

prerequisite.

---

[1] The Class Order denied Plaintiffs' motion to certify a nationwide class of Medicare Part B beneficiaries pending Plaintiffs' proposed amendment to add individual class representatives ("Class 1"); certified a statewide class of third-party payors ("TPPs") that pay MediGap supplemental insurance to cover Medicare co-payments, with intent to apply Mass. Gen. Laws ch. 93A ("Class 2"); and certified a statewide class of TPPs and consumers paying for physician-administered drugs in the private context based on AWP, with intent to apply Mass. Gen. Laws ch. 93A ("Class 3").  Class Order at 88.

1

Mindful of Defendants' position, and in a further effort to protect the Class, Plaintiffs seek to add Massachusetts-based consumers and TPPs to co-lead Classes 2 and 3, in addition to the TPPs originally proposed and those being added via the TAC. Although Plaintiffs reject Defendants' contention that only Massachusetts-based Plaintiffs can be considered class representatives, Plaintiffs propose to add the Pipefitters Local in the event that the Court desires a local presence.

The Pipefitters Local is located at 35 Travis Street, Unit One, Allston, Massachusetts 02134. Between January 1995 and December 2001, it made payments based on AWP for the following drugs marketed by Track One Defendants:[2]

> AstraZeneca: Zoladex
> BMS: Cytoxan, Etopophos, Paraplatin, Rubex and Taxol
> GSK: Zofran
> J&J: Procrit

Plaintiffs had been in discussions with Pipefitters Local prior to filing the TAC. In contrast to the process associated with identifying additional individual class representatives, identifying TPPs is much more involved. TPPs have a due diligence process that requires significant lead time to evaluate potential legal action. This process includes formal legal review and presentations to governing boards, whose approval is required to authorize action. Consequently, no Massachusetts representatives for Class 3 could be added to the case on or before the Court's October 17, 2005, deadline, although Plaintiffs had been intensely engaged in ongoing discussions with, and data analysis for, several Massachusetts-based TPPs before that date, including the Pipefitters Local. Pipefitters Local indicated that it needed additional time in order to complete the due diligence process, has completed that process and now wishes to join the case. *See* Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Leave to Join

---

[2] Pipefitters is continuing to identify AWP-based payments for other time periods and for subject drugs marketed by the Track Two Defendants.

Pipefitters Local 537 Trust Funds as a Plaintiff and Proposed Class Representative ("Berman Decl."), at ¶ 2.[3]

Defendants, notwithstanding their objections to the additional plaintiffs identified in the TAC, have advised that they oppose this motion to add a Massachusetts-based class representative. On November 17, 2005, Plaintiffs sought Defendants' agreement to add the Pipefitters Local via a proposed stipulation that (i) called for Pipefitters Local to provide documentation that it reimbursed based on AWP within one week of filing an addendum to the complaint; (ii) provided Defendants with 21 days to depose Pipefitters Local on issues of typicality; and (iii) authorized each side to file a 5-page additional brief to supplement the briefing authorized in the Court's Class Order. The intent behind this proposal was to keep the Track One additional certification proceedings on track, notwithstanding the addition of the Pipefitters Local. Defendants rejected this proposal. Berman Decl. at ¶ 3.[4]

In the event that the Court would like at least one of the Class 3 representatives to have a nexus to Massachusetts for purposes of applying Massachusetts law in a "test case" approach, this proposed amendment accomplishes that result.[5] Accordingly, Plaintiffs' respectfully submit that their motion should be granted.

---

[3] In the interests of full disclosure, Plaintiffs advise the Court that they will soon move to add another, additional proposed class representative from Massachusetts: Blue Cross/Blue Shield of Massachusetts ("BCBS MA"). Plaintiffs will promptly move to add BCBS MA to the litigation upon expiration of the 30-day pre-suit notice provision contained in Mass. Gen. Laws ch. 93A, § (9). Defendants, of course, can speed this process by waiving the 30-day pre-suit period.

[4] Plaintiffs have conferred with Defendants and attempted in good faith to resolve the issues pursuant to Local Rule 7.1(2). Berman Decl. at ¶ 3.

[5] Given the prospect of adding BCBS MA, as well as additional representatives *vis-à-vis* the Track Two Defendants as contemplated by the Court's just-issued Case Management Order No. 16, Plaintiffs have not sought to file a fourth amended complaint at this time and instead propose to include the Pipefitters Local by separate order.

3

DATED:  November 29, 2005.

By____/s/ Steve W. Berman_____
   Thomas M. Sobol (BBO#471770)
   Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735