UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) | MDL No. 1456 CIVIL ACTION:  01-CV-12257-PBS |
| ) | |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS. ) ) ) | Judge Patti B. Saris |

PLAINTIFFS' REPLY TO WATSON PHARMACEUTICALS, INC.'S
RESPONSE TO COURT ORDER REGARDING DISCOVERY SCHEDULE

Plaintiffs respectfully submit this Reply To Watson Pharmaceuticals, Inc.'s Response to Court Order Regarding Discovery Schedule.

I.   **Introduction**

Defendant Watson Pharmaceuticals, Inc. ("Watson") has diverged from the majority of the Track II Defendants, by proposing -- for itself only -- a substantially shortened discovery schedule, which, if adopted, would severely prejudice plaintiffs' ability to prosecute their case against Watson.[1]  For example, in its submission to the Court, Watson contends that the Court should impose a December 16, 2005 deadline for Watson's production of documents and electronic data, even though Watson will be unable to meet such a deadline.[2]  Even more significant for purposes of this Reply, Watson seeks to impose an unreasonably short deadline of January 13, 2006 for plaintiffs

---

[1] By way of reference, Plaintiffs hereby incorporate the arguments and schedule set forth in Plaintiffs' Memorandum Regarding Schedule for the Track II Defendants filed with this Court on December 9, 2005.

[2] Defense counsel recently has stated that he intends to produce e-mails and other electronic documents after December 16, 2005.  Watson also still has not produced all necessary, responsive electronic sales data for all relevant drugs.

to complete their fact discovery against Watson. Thus, even if Watson were to complete its electronic and hard copy production by its proffered deadline of December 16, plaintiffs would have less than four weeks, during the heart of the winter holiday season, to organize and review Watson's production for any substantive gaps, as well as to identify, notice and complete all current and ex-employee depositions.

Watson contends that it is entitled to impose such unreasonable deadlines due to its purportedly "tremendous effort to provide discovery" prior to December 3, 2005. Defs' Br. at 2. However, despite defendants' contention otherwise, the record shows that Watson's production efforts, prior to the last two weeks of November 2005, have been minimal, at best. Accordingly, Watson's discovery proposal should be denied.

## II.     Argument

Until very recently, Watson's efforts to produce responsive discovery have been severely deficient. More specifically, as defendant concedes at page 3 of its brief, the majority of Watson's document production was made in December 2002. However, that production was limited to productions made in earlier government investigations relating mainly to three drugs, namely Buspirone, Doxazosin and Oxycodone, which have never been at issue in this action.

Plaintiffs subsequently served Watson with several requests, including: Plaintiffs' Omnibus Requests for Production and Interrogatories to Defendants dated March 31, 2004; and, Plaintiffs' Request for Production to Defendants Regarding HHS ASPs, dated May 26, 2004. These requests sought responsive documents for 17 Watson drugs, and sought numerous document categories beyond the scope of Watson's earlier government productions. However, Watson all but disregarded plaintiffs' requests for production,

and prior to the last two weeks of November 2005, merely produced copies of select business plans, document retention policies, organizational charts and some sales and pricing information. This is particularly troubling because in response to a follow-up letter from plaintiffs seeking documents identified at 30(b)(6) depositions, Watson agreed in a November 24, 2004 letter to make a substantial supplemental production of documents. In short, the overwhelming majority of documents produced by Watson prior to November 2005 were merely copies of documents responsive to earlier investigations, but not responsive to plaintiffs' specific requests.

In early November 2005, plaintiffs' counsel wrote a letter to defense counsel demanding the production of all outstanding discovery. Even though Watson had an ongoing duty to produce documents without prodding from plaintiffs, it finally commenced producing thousands of pages of responsive documents in mid-November 2005. In light of its own delay, Watson's frenzied efforts to produce such documents certainly does not justify its prejudicial discovery schedule. According to its own submission, Watson dropped more than 10,000 pages of documents, more than a third the size of its entire prior production, on plaintiffs in the last two weeks of discovery, from November 18, 2005 through November 29, 2005. See Defs' Br. at 3. In fact, many of the documents produced during that period were literally produced just prior to or during depositions of Watson employees. Thus, by the time plaintiffs received such documents, they could not even timely serve subpoenas on ex-employees prior to the discovery deadline.

Clearly, Watson's November 2005 strategy was to appear to make substantial efforts to provide requested discovery in order to claim that plaintiffs waived their

opportunity to take discovery. However, Watson could not even achieve its aims as is evidenced by the fact that numerous documents and data remain outstanding. For example, defense counsel has stated that approximately 9,000 pages of e-mails and electronic documents are yet to be produced. Watson also has not produced all of the requested data necessary for plaintiffs' expert to calculate damages, and even refuses to produce data for Lorazepam, a drug identified at Appendix A of the Third Amended Complaint, on the grounds that the drug is identified only in the tablet form rather than the injectible form, even though this Court, in CMO # 10 already clearly stated that "[t]he identification of a drug as a Phase I Drug pursuant to this paragraph shall include **all NDCs for that defendant's product** set forth in Appendix A to the AMCC." (Emphasis added.) Watson should not be rewarded for producing agreed to materials at the eleventh hour of discovery.

The Court also should be aware that for most of the discovery period, Watson misinformed plaintiffs regarding the reimbursement of their brand name drugs, INFeD and Ferrlecit. Approximately a year and a half ago, on July 14, 2004, during Watson's 30(b)(6) deposition, the designee, Timothy Callahan, Vice President of Sales and Marketing who has been with defendant companies since 1993 and who has knowledge relating to INFeD and Ferrlecit (*See* Callahan 7/14/04 Dep. at p. 7 attached hereto as Exhibit A) was questioned by plaintiffs' counsel, Rachel Kopp, as to whether such drugs have been reimbursed under Medicare Part B:

> Q: Okay. So INFeD and Ferrlecit, they are reimbursed by Medicare Part B, correct?
>
> A: No.
>
> Q: They're not?

>   A:  (Witness nods.)
>
>   Q:  Does Watson market any brand drugs that are Medicare Part B drugs?
>
>   A:  Not that I would know of, I'm only familiar in terms of the overall structure with our products in my division.

*See* Callahan 7/14/04 Dep. at pp. 28-29 attached hereto as Exhibit A.  Mr. Callahan did not correct his testimony that day nor on the following day during his continued 30(b)(6) deposition.  Even though defense counsel must have known that Mr. Callahan's response was incorrect, they never made any effort to correct the incorrect statement.  Rather, it was not until Mr. Callahan was deposed again as a fact witness on November 29, 2005, nearly a year and a half later, that he finally admitted that both INFeD and Ferrlecit were indeed reimbursed under Medicare Part B.

Because Watson still has not yet: (i) produced a single e-mail or memo outside of those produced in response to government subpoenas; (ii) completed its hard copy or electronic data productions; and (iii) only began producing substantially responsive documents to plaintiffs requests during the last two weeks of November 2005, its proposed discovery schedule and attempt to preclude plaintiffs from deposing additional witnesses should be denied.

### III.     CONCLUSION

For all of the foregoing reasons, defendant Watson Pharmaceuticals, Inc.'s Response to Court Order Regarding Discovery Schedule should be denied.

Respectfully submitted,

Dated:  December 15, 2005               By:     /s/ Allan M. Hoffman
                                        Allan Hoffman
                                        Marc H. Edelson
                                        HOFFMAN & EDELSON, LLC
                                        45 West Court Street
                                        Doylestown, PA 18901
                                        Telephone: 215-230-8043
                                        Telecopier: 215-230-8735

                                        Thomas M. Sobol (BBO#471770)
                                        Edward Notargiacomo (BBO#567636)
                                        Hagens Berman Sobol Shapiro LLP
                                        One Main Street, 4th Floor
                                        Cambridge, MA  02142
                                        Telephone: (617) 482-3700
                                        Facsimile: (617) 482-3003
                                        **LIAISON COUNSEL**

                                        Steve W. Berman
                                        Sean R. Matt
                                        Robert F. Lopez
                                        Hagens Berman Sobol Shapiro LLP
                                        1301 Fifth Avenue, Suite 2900
                                        Seattle, WA  98101
                                        Telephone: (206) 623-7292
                                        Facsimile: (206) 623-0594

                                        Elizabeth Fegan
                                        Hagens Berman Sobol Shapiro LLP
                                        60 W. Randolph Street, Suite 200
                                        Chicago, IL  60601
                                        Telephone: (312) 762-9235
                                        Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611


Kenneth A. Wexler
Jennifer F. Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Samuel D. Heins
Alan I. Gilbert
Susan E. MacMenamin
Heins, Mills & Olson, P.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone: (612) 338-4605
Facsimile: (612) 338-4692

**CO-LEAD COUNSEL FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

    I hereby certify that I, Allan M. Hoffman, an attorney, caused a true and correct copy of the foregoing, **PLAINTIFFS' REPLY TO WATSON PHARMACEUTICALS, INC.'S RESPONSE TO COURT ORDER REGARDING DISCOVERY SCHEDULE** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on December 15, 2005, a copy to LexisNexis File & Serve for Posting and notification to all parties.

    /s/ Allan M. Hoffman
    Allan M. Hoffman

    *Attorneys for Plaintiffs*

# EXHIBIT A

```
1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2      _____
                                    )
3      IN RE PHARMACEUTICAL INDUSTRY )   MDL No. 1456
       AVERAGE WHOLESALE PRICE       )
4      LITIGATION                    )
                                    )
5      -----------------------------*
                                    )
6      This Document Relates To:     )   01-CV-12257-PBS
            ALL ACTIONS----------    )
7                                    )
       -----------------------------*
8                  HIGHLY CONFIDENTIAL
9
10                    Wednesday, July 14, 2004
11                    New York, New York
12                    3:58 p.m.
13            Deposition of TIMOTHY CALLAHAN, held
14     at the offices of Cohen, Tauber, Spievack &
15     Wagner, LLP, 420 Lexington Avenue, New York,
16     New York, pursuant to 30(b)(6) Notice, before
17     Josephine H. Fassett, a Certified Shorthand
18     Reporter and Notary Public of the State of New
19     York.
20
21
22
```

Timothy Callahan  
Volume I  

Highly Confidential  
New York, NY  

July 14, 2004  

3 (Pages 6 to 9)

**Page 6**

1  mean when you nod, the court reporter can't
2  understand that, so we need a Yes or a No.
3     A   Okay.
4     Q   So, first, I would like to show
5  you what we have marked here as Exhibit 1.
6     If you could just take a look at
7  that. And that's the Notice that we're going to
8  be talking about today that you're here in
9  reference to.
10    Do you feel confident that you
11 can, at least to the best of your knowledge,
12 tell us about these Areas of Inquiry for the
13 brand drugs at Watson?
14    A   Yes.
15    Q   Okay. First of all, can you just
16 tell us first the two brand drugs are
17 Ferrlecit --
18    A   Right.
19    Q   -- and INFeD, correct?
20    A   Yes.
21    Q   And does Watson have any other
22 brand drugs?

**Page 7**

1     A   Yes.
2     Q   Okay. And, first, how long have
3  you been at Watson?
4     A   Approximately four years.
5     Q   And have you always been in the
6  same position?
7     A   No. No.
8     Q   Okay. What position did you hold
9  before?
10    A   I started with Watson as Director
11 of Marketing and then was Executive Director of
12 Marketing and now to the current position which
13 is Vice President of Sales and Marketing.
14    Q   Okay. And what year did you start
15 as Director of Marketing?
16    A   That would have been 2000.
17    Q   Okay. And before Watson what did
18 you do?
19    A   I worked for Schein
20 Pharmaceutical.
21    Q   Okay. And when did you start with
22 Schein?

**Page 8**

1     A   August 1993.
2     Q   Okay. And what was your role
3  there when you first started?
4     A   Sales representative.
5     Q   And then where did you go from
6  sales representative at Schein?
7     A   Sales training.
8     Q   Okay. And then where?
9     A   To marketing, associate product
10 manager.
11    Q   Okay. And from there?
12    A   To product manager.
13    Q   Okay. And what year was that, if
14 you remember?
15    A   Gosh, it was probably 1997 or so.
16    Q   Okay. And then from there were
17 you product manager when Schein was acquired by
18 Watson?
19    A   Was director of marketing when
20 Watson acquired Schein.
21    Q   Okay. And did you stay on as
22 director of marketing at Watson?

**Page 9**

1     A   Yes.
2     Q   Okay. So first let's just talk
3  about director of marketing at Schein.
4     What were you responsible for as
5  director of marketing at Schein?
6     A   Managing the overall strategy and
7  tactics associated with the two products INFeD
8  and Ferrlecit.
9     Q   Exclusively for those two products
10 was your main responsibilities?
11    A   Yes.
12    Q   You said strategy and tactics,
13 what exactly does that entail?
14    A   Strategy would be things such as
15 what is the best way to position our product,
16 which clinical aspect should we focus on.
17    Tactics would be things like a
18 journal advertisement, a detail aid for a sales
19 representative to carry with them.
20    Q   Okay. And when you're talking
21 about positioning the products, where did you
22 position them, in what respect were you in

Timothy Callahan  
Volume I

Highly Confidential  
New York, NY

July 14, 2004

8 (Pages 26 to 29)

**Page 26**

1  for the business because as we look at Ferrlecit
2  and INFeD, they're both iron, so we kind of
3  looked at that as one product across a
4  continuum.
5      Q    But they would differentiate
6  within the market plan, let's say, if there was
7  a difference between the INFeD target or the
8  Ferrlecit target?
9      A    If there was one in there, yes, it
10 would be there.
11     Q    Were those marketing plans, were
12 they for the nephrology division or were they
13 for just iron replacement?
14     A    The nephrology division.
15     Q    Okay. Did iron replacement have
16 its own marketing plan?
17     A    No, one is really the other --
18     Q    Okay.
19     A    -- in terms of the way it was
20 looked at.
21     Q    Are there any other drugs in the
22 Nephrology Division other than INFeD and

**Page 27**

1  Ferrlecit?
2      A    Yes.
3      Q    And what might they -- what other
4  drugs would they be?
5      A    There is a small line of renal
6  vitamins.
7      Q    So they would also probably be
8  addressed in the marketing plans?
9      A    No.
10     Q    Did they have their own marketing
11 plans or was it just not applicable?
12     A    No.
13     Q    And how often did those marketing
14 plans come out, were they regularly?
15     A    Usually once per year.
16     Q    And what types of information
17 might they discuss about INFeD and Ferrlecit?
18     A    Target customers, budgets,
19 forecasts, tactics, strategies.
20     Q    And who drafted those marketing
21 plans?
22     A    The Product Management Team.

**Page 28**

1      Q    And who approved those marketing
2  plans?
3      A    To the extent that they were
4  approved it would be a management committee.
5      Q    Okay. And then what was done with
6  them, I mean, were they presented to anyone?
7      A    To the management committee they
8  were presented.
9      Q    Okay. And then once the
10 management committee, I guess, approved them, as
11 much as they did approve them, then what
12 happened to the marketing plans?
13     A    It would be executed by the
14 Product Management Team and sales force and
15 whoever else was a part of that.
16     Q    Okay. And that's still just for
17 the Nephrology Division?
18     A    Correct. I can't comment
19 specifically for the other groups as I'm not as
20 familiar with what they would do.
21     Q    Okay. So INFeD and Ferrlecit,
22 they are reimbursed by Medicare Part B, correct?

**Page 29**

1      A    No.
2      Q    They're not?
3      A    (Witness nods.)
4      Q    Does Watson market any brand drugs
5  that are Medicare Part B drugs?
6      A    Not that I would know of, I'm only
7  familiar in terms of the overall structure with
8  our products in my division.
9      Q    Okay. Now, you said that
10 ultimately the Brand Division reports to a COO,
11 correct?
12     A    Correct.
13     Q    And do you use any of the same
14 documents, let's say, business plans,
15 company-wide policy, anything to share any of
16 that with the generic side?
17     A    No.
18     Q    None? You have all your own
19 policies, procedures, et cetera?
20     A    Policies and procedures for
21 general business activities and, again, expense
22 report and things like that would be Watson wide