## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION, | MDL No. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| | Judge Patti B. Saris |

THIS DOCUMENT RELATES TO:

*State of Nevada v. Abbott Labs., Inc. et al.,* Case No. CV02-00260

*State of Nevada v. American Home Products, et al.,* CA No. 02-CV-12086-PBS

*State of Montana v. Abbott Labs., Inc., et al.* D. Mont. Cause No. CV-02-09-H-DWM

## DECLARATION OF JENIPHR BRECKENRIDGE IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR EXPEDITED BRIEFING SCHEDULE AND ORAL ARGUMENT

I, Jeniphr Breckenridge, declare:

1.      I am a partner in the law firm of Hagens Berman Sobol Shapiro LLP and I am one of the lawyers representing the States of Nevada and Montana in these cases.

2.      I have been involved in the discovery efforts on the part of the State of Nevada and the State of Montana in these cases. Most recently, as described in the previously-filed Declaration of Jeniphr Breckenridge in Support of Opposition to Defendants' Motion for Expedited Briefing Schedule and Oral Argument, I have worked to address defendants' allegations that the State of Nevada and the State of Montana have destroyed – or "failed to preserve" – documents relevant to this lawsuit.

3.      Before I describe the steps taken and the assurances we have received from State employees that documents were not destroyed, I note that the investigation is ongoing. In some manner, such investigations are always ongoing because the discovery obligations of the parties

and counsel are ongoing.  Here, the investigation has been impacted by its timing.  Although we are confident that we have investigated the matter as fully as possible, December is a difficult month to gather information.  We will continue to interview employees in both States to discharge all discovery obligations.  One step that would be taken if we had had more time is to have individuals file individual affidavits reflecting the information given by State employees.

> ### a.   The State of Nevada Investigations and Measures to Preserve Evidence

4.     I previously described the defendants' casual raising of the issue in connection with the Nevada case with Deputy Attorney Tim Terry and me following a deposition on November 17, 2005.  The State of Nevada did not take the matter casually.  On behalf of the State of Nevada, we immediately began an investigation of what measures had been taken to preserve relevant evidence.  We did this even though (1) I had been working closely with State personnel for three months to respond to defendants' discovery requests and had seen or heard of no evidence that documents had been destroyed; and (2) defendants' allegations were vague and did not request the State to take any actions.

5.     In order to investigate, I first contacted key individuals with relevant information to confirm their document handling practices and to confirm whether and how they had disposed of documents.  No one reported destroying documents.

6.     I also interviewed the state archives and records management departments to confirm how they would handle State Medicaid documents, including the disposition and eventual destruction of the documents.  I asked and no one reported destroying documents.

7.     John Liveratti, Compliance Chief, Division of Health Care Finance and Policy ("DHCFP") for the State of Nevada is one of the individuals I interviewed.  Mr. Liveratti was also deposed in this case on November 17, 2005.  Mr. Liveratti testified at his deposition that he first became aware of this lawsuit approximately 4 to 5 months ago.

8.     At the time the lawsuit was filed in 2002, Mr. Liveratti employed by the State of Nevada's Medicaid division.  Mr. Liveratti's job responsibilities at that time would ***not*** have

included information that would be relevant to this lawsuit. In Mr. Liveratti's words, in an

interview with me, on December 9, 2005:

> I was also not asked if given my position in 2002, when the lawsuit
> was filed, I would have been someone who would be notified of
> the filing of the lawsuit. If I had been asked, the answer would be
> no. The lawsuit would not have affected me in my position. At
> the time, I was the SURS Chief. Nothing I did in that position
> would be germane to this lawsuit. In other words, in 2002, I had
> no responsibilities related to issues in this lawsuit.

This is a direct quotation from Mr. Liveratti.

9.     In the same interview, Mr. Liveratti also told me:

> The fact is that with one exception nothing I do in my current
> position would be germane to this lawsuit. The one exception is
> that I am in charge of the State Plan Amendment process.
> Principally this involves organizing and conducting the public
> hearing process for the Amendments to the State Plan for
> Medicaid.

10.     Mr. Liveratti became involved in the lawsuit in approximately May of this year

when Medicaid Administrator Charles Duarte asked him to supervise certain aspects of the

State's responses to requests for documents. This was an organizational role. He carried out this

role by searching for and producing responsive documents and directing his staff to do the same.

11.     I have spoken to Mr. Liveratti several times in connection with the of State of

Nevada's efforts to preserve evidence. On December 9, 2005 he confirmed for me:

> Based on what I know about the documents relevant to this lawsuit
> from reviewing the discovery requests and working to produce
> responsive information, I have never destroyed documents
> potentially relevant to this lawsuit either deliberately or
> accidentally. Further, I am not aware of any State employee who
> has destroyed such documents. No one reported any deliberate or
> accidental destruction of documents to me during my work
> searching for and producing documents to counsel for purposes of
> this lawsuit. Destruction of documents would have been relevant
> to my investigation and I believe State employees would have told
> me if they had destroyed documents we were looking for.

12.     Yet, defendants in this case used Mr. Liveratti's testimony to suggest that *no one* in the division was aware of this lawsuit or that the division did not undertake proper document preservation measures in connection with the lawsuit. Mr. Liveratti has told me that when he gave that testimony, he was speaking on behalf of himself only – not the division. He was not testifying as a State designee; he was testifying as a fact witness at the defendants' request. He was not asked, nor does he know, what others in the division knew about this lawsuit or document preservation measures in 2002. He did tell the examining lawyer that *he did not know* if others received instruction to preserve documents.

13.     During the course of the investigation into the State's document preservation measures – and after the Liveratti deposition – I confirmed that at or around the time it was filed in February, 2002, this lawsuit appeared on the Monthly Case Report circulated among Nevada state agencies. It appeared on that list as *State v. Abbott Pharmaceuticals* and *State v. American Home Products*. John Liveratti located this document and showed it to me. John Liveratti confirmed that the case appeared on the list. The purpose of the list is to advise State employees of lawsuits involving the State. Although the State does not have a copy of the 2002 list reflecting the lawsuit's first listing, a copy of the current list is attached as Exhibit 1. The format would be identical.

14.     I also interviewed Coleen Lawrence in connection with the investigation into measures taken by the State to preserve documents. Ms. Lawrence is the Medical Pharmacy Director. Ms. Lawrence's account of document preservation was identical to Mr. Liveratti's. She told me that she has retained all working documents. She is not aware of instances where staff have destroyed documents.

15.     As an added measure to ensure compliance of proper litigation document handling practices going forward, DHCFP Administrator Charles Duarte issued a reminder memorandum confirming proper practices. I drafted the email. Mr. Duarte circulated the memorandum and defendants written discovery to the State on November 30, 2005. A true and accurate copy is attached as Exhibit 2 to this Declaration.

16.     After that memorandum was issued, I interviewed other employees. I showed those employees the memorandum and asked them about their document handling practices and document destruction practices as they related to material that might be relevant to this lawsuit. No one reported to me that they destroyed documents.

**b.     State of Montana Investigation and Measures to Preserve Documents**

17.     On or about the same time as I launched the Nevada investigation, I undertook the same steps in the State of Montana. I did this even though the subject of document destruction or preservation was not raised in Montana formally until December 1, 2005.

18.     In order to investigate, I first contacted key individuals with relevant information to confirm their document handling practices and to confirm whether and how they had disposed of documents. No one reported destroying documents.

19.     As an added measure to ensure compliance of proper litigation document handling practices going forward, John Chappuis, Administrator of the Montana Department of Public Health and Human Services (also known as State Medicaid) issued a reminder memorandum confirming proper practices. My co-counsel, Joe Mazurek, handled the contacts with Mr. Chappuis. Mr. Chappuis circulated the memorandum and defendants written discovery to the State on December 14, 2005. A true and accurate copy is attached as Exhibit 3 to this Declaration.

20.     Among the individuals I interviewed regarding their document handling practices and practices in connection with this litigation were both the State designees for the Rule 30(B)(6) deposition, Jeff Buska, Senior Medicaid Policy Analyst, Office of Planning Coordination and for Department of Public Health & Human Services, and Dan Peterson, Health Policy and Services Division Program Officer. Neither Mr. Buska nor Mr. Peterson were aware of instances under which individuals destroyed documents relevant to this litigation.

21.     During the course of my investigation, I confirmed that in February, 2002, the month the lawsuit was originally filed in Montana, representatives from the State Attorney General's Office contacted DPHHS about the filing of the lawsuit. Jeff Buska and Shannon Marr, Medicaid Program Officer and Dan Peterson's predecessor were both contacted. The records show that Shannon Marr met with the Attorney General's Office. The records further show that DPHHS conducted some of the initial research into drug data related to the complaint.

22.     In addition to interviewing Dan Peterson informally regarding his document preservation practices and those of other Montana Medicaid staff, I also examined him under oath on December 15, 2005 at his deposition as the State's Fed. R. Civ. P. 30(b)(6) deposition. A true and accurate copy of this examination in the court reporter's rough form is attached to this Declaration as Ex. 4. In summary, Mr. Peterson confirmed his document handling practices, the fact that he had not destroyed documents and the fact that he was not aware of anyone at the State who had.

23.     Defendants had the opportunity to examine Mr. Buska under oath regarding this topic on Wednesday, December 14, 2005 at his depositions as the 30(b)(6) designee. They did not do so.

I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Jeniphr A.E. Breckenridge
HAGENS BERMAN SOBOL SHAPIRO
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

December 21, 2005, Seattle, Washington
Date and Place of Execution

21.     During the course of my investigation, I confirmed that in February, 2002, the month the lawsuit was originally filed in Montana, representatives from the State Attorney General's Office contacted DPHHS about the filing of the lawsuit. Jeff Buska and Shannon Marr, Medicaid Program Officer and Dan Peterson's predecessor were both contacted. The records show that Shannon Marr met with the Attorney General's Office. The records further show that DPHHS conducted some of the initial research into drug data related to the complaint.

22.     In addition to interviewing Dan Peterson informally regarding his document preservation practices and those of other Montana Medicaid staff, I also examined him under oath on December 15, 2005 at his deposition as the State's Fed. R. Civ. P. 30(b)(6) deposition. A true and accurate copy of this examination in the court reporter's rough form is attached to this Declaration as Ex. 4. In summary, Mr. Peterson confirmed his document handling practices, the fact that he had not destroyed documents and the fact that he was not aware of anyone at the State who had.

23.     Defendants had the opportunity to examine Mr. Buska under oath regarding this topic on Wednesday, December 14, 2005 at his depositions as the 30(b)(6) designee. They did not do so.

I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Jeniphr A.E. Breckenridge
HAGENS BERMAN SOBOL SHAPIRO
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101

December 21, 2005, Seattle, Washington
Date and Place of Execution

# Exhibit 1

# MONTHLY CASE REPORT

| Status | Close | Name | PVDR # | Case # | Open | Closed | Source |
|--------|-------|------|--------|--------|------|--------|--------|
| Open | | | | | | | |

REDACTED

REDACTED

REDACTED

Tuesday, June 29, 2005

| Status | Close | Name | PVDR # | Case # | Open | Closed | Source |
|--------|-------|------|--------|--------|------|--------|--------|

REDACTED

| | | | | | | | |
|--------|-------|------|--------|--------|------|--------|--------|
| STATE vs. Abbott Pharmaceuticals | | | 0354 | 2/18/2002 | | | Other |
| STATE vs. American Home Products | | | 0356 | 3/8/2002 | | | Other |

REDACTED

nesday, June 25, 2003

| Status | Close | Name | | PVDR # | Case # | Open | Closed | Source |
|--------|-------|------|--|--------|--------|------|--------|--------|

REDACTED

REDACTED

REDACTED

| Status | Close | Name | PVDR # | Case # | Open | Closed | Source |
|--------|-------|------|--------|--------|------|--------|--------|

REDACTED

# Exhibit 2

## Jeniphr Breckenridge

| | |
|---|---|
| **From:** | Chuck Duarte [cduarte@dhcfp.state.nv.us] |
| **Sent:** | Wednesday, November 30, 2005 8:59 AM |
| **To:** | Everyone (DHCFP) |
| **Cc:** | TIM TERRY; Jeniphr Breckenridge; CINDY PYZEL; Darrell Faircloth ; Mike Willden; Mary Liveratti |

**Importance:** High

To:     Division of Health Care Financing and Policy staff

From:   Charles Duarte, Administrator

Re:     In re: Average Wholesale Price Litigation
        Ongoing Litigation / Document Request

As many, of you are aware, the State of Nevada is involved in litigation entitled *State of Nevada v. American Home Products Corp., et al.;* this lawsuit is also known as the Average Wholesale Price Litigation or "AWP Litigation. This lawsuit was brought by the State of Nevada in 2002 through its Attorney General on behalf of the State of Nevada and persons residing in Nevada who have paid inflated charges for medications based in whole or in part on the defendant pharmaceutical companies use of the Average Wholesale Price for pricing of drugs for which the State reimburses.

The purpose of this e-mail is to confirm the proper handling and preservation  of documents which might be relevant to the lawsuit.  In this instance, the term "documents" is interpreted broadly to encompass paper, electronic and any other recorded forms of information that might be related to the lawsuit. **It is extremely important that any documents pertaining to the litigation are identified,  separated from other files and protected. All destruction of records pertaining to the lawsuit must be stopped until the legal action has been resolved. Although the relevant time period for the lawsuit extends back to 1991, it is important that all documents which might be relevant are preserved and maintained regardless of their date.  A description of documents that might be relevant is included below.**

This handling is consistent with the State's Authorized Records Retention and Disposition Schedules section relating to "Disposition Holds - Litigation."

In most cases, these steps have already been taken.  We are issuing this e.mail as a reminder.

This request relates to your files, both electronic and paper, as well as division files and the files for any other individuals for whom you have responsibility.

To help you determine whether information might be covered by this communication, we have attached a copy of the questions and requests for documents that defendants have served upon the State.  The title of this list of questions and requests is Defendants' First Set of Interrogatories and Requests for Production to the State of Nevada.  Again, most of you have seen this document before as you have been involved in searching for and producing documents responsive to the questions and requests from your department's files, your files or the files of others.

A summary of the types of information - in both electronic and paper form -  which would be covered follows.  This is a summary only and is no substitute for the description in the attached document.

Generally all documents related to the division's prescription drug program should be separated from other files and preserved. More specifically, these documents might included documents containing information on the following list as well as others like them.

- The State's reimbursement of or expenditures for pharmaceutical products or dispensing fees;
- Pricing for the reimbursements or expenditures: AWP, MAP, MAC, WAC, EAC, Best Price, or other prices - from any source
- The methodologies for pricing and/or setting of reimbursement rates
- The cost of drugs
- Legislative testimony and preparation for legislative testimony involving any topic related to pharmaceutical products
- Public hearings, preparation for public hearings and any public comment involving any topic related to pharmaceutical products
- Communications with the federal government (including, but not limited to, HHS Offices of the Inspector General, HCFA, General Accounting Office) , state governments or pharmaceutical manufacturers and/or their employees related to pharmaceutical products, including - but not limited to -  studies and reports
- Pharmaceutical company information regarding drug pricing
- NDC Codes
- J-Codes
- The Federal Supply Schedule
- Rebate and Supplemental Rebate programs related to pharmaceutical drugs, including the programs themselves and any hearing mechanism for rebate disputes
- Provider comments regarding the State's reimbursement or expenditures for drugs and dispensing fees
- Documents related to Third Party Administrators, Benefits Consultants, or PBMs working for the State - whether or not actually retained
- Reviews or evaluations or studies of the State Medicaid program
- Dual eligible
- Provider payments
- cost containment efforts related to State expenditure for drugs
- Communications with National Association of Medicaid Fraud Control Units, the National Association of Attorneys General, PAL
- Responses to federal or state assessment, study , analysis , review or audit concerning reimbursement of pharmaceutical products, definitions or methods of determining EAC, use of AWP or dispensing fees.
- Ven-A-Care of the Florida Keys

If you have any questions about his request or believe that you are aware of circumstances under which these steps have not been followed for this litigation, please contact Deputy Attorney General **L.** Timothy Terry at 775.684.1185 **LTTERRY@ag.state.nv.us**  or the State's outside counsel, Jeniphr Breckenridge of Hagens Berman Sobol Shapiro at 206.224.9325 or jeniphr@hbsslaw.com .


**Charles Duarte**
Administrator
Division of Health Care Financing & Policy
1100 E. Williams St. Suite 101
Carson City, Nevada 89701
PH:  (775) 684-3677
Fax: (775) 687-3893

# Exhibit 3

To:     DPHHS, HEALTH RESOURCES DIVISION

From:   John Chappuis, Deputy Director

Re:     In re: Average Wholesale Price Litigation
        Ongoing Litigation / Document Request

As many - if not all - of you are aware, the State of Montana is involved in litigation entitled *State of Montana v Abbott Labs, et al* ; this lawsuit is also known as the Average Wholesale Price Litigation or "AWP Litigation.  This lawsuit was brought by the State of Montana in 2002 through its Attorney General Mike McGrath on behalf of the State of Montana and persons residing in Nevada who have paid inflated charges for medications based in whole or in part on the defendant pharmaceutical companies use of the Average Wholesale Price for pricing of drugs for which the State reimburses.

The purpose of this e-mail is to confirm the proper handling and preservation  of documents which might be relevant to the lawsuit.  In this instance, the term "documents" is interpreted broadly to encompass paper and electronic and any other recorded forms of information that might be related to the lawsuit.  **It is extremely important that any documents pertaining to the litigation are identified,  separated from other files and protected.  All destruction of records pertaining to the lawsuit must be stopped until the legal action has been resolved.  Although the relevant time period for the lawsuit extends back to 1991, it is important that all documents which might be relevant are preserved and maintained regardless of their date.**

In most cases, these steps have already been taken.  We are issuing this e.mail as a reminder.

This request relates to your files, both electronic and paper, as well as division files and the files for any other individuals for whom you have responsibility.

To help you determine whether information might be covered by this communication, we have attached a copy of the questions and requests for documents that defendants have served upon the State.  The title of this list of questions and requests is Defendants' First Set of Interrogatories and Requests for Production to the State of Montana.  Again, many of you have seen this document before as you have been involved in searching for and producing documents responsive to the questions and requests from your department's files, your files or the files of others.

A summary of the types of information - in both electronic and paper form -  which would be covered follows.  This is a summary only and is no substitute for the description in the attached document.

- The State's reimbursement of or expenditures for pharmaceutical products or dispensing fees;

- Pricing for the reimbursements or expenditures: AWP, MAP, MAC, WAC, EAC, Best Price, or other prices - from any source

- The methodologies for pricing and/or setting of reimbursement rates

- Documents related to the cost of drugs

- Legislative testimony and preparation for legislative testimony involving any topic related to pharmaceutical products

- Public hearings, preparation for public hearings and any public comment involving any topic related to pharmaceutical products

December 19, 2005
Page 2

- Communications with the federal government (including, but not limited to, HHS Offices of the Inspector General, HCFA, General Accounting Office) , state governments or pharmaceutical manufacturers and/or their employees related to pharmaceutical products, including - but not limited to - studies and reports

- Pharmaceutical company information regarding drug pricing

- NDC Codes

- J-COdes

- The Federal Supply Schedule

- Rebate and Supplemental Rebate programs related to pharmaceutical drugs, including the programs themselves and any hearing mechanism for rebate disputes

- Provider comments regarding the State's reimbursement or expenditures for drugs and dispensing fees

- Documents related to Third Party Administrators, Benefits Consultants, or PBMs working for the State - whether or not actually retained

- Reviews or evaluations or studies of the State Medicaid program

- Dual eligible

- Provider payments

- cost containment efforts related to State expenditure for drugs

- Communications with National Association of Medicaid Fraud Control Units, the National Association of Attorneys General, PAL

- Responses to federal or state assessment, study , analysis , review or audit concerning reimbursement of pharmaceutical products, definitions or methods of determining EAC, use of AWP or dispensing fees.

- Ven-A-Care of the Florida Keys


If you have any questions about his request or believe that you are aware of circumstances under which these steps have not been followed for this litigation, please contact outside counsel Joe Mazurek of Crowley, Haughey, Hanson, Toole & Dietrich PLLP  at 457-2030 or jmazurek@crowleylaw.com  or Jeniphr Breckenridge of Hagens Berman Sobol Shapiro at 206.224.9325 or jeniphr@hbsslaw.com .

# Exhibit 4

```
1                THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MASSUCHESETTS

3                         ---oOo---

4

5

6    In re:  PHARMACEUTICAL,          MDL DOCKET NO.

7    INDUSTRY AVERAGE WHOLESALE       CIVIL ACTION

8    PRICE LITIGATION                 01CV12257-PBS

9    _____

10

11   THIS DOCUMENT RELATES TO:

12   ALL ACTIONS

13   _____

14                     Volume II

15              DEPOSITION OF JEFF BUSKA

16                     Taken at

17                  Law Offices of

18       Gough, Shanahan, Johnson & Waterman

19            33 South Last Chance Gulch

20                 Helena, Montana

21               December 14, 2005

22                   9:00 a.m.

23

24

25
```

1    So if their usual and customary is lower than our

2    stated reimbursement rate, we will reimburse at the

3    lower rate.

4        Q.   Okay.

5             MS. SMITH-KLOCEK:  Mr. Peterson, I thank

6    you for coming in today, and I believe that that

7    concludes the questions that we have for you.

8             MS.  BRECKENRIDGE:  I have some questions.

9    I would like a chance to meet with the witness.

10            MS. SMITH-KLOCEK:  Sure.

11            (Recess.) ^ (( examination by counsel for

12   plaintiff ^ ((.

13       Q.   (BY MS.  BRECKENRIDGE)  Mr. Peterson, I

14   just have a few questions for you.

15            You were asked earlier whether you had ever

16   received notice regarding this lawsuit and

17   directions regarding your documents.

18            Do you know when this lawsuit was filed?

19       A.   No, ^ (( no idea.

20       Q.   When did you start with the state?

21       A.   August of 2002.

22       Q.   So if the lawsuit was filed prior to

23   August, 2002, and notice was sent out at the time

24   the lawsuit was filed, would you have necessarily

25   received notice?

```
 1        A.    Not if I wasn't an employee of the state.
 2        Q.    Would you have received other notifications
 3   regarding the filing of the lawsuit and document
 4   handling?
 5        A.    I just don't recall receiving anything, so.
 6        Q.    Would you know if others within the state
 7   Medicaid program received communications at the
 8   time the lawsuit was filed?
 9        A.    I couldn't speak to that, I don't know.
10        Q.    Is there a possibility that others received
11   communications prior to the time that you were
12   hired?
13             MS. SMITH-KLOCEK:  Objection.
14             MS.  BRECKENRIDGE:  Basis.
15             MS. SMITH-KLOCEK:  Possibility?  Speculate.
16             MS.  BRECKENRIDGE:  You may answer.
17        A.    Possible, yes.
18        Q.    (BY MS.  BRECKENRIDGE)  Okay.  And you are
19   aware that the defendants represented by counsel
20   here today and co-defendants have accused the state
21   of Montana of destroying documents, aren't you?
22        A.    Correct, yes.
23        Q.    I want to ask you pursuant to that what
24   your own document handling has been since you
25   started with the state.  Did you receive certain
```

94

1      files when you started with the state?

2         A.    When I assumed the job of program officer,

3      I basically inherited whatever files were at my

4      work station.  So anything that, any of the

5      previous program officer may have left I basically

6      assumed control of those ^ (( no comma ^ ((.

7         Q.    Is that what is known as the program

8      officer files?

9         A.    Yes.

10        Q.    Is it the understanding, let me ask a

11     different question.  Is it the practice within stat

12     Medicaid that when an individual assumes a

13     position, they also assume the files for that

14     position?

15        A.    Yes.  That's really an assumption on my

16     part but that is really how it's done.  Just

17     everything stays there, and that, you know, if you

18     need to look back on anything you refer to those

19     old files.

20        Q.    Who was your predecessor in your position?

21        A.    Ms. Shannon Marr.

22        Q.    Was it Shannon Marr's files you received

23     when you began your position?

24        A.    Correct.

25        Q.    Did Shannon Marr or anyone indicate to you

 1     that you were receiving anything than the complete

 2     program officer files?

 3        A.    I never had the opportunity to talk to

 4     /SHAPB in an March.  She was gone before I had

 5     gotten there.

 6        Q.    But you Nevada heard of any suggestion that

 7     you didn't receive the complete files, did you?

 8        A.    No.

 9        Q.    And I would like to ask you a few questions

10     about how you've handled the documents since you

11     started in the position.

12        A.    Okay.

13        Q.    About seven months after the lawsuit was

14     filed.

15              What has your document handling practice

16     been?

17        A.    Essentially, when I create a document, I

18     put a number on it, I save a copy for myself and

19     put it in my program files.  Then that is sent over

20     to, I hand them over to our administrative

21     assistants who have either a chronological or

22     subject file that they would file those documents

23     in.

24        Q.    When you say program files, has that also

25     been referred to here, today, as the program

96

```
1    officer files?

2         A.    Correct.

3         Q.    Are they basically the same thing?

4         A.    Yes.

5         Q.    Have you gone through and destroyed any

6    documents since you started in your position?

7         A.    No.

8         Q.    You don't keep every document, though, do

9    you?

10        A.    No.   Some things that I will -- I'll get

11   rid of or destroy would be any protected health

12   information from clients with Social Security

13   numbers, those type of things where I just wouldn't

14   want them falling into anybody else's hands because

15   I have a duty to protect health information for

16   somebody.

17        Q.    Okay.   And as far as the document retention

18   schedule that you were asked about earlier, does it

19   fall within your job responsibilities to handle

20   document retention?

21        A.    No, it doesn't.

22        Q.    Have you had occasion to archive any of

23   your documents since you began in your position?

24        A.    Before I heard from you I kind of ran out

25   of room for my filing cabinet, so I went ahead and
```

1      prepared eight or nine boxes for archiving, was

2      getting ready to do the paperwork on that.   Then I

3      found out about the lawsuit, so they had to stay.

4          Q.   When you say you were getting ready to

5      archive documents, archive is not another word for

6      destroy, is it?

7          A.   No.   It's just to go into storage

8      ^ off site ^ off-site or away from my cubicle or my

9      area.

10         Q.   Would you, yourself, handle the details of

11     the archiving?

12         A.   No.

13         Q.   Would you, yourself, handle the details of

14     records retention?

15         A.   No.

16         Q.   Is there someone within your department you

17     would or could contact if you wanted to archive or

18     store documents?

19         A.   I would relight on ^ (( rely on Jean

20     Robinson, our administrative assistant just to let

21     me know what I needed to do to get those into

22     archive.

23         Q.   You wouldn't take it upon yourself to do

24     it?

25         A.   No.

98

1       Q.    Are you aware of anyone else within the

2       state Medicaid who has destroyed documents since

3       you began?

4       A.    No, I do not.

5       Q.    In terms of your role, assistant counsel

6       and participating in the response to discovery ^ ((

7       assisting ^ (( no one has /TOELDZ you that they

8       have destroyed documents that you were searching

9       for have they?

10      A.    No.

11            MS.    BRECKENRIDGE:   I have no /TPURT

12      questions.

13            MS. SMITH-KLOCEK:   I have a couple ^ ((

14      further examination.

15      Q.    (BY MS. SMITH-KLOCEK)   A moment ago your

16      counsel asked questions about destruction of

17      documents.

18      A.    Uh-huh.

19      Q.    When I use that term I also mean throw away

20      documents?

21      A.    Right.

22      Q.    As in discard.

23      A.    Uh-huh.

24      Q.    Earlier you testified that you threw away

25      certain notes from meetings you attended with

99

1       Mr. Press; is that correct?

2          A.   I did say that, uh-huh.

3          Q.   Are there --

4          A.   Handwritten like notes to myself, reminders

5       or points I would make on whatever project I was

6       working on.

7          Q.   Are there any other handwritten notes that

8       you create that you have thrown away since you

9       started in 2002?

10         A.   Gosh, that's -- I -- I don't know.  I do so

11      much every day, it's just hard for me to remember,

12      I've got to write notes to myself, reminders,

13      little sticky notes.  I got stuff laying all over

14      the place.

15         Q.   Have you kept all your handwritten notes

16      since 2002?

17         A.   No.

18         Q.   Other than the ones that you --

19         A.   No.

20         Q.   And in the files that you inherited from

21      Shannon Marr, did you see any directive or

22      communication stating that you should retain

23      documents based on the filing of the lawsuit?

24         A.   No, I did not.

25              MS. SMITH-KLOCEK:  I'm done.

100

1          MS.   BRECKENRIDGE:    Thank you.

2             (Examination concluded -- 12:15 ^ ((

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25