# Exhibit 4

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-o0o-

| | |
|---|---|
| In Re:  Pharmaceutical Industry Average | MDL No. 1456 |
| Wholesale Price Litigation | Civil Action No. |
| | 01-CV-12257-PBS |

This Document Relates to State of
Nevada v. Abbott Laboratories, et al.,
CA NO. 02-CV-00260-ECR (Nevada I), and

State of Nevada v. American Home Products
et al., CA No. 02-CV-12086-PBS (Nevada II)

———————————————————————————————

UNCERTIFIED ROUGH DRAFT

DEPOSITION OF

PHILLIP NOWAK

Thursday, December 22, 2005

Carson City, Nevada

APPEARANCES:  (See separate page)

Reported by:  Lesley A. Clarkson, CCR #182
              UNCERTIFIED ROUGH DRAFT

5

1  Covington and Burling in Washington, D.C., along with my

2  colleague here, Shankar Duraiswamy.  Our firm represents

3  GlaxcoSmithKline, which is one of the defendants in this

4  action.

5       Could you please state and spell your name for the

6  record.

7     A    My name is Phillip with two ls.  Last name is

8  Nowak, N-o-w-a-k.

9     Q    What is your business address?

10    A    It is 1100 East William Street, Carson City,

11  Nevada, 89701, and it's Suite 122.

12    Q    Have you ever been deposed before?

13    A    Yes, I have.

14    Q    On how many occasions?

15    A    Oh, I'd say a handful.  Maybe three or four, off

16  the top of my head.

17    Q    What's the first such occasion that you can

18  recall?

19    A    When I worked, I was employed by Bank of America,

20  and in my capacity as the national manager for the student

21  loan product, the bank was party to litigation involving

22  some secondary market transactions, at which I was a named

23  defendant as I recall.

24    Q    And when was that, approximately?

25    A    That would be approximately 1988.
                UNCERTIFIED ROUGH DRAFT

30

1       MR. LITOW:  Back on the record.

2 BY MR. LITOW:

3     Q    During your time as deputy administrator, did you

4 perform any functions relating to prescription drug

5 reimbursement?

6     A    Not directly.

7     Q    And then what position did you hold after deputy

8 administrator?

9     A    It was as, a name change, but basically in

10 function responsibility for the managed care activities of

11 the division.

12    Q    And when did you assume that position?

13    A    That would have been in the latter part of 2000.

14    Q    And that's your current position?

15    A    Yes.

16    Q    Does it have any other responsibilities besides

17 oversight of the managed care portion of the Medicaid

18 program?

19    A    Yes, it does.

20    Q    And what are those responsibilities?

21    A    It's responsible for, from a programmatic

22 standpoint, for dental services, whether or not managed

23 care, and for transportation, whether or not under a managed

24 care model.  And then the medical managed care extends to

25 the, geographically speaking, to the urban areas of the
                    UNCERTIFIED ROUGH DRAFT

31

1  state for the Medicaid, certain subsets of the Medicaid

2  population, and for the Nevada checkup population.

3     Q   And who was responsible for overseeing the managed

4  care program before you took that position?

5     A   Immediately prior there was a, it was vacant.

6  Going back, I think I would be correct in saying the last

7  person prior was Lorrie England.

8     Q   Do you know approximately when she was at

9  Medicaid?

10     A   Not precisely.  I'm recalling I think -- well,

11  managed care as a direction was effective at some point in

12  1998.  I'm not sure when.  So she would have, I don't

13  believe, been in place, could not have been in place longer

14  than about a year or year and a half, perhaps, if my numbers

15  are right.

16     Q   Which third parties does the state contract with

17  to provide managed care services for Medicaid beneficiaries?

18     A   With two different health maintenance

19  organizations.  One being Health Plan of Nevada, and the

20  other being, the parent being IMX companies, or they do

21  business, Nevada Care.

22     Q   Is Health Plan of Nevada the same as Nevada Care?

23     A   No, Health Plan of Nevada is a wholly owned

24  subsidiary of Sierra Health Services, which is a publicly

25  traded company.
               UNCERTIFIED ROUGH DRAFT

40

1  document, please.

2      A    (Reviewing document.)

3          Okay.

4      Q    What is this document?

5      A    I would describe it as an informational document

6  and also a directive document as it pertains to a document,

7  and document handling.

8      Q    Have you seen this document before?

9      A    Yes, I have.

10     Q    And when did you receive it?

11     A    This is the one I was referring to which I

12  couldn't recall the date on, which is when you asked me

13  about familiarity with the action.

14     Q    This is the e-mail, this is the document --

15     A    This is the document --

16     Q    -- you reviewed during your meeting with Miss

17  Breckenridge yesterday; is that correct?

18     A    Yes.  And in terms of documents, I had seen it

19  prior to to.  This is the one I was thinking of.

20     Q    Have you ever received an e-mail or a document

21  like this before regarding this case?

22     A    Other than this one?

23     Q    Other than this one.

24     A    No, nothing.

25     Q    I just direct your attention to the first
                    UNCERTIFIED ROUGH DRAFT

41

1  sentence, please.

2      A   Okay.

3      Q   "As many of you are aware, the state of Nevada is

4  involved in litigation entitled State of Nevada v. American

5  Home Products Corp., et al.  This lawsuit is also known as

6  the Average Wholesale Price Litigation or AWP litigation."

7          Do you see that?

8      A   Yes, I do.

9      Q   When did you first become aware of this action?

10     A   To be conscious of it, this was the first I had

11  heard of it.

12     Q   So you weren't aware of it in 2002, for example,

13  when it was filed?

14     A   No.

15     Q   I want to direct your attention to the second

16  paragraph, the first bolded sentence.

17     A   Okay.

18     Q   Which states, "It is extremely important that any

19  documents pertaining to the litigation are identified,

20  separated from other files and protected."

21          Do you see that?

22     A   Yes, I do.

23     Q   Prior to receiving this e-mail had you ever

24  received that particular instruction before in relation to

25  this case?

                    UNCERTIFIED ROUGH DRAFT

42

1     A   No, I had not.

2     Q   I direct your attention to the next sentence.

3   "All destruction of records pertaining to the lawsuit must

4   be stopped until the legal action is resolved."

5       Do you see that?

6     A   Yes, I do.

7     Q   Prior to receiving this e-mail had you ever

8   received that specific instruction before relating to this

9   case?

10    A   No, I had not.

11    Q   I'll direct your attention to the sixth paragraph,

12   please.

13    A   Okay.

14    Q   The last sentence of that paragraph, which states,

15   "Again, most of you have seen this document before as you

16   have been involved in searching for and producing documents

17   responsive to the questions and requests from your

18   department's files, your files or the files of others."

19       Do you see that?

20    A   Yes, I do.

21    Q   Did you search your files for documents responsive

22   to defendant's documents request?

23    A   The only request that I received was specific to

24   copies of the contracts with the managed care organizations

25   and the, what was -- well, a contract which did apply to who

UNCERTIFIED ROUGH DRAFT

43

1  was then our fiscal agent, Anthem Blue Cross Blue Shield.

2  And those are the only requests I received.

3      Q   Did you provide copies of the contracts with the

4  managed care organizations to whoever requested them?

5      A   Yes, I did.

6      Q   Do you know if the files for those individuals who

7  work under you were searched for documents pertaining to

8  this litigation?

9      A   I don't know if they were.

10     Q   I would like to direct your attention to the next

11  page, please.  I'm just going to go through these categories

12  and see whether you have any documents that would fit within

13  them.

14     A   Sure.

15     Q   Do you have any documents in your files relating

16  to the state's reimbursement or expenditures for

17  pharmaceutical products or dispensing fees?

18     A   I might have in, specifically because we have in

19  our unit a copy of the Medicaid policy manual or services

20  manual as it's referred to.  And just on a general level I'm

21  aware that there's a pharmacy chapter.  That's the only one

22  that comes to mind.

23     Q   How about the next category.  Do you have any

24  documents relating to the pricing for the reimbursements or

25  expenditures, AWP, MAP, MAC, WAC, EAC, Best Price or any
                UNCERTIFIED ROUGH DRAFT

48

1  periodically from Kaiser Foundation, they publish a lot of

2  things about dual eligibles, and so that kind of

3  communication, yes.

4      Q    What would you do with those e-mails when you get

5  them?

6      A    Usually, they typically provide an abstract, and

7  then if you want the full report you can print it or not.  I

8  typically just read the abstracts, and absent any particular

9  interest to managed care or something like that, I probably

10  just delete them.

11      Q    What about documents relating to provider

12  payments?

13      A    Yes, we would have, we do have correspondence in

14  that regard, or documents in that regard.

15      Q    What type of documents would those be?

16      A    A typical, I mean example I'm thinking of is a

17  provider may either directly or indirectly complain to the

18  division about reimbursement.  In some cases it involves

19  behavior or alleged behavior by the managed care plan, we

20  rendered a service, you didn't pay us, or conversely, you

21  didn't pay us timely, you didn't pay us enough, or whatever.

22  In other cases it's, you know, more complicated situation.

23  But typically correspondence related to payments to

24  providers or not.

25      Q    And what do you do with that correspondence after
                    UNCERTIFIED ROUGH DRAFT

49

1  you receive it?

2      A    Yeah.  Those are, anything of that nature is

3  retained, in that either, whether it's for whatever reason

4  came directly to me or to my area, or what's more typically

5  the case, it will come to the division, people just send it,

6  you know, wherever they think they can find a point of

7  entry.  And then for some of these they are actually logged.

8  If they have responses due back through the administrator or

9  through some other channel, and so those are, whether in a

10 reader file or retained file, in some fashion, whether in

11 combination, electronic or paper, those are maintained.

12     Q    What about documents related to communication with

13 the National Association of Medicaid Fraud Control Units,

14 National Association of Attorneys General or PAL?

15     A    No.

16     Q    How about documents related to responses to

17 federal or state assessment, study, analysis, review or

18 audit concerning reimbursement of pharmaceutical products,

19 definitions or methods of concerning EAC, use of AWP or

20 dispensing fees?

21     A    No.

22     Q    How about documents relating to Ven-A-Care of the

23 Florida Keys?

24     A    No.

25     Q    Prior to receiving this particular e-mail from
            UNCERTIFIED ROUGH DRAFT

50

1  Mr. Duarte, had you taken any measures to preserve documents

2  that might be in your possession that would fit within the

3  categories listed here?

4      A   Not -- not specifically because of the directive,

5  but the directive fits in terms of what we would do anyway

6  for the areas I indicate where we do occasionally or

7  frequently retain correspondence.  So I guess we didn't have

8  to do anything differently because we would retain it

9  anyway.

10     Q   How long would it be retained for?  In perpetuity

11  or --

12     A   Pretty much.

13     Q   So they would still all, you would still have all

14  the correspondence, correct?

15     A   Yes.

16        MR. LITOW:  I'm going to take about a five, ten

17  minute break now, see what additional questions we have.

18           (Recess taken.)

19        MR. LITOW:  Go back on the record now.

20  BY MR. LITOW:

21     Q   I want to go back for a moment to our discussion

22  that we had of the rate that Nevada pays the managed care

23  organizations.  Do you recall that discussion?

24     A   Yes, I do.

25     Q   I believe you testified that, let me know if I'm
                    UNCERTIFIED ROUGH DRAFT

54

1 various managed care organizations.  Do you recall that?

2     A   Yes.

3     Q   When did you receive that request?  Was it more

4 than a month ago, two months?

5     A   More than a month ago.

6     Q   More than six months ago?

7     A   No, I don't think so.

8     Q   Do you recall ever seeing a document entitled

9 Monthly Case Report that lists various cases that Nevada

10 Medicaid is involved in, or cases in litigation?

11     A   No.

12     Q   I'd like to go back to some of the discussion we

13 had earlier about the department of corrections,

14 specifically the purchasing of drugs through Bergin

15 Brunswick.

16     A   Yes.

17     Q   Do you know whether the department of corrections

18 received discounts or rebates from Bergin Brunswick in

19 connection with their purchasing of drugs?

20     A   I really don't know.

21     Q   Do you know who would know that, which particular

22 position at corrections would know that?

23     A   I guess I'd speculate it would be the chief

24 pharmacist would be the closest to it.

25        MR. LITOW:  We have no further questions at this
          UNCERTIFIED ROUGH DRAFT

55

1  time.

2        MS. BRECKENRIDGE:  Phone?  Counsel?

3        MR. LITOW:  Anybody have questions?

4        S SPEAKER:  No.

5        S SPEAKER:  No questions.

6        MS. BRECKENRIDGE:  We have no questions.

7        MR. LITOW:  We are finished.  Thank you.

8        (2:53 p.m., deposition concluded.)

9              -o0o-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

       UNCERTIFIED ROUGH DRAFT