# EXHIBIT A

Pg. 1-25

IN THE COURT OF THE SECOND JUDICIAL CIRCUIT IN AND FOR
LEON COUNTY, FLORIDA

THE STATE OF FLORIDA )
)
ex rel. )
)
VEN-A-CARE OF THE )
FLORIDA KEYS, INC., )
a Florida Corporation, by and )
through its principal )
officers and directors, )
ZACHARY T. BENTLEY and )
T. MARK JONES, )
)
Plaintiffs )
)
CIVIL ACTION NOS.   98-3032F
v. ) 03-CA1165A
)
JURY TRIAL DEMANDED
ALPHARMA, INC.; ALPHARMA, )
USPD, INC. f/k/a BARRE-NATIONAL, )
INC.; BARRE PARENT )
CORPORATION; FAULDING, INC.; )
IVAX CORPORATION; IVAX )
PHARMACEUTICALS, INC. f/k/a )
ZENITH-GOLDLINE )
PHARMACEUTICALS, INC.; MAYNE )
GROUP, LTD.; SANDOZ, INC., )
f/k/a GENEVA PHARMACEUTICALS, )
INC.; NOVARTIS, A.G.; and PUREPAC )
PHARMACEUTICAL CO. )
)
Defendants. )

## COMPLAINT

Plaintiff, the STATE OF FLORIDA, acting by and through its Attorney General,

Charles J. Crist, Jr., brings this cause of action against Defendants, Alpharma, Inc.;

Alpharma, USPD, Inc. f/k/a Barre-National, Inc.; Barre Parent Corporation; Faulding,

Inc.; Ivax Corporation; Ivax Pharmaceuticals, Inc., f/k/a Zenith Goldline

Pharmaceuticals, Inc.; Mayne Group, Ltd.; Sandoz, Inc., f/k/a Geneva Pharmaceuticals,

Inc.; Novartis, A.G.; and Purepac Pharmaceutical, Co.

## INTRODUCTION

1.  This is a civil action to recover damages in excess of Fifteen Thousand

Dollars ($15,000), plus all applicable civil penalties and other relief from Defendants for

making or causing to be made, false or fraudulent statements, representations and

claims to the State of Florida's Medicaid Program for the specified dispensed

pharmaceuticals from July 1, 1994, through and including the present.  The specified

pharmaceuticals (hereinafter "the Subject Drugs") at issue are attached as Exhibit "A"

and incorporated by reference in this Complaint.

2.  Plaintiffs seek recovery against Defendants pursuant to the Florida False

Claims Act §§ 68.081 - 68.092, Florida Statutes (hereinafter "the Act"), and for common

law fraud.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction of the causes of action set forth in this Complaint

pursuant to Art. V § 20(3), Fla. Const.; § 26.012, Florida Statutes; and §§ 68.081 -

68.092, Florida Statutes.

4.  Venue is proper in Leon County pursuant to § 68.083(3), Florida Statutes.

## PARTIES

5.  The State of Florida, Office of the Attorney General, Department of Legal

Affairs (hereinafter "the Attorney General"), is acting on behalf of the Florida Agency for

Health Care Administration (hereinafter "AHCA"), which administers the Florida Medicald Program pursuant to § 409.902, Florida Statutes, and pursuant to the Attorney General's own authority under §§ 409.920 and 68.083, Florida Statutes.

6.    Private person Plaintiff/Relator Ven-A-Care of the Florida Keys, Inc. (hereinafter "the Relator" or "Ven-A-Care") originally provided information to the State of Florida which is the basis of this suit pursuant to § 68.083(3), Florida Statutes and is included as a named party Plaintiff in this case pursuant to § 68.083(2) and (3), Florida Statutes.

7.    Defendant Ivax Corporation (hereinafter "Ivax"), is a corporation organized under the laws of Florida with its principal offices in Miami, Florida.  Ivax is the corporate parent of Ivax Pharmaceuticals, Inc., formerly know as Zenith-Goldline Pharmaceuticals, Inc. (hereinafter "Ivax/Zenith-Goldline"), a Florida corporation with its principal offices in Miami, Florida.  To the extent that the acts of Ivax/Zenith-Goldline at issue in this Complaint were performed by or otherwise attributable to Ivax, or any subsidiary or affiliate of it, then judgment should be entered against Ivax where appropriate.  At all times material to this Complaint, Ivax transacted business in the State of Florida by, including but not limited to, selling directly or through wholesalers its specified drugs, including the Subject Drugs identified in this Complaint, in the State of Florida, including Leon County.

8.    Defendant Sandoz, Inc., f/k/a Geneva Pharmaceuticals, Inc. (hereinafter "Sandoz/Geneva"), is a corporation organized under the laws of Colorado with its principal offices in Princeton, New Jersey.  Novartis, A.G. (hereinafter "Novartis") is a Swiss corporation headquartered in Switzerland and is the corporate parent of Geneva.

To the extent that the acts of Sandoz/Geneva at issue in this Complaint were performed by or otherwise attributable to Novartis, or any subsidiary or affiliate of it, then judgment should be entered against Novartis where appropriate.  At all times material to this action, Sandoz/Geneva transacted business in the State of Florida by, including but not limited to, selling directly or through wholesalers, its specified drugs, including those identified in this Complaint, to purchasers within the State of Florida.

9.  Defendant Purepac Pharmaceutical Co. (hereinafter "Purepac") is a corporation organized under the laws of Delaware with its principal offices in Elizabeth, New Jersey.  At all times material to this action, Purepac transacted business in the State of Florida by, including but not limited to, selling and distributing its specified drugs, including those identified in this Complaint, to purchasers within the State of Florida, including Leon County.  The Defendant Faulding, Inc. (hereinafter "Faulding") is a corporation organized under the laws of Delaware with its principal offices in New Jersey.  Purepac became a subsidiary of Faulding.  In or about February 2001, the Defendant Mayne Group Limited (hereinafter "Mayne") acquired Faulding, including all of its subsidiaries such as Purepac, and became its corporate parent.  Mayne is an Australian company with its principal offices in Melbourne, Australia.  In or about October 2001, Alpharma, Inc. (hereinafter "Alpharma") acquired Mayne and all of its subsidiaries, including Purepac, and became its corporate parent.  Alpharma is a corporation organized under the laws of Delaware with its principal offices in Fort Lee, New Jersey.  The Defendant Alpharma USPD, Inc., f/k/a Barre-National, Inc., (hereinafter "Alpharma USPD") is a Maryland corporation with its principal offices in Baltimore, Maryland.  Barre Parent Corporation (hereinafter "Barre") is a Delaware

corporation with its principal offices in Baltimore, Maryland and is the parent corporation of Alpharma USPD. Alpharma is the ultimate parent corporation of Barre. To the extent the acts of Purepac at issue in this action were performed or otherwise attributable to Defendants Faulding, Mayne, Alpharma, Alpharma USPD, or Barre, or any subsidiary or affiliate of these five Defendants, then judgment should be entered against Faulding, Mayne, Alpharma, Alpharma USPD, or Barre where appropriate.

10. Whenever reference is made in this Complaint to any representation, act or transaction of any of the Defendants, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents or representatives, while actively engaged in the course and scope of their employment, did or authorized such representations, acts, or transactions on behalf of the Defendants.

## THE FLORIDA MEDICAID PHARMACEUTICAL PROGRAM

11. The Medicaid Program provides funding for health care for indigent individuals pursuant to § 409.901, Fla. Stat., *et seq.*

12. The State of Florida Medicaid Program is administered by AHCA pursuant to § 409.902, Fla. Stat.

13. The Office of the Attorney General conducts a program of Medicaid fraud control through its Medicaid Fraud Control Unit.

14. Prescribed drug services are a benefit for Medicaid recipients under the Florida Medicaid Program pursuant to § 409.906(20), Fla. Stat.

15. The ultimate providers of pharmaceuticals to Medicaid recipients, including physicians, hospitals, nursing homes, and pharmacies, purchase drugs from

manufacturers or wholesalers[1] and in turn dispense or administer the drugs to Medicaid recipients.

16.     The providers submit claims for reimbursement of their costs incurred in purchasing and dispensing the drugs to AHCA's "fiscal agent" under a Medicaid provider contract pursuant to § 409.907, Fla. Stat.  The fiscal agent accomplishes claims adjudication under contract with AHCA on behalf of AHCA. From 1994 until 1996, AHCA's fiscal agent was Consultec, Inc.  From 1996 until 1998, AHCA's fiscal agent was the Unisys Corporation.  From 1998 through the present, Consultec, Inc. was AHCA's fiscal agent.  In 2001, Consultec, Inc., changed its name to ACS, Inc.

17.  Pharmacy claims are submitted in one of two ways.  The first is by submitting a completed hard copy pharmacy claim form to the fiscal agent.  The second is through an electronic claims filing procedure where the same information required by the hard copy form is transmitted electronically to the fiscal agent.  Pharmaceuticals are identified on Florida Medicaid claims and the Florida Medicaid computer system drug file by means of unique identification numbers commonly known as National Drug Codes ("NDC"s).  *See* Prescribed Drug Services Coverage, Limitations and Reimbursement Handbook, p. 6-1, *infra*.   This handbook is available on AHCA's website.  *See*, http://floridamedicaid.acs-inc.com/index.jsp?display=handbooks.

18.  AHCA's current reimbursement to the provider of the drug under the pharmacy program is based on AHCA's best estimate of acquisition cost (hereinafter "EAC") to the provider for the drug.  From July 1, 1994, through and including June 30,

---

[1] Including re-packagers and re-lablers.

Page 6 of  45

2004, the EAC was the lower of the "Average Wholesale Price" (hereinafter "AWP")
less 13.25 percent or "Wholesaler Acquisition Cost" (hereinafter "WAC") plus 7 percent.
Pursuant to a legislative change effective July 1, 2004, the EAC is the lower of AWP
less 15.4 percent or WAC plus 5.75 percent, whichever is less.

19.   AHCA has established other safeguards to ensure it is a prudent purchaser
of drugs.  From July 1, 1994, through and including June 30, 2004, AHCA  reimbursed
the least of:

a).   "Average Wholesale Price" ("AWP") less 13.25 percent, plus a
dispensing fee;

b).   "Wholesaler Acquisition Cost" ("WAC") plus 7 percent, plus a
dispensing fee;

c).   the "Federal Upper Limit" ("FUL"), plus a dispensing fee;

d).   the "State Maximum Allowable Cost" ("SMAC"), plus a dispensing fee;
or

e).   the provider's "usual and customary charge" to the public.

See Prescribed Drug Services Coverage, Limitations and Reimbursement Handbook, p.
6-2, July 2001, as incorporated into law at Rule 59G-4.250, Fla.Admin.Code; See also,
§409.908(14), Fla. Stat.

20.   After § 409.908(14), Florida Statutes was amended, AHCA reimburses the
least of:

a).   "Average Wholesale Price" ("AWP") minus 15.4 percent, plus a
dispensing fee;

b).   "Wholesaler Acquisition Cost" ("WAC") plus 5.75 percent, plus a

dispensing fee;

c). the "Federal Upper Limit" ("FUL"), plus a dispensing fee;

d). the "State Maximum Allowable Cost" ("SMAC"), plus a dispensing fee; or

e). the providers' "usual and customary charge" to the public.

See, Fla. Stat, § 409.908(14).

21.     The Florida Medicaid dispensing fee is currently $4.23 per prescription. See, Prescribed Drug Services Coverage, Limitations and Reimbursement Handbook, p. 6-3, supra. An additional $0.015 per unit is paid to pharmacies who prepare in-house unit dose packaging of tablets or capsules. Id.

22.     The AHCA fiscal agent reimburses pharmaceutical provider claims based on the current Florida Medicaid computer system drug file prices, and such prices are derived from pricing information, including AWPs and WACs, supplied and updated weekly by the First DataBank, Inc. ("First DataBank") National Drug Data file electronic service. See Prescribed Drug Services Coverage, Limitations and Reimbursement Handbook, p. 6-3, supra. First DataBank, a division of The Hearst Corporation, is a nationally-recognized company that specializes in gathering and disseminating prescription drug pricing information, including AWPs and WACs, to public health programs and private health insurers.

23.     AHCA's fiscal agent has at all times relevant to this complaint contracted with First DataBank to provide National Drug Data file prices to establish Florida Medicaid provider drug reimbursement. The Florida Medicaid Program has utilized First

DataBank as its primary reference source and has utilized representations of AWP and WAC supplied by First DataBank to establish provider reimbursement prices.

24. The manufacturers of the drugs directly supply AWP and WAC on a continual basis to First DataBank. First DataBank uses the AWPs and WACs supplied by the manufacturers, to compile the National Drug Data file price list, which in turn is utilized by the Florida Medicaid Program for its computer system drug file prices. Each drug manufacturer, including each Defendant, filled out, at the request of First DataBank, a "National Drug Data File Product Update Report" including pricing information such as WAC (Wholesale Net), Direct Price ("DP"), and AWP.

25. The Florida Medicaid Program cannot reimburse a provider for any drug not listed in the National Drug Data file. *See* Prescribed Drug Services Coverage, Limitations and Reimbursement Handbook, p. 6-2, *supra*. Drug manufacturers, including the Defendants, voluntarily report AWP and WAC pricing information to First DataBank to ensure their products are included in the National Drug Data file and their customers will be reimbursed by the Florida Medicaid Program.

## SUMMARY OF DEFENDANTS' FRAUD SCHEME

26. The Florida Medicaid Program reimburses providers for the drugs they dispense to Medicaid recipients at EAC, estimated acquisition cost. Florida Medicaid determines EAC by using the AWPs and WACs supplied by pharmaceutical manufacturers to First DataBank. The Defendants knowingly misrepresented AWP and WAC prices solely for the purpose of illicit financial gain in an attempt to manipulate and control market share of the Subject Drugs.

27. The Defendants knowingly and intentionally made false representations of

prices and costs for certain of their drugs to the Florida Medicaid Program. The Defendants reported, and caused First DataBank to report, prices for the Subject Drugs that substantially exceeded the market prices known to the Defendants from their own business information. The Defendants knew that reporting false, inflated AWP and WAC prices for the Subject Drugs would cause the Florida Medicaid Program's estimates of the acquisition costs of the Subject Drugs to substantially exceed any reasonable estimates of the acquisition costs of those drugs.

28. The Defendants knowingly and intentionally created a price spread for several of their drugs by supplying to First DataBank prices for those drugs far in excess of the prices for which the drugs were sold. The Defendants intended the Florida Medicaid Program to use those false, inflated prices in setting provider reimbursement rates, and in fact the Florida Medicaid Program did use those false inflated prices to set Medicaid reimbursement rates. As a direct result of its utilization of the false prices supplied by the Defendants, the Medicaid Program paid provider claims for the Subject Drugs dispensed in amounts far in excess of the prices and costs generally and currently available in the marketplace for the Subject Drugs.

29. After creating price spreads for their drugs, Defendants enlarged those spreads by reducing acquisition costs to providers without disclosing the reductions to First DataBank or to the Florida Medicaid Program. Price reductions were accomplished by giving providers financial incentives such as discounts, rebates, off-invoice pricing, free goods, and cash payments. Price reductions were granted to some retail pharmacy chains, wholesalers, buying groups, pharmacy benefit managers at the request of those chains, wholesalers, buying groups or pharmacy benefit managers.

Defendants knowingly utilized these financial incentives to reduce the effective acquisition prices of their drugs, while knowingly reporting AWPs and WACs to First DataBank that were not reflective of the price reductions.

30.    After maximizing the spread on their drugs, Defendants engaged in a tactic commonly referred to as "marketing the spread," for the purpose of increasing their market share and maximizing their profits.  Providers were induced to buy the Subject Drugs at issue because the Medicaid reimbursements for such drugs, unlike otherwise-identical competing drugs with little or no price spread, far exceeded the providers' acquisition cost generally or currently available in the marketplace.  The Defendants actively marketed the spread through sales presentations, bid proposals, advertising, and various pharmacy inventory software programs specifically to increase their market share and profits.

31.    The Defendants sold the Subject Drugs to providers, typically retail pharmacies, with full knowledge that the profits realized upon distribution of such drugs to Medicaid recipients far exceeded any commercially reasonable profits that would otherwise be obtained had AWPs and WACs been reported by the Defendants that represented prices and costs generally and currently available in the marketplace based on the Defendants' own business information.

32.    The goals of the Defendants' fraudulent business plan include: maximized demand for the drugs at issue, domination of the market for the Subject Drugs, and illegal over-reimbursement of Medicaid provider claims for the drugs at issue.  The Defendants inflated their reported prices and marketed the resulting "Spread", with the purpose and intent of increasing sales of the Subject Drugs to Providers.  As a direct,

foreseeable, and proximate result of this conduct, they caused false claims for excessive reimbursement to be made to the Florida Medicaid Program. But for each of the Defendants' actions, the Florida Medicaid Program would not have paid the excessive reimbursement amounts which were paid for the Subject Drugs. Consequently, each Defendant is liable under the Florida False Claims Act and for common law fraud for each Medicaid reimbursement claim for the Subject Drugs which resulted in payment of a falsely inflated reimbursement amount.

33. Defendants' knowing misrepresentation of drug prices to First DataBank caused each and every claim paid by the Florida Medicaid Program for the Subject Drugs to be a false claim under § 68.081, Fla. Stat., *et seq*. The Florida Medicaid Program is also entitled to be reimbursed for all payments made in excess of what the State of Florida Medicaid Program should have paid in pharmacy claims for Defendant's drugs in accordance with the legal remedies for common law fraud.

34. The manufacturers virtually control what price information the payers, including the Florida Medicaid Program, can obtain. Defendants have taken undue advantage of the resulting disparity in status, power and knowledge by knowingly reporting prices for Medicaid reimbursement purposes that bear no relationship whatsoever to prices generally or currently available in the marketplace.

35. The Defendants were in a position to mislead the Florida Medicaid Program, in part, because other drug manufacturers typically report truthful prices for brand drugs, not the generic drugs subject to this action. The Defendants knew that the Florida Medicaid Program uses manufacturer-supplied prices to reimburse providers for 30,000 of the approximately 300,000 NDCs in the Florida Medicaid computer system

drug file in any given month. The Defendants knew that AHCA, with a handful of

pharmacy employees, would never have the manufacturers' insider knowledge,

resources, or opportunity necessary to discover and remedy the Defendants' drug

pricing fraud.

36.     The Defendants were fully capable of making representations of price and

cost for the Subject Drugs that represented the prices and costs generally and currently

available in the marketplace based on the Defendants' own business information.

## THE ACTIONABLE CONDUCT OF DEFENDANTS

37.     The Defendants acted knowingly, or in reckless disregard, or in deliberate

ignorance of the truth in presenting or causing to be presented to the Florida Medicaid

Program false claims for payment or approval in violation of § 68.082(2)(a), Fla. Stat.

by:

a).     Submitting false, inflated prices and costs, including AWPs and
        WACs, for specified pharmaceuticals to First DataBank initially;

b).     Concealing or failing to disclose decreases in prices and costs of
        such pharmaceuticals to First DataBank;

c).     Concealing or failing to disclose decreases in prices and costs of
        specified pharmaceuticals by reporting price reductions much
        smaller than the price reductions generally and currently available
        in the marketplace;

d).     Concealing or failing to disclose financial incentives such as
        discounts, rebates, off-invoice pricing, free goods, cash payments,
        and charge backs that decreased the effective prices of the

Page 13 of 45

specified pharmaceuticals;

e). Reporting that the price or cost of a specified drug was increasing, when in fact it was increasing in a lesser proportion, remained the same, or was decreasing; and

f). Reporting that the price or cost of a specified drug was the same when in fact it was falling.

38. The Defendants acted knowingly, or recklessly disregarded, or acted in deliberate ignorance in making, using, or causing to be made false records or statements to get claims paid or approved by the Florida Medicaid Program in violation of § 68.082(2)(b), Fla. Stat. by:

a). Submitting false, inflated prices and costs, including AWPs and WACs, for specified pharmaceuticals to First DataBank initially;

b). Concealing or failing to disclose decreases in prices and costs of such pharmaceuticals to First DataBank;

c). Concealing or failing to disclose decreases in prices and costs of specified pharmaceuticals by reporting price reductions much smaller than the price reductions generally and currently available in the marketplace;

d). Concealing or failing to disclose financial incentives such as discounts, rebates, off-invoice pricing, free goods, cash payments, and charge backs that decreased the effective prices of the specified pharmaceuticals;

e). Reporting that the price or cost of a specified drug was increasing,

when in fact it was increasing in a lesser proportion, remained the

same, or was decreasing; and

f).    Reporting that the price or cost of a specified drug was the same

when in fact it was falling.

39.    The Defendants conspired to submit false claims or deceive the Florida

Medicaid Program for the purpose of getting false or fraudulent claims allowed or paid

in violation of § 68.082(2)(c), Fla. Stat., by:

a).    Submitting false, inflated prices and costs, including AWPs and

WACs, for specified pharmaceuticals to First DataBank initially;

b).    Concealing or failing to disclose decreases in prices and costs of

such pharmaceuticals to First DataBank;

c).    Concealing or failing to disclose decreases in prices and costs of

specified pharmaceuticals by reporting price reductions much

smaller than the price reductions generally and currently available

in the marketplace;

d).    Concealing or failing to disclose financial incentives such as

discounts, rebates, off-invoice pricing, free goods, cash payments,

and charge backs that decreased the effective prices of the

specified pharmaceuticals;

e).    Reporting that the price or cost of a specified drug was increasing,

when in fact it was increasing in a lesser proportion, remained the

same, or was decreasing; and

f).    Reporting that the price or cost of a specified drug was the same

Page 15 of 45

when in fact it was falling.

## THE SPECIFIC FALSE PRICE REPRESENTATIONS OF DEFENDANTS IVAX/ZENITH-GOLDLINE

40.  Throughout the period starting July 1, 1994, through and including the present date, Ivax/Zenith-Goldline knowingly caused the Florida Medicaid Program to pay false or fraudulent claims for prescription drugs, including those specified in this section, and further made or used false or fraudulent records and/or statements to get such claims paid or approved. As a result of the actions of Ivax/Zenith-Goldline and those persons and entities acting directly or indirectly in concert with Ivax/Zenith-Goldline, the Florida Medicaid Program paid grossly excessive, unreasonable, and unlawful reimbursement amounts for drugs, including those specified in this section. The acts committed by Ivax/Zenith-Goldline that caused the Florida Medicaid Program to pay or approve these false or fraudulent claims included, but were not limited to: knowingly making false representations about prices and costs of drugs, including those specified in this Section, which Ivax/Zenith-Goldline knew would be used by the Florida Medicaid Program in paying or approving claims for such drugs; using the Spread as a financial inducement to increase sales of the Subject Drugs; and paying additional rebates and discounts to customers effectively reducing the customers' acquisition cost for these drugs without reporting these discounts and rebates to First DataBank.  Each of these false pricing representations were used by the Florida Medicaid Program in paying or approving claims for drugs, including those specified in this section.

41.  Ivax/Zenith-Goldline knowingly caused its false price and cost representations to be published for the years specified in this section in First

Page 16 of  45

DataBank's Automated Services and further made or used false records or statements regarding its prices of the drugs, including those specified in this section.  For example, the false price representations as reported by Ivax/Zenith-Goldline and reflected by First DataBank and the inflated Medicaid reimbursement amounts calculated by the Florida Medicaid Program are reflected in the following chart for some of Ivax/Zenith-Goldline's Subject Drugs.  The amount listed under the Relator's Cost column reflects the prices generally or currently available in the marketplace to the Relator or the Relator's Group Purchasing Organization for the listed drugs from Ivax/Zenith-Goldline or a wholesaler.

|  | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Defendant IVAX/ZENITH-GOLDLINE** <br> **Clozapine 100mg 100's** <br> **NDC# 00172-4360-60** | | | | | | | |
| Date | First DataBank AWP | First DataBank WAC | FLORIDA MEDICAID PER UNIT REIMBURSEMENT BASED ON FALSE REPORTED "WAC" or "AWP" | Maximum Allowable Cost | Relator's Cost <br> Contract Price | SPREAD $ | SPREAD % (SPREAD $ ÷ RELATOR'S COST) |
| 10-23-2000 | $316.95 | $245.85 | $274.95 | | $165.08 | $109.87 | 67% |
| 12-12-2000 | $316.95 | $245.85 | $274.95 | | $165.08 | $109.87 | 67% |
| 02-22-2001 | $332.80 | $245.85 | $274.95 | | $148.73 | $126.22 | 85% |
| 04-20-2001 | $332.80 | $245.85 | $274.95 | | $156.56 | $118.39 | 76% |
| 06-19-2001 | $332.80 | $245.85 | $274.95 | | $148.73 | $126.22 | 85% |
| 08-09-2001 | $332.80 | $245.85 | $274.95 | | $148.73 | $126.22 | 85% |
| 11-12-2001 | $332.80 | $245.85 | $274.95 | | $148.73 | $126.22 | 85% |
| 01-28-2002 | $332.80 | $245.85 | $274.95 | | $133.07 | $141.88 | 107% |
| 03-10-2002 | $332.80 | $245.85 | $274.95 | | $133.07 | $141.88 | 107% |
| 05-08-2002 | $332.80 | $245.85 | $263.06 | | $133.07 | $129.99 | 98% |
| 06-25-2002 | $332.80 | $245.85 | $263.06 | | $133.07 | $129.99 | 98% |

42.  As a direct and proximate result of Ivax/Zenith-Goldline's actions alleged in this Complaint, the State of Florida sustained actual damages in excess of $15,000 together

with treble damages, penalties, and attorneys fees pursuant to the Florida False Claims Act.

### THE SPECIFIC FALSE PRICE REPRESENTATIONS OF DEFENDANT SANDOZ/GENEVA

43.  Throughout the period starting July 1, 1994, through and including the present date, Sandoz/Geneva knowingly caused the Florida Medicaid Program to pay false or fraudulent claims for prescription drugs, including those specified in this section, and further made or used false or fraudulent records and/or statements to get such claims paid or approved.  As a result of the actions of Sandoz/Geneva and those persons and entities acting directly or indirectly in concert with Sandoz/Geneva, the Florida Medicaid Program paid grossly excessive, unreasonable, and unlawful reimbursement amounts for drugs, including those specified in this section.  The acts committed by Sandoz/Geneva that caused the Florida Medicaid Program to pay or approve these false or fraudulent claims included, but were not limited to: knowingly making false representations about prices and costs of drugs, including those specified in this Section, which Sandoz/Geneva knew would be used by the Florida Medicaid Program in paying or approving claims for such drugs; using the Spread as a financial inducement to increase sales of the Subject Drugs; and paying additional rebates and discounts to customers, effectively reducing the customer's acquisition cost for these drugs without reporting these discounts and rebates to First DataBank.  Each of these false pricing representations were used by the Florida Medicaid Program in paying or approving claims for drugs, including those specified in this section.

44.  Sandoz/Geneva knowingly caused its false price and cost representations to

be published for the years specified in this section in First DataBank's Automated

Services and further made or used false records or statements regarding its prices of

the drugs, including those specified in this section.  For example, the false price

representations as reported by Sandoz/Geneva and reflected by First DataBank and

the inflated Medicaid reimbursement amounts calculated by the Florida Medicaid

Program are reflected in the following chart for some of Sandoz/Geneva's Subject

Drugs.  The amount listed under the Relator's Cost column reflects the prices generally

or currently available in the marketplace to the Relator or the Relator's Group

Purchasing Organization for the listed drugs from Sandoz/Geneva or a wholesaler.

| Defendant SANDOZ/GENEVA RANITIDINE TAB 300mg NDC# 00781-1884-10 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Date | First DataBank AWP | First DataBank WAC | FLORIDA MEDICAID PER UNIT REIMBURSEMENT BASED ON FALSE REPORTED "WAC" or "AWP" | Maximum Allowable Cost | Relator's Cost Contract Price | SPREAD $ | SPREAD % (SPREAD $ ÷ RELATOR'S COST) |
| 02-22-2001 | $2,687.00 | $712.50 | $2,330.97 | $683.00 | $97.88 | $585.12 | 598% |
| 06-19-2001 | $2,687.00 | $712.50 | $2,330.97 | $683.00 | $97.88 | $585.12 | 598% |
| 11-12-2001 | $2,687.00 | $712.50 | $2,330.97 | $683.00 | $97.88 | $585.12 | 598% |
| 01-28-2002 | $2,687.00 | $712.50 | $2,330.97 | $318.00 | $126.81 | $191.19 | 150% |
| 03-10-2002 | $2,687.00 | $712.50 | $2,330.97 | $318.00 | $126.81 | $191.19 | 150% |
| 05-08-2002 | $2,687.00 | $712.50 | $762.38 | $318.00 | $126.81 | $191.19 | 150% |
| 06-25-2002 | $2,687.00 | $712.50 | $762.38 | $318.00 | $126.81 | $191.19 | 150% |

45. As a direct and proximate result of Sandoz/Geneva's actions alleged in this

Complaint, the State of Florida sustained actual damages in excess of $15,000 together

with treble damages, penalties, and attorneys fees pursuant to the Florida False Claims

Act.

## THE SPECIFIC FALSE PRICE REPRESENTATIONS OF DEFENDANTS PUREPAC/FAULDING/MAYNE/ALPHARMA/ALPHARMA USPD/BARRE

46.  Throughout the period starting July 1, 1994, through and including the present date, Purepac/Faulding/Mayne/Alpharma/Alpharma USPD/Barre knowingly caused the Florida Medicaid Program to pay false or fraudulent claims for prescription drugs, including those specified in this section, and further made or used false or fraudulent records and/or statements to get such claims paid or approved.  As a result of the actions of Purepac/Faulding/Mayne/Alpharma/Alpharma USPD/Barre and those persons and entities acting directly or indirectly in concert with Purepac/Faulding/Mayne/Alpharma/Alpharma USPD/Barre, the Florida Medicaid Program paid grossly excessive, unreasonable, and unlawful reimbursement amounts for drugs, including those specified in this section.  The acts committed by Purepac/Faulding/Mayne/Alpharma/Alpharma USPD/Barre that caused the Florida Medicaid Program to pay or approve these false or fraudulent claims included, but were not limited to: knowingly making false representations about prices and costs of drugs, including those specified in this Section, which Purepac/Faulding/Mayne/Alpharma/Alpharma USPD/Barre knew would be used by the Florida Medicaid Program in paying or approving claims for such drugs and using the Spread as a financial inducement to increase sales of the Subject Drugs.  Each of these false pricing representations were used by the Florida Medicaid Program in paying or approving claims for drugs, including those specified in this section.

47. Purepac/Faulding/Mayne/Alpharma/Alpharma USPD/Barre knowingly caused its false price and cost representations to be published for the years specified in this section in First DataBank's Automated Services and further made or used false records or statements regarding its prices of the drugs, including those specified in this section. For example, the false price representations as reported by Purepac/Faulding/Mayne/Alpharma/Alpharma USPD/Barre and reflected by First DataBank and the inflated Medicaid reimbursement amounts calculated by the Florida Medicaid Program are reflected in the following chart for some of Purepac/Faulding/Mayne/Alpharma/Alpharma USPD/Barre's Subject Drugs. The amount listed under the Relator's Cost column reflects the prices generally or currently available in the marketplace to the Relator or the Relator's Group Purchasing Organization for the listed drugs from Purepac or a wholesaler.

| Defendant PUREPAC **ISOSORBIDE 30MG** NDC #00228-2713-11 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Date | First DataBank AWP | First DataBank WAC | FLORIDA MEDICAID PER UNIT REIMBURSEMENT BASED ON FALSE REPORTED "WAC" or "AWP" | Maximum Allowable Cost | Relator's Cost Contract Price | SPREAD $ | SPREAD % (SPREAD $ + RELATOR'S COST) |
| 11-12-2001 | $129.13 | $77.48 | $112.02 | | $72.56 | $39.46 | 54% |
| 01-28-2002 | $129.13 | $77.48 | $112.02 | | $72.56 | $39.46 | 54% |
| 03-10-2002 | $129.13 | $77.48 | $112.02 | | $72.56 | $39.46 | 54% |
| 11-21-2002 | $144.81 | $77.48 | $82.90 | | $10.06 | $72.84 | 724% |
| 11-05-2004 | $144.81 | $77.48 | $82.90 | $22.08 | $10.06 | $12.00 | 119% |
| 03-31-2005 | $144.81 | $77.48 | $82.90 | $22.08 | $10.06 | $12.00 | 119% |

48. As a direct and proximate result of

Purepac/Faulding/Mayne/Alpharma/Alpharma USPD/Barre's actions alleged in this

Complaint, the State of Florida sustained actual damages in excess of $15,000 together

with treble damages, penalties, and attorneys fees pursuant to the Florida False Claims

Act.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE FLORIDA FALSE CLAIMS ACT
### DEFENDANT IVAX

49.  The Plaintiffs reallege and incorporate by reference paragraphs 1 through 48

as though fully set forth herein.

50.  Ivax knowingly presented or caused to be presented false claims for

payment to the Florida Medicaid Program creating liability for a false claims action

pursuant to § 68.081, Fla. Stat., *et seq.*

51.  As a result of Ivax's conduct set forth in this count, the State of Florida,

AHCA or its fiscal intermediary paid the improper Medicaid claims and has suffered

actual damages in excess of $15,000.

52.  Pursuant to §§ 68.082(2) and 68.086, Fla. Stat., the Plaintiffs are entitled to

treble the actual damages sustained, not less than $5,000 and not more than $10,000

penalty per claim, all other relief set forth in said statutes, prejudgment interest,

attorneys' fees and court costs.

### COUNT II
### COMMON LAW FRAUD
### DEFENDANT IVAX

53.  The Plaintiffs reallege and incorporate by reference paragraphs 1 through

48 as though fully set forth herein.

54. The elements of common law fraud in Florida are:  a false statement concerning a material fact;  knowledge by the person making the statement that the representation is false; the intent by the person making the statement that the representation will induce another to act on it; and reliance on the representation to the injury of the other party.  *See e.g., Tucker v. Mariani*, 655 So.2d 221, 225 (Fla. 1st DCA 1995);  *Lance v. Wade*, 457 So.2d 1008, 1011 (Fla.1984).

55. Ivax made false statements of material fact regarding drug prices to First DataBank; Ivax knew that the submitted prices were false and significantly exceeded prices generally or currently available in the marketplace; Ivax knew that the Florida Medicaid Program relied on First DataBank prices and intended that the Florida Medicaid Program rely upon the false prices Ivax submitted to First DataBank;  and, the Florida Medicaid Program did in fact rely upon such false price representations and was injured by paying provider reimbursements far in excess of reasonable estimates of provider acquisition cost as required by law.

56. As a result of Ivax's conduct as set forth in this Count, the State of Florida, AHCA, or its fiscal intermediary paid the improper Medicaid claims and suffered actual damages in excess of $15,000.

57. Pursuant to the common law of fraud in Florida, the Plaintiffs are entitled to a remedy for the State's damages; to wit, the difference between what the Florida Medicaid Program should have paid in pharmacy claims for Ivax's drugs and what was in fact paid, as well as any other relief the Court deems appropriate, to include, prejudgment interest and costs.

## COUNT III
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT
## DEFENDANT IVAX/ZENITH-GOLDLINE

58.  The Plaintiffs reallege and incorporate by reference paragraphs 1 through 48 as though fully set forth herein.

59.  Ivax/Zenith-Goldline, through its parent company Ivax, knowingly presented or caused to be presented false claims for payment to the Florida Medicaid Program creating liability for a false claims action pursuant to § 68.081, Fla. Stat., *et seq.*

60. As a result of Ivax/Zenith-Goldline's conduct set forth in this count, the State of Florida, AHCA or its fiscal intermediary paid the improper Medicaid claims and has suffered actual damages in excess of $15,000.

61.  Pursuant to §§ 68.082(2) and 68.086, Fla. Stat., the Plaintiffs are entitled to treble the actual damages sustained, not less than $5,000 and not more than $10,000 penalty per claim, all other relief set forth in said statutes, prejudgment interest, attorneys' fees and court costs.

## COUNT IV
## COMMON LAW FRAUD
## DEFENDANT IVAX/ZENITH-GOLDLINE

61. The Plaintiffs reallege and incorporate by reference paragraphs 1 through 48 as though fully set forth herein.

62.  The elements of common law fraud in Florida are:  a false statement concerning a material fact;  knowledge by the person making the statement that the representation is false; the intent by the person making the statement that the representation will induce another to act on it; and reliance on the representation to the

injury of the other party.  *See e.g., Tucker v. Mariani,* 655 So.2d 221, 225 (Fla. 1st DCA 1995); *Lance v. Wade,* 457 So.2d 1008, 1011 (Fla.1984).

63.  Ivax/Zenith-Goldline, by and through its parent company Ivax, made false statements of material fact regarding drug prices to First DataBank; Ivax/Zenith-Goldline, by and through its parent company Ivax, knew that the submitted prices were false and significantly exceeded prices generally or currently available in the marketplace; Ivax/Zenith-Goldline, by and through its parent company Ivax, knew that the Florida Medicaid Program relied on First DataBank prices and intended that the Florida Medicaid Program rely upon the false prices Ivax/Zenith-Goldline, by and through its parent company Ivax, submitted to First DataBank;  and, the Florida Medicaid Program did in fact rely upon such false price representations and was injured by paying provider reimbursements far in excess of reasonable estimates of provider acquisition cost as required by law.

65.  As a result of Ivax/Zenith-Goldline's conduct as set forth in this count, the State of Florida, AHCA, or its fiscal intermediary paid the improper Medicaid claims and suffered actual damages in excess of $15,000.

66.  Pursuant to the common law of fraud in Florida, the Plaintiffs are entitled to a remedy for the State's damages; to wit, the difference between what the Florida Medicaid Program should have paid in pharmacy claims for Ivax/Zenith-Goldline and/or Ivax's drugs and what was in fact paid, as well as any other relief the Court deems appropriate, to include, prejudgment interest and costs.

## COUNT V
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT