UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION,

THIS DOCUMENT RELATES TO THE MASTER CONSOLIDATED CLASS ACTION

MDL No. 1456

Civil Action No. 01-12257-PBS

**NON-PARTY FALLON COMMUNITY HEALTH PLAN, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO QUASH THE SUBPOENA OF DEFENDANT DEY, INC.**

Non-Party Fallon Community Health Plan, Inc. ("Fallon"), by its attorneys, Nelson, Kinder, Mosseau & Saturley, P.C., and in accordance with Local Rule 7.1(B)(1), respectfully submits the following Memorandum of Law in Support of Its Motion to Quash the Subpoena of Defendant Dey, Inc. ("Dey").

## INTRODUCTION

At some point, Defendants' discovery probe of non-party health plans must come to a halt. As the Plaintiffs have argued, the Defendants have already conducted discovery, or are in the process of conducting discovery, of more than 40 health plans nationwide, representing in excess of 50 percent of individuals covered by private health insurance in the United States, as well as more than 50 percent of Massachusetts covered lives. Despite having been granted access to such a vast array of discovery materials from non-party health plans, Defendant Dey now seeks similar documents and Rule 30(b)(6) testimony from several additional non-party health plans, including Fallon. By Dey's own admission, the Defendants expect this new round

of discovery to yield information "consistent with testimony obtained from other [health] plans." Docket Entry No. 1919, at 6.

Contrary to the arguments offered by Dey in support of its subpoenas, there is no decision of this Court or order in this case giving Dey *carte blanche* authority to conduct discovery of absent class members. Rather, it is well-settled that a party seeking discovery of a non-party class member must make a particularized showing of need, and demonstrate that the discovery is not unduly burdensome. In this instance, the Affidavits submitted herewith conclusively establish that compliance with the subpoena by Fallon, a small health maintenance organization with very limited resources, would impose extraordinary burdens upon it. Particularly in light of the large amount of discovery of non-party health plans to which the Defendants already have access, Dey has not carried its burden to show that the additional discovery it seeks is justified.

For all of these reasons, Fallon respectfully requests that this Court quash the subpoena issued to it by Dey, and enter any other Order it deems appropriate.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Fallon is a small health maintenance organization with limited resources to respond to discovery requests.

Fallon is a small health maintenance organization providing physician care and pharmaceuticals to approximately 171,000 members in 228 cities and towns, located primarily in Worcester County, Massachusetts. Fallon's two primary competitors, by contrast, serve over 2,400,000 and 800,000 members, respectively. See Affidavit of Daniel M. Concaugh ("Concaugh Affidavit"), attached hereto as Exhibit A, at ¶ 2; see also Affidavit of Kevin C. McGovern ("McGovern Affidavit"), attached hereto as Exhibit B, at ¶ 5.[1]

[1] The Affidavits submitted herewith as Exhibits A through C have been separately submitted to the Court in support of Fallon's Motion to Stay Discovery (Docket Entry No. 2005), and appear at Docket Entry Nos. 2083, 2084, and 2085. For the Court's convenience, they are also being attached to this memorandum.

Fallon employs a total of approximately 525 employees. Of that total, approximately 200 serve in an administrative capacity, and would be involved in responding to the discovery sought by Dey. See id. at ¶ 3.

**B. The discovery sought by Dey of Fallon is extraordinarily broad, overly burdensome, and seeks highly confidential information.**

In its subpoena to Fallon, Dey seeks Rule 30(b)(6) testimony on 33 separate topics. In addition, Dey seeks 12 separate categories of documents generated by Fallon over a 14-year period. See generally Subpoena, attached hereto as Exhibit D.

**(1) The discovery Fallon seeks is extraordinarily broad and seeks highly confidential information.**

A brief survey of the document production requests demonstrates just how broad and burdensome the subpoena is. For instance, the first document request seeks "all schedules disclosing the amount reimbursed to physicians for services rendered and drugs administered . . . and documents detailing how those schedules were calculated." In order to respond to this request, Fallon would need to manually review between 100,000 and 120,000 separate contracts, each one being between five and thirty pages in length. Specifically, each contract would require manual review to identify the drugs which were on the formulary and the reimbursable amounts, and to identify and/or redact commercially-sensitive and proprietary information from which Fallon's competitors could calculate its fee schedule methodology to its detriment. Electronic review of these documents is not available, and the manual review process would take an estimated 50,000 hours to complete. See generally Concaugh Affidavit at ¶ 5.

Similarly, Dey's second document production request seeks all "[e]lectronic medical claims data regarding reimbursement to Providers for all drugs [listed in the subpoena], including all data regarding reimbursements for related administration or service fees, and all claims

processing manuals corresponding to the electronic medical claims data produced." Fallon receives on a *daily* basis tens of thousands of electronic medical claims submitted directly by physicians. Fallon has no capability of electronically searching the records to identify the requested information. Accordingly, each claim would need to be manually reviewed to determine whether it contains responsive information. This would necessitate manual review of millions of claims records *per year* between 1991 and the present, requiring tens of thousands of hours to complete. Moreover, producing this data would allow a competitor of Fallon to calculate Fallon's fee and reimbursement schedules, which are among the most commercially sensitive and proprietary information it possesses. See Concaugh Affidavit at ¶¶ 7-8.

To the extent the second document production request seeks claims processing manuals, such records are not maintained in a specific file for all the years in question. Accordingly, to comply with the request Fallon would be required to retrieve an unknown number of records from its off-site storage. Additionally, portions of such manuals are likewise proprietary because they contain Fallon's internal procedures for handling claims. See Concaugh Affidavit at ¶ 9.

Dey's fourth document request requires production of "[a]ll documents concerning advisory boards conducted by You, or on Your behalf, involving physicians or pharmacists, including final reports or other documents reflecting the issues discussed, documents reflecting all entities participating in such advisory boards, and documents reflecting the conclusions of such advisory boards." Fallon advisory boards (or similar committees) include Customer Service, Utilization Management, the Physician Advisory Committee, and the Pharmacy and Therapeutic Committee. These committees generally meet on either a quarterly or monthly basis. See Concaugh Affidavit at ¶ 10. With respect to the first three committees, agendas and meeting notes are generated by each, and are not searchable by any computer records search. On

an annual basis, thousands of pages are produced by these three committees. Accordingly, Fallon estimates it would take hundreds of hours to review these records generated over a fourteen year period. See Concaugh Affidavit at ¶ 10.

The Pharmacy and Therapeutic Committee has been in existence since 2003, and meets at least quarterly. Prior to each meeting at least fifty pages of materials are prepared, and subsequently committee notes are likewise prepared. As with the other committee notes, these records are not all searchable electronically, and would thus require manual review. The manual review would also be required to identify information responsive to Document Request No. 9, which seeks information regarding how drug formularies are determined. These documents include proprietary information such as formulary prices and utilization management protocols which are unique to Fallon, and whose public disclosure would be detrimental to Fallon. Fallon anticipates it would take approximately fifty to seventy-five hours of its Pharmacy Division workforce to procure this information. See Affidavit of Leslie Fish ("Fish Affidavit"), attached hereto as Exhibit C, at ¶ 7. While this amount of time may not, alone, seem excessive, as noted below at least forty percent of Fallon's Pharmacy Division workforce are already fully engaged in required regulatory compliance and audit preparation activities, and will be so engaged for much of 2006. Moreover, this time requirement would be cumulative to the tens of thousands of hours required by Dey's other document requests.

Document Request No. 5 seeks, in part, "all documents" that reflect "any consideration or actual changes" to Fallon's reimbursements for drugs or services based on changes in Medicare reimbursement rates since 2003. As with the first document production request, this request would require Fallon to manually review between 20,000 and 25,000 contracts, each one between five and thirty pages in length, to identify responsive information, and to identify and/or

redact commercially sensitive and proprietary information. The contract review would also entail a manual process to identify the drugs which were on the formulary, and the reimbursable amounts. This process will require 12,000 hours of Fallon's Pharmacy Division workforce, at least forty percent of which, as noted below, will be fully engaged in regulatory compliance and audit preparation activities for the balance of 2006. See Fish Affidavit at ¶ 6.

Document Request No. 8 requests, *inter alia*, "[a]ll documents, including communications between You and Providers, regarding . . . [t]he cost to Providers of acquiring physician-administered drugs, including, but not limited to, the drugs [specifically identified by the subpoena]." This request encompasses virtually every record maintained by Fallon. Documents such as fee schedules, contracts, licenses, claims, appeals, referrals, and formulary approvals and denials appear to be responsive to the request. Complying with the request is, therefore, extraordinarily burdensome, and would likely result in the disclosure of proprietary information. See Concaugh Affidavit at ¶ 11.

Finally, it should be noted that Document Request Nos. 6, 7, and 10 either explicitly state or imply that Fallon directly purchases pharmaceuticals from manufacturers. Fallon does not directly purchase drugs from manufacturers. See McGovern Affidavit at ¶¶ 5-9.

**(2) Responding to the subpoena would impose unnecessary and unduly burdensome expenses on Fallon.**

**(a) Responding to the subpoena would impose excessively burdensome costs on Fallon.**

Fallon maintains approximately three years of records at its administrative offices. Older records are stored at an Iron Mountain commercial storage facility. The facility charges fees for both retrieving and re-storing such records. Accordingly, compliance with the Dey subpoena would require that approximately 11 years' worth of records be retrieved from off-site storage

and placed in a warehouse with sufficient room and resources to conduct a document review. Moreover, because Fallon's records are not catalogued in a manner corresponding to the document production requests, the retrieval and review process would be much broader in scope than merely requesting specified records. The logistics of responding to the subpoena would, in short, impose significant out-of-pocket expenses on Fallon in addition to the internal labor costs Fallon would be forced to incur by dedicating its limited administrative staff to document review. See Concaugh Affidavit at ¶ 6.

**(b) Fallon's staff members who might otherwise be available to conduct document review are already engaged in a significant amount of required regulatory compliance and audit preparation activities, making them unavailable to conduct document review.**

As noted above, Fallon estimates that responding to even just the first few document production requests would require substantially in excess of 50,000 hours. See Concaugh Affidavit at ¶¶ 5, 7. Responding to the subpoena would impose inordinate burdens on a staff the size of Fallon's even if that staff had no competing duties. As more fully set forth below, however, many of Fallon's administrative staff members are already engaged in regulatory compliance and audit preparation tasks, making them unavailable to assist with document production.

Fallon's administrative staff is currently preparing for or participating in ongoing site inspections from both Medicaid and the Massachusetts State Division of Insurance, which include document production. Fallon employees who might otherwise be available to comply with the subpoena are, therefore, already working up to 80 hours per week to comply with the regulatory requirements of these visits. Fallon does not anticipate they will be released from these duties until at least March of 2006. See Concaugh Affidavit at ¶¶ 12-13.

In addition, recent changes to Medicare have mandated significant regulatory responsibilities that must be complied with in the spring of 2006. Specifically, prescription drug coverage, now known as Medicare Part D, became available effective on January 1, 2006, requiring all health plans to provide the same or better benefits than the level set by Medicare. As a result, Fallon employees who would otherwise work on the document review demanded by Dey's subpoena are currently working with Fallon information technology personnel to modify computer system functions, revise formulary coding, update benefit designs, devise Medicare submission and reporting forms, and update Fallon policies and procedures to comply with the Medicare requirements. See Fish Affidavit at ¶ 4.

The end result of the Medicare revisions has been to increase the number of Fallon members who now have prescription benefits. Consequently, Fallon administrative staff members who would otherwise assist with document production now spend a substantial amount of time assessing these new members' eligibility for prescribed drugs, advising providers and members about drug benefits, and adjudicating the new patients' reimbursement requests. Such staff must also field numerous inquiries from new members regarding the regulations and reimbursement requests. The staff is, in short, already working overtime to comply with these new regulations and responsibilities, and will be so engaged for another nine to twelve months before these additional tasks are completed. See Fish Affidavit at ¶ 4.

Further, the National Commission on Quality Assurance ("NCQA") is scheduled to inspect Fallon on September 18 and 19, 2006, as part of its certification process. Approximately forty percent of Fallon's Pharmacy Division workforce, who would otherwise be responsible to respond to several of Dey's document production requests, are currently engaged in responding

to detailed requests for information from NCQA, which are due by July 24, 2006. See Fish Affidavit at ¶ 5.

Finally, as a 501(c)(3) entity, Fallon undergoes a two-week financial audit every February by its financial auditors in anticipation of its filings with the Commonwealth of Massachusetts. This audit will consume approximately 40 hours per week of its administrative staff while the auditors are on-site. See Concaugh Affidavit at ¶ 14.

**(3) Compliance with the subpoena would require Fallon to dedicate legal and administrative resources to ensure HIPPA compliance.**

It bears noting that many of the documents Dey seeks contain private medical records. Fallon is obligated to keep such records confidential pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), absent certain limited conditions. Fallon already devotes two staff positions exclusively to HIPAA compliance, and the daily compliance with HIPAA terms and conditions by other staff consumes the full time equivalent of an estimated ten more positions. Review of the records in anticipation of production would, therefore, require a separate and additional analysis by legal counsel. See Concaugh Affidavit at ¶ 15.

**C. Dey filed similar subpoenas against other third party health plans, and the Court is scheduled to hear motions to quash all such subpoenas on February 2, 2006.**

Dey served the instant subpoena upon Fallon on or about November 21, 2005. Dey served similar subpoenas upon Tufts Associated Health Plans, Inc. ("Tufts") and Neighborhood Health Plan, Inc. ("Neighborhood"), two other absent class member health plans. The plaintiffs filed motions to quash and for protective orders with respect to all three subpoenas. See Docket Entry Nos. 1907, 1908, and 1909. Likewise, Tufts and Neighborhood filed separate motions for protective orders. See Docket Entry Nos. 1910, 1911, 1914, and 1915.

Dey served its subpoena upon Fallon on or about November 21, 2005. Fallon originally engaged counsel to represent it with respect to the subpoena, and negotiated an extension of time to object. Fallon later discovered a conflict of interest, however, and engaged its current counsel on or about December 22, 2005. Under the circumstances, and in view of the fact that the subpoena suffers from the identical defects identified in the other motions to quash, Fallon objected to the subpoena and filed a separate motion to stay its enforcement until the pending motions to quash were resolved. See Objection, attached hereto as Exhibit E; see also Docket Entry Nos. 2005 and 2006. Fallon noted in its motion to stay that it would likely be filing the present motion to quash, which is similar in nature the other motions to quash.[2] The pending motions to quash and Fallon's motion to stay enforcement of the subpoena against it are currently scheduled for a hearing on February 2, 2006.

## ARGUMENT

### A. In order to warrant the discovery it seeks, it is Dey's burden to make a particularized showing of need for the discovery, and to demonstrate that the discovery is not unduly burdensome.

An absent class member is not, technically, a "party" to a class action lawsuit for purposes of discovery. Rather, absent class members are "mere passive beneficiaries of the action brought in their behalf." American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 552 (1974). Accordingly, discovery is not available as a matter of course against absent class members. See M. Berenson Co. v. Faneuil Hall Marketplace, Inc., 103 F.R.D. 635, 637 (D. Mass. 1984).

---

2 For purposes of Local Rules 7.1 and 37.1, Fallon conducted a discovery conference on January 26 and 27, 2006. Specifically, the discovery conference consisted of an exchange of telephone messages on January 26, 2006 between William Saturley, Esq., counsel for Fallon, and Lorianne Trewick, Esq., counsel for Dey, regarding the burdens imposed upon Fallon by responding to discovery at this time, and the reasons for moving to quash if Dey did not agree to withdraw its subpoena. A subsequent telephone conference was then held on January 27, 2006, at which the parties' positions were discussed at further length. The January 27, 2006 discovery conference was attended by Attorney Richard Bell for Fallon and Attorney Trewick, occurred at approximately 2:00 PM, and lasted approximately 10 minutes.

Although a party to a class action lawsuit may seek discovery of an absent class member, it is that party's burden to demonstrate particularized need for the discovery. See In re Carbon Dioxide Industry Antitrust Ligitation, 155 F.R.D. 209, 212 (M.D. Fla. 1993). As more fully argued in the motions to quash filed on behalf of the other absent class member health plans, discovery of non-party class members "should be sharply limited and allowed only on a strong showing of justification." Manual for Complex Litigation, Third, § 30.232, at 231 (1995) (quoting 8 Charles A. Wright *et al.*, Federal Practice and Procedure § 2171 (2d ed 1994)). Deposition subpoenas of absent class members are subject to an even stronger showing of need. See id. (citing Clark v. Universal Builders, Inc., 501 F.2d 324, 340-41 (7th Cir. 1974)).

In assessing whether the proponent of the discovery has met its burden, courts typically consider factors such as the following: (1) whether the discovery is necessary; (2) whether the discovery seeks information that is not already known by, or is otherwise unavailable to, the proponent; and (3) whether the discovery will pose an undue burden upon absent class members or otherwise have the effect of harassing or altering membership of the class. See, e.g., On the House Syndication, Inc. v. Federal Express Corp., 203 F.R.D. 452, 456 (S.D. Cal. 2001). Accord, M. Berenson Co., 103 F.R.D. at 637 (discovery of absent class member may be pursued where the information is relevant to common questions, the discovery is tendered in good faith and is not unduly burdensome, and the information is not available from representative parties).

Even where courts have allowed discovery of absent class members, courts have limited the discovery so as not to impose an undue burden on the absent class members. See, e.g., Transamerican Refining Corp. v. Dravo Corp., 139 F.R.D. 619, 622 (S.D. Tex. 1991) (limiting discovery to 50 of 6,000 absent class members); Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc., 1998 WL 241 279, at *3 (S.D.N.Y. 1998) (allowing defendants to select a

total of 10 class members from whom to seek documents, and rejecting defendants' request to take discovery of 25 absent members); Robertson v. National Basketball Assoc., 67 F.R.D. 691, 700-701 (S.D.N.Y. 1975) (limiting number of absent class members subject to discovery so as to protect the class from undue harassment and excessive taxing of resources).

**(1) No decision of this Court has ever allowed unlimited discovery of absent class members.**

In its opposition to the Plaintiffs' motion for a protective order, Dey contends that "this Court has recognized on several prior occasions . . . [that] Defendants are entitled to proceed with their discovery of the subpoenaed plans, even though they are absent class members." Docket Entry 1919, at 4. No decision of this Court, however, has ever granted the Defendants unfettered authority to conduct discovery of absent class members. This Court's decision in M. Berenson Co., relied upon heavily by Dey, simply recognized that discovery of absent class members "is available, at least when the information requested is relevant to the decision of common questions, when the interrogatories or document requests are tendered in good faith and are not unduly burdensome, and when the information is not available from the representative parties." M. Berenson Co., 103 F.R.D. at 637 (quoting Dellums v. Powell, 556 F.2d 167, 187 (D.C. Cir. 1977)). This is consistent with the majority of federal cases recognizing limits on discovery of absent class members, and placing the burden squarely upon the proponent of such discovery to demonstrate a particularized need for the discovery.

The fact that this Court has on prior occasions allowed discovery of absent class member health plans does not give the Defendants *carte blanche* authority to conduct discovery of other absent class member health plans. Indeed, even where courts in other cases have allowed absent class member discovery, they have been careful to limit the number of absent class members subject to the discovery and to require the proponent of the discovery to demonstrate why

follow-up discovery is required. See Transamerican Refining Corp., 139 F.R.D. at 622; Laborers Local 17 Health and Benefit Fund, 1998 WL 241279, at *3; Robertson, 67 F.R.D. at 700-701. No prior decision of this Court absolves Dey of its burden to make a particularized showing that the discovery it seeks in this instance is warranted.

**(2) The fact that Fallon is not an individual does not lessen the burden that Dey seeks to impose upon it.**

Dey also suggests that the case law limiting absent class member discovery does not apply where the class members are corporate entities, as opposed to individuals. See Docket Entry No. 1919 at 8. In support of this contention, Dey relies upon Laborers Local 17 Health and Benefit Fund, 1998 WL 241279, at *3.

To the contrary, Laborers Local 17 Health and Benefit Fund does not hold that the concerns leading to the limits placed on absent class member discovery do not apply where the absent class members are corporate entities. Rather, the case simply notes that, where the class members in that case were unions "providing financial and other benefits to members of their constituencies," there was "*less* concern that *some controlled* discovery [would] be unduly burdensome." Id. at *3 (emphasis added). Notably, however, the Court rejected the Defendants' proposal to take discovery from as many as 25 absent class members, limited the Defendants' discovery to 10 class members, and required the Defendants to "make a showing that specific further inquiry [wa]s warranted" to the extent the Defendants sought follow-up discovery.

Simply stated, Fallon is not a Fortune 500 company or large labor union with vast economic resources to respond to discovery. Rather, Fallon is a small health plan with very limited administrative resources to comply with Dey's subpoena. The concerns expressed by the cases limiting the discovery of absent class members are, in short, just as valid to Fallon as they would be to "typical members of a plaintiff class."

**B. Dey has not demonstrated the requisite need for the discovery it seeks of Fallon, or that the discovery would not be unduly burdensome or duplicative of the discovery it has already received.**

Dey contends that the discovery it is seeking of the absent class members is necessary to rebut the Plaintiffs' theory of fraud. Dey's argument ignores, however, the fact that it has already been granted access to an enormous amount of discovery from more than 40 health plans nationwide, including health plans representing more than half of all Massachusetts covered lives.[3] Indeed, Dey admits that the Defendants anticipate the discovery they are now seeking will be "*consistent with testimony obtained from other [health] plans*" which, Defendants contend, support their defense to the Plaintiffs' theory of fraud. Docket Entry No. 1919 at 6 (emphasis added). If, as Dey concedes, the discovery it is seeking will be consistent with the discovery it has already obtained, the discovery it now seeks is, by definition, duplicative.

Finally, the evidence submitted with this motion conclusively establishes the extraordinary burden that complying with the subpoena will impose upon Fallon. Quite simply, Fallon does not have resources to respond to discovery of the magnitude Dey seeks in this case.

**CONCLUSION**

Contrary to its contentions, Dey does not have unlimited authority to conduct discovery of absent class members. In this case, Dey has not carried its burden to make a particularized showing of need for the discovery it seeks, or that the discovery is not unduly burdensome. In light of the extraordinary burdens that enforcement of the subpoena would place upon Fallon, and in view of the broad discovery Dey has already conducted of absent class member health

---

[3] Even if, as Dey contends, Defendants' prior discovery "did not focus on a sample of Massachusetts third-party payors," Docket Entry No. 1919 at 7-8, the Defendants did, according to the Plaintiffs, seek discovery of Massachusetts health plans representing more than half of all insured persons in the Commonwealth. To the extent, as Dey suggests, the Massachusetts health plans from whom this Court has allowed discovery have not complied with their discovery obligations, see Docket Entry No. 1919 at 12-13; Docket Entry No. 1939 at 8, Defendants' remedy is to seek enforcement of the Court's orders from those parties.

plans, Fallon respectively requests that this Court quash the subpoena served upon it, and enter any other relief as may be appropriate in the discretion of the Court.

Respectfully submitted,

FALLON COMMUNITY HEALTH PLAN, INC.

By its attorneys,

NELSON, KINDER, MOSSEAU & SATURLEY, PC

Dated: January 27, 2006

By:/s/ William C. Saturley, Esquire
Peter W. Mosseau, Esquire (BBO #358060)
William C. Saturley, Esquire (BBO #442800)
99 Middle Street
Manchester, NH 03101
603-647-1800

**CERTIFICATE OF SERVICE**

I, William C. Saturley, counsel to Fallon Community Health Plan, Inc., hereby certify that on the 27th day of January, 2006, I caused copies of Non-Party Fallon Community Health Plan, Inc.'s Memorandum of Law in Support of Its Motion to Quash the Subpoena of Defendant Dey, Inc., and for a Protective Order to be served electronically on all counsel of record.

Dated: January 27, 2006

By:/s/ William C. Saturley, Esquire
William C. Saturley, Esquire