# EXHIBIT 3

19SEPT05.txt

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2                          BOSTON DIVISION

3

4      IN RE:  PHARMACEUTICAL        .
       AVERAGE WHOLESALE PRICE       .
5      LITIGATION                    .
                                     .      01-CV-12257-PBS
6                                    .
                                     .      Monday, September 19, 2005
7                                    .      Courtroom 25
                                     .      1 Courthouse Way
8                                    .      Boston, MA. 02210

9

10                      TRANSCRIPT OF MOTIONS

11

12            BEFORE THE HONORABLE MARIANNE B. BOWLER
              UNITED STATES DISTRICT MAGISTRATE JUDGE
13

14

15

16     A P P E A R A N C E S:

17     FOR THE PLAINTIFFS:
       THE WEXLER FIRM, LLP
18     BY:  Jennifer Fountain Connolly, Atty.
       One North Lasalle Street, Suite 20000
19     Chicago IL. 60602

20     FOR THE PLAINTIFFS:
       HAGENS BERMAN SOBOL SHAPIRO, LLP
21     BY:  David S. Nalven, Esq.
       One Main Street, Fourth Floor
22     Cambridge, MA. 02142

23     FOR THE DEFENDANT GLAXOSMITHKLINE:
       COVINGTON & BURLING
24     BY: Geoffrey E. Hobart, Esq.
       1201 Pennsylvania Avenue, N.W.
25     Washington, D.C.

1      FOR THE DEFENDANT ASTRAZENECA:
       DAVIS POLK & WARDWELL
2      BY:  Kimberley D. Harris, Atty. and
       Kristi T. Prinzo, Atty.
3      450 Lexington Avenue
       New York, NY. 10017
                            Page 1

19SEPT05.txt

```
 4

 5

 6  Court Reporter:                    Niles Jon Fowlkes, RMR
                                       20 Malverna Road
 7                                     Roslindale, MA. 02131-4512
                                       Tel.  617-469-0756
 8

 9    Proceedings Reported by Stenotype, Transcript Produced By
                    Computer-Aided Transcription.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                                           3

```
 1                        I N D E X

 2

 3     Hearing re docket:

 4

 5     No. 1581 -    4

 6     No. 1597 -   33

 7     No. 1601 -   34

 8     No. 1621 -   40
```

19SEPT05.txt

9      No. 1623 - 41

10     No. 1634 - 53

11

12

13

14

15

16

17

18                              * * *

19

20

21

22

23

24

25

□

                                                    4

1                  Monday, September 19, 2005

2

3

4           THE CLERK:  Today is Monday, September 19, 2005.

5    The case of In Re Pharmaceutical Industry Average Wholesale

6    Price Litigation, Civil Action No. 01-12257 will now be

7    heard before this Court.

8           Will counsel please identify themselves for the

9     record.

10          MR NALVEN:  Good morning, your Honor.  David

19SEPT05.txt

20   motion to compel the deposition of Erik Schultz.

21          MS. HARRIS:  Your Honor, that motion has actually

22   been withdrawn, I believe by plaintiffs without prejudice

23   because Mr. Schultz appeared for his deposition.  We did not

24   represent Mr. Schultz, but I wanted to give the Court the

25   information.


□

                                                          41

1           THE COURT:  Was it withdrawn by motion?

2           MS. CONNOLLY:  Yes, your Honor, by an unopposed

3    motion.

4           THE COURT:  All right.

5           So that takes us to 1623, which is the motion to

6    compel the supplementation.

7           Mr. Hobart.

8           MR. HOBART:  Thank you, your Honor.

9           1623, your Honor, for clarification for the

10   record, is defendant's motion to compel production from the

11   plaintiff states of Nevada and Montana.

12          THE COURT:  I'm sorry.  All right.  In the

13   alternative.  All right.

14          MR. HOBART:  Your Honor, if -- if the Court has

15   the defendant's motion in front of it, I think that would

16   probably be the easiest way to work through some of this.

17          THE COURT:  Well, the easiest would be to get it

18   on the screen [computer].  You can start while I'm pulling

19   it up.

20          MR. HOBART:  Sure.

21          Your Honor, very briefly, this is -- came before

                            Page 38

19SEPT05.txt

22      the Court to argue discovery issues.  Certainly would not

23      be my personal preference, and it's not the preference of

24      the company I represent, GlaxoSmithKline, but we're here

25      today with a discovery cut off of January 31st, 2006, you

42

1       know, four or five months away.  We served discovery on the

2       defendant states of Nevada and Montana at the beginning of

3       May.  We have received absolutely nothing from the state of

4       Montana, not a single interrogatory answer, not a single

5       piece of paper, just empty promises, absolutely nothing.

6               With respect to the state of Nevada, who Hagens

7       Berman represents as private counsel, we received two boxes

8       of documents.  One box of documents was a printout of the

9       state's web site.  The other box of documents was an

10      assorted collection of documents that were, you know,

11      responsive to the discovery requests served by the

12      defendants.

13              The plaintiff state of Nevada promised and

14      represented during a meet and confer that took place on

15      June 20th they would provide answers to interrogatories by

16      July 8th.  It's September 19th; we're still waiting.  And

17      there's been no good explanation for why we're still

18      waiting for those interrogatory answers.

19              Now, the plaintiffs' response are, you know,

20      paraphrasing, We're a small state, we're trying to work

21      through the process.  And that's -- that's fine, but we're

22      -- we're here, we're running out of time.  And the reason

23      we're here is we need to work with the Court to get this on

Page 39

19SEPT05.txt

24    a schedule.  We -- we are willing to work with the

25    plaintiffs to make our own resources available to review

43

1    documents.  If the issue is they don't have the resources

2    to review large collections of documents, we'll bring

3    resources to the table to do that, to work with the states

4    to make it happen, but need the documents pretty soon to

5    take the depositions that we need to take because we intend

6    to abide by the January 31st, 2006, discovery cut off.

7    It's reasonable and there's plenty of time to work through

8    this, and for a lot of things that we're going to talk

9    about today, for the pace of production issues, you know,

10    we stand ready to be flexible, to apply resources to get

11    the job done, and we'll work with the plaintiffs in that

12    fashion.

13          Part of the frustration here is for a lot of

14    documents, the response is, "Well, it's too -- the

15    categories are too broad."  We're not looking for every

16    physical piece of paper with a prescription written on it.

17    And there are certain categories of documents that the

18    typical way you work through these issues, you know, "Do

19    you really want the stuff?  Here's ten examples you can

20    look at, and you can negotiate from there whether you

21    really need it or you really don't."  There hasn't been any

22    of that type of exchange.  And it's really, you know,

23    astonishing that a state can bring a case, and

24    two-and-a-half years later not produce a single piece of

25    paper.  But, again, we're not here to -- that's the state

Page 40

19SEPT05.txt

44

1    of affairs, that's the state of play, and we'll be as

2    flexible as we can to work through it.

3         The other kind or broader issue, like separate

4    from the individual requests, is a date issue in terms of

5    the relevant time period, and the defendants are looking

6    for a very discrete category of documents that goes back to

7    1985 -- the year I graduated from law school, 150 years ago

8    [laughter].

9         But we're not looking for claims filed going back

10   to 1985.  We're not asking the plaintiffs to go back to a

11   warehouse and search hundreds and hundreds and hundreds of

12   boxes of documents.

13        There's a very practical way to go about this.

14   And the reason why we're looking to this discrete category

15   is it goes to the states' knowledge.  You know, they -- in

16   the Medicaid world, the states elect or set their

17   reimbursement rate, their top line number reimbursement

18   rate for drugs.  A lot of states use AWP.  It is usually

19   AWP minus a percentage, or in Massachusetts, it's WAC or

20   actual acquisition costs plus a percentage.  So there's

21   different formulas, and the states have discretion as to

22   how they set their reimbursement rates.

23        And the reason why we're interested in 1985, there

24   was a government report that was issued in September of

25   1984 that basically told the states, instructed the states,

19SEPT05.txt

45

1    "You are overpaying for your Medicaid drugs by tying the

2    reimbursement rate to AWP."  So to the extent that this is

3    a fraud case and the states are claiming they were

4    defrauded by AWP and the way AWP was set, there's a pretty

5    strong argument, very strong argument, they are on notice

6    in 1984 that that reimbursement rate was too high or could

7    be too high.  Another government report came out in 1989

8    that basically repeated the caution or warning and

9    direction contained in the 1984 report.

10            So what we're looking for is documents that would

11   relate to the knowledge of the states regarding those --

12   the selection of the AWP for reimbursement rate.  And I

13   think the practical way to approach this is to look at who

14   worked at the state Medicare bureaus with the

15   decision-making authority to set the reimbursement rate,

16   and search a very discrete number of files related to those

17   easily identifiable individuals.  It's not a blunderbuss

18   search; it's very focussed and it's for a very specific

19   purpose.

20            THE COURT:  It seems to me you can narrow it a

21   little bit by telling them exactly what kind of documents.

22   I mean, whether it's correspondence between these people,

23   and, I mean --

24            MR. HOBART:  We can do that, and we'd be happy to

25   do that.  It is correspondence, minutes of meetings,

46

19SEPT05.txt

1   reports, budget analysis, that sort of thing, within, like,
2   the core decision making group of the two states.  It's not
3   the claims filed, that sort of thing.
4            THE COURT:  Exactly.  If you can narrow the
5   category.
6            MR. HOBART:  And what we need to really get to
7   work on this issue is from the plaintiffs the list of their
8   decision makers so we can try, you know, limit the number of
9   sources that we have to go to to look at their files,
10   because in the document --
11            THE COURT:  The list of decision makers in the
12   time period 19?
13            MR. HOBART:  Eighty-five forward.
14            And we would be happy to provide, like, a very
15   specific list of documents, the types of documents that we
16   would be looking for to do that.
17            And, again, if it's a situation where those, you
18   know, those documents have been archived and you have a lot
19   of boxes of documents, they can pull those back from
20   archives, we'll have our people go through them if that
21   would be of any help to the states.
22            THE COURT:  All right.  What is your response?
23   Two-and-a-half years, no documents.
24            MR NALVEN:  Your Honor, I'm David Nalven again,
25   and I represent the Attorneys General of the states of

□

47

1   Nevada and Montana in connection with this motion.
2            It's interesting to hear the dialogue between you
                        Page 43

19SEPT05.txt

3    and Mr. Hobart now as to specific categories of documents

4    within the very broad categories that were set forth in the

5    request that itself set forth 56 categories of documents

6    that the defendants served on the states of Montana and

7    Nevada in May 2nd.

8           The -- there have been multiple communications

9    between my co-counsel, my partner in Seattle, and counsel

10   for the defendants within the last two weeks, including a

11   meet and confer session that I think was extraordinarily

12   productive last Wednesday in which I participated.  There

13   are also one if not two conferences that are set up for

14   this week --

15          THE COURT:  Well, then why am I hearing this?  I

16   mean, are you close to resolving it on your own?

17          MR NALVEN:  Your Honor, our view is that the

18   motion is premature, that the parties are working closely

19   together to resolve these issues.  And I would recommend,

20   your Honor, that the motion be dismissed without prejudice

21   to be renewed in 30 days if the parties aren't able to reach

22   agreement with respect to the few outstanding issues that

23   exist.

24          THE COURT:  Do you think you are close,

25   Mr. Hobart?

⬚

48

1           MR. HOBART:  I think what Mr. Nalven is referring

2    to is, like, some of the categories we are actually moving

3    forward in terms of producing data that may be maintained by

4    a third-party, like First Health; but there are other

Page 44

19SEPT05.txt

5   categories that they are just flatly refusing to produce

6   documents which I think we should address today while we're

7   here.

8          My caution with 30 days is that we've been -- this

9   process of receiving these promises that haven't been kept,

10   you know, 30 days becomes 60 days becomes 90 days, we're at

11   Thanksgiving and the discovery cut off is January 31st.  So

12   I'm, you know, in agreement that we have had a series of

13   meetings, and we are making some progress in terms of

14   narrowing the issues, but --

15          THE COURT:  Well, let's go through the categories

16   that they totally refuse.

17          MR. HOBART:  There are three categories, your

18   Honor, I should just take off the table which we are

19   satisfied with the promises, and, again, it's a

20   pace-of-production issue, and those categories that are not

21   at issue today are Request Nos. 4, 5 and 8.

22          THE COURT:  All right.

23          MR. HOBART:  Now, Request No. 2 requests for

24   documents related to the Medicaid rebate program, the, uh,

25   the Federal Medicaid Rebate Program.  And just very briefly,

49

1   your Honor, the reason why those documents are relevant, put

2   apart -- the AWP reimbursement rate is the top line.

3   There's also a formula where states get rebates back under

4   the Medicaid Rebate Statute from the companies, there's an

5   average manufacturer's price, which, for most drugs, is the

6   equivalent of WAC minus 2 percent, less the best price or

Page 45

19SEPT05.txt

7   lowest price offered anywhere in the marketplace.  The

8   companies have an obligation to report that lowest price to

9   CMS or HCFA.  The difference between AWP and best price

10   becomes the unit rebate amount.  There is a cost-of-living

11   adjustment that's multiplied through that; and for every

12   unit of utilization times the unit rebate amount the states

13   get the money back from the companies directly every

14   quarter.

15        So one of the reasons this is relevant is in terms

16   of the damages analysis.  Our position is -- and I don't

17   think it can even be denied -- you need to net out the

18   rebates that are returned on the back end from whatever

19   manipulation they claim on the top -- the top line of the

20   AWP.

21        So we have been in discussions with the plaintiffs

22   with Request 2 and with Request 6, and I believe they are

23   in agreement to provide us with the utilization data and

24   some of their claims data.

25        But we also -- and we will continue to work with

50

1   the plaintiffs -- but there are other narrower categories

2   of documents that we're interested in, in terms of the

3   budgeting process, the forecast for these rebate amounts,

4   any correspondence to the federal government about the

5   rebate program generally.  Those are all categories of

6   documents that we're interested in, and which I believe the

7   plaintiffs are now beginning to come around to the view

8   that we're entitled to those.

Page 46

19SEPT05.txt

```
 9              THE COURT:  Well, it seems to me that there is
10    some give and take here, and that they are coming around.
11    So I -- I think I will go with the 30 days.
12              MR. HOBART:  Yeah.
13              And just two -- two other categories where the
14    plaintiffs are just flatly, uh, flatly denying, refuse to
15    produce documents.
16              Requests 26 and 52.  Twenty-six -- actually, I'm
17    sorry, there are three categories.  Request No. 3, your
18    Honor, deals with the equal access provisions in the
19    federal statutes.  And the defendants have evidence that in
20    other states, North Carolina, Massachusetts in particular,
21    and there's a series of lawsuits against other Medicaid
22    agencies, that the proposition is that the reimbursement
23    rates need to be higher in order to attract pharmacies to
24    participate in the Medicaid Program.  So it's -- again, it
25    ties back into the states' knowledge.
```

51

```
 1              So what we're looking for is evidence that the
 2    state intentionally maintained their reimbursement rates at
 3    a higher level in order to increase or to comply with the
 4    equal access provisions to invite or to make -- make sure
 5    sufficient pharmacies participate.  Again, it's a discrete
 6    category of documents relating directly to one of the key
 7    issues in our defenses, which is what did the state know
 8    about the nature of AWP.
 9              And then for the Court's information, again, North
10    Carolina has publicly said that they relied on equal access
```

Page 47

19SEPT05.txt

11    provisions to maintain their reimbursement levels at or
12    around AWP.  And Massachusetts, in a case in the First
13    Circuit, again, relied on that defense and the lawsuit it
14    brought against it for providing equal access.
15         THE COURT:  All right.  Well, what about the
16    documents in Request No. 3?
17         MR NALVEN:  Your Honor, we had a very specific
18    discussion about this category of documents in the meet and
19    confer session last Wednesday.  To begin with, even if there
20    is some suspicion in the states of North Carolina and in the
21    Commonwealth that, uh, that lobbying by pharmacists,
22    lobbying in connection with equal access provisions, caused
23    the state legislatures in those states to adopt a certain
24    AWP reimbursement scheme, there is absolutely nothing to
25    suggest that any of that occurred in the states of Nevada

52

1    and Montana.  So it's a highly attenuated relevance
2    argument.
3         Now, in terms of the burden of looking for these
4    materials, we have actually inquired in the state -- at
5    least I can represent for sure in the state of Nevada, is
6    there an equal access officer?  Is there a repository of
7    documents concerning equal access compliance?  And as far
8    as we know at this point, there is no such place.
9         So the burden of looking for these documents is
10    really extraordinary.  In connection with our meet and
11    confer on Wednesday, it was asked of defendant's counsel,
12    "You folks are involved in litigation with large states,
                          Page 48

19SEPT05.txt

13    California, Illinois, Texas, Pennsylvania, New York.  Do

14    you have experience that can tell us where in those

15    organizations a file of equal access documents resides?

16    Tell us the function in those offices, and we will look in

17    the file of Nevada and Montana and see whether we have such

18    a file."

19         But simply to look through all of the documents in

20    any possible functionary office is -- is an extraordinary

21    burden, and given the highly attenuated relevance to Nevada

22    and Montana, we think the request is improper.

23         THE COURT:  Well, I think I'm going to withhold my

24    ruling at this time, because it sounds to me like a lot is

25    going to be produced, and you are making some progress.  So

53

1    I'm going to deny this motion at this time without prejudice

2    to be renewed in 30 days, if, in fact, you find you really

3    need these documents, Mr. Hobart.

4         MR. HOBART:  Yes, your Honor.

5         I think, you know, one of the things Mr. Nalven

6    just referenced, which I think would be useful for this

7    request, and also Requests 26 and 52, which go to the

8    mitigation of damages theory the defendants have, if we

9    could get Mr. Nalven as soon as possible organizational

10   charts within these different Medicaid agencies so we could

11   talk about, like, the source and people --

12        THE COURT:  And have you made the actual request

13   for that?

14        MR. HOBART:  I believe we have, your Honor.

Page 49

19SEPT05.txt

15          THE COURT:  Yes.

16          MR. HOBART:  We would be able to negotiate.  His

17  document collection, really, like how many people get to go

18  to him and get their documents.  If we narrow the sources,

19  this becomes a much more manageable process.

20          THE COURT:  All right.  See if you can sit down

21  and do that.

22          All right.  The final motion is 1634, which is

23  Glaxo's motion for protective order to prohibit the

24  depositions of Attorneys Bartels and Carter.

25          MR. HOBART:  Yes, your Honor.


                                                          54

1           If I could just spend a couple minutes providing

2   the Court with some of the context and background to this

3   particular dispute, I think that would, uh, would serve

4   everybody well.

5           The -- before -- before I even get into the

6   background, I believe that the law is fairly clear in this

7   area.  The deposition of lawyers and opposing counsel in

8   particular is frowned upon.  There's an 8th Circuit case

9   that was decided in 1986 that sets forth a three-part test,

10  three-prong test, and it puts the burden on the party

11  seeking to depose the lawyers to establish three things, to

12  establish, you know, a limited set of circumstances where a

13  deposition's appropriate.

14          And that three-prong test is as follows:  First,

15  the plaintiffs would have to demonstrate that no other

16  means exists to obtain the information they are seeking;

                        Page 50