# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In Re: PHARMACEUTICAL INDUSTRY                :
AVERAGE WHOLESALE PRICE                        :
LITIGATION                                     :
                                              :
                                              :    MDL NO. 1456
THIS DOCUMENT RELATES TO                       :
                                              :    Master File No. 01-CV-12257-PBS
State of Nevada v. Abbott Laboratories,        :
et al., Case No. CV02-00260 (2nd Jud. Dist. Ct.)  :    Judge Patti B. Saris
(Nevada I),                                    :
                                              :
                                              :
State of Nevada v. American Home Prods. Corp.,  :
et al., 02-CV-12086-PBS (Nevada II)            :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## STIPULATION

The parties in the above-captioned actions hereby stipulate that the State of

Nevada does not assert claims on behalf of any State entities or agencies other than the Nevada

Medicaid program.

DATED: December ___, 2005

_____
Steve W. Berman
*Counsel for the State of Nevada*

_____
Ronald G. Dove, Jr.
*Counsel for Defendant SmithKline Beecham Corp.*
*d/b/a GlaxoSmithKline* (on behalf of all defendants
in the above-captioned actions)

# EXHIBIT 2



Kathleen M. O'Sullivan
PHONE: 206.359.6375
FAX:   206.359.7375
EMAIL: kosullivan@perkinscoie.com

1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.8000
FAX: 206.359.9000
www.perkinscoie.com

December 16, 2005

**VIA E-MAIL AND ELECTRONIC SERVICE**

Jeniphr A.E. Breckenridge
Hagens Berman Sobol Shapiro LLP
Suite 2900
1301 Fifth Avenue
Seattle, WA  98101

Re:   **Montana AWP Action**

Dear Jeniphr:

This letter is in response to your letter dated December 12, 2005, regarding discovery issues in the Montana AWP case.

**A.    General Issues**

**1.    Scope of Montana's Claims**

We understand that, subject to your client's approval, you will prepare a stipulation confirming that Montana's claims do not include claims on behalf of any State agencies in Montana other than Montana Medicaid.  Please forward us that stipulation once it has been drafted.

Because the Plaintiff in this action is the State of Montana, we believe that it is relevant to discover what other State entities and officials knew and what prices they paid for drugs.  Based on Mr. Buska's Rule 30(b)(6) testimony, we know that the following non-Medicaid State entities purchased drugs:  the State Employees Benefits Plan (purchased through the Department of Administration), the Department of Corrections, the state workers' compensation fund, and the Addictive and Mental Disorders Division (which, like Montana Medicaid, is within DPHHS).  We believe that we are entitled to limited discovery from these entities – discovery targeted

Jeniphr Breckenridge
December 16, 2005
Page 2

towards the entities' knowledge, the prices paid for drugs, and the extent to which that
information was shared with Medicaid.

### 2.    Time Period

You have agreed to produce the remaining responsive documents and electronic data
in Montana's possession, custody and control for the time period 1991-1997. We note
that Montana's production to date has included many documents from the pre-1997
period. Please inform us when we can expect to receive Montana's production of the
remaining documents and data for this time period. To be clear, however, our receipt
of these documents from Montana in no way constitutes agreement with your
argument that the time period for any document production should be "bilateral."

### 3.    Files Searched for Responsive Documents

We understand from your letter that Montana continues to refuse to search for
additional responsive documents within the executive or legislative branches – even
to the extent that individuals in or files from those branches (including file archives)
have documents relating to drug pricing and reimbursement, proposals to amend the
rate for reimbursement of drugs in Montana's Medicaid program, drug rebates, or any
of the allegations made in the State's Complaint. We believe that we are at an
impasse here.

We also understand the State will produce all responsive documents in its possession
from other relevant file holders. Although we will continue to inquire during
depositions about whom within Montana Medicaid or other State agencies may have
responsive documents, our position remains that Montana (which is in a far better
position to determine who the relevant file holders may be) has an independent
obligation to locate and produce responsive documents.

### 4.    Litigation Hold on Destruction of Documents

You still have not answered our question, first raised on November 23, whether and
when Montana has initiated any litigation hold to prevent the destruction of
documents relevant to the lawsuit that the State filed over three years ago. We
learned yesterday from Dan Peterson's deposition testimony that the State issued some
sort of litigation hold last week, but our question is whether the State issued such a
hold prior to or at the inception of this suit. The fact that the Defendants have sought

Jeniphr Breckenridge
December 16, 2005
Page 3

Montana's compliance by motion does not allow the State to ignore our request, nor
did the State's response to that motion "address" this issue, beyond indicating that the
State has not confirmed whether or not such a hold has been issued.

## B.    Documents Identified in Our November 11, 2005 Letter

First, with respect to emails and electronic files, you requested that Defendants
identify the individuals whose emails we would like searched and provide specific
search terms. Defendants believe it is the State's burden to ensure that its discovery
obligations are satisfied. Nonetheless, Defendants ask that the State begin by
searching the emails of the following former and current Medicaid employees whose
depositions we have either taken or noticed: Denise Brunett, Jeff Buska, Russ Cater,
John Chappuis, Mary Angela Collins, Mary Dalton, Doug Girard, Shannon Marr, Dan
Peterson, and Duane Preshinger (current employees); and Randy Bowsher, Maggie
Bullock, Nancy Ellery, Chuck Hunter, Jeff Ireland, and Dorothy Poulsen (former
employees). As for specific search terms, we intend to provide you, early next week,
with a list similar to that proposed yesterday by the Defendants for Nevada's search.
Like in Nevada, our position is that all electronic documents need to be searched and
produced, not just emails.

Second, given Montana's refusal to search legislative and executive files, we are not
surprised by your failure to identify any additional documents related to legislative
hearings or testimony. If any such documents are located in subsequent searches, we
expect they will be produced. Third, we confirm receipt of your production of Drug
Utilization Review Board records.

Your December 12 letter addresses only four of the sixteen categories of documents
set forth our November 11 letter. No response was given with respect to numbers 4-6
and 8-16 from that letter, other than informing us that either you or Mr. Mazurek
would provide Montana's response at an unidentified time in the future. As you
know, our December 1 letter merely reiterated our request for the documents
specifically identified in our letter of November 11. Given the pending discovery
deadline and numerous depositions scheduled, please let us know no later than
January 3 when Montana intends to produce the requested documents.

Jeniphr Breckenridge
December 16, 2005
Page 4

Finally, many additional categories of documents were identified during the depositions of Montana's 30(b)(6) witnesses earlier this week.  We will address production of these documents in a separate letter.

Very truly yours,

*Kath M. O'Sull.*

Kathleen M. O'Sullivan

cc:     Joseph P. Mazurek (via e-mail)
        Counsel of record (by electronic service)

# EXHIBIT 3

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

CERTIFIED COPY

In Re: PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

_____          MDL DOCKET NO.

CIVIL ACTION

01CV12257-PBS

THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____/

VOLUME I

DEPOSITION OF CHARLES DUARTE

NOVEMBER 15, 2005

CARSON CITY, NEVADA

REPORTED BY: STEPHANIE ZOLKOWSKI CCR 283

COMPUTER-ASSISTED TRANSCRIPTION BY:  caseCATalyst

Duarte, Charles - Vol. I                    November 15, 2005
                    Carson City, NV

15

1    testimony while legislature of was in session?

2        A    Joint Sub Committees on Finance and Ways and

3    Means.  The Joint Committee on Health and Human

4    Services.  Individual committees for the Senate and

5    the Assembly on Health and Human Services.

6            I believe that's the primary bodies where I

7    delivered testimony.

8        Q   With regard to your testimony before these

9    committees, is there a particular staff person or

10   staff people that you deal with on each committee?  Or

11   do you deal mostly directly with legislators?  How

12   does that work?

13       A    I deal with both.

14           On occasion the staff will be asked to work

15   with me prior to my presentations and have specific

16   questions in mind which they would like me to address.

17           On occasions I get requests from individual

18   legislators to present specific information.  On

19   occasion probably most often they'll just ask

20   questions as they come up and I answer to the best of

21   my ability.  Sort of like here.

22       Q   With regard to the Interim Committee on

Duarte, Charles - Vol. I

Carson City, NV

November 15, 2005

16

1   Health Care is there a particular staff person on that

2   committee that you have dealt with with regard to your

3   testimony relating to reimbursement of prescription

4   drugs?

5       A    There have been several.   Particularly an

6   analyst named Marsheila Lyons.

7       Q    Is there anyone else on that committee that

8   comes to mind?

9       A    Not offhand.

10       Q    How about the Interim Committee on Persons

11   With Disabilities?   Is there a staff person or staff

12   people there who you have dealt with on the

13   prescription drug issue?

14       A    No.

15           Actually, I dealt more directly with the --

16   I'm sure they had a staff person.   But my dealings

17   were with the legislators.

18       Q    Is there a particular legislator who you

19   dealt with that on Committee?

20       A    I can't remember the chair.   I think it was

21   Dina Titus.   Senator Dina Titus.

22       Q    How about the Interim Finance Committee?   Is

Duarte, Charles - Vol. I                          November 15, 2005
                          Carson City, NV

17

1    there a staff person on that Committee you have dealt

2    with on prescription drug issues?

3        A   Steve Abba.

4        Q   A-b-b-a?

5        A   Yeah.

6        Q   Anyone's else?

7        A   No.

8        Q   The Interim Standing Commit te For Children

9    and Families, is there a particular person you dealt

10   with on prescription issues?

11       A   No.

12       Q   Is there a legislator on that Committee with

13   a particular interest in prescription drug interest --

14       A   Not to my knowledge.

15       Q   -- issues?

16           Turning to the committees during the

17   legislative session, is there a staff person on the

18   Joint Sub Committee on Finance and Ways and Means that

19   you dealt with in connection with testimony relating

20   to prescription drug issues?

21       A   Steve Abba.

22       Q   Anyone else?

Duarte, Charles - Vol. I                          November 15, 2005
Carson City, NV

18

```
 1        A    No.

 2        Q    How about the Joint Committee on Health and

 3   Human Services?

 4        A    Marshelia Lyons.

 5        Q    Anyone else?

 6        A    Not that I can recall.

 7        Q    Would Marshelia Lyons also be your contact on

 8   the individual committees on Health and Human

 9   Services?

10        A    I can't recall who the staff people were

11   during the legislative session.  I'm sorry.

12        Q    In general are there particular legislators

13   who have a real active involvement on this

14   prescription drug reimbursement issue that you can

15   identify?

16        A    Can you kind of tell me, give me, some

17   context?  A number of them have been involved.  But

18   how do you mean?  To what extent?

19        Q    I guess I'm looking for -- I understand to

20   some extent all legislators may be involved in voting

21   on an issue --

22        A    Right.
```

Duarte, Charles - Vol. I                    November 15, 2005

Carson City, NV

19

1        Q    -- or are aware of it.  I don't know if there

2    are one or several legislators who really made the

3    prescription drug reimbursement issue a real issue for

4    them so that they contact you more than normal or

5    you're in communication with them more than you would

6    be with your ordinary legislators.

7        A    I think one was Senator Ray Rawson.  He's no

8    longer in the legislature.  The other is Assemblywoman

9    Ellen Koivisto.

10        Q    Could you spell that?

11        A    K-o-i-v-i-s-t-o, I believe.

12            And then finally in terms of active

13    involvement, Senator Barbara Cegavske.  Don't ask me

14    how to spell her name.  I think it's something like

15    C-e-g-a-v-s-k-e, I think.

16        Q    How about with the Governor's office?  Do you

17    ever prepare presentations for the Governor or staff

18    in the Governors' office?

19        A    Yes.

20        Q    Have you ever prepared presentations on

21    prescription drug price issues for either the Governor

22    or some of the Governor's staff?

Duarte, Charles - Vol. I                    November 15, 2005
                       Carson City, NV

20

1          A   Not specifically pricing issues.

2          Q   **Have you prepared any presentations that**

3   **relate in some way to prescription drug reimbursement**

4   **issues?**

5          A   Yes.

6          Q   **On how many occasions have you prepared such**

7   **presentations?**

8          A   I can't recall the exact number.  Two or

9   three perhaps.

10         Q   **Are there people on the Governor's staff that**

11  **have served as principal contact with you on the**

12  **prescription drug reimbursement issue?**

13         A   Yes.

14             Primarily my contact is through the

15  Director's office.  He's direct report to the Governor

16  while I'm not.

17             So the people that we individual -- we

18  normally met with a gentleman named Michael Hillerby

19  and his predecessor Mary Bell Batcher, B-a-t-c-h-e-r.

20             Both -- she was and he is the Chief of Staff

21  for the Governor.

22         Q   **Has the Governor ever sat in on any of these**

Duarte, Charles - Vol. I                                November 15, 2005
                        Carson City, NV

                                                                    50

1          A    The Public Employee Benefit Fund Board.

2          Q    What is your role in the Public Employee

3     Benefit Fund Board?

4          A    I am a board member.

5          Q    How does your role as a board member relate

6     to prescription drug reimbursement?

7          A    We occasionally deal with issues related to

8     the pharmacy benefit provided to state and local

9     employees who participate in the Public Employee

10    Benefit Plan.

11         Q    Who pays for the pharmacy benefit for Nevada

12    State employees?

13         A    The State and the employees themselves.

14         Q    Does the State contract with a third party

15    administrator or --

16         A    Yes.

17         Q    What is that third party administrator?

18         A    Catalyst RX.

19         Q    I take it Catalyst RX is a third party

20    administrator that deals with the prescription drug

21    pharmacy benefit; is that correct?

22         A    Yes.

Duarte, Charles - Vol. I                    November 15, 2005
                        Carson City, NV

                                                              51

1        Q    Is there a third party administrator that the

2   State is contracted with to deal with physician

3   administered drugs and the medical benefit?

4        A    Yes.  Benefit Planners.  They're the claims

5   administrator.

6        Q    Do you know if prescription drugs that the

7   State reimburses for in connection with the Public

8   Employee Benefit Fund, whether that reimbursement is

9   based on AWP?

10       A    I do not know.

11       Q    Who would know the answer to that?

12       A    Woody Thorn who is the Executive Officer for

13   the Public Employee Benefit Plan.

14       Q    In addition to the Public Employee Benefit

15   Fund do you serve on any other boards that involve in

16   any way issues relating to prescription drug

17   reimbursement?

18       A    No.

19       Q    In your position as board member of the

20   Public Employee Benefit Fund have you ever had

21   discussions with Woody Thorn about AWP?

22       A    Not to my recollection.

Duarte, Charles - Vol. I                          November 15, 2005

Carson City, NV

52

```
 1        Q    Do you know if Woody Thorn is aware of the

 2   lawsuit that the State of Nevada has filed that is the

 3   subject of this deposition?

 4        A    I don't know.

 5             If I could go back, Woody and I have had

 6   discussions about joint purchasing activities between

 7   our different programs.

 8             I don't recall whether we specifically

 9   touched on AWP.  It's not an area that we have to deal

10   with when we work through a pharmacy benefit manager.

11        Q    When you say joint purchasing activities,

12   what do you mean by that?

13        A    Looking at the potential of similar benefit

14   administrator for a Medicaid pharmacy benefit and

15   public employee board benefit.

16        Q    So is there some exchange of information

17   between your Department, Division of Health Care

18   Financing and Policy, and the Public Employee Benefit

19   Fund?

20        A    No.  Not formally.

21        Q    But informally?

22        A    This occurred at the Governor's Drug Summit
```

Duarte, Charles - Vol. I                          November 15, 2005

Carson City, NV

53

1    in Las Vegas this summer where we had some discussion

2    about joint purchasing activity.

3        Q    You mentioned the Governor's Drug Summit in

4    Las Vegas.

5             What was that?

6        A    The Governor in the last State of the State

7    identified the need for the State to look at ways of

8    providing prescription drugs to its residents more

9    cost effectively and asked a number of policy makers

10   to get together and talk about initiatives that might

11   achieve that goal.

12            I was just one of the participants.

13       Q    Were there any handouts or other documents

14   either distributed or generated by the Governor's Drug

15   Summit?

16       A    Yes.

17       Q    I would certainly ask any documents from the

18   Governor's Drug Summit that relate to prescription

19   drug reimbursement issues or AWP or any of the other

20   issues that we have identified in our document

21   requests, that those documents be produced to us.

22            Who all participated in the Governor's drug

Duarte, Charles - Vol. I

November 15, 2005

Carson City, NV

54

1  summit?

2       A    It's a list of probably close to a hundred

3  people.  I couldn't tell you who participated

4  entirely.

5       Q    Do you know if Mr. Terry participated?

6       A    No.  He did not.  Unless he snuck in.  I

7  don't think so.

8            MR. TERRY:  I'm not under oath.

9  BY MR. DOVE:

10      Q    We certainly would ask if a list of

11 participants at the Governor's Drug Summit exists it

12 be provided to us.

13           Do you know whether this lawsuit was

14 discussed at the Governor's Drug Summit?

15      A    I didn't hear it discussed.

16      Q    Was Woody Thorn present at the Governor's

17 Drug Summit?

18      A    Yes.

19      Q    Other than the Public Employee Benefit Fund

20 and Nevada Medicaid are there any other State agencies

21 or State affiliated groups that are involved in either

22 the purchase or reimbursement of prescription drugs?

Duarte, Charles - Vol. I                    November 15, 2005
                    Carson City, NV

                                                              57

1     and so they actually purchase and reimburse for aids-

2     related treatment.  Drugs for aids-related treatment.

3          Q    Would representatives from each of these

4     entities have been present at the Governor's Drug

5     Summit in Las Vegas?

6          A    With the exception of Child and Family

7     Services there were representatives from Mental Health

8     as well as from the Health Division.  Also from the

9     Director's office representing the State Pharmacy

10    Assistance Program.

11         Q    Didn't mean to cut short your list.

12              Are there any other entities that are either

13    State agencies or affiliated in some way with the

14    State that either purchase or reimburse for

15    prescription drugs?

16         A    Not to my knowledge.

17         Q    Is there a Nevada bureau of prisons or

18    something?

19         A    Yeah.

20         Q    Would they --

21         A    I'm sure they do.  Yeah.  I'm just not

22    familiar with them.  They run their medical programs.

1    Department of Health and Human Services.

2           Then specifically I have statutory authority

3    under the Director to administer the program in my

4    Division.

5           So Mr. Wilden actually serves as the State

6    Medicaid Agency.  I work under his direction and

7    through statute have the authority to administer the

8    programs.

9       Q    What is the general role of the Department of

10   Human Resources in the State of Nevada?

11      A    The general role?

12      Q    Yes.

13      A    They have administrative responsibility for

14   Medicaid and the State Children's Health Insurance

15   Program.

16          Do you want me to go down the list?  It's an

17   extensive list.

18      Q    I'm really more interested in getting the

19   sense of their general coverage and then we're going

20   to focus in on your particular Division.

21      A    They're responsible for administration of a

22   wide array of Federally funded, State funded -- and

Duarte, Charles - Vol. I                    November 15, 2005
                        Carson City, NV

                                                            132

1        A    Yes.

2        Q    I would like to go back to some of those

3    agencies and ask you a few more questions about that.

4             You mentioned the State Pharmacy Assistance

5    Program.

6             Do you recall that?

7        A    Yes.

8        Q    Who is the head of the State Pharmacy

9    Assistance Program?

10       A    Mike Wilden is responsible overall for it.

11   But the manager for the State Pharmacy Assistance

12   Program is Laurie Olson, L-a-u-r-i-e.

13       Q    Is she the person who would be most

14   responsibile for the purchase and/or reimbursement of

15   prescription drugs for that program?

16       A    Yes.

17       Q    Is there anyone else at that program who

18   would be knowledgeable regarding the purchase or

19   reimbursement of prescription drugs?

20       A    Besides Laurie perhaps their vendor, Catalyst

21   RX.

22       Q    Have you ever spoken with Laurie regarding

Duarte, Charles - Vol. I

November 15, 2005

Carson City, NV

133

1   the purchase or reimbursement of prescription drugs?

2       A    Yes.

3       Q    What did you discuss?

4       A    A variety of issues related to primarily to

5   Medicare Part D and its implementation.   Its enactment

6   and implementation.

7       Q    Is there any other issue you can recall

8   discussing with her relating to prescription drugs?

9       A    In general we talk -- we've had numerous

10  discussions about Medicaid policy in support of our

11  dual eligibles as they move toward the Medicare

12  benefit effective January 1st.  How we can continue to

13  provide them with certain excluded drugs including

14  barbiturates, benzodiazapene, over the counter

15  medications and to cover co-payments for those

16  individuals who participate in Medicare Part D and

17  currently do not pay co-payments.

18      Q    What's the organizational structure of the

19  State Pharmacy Assistance Program?  By that I don't

20  mean ever single position but just more generally who

21  do they report to within the larger State government?

22      A    They are a part of the Director's office.

Duarte, Charles - Vol. I

November 15, 2005

Carson City, NV

134

1   And I don't know who Laurie directly reports to.  It

2   may be Michael Wilden.  It may also be Mary Liveratti,

3   the Deputy Director of Health and Human Resources.

4       Q    Is Mary Liveratti related to John Liveratti?

5       A    Yes.

6       Q    Husband and wife?

7       A    Yes.

8       Q    Who is the Division -- who is the head of the

9   Division of Mental Health and Developmental Services?

10      A    The Administrator is Carlos Brandenberg,

11  B-r-a-n-d-e-n-b-e-r-g.

12      Q    Is he the person who would have the most

13  knowledge regarding the purchase or reimbursement of

14  prescription drugs by the Division of Mental Health

15  and Developmental Services?

16      A    I believe the individual who would probably

17  have the most knowledge is Dr. Emanuel Ebo, E-b-o.  He

18  is a doctor of pharmacy.  What's the designation?

19  Capital R Ph.D.

20      Q    Other than Dr. Ebo is there anyone else at

21  the Division of Mental Health and Developmental

22  Services who you think would be knowledgeable about

Duarte, Charles - Vol. I                    November 15, 2005
                        Carson City, NV

135

1    the purchase or reimbursement of prescription drugs?

2        A    Their medical director.  I can't remember his

3    name.  It will come to me.  I'm sorry.

4        Q    But his position is medical director?

5        A    Yes.

6        Q    Have you ever spoken with either Mr.

7    Brandenberg --

8        A    Actually, Dr. Brandenberg.

9        Q    Dr. Brandenberg or Dr. Ebo regarding, or the

10   medical director regarding, purchase or reimbursement

11   of prescription drugs?

12       A    More specifically I have spoken with Dr.

13   Brandenberg and Dr. Ebo about that.

14       Q    What sort of issues have you discussed with

15   them?

16       A    Utilization management procedures related to

17   the issuance of mental health drugs including anti-

18   convulsives, atypical and typical anti-psychotic

19   medications and anti-depressants.

20       Q    What department does Division of Mental

21   Health and Developmental Services fall under?

22       A    Department of Health and Human Services.

Duarte, Charles - Vol. I

November 15, 2005

Carson City, NV

136

1     **Q**   **Again, Michael Wilden would be --**

2     A   Director.

3     **Q**   **-- responsible for overseeing that Division?**

4     A   Yes.

5     They're organized slightly different in that

6   Dr. Brandenberg is appointed by the Governor whereas

7   other administrators in the department are appointed

8   by the Director.  There's a little bit of different

9   line of authority there, at least in terms of

10   appointment.

11     **Q**   **Who is the head of the Division of Child and**

12  **Family Services?**

13     A   Currently they don't have an administrator.

14   Their Deputy Administrator is Diane Comeaux,

15   C-o-m-e-a-u-x.

16     **Q**   **Would she be the person most knowledgeable**

17  **regarding the purchase or reimbursement of**

18  **prescription drugs by that Division?**

19     A   I don't believe so.

20     **Q**   **Who would be the most knowledgeable person?**

21     A   Actually, I do not know.  Perhaps you might

22  want to put down Patty Merrifield.  P-a-t-t-y

Duarte, Charles - Vol. I                    November 15, 2005
                        Carson City, NV

                                                                    137

1    M-e-r-r-i-f-i-e-l-d.

2        Q    Have you ever spoken with anyone at the

3    Division of Child and Family Services regarding

4    prescription drug issues?

5        A    Not that I recall.

6        Q    The Division of Child and Family Services,

7    does it also fall under the Department of Health and

8    Human Services?

9        A    Yes.

10       Q    Do you know who the head of Nevada Bureau of

11   Prisons is?

12       A    No, I do not.

13       Q    Do you know anyone at the Nevada Bureau of

14   Prisons who would be knowledgeable regarding the

15   purchase or reimbursement of prescription drugs?

16       A    You may want to -- I don't know the

17   individual's name but their Medical Director I'm

18   certain might know something about that or perhaps

19   their fiscal officer, their administrative services

20   officer.  I don't know their names.

21       Q    We discussed the Public Employees Benefit

22   Fund and Woody Thorn.

Duarte, Charles - Vol. I                    November 15, 2005
Carson City, NV

138

1          I believe you testified Woody Thorn would be

2     the person at that Fund most knowledgeable regarding

3     the purchase or reimbursement of prescription drugs;

4     is that correct?

5          A    Yes.

6          Q    Is there anyone else at the Fund who would be

7     knowledgeable regarding the purchase or reimbursement

8     of prescription drugs?

9          A    Perhaps his Deputy, Leslie Johnstone,

10    J-o-h-n-s-t-o-n-e.

11         Q    Anyone else?

12         A    Jim Wells, their Fiscal Officer.

13         Q    Are there any other agencies or State

14    affiliated organizations or entities that are involved

15    in the purchase or reimbursement of prescription drugs

16    to your knowledge?

17         A    Yes.

18         I previously testified the Health Division

19    administers the ADAP Program for the State of Nevada.

20         Q    Who is the head of that program?

21         A    I don't know the name of the individual in

22    charge of ADAP.  But the administrator and former I

Duarte, Charles - Vol. I                        November 15, 2005
                        Carson City, NV

139

1   think ADAP Chief would probably know.   The

2   Administrator is a gentlemen named Alex Haartz,

3   H-a-a-r-t-z.   The Deputy Administrator is a gentleman

4   named Richard Whitley, W-h-i-t-l-e-y.

5       Q    Would they be the persons most knowledgeable

6   regarding the purchase or reimbursement of

7   prescription drugs by that program?

8       A    Yes.

9       Q    Have you ever had discussions with either

10  those two individuals regarding the purchase or

11  reimbursement of prescription drugs?

12      A    Yes.

13      Q    What did you discuss?

14      A    I discussed some methodologies for

15  administering the ADAP program in a manner which might

16  assist them with some cash flow issues.

17      Q    Any other topics you discussed with them

18  regarding -- relating to prescription drug

19  reimbursement?

20      A    Use of pharmacy point of sales systems for

21  administration of 340 B price drugs.

22      Q    Anything else?

Duarte, Charles - Vol. I                    November 15, 2005
                    Carson City, NV

168

1    Amendment or we withdrew this one and submitted

2    another one.  I can't recall the process.

3        Q   Do you recall if there was a similar meeting

4    for public comment on the change in the drug

5    reimbursement rate from AWP minus 10 percent to AWP

6    minus 15 percent?

7        A   Not with the Governor's staff.  There was a

8    public hearing.

9        Q   After that public hearing did you meet with

10   anyone with regard to the result of that public

11   hearing?

12       A   My recollection, and I have to go back to the

13   records, my recollection was we actually met with the

14   Director and representative, I think I referred to

15   this meeting already in testimony, representatives of

16   Walgreens, the National Association of Chain Drug

17   Stores, the Nevada Retailers Association, prior to our

18   implementation of the revision in the discount policy

19   off of average wholesale price.

20           I can't remember -- I believe it was prior to

21   but I'm not certain.

22       Q   Do you recall meeting -- you said you met

Duarte, Charles - Vol. I                     November 15, 2005
Carson City, NV

169

1    with Mr. Wilden and the representatives from Walgreens

2    and some of the other providers.

3            Did you recall meeting with either the

4    Governor or anyone in the Governor's staff regarding

5    that particular change in reimbursement?

6        A    No.

7            The reason was, I explained in prior

8    meetings, was that we already had word that a large

9    number of the specialty practices were going to drop

10   out as a result of State Plan Amendment.  I guess this

11   is 03-031.  And we had not had that kind of response

12   to proposed changes in reimbursement method for the

13   pharmacies.

14           In fact, my recollection was they finally

15   agreed to it.  The pharmacy representatives that is.

16       Q    In that sentence that starts out with

17   "Mr. Duarte indicated comments from this meeting;" the

18   last clause of that sentence says "for impact on

19   access to services and the state budget," I think I

20   understand impact to access to services.

21           What do you mean impact on state budget?

22       A    The legislature had authorized us to reduce

Duarte, Charles - Vol. I                    November 15, 2005
                      Carson City, NV

218

1   Governor's office need to be involved.

2          Keep in mind that the executive branch is

3   separate from the legislative and, of course, has

4   authority to administer the program as it needs to

5   within its budget authority.

6          And while -- it's not necessary for us to

7   take these kinds of programs to the legislature for

8   approval during the interim, the interim between

9   legislative sessions, unless we believe that there's

10  something that they need to get involved with.

11         In this case we didn't believe this was

12  something they needed to be involved with.  We did

13  report this in 2003 session as an administrative

14  action to save money related to the pharmacy program.

15  As such we did report it to them.  But really was the

16  executive branch initiative.  The Director's office

17  was involved.  I can't say whether or not he informed

18  the Governor's office.  I assume so.

19     Q    **When you say you reported this in 2003, what**

20  **does that mean?  You testified at the legislature**

21  **about it?**

22     A    Yes.

# EXHIBIT 4

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

---------------------------x

In Re:  PHARMACEUTICAL,      )   MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE   )   CIVIL ACTION

PRICE LITIGATION             )   01CV12257-PBS

---------------------------)

                             )

THIS DOCUMENT RELATES TO:    )

ALL ACTIONS                  )

---------------------------x


DEPOSITION OF APRIL TOWNLEY

JANUARY 27, 2006

RENO, NEVADA


REPORTED BY:  AMY JO TREVINO, CCR #825, CSR #5296, RPR

COMPUTER-ASSISTED TRANSCRIPTION BY:  CASE CATALYST

April Townley                              January 27, 2006

Reno, NV

---

**18**

1   A.  I know that we used it and it was happening
2   in the latter part when I was there, and I don't
3   really remember what we did with it. The last two
4   years that I was at Medicaid I wasn't responsible for
5   rates, I just was responsible for the program itself,
6   so I pretty much dropped out of that issue.
7       Q.  We will get into that a little bit, I will
8   go through your work history and when you --
9       A.  All right. Did what.
10      Q.  Did what and were responsible for different
11  things.
12      A.  Okay.
13      Q.  Do you recall discussing the term AWP or
14  issues relating to AWP with other people in Nevada
15  Medicaid?
16      A.  Yes, there would have been discussions and
17  I would have been part of them. I don't remember any
18  specifics, but you know, in establishing rates, that
19  kind of thing, many people were consulted.
20      Q.  Do you recall any particular people that
21  would, you would consult where you might discuss AWP?
22      A.  Well, there was a person by the name of

**19**

1   Jeff, and I have forgotten his last name, that was a
2   pharmacy consultant in the '80s, and then there was
3   Steve Bradford who was also a pharmacy consultant,
4   and then Laurie Squartsoff. And then, we also in the
5   early years we had a pharmacy committee, and I don't
6   remember, you know, whether it was specifically on an
7   agenda or not, but I would assume that we would have
8   talked to them about it. That was the nature of what
9   we did with these committees, talked to them about
10  policies and rates.
11      Q.  You say you spoke with, you mentioned a
12  Jeff, was a pharmacy consultant, do you know if Jeff
13  is still working with Nevada Medicaid today or --
14      A.  He left in the '80s and I heard, I just
15  heard he went here, there and everywhere, but I don't
16  have any idea where he is.
17      Q.  Do you have any idea where Steve Bradford
18  is?
19      A.  He is dead.
20      Q.  You mention discussing the term AWP with
21  the pharmacy committee, do you recall discussing the
22  term AWP with other people at other state agencies?

**20**

1   A.  Well, one of the type of studies that we
2   often did was to, you know, contact other states and
3   see how they were reimbursing, you know, not just
4   pharmacy but many rates, and so I would say I don't
5   know that I talked to them because generally staff
6   would have been the ones, you know, calling and
7   talking with them and I would just have reviewed the
8   reports. So it's, you know, it's just something that
9   could have happened because that's the methodology we
10  used every year to check how things were going in
11  other states.
12      Q.  Do you recall discussing AWP with any
13  legislative staff?
14      A.  Oh, you know, it could have happened. What
15  happens is the process is that staff put together the
16  budget and we would base that on, you know, AWP a
17  factor and dispensing fee. That may have been based
18  on calling other states. I don't remember what
19  exactly we, for each year what happened, but then our
20  recommendations for the budget would go to our
21  executive budget office and from there it would go to
22  the legislature, so anywhere along the process I

**21**

1   could have spoken with someone. I don't remember any
2   major incident about it, though.
3       Q.  Are you familiar with the term WAC or
4   wholesale acquisition cost?
5       A.  No, I'm afraid I don't remember that one.
6       Q.  Miss Townley, would you please briefly
7   describe your educational background since high
8   school?
9       A.  Sure. I got a BA degree from Oklahoma
10  State University in psychology, and I attended
11  graduate school at the University of Nevada in the
12  area of social psychology, and I completed everything
13  except the dissertation just like everybody else.
14      Q.  Did you go directly from undergraduate
15  school to graduate school?
16      A.  Yes.
17      Q.  After you finished graduate school what did
18  you do next?
19      A.  Okay, I took a job with the State of Nevada
20  and it was called, the agency was called
21  Comprehensive Health Planning and they were a big
22  agency type, I mean, important type agency in the

---

Henderson Legal Services
(202) 220-4158

April Townley                                          January 27, 2006
                              Reno, NV

---

**118**

1  Medicaid program as a whole?
2      A.  Oh, yeah.  Started in, you know, mid '80s
3  it has always been a concern.  One legislator
4  referred to it as the black hole.  So it's always
5  been an issue, just like it is naturally.
6      Q.  Did you feel you were under any sort of
7  pressure to reduce expenditures at the Medicaid
8  program in light of this over arching concern?
9      A.  Well, we were given a budget and it was
10  just like a line item for the medical payments, and
11  so we followed the plan that we developed for the
12  legislature and which we made calculations on what we
13  thought it was going to be in the future.  So if we
14  thought that was getting away or running away or
15  something, we had to throw up red flags and then you
16  go through the whole process again of study
17  evaluation up the chain, what are we going to do, and
18  there were several times when we actually had to make
19  a budget cut and you know, we didn't, I don't think
20  anything was done to the pharmacies in those cuts.
21  But you know, like we cut out podiatry and things
22  like that.  So I always felt responsible for

**119**

1  remaining within budget unless there were factors
2  that I couldn't control and then it was time to go
3  further.
4      Q.  When you said that there were always
5  concerns about the cost of the Medicaid program in
6  general, where did those concerns come from?  Did you
7  get, you know, concerns from the Governor's office,
8  from the legislature, from the federal government, I
9  mean where, who was kind of communicating those
10  budgetary concerns?
11      A.  Well, the Governor's office you know when
12  we had to make cuts came directly from them.  And it
13  was not only Medicaid that had to do something, it
14  was many state agencies all up and down the line.
15  And so, of course, all we could do was go in and take
16  a look at the discretionary part of the program, and
17  then in terms of you know, where else did it come
18  from, it was just kind of an ethic within Nevada that
19  if you are going to be an administrator of the
20  program that you are to live within your budget and you
21  are to be responsible for making sure that happens
22  without violating things like the federal law.  And

**120**

1  then many legislators would say I'm going to go to
2  Carson City and find all the waste, and Medicaid went
3  up 235 percent last year so we are going to go after
4  them, and so you knew you always had that kind of
5  thing facing you and within Nevada people are you
6  know, it's a very limited Medicaid program in terms
7  of who is eligible.  And so I have lost my train of
8  thought, isn't that nice.  I'm fatiguing, that's an
9  expression.
10      Q.  Let us know if you want to take another
11  break, because it is getting into the afternoon.  Do
12  you ever recall any specific concerns being raised
13  about the escalating costs of prescription drugs in
14  the Medicaid program?
15      A.  Yes.
16      Q.  What do you recall about that?
17      A.  Well, it was just like all the other areas
18  where there was an informa cost base to it that these
19  costs, nobody liked them, you know, it was something
20  is wrong with the big system, not with Medicaid here
21  you know and how it was you know, too bad sometimes
22  that we had to get rid of other programs to continue

**121**

1  funding, you know, that the pharmacy part, that kind
2  of thing, so yeah, it was and other areas where we
3  felt like you know, there was not, you know, we had
4  to pare down hospital costs just about all we could
5  and that was also starting to really escalate, that
6  kind of thing.  So yes.
7      Q.  In light of these, you know, budgetary
8  concerns about prescription drugs and other programs
9  did Nevada Medicaid consider any sort of cost saving
10  measures that they could undertake to reduce the
11  expenditures?
12      A.  Oh, yeah, I mean we did that all the time.
13  There was a day in 1992 where I had to stay the night
14  before a board and talk about one measure after
15  another to control costs, and so it was a constant.
16      Q.  Do you recall any measures being discussed
17  or implemented that related to reducing the cost of
18  prescription drugs?
19      A.  Not the cost, the dispensing fee was
20  discussed.
21      Q.  Any other measures that you can remember
22  for saving money and prescription drugs?

122

1  A. Well, we have always had utilization
2  controls on it. I think when I left it was still two
3  physician visits and three prescriptions per month,
4  then you had to get authorization after that, and I
5  am not sure what they are doing now, but there was an
6  attempt to curb the utilization. And then you know
7  there is just this constant review of individuals and
8  to look for the fraud and the abuse, both for
9  recipient, provider, that kind of thing. But no
10  measures, there was never a thing about we are going
11  to just say you can't have the cost, we are going to
12  keep costs the same we paid last year, you know, that
13  was not discussed or was discussed and thrown out.
14  And what would happen in terms of Nevada, too, is
15  that like a legislator would look at a list of what
16  is mandatory and what is operational and see pharmacy
17  and say okay, just get rid of that. There is a nest
18  of 20 million right there, and there was always the
19  struggle, you know with the legislature saying, you
20  know, if you don't give them the prescriptions they
21  will be getting it through the counties and the
22  counties will just have to, you know, blah, blah,

123

1  blah. That's going to look cute on the record.
2       By the way, I want to point out some
3  things, Laurie Squartsoff did come and talk to me
4  sometimes, about things that she perceived, ideas
5  that she had and we didn't, I didn't pursue them.
6  Now, she, when she worked with Chris things may have
7  happened, you know, so I just wanted to point that
8  out. Laurie definitely was a very well educated
9  person, talked with other people.
10  Q. You said she was a pharmacist, she had a
11  pharmacy degree. What was her background, do you
12  know?
13  A. She had been an active pharmacist, and I
14  think she worked with another program, but I'm not
15  completely positive. She was a pharmacist, which I
16  think she just had an advance degree, I'm not sure.
17  Q. Do you recall, you say she was a
18  pharmacist, so would she have been, when she was a
19  pharmacist would she have been involved in the
20  acquisition of the drugs for use in her pharmacy, do
21  you remember anything like that?
22  A. I remember she was a pharmacist with the

124

1  State Mental Health Program, and I'm not sure about
2  whether she did any private, and at State Mental
3  Health I don't think she would have been, it would
4  have just been ordering drugs, so I don't know her
5  role as far as that.
6  Q. So you say she worked with the State Mental
7  Health Program, the State Mental Health Program had
8  its own program for acquiring prescription drugs?
9  A. Yes, they only dispense certain drugs and
10  so they, when they went out and got the best price,
11  based on what, I don't know their methodology but
12  they went out actually on a best price for the drug
13  is what I remember.
14  Q. And who, do you recall who at the
15  Department of Mental Health Services would have been
16  involved in that process of finding out the best
17  price?
18  A. No, I don't. I'm not real clear on their
19  whole program. I just know that it was different
20  than ours in that sense, and so I really, that's a
21  little aside, you know, that I really don't know
22  enough to be speaking to.

125

1  Q. Do you know if, just to finish the thought
2  on the Department of Mental Health Services, are they
3  within the same organizational umbrella as Medicaid
4  or are they under their own department? What is the
5  relationship between the Department of Mental Health
6  Services and Medicaid?
7       MS. BRECKENRIDGE: Today?
8       MR. DOVE: No, during her tenure.
9       THE WITNESS: I don't know today, but
10  basically we were, both were divisions within the
11  Department of Human Resources, so we purchased a lot
12  of services from them and so our relationship with
13  them was more like they were a provider, and you
14  know, and then I'm not sure what happened with the
15  director's office, with the administrators I can't
16  speak to.
17  Q. But was there one administrator overseeing
18  both the Medicaid Program and the Mental Health
19  Program?
20  A. Yes.
21  Q. Ms. Townley, are you aware that the State
22  of Nevada received rebates from manufacturers for

April Townley                                      January 27, 2006

Reno, NV

---

126

1  prescription drugs?
2      A.  Right.
3      Q.  Would you please describe the process by
4  which manufacturer rebates were selected by Nevada
5  Medicaid during your time there?
6      A.  Okay.  Well, let's see, I'm real fuzzy on
7  this, you know we had a staff member who worked under
8  Laurie who identified the amounts and then Laurie
9  reviewed it, and then I am just, I have forgotten
10  what we did next.
11      Q.  Do you recall the staff person who worked
12  with Laurie on this?
13      A.  I can see her face, the name escapes me,
14  but Laurie supervised her.
15      Q.  Laurie would be the one to ask about it?
16      A.  Right, Laurie would be the one.
17      Q.  During your time at Nevada Medicaid were
18  you satisfied that all the rebates that Nevada
19  Medicaid was eligible for were being collected?
20      A.  Well, I was satisfied that we were catching
21  up on it, but no, we had not done it all.
22      Q.  And why was that?

127

1      A.  It's fairly labor intensive as I recall to
2  identify it, and it was just a matter of staffing.
3      Q.  Do you know whether the rebate money that
4  was collected from the manufacturers was funneled
5  back into the Nevada Medicaid Program?
6      A.  Yes, it was.
7      Q.  Do you know whether Nevada Medicaid sought
8  rebates for physician administered drugs during your
9  time there?
10      A.  I don't know for sure.  I don't think so,
11  but Laurie would be the one again, who would know.
12  I'm pretty sure we didn't.
13      Q.  When you were at Nevada Medicaid to your
14  knowledge were other state agencies involved in the
15  purchasing or reimbursement of prescription drugs, I
16  mean other than you already mentioned the Mental
17  Health Division, but other than the Mental Health
18  Division were there any other state agencies that
19  were involved in the purchasing or reimbursement of
20  prescription drugs?
21      A.  Let me think.  Well, the Health Division
22  was involved with vaccines and they purchased and

128

1  distributed some of the vaccines, and then they had
2  some other public health programs that I think had a
3  direct component to it.  And that's all I remember.
4      Q.  Did Nevada Medicaid ever compare the prices
5  of which other agencies were purchasing drugs with
6  the price at which Medicaid was reimbursing
7  pharmacies and providers?
8      A.  Laurie did that, uh-huh.
9      Q.  Do you recall Laurie talking to you about
10  this?
11      A.  Uh-huh.
12      Q.  What do you recall from that conversation?
13      A.  Well, she and I were talking about whether
14  there was a possibility of you know, using the same
15  kind of system that mental health did for acquiring
16  certain basic drugs and you know, the issue became
17  one of distribution, how do you do that and we
18  weren't a pharmacy and we weren't set up to be a
19  pharmacy so we would have to purchase the drugs and
20  still find a pharmacy that would be willing to
21  dispense it.  So we were just talking about those
22  kind of logistical problems and then I retired.  Just

129

1  in time.  But she had, and she brought up the
2  information to me showing, and she had even talked to
3  the mental health people and they were very willing
4  to work with us.
5      Q.  Do you know whether the State ever had any
6  communication with Venicare or the Florida Keys?
7      A.  I'm not aware that we did.  But I don't,
8  you know, I wasn't made aware of every communication,
9  but to my knowledge we were not.
10      Q.  What is the procedure for amending the
11  pharmacy dispensing fee?
12      A.  Okay, I can just tell you about what it was
13  like when I was there, when I left, but what we would
14  do there was, we had to send things out for public
15  review so what would happen would be that the State
16  would come up with an alteration, change, and more
17  than likely would have incorporated it into their
18  budget projections, then that would have gone through
19  the budget office and that would have gotten its
20  approval, and then there would have also been
21  correspondingly at the same time going out for public
22  review or maybe before it went to the budget office

---