# EXHIBIT 5

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

*************************************

IN RE PHARMACEUTICAL INDUSTRY AVERAGE) MDL NO. 1456

WHOLESALE PRICE LITIGATION          ) CIVIL ACTION:

------------------------------------) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO STATE OF    )

NEVADA V. ABBOTT LABORATORIES, Et al,)

Case No. 02-CV-00260 (Nevada I) and  )

STATE OF NEVADA V. AMERICAN HOME     )

PRODUCTS, et al., Case No.           )

02-CV-12086-PBS (Nevada II)          )

*************************************

DEPOSITION OF CHRISTOPHER THOMPSON

CARSON CITY, NEVADA

BE IT REMEMBERED that on Friday, the 6th day

of January, 2006, at the hour of 9:05 a.m., at the

offices of the Attorney General, 198 N. Carson Street,

Carson City, Nevada, before me, CINDY LEE BROWN, a

notary public, personally appeared CHRISTOPHER

THOMPSON, who was by me first duly sworn, and was

examined as a witness in said cause.

Christopher Thompson                                    January 6, 2006
Carson City, NV

58

1  program?
2      A.  I don't recall anything as far as the cost
3  of prescription drugs.  Let me just backtrack on that
4  as I say that.  The one place where I do recall some
5  concerns about prescription drugs and the cost of
6  prescription drugs was regarding the cost for the
7  mentally disabled.  And I do recall some specific
8  discussions both about the types of drugs that were
9  included in the formularies and the cost for those
10 drugs.
11     Q.  What, if any, cost-saving measures did the
12 State consider while you were the director?
13         MS. BRECKENRIDGE:  Objection.
14         THE WITNESS:  Are you saying overall or as
15 it relates to --
16 BY MR. LITOW:
17     Q.  Did you consider, for example, using a
18 preferred drug list for drugs or using a MAC pricing,
19 M-A-C?
20     A.  During that time the primary focus was on
21 moving people into managed care, and as a result,
22 essentially, shifting out of the issues of direct

59

1  reimbursement of drug costs.  I heard some
2  discussions, and I don't recall, I don't recall
3  specifically whether it was at a Medicaid directors
4  conference or whether it was at an NGA meeting or
5  whether it was at some other kind of national
6  conference, some discussion about moving into
7  preferred drug lists or that kind of management of
8  prescription drugs.
9          And at that time it was not something that
10 I was going to spend our resources on.  It was lower
11 down, it was quite a bit lower down on the list.
12     Q.  When you were with the division, to your
13 knowledge, were any other State agencies involved in
14 purchasing prescription drugs?
15     A.  I believe that the -- okay.  Let me try to
16 get the name right.  I -- what's the name of mental
17 health and mental retardation now?  I mean, it's
18 developmental disability or something.
19     Q.  Whatever the division that was responsible
20 for mental health services?
21     A.  Yeah.  That group had their own dispensary,
22 and so I'm aware that they were purchasing drugs.

60

1      Q.  Any other agencies that you're aware of?
2      A.  I can't think of any others.
3      Q.  Did you ever have conversations with
4  anybody from the Mental Health Division regarding the
5  prices at which they were purchasing drugs?
6      A.  I may have.  I don't have any specific
7  recollection of them.
8      Q.  And do you know specifically who at that
9  division you would have spoken to or who would have
10 had knowledge of the prescription drug purchasing?
11     A.  It would have been, perhaps, Mike Torvenin,
12 perhaps Carlos Brandenburg, who was the, Carlos was
13 the administrator of the division.  Mike at that time
14 was the chief accountant.
15     Q.  Correct me if I'm wrong, but I believe you
16 testified that your division fell under the scope of
17 the Department of Human Resources; is that correct?
18     A.  That's correct.
19     Q.  Was the Mental Health Division also under
20 the Department of Human Resources?
21     A.  Yes.
22     Q.  What sorts of communications did you have

61

1  with drug manufacturers during your tenure at the
2  division?
3      A.  The only -- and it wasn't directly with
4  drug manufacturers, but with some of their lobbyists.
5  I know that in the 1995 session and in the 1997
6  session there was quite a bit of discussion
7  regarding, regarding managed care, and from the
8  pharmacies there was, there were issues of assuring
9  that they would be included in whatever groups were
10 allowed to work with those managed care companies.
11 There was also some specific legislation at the time
12 that they wanted to, essentially, to protect their
13 position with those managed care organizations.
14     Q.  Did any other entities, other than Nevada
15 Medicaid itself, make payments to providers in
16 connection with the Medicaid program?
17         MS. BRECKENRIDGE:  Objection.
18         THE WITNESS:  Did anyone other than -- I'm
19 not sure, I'm not sure what you mean by that.
20 BY MR. LITOW:
21     Q.  Well, other than Nevada Medicaid itself,
22 did Medicaid providers receive reimbursement from any

# EXHIBIT 6



10467795

Jan 31 2006
7:24PM

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

MDL No. 1456
CIVIL ACTION:  01-CV-12257-PBS
PBS

Judge Patti B. Saris
Chief Magistrate Judge Marianne B. Bowler

THIS DOCUMENT RELATES TO
*State of Nevada v. Abbott Labs, Inc., et al.,*
Case No. CV02-00260 *(Nevada I)*

*State of Nevada v. American Home Prods. Cop.,*
*et al.,* 02-CV-12086-PBS *(Nevada II)*

## SECOND NOTICE OF RULE 30(B)(6) DEPOSITION
## TO PLAINTIFF THE STATE OF NEVADA

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of

Civil Procedure, Defendants in the above-captioned actions, by and through their counsel,

will take the deposition upon oral examination of a representative or representatives

designated by the State of Nevada (hereinafter "Plaintiff") to testify on behalf of Plaintiff

concerning all matters described herein, before a Notary Public or other person

authorized to administer oaths at 198 N. Carson Street, Carson City, NV, on February 22,

2006, at 10:00AM.  The deposition will be recorded by stenographic and/or sound and

visual means and will continue from day to day until completion.

Pursuant to Rule 30(b)(6), Plaintiff shall designate in writing to the undersigned

counsel for Defendants one or more officers, officials, employees, or other representative

to testify on their behalf who are most knowledgeable about and will testify as to matters

known or reasonably available to Plaintiff in regard to the matters set forth below. Plaintiff is further requested to set forth the matter or matters on which each such designated person will testify.

All terms used in this Notice, whether or not capitalized, shall be defined as stated in Defendants' First Set of Interrogatories and Requests for Production to the State of Nevada and Defendants' First Set of Requests for Admission to the State of Nevada.

Unless otherwise specified, the relevant time period is the period from January 1991 to the present.

## AREAS OF INQUIRY

Plaintiff is requested to designate one or more persons who consent to testify on its behalf concerning the following matters:

1.    The formula or other basis on which each Subject Drug was purchased or reimbursed by Nevada's Public Employee Benefits Fund; negotiations with distributors, PBMs, or other vendors or representatives for purchasing each Subject Drug; and, if no formula was involved, the actual purchase or reimbursement price for each Subject Drug.

2.    The formula or other basis on which each Subject Drug was purchased or reimbursed by Nevada's Bureau of Prisons; negotiations with distributors, PBMs, or other vendors or representatives for purchasing each Subject Drug; and, if no formula was involved, the actual purchase or reimbursement price for each Subject Drug.

3.    The formula or other basis on which each Subject Drug was purchased or reimbursed by Nevada's Division of Child and Family Services; negotiations

2

with distributors, PBMs, or other vendors or representatives for purchasing each Subject Drug; and, if no formula was involved, the actual purchase or reimbursement price for each Subject Drug.

4.      The formula or other basis on which each Subject Drug was purchased or reimbursed by Nevada's Division of Mental Health and Developmental Services; negotiations with distributors, PBMs, or other vendors or representatives for purchasing each Subject Drug; and, if no formula was involved, the actual purchase or reimbursement price for each Subject Drug.

5.      The formula or other basis on which each Subject Drug was purchased or reimbursed by Nevada's Health Division; negotiations with distributors, PBMs, or other vendors or representatives for purchasing each Subject Drug; and, if no formula was involved, the actual purchase or reimbursement price for each Subject Drug.

6.      The formula or other basis on which each Subject Drug was purchased or reimbursed by Nevada's Senior Rx Program; negotiations with distributors, PBMs, or other vendors or representatives for purchasing each Subject Drug; and, if no formula was involved, the actual purchase or reimbursement price for each Subject Drug.

7.      Communications between Plaintiff and physicians, pharmacists, or other Medicaid providers, regarding changes to the rate of reimbursement for services provided under Medicaid.

3

8.    Communications between Plaintiff and any pharmacy association regarding reimbursement or acquisition costs for pharmaceuticals or any Subject Drug.

9.    Communications between Plaintiff and Myers & Stauffer or any other consultant or adviser regarding AWP or reimbursement or acquisition costs for pharmaceuticals or any Subject Drug.

10.    Communications between Plaintiff and Ven-A-Care or any other complainant or "whistleblower," or their attorneys or other representatives, regarding AWP or reimbursement or acquisition costs for pharmaceuticals or any Subject Drug.

11.    Any efforts by Plaintiff to determine providers' actual acquisition costs for pharmaceuticals or any Subject Drug.

12.    Any consideration given by Plaintiff to the meaning of AWP or to defining that term for use in dealing with Plaintiff.

13.    All efforts to obtain information from any Defendant(s) as to what providers were paying to acquire any Subject Drug.

14.    Plaintiff's compliance with its statutory and regulatory obligations to establish appropriate Medicaid reimbursement rates.

15.    All efforts undertaken since Plaintiff began considering this litigation to determine the understanding of and reliance upon published AWPs of the Subject Drugs by Nevada residents for whom Plaintiff is asserting damages pursuant to its alleged *parens patriae* powers.

4

16.     All efforts undertaken since Plaintiff began considering this litigation to

determine the damages, if any, suffered by Nevada residents for whom

Plaintiff is asserting damages pursuant to its alleged *parens patriae* powers.

17.     The steps taken by Plaintiff to preserve documents and information

relating to this litigation since the filing of the complaint in this action.


Dated:  January 31, 2006                        __/s/ Ronald G. Dove, Jr._____
                                                Ronald G. Dove, Jr.
                                                Jason R. Litow
                                                Covington & Burling
                                                1201 Pennsylvania Avenue, NW
                                                Washington, DC  20004
                                                (202) 662-5685

                                                *Attorneys for SmithKline Beecham
                                                Corp., d/b/a GlaxoSmithKline on behalf
                                                of Defendants in the above-captioned
                                                actions.*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing Defendants'

Second Notice of Rule 30(b)(6) Deposition to Plaintiff State of Nevada to be served on

all counsel of record electronically via Lexis/Nexis File & Serve on January 31, 2006,

pursuant to Case Management Order No. 2.

Dated:  January 31, 2006                    /s/ Jason R. Litow
                                            Jason R. Litow

6

# EXHIBIT 7



LEXISNEXIS FILE & SERVE
10467297
E-SERVICE
Jan 31 2006
6:52PM

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

MDL No. 1456
CIVIL ACTION: 01-CV-12257-PBS
PBS

Judge Patti B. Saris
Chief Magistrate Judge Marianne B. Bowler

THIS DOCUMENT RELATES TO
*State of Montana v. Abbott Labs, Inc., et al.,*
D. Mont. Cause No. CV- 02-09-H-DWM

## SECOND NOTICE OF RULE 30(B)(6) DEPOSITION
## TO THE STATE OF MONTANA

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of

Civil Procedure, Defendants in the above-captioned action, by and through their counsel,

will take the deposition upon oral examination of a representative or representatives

designated by the State of Montana (hereinafter "Plaintiff") to testify on behalf of

Plaintiff concerning all matters described herein, before a Notary Public or other person

authorized to administer oaths at the offices of Gough, Shanahan, Johnson & Waterman,

33 S. Last Chance Gulch, P.O. Box 1715, Helena, MT, 59601, on February 22, 2006, at

9:30am. The deposition will be recorded by stenographic and/or sound-and visual means

and will continue from day to day until completion.

Pursuant to Rule 30(b)(6), Plaintiff shall designate in writing to the undersigned

counsel for Defendants one or more officers, officials, employees, or other representative

to testify on their behalf who are most knowledgeable about and will testify as to matters

known or reasonably available to Plaintiff in regard to the matters set forth below. Plaintiff is further requested to set forth the matter or matters on which each such designated person will testify.

All terms used in this Notice, whether or not capitalized, shall be defined as stated in Defendants' First Set of Interrogatories and Requests for Production to the State of Montana and Defendants' First Set of Requests for Admission to the State of Montana.

Unless otherwise specified, the relevant time period is the period from January 1991 to the present.

## AREAS OF INQUIRY

Plaintiff is requested to designate one or more persons who consent to testify on its behalf concerning the following matters:

1.  The formula or other basis on which each Subject Drug was purchased or reimbursed by Montana's State Employees Benefits Plan; negotiations with distributors, PBMs, or other vendors or representatives for purchasing each Subject Drug; and, if no formula was involved, the actual purchase or reimbursement price for each Subject Drug.

2.  The formula or other basis on which each Subject Drug was purchased or reimbursed by Montana's Department of Corrections; negotiations with distributors, PBMs, or other vendors or representatives for purchasing each Subject Drug; and, if no formula was involved, the actual purchase or reimbursement price for each Subject Drug.

3.  The formula or other basis on which each Subject Drug was purchased or reimbursed by Montana's State Workers' Compensation Fund; negotiations

2

with distributors, PBMs, or other vendors or representatives for purchasing each Subject Drug; and, if no formula was involved, the actual purchase or reimbursement price for each Subject Drug.

4.    The formula or other basis on which each Subject Drug was purchased or reimbursed by Montana's Addictive & Mental Disorders Division; negotiations with distributors, PBMs, or other vendors or representatives for purchasing each Subject Drug; and, if no formula was involved, the actual purchase or reimbursement price for each Subject Drug.

5.    The formula or other basis on which each Subject Drug was purchased or reimbursed by Montana's Children's Health Insurance Program Special Health Bureau; negotiations with distributors, PBMs, or other vendors or representatives for purchasing each Subject Drug; and, if no formula was involved, the actual purchase or reimbursement price for each Subject Drug.

6.    The formula or other basis on which each Subject Drug was purchased or reimbursed by Montana's End-Stage Renal Disease Program; negotiations with distributors, PBMs, or other vendors or representatives for purchasing each Subject Drug; and, if no formula was involved, the actual purchase or reimbursement price for each Subject Drug.

7.    Communications between Plaintiff and physicians, pharmacists, or other Medicaid providers, regarding changes to the rate of reimbursement for services provided under Medicaid.

3

8.  Communications between Plaintiff and the Montana Pharmacy Association regarding reimbursement or acquisition costs for pharmaceuticals or any Subject Drug.

9.  Communications between Plaintiff and Time Stratton or any other consultant or adviser regarding AWP or reimbursement or acquisition costs for pharmaceuticals or any Subject Drug.

10.  Communications between Plaintiff and Ven-A-Care or any other complainant or "whistleblower," or their attorneys or other representatives, regarding AWP or reimbursement or acquisition costs for pharmaceuticals or any Subject Drug.

11.  Any efforts by Plaintiff to determine providers' actual acquisition costs for pharmaceuticals or any Subject Drug.

12.  Any consideration given by Plaintiff to the meaning of AWP or to defining that term for use in dealing with Plaintiff.

13.  All efforts to obtain information from any Defendant(s) as to what providers were paying to acquire any Subject Drug.

14.  Plaintiff's use of Direct Price as a basis for reimbursement under its Medicaid program for any of the Subject Drugs.

15.  Plaintiff's compliance with its statutory and regulatory obligations to establish appropriate Medicaid reimbursement rates.

16.  All efforts undertaken since Plaintiff began considering this litigation to determine the understanding of and reliance upon published AWPs of the

4

Subject Drugs by Montana residents for whom Plaintiff is asserting damages pursuant to its alleged *parens patriae* powers.

17.     All efforts undertaken since Plaintiff began considering this litigation to determine the damages, if any, suffered by Montana residents for whom Plaintiff is asserting damages pursuant to its alleged *parens patriae* powers.

18.     The steps taken by Plaintiff to preserve documents and information relating to this litigation since the filing of the complaint in this action.

Dated:  January 31, 2006
        Philadelphia, PA

                                    __/s/ Erica Smith-Klocek_____
                                    John C. Dodds
                                    Erica Smith-Klocek
                                    MORGAN, LEWIS & BOCKIUS LLP
                                    1701 Market Street
                                    Philadelphia, PA 19103

                                    *Attorneys for Pfizer Inc. and Pharmacia*
                                    *Corporation on behalf of Defendants in*
                                    *the above-captioned action.*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the foregoing Defendants'

Second Notice of Rule 30(b)(6) Deposition to Plaintiff State of Montana to be served on

all counsel of record electronically via Lexis/Nexis File & Serve on January 31, 2006,

pursuant to Case Management Order No. 2.

Dated:  January 31, 2006
          Philadelphia, PA

___ /s/ Erica Smith-Klocek___
Erica Smith-Klocek

6

# EXHIBIT 8

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

In re: PHARMACEUTICAL,                  MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE              CIVIL ACTION

PRICE LITIGATION                        01CV12257-PBS

_____

THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____

Volume I

DEPOSITION OF JEFF BUSKA

Taken at:

Law offices of

Gough, Shanahan, Johnson & Waterman

33 South Last Chance Gulch

Helena, Montana

October 19, 2005

9:00 a.m.

6d2a050c-6de1-47d1-a56c-f87396199dd2

Jeff Buska                                    October 19, 2005

Helena, MT

Page 86

1        Q.     Who coordinated the meetings prior to Ms.

2    Bernard?

3        A.     It would be under Maggie Bullock and Nancy

4    Ellery and their administrative staff.

5        Q.     Have you heard of the Montana Medical Care

6    Advisory Council?

7        A.     I believe that was the name of the Health

8    Coalition prior to the redesign.  That's what they

9    called it prior.

10       Q.     The redesign you're referring to there was

11   this Healthcare Redesign Advisory Council?

12       A.     That would be correct.

13       Q.     I want to ask you about a few non-Medicaid

14   entities.  The reason I want to ask is the complaint

15   in this case suggests that numerous state agencies

16   overpaid for prescription drugs because of the alleged

17   inflation of AWP.  I'm trying to figure out which

18   other agencies those are.

19       A.     Okay.  The other agencies that, to my

20   knowledge, pay for prescription drugs would be the

21   state, the State Employees Benefits Plan, and that is

22   operated through the Department of the Administration;

Jeff Buska                                    October 19, 2005
                        Helena, MT

1    our Department of Corrections pays for prescription

2    drugs; our State Fund, state workers' compensation.  I

3    believe I mentioned a couple of them earlier that are

4    non-Medicaid.

5         Q.    You mentioned the children's division?

6         A.    Children's special health services and the

7    end-stage renal disease program.

8         Q.    Are you aware of any other state agencies

9    that purchase drugs from manufacturers?

10        A.    Those are the only ones that I'm aware of.

11        Q.    You wouldn't be aware of the state

12   procurement bureau purchasing prescription drugs?

13        A.    That is part of the Department of

14   Administration for the State Employees Benefits Plan.

15        Q.    What about any higher education

16   institutions such as the University of Montana?  Do

17   they purchase prescription drugs?

18        A.    It is possible that they do.  I'm not sure

19   if they are part of the State Employees Benefits

20   Program or if it's a separate entity.

21        Q.    Do you know whether the agencies you just

22   mentioned that purchase drugs from manufacturers, do

6d2a050c-6de1-47d1-a56c-f87396199dd2

Jeff Buska                                      October 19, 2005
                          Helena, MT

Page 88

 1    you know whether they purchase them directly from the

 2    manufacturers?

 3         A.    No, I don't know if they purchase them

 4    directly or not.

 5         Q.    And by "indirectly", I'm referring to

 6    wholesalers.  You don't know whether they purchase

 7    them from wholesalers?

 8         A.    No, I don't.  I'm not aware of their

 9    business practices.  I'm aware of the typical business

10    practice in the administration of pharmaceuticals,

11    which is through pharmacy benefits managers.

12         Q.    Through PBMs.

13         A.    That is correct.

14         Q.    So you know that's typical, but you don't

15    know one way or the other what these agencies do?

16         A.    How they do it, no, I do not.

17         Q.    Do you know whether they participate in

18    any group purchasing organizations to buy drugs?

19         A.    I'm aware that the Department of

20    Corrections is involved with the Department of Public

21    Health in a group purchasing arrangement.  At least

22    they used to be.  They're not in it currently.

6d2a050c-6de1-47d1-a56c-f87396199dd2

Jeff Buska                                    October 19, 2005
Helena, MT

Page 89

1      Q.    They are not?

2      A.    They are not.

3      Q.    Do you know for how many years they had

4  some type of joint purchasing arrangement?

5      A.    I'm not aware of the time period of that,

6  the exact time period.

7      Q.    Since you don't know exactly how these

8  agencies purchase prescription drugs, is it fair to

9  say you don't know whether they negotiate or contract

10  for their prices?

11      A.    Can you explain that in terms of "contract

12  for their prices"?

13      Q.    I think that's a poorly worded question.

14  You're not aware -- are you aware of the contractual

15  arrangements between these state agencies and the drug

16  manufacturers?

17      A.    No, I'm not aware of their contracts.

18      Q.    Are you aware of any state agencies that

19  don't purchase drugs but may reimburse for

20  prescription drugs, such as possibly the Department of

21  Labor and Industry?

22      A.    I don't know.

6d2a050c-6de1-47d1-a56c-f87396199dd2

Jeff Buska                                    October 19, 2005

Helena, MT

---

Page 90

1       Q.      Do you know whether Montana Medicaid ever

2   compared the prices at which they were purchasing

3   drugs with the prices paid by the other state

4   entities?

5       A.      No.

6       Q.      Just to clarify, you don't know one way or

7   the other?

8       A.      I don't know one way or the other.

9       Q.      Did you ever speak about prescription drug

10  pricing with anyone at other Montana agencies?

11      A.      No.

12      Q.      Are there any management overlaps between

13  the Department of Public Health and Human Services and

14  the other state agencies that you mentioned that

15  purchase drugs from manufacturers?

16      A.      Management overlap?  No, I don't believe

17  so.

18      Q.      Are you aware of any employees who have

19  moved between DPHHS and any of those other public

20  entities that purchase prescription drugs?

21      A.      I don't recall any staff that have moved

22  from one to the other.

---

Henderson Legal Services
(202) 220-4158

6d2a050c-6de1-47d1-a56c-f87396199dd2

Jeff Buska                                    October 19, 2005

Helena, MT

1     Q.    Are you aware of any mechanism for sharing

2     information about drug purchasing across Montana

3     agencies?

4     A.    For sharing the information, if I

5     understand your question correctly, of sharing

6     information about how we paid for the prescription

7     drugs?

8     Q.    The prices that are paid or the

9     reimbursement for those drugs.

10    A.    I'm not aware.  Of course, our

11    reimbursement is public knowledge for the Medicaid

12    program.  They have access to that.  They may have

13    looked it up.

14    Q.    Is it public knowledge of the pricing for

15    the other state agencies who purchase drugs from

16    manufacturers?

17    A.    Probably.  Under the Freedom of

18    Information Act, I would imagine it's probably public

19    knowledge how they pay for it.

20    Q.    So when you say that you've never spoken

21    about prescription drug pricing with anyone at any

22    other Montana agencies, is it also fair to say you

6d2a050c-6de1-47d1-a56c-f87396199dd2

Jeff Buska                                    October 19, 2005
Helena, MT

Page 92

1    never participated in any meetings with

2    representatives from other Montana agencies about

3    prescription drug pricing?

4         A.    I don't recall any specific discussions

5    with other agencies.

6         Q.    Or any task forces, joint task forces?

7         A.    No, not that I'm aware of, not that I have

8    been personally involved with.

9         Q.    Who would have the most knowledge on the

10   issue of drug purchases by Montana agencies other than

11   Medicaid?

12        A.    Probably the bureau chief of the

13   department of the administration for the employee

14   benefits bureau would have knowledge of how they do

15   it.  I believe her name is Connie Welch.  The State

16   Fund, I don't know the name of the person, but I'd

17   contact the executive director of that fund.

18        Q.    That was the employee benefits fund?

19        A.    The State Fund, I think is what it's

20   referred to, the workers' compensation.  The employee

21   benefits would be Connie Welch.

22        Q.    Who within the Department of Corrections

6d2a050c-6de1-47d1-a56c-f87396199dd2

Jeff Buska                                        October 19, 2005
                          Helena, MT

                                                          Page 93

1    would be most knowledgeable about the purchasing of

2    drugs from manufacturers?

3         A.    Probably the director is where you would

4    start with.

5         Q.    Who is that?

6         A.    I don't know his name.  I think it's Bud

7    Clinch, but I'm not sure if that's the right person or

8    not.

9               (Document marked Deposition

10        Exhibit Buska 005 for identification.)

11   BY MS. O'SULLIVAN:

12        Q.    Mr. Buska, I'm showing you what has been

13   marked as Exhibit Buska 005, which is Defendants' First

14   Set of Interrogatories and Requests for Production to

15   the State of Montana.  Have you seen this before?

16        A.    Yes, I believe it looks familiar.

17             MS. BRECKENRIDGE:  You might have seen it

18   in a different format.

19        Q.    (By Ms. O'Sullivan) Do you recall when you

20   saw it?

21        A.    I believe this is the document that

22   requested the agency to put together documents and

# EXHIBIT 9

Org Chart 2005 for web.gif 754×458 pixels

02/12/2006 12:40 PM

