# EXHIBIT 10





# The Legislative Counsel Bureau

Legislative service agencies were created to free legislators from dependence upon the executive branch of state government and lobbyists for information and assistance. With service agencies, a legislator is not dependent upon a lobbyist or a governor to draft a bill, research data, or provide information about other states with similar problems. The more professional and expert the service agency staff, the less legislators need to depend on sources of support that may be biased.

Many states, including Nevada, use the basic legislative council pattern providing for a body composed of legislators from each house and from each party empowered to function during the interim between sessions. Powers and responsibilities vary among the states, but basically councils carry out functions assigned by the full legislatures. These functions range from simple administrative duties to extensive power of legislative oversight, policy research, and emergency appropriations.

Although many states maintain separate staff for each house in addition to partisan staff, the Legislative Counsel Bureau is a nonpartisan centralized agency serving both houses and members of all political parties.

In March of 1945, the Nevada Legislature recognized a need for more information and assistance in order to deal with increasingly complex tasks as described in the *preamble* to the bill creating the Legislative Counsel Bureau:

At each biennial session of the legislature, that body is confronted by requests for legislation expanding and changing the functions of and increasing the appropriations of numerous offices, departments, institutions, and agencies of the state government; and . . . not withstanding the information provided by the messages and budgets of the governor and the reports of public officers, it is impossible for the legislature or its committees to secure sufficient information to act advisedly on such requests in the time limited for its sessions.

The 1945 law establishing the bureau charged it with assisting the Legislature to find facts concerning government, proposed legislation, and various other public matters.

During the next several years, the duties of the bureau and its staff were modified and expanded. In 1963, the Nevada Legislature reorganized the Legislative Counsel Bureau, giving it structure and responsibilities similar to those it has today. One part of this change was the incorporation of the Statute Revision Commission into the Legislative Counsel Bureau as the Legal Division. The Statute Revision Commission was originally created by the Supreme Court in 1951 and became involved in bill drafting as an adjunct to its statute revision work. The 1963 legislation also added a Fiscal and Auditing Division and a Research Division.

## Summary
The staff services of the Legislative Counsel Bureau are furnished throughout the year for any legislator. Legal advice, fiscal information, and background research are furnished upon request. Services of a more extensive nature are executed when the Legislature so orders by means of a law or resolution. Between sessions, such projects may be requested through the Legislative Commission.

Session Info | Interim Info | Law Library | General Info | Counsel Bureau | Research Library | Assembly | Senate | Scheduled Meetings | Live Meetings | Site Map | Publications | Proposals | Career Opportunities | Gift Shop



© 2006 Nevada Legislative Counsel Bureau

# EXHIBIT 11

 

Home -
Search -
Contact Us -
Scheduled Meetings -

# Research Library

## Research Division Home

### Legislative History

**Search our database for a compiled legislative history:**
- ☑ **Simple Search**
- ☑ **Advanced Search**

**How to use legislative history material available online for:**
- ☑ **2005**   ☑ **2001**   ☑ **1997**   ☑ **1993**
- ☑ **2003**   ☑ **1999**   ☑ **1995**

☑ **Legislative History Tutorial**

☑ **Legislative History FAQs**

☑ **Minutes available on microfiche**

☑ **Interim Information**

☑ **Links** (Find state, federal, legal and election/voter information; libraries and news)

☑ **Hot Topics** (Senior Citizens Property Tax Assistance; Various Residency Requirements; Ombudsmen, Advocates, Public Information Officers; Public Employees' Benefit Program; 2005 Nevada Education Data Book; America's Legislators Back to School Program; and **The Back Burner**, the Hot Topics archive)

☑ **Holdings & Acquisitions** (A general description of the materials we collect, new items, and a list of the journals/magazines to which we subscribe)

☑ **Research Division Publications** (Interim Study Bulletins, Background Papers, Legislative Manual, etc.) and **other LCB publications**

☑ **About the Research Library** (Who we are, where we are, and how to get in touch with us)

☑ **Email the Research Library**

If you have any questions about the Library's web pages, please **contact** us.
Last updated 01/23/2006

---

Session Info | Interim Info | Law Library | General Info | Counsel Bureau | Research Library | Assembly |
Senate
Scheduled Meetings | Live Meetings | Site Map | Publications | Proposals | Career Opportunities | Gift Shop



© 2006 Nevada Legislative Counsel Bureau





Home -
Search -
Contact Us -
Scheduled Meetings -

# About the Research Library

### Research Library Home          Research Division Home

The responsibility of the LCB Research Library is to collect and organize materials for research on Nevada legislative issues. While primarily serving the legislative branch, the Library is open to the public.

The non-circulating collection includes legislative publications, selected state and federal documents, and studies on governmental issues. Library staff provide assistance in finding materials and answering reference questions.

Hours are 8 am to 5 pm Monday thru Friday in the Sedway Office Building in Carson City. The Sedway Office Building is located southeast of the Legislative Building on the southwest corner of Fifth and Stewart Streets. This three-story structure houses the Legislative Library and the offices of the Audit, Fiscal Analysis, and Research Divisions.

**YAHOO! Maps**
**Map of 333 E Fifth St**
**Carson City, NV 89701-4750**

**YAHOO! Maps**
**Directions from Reno Tahoe International**
**Airport to 333 E Fifth St**
**Carson City, NV 89701-4750**

### Contact Information

**Correspondence:**
Legislative Counsel Bureau
Research Library
401 South Carson Street
Carson City NV 89701-4747

**Telephone:** (775) 684-6827
**Toll-free within Nevada:** (800) 992-0973
**Fax:** (775) 684-6420

**Library Staff:**
Nan Bowers, Legislative Librarian
Teresa Wilt, Assistant Librarian
Jan Wolfley, Assistant Librarian

**Email**

### Printable brochure about the library

If you have any questions about the Library's web pages, please **contact us.**
Last updated 08/25/2004

---

Session Info | Interim Info | Law Library | General Info | Counsel Bureau | Research Library | Assembly | Senate
Scheduled Meetings | Live Meetings | Site Map | Publications | Proposals | Career Opportunities | Gift Shop



© 2006 Nevada Legislative Counsel Bureau

## 2001-2002

- Department of Conservation and Natural Resources, Division of Forestry (**LA02-32**)

- Department of Transportation, Highway Planning and Real Property Management (**LA02-31**)

- Department of Information Technology (**LA02-30**)

- Clark and Washoe County School Districts, Performance Audit Preliminary Survey (**LA02-29**)

- Department of Administration, State Printing Division (**LA02-28**)

- Department of Personnel (**LA02-27**)

- State Emergency Response Commission (**LA02-26**)

- Judicial Branch of Government, Administrative Oversight of the State Court System (**LA02-25**)

- Security and Integrity of the State's Criminal History Repository (**LA02-24**)

- Commission on Tourism  (**LA02-23**)

- Department of Business and Industry, Nevada Housing Division (**LA02-22**)

- Board of Examiners  (**LA02-21**)

- Department of Public Safety, Division of Emergency Management (**LA02-20**)

- Reliability of Performance Measures Used in the State's Budget Process (**LA02-19**)

- Department of Motor Vehicles and Public Safety, Administrative Services Division (**LA02-17**)

- Department of Conservation and Natural Resources, Division of Water Resources (**LA02-16**)

- Office of the Military (**LA02-15**)

- Internal Controls In State Government (**LA02-14**)

- Department of Business and Industry, State Dairy Commission (**LA02-13**)

- Department of Motor Vehicles and Public Safety, State Fire Marshal Division (**LA02-12**)

- State's Contracting Process **(LA02-11)**

- Department of Administration, Purchasing Division **(LA02-10)**

- Department of Employment, Training and Rehabilitation, Employment Security Division **(LA02-09)**

- Department of Employment, Training and Rehabilitation, Rehabilitation Division, Bureau of Services to the Blind and Visually Impaired **(LA02-08)**

- Public Works Board, Lied Library Project **(LA02-07)**

- Department of Employment, Training and Rehabilitation, Rehabilitation Division, Vocational Assessment Centers **(LA02-06)**

- Department of Employment, Training and Rehabilitation Nevada Equal Rights Commission **(LA02-05)**

- Department of Business and Industry Office of Labor Commissioner **(LA02-04)**

- Integrated Financial System Payroll Process **(LA02-03)**

- Department of Business and Industry, Financial Institutions Division **(LA02-02)**

- Department of Administration, Buildings and Grounds Division, State Mail Services **(LA02-01)**

## 1999-2000

- Department or Business and Industry, Division of Unclaimed Property**(LA00-30)**

- Nevada School Districts Analysis Of Instructional Costs And Materials Available To Students **(LA00-29)**

- Department of Business and Industry, Real Estate Division **(LA00-28)**

- Office of The Governor, Agency for Nuclear Projects **(LA00-26)**

- Department of Human Resources, Division of Mental Health and Developmental Services, Nevada Mental Health Institute **(LA00-25)**

- Office of Attorney General **(LA00-24)**

- Department of Prisons, Sex Offender Certification Panel **(LA00-23)**

- Public Utilities Commission **(LA00-22)**

- Department of Human Resources, Office of State Public Defender **(LA00-21)**

- Office of State Controller **(LA00-20)**

- Integrated Financial System, Expenditure and Budgetary Process **(LA00-19)**

- Strategic Planning Process **(LA00-18)**

- Office of Governor **(LA00-17)**

- Department of Human Resources, Health Division, Bureau of Alcohol and Drug Abuse **(LA00-16)**

- State of Nevada, State Public Works Board **(LA00-15)**

- Department of Human Resources, Division of Health Care Financing and Policy **(LA00-14)**

- Department of Human Resources, Welfare Division **(LA00-13)**

- Office of State Treasurer **(LA00-12)**

- Department of Human Resources, Aging Services Division **(LA00-11)**

- Office of Lieutenant Governor **(LA00-10)**

- Department of Human Resources, Health Division, Bureau of Licensure and Certification **(LA00-09)**

- Report on Count of Money in State Treasury (LA00-08)

- Department of Motor Vehicles and Public Safety, Division of Parole and Probation **(LA00-07)**

- Department of Taxation **(LA00-06)**

- Department of Administration, Motor Pool Division **(LA00-05)**

- Department of Business and Industry, Division of Insurance **(LA00-04)**

- Department of Human Resources, Division of Child and Family Services **(LA00-03)**

- Department of Human Resources, Welfare Division, Child Support Enforcement **(LA00-02)**

- Southern Nevada Water Authority **(LA00-01)**

## 1997-1998

- Department of Administration, Internal Control Reporting Process **(LA98-31)**

- Group Health Insurance Program **(LA98-30)**

- State Board of Finance **(LA98-29)**

- Report on Count of Money in State Treasury (LA98-28)

- Department of Conservation and Natural Resources, Commission for the Preservation of Wild Horses **(LA98-27)**

- Escheated Estates **(LA98-26)**

- Department of Conservation and Natural Resources, Division of Wildlife **(LA98-25)**

- Department of Prisons, Inmate Medical Services **(LA98-24)**

- Department of Business and Industry, Nevada Attorney for Injured Workers **(LA98-23)**

- Department of Business and Industry, Division of Industrial Relations **(LA98-22)**

- State Board of Parole Commissioners **(LA98-21)**

- Department of Information Technology **(LA98-20)**

- Department of Prisons, Inmate Classification **(LA98-19)**

- Risk Management Division, Follow-up **(LA98-18)**

- Department of Prisons,Computer Systems Security **(LA98-17)**

- Nevada Disability Advocacy and Law Center **(LA98-16)**

- Risk Management **(LA98-15)**

- Colorado River Commission **(LA98-14)**

- State Emergency Response Commission **(LA98-13)**

- Division of Museums and History, Nevada State Museum **(LA98-12)**

- Management and Collection of the State's Accounts Receivable **(LA98-11)**

- Division of Minerals **(LA98-10)**

- State Treasury Money Count **(LA98-9)**

- Judicial Branch of Government-Administrative Office of the Courts **(LA98-8)**

- Division of Museums and History-Nevada State Railroad Museum **(LA98-7)**

- Department of Business and Industry, Division of Agriculture **(LA98-6)**

- Department of Museums, Library and Arts, Nevada State Library **(LA98-5)**

- Division of Museums and History - Lost City Museum **(LA98-4)**

- Division of Museums and History - Nevada Museum and Historical Society **(LA98-3)**

- Division of Museums and History - Nevada Historical Society **(LA98-2)**

- State Council on the Arts **(LA98-1)**

### 1995-1996

- Department of Personnel **(LA96-34)**

- University and Community College System of Nevada **(LA96-33)**

- Audit Follow-up Process **(LA96-32)**

- Department of Transportation **(LA96-31)**

- Office of Historic Preservation **(LA96-30)**

- Hearings Division **(LA96-29)**

- State Payroll System **(LA96-28)**

- State Lands **(LA96-27)**

- Division of Water Planning **(LA96-26)**

- Archives and Records **(LA96-25)**

- Division of Water Resources **(LA96-24)**

- Commission of Tourism - Division of Tourism **(LA96-23)**

- Commission of Tourism - Division of Publications **(LA96-22)**

- Commission on Economic Development **(LA96-21)**

- Western Interstate Commission on Higher Education **(LA96-20)**

- Division of Conservation Districts **(LA96-19)**

- State Gaming Control Board **(LA96-18)**

- Office of Nuclear Projects **(LA96-17)**

- Department of Conservation and Natural Resources - Director's Office **(LA96-16)**

- Department of Transportation - Computer System's Security Controls **(LA96-15)**

- Taxicab Authority **(LA96-14)**

- Office of Secretary of State **(LA96-13)**

- Division of Environmental Protection **(LA96-12)**

- Division of State Parks **(LA96-11)**

- Office of the Military **(LA96-10)**

- Office for Hospital Patients **(LA96-9)**

- Judicial Branch of Government - Uniform System of Judicial Records **(LA96-8)**

- Commission on Postsecondary Education **(LA96-7)**

- Nevada Athletic Commission **(LA96-6)**

- Consumer Affairs Division **(LA96-5)**

- Division of Forestry **(LA96-4)**

- Industrial Development Revenue Bond Program **(LA96-3)**

- Judicial Branch of Government – Administrative Oversight of the State Court System **(LA96-2)**

- Department of Taxation – Business Tax **(LA96-1)**

---



**Session Info | Interim Info | Law Library | General Info | Counsel Bureau | Research Library | Assembly | Senate**
**Scheduled Meetings | Live Meetings | Site Map | Publications | Proposals | Career Opportunities | Gift Shop**

© 2006 Nevada Legislative Counsel Bureau

 

Home -
Search -
Contact Us -
Scheduled Meetings -

# Legislative Counsel Bureau

The Legislative Counsel Bureau consists of the Legislative Commission, an Interim Finance Committee, a Director, an Audit Division, a Fiscal Analysis Division, a Legal Division, a Research Division, and an Administrative Division. The following sections describe activities of these units.

## History and Scope of the LCB
## Organizational Chart
## Facilities and Services

- **Legislative Commission**
- **Interim Finance Committee**
- **Director**
    **Lobbyist Information**
- **Administrative Division**
- **Legal Division**
    **Publications**
- **Research Division**
    **Research Library**
- **Audit Division**
- **Fiscal Division**
    **Bureau of Educational Accountability & Program Evaluation (LeBeape)**

---



© 2006 Nevada Legislative Counsel Bureau

# EXHIBIT 12

## Jeniphr Breckenridge

**From:**   Jeniphr Breckenridge

**Sent:**   Tuesday, January 31, 2006 11:45 AM

**To:**   'Litow, Jason'

**Cc:**   'LTTERRY@ag.state.nv.us'

**Subject:** AWP : NV : Jan. 12, 2006 Litow Letter

Part II.3 of your letter requests "all documents relating to the state's consideration of alternative drug reimbursement methodologies as referenced by Mr. Duarte." The deposition reference was Duarte 30(b)(6) Transcript dates 11/16/2005 at 75 - 77.  Mr. Duarte has confirmed that his testimony related to more recent U.S. Congress proposals, specifically year 2005.  Mr. Duarte did not locate any documents related to such congressional proposals.  In addition, anything he confirmed that anything that he had at any time  was limited to publicly available information.  Mr. Duarte explains that the  relevant Senate budget bill is both quite lengthy and publicly available via http://thomas.loc.gov.  The changes in methodologies about which Mr. Duarte testified at his deposition relate solely to proposed U.S. Congress changes.  In response to your request, he searched his files and did not locate any responsive documents.  The State considers this inquiry closed.

We will respond to other issues raised by the January 12 letter separately.

Jeniphr Breckenridge
Hagens Berman Sobol Shapiro LLP
206.224.9325

## Jeniphr Breckenridge

**From:**   Jeniphr Breckenridge

**Sent:**   Tuesday, January 31, 2006 12:00 PM

**To:**   'Litow, Jason'

**Cc:**   'LTTERRY@ag.state.nv.us'

**Subject:** AWP : NV : Jan. 16, 2006 Litow Letter : HCFA / CMS 64 Forms from 1991 to present

Jason.  This e.mail responds to Part I.3 of the Jan. 16, 2006 Litow Letter.  The State has pulled HCFA / CMS 64 reports for the period 1995 to the present.  Defendants may review them at the Nevada State Medicaid offices in Carson City at a mutually convenient time.  The volume is approximately 10 to 12 boxes.  Arrangements for any photocopying of selected materials can be discussed.

Jeniphr Breckenridge
Hagens Berman Sobol Shapiro LLP
206.224.9325

## Jeniphr Breckenridge

**From:** Jeniphr Breckenridge

**Sent:** Tuesday, January 31, 2006 4:21 PM

**To:** 'Litow, Jason'

**Cc:** Carrie Flexer; 'LTTERRY@ag.state.nv.us'; Sean Matt

**Subject:** AWP: NV : Jan. 16, 2006 Litow Letter : Vicki Langdon files

In response to Part I.1 of the Jan. 16, 2006 Litow Letter, the State through its counsel has: (1) confirmed that Vicki Langdon's file was previously searched for responsive material; and (2) re-searched Ms. Langdon's files. Responsive material will be produced to defendants. It is likely to be duplicative of previous productions.

Jeniphr Breckenridge
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue; Suite 2900
Seattle, WA  98101
206.623.7292
206.224.9325 (direct)
206.623.0594 (fax)

## Jeniphr Breckenridge

**From:** Jeniphr Breckenridge

**Sent:** Tuesday, February 07, 2006 1:39 PM

**To:** 'Litow, Jason'

**Cc:** 'Dove, Ronald'; 'TIM TERRY'; Carrie Flexer

**Subject:** Jan. 12, 2006 Litow Letter / Keith Macdonald Study

Jason. This e.mail responds to Part II.5 of the Jan. 12, 2006 Litow Letter . We have confirmed with Coleen Lawrence that the Keith Macdonald study has not been located. This is consistent with the State's last report to you on this topic. The State considers this discovery issue closed. If the study is located at a later time and is responsive and within the relevant time period, it will be produced.

**Jeniphr Breckenridge**
**Hagens Berman Sobol Shapiro LLP**
**1301 Fifth Avenue; Suite 2900**
**Seattle, WA  98101**
**206.623.7292**
**206.224.9325 (direct)**
**206.623.0594 (fax)**
**www.hagens-berman.com**

# EXHIBIT 13

 

 Centers for **Medicare** & **Medicaid** Services ☐ Go

Home | Medicare | Medicaid | SCHIP | About CMS | Regulations & Guidance | Research, Statistics, Data & Systems | Outreach &

People with Medicare & Medicaid | Questions | Careers | Press Center | Legislative Affairs | Contact CMS | H

CMS Home > Medicaid > Medicaid Drug Rebate Program > Overview

## Medicaid Drug Rebate Program

Overview
SPAP Best Price List
State Releases
Drug Manufacturer
Releases
Consumer Price Index-
Urban Values
91 Day Treasury Bill
Rates
Util Data Specs
Medicaid Drug Rebate
Program - State Contact
Information
Medicaid Prescription
Reimbursement
Information By State
Drug Product Data
Drug Company Contact
Information
Interest Calculation For
Late Rebate Payments
Less Than Effective (LTE)
and Identical, Related
and Similar (IRS) Drugs
Unit Rebate Amount
(URA) Calculation
National Drug Rebate
Agreement
State Drug Utilization
Data

## Overview

Created by the Omnibus Budget Reconciliation Act of 1990 (OBRA'90),
Medicaid Drug Rebate Program requires a drug manufacturer to enter in
have in effect a national rebate agreement with the Secretary of the De
Health and Human Services (HHS) for states to receive Federal funding
outpatient drugs dispensed to Medicaid patients. The drug rebate progr
administered by the Centers for Medicare & Medicaid Services' Center fo
and State Operations (CMSO). The drug rebate program was amended
Veterans Health Care Act of 1992 (VHCA). Under VHCA, drug manufact
required to enter a pricing agreement with HHS for the Section 340B Dr
Program, which is administered by the Health Resources and Services
Administration. To obtain a copy of this pricing agreement, click on the
links listed below. In addition, VHCA requires drug manufacturers to en
various agreements with the Department of Veterans Affairs. For more
regarding Section 603 of the VHCA's requirements, please contact Caro
at (708)786-4957 or carole.obrien@med.va.gov. A drug manufacturer i
an agreement with these two programs in order to have its drugs cover
Medicaid.

Approximately 550 pharmaceutical companies currently participate in th
Forty nine states, (Arizona is excluded), and the District of Columbia co
under the Medicaid Drug Rebate Program.

As of January 1, 1996, the rebate for covered outpatient drugs is as fol

**Innovator Drugs** – the larger of 15.1 % of the Average Manufacturer
per unit or the difference between the AMP and the best price per unit a
adjusted by the CPI-U based on launch date and current quarter AMP.

**Non-innovator Drugs** – 11 % of the AMP per unit.

**Downloads**

General Instructions for Completing the Pharmaceutical Pricing Agreem
[PDF, 76KB]
**Related Links Inside CMS**
Excluded Drug Coverage by State Medicaid Program
Medicaid Drug Rebate Dispute Resolution Program
**Related Links Outside CMS**

There are no Related Links Outside CMS

**Page Last Modified: 12/14/05 12:00 AM**
Help with File Formats and Plug-Ins

| Department of Health & Human Services | | Medicare.gov | | Firstgov.gov |
|---|---|---|---|---|
| Web Policies & Important Links | Privacy Policy | Freedom of Information Act | | No Fear Act |
| CENTERS FOR MEDICARE & MEDICAID SERVICES 7500 SECURITY BOULEVARD BALTIMORE, MD 21244 | | | | |

www2

# EXHIBIT 14

Daniel Wade Peterson                    December 15, 2005

Helena, MT

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

CERTIFIED COPY

In re:  PHARMACEUTICAL,            MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE         CIVIL ACTION

PRICE LITIGATION                   01CV12257-PBS

_____


THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____


DEPOSITION OF DANIEL WADE PETERSON

Taken at

Law Offices of

Gough, Shanahan, Johnson & Waterman

33 South Last Chance Gulch

Helena, Montana

December 15, 2005

9:00 a.m.

Daniel Wade Peterson

December 15, 2005

Helena, MT

70

1          So you look at stuff like supplemental

2    rebates, various financial issues.

3       **Q.    By various financial issues?**

4       A.    Whether something has a MAC price on it,

5    whether it's a generic drug.

6       **Q.    Anything else?**

7       A.    That is all I can think of right now.

8       **Q.    Earlier you mentioned that First Health**

9    **adjudicates supplemental rebates for Montana.**

10      A.    Uh-huh.

11      **Q.    What does First Health do on behalf of**

12   **Montana with regard to supplemental rebates?**

13      A.    They invoice pharmaceutical manufacturers

14   and do any dispute resolutions relating to those

15   supplemental rebates.

16         First Health also negotiates any

17   supplemental rebates with the manufacturers.

18      **Q.    Does anyone from Montana Medicaid**

19   **participate in the negotiations with manufacturers**

20   **regarding supplemental rebates?**

21      A.    No, we do not.

22      **Q.    Does Montana participate in a multi-state**

Daniel Wade Peterson                    December 15, 2005
                     Helena, MT

72

1   made --

2       A.   Can we go back?  Can you go back?

3       Q.   To what?

4       A.   As far as the information we have.  What

5   about receiving, you know, the receipts, the

6   checks.

7       Q.   That was just about what I was --

8       A.   All right.

9       Q.   That was my next question.

10      A.   So.

11      Q.   Are the supplemental rebates paid directly

12  to Montana Medicaid?

13      A.   Yes.  Yes, they are.

14      Q.   Who receives those, what department?

15      A.   That would be my rebate department.

16      Q.   How are those supplemental rebates

17  processed by the rebate department?

18      A.   Essentially, the checks come in, they log

19  them into our check log, and they are sent over to

20  our fiscal bureau.

21      Q.   Is there an electronic database to track

22  supplemental rebates?

Daniel Wade Peterson                          December 15, 2005
                      Helena, MT

73

1     A.    I'm not aware of any.  I have none under my

2     control.

3     Q.    Are the supplemental rebate payments tied

4     to individual drugs?

5     A.    Yes.

6     Q.    How?

7     A.    I would just be -- I really can't speak on

8     behalf of First Health, so --

9     Q.    When Montana Medicaid receives supplemental

10    rebate payments, is there any effort to match up

11    that supplemental rebate payment with particular

12    drug reimbursement payments?

13         MS.  BRECKENRIDGE:  Objection.

14    A.    I don't follow your question.

15         BY MS. SMITH-KLOCEK:

16    Q.    Earlier, you indicated that the

17    supplemental rebates are tied to particular drugs.

18    Are the supplemental rebates, for example, credited

19    to reimbursements for particular drugs?

20         MS.  BRECKENRIDGE:  Objection.

21    A.    I'm sorry, I just don't understand your

22    question.

# EXHIBIT 15



Kathleen M. O'Sullivan
PHONE: 206.359.6375
FAX:   206.359.7375
EMAIL: kosullivan@perkinscoie.com

1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.8000
FAX: 206.359.9000
www.perkinscoie.com

December 1, 2005

**VIA E-MAIL AND ELECTRONIC SERVICE**

Jeniphr A.E. Breckenridge
Hagens Berman Sobol Shapiro LLP
Suite 2900
1301 Fifth Avenue
Seattle, WA 98101

Re:   **Montana AWP Action**

Dear Jeniphr:

This letter summarizes the agreements reached and the action items identified in our
telephonic meet and confer on Wednesday, November 23, regarding the status of
Montana's document production. We discussed various general issues and then heard
your response to the outstanding items identified in our letter to you of November 11.

A.   **General Issues**

1.   **Scope of Montana's Claims**

We asked you whether Montana asserts claims on behalf of any state agencies or
entities other than Medicaid. You agreed to provide us with a final answer to this
question. We stated, however, that a limitation of Montana's claims to Medicaid does
not necessarily eliminate our need for discovery from the other Montana state
agencies that purchased prescription drugs. As I previously explained, discovery
from other state agencies is relevant to the issue of Montana's knowledge regarding
AWP, and defendants' discovery continues to encompass requests for that
information.

ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DENVER · HONG KONG · LOS ANGELES
MENLO PARK · OLYMPIA · PHOENIX · PORTLAND · SAN FRANCISCO · SEATTLE · WASHINGTON, D.C.
Perkins Coie LLP and Affiliates

Jeniphr Breckenridge
December 1, 2005
Page 2

### 2. Time Period

You raised the issue of the relevant time period for the production of documents by
Montana. We discussed, but did not resolve, the issue of whether or not Montana
would produce documents, including data, dating back to 1991. From your letter of
November 29, we now understand that Montana is taking the position that it will not
produce any responsive documents or data prior to 1997 or after 2001. Your letter
acknowledged that you are "withhold[ing] State documents for the 1991 to 1997 and
2001 [to present] time periods." Montana's newest position regarding the scope of the
State's production is untenable for at least four reasons.

First, it is inconsistent with the position taken by the State over three months ago in
Court. In their brief in opposition to defendants' motion to compel, the States of
Montana and Nevada stated that "[t]he States likewise agreed to produce from 1991 to
the present, but would not agree to search for 1985 to 1990 unless defendants agree to
do so as well." Until your recent communication, we understood that the States of
Montana and Nevada were objecting to the production of pre-1991 documents absent
a court order, but we had had no such understanding regarding the production of
documents from 1991-1997 and from 2001-present. Your change in position, two
months from the discovery cut-off, is troubling. Second, Montana's current position is
inconsistent with the position that Montana took over two years ago in a subpoena to
National Pharmaceutical Council, in which Montana defined the "**RELEVANT
TIME PERIOD**" as "January 1, 1991 to the date of production." Third, your current
position that Montana will not produce claims data from its fiscal agent dating back to
1991 (or after 2001) is inconsistent with your position in Nevada, where the State has
already produced claims data from 1991-2003. It's even inconsistent with the limited
production of data by Montana, which included data from 1997-2005.

Finally, and most importantly, your position that the State may unilaterally withhold
responsive documents unless "all defendants agree to produce documents for the same
period" is contrary to established law. "Parties to a lawsuit cannot, without seeking
some sort of relief from the Court, refuse to provide discovery to another party on the
basis that the other party has not provided discovery to them." *Mahoney v. Kempton*,
142 F.R.D. 32, 33 (D. Mass. 1992). As you know, some companies, including our
client, Immunex Corporation, have produced documents dating back to 1991, but that
is not the issue here. If the State believes that certain defendants' document
productions are inadequate, the solution is for you or other plaintiffs' counsel to meet

Jeniphr Breckenridge
December 1, 2005
Page 3

and confer and, if necessary, file a motion compelling their production. At bottom, your letter of November 29 acknowledges the "fact that the State's claims extend to 1991." Accordingly, the State of Montana and its fiscal agent, ACS, must produce responsive documents, including but not limited to electronic data, dating back to 1991 and after 2001 so that the defendants may have the opportunity to defend themselves against the State's claims.[1]

In particular, we repeat our demand that Montana produce its pharmacy and medical claims data back to 1991. As we learned in the September 23 call with ACS, which we confirmed in our September 27 letter, ACS has used the same database with the same fields for Montana Medicaid claims since 1985; there is no issue regarding the availability of the data. The relevant data is in the State's possession, it is responsive, and it must be produced. We will seek relief from the Court if Montana persists in its refusal to provide the responsive documents, including electronic data.

### 3. Files Searched for Responsive Documents

We discussed the scope of documents and files searched to date in response to our discovery requests. It appears, both from the documents produced thus far and the information you relayed on our call, that searching has so far been limited to specific file holders within Montana Medicaid. For example, you confirmed that no searches have taken place of files maintained by the legislature or executive related to prescription drug pricing, drug reimbursement, or drug rebates. The failure to search additional files, including the files of all State employees who may have relevant documents, constitutes a disregard of Montana's discovery obligations.

---

[1] As you know, defendants' position regarding documents from 1985-1991 is that the States' knowledge – that AWP was not an average of actual acquisition cost – prior to the date on which the States' claims begin goes to the heart of whether the States were actually defrauded. Such documents are uniquely in the possession of the States, not defendants. Accordingly, although temporal parity in discovery may make sense with respect to issues that apply to both sides (e.g., damages calculations and utilization information), we cannot defend ourselves if the States are permitted to draw down the curtain on everything it learned prior to the date on which the States' claims purportedly begin.

Jeniphr Breckenridge
December 1, 2005
Page 4

You agreed to confirm whether or not any State archives had been searched for
documents responsive to Defendants' requests. We also ask that you confirm that
Montana's searches for responsive documents encompass all State employees and file
holders who may have such documents.

### 4.    Litigation Hold on Destruction of Documents

We were dismayed to learn that neither you nor Joe Mazurek could confirm that a
litigation hold has been issued to halt the destruction of documents by Montana
relevant to this action, which the State commenced over three years ago. Mr.
Mazurek indicated that the state recycles or destroys documents "every 30 days," and
was not aware of any instruction given to the State to suspend this process. Both you
and Mr. Mazurek agreed to confirm whether and if any hold order had been
implemented in Montana to preserve relevant documents. We ask that you confirm
the date any such hold order was implemented, and to confirm that its scope covers all
State employees, file holders, and documents potentially responsive to defendants'
discovery requests or otherwise relevant to this action.

If no such hold order is in place, we demand that Montana take immediate steps to
preserve potentially relevant documents in the possession of all State employees. As
outlined in Jason Litow's November 23, 2005 letter to you and Timothy Terry
regarding spoliation by Nevada, both the Federal Rules and Judge Saris' Case
Management Order No. 2 place an affirmative obligation on Montana to preserve all
records pertaining to this litigation. Please confirm no later than the close of business
on Monday, December 5, the status of any hold order already in place, or if there is
none, confirm that you have taken steps to put such an order in place. Defendants
reserve the right to seek sanctions against the State for failure to initiate a proper
litigation document hold and for any destruction of documents relevant to this action.

### B.    Documents Identified in Our November 11, 2005 Letter

Many of the documents or categories of documents identified in our November 11
letter were those that Montana's Rule 30(b)(6) designee, Jeff Buska, had specifically
identified during his deposition. You indicated that you had not yet received Mr.
Buska's deposition transcript and we provided that transcript to you during our call.
You agreed that you would review Mr. Buska's deposition testimony with him in an
effort to expedite the production of these documents.

Jeniphr Breckenridge
December 1, 2005
Page 5

Listed below are the agreements we reached with respect to specific documents or categories of documents, numbered to correspond with the numbers set forth in our November 11 letter.

1. Email. You confirmed that no email searches have been done to date, other than what may have been produced in hard copy files. You agreed that, subject to your client's approval, Montana would search its email based on search terms to be provided by the defendants. You also agreed that we would work in collaboration to determine the persons whose email accounts would be searched. At a minimum, we expect those persons would include all State employees Mr. Buska identified during his deposition. Once we receive confirmation from you that your client is willing to proceed with these searches, we will provide you a list of our requested search terms.

2. Other electronic documents and files. Again, you confirmed that to date, the State has failed to conduct any search for electronic documents or files. You agreed to search based on search terms provided by the Defendants, subject to your client's agreement and confirmation that such searches were technologically feasible. In the interim, however, you said that you believe that Mr. Buska's folder labeled "AWP" has been collected and would be produced within the week.

3. Legislative testimony and related documents. Mr. Buska testified at his deposition regarding legislative testimony that he had provided and for which he had prepared other State employees. You indicated that you had reviewed Mr. Buska's files for this information. Of course, we imagine that there were additional legislative hearings and committee meetings regarding prescription drug pricing, reimbursement, or rebates in which Mr. Buska was not involved. You agreed to search additional files for these documents, and produce any responsive documents you locate.

4. Conference materials and related documents. You agreed to search additional files for these documents, including files of individuals other than Mr. Buska, and produce any responsive documents you locate.

5. Montana Medicaid organization charts. You stated that you have produced the only organizational charts you are aware of.

Jeniphr Breckenridge
December 1, 2005
Page 6

6.     Advisory councils and coalitions. You were not prepared to discuss documents
       related to this topic. You agreed to discuss these documents with Mr. Buska
       and report back to us regarding additional responsive documents.

7.     Documents from Montana's Drug Utilization Review Board. You said that
       Montana would be producing many documents from the Drug Utilization
       Review Board, and that we would receive those documents within the week.

8.     Drug purchases by the State other than by Medicaid. We agreed to revisit this
       issue once we have your final answer regarding the scope of the State's claims,
       and we reiterated that defendants have no intention of waiving their request for
       discovery from other State agencies that purchased prescription drugs.

9.     Comments relating to amendments. You stated that many comments were
       made orally at public meetings. We stated that we assumed that at least some
       comments were submitted in writing. We do not believe that any written
       comments have been produced, except for documents summarizing the
       comments received (e.g., MT 00030-38, a document we noted in our letter of
       November 11). The summaries are responsive, but of limited use, as they do
       not contain the identity of those who provided the comments. You agreed to
       search additional files for these documents, and produce any responsive
       documents you locate. Our understanding is that these documents are
       maintained by Montana's Office of Legal Affairs. We would like you to
       confirm that you have searched that Office's files and the archives for that
       Office's files.

10.    Minutes from meetings and hearings. You agreed to search additional files for
       these documents, and produce any responsive documents you locate.

11.    State requested or conducted studies. You reiterated that the State has
       produced all audits from the Legislative Audit Division relating to prescription
       drugs. We noted that our request was not so limited, but, as noted in our
       November 11 letter, we also were seeking documents relating to the State's
       effort to determine compliance with Federal MAC pricing and the tri-annual
       report submitted by Montana to CMS, as well as any external studies or
       analyses of drug pricing commissioned or requested by Montana. Mr. Buska
       testified that Duane Preshinger might have knowledge regarding those studies
       and related documents. Mr. Buska further testified that the Quality Assurance

Jeniphr Breckenridge
December 1, 2005
Page 7

> Division working under Mary Dalton's supervision would have oversight
> regarding these audits and would possess related documents. You agreed that
> you would confer with Mr. Buska and follow up with us. Mr. Mazurek also
> agreed to confer with Duane Preshinger regarding any responsive documents
> related to studies or audits. You agreed to produce any additional responsive
> documents you identify.

12. Documents related to budgeting and analysis of Montana's Medicaid
    expenditures. You were not prepared to discuss documents related to this
    topic. You agreed to discuss these documents with Mr. Buska and report back
    to us regarding additional responsive documents.

13. Documents related to competitive bidding and requests for proposals for
    administrative services. You were not prepared to discuss documents related
    to this topic. You agreed to discuss these documents with Mr. Buska and
    report back to us regarding additional responsive documents.

14. Documents related to third-party administrators or consultants actually
    engaged by Montana Medicaid. You stated that you have additional
    documents responsive to this request, and that they would be produced within
    the week.

15. Reports and correspondence from the National Association of Medicaid Fraud
    Control Unit related to pricing and reimbursement. You agreed to produce
    these documents, subject to our acknowledgment that doing so would not
    constitute a waiver of privilege. We agreed to the production of these
    documents on that condition.

16. June 13, 2000, document sent to "Pharmacy Providers" regarding "AWP
    Wholesale Pricing." You indicated that you believe you have seen this
    document recently, and that it may already be prepared for production, and if
    so would be produced within the week. If not, you agreed to locate and
    produce this document.

Finally, we agreed to schedule a time this week to discuss the status of collection of
the ACS claims data outlined in my November 4, 2005 letter to you. Your co-
counsel, Joe Mazurek, said that he had recently learned that it might take up to three
weeks to collect that data. It remains unclear what, if anything, has been done since

Jeniphr Breckenridge
December 1, 2005
Page 8

our November 4 letter regarding ACS data to begin compiling this data.  In light of
the three weeks that have already lapsed since my letter was sent, we ask that you
immediately begin whatever process is necessary to collect this data.  On November
29, I asked for your assistance in scheduling a call regarding the ACS data issues, but
you responded that "A [call] on the 1991 to 1997 data would be premature before we
resolve the issue of certain defendants' failure to produce information for the same
period."  As set forth above, we believe that your position regarding the time period
is invalid and will be flatly rejected by the Court.  But it is no reason to delay this call.
We again ask that you agree to a call later this week or early next week so that we can
clarify for you and ACS exactly what defendants are asking for, and so that you and
ACS can clarify for us and our data expert what any difficulties in producing the data
are.

We look forward to the production of documents this week and prompt resolution of
the remaining discovery matters that are outstanding.

Very truly yours,

Kathleen M. O'Sullivan

cc:    P. Joseph Mazurek (via e-mail)
       Counsel of record (by electronic service)

# EXHIBIT 16

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


In Re:   Pharmaceutical

Average Wholesale Price Litigagion.

MDL. NO. 145

CIVIL ACTION NO: 01-CV-12257-PBS


This Document Relates to State of Nevada V

Abbott Laboratories, et al., CA No. 02-CV-00260-ECR

(Nevada I) and

State of Nevada V American Homp Products, et al.,

CA No. 02-CV=12086-PBS (Nevada II)

-oOo-

DEPOSITION OF

MEL ROSENBERG


November 16, 2005

Carson City, Nevada


REPORTED BY: JACKIE ADAMS CA CSR 7455; NV CSR 278; RPR

COMPUTER-ASSISTED TRANSCRIPTION BY: caseCATalyst 4

Mel Rosenberg                                              November 16, 2005
                        Carson City, NV

---

**22**

1  Q   And which serve is that?
2  A   It's the Wedi, W-E-D-I.
3  Q   Generally, what is that for?
4  A   It's a list serve that that generally
5  provides a view of the Medicaid world of upcoming
6  events -- technical changes for -- you know, for the
7  Medicaid world.
8      And of particular interest is their view on
9  the national provider ID project that's coming up in a
10  year and a half -- actually -- yeah, in a year and a
11  half.
12  Q   And you mentioned your unit subscribes to the
13  CMS list serve. Do you know if other employees in the
14  Division have subscribed to that list serve as well?
15  A   Well, there's not a single list serve. There
16  is -- each -- each focus area, you know, in CMS may or
17  may not have a list serve.
18      And, you know, a variety of people -- and
19  they're basically free, so subscribing doesn't have to
20  be made known to me.
21  Q   So each individual employee kind of
22  determines what list serve he or she wants to

---

**23**

1  participate in?
2  A   That's correct, yes.
3  Q   Do you know what list serves Charles Duarte
4  belongs to for example?
5  A   No.
6      MR. LITOW: At this time, I'd like to ask the
7  court reporter to mark as Exhibit Rosenberg 001 a
8  document bearing a Bates label N-V zero three seven
9  six zero through N-V zero three seven nine three,
10  which is entitled the state of Nevada Department of
11  Human Resources, Division of Health Care Financing and
12  Policy Authorized Record Retention and Disposition
13  Schedule.
14      (Exhibit Rosenberg 001 marked for identification.)
15  BY MR. LITOW:
16  Q   Mr. Rosenberg, just take a moment to review
17  that document. Have you ever seen this document
18  before, Mr. Rosenberg?
19  A   Uh-huh, yes.
20  Q   And what is it?
21  A   It's our policy on archive and disposition of
22  paper documents.

---

**24**

1  Q   And I note that it's dated June nine, 2004.
2  To your knowledge, is this the document retention
3  policy that is currently in effect?
4  A   I do not know for a fact whether it is or
5  not. It is -- it appears to be a rather recent one,
6  but I don't know if we've changed it or added --
7  updated it since then.
8  Q   So you don't recall having seen a retention
9  policy with a later date than that?
10  A   No, I don't recall seeing one with a later
11  date.
12  Q   Have you seen document retention policies
13  with an  earlier date?
14  A   What I -- you know, since I have been there,
15  I remember one time where, in the review process, a
16  document that I assume would have been this document
17  was sent through and approved; I don't remember when
18  it was. And that's my exposure to this document.
19  Q   Okay. Does the document retention policy
20  cover electronic documents? And by electronic
21  documents, I mean, you know, word processing
22  documents, spread sheets, e-mail, things of that

---

**25**

1  nature.
2  A   Not in electronic form.
3  Q   So the policy is only meant to apply to paper
4  documents?
5  A   I -- my understanding is that the decision
6  was that if it's something we need to retain, we need
7  to drop it to paper and then put it in the State
8  archive, because the archive only handles paper
9  documents. Or it handles tapes, but the best way, our
10  decision was to convert them to paper.
11  Q   So if there were a document in electronic
12  format that, pursuant to this policy, needed to be
13  retained, it would have to be printed out or some
14  other way converted to a paper document; is that
15  correct?
16  A   Yes.
17  Q   So the retention requirements apply
18  regardless of whether the document is initially in
19  electronic format or paper format, correct?
20  A   Correct.
21  Q   Who's primarily responsible for administering
22  the retention policy?

---

Mel Rosenberg                                     November 16, 2005
                        Carson City, NV

---

**30**

1  drivers or network drives or archives or users that
2  might contain responsive -- strike that.
3          Was any attempt made to isolate those drives,
4  archives, or users where relevant documents might
5  exist?
6     A   No, not to my knowledge.
7     Q   Was any attempt made to restore potentially
8  responsive deleted data from individual hard drives or
9  network drives?
10    A   This gets a little hard to answer since we
11  are not -- I mean, the policy isn't to maintain
12  electronic stuff and to isolate it.
13    Q   I understand that. I was just meaning --
14    A   It's a paper document protection policy. Now
15  at a deep -- at a more specific level, could my
16  support unit have received calls to restore data and
17  we would have done that to the best of our ability,
18  yes.
19          Do I know what that data was, no. Do I know
20  if any of those requests actually were fielded during
21  whatever time frame I know that we have from time to
22  time dealt with disk corruption and file recovery,

---

**31**

1  that's an ongoing activity of an IT department.
2          But I have no knowledge what the files were
3  and whether or not they at all pertained to this in
4  any way.
5     Q   What operating system does the Medicaid
6  division use? Is it Windows-based?
7     A   If you're asking are we using Windows versus
8  a Unix-based, it is Windows-based.
9     Q   And has it always been Windows-based to your
10  knowledge?
11    A   During my tenure, it has always been
12  Windows-based. I don't know how far back in time that
13  goes.
14    Q   I'm going to focus now on electronic
15  documents other than e-mail. This would include
16  documents -- word processing documents, spread sheets,
17  power points, data bases, presentation, PDF files,
18  scan documents, things of that nature.
19          Can you tell me generally what applications
20  employees at Medicaid would have on their computer to
21  create these types of documents?
22    A   The vast majority of all these documents

---

**32**

1  would be the Microsoft office suite: Word, Excel,
2  Power Point, Access.
3     Q   Adobe Acrobat as well?
4     A   We have a limited number of licenses to
5  create Adobe Acrobat files, and we do have some older
6  applications. We have one that I know of that is
7  based on Paradox and Word Perfect.
8     Q   And has the Microsoft office suite been in
9  use since the time that you've been at Medicaid?
10    A   Yes.
11    Q   Let's start with Microsoft Word. Are
12  Microsoft Word documents -- strike that. Can you
13  search Microsoft Word files for example by key word?
14    A   Well, it all depends on what you're asking.
15  Can I search the data by file name using a key word
16  search?
17          There are certain built-in facilities within
18  the Microsoft operating system to make those kinds of
19  searches.
20          To use the name of a file as a key word, the
21  extension, date, time -- you know, date, time
22  modified, those kinds of things, all of that can be

---

**33**

1  done.
2     Q   And could you also search the data that --
3  the content of the document itself, or can you only
4  search the file name of the document?
5     A   Well, in an individual application, if you
6  open up the application, then you can use the built-in
7  facilities of that application to search the contents
8  based upon key words.
9     Q   All right. Let's assume you don't know which
10  files, you know, have, you know, the particular key
11  words in them; you just want to do a search for any --
12  any word files that, for example, you know, have the
13  word AWP in it. Would that be possible?
14    A   Possible is an interesting choice of word.
15  It is technically possible in the universe to do that,
16  yes.
17          Do we have any tools in-house to do that
18  facility, not to my knowledge. We would have to -- to
19  do that, we'd have to procure tools.
20    Q   But you would have the capability in-house to
21  search for documents that have a particular word in
22  the file name; is that correct?

---

Henderson Legal Services
(202) 220-4158

Mel Rosenberg                                          November 16, 2005
                        Carson City, NV

---

**34**

1    A    That is correct.
2    Q    And would you be able to do that from a
3    centralized computer to search the files of all the
4    employees, or would you need to go to each employee's
5    computer to search, you know, their particular files?
6    A    Well, the -- oh, okay, in the way you're
7    asking the question, yes, it can be done from a
8    central location.
9    Q    All right. I'm going to ask the same
10   questions about the other -- the other programs in the
11   Microsoft office as well.
12        So for Microsoft excel, would you also be
13   able to search for documents that have a particular
14   key word in the file name?
15   A    Yes.
16   Q    From a centralized location?
17   A    Yes.
18   Q    How about for documents that have a
19   particular key word in the document itself and not in
20   the file name?
21   A    Okay, if you're asking question one, can that
22   be done --

---

**35**

1    Q    Right.
2    A    That can only be done on an individual file
3    basis with the tools that I have in hand.
4    Q    Okay.
5    A    And --
6    Q    What tools would you need for that to be
7    possible?
8    A    There -- you know, my assumption is that
9    there are tools provided that can read the actual data
10   base format of Word files and Excel files that can
11   then go search inside the actual data structure.
12        We don't do that. We don't have a need for
13   those tools, so we don't have those tools on hand.
14   Q    So you're saying it physically is possible,
15   but it's just not possible with the tools you have on
16   hand right now?
17   A    Other -- yes, other than having a human open
18   each file and perform the search.
19   Q    And when you say tools, I mean, what does
20   that mean? You need a particular program?
21   A    Software application, yes.
22   Q    And that's just -- is that just a matter of,

---

**36**

1    you know, purchasing that particular program and
2    installing it on a central computer to be able to
3    perform the search, or is it more complicated than
4    that?
5    A    Well, first of all, I don't know specifically
6    of the tool that does it, so I would first have to go
7    research the -- the available tools out there and go
8    through a procurement process since I don't have the
9    budget to do this, and then learn how it works, then
10   install it, and then run the search.
11   Q    And with respect to -- with Power Point,
12   would your answers be the same; number one, you are
13   able to search for file names with the tools you have
14   on hand, but number two, you cannot search for -- you
15   know, for words within the file without particular
16   additional tools; is that correct?
17   A    That is correct.
18   Q    What about Adobe documents; is your answer
19   the same with respect to those documents as well?
20   A    Yes.
21   Q    If a user uses one of these applications,
22   whether it's Word or Excel or Power Point, where could

---

**37**

1    such a document be saved; for example, a local hard
2    drive or other network servers, other locations?
3    A    Okay, I sort of have to answer that -- I have
4    to sort of explain a little bit about our environment.
5    When we set up a user, each user's given a, if you're
6    familiar with Microsoft, my documents folder.
7        That folder is mapped into a shared storage
8    device that gives -- that is part of the server
9    environment. Anything that's saved into that will be
10   backed up.
11        We also have other locations out there that
12   are shared devices that everybody can get to. They
13   could save it there. They can save it to their local
14   C drive. They can also write it to a floppy, and
15   certain limited number of people have CD writers, and
16   they can write it there.
17   Q    So the default place to save it would be the
18   my documents location?
19   A    That is correct, that is --
20   Q    And that goes to a server that is shared by
21   the employees of the Division?
22   A    The my documents is -- access is restricted

---

Mel Rosenberg                                           November 16, 2005
Carson City, NV

58

1   file size limit to how many e-mails -- how much e-mail
2   you can have before it stops.
3          There is a limit, and once you reach that
4   limit, the user then has choices of removing some of
5   the e-mails or taking what Microsoft calls an archive
6   step.
7          And then it would remove the data from that
8   centralized location to an individualized location to
9   be put in the archive.
10  Q   When you say individualized location, do you
11  mean kind of -- do you mean like a folder in Outlook
12  or do you mean something outside of Outlook entirely?
13  A   An archive is a type of file supported by
14  Microsoft that would be a file and be required to be
15  on a disk someplace, and that would store the contents
16  of the e-mails that were put into it.
17  Q   When you say on a disk, you mean a physical
18  disk or like a -- like a -- you know, like a local
19  disk drive?
20  A   Either actually. It could be on the share
21  drive, it could be on the local drive. Technically --
22  yeah, technically it could be on a floppy.

59

1          Any kind of disk storage space where you
2   create the file, as long as you can point to it, you
3   can create an archive.
4   Q   And so what determines which e-mails are
5   archived? Is that up to the individual users when
6   they realize that they're running out of space, or are
7   they archived as a matter of course based on how long
8   they've been, or --
9   A   Okay, again, compound. In -- you know,
10  there's a yes to both of those. Well, let's be clear.
11         There is -- Microsoft provides an automatic
12  archiving facility within its application. If it is
13  turned on and enabled, then on a periodic basis set by
14  the configuration, it will take an and archive e-mails
15  to the defined spot matching the parameters that you
16  put into it.
17  Q   Okay.
18  A   On the other hand, when an individual user --
19  an individual user can drag -- can fire off the
20  archiver manually, or can just take and drag and drop
21  e-mails from the central server into an archive.
22  Q   Okay.

60

1          MS. BRECKENRIDGE: Could the person on the
2   phone who's typing please put their phone on mute.
3   Thank you.
4   BY MR. LITOW:
5   Q   So let's go back to the question I asked
6   about the searches. Let's start with those e-mails
7   that are on the DOIT system -- still on a DOIT system.
8   Would you be able to conduct a search of all of those
9   e-mails kind of from a centralized location by key
10  word?
11  A   No.
12  Q   What type of searches could you conduct?
13  A   Again, a compound question. Can e-mail be
14  searched by key word, yes. Can multiple users e-mails
15  be searched by key word -- be searched, no. An
16  individual user's e-mails can be searched by key word,
17  not multiple.
18  Q   What capabilities would you have to search
19  multiple users at once?
20  A   I'm not aware of any.
21  Q   So any e-mail searches on the DOIT -- e-mails
22  on the DOIT system would have to be user by user?

61

1   A   That is correct.
2   Q   And what -- what other -- besides searching
3   by key word, what other methods of search could you
4   use?
5   A   The Microsoft tool allows you to search by,
6   you know, key word in the subject, in the contents, by
7   when it was received, when it was sent, whether or not
8   it has attachments.
9          There's also rules-based searching for a
10  variety of other things. It is quite extensive, the
11  capabilities that they provide for you to do these
12  searches.
13  Q   You mentioned attachments. Would you be able
14  to search for e-mails that contain attachments with
15  particular file names for example?
16  A   No, you can search whether or not it has an
17  attachment, but no, you don't get that further
18  granularity.
19  Q   So how about e-mails that are -- that have
20  been archived; how would we go about -- or how would
21  one go about conducting searches of -- in those
22  e-mails?

Henderson Legal Services
(202) 220-4158

**62**

1    A    Okay, archives are problematic. While there
2    is a standard place to put an archive, the user has
3    full control over where the archive physically is, and
4    actually how many archives they create.
5         And those archives can be anywhere on any of
6    the drives we talked about, and there can be more than
7    one.
8         To -- once you find the archive and once you
9    connect to it, the searches options are all the same.
10   The problem is the individual user may or may -- you
11   know, depending on how savvy they are, they may or may
12   not know where they all are or how many they have,
13   and --
14   Q    So you can't search for an archive for
15   example?
16   A    You -- you know, at one level, you could
17   search the entire data store for everything that has
18   that archive in the Microsoft generically defined
19   extension of archive file.
20        But then figuring out whose archive it is and
21   attaching to it and getting the permissions right to
22   open it up would be an individual-by-individual task.

**63**

1    Q    So if we -- if somebody wanted to conduct an
2    e-mail search for example of the e-mails of Charles
3    Duarte, we could go to those e-mails that are still in
4    the DOIT system and conduct a key word search or, you
5    know, some other type of search that Outlook permits,
6    correct?
7    A    That's right.
8    Q    And then assuming -- first of all, assuming
9    he knew where his archive location was, we could do a
10   search of the archive e-mails, right?
11   A    Archive -- one archive at a time.
12   Q    And if he -- if he does not have any idea
13   where his archives are located, what would be your
14   capabilities of locating the archive?
15   A    Well, assuming that he followed the naming
16   convention defined by Microsoft, we could search the
17   likely places within where he would have put them and
18   discover file names that have that extension, and then
19   we would attempt to open up each one and see what's in
20   there.
21   Q    You mentioned that each user only has a
22   particular amount of space on the DOIT, you know,

**64**

1    system before they have to use the archives.
2         What happens if they don't archive? Do they
3    just -- are they unable to accept new e-mails or are
4    e-mails automatically deleted to make room for the new
5    e-mails, or what happens?
6    A    Generally one of two things occurs; I don't
7    know which one occurs first, is they stop being able
8    to receive e-mails, and then they -- or stop being
9    able to send. And when it gets full enough, both of
10   those things stop.
11   Q    So they'll get like a nasty e-mail saying
12   you're exceeding your storage capabilities, please,
13   you know --
14   A    Please delete some files.
15   Q    -- please do something? I mean, I've gotten
16   those before.
17        MS. BRECKENRIDGE: I was just about to say
18   you sound very familiar with that message.
19        THE WITNESS: Yes, that's almost exactly the
20   message you get.
21   BY MR. LITOW:
22   Q    Is that a policy for the retention period of

**65**

1    e-mails, or is it up to each user to decide which
2    e-mails are retained and which ones are deleted?
3    A    Okay, there's levels to that question. The
4    general top level is it is the responsibility of the
5    user to decide whether or not to retain e-mails.
6         The retention of e-mails, you know, again,
7    it's analogous to the file system. If you keep it
8    either on the server or in your archive, then you have
9    access to it.
10        If you put the archive in the recommended
11   spot on the network, then that archive is backed up in
12   our backups. And then should you need to restore, you
13   will have your data back.
14        If you don't put it there and you put it in a
15   spot that is not backed up and you lose it, it's gone.
16   Q    Okay. Is there any -- strike that. When you
17   mention backup, is that the same backup that we were
18   talking about in the context of the other electronic
19   documents before?
20   A    Exactly.
21   Q    And so the e-mails that are put on that
22   backup would be recycled as well; is that correct?