# EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Docket No. 01-12257-PBS

CITIZENS FOR CONSUMER JUSTICE, ET AL.
      Plaintiffs

        v.

ABBOTT LABORATORIES, et al
      Defendants

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
HELD ON NOVEMBER 9, 2005

APPEARANCES:

For the plaintiffs: Sean Matt, Esquire, Hagens, Berman, Sobol, Shapiro, LLP, 1301 Fifth Avenue, Seattle WA  98101

John Macoretta, Esquire, Spector, Roseman & Kodroff, P.C., 1818 Market Street, Ste. 2500, Philadelphia, PA  19103.

David S. Nalven, Esquire, Hagens, Berman, Sobol, Shapiro, LLP, One Main Street, Cambridge, MA  02142.

For Shering-Plough:  John Montgomery, Esquire

For Pfizer and Pharmacia:  Scott Stempel, Esquire

For Johnson & Johnson:  Andrew Schau, Esquire, Adeel Mangi, Esquire, Patterson, Belknap, Webb & Tyler, LLP, 1133 Avenue of the Americas, New York, NY  10036-6710.

For Non-parties and Absent Class Members, Blue Cross Blue Shield of Vermont, et al: Thomas J. Poulin, Robins, Kaplan, Miller & Ceresi, LLP, 1801 K Street, N.W., Ste. 1200, Washington, DC 20006

Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.

MARYANN V. YOUNG
Certified Court Transcriber
Wrentham, Massachusetts 02093
(508) 384-2003

2

1

2 **I N D E X**

3 Proceedings              3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

3

1                    P R O C E E D I N G S

2        (Court called into session)

3               THE CLERK:  Today is Wednesday November 9, 2005.  The

4    case of Citizens for Consumer Justice, et al v. Abbott

5    Laboratories, et al, Civil action 01-12257 will now be heard

6    before this court.  Will counsel, please, identify themselves

7    for the record.

8               MR. MATT:  Good morning, Your Honor, Sean Matt

9    representing plaintiffs in this action.

10              THE COURT:  Thank you.

11              MR. MACORETTA:  Good afternoon, Your Honor, John

12   Macoretta here for the plaintiffs.

13              THE COURT:  Thank you very much.

14              MR. NALVEN:  David Nalven for the plaintiffs, Your

15   Honor.

16              MR. MONTGOMERY:  John Montgomery, Your Honor, I

17   represent Schering-Plough, and I'll also speak for the Track

18   One defendants.

19              MR. STEMPEL:  Scott Stempel, Your Honor, I represent

20   Pharmacia and Pfizer and I'll be speaking for the Track Two

21   defendants.

22              MR. SCHAU:  Andrew Schau, I represent Johnson &

23   Johnson defendants, and I will be addressing some of Johnson

24   and Johnson's motions.  My colleague Adeel Mangi will be

25   addressing the other motion.

4

1       THE COURT:  Thank you.  All right, first of all

2  counsel I have an apology to make and that is in reviewing the

3  docket the last few days, the clerk, who is no longer working

4  for the court, made the mistake when she noticed this hearing.

5  She noticed it for docket entries 1741 and 1694, the motion to

6  modify the discovery schedule and to extend the time for expert

7  witness disclosure.  These are clearly motions that should be

8  handled by Judge Saris, and they will not be heard today and I

9  do apologize for people who may have made the trip but

10  unfortunately it was a mistake on her part.

11       Now as to the motion to quash filed on behalf of

12  Stanley Hopkins, which is docket entry number 1752, I will take

13  that on the papers.  There is opposition to that motion by

14  AstraZeneca, which is docket entry number 1768, and there is an

15  expedited motion to have that heard.  And I will take care of

16  that and give you a margin ruling within a day or so.

17       So I will start today with Johnson & Johnson's motion

18  which is docket entry number 1725.  All right, so I'll hear

19  you.

20       MR. SCHAU:  Thank you, Your Honor.

21       THE COURT:  You're welcome.

22       MR. SCHAU:  As I said before my name is Andrew Schau,

23  and I represent Johnson & Johnson defendants in this matter,

24  and I'm here to argue for you our motion to compel responses to

25  requests for admission and interrogatories relating to two

5

1   Johnson and Johnson drugs, one by the name of Procrit, the

2   other by the name of Remicade.  Just by way of brief

3   background, this case began with the plaintiffs naming over 30

4   Johnson & Johnson drugs that allegedly are being part of a

5   fraudulent conspiracy that you're familiar with.  We're down to

6   these two drugs at this point, and we have moved to compel

7   these two drugs only.

8           We served timely requests for discovery on August 1st.

9   We did that in anticipation of the fact that they needed 30

10  days to respond and then after 30 days needed to come before

11  the close of discovery on September 1.  Our goal in serving

12  these requests to admit interrogatories was to narrow the

13  issues in the case and set up our anticipated motion for

14  summary judgment.  We don't think that we need to actually have

15  to litigate issues that are not substantially in dispute, and

16  we tried to focus our requests to admit interrogatories on

17  issues that we believe are not substantially in dispute.

18  Moreover, we focused our interrogatories and requests on issues

19  that lie at the very core of plaintiffs' claim.

20          If I could be just indulged a couple of examples.  We

21  ask plaintiffs to admit, for example, that the AWP for Procrit

22  has always been 20% more than what's called the wholesale

23  acquisition cost of Procrit.  I don't think there's any dispute

24  about that on the record.  There's extensive testimony on that.

25  Plaintiffs know it to be true.  We asked them to admit that

1   Remicade's AWP has always been 130% higher than its wholesale

2   acquisition cost.  We asked them to admit that Centocor, the

3   company that sells Remicade, has never paid rebates of any kind

4   to physicians.  We asked them to admit that Centocor has never

5   paid rebates to pharmacy benefit managers.  We asked them to

6   admit or to tell us what they say the net acquisition cost was

7   for Remicade and what the net reimbursement costs was for

8   Remicade, numbers that lie at the heart of their theory of the

9   case.

10          We believe these requests are straightforward and

11   that after three exhaustive years of discovery plaintiffs are

12   in a position to say, yes, I admit that, no, I don't admit it

13   or I can't admit it for the following reasons.  I think we're

14   entitled to know that under oath in every case.  The reason

15   we've posed the ones we did is we believe that truthful and

16   candid responses to these interrogatories and document requests

17   will very much advance our case for summary judgment.  It's the

18   reason we've served them.  We anticipate making that motion.

19          We think that plaintiffs when they received these

20   requests realized the implications and, therefore, decided to

21   duck them.  For example, except for interrogatories asking them

22   to admit when the two drugs were first sold in the United

23   States they have objected to every single request to admit and

24   every single request for an interrogatory.  For example, in

25   response to our request that they admit what the relationship

7

1   was between the AWP and the WAC for these two drugs, they say

2   plaintiffs object to this contention interrogatory which would

3   require sorting of various publishers' databases and WAC

4   information.   If defendant supplies data that backs up this RFA

5   plaintiffs will respond.   This is not time for discovery.   We

6   have supplied data until we're blue in the face.   We've given

7   them everything they've asked for.   We deserve a response.   For

8   example, our request to admit number three said, tell us, admit

9   that we didn't pay rebates to physicians.   They object as

10  follows, objection, the term rebates is vague, ambiguous and

11  undefined.

12          For us to be three years into this litigation and for

13  plaintiffs to tell us that they cannot respond to a request

14  that uses the word rebates is beyond comprehension.   Let me

15  just give you an example of what plaintiffs have told Judge

16  Saris in a different context.   Recently Mr. Berman, the lead

17  plaintiffs' counsel, opposed our motion for an extension – I

18  mean, our motion for sanctions based on their failure to comply

19  with the expert report deadline.   In the course of responding

20  to that he said that their experts are currently reviewing all

21  the rebate transactions including one, amount; two, date of

22  rebate; three, information sufficient to identify the type of

23  rebate; four, information sufficient to identify the customer

24  and the class and trade designation.   They are intently focused

25  on our rebates.   They know whether or not we paid rebates to

8

1   physicians and we're entitled to their answer under oath.

2          I submit, Your Honor, that the time for playing games

3   on discovery requests has ended.  They're refusing to give us

4   responses to simple and straightforward and critical requests

5   and our motion should be granted.

6          Thank you.

7          THE COURT:  Okay, I'll hear you briefly, but my

8   fashion in handling these matters is to go through them one by

9   one.  So if you want to give me first, a brief response, I'll

10  hear you and then we'll tackle them.

11         MR. MACORETTA:  Very well, Your Honor, John Macoretta

12  here for the plaintiffs.  I'll give a brief response and it

13  might be better if I simply respond to them one by one.

14  There's only about 10 of them.  That might be the best.

15         The overview, Your Honor's, that a lot of what J&J is

16  asking for here is not at all simple and will require expert

17  analysis and opinion at the end of the day.  And we simply

18  cannot - to ask us for answers to this question would require

19  us to get an expert, to have an opinion on issues which the

20  defendants have argued up to date especially in their class

21  cert papers are too complicated to be determined.  Some of the

22  other things - well, the purpose of interrogatories and

23  admissions is to take out issue what should be simple facts

24  that are not in dispute.

25         THE COURT:  Counsel, I know the purpose.

9

1        MR. MACORETTA:  Okay, that's fine.  Let me go

2   through them in order, Your Honor.  Let me start – they vary,

3   there are two sets, one for Remicade, one for Procrit.  They

4   vary slightly.  I will use the Remicade set, which is Exhibit 4

5   to Mr. Schau's declaration.  Request number 1, admit that

6   Centocor began selling Remicade in 1998.  We admitted that.

7   Interrogatory number 1 we don't have to answer because we did.

8        THE COURT:  Let's only go through the ones that--

9        MR. MACORETTA:  That's fine.

10        THE COURT:  --are at issue.

11        MR. MACORETTA:  That's going to be, request number 2,

12   admit that from '98 to the present the published AWP for

13   Remicade has been 130% of the published WAC for Remicade.  Our

14   answer to that is that it's J & J who published that.  They're

15   the people who have that information.  They published the WAC

16   and the AWP.  They're asking us to essentially admit what their

17   own data says.  That's the basis for our objection there.

18        THE COURT:  Do you want to be heard on that?  This is

19   the way I'll go, back and forth.

20        MR. SCHAU:  Sure.  I think this is not a discovery

21   request in the sense of, you know, this is at the end of the

22   day.  We have given them all this data.  They've had it for

23   three years.  It's time for them to either admit it, deny it or

24   tell us why they can't.

25        THE COURT:  What's wrong with that?

10

1    MR. MACORETTA:  They've given us a mountain of data

2  and to admit this would require us then to sort through their

3  own data and to admit a conclusion which is well within their

4  knowledge.

5    THE COURT:  Well, admit it or deny it.

6    MR. MACORETTA:  All right.  Request number three,

7  admit that from 1998 to the present Centocor has not paid

8  rebates on Remicade to physicians who purchase or dispense

9  Remicade.  Well, we did argue the term rebates is vague here

10  and that has been the subject of discussion.  There's no

11  question that J&J has giving us something they call the rebate

12  database.  You'll see in their definitions at the beginning of

13  their instructions a lot of terms are defined, rebates is not

14  one of them.

15    THE COURT:  Well, can you agree on a definition of

16  rebates?

17    MR. MACORETTA:  I suppose we could try to do that,

18  Your Honor.  We have not yet done that.

19    THE COURT:  It doesn't seem so difficult that you

20  couldn't do it right here and now.  Do you have a suggestion?

21    MR. MACORETTA:  I'm thinking through my head as to

22  whether or not there's been some definition of rebate that's

23  been — that anybody's been accepted in any other context in

24  this case.  I think this was a fight among the experts as well

25  as to what's a rebate as opposed to a charge back or a discount

11

1   as well.  Remicade produced a database that was called

2   rebates.  If this is limited to admitting that a review of that

3   database says that no rebates -- that database doesn't indicate

4   that any rebates went to physicians, we could do that if

5   that's--

6        MR. SCHAU:  If they have any evidence that we've ever

7   given a rebate to a physician they can deny this request to

8   admit and they can tell me what that evidence is.  A rebate is

9   real simple, Judge.  It's what you give to a physician after he

10  or she has purchased the drug.  It offsets some of the cost of

11  the drug in the first instance.  That may not be an economist

12  definition, but it's a very common sense simple concept to

13  understand.  They know what a rebate is.

14        THE COURT:  Respond.

15        MR. MACORETTA:  If the Court orders us to use that

16  definition then we will use that definition and comply with it.

17  And now there's a related issue, Judge, in that the data from

18  J&J is incomplete.  Going forward as you know Judge Saris'

19  order in August she seemed to indicate a class period up to the

20  present.  We only have data from J&J up to 2003.  Going

21  backward for Procrit the class period goes to 1991.  We only

22  have data to 1994.  That's because J&J says they don't have the

23  data.  They cannot produce it in any form before that.  So that

24  means--

25        THE COURT:  Well you'll answer it to the extent that

1    you have the data.

2           MR. MACORETTA:   Are we using - I don't know if Your

3    Honor ordered us to use the definition Mr. Schau gave or are we

4    just agree to that or I'm not--

5           THE COURT:   Can you agree to it?

6           MR. MACORETTA:   I believe that we can, yes--

7           THE COURT:   All right.

8           MR. MACORETTA:   --Your Honor.  The request to admit

9    number four is the same thing, admissions to pharmacy benefit

10   managers.  That should be resolved by what you just said.  We -

11   with the request to admit number five is admitting about

12   Remicade, rebates that may have been paid to help maintenance

13   organizations and preferred provider organizations.  Subject to

14   that definition then I believe we can answer that as well.

15          Request to admit number six.  This is where things

16   change and it becomes more complicated.  Admit that from '98 to

17   the present, that's when Remicade came on the market, the

18   rebates that Centocor has paid on Remicade have reduced the net

19   reimbursement cost of Remicade for those payers that have

20   received rebates.  Well, net reimbursement costs is defined -

21   that's not a term the plaintiffs ever use by the way, is

22   defined by them to mean that the cost incurred by a payer such

23   as a patient, insurer or the government for a drug or biologic

24   product net of any rebates or other reimbursement or other

25   rebates or other price adjustments?  That is not a term the

13

1  plaintiffs ever use.  We have not attempted to figure it out

2  to date.

3          THE COURT:  It's pretty straightforward.

4          MR. MACORETTA:  Well, but, Your Honor, to do that we

5  would then need data from the entire class.  The net

6  reimbursement cost incurred by a payer such as an insurer or a

7  patient meaning what did that patient or payer ultimately pay?

8  We don't have that data from the entire class.  I mean, that's

9  - you're going to hear other motions today about discovery from

10  third party Blue's.  That's just simply that it's not available

11  to us.

12          THE COURT:  Well to the extent that you have the

13  data, what's your--

14          MR. SCHAU:  May I just say on this issue I don't

15  think they need to crunch a single number to answer this

16  question.  All we're trying to get at here is the fact that the

17  people who are paying for our drugs are the ones getting the

18  rebates so that it reduces their costs of having to reimburse

19  for our drugs.  We're not asking them to run any mathematical

20  number crunching calculations.  All they have to do is

21  understand that, you know, X minus Y is a lower number than X

22  plus Y.

23          MR. MACORETTA:  If that's the limitation then we can

24  probably do that but when we read this interrogatory it seemed

25  to indicate that we had to come up with some nationwide net

14

1  reimbursement cost.

2          THE COURT:  Let's take it with — you've heard it,

3  take it at that.

4          MR. MACORETTA:  That's fine.

5          THE COURT:  Next.

6          MR. MACORETTA:  Admit that from 1998 to the present

7  the rebates that Centocor has paid on Remicade have reduced the

8  spread.  Spread as defined by J&J is different than the way

9  plaintiffs have always defined the spread.  Spread here means

10  the difference between the net acquisition cost, which is

11  another term created by J&J and the net reimbursement cost.

12  Net acquisition cost is apparently what doctors ultimately pay

13  to acquire the drug.  We don't know what that is.  It's

14  completely irrelevant to our claims.  Every J&J witness we have

15  asked, do you know what doctors pay to acquire your drug, the

16  answer is no.  We know what we sell it to the wholesalers for.

17  We have no idea what the wholesalers mark-up is.  To answer

18  this we would know need to know the information that J&J

19  disclaims any knowledge of.

20          THE COURT:  What's your response?

21          MR. SCHAU:  I think again, this does not require them

22  to crunch any numbers, but I will tell you that if they will

23  say under oath that they have no idea what physicians pay for

24  Remicade and that that lack of information has no implications

25  for their case, I think that enhances my prospects for summary

1  judgment--

2          MR. MACORETTA:  Well--

3          MR. SCHAU:  --very significantly.

4          THE COURT:  Is that a--

5          MR. MACORETTA:  I don't know if we can make that

6  representation.  I mean, we still have expert reports.  I can

7  tell you right now that that's not part of our theory, but I

8  don't think we can make a representation under oath that that

9  has no relevance to anything.  You know, and our answer under

10  oath is we've conducted discovery on this from their witnesses

11  all of whom said they don't know.  So as we read this they're

12  asking us to come up with a formula using data that they admit

13  they don't have.  To do this we would have to depose

14  wholesalers who have resisted that and the time for that

15  discovery is over as well.

16          THE COURT:  Well, if you don't have the information

17  I'm not going to order further discovery on it.  Okay?

18          MR. MACORETTA:  Request to admit number eight is

19  going to go to the same issue because that says admit that from

20  '98 to the present the spread on Remicade has not exceeded the

21  difference between its public WAC and its published AWP.  Well,

22  the information that - we still have the information to figure

23  out spread as they used in that, which is same as the last

24  question.

25          MR. SCHAU:  Your Honor, there's no dispute that they

1  have all of the information on Remicade from the beginning of

2  time until the end of 2003.  If they want to say we can't admit

3  in 2004 because we never got that information in discovery and

4  never moved to compel it, I accept that.

5       THE COURT:  Okay.

6       MR. SCHAU:  But to say that they don't have the

7  information and, therefore, they can't make these calculations

8  is just simply untrue.  And I think the predicate of your last

9  ruling was that you accepted that representation, and I just

10  wanted to make it clear that--

11       THE COURT:  That's clear.

12       MR. SCHAU:  --we dispute that.

13       MR. MACORETTA:  We don't dispute that we have

14  information from J&J.  Our position is the information this

15  seeks is not information from J&J.  It's information from

16  someone else that we don't have.

17       THE COURT:  Well, set that out in your response then.

18       MR. MACORETTA:  All right.  The - interrogatory, now

19  we have some interrogatories that say from '98 to the present

20  state each published WAC and each published AWP for Remicade,

21  Remicade and the effective date of change in each of Remicade's

22  WAC and AWP.  Well, again, Your Honor, this is - there the ones

23  who set the AWP and the WAC, so this is an interrogatory that

24  says you tell us when we changed all of our prices.  At best

25  this would be set out, this would be better set out in the form

17

1  of an admission that says this is when we changed the prices

2  admit or deny as opposed to making us go through a bunch of

3  data to come up with this.

4          MR. SCHAU:  They have all this information, Your

5  Honor, and it's a request to admit.  It's not a request to tell

6  us something we don't know.  I don't want to have to fight

7  about something they know, and I think they should either have

8  to admit it, deny it or say why they can't, and they can't come

9  and say we don't know what the date of the AWP's were and we

10 don't know what the WAC's were because the entire premise of

11 this case is that those numbers were published and that they're

12 fraudulent.  For them to tell you now they can't admit or deny

13 what they are when they are willing to tell the Court that they

14 know them to be fraudulent strikes me as worse than ironic--

15         THE COURT:  Well they have to--

16         MR. SCHAU:  --but disingenuous.

17         THE COURT:  --they have to admit or deny.

18         MR. MACORETTA:  But this is an interrogatory, Your

19 Honor.  That - Mr. Schau's incorrect, what I just read is an

20 interrogatory not an admission.  I just suggested that if it

21 was in the--

22         THE COURT:  So did you jump from one--

23         MR. MACORETTA:  Pardon?

24         THE COURT:  Where were - what was--

25         MR. MACORETTA: I just read - we're done with the

1    admissions.    I just read interrogatory number nine.

2              THE COURT:   All right.

3              MR. MACORETTA:  It said from '98 state each of them.

4              THE COURT:   All right.

5              MR. MACORETTA:  And my point there was if that was an

6    admission we could do it, but to say go take the 100 plus

7    thousand pages of data and generate a price list of every time

8    we changed our prices is not an appropriate use of the

9    interrogatories and that's why we objected to it.  This is

10   there information.  They know it a lot better than we do.  This

11   - ask us to go sort through their data and find this

12   information now's an inappropriate use of interrogatories.

13             MR. SCHAU:  It's not our data.  We're asking for them

14   to admit what the published data of UP was and to admit what

15   the published WAC was.

16             THE COURT:  This is not a request for admission.

17   This is--

18             MR. SCHAU:  I'm sorry, you're right.  I'm incorrect.

19   We're asking them to tell us what those two numbers were.  Yes,

20   they have to look it up.  They have to look it up in First Data

21   Bank's books.  They have to answer those questions.  But

22   remember they know enough about those numbers to tell you that

23   they're fraudulent.  I just want to know what they say they

24   are.

25             MR. MACORETTA:  Your Honor, this is like me handing

19

1   you the paperwork from a car I just bought and then serving an

2   interrogatory that says tell me how much I paid for the car.

3   It's my knowledge.   It's within my knowledge, what's the

4   purpose of making you answer an interrogatory?

5           THE COURT:   Answer.

6           MR. MACORETTA:   Interrogatory number 10; state the

7   ASP for Remicade for each of the time intervals between the

8   changes in Remicade's WAC and AWP identified in response to

9   interrogatory number nine.   Now this calls for a definite, a

10  calculation of ASP, your average selling price.   A few issues

11  here.   First of all, we asked the defendants for this

12  information in 2004.   We filed a motion and you refused to, you

13  denied it.   You said they didn't have to produce that

14  information to us.   Secondly, to the extent our expert,

15  Professor Hartman or someone else, is in their expert report

16  going to make a calculation of ASP, then we agree that they're

17  entitled to that calculation and whatever's behind it as part

18  of the expert report.   And our answer to that is what I just

19  said to you.   This is an appropriate part of an expert report.

20  It's not appropriate outside that context.   Expert's report

21  will be filed.   You said there's an ASP in it, we'll provide

22  all the information.

23          MR. SCHAU:   Your Honor, the theory of the case

24  against J&J is that our ASP's are too low relative to our

25  AWP's.   I want to know what our ASP's were.   It is true that

1   you denied their motion to have us tell you what our ASP's

2   were, and I don't know if you remember that argument but it had

3   to do with the fact that we don't calculate that number.  This

4   is a number that plaintiffs say matters.  It is a number that

5   plaintiffs say is crucial to their case.  I'm delighted to

6   learn that Dr. Hartman will tell us what he thinks that number

7   is.  And I would also point out to you that in this

8   interrogatory response they tell us that Dr. Hartman was going

9   to give us the answer to that question on October 1st.  Had he

10  done so when his expert report was due this would be moot.

11  It's not moot.  I have experts trying to do damage reports as

12  we speak not knowing what the plaintiffs' claims are.  I was

13  entitled to know this at the end of the discovery period.

14          MR. MACORETTA:  Your Honor, the timing of Dr.

15  Hartman's expert report was the subject of one of the two

16  motions that came off the docket today.  At the time we filed

17  this, we thought we could comply with that deadline, and I

18  won't go into the details of why we need more time subject this

19  place to say there's some good arguments for that.  In any

20  event to require us to answer this interrogatory now we'd have

21  to go to Dr. Hartman, make him do exactly what he's doing in

22  his expert report.

23          THE COURT:  Well that would just speed things up,

24  wouldn't it?

25          MR. MACORETTA:  Well, it'd speed things up for two

21

1  drugs at the expense of everything else.  I mean, what is the

2  benefit to J&J of getting this in advance of his expert report?

3  As you can imagine he's doing a lot of work.

4          THE COURT:  They've asked for it, they can have it.

5  Ordered to respond.

6          MR. MACORETTA:  Thank you, Your Honor.  That's – let

7  me see, interrogatory number 11, one more, state the average

8  net reimbursement cost and the average net acquisition cost for

9  Remicade for each of the time intervals between the changes in

10  WAC and AWP.  I think Your Honor ordered us to calculate one of

11  them and agree that we didn't have to calculate the other.  So

12  to the extent we provide some of that information would be the

13  same calculation here.

14          THE COURT:  All right.  Can live with that?

15          MR. SCHAU:  I can live with the answer, I don't know

16  under oath.

17          THE COURT:  Certainly.

18          MR. MACORETTA:  Great.

19          THE COURT:  All right.

20          MR. MACORETTA:  That's--

21          MR. SCHAU:  Your Honor, there were a handful of

22  Procrit interrogatories and requests to admit that were

23  slightly different.  I don't think it's worth the Court's time

24  to go through those separately.  I think we've gotten enough of

25  your direction--

1    THE COURT:  To the extent that they follow along--

2    MR. SCHAU:  Yeah.

3    MR. MACORETTA:  Yeah, I understand that.

4    MR. SCHAU:  And to the extent that we don't--

5    MR. MACORETTA:  I don't think--

6    MR. SCHAU:  --I think we can work that out, and if we

7  can't, unfortunately, we'll come back.

8    THE COURT:  All right.

9    MR. MACORETTA:  I don't think there's anything that's

10  substantively different.  Thank you.

11    THE COURT:  All right, thank you.  All right, moving

12  on now to docket entry number 1734, which is the non-parties

13  and absent class members, Blue Cross Blue Shield of Vermont, et

14  cetera.

15    MR. POULIN:  That's me, Your Honor.

16    THE COURT:  Good afternoon.

17    MR. POULIN:  Thomas Poulin from Robins, Kaplan,

18  Miller and Ciresi in Washington for the movants.  Your Honor,

19  the reason why we filed our motion, filing it even after the

20  close of the discovery period is that the defendants are at a

21  point here where they are far exceeding the limits that Judge

22  Saris placed on the discovery of non-parties which our clients

23  are as well as absent class members.  They're far exceeding the

24  bounds under existing case law and the guidelines in the manual

25  for complex litigation.

23

1    Your Honor, let me just as way of background take
2  the Court back to what Judge Saris actually said at the motion
3  hearing on Monday March 8, 2004 when the discussion arose about
4  discovery, the defendants taking discovery of absent class
5  members and non-parties.  This was all in the context of
6  determining whether the class representatives in this case were
7  typical of all of the other members of the class.  And that was
8  Judge Saris' concern and that was the discussion at that time.
9  Judge Saris stated in this is on page - I'm sorry, this is on
10  page 20 - actually, Your Honor, let me also reference this is
11  Exhibit 11 to the response by defendants - Judge Saris on page
12  48 of the transcript at that hearing, she noted that "in this
13  case it may be critical to understanding not just preemption
14  issues but also what's typical.  And so I do think you need to
15  be responsive to producing plans at the very least for a few.
16  I don't even know if there are different kinds of ERISA Plans
17  even among the plaintiffs.

18    The Court then states in response to Mr. Berman, I
19  assume you're not going to take a deposition of every ERISA
20  Plan in America - and I'm sorry, this is in response to
21  Mr. Wise.  Mr. Wise who's counsel for AstraZeneca in response
22  to the Court's question about assuming you're not going to take
23  a depo of every ERISA Plan in America he says, "no, I can
24  answer that question, no."  And so you see, Your Honor, in the
25  colloquy between counsel and the Court here, it's clear that

24

1  what Judge Saris was allowing and acknowledging that in a

2  class action, class wide discovery of every class member is not

3  allowed and so Judge Saris correctly allowed defendants to take

4  discovery of absent class members but it was to be limited.

5  And Mr. Wise even goes on to say on page 49 of the transcript,

6  "What we want to do is just develop enough information so we

7  can present a sample." And that's what he's talking about, a

8  sample. And, Your Honor, I submit to you that that is proper

9  in a class action that a sample of absent class members

10 information, data, documents, depositions is certainly allowed.

11         What we have here, Your Honor, is a case in which the

12 defendants are overreaching. They now want extensive data,

13 documents and depositions of my six non-party class members,

14 and at this point in time I don't think, Your Honor, defendants

15 haven't had any burden at all to present the Court with a

16 compelling reason why they need this discovery. But what they

17 will say is, well, we want to understand the state of mind of

18 every health plan or every insurer in America. Well, Your

19 Honor, that subverts the whole reason behind Rule 23 in a

20 limitation placed upon discovery.

21         THE COURT: But you acknowledge that they're entitled

22 to a sample?

23         MR. POULIN: I acknowledge that they're entitled to a

24 sample and as we pointed out in our brief, Your Honor, they

25 have taken their sample and then some. They have taken

25

1    discovery.   They have received documents, data--

2            THE COURT:  Ms. Fried, don't go out of the courtroom.

3            MS. FRIED:  All right.

4            THE COURT:  I'm just waiting for the government and

5    I'll take a brief break.  I have a criminal matter that I have

6    to deal with and as soon as the government counsel arrives,

7    I'll see you first at the sidebar.

8            MS. FRIED:  Okay.

9            THE COURT:  Excuse me.

10           MR. POULIN:  That's fine, Your Honor.  Well, the

11   point I was trying to make is and as we pointed out in our

12   brief they've already taken depositions and received documents

13   and data from at least half of the health plans in this country

14   represented by the number of covered lives, including a number

15   of Blue Cross and Blue Shield plans.

16           THE COURT:  How many?

17           MR. POULIN:  So they've taken--

18           THE COURT:  How many Blue Cross?

19           MR. POULIN:  Your Honor, by my count I count some 10

20   to 12.

21           MS. FRIED:  I think the government might be standing

22   outside in the hall.

23           THE COURT:  Okay.

24           MS. FRIED:  So--

25           THE COURT:  Bring them in.

26

1        MS. FRIED:  If I could hold a minute.

2        MR. POULIN:  If I may continue, Your Honor, on page

3   four of our brief, we list the number of absent class members

4   that have been subpoenaed and that have produced documents and

5   this is an extensive list.  This represents in terms of covered

6   lives, some 150 million covered lives.

7        Now in America there are approximately 200 people

8   covered by private - 200 million people covered by private

9   insurance.  This represents well over half of the country.  It

10  would seem to me that we're at a point in time here in this

11  litigation in 2005, after class certification briefing has been

12  complete, after the decision has been rendered, after the close

13  of the discovery period where enough is enough and that's why

14  we're here, Your Honor.

15       THE COURT:  All right, I'll take a brief recess right

16  now.  If the marshal maybe could bring in counsel.  I'm going

17  to see if I can quickly deal with this criminal matter.

18       MR. SCHAU:  Do you want us to vacate this table, Your

19  Honor?

20       THE COURT:  You can vacate the table but you can

21  leave your papers.

22  (Pause)

23       THE COURT:  I have the issue of the prisoners van

24  that I have to deal with by 4:00 so.

25  (Recess)

27

1       THE COURT:  All right, resuming.  And your criminal

2  lawyers are not on the hourly rate.

3       UNIDENTIFIED:  But nobody's going to jail here.

4       THE COURT:  You hope.

5  (Recess)

6       THE COURT:  All right, resuming on the record.  Why

7  shouldn't I grant this motion?

8       MR. MANGI:  Thank you, Your Honor, Adeel Mangi from

9  Patterson, Belknap, Webb & Tyler.  Your Honor, the Blues plans

10  that are at issue here were served, five out of the six of them

11  were served well over a year ago.  They were part of the

12  initial industry sample that defendants touted and were a

13  particularly critical part of that sample because of their

14  status as Blues plans.  It's a survey of precisely such plans

15  that have been studied that the plaintiffs in this case rely on

16  for many of the assumptions that underlie their theories of

17  liability and damages.

18       The sixth plan, Mutual of Omaha was subpoenaed this

19  past summer and their discovery focused purely on

20  physician-administer costs.  On areas as to which Judge Saris

21  and the court's independent expert noted that the record was

22  unsettled and additional discovery was needed.  Despite the

23  fact that these requests have been outstanding for this

24  extensive period of time, these plans between them have yet to

25  produce a single document or a single witness.  Their position

28

1   as stated by Mr. Poulin appears to be that other plans have

2   made productions while they have been standing by recalcitrant

3   and refusing to produce and, therefore, they should somehow be

4   rewarded for that by being exempted from production.  They've

5   stuck to that position even as Your Honor has granted motions

6   to compel against other health plans that cover substantially

7   the same discovery sought here.  For example, Your Honor,

8   granted a motion to compel against Health Net where the

9   documents sought were actually far broader than those we seek

10  from these plaintiffs.  Broader because the discovery had issue

11  that also included self-administered drugs, whereas the focus

12  is now on physician-administered drugs.  Similarly, Your Honor

13  has granted motions to compel their position testimony from

14  other health plans, Etna, Cigna, Umeta on the very same

15  deposition copies as to which we seek testimony from these

16  plans.  The plans are aware of these rulings but nonetheless

17  have refused to comply in any form which these subpoenas most

18  of which have been outstanding for over a year.

19        Now, the only excuses for this tardiness that we've

20  heard today are that, well other health plans have responded

21  and they're a sufficiently large sample.  Well, they're not,

22  Your Honor, and the evidence for that is twofold.  First, the

23  discovery we seek is on physician-administered drugs.  In its

24  cost certification opinion the Court expressly noted that there

25  were areas pertaining to that record that required

1   supplementation.  My learned friend also points to a chart

2   that they include in their motions and claim that well, our

3   sample to date has included a sufficient number of lives.  Well

4   that's simply not true.  This chart does represent the entities

5   that were subpoenaed and the number of lives it covered.  It

6   does not reflect the extent of their responses.  For example,

7   United Health Group is one of the largest players on this list

8   from my learned friend that the 20 million lives, they're

9   subject to a motion to compel.  So it's Empire, Blue Cross Blue

10  Shield with about 5 million lives.

11          In short, Your Honor, if we had a sufficient industry

12  sample we wouldn't be here today, but the fact is that these

13  plans were a core part of the initial industry sample and they

14  have yet to respond to this subpoena.

15          Now the only other arguments that I heard from Mr.

16  Poulin refers that these plans are absent class members so

17  should be shielded from discovery.  That issue, Your Honor, has

18  already been determined by Judge Saris.  In December of 2003

19  the MDL class plaintiffs filed a motion for a protective order

20  seeking to bar discovery from third party health plans on

21  exactly that basis, that they're absent class members.  The

22  Court had the benefit of extensive briefing from all sides

23  including a reply brief by the plaintiffs, heard testimony and

24  then allowed that discovery to proceed.  Judge Saris placed no

25  limitations on that discovery in her written order, which is

30

1    part of our papers, nor did she at the hearing.  Mr. Poulin

2    pointed to--

3            THE COURT:  Let me just interrupt for a minute.  When

4    were the first absent class members noticed?

5            MR. MANGI:  Your Honor, I believe the initial

6    subpoenas to third parties were served in the fall of 2003.

7    They led to the motion practice in December of 2003.

8            THE COURT:  And these were served?

9            MR. MANGI:  These subpoenas were served, Your Honor,

10   in 2004 for the most part.  The initial subpoenas that lead to

11   the motion practice were a very small sample.  We were just

12   getting the process going but when defendants filed that motion

13   everything ground to a halt.  No third party health plan would

14   respond until the motion was adjudicated.  So it wasn't until

15   that motion was actually decided that the sample of discovery

16   began in earnest.

17           Now Mr. Poulin also pointed to some excerpts from the

18   transcript when Judge Saris dealt with this issue.  For the

19   proposition that she imposed some form of limitation on the

20   discovery.  I respectfully disagree with my learned friend, the

21   record there is very clear.  The sections that Mr. Poulin

22   referred Your Honor to were where Judge Saris was dealing with

23   issues pertaining to ERISA Plans and discovery of the

24   plaintiffs.  And it's clear from the relying from Mr. Berman

25   that Mr. Poulin did not read out.  In fact, where Judge Saris

31

1   did deal with this issue she stated, I think the plans

2   themselves are able to protect themselves.  There's nothing I

3   can imagine that would be a problem with that.  When Mr. Wise

4   pointed out, we're not looking to be burdensome, we just want a

5   sample, the Court stated, I think that's appropriate because I

6   remember looking at the case law.  And Judge Saris' written

7   order followed up and similarly allowed this discovery to

8   proceed without placing any such limitations upon it.

9        THE COURT:  Are there any other discovery requests to

10   absent class members that have not been responded to that are

11   outstanding at this time?

12        MR. MANGI:  Your Honor, there are two motions to

13   compel that are currently pending before Your Honor, fully

14   briefed, one pertaining to United, another pertaining to Empire

15   Blue Cross Blue Shield.  There are also some discovery requests

16   that have been served by Track Two defendants that are

17   Massachusetts specific, falling all on the Court's class

18   certification ruling and those are still being discussed,

19   negotiated between the parties.

20        Now finally, the only other argument that Mr. Poulin

21   made is in reference to the August 31st close of Track One

22   discovery.  That argument has no merit or application here.

23   First of all, these subpoenas were served on behalf of all

24   defendants, including the Track Two defendants.  Moreover, they

25   were served for the most part over a year ago.  Responses are

32

1   always due prior to the close of discovery.  In fact on August

2   8th we sent counsel for the plaintiffs a draft motion to compel

3   as part of the meet and confer process making clear we intended

4   to move to compel these productions.  The plans then changed

5   tact and agreed to make productions.  So we have often prior to

6   that.  It's not until September 22 the reliance on the policy

7   certification are there, the plans then change tact again,

8   again refuse to produce--

9           THE COURT:  So there was an agreement at one point to

10   produce everything?

11          MR. POULIN:  No, Your Honor, my view that we did not

12   have an agreement.  My representation to counsel was that I

13   would go back to the clients and discuss this particularly in

14   light of what had transpired since the subpoenas had been

15   served including class certification briefing and also we were

16   discussing the fact that between November of 2004 which was

17   shortly after the subpoenas were served for six months we

18   didn't hear from the defendants.  During that time we presumed

19   class certification issues--

20          THE COURT:  Well that doesn't exactly relieve you of

21   this.

22          MR. POULIN:  No, it doesn't, Your Honor.  But, again,

23   the last time we heard from the defendants prior to that six

24   months was in November of 2004, and, again, I haven't heard,

25   you know, the defendants say, you know, why they need this

33

1   additional information.   I will point out that in the papers

2   filed initially before Judge Saris on subpoenas defendants had

3   initially issued I believe it was 29 subpoenas.   So it wasn't a

4   few, and certainly there was some motion practice related to

5   the discovery of absent class members initially.   But that's in

6   2004, Your Honor.   Much has transpired since then.   I think the

7   law is pretty clear that you just can't take a discovery

8   campaign against all class members.

9              THE COURT:   No, I know the law.

10             MR. POULIN:   Right.

11             THE COURT:   But is there any possibility we can

12   narrow this at all?   Are you willing to compromise at all?

13             MR. MANGI:   Your Honor, the defendants have already

14   substantially narrowed the discovery that's sought in the

15   subpoena.   There's a letter in the record dated I believe June

16   1st where we convey to the plans a very narrow and focused

17   amount of discovery that we sought.   Indeed, we eliminated

18   almost all of the requests that pertained to self-administered

19   drugs, focusing on physician-administered drugs on discreet

20   categories that are the core of this case.   Plaintiffs'

21   allegations--

22             THE COURT:   Well, what I'm asking you is can you

23   narrow it further?

24             MR. MANGI:   Your Honor, the narrowing that we've made

25   in that letter is so substantial that we're not able to narrow

34

1    it any further.

2              THE COURT:  All right.

3         MR. MANGI:  And indeed that discovery has already

4    been ordered by Your Honor in reference to other plans.

5              MR. POULIN:  Your Honor, I would disagree that it's

6    been severely limited.  They want all the medical claims data

7    for years and years.  They want documents going back for at

8    least the entire class period probably before then.  And I'll

9    also note that in that June 1st letter--

10             THE COURT:  Do you want materials from before the

11   class period?

12             MR. MANGI:  That's not correct.  Your Honor, we've

13   clearly defined the period for which we are seeking documents

14   and it's all within the class period.

15             MR. POULIN:  Your Honor, I would also point out that

16   in that June 1 letter which was the--

17             THE COURT:  So let's be careful.  Let's be very

18   precise with our language.

19             MR. POULIN:  Yes, I would agree, Your Honor.  I am

20   being precise when I state that in that narrowed list it

21   included non-physician-administered drugs.  It sought

22   information on all drugs including self-administered drugs.

23   For instance, they request, number five, wanted information on

24   all rebates.  Request number eight wanted information on all

25   MAC lists, those are the lists of generic drugs upon which

35

1   third party payers base their generic reimbursement.  And that

2   has nothing to do with injectable drugs.  So those are just two

3   examples of how extremely broad their requests currently are to

4   our clients who are not in this case.

5          THE COURT:  Two minutes, that's it.

6          MR. MANGI:  Thank you, Your Honor.  Briefly on the

7   topic of the discovery that we're seeking, claims data that

8   Mr. Poulin objects to this is a simple process of an electronic

9   download.  Numerous other health plans have done it to date and

10  indeed the defendants have paid the costs of doing that

11  electronic download.  So there's simply no burden issue.

12         THE COURT:  And you're willing to pay the costs here?

13         MR. MANGI:  Your Honor, we made that offer over a

14  year ago.  As to the other areas as to which we seek documents

15  we're not seeking all the documents about these drugs, we're

16  very specific.  For example, all documents reflecting your

17  client's understanding of whether healthcare providers are in

18  the margin.  And the other requests are similarly limited.  As

19  to the areas where there may be some overlap with

20  self-administered drugs, it's necessary, but it's limited.

21         THE COURT:  All right.  I've heard enough.

22  Protective order denied.  Pay the costs for the download.

23         MR. POULIN:  Thank you, Your Honor.

24         THE COURT:  All right.  All right, moving on to

25  docket entry number 1738, which is the motion by Johnson &

36

1    Johnson, Centocor, Wagner, et cetera.

2        MR. MANGI:  Thank you, Your Honor.  This motion,

3    1738, is a motion by Centocor, which is a subsidiary of Johnson

4    & Johnson and the group of six former employees to quash

5    subpoenas served on those former employees on the grounds that

6    they're untimely.  Now, the subpoenas that are at issue here

7    seek both documents and testimony and were served on the

8    individuals on various dates between September 7 and September

9    17, 2005 and sought depositions from September 20th through

10   September 26th.  Both the service dates of the subpoenas and the

11   date in which they called for responses were well outside of

12   the August 31st close of Track One discovery specified in case

13   management order 13.

14        Now the local rules of this Court and Rule 16.1(f) as

15   well as case law from around the country that we cite in our

16   papers even treatises at Wright and Miller, are all clear and

17   straightforward as to what the close of fact discovery means.

18   It meant that by August 31st the plaintiffs here had to complete

19   all of the depositions that they were seeking to take.

20        In this case, Judge Saris also ordered case

21   management order 10, which specified a 21-day notice period for

22   depositions.  Accordingly, plaintiffs' obligation here was very

23   clear, straightforward and there are notice of it since at

24   least March of this year when CMO-13 was ordered.  Before

25   August 10 plaintiffs had to identify the witnesses who they

1   wanted to depose, do any due investigation to ascertain
2   whether they were current employees, former employees, and then
3   timely notice their depositions or subpoena them so that the
4   depositions could be completed before the close of discovery on
5   August 31st.   The plaintiffs here failed to adhere to those
6   deadlines and there's simply no excuse for their failure to do
7   so.

8            As of November 2004, some 10 months before the close
9   of discovery, Centocor had already produced over 95% of the
10  documents that they've produced in this case.   Those included
11  it appears all of the documents that the plaintiffs are
12  interested in exploring with these six individual reps.
13  Throughout the spring and the summer other plaintiffs counsel
14  dealing with other defendants.identified the witnesses they
15  wanted, subpoenaed those who were former employees, took their
16  depositions.   Indeed, they did so with other Johnson & Johnson
17  Companies and we had no objection.   But counsel dealing with
18  Centocor did nothing, and they waited until after the deadline
19  had expired.

20            Now this motion was a natural consequence and the
21  plaintiffs' response in their papers has been twofold.   First,
22  they tell the Court, and this was raised for the first time in
23  their opposition papers, that these are not discovery
24  depositions at all.   They state that these are trial
25  depositions being taken for the purpose of preservation of

38

1  evidence and, therefore, they should not be constrained by the

2  CMO-13 close of fact discovery.  Now that argument, Your Honor,

3  is simply a non-stopper for two reasons.  First, we submit that

4  the better view as expounded in cases before Your Honor in our

5  papers such as *Integra* and *Bompreau*, is that there is no such

6  distinction in the federal rules and all depositions should be

7  completed bar exceptional circumstances by the close of

8  discovery.  That logic is especially compelling in an MDL

9  proceeding such as this where the plaintiffs could otherwise

10  continue taking depositions for as long as they choose to do

11  so.  But second and more importantly it's very clear on the

12  record that these are discovery depositions and not trial

13  depositions at all.  Indeed in the run up to the filing of this

14  motion--

15          THE COURT:  Well, what do you base that on?

16          MR. MANGI:  I base it, Your Honor, both on facts and

17  on the case law the plaintiffs cite which is as follows; first

18  as to the facts, in the run up to filing this motion we had to

19  meet and confer with plaintiffs' counsel, Mr. Macoretta.  He

20  told us that he wanted to take these depositions of these six

21  individuals to explore the perspective of Centocor's sales

22  level employees, to explore documents with those employees.

23  Indeed he stated he may even be satisfied after taking two

24  depositions let alone all six.  These depositions are no

25  different from all the other sales level discovery depositions

1  plaintiffs have been pursuing against all Track One

2  defendants.  And indeed this is evidence by the very cases that

3  the plaintiffs cite for the proposition that they should be

4  permitted trial depositions.  For example, the plaintiffs rely

5  on--

6        THE COURT:  Well, can you agree and maybe take two

7  and then see what happens?

8        MR. MACORETTA:  I believe I made the offer.  Your

9  Honor, I suggested that we would start with two.  The purpose

10  is to get these people for trial.  I'm not interested in

11  exploring anything.  If two of them give what we believe is

12  useful testimony I suggested that we would stop at two.  We

13  don't need to present eight witnesses at trial.  But if the

14  first two have selective memory, which has been the problem

15  with some other witnesses and are useless at trial then we may

16  need to go to the next step.

17        THE COURT:  Oh.

18        MR. MACORETTA:  So I could agree to that.

19        THE COURT:  Where are they?

20        MR. MACORETTA:  They're all over the country, Your

21  Honor.  Our papers are incorrect.  Mr. Babone is in New

22  Hampshire, so he's probably available for trial.  We have a

23  couple in California, one in Missouri, one in Virginia, one by

24  New York City.  That's all six.

25        THE COURT:  All right.  I didn't mean to interrupt

40

1  you.

2       MR. MACORETTA:  I'm sorry.

3       MR. MANGI:  Thank you, Your Honor.  Well, on that

4  specific point, Your Honor, I should point out that the

5  plaintiffs have already deposed two sales level employees who

6  they did notice in time.  So what they're seeking here is

7  duplicative testimony to further evidence positions that we've

8  never disputed.  Returning to the specific point on trial

9  depositions, the cases that plaintiffs cite where trial

10  depositions were allowed, *RLS Associates, The Esten Felder*

11  case, all pertain to situations where a party was seeking to

12  depose their own employee where they knew exactly what they

13  were going to say and had to leave the company unexpectedly.

14  Indeed in the *Esten Felder* case the court stated what the test

15  was very explicitly.  If a parties seeking to depose its own

16  witness that may well be a trial deposition depending on the

17  facts, but where they're seeking to depose an opposing parties

18  witness, as is the case here, the court stated it's likely a

19  discovery deposition and I quote, "attempting to pose as a

20  trial deposition", and that's precisely what we have here.

21       The only other argument that the plaintiffs have made

22  to excuse their tardiness in this case is to the point and the

23  fact that they intimated that they wanted to depose these six

24  individuals on August 10 and that they did so by raising their

25  names for the very first time through a deposition notice.

41

1    Well, Your Honor, the case law that we cited in our briefs and

2    which I referred to earlier is very clear as to what

3    plaintiffs' obligation is.  By August 10 they had to subpoena

4    the individuals, conduct all of their investigations prior to

5    that date and complete the depositions by the close of

6    discovery.  They simply failed to adhere to that requirement

7    here.  There's no excuse.  They had the names.  They had the

8    documents up to 10 months in advance, therefore, we

9    respectfully ask the subpoenas be quashed, the protective order

10   entered.

11           THE COURT:  I'll hear you.

12           MR. MACORETTA:  Your Honor, what didn't have until

13   August 26th was the fact that these people were former

14   representatives and where they lived.  Let me give you a little

15   bit of the details of this.

16           The purpose of taking this testimony is to present at

17   trial how that we allege the scheme was enacted.  We allege

18   there was a scheme to go market the spread to physicians.  We

19   have corporate documents, business plans creating that.  These

20   witnesses are the sales representatives who actually went to

21   the doctor and said, look doctor this is how much you make on

22   the spread.  We noticed eight people for that on the belief

23   that we would not need all of them.  Two of them so worked at

24   Centocor.  We have testimony from them.  One, Laura Glasgow,

25   sat up and explained this is what I said to a room full of

42

1   doctors, this is how much he can make.  The other one, Cheryl

2   Cohen, essentially couldn't remember anything.  So we're left

3   with one useful witness at trial.  The other six people we

4   noticed no longer worked at Centocor.  Noticed them August 10th.

5   We learned for the first time they didn't work at Centocor on

6   August 21st.  We didn't learn their addresses until August 26th.

7   That was a Friday.  On Monday or Tuesday we issued subpoenas to

8   the addresses we had.  That is the timing of this.

9        They are not discovery depositions in the sense that

10  we're not interested in learning more discovery or finding more

11  documents or learning other people to go depose from this, but

12  we videotaped we want to put them on at trial to explain to the

13  jury how the scheme was effectuated.  That is the purpose of

14  this.  The timing is – the dates at least as Mr. Mangi

15  explained it is exactly what they said.  The subpoenas were

16  issued August 30th.  There's no question they weren't served

17  until after August 31st and obviously they require testimony

18  after August 31st. That's because we didn't have, we didn't know

19  these people weren't at Centocor anymore and we didn't have

20  addresses until that date.

21        I told you I would need their trial testimony.  That

22  should respond to the discovery versus trial deposition issue.

23  Seriously, Your Honor, this is a variation on the same issue

24  that came up in the last motion where counsel for Blue Cross

25  said, well, you know, we didn't have an agreement.

43

1   Mr. Mangi said we did have an agreement.  The deadline passed

2   and they didn't do anything.  So there they had – they didn't

3   want to be barred by the deadline.  Here they're seeking to bar

4   us from the deadline.

5           THE COURT:  Okay, I'll let you have two of them.  You

6   pick the two that you think might be the most fruitful.

7           MR. MACORETTA:  All right.

8           THE COURT:  If you come back after you've taken two

9   and you have two that have no memory, I'll consider whether I

10  let you do something else.

11          MR. MACORETTA:  All right.  Thank you, Your Honor.

12          THE COURT:  But do it on a short timeframe.

13          MR. MACORETTA:  We will.  Thank you, Your Honor.

14          THE COURT:  You're welcome.

15          MR. MONTGOMERY:  Your Honor––

16          THE COURT:  All right.

17          MR. MONTGOMERY:  Your Honor, with your permission I'd

18  like to raise briefly one issue on behalf of the Track One

19  defendants.  This relates to docket number 1694 which we

20  understand is going to be decided by Judge Saris, but the

21  absence of a determination or at least a presentation on that

22  issue today leaves us in a technical bind.  Docket number 1694

23  involves the expert disclosure schedule.  Under the current

24  case management order, the plaintiffs were required to file

25  their expert report on October 1st.  The defendants are required

44

1    to file on November 15th.  While the plaintiffs simply blew by

2    October 1st, we are immensely uncomfortable about doing that

3    without judicial relief.  The order of course contemplates that

4    our reports are going to be responsive to the plaintiffs'

5    reports.  That obviously we can't do since they're not going to

6    file their reports.

7              THE COURT:  When are you going to file your reports?

8              MR. MACORETTA:  Mr. Matt, will address this.

9              Mr. MATT:  First of all we don't know when we're

10   going to file the expert report because it is the subject of a

11   motion to extend the expert deadline which you understand we

12   are not hearing today so I cannot give you a date.  And let's

13   respond to a statement that plaintiffs just blew by the

14   deadline.  That is simply not true.  We filed our motion for

15   extension on August 31st.  I will state for the record that

16   plaintiffs don't object to have a forbearance of the

17   defendants' experts' report that are due until there is a

18   resolution over which.

19             THE COURT:  I would say--

20             MR. MATT:  I think that's logical.

21             THE COURT:  And I would endorse that and I would say

22   regardless of when it's filed, yours will be due 45 days later

23   which is what it was.  I'm not going to alter--

24             MR. MATT:  Which is what it was.

25             THE COURT:  Yeah.

45

1    MR. MATT:  We do have some issues as to whether we
2  now are entitled to more time, but we understand we can address
3  those to Judge Saris and we do appreciate--
4    THE COURT:  All right.  I don't want to go too much
5  beyond that but I think that's fair and reasonable, and I think
6  if you tell her that I endorsed that she will be in agreement.
7    MR. MATT:  We appreciate that, your Honor.
8    THE COURT:  All right.
9    MR. MATT:  Thank you very much.
10   THE COURT:  All right.  I will schedule for few
11 future hearings nonparty Empire Blue Cross' motion to quash,
12 docket entry number 1682, motion to compel third party United
13 Health Care to produce documents and witnesses for deposition,
14 docket entry 1770, and a motion to compel production of IMS
15 data, docket number 1794, motion to compel production by Amgen,
16 docket entry number 1820, and a motion to compel production by
17 Baxter 1862.  There maybe a few others.
18   What I would ask is that - the former deputy clerk
19 was kind of managing these motions as they came in, and
20 although I look at the docket everyday and note that X has come
21 in and then wait 14 days for a response, some things I think
22 have slipped through the cracks, so I would ask you if you have
23 things that you want scheduled, tell me now or tell me in a
24 letter forthwith.
25   MR. MACORETTA:  Your Honor, one for the plaintiffs

46

1    now there's an Aventis motion for a protective order arguing

2    that the 10 deposition limit of the local rules stops us from

3    taking anymore Aventis depositions.  I believe that's fully

4    briefed.  I don't have the docket number.

5              THE COURT:  Is that the one I agreed to take on the

6    papers?  No.  Okay.  Oh, okay, that's--

7              MR. MACORETTA:  There's actually a motion within

8    that.

9              THE COURT:  --1792?

10   (Pause)

11             THE COURT:  Yeah, it would look like 1792, 1804 and

12   1839, the cross motion for a protective order all related.

13             MR. DEMARCO:  Yes, Your Honor.

14             MR. MACORETTA:  I believe that's 04.

15             MR. DEMARCO:  For the record, Michael DeMarco for

16   Aventis.  I don't believe that is fully briefed as yet.  I

17   think that brief is due next week.

18             MR. MACORETTA:  Oh, your response to our cross motion

19   is due next week.  Okay.

20             THE COURT:  Okay.

21             MR. MACORETTA:  That is correct, yes.

22             THE COURT:  So set those up for a hearing.

23             MR. MACORETTA:  Okay.  Do we need to then schedule

24   that after it's fully briefed, Your Honor?  Is that the best

25   way to proceed with this?

47

1      THE COURT:  Oh, I think I can figure this out.

2      MR. MACORETTA:  I just wanted to help you.  Okay.

3      UNIDENTIFIED:  Your Honor, may I--

4      MR. MATT:  So we'll wait for your scheduling order on

5   that without--

6      THE COURT:  Yes, yeah.  I'll try and get all of this

7   done before the holidays.

8      MR. MACORETTA:  Thank you.

9      The COURT:  It's been tough because I've been doing a

10   lot of the docketing myself and Ms. Filo has been very, very

11   helpful but.

12      MR. MACORETTA:  Your Honor, we'll endeavor, the

13   plaintiffs will endeavor to send you a letter Monday on

14   anything else we think maybe out there.

15      THE COURT:  All right.  And the same for everybody

16   else in the room, if there are things you want to have heard I

17   have two jury trials between now and Christmas, but I can see

18   you in the afternoon.

19      MR. MACORETTA:  Your Honor, may I suggest that with

20   respect to the split between what Your Honor is going to

21   address and what Judge Saris is going to address that there is

22   a very close relationship between the 1694, 1769 and 1794.

23   1794 is a motion to compel INS data.  On the other hand one of

24   the bases for the motion for an extension relates to INS data.

25      THE COURT:  That, yeah.

48

1    MR. MACORETTA:  So I think those you might wish to

2  consider and we'd be glad to submit a letter explaining our

3  reasoning for hearing those together.

4    THE COURT:  That would be helpful.  And I can discuss

5  it with Judge Saris.  It may be that she does want me to deal

6  with it.

7    MR. MACORETTA:  Okay.

8    THE COURT:  But I don't want to overstep.

9    MR. MACORETTA:  Thank you, Your Honor.  We'll do that

10  tomorrow.

11    THE COURT:  All right.

12    MR. MACORETTA:  Thank you.

13    THE COURT:  All right, hearing nothing else but my

14  new clerk will be starting a week from Monday.  His name is

15  Marc, M-A-R-C, Duffy, D-U-F-F-Y.  He will be at the same

16  contact numbers that Mr. Saccoccio had.  So you do – my

17  secretary has tried valiantly to deal with some of these

18  inquiries, but I can tell you she is a very frustrated lady by

19  the end of the week, and so we've done our best to kind of keep

20  track of it.  We've been in trial, which is also made it

21  harder.

22    All right, hearing nothing else we stand in recess.

23    MR. MACORETTA:  Thank you, Your Honor.

24    THE COURT:  All right.

25  //

26

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

_____          November 20, 2005
Maryann V. Young