# EXHIBIT B

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3    _____

     UNITED STATES OF AMERICA,
4                        Plaintiff,

5    V.                           Criminal Action No. 05-10282-RCL

6    SERONO LABORATORIES, INC.,   December 15, 2005, 10:31 a.m.
                        Defendant.  Boston, Massachusetts
7    _____

8

9

10

11

12   TRANSCRIPT OF PLEA/SENTENCING OF SERONO LABORATORIES, INC.

13          BEFORE THE HONORABLE REGINALD C. LINDSAY

14             UNITED STATES DISTRICT COURT

15            JOHN J. MOAKLEY U.S. COURTHOUSE

16               ONE COURTHOUSE WAY

17                BOSTON, MA  02210

18

19

20

21

22               DEBRA M. JOYCE, RMR, CRR
                  Official Court Reporter
23           John J. Moakley U.S. Courthouse
             1 Courthouse Way, Room 5204
24               Boston, MA  02210
                   617-737-4410
25

```
 1    APPEARANCES:

 2    FOR THE GOVERNMENT:

 3    MARY ELIZABETH CARMODY, ESQ.
      Assistant United States Attorney
 4    Office of the United States Attorney
      John J. Moakley U.S. Courthouse
 5    1 Courthouse Way, Suite 9200
      Boston, MA  02210
 6    617-748-3100

 7    SONDRA L. MILLS, ESQ.
      United States Department of Justice
 8    Office of Consumer Litigation
      PO Box 386
 9    Benjamin Franklin Station
      Washington, DC  20044
10    202-616-2375

11    FOR SERONO LABORATORIES, INC.:

12    HENRY J. DEPIPPO, ESQ.
      Nixon & Peabody, LLP
13    PO Box 31051
      Rochester, NY  14603
14    508-263-1000

15    MELISSA B. TEARNEY, ESQ.
      Nixon Peabody, LLP
16    100 Summer Street
      Boston, MA  02110
17    617-345-1000

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2                    (The following proceedings were held in open court

3    before the Honorable Reginald C. Lindsay, United States

4    District Judge, United States District Court, District of

5    Massachusetts, at the John J. Moakley United States Courthouse,

6    1 Courthouse Way, Boston, Massachusetts, on December 15,, 2005.

7                    The defendant, Serono Laboratories, Inc., is

8    present with counsel.  The Assistant United States Attorney is

9    present.)

10                   THE CLERK:  This is criminal action 05-10282,

11   United States v. Serono Labs.

12                   Would counsel please state your name for the

13   record?

14                   MS. CARMODY:  Good morning, your Honor.  Mary

15   Elizabeth Carmody the United States.

16                   MS. MILLS:  Sondra Mills for the United States.

17                   THE COURT:  Good morning.

18                   MR. DEPIPPO:  Henry Depippo for Serono Labs.

19                   MS. TEARNEY:  Melissa Tearney for Serono Labs.

20                   MR. DEPIPPO:  With us is corporate representative

21   Tom Gunning.

22                   THE COURT:  Would you, sir, give me your name?

23                   MR. DEPIPPO:  Henry Depippo.

24                   THE COURT:  And you, ma'am?

25                   MS. TEARNEY:  Melissa Tearney.

1          THE COURT:  And the gentleman between the two of

2    you once again?

3          MR. GUNNING:  It's Tom Gunning.

4          THE COURT:  Okay.  Thank you.

5          Ladies and gentlemen, let me first begin by

6    apologizing for the late start of this morning's proceedings.

7    This is not my customary courtroom.  I'm usually sitting next

8    door in courtroom 11, and some work is being done in courtroom

9    11 to enable me to have all the fancy electronic equipment that

10   you see in this courtroom starting Monday morning, and in order

11   for that to work Monday morning, I had to be trained -- and I

12   put that in quotation marks -- on the system this morning.  And

13   so I was finishing my training.  By the way, when I put

14   training in quotation marks, that is no reflection on the

15   trainer, but rather on the trainee.  And so I was learning how

16   that system worked or attempting to learn how that system

17   worked, and so I am later than I anticipated.

18          But I'm here, and we are here this morning for what

19   I understand to be a plea of the defendant Serono Labs,

20   Incorporated; and then, as I understand it, we will proceed to

21   the sentencing if the plea is done.  Is that right,

22   Mr. Depippo?

23          MR. DEPIPPO:  Yes, your Honor.

24          THE COURT:  Let me suggest to you that in the

25   ordinary case in which there is a preplea presentence report

Page 5

1    prepared in anticipation that the sentencing would immediately

2    follow the plea, that generally is what happens.  There's a

3    plea, I decide whether I can accept the plea, and then we go on

4    to the sentence.

5           This plea, I understand, is being tendered pursuant

6    to Rule 11(c)(1)(e), Federal Rules of Criminal Procedure.  It

7    is, therefore, a so-called or often called binding plea, which

8    I understand to mean that the plea may be withdrawn by the

9    defendant if I do not accept the terms of the plea; is that

10   right?

11          MR. DEPIPPO:  Yes, your Honor.

12          THE COURT:  So I think that the most efficient way

13   for me to proceed this morning is to do much of what I would do

14   in a sentencing as I take the plea.  So I'm going to combine

15   the sentencing with the plea.

16          I have some questions, which I might ask during the

17   course of this plea.  They are relevant to the plea, and they

18   would be relevant to sentencing as well.  So I anticipate that

19   I will do it that way.

20          Is that satisfactory to everyone?

21          MS. CARMODY:  Yes, your Honor.

22          THE COURT:  Okay.

23          All right.  I was looking for some notes and papers

24   that I made in connection with this matter.

25          Mr. Depippo, is Mr. Gunning the corporate officer

United States v. Serono Labs, Plea/Sentencing, 12/15/05

Page 6

1    who will be representing the defendant this morning?

2               MR. DEPIPPO:  Yes, your Honor, he is.

3               THE COURT:  All right.  Mr. Gunning, could you

4    stand a minute, please?

5               I think I will have you sworn right now, all right?

6               THE CLERK:  If you can please raise your right

7    hand.

8               (Tom Gunning was sworn in by the Clerk.)

9               THE COURT:  Would you state your name, please?

10              MR. GUNNING:  It's Tom Gunning.

11              THE COURT:  And do you hold a corporate office in

12   the defendant Serono Laboratories, Incorporated?

13              MR. GUNNING:  I do.

14              THE COURT:  What office do you hold?

15              MR. GUNNING:  Vice president and general counsel.

16              THE COURT:  Let me tell you, Mr. Gunning, what we

17   are going to do this morning.  I understand that the

18   corporation has agreed, and I see papers -- a resolution of the

19   corporation --

20              MR. GUNNING:  Yes.

21              THE COURT:  -- that it will waive indictment in

22   this matter and plead guilty thereafter to an information of

23   the United States attorney.  And I have to be satisfied that

24   the waiver of indictment is voluntarily and knowingly given, so

25   I have to find out how much you know about it, since you

1   represent the corporation.  And if I accept the waiver of

2   indictment, then we can move to the plea.

3            You're now under oath, I will be asking you some

4   questions or giving you some information to make sure that

5   you -- and by you in this context I mean the corporation --

6   will understand -- understands the consent of waiving

7   indictment and the concept of pleading guilty to an

8   information.

9            Because you are under oath, you are required to

10  answer all of my questions truthfully.  If you fail to answer

11  any question truthfully, you personally may be subject to other

12  penalties growing out of offenses against the United States,

13  like making false statements and perjury.  And you may also,

14  since you represent the company, subject the company, the

15  corporation to those offenses as well.  Do you understand?

16            MR. GUNNING:  I understand.

17            THE COURT:  All right.  Do you have any question

18  before we begin?

19            MR. GUNNING:  No.

20            THE COURT:  All right.  You are the vice president

21  and general counsel of the corporation, the defendant in this

22  case you have told me; is that correct?

23            MR. GUNNING:  Yes.

24            THE COURT:  All right.  The corporation is aware,

25  that is, you are aware that the corporation has been charged

1    with two separate felonies, one of them is a conspiracy to

2    introduce into interstate commerce, with intent to defraud,

3    certain adulterated, mislabeled medical devices; and the second

4    felony with which the corporation is charged is conspiracy to

5    offer to pay illegal remuneration.  Do you understand that?

6              MR. GUNNING:  Yes, sir.

7              THE COURT:  A felony offense, Mr. Gunning, is an

8    offense against the United States which, were there an

9    individual, there would a term of imprisonment greater than one

10   year.  And no one, including a corporation, may be prosecuted

11   and tried for a felony in this court, except upon indictment by

12   a grand jury.  Do you understand?

13             MR. GUNNING:  I do.

14             THE COURT:  On the other hand, the right to

15   indictment by grand jury may be waived by the defendant, and it

16   is my understanding that this defendant intends to waive

17   indictment by the grand jury.

18             Before that happens, I want the corporation to

19   understand that it has a constitutional right to an indictment

20   before these charges may be prosecuted.  And unless the

21   corporation waives indictment, the case may not proceed.

22             If the corporation does not waive indictment, the

23   United States attorney may present this case to a grand jury

24   and ask of a grand jury indict the corporation.  A grand jury

25   is composed of at least 16 and not more than 23 persons.  Those

1   persons would be drawn at random from among the population

2   residing in the eastern division of the District of

3   Massachusetts.  The eastern division of the District of

4   Massachusetts comprises all of those counties east of Worcester

5   County.

6           If the case were to go to a grand jury, at least 12

7   of them would have to find that there is probable cause to

8   believe that the felonies charged in this case were committed

9   and that the corporation committed those felonies.  And you

10  should understand, if the case were presented to a grand jury,

11  the grand jury might indict the corporation, it might not

12  indict the corporation.  Do you understand?

13          MR. GUNNING:  I do.

14          THE COURT:  Now, if the corporation waives

15  indictment, the case will proceed against the corporation as if

16  there had been an indictment.  Do you understand that?

17          MR. GUNNING:  Yes.

18          THE COURT:  Has the corporation discussed the

19  matter of waiving indictment with its counsel?

20          MR. GUNNING:  Yes.

21          THE COURT:  And does the corporation understand the

22  right to an indictment?

23          MR. GUNNING:  Yes.

24          THE COURT:  Have any threats or promises been made

25  to the corporation apart from what's in the settlement

Page 10

```
 1    agreement, the plea agreement in this case to induce the

 2    corporation to waive indictment?

 3              MR. GUNNING:  No.

 4              THE COURT:  Does the corporation wish to waive

 5    indictment?

 6              MR. GUNNING:  Yes.

 7              THE COURT:  Mr. Depippo, do you see any reason why

 8    the corporation should not waive indictment?

 9              MR. DEPIPPO:  No, your Honor.

10              THE COURT:  Ms. Carmody, are you the right person

11    to ask?  Does the government see any reason why the corporation

12    should not waive indictment?

13              MS. CARMODY:  No, your Honor.

14              THE COURT:  Is there a written waiver of indictment

15    signed by Mr. Gunning as the authorized corporate

16    representative?

17              MS. TEARNEY:  We have it with us and we'll sign

18    it.  We didn't know if it needed to be signed in front of a

19    judicial officer.

20              THE COURT:  The corporation has authorized you, has

21    it not, to sign this waiver of indictment on its behalf?

22              MR. GUNNING:  It has.

23              THE COURT:  All right.  I have been handed a

24    document called waiver of indictment in the case of United

25    States of America v. Serono Laboratories, Incorporated,
```

1    criminal action 05-10282-RCL.

2              Mr. Gunning has executed this document in my

3    presence.  It is co-signed -- co-signed is not the right

4    word -- but witnessed by Melissa Tearney, Esq., counsel for the

5    defendant.

6              I find that the waiver is knowingly and voluntarily

7    made, and I, therefore, accept it; and I will execute the

8    waiver indicating my acceptance of it.

9              Now I want to proceed to the plea phase.  As I

10   said, part of what we are going to be doing in the plea phase

11   is also relevant to what will happen during the sentencing

12   phase.

13             You are, Mr. Gunning, authorized by the corporation

14   to enter a plea of guilty to these two felonies, are you not?

15             MR. GUNNING:  Yes.

16             THE COURT:  And you understand from our earlier

17   conversation what it is the corporation has been charged with;

18   is that right?

19             MR. GUNNING:  I do.

20             THE COURT:  All right.

21             Just so the record is clear, let me state, again,

22   the corporation has been charged in count one with a violation

23   of Title 18 United States Code section 371, the conspiracy

24   statute; and the conspiracy that's charged in that is a

25   conspiracy to introduce into interstate commerce, with intent

1   to defraud and mislead, adulterated medical devices.

2         Count two also charges a conspiracy pursuant to

3   Title 18 United States Code section 371.  The conspiracy there

4   charged is conspiracy to offer to pay illegal remuneration to

5   health care providers.

6         I may have side the indictment charges.  The

7   information charges.  We're proceeding now by information of

8   the United States attorney.

9         Mr. Gunning, let me advise the corporation through

10  you that the corporation faces, if it pleads guilty to these

11  felonies, maximum penalties as follows:  A term of probation of

12  five years; a fine of $228,224 -- $228 million, excuse me,

13  $228,244,000.

14         PROBATION OFFICER:  224.  The second figure is 224,

15  Judge.

16         THE COURT:  Let me try it again.  $228,224,000,

17  with respect to count one, and a special assessment of $400.

18         With respect to count two, the corporation --

19         PROBATION OFFICER:  Excuse me, Judge, that's

20  actually the total fine.

21         THE COURT:  I'm sorry.  I don't do corporations

22  that often, so I'm having my probation officer sit next to me

23  and make sure I say all of this correctly.

24         All right.  Let me start again, Mr. Gunning.

25         On count one, the corporation faces a maximum term

1    of probation of five years; and on count two, the corporation,

2    likewise, faces a maximum term of five years.

3             And in addition, the corporation faces a maximum

4    fine on both of the counts of $228,224 --

5             PROBATION OFFICER:  I'm sorry, Judge, that's

6    actually the total amount of the total fine.  The counts are

7    separated at paragraph 205 by individual counts.

8             THE COURT:  All right.

9             Why don't you tell me what -- help me out with what

10   the maximum fine with respect to count one is.

11            PROBATION OFFICER:  It's $209,824,000 on count

12   one.  And 180 -- excuse me, $18,400,000 on count two.

13            THE COURT:  Okay.

14            PROBATION OFFICER:  Thank you.

15            THE COURT:  That's actually what I have.

16            Thank you.

17            Let me -- Mr. Gunning, forgive me for the

18   confusion.  As I say, I don't often take pleas against

19   corporations.

20            So let me start again, and I'm going to take this

21   count by count.

22            With respect to count one, the corporation faces a

23   maximum term of probation of five years; a maximum statutory

24   fine of $209,824; and a mandatory special assessment of $400.

25            PROBATION OFFICER:  $209 million.

1              THE COURT:  209 -- all right.

2              Sit down, Mr. Gunning.  Have a seat.  I'm going to

3    try to compose myself so I can say these numbers.

4              All right.  You may stand again.  All right.  Let

5    me do the probation first.  On each count, the corporation

6    faces a term of -- a maximum term of probation of five years.

7              On each count the corporation faces a mandatory

8    special assessment of $400.

9              On count one of the information the corporation

10   faces a maximum fine of $209,824,000.

11             Did I say that right?

12             On count two the corporation faces a maximum fine

13   of $18,400,000.  All right?

14             Do you understand that?

15             MR. GUNNING:  Very clear I understand it.

16             THE COURT:  I'm certainly glad it's clear to you,

17   sir.

18             Now, before I go further, I want to ask you, sir,

19   about the total fine.  The total fine is $228,224,000, the

20   maximum fine faced by the corporation.  Do you understand?

21             MR. GUNNING:  Yes.

22             THE COURT:  Does the corporation have the ability

23   to pay a fine of that size should it be imposed by the Court?

24             MR. GUNNING:  The corporation has the ability to

25   pay.

Page 15

1               THE COURT:  All right.  Now, there's an agreement

2    that you have that the fine that you will pay is $136,936.

3    Since you can pay the larger am, I assume the corporation may

4    pay this smaller amount of fine; is that right?

5               MR. GUNNING:  Yes.

6               THE COURT:  What is the -- the corporation no

7    longer operates; is that right?

8               MR. GUNNING:  The corporation continues to exist,

9    yes.

10              THE COURT:  It does continue.

11              MR. GUNNING:  Yes.

12              THE COURT:  What would be the impact on the

13   corporation of a fine of -- first, a fine of $228,224,000?

14              MR. GUNNING:  The corporation continues to exist,

15   but will not have active operations going forward.

16              THE COURT:  So the fine, if imposed, will be

17   imposed on the parent -- will be paid by the parent

18   corporation?

19              MR. GUNNING:  Yes.

20              THE COURT:  All right.  What would be the impact on

21   the parent, that's Serono -- what's the parent corporation?

22              MR. GUNNING:  The company that will pay the fine is

23   called Ares Trading.

24              THE COURT:  Is what?

25              MR. GUNNING:  Ares, A-r-e-s, Trading.

Page 16

```
1              THE COURT:  What's the impact on Ares Trading --

2    and by impact I mean on the net income -- over the next five

3    years of a fine of $228,224,000?

4              MR. GUNNING:  The -- I don't have the numbers

5    handy, but the fine is a very large fine.  I would say it's

6    greater than the net income of the corporation for an entire

7    operating year.

8              THE COURT:  The corporation meaning the defendant

9    corporation?

10             MR. GUNNING:  No, I would say of the group, of

11   which the defendant is one of the affiliates.

12             THE COURT:  Okay.  The $136,935,000 fine to which

13   you have agreed, what impact does that have on these

14   corporations?

15             MR. GUNNING:  Your Honor, I wasn't clear.  When I

16   talked about the fine, I had in my mind the complete fine both

17   on the criminal and civil side.  So just referring to the 136

18   million --

19             THE COURT:  Let's talk then about the fine -- first

20   I need to find out if the corporation can pay the fine.  The

21   fine is 136 -- to which you've agreed -- $136,936,000.  That is

22   the fine to which you have agreed in this plea agreement.  Can

23   the corporation pay that fine?

24             MR. GUNNING:  Yes.

25             THE COURT:  And the corporation is Serono
```

Page 17

```
 1    Laboratories.  Can it pay the fine?

 2               MR. GUNNING:  Serono Laboratories -- the fine will

 3    be paid by another corporation.  Serono Laboratories itself

 4    could not pay that fine.

 5               THE COURT:  And the corporation that's paying the

 6    fine, what is the relationship between that corporation and

 7    Serono Laboratories?

 8               MR. GUNNING:  It's one of the affiliated

 9    corporations.

10               THE COURT:  And was there a particular reason to

11    take that affiliate to pay this fine?

12               MR. GUNNING:  Yes.  It has the ability to pay.

13               THE COURT:  Okay.  And it has the ability to pay

14    $136,936,000; is that right?

15               MR. GUNNING:  It does.

16               THE COURT:  What would be the effect on the

17    operation of the corporate group of the fine, just the fine on

18    the net income of the corporate income?

19               MR. GUNNING:  The fine, the $136 million in my

20    rough calculations is approximately 25 percent of the entire

21    corporate affiliated group's net income for one year.

22               THE COURT:  Okay.  I ask this question, just so

23    that everyone knows and I'm just not -- this is not idle

24    curiosity.  I have to determine at the end of this process

25    whether I can accept the agreement that you have entered, and
```

Page 18

1    in determining whether I can accept that agreement, I have to

2    determine whether the goals of sentencing as set forth in Title

3    18 United States Code section 3553(a) have been met.  One of

4    such goals is:  Is punishment sufficient in the circumstances?

5    And another goal is to deter activities in the future.  And I

6    have to be certain that the punishment in this case, and I, in

7    truth, should include the entire global arrangement here, is

8    sufficient to meet these goals of sentencing.

9             So that's why I asked.  So I put to you now whether

10   the corporation or one of these corporations or all of them can

11   pay the amounts to which the corporation has agreed as

12   restitution and fine, the total of some $700 million.  Can that

13   be paid?

14             MR. GUNNING:  That can be paid.

15             THE COURT:  The fine, as I understand it, is to be

16   paid within seven days of the judgment being entered.  I think

17   it's judgment being entered; is that right?  That is right,

18   Ms. Carmody?

19             MS. CARMODY:  Yes, your Honor.

20             THE COURT:  If I were to enter the judgment today,

21   this afternoon, could that $136,936,000 be paid within seven

22   days of today?

23             MR. GUNNING:  Yes.  Our intention is to pay all

24   amounts tomorrow.

25             THE COURT:  All right.  And as to the remaining

1   $500 million, how is that to be paid?

2             MR. GUNNING:  The intention is to pay the entire

3   global settlement tomorrow.

4             THE COURT:  Now, I ask this -- this is not

5   necessarily part of your plea, but I ask this to all of you

6   here today, counsel in particular, I understand from the papers

7   that the restitution aspect of this settlement, the $500

8   million, largely is restitution to the Medicaid program and to

9   the states participating in the Medicaid program, and that the

10  Medicaid losses comprise 90 percent of the total losses from

11  the wrongful conduct of this corporation; is that correct,

12  Ms. Carmody?

13            MS. CARMODY:  Yes, your Honor.  The total -- the

14  total sales for the drug, the total reimbursement was 90

15  percent -- the total Medicaid reimbursement was 90 percent of

16  the total sales for this drug.  So that there were -- medicaid

17  accounted for 80 percent of the prescriptions, but 90 percent

18  of the total sales, because Medicaid state agencies provided

19  different reimbursement rates.  So, yes, you're correct, bottom

20  line is 90 percent is correct.

21            THE COURT:  So the losses being reimbursed to which

22  restitution will apply will be 90 percent of the actual losses,

23  as you determine to be; is that right?

24            MS. CARMODY:  Yes.

25            THE COURT:  Or estimated to be.

1          MS. CARMODY:  Yes, your Honor.

2          THE COURT:  So that there is no -- there will be no

3    restitution in this arrangement for 10 percent of the losses as

4    estimated; is that right?

5          MS. CARMODY:  That's correct, your Honor.

6          THE COURT:  And those losses will have been --

7    would have been incurred by perhaps by private insurers or by

8    private individuals; is that right?

9          MS. CARMODY:  That's correct, your Honor.

10          THE COURT:  Now, may I ask you, all of you -- any

11   one of you can comment on it -- whether you considered in

12   putting this global settlement together the possibility -- I

13   understand that you say that there's difficulty in trying to

14   compensate everybody who may have suffered a loss, the one

15   quick thing that I learned from the memorandum that the

16   government had filed is that there may be 9,000 individuals.

17          So I ask -- and maybe this isn't a question for

18   you, Mr. Gunning, right now, but I ask the lawyers who have

19   negotiated this deal, whether there was ever a consideration

20   given to a 100 percent restitution in which the 90 percent

21   would have been distributed or allocated in the manner in which

22   you've allocated; namely, back to the Medicaid program to be

23   allocated to the various states, and ten percent put in a fund

24   to which other people who have -- other parties who have

25   suffered a loss, private insurers, individuals, could apply for

1    relief?

2            Now, that would be $50 million or so?

3            MS. CARMODY:  I don't know the math, your Honor,

4    but --

5            THE COURT:  And believe me, as you have heard, math

6    is not my strong suit.

7            MS. CARMODY:  Neither mine.

8            MR. GUNNING:  That's about 10 percent of the civil

9    settlement, $50 million, yes.

10           THE COURT:  I did get that right?

11           MS. CARMODY:  Ten percent of the civil recovery,

12   you're exactly right, your Honor.

13           THE COURT:  Well -- all right.  I've had my

14   probation officer sitting here to help me with these numbers.

15           All right.  But the question is:  Did you consider

16   putting the $50 million, the remaining 10 percent of the loss

17   in a fund for victims to apply for relief?

18           MS. CARMODY:  We did not consider that particular

19   solution to the issue that confronted us, your Honor.

20           We did give careful consideration, the government

21   did, in the context of our obligations to what we could or

22   could not do with respect to even identifying those other

23   victims.

24           There was, and continues to remain, and I think the

25   parties agree on this, an inordinate difficulty even

1    identifying who those victims would be.  There are insurers

2    that did pay for the drug, private insurers.

3              To go into the facts of the case, with respect to

4    how those insurers decided and determined to reimburse and

5    whether or not those reimbursements were based on the

6    fraudulent activity of the company, we couldn't determine that

7    on an individual insurer basis.  It would be impossible.

8    There's almost 1,000 insurers that we know of.

9              The factual database that we could go to to even

10   determine who those private payers were is a company document

11   called the SeroCAD database, that's a medical reimbursement

12   option that the company afforded private payers to try to

13   facilitate payment for patients.  That database does not

14   identify all the payers at this point, and so we could not even

15   identify all the private payers.

16             With respect to the patients who received the drug,

17   as we said, about 85 to 90 percent of the patients who received

18   the drug were Medicaid patients.  The private -- the ones that

19   had private insurance would have been -- had an opportunity to

20   receive insurance reimbursement for the drug.  What the rates

21   were as between the patient and the insurance company would be

22   almost impossible to determine.  Each insurance company had a

23   difficult -- a different way to -- in different terms of the

24   contract to determine how much a patient was required to pay

25   versus the insurance company.

1          So that's a very difficult thing to determine.

2          In addition, there were patients that paid cash for

3     this drug, and so that there are patients out there that did

4     pay out-of-pocket for the drug, no question.

5          It's impossible for us to determine who those

6     patients were for a number of reasons, including a lack of

7     complete database from the company records, as well as there's

8     no insurer or Medicaid agency that would have a record of these

9     individuals.

10          There was a program by the company that provided

11     some free drug to patients, and so that there were patients

12     that received drugs from the company that way.

13          So in terms of the total complex picture here, we

14     were not able to determine even with respect to reimbursement

15     rates or the fraudulent activity what we could attribute to

16     those private payers; and with respect to the individuals, it's

17     an almost impossible task to even identify them.

18          Did we consider the option that the Court just

19     mentioned in terms of the total construct of the settlement?

20     No, your Honor, we did not.

21          THE COURT:  Well, let me -- maybe the question goes

22     beyond did you consider.  Wouldn't it be possible to take this

23     $50 million and announce to the public that there is a fund of

24     $50 million and that fund is being held for people who may

25     be -- for parties who may be victims of this scheme to which

1  the corporation is pleading, or these schemes; and the people

2  who believe they have claims, the parties who believe they have

3  claims would go to some arbiter, mediator -- I'm thinking of a

4  9/11 program.

5          MS. CARMODY:  Right.

6          THE COURT:  And they would present their claims to

7  that person, and that person would decide the validity of the

8  claim, how much of it -- of that $50 million should go to any

9  given party, and so on.  And I particularly have in mind the

10  individuals that you spoke of who might have paid out of their

11  pocket.

12          The private insurers, if they think they have been

13  defrauded, could also apply, but they also have more

14  substantial means to take on this company themselves, but I

15  have in mind in particular individuals who may have paid

16  out-of-pocket or individuals who may have paid not all of it

17  out-of-pocket but whatever deductible amount or co-insurance

18  amount they had to pay either Medicaid or private insurer was

19  paying the principal amount.

20          I understand we're talking $7,000 a week or

21  something like that.

22          MS. CARMODY:  Yes, your Honor.

23          THE COURT:  So if a particular person using this

24  drug had to pay $7,000 a week for X number of weeks and had

25  co-insurance, let's say 10 percent, we're talking that person

Page 25

1   having lost $700 a week, and those -- that person in this

2   settlement is never going to be reimbursed or no attempt would

3   be made to reimburse that person or give restitution to that

4   person.  And that -- I'm stuck on that, I have to tell you.

5        MS. CARMODY:  Your Honor, I understand where the

6   Court's coming from; and if we thought that that was a workable

7   solution, I would be the first proponent for it.

8        In order to do that, the government would have to

9   fund a program --

10       THE COURT:  Why does the government have to do

11  that?  Why can't the defendant do it?

12       MS. CARMODY:  Serono would have to do it.  In the

13  context of this case I guess they would.

14       To set it up, to set up -- put somebody in charge

15  of it, you'd have to hire somebody --

16       THE COURT:  I understand.

17       MS. CARMODY:  You'd have set criteria, you'd have

18  to have investigation to know in fact whether or not the claims

19  that were made against the fund were proper and not

20  fraudulent.  It's the kind -- it's exactly the kind of huge

21  complication that the statute, I think, looks to to say if it's

22  that complex -- if we were to try to have done that, your

23  Honor, we wouldn't be here today, we'd still be out talking

24  about how to get that done.

25       It took over -- it took four years of investigation

United States v. Serono Labs, Plea/Sentencing, 12/15/05

1  and over a year of just negotiation not just with the federal

2  government, but all of the 50 states and the District of

3  Columbia.  So that in order to effectuate this global

4  resolution, the company not only had to negotiate with the

5  federal government, each one of the states have a separate

6  civil settlement agreement so that each of the 50 states had to

7  sign on to the settlement agreement.

8          The primary goal of the statutes that we're

9  prosecuting, not that -- and I'm not in any way looking away

10  from any patient victims or insurer victims, but the primary

11  goal of our statute is to make the government --

12          THE COURT:  I understand.

13          MS. CARMODY:  -- and its states whole.

14          THE COURT:  I understand.

15          MS. CARMODY:  So I think that the kind of

16  well-intentioned program that the Court has described I think

17  it's simply something that is so complex that it would be

18  impossible to effectuate in the context of this negotiation in

19  this plea.

20          THE COURT:  Well, you don't mean impossible; you

21  mean difficult, don't you?

22          MS. CARMODY:  Extraordinarily difficult.

23          MR. GUNNING:  If I could --

24          THE COURT:  It could be done; it has been done.

25          Yes, sir.

```
 1              MR. GUNNING:  Just one thing to add in terms of

 2    your concern about the individuals who paid.  Again, I don't

 3    have numbers, but I have the firm understanding that the cash

 4    paid by individuals for the product is a very, very small

 5    percentage of even that ten percent remainder.

 6              THE COURT:  Okay.

 7              Well, I hear what Ms. Carmody has said, and I

 8    hear -- I interpret what she has said to mean that this

 9    settlement represents the greatest good for the greatest

10    number.

11              MS. CARMODY:  Yes, your Honor; I would say that.

12              THE COURT:  And that if I wanted to engraft some

13    other condition on this settlement -- of course you'd be

14    allowed to withdraw your plea; and you might decide not to

15    plead to anything and the whole thing would go down the tube,

16    that could happen; is that right?

17              So I have to think about whether I want to insist

18    on that, what happened to that $50 million, as against all of

19    the complications of negotiating with the company -- the United

20    States negotiating with the company and then negotiating with

21    all the 50 states.

22              I want to think about that just for at least a few

23    minutes, because I just want to ask for the company's point of

24    view, the corporation's point of view.

25              I recognize this is a difficult administration
```

Page 28

1    matter, but in the context of the settlement as a whole, this

2    is a relatively small amount of money, $50 million, and I am,

3    as you heard me say, concerned about the individual --

4    concerned about the private insurers as well, but I have the

5    notion that the private insurers are better able to protect

6    themselves than private individuals.

7            You say that there aren't very many of such people

8    or if there are very many of such people, they didn't pay much

9    money, Mr. Gunning.  Is that what you said?

10           MR. GUNNING:  That's my understanding.  That if

11   there is -- in terms of actual cash patients paying for the

12   product, that it is less than one percent of what was paid for

13   the product.

14           THE COURT:  Okay.  Well, I have in mind the

15   scenario where there are especially vulnerable victims at the

16   end of this chain.  You don't -- the guidelines -- sentencing

17   guidelines don't permit the kind of ratcheting up of the

18   punishment in this kind of case for a specially vulnerable

19   victim, but there are especially vulnerable victims who are

20   people who have AIDS; and as I understand what has happened,

21   what the government charges and what the corporation is

22   planning to plead guilty to, is the selling of devices and

23   medication to these victims with the promotion by the

24   corporation that a symptom of their illness was wasting of the

25   body; and that even in cases where they may not have had that

Page 29

1   symptom, they were led to believe that they did have that

2   indication, that they were suffering, and they paid for the

3   medication, they paid for the devices, which means to me that

4   the person who pays -- who might have paid $700, ten percent of

5   a private insurer, puts the $700 down as his or her

6   co-insurance, and that $700 can't be used to buy something

7   else, other medication or pay the rent, pay the mortgage

8   because it's going into the payment of -- for this device and

9   this medication, which the patient had been led to believe is

10  necessary for his health when it was not.

11          And so I don't want to preach about this, but I am

12  concerned about those people who had to pay the $700, and maybe

13  there are a few and who made choices that they didn't have to

14  make.

15          Now, I just need -- at the end of the day you'll

16  have to talk to me again about those people.

17          I understand the global nature, I understand this

18  is the greatest good, but I -- between the United States, the

19  corporation.  I see my role is to sort of speak for the

20  individual who has suffered that particular harm.  And maybe at

21  the end of the day this will be all right, this settlement is

22  all right because it is the greatest good for the greatest

23  number.  And I don't want to mess it up so that that great good

24  cannot be achieved, because at the end of the day what I hear

25  is that the compensation is going to go to us as tax -- the

1   taxpayers, all of us individual will get our money back; but

2   the person who won't get their money back is that person who

3   paid the $700 co-insurance.

4           All right.  I'm through with the sermon about that,

5   but I want to come back to it, because you have to satisfy me

6   that I need to accept this plea knowing that there is X and Y

7   and Z out there who spent $700.  And maybe they didn't take the

8   cocktail, who maybe got worse, and if not physically worse,

9   psychologically worse because of this activity.

10          All right.  Let me move on, because I haven't done

11  this, but let me move on.

12          Okay.  Now, Mr. Gunning, let me make sure you

13  understand that the corporation does not have to plead guilty.

14  The corporation can plead not guilty and is entitled to a trial

15  by jury, which the corporation is entitled to the assistance of

16  counsel.  It would have a right in a trial to confront the

17  witnesses against the corporation and have those witnesses

18  examined in the defense of the corporation.  The corporation

19  would have the right to testify, to call witnesses on its own.

20  If the corporation wanted to call witnesses and those witnesses

21  were reluctant to come to court, the corporation would have the

22  right to have the court issue subpoenas for those witnesses

23  appear.

24          On the other hand, the corporation has the absolute

25  right, guaranteed by the fifth amendment of the Constitution,

1   to put the government to its burden of proof.  The corporation

2   would have no burden at trial; and, therefore, the corporation

3   would not have to put on a defense, would not have to call any

4   witnesses, and would not have to testify on its behalf.  That

5   if the corporation took that course, I would instruct the jury

6   in the strongest possible terms that no inference of guilt or

7   anything else and no -- well, let me leave it at no inference

8   of guilt or anything else could be drawn by the jury because

9   the corporation decided not to offer a defense.

10          I guess what I usually say is that the jury would

11   be -- could not hold it against the corporation if it offered

12   no defense or had no one testify on its behalf.

13          And I would tell you, as I would tell any

14   individual before me, that before I seated any jury in this

15   case I would inquire of the potential members of the jury, each

16   of them, whether any one juror would hold it against the

17   corporation or draw an inference adverse to the corporation

18   because the corporation did not testify or otherwise present a

19   defense.

20          If some potential juror indicated to me that that

21   juror would hold it against the corporation or draw an

22   inference adverse to the corporation if the corporation didn't

23   testify or offer a defense, I would not seat that person.

24          I try to challenge that by asking potential jurors

25   if they think that the corporation must be guilty otherwise the

Page 32

1    corporation wouldn't be in the courtroom charged with two

2    felonies.

3              And if some potential juror were to indicate in

4    some fashion, however remote, that he or she harbored that

5    feeling, I wouldn't seat that person.

6              Now, if the corporation pleads guilty, all the

7    rights that I've just explained and all the rights that are

8    associated with a trial by jury in this court in a felony

9    criminal case will have been waived.

10             Does the corporation understand that?

11             MR. GUNNING:  Yes.

12             THE COURT:  Has the corporation's decision to plead

13   guilty in this case resulted from discussions between your

14   attorneys representing the corporation and the attorneys for

15   the government?

16             MR. GUNNING:  Yes.

17             THE COURT:  Is the plea of guilty that you propose

18   to make on behalf of the corporation a voluntary plea because

19   the company, the corporation is guilty of these offenses?

20             MR. GUNNING:  Yes.

21             THE COURT:  Let me advise you that at trial, as I

22   think I've said or at least suggested, the burden would be upon

23   the United States to prove the corporation guilty of these

24   offenses, and the burden upon the United States is to prove the

25   corporation's guilty by proof beyond a reasonable doubt.  That

1   means, Mr. Gunning, that with respect to each of these two

2   counts, the government must prove each of the separate things

3   that make up the offense charged in that count by proof beyond

4   a reasonable doubt.  The failure of the government to prove the

5   separate things that make up an offense against the United

6   States are called the elements of that offense.  The failure of

7   the government to prove even one element, even if it proves all

8   the others save one, means that the corporation would be

9   entitled to a verdict of not guilty.

10          Now, with respect to count one of the information,

11   the government must prove the following elements:  First, that

12   there was a conspiracy among at least two persons to introduce

13   into interstate commerce, with intent to defraud or mislead,

14   adulterated medical devices as charged in the information; that

15   at sometime during the life of that conspiracy the corporation,

16   understanding what the conspiracy was all about, deliberately

17   and intentionally joined that conspiracy and intended by

18   joining that conspiracy to advance the purposes of the

19   conspiracy.

20          And, finally, the government must establish that at

21   sometime during the life of the conspiracy and during a time in

22   which the corporation was a part of it, one of the

23   conspirators -- I'm sorry, I don't -- let me revise this last

24   statement.

25          Sometime during the life of the conspiracy some

1   member of the conspiracy committed some overt act for the

2   purpose of advancing the conspiracy.

3           Do you understand?

4           MR. GUNNING:  Yes.

5           THE COURT:  With respect to count two, which also

6   charges conspiracy, this conspiracy also is charged under Title

7   18 United States Code section 371, this is a conspiracy charged

8   in the information as one to offer to pay illegal remuneration

9   to health care providers.  In that case, the government must

10  prove that there was a conspiracy among two or more persons to

11  offer to pay illegal remuneration to health care providers;

12  second, at sometime during the life of that conspiracy, the

13  corporation, understanding what the conspiracy was all about,

14  joined intentionally deliberately with the intention by joining

15  to advance the purposes of the conspiracy; and third, that at

16  sometime during the life of that conspiracy one of the

17  conspirators committed an overt act to advance the purposes of

18  the conspiracy.

19          Do you understand, sir?

20          MR. GUNNING:  Yes.

21          THE COURT:  Mr. Gunning, do you have any question

22  you want to ask me before you go any further?

23          MR. GUNNING:  No.

24          THE COURT:  You hesitated, so if you have a

25  question, this is the time to ask.

1           MR. GUNNING:  No, I guess as you go through -- I

2    understand the elements, and I believe that there are facts

3    that are sufficient to show those elements; but we don't agree

4    with all of the facts that are set forth in the information or

5    the sentencing memo.  So that was the reason for my hesitation.

6           THE COURT:  All right.  Well, let me do this:  Is

7    the government prepared to make a representation of what it

8    would show if the case were to go to trial?

9           MS. CARMODY:  Yes, your Honor, we are.

10           THE COURT:  Have a seat, Mr. Gunning.  Listen

11    carefully as Ms. Carmody summarizes the case the government

12    would present if the case were to go to trial.

13           MS. CARMODY:  Your Honor, if the case were to go to

14    trial, the evidence would show the following -- and I'm going

15    to incorporate by reference the government's sentencing

16    memorandum, which was filed yesterday; and if there is any fact

17    or point that I don't -- I fail to mention here because it's so

18    complicated, I would refer back to the sentencing memorandum.

19           THE COURT:  The defendant has that sentencing

20    memorandum?

21           MS. CARMODY:  Yes, your Honor.

22           THE COURT:  Okay.

23           MS. CARMODY:  The two conspiracies charged in the

24    information are components -- are two components of an illegal

25    marketing scheme by the defendant Serono Labs and others to

1    increase the sales offer, which is a form of recombinant human

2    growth hormone approved by the FDA for AIDS wasting, a

3    condition characterized by profound involuntary weight loss in

4    AIDS patients.

5            Beginning in August of 1996, the FDA initially

6    granted accelerated approval for Serostim for the condition of

7    wasting, which was at that time an AIDS defining condition and

8    a leading cause of death among those effected by HIV and AIDS.

9            Shortly following the launch of Serostim in the

10   fall of 1996, the incidence of AIDS wasting began to decline

11   markedly as a result of the simultaneous advent of protease

12   inhibitor drugs administered with other drugs in various

13   cocktail combinations commonly referred to as Highly Active

14   Anti-Retroviral Therapy, or HAART, H-A-A-R-T.  The HAART

15   regimens treated the HIV virus itself, and, as a result,

16   averted the condition of wasting, which the drug Serostim was

17   developed to treat.

18           Consequently, many physicians declined to prescribe

19   Serostim, because it was not medically necessary and it was

20   also a very expensive drug, approximately costing $21,000 for a

21   12-week course of therapy.

22           Confronted with the rapidly diminishing market,

23   Serono Labs and others embarked on a campaign to redefine AIDS

24   wasting immediately following that launch.  The company sought

25   to expand the definition of AIDS wasting to encompass newly

1    emerging symptoms exhibited by AIDS patients and promoting

2    Serostim to treat these symptoms --

3              THE COURT:  You're beginning to speed up again.

4              MS. CARMODY:  I'm sorry, your Honor.

5              THE COURT:  Keep it, you know, in a more

6    conversational pace so we can all understand.

7              MS. CARMODY:  Sure, your Honor.

8              THE COURT:  You were telling me that the company

9    began a campaign to redefine AIDS wasting.

10             MS. CARMODY:  AIDS wasting.

11             THE COURT:  AIDS wasting.

12             MS. CARMODY:  They sought to expand the definition

13   of AIDS wasting to encompass newly emerging symptoms that were

14   not symptoms or conditions for which the drug was granted

15   approval by the FDA.

16             Principally, and this refers to specifically count

17   one of the indictment, Serono Labs began using what's called

18   the bioelectrical impedance analysis, or BIA testing device,

19   which was a medical device that the company used to,

20   quote-unquote, unmask wasting.  And they also, referring to

21   count two, offered illegal remunerations, offered to pay or did

22   pay for doctors an all-expenses paid trip to a medical

23   conference in Cannes, France, which I'll refer to as the Cannes

24   conference.

25             The conspiracy to disseminate the BIA device began

1    in 1996 and lasted at least through 2002.

2              Serono Labs knowingly and willingly conspired with

3    the medical device maker RJL Sciences, Inc., which was a

4    company that was run by a person named Rudy Liedtke and is

5    located in Michigan.  RJL Sciences was the one to develop the

6    BIA device, the testing device as well as the accompanying

7    software, which are a separate medical device, and which were

8    the adulterated devices that I referred in count one of the

9    information.

10             Despite knowing that the FDA did not approve the

11   medical device for use in diagnosing AIDS wasting or to

12   diagnose a condition -- to be used as a device to determine

13   whether a patient was suffering from a condition known as body

14   cell mass wasting, both Serono and RJL agreed to disseminate

15   that device to both patients and other providers with respect

16   to those who were treating or providing for AIDS patients so

17   that that device could be used to diagnose the condition called

18   AIDS wasting.

19             Serono Labs used an array of practices to

20   manipulate the BIA testing device.  And the BIA testing device

21   was basically a very small device with electrical cords that

22   extended from it that were put on the hands and feet of

23   patients.  And the purpose of -- when they put it on the

24   patient was to measure the electrical current rubbing through

25   the patient to determine the resistance and the reactants.

1           Those two measurements were taken -- which were

2   determined by the testing device, had to be taken manually from

3   the device and inserted into a computer system and operated

4   through a computer software in order to determine whether or

5   not a patient -- what the measurements were, for among other

6   things, body cell mass.

7           THE COURT:  May I ask you something as you go

8   along?  Because this isn't very -- has never been clear to me.

9           Does this device, this BIA device have value at

10  all?  Or is what you're saying it does something that is useful

11  but the results were manipulated?

12          MS. CARMODY:  It's originally -- its original use,

13  your Honor, was for nutritional purposes to determine body

14  composition.  And people that -- particularly people that have

15  weight loss problems or people who want to bodybuild or other

16  people who are particularly interested not just in what their

17  weight is on a scale, but what is the composition of elements

18  within one's body, that makes a difference in terms of how the

19  weight is both distributed in the body and how it works within

20  the body.

21          So the original purpose, which was developed by the

22  company in the 1980s, was to just determine a person's body

23  composition for nutritional purposes.

24          The use that brought it forward into diagnosing a

25  medical condition, that was a use -- that's exactly the use