# EXHIBIT H

Plea Hearing Transcript.txt

1

```
 1                 UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS

 3                     No. 05-cr-10088-EFH-1

 4

 5
     UNITED STATES OF AMERICA
 6

 7   vs.

 8
     RUDOLPH J. LIEDTKE and RJL SCIENCES, INC.
 9

10

11                      *********

12

13                 For Plea Hearing Before:
                   Honorable Edward F. Harrington
14

15
                   United States District Court
16                   District of Massachusetts (Boston.)
                     One Courthouse Way
17                 Boston, Massachusetts 02210
                   Tuesday, April 19, 2005
18

19                      ********

20

21
                 REPORTER: RICHARD H. ROMANOW, RPR
22                   Official Court Reporter
                   United States District Court
23       One Courthouse Way, Room 3507, Boston, MA 02210
                       (617) 737-0370
24

25


                                                         2

 1                 A P P E A R A N C E S

 2

     MARY ELIZABETH CARMODY, ESQ.
 3     United States Attorney's Office
       John Joseph Moakley Federal Courthouse
 4     One Courthouse Way, Suite 9200
```

Page 1

Plea Hearing Transcript.txt

```
         Boston, MA 02110
5        (617) 748-3290
         Email: Mary.carmody@usdoj.gov
6    and
     SONDRA L. MILLS, ESQ.
7        Trial Attorney
         United States Department of Justice
8        Office of Consumer Litigation
         P.O. Box 386
9        Washington, D.C. 20044
         (202) 616-2375
10       For the United States of America

11

     SCOTT P. LOPEZ, ESQ.
12       Law Office of Scott P. Lopez
         24 School Street
13       Boston, MA 02108
         (617) 742-5700
14       Email: Lopez@lopezlaw.com
         For the Defendant
15   and
     ROBERT M. KALEC, ESQ.
16       Dean & Fulerson
         801 West Big Beaver Road, 5th Floor
17       Troy, MI 48084
         (248) 362-1300
18       For the Defendant, Pro Hac Vice

19

20

21

22

23

24

25
```

3

```
1            P R O C E E D I N G S

2            (Begins 2:00 p.m.)

3            THE CLERK:  Criminal Action 05-10088, United States

4    versus R. J. Liedtke, et al.

5            THE COURT:  I'm sorry to be late.  I had a

6    meeting.  But I'll hear from the Government.

7            MS. CARMODY:  Good afternoon, your Honor.  My name

8    is Mary Elizabeth Carmody, Assistant United States Attorney.

9    And with me today is Sondra Mills, a trial attorney from the
```

Page 2

Plea Hearing Transcript.txt

10    Department of Justice.  We're here today for an arraignment and
11    an entry of a plea of guilty by the defendant, both the
12    corporation and the individual, to the information.  The
13    defendant has agreed to waive indictment, your Honor.  I have
14    simply forgotten to bring the form with us.  So that Counsel
15    has agreed that we will sign it and file it as soon the hearing
16    is concluded.  Other than that, your Honor, we're ready to go
17    forward on a Rule 11 hearing as well as an agreement.
18             THE COURT:  My understanding is that a Crawford
19    defendant is involved?
20             MS. CARMODY:  Yes, your Honor.
21             THE COURT:  And who is going to plea on behalf of
22    the Crawford defendant?
23             MR. LOPEZ:  Your Honor, good afternoon.  Scott
24    Lopez on behalf of Rudolph Liedtke, RJL Sciences, Inc.  I've
25    filed a notice of appearance in this matter and I've also filed

                                                                    4

1     a motion to admit Attorney Robert Kalec pro hac vice.  At this
2     time I would move to -- I would move this court to allow him to
3     appear pro hac vice.
4             THE COURT:  Okay.
5             MR. LOPEZ:  And with that I'll turn the microphone
6     over to Mr. Kalec, so to speak.
7             MR. KALEC:  Good afternoon, your Honor.
8     Mr. Liedtke appears today on his personal behalf and also as
9     President and principal owner of RJL Sciences and he will
10    represent the corporation, in its corporate capacity, today for
11    the plea.
12             THE COURT:  And how big a corporation is it?
13             MR. KALEC:  Including himself, it has six
14    employees, your Honor.
                              Page 3

Plea Hearing Transcript.txt

15          THE COURT:  And does anyone else own the

16    corporation?

17          MR. KALEC:  There are four other minority owners,

18    your Honor.

19          THE COURT:  And has the -- does it have a board of

20    directors?

21          MR. KALEC:  It does, your Honor.  And we had

22    submitted to the prosecution a corporate resolution authorizing

23    Mr. Liedtke to appear on behalf of the corporation and to enter

24    into the Rule 11 agreement.

25          MS. CARMODY:  And we filed a corporate resolution

☐                                                                5

1    today, your Honor.

2          THE COURT:  All right.  Prior to accepting any plea

3    of an individual nature or on behalf of the corporation, I wish

4    to ask the individual defendant certain questions.  You are

5    going to answer these questions both on your own behalf and on

6    behalf of the corporation.

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  I want to advise you as to certain

9    constitutional rights.  You have a constitutional right to a

10    speedy, public trial by jury.  Do you understand that?

11          THE DEFENDANT:  Yes.

12          THE COURT:  You have a constitutional right to see

13    and hear the evidence against you and to cross-examine

14    witnesses against you.  Do you understand that?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  You have a constitutional right to the

17    processes of this court to compel the attendance of witnesses

18    in your own behalf.  Do you understand that?

19          THE DEFENDANT:  Yes, your Honor.

Page 4

Plea Hearing Transcript.txt

20          THE COURT:  You have a constitutional right to the

21    assistance of counsel, which right you have exercised, and you

22    have a constitutional right to remain silent and not be

23    compelled to incriminate yourself or the corporation.  Do you

24    understand that?

25          THE DEFENDANT:  Yes.


                                                                    6

1          THE COURT:  That in pleading guilty, you are giving

2    up all of those constitutional rights with the exception of the

3    right to counsel.  Do you understand that?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  I wish, also, to advise you that you

6    are not required to establish your innocence, the innocence of

7    the corporation, um, but it's the duty of the Government to

8    prove their case beyond a reasonable doubt.  Do you understand

9    that?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  When you're pleading guilty, you are

12    giving up the so-called presumption of innocence.  Do you

13    understand that?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  Have you advised your attorney of all

16    the circumstances surrounding the charge pending against you

17    and the corporation?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  Has he advised you as to the nature of

20    those charges and any possible defense you or the corporation

21    might have?

22          THE DEFENDANT:  Yes, your Honor.

23          THE COURT:  What is the penalty provided by statute

24    for the offenses to which the individual defendant, the

Page 5

Plea Hearing Transcript.txt

25    corporate defendant is pleading guilty to?

                                                              7

1              MS. CARMODY:  Your Honor, on the charge of
2     conspiracy, the defendant is subject to a term of imprisonment
3     for five years, a fine of $250,000, a term of supervised
4     release of three years, and a mandatory special assessment of
5     100 dollars.  With respect to the corporation, your Honor, the
6     corporation is subject to a fine of $500,000, or twice the
7     gross gain or loss involved in the event, whichever is greater,
8     or both, and a special assessment of 400 dollars.
9              THE COURT:  You understand that that's the
10    statutory penalty provided for the offenses for which you and
11    the corporation are pleading guilty?
12             THE DEFENDANT:  Yes, your Honor.
13             THE COURT:  Has anyone threatened you to change
14    your plea to guilty?
15             THE DEFENDANT:  No, your Honor.
16             THE COURT:  Was there any plea bargain involved in
17    this case?
18             MS. CARMODY:  Yes, your Honor.
19             THE COURT:  And would you advise the Court what
20    that plea bargain consists of?
21             MS. CARMODY:  Yes, your Honor.  We have filed
22    earlier today with the Court a plea agreement for both the
23    individual, Rudolph J. Liedtke, as well as the corporation.
24    With respect to Mr. Liedtke, your Honor, there is a sentencing
25    guidelines calculation that would indicate that his guideline

                                                              8

1     range would be between 30 and 37 months.  Um, that the
2     Government's plea agreement calls for a base offense level of

Page 6

Plea Hearing Transcript.txt

3       6, an enhancement of 16, for the amount of the fraud involved

4       with respect to this case, your Honor.  Um, we have valued the

5       loss at somewhere between, at least, approximately, I would

6       say, your Honor, 2 million dollars, 2.63 million dollars.  With

7       respect to the Government's recommendation, your Honor, we

8       intend, based on the defendant's cooperation, to file a 5K-1

9       motion.  Failing that, your Honor, the Government would

10      recommend a term of imprisonment at the low end of the

11      guidelines.  But we fully expect -- the defendant has agreed to

12      cooperate and that we will be filing that motion at the

13      appropriate time with respect to the individual.

14              THE COURT:  How about with respect to the

15      corporation, what is the recommendation, according to the plea

16      agreement, that you will make with respect to the corporate

17      entity?

18              MS. CARMODY:  With respect to the corporate entity,

19      your Honor, we have made a determination preliminarily based on

20      the corporate defendant's asserted inability to pay any fine,

21      and that they have provided documents that support that

22      assertion, that the recommendation under the plea agreement

23      would be that the corporation pay a fine in the amount of

24      $5,000.  Um, should the corporation be found to have the

25      ability to pay -- we haven't even determined the guidelines

                                                                    9

1       based on the inability to pay.  But should that not be found to

2       be the case down the end of the road, we will recommend a

3       sentence at the low end of the guideline range.

4               THE COURT:  A fine at the low end?

5               MS. CARMODY:  A fine, yes.

6               THE COURT:  Has this plea agreement been reduced to

7       writing?

Plea Hearing Transcript.txt

8          MS. CARMODY:  It has, your Honor.  We have filed

9   both a copy of the individual and the corporate agreement with

10  the Court.

11          THE COURT:  I see.  And just so the record is

12  clear, did you sign that plea agreement with the full

13  understanding of its contents?

14          THE DEFENDANT:  Yes.

15          THE COURT:  And did you sign it after consulting

16  with your attorney?

17          THE DEFENDANT:  Yes.

18          THE COURT:  A reference has been made to a

19  sentencing commission guideline factor.  Um, as we know, as a

20  result of the Booker case, the guidelines, at this time, are

21  advisory, but they are a factor which the sentencing court will

22  take into consideration.  Do you understand that?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  Have you had an opportunity to discuss

25  with your attorney how the advisory sentencing commission

                                                              10

1   guidelines might apply to your case?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  And has he advised you that the exact

4   guideline range applicable to your case cannot be specifically

5   decided until after a presentence report has been concluded?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  And you understand that the Court, um,

8   even though the guidelines are advisory, um, will take them in

9   consideration and either enhance the guideline sentence or

10  depart downward from that guideline range?

11          THE DEFENDANT:  I understand that.

12          THE COURT:  All right.  Is the plea that you're

                              Page 8

Plea Hearing Transcript.txt

13      offering here today, on behalf of yourself and on behalf of the

14      corporate entity, entirely free and voluntary?

15                  THE DEFENDANT:  Yes, your Honor.

16                  THE COURT:  Take the plea.

17                  THE CLERK:  Rudolph J. Liedtke and RJL Sciences,

18      Inc., doing business as RJL Systems, Inc., as to Count 1 of an

19      information charging you with conspiracy to commit an offense

20      against the United States in violation of Title 18 USC Code

21      Section 371, how do you plead, guilty or not guilty?

22                  THE DEFENDANT:  Guilty.

23                  THE COURT:  I think the record, even at this stage,

24      should show that you understand that you have the

25      constitutional right to be charged by way of indictment, but

                                                                    11

1      knowing that, you willingly waive to be prosecuted by way of

2      indictment.  Is that correct?

3                  MR. KALEC:  By way of information.

4                  THE COURT:  By way of information.  Are you willing

5      to be tried or to plea to an information, notwithstanding the

6      fact that you have a constitutional right to be prosecuted by

7      way of indictment, but you are pleading here to an

8      information.  You do that knowingly and willingly, realizing

9      that you have such a constitutional right?

10                  THE DEFENDANT:  Yes, your Honor.

11                  THE COURT:  I would ask the Government to briefly

12      set forth the evidence which it would have introduced were the

13      case to have gone to trial.  You may sit down.

14                  MS. CARMODY:  Your Honor, I would like to say that

15      this is a medical device case and it's quite a complex case.

16      The parties have filed an agreed statement of facts with the

17      Court which sets forth the facts in great detail.  So without

Page 9

Plea Hearing Transcript.txt

18    going into all of the details in the agreed statement of facts,

19    should the case have gone to trial, the Government would have

20    proved that the defendant, RJL Sciences, doing business as RJL

21    Systems -- and I'll refer to them as "RJL," is located in

22    Clinton Township, Michigan.  That RJL manufactured and sold

23    medical devices, including a Bioelectrical Impedance Analysis

24    known as a BIA device, and computer software for use in

25    connection with a BIA device.

                                                                12

1         Commencing in 1996, RJL manufactured and sold the BIA

2     device and computer software together with and pursuant to

3     others who are not specifically named in the information, but

4     for whom the Court -- we have filed with the Court an in-camera

5     submission that will identify, for the Court's purposes, who

6     those entities are.  Mr. Liedtke was the President and

7     principal owner of RJL and Mr. Liedtke directed, participated

8     and controlled and manufactured the sale of the BIA devices as

9     well as the software devices.

10        The BIA device, manufactured by the defendant, is a

11    portable device.  It has two protruding electrodes.  And in

12    order to perform the BIA test, the electrodes are placed on the

13    hands and feet of a human test subject and there's a very low

14    level electrical current that's run through the body.  This

15    measures -- it encounters impedance and it measures the

16    reactance and resistance of the current as it flows through the

17    body.  These measurements, um, generated by the BIA device,

18    were used to estimate the body's composition of humans.

19    Estimates of body compositions were computed by applying these

20    measurements generated by the BIA device to predictive

21    equations.

22        In other words, your Honor, the test is performed on a

                              Page 10

Plea Hearing Transcript.txt

23    human and the device itself gives two measurements, reactance

24    and resistance and the individual performing the test then

25    takes those two numbers and transforms them, takes them and

                                                                    13

1     inputs them into a computer with computer software.

2     Incorporated in the computer software is a predictive equation

3     that then gives different values as a result of that test

4     measurement.  And those measurements are measures of human body

5     composition, lean body mass, fat free mass, and in some

6     instances with respect to this case body, cell mass and other

7     measurements.

8          These predictive equations, which actually give the

9     ultimate measurements, were developed mathematically,

10    calculating the statistical relationship between the resistance

11    and reactance measurement obtained by the BIA test on a sample

12    population of human subjects, actual measurements of body

13    composition for that population.  Prediction equations are used

14    to estimate the body composition of humans and it varies

15    depending on the characteristics and size of the sample

16    population used to develop the equation as well as on the

17    methodology used to measure the body composition within that

18    population.

19         The defendant participated in the development and

20    distribution of various BIA software devices and computer

21    software.  In other words, the device stayed essentially the

22    same, your Honor, but it's the computer software packages that

23    took the measurements and used them to -- with a predictive

24    equation to give other values.  Um, those changed over time.

25    And those computer software were known as -- one is known as

                                                                    14

1     "Body Comp," one is known as "Weight Manager," another is known
                              Page 11

Plea Hearing Transcript.txt

2 as "Fluid and Nutrition," another is known as "Cyprus," and

3 another computer software we'll refer to as the "Y Software,"

4 and they were all used to estimate body composition in humans.

5 The BIA, as well as the computer software devices, were each

6 medical devices within the meaning of the Federal Food, Drug

7 and Cosmetic Act, 21 USC Section 321(H).

8   In order to sell these devices, the defendants could not

9 sell them legally without first obtaining premarket clearance

10 and/or premarket approval from the U.S. Food & Drug

11 Administration.  And it depended -- that approval, whether or

12 not it was a clearance or an approval, depended upon the

13 intended use for which the device was to be put.  The FDA could

14 grant what was called a 510(K) premarket clearance if it

15 determined, following a review of the information submitted, it

16 supported the premarket notification that the device was

17 substantially equivalent to a device that was in existence and

18 marketed in interstate commerce prior to May 26th, 1976.  That

19 device would be known as a "predicate device."  In other words,

20 if the device preexisted the passage of this section of the

21 Food, Drug and Cosmetic Act, then the FDA could clear it.  But

22 that only happened if, among other things, the intended use of

23 the current device was the same intended use as the predicate

24 device.  So if the intended use of the device was different

25 from the predicate device, a substantial equivalent, which is

                     15

1 what the FDA would have to find, it could not be cleared,

2 because it would be a different use.

3   Um, premarket approval and review by the FDA generally

4 entailed, among other things, a review of clinical trials and

5 scientific data offered to confirm the safety and the efficacy

6 of the device as well as a review of the device's labeling, and

Plea Hearing Transcript.txt

7    it also has to include adequate directions for use.  In 1983,

8    the defendants, RJL and Liedtke, filed a 510(K) premarket

9    notification with the FDA's Center for Devices and Radiological

10   Health, seeking premarket clearance for a Body Composition

11   Analyzer, a type of BIA device that was manufactured and sold

12   by RJL.  In that 510(K) submission, the defendant stated that

13   the intended use of the BIA device was to estimate total body

14   water, lean body mass, also known as fat free mass, and fat in

15   healthy humans.  RJL's BIA device was accompanied by a hand-

16   held programmable calculator and computer to facilitate the

17   computation of the estimated total body water, lean body mass,

18   and fat.  After a review of the data submitted in support of

19   that 510(K) submission, the FDA found that the Body Comp

20   Analyzer was substantially equivalent to a device that had been

21   marketed prior to the FDCA Medical Device Amendments of 1976,

22   and they granted premarket clearance to RJL to distribute the

23   device on August 11th, 1983 for the intended use of estimating

24   total body water, lean body mass, and fat in healthy humans,

25   and that was the limitation.

                                                            16

1        During a subsequent inspection of RJL, by the FDA, in

2    1984, the FDA discovered that RJL had been marketing a modified

3    version of the BIA device as well as a computer software device

4    that had not been previously reviewed by the FDA as part of a

5    510(K) submission.  The FDA issued a Notice of Adverse Findings

6    to the defendant, RJL and Liedtke, in January of 1986,

7    informing them that the 1984 inspection revealed that they had

8    been marketing misbranded devices, specifically the modified

9    BIA device and the accompanying computer software device in

10   violation of the FDCA.  In response to the Notice of Adverse

11   Findings, the defendant submitted another 510(K) premarket

Page 13

Plea Hearing Transcript.txt

12      notification for the modified BIA device as well as for the new

13      computer -- the computer software device, accompanying the BIA

14      device on June 24th, 1986.

15           RJL and Liedtke told the FDA that the computer software

16      only performed calculations that previously would have been

17      done by hand to estimate body composition and that the Body

18      Comp Analyzer and its accompanying computer software had the

19      same intended uses as that previously submitted BIA device for

20      estimating total body water, lean body mass, and fat.  The

21      defendants told the CDRH that the intended uses of the BIA

22      device, accompanying this computer software, did not include

23      measuring body cell mass or diagnosing any disease state.  The

24      defendants also described the methods used to develop the

25      prediction equations in the computer software and told CDRH

                                                                      17

1      that the equations were based on a population consisting of 278

2      healthy and obese college students whose body composition was

3      measured through hydrostatic weighing and that total body water

4      measurements of the college students were determined using

5      deuterium oxide dilution, in other words, underwater weighing,

6      your Honor.

7           Based on the representations made by the defendants, RJL

8      and Liedtke, in their 510(K) submission and related

9      communications, the CDRH concluded that the modified Body Comp

10      Analyzer and accompanying computer software were substantially

11      equivalent to a device marketed prior to the Medical Device

12      Amendments of 1976 and they granted premarked clearance to RJL

13      to distribute the Body Comp Analyzer and the accompanying

14      computer software devices on February 3rd, 1987 for the

15      intended uses of estimating total body water, lean body mass,

16      and fat in healthy humans.  At that time, the computer software

                                Page 14

Plea Hearing Transcript.txt

17   device was called "Body Comp."  Later versions of the RJL

18   software, with similar intended uses, were called "Weight

19   Manager."

20        Beginning in, at least, 1994, the defendant, RJL and

21   Liedtke, assisted others in developing a prediction equation

22   that would calculate the BIA resistance and reactance

23   measurements into estimated body cell mass.  This equation,

24   which we'll refer to as the Z equation, estimated body cell

25   mass based on measurements of total body potassium in a

☐                                                              18

1   population that we're going to refer to as the ABC database.

2   That database consisted of approximately 332 humans, including

3   individuals who were healthy, and others who had tested HIV

4   positive.  Beginning, again, in sometime during 1994, the

5   defendants, RJL and Liedtke, developed new computer software

6   for use in interpreting BIA test results that incorporated the

7   Z equation and marketed the software under the name "Fluid and

8   Nutrition Analysis" or FNA.  The FNA software purported to

9   calculate the individual test subject's estimated body cell

10   mass, total body water, intracellular and extracellular water,

11   fat free mass, extracellular tissue and fat.  The FNA software

12   also computed purported "normal ranges" for the individual test

13   subject's total body water and intracellular water and

14   extracellular water.  These normal ranges were calculated by

15   the defendant, RJL and Liedtke, by comparing the individual BIA

16   test results to a select portion of the population included in

17   this ABC database.

18        This FNA software, pursuant to 21 USC Section

19   351(F)(1)(B)(I) required FDA approval before it could be

20   legally marketed.  No application for premarket approval has

21   been submitted to the FDA with respect to the FNA software and

Page 15

Plea Hearing Transcript.txt

22  the device has never been the subject of an approved

23  application for premarket approval under 21 USC Section

24  350(E).  Others marketed and sold the drug known to the United

25  States Attorney and referred to herein as "the drug," which was

□                                                                    19

1   approved by the FDA to treat AIDS wasting, a condition

2   involving profound involuntary weight loss in AIDS patients.

3   At the time the FDA approved the drug, AIDS wasting was an

4   AIDS-defining condition.

5        On or about January of 1995, the defendants met with

6   others regarding the possible use of BIA technology by, um,

7   others known and unknown to the U.S. Attorneys.  Thereafter,

8   between September 1995 and June 1996, the defendant, RJL,

9   shipped approximately 25 BIA devices together with the FNA

10  Version 3.1 software packages to others known and unknown for

11  use in evaluating the body composition in AIDS patients.

12  Commencing as early as September 1996 and continuing thereafter

13  until about January 2002, the defendants, and others knowingly

14  -- and others, knowingly and willfully, combined and conspired

15  and agreed to commit an offense against the United States, that

16  is, the parties to this conspiracy agreed to introduce or

17  deliver for introduction or cause to be introduced or delivered

18  for introduction into interstate commerce and did, in fact,

19  introduce and cause to be introduced and delivered for

20  introduction into interstate commerce with the intent to

21  defraud and to mislead, adulterated medical devices, those

22  devices being the computer software packages that accompanied

23  the BIA device.

24       Specifically, these adulterated devices were BIA

25  computer software packages known as "FNA," known as "Y

Page 16

Plea Hearing Transcript.txt

20

1   Software" and "Cyprus."  They were for use in calculating body

2   cell mass and/or diagnosing AIDS wasting based upon BIA

3   resistance and reactance measurements.  So that was a new

4   intended use, your Honor.  These devices were adulterated

5   within the meaning of Title 21, USC, Section 351(F)(1)(B)(I),

6   and that neither RJL nor Liedtke nor others obtained premarket

7   approval from the FDA to introduce such medical devices into

8   interstate commerce.  And this was all in violation of 18 USC

9   Section 371, Title 21, USC, Section 331(A) and 333(A)(2).

10       It was the purpose of this conspiracy that RJL and

11   Liedtke, with others, introduced or delivered for introduction

12   or caused to be introduced or to be delivered for introduction

13   into interstate commerce adulterated devices in order to

14   increase the market for BIA devices and computer software and

15   to increase the market for the drug.  To that end, RJL and

16   Liedtke and others participated in the development and

17   dissemination of BIA computer software that purported to

18   measure body cell mass for use in diagnosing AIDS wasting based

19   upon a test subject's purported loss of body cell mass.  The

20   disease state of AIDS wasting, which the drug was tested and

21   approved by the FDA, consisted of profound involuntary weight

22   loss and loss of lean body mass in AIDS patients and did not

23   include the loss of body cell mass.  The use of BIA computer

24   software that purported to measure the loss of body cell mass

25   enabled RJL and Liedtke and others to expand the market for BIA

21

1   devices and computer software devices and for others to expand

2   the market for the drug beyond this disease state for which the

3   drug was tested and approved.

4       This conspiracy operated through various manner and

Page 17

Plea Hearing Transcript.txt

5    means.  It was part of the conspiracy to disseminate BIA

6    devices and FNA software to others in order to promote the

7    diagnosis of AIDS wasting as a disease state involving the loss

8    of lean body mass and to thereby promote the prescribing and

9    sale of the drug.  The FNA software was not submitted to the

10   FDA for premarket approval.  It was not approved by the FDA for

11   shipment in interstate commerce for the intended use of

12   measuring body cell mass or diagnosing in AIDS wasting.  The

13   inclusion of the Z equation and the ABC database in the FNA

14   software and the use of the computer software to measure body

15   cell mass as a tool for diagnosing AIDS wasting were new

16   intended uses that required premarket approval from the FDA

17   before their introduction or delivery for introduction into

18   interstate commerce.  It was also part of the conspiracy to

19   develop and disseminate the Y software to others in order to

20   promote the diagnosis of --

21           THE COURT:  So, in essence, what you're saying is

22   that there has been a new intended use and that was not

23   approved?

24           MS. CARMODY:  Exactly, your Honor.  And there were

25   several versions of the software with respect to the BIA.  So

 ☐                                                              22

1    it continued through the FNA software, to the Y software, which

2    had a different population base, that employing the NHANES

3    database rather than the population base of the ABC database,

4    and it used "ideal" measurements and not "normal" measurements

5    in that software.  And that was a --

6           THE COURT:  Let me ask you this question.  Is an

7    application for this -- for these new intended uses that have

8    not been approved been sought?

9           MR. CARMODY:  No, your Honor.

Page 18

Plea Hearing Transcript.txt

10          THE COURT:   No new application whatsoever?

11          MR. CARMODY:   None, your Honor.

12          So it went through the Y software and then it continued

13     through the Cyprus software, which is the last version of the

14     software, again, using the equation and the NHANES database,

15     which was a new database.

16          Um, in addition, your Honor, the parties to the

17     conspiracy engaged in certain overt acts in furtherance of --

18          THE COURT:   You don't have to give me all the overt

19     acts.

20          MS. CARMODY:   Okay.   Generally, your Honor, there

21     were meetings here in Massachusetts, looking for the

22     Massachusetts connection, in which the company that sold the

23     drug is located here in Massachusetts and the defendants came

24     and met with employees of the company, here in Massachusetts,

25     to discuss and to take action with regard to the dissemination

                                                              23

1     of the adulterated devices.   And that continued through March

2     1997 and up through and including 2002.

3          THE COURT:   All right.   Let me ask counsel for the

4     defendant, you've heard the representations made by the United

5     States as to the acts which constitute the violation of law.

6     Is there anything that you wish to contest or to add?

7          MR. KALEC:   No, your Honor, outside of what was

8     submitted in the stipulated statement attached, which was not

9     read into the record by the Assistant United States Attorney.

10          THE COURT:   The entire statement of facts is part

11     of the record in the case, though, that's been submitted?

12          MS. CARMODY:   Yes, your Honor.   We have an agreed

13     statement of facts.   I have not read the entire statement of

14     facts, but I've read three quarters of it.   And it is filed in

Plea Hearing Transcript.txt

15   the record, your Honor.

16          THE COURT:  I understand that you can't promote or

17   sell medical devices that have not been approved.  That's the

18   core of the violation.  My additional question is, has this

19   device caused any harm, is it harmful, in addition to being not

20   approved?  Do you understand?  I understand that medical

21   devices have to be approved and the failure to have them

22   approved is itself a violation of law.  But sometimes, in

23   addition thereto, the device causes harm.  Is there any -- is

24   that factor here in this case or not?

25          MS. CARMODY:  The way it factors in, your Honor --

▯                                                                24

1    the test itself is harmless.  The test itself did not, in any

2    way, cause the patient pain or harm.  The harm is the fraud on

3    -- in particular, the Medicaid system.  This particular drug

4    was paid for, 75 to 80 percent, by the state Medicaid program

5    throughout the United States.  It was a very expensive drug.

6    And so patients, by virtue of this test, who got the drug when

7    they otherwise should either not have gotten the drug or would

8    not have qualified to get the drug, that, therein, lies the

9    harm, your Honor.

10          THE COURT:  Do you wish to add anything?

11          MR. KALEC:  No, your Honor.  There was no physical

12   harm to any patient.

13          THE COURT:  But the representation made by the

14   attorney for the Government is that there was, in a sense,

15   additional expenses paid for by the Medicaid system.  Is that

16   right?

17          MR. KALEC:  That is correct, your Honor.

18          THE COURT:  And that's when you say that the loss

19   or the financial harm is in the area of -- I think you

Page 20

Plea Hearing Transcript.txt

20    indicated 2 million dollars?

21         MS. CARMODY:  Well, that's an important point, your

22    Honor.  I want to make an important distinction here.  And you

23    can see, in the plea agreement, because we go into considerable

24    detail with respect to what was going on here, um, that the

25    defendant conspired with the company to disseminate the

                                                              25

1     adulterated devices and that increased the sales of the drug.

2     And in the plea agreement, at Page 3, we talk about the fact

3     that -- and I think it's an important distinction here, that

4     the defendant committed some act with respect to the company,

5     but the company also committed independent acts of fraud that

6     were not reasonably foreseeable to this defendant.  So that in

7     terms of the sale of the devices from August 14th, 1995 through

8     January 15th, 2002, the total price paid by the company for the

9     sale of these devices was a little over a million dollars,

10    $1,031,583.25.  In Paragraph 4 on Page 3, it says, in

11    determining the guideline calculation:  "The Government

12    contends that from 1997 to 2002, the company received more than

13    100 million dollars in sales for this drug."  However, at the

14    end of that paragraph, the Government takes the position that

15    -- and the parties agree that it was reasonably foreseeable

16    that many of the acts of fraud committed by the company and its

17    employees were not known or reasonably foreseeable to this

18    defendant.  So that it was reasonably foreseeable, however,

19    that the sales of the drug would increase as a result of the

20    use of the devices.  It is impossible to calculate, your Honor,

21    exactly where you factor that in.  So that the parties have

22    agreed that the total fraud loss that was reasonably

23    foreseeable would have been at least equal to the amount of the

24    sale of the devices, otherwise the company wouldn't have

                              Page 21

Plea Hearing Transcript.txt

25    invested in a device where it was going to lose money,

                                                                26

1     basically.  So that's where we come to a figure of

2     approximately 2 million dollars in fraud loss with respect to

3     the adulterated devices.

4               THE COURT:  Anything further?

5               MR. KALEC:  No, your Honor.

6               THE COURT:  All right.  I'd ask the defendant, are

7     you presently under a doctor's care?

8               THE DEFENDANT:  No, your Honor.

9               THE COURT:  Have you taken any medicine, pills or

10    drugs today?

11              THE DEFENDANT:  No, your Honor.

12              THE COURT:  Have you ever been under psychiatric

13    care?

14              THE DEFENDANT:  No, your Honor.

15              THE COURT:  So you understand the nature of these

16    proceedings and that you've pled guilty to the one count

17    information, both on your own behalf and on behalf of the

18    corporation?

19              THE DEFENDANT:  Yes, your Honor.

20              THE COURT:  Counsel, do you know any reason why the

21    Court should not accept the pleas of guilty?

22              MR. KALEC:  None, your Honor.

23              THE COURT:  I'm going to ask the defendant.  Have

24    you had sufficient time to discuss this matter with your

25    attorney?

                                                                27

1               THE DEFENDANT:  Yes, your Honor.

2               THE COURT:  And are you satisfied with his

3     representation of you?

Page 22

Plea Hearing Transcript.txt

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  I find that the pleas have been

6    voluntarily and knowledgeably offered with an understanding of

7    their possible consequences.  I further find that there is an

8    independent basis for accepting the pleas and therefore

9    I accept the pleas of guilty and order that they be entered in

10   this case.

11         Disposition in this case is set for -- what is the

12   date?  September 13th 2005 at 2:00.  Any need for bail?

13         MR. KALEC:  Your Honor, we met with Pretrial

14   Services this morning.  I have reviewed his report.  The

15   recommendation is personal recognizance with a condition that

16   Mr. Liedtke not apply for a passport and travel be limited to

17   the United States.  We'd ask the Court to accept the

18   recommendation from Pretrial.

19         MS. CARMODY:  No objection, your Honor.

20         THE COURT:  All right.  So ordered.  All right.

21   I'll see you on the 13th of September.

22         (Adjourned, 2:45 p.m.)

23

24

25


☐                                                                28

1                  C E R T I F I C A T E

2

3

4

5

6

7     I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do
hereby certify that the foregoing record is a true and
8    accurate transcription of my stenographic notes on
                         Page 23

Plea Hearing Transcript.txt
Tuesday, April 19, 2005 before Honorable Edward F.
9    Harrington, to the best of my skill and ability.

10

11

12

13

14

15    _____

      RICHARD H. ROMANOW
16

   17

18

19

20

21

22

23

24

25