## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 |
| | ) | CIVIL ACTION:  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) ) ) ) | Judge Patti B. Saris |

## <u>FOURTH AMENDED MASTER CONSOLIDATED CLASS ACTION COMPLAINT</u>

## <u>AMENDED TO COMPLY WITH COURT'S CLASS CERTIFICATION ORDER</u>

## <u>REDACTED VERSION</u>

# TABLE OF CONTENTS

<div align="right">Page</div>

I.  INTRODUCTION ..........................................................................................................1

II.  JURISDICTION AND VENUE ....................................................................................4

III.  PARTIES .........................................................................................................................5

    A.  PLAINTIFFS ........................................................................................................5

        1.  Proposed Class 1 Representatives (Medicare Part B Beneficiaries).................5

        2.  Proposed Class 2 Representatives (MediGap Payors) ....................................11

        3.  Proposed Class 3 Representatives (TPPs and Consumers for AWP-Based Charges on Physician Administered Drugs Outside of Medicare)......................................................................................................14

        4.  Public Interest Group Plaintiffs .....................................................................24

    B.  DEFENDANTS ...................................................................................................27

        1.  Abbott ...............................................................................................................27

        2.  Amgen ..............................................................................................................28

        3.  AstraZeneca .....................................................................................................28

        4.  The Aventis Group (Aventis, Pharma, Hoechst and Behring).......................29

        5.  Baxter...............................................................................................................30

        6.  Bayer ................................................................................................................31

        9.  The BMS Group (Oncology Therapeutics; Apothecon).................................32

        10.  Dey, Inc............................................................................................................33

        11.  The Fujisawa Group (Fujisawa Healthcare, Fujisawa USA)...........................34

        12.  The GSK Group (GlaxoSmithKline, SmithKline Beecham, Glaxo Wellcome)..........................................................................................................34

        13.  Immunex ...........................................................................................................36

        14.  The Johnson & Johnson Group (J&J, Centocor, Janssen, NcNeil, Ortho) ......36

<div align="center">- i -</div>

|  | 15. | Pfizer, Inc. ....................................................................................................37 |
|---|---|---|
|  | 16. | The Pharmacia Group (Pharmacia and Pharmacia & Upjohn)........................38 |
|  | 17. | The Schering-Plough Group (Schering Plough & Warrick)............................39 |
|  | 18. | The Sicor Group (Sicor and Gensia)...............................................................40 |
|  | 20. | Watson ............................................................................................................41 |

IV.  GENERAL ALLEGATIONS APPLICABLE  TO ALL DEFENDANTS..............................41

A.   THE AWP SYSTEM ..................................................................................................42

B.   THE DEFENDANT DRUG MANUFACTURERS COMMIT AWP
     FRAUD TO INCREASE MARKET SHARE FOR THEIR DRUGS
     COVERED BY MEDICARE PART B ........................................................................44

     1.   The Medicare Insurance Program ....................................................................44

     2.   Congressional and Other Federal Investigations and Actions .........................47

     3.   Certain of the Defendants Drug Manufacturers' Fraudulent Conduct
          Within the Medicare Part B Program................................................................49

C.   THE DEFENDANT DRUG MANUFACTURERS' USE OF AWP FRAUD
     TO INCREASE AND MAINTAIN THE PRICE OF DRUGS OUTSIDE
     OF THE MEDICARE PART B CONTEXT ...............................................................51

D.   THE DEFENDANT DRUG MANUFACTURERS' USE OF AWP
     FRAUD TO INCREASE AND MAINTAIN VOLUME AND MARKET
     SHARE FOR GENERIC AND MULTI-SOURCE DRUGS .......................................54

E.   DEFENDANTS' CONCEALMENT OF THE TRUTH .............................................59

F.   TOLLING OF APPLICABLE STATUTES OF LIMITATION ..................................60

V.   EXAMPLES OF SPECIFIC UNLAWFUL CONDUCT ........................................................61

A.   ABBOTT......................................................................................................................61

     1.   Abbott Has Been The Target of Government Investigations............................63

     2.   Abbott Controls the Published AWP for Its Products .....................................64

     3.   Abbott's AWP Manipulation Benefited Providers at the Expense of the
          Class..................................................................................................................64

     4.   Specific Abbott AWPs Documented by the DOJ .............................................65

     5.   Additional Evidence Concerning Vancomycin ................................................66

|   |   | 6. | Additional Evidence for Amikacin ..................................................................67 |
|   |   | 7. | Inflated AWPs From Abbott Price Lists..........................................................67 |
| B. | AMGEN .......................................................................................................................69 |
|   |   | 1. | The Drugs at Issue and Their Competitive Environment ................................69 |
|   |   | 2. | Amgen's Definition and Understanding of AWP ............................................71 |
|   |   | 3. | Amgen Controls the Published AWP for Its Products.....................................71 |
|   |   | 4. | Amgen Understands the Importance of Reimbursement Rates ........................72 |
|   |   | 5. | Specific Examples of AWP Abuse ..................................................................74 |
|   |   | 6. | Amgen Rebates on Epogen..............................................................................77 |
|   |   | 7. | Amgen Concealed Its AWP Manipulation ......................................................78 |
| C. | ASTRAZENECA...........................................................................................................78 |
|   |   | 1. | AstraZeneca Has Been the Target of a Government Investigation..................80 |
|   |   | 2. | AstraZeneca's Definition and Understanding of AWP ...................................80 |
|   |   | 3. | AstraZeneca Controls the Published AWP for Its Products ............................81 |
|   |   | 4. | AstraZeneca's AWP Manipulation Benefited Providers at the Expense of the Class ..........................................................................................81 |
|   |   | 5. | AstraZeneca Manipulated and Marketed the AWP for Zoladex ....................82 |
| D. | THE AVENTIS GROUP (AVENTIS, PHARMA, HOECHST AND BEHRING) ....87 |
|   |   | 1. | Aventis Has Been the Target of Government Investigations...........................89 |
|   |   | 2. | Aventis' Definition and Understanding of AWP............................................89 |
|   |   | 3. | Aventis Controls the Published AWP for Its Products ...................................90 |
|   |   | 4. | Aventis' AWP Manipulation Benefited Providers at the Expense of the Class ..........................................................................................90 |
|   |   | 5. | Specific Aventis AWPs Documented by the DOJ ...........................................92 |
|   |   | 6. | Additional Evidence Concerning Anzemet ....................................................93 |
|   |   | 7. | Additional Evidence Concerning Gammar......................................................94 |
|   |   | 8. | Inflated AWPs From Aventis' Price Lists ......................................................95 |

9.   Aventis Concealed its AWP Manipulation ......................................................96

E.   BAXTER .............................................................................................................96

1.   Baxter Has Been the Target of Government Investigations ...........................98

2.   Baxter's Definition and Understanding of AWP ...........................................98

3.   Baxter Controls the Published AWP for its Products ....................................99

4.   Baxter's AWP Manipulation Benefited Providers at the
     Expense of the Class ......................................................................................99

5.   Specific Baxter AWPs Documented by the DOJ .........................................100

6.   Evidence Concerning Gammagard S/D (immune globulin solution) ...........101

7.   Inflated AWPs From Baxter's Price Lists ...................................................101

8.   Baxter Provided Free Goods and Other Incentives ......................................103

F.   BAYER ............................................................................................................103

1.   Bayer Has Been the Target of Government Investigations ..........................104

2.   Bayer Controls the Published AWP for Its Products ...................................105

3.   Bayer's AWP Manipulation Benefited Providers at the
     Expense of the Class ....................................................................................105

4.   Specific Bayer AWPs Documented by the DOJ ..........................................106

5.   Inflated AWPs From Bayer's Price Lists .....................................................107

6.   Bayer Provided Free Goods and Other Incentives .......................................107

7.   Bayer Concealed Its AWP Manipulation .....................................................108

I.   THE BMS GROUP (BRISTOL-MYERS, OTN AND APOTHECON) ....................108

1.   The BMS Group Has Been the Target of Government Investigations ..........109

2.   The BMS Group Controls the Published AWP for Its Products ...................110

3.   BMS's AWP Manipulation Benefited Providers at the
     Expense of the Class ....................................................................................111

4.   Specific BMS AWPs Documented by the DOJ ...........................................112

5.   Other AWPs Related to VEPESID (etoposide) ...........................................112

6.   Other AWPs Related to Blenoxane...................................................112

7.   The BMS Group Provided Free Goods and Other Incentives ......................113

J.   DEY ...............................................................................................115

1.   Dey Has Been the Target of Government Investigations ...............................116

2.   Dey Controls the Published AWP for Its Products..........................................117

3.   Dey's AWP Manipulation Benefited Providers at the
     Expense of the Class...........................................................................118

4.   Specific Dey AWPs Documented by the DOJ.................................................119

5.   Inflated Dey AWPs From Dey's Price Lists...................................................120

6.   Dey Provided Free Goods and Other Incentives...........................................120

7.   Dey Has Concealed Its AWP Manipulation ...................................................121

K.   THE FUJISAWA GROUP (FUJISAWA PHARMACEUTICAL,
     FUJISAWA HEALTHCARE,  FUJISAWA USA)...................................................121

1.   Fujisawa Has Been the Target of Government Investigations.......................123

2.   Fujisawa Controls the Published AWP for Its Products ...............................123

3.   Fujisawa's AWP Manipulation Benefited Providers at the
     Expense of the Class ...........................................................................123

4.   Specific Fujisawa AWPs Documented by the DOJ.......................................125

5.   Inflated AWPs From Fujisawa Price Lists....................................................125

L.   THE GSK GROUP (GLAXOSMITHKLINE, SMITHKLINE BEECHAM,
     GLAXO WELLCOME)...........................................................................127

1.   The GSK Group Has Been the Target of Government
     Investigations ...................................................................................130

2.   The GSK Group's Definition and Understanding of AWP ...........................130

3.   The GSK Group Controls the Published AWP for Its Products ....................130

4.   The GSK Group's AWP Manipulation Benefited Providers at
     the Expense  of Plaintiffs and the Class........................................................131

5.   Glaxo's Zofran® ................................................................................132

6.   SKB's Kytril ......................................................................................137

|   | 7. | General Counsel Correspondence Between Glaxo and SKB | 138 |
|   | 8. | Other Improper Incentives | 140 |
|   | 9. | Specific GSK Group AWPs Documented by the DOJ | 141 |
| M. | | IMMUNEX | 142 |
|   | 1. | Immunex Has Been the Target of Government Investigations | 142 |
|   | 2. | Immunex Definition and Understanding of AWP | 143 |
|   | 3. | Immunex Controls the Published AWP for its Products | 143 |
|   | 4. | Immunex's AWP Manipulation Benefited Providers at the Expense of the Class | 144 |
|   | 5. | Specific Immunex AWPs Documented by the DOJ | 145 |
|   | 6. | Inflated AWPs From Immunex Price Lists | 146 |
|   | 7. | Immunex Concealed Its AWP Manipulation | 147 |
| N. | | THE JOHNSON & JOHNSON GROUP (J&J, CENTOCOR AND ORTHO) | 147 |
|   | 1. | The Johnson & Johnson Group Has Been the Target of Government Investigations | 150 |
|   | 2. | J&J Concealed Its AWP Manipulation | 152 |
| P. | | PFIZER | 152 |
| Q. | | THE PHARMACIA GROUP (PHARMACIA AND P&U) | 154 |
|   | 1. | The Pharmacia Group Has Been the Target of Government Investigations | 155 |
|   | 2. | Pharmacia's Definition and Understanding of AWP | 156 |
|   | 3. | The Pharmacia Group Controls the Published AWP for Its Products | 156 |
|   | 4. | The Pharmacia Group's AWP Manipulation Benefited Providers at the Expense of the Class | 157 |
|   | 5. | Specific Pharmacia AWPs Documented by the DOJ | 160 |
|   | 6. | Inflated Pharmacia AWPs From Pharmacia's Price Lists | 162 |
|   | 7. | The Pharmacia Group Provided Free Goods and Other Incentives | 162 |

R.  THE SCHERING-PLOUGH GROUP (SCHERING-PLOUGH AND WARRICK)......................................................................................................163

1.  The Schering Plough Group Has Been the Target of Government Investigations ........................................................................................................165

2.  The Schering Plough Group Controls the Published AWP for Its Products................................................................................................................167

3.  The Schering Plough Group's AWP Manipulation Benefited Providers at the Expense of the Class.............................................................167

4.  The DOJ Specifically Documented AWP Inflation for Albuterol Sulfate......................................................................................................169

5.  The Schering Plough Group Provided Free Goods and Other Incentives............................................................................................................170

S.  THE SICOR GROUP (SICOR, GENSIA AND GENSIA SICOR) ..........................171

1.  The Sicor Group Has Been the Target of Government Investigations ..........172

2.  The Sicor Group Controls the Published AWP for Its Products....................172

3.  The Sicor Group's AWP Manipulation Benefited Providers at the Expense of the Class .........................................................................................173

4.  Specific Sicor Group AWPs Documented by the DOJ..................................174

5.  Inflated Sicor Group AWPs From the Sicor Group's Price Lists..................175

6.  The Sicor Group Provided Free Goods and Other Incentives ......................176

U.  WARRICK...................................................................................................................176

V.  WATSON ....................................................................................................................176

1.  Watson Has Been the Target of Government Investigations.........................178

2.  Watson's Definition and Understanding of AWP .........................................178

3.  Watson Controls the Published AWP for Its Products ..................................178

4.  Watson's AWP Manipulation Benefited Providers at the Expense of the Class ................................................................................................................179

5.  Specific Watson AWPs Documented by the DOJ .........................................179

6.  Inflated Watson AWPs From Watson's Price Lists.......................................180

7.  Watson Provided Free Goods and Other Incentives......................................181

        8.      Watson Concealed Its AWP Manipulation ...................................................181

VI.    DIRECT DAMAGE SUSTAINED BY PLAINTIFFS AND THE MEMBERS OF THE AWP CLASS....................................................................181

VII.   CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME...........................182

       COUNT I_VIOLATIONS OF 18 U.S.C. § 1962(C) (AGAINST DEFENDANT DRUG MANUFACTURERS IDENTIFIED HEREIN FOR UNLAWFUL CONDUCT ASSOCIATED WITH AWPID DRUGS)...........................................186

       COUNT II_VIOLATIONS OF 18 U.S.C. § 1962(C) (AGAINST DEFENDANT DRUG MANUFACTURERS IDENTIFIED HEREIN)...........................................215

       COUNT III_DECLARATORY AND OTHER RELIEF PURSUANT TO 28 U.S.C. §§ 2201, 2002 (AGAINST DEFENDANT DRUG MANUFACTURERS FOR UNLAWFUL CONDUCT ASSOCIATED WITH PHYSICIAN-ADMINISTERED AND MEDICARE PART B COVERED DRUGS)................................................................................242

       COUNT IV_VIOLATIONS OF CONSUMER PROTECTION STATUTES .....................243

       COUNT V VIOLATION OF CONSUMER PROTECTION LAWS – MEDICARE PART B CO-PAY SUB-CLASS .............................................................................245

       COUNT VI.....................................................................................................251

       (VIOLATIONS OF CONSUMER PROTECTION LAWS – THIRD-PARTY PAYORS PART B MEDIGAP CLASS).................................................................251

       COUNT VII ...................................................................................................256

       (VIOLATIONS OF CONSUMER PROTECTION LAWS – PHYSICIAN-ADMINISTERED CLASS FOR CONSUMERS AND TPPS)..........256

       COUNT IX CIVIL CONSPIRACY (AGAINST ALL DEFENDANTS IDENTIFIED HEREIN FOR CONSPIRING WITH PBMS) .................................264

VIII.  PRAYER FOR RELIEF ........................................................................................274

IX.    DEMAND FOR JURY TRIAL ..............................................................................275

Plaintiffs, by and through their counsel, upon personal knowledge as to their own acts and beliefs, and upon information and belief as to all other matters based upon the investigations of counsel, allege as follows:

## I.      INTRODUCTION

1.      This case is brought by Plaintiffs as a proposed class action on behalf of consumers, self-insured employers, health and welfare plans, health insurers and other end payors for prescription drugs (the "Class") against certain pharmaceutical companies (referred to as the "Defendant Drug Manufacturers").

2.      For the last decade, the Defendant Drug Manufacturers have conspired with others in the pharmaceutical distribution chain, including but not limited to physicians and hospitals (hereafter "medical providers" or "providers"), pharmacy benefit managers ("PBMs") and various publishing entities, to collect inflated prescription drug payments from Plaintiffs and the Class.

3.      More specifically, the Defendant Drug Manufacturers report to trade publications a drug price – the Average Wholesale Price (or "AWP") -- that for many drugs is deliberately set far above the prices that these drugs are available in the marketplace.  The AWPs for these drugs are deliberately false and fictitious and created solely to cause Plaintiffs and the Class members to overpay for drugs.  Because all drugs administered under Medicare Part B are priced based on the published AWPs, the Defendant Drug Manufacturers inflate AWP reimbursement rates to enable providers and others to make secret profits through overcharges to patients, their insurers and other end payors.  This, in turn, motivates the providers to sell and administer the drugs with the most inflated AWPs, resulting in increased market share and profit for the Defendant Drug Manufacturers and inflated payments for drugs by individual patients (through co-pays or direct payments), health plans and insurers.

- 1 -

4.     For drugs reimbursed by Medicare Part B (which generally, but not always, require administration in a provider's office), the health care providers administer the drugs and are reimbursed by Medicare based on the inflated AWP.  Thus, the providers benefit by pocketing the "spread" between the AWP and the actual cost that they pay for the drugs, and the Defendant Drug Manufacturers benefit by increasing the sales of their drugs that are covered by Medicare Part B ("Covered Drugs") and by increasing their market share.  In some cases, the Defendant Drug Manufacturers also provide chargebacks, rebates, hidden price discounts and/or other unlawful financial inducements, including free samples, to further increase the provider's spread and, therefore, their incentive to prescribe a particular Defendant Drug Manufacturer's product.  Those discounts are not used by the Defendant Drug Manufacturers in calculating the published AWPs, resulting in their inflation.

5.     The use of AWP is not limited to Medicare reimbursement.  Rather, AWP is a benchmark from which hundreds of drug prices are derived in transactions throughout the pharmaceutical distribution chain.  For "Part B covered drugs" administered outside of the Medicare Part B context, non-Medicare patients and health plans pay for these drugs based on the inflated AWP with an intermediary (for example, a pharmacy benefit manager) pocketing the "spread" between the AWP and the actual cost that the intermediaries pay for these drugs.  And similar to the benefit that the Defendant Drug Manufacturers obtain through the AWP scheme for Part B drugs, the Defendant Drug Manufacturers also benefit from the AWP scheme with respect to these drugs by increasing the sales of their particular AWP-inflated drugs and their market share for those drugs.  The use of AWP as a benchmark for reimbursement is also not limited to Part B drugs being administered outside of Medicare, but extends to thousands of other drugs as well.  And again, with respect to these non-Part B drugs, it is the end payor, be it a health plan or private insurer, that pays the inflated amount.  All others in the distribution chain,

- 2 -

be they wholesalers, pharmacies or pharmacy benefit manufacturers, benefit from the spread between AWP and actual costs.

6.      Thus, in a perversion of the type of competitive behavior expected in a market not subject to illegal manipulation, the Defendant Drug Manufacturers often promote their drugs not based on lower prices, but by the use of reimbursement rates based on a fictitious and inflated AWP that allows purchasers and intermediaries (including providers and PBMs) to make inflated profits – and the Defendant Drug Manufacturers to increase their market share – at the expense of Plaintiffs and the Class. The Class, as further defined below, consists of all purchasers of drugs whose AWPs were inflated ("AWP End Payor Class").

7.      The Defendant Drug Manufacturers also caution providers and other intermediaries that the success of the high profit scheme will be jeopardized if anyone discloses the significantly lower prices actually paid for the drugs (allowing the scheme to be concealed and to continue). All Defendants actively conceal, and caused others to conceal, information about the true pricing structure for the prescription drugs, including the fact that the AWPs for the drugs are deliberately overstated. And, all those in the distribution chain also conceal the rebates, free samples, educational grants and other economic rewards which they receive, but which are not reflected in calculating AWP.

8.      In response to the Court's Order on the motion to dismiss, plaintiffs have prepared a list of each of the specific drugs that are the subject of the claims herein. This list is attached as Exhibit A to the Complaint. The drugs identified in Exhibit A will be referred to herein as the AWP Inflated Drugs ("AWPID" or "AWPIDs"). And, in Appendix A, plaintiffs identify the AWP that is the subject of this Complaint for each drug currently at issue pursuant to this Court's Order. Appendix B details which AWPIDs were purchased by each plaintiff.

- 3 -

## II.    JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, 18 U.S.C. § 1964(c), and because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.  The Court also has diversity jurisdiction on Counts IX and X pursuant to 28 U.S.C. § 1332(a) as there is diversity between plaintiff Board of Trustees of Carpenters and Millwrights of Houston and Vicinity Welfare Trust Fund and each Defendant, and the amount in controversy exceeds $75,000.  Those claims are asserted only on behalf of this plaintiff as the named plaintiff.

10.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  To the extent necessary, the District Court should retain jurisdiction over all parties pursuant to 28 U.S.C. § 1367 as the claims against all parties are related to the claims upon which original jurisdiction is based.

11.     A substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial District, and Defendants may be found within this judicial District.  Venue is proper in this jurisdiction under 28 U.S.C. § 1391 and 18 U.S.C. § 1965.  Defendants implemented their fraudulent marketing scheme in this District, as well as nationwide, through providers and sales representatives who reside or transact business in this District and thereby affected Class Members, who similarly reside or transact business in this District.

12.     The Judicial Panel on Multidistrict Litigation has, by Order dated April 30, 2002, ordered all related cases in the *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, MDL Docket Number 1456, transferred to the District of Massachusetts for coordinated or consolidated pre-trial proceedings.

- 4 -

## III.   PARTIES

### A.   Plaintiffs

13.   With the exception of the Public Interest Group Plaintiffs, each of the Plaintiffs identified below have, upon information and belief, were charged for the drugs noted based on a formula incorporating AWP.

### 1.   Proposed Class 1 Representatives (Medicare Part B Beneficiaries)

14.   Plaintiff Leroy Townsend is a resident of Naples, Florida. During the time period relevant to this Complaint, he was a Medicare recipient who took Zoladex and paid a 20% co-payment.

15.   Plaintiff Susan Aaronson resides in Matthews, North Carolina. Mrs. Aaronson, the wife of a local minister, is a Medicare beneficiary with supplemental insurance coverage through her church. Mrs. Aaronson lives with breast cancer and is currently being treated for ovarian cancer. During the applicable time period, Ms. Aaronson was prescribed, and was charged for, the following physician-administered drugs, based in whole or in part on AWP: albumin (manufactured by co-conspirators Aventis Group and Baxter), albuterol sulfate (Dey, the GSK Group, and the Schering-Plough Group), bacitracin (Pfizer), bupivacaine (Abbott), carboplatin injectable (Baxter, the BMS Group), cefazolin sodium (Baxter, and the GSK Group), cisplatin (Baxter, the BMS Group, and the Sicor Group), darbepoetin alfa (Amgen), dexamethasone sodium phosphate (Baxter, the Fujisawa Group, the Sicor Group, and Watson), dextrose injectable (Abbott, AstraZeneca, and Baxter), dextrose sodium chloride (Abbott), diltiazem hydrochloride injectable (Abbott, Baxter and the Sicor Group), diphenhydramine injectable (Baxter, Pfizer, and the Pharmacia Group), enoxaparin sodium (the Aventis Group), epinephrine (Abbott, Dey and the Sicor Group), epoetin alfa (the Johnson & Johnson Group and Amgen), famotidine (Abbott and Baxter), fentanyl citrate (Abbott, AstraZeneca, Baxter, and the Johnson & Johnson Group), furosemide (Abbott, the Aventis Group, and Baxter), glycopyrrolate injectable (Abbott, Baxter, the Sicor Group, and the Wyeth Group), heparin sodium (Abbott,

- 5 -

Baxter, Pfizer, and the Pharmacia Group), hetastarch sodium chloride injectable (Baxter and the BMS Group), hydromorphone injectable (Abbott, AstraZeneca and Baxter), ipratopium bromide (Dey), lidocaine hydrochloride injectable (Abbott, AstraZeneca and Baxter), magnesium sulfate injectable (Abbott and the Sicor Group), midazolam hydrochloride (Abbott, Baxter and Hoffman-La Roche), morphine sulfate injectable (Abbott, AstraZeneca and the BMS Group), neostigmine methylsulfate (Abbott, Baxter, and the Sicor Group), odansetron (the GSK Group), paclitaxel, (the BMS Group), pegfilgrastim (Amgen), phenylephrine (Baxter and the Sicor Group), plicamycin (Bayer), potassium chloride (Abbott and Baxter), promethazine injectable (Abbott, Baxter, the Sicor Group, and Watson), ringers lactated with dextrose injectable (Abbott and Baxter), propofol injectable (Abbott, AstraZeneca, Baxter, Pfizer, and the Sicor Group), sodium chloride (Abbott, the Aventis Group, Baxter, the Schering-Plough Group, and the Sicor Group), succinylcholine chloride injectable (Abbott), and vercuronium bromide injectable (Abbott, Baxter and the Sicor Group).  To date, Mrs. Aaronson has paid several thousands of dollars for these and other prescription drug medications.  Although Mrs. Aaronson had supplemental insurance coverage, the coverage required her to make percentage co-payments. Mrs. Aaronson is a proposed class representative for, among other defendants, Aventis, Baxter, BMS, Dey, Fujisawa, GSK, Johnson & Johnson, Sicor and Watson.

16.     Plaintiff Harold Carter resides in Austin, Texas, and is a 74 year-old, retired wholesale florist.  He is a Medicare beneficiary who currently receives partial assistance from Sterling to help defray a portion of his co-insurance obligations under Medicare Part B for his medical care and treatment.  Mr. Carter takes prescription drugs for coronary artery disease and other medical conditions, including prostate cancer.  During the applicable time period, Mr. Carter was prescribed, and was charged for, the following physician-administered prescription drugs, based in whole or in part on AWP:  adenosine (Abbott and Fujisawa), darbepoetin alfa (Amgen), and epoetin alfa (Amgen and the Johnson & Johnson Group).  It has been difficult for

- 6 -

Mr. Carter to pay for the high cost of these and other medications, as his supplemental insurance required him to make percentage payments.  On a least one occasion Mr. Carter's doctor did not prescribe a medication because Mr. Carter could not pay for it.  Mr. Carter is a proposed class representative for Abbott, Amgen and Fujisawa.

17.     Plaintiff Roger Clark is representing the estate of his father, David E. Clark.  Mr. Clark resided in Tonto Basin, Arizona, and was a Medicare beneficiary with secondary insurance through the Operating Engineers American Benefit Plan.  Berfore he died, Mr. Clark was treated for prostate cancer and inoperable brain cancer.  During the applicable time period, Mr. Clark was prescribed, and was charged for, among others, the following physician-administered prescription drugs, based in whole or in part on AWP:  cefazolin (Baxter, the BMS Group, and GSK), cefotetan disodium (the BMS Group), ciprofloxacin hydrochloride (Abbott, Baxter, Bayer, and the Schering-Plough Group), cisplatin (Baxter, the BMS Group, and the Sicor Group), dexamethasone acetate (Watson), dexamethasone sodium phosphate (Baxter, Fujisawa, the Sicor Group, and Watson), dextrose injectable (Abbott, AstraZeneca and Baxter), enalaprilat injectable (Abbott, Baxter and the Sicor Group), epoetin alfa (Amgen and the Johnson & Johnson Group), etoposide (Bedford, Genesia), famotidine (Abbott and Baxter), fentanyl citrate (Abbott, AstraZeneca, Baxter, and the Johnson & Johnson Group), granisetron (the GSK Group and Hoffman-LaRoche), hetastarch sodium chloride injectable (Baxter and the BMS Group), hydromorphone injectable (Abbott, AstraZeneca and Baxter), labetalol injectable (Abbott and Baxter), lidocaine hydrochloride injectable (Abbott, AstraZeneca and Baxter), methylsulfate (the Fujisawa Group), midazolam hydrochloride (Abbott, Baxter and Hoffman-La Roche), morphine sulfate injectable (Abbott, AstraZeneca and the BMS Group), potassium chloride (Abbott, Baxter and Pfizer), ranitidine (the GSK Group), and sodium chloride (Abbott, the Aventis Group, Baxter, the Schering-Plough Group, and the Sicor Group).  Mr. Clark has made payments for the foregoing drugs totaling nearly $10,000.00 to date, as his supplemental insurance required him to

- 7 -

make percentage payments for his drugs. Mr. Clark is a proposed class representative for, among other defendants, Abbott, Aventis, Baxter, GSK, J&J and Sicor.

18.     Plaintiff Robert Howe resides in Mapleton, Oregon, and is a 79 year-old Medicare beneficiary, with supplemental insurance coverage through United Health Care of Utah. Before he died, Mr. Howe was treated for prostate cancer. During the applicable time period, Mr. Howe was prescribed, and was charged for, among others, the following physician-administered drugs, based in whole or in part on AWP: dexamethasone sodium phosphate (Baxter, the Fujisawa Group, the Sicor Group, and Watson), docetaxel (the Aventis Group), gentamicicin sulfate (Abbott, Baxter, the Fujisawa Group, and Watson), goserelin acetate (AstraZeneca), granisetron (the GSK Group and Hoffman-LaRoche), novatrone (Immunex) and pegfilgrastim (Amgen). Mr. Howe has made payments for the foregoing drugs, as his supplemental insurance required him to make percentage payments for his drugs. Mr. Howe is a proposed class representative for, among other defendants, Amgen, AstraZeneca, Aventis, GSK, Sircor and Watson.

19.     Plaintiff James Monk resides in Lake Village, Arkansas and is a 81 year old Medicare recipient with supplemental insurance. During the applicable time period, Mr. Monk was prescribed, and was charged for, among others, the following physician-administered drugs, based in whole or in part on AWP: casodex (AstraZeneca), eligard (Aventis). Mr. Monk has made payments for the foregoing drugs, as his supplemental insurance requires him to make percentage payments. Mr. Monk is a proposed class representative for, among other defendants, Aventis.

20.     Plaintiff James Shepley resides in Reno, Nevada, and is an 85 year-old Medicare beneficiary, with secondary insurance coverage through United American. Mr. Shepley is living with prostate cancer. During the applicable time period, Mr. Shepley was prescribed, and was charged for, the following physician-administered prescription drugs, based in whole or in part on AWP: epoetin alfa (Amgen and the Johnson & Johnson Group), goserelin acetate

- 8 -

(AstraZeneca). Mr. Shepley has made payments for the foregoing drugs. Although Mr. Shepley had supplemental insurance coverage, the coverage required him to make percentage co-payments. Mr. Shepley is a proposed class representative for, among other defendants, AstraZeneca and J&J.

21.     Plaintiff Larry Young is representing the Estate of Patricia K. Young, his late wife. Before she died, Mrs. Young resided in Enid, Oklahoma where her husband still resides. She was a Medicare beneficiary as a result of a longstanding disability, with supplemental insurance through United Healthcare that covered only a portion of her co-insurance obligation for prescription drugs under Medicare Part B. She received medication for rheumatoid arthritis, Hepatitis C, and lymphoma, the disease that ultimately caused her death. During the applicable time period, Mrs. Young was prescribed, and was charged for, among others, the following physician-administered prescription drugs manufactured and sold by the defendant companies, based in whole or in part on AWP: anzemet (Aventis), aristocort (Fujisawa), cytoxan (the BMS Group, Pfizer, and the Pharmacia Group), dexamethasone acetate (Abbott, Bayer and Watson), dexamethasone sodium phosphate (Baxter, the Fujisawa Group, the Sicor Group, and Watson), dolasetron mesylate (the Aventis Group), dopamine hydrochloride (Abbott, Baxter, and the BMS Group), epirubicin (Pfizer and the Pharmacia Group), epoetin alfa (Amgen), fentanyl citrate (Abbott, AstraZeneca, Baxter, and the Johnson & Johnson Group), filgrastim (Amgen), heparin sodium (Abbott, Baxter, Pfizer, and the Pharmacia Group), hydrocortisone sodium succinate (Pfizer and the Pharmacia Group), infliximab (the Johnson & Johnson Group), ketorolac tromethamine (Abbott and Baxter), levofloxacin (Abbott and the Johnson & Johnson Group), lidocaine hydrochloride injectable (Abbott, AstraZeneca and Baxter), lorazepam injectable (Abbott, Baxter, and Watson), methotrexate sodium injectable (Baxter, Immunex, and the Wyeth Group), midazolam (Abbott, Baxter and Hoffman-LaRoche), moxifloxacin injectable (Bayer and the Schering-Plough Group), oprelvekin (the Wyeth Group), promethazine (Abbott, Baxter, the

- 9 -

Sicor Group, and Watson), protonix injectable (the Wyeth Group), solucortef (Pharmacia), triamcinolone acetonide (the BMS Group), vancomycin sulfate (Abbott, Baxter, and Watson), vincristine sulfate (the Pharmacia Group and the Sicor Group), and warfarin sodium injectable (the BMS Group). At various times throughout the course of Mrs. Young's treatment, the Youngs' made payments via credit card to meet their payment obligations to their various medical providers. To date, the Youngs made many payments for the foregoing drugs, as their supplemental insurance requires them to make percentage payments. The Estate of Patricia Young is a proposed class representative for, among other defendants, Abbott, Amgen, Aventis, Baxter, BMS, Fujisawa, J&J, Pfizer, Sicor and Watson.

22.     Plaintiff Virginia Newell is representing the Estate of William Newell. Mr. Newell was a resident of Mooresville, North Carolina. Mr. Newell took prescription drug medications for diabetes and osteoparothis. He was a Medicare recipient with supplemental insurance through the American Association of Retired Persons. During the applicable time period, Mr. Newell was prescribed, and was charged for, among others, the following physician-administered drugs, based in whole or in part on AWP:  epoetin alfa (Amgen and the Johnson & Johnson Group), viadur (the Johnson & Johnson Group), taxotere (Aventis) and levaquin (the Johnson & Johnson Group). The Newells made payments for the foregoing drugs, as their supplemental insurance did not cover the full cost of their drugs. The Estate of William Newell is a proposed class representative for, among other defendants, Amgen, AstraZeneca, BMS, J&J and Aventis.

23.     Plaintiff Oral Ray Roots resides in Wichita, Kansas and is an 82 year old Medicare recipient with supplemental insurance through AETNA. During the applicable time period, Mr. Roots was prescribed, and was charged for, among others, the following physician-administered drugs, based in whole or in part on AWP:  albuterol sulfate (Dey, the GSK Group, and the Schering-Plough Group) and depo provera (Pfizer). Mr. Roots has made payments for

- 10 -

the foregoing drugs because his supplemental coverage required him to make payments for them. Mr. Roots is a proposed class representative for, among other defendants, Dey, Pfizer and Schering-Plough.

24.    Plaintiff Hunter G. Walters resides in Bandalia, Michigan and is a Medicare recipient with no supplemental insurance. Mr. Walters receives medication for emphysema and prostate cancer. During the applicable time period, Mr. Walters was prescribed, and was charged for, among others, the following physician-administered drugs, based in whole or in part on AWP: albuterol sulfate (Dey, the GSK Group, and the Schering-Plough Group) and ipratropium bromide (Dey). Mr. Walters has made payments for the foregoing drugs. Mr. Walters is a proposed class representative for, among other defendants, Dey and Schering Plough.

### 2.    Proposed Class 2 Representatives (MediGap Payors)

25.    Plaintiff United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund ("UFCW") is an employee welfare benefit plan and employee benefit plan maintained pursuant to Section 302(c)(5) of the LMRA, and is an employee welfare benefit plan established and maintained pursuant to ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. UFCW maintains its principal place of business in Cook County, Illinois. During the Class Period, UFCW has been billed for and paid charges for AWPIDs, including: Abbott's sodium chloride, gentamicin sulfate, furosemide, heparin lock flush and dextrose; Baxter's sodium chloride and dextrose; Bedford's leucovorin calcium; Sicor's leucovorin calcium; Pharmacia's methylprednisolone sodium; Aventis' Furosemide; Immunex' leucovorin calcium and Johnson & Johnson's Remicade. UFCW also made payments for drugs outside of the Medicare Part B context based on published AWPs. All of UFCW drugs that are at issue in the Complaint are identified in Appendix B. From December 2000 to the present, UFCW has contracted with a PBM to administer its prescription drug benefit for its beneficiaries. For brand name drugs its contract expressly provides that reimbursement is at

- 11 -

"AWP less 13%." For generic drugs its reimbursement is also based on AWP. Prior to December 2000, UFCW contracted with pharmacies for the payment of purchases of pharmaceutical drugs by its members and beneficiaries at an estimated acquisition cost based on the AWPs (less a specified percentage) published by the manufacturers in Medispan.

26.     UFCW's beneficiaries began to and have continued to be reimbursed for their purchases of physician-administered drugs pursuant to UFCW's comprehensive medical expense benefit, its major medical plan. *See* United Food and Commercial Workers Unions and Employers Midwest Health Benefits Plan, P001294-1417. UFCW made payments for physician-administered drugs based on published AWPs. Since November 1, 1994, UFCW's comprehensive medical expense benefit has been administered by Blue Cross Blue Shield of Illinois ("BCBS"). Until January 1, 2005, when BCBS' payments for physician-administered drugs began to be established considering ASP, BCBS' payments were based on a negotiated allowance which was established considering a percentage above AWP. For physician-administered drugs not covered by Medicare Part B, UFCW paid 80% or 85% of BCBS' payments, and the UFCW member paid the remainder. Further, UFCW has made co-payments under Medicare Part B throughout the Class Period. A member's 20 percent co-payment under Medicare Part B is, and has been, an eligible expense under UFCW's plans during the Class Period. If Medicare pays a portion of a Fund member's claim under Medicare Part B, UFCW reimburses the remainder of the claim.

27.     For transactions that occurred after October 31, 2004, Plaintiff UFCW is able to determine for which drugs it reimbursed and by how much it reimbursed by performing a computer search of its claims files. Such files also show which of its covered members had an amount due and owing after UFCW made its reimbursement of the claim.

28.     Plaintiff Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("PMBT") is a voluntary employee benefits association maintained pursuant to the federal

- 12 -

Employee Retirement Security Act, 29 U.S.C. § 1132, *et seq.*, and to the settlement of a federal court action (Case No. 3:94-0573) brought in the United States District Court for the Middle District of Tennessee against Pirelli Armstrong Tire Corp. ("Pirelli") in the early 1990's by many Pirelli retirees, for the purpose of providing health and medical bnefits to eligible participants and beneficiaries. PMBT maintains its principal place of business in Goodlettsville, Sumner County, Tennessee.

29. During the Class Period, PMBT also reimbursed its members for portions of pharmaceutical bills (including physician-administered drugs) that were covered in the first instance by Medicare Part B. The plan expressly states that it pays 20 percent of all covered Medicare Part B claims. The fund notified that Medicare Part B has covered a given drug or procedure and has paid 80 percent of the cost. The fund then pays the identified "coinsurance" amount, or 20 percent of the total cost Medicare has paid. Numerous drugs fall into this category. Based on a recent review of a small number of our files, PMBT has determined that, with respect to drugs manufactured by the Track 1 Defendants (Astra-Zeneca, Bristol-Myers-Squibb, Glaxo-Smith-Kline and Johnson & Johnson), PMBT made Medicare co-payments with respect to at least the following drugs: Zovirax (Glaxo Smith Kiline), Zoladex (Astra-Zeneca), Cytoxan (Bristol-Myers-Squibb), and Procrit (Johnson & Johnson). Because the fund is composed of retirees, about two-thirds of whom are eligible for Medicare, and because the search was only of a relatively small number of files, plaintiffs are confident that further investigation will show that other drugs were paid for in the Medicare Part B context with respect to the various companies known in this case as "Track 1" and "Track 2" Defendants. Our investigation is continuing.

30. Plaintiff Sheet Metal Workers National Health Fund ("SMW Health Fund") is a Taft-Hartley trust administered pursuant to the requirements of 29 U.S.C. § 186 by an equal number of trustees appointed by labor representatives and union representatives. Its Fund Office

- 13 -

is in Goodlettsville, Tennessee. The SMW Health Fund is also a multiemployer welfare fund subject to ERISA. The SMW Heath Fund provides a Supplemental Medicare Wraparound Plus ("SMW+") program that covers the Medicare Part B co-payments of its beneficiaries. There are over 15,000 retirees and covered beneficiaries who receive benefits under the SMW+ program. During the Class Period, the SMW Health Fund has paid for portions of pharmaceutical bills that were covered in the first instance by Medicare Part B. The drugs for which payments were made include Cytoxan (BMS), Etopophos (BMS), Kytril (GSK), Levaquin (J&J), Nevelbine (GSK), Paraplatin (BMS), Procrit (J&J), Remicade (J&J), Rubex (BMS), Taxol (BMS), Vepesid (BMS) and Zoladex (AstraZeneca), and drugs manufactured by Abbott, Amgen, Aventis, Baxter, Bayer, Dey, Fujisawa, Genesia, Immunex, Pfizer, Pharmacia, Sicor and Watson.

31.    Plaintiff Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBSMA") is a not-for-profit hospital and medical services corporation organized under the laws of Massachusetts, and has its principal place of business in Boston, Massachusetts and is a proposed class representative for Class 2 as against Track 1 defendants. At all times relevant to this action, BCBSMA has been, and is, licensed to do, and is doing, business in the state of Massachusetts. During the Class Period BCBSMA has made co-payments under Medicare Part B for AWPIDs for Track 1 Defendants, including: BMS's Cytoxan, Etopophos, Rubex, Belnoxane, Paraplantin, Vepesid, and Taxol; GSK's Kytril, Zofran, Zantac, Alkeran, Nalvelbine; Shearing's Procrit and Intron-A; AstraZenaca's Zoladex and Pulmicort; and Johnson & Johnson's Remicade, as part of its medigap insurance product known as Medex.

### 3.    Proposed Class 3 Representatives (TPPs and Consumers for AWP-Based Charges on Physician Administered Drugs Outside of Medicare)

32.    UFCW is also a proposed representative for this Class.

33.    Plaintiff Board of Trustees of Carpenters and Millwrights of Houston and Vicinity Welfare Trust Fund ("CMHV") is an employee welfare benefit plan and employee benefit plan established and maintained pursuant to Section 302(c)(5) of the Labor Management Relations

- 14 -

Act ("LMRA"), 29 U.S.C. § 186(c)(5), and as defined by §§ 1002(1) and (3) of the Employee
Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, for the purpose of
providing health benefits to eligible participants and beneficiaries. As such, CMHV is a legal
entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d). CMHV maintains
its principal place of business at 9555 West Sam Houston Parkway South, Suite 400, Houston,
Texas. During the Class Period, Carpenters Welfare Trust Fund has been billed for and paid
charges for Covered Drugs and otherwise made payments for drugs outside of the Medicare Part
B context based on published AWPs. These drugs are identified in Appendix B. During the
period relevant to the complaint, CMHV used an administrator to provide medical and drug
benefits to its members. CMHV's administrator contracted directly with a PBM to provide
pharmacy services to CMHV participants. By contract, all of CMHV's drug purchases were
directly and expressly tied to AWP. CMHV paid for brand named drugs in both the retail and
mail order context based on AWP minus a fixed percentage. For generic drugs in the retail
context CMHV paid based upon MAC, which itself was tied to AWP and in the mail order
context CMHV's generic purchases were made at either MAC or AWP minus a fixed
percentage. By contract, the AWP used to determine prices was based on that published by
"First Databank Blue Book."

34.     Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity
("THWF") is an employee welfare benefit plan and employee benefit plan established and
maintained pursuant to Section 302(c)(5) of the LMRA, and is an employee welfare benefit plan
established and maintained pursuant to §§ 1002(1) and (3) of ERISA, for the purpose of
providing health benefits to eligible participants and beneficiaries. As such, THWF is a legal
entity entitled to bring suit in its own name pursuant to 29 U.S.C. 1132(d). THWF maintains its
principal place of business at Fourth & Cherry Streets, Philadelphia, Pennsylvania 19106. It
provides comprehensive health coverage for over 28,000 participants and beneficiaries in parts

- 15 -

of Pennsylvania, New Jersey and Delaware. During the Class Period, THWF has been billed for and paid charges for AWPIDs. THWF also made payments for drugs outside of the Medicare Part B context based on published AWPs. All drugs covered by this Complaint purchased by this plaintiff are identified in Appendix B. THWF uses the services of a PBM to administer its prescription drug program. Based upon its contracts it pays for brand name drugs at AWP minus a fixed percentage, and pays for generics based on MAC, which is itself based on AWP. It also pays for certain drugs outside the PBM context and does so based on AWP.

35.     Plaintiff Twin Cities Bakery Workers Health and Welfare Fund ("TCBW") is a jointly administered Taft-Hartley Fund established and maintained pursuant to Section 302(c)(5) of the LMRA, and is an employee welfare benefit plan established and maintained pursuant to ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. TCBW maintains its principal place of business in Eagan, Minnesota. As such, TCBW is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d). TCBW provides health benefits, including prescription drug benefits, to approximately 2000 active participants, and their spouses and dependants. During the Class Period, TCBW has been billed for and paid charges for AWPIDs. TCBW also made payments for drugs outside of the Medicare Part B context based on published AWPs. The drugs purchased by TCBW at issue in this litigation are identified in Appendix B. TCBW contracts with a third-party administrator for administration of its pharmacy and medical benefits programs. This administrator in turn contracts with pharmacies and reimburses the pharmacies based upon published AWPs. For example, a typical agreement with a pharmacy providing services to TCBW members provides that reimbursement is at "AWP minus 10%." It further provides that the AWP is determined by Medispan. As for generics, reimbursement is based on MAC, which in turn is derived from AWP.

36.     Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("PFTHW") is a voluntary employee benefits plan organized pursuant to § 501(c) of the Internal

- 16 -

Revenue Code for the purpose of providing health benefits to eligible participants and beneficiaries. PFTHW maintains its principal place of business in Philadelphia, Pennsylvania. PFTHW provides health benefits, including prescription drug benefits, to approximately 20,000 active participants, and their spouses and dependents. During the class period, PFTHW has been billed for and paid charges for covered drugs and otherwise made payments for drugs outside of the Medicare Part B context based on published AWPs. These drugs are identified in Appendix B. During the period relevant to this Complaint PFTHW used a PBM to provide prescription services for its members. At all times its payment formula for both brand name and generic drugs was expressly tied to AWP.

37.    Plaintiff Man-U Service Contract Trust Fund ("Man-U Service Fund") is a trust fund established and maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5), and is an employee benefit plan established and maintained pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.*, for the purpose of providing health benefits, including prescription drug coverage, to eligible participants and beneficiaries. The Man-U Service Fund maintains its principal place of business at 4600 Powder Mill Road, Suite 100, Beltsville, Maryland 20705. The Manu-U Service Fund provides comprehensive health coverage, including prescription drug coverage, for approximately 1,200 participants and beneficiaries located in Maryland, Delaware, Virginia, North Carolina, Pennsylvania and Washington, D.C. All of Man-U Service Fund's drugs at issue in the Complaint are identified in Appendix B. Plaintiff Man-U Service Fund utilizes the services of a PBM and all of its contracts provide that its drug purchases are directly based on AWP. For example, for drugs purchased through the pharmacy, its contract provides for payment at "AWP – 16%," and for mail-order drugs, "AWP – 23%."

38.    BCBSMA is also a proposed representative for Class 3 as against Track 1 defendants. During the Class Period, BCBSMA made payments for drugs outside of the

- 17 -

Medicare Part B context based on published AWPs from Track 1 Defendants. All of BCBSMA drugs that are at issue in the Complaint are identified in __________. BCBSMA contracts to reimburse providers based on fee schedules generated by BCBSMA which fee schedules relating to physician administered drugs are based on the AWP for those drugs.

39. Pipefitter's Local Union 357 ("Pipefitters") is an employee welfare benefit plan and employee benefit plan maintained pursuant to Section 302(c)(5) of the LMRA and is an employee welfare benefit plan established and maintained pursuant to ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. Pipefitters maintains its principal place of business in Allston, Massachusetts. During the Class Period, Pipefitters has been billed for and paid charges for AWPIDs outside of the Medicare Part B context based on published AWPs. All of Pipefitters drugs that are at issue in the Complaint are identified in Exhibit ______. During the Class Period Pipefitters contracted with a third-party administrator, BCBSMA, to administer its prescription drug benefit for its beneficiaries. Pipefitter's Reimbursement for AWPIDs is based on fee schedules generated by BCBSMA which fee schedules relating to physician administered drugs are based on the AWP for those drugs.

40. In addition, from 2002 through 2003, plaintiff William Barnewolt paid out-of-pocket amounts for Procrit (J&J), Arenesp (Amgen), Furosemide (Abbott), and Infed (Watson). Plaintiff William Barnewolt is represented in this action by plaintiff Bonnie Barnewolt, as a successor in interest to William Barnewolt. The amounts Mr. Barnewolt paid were based on AWP. Mr. Barnewolt was a beneficiary of the UFCW Fund. The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

41. Plaintiff Cheryl Barreca is a resident of Schaumburg, Illinois. In 1997, 1998, and 2001, Ms. Barreca paid out-of-pocket amounts for Procrit (J&J), Rubex (BMS), Cytoxan (BMS), Kytril (GSK), and Dexamethasone Sodium. Kytril (granisetron HCL) is a physician

administered injectable drug marketed by GSK, which is used to relieve suffering from nausea and vomiting as a result of chemotherapy and radiation therapy. The amounts she paid were based on AWP. Ms. Barreca is a beneficiary of the UFCW Fund. The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

42.    Plaintiff Cynthia Byrski is a resident of Chicago Heights, Illinois. In 2002, Ms. Byrski paid out-of-pocket amounts for Rubex (BMS), Kytril (GSK), Cytoxan (BMS), and Dexamethasone Sodium. The amounts she paid were based on AWP. Ms. Byrski is a beneficiary of the UFCW Fund. The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

43.    Plaintiff Mary Cauble is a resident of Granite City, Illinois. In 2004, Ms. Cauble paid out-of-pocket amounts for Rubex (BMS), Dextrose, Dexamethasone Sodium, and Heparin Sodium. The amounts she paid were based on AWP. Ms. Cauble is a beneficiary of the UFCW Fund. The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

44.    Plaintiff Anna Choice is a resident of Chicago, Illinois. From 2000 through 2005, Ms. Choice paid out-of-pocket amounts for Rubex (BMS), Zofran (GSK), Cytoxan (BMS), Heparin, Dexamethasone Sodium, and Taxotere (Aventis). Taxotere (docetaxel) is a physician administered injectable drug marketed by Aventis, which is used to treat locally advanced cancers following the failure of chemotherapy. The amounts she paid were based on AWP. Ms. Choice is a beneficiary of the UFCW Fund. The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting co-insurance amounts paid by plan participants, are based on AWP.

- 19 -

45.    Plaintiff Joyce Dison is a resident of Toulon, Illinois. In 2000 and 2001, Ms. Dison paid out-of-pocket amounts for Rubex (BMS), Cytoxan (BMS), Dexamethasone Sodium, and Anzemet (Aventis). The amounts she paid were based on AWP. Ms. Dison is a beneficiary of the UFCW Fund. The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

46.    Plaintiff Tracy Garcia is a resident of Oak Lawn, Illinois. In 2004 and 2005, Ms. Garcia paid out-of-pocket amounts for Rubex (BMS), Cytoxan (BMS), Albuterol (Schering-Plough), Neulasta (Amgen), Heparin, Sodium Chloride, Anzemet (Aventis), and Dexamethasone Sodium. The amounts she paid were based on AWP. Ms. Garcia is a beneficiary of the UFCW Fund. The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

47.    Plaintiff Donna Kendall is a resident of Decatur, Illinois. From 2002 to 2004, Ms. Kendall paid out-of-pocket amounts for Cytoxan (BMS), Kytril (GSK), Rubex (BMS), Procrit (J&J), Dexamethasone Sodium, Sodium Chloride, Lorazepam (Abbott), and Taxotere (Aventis). The amounts she paid were based on AWP. Ms. Kendall is a beneficiary of the UFCW Fund. The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

48.    Plaintiff Sandra Leef is a resident of Chicago, Illinois. In 2001, Ms. Leef paid out-of-pocket amounts for Cytoxan (BMS), Dexamethasone Sodium, Anzemet (Aventis), Lorazepam (Abbott), and Fluorouracil (Fujisawa). The amounts she paid were based on AWP. Ms. Leef is a beneficiary of the UFCW Fund. The UFCW Fund is administered by Blue

- 20 -

Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

49.      Plaintiff Gerald Miller is a resident of Peoria, Illinois.  In 2004 and 2005, Mr. Miller paid out-of-pocket amounts for Paraplatin and Dexamethasone Sodium manufactured by BMS.  The amounts he paid were based on AWP.  Mr. Miller is a beneficiary of the UFCW Fund, which is administered by Blue Cross/Blue Shield of Illinois, which charges for physician-administered drugs based on AWP, and any co-payments are based upon AWP.

50.      Plaintiff Joseph Miller is a resident of Merrillville, Indiana.  In 1997 and 1998, Mr. Miller paid out-of-pocket amounts for Zofran (GSK), Heparin Sodium, Cisplatin (Baxter), Furosemide (Abbott), and Dexamethasone Sodium.  The amounts he paid were based on AWP. Mr. Miller is a beneficiary of the UFCW Fund.  The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

51.      Plaintiff Constance Nelson is a resident of McHenry, Illinois.  In 2000 and 2002, Ms. Nelson paid out-of-pocket amounts for Rubex (BMS), Zofran (GSK), Cytoxan (GSK), Heparin, Procrit and Dexamethasone Sodium.  The amounts she paid were based on AWP.  Ms. Nelson is a beneficiary of the UFCW Fund.  The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

52.      Plaintiff Andrea Palenica is a resident of Oak Lawn, Illinois.  In 2000 and 2005, Ms. Palenica paid out-of-pocket amounts for Cytoxan (BMS), Kytril (GSK), Dexamethasone Sodium (Watson), Leucovorin Calcium (Sicor), and Dextrose (Baxter).  Upon information and belief, the amounts Ms. Palenica paid were based on AWP.  Ms. Palenica is a beneficiary of the UCFW Fund, which is administered by Blue Cross/Blue Shield of Illinois, which has previously

- 21 -

testified that its charges for physician-administered drugs, and the resulting co-insurance amounts paid by plan participants, are based on AWP.

53.     Plaintiff Regina Shoemaker is a resident of Crown Point, Indiana. In 1996 and 1997, Ms. Shoemaker paid out-of-pocket amounts for Cytoxan (BMS) and Dextrose. The amounts she paid were based on AWP. Ms. Shoemaker is a beneficiary of the UFCW Fund. The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

54.     Plaintiff Scott Tell is a resident of Freeport, Illinois. In 1999, 2000 and 2004, Mr. Tell paid out-of-pocket amounts for his wife Rhonda's medications, including Kytril (GSK), Paraplatin (BMS), Heparin and Dexamethasone Sodium. The amounts he paid were based on AWP. Mr. Tell is a beneficiary of the UFCW Fund. The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

55.     Plaintiff Kenneth Vanderwal is a resident of Dyer, Indiana. In 2003 and 2004, Mr. Vanderwal paid out-of-pocket amounts for Remicade (J&J). The amounts he paid were based on AWP. Mr. Vanderwal is a beneficiary of the UFCW Fund. The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

56.     Plaintiff Pauline Vernick is a resident of Buffalo Grove, Illinois. In 2002, Ms. Vernick paid out-of-pocket amounts for Cytoxan (BMS), Rubex (BMS), Sodium Chloride, Heparin, Anzemet (Aventis), and Dexamethasone Sodium. The amounts she paid were based on AWP. Ms. Vernick is a beneficiary of the UFCW Fund. The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

- 22 -

57.     Plaintiff Mardolyn Vescovi is a resident of Shorewood, Illinois.  In 2002, Ms. Vescovi paid out-of-pocket amounts for Cytoxan (BMS), Rubex (BMS), Procrit (J&J), Heparin, Dexamethasone Sodium and Anzemet (Aventis).  The amounts she paid were based on AWP. Ms. Vescovi is a beneficiary of the UFCW Fund.  The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

58.     Plaintiff Susan Wessels is a resident of Rock Falls, Illinois.  In 2004 and 2005, Ms. Wessels paid out-of-pocket amounts for Zoladex (AstraZeneca).  The amounts she paid were based on AWP.  Ms. Wessels is a beneficiary of the UFCW Fund.  The UFCW Fund is administered by Blue Cross/Blue Shield of Illinois whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

59.     Plaintiff Kathleen Weaver-Zech is a resident of Chicago, Illinois.  In 2003, Mrs. Weaver-Zech paid out-of-pocket amounts for Remicade.  The amounts she paid were based on AWP.  Mrs. Weaver-Zech was a beneficiary of the UFCW Fund, which is administered by Blue Cross Blue Shield of Illinois, whose charges for physician-administered drugs, and the resulting amounts paid by plan participants, are based on AWP.

60.     Rebecca Hopkins resides in North East, Pennsylvania, and is a 49 year-old who has been privately insured through Blue Cross/Blue Shield of Pennsylvania for most of the applicable time period.  However, for a portion of her medical care and treatment, Mrs. Hopkins had no insurance coverage and had to pay 100% of the cost of her care, amounting to thousands of dollars, which care included physician-administered drugs for which she paid out of pocket. Mrs. Hopkins received medication for ovarian cancer.  During the applicable time period, Mrs. Hopkins was prescribed, and was charged for, the following physician-administered drugs, based in whole or in part on AWP: azithromycin (Pfizer), bleomycin sulfate (the BMS Group and the Pharmacia Group), carboplatin injectable (the BMS Group and Baxter), cefuroxime (Baxter),

- 23 -

cisplatin (Baxter, the BMS Group, and the Sicor Group), doxycycline (Pfizer), etoposide phosphate (the BMS Group, the Pharmacia Group, and the Sicor Group), minocycline (the Wyeth Group), paclitaxel (the BMS Group), tamoxifen (AstraZeneca), and vancomycin sulfate (Abbott, Baxter, and Watson).  Mrs. Hopkins has made payments for the foregoing drugs.  Mrs. Hopkins is a proposed class representative for, among other defendants, BMS.

61.     George Baker Thomson resides in Gulfport, Florida, and is a 78 year-old who is privately insured through Wellcare.  Mr. Thomson is living with prostate cancer.  During the applicable time period, Mr. Thomson was prescribed, and was charged for, the following physician-administered drugs, based in whole or in part on AWP:  goserelin acetate (AstraZeneca) and triptorelin pamoate (Pfizer and the Pharmacia Group).  Mr. Thomson has made payments for the foregoing drugs.  Although Mr. Thomson had insurance coverage, the coverage required him to make percentage co-payments.  Mr. Thomson is a proposed class representative for, among other defendants, AstraZeneca.

62.     Each of the plaintiffs is either producing complete documentation or is in the process of obtaining medical records.

###     4.     Public Interest Group Plaintiffs

63.     Plaintiff Vermont Public Interest Research Group ("VPIRG") has been Vermont's leading watchdog and advocacy group since 1972.  It is located at 141 Main Street, Ste. 6, Montpelier, Vermont.  During the Class Period, VPIRG's members purchased prescription pharmaceuticals manufactured and/or distributed by the Defendant Drug Manufacturers and made inflated payments or co-payments based in whole or in part on published AWPs, and were injured by the illegal conduct alleged herein.  For example, Ms. Elizebeth Ryan Cole of Thetford, Vermont, an active VPIRG member, purchased the Johnson & Johnson Group's drug Retin-A based in whole or in part upon the published AWP and Ms. Dawn Taylor of Hinesburg, Vermont, an active VPIRG member, purchased BMS's drug Plavix in whole or in part based

- 24 -

upon Defendants' published AWP. As an unincorporated association, VPIRG has standing to pursue this action under Fed. R. Civ. P. 17(b)(1). VPIRG appears in this action for purposes of seeking declaratory, injunctive and other non-monetary relief pursuant to 28 U.S.C. §§ 2201, 2202, § 16 of the Clayton Act and any other applicable statute.

64.    Plaintiff Wisconsin Citizen Action ("WCA") is the state's premiere public interest organization with 53,000 individual members and 250 affiliate organizations. It is located at 1202 Williamson St., Suite B, Madison, Wisconsin. During the Class Period, Plaintiff's members purchased prescription pharmaceuticals manufactured and/or distributed by the Defendant Drug Manufacturers and made inflated payments or co-payments based in whole or in part upon the published AWP, and were injured by the illegal conduct alleged herein. For example, Ms. Ida Johnson of Oconomowoc, Wisconsin, and active WCA member, purchased Pfizer's drug Lipitor in whole or in part based upon Defendants' published AWP. As an unincorporated association, WCA has standing to pursue this action under Fed. R. Civ. P. 17(b)(1). WCA appears in this action for purposes of seeking declaratory, injunctive and other non-monetary relief pursuant to 28 U.S.C. §§ 2201, 2202, §16 of the Clayton Act and any other applicable statute.

65.    Plaintiff New York StateWide Senior Action Council ("StateWide") is a grassroots membership organization made up of individual senior citizens and senior citizen clubs from all parts of New York State. It is located at 275 State Street, Albany, New York. During the Class Period, StateWide's members purchased prescription pharmaceuticals manufactured and/or distributed by the Defendant Drug Manufacturers, made inflated payments or co-payments based in whole or in part upon published AWPs, and were injured by the illegal conduct alleged herein. For example, Ms. Mary Jane Snyder of Clifton Park, New York, an active StateWide member, purchased AstraZenaca's drugs Prilosec and Nexium, BMS's drug Tequin, and Schering's drugs Clarinex and K-Dur based in whole or in part on Defendants'

- 25 -

published AWPs. As an unincorporated association, StateWide has standing to pursue this action under Fed. R. Civ. P. 17(b)(1). StateWide appears in this action for purposes of seeking declaratory, injunctive and other non-monetary relief pursuant to 28 U.S.C. §§ 2201, 2202, §16 of the Clayton Act and any other applicable statute.

66.     Plaintiff Citizen Action of New York ("CANY") is a coalition of labor, senior citizen, women's, student, tenant and community organizations that works with community activists for social and economic justice. It is located at 94 Central Avenue, Albany, New York. During the Class Period, CANY's members purchased prescription pharmaceuticals manufactured and/or distributed by the Defendant Drug Manufacturers, made inflated payments or co-payments therefore based in whole or in part on published AWPs, and were injured by the illegal conduct alleged herein. For example, Ms. Marilyn Gourley of Binghamton, New York, an active CANY member, purchased Pfizer's drug Zoloft based in whole or in part upon Defendants' published AWPs. As an unincorporated association, CANY has standing to pursue this action under Fed. R. Civ. P. 17(b)(1). CANY appears in this action for purposes of seeking declaratory, injunctive and other non-monetary relief pursuant to 28 U.S.C. §§ 2201, 2202, §16 of the Clayton Act and any other applicable statute.

67.     Plaintiff Citizens for Consumer Justice ("CCJ") is a Pennsylvania nonprofit umbrella organization that promotes affordable, quality health care. It is located at Architects Building, 117 South 17th Street, Suite 311, Philadelphia, Pennsylvania. During the Class Period, CCJ's members purchased prescription pharmaceuticals manufactured and/or distributed by the Defendant Drug Manufacturers, made inflated payments or copayments based in whole or in part on published AWPs, and were injured by the illegal conduct alleged herein. For example, Ms. Patricia Pudyk of Aliquippa, Pennsylvania, an active CCJ member, purchased AZ's drug Nexium in whole or in part based upon Defendants' published AWP. As an unincorporated association, CCJ has standing to pursue this action under Fed. R. Civ. P. 17(b)(1). CCJ appears

- 26 -

in this action for purposes of seeking declaratory, injunctive and other non-monetary relief pursuant to 28 U.S.C. §§ 2201, 2202, § 16 of the Clayton Act and any other applicable statute.

**B.    Defendants**

68.    The acts charged in this Complaint as having been done by the Defendants were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of the Defendants' business or affairs.

69.    Various other individuals, partnerships, sole proprietors, business entities, companies and corporations, presently unknown to Plaintiffs and not named as Defendants in this Complaint, participated as co-conspirators in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof.  Such unknown persons or entities acted as co-conspirators and aided, abetted or participated with Defendants in the commission of the wrongful acts alleged in this Complaint.

**1.    Abbott**

70.    Defendant Abbott Laboratories ("Abbott") is an Illinois corporation with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois.  Abbott is a diversified health care company that discovers, develops, manufactures, and markets health care products and pharmaceuticals.  Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products.  Abbott reported revenues for the year 2000 of approximately $13.7 billion and net earnings of $2.8 billion.

71.    Abbott, one of the world's largest pharmaceutical companies, is in the business of manufacturing prescription medications for clinical distribution by Medicare Plan B providers nationwide.  The drugs manufactured by Abbott and covered by Medicare Part B include, but may not be limited to:  acetylcysteine, acyclovir, amikacin sulfate, calcitriol, cimetidine hydrochloride, clindamycin phosphate, dextrose, dextrose sodium chloride, diazepam,

- 27 -

furosemide, gentamicin sulfate, heparin lock flush, metholprednisolone sodium succinate, sodium chloride, tobramycin sulfate, vancomycin, and zemplar.

72.     Abbott is also sued herein in its capacity as a participant in the Together Rx conspiracy.

**2.     Amgen**

73.     Defendant Amgen Inc. ("Amgen") is a Delaware corporation with its principal place of business at One Amgen Drive, Thousand Oaks, California. Amgen is a biotechnology corporation that focuses its research and development efforts on drugs related to nephrology, cancer, inflammation, neurology and metabolism. In 2000, Amgen's revenues exceeded $3.6 billion.

74.     Amgen is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide. Pharmaceuticals that are manufactured by Amgen and covered by Medicare Part B include, but may not be limited to: Epogen® (epoetin alfa) and Neupogen® (filgrastim).

**3.     AstraZeneca**

75.     Defendant Zeneca, Inc. ("Zeneca") is a Delaware corporation with its principal place of business at Malvern, Pennsylvania. Zeneca is a wholly owned subsidiary of AstraZeneca, PLC, a limited liability company domiciled in the United Kingdom.

76.     Defendant AstraZeneca US is a Delaware corporation with its principal place of business at 1800 Concord Pike, Wilmington, Delaware.

77.     Defendant AstraZeneca Pharmaceuticals L.P. is a Delaware corporation, with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware. AstraZeneca Pharmaceuticals L.P. is owned and controlled by AstraZeneca PLC, a public limited liability company domiciled in the United Kingdom.

- 28 -

78.     AstraZeneca, PLC, Zeneca, Inc., AstraZeneca Pharmaceuticals L.P. and AstraZeneca U.S. are collectively referred to as "AstraZeneca."

79.     AstraZeneca maintains research and development and manufacturing facilities worldwide, including in the United States. AstraZeneca reported annual sales of $16.5 billion in 2001, with an operating profit of $4.2 billion.

80.     AstraZeneca manufactures and markets several drugs covered by Medicare Part B including, but not limited to:  Zoladex® (goserilin acetate implant), Nolvadex® (tamoxifen citrate), Tomudex® (raltitrexed), and Diprivan® (propofol).

81.     AstraZeneca is also sued herein in its capacity as a participant in the Together Rx conspiracy.

**4.     The Aventis Group (Aventis, Pharma, Hoechst and Behring)**

82.     Defendant Aventis Pharmaceuticals, Inc. ("Pharma") is a Delaware corporation with its principal place of business located at 300-400 Somerset Corporate Blvd., Bridgewater, New Jersey. Pharma is a wholly owned subsidiary of Aventis, S.A., a company domiciled in France. Pharma is comprised of the U.S. commercial operations of predecessor companies Rhone-Poulenc Rorer, S.A. and Defendant Hoechst Marion Roussel, Inc. ("Hoechst"). Prior to its acquisition by Pharma, Hoechst was a Delaware corporation with its principal place of business located at 10236 Marion Park Drive, Kansas City, Missouri.

83.     Pharma's principal business activities are the discovery, development, manufacture and sale of prescription pharmaceuticals in the areas of cardiology, oncology, infectious diseases, arthritis, allergies and respiratory disorders, diabetes and central nervous system disorders. Pharma reported U.S. net sales of approximately $5.8 billion in 2001.

84.     Defendant Aventis Behring L.L.C. ("Behring"), located at 1020 First Avenue, King of Prussia, Pennsylvania, formerly did business as Centeon L.L.C., a 50/50 joint venture

- 29 -

between Hoechst and Rhone-Poulenc Rorer, S.A. When Centeon L.L.C.'s parent companies merged to create Aventis in 1996, Behring became its wholly-owned subsidiary.

85.     Behring is the plasma protein business of Pharma, producing a line of therapies including coagulation therapies for the treatment of hemophilia, wound healing agents used during major surgical procedures, inhibitor treatments that inhibit the formation of blood clots, immunoglobulins for the prevention and treatment of immune disorders, and plasma expanders for the treatment of a variety of conditions such as shock, burns and circulatory disorders. In 2000, Behring held assets estimated at $1.5 billion.

86.     The drugs manufactured by Pharma, Hoechst and Behring (collectively referred to as "The Aventis Group") and covered by Medicare Part B include, but may not be limited to: Anzemet® (dolasteron mesylate), Bioclate® (antihemo factor viii), Gammar® (immune globulin), Helixate® (antihemo factor viii), Humate-P® (antihemo factor viii), Mononine® (antihemo factor ix complex), Monoclate-P® (antihemo factor viii), and Taxotere® (docetaxel).

87.     Aventis is also sued in its capacity as a participant in the Together Card Rx conspiracy.

         **5.     Baxter**

88.     Defendant Baxter International Inc. ("Baxter") is a Delaware corporation with its principal place of business at One Baxter Parkway, Deerfield, Illinois. Baxter manufactures and distributes prescription drugs to clinical administrators. Baxter's annual sales from January 1, 2000 through December 31, 2000 were over $6.8 billion.

89.     Defendant Baxter Healthcare Corporation is the principal domestic operating subsidiary of Baxter International. Baxter International and Baxter Healthcare Corporation are collectively referred to as "Baxter."

90.     Baxter is a global medical products company that, *inter alia*, develops, manufactures, markets and/or distributes drugs to treat cancer, trauma, hemophilia, immune

- 30 -

deficiencies, infectious diseases, kidney disease and other disorders. Baxter reported a year 2000 sales of $6.9 billion.

91.     The drugs developed, manufactured, marketed, sold and/or distributed by Baxter that are covered by Medicare Part B include, but may not be not limited to:  albumin, Bebulin® (factor ix complex), Buminat® (human albumin), dextrose, dextrose sodium chloride, Gammagard® (immune globulin), Iveegam® (immune globulin), Holoxan® (ifosfanide), Uromitexan® (mesna), Endoxan® (cyclophosphamide), Hemofil M® (antihemo factor viii), Proplex T® (factor ix complex), Recombinate® (antihemo factor viii), cisplatin, sodium chloride, and diazepam.

6.     **Bayer**

92.     Defendant Bayer Corporation ("Bayer") is an Indiana corporation with its principal place of business located at 100 Bayer Road, Pittsburgh, Pennsylvania. Bayer is a wholly owned United States subsidiary of a German corporation, Bayer AG. Bayer's pharmaceutical division is located at 400 Morgan Lane, West Haven, Connecticut.

93.     Bayer is a highly diversified health care company whose principal business includes the development, manufacture, marketing, sale and/or distribution of healthcare products and services, including pharmaceuticals. Bayer reported sales in the United States of $10.1 billion in 2001 and $8.9 billion in 1999.

94.     Bayer is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide. The pharmaceutical drugs manufactured by Bayer and covered by Medicare Part B include, but may not be limited to:  Kogenate® (antihemo factor viii), FS/Kogenate® (antihemo factor viii), and Koate-DVI® (antihemo factor viii) and Gamimune® (immune globulin), all used to treat hemophilia, and Gamimune® which is used in the treatment of immunodeficiency and autoimmune disorders.

- 31 -

### 7.     The BMS Group (Oncology Therapeutics; Apothecon)

95.     Defendant Bristol-Myers Squibb Co. ("Bristol-Myers") is a Delaware corporation with its principal place of business located at 345 Park Avenue, New York, New York. Bristol-Myers is a multi-national health care company specializing in the manufacturing, marketing and sale of pharmaceuticals and medical devices. For the year 2000, Bristol-Meyers reported revenues of approximately $20 billion and net earnings of $4.7 billion.

96.     Defendant Oncology Therapeutics Network Corp. ("OTN") is a Delaware corporation with its principal place of business located at 395 Oyster Point Boulevard, Suite 405, South San Francisco, California. OTN has been a wholly-owned subsidiary of Bristol-Myers since its acquisition in 1996. Prior to 1996, OTN was an independent company. In 2001, OTN reported revenues of over $1.4 billion.

97.     OTN is a healthcare services and distribution firm that directly sells Bristol-Myers' infusion oncology drugs and related products to approximately 2,300 office-based oncology practices in the United States. At the time of its acquisition by Bristol-Myers, OTN was the leading distributor of chemotherapeutic drugs and related products for the treatment of cancer. Bristol-Myers paid OTN a commission for marketing and selling its drugs. Both prior to and after Bristol-Myers acquired OTN, Bristol-Myers marketed and sold its drugs directly to medical providers across the country, and thus Bristol-Myers and OTN employed and maintained extensive marketing and sales departments.

98.     Defendant Apothecon, Inc. ("Apothecon") is a Delaware corporation with its principal place of business located in Princeton, New Jersey. It is a subsidiary of Bristol-Myers specializing in small to mid-size niche brand and generic products.

99.     Bristol-Myers, OTN and Apothecon are collectively referred to herein as the "BMS Group."

100.     The BMS Group manufactures and distributes prescription drugs that are clinically distributed by Medicare Plan B providers nationwide. The drugs manufactured by the

- 32 -

BMS Group and covered by Medicare Part B include, but may not be not limited to: Blenoxane® (bleomycin sulfate), Paraplatin® (carboplatin), Cytoxan® (cyclophospamide), Rubex® (doxorubicin hydrochloride), Etopophos® (etoposide), Vepesid® (etoposide), TaxolV (paclitaxel), and Fungizone® (amphotericin B).

101.    Bristol-Myers is also sued herein in its capacity as a participant in the Together Rx conspiracy.

102.    The BMS Group engages in an organization-wide and deliberate scheme to inflate AWPs. The BMS Group has stated fraudulent AWPs for all or almost all of its drugs including Amikacin Sulfate, Amphotercin B, Bleomycin Sulfate, Cyclophospamide, Vespid (Etoposide), Carboplatin (Paraplatin), Taxol (paclitaxel), and Blenoxane.   The specific drugs of the BMS Group for which relief is sought in this case are set forth in Appendix A.

**8.    Dey, Inc.**

103.    Defendant Dey, Inc. ("Dey") is a Delaware corporation with its principal place of business at 2751 Napa Valley Corporate Drive, Napa, California.  Dey is a unit of Merck KGaA, a German pharmaceutical conglomerate.

104.    Dey is a specialty pharmaceutical company that primarily develops, manufactures and markets generic drugs used in the treatment of selected respiratory diseases and allergies. Dey, one of the largest U.S. manufacturers of such pharmaceuticals, had net sales of $266 million in 1998.

105.    The drugs manufactured by Dey and covered by Medicare Part B include, but may not be not limited to:  albuterol sulfate, acetylcysteine, cromolyn sodium, ipratropium bromide, and metproterenol sulfate.

106.    Defendant Dey, Inc. f/k/a Dey Laboratories, Inc. ("Dey") is a corporation organized under the laws of Delaware with its principal offices in Napa, California.

107.    Dey is a specialty pharmaceutical company focusing on drug products for respiratory diseased and related allergies.  The products it manufactures and publishes AWPs on include:  Ipratropium, Bromide; Metapeoterenol Sulfate, and Accuneb.

9.    **The Fujisawa Group (Fujisawa Healthcare, Fujisawa USA)**

108.    Defendant Fujisawa Healthcare, Inc. ("Fujisawa Healthcare") is a Delaware corporation with its principal place of business located at Three Parkway North, Deerfield, Illinois, 60015.  Fujisawa Healthcare is a wholly-owned subsidiary of Fujisawa Pharmaceutical Co. Ltd., a Japanese corporation.  Fujisawa Healthcare focuses its efforts in the therapeutic areas of immuno-suppression and transplantation, cardiovascular care, skin care, oncology, and antifungal and anti-infective treatment.

109.    Defendant Fujisawa USA, Inc. ("Fujisawa USA") is a Delaware corporation with its principal place of business located at Three Parkway North, Deerfield, Illinois.  Fujisawa USA was a wholly-owned subsidiary of Fujisawa Pharmaceutical Co. Ltd.  In 1998, Fujisawa Healthcare assumed responsibility for Fujisawa USA's portfolio of proprietary products

110.    The drugs manufactured by Fujisawa Healthcare and Fujisawa USA (collectively referred to as "The Fujisawa Group") and covered by Medicare Part B include, but may not be limited to:  Acyclovir Sodium, Dexamethasone Sodium Phosphate, Doxorubicin Hydrochloride, Fluorouracil, Gentamicin Sulfate, Pentamidine Isethionate, and Vancomycin Hydrochloride.

10.    **The GSK Group (GlaxoSmithKline, SmithKline Beecham, Glaxo Wellcome)**

111.    Defendant GlaxoSmithKline, P.L.C. ("GlaxoSmithKline") is a public limited company incorporated under the laws of England and Wales, with its corporate headquarters located at 980 Great West Road, Brentford, Middlesex, United Kingdom TW8 9GS.  GlaxoSmithKline was created through the December 27, 2000, merger of GlaxoWellcome, P.L.C. and SmithKline Beecham, P.L.C.  GlaxoSmithKline's operational headquarters are located at One Franklin Plaza, 16th and Race Streets, Philadelphia, Pennsylvania.

- 34 -

112.    Defendant SmithKline Beecham Corporation ("SKB"), a wholly-owned U.S. subsidiary of the former SmithKline Beecham P.L.C., is a Pennsylvania corporation with its principal place of business at One Franklin Plaza, 16th and Race Streets, Philadelphia, Pennsylvania.

113.    Defendant GlaxoWellcome, Inc. ("Glaxo"), a wholly-owned subsidiary of GlaxoSmithKline, is a North Carolina corporation with its principal place of business at 5 Moore Drive, P.O. Box 13398, Research Triangle Park, North Carolina.  Cerenex Pharmaceuticals ("Cerenex"), a division of Glaxo prior to the merger, was responsible for Glaxo's central nervous system drugs, including Zofran.

114.    Defendants GlaxoSmithKline, SKB and Glaxo are referred to collectively as the "GSK Group."

115.    The GSK Group is a diversified pharmaceutical company which controls an estimated 7 percent of the world's pharmaceutical market.  In 2001, the GSK Group reported pharmaceutical sales of $24.8 billion.

116.    The drugs manufactured by the GSK Group and covered by Medicare Part B include, but may not be limited to:  Hycamtin® (topotecan hydrochloride), Ventolin® (albuterol) and Zofran® (ondansetron hydrochloride).  Pierre Fabré Médicament licenses another Medicare Part B drug, Navelbine® (vinorelbine tartrate), to the GSK Group.  SmithKline Beecham P.L.C. manufactured and sold Kytril® (granisteron hydrochloride), another drug covered by Medicare Part B (and a competitor to Zofran®), prior to the merger.  To secure regulatory approval for the merger, SmithKline Beecham P.L.C. sold Kytril®'s global rights to the Roche Group in December of 2000.

117.    GSK is also sued herein as a member of the Together Rx conspiracy.

- 35 -

### 11.   Immunex

118.   Defendant Immunex Corporation ("Immunex"), a wholly owned subsidiary of Defendant Amgen, Inc., is a Washington corporation with its principal place of business at 51 University Street, Seattle, Washington.  Immunex is a company that develops products for the treatment of cancer, asthma, rheumatoid arthritis, inflammatory diseases, infectious diseases, and cardiovascular diseases.  In 1999, its total revenues were $542 million.

119.   Immunex is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.  Pharmaceutical drugs that are manufactured by Immunex and covered by Medicare Part B include, but may not be limited to:  Leucovorin Calcium, Enbrel® (etanercept), Novantrone® (mitoxane hydrochloride), Leukine® (sargramostim), and Thioplex®(thiotepa).

120.   Defendant Immunex has been a wholly owned subsidiary of Defendant Amgen, since Immunex' acquisition in July 2002.

### 12.   The Johnson & Johnson Group (J&J, Centocor, Janssen, NcNeil, Ortho)

121.   Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.  In 2001, pharmaceutical sales represented 45% of J&J's worldwide sales and 19% of its operational growth.  J&J is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

122.   Defendant Centocor, Inc. ("Centocor") is a Pennsylvania corporation and has been a wholly owned subsidiary of Defendant J&J since its acquisition by J&J in October 1999. Centocor's principal place of business is located at 200 Great Valley Parkway, Malvern, Pennsylvania.  Centocor manufactures, markets and distributes prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

123.   Defendant Janssen Pharmaceutica Products, L.P. ("Janssen") is a New Jersey limited partnership with a principal place of business located at 1125 Trenton-Harbourton Road,

Titusville, New Jersey 08560. Janssen is a subsidiary of Johnson & Johnson. Janssen is sued for its role in the Together Rx conspiracy.

124.    Defendant McNeil-PPC, Inc., is a New Jersey corporation. McNeil-PPC, Inc. is a subsidiary of Johnson & Johnson. McNeil Consumer & Specialty Pharmaceuticals is a division of McNeil-PPC, Inc. and has a principal place of business located at 7050 Camp Hill Road, Fort Washington, Pennsylvania 19034. McNeil-PPC is sued for its role in the Together Rx conspiracy.

125.    Defendant Ortho Biotech ("Ortho") is New Jersey corporation and has been a wholly owned subsidiary of Defendant J&J since its formation by J&J in 1990. Ortho's principal place of business is located at 700 U.S. Highway 202, Raritan, New Jersey. Ortho manufactures and distributes prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

126.    The drugs manufactured by J&J, Centocor, Ortho, McNeil-PPC and Janssen (collectively referred to as "J&J Group") and covered by Medicare Part B include, but may not be limited to: ReoPro® (abciximab), an anti-blood clotting medication, Retavase® (reteplase), an anti blood clotting agent, Procrit® (epoetin alfa), for the treatment of anemia, Leustatin® (cladribine), for the treatment of leukemia, Orthoclone® (muromonab-CD3), used to prevent organ transplant rejection, Sporanox® (itraconazole), used in the treatment of fungal infections, and Remicade® (infliximab), an anti-inflammatory drug.

### 13.    Pfizer, Inc.

127.    Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, New York. Pfizer is one of the largest pharmaceutical companies in the United States, whether measured by number of prescriptions written, revenues, or market capitalization.

128.     Pfizer is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.  Pharmaceuticals that are manufactured by the Pfizer Group and covered by Medicare Part B include, but may not be limited to:  Cerebyx® (fosphenytoin sodium injection), Dilatin® (phenytoin), Diflucan® (fluconazole), Zithromax® (azithromycin), Trovan® (trovafloxacin mesylate), and Unasyn® (ampicillin sodium/sulbactam sodium).

129.     In addition to manufacturing and marketing drugs that are reimbursed by Medicare Plan B, the Pfizer Group also manufactures and distributes other named brand drugs for which it publishes, or causes to be published, an AWP in various industry compendia.

**14.     The Pharmacia Group (Pharmacia and Pharmacia & Upjohn)**

130.     Defendant Pharmacia Corporation ("Pharmacia") is a Delaware corporation with its principal place of business located at 100 Route 206, North Peapack, New Jersey.  Pharmacia was created through the merger of Defendant Pharmacia and Upjohn, Inc. and Monsanto Company on March 31, 2000.

131.     Defendant Pharmacia & Upjohn, Inc. ("P&U") is a subsidiary of Pharmacia Corp. In 1995, P&U was formed through the merger of Pharmacia AB and The Upjohn Company. P&U became a global provider of human healthcare products, animal health products, diagnostics and specialty products.  In 1998, Pharmacia & Upjohn relocated its global headquarters from the United Kingdom to New Jersey.  In September 1999, the company established its global headquarters on a 70-acre campus in Peapack, New Jersey.  This site is now the management and pharmaceutical headquarters for Pharmacia.

132.     Pharmacia is a highly diversified health care company whose business focuses on the discovery, development, manufacture and sale of a broad and diversified line of health care products and services, including pharmaceuticals, diagnostics and hospital products. Pharmacia's Prescription Pharmaceuticals business segment is involved in researching,

- 38 -

developing, registering, manufacturing and selling prescription pharmaceutical products, including general therapeutics, ophthalmology, and hospital products, which include oncology products and diversified therapeutics. Pharmacia reported sales of $18.1 billion for the fiscal year ended December 31, 2000. Pharmacia also reported $12.0 billion in prescription pharmaceuticals sales for the year 2001, and $10.8 billion in prescription pharmaceuticals sales for the year 2000. Prescription pharmaceuticals sales account for over 85 percent of Pharmacia's overall pharmaceutical sales. According to its Annual Report, Pharmacia's oncology drugs generated more than $1 billion in sales in 2001.

133.    The drugs manufactured by Pharmacia and P&U (collectively referred to as "The Pharmacia Group") and covered by Medicare Part B include, but may not be limited to: Adriamycin PFS® (doxorubicin hydrochloride), Adrucil® (fluorouracil), Amphocin® (amphotericin), Aromasin® (bleomycin), Camptosar® (irinotecan hydrochloride), Cleocin Phosphate® (clindamycin phosphate), Neosar ® (cyclophosphamide), Cytosar-U (cytarabine), Depo-Testosterone® (testosterone cypionate), Adriamycin PFS® (doxorubicin HCL), Ellence® (epirubicin HCL), Toposar® (etoposide), Adrucil® (fluorouracil), Solu-Cortef® (hydrocortisone sodium succinate), Idamycin® (idarubicin hydrochloride), Medrol® (methylprednisolone), and Vincasar® (vincristine sulfate).

**15.    The Schering-Plough Group (Schering Plough & Warrick)**

134.    Defendant Schering-Plough Corporation ("Schering-Plough") is a New Jersey corporation with its principal place of business located at 2000 Galloping Hill Road, Kenilworth, New Jersey.

135.    Schering-Plough's primary business involves prescription products in core product categories, including allergy and respiratory, anti-infective and anticancer, cardiovasculars, dermatologicals and central nervous systems and other disorders. Schering-Plough's revenues in 2001 totaled $9.8 billion.

- 39 -

136.    Defendant Warrick Pharmaceuticals Corporation ("Warrick"), is a Delaware corporation with its principal place of business at 12125 Moya Boulevard, Reno, Nevada. Warrick is a wholly-owned subsidiary of Defendant Schering-Plough and has been since its formation in 1993. Warrick manufactures generic pharmaceuticals.

137.    The drugs manufactured by Schering-Plough and Warrick (collectively at times referred to as "The Schering-Plough Group") and covered by Medicare Part B include, but may not be limited to: Proventil® (albuterol sulfate), Integrelin® (eptifibatide), Intron A® (interferon alfa-2b recombinant), and Temodar® (temozolomide). The Schering-Plough Group's Albuterol sulfate sales alone totaled $154 million in 2000.

### 16.    The Sicor Group (Sicor and Gensia)

138.    Defendant Sicor, Inc. ("Sicor") is a Delaware corporation with its principal place of business located at 19 Hughes, Irvine, California. Sicor was the result of the 1997 merger between Defendant Gensia, Inc. ("Gensia"), a finished dosage manufacturer, and Rakepoll Holding, a Europe-based supplier of active pharmaceutical ingredients.

139.    Sicor markets itself as a vertically-integrated specialty pharmaceutical company with expertise in the development, manufacturing and marketing of injectable pharmaceutical products, primarily used worldwide by hospitals. Sicor's finished dosage products manufacturing operations account for 32% of its total revenue, and is comprised of a portfolio of products that includes oncology, anesthesiology, and critical care. Sicor's 2001 revenues totaled nearly $370 million. According to its website, Sicor operates its business through several subsidiaries.

140.    Defendant Gensia Sicor Pharmaceuticals, Inc. ("Gensia Sicor"), a Delaware corporation, is a wholly-owned subsidiary of Sicor with its principal place of business located at 17 Hughes, Irvine, California. Gensia Sicor focuses on acute-care multisource products in the

- 40 -

fields of oncology, cardiology, and anesthesiology. Gensia Sicor's injectable drug business includes more than 60 products.

141.    In 1999, Gensia Sicor entered into a sales distribution agreement with Abbott Laboratories under which the two companies formed a strategic alliance for the marketing and distribution of oncology products in the U.S. The agreement was restructured in March 2002. In 1999, Gensia Sicor also amended an earlier agreement with Baxter Pharmaceutical Products, Inc. Notably, Abbott (6%) and Baxter (34%) accounted for nearly 40% of Sicor's total product sales in 2001.

142.    The drugs manufactured by Sicor, Gensia, and Gensia Sicor (collectively referred to as "The Sicor Group") and covered by Medicare Part B include, but may not be not limited to: amikacin sulfate and tobramycin sulfate.

### 17.    Watson

143.    Defendant Watson Pharmaceuticals, Inc. ("Watson") is a Delaware corporation with its principal place of business at 311 Bonnie Circle, Corona, California. Watson develops, manufactures and markets brand and generic pharmaceuticals. Watson is in the business of manufacturing and distributing prescription pharmaceuticals for distribution by Medicare Plan B providers nationwide.

144.    The pharmaceuticals manufactured by Watson and covered by Medicare Part B include, but may not be limited to:  albuterol sulfate, dexamethasone acetate, diazepam, gentamicin sulfate, iron dextran, testosterone enanthate, vancomycin hydrochloride, and cytarabine.

## IV.    GENERAL ALLEGATIONS APPLICABLE
## TO ALL DEFENDANTS

145.    The allegations contained herein apply generally to all Defendants.

- 41 -

A.    **The AWP System**

146.    There are approximately 65,000 different drug products in the United States
market, including different dosages of the same drug.  Prescription drugs are dispensed to
patients by or through different types of medical providers, including but not limited to:
(a) physicians who administer the drug in an office, (b) retail pharmacies, (c) home infusion
pharmacies, and (d) other medical providers.

147.    Providers regularly submit claims for reimbursement, seeking payment for the
drugs from Medicare, insurers and patients.  During the Class Period, the Defendants were aware
that the Medicare program and virtually all end payors (the latter are included as members of the
Class) use published AWPs to reimburse providers for drugs.  Use of the published AWPs to
establish reimbursement rates for drugs is an industry-wide practice and exists with respect to all
classes of drugs, brand name and generic and is used for Part B drugs and non-Part B drugs.

148.    There are several pharmaceutical industry compendia that periodically publish, in
printed and electronic media, the AWPs for the tens of thousands of drugs on the market,
including the *Drug Topics Red Book* (the "*Red Book*"), *American Druggist First Databank
Annual Director of Pharmaceuticals* and *Essential Director of Pharmaceuticals* (the "*Blue
Book*") and Medi-Span's *Master Drug Database* (collectively referred to herein as the
"Publishers").  These Publishers publish AWPs for the various dosage forms for drugs.  And the
AWPs are published for Part B, non-Part B, brand name and generic drugs.

149.    In periodically announcing the AWP for each drug, during the time period
relevant to this Complaint the Publishers publish the prices that are supplied to them by the
Defendant Drug Manufacturers for their respective drugs.  For instance, the forward to the 1999
edition of the *Red Book* states that "all pricing information is supplied and verified by the
products' manufacturers, and it should be noted that no independent review of those prices for
accuracy is conducted."  In addition, a June 1996 Dow Jones news article reported that Phil
Southerd, an associate product manager of the *Red Book,* stated that it only publishes prices that

- 42 -

are faxed directly from the manufacturer. Thus, the Defendant Drug Manufacturers control the prices listed as the AWPs for each drug listed by the Publisher.

150.    A system that bases its reimbursement rates for drugs on the published AWP is thus dependent on the honesty of the drug manufacturers. The Defendant Drug Manufacturers knew they could directly control and fabricate the AWP for their drugs at any time by forwarding to the Publishers a phony AWP. The Defendant Drug Manufacturers also knew that actual transaction price data – the amounts charged to providers and others for their drugs – was not publicly available, and they kept this information (on which AWPs should have been calculated) highly confidential and secret.

151.    As detailed, the AWPs for the drugs at issue here bore little relationship to the drugs' pricing in the marketplace. They were simply fabricated and overstated in furtherance of Defendants' scheme to generate the profit spread to providers, PBMs and others and to increase Defendants' profits at the expense of Plaintiffs and the Class members.

152.    Plaintiffs and the members of the Class paid for the drugs based on the inflated AWPs reported by the Defendant Drug Manufacturers.

153.    The Defendant Drug Manufacturers' pattern of fraudulent conduct in artificially inflating the AWPs for their drugs (sometimes referred to herein as the "AWP Scheme") directly caused Plaintiffs and the members of the Class to substantially overpay for those drugs.

154.    As detailed below, this overpayment manifested itself in two contexts, both of which were well known and understood by the Defendant Drug Manufacturers: (i) all drugs administered under Medicare Part B and (ii) drugs administered outside of the Medicare context whose reimbursement was established by use of AWP as a benchmark.

- 43 -

B.     **The Defendant Drug Manufacturers Commit AWP Fraud to Increase Market Share For Their Drugs Covered by Medicare Part B**

1.     **The Medicare Insurance Program**

155.     In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care.

156.     The United States Department of Health & Human Services ("HHS") is responsible for the funding, administration and supervision of the Medicare Program. The Centers for Medicare and Medicaid Services ("CMMS"), formerly known as the Health Care Financing Administration ("HCFA"), is a division of HHS and is directly responsible for the administration of the Medicare Program.

157.     The Medicare Program generally does not cover the cost of prescription drugs that a Medicare beneficiary self administers (*e.g.*, by swallowing the drug in liquid or pill form). However, Medicare Part B does cover some drugs, including injectables administered directly by a doctor, certain oral anti-cancer drugs, and drugs furnished under a durable medical equipment benefit. Approximately 450 drugs are covered by Medicare Part B.

158.     In determining the amount it will pay, Medicare calculates the "allowed" amount for the drug. During the period 1992 through 1997, Medicare's reimbursement for Covered Drugs was set at the lesser of the estimated acquisition cost or national average wholesale price. For generic drugs (where more than one company sells a certain drug, sometimes called multiple-source drugs), payment was based on the lower of the estimated acquisition cost or the wholesale price that was defined as the median price for all sources of the generic form of the drug. This payment methodology was set forth in 42 C.F.R. § 405.517, a regulation first published in the Federal Register on November 25, 1991 and which became effective on or about January 1, 1992.

159.     The estimated acquisition cost for a drug could be determined by the Medicare Program "based on surveys of the actual invoice prices paid for the drug" taking into

- 44 -

consideration the estimated acquisition cost, including "factors such as inventory, waste and spoilage." However, historically it has been the AWP published in the *Red Book* or other compendia that has been used as a ceiling for Medicare reimbursement.

160.    On January 1, 1998, 42 C.F.R. § 405.517 was amended to provide that the allowed amount would be based upon the lower of the billed charge on the Medicare claim form or 95 percent of AWP.

161.    The Medicare Program has publicly announced that it would use the AWP published in pharmaceutical industry magazines as the basis for reimbursement. Specifically, Program Memorandum AB-99-63 (dated September 1999 but re-issuing PM AB-98-76 dated in December 1998), a publicly available Medicare Program bulletin, confirmed that reimbursement for certain Medicare Part B drugs and biologicals "are paid based on the lower of the billed charge or 95 percent of the AWP as reflected in sources such as the *Red Book*, *Blue Book*, or Medi-Span."

162.    Pursuant to PM AB-99-63, the AWP for a single-source drug or biological equals the AWP of the single product. For a multi-source drug or biological, the AWP is equal to the lesser of the median AWP of all of the generic forms of the drug or biological or the lowest brand name product AWP.

163.    Medicare Part B reimburses medical providers 80% of the allowable amount for a drug. The remaining 20% is paid by the Medicare Part B beneficiary, and is called the "co-payment" amount. All medical providers are required by law to bill the 20% co-payment and make attempts beyond merely billing to collect that amount. In addition, beneficiaries under Part B are required to pay an annual deductible amount before Part B benefits are payable.

164.    Some Medicare beneficiaries are able to purchase private Medigap insurance, which covers, among other things, all or part of the 20% co-payment for Covered Drugs.

165.    In setting reimbursement rates, the Medicare Program uses the AWPs generated by the pharmaceutical industry. There are no regulations describing how AWPs are to be calculated, nor any regulatory process for approving them. Pharmaceutical companies do not report AWPs directly to the federal government, but instead send their pricing information to independent publishing companies that compile the data and publish the AWPs in trade publications, which are then used by the government, as well as private health plans.

166.    The importance of an accurate AWP was recently reconfirmed by the Office of the Inspector General ("OIG") in an April 2003 report: "Compliance Program Guidance for Pharmaceutical Manufacturers." The OIG report found that the "government sets reimbursement with the expectation that the data provided are complete and accurate." The OIG report made it clear that the AWP must be a meaningful figure that is not artificially inflated:

> Where appropriate, manufacturers' reported prices should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers. Any discount, price concession, or similar benefit offered on purchases of multiple products should be fairly apportioned among the products (and could potentially raise anti-kickback issues). Underlying assumptions used in connection with reported prices should be reasoned, consistent, and appropriately documented, and pharmaceutical manufacturers should retain all relevant records reflecting reported prices and efforts to comply with federal health care program requirements.

167.    And, the OIG rejected the notion that purposeful AWP manipulation was a lawful practice:

> The "spread" is the difference between the amount a customer pays for a product and the amount the customer receives upon resale of the product to the patient or other payer. In many situations under the federal programs, pharmaceutical manufacturers control not only the amount at which they sell a product to their customers, but also the amount those customers who purchase the product for their own accounts and thereafter bill the federal health care programs will be reimbursed. To the extent that a manufacturer controls the "spread," it controls its customer's profit.

- 46 -

Average Wholesale Price (AWP) is the benchmark often used to set reimbursement for prescription drugs under the Medicare Part B program. For covered drugs and biologicals, Medicare Part B generally reimburses at "95 percent of average wholesale price." 42 U.S.C. 1395u(o). Similarly many state Medicaid programs and other payers base reimbursement for drugs and biologicals on AWP. Generally, AWP or pricing information used by commercial price reporting services to determine AWP is reported by pharmaceutical manufacturers.

If a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated. Unlike *bona fide* discounts, which transfer remuneration from a seller to a buyer, manipulation of the AWP transfers remuneration to a seller's immediate customer from a subsequent purchaser (the federal or state government). Under the anti-kickback statute, offering remuneration to a purchaser or referral source is improper if one purpose is to induce the purchase or referral of program business. In other words, it is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the "spread" to induce customers to purchase its product.

In the light of this risk, we recommend that manufacturers review their AWP reporting practices and methodology to confirm that marketing considerations do not influence the process. Furthermore, manufacturers should review their marketing practices. *The conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is strong evidence of the unlawful intent necessary to trigger the anti-kickback statute.* Active marketing of the spread includes, for example, sales representatives promoting the spread as a reason to purchase the product or guaranteeing a certain profit or spread in exchange for the purchase of a product. [Emphasis added.]

## 2. Congressional and Other Federal Investigations and Actions

168. The United States Department of Justice ("DOJ"), the United States General Accounting Office ("GAO"), the Office of the Inspector General at the United States Department of HHS ("OIG"), and certain Congressional subcommittees have been investigating the Defendant Drug Manufacturers and other pharmaceutical manufacturers for questionable practices regarding the industry's calculation of AWPs and for offering illegal incentives to providers.

- 47 -

169.    In a letter dated September 28, 2000, sent from the House of Representatives

Committee on Ways and Means, Subcommittee on Health to the President of the trade

organization known as the Pharmaceutical Research and Manufacturers of America (most of the

Defendant Drug Manufacturers are members of this association), Congressman Stark identified

the improper scheme of manipulating AWPs and noted:

> This corruptive scheme is perverting financial integrity of the
> Medicare program and harming beneficiaries who are required to
> pay 20% of Medicare's current limited drug benefit.

170.    In his September 28 letter, Congressman Stark made the following five "shocking

conclusions":

> First – Certain drug manufacturers have abused their position of
> privilege in the United States by reporting falsely inflated drug
> prices in order to create a de facto improper kickback for their
> customers.
>
> Second – Certain drug manufacturers have routinely acted with
> impunity in arranging improper financial inducements for their
> physicians and other healthcare provider customers.
>
> Third – Certain drug manufacturers engage in the fraudulent price
> manipulation for the express purpose of causing federally funded
> health care programs to expend scarce tax dollars in order to
> arrange de facto kickbacks for the drug manufacturers' customers
> at a cost of billions of dollars.
>
> Fourth – Certain drug manufacturers arrange kickbacks to
> improperly influence physicians' medical decisions and judgments
> notwithstanding the severely destructive effect upon the
> physician/patient relationship and the exercise of independent
> medical judgment.
>
> Fifth – Certain drug manufacturers engage in illegal price
> manipulation in order to increase utilization of their drugs beyond
> that which is necessary and appropriate based on the exercise of
> independent medical judgment not affected by improper financial
> incentives.

171.    The DOJ and Congressional investigations are ongoing.

- 48 -

3. **Certain of the Defendants Drug Manufacturers' Fraudulent Conduct Within the Medicare Part B Program**

172. As set forth below, certain of the Defendants Drug Manufacturers each perpetrated the alleged fraudulent scheme by using some and/or all of the following practices:

a. **Artificially Inflating AWPs**

173. Each Defendant Drug Manufacturer provided AWPs for each of its drugs to the *Red Book*, the *Blue Book*, Medi-Span and other pharmaceutical compendia for Covered Drugs and non-Part B drugs, both brand name and generic.

174. During the Class Period, the Defendant Drug Manufacturers deliberately and intentionally published AWPs for Covered Drugs that did not reflect the actual pricing structure of the drugs, but was created solely to cause Plaintiffs and the Class members to overpay for the Covered Drugs. The Defendant Drug Manufacturers created and perpetuated this scheme so that the medical providers who purchased these drugs at a low cost would bill patients and their insurers at the inflated AWPs and earn a substantial profit from the "spread" between the real cost and the various AWP-related reimbursement rates.

175. The Defendant Drug Manufacturers knew and understood that Medicare and Plaintiffs and the Class members used the *Red Book* and other publications to determine the AWPs of the drugs. Because the Defendant Drug Manufacturers controlled the AWPs published in the *Red Book* and other compendia, the Defendant Drug Manufacturers knew and understood that they could manipulate the providers' profits from Plaintiffs and the Class. The purpose of artificially inflating the providers' profits was to create an illegal kickback to the providers, funded by Plaintiffs' and the Class members' overpayments.

176. As part of their scheme, the Defendant Drug Manufacturers specifically instructed and expected the providers to charge the inflated AWPs for Covered Drugs to Medicare, Plaintiffs and the Class members.

### b.   Improper Use of Free Samples

177.   The Defendant Drug Manufacturers, through their sales personnel and marketing representatives, also provided free samples of their drugs to providers as a means of lowering the price. The free samples were used to offset the total cost associated with the purchases of the drugs, thereby increasing the "spread." Moreover, the Defendant Drug Manufacturers specifically told providers to bill Plaintiffs and the members of the Class for the free samples, which Defendants knew was unlawful.

178.   Every free sample of a drug for which a provider bills a patient or insurer effectively reduces that provider's overall cost for that drug. However, the full cost of the Covered Drug was charged to the Plaintiffs and the Class members, and the free sample is not used by the drug company in calculating the AWP, which in turn inflates the AWP.

179.   Although the Defendant Drug Manufacturers provided free samples and marketed them as a way to lower the providers' actual cost of the Covered Drugs, they did not include the value of the free samples in calculating the AWPs for those drugs. Thus, the Defendant Drug Manufacturers effectively and improperly passed on the cost of the free samples directly to Plaintiffs and the members of the Class.

### c.   Other Hidden and Improper Inducements and Price Reductions

180.   The Defendant Drug Manufacturers also have provided and/or arranged for many other non-public financial inducements to stimulate sales of their Covered Drugs at the expense of Plaintiffs and the members of the Class. Such inducements included volume discounts, rebates, off-invoice pricing, free goods, credit memos, consulting fees, debt forgiveness and educational and promotional grants. All of these incentives were designed to lower the providers' net cost of purchasing the Defendant Drug Manufacturers' Covered Drugs. And again, the value of these services was kept "off the book," so as to not be reflected in the AWP, which in turn inflates the AWP.

- 50 -