424.    By way of further example, the J&J Group has deliberately overstated and continues to overstate the AWP for Remicade®. The published AWP for Remicade® continued to increase each year during the class period. For example, the AWP was listed as $611.33 for a 100 mg vial of Remicade® as of November 1999, and rose to $665.65 when listed in the 2001 edition of the *Red Book*. At the same time, J&J deliberately marketed and promoted the sale of Remicade® to physicians based on the availability of inflated payments made by Medicare, assuring them that they would make a significant profit from the purchase of Remicade® as a result of the spread between the actual price to physicians and reimbursement based on the published AWP.

425.    The J&J Group created promotional materials and worksheets to allow them to market the spread between the published AWP and the actual selling price to doctors. For example, a publication accessible through Defendants' web sites entitled "Office-Based Infusion Guide" demonstrates Defendants' aggressive marketing of this spread, specifically noting that, "[d]epending on reimbursement, office-based infusion may provide a financial impact to a physician's practice." Moreover, the "Financial Analysis" section of the guide includes a "REMICADE® (infliximab) Financial Impact Worksheet," which enables doctors see in actual dollars how much additional revenue the use of Remicade® would bring to their practice.

426.    As set forth above, the J&J Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Plaintiffs and the Class.

427.    Set forth below in Table 1 are the contract prices (not already referenced above) included in a J&J contract price list (effective from April 1, 1997 through March 31, 1998) contained in a supply agreement with Managed Healthcare Associates, Inc. dated March 17, 1997 and the AWP published in the 1997 *Red Book*, and their associated AWP spread. (J&J000121-23) (Highly Confidential).

- 151 -

**Table 1**

| Drug | Contract Price | AWP | $ Diff AWP | % Spread |
|------|----------------|-----|------------|----------|
| Procrit (epoetin alfa) | $950.00 (4000 u/ml 25x1 ml vials) | $1200 | $250 | 20.8% |
| Ultram (tramadol hcl) | $53.97 (1x100 50 mg) | $62.34 | $8.37 | 13.4% |
| Duragesic fentanyl transdermal) | $44.94 (25M 25mcg/hr 1x5) | $53.94 | $9 | 16.7% |
| Floxin (ofloxacin) | $276.89 (1x100 btls 200 mg/case) | $332.28 | $55.39 | 16.7% |
| Propulsid (cisapride) | $56.62 (10mgx100) | $67.96 | $11.34 | 16.7% |
| Risperdal (risperidone) | $335.59 (3 mg 1x100) | $402.72 | $67.13 | 16.7% |
| Topamax tiramate) | $123.00 (100 mg 1x60) | $147.60 | $24.6 | 16.7% |

## 2.    J&J Concealed Its AWP Manipulation

428.    J&J deliberately acted to conceal its fraudulent reporting and marketing of the AWP spread.  J&J routinely required that its customers keep secret the prices they were being charged for J&J drugs.  (J&J001022; J&J000110; J&J001430; J&J001483).

## M.    Pfizer

429.    Pfizer engages in an organization-wide and deliberate scheme to inflate AWPs and has stated fraudulent AWPs for many of its drugs.  The specific drugs of Pfizer for which relief is sought in this case are set forth in Appendix A or in the proposed class certification order, and are summarized below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|--------------|---------------------------|--------------|----------------------------|
| PFIZER | Accupril | quinapril hcl | ACE Inhibitor (Cardiovascular Agent) Used in the treatment of hypertension |
| | Cardura | doxazosin mesylate | Autonomic Nervous System Agent Used to treat hypertension and benign prostatic hypertrophy |
| | Estrostep FE | norethindrone-ethinyl estradiol-fe | Oral Contraceptive Also used in the treatment of acne |
| | Femhrt 1/5 | ethinyl estradiol-norethindrone acetate | Estrogen Combination (Hormone) Used in the treatment of menopause and prevention of postmenopausal osteoporosis |
| | Lipitor | atorvastatin calcium | Antilipemic Agent (Cardiovascular Agent) Used to lower cholesterol |

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | Nardil | phenelzine sulfate | Antidepressant (Psychotherapeutic Agent) Used in the treatment of depression |
| | Neurontin | gabapentin | Anticonvulsant Used in the treatment of epilepsy |
| | Zithromax | azithromycin | Macrolide Antibiotic Agent (Anti-Infective Agent) General antibiotic |
| | Zoloft | sertraline hcl | Serotonin Reuptake Inhibitor (Psychotherapeutic Agent: Antidepressant) Used in the treatment of depression |
| | Zyrtec | cetirizine hcl | Antihistamine Used in the treatment of allergic rhinitis |

430.     Pfizer manufactuares and distributes some of the nation's most popular and highest selling brand name drugs.

431.     Historically, Pfizer almost never changes the "spread" between the posted AWP and posted WAC for a Pfizer brand name product.  Once initially launched, a Pfizer brand name product continues to bear the same difference between the posted AWP and the posted WAC (*e.g.*, 16 2/3%, or 20%, or sometimes 25%).

432.     In January 2002, Pfizer announced a prescription drug discount card that would be available to elderly and poor consumers along eligibility criteria similar to that of other discount cards.

433.     At the same time, January 2002, Pfizer secretly increased the AWP/WAC spread to 25% for *all* of its brand name drugs.  If a drug theretofore had a posted AWP/WAC spread of 20%, it was increased to 25% (something which Pfizer, and indeed all other drug companies, almost never do).  If a Pfizer brand name drug already had had a 25% AWP/WAC spread, it remained so.

434.     By doing so, Pfizer knew that the purpose and effect of these new listings would be to increase reimbursement payments by end payors by amounts that would be greater than actual transaction costs for other participants in the distribution chain (*i.e.*, wholesalers,

distributors, pharmacies and PBMs). Also in doing so, Pfizer knew that the posted AWPs for many of their brand name drugs would become more misrepresentative of actual average wholesale prices given that the increased AWP/WAC spread bore no relation to actual transation cost changes occurring in the marketplace.

435.    Pfizer has been investigated by the Office of the Inspector General of the Department of Human Health Services and has entered into a $49 million settlement arising from illegal practices with respect to Lipitor. OIG-HSS found that Pfizer has been providing unrestricted educational grants and rebates that were in fact discounts off the purchase price of Lipitor. Pfizer concealed these discounts from states who were entitled to receive the "best price" for Lipitor.

436.    The provision of educational grants and rebates on Lipitor also had the effect of inflating the reported AWP.

437.    On information and belief, based in part due to the substantial nature of the spreads between AWP and WAC identified in Appendix A, Pfizer has inflated its AWP on other drugs at issue.

**N.    The Pharmacia Group (Pharmacia and P&U)**

438.    The Pharmacia Group engages in an organization-wide and deliberate scheme to inflate AWPs. The Pharmacia Group has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below. The specific drugs of The Pharmacia Group for which relief is sought in this case are set forth in Appendix A or in the proposed class certification order, and are summarized below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| PHARMACIA GROUP (Pharmacia and P&U) | Adriamycin | doxorubicin hydrochloride | Antineoplastic Used in the treatment of various forms of cancer |

- 154 -

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | Adrucil | fluorouracil | Antimetabolite; Antineoplastic<br>Used in the treatment of various forms of cancer |
| | Amphocin | amphotericin b | Antifungal (Anti-Infective Agent)<br>Used in the treatment of serious fungal infections |
| | Celebrex | celecoxib | Analgesic; Antirheumatic Agent<br>Used to relieve some symptoms caused by arthritis |
| | Cleocin-T | clindamycin phosphate (topical) | Antibacterial Agent (Anti-Infective Agent)<br>Used to treat bacterial infections |
| | Cytosar-U | cytarabine | Antineoplastic<br>Used in the treatment of cancer of the blood |
| | Depo-Testosterone | testosterone cypionate | Androgen (Hormone)<br>Used to replace hormones or stimulate growth |
| | Neosar | cyclophosphamide | Alkylating Agent (Antineoplastic)<br>Used in the treatment of various forms of cancer as well as some kidney disease |
| | Solu-Cortef | hydrocortisone sodium succinate | Anti-Inflammatory Agent; Skin and Mucous Membrane Agent<br>Used to provide relief for inflamed areas of the body. Also used as replacement therapy in adrenocortical insufficiency |
| | Solu-Medrol | methylprednisolone sodium succinate | Anti-Inflammatory Agent<br>Used to provide relief for inflamed areas of the body. Also used as replacement therapy in adrenocortical insufficiency |
| | Toposar | etoposide | Antineoplastic<br>Used in the treatment of testicular and lung cancer |
| | Vincasar | vincristine sulfate | Antineoplastic<br>Used in the treatment of various forms of leukemia and cancer |
| | | bleomycin sulfate | Antineoplastic; Antibiotic Agent (Anti-Infective Agent)<br>Used in the treatment of various forms of cancer |

### 1.    The Pharmacia Group Has Been the Target of Government Investigations

439.    In connection with its scheme to inflate AWPs, The Pharmacia Group has been investigated by the Department of Justice, the Texas Attorney General, the California Attorney General, the Massachusetts Attorney General, the Attorney General of the State of Connecticut,

- 155 -

the Attorney General of the State of New York, and the Department of Health and Human

Services Office of Inspector General.

### 2.    Pharmacia's Definition and Understanding of AWP

440.    Pharmacia understands that third party reimbursement is based on its published

AWPs.  According to a "Strategic Presentation on Average Wholesale Price (AWP)" prepared by

P&U, the "Definition of AWP" is:

> An artificial pricing index that is used as a common basis for third-party reimbursement to pharmacists and physicians.
>
> -The difference between the published AWP (less a percentage) and the direct price is the profit margin that drives these classes of trade.

(PH 025785) (Highly Confidential).  During this same presentation, Pharmacia provided an

"AWP History":

- ♦ Historically, Wholesalers viewed AWP as an actual average selling price to their customers.
- ♦ Competition of 1980's led to AWP representing a "Suggested List Price"
- ♦ P&U AWP = 125% of Direct Price (DP)
- ♦ Exceptions being VANTIN, CVC, GENOTROPIN, and RESCRIPTOR = 120% of DP

(PH025791) (Highly Confidential).  Further, the presentation recognized that "'95 Medicare

(Part B) outpatient drug bill (I.V./inhalants/oncolitics/nutritionals) of $1.8 billion based primarily

on AWP."  (PH025793) (Highly Confidential).

### 3.    The Pharmacia Group Controls the Published AWP for Its Products

441.    The Pharmacia Group has controlled and set the AWPs for its pharmaceutical

products through direct communications with industry compendia during the Class Period.  In its

presentation entitled "Strategic Presentation on Average Wholesale Price (AWP)," P&U

included a flow chart that shows P&U communicates its AWPs to First Data Bank, Medi-Span

and *Red Book.* This same flow chart then shows that third party payors rely on these industry

compendia for prices. (PH025792) (Highly Confidential).

### 4.    The Pharmacia Group's AWP Manipulation Benefited Providers at the Expense of the Class

442.    The Pharmacia Group has engaged in an ongoing deliberate scheme to inflate

AWPs. According to one member of the Congressional Ways and Means Committee:

> The evidence . . . indicates that [Pharmacia & Upjohn] have
> knowingly and deliberately inflated their representations of the
> average wholesale price ("AWP"), wholesale acquisition cost
> ("WAC") and direct price ("DP") which are utilized by the
> Medicare and Medicaid programs in establishing drug
> reimbursements to providers.
>
> \* \* \*
>
> [T]hese practices must stop and ... these companies must return
> the money to the public that is owed because of their abusive
> practices.

*See* Extension of Remarks of U.S. Representative Pete Stark in the House of Representatives,

October 3, 2000 (P007545-P007547).

443.    In a letter dated October 3, 2000 to Pharmacia (with accompanying exhibits),

Representative Stark addressed the Pharmacia Group's illegal practices:

> The manipulated disparities between your company's reported
> AWPs and DPs are staggering. For example, in 1997, Pharmacia
> & Upjohn reported an AWP of $946.94 for 200 mg. of Adriamycin
> PFS while offering to sell it to American Oncology Resources
> (AOR) for $168.00 and to Comprehensive Cancer Center for
> $152.00 (Composite Exhibit "1"). Your company then
> aggressively marketed its cancer drugs to health care providers by
> touting financial inducements and other types of incentives.
> Pharmacia & Upjohn created and marketed the financial
> inducements for the express purpose of influencing the
> professional judgment of doctors and other health care providers in
> order to increase the company's market share.
>
> \* \* \*
>
> Pharmacia & Upjohn's own internal documents . . . reveal that the
> company abused its position as a drug innovator in an initial
> *Phase III* FDA clinical trial for a cancer drug used to treat

- 157 -

lymphoma (Composite Exhibit "2") (emphasis in original).

". . . Clinical Research Trials

> Initial Phase III Protocol trial for "Oral Idamycin" in lymphomas. This trial will offer AOR $1.1M [million] in additional revenues. Two hundred twenty-five (225) patients at $5,000 per patient . . . (emphasis added by Rep. Stark)

> The above . . . items are contingent on the signing of the AOR Disease Management Partner Program. AOR's exclusive compliance to the purchase of the products listed in the contract product attachment is also necessary for the above items to be in effect."

The linking of doctor participation in FDA clinical drug trials to their purchase and administration of profit-generating oncology drugs is entirely inconsistent with the objective scientific testing that is essential to the integrity of the trial.

\* \* \*

It is clear that Pharmacia & Upjohn targeted health care providers, who might be potential purchasers, by creating and then touting the windfall profits arising from the price manipulation. For example, Pharmacia & Upjohn routinely reported inflated average wholesale prices for its cancer drug Bleomycin, 15u, as well as direct prices. The actual prices paid by industry insiders was in many years less than half of what Pharmacia & Upjohn represented. Pharmacia & Upjohn reported that the average wholesale price for Bleomycin, 15u, rose from $292.43 to $309.98, while the price charged to industry insiders fell by $43.15 (Composite Exhibit "4").

\* \* \*

Pharmacia & Upjohn reported price increases in October 1997 with full knowledge that the true prices of the drugs were falling. For example, Composite Exhibit "7" reveals that Pharmacia & Upjohn voluntarily lowered its price of Adriamycin PFS 200 mg to $152.00 while reporting an AWP of $946.94:

> "Dear Willie,

> > A (VPR) Voluntary Price Reduction will become effective May 9, 1997. The wholesalers have been notified, however it may take two weeks to complete the transition . . ."

Additionally, internal Pharmacia & Upjohn documents secured through the Congressional investigations show that Pharmacia &

- 158 -

Upjohn also utilized a large array of other inducements to stimulate product sales. These inducements, including "educational grants" and free goods, were designed to result in a lower net cost to the purchaser while concealing the actual price beneath a high invoice price. Through these means, drug purchasers were provided substantial discounts that induced their patronage while maintaining the fiction of a higher invoice price – the price that corresponded to reported AWPs and inflated reimbursements from the government. Composite Exhibit "8" highlights these inducements:

AOR/PHARMACIA & UPJOHN PARTNERSHIP PROPOSAL: Medical Education Grants. A $55,000 grant has been committed for 1997 for the AOR Partnership for excellence package including Education/Disease Management, Research Task Force, AOR Annual Yearbook. A $40,000 grant to sponsor the AOR monthly teleconference. This sponsorship was committed and complete in February 1997 . . .

PHARMACIA & UPJOHN, INC. INTEROFFICE MEMO: If needed, you have a "free goods" program to support your efforts against other forms of generic doxorubicin . . .

Use your "free goods" wisely to compete against other generic forms of Adriamycin, not to shift the customer to direct shipments. The higher we can keep the price of Adriamycin, the easier it is for you to meet your sales goals for Adriamycin (emphasis added by Rep. Stark).

(P007613-P007632).

444.   Pharmacia's marketing pitches, as quoted by U.S. Rep. Pete Stark in a

September 28, 2000 letter to Alan F. Holmer, President of the Pharmaceutical Research and

Manufacturers of America, promoted a physician's ability to profit at the expense of Medicare

and its beneficiaries:

PHARMACIA: Some of the drugs on the multi-source list offer you savings of over 75% below list price of the drug. For a drug like Adriamycin, the reduced pricing offers AOR a reimbursement of over $8,000,000 profit when reimbursed at AWP. The spread from acquisition cost to reimbursement on the multi-source products offered on the contract give AOR a wide margin for profit.

(P007548-P007588).

445.   In 1997, Pharmacia sent to a clinic a proposal listing the AWP and the contract price at which several drugs would be sold to the provider.  The differences are staggering and just a few are noted below:

| Drug | AWP | Suggested New Contract Price |
|---|---|---|
| Adriamycin (10 mg) | 46.00 | 7.50 |
| Adriamycin (50 mg) | 230.00 | 37.50 |
| Neosar (2 g) | 86.00 | 18.00 |
| Toposar (1 g) | 1,330.75 | 120.00 |
| Vincasar (2 mg) | 741.50 | 7.50 |

(P007615).

## 5.   Specific Pharmacia AWPs Documented by the DOJ

446.   In a report published by the DHHS, the DOJ documented at least 43 instances where the published AWPs for various dosages of drugs manufactured by The Pharmacia Group were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each drug.  These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by The Pharmacia Group in the 2001 *Red Book*.

| Drug | The Pharmacia Group's 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Spread |
|---|---|---|---|---|
| Amphotercin B | $36.26 | $16.00 | $20.26 | 127% |
| Bleomycin Sulfate | $309.98[8] | $158.67 | $151.31 | 96% |
| Clindamycin Phosphate | $93.60 | $61.20 | $32.40 | 53% |
| Cyclophospamide | $6.29 | $3.92 | $2.37 | 60% |
| Cytarabine | $8.98 | $4.06 | $4.92 | 122% |
| Doxorubicin HCL | $1104.13 | $150.86 | $953.27 | 632% |

---

[8] Calculation based on the AWP listed in the 2000 *Red Book*.

- 160 -

| Etoposide | $157.65 | $9.47 | $148.18 | 1,565% |
|---|---|---|---|---|
| Fluorouracil | $3.20 | $1.47 | $1.73 | 118% |
| Hydrocortisone Sodium Succinate | $2.00 | $1.55 | $.45 | 29% |
| Metholprednisolone Sodium Succinate | $2.05 | $1.45 | $.60 | 41% |
| Testosterone Cypionate | $17.01 | $11.79 | $5.22 | 44% |
| Vincristine Sulfate | $43.23 | $5.10 | $38.13 | 748% |

447.    In OIG report OEI-03-00-00310, the government noted that 20 mg of irinotecan, which according to the *Red Book* is manufactured only by The Pharmacia Group, had a Medicare Median of $117.81 and a Catalog Median of $98.63, resulting in a spread of 19.45%. (P006398-P006424).

448.    The GAO issued a report entitled "Payments for Covered Outpatient Drugs Exceed Providers' Cost" (GAO-01-1118) wherein it found that irinotecan had an Average AWP of $141.32, the Average Widely Available Discount from AWP to physicians for irinotecan was 22.9%, and the drug constituted 2.0% of the total amount of Medicare spending in 1999. (P005546-P005578).

449.    As of April 2000, another Pharmacia Group drug, Toposar® (etoposide), had an AWP of $28.38. The DOJ found that retailers were buying it for $1.70. (P006299-006316).

450.    Similarly, by letter dated September 25, 2000 to the HCFA Administrator, the Chairman of the Commerce Committee revealed that:

> [I]n 1998, Pharmacia-Upjohn's Bleomycin had an AWP of $309.98, but health care providers could purchase it for $154.85. In 1997, Pharmacia-Upjohn's Vincasar could be purchased for $7.50, while the AWP was a staggering $741.50.

*See* letter dated May 25, 2000 from U.S. Rep. Thomas J. Bliley to Nancy-Ann Min DeParle, HCFA Administrator. (P007015-P007490).

451.    Exhibit 1 to U.S. Rep. Pete Stark's September 28, 2000 letter to Alan F. Holmer, President of the Pharmaceutical Research and Manufacturers of America, reveals that while the

- 161 -

AWP for 1 mg of Vincasar® (vincritine sulfate) was $370.75 in 1997, one physician group's (American Oncology Resources) price in 1997 was only $4.15.  (P007515).  Similarly, while the AWP for 2 mg of Vincasar® was $741.50, AOR's actual pre-April 1997 price was $7.75 (in fact, The Pharmacia Group had offered to reduce it to $7.50).  *Id.*  As of April 2000, Adriamycin had a reported AWP of $241.36, while the real wholesale price was $33.43.

### 6.    Inflated Pharmacia AWPs From Pharmacia's Price Lists

452.    According to Pharmacia's own documents, the published AWPs for its drugs were higher than the actual prices provided to wholesalers.  In response to government subpoenas, the Pharmacia Group produced numerous price lists setting forth spreads between AWPs and prices apparently offered to wholesalers, providers and other intermediaries.  A review of those price lists reveals that Pharmacia has consistently offered hundreds of its drugs and other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers.  To repeat every one of those drugs and the spread offered to each specific customer here is not practical.  However, set forth below in Table 1 are a number of those drugs with spreads between the AWPs and direct prices.  Table 1 is an analysis of certain dosages of P&U drugs from a document entitled "Oncology Express CONTRACT PRICING" (PH011977) (Highly Confidential).

**Table 1**

| PRODUCT | LIST | AWP | CONTRACT PRICE | DIFFERENCE (between AWP and contract price) | PERCENTAGE SPREAD |
|---|---|---|---|---|---|
| Adriamycin | 883.80 | 1104.13 | 119.00 | 985.13 | 828% |
| Adrucil | 12.83 | 16.04 | 4.56 | 11.48 | 252% |
| Amphocin | 29.01 | 36.26 | 13.00 | 23.26 | 179% |
| Neosar | 80.22 | 100.28 | 16.15 | 84.13 | 521% |
| Toposar | 614.81 | 768.51 | 33.84 | 734.67 | 2,171% |

### 7.    The Pharmacia Group Provided Free Goods and Other Incentives

453.    In addition to marketing the spread, The Pharmacia Group has utilized other impermissible inducements to stimulate sales of its drugs.  These inducements were designed to

result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price. By utilizing "off-invoice" inducements, The Pharmacia Group provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

454.    The government investigators also uncovered an October 3, 1996 internal memorandum wherein Pharmacia told three oncology sales representatives:

> Our competitive intelligence tells us that our pricing on Adriamycin, although higher than generics, is in the "ball park" for you to attain the customers Adriamycin business. If needed, you have a "free goods" program to support your efforts against other forms of generic doxorubicin.
>
> . . . .
>
> You should not have to use "free goods" to steer customer [sic] away from NSS or OTN. OTN and NSS Adriamycin pricing is competitive. Use your "free goods" wisely to compete against other generic forms of Adriamycin, not to shift the customer to direct shipments. The higher we can keep the price of Adriamycin, the easier it is for you to meet your sales goals for Adriamycin.

(PH 024315).

455.    As set forth above, The Pharmacia Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

**O.    The Schering-Plough Group (Schering-Plough and Warrick)**

456.    The Schering Plough Group engages in an organization-wide and deliberate scheme to inflate AWPs. The Schering Plough Group has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below. The specific drugs of The Schering Plough Group for which relief is sought in this case are set forth in Appendix A, and are set forth below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| SCHERING-PLOUGH GROUP | Clarinex | desloratadine | Antihistamine<br>Used to relieve the symptoms of hay fever and hives of the skin |
| (Schering-Plough and Warrick) | Claritin | loratadine | Antihistamine<br>Used to relieve or prevent the symptoms of asthma |
| | Claritin-D | loratadine & pseudoephedrine | Antihistamine<br>Used to treat the nasal congestion, sneezing, and runny nose caused by colds and hay fever |
| | Diprolene | aug betamethasone dipropionate | Antipruritic (Skin & Mucous Membrane Agent)<br>Used to help relieve redness, swelling, itching, and discomfort of many skin problems |
| | Diprosone | betamethasone dipropionate | Antipruritic (Skin & Mucous Membrane Agent)<br>Used to help relieve redness, swelling, itching, and discomfort of many skin problems |
| | Elocon | mometasone furoate | Antipruritic (Skin & Mucous Membrane Agent)<br>Used to help relieve redness, swelling, itching, and discomfort of many skin problems |
| | Eulexin | flutamide | Antineoplastic<br>Used to treat cancer of the prostate gland |
| | Integrilin | eptifibatide | Cardiovascular Agent<br>Used in the treatment of patients with acute coronary syndrome |
| | Intron-A | interferon alfa-2b | Immunomodulator<br>Used in the treatment of hairy cell leukemia and chronic hepatitis B or C. |
| | Lotrisone | clotrimazole w/ betamethasone | Antifungal Agent (Anti-Infective Agent)<br>Used to treat fungus infections |
| | Nasonex | mometasone furoate (nasal) | Anti-Inflammatory Agent (Nasal Preparation)<br>Relieve the stuffy nose, irritation, and discomfort of hay fever and other allergies |
| | Peg-Intron | peginterferon alfa-2b | Biological Response Modifier<br>Used to treat chronic hepatitis C |
| | Proventil | albuterol sulfate | Bronchodilator (Respiratory Agent)<br>Used to treat the symptoms of asthma, chronic bronchitis, emphysema, and other lung diseases |
| | Rebetol | ribavirin | Biological Response Modifier<br>Used to treat hepatitis C |
| | Sebizon | sulfacetamide sodium | Anti-Infective Agent<br>Used in the treatment of conjunctivitis and other ocular infections |
| | Temodar | temozolomide | Antineoplastic<br>Used to treat a specific type of cancer of the brain in adults whose tumors have returned |

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | Trinalin Rep | azatadine & pseudoephedrine | Antihistamine<br>Used to treat the nasal congestion, sneezing, and runny nose caused by colds and hay fever. |
| | Vanceril | beclomethosone (nasal) | Anti-Inflammatory Agent; Antiasthmatic<br>Used to help prevent the symptoms of asthma |
| | | albuterol | Bronchodilator (Respiratory Agent)<br>Used for relief of bronchospasm in asthma sufferers |
| | | clotrimazole | Antifungal Agent (Anti-Infective Agent)<br>Used to treat yeast (fungus) infections of the vagina |
| | | griseofulvin ultramicrocrystalline | Antifungal Agent (Anti-Infective Agent)<br>Used to treat fungus infections of the skin, hair, fingernails, and toenails |
| | | oxaprozin | Central Nervous System Agent; Antipyretic (Analgesic)<br>Used in the treatment of osteoarthritis and rheumatoid arthritis |
| | | perphenazine | Antiemetic (Gastrointestinal Agent);<br>Antipsychotic Agent (Psychotherapeutic Agent)<br>Used to treat serious mental and emotional disorders. Also used to relieve moderate to severe pain in some hospitalized patients |
| | | potassium chloride | Electrolytic Agent<br>Used to prevent and treat potassium deficit secondary to diuretic or corticosteroid therapy |
| | | sodium chloride | Flush; Abortifacient<br>Used to remove medicine and blockage from intravenous (IV) catheter. Also used to induce abortion |
| | | sulcrafate | Gastrointestinal agent<br>Used for short term treatment of duodenal ulcer |
| | | theophylline er | Bronchodilator (Respiratory Agent)<br>Used to treat and/or prevent the symptoms of bronchial asthma, chronic bronchitis, and emphysema |

### 1.    The Schering Plough Group Has Been the Target of Government Investigations

457.    In connection with its scheme to inflate AWPs, The Schering Plough Group has been investigated by the Department of Justice, Texas Attorney General, West Virginia Attorney General, California Attorney General, California Bureau of Medi-Cal Fraud and Elder Abuse,

- 165 -

and the Department of Health and Human Services Office of Inspector General, and the U.S. Attorney for the District of Massachusetts.

458. On May 30, 2003, Schering Plough announced that the U.S. Attorney for the District of Massachusetts had advised that its subsidiary, Schering Corporation, is the subject of a federal grand jury investigation. Schering Plough is the target of a criminal investigation involving: (i) providing remuneration, such as drug samples, to providers to induce the purchase of Schering products for which payment was made through federal health care programs; (ii) selling misbranded or unapproved drugs; (iii) submitting false wholesale pricing information for its pharmaceutical products to the government; and (iv) destroying evidence and obstructing justice relating to the government's investigation. *See* Schering Plough Press Release dated May 30, 2003, located at http://www.sch-plough.com/news/2003/business/20030530.html; "Schering Plough expects indictment," The Philadelphia Inquirer, at C3 (May 31, 2003). Moreover, according to Schering Plough's Form 10-K for the year 2000, this investigation has focused on "whether the AWP set by pharmaceutical companies for certain drugs improperly exceeds the average prices paid by dispensers . . . and other pricing and/or marketing practices."

459. A Medicaid investigation by the Texas Attorney General revealed that The Schering-Plough Group defrauded the State of Texas $14.5 million. Investigators determined that The Schering-Plough Group provided the greatest "spread" amongst the drug companies selling albuterol in Texas, and thereby obtained the largest market share for albuterol. The Schering-Plough Group sold a box of albuterol to pharmacies for $13.50, while it charged the Texas Medicaid program $40.30, a 200% increase. *See Cornyn Sues Three Drug Companies for Medicaid Fraud*, Press Release by the Office of the Attorney General, State of Texas, Sept. 7, 2000. (www.oag.state.tx.us.gov)

460.    On October 11, 2001, the West Virginia Attorney General filed suit against

Warrick, alleging that Warrick defrauded state agencies and citizens by deliberately overstating

the AWP for certain drugs, including albuterol, from approximately 1995 until December 2000.

### 2.    The Schering Plough Group Controls the Published AWP for Its Products

461.    The Schering Plough Group has controlled and set the AWPs for its

pharmaceutical products through direct communications with industry compendia during the

Class Period.  For example, on February 23, 1995, Warrick sent a letter to First Data Bank,

stating:

> Effective Friday, February 24, 1995, at 5:00 p.m., the price of
> Warrick Albuterol Solution 0.5% 20ml will increase as follows:

| | NDC 59930- | AWP |
|---|---|---|
| Albuterol Solution 0.5% 20 ml | 1515-04 | $13.95 |

(WAR0024086) (Highly Confidential).

### 3.    The Schering Plough Group's AWP Manipulation Benefited Providers at the Expense of the Class

462.    A Schering Laboratories memorandum dated May 20, 1993 demonstrates

Defendant's recognition that intermediaries choose drugs based on favorable AWP

spreads. At the generic launch of albuterol, Schering stated:

> Proventil will stay listed at AWP; therefore, Proventil is a favored
> product for third party reimbursement that provides for the AWP
> minus 10% reimbursement rate to chains.  Thus, they can buy off
> the Proventil deal and bill at AWP.

(WAR005419-20) (Highly Confidential).

463.    According to Warrick's own documents, Warrick consistently maintained a

spread between the AWPs and the direct prices it offered for its albuterol products.  For example,

a "Price Change" alert dated June 7, 1999 sent to Warrick customers provides:

| Product | Pkg. Size | NDC 59930 | AWP | Direct Price |
|---|---|---|---|---|

- 167 -

| Albuterol Inhalation Aerosol | 17 g | 1560-1 | $21.41 | $3.40 |
| Albuterol Aerosol Refill | 17 g | 1560-2 | $19.79 | $3.40 |

(WAR0000532) (Highly Confidential). Thus, Warrick touted a 529% spread on its albuterol inhalation aerosol and a 482% spread on the refill.

464.    In a report to Congress, the GAO reported that albuterol sulfate was one of a small number of products that accounted for the majority of Medicare spending and volume. Albuterol sulfate accounted for 6.3% of total Medicare spending, ranking fifth out of more than 400 covered drugs. Albuterol sulfate ranked first for volume of units covered, accounting for 65.8% of total units reimbursed. *See* GAO Report to Congressional Committees, "Payments for Covered Outpatient Drugs Exceed Providers' Cost," Tables 1 and 2, pp. 7-8 (GAO-01-0118 (P005546-005578)). The Schering Plough Group is one of three companies noted by the DOJ as manufacturing albuterol. *See* DHHS report, AB-00-86 (P006299-006316).

465.    According to The Schering Plough Group's own documents, the published AWPs for most of its drugs were higher than the actual prices provided to wholesalers.

466.    In response to government subpoenas, The Schering Plough Group produced numerous price lists setting forth spreads between AWPs and prices apparently offered to wholesalers, providers and other intermediaries. A review of those price lists reveals that Warrick has consistently offered hundreds of its drugs and other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers. To repeat every one of those drugs and the spread offered to each specific customer here is not practical. However, set forth below in Tables 1, 2 and 3 are a number of those drugs with spreads between the AWPs and direct prices. Table 1 is an analysis of certain dosages of Warrick drugs from a document entitled, "Amerisource" (WAR0022160) (Highly Confidential).

**TABLE 1**

| LABEL (MFG) | GENERIC NAME | AWP | INVOICE COST | DIFFERENCE | PERCENTAGE SPREAD |
| --- | --- | --- | --- | --- | --- |
| Warrick | Albuterol Inhaler | 21.41 | 5.75 | 15.66 | 272% |
| | Aug Beta Dip Oint | 43.20 | 26.90 | 16.30 | 61% |

- 168 -

| LABEL (MFG) | GENERIC NAME | AWP | INVOICE COST | DIFFERENCE | PERCENTAGE SPREAD |
|---|---|---|---|---|---|
| | 0.05% | | | | |
| | Griseofulvin | 82.47 | 37.22 | 45.25 | 122% |
| | Theophylline | 11.70 | 2.83 | 8.87 | 313% |

Table 2 is an analysis of certain dosages of Warrick drugs from a document entitled, "1997 Care Group Bid Proposal." (WAR0022122) (Highly Confidential).

**TABLE 2**

| PRODUCT | AWP | INVOICE PRICE | NET PRICE (AFTER REBATE) | DIFFERENCE BETWEEN AWP AND INVOICE PRICE | PERCENTAGE SPREAD |
|---|---|---|---|---|---|
| Clotrimazole | 22.25 | 7.77 | 6.99 | 14.48 | 186% |
| Perphenazine | 78.00 | 19.53 | 17.58 | 58.47 | 299% |

Table 3 is an analysis of certain dosages of Warrick drugs from a document entitled, "Managed Care Pricing," dated July 1, 2002. (WAR0054226) (Highly Confidential).

**TABLE 3**

| Product | Minimum PBM/Mail Order/ Staff Price Guide | Target PBM/Mail Order/ Staff Price Guide | Minimum GPO Price Guide | Target GPO Price Guide | AWP | Difference | % Spread |
|---|---|---|---|---|---|---|---|
| ISMN | 4.48 | 4.93 | 5.15 | 5.38 | 117.40 | 112.02 | 2,082% |
| Oxaprozin | 11.42 | 12.56 | 13.13 | 13.70 | 117.40 | 103.70 | 757% |
| Potassium Chloride | 9.67 | 10.64 | 11.12 | 11.60 | 65.00 | 53.40 | 460% |
| Sodium Chloride | 6.12 | 6.73 | 7.04 | 7.34 | 24.30 | 16.96 | 231% |
| Sulcrafate Tablets | 45.15 | 49.67 | 51.92 | 54.18 | 353.71 | 299.53 | 553% |

**4.     The DOJ Specifically Documented AWP Inflation for Albuterol Sulfate**

467.    In a report published by the DHHS (AB-00-86 (P006299-006316)), the DOJ documented at least one instance where the published AWPs for various dosages of albuterol sulfate manufactured by The Schering Plough Group were substantially higher than the actual prices listed by wholesalers. The following figures compare the DOJ's determination of an accurate AWP for one particular dosage, based upon wholesalers' price lists, with the AWP

- 169 -

reported by The Schering Plough Group in the 2001 *Red Book*: The Schering-Plough Group

reported to *Red Book* an AWP of $30.25 for albuterol sulfate, yet the DOJ determined the actual

AWP to be $9.16, or $21.09 less.

468.    As stated in a May 4, 2000, letter from U.S. Rep. Tom Bliley, Chairman of the

Congressional Committee on Commerce, to Raman Kapur, President of Warrick:

> I am writing to you because one of the drugs reflecting a
> significant variation between the AWP-based prices paid by
> Medicare and the prices generally charged to private sector
> purchasers is albuterol sulfate, a drug manufactured by Warrick
> Pharmaceuticals.

(P006938-006941).

469.    In his May 4, 2000, letter, Bliley outlined The Schering Plough Group's scheme

with respect to the prescription drug albuterol sulfate. The government's investigation

uncovered a significant spread between the amount Medicare reimbursed for albuterol sulfate

and the amount the Schering-Plough Group actually charged. U.S. Rep. Bliley stated:

> The OIG [Office of the Inspector General] has determined that the
> Medicare-allowed amount for albuterol sulfate, a pharmaceutical
> product sold by your company, in the Fiscal Year 1996 was $.42.
> The OIG further estimated that the actual wholesale price of this
> drug was $.15 and the highest available wholesale price that the
> OIG was able to identify was $.21.

*Id.*

### 5.    The Schering Plough Group Provided Free Goods and Other Incentives

470.    In addition to marketing the spread, The Schering Plough Group has utilized other

impermissible inducements to stimulate sales of its drugs. These inducements were designed to

result in a lower net cost to the provider while concealing the actual wholesale price beneath a

high invoice price. By utilizing "off-invoice" inducements, The Schering Plough Group

provided purchasers with substantial discounts meant to gain their patronage while maintaining

the fiction of a higher wholesale price.

471.    As set forth above, The Schering Plough Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

## P.    The Sicor Group (Sicor, Gensia and Gensia Sicor)

472.    The Sicor Group engages in an organization-wide and deliberate scheme to inflate AWPs. The Sicor Group has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below. The specific drugs of The Sicor Group for which relief is sought in this case are set forth in Appendix A, and are identified below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| SICOR GROUP (Sicor, Gensia and Gensia-Sicor) | | acyclovir sodium | Anti-Infective Agent<br>Used in the treatment of herpes infections |
| | | amikacin sulfate | Antibiotic Agent (Anti-Infective Agent)<br>Used to treat respiratory tract, urinary tract, bone, skin and soft tissue infections |
| | | amphotercin b | Antifungal Agent (Anti-Infective Agent)<br>Used to help the body overcome serious fungus infections |
| | | doxorubicin hydrochloride | Antineoplastic<br>Used in the treatment of ovarian cancer and AIDS-related Kaposi's sarcoma |
| | | etoposide | Mitotic Inhibitor (Antineoplastic)<br>Used in the treatment of testicular neoplasm and small cell cancer of the lung |
| | | leucovorin calcium | Antianemic Agent (Blood Modifier)<br>Used in the treatment of anemia |
| | | pentamidine isethionate | Anti-Infective Agent<br>Used in the treatment of pneumonia |
| | | tobramycin sulfate | Antibiotic Agent (Anti-Infective Agent)<br>Used to treat severe infection |

- 171 -

1.    **The Sicor Group Has Been the Target of Government Investigations**

473.    In connection with its scheme to inflate AWPs, The Sicor Group has been

investigated by the Department of Justice, Department of Health and Human Services Office of

Inspector General, the Texas Department of Health, and the California Attorney General.

2.    **The Sicor Group Controls the Published AWP for Its Products**

474.    The Sicor Group has controlled and set the AWPs for its pharmaceutical products

through direct communications with industry compendia during the Class Period.  For example,

by letter dated February 21, 1994, Gensia advised MediSpan of the impending launch of its new

product called "Etoposide" and stated:  "I have also include [sic] some guidelines in this pack for

establishing Gensia's AWPs for our Etoposide." (SICOR 00955) (Confidential).  That same day,

Gensia sent a second letter to MediSpan stating, in part:

> The following represents the detailed information for this product
> and the AWP that we would like MediSpan to use:

### ETOPOSIDE INJECTION

| NDC # | PRODUCT DESC. | VIALSIZE | LIST PRICE | AWP |
|---|---|---|---|---|
| 0703-5643-01 | 20MG/ML (100MG) | 5ML | $105.16 | $131.30 |
| 0703-5646-01 | 20MG/ML (500MG) | 25ML | $483.74 | $638.76 |

(SICOR 00956).

475.    Moreover, The Sicor Group has told its sales force to rely on the AWP

information contained in the industry compendia when marketing to customers.  For example, a

memorandum dated April 6, 1994 to "Field Sales force" regarding "Average Wholesale Prices

(AWP)" provides in pertinent part:

> Attached is a copy of Medi-Span's March 31, 1994 printout of
> product and AWP information for Gensia Laboratories.  Since this
> information comes directly from Medi-Span's computer file, you
> will find it to be more accurate than the information that your
> customers are using from their reference texts.  You will note, that
> the AWP information (listed in pack quantity) is found in the third
> column from the right. Additionally, the two columns to the
> immediate left of the AWP column represent: WAC (Wholesalers
> Acquisition Cost) and DP (Direct Price).

- 172 -

(SICOR 00753) (Highly Confidential).

### 3. The Sicor Group's AWP Manipulation Benefited Providers at the Expense of the Class

476. The Sicor Group has engaged in an ongoing deliberate scheme to inflate AWPs.
For example, by letter dated September 25, 2000 to the HCFA administrator, the Chairman of the
Commerce Committee revealed that: "[I]n 1998, a health care provider could buy Gensia's
Etoposide for $14.00, while the AWP used to determine Medicare reimbursement was $141.97."
(P007015-P007490).

477. The Sicor Group's marketing strategies further demonstrate its fraudulent
practices. In a marketing document prepared by Gensia and obtained by the government in its
investigation, Gensia stated:

> Concentrate field reps on the top 40 AIDS hospitals using a $54.00
> price in conjunction with a 10% free goods program to mask the
> final price. Provides the account with an effective price of $48.60
> per vial.

*See* letter dated September 28, 2000 from U.S. Rep. Pete Stark to Alan F. Holmer, President of
the Pharmaceutical Research and Manufacturers of America. (P007512).

478. Certain handwritten notations appear on this same marketing document
comparing the AWP with other prices used for the same drug:

> FSS    $44.95
>
> Whls   $71.00
>
> Distr.  $51.50
>
> AWP    $109.20

(P007532).

479. Similarly, a document entitled "Comparison of AWPs" based on the 1996 *Red
Book* contains the following handwritten notation:

> Rob, Joe,

Tim suggested sending this info to the reps. Your thoughts?

B

(SICOR 00756) (Highly Confidential). Following this notation is a chart comparing the AWPs for certain drugs published by various manufacturers, including Gensia. One example follows:

| Doxurubicin | | Abbott/ Adria | Bedford | FUSA | Gensia | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | X | | | |
| 10 | | $48.31 | $47.35 | $44.50 | $49.29 | <Polymer | | |
| | | | | | X | | | |
| 50 | | $241.56 | $236.74 | $231.00 | $246.46 | <Polymer | | |
| | | | | | X | | | |
| 200 | | $946.94 | $945.98 | NA | $966.14 | <Polymer | | |

*Id.*

480.    Moreover, Gensia disseminated advertisements that actually contained a comparison of the Contract Price with the AWP and set forth the resulting spread (SICOR 00751, 00752) (Highly Confidential), because Gensia knew that marketing the spread was in its best interests. Realizing this, one customer of Gensia, Opti Care, sent a memorandum to all its offices (with a copy to Gensia) stating: "Gensia's products offer a significant spread between AWP and contract price. This spread may be attractive, when a payor's reimbursement is based on AWP and the drug is not MAC'd. (SICOR 00758) (Highly Confidential).

### 4.    Specific Sicor Group AWPs Documented by the DOJ

481.    In a report published by the DHHS, the DOJ documented at least 17 instances where the published AWPs for various dosages of drugs manufactured by The Sicor Group were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by The Sicor Group in the 2001 *Red Book*.

- 174 -

| Drug | The Sicor Group's 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Spread |
|------|------|------|------|------|
| Acyclovir Sodium | $125.00[9] | $100.00 | $25.00 | 25% |
| Amikacin Sulfate | $87.50 | $72.68 | $14.82 | 20% |
| Tobramycin Sulfate | $342.19 | $6.98 | $335.21 | 4,802% |

(P006299-006316).

### 5.    Inflated Sicor Group AWPs From the Sicor Group's Price Lists

482.    According to The Sicor Group's own documents, the published AWPs for its drugs were higher than the actual prices provided to wholesalers. In response to government subpoenas, The Sicor Group produced numerous price lists setting forth spreads between AWPs and prices apparently offered to wholesalers, providers and other intermediaries. A review of those price lists reveals that The Sicor Group has consistently offered hundreds of its drugs and other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers.  To repeat every one of those drugs and the spread offered to each specific customer here is not practical. However, set forth below in Tables 1 and 2 are a number of those drugs with spreads between the AWPs and direct prices. Table 1 is an analysis of certain dosages of two Gensia drugs from a Medi-Span printout on which Gensia wanted its sales force to rely (the remaining drugs were redacted by The Sicor Group prior to production).   (SICOR 00754-755) (Highly Confidential).

### Table 1

| Product | WAC | DP | AWP | DIFFERENCE (between AWP and DP) | PERCENTAGE SPREAD |
|---------|-----|-----|-----|------|------|
| Etoposide Inj | 483.73 | 483.73 | 638.76 | 155.03 | 32% |
| Leucovorin CA Inj | 32.50 | 32.50 | 40.63 | 8.13 | 25% |

483.    Table 2 is an analysis of certain dosages of four Gensia drugs from multiple Gensia price lists for a particular customer, Pharmaceutical Buyers, Inc., comparing the customer's Contract Price with the AWP and the resulting spread (the remaining drugs were

---

[9] Calculation based on the AWP listed in the 2000 *Red Book*.

redacted by The Sicor Group prior to production).  (SICOR 00555, 573, 614, 633) (Highly Confidential).

**Table 2**

| Product | AWP | PBI CONTRACT | SPREAD | PERCENTAGE SPREAD |
|---|---|---|---|---|
| DOXURUBICIN HYDROCHLORIDE | 871.70 | 293.60 | 578.10 | 1,969% |
| ETOPOSIDE | 1207.33 | 456.00 | 751.33 | 1,648% |
| LEUCOVORIN CALCIUM | 39.00 | 4.58 | 34.42 | 752% |
| PENTAMIDINE ISETHIONATE | 468.00 | 193.75 | 274.25 | 1,415% |

### 6.    The Sicor Group Provided Free Goods and Other Incentives

484.    In addition to marketing the spread, The Sicor Group has utilized other impermissible inducements to stimulate sales of its drugs.  These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.  By utilizing "off-invoice" inducements, such as free goods, The Sicor Group provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.  (SICOR 00718, 04182, 00689) (Highly Confidential).

485.    As set forth above, The Sicor Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

### Q.    Warrick

486.    Warrick has acted to inflate AWPs pursuant to the scheme identified above.  The specific drugs are identified in Appendix A.

### R.    Watson

487.    Watson engages in an organization-wide and deliberate scheme to inflate AWPs. Watson has stated fraudulent AWPs for all or almost all of its drugs, including: Ferrlecit, Verapamil HCL, Vinblastine Sulfate, Vincristine Sulfate, Dexamethasone, Diazepam,

- 176 -

Gentamicin, Testosterone Ethanate, Vancomycin, Fluphenazine, Gemfibrozil, Imipramine, Nadolol, and Perphenazine. The specific drugs of Watson for which relief is sought in this case are set forth in Appendix A or in the proposed class certification order, and are summarized below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| WATSON (Watson and Schein) | Ferrlecit | sodium ferric gluconate complex in sucrose injection | Iron Preparation (Blood modifier) Used for treatment of anemia in patients undergoing hemodialysis |
| | InfeD | iron dextran | Iron Preparation (Blood modifier); Nutritional Supplement Used for treatment of iron deficiency |
| | | dexamethasone acetate | Hormone; Glucocorticoid Used to treat inflammatory conditions, hematologic disorders and cerebral adema |
| | | dexamethasone sodium phosphate | Hormone; Glucocorticoid Used to treat inflammatory conditions, hematologic disorders and cerebral adema |
| | | diazepam | Central Nervous System Agent Used to treat status eplipeticus and anxiety disorders.  Also used as an amnesic prior to surgical procedures |
| | | estradiol | Estrogen (Hormone) Used for treatment of menopausal symptoms and postmenopausal osteoporosis |
| | | fluphenazine hcl | Central Nervous System Agent; Psychotherapeutic Agent Used to manage psychotic disorders |
| | | gemfibrozil | Antilipemic Agent (Cardiovascular Agent) Used to lower cholesterol |
| | | gentamicin sulfate | Anti-Infective Agent Used as a general antibiotic to treat serious gastrointestinal, respiratory, bone, skin and soft tissue infections |
| | | imipramine hcl | Central Nervous System Agent; Psychotherapeutic Agent Used in the treatment of depression |
| | | lorazepam | Central Nervous System Agent Used for treatment of anxiety disorders |
| | | nadolol | Antihypertensive (Cardiovascular Agent) Used in the treatment of hypertension and management of angina |

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | | perphenazine | Central Nervous System Agent; Psychotherapeutic Agent Used to manage psychotic disorders |
| | | propanolol hcl | Beta Adrenergic Blocking Agent (Cardiovascular Agent) Used to treat hypertension |
| | | ranitidine hcl | Histamine Receptor Antagonist (Gastrointestinal Agent) Used for treatment of duodenal ulcer, gastric ulcer, gastroesophagael disease and heartburn |
| | | vancomycin hcl | Antibiotic Agent (Anti-Infective Agent) Used as a general antibiotic |
| | | verapamil hcl | Calcium Channel Blocker (Cardiovascular Agent) Used in the treatment of tachyarrhythmia, angina and hypertension |

### 1. Watson Has Been the Target of Government Investigations

488. In connection with its scheme to inflate AWPs, Watson has been investigated by the Department of Justice, Department of Health and Human Services Office of Inspector General, and the State of California.

### 2. Watson's Definition and Understanding of AWP

489. Watson plainly recognizes that "AWP drives reimbursement." (MDLW12564) (Highly Confidential).

### 3. Watson Controls the Published AWP for Its Products

490. Watson has controlled and set the AWPs for its pharmaceutical products through direct communications with industry compendia during the Class Period. In a memo, Watson states that it is faxing prices to various pricing services, but "not all pricing services received all of the prices listed on this letter. Most only received the AWP price…" The memo goes on to state that "AWP is the primary price being communicated in these faxes to establish a reference for reimbursement." (MDLW25203) (Highly Confidential).

- 178 -

491.    A *Red Book* Product Listing Verification form asks for approval of changes to the stated AWP for Schein's (which was later acquired by Watson) Verapamil HCL, Vinblastine Sulfate and Vincristine Sulfate. A Schein executive okayed the changes and signed the *Red Book* form. (MDLW00887).

### 4.    Watson's AWP Manipulation Benefited Providers at the Expense of the Class

492.    When deciding where to set the price for its drug Ferrlecit, Watson recognized that, in a Medicare Reimbursement Mechanism, "margin drives AWP and ASP" and that a goal of setting the price is that "profit margin at the unit level must not decrease." Watson recognizes that 20% of reimbursement is patient co-pay, which can be private insurance, Medicaid or cash. (MDLW05457-05460) (Highly Confidential).

493.    Watson was well aware that payors relied on the AWP, and was sensitive to avoid alerting payors to Watson's AWP manipulation. In the context of a pricing study, a Schein executive noted that "it would be great to get a read from some HCFA personnel regarding what level of price will set off alarms with reimbursement." (MDLW25216) (Highly Confidential).

494.    In that same document, Watson acknowledges that AWP manipulation is the key to its customers' profits "if through reimbursement we can maintain or increase the money a unit makes on using this product does the price even matter?" (MDLW25216) (Highly Confidential).

### 5.    Specific Watson AWPs Documented by the DOJ

495.    In a report published by the DHHS (AB-00-86), the DOJ documented at least 12 instances where the published AWPs for various dosages drugs manufactured by Watson were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by Watson in the *Red Book*.

- 179 -

| Drug | Watson's 1998–2001 *Red Book* AWPs | DOJ Determined Actual AWP | Difference | Spread |
|---|---|---|---|---|
| Dexamethasone Acetate | $46.45 (1998) | $11.50 | $34.95 | 304% |
| Dexamethasone Sodium Phosphate | $93.04 (2001) | $1.08 | $91.96 | 851% |
| Diazepam | $18.15 (2000) | $2.50 | $15.65 | 626% |
| Gentamicin Sulfate | $114.10 (1999) | $1.18 | $112.92 | 957% |
| Iron Dextran | $377.04 (2001) | $24.69 | $352.35 | 1,427% |
| Testosterone Ethanate | $42.10 (2001) | $13.39 | $28.71 | 214% |
| Vancomycin HCL | $70.00 (1998) | $3.84 | $60.16 | 1,567% |

(P006299-P006316).

### 6.    Inflated Watson AWPs From Watson's Price Lists

496.    In response to government subpoenas, Watson produced numerous price lists setting forth spreads between AWP and prices offered to wholesalers, providers and other intermediaries.  A review of those lists indicates that Watson has consistently offered drugs to its customers at prices significantly below the published AWP, and that the spread was of great importance to Watson's customers.   It is not practical to repeat every one of those drugs and the spread offered to specific customers.  However, set forth below in Table 1 are a number of those drugs (not already referenced above) and the substantial spread offered to Watson customers.

497.    Table 1 is an analysis of certain dosages of Schein drugs from a chart titled Schein Product Status Report, February 1996.  (MDLW01237).

**Table 1**

| Drug | AWP | WAC | % Spread |
|---|---|---|---|
| Fluphenazine HCL 1mg | $46.08 | $15.71 | 193% |
| Gemfibrozil 600mg | $55.65 | $7.95 | 600% |
| Imipramine HCL 10mg | $4.45 | $1.32 | 237% |
| Nadolol 20mg | $85.32 | $42.95 | 98% |
| Perphenazine 2mg | $42.53 | $19.76 | 115% |

- 180 -

498.    As set forth above, Watson's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Plaintiffs and the Class.

### 7.    Watson Provided Free Goods and Other Incentives

499.    In addition to marketing the spread, Watson has utilized other inducements to stimulate sales of its drugs.  These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.  In one instance in May 2000, Schein offered "Priority Customers" an additional 5% discount on Ferrlecit "off invoice" for all purchases made that month.  (MDLW15896.)  By utilizing "off-invoice" inducements, Watson provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

500.    As set forth above, Watson's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

### 8.    Watson Concealed Its AWP Manipulation

501.    Watson deliberately acted to conceal its fraudulent reporting and marketing of the AWP spread.  For example, as noted above, Watson reported its AWP to various industry compendia, but disclosed WAC, direct price and average sale price to only a very few, if any, outside entities.  (MDLW25204) (Highly Confidential).  Also as noted above, Watson needed to keep the AWP high, but at a level that would not "set off alarms with reimbursement" (MDLW25216).  Watson effectively hid the AWP spread from Plaintiffs and the Class.

## VI.    DIRECT DAMAGE SUSTAINED BY PLAINTIFFS
## AND THE MEMBERS OF THE AWP CLASS

502.    Plaintiffs and other Third-Party Payors who are members of the class reimburse health care providers for pharmaceuticals based upon the published AWP for brand name drugs

and based upon MAC, for generic drugs, which in turn is derived from AWP.  Accordingly, plaintiffs and Third-Party Payors are directly damaged by fraudulent AWP pricing schemes for drugs covered by employee health and benefit plans.  By virtue of the fact that AWP is the reimbursement benchmark for pricing of the AWPIDs at issue, such injury occurs in all aspects of the distribution chain for the AWPIDs, including the PBM segment, non-PBM purchases, Part B covered drugs and non-Part B covered drugs.

## VII.   CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME

503.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves Classes comprised of:

**Physician-Administered Drugs Class (Medicare Part B Co-Pay and Private System Physician-Administered Drugs)**

All persons or entities in the United States and its territories who (i) paid all or a portion of the co-insurance under Medicare Part B for an AWPID during the Class Period, and/or (ii) reimbursed another for a physician-administered AWPID under a contract or other payment scheme that expressly uses AWP as a pricing standard, along with all individual persons who paid coinsurance (*i.e.*, co-pays proportional to the reimbursed amount) under such circumstances for such AWPIDs, during the Class Period. Excluded from the Class are those who make flat co-pays and those whose co-pay was reimbursed by an insurer or other third party.

**Self-Administered and Specialty Pharmacy Drugs Class (Third-Party and Co-Payor Class for Self-Administered Drugs)**

All persons or entities in the United States and its territories who reimbursed another for any self-administered AWPID, or for any AWPID which was distributed through a specialty pharmacy, under a contract or other payment scheme that expressly uses AWP as a pricing standard, along with all individual persons who paid coinsurance (*i.e.*, co-pays proportional to the reimbursed amount) under such contracts for such AWPIDs.  Excluded from the Class are those who make flat co-pays and those whose co-pay was reimbursed by an insurer or other third party.

The foregoing class is further subdivided into the following subclasses:

(a)     brand name sub-class; and

(b)     generic drug sub-class

### RICO Class for Self-Administered and Specialty Drugs

All persons or entities in the United States and its territories who reimbursed another for any self-administered AWPID, or for any AWPID which was distributed through a specialty pharmacy, under a contract with Caremark, AdvancePCS, Express Scripts and/or Medco (or their predecessors), which contract expressly uses AWP as pricing standard, along with all individual persons who paid coinsurance (*i.e.*, co-pays proportional to the reimbursed amount) under such contracts for such AWPIDs. Excluded from the Class are those who make flat co-pays and those whose co-pay was reimbursed by an insurer or other third party.

The foregoing class is further subdivided into the following subclasses:

(a)     brand name sub-class; and

(b)     generic the sub-class

504.    Plaintiffs also seek certification of each of the classes pursuant to Fed. R. Civ. P. 23 (b)(2) for Count III of the TAMCAC, in that 23 (b)(2) certification is appropriate as this Count seeks purely declaratory and injunctive relief. The class representatives for this Count are each of the plaintiffs, including the organizational plaintiffs.

505.    The Class Period is January 1991 to the present.

506.    Excluded from these classes are the defendants herein; any subsidiaries or affiliates of defendants; the officers and directors of defendants during the Class Period; members of the Individual Defendants' immediate families; any person, firm, trust, corporation, officer, director or any individual or entity in which any defendant has a controlling interest or which is related to, or affiliated with, any of the defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party and governmental entities with respect to claims asserted for governmental damages.

507.    The Classes consist of numerous individuals and entities throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a) (1). The disposition of the claims of the Class Members in a single class action will provide substantial benefits to all parties and to the Court.

508.    The claims of the representative Plaintiffs are typical of the claims of the Class, as required by Rule 23(a) (3), in that the representative Plaintiffs include people and entities who, like all Class Members, purchased the AWPIDs at inflated prices based on AWPs. Such representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct because, among other things, they paid prices for these drugs that were higher than they would have been but for Defendants' improper actions and have had medical providers make pharmacy decisions based on economic factors as opposed to purely medical factors.

509.    The factual and legal bases of each Defendant's misconduct are common to the Class Members and represent a common thread of fraud and other misconduct resulting in injury to Plaintiffs and members of the Class.

510.    There are many questions of law and fact common to Plaintiffs and the Class, and those questions predominate over any questions that may affect individual Class Members, within the meaning of and fulfilling Rules 23(a) (2) and 23(b)(2) and (3). Common questions of law and fact include, but are not limited to, the following:

        a.    Whether Defendants engaged in a fraudulent and/or deceptive scheme of improperly inflating the AWPs for the Drugs identified in Appendix A used by Plaintiffs and Class Members as the basis for reimbursement;

        b.    Whether Defendants artificially inflated the AWPs for these drugs;

        c.    Whether it was the policy and practice of Defendants to prepare marketing and sales materials that contained comparisons of the published AWPs and the spreads available;

- 184 -

   d.  Whether Defendants provided free samples of the AWPIDs to providers, and whether Defendants instructed them to bill Plaintiffs and the Class for those free samples;

   e.  Whether Defendants' provision of free samples to providers, with the intent that the providers bill Plaintiffs and the Class for the free samples, was unlawful;

   f.  Whether Defendants paid financial inducements to providers and other intermediaries, with the effect of lowering their costs for AWPIDs;

   g.  Whether Defendants engaged in a pattern and practice of paying illegal kickbacks, disguised as free goods, rebates, consulting fees, junkets and education grants to providers and other intermediaries;

   h.  Whether AWPs are used as a benchmark for negotiating payments by Third-Party Payors for the AWPIDs;

   i.  Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class Members to make inflated payments for the AWPIDs;.

   j.  Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiffs and the Class members;

   k.  Whether Defendants formed enterprises for the purpose of carrying out the AWP Scheme;

   l.  Whether Defendants used the U.S. mails and interstate wire facilities to carry out the AWP Scheme;

   m.  Whether Defendants' conduct violated RICO;

   n.  Whether Defendants are liable to Plaintiffs and the Class members for damages for conduct actionable under the various state consumer protection statutes.

  511. Plaintiffs will fairly and adequately represent and protect the interests of the Class, as required by Rule 23(a)(4). Plaintiffs have retained counsel with substantial experience in prosecuting nationwide consumer class actions. Plaintiffs and their counsel are committed to

vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the Class.

512.   Plaintiffs and members of the Class have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the Courts and the litigants, and promotes consistency and efficiency of adjudication. Additionally, Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Class and require Court imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby making appropriate equitable relief to the Class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

### COUNT I[10]

### VIOLATIONS OF 18 U.S.C. § 1962(C)

### (AGAINST DEFENDANT DRUG MANUFACTURERS IDENTIFIED HEREIN FOR UNLAWFUL CONDUCT ASSOCIATED WITH AWPID DRUGS)

513.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

---

[10] This Amended Complaint does not contain certain material struck or dismissed by the Court in its May 13, 2003 Memorandum and Order. For instance, many association plaintiffs and several RICO counts that were included in the MCC have not been included in this amended complaint in order to reduce the volume of an already lengthy pleading. However, plaintiffs incorporate by this reference, into this Complaint, material struck or dismissed by the Court in order to, if necessary, preserve appellate rights. Plaintiffs acknowledge that these allegations would be dismissed if reasserted.

514.     This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C.
§ 1962(c), is asserted against the Defendant Drug Manufacturers on behalf of the AWP classes
with respect to all AWPID drugs not purchased through use of a PBM and includes drugs
covered under Medicare Part B and those outside of Part B coverage.  The pricing of all such
AWPIDs was directly tied to the published AWPs

515.     Plaintiffs, the members of Classes, and the Defendant Drug Manufacturers are
each "persons," as that term is defined in 18 U.S.C. § 1961(3).

516.     The following publishers of pharmaceutical industry compendia that periodically
publish the AWPs, both in printed and electronic media, for various dosages of drugs are each
"persons," as that term is defined in 18 U.S.C. § 1961(3):  (a) **Thomson Medical Economics**
("Thomson Medical") is a division of Thomson Corporation, a Delaware corporation with its
principal place of business located at One Station Place, Stamford, Connecticut, and it is the
publisher of the *Drug Topics Red Book* (the "*Red Book*"); (b) **First DataBank, Inc.,** ("First
DataBank") a Missouri corporation, with its principal place of business at 1111 Bayhill Drive,
San Bruno, California, and it is the publisher of drug pricing information including, but not
limited to, *American Druggist First Databank Annual Directory of Pharmaceuticals* and
*Essential Directory of Pharmaceuticals*, commonly referred to as the *Blue Book*; (c) and **Facts &
Comparisons, Inc.,** ("Facts & Comparisons") a division of Lippincott Williams & Wilkins, Inc.,
a Pennsylvania corporation which acquired all drug information reference products formerly
published by Medi-Span, Inc. and which currently makes available drug pricing information,
including, but not limited to, the Medi-Span *Master Drug Data Base*.  These entities are
sometimes collectively referred to herein as "the Publishers."

517.     At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendant Drug
Manufacturers conducted the affairs of certain association-in-fact enterprises identified herein,
the affairs of which affected interstate commerce through a pattern of racketeering activity.

**The Manufacturer-Publisher Enterprises**

518.    For purposes of this claim, certain RICO "enterprises" are associations-in-fact
consisting of (a) one of the Publishers that reported AWPs for AWPIDs, and (b) a Defendant
Drug Manufacturer, including its directors, employees and agents. These associations-in-fact are
sometimes collectively referred to herein as the "Manufacturer-Publisher Enterprises." Each of
the Manufacturer-Publisher Enterprises is an ongoing and continuing business organization
consisting of both corporations and individuals that are and have been associated for the common
or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price
information, which all too often includes disseminating false and misleading AWPs, (b) selling,
purchasing, and administering AWPIDs to Plaintiffs and Class members, and (c) deriving profits
from these activities. Each of the enterprises had a common purpose of perpetuating use of
AWPs as a benchmark for reimbursement in the pharmaceutical industry, generally, and
specifically for the drugs of that defendant. The manufacturing defendants have this as a purpose
because without the AWP scheme, they would not be able to push the spread. The publishers
agree to this scheme, because if they did not, the manufacturers could easily revert to the other
methods of publishing prices or the publishers would have to independently investigate the AWP
at significant expense. The Publishers also have an economic incentive to merely report the
AWPs provided to them by the manufacturers, because to do otherwise would require the
Publishers to spend money to extensively survey actual sales prices in the market. By simply
republishing what is submitted to them by the drug manufacturers, the Publishers save on
expenses and consequently reap greater profits. Thus, each of the Manufacturer-Publisher
Enterprises has a common purpose of perpetuating the use of AWPs as a benchmark for
reimbursement in the pharmaceutical industry.

519.    Each of the Manufacturer-Publisher Enterprises has a systemic linkage because
there are contractual relationships, financial ties, and continuing coordination of activities

- 188 -

between the Defendant Drug Manufacturer and the specific Publisher that are its associates. As to each of the Manufacturer-Publisher Enterprises, there is a common communication network by which the Defendant Drug Manufacturer and the specific Publisher share information on a regular basis. Typically this communication occurs by use of the wires and mails in which a manufacturer will instruct a publisher to list a certain AWP. As to each of the Manufacturer-Publisher Enterprises, the Defendant Drug Manufacturer and the specific Publisher functioned as a continuing unit. At all relevant times, each of the Manufacturer-Publisher Enterprises was operated by the specific Defendant Drug Manufacturer for criminal purposes, namely, carrying out the AWP Scheme.

520. At all relevant times, each one of the Publishers was aware of the Defendants Drug Manufacturers' AWP Scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme. Each of the publishing manufacturers is aware that the published AWPs are inflated. This awareness comes from the following sources: First, at some point prior to 1992 the publishers in many instances obtained AWPs themselves by survey. From their surveys of those in the distribution chain, they were and are aware that the reported AWPs were not accurate. Second, as various congressional bodies and government agencies reported on AWP inflation, the Publishers did not change or challenge the self-reported AWPs, but continued blindly accepting the requested AWPs. Third, when the State of Texas began prosecuting Dey for its AWP practices, and when other states began focusing on Dey, the Publishers stopped accepting Dey's reported AWPs and published a different, far lower AWP. They withdraw from the Dey enterprise due to fear that they would be sued if they continued to publish Dey's false AWPs. This prompted a lawsuit by Dey alleging that the Publishers were treating Dey differently than they were treating all other manufacturers. In other words, Dey was complaining of the others being allowed to continue the scheme while it could not.

- 189 -

521.    The foregoing evidences the Publishers willing participation in the enterprise; their common purpose in the AWP scheme; and their agreement to a structure wherein the manufacturers made decisions as to what AWPs would be reported.  This structure was the basis in which each of the enterprises was structured and its affairs conducted.  The only exception occurred when the Publishers, fearing litigation, refused to accept Dey's instructions.  The Publishers were willing participants in the scheme because if the truth were revealed the entire AWP reporting system would collapse.

522.    For purposes of this count, the Manufacturer-Publisher Enterprises are identified as follows:

(a)    *The Abbott Manufacturer-Publisher Enterprises:*  The Abbott Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Abbott, and Abbott, including its directors, employees and agents:  (1) the Abbott-Thomson Medical Enterprise; (2) the Abbott-First DataBank Enterprise; and (3) the Abbott-Facts & Comparisons Enterprise.  Each of the Abbott Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Abbott Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Abbott and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons.  As to each of these Abbott Manufacturer-Publisher Enterprises, there is a common

- 190 -

communication network by which Abbott and Thomson Medical, Abbott and First Data Bank, and Abbott and Facts & Comparisons share information on a regular basis. As to each of these Abbott-Manufacturer-Publisher Enterprises, Abbott and Thomson Medical, Abbott and First Data Bank, and Abbott and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Abbott Manufacturer-Publisher Enterprises was operated and conducted by Abbott for criminal purposes, namely, carrying out the AWP Scheme.

(b)     *The Amgen Manufacturer-Publisher Enterprises:* The Amgen Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Amgen, and Amgen, including its directors, employees and agents: (1) the Amgen-Thomson Medical Enterprise; (2) the Amgen-First DataBank Enterprise; and (3) the Amgen-Facts & Comparisons Enterprise. Each of the Amgen Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Amgen Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Amgen and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons. As to each of these Amgen Manufacturer-Publisher Enterprises, there is a common communication network by which Amgen and Thomson Medical, Amgen and First Data Bank, and Amgen and Facts & Comparisons share information on a regular basis. As to

- 191 -

each of these Amgen-Manufacturer-Publisher Enterprises, Amgen and Thomson Medical, Amgen and First Data Bank, and Amgen and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Amgen Manufacturer-Publisher Enterprises was operated and conducted by Amgen for criminal purposes, namely, carrying out the AWP Scheme.

(c)    *The AstraZeneca Manufacturer-Publisher Enterprises:*  The AstraZeneca Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by AstraZeneca, and AstraZeneca, including its directors, employees and agents:  (1) the AstraZeneca -Thomson Medical Enterprise; (2) the AstraZeneca -First DataBank Enterprise; and (3) the AstraZeneca -Facts & Comparisons Enterprise.  Each of the AstraZeneca Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the AstraZeneca Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between AstraZeneca and Thomson Medical, AstraZeneca and First DataBank, and AstraZeneca and Facts & Comparisons.  As to each of these AstraZeneca Manufacturer-Publisher Enterprises, there is a common communication network by which AstraZeneca and Thomson Medical, AstraZeneca and First Data Bank, and AstraZeneca and Facts & Comparisons share information on a regular basis.  As to each of these AstraZeneca -Manufacturer-Publisher Enterprises, AstraZeneca and

- 192 -

Thomson Medical, AstraZeneca and First Data Bank, and AstraZeneca and Facts &
Comparisons functioned as continuing but separate units.  At all relevant times, each of
the AstraZeneca Manufacturer-Publisher Enterprises was operated and conducted by
AstraZeneca for criminal purposes, namely, carrying out the AWP Scheme.

> (d)     *The Aventis Group Manufacturer-Publisher Enterprise:*  The Aventis
Group Manufacturer-Publisher Enterprises are three separate associations-in-fact
consisting of each of the Publishers that reported the AWPID AWPs that were provided
to them by Aventis Group, and Aventis Group, including its directors, employees and
agents:  (1) the Aventis Group -Thomson Medical Enterprise; (2) the Aventis Group-First
DataBank Enterprise; and (3) the Aventis Group-Facts & Comparisons Enterprise.  Each
of the Aventis Group Manufacturer-Publisher Enterprises is an ongoing and continuing
business organization consisting of both corporations and individuals that are and have
been associated for the common or shared purposes of (a) publishing or otherwise
disseminating false and misleading AWPs, (b) selling, purchasing, and administering
AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs
and Class members that comprise health and welfare plans, and (c) deriving profits from
these activities.  Each of the Aventis Group Manufacturer-Publisher Enterprises has a
systemic linkage because there are contractual relationships, financial ties, and continuing
coordination of activities between Aventis Group and Thomson Medical, Aventis Group
and First DataBank, and Aventis Group and Facts & Comparisons.  As to each of these
Aventis Group Manufacturer-Publisher Enterprises, there is a common communication
network by which Aventis Group and Thomson Medical, Aventis Group and First Data
Bank, and Aventis Group and Facts & Comparisons share information on a regular basis.
As to each of these Aventis Group-Manufacturer-Publisher Enterprises, Aventis Group
and Thomson Medical, Aventis Group and First Data Bank, and Aventis Group and Facts

& Comparisons functioned as continuing but separate units. At all relevant times, each of
the Aventis Group Manufacturer-Publisher Enterprises was operated and conducted by
Aventis Group for criminal purposes, namely, carrying out the AWP Scheme.

(e)     *The Baxter Manufacturer-Publisher Enterprises:* The Baxter

Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of
each of the Publishers that reported the AWPID AWPs that were provided to them by
Baxter, and Baxter, including its directors, employees and agents: (1) the Baxter-
Thomson Medical Enterprise; (2) the Baxter-First DataBank Enterprise; and (3) the
Baxter Facts & Comparisons Enterprise. Each of the Baxter Manufacturer-Publisher
Enterprises is an ongoing and continuing business organization consisting of both
corporations and individuals that are and have been associated for the common or shared
purposes of (a) publishing or otherwise disseminating false and misleading AWPs,
(b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class 1
members and to participants in those Plaintiffs and Class 1 members that comprise health
and welfare plans, and (c) deriving profits from these activities. Each of the Baxter
Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual
relationships, financial ties, and continuing coordination of activities between Baxter and
Thomson Medical, Baxter and First DataBank, and Baxter and Facts & Comparisons. As
to each of these Baxter Manufacturer-Publisher Enterprises, there is a common
communication network by which Baxter and Thomson Medical, Baxter and First Data
Bank, and Baxter and Facts & Comparisons share information on a regular basis. As to
each of these Baxter-Manufacturer-Publisher Enterprises, Baxter and Thomson Medical,
Baxter and First Data Bank, and Baxter and Facts & Comparisons functioned as
continuing but separate units. At all relevant times, each of the Baxter Manufacturer-

- 194 -

Publisher Enterprises was operated and conducted by Baxter for criminal purposes, namely, carrying out the AWP Scheme.

(f)     *The Bayer Manufacturer-Publisher Enterprises:*   The Bayer Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Bayer, and Bayer, including its directors, employees and agents: (1) the Bayer-Thomson Medical Enterprise; (2) the Bayer-First DataBank Enterprise; and (3) the Bayer-Facts & Comparisons Enterprise.  Each of the Bayer Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Bayer Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Bayer and Thomson Medical, Bayer and First DataBank, and Bayer and Facts & Comparisons.  As to each of these Bayer Manufacturer-Publisher Enterprises, there is a common communication network by which Bayer and Thomson Medical, Bayer and First Data Bank, and Bayer and Facts & Comparisons share information on a regular basis.  As to each of these Bayer Manufacturer-Publisher Enterprises, Bayer and Thomson Medical, Bayer and First Data Bank, and Bayer and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Bayer Manufacturer-Publisher Enterprises was operated and conducted by Bayer for criminal purposes, namely, carrying out the AWP Scheme.

- 195 -

(g)    *The BMS Group Manufacturer-Publisher Enterprises:*  The BMS Group
Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of
each of the Publishers that reported the AWPID AWPs that were provided to them by
BMS Group, and BMS Group, including its directors, employees and agents:  (1) the
BMS Group-Thomson Medical Enterprise; (2) the BMS Group-First DataBank
Enterprise; and (3) the BMS Group-Facts & Comparisons Enterprise.  Each of the BMS
Group Manufacturer-Publisher Enterprises is an ongoing and continuing business
organization consisting of both corporations and individuals that are and have been
associated for the common or shared purposes of (a) publishing or otherwise
disseminating false and misleading AWPs, (b) selling, purchasing, and administering
AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs
and Class members that comprise health and welfare plans, and (c) deriving profits from
these activities.  Each of the BMS Group Manufacturer-Publisher Enterprises has a
systemic linkage because there are contractual relationships, financial ties, and continuing
coordination of activities between BMS Group and Thomson Medical, BMS Group and
First DataBank, and BMS Group and Facts & Comparisons.  As to each of these BMS
Group Manufacturer-Publisher Enterprises, there is a common communication network
by which BMS Group and Thomson Medical, BMS Group and First Data Bank, and
BMS Group and Facts & Comparisons share information on a regular basis.  As to each
of these BMS Group Manufacturer-Publisher Enterprises, BMS Group and Thomson
Medical, BMS Group and First Data Bank, and BMS Group and Facts & Comparisons
functioned as continuing but separate units.  At all relevant times, each of the BMS
Group Manufacturer-Publisher Enterprises was operated and conducted by BMS Group
for criminal purposes, namely, carrying out the AWP Scheme.

- 196 -

(h)     *The Dey Manufacturer-Publisher Enterprises:* The Dey Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Dey, and Dey, including its directors, employees and agents:  (1) the Dey-Thomson Medical Enterprise; (2) the Dey-First DataBank Enterprise; and (3) the Dey-Facts & Comparisons Enterprise. Each of the Dey Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Dey Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Dey and Thomson Medical, Dey and First DataBank, and Dey and Facts & Comparisons.  As to each of these Dey Manufacturer-Publisher Enterprises, there is a common communication network by which Dey and Thomson Medical, Dey and First Data Bank, and Dey and Facts & Comparisons share information on a regular basis.  As to each of these Dey Manufacturer-Publisher Enterprises, Dey and Thomson Medical, Dey and First Data Bank, and Dey and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Dey Manufacturer-Publisher Enterprises was operated and conducted by Dey for criminal purposes, namely, carrying out the AWP Scheme.

(i)     *The Fujisawa Group Manufacturer-Publisher Enterprises:* The Fujisawa Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided

to them by Fujisawa Group, and Fujisawa Group, including its directors, employees and agents: (1) the Fujisawa Group-Thomson Medical Enterprise; (2) the Fujisawa Group-First DataBank Enterprise; and (3) the Fujisawa Group-Facts & Comparisons Enterprise. Each of the Fujisawa Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Fujisawa Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Fujisawa Group and Thomson Medical, Fujisawa Group and First DataBank, and Fujisawa Group and Facts & Comparisons. As to each of these Fujisawa Group Manufacturer-Publisher Enterprises, there is a common communication network by which Fujisawa Group and Thomson Medical, Fujisawa Group and First Data Bank, and Fujisawa Group and Facts & Comparisons share information on a regular basis. As to each of these Fujisawa Group Manufacturer-Publisher Enterprises, Fujisawa Group and Thomson Medical, Fujisawa Group and First Data Bank, and Fujisawa Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Fujisawa Group Manufacturer-Publisher Enterprises was operated and conducted by Dey for criminal purposes, namely, carrying out the AWP Scheme.

(j)     *The GSK Group Manufacturer-Publisher Enterprises:* The GSK Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by

GSK Group, and GSK Group, including its directors, employees and agents: (1) the GSK Group-Thomson Medical Enterprise; (2) the GSK Group-First DataBank Enterprise; and (3) the GSK Group-Facts & Comparisons Enterprise. Each of the GSK Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the GSK Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between GSK Group and Thomson Medical, GSK Group and First DataBank, and GSK Group and Facts & Comparisons. As to each of these GSK Group Manufacturer-Publisher Enterprises, there is a common communication network by which GSK Group and Thomson Medical, GSK Group and First Data Bank, and GSK Group and Facts & Comparisons share information on a regular basis. As to each of these GSK Group Manufacturer-Publisher Enterprises, GSK Group and Thomson Medical, GSK Group and First Data Bank, and GSK Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the GSK Group Manufacturer-Publisher Enterprises was operated and conducted by GSK Group for criminal purposes, namely, carrying out the AWP Scheme.

(k)     *The Hoffman-La Roche Manufacturer-Publisher Enterprises:* The Hoffman-La Roche Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Hoffman-La Roche, and Hoffman-La Roche, including its

- 199 -

directors, employees and agents:  (1) the Hoffman-La Roche-Thomson Medical
Enterprise; (2) the Hoffman-La Roche-First DataBank Enterprise; and (3) the Hoffman-
La Roche-Facts & Comparisons Enterprise.  Each of the Hoffman-La Roche
Manufacturer-Publisher Enterprises is an ongoing and continuing business organization
consisting of both corporations and individuals that are and have been associated for the
common or shared purposes of (a) publishing or otherwise disseminating false and
misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual
Plaintiffs and Class members and to participants in those Plaintiffs and Class members
that comprise health and welfare plans, and (c) deriving profits from these activities.
Each of the Hoffman-La Roche Group Manufacturer-Publisher Enterprises has a systemic
linkage because there are contractual relationships, financial ties, and continuing
coordination of activities between Hoffman-La Roche and Thomson Medical, Hoffman-
La Roche and First DataBank, and Hoffman-La Roche and Facts & Comparisons.  As to
each of these Hoffman-La Roche Manufacturer-Publisher Enterprises, there is a common
communication network by which Hoffman-La Roche and Thomson Medical, Hoffman-
La Roche and First Data Bank, and Hoffman-La Roche and Facts & Comparisons share
information on a regular basis.  As to each of these Hoffman-La Roche Manufacturer-
Publisher Enterprises, Hoffman-La Roche and Thomson Medical, Hoffman-La Roche
and First Data Bank, and Hoffman-La Roche and Facts & Comparisons functioned as
continuing but separate units.  At all relevant times, each of the Hoffman-La Roche
Manufacturer-Publisher Enterprises was operated and conducted by Hoffman-La Roche
for criminal purposes, namely, carrying out the AWP Scheme.

     (l)   *The Immunex Manufacturer- Publisher Enterprises:*  The Immunex
Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of
each of the Publishers that reported the AWPID AWPs that were provided to them by