Immunex, and Immunex, including its directors, employees and agents: (1) the Immunex-La Roche-Thomson Medical Enterprise; (2) the Immunex-First DataBank Enterprise; and (3) the Immunex-Facts & Comparisons Enterprise. Each of the Immunex Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Immunex Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Immunex and Thomson Medical, Immunex and First DataBank, and Immunex and Facts & Comparisons. As to each of these Immunex Manufacturer-Publisher Enterprises, there is a common communication network by which Immunex and Thomson Medical, Immunex and First Data Bank, and Immunex and Facts & Comparisons share information on a regular basis. As to each of these Immunex Manufacturer-Publisher Enterprises, Immunex and Thomson Medical, Immunex and First Data Bank, and Immunex and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Immunex Manufacturer-Publisher Enterprises was operated and conducted by Immunex for criminal purposes, namely, carrying out the AWP Scheme.

(m)    *The Johnson & Johnson Group Manufacturer-Publisher Enterprise:* The Johnson & Johnson Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Johnson & Johnson Group, and Johnson & Johnson Group,

including its directors, employees and agents: (1) the Johnson & Johnson Group-La Roche-Thomson Medical Enterprise; (2) the Johnson & Johnson Group-First DataBank Enterprise; and (3) the Johnson & Johnson Group-Facts & Comparisons Enterprise. Each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Johnson & Johnson Group and Thomson Medical, Johnson & Johnson Group and First DataBank, and Johnson & Johnson Group and Facts & Comparisons. As to each of these Johnson & Johnson Group Manufacturer-Publisher Enterprises, there is a common communication network by which Johnson & Johnson Group and Thomson Medical, Johnson & Johnson Group and First Data Bank, and Johnson & Johnson Group and Facts & Comparisons share information on a regular basis. As to each of these Johnson & Johnson Group Manufacturer-Publisher Enterprises, Johnson & Johnson Group and Thomson Medical, Johnson & Johnson Group and First Data Bank, and Johnson & Johnson Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises was operated and conducted by Johnson & Johnson Group for criminal purposes, namely, carrying out the AWP Scheme.

- 202 -

(n)     *The Pfizer Manufacturer-Publisher Enterprises:*  The Pfizer Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Pfizer, and Pfizer, including its directors, employees and agents:  (1) the Pfizer-La Roche-Thomson Medical Enterprise; (2) the Pfizer-First DataBank Enterprise; and (3) the Pfizer-Facts & Comparisons Enterprise.  Each of the Pfizer Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Pfizer Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pfizer and Thomson Medical, Pfizer and First DataBank, and Pfizer and Facts & Comparisons.  As to each of these Pfizer Manufacturer-Publisher Enterprises, there is a common communication network by which Pfizer and Thomson Medical, Pfizer and First Data Bank, and Pfizer and Facts & Comparisons share information on a regular basis.  As to each of these Pfizer Manufacturer-Publisher Enterprises, Pfizer and Thomson Medical, Pfizer and First Data Bank, and Pfizer and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Pfizer Manufacturer-Publisher Enterprises was operated and conducted by Pfizer for criminal purposes, namely, carrying out the AWP Scheme.

(o)     *The Pharmacia Group Manufacturer-Publisher Enterprises:*  The Pharmacia Group Manufacturer-Publisher Enterprises are three separate associations-in-

fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Pharmacia Group, and Pharmacia Group, including its directors, employees and agents: (1) the Pharmacia Group-Thomson Medical Enterprise; (2) the Pharmacia Group-First DataBank Enterprise; and (3) the Pharmacia Group-Facts & Comparisons Enterprise. Each of the Pharmacia Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Pharmacia Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pharmacia Group and Thomson Medical, Pharmacia Group and First DataBank, and Pharmacia Group and Facts & Comparisons. As to each of these Pharmacia Group Manufacturer-Publisher Enterprises, there is a common communication network by which Pharmacia Group and Thomson Medical, Pharmacia Group and First Data Bank, and Pharmacia Group and Facts & Comparisons share information on a regular basis. As to each of these Pharmacia Group Manufacturer-Publisher Enterprises, Pharmacia Group and Thomson Medical, Pharmacia Group and First Data Bank, and Pharmacia Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Pharmacia Group Manufacturer-Publisher Enterprises was operated and conducted by Pharmacia Group for criminal purposes, namely, carrying out the AWP Scheme.

(p)     *The Schering-Plough Group Manufacturer-Publisher Enterprises:* The
Schering-Plough Group Manufacturer-Publisher Enterprises are three separate
associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs
that were provided to them by Schering-Plough Group, and Schering-Plough Group,
including its directors, employees and agents: (1) the Schering-Plough Group-Thomson
Medical Enterprise; (2) the Schering-Plough Group-First DataBank Enterprise; and
(3) the Schering-Plough Group-Facts & Comparisons Enterprise. Each of the Schering-
Plough Group Manufacturer-Publisher Enterprises is an ongoing and continuing business
organization consisting of both corporations and individuals that are and have been
associated for the common or shared purposes of (a) publishing or otherwise
disseminating false and misleading AWPs, (b) selling, purchasing, and administering
AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs
and Class members that comprise health and welfare plans, and (c) deriving profits from
these activities. Each of the Schering-Plough Group Manufacturer-Publisher Enterprises
has a systemic linkage because there are contractual relationships, financial ties, and
continuing coordination of activities between Schering-Plough Group and Thomson
Medical, Schering-Plough Group and First DataBank, and Schering-Plough Group and
Facts & Comparisons. As to each of these Schering-Plough Group Manufacturer-
Publisher Enterprises, there is a common communication network by which Schering-
Plough Group and Thomson Medical, Schering-Plough Group and First Data Bank, and
Schering-Plough Group and Facts & Comparisons share information on a regular basis.
As to each of these Schering-Plough Group Manufacturer-Publisher Enterprises,
Schering-Plough Group and Thomson Medical, Schering-Plough Group and First Data
Bank, and Schering-Plough Group and Facts & Comparisons functioned as continuing
but separate units. At all relevant times, each of the Schering-Plough Group

- 205 -

Manufacturer-Publisher Enterprises was operated and conducted by Schering-Plough Group for criminal purposes, namely, carrying out the AWP Scheme.

(q)    *The Sicor Group Manufacturer-Publisher Enterprises:*  The Sicor Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Sicor Group, and Sicor Group, including its directors, employees and agents: (1) the Sicor Group-Thomson Medical Enterprise; (2) the Sicor Group-First DataBank Enterprise; and (3) the Sicor Group-Facts & Comparisons Enterprise. Each of the Sicor Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Sicor Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sicor Group and Thomson Medical, Sicor Group and First DataBank, and Sicor Group and Facts & Comparisons. As to each of these Sicor Group Manufacturer-Publisher Enterprises, there is a common communication network by which Sicor Group and Thomson Medical, Sicor Group and First Data Bank, and Sicor Group and Facts & Comparisons share information on a regular basis. As to each of these Sicor Group Manufacturer-Publisher Enterprises, Sicor Group and Thomson Medical, Sicor Group and First Data Bank, and Sicor Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Sicor

- 206 -

Group Manufacturer-Publisher Enterprises was operated and conducted by Sicor Group for criminal purposes, namely, carrying out the AWP Scheme.

(r)     *The Watson Manufacturer-Publisher Enterprises:* The Watson Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Watson, and Watson, including its directors, employees and agents: (1) the Watson-Thomson Medical Enterprise; (2) the Watson-First DataBank Enterprise; and (3) the Watson-Facts & Comparisons Enterprise. Each of the Watson Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Watson Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Watson and Thomson Medical, Watson and First DataBank, and Watson and Facts & Comparisons. As to each of these Watson Manufacturer-Publisher Enterprises, there is a common communication network by which Watson and Thomson Medical, Watson and First Data Bank, and Watson and Facts & Comparisons share information on a regular basis. As to each of these Watson Manufacturer-Publisher Enterprises, Watson and Thomson Medical, Watson and First Data Bank, and Watson and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Watson Manufacturer-Publisher Enterprises was operated and conducted by Watson for criminal purposes, namely, carrying out the AWP Scheme.

- 207 -

(s)     *The Warrick Manufacturer-Publisher Enterprises*:  The Warrick

Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of

each of the Publishers that reported the AWPID AWPs that were provided to them by

Warrick, and Warrick, including its directors, employees and agents:  (1) the Warrick-

Thomson Medical Enterprise; (2) the Warrick-First DataBank Enterprise; and (3) the

Warrick-Facts & Comparisons Enterprise.  Each of the Warrick Manufacturer-Publisher

Enterprises is an ongoing and continuing business organization consisting of both

corporations and individuals that are and have been associated for the common or shared

purposes of (a) publishing or otherwise disseminating false and misleading AWPs,

(b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class

members and to participants in those Plaintiffs and Class members that comprise health

and welfare plans, and (c) deriving profits from these activities.  Each of the Warrick

Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual

relationships, financial ties, and continuing coordination of activities between Warrick

and Thomson Medical, Warrick and First DataBank, and Warrick and Facts &

Comparisons.  As to each of these Warrick Manufacturer-Publisher Enterprises, there is a

common communication network by which Warrick and Thomson Medical, Warrick and

First Data Bank, and Warrick and Facts & Comparisons share information on a regular

basis.  As to each of these Warrick Manufacturer-Publisher Enterprises, Warrick and

Thomson Medical, Warrick and First Data Bank, and Warrick and Facts & Comparisons

functioned as continuing but separate units.  At all relevant times, each of the Warrick

Manufacturer-Publisher Enterprises was operated and conducted by Warrick for criminal

purposes, namely, carrying out the AWP Scheme.

**The Defendant Drug Manufacturers' Use of the U.S. Mails and Interstate Wire Facilities**

523.    Each of the Manufacturer-Publisher Enterprises engaged in and affected interstate commerce because they engage in the following activities across state boundaries:  The transmission and publication of false and misleading information concerning AWPs; the sale, purchase and/or administration of AWPIDs; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission and/or receipt of invoices, statements and payments related to the use or administration of AWPIDs.

524.    During the Class Period, the Defendants Drug Manufacturers' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

525.    The nature and pervasiveness of the Defendant Drug Manufacturers' AWP Scheme, which was orchestrated out of the corporate headquarters of the Defendant Drug Manufacturers, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the various local district managers overseeing the sales force(s), the numerous pharmaceutical sales representatives who, in turn, directly communicated with providers and employees who communicated with the Publishers.

526.    Many of the precise dates of Defendant Drug Manufacturers' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records.  Indeed, an essential part of the successful operation of the AWP Scheme alleged herein depended upon secrecy, and as alleged above, the Defendant Drug Manufacturers took deliberate steps to conceal their wrongdoing.  However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the AWP Scheme and do so below.

527. The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities to perpetrate the AWP Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

(a) Marketing materials about the AWPs for AWPIDs and the available spread, which were sent by the Defendant Drug Manufacturers to health care providers located across the country;

(b) Written representations of the AWPs made by the Defendant Drug Manufacturers to the Publishers, which were made at least annually and in many cases several times during a single year;

(c) Documents providing information or incentives designed to lessen the prices that health care providers paid for AWPIDs and/or to conceal those prices or the AWP Scheme alleged here;

(d) Written communications, relating to rebates, kickbacks, or other financial inducements included, but not limited to, checks, as detailed herein;

(e) Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

(f) Written and oral communications with health insurers and patients, including Plaintiffs and members of the Class, inducing payments for the drugs that were made in reliance on AWPs; and

(g) Receipts of money sent on tens of thousands of occasions through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Defendant Drug Manufacturers' AWP Scheme.

- 210 -

(h)     In addition to the above-referenced RICO predicate acts, it was foreseeable to the Defendant Drug Manufacturers that the Publishers would distribute their publications containing false AWPs through the U.S. mails and by interstate wire facilities.  Further, the Defendant Drug Manufacturers' corporate headquarters have, in furtherance of the AWP Scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions.  These uses of the U.S. mails include some of the documents referenced in this Amended Complaint.

**Conduct of the RICO Enterprises' Affairs**

528.     During the Class Period, the Defendant Drug Manufacturers have exerted control over their Manufacturer-Publisher Enterprises and, in violation of Section 1962(c) of RICO, the Defendant Drug Manufacturers have conducted or participated in the conduct of the affairs of those RICO enterprises, directly or indirectly, in the following ways:

(a)     Each of the Defendant Drug Manufacturers has directly controlled the price for its AWPIDs;

(b)     Each of the Defendant Drug Manufacturers has directly controlled the AWPs that are reported by the Publishers;

(c)     Each of the Defendant Drug Manufacturers has directly controlled the creation and distribution of marketing, sales, and other materials used to inform health care providers nationwide of the profit potential of its AWPIDs;

(d)     Each of the Defendant Drug Manufacturers has controlled and participated in the affairs of its Manufacturer-Publisher Enterprises by using a fraudulent scheme to manufacture, market and sell its AWPIDs on the basis of AWPs that each of the Defendant Drug Manufacturers provides to the Publishers;

- 211 -

(e)     Each of the Defendant Drug Manufacturers intended that each of the Publishers would (and did) distribute their publications containing false AWPs through the U.S. mails and by interstate wire facilities; and

(f)     Each of the publishers has allowed these Defendants to exert control over their organizations knowing that the AWPs were inflated and were not real numbers. Each publisher did so because the reporting of AWPs was, and is, a major part of its business.

529.    Each of the Manufacturer-Publisher Enterprises had a hierarchical decision-making structure headed by the respective Defendant Drug Manufacturer. The Defendant Drug Manufacturers issued instructions on how its AWPs were to be reported and each publisher accepted those instructions despite knowing of their falsity.

530.    In violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers have conducted the affairs of each of the Manufacturer-Publisher Enterprises with which they associated by reporting fraudulently inflated AWPs for AWPIDs that were then published by the Publishers and disseminated nationwide.

### The Defendant Drug Manufacturers' Pattern of Racketeering Activity

531.    Each of the Defendant Drug Manufacturers have conducted and participated in the affairs of their above-referenced Manufacturer-Publisher Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The Defendant Drug Manufacturers' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their AWP Scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the

- 212 -

Defendant Drug Manufacturers intended to defraud Plaintiffs, members of the Classes and other intended victims of the AWP Scheme.

532.    The Defendants Drug Manufacturers' fraudulent and unlawful AWP Scheme consisted, in part, of deliberately overstating the AWPs for their AWPIDs, thereby creating a "spread" based on the inflated figure in order to induce others to advocate and favor that Defendant Drug Manufacturer's AWPIDs. Further, others would bill their clients for the Defendant Drug Manufacturers' AWPIDs based on the inflated AWPs, which did not reflect the true price paid for the AWPIDs.

533.    The AWP Scheme was calculated and intentionally crafted to ensure that Plaintiffs and members of the Classes would be over-billed for the drugs. In designing and implementing the AWP Scheme, at all times the Defendant Drug Manufacturers were cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the Defendant Drug Manufacturers in setting the AWPs, as reported by the Publishers.

534.    Each of the plaintiffs, to the extent they purchased drugs outside of the PBM context, made purchases with the price being tied to AWP.

535.    By intentionally and artificially inflating the AWPs, and by subsequently failing to disclose such practices to the individual patients, health plans and their insurers, the Defendant Drug Manufacturers engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

536.    The Defendant Drug Manufacturers' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and members of the Classes. Each separate use of the U.S. mails and/or interstate wire facilities employed by the Defendant Drug Manufacturers was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Classes. Each of the Defendant Drug

- 213 -

Manufacturers has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular Manufacturer-Publisher Enterprises.

### The Defendant Drug Manufacturers' Motive

537.    The Defendant Drug Manufacturers' motive in creating and operating the AWP Scheme and conducting the affairs of the Manufacturer-Publisher Enterprises described herein was to fraudulently obtain sales of and profits from their AWPIDs.

538.    The AWP Scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the Defendant Drug Manufacturers' AWPIDs. Thus, each of the Defendant Drug Manufacturers used the AWP Scheme to sell more of its drugs, thereby fraudulently gaining sales and market share and profits.

### Damages Caused by the Defendant Drug Manufacturers' AWP Scheme

539.    The Defendant Drug Manufacturers' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Classes to be injured in their business or property because Plaintiffs and members of the Classes have paid many hundreds of millions of dollars in inflated reimbursements or other payments for AWPIDs.

540.    The Defendant Drug Manufacturers sent billing statements through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their AWP Scheme. Plaintiffs and members of the Classes have made inflated payments for AWPIDs based on and/or in reliance on reported and false AWPs.

541.    Under the provisions of Section 1964(c) of RICO, the Defendant Drug Manufacturers are jointly and severally liable to Plaintiffs and members of the Classes for three times the damages that Plaintiffs and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

### COUNT II

### VIOLATIONS OF 18 U.S.C. § 1962(C)

### (AGAINST DEFENDANT DRUG MANUFACTURERS IDENTIFIED HEREIN)

542.     Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

543.     This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against the Defendant Drug Manufacturers identified below on behalf of AWP Classes by the AWP Class representatives.

544.     Plaintiffs, the members of Classes, and the Defendant Drug Manufacturers are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

545.     The following pharmacy benefit managers (collectively "PBMs") are each "persons," as that term is defined in 18 U.S.C. § 1961(3): (a) **AdvancePCS** ("Advance PCS"), a Delaware corporation with its principal place of business located at 750 West John Carpenter Freeway, Suite 1200, Irving, Texas; Advance PCS is the largest PBM in the United States and currently serves more than 75 million health plan members; (b) **Caremark, Rx, Inc.** ("Caremark Rx"), a Delaware corporation with its principal place of business located at 300 Galloria Tower, Suite 1000, Birmingham, Alabama; Caremark Rx is one of the largest pharmaceutical services companies in the United States with net revenues of approximately $5.6 billion in 2001; (c) **Express Scripts, Inc.** ("Express Scripts"), a Delaware corporation with its principal place of business located at 13900 Riverpoint Drive, Maryland Heights, Missouri; Express Scripts is the third largest PBM in North America; and (d) **Medco Health Solutions, Inc.** ("Medco Health"), a successor-in-interest to Merck-Medco Managed Care, L.L.C., is a Delaware corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey; since its acquisition in 1993, Medco Health has been a wholly-owned subsidiary of Defendant Drug Manufacturer Merck.

- 215 -

### The Manufacturer-PBM RICO Enterprises

546.    For purposes of this claim, the RICO "enterprises" are associations-in-fact consisting of (a) one of the PBMs that administered purchases of a Defendant Drug Manufacturer's brand name drugs and billed its members on the basis of the Defendant Drug Manufacturer's reported AWPs, and (b) a Defendant Drug Manufacturer, including its directors, employees and agents.  These associations-in-fact are collectively referred to herein as the "Manufacturer-PBM Enterprises."

547.    Each of the Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Classes that comprise health and welfare plans, and deriving profits from these activities.

548.    Each of the Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the Defendant Drug Manufacturer and the specific PBM that are associates.  As to each of the Manufacturer-PBM Enterprises, there is a common communication network by which the Defendant Drug Manufacturer and the specific PBM share information on a regular basis.  As to each of the Manufacturer-PBM Enterprises, the Defendant Drug Manufacturer and the specific PBM functioned as a continuing unit.  At all relevant times, each of the Manufacturer-PBM Enterprises was operated by the specific Defendant Drug Manufacturer for criminal purposes, namely, carrying out the AWP Scheme.

549.    Each manufacturer-PBM enterprise had a common purpose of perpetuating use of AWPs as a benchmark for reimbursement in the pharmaceutical industry.  The manufacturing defendants had this as a purpose, because without the use of inflated AWPs as an industry price setting benchmark, they would not be able to push the spread to those in the distribution chain.

- 216 -

The PBMs share this common purpose, because they are subject to a great deal of control from the manufacturers. PBMs are now turning to drug manufacturers for hidden profit-making schemes, because PBM clients are no longer allowing PBMs to collect as much for claims administration. Thus, as a result, PBMs have, with the knowing and willful participation and assistance of the drug manufacturers, engaged in hidden profit-making schemes falling into three general categories: (i) garnering rebates and other "soft dollars" from drug manufacturers that the PBM Defendants, to a large extent, keep without disclosing to their health plans the true amounts of the rebates; (ii) pocketing secret spreads between actual drug costs and the prices charged to health plans and their members; and (iii) keeping secret discounts provided by the drug manufacturers in association with the PBMs' mail order operations.

550.    The existence and magnitude of PBM rebates and accompanying profits at the expense of PBM clients is acknowledged within the PBM industry. For example, a recent industry report observed:

> [R]ebates paid to the PBMs by pharmaceutical companies continue to increase, as evidenced by the increasing PBM profits . . . . [T]his should hold true so long as the PBMs add value [apparently to the drug makers] by moving market share within drug classes.

551.    Thus, PBMs were willing participants in the enterprise, and each participant in the enterprise shared many common purposes.

552.    Further, as a result of their reliance on the manufacturers, PBMs took instructions and commands from the manufacturers regarding the use of AWP, not only so that they could keep part of the spread, but also so as to continue to earn from the manufacturers: (i) *Access rebates* for placement of products on the PBMs' formulary; (ii) *Market share rebates* for garnering higher market share than established targets; (iii) *Administrative fees* for assembling data to verify market share results; and (iv) *Other fees and grants* in an effort to promote products.

- 217 -

553.    In order to garner all of these fees from the drug manufacturers, the PBMs each meet on a frequent basis to discuss drug prices, spreads, marketing opportunities and coordination of all of the above.

554.    There is a common communication network between each PBM and each manufacturer for the purpose of implementing the AWP spread scheme and for the exchange of financial rewards for the PBMs activities that benefit the drug company manufacturers.

555.    At all relevant times, each one of the PBMs was aware of the Defendants Drug Manufacturers' AWP Scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.

556.    For purposes of this count, the Manufacturer-PBM Enterprises are identified as follows:

(a)    *The Abbott Manufacturer-PBM Enterprises:*  The Abbott Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Abbott's AWPIDs and billed its members on the basis of Abbott's reported AWPs, and Abbott, including its directors, employees and agents: (1) the Abbott-AdvancePCS Enterprise; (2) the Abbott-Caremark Rx Enterprise; (3) the Abbott-Express Scripts Enterprise; and (4) the Abbott-Medco Health Enterprise. Each of the Abbott Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Abbott Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and Abbott and Medco Health. As to each of these Abbott

- 218 -

Manufacturer-PBM Enterprises, there is a common communication network by which Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and Abbott and Medco Health share information on a regular basis. As to each of these Abbott-Manufacturer-PBM Enterprises, Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and Abbott and Medco Health functioned as continuing but separate units. At all relevant times, each of the Abbott Manufacturer-PBM Enterprises was operated and conducted by Abbott for criminal purposes, namely, carrying out the AWP Scheme.

(b)     *The Amgen Manufacturer-PBM Enterprises:* The Amgen Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Amgen's AWPIDs and billed its members on the basis of Amgen's reported AWPs, and Amgen, including its directors, employees and agents: (1) the Amgen-AdvancePCS Enterprise; (2) the Amgen-Caremark Rx Enterprise; (3) the Amgen-Express Scripts Enterprise; and (4) the Amgen-Medco Health Enterprise. Each of the Amgen Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Amgen Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and Express Scripts, and Amgen and Medco Health. As to each of these Amgen Manufacturer-PBM Enterprises, there is a common communication network by which Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and Express Scripts, and Amgen and Medco Health share information on a regular basis. As to each of these

Amgen-Manufacturer-PBM Enterprises, Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and Express Scripts, and Amgen and Medco Health functioned as continuing but separate units. At all relevant times, each of the Amgen Manufacturer-PBM Enterprises was operated and conducted by Amgen for criminal purposes, namely, carrying out the AWP Scheme.

   (c)  *The AstraZeneca Manufacturer-PBM Enterprises:* The AstraZeneca Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of AstraZeneca's AWPIDs and billed its members on the basis of AstraZeneca's reported AWPs, and AstraZeneca, including its directors, employees and agents: (1) the AstraZeneca-AdvancePCS Enterprise; (2) the AstraZeneca-Caremark Rx Enterprise; (3) the AstraZeneca-Express Scripts Enterprise; and (4) the AstraZeneca-Medco Health Enterprise. Each of the AstraZeneca Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the AstraZeneca Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca and Express Scripts, and AstraZeneca and Medco Health. As to each of these AstraZeneca Manufacturer-PBM Enterprises, there is a common communication network by which AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca and Express Scripts, and AstraZeneca and Medco Health share information on a regular basis. As to each of these AstraZeneca-Manufacturer-PBM Enterprises, AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca and Express Scripts, and

AstraZeneca and Medco Health functioned as continuing but separate units. At all relevant times, each of the AstraZeneca Manufacturer-PBM Enterprises was operated and conducted by AstraZeneca for criminal purposes, namely, carrying out the AWP Scheme.

(d)     *The Aventis Group Manufacturer-PBM Enterprise:* The Aventis Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Aventis Group's AWPIDs and billed its members on the basis of Aventis Group's reported AWPs, and Aventis Group, including its directors, employees and agents: (1) the Aventis Group-AdvancePCS Enterprise; (2) the Aventis Group-Caremark Rx Enterprise; (3) the Aventis Group-Express Scripts Enterprise; and (4) the Aventis Group-Medco Health Enterprise. Each of the Aventis Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Aventis Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health. As to each of these Aventis Group Manufacturer-PBM Enterprises, there is a common communication network by which Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health share information on a regular basis. As to each of these Aventis Group-Manufacturer-PBM Enterprises, Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Aventis Group

- 221 -

Manufacturer-PBM Enterprises was operated and conducted by Aventis Group for criminal purposes, namely, carrying out the AWP Scheme.

      (e)    *The Baxter Manufacturer-PBM Enterprises:*  The Baxter Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Amgen's AWPIDs and billed its members on the basis of Baxter's reported AWPs, and Baxter, including its directors, employees and agents: (1) the Baxter-AdvancePCS Enterprise; (2) the Baxter-Caremark Rx Enterprise; (3) the Baxter-Express Scripts Enterprise; and (4) the Baxter-Medco Health Enterprise.  Each of the Baxter Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Baxter Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health.  As to each of these Baxter Manufacturer-PBM Enterprises, there is a common communication network by which Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health share information on a regular basis.  As to each of these Baxter-Manufacturer-PBM Enterprises, Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Baxter Manufacturer-PBM Enterprises was operated and conducted by Baxter for criminal purposes, namely, carrying out the AWP Scheme.

- 222 -

(f)     *The Bayer Manufacturer-PBM Enterprises:*  The Bayer Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Bayer's AWPIDs and billed its members on the basis of Bayer's reported AWPs, and Bayer, including its directors, employees and agents: (1) the Bayer-AdvancePCS Enterprise; (2) the Bayer-Caremark Rx Enterprise; (3) the Bayer-Express Scripts Enterprise; and (4) the Bayer-Medco Health Enterprise.  Each of the Bayer Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Bayer Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health.  As to each of these Bayer Manufacturer-PBM Enterprises, there is a common communication network by which Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health share information on a regular basis.  As to each of these Bayer-Manufacturer-PBM Enterprises, Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Bayer Manufacturer-PBM Enterprises was operated and conducted by Bayer for criminal purposes, namely, carrying out the AWP Scheme.

(g)     *The BMS Group Manufacturer-PBM Enterprises:*  The BMS Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of BMS Group's AWPIDs and billed its members on the basis of BMS Group's reported AWPs, and BMS Group, including its

- 223 -

directors, employees and agents: (1) the BMS Group-AdvancePCS Enterprise; (2) the BMS Group-Caremark Rx Enterprise; (3) the BMS Group-Express Scripts Enterprise; and (4) the BMS Group-Medco Health Enterprise. Each of the BMS Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the BMS Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health. As to each of these BMS Group Manufacturer-PBM Enterprises, there is a common communication network by which BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health share information on a regular basis. As to each of these BMS Group-Manufacturer-PBM Enterprises, BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the BMS Group Manufacturer-PBM Enterprises was operated and conducted by BMS Group for criminal purposes, namely, carrying out the AWP Scheme.

(h)     *The Fujisawa Group Manufacturer-PBM Enterprise:* The Fujisawa Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Fujisawa Group's AWPIDs and billed its members on the basis of Fujisawa Group's reported AWPs, and Fujisawa Group, including its directors, employees and agents: (1) the Fujisawa Group-AdvancePCS Enterprise; (2) the Fujisawa Group-Caremark Rx Enterprise; (3) the Fujisawa Group-

Express Scripts Enterprise; and (4) the Fujisawa Group-Medco Health Enterprise. Each of the Fujisawa Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Fujisawa Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health. As to each of these Fujisawa Group Manufacturer-PBM Enterprises, there is a common communication network by which Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health share information on a regular basis. As to each of these Fujisawa Group-Manufacturer-PBM Enterprises, Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Fujisawa Group Manufacturer-PBM Enterprises was operated and conducted by Fujisawa Group for criminal purposes, namely, carrying out the AWP Scheme.

(i)     *The GSK Group Manufacturer-PBM Enterprises:* The GSK Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of GSK Group's AWPIDs and billed its members on the basis of GSK Group's reported AWPs, and GSK Group, including its directors, employees and agents: (1) the GSK Group-AdvancePCS Enterprise; (2) the GSK Group-Caremark Rx Enterprise; (3) the GSK Group-Express Scripts Enterprise; and (4) the GSK Group-Medco Health Enterprise. Each of the GSK Group Manufacturer-

- 225 -

PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the GSK Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between GSK Group and AdvancePCS, GSK Group and Caremark Rx, GSK Group and Express Scripts, and GSK Group and Medco Health.  As to each of these GSK Group Manufacturer-PBM Enterprises, there is a common communication network by which GSK Group and AdvancePCS, GSK Group and Caremark Rx, GSK Group and Express Scripts, and GSK Group and Medco Health share information on a regular basis.  As to each of these GSK Group-Manufacturer-PBM Enterprises, GSK Group and AdvancePCS, GSK Group and Caremark Rx, GSK Group and Express Scripts, and GSK Group and Medco Health functioned as continuing but separate units.  At all relevant times, each of the GSK Group Manufacturer-PBM Enterprises was operated and conducted by GSK Group for criminal purposes, namely, carrying out the AWP Scheme.

(j)     *The Hoffman-La Roche Manufacturer-PBM Enterprises:*  The Hoffman-La Roche Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Hoffman-La Roche's AWPIDs and billed its members on the basis of Hoffman-La Roche's reported AWPs, and Hoffman-La Roche, including its directors, employees and agents:  (1) the Hoffman-La Roche-AdvancePCS Enterprise; (2) the Hoffman-La Roche-Caremark Rx Enterprise; (3) the Hoffman-La Roche-Express Scripts Enterprise; and (4) the Hoffman-La Roche-Medco Health Enterprise.  Each of the Hoffman-La Roche Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and

- 226 -

individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Hoffman-La Roche Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Hoffman-La Roche and AdvancePCS, Hoffman-La Roche and Caremark Rx, Hoffman-La Roche and Express Scripts, and Hoffman-La Roche and Medco Health. As to each of these Hoffman-La Roche Manufacturer-PBM Enterprises, there is a common communication network by which Hoffman-La Roche and AdvancePCS, Hoffman-La Roche and Caremark Rx, Hoffman-La Roche and Express Scripts, and Hoffman-La Roche and Medco Health share information on a regular basis. As to each of these Hoffman-La Roche Manufacturer-PBM Enterprises, Hoffman-La Roche and AdvancePCS, Hoffman-La Roche and Caremark Rx, Hoffman-La Roche and Express Scripts, and Hoffman-La Roche and Medco Health functioned as continuing but separate units. At all relevant times, each of the Hoffman-La Roche Manufacturer-PBM Enterprises was operated and conducted by Hoffman-La Roche for criminal purposes, namely, carrying out the AWP Scheme.

(k)     *The Immunex Manufacturer-PBM Enterprises:*  The Immunex Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Immunex's AWPIDs and billed its members on the basis of Immunex's reported AWPs, and Immunex, including its directors, employees and agents: (1) the Immunex-AdvancePCS Enterprise; (2) the Immunex-Caremark Rx Enterprise; (3) the Immunex-Express Scripts Enterprise; and (4) the Immunex-Medco Health Enterprise. Each of the Immunex Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both

- 227 -

corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Immunex Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Immunex and AdvancePCS, Immunex and Caremark Rx, Immunex and Express Scripts, and Immunex and Medco Health. As to each of these Immunex Manufacturer-PBM Enterprises, there is a common communication network by which Immunex and AdvancePCS, Immunex and Caremark Rx, Immunex and Express Scripts, and Immunex and Medco Health share information on a regular basis. As to each of these Immunex Manufacturer-PBM Enterprises, Immunex and AdvancePCS, Immunex and Caremark Rx, Immunex and Express Scripts, and Immunex and Medco Health functioned as continuing but separate units. At all relevant times, each of the Immunex Manufacturer-PBM Enterprises was operated and conducted by Immunex for criminal purposes, namely, carrying out the AWP Scheme.

(l)     *The Johnson & Johnson Group Manufacturer-PBM Enterprise:* The Johnson & Johnson Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Johnson & Johnson Group's AWPIDs and billed its members on the basis of Johnson & Johnson Group's reported AWPs, and Johnson & Johnson Group, including its directors, employees and agents: (1) the Johnson & Johnson Group-AdvancePCS Enterprise; (2) the Johnson & Johnson Group-Caremark Rx Enterprise; (3) the Johnson & Johnson Group-Express Scripts Enterprise; and (4) the Johnson & Johnson Group-Medco Health Enterprise. Each of the Johnson & Johnson Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are

- 228 -

and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Johnson & Johnson Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Johnson & Johnson Group and AdvancePCS, Johnson & Johnson Group and Caremark Rx, Johnson & Johnson Group and Express Scripts, and Johnson & Johnson Group and Medco Health. As to each of these Johnson & Johnson Group Manufacturer-PBM Enterprises, there is a common communication network by which Johnson & Johnson Group and AdvancePCS, Johnson & Johnson Group and Caremark Rx, Johnson & Johnson Group and Express Scripts, and Johnson & Johnson Group and Medco Health share information on a regular basis. As to each of these Johnson & Johnson Group-Manufacturer-PBM Enterprises, Johnson & Johnson Group and AdvancePCS, Johnson & Johnson Group and Caremark Rx, Johnson & Johnson Group and Express Scripts, and Johnson & Johnson Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Johnson & Johnson Group Manufacturer-PBM Enterprises was operated and conducted by Johnson & Johnson Group for criminal purposes, namely, carrying out the AWP Scheme.

(m)    *The Pfizer Manufacturer-PBM Enterprises:* The Pfizer Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Pfizer's AWPIDs and billed its members on the basis of Pfizer's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Pfizer-AdvancePCS Enterprise; (2) the Pfizer-Caremark Rx Enterprise; (3) the Pfizer-Express Scripts Enterprise; and (4) the Pfizer-Medco Health Enterprise. Each of the Pfizer Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been

- 229 -

associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Pfizer Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pfizer and AdvancePCS, Pfizer and Caremark Rx, Pfizer and Express Scripts, and Pfizer and Medco Health. As to each of these Pfizer Manufacturer-PBM Enterprises, there is a common communication network by which Pfizer and AdvancePCS, Pfizer and Caremark Rx, Pfizer and Express Scripts, and Pfizer and Medco Health share information on a regular basis. As to each of these Pfizer Manufacturer-PBM Enterprises, Pfizer and AdvancePCS, Pfizer and Caremark Rx, Pfizer and Express Scripts, and Pfizer and Medco Health functioned as continuing but separate units. At all relevant times, each of the Pfizer Manufacturer-PBM Enterprises was operated and conducted by Pfizer for criminal purposes, namely, carrying out the AWP Scheme.

(n)     *The Pharmacia Group Manufacturer-PBM Enterprises:*  The Pharmacia Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Pharmacia Group's AWPIDs and billed its members on the basis of Pharmacia Group's reported AWPs, and Pharmacia Group, including its directors, employees and agents:  (1) the Pharmacia Group-AdvancePCS Enterprise; (2) the Pharmacia Group-Caremark Rx Enterprise; (3) the Pharmacia Group-Express Scripts Enterprise; and (4) the Pharmacia Group-Medco Health Enterprise. Each of the Pharmacia Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Pharmacia Group Manufacturer-PBM Enterprises has a

- 230 -

systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pharmacia Group and AdvancePCS, Pharmacia Group and Caremark Rx, Pharmacia Group and Express Scripts, and Pharmacia Group and Medco Health. As to each of these Pharmacia Group Manufacturer-PBM Enterprises, there is a common communication network by which Pharmacia Group and AdvancePCS, Pharmacia Group and Caremark Rx, Pharmacia Group and Express Scripts, and Pharmacia Group and Medco Health share information on a regular basis. As to each of these Pharmacia Group-Manufacturer-PBM Enterprises, Pharmacia Group and AdvancePCS, Pharmacia Group and Caremark Rx, Pharmacia Group and Express Scripts, and Pharmacia Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Pharmacia Group Manufacturer-PBM Enterprises was operated and conducted by Pharmacia Group for criminal purposes, namely, carrying out the AWP Scheme.

(o)     *The Schering-Plough Group Manufacturer-PBM Enterprises:* The Schering-Plough Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Schering-Plough Group's AWPIDs and billed its members on the basis of Schering-Plough Group's reported AWPs, and Schering-Plough Group, including its directors, employees and agents: (1) the Schering-Plough Group-AdvancePCS Enterprise; (2) the Schering-Plough Group-Caremark Rx Enterprise; (3) the Schering-Plough Group-Express Scripts Enterprise; and (4) the Schering-Plough Group-Medco Health Enterprise. Each of the Schering-Plough Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from

- 231 -

these activities. Each of the Schering-Plough Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Schering-Plough Group and AdvancePCS, Schering-Plough Group and Caremark Rx, Schering-Plough Group and Express Scripts, and Schering-Plough Group and Medco Health. As to each of these Schering-Plough Group Manufacturer-PBM Enterprises, there is a common communication network by which Schering-Plough Group and AdvancePCS, Schering-Plough Group and Caremark Rx, Schering-Plough Group and Express Scripts, and Schering-Plough Group and Medco Health share information on a regular basis. As to each of these Schering-Plough Group-Manufacturer-PBM Enterprises, Schering-Plough Group and AdvancePCS, Schering-Plough Group and Caremark Rx, Schering-Plough Group and Express Scripts, and Schering-Plough Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Schering-Plough Group Manufacturer-PBM Enterprises was operated and conducted by Schering-Plough Group for criminal purposes, namely, carrying out the AWP Scheme.

(p)     *The Sicor Group Manufacturer-PBM Enterprises:*  The Sicor Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Sicor Group's AWPIDs and billed its members on the basis of Sicor Group's reported AWPs, and Sicor Group, including its directors, employees and agents:  (1) the Sicor Group-AdvancePCS Enterprise; (2) the Sicor Group-Caremark Rx Enterprise; (3) the Sicor Group-Express Scripts Enterprise; and (4) the Sicor Group-Medco Health Enterprise. Each of the Sicor Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering

- 232 -

AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Sicor Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sicor Group and AdvancePCS, Sicor Group and Caremark Rx, Sicor Group and Express Scripts, and Sicor Group and Medco Health. As to each of these Sicor Group Manufacturer-PBM Enterprises, there is a common communication network by which Sicor Group and AdvancePCS, Sicor Group and Caremark Rx, Sicor Group and Express Scripts, and Sicor Group and Medco Health share information on a regular basis. As to each of these Sicor Group-Manufacturer-PBM Enterprises, Sicor Group and AdvancePCS, Sicor Group and Caremark Rx, Sicor Group and Express Scripts, and Sicor Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Sicor Group Manufacturer-PBM Enterprises was operated and conducted by Sicor Group for criminal purposes, namely, carrying out the AWP Scheme.

(q)     *The Watson Manufacturer-PBM Enterprises:* The Watson Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Watson's AWPIDs and billed its members on the basis of Watson's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Watson-AdvancePCS Enterprise; (2) the Watson-Caremark Rx Enterprise; (3) the Watson-Express Scripts Enterprise; and (4) the Watson-Medco Health Enterprise. Each of the Watson Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Watson Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of

- 233 -

activities between Watson and AdvancePCS, Watson and Caremark Rx, Watson and
Express Scripts, and Watson and Medco Health. As to each of these Watson
Manufacturer-PBM Enterprises, there is a common communication network by which
Watson and AdvancePCS, Watson and Caremark Rx, Watson and Express Scripts, and
Watson and Medco Health share information on a regular basis. As to each of these
Watson Manufacturer-PBM Enterprises, Watson and AdvancePCS, Watson and
Caremark Rx, Watson and Express Scripts, and Watson and Medco Health functioned as
continuing but separate units. At all relevant times, each of the Watson Manufacturer-
PBM Enterprises was operated and conducted by Watson for criminal purposes, namely,
carrying out the AWP Scheme.

(r)     *The Warrick Manufacturer-PBM Enterprises:* The Warrick
Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each
of the PBMs that administered purchases of Warrick's AWPIDs and billed its members
on the basis of Warrick's reported AWPs, and Pfizer, including its directors, employees
and agents: (1) the Warrick-AdvancePCS Enterprise; (2) the Warrick-Caremark Rx
Enterprise; (3) the Warrick-Express Scripts Enterprise; and (4) the Warrick-Medco
Health Enterprise. Each of the Warrick Manufacturer-PBM Enterprises is an ongoing
and continuing business organization consisting of both corporations and individuals that
are and have been associated for the common or shared purposes of selling, purchasing,
prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving
profits from these activities. Each of the Warrick Manufacturer-PBM Enterprises has a
systemic linkage because there are contractual relationships, financial ties, and continuing
coordination of activities between Warrick and AdvancePCS, Warrick and Caremark Rx,
Warrick and Express Scripts, and Warrick and Medco Health. As to each of these
Warrick Manufacturer-PBM Enterprises, there is a common communication network by

- 234 -

which Warrick and AdvancePCS, Warrick and Caremark Rx, Warrick and Express Scripts, and Warrick and Medco Health share information on a regular basis. As to each of these Warrick Manufacturer-PBM Enterprises, Warrick and AdvancePCS, Warrick and Caremark Rx, Warrick and Express Scripts, and Warrick and Medco Health functioned as continuing but separate units. At all relevant times, each of the Warrick Manufacturer-PBM Enterprises was operated and conducted by Warrick for criminal purposes, namely, carrying out the AWP Scheme.

(s)     *The Dey Manufacturer-PBM Enterprises:* The Dey Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Dey's AWPIDs and billed its members on the basis of Dey's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Dey-AdvancePCS Enterprise; (2) the Dey-Caremark Rx Enterprise; (3) the Dey-Express Scripts Enterprise; and (4) the Dey-Medco Health Enterprise. Each of the Dey Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Dey Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Dey and AdvancePCS, Dey and Caremark Rx, Dey and Express Scripts, and Dey and Medco Health. As to each of these Dey Manufacturer-PBM Enterprises, there is a common communication network by which Dey and AdvancePCS, Dey and Caremark Rx, Dey and Express Scripts, and Dey and Medco Health share information on a regular basis. As to each of these Dey Manufacturer-PBM Enterprises, Dey and AdvancePCS, Dey and Caremark Rx, Dey and Express Scripts, and Dey and Medco Health functioned

- 235 -

as continuing but separate units. At all relevant times, each of the Dey Manufacturer-PBM Enterprises was operated and conducted by Dey for criminal purposes, namely, carrying out the AWP Scheme.

**The Defendant Drug Manufacturers' Use of the U.S. Mails and Interstate Wire Facilities**

557.    Each of the Manufacturer-PBM Enterprises and Medco Health engaged in and affected interstate commerce because they engage in the following activities across state boundaries: The sale, purchase and/or administration of drugs; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission to patients of individual prescriptions for drugs by mail-order pharmacies; and/or the transmission and/or receipt of invoices, statements and payments related to the use or administration of drugs. During the Class Period, the Manufacturer-PBM Enterprises and Medco Health participated in the administration of prescription drugs to millions of individuals located throughout the United States.

558.    During the Class Period, the Defendants Drug Manufacturers' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

559.    The nature and pervasiveness of the Defendant Drug Manufacturers' AWP Scheme, which was orchestrated out of the corporate headquarters of the Defendant Drug Manufacturers, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the various local district managers overseeing the sales force(s), the numerous pharmaceutical sales representatives who, in turn, directly communicated with providers and employees who communicated with the PBMs, including Medco Health.

560.    Many of the precise dates of Defendant Drug Manufacturers' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records.  Indeed, an essential part of the successful operation of the AWP Scheme alleged herein depended upon secrecy, and as alleged above, the Defendant Drug Manufacturers took deliberate steps to conceal their wrongdoing.  However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the AWP Scheme and do so below.

561.    The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities to perpetrate the AWP Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

(a)     Marketing materials about the AWPs for brand name drugs and the available spread, which were sent by the Defendant Drug Manufacturers to PBMs (including Medco Health) located across the country;

(b)     Written representations of the AWPs made by the Defendant Drug Manufacturers to the Publishers, which were made at least annually and in many cases several times during a single year;

(c)     Thousands of written and oral communications discussing, negotiating and confirming the placement of a Defendant Drug Manufacturer's drugs on a particular PBM's formulary;

(d)     Documents providing information or incentives designed to lessen the prices that each of the PBMs paid for drugs, and/or to conceal those prices or the AWP Scheme;

- 237 -

(e)     Written communications, including checks, relating to rebates, kickbacks or other financial inducements paid to each of the PBMs to persuade them to advocate one Defendant Drug Manufacturers' drug over a drug manufactured by a competitor;

(f)     Written and oral communications with U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

(g)     Written and oral communications with health insurers and patients;

(h)     Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities -- the wrongful proceeds of the Defendant Drug Manufacturers' AWP Scheme; and

(i)     In addition to the above-referenced RICO predicate acts, Defendants' corporate headquarters have communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the AWP Scheme. These mails include some of the documents referenced in this Amended Complaint.

**Conduct of the RICO Enterprises' Affairs**

562.     During the Class Period, each of the Defendant Drug Manufacturers have exerted control over the Manufacturer-PBM Enterprises with which they were associated and, in violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers have conducted or participated in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly.  Such participation was carried out in the following ways:

(a)     Each of the Defendant Drug Manufacturers has directly controlled the price for its AWPIDs, which determines the amount of each of the PBMs' compensation;

- 238 -

(b)     Each of the Defendant Drug Manufacturers has directly controlled the AWPs that are reported by the Publishers;

(c)     Each of the Defendant Drug Manufacturers has directly controlled the creation and distribution of marketing, sales, and other materials used to inform each of the PBMs of the profit potential of its AWPIDs;

(d)     Each of the Defendant Drug Manufacturers has relied upon its employees and agents to promote the AWP Scheme through the U.S. mails, through interstate wire facilities, and through direct contacts with providers and the PBMs; and

(e)     Each of the Defendant Drug Manufacturers has controlled and participated in the affairs of the Manufacturer-PBM Enterprises with which they are associated by providing or receiving rebates (as detailed above) or other inducements to place a certain Defendant Drug Manufacturer's AWPIDs on a PBM formulary or advocate the use of a certain AWPID. These inducements include drug manufacturers' payment to PBMs of: (i) access rebates for placement of products on the PBMs' formulary; (ii) market share rebates for garnering higher market share than established targets; (iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants. Although PBMs typically agree to share rebates in some form with clients, they link the rebates to formulary savings in such a manner that the PBM often is able to secretly retain all of the rebates. Furthermore, PBMs refuse to disclose specific rebate amounts to clients in any fashion other than in the aggregate compared to performance standards, thereby preventing the client from learning the true amount of rebates that the PBM has received in connection with the health plan client.

563.     Each of the Manufacturer-PBM Enterprises identified above had a hierarchical decision-making structure headed by the respective Defendant Drug Manufacturer.

564.    In violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers has conducted the affairs of each of the Manufacturer-PBM Enterprises with which they associated by reporting fraudulently inflated AWPs for AWPIDs and by submitting false and misleading invoices to Plaintiffs and members of the Classes, thereby inducing Plaintiffs and Class members to pay inflated amounts for AWPIDs.

### The Defendant Drug Manufacturers' Pattern of Racketeering Activity

565.    Each of the Defendant Drug Manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The Defendant Drug Manufacturers' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their AWP Scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) (B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Defendant Drug Manufacturers intended to defraud Plaintiffs, members of the Classes and other intended victims of the AWP Scheme.

566.    The Defendant Drug Manufacturers' fraudulent and unlawful AWP Scheme consisted, in part, of deliberately overstating the AWPs for their AWPIDs, thereby creating a "spread" based on the inflated figure in order to induce each of the PBMs to advocate and favor that particular Defendant Drug Manufacturer's drugs to the members of that PBM's clients. Further, each of the PBMs billed their clients for the particular Defendant Drug Manufacturers' AWPIDs based on the inflated AWPs, which did not reflect the true price paid by the PBMs for the AWPIDs.

- 240 -

567.    The AWP Scheme was calculated and intentionally crafted to ensure that Plaintiffs and members of the Classes would be over-billed for AWPIDs.  In designing and implementing the AWP Scheme, at all times the Defendant Drug Manufacturers were cognizant of the fact those in the distribution chain that were not part of the enterprise relied upon the integrity of the Defendant Drug Manufacturers in setting the AWPs, as reported by the Publishers.

568.    By intentionally and artificially inflating the AWPs, and by subsequently failing to disclose such practices to the individual patients and their insurers, each of the Defendant Drug Manufacturers engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

569.    The Defendant Drug Manufacturers' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and members of the Classes.  Each separate use of the U.S. mails and/or interstate wire facilities employed by each of the Defendant Drug Manufacturers was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Classes.  Each of the Defendant Drug Manufacturers has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Enterprises with which each of them is and was associated-in-fact.

**The Defendant Drug Manufacturers' Motive**

570.    The Defendant Drug Manufacturers' motive in creating and operating the AWP Scheme and conducting the affairs of the Manufacturer-PBM Enterprises described herein was to fraudulently obtain sales of and profits from their AWPIDs.

571.    The AWP Scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the Defendant Drug Manufacturers' AWPIDs.  Thus, each

of the Defendant Drug Manufacturers used the AWP Scheme to sell more of its drugs, thereby fraudulently gaining sales and market share and profits.

### Damages Caused by the Defendant Drug Manufacturers' AWP Scheme

572.   The Defendant Drug Manufacturers' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Classes to be injured in their business or property because Plaintiffs and Class members have paid many hundreds of millions of dollars in inflated reimbursements for AWPIDs.

573.   The Defendant Drug Manufacturers sent billing statements through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their AWP Scheme. Plaintiffs and members of the Classes have made inflated payments for AWPIDs based on and/or in reliance on reported and false AWPs.

574.   Under the provisions of Section 1964(c) of RICO, the Defendant Drug Manufacturers are jointly and severally liable to Plaintiffs and members of the Classes for three times the damages that Plaintiffs and Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

### COUNT III

### DECLARATORY AND OTHER RELIEF PURSUANT TO 28 U.S.C. §§ 2201, 2002

### (AGAINST DEFENDANT DRUG MANUFACTURERS FOR UNLAWFUL CONDUCT ASSOCIATED WITH PHYSICIAN-ADMINISTERED AND MEDICARE PART B COVERED DRUGS)

575.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint. This Court is asserted under Fed. R. Civ. P. 23(b)(2) by all Plaintiffs for the physician-administered-Medicare Part B drug class, including all consumers who made co-payments for Part B covered drugs; all TPP's making payments for Part B covered drugs; and all consumers and TPPs making payments for physician-administered drugs.

- 242 -

576.    An actual case and controversy exists between the Plaintiffs and each of the
Defendant Drug Manufacturers with respect to the Defendant Drug Manufacturers' conduct of
inflating the published reimbursement rates for AWPIDs.  The Plaintiffs contend that setting
stated reimbursement prices above the actual average wholesale price for AWPIDs is unlawful,
and that each Defendant Drug Manufacturer does so in violation of applicable law, knowing that
Medicare beneficiaries and other end payors will incur similarly inflated co-payments and
payments for AWPIDs.

577.    Each Defendant Drug Manufacturer contends to the contrary.  Each of the
Defendant Drug Manufacturers, either by itself or through groups or its trade association,
contend that they may exploit the Medicare reimbursement system without limit, and regardless
of its effect on Medicare beneficiaries and their insurers.

578.    The Plaintiffs, on behalf of themselves, their constituent members and all others
similarly situated, are entitled to a judgment declaring that the practice of the Defendant Drug
Manufacturers of inflating stated reimbursement rates for AWPIDs is unlawful, and are entitled
to further relief pursuant to 28 U.S.C. § 2202.

**COUNT IV**

**VIOLATIONS OF CONSUMER PROTECTION STATUTES**

579.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and
incorporate herein by reference each of the allegations contained in the preceding paragraphs of
this Complaint.  This Count is in the TAMCAC to preserve Plaintiffs' right to appease the home
state issues.

580.    This Count is asserted by each Class by each class representative.

581.    Defendants are incorporated, or maintain their principal places of business, in
either California, Delaware, Illinois, New Jersey, Pennsylvania or Washington.  In addition,
individual Patient and Third-Party Payor Plaintiffs reside in either California, Florida, New

- 243 -

York, Minnesota, Louisiana, Pennsylvania or Texas. Each of these states has enacted statutes to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising. The statutes of these states, legally and substantively common, provide consumers with a private right of action, as follows:

| | |
|---|---|
| *California*: | Cal. Civ. Code §§ 1750, Bus. & Prof. Code § 17200, *et seq.* and 17500, *et seq.* |
| *Delaware*: | 6 Del. Code §§ 2511-2537 |
| *Florida*: | Fla. Stat. Stat. §§ 501.201-501.213 |
| *Illinois*: | 815 ILCS § 505/1, *et seq.* |
| *Louisiana:* | La. Rev. Stat. Ann. § 51:1405 |
| *Minnesota:* | Minn. Stat. Ann. §§ 325D.09 - 325D.16, § 325F.67 - 69 |
| *New Jersey*: | N.J. Stat. Ann. §§ 56:8-1 - 56:8-24 |
| *New York*: | N.Y. Gen. Bus. L. §§ 349-350 |
| *Pennsylvania*: | 73 Pa. Stat. § 201-1 *et seq.* |
| *Texas:* | Tex. Bus. & Com. Code §§ 17.41 – 17.63 |
| *Washington:* | RCW 19.86.010, *et seq.* |

These statutes do not require a showing of either scienter or individual reliance.

582. Defendants' conduct, as alleged in this Complaint, constitutes unfair and deceptive acts or practices, unconscionable practices, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission of material fact in violation of these statutes. Defendants' continuing violations include:

> (a)    Failing to disclose material facts in the conduct of trade or commerce in that they have not disclosed that the AWP does not reflect the true average wholesale price of the drugs they sell, and that the published AWPs are instead deliberately inflated in order to (1) increase the prices paid by Plaintiffs and the members of the Classes; (2) increase the profitability of the Defendant Drug Manufacturer's drugs to the providers who prescribe or dispense them, and to the other intermediaries that promote them; and thereby (3) increase Defendants' market shares and profits;

- 244 -

(b)     Making false or misleading statements of fact concerning the price of goods in that they have not reported the true AWP paid for their medications in order to accomplish the goals described above;

(c)     Knowingly making false representations in a transaction by representing that the AWP is an accurate reflection of the average wholesale price paid for their drugs when AWP is, in reality, a fictitious and inflated amount;

(d)     Publishing fictitious and inflated AWPs in the *Red Book* and other publications;

(e)     Encouraging Medicare Part B providers to use drugs based upon the "spread" as opposed to medicines being prescribed based on medical reasons; and

(f)     Providing PBMs with a cut on the spread in return for the PBMs' participation in the AWP scheme.

583.    Defendants willfully engaged in such practices knowing them to be deceptive and with the intent that Plaintiffs and the Class would rely thereon.

584.    The wrongful conduct alleged in this Complaint occurs, and continues to occur, in the ordinary course of Defendants' business or occupation and has caused great harm to Plaintiffs and the Class, who were foreseeable and direct victims.

585.    Defendants have injured the public interest, and Defendants' actions continue to pose a threat to the public.

586.    As a direct and legal result of Defendants' misleading, deceptive, unfair, false and fraudulent trade practices, Plaintiffs and the Class have sustained damages.

## COUNT V

## VIOLATION OF CONSUMER PROTECTION LAWS – MEDICARE PART B CO-PAY SUB-CLASS

587.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein, and this Count is asserted in the event that the Court does not apply the laws asserted as applicable in Count IV.

- 245 -

588.    This Count is asserted on behalf of a nationwide class of these persons who made a co-payment for a Part B covered drug manufactured by any defendant.

589.    For the purposes of Track 1 proceedings, the following individuals are proposed class representatives for this class:  Leroy Townsend (AstraZeneca); Susan Aaronson (GSK, J&J, BMS); David Clark (GSK, J&J); Robert Howe (AstraZeneca, GSK); James Shepley (J&J, Astra); Estate of Patricia Young (BMS, J&J); Estate of William Newell (AstraZeneca, J&J, BMS).  With respect to Schering, plaintiffs proffer UFCW and SMW Health Fund made co-payments for Part B covered drugs and have the same incentive as any individual co-payor would have to represent this Class.  To the extent that the Court finds any of these Plaintiffs inadequate, then Plantiffs assert that the UFCW should be declared an adequate representative rather than leave the Class uncertified due to a lack of a plaintiff representative who made a co-payment under Medicare Part B.  Alternatively, the following individuals also made co-payments based upon AWP for drugs manufactured by Track 1 defendants:  Cynthia Byrski (BMS, GSK); Estate of William Barnewolt (J&J, Amgen, Abbott, Watson); Cheryl Barreca (J&J, BMS, GSK); Mary Cauble (BMS); Anna Choice (BMS, GSK); Joyce Dison (BMS); Tracy Garcia (BMS, Schering); Donna Kendall (GSK, BMS, J&J); Sandra Leef (BMS, Aventis, Abbott, Fujisawa); Gerald Miller (BMS); Constance Nelson (BMS, GSK); Andrea Palenica (BMS, GSK); Scott Tell (GSK, BMS); Pauline Vernick (BMS, Aventis); Mardolyn Vescovi (BMS, J&J); Kathleen Weaver-Zech (J&J); Susan Wessels (Astra); Joseph Miller (GSK, Baxter, Abbott); Regina Shoemaker (BMS); Kenneth Vanderwal (J&J); Rebecca Hopkins (BMS); and George Baker Thomson (Astra).  They each have the same incentive as any Part B victim to recover damages and/or obtain injunctive relief.

590.    For the purposes of Track 2 proceedings, the following individuals are proposed representatives:  Susan Aaronson (Abbott, Amgen, Aventis, Baxter, Dey, Fujisawa, Pfizer, Pharmacia, Schering-Plough, Sicor and Watson); Harold Carter (Abbott, Amgen and Fujisawa);

Roger Clark (Baxter, Abbott, Amgen, Fujisawa, Pfizer, Sicor and Watson); Robert Howe (Abbott, Amgen, Aventis, Baxter, Fujisawa, Immunex, Sicor and Watson); James Monk (Aventis); Virginia Newell (Amgen and Aventis); Oral Roots (Dey, Pfizer); Hunter G. Walters (Dey); Larry Young (Abbott, Amgen, Aventis, Bayer, Baxter, Fujisawa, Immunex, Pfizer, Pharmacia, Sicor and Watson).

591.    Certification of this sub-class is sought pursuant to Fed. R. Civ. P. 23(b)(3) for the damage claims and (b)(2) for the injunctive relief claims.

592.    As described herein, each Defendant has intentionally and repeatedly used deception, fraud, false pretense, false promise, misrepresentation, and/or concealment, suppression or omission of material facts in connection with the sale or advertisement of AWPIDs. It was the intent of each Defendant that others rely on said concealment, suppression or omissions.

593.    Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed below:

(a)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

(b)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*;

(c)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, 1770;

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

(e)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

- 247 -

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*;

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*;

(h)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

(i)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

(j)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

(k)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*;

(l)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

(m)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

(n)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*;

(o)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

(p)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

(q)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

(r)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

(s)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

(t)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(u)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

(v)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*;

(w)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

(x)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(y)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(z)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

(aa)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

(bb)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(cc)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

(dd)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;

(ee)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*;

(ff)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

(gg)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

(hh)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

(ii)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

(jj)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

(kk)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 245 1, *et seq.*;

(ll)   Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*;

(mm)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

(nn)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*; and

(oo)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*

1534.16 0301 BSC.DOC