# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) <br> AVERAGE WHOLESALE PRICE ) <br> LITIGATION ) <br> ) <br> THIS DOCUMENT RELATES TO: ) <br> ) <br> State of California *ex. rel.* Ven-A-Care, *et. al.* ) <br> v. Abbott Laboratories, Inc., *et. al.* ) <br> Case No. 03-CV-2238 ) <br> ) <br> ) <br> ) | MDL No. 1456 <br><br> CIVIL ACTION: 01-CV-12257-PBS <br><br> Judge Patti B. Saris |

| | | |
|---|---|---|
| COUNTY OF LEHIGH | ) | |
| | ) | ss: |
| COMMONWEALTH OF PENNSYLVANIA | ) | |

### AFFIDAVIT OF CHARLES A. DINARDO

1. My name is Charles A. DiNardo. I am the Senior Vice President, Chief Corporate Officer, and Secretary at B. Braun of America Inc. ("BBA"). I provide this affidavit based on my own personal knowledge and after reasonable inquiry of available sources of information at BBA.

2. BBA is incorporated in Pennsylvania. It is also based there.

3. I understand that BBA is named as one of the defendants in the State of California's First Amended Complaint in Intervention (the "Complaint"), filed on or about October 6, 2005 and styled *State of California ex. rel. Ven-A-Care, et. al. v. Abbott Laboratories, Inc., et. al.*, Case No. 03-CV-2238.

4. I understand that the Complaint alleges that an entity called "McGaw, Inc." "was acquired by" BBA "and its wholly owned subsidiary, B. BRAUN MEDICAL[]Inc." in 1997. Complaint ¶ 15. This is incorrect. BBA did not acquire McGaw, Inc. in 1997 as alleged. Rather, McGaw, Inc. was acquired by and merged into a separate corporate entity, B. Braun Medical Inc. McGaw, Inc. no longer exists as a legal entity.

5. I understand that the Complaint appears to allege, by including BBA among the three entities that it collectively refers to as "McGAW," that BBA is engaged in the business of manufacturing, distributing, or selling certain pharmaceuticals. Complaint ¶¶ 15, 119-22.

This is incorrect.   BBA has not engaged in any of these activities -- in California or elsewhere.

6.  BBA is a holding company, operating no business of its own.  BBA has not transacted any business in the State of California and has not directed any activities toward the State.

7.  BBA has not submitted, or caused to be submitted, any claims for reimbursement to Medi-Cal or any other agency of the State.

8.  BBA has not reported, advertised or published, or caused to be reported, advertised or published, any prices for any pharmaceuticals.

_____
Charles A. DiNardo

Subscribed and sworn to before me
this _17_ th day of January 2006.

_____
Notary Public

Notarial Seal
Mary L. Scott-Perez, Notary Public
City of Bethlehem, Lehigh County
My Commission Expires Jan. 29, 2007
Member, Pennsylvania Association of Notaries

2

# EXHIBIT 2

```
                              IVAX10-Q.txt
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjIWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 KFiIJkyYNPv1TqDEVFiI9Q7QWdeL7pqrYIacMwCfPJ2zU1k/V3CYonVZ1xTyILIE
 /dTBZ1sVmN47OcRQYhIaLQ==

<SEC-DOCUMENT>0000950170-97-000995.txt : 19970815
<SEC-HEADER>0000950170-97-000995.hdr.sgml : 19970815
ACCESSION NUMBER:              0000950170-97-000995
CONFORMED SUBMISSION TYPE:     10-Q
PUBLIC DOCUMENT COUNT:         5
CONFORMED PERIOD OF REPORT:    19970630
FILED AS OF DATE:              19970814
SROS:              AMEX

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:           IVAX CORP /DE
                CENTRAL INDEX KEY:                0000772197
                STANDARD INDUSTRIAL CLASSIFICATION:    PHARMACEUTICAL PREPARATIONS
[2834]
                IRS NUMBER:                       161003559
                STATE OF INCORPORATION:           FL
                FISCAL YEAR END:                  1231

        FILING VALUES:
                FORM TYPE:           10-Q
                SEC ACT:             1934 Act
                SEC FILE NUMBER:     001-09623
                FILM NUMBER:         97661902

        BUSINESS ADDRESS:
                STREET 1:            4400 BISCAYNE BOULEVARD
                CITY:                MIAMI
                STATE:               FL
                ZIP:                 33137
                BUSINESS PHONE:      3055902200

        MAIL ADDRESS:
                STREET 1:            4400 BISCAYNE BOULEVARD
                CITY:                MIAMI
                STATE:               FL
                ZIP:                 33137

        FORMER COMPANY:
                FORMER CONFORMED NAME:  IVAX CORP
                DATE OF NAME CHANGE:    19920703

        FORMER COMPANY:
                FORMER CONFORMED NAME:  IVACO INDUSTRIES INC
                DATE OF NAME CHANGE:    19871213

        FORMER COMPANY:
                FORMER CONFORMED NAME:  INLAND VACUUM INDUSTRIES INC
                DATE OF NAME CHANGE:    19870611
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-Q
```

IVAX10-Q.txt

<SEQUENCE>1
<TEXT>

FORM 10-Q

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE
SECURITIES EXCHANGE ACT OF 1934

FOR THE QUARTERLY PERIOD ENDED JUNE 30, 1997

Commission File Number 1-09623

IVAX CORPORATION

| | |
|---|---|
| FLORIDA | 16-1003559 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

4400 BISCAYNE BOULEVARD, MIAMI, FLORIDA 33137
(Address of principal executive offices) (Zip Code)

(305) 575-6000
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

YES   X            NO
      ------        --------

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

121,498,071 SHARES OF COMMON STOCK, $.10 PAR VALUE, OUTSTANDING AS OF JULY 30, 1997.

<PAGE>

IVAX CORPORATION

INDEX

PART I - FINANCIAL INFORMATION

PAGE NO.
--------

Item 1 - Financial Statements

Condensed Consolidated Balance Sheets as of June 30, 1997
and December 31, 1996                                        2

Condensed Consolidated Statements of Operations

Page 2

IVAX10-Q.txt

for the three months and six months ended June 30, 1997 and 1996      3

Condensed Consolidated Statements of Cash Flows
for the six months ended June 30, 1997 and 1996                        4

Notes to Condensed Consolidated Financial Statements                   5

Item 2 - Management's Discussion and Analysis of Financial Condition and
Results of Operations                                                 11

PART II - OTHER INFORMATION

Item 1 - Legal Proceedings                                            17

Item 6 - Exhibits and Reports on Form 8-K                             17

<PAGE>

PART I -- FINANCIAL INFORMATION

ITEM 1 -- FINANCIAL STATEMENTS
<TABLE>
<CAPTION>
IVAX CORPORATION AND SUBSIDIARIES
CONDENSED CONSOLIDATED BALANCE SHEETS
(Unaudited)
(In thousands)

JUNE 30,      DECEMBER 31,

1997          1996

-------------    ---------
                                       ASSETS
<S>                                                                    <C>
             <C>

Current assets:
    Cash and cash equivalents                                          $
 88,396    $     80,806
    Accounts receivable, net
148,282         191,423
    Inventories
177,100         204,194
    Other current assets
 57,436         101,117
    Net assets of discontinued operations
 93,024         398,329

-------------    -------------
        Total current assets
564,238         975,869

Property, plant and equipment, net
 204,868        223,312
Cost in excess of net assets of acquired companies, net
Page 3

```
                              IVAX10-Q.txt
      25,571            25,998
Patents, trademarks, licenses and other intangibles, net
      27,267            28,728
Other
      71,500            73,155

    -------------  -------------
          Total assets                                                      $
   893,444    $   1,327,062

    =============  =============
            LIABILITIES AND SHAREHOLDERS' EQUITY

Current liabilities:
      Loans payable                                                         $
      5,039    $       5,027
      Current portion of long-term debt
      1,584            5,595
      Accounts payable
     51,529           58,075
      Accrued income taxes payable
      5,832           13,437
      Accrued expenses and other current liabilities
     79,918           79,479

    -------------  -------------
          Total current liabilities
   143,902          161,613

Long-term debt, net of current portion
   104,574          442,819

Other long-term liabilities
    10,961           12,934

Minority interest
    14,333           14,568

Shareholders' equity:
      Common stock, $.10 par value, authorized 250,000 shares,
         issued and outstanding 121,496 shares (121,476 in 1996)
     12,150           12,148
      Capital in excess of par value
    515,094          515,070
      Retained earnings
    105,507          160,960
      Cumulative translation adjustment and other
   (13,077)           6,950

    -------------  -------------
          Total shareholders' equity
   619,674          695,128

    -------------  -------------
          Total liabilities and shareholders' equity                        $
   893,444    $   1,327,062

    =============  =============
</TABLE>

     THE ACCOMPANYING NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS ARE AN
                   INTEGRAL PART OF THESE BALANCE SHEETS.
                              Page 4
```

IVAX10-Q.txt

2

<PAGE>

<TABLE>
<CAPTION>

IVAX CORPORATION AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited)

| PERIOD ENDED JUNE 30, (In thousands, except per share data) | SIX MONTHS 1997 | 1996 | THREE MONTHS 1997 | 1996 |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| NET REVENUES | $ 340,707 | $ 367,437 | $ 173,809 | $ 151,627 |
| COST OF SALES | 229,986 | 229,762 | 120,267 | 115,744 |
| Gross Profit | 110,721 | 137,675 | 53,542 | 35,883 |
| OPERATING EXPENSES: | | | | |
| Selling | 62,934 | 55,623 | 33,379 | 29,080 |
| General and administrative | 56,302 | 44,459 | 28,881 | 24,032 |
| Research and development | 25,913 | 24,478 | 13,982 | 13,021 |
| Amortization of intangible assets | 1,951 | 2,197 | 968 | 1,384 |
| Asset write-downs | 20,500 | - | 20,500 | - |
| Merger expenses | 2,343 | 184 | 247 | - |
| Total operating expenses | 169,943 | 126,941 | 97,957 | 67,517 |
| Income (loss) from operations | (59,222) | 10,734 | (44,415) | (31,634) |
| OTHER INCOME (EXPENSE): | | | | |
| Interest income | 1,873 | 419 | 1,215 | 157 |
| Interest expense | (10,920) | (5,734) | (5,275) | (3,179) |
| Other income, net | 6,587 | 3,802 | (493) | (317) |

IVAX10-Q.txt

| | | | | |
|---|---:|---:|---:|---:|
| | ----------- | ------------- | | |
| | (2,460) | (1,513) | (4,553) | (3,339) |
| | ----------- | ------------- | ----------- | ----------- |
| Income (loss) from continuing operations before income taxes and minority interest | (61,682) | 9,221 | (48,968) | (34,973) |
| PROVISION (BENEFIT) FOR INCOME TAXES | (647) | (5,864) | 2,447 | (13,387) |
| | ----------- | ------------- | ----------- | ------------- |
| Income (loss) from continuing operations before minority interest | (61,035) | 15,085 | (51,415) | (21,586) |
| MINORITY INTEREST | (2,881) | (3,902) | (1,409) | (1,718) |
| | ----------- | ------------- | ----------- | ----------- |
| Income (loss) from continuing operations | (63,916) | 11,183 | (52,824) | (23,304) |
| Income from discontinued operations | 10,600 | 10,782 | 7,447 | 9,373 |
| | ----------- | ------------- | ----------- | ----------- |
| Income (loss) before extraordinary items | (53,316) | 21,965 | (45,377) | (13,931) |
| Extraordinary items - losses on extinguishment of debt, net of taxes | (2,137) | (2,073) | (2,137) | (2,072) |
| | ----------- | ------------- | ----------- | ----------- |
| NET INCOME (LOSS) | $ (55,453) | $ 19,892 | $ (47,514) | $ (16,003) |
| | =========== | ============ | =========== | =========== |
| EARNINGS (LOSS) PER COMMON SHARE: | | | | |
| Continuing operations | $ (.53) | $ .09 | $ (.43) | $ (.19) |
| Discontinued operations | .09 | .09 | .06 | .08 |
| Extraordinary items | (.02) | (.02) | (.02) | (.02) |
| | ----------- | ----------- | ----------- | ----------- |
| Net earnings (loss) | $ (.46) | $ .16 | $ (.39) | $ (.13) |
| | =========== | ============ | =========== | =========== |
| WEIGHTED AVERAGE NUMBER OF COMMON SHARES OUTSTANDING: | 121,484 | 121,858 | 121,488 | 121,015 |
| | =========== | ============ | =========== | =========== |

</TABLE>

THE ACCOMPANYING NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS ARE AN INTEGRAL PART OF THESE STATEMENTS.

IVAX10-Q.txt
3
<PAGE>

<TABLE>
<CAPTION>


IVAX CORPORATION AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(Unaudited)

| SIX MONTHS ENDED JUNE 30, | 1997 | 1996 |
|---|---|---|
| (In thousands) | | |
| <S> | <C> | <C> |
| Cash flows from operating activities: | | |
| Net income (loss) | $ (55,453) | $ 19,892 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | |
| Non cash charges relating to asset write-downs | 20,500 | - |
| Depreciation and amortization | 16,576 | 14,319 |
| Benefit for deferred taxes | (5,982) | (20,716) |
| Provision for allowances for doubtful accounts | 3,046 | 1,467 |
| Losses (gains) on sale of long-term assets | 525 | (567) |
| Losses on extinguishment of debt | 2,137 | 1,640 |
| Minority interest | 2,881 | 3,902 |
| Income from discontinued operations | (10,600) | (10,782) |
| Changes in assets and liabilities: | | |
| Decrease (increase) in accounts receivable | 33,690 | (9,318) |
| Decrease (increase) in inventories | 21,326 | (55,254) |
| Decrease (increase) in other current assets | 44,387 | (15,986) |
| Decrease (increase) in other assets | 890 | (1,459) |
| (Decrease) increase in accounts payable, accrued expenses and other current liabilities | (22,149) | 25,921 |
| Decrease in other long-term liabilities | (619) | (2,483) |
| Other, net | (840) | (760) |
| Net cash provided by (used for) discontinued operations | 25,089 | (7,296) |
| | ------------- | ------------- |
| Net cash provided by (used for) operating activities | 75,404 | (57,480) |
| | ------------- | ------------- |

IVAX10-Q.txt

Cash flows from investing activities:
Proceeds from divestiture                                    320,000
-
Capital expenditures, net of proceeds from sales            (16,856)
(24,064)
Acquisitions of patents, trademarks, licenses
and other intangibles, net of sales proceeds            (739)
(719)
Acquisitions of businesses and other, net of cash acquired  (10,500)
(12,006)

Net cash used for discontinued operations               (13,340)
(16,415)
                                                        -------------
-------------
        Net cash provided by (used for) investing activities   278,565
(53,204)
                                                        -------------
-------------
Cash flows from financing activities:
Borrowings on long-term debt and loans payable           46,911
485,220
Payments on long-term debt and loans payable            (386,882)
(310,450)
Issuance of common stock                                      26
31,777
Cash dividends paid                                           -
(6,057)
Net cash used for discontinued operations                   (93)
(87,329)
                                                        -------------
-------------
        Net cash (used for) provided by financing activities  (340,038)
113,161
                                                        -------------
-------------
Effect of exchange rate changes on cash                      (6,341)
(389)
                                                        -------------
-------------
Net increase in cash and cash equivalents                     7,590
2,088

Cash and cash equivalents at the beginning of the year       80,806
14,720
                                                        -------------
-------------
Cash and cash equivalents at the end of the period   $       88,396    $
16,808
                                                        =============
=============
Supplemental disclosures:

Interest paid                                        $       13,743    $
14,696
                                                        =============
=============
Income tax (refunds) payments                        $      (48,039)   $
9,775
                                                        =============
=============
</TABLE>

IVAX10-Q.txt
THE ACCOMPANYING NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS ARE AN
INTEGRAL PART OF THESE STATEMENTS.

4

<PAGE>


IVAX CORPORATION AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)
(In thousands, except per share data)

(1)  GENERAL:

     In management's opinion, the accompanying unaudited condensed
consolidated financial statements of IVAX Corporation and subsidiaries ("IVAX")
contain all adjustments (consisting of only normal recurring adjustments)
necessary to present fairly the financial position of IVAX as of June 30, 1997,
and the results of its operations for the three and six months ended June 30,
1997 and 1996. The results of operations and cash flows for the six months ended
June 30, 1997 are not necessarily indicative of the results of operations or
cash flows which may be reported for the remainder of 1997.

     The accompanying unaudited interim condensed consolidated financial
statements have been prepared pursuant to the rules and regulations of the
Securities and Exchange Commission for reporting on Form 10-Q. Pursuant to such
rules and regulations, certain information and footnote disclosures normally
included in financial statements prepared in accordance with generally accepted
accounting principles have been condensed or omitted. The condensed consolidated
financial statements should be read in conjunction with the Consolidated
Financial Statements and the Notes to Consolidated Financial Statements included
in IVAX's Annual Report on Form 10-K for the year ended December 31, 1996.

     The accounting policies followed for interim financial reporting are
the same as those disclosed in Note 2 of the Notes to Consolidated Financial
Statements included in IVAX's Annual Report on Form 10-K for the year ended
December 31, 1996.

     Certain amounts presented in the condensed consolidated financial
statements for prior period's have been reclassified to conform to the current
periods presentation and as required with respect to discontinued operations.

(2)  EARNINGS (LOSS) PER SHARE:

     Earnings (loss) per share is computed by dividing net income (loss) by
the weighted-average number of common and dilutive common equivalent shares
outstanding for each period. Common stock equivalents include the dilutive
effect of all outstanding stock options and warrants using the treasury stock
method.

     Statement of Financial Accounting Standards ("SFAS") No. 128, EARNINGS
PER SHARE, requires the disclosure of "basic" and "diluted" earnings per share
for periods ending after December 15, 1997. The computation under SFAS No. 128
differs from the computation of primary and fully diluted earnings per share
under Accounting Principles Board ("APB") Opinion No. 15 primarily in the manner
in which potential common stock (that is, securities such as options, warrants,
convertible securities, or contingent stock agreements) is treated. Basic
earnings per share is computed by dividing net income (loss) by the
weighted-average number of common shares outstanding for the period. In the
computation of diluted earnings per share, the weighted-average number of common
shares outstanding is adjusted for the effect of all dilutive potential common
stock.

IVAX10-Q.txt
        Basic and diluted earnings per share computed in accordance with SFAS
No. 128 for the three and six months ended June 30, 1997 and 1996 do not differ
from the primary earnings per share

                                        5
<PAGE>

reported in the accompanying condensed consolidated statements of operations.
Both diluted earnings per share computed in accordance with SFAS No. 128 and
fully diluted earnings per share computed under APB Opinion No. 15 are not
dilutive for periods presented.

(3) ASSET WRITE-DOWNS:

        During the second quarter of 1997, management reevaluated the carrying
value of certain long-lived assets. The reevaluation was performed, primarily,
in conjunction with initiatives to further consolidate facilities of IVAX's
domestic generic pharmaceutical operations in an effort to improve its
efficiency. As a result of these initiatives, a $20,500 asset write-down was
recognized which primarily represents an initial estimate of the minimum level
of charges associated with expected losses on facility disposals. Management
anticipates that it will continue to consolidate facilities and restructure its
domestic generic pharmaceutical operations in an ongoing effort to improve
efficiencies and operations. Accordingly, additional asset write-downs and
restructuring costs may be recorded in future periods as consolidation and
restructuring initiatives develop further.

        These asset write-downs were recorded in accordance with SFAS No. 121,
ACCOUNTING FOR THE IMPAIRMENT OF LONG LIVED ASSETS AND FOR LONG LIVED ASSETS TO
BE DISPOSED OF, and are shown as asset write-downs in the accompanying condensed
consolidated statements of operations. Management determined the amount of the
write-downs based on various valuation techniques, including discounted cash
flow analysis, independent appraisals and third party offers.

(4) INCOME TAXES:

        The provision (benefit) for income taxes is based on the consolidated
United States entities' and individual foreign companies' estimated tax rates
for the applicable year. IVAX utilizes the asset and liability method, and
deferred taxes are determined based on the estimated future tax effects of
differences between the financial accounting and tax bases of assets and
liabilities using the applicable tax laws. Deferred income tax provisions and
benefits are based on the changes in the deferred tax asset or tax liability
from period to period.

        The provision (benefit) for income taxes from continuing operations
consists of the following:
<TABLE>
<CAPTION>

| PERIOD ENDED JUNE 30, | | THREE MONTHS | |
| SIX MONTHS | | | |
| 1997 | 1996 | 1997 | 1996 |
| ------------- | --------- | ------------- | -------------- |
| <S> | | <C> | <C> |
| <C> | <C> | | |
| Current: | | | |
| United States | | $        - | $       5,292 |
| $     174 | $      645 | | |
| Foreign, including Puerto Rico | | | |
| and U.S. Virgin Islands | | 1,479 | 1,931 |

Page 10

IVAX10-Q.txt

```
<TABLE>
        5,161              14,207                                    968              (20,610)
Deferred
       (5,982)            (20,716)                              -------------      --------------

------------       --------------
Provision (benefit) for income taxes                        $       2,447     $      (13,387)
$        (647)    $       (5,864)
                                                              =============      ==============
===========       ==============
</TABLE>
```

In the second quarter of 1997, IVAX recognized a $24,132 valuation allowance against certain deferred tax assets generated from losses incurred in the second quarter by its domestic operations. Management expects that it will also recognize additional valuation allowances related to any future deferred tax assets generated from its domestic operations until such time as sustainable operating income is achieved.

6

<PAGE>

As of June 30, 1997, a net deferred tax asset aggregating $72,484 ($55,749 and $16,735 domestic and foreign, respectively) is included in other current assets and liabilities and other assets and other long-term liabilities in the accompanying condensed consolidated balance sheet. Realization of the net deferred tax asset is dependent upon generating sufficient future taxable income which will include income from the sale of non-strategic assets. Although realization is not assured, management believes, after consideration of existing valuation allowances, it is more likely than not that the remaining net deferred tax asset will be realized. Management's estimates of future taxable income are subject to revision due to, among other things, regulatory and competitive factors affecting the generic pharmaceutical industry. Such factors are further discussed in "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in IVAX's Annual Report on Form 10-K for the year ended December 31, 1996.

(5) MERGERS:

On March 20, 1997, IVAX announced that Bergen Brunswig Corporation ("Bergen") unilaterally terminated the proposed merger between IVAX and Bergen. On March 21, 1997, Bergen filed a lawsuit against IVAX in federal court alleging, among other things, various breaches of the merger agreement. IVAX does not believe that Bergen had a contractual right to terminate the merger agreement, intends to defend the suit vigorously, and has filed a counterclaim for breach of the merger agreement by Bergen. Included in the accompanying condensed consolidated statement of operations for the six months ended June 30, 1997 are $2,343 of merger expenses related to the terminated merger.

(6) DIVESTITURE:

Effective May 30, 1997, IVAX sold McGaw, Inc. ("McGaw"), its intravenous division, to B. Braun of America, Inc. ("B. Braun"), a subsidiary of B. Braun Melsungen AG, for $320,000 in cash (subject to certain post-closing adjustments), additional payments of up to $80,000 contingent upon the combined operating results of McGaw and B. Braun's principal United States operating subsidiary, and certain royalties based on sales of the Duplex(TM) drug delivery system. The Duplex(TM) system, presently in development, is a multi-compartment intravenous drug delivery system devised for drugs that have limited stability after mixing. The gain on sale and results of operations of the intravenous division were classified as part of discontinued operations for all periods presented (See Note 7, Discontinued Operations).

(7) DISCONTINUED OPERATIONS:

IVAX10-Q.txt

During the second quarter of 1997, IVAX's board of directors determined
to divest its intravenous, personal care products and specialty chemicals
divisions. As a result, IVAX classified these businesses as discontinued
operations, and, accordingly, has included their results of operations in
income from discontinued operations in the accompanying condensed consolidated
statements of operations. Results of these operations were as follows:

7

<PAGE>

<TABLE>
<CAPTION>

| PERIOD ENDED JUNE 30, | | | THREE MONTHS | |
| SIX MONTHS | | | | |
| 1997 | 1996 | | 1997 | 1996 |
| ------------- | --------- | | ------------- | -------------- |
| <S> | | | <C> | <C> |
| <C> | <C> | | | |
| **INTRAVENOUS DIVISION (THROUGH MAY 30, 1997)** | | | | |
| Net Revenues (1) | | | $    58,041 | $    84,840 |
| $    140,634 | $    168,043 | | | |
| Income from operations before taxes (2) | | | $     1,062 | $     2,573 |
| $      3,770 | $      1,970 | | | |
| Income tax benefit | | | (42) | (6,783) |
| (427) | (8,554) | | | |
| | | | ------------- | -------------- |
| ------------- | -------------- | | | |
| Income from operations | | | $     1,104 | $     9,356 |
| $      4,197 | $     10,524 | | | |
| ------------- | -------------- | | ------------- | -------------- |
| **PERSONAL CARE PRODUCTS** | | | | |
| Net Revenues (1) | | | $    19,928 | $    19,627 |
| $     38,829 | $     39,058 | | | |
| Income/(loss) from operations before taxes (2) | | | $       (45) | $     2,191 |
| $        211 | $      4,093 | | | |
| Income tax provision | | | 29 | 992 |
| 186 | 1,852 | | | |
| | | | ------------- | -------------- |
| ------------- | -------------- | | | |
| Income/(loss) from operations | | | $       (74) | $     1,199 |
| $         25 | $      2,241 | | | |
| ------------- | -------------- | | ------------- | -------------- |
| **SPECIALTY CHEMICALS** | | | | |
| Net Revenues (1) | | | $    18,070 | $    18,142 |
| $     35,050 | $     34,270 | | | |
| Income/(loss) from operations before taxes (2) | | | $       577 | $    (1,470) |
| $        640 | $     (2,750) | | | |
| Income tax provision/(benefit) | | | 299 | (288) |
| 401 | (767) | | | |
| | | | ------------- | -------------- |
| ------------- | -------------- | | | |
| Income/(loss) from operations | | | $       278 | $    (1,182) |

IVAX10-Q.txt

```
$          239   $        (1,983)                          -------------    --------------

-------------   --------------
      Sub-total income from operations           $       1,308   $        9,373
$       4,461   $       10,782
                                                         -------------    --------------
-------------   --------------
DIVESTITURE (SEE NOTE 6)
      Pre-tax gain on divestiture                $      31,215   $            -
$      31,215   $            -
      Income tax provision on divestiture               25,076                 -
       25,076                -
                                                         -------------    --------------
-------------   --------------
      Net gain on divestiture                    $       6,139   $            -
$       6,139   $            -
-------------   --------------
Total income from discontinued operations        $       7,447   $        9,373
$      10,600   $       10,782
                                                         =============    ==============
=============   ==============
</TABLE>
```

(1) Net revenues include intersegment sales of $671 and $353 for the three months ended June 30, 1997 and 1996, respectively, and $1,493 and $880 for the six months ended June 30, 1997 and 1996, respectively.

(2) Reflects an allocation of interest expense based on the ratio of net assets of each of the discontinued businesses to IVAX's consolidated total capital. The above operating results include interest expense allocations of $2,635 and $1,344 for the three months ended June 30, 1997 and 1996, respectively, and $5,072 and $2,425 for the six months ended June 30, 1997 and 1996, respectively.

        The net assets of IVAX's remaining discontinued operations (excluding intercompany assets) at June 30, 1997, as presented in the Condensed Consolidated Balance Sheet, are as follows:

8

```
<PAGE>
<TABLE>
<CAPTION>
                                                               PERSONAL CARE
SPECIALTY
                                                                 PRODUCTS
CHEMICALS
                                                                 DIVISION
DIVISION                        TOTAL
                                                               -------------
---------              -----------
<S>                                            <C>             <C>             <C>
                       <C>
Current assets                                 $       44,655   $
   21,591   $         66,246
Property, plant, and equipment, net                     5,731
    5,554              11,285
Other assets                                           22,779
   12,926              35,705
                                                               ----------------
----------------   ----------------
      Total assets                                     73,165
```

Page 13

IVAX10-Q.txt

| | | | | |
|---|---|---|---|---|
| 40,071 | 113,236 | | | |
| ---------------- | ---------------- | | ---------------- | |
| Current liabilities | | | 8,736 | |
| 7,446 | 16,182 | | | |
| Other liabilities | | | 1,846 | |
| 2,184 | 4,030 | | | |
| | | | ---------------- | |
| ---------------- | ---------------- | | | |
| Total liabilities | | | 10,582 | |
| 9,630 | 20,212 | | | |
| | | | ---------------- | |
| ---------------- | ---------------- | | | |
| Net assets of discontinued operations | | $ | 62,583 | $ |
| 30,441 | $ 93,024 | | | |
| | | | ================ | |
| ================ | ================ | | | |

</TABLE>


(8) DEBT:

        During the second quarter of 1997, IVAX utilized a portion of the
proceeds from the sale of its intravenous division (See Note 6, Divestiture) to
pay the $270,147 outstanding balance of its revolving credit facility which was
scheduled to mature November 14, 1999. The facility was terminated in
conjunction with this payment, resulting in IVAX recording an extraordinary loss
of $2,137 primarily related to the write-off of deferred financing costs.

(9) CONTINGENCIES:

        With regard to the shareholder class action lawsuit filed against IVAX
in September 1994, the parties executed a definitive settlement agreement in
April 1997. Pursuant to the settlement agreement, the parties agreed to settle
the action in its entirety in exchange for the payment by the defendant and its
insurers of $7.5 million. IVAX's portion of the settlement obligation, which is
not significant, was appropriately accrued at December 31, 1996, based on a
memorandum of understanding with the defendants executed in January 1997. In
August 1997, the court approved the settlement agreement and entered a final
judgment and order of dismissal with prejudice, which provides for, among other
things, the dismissal of the lawsuit with prejudice and the complete release of
all defendants by all plaintiffs. Pursuant to the settlement agreement, the
settlement and final judgment will be deemed final and conclusive upon the
latter of (i) if no appeal or review of the final judgment is sought, on the day
following the expiration of the time to appeal or petition from the final
judgment; or (ii) if an appeal of the final judgment is sought, the day after
such final judgment is affirmed and is no longer subject to further judicial
review.

(10) COMPREHENSIVE INCOME:

        SFAS No. 130, REPORTING COMPREHENSIVE INCOME, is effective for fiscal
years beginning after December 15, 1997. SFAS No. 130 establishes standards for
reporting and display of comprehensive income and its components in a full set
of financial statements. The objective of SFAS No. 130 is to report a measure of
all changes in equity of an enterprise that result from transactions and other
economic events in a period other than transactions with owners. Comprehensive
income is the total of net income and all other non-owner changes in equity.
Management believes that the adoption of SFAS No. 130 will not have a material
impact on IVAX's consolidated financial statements, and IVAX has elected to
disclose comprehensive income in the consolidated statement of shareholders'
equity.

IVAX10-Q.txt
9

<PAGE>

(11) SUBSEQUENT EVENTS:

        During July and August 1997, IVAX completed the sale of a significant
portion of the assets of its specialty chemicals division in separate
transactions with three different buyers. As part of the sales, IVAX received an
aggregate of $41,800 in cash, subject to certain post closing adjustments. As a
result, the inland vacuum specialty lubricants business is the only remaining
business of IVAX's specialty chemicals division.

10

<PAGE>

ITEM 2--MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
        OF OPERATIONS

        The following discussion and analysis should be read in conjunction
with the Consolidated Financial Statements, the related Notes to Consolidated
Financial Statements and Management's Discussion and Analysis of Financial
Condition and Results of Operations included in IVAX's Annual Report on Form
10-K for the year ended December 31, 1996 and the Condensed Consolidated
Financial Statements and the related Notes to Condensed Consolidated Financial
Statements included in Item 1 of this Quarterly Report on Form 10-Q. Except for
historical information contained herein, the matters discussed below are forward
looking statements made pursuant to the safe harbor provisions of the Securities
Litigation Reform Act of 1995. Such statements involve risks and uncertainties,
including but not limited to economic, competitive, governmental and
technological factors affecting IVAX's operations, markets, products and prices,
and other factors discussed elsewhere in this report and the documents filed by
IVAX with the Securities and Exchange Commission ("SEC").

        Results for the three and six months ending June 30, 1996 have been
restated to reflect the classification of certain businesses as discontinued
operations. See "Results of Operations - Discontinued Operations" for a further
discussion. Additionally, the diagnostics division's results of operations,
previously reported as part of the "Other operations" segment, are not disclosed
as a separate segment because they are not significant.

RESULTS OF OPERATIONS

SIX MONTHS ENDED JUNE 30, 1997 COMPARED TO THE SIX MONTHS ENDED JUNE 30, 1996

        IVAX reported a loss from continuing operations of $63.9 million for
the six months ended June 30, 1997, compared to income from continuing
operations of $11.2 million for the six months ended June 30, 1996. The net loss
for the six months ended June 30, 1997 was $55.5 million, compared to net income
of $19.9 million for the same period of the prior year. Results for both periods
included a $2.1 million net extraordinary loss relating to the extinguishment of
debt.

        Loss per common share from continuing operations was $.53 for the six
months ended June 30, 1997, compared to earnings of $.09 for the six months
ended June 30, 1996. Net loss per common share was $.46 for the first half of
1997, compared to net earnings of $.16 for the same period of the prior year.
The net extraordinary losses recorded in both periods relating to the early
extinguishment of debt resulted in a $.02 loss per common share.

        Net revenues for the first half of 1997 totaled $340.7 million, a

IVAX10-Q.txt
decrease of $26.7 million, or 7%, compared to the same period of the prior year.
An increase of $29.7 million in net revenues of IVAX's international operations
was more than offset by a decrease of $56.4 million in net revenues of IVAX's
domestic operations.

Domestic net revenues totaled $148.8 million for the first six months
of 1997, compared to $205.2 million for the same period of 1996. The $56.4
million, or 27%, decrease in domestic net revenues was primarily attributable to
lower sales volumes and prices of certain generic products. This decline was
partially offset by net revenues generated by certain new generic and
proprietary products manufactured by IVAX and introduced into the market over
the past twelve months. The lower sales volume and decreased prices primarily
relate to IVAX's albuterol metered dose inhaler, approved for marketing and
launched during the fourth quarter of 1995 and first quarter of 1996. In
addition, and to

                                      11
<PAGE>

a lesser extent, verapamil HCl ER tablets and cefadroxil also experienced
lower sales volume and decreased prices as a result of increased competition.

During the first six months of 1997 and 1996, the Company's domestic
generic pharmaceutical business provided reserves which reduced gross sales by
$69.5 million and $126.5 million, respectively (which includes reserves for
expected inventory credits and returns of $16.0 million and $78.4 million,
respectively). At June 30, 1997 and December 31, 1996, these reserves totaled
$51.8 million and $98.2 million, respectively (which includes reserves for
expected inventory credits and returns of $27.5 million and $65.9 million,
respectively).

IVAX's international operations generated net revenues of $191.9
million in the first six months of 1997, compared to $162.2 million for the same
period of the prior year. The $29.7 million, or 18%, increase in international
net revenues was primarily due to increased volume for both generic and branded
products and, to a lesser extent, the favorable impact of foreign currency
fluctuations.

Gross profit for the first half of 1997 decreased $27.0 million, or
20%, from the same period of the prior year. Gross profit was $110.7 million
(32.5% of net revenues) for the first half of 1997, compared to $137.7 million
(37.5% of net revenues) for the first half of 1996. The decline in gross profit
percentage is primarily due to price declines, unfavorable product mix for both
the domestic generic pharmaceutical business and international operations and,
to a lesser extent, increased inventory obsolescence reserves at IVAX's domestic
generic pharmaceutical business.

Selling expenses totaled $62.9 million (18.5% of net revenues) for the
first six months of 1997, compared to $55.6 million (15.1% of net revenues) for
the first six months of 1996. The increase was primarily attributable to
additional sales force and promotional costs related to Elmiron(R), IVAX's
innovative drug used to treat interstitial cystitis, approved for marketing in
the United States during September 1996, and additional sales costs related to
IVAX's international operations. This was partially offset by a decrease in
selling expenses of the domestic generic pharmaceutical operations as a result
of fewer product promotions and reductions in sales and marketing personnel.

General and administrative expenses totaled $56.3 million (16.5% of net
revenues) for the first six months of 1997, compared to $44.5 million (12.1% of
net revenues) for the first six months of 1996, an increase of $11.8 million.
The increase is primarily attributable to higher occupancy costs and
professional fees at IVAX's international operations. To a lesser extent,
corporate general and administrative expenses increased from the same period in

IVAX10-Q.txt
1996 primarily due to increases in health insurance, personnel and legal costs.

Research and development expenses for the first six months of 1997 increased $1.4 million, or 6%, compared to the first half of 1996, to a total of $25.9 million (7.6% of net revenues). The future level of research and development expenditures will depend on, among other things, the outcome of clinical testing of products under development, delays or changes in government required testing and approval procedures, technological and competitive developments, and strategic marketing decisions.

During the second quarter of 1997, management reevaluated the carrying value of certain long-lived assets. The reevaluation was performed, primarily, in conjunction with initiatives to further consolidate facilities of IVAX's domestic generic pharmaceutical operations in an effort to improve its efficiency. As a result of these initiatives, a $20.5 million asset write-down was recognized which primarily represents an initial estimate of the minimum level of charges associated with expected losses on facility disposals. Management anticipates that it will continue to consolidate facilities and restructure its

12

<PAGE>

domestic generic pharmaceutical operations in an ongoing effort to improve efficiencies and operations. Accordingly, additional asset write-downs and restructuring costs may be recorded in future periods as consolidation and restructuring initiatives develop further. Management determined the amount of the write-downs based on various valuation techniques, including discounted cash flow analysis, independent appraisals and third party offers.

Interest expense increased $5.2 million in the first six months of 1997, as compared to the first six months of the prior year, primarily due to higher debt levels associated with borrowings to fund capital expenditures and operations. Interest expense is expected to decline in the near term as compared to recent prior periods due to the reduction of debt.

THREE MONTHS ENDED JUNE 30, 1997 COMPARED TO THE THREE MONTHS ENDED JUNE 30, 1996

IVAX reported a loss from continuing operations of $52.8 million for the three months ended June 30, 1997, compared to a loss of $23.3 million for the same period in 1996. The net loss for the three months ended June 30, 1997 was $47.5 million, compared to a net loss of $16.0 million for the same period in 1996. Results for both periods included a $2.1 million net extraordinary loss from the extinguishment of debt.

Loss per common share from continuing operations was $.43 for the three months ended June 30, 1997, compared to a loss of $.19 for the three months ended June 30, 1996. Net loss per common share was $.39 for the three months ended June 30, 1997, compared to a net loss of $.13 for the same period in the prior year. The net extraordinary losses recorded in both periods relating to the early extinguishment of debt resulted in a $.02 loss per common share.

Net revenues for the three months ended June 30, 1997, totaled $173.8 million, an increase of $22.2 million, or 15%, compared to the same period of the prior year. Net revenues from IVAX's domestic and international operations increased by $2.0 million and $20.2 million, respectively.

Domestic net revenues totaled $69.3 million for the three months ended June 30, 1997, compared to $67.3 million for the same period of the prior year. The $2.0 million increase was primarily attributable to net revenues generated by certain new generic and proprietary products manufactured by IVAX and
Page 17

IVAX10-Q.txt
introduced into the market over the past twelve months, and, to a lesser extent, by lower sales returns and allowances. This was partially offset by decreased volume and prices for certain generic products. The decline in prices primarily related to IVAX's albuterol metered dose inhaler, indapamide and verapamil, while lower sales volume primarily related to cefadroxil and nitrofurantoin.

IVAX's international operations generated net revenues of $104.5 million for the three months ended June 30, 1997, compared to $84.3 million for the same period of the prior year. The $20.2 million increase in international net revenues was primarily due to increases in volume and, to a lesser extent, higher licensing fee revenues from IVAX's United Kingdom operations and the favorable impact of foreign currency fluctuations.

Gross profit for the three months ended June 30, 1997, increased $17.6 million, or 49%, compared to the same period in 1996. Gross profit was $53.5 million (30.8% of net revenues) for the 1997 period, compared to $35.9 million (23.7% of net revenues) for the 1996 period. The improvement in gross profit percentage was primarily the result of an increase in net revenues principally driven by a decrease in sales returns and allowances at IVAX's domestic generic

13

<PAGE>

pharmaceutical business partially offset by unfavorable product mix and, to a lesser extent, increased inventory obsolescence reserves at IVAX's domestic generic pharmaceutical business.

Selling expenses totaled $33.4 million (19.2% of net revenues) for the three months ended June 30, 1997, an increase of $4.3 million, from $29.1 million (19.2% of net revenues) for the same period of 1996. The increase was primarily attributable to higher sales expenses associated with international operations related to higher sales force and commission costs. In addition, the domestic proprietary pharmaceutical operations incurred higher sales costs associated with the launch of Elmiron\registermark\. These increases were partially offset by reductions in the sales force and promotional expenses at IVAX's domestic generic pharmaceutical operations.

General and administrative expenses totaled $28.9 million (16.6% of net revenues) for the three months ended June 30, 1997, compared to $24.0 million (15.8% of net revenues) for the same period of 1996, an increase of $4.9 million. The increase is primarily attributable to increased legal and professional fees at corporate and IVAX's international operations as well as higher bad debt provisions at IVAX's domestic generic pharmaceutical operations.

Research and development expenses for the three months ended June 30, 1997, increased 7.4% compared to the same period of the prior year to a total of $14.0 million.

Refer to the "Results of Operations - Six months ended June 30, 1997 compared to the six months ended June 30, 1996" for a discussion of the $20.5 million asset write-down recognized during the three months ended June 30, 1997.

Interest income increased $1.1 million over the same period of the prior year as a result of higher average cash balances in the current period as compared to the prior year period and the associated interest income earned. Interest expense increased $2.1 million over the same period of the prior year primarily due to higher debt levels associated with borrowings to fund capital expenditures and operations.

DISCONTINUED OPERATIONS

During the second quarter of 1997, IVAX's board of directors

IVAX10-Q.txt
determined to divest its intravenous, personal care products and specialty chemicals divisions. As a result, IVAX classified these businesses as discontinued operations. For the six months ended June 30, 1997 and 1996, income from discontinued operations was $10.6 million and $10.8 million, respectively. For the three months ended June 30, 1997 and 1996, income from discontinued operations was $7.4 million and $9.4 million, respectively. The three months ended June 30, 1997, includes a net gain on the divestiture of McGaw, Inc. ("McGaw"), IVAX's intravenous division, of $6.1 million.

CURRENCY FLUCTUATIONS

For the three and six months ended June 30, 1997, approximately 67% and 62%, respectively, of IVAX's net revenues were attributable to operations which principally generated revenues in currencies other than the United States dollar, compared to approximately 58% and 46% for the three and six months ended June 30, 1996, respectively. Fluctuations in the value of foreign currencies relative to the United States dollar impact the reported results of operations for IVAX. If the United States dollar weakens relative to the foreign currency, the earnings generated in the foreign currency will, in effect, increase when converted into United States dollars and vice versa. As a result of

14

<PAGE>

exchange rate differences, net revenues increased by approximately $1.6 million and $4.1 million for the three and six months ended June 30, 1997, respectively, as compared to the same periods of the prior year.

INCOME TAXES

IVAX recognized a $.6 million tax benefit for the six months ended June 30, 1997. The amount is net of a $24.1 million valuation allowance recognized in the second quarter of 1997 against certain deferred tax assets generated from losses incurred in the second quarter by its domestic operations. Management expects that it will also recognize additional valuation allowances related to any future deferred tax assets generated from its domestic operations until such time as sustainable operating income is achieved.

As of June 30, 1997, IVAX had a net deferred tax asset aggregating $72.5 million. Realization of the net deferred tax asset is dependent upon generating sufficient future taxable income which will include income from the sale of non-strategic assets. Although realization is not assured, management believes, after consideration of existing valuation allowances, it is more likely than not that the remaining net deferred tax asset will be realized. Management's estimates of future taxable income are subject to revision due to, among other things, regulatory and competitive factors affecting the generic pharmaceutical industry. Such factors are further discussed in "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in IVAX's Annual Report on Form 10-K for the year ended December 31, 1996.

LIQUIDITY AND CAPITAL RESOURCES

At June 30, 1997, IVAX's working capital, excluding net assets of discontinued operations, was $327.3 million, compared to $415.9 million at December 31, 1996. Cash and cash equivalents totaled $80.8 million at December 31, 1996, as compared to $88.4 million at June 30, 1997 and $16.8 million at June 30, 1996.

Net cash of $75.4 million was provided by operating activities during the first six months of 1997, compared to $57.5 million in cash used for operating activities during the first six months of 1996. The increase in cash

IVAX10-Q.txt
provided by operating activities, as compared to the first six months of 1996, was primarily the result of increased cash collections on accounts receivable and better inventory management at IVAX's domestic generic pharmaceutical operations. Additionally, IVAX received a $52.5 million refund of federal income taxes paid in prior years.

Net cash of $278.6 million was provided by investing activities during the first six months of 1997, as compared to $53.2 million in cash used for investing activities during the same period of the prior year. The increase was primarily attributable to the cash proceeds received for the sale of McGaw in June 1997. Capital expenditures during the first six months of 1997 decreased $7.2 million compared to the first six months of 1996 due to spending constraints imposed by the revolving credit facility. During the first quarter of 1997, IVAX purchased a pharmaceutical manufacturing facility in Kirkland, Canada for $10.5 million.

Net cash of $340.0 million was used for financing activities during the first six months of 1997, compared to $113.2 million provided by financing activities in the same period of the prior year, primarily reflecting the pay off of the revolving credit facility in June 1997.

15

<PAGE>

Management has initiated an enterprise-wide program to prepare IVAX's computer systems and applications for the year 2000. IVAX expects to incur internal staff costs as well as consulting and other expenses related to infrastructure and facilities enhancements necessary to prepare its systems for the year 2000. Testing and conversion of systems applications is estimated to cost approximately $9.0 million over the next three years. A significant portion of these costs are not likely to be incremental costs, but instead will represent the upgrade to existing information technology resources and new systems replacements which are currently underway.

During the second quarter of 1997, IVAX's board of directors determined to divest its intravenous, personal care products and specialty chemicals divisions. Effective May 30, 1997, IVAX sold McGaw, its intravenous division, to B. Braun of America, Inc. ("B. Braun"), a subsidiary of B. Braun Melsungen AG, for $320.0 million in cash (subject to certain post-closing adjustments), additional payments of up to $80.0 million contingent upon the combined operating results of McGaw and B. Braun's principal United States operating subsidiary, and certain royalties based on sales of the Duplex(TM) drug delivery system. The Duplex(TM) system, presently in development, is a multi-compartment intravenous drug delivery system devised for drugs that have limited stability after mixing. On June 24, 1997, IVAX utilized a portion of the McGaw sale proceeds in the amount of $270.1 million to pay off the outstanding balance of its revolving credit facility which was scheduled to mature November 14, 1999. The facility was terminated in conjunction with the payment and IVAX recognized a net extraordinary loss of $2.1 million on the early extinguishment of debt.

During July and August 1997, IVAX completed the sale of a significant portion of the assets of its specialty chemicals division in separate transactions with three different buyers. As part of the sales, IVAX received an aggregate of $41.8 million in cash, subject to certain post closing adjustments. As a result, the inland vacuum specialty lubricants business is the only remaining business of IVAX's specialty chemicals division.

IVAX's principal sources of short term liquidity are existing cash and internally generated funds which IVAX believes will be sufficient to meet its operating needs and anticipated capital expenditures over the short term. For the long term, IVAX intends to utilize capital from the disposition of certain non-strategic assets, including those currently classified as discontinued

IVAX10-Q.txt

operations, but may need to seek alternative sources of financing to fund its
operations. IVAX has terminated its revolving credit facility and no assurance
can be given that alternative financing will be available, if at all, in a
timely manner, on favorable terms. If IVAX is unable to obtain satisfactory
alternative financing, IVAX may be required to delay or reduce its proposed
expenditures, including expenditures for research and development, or sell
assets in order to meet its future obligations.

16

<PAGE>

PART II -- OTHER INFORMATION

ITEM 1 -- LEGAL PROCEEDINGS

        With respect to the case styled HARVEY M. JASPER RETIREMENT TRUST, ET
AL. V. IVAX CORPORATION AND PHILLIP FROST ET AL., previously reported in IVAX's
Annual Report on Form 10-K for the year ended December 31, 1996, on August 7,
1997, the court gave final approval to the settlement embodied in the April 28,
1997 Stipulation of Settlement, which was previously reported in IVAX's
Quarterly Report on Form 10-Q for the quarterly period ended March 31, 1997, and
entered a Final Judgment and Order Of Dismissal With Prejudice ("Final
Judgment"). The Final Judgment provides for, among other things, the dismissal
of the lawsuit with prejudice and the complete release of all defendants by all
plaintiffs. Pursuant to the parties' Stipulation of Settlement, the Final
Judgment is deemed to be final and conclusive upon the latter of (i) if no
appeal or review of the Final Judgment is sought, on the day following the
expiration of the time to appeal or petition from the Final Judgment; or (ii) if
an appeal of the Final Judgment is sought, the day after such Final Judgment is
affirmed and is no longer subject to further judicial review.

        With respect to the cases styled ALAN M. HARRIS AND YITZCHOK WOLPIN V.
IVAX CORPORATION, PHILLIP FROST AND MICHAEL W. FIPPS, previously reported in
IVAX's Annual Report on Form 10-K for the year ended December 31, 1996, and
FAUSTO POMBAR V. IVAX CORPORATION, PHILLIP FROST AND MICHAEL W. FIPPS,
previously reported in IVAX's Quarterly Report on Form 10-Q for the quarterly
period ended March 31, 1997, on June 19, 1997, the court entered an order
dismissing the POMBAR action without prejudice and ordered the plaintiffs in
both actions to file an amended complaint incorporating the allegations in both
the HARRIS and POMBAR actions under a single case styled ALAN M. HARRIS,
YITZCHOK WOLPIN AND FAUSTO POMBAR V. IVAX CORPORATION, PHILLIP FROST AND MICHAEL
W. FIPPS. The amended complaint was filed on July 10, 1997, and plaintiffs
therein seek to act as representatives of a class consisting of all persons who
purchased IVAX common stock and/or call options during the period from August 2,
1996 through November 11, 1996, inclusive.

ITEM 6 -- EXHIBITS AND REPORTS ON FORM 8-K

(a)     EXHIBITS

                10.1 Employment Agreement dated July 28, 1997, between IVAX
                     Corporation and Dr. Rafick G. Henein

                10.2 Employment Agreement dated as of July 28, 1997, between IVAX
                     Corporation and David R. Bethune

                11   Computation of Earnings (Loss) Per Share

                27   Financial Data Schedule

(b)     REPORTS OF FORM 8-K

```
                          IVAX10-Q.txt
     1.   Form 8-K dated May 30, 1997 relating to the execution of an
          agreement to divest McGaw.

     2.   Form 8-K dated June 24, 1997 relating to the divestiture of
          McGaw, which included unaudited pro forma condensed
          consolidated financial statements to reflect IVAX
          Corporation after giving effect to the sale of McGaw.

                                   17
<PAGE>




                              SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the
Registrant has duly caused this report to be signed on its behalf by the
undersigned thereunto duly authorized.

                                   IVAX CORPORATION

     Date:   August 14, 1997       By: /s/ MICHAEL W. FIPPS
                                       --------------------
                                       Michael W. Fipps
                                       Senior Vice President-Finance
                                       Chief Financial Officer


<PAGE>

                             EXHIBIT INDEX

Exhibit
- -------


10.1 Employment Agreement dated July 28, 1997, between IVAX Corporation and Dr.
     Rafick G. Henein

10.2 Employment Agreement dated as of July 28, 1997, between IVAX Corporation
     and David R. Bethune

11   Computation of Earnings (Loss) Per Share

27   Financial Data Schedule


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.1
<SEQUENCE>2
<TEXT>

                          EMPLOYMENT AGREEMENT

        This Employment Agreement (the "AGREEMENT"), dated July 28, 1997 (the
"EFFECTIVE DATE"), is entered into between IVAX Corporation (the "COMPANY") and
Dr. Rafick G. Henein (the "EXECUTIVE").
                              Page 22
```

IVAX10-Q.txt
RECITAL

The Board of Directors of the Company desires to employ the Executive and to assure the Executive's continued employment by the Company on the terms and conditions of this Agreement, and the Executive desires to be employed by the Company on the terms and conditions of this Agreement.

AGREEMENT

In consideration of the Recital and of the mutual promises set forth in this Agreement, the Company and the Executive agree as set forth below.

1.        EMPLOYMENT.

(A) EMPLOYMENT AND TERM. The Company agrees to employ the Executive and the Executive agrees to be employed by the Company, on the terms and conditions of this Agreement, for a period commencing on the Effective Date and expiring on the fifth anniversary of the Effective Date (the "INITIAL TERM"). The term of this Agreement shall automatically be extended for a period of two years (a "RENEWAL TERM"), on the fifth anniversary of the Effective Date and on each subsequent anniversary of the Effective Date unless at least two years and 90 days prior to any such anniversary, the Executive shall have delivered to the Company a written notice stating that the term of the Agreement will not be extended. For purposes of this Agreement, the word "TERM" means the Initial Term and all Renewal Terms.

(B) DUTIES. The Executive shall serve as the President and Chief Executive Officer of Zenith Goldline Pharmaceuticals, Inc. ("ZENITH GOLDLINE") and shall have powers and authority superior to any other officer or employee of Zenith Goldline. In that capacity, he shall be responsible for the operation of Zenith Goldline's activities globally, which shall include the coordination of Zenith Goldline's activities with those of the Company's affiliates in various parts of the world, and shall have duties commensurate with his position. The Executive shall also serve as a Senior Vice President of the Company and in this capacity shall have such powers and authority as may be given to him from time to time by the Board of Directors of the Company or a committee thereof (the "BOARD OF DIRECTORS"). The Executive shall report to and be subject to the supervision and direction of the Chief Operating Officer, the Chief Executive Officer, and the Board of Directors. The Executive shall devote his full business time and energies to the business and affairs of the Company and shall use his best efforts, skills and abilities to promote the interests of the Company and to diligently and competently perform the duties of his position. The Executive shall have the right to (i) serve on civic or charitable boards or committees and, with the consent of the Board of Directors, serve on corporate boards, (ii) deliver lectures, fulfill speaking engagements, or teach at educational institutions, and (iii) manage personal investments; provided that such activities do not unreasonably interfere with the Executive's duties to the Company under this Agreement.

<PAGE>

(C) PLACE OF PERFORMANCE. The Executive will perform his duties from Zenith Goldline's principal place of business, which is currently located in Ft. Lauderdale, Florida, except for travel reasonably necessary in connection with the Company's and Zenith Goldline's business. The Executive acknowledges that the Company may cause Zenith Goldline's principal place of business to be moved to Miami, Florida.

(D) WORKING FACILITIES. The Company shall provide the Executive with an office, a secretary, a portable phone, a portable personal computer, a home facsimile, and such other customary facilities and equipment as are necessary for the performance of his duties, all of which Executive acknowledges are and shall remain the property of the Company.

IVAX10-Q.txt

2.        COMPENSATION.

(A) SIGNING BONUS. Within two business days after the Effective Date, the Company shall pay to the Executive a cash signing bonus in the amount of $200,000.

(B) INITIAL STOCK OPTION GRANT. The Company shall grant to the Executive, in accordance with the terms of the Company's 1994 Stock Option Plan (the "PLAN"), nonqualified options (the "INITIAL STOCK OPTIONS") to purchase 250,000 shares of the common stock of the Company (the "COMMON STOCK"). The exercise price of the Initial Stock Options shall be equal to the closing price of the Common Stock, as reported in THE WALL STREET JOURNAL, on the Effective Date. The Initial Stock Options shall have a term of ten years. The Initial Stock Options shall vest 25% on the Effective Date and 25% on each of the first three anniversary dates of the Effective Date; provided that the Initial Stock Options shall vest and become immediately exercisable upon a termination of Executive's employment pursuant to Sections 4(a) or 4(b). The Company agrees to take all action reasonably requested by the Executive to permit the Executive to take advantage of the "cashless" exercise feature of Section 4(d) of the Plan to exercise the Initial Stock Options. Immediately upon the exercise of the Initial Stock Options in accordance with the Plan, the Executive shall be deemed to be the owner of the Common Stock into which the Initial Stock Options were exercisable. In case at any time or from time to time the holders of Common Stock become entitled to receive, without payment therefor, other or additional stock or other securities or property of the Company by way of a spin-off, special dividend and/or liquidation distribution (other than a regular cash dividend), the Board of Directors shall consider in good faith a fair and equitable adjustment to the exercise price or other terms of the Initial Stock Options. The Initial Stock Options will not be affected by any amendment to Section 13(c) of the Plan.

(C) BASE SALARY. The Executive will be paid a base salary at the annual rate of not less than $575,000 (the "BASE SALARY"). In addition, the Company shall pay to the Executive annually the sum of $38,500 as additional cash compensation. The Base Salary and the additional cash compensation shall be paid in installments consistent with the Company's normal payroll policies. The Company shall review the Base Salary six months after the Effective Date and annually thereafter for merit increases, which shall be made subject to and at the discretion of the Board of Directors. Once increased, the Base Salary shall not thereafter be decreased.

(D) ANNUAL BONUS. The Executive shall be entitled to receive an annual cash bonus in an amount up to 100% of the Base Salary based on the Executive's performance during the applicable year. The amount of the bonus payable in any year shall be determined by reference to the profitability of Zenith Goldline and such other measures as the Company and the Executive may agree. The terms and conditions relating to the payment and amount of the bonus shall be negotiated in good faith by the Company and the Executive. The Executive acknowledges that the Company requires that the bonus satisfy the requirements for performance-based compensation under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "CODE").

<PAGE>

(E) SUBSEQUENT STOCK OPTIONS. The Executive shall be entitled to receive stock options and such other long term compensation as may be determined by the Board of Directors from time to time in its discretion. In making any determinations concerning the award of stock options to the Executive, the Board of Directors will apply the same criteria as it applies in making awards to the other key executives of the Company, and its determinations will not be affected by the bonus arrangement described in Section 2(d).

IVAX10-Q.txt

3. BENEFITS. During the Term, the Executive shall be entitled to the benefits described below.

(A) EXPENSE REIMBURSEMENT. Upon submission of appropriate supporting documentation and in specific accordance with such guidelines as may be established from time to time by the Company for senior executives, the Executive shall be reimbursed by the Company for all reasonable business expenses (including travel and entertainment) actually and necessarily incurred by the Executive on behalf of the Company in connection with the performance of his duties under this Agreement.

(B) INCENTIVE SAVINGS AND RETIREMENT PLANS. The Executive shall be entitled to participate in all savings, incentive and retirement plans, practices, policies and programs, if any, generally made available by the Company to other key executives of the Company based in the United States. The Company agrees to waive any waiting period under such plans so that the Executive may be eligible for participation in such plans as of the Effective Date; provided that such waiver is permitted by the applicable plan and does not adversely affect the Company.

(C) WELFARE PLANS. The Executive shall be entitled to participate in all welfare benefit plans, practices, policies and programs, if any, generally made available by the Company to other key executives of the Company based in the United States. The Company agrees to waive any waiting period under such plans so that the Executive may be eligible for participation in such plans as of the Effective Date.

(D) VACATION. The Executive shall be entitled to paid vacation in accordance with the most favorable plans, practices, policies and programs, if any, generally made available by the Company to other key executives of the Company based in the United States; provided that the Executive shall be entitled to at least four weeks paid vacation each year.

(E) PROFESSIONAL MEMBERSHIPS; SEMINARS. The Company shall pay for the Executive the membership dues in professional organizations that are directly related to the Executive's duties to the Company, including without limitation, the Order of Pharmacists for the Province of Ontario, the Order of Pharmacists of the Province of Quebec, and the Order of Pharmacists of Florida. The Company agrees that the Executive shall be entitled to attend each year two seminars or similar meetings relating to the business of the Company, and the Executive's expenses related thereto shall be reimbursed by the Company in accordance with Section 3(a).

<PAGE>

(F) CANADIAN RESIDENCE. The Company shall pay to the Executive $100,000 within two business days after the Effective Date to compensate the Executive for the loss of value of his home in Canada, such amount to be used by the Executive in his sole discretion.

(G) RELOCATION. In connection with the Executive's relocation to South Florida:

(i) The Company shall provide the Executive for his use a furnished condominium in Dade or Broward county (at the Executive's election) for a period of twelve months commencing on the Effective Date; provided that the Company shall not be required to pay more than $1,500 per month pursuant to this clause (i).

(ii) The Company shall reimburse the Executive for all reasonable moving expenses incurred by him to relocate his home from Canada to Miami.

IVAX10-Q.txt

(iii) The Company shall reimburse the Executive for all reasonable closing costs incurred by him in connection with the purchase of a home in South Florida, including reasonable legal fees and expenses.

(iv) To facilitate the financing of a home in South Florida, the Company will agree to guaranty the Executive's obligations to a bank or other financial institution providing traditional mortgage lending to the Executive.

(v) Until the first anniversary of the Effective Date, the Company shall reimburse the Executive for up to two round-trip air fares between Toronto and Miami each month.

(H) SUPPORTING DOCUMENTS. The Executive shall provide the Company with such supporting documents as the Company may reasonably request in connection with the expenses described in Sections 3(e), and (g).

4.     TERMINATION.

(A) TERMINATION WITHOUT CAUSE. Notwithstanding any other provision of this Agreement, the Board of Directors shall have the right to terminate this Agreement at any time upon written notice to the Executive; provided that the Company shall pay to the Executive in a cash lump sum within 30 days after the effective date of the termination (the "TERMINATION DATE") an amount equal to (i) if the Termination Date is a date within three years after the Effective Date, three times the Base Salary as of the Termination Date, or (ii) if the Termination Date is a date after the third anniversary of the Effective Date, two times the Base Salary as of the Termination Date. In addition, the Company shall continue to provide benefits to the Executive pursuant to Section 3(c) for the applicable period.

(B) TERMINATION FOR GOOD REASON. The Company shall be deemed to have terminated this Agreement pursuant to Section 4(a) if the Executive terminates this Agreement for Good Reason. For purposes of this Agreement, the term "GOOD REASON" means:

(i) the assignment to the Executive of any duties inconsistent in any respect with the Executive's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities as contemplated by Section 1(b), or any other action by the Company which results in a diminution in such position,

<PAGE>

authority, duties or responsibilities, in each case if not remedied within 30 days after receipt of written notice thereof from the Executive;

(ii) any failure by the Company to comply with any of the provisions of Sections 2 or 3 which is not remedied within 30 days after receipt of written notice thereof from the Executive;

(iii) the Company's requiring the Executive to be based at any office or location other than in Dade or Broward county, except for travel reasonably required in the performance of the Executive's responsibilities;

(iv) any termination by the Company of the Executive's employment otherwise than as expressly permitted by this Agreement;

(v) any failure by the Company to comply with and satisfy the penultimate sentence of Section 9(c)(iii); or

Page 26

IVAX10-Q.txt

        (vi) any termination by the Executive for any reason during the three-month period following the effective date of any Change in Control (as defined in Section 5).

For purposes of this Section, any good faith determination of Good Reason made by the Executive shall be conclusive.

        (C) TERMINATION FOR CAUSE. Notwithstanding any other provision of this Agreement, this Agreement may be terminated by the Company for Cause. For purposes of this Agreement, the word "CAUSE" means: (i) an act or acts of personal dishonesty taken by the Executive and intended to result in the direct or indirect personal enrichment of the Executive at the expense of the Company (except that disputes regarding expense reimbursement shall not be subject to this clause and shall instead be resolved in good faith by the Board of Directors and the Executive), (ii) subject to the following sentences, violation by the Executive of his material obligations or representations under this Agreement which are demonstrably willful and deliberate and which are not remedied within 30 days after written notice to the Executive, or (iii) the conviction of the Executive of any criminal act which is a felony. Upon a determination by the Company that cause exists under clause (ii) of the preceding sentence, the Company shall cause a special meeting of the Board of Directors to be called and held at a time mutually convenient to the Board of Directors and the Executive, but in no event later than 10 business days after the Executive's receipt of the notice contemplated in clause (ii). The Executive shall have the right to appear at such special meeting with legal counsel of his choosing to refute any determination of Cause specified in such notice, and any termination of this Agreement by reason of such Cause determination shall not be effective until the Executive is afforded such opportunity to appear before the Board of Directors. Any notice of termination for Cause pursuant to clause (i) or (iii) of the second sentence of this Section shall be made in writing to the Executive, which notice shall set forth in detail all acts or omissions upon which the Company is relying for such termination. Upon any termination pursuant to this Section, the Executive shall be entitled to be paid his Base Salary to the date of termination and the Company shall have no further liability under this Agreement to the Executive (other than for reimbursement of business expenses incurred prior to the termination date, in accordance with Section 3(a)).

<PAGE>

        (D) DEATH. This Agreement shall automatically terminate upon the death of the Executive. If this Agreement is terminated pursuant to this Section, the Company shall pay to the Executive's estate (i) Base Salary through the termination date, and (ii) an amount in cash equal to six months of the Base Salary as of the date of termination.

        (E) DISABILITY. The Company, by written notice to the Executive, shall at all times have the right to terminate this Agreement if the Executive shall, as the result of mental or physical incapacity, illness or disability, fail to perform his duties and responsibilities provided for herein for a period of more than 180 consecutive days. Upon any termination pursuant to this Section 4(e), the Executive shall be entitled to be paid his Base Salary to the date of termination and the Company shall have no further liability hereunder (other than for reimbursement of business expenses incurred prior to the termination date, in accordance with Section 3(a)).

        5. CHANGE IN CONTROL. For purposes of this Agreement, a "CHANGE IN CONTROL" means any one of the following events:

        (a) The acquisition (other than by or from the Company), at any time after the date hereof, by any person, entity or "group", within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934 (the

Page 27

IVAX10-Q.txt

"EXCHANGE ACT"), of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 50% or more of either the then outstanding shares of Common Stock or the combined voting power of the Company's then outstanding voting securities entitled to vote generally in the election of directors; or

(b) All or any of the individuals who, as of the Effective Date, constitute the full Board of Directors (the "INCUMBENT BOARD") cease for any reason to constitute at least a majority of the Board, provided that any person becoming a director subsequent to the Effective Date whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board (other than an election or nomination of an individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the directors of the Company, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act) shall be, for purposes of this Agreement, considered as though such person were a member of the Incumbent Board; or

(c) Approval by the shareholders of the Company of (i) a reorganization, merger or consolidation with respect to which persons who were the shareholders of the Company immediately prior to such reorganization, merger or consolidation do not, immediately thereafter, own more than 50% of the combined voting power entitled to vote generally in the election of directors of the reorganized, merged or consolidated company's then outstanding voting securities, (ii) a liquidation or dissolution of the Company, or (iii) the sale of all or substantially all of the assets of the Company, unless the approved reorganization, merger, consolidation, liquidation, dissolution or sale is subsequently abandoned.

Notwithstanding anything contained in this Section 5 to the contrary, any transaction in which Zenith Goldline becomes a separate company the shares of which are publicly traded on a stock exchange or on the National Association of Securities Dealers' Automated Quotation system (by way of a spin-off, split-off, public offering, merger, consolidation or otherwise) shall not be deemed a change in control under this Agreement; provided that, concurrent with such


<PAGE>

transaction, this Agreement is assumed by Zenith Goldline and the Executive is appointed the Chief Executive Officer of Zenith Goldline.

        6.      RESTRICTIVE COVENANTS.

        (A) NONDISCLOSURE. On the Effective Date, the Executive will execute the Company's standard form of Confidentiality Agreement, a copy of which is attached hereto as Exhibit A.

        (B) NONSOLICITATION OF EMPLOYEES. While employed by the Company and for a period of two years thereafter, Executive shall not directly or indirectly, for himself or for any other person, firm, corporation, partnership, association or other entity, attempt to employ or enter into any contractual arrangement with any employee or former employee of the Company, unless such employee or former employee has not been employed by the Company for a period in excess of one year.

        (C) INJUNCTION. It is recognized and hereby acknowledged by the parties hereto that a breach by the Executive of any of the covenants contained in Section 6(a) or 6(b) will cause irreparable harm and damage to the Company, the monetary amount of which may be virtually impossible to ascertain. As a result, the Executive recognizes and hereby acknowledges that the Company shall be entitled to an injunction from any court of competent jurisdiction enjoining and

IVAX10-Q.txt
restraining any violation of any or all of the covenants contained in such
Section by the Executive or any of his affiliates, associates, partners or
agents, either directly or indirectly, and that such right to injunction shall
be cumulative and in addition to whatever other remedies the Company may
possess.

7.       CONFLICTS WITH EXISTING AGREEMENTS; COMPANY POLICIES.

(a) The Executive represents and warrants that attached hereto as
Exhibit B is a true and complete copy of all contracts (or, if oral, an accurate
written description thereof) to which he is a party, or bound by, which in the
future may have a possibility of adversely affecting the business of the Company
or the performance by the Executive of his duties under this Agreement,
including but not limited to contracts related to previous employment containing
confidentiality or noncompete covenants. The Company acknowledges that it has
reviewed Exhibit B.

(b) The Executive acknowledges that he will be subject to and required
to abide by the policies and procedures of the Company applicable to senior
executives as in effect from time to time, and that he will be required to
execute and abide by the Company's Code of Conduct, as in effect from time to
time.

8. VISAS. The Company will sponsor the Executive for a non-immigrant
visa to permit the Executive to live and work in the United States. Following
the receipt of such visa, the Company agrees to sponsor the Executive for an
immigrant visa ("green card"). The Company will pay all legal and other expenses
related to obtaining the non-immigrant visa and immigrant visa. The Executive
agrees to take all actions necessary and appropriate to obtain the non-immigrant
visa and immigrant visa and shall fully cooperate with the Company in good faith
to obtain such visas. In the event that a visa is not granted to the Executive,
and all applicable appeals have been exhausted, this Agreement shall be deemed
to have been terminated pursuant to Section 4(a) and the Executive will be
entitled to receive the payments and the benefits provided in that Section;
provided that if the Executive's representation in the last sentence of this

<PAGE>

Section is not true, then, notwithstanding the provisions of Section 4(a), the
Company shall only be required to pay to the Executive in a cash lump sum an
amount equal to his then Base Salary and to continue to provide benefits to the
Executive pursuant to Section 3(c) for a period of one year; and provided
further, that, if the Company requests that the Executive serve as the chief
executive officer of its Canadian-based generic pharmaceutical business, then
the Executive shall assume such position and this Agreement shall not terminate.
The Executive represents to the Company that he is aware of no facts or
circumstances applicable to him that would prevent the issuance of the visas
described in this Section.

9.       MISCELLANEOUS.

(A) GOVERNING LAW. This Agreement shall be governed by and construed in
accordance with the laws of the State of Florida, without regard to the conflict
of law principles thereof.

(B) NOTICES. Any notice required or permitted to be given under this
Agreement shall be in writing and shall be deemed to have been given when
delivered by hand or when deposited in the United States mail, by registered or
certified mail, return receipt requested, postage prepaid, addressed as follows:

          If to the Company:     IVAX Corporation
                                 4400 Biscayne Boulevard
                                 Miami, Florida 33137
                                 Page 29

IVAX10-Q.txt
Attention: General Counsel

If to the Executive:    Dr. Rafick G. Henein

or to such other addresses as either party hereto may from time to time give
notice of to the other in the aforesaid manner.

    (C)    SUCCESSORS.

    (i) This Agreement is personal to the Executive and without
the prior written consent of the Company shall not be assignable by the
Executive otherwise than by will or the laws of descent and
distribution.

    (ii) This Agreement shall inure to the benefit of and be
enforceable by the Executive's legal representatives.

    (iii) This Agreement shall inure to the benefit of and be
binding upon the Company and its successors and assigns. The Company
will require any successor (whether direct or indirect, by purchase,
merger, consolidation or otherwise) to all or substantially all of the
business and/or assets of the Company or, if the last sentence of
Section 5 is applicable, Zenith Goldline, to expressly assume and agree
to perform this Agreement in the same manner and to the same extent
that the Company would be required to perform it if no such succession
had taken place. As used in this Agreement, "Company" shall mean the
Company as hereinbefore defined and any successor to its business
and/or assets which assumes and agrees to perform this Agreement by
operation of law or otherwise.

<PAGE>

    (iv) If this Agreement is assumed by Zenith Goldline pursuant
to the penultimate sentence of clause (iii), the Company shall have no
further obligation to the Executive.

    (D) SEVERABILITY. The invalidity of any one or more of the words,
phrases, sentences, clauses or sections contained in this Agreement shall not
affect the enforceability of the remaining portions of this Agreement or any
part thereof, all of which are inserted conditionally on their being valid in
law, and, in the event that any one or more of the words, phrases, sentences,
clauses or sections contained in this Agreement shall be declared invalid, this
Agreement shall be construed as if such invalid word or words, phrase or
phrases, sentence or sentences, clause or clauses, or section or sections had
not been inserted. If such invalidity is caused by length of time or size of
area, or both, the otherwise invalid provision will be considered to be reduced
to a period or area which would cure such invalidity.

    (E) WAIVERS. The waiver by either party hereto of a breach or violation
of any term or provision of this Agreement shall not operate nor be construed as
a waiver of any subsequent breach or violation.

    (F) DAMAGES. Nothing contained herein shall be construed to prevent the
Company or the Executive from seeking and recovering from the other damages
sustained by either or both of them as a result of its or his breach of any term
or provision of this Agreement, except that the payment required to be made by
the Company to the Executive pursuant to Sections 4 and 8 shall be the
Executive's exclusive remedy for any termination of this Agreement pursuant to
such sections.

    (G) NO THIRD PARTY BENEFICIARY. Nothing expressed or implied in this
Agreement is intended, or shall be construed, to confer upon or give any person
(other than the parties hereto and, in the case of Executive, his heirs,

Page 30

IVAX10-Q.txt
personal representative(s) and/or legal representative) any rights or remedies
under or by reason of this Agreement.

(H) MISCELLANEOUS. The Company's obligation to make the payments
provided for in this Agreement and otherwise to perform its obligations
hereunder shall not be affected by any set-off, counterclaim, recoupment,
defense or other claim, right or action which the Company may have against the
Executive or others. In no event shall the Executive be obligated to seek other
employment or take any other action by way of mitigation of the amounts payable
to the Executive under any of the provisions of this Agreement. To the extent
that the Executive is successful in any legal proceeding against the Company
involving this Agreement, the Company agrees to pay, to the full extent
permitted by law, all legal fees and expenses which the Executive may reasonably
incur in connection with such proceeding.

(I) MEDIATION. The Company and the Executive agree so submit any
controversy or claim arising out of or relating to this Agreement to mediation
with a mutually agreeable mediator in Dade County, Florida, prior to instituting
any legal proceeding.

10.       CERTAIN REDUCTION OF PAYMENTS BY THE COMPANY.

<PAGE>

(a) Anything in this Agreement to the contrary notwithstanding, in the
event it shall be determined that any payment or distribution by the Company to
or for the benefit of the Executive, whether paid or payable or distributed or
distributable pursuant to the terms of this Agreement or otherwise (a
"PAYMENT"), would be nondeductible by the Company for Federal income tax
purposes because of Section 280G of the Code, then the aggregate present value
of amounts payable or distributable to or for the benefit of the Executive
pursuant to this Agreement (such payments or distributions pursuant to this
Agreement are hereinafter referred to as "AGREEMENT PAYMENTS") shall be reduced
to the Reduced Amount. The "REDUCED AMOUNT" shall be an amount expressed in
present value which maximizes the aggregate present value of Agreement Payments
without causing any Payment to be nondeductible by the Company because of
Section 280G of the Code. Anything to the contrary notwithstanding, if the
Reduced Amount is zero and it is determined further that any Payment which is
not an Agreement Payment would nevertheless be nondeductible by the Company for
Federal income tax purposes because of Section 280G of the Code, then the
aggregate present value of Payments which are not Agreement Payments shall also
be reduced (but not below zero) to an amount expressed in present value which
maximizes the aggregate present value of Payments without causing any Payment to
be nondeductible by the Company because of Section 280G of the Code. For
purposes of this Section, present value shall be determined in accordance with
Section 280G(d)(4) of the Code. Any amount which is not paid in the taxable year
in which it was originally scheduled to be paid as a result of the postponement
thereof pursuant hereto shall be payable in the next succeeding taxable year in
which such payment will not result in the disallowance of a deduction pursuant
to either Section 162(m) or 280G of the Code; provided, however, that all
postponed payments shall be placed in a Rabbi trust or similar vehicle for the
benefit of the Executive in such a way that the amounts so transferred are not
taxable to such person or deductible by the Company until payment from such
vehicle to the Executive is made. In the event a payment has been made to the
Executive, but then disallowed as a deduction by the Internal Revenue Service
and return of the payment is required into the trust, said payment to the
Executive shall be treated as a loan and said payment to the trust shall be
treated as repayment of said loan. The Company shall not pledge, hypothecate or
otherwise encumber any amounts held in the trust or other similar vehicle for
the benefit of the Executive hereunder.

(b) All determinations required to be made under this Section shall be
made by the Company's independent public accountants (the "ACCOUNTING FIRM"),
Page 31

IVAX10-Q.txt
which shall provide (i) detailed supporting calculations both to the Company and
the Executive within 20 business days of the termination of Executive's
employment or such earlier time as is requested by the Company, and (ii) an
opinion to the Executive that he has substantial authority not to report any
excise tax on his Federal income tax return with respect to any Payments. Any
such determination by the Accounting Firm shall be binding upon the Company and
the Executive. The Executive shall determine which and how much of the Payments
shall be eliminated or reduced consistent with the requirements of this Section,
provided that, if the Executive does not make such determination within ten
business days of the receipt of the calculations made by the Accounting Firm,
the Company shall elect which and how much of the Payments shall be eliminated
or reduced consistent with the requirements of this Section and shall notify the
Executive promptly of such election. Within five business days thereafter, the
Company shall pay to or distribute to or for the benefit of the Executive such
amounts as are then due to the Executive under this Agreement. All fees and
expenses of the Accounting Firm incurred in connection with the determinations
contemplated by this Section shall be borne by the Company.

<PAGE>

        (c) As a result of the uncertainty in the application of Section 280G
of the Code at the time of the initial determination by the Accounting Firm
hereunder, it is possible that Payments will have been made by the Company which
should not have been made ("OVERPAYMENT") or that additional Payments which will
not have been made by the Company could have been made ("UNDERPAYMENT"), in each
case, consistent with the calculations required to be made hereunder. In the
event that the Accounting Firm, based upon the assertion of a deficiency by the
Internal Revenue Service against the Executive which the Accounting Firm
believes has a high probability of success, determines that an Overpayment has
been made, any such Overpayment paid or distributed by the Company to or for the
benefit of the Executive shall be treated for all purposes as a loan AB INITIO
to the Executive which the Executive shall repay to the Company together with
interest at the applicable federal rate provided for in Section 7872(f)(2) of
the Code; provided, however, that no such loan shall be deemed to have been made
and no amount shall be payable by the Employee to the Company if and to the
extent such deemed loan and payment would not either reduce the amount on which
the Executive is subject to tax under Section 1 and Section 4999 of the Code or
generate a refund of such taxes. In the event that the Accounting Firm, based
upon controlling precedent or other substantial authority, determines that an
Underpayment has occurred, any such Underpayment shall be promptly paid by the
Company to or for the benefit of the Executive together with interest at the
applicable federal rate provided for in Section 7872(f)(2) of the Code.

        IN WITNESS WHEREOF, the undersigned have executed this Agreement as of
the date first above written.

                                        IVAX CORPORATION

                                        /s/ PHILLIP FROST
                                        ------------------
                                        Phillip Frost, M.D.,
                                        Chairman and Chief
                                        Executive Officer

                                        EXECUTIVE:

                                        /s/ RAFICK G. HENEIN
                                        ---------------------
                                        Dr. Rafick G. Henein

</TEXT>
</DOCUMENT>
<DOCUMENT>
                            Page 32

IVAX10-Q.txt

\<TYPE>EX-10.2
\<SEQUENCE>3
\<TEXT>


EMPLOYMENT AGREEMENT

        This Employment Agreement (the "AGREEMENT"), dated July 28, 1997 (the
"EFFECTIVE DATE"), is entered into between IVAX Corporation (the "COMPANY") and
David R. Bethune (the "EXECUTIVE").

RECITAL

        The Company desires to employ the Executive on the terms and conditions
of this Agreement, and the Executive desires to be employed by the Company on
the terms and conditions of this Agreement.

AGREEMENT

        In consideration of the Recital and of the mutual promises set forth in
this Agreement, the Company and the Executive agree as set forth below.

        1.      EMPLOYMENT.

        (A) EMPLOYMENT AND TERM. The Company agrees to employ the Executive and
the Executive agrees to be employed by the Company, on the terms and conditions
of this Agreement. For purposes of this Agreement, the word "TERM" means the
period during which this Agreement is in effect.

        (B) DUTIES. The Executive shall serve as President and Chief Operating
Officer of the Company and shall have such powers and authority as may be given
to him from time to time by the Board of Directors of the Company or a committee
thereof (the "BOARD OF DIRECTORS"). The Executive shall report to and be subject
to the supervision and direction of the Chief Executive Officer and the Board of
Directors. The Executive shall devote his full business time and energies to the
business and affairs of the Company and shall use his best efforts, skills and
abilities to promote the interests of the Company and to diligently and
competently perform the duties of his position.

        2.      COMPENSATION.

        (A) STOCK OPTION GRANT. The Company shall grant to the Executive, in
accordance with the terms of the Company's 1994 Stock Option Plan (the "PLAN"),
nonqualified options (the "STOCK OPTIONS") to purchase 350,000 shares of the
common stock of the Company (the "COMMON STOCK"). The exercise price of the
Stock Options shall be equal to the closing price of the Common Stock, as
reported in THE WALL STREET JOURNAL, on the Effective Date. The Stock Options
shall have a term of ten years. The Stock Options shall vest in equal
installments on each of the first three anniversary dates of the Effective Date.

        (B) BASE SALARY. The Executive will be paid a base salary at the annual
rate of not less than $400,000 (the "BASE SALARY"). The Base Salary shall be
paid in installments consistent with the Company's normal payroll policies.

        3.      BENEFITS. During the Term, the Executive shall be entitled to
                the benefits described below.


\<PAGE>


        (A) EXPENSE REIMBURSEMENT. Upon submission of appropriate supporting
documentation and in specific accordance with such guidelines as may be

IVAX10-Q.txt
established from time to time by the Company for senior executives, the
Executive shall be reimbursed by the Company for all reasonable business
expenses actually and necessarily incurred by the Executive on behalf of the
Company in connection with the performance of his duties under this Agreement.

(B) INCENTIVE SAVINGS AND RETIREMENT PLANS. The Executive shall be
entitled to participate in all savings, incentive and retirement plans,
practices, policies and programs, if any, generally made available by the
Company to other key executives of the Company based in the United States.

(C) WELFARE PLANS. The Executive shall be entitled to participate in
all welfare benefit plans, practices, policies and programs, if any, generally
made available by the Company to other key executives of the Company based in
the United States.

(D) VACATION. The Executive shall be entitled to paid vacation in
accordance with the most favorable plans, practices, policies and programs, if
any, generally made available by the Company to other key executives of the
Company based in the United States.

(E) RELOCATION. In connection with the Executive's relocation to South
Florida, the Company shall reimburse the Executive for (i) all reasonable moving
expenses incurred by him to relocate his home from Arizona to Miami; (ii) all
reasonable closing costs incurred by him in connection with the sale of his
Arizona home, including realtor commissions, up to a maximum of $60,000; and
(iii) all reasonable temporary living expenses in Miami, Florida for a period of
up to three months following the Effective Date. The Executive shall provide the
Company with such supporting documents as the Company may reasonably request in
connection with the expenses described in this Section.

4.        TERMINATION.

(A) TERMINATION WITHOUT CAUSE. Notwithstanding any other provision of
this Agreement, the Company shall have the right to terminate this Agreement at
any time upon written notice to the Executive; provided that the Company shall
continue to pay to the Executive his Base Salary following the effective date of
the termination (the "TERMINATION DATE") for a period equal to: (i) if the
Termination Date is a date within two years after the Effective Date, twelve
months; and (ii) if the Termination Date is a date after the second anniversary
of the Effective Date, eighteen months.

(B) TERMINATION FOR CAUSE. Notwithstanding any other provision of this
Agreement, this Agreement may be terminated by the Company for Cause. For
purposes of this Agreement, the word "CAUSE" means: (i) an act or acts of
personal dishonesty taken by the Executive and intended to result in the direct
or indirect personal enrichment of the Executive at the expense of the Company,
(ii) subject to the following sentences, violation by the Executive of his
material obligations or representations under this Agreement which are
demonstrably willful and deliberate and which are not remedied within 30 days
after written notice to the Executive, or (iii) the conviction of the Executive
of any criminal act which is a felony. Upon any termination pursuant to this
Section, the Executive shall be entitled to be paid his Base Salary to the date

<PAGE>

of termination and the Company shall have no further liability under this
Agreement to the Executive (other than for reimbursement of business expenses
incurred prior to the termination date, in accordance with Section 3(a)).

(C) DEATH. This Agreement shall automatically terminate upon the death
of the Executive. If this Agreement is terminated pursuant to this Section, the

IVAX10-Q.txt
Company shall pay to the Executive's estate his Base Salary through the termination date.

(D) DISABILITY. The Company, by written notice to the Executive, shall at all times have the right to terminate this Agreement if the Executive shall, as the result of mental or physical incapacity, illness or disability, fail to perform his duties and responsibilities provided for herein for a period of more than 180 consecutive days. Upon any termination pursuant to this Section 4(d), the Executive shall be entitled to be paid his Base Salary to the date of termination and the Company shall have no further liability hereunder (other than for reimbursement of business expenses incurred prior to the termination date, in accordance with Section 3(a)).

5. CONFIDENTIALITY AGREEMENT; COMPANY POLICIES. On the Effective Date, the Executive will execute the Company's standard form of Confidentiality Agreement. The Executive acknowledges that he will be subject to and required to abide by the policies and procedures of the Company applicable to senior executives as in effect from time to time, and that he will be required to execute and abide by the Company's Code of Conduct, as in effect from time to time.

6. CONFLICTS WITH EXISTING AGREEMENTS. The Executive represents and warrants that he is not a party to or bound by any contract which in the future may have a possibility of adversely affecting the business of the Company or the performance by the Executive of his duties under this Agreement, including but not limited to contracts related to previous employment containing confidentiality or noncompete covenants.

7. MISCELLANEOUS.

(A) GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to the conflict of law principles thereof.

(B) NOTICES. Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given when delivered by hand or when deposited in the United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to the Company:          IVAX Corporation
                            4400 Biscayne Boulevard
                            Miami, Florida 33137
                            Attention: General Counsel

If to the Executive:        David R. Bethune
                            37800 N. 93rd Street
                            Scottsdale, Arizona 85262


<PAGE>


or to such other addresses as either party hereto may from time to time give notice of to the other in the aforesaid manner.

(C) SUCCESSORS. (i) This Agreement is personal to the Executive and without the prior written consent of the Company shall not be assignable by the Executive otherwise than by will or the laws of descent and distribution; (ii) This Agreement shall inure to the benefit of and be enforceable by the Executive's legal representatives; (iii) This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns. The Company will require any successor (whether direct or indirect, by purchase,

IVAX10-Q.txt

merger, consolidation or otherwise) to all or substantially all of the business
and/or assets of the Company to expressly assume and agree to perform this
Agreement in the same manner and to the same extent that the Company would be
required to perform it if no such succession had taken place. As used in this
Agreement, "Company" shall mean the Company as hereinbefore defined and any
successor to its business and/or assets which assumes and agrees to perform this
Agreement by operation of law or otherwise.

　　　　(D) SEVERABILITY. The invalidity of any one or more of the words,
phrases, sentences, clauses or sections contained in this Agreement shall not
affect the enforceability of the remaining portions of this Agreement or any
part thereof, all of which are inserted conditionally on their being valid in
law, and, in the event that any one or more of the words, phrases, sentences,
clauses or sections contained in this Agreement shall be declared invalid, this
Agreement shall be construed as if such invalid word or words, phrase or
phrases, sentence or sentences, clause or clauses, or section or sections had
not been inserted. If such invalidity is caused by length of time or size of
area, or both, the otherwise invalid provision will be considered to be reduced
to a period or area which would cure such invalidity.

　　　　(E) WAIVERS. The waiver by either party hereto of a breach or violation
of any term or provision of this Agreement shall not operate nor be construed as
a waiver of any subsequent breach or violation.

　　　　(F) DAMAGES. Nothing contained herein shall be construed to prevent the
Company or the Executive from seeking and recovering from the other damages
sustained by either or both of them as a result of its or his breach of any term
or provision of this Agreement, except that the payments required to be made by
the Company to the Executive pursuant to Section 4 shall be the Executive's
exclusive remedy for any termination of this Agreement pursuant to such
sections.

　　　　(G) NO THIRD PARTY BENEFICIARY. Nothing expressed or implied in this
Agreement is intended, or shall be construed, to confer upon or give any person
(other than the parties hereto and, in the case of Executive, his heirs,
personal representative(s) and/or legal representative) any rights or remedies
under or by reason of this Agreement.

　　　　IN WITNESS WHEREOF, the undersigned have executed this Agreement as of
the date first above written.

                                        IVAX CORPORATION

                                        /s/ PHILLIP FROST, M.D.
                                        ------------------------
                                        Phillip Frost, M.D.,
                                        Chairman and Chief
                                        Executive Officer

                                        EXECUTIVE:

                                        /s/ DAVID R. BETHUNE
                                        -----------------------
                                        David R. Bethune

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-11
<SEQUENCE>4
<TEXT>

IVAX10-Q.txt

```
<TABLE>
<CAPTION>
```

IVAX CORPORATION AND SUBSIDIARIES

COMPUTATION OF EARNINGS (LOSS) PER SHARE

(In thousands, except per share data)

| PERIOD ENDED JUNE 30, | | THREE MONTHS | |
| SIX MONTHS | | | |
| 1997 | 1996 | 1997 | 1996 |
| ------------ | ---------- | ------------ | ------------ |

```
<S>                                                <C>            <C>
<C>             <C>
PRIMARY EARNINGS (LOSS) PER COMMON SHARE:

    Income (loss) before extraordinary items        $    (45,377)  $    (13,931)
$    (53,316)  $     21,965
    Extraordinary items, net of tax                       (2,137)        (2,072)
    (2,137)        (2,073)
                                                   ------------   ------------
------------   ------------
    Net income (loss) for primary computation       $    (47,514)  $    (16,003)
$    (55,453)  $     19,892
                                                   ============   ============
============   ============
    Average number of common and dilutive
       common equivalent shares-primary                  121,488        121,015
    121,484        121,858
                                                   ============   ============
============   ============
    Earnings (loss) before extraordinary items      $       (.37)  $       (.11)
$       (.44)  $         .18
                                                   ============   ============
============   ============
    Net earnings (loss)                             $       (.39)  $       (.13)
$       (.46)  $         .16
                                                   ============   ============
============   ============

FULLY DILUTED EARNINGS (LOSS) PER COMMON SHARE:

    Income (loss) before extraordinary items        $    (45,377)  $    (13,931)
$    (53,316)  $     21,965
    Extraordinary items, net of tax                       (2,137)        (2,072)
    (2,137)        (2,073)
                                                   ------------   -----------
------------   -----------
    Net income (loss) for fully diluted computation $    (47,514)  $    (16,003)
$    (55,453)  $     19,892
                                                   ============   ===========
============   ============
    Average number of common and dilutive
       common equivalent shares-fully diluted            121,488        121,015
    121,484        121,882
                                                   ============   ===========
============   ============
    Earnings (loss) before extraordinary items      $       (.37)  $       (.11)
$       (.44)  $         .18
                                                   ============   ===========
============   ===========
```

```
                              IVAX10-Q.txt
      Net earnings (loss)                           $     (.39)   $      (.13)
$       (.46)    $         .16
                                                    ============   ===========
  ===========    ============
AVERAGE NUMBER OF COMMON SHARES AND
     DILUTIVE COMMON SHARES EQUIVALENTS

Primary shares:
      Average number of common shares outstanding        121,488        121,015
      121,484         120,423
      Incremental shares for options and warrants              -              -
          -           1,435

      ------------    ------------                    -------------   ------------
                                                           121,488        121,015
      121,484         121,858
                                                     =============   ============
  ============    ============
Fully diluted shares:
      Average number of common shares outstanding        121,488        121,015
      121,484         120,423
      Incremental shares for options and warrants              -              -
          -           1,459

      ------------    ------------                    -------------   ------------
                                                           121,488        121,015
      121,484         121,882
                                                     =============   ============
  ============    ============
</TABLE>
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-27
<SEQUENCE>5
<DESCRIPTION>ART. 5 FDS FOR 2ND QUARTER 1997 10-Q
<TEXT>

<TABLE> <S> <C>


<ARTICLE>                      5
<LEGEND>
                                   THE SCHEDULE CONTAINS SUMMARY
                                   FINANCIAL INFORMATION EXTRACTED FROM
                                   IVAX CORPORATION'S FORM 10-Q FOR THE
                                   QUARTERLY PERIOD ENDED JUNE 30, 1997
                                   AND IS QUALIFIED IN ITS ENTIRETY BY
                                   REFERENCE TO SUCH FINANCIAL
                                   STATEMENTS.

</LEGEND>

<MULTIPLIER>                   1,000


<S>                                                 <C>
<PERIOD-TYPE>                                       6-MOS

<FISCAL-YEAR-END>
 DEC-31-1996
<PERIOD-END>
 JUN-30-1997
<CASH>
```

Page 38

IVAX10-Q.txt
```
          88,396
<SECURITIES>
                  0
<RECEIVABLES>
         148,282   <F1>
<ALLOWANCES>
                  0
<INVENTORY>
         177,100
<CURRENT-ASSETS>
         564,238
<PP&E>
         204,868   <F2>
<DEPRECIATION>
                  0
<TOTAL-ASSETS>
         893,444
<CURRENT-LIABILITIES>
         143,902
<BONDS>
         104,574
<PREFERRED-MANDATORY>
                  0
<PREFERRED>
                  0
<COMMON>
          12,150
<OTHER-SE>
         607,524
<TOTAL-LIABILITY-AND-EQUITY>
         893,444
<SALES>
         340,707
<TOTAL-REVENUES>
         340,707
<CGS>
         229,986
<TOTAL-COSTS>
         229,986
<OTHER-EXPENSES>
         169,943
<LOSS-PROVISION>
           3,046
<INTEREST-EXPENSE>
          10,920
<INCOME-PRETAX>
         (61,682)
<INCOME-TAX>
            (647)
<INCOME-CONTINUING>
         (63,916)
<DISCONTINUED>
          10,600
<EXTRAORDINARY>
          (2,137)
<CHANGES>
                  0
<NET-INCOME>
         (55,453)
<EPS-PRIMARY>
            (.46)
<EPS-DILUTED>
                  0   <F3>
```

IVAX10-Q.txt

```
<FN>

<F1>  AMOUNT SHOWN IS NET OF ALLOWANCES.
<F2>  AMOUNT SHOWN IS NET OF ACCUMULATED DEPRECIATION AND AMORTIZATION.
<F3>  AMOUNT IS ANTI-DILUTIVE.

</FN>


</TABLE>
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

# EXHIBIT 3

# California Business Portal

## Secretary of State BRUCE McPHERSON

SECRETARY OF STATE | ELECTIONS & VOTER INFO | POLITICAL REFORM | CA BUSINESS PORTAL | ARCHIVES & MUSEUM | SPECIAL PROGRAMS

**Business Search**
**Corporations**

**Printer Friendly Page**

**New Search**

**Search Tips**

**Field Definitions**

**Status Definitions**

**Name Availability**

**Corporate Records**

**Business Entities**
**Records Order Form**
  **Certificates**
  **Copies**
  **Status Reports**

**FAQS**

**Corporations Main Page**

**Site Search**

## Corporations

The information displayed here is current as of "FEB 03, 2006" and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation |
|---|
| MCGAW, INC. |

| Number: C1817431 | Date Filed: 3/16/1992 | Status: surrender |
|---|---|---|

| Jurisdiction: DELAWARE |
|---|

| Address |
|---|
| P.O. BOX 19791 |
| IRVINE, CA 92623-9791 |

| Agent for Service of Process |
|---|
| C T CORPORATION SYSTEM |
| 818 WEST 7TH STREET |
| LOS ANGELES, CA 90017 |

Printer Friendly

**New Search**

- For information about certification of corporate records or for additional corporate information, please refer to **Corporate Records**.
- Blank fields indicate the information is not contained in the computer file.
- If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code **Section 2114** for information relating to service upon corporations that have surrendered.

Copyright ©2001 California Secretary of State. **Privacy Statement**.

# EXHIBIT 4

# State of California
## Secretary of State

## CERTIFICATE OF FILING

I, BRUCE McPHERSON, Secretary of State of the State of California, hereby
certify:

That on the **28th day of August, 1998,** there was filed, in accordance with the
statutory provisions of the California Corporations Code, a Certificate of
Surrender of Right to Transact Intrastate Business by **MCGAW, INC.,** a
**Delaware** corporation.

That attached to said Certificate of Surrender is a certificate of tax satisfaction
issued by the Franchise Tax Board of the State of California.

**IN WITNESS WHEREOF**, I execute
this certificate and affix the Great Seal
of the State of California this day of
February 15, 2006.



BRUCE McPHERSON
Secretary of State

ch

# EXHIBIT 5

D&B Comprehensive Insight Plus Report: B. BRAUN OF AMERICA INC.

Case 1:01-cv-12257-PBS    Document 2182-2    Filed 03/02/06    Page 50 of 75

# D&B Small Business Solutions

Comprehensive Insight Plus Report for
**B. BRAUN OF AMERICA INC.**
Report Printed: January 26, 2006

**D-U-N-S #: 04-478-7661**

Copyright 2004 Dun & Bradstreet – Provided under contract for the exclusive use of subscriber ZDavid Zlotnick,

| Company Snapshot | Creditworthiness | Payment History & Trends | Public Filings | History & Operations | Banking & Finance |
|---|---|---|---|---|---|

# Company Snapshot

## Business Summary

### Profile
**B. BRAUN OF AMERICA INC.**
824 12th Ave
Bethlehem, PA 18018

**Mailing address:**
PO Box 4027
Bethlehem, PA 18018

**Tel:** 610 691-5400
**Fax:** 610 691-1547

www.bbraunusa.com

**D-U-N-S #:** 04-478-7661
(FOREIGN PARENT IS B. BRAUN NORDAMERIKA
VERWALTUNGSGELLSCHAFT MBH)
**D&B Rating:** --

### Company Stats
| | |
|---|---|
| **Year incorporated** | 1979 |
| **Year started** | 1979 |
| **Management control** | 1997 |
| **Employees** | 4,099 ( 1 here) |
| **Chief Executive** | Caroll H Neubauer , Chb-ceo |
| **S.I.C.** | 6719 |
| | 3841 |

**Industry**
Holding company - mfg plastic medical apparatus

This is a **headquarters (subsidiary)** location.
Branch(es) or division(s) exist.

The Net worth amount in this section may have been adjusted by
D&B to reflect typical deductions, such as certain intangible assets.

| Likelihood this company will not pay on time over the next 12 months | LOW |
|---|---|
| Credit Score Class: 2 | |

| Likelihood this company will experience financial distress in the next 12 months | LOW |
|---|---|
| Financial Stress Class: 1 | |

| Timeliness of historical payments for this company** | SLOW |
|---|---|
| D&B PAYDEX®: 62 | |
| Industry benchmark: Slow **Based on 17 trade experiences on file with D&B | |

| Payment performance trend over the past 90 days | UNCHANGED |
|---|---|

| | |
|---|---|
| **Evidence of bankruptcy, fraud, or criminal proceedings in the history of this business or its management** | **NO** |
| **Noteworthy special events in this company's file** | **NO** |
| **Total number of suits, liens and judgments in this company's file** | **0** |
| **Value of open suits, liens and judgments for this company** | **$0** |

Value of open records refers only to 10 most recent filings for each record type.

D&B Comprehensive Insight Plus Report: B. BRAUN OF AMERICA INC.

Case 1:01-cv-12257-PBS   Document 2182-2   Filed 03/02/06   Page 51 of 75

# Creditworthiness

## Summary

| | | |
|---|---|---|
| **Likelihood this company will experience financial distress in the next 12 months** | **LOW** | **D&B Rating: --** |

The blank rating symbol should not be interpreted as indicating that credit should be denied. It simply means that the information available to D&B does not permit us to classify the company within our rating key and that further enquiry should be made before reaching a decision. Some reasons for using a "-" symbol include: deficit net worth, bankruptcy proceedings, insufficient payment information, or incomplete history information. For more information, see the D&B Rating Key.

**Likelihood this company will not pay on time over the next 12 months**   **LOW**

## Default on Payment: Financial Stress Summary

**Likelihood this company will experience financial distress in the next 12 months**   **LOW**

Financial Stress Class: **1**

During the prior year, firms in this Financial Stress Class had a failure rate of 0.49%, which is 0.35 times lower than the national average.

Financial stress national percentile: 63 (high risk: 1%; low risk: 100%)

National percentile industry norm: 65 (high risk: 1%; low risk: 100%)

**Key Factors**
- - 17 trade experiences exist for this company.
- - Financial Stress Score: 1453 (high risk: 1,001; low risk: 1,850)
- - No record of open suit(s), lien(s), or judgement(s) in the D&B files.
- - Control age or date entered in D&B files indicates higher risk.
- - 12% of trade experiences indicate slow payment(s) are present.

## Payment within Terms: Credit Score Summary

**Likelihood this company will not pay on time over the next 12 months**   **LOW**

Credit Score Class: **2**

The Credit Score class of 2 for this company shows that during the previous year, 4.7% of the firms with this classification paid one or more bills severely delinquent, which is lower than the national average.

Credit score percentile: 83 (high risk: 1%; low risk: 100%)
Industry norm percentile: 60 (high risk: 1%; low risk: 100%)

**Key Factors**
- - 17 trade experiences exist for this company.
- - No record of open suit(s), lien(s), or judgments(s) in the D&B files.
- - Business does not own facilities.

## Additional Information

D&B Comprehensive Insight Plus Report: B. BRAUN OF AMERICA INC.

Case 1:01-cv-12257-PBS   Document 2182-2   Filed 03/02/06   Page 52 of 75

**Financial Stress Summary**
- - The Financial Stress Class indicates that this firm shares some of the same business and financial characteristics of other companies with this classification. It does not mean the firm will necessarily experience financial stress.
- - The Incidence of Financial Stress shows the percentage of firms in a given Class that discontinued operations over the past year with loss to creditors. The Incidence of Financial Stress - National Average represents the national failure rate and is provided for comparative purposes.
- - The Financial Stress National Percentile reflects the relative ranking of a company among all scorable companies in D&B's file.
- - The Financial Stress Score offers a more precise measure of the level of risk than the Class and Percentile. It is especially helpful to customers using a scorecard approach to determining overall business performance.
- - All Financial Stress Class, Percentile, Score and Incidence statistics are based on 2002.

**Credit Score Summary**
- - The Incidence of Delinquent Payment is the percentage of companies with this classification that were reported 90 days past due or more by creditors. The calculation of this value is based on an inquiry weighted sample.
- - The Percentile ranks this firm relative to other businesses. For example, a firm in the 80th percentile has a lower risk of paying in a severely delinquent manner than 79% of all scorable companies in D&B's files.

---

| [Company Snapshot](#) | [Creditworthiness](#) | [Payment History & Trends](#) | [Public Filings](#) | [History & Operations](#) | [Banking & Finance](#) |

# Payment History

## Summary

| | | | |
|---|---|---|---|
| **Average payment performance trend when weighted by dollar amount** | **UNCHANGED** | **Company's payment performance over the past 12 months compared with its peers** | **SLOW** |

## Payment History Overview

| | | | |
|---|---|---|---|
| **Payment experiences on file with D&B:** | **17** | Average highest credit: | $5,286 |
| Payments made within terms: | 16 (93%) | Largest high credit: | $35,000 |
| Amount placed for collections: | 0 (0%) | Highest now owing: | $25,000 |
| | | Highest past due: | $10,000 |

## Historical Payment Trends: PAYDEX®

**Average payment performance trend when weighted by dollar amount**

| | |
|---|---|
| **Last 3 months**: Trend is unchanged | **UNCHANGED** |
| **Last 12 months**: 21 days beyond terms Industry benchmark: Slow | D&B PAYDEX® : **62** |

Based on payments collected over last 12 months.
Indications of slowness can be the result of dispute over merchandise, skipped invoices, etc. Accounts are sometimes placed for collection even though the existence or amount of the debt is disputed.

## Historical Payment Trends: PAYDEX® Comparison to Industry

D&B Comprehensive Insight Plus Report: B. BRAUN OF AMERICA INC.

Case 1:01-cv-12257-PBS    Document 2182-2    Filed 03/02/06    Page 53 of 75

**Company's payment performance over the past 12 months compared with its peers**    **SLOW**

**This company's 12-month high**: 62, or equal to 21 days beyond terms
**This company's 12-month low**: 56, or equal to 26 days beyond terms

|  | 2/05 | 3/05 | 4/05 | 5/05 | 6/05 | 7/05 | 8/05 | 9/05 | 10/05 | 11/05 | 12/05 | 1/06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| This Business | 56 | 56 | 58 | 58 | 58 | 59 | 59 | 59 | 59 | 59 | 59 | 62 |
| Industry Quartiles |  |  |  |  |  |  |  |  |  |  |  |  |
| Upper |  | 79 |  |  | 79 |  |  | 79 |  |  | 79 |  |
| Median |  | 75 |  |  | 75 |  |  | 75 |  |  | 75 |  |
| Lower |  | 68 |  |  | 68 |  |  | 69 |  |  | 69 |  |

Shows PAYDEX scores of this Business compared to the Primary Industry from each of the last four quarters. The Primary Industry is Holding company - mfg plastic medical apparatus, based on SIC code 6719.

## Payment History Details

| Date Reported | Paying Record | High Credit ($) | Now Owes ($) | Past Due ($) | Selling Terms | Last Sale Within (months) |
|---|---|---|---|---|---|---|
| 01/06 | Prompt-Slow 30 | 30,000 | 2,500 | 750 |  | 1 |
| 01/06 | (002) | 100 | 0 |  |  | 6-12 |
| 12/05 | Prompt | 7,500 | 7,500 | 500 |  | 1 |
| 12/05 | Prompt | 1,000 | 500 | 500 |  | 1 |
| 12/05 | Prompt | 750 | 750 | 0 | Net30 | 1 |
| 12/05 | Prompt | 500 | 0 | 0 |  | 4-5 |
| 12/05 | Slow 30 | 35,000 | 25,000 | 10,000 |  | 1 |
| 11/05 | Prompt | 2,500 | 2,500 | 0 |  | 1 |
| 11/05 | Prompt | 750 | 0 | 0 |  | 1 |
| 11/05 | Prompt | 750 | 500 | 0 |  | 1 |
| 11/05 | Prompt | 250 | 0 | 0 |  | 2-3 |
| 09/05 | Prompt | 100 | 0 | 0 | Net30 | 6-12 |
| 07/05 | Prompt | 50 |  |  |  | 1 |
| 07/05 | Prompt | 50 |  |  |  | 1 |
| 07/05 | Prompt | 50 |  |  |  | 1 |
| 01/05 | Prompt | 0 | 0 |  |  | 1 |
| 10/04 | Prompt | 50 | 0 | 0 |  | 6-12 |

Payment experiences reflect how bills are met in relation to the terms granted. In some instances payment beyond terms can be the result of dispute over merchandise, skipped invoices, etc.
Each experience shown is from a separate supplier. Updated trade experiences replace those previously reported.
Accounts are sometimes placed for collection even though the existence or amount of the debt is disputed.

## Payment Analysis By Industry

**Company's dollar-weighted payments listed by the primary industries of its suppliers**

D&B Comprehensive Insight Plus Report: B. BRAUN OF AMERICA INC.

Case 1:01-cv-12257-PBS   Document 2182-2   Filed 03/02/06   Page 54 of 75

| | Total Received (#) | Total Dollar Amount ($) | Largest High Credit ($) | Within Terms | Slow 1-30 | Slow 31-60 | Slow 61-90 | Slow 91+ |
|---|---|---|---|---|---|---|---|---|
| | | | | | (% of dollar amount) | | | |
| **Industry** | | | | | | | | |
| Reg misc coml sector | 3 | 150 | 50 | 100 | 0 | 0 | 0 | 0 |
| Whol office supplies | 2 | 1,500 | 750 | 100 | 0 | 0 | 0 | 0 |
| Industrial launderer | 1 | 35,000 | 35,000 | 0 | 100 | 0 | 0 | 0 |
| Truck rental/leasing | 1 | 30,000 | 30,000 | 50 | 50 | 0 | 0 | 0 |
| Whol frozen foods | 1 | 7,500 | 7,500 | 100 | 0 | 0 | 0 | 0 |
| Nonclassified | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Whol durable goods | 1 | 1,000 | 1,000 | 100 | 0 | 0 | 0 | 0 |
| Whol industrial equip | 1 | 750 | 750 | 100 | 0 | 0 | 0 | 0 |
| Whol metal | 1 | 500 | 500 | 100 | 0 | 0 | 0 | 0 |
| Local truck w/storage | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Ret mail-order house | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Telephone communictns | 1 | 50 | 50 | 100 | 0 | 0 | 0 | 0 |
| Misc business service | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Other payment categories** | | | | | | | | |
| Cash experiences | 0 | 0 | 0 | | | | | |
| Payment record unknown | 1 | 100 | 100 | | | | | |
| Unfavorable comments | 0 | 0 | 0 | | | | | |
| **Placed for collection** | | | | | | | | |
| With D&B | 0 | 0 | 0 | | | | | |
| Other | 0 | N/A | 0 | | | | | |
| **Total in D&B's file** | **17** | **79,400** | **35,000** | | | | | |

There are 17 payment experiences in D&B's file for the most recent 12 months, with 11 experiences reported during the last three month period.

| Company Snapshot | Creditworthiness | Payment History & Trends | Public Filings | History & Operations | Banking & Finance |
|---|---|---|---|---|---|

# Public Filings

## Summary of Court Actions

**The following data includes both open and closed filings found in D&B's database on the subject company.**

| Record Type | Open Records | Open Value | Total Records | Most Recent Filing Date |
|---|---|---|---|---|
| **Suits** | 0 | 0 | 0 | - |
| **Liens** | 0 | 0 | 0 | - |
| **Judgments** | 0 | 0 | 0 | - |
| **UCC Filings** | 0 | N/A | 0 | - |
| **Bankruptcy Proceedings** | 0 | N/A | 0 | - |

Public filing data is for informational purposes only and is not the official record. Certified copies can only by obtained from the official source. Number and value of open records refers only to 10 most recent filings for each record type.

D&B Comprehensive Insight Plus Report: B. BRAUN OF AMERICA INC.

Case 1:01-cv-12257-PBS   Document 2182-2   Filed 03/02/06   Page 55 of 75

| Company Snapshot | Creditworthiness | Payment History & Trends | Public Filings | History & Operations | Banking & Finance |

# History & Operations

| Topic | Description |
|-------|-------------|
| History | Detailed information on the history of a company, including background information on the management team and key principals, and information on related companies. |
| Corporate Family | Detailed information on all related companies, including subsidiaries, affiliates and branches. |
| Registration & Incorporation | Detailed registration and incorporation information, including the date and state of incorporation and the type of corporation formed. |
| Company Operations | Detailed information on a company's operations, including the identity of the parent company, the geographic scope of the business, and the key holdings. |
| Industry Classification | Details on the specific industry within which a company is classified. |

## History

**Officer(s):**
CAROLL H NEUBAUER, CHB-CEO

**Director(s):**
THE OFFICER(S)
and .

Business started 1979. Present control succeeded 1997. 100% of capital stock is owned by the parent company.

CAROLL H NEUBAUER. OCCUPATIONAL BACKGROUND: Active with parent company, Melsungen, Germany and active here.

## Corporate Family

**Global Ultimate:**

| B. braun melsungen ag | Melsungen, Germany | DUNS # 31-501-6972 |

**Parent:**

| B. braun nordamerika verwaltungsges. mbh | Tuttlingen, Germany | DUNS # 33-187-6230 |

**Subsidiaries (US):**

| B Braun Medical Inc | 824 12th Ave, Bethlehem, PA | DUNS # 00-239-7347 |

**Branches (US):**

| C APS Boston | 4 Alfred Ter, Woburn, MA | DUNS # 15-742-2200 |

## Registration & Incorporation

D&B Comprehensive Insight Plus Report: B. BRAUN OF AMERICA INC.

Case 1:01-cv-12257-PBS    Document 2182-2    Filed 03/02/06    Page 56 of 75

| | | | |
|---|---|---|---|
| **Registered Name**: | Braun, b. of america inc. | **Filing Date**: | October 29, 1979 |
| **Business Type**: | Corporation | **Registration ID**: | 0689679 |
| **Corporation Type**: | Profit | | |
| **Date incorporated**: | October 29, 1979 | **Where filed**: | SECRETARY OF STATE/ CORPORATIONS DIVISION, HARRISBURG, PA |
| **State of incorporation**: | Pennsylvania | | |
| **Duration** : | Perpetual | **Principals**: | CARROL H NEUBAUR, CHIEF EXECUTIVE OFFICER |
| **Status**: | Active | | |
| | | | HUGH M MORRISON, SECRETARY |
| | | | THOMAS J YOUNG, TREASURER |
| | | | RICHARD B TRECHAK, VICE PRESIDENT |

Corporate and business registrations provided by management or other source.

## Company Operations

**Description:** Foreign Parent is B. Braun Nordamerika Verwaltungsgesellschaft mbH, Aesculap-Platz, Tuttlingen, Germany. Duns#33-187-6230.

This business operates as a holding company which through its subsidiary manufactures plastic medical apparatus.

**Employees:** 4,099 which includes officer(s). 1 employed here.

**Facilities:** Occupies premises in building.

**Subsidiaries:** This holding company has one subsidiary listed below.

B Braun Medical Inc, Bethlehem, PA. DUNS #00-239-7347 (100%) chartered 1979. Operates as a mfg of of plastic medical apparatus.

B Braun Medical Inc has four subsidiaries listed below.

(a) B Braun of Delaware Inc, Wilmington, DE.

(b) B Braun Of Puerto Rico Inc, Sabana Grande, PR. Duns#17-404-7142.

(c) Central Admixture Pharmacy Services Inc +CAPS, Irvine, CA. Duns#78-410-7856.

(d) B Braun Dominican Republic Inc, Santo Domingo, DR.

## Industry Classification

D&B Comprehensive Insight Plus Report: B. BRAUN OF AMERICA INC.

Case 1:01-cv-12257-PBS    Document 2182-2    Filed 03/02/06    Page 57 of 75

| SIC | | NAICS | |
|---|---|---|---|
| 67199901 | Investment holding companies, except banks | 551112 | Offices of Other Holding Companies |
| 38410000 | Surgical and medical instruments | 339112 | Surgical and Medical Instrument Manufacturing |

Based on information in our file, D&B has assigned this company an extended 8-digit SIC. D&B's use of 8-digit SICs enables us to be more specific to a company's operations than if we use the standard 4-digit code.

The 4-digit SIC numbers link to the description on the Occupational Safety & Health Administration (OSHA) Web site. Links open in a new browser window.

Company Snapshot | Creditworthiness | Payment History & Trends | Public Filings | History & Operations | Banking & Finance

# Banking & Finance

## Key Business Ratios

Business ratios are not available for this company or its industry. Certain segments, such as financial services, insurance companies, government agencies and public institutions, have distinctive financial reporting characteristics that do not allow for calculation of these measures.

## Finance

**10/14/2004**

On OCT 12 2004 Larry Kiefer, Credit & Collect Mgr, declined financial information.

As of October 12 2004 a search of Dun & Bradstreets Public Record database found no open suits, liens, judgements or UCCs to which B. Braun Of America Inc at 824 12th Ave, Bethlehem PA was named defendant or debtor. Public records received hereafter will be entered into the database and will be included in reports which contain a Public Filings section.

Company Snapshot | Creditworthiness | Payment History & Trends | Public Filings | History & Operations | Banking & Finance

**Customer Service**

▶ Email us with your questions at sbsSupport@dnb.com

▶ If you'd like to speak to one of our member support technicians directly, call toll-free 1-866-472-7362, Monday through Friday, 7:00AM to 7:00 PM CST

▶ If this is a report on your own company use eUpdate, our easy online tool, to inform D&B of any changes to your business information.

Copyright 2004 Dun & Bradstreet – Provided under contract for the exclusive use of subscriber ZDavid Zlotnick,

# EXHIBIT 6

# California Business Portal

Secretary of State BRUCE McPHERSON

SECRETARY OF STATE | ELECTIONS & VOTER INFO | POLITICAL REFORM | CA BUSINESS PORTAL | ARCHIVES & MUSEUM | SPECIAL PROGRAMS

**Business Search Corporations**

Printer Friendly Page
New Search
Search Tips
Field Definitions
Status Definitions
Name Availability
Corporate Records
Business Entities
Records Order Form
  Certificates
  Copies
  Status Reports
FAQS
Corporations Main Page
Site Search

# Corporations

The information displayed here is current as of "FEB 03, 2006" and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| CENTRAL ADMIXTURE PHARMACY SERVICES, INC. | | |
| **Number:** C1706200 | **Date Filed:** 5/4/1992 | **Status:** active |
| **Jurisdiction:** DELAWARE | | |
| **Address** | | |
| PO BOX 4027 | | |
| BETHLEHEM, PA 18018-0027 | | |
| **Agent for Service of Process** | | |
| CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE | | |
| PO BOX 526036 | | |
| SACRAMENTO, CA 95852-6036 | | |

Printer Friendly

**New Search**

- For information about certification of corporate records or for additional corporate information, please refer to **Corporate Records**.
- Blank fields indicate the information is not contained in the computer file.
- If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code **Section 2114** for information relating to service upon corporations that have surrendered.

Copyright ©2001 California Secretary of State. **Privacy Statement**.

# EXHIBIT 7

## D&B Small Business Solutions

Comprehensive Insight Plus Report for
**B BRAUN MEDICAL INC**
Report Printed: January 25, 2006

**D-U-N-S #: 00-239-7347**

Copyright 2004 Dun & Bradstreet – Provided under contract for the exclusive use of subscriber ZDavid Zlotnick,

[Company Snapshot](#)   [Creditworthiness](#)   [Payment History & Trends](#)   [Public Filings](#)   [History & Operations](#)   [Banking & Finance](#)

# Company Snapshot

## Business Summary

**Profile**
**B BRAUN MEDICAL INC**
824 12th Ave
Bethlehem, PA 18018

**Mailing address:**
PO Box 4027
Bethlehem, PA 18018

**Tel:** 610 691-5400
**Fax:** 610 954-7969

[www.bbraunmedical.com](http://www.bbraunmedical.com)
**D-U-N-S #:** 00-239-7347
(SUBSIDIARY OF B. BRAUN OF AMERICA INC, BETHLEHEM, PA)
BLOOD TREATMENTS DIV
**D&B Rating:** –

**Company Stats**

| | |
|---|---|
| Year incorporated | 1979 |
| Year started | 1957 |
| Employees | 4,099 ( 600 here) |
| Financial condition | FAIR |
| Net worth F | $64,254,000 |
| Sales F | $639,207,000 |
| Chief Executive | Caroll H Neubauer , Chb-ceo+ |
| S.I.C. | 3841 |
| Industry | |
| Mfg plastic medical apparatus | |

This is a **headquarters (subsidiary)** location.
Branch(es) or division(s) exist.

The Net worth amount in this section may have been adjusted by D&B
to reflect typical deductions, such as certain intangible assets.

| | |
|---|---|
| Likelihood this company will not pay on time over the next 12 months | **MODERATE** |
| **Credit Score Class: 3** | |
| Likelihood this company will experience financial distress in the next 12 months | **LOW** |
| **Financial Stress Class: 1** | |
| Timeliness of historical payments for this company** | **SLOW** |
| **D&B PAYDEX®: 67** | |
| Industry benchmark: Slow **Based on 335 trade experiences on file with D&B | |
| Payment performance trend over the past 90 days | **UNCHANGED** |

| | |
|---|---|
| **Evidence of bankruptcy, fraud, or criminal proceedings in the history of this business or its management** | **NO** |
| **Noteworthy special events in this company's file** | **NO** |
| **Total number of suits, liens and judgments in this company's file** | **2** |
| **Value of open suits, liens and judgments for this company** | **$0** |

Value of open records refers only to 10 most recent filings for each record type. There may be additional suits, liens, judgments, or UCC filings in D&B's file on this company available by contacting 1-866-472-7362.

[Company Snapshot](#)   [Creditworthiness](#)   [Payment History & Trends](#)   [Public Filings](#)   [History & Operations](#)   [Banking & Finance](#)

# Creditworthiness

## Summary

| | |
|---|---|
| **Likelihood this company will experience financial distress in the next 12 months** | **LOW** |
| **Likelihood this company will not pay on time over the next 12 months** | **MODERATE** |

**D&B Rating: –**
The blank rating symbol should not be interpreted as indicating that credit should be denied. It simply means that the information available to D&B does not permit us to classify the company within our rating key and that further enquiry should be made before reaching a decision. Some reasons for using a "-" symbol include: deficit net worth, bankruptcy proceedings, insufficient payment information, or incomplete history information. For more information, see the D&B Rating Key.

## Default on Payment: Financial Stress Summary

**Likelihood this company will experience financial distress in the next 12 months**  **LOW**

Financial Stress Class: **1**

During the prior year, firms in this Financial Stress Class had a failure rate of 0.49%, which is 0.35 times lower than the national average.

Financial stress national percentile: 47 (high risk: 1%; low risk: 100%)
National percentile industry norm: 49 (high risk: 1%; low risk: 100%)

**Key Factors**
- 335 trade experiences exist for this company.
- Financial Stress Score: 1426 (high risk: 1,001;low risk: 1,850)
- Payment experiences exist for this firm which are greater than 60 days past due.
- 42% of trade experiences indicate slow payment(s) are present.
- Control age or date entered in D&B files indicates lower risk.
- Business owns facilities.

## Payment within Terms: Credit Score Summary

**Likelihood this company will not pay on time over the next 12 months**  **MODERATE**

Credit Score Class: **3**

The Credit Score class of 3 for this company shows that during the previous year, 12.3% of the firms with this classification paid one or more bills severely delinquent, which is lower than the national average.

Credit score percentile: 33 (high risk: 1%; low risk: 100%)
Industry norm percentile: 53 (high risk: 1%; low risk: 100%)

**Key Factors**
- 335 trade experiences exist for this company.
- 42% of trade experiences indicate slow payment(s) are present.
- Payment experiences exist for this firm which are greater than 60 days past due.
- Control age or date entered in D&B files indicates lower risk.

## Additional Information

**Financial Stress Summary**
- The Financial Stress Class indicates that this firm shares some of the same business and financial characteristics of other companies with this classification. It does not mean the firm will necessarily experience financial stress.
- The Incidence of Financial Stress shows the percentage of firms in a given Class that discontinued operations over the past year with loss to creditors. The Incidence of Financial Stress - National Average represents the national failure rate and is provided for comparative purposes.
- The Financial Stress National Percentile reflects the relative ranking of a company among all scorable companies in D&B's file.
- The Financial Stress Score offers a more precise measure of the level of risk than the Class and Percentile. It is especially helpful to customers using a scorecard approach to determining overall business performance.
- All Financial Stress Class, Percentile, Score and Incidence statistics are based on 2002.

**Credit Score Summary**
- The Incidence of Delinquent Payment is the percentage of companies with this classification that were reported 90 days past due or more by creditors. The calculation of this value is based on an inquiry weighted sample.
- The Percentile ranks this firm relative to other businesses. For example, a firm in the 80th percentile has a lower risk of paying in a severely delinquent manner than 79% of all scorable companies in D&B's files.

Company Snapshot    Creditworthiness    Payment History & Trends    Public Filings    History & Operations    Banking & Finance

# Payment History

## Summary

| | | | |
|---|---|---|---|
| **Average payment performance trend when weighted by dollar amount** | **UNCHANGED** | **Company's payment performance over the past 12 months compared with its peers** | **SLOW** |

## Payment History Overview

| | | | |
|---|---|---|---|
| **Payment experiences on file with D&B:** | **335** | Average highest credit: | $27,490 |
| Payments made within terms: | 251 (75%) | Largest high credit: | $1,000,000 |
| Amount placed for collections: | 0 (0%) | Highest now owing: | $600,000 |
| | | Highest past due: | $200,000 |

## Historical Payment Trends: PAYDEX®

**Average payment performance trend when weighted by dollar amount**

**Last 3 months** : Trend is unchanged          **UNCHANGED**

**Last 12 months** : 18 days beyond terms     D&B PAYDEX® : **67**
Industry benchmark: Slow

Based on payments collected over last 12 months.
Indications of slowness can be the result of dispute over merchandise, skipped invoices, etc. Accounts are sometimes placed for collection even though the existence or amount of the debt is disputed.

## Historical Payment Trends: PAYDEX® Comparison to Industry

**Company's payment performance over the past**          **SLOW**
**12 months compared with its peers**

**This company's 12-month high** : 69, or equal to 16 days beyond terms
**This company's 12-month low** : 66, or equal to 19 days beyond terms

| | 2/05 | 3/05 | 4/05 | 5/05 | 6/05 | 7/05 | 8/05 | 9/05 | 10/05 | 11/05 | 12/05 | 1/06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **This Business** | 66 | 66 | 66 | 66 | 66 | 68 | 69 | 69 | 67 | 67 | 67 | 67 |
| **Industry Quartiles** | | | | | | | | | | | | |
| **Upper** | | 77 | | | 77 | | | 77 | | | 78 | |
| **Median** | | 73 | | | 73 | | | 74 | | | 74 | |
| **Lower** | | 69 | | | 68 | | | 69 | | | 69 | |

Shows PAYDEX scores of this Business compared to the Primary Industry from each of the last four quarters. The Primary Industry is Mfg plastic medical apparatus, based on SIC code 3841.

## Payment History Details

| Date Reported | Paying Record | High Credit ($) | Now Owes ($) | Past Due ($) | Selling Terms | Last Sale Within (months) |
|---|---|---|---|---|---|---|
| 01/06 | Disc | 250 | 0 | 0 | | 6-12 |
| 01/06 | Prompt | 20,000 | 500 | 0 | | 1 |
| 01/06 | Prompt | 20,000 | 10,000 | 0 | Net30 | 1 |

| 01/06 | Prompt | 7,500 | 0 | | | 2-3 |
|-------|--------|-------|---|---|---|-----|
| 01/06 | Prompt | 7,500 | 0 | 0 | | 4-5 |
| 01/06 | Prompt | 2,500 | 250 | 250 | Net30 | 1 |
| 01/06 | Prompt | 2,500 | 2,500 | 0 | | 1 |
| 01/06 | Prompt | 2,500 | 1,000 | 0 | | 1 |
| 01/06 | Prompt | 2,500 | 1,000 | | | 2-3 |
| 01/06 | Prompt | 1,000 | 1,000 | 0 | | 1 |
| 01/06 | Prompt | 500 | 250 | 50 | Net30 | 1 |
| 01/06 | Prompt | 500 | 0 | 0 | Net30 | 6-12 |
| 01/06 | Prompt | 50 | 50 | 0 | | 1 |
| 01/06 | Prompt-Slow 30 | 45,000 | 40,000 | 15,000 | | 1 |
| 01/06 | Prompt-Slow 30 | 2,500 | 0 | 0 | Net30 | 4-5 |
| 01/06 | Prompt-Slow 30 | 1,000 | 0 | 0 | | 6-12 |
| 01/06 | Prompt-Slow 30 | 750 | 750 | | | 6-12 |
| 01/06 | Prompt-Slow 30 | 250 | 250 | 0 | | 1 |
| 01/06 | Prompt-Slow 60 | 100 | 0 | 0 | | 6-12 |
| 01/06 | Slow 30 | 15,000 | 10,000 | 5,000 | | 1 |
| 01/06 | Slow 30 | 2,500 | 0 | 0 | Net15 | 6-12 |
| 12/05 | Prompt | 200,000 | 200,000 | 0 | | 1 |
| 12/05 | Prompt | 200,000 | 200,000 | 0 | | 1 |
| 12/05 | Prompt | 55,000 | 7,500 | 0 | | 1 |
| 12/05 | Prompt | 45,000 | 45,000 | 0 | | 1 |
| 12/05 | Prompt | 25,000 | 20,000 | 0 | | 1 |
| 12/05 | Prompt | 25,000 | 7,500 | 0 | Net30 | 1 |
| 12/05 | Prompt | 15,000 | 15,000 | 0 | | 1 |
| 12/05 | Prompt | 15,000 | 15,000 | 0 | | 1 |
| 12/05 | Prompt | 15,000 | 10,000 | 1,000 | | 1 |
| 12/05 | Prompt | 5,000 | 5,000 | 0 | Net30 | 1 |
| 12/05 | Prompt | 5,000 | 750 | 0 | | 1 |
| 12/05 | Prompt | 5,000 | 5,000 | 1,000 | | 1 |
| 12/05 | Prompt | 2,500 | 0 | 0 | Net30 | 4-5 |
| 12/05 | Prompt | 2,500 | 750 | 0 | | 1 |
| 12/05 | Prompt | 2,500 | 2,500 | 0 | Net30 | 1 |
| 12/05 | Prompt | 2,500 | 0 | 0 | Net30 | 2-3 |
| 12/05 | Prompt | 2,500 | 2,500 | 0 | 1 10 Net30 | 1 |
| 12/05 | Prompt | 1,000 | 1,000 | 0 | | 1 |
| 12/05 | Prompt | 750 | 0 | 0 | Net30 | 1 |
| 12/05 | Prompt | 500 | 0 | 0 | | 6-12 |
| 12/05 | Prompt | 500 | 250 | 0 | Net30 | 1 |
| 12/05 | Prompt | 500 | 0 | 0 | Net30 | 4-5 |
| 12/05 | Prompt | 500 | 0 | 0 | Net30 | 2-3 |
| 12/05 | Prompt | 250 | 0 | 0 | Net30 | 4-5 |
| 12/05 | Prompt | 250 | 0 | 0 | | 6-12 |

| 12/05 | Prompt | 100 | 0 | 0 | Net30 | 2-3 |
|-------|--------|-----|---|---|-------|-----|
| 12/05 | Prompt | 100 | 0 | 0 | | 4-5 |
| 12/05 | Prompt | 100 | 0 | 0 | | 4-5 |
| 12/05 | Prompt | 50 | 0 | 0 | Net30 | 6-12 |
| 12/05 | Prompt | 0 | 0 | 0 | | 1 |
| 12/05 | Prompt-Slow 15 | 750 | 0 | 0 | | 2-3 |
| 12/05 | Prompt-Slow 30 | 100,000 | 70,000 | 0 | | 1 |
| 12/05 | Prompt-Slow 30 | 7,500 | 0 | 0 | | 1 |
| 12/05 | Prompt-Slow 30 | 7,500 | 5,000 | 5,000 | | 4-5 |
| 12/05 | Prompt-Slow 30 | 5,000 | 5,000 | 2,500 | Net30 | 1 |
| 12/05 | Prompt-Slow 30 | 2,500 | 100 | 100 | | 2-3 |
| 12/05 | Prompt-Slow 30 | 2,500 | 1,000 | 1,000 | Net15 | 6-12 |
| 12/05 | Prompt-Slow 30 | 2,500 | 100 | 100 | Net15 | 2-3 |
| 12/05 | Prompt-Slow 30 | 1,000 | 500 | 250 | Net30 | 1 |
| 12/05 | Prompt-Slow 30 | 1,000 | 1,000 | 1,000 | | 1 |
| 12/05 | Prompt-Slow 30 | 1,000 | 1,000 | 0 | Net30 | 1 |
| 12/05 | Prompt-Slow 30 | 500 | 0 | 0 | | 2-3 |
| 12/05 | Prompt-Slow 60 | 80,000 | 15,000 | 0 | | 1 |
| 12/05 | Prompt-Slow 60 | 35,000 | 15,000 | 15,000 | | 2-3 |
| 12/05 | Prompt-Slow 60 | 15,000 | 0 | 0 | | 2-3 |
| 12/05 | Prompt-Slow 90 | 1,000 | 100 | 0 | | 1 |
| 12/05 | Prompt-Slow 90 | 50 | 50 | 50 | Net30 | 2-3 |
| 12/05 | Slow 5 | 250 | 0 | 0 | Net30 | 4-5 |
| 12/05 | Slow 10 | 2,500 | 0 | 0 | Net30 | 4-5 |
| 12/05 | Slow 30 | 5,000 | 5,000 | 2,500 | | 1 |
| 12/05 | Slow 30 | 1,000 | 0 | 0 | Net30 | 2-3 |
| 12/05 | Slow 15-30 | 1,000 | 750 | 500 | | 1 |
| 12/05 | Slow 30 | 750 | 750 | 750 | | 1 |
| 12/05 | Slow 5-30 | 500 | 0 | 0 | Net15 | 6-12 |
| 12/05 | Slow 35 | 2,500 | 750 | 750 | | 1 |
| 12/05 | Slow 90 | 2,500 | 0 | 0 | | 4-5 |
| 12/05 | Slow 150 | 500 | 500 | 500 | Net30 | 1 |
| 12/05 | (079) | 0 | 0 | 0 | Cash account | 1 |
| 11/04 | Prompt-Slow 60+ | 5,000 | 2,500 | 2,500 | | 1 |

Payment experiences reflect how bills are met in relation to the terms granted. In some instances payment beyond terms can be the result of dispute over merchandise, skipped invoices, etc.
Each experience shown is from a separate supplier. Updated trade experiences replace those previously reported.
Accounts are sometimes placed for collection even though the existence or amount of the debt is disputed.

## Payment Analysis By Industry

**Company's dollar-weighted payments listed by the primary industries of its suppliers**

| Industry | Total Received (#) | Total Dollar Amount ($) | Largest High Credit ($) | Within Terms | Slow 1-30 | Slow 31-60 | Slow 61-90 | Slow 91+ |
|----------|--------------------|-----------------------|------------------------|--------------|-----------|------------|------------|----------|
| | | | | | | (% of dollar amount) | | |
| Trucking non-local | 42 | 377,450 | 200,000 | 88 | 4 | 1 | 7 | 0 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Telephone communictns | 15 | 149,850 | 45,000 | 91 | 0 | 9 | 0 | 0 |
| Whol industrial suppl | 15 | 36,750 | 20,000 | 87 | 10 | 0 | 0 | 3 |
| Nonclassified | 13 | 255,800 | 200,000 | 99 | 0 | 1 | 0 | 0 |
| Whol electronic parts | 10 | 116,550 | 90,000 | 92 | 8 | 0 | 0 | 0 |
| Whol industrial equip | 8 | 74,600 | 30,000 | 68 | 21 | 11 | 0 | 0 |
| Misc business credit | 8 | 75,100 | 25,000 | 100 | 0 | 0 | 0 | 0 |
| Whol service paper | 7 | 82,500 | 45,000 | 99 | 1 | 0 | 0 | 0 |
| Executive office | 7 | 450 | 100 | 100 | 0 | 0 | 0 | 0 |
| Electric services | 6 | 167,650 | 100,000 | 99 | 1 | 0 | 0 | 0 |
| Whol office supplies | 6 | 4,500 | 1,000 | 97 | 3 | 0 | 0 | 0 |
| Help supply service | 5 | 1,034,250 | 1,000,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg photograph equip | 5 | 270,750 | 250,000 | 6 | 0 | 0 | 94 | 0 |
| Whol misc profsn eqpt | 5 | 32,600 | 20,000 | 92 | 8 | 0 | 0 | 0 |
| Whol electrical equip | 5 | 4,150 | 2,500 | 40 | 60 | 0 | 0 | 0 |
| Security broker/deal | 5 | 5,000 | 1,000 | 70 | 0 | 10 | 20 | 0 |
| Mfg plastics/resins | 4 | 707,500 | 700,000 | 51 | 0 | 49 | 0 | 0 |
| Public finance | 4 | 311,000 | 200,000 | 100 | 0 | 0 | 0 | 0 |
| Whol medical equip | 4 | 205,500 | 100,000 | 73 | 24 | 0 | 0 | 3 |
| Truck rental/leasing | 4 | 130,000 | 70,000 | 44 | 56 | 0 | 0 | 0 |
| Mfg industrial gases | 4 | 59,500 | 55,000 | 52 | 46 | 0 | 2 | 0 |
| Arrange cargo transpt | 4 | 36,250 | 20,000 | 77 | 23 | 0 | 0 | 0 |
| Short-trm busn credit | 4 | 10,600 | 7,500 | 86 | 14 | 0 | 0 | 0 |
| Misc business service | 4 | 300 | 250 | 100 | 0 | 0 | 0 | 0 |
| Mfg medical instrmnt | 3 | 117,500 | 95,000 | 3 | 94 | 0 | 0 | 3 |
| Mfg chemicals | 3 | 87,500 | 80,000 | 54 | 0 | 46 | 0 | 0 |
| Mfg surgical supplies | 3 | 70,000 | 50,000 | 96 | 0 | 4 | 0 | 0 |
| Whol plastic material | 3 | 47,500 | 40,000 | 97 | 3 | 0 | 0 | 0 |
| Mfg process controls | 3 | 8,100 | 7,500 | 52 | 48 | 0 | 0 | 0 |
| Misc repair services | 3 | 10,500 | 5,000 | 48 | 26 | 24 | 0 | 2 |
| Whol office equipment | 3 | 5,300 | 5,000 | 94 | 5 | 0 | 0 | 1 |
| Misc publishing | 3 | 3,600 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Whol computers/softwr | 3 | 1,750 | 1,000 | 14 | 86 | 0 | 0 | 0 |
| Misc general gov't | 3 | 850 | 750 | 100 | 0 | 0 | 0 | 0 |
| Mfg misc special mach | 2 | 1,015,000 | 1,000,000 | 98 | 1 | 1 | 0 | 0 |
| Computer system desgn | 2 | 255,000 | 250,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg inorganic chemcls | 2 | 300,000 | 200,000 | 83 | 17 | 0 | 0 | 0 |
| Electrical contractor | 2 | 95,000 | 55,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg adhesives/sealant | 2 | 50,000 | 35,000 | 65 | 0 | 35 | 0 | 0 |
| Mfg computers | 2 | 35,000 | 25,000 | 86 | 14 | 0 | 0 | 0 |
| Industrial launderer | 2 | 20,000 | 15,000 | 38 | 62 | 0 | 0 | 0 |
| Whol durable goods | 2 | 11,000 | 10,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg electric test prd | 2 | 8,500 | 7,500 | 94 | 6 | 0 | 0 | 0 |
| Whol hardware | 2 | 12,500 | 7,500 | 100 | 0 | 0 | 0 | 0 |
| Whol plumb/hydronics | 2 | 7,750 | 7,500 | 2 | 98 | 0 | 0 | 0 |
| Mfg fluid power pumps | 2 | 7,600 | 7,500 | 51 | 49 | 0 | 0 | 0 |
| Mfg misc plastic prdt | 2 | 10,000 | 7,500 | 100 | 0 | 0 | 0 | 0 |
| Mfg steel pipe/tubes | 2 | 12,500 | 7,500 | 40 | 60 | 0 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mfg misc office eqpt | 2 | 5,500 | 5,000 | 0 | 55 | 0 | 45 | 0 |
| Mfg refrig/heat equip | 2 | 3,500 | 2,500 | 86 | 14 | 0 | 0 | 0 |
| Lithographic printing | 2 | 1,100 | 1,000 | 50 | 45 | 5 | 0 | 0 |
| Whol metal | 2 | 1,750 | 1,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg electromedcl prdt | 2 | 1,500 | 1,000 | 83 | 17 | 0 | 0 | 0 |
| Mfg packaging mach | 2 | 600 | 500 | 100 | 0 | 0 | 0 | 0 |
| Mfg analytic instrmnt | 2 | 750 | 500 | 67 | 33 | 0 | 0 | 0 |
| R.V./trailer rentals | 2 | 300 | 250 | 83 | 17 | 0 | 0 | 0 |
| Gas transmission dist | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mfg comp peripherals | 1 | 800,000 | 800,000 | 0 | 50 | 50 | 0 | 0 |
| Mfg synthetic rubber | 1 | 500,000 | 500,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg paper indus mach. | 1 | 400,000 | 400,000 | 50 | 0 | 0 | 0 | 50 |
| Wet corn milling | 1 | 100,000 | 100,000 | 50 | 50 | 0 | 0 | 0 |
| Ret-direct selling | 1 | 100,000 | 100,000 | 100 | 0 | 0 | 0 | 0 |
| Nonphysical research | 1 | 40,000 | 40,000 | 50 | 50 | 0 | 0 | 0 |
| Detective/guard svcs | 1 | 35,000 | 35,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg switchgear-boards | 1 | 35,000 | 35,000 | 50 | 0 | 50 | 0 | 0 |
| Mfg organic fibers | 1 | 35,000 | 35,000 | 0 | 100 | 0 | 0 | 0 |
| Mfg organic chemicals | 1 | 35,000 | 35,000 | 50 | 50 | 0 | 0 | 0 |
| Misc equipment rental | 1 | 30,000 | 30,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg cold rolled steel | 1 | 10,000 | 10,000 | 0 | 100 | 0 | 0 | 0 |
| Mfg combustion engine | 1 | 7,500 | 7,500 | 50 | 50 | 0 | 0 | 0 |
| Medical equip rental | 1 | 5,000 | 5,000 | 50 | 50 | 0 | 0 | 0 |
| Whol petroleum prdts | 1 | 5,000 | 5,000 | 50 | 50 | 0 | 0 | 0 |
| Central Reserve Bank | 1 | 2,500 | 2,500 | 0 | 0 | 0 | 100 | 0 |
| Mfg scales/balances | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Mfg environment cntrl | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Ret misc merchandise | 1 | 2,500 | 2,500 | 50 | 50 | 0 | 0 | 0 |
| Mfg overhead hoists | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Mfg drug preparations | 1 | 2,500 | 2,500 | 50 | 50 | 0 | 0 | 0 |
| Ret computer/software | 1 | 1,000 | 1,000 | 50 | 50 | 0 | 0 | 0 |
| Gas service station | 1 | 1,000 | 1,000 | 100 | 0 | 0 | 0 | 0 |
| Paper mill | 1 | 1,000 | 1,000 | 0 | 0 | 0 | 0 | 0 |
| Oil/gas production | 1 | 1,000 | 1,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg general machinery | 1 | 1,000 | 1,000 | 0 | 100 | 0 | 0 | 0 |
| Mfg fabricated rubber | 1 | 1,000 | 1,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg blankbook/binder | 1 | 1,000 | 1,000 | 0 | 100 | 0 | 0 | 0 |
| Mfg jewelry | 1 | 750 | 750 | 0 | 100 | 0 | 0 | 0 |
| Mfg metalworking mach | 1 | 750 | 750 | 100 | 0 | 0 | 0 | 0 |
| Mfg ceramic tile | 1 | 750 | 750 | 100 | 0 | 0 | 0 | 0 |
| Mfg furn/fixtures | 1 | 500 | 500 | 100 | 0 | 0 | 0 | 0 |
| Mfg industry furnaces | 1 | 500 | 500 | 100 | 0 | 0 | 0 | 0 |
| Mfg relays/controls | 1 | 500 | 500 | 100 | 0 | 0 | 0 | 0 |
| Mfg industrial valves | 1 | 500 | 500 | 0 | 0 | 0 | 0 | 100 |
| Books-print/publish | 1 | 500 | 500 | 100 | 0 | 0 | 0 | 0 |
| Mfg cleaning products | 1 | 500 | 500 | 100 | 0 | 0 | 0 | 0 |
| Mfg pumping equipment | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Information retrieval | 1 | 250 | 250 | 50 | 50 | 0 | 0 | 0 |
| Mfg laminated paper | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Airport/airport svcs | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Mfg air/gas compress | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Air courier service | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Radiotelephone commun | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Ret mail-order house | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Ret misc apparel | 1 | 50 | 50 | 100 | 0 | 0 | 0 | 0 |
| Whol appliances | 1 | 50 | 50 | 50 | 0 | 0 | 50 | 0 |
| Mfg die cut/paper brd | 1 | 50 | 50 | 50 | 0 | 0 | 50 | 0 |
| **Other payment categories** | | | | | | | | |
| Cash experiences | 4 | 2,500 | 2,500 | | | | | |
| Payment record unknown | 13 | 90,550 | 65,000 | | | | | |
| Unfavorable comments | 0 | 0 | 0 | | | | | |
| **Placed for collection** | | | | | | | | |
| With D&B | 0 | 0 | 0 | | | | | |
| Other | 0 | N/A | 0 | | | | | |
| **Total in D&B's file** | **335** | **8,615,250** | **1,000,000** | | | | | |

There are 335 payment experiences in D&B's file for the most recent 12 months, with 281 experiences reported during the last three month period.

Company Snapshot      Creditworthiness      Payment History & Trends      Public Filings      History & Operations      Banking & Finance

# Public Filings

## Summary of Court Actions

**The following data includes both open and closed filings found in D&B's database on the subject company.**

| Record Type | Open Records | Open Value | Total Records | Most Recent Filing Date |
|---|---|---|---|---|
| Suits | 1 | 0 | 1 | 05/18/2005 |
| Liens | 0 | 0 | 0 | - |
| Judgments | 0 | 0 | 1 | 06/03/2003 |
| UCC Filings | 4 | N/A | 124 | 11/02/2005 |
| Bankruptcy Proceedings | 0 | N/A | 0 | - |

Public filing data is for informational purposes only and is not the official record. Certified copies can only by obtained from the official source. Number and value of open records refers only to 10 most recent filings for each record type. There are additional suits, liens, judgments, or UCC filings in D&B's file on this company available by contacting 1-866-472-7362.

## Suits

| Status | Amount | Cause | Plaintiff | Defendant | Date Filed | Additional Details |
|---|---|---|---|---|---|---|
| Pending | Unavailable | Unavailable | UTILITY RESOURCE MANAGEMENT GROUP INC | B BRAUN MEDICAL INC, IRVINE, CA AND OTHERS | 05/18/2005 | Case number: 05CC06305 Date status Attained: 05/18/2005 Latest info Received: 07/22/2005 Where filed: ORANGE COUNTY SUPERIOR COURT, SANTA ANA, CA |

If it is indicated that there are defendants other than the report subject, the lawsuit may be an action to clear title to property and does not necessarily imply a claim for money against the subject. Any public filings displayed in red are open.

## Judgments

| Status | Award | Type | Against | In Favour of | Date Entered | Additional Details |
|--------|-------|------|---------|--------------|--------------|--------------------|
| Satisfied | $30,664 | Judgment | B BRAUN MEDICAL, INC. and OTHERS | THE CARNEY GROUP, INC. | 06/03/2003 | Case Number (Docket/Warrant): 03 -N-436 Date status Attained: 06/30/2003 Latest info Received: 12/14/2005 Where filed: LEHIGH COUNTY PROTHONOTARY, ALLENTOWN, PA |

Any public filings displayed in red are open.

## UCC Filings

| Collateral | Type | Sec. Party | Debtor | Date Filed | Additional Details |
|------------|------|-----------|--------|------------|--------------------|
| Equipment and proceeds | Original | CUPERTINO NATIONAL BANK C/O GREATER BAY CAPITAL, LINCOLNSHIRE, IL CUPERTINO NATIONAL BANK C/O GREATER BAY CAPITAL, LINCOLNSHIRE, IL | B. BRAUN MEDICAL INC. | 01/16/2003 | Filing number: 006413439 Filed with: SECRETARY OF STATE/UCC DIVISION, SPRINGFIELD, IL Latest info Received: 02/10/2003 |
| Equipment and proceeds | Original | ASSOCIATES COMMERCIAL CORP, IRVING, TX | B BRAUN MEDICAL INC | 06/13/2000 | Filing number: 31721210 Filed with: SECRETARY OF STATE/UCC DIVISION, HARRISBURG, PA Latest info Received: 08/02/2000 |
| Equipment | Original | FLEET BUSINESS CREDIT, LLC, CHICAGO, IL | B. BRAUN MEDICAL INC. | 08/11/2004 | Filing number: 20040839417 Filed with: SECRETARY OF STATE/UCC DIVISION, HARRISBURG, PA Latest info Received: 09/21/2004 |
| Computer equipment | Original | IBM CREDIT LLC, ARMONK, NY | B.BRAUN MEDICAL INC. | 11/17/2003 | Filing number: 007849273 Filed with: SECRETARY OF STATE/UCC DIVISION, SPRINGFIELD, IL Latest info Received: 11/24/2003 |
| Business machinery/equipment | Original | NORWEST FINANCIAL LEASING INC, DES MOINES, IA | B BRAUN MEDICAL | 09/19/2000 | Filing number: 33071731 Filed with: SECRETARY OF STATE/UCC DIVISION, HARRISBURG, PA Latest info Received: 10/30/2000 |
| Equipment | Original | NORWEST FINANCIAL LEASING, DES MOINES, IA | B BRAUN MEDICAL | 07/07/2000 | Filing number: 31821138 Filed with: SECRETARY OF STATE/UCC DIVISION, HARRISBURG, PA Latest info Received: 08/24/2000 |
| Business machinery/equipment | Original | NORWEST FINANCIAL LEASING, DES MOINES, IA | B BROWN MEDICAL | 02/07/2000 | Filing number: 31250344 Filed with: SECRETARY OF STATE/UCC DIVISION, HARRISBURG, PA Latest info Received: 03/13/2000 |
| Equipment | Original | FLEETWOOD FINANCIAL CORP, EDISON, NJ | B BRAUN MEDICAL INC | 01/13/2000 | Filing number: 31170912 Filed with: SECRETARY OF STATE/UCC DIVISION, HARRISBURG, PA Latest info Received: 02/14/2000 |
| Unavailable | Assignment | Unavailable | B BRAUN MEDICAL INC | 07/06/2000 | Filing number: 31820710 Filed with: SECRETARY OF STATE/UCC DIVISION, HARRISBURG, PA Latest info Received: 08/24/2000 |
| Business machinery/equipment | Original | Unavailable | BRAUN, B | 11/19/1999 | Filing number: 30960054 Filed with: SECRETARY OF STATE/UCC DIVISION, |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  |  |  |  | HARRISBURG, PA<br>Latest info Received: 12/16/1999 |
| Business<br>machinery/equipment | Original | Unavailable | B BRAUN<br>MEDICAL INC | 02/24/1999 | Filing number: 29941616<br>Filed with: SECRETARY OF<br>STATE/UCC DIVISION,<br>HARRISBURG, PA<br>Latest info Received: 03/11/1999 |

The public record items contained in this report may have been paid, terminated, vacated or released prior to the date this report was printed. There are additional suits, liens, judgments, or UCC filings in D&B's file on this company available by contacting 1-866-472-7362. Any public filings displayed in red are open.

## Government Activity

### Activity Summary

| | | Possible Candidate for Socio-Economic Program Consideration | |
|---|---|---|---|
| Borrower (Dir/Guar) | No | | |
| Administrative Debt | No | Labor Surplus Area | N/A |
| Contractor | Yes | Small Business | N/A |
| Grantee | No | 8(A) Firm | N/A |
| Party Excluded from Federal Program(s) | No | | |

The details provided in the Government Activity section are as reported to D&B by the federal government and other sources.

Company Snapshot     Creditworthiness     Payment History & Trends     Public Filings     History & Operations     Banking & Finance

## History & Operations

| Topic | Description |
|---|---|
| History | Detailed information on the history of a company, including background information on the management team and key principals, and information on related companies. |
| Corporate Family | Detailed information on all related companies, including subsidiaries, affiliates and branches. |
| Registration & Incorporation | Detailed registration and incorporation information, including the date and state of incorporation and the type of corporation formed. |
| Company Operations | Detailed information on a company's operations, including the identity of the parent company, the geographic scope of the business, and the key holdings. |
| Industry Classification | Details on the specific industry within which a company is classified. |

## History

**Officer(s):**            **Director(s):**
CAROLL H NEUBAUER, CHB-      THE OFFICER(S)
CEO+

Business started 1957 by George K Burke. Present control succeeded Nov 15 1979. 100% of capital stock is owned by the parent company.

CAROLL H NEUBAUER born 1955. 1996-present Chairman of the Board and CEO of B Bruan of America Inc and B Braun Medical Inc. 1991 appointed member of the Board of Directors of B Braun Melsungen AG. 1988 joined B Braun Melsungen AG as Assistant to the Chief Executive Officer. 1987 Associate, Law Firm Kiethe & Partner, Munich, Germany.

## Corporate Family

**Global Ultimate:**

|  |  |  |
|---|---|---|
| B. braun melsungen ag | Melsungen, Germany | DUNS # 31-501-6972 |

**Parent:**

| | | |
|---|---|---|
| B. braun of america inc. | Bethlehem, PA | DUNS # 04-478-7661 |

**Subsidiaries (US):**

| | | |
|---|---|---|
| B Braun Medical of Delaware | 824 12th Ave, Bethlehem, PA | DUNS # 06-322-0037 |
| B Braun of Puerto Rico Inc | Km 215 HM 7 RR 2, Sabana Grande, PR | DUNS # 17-404-7142 |
| Central Admixture Pharmacy Services, Inc | 2525 Mcgaw Ave, Irvine, CA | DUNS # 78-410-7856 |

**Branches (US):**

| | | |
|---|---|---|
| B Braun Medical Inc | 2525 Mcgaw Ave, Irvine, CA | DUNS # 03-742-5308 |

## Registration & Incorporation

**Registered Name**: Braun, b. medical inc.
**Business Type** : Corporation
**Corporation Type**: Profit
**Date incorporated**: September 12, 1979
**State of incorporation**: Pennsylvania
**Duration** : Perpetual
**Status** : Active

**Filing Date** : September 12, 1979
**Registration ID**: 0693517
**Where filed** : SECRETARY OF STATE/CORPORATIONS DIVISION, HARRISBURG, PA
**Principals** : GEORGE K BURKE JR, CHIEF EXECUTIVE OFFICER
CHARLES A DINARDO, SECRETARY
THOMAS J YOUNG, TREASURER
WILLEM DEGOEDE, VICE PRESIDENT

Corporate and business registrations provided by management or other source.

## Company Operations

**Description:** Subsidiary of B. Braun Of America Inc, Bethlehem, PA started 1979 which operates as stockholding company. Parent company owns 100% of capital stock. Parent company has two other subsidiary(ies). Intercompany relations: Reported by management to consist of occasional loans and advances and service transactions.

Operates as a manufacturer of disposable plastic medical apparatus including pharmacy additive products, catheters and filtering devices (100%).

Terms are net 30 days. Has 10,000 account(s). Sells to wholesalers and government.

Nonseasonal.

**Employees:** 4,099 which includes officer(s). 600 employed here.

**Facilities:** Owns 107,000 sq. ft. in a two story brick building.

**Location:** Industrial section on main street.

**Branches:** This business has additional branches; detailed branch information is available in D&B's linkage or family tree products.

**Subsidiaries:** This business has 3 subsidiaries listed below.

1) Burron Medical of Delaware Inc, Wilmington, DE started on Oct 3 1998. DUNS #06-322-0037. Delaware investment company. (100%).

2) B Braun of Puerto Rico, KM 215.7 Insuair Rd, Sabana Grande, Puerto Rico, 00637. Manufactures disposable plastic medical apparatus in Puerto Rico. DUNS #17-404-7142. (100%).

3) Central Admixture Pharmacy Services Inc, Irvine, CA. DUNS #78 -410-7856 (100%).

## Industry Classification

| SIC | | NAICS | |
|---|---|---|---|
| 3841 0000 | Surgical and medical instruments | 339112 | Surgical and Medical Instrument Manufacturing |
| 3841 0403 | Catheters | 339112 | Surgical and Medical Instrument Manufacturing |

Based on information in our file, D&B has assigned this company an extended 8 -digit SIC. D&B's use of 8-digit SICs enables us to be more specific to a company's operations than if we use the standard 4-digit code.
The 4-digit SIC numbers link to the description on the Occupational Safety & Health Administration (OSHA) Web site. Links open in a new browser window.

Company Snapshot   Creditworthiness   Payment History & Trends   Public Filings   History & Operations   Banking & Finance

# Banking & Finance

## Banking

| 12/05 | Borrowing account. Now owing low 8 figures. |
|---|---|

## Key Business Ratios

**Statement date:**  Dec 31 2003

### Industry Norms based on 14 establishments

| | This Business | Industry Median | Industry Quartile |
|---|---|---|---|
| **Profitability** | | | |
| Return on Sales | UN | 10.2 | UN |
| Return on Net Worth | UN | 13.3 | UN |
| **Short-Trem Solvency** | | | |
| Current Ratio | 1.5 | 2.7 | 4 |
| Quick Ratio | UN | 1.6 | UN |
| **Efficiency** | | | |
| Assets Sales | UN | 120.3 | UN |
| Sales / Net Working Capital | 6.5 | 2.6 | 1 |
| **Utilization** | | | |
| Total Liabilities / Net Worth | UN | 42.2 | UN |
| UN = Unavailable | | | |

## Finance

**10/26/2004**

**Three -year statement comparative:**

| | Fiscal Sep 30 2001 | Fiscal Sep 30 2002 | Fiscal Dec 31 2003 |
|---|---|---|---|
| Current Assets | 249,840,000 | 261,723,000 | 291,452,000 |
| Current Liabs | 401,360,000 | 117,502,000 | 192,997,000 |
| Current Ratio | 0.62 | 2.23 | 1.51 |
| Working Capital | (151,520,000) | 144,221,000 | 98,455,000 |
| Other Assets | 349,698,000 | 357,131,000 | 388,474,000 |
| Net Worth | 98,039,000 | 98,913,000 | 64,254,000 |

| | | | |
|---|---|---|---|
| Sales | 556,856,000 | 601,609,000 | 639,207,000 |
| Long Term Liab | 100,139,000 | 402,439,000 | 422,675,000 |

Submitted by Larry Kiefer, Credit Manager. Accountant: PricewaterhouseCoopers.

**Accountant's Opinion**
A review of the accountant's opinion indicates the financial statements meet generally accepted accounting principles and that the audit contains no qualifications.

## Balance Sheet Explanations
. ------ STATEMENT ITEM EXPLANATIONS ------ .
It is noted there are no intangibles.
The statement includes no deferred credits.

**Contingencies**
None.

**Liquidity**
Liquid assets provide adequate coverage of current liabilities.

On September 3, 2004, Larry Kiefer, manager, confirmed company name, address, principals, annual sales and operational information using Dun & Bradstreet's Internet-based update method (eUpdate) at www.dnb.com.

Company Snapshot      Creditworthiness      Payment History & Trends      Public Filings      History & Operations      Banking & Finance

**Customer Service**
▶ Email us with your questions at sbsSupport@dnb.com.
▶ If you'd like to speak to one of our member support technicians directly, call toll-free 1-866-472-7362, Monday through Friday, 7:00AM to 7:00 PM CST
▶ If this is a report on your own company use eUpdate, our easy online tool, to inform D&B of any changes to your business information.

Copyright 2004 Dun & Bradstreet – Provided under contract for the exclusive use of subscriber ZDavid Zlotnick,

# EXHIBIT 8

Form: All Guided Search Forms > Company
Terms: **company(mcgaw, inc.)** (Edit Search | Suggest Terms for My Search)

✦Select for FOCUS™ or Delivery
☐

*S&P Register of Corporations, 2/8/2006, McGaw, Inc.*

Copyright 2006 McGraw-Hill, Inc.
Standard & Poor's Register of Corporations

February 8, 2006

**McGaw, Inc.**

2525 McGaw Ave., Box 19791
Irvine, CA 92614-5841
United States

**MAILING ADDRESS:** 2525 McGaw Ave., Box 19791, Irvine, CA United States 92614-5841
**MSA:** CA Santa Anna-Anaheim

* * * * * * * * * **COMMUNICATIONS** * * * * * * * * * *
**TELEPHONE:** 949-660-2000
**FAX:** 949-660-2700

* * * * * * * * * **COMPANY INFORMATION** * * * * * * * * * *
**FOUNDED:** 1928
**LEGAL STATUS:** Private
**EMPLOYEES:** From 3,100

* * * * * * * * * **EXECUTIVES** * * * * * * * * * *
Robert J. Krist, Exec V-P (Mfg)
Robert Kutteh, Exec V-P (Sales & Mktg)
William DeGoode, Sr V-P
Richard J. Hirshberg, V-P & Chief Fin Officer
Melissa Kummings, V-P (Human Resources)
John M. Kling, V-P, Asst Secy & Gen Coun
Jan S. Prokop, V-P & Chief Info Officer
Richard C. Pfenniger Jr., V-P
Sterling Blanchard, V-P (New Bus Devel & Intl)
Armando A. Tabernilla, Secy
Phillip Frost

* * * * * * * * * **DESCRIPTION** * * * * * * * * * *
**INDUSTRY TYPE:**
Manufacturing

* * * * * * * * * **MARKET AND INDUSTRY** * * * * * * * * * *
**NAICS CODES:**
325412 - Pharmaceutical Preparation Manufacturing
**PRODUCTS:**
Intravenous solutions & administration equipment, nutritional disease specifics
**MARKETS:**
National; International