## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) <br> ) MDL No. 1456 <br> ) <br> ) <br> ) CIVIL ACTION: 01-CV-12257 PBS <br> ) |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) <br> ) Judge Patti B. Saris <br> ) <br> ) <br> ) |

## PLAINTIFFS' OPPOSITION TO DEY, INC.'S AND ABBOTT LABORATORIES' OBJECTIONS TO CHIEF MAGISTRATE JUDGE BOWLER'S ORDER DENYING FURTHER DISCOVERY OF MASSACHUSETTS HEALTH PLANS

Plaintiffs oppose defendants' objection to Chief Magistrate Judge Bowler's order denying further discovery of Massachusetts health plans. Chief Magistrate Judge Bowler ruled that further discovery of Massachusetts health plans was unwarranted, that the burden of the discovery sought on these absent class members was "quite dramatic," and that disclosure of health plan contracts and other confidential documents within the small community of Massachusetts health plans would impose unnecessary risks of prejudicial disclosure on the Massachusetts health plans. Magistrate Bowler ruled based review of extensive briefing by plaintiffs, three Massachusetts health plans, and two defendants; substantial evidentiary submissions, including affidavits by health plan officers; and lengthy oral argument. Magistrate Bowler's ruling was not clearly erroneous and it should be affirmed. The argument and ruling are set forth in the transcript of hearing dated February 2, 2006 at 21-48. A copy of the transcript of the hearing is annexed hereto as exhibit A.

## I.        INTRODUCTION

During the Track I discovery phase of this case, defendants subpoenaed *over 40* health plans, covering *more than 50 percent* of all persons in the United States who have health insurance.  Included in this campaign were subpoenas directed to Massachusetts health plans Blue Cross Blue Shield of Massachusetts ("BCBSMA") and Harvard Pilgrim Health Care ("HPHC"), which together represent *more than 50 percent* of the covered lives in Massachusetts.  To date, defendants have taken *six* depositions of BCBSMA and *four* depositions of HPHC, and have collected many thousands of pages of documents from each.  Defendants obtained the Court's permission to obtain this broad absent class member discovery based upon repeated representations that they had constructed a representative on third-party payors and that discovery from each of the prospective deponents was needed to satisfy the sampling requirements.

Having obtained discovery from health plans representing 50 percent of the covered lives nationally and 50 percent of the covered lives in Massachusetts – far more than any reasonable sample would require – in November 2005, defendants issued *four more* health plan subpoenas, to Tufts Associated Health Plans, Inc. ("Tufts Health"), Neighborhood Health Plan, Inc. ("Neighborhood Health"), Fallon Community Health Plan ("Fallon Community"), and *another* subpoena to HPHC.  With Track I discovery closed, the subpoenas were purportedly issued on behalf of Track II defendant Dey, Inc. ("Dey") and Abbott Laboratories ("Abbott").  But the subpoenas sought discovery concerning only a handful of drugs manufactured by Abbott and Dey -- and *147 drugs* manufactured by the Track I defendants.

The subpoenas are invasive and extraordinarily burdensome.  They also run afoul of class action concepts because they require affirmative conduct on the part of companies that are absent class members and may never be parties to the action.  The MANUAL FOR COMPLEX LITIGATION,

recognizes that discovery of absent class members should be permitted only to the extent necessary and should be carefully limited to ensure that it serves a legitimate purpose and is not used to harass either the class representatives or the class members.  MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21.41 at 400 (2004) (hereafter "MANUAL").  Defendants' discovery campaign far exceeds what the defendants themselves have represented they need.  There is no compelling need for the additional discovery defendants now demand.

Defendants' subpoenas to the Tufts Health, Neighborhood Health, Fallon Community, and HPHC also represent an improper attempt to end run the Track I discovery cut-off.  All defendants' prior health plan subpoenas included requests for information concerning Dey and Abbott products.  Dey and Abbott, like all other defendants, have had the opportunity to attend and cross-examine at all health plan depositions, and has had the benefit of that discovery.  These subpoenas are not in furtherance of a specialized discovery need of Dey and Abbott.  The discovery is for the benefit of all defendants – and particularly, given the number of drugs listed, the Track I defendants -- but advanced through the subterfuge of Track II defendant service.

For these reasons and others and set forth herein, Magistrate Bowler's ruling rejecting defendants' demand to take discovery of Tufts Health, Neighborhood Health, Fallon Community, and additional discovery of HPHC, should be affirmed.

## II.    FACTUAL BACKGROUND

In November 2005, Track II defendants Dey and Abbott issued subpoenas to four absent class member Massachusetts health plans.  The information sought through these subpoenas was, for all intents and purposes identical (in some cases actually identical) to the information sought by subpoenas previously issued to health plans around the country by Track I defendants.  Indeed, the defendants had already subpoenaed and sought depositions and documents

concerning precisely these categories of information from *over 40 health plans* accounting for *50 percent* of the individuals covered by private health insurance in the United States, including the two largest health plans in Massachusetts.

The issue of the scope of permissible discovery of absent class members has been raised in this proceeding before. At each turn, the defendants have represented to the Court that each health plan from which they sought discovery was needed because it was a *critical part of a representative sample*, and that its discovery was limited to the sample group. For example:

- In their opposition to a motion by plaintiffs in December 2003 to limit non-party health plan discovery, the defendants represented that they had "compiled a list of forty Health Plans from among thousands of plans operating around the United States. The targeted Health Plans were intended to represent a cross-section of the industry, in terms of geographic diversity, size and type of plan." *Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Protective Order,* dated January 9, 2004, at 6.

- At a status conference before Judge Saris at which this motion was raised, on March 8, 2004, defendants again represented that they were seeking discovery only of the health plans that comprised their sample, stating: "It's not in our interest to be burdensome to that community. What we want to do is just develop enough information so we can present a sample . . . ." *Transcript of Status Conference,* at 49.

- Similarly, at a hearing before Magistrate Judge Bowler on a motion by health plan Health Net, Inc. for relief from defendants' subpoena, defendants again represented that their health plan discovery was limited to the sample they had devised: "As your Honor is aware, Judge Saris allowed the defendants to proceed with discovery of a sample of health insurers in the industry. Health Net is a key part of that industry sample." *Transcript of Hearing* dated January 27, 2005, at 7.

- In their written opposition to the recent motion of a group of six non-party health plans, including Blue Cross Blue Shield of Massachusetts, defendants justified their need for discovery because "The Plans were a critical part of the industry sample identified by defendants." *Defendants' Memorandum of Law in Opposition to Motion to Quash Subpoenas,* dated October 11, 2005, at 10.

- At the hearing before Magistrate Judge Bowler on the motion by the six non-party health plans, Defendants underscored their position that they were merely seeking to round out their representative sample, stating that the subpoenas "were part of the initial industry sample that defendants touted and were a particularly critical part of that sample because of their status as Blues plans. It's a survey of precisely such plans that have been studied

that the plaintiffs in this case rely on for many of the assumptions that underlie their theories of liability and damages." *Transcript of Hearing,* dated November 9, 2005.

Defendants consistently have represented that that their discovery of the absent class member health plans was limited to a necessary, targeted, representative sample they had devised.  Based on these representations, the Court has permitted defendants to proceed.

Defendants previously have included in their representative sample BCBSMA and HPHC.  These are the two largest Massachusetts absent class member health plans, with a combined membership of well over 50 percent of Massachusetts covered lives. BCBSMA, as the Court knows, has since become a named plaintiff and class representative in this proceeding and additional discovery is proceeding against it.  HPHC required four depositions in addition to document and production.

The new round of discovery is inconsistent with the defendants' prior representations to the Court and prior discovery activities.  Tufts Health, Neighborhood Health, and Fallon Community were never held out by defendants as part of the necessary, targeted representative sample.  And HPHC, of course, has already been subject to extensive discovery.  Instead of issuing the discovery through the Track I defendants, however, as had consistently been done before, the subpoenas were issued through Track II defendants Dey and Abbott.

The subpoenas to Tufts Health and Neighborhood Health, however, were carbon copies of the subpoenas previously issued by the Track I defendants, and the subpoenas to Fallon Community and HPHC were close seconds.  Moreover, the subpoenas seek information concerning only 24 of  Dey and Abbott drugs.  The number of drugs manufactured by the Track I defendants about which the subpoenas seek discovery is 147.

## III.    ARGUMENT

Rulings by a magistrate judge on non-dispositive matters such as discovery are entitled to deference unless "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1).  *United States v. Raddatz,* 447 U.S. 667, 673 (1980).  Defendants have failed to put forward any basis for overturning Magistrate Bowler's ruling, much less a basis that outweighs the "quite dramatic" burden the defendants purport to impose.  Accordingly, Magistrate Bowler's ruling should be affirmed.

### A.    Discovery of Absent Class Members Must Be Supported By Specific Need

The Massachusetts health plans currently subject to defendants' discovery efforts are absent class members.  Absent class members generally are not amenable to discovery as a matter of course.  As the Supreme Court has reasoned, under the intent of Fed. R. Civ. P. 23, absent class members are "passive beneficiaries" to litigation, and are entitled to sit back and await results without undue involvement or bother.  *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552 (1974); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810-11 (1985) ("Unlike a defendant in a normal civil suit, an absent class-action plaintiff is not required to do anything.  He may sit back and allow the litigation to run its course, content in knowing there are safeguards provided for his protection."). For this reason, the MANUAL recognizes that discovery of absent class members should be permitted only to the extent necessary and should be carefully limited to ensure that it serves a legitimate purpose and is not used to harass either the class representatives or the class members.  MANUAL AT § 21.41 at 400 (2004).

The teaching of the MANUAL mirrors case law on the subject.  First, courts should not permit parties to obtain discovery from absent class members unless they are able to "make a strong showing" of the reasons why the discovery was *absolutely necessary*.  *Enterprise Wall*

*Paper Mfg. Co. v. Bodman*, 85 F.R.D. 325, 327 (S.D.N.Y. 1980).  Second, courts allowing such

discovery require that the party seeking discovery establish that the discovery sought is

*unavailable elsewhere.  Clark v. Universal Builders, Inc.*, 501 F.2d 324, 340-41 (7th Cir. 1974)

("The burden is heavy to justify asking questions by interrogatories, even heavier to justify

depositions.").  Third, the court must ensure that the discovery will not subject absent class

members to *undue harassment* or excessive taxing of their resources.  *Robertson*, 67 F.R.D. at

700; *see also United States v. Trucking Employers, Inc.*, 72 F.R.D. 101, 104 (D.D.C. 1976)

(string citations omitted); *see also Clark,* 501 F.2d at 340 (there must be a "showing that the

information . . . is not designed 'as a tactic to take undue advantage of the class members or as a

stratagem to reduce the number of claimants.'").

Defendants can make no showing that the discovery they seek is necessary at this stage.

*Bodman*, 85 F.R.D. at 327.  Defendants previously have subpoenaed health plans covering more

than 50 percent of the covered lives in both the United States and Massachusetts.  To secure

discovery from these absent class members, defendants argued that discovery from each of the

targeted health plans was necessary to round out the representative sample they had devised.  But

defendants have never before included three of the four newly subpoenaed health plans in their

purported representative sample, and have already taken extensive discovery of the fourth. There

is no basis to claim now that the sample of absent Massachusetts health plan class members

requires enriching.  By their own representations and actions, defendants have proven that

further discovery of Massachusetts health plans is completely unwarranted.

Furthermore, defendants have failed to demonstrate that the information they seek has not

been obtained from other sources.  Indeed, because the requests to Tufts Health and

Neighborhood Health are identical to requests sent to the representative group previously

subpoenaed, including Massachusetts absent class members BCBSMA and HPHC, defendants have already obtained the information sought or like information from other absent class members.

In issuing her ruling subject to the defendants' objection, Magistrate Bowler was presented precisely with the facts and arguments supporting plaintiffs' position that the discovery defendants now seek from Massachusetts absent class member health plans is not necessary, was already obtained elsewhere, and is unduly invasive and burdensome. Magistrate Bowler's discovery ruling is not clearly erroneous, and should be affirmed.

**B.    The Use By Defendants Of Track II Defendant Dey To Serve This Subpoena Is A Subterfuge And The Request Is Untimely Under the Track I Discovery Cutoff**

Pursuant to CMO no. 13, issued by the Court on March 10, 2005, Track I discovery was required to be completed by August 31, 2005. During the period for Track I discovery, defendants crafted and undertook discovery of a representative sample of absent class member health plans. That discovery sought documents and testimony concerning drugs manufactured and marketed by both Track I and Track II defendants. In addition, Track I and Track II defendants' counsel had access to all documents, and were invited to attend and cross-examine at all depositions.

Through this latest round of discovery, defendants' seek to continue the extraordinary campaign of discovery undertaken during the Track I phase of discovery against absent class members. To avoid the bar of the Track I discovery cutoff, however, they have proceeded through Track II defendant Dey.

The proof of defendants' subterfuge is ample. First, the subpoenas issued to Tufts Health and Neighborhood Health are substantively identical to the subpoenas issued to the health plans

by the Track I defendants.  There is nothing in the subpoenas reflecting unique discovery needs of Dey and Abbott.

Second, the subpoenas issued to these absent class member health plans mark the first health plan subpoenas issued by any defendant other than a Track I defendant.  This campaign has been orchestrated entirely by the Track I defendants.

Third, the subpoenas seek extensive discovery with respect to Track I defendant drugs. Indeed, nearly half of the drugs about which inquiry is made – 147 drugs – are Track I defendant products.  The Court should not abide the efforts by Track I defendants to end-run the deadlines set forth in CMO no. 13 by permitting them to continue to conduct their discovery through a Track II defendant.

In holding the subpoenas to be invalid, Magistrate Bowler found that defendants had failed to present a legitimate discovery need to overcome the "dramatic" burden the discovery placed upon the Massachusetts health plans.  Magistrate Bowler's ruling should be affirmed.

**C.    The Subpoenas Issued to Fallon Community and HPHC Are Invalid Because They Were Issued In Violation of CMO no. 10**

The subpoena to Fallon Health is dated November 21, 2005 and called for the production of documents and deposition testimony on December 2, 2005.  Dey thus provided only *11 days notice* of the deposition.  The subpoena to HPHC is dated November 23, 2005 and called for the production of documents and deposition testimony on December 2, 2005.  Abbott thus provided only *9 days notice* of the deposition.

Case Management Order No. 10 entered March 24, 2004, at ¶ 7, states:

A party shall provide a "three week deposition notice" under which such party provides **at least 21 days notice** for a proposed deposition.  (Emphasis added).

Because Dey and Abbott failed to provide at least 21 days notice for the proposed depositions, as is required by this Court's case management order, their notices of deposition of Fallon Health and HPHC are invalid.

Abbott's notice of deposition to HPHC should be stricken for the additional reason that defendants had already subpoenaed HPHC once before.  Specifically, in a subpoena data November 19, 2003, the Track I defendants sought production of 26 categories of documents and testimony from HPHC.   That subpoena resulted in the production of voluminous documents and four deposition*s* of HPHC employees.  Abbott was entitled to participate in those depositions and obtained discovery from them specific to Abbott.  In particular, the subpoena called for production of documents relating to *31 drugs manufactured by Abbott.*

Notably, the November 19, 2003 subpoena called for the deposition of HPHC to take place on December 10, 2005 – exactly *21 days* from the date of the subpoena.

During the hearing on the motions underlying defendants' objections, Magistrate Bowler considered and rejected defendants' argument for the validity of their Massachusetts health plan subpoenas notwithstanding their failure to comply with CMO No. 10.  Magistrate Bowler's ruling should be affirmed.

## IV.    CONCLUSION

"If discovery from absent members of the class is permissible at all, *it should be sharply limited and allowed only on a strong showing of justification.*"  MANUAL, § 30.232 at 232 (quoting 8 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 2171 (2d ed. 1994)) (emphasis added).  The subpoenas that defendants have served on Massachusetts health plans are far from "sharply limited."  Moreover, defendants have not demonstrated a "strong showing" justifying the discovery that they seek.  The subpoenas are unnecessary; seek information that

defendants already have obtained – they already have their representative sample, *both*

*nationally and from Massachusetts*; and are burdensome and harassing.  In addition, the

discovery is untimely because it is clearly undertaken at the behest of Track I defendants in order

to avoid the Track I discovery cutoff.  It is also invalid as issued in violation of CMO no. 10.


                    Respectfully submitted,



              By **/s/ David Nalven**
                  Thomas M. Sobol
                  David S. Nalven
                  Edward Notargiacomo
                  Hagens Berman Sobol Shapiro LLP
                  One Main Street
                  Cambridge, MA  02142
                  Telephone: (617) 482-3700
                  Facsimile: (617) 482-3003

                  Steve W. Berman
                  Sean R. Matt
                  Hagens Berman Sobol Shapiro LLP
                  1301 Fifth Avenue, Suite 2900
                  Seattle, WA  98101
                  Telephone: (206) 623-7292
                  Facsimile: (206) 623-0594

                  *LIAISON AND CO-LEAD COUNSEL*

                  Jeffrey Kodroff
                  John Macoretta
                  Spector, Roseman & Kodroff, P.C.
                  1818 Market Street, Suite 2500
                  Philadelphia, PA  19103
                  Telephone: (215) 496-0300
                  Facsimile: (215) 496-6611

                  Marc H. Edelson
                  Hoffman & Edelson
                  45 West Court Street
                  Doylestown, PA  18901
                  Telephone: (215) 230-8043
                  Facsimile: (215) 230-8735

Kenneth A. Wexler
Wexler & Associates
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

*CO-LEAD COUNSEL*

Dated: March 8, 2006

## CERTIFICATE OF SERVICE

Docket No. MDL 1456

I, David S. Nalven, hereby certify that I am one of plaintiffs' attorneys and that, on March 8, 2006, I caused copies of this pleading to be served via Lexis/Nexis File Serve on all counsel of record.

**  /s/ David S. Nalven  **

Dated: March 8, 2006

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Docket No. 01-12257-PBS

CITIZENS FOR CONSUMER JUSTICE, ET AL.
         Plaintiffs                  .
                                     .
              v.                     .
                                     .
ABBOTT LABORATORIES, et al           .
         Defendants                  .
. . . . . . . . . . . . . . . . . .  .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
HELD ON FEBRUARY 2, 2006

APPEARANCES:

For the plaintiffs: David S. Nalven, Esquire, Hagens, Berman, Sobol, Shapiro, LLP, One Main Street, Cambridge, MA  02142.

For Shering-Plough: Eric Christofferson, Esquire, Ropes and Gray, LLP, One International Place, Boston, MA  02110, (617) 951-7751.

For Johnson & Johnson:  Adel Mangi, Esquire, Patterson, Belknap, Webb & Tyler, LLP, 1133 Avenue of the Americas, New York, NY 10036-6710.

For Astrazeneca Pharm.:  Nicholas Theodorou, Esquire, Foley Hoag LLP, 155 Seaport Boulevard, Seaport World Trade Center West, Boston, MA  02210, (617) 832-1163.

For Dey, Inc.:  Chris Palermo, Esquire, Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY  10178, (212) 808-7800.

For Abbott Labs:  Carol Geisler, Esquire, Jones Day, 222 East 41st Street, New York, NY  10017-6702.

For Empire Blue Cross Blue Shield:  Theodore Hess-Mahan, Esquire, Shapiro Haber & Urmy, LLP, 53 State Street, Boston, MA 02108, (617) 439-3939.

For United Health Care:  Michael Prame, Esquire, Groom Law Group, 1701 Pennsylvania Avenue, N.W., Washington, DC  20006, (202) 857-0620.

For Tufts Associated Health Plan:  Anne Josephson, Esquire, Kotin, Crabtree & Strong, One Bowdoin Square, Boston, MA  02114, (617) 227-7031.

For Neighborhood Health Plan:  Susan Banning, Esquire, Hemenway & Barnes, 60 State Street, Boston, MA  02109, (617) 557-9701.

For Fallon Community Health Plan:  William Saturley, Esquire, Nelson, Kinder, Mosseau & Saturley, PC, 99 Middle Street, Manchester, NH 03101-1510, (603) 606-5005.

For Amgen:  Joseph H. Young, Esquire, Hogan & Hartson, LLP, 111 Soth Calvert Street, Ste. 1600, Baltimore, MD  21202, (410) 659-2775.

Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.

2

1                                 **I N D E X**

2   Proceedings                                                    3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1               <u>P R O C E E D I N G S</u>

2          (Court called into session)

3               THE CLERK:  The Honorable Marianne D. Bowler

4    presiding.  Today is February 2, 2006.  The case of Citizens

5    for Consume, et al v. Abbott Labs, et al, Civil Action

6    No. 01-12257 will now be heard.  Will counsel please identify

7    themselves for the record.

8               MR. NALVEN:  Your Honor, I'm David Nalven from Hagens

9    Berman in Boston representing the plaintiffs.

10              THE COURT:  Thank you.

11              MR. CHRISTOFFERSON:  Good morning, Your Honor, Eric

12   Christofferson from Ropes and Gray representing Schering-Plough

13   Warrick Pharmaceuticals Corporation.

14              THE COURT:  Thank you.

15              MR. MANGI:  Good morning, Your Honor, Adel Mangi from

16   Patterson, Belknap, Webb & Tyler for Johnson & Johnson.

17              THE COURT:  Thank you.

18              MR. THEODOROU:  Good morning, Your Honor, Nicholas

19   Theodorou representing Astrazeneca Pharmaceuticals.

20              MR. PALERMO:  Good morning, Your Honor, Chris Palermo

21   from Kelley Drye & Warren representing Dey, Inc.

22              THE COURT:  Thank you.

23              MS. GEISLER:  Good morning.  Carol Geisler from Jones

24   Day representing Abbott Laboratories.

25              THE COURT:  All right.  Counsel have received the

4

1   notice, and I've just received from Mr. Nalven the order in

2   which he would like to proceed here and--

3            MR. NALVEN:  Yes, Your Honor, I shared that by

4   telephone with all counsel previously.  I received no

5   objection.  No joinder but no objection and so I provided it to

6   the Court this morning.

7            THE COURT:  Is there any objection?

8            MR. THEODOROU:  Well, I don't really know which the

9   order is, but I assume that we're--

10           THE COURT:  Can you show Mr. Theodorou?

11           MR. THEODOROU:  Hopefully I'm first.

12           MR. MANGI:  I have a copy here.

13           THE COURT:  I could say something, Mr. Theodorou, but

14   I won't.

15           MR. NALVEN:  Your Honor, as I explained to Mr. Duffy,

16   the two matters at the bottom of the list I believe are off the

17   calendar because they've been resolved and one of those is

18   Mr. Theodorou's.

19           MR. THEODOROU:  Yes, Your Honor--

20           THE COURT:  Which--

21           MR. THEODOROU:  --1894, the motion to compel

22   production of documents from the Union of Operating Engineers.

23   Judge Saris had argument on that on Friday.  We have submitted

24   orders.  Plaintiffs have submitted their own proposed order and

25   it's before Judge Saris.

1          THE COURT:  And would you like to be excused,

2     Mr. Theodorou?

3          MR. THEODOROU:  If I may?

4          THE COURT:  You may.

5          MR. THEODOROU:  Thank you, Your Honor.

6          THE COURT:  You're welcome.

7          MR. NALVEN:  Your Honor, in addition, plaintiffs and

8     defendants yesterday evening resolved motion 1794.  That's the

9     motion to compel production of IMS data and reports by the

10    Track 1 defendants.  I reached an agreement with

11    Mr. Christofferson last night.

12         THE COURT:  All right, so the motion--

13         MR. CHRISTOFFERSON:  That's right, Your Honor.

14         THE COURT:  --should be withdrawn by agreement of

15    counsel?

16         MR. NALVEN:  Yes, ma'am.

17         MR. CHRISTOFFERSON:  Yes, Your Honor.

18         THE COURT:  Anything but ma'am.  And would you like

19    to be excused, Mr. Christofferson?

20         MR. CHRISTOFFERSON:  Respectfully, no, Your Honor, we

21    have another motion on.

22         THE COURT:  You have other matters, all right.  All

23    right, then we will proceed in the order listed by Mr. Nalven,

24    starting with docket entry no. 1682.

25         MR. HESS-MAHAN:  Good morning, Your Honor, my name is

1    Theodore Hess-Mahan from the law firm of Shapiro Haber & Urmy,

2    and I represent Empire Blue Cross Blue Shield, which is the

3    movant on the motion for protective order, 1682.

4              THE COURT:  I'll hear you.

5              MR. HESS-MAHAN:  Okay.  Thank you, Your Honor.  This

6    is a very simple, straightforward motion, Your Honor.  Just to

7    give you some background, this is not the first time that my

8    client's been subpoenaed by the defendants in this case.  They

9    were served in April of 2004 with a 26 document request and

10   request for deposition topics which over the course of several

11   months were negotiated and narrowed somewhat but resulted in

12   Empire producing close to 30,000 pages of documents and two

13   deposition witnesses for full day depositions at which they

14   testified in large part on the very areas which defendants are

15   now pressing to have additional depositions; that is on

16   physician administered drugs.  And the situation we find

17   ourselves in now since the class certification order is that we

18   are no longer really a member of the class.  As a non-party

19   here, it's a different burden.  It's whether it's unduly

20   burdensome.  I submit respectfully, Your Honor, that enough is

21   enough.  We've produced 30,000 pages of documents.  We produced

22   two witnesses for two days of depositions.  They've testified

23   at length as the reply memo and the attached deposition

24   transcripts, Exhibits D and E, show.  At this point there

25   really isn't much more that we can provide.  We've responded to

1  the document request, given them additional documents in

2  response to a subsequent subpoena.  But at this point in the

3  game, there really isn't a reason why they need to take a

4  deposition witness in advance.  It would be large and

5  duplicative discovery.  There's nothing new that they're going

6  to discover here.  They've done the discovery on Empire's use

7  or non-use of AWP and how they handled physician administered

8  drugs.  At this point, Your Honor, we'd be just asking to be

9  relieved of the burden of having to come back with additional

10  witnesses who are simply going to give the same testimony.

11            THE COURT:  I'll hear you.

12            MR. NALVEN:  Thank you, Your Honor.  Respectfully,

13  there really can be no dispute first that this discovery is

14  still relevant.  The discovery here clearly goes to the heart

15  of the case.  It's third party payers, like Empire, that the

16  plaintiffs claim were duped by the alleged AWP scheme and the

17  practices and knowledge of one of the biggest insurers in this

18  country are surely relevant to the claims and defenses in this

19  litigation.  The fact that Empire is based in New York and not

20  Massachusetts is of no moment.  Empire says that the discovery

21  is irrelevant because the classes are limited to Massachusetts,

22  but Judge Saris' class certification order, which was just

23  issued on Monday, defines the classes to include third party

24  payers who made purchases of drugs in Massachusetts.  And

25  Empire has admitted in its papers that at least it has made on

8

1    at least a few occasions payments to prescribers in

2    Massachusetts.  So they very likely are, in fact, a class

3    member.  But even if Empire's somehow not a class member--

4              THE COURT:  I mean a few occasions, what does that

5    mean in terms of raw numbers?

6              MR. NALVEN:  Your Honor, in their reply paper they

7    mention that they have some members who lived or received

8    treatment in Massachusetts.  We haven't, there's no, you know,

9    significant record on what their contacts are, but we would

10   submit that it's very likely that they have paid prescribers in

11   Massachusetts.  For example, a New York resident who needs to

12   go to Mass General to receive treatment is probably something

13   that happens quite often.  But even if somehow they're not a

14   member of this particular class, it's still very relevant.  The

15   plaintiffs expert, Dr. Hartman, relies on data that he received

16   from Blue Cross Blue Shield of Kansas City, a Missouri third

17   party payer, for some of his analysis regarding the so-called

18   Massachusetts classes.  I highly doubt that the plaintiffs in

19   this case would say that the actions and knowledge of a third

20   party payer in New York are irrelevant to the so-called

21   nationwide AWP scheme.  And Your Honor has already granted

22   discovery similar to that that's being requested.

23             With respect to the burden here, Your Honor, I think

24   that it's also not very burdensome at all.  With respect to

25   documents that were requested in the subpoena, Empire has

1  already produced those documents, so all we're talking about

2  is a single 30(b)(6) deposition.

3          THE COURT:  It can be done in one day?

4          MR. NALVEN:  I believe so.  They have already

5  identified two people to speak to the narrow focused topics

6  that we've negotiated.  It's not a very large, you know, it's

7  not a very expansive set of topics that we've asked for and,

8  you know, it seems to us that it could be done very quickly

9  depending on the schedules of course of the witnesses.  We are

10  willing to travel to them.  They don't have to travel anywhere,

11  and the discovery, I just want to add, Your Honor, the

12  discovery that Mr. Hess-Mahan referred to regarding what was

13  done earlier was simply not on the specific topics that we've

14  identified here.  They're very narrow, focused topics and the

15  witnesses before were not knowledgeable about these particular

16  specific narrowed topics.  And so we just don't see that Empire

17  has identified that there's a significant burden here and, you

18  know, we just want to ask them some narrow focused questions

19  about documents they've already produced.  It doesn't seem to

20  us that it's going to be a long or a taxing deposition.

21          MR. HESS-MAHAN:  May I just briefly be heard?  As to

22  the number of subscribers that we have that are treated in

23  Massachusetts these are purely incidental.  These are folks who

24  lived in New York, moved to Massachusetts.  There maybe some

25  who in fact got treatment in Massachusetts but because of the

1   geographic territory we're talking about, which is lower state

2   New York, we're not talking about a whole lot of people.  It's

3   going to be a very, very few.  And there certainly wasn't any

4   sort of, you know, there wasn't no intention to cover people

5   who are now within the class of patients who are covered.

6           With respect to testimony that was already given, I

7   just direct the Court's attention to page three of the reply

8   memo and the citations there to the record.  There has already

9   been, and again the subpoena here is specifically on oncology

10  drugs.  That's exactly what the two witnesses who have already

11  testified in full day depositions have testified regarding.

12  They gave the knowledge that was available to the company

13  Empire at the time, and all we'd really be doing is rehashing

14  what's already been discussed and basically, you know,

15  authenticating documents, which again, the burden compared to –

16  and we're perfectly willing to authenticate those documents.

17  There's no dispute from us.

18          THE COURT:  Well, it doesn't seem to me that's it's

19  overly burdensome.  I'll limit it to one day.  The two people

20  have been identified.  They're willing to travel to you.  I

21  don't think that's unreasonable.

22          MR. NALVEN:  Thank you, Your Honor.

23          THE COURT:  All right.  So the motion to quash is

24  denied but the deposition is limited to one day.

25          MR. HESS-MAHAN:  Thank you.

1        THE COURT:  All right, moving on to docket entry

2   number 1770.

3        MR. MANGI:  Thank you, Your Honor, Adel Mangi from

4   Patterson and Belknap on behalf of defendants.  The subpoena at

5   issue here, Your Honor, was issued on April 9, 2004.  United,

6   the recipient of the subpoena, is a particularly critical part

7   of defendants industry sample because of their status as a

8   major national insurer.  That subpoena was issued almost two

9   years ago now, but to date United has made only a limited

10   production of documents.  It's produced some documents from a

11   prior litigation production and it's produced some contracts.

12   United has refused to produce documents responsive to

13   defendants narrowed production demands and United has refused

14   to produce any witnesses for deposition.  The only arguments

15   that United has put forward to excuse their non-compliance with

16   the subpoena are arguments that Your Honor has previously ruled

17   on, not in reference to one or two health plans but in relation

18   to 10 health plans now.

19        Most recently in November of 2005 Your Honor heard a

20   motion to compel against six Blue Cross Blue Shield plans and

21   the arguments there were identical to the issues raised here.

22   The documents sought were identical to the documents sought

23   here and the deposition focus are slightly narrower for United.

24   Previously in January of `05 Your Honor ordered discovery to

25   proceed against Health Net which was substantially broader then

1   the discovery sought here because that also encompassed self

2   administered drugs whereas the focus is now purely on physician

3   administered drugs.  And of course there were previous motions,

4   in November of `04 against Aetna, Cigna, Humana and Judge Saris

5   also ordered discovery to proceed against health plans in April

6   of 2004.

7           In sum, Your Honor, what we have here is a situation

8   where for almost two years United has engaged in every possible

9   effort to delay and stall this discovery and is now seeking to

10  be rewarded for that by being excused from production.

11  Defendants ask that United be held in the same standard as all

12  the other health plans that have been subpoenaed in this

13  litigation, ordered to make a good faith production to the same

14  narrow demands we've addressed to other health plans.  As to

15  the substance of the request, we've previously argued those

16  before Your Honor so I won't take the Court's time with them

17  again, but I'm available to respond to any specific points my

18  learned friend Mr. Prame may raise for United.

19          THE COURT:  All right.  I'll hear you.

20          MR. PRAME:  Thank you, Your Honor, Michael Prame from

21  Groom Law Group in Washington on behalf of United Health Care.

22  United submits there are four reasons why the Court should deny

23  the motion to compel.  I believe my colleague underestimates or

24  understates United's efforts to comply with the subpoena.  They

25  have not been recalcitrant.  In 2004 United spent over 250

13

1   staff hours identifying, collecting and producing over 25,000

2   pages of material pursuant to the request that the defendants

3   were making at that time.  The second reason why the motion

4   should be denied, the additional discovery that the defendants

5   are now seeking United submits would be unduly burdensome in

6   that it would take thousands of hours over a six month period

7   to respond to those requests to the extent, at least in

8   particular one item it may not even be possible to do that.

9   The discovery sought also as been discussed earlier has not be

10  tailored to the classes that have been certified by the Court.

11  Third, United submits the defendants have already obtained the

12  sample that the Court authorized them to get.  They have taken

13  the depositions and obtained discovery from over 50% of the

14  insured lives in the United States and health plans and

15  insurers covering more than 50% of the classes that were

16  certified by the Court.  And fourth, the motion to compel is

17  not timely.

18          To focus a little bit upon what happened in 2004,

19  United did receive the subpoena in April of 2004.  They filed

20  their objections and immediately turned around and started

21  discussing with counsel what it was that defendants were

22  seeking from them.  That was a three-month process, Your Honor.

23  In August of 2004 there was an agreement reached as to what we

24  produce for documents.  United turned around those documents,

25  spent 250 hours over the next two months gathering,

1    identifying, collecting those documents from sites nationwide.

2    Many of these documents were archived off site.  They pulled

3    those back.  Others were in computer archives, pulled those

4    back.  United completed its document production in November of

5    2004.  As I said, all tolled it was 250 staff hours, 25,000

6    pages of material and outside legal fees in connection with

7    negotiating the scope of the subpoena, reviewing documents for

8    production hit the six figure mark.  United completes its

9    production in November of 2004.  It's not until nearly June of

10   2005 defendants come back and say we'd really like more, May

11   27th.  We negotiated with them again for another month and a

12   half.  And after that month and a half United simply said it's

13   too burdensome.  Now let me speak to that burden.  One of the

14   things that they request is for United to produce its fee

15   schedules for the period 1997 to 2003.  There are

16   70,000 fee schedules for that period.  Those fee schedules in

17   United's computer--

18           THE COURT:  Isn't this available though in electronic

19   format?

20           MR. PRAME:  Comprised of billions of rows of computer

21   code.  United can't even say that they have the system band

22   with to download that type of information.  To the extent that

23   they do, they estimate it's going to take 20 employees full

24   time for four months to download that, to get that information.

25   We had offered during the negotiation to do a representative

1    sample of fee schedules and it was rejected.

2            THE COURT:  Why isn't that a reasonable place to

3    start?

4            MR. MANGI:  Your Honor, on the specific issue of fee

5    schedules defendants have had some experience dealing with fee

6    schedule productions from health plans to date.  Your Honor has

7    ordered that production many times and we've received it from a

8    number of health plans.  In no case to date has the production

9    of fee schedules proved a burden because as Your Honor

10   indicated it's a simple electronic download.  They're not even

11   field issues as there can sometimes be with claims data.  Now

12   insofar as there are unique issues pertaining to United's fee

13   schedule production we have asked for a specific identification

14   of what the problems are so that we can work with United to

15   find a reasonable solution.  We have received no technical

16   specifications as to where this problem is coming up that makes

17   United unique.  We would submit that if United's obligation to

18   produce documents in response to the subpoena is made clear we

19   are then willing to work with United.  If it's a simple

20   technical roadblock that we can resolve we're willing to do

21   that.  If it cannot and we need to sample fee schedules then

22   we'll do that.

23           THE COURT:  Well, I think you have to at least share

24   with your brother the source of the technical problem.  If it's

25   been feasible for everyone else, I don't know why it's such a

1  problem.

2          MR. PRAME:  Yeah, I mean, we outlined in our papers,

3  Your Honor.  We've discussed with them the issue.  Even--

4          THE COURT:  Well, your brother's just telling me that

5  he doesn't know.

6          MR. PRAME:  With all do respect, Your Honor, we have

7  been dealing with a separate attorney at that law firm until

8  August of this year.  We had these discussions with her.

9  Mr. Mangi, we've had more recent discussions with in September.

10  We started over from square one with Mr. Mangi in September.

11  We had told them--

12          THE COURT:  Well, apparently he is not satisfied with

13  your explanation in terms of the technical problems that make

14  your company unique from all the others.

15          MR. PRAME:  And we would be happy to continue that

16  discussion.  We've outlined in our paper that it's billions of

17  lines of computer code.  Even in the letter that we sent

18  proposing the sample, we said we'll give you 10 contracts from

19  Massachusetts for each year, 10 fee schedules and for those fee

20  schedules you identify the drugs that you want and we'll go

21  back and get them.

22          THE COURT:  And how many fee schedules are there on

23  average per year?  I mean, I'd like to know what the – if you

24  say 10 what portion of the sample that is?

25          MR. PRAME:  Yeah, a couple of concepts, Your Honor.

1    The fee schedule just doesn't focus on drugs.  The fee

2    schedule with providers is every type of fee for service that

3    they provide.

4              THE COURT:  Sure, I realize that.

5              MR. PRAME:  The drug, as I understand it, the drug

6    components of those fee schedules get updated twice a year.

7              THE COURT:  But you didn't answer my question.  If

8    you say we're willing to provide 10, well if 10 of 50, that's

9    significant, but if it's 10 of 200 it's perhaps not as

10   significant.  So I'm trying to get a sense of what it is--

11             MR. PRAME:  Yeah.

12             THE COURT:  --you're willing to offer.

13             MR. PRAME:  Yeah.  We had, as I said there are

14   70,000--

15             THE COURT:  Do you know the answer to my question?

16             MR. PRAME:  There are 70,000 fee schedules, Your

17   Honor from the--

18             THE COURT:  For the time periods?

19             MR. PRAME:  --`97 to 2003.  We had--

20             THE COURT:  70,000 and you telling me you would

21   provide 10?

22             MR. PRAME:  No, we would provide 70, we've done 10

23   for each year for the Boston area, and what that was being

24   projected was 80 hours worth of work over two to three week

25   period to do that.

18

1          THE COURT:  Well, I think 70 out of 70,000 is

2    probably not statistically significant.  Mr. Mangi?

3          MR. MANGI:  Thank you, Your Honor.  If I may address

4    the specific issue of fee schedules and then I'll address the

5    other issues if Your Honor pleases.  It sounds to me, first of

6    all in relation to communications United has had with Collins

7    at Patterson Belknap, I've reviewed all those files and all the

8    logs of phone conversations and was involved in some.  It

9    appears to me that the source of United's problem insofar has

10   be able to--

11         THE COURT:  You can be seated while your brother

12   argues.

13         MR. PRAME:  Thank you.

14         MR. MANGI:  --insofar as I've been able to ascertain

15   to date pertains to fees for physician services that have no

16   relation to drug administration.  We're not interested in those

17   fees.  We've made that clear to United as to other plans.

18   We're interested in the fee schedules pertaining to drugs and

19   in the fee schedules pertaining to services incident to drug

20   administration.  There are a number of relatively simple ways

21   to pull the services incident to drug administration.  In some

22   claim systems they can be pulled by reference to the same

23   overarching claims number that pertain to drugs.  In others we

24   have and can provide again a list of administration specific

25   codes.  To put this in context, Your Honor, the fee schedule

1 production to date no third party health plan has even asked

2 for any cost from fee schedule production to be reimbursed

3 because they've proved nominal.  And again, I would submit that

4 once the obligation to United to produce is made clear any

5 issues can be resolved expeditiously.

6          If I may respond briefly to a couple of other points

7 that my learned friend made.  In relation to productions to

8 date and the issue of burden, the mere volume of pages that

9 have been produced says nothing as to the nature of the

10 documents that have been produced.  To put that issue in

11 context, United has not produced any documents reflecting its

12 knowledge of critical issues such as margin, the existence of

13 margin, expectation of margin, which is at the core of

14 plaintiffs' case.  In relation to the burden of producing those

15 additional documents we suspect it's nominal.  In fact in a

16 letter from July United told us that they had already

17 identified the documents that they needed to produce as to

18 margin.  They just haven't produced them.

19          As to the issue of our not having focused purely on

20 United's Massachusetts operations, well again, that's a simple

21 point.  There is no claim in this case that there was a

22 Massachusetts specific fraud.  The claim is of a nationwide

23 fraud.  It so happens that the class that's been certified in

24 this context is Massachusetts specific, but proving or

25 disproving it and plaintiffs' theories is a consequence of the

1   knowledge of the industry as a whole.  So United's knowledge

2   on these issues is absolutely critical.

3        And finally in terms of the fact that we subpoenaed

4   other plans in addition to United is the identical argument

5   made by the group of Blues plans saying, well, others have

6   produced so we shouldn't have to.  Well, Your Honor, this is a

7   bit of chicken and egg.  You'll recall the Blues plan said,

8   well, United has been subpoenaed so we shouldn't have to

9   produce and here we see United making the same argument.

10  They're all critical parts of the same industry sample.  Some

11  are major players.  Some are smaller players.  United's

12  subpoena's been outstanding for some two years now and we

13  submit they should be ordered to produce.

14        MR. PRAME:  May I be heard, Your Honor?

15        THE COURT:  You may.

16        MR. PRAME:  A couple of additional points, and I want

17  to make sure that it's clear, we were not posing to produce our

18  entire fee schedule.  What I was talking about was producing

19  the schedules as they related to drugs and those numbers that I

20  was referencing was specifically related to the drug issue.  I

21  think the inference that we have been withholding documents is

22  misleading.  We have produced every single document that they

23  requested back and we negotiated back in 2004, every single

24  one.  They came back in June 2005 and said, notwithstanding

25  that we want more.  So we have produced everything that had

1  been agreed to, but our objection on burden is not limited to

2  the fee schedules.  We have the same issue for claims data.

3  For claims data we've told them on multiple occasions, we've

4  written them series of letters of how many hours it's going to

5  take and how long it's going to take.  The current request is

6  estimated 450 hours over a three to six month period to produce

7  data for Arizona and Massachusetts for 1997 to 2003.

8          THE COURT:  Well, I'm going to grant the motion, and

9  I suggest that you sit down and see if there is some way that

10  by providing them some technical information they may be able

11  to expedite the process for you.  Agreeable?

12          MR. MANGI:  Thank you, Your Honor.

13          THE COURT:  All right.

14          MR. PRAME:  With all do respect, Your Honor, I assume

15  that the points that we have made in our briefs would be within

16  the record and the reasons why you're denying the motion would

17  include those arguments that we have made on other points.

18          THE COURT:  So noted.

19          MR. PRAME:  Thank you, Your Honor.

20          THE COURT:  All right, moving on.  Docket entry

21  number 1907.

22          MR. NALVEN:  Your Honor, before you you have six

23  motions, the following six motions listed on the argument list

24  that I provided to the Court this morning.  All of these six

25  motions deal with subpoenas that were sent to four--

22

1         THE COURT:  Right.

2         MR. NALVEN:  --Massachusetts's third party payers,

3  Tufts, Neighborhood Health Plan, Fallon and Harvard Pilgrim

4  Community Health Plan.  Because all of these, because the

5  protective order motions and the motions to quash address the

6  same subpoenas I would recommend to the Court that the Court

7  consider all of these motions together.  I can address on

8  behalf of plaintiffs the arguments for plaintiffs' protective

9  order motion.  I would recommend to the Court that the Court

10  include in this global argument the arguments of third party

11  payer counsel who are here today and are prepared to step up--

12         THE COURT:  All right.

13         MR. NALVEN:  --and perhaps it would be useful for you

14  to have before you all counsel at one time.

15         THE COURT:  I agree.

16  (Pause)

17         UNIDENTIFIED:  Would the Court like counsel for the

18  third party payers to identify themselves?

19         THE COURT:  I certainly would.

20         MS. JOSEPHSON:  Good morning, Your Honor, I'm Anne

21  Josephson from Kotin, Crabtree & Strong.  I represent Tufts

22  Associated Health Plan.

23         THE COURT:  Thank you.

24         MS. JOSEPHSON:  Thank you.

25         MS. BANNING:  Good morning, Your Honor, my name is

1    Susan Banning from Hemenway & Barnes.  I represent

2    Neighborhood Health Plan.

3            THE COURT:  Thank you.

4            MR. SATURLEY:  Good morning, Your Honor, William

5    Saturley from Nelson, Kinder, Mosseau & Saturley.  And in this

6    matter I speak for Fallon Community Health Plan.

7            THE COURT:  Thank you very much.

8            MR. SATURLEY:  Thank you.

9            MR. NALVEN:  Your Honor, now on behalf of plaintiffs

10   I will address together, because the arguments are almost

11   identical, motions 1907 and 1909.  1907 is directed to the

12   subpoenas issued to Tufts and Neighborhood Health Plan, and

13   1909 is directed to the subpoenas issued to Fallon and Harvard

14   Pilgrim.  The issue of discovery of non-parties, that is absent

15   class members, is an issue that the Court has dealt with on

16   several occasions before.  What's critical to understand is

17   that when the issue was first raised with Judge Saris, Judge

18   Saris understood and expressly acknowledged that discovery of

19   absent class members was generally frowned upon absent a

20   showing of a specific need.  The defendants argued to Judge

21   Saris and have argued to you repeatedly that the reason that

22   they needed discovery of absent class members is because they

23   had constructed a representative sample of third party payers

24   from around the country and that they needed the specific third

25   party payers whom they had subpoenaed and they took the

1   depositions of over 40 third party payers - they're seeking as

2   well - the two that you previously saw on the basis that they

3   had constructed this representative sample.  They argued and

4   we've set forth in our papers on four or five occasions when

5   they represented to Judge Saris and to you that the reason that

6   they needed the specific discovery of an identified health plan

7   provider was because it was a key part of that representative

8   sample.

9          Defendants have already taken over 40 health plans

10  covering over 50% of the covered lives in the United States.

11  It really begs the question at this point now that they have

12  obtained all of the health plans discovery that constituted

13  their representative sample why are they back here now seeking

14  further discovery of four Massachusetts health plans?  Did the

15  defendants have a representative sample in the first place as

16  they have represented to the Court, and if they did, why is it

17  that at this point they require more?  The defendants respond

18  to that argument which is set forth in our papers by saying in

19  essence the world has changed since they constructed their

20  representative sample.  What they say to the Court is Judge

21  Saris has certified two specific Massachusetts only classes and

22  so that as a result now they need to drill down into

23  Massachusetts third party payers.  You did hear from Mr. Mangi

24  just one moment ago that the proof with respect to the

25  Massachusetts class will be demonstrated by the knowledge of

1    the industry as a whole which is the reason that they continue

2    to pursue discovery of third party payers nationally.  So that

3    again begs the question why select four more Massachusetts

4    third party payers?  Let me note, Your Honor, that they have

5    already taken two depositions, I'm sorry, three depositions of

6    Blue Cross Blue Shield of Massachusetts which were granted by

7    Your Honor in November.  And they have also already taken

8    discovery and four depositions from Harvard Pilgrim Community

9    Health Plan.  These two Health Plans together compromise more

10   than 50% of the covered lives in Massachusetts.  Your Honor, I

11   work here in Massachusetts, you work here in Massachusetts.

12   They have discovery from Blue Cross Blue Shield of

13   Massachusetts, Harvard Pilgrim.  They are now seeking discovery

14   from Tufts, Fallon, Neighborhood Health and more discovery from

15   Harvard Pilgrim.  Are you aware of any health plan providers

16   other than those five in Massachusetts?  This is not a

17   representative sample even of Massachusetts, even if it were

18   needed, this is every covered life in Massachusetts.  This

19   isn't a representative sample, Your Honor.  This is a census

20   that they are seeking.  You know, the Nielson Company does

21   their sample of all American television watchers with 400

22   families.  It seems to defy credulity that the defendants

23   really need discovery of virtually every covered life in

24   Massachusetts.

25            Three more very brief points, Your Honor.  Number

1   one, the discovery of third party payers has been undertaken

2   entirely through the course of this proceeding through the

3   Track 1 defendants, and it was the Track 1 defendants who had

4   represented to you that the defendants had constructed a

5   representative sample.  As Your Honor knows Track 1 discovery

6   concluded at the end of August.  So the subpoenas that were

7   sent to my brothers' and sisters' clients were sent by Track 2

8   defendants.   Track 2 defendants after all were permitted to

9   take discovery until December 3rd.  But it's clear from the

10  subpoenas and from their attachments and from the content of

11  their attachments that these subpoenas, that the Track 2

12  defendants are acting no more as agents for the Track 1

13  defendants in this discovery effort and it's utterly a

14  subterfuge to permit the Track 1 defendants to extend their

15  discovery campaign against absent class members.  What is the

16  proof of that?  The attachment to the subpoena is virtually

17  identical to the attachments to the subpoenas sent by the Track

18  1 defendants.  What is the other proof of that?  There are a

19  list of drugs that the companies want information concerning on

20  those subpoenas.  Among those lists are 147 drugs that were

21  manufactured by the Track 1 defendants.  They, one of the

22  manufacturers sending the subpoenas, had submitted, the

23  subpoena that they had submitted had only five day drugs on it

24  but 147 Track 1 drugs.

25          And again, Your Honor, two more very small points.

1   Number one, as Your Honor knows there is a CMO in place in

2   this case which requires 21 days notice.  The subpoenas that

3   were sent to Fallon and to Harvard Community Health Plan were

4   sent on I think something like 11 and nine days notice

5   respectfully, respectively.  Why is that?  Well because they

6   were sent too close to the December 3rd Track 2 cutoff in order

7   to provide sufficient notice.  On that ground alone they should

8   be stricken.  I want to add as well one small point.  In one of

9   Dey's responses it indicates that while my brothers' and

10  sisters' clients before you today are not cooperating with the

11  subpoena that Harvard Pilgrim Community Health Plan is

12  complying with the subpoena and subsequent to Dey's submission

13  of that representation Harvard Community did submit to the

14  parties, and I provided it to the Court yesterday an extensive

15  objection submitted by Harvard Pilgrim.  So on those grounds,

16  Your Honor, plaintiffs submit that these subpoenas should be

17  quashed, that the protective order should be granted and that

18  no further discovery is needed or should be allowed against the

19  health plans in Massachusetts.

20          THE COURT:  All right.  Responding?

21          MR. PALERMO:  Good morning, Your Honor, Chris Palermo

22  on behalf of Dey.  Your Honor, as counsel for plaintiffs has

23  acknowledged, the issue of discovery against the absent class

24  members has already been considered by the Court and the Court

25  has already permitted on two occasions absent class member

1   discovery.   The issue is relevance--

2           THE COURT:   The issue is why were they so late?

3           MR. PALERMO:   In terms of--

4           THE COURT:   The 21 days?

5           MR. PALERMO:   Well, Your Honor, I believe CMO 10

6   permits, and I think it's CMO 10, permits notice to third party

7   payers on seven days notice, Your Honor, and I believe that

8   that's--

9           THE COURT:   What's your position on that?

10          MR. NALVEN:   Your Honor, that's flatly incorrect.

11  We've attached the CMO to our papers and we've explained why

12  that argument is incorrect.

13          THE COURT:   Point it out to me then.

14          MR. PALERMO:   Your Honor, I'll have to look in our

15  papers.   It was in our opposition to the plaintiffs' motion.

16          THE COURT:   Well, do you have it in front of you?

17          MR. PALERMO:   I'll have to get it, Your Honor.   Just

18  one moment.

19  (Pause)

20          MR. PALERMO:   I apologize, Your Honor.

21  (Pause)

22          THE COURT:   Do you have it, Mr. Nalven, where you

23  could--

24          MR. PALERMO:   Your Honor, it's Exhibits G and H to

25  the proposition to the plaintiffs' motion, Your Honor.

1      THE COURT:  Let's see if I can pull it up

2  electronically.

3  (Pause)

4      MR. PALERMO:  Your Honor, on and I'm sorry, Your

5  Honor, at September 27, 2004 Exhibit F and, Your Honor, the

6  Court had ruled that defendants could notice third party payer

7  depositions on seven days notice provided that the defendants

8  did not notice more than 10 depositions in any one week.

9      MR. NALVEN:  Your Honor, Your Honor, I'm sorry,

10  you're looking at me so I assume you would like me to respond.

11  Your Honor, there was a hearing as counsel notes on September

12  27, 2004.  That hearing involved third party subpoenas that

13  were noticed on more than 21 days notice.  The issue before the

14  Court was whether having noticed those subpoenas because of

15  scheduling changes among the third parties whether those

16  depositions could proceed on less than 21 days notice having

17  been previously noticed properly.

18      THE COURT:  The date of that again was September--

19      MR. NALVEN:  September 27, 2004.  But, Your Honor,

20  respectfully, you did not modify nor do I believe you intended

21  to modify Judge Saris' CMO 10 with your September 27th order.

22  What you said simply was with respect to properly noticed

23  subpoenas if there's a result of scheduling issues with the

24  non-parties the deposition needed to proceed on less than 21

25  days notice, having been properly noticed that it could proceed

1    on seven days notice.  In fact, Your Honor, as I mentioned,

2    this is the second time that Harvard Pilgrim Community Health

3    has been subpoenaed in this proceeding, and I'll just note for

4    you, Your Honor, that the first time the defendants noticed the

5    deposition of Harvard Pilgrim they noticed it on exactly 21

6    days notice.  It's only with respect to these last two

7    depositions, which bumped up against the December 3rd deadline

8    that the 21 day notice violated.

9              THE COURT:  Well that's what's most bothersome to me,

10   you know, I mean--

11             MR. PALERMO:  Well, Your Honor, on that front I would

12   note that the plaintiffs noticed the IMS request one day before

13   the close of discovery, Your Honor.  That would not be

14   sufficient notice under the 21 day rule.

15             THE COURT:  Well tit for tat is not the approach

16   here.

17             MR. PALERMO:  And, and clearly given the delay till

18   now, Your Honor, in February the issue of the timing of the

19   notice, they've had ample notice and time now, Your Honor, to

20   address it.

21             MR. NALVEN:  I only note, Your Honor, with respect to

22   the IMS request that was a document request not a deposition

23   notice not subject to CMO 10.  That matter also has been

24   resolved.

25             THE COURT:  All right.  I'll take it under

1    advisement.  I'll take a break and then I'll give you a

2    ruling.

3         MR. PALERMO:  Your Honor, would you like me to

4    address the other issues that--

5         THE COURT:  Sure.

6         MR. PALERMO:  --plaintiffs' counsel raised?

7         THE COURT:  Go through it all and then I'll take a

8    break and come back and give you a ruling.

9         MR. PALERMO:  Well, Your Honor, there's clearly a

10   need for the discovery.  It's relevant to the Massachusetts

11   Class three that the Court had certified and is clearly, it

12   goes to the heart of those allegations.  Plaintiffs' counsel

13   had referenced the discovery against Blue Cross Blue Shield.

14   That is one, Blue Cross Blue Shield of Massachusetts, Your

15   Honor, that's one plan.  Your Honor, we submit that one plan

16   alone is insufficient in terms of demonstrating industry

17   knowledge and the methodologies that are used by the plans.

18   Dey needs and the Track 2 defendants need discovery on industry

19   knowledge relating to the third party payers' understandings

20   and expectations and how they went about reimbursing.  In terms

21   of the scope of the subpoena, there are issues relating to

22   cross subsidization between the brand and generic drugs.  With

23   respect to the issue of Dey being a Track 2 defendant, Your

24   Honor, Track 2 defendants are entitled to take discovery and to

25   pursue discovery and Dey did so recognizing how the Court had

1    ruled in its class certification decision with respect to

2    certifying the Massachusetts class.  That's the focus of that

3    discovery and it's clearly relevant to that discovery.

4              MR. NALVEN:  Your Honor, I did not address the issues

5    of burden to the Massachusetts third party payers because

6    counsel for those third party payers are here today and I know

7    that they would like--

8              THE COURT:  Uh-huh.

9              MR. NALVEN:  --to be heard with respect to burden.

10             THE COURT:  I'll hear you.

11             MS. BANNING:  I'm at the end, Your Honor, Susan

12   Banning for Neighborhood Health Plan.  With respect to

13   Neighborhood Health Plan that is our argument really, burden,

14   whether it is analyzed under an absent class member under Rule

15   45.  In our view Dey has not made any showing that they need

16   discovery from this particular health plan or that the need

17   outweighs the significant burden.

18             THE COURT:  How many subscribers do you have?

19             MS. BANNING:  We have approximately 125,000 members,

20   Your Honor, and approximately 300 employees.  What NHP does, it

21   was founded to serve, bring managed care to underserved

22   populations.  Today approximately 80% of its members are on

23   Medicaid and what NHP does is it contracts with Mass Health.

24   It's a Mass Health managed care organization to provide that

25   care.  NHP does not have any in-house counsel.  It has on staff

33

1  a grand total of two pharmacists, one of which has already

2  spent significant time going through these requests and trying

3  to analyze what would be needed.  NHP certainly is not a major

4  national insurer or anything like the things that other people

5  have been talking about.

6        What we did try to do, Your Honor, and even that took

7  a significant amount of time, and I heard a lot about timing

8  and obviously when I got this subpoena I did not know of all

9  these various orders, but just with respect to NHP, Your Honor,

10 contrary to what Dey says, the subpoena to NHP, the original

11 subpoena, was served on November 14th.  The documents were due

12 on November 23rd.  The deposition was scheduled for December 2nd.

13 I sent three separate pieces of correspondence to Dey including

14 objections, did not get a response, and that was when we filed

15 the motion for a protective order.  They never would even tell

16 me that they were taken the deposition off for December 2nd.

17 They did not tell me plaintiffs had filed a motion.  I had to

18 get that information by calling around to other people.

19       After all this happened, Your Honor, Dey sent what

20 they called a reduced list of drugs and a reduced list of

21 requests.  And we did nonetheless try to respond to that

22 despite all of these different motions that are outstanding.

23 And in document number 2089, Your Honor, and the attachment 1

24 to that, it's our motion to file a supplemental affidavit of

25 Pamela Siren.  And what we try to do in that in the event Your

1   Honor does order discovery is in paragraph 10 NHP explains

2   what they could produce from the reduced list tabbing it to

3   their different request, and in paragraph 10 of that affidavit

4   it lists things like physician fee schedules, contracts with

5   current and former PBM's et cetera.  But what NHP also does is

6   try to explain why with respect to their size and their

7   resources in both this affidavit and the other affidavit of

8   Ms. Siren, this would be an incredible burden and those

9   arguments, Your Honor, range from everything that we cannot

10  access our information by J codes.  And the best way to see the

11  dramatic difference is between this J code list of many drugs

12  and the way NHP accesses its drugs is to look at Judge Saris'

13  list of drugs and the recent order.  That is how they foresee

14  then can access drugs.  They go onto explain why things like

15  trying to retrieve every piece of correspondence with

16  providers, every contract out there which there are over 5,000

17  on site, the rest stored, is for this size organization an

18  incredible burden and so, again, even with the reduced list we

19  did try to say what we could produce with the original list.

20  We filed a variety of objections.

21              THE COURT:  Now you're non-profit?

22              MS. BANNING:  Yes, Your Honor, we are.

23              THE COURT:  All right.

24              MR. PALERMO:  Your Honor, I'm sorry, would you like

25  me to address the burden issues with respect to each--

1    THE COURT:  Well one each time if it's easier for

2  you to keep track of the argument.  Go ahead.

3    MR. PALERMO:  Thank you, Your Honor.  Your Honor,

4  with respect to the issue of the communications with Dey upon

5  receipt of the subpoena that's addressed in our papers, Your

6  Honor, their communications were misaddressed to a lawyer.  It

7  should have been addressed to one lawyer, Kelley Drye, and they

8  got the person's name wrong, so we were unaware of that

9  communication till a subsequent communication with my associate

10  Ms. Trewick and as soon as we became aware of that we

11  communicated with them.  We've expressed our willingness to try

12  and work with them to narrow the scope.  We continue to be

13  willing to try and address issues relating to burden but they

14  are--

15    THE COURT:  What's the significance of such a small

16  plan?

17    MR. PALERMO:  Well, Your Honor, we're trying, the

18  allegations in the complaint are so broad that we want to get a

19  cross section of plans.  Blue Cross Blue Shield obviously is a

20  very large plan, Your Honor.  Tufts and Harvard Pilgrim are

21  smaller plans and Neighborhood and Fallon are smaller scope

22  plans so what we've tried to do is get a range of plans, Your

23  Honor, and we think that the four subpoenas are not excessive

24  and that it's important for us to be able to have discovery

25  relating to, again, a cross section of those plans.

1          THE COURT:  Ms. Josephson?

2          MS. JOSEPHSON:  Thank you.  Your Honor, Tufts

3   associated Health Plan is the operational arm of a number of

4   related Massachusetts related third party payers that I'll just

5   refer to as Tufts Health Plan.  It's the third largest--

6          THE COURT:  Covering how many people?

7          MS. JOSEPHSON:  It covers just over 600,000 members,

8   and this makes Tufts Health Plan comparable in size as counsel

9   for Dey has just said to Harvard Pilgrim whose enrollment is

10  somewhere between 700 and 800,000 members.  In fact, Dey Inc.

11  concedes in its opposition papers to the plaintiffs' motion for

12  protective order that it actually chose to direct the subpoena

13  to Tufts Health Plan precisely because it was comparable in

14  size to Harvard Pilgrim.  But the defendants have already

15  obtained discovery from Harvard Pilgrim from this comparable

16  health plan.  So in seeking discovery from Tufts Health Plan

17  Dey Inc. is going beyond a representative sample here and it's

18  seeking discovery of the only two health plans in this

19  particular size bracket, Harvard Pilgrim and Tufts.

20          There's no dispute and Dey seems to concede that it

21  is entitled to discovery from absent class members such as

22  Tufts Health Plan really only on a showing of need and it has

23  to meet several criteria including two that I wanted to talk

24  about.  First, upon a showing that the discovery is not unduly

25  burdensome.  And second, that the information is not available

1  from the representative parties.  Now, the central

2  justification for issuing these subpoenas to all of these

3  Massachusetts health plans in the first place, and you'll see

4  it in the memos in opposition, was that at the time the

5  subpoenas were issued there were actually no Massachusetts

6  health plans that were parties to this case, and that was true

7  at that time.  But everything has changed because this past

8  Monday on January 30th when Judge Saris issued the consolidated

9  order she certified Blue Cross Blue Shield of Massachusetts as

10  a representative party of Massachusetts third party payers.

11  So that problem that the defendants had that justified these

12  subpoenas is solved.  There is no more need to take this broad

13  sample now that you have a clearly certified representative of

14  this class of third party payers that's an actual party to the

15  case.  The question at this point is why and how badly do the

16  defendants need discovery from Tufts Health Plan?  What could

17  Tufts Health Plan actually offer here that's not cumulative or

18  duplicative where there is now a representative Massachusetts

19  health plan who's a plaintiff in this case and where the

20  defendants already have discovery from a health plan that it

21  concedes is actually comparable in size to Tufts Health Plan.

22  Between discovery from Blue Cross Blue Shield and Harvard, the

23  defendants already have information that covers more than 50%,

24  I have no idea of the percentage, but close to 3,000,000

25  covered lives in Massachusetts, there is no need to seek

1  discovery from Tufts Health Plan.

2          There also can be no material dispute, there's been

3  no dispute to the information we've provided by affidavit and

4  supplemental affidavit about the enormous time, expense, cost,

5  opportunity cost in terms of diverting attention from vital and

6  time sensitive business that Tufts Health Plan staff needs to

7  attend to that would be required in responding to this

8  subpoena.  To comply just with Dey's narrowed request, the 12

9  document categories that it sent as a compromise proposal, to

10  comply just with that we would estimate would require 1,500

11  hours of time, nine months of a full-time equivalence time just

12  to retrieve and organize the information for production, and

13  the cost of this labor alone comes to just short of $80,000.

14  After retrieval of this information, it would then have to be

15  reviewed for responsiveness, confidentiality designations and

16  assertions of privilege.

17          And there's one other thing that I can't

18  overemphasize, the addition of Blue Cross Blue Shield as a

19  party to this case adds another even more critical and to Tufts

20  Health Plan disturbing cost to production in this case.  Blue

21  Cross Blue Shield of Massachusetts is Tufts Health Plan's

22  largest competitor in a brutally competitive and small market.

23  Dey has not asked only for fee schedules pertaining to drug

24  reimbursement but for provider contracts that show exactly what

25  Tufts Health Plan pays its doctors, the very same doctors that

1   Blue Cross Blue Shield of Massachusetts negotiates with when

2   all of these health insurers who are competitors set

3   reimbursement rates, again, not just for drug prices but for

4   the services that are rendered.  There's absolutely no reason

5   why simply because Tufts meets certain criteria of class

6   membership in this case that it must deliver up to its largest

7   competitor its provider contracts.  That is the most sensitive,

8   competitively sensitive proprietary information that Tufts has.

9   There is no prior order or ruling in this case that would

10  require such a result.  Every time this Court or Judge Saris

11  has ordered production from absent class members or potential

12  absent class members, it satisfied itself that there is an

13  actual need for this information and that there are no undo

14  confidentiality concerns.

15         The Court has also frequently conditioned discovery

16  of absent class members upon the defendants' payments of cost

17  and expenses.  On November 2nd, for example, this Court ordered

18  the defendants to pay absent class members for the reasonable

19  cost of transportation and related expenses, attorney's fees,

20  and lost income involved in appearing for deposition.  On

21  January 27th this Court ordered Health Net to provide redacted

22  claims data to the defendants as part of its core industry

23  sample with the defendants to pay the cost of retrieval.  We

24  have offered actually to provide, before Blue Cross Blue Shield

25  became a party to this case, we have offered to provide our fee

40

1   schedules.  We have offered to provide claims data and even

2   sample provider contracts with proprietary information

3   redacted.  If the defendants would pay for that effort and if

4   the confidentiality order that is currently existing in this

5   case were tightened up in one respect and the respect that we

6   ask for is this, that the expert certification on the highly

7   confidential protective order would be tightened up to make

8   sure that the expert also certifies essentially the same thing

9   that in-house counsel certifies, that the expert that's

10  reviewing this information has no business conflict of interest

11  and that the expert is not involved in actually advising either

12  health care providers or others negotiating with health care

13  providers on reimbursement rates.  Those suggestions were

14  rejected by Dey.

15          We would also have no objection if discovery from

16  Tufts is actually ordered at all to describe in general terms

17  in a deposition how AWP actually factors into contract

18  negotiations generally as long as we're not required to

19  disclose to Blue Cross Blue Shield under any circumstances

20  directly or indirectly the precise terms of the deal that we

21  strike with our physician and physician groups.  We would

22  actually have to consider seriously opting out of this class if

23  that would protect us and prevent us from having to disclose

24  that and that's a result to be avoided because that would allow

25  the defendants actually to be using discovery as a weapon--

1          THE COURT:  Uh-huh.

2          MS. JOSEPHSON:  --and to reduce potential claimants.

3  So Dey has not agreed to this limited production or to payment

4  of anything beyond claims data retrieval costs or to enhanced

5  confidentiality protection and essentially stands by its

6  subpoena even though it's overreaching in several respects.  It

7  stands by a list of subject drugs that is far different and far

8  broader than was attached to the consolidated order that Judge

9  Saris issued on Monday.  I'm willing to settle for fees

10 schedules, claims data and sample contracts.  Dey wants all of

11 Tufts documents not only that reflect reimbursement for drugs

12 but all documents reflecting anyone's thinking about the price

13 of drugs and any communications with physicians about the price

14 of drugs or the cost of drugs over the entire 14 year period

15 that they're concerned about.  This creates an unworkable

16 burden for Tufts.  We would have to look through every document

17 we have to figure out if there is something that would

18 potentially be responsive to that request.

19          According to Judge Saris the open question in this

20 case is a simple one, is AWP relevant to health plans in

21 connection with setting reimbursement rates with physicians for

22 physician administered drugs?  Dey Inc., the defendants, do not

23 need 14 years of provider contracts, 14 years of communications

24 with physicians, 14 years of committee meetings from defendants

25 that are or from absent class members that they already have

42

1   information from comparable ones.  They just don't need this

2   information to answer that simple question.  If there is to be

3   any discovery of Tufts Health Plan at all, we have a number of

4   conditions and I'd be happy to submit them in the form of a

5   proposed order but we would really--

6              THE COURT:  Well that's the next step.  So let's--

7              MS. JOSEPSON:  Okay.  We'd ask this Court to

8   seriously consider the position that we urging here that the

9   defendants have what they need now with the representative

10  party named as a party and with the comparable discovery from

11  Harvard Pilgrim.  Thank you.

12             THE COURT:  All right, on behalf of Fallon?  Do you

13  want to respond?

14             MR. PALERMO:  However Your Honor would prefer.

15             THE COURT:  No, we'll do it one on one so go ahead.

16             MR. PALERMO:  Okay.

17             THE COURT:  I'll hear you.

18             MR. PALERMO:  Your Honor, with respect to the issues

19  relating to the confidentiality because of that information,

20  those issues were already raised and addressed by the Court in

21  the Health Net motion to compel where the Court ruled on

22  January 27th of last year ruling that the confidentiality order

23  is in place to protected third parties, Your Honor, and we

24  believe that the orders that are currently in place to provide

25  sufficient protection to third party payers including Tufts and

1   the other third party plans.

2          With respect to the issue of the burden, Your Honor,

3   again, we're looking at the complaint.  The scope of the

4   complaint is what it is, Your Honor, and the allegations in the

5   case go to the issues we've identified in our request, we've

6   narrowed the request.  We're willing to try and work with Tufts

7   and the other entities to resolve them.  And, Your Honor, I

8   think the experience with respect to the plans that it

9   previously responded to subpoenas is inconsistent with the

10  representations about the burden that Tufts identifies.  And

11  with respect to the issue of Blue Cross Blue Shield

12  Massachusetts, Your Honor, given their size in Massachusetts,

13  we think that the other subpoenas and information from the

14  other plans are necessary to get the cross section that we've

15  identified.  The different size plans, their knowledge if we

16  can demonstrate that plans that are smaller than Blue Cross

17  Blue Shield have knowledge concerning an understanding of what

18  AWP is and how they go about reimbursing, obviously I think

19  that's highly relevant to the case and not-for-profit plans

20  aren't exempt from the discovery but just because they're not

21  for profits.  Your Honor, I think consistent with the Court's

22  prior rulings we're entitled to get this discovery and with

23  respect to the burden issues, Your Honor, I think that we can

24  work with Tufts to try and resolve those issues consistent with

25  getting the discovery that's been ordered in prior instances.

1   Thank you, Your Honor.

2             THE COURT:  All right.  Do you want to reply briefly?

3             MS. JOSEPHSON:  Could I just very, very briefly.  I

4   just wanted to point out because counsel for Dey referenced the

5   action that you took on the Health Net issue, this is the

6   transcript of that hearing is attached to document 1940-1 at

7   Exhibit E, and in that hearing it was very clear that one of

8   the factors that the defendants brought forward to convince you

9   to order discovery from Health Net was that there was no

10  competitive relationship between Health Net and any of the

11  parties in the case, also, that the defendants only sought a

12  representative sample of contracts and that is sample not what

13  their position is here.  Thank you.

14            THE COURT:  All right, on behalf of Fallon?

15            MR. SATURLEY:  Thank you, Your Honor, William

16  Saturley on behalf of Fallon Community Health Plan.  Fallon has

17  171,000 members, Your Honor, and they are largely located in

18  Worcester County in the Commonwealth.  My brothers have already

19  ably dealt with whether or not there's a benefit to the

20  defendants of pursuing this subpoena issuance, and so I will

21  certainly pass over that other than I endorse the arguments

22  that have been made by Attorney Nalven.

23            We've only been involved in this, my law firm, since

24  December 22nd and so there's been an awful lot--

25            THE COURT:  You're lucky.

45

1        MR. SATURLEY:  --to try to catch up with, and I'm

2   hoping you'll let me stay lucky, Your Honor, and grant our

3   motion because from our standpoint while the subpoena that was

4   served on Fallon maybe a narrowed subpoena it's quite

5   significant.  It asks for in essence if read largely and on its

6   face, it essentially asks for every piece of paper that Fallon

7   has generated or collected in one form or other for the past 14

8   years.

9        The first document request seeks all schedules

10  disclosing the amounts reimbursed to physicians for any

11  services rendered or drugs administered.  Your Honor, the way

12  that Fallon does its business is it signs a separate contract

13  with every physician or every entity that employs physician or

14  every provider every year.  That's on average 8,000 contracts

15  per year times 14 years is approximately 110 to 120,000

16  contracts.  In order to determine and to go through the process

17  of reviewing those contracts to strike them for privilege, to

18  determine whether they were responsive at all, to worry about

19  the commercial information that my sister has addressed, would

20  require just in and of itself the equivalent of 50,000 hours

21  worth of work.  Fallon cannot meet that burden.  That's just

22  the first category of 12.

23        The second category, for instance, please give us all

24  electronic claims data, in essence is what it says.  Fallon

25  receives tens of thousands of electronic claims every day.  In

1   order to comply with a request that would entail a review of

2   millions of claims.  There is no electronic computer search

3   mechanism that would allow us to respond to the subpoena and go

4   through the process we would need to in order to determine if

5   those records were compliant, determine if there was

6   information in there that we should not produce.  So, again,

7   we're talking a manual review process.  Fallon has already told

8   you in the context of the companies that are involved here is

9   very small.  It has a total of 525 employees, 200 of them in

10  the administrative capacity.  They're all very busy.  The

11  affidavit of Daniel Conquer, which is document number 2783,

12  sets forth the other things that Fallon is doing today.  Fallon

13  is trying to convert all of its records and answer multiple

14  inquiries just with regards to the Medicare Part D change that

15  was made with regards to the health reinsurance business as of

16  January 1.  Fallon is also preparing for a Medicaid site visit

17  upcoming.  Fallon is undergoing a Department of Insurance

18  investigation right now, an annual site visit.  Fallon is

19  preparing for its two week audit in order to file its 501(c)(3)

20  information, et cetera, et cetera, et cetera.  Fallon's staff

21  are working up to 80 hours a week now to comply with their

22  existing obligations.  To undertake any response to the

23  subpoena as stands or even as what might, from your situation

24  might appear to be a reasonable accommodation, why not do it

25  for instance for the past three years all the records on site

1  as opposed to iron mountain still remains an overwhelming and

2  unreasonable burden to Fallon.

3          I will say that we have communicated with counsel for

4  Dey.  They have been polite.  They have been responsive.  We

5  haven't had any problem talking with each other, but we are up

6  against the unassailable fact to respond to the subpoena either

7  as stated or as modified in a way that would be acceptable to

8  Dey is an incredible, unreasonable burden to a very small

9  company.  And we ask under those circumstances that you just

10 say, that's not necessary, the subpoena on Fallon is squashed.

11 Thank you.

12          MR. PALERMO:  Your Honor--

13          THE COURT:  Clearly the theme all the way across the

14 board with all three entities is burden here.

15          MR. PALERMO:  Well, Your Honor, in the last argument

16 counsel's argument seemed to be that any response would be too

17 burdensome because they're too busy with all the other things

18 that they have to do.  What we've tried to do with our narrowed

19 request, Your Honor, is narrow them to exactly the same

20 discovery that Your Honor has permitted on numerous prior

21 occasions.  The Court has previously ordered discovery from

22 Blue Cross Blue Shield and Mutual of Omaha even though they're

23 small plans.  Small plans are particularly relevant here with

24 respect their knowledge of reimbursement and their methodology,

25 and they're highly relevant to the allegations that are at the

1   heart of this case, Your Honor.  And we have really tried to

2   narrow those requests and tried to be consistent with what's

3   been permitted over and over and over again.  Thank you, Your

4   Honor.

5          THE COURT:  All right.  I'll take the morning recess

6   at this time.  All right, 10 minutes.

7   (RECESS)

8          THE COURT:  All right, having given the matter some

9   further thought and having heard extensive argument in

10  reference to docket entries 1907, 1909, 1910, 1914, 2005 and

11  2091, I will grant the plaintiffs' motion for protective orders

12  in those individual motions, and I will grant the motions to

13  quash as well.  Having reevaluated the situation and having

14  heard really very extensive argument on burdensomeness today, I

15  believe that the presence of Blue Cross Blue Shield in the

16  litigation at this time does change things, and I feel that the

17  oppressiveness of the burden as has been outlined by counsel

18  for the three health plans is quite dramatic.  I'm also

19  concerned about the issues of confidentiality.  I think there

20  are serious confidentiality issues here in a competitive

21  situation, and for that reason I'm very much concerned about

22  the rights of the non-parties and, therefore, grant the

23  motions.

24          All right, I believe we have one remaining motion and

25  that is 1820, which is plaintiffs' motion to compel production

1  of Amgen.

2          MR. NALVEN:  Your Honor, this will be a brief motion.

3  I didn't know if you wanted to excuse counsel who had already

4  been heard?

5          THE COURT:  Yes.  If counsel who have been heard

6  don't want to stay for the remainder, you're welcome to leave

7  at this time.

8          MR. YOUNG:  Your Honor, I didn't have an opportunity

9  to introduce myself earlier.  My name is Joseph Young.  I'm

10 with the law firm of Hogan & Hartson in Baltimore.  I represent

11 Amgen Inc.

12         THE COURT:  And the spelling of your last name?

13         MR. YOUNG:  Young, Y-O-U-N-G--

14         THE COURT:  Oh.

15         MR. YOUNG:  --Your Honor.

16         MR. COMMISSO:  Good morning, Your Honor, John

17 Commisso of Kelly Libby & Hoopes.  That's Commisso, C-O-M-M-I-

18 S-S-O.

19         THE COURT:  We know that, Mr. Commisso, having had

20 you in court yesterday.

21         MR. NALVEN:  Your Honor, I know that it's been a long

22 morning so I'll be brief on this motion.

23         THE COURT:  Well not as long as many others.

24         MR. NALVEN:  Your Honor, Amgen is one of the Track 2

25 defendants in this case and Amgen manufactures a drug by the

1  name of Aranesp among others which is a competitor of the drug

2  Procrit which is a drug manufactured by Johnson and Johnson.

3  These drugs are chemically identical.  And I raised that with

4  Your Honor at the outset just to assure you that as Your Honor

5  knows the drugs that are at issue in the cases has changed--

6          THE COURT:  Uh-huh.

7          MR. NALVEN:  --have changed over the course of the

8  case but the heartland of the case has always been physician

9  administered drugs where there's either therapeutic or chemical

10 identity and so Amgen's manufacture of Aranesp makes Amgen a

11 central focus of the AWP MDL.  I think the papers candidly

12 submitted by both parties fairly fully explore the issues for

13 Your Honor but I'll summarize briefly.  The plaintiffs served

14 several document requests on Amgen beginning in late 2003 and

15 into early 2004, including what might be referred to as a

16 summary or omnibus request in March of 2004.  There was no

17 production by Amgen at that time.  The papers I think by both

18 sides sort of identify a series of communications that Your

19 Honor probably doesn't want to get bogged down in about who

20 acted first and who acted next, but I think what's significant

21 to understand is that by May of 2005 plaintiffs were closely

22 focused on obtaining discovery from Amgen and in fact on May

23 26th of 2005 my partner Steve Berman provided counsel for Amgen

24 with a very detailed memo, it was actually an internal memo but

25 it was provided without waiver, and I think for that reason

51

1    counsel did not attach it to his papers.  But it was a very

2    detailed memo identifying the categories of documents that

3    would satisfy plaintiffs in connection with the earlier

4    document request.

5           At the time that we filed this motion, which was

6    October of 2005, plaintiffs still had not received any

7    production from Amgen of a documentary nature.  Plaintiffs had

8    only received some transactional data.  Now remember that at

9    the time that we filed that motion, the discovery cutoff for

10   Track 2 which is still in place, although there's a motion

11   pending concerning this matter, was December 3rd, and even as

12   recently, I think shortly after the motion was filed Amgen did

13   begin to produce some documents.  As of a couple of days ago

14   I'm told by one of my colleagues that Amgen has produced about

15   43,000 pages of documents and has represented that it believes

16   its production to be complete.  We believe the production to be

17   far, far, far from complete.  As Your Honor knows the primary

18   focus in terms of company of my work in this proceeding has

19   been Glaxosmithkline and I can tell you that Glaxosmithkline,

20   for example, produced in excess of 3,000,000 pages of

21   documents.

22          THE COURT:  Yes, but how can you say it until you've

23   really taken a look?

24          MR. NALVEN:  Well, we are taking a look, Your Honor,

25   but at this point we can really identify for you one very

52

1    specific and very troubling issue in this case or actually I

2    would take two specific and troubling issues.  The first is

3    that as a result of the very, very late production and what we

4    believe to be, we know to be a partial production, we don't

5    know how partial, at this point plaintiffs have been very

6    seriously prejudiced.  We have discovery – the discovery period

7    already ended and we're only beginning to receive documents

8    now.  Except for some initial 30(b)(6) depositions we were

9    unable to take depositions that were meaningful because we

10   didn't have documents.  Amgen, whatever its excuses for not

11   producing documents prior to let's say May of 2005, certainly

12   by May there was no question that it was very clear what it is

13   we were looking for, and sat on our requests for an additional

14   period of time and in fact did not begin producing until we

15   filed.  In our motion we are asking for sanctions which will

16   allow us not only to obtain documents more quickly but also

17   will send the message to Amgen and defendants that the Court is

18   not going to tolerate violations of CMO's and discovery

19   obligations.

20          The second issue that is of very special concern,

21   Your Honor, is the time period that Amgen claims it has to

22   produce documents with respect to.  Amgen has taken the

23   position in this case that it need only produce documents for

24   the period 1997 to 2001 or sort of creeping into 2002.  Sort of

25   at the last exchange between one of my colleagues and Amgen's

1   counsel, Amgen's counsel said that it would return to its

2   client to see whether that position could be modified, but that

3   position is inconsistent with the complaint in this case which

4   seeks data and documents since 1991.  The conduct of other

5   defendants in the case, including Glaxosmithkline which for

6   example Your Honor produced documents from 1991, and it's

7   inconsistent most importantly with Judge Saris' recent class

8   certification order which certifies a class for the period 1991

9   to 2005.  Plaintiffs need this critical information from this

10  critical defendant promptly, a full production promptly for the

11  entire class period.  So in addition to, among the sanctions

12  that we seek, Your Honor, among the relief that we seek in

13  terms of prompt production is a full and complete production

14  that at this point is now within the next 60 days in order to

15  review the documents and prepare for further testimonial

16  discovery.  Thank you, Your Honor.

17          THE COURT:  All right, I'll hear you, Mr. Young.

18          MR. YOUNG:  Thank you, Your Honor.  First, I think

19  the Court needs to focus on what it has before it.  The motion

20  that was filed in October was a motion for sanctions based on

21  essentially what plaintiffs claim was Amgen's complete refusal

22  to conduct discovery.  And the documents that were attached to

23  our briefs, let me make clear that there was no waiver, objects

24  were timely filed, they were all pursuant to express

25  understandings and agreements with plaintiffs' counsel, not Mr.

1  Nalven but his other lawyers in his office, and that there is

2  in fact a documented record of that exchange.

3          We, also I think, and this is important in thinking

4  through other sanctions are at all appropriate in this context,

5  Amgen did early on push for a meet and confer as of last

6  December and it did take five months for a sit down and a final

7  meeting with Mr. Nalven's partner to get the list that he

8  described, the detailed list that narrowed the production, in

9  fact narrowed the production in order to avoid the 3,000,000

10  page production that Mr. Nalven commented about from another

11  defendant in the Track 1 case.  Our purpose was to focus it,

12  narrow it, make it tight so that it's not a strict, you know, a

13  broad data dump.  The data was provided within a month of that

14  time pursuant to a request to modify the original data request

15  that had been made.  That took time with the experts, and we

16  began reviewing over the summer.

17          The production was made beginning of October and it

18  was made in fact the day after plaintiffs had filed their

19  motion to compel.  Had they called and said we're about to file

20  a motion to compel, we would have said we're filing our

21  documents Monday.  But the document production began in

22  October, which was consistent with our representations to Judge

23  Saris in connection with the scheduling issue that was filed in

24  late September and early October on Track 2 discovery, and it

25  continued on a rolling production through December and

55

1  completed in January.  We are substantially completed the

2  production of the limited discovery requests that were the

3  result of a meet and confer with Mr. Berman in May.

4        So, first, with respect to the motion to compel on

5  for sanctions with respect to discovery, Amgen believes that it

6  did work in good faith to resolve issues, that the parties

7  understood that and the production proceeded accordingly.  And

8  in fact, had we gotten in December of 2004 where we were in May

9  of 2005, it would have all been over by July and none of us

10  would be here this morning.

11        With respect to the two troubling issues that

12  Mr. Nalven refers to, the timing of production and the effect

13  on discovery scheduling, that is precisely the issue before

14  Judge Saris on two competing CMO's that were submitted in

15  December of 2005.  The plaintiffs use the same kinds of

16  arguments with respect to defendants' productions, not just

17  Amgen's, but a broad number of defendants, and requesting an

18  extension of discovery till June.  The defendants in the Track

19  2 have requested or suggested an extension to allow additional

20  discovery through March.  I think an important point there is

21  that both parties understood and in fact Judge Saris in what

22  has been called her holiday order understood that December 3rd

23  wasn't likely to be the firm cutoff, that the parties, I think

24  she said, shouldn't kill themselves over the holidays, and she

25  was going to deal with scheduling after, my guess is after she

56

1    dealt with the Track 1 house and put that in order that she'd

2    then deal with Track 2 and the parties are waiting on that

3    schedule from Judge Saris at this time.

4           On the timeframe issues, Your Honor, I do not believe

5    that that is properly before the Court this morning.  It is not

6    the subject of the motion to compel.  There is not a word in

7    their motion to compel with respect to timeframe.  And in fact,

8    it was not something that was even discussed when Mr. Berman

9    and Mr. Barley and I met by telephone back in May.  The first

10   occasion that the timeframe exception that Amgen put into its

11   objection was back in 2004 and repeated in June of 2005 over

12   initial production.  The first reference to that was in a

13   letter on January 9, 2006, about two weeks ago.  And I think

14   more important, more to point, we have been involved in meet

15   and confers with Mr. Nalven's associate in the Seattle office,

16   Rob Lopez, as late as Tuesday and have made I believe

17   substantial progress on a number of the categories of documents

18   and what accommodations could be made and Amgen would be

19   willing to make.

20          In light of Judge Saris' order with respect to the

21   Track 1 class certification, the plaintiffs have now taken the

22   position that discovery must be from 1991 through January 1,

23   2006, through to the present, which is two - well, first of all

24   it's beyond anything that's been requested of any other

25   defendant in the case that I'm aware of beyond what they

1   negotiated with other defendants and I think, frankly, beyond

2   what Judge Saris probably contemplated.  I don't believe that

3   in certifying that class she was thinking about reopening

4   discovery or reopening document productions for the Track 1 or

5   the Track 2 defendants.  I think that the key here is to focus

6   on documents that are central to the timeframe of the alleged

7   scheme that the plaintiffs have presented, which is 1997, five

8   years prior according to the defendants through to the date of

9   the filing of those first complaints in 2001 and 2002, and they

10  will involve the core documents that, you know, that the

11  plaintiffs need.  Mr. Nalven mentioned Aranesp and Procrit;

12  well Aranesp was preceded by a drug called Ibogen and Ibogen

13  and Procrit are also competitive drugs, and there are clearly

14  documents encompassed in our five year production that meet the

15  plaintiffs' request and meet their needs with respect to

16  showing if there was a competitive effect and how that

17  competitive effect led to pricing.

18          THE COURT:  Briefly.

19          MR. NALVEN:  Your Honor, I think you can hear from

20  both arguments that there is not really a great deal of dispute

21  here, critical points.  To begin with, counsel says that the

22  motion before Your Honor doesn't cover the timeframe issue.

23  Well, of course the motion that was before Your Honor was

24  before was served before any documents were produced.  Clearly

25  the timeframe issue is subsumed in a motion in which somebody,

1   which is made in response to no document production.  With

2   respect to the timeframe itself, counsel does not dispute that

3   the period for production ought to be the period set forth in

4   Judge Saris' class certification order and doesn't dispute in

5   any way the propriety of the demand for production from 1991 to

6   1997.  The issue that he raises is whether the production ought

7   to be, ought to end at the end of the class period or whether

8   because some defendants who produced promptly in response to

9   the omnibus request that was served in March of 2004, whether

10  Amgen ought to get the same benefit that they did where on a

11  defendant by defendant basis there have been different

12  agreements and arrangements made depending on how the case

13  proceeds.  For example, with Glaxosmithkline we have an

14  agreement that allowed Glaxosmithkline to forbear from

15  producing its most recent transactional data pending summary

16  judgment or some other milestone in the case.

17          In terms of the time at which or the deadline for

18  production, as Your Honor knows there are motions before Judge

19  Saris to extend that period of time.  Plaintiffs now are

20  helpless.  We don't know what the period is but we know that

21  it's going to be sometime in the next few months and we still

22  don't have anywhere near a full production.  So we request –

23  one other point, Your Honor, Mr. Young said that he was

24  involved in active, an active meet and confer discussion and

25  I've talked extensively with my colleagues in Seattle about

59

1   this, and my colleagues in Seattle have notified Mr. Young and

2   have told me that while the discussions have been cordial, that

3   at this point they're going nowhere and that there is no longer

4   a fruitful meet and confer.  Our position is that we need

5   documents for the entire period and we need them in sufficient

6   time to review them and to take some depositions.

7         THE COURT:  What's your position, Mr. Young, on the

8   completion of what you intend to produce at this time?

9         MR. YOUNG:  Your Honor, the documents that Amgen

10  produced in response to the narrowed request that Mr. Berman

11  provided to us in May that is essentially complete.  The

12  shortcomings that Mr. Nalven is referring to, I received my

13  first notice of that last night in an email sent after hours to

14  me to which I responded this morning from his associate in

15  their Seattle office.  They're not at issue this morning in any

16  event.  We're trying to work through with them, and I guess

17  what I'm asking Your Honor is allow us to use the process that

18  the local rules establish.  We're trying to do that.  The most

19  recent conversation was on Tuesday of this week at which time I

20  was promised to get a letter that I could provide my client and

21  I, at least my position with Mr. Lopez was I want to review

22  that with my client, I want to see what we can provide and what

23  we can't or what we can agree on and there were categories that

24  we agreed on that we would assent to.  And as far as I'm

25  concerned that process is still an open one, and if we need to

60

1    come back to the Court in two weeks or three weeks or whenever

2    we need to, we can do it at that time, but it's simply not ripe

3    at this time.

4              THE COURT:  Yeah, I think based on what's happened

5    this motion as it's framed presently is now moot, and if you

6    need to renew it you may.  All right.

7              MR. YOUNG:  I appreciate that, Your Honor.  Thank

8    you.

9              THE COURT:  I think that resolves everything that's

10   on the table for today.  Any counsel want to raise anything

11   else?

12   (Pause)

13             THE COURT:  All right.  Then we stand in recess.

14             MR. NALVEN:  Thank you, Your Honor.

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

_____                    February 24, 2006

Maryann V. Young_____