# Exhibit 7



From:       ECFnotice@mad.uscourts.gov
Sent:       11/2/2004 3:52:31 PM
To:         CourtCopy@mad.uscourts.gov
CC:
BCC:
Subject:    Activity in Case 1:01-cv-12257-PBS Citizens for Consume, et al v. Abbott
            Laboratories,, et al "Order on Motion to Compel"

***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without
charge. To avoid later charges, download a copy of each document during this first viewing.

United States District Court
District of Massachusetts

Notice of Electronic Filing
The following transaction was received from Bowler, Marianne entered on 11/2/2004 at 3:52 PM
EST and filed on 11/2/2004

Case Name: Citizens for Consume, et al v. Abbott Laboratories,, et al
Case Number: 1:01-cv-12257 https://ecf.mad.uscourts.gov/cgi-bin/DktRpt.pl?77895

Document Number:
Copy the URL address on the line below into the location bar of your Web browser to view the
document:

Docket Text:
Judge Marianne B. Bowler: Electronic ORDER entered granting in part and denying in part [996]
Motion to Compel to the extent set forth in the ruling on Docket Entry # 1068. Electronic Order
denying [1068] nonparties' Motion to Quash, consistent with the reasoning employed by the court
at the March 8, 2004 status conference.  The nonparties are ordered to appear at the noticed
depositions which, absent an agreement among all participating entities, shall be taken within the
next 30 days.  The subject matter shall be item numbers 1-3, 5-7, 11-13, 16-17 and 20-21 as set
forth in the list attached to the August 23, 2004 letter (Docket Entry # 170, Ex. F) which reiterates
topics encompassed in the list of documents to be produced attached to the re-noticed deposition
subpoenas (Docket Entry # 1018, Ex. E-G).  As agreed to in open court by defendants, they shall
pay the reasonable costs of transportation and related expenses, reasonable attorney's fees and
lost income incurred by I
witnesses. Electronic Order denying Motion to Compel [1090], in accordance with the prior ruling
of Judge Saris on April 26, 2004 (Docket Entry # 816), inasmuch as the prior motion (Docket
Entry # 652) requested an accounting of all communications between defendants and putative
class members and that motion was denied. (Bowler, Marianne)

The following document(s) are associated with this transaction:


1:01-cv-12257 Notice will be electronically mailed to:
Daniel F. Attridge                        dattridge@kirkland.com

Anita B. Bapooji                          bapooji@tht.com

Jessica Vincent Barnett                   jbarnett@foleyhoag.com

Steve W. Berman                           steve@hagens-berman.com



| | |
|---|---|
| Aimee E. Bierman | abierman@kl.com |
| Jill Lori Brenner | jlb@dcglaw.com |
| Douglas S. Brooks | dbrooks@klhboston.com |
| James C. Burling | james.burling@wilmerhale.com |
| Eric P. Christofferson SamplePlead@ropesgray.com | echristofferson@ropesgray.com, |
| Joanne M. Cicala | jcicala@kmslaw.com, |
| Toni-Ann Citera | tcitera@jonesday.com |
| Daniel J. Cloherty sphillips@dwyercollora.com | dcloherty@dwyercollora.com, |
| Jonathan D Cohen | cohenjo@gtlaw.com,  champagnew@gtlaw.com |
| Jeremy P. Cole | jpcole@jonesday.com |
| Robert C. Cook tcitera@jonesday.com;jmhelm@jonesday.com | christophercook@jonesday.com, |
| Michael R. Costa | costam@gtlaw.com |
| Paul J. Coval | pjcoval@vssp.com |
| William A. Davis | wadavis@mintz.com |
| Michael DeMarco | mdemarco@kl.com |
| Merle M. Delancey | DelanceyM@dsmo.com |
| Thomas E. Dwyer | tdwyer@dwyercollora.com |
| Steven M. Edwards | SMEdwards@HHlaw.com |
| Douglas Farquhar | dbf@hpm.com |
| Lucy Fowler | lfowler@foleyhoag.com |
| Monica Meier Franceschini franceschini@tht.com | |
| Brian V. Frankel | Brian.Frankel@doj.ca.gov |
| Peter E. Gelhaar | peg@dcglaw.com |
| Evan Georgopoulos | georgopoulose@gtlaw.com,  kaikala@gtlaw.com |
| Karen F. Green | karen.green@wilmerhale.com |
| Gary R. Greenberg champagnew@gtlaw.com;cohenjo@gtlaw.com;scerral@gtlaw.com;kaikala@gtlaw.com | greenbergg@gtlaw.com, |



| | |
|---|---|
| Elizabeth I. Hack | ehack@sonnenschein.com |
| Joseph Ernest Haviland | jhaviland@dwyercollora.com |
| Richard C. Heidlage richard.heidlage@ago.state.ma.us | |
| George B. Henderson janice.zaniboni@usdoj.gov | george.henderson2@usdoj.gov, |
| Colleen M. Hennessey | chennessey@peabodyarnold.com |
| Andrew L. Hurst | ahurst@reedsmith.com |
| Marisa L. Jaffe | mjaffe@nixonpeabody.com |
| Colin R. Kass ckass@kirkland.com, Kewing@kirkland.com;kmarch@kirkland.com;pbryan@kirkland.com | |
| John A. Kiernan | jkiernan@bktc.net |
| Terry Klein | tklein@lawtk.com |
| Joseph L. Kociubes | joe.kociubes@bingham.com |
| Seth B. Kosto seth.kosto@hklaw.com, mlynch@cov.com;matthew.oconnor@hklaw.com;frederick.herold@dechert.com | |
| William F. Lee | william.lee@wilmerhale.com |
| Ralph T. Lepore | rlepore@hklaw.com |
| Frank A. Libby | falibby@klhboston.com |
| James W. Matthews | jwmatthews@sherin.com, jrossi@sherin.com |
| Kirsten V. Mayer SamplePlead@ropesgray.com | kmayer@ropesgray.com, |
| S. Elaine McChesney | elaine.mcchesney@bingham.com |
| Darrell A.H. Miller | dahmiller@vssp.com |
| John T. Montgomery SamplePlead@ropesgray.com | jmontgomery@ropesgray.com, |
| Robert J. Muldoon | rjmuldoon@sherin.com |
| Mary B. Murrane | mary.murrane@bingham.com |
| Brien T. O'Connor SamplePlead@ropesgray.com | boconnor@ropesgray.com, |
| A. John Pappalardo | pappalardoj@gtlaw.com |
| Richard D. Raskin | rraskin@sidley.com |



| | |
|---|---|
| Richard J. Riley | RRiley@murphyriley.com |
| Philip D. Robben probben@kelleydrye.com | |
| Douglas L. Rogers | dlrogers@vssp.com |
| Gary M Ronan | gronan@goulstonstorrs.com |
| Daniel E. Rosenfeld | drosenfeld@kl.com |
| Kenneth A. Sansone | ksansone@goulstonstorrs.com |
| Thomas J. Sartory | tsartory@goulstonstorrs.com |
| Joseph R. Saveri | jsaveri@lchb.com |
| Louis J. Scerra | scerra@gtlaw.com |
| Andrew D. Schau | adschau@pbwt.com, cbelanger@pbwt.com |
| William S. Schneider | will.schneider@doj.ca.gov |
| John D. Shakow | jshakow@kslaw.com |
| Jonathan Shapiro | jshapiro@sswg.com |
| Robert P. Sherman | rsherman@nixonpeabody.com |
| Mark D Smith | smith@laredosmith.com |
| Thomas M. Sobol | heatherc@hagens-berman.com |
| Charles L. Solomont | carl.solomont@bingham.com |
| Benjamin M. Stern | benjamin.stern@wilmerhale.com |
| Tina M. Tabacchi | tmtabacchi@jonesday.com |
| Nicholas C. Theodorou | ntheodor@foleyhoag.com |
| John R. Therien SamplePlead@ropesgray.com | jtherien@ropesgray.com, |
| Lyndon M. Tretter | Lmtretter@hhlaw.com |
| Peter J. Venaglia | venaglia@dmmslaw.com |
| Kenneth A. Wexler | kawexler@wexlerfirm.com |
| Pamela A. Zorn | pazom@sherin.com |

1:01-cv-12257 Notice will not be electronically mailed to:
Jeffrey B. Aaronson
Bell, Boyd & Lloyd



3 First National Plaza
70 West Madison Street, Suite 3200
Chicago, IL 60602-4207

Gary L. Azorsky
Berger & Montague, PC
1622 Locust Street
Philadelphia, PA 19103

Steven F. Barley
Hogan & Hartson, LLP
111 South Calvert Street
Baltimore, MD 21202

Rebecca  Bedwell-Coll
Mascone, Embiidge & Quadra
180 Montgomery Street
1240
San Francisco, CA 94104

Mark A. Berman
Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C.
One Riverfront Plaza
Newark, NJ 01702-5497

David J. Bershad
Milberg Weiss Bershad Hynes & Lerach LLP
One Pennsylvania Plaza
49th Floor
New York, NY 10119

Jack B. Blumenfeld
Morris, Nichols, Arsht, & Tunnell
1201 North Market Street
Wilmington, DE 19899-1347

Thomas L. Boeder
Perkins Cole
1201 Third Avenue, 40th Floor
Seattle, WA 98101-3099

Anthony Bolognese
Bolognese & Associates
Suite 650
One Penn Center
1617 JFK Blvd.
Philadelphia, PA 19103

James J. Breen
Breen Law firm
3562 Old Milton Parkway
Alpharetta, GA 30005

Nicole Y. Brumsted
Lieff Cabraser Heimann & Bernstein, LLP
175 Federal Street, 7th Floor



Boston, MA 02110

Michael M. Buchman
Milbert, Weiss, Bershad, Hynes & Lerach, LLP
One Pennsylvania Plaza
New York, NY 10119-0165

David J. Burman
Perkins Coie
1201 Third Avenue, 40th Floor
Seattle, WA 98101-3099

James P. Carroll
Kirby McInerney & Squire
830 3rd Avenue
10th Floor
New York, NY 10022

Tod S. Cashin
Buchanan Ingersoll, PC
700 Alexander Road
Suite 300
Princeton, NJ 08540

Ronald L. Castle
Arent,Fox, Kintner,Plotkin,Plotkin & Kahn, LLC
1050 Conneticut Ave., N.W.
Washington, DC 20036-5186

William F. Cavanaugh
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

Christopher R. Cook
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Florence A Crisp
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Jonathan W. Cuneo
Cuneo Law Group
317 Massachusetts Avenue, N.E.
Washington, DC 20002

Joseph Danis
The David Danis Law Firm, P.C.
8235 Forsyth Blvd.
Suite 1100
St. Loius, MO 63105

John C. Dodds



Morgan Lewis & Boskius, LLP
1701 Market Street
Philadelphia, PA 19103-2921

Lloyd Donders
Kirby McInerney & Squire
830 3rd Avenue
10th Floor
New York, NY 10022

Alan J. Droste
Pillsbury Winthrop
650 Town Center Dr
7th Floor
Costa Mesa, CA 92626-7122

James J Duffy
Davis Polk & Wardwell
450 Lexington Ave
New York, NY 10017

Kimberly A. Dunne
Sidley Austin Brown & Wood
555 West 5th Street
Suite 4000
Los Angeles, CA 90013-1010

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901

Elizabeth S. Finberg
Sonnenschein, Nath & Rosenthal, LLP
1301 K Street, NW
East Tower
Suite 600
Washington, DC 20005

Kathryn C. Finnerty
58th Floor, US Steel Tower
600 Grant Street
Pittsburgh, PA 15219

Matthew A. Fischer
Sedgwick, Detert, Moran & Arnold
One Embarcadero Center
18th Floor
San Francisco, CA 94111

Todd G. Friedland
Pillsbury Winthrop
650 Town Center Dr
7th Floor
Costa Mesa, CA 92626-7122



Jeffrey S. Friedman
Silverman & McDonald
1010 North Bancroft Parkway
Suite 22
Wilmington, DE 19805

Todd S. Garber
Lowey Dannenberg Bemporad & Selinger, P.C.
The Gateway
One North Lexington Ave
White Plains, NY 10601

David C. Giardina
Sidley Austin Brown & Wood
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603

Alison C. Gilbert
Hogan & Hartson, LLP
875 Third Avenue
Suite 2600
New York, NY 10012

Arthur F. Golden
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

David F. Graham
Sidley Austin Brown & Wood
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603

Daniel E. Gustafson
Heins Mills & Olson, P.L.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Erik  Haas
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

Blake M. Harper
Hulett Harper
550 West C Street
Suite 1770
San Diego, CA 92101

Kimberley D. Harris
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017



Elizabeth Fegan Hartweg
Kenneth A. Wexler & Associates
1 North La Salle
Suite 2000
Chicago, IL 60602

James Vincent Hayes
Williams & Connolly, LLP
725 Twelfth Street N.W.
Washington, DC 20005

Mary Ellen Hennessy
Katten Muchin & Zavis
525 W. Monroe, Suite 1600
Chicago, IL 60661-3693

Frederick G. Herold
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793

Nicola R. Heskett
Shook, Hardy & Bacon LLP
2555 Grand Blvd
Kansas City, MO 64108

Robert J. Higgins
Dickstein, Shapiro & Morin
2101 L Street, N.W.
Washington, DC 20037

Aaron D. Hovan
Kirby McInerney & Squire LLP
830 3rd Avenue
10th Floor
New York, NY 10022

Robert B. Hubbell
Heller Ehrman White & McAuliffe
601 South Figueroa Street
40th Floor
Los Angeles, CA 90017-5758

Stephen M. Hudspeth
Coudert Brothers
1114 Avenue of the Americas
New York, NY 10036

Kirk B. Hulett
Hulett Harper
550 West C Street
Suite 1770
San Diego, CA 92101



Andrew J. Jackson
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street N.W.
Washington, DC 20037-1526

J. Andrew Jackson
Dickstein, Shapiro & Morin
2101 L Street, N.W.
Washington, DC 20037

Ryan James
U.S. Steel Tower
600 Grant Street
58th Floor
Pittsburg, PA 15219

James E. Johnson
Morrison and Foerster LLP
1290 Avenues of the Americas
New York, NY 10104

Jonathan D. Karmel
Karmel & Gilden
221 North La Salle Street
Suite 1414
Chicago, IL 60601

Roger W. Kirby
Kirby, McInerney & Squire
830 Third Avenue
10th Floor
New York, NY 10022

Kenneth D. Klein
Hogan & Hartson
Biltmore Tower
500 S Grand Ave.
Suite 1900
Los Angeles, CA 90071-2611

Jeffrey L. Kodroff
Spector & Roseman
1818 Market Street
Suite 2500
Philadelphia, PA 19103

Michael L. Koon
Shook, Hardy, & Bacon
2555 Grand Blvd
Kansas City, MO 64108

Daniel Kovel
Kirby McInerney & Squire
830 3rd Avenue
10th Floor
New York, NY 10022



Walter J. Lack
Engstrom, Lipscomb & lack
10100 Santa Monica Boulevard
16th Floor
Losn Angeles, CA 90067-4107

Matthew Lloyd Larrabee
Heller Ehrman White & McAuliffe
333 Bush Street
San Francisco, CA 94104-2878

Bruce A. Levy
Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C
One Riverfront Plaza
Newark, NJ 07102-5496

Stephen David Libowsky
Katten Muchin & Zavis
525 W. Monroe, Suite 1600
Chicago, IL 60661-3693

Albert G. Lin
Pillsbury Winthrop LLP
50 Freemont Street
P.O. Box 7880
San Francisco, CA 94120

Susan E. MacMenamin
Heins Mills & Olson, P.L.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55403

Ann H. Malekzadeh
King & Spalding LLP
1730 Pennsylvania Avenue NW
Washington, DC 20006

Jay D. Marinstein
Kirkpatrick & Lockhart LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

Robert J. McCully
Shook, Hardy & Bacon LLP
2555 Grand Blvd
Kansas City, MO 64108

Jennifer McGee
Shook, Hardy & Bacon LLP
Hamilton Square
600 14th St NW
Suite 800
Washington, DC 20005-2004



Neil Merkl
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178

Oliver Metzger
Morrison and Foerster LLP
1290 Avenues of the Americas
New York, NY 10104

Adam D. Miller
Engstrom, Lipscomb & Lack
10100 Santa Monica Boulevard
16th Floor
Los Angeles, CA 90067-4107

Robert Miller
599 Lexington Avenue
29th Floor
New York, NY 10022

Cheryl A. Mitchell
599 Lexington Avenue
29th Floor
New York, NY 10022

Saul P. Morgenstern
Kaye, Scholer, Fierman, Hays & Handler
425 Park Avenue
New York, NY 10022

James P. Muehlberger
Shook, Hardy & Bacon LLP
2555 Grand Blvd
Kansas City, MO 64108

Dianne M. Nast
Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA 17601

Edward Notargiacomo
Hagens Berman LLP
225 Franklin St.
Boston, MA 02110

Kathleen O'Sullivan
Perkins Coie LLP
1201 Third Ave
40th Floor
Seattle, WA 98101-8575

Jane Parver



Nicholas H. Patton
Patton Tidwell Sandefur
4605 Texas Blvd.
PO Box 5398
Texarkana, TX 75505-5398

Zoe Philippides
Perkins Coie LLP
1201 Third Avenue
Suite 4800
Seattle, WA 98101

Michael R. Plummer
58th Floor
US Steel Tower
600 Grant Street
Pittsburgh, PA 15219

Kristi T Prinzo
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

James A. Quadra
Mascone, Emblidge & Quadra
180 Montgomery Street
1240
San Francisco, CA 94104

Brian T. Rafferty
Dornbush Mensch Mandelstam & Schaeffer, LLP
747 Third Avenue
New York, NY 10017

Jonathan T. Rees
Hogan & Hartson, LLP
555 13th Street N.W.
Washington, DC 20004

Daniel E. Reidy
Jones Day
77 West Wacker Drive
Chicago, IL 60601-1692

Paula W. Render
Bell, Boyd & Lloyd
3 First National Plaza
70 West Madison Street, Suite 3200
Chicago, IL 60602-4207

Ira N. Richards
Rodriguez & Richards
226 W. Rittenhouse Square
Philadelphia, PA 19103

J. Douglas Richards



Milberg Weiss Bershad Hynes & Lerach, LLP
One Pennsylvania Plaza
New York, NY 10119-0165

Paul J. Riehle
Sedgwick, Detert, Moran & Arnold
One Embarcadero Center
16th Floor
San Francisco, CA 94111

Kevin P. Roddy
Hagens Berman
700 S. Flower Street
Suite 2940
Los Angeles, CA 90017-4101

Grace Rodriguez
King & Spalding LLP
1730 Pennsylvania Avenue NW
Washington, DC 20006

Henry H. Rossbacher
Rossbacher & Associates
811 Wilshire Blvd.
Suite 1650
Los Angeles, CA 90017-2666

Robert S. Ryland
Kirkland & Ellis
655 Fifthteenth Street, N.W.
Suite 1200
Washington, DC 20005

Robert D. Sanford
Moscone, Emblidge & Quadra
180 Montgomery Street
1240
San Francisco, CA 94104

Sherrie R. Savett
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103

Lori A. Schechter
Morrison & Foerster
425 Market Street
San Francisco, CA 94105-2482

Paul S. Schleifman
Shook, Hardy & Bacon LLP
Hamilton Square
600 14th St NW
Suite 800
Washington, DC 20005-2004



Susan Schneider Thomas
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103

Michael Sennett
Bell, Boyd & Lloyd
3 First National Plaza
70 West Madison Street, Suite 3200
Chicago, IL 60602-4207

Jonathan Shub
Sheller, Ludwig & Badey
1528 Walnut St.
Philadelphia, PA 19102

Charles C. Sipos
Perkins Coie LLP
1201 Third Avenue
Suite 4800
Seattle, WA 98101-3099

Peter D. St. Phillip
Lowey Dannenberg Bemporad & Selinger, P.C.
The Gateway
One North Lexington Ave
White Plains, NY 10601

Scott A. Stempel
Morgan Lewis & Bockius, LLP
1111 Pennsylvania Ave, NW
Washington, DC 20004

Kevin R. Sullivan
King & Spalding LLP
1730 Pennsylvania Avenue NW
Washington, DC 20006

Thomas J. Sweeney
Hogan and Harston, LLP
875 Third Avenue
Suite 2600
New York, NY 10012

Randal C Teague
Vorys, Sater, Seymour and Pease LLP
1828 L Street N.W.
11th Floor
Washington, DC 20036-5109

Thomas A. Temmerman
California Bureau of Medi-Cal Fraud and Elder Abuse
1425 River Park Drive
Suite 300
Sacramento, CA 95815



Sandra G. Tillotson
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022-4689

Mitchell A. Toups
Weller Green Toups & Terrell
2615 Calder
Suite 400
Beaumont, TX 77704

John M. Townsend
Hughes, Hubbard & Reed
1775 I Street, N.W.
Washington, DC 20006-2401

Stephen A. Tuggy
Heller Ehrman White & McAuliffe
601 South Figueroa Street
40th Floor
Los Angeles, CA 90017-5758

Michael J. Vanselow
Minnesota Attorney Generals Office
102 State Capital
75 Constitution Ave
St. Paul, 55155

Edward A. Wallace
Kenneth A. Wexler & Associates
1 North La Salle
Suite 2000
Chicago, IL 60602

Liza M. Walsh
Connell, Foley & Geiser
85 Livingston Ave.
Roseland, NJ 07068

Nina I. Webb-Lawton
Vorys, Sater, Seymour and Pease
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008

Jeffrey I. Weinberger
Munger Tolles & Olson
355 S. Grand Avenue
Suite 3500
Los Angeles, CA 90071-1560

Robert Alan White
Morgan, Lewis & Bockius, LLP
502 Carnegie Center
Princeton, NH 08540

# Exhibit 8

J5400-864

| SERIAL NO. | 535 | |
|---|---|---|
| SERVED | | |
| RECEIVED | | |
| FILED | | |

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Docket No. 01-12257-PBS

In re:  Pharmaceutical
     Industry Wholesale Price
     Litigation

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
HELD ON JANUARY 27, 2005

APPEARANCES:

For County of Suffolk:  Joanne Cicala, Esquire, Kirby, McInerney & Squire, 830 3rd. Avenue, 10th Floor, New York, NY 10022, (212) 371-6600.

For Defendants:  Adil Mangi, Esquire, Patterson, Belknap, Webb & Tyler, LLP, 1133 Avenue of the Americas, New York, NY 10036-6710, (212) 336-2000.

For Health Net:  Kevin McGinty, Esquire, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, One Financial Center, Boston, MA 02111, (617) 542-2241.

For Health Net:  Lance Selfridge, Esquire, Lewis Brisbois Bisgard & Smith, LLP, 221 North Figueroa Street, St. 1200, Los Angeles, CA 90012.

For Schering-Plough Corp.:  Eric Christofferson, Esquire, Ropes & Gray, LLP, One International Place, Boston, MA 02110, (617) 951-7385.

For the Class MDL Plaintiffs:  Edward Notargiacomo, Esquire, Hagens, Berman, LLP, One Main Street, 4th Floor, Cambridge, MA 02142, (617) 374-3738.

MARYANN V. YOUNG
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

For Aventis Behring, LLC:  Michael DeMarco, Esquire,
Kirckpatrick & Lockhart, Nicholson Graham, LLP, 75 State Street,
Boston, MA  02109, (617) 951-9111.

For Aventis:  James Muehlberger, Esquire, Shook, Hardy & Bacon,
2555 Grand Blvd., Kansas City, MO  64108, (816) 474-6550.

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

MARYANN V. YOUNG
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003



1

2          **I N D E X**

Proceedings                                                    3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Maryann V. Young*
**Certified Court Transcriber**
**(508) 384-2003**

2

<u>P R O C E E D I N G S</u>                                    3

1
2         THE CLERK:  Today is Thursday, January 27, 2005.  The

3   case of Citizens for Consumer Justice, et al v. Private

4   Laboratories, et al, Criminal Action No. 01-12257 will now be

5   heard before this Court.  Will counsel please identify

6   themselves for the record?

7         MR. MANGI:  Your Honor, Adil Mangi from Patterson,

8   Belknap, Webb & Tyler for defendants.  I'll be arguing the

9   motion to compel Health Net.

10        THE COURT:  Thank you.

11        MS. CICALA:  Good morning, your Honor.  Joanne Cicala

12  from Kirby McInerny & Squire, for plaintiff, the County of

13  Suffolk, here on the discovery motion.

14        MR. McGINTY:  Good morning, your Honor.  Kevin

15  McGinty from Mintz Levin for Health Net, respondent to the

16  motion to compel.

17        MR. SELFRIDGE:  Good morning, your Honor. Lance

18  Selfridge from Lewis Brisbois Bisgard & Smith in Los Angeles

19  also here on behalf of Health Net.  I understand that

20  Mr. McGinty has a motion for pro hac vice admission for me.

21        THE COURT:  Okay. And that motion will be allowed.

22        MR. SELFRIDGE:  Thank you, your Honor.

23        THE COURT:  Has it been filed or are you just--

24        MR. McGINTY:  I have it here, your Honor, with the

25  filing fee as well.

4

1          THE COURT: Okay. Oh, we always want the money.

2          MR. McGINTY: Yes. I've learned from said experience

3 so, I will hand it up now.

4          THE COURT: All right, that's fine.

5          MR. SELVICH: Thank you, your Honor.

6          THE COURT: You're welcome.

7          MR. CHRISTOFFERSON: Good morning, your Honor. Eric

8 Christofferson from Ropes & Gray, on behalf of Schering-Plough

9 Corporation.

10         THE COURT: Thank you, very much.

11         MR. NOTARGIACOMO: Good morning, your Honor. Edward

12 Notargiacomo from Hagens, Berman on behalf of the Class MDL

13 plaintiffs. I don't have any particular motion. I'm just here

14 in case there are questions that need to be answered.

15         THE COURT: Mr. DeMarco, do you want to be noted on

16 the record.

17         MR. DeMARCO: And, your Honor, I am Michael DeMarco

18 as you know, and I'm here with my colleague Jim Muehlberger.

19         MR. MUEHLBERGER: Good morning, your Honor.

20         THE COURT: Good morning.

21         MR. DeMARCO: I'm with Kirckpatrick & Lockhart,

22 Nicholson Graham. And Jim is with Shook, Hardy & Bacon from

23 Kansas City and he represents Aventis, an interested party, the

24 defendant in the class action.

25         THE COURT: All right. Well, we'll take the two, the

5

1   motions in the order in which they were filed.  So the first

2   is docket entry number 1175, which is defendants' motion to

3   compel third party Health Net to produce with opposition.

4           MR. MANGI:  Thank you, your Honor.  As your Honor is

5   aware, Judge Saris allowed the defendants to proceed with

6   discovery of a sample of health insurers in the industry.

7   Health Net is a key part of that industry sample.  Primarily

8   because of their geographical reach, they operate on both

9   coasts, both coasts, but also because they have an internal PBF

10  which renders them particularly of interest to defendants.

11  This motion is before your Honor on two specific issues.

12          First of all, Health Net has produced about half a

13  box of documents.  That came after about a year worth of

14  negotiation on the subpoena and the scope of production.  But

15  all of the documents that were produced were redacted.  In

16  fact, they were redacted of all terms that would be useful to

17  defendants in this case.  All reimbursement methodologies were

18  redacted.  All dispensing fees or administration fees were

19  redacted.  The same for financial terms, even the names of

20  contracting parties, - (inaudible #11:04:07) - were essentially

21  shell contracts, worthless paper or templates.  That's the

22  first and the primary issue for this motion.

23          The second is there were certain very limited

24  documents that were identified by Health Net's witnesses at

25  depositions as being central to this case.  We sought their

6

1  production after the deposition, and again these were very

2  specific categories of documents, and Health Net has refused to

3  produce them without giving any reason for that refusal.  Now,

4  on the issue of redactions, Health Net's only reason for not

5  producing these documents in their unredacted form, and again

6  it's half a box so far, is that they have confidential

7  information and Health Net's taken that position despite the

8  fact that their protective order is in place.  So what Health

9  Net is seeking here is unique status in this litigation.  All

10  the other health plans that are part of the industry sample

11  have produced their documents in unredacted form providing all

12  of this information, the methodology, the dispensing fees, and

13  so on, the defendants seek.  Health Net claims that they should

14  be given unique status and allowed to keep their information

15  confidential and that the protective order is not sufficient.

16       Now, I will point out that Judge Saris in CMO 10

17  already made a ruling on the issue of redaction and said in

18  that order, which is appended to our the papers, the redaction

19  should only be allowed on the grounds of privilege.  Now, that

20  order was by its terms addressed to parties, but the logic is

21  equally applicable here, given that the same protective orders

22  protect the interest of third parties as parties.  Now, Health

23  Net in their papers have made a lot of human cry about the

24  relevance of these methodologies.  We've discussed that with

25  them on numerous occasions.  We've even sent them letters, many

7

1   letters, expressing why the information is relevant, but I'll

2   address it here very briefly by giving just a few examples.  As

3   your Honor is aware, the plaintiff's in the MDL, are now

4   focused on a theory performed by the expert Dr. Hartman which

5   pertains to the expectations of pairs alleging a common

6   expectation of cost classes of trade.  The only way the

7   defendants can test that theory is by reference to the

8   methodologies that are actually being used.  If they're

9   different methodologies, different classes of trade or even

10  different entities within classes of trade, defeats those

11  common expectations.  Similarly, another issue that's going to

12  be critical to the merits is the defendant's position that

13  these contracts have to be looked at on an overall basis.  You

14  have to look at the bundle of services that are being provided

15  and the bundle of payments that's being given.  You can't

16  compare the bundle if you don't know what the terms are.  You

17  can't compare methodology and dispensing fee and see their

18  interrelationship of all the terms, if you don't know what any

19  of those terms are.  And there are numerous other factors that

20  show the relevance of this.  As your Honor's aware, we've put

21  in experts' submissions that have scattered thoughts showing

22  different reimbursements for different drugs.  Health Net has

23  testified about different methodologies they use.  Fee

24  schedules, for example, you can only assess them if you know

25  what they're based on.  So that information is simply central

1   to our claims.                                                  8

2          Now, the only law that Health Net has cited for their

3   position which we consider unique is the Vitamins case from the

4   Southern District of Ohio, but as we point out in our reply

5   papers that that case has no application here.  The court there

6   expressed concern over confidentiality, but that was because

7   the party there that was seeking the discovery was a direct

8   competitor of the party that was making production.  Here,

9   there is no such relationship between the defendant

10  manufacturers and Health Net.  Moreover, the issue of

11  confidentiality was not dispositive in the Vitamins case.  The

12  court expressly said so, and in fact, invited the party to

13  reserve the subpoena.  They didn't rule on the subpoena in

14  Vitamins because it was premature.  There were motions to

15  dismiss pending.  The court said if you win the motion to

16  dismiss, the issue goes away, so let's wait and see what

17  happens there.  So again, they're seeking entirely unique

18  status here.

19         Secondly, that issue of redactions also feeds into

20  claims data.  We've sought claims data from Health Net as we

21  had from numerous insurers.  We've already used a lot of that

22  claims data, and with all health insurers, we've offered to pay

23  for it.  Health Net here raises a few additional arguments

24  which we submit are just red herrings.  They raise the HIPA

25  statute.  There is a precise HIPA regulation on point that

9

1   allows disclosure where there's a subpoena and a HIPA

2   compliant protective order in place.  The defendant's haven't

3   even stood on that.  We've said okay, you can redact or rather

4   you can replace patient identifying information with dummy

5   numbers as long as they're consistent so we can carry out our

6   analysis.  So we don't care what the names of the individual

7   patients are.  We just want to be able to relate them to the

8   claims so we can study what was paid in relation to specific--

9         THE COURT:  What's wrong with doing that, counsel?

10        MR. McGINTY:  In fact, your Honor, if it is possible

11   to run some kind of algorithm as they suggest that would

12   scramble the patient identifiable information, I expect that

13   it's probably not going to be a problem.  As counsel indicated,

14   the problem really comes with embedded in claims data is the

15   confidential business information concerning dollar value of

16   reimbursement terms.

17        THE COURT:  Okay, so the--

18        MR. MANGI:  Your Honor, the only thing I'll add on

19   claims data is that Health Net, in two letters that are before

20   your Honor have already agreed that the scrambled algorithm

21   which we've used with other insurers already and it works fine,

22   will satisfy all of their patient confidentiality concerns, so

23   that issue we submit is straightforward.

24        Now, the other aspect of this motion pertains to

25   documents identified at deposition.  After the depositions, we

10

1   sent a letter to Health Net on October 15, 2004 identifying

2   the specific documents that the witnesses talked about.  These

3   again are very specific.  Some of them are as a simple as

4   missing pages with bates numbers to be provided.  Somehow, they

5   dropped out of the production.  Please give them to us, have

6   nothing in response despite numerous letters.  Some of them are

7   slightly more substantive.  For example, in narrowing our

8   production, and as I mentioned, Health Net's only produced half

9   a box because we narrowed it so extensively.  We only sought

10  representative samples of contracts rather than all contracts.

11  We told Health Net that we would test the representative nature

12  of the sample at depositions in relation to, for example, the

13  retail pharmacy contracts between Health Net or the internal

14  PBM and the pharmacies.  Health Net gave us one 2004 template

15  contending it was representative of all their contracts since

16  1991.  Other health plans, some have produced five, some have

17  produced five boxes.  One is rarely going to do.  We asked the

18  witness at deposition is this representative?  He said, no,

19  it's not.  Now, their contracts are again very specific.

20  There's a mail order contract that was referenced. We asked for

21  it.  They mentioned the production of documents in a related

22  AWP litigation, already produced.  We asked for those.

23          THE COURT:  Just one second.  Mr. Keefe, did you lose

24  something?

25          MR. KEEFE:  I think I misplaced a hat somewhere, your

*Maryann V. Young*
*Certified Court Transcriber*
*(508) 384-2003*

1   Honor.                                                    11

2            THE COURT:  What's it look like?

3            MR. KEEFE:  It's just a black hat.

4            THE COURT:  If we find it, we'll know who it belongs

5   to.

6            MR. KEEFE:  Your Honor, in my condition, I need it.

7   It must be out in the hall.  Thank you, Judge.

8            MR. MANGI:  So as I was saying your Honor, these are

9   very specific documents that we've asked for.  There's no

10  burden issue, but yet, Health Net has refused to produce them

11  and has provided no reason for their refusal to do so.  They're

12  specific additional issues raised in Health Net's papers but

13  I'll address them if counsel raises them today.

14            Thank you, your Honor.

15            THE COURT:  All right.  Your brother makes it sound

16  very simple.

17            MR. McGINTY:  It always is at first look.  One thing

18  that counsel for the defendants I think has omitted to discuss

19  is the significant threshold issue about whether this Court

20  even has jurisdiction over this particular subpoena.  As noted

21  in the papers, admitted by the defendants, there is a conflict

22  between various courts as to the scope of 28 U.S.C. Section

23  1407 and whether or not that empowers this court as the

24  transferee court in an MBL proceeding to consider manners·

25  concerning the enforcement of a subpoena under Rule 45.  It's

12

1  undisputed that Rule 45 says that motions for enforcement or

2  motions to quash any motion concerning the scope of a Rule 45

3  subpoena, that the power there is best to be heard by the court

4  that issued the subpoena, in this case, the court in

5  California, and what the defendants argues is that Section 1407

6  by virtue of its consolidation procedures gives this court

7  power that essentially trumps Rule 45, and they cite a couple

8  of cases for that proposition.  We cite the Visics (ph) case,

9  which says that Rule 45 controls, and we submit to you that the

10 case that we cite is probably better authority because it

11 comports with sound statutory construction principles.  The

12 provision at issue in Section 1407 is this, there is a portion

13 of that statute which says that the judge or judges to whom MDL

14 actions are assigned, may assign the powers of the district

15 judge in any district for the purpose of conducting pretrial

16 depositions in such coordinated or consolidated pretrial

17 proceedings.  Now, that's very clean language.  It only refers

18 to depositions.  That's the only discovery matter specifically,

19 you know, assigned to the transferee court, and the most basic

20 cannon of statutory construction says that you read a statute

21 the way it's written.  Congress is presumed to know the meaning

22 of the, of the terms of the statute.  It, it's not a stretch to

23 say that Congress knows what the term deposition means.

24 Congress is responsible for the content of Rules of Civil

25 Procedure, so they're presumed to know what--

13

1        THE COURT:  And a lot of other things.

2        MR. McGINTY:  But they presume to know what Rule 45

3  says.

4        THE COURT:  Including the fact that we don't get a

5  raise.

6        MR. McGINTY:  That too, unfortunately.  The mission

7  to refer to matters of, in depositions can only be taken to be

8  purposeful, and, and the way that the authority say about the

9  defendants gets around that is they appeal to some general

10  policy argument concerning the nature of a 1407 proceeding

11  saying well, it says that coordinated or consolidated pretrial

12  proceedings shall be conducted by a judge or judge to whom such

13  actions are assigned.  Gee, you know, that's if there's a

14  policy for them to get everything, but if that's true, why have

15  the separate reference to depositions at all.  If that

16  consolidation language is good enough to give this Court

17  control over Rule 45 matters, you wouldn't need to refer to

18  depositions at all.  So the question is why--

19        THE COURT:  Well, does it not refer to depositions

20  that can be going on in another district where disputes arise?

21        MR. McGINTY:  That's, I think that's the purpose,

22  your Honor, is that Rule 30 of the Rules of Civil Procedure has

23  very specific provisions referenced in the Visics' case,

24  30(B)(4).  It says that any time during a deposition on motion

25  of a party or of the deponent and upon a showing of, you know,

14

1   that the examination is being conducted in bad faith, et

2   cetera, et cetera, et cetera, the court in which the action is

3   pending or the court in the district where the deposition is

4   being taken may order the officer conducting the examination to

5   cease forthwith or may limit the scope or manner or whatever.

6   What this essentially says is that depositions being a special

7   case where stuff happens, if you need to suspend and get a

8   ruling, Section 1407 says you go to the transferee court.

9   That's the purpose of having a specific reference to

10  depositions in Section 1407.  Otherwise, there's no reference

11  to any other kind of discovery, Rule 45 should control, and as

12  a third party, not a party to the case, Health Net is the third

13  party stranger to this case, resident out in California

14  producing documents in site two within California should be

15  subject to the jurisdiction of the California court.  And it

16  makes sense for a number of reasons, in particular, for issues

17  that had been raised in this motion although I think have

18  been--

19          THE COURT:  Well, it makes no sense in terms of the

20  fact that the judge in California knows absolutely nothing

21  about the case.

22          MR. McGINTY:  Well, I think that's the, that's the--

23          THE COURT:  Particularly in a complex case.

24          MR. McGINTY:  Well, that's always going to be the

25  case, your Honor.  I mean cases can be incredibly complex

15

1    without being an MDL proceeding, yet Rule 45 nonetheless gives

2    the local court the authority to determine the propriety of the

3    discovery that's being sought.

4            THE COURT:  Okay, I'll hear from your brother just on

5    this issue of jurisdiction.

6            MR. MANGI:  Your Honor, I admire my learned friend's

7    efforts to create an issue on the jurisdictional point, but

8    it's one that doesn't exist.  The case law is discussed

9    extensively in our reply papers, and I'm happy to hand up the

10   pages if your Honor would like them.  There are numerous cases

11   that address this precise issue.  It's come up many times and

12   all of them uniformly hold that the MDL court has jurisdiction,

13   and, in fact, exclusive jurisdiction over these matters.

14   What's more, they go into the logic for that as your Honor just

15   pointed out, judicial economy demands that the judge most

16   familiar with the litigation hear these disputes.  The district

17   for example pointed to that precise factor in the Boise case.

18   Similarly, the, Poe case in the District of DC said it would

19   make no sense if depositions were heard in one place, documents

20   in another.  All these cases, and there are plenty more,

21   there's Factor A from the Northern District of Illinois,

22   Sunrise Securities from the Eastern District of Pennsylvania,

23   Dupont Plaza from Puerto Rico, even Wright & Miller have spoken

24   to this point.  All of them uniformly stand--

25           THE COURT:  Dupont Plaza is a First Circuit Case, so

16

1   yes.

2           MR. MANGI:  -- that the MDL court has jurisdiction.

3   Now, the <u>Visics</u> case that, that my learned friend relies on,

4   that court explicitly distinguished this situation.  They

5   applied their ruling only to cases where the docket, where the

6   subpoena was for documents only.  They expressly distinguished

7   cases where the subpoena was for documents and a deposition,

8   which is what we have here.  So <u>Visics,</u> even in its own terms

9   doesn't apply and what's more, <u>Visics</u> was expressly rejected in

10  <u>Poe</u>, which is the leading case and it's never been cited again.

11  So we would suggest that the weight of the authority on this

12  issue and the weight of, of shear logic is, is simple.

13          THE COURT:  Do you have a copy of the reply brief--

14          MR. MANGI:  Yes, your Honor.

15          THE COURT:  -- if it's handy.  I have it.

16          MR. MANGI: I have a, a highlighted copy that I'm

17  happy to hand up if your Honor would, would ignore the

18  highlighting.

19          THE COURT:  I'm colored blind.  Just one point. I

20  remember looking at it, but there was one point that I wanted

21  to--.

22          All right, well, let's move on to the substantive

23  portion of it.

24          MR. McGINTY:  I'd like to focus now on the, the

25  portion of the, of the request that seeks confidential

17

1    competitive business information, namely, specific

2    reimbursement terms, and I'd like to, to I think clarify some

3    things that, that perhaps might not have been addressed in, in

4    the defendants' presentation.  First of all, it's fair in a

5    point to say that the defendants are entitled to, to learn

6    about methodologies.  A methodology would be to say, do you

7    reimburse someone on a captitated basis?  In other words, you

8    give them X dollars per member.  Do you reimburse them based on

9    some Mac type schedule where you have a separate, you have

10   price list for the drugs?  Do you reimburse them on a formula

11   that says AWP minus a stated percentage plus a dispensing fee?

12   That's methodology, that's what they're, that's what they're,

13   they're certainly entitled to get is methodology.  What Health

14   Net is talking about is the actual price.  It matters

15   competitively for Health Net that there is a difference, a

16   competitive difference between them and other, other plans with

17   whom they compete, whether it's just to, to use number

18   randomly, whether it's AWP minus 12.5% versus AWP minus 13% or

19   15% or whatever.  What we're saying is they can find, we can,

20   they're entitled to find and we've given them the information

21   which shows to them that it is in these exemplar contracts AWP,

22   AWP minus a percent.  We just don't tell them what the

23   percentage is, and that's what we think is entitled to be

24   protected here.  It's not clear to us why that precise

25   percentage is needed to be disclosed.  What is clear is that it

18

1   is going to be a competitive disadvantage for Health Net,

2   that, you know, Health Net believes that it does a good deal

3   striking, good job striking competitive deals and what is a

4   great competitive realm.  In fact, the defendants in their own

5   tutorial to this Court on these issues says these are complex

6   negotiations between multiple entities.  There's

7   competitiveness at each level of the chain and Health Net is

8   able to price its services to its clients because it negotiates

9   these deals and it potentially loses that advantage if other

10  people know what they're able to extract from the providers

11  with whom they contract.

12          THE COURT:  Well, there is a protective order here.

13          MR. McGINTY:  Well, it's, the protective order is

14  certainly there, but I think it's at best an imperfect

15  protection, certainly one that has to get a third party

16  stranger to this dispute.  Plus, I know that at one of the

17  tutorials, notwithstanding the existence of this protective

18  order, it's my understanding that the reimbursement rate that

19  Express Scripts uses to pay to CVS was actually disclosed in

20  open court, and there's no, there's no dispute that there's a

21  likelihood that this sort of information can come out at trial,

22  notwithstanding the protective order.  So, while the--

23          THE COURT:  Well, that's an issue for trial down the

24  road, that's--

25          MR. McGINTY:  But that's, I guess the question is

19

1   that assuming that it is, it is, it is possible for the

2   purposes of allowing the defense to mount an adequate defense

3   to give them methodology without giving them precise pricing,

4   why expose Health Net to the competitive risk, and, all we're

5   saying is there needs to be an appropriate balancing here.

6   Parenthetically, your Honor, you know, the only reason we're

7   here is to strike this balance.  There's the--

8           THE COURT:  Well, are you proposing an alternative of

9   what you're willing to produce?

10          MR. McGINTY:  Well, first of all, as a, the point I

11  think I was about to make was that with respect to the

12  documents that that they asked for after the deposition that

13  have not been produced, the only reason they have not been

14  produced is that until these issues are resolved, there's no

15  purpose in producing them, so that certainly if, if they are

16  resolved, we'll hand them over at that point.  But I think your

17  Honor, that our argument is, is that what we've given which

18  shows them the methodology but not the precise pricing is

19  giving them what they need and this is an appropriate

20  disclosure.  They have the methodology.  They say that's what

21  they're entitled to.  We're not sure why there should be

22  anything more produced on that point, and I think that the

23  Vitamins case is, is not distinguishable on the grounds that

24  counsel presents.  Yes, the posture of the case was that it was

25  early in the case while motion to dismiss was pending, but what

20

1  was going on there is what should go on whenever there is this

2  type of discovery dispute.  It's a balance, and in that posture

3  of the case, the court is saying the need for it at this stage

4  is low.  The risk is considerable to the producing third party,

5  we're going to exercise our discretion to strike that balance

6  now against the production of the documents, reserving frankly

7  the question about what, how the balance would be struck later

8  on in the case, but certainly the principle holds.  And, I

9  think where we come out on this is that defendants haven't

10  offered a compelling argument why the balance should be struck

11  here to require us to to disclose information which is going to

12  put us--

13          THE COURT:  It, it may not be compelling to you--

14          MR. McGINTY:  -- at this stage.

15          THE COURT:  -- but I'm inclined to think it's

16  compelling to me at this point.  But, anything else?

17          MR. McGINTY:  I mean, the other, I think one other

18  point just to address the issue about why it should be

19  important to get the precise pricing is the notion that things

20  are going to, you know, things change over time and, of course,

21  contracts are set for a fixed term.  And during a contract

22  term, it's always going to be AWP minus whatever percentage it

23  is that these contracts are not indexed.  Certainly if they

24  want to see earlier versions of contracts, we can show them

25  that the methodology was used and maybe even tell them that,

21

1    about the magnitude of any changes in the discount that was

2    used over time, but the precise pricing isn't going to be

3    necessary to address that point.

4            THE COURT:  Two minutes--

5            MR. MANGI:  Your Honor--

6            THE COURT:  -- on why you need the precise pricing.

7            MR. MANGI:  Absolutely.  Your Honor, the fact that

8    AWP maybe used in some of Health Net's contracts doesn't give

9    defendants any information that's not available in the public

10   domain.  Some insurers use AWP for some of their contracts, as

11   does Health Net.  Health Net also uses other methodologies,

12   such as capitation in some cases.  But, the key parts, and I'll

13   try not to repeat myself, is that one can only carry out useful

14   analysis using the actual numbers, and I'll take just one

15   example leaving aside the four I discussed, and go back to the

16   bundling point.  These contracts are competitive bargains in

17   the marketplace.  I completely agree with my brother on that,

18   but the only way you can assess that is by looking at the

19   terms.  If for example there's a lower amount being paid in

20   reimbursement, there'll be a higher amount being in the

21   dispensing fee.  There'll be other terms of the contract that

22   may come in and be relevant, the financial terms that'll modify

23   those accounts, the expectation theory.  There's no way to

24   counter that unless you know the exact terms.  If I know that

25   they use AWP in some contracts, that doesn't tell me anything

22

1   about whether Dr. Hartman's expectation is valid or not.

2   There's simply no way if you look at even at the tutorial,

3   which is public.  Defendants use some scatter clause showing

4   claims data and precise reimbursement points.  You can't make

5   those points with only methodologies.

6          The only other point, your Honor, that I'll make

7   briefly is in terms of the other documents.  As your Honor

8   knows, this subpoena was issued in, in November of, of 2000.

9   These additional documents that were sought after subpoena,

10  most of them were nothing new.  They were stuff we'd asked for

11  originally.  The witness just testified about them.  So I would

12  request that if your Honor is inclined to grant these motions,

13  your Honor also provide a specific timeframe as we requested in

14  our proposed order so we can get all of these documents

15  together in time for summary judgment.

16          Thank you, your Honor.

17          THE COURT:  All right, I'll move on.

18          MR. McGINTY:  I'm, I'm sorry.

19          THE COURT:  Just seconds.  Do you want a quick

20  response or--

21          MR. McGINTY:  Actually, one, one point which I think

22  is not a matter of great dispute but I did at least want to, to

23  raise here is that we had, we had raised in our papers the

24  notion that, that some of what they're seeking with respect to

25  claims data is very expensive to try to recover because it's

23

1  archived, and it's my understanding the defendants have

2  conceded that they would be obligated to pay for that.  We

3  think that any order requiring the production of that data

4  should provide the defendants will bear the reasonable cost of

5  recovering the archived data.

6       MR. MANGI:  Your Honor, we stated we'd pay for it

7  before we even asked for it.

8       THE COURT:  All right.  All right, moving on to your

9  motion.  I'll--

10      MS. CICALA:  Thank you, your Honor.

11      THE COURT:  I'll hear the argument on both motions,

12  take a brief recess, and then give you a ruling from the bench.

13      MS. CICALA:  Thank you, your Honor.  Just a point of

14  clarification.  Suffolk County had filed a second motion to

15  compel against Schering-Plough.  We served that on defendants

16  on January 20th.  They responded on the 25th.  It was not

17  regrettably filed with the court until yesterday.  I don't know

18  if your Honor is expecting to hear argument on that today. I am

19  prepared to proceed if you would like.  I can't speak for

20  defense counsel on that, but I'll leave it to your Honor.

21      THE COURT:  Well no, because I don't have it.  This

22  docket was just, the docket that I had yesterday, didn't have

23  it on it.  This docket was just printed out this morning and--

24      MS. CICALA:  It concerns a narrow issue of, regarding

25  production of sharing documents related to their Texas

1   litigation.                                                    24

2          THE COURT:  For the record, for the record it's

3   docket entry number 1300.

4          MS. CICALA:  Thank you.

5          THE COURT:  Well, we'll see.  I mean, if your brother

6   is prepared to address it as well.

7          MR. McGINTY:  Your Honor, we are prepared to address

8   it if you'd like to hear the motion.

9          THE COURT:  Well, then we might as well.

10          MS. CICALA:  Thank you, your Honor.  Should we do

11   them one at a time, however?

12          THE COURT:  Please.

13          MS. CICALA:  Okay.  The first motion filed by Suffolk

14   concerns the form of the discovery being produced to it by

15   Schering-Plough.  And specifically, Suffolk seeks Schering's

16   compliance with that part of CMO 10 that directs any of the

17   parties to produce any documents available in electronic

18   format, shall be so provided in that format.  Suffolk began

19   it's review of Schering documents in Boston a couple of months

20   ago, and in the course of that review, confirmed that those

21   same documents it was reviewing in hard copy were available

22   electronically.  However, Schering refused to produce them to

23   us electronically on the basis that the liaison counsel and the

24   MDL had negotiated with Schering that the documents would be

25   produced in hard copy.  We were not privy to those discussions

25

1    and did not elect to receive documents in hard copy.  For most

2    of these, our preference is to receive them electronically, and

3    we would like to be able to do that.

4          THE COURT:  Well, if they're available in hard, in

5    electronic form, why can't they have it that way?

6          MR. CHRISTOFFERSON:  Thank you, your Honor.  I think

7    the answer to this question lies in Case Management Order No.

8    9, which preceded Case Management Order No. 10.  It, it is true

9    as counsel for Suffolk has suggested, that Schering had

10   hundreds of thousands of documents, responsive paper documents

11   scanned into electronic format at a cost of nearly $300,000 to

12   Schering.  Case Management Order No. 9 requires liaison counsel

13   to coordinate discovery for plaintiffs from cases that were

14   brought by government entities, including Suffolk.  Schering

15   offered to provide those responsive documents to lead

16   plaintiffs in electronic format if they would agree to share in

17   the cost.  The lead plaintiffs declined that offer and

18   requested that we produce those documents in paper form, which

19   we did.  Case Management Order No. 9 also requires defendants,

20   Schering, to make available to Suffolk those documents that

21   were made available to the lead plaintiffs to the extent that

22   those documents relate to drugs identified in Suffolk's

23   complaint.  Schering made available those documents to Suffolk.

24   Suffolk has reviewed those documents and those were documents

25   that were related to Suffolk's complaint, the drug identified

*Maryann V. Young*
**Certified Court Transcriber**
(508) 384-2003

26

1   in Suffolk's complaint.  Suffolk has reviewed the documents

2   and, contrary to their assertions, under the Case Management

3   Orders, Schering is not required to make additional and

4   separately negotiated productions to Suffolk.  Notwithstanding

5   the reliance on Case Management Order No. 10, Case Management

6   Order No. 10 did not supplant or revise the language regarding

7   discovery coordination in Case Management Order No. 9.  The

8   whole point of this Case Management Order is to avoid

9   unnecessary and duplicative discovery requests and negotiations

10  and the associated costs.  Suffolk now apparently wants to

11  substitute themselves into the position of lead plaintiffs, but

12  that's not a decision that either Schering or Suffolk can make.

13  Schering has made the documents available to Suffolk.  Suffolk

14  has reviewed those documents, and nothing more is required of

15  Schering.

16          THE COURT:  I'm inclined to agree.

17          MS. CICALA:  Your Honor, I, I don't, I, I'm unsure

18  what my brother refers to when he refers to us being lead

19  plaintiffs.  I mean, Suffolk has an independent case.  It's not

20  part of the class case.  It was not consulted so, first of all,

21  I don't understand why Suffolk should be bound--

22          THE COURT:  But I think everybody has to play by the

23  same rules here.  I mean, the idea is to keep the cost down.

24          MS. CICALA:  Absolutely agreed, your Honor. Had

25  Suffolk the opportunity, had liaison counsel in any way

27

1  consulted with Suffolk before making a unilateral decision

2  with regard to how it sought to collect the sharing materials,

3  then I would not be standing before you.  But regrettably, and

4  we have a motion that continues to be subjudice on this issues,

5  regrettably, Suffolk was not privy, was not included in any of

6  those discussions.  Then perhaps the issue should be--

7           THE COURT:  Well I think your issue--

8           MS. CICALA:  -- addressed between--

9           THE COURT:  -- is with liaison counsel.

10          MS. CICALA:  So it would seem, your Honor.  If I may

11  say one more thing though.  However, on the issue of cost and

12  efficiency, I cannot understand how there is any excessive cost

13  or inefficiency in Schering delivering to us electronically

14  that which is available electronically.  The, there's no, we're

15  talking about a punch, you know, a click of a button, a copying

16  of a CD, as opposed to copying papers and transmitting boxes

17  which is certainly under any scenario, far less efficient.

18          THE COURT:  Well, it sets a precedent.  That's the

19  only problem.

20          MS. CICALA:  I'm afraid that the precedent that may

21  be set here, however, your Honor, is that Suffolk County and my

22  other clients, frankly, I also represent the City of New York

23  and the counties of Rockland, Westchester, Onijaga (ph), and

24  numerous other counties who are about to join in this

25  litigation who have separately retained us, that each of these

28

1  important governmental entities, the City of New York, for

2  example is one of the largest Medicaid payers in this country,

3  shall be prejudiced by the fact that liaison counsel in this

4  matter has not conducted itself as liaison counsel.  I'm sorry

5  to have to say this, should be conducting itself, i.e.,

6  coordinating with those parties for whom has been charged to

7  coordinate.  Now, if the issue is that I need to address that

8  more strenuously with liaison counsel and this Court, then that

9  will be our route.

10         THE COURT:  All right, briefly.

11         MR. CHRISTOFFERSON:  Your Honor, just briefly, if I,

12  if I may.  I think the bad precedent that may be set here is

13  precedent that is, that is negative towards the defendants

14  because Schering spent over, nearly $300,000 preparing these

15  trial preparation materials.  There's a large amount of sum

16  cost that have gone into that process and if now simply just by

17  asking and not following the Case Management Orders the other

18  counties and other plaintiffs are allowed access to those

19  documents, it is a windfall for them and a loss to Schering.

20         THE COURT:  All right,

21         COUNSEL:  Your Honor-

22         THE COURT:  -- now I'll hear you on the other.

23         COUNSEL:  -- if I could just briefly as counsel for

24  liaison counsel just speak to what's been said.  I, I do take

25  offense to the fact the statement that liaison counsel has not

1    conducted themselves in a manner which is appropriate for

2    liaison counsel to conduct themselves.  At the time, I haven't

3    been privy to all of the negotiations with respect to Schering-

4    Plough, but when we negotiated with Schering-Plough, we did so

5    in what we thought was the most efficient manner.  There are

6    plaintiffs who came in, you know, either during or after those

7    negotiations took place.  We were not purporting to negotiate

8    on behalf of absent plaintiffs who come in afterwards.  It's

9    not clear to me that Suffolk even had document requests pending

10   at the time that that negotiation was had.  And let me just

11   tell you about where we ended up with respect to Schering's

12   documents and the reason we did what we did.  Schering

13   indicated the volume of documentation that they had available

14   in paper.  We knew from our investigation of the case and from

15   experience that a lot of that paper was going to be useless to

16   us, and turning that into electronic format would be even more

17   useless.  It would be a waste of time and money for all

18   involved.  So our approach to this entire thing is when they

19   tell us we have 600 boxes available in a warehouse down in New

20   Jersey, we send a team of lawyers to go down there and cull

21   through that 600 boxes and pick out however many boxes, a

22   subset of those boxes that are relevant to the case, and we had

23   those documents copied in paper format and sent to our offices

24   and had them distributed widely amongst the co-lead counsel who

25   are working on our case, and analyzed and are not in one

30

1   specific format or place that are able, you know, they're

2   sharing 600, what, what have you.  That's how we've tried to

3   cut things back.  We didn't think it made sense to wholesale

4   copy things.  Believe me, I was in one of those warehouses for

5   two to three days, and there was a lot of stuff that no one

6   wants, and it didn't make sense to do it any other way.

7           THE COURT:  All right.  Do you want to be heard on

8   1300?

9           MS. CICALA:  Yes, thank you, your Honor.  Suffolk's

10  second motion concerns a document request it served on

11  Schering-Plough seeking production of all documents and

12  materials, including deposition transcripts and so forth, that

13  Schering produced to the State of Texas in its litigation with

14  the State of Texas.  Schering's objection to our request is

15  that the production, well, initially Schering said that there

16  were not documents in there that concerned Schering, and now

17  they have acknowledged that there are documents within the

18  Texas production that involved Schering or were Schering

19  produced documents, but Schering says it would be burdensome

20  for them to go through the Texas production to identify the

21  Schering documents.  I think I can solve that problem.  I have

22  a relationship with the Texas attorney general who's

23  cooperating with the City of New York and the County of Suffolk

24  and all of my other clients.  They will provide us access to

25  the documents.  We will do Schering's work for it.  It needn't

31

1    be bothered in the slightest with this production.  Schering

2    has produced to Suffolk here.  They've acknowledged that they

3    should be.  The production has not been confined to Claritin.

4    We have received from Schering the documents that it produced

5    to the House Energy Committee.  So they have produced a broader

6    production here, so there can be no reasonable objection to us

7    receiving that which they produced to Texas, particularly where

8    we're willing to do the work, and of course include them in

9    whatever we receive from Texas so that there's nothing

10   inappropriate and that we don't go into warrant witnesses, so,

11   so for example.

12           THE COURT:  Do you need a special agreement in place

13   to do this, or?

14           MS. CICALA:  With Texas?

15           THE COURT:  Yes.

16           MS. CICALA:  To the extent we need to be singed on to

17   the Texas protective order, the Texas AG has agreed that we,

18   that they will facilitate that process for us.  We've asked

19   Schering to not object to our signing on to the Texas

20   protective order.  I would certainly include Schering in all my

21   communications with the Texas AG with regard to these documents

22   and copy them on any documents I receive from the Texas AG.

23   This needn't burden Schering in the slightest.

24           THE COURT:  Problem with it?

25           MR. CHRISTOFFERSON:  Yes, your Honor.  Thank you.  I,

*Maryann V. Young*
**Certified Court Transcriber**
(508) 384-2003

32

1   I'm not sure--

2          THE COURT:  Too good to be true.

3          MR. CHRISTOFFERSON:  Your Honor, I'm not sure if

4   you'd like a copy, I brought extra copies of opposition if

5   you'd like me to hand them up to you, or you'd rather it—

6          THE COURT:  No, just argue it to me.

7          MR. CHRISTOFFERSON:  Okay. Respectfully, your Honor,

8   I think that counsel for Suffolk is missing the point here. It

9   is true that pursuant to discovery requests in this litigation,

10  Schering has made available to the lead plaintiffs in this case

11  relevant documents from this Texas litigation.  That entire

12  case though concerns generic products, including products

13  manufactured and marketed by Warrick.  There were no claims in

14  that case that Schering did anything wrong with respect to any

15  of its drugs.  The discovery produced by Schering and Warrick

16  in that case overwhelmingly related to Warrick and Warrick

17  products, and there was lots of discovery in that case, nearly

18  400,000 pages worth.  Although Ropes & Gray did not represent

19  Schering and Warrick in that action, local counsel, who has

20  submitted a declaration in support of our opposition, informs

21  us that there might have been some minimal amount of documents

22  produced in that production that did not relate exclusively to

23  Warrick or Warrick related products, and that may have had some

24  bearing on Schering.  Judge Saris, however, has issued a stay

25  on discovery by Suffolk into claims, its claims against

33

1  Warrick.  So, all the documents produced in the Texas

2  litigation, except for some minimal amount, relate to claims

3  into which discovery is stayed.  The only remaining question

4  would be whether these minimal needles in a giant haystack of

5  documents are even relevant to Schering, to Suffolk's claims

6  against Schering.  We don't know the answer to that and could

7  not know the answer to that without ourselves reviewing the

8  entire production.  The suggestion that Suffolk go and do our

9  "work" for us, does not solve the problem, because then they

10  would have access to lots of documents, almost 400,000 pages

11  worth, that relate only to their claims into which discovery

12  has been stayed.  It's simply unreasonable and unduly

13  burdensome for them to require Schering to sift through

14  hundreds of thousands of pages of documents to find a few that

15  may or may not be relevant to Suffolk's claims.  In other

16  words, the burden that Schering would have to bear is grossly

17  disproportionate to the value that Suffolk would gain from some

18  few potentially relevant documents.  The discovery here

19  violates Judge Saris' order because the claims to which it is

20  directed, the claims against Warrick have been stayed and are

21  not subject to discovery at this time, regardless of to whom

22  the request might now only be made.

23        THE COURT:  Why should I grant this with the stay in

24  place?

25        MS. CICALA:  The stay is against, is at to Warrick.  I

34

1   absolutely agree.  We don't seek any Warrick documents.  We

2   don't seek any deposition testimony from any Warrick witnesses.

3   We seek documents produced in Texas by Schering, which exist.

4   We seek Schering deposition transcripts, which exist.  The

5   Texas AG has those documents identified as Schering documents

6   and those transcripts identified as Schering witnesses.  I'm

7   not looking for anything that's stamped with a Warrick bates

8   number at this time.  I'm talking about Schering documents and

9   Schering witnesses.  So, in that regard, this in no way

10   violates Judge Saris' order.  The issue devolves to burden and

11   we can relieve them of the burden by receiving only that which

12   is stamped Schering-Plough and only for witnesses that were

13   produced by Schering-Plough.

14         MR. CHRISTOFFERSON:  Your Honor, if I may respond

15   just briefly?  I think again counsel is missing the point.  It,

16   it doesn't matter to whom, you know, whether Schering as

17   Schering produced the documents.  The documents that Schering

18   produced overwhelming related to Warrick and Warrick's

19   products.  You would have to, she would have to then figure out

20   which of those documents were actually relevant to their

21   claims, and according to the, the information that you received

22   from local counsel, those documents are minimal, minimal and it

23   would only be a handful.  So whether Schering is required to go

24   through and wade through and find a handful of documents or

25   someone else, I guess the, the attorney general would find

35

1   documents and then, you know, send them back to Suffolk.

2   Either way, it's going to require an amazing amount of effort

3   that is frankly disproportionate to the value.

4          MR. DeMARCO:  Your Honor--

5          THE COURT:  Mr. DeMarco?

6          MR. DeMARCO:  -- just briefly.  There's another

7   feature to this that my colleague, Mr. Muehlberger would like

8   to discuss with respect to other defendant in this aspect of

9   discovery.

10          MR. MUEHLBERGER:  Your Honor, very briefly, this is

11  the first I've heard about the, possibly the County of Suffolk

12  signing on to the Texas Attorney General protective order.  But

13  there are witnesses in that case, for instance plaintiffs'

14  expert in the MDL, Dr. Schondlemyer, as I understand it was

15  also an expert witness who rendered a report and I understand

16  also testified in deposition in the Texas AG case, which we

17  have not been privy to and not been allowed to see because of

18  the Texas AG order in place, and so what I simply raise, to the

19  extent the Court is inclined to consider to allow the County of

20  Suffolk to sign on the Texas Attorney General protective order,

21  defendants be allowed to consider that issue and perhaps file

22  something on the record to protect their interest and make sure

23  everybody is on the same playing field.

24          THE COURT:  All right.  I'll take a brief recess, come

25  back at quarter of twelve.

Maryann V. Young
Certified Court Transcriber
(508) 384-2003

36

1    (Recess, reconvene 11:51:16 a.m.)

2    (Court called into session)

3        THE COURT: All right, please be seated. All right.

4    On docket entry No. 1175, the motion is allowed subject to the

5    enforcement of the confidentiality order. I'd like to set a

6    deadline, so tell me what you think is a reasonable time for

7    production.

8        MR. McGINTY: Your Honor, I would suggest that that

9    deadline should be 90 to 120 days. These documents by and large

10   are located in Sacramento. They will have to be reviewed.

11   They will have to be vetted for privilege, and it's going to

12   take some time to do that. In addition, many of these

13   documents are in electronic format and, as it stands right now,

14   I'm unaware of what, if any, systems are in place in order to

15   access some of those documents. So we should have a

16   significant amount of time.

17       THE COURT: Well, I could give you 90 days, but what

18   about phasing it as things become available?

19       MR. McGINTY: Your Honor, we have no objection to

20   that, and as a matter of fact, in the productions that have

21   been taking place at this point, we have been producing on a

22   rolling basis that by agreement with Mr. Mangi's office. So, I

23   would not object to that.

24       THE COURT: Okay.

25       MR. MANGI: May I be heard, your Honor?

37

1      THE COURT:  All right.

2      MR. MANGI:  Your Honor, very briefly, there, there's

3  separate components to this motion.  First producing an

4  un-redacted copy of what they've already produced, that takes

5  no time.  Just take off the tape, and copy it again.  So we

6  submit that should be produced within 14 days.  The second

7  component is a production of claims data.

8      THE COURT:  Can you do that within 14 days?

9      MR. McGINTY:  I do not know, your Honor, whether that

10  can be done that quickly.  I would suggest that the order the

11  Court was intending to enter is probably the right one.

12      THE COURT:  Well--

13      MR. McGINTY:  But we will--

14      THE COURT:  -- what I'd like to do is say 90 days,

15  but let's set a tentative schedule for the phases.  So if you

16  could do this within four, the first 14--

17      MR. McGINTY:  Yes, your Honor.  As I, as I have, have

18  indicated, we are willing to produce on a rolling basis, as

19  we're able to do it.  I think that the outside limit of 90

20  days, should, should stay in place, but I will represent to the

21  Court and to Mr. Mangi that we will produce on a rolling basis

22  as we are able to do that.

23      THE COURT:  But let's see if we can set a schedule

24  for that rolling basis.

25      MR. MANGI:  Your Honor, if, if I may just speak to

38

1  the two other components of this?  The second component is

2  claims data.  Health Net has represented to us in numerous

3  letters that are appended to our motion they can produce claims

4  data within six to eight weeks of start.  Given that summary

5  judgment is, is fast up and coming in this case, we would

6  request that they be held to that schedule.  And the third

7  component of it, are these additional documents.  Again your

8  Honor, these are very specific documents.  They won't be more

9  than that high.  There are no privilege issues.  Most of them

10 are just contracts.  Ninety days, we would submit, is entirely

11 unrealistic and we would submit that certainly the un-redacted

12 production in 14 days, original--

13        THE COURT:  All right, un-redacted production, 14

14 days.

15        MR. MANGI:  The claims data within, they ask for six

16 to eight weeks, we'll say eight weeks is fine.

17        THE COURT:  All right.

18        MR. MANGI:  And the additional documents--

19        THE COURT:  So, six to eight weeks, so will give you

20 the 60 days on that.

21        MR. MANGI:  And these additional documents, your

22 Honor, which is again as I mentioned, just a handful, we would

23 suggest those could be produced within a month.  I mean, the

24 subpoena has been out there since November or 03.

25        THE COURT:  All right, within 30 days.

39

1    MR. McGINTY:  Your Honor, if I may.  The

2  representation that was previously made to Mr. Mangi's office

3  was that it would, it would take eight weeks after we had

4  systems in place in order to locate and access the documents.

5  Eight weeks is two, is two months.  It's 60 days essentially. I

6  would request that the Court stand upon the original intent of

7  90 days because it's going to take us eight weeks after we get

8  the systems in place and, and there's an, an unknown amount of

9  time to get that done.  I think 90 days is a much more

10  reasonable estimate for, for producing--

11    THE COURT:  For final completion.

12    MR. McGINTY:  Yes, your Honor.

13    THE COURT:  But phased in as we've said here today.

14    MR. MANGI:  Your Honor, on claims data, we got claims

15  data from other defendants within four days, within five days.

16  This, this eight weeks is outlandish to begin with, but that's

17  the maximum we can work with to be able to use this data for

18  summary judgment.

19    THE COURT:  Yes, I mean I had, haven't thought of the

20  summary judgment issue since I'm not dealing with that so, I'm

21  inclined to say 60 not 80, not 90.

22    MR. McGINTY:  Your Honor, may I inquire because I am

23  unaware.  When is the summary judgment motion scheduled to be

24  heard?

25    THE COURT:  Well, to be heard, I don't know.

40

1        MR. McGINTY:  When is it scheduled to be briefed?

2        MR. MANGI:  Your Honor, I believe summary judgment is

3    in, is in May.  Is that correct?

4        UNIDENTIFIED:  Yes.

5        THE COURT:  Well--

6        MR. MANGI:  Your Honor, plus on, on the other claims

7    data--

8        THE COURT:  You know, at the end of the 60 days, if

9    it's not done, we'll deal with it.  But let's, let's shoot for

10   60, rather than 90.

11       MR. MANGI:  Your Honor, the, the only remaining issue

12   on, there was one minor lingering issue which is that of Health

13   Net has put these water marks on their documents.  They're

14   expressly forbidden in CMO 10.  They obscure text.  Judge Saris

15   explicitly forbade them.  We told them that.  They still did

16   it.  We ask for clarification on that matter also.  It's in our

17   proposed order.

18       MR. McGINTY:  Your Honor, there are water marks on

19   the documents.  I've seen every one of them.  Not one of them

20   obscures text.  They are a gray background, rather than an

21   overlay.  I'm personally unaware of what Judge Saris has

22   ordered.

23       THE COURT:  Are these watermarks already on the

24   documents?

25       MR. McGINTY:  They are already on the documents that

Maryann V. Young
Certified Court Transcriber
(508) 384-2003

41

1    have already been produced.

2            MR. MANGI:  Your Honor, they're, they're highly

3    confidential 1456, all over the page.  They can just be put on

4    the bottom right like every other document in the case.

5            MR. McGINTY:  They, they are, they are again, your

6    Honor, I've seen, I have personally seen each and every page of

7    these.  They, they are not all over the page.  They are in the

8    center.  They are a gray background. They do not obscure any

9    text.

10           THE COURT:  Well, if they obscure something, then you

11   have to produce it a second time in a non-obscure form.

12           MR. MANGI:  Your Honor, counsel's point is that they

13   are in grayscale.  The color of grayscale varies by the

14   photocopy.  Judge Saris said put them where, outside the text.

15           THE COURT:  You know, I don't want to deal with this.

16   Work it out.

17           MR. MANGI:  Your Honor--

18           THE COURT:  Work it out.  Get together.  Work it out

19   so everybody can read everything.

20           MR. MANGI:  Thank you, your Honor.

21           MR. McGINTY:  Your Honor, for my edification, I

22   perhaps didn't make my notes as as completely clear as they

23   should be.  May I ask if the Court would summarize what the

24   order, what the order is?

25           THE COURT: Get a copy of the transcript.

*Maryann V. Young*
**Certified Court Transcriber**
(508) 384-2003

42

          MR. McGINTY: Is there one, is there a trans--

          THE COURT:  Well, they'll have to be prepared.

          MR. MANGI:  I have good notes.  I'll be happy to
discuss--

          THE COURT:  Okay, outline how you believe--

          MR. MANGI:  Absolutely.

          THE COURT:  -- I've stated.

          MR. MANGI:  Your Honor, the production, the documents
that have already been produced, your Honor has said that they
should be produced in their un-redacted form, presumably
including missing pages, within 14 days.

          THE COURT:  Slow, slow down so that he can take it
down.

          MR. McGINTY:  A little slower, Adil, please.

          MR. MANGI:  Oh, I apologize.

          THE COURT:  Wait, let him get this--

          MR. McGINTY:  I, I got that.

          THE COURT:  You got that.

          MR. McGINTY:  But a little slower next time.

          MR. MANGI:  I personally wrote a big 14.  The, the
additional documents that are identified in our October 15,
2004 letter, which follow depositions, your Honor has ordered
the production of those documents within 30 days.  And the
production of claims data, your Honor has ordered within 60
days.

43

1      THE COURT:  Clear enough?

2      MR. McGINTY:  Yes, your Honor, simply that that 60

3  days subject to reevaluation depending on what the technical

4  issues are.

5      THE COURT:  I'll listen to you.  You know, you get to

6  that point, you file a motion, I'll hear you.

7      MR. McGINTY: Okay.

8      THE COURT:  But, you know, always try and talk with

9  each other and see if you can try and work things out, and, you

10  know, as to the watermarks, see if you can work this issue out.

11  I mean this is--

12      MR. McGINTY:  We, we do speak to each other, your

13  Honor, regularly.  I'm sure that as reasonable people, we can

14  resolve that.

15      THE COURT:  All right, as to docket entry No. 1189,

16  the motion is denied.  I'm afraid you are bound by what liaison

17  counsel has done in the past, and I think you have to talk to

18  liaison counsel and make that clear.

19      As to 1300, it's denied without prejudice at this

20  time, having heard from Mr. DeMarco's co-counsel.  I'll give

21  everybody else 14 days to weigh in on this if they want to file

22  anything.

23      MS. CICALA:  Thank you, your Honor.

24      THE COURT:  All right, and then when you, when we get

25  everything, we can set up another hearing date

44

1          MS. CICALA: Thank you.

2          MR. CHRISTOFFERSON:  Your Honor, just a quick point

3     of clarification, are you inviting further submissions by, by

4     Schering & Suffolk or just, you know, other defendants?

5          THE COURT:  Well, you've, did, I mean, did you really

6     get much of chance to respond?

7          MR. CHRISTOFFERSON:  We, we did file--

8          THE COURT:  You're satisfied.  I mean--

9          MR. CHRISTOFFERSON:  Okay.  Thank you, your Honor.

10          THE COURT: If anybody else wants to respond, only

11     because it was just yesterday.  Okay.

12     //

13     //

14     //

15     //

16     //

17     //

18     //

19     //

20     //

21     //

22     //

23     //

24     //

25     //

45

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

_____          March 6, 2005
Maryann V. Young

Maryann V. Young
Certified Court Transcriber
(508) 384-2003