# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No. 01-12257-PBS

CITIZENS FOR CONSUMER JUSTICE, ET AL.
       Plaintiffs

          v.

ABBOTT LABORATORIES, et al
       Defendants

COPY

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
HELD ON FEBRUARY 2, 2006

APPEARANCES:

For the plaintiffs: David S. Nalven, Esquire, Hagens, Berman, Sobol, Shapiro, LLP, One Main Street, Cambridge, MA 02142.

For Shering-Plough: Eric Christofferson, Esquire, Ropes and Gray, LLP, One International Place, Boston, MA 02110, (617) 951-7751.

For Johnson & Johnson: Adel Mangi, Esquire, Patterson, Belknap, Webb & Tyler, LLP, 1133 Avenue of the Americas, New York, NY 10036-6710.

For Astrazeneca Pharm.: Nicholas Theodorou, Esquire, Foley Hoag LLP, 155 Seaport Boulevard, Seaport World Trade Center West, Boston, MA 02210, (617) 832-1163.

For Dey, Inc.: Chris Palermo, Esquire, Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178, (212) 808-7800.

For Abbott Labs: Carol Geisler, Esquire, Jones Day, 222 East 41st Street, New York, NY 10017-6702.

For Empire Blue Cross Blue Shield: Theodore Hess-Mahan, Esquire, Shapiro Haber & Urmy, LLP, 53 State Street, Boston, MA 02108, (617) 439-3939.

For United Health Care:  Michael Prame, Esquire, Groom Law
Group, 1701 Pennsylvania Avenue, N.W., Washington, DC  20006,
(202) 857-0620.

For Tufts Associated Health Plan:  Anne Josephson, Esquire,
Kotin, Crabtree & Strong, One Bowdoin Square, Boston, MA  02114,
(617) 227-7031.

For Neighborhood Health Plan:  Susan Banning, Esquire, Hemenway
& Barnes, 60 State Street, Boston, MA  02109, (617) 557-9701.

For Fallon Community Health Plan:  William Saturley, Esquire,
Nelson, Kinder, Mosseau & Saturley, PC, 99 Middle Street,
Manchester, NH 03101-1510, (603) 606-5005.

For Amgen:  Joseph H. Young, Esquire, Hogan & Hartson, LLP, 111
Soth Calvert Street, Ste. 1600, Baltimore, MD  21202, (410) 659-
2775.

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, Massachusetts 02093**
**(508) 384-2003**

2

1                    **I N D E X**

2   Proceedings                                    3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1              P R O C E E D I N G S

2      (Court called into session)

3          THE CLERK:  The Honorable Marianne D. Bowler

4  presiding.  Today is February 2, 2006.  The case of Citizens

5  for Consume, et al v. Abbott Labs, et al, Civil Action

6  No. 01-12257 will now be heard.  Will counsel please identify

7  themselves for the record.

8          MR. NALVEN:  Your Honor, I'm David Nalven from Hagens

9  Berman in Boston representing the plaintiffs.

10         THE COURT:  Thank you.

11         MR. CHRISTOFFERSON:  Good morning, Your Honor, Eric

12 Christofferson from Ropes and Gray representing Schering-Plough

13 Warrick Pharmaceuticals Corporation.

14         THE COURT:  Thank you.

15         MR. MANGI:  Good morning, Your Honor, Adel Mangi from

16 Patterson, Belknap, Webb & Tyler for Johnson & Johnson.

17         THE COURT:  Thank you.

18         MR. THEODOROU:  Good morning, Your Honor, Nicholas

19 Theodorou representing Astrazeneca Pharmaceuticals.

20         MR. PALERMO:  Good morning, Your Honor, Chris Palermo

21 from Kelley Drye & Warren representing Dey, Inc.

22         THE COURT:  Thank you.

23         MS. GEISLER:  Good morning.  Carol Geisler from Jones

24 Day representing Abbott Laboratories.

25         THE COURT:  All right.  Counsel have received the

4

1   notice, and I've just received from Mr. Nalven the order in

2   which he would like to proceed here and--

3           MR. NALVEN:  Yes, Your Honor, I shared that by

4   telephone with all counsel previously.  I received no

5   objection.  No joinder but no objection and so I provided it to

6   the Court this morning.

7           THE COURT:  Is there any objection?

8           MR. THEODOROU:  Well, I don't really know which the

9   order is, but I assume that we're--

10          THE COURT:  Can you show Mr. Theodorou?

11          MR. THEODOROU:  Hopefully I'm first.

12          MR. MANGI:  I have a copy here.

13          THE COURT:  I could say something, Mr. Theodorou, but

14  I won't.

15          MR. NALVEN:  Your Honor, as I explained to Mr. Duffy,

16  the two matters at the bottom of the list I believe are off the

17  calendar because they've been resolved and one of those is

18  Mr. Theodorou's.

19          MR. THEODOROU:  Yes, Your Honor--

20          THE COURT:  Which--

21          MR. THEODOROU:  --1894, the motion to compel

22  production of documents from the Union of Operating Engineers.

23  Judge Saris had argument on that on Friday.  We have submitted

24  orders.  Plaintiffs have submitted their own proposed order and

25  it's before Judge Saris.

5

THE COURT:  And would you like to be excused,
Mr. Theodorou?

MR. THEODOROU:  If I may?

THE COURT:  You may.

MR. THEODOROU:  Thank you, Your Honor.

THE COURT:  You're welcome.

MR. NALVEN:  Your Honor, in addition, plaintiffs and
defendants yesterday evening resolved motion 1794.  That's the
motion to compel production of IMS data and reports by the
Track 1 defendants.  I reached an agreement with
Mr. Christofferson last night.

THE COURT:  All right, so the motion--

MR. CHRISTOFFERSON:  That's right, Your Honor.

THE COURT:  --should be withdrawn by agreement of
counsel?

MR. NALVEN:  Yes, ma'am.

MR. CHRISTOFFERSON:  Yes, Your Honor.

THE COURT:  Anything but ma'am.  And would you like
to be excused, Mr. Christofferson?

MR. CHRISTOFFERSON:  Respectfully, no, Your Honor, we
have another motion on.

THE COURT:  You have other matters, all right.  All
right, then we will proceed in the order listed by Mr. Nalven,
starting with docket entry no. 1682.

MR. HESS-MAHAN:  Good morning, Your Honor, my name is

6

1   Theodore Hess-Mahan from the law firm of Shapiro Haber & Urmy,

2   and I represent Empire Blue Cross Blue Shield, which is the

3   movant on the motion for protective order, 1682.

4          THE COURT:  I'll hear you.

5          MR. HESS-MAHAN:  Okay.  Thank you, Your Honor.  This

6   is a very simple, straightforward motion, Your Honor.  Just to

7   give you some background, this is not the first time that my

8   client's been subpoenaed by the defendants in this case.  They

9   were served in April of 2004 with a 26 document request and

10  request for deposition topics which over the course of several

11  months were negotiated and narrowed somewhat but resulted in

12  Empire producing close to 30,000 pages of documents and two

13  deposition witnesses for full day depositions at which they

14  testified in large part on the very areas which defendants are

15  now pressing to have additional depositions; that is on

16  physician administered drugs.  And the situation we find

17  ourselves in now since the class certification order is that we

18  are no longer really a member of the class.  As a non-party

19  here, it's a different burden.  It's whether it's unduly

20  burdensome.  I submit respectfully, Your Honor, that enough is

21  enough.  We've produced 30,000 pages of documents.  We produced

22  two witnesses for two days of depositions.  They've testified

23  at length as the reply memo and the attached deposition

24  transcripts, Exhibits D and E, show.  At this point there

25  really isn't much more that we can provide.  We've responded to

7

1  the document request, given them additional documents in

2  response to a subsequent subpoena. But at this point in the

3  game, there really isn't a reason why they need to take a

4  deposition witness in advance. It would be large and

5  duplicative discovery. There's nothing new that they're going

6  to discover here. They've done the discovery on Empire's use

7  or non-use of AWP and how they handled physician administered

8  drugs. At this point, Your Honor, we'd be just asking to be

9  relieved of the burden of having to come back with additional

10 witnesses who are simply going to give the same testimony.

11        THE COURT:  I'll hear you.

12        MR. NALVEN:  Thank you, Your Honor. Respectfully,

13 there really can be no dispute first that this discovery is

14 still relevant. The discovery here clearly goes to the heart

15 of the case. It's third party payers, like Empire, that the

16 plaintiffs claim were duped by the alleged AWP scheme and the

17 practices and knowledge of one of the biggest insurers in this

18 country are surely relevant to the claims and defenses in this

19 litigation. The fact that Empire is based in New York and not

20 Massachusetts is of no moment. Empire says that the discovery

21 is irrelevant because the classes are limited to Massachusetts,

22 but Judge Saris' class certification order, which was just

23 issued on Monday, defines the classes to include third party

24 payers who made purchases of drugs in Massachusetts. And

25 Empire has admitted in its papers that at least it has made on

8

1    at least a few occasions payments to prescribers in

2    Massachusetts.  So they very likely are, in fact, a class

3    member.  But even if Empire's somehow not a class member--

4              THE COURT:  I mean a few occasions, what does that

5    mean in terms of raw numbers?

6              MR. NALVEN:  Your Honor, in their reply paper they

7    mention that they have some members who lived or received

8    treatment in Massachusetts.  We haven't, there's no, you know,

9    significant record on what their contacts are, but we would

10   submit that it's very likely that they have paid prescribers in

11   Massachusetts.  For example, a New York resident who needs to

12   go to Mass General to receive treatment is probably something

13   that happens quite often.  But even if somehow they're not a

14   member of this particular class, it's still very relevant.  The

15   plaintiffs expert, Dr. Hartman, relies on data that he received

16   from Blue Cross Blue Shield of Kansas City, a Missouri third

17   party payer, for some of his analysis regarding the so-called

18   Massachusetts classes.  I highly doubt that the plaintiffs in

19   this case would say that the actions and knowledge of a third

20   party payer in New York are irrelevant to the so-called

21   nationwide AWP scheme.  And Your Honor has already granted

22   discovery similar to that that's being requested.

23             With respect to the burden here, Your Honor, I think

24   that it's also not very burdensome at all.  With respect to

25   documents that were requested in the subpoena, Empire has

9

1  already produced those documents, so all we're talking about

2  is a single 30(b)(6) deposition.

3          THE COURT:  It can be done in one day?

4          MR. NALVEN:  I believe so.  They have already

5  identified two people to speak to the narrow focused topics

6  that we've negotiated.  It's not a very large, you know, it's

7  not a very expansive set of topics that we've asked for and,

8  you know, it seems to us that it could be done very quickly

9  depending on the schedules of course of the witnesses.  We are

10  willing to travel to them.  They don't have to travel anywhere,

11  and the discovery, I just want to add, Your Honor, the

12  discovery that Mr. Hess-Mahan referred to regarding what was

13  done earlier was simply not on the specific topics that we've

14  identified here.  They're very narrow, focused topics and the

15  witnesses before were not knowledgeable about these particular

16  specific narrowed topics.  And so we just don't see that Empire

17  has identified that there's a significant burden here and, you

18  know, we just want to ask them some narrow focused questions

19  about documents they've already produced.  It doesn't seem to

20  us that it's going to be a long or a taxing deposition.

21          MR. HESS-MAHAN:  May I just briefly be heard?  As to

22  the number of subscribers that we have that are treated in

23  Massachusetts these are purely incidental.  These are folks who

24  lived in New York, moved to Massachusetts.  There maybe some

25  who in fact got treatment in Massachusetts but because of the

10

1   geographic territory we're talking about, which is lower state

2   New York, we're not talking about a whole lot of people.  It's

3   going to be a very, very few.  And there certainly wasn't any

4   sort of, you know, there wasn't no intention to cover people

5   who are now within the class of patients who are covered.

6            With respect to testimony that was already given, I

7   just direct the Court's attention to page three of the reply

8   memo and the citations there to the record.  There has already

9   been, and again the subpoena here is specifically on oncology

10  drugs.  That's exactly what the two witnesses who have already

11  testified in full day depositions have testified regarding.

12  They gave the knowledge that was available to the company

13  Empire at the time, and all we'd really be doing is rehashing

14  what's already been discussed and basically, you know,

15  authenticating documents, which again, the burden compared to -

16  and we're perfectly willing to authenticate those documents.

17  There's no dispute from us.

18           THE COURT:  Well, it doesn't seem to me that's it's

19  overly burdensome.  I'll limit it to one day.  The two people

20  have been identified.  They're willing to travel to you.  I

21  don't think that's unreasonable.

22           MR. NALVEN:  Thank you, Your Honor.

23           THE COURT:  All right.  So the motion to quash is

24  denied but the deposition is limited to one day.

25           MR. HESS-MAHAN:  Thank you.

11

1         THE COURT:  All right, moving on to docket entry

2   number 1770.

3         MR. MANGI:  Thank you, Your Honor, Adel Mangi from

4   Patterson and Belknap on behalf of defendants.  The subpoena at

5   issue here, Your Honor, was issued on April 9, 2004.  United,

6   the recipient of the subpoena, is a particularly critical part

7   of defendants industry sample because of their status as a

8   major national insurer.  That subpoena was issued almost two

9   years ago now, but to date United has made only a limited

10   production of documents.  It's produced some documents from a

11   prior litigation production and it's produced some contracts.

12   United has refused to produce documents responsive to

13   defendants narrowed production demands and United has refused

14   to produce any witnesses for deposition.  The only arguments

15   that United has put forward to excuse their non-compliance with

16   the subpoena are arguments that Your Honor has previously ruled

17   on, not in reference to one or two health plans but in relation

18   to 10 health plans now.

19         Most recently in November of 2005 Your Honor heard a

20   motion to compel against six Blue Cross Blue Shield plans and

21   the arguments there were identical to the issues raised here.

22   The documents sought were identical to the documents sought

23   here and the deposition focus are slightly narrower for United.

24   Previously in January of `05 Your Honor ordered discovery to

25   proceed against Health Net which was substantially broader then

12

1   the discovery sought here because that also encompassed self

2   administered drugs whereas the focus is now purely on physician

3   administered drugs.  And of course there were previous motions,

4   in November of `04 against Aetna, Cigna, Humana and Judge Saris

5   also ordered discovery to proceed against health plans in April

6   of 2004.

7           In sum, Your Honor, what we have here is a situation

8   where for almost two years United has engaged in every possible

9   effort to delay and stall this discovery and is now seeking to

10  be rewarded for that by being excused from production.

11  Defendants ask that United be held in the same standard as all

12  the other health plans that have been subpoenaed in this

13  litigation, ordered to make a good faith production to the same

14  narrow demands we've addressed to other health plans.  As to

15  the substance of the request, we've previously argued those

16  before Your Honor so I won't take the Court's time with them

17  again, but I'm available to respond to any specific points my

18  learned friend Mr. Prame may raise for United.

19          THE COURT:  All right.  I'll hear you.

20          MR. PRAME:  Thank you, Your Honor, Michael Prame from

21  Groom Law Group in Washington on behalf of United Health Care.

22  United submits there are four reasons why the Court should deny

23  the motion to compel.  I believe my colleague underestimates or

24  understates United's efforts to comply with the subpoena.  They

25  have not been recalcitrant.  In 2004 United spent over 250

13

1  staff hours identifying, collecting and producing over 25,000

2  pages of material pursuant to the request that the defendants

3  were making at that time.  The second reason why the motion

4  should be denied, the additional discovery that the defendants

5  are now seeking United submits would be unduly burdensome in

6  that it would take thousands of hours over a six month period

7  to respond to those requests to the extent, at least in

8  particular one item it may not even be possible to do that.

9  The discovery sought also as been discussed earlier has not be

10 tailored to the classes that have been certified by the Court.

11 Third, United submits the defendants have already obtained the

12 sample that the Court authorized them to get.  They have taken

13 the depositions and obtained discovery from over 50% of the

14 insured lives in the United States and health plans and

15 insurers covering more than 50% of the classes that were

16 certified by the Court.  And fourth, the motion to compel is

17 not timely.

18         To focus a little bit upon what happened in 2004,

19 United did receive the subpoena in April of 2004.  They filed

20 their objections and immediately turned around and started

21 discussing with counsel what it was that defendants were

22 seeking from them.  That was a three-month process, Your Honor.

23 In August of 2004 there was an agreement reached as to what we

24 produce for documents.  United turned around those documents,

25 spent 250 hours over the next two months gathering,

14

1  identifying, collecting those documents from sites nationwide.

2  Many of these documents were archived off site.  They pulled

3  those back.  Others were in computer archives, pulled those

4  back.  United completed its document production in November of

5  2004.  As I said, all tolled it was 250 staff hours, 25,000

6  pages of material and outside legal fees in connection with

7  negotiating the scope of the subpoena, reviewing documents for

8  production hit the six figure mark.  United completes its

9  production in November of 2004.  It's not until nearly June of

10  2005 defendants come back and say we'd really like more, May

11  27th.  We negotiated with them again for another month and a

12  half.  And after that month and a half United simply said it's

13  too burdensome.  Now let me speak to that burden.  One of the

14  things that they request is for United to produce its fee

15  schedules for the period 1997 to 2003.  There are

16  70,000 fee schedules for that period.  Those fee schedules in

17  United's computer--

18        THE COURT:  Isn't this available though in electronic

19  format?

20        MR. PRAME:  Comprised of billions of rows of computer

21  code.  United can't even say that they have the system band

22  with to download that type of information.  To the extent that

23  they do, they estimate it's going to take 20 employees full

24  time for four months to download that, to get that information.

25  We had offered during the negotiation to do a representative

15

1   sample of fee schedules and it was rejected.

2           THE COURT:  Why isn't that a reasonable place to

3   start?

4           MR. MANGI:  Your Honor, on the specific issue of fee

5   schedules defendants have had some experience dealing with fee

6   schedule productions from health plans to date.  Your Honor has

7   ordered that production many times and we've received it from a

8   number of health plans.  In no case to date has the production

9   of fee schedules proved a burden because as Your Honor

10  indicated it's a simple electronic download.  They're not even

11  field issues as there can sometimes be with claims data.  Now

12  insofar as there are unique issues pertaining to United's fee

13  schedule production we have asked for a specific identification

14  of what the problems are so that we can work with United to

15  find a reasonable solution.  We have received no technical

16  specifications as to where this problem is coming up that makes

17  United unique.  We would submit that if United's obligation to

18  produce documents in response to the subpoena is made clear we

19  are then willing to work with United.  If it's a simple

20  technical roadblock that we can resolve we're willing to do

21  that.  If it cannot and we need to sample fee schedules then

22  we'll do that.

23          THE COURT:  Well, I think you have to at least share

24  with your brother the source of the technical problem.  If it's

25  been feasible for everyone else, I don't know why it's such a

16

1   problem.

2           MR. PRAME:  Yeah, I mean, we outlined in our papers,

3   Your Honor.  We've discussed with them the issue.  Even--

4           THE COURT:  Well, your brother's just telling me that

5   he doesn't know.

6           MR. PRAME:  With all do respect, Your Honor, we have

7   been dealing with a separate attorney at that law firm until

8   August of this year.  We had these discussions with her.

9   Mr. Mangi, we've had more recent discussions with in September.

10  We started over from square one with Mr. Mangi in September.

11  We had told them--

12          THE COURT:  Well, apparently he is not satisfied with

13  your explanation in terms of the technical problems that make

14  your company unique from all the others.

15          MR. PRAME:  And we would be happy to continue that

16  discussion.  We've outlined in our paper that it's billions of

17  lines of computer code.  Even in the letter that we sent

18  proposing the sample, we said we'll give you 10 contracts from

19  Massachusetts for each year, 10 fee schedules and for those fee

20  schedules you identify the drugs that you want and we'll go

21  back and get them.

22          THE COURT:  And how many fee schedules are there on

23  average per year?  I mean, I'd like to know what the - if you

24  say 10 what portion of the sample that is?

25          MR. PRAME:  Yeah, a couple of concepts, Your Honor.

17

1   The fee schedule just doesn't focus on drugs.  The fee

2   schedule with providers is every type of fee for service that

3   they provide.

4           THE COURT:  Sure, I realize that.

5           MR. PRAME:  The drug, as I understand it, the drug

6   components of those fee schedules get updated twice a year.

7           THE COURT:  But you didn't answer my question.  If

8   you say we're willing to provide 10, well if 10 of 50, that's

9   significant, but if it's 10 of 200 it's perhaps not as

10  significant.  So I'm trying to get a sense of what it is--

11          MR. PRAME:  Yeah.

12          THE COURT:  --you're willing to offer.

13          MR. PRAME:  Yeah.  We had, as I said there are

14  70,000--

15          THE COURT:  Do you know the answer to my question?

16          MR. PRAME:  There are 70,000 fee schedules, Your

17  Honor from the--

18          THE COURT:  For the time periods?

19          MR. PRAME:  --`97 to 2003.  We had--

20          THE COURT:  70,000 and you telling me you would

21  provide 10?

22          MR. PRAME:  No, we would provide 70, we've done 10

23  for each year for the Boston area, and what that was being

24  projected was 80 hours worth of work over two to three week

25  period to do that.

18

1          THE COURT:  Well, I think 70 out of 70,000 is

2    probably not statistically significant.  Mr. Mangi?

3          MR. MANGI:  Thank you, Your Honor.  If I may address

4    the specific issue of fee schedules and then I'll address the

5    other issues if Your Honor pleases.  It sounds to me, first of

6    all in relation to communications United has had with Collins

7    at Patterson Belknap, I've reviewed all those files and all the

8    logs of phone conversations and was involved in some.  It

9    appears to me that the source of United's problem insofar has

10   be able to--

11         THE COURT:  You can be seated while your brother

12   argues.

13         MR. PRAME:  Thank you.

14         MR. MANGI:  --insofar as I've been able to ascertain

15   to date pertains to fees for physician services that have no

16   relation to drug administration.  We're not interested in those

17   fees.  We've made that clear to United as to other plans.

18   We're interested in the fee schedules pertaining to drugs and

19   in the fee schedules pertaining to services incident to drug

20   administration.  There are a number of relatively simple ways

21   to pull the services incident to drug administration.  In some

22   claim systems they can be pulled by reference to the same

23   overarching claims number that pertain to drugs.  In others we

24   have and can provide again a list of administration specific

25   codes.  To put this in context, Your Honor, the fee schedule

19

1    production to date no third party health plan has even asked

2    for any cost from fee schedule production to be reimbursed

3    because they've proved nominal.  And again, I would submit that

4    once the obligation to United to produce is made clear any

5    issues can be resolved expeditiously.

6         If I may respond briefly to a couple of other points

7    that my learned friend made.  In relation to productions to

8    date and the issue of burden, the mere volume of pages that

9    have been produced says nothing as to the nature of the

10   documents that have been produced.  To put that issue in

11   context, United has not produced any documents reflecting its

12   knowledge of critical issues such as margin, the existence of

13   margin, expectation of margin, which is at the core of

14   plaintiffs' case.  In relation to the burden of producing those

15   additional documents we suspect it's nominal.  In fact in a

16   letter from July United told us that they had already

17   identified the documents that they needed to produce as to

18   margin.  They just haven't produced them.

19        As to the issue of our not having focused purely on

20   United's Massachusetts operations, well again, that's a simple

21   point.  There is no claim in this case that there was a

22   Massachusetts specific fraud.  The claim is of a nationwide

23   fraud.  It so happens that the class that's been certified in

24   this context is Massachusetts specific, but proving or

25   disproving it and plaintiffs' theories is a consequence of the

20

1    knowledge of the industry as a whole.  So United's knowledge

2    on these issues is absolutely critical.

3           And finally in terms of the fact that we subpoenaed

4    other plans in addition to United is the identical argument

5    made by the group of Blues plans saying, well, others have

6    produced so we shouldn't have to.  Well, Your Honor, this is a

7    bit of chicken and egg.  You'll recall the Blues plan said,

8    well, United has been subpoenaed so we shouldn't have to

9    produce and here we see United making the same argument.

10   They're all critical parts of the same industry sample.  Some

11   are major players.  Some are smaller players.  United's

12   subpoena's been outstanding for some two years now and we

13   submit they should be ordered to produce.

14           MR. PRAME:  May I be heard, Your Honor?

15           THE COURT:  You may.

16           MR. PRAME:  A couple of additional points, and I want

17   to make sure that it's clear, we were not posing to produce our

18   entire fee schedule.  What I was talking about was producing

19   the schedules as they related to drugs and those numbers that I

20   was referencing was specifically related to the drug issue.  I

21   think the inference that we have been withholding documents is

22   misleading.  We have produced every single document that they

23   requested back and we negotiated back in 2004, every single

24   one.  They came back in June 2005 and said, notwithstanding

25   that we want more.  So we have produced everything that had

21

1  been agreed to, but our objection on burden is not limited to

2  the fee schedules.  We have the same issue for claims data.

3  For claims data we've told them on multiple occasions, we've

4  written them series of letters of how many hours it's going to

5  take and how long it's going to take.  The current request is

6  estimated 450 hours over a three to six month period to produce

7  data for Arizona and Massachusetts for 1997 to 2003.

8          THE COURT:  Well, I'm going to grant the motion, and

9  I suggest that you sit down and see if there is some way that

10 by providing them some technical information they may be able

11 to expedite the process for you.  Agreeable?

12         MR. MANGI:  Thank you, Your Honor.

13         THE COURT:  All right.

14         MR. PRAME:  With all do respect, Your Honor, I assume

15 that the points that we have made in our briefs would be within

16 the record and the reasons why you're denying the motion would

17 include those arguments that we have made on other points.

18         THE COURT:  So noted.

19         MR. PRAME:  Thank you, Your Honor.

20         THE COURT:  All right, moving on.  Docket entry

21 number 1907.

22         MR. NALVEN:  Your Honor, before you you have six

23 motions, the following six motions listed on the argument list

24 that I provided to the Court this morning.  All of these six

25 motions deal with subpoenas that were sent to four--

1          THE COURT:  Right.

2          MR. NALVEN:  --Massachusetts's third party payers,

3    Tufts, Neighborhood Health Plan, Fallon and Harvard Pilgrim

4    Community Health Plan.  Because all of these, because the

5    protective order motions and the motions to quash address the

6    same subpoenas I would recommend to the Court that the Court

7    consider all of these motions together.  I can address on

8    behalf of plaintiffs the arguments for plaintiffs' protective

9    order motion.  I would recommend to the Court that the Court

10   include in this global argument the arguments of third party

11   payer counsel who are here today and are prepared to step up--

12          THE COURT:  All right.

13          MR. NALVEN:  --and perhaps it would be useful for you

14   to have before you all counsel at one time.

15          THE COURT:  I agree.

16   (Pause)

17          UNIDENTIFIED:  Would the Court like counsel for the

18   third party payers to identify themselves?

19          THE COURT:  I certainly would.

20          MS. JOSEPHSON:  Good morning, Your Honor, I'm Anne

21   Josephson from Kotin, Crabtree & Strong.  I represent Tufts

22   Associated Health Plan.

23          THE COURT:  Thank you.

24          MS. JOSEPHSON:  Thank you.

25          MS. BANNING:  Good morning, Your Honor, my name is

23

1    Susan Banning from Hemenway & Barnes.  I represent

2    Neighborhood Health Plan.

3              THE COURT:  Thank you.

4              MR. SATURLEY:  Good morning, Your Honor, William

5    Saturley from Nelson, Kinder, Mosseau & Saturley.  And in this

6    matter I speak for Fallon Community Health Plan.

7              THE COURT:  Thank you very much.

8              MR. SATURLEY:  Thank you.

9              MR. NALVEN:  Your Honor, now on behalf of plaintiffs

10   I will address together, because the arguments are almost

11   identical, motions 1907 and 1909.  1907 is directed to the

12   subpoenas issued to Tufts and Neighborhood Health Plan, and

13   1909 is directed to the subpoenas issued to Fallon and Harvard

14   Pilgrim.  The issue of discovery of non-parties, that is absent

15   class members, is an issue that the Court has dealt with on

16   several occasions before.  What's critical to understand is

17   that when the issue was first raised with Judge Saris, Judge

18   Saris understood and expressly acknowledged that discovery of

19   absent class members was generally frowned upon absent a

20   showing of a specific need.  The defendants argued to Judge

21   Saris and have argued to you repeatedly that the reason that

22   they needed discovery of absent class members is because they

23   had constructed a representative sample of third party payers

24   from around the country and that they needed the specific third

25   party payers whom they had subpoenaed and they took the

24

1  depositions of over 40 third party payers - they're seeking as
2  well - the two that you previously saw on the basis that they
3  had constructed this representative sample.  They argued and
4  we've set forth in our papers on four or five occasions when
5  they represented to Judge Saris and to you that the reason that
6  they needed the specific discovery of an identified health plan
7  provider was because it was a key part of that representative
8  sample.

9         Defendants have already taken over 40 health plans
10 covering over 50% of the covered lives in the United States.
11 It really begs the question at this point now that they have
12 obtained all of the health plans discovery that constituted
13 their representative sample why are they back here now seeking
14 further discovery of four Massachusetts health plans?  Did the
15 defendants have a representative sample in the first place as
16 they have represented to the Court, and if they did, why is it
17 that at this point they require more?  The defendants respond
18 to that argument which is set forth in our papers by saying in
19 essence the world has changed since they constructed their
20 representative sample.  What they say to the Court is Judge
21 Saris has certified two specific Massachusetts only classes and
22 so that as a result now they need to drill down into
23 Massachusetts third party payers.  You did hear from Mr. Mangi
24 just one moment ago that the proof with respect to the
25 Massachusetts class will be demonstrated by the knowledge of

25

1   the industry as a whole which is the reason that they continue

2   to pursue discovery of third party payers nationally.  So that

3   again begs the question why select four more Massachusetts

4   third party payers?  Let me note, Your Honor, that they have

5   already taken two depositions, I'm sorry, three depositions of

6   Blue Cross Blue Shield of Massachusetts which were granted by

7   Your Honor in November.  And they have also already taken

8   discovery and four depositions from Harvard Pilgrim Community

9   Health Plan.  These two Health Plans together compromise more

10  than 50% of the covered lives in Massachusetts.  Your Honor, I

11  work here in Massachusetts, you work here in Massachusetts.

12  They have discovery from Blue Cross Blue Shield of

13  Massachusetts, Harvard Pilgrim.  They are now seeking discovery

14  from Tufts, Fallon, Neighborhood Health and more discovery from

15  Harvard Pilgrim.  Are you aware of any health plan providers

16  other than those five in Massachusetts?  This is not a

17  representative sample even of Massachusetts, even if it were

18  needed, this is every covered life in Massachusetts.  This

19  isn't a representative sample, Your Honor.  This is a census

20  that they are seeking.  You know, the Nielson Company does

21  their sample of all American television watchers with 400

22  families.  It seems to defy credulity that the defendants

23  really need discovery of virtually every covered life in

24  Massachusetts.

25          Three more very brief points, Your Honor.  Number

26

1    one, the discovery of third party payers has been undertaken

2    entirely through the course of this proceeding through the

3    Track 1 defendants, and it was the Track 1 defendants who had

4    represented to you that the defendants had constructed a

5    representative sample.  As Your Honor knows Track 1 discovery

6    concluded at the end of August.  So the subpoenas that were

7    sent to my brothers' and sisters' clients were sent by Track 2

8    defendants.  Track 2 defendants after all were permitted to

9    take discovery until December 3rd.  But it's clear from the

10   subpoenas and from their attachments and from the content of

11   their attachments that these subpoenas, that the Track 2

12   defendants are acting no more as agents for the Track 1

13   defendants in this discovery effort and it's utterly a

14   subterfuge to permit the Track 1 defendants to extend their

15   discovery campaign against absent class members.  What is the

16   proof of that?  The attachment to the subpoena is virtually

17   identical to the attachments to the subpoenas sent by the Track

18   1 defendants.  What is the other proof of that?  There are a

19   list of drugs that the companies want information concerning on

20   those subpoenas.  Among those lists are 147 drugs that were

21   manufactured by the Track 1 defendants.  They, one of the

22   manufacturers sending the subpoenas, had submitted, the

23   subpoena that they had submitted had only five day drugs on it

24   but 147 Track 1 drugs.

25              And again, Your Honor, two more very small points.

27

1   Number one, as Your Honor knows there is a CMO in place in

2   this case which requires 21 days notice.  The subpoenas that

3   were sent to Fallon and to Harvard Community Health Plan were

4   sent on I think something like 11 and nine days notice

5   respectfully, respectively.  Why is that?  Well because they

6   were sent too close to the December 3rd Track 2 cutoff in order

7   to provide sufficient notice.  On that ground alone they should

8   be stricken.  I want to add as well one small point.  In one of

9   Dey's responses it indicates that while my brothers' and

10  sisters' clients before you today are not cooperating with the

11  subpoena that Harvard Pilgrim Community Health Plan is

12  complying with the subpoena and subsequent to Dey's submission

13  of that representation Harvard Community did submit to the

14  parties, and I provided it to the Court yesterday an extensive

15  objection submitted by Harvard Pilgrim.  So on those grounds,

16  Your Honor, plaintiffs submit that these subpoenas should be

17  quashed, that the protective order should be granted and that

18  no further discovery is needed or should be allowed against the

19  health plans in Massachusetts.

20          THE COURT:  All right.  Responding?

21          MR. PALERMO:  Good morning, Your Honor, Chris Palermo

22  on behalf of Dey.  Your Honor, as counsel for plaintiffs has

23  acknowledged, the issue of discovery against the absent class

24  members has already been considered by the Court and the Court

25  has already permitted on two occasions absent class member

28

1   discovery.   The issue is relevance--

2                  THE COURT:   The issue is why were they so late?

3                  MR. PALERMO:   In terms of--

4                  THE COURT:   The 21 days?

5                  MR. PALERMO:   Well, Your Honor, I believe CMO 10

6   permits, and I think it's CMO 10, permits notice to third party

7   payers on seven days notice, Your Honor, and I believe that

8   that's--

9                  THE COURT:   What's your position on that?

10                  MR. NALVEN:   Your Honor, that's flatly incorrect.

11   We've attached the CMO to our papers and we've explained why

12   that argument is incorrect.

13                  THE COURT:   Point it out to me then.

14                  MR. PALERMO:   Your Honor, I'll have to look in our

15   papers.   It was in our opposition to the plaintiffs' motion.

16                  THE COURT:   Well, do you have it in front of you?

17                  MR. PALERMO:   I'll have to get it, Your Honor.   Just

18   one moment.

19   (Pause)

20                  MR. PALERMO:   I apologize, Your Honor.

21   (Pause)

22                  THE COURT:   Do you have it, Mr. Nalven, where you

23   could--

24                  MR. PALERMO:   Your Honor, it's Exhibits G and H to

25   the proposition to the plaintiffs' motion, Your Honor.

29

1          THE COURT:  Let's see if I can pull it up

2   electronically.

3   (Pause)

4          MR. PALERMO:  Your Honor, on and I'm sorry, Your

5   Honor, at September 27, 2004 Exhibit F and, Your Honor, the

6   Court had ruled that defendants could notice third party payer

7   depositions on seven days notice provided that the defendants

8   did not notice more than 10 depositions in any one week.

9          MR. NALVEN:  Your Honor, Your Honor, I'm sorry,

10  you're looking at me so I assume you would like me to respond.

11  Your Honor, there was a hearing as counsel notes on September

12  27, 2004.  That hearing involved third party subpoenas that

13  were noticed on more than 21 days notice.  The issue before the

14  Court was whether having noticed those subpoenas because of

15  scheduling changes among the third parties whether those

16  depositions could proceed on less than 21 days notice having

17  been previously noticed properly.

18          THE COURT:  The date of that again was September--

19          MR. NALVEN:  September 27, 2004.  But, Your Honor,

20  respectfully, you did not modify nor do I believe you intended

21  to modify Judge Saris' CMO 10 with your September 27th order.

22  What you said simply was with respect to properly noticed

23  subpoenas if there's a result of scheduling issues with the

24  non-parties the deposition needed to proceed on less than 21

25  days notice, having been properly noticed that it could proceed

30

1    on seven days notice.  In fact, Your Honor, as I mentioned,

2    this is the second time that Harvard Pilgrim Community Health

3    has been subpoenaed in this proceeding, and I'll just note for

4    you, Your Honor, that the first time the defendants noticed the

5    deposition of Harvard Pilgrim they noticed it on exactly 21

6    days notice.  It's only with respect to these last two

7    depositions, which bumped up against the December 3rd deadline

8    that the 21 day notice violated.

9             THE COURT:  Well that's what's most bothersome to me,

10   you know, I mean--

11            MR. PALERMO:  Well, Your Honor, on that front I would

12   note that the plaintiffs noticed the IMS request one day before

13   the close of discovery, Your Honor.  That would not be

14   sufficient notice under the 21 day rule.

15            THE COURT:  Well tit for tat is not the approach

16   here.

17            MR. PALERMO:  And, and clearly given the delay till

18   now, Your Honor, in February the issue of the timing of the

19   notice, they've had ample notice and time now, Your Honor, to

20   address it.

21            MR. NALVEN:  I only note, Your Honor, with respect to

22   the IMS request that was a document request not a deposition

23   notice not subject to CMO 10.  That matter also has been

24   resolved.

25            THE COURT:  All right.  I'll take it under