31

1  advisement.  I'll take a break and then I'll give you a

2  ruling.

3     MR. PALERMO:  Your Honor, would you like me to

4  address the other issues that--

5     THE COURT:  Sure.

6     MR. PALERMO:  --plaintiffs' counsel raised?

7     THE COURT:  Go through it all and then I'll take a

8  break and come back and give you a ruling.

9     MR. PALERMO:  Well, Your Honor, there's clearly a

10  need for the discovery.  It's relevant to the Massachusetts

11  Class three that the Court had certified and is clearly, it

12  goes to the heart of those allegations.  Plaintiffs' counsel

13  had referenced the discovery against Blue Cross Blue Shield.

14  That is one, Blue Cross Blue Shield of Massachusetts, Your

15  Honor, that's one plan.  Your Honor, we submit that one plan

16  alone is insufficient in terms of demonstrating industry

17  knowledge and the methodologies that are used by the plans.

18  Dey needs and the Track 2 defendants need discovery on industry

19  knowledge relating to the third party payers' understandings

20  and expectations and how they went about reimbursing.  In terms

21  of the scope of the subpoena, there are issues relating to

22  cross subsidization between the brand and generic drugs.  With

23  respect to the issue of Dey being a Track 2 defendant, Your

24  Honor, Track 2 defendants are entitled to take discovery and to

25  pursue discovery and Dey did so recognizing how the Court had

32

1   ruled in its class certification decision with respect to

2   certifying the Massachusetts class.  That's the focus of that

3   discovery and it's clearly relevant to that discovery.

4        MR. NALVEN:  Your Honor, I did not address the issues

5   of burden to the Massachusetts third party payers because

6   counsel for those third party payers are here today and I know

7   that they would like--

8        THE COURT:  Uh-huh.

9        MR. NALVEN:  --to be heard with respect to burden.

10       THE COURT:  I'll hear you.

11       MS. BANNING:  I'm at the end, Your Honor, Susan

12  Banning for Neighborhood Health Plan.  With respect to

13  Neighborhood Health Plan that is our argument really, burden,

14  whether it is analyzed under an absent class member under Rule

15  45.  In our view Dey has not made any showing that they need

16  discovery from this particular health plan or that the need

17  outweighs the significant burden.

18       THE COURT:  How many subscribers do you have?

19       MS. BANNING:  We have approximately 125,000 members,

20  Your Honor, and approximately 300 employees.  What NHP does, it

21  was founded to serve, bring managed care to underserved

22  populations.  Today approximately 80% of its members are on

23  Medicaid and what NHP does is it contracts with Mass Health.

24  It's a Mass Health managed care organization to provide that

25  care.  NHP does not have any in-house counsel.  It has on staff

33

1  a grand total of two pharmacists, one of which has already
2  spent significant time going through these requests and trying
3  to analyze what would be needed.  NHP certainly is not a major
4  national insurer or anything like the things that other people
5  have been talking about.

6       What we did try to do, Your Honor, and even that took
7  a significant amount of time, and I heard a lot about timing
8  and obviously when I got this subpoena I did not know of all
9  these various orders, but just with respect to NHP, Your Honor,
10 contrary to what Dey says, the subpoena to NHP, the original
11 subpoena, was served on November 14th.  The documents were due
12 on November 23rd.  The deposition was scheduled for December 2nd.
13 I sent three separate pieces of correspondence to Dey including
14 objections, did not get a response, and that was when we filed
15 the motion for a protective order.  They never would even tell
16 me that they were taken the deposition off for December 2nd.
17 They did not tell me plaintiffs had filed a motion.  I had to
18 get that information by calling around to other people.

19      After all this happened, Your Honor, Dey sent what
20 they called a reduced list of drugs and a reduced list of
21 requests.  And we did nonetheless try to respond to that
22 despite all of these different motions that are outstanding.
23 And in document number 2089, Your Honor, and the attachment 1
24 to that, it's our motion to file a supplemental affidavit of
25 Pamela Siren.  And what we try to do in that in the event Your

34

1    Honor does order discovery is in paragraph 10 NHP explains

2    what they could produce from the reduced list tabbing it to

3    their different request, and in paragraph 10 of that affidavit

4    it lists things like physician fee schedules, contracts with

5    current and former PBM's et cetera.  But what NHP also does is

6    try to explain why with respect to their size and their

7    resources in both this affidavit and the other affidavit of

8    Ms. Siren, this would be an incredible burden and those

9    arguments, Your Honor, range from everything that we cannot

10   access our information by J codes.  And the best way to see the

11   dramatic difference is between this J code list of many drugs

12   and the way NHP accesses its drugs is to look at Judge Saris'

13   list of drugs and the recent order.  That is how they foresee

14   then can access drugs.  They go onto explain why things like

15   trying to retrieve every piece of correspondence with

16   providers, every contract out there which there are over 5,000

17   on site, the rest stored, is for this size organization an

18   incredible burden and so, again, even with the reduced list we

19   did try to say what we could produce with the original list.

20   We filed a variety of objections.

21            THE COURT:  Now you're non-profit?

22            MS. BANNING:  Yes, Your Honor, we are.

23            THE COURT:  All right.

24            MR. PALERMO:  Your Honor, I'm sorry, would you like

25   me to address the burden issues with respect to each--

35

1      THE COURT:  Well one each time if it's easier for

2  you to keep track of the argument.  Go ahead.

3      MR. PALERMO:  Thank you, Your Honor.  Your Honor,

4  with respect to the issue of the communications with Dey upon

5  receipt of the subpoena that's addressed in our papers, Your

6  Honor, their communications were misaddressed to a lawyer.  It

7  should have been addressed to one lawyer, Kelley Drye, and they

8  got the person's name wrong, so we were unaware of that

9  communication till a subsequent communication with my associate

10 Ms. Trewick and as soon as we became aware of that we

11 communicated with them.  We've expressed our willingness to try

12 and work with them to narrow the scope.  We continue to be

13 willing to try and address issues relating to burden but they

14 are--

15     THE COURT:  What's the significance of such a small

16 plan?

17     MR. PALERMO:  Well, Your Honor, we're trying, the

18 allegations in the complaint are so broad that we want to get a

19 cross section of plans.  Blue Cross Blue Shield obviously is a

20 very large plan, Your Honor.  Tufts and Harvard Pilgrim are

21 smaller plans and Neighborhood and Fallon are smaller scope

22 plans so what we've tried to do is get a range of plans, Your

23 Honor, and we think that the four subpoenas are not excessive

24 and that it's important for us to be able to have discovery

25 relating to, again, a cross section of those plans.

36

1          THE COURT:  Ms. Josephson?

2          MS. JOSEPHSON:  Thank you.  Your Honor, Tufts

3   associated Health Plan is the operational arm of a number of

4   related Massachusetts related third party payers that I'll just

5   refer to as Tufts Health Plan.  It's the third largest--

6          THE COURT:  Covering how many people?

7          MS. JOSEPHSON:  It covers just over 600,000 members,

8   and this makes Tufts Health Plan comparable in size as counsel

9   for Dey has just said to Harvard Pilgrim whose enrollment is

10  somewhere between 700 and 800,000 members.  In fact, Dey Inc.

11  concedes in its opposition papers to the plaintiffs' motion for

12  protective order that it actually chose to direct the subpoena

13  to Tufts Health Plan precisely because it was comparable in

14  size to Harvard Pilgrim.  But the defendants have already

15  obtained discovery from Harvard Pilgrim from this comparable

16  health plan.  So in seeking discovery from Tufts Health Plan

17  Dey Inc. is going beyond a representative sample here and it's

18  seeking discovery of the only two health plans in this

19  particular size bracket, Harvard Pilgrim and Tufts.

20          There's no dispute and Dey seems to concede that it

21  is entitled to discovery from absent class members such as

22  Tufts Health Plan really only on a showing of need and it has

23  to meet several criteria including two that I wanted to talk

24  about.  First, upon a showing that the discovery is not unduly

25  burdensome.  And second, that the information is not available

37

1  from the representative parties.  Now, the central

2  justification for issuing these subpoenas to all of these

3  Massachusetts health plans in the first place, and you'll see

4  it in the memos in opposition, was that at the time the

5  subpoenas were issued there were actually no Massachusetts

6  health plans that were parties to this case, and that was true

7  at that time.  But everything has changed because this past

8  Monday on January 30th when Judge Saris issued the consolidated

9  order she certified Blue Cross Blue Shield of Massachusetts as

10  a representative party of Massachusetts third party payers.

11  So that problem that the defendants had that justified these

12  subpoenas is solved.  There is no more need to take this broad

13  sample now that you have a clearly certified representative of

14  this class of third party payers that's an actual party to the

15  case.  The question at this point is why and how badly do the

16  defendants need discovery from Tufts Health Plan?  What could

17  Tufts Health Plan actually offer here that's not cumulative or

18  duplicative where there is now a representative Massachusetts

19  health plan who's a plaintiff in this case and where the

20  defendants already have discovery from a health plan that it

21  concedes is actually comparable in size to Tufts Health Plan.

22  Between discovery from Blue Cross Blue Shield and Harvard, the

23  defendants already have information that covers more than 50%,

24  I have no idea of the percentage, but close to 3,000,000

25  covered lives in Massachusetts, there is no need to seek

38

1   discovery from Tufts Health Plan.

2           There also can be no material dispute, there's been

3   no dispute to the information we've provided by affidavit and

4   supplemental affidavit about the enormous time, expense, cost,

5   opportunity cost in terms of diverting attention from vital and

6   time sensitive business that Tufts Health Plan staff needs to

7   attend to that would be required in responding to this

8   subpoena.   To comply just with Dey's narrowed request, the 12

9   document categories that it sent as a compromise proposal, to

10  comply just with that we would estimate would require 1,500

11  hours of time, nine months of a full-time equivalence time just

12  to retrieve and organize the information for production, and

13  the cost of this labor alone comes to just short of $80,000.

14  After retrieval of this information, it would then have to be

15  reviewed for responsiveness, confidentiality designations and

16  assertions of privilege.

17          And there's one other thing that I can't

18  overemphasize, the addition of Blue Cross Blue Shield as a

19  party to this case adds another even more critical and to Tufts

20  Health Plan disturbing cost to production in this case.   Blue

21  Cross Blue Shield of Massachusetts is Tufts Health Plan's

22  largest competitor in a brutally competitive and small market.

23  Dey has not asked only for fee schedules pertaining to drug

24  reimbursement but for provider contracts that show exactly what

25  Tufts Health Plan pays its doctors, the very same doctors that

39

1   Blue Cross Blue Shield of Massachusetts negotiates with when

2   all of these health insurers who are competitors set

3   reimbursement rates, again, not just for drug prices but for

4   the services that are rendered.  There's absolutely no reason

5   why simply because Tufts meets certain criteria of class

6   membership in this case that it must deliver up to its largest

7   competitor its provider contracts.  That is the most sensitive,

8   competitively sensitive proprietary information that Tufts has.

9   There is no prior order or ruling in this case that would

10  require such a result.  Every time this Court or Judge Saris

11  has ordered production from absent class members or potential

12  absent class members, it satisfied itself that there is an

13  actual need for this information and that there are no undo

14  confidentiality concerns.

15       The Court has also frequently conditioned discovery

16  of absent class members upon the defendants' payments of cost

17  and expenses.  On November 2nd, for example, this Court ordered

18  the defendants to pay absent class members for the reasonable

19  cost of transportation and related expenses, attorney's fees,

20  and lost income involved in appearing for deposition.  On

21  January 27th this Court ordered Health Net to provide redacted

22  claims data to the defendants as part of its core industry

23  sample with the defendants to pay the cost of retrieval.  We

24  have offered actually to provide, before Blue Cross Blue Shield

25  became a party to this case, we have offered to provide our fee

40

1   schedules.  We have offered to provide claims data and even

2   sample provider contracts with proprietary information

3   redacted.   If the defendants would pay for that effort and if

4   the confidentiality order that is currently existing in this

5   case were tightened up in one respect and the respect that we

6   ask for is this, that the expert certification on the highly

7   confidential protective order would be tightened up to make

8   sure that the expert also certifies essentially the same thing

9   that in-house counsel certifies, that the expert that's

10  reviewing this information has no business conflict of interest

11  and that the expert is not involved in actually advising either

12  health care providers or others negotiating with health care

13  providers on reimbursement rates.  Those suggestions were

14  rejected by Dey.

15       We would also have no objection if discovery from

16  Tufts is actually ordered at all to describe in general terms

17  in a deposition how AWP actually factors into contract

18  negotiations generally as long as we're not required to

19  disclose to Blue Cross Blue Shield under any circumstances

20  directly or indirectly the precise terms of the deal that we

21  strike with our physician and physician groups.  We would

22  actually have to consider seriously opting out of this class if

23  that would protect us and prevent us from having to disclose

24  that and that's a result to be avoided because that would allow

25  the defendants actually to be using discovery as a weapon--

41

```
1        THE COURT:  Uh-huh.

2        MS. JOSEPHSON:  --and to reduce potential claimants.

3  So Dey has not agreed to this limited production or to payment

4  of anything beyond claims data retrieval costs or to enhanced

5  confidentiality protection and essentially stands by its

6  subpoena even though it's overreaching in several respects.  It

7  stands by a list of subject drugs that is far different and far

8  broader than was attached to the consolidated order that Judge

9  Saris issued on Monday.  I'm willing to settle for fees

10 schedules, claims data and sample contracts.  Dey wants all of

11 Tufts documents not only that reflect reimbursement for drugs

12 but all documents reflecting anyone's thinking about the price

13 of drugs and any communications with physicians about the price

14 of drugs or the cost of drugs over the entire 14 year period

15 that they're concerned about.  This creates an unworkable

16 burden for Tufts.  We would have to look through every document

17 we have to figure out if there is something that would

18 potentially be responsive to that request.

19        According to Judge Saris the open question in this

20 case is a simple one, is AWP relevant to health plans in

21 connection with setting reimbursement rates with physicians for

22 physician administered drugs?  Dey Inc., the defendants, do not

23 need 14 years of provider contracts, 14 years of communications

24 with physicians, 14 years of committee meetings from defendants

25 that are or from absent class members that they already have
```

42

1 information from comparable ones.  They just don't need this

2 information to answer that simple question.  If there is to be

3 any discovery of Tufts Health Plan at all, we have a number of

4 conditions and I'd be happy to submit them in the form of a

5 proposed order but we would really--

6      THE COURT:  Well that's the next step.  So let's--

7      MS. JOSEPSON:  Okay.  We'd ask this Court to

8 seriously consider the position that we urging here that the

9 defendants have what they need now with the representative

10 party named as a party and with the comparable discovery from

11 Harvard Pilgrim.  Thank you.

12      THE COURT:  All right, on behalf of Fallon?  Do you

13 want to respond?

14      MR. PALERMO:  However Your Honor would prefer.

15      THE COURT:  No, we'll do it one on one so go ahead.

16      MR. PALERMO:  Okay.

17      THE COURT:  I'll hear you.

18      MR. PALERMO:  Your Honor, with respect to the issues

19 relating to the confidentiality because of that information,

20 those issues were already raised and addressed by the Court in

21 the Health Net motion to compel where the Court ruled on

22 January 27th of last year ruling that the confidentiality order

23 is in place to protected third parties, Your Honor, and we

24 believe that the orders that are currently in place to provide

25 sufficient protection to third party payers including Tufts and

1   the other third party plans.

2        With respect to the issue of the burden, Your Honor,

3   again, we're looking at the complaint.  The scope of the

4   complaint is what it is, Your Honor, and the allegations in the

5   case go to the issues we've identified in our request, we've

6   narrowed the request.  We're willing to try and work with Tufts

7   and the other entities to resolve them.  And, Your Honor, I

8   think the experience with respect to the plans that it

9   previously responded to subpoenas is inconsistent with the

10  representations about the burden that Tufts identifies.  And

11  with respect to the issue of Blue Cross Blue Shield

12  Massachusetts, Your Honor, given their size in Massachusetts,

13  we think that the other subpoenas and information from the

14  other plans are necessary to get the cross section that we've

15  identified.  The different size plans, their knowledge if we

16  can demonstrate that plans that are smaller than Blue Cross

17  Blue Shield have knowledge concerning an understanding of what

18  AWP is and how they go about reimbursing, obviously I think

19  that's highly relevant to the case and not-for-profit plans

20  aren't exempt from the discovery but just because they're not

21  for profits.  Your Honor, I think consistent with the Court's

22  prior rulings we're entitled to get this discovery and with

23  respect to the burden issues, Your Honor, I think that we can

24  work with Tufts to try and resolve those issues consistent with

25  getting the discovery that's been ordered in prior instances.

44

1   Thank you, Your Honor.

2           THE COURT:  All right.  Do you want to reply briefly?

3           MS. JOSEPHSON:  Could I just very, very briefly.  I

4   just wanted to point out because counsel for Dey referenced the

5   action that you took on the Health Net issue, this is the

6   transcript of that hearing is attached to document 1940-1 at

7   Exhibit E, and in that hearing it was very clear that one of

8   the factors that the defendants brought forward to convince you

9   to order discovery from Health Net was that there was no

10  competitive relationship between Health Net and any of the

11  parties in the case, also, that the defendants only sought a

12  representative sample of contracts and that is sample not what

13  their position is here.  Thank you.

14          THE COURT:  All right, on behalf of Fallon?

15          MR. SATURLEY:  Thank you, Your Honor, William

16  Saturley on behalf of Fallon Community Health Plan.  Fallon has

17  171,000 members, Your Honor, and they are largely located in

18  Worcester County in the Commonwealth.  My brothers have already

19  ably dealt with whether or not there's a benefit to the

20  defendants of pursuing this subpoena issuance, and so I will

21  certainly pass over that other than I endorse the arguments

22  that have been made by Attorney Nalven.

23          We've only been involved in this, my law firm, since

24  December 22nd and so there's been an awful lot--

25          THE COURT:  You're lucky.

45

1        MR. SATURLEY:  --to try to catch up with, and I'm

2  hoping you'll let me stay lucky, Your Honor, and grant our

3  motion because from our standpoint while the subpoena that was

4  served on Fallon maybe a narrowed subpoena it's quite

5  significant.  It asks for in essence if read largely and on its

6  face, it essentially asks for every piece of paper that Fallon

7  has generated or collected in one form or other for the past 14

8  years.

9        The first document request seeks all schedules

10 disclosing the amounts reimbursed to physicians for any

11 services rendered or drugs administered.  Your Honor, the way

12 that Fallon does its business is it signs a separate contract

13 with every physician or every entity that employs physician or

14 every provider every year.  That's on average 8,000 contracts

15 per year times 14 years is approximately 110 to 120,000

16 contracts.  In order to determine and to go through the process

17 of reviewing those contracts to strike them for privilege, to

18 determine whether they were responsive at all, to worry about

19 the commercial information that my sister has addressed, would

20 require just in and of itself the equivalent of 50,000 hours

21 worth of work.  Fallon cannot meet that burden.  That's just

22 the first category of 12.

23        The second category, for instance, please give us all

24 electronic claims data, in essence is what it says.  Fallon

25 receives tens of thousands of electronic claims every day.  In

46

1  order to comply with a request that would entail a review of

2  millions of claims.  There is no electronic computer search

3  mechanism that would allow us to respond to the subpoena and go

4  through the process we would need to in order to determine if

5  those records were compliant, determine if there was

6  information in there that we should not produce.  So, again,

7  we're talking a manual review process.  Fallon has already told

8  you in the context of the companies that are involved here is

9  very small.  It has a total of 525 employees, 200 of them in

10 the administrative capacity.  They're all very busy.  The

11 affidavit of Daniel Conquer, which is document number 2783,

12 sets forth the other things that Fallon is doing today.  Fallon

13 is trying to convert all of its records and answer multiple

14 inquiries just with regards to the Medicare Part D change that

15 was made with regards to the health reinsurance business as of

16 January 1.  Fallon is also preparing for a Medicaid site visit

17 upcoming.  Fallon is undergoing a Department of Insurance

18 investigation right now, an annual site visit.  Fallon is

19 preparing for its two week audit in order to file its 501(c)(3)

20 information, et cetera, et cetera, et cetera.  Fallon's staff

21 are working up to 80 hours a week now to comply with their

22 existing obligations.  To undertake any response to the

23 subpoena as stands or even as what might, from your situation

24 might appear to be a reasonable accommodation, why not do it

25 for instance for the past three years all the records on site

47

1    as opposed to iron mountain still remains an overwhelming and

2    unreasonable burden to Fallon.

3            I will say that we have communicated with counsel for

4    Dey.  They have been polite.  They have been responsive.  We

5    haven't had any problem talking with each other, but we are up

6    against the unassailable fact to respond to the subpoena either

7    as stated or as modified in a way that would be acceptable to

8    Dey is an incredible, unreasonable burden to a very small

9    company.  And we ask under those circumstances that you just

10   say, that's not necessary, the subpoena on Fallon is squashed.

11   Thank you.

12           MR. PALERMO:  Your Honor--

13           THE COURT:  Clearly the theme all the way across the

14   board with all three entities is burden here.

15           MR. PALERMO:  Well, Your Honor, in the last argument

16   counsel's argument seemed to be that any response would be too

17   burdensome because they're too busy with all the other things

18   that they have to do.  What we've tried to do with our narrowed

19   request, Your Honor, is narrow them to exactly the same

20   discovery that Your Honor has permitted on numerous prior

21   occasions.  The Court has previously ordered discovery from

22   Blue Cross Blue Shield and Mutual of Omaha even though they're

23   small plans.  Small plans are particularly relevant here with

24   respect their knowledge of reimbursement and their methodology,

25   and they're highly relevant to the allegations that are at the

48

1    heart of this case, Your Honor.  And we have really tried to

2    narrow those requests and tried to be consistent with what's

3    been permitted over and over and over again.  Thank you, Your

4    Honor.

5            THE COURT:  All right.  I'll take the morning recess

6    at this time.  All right, 10 minutes.

7    (RECESS)

8            THE COURT:  All right, having given the matter some

9    further thought and having heard extensive argument in

10   reference to docket entries 1907, 1909, 1910, 1914, 2005 and

11   2091, I will grant the plaintiffs' motion for protective orders

12   in those individual motions, and I will grant the motions to

13   quash as well.  Having reevaluated the situation and having

14   heard really very extensive argument on burdensomeness today, I

15   believe that the presence of Blue Cross Blue Shield in the

16   litigation at this time does change things, and I feel that the

17   oppressiveness of the burden as has been outlined by counsel

18   for the three health plans is quite dramatic.  I'm also

19   concerned about the issues of confidentiality.  I think there

20   are serious confidentiality issues here in a competitive

21   situation, and for that reason I'm very much concerned about

22   the rights of the non-parties and, therefore, grant the

23   motions.

24           All right, I believe we have one remaining motion and

25   that is 1820, which is plaintiffs' motion to compel production

49

1    of Amgen.

2                MR. NALVEN:  Your Honor, this will be a brief motion.

3    I didn't know if you wanted to excuse counsel who had already

4    been heard?

5                THE COURT:  Yes.  If counsel who have been heard

6    don't want to stay for the remainder, you're welcome to leave

7    at this time.

8                MR. YOUNG:  Your Honor, I didn't have an opportunity

9    to introduce myself earlier.  My name is Joseph Young.  I'm

10   with the law firm of Hogan & Hartson in Baltimore.  I represent

11   Amgen Inc.

12               THE COURT:  And the spelling of your last name?

13               MR. YOUNG:  Young, Y-O-U-N-G--

14               THE COURT:  Oh.

15               MR. YOUNG:  --Your Honor.

16               MR. COMMISSO:  Good morning, Your Honor, John

17   Commisso of Kelly Libby & Hoopes.  That's Commisso, C-O-M-M-I-

18   S-S-O.

19               THE COURT:  We know that, Mr. Commisso, having had

20   you in court yesterday.

21               MR. NALVEN:  Your Honor, I know that it's been a long

22   morning so I'll be brief on this motion.

23               THE COURT:  Well not as long as many others.

24               MR. NALVEN:  Your Honor, Amgen is one of the Track 2

25   defendants in this case and Amgen manufactures a drug by the

50

1   name of Aranesp among others which is a competitor of the drug

2   Procrit which is a drug manufactured by Johnson and Johnson.

3   These drugs are chemically identical.  And I raised that with

4   Your Honor at the outset just to assure you that as Your Honor

5   knows the drugs that are at issue in the cases has changed--

6          THE COURT:  Uh-huh.

7          MR. NALVEN:  --have changed over the course of the

8   case but the heartland of the case has always been physician

9   administered drugs where there's either therapeutic or chemical

10  identity and so Amgen's manufacture of Aranesp makes Amgen a

11  central focus of the AWP MDL.  I think the papers candidly

12  submitted by both parties fairly fully explore the issues for

13  Your Honor but I'll summarize briefly.  The plaintiffs served

14  several document requests on Amgen beginning in late 2003 and

15  into early 2004, including what might be referred to as a

16  summary or omnibus request in March of 2004.  There was no

17  production by Amgen at that time.  The papers I think by both

18  sides sort of identify a series of communications that Your

19  Honor probably doesn't want to get bogged down in about who

20  acted first and who acted next, but I think what's significant

21  to understand is that by May of 2005 plaintiffs were closely

22  focused on obtaining discovery from Amgen and in fact on May

23  26th of 2005 my partner Steve Berman provided counsel for Amgen

24  with a very detailed memo, it was actually an internal memo but

25  it was provided without waiver, and I think for that reason

51

1  counsel did not attach it to his papers.  But it was a very

2  detailed memo identifying the categories of documents that

3  would satisfy plaintiffs in connection with the earlier

4  document request.

5       At the time that we filed this motion, which was

6  October of 2005, plaintiffs still had not received any

7  production from Amgen of a documentary nature.  Plaintiffs had

8  only received some transactional data.  Now remember that at

9  the time that we filed that motion, the discovery cutoff for

10  Track 2 which is still in place, although there's a motion

11  pending concerning this matter, was December 3rd, and even as

12  recently, I think shortly after the motion was filed Amgen did

13  begin to produce some documents.  As of a couple of days ago

14  I'm told by one of my colleagues that Amgen has produced about

15  43,000 pages of documents and has represented that it believes

16  its production to be complete.  We believe the production to be

17  far, far, far from complete.  As Your Honor knows the primary

18  focus in terms of company of my work in this proceeding has

19  been Glaxosmithkline and I can tell you that Glaxosmithkline,

20  for example, produced in excess of 3,000,000 pages of

21  documents.

22       THE COURT:  Yes, but how can you say it until you've

23  really taken a look?

24       MR. NALVEN:  Well, we are taking a look, Your Honor,

25  but at this point we can really identify for you one very

52

1   specific and very troubling issue in this case or actually I

2   would take two specific and troubling issues.  The first is

3   that as a result of the very, very late production and what we

4   believe to be, we know to be a partial production, we don't

5   know how partial, at this point plaintiffs have been very

6   seriously prejudiced.  We have discovery - the discovery period

7   already ended and we're only beginning to receive documents

8   now.  Except for some initial 30(b)(6) depositions we were

9   unable to take depositions that were meaningful because we

10  didn't have documents.  Amgen, whatever its excuses for not

11  producing documents prior to let's say May of 2005, certainly

12  by May there was no question that it was very clear what it is

13  we were looking for, and sat on our requests for an additional

14  period of time and in fact did not begin producing until we

15  filed.  In our motion we are asking for sanctions which will

16  allow us not only to obtain documents more quickly but also

17  will send the message to Amgen and defendants that the Court is

18  not going to tolerate violations of CMO's and discovery

19  obligations.

20       The second issue that is of very special concern,

21  Your Honor, is the time period that Amgen claims it has to

22  produce documents with respect to.  Amgen has taken the

23  position in this case that it need only produce documents for

24  the period 1997 to 2001 or sort of creeping into 2002.  Sort of

25  at the last exchange between one of my colleagues and Amgen's

53

1    counsel, Amgen's counsel said that it would return to its

2    client to see whether that position could be modified, but that

3    position is inconsistent with the complaint in this case which

4    seeks data and documents since 1991.  The conduct of other

5    defendants in the case, including Glaxosmithkline which for

6    example Your Honor produced documents from 1991, and it's

7    inconsistent most importantly with Judge Saris' recent class

8    certification order which certifies a class for the period 1991

9    to 2005.  Plaintiffs need this critical information from this

10   critical defendant promptly, a full production promptly for the

11   entire class period.  So in addition to, among the sanctions

12   that we seek, Your Honor, among the relief that we seek in

13   terms of prompt production is a full and complete production

14   that at this point is now within the next 60 days in order to

15   review the documents and prepare for further testimonial

16   discovery.  Thank you, Your Honor.

17        THE COURT:  All right, I'll hear you, Mr. Young.

18        MR. YOUNG:  Thank you, Your Honor.  First, I think

19   the Court needs to focus on what it has before it.  The motion

20   that was filed in October was a motion for sanctions based on

21   essentially what plaintiffs claim was Amgen's complete refusal

22   to conduct discovery.  And the documents that were attached to

23   our briefs, let me make clear that there was no waiver, objects

24   were timely filed, they were all pursuant to express

25   understandings and agreements with plaintiffs' counsel, not Mr.

54

1    Nalven but his other lawyers in his office, and that there is

2    in fact a documented record of that exchange.

3           We, also I think, and this is important in thinking

4    through other sanctions are at all appropriate in this context,

5    Amgen did early on push for a meet and confer as of last

6    December and it did take five months for a sit down and a final

7    meeting with Mr. Nalven's partner to get the list that he

8    described, the detailed list that narrowed the production, in

9    fact narrowed the production in order to avoid the 3,000,000

10   page production that Mr. Nalven commented about from another

11   defendant in the Track 1 case.  Our purpose was to focus it,

12   narrow it, make it tight so that it's not a strict, you know, a

13   broad data dump.  The data was provided within a month of that

14   time pursuant to a request to modify the original data request

15   that had been made.  That took time with the experts, and we

16   began reviewing over the summer.

17          The production was made beginning of October and it

18   was made in fact the day after plaintiffs had filed their

19   motion to compel.  Had they called and said we're about to file

20   a motion to compel, we would have said we're filing our

21   documents Monday.  But the document production began in

22   October, which was consistent with our representations to Judge

23   Saris in connection with the scheduling issue that was filed in

24   late September and early October on Track 2 discovery, and it

25   continued on a rolling production through December and

55

1  completed in January.  We are substantially completed the

2  production of the limited discovery requests that were the

3  result of a meet and confer with Mr. Berman in May.

4      So, first, with respect to the motion to compel on

5  for sanctions with respect to discovery, Amgen believes that it

6  did work in good faith to resolve issues, that the parties

7  understood that and the production proceeded accordingly.  And

8  in fact, had we gotten in December of 2004 where we were in May

9  of 2005, it would have all been over by July and none of us

10  would be here this morning.

11      With respect to the two troubling issues that

12  Mr. Nalven refers to, the timing of production and the effect

13  on discovery scheduling, that is precisely the issue before

14  Judge Saris on two competing CMO's that were submitted in

15  December of 2005.  The plaintiffs use the same kinds of

16  arguments with respect to defendants' productions, not just

17  Amgen's, but a broad number of defendants, and requesting an

18  extension of discovery till June.  The defendants in the Track

19  2 have requested or suggested an extension to allow additional

20  discovery through March.  I think an important point there is

21  that both parties understood and in fact Judge Saris in what

22  has been called her holiday order understood that December 3rd

23  wasn't likely to be the firm cutoff, that the parties, I think

24  she said, shouldn't kill themselves over the holidays, and she

25  was going to deal with scheduling after, my guess is after she

56

1    dealt with the Track 1 house and put that in order that she'd

2    then deal with Track 2 and the parties are waiting on that

3    schedule from Judge Saris at this time.

4           On the timeframe issues, Your Honor, I do not believe

5    that that is properly before the Court this morning.  It is not

6    the subject of the motion to compel.  There is not a word in

7    their motion to compel with respect to timeframe.  And in fact,

8    it was not something that was even discussed when Mr. Berman

9    and Mr. Barley and I met by telephone back in May.  The first

10   occasion that the timeframe exception that Amgen put into its

11   objection was back in 2004 and repeated in June of 2005 over

12   initial production.  The first reference to that was in a

13   letter on January 9, 2006, about two weeks ago.  And I think

14   more important, more to point, we have been involved in meet

15   and confers with Mr. Nalven's associate in the Seattle office,

16   Rob Lopez, as late as Tuesday and have made I believe

17   substantial progress on a number of the categories of documents

18   and what accommodations could be made and Amgen would be

19   willing to make.

20          In light of Judge Saris' order with respect to the

21   Track 1 class certification, the plaintiffs have now taken the

22   position that discovery must be from 1991 through January 1,

23   2006, through to the present, which is two - well, first of all

24   it's beyond anything that's been requested of any other

25   defendant in the case that I'm aware of beyond what they

57

1  negotiated with other defendants and I think, frankly, beyond

2  what Judge Saris probably contemplated.  I don't believe that

3  in certifying that class she was thinking about reopening

4  discovery or reopening document productions for the Track 1 or

5  the Track 2 defendants.  I think that the key here is to focus

6  on documents that are central to the timeframe of the alleged

7  scheme that the plaintiffs have presented, which is 1997, five

8  years prior according to the defendants through to the date of

9  the filing of those first complaints in 2001 and 2002, and they

10  will involve the core documents that, you know, that the

11  plaintiffs need.  Mr. Nalven mentioned Aranesp and Procrit;

12  well Aranesp was preceded by a drug called Ibogen and Ibogen

13  and Procrit are also competitive drugs, and there are clearly

14  documents encompassed in our five year production that meet the

15  plaintiffs' request and meet their needs with respect to

16  showing if there was a competitive effect and how that

17  competitive effect led to pricing.

18          THE COURT:  Briefly.

19          MR. NALVEN:  Your Honor, I think you can hear from

20  both arguments that there is not really a great deal of dispute

21  here, critical points.  To begin with, counsel says that the

22  motion before Your Honor doesn't cover the timeframe issue.

23  Well, of course the motion that was before Your Honor was

24  before was served before any documents were produced.  Clearly

25  the timeframe issue is subsumed in a motion in which somebody,

58

1   which is made in response to no document production.  With

2   respect to the timeframe itself, counsel does not dispute that

3   the period for production ought to be the period set forth in

4   Judge Saris' class certification order and doesn't dispute in

5   any way the propriety of the demand for production from 1991 to

6   1997.  The issue that he raises is whether the production ought

7   to be, ought to end at the end of the class period or whether

8   because some defendants who produced promptly in response to

9   the omnibus request that was served in March of 2004, whether

10  Amgen ought to get the same benefit that they did where on a

11  defendant by defendant basis there have been different

12  agreements and arrangements made depending on how the case

13  proceeds.  For example, with Glaxosmithkline we have an

14  agreement that allowed Glaxosmithkline to forbear from

15  producing its most recent transactional data pending summary

16  judgment or some other milestone in the case.

17          In terms of the time at which or the deadline for

18  production, as Your Honor knows there are motions before Judge

19  Saris to extend that period of time.  Plaintiffs now are

20  helpless.  We don't know what the period is but we know that

21  it's going to be sometime in the next few months and we still

22  don't have anywhere near a full production.  So we request –

23  one other point, Your Honor, Mr. Young said that he was

24  involved in active, an active meet and confer discussion and

25  I've talked extensively with my colleagues in Seattle about

59

1   this, and my colleagues in Seattle have notified Mr. Young and

2   have told me that while the discussions have been cordial, that

3   at this point they're going nowhere and that there is no longer

4   a fruitful meet and confer.  Our position is that we need

5   documents for the entire period and we need them in sufficient

6   time to review them and to take some depositions.

7           THE COURT:  What's your position, Mr. Young, on the

8   completion of what you intend to produce at this time?

9           MR. YOUNG:  Your Honor, the documents that Amgen

10  produced in response to the narrowed request that Mr. Berman

11  provided to us in May that is essentially complete.  The

12  shortcomings that Mr. Nalven is referring to, I received my

13  first notice of that last night in an email sent after hours to

14  me to which I responded this morning from his associate in

15  their Seattle office.  They're not at issue this morning in any

16  event.  We're trying to work through with them, and I guess

17  what I'm asking Your Honor is allow us to use the process that

18  the local rules establish.  We're trying to do that.  The most

19  recent conversation was on Tuesday of this week at which time I

20  was promised to get a letter that I could provide my client and

21  I, at least my position with Mr. Lopez was I want to review

22  that with my client, I want to see what we can provide and what

23  we can't or what we can agree on and there were categories that

24  we agreed on that we would assent to.  And as far as I'm

25  concerned that process is still an open one, and if we need to

60

1    come back to the Court in two weeks or three weeks or whenever

2    we need to, we can do it at that time, but it's simply not ripe

3    at this time.

4              THE COURT:  Yeah, I think based on what's happened

5    this motion as it's framed presently is now moot, and if you

6    need to renew it you may.  All right.

7              MR. YOUNG:  I appreciate that, Your Honor.  Thank

8    you.

9              THE COURT:  I think that resolves everything that's

10   on the table for today.  Any counsel want to raise anything

11   else?

12   (Pause)

13             THE COURT:  All right.  Then we stand in recess.

14             MR. NALVEN:  Thank you, Your Honor.

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

61

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

February 24, 2006

Maryann V. Young

# EXHIBIT D

**Parekh, Niraj (x2641)**

---

**To:**      Mangi, Adeel A. (x2563)
**Subject:** RE: United


-----Original Message-----
**From:** Mangi, Adeel A. (x2563)
**Sent:** Thursday, March 02, 2006 10:21 AM
**To:** Parekh, Niraj (x2641)
**Subject:** FW: United


-----Original Message-----
**From:** Mangi, Adeel A. (x2563)
**Sent:** Wednesday, February 15, 2006 5:13 PM
**To:** 'Prame, Michael'
**Subject:** RE: United

sure

-----Original Message-----
**From:** Prame, Michael [mailto:MJP@groom.com]
**Sent:** Wednesday, February 15, 2006 5:10 PM
**To:** Mangi, Adeel A. (x2563)
**Subject:** RE: United

Are you around in the morning?

---

**From:** Mangi, Adeel A. (x2563) [mailto:AAMANGI@PBWT.COM]
**Sent:** Wednesday, February 15, 2006 5:04 PM
**To:** Prame, Michael
**Subject:** RE: United

Mike:
Thanks for your email and apologies for the delay in getting back to you.  In response to your
questions:

- At this stage, defendants are willing to narrow the request calling for PBM reports and MAC
  lists to facilitate timely production.  We will accept rebate reports showing any drug
  manufacturer rebates paid directly to United or passed onto United by its PBM in lieu of full
  production on these categories.
- The defense group experts include Charles River Associates and Bates White.  Plaintiffs
  experts include Raymond Hartman and Meredith Rosenthal.  The terms of the protective
  order are self explanatory in terms of their application to experts and consultants.  Those
  provisions have been fully complied with by defendants.
- Attached is the current list of drugs as to which we seek claims data and fee schedules.  As
  discussed, we also seek fee schedules for services related to drug administration.

Let me know if you have any questions.

-----Original Message-----

**From:** Prame, Michael [mailto:MJP@groom.com]
**Sent:** Monday, February 13, 2006 4:22 PM
**To:** Mangi, Adeel A. (x2563)
**Cc:** Fitzgerald, Tom; Golumbic, Lars
**Subject:** RE: United

Thanks for your message Adeel.

A couple of thoughts...

1.   United will likely file objections to the ruling with Judge Saris.  I should know in the next few days whether United will appeal the entire order or only parts thereof (e.g., the requests for fee schedules, claims data and depositions).  I need to confirm with the client, but I expect that, if United does not appeal the entire order, it would attempt to produce in the near future the documents responsive to unappealed portions of the order.

2.   We would like continue discussing the requests with you as we seek further guidance from Judge Saris.  To that end, a couple of questions:

     a.   In light of the class rulings limiting the case to physician administered drugs, why are Defendants seeking the PBM rebate reports and MAC Lists related to the retail pharmacy program?  After sending the May 27 letter to us, Jessica had not pressed for the production of these materials during our follow up discussions.

     b.   I assume that you have identified your experts/consultants?  Could you tell us who they are so that we would know who may have access to United's confidential information?  Would our information be shared with Plaintiffs and their experts/consultant also?  If so, who are they?  Who else has been given access to the highly confidential information of third-party witnesses?

3.   Is there an updated list of drugs for which you are seeking claims data and fee schedule information?

Thanks

MJP

--------------------------------------------------------------------------------

**From:** Mangi, Adeel A. (x2563) [mailto:AAMANGI@PBWT.COM]
**Sent:** Friday, February 10, 2006 6:28 PM
**To:** Prame, Michael
**Subject:** United

Mike: We have not heard from you since last week's ruling.  Is United pressing ahead with production of documents and generation of a fields listing for claims data or are there issues we need to discuss?  If there are, let's do that Monday when you are available.

Thanks

Adeel Abdullah Mangi
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Ph: (212) 336 2563
Fax: (212) 336 7947
aamangi@pbwt.com

--------------------------------------------------------------------
Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to Internet email for messages of this kind.

--------------------------------------------------------------------
IRS Circular 230 disclosure: Any tax advice contained in this communication (including any attachments or enclosures) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication. (The foregoing disclaimer has been affixed pursuant to U.S. Treasury regulations governing tax practitioners.)
================================================================

Michael J. Prame / 1701 Pennsylvania Ave., N.W. / Washington, DC 20006 / Phone: 202-861-6633 / Fax: 202-659-4503 / www.Groom.com / MJP@groom.com

--------------------------------------------------------------------
Notice: This message is intended only for use by the person or entity to which it is addressed. Because it may contain confidential information intended solely for the addressee, you are notified that any disclosing, copying, downloading, distributing, or retaining of this message, and any attached files, is prohibited and may be a violation of state or federal law. If you received this message in error, please notify the sender by reply mail, and delete the message and all attached files.
To comply with U.S. Treasury Regulations, we also inform you that, unless expressly stated otherwise, any tax advice contained in this communication is not intended to be used and cannot be used by any taxpayer to avoid penalties under the Internal Revenue Code, and such advice cannot be quoted or referenced to promote or market to another party any transaction or matter addressed in this communication.

--------------------------------------------------------------------
Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to Internet email for messages of this kind.

--------------------------------------------------------------------
IRS Circular 230 disclosure: Any tax advice contained in this communication (including any attachments or enclosures) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication. (The foregoing disclaimer has been affixed pursuant to U.S. Treasury regulations governing tax practitioners.)
================================================================