# EXHIBIT 2
# (Part Two)

> As of late, Glaxo promotional efforts have focused almost entirely on the financial benefits of "up-dosing" rather than efficacy of Zofran. ***Though physicians have certainly benefited financially from such tactics, it is costing 3rd party payers and patients more for medication***.

(P007115-P007490, at P007138-P007139) (Highly Confidential) (emphasis added).

389.    In a September 27, 2000 article in *USA Today,* Glaxo spokesman Rick Sluder (who received a copy of the October 24, 1994 memo described herein) discussed the issue of the spread and blamed a system that set up a reimbursement method that relies on average wholesale prices which are not actually "representative of actual prices."  Mr. Sluder, admitting that Glaxo changed its wholesale prices to keep up with competitors who changed wholesale prices, stated "We didn't want to put ourselves at a price disadvantage."  Mr. Sluder also admitted that the marketing of Glaxo drugs is based, in part, on the spread.  In fact, he noted that Glaxo's sales staff is briefed on the price advantages to doctors who bill and get reimbursed based upon the AWP.  (E-mail from Clapton to Vaughan dated Sept. 27, 2000 citing "How Drug Makers Influence Medicare Reimbursements to Doctors; WALL STREET JOURNAL (P007501-P007506).

### 6.    SKB's Kytril

390.    According to its internal documents (and prior to selling Kytril®'s global rights to the Roche Group in December 2000), SKB also knew that by creating the spread for Kytril®, it could directly affect the amount of revenue medical providers receive and thereby affect overall demand for Kytril®.  Specifically, an August 6, 1996 internal SKB memo stated:

> In the clinic setting however, since Medicare reimbursement is based on AWP, product selection is largely based upon the spread between acquisition cost and AWP.
>
> *         *         *
>
> From this analysis, there seems to be no other reason, other than profitability, to explain uptake differentials between the hospital and clinic settings, therefore explaining why physicians are willing to use more expensive drug regimens.

(P007015-P007490, at P007249-P007250).

391.     Internal SKB documents reveal how it marketed the spread.  One internal document entitled "Price Comparison of Kytril and Zofran for Reimbursement" discussed how much additional revenue and "spread per patient" a medical provider would make by using Kytril® due to its larger spread.  It stated:

> Kytril reimbursement for 5 patients treated $540.00 - Kytril 6 treated patients $423.12
>
> Difference = $117.00 every 6 patients.
>
> Use 5ht3 5 times a day = $2,340.00 month.  $28,080.00 year more!

(P007015-P007490, at P007117).

392.     Other internal SKB documents entitled "Cost v. Profit" and "Kytril Profit Model" compare Kytril® and Zofran® to demonstrate how much additional profit/revenue the medical provider will receive by using Kytril®.

### 7.     General Counsel Correspondence Between Glaxo and SKB

393.     Most revealing is an exchange of correspondence between counsel for Glaxo and SKB over Zofran® and Kytril® in which each accuse the other of fraud.

394.     On February 6, 1995, Timothy D. Proctor, Senior Vice President, General Counsel and Secretary for Glaxo, sent a letter to J. Charles Wakerly, Senior Vice President, Director and General Counsel of SKB informing him of "several issues pertaining to the advertising and marketing of Kytril":

> Glaxo's sales representatives have encountered a substantial amount of what appear to be "homemade" Kytril vs. Zofran cost comparisons.  It is our understanding that many of these pieces have been generated through a company-provided lap top computer program.
>
> . . . .
>
> In addition, a significant number of these pieces (see Exhibits F-J) contain direct statements or make references as to how institutions can increase their "profits" from Medicare through the use of Kytril.  Some even go so far as to recommend that the medical professional use one vial of Kytril for two patients (see Exhibit F)

- 138 -

> but charge Medicaid for three vials.  This raises significant fraud
> and abuse issues which I am sure you will want to investigate."

(P007015-P007490, at P007123-P007126).

395.    On February 22, 1995, Ursualy B. Bartels, Vice President and Associate General

Counsel for SKB, wrote in response that SKB was investigating Glaxo's claims and asked

whether Glaxo had specific information regarding the improper marketing of Kytril.  Mr. Bartels

also accused Glaxo of using false and misleading marketing materials regarding Zofran that rely

on the medical providers' ability to garner more profit.  Specifically, he stated:

> Regarding similar concerns, we would like to draw your attention
> to reports we are receiving from our field force regarding
> reimbursement issues.  In an apparent effort to increase
> reimbursement to physicians and clinics, effective 1/10/95, Glaxo
> increased AWP for Zofran by 8.5%, while simultaneously fully
> discounting this increase to physicians.  The latter was
> accomplished by a 14% rebate available to wholesalers on all non-
> hospital Zofran sales on the multi-dose vial.  ***The net effect of
> these adjustments is to increase the amount of reimbursement
> available to physicians from Medicare and other third party
> payors whose reimbursement is based on AWP.***  Since the net
> price paid to Glaxo for the non-hospital sales of the Zofran multi-
> dose vial is actually lower, it does not appear that the increase in
> AWP was designed to increase revenue per unit to Glaxo.  ***Absent
> any other tenable explanation, this adjustment appears to reflect
> an intent to induce physicians to purchase Zofran based on the
> opportunity to receive increased reimbursement from Medicare
> and other third party payors.  In fact, we have had numerous
> verbal reports from the field concerning Glaxo representatives
> who are now selling Zofran based on the opportunity for
> physicians to receive a higher reimbursement from Medicare and
> other third-party payors while the cost to the physician of Zofran
> has not changed.***

(P007015-007490, at P007478-P007481) (emphasis added).

396.    On April 25, 1995, Adrianna L. Carter, Glaxo Assistant General Counsel,

responded to SKB's February 22, 1995 letter.  Ms. Carter provided, pursuant to SKB's request,

numerous additional examples of false and misleading marketing materials concerning "cost

comparisons distributed to health care professionals by SmithKline representatives."  Ms. Carter

also denied SKB's allegations regarding "fraud and abuse" over the price increase of Zofran.

- 139 -

However, Ms. Carter did admit that the AWP price increase for Zofran® does not affect the actual cost to medical providers and that Glaxo's sales representatives were using the "spread" to gain market share.  Specifically, Ms. Carter stated:

> It is true that, despite a price increase, some physicians and other healthcare professionals will not see the higher price as the result of rebates or other incentives.
>
> *     *     *
>
> It is also true that our sales representatives have been explaining the relationship between the price and Medicare reimbursement for Zofran to physicians.
>
> *     *     *
>
> Finally, Ms. Carter stated that despite SKB's assertions that any alleged improper marketing of Kytril would end, "Unfortunately, despite your efforts, these activities are still ongoing."

(P007015-007490, at P007127-P007131).

397.    The fact that Glaxo and SKB each accused the other of similar conduct, but neither took any action to bring it to the attention of the public or the appropriate authorities, is evidence that each of them were engaged in an ongoing scheme to defraud the Plaintiffs and Class.

**8.    Other Improper Incentives**

398.    In addition to marketing the spread on its products, the GSK Group has also used other methods to induce physicians and other intermediaries to use its drugs such as rebates and free samples in order to increase the spread between acquisition costs and reimbursement.

399.    In an e-mail by GSK account representative Paul J. Ostruszka explaining how he was able to increase the market share of Zofran over Anzimet, among the suggested techniques he recommends to his fellow GSK account reps is "Ask your customers how much JUST 1 FREE Zofran Tablet Sample is WORTH" (emphasis in original).  This e-mail was later forwarded to the entire Zofran team.  (GSK-MDL-ZN02-077634).

400.     An advertisement in the *Florida Infusion Chemo net* reveals that SKB created the spread not only by artificially inflating the AWP for Kytril®, but also by providing discounts and rebates. Specifically, the advertisement states:

> We have been notified that, effective April 1, 1995, SmithKline's long running promotional rebate for Kytril purchases will come to a very successful conclusion.

(P007015-007490, at P007187).

401.     SKB also knew that medical providers were billing Plaintiffs and the Class for a 1 mg single dose vial per patient, but actually were using less than the full single dose per patient.  Depending on the weight of a patient, medical providers were able to use less of the drug, *i.e.*, the lighter the patient, the less Kytril® was needed.  SKB subsequently introduced a Kytril® 4 mg Multi-Dose vial that allowed medical providers to bill 6 treatments for the cost of 4.  For example, an SKB marketing document entitled "Kytril Vial Usage" states, "You can use only three vials of Kytril for four patients."  (P007015-007490, at P007068 and P007455).

402.     SKB also used other financial incentives to decrease medical providers' costs and thereby increase profits.  For example, SKB promised to contribute to research and education programs through the OnCare Foundation if OnCare agreed to use Kytril instead of a competing drug.  (P007015-007490, at P007061).

### 9.     Specific GSK Group AWPs Documented by the DOJ

403.     In a report published by the DHHS (the "DHHS Report"), the DOJ documented that the published AWPs for various dosages of Zofran and Kytril manufactured by The GSK Group were substantially higher than the actual prices listed by wholesalers.  The chart below sets forth the AWPs identified by the DOJ and the spread associated with one particular dosage of each drug.  These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by The GSK Group in the 2001 *Red Book*.

- 141 -

| Drug | GSK 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| Ondanestron (Zofran) | $128.24 | $22.61 | $101.63 | 450% |
| Granisetron (Kytril) | $195.20 | $139.04 | 56.16 | 40% |

(P006299-P006316).

404.    As set forth above, the GSK Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Plaintiffs and the Class.

## K.    Immunex

405.    Immunex engages in an organization-wide and deliberate scheme to inflate AWPs.  Immunex has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below.  The specific drugs of Immunex for which relief is sought in this case are set forth in Appendix A and are identified below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| IMMUNEX | Leukine | sagramostin | Antineutropenic Agent<br>Used to help produce bone marrow and white blood cells |
| | Novantrone | mitoxane hydrochloride | Antineoplastic<br>Used in the treatment of multiple sclerosis and various forms of cancer |
| | Thioplex | lyophilized thiotepa | Antineoplastic<br>Used in the treatment of ovarian and breast cancer, lymphoma and bladder tumors |
| | | leucovorin calcium | Antianemic Agent (Blood Modifier)<br>Used in the treatment of anemia |
| | | methotrexate sodium | Antineoplastic<br>Used in the treatment of various forms of cancer |

### 1.    Immunex Has Been the Target of Government Investigations

406.    In connection with its scheme to inflate AWPs, Immunex has been investigated by the United States Department of Justice, the Office of Inspector General of the Department of

- 142 -

Health and Human Services, the Attorney General for the State of Texas, and the Attorney

General for the State of California.

### 2.    Immunex Definition and Understanding of AWP

407.    Immunex's internal documents reveal that it understood how industry compendia

defined and utilized AWPs:

> Red Book Definition of AWP
>
> The average wholesale price as we consider it here at Red Book is the price a retail hospital or pharmacy pays if purchases product from wholesaler before the discount if any.
>
> Blue Book Definition of AWP
>
> AWP represents an average price which a wholesaler would charge a pharmacy for a particular product.

(IAWP002238) (Highly Confidential).

### 3.    Immunex Controls the Published AWP for its Products

408.    Immunex controlled and set the AWPs for its pharmaceutical products through

direct communications with industry compendia during the Class Period.  In 2000, in the midst

of numerous government investigations concerning AWP manipulation, Immunex denied

responsibility for controlling the published AWP for its products.  For example, in an

October 26, 2000 letter to *Red Book*, Immunex states in pertinent part:

> As requested, enclosed please find an updated summary of list pricing and package information for Immunex products.  Please note that Immunex Corporation is not responsible for setting the Average Wholesale Price (AWP).  Therefore, we do not set or approve AWP information for any Immunex products.

(IAWP023473) (Highly Confidential).  Previously, in a 1996 interview, an Immunex

spokesperson had informed Barron's that "drug manufacturers have no control over the AWPs

published."  (IAWP003071) (Hooked on Drugs," Barron's, Jun. 10, 1996).

409.    Immunex's internal documents, however, establish that it controlled the AWP for all of its products throughout the Class Period.  For example:

a.    A January 12, 1996 letter from *Red Book* to Immunex, in pertinent part, states:

> This letter is a confirmation letter that we have received and entered your latest AWP price changes in our system.

(IAWP008102) (Highly Confidential).

b.    A January 12, 1995 letter from Immunex to *Red Book* states:

> Below you will find a list of new suggested Average Wholesale Prices (AWPs) for selected Immunex products, along with a new NDC … all effective January 10, 1995 … Please update your databases accordingly.  A new copy of Immunex's Average Wholesale Price Product Pricing Guide will be sent to you next week.

(IAWP016500) (Highly Confidential).

## 4.    Immunex's AWP Manipulation Benefited Providers at the Expense of the Class

410.    The purpose of Immunex's manipulation was to increase the spread in order to maximize the profit to providers and other intermediaries at the expense of Plaintiffs and the Class.  Immunex understood that providers and intermediaries were reimbursed at AWP – and benefited from a larger spread.

a.    In an internal document entitled "Health Care Policy Fast Facts," created in 1995, Immunex urged its sales personnel to remember "[p]hysician's offices use their own charge schedule for billing purposes, and get reimbursed at AWP, based on the published prices in the pricing databases."  (IAWP012961) (Highly Confidential).

b.    Recently, in a January 3, 2000 interoffice memo, Immunex discussed the significant revenues to be made by providers which used its Leucovorin and Methotrexate products.  Specifically, Immunex stated that, "Leucovorin and Methotrexate represent significant revenue sources for the physician office or clinic.  Due to the 'spread' (difference between

- 144 -

acquisition cost and AWP), physicians have reaped substantial profits." (IAWP051149-52) (Highly Confidential).

411.    Immunex, in a conscious effort to increase the spread for providers and intermediaries, changed its AWPs and marketing practices accordingly.  In a February 21, 1997 internal memo discussing reimbursement on its products, in pertinent part, Immunex stated:

> The following are the reimbursement schema for Leukine,
> Novantrone, Thioplex and Leucovorin:
>
> Here's the way it works [for Leukine] – the Red Book Price
> (AWP) for our 250 mcg is $117.79 and $221.71.  **However**, payors
> take the $117.79 and divide it by 5, now that we bill per 50 mcg
> increments.  This is equal to $23.56 per 50 mcg, hence
> reimbursement on a 500 mcg vial is $235.60.  We need to take into
> account that in some AOR markets they get AWP or AWP plus a
> percentage, in others, depending on the makeup of the patient
> population, they may only get the 80% Medicare allowable
> ($188.48).  So here's what the spread looks like:
>
> |   $235.60 (AWP)            |   $188.48                  |
> |                            |     (80% Medicare allowable) |
> | -$112.06 (AOR contract price) | -$112.06                |
> | +$123.54 per 500 mcg vial   |   $76.42 (68% spread)     |
> |     (110% spread)           |                            |

(IAWP008528) (Highly Confidential) (emphasis in original).

412.    Immunex performed an analysis of competitive AWP pricing (IAWP003407-13) (Highly Confidential) and established a "Reimbursement Hotline" for a number of its products (IAWP016686-88) (Highly Confidential).

413.    Immunex, through its employees and agents, also provided free samples of its drugs to customers.  (IAWP005418) (Highly Confidential)  The free samples would be used to offset the total cost associated with purchases of its drugs, thereby increasing the spread, while also concealing the actual cost of the drug from Plaintiffs and the Class.

**5.    Specific Immunex AWPs Documented by the DOJ**

414.    In a report published by the DHHS (the "DHHS Report"), the DOJ documented at least 7 instances where the published AWPs for various dosages of 2 drugs manufactured by

Immunex were substantially higher than the actual prices listed by wholesalers.  The chart below sets forth the 2 drugs identified by the DOJ and the spread associated with one particular dosage of each drug.  These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by Immunex in the 2001 *Red Book*.

| Drug | 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|------|------|------|------|------|
| Leucovorin Calcium | $137.94 | $14.58 | $123.36 | 846% |
| Methotrexate Sodium | $20.48 | $7.10 | $13.38 | 188% |

(P006299-P006316).

415.    In a report published by DHHS in 1997, the Department undertook an analysis of the twenty drug codes that represented the largest dollar outlays to the Medicare Program and compared Medicare's payments with the prices available to the physician and supplier communities.  For mitoxantrone hydrochloride, sold by Immunex under the brand name Novantrone, the DHHS found that Medicare paid $172.81, while the actual average wholesale price was $142.40, resulting in a spread of 21.36%.  "Excessive Medicare Payments for Prescription Drugs" (Dec. 1997).

### 6.    Inflated AWPs From Immunex Price Lists

416.    In response to government subpoenas, Immunex produced numerous price lists setting forth spreads between AWPs and prices offered to wholesalers, providers and other intermediaries.  A review of those price lists reveals that Immunex has consistently offered drugs and other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers.

417.    As set forth above, Immunex's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Plaintiffs and the Class.

- 146 -

### 7.     Immunex Concealed Its AWP Manipulation

418.    Immunex deliberately acted to conceal its fraudulent reporting and marketing of the AWP spread.  For example, under the guise of "simplifying" its product listings, on June 3, 1994, Immunex instructed the *Red Book* to "delete all references to Direct Price for all Immunex products, effective immediately" and confirmed that "only AWP (Average Wholesale Price) w[ould] be listed for [its] products[.]"  (IAWP016524) (Highly Confidential).  Immunex effectively hid the AWP spread from Plaintiffs and the Class.

### L.     The Johnson & Johnson Group (J&J, Centocor and Ortho)

419.    The Johnson & Johnson Group engages in an organization-wide and deliberate scheme to inflate AWPs.  The Johnson & Johnson Group has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below.  The specific drugs of the Johnson & Johnson Group for which relief is sought in this case are set forth in Appendix A, and are set forth below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| JOHNSON & JOHNSON GROUP (J&J, Janssen, McNeil, Ortho and | Aciphex | rabeprazole sodium | Gastric Acid Pump Inhibitor (Gastrointestinal Agent) Used in the treatment of gastroesophageal reflux disease and duodenal ulcers |
| Centocor) | Bicitra | sodium citrate & citric acid | Alkalizer Used in the prevention of kidney stones |
| | Duragesic | fentanyl | Analgesic Used in the treatment of chronic pain |
| | Elmiron | pentosan polysulfate sodium | Anti-Inflammatory Agent Used for relief of pain associated with interstitial cystitis |
| | Erycette | erythromycin | Antiacne Agent; Antibacterial Agent Used to help control acne |
| | Flexeril | cyclobenzaprine | Skeletal Muscle Relaxant (Analgesic) Used in the treatment of muscle spasm associated with musculoskeletal conditions |
| | Floxin | ofloxacin | Antibacterial Agent Used in the treatment of pneumonia, bronchitis, gonorrhea and certain other infections |

- 147 -

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | Grifulvin | griseofulvin microsize | Antifungal Agent<br>Used to treat fungus infections of the skin, hair, fingernails, and toenails |
| | Haldol | haloperidol lactate | Antiemetic (Gastrointestinal Agent); Antipsychotic (Psychotherapeutic Agent)<br>Used to treat nervous, mental, and emotional conditions |
| | Haldol Decanoate | haloperidol decanoate | Antiemetic (Gastrointestinal Agent); Antipsychotic (Psychotherapeutic Agent)<br>Used to treat nervous, mental, and emotional conditions |
| | Levaquin | levofloxacin | Antibacterial Agent<br>Used to treat bacterial infections in many different parts of the body |
| | Monistat | miconazole nitrate | Antifungal Agent<br>Used in the treatment of yeast infections |
| | Mycelex | clotrimazole | Antifungal Agent<br>Used in the treatment of candidiasis and tinea versicolor |
| | Pancrease | amylase-lipase-protease | Digestant; Enzyme, Pancreatic (Gastrointestinal Agent)<br>Used in the treatment of gastrointestinal orders |
| | Parafon Fort | chlorzoxazone | Skeletal Muscle Relaxant (Analgesic)<br>Used to relax certain muscles and relieve the pain and discomfort caused by strains, sprains, or other injuries to muscles |
| | Polycitra | potassium & sodium citrates w/ citric acid | Alkalizer<br>Used in the prevention of kidney stones |
| | Procrit | epoetin alfa | Antianemic<br>Used in the treatment of anemia in HIV-infected, cancer or chronic renal failure patients |
| | Regranex | becaplermin | Biological Response Modifier<br>Used in the treatment of diabetic neuropathic ulcers |
| | Remicade | infliximab | Anti-Inflammatory Agent; Antirheumatic Agent<br>Used to treat Crohn's disease and rheumatoid arthritis |
| | Reminyl | galantamine hydrobromide | Cholinesterase Inhibitor (Central Nervous System Agent)<br>Used in the treatment of dementia of the Alzheimer's type |

- 148 -

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | Renova | tretinoin | Antiacne Agent<br>Used for mitigation of fine wrinkles and other attributes of facial skin |
| | Retin-A | tretinoin | Antiacne Agent<br>Used to treat acne |
| | Retin-A Micro | tretinoin microsphere | Antiacne Agent<br>Used to treat acne |
| | Risperdal | risperidone | Antipsychotic Agent (Psychotherapeutic Agent)<br>Used to treat the symptoms of psychotic disorders |
| | Spectazole | econazole nitrate | Antifungal Agent<br>Used to treat infections caused by a fungus |
| | Sporanox | itraconazole | Antifungal Agent<br>Used in the treatment of various fungal infections |
| | Terazol | terconazole vaginal | Antifungal Agent<br>Used to treat yeast (fungus) infections of the vagina |
| | Testoderm | testosterone | Androgen; Antianemic Agent; Antineoplastic<br>Used for replacement therapy in males with a deficiency or absence of testosterone |
| | Tolectin | tolmetin sodium | Antirheumatic Agent<br>Used to relieve some symptoms caused by arthritis |
| | Topamax | topiramate | Anticonvulsant<br>Used to help control some types of seizures in the treatment of epilepsy |
| | Tylox | acetaminophen w/ codeine | Analgesic<br>Used to relieve pain. |
| | Tylenol with codeine | | |
| | Ultracet | tramadol-acetaminophen | Analgesic<br>Used to relieve pain |
| | Ultram | tramadol hcl | Analgesic<br>Used for management of pain |
| | Urispas | flavoxate hydrochloride | Autonomic Nervous System Agent<br>Used in the treatment of symptoms of various urologic disorders. |
| | Vascor | bepridil hcl | Antianginal Agent<br>Used to relieve and control angina pectoris and hypertension |

1.    **The Johnson & Johnson Group Has Been the Target of Government Investigations**

420.    In connection with its scheme to inflate AWPs, the Johnson & Johnson Group has been investigated by the General Accounting Office and the Office of the Attorney general for the Commonwealth of Massachusetts.

421.    J&J's internal documents reveal that it was familiar with and understood how industry compendia defined and utilized AWPs.  For example, in a rebate agreement between J&J and Merck-Medco Managed Care, Inc. dated December 19, 1996, the parties defined AWP as meaning "the average wholesale price as published in the most current version of either First Data Bank or the Red Book." (J&J000599) (Highly Confidential).

422.    The Johnson & Johnson Group has engaged in an ongoing deliberate scheme to inflate AWPs and to market the spread to increase the sales of its products.  In a report published by the GAO, federal investigations have documented fraudulently inflated AWPs reported for epotein alpha (sold by J&J as Procrit).  J&J is identified in various annual *Red Book* publications as one of two sources for epoetin alfa.  The other source for epoetin alfa is Defendant Amgen.[6]

423.    In September 2001, the GAO reported that epoetin alfa accounted for the second highest percentage of Medicare expenditures on drugs in 1999, accounting for 9.5% of spending for prescription drugs by Medicare in 1999 and for 3.4% of all Medicare allowed services. These massive federal expenditures for epoetin alfa, caused by the J&J Group and Amgen's AWP scheme as well as the inflated cost to Plaintiffs and members of the Class, are even more outrageous given the fact that the research and development of epoetin alpha was originally underwritten by grants from the federal government.[7]

---

[6] Amgen markets epoetin alfa for use in the treatment of dialysis patients while the right to market epoetin alfa for all other uses is licensed to Defendant J&J.

[7] Epogen® and Procrit® are based on different uses of a patented process technology developed at Columbia University with support from grants from the NIH. Columbia licensed their technology to Amgen for Epogen® and to Johnson & Johnson for Procrit®.   *NIH Response to the Conference Report Request for a Plan to Ensure Taxpayers' Interests are Protected,* Department Of Health And Human Services National Institutes Of Health, July 2001.

424.     By way of further example, the J&J Group has deliberately overstated and continues to overstate the AWP for Remicade®.  The published AWP for Remicade® continued to increase each year during the class period.  For example, the AWP was listed as $611.33 for a 100 mg vial of Remicade® as of November 1999, and rose to $665.65 when listed in the 2001 edition of the *Red Book*.  At the same time, J&J deliberately marketed and promoted the sale of Remicade® to physicians based on the availability of inflated payments made by Medicare, assuring them that they would make a significant profit from the purchase of Remicade® as a result of the spread between the actual price to physicians and reimbursement based on the published AWP.

425.     The J&J Group created promotional materials and worksheets to allow them to market the spread between the published AWP and the actual selling price to doctors.  For example, a publication accessible through Defendants' web sites entitled "Office-Based Infusion Guide" demonstrates Defendants' aggressive marketing of this spread, specifically noting that, "[d]epending on reimbursement, office-based infusion may provide a financial impact to a physician's practice."  Moreover, the "Financial Analysis" section of the guide includes a "REMICADE® (infliximab) Financial Impact Worksheet," which enables doctors see in actual dollars how much additional revenue the use of Remicade® would bring to their practice.

426.     As set forth above, the J&J Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Plaintiffs and the Class.

427.     Set forth below in Table 1 are the contract prices (not already referenced above) included in a J&J contract price list (effective from April 1, 1997 through March 31, 1998) contained in a supply agreement with Managed Healthcare Associates, Inc. dated March 17, 1997 and the AWP published in the 1997 *Red Book*, and their associated AWP spread. (J&J000121-23) (Highly Confidential).

- 151 -

**Table 1**

| Drug | Contract Price | AWP | $ Diff AWP | % Spread |
|------|----------------|-----|------------|----------|
| Procrit (epoetin alfa) | $950.00 (4000 u/ml 25x1 ml vials) | $1200 | $250 | 20.8% |
| Ultram (tramadol hcl | $53.97 (1x100 50 mg) | $62.34 | $8.37 | 13.4% |
| Duragesic fentanyl transdermal) | $44.94 (25M 25mcg/hr 1x5) | $53.94 | $9 | 16.7% |
| Floxin (ofloxacin) | $276.89 (1x100 btls 200 mg/case) | $332.28 | $55.39 | 16.7% |
| Propulsid (cisapride) | $56.62 (10mgx100) | $67.96 | $11.34 | 16.7% |
| Risperdal (risperidone) | $335.59 (3 mg 1x100) | $402.72 | $67.13 | 16.7% |
| Topamax tiramate) | $123.00 (100 mg 1x60) | $147.60 | $24.6 | 16.7% |

## 2.      J&J Concealed Its AWP Manipulation

428.    J&J deliberately acted to conceal its fraudulent reporting and marketing of the AWP spread.  J&J routinely required that its customers keep secret the prices they were being charged for J&J drugs.  (J&J001022; J&J000110; J&J001430; J&J001483).

## M.      Pfizer

429.    Pfizer engages in an organization-wide and deliberate scheme to inflate AWPs and has stated fraudulent AWPs for many of its drugs.  The specific drugs of Pfizer for which relief is sought in this case are set forth in Appendix A or in the proposed class certification order, and are summarized below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|--------------|---------------------------|--------------|---------------------------|
| PFIZER | Accupril | quinapril hcl | ACE Inhibitor (Cardiovascular Agent) Used in the treatment of hypertension |
|  | Cardura | doxazosin mesylate | Autonomic Nervous System Agent Used to treat hypertension and benign prostatic hypertrophy |
|  | Estrostep FE | norethindrone-ethinyl estradiol-fe | Oral Contraceptive Also used in the treatment of acne |
|  | Femhrt 1/5 | ethinyl estradiol-norethindrone acetate | Estrogen Combination (Hormone) Used in the treatment of menopause and prevention of postmenopausal osteoporosis |
|  | Lipitor | atorvastatin calcium | Antilipemic Agent (Cardiovascular Agent) Used to lower cholesterol |

- 152 -

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | Nardil | phenelzine sulfate | Antidepressant (Psychotherapeutic Agent) Used in the treatment of depression |
| | Neurontin | gabapentin | Anticonvulsant Used in the treatment of epilepsy |
| | Zithromax | azithromycin | Macrolide Antibiotic Agent (Anti-Infective Agent) General antibiotic |
| | Zoloft | sertraline hcl | Serotonin Reuptake Inhibitor (Psychotherapeutic Agent: Antidepressant) Used in the treatment of depression |
| | Zyrtec | cetirizine hcl | Antihistamine Used in the treatment of allergic rhinitis |

430.    Pfizer manufactuares and distributes some of the nation's most popular and highest selling brand name drugs.

431.    Historically, Pfizer almost never changes the "spread" between the posted AWP and posted WAC for a Pfizer brand name product.  Once initially launched, a Pfizer brand name product continues to bear the same difference between the posted AWP and the posted WAC (*e.g.*, 16 2/3%, or 20%, or sometimes 25%).

432.    In January 2002, Pfizer announced a prescription drug discount card that would be available to elderly and poor consumers along eligibility criteria similar to that of other discount cards.

433.    At the same time, January 2002, Pfizer secretly increased the AWP/WAC spread to 25% for *all* of its brand name drugs.  If a drug theretofore had a posted AWP/WAC spread of 20%, it was increased to 25% (something which Pfizer, and indeed all other drug companies, almost never do).  If a Pfizer brand name drug already had had a 25% AWP/WAC spread, it remained so.

434.    By doing so, Pfizer knew that the purpose and effect of these new listings would be to increase reimbursement payments by end payors by amounts that would be greater than actual transaction costs for other participants in the distribution chain (*i.e.*, wholesalers,

- 153 -

distributors, pharmacies and PBMs).  Also in doing so, Pfizer knew that the posted AWPs for

many of their brand name drugs would become more misrepresentative of actual average

wholesale prices given that the increased AWP/WAC spread bore no relation to actual transation

cost changes occurring in the marketplace.

435.    Pfizer has been investigated by the Office of the Inspector General of the

Department of Human Health Services and has entered into a $49 million settlement arising from

illegal practices with respect to Lipitor.  OIG-HSS found that Pfizer has been providing

unrestricted educational grants and rebates that were in fact discounts off the purchase price of

Lipitor.  Pfizer concealed these discounts from states who were entitled to receive the "best

price" for Lipitor.

436.    The provision of educational grants and rebates on Lipitor also had the effect of

inflating the reported AWP.

437.    On information and belief, based in part due to the substantial nature of the

spreads between AWP and WAC identified in Appendix A, Pfizer has inflated its AWP on other

drugs at issue.

**N.    The Pharmacia Group (Pharmacia and P&U)**

438.    The Pharmacia Group engages in an organization-wide and deliberate scheme to

inflate AWPs.  The Pharmacia Group has stated fraudulent AWPs for all or almost all of its

drugs, including those set forth below.  The specific drugs of The Pharmacia Group for which

relief is sought in this case are set forth in Appendix A or in the proposed class certification

order, and are summarized below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| PHARMACIA GROUP (Pharmacia and P&U) | Adriamycin | doxorubicin hydrochloride | Antineoplastic Used in the treatment of various forms of cancer |

- 154 -

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | Adrucil | fluorouracil | Antimetabolite; Antineoplastic<br>Used in the treatment of various forms of cancer |
| | Amphocin | amphotericin b | Antifungal (Anti-Infective Agent)<br>Used in the treatment of serious fungal infections |
| | Celebrex | celecoxib | Analgesic; Antirheumatic Agent<br>Used to relieve some symptoms caused by arthritis |
| | Cleocin-T | clindamycin phosphate (topical) | Antibacterial Agent (Anti-Infective Agent)<br>Used to treat bacterial infections |
| | Cytosar-U | cytarabine | Antineoplastic<br>Used in the treatment of cancer of the blood |
| | Depo-Testosterone | testosterone cypionate | Androgen (Hormone)<br>Used to replace hormones or stimulate growth |
| | Neosar | cyclophosamide | Alkylating Agent (Antineoplastic)<br>Used in the treatment of various forms of cancer as well as some kidney disease |
| | Solu-Cortef | hydrocortisone sodium succinate | Anti-Inflammatory Agent; Skin and Mucous Membrane Agent<br>Used to provide relief for inflamed areas of the body.  Also used as replacement therapy in adrenocortical insufficiency |
| | Solu-Medrol | methylprednisolone sodium succinate | Anti-Inflammatory Agent<br>Used to provide relief for inflamed areas of the body.  Also used as replacement therapy in adrenocortical insufficiency |
| | Toposar | etoposide | Antineoplastic<br>Used in the treatment of testicular and lung cancer |
| | Vincasar | vincristine sulfate | Antineoplastic<br>Used in the treatment of various forms of leukemia and cancer |
| | | bleomycin sulfate | Antineoplastic; Antibiotic Agent (Anti-Infective Agent)<br>Used in the treatment of various forms of cancer |

## 1.     The Pharmacia Group Has Been the Target of Government Investigations

439.    In connection with its scheme to inflate AWPs, The Pharmacia Group has been investigated by the Department of Justice, the Texas Attorney General, the California Attorney General, the Massachusetts Attorney General, the Attorney General of the State of Connecticut,

- 155 -

the Attorney General of the State of New York, and the Department of Health and Human

Services Office of Inspector General.

### 2.   Pharmacia's Definition and Understanding of AWP

440.   Pharmacia understands that third party reimbursement is based on its published

AWPs.  According to a "Strategic Presentation on Average Wholesale Price (AWP)" prepared by

P&U, the "Definition of AWP" is:

> An artificial pricing index that is used as a common basis for third-
> party reimbursement to pharmacists and physicians.
>
> -The difference between the published AWP (less a percentage)
> and the direct price is the profit margin that drives these classes of
> trade.

(PH 025785) (Highly Confidential).  During this same presentation, Pharmacia provided an

"AWP History":

- ♦   Historically, Wholesalers viewed AWP as an actual average selling
  price to their customers.

- ♦   Competition of 1980's led to AWP representing a "Suggested List
  Price"

- ♦   P&U AWP = 125% of Direct Price (DP)

- ♦   Exceptions being VANTIN, CVC, GENOTROPIN, and
  RESCRIPTOR = 120% of DP

(PH025791) (Highly Confidential).  Further, the presentation recognized that "'95 Medicare

(Part B) outpatient drug bill (I.V./inhalants/oncolitics/nutritionals) of $1.8 billion based primarily

on AWP."  (PH025793) (Highly Confidential).

### 3.   The Pharmacia Group Controls the Published AWP for Its Products

441.   The Pharmacia Group has controlled and set the AWPs for its pharmaceutical

products through direct communications with industry compendia during the Class Period.  In its

presentation entitled "Strategic Presentation on Average Wholesale Price (AWP)," P&U

included a flow chart that shows P&U communicates its AWPs to First Data Bank, Medi-Span

and *Red Book*.  This same flow chart then shows that third party payors rely on these industry

compendia for prices. (PH025792) (Highly Confidential).

### 4.      The Pharmacia Group's AWP Manipulation Benefited Providers at the Expense of the Class

442.     The Pharmacia Group has engaged in an ongoing deliberate scheme to inflate

AWPs.  According to one member of the Congressional Ways and Means Committee:

> The evidence . . . indicates that [Pharmacia & Upjohn] have
> knowingly and deliberately inflated their representations of the
> average wholesale price ("AWP"), wholesale acquisition cost
> ("WAC") and direct price ("DP") which are utilized by the
> Medicare and Medicaid programs in establishing drug
> reimbursements to providers.

> * * *

> [T]hese practices must stop and … these companies must return
> the money to the public that is owed because of their abusive
> practices.

*See* Extension of Remarks of U.S. Representative Pete Stark in the House of Representatives,

October 3, 2000 (P007545-P007547).

443.     In a letter dated October 3, 2000 to Pharmacia (with accompanying exhibits),

Representative Stark addressed the Pharmacia Group's illegal practices:

> The manipulated disparities between your company's reported
> AWPs and DPs are staggering.  For example, in 1997, Pharmacia
> & Upjohn reported an AWP of $946.94 for 200 mg. of Adriamycin
> PFS while offering to sell it to American Oncology Resources
> (AOR) for $168.00 and to Comprehensive Cancer Center for
> $152.00 (Composite Exhibit "1").  Your company then
> aggressively marketed its cancer drugs to health care providers by
> touting financial inducements and other types of incentives.
> Pharmacia & Upjohn created and marketed the financial
> inducements for the express purpose of influencing the
> professional judgment of doctors and other health care providers in
> order to increase the company's market share.

> * * *

> Pharmacia & Upjohn's own internal documents . . . reveal that the
> company abused its position as a drug innovator in an initial
> *Phase III* FDA clinical trial for a cancer drug used to treat

- 157 -

lymphoma (Composite Exhibit "2") (emphasis in original).

". . . Clinical Research Trials

> Initial Phase III Protocol trial for "Oral Idamycin" in lymphomas.  This trial will offer AOR $1.1M [million] in additional revenues.  Two hundred twenty-five (225) patients at $5,000 per patient . . . (emphasis added by Rep. Stark)

> The above . . . items are contingent on the signing of the AOR Disease Management Partner Program.  AOR's exclusive compliance to the purchase of the products listed in the contract product attachment is also necessary for the above items to be in effect."

The linking of doctor participation in FDA clinical drug trials to their purchase and administration of profit-generating oncology drugs is entirely inconsistent with the objective scientific testing that is essential to the integrity of the trial.

* * *

It is clear that Pharmacia & Upjohn targeted health care providers, who might be potential purchasers, by creating and then touting the windfall profits arising from the price manipulation.  For example, Pharmacia & Upjohn routinely reported inflated average wholesale prices for its cancer drug Bleomycin, 15u, as well as direct prices.  The actual prices paid by industry insiders was in many years less than half of what Pharmacia & Upjohn represented.  Pharmacia & Upjohn reported that the average wholesale price for Bleomycin, 15u, rose from $292.43 to $309.98, while the price charged to industry insiders fell by $43.15 (Composite Exhibit "4").

* * *

Pharmacia & Upjohn reported price increases in October 1997 with full knowledge that the true prices of the drugs were falling.  For example, Composite Exhibit "7" reveals that Pharmacia & Upjohn voluntarily lowered its price of Adriamycin PFS 200 mg to $152.00 while reporting an AWP of $946.94:

> "Dear Willie,

> > A (VPR) Voluntary Price Reduction will become effective May 9, 1997.  The wholesalers have been notified, however it may take two weeks to complete the transition . . ."

Additionally, internal Pharmacia & Upjohn documents secured through the Congressional investigations show that Pharmacia &

- 158 -

Upjohn also utilized a large array of other inducements to stimulate product sales.  These inducements, including "educational grants" and free goods, were designed to result in a lower net cost to the purchaser while concealing the actual price beneath a high invoice price.  Through these means, drug purchasers were provided substantial discounts that induced their patronage while maintaining the fiction of a higher invoice price – the price that corresponded to reported AWPs and inflated reimbursements from the government.  Composite Exhibit "8" highlights these inducements:

AOR/PHARMACIA & UPJOHN PARTNERSHIP PROPOSAL: Medical Education Grants.  A $55,000 grant has been committed for 1997 for the AOR Partnership for excellence package including Education/Disease Management, Research Task Force, AOR Annual Yearbook.  A $40,000 grant to sponsor the AOR monthly teleconference.  This sponsorship was committed and complete in February 1997 . . .

PHARMACIA & UPJOHN, INC. INTEROFFICE MEMO: If needed, you have a "free goods" program to support your efforts against other forms of generic doxorubicin . . .

Use your "free goods" wisely to compete against other generic forms of Adriamycin, not to shift the customer to direct shipments. The higher we can keep the price of Adriamycin, the easier it is for you to meet your sales goals for Adriamycin (emphasis added by Rep. Stark).

(P007613-P007632).

444.    Pharmacia's marketing pitches, as quoted by U.S. Rep. Pete Stark in a September 28, 2000 letter to Alan F. Holmer, President of the Pharmaceutical Research and Manufacturers of America, promoted a physician's ability to profit at the expense of Medicare and its beneficiaries:

PHARMACIA: Some of the drugs on the multi-source list offer you savings of over 75% below list price of the drug.  For a drug like Adriamycin, the reduced pricing offers AOR a reimbursement of over $8,000,000 profit when reimbursed at AWP.  The spread from acquisition cost to reimbursement on the multi-source products offered on the contract give AOR a wide margin for profit.

(P007548-P007588).

- 159 -

445.    In 1997, Pharmacia sent to a clinic a proposal listing the AWP and the contract price at which several drugs would be sold to the provider.  The differences are staggering and just a few are noted below:

| Drug | AWP | Suggested New Contract Price |
|------|-----|------------------------------|
| Adriamycin (10 mg) | 46.00 | 7.50 |
| Adriamycin (50 mg) | 230.00 | 37.50 |
| Neosar (2 g) | 86.00 | 18.00 |
| Toposar (1 g) | 1,330.75 | 120.00 |
| Vincasar (2 mg) | 741.50 | 7.50 |

(P007615).

### 5.    Specific Pharmacia AWPs Documented by the DOJ

446.    In a report published by the DHHS, the DOJ documented at least 43 instances where the published AWPs for various dosages of drugs manufactured by The Pharmacia Group were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each drug.  These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by The Pharmacia Group in the 2001 *Red Book*.

| Drug | The Pharmacia Group's 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Spread |
|------|-------------------------------------------|---------------------------|------------|--------|
| Amphotercin B | $36.26 | $16.00 | $20.26 | 127% |
| Bleomycin Sulfate | $309.98[8] | $158.67 | $151.31 | 96% |
| Clindamycin Phosphate | $93.60 | $61.20 | $32.40 | 53% |
| Cyclophospamide | $6.29 | $3.92 | $2.37 | 60% |
| Cytarabine | $8.98 | $4.06 | $4.92 | 122% |
| Doxorubicin HCL | $1104.13 | $150.86 | $953.27 | 632% |

---

[8] Calculation based on the AWP listed in the 2000 *Red Book*.

- 160 -

| | | | |
|---|---|---|---|
| Etoposide | $157.65 | $9.47 | $148.18 | 1,565% |
| Fluorouracil | $3.20 | $1.47 | $1.73 | 118% |
| Hydrocortisone Sodium Succinate | $2.00 | $1.55 | $.45 | 29% |
| Metholprednisolone Sodium Succinate | $2.05 | $1.45 | $.60 | 41% |
| Testosterone Cypionate | $17.01 | $11.79 | $5.22 | 44% |
| Vincristine Sulfate | $43.23 | $5.10 | $38.13 | 748% |

447.    In OIG report OEI-03-00-00310, the government noted that 20 mg of irinotecan, which according to the *Red Book* is manufactured only by The Pharmacia Group, had a Medicare Median of $117.81 and a Catalog Median of $98.63, resulting in a spread of 19.45%.  (P006398-P006424).

448.    The GAO issued a report entitled "Payments for Covered Outpatient Drugs Exceed Providers' Cost" (GAO-01-1118) wherein it found that irinotecan had an Average AWP of $141.32, the Average Widely Available Discount from AWP to physicians for irinotecan was 22.9%, and the drug constituted 2.0% of the total amount of Medicare spending in 1999. (P005546-P005578).

449.    As of April 2000, another Pharmacia Group drug, Toposar® (etoposide), had an AWP of $28.38.  The DOJ found that retailers were buying it for $1.70.  (P006299-006316).

450.    Similarly, by letter dated September 25, 2000 to the HCFA Administrator, the Chairman of the Commerce Committee revealed that:

> [I]n 1998, Pharmacia-Upjohn's Bleomycin had an AWP of
> $309.98, but health care providers could purchase it for $154.85.
> In 1997, Pharmacia-Upjohn's Vincasar could be purchased for
> $7.50, while the AWP was a staggering $741.50.

*See* letter dated May 25, 2000 from U.S. Rep. Thomas J. Bliley to Nancy-Ann Min DeParle, HCFA Administrator.  (P007015-P007490).

451.    Exhibit 1 to U.S. Rep. Pete Stark's September 28, 2000 letter to Alan F. Holmer, President of the Pharmaceutical Research and Manufacturers of America, reveals that while the

- 161 -

AWP for 1 mg of Vincasar® (vincritine sulfate) was $370.75 in 1997, one physician group's (American Oncology Resources) price in 1997 was only $4.15.  (P007515).  Similarly, while the AWP for 2 mg of Vincasar® was $741.50, AOR's actual pre-April 1997 price was $7.75 (in fact, The Pharmacia Group had offered to reduce it to $7.50).  *Id.*  As of April 2000, Adriamycin had a reported AWP of $241.36, while the real wholesale price was $33.43.

**6.     Inflated Pharmacia AWPs From Pharmacia's Price Lists**

452.     According to Pharmacia's own documents, the published AWPs for its drugs were higher than the actual prices provided to wholesalers.  In response to government subpoenas, the Pharmacia Group produced numerous price lists setting forth spreads between AWPs and prices apparently offered to wholesalers, providers and other intermediaries.  A review of those price lists reveals that Pharmacia has consistently offered hundreds of its drugs and other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers.  To repeat every one of those drugs and the spread offered to each specific customer here is not practical.  However, set forth below in Table 1 are a number of those drugs with spreads between the AWPs and direct prices.  Table 1 is an analysis of certain dosages of P&U drugs from a document entitled "Oncology Express CONTRACT PRICING" (PH011977) (Highly Confidential).

**Table 1**

| PRODUCT | LIST | AWP | CONTRACT PRICE | DIFFERENCE (between AWP and contract price) | PERCENTAGE SPREAD |
|---------|------|-----|----------------|---------------------------------------------|-------------------|
| Adriamycin | 883.80 | 1104.13 | 119.00 | 985.13 | 828% |
| Adrucil | 12.83 | 16.04 | 4.56 | 11.48 | 252% |
| Amphocin | 29.01 | 36.26 | 13.00 | 23.26 | 179% |
| Neosar | 80.22 | 100.28 | 16.15 | 84.13 | 521% |
| Toposar | 614.81 | 768.51 | 33.84 | 734.67 | 2,171% |

**7.     The Pharmacia Group Provided Free Goods and Other Incentives**

453.     In addition to marketing the spread, The Pharmacia Group has utilized other impermissible inducements to stimulate sales of its drugs.  These inducements were designed to

- 162 -

result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.  By utilizing "off-invoice" inducements, The Pharmacia Group provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

454.    The government investigators also uncovered an October 3, 1996 internal memorandum wherein Pharmacia told three oncology sales representatives:

> Our competitive intelligence tells us that our pricing on Adriamycin, although higher than generics, is in the "ball park" for you to attain the customers Adriamycin business.  If needed, you have a "free goods" program to support your efforts against other forms of generic doxorubicin.
>
> . . . .
>
> You should not have to use "free goods" to steer customer [sic] away from NSS or OTN.  OTN and NSS Adriamycin pricing is competitive.  Use your "free goods" wisely to compete against other generic forms of Adriamycin, not to shift the customer to direct shipments.  The higher we can keep the price of Adriamycin, the easier it is for you to meet your sales goals for Adriamycin.

(PH 024315).

455.    As set forth above, The Pharmacia Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

**O.    The Schering-Plough Group (Schering-Plough and Warrick)**

456.    The Schering Plough Group engages in an organization-wide and deliberate scheme to inflate AWPs.  The Schering Plough Group has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below.  The specific drugs of The Schering Plough Group for which relief is sought in this case are set forth in Appendix A, and are set forth below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| SCHERING-PLOUGH GROUP | Clarinex | desloratadine | Antihistamine<br>Used to relieve the symptoms of hay fever and hives of the skin |
| (Schering-Plough and Warrick) | Claritin | loratadine | Antihistamine<br>Used to relieve or prevent the symptoms of asthma |
| | Claritin-D | loratadine & pseudoephedrine | Antihistamine<br>Used to treat the nasal congestion, sneezing, and runny nose caused by colds and hay fever |
| | Diprolene | aug betamethasone dipropionate | Antipruritic (Skin & Mucous Membrane Agent)<br>Used to help relieve redness, swelling, itching, and discomfort of many skin problems |
| | Diprosone | betamethasone dipropionate | Antipruritic (Skin & Mucous Membrane Agent)<br>Used to help relieve redness, swelling, itching, and discomfort of many skin problems |
| | Elocon | mometasone furoate | Antipruritic (Skin & Mucous Membrane Agent)<br>Used to help relieve redness, swelling, itching, and discomfort of many skin problems |
| | Eulexin | flutamide | Antineoplastic<br>Used to treat cancer of the prostate gland |
| | Integrilin | eptifibatide | Cardiovascular Agent<br>Used in the treatment of patients with acute coronary syndrome |
| | Intron-A | interferon alfa-2b | Immunomodulator<br>Used in the treatment of hairy cell leukemia  and chronic hepatitis B or C. |
| | Lotrisone | clotrimazole w/ betamethasone | Antifungal Agent (Anti-Infective Agent)<br>Used to treat fungus infections |
| | Nasonex | mometasone furoate (nasal) | Anti-Inflammatory Agent (Nasal Preparation)<br>Relieve the stuffy nose, irritation, and discomfort of hay fever and other allergies |
| | Peg-Intron | peginterferon alfa-2b | Biological Response Modifier<br>Used to treat chronic hepatitis C |
| | Proventil | albuterol sulfate | Bronchodilator (Respiratory Agent)<br>Used to treat the symptoms of asthma, chronic bronchitis, emphysema, and other lung diseases |
| | Rebetol | ribavirin | Biological Response Modifier<br>Used to treat hepatitis C |
| | Sebizon | sulfacetamide sodium | Anti-Infective Agent<br>Used in the treatment of conjunctivitis and other ocular infections |
| | Temodar | temozolomide | Antineoplastic<br>Used to treat a specific type of cancer of the brain in adults whose tumors have returned |

- 164 -

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | Trinalin Rep | azatadine & pseudoephedrine | Antihistamine<br>Used to treat the nasal congestion, sneezing, and runny nose caused by colds and hay fever. |
| | Vanceril | beclomethosone (nasal) | Anti-Inflammatory Agent; Antiasthmatic<br>Used to help prevent the symptoms of asthma |
| | | albuterol | Bronchodilator (Respiratory Agent)<br>Used for relief of bronchospasm in asthma sufferers |
| | | clotrimazole | Antifungal Agent (Anti-Infective Agent)<br>Used to treat yeast (fungus) infections of the vagina |
| | | griseofulvin ultramicrocrystalline | Antifungal Agent (Anti-Infective Agent)<br>Used to treat fungus infections of the skin, hair, fingernails, and toenails |
| | | oxaprozin | Central Nervous System Agent; Antipyretic (Analgesic)<br>Used in the treatment of osteoarthritis and rheumatoid arthritis |
| | | perphenazine | Antiemetic (Gastrointestinal Agent); Antipsychotic Agent (Psychotherapeutic Agent)<br>Used to treat serious mental and emotional disorders.  Also used to relieve moderate to severe pain in some hospitalized patients |
| | | potassium chloride | Electrolytic Agent<br>Used to prevent and treat potasium deficit secondary to diuretic or cortiocosteroid therapy |
| | | sodium chloride | Flush; Abortifacient<br>Used to remove medicine and blockage from intravenous (IV) catheter.  Also used to induce abortion |
| | | sulcrafate | Gastrointestinal agent<br>Used for short term treatment of duodenal ulcer |
| | | theophylline er | Bronchodilator (Respiratory Agent)<br>Used to treat and/or prevent the symptoms of bronchial asthma, chronic bronchitis, and emphysema |

1.   **The Schering Plough Group Has Been the Target of Government Investigations**

457.   In connection with its scheme to inflate AWPs, The Schering Plough Group has been investigated by the Department of Justice, Texas Attorney General, West Virginia Attorney General, California Attorney General, California Bureau of Medi-Cal Fraud and Elder Abuse,

- 165 -

and the Department of Health and Human Services Office of Inspector General, and the U.S. Attorney for the District of Massachusetts.

458.    On May 30, 2003, Schering Plough announced that the U.S. Attorney for the District of Massachusetts had advised that its subsidiary, Schering Corporation, is the subject of a federal grand jury investigation.  Schering Plough is the target of a criminal investigation involving: (i) providing remuneration, such as drug samples, to providers to induce the purchase of Schering products for which payment was made through federal health care programs; (ii) selling misbranded or unapproved drugs; (iii) submitting false wholesale pricing information for its pharmaceutical products to the government; and (iv) destroying evidence and obstructing justice relating to the government's investigation.  *See* Schering Plough Press Release dated May 30, 2003, located at http://www.sch-plough.com/news/2003/business/20030530.html; "Schering Plough expects indictment," The Philadelphia Inquirer, at C3 (May 31, 2003). Moreover, according to Schering Plough's Form 10-K for the year 2000, this investigation has focused on "whether the AWP set by pharmaceutical companies for certain drugs improperly exceeds the average prices paid by dispensers . . . and other pricing and/or marketing practices."

459.    A Medicaid investigation by the Texas Attorney General revealed that The Schering-Plough Group defrauded the State of Texas $14.5 million.  Investigators determined that The Schering-Plough Group provided the greatest "spread" amongst the drug companies selling albuterol in Texas, and thereby obtained the largest market share for albuterol.  The Schering-Plough Group sold a box of albuterol to pharmacies for $13.50, while it charged the Texas Medicaid program $40.30, a 200% increase.  *See Cornyn Sues Three Drug Companies for Medicaid Fraud*, Press Release by the Office of the Attorney General, State of Texas, Sept. 7, 2000.  (www.oag.state.tx.us.gov)

- 166 -

460.     On October 11, 2001, the West Virginia Attorney General filed suit against

Warrick, alleging that Warrick defrauded state agencies and citizens by deliberately overstating

the AWP for certain drugs, including albuterol, from approximately 1995 until December 2000.

**2.     The Schering Plough Group Controls the Published AWP for Its Products**

461.     The Schering Plough Group has controlled and set the AWPs for its

pharmaceutical products through direct communications with industry compendia during the

Class Period.  For example, on February 23, 1995, Warrick sent a letter to First Data Bank,

stating:

> Effective Friday, February 24, 1995, at 5:00 p.m., the price of
> Warrick Albuterol Solution 0.5% 20ml will increase as follows:

|                            | NDC 59930- | AWP     |
|----------------------------|------------|---------|
| Albuterol Solution 0.5% 20 ml | 1515-04    | $13.95  |

(WAR0024086) (Highly Confidential).

**3.     The Schering Plough Group's AWP Manipulation Benefited Providers at the Expense of the Class**

462.     A Schering Laboratories memorandum dated May 20, 1993 demonstrates

Defendant's recognition that intermediaries choose drugs based on favorable AWP

spreads. At the generic launch of albuterol, Schering stated:

> Proventil will stay listed at AWP; therefore, Proventil is a favored
> product for third party reimbursement that provides for the AWP
> minus 10% reimbursement rate to chains.  Thus, they can buy off
> the Proventil deal and bill at AWP.

(WAR005419-20) (Highly Confidential).

463.     According to Warrick's own documents, Warrick consistently maintained a

spread between the AWPs and the direct prices it offered for its albuterol products.  For example,

a "Price Change" alert dated June 7, 1999 sent to Warrick customers provides:

| Product | Pkg. Size | NDC 59930 | AWP | Direct Price |
|---------|-----------|-----------|-----|--------------|

- 167 -

| Albuterol Inhalation Aerosol | 17 g | 1560-1 | $21.41 | $3.40 |
| Albuterol Aerosol Refill | 17 g | 1560-2 | $19.79 | $3.40 |

(WAR0000532) (Highly Confidential).  Thus, Warrick touted a 529% spread on its albuterol

inhalation aerosol and a 482% spread on the refill.

464.    In a report to Congress, the GAO reported that albuterol sulfate was one of a

small number of products that accounted for the majority of Medicare spending and volume.

Albuterol sulfate accounted for 6.3% of total Medicare spending, ranking fifth out of more than

400 covered drugs.  Albuterol sulfate ranked first for volume of units covered, accounting for

65.8% of total units reimbursed.  *See* GAO Report to Congressional Committees, "Payments for

Covered Outpatient Drugs Exceed Providers' Cost," Tables 1 and 2, pp. 7-8 (GAO-01-0118

(P005546-005578)).  The Schering Plough Group is one of three companies noted by the DOJ as

manufacturing albuterol.  *See* DHHS report, AB-00-86 (P006299-006316).

465.    According to The Schering Plough Group's own documents, the published AWPs

for most of its drugs were higher than the actual prices provided to wholesalers.

466.    In response to government subpoenas, The Schering Plough Group produced

numerous price lists setting forth spreads between AWPs and prices apparently offered to

wholesalers, providers and other intermediaries.  A review of those price lists reveals that

Warrick has consistently offered hundreds of its drugs and other solutions to its customers at

prices significantly below the published AWP and that the spread was of great importance to its

customers.  To repeat every one of those drugs and the spread offered to each specific customer

here is not practical.  However, set forth below in Tables 1, 2 and 3 are a number of those drugs

with spreads between the AWPs and direct prices. Table 1 is an analysis of certain dosages of

Warrick drugs from a document entitled, "Amerisource" (WAR0022160) (Highly Confidential).

**TABLE 1**

| LABEL (MFG) | GENERIC NAME | AWP | INVOICE COST | DIFFERENCE | PERCENTAGE SPREAD |
|---|---|---|---|---|---|
| Warrick | Albuterol Inhaler | 21.41 | 5.75 | 15.66 | 272% |
| | Aug Beta Dip Oint | 43.20 | 26.90 | 16.30 | 61% |

- 168 -

| LABEL (MFG) | GENERIC NAME | AWP | INVOICE COST | DIFFERENCE | PERCENTAGE SPREAD |
|---|---|---|---|---|---|
|  | 0.05% |  |  |  |  |
|  | Griseofulvin | 82.47 | 37.22 | 45.25 | 122% |
|  | Theophylline | 11.70 | 2.83 | 8.87 | 313% |

Table 2 is an analysis of certain dosages of Warrick drugs from a document entitled, "1997 Care Group Bid Proposal." (WAR0022122) (Highly Confidential).

**TABLE 2**

| PRODUCT | AWP | INVOICE PRICE | NET PRICE (AFTER REBATE) | DIFFERENCE BETWEEN AWP AND INVOICE PRICE | PERCENTAGE SPREAD |
|---|---|---|---|---|---|
| Clotrimazole | 22.25 | 7.77 | 6.99 | 14.48 | 186% |
| Perphenazine | 78.00 | 19.53 | 17.58 | 58.47 | 299% |

Table 3 is an analysis of certain dosages of Warrick drugs from a document entitled, "Managed Care Pricing," dated July 1, 2002.  (WAR0054226) (Highly Confidential).

**TABLE 3**

| Product | Minimum PBM/Mail Order/ Staff Price Guide | Target PBM/Mail Order/ Staff Price Guide | Minimum GPO Price Guide | Target GPO Price Guide | AWP | Difference | % Spread |
|---|---|---|---|---|---|---|---|
| ISMN | 4.48 | 4.93 | 5.15 | 5.38 | 117.40 | 112.02 | 2,082% |
| Oxaprozin | 11.42 | 12.56 | 13.13 | 13.70 | 117.40 | 103.70 | 757% |
| Potassium Chloride | 9.67 | 10.64 | 11.12 | 11.60 | 65.00 | 53.40 | 460% |
| Sodium Chloride | 6.12 | 6.73 | 7.04 | 7.34 | 24.30 | 16.96 | 231% |
| Sulcrafate Tablets | 45.15 | 49.67 | 51.92 | 54.18 | 353.71 | 299.53 | 553% |

**4.     The DOJ Specifically Documented AWP Inflation for Albuterol Sulfate**

467.     In a report published by the DHHS (AB-00-86 (P006299-006316)), the DOJ documented at least one instance where the published AWPs for various dosages of albuterol sulfate manufactured by The Schering Plough Group were substantially higher than the actual prices listed by wholesalers.  The following figures compare the DOJ's determination of an accurate AWP for one particular dosage, based upon wholesalers' price lists, with the AWP

- 169 -

reported by The Schering Plough Group in the 2001 *Red Book*:  The Schering-Plough Group reported to *Red Book* an AWP of $30.25 for albuterol sulfate, yet the DOJ determined the actual AWP to be $9.16, or $21.09 less.

468.    As stated in a May 4, 2000, letter from U.S. Rep. Tom Bliley, Chairman of the Congressional Committee on Commerce, to Raman Kapur, President of Warrick:

> I am writing to you because one of the drugs reflecting a significant variation between the AWP-based prices paid by Medicare and the prices generally charged to private sector purchasers is albuterol sulfate, a drug manufactured by Warrick Pharmaceuticals.

(P006938-006941).

469.    In his May 4, 2000, letter, Bliley outlined The Schering Plough Group's scheme with respect to the prescription drug albuterol sulfate.  The government's investigation uncovered a significant spread between the amount Medicare reimbursed for albuterol sulfate and the amount the Schering-Plough Group actually charged.  U.S. Rep. Bliley stated:

> The OIG [Office of the Inspector General] has determined that the Medicare-allowed amount for albuterol sulfate, a pharmaceutical product sold by your company, in the Fiscal Year 1996 was $.42. The OIG further estimated that the actual wholesale price of this drug was $.15 and the highest available wholesale price that the OIG was able to identify was $.21.

*Id.*

### 5.    The Schering Plough Group Provided Free Goods and Other Incentives

470.    In addition to marketing the spread, The Schering Plough Group has utilized other impermissible inducements to stimulate sales of its drugs.  These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.  By utilizing "off-invoice" inducements, The Schering Plough Group provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

- 170 -

471.    As set forth above, The Schering Plough Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

**P.      The Sicor Group (Sicor, Gensia and Gensia Sicor)**

472.    The Sicor Group engages in an organization-wide and deliberate scheme to inflate AWPs.  The Sicor Group has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below.  The specific drugs of The Sicor Group for which relief is sought in this case are set forth in Appendix A, and are identified below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| SICOR GROUP (Sicor, Gensia and Gensia-Sicor) | | acyclovir sodium | Anti-Infective Agent<br>Used in the treatment of herpes infections |
| | | amikacin sulfate | Antibiotic Agent (Anti-Infective Agent)<br>Used to treat respiratory tract, urinary tract, bone, skin and soft tissue infections |
| | | amphotercin b | Antifungal Agent (Anti-Infective Agent)<br>Used to help the body overcome serious fungus infections |
| | | doxorubicin hydrochloride | Antineoplastic<br>Used in the treatment of ovarian cancer and AIDS-related Kaposi's sarcoma |
| | | etoposide | Mitotic Inhibitor (Antineoplastic)<br>Used in the treatment of testicular neoplasm and small cell cancer of the lung |
| | | leucovorin calcium | Antianemic Agent (Blood Modifier)<br>Used in the treatment of anemia |
| | | pentamidine isethionate | Anti-Infective Agent<br>Used in the treatment of pneumonia |
| | | tobramycin sulfate | Antibiotic Agent (Anti-Infective Agent)<br>Used to treat severe infection |

- 171 -

### 1.     The Sicor Group Has Been the Target of Government Investigations

473.     In connection with its scheme to inflate AWPs, The Sicor Group has been

investigated by the Department of Justice, Department of Health and Human Services Office of

Inspector General, the Texas Department of Health, and the California Attorney General.

### 2.     The Sicor Group Controls the Published AWP for Its Products

474.     The Sicor Group has controlled and set the AWPs for its pharmaceutical products

through direct communications with industry compendia during the Class Period.  For example,

by letter dated February 21, 1994, Gensia advised MediSpan of the impending launch of its new

product called "Etoposide" and stated:  "I have also include [sic] some guidelines in this pack for

establishing Gensia's AWPs for our Etoposide." (SICOR 00955) (Confidential).  That same day,

Gensia sent a second letter to MediSpan stating, in part:

> The following represents the detailed information for this product
> and the AWP that we would like MediSpan to use:

**ETOPOSIDE INJECTION**

| NDC # | PRODUCT DESC. | VIALSIZE | LIST PRICE | AWP |
|-------|---------------|----------|------------|-----|
| 0703-5643-01 | 20MG/ML (100MG) | 5ML | $105.16 | $131.30 |
| 0703-5646-01 | 20MG/ML (500MG) | 25ML | $483.74 | $638.76 |

(SICOR 00956).

475.     Moreover, The Sicor Group has told its sales force to rely on the AWP

information contained in the industry compendia when marketing to customers. For example, a

memorandum dated April 6, 1994 to "Field Sales force" regarding "Average Wholesale Prices

(AWP)" provides in pertinent part:

> Attached is a copy of Medi-Span's March 31, 1994 printout of
> product and AWP information for Gensia Laboratories.  Since this
> information comes directly from Medi-Span's computer file, you
> will find it to be more accurate than the information that your
> customers are using from their reference texts.  You will note, that
> the AWP information (listed in pack quantity) is found in the third
> column from the right. Additionally, the two columns to the
> immediate left of the AWP column represent: WAC (Wholesalers
> Acquisition Cost) and DP (Direct Price).

- 172 -

(SICOR 00753) (Highly Confidential).

### 3.    The Sicor Group's AWP Manipulation Benefited Providers at the Expense of the Class

476.    The Sicor Group has engaged in an ongoing deliberate scheme to inflate AWPs. For example, by letter dated September 25, 2000 to the HCFA administrator, the Chairman of the Commerce Committee revealed that: "[I]n 1998, a health care provider could buy Gensia's Etoposide for $14.00, while the AWP used to determine Medicare reimbursement was $141.97." (P007015-P007490).

477.    The Sicor Group's marketing strategies further demonstrate its fraudulent practices.  In a marketing document prepared by Gensia and obtained by the government in its investigation, Gensia stated:

> Concentrate field reps on the top 40 AIDS hospitals using a $54.00 price in conjunction with a 10% free goods program to mask the final price.  Provides the account with an effective price of $48.60 per vial.

*See* letter dated September 28, 2000 from U.S. Rep. Pete Stark to Alan F. Holmer, President of the Pharmaceutical Research and Manufacturers of America.  (P007512).

478.    Certain handwritten notations appear on this same marketing document comparing the AWP with other prices used for the same drug:

FSS     $44.95

Whls   $71.00

Distr.   $51.50

AWP   $109.20

(P007532).

479.    Similarly, a document entitled "Comparison of AWPs" based on the 1996 *Red Book* contains the following handwritten notation:

Rob, Joe,

- 173 -

Tim suggested sending this info to the reps.  Your thoughts?

B

(SICOR 00756) (Highly Confidential).  Following this notation is a chart comparing the AWPs

for certain drugs published by various manufacturers, including Gensia. One example follows:

| Doxurubicin | | Abbott/ Adria | Bedford | FUSA | Gensia | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | X | | | |
| 10 | | $48.31 | $47.35 | $44.50 | $49.29 | <Polymer | | |
| | | | | | X | | | |
| 50 | | $241.56 | $236.74 | $231.00 | $246.46 | <Polymer | | |
| | | | | | X | | | |
| 200 | | $946.94 | $945.98 | NA | $966.14 | <Polymer | | |

*Id.*

480.    Moreover, Gensia disseminated advertisements that actually contained a

comparison of the Contract Price with the AWP and set forth the resulting spread (SICOR

00751, 00752) (Highly Confidential), because Gensia knew that marketing the spread was in its

best interests.  Realizing this, one customer of Gensia, Opti Care, sent a memorandum to all its

offices (with a copy to Gensia) stating:  "Gensia's products offer a significant spread between

AWP and contract price.  This spread may be attractive, when a payor's reimbursement is based

on AWP and the drug is not MAC'd. (SICOR 00758) (Highly Confidential).

**4.    Specific Sicor Group AWPs Documented by the DOJ**

481.    In a report published by the DHHS, the DOJ documented at least 17 instances

where the published AWPs for various dosages of drugs manufactured by The Sicor Group were

substantially higher than the actual prices listed by wholesalers. The chart below sets forth the

drugs identified by the DOJ and the spread associated with one particular dosage of each drug.

These figures compare the DOJ's determination of an accurate AWP for that particular dosage,

based upon wholesalers' price lists, with the AWP reported by The Sicor Group in the 2001 *Red*

*Book*.

- 174 -

| Drug | The Sicor Group's 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Spread |
|---|---|---|---|---|
| Acyclovir Sodium | $125.00[9] | $100.00 | $25.00 | 25% |
| Amikacin Sulfate | $87.50 | $72.68 | $14.82 | 20% |
| Tobramycin Sulfate | $342.19 | $6.98 | $335.21 | 4,802% |

(P006299-006316).

### 5.   Inflated Sicor Group AWPs From the Sicor Group's Price Lists

482.   According to The Sicor Group's own documents, the published AWPs for its drugs were higher than the actual prices provided to wholesalers. In response to government subpoenas, The Sicor Group produced numerous price lists setting forth spreads between AWPs and prices apparently offered to wholesalers, providers and other intermediaries. A review of those price lists reveals that The Sicor Group has consistently offered hundreds of its drugs and other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers.  To repeat every one of those drugs and the spread offered to each specific customer here is not practical. However, set forth below in Tables 1 and 2 are a number of those drugs with spreads between the AWPs and direct prices. Table 1 is an analysis of certain dosages of two Gensia drugs from a Medi-Span printout on which Gensia wanted its sales force to rely (the remaining drugs were redacted by The Sicor Group prior to production).   (SICOR 00754-755) (Highly Confidential).

**Table 1**

| Product | WAC | DP | AWP | DIFFERENCE (between AWP and DP) | PERCENTAGE SPREAD |
|---|---|---|---|---|---|
| Etoposide Inj | 483.73 | 483.73 | 638.76 | 155.03 | 32% |
| Leucovorin CA Inj | 32.50 | 32.50 | 40.63 | 8.13 | 25% |

483.   Table 2 is an analysis of certain dosages of four Gensia drugs from multiple Gensia price lists for a particular customer, Pharmaceutical Buyers, Inc., comparing the customer's Contract Price with the AWP and the resulting spread (the remaining drugs were

---

[9] Calculation based on the AWP listed in the 2000 *Red Book*.

- 175 -

redacted by The Sicor Group prior to production).  (SICOR 00555, 573, 614, 633) (Highly Confidential).

**Table 2**

| Product | AWP | PBI CONTRACT | SPREAD | PERCENTAGE SPREAD |
|---|---|---|---|---|
| DOXURUBICIN HYDROCHLORIDE | 871.70 | 293.60 | 578.10 | 1,969% |
| ETOPOSIDE | 1207.33 | 456.00 | 751.33 | 1,648% |
| LEUCOVORIN CALCIUM | 39.00 | 4.58 | 34.42 | 752% |
| PENTAMIDINE ISETHIONATE | 468.00 | 193.75 | 274.25 | 1,415% |

**6.      The Sicor Group Provided Free Goods and Other Incentives**

484.    In addition to marketing the spread, The Sicor Group has utilized other impermissible inducements to stimulate sales of its drugs.  These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.  By utilizing "off-invoice" inducements, such as free goods, The Sicor Group provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.  (SICOR 00718, 04182, 00689) (Highly Confidential).

485.    As set forth above, The Sicor Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

**Q.      Warrick**

486.    Warrick has acted to inflate AWPs pursuant to the scheme identified above.  The specific drugs are identified in Appendix A.

**R.      Watson**

487.    Watson engages in an organization-wide and deliberate scheme to inflate AWPs. Watson has stated fraudulent AWPs for all or almost all of its drugs, including: Ferrlecit, Verapamil HCL, Vinblastine Sulfate, Vincristine Sulfate, Dexamethasone, Diazepam,

- 176 -

Gentamicin, Testosterone Ethanate, Vancomycin, Fluphenazine, Gemfibrozil, Imipramine, Nadolol, and Perphenazine. The specific drugs of Watson for which relief is sought in this case are set forth in Appendix A or in the proposed class certification order, and are summarized below:

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| WATSON (Watson and Schein) | Ferrlecit | sodium ferric gluconate complex in sucrose injection | Iron Preparation (Blood modifier) Used for treatment of anemia in patients undergoing hemodialysis |
| | InfeD | iron dextran | Iron Preparation (Blood modifier); Nutritional Supplement Used for treatment of iron deficiency |
| | | dexamethasone acetate | Hormone; Glucocorticoid Used to treat inflammatory conditions, hematologic disorders and cerebral adema |
| | | dexamethasone sodium phosphate | Hormone; Glucocorticoid Used to treat inflammatory conditions, hematologic disorders and cerebral adema |
| | | diazepam | Central Nervous System Agent Used to treat status elipeticus and anxiety disorders.  Also used as an amnesic prior to surgical procedures |
| | | estradiol | Estrogen (Hormone) Used for treatment of menopausal symptoms and postmenopausal osteoporosis |
| | | fluphenazine hcl | Central Nervous System Agent; Psychotherapeutic Agent Used to manage psychotic disorders |
| | | gemfibrozil | Antilipemic Agent (Cardiovascular Agent) Used to lower cholesterol |
| | | gentamicin sulfate | Anti-Infective Agent Used as a general antibiotic to treat serious gastrointestinal, respiratory, bone, skin and soft tissue infections |
| | | imipramine hcl | Central Nervous System Agent; Psychotherapeutic Agent Used in the treatment of depression |
| | | lorazepam | Central Nervous System Agent Used for treatment of anxiety disorders |
| | | nadolol | Antihypertensive (Cardiovascular Agent) Used in the treatment of hypertension and management of angina |

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | | perphenazine | Central Nervous System Agent; Psychotherapeutic Agent Used to manage psychotic disorders |
| | | propanolol hcl | Beta Adrenergic Blocking Agent (Cardiovascular Agent) Used to treat hypertension |
| | | ranitidine hcl | Histamine Receptor Antagonist (Gastrointestinal Agent) Used for treatment of duodenal ulcer, gastric ulcer, gastroesophagael disease and heartburn |
| | | vancomycin hcl | Antibiotic Agent (Anti-Infective Agent) Used as a general antibiotic |
| | | verapamil hcl | Calcium Channel Blocker (Cardiovascular Agent) Used in the treatment of tachyarrhythmia, angina and hypertension |

**1.      Watson Has Been the Target of Government Investigations**

488.    In connection with its scheme to inflate AWPs, Watson has been investigated by the Department of Justice, Department of Health and Human Services Office of Inspector General, and the State of California.

**2.      Watson's Definition and Understanding of AWP**

489.    Watson plainly recognizes that "AWP drives reimbursement."  (MDLW12564) (Highly Confidential).

**3.      Watson Controls the Published AWP for Its Products**

490.    Watson has controlled and set the AWPs for its pharmaceutical products through direct communications with industry compendia during the Class Period.  In a memo, Watson states that it is faxing prices to various pricing services, but "not all pricing services received all of the prices listed on this letter.  Most only received the AWP price…"  The memo goes on to state that "AWP is the primary price being communicated in these faxes to establish a reference for reimbursement."  (MDLW25203) (Highly Confidential).

- 178 -

491.     A *Red Book* Product Listing Verification form asks for approval of changes to the stated AWP for Schein's (which was later acquired by Watson) Verapamil HCL, Vinblastine Sulfate and Vincristine Sulfate.  A Schein executive okayed the changes and signed the *Red Book* form.  (MDLW00887).

**4.     Watson's AWP Manipulation Benefited Providers at the Expense of the Class**

492.     When deciding where to set the price for its drug Ferrlecit, Watson recognized that, in a Medicare Reimbursement Mechanism, "margin drives AWP and ASP" and that a goal of setting the price is that "profit margin at the unit level must not decrease."  Watson recognizes that 20% of reimbursement is patient co-pay, which can be private insurance, Medicaid or cash. (MDLW05457-05460) (Highly Confidential).

493.     Watson was well aware that payors relied on the AWP, and was sensitive to avoid alerting payors to Watson's AWP manipulation.  In the context of a pricing study, a Schein executive noted that "it would be great to get a read from some HCFA personnel regarding what level of price will set off alarms with reimbursement."  (MDLW25216) (Highly Confidential).

494.     In that same document, Watson acknowledges that AWP manipulation is the key to its customers' profits "if through reimbursement we can maintain or increase the money a unit makes on using this product does the price even matter?"  (MDLW25216) (Highly Confidential).

**5.     Specific Watson AWPs Documented by the DOJ**

495.     In a report published by the DHHS (AB-00-86), the DOJ documented at least 12 instances where the published AWPs for various dosages drugs manufactured by Watson were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by Watson in the *Red Book*.

- 179 -

| Drug | Watson's 1998-2001 *Red Book* AWPs | DOJ Determined Actual AWP | Difference | Spread |
|---|---|---|---|---|
| Dexamethasone Acetate | $46.45 (1998) | $11.50 | $34.95 | 304% |
| Dexamethasone Sodium Phosphate | $93.04 (2001) | $1.08 | $91.96 | 851% |
| Diazepam | $18.15 (2000) | $2.50 | $15.65 | 626% |
| Gentamicin Sulfate | $114.10 (1999) | $1.18 | $112.92 | 957% |
| Iron Dextran | $377.04 (2001) | $24.69 | $352.35 | 1,427% |
| Testosterone Ethanate | $42.10 (2001) | $13.39 | $28.71 | 214% |
| Vancomycin HCL | $70.00 (1998) | $3.84 | $60.16 | 1,567% |

(P006299-P006316).

### 6. Inflated Watson AWPs From Watson's Price Lists

496.    In response to government subpoenas, Watson produced numerous price lists setting forth spreads between AWP and prices offered to wholesalers, providers and other intermediaries.  A review of those lists indicates that Watson has consistently offered drugs to its customers at prices significantly below the published AWP, and that the spread was of great importance to Watson's customers.   It is not practical to repeat every one of those drugs and the spread offered to specific customers.  However, set forth below in Table 1 are a number of those drugs (not already referenced above) and the substantial spread offered to Watson customers.

497.    Table 1 is an analysis of certain dosages of Schein drugs from a chart titled Schein Product Status Report, February 1996.  (MDLW01237).

### Table 1

| Drug | AWP | WAC | % Spread |
|---|---|---|---|
| Fluphenazine HCL 1mg | $46.08 | $15.71 | 193% |
| Gemfibrozil 600mg | $55.65 | $7.95 | 600% |
| Imipramine HCL 10mg | $4.45 | $1.32 | 237% |
| Nadolol 20mg | $85.32 | $42.95 | 98% |
| Perphenazine 2mg | $42.53 | $19.76 | 115% |

- 180 -

498.    As set forth above, Watson's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Plaintiffs and the Class.

### 7.    Watson Provided Free Goods and Other Incentives

499.    In addition to marketing the spread, Watson has utilized other inducements to stimulate sales of its drugs.  These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.  In one instance in May 2000, Schein offered "Priority Customers" an additional 5% discount on Ferrlecit "off invoice" for all purchases made that month.  (MDLW15896.)  By utilizing "off-invoice" inducements, Watson provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

500.    As set forth above, Watson's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by Plaintiffs and the Class.

### 8.    Watson Concealed Its AWP Manipulation

501.    Watson deliberately acted to conceal its fraudulent reporting and marketing of the AWP spread.  For example, as noted above, Watson reported its AWP to various industry compendia, but disclosed WAC, direct price and average sale price to only a very few, if any, outside entities.  (MDLW25204) (Highly Confidential).  Also as noted above, Watson needed to keep the AWP high, but at a level that would not "set off alarms with reimbursement" (MDLW25216).  Watson effectively hid the AWP spread from Plaintiffs and the Class.

## VI.    DIRECT DAMAGE SUSTAINED BY PLAINTIFFS AND THE MEMBERS OF THE AWP CLASS

502.    Plaintiffs and other Third-Party Payors who are members of the class reimburse health care providers for pharmaceuticals based upon the published AWP for brand name drugs

- 181 -

and based upon MAC, for generic drugs, which in turn is derived from AWP.  Accordingly,

plaintiffs and Third-Party Payors are directly damaged by fraudulent AWP pricing schemes for

drugs covered by employee health and benefit plans.  By virtue of the fact that AWP is the

reimbursement benchmark for pricing of the AWPIDs at issue, such injury occurs in all aspects

of the distribution chain for the AWPIDs, including the PBM segment, non-PBM purchases, Part

B covered drugs and non-Part B covered drugs.

## VII.   CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME

503.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure, on behalf of themselves Classes comprised of:

> **Physician-Administered Drugs Class (Medicare Part B Co-Pay and Private System Physician-Administered Drugs)**
>
> All persons or entities in the United States and its territories who (i) paid all or a portion of the co-insurance under Medicare Part B for an AWPID during the Class Period, and/or (ii) reimbursed another for a physician-administered AWPID under a contract or other payment scheme that expressly uses AWP as a pricing standard, along with all individual persons who paid coinsurance (*i.e.*, co-pays proportional to the reimbursed amount) under such circumstances for such AWPIDs, during the Class Period. Excluded from the Class are those who make flat co-pays and those whose co-pay was reimbursed by an insurer or other third party.
>
> **Self-Administered and Specialty Pharmacy Drugs Class (Third-Party and Co-Payor Class for Self-Administered Drugs)**
>
> All persons or entities in the United States and its territories who reimbursed another for any self-administered AWPID, or for any AWPID which was distributed through a specialty pharmacy, under a contract or other payment scheme that expressly uses AWP as a pricing standard, along with all individual persons who paid coinsurance (*i.e.*, co-pays proportional to the reimbursed amount) under such contracts for such AWPIDs.  Excluded from the Class are those who make flat co-pays and those whose co-pay was reimbursed by an insurer or other third party.

- 182 -

The foregoing class is further subdivided into the following subclasses:

(a)     brand name sub-class; and

(b)     generic drug sub-class

**RICO Class for Self-Administered and Specialty Drugs**

All persons or entities in the United States and its territories who reimbursed another for any self-administered AWPID, or for any AWPID which was distributed through a specialty pharmacy, under a contract with Caremark, AdvancePCS, Express Scripts and/or Medco (or their predecessors), which contract expressly uses AWP as pricing standard, along with all individual persons who paid coinsurance (*i.e.*, co-pays proportional to the reimbursed amount) under such contracts for such AWPIDs.  Excluded from the Class are those who make flat co-pays and those whose co-pay was reimbursed by an insurer or other third party.

The foregoing class is further subdivided into the following subclasses:

(a)     brand name sub-class; and

(b)     generic the sub-class

504.    Plaintiffs also seek certification of each of the classes pursuant to Fed. R. Civ. P. 23 (b)(2) for Count III of the TAMCAC, in that 23 (b)(2) certification is appropriate as this Count seeks purely declaratory and injunctive relief.  The class representatives for this Count are each of the plaintiffs, including the organizational plaintiffs.

505.    The Class Period is January 1991 to the present.

506.    Excluded from these classes are the defendants herein; any subsidiaries or affiliates of defendants; the officers and directors of defendants during the Class Period; members of the Individual Defendants' immediate families; any person, firm, trust, corporation, officer, director or any individual or entity in which any defendant has a controlling interest or which is related to, or affiliated with, any of the defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party and governmental entities with respect to claims asserted for governmental damages.

- 183 -

507.    The Classes consist of numerous individuals and entities throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a) (1).  The disposition of the claims of the Class Members in a single class action will provide substantial benefits to all parties and to the Court.

508.    The claims of the representative Plaintiffs are typical of the claims of the Class, as required by Rule 23(a) (3), in that the representative Plaintiffs include people and entities who, like all Class Members, purchased the AWPIDs at inflated prices based on AWPs.  Such representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct because, among other things, they paid prices for these drugs that were higher than they would have been but for Defendants' improper actions and have had medical providers make pharmacy decisions based on economic factors as opposed to purely medical factors.

509.    The factual and legal bases of each Defendant's misconduct are common to the Class Members and represent a common thread of fraud and other misconduct resulting in injury to Plaintiffs and members of the Class.

510.    There are many questions of law and fact common to Plaintiffs and the Class, and those questions predominate over any questions that may affect individual Class Members, within the meaning of and fulfilling Rules 23(a) (2) and 23(b)(2) and (3).  Common questions of law and fact include, but are not limited to, the following:

    a.    Whether Defendants engaged in a fraudulent and/or deceptive scheme of improperly inflating the AWPs for the Drugs identified in Appendix A used by Plaintiffs and Class Members as the basis for reimbursement;

    b.    Whether Defendants artificially inflated the AWPs for these drugs;

    c.    Whether it was the policy and practice of Defendants to prepare marketing and sales materials that contained comparisons of the published AWPs and the spreads available;

- 184 -

d.      Whether Defendants provided free samples of the AWPIDs to providers, and whether Defendants instructed them to bill Plaintiffs and the Class for those free samples;

e.      Whether Defendants' provision of free samples to providers, with the intent that the providers bill Plaintiffs and the Class for the free samples, was unlawful;

f.      Whether Defendants paid financial inducements to providers and other intermediaries, with the effect of lowering their costs for AWPIDs;

g.      Whether Defendants engaged in a pattern and practice of paying illegal kickbacks, disguised as free goods, rebates, consulting fees, junkets and education grants to providers and other intermediaries;

h.      Whether AWPs are used as a benchmark for negotiating payments by Third-Party Payors for the AWPIDs;

i.      Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class Members to make inflated payments for the AWPIDs;.

j.      Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiffs and the Class members;

k.      Whether Defendants formed enterprises for the purpose of carrying out the AWP Scheme;

l.      Whether Defendants used the U.S. mails and interstate wire facilities to carry out the AWP Scheme;

m.      Whether Defendants' conduct violated RICO;

n.      Whether Defendants are liable to Plaintiffs and the Class members for damages for conduct actionable under the various state consumer protection statutes.

511.    Plaintiffs will fairly and adequately represent and protect the interests of the Class, as required by Rule 23(a)(4).  Plaintiffs have retained counsel with substantial experience in prosecuting nationwide consumer class actions.  Plaintiffs and their counsel are committed to

- 185 -

vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to those of the Class.

512.    Plaintiffs and members of the Class have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3).  Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the Courts and the litigants, and promotes consistency and efficiency of adjudication.  Additionally, Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Class and require Court imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby making appropriate equitable relief to the Class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

## COUNT I[10]

## VIOLATIONS OF 18 U.S.C. § 1962(C)

### (AGAINST DEFENDANT DRUG MANUFACTURERS IDENTIFIED HEREIN FOR UNLAWFUL CONDUCT ASSOCIATED WITH AWPID DRUGS)

513.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

---

[10] This Amended Complaint does not contain certain material struck or dismissed by the Court in its May 13, 2003 Memorandum and Order.  For instance, many association plaintiffs and several RICO counts that were included in the MCC have not been included in this amended complaint in order to reduce the volume of an already lengthy pleading.  However, plaintiffs incorporate by this reference, into this Complaint, material struck or dismissed by the Court in order to, if necessary, preserve appellate rights.  Plaintiffs acknowledge that these allegations would be dismissed if reasserted.

514.    This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C.

§ 1962(c), is asserted against the Defendant Drug Manufacturers on behalf of the AWP classes

with respect to all AWPID drugs not purchased through use of a PBM and includes drugs

covered under Medicare Part B and those outside of Part B coverage.  The pricing of all such

AWPIDs was directly tied to the published AWPs

515.    Plaintiffs, the members of Classes, and the Defendant Drug Manufacturers are

each "persons," as that term is defined in 18 U.S.C. § 1961(3).

516.    The following publishers of pharmaceutical industry compendia that periodically

publish the AWPs, both in printed and electronic media, for various dosages of drugs are each

"persons," as that term is defined in 18 U.S.C. § 1961(3):  (a) **Thomson Medical Economics**

("Thomson Medical") is a division of Thomson Corporation, a Delaware corporation with its

principal place of business located at One Station Place, Stamford, Connecticut, and it is the

publisher of the *Drug Topics Red Book* (the "*Red Book*"); (b) **First DataBank, Inc.**, ("First

DataBank") a Missouri corporation, with its principal place of business at 1111 Bayhill Drive,

San Bruno, California, and it is the publisher of drug pricing information including, but not

limited to, *American Druggist First Databank Annual Directory of Pharmaceuticals* and

*Essential Directory of Pharmaceuticals*, commonly referred to as the *Blue Book*; (c) and **Facts &**

**Comparisons, Inc.**, ("Facts & Comparisons") a division of Lippincott Williams & Wilkins, Inc.,

a Pennsylvania corporation which acquired all drug information reference products formerly

published by Medi-Span, Inc. and which currently makes available drug pricing information,

including, but not limited to, the Medi-Span *Master Drug Data Base*.  These entities are

sometimes collectively referred to herein as "the Publishers."

517.    At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendant Drug

Manufacturers conducted the affairs of certain association-in-fact enterprises identified herein,

the affairs of which affected interstate commerce through a pattern of racketeering activity.

**The Manufacturer-Publisher Enterprises**

518.    For purposes of this claim, certain RICO "enterprises" are associations-in-fact

consisting of (a) one of the Publishers that reported AWPs for AWPIDs, and (b) a Defendant

Drug Manufacturer, including its directors, employees and agents.  These associations-in-fact are

sometimes collectively referred to herein as the "Manufacturer-Publisher Enterprises."  Each of

the Manufacturer-Publisher Enterprises is an ongoing and continuing business organization

consisting of both corporations and individuals that are and have been associated for the common

or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price

information, which all too often includes disseminating false and misleading AWPs, (b) selling,

purchasing, and administering AWPIDs to Plaintiffs and Class members, and (c) deriving profits

from these activities.  Each of the enterprises had a common purpose of perpetuating use of

AWPs as a benchmark for reimbursement in the pharmaceutical industry, generally, and

specifically for the drugs of that defendant.  The manufacturing defendants have this as a purpose

because without the AWP scheme, they would not be able to push the spread.  The publishers

agree to this scheme, because if they did not, the manufacturers could easily revert to the other

methods of publishing prices or the publishers would have to independently investigate the AWP

at significant expense.  The Publishers also have an economic incentive to merely report the

AWPs provided to them by the manufacturers, because to do otherwise would require the

Publishers to spend money to extensively survey actual sales prices in the market.  By simply

republishing what is submitted to them by the drug manufacturers, the Publishers save on

expenses and consequently reap greater profits.  Thus, each of the Manufacturer-Publisher

Enterprises has a common purpose of perpetuating the use of AWPs as a benchmark for

reimbursement in the pharmaceutical industry.

519.    Each of the Manufacturer-Publisher Enterprises has a systemic linkage because

there are contractual relationships, financial ties, and continuing coordination of activities

- 188 -

between the Defendant Drug Manufacturer and the specific Publisher that are its associates.  As to each of the Manufacturer-Publisher Enterprises, there is a common communication network by which the Defendant Drug Manufacturer and the specific Publisher share information on a regular basis.  Typically this communication occurs by use of the wires and mails in which a manufacturer will instruct a publisher to list a certain AWP.  As to each of the Manufacturer-Publisher Enterprises, the Defendant Drug Manufacturer and the specific Publisher functioned as a continuing unit.  At all relevant times, each of the Manufacturer-Publisher Enterprises was operated by the specific Defendant Drug Manufacturer for criminal purposes, namely, carrying out the AWP Scheme.

520.   At all relevant times, each one of the Publishers was aware of the Defendants Drug Manufacturers' AWP Scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.  Each of the publishing manufacturers is aware that the published AWPs are inflated.  This awareness comes from the following sources:  First, at some point prior to 1992 the publishers in many instances obtained AWPs themselves by survey.  From their surveys of those in the distribution chain, they were and are aware that the reported AWPs were not accurate.  Second, as various congressional bodies and government agencies reported on AWP inflation, the Publishers did not change or challenge the self-reported AWPs, but continued blindly accepting the requested AWPs.  Third, when the State of Texas began prosecuting Dey for its AWP practices, and when other states began focusing on Dey, the Publishers stopped accepting Dey's reported AWPs and published a different, far lower AWP.  They withdraw from the Dey enterprise due to fear that they would be sued if they continued to publish Dey's false AWPs.  This prompted a lawsuit by Dey alleging that the Publishers were treating Dey differently than they were treating all other manufacturers.  In other words, Dey was complaining of the others being allowed to continue the scheme while it could not.

521.    The foregoing evidences the Publishers willing participation in the enterprise; their common purpose in the AWP scheme; and their agreement to a structure wherein the manufacturers made decisions as to what AWPs would be reported.  This structure was the basis in which each of the enterprises was structured and its affairs conducted.  The only exception occurred when the Publishers, fearing litigation, refused to accept Dey's instructions.  The Publishers were willing participants in the scheme because if the truth were revealed the entire AWP reporting system would collapse.

522.    For purposes of this count, the Manufacturer-Publisher Enterprises are identified as follows:

(a)    *The Abbott Manufacturer-Publisher Enterprises:*  The Abbott Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Abbott, and Abbott, including its directors, employees and agents:  (1) the Abbott-Thomson Medical Enterprise; (2) the Abbott-First DataBank Enterprise; and (3) the Abbott-Facts & Comparisons Enterprise.  Each of the Abbott Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Abbott Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Abbott and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons.  As to each of these Abbott Manufacturer-Publisher Enterprises, there is a common

- 190 -

communication network by which Abbott and Thomson Medical, Abbott and First Data Bank, and Abbott and Facts & Comparisons share information on a regular basis.  As to each of these Abbott-Manufacturer-Publisher Enterprises, Abbott and Thomson Medical, Abbott and First Data Bank, and Abbott and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Abbott Manufacturer-Publisher Enterprises was operated and conducted by Abbott for criminal purposes, namely, carrying out the AWP Scheme.

(b)     *The Amgen Manufacturer-Publisher Enterprises:*  The Amgen Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Amgen, and Amgen, including its directors, employees and agents:  (1) the Amgen-Thomson Medical Enterprise; (2) the Amgen-First DataBank Enterprise; and (3) the Amgen-Facts & Comparisons Enterprise.  Each of the Amgen Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Amgen Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Amgen and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons.  As to each of these Amgen Manufacturer-Publisher Enterprises, there is a common communication network by which Amgen and Thomson Medical, Amgen and First Data Bank, and Amgen and Facts & Comparisons share information on a regular basis.  As to

each of these Amgen-Manufacturer-Publisher Enterprises, Amgen and Thomson Medical, Amgen and First Data Bank, and Amgen and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Amgen Manufacturer-Publisher Enterprises was operated and conducted by Amgen for criminal purposes, namely, carrying out the AWP Scheme.

(c)     *The AstraZeneca Manufacturer-Publisher Enterprises:*  The AstraZeneca Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by AstraZeneca, and AstraZeneca, including its directors, employees and agents:  (1) the AstraZeneca -Thomson Medical Enterprise; (2) the AstraZeneca -First DataBank Enterprise; and (3) the AstraZeneca -Facts & Comparisons Enterprise.  Each of the AstraZeneca Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the AstraZeneca Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between AstraZeneca and Thomson Medical, AstraZeneca and First DataBank, and AstraZeneca and Facts & Comparisons.  As to each of these AstraZeneca Manufacturer-Publisher Enterprises, there is a common communication network by which AstraZeneca and Thomson Medical, AstraZeneca and First Data Bank, and AstraZeneca and Facts & Comparisons share information on a regular basis.  As to each of these AstraZeneca -Manufacturer-Publisher Enterprises, AstraZeneca and

- 192 -

Thomson Medical, AstraZeneca and First Data Bank, and AstraZeneca and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the AstraZeneca Manufacturer-Publisher Enterprises was operated and conducted by AstraZeneca for criminal purposes, namely, carrying out the AWP Scheme.

(d)     *The Aventis Group Manufacturer-Publisher Enterprise:*  The Aventis Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Aventis Group, and Aventis Group, including its directors, employees and agents:  (1) the Aventis Group -Thomson Medical Enterprise; (2) the Aventis Group-First DataBank Enterprise; and (3) the Aventis Group-Facts & Comparisons Enterprise.  Each of the Aventis Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Aventis Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Aventis Group and Thomson Medical, Aventis Group and First DataBank, and Aventis Group and Facts & Comparisons.  As to each of these Aventis Group Manufacturer-Publisher Enterprises, there is a common communication network by which Aventis Group and Thomson Medical, Aventis Group and First Data Bank, and Aventis Group and Facts & Comparisons share information on a regular basis. As to each of these Aventis Group-Manufacturer-Publisher Enterprises, Aventis Group and Thomson Medical, Aventis Group and First Data Bank, and Aventis Group and Facts

- 193 -

& Comparisons functioned as continuing but separate units.  At all relevant times, each of the Aventis Group Manufacturer-Publisher Enterprises was operated and conducted by Aventis Group for criminal purposes, namely, carrying out the AWP Scheme.

(e)      *The Baxter Manufacturer-Publisher Enterprises:*  The Baxter Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Baxter, and Baxter, including its directors, employees and agents:  (1) the Baxter-Thomson Medical Enterprise; (2) the Baxter-First DataBank Enterprise; and (3) the Baxter Facts & Comparisons Enterprise.  Each of the Baxter Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class 1 members and to participants in those Plaintiffs and Class 1 members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Baxter Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Baxter and Thomson Medical, Baxter and First DataBank, and Baxter and Facts & Comparisons.  As to each of these Baxter Manufacturer-Publisher Enterprises, there is a common communication network by which Baxter and Thomson Medical, Baxter and First Data Bank, and Baxter and Facts & Comparisons share information on a regular basis.  As to each of these Baxter-Manufacturer-Publisher Enterprises, Baxter and Thomson Medical, Baxter and First Data Bank, and Baxter and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Baxter Manufacturer-

Publisher Enterprises was operated and conducted by Baxter for criminal purposes, namely, carrying out the AWP Scheme.

(f)     *The Bayer Manufacturer-Publisher Enterprises:*  The Bayer Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Bayer, and Bayer, including its directors, employees and agents:  (1) the Bayer-Thomson Medical Enterprise; (2) the Bayer-First DataBank Enterprise; and (3) the Bayer-Facts & Comparisons Enterprise.  Each of the Bayer Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Bayer Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Bayer and Thomson Medical, Bayer and First DataBank, and Bayer and Facts & Comparisons.  As to each of these Bayer Manufacturer-Publisher Enterprises, there is a common communication network by which Bayer and Thomson Medical, Bayer and First Data Bank, and Bayer and Facts & Comparisons share information on a regular basis.  As to each of these Bayer Manufacturer-Publisher Enterprises, Bayer and Thomson Medical, Bayer and First Data Bank, and Bayer and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Bayer Manufacturer-Publisher Enterprises was operated and conducted by Bayer for criminal purposes, namely, carrying out the AWP Scheme.

- 195 -

(g)      *The BMS Group Manufacturer-Publisher Enterprises:*  The BMS Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by BMS Group, and BMS Group, including its directors, employees and agents:  (1) the BMS Group-Thomson Medical Enterprise; (2) the BMS Group-First DataBank Enterprise; and (3) the BMS Group-Facts & Comparisons Enterprise.  Each of the BMS Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the BMS Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between BMS Group and Thomson Medical, BMS Group and First DataBank, and BMS Group and Facts & Comparisons.  As to each of these BMS Group Manufacturer-Publisher Enterprises, there is a common communication network by which BMS Group and Thomson Medical, BMS Group and First Data Bank, and BMS Group and Facts & Comparisons share information on a regular basis.  As to each of these BMS Group Manufacturer-Publisher Enterprises, BMS Group and Thomson Medical, BMS Group and First Data Bank, and BMS Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the BMS Group Manufacturer-Publisher Enterprises was operated and conducted by BMS Group for criminal purposes, namely, carrying out the AWP Scheme.

(h)     *The Dey Manufacturer-Publisher Enterprises:*  The Dey Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Dey, and Dey, including its directors, employees and agents:  (1) the Dey-Thomson Medical Enterprise; (2) the Dey-First DataBank Enterprise; and (3) the Dey-Facts & Comparisons Enterprise.  Each of the Dey Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Dey Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Dey and Thomson Medical, Dey and First DataBank, and Dey and Facts & Comparisons.  As to each of these Dey Manufacturer-Publisher Enterprises, there is a common communication network by which Dey and Thomson Medical, Dey and First Data Bank, and Dey and Facts & Comparisons share information on a regular basis.  As to each of these Dey Manufacturer-Publisher Enterprises, Dey and Thomson Medical, Dey and First Data Bank, and Dey and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Dey Manufacturer-Publisher Enterprises was operated and conducted by Dey for criminal purposes, namely, carrying out the AWP Scheme.

(i)     *The Fujisawa Group Manufacturer-Publisher Enterprises:*  The Fujisawa Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided

- 197 -

to them by Fujisawa Group, and Fujisawa Group, including its directors, employees and agents:  (1) the Fujisawa Group-Thomson Medical Enterprise; (2) the Fujisawa Group-First DataBank Enterprise; and (3) the Fujisawa Group-Facts & Comparisons Enterprise. Each of the Fujisawa Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Fujisawa Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Fujisawa Group and Thomson Medical, Fujisawa Group and First DataBank, and Fujisawa Group and Facts & Comparisons.  As to each of these Fujisawa Group Manufacturer-Publisher Enterprises, there is a common communication network by which Fujisawa Group and Thomson Medical, Fujisawa Group and First Data Bank, and Fujisawa Group and Facts & Comparisons share information on a regular basis.  As to each of these Fujisawa Group Manufacturer-Publisher Enterprises, Fujisawa Group and Thomson Medical, Fujisawa Group and First Data Bank, and Fujisawa Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Fujisawa Group Manufacturer-Publisher Enterprises was operated and conducted by Dey for criminal purposes, namely, carrying out the AWP Scheme.

(j)     *The GSK Group Manufacturer-Publisher Enterprises:*  The GSK Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by

- 198 -

GSK Group, and GSK Group, including its directors, employees and agents: (1) the GSK Group-Thomson Medical Enterprise; (2) the GSK Group-First DataBank Enterprise; and (3) the GSK Group-Facts & Comparisons Enterprise. Each of the GSK Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the GSK Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between GSK Group and Thomson Medical, GSK Group and First DataBank, and GSK Group and Facts & Comparisons. As to each of these GSK Group Manufacturer-Publisher Enterprises, there is a common communication network by which GSK Group and Thomson Medical, GSK Group and First Data Bank, and GSK Group and Facts & Comparisons share information on a regular basis. As to each of these GSK Group Manufacturer-Publisher Enterprises, GSK Group and Thomson Medical, GSK Group and First Data Bank, and GSK Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the GSK Group Manufacturer-Publisher Enterprises was operated and conducted by GSK Group for criminal purposes, namely, carrying out the AWP Scheme.

(k)     *The Hoffman-La Roche Manufacturer-Publisher Enterprises:* The Hoffman-La Roche Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Hoffman-La Roche, and Hoffman-La Roche, including its

- 199 -

directors, employees and agents:  (1) the Hoffman-La Roche-Thomson Medical
Enterprise; (2) the Hoffman-La Roche-First DataBank Enterprise; and (3) the Hoffman-
La Roche-Facts & Comparisons Enterprise.  Each of the Hoffman-La Roche
Manufacturer-Publisher Enterprises is an ongoing and continuing business organization
consisting of both corporations and individuals that are and have been associated for the
common or shared purposes of (a) publishing or otherwise disseminating false and
misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual
Plaintiffs and Class members and to participants in those Plaintiffs and Class members
that comprise health and welfare plans, and (c) deriving profits from these activities.
Each of the Hoffman-La Roche Group Manufacturer-Publisher Enterprises has a systemic
linkage because there are contractual relationships, financial ties, and continuing
coordination of activities between Hoffman-La Roche and Thomson Medical, Hoffman-
La Roche and First DataBank, and Hoffman-La Roche and Facts & Comparisons.  As to
each of these Hoffman-La Roche Manufacturer-Publisher Enterprises, there is a common
communication network by which Hoffman-La Roche and Thomson Medical, Hoffman-
La Roche and First Data Bank, and Hoffman-La Roche and Facts & Comparisons share
information on a regular basis.  As to each of these Hoffman-La Roche Manufacturer-
Publisher Enterprises, Hoffman-La Roche and Thomson Medical, Hoffman-La Roche
and First Data Bank, and Hoffman-La Roche and Facts & Comparisons functioned as
continuing but separate units.  At all relevant times, each of the Hoffman-La Roche
Manufacturer-Publisher Enterprises was operated and conducted by Hoffman-La Roche
for criminal purposes, namely, carrying out the AWP Scheme.

(l)     *The Immunex Manufacturer- Publisher Enterprises:*  The Immunex
Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of
each of the Publishers that reported the AWPID AWPs that were provided to them by

Immunex, and Immunex, including its directors, employees and agents: (1) the Immunex-La Roche-Thomson Medical Enterprise; (2) the Immunex-First DataBank Enterprise; and (3) the Immunex-Facts & Comparisons Enterprise. Each of the Immunex Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities. Each of the Immunex Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Immunex and Thomson Medical, Immunex and First DataBank, and Immunex and Facts & Comparisons. As to each of these Immunex Manufacturer-Publisher Enterprises, there is a common communication network by which Immunex and Thomson Medical, Immunex and First Data Bank, and Immunex and Facts & Comparisons share information on a regular basis. As to each of these Immunex Manufacturer-Publisher Enterprises, Immunex and Thomson Medical, Immunex and First Data Bank, and Immunex and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Immunex Manufacturer-Publisher Enterprises was operated and conducted by Immunex for criminal purposes, namely, carrying out the AWP Scheme.

(m)     *The Johnson & Johnson Group Manufacturer-Publisher Enterprise:* The Johnson & Johnson Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Johnson & Johnson Group, and Johnson & Johnson Group,

- 201 -

including its directors, employees and agents:  (1) the Johnson & Johnson Group-La Roche-Thomson Medical Enterprise; (2) the Johnson & Johnson Group-First DataBank Enterprise; and (3) the Johnson & Johnson Group-Facts & Comparisons Enterprise.  Each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Johnson & Johnson Group and Thomson Medical, Johnson & Johnson Group and First DataBank, and Johnson & Johnson Group and Facts & Comparisons.  As to each of these Johnson & Johnson Group Manufacturer-Publisher Enterprises, there is a common communication network by which Johnson & Johnson Group and Thomson Medical, Johnson & Johnson Group and First Data Bank, and Johnson & Johnson Group and Facts & Comparisons share information on a regular basis.  As to each of these Johnson & Johnson Group Manufacturer-Publisher Enterprises, Johnson & Johnson Group and Thomson Medical, Johnson & Johnson Group and First Data Bank, and Johnson & Johnson Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Johnson & Johnson Group Manufacturer-Publisher Enterprises was operated and conducted by Johnson & Johnson Group for criminal purposes, namely, carrying out the AWP Scheme.

(n)     *The Pfizer Manufacturer-Publisher Enterprises:*  The Pfizer Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Pfizer, and Pfizer, including its directors, employees and agents:  (1) the Pfizer-La Roche-Thomson Medical Enterprise; (2) the Pfizer-First DataBank Enterprise; and (3) the Pfizer-Facts & Comparisons Enterprise.  Each of the Pfizer Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Pfizer Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pfizer and Thomson Medical, Pfizer and First DataBank, and Pfizer and Facts & Comparisons.  As to each of these Pfizer Manufacturer-Publisher Enterprises, there is a common communication network by which Pfizer and Thomson Medical, Pfizer and First Data Bank, and Pfizer and Facts & Comparisons share information on a regular basis.  As to each of these Pfizer Manufacturer-Publisher Enterprises, Pfizer and Thomson Medical, Pfizer and First Data Bank, and Pfizer and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Pfizer Manufacturer-Publisher Enterprises was operated and conducted by Pfizer for criminal purposes, namely, carrying out the AWP Scheme.

(o)     *The Pharmacia Group Manufacturer-Publisher Enterprises:*  The Pharmacia Group Manufacturer-Publisher Enterprises are three separate associations-in-

- 203 -

fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Pharmacia Group, and Pharmacia Group, including its directors, employees and agents:  (1) the Pharmacia Group-Thomson Medical Enterprise; (2) the Pharmacia Group-First DataBank Enterprise; and (3) the Pharmacia Group-Facts & Comparisons Enterprise.  Each of the Pharmacia Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Pharmacia Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pharmacia Group and Thomson Medical, Pharmacia Group and First DataBank, and Pharmacia Group and Facts & Comparisons.  As to each of these Pharmacia Group Manufacturer-Publisher Enterprises, there is a common communication network by which Pharmacia Group and Thomson Medical, Pharmacia Group and First Data Bank, and Pharmacia Group and Facts & Comparisons share information on a regular basis.  As to each of these Pharmacia Group Manufacturer-Publisher Enterprises, Pharmacia Group and Thomson Medical, Pharmacia Group and First Data Bank, and Pharmacia Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Pharmacia Group Manufacturer-Publisher Enterprises was operated and conducted by Pharmacia Group for criminal purposes, namely, carrying out the AWP Scheme.

- 204 -

(p)      *The Schering-Plough Group Manufacturer-Publisher Enterprises:*  The

Schering-Plough Group Manufacturer-Publisher Enterprises are three separate

associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs

that were provided to them by Schering-Plough Group, and Schering-Plough Group,

including its directors, employees and agents:  (1) the Schering-Plough Group-Thomson

Medical Enterprise; (2) the Schering-Plough Group-First DataBank Enterprise; and

(3) the Schering-Plough Group-Facts & Comparisons Enterprise.  Each of the Schering-

Plough Group Manufacturer-Publisher Enterprises is an ongoing and continuing business

organization consisting of both corporations and individuals that are and have been

associated for the common or shared purposes of (a) publishing or otherwise

disseminating false and misleading AWPs, (b) selling, purchasing, and administering

AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs

and Class members that comprise health and welfare plans, and (c) deriving profits from

these activities.  Each of the Schering-Plough Group Manufacturer-Publisher Enterprises

has a systemic linkage because there are contractual relationships, financial ties, and

continuing coordination of activities between Schering-Plough Group and Thomson

Medical, Schering-Plough Group and First DataBank, and Schering-Plough Group and

Facts & Comparisons.  As to each of these Schering-Plough Group Manufacturer-

Publisher Enterprises, there is a common communication network by which Schering-

Plough Group and Thomson Medical, Schering-Plough Group and First Data Bank, and

Schering-Plough Group and Facts & Comparisons share information on a regular basis.

As to each of these Schering-Plough Group Manufacturer-Publisher Enterprises,

Schering-Plough Group and Thomson Medical, Schering-Plough Group and First Data

Bank, and Schering-Plough Group and Facts & Comparisons functioned as continuing

but separate units.  At all relevant times, each of the Schering-Plough Group

Manufacturer-Publisher Enterprises was operated and conducted by Schering-Plough Group for criminal purposes, namely, carrying out the AWP Scheme.

      (q)    *The Sicor Group Manufacturer-Publisher Enterprises:*  The Sicor Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Sicor Group, and Sicor Group, including its directors, employees and agents:  (1) the Sicor Group-Thomson Medical Enterprise; (2) the Sicor Group-First DataBank Enterprise; and (3) the Sicor Group-Facts & Comparisons Enterprise.  Each of the Sicor Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Sicor Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sicor Group and Thomson Medical, Sicor Group and First DataBank, and Sicor Group and Facts & Comparisons.  As to each of these Sicor Group Manufacturer-Publisher Enterprises, there is a common communication network by which Sicor Group and Thomson Medical, Sicor Group and First Data Bank, and Sicor Group and Facts & Comparisons share information on a regular basis.  As to each of these Sicor Group Manufacturer-Publisher Enterprises, Sicor Group and Thomson Medical, Sicor Group and First Data Bank, and Sicor Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Sicor

Group Manufacturer-Publisher Enterprises was operated and conducted by Sicor Group for criminal purposes, namely, carrying out the AWP Scheme.

(r)     *The Watson Manufacturer-Publisher Enterprises:*  The Watson Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Watson, and Watson, including its directors, employees and agents:  (1) the Watson-Thomson Medical Enterprise; (2) the Watson-First DataBank Enterprise; and (3) the Watson-Facts & Comparisons Enterprise.  Each of the Watson Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Watson Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Watson and Thomson Medical, Watson and First DataBank, and Watson and Facts & Comparisons.  As to each of these Watson Manufacturer-Publisher Enterprises, there is a common communication network by which Watson and Thomson Medical, Watson and First Data Bank, and Watson and Facts & Comparisons share information on a regular basis.  As to each of these Watson Manufacturer-Publisher Enterprises, Watson and Thomson Medical, Watson and First Data Bank, and Watson and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Watson Manufacturer-Publisher Enterprises was operated and conducted by Watson for criminal purposes, namely, carrying out the AWP Scheme.

- 207 -

(s)     *The Warrick Manufacturer-Publisher Enterprises*:  The Warrick Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Warrick, and Warrick, including its directors, employees and agents:  (1) the Warrick-Thomson Medical Enterprise; (2) the Warrick-First DataBank Enterprise; and (3) the Warrick-Facts & Comparisons Enterprise.  Each of the Warrick Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Plaintiffs and Class members that comprise health and welfare plans, and (c) deriving profits from these activities.  Each of the Warrick Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Warrick and Thomson Medical, Warrick and First DataBank, and Warrick and Facts & Comparisons.  As to each of these Warrick Manufacturer-Publisher Enterprises, there is a common communication network by which Warrick and Thomson Medical, Warrick and First Data Bank, and Warrick and Facts & Comparisons share information on a regular basis.  As to each of these Warrick Manufacturer-Publisher Enterprises, Warrick and Thomson Medical, Warrick and First Data Bank, and Warrick and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Warrick Manufacturer-Publisher Enterprises was operated and conducted by Warrick for criminal purposes, namely, carrying out the AWP Scheme.

**The Defendant Drug Manufacturers' Use of the U.S. Mails and Interstate Wire Facilities**

523.    Each of the Manufacturer-Publisher Enterprises engaged in and affected interstate commerce because they engage in the following activities across state boundaries:  The transmission and publication of false and misleading information concerning AWPs; the sale, purchase and/or administration of AWPIDs; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission and/or receipt of invoices, statements and payments related to the use or administration of AWPIDs.

524.    During the Class Period, the Defendants Drug Manufacturers' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

525.    The nature and pervasiveness of the Defendant Drug Manufacturers' AWP Scheme, which was orchestrated out of the corporate headquarters of the Defendant Drug Manufacturers, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the various local district managers overseeing the sales force(s), the numerous pharmaceutical sales representatives who, in turn, directly communicated with providers and employees who communicated with the Publishers.

526.    Many of the precise dates of Defendant Drug Manufacturers' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records.  Indeed, an essential part of the successful operation of the AWP Scheme alleged herein depended upon secrecy, and as alleged above, the Defendant Drug Manufacturers took deliberate steps to conceal their wrongdoing.  However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the AWP Scheme and do so below.

- 209 -

527.     The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities to perpetrate the AWP Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

(a)     Marketing materials about the AWPs for AWPIDs and the available spread, which were sent by the Defendant Drug Manufacturers to health care providers located across the country;

(b)     Written representations of the AWPs made by the Defendant Drug Manufacturers to the Publishers, which were made at least annually and in many cases several times during a single year;

(c)     Documents providing information or incentives designed to lessen the prices that health care providers paid for AWPIDs and/or to conceal those prices or the AWP Scheme alleged here;

(d)     Written communications, relating to rebates, kickbacks, or other financial inducements included, but not limited to, checks, as detailed herein;

(e)     Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

(f)     Written and oral communications with health insurers and patients, including Plaintiffs and members of the Class, inducing payments for the drugs that were made in reliance on AWPs; and

(g)     Receipts of money sent on tens of thousands of occasions through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Defendant Drug Manufacturers' AWP Scheme.

001534-16  97978 V1

(h)     In addition to the above-referenced RICO predicate acts, it was foreseeable to the Defendant Drug Manufacturers that the Publishers would distribute their publications containing false AWPs through the U.S. mails and by interstate wire facilities.  Further, the Defendant Drug Manufacturers' corporate headquarters have, in furtherance of the AWP Scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions.  These uses of the U.S. mails include some of the documents referenced in this Amended Complaint.

**Conduct of the RICO Enterprises' Affairs**

528.    During the Class Period, the Defendant Drug Manufacturers have exerted control over their Manufacturer-Publisher Enterprises and, in violation of Section 1962(c) of RICO, the Defendant Drug Manufacturers have conducted or participated in the conduct of the affairs of those RICO enterprises, directly or indirectly, in the following ways:

(a)     Each of the Defendant Drug Manufacturers has directly controlled the price for its AWPIDs;

(b)     Each of the Defendant Drug Manufacturers has directly controlled the AWPs that are reported by the Publishers;

(c)     Each of the Defendant Drug Manufacturers has directly controlled the creation and distribution of marketing, sales, and other materials used to inform health care providers nationwide of the profit potential of its AWPIDs;

(d)     Each of the Defendant Drug Manufacturers has controlled and participated in the affairs of its Manufacturer-Publisher Enterprises by using a fraudulent scheme to manufacture, market and sell its AWPIDs on the basis of AWPs that each of the Defendant Drug Manufacturers provides to the Publishers;

- 211 -

(e)      Each of the Defendant Drug Manufacturers intended that each of the Publishers would (and did) distribute their publications containing false AWPs through the U.S. mails and by interstate wire facilities; and

(f)      Each of the publishers has allowed these Defendants to exert control over their organizations knowing that the AWPs were inflated and were not real numbers. Each publisher did so because the reporting of AWPs was, and is, a major part of its business.

529.      Each of the Manufacturer-Publisher Enterprises had a hierarchical decision-making structure headed by the respective Defendant Drug Manufacturer.  The Defendant Drug Manufacturers issued instructions on how its AWPs were to be reported and each publisher accepted those instructions despite knowing of their falsity.

530.      In violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers have conducted the affairs of each of the Manufacturer-Publisher Enterprises with which they associated by reporting fraudulently inflated AWPs for AWPIDs that were then published by the Publishers and disseminated nationwide.

**The Defendant Drug Manufacturers' Pattern of Racketeering Activity**

531.      Each of the Defendant Drug Manufacturers have conducted and participated in the affairs of their above-referenced Manufacturer-Publisher Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The Defendant Drug Manufacturers' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their AWP Scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the

- 212 -

Defendant Drug Manufacturers intended to defraud Plaintiffs, members of the Classes and other intended victims of the AWP Scheme.

532.    The Defendants Drug Manufacturers' fraudulent and unlawful AWP Scheme consisted, in part, of deliberately overstating the AWPs for their AWPIDs, thereby creating a "spread" based on the inflated figure in order to induce others to advocate and favor that Defendant Drug Manufacturer's AWPIDs.  Further, others would bill their clients for the Defendant Drug Manufacturers' AWPIDs based on the inflated AWPs, which did not reflect the true price paid for the AWPIDs.

533.    The AWP Scheme was calculated and intentionally crafted to ensure that Plaintiffs and members of the Classes would be over-billed for the drugs.  In designing and implementing the AWP Scheme, at all times the Defendant Drug Manufacturers were cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the Defendant Drug Manufacturers in setting the AWPs, as reported by the Publishers.

534.    Each of the plaintiffs, to the extent they purchased drugs outside of the PBM context, made purchases with the price being tied to AWP.

535.    By intentionally and artificially inflating the AWPs, and by subsequently failing to disclose such practices to the individual patients, health plans and their insurers, the Defendant Drug Manufacturers engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

536.    The Defendant Drug Manufacturers' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and members of the Classes.  Each separate use of the U.S. mails and/or interstate wire facilities employed by the Defendant Drug Manufacturers was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Classes.  Each of the Defendant Drug

- 213 -

Manufacturers has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular Manufacturer-Publisher Enterprises.

### The Defendant Drug Manufacturers' Motive

537.    The Defendant Drug Manufacturers' motive in creating and operating the AWP Scheme and conducting the affairs of the Manufacturer-Publisher Enterprises described herein was to fraudulently obtain sales of and profits from their AWPIDs.

538.    The AWP Scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the Defendant Drug Manufacturers' AWPIDs.  Thus, each of the Defendant Drug Manufacturers used the AWP Scheme to sell more of its drugs, thereby fraudulently gaining sales and market share and profits.

### Damages Caused by the Defendant Drug Manufacturers' AWP Scheme

539.    The Defendant Drug Manufacturers' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Classes to be injured in their business or property because Plaintiffs and members of the Classes have paid many hundreds of millions of dollars in inflated reimbursements or other payments for AWPIDs.

540.    The Defendant Drug Manufacturers sent billing statements through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their AWP Scheme.  Plaintiffs and members of the Classes have made inflated payments for AWPIDs based on and/or in reliance on reported and false AWPs.

541.    Under the provisions of Section 1964(c) of RICO, the Defendant Drug Manufacturers are jointly and severally liable to Plaintiffs and members of the Classes for three times the damages that Plaintiffs and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II

## VIOLATIONS OF 18 U.S.C. § 1962(C)

## (AGAINST DEFENDANT DRUG MANUFACTURERS IDENTIFIED HEREIN)

542.     Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Amended Complaint.

543.     This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against the Defendant Drug Manufacturers identified below on behalf of AWP Classes by the AWP Class representatives.

544.     Plaintiffs, the members of Classes, and the Defendant Drug Manufacturers are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

545.     The following pharmacy benefit managers (collectively "PBMs") are each "persons," as that term is defined in 18 U.S.C. § 1961(3):  (a) **AdvancePCS** ("Advance PCS"), a Delaware corporation with its principal place of business located at 750 West John Carpenter Freeway, Suite 1200, Irving, Texas; Advance PCS is the largest PBM in the United States and currently serves more than 75 million health plan members; (b) **Caremark, Rx, Inc.** ("Caremark Rx"), a Delaware corporation with its principal place of business located at 300 Galloria Tower, Suite 1000, Birmingham, Alabama; Caremark Rx is one of the largest pharmaceutical services companies in the United States with net revenues of approximately $5.6 billion in 2001; (c) **Express Scripts, Inc.** ("Express Scripts"), a Delaware corporation with its principal place of business located at 13900 Riverpoint Drive, Maryland Heights, Missouri; Express Scripts is the third largest PBM in North America; and (d) **Medco Health Solutions, Inc.** ("Medco Health"), a successor-in-interest to Merck-Medco Managed Care, L.L.C., is a Delaware corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey; since its acquisition in 1993, Medco Health has been a wholly-owned subsidiary of Defendant Drug Manufacturer Merck.

- 215 -

### The Manufacturer-PBM RICO Enterprises

546.    For purposes of this claim, the RICO "enterprises" are associations-in-fact consisting of (a) one of the PBMs that administered purchases of a Defendant Drug Manufacturer's brand name drugs and billed its members on the basis of the Defendant Drug Manufacturer's reported AWPs, and (b) a Defendant Drug Manufacturer, including its directors, employees and agents.  These associations-in-fact are collectively referred to herein as the "Manufacturer-PBM Enterprises."

547.    Each of the Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, and administering AWPIDs to individual Plaintiffs and Class members and to participants in those Classes that comprise health and welfare plans, and deriving profits from these activities.

548.    Each of the Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the Defendant Drug Manufacturer and the specific PBM that are associates.  As to each of the Manufacturer-PBM Enterprises, there is a common communication network by which the Defendant Drug Manufacturer and the specific PBM share information on a regular basis.  As to each of the Manufacturer-PBM Enterprises, the Defendant Drug Manufacturer and the specific PBM functioned as a continuing unit.  At all relevant times, each of the Manufacturer-PBM Enterprises was operated by the specific Defendant Drug Manufacturer for criminal purposes, namely, carrying out the AWP Scheme.

549.    Each manufacturer-PBM enterprise had a common purpose of perpetuating use of AWPs as a benchmark for reimbursement in the pharmaceutical industry.  The manufacturing defendants had this as a purpose, because without the use of inflated AWPs as an industry price setting benchmark, they would not be able to push the spread to those in the distribution chain.

The PBMs share this common purpose, because they are subject to a great deal of control from the manufacturers.  PBMs are now turning to drug manufacturers for hidden profit-making schemes, because PBM clients are no longer allowing PBMs to collect as much for claims administration.  Thus, as a result, PBMs have, with the knowing and willful participation and assistance of the drug manufacturers, engaged in hidden profit-making schemes falling into three general categories:  (i) garnering rebates and other "soft dollars" from drug manufacturers that the PBM Defendants, to a large extent, keep without disclosing to their health plans the true amounts of the rebates; (ii) pocketing secret spreads between actual drug costs and the prices charged to health plans and their members; and (iii) keeping secret discounts provided by the drug manufacturers in association with the PBMs' mail order operations.

550.    The existence and magnitude of PBM rebates and accompanying profits at the expense of PBM clients is acknowledged within the PBM industry.  For example, a recent industry report observed:

> [R]ebates paid to the PBMs by pharmaceutical companies continue to increase, as evidenced by the increasing PBM profits . . . . [T]his should hold true so long as the PBMs add value [apparently to the drug makers] by moving market share within drug classes.

551.    Thus, PBMs were willing participants in the enterprise, and each participant in the enterprise shared many common purposes.

552.    Further, as a result of their reliance on the manufacturers, PBMs took instructions and commands from the manufacturers regarding the use of AWP, not only so that they could keep part of the spread, but also so as to continue to earn from the manufacturers:  (i) *Access rebates* for placement of products on the PBMs' formulary; (ii) *Market share rebates* for garnering higher market share than established targets; (iii) *Administrative fees* for assembling data to verify market share results; and (iv) *Other fees and grants* in an effort to promote products.

553.     In order to garner all of these fees from the drug manufacturers, the PBMs each meet on a frequent basis to discuss drug prices, spreads, marketing opportunities and coordination of all of the above.

554.     There is a common communication network between each PBM and each manufacturer for the purpose of implementing the AWP spread scheme and for the exchange of financial rewards for the PBMs activities that benefit the drug company manufacturers.

555.     At all relevant times, each one of the PBMs was aware of the Defendants Drug Manufacturers' AWP Scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.

556.     For purposes of this count, the Manufacturer-PBM Enterprises are identified as follows:

(a)     *The Abbott Manufacturer-PBM Enterprises:*  The Abbott Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Abbott's AWPIDs and billed its members on the basis of Abbott's reported AWPs, and Abbott, including its directors, employees and agents: (1) the Abbott-AdvancePCS Enterprise; (2) the Abbott-Caremark Rx Enterprise; (3) the Abbott-Express Scripts Enterprise; and (4) the Abbott-Medco Health Enterprise.  Each of the Abbott Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Abbott Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and Abbott and Medco Health.  As to each of these Abbott

- 218 -

Manufacturer-PBM Enterprises, there is a common communication network by which Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and Abbott and Medco Health share information on a regular basis. As to each of these Abbott-Manufacturer-PBM Enterprises, Abbott and AdvancePCS, Abbott and Caremark Rx, Abbott and Express Scripts, and Abbott and Medco Health functioned as continuing but separate units. At all relevant times, each of the Abbott Manufacturer-PBM Enterprises was operated and conducted by Abbott for criminal purposes, namely, carrying out the AWP Scheme.

(b)     *The Amgen Manufacturer-PBM Enterprises:*  The Amgen Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Amgen's AWPIDs and billed its members on the basis of Amgen's reported AWPs, and Amgen, including its directors, employees and agents: (1) the Amgen-AdvancePCS Enterprise; (2) the Amgen-Caremark Rx Enterprise; (3) the Amgen-Express Scripts Enterprise; and (4) the Amgen-Medco Health Enterprise. Each of the Amgen Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Amgen Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and Express Scripts, and Amgen and Medco Health. As to each of these Amgen Manufacturer-PBM Enterprises, there is a common communication network by which Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and Express Scripts, and Amgen and Medco Health share information on a regular basis. As to each of these

- 219 -

Amgen-Manufacturer-PBM Enterprises, Amgen and AdvancePCS, Amgen and Caremark Rx, Amgen and Express Scripts, and Amgen and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Amgen Manufacturer-PBM Enterprises was operated and conducted by Amgen for criminal purposes, namely, carrying out the AWP Scheme.

(c)     *The AstraZeneca Manufacturer-PBM Enterprises:*  The AstraZeneca Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of AstraZeneca's AWPIDs and billed its members on the basis of AstraZeneca's reported AWPs, and AstraZeneca, including its directors, employees and agents:  (1) the AstraZeneca-AdvancePCS Enterprise; (2) the AstraZeneca-Caremark Rx Enterprise; (3) the AstraZeneca-Express Scripts Enterprise; and (4) the AstraZeneca-Medco Health Enterprise.  Each of the AstraZeneca Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the AstraZeneca Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca and Express Scripts, and AstraZeneca and Medco Health.  As to each of these AstraZeneca Manufacturer-PBM Enterprises, there is a common communication network by which AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca and Express Scripts, and AstraZeneca and Medco Health share information on a regular basis.  As to each of these AstraZeneca-Manufacturer-PBM Enterprises, AstraZeneca and AdvancePCS, AstraZeneca and Caremark Rx, AstraZeneca and Express Scripts, and

- 220 -

AstraZeneca and Medco Health functioned as continuing but separate units.  At all relevant times, each of the AstraZeneca Manufacturer-PBM Enterprises was operated and conducted by AstraZeneca for criminal purposes, namely, carrying out the AWP Scheme.

(d)      *The Aventis Group Manufacturer-PBM Enterprise:*  The Aventis Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Aventis Group's AWPIDs and billed its members on the basis of Aventis Group's reported AWPs, and Aventis Group, including its directors, employees and agents:  (1) the Aventis Group-AdvancePCS Enterprise; (2) the Aventis Group-Caremark Rx Enterprise; (3) the Aventis Group-Express Scripts Enterprise; and (4) the Aventis Group-Medco Health Enterprise.  Each of the Aventis Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Aventis Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health.  As to each of these Aventis Group Manufacturer-PBM Enterprises, there is a common communication network by which Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health share information on a regular basis.  As to each of these Aventis Group-Manufacturer-PBM Enterprises, Aventis Group and AdvancePCS, Aventis Group and Caremark Rx, Aventis Group and Express Scripts, and Aventis Group and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Aventis Group

- 221 -

Manufacturer-PBM Enterprises was operated and conducted by Aventis Group for criminal purposes, namely, carrying out the AWP Scheme.

(e)     *The Baxter Manufacturer-PBM Enterprises:*  The Baxter Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Amgen's AWPIDs and billed its members on the basis of Baxter's reported AWPs, and Baxter, including its directors, employees and agents: (1) the Baxter-AdvancePCS Enterprise; (2) the Baxter-Caremark Rx Enterprise; (3) the Baxter-Express Scripts Enterprise; and (4) the Baxter-Medco Health Enterprise.  Each of the Baxter Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Baxter Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health.  As to each of these Baxter Manufacturer-PBM Enterprises, there is a common communication network by which Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health share information on a regular basis.  As to each of these Baxter-Manufacturer-PBM Enterprises, Baxter and AdvancePCS, Baxter and Caremark Rx, Baxter and Express Scripts, and Baxter and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Baxter Manufacturer-PBM Enterprises was operated and conducted by Baxter for criminal purposes, namely, carrying out the AWP Scheme.

- 222 -

(f)     *The Bayer Manufacturer-PBM Enterprises:*  The Bayer Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Bayer's AWPIDs and billed its members on the basis of Bayer's reported AWPs, and Bayer, including its directors, employees and agents: (1) the Bayer-AdvancePCS Enterprise; (2) the Bayer-Caremark Rx Enterprise; (3) the Bayer-Express Scripts Enterprise; and (4) the Bayer-Medco Health Enterprise.  Each of the Bayer Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Bayer Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health.  As to each of these Bayer Manufacturer-PBM Enterprises, there is a common communication network by which Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health share information on a regular basis.  As to each of these Bayer-Manufacturer-PBM Enterprises, Bayer and AdvancePCS, Bayer and Caremark Rx, Bayer and Express Scripts, and Bayer and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Bayer Manufacturer-PBM Enterprises was operated and conducted by Bayer for criminal purposes, namely, carrying out the AWP Scheme.

(g)     *The BMS Group Manufacturer-PBM Enterprises:*  The BMS Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of BMS Group's AWPIDs and billed its members on the basis of BMS Group's reported AWPs, and BMS Group, including its

- 223 -

directors, employees and agents:  (1) the BMS Group-AdvancePCS Enterprise; (2) the BMS Group-Caremark Rx Enterprise; (3) the BMS Group-Express Scripts Enterprise; and (4) the BMS Group-Medco Health Enterprise.  Each of the BMS Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the BMS Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health.  As to each of these BMS Group Manufacturer-PBM Enterprises, there is a common communication network by which BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health share information on a regular basis.  As to each of these BMS Group-Manufacturer-PBM Enterprises, BMS Group and AdvancePCS, BMS Group and Caremark Rx, BMS Group and Express Scripts, and BMS Group and Medco Health functioned as continuing but separate units.  At all relevant times, each of the BMS Group Manufacturer-PBM Enterprises was operated and conducted by BMS Group for criminal purposes, namely, carrying out the AWP Scheme.

(h)     *The Fujisawa Group Manufacturer-PBM Enterprise:*  The Fujisawa Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Fujisawa Group's AWPIDs and billed its members on the basis of Fujisawa Group's reported AWPs, and Fujisawa Group, including its directors, employees and agents:  (1) the Fujisawa Group-AdvancePCS Enterprise; (2) the Fujisawa Group-Caremark Rx Enterprise; (3) the Fujisawa Group-

- 224 -

Express Scripts Enterprise; and (4) the Fujisawa Group-Medco Health Enterprise.  Each of the Fujisawa Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Fujisawa Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health.  As to each of these Fujisawa Group Manufacturer-PBM Enterprises, there is a common communication network by which Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health share information on a regular basis.  As to each of these Fujisawa Group-Manufacturer-PBM Enterprises, Fujisawa Group and AdvancePCS, Fujisawa Group and Caremark Rx, Fujisawa Group and Express Scripts, and Fujisawa Group and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Fujisawa Group Manufacturer-PBM Enterprises was operated and conducted by Fujisawa Group for criminal purposes, namely, carrying out the AWP Scheme.

(i)     *The GSK Group Manufacturer-PBM Enterprises:*  The GSK Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of GSK Group's AWPIDs and billed its members on the basis of GSK Group's reported AWPs, and GSK Group, including its directors, employees and agents:  (1) the GSK Group-AdvancePCS Enterprise; (2) the GSK Group-Caremark Rx Enterprise; (3) the GSK Group-Express Scripts Enterprise; and (4) the GSK Group-Medco Health Enterprise.  Each of the GSK Group Manufacturer-

- 225 -

PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the GSK Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between GSK Group and AdvancePCS, GSK Group and Caremark Rx, GSK Group and Express Scripts, and GSK Group and Medco Health.  As to each of these GSK Group Manufacturer-PBM Enterprises, there is a common communication network by which GSK Group and AdvancePCS, GSK Group and Caremark Rx, GSK Group and Express Scripts, and GSK Group and Medco Health share information on a regular basis.  As to each of these GSK Group-Manufacturer-PBM Enterprises, GSK Group and AdvancePCS, GSK Group and Caremark Rx, GSK Group and Express Scripts, and GSK Group and Medco Health functioned as continuing but separate units.  At all relevant times, each of the GSK Group Manufacturer-PBM Enterprises was operated and conducted by GSK Group for criminal purposes, namely, carrying out the AWP Scheme.

(j)     *The Hoffman-La Roche Manufacturer-PBM Enterprises:*  The Hoffman-La Roche Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Hoffman-La Roche's AWPIDs and billed its members on the basis of Hoffman-La Roche's reported AWPs, and Hoffman-La Roche, including its directors, employees and agents:  (1) the Hoffman-La Roche-AdvancePCS Enterprise; (2) the Hoffman-La Roche-Caremark Rx Enterprise; (3) the Hoffman-La Roche-Express Scripts Enterprise; and (4) the Hoffman-La Roche-Medco Health Enterprise.  Each of the Hoffman-La Roche Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and

- 226 -

individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Hoffman-La Roche Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Hoffman-La Roche and AdvancePCS, Hoffman-La Roche and Caremark Rx, Hoffman-La Roche and Express Scripts, and Hoffman-La Roche and Medco Health.  As to each of these Hoffman-La Roche Manufacturer-PBM Enterprises, there is a common communication network by which Hoffman-La Roche and AdvancePCS, Hoffman-La Roche and Caremark Rx, Hoffman-La Roche and Express Scripts, and Hoffman-La Roche and Medco Health share information on a regular basis.  As to each of these Hoffman-La Roche Manufacturer-PBM Enterprises, Hoffman-La Roche and AdvancePCS, Hoffman-La Roche and Caremark Rx, Hoffman-La Roche and Express Scripts, and Hoffman-La Roche and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Hoffman-La Roche Manufacturer-PBM Enterprises was operated and conducted by Hoffman-La Roche for criminal purposes, namely, carrying out the AWP Scheme.

(k)     *The Immunex Manufacturer-PBM Enterprises:*  The Immunex Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Immunex's AWPIDs and billed its members on the basis of Immunex's reported AWPs, and Immunex, including its directors, employees and agents:  (1) the Immunex-AdvancePCS Enterprise; (2) the Immunex-Caremark Rx Enterprise; (3) the Immunex-Express Scripts Enterprise; and (4) the Immunex-Medco Health Enterprise.  Each of the Immunex Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both

- 227 -

corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Immunex Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Immunex and AdvancePCS, Immunex and Caremark Rx, Immunex and Express Scripts, and Immunex and Medco Health.  As to each of these Immunex Manufacturer-PBM Enterprises, there is a common communication network by which Immunex and AdvancePCS, Immunex and Caremark Rx, Immunex and Express Scripts, and Immunex and Medco Health share information on a regular basis.  As to each of these Immunex Manufacturer-PBM Enterprises, Immunex and AdvancePCS, Immunex and Caremark Rx, Immunex and Express Scripts, and Immunex and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Immunex Manufacturer-PBM Enterprises was operated and conducted by Immunex for criminal purposes, namely, carrying out the AWP Scheme.

(l)  *The Johnson & Johnson Group Manufacturer-PBM Enterprise:*  The Johnson & Johnson Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Johnson & Johnson Group's AWPIDs and billed its members on the basis of Johnson & Johnson Group's reported AWPs, and Johnson & Johnson Group, including its directors, employees and agents:  (1) the Johnson & Johnson Group-AdvancePCS Enterprise; (2) the Johnson & Johnson Group-Caremark Rx Enterprise; (3) the Johnson & Johnson Group-Express Scripts Enterprise; and (4) the Johnson & Johnson Group-Medco Health Enterprise. Each of the Johnson & Johnson Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are

- 228 -

and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Johnson & Johnson Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Johnson & Johnson Group and AdvancePCS, Johnson & Johnson Group and Caremark Rx, Johnson & Johnson Group and Express Scripts, and Johnson & Johnson Group and Medco Health.  As to each of these Johnson & Johnson Group Manufacturer-PBM Enterprises, there is a common communication network by which Johnson & Johnson Group and AdvancePCS, Johnson & Johnson Group and Caremark Rx, Johnson & Johnson Group and Express Scripts, and Johnson & Johnson Group and Medco Health share information on a regular basis.  As to each of these Johnson & Johnson Group-Manufacturer-PBM Enterprises, Johnson & Johnson Group and AdvancePCS, Johnson & Johnson Group and Caremark Rx, Johnson & Johnson Group and Express Scripts, and Johnson & Johnson Group and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Johnson & Johnson Group Manufacturer-PBM Enterprises was operated and conducted by Johnson & Johnson Group for criminal purposes, namely, carrying out the AWP Scheme.

(m)     *The Pfizer Manufacturer-PBM Enterprises:*  The Pfizer Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Pfizer's AWPIDs and billed its members on the basis of Pfizer's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Pfizer-AdvancePCS Enterprise; (2) the Pfizer-Caremark Rx Enterprise; (3) the Pfizer-Express Scripts Enterprise; and (4) the Pfizer-Medco Health Enterprise.  Each of the Pfizer Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been

- 229 -

associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Pfizer Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pfizer and AdvancePCS, Pfizer and Caremark Rx, Pfizer and Express Scripts, and Pfizer and Medco Health.  As to each of these Pfizer Manufacturer-PBM Enterprises, there is a common communication network by which Pfizer and AdvancePCS, Pfizer and Caremark Rx, Pfizer and Express Scripts, and Pfizer and Medco Health share information on a regular basis.  As to each of these Pfizer Manufacturer-PBM Enterprises, Pfizer and AdvancePCS, Pfizer and Caremark Rx, Pfizer and Express Scripts, and Pfizer and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Pfizer Manufacturer-PBM Enterprises was operated and conducted by Pfizer for criminal purposes, namely, carrying out the AWP Scheme.

(n)     *The Pharmacia Group Manufacturer-PBM Enterprises:*  The Pharmacia Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Pharmacia Group's AWPIDs and billed its members on the basis of Pharmacia Group's reported AWPs, and Pharmacia Group, including its directors, employees and agents:  (1) the Pharmacia Group-AdvancePCS Enterprise; (2) the Pharmacia Group-Caremark Rx Enterprise; (3) the Pharmacia Group-Express Scripts Enterprise; and (4) the Pharmacia Group-Medco Health Enterprise.  Each of the Pharmacia Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Pharmacia Group Manufacturer-PBM Enterprises has a

- 230 -

systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pharmacia Group and AdvancePCS, Pharmacia Group and Caremark Rx, Pharmacia Group and Express Scripts, and Pharmacia Group and Medco Health.  As to each of these Pharmacia Group Manufacturer-PBM Enterprises, there is a common communication network by which Pharmacia Group and AdvancePCS, Pharmacia Group and Caremark Rx, Pharmacia Group and Express Scripts, and Pharmacia Group and Medco Health share information on a regular basis. As to each of these Pharmacia Group-Manufacturer-PBM Enterprises, Pharmacia Group and AdvancePCS, Pharmacia Group and Caremark Rx, Pharmacia Group and Express Scripts, and Pharmacia Group and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Pharmacia Group Manufacturer-PBM Enterprises was operated and conducted by Pharmacia Group for criminal purposes, namely, carrying out the AWP Scheme.

(o)     *The Schering-Plough Group Manufacturer-PBM Enterprises:*  The Schering-Plough Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Schering-Plough Group's AWPIDs and billed its members on the basis of Schering-Plough Group's reported AWPs, and Schering-Plough Group, including its directors, employees and agents:  (1) the Schering-Plough Group-AdvancePCS Enterprise; (2) the Schering-Plough Group-Caremark Rx Enterprise; (3) the Schering-Plough Group-Express Scripts Enterprise; and (4) the Schering-Plough Group-Medco Health Enterprise.  Each of the Schering-Plough Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from

- 231 -

these activities.  Each of the Schering-Plough Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Schering-Plough Group and AdvancePCS, Schering-Plough Group and Caremark Rx, Schering-Plough Group and Express Scripts, and Schering-Plough Group and Medco Health.  As to each of these Schering-Plough Group Manufacturer-PBM Enterprises, there is a common communication network by which Schering-Plough Group and AdvancePCS, Schering-Plough Group and Caremark Rx, Schering-Plough Group and Express Scripts, and Schering-Plough Group and Medco Health share information on a regular basis.  As to each of these Schering-Plough Group-Manufacturer-PBM Enterprises, Schering-Plough Group and AdvancePCS, Schering-Plough Group and Caremark Rx, Schering-Plough Group and Express Scripts, and Schering-Plough Group and Medco Health functioned as continuing but separate units. At all relevant times, each of the Schering-Plough Group Manufacturer-PBM Enterprises was operated and conducted by Schering-Plough Group for criminal purposes, namely, carrying out the AWP Scheme.

(p)    *The Sicor Group Manufacturer-PBM Enterprises:*  The Sicor Group Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Sicor Group's AWPIDs and billed its members on the basis of Sicor Group's reported AWPs, and Sicor Group, including its directors, employees and agents:  (1) the Sicor Group-AdvancePCS Enterprise; (2) the Sicor Group-Caremark Rx Enterprise; (3) the Sicor Group-Express Scripts Enterprise; and (4) the Sicor Group-Medco Health Enterprise.  Each of the Sicor Group Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering

- 232 -

AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Sicor Group Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sicor Group and AdvancePCS, Sicor Group and Caremark Rx, Sicor Group and Express Scripts, and Sicor Group and Medco Health.  As to each of these Sicor Group Manufacturer-PBM Enterprises, there is a common communication network by which Sicor Group and AdvancePCS, Sicor Group and Caremark Rx, Sicor Group and Express Scripts, and Sicor Group and Medco Health share information on a regular basis.  As to each of these Sicor Group-Manufacturer-PBM Enterprises, Sicor Group and AdvancePCS, Sicor Group and Caremark Rx, Sicor Group and Express Scripts, and Sicor Group and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Sicor Group Manufacturer-PBM Enterprises was operated and conducted by Sicor Group for criminal purposes, namely, carrying out the AWP Scheme.

(q)     *The Watson Manufacturer-PBM Enterprises:*  The Watson Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Watson's AWPIDs and billed its members on the basis of Watson's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Watson-AdvancePCS Enterprise; (2) the Watson-Caremark Rx Enterprise; (3) the Watson-Express Scripts Enterprise; and (4) the Watson-Medco Health Enterprise.  Each of the Watson Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities.  Each of the Watson Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of

- 233 -

activities between Watson and AdvancePCS, Watson and Caremark Rx, Watson and Express Scripts, and Watson and Medco Health. As to each of these Watson Manufacturer-PBM Enterprises, there is a common communication network by which Watson and AdvancePCS, Watson and Caremark Rx, Watson and Express Scripts, and Watson and Medco Health share information on a regular basis. As to each of these Watson Manufacturer-PBM Enterprises, Watson and AdvancePCS, Watson and Caremark Rx, Watson and Express Scripts, and Watson and Medco Health functioned as continuing but separate units. At all relevant times, each of the Watson Manufacturer-PBM Enterprises was operated and conducted by Watson for criminal purposes, namely, carrying out the AWP Scheme.

(r)     *The Warrick Manufacturer-PBM Enterprises:*  The Warrick Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Warrick's AWPIDs and billed its members on the basis of Warrick's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Warrick-AdvancePCS Enterprise; (2) the Warrick-Caremark Rx Enterprise; (3) the Warrick-Express Scripts Enterprise; and (4) the Warrick-Medco Health Enterprise. Each of the Warrick Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Warrick Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Warrick and AdvancePCS, Warrick and Caremark Rx, Warrick and Express Scripts, and Warrick and Medco Health. As to each of these Warrick Manufacturer-PBM Enterprises, there is a common communication network by

- 234 -

which Warrick and AdvancePCS, Warrick and Caremark Rx, Warrick and Express Scripts, and Warrick and Medco Health share information on a regular basis.  As to each of these Warrick Manufacturer-PBM Enterprises, Warrick and AdvancePCS, Warrick and Caremark Rx, Warrick and Express Scripts, and Warrick and Medco Health functioned as continuing but separate units.  At all relevant times, each of the Warrick Manufacturer-PBM Enterprises was operated and conducted by Warrick for criminal purposes, namely, carrying out the AWP Scheme.

(s)     *The Dey Manufacturer-PBM Enterprises:*  The Dey Manufacturer-PBM Enterprises are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Dey's AWPIDs and billed its members on the basis of Dey's reported AWPs, and Pfizer, including its directors, employees and agents:  (1) the Dey-AdvancePCS Enterprise; (2) the Dey-Caremark Rx Enterprise; (3) the Dey-Express Scripts Enterprise; and (4) the Dey-Medco Health Enterprise.  Each of the Dey Manufacturer-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to Plaintiffs and Class members, and deriving profits from these activities. Each of the Dey Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Dey and AdvancePCS, Dey and Caremark Rx, Dey and Express Scripts, and Dey and Medco Health.  As to each of these Dey Manufacturer-PBM Enterprises, there is a common communication network by which Dey and AdvancePCS, Dey and Caremark Rx, Dey and Express Scripts, and Dey and Medco Health share information on a regular basis.  As to each of these Dey Manufacturer-PBM Enterprises, Dey and AdvancePCS, Dey and Caremark Rx, Dey and Express Scripts, and Dey and Medco Health functioned

- 235 -

as continuing but separate units.  At all relevant times, each of the Dey Manufacturer-PBM Enterprises was operated and conducted by Dey for criminal purposes, namely, carrying out the AWP Scheme.

**The Defendant Drug Manufacturers' Use of the U.S. Mails and Interstate Wire Facilities**

557.    Each of the Manufacturer-PBM Enterprises and Medco Health engaged in and affected interstate commerce because they engage in the following activities across state boundaries:  The sale, purchase and/or administration of drugs; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission to patients of individual prescriptions for drugs by mail-order pharmacies; and/or the transmission and/or receipt of invoices, statements and payments related to the use or administration of drugs.  During the Class Period, the Manufacturer-PBM Enterprises and Medco Health participated in the administration of prescription drugs to millions of individuals located throughout the United States.

558.    During the Class Period, the Defendants Drug Manufacturers' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

559.    The nature and pervasiveness of the Defendant Drug Manufacturers' AWP Scheme, which was orchestrated out of the corporate headquarters of the Defendant Drug Manufacturers, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the various local district managers overseeing the sales force(s), the numerous pharmaceutical sales representatives who, in turn, directly communicated with providers and employees who communicated with the PBMs, including Medco Health.

- 236 -

560.    Many of the precise dates of Defendant Drug Manufacturers' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records.  Indeed, an essential part of the successful operation of the AWP Scheme alleged herein depended upon secrecy, and as alleged above, the Defendant Drug Manufacturers took deliberate steps to conceal their wrongdoing.  However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the AWP Scheme and do so below.

561.    The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities to perpetrate the AWP Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

    (a)    Marketing materials about the AWPs for brand name drugs and the available spread, which were sent by the Defendant Drug Manufacturers to PBMs (including Medco Health) located across the country;

    (b)    Written representations of the AWPs made by the Defendant Drug Manufacturers to the Publishers, which were made at least annually and in many cases several times during a single year;

    (c)    Thousands of written and oral communications discussing, negotiating and confirming the placement of a Defendant Drug Manufacturer's drugs on a particular PBM's formulary;

    (d)    Documents providing information or incentives designed to lessen the prices that each of the PBMs paid for drugs, and/or to conceal those prices or the AWP Scheme;

(e)      Written communications, including checks, relating to rebates, kickbacks or other financial inducements paid to each of the PBMs to persuade them to advocate one Defendant Drug Manufacturers' drug over a drug manufactured by a competitor;

(f)      Written and oral communications with U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

(g)      Written and oral communications with health insurers and patients;

(h)      Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Defendant Drug Manufacturers' AWP Scheme; and

(i)      In addition to the above-referenced RICO predicate acts, Defendants' corporate headquarters have communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the AWP Scheme. These mails include some of the documents referenced in this Amended Complaint.

**Conduct of the RICO Enterprises' Affairs**

562.      During the Class Period, each of the Defendant Drug Manufacturers have exerted control over the Manufacturer-PBM Enterprises with which they were associated and, in violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers have conducted or participated in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly.  Such participation was carried out in the following ways:

(a)      Each of the Defendant Drug Manufacturers has directly controlled the price for its AWPIDs, which determines the amount of each of the PBMs' compensation;

- 238 -

(b)     Each of the Defendant Drug Manufacturers has directly controlled the AWPs that are reported by the Publishers;

(c)     Each of the Defendant Drug Manufacturers has directly controlled the creation and distribution of marketing, sales, and other materials used to inform each of the PBMs of the profit potential of its AWPIDs;

(d)     Each of the Defendant Drug Manufacturers has relied upon its employees and agents to promote the AWP Scheme through the U.S. mails, through interstate wire facilities, and through direct contacts with providers and the PBMs; and

(e)     Each of the Defendant Drug Manufacturers has controlled and participated in the affairs of the Manufacturer-PBM Enterprises with which they are associated by providing or receiving rebates (as detailed above) or other inducements to place a certain Defendant Drug Manufacturer's AWPIDs on a PBM formulary or advocate the use of a certain AWPID.  These inducements include drug manufacturers' payment to PBMs of: (i) access rebates for placement of products on the PBMs' formulary; (ii) market share rebates for garnering higher market share than established targets; (iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants. Although PBMs typically agree to share rebates in some form with clients, they link the rebates to formulary savings in such a manner that the PBM often is able to secretly retain all of the rebates.  Furthermore, PBMs refuse to disclose specific rebate amounts to clients in any fashion other than in the aggregate compared to performance standards, thereby preventing the client from learning the true amount of rebates that the PBM has received in connection with the health plan client.

563.    Each of the Manufacturer-PBM Enterprises identified above had a hierarchical decision-making structure headed by the respective Defendant Drug Manufacturer.

- 239 -

564.     In violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers has conducted the affairs of each of the Manufacturer-PBM Enterprises with which they associated by reporting fraudulently inflated AWPs for AWPIDs and by submitting false and misleading invoices to Plaintiffs and members of the Classes, thereby inducing Plaintiffs and Class members to pay inflated amounts for AWPIDs.

**The Defendant Drug Manufacturers' Pattern of Racketeering Activity**

565.     Each of the Defendant Drug Manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The Defendant Drug Manufacturers' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their AWP Scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) (B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Defendant Drug Manufacturers intended to defraud Plaintiffs, members of the Classes and other intended victims of the AWP Scheme.

566.     The Defendant Drug Manufacturers' fraudulent and unlawful AWP Scheme consisted, in part, of deliberately overstating the AWPs for their AWPIDs, thereby creating a "spread" based on the inflated figure in order to induce each of the PBMs to advocate and favor that particular Defendant Drug Manufacturer's drugs to the members of that PBM's clients. Further, each of the PBMs billed their clients for the particular Defendant Drug Manufacturers' AWPIDs based on the inflated AWPs, which did not reflect the true price paid by the PBMs for the AWPIDs.

- 240 -

567.    The AWP Scheme was calculated and intentionally crafted to ensure that Plaintiffs and members of the Classes would be over-billed for AWPIDs.  In designing and implementing the AWP Scheme, at all times the Defendant Drug Manufacturers were cognizant of the fact those in the distribution chain that were not part of the enterprise relied upon the integrity of the Defendant Drug Manufacturers in setting the AWPs, as reported by the Publishers.

568.    By intentionally and artificially inflating the AWPs, and by subsequently failing to disclose such practices to the individual patients and their insurers, each of the Defendant Drug Manufacturers engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

569.    The Defendant Drug Manufacturers' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and members of the Classes.  Each separate use of the U.S. mails and/or interstate wire facilities employed by each of the Defendant Drug Manufacturers was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Classes.  Each of the Defendant Drug Manufacturers has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Enterprises with which each of them is and was associated-in-fact.

**The Defendant Drug Manufacturers' Motive**

570.    The Defendant Drug Manufacturers' motive in creating and operating the AWP Scheme and conducting the affairs of the Manufacturer-PBM Enterprises described herein was to fraudulently obtain sales of and profits from their AWPIDs.

571.    The AWP Scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the Defendant Drug Manufacturers' AWPIDs.  Thus, each

- 241 -

of the Defendant Drug Manufacturers used the AWP Scheme to sell more of its drugs, thereby fraudulently gaining sales and market share and profits.

**Damages Caused by the Defendant Drug Manufacturers' AWP Scheme**

572.    The Defendant Drug Manufacturers' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Classes to be injured in their business or property because Plaintiffs and Class members have paid many hundreds of millions of dollars in inflated reimbursements for AWPIDs.

573.    The Defendant Drug Manufacturers sent billing statements through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their AWP Scheme.  Plaintiffs and members of the Classes have made inflated payments for AWPIDs based on and/or in reliance on reported and false AWPs.

574.    Under the provisions of Section 1964(c) of RICO, the Defendant Drug Manufacturers are jointly and severally liable to Plaintiffs and members of the Classes for three times the damages that Plaintiffs and Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**COUNT III**

**DECLARATORY AND OTHER RELIEF PURSUANT TO 28 U.S.C. §§ 2201, 2002**

**(AGAINST DEFENDANT DRUG MANUFACTURERS FOR UNLAWFUL CONDUCT ASSOCIATED WITH PHYSICIAN-ADMINISTERED AND MEDICARE PART B COVERED DRUGS)**

575.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.  This Court is asserted under Fed. R. Civ. P. 23(b)(2) by all Plaintiffs for the physician-administered-Medicare Part B drug class, including all consumers who made co-payments for Part B covered drugs; all TPP's making payments for Part B covered drugs; and all consumers and TPPs making payments for physician-administered drugs.

- 242 -

576.    An actual case and controversy exists between the Plaintiffs and each of the Defendant Drug Manufacturers with respect to the Defendant Drug Manufacturers' conduct of inflating the published reimbursement rates for AWPIDs.  The Plaintiffs contend that setting stated reimbursement prices above the actual average wholesale price for AWPIDs is unlawful, and that each Defendant Drug Manufacturer does so in violation of applicable law, knowing that Medicare beneficiaries and other end payors will incur similarly inflated co-payments and payments for AWPIDs.

577.    Each Defendant Drug Manufacturer contends to the contrary.  Each of the Defendant Drug Manufacturers, either by itself or through groups or its trade association, contend that they may exploit the Medicare reimbursement system without limit, and regardless of its effect on Medicare beneficiaries and their insurers.

578.    The Plaintiffs, on behalf of themselves, their constituent members and all others similarly situated, are entitled to a judgment declaring that the practice of the Defendant Drug Manufacturers of inflating stated reimbursement rates for AWPIDs is unlawful, and are entitled to further relief pursuant to 28 U.S.C. § 2202.

## COUNT IV

## VIOLATIONS OF CONSUMER PROTECTION STATUTES

579.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.  This Count is in the TAMCAC to preserve Plaintiffs' right to appease the home state issues.

580.    This Count is asserted by each Class by each class representative.

581.    Defendants are incorporated, or maintain their principal places of business, in either California, Delaware, Illinois, New Jersey, Pennsylvania or Washington.  In addition, individual Patient and Third-Party Payor Plaintiffs reside in either California, Florida, New

- 243 -

York, Minnesota, Louisiana, Pennsylvania or Texas.  Each of these states has enacted statutes to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising.  The statutes of these states, legally and substantively common, provide consumers with a private right of action, as follows:

| | |
|---|---|
| *California*: | Cal. Civ. Code §§ 1750, Bus. & Prof. Code § 17200, *et seq.* and 17500, *et seq.* |
| *Delaware*: | 6 Del. Code §§ 2511-2537 |
| *Florida*: | Fla. Stat. Stat. §§ 501.201-501.213 |
| *Illinois*: | 815 ILCS § 505/1, *et seq.* |
| *Louisiana:* | La. Rev. Stat. Ann. § 51:1405 |
| *Minnesota:* | Minn. Stat. Ann. §§ 325D.09 - 325D.16, § 325F.67 - 69 |
| *New Jersey*: | N.J. Stat. Ann. §§ 56:8-1 - 56:8-24 |
| *New York*: | N.Y. Gen. Bus. L. §§ 349-350 |
| *Pennsylvania*: | 73 Pa. Stat. § 201-1 *et seq.* |
| *Texas:* | Tex. Bus. & Com. Code §§ 17.41 B 17.63 |
| *Washington:* | RCW 19.86.010, *et seq.* |

These statutes do not require a showing of either scienter or individual reliance.

582.    Defendants' conduct, as alleged in this Complaint, constitutes unfair and deceptive acts or practices, unconscionable practices, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission of material fact in violation of these statutes.  Defendants' continuing violations include:

(a)    Failing to disclose material facts in the conduct of trade or commerce in that they have not disclosed that the AWP does not reflect the true average wholesale price of the drugs they sell, and that the published AWPs are instead deliberately inflated in order to (1) increase the prices paid by Plaintiffs and the members of the Classes; (2) increase the profitability of the Defendant Drug Manufacturer's drugs to the providers who prescribe or dispense them, and to the other intermediaries that promote them; and thereby (3) increase Defendants' market shares and profits;

- 244 -

(b)     Making false or misleading statements of fact concerning the price of goods in that they have not reported the true AWP paid for their medications in order to accomplish the goals described above;

(c)     Knowingly making false representations in a transaction by representing that the AWP is an accurate reflection of the average wholesale price paid for their drugs when AWP is, in reality, a fictitious and inflated amount;

(d)     Publishing fictitious and inflated AWPs in the *Red Book* and other publications;

(e)     Encouraging Medicare Part B providers to use drugs based upon the "spread" as opposed to medicines being prescribed based on medical reasons; and

(f)     Providing PBMs with a cut on the spread in return for the PBMs' participation in the AWP scheme.

583.    Defendants willfully engaged in such practices knowing them to be deceptive and with the intent that Plaintiffs and the Class would rely thereon.

584.    The wrongful conduct alleged in this Complaint occurs, and continues to occur, in the ordinary course of Defendants' business or occupation and has caused great harm to Plaintiffs and the Class, who were foreseeable and direct victims.

585.    Defendants have injured the public interest, and Defendants' actions continue to pose a threat to the public.

586.    As a direct and legal result of Defendants' misleading, deceptive, unfair, false and fraudulent trade practices, Plaintiffs and the Class have sustained damages.

**COUNT V**

**VIOLATION OF CONSUMER PROTECTION LAWS – MEDICARE PART B CO-PAY SUB-CLASS**

587.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein, and this Count is asserted in the event that the Court does not apply the laws asserted as applicable in Count IV.

- 245 -

588.    This Count is asserted on behalf of a nationwide class of these persons who made a co-payment for a Part B covered drug manufactured by any defendant.

589.    For the purposes of Track 1 proceedings, the following individuals are proposed class representatives for this class:  Leroy Townsend (AstraZeneca); Susan Aaronson (GSK, J&J, BMS); David Clark (GSK, J&J); Robert Howe (AstraZeneca, GSK); James Shepley (J&J, Astra); Estate of Patricia Young (BMS, J&J); Estate of William Newell (AstraZeneca, J&J, BMS).  With respect to Schering, plaintiffs proffer UFCW and SMW Health Fund made co-payments for Part B covered drugs and have the same incentive as any individual co-payor would have to represent this Class.  To the extent that the Court finds any of these Plaintiffs inadequate, then Plantiffs assert that the UFCW should be declared an adequate representative rather than leave the Class uncertified due to a lack of a plaintiff representative who made a co-payment under Medicare Part B.  Alternatively, the following individuals also made co-payments based upon AWP for drugs manufactured by Track 1 defendants:  Cynthia Byrski (BMS, GSK); Estate of William Barnewolt (J&J, Amgen, Abbott, Watson); Cheryl Barreca (J&J, BMS, GSK); Mary Cauble (BMS); Anna Choice (BMS, GSK); Joyce Dison (BMS); Tracy Garcia (BMS, Schering); Donna Kendall (GSK, BMS, J&J); Sandra Leef (BMS, Aventis, Abbott, Fujisawa); Gerald Miller (BMS); Constance Nelson (BMS, GSK); Andrea Palenica (BMS, GSK); Scott Tell (GSK, BMS); Pauline Vernick (BMS, Aventis); Mardolyn Vescovi (BMS, J&J); Kathleen Weaver-Zech (J&J); Susan Wessels (Astra); Joseph Miller (GSK, Baxter, Abbott); Regina Shoemaker (BMS); Kenneth Vanderwal (J&J); Rebecca Hopkins (BMS); and George Baker Thomson (Astra).  They each have the same incentive as any Part B victim to recover damages and/or obtain injunctive relief.

590.    For the purposes of Track 2 proceedings, the following individuals are proposed representatives:  Susan Aaronson (Abbott, Amgen, ~~Aventis~~, Baxter, Dey, Fujisawa, Pfizer, Pharmacia, Schering-Plough, ~~Sicor~~ and Watson); Harold Carter ~~(Abbott,~~ Amgen and Fujisawa);

Roger Clark (Baxter, Abbott, Amgen, Fujisawa, Pfizer, Sicor and Watson); Robert Howe (Abbott, Amgen, Aventis, Baxter, Fujisawa, Immunex, ~~Sicor~~ and Watson); ~~James Monk (Aventis)~~; Virginia Newell (Amgen and Aventis); Oral Roots (Dey, Pfizer); Hunter G. Walters (Dey); Larry Young (Abbott, Amgen, Aventis, Bayer, Baxter, Fujisawa, Immunex, Pfizer, Pharmacia, ~~Sicor~~ and Watson).

591.    Certification of this sub-class is sought pursuant to Fed. R. Civ. P. 23(b)(3) for the damage claims and (b)(2) for the injunctive relief claims.

592.    As described herein, each Defendant has intentionally and repeatedly used deception, fraud, false pretense, false promise, misrepresentation, and/or concealment, suppression or omission of material facts in connection with the sale or advertisement of AWPIDs. It was the intent of each Defendant that others rely on said concealment, suppression or omissions.

593.    Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed below:

(a)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

(b)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*;

(c)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, 1770;

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

(e)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

- 247 -

(f)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*;

(g)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*;

(h)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

(i)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

(j)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

(k)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*;

(l)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

(m)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

(n)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*;

(o)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

(p)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

(q)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

(r)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

(s)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

(t)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(u)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

(v)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*;

(w)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

(x)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(y)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(z)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

(aa)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

(bb)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(cc)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

- 249 -

(dd)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;

(ee)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*;

(ff)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

(gg)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

(hh)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

(ii)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

(jj)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

(kk)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 245 1, *et seq.*;

(ll)    Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*;

(mm)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

(nn)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*; and

(oo)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*

- 250 -

594.     Plaintiffs provided notice of this litigation as follows:  On January 9, 2002, to the Attorneys General of New Jersey, New York, Arizona, of Case 01-C-8828; of Case 01-CV-5427, of Case CV-N-H-01666, 01-5548, SA-01-1029; 01-4466, 01-1917, 01-CU-5790, 01-4303, 01-CU-5978, and 01-C-8827.  The foregoing are cases against Baxter, Warrick, Aventis, Sicor, Dey, Immunex, GSK, BMS, Bayer and Abbott.

595.     In addition, on October 6, 2005, notice was sent to each Attorney General in each of the states requiring notice and where demand on a defendant is required, such demand was made on or about October 6, 2005.

### COUNT VI

### (VIOLATIONS OF CONSUMER PROTECTION LAWS – THIRD-PARTY PAYORS PART B MEDIGAP CLASS)

596.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein, and this Count is asserted in the event that the Court does not apply the laws asserted as applicable in Count IV.

597.     This Count is asserted on behalf of a nationwide class of third-party payors ("TPPs") who made a payment for drugs covered by Medicare Part B.  The proposed class representatives are UFCW, PMBT, SMW Health Fund and BCBS of Massachusetts for Track 1. To the extent the Court limits this claim as a certified class for Massachusetts only for test purposes, each of these representatives is adequate.  To the extent defendants assert that a non-Massachusetts entity cannot be an adequate class representative and the Court agrees, then the Court should allow the test case to be based on the law of the home state of the class representives:  Illinois and Tennessee.

598.     In addition, for Track 1, Blue Cross and Blue Shield of Massachusetts and Sheet Metal Worker National Health Fund are proposed class representatives.  In addition, for Track 2, SMW Health Fund is a proposed class representative for Class 2.

- 251 -

599. Plaintiffs seek to certify this class under Fed. R. Civ. P. 23(b)(3) for Plaintiffs' damage claims and Fed. R. Civ. P. (b)(2), for injunctive relief.

600. As described herein, defendant has intentionally and repeatedly used deception, fraud, false pretense, false promise, misrepresentation, and/or concealment, suppression or omission of material facts in connection with the sale or advertisement of AWPIDs.  It was the intent of defendant that others rely on said concealment, suppression or omissions.

601. Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes.  Pursuant to the Court's Order of August 16, 2005, Plaintiffs identify the states that permit TPP claims under the consumer protection laws as set forth below.

(a) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

(b) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*, including 4-88-113(f), and 4-8-102(5);

(c) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

(d) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*, including § 6-1-113(1)© and § 6-1-102(b);

(e) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*, including § 42-110(a)(3);

(f) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq*, including 6 Del. Code § 2512;

(g) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*, including § 28-390(1);

- 252 -

(h)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

(i)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*, including § 481A-2;

(j)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*, including § 48-602;

(k)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*;

(l)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

(m)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

(n)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*, including § 13-101(h);

(o)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

(p)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*, including § 445-902(c);

(q)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*, including § 407.010(5);

(r)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

(s)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, including § 59-160(1);

- 253 -

(t)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(u)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, including § 358A:1(1);

(v)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*, § 56:8-1(d);

(w)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

(x)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(y)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(z)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*, including § 51-15-01(4);

(aa)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*, including § 1345.01(B);

(bb)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(cc)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*, including § 646.605(4);

(dd)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*, including § 201-2(2);

(ee)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*, including § 6-13.1(3);

- 254 -

(ff)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.,* including § 39-5-10(9);

(gg)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.,* including § 37-24-1(8);

(hh)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.,* including § 47-18-103(9);

(ii)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.,* including § 17.45(4);

(jj)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

(kk)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 245 1, *et seq.*;

(ll)     Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.,* including § 19.86.010(1);

(mm)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

(nn)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*; and

(oo)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.,* including § 40-12-102(a)(i).

602.   Plaintiffs provided notice of this litigation as follows:  On January 9, 2002, to the Attorneys General of New Jersey, New York, Arizona, of Case 01-C-8828; of Case 01-CV-5427, of Case CV-N-H-01666, 01-5548, SA-01-1029; 01-4466, 01-1917, 01-CU-5790, 01-4303,

01-CU-5978, and 01-C-8827.  The foregoing are cases against Baxter, Warrick, Aventis, Sicor, Dey, Immunex, GSK, BMS, Bayer and Abbott.

603.    In addition, on October 6, 2005, notice was sent to each Attorney General in each of the states requiring notice and where demand on a defendant is required, such demand was made on October 6, 2005.

### COUNT VII

### (VIOLATIONS OF CONSUMER PROTECTION LAWS – PHYSICIAN-ADMINISTERED CLASS FOR CONSUMERS AND TPPS)

604.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein, and this Count is asserted in the event that the Count does not apply the laws asserted as applicable in Count IV.

605.    Plaintiffs seek certification of this class pursuant to Fed. R. Civ. P. 23(b)(3) for damage claims and (b)(2) for injunctive relief claims.

606.    The proposed consumer class representatives for this claim as to the Track 1 defendants are:  Cynthia Byrski (BMS, GSK); Estate of William Barnewolt (J&J, Amgen, Abbott, Watson); Cheryl Barreca (J&J, BMS, GSK); Mary Cauble (BMS); Anna Choice (BMS, GSK); Joyce Dison (BMS); Tracy Garcia (BMS, Schering); Donna Kendall (GSK, BMS, J&J); Sandra Leef (BMS, Aventis, Abbott, Fujisawa); Gerald Miller (BMS); Constance Nelson (BMS, GSK); Andrea Palenica (BMS, GSK); Scott Tell (GSK, BMS); Pauline Vernick (BMS, Aventis); Mardolyn Vescovi (BMS, J&J); Kathleen Weaver-Zech (J&J); Susan Wessels (AstraZeneca); Joseph Miller (GSK, Baxter, Abbott); Regina Shoemaker (BMS); Kenneth Vanderwal (J&J); Rebecca Hopkins (BMS); and George Baker Thomson (AstraZeneca).

607.    The TPP class representatives for this claim are:  United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund ("UFCW"); Board of Trustees of Carpenters and Millwrights of Houston and Vicinity Welfare Trust Fund (CMHV); Teamsters Health & Welfare Fund of Philadelphia and Vicinity ("THWF"); Philadelphis Federation of

Teachers Health and Welfare Fund ("PFTHW"); Man-U Service Contract Trust Fund ("Man-U"); and Twin Cities Bakery Workers Health and Welfare Fund ("TCBW").

608.     The TPP class representatives for this class, to the extent it is limited to Massachusetts and BCBS of Massachusetts for Track 1, are Pipefitters Local 537 Trust Fund.

609.     Since the Court did not require consumer representatives for Class 3, plaintiffs do not offer any but reserve the right to do so.

610.     This sub-class is asserted for consumers and TPPs for physician-administered AWPIDs.

611.     The consumer class groups its claims as follows:

        (a)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

        (b)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*;

        (c)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, 1770;

        (d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

        (e)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

        (f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*;

        (g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*;

        (h)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

(i)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

(j)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

(k)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*;

(l)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

(m)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

(n)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*;

(o)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

(p)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

(q)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

(r)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

(s)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

(t)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

- 258 -

(u)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

(v)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*;

(w)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

(x)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(y)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(z)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

(aa)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

(bb)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(cc)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

(dd)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;

(ee)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*;

(ff)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

(gg)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

(hh)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

(ii)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

(jj)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

(kk)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 245 1, *et seq.*;

(ll)    Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*;

(mm)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

(nn)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*; and

(oo)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*

612.    The TPP class groups its claims as set forth below:

(a)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

(b)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*, including 4-88-113(f), and 4-8-102(5);

(c)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

- 260 -

(d)       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*, including § 6-1-113(1)© and § 6-1-102(b);

(e)       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*, including § 42-110(a)(3);

(f)       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq*, including 6 Del. Code § 2512;

(g)       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*, including § 28-390(1);

(h)       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

(i)       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*, including § 481A-2;

(j)       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*, including § 48-602;

(k)       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*;

(l)       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

(m)       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

(n)       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*, including § 13-101(h);

(o)       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

- 261 -

(p)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*, including § 445-902(c);

(q)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*, including § 407.010(5);

(r)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

(s)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, including § 59-160(1);

(t)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(u)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, including § 358A:1(1);

(v)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*, § 56:8-1(d);

(w)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

(x)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(y)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(z)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.,* including § 51-15-01(4);

(aa)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.,* including § 1345.01(B);

(bb)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(cc)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.,* including § 646.605(4);

(dd)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.,* including § 201-2(2);

(ee)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.,* including § 6-13.1(3);

(ff)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.,* including § 39-5-10(9);

(gg)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.,* including § 37-24-1(8);

(hh)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.,* including § 47-18-103(9);

(ii)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.,* including § 17.45(4);

(jj)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

(kk)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 245 1, *et seq.*;

(ll)     Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.,* including § 19.86.010(1);

(mm)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

- 263 -

(nn)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*; and

(oo)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.,* including § 40-12-102(a)(i).

613.    As described herein, Defendants have intentionally and repeatedly used deception, fraud, false pretense, false promise, misprepresentative, and/or concealment, suppression or omission of material facts in connection with the sale or advertisement of AWPIDs.  It was the intent of Defendants that others rely on said concealment, suppression or omissions.

## COUNT IX

## CIVIL CONSPIRACY

## (AGAINST ALL DEFENDANTS IDENTIFIED HEREIN FOR CONSPIRING WITH PBMS)

614.    Plaintiffs incorporate the preceding allegations as if fully set forth above.

615.    This Court is asserted on behalf of the AWP Payor class by class representative CMHV and the Court has diversity jurisdiction over this claim.

616.    Each of the defendants named below, for the purpose of implementing the AWP scheme, and thereby causing plaintiffs and the Class to overpay for AWPIDs, conspired with each of the four major PBMs:  AdvancePCS, Caremark, Rx, Inc., Express Scripts, Inc. and Medco Health Solutions.  The conspiratorial arrangements are as follows:

(a)    *The Abbott Manufacturer-PBM Conspiracies:*  The Abbott Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Abbott's AWPIDs and billed its members on the basis of Abbott's reported AWPs, and Abbott, including its directors, employees and agents: (1) the Abbott-AdvancePCS; (2) the Abbott-Caremark Rx; (3) the Abbott-Express Scripts; and (4) the Abbott-Medco Health.  Each of the Abbott Manufacturer-PBM

- 264 -

Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(b)     *The Amgen Manufacturer-PBM Conspiracies:*  The Amgen Manufacturer-PBM Conspiracies are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Amgen's AWPIDs and billed its members on the basis of Amgen's reported AWPs, and Amgen, including its directors, employees and agents:  (1) the Amgen-AdvancePCS; (2) the Amgen-Caremark Rx; (3) the Amgen-Express Scripts; and (4) the Amgen-Medco Health.  Each of the Amgen Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPID drugs to individual Plaintiffs and Class members.

(c)     *The AstraZeneca Manufacturer-PBM Conspiracies:*  The AstraZeneca Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of AstraZeneca's AWPIDs and billed its members on the basis of AstraZeneca's reported AWPs, and AstraZeneca, including its directors, employees and agents:  (1) the AstraZeneca-AdvancePCS; (2) the AstraZeneca-Caremark Rx; (3) the AstraZeneca-Express Scripts; and (4) the AstraZeneca-Medco Health.  Each of the AstraZeneca Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

- 265 -

(d)     *The Aventis Group Manufacturer-PBM Conspiracies:*  The Aventis Group Manufacturer-PBM Conspiracies are four separate associations-in-fact consisting of each of the PBMs that administered purchases of Aventis Group's AWPIDs and billed its members on the basis of Aventis Group's reported AWPs, and Aventis Group, including its directors, employees and agents:  (1) the Aventis Group-AdvancePCS; (2) the Aventis Group-Caremark Rx; (3) the Aventis Group-Express Scripts; and (4) the Aventis Group-Medco Health.  Each of the Aventis Group Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(e)     *The Baxter Manufacturer-PBM Conspiracies:*  The Baxter Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Baxter's AWPIDs and billed its members on the basis of Baxter's reported AWPs, and Baxter, including its directors, employees and agents: (1) the Baxter-AdvancePCS; (2) the Baxter-Caremark Rx; (3) the Baxter-Express Scripts; and (4) the Baxter-Medco Health.  Each of the Baxter Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(f)     *The Bayer Manufacturer-PBM Conspiracies:*  The Bayer Manufacturer-PBM Conspiracy are four separate conspiracies consisting of each of the PBMs that administered purchases of Bayer's AWPIDs and billed its members on the basis of Bayer's reported AWPs, and Bayer, including its directors, employees and agents: (1) the Bayer-AdvancePCS; (2) the Bayer-Caremark Rx; (3) the Bayer-Express Scripts;

and (4) the Bayer-Medco Health.  Each of the Bayer Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(g)     *The BMS Group Manufacturer-PBM Conspiracies:*  The BMS Group Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of BMS Group's AWPIDs and billed its members on the basis of BMS Group's reported AWPs, and BMS Group, including its directors, employees and agents:  (1) the BMS Group-AdvancePCS; (2) the BMS Group-Caremark Rx; (3) the BMS Group-Express Scripts; and (4) the BMS Group-Medco Health.  Each of the BMS Group Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(h)     *The GSK Group Manufacturer-PBM Conspiracies:*  The GSK Group Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of GSK Group's AWPIDs and billed its members on the basis of GSK Group's reported AWPs, and GSK Group, including its directors, employees and agents:  (1) the GSK Group-AdvancePCS; (2) the GSK Group-Caremark Rx; (3) the GSK Group-Express Scripts; and (4) the GSK Group-Medco Health.  Each of the GSK Group Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

- 267 -

(i)      *The Hoffman-La Roche Manufacturer-PBM Conspiracies:*  The Hoffman-La Roche Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Hoffman-La Roche's AWPIDs and billed its members on the basis of Hoffman-La Roche's reported AWPs, and Hoffman-La Roche, including its directors, employees and agents:  (1) the Hoffman-La Roche-AdvancePCS; (2) the Hoffman-La Roche-Caremark Rx; (3) the Hoffman-La Roche-Express Scripts; and (4) the Hoffman-La Roche-Medco Health.  Each of the Hoffman-La Roche Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(j)      *The Immunex Manufacturer-PBM Enterprises:*  The Immunex Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Immunex's AWPIDs and billed its members on the basis of Immunex's reported AWPs, and Immunex, including its directors, employees and agents:  (1) the Immunex-AdvancePCS; (2) the Immunex-Caremark Rx; (3) the Immunex-Express Scripts; and (4) the Immunex-Medco Health.  Each of the Immunex Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(k)      *The Johnson & Johnson Group Manufacturer-PBM Conspiracies:*  The Johnson & Johnson Group Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Johnson & Johnson Group's AWPIDs and billed its members on the basis of Johnson & Johnson

Group's reported AWPs, and Johnson & Johnson Group, including its directors, employees and agents:  (1) the Johnson & Johnson Group-AdvancePCS; (2) the Johnson & Johnson Group-Caremark Rx; (3) the Johnson & Johnson Group-Express Scripts; and (4) the Johnson & Johnson Group-Medco Health.  Each of the Johnson & Johnson Group Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(*l*)      *The Pfizer Manufacturer-PBM Conspiracies:*  The Pfizer Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Pfizer's AWPIDs and billed its members on the basis of Pfizer's reported AWPs, and Pfizer, including its directors, employees and agents: (1) the Pfizer-AdvancePCS; (2) the Pfizer-Caremark Rx; (3) the Pfizer-Express Scripts; and (4) the Pfizer-Medco Health.  Each of the Pfizer Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(m)      *The Pharmacia Group Manufacturer-PBM Conspiracies:*  The Pharmacia Group Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Pharmacia Group's AWPIDs and billed its members on the basis of Pharmacia Group's reported AWPs, and Pharmacia Group, including its directors, employees and agents:  (1) the Pharmacia Group-AdvancePCS; (2) the Pharmacia Group-Caremark Rx; (3) the Pharmacia Group-Express Scripts; and (4) the Pharmacia Group-Medco Health.  Each of the Pharmacia Group Manufacturer-

- 269 -

PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(n)    *The Schering-Plough Group Manufacturer-PBM Conspiracies:*  The Schering-Plough Group Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Schering-Plough Group's AWPIDs and billed its members on the basis of Schering-Plough Group's reported AWPs, and Schering-Plough Group, including its directors, employees and agents: (1) the Schering-Plough Group-AdvancePCS; (2) the Schering-Plough Group-Caremark Rx; (3) the Schering-Plough Group-Express Scripts; and (4) the Schering-Plough Group-Medco Health.  Each of the Schering-Plough Group Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(o)    *The Sicor Group Manufacturer-PBM Conspiracies:*  The Sicor Group Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Sicor Group's AWPIDs and billed its members on the basis of Sicor Group's reported AWPs, and Sicor Group, including its directors, employees and agents:  (1) the Sicor Group-AdvancePCS; (2) the Sicor Group-Caremark Rx; (3) the Sicor Group-Express Scripts; and (4) the Sicor Group-Medco Health.  Each of the Sicor Group Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been

associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(p)   *The Watson Manufacturer-PBM Conspiracies:*  The Watson Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Watson's AWPIDs and billed its members on the basis of Watson's reported AWPs, and Pfizer, including its directors, employees and agents:  (1) the Watson-AdvancePCS; (2) the Watson-Caremark Rx; (3) the Watson-Express Scripts; and (4) the Watson-Medco Health.  Each of the Watson Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(q)   *The Warrick Manufacturer – PBM Conspiracies:*  The Warrick Manufacturer-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Warrick's AWPIDs and billed its members on the basis of Warrick's reported AWPs, and Pfizer, including its directors, employees and agents:  (1) Warrick-AdvancePCS; (2) Warrick-Caremark Rx; (3) Warrick-Express Scripts; and (4) Warrick-Medco Health.  Each of the Warrick Manufacturer-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(r)   *The Dey-PBM Conspiracies:*  The Dey-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Dey's AWPIDs and billed its members on the basis of Dey's reported AWPs, and Pfizer,

including its directors, employees and agents:  (1) Dey -AdvancePCS; (2) Dey-Caremark Rx; (3) Dey -Express Scripts; and (4) Dey -Medco Health.  Each of Dey-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

(s)    *The Fujisawa-PBM Conspiracies:*  The Fujisawa-PBM Conspiracies are four separate conspiracies consisting of each of the PBMs that administered purchases of Fujisawa's AWPIDs and billed its members on the basis of Fujisawa's reported AWPs, and Pfizer, including its directors, employees and agents:  (1) Fujisawa-AdvancePCS; (2) Fujisawa-Caremark Rx; (3) Fujisawa-Express Scripts; and (4) Fujisawa-Medco Health.  Each of Fujisawa-PBM Conspiracies is an ongoing and continuing conspiracy consisting of both corporations and individuals that are and have been associated for the common or shared purposes of selling, purchasing, prescribing and administering AWPIDs to individual Plaintiffs and Class members.

617.    Defendants consciously conspired and deliberately pursued a common plan or design to commit tortious acts, with each PBM that was part of its conspiracy, subjecting each to joint liability.  Each Defendant Drug Manufacturer and each PBM had the common purpose of perpetuating a reimbursement system based on AWP, because such a system financially benefits **both** the manufacturer and the PBM.  The Defendant Drug Manufacturers deliberately and fraudulently overstate the AWPs for their AWPIDs, thereby creating a "spread" based on the inflated figure in order to obtain each of the PBM agreement to advocate and favor that particular Defendant Drug Manufacturer's drugs to the members of that PBM's clients.  Each of the PBMs then billed their clients for the particular Defendant Drug Manufacturers' AWPIDs based on the inflated AWPs, which did not reflect the true price paid by the PBMs for the AWPIDs.  All of

- 272 -

these acts – and more – were done as part of a conspiracy to deceive payors, in violation of applicable state consumer protection laws and the common law of fraud.  All of these acts were done in violation of Medicare anti-fraud kickback statutes and were done pursuant to acts of wire and mail fraud.

618.    Defendants each committed an unlawful act or acts in furtherance of this conspiracy, including:

(a)    Issuing false marketing materials about the AWPs for AWPIDs and the available spread, which were sent by the Defendant Drug Manufacturers to PBMs (including Medco Health) located across the country;

(b)    Written representations of the AWPs made by the Defendant Drug Manufacturers to the Publishers, which were made at least annually and in many cases several times during a single year and which the PBMs knew were false;

(c)    Thousands of written and oral communications discussing, negotiating and confirming the placement of a Defendant Drug Manufacturer's brand name drugs on a particular PBM's formulary;

(d)    Documents providing information or incentives designed to lessen the prices that each of the PBMs paid for AWPIDs, and/or to conceal those prices or the AWP Scheme;

(e)    Written communications, including checks, relating to rebates, kickbacks or other financial inducements paid to each of the PBMs to persuade them to advocate one Defendant Drug Manufacturers' AWPIDs over a drug manufactured by a competitor;

(f)    Written and oral communications with U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

- 273 -

(g)     Written and oral communications with health insurers and patients, including Plaintiffs and the members of Classes, inducing payments for the drugs that were made in reliance on AWPs; and

(h)     Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Defendant Drug Manufacturers' AWP Scheme.

619.     All of these acts were done as part of a conspiracy to deceive end payors, in violation of applicable state consumer protection laws and the common law of fraud.  All of these acts were also committed in violation of applicable Medicare anti-fraud kickback statutes, and were committed pursuant to acts of unlawful instances of mail and wire fraud.

620.     Plaintiffs are entitled to a presumption of reliance on the false representations, concealments and nondisclosures by Defendants.  The Class Members were ignorant of Defendants' representations and were ignorant of the full and true facts suppressed by Defendants, and such reliance was justified.

621.     As a direct, proximate result of this conspiracy, Plaintiffs and Class Members have been injured, as they have suffered and continue to suffer economic losses and general and specific damages, all in an amount to be determined according to proof.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

A.     The Court determine that this action may be maintained as a class action pursuant to Rule 23(b) (2) of the Federal Rules of Civil Procedure with respect to Plaintiffs' claims for declaratory, equitable and injunctive relief, and Rule 23(b) (3) of the Federal Rules of Civil Procedure with respect to the claims for damages, and declaring Plaintiffs as representatives of the Classes and their counsel as counsel for the Classes;

B.     The conduct alleged herein be declared, adjudged and decreed to be unlawful;

- 274 -

C.      Plaintiffs and the Classes be granted an award of damages in such amount to be determined at trial to the full extent to all remedies as provided by law, with trebling where permitted by law;

D.      Plaintiffs and the Classes be granted an award of punitive damages in such amount to be determined at trial;

E.      Defendants be enjoined from continuing the illegal activities alleged herein;

F.      Plaintiffs and the Classes recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law; and

G.      Plaintiffs and the Classes be granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

DATED:  March 1, 2006.

Seattle, Washington


By **___/s/ Steve W. Berman_____**
    Thomas M. Sobol
    David T. Nalven
    Edward Notargiacomo
    Hagens Berman Sobol Shapiro LLP
    One Main Street, 4th Floor
    Cambridge, MA 02142
    Telephone: (617) 482-3700
    Facsimile: (617) 482-3003

Steve W. Berman
Sean R. Matt
Robert Lopez
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

*LIAISON AND CO-LEAD COUNSEL*


Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer F. Connolly
The Wexler Firm
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Shanin Specter
Donald E. Haviland, Jr.
Kline & Specter
A Professional Corporation
1525 Locust Street, 19th Floor
Philadelphia, PA  19102-3712
Telephone: (215) 772-1000
Facsimile: (215) 735-0957

CO-LEAD COUNSEL

- 276 -

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Michael McShane
Alexander, Hawes & Audet, LLP
300 Montgomery Street, Suite 400
San Francisco, CA  94104
Telephone: (415) 982-1886
Facsimile: (415) 576-1776

Robert E. Piper, Jr.
Piper & Associates
624 Pierre Avenue
Shreveport, LA 71103
Telephone: (318) 226-0826
Facsimile: (318) 424-9900

Anthony Bolognese
Bolognese & Associates
One Penn Center
1617 JFK Boulevard, Suite 650
Philadelphia, PA  19103
Tel:  (215) 814-6750
Fax:  (215) 814-6764

Jonathan W. Cuneo
The Cuneo Law Group
317 Massachusetts Ave. N.E., Suite 300
Washington, DC 20002
Tel: (202) 789-3960
Fax: (202) 789-1813

Neal Goldstein (Of Counsel)
Freedman & Lorry, PC
400 Market Street, Suit 900
Philadelphia, PA 19106
Tel: (215) 925-8400
Fax: (215) 925-7516

Michael E. Criden
Hanzman & Criden, PA
Commerce Bank Center, Suite 400
220 Alhambra Circle
Coral Gables, FL  33134
Tel:  (305) 357-9000
Fax: (305) 357-9050

- 277 -

Kent M. Williams
1300 Godward Street NE, Suite 6200
Minneapolis, MS  55413
Tel:  (651) 633-9000
Fax: (651) 639-1551

Larry Crown
Jorge Franco
Jennings, Haug & Cunningham, L.L.P.
2800 North Central Ave., Ste. 1800
Phoenix, AZ  85004-1049
Tel:  (602) 234-7800
Fax: (602) 277-5595

Adam S. Levy
Law Offices of Adam S. Levy
505 Willow Road
Oreland, PA  19075
Tel:  (267) 994-6952
Fax: (215) 233-2992

Blake M. Harper
Kirk B. Hulett
Hulett Harper LLP
550 West C Street, Suite 1700
San Diego, CA  92101
Tel:  (619) 338-1133
Fax: (619) 338-1139

Jonathan D. Karmel
Karmel & Gilden
221 N. LaSalle Street
Suite 1414
Chicago, IL  60601
Tel: (312) 641-2910
Fax: (312) 641-0781

Dianne M. Nast
Roda & Nast, PC
801 Estelle Drive
Lancaster, PA 17601
Tel: 717-892-3000
Fax: 717-892-1200

Jonathan Shub
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd Floor
Philadelphia, PA  19102
Tel:  (215) 790-7300
Fax:  (215) 546-0942

- 278 -

Scott R. Shepherd
Shepherd & Finkleman, LLC
117 Gayley Street, Suite 200
Media, PA 19063
Tel:  (610) 891-9880
Fax:  (610) 891-9883

Lisa J. Rodriguez
Ira Neil Richards
Trujillo Rodriguez& Richards, LLC
The Penthouse
226 West Rittenhouse Square
Philadelphia, PA  19103
Tel:  (215) 731-9004
Fax:  (215) 731-9044

Mitchell A. Toups
Weller, Green, Toups & Terrell, L.L.P.
2615 Calder Street, Suite 400
Beaumont, TX  77704
Tel: (409) 838-0101
Fax: 409-838-6780

Damon Young
Lance Lee
Young, Pickett & Lee
4122 Texas Boulevard
Texarkana, AR/TX  75504
Tel: (903) 794-1303
Fax: 903-792-5098; 903-794-5098

Stephen C. Richman, Esq.
Markowitz & Richman
121 South Broad Street
1100 North America Building
Philadelphia, PA  19107
Telephone:  (215) 875-3100

- 279 -

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing **FOURTH AMENDED MASTER CONSOLIDATED CLASS ACTION COMPLAINT [UNREDACTED VERSION]** to be electronically filed with the Court pursuant to the December 16, 2004 Order and to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on March 1, 2006, a copy to LexisNexis File and Serve for Posting and notification to all parties

By:  **/s/ Steve W. Berman**
Steve W. Berman, Esq.
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 5th Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594