# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) MDL No. 1456 |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) Civil Action No. 01-CV-12257 PBS ) ) Judge Patti B. Saris ) Chief Magistrate Judge Marianne B. Bowler |

## DECLARATION OF ZOLTAN SZABO IN SUPPORT OF DEFENDANT BRISTOL-MYERS SQUIBB COMPANY'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Zoltan Szabo, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am the Senior Director of Pricing and Reimbursement for the U.S. Pharmaceuticals Group of Bristol-Myers Squibb Company ("BMS"). I, and the BMS employees who report to me, have responsibility for among other things: (i) reporting BMS's wholesale list prices to industry publications and (ii) maintaining data on the company's contracts with customers and rebates to managed care and institutional entities.

Wholesale List Prices

2. BMS establishes list prices for sales of its drug products to wholesalers. We call these prices Wholesale List Prices or "WLPs". For the drugs involved in this case, BMS's invoices to wholesalers are at WLP. BMS also offers wholesalers a 2% discount for prompt payment.

3. While a BMS drug is protected by patent, BMS may periodically raise the WLP for that drug. BMS does not do so, however, unless we believe that we can obtain sales at that new price. After a BMS drug loses its patent protection, BMS generally does not further raise the WLP but rather keeps it constant.

4.      From time to time, especially if BMS has competition from generics or from other brands in a therapeutic class, BMS will offer price concessions in the form of discounts or rebates to "downstream" customers (i.e., the providers, hospitals, HMO's and others who buy from the wholesalers) manufacturer discounts or rebates that result in their paying less than WLP.[1]

5.      BMS regularly informs industry publications of both the initial WLP for each of its drugs and any subsequent changes in that WLP. Since 1999, BMS has also included in its communications with those publications a reminder that some customers receive manufacturer discounts or rebates that are not reflected in the reported WLPs.

6.      To my knowledge, BMS has never reported or suggested average wholesale prices or AWPs to the publications for its products. My understanding is that the publications sometimes survey wholesalers to determine what "mark-up" factor the publications wish to apply to our reported WLP to reach the publications' AWPs. The only exception that I am aware of occurred in 1992 when BMS asked the publications to increase the mark-up factor for certain oncology products. One of the publications agreed; the other two did not. (A copy of a 1996 e-mail detailing BMS' policy, the one 1992 exception, and its understanding of the publications' role is annexed hereto as Exhibit A).

---

[1]     If the price concession is offered at the time of sale to the downstream customer, this is referred to as a "discount." In this instance, the wholesaler who originally bought the drug from BMS based on WLP is entitled to a "chargeback" equal to the difference between the discounted price the downstream customer pays and the WLP the wholesaler paid. If the downstream customer is entitled to a price concession after the original sale, this is called a rebate. Rebates are usually paid or credited directly to the downstream customer and do not affect the wholesaler.

Discounts And Rebates for the Drugs In the AMCC

7. The Amended Master Consolidated Complaint ("AMCC") identifies 20 drugs manufactured by BMS and its former subsidiary Apothecon, Inc. Those 20 drugs are manufactured in different dosage forms, strengths and sizes, each of which under federal regulations has its own National Drug Code or "NDC." There are approximately 150 BMS and Apothecon NDC at issue in this litigation.

8. BMS knows the number of units of each NDC it sold and the WLPs for those NDCs. It also knows the dollar amounts of sales to and chargebacks received from wholesalers and thus can calculate total dollar value of the discounts offered to downstream customers by NDC. BMS does not, however, have any way of matching its gross revenues from sales to wholesalers relating to a particular NDC with chargebacks or discounts provided to individual customers for that same NDC. In other words, it cannot say which particular units sold to wholesalers were subsequently sold to which downstream customers at what discount. Moreover, in many cases, rebate information is not maintained by separate NDC at all.

9. The available information, while not broken down on an NDC level, does allow BMS to make some worthwhile calculations for the purposes of this case. For example, BMS can calculate the total dollar amount of chargebacks (as a proxy for discounts below WLP it granted customers) over the course of a year for all NDC's for a particular drug and can estimate the total dollar value of customer rebates it paid on the same drug during that year.

10. With this information, one can calculate for each drug listed in the AMCC (1) a hypothetical gross revenue figure for BMS had it sold every single unit of a drug at 100% of its WLP and (2) the dollar value of the estimated discounts and rebates granted during the same period. It is then possible to compare the percentage that the dollar amount of discounts

3

and rebates bear to the hypothetical revenue BMS would have received if every sale were made at WLP and there had been absolutely no discounts or rebates.

11. I have reviewed estimates and calculations of the above figures for the period 1997 through 2002 for the drugs listed in the AMCC. The only rebates that were deliberately excluded from the analysis are the rebates paid by BMS under the Medicaid program. The analysis shows that for 12 of the 18 brand-name drugs listed in the AMCC, BMS achieved sales revenues totaling 83% to 95% of the amount it would have achieved if every unit had been sold at 100% of WLP. Four of such drugs achieved 50% to 70% of full WLP sales value and for the two remaining brand name drugs, BMS achieved sales revenues totaling 25% and 29% of full WLP. For the two generic drugs, Apothecon received 17.5% and 39% of full WLP.

12. Based on these numbers, I believe it is safe to say that BMS engaged in numerous transactions for the drugs listed in the AMCC at its reported WLP with no subsequent discounts or rebates provided (other than the 2% prompt pay discount to the wholesaler). This analysis confirms my personal belief that the WLPs that BMS establishes and reports to the publications are reflective of actual prices paid in the marketplace for BMS drugs.

I declare under penalty of perjury that the foregoing is true.

Executed this the 25th day of October, 2004 at Plainsboro, New Jersey.

_/s/ Zoltan Szabo_
Zoltan Szabo

# Exhibit 1

```
Author: Denise M Kaszuba at ~PGRSM34P
Date:   7/10/96  4:30 PM
Priority: Normal
Receipt Requested
CC: Steven C Sembler at ~PGRSM16P
TO: Timothy D Wert at ~PGRSM15P
TO: George A Kegler at ~PGRSM11P
CC: Frances E Hamer at ~PGRSM36P
CC: John C O'Leary at ~PGRSM14P
BCC: Barbara C Goetz at ~PGRSM33P
Subject: Re: AWP Calculations
```
---------------------------------------------- Message Contents ----------------------------------------------

Tim,

The AWPs' published by First Data Bank, Medispan and Redbook are established by any of the 3 methods below:

1.  Manufacturer supplies the Average Wholesale Price

2.  Manufacturer supplies the Average Wholesale Factor

3.  The Data Services through wholesale surveys calculates the AWP factor by the weighted average of all average wholesale factors received from the surveyed wholesalers. The manufacturers responsibility is the supplying the current wholesale list price.

Bristol-Myers Squibb's general policy is Method 3 with one exception. Mid 1992 BMSOI requested an AWP factor change of 25%. First Data Bank and Medispan chose to resurvey the wholesalers and declined the request since our general policy is method 3. Both MediSpan and First Data Banks policy is not to mix and match methods within a Manufacturer. Redbook accommodated our request upon receipt of written notification.

In reviewing AWP factors for Bristol-Myers Squibb very little movement has occurred within the past 10 years.

I am forwarding to you via intercompany mail the following items:

Understanding AWP published by First Data Bank.
Lotus Spreadsheet containing AWP factors established by the Data Services for BMSOI.

As a follow-up I will contact you Tuesday of next week.

Denise

_____ Reply Separator _____
Subject: AWP Calculations
Author: Timothy D Wert at ~PGRSM15P
Date:   6/24/96 5:36 PM

Denise, would you explain the process and formula whereby AWPs are established by Red Book, Medispan and First Data Bank for drugs in general. The formula used by the pricing sources, how is that derived, e.g.: distributor surveys, overhead factors for drugs, etc. What are the current manufacturer mark-up factor is for BMSO for the different sources? How often are the revised or recalculated? Thank you for your help. We are attempting to gain a full understanding of this area.

Tim

Trade Secret/
FOIA Confidential

BMY0000771        PLB/007

BMS − 0012628