# EXHIBIT A

AO 88 (Rev. 1/94) Subpoena in a Civil Case

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

### SUBPOENA IN A CIVIL CASE

In re LUPRON MARKETING AND SALES
PRACTICES LITIGATION

CASE NUMBER:  MDL DOCKET NO. 1430
Master File No. 01-CV-10861
Judge Richard G. Stearns (D. Mass.)

TO:   Office of the General Counsel

United States Department of Health and Human Services
Room 711-E
200 Independence Avenue, S.W.
Washington, D.C.  20201

☒   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See EXHIBIT A (attached)

| PLACE | DATE AND TIME |
|---|---|
| Joshua T. Buchman, Esq.<br>McDermott, Will & Emery<br>227 West Monroe Street<br>Chicago, IL  60606-5096<br>(312) 372-2000 | January 5, 2004 |

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| | 10-23-03 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Michael S. Nadel, D.C. Bar # 470144
(Attorney for Abbott Laboratories)
McDermott, Will & Emery
600 Thirteenth Street
Washington, D.C.  200005
(202) 756-8000

(See Rule 45, Federal Rules of civil Procedure, Parts C & D on Reverse)

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
| | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
           DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT A TO SUBPOENA TO HHS

### PRELIMINARY STATEMENT

Abbott Laboratories ("Abbott"), TAP Pharmaceutical Products Inc. and TAP Pharmaceuticals Inc. (collectively "TAP"), and Takeda Chemical Industries, Ltd. ("Takeda") are serving this Subpoena on the Office of the General Counsel of the United States Department of Health and Human Services ("HHS") pursuant to Rule 45 of the Federal Rules of Civil Procedure and 45 C.F.R. § 2.5.

### DEFINITIONS

1.      "Document" means the original and each non-identical copy of a document in any medium, including electronic form, whether or not it was communicated to any person other than the author, and shall include but not be limited to, writings, printings, photographs, photocopies, tapes, recordings, video recordings, electronic data, e-mails, and any other symbolic representations in the possession, custody or control of Plaintiffs or known or believed by Plaintiffs to exist.

2.      "Copy" or "Copies" when used in reference to a document means any color or black-and-white reproduction of a document, regardless of whether the reproduction is made by means of carbon paper pressure, sensitive paper, photostat, xerography or other means or process.

3.      "Correspondence" means all communications between two different persons or entities, including e-mail and other forms of electronic communications.

4.      "Home drug infusion therapy services" means the administration of drugs at the patient's home using an infusion pump.

5.    "Home nebulizer treatments" means the administration of drugs at the patient's home by means of a nebulizer.

6.    "AWP" shall refer to the published Average Wholesale Price as reported in pharmaceutical pricing compendia, such as the Red Book and First Data Bank.

7.    "HHS" means the United States Department of Health and Human Services and all constituent agencies.

8.    "CMS" means Centers for Medicare and Medicaid Services, formerly known as Health Care Financing Administration ("HCFA"), and encompasses the Social and Rehabilitation Service ("SRS"), HCFA's predecessor in the administration of the Medicaid program.

9.    "OIG" means the HHS Office of Inspector General.

10.    "Carrier" shall mean and refer to any and all insurance companies or other entities that have contracted with HCFA or CMS at any time from Jan. 1, 1985 to the present to process claims submitted under Part B of the Medicare program.

11.    "Relating to" means all information, facts and/or documents that directly, indirectly or in any other way support, negate, bear upon, touch upon, incorporate, affect, include, pertain to and/or are otherwise connected with the subject matter about which a request is being made.

12.    "Communication" means the transmission, sending and/or receipt of information of any kind by and/or through any means including but not limited to speech, writings, language, computer electronics of any kind, magnetic tape, video tape, photographs, graphs, symbols, signs, magnetic disks, sound, radio and/or video signal, telephone, teletype, telecommunication, telegram, microfilm, microfiche, photographic film of any type and/or other media of any kind.

13.    "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request any information that might otherwise be construed to be outside its scope.

14.    The singular form of a noun or pronoun shall include within its meaning the plural form of the noun or pronoun and vice versa; the masculine form of a pronoun shall include within its meaning the feminine form of the pronoun, and vice versa; and the use of any tense of any verb shall include within its meaning all other tenses of the verb.

## INSTRUCTIONS

1.    Abbott, TAP, and Takeda request that HHS certify that the records it produces are true and correct copies.

2.    Unless the request specifically relates to an earlier time period, the requests below refer to the period of January 1, 1991 to the present

3.    The headings provided in the document requests, below, are intended to assist HHS in locating responsive documents by setting forth general categories, and should not be relied upon to modify in any way the actual numbered requests.

4.    Please produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories in the request.   The following constituents within HHS are believed by Abbott, TAP, and Takeda to be in possession of documents responsive to this subpoena: (a) HHS Main Office and Regional Offices; (b) HHS Office of General Counsel; (c) OIG; (d) CMS; and (e) Public Health Service.

5.    Provide the following information for each document withheld on the grounds of privilege:

     (a)    its date;

     (b)    its title;

3

(c)   its author;

(d)   its addressee;

(e)   the identity of each person who received and/or saw the original or any
      copy of such document;

(f)   the specific privilege under which it is withheld;

(g)   its general subject matter;

(h)   its present custodian(s); and

(i)   a description of the document adequate to support the contention of
      privilege.

## DOCUMENTS TO PRODUCE

### Regulatory Documents Regarding Medicare or Medicaid Drug Reimbursement

1.      All documents relating to the promulgation of a regulation concerning Medicare reimbursement for prescription drugs, effective January 1, 1992, including all comments on the proposed and final regulation, all drafts of the regulation, and all memoranda, correspondence, analyses and other documents concerning the regulation. (The Notice of Proposed Rulemaking for the regulation was published at 56 Fed. Reg. 25,860 (June 5, 1991), and the Notice of Final Rule was published at 56 Fed. Reg. 59,424 (Nov. 25, 1991).) This request seeks only documents relating to reimbursement by Medicare of prescription drugs, and not documents related to other matters covered by the regulation in question.

2.      All documents relating to the promulgation of a regulation concerning Medicare reimbursement for prescription drugs, effective January 1, 1999, including all comments on the proposed and final regulation, all drafts of the regulation, and all memoranda, correspondence, analyses and other documents concerning the regulation. (The Notice of Proposed Rulemaking

for the regulation was published at 63 Fed. Reg. 30,818 (June 5, 1998), and the Notice of Final Rule was published at 63 Fed. Reg. 58,814 (Nov. 2, 1998).) This request seeks only documents related to reimbursement by Medicare of prescription drugs, and not documents relating to other matters covered by the regulation in question.

3.     From 1985 to the present, all documents relating to the promulgation of a regulation concerning Medicaid reimbursement for prescription drugs published at 34 Fed. Reg. 1,244 (January 25, 1969), codified at 45 C.F.R. § 250.30(b)(2) (1970), including all comments on the proposed and final regulation, all drafts of the regulation, and all memoranda, correspondence, analyses and other documents concerning the regulation. This request seeks only documents related to reimbursement by Medicaid of prescription drugs, and not documents related to other matters covered by the regulation in question.

4.     From 1974 to the present, all documents relating to the promulgation of a regulation concerning Medicaid reimbursement for prescription drugs, effective July 1976, including all comments on the proposed and final regulation, all drafts of the regulation, and all memoranda, correspondence, analyses and other documents concerning the regulation. (The Notice of Proposed Rulemaking for the regulation was published at 39 Fed. Reg. 41,480 (Nov. 27, 1974), and the Notice of Final Rule was published at 40 Fed. Reg. 34,516 (Aug. 15, 1975).) This request seeks only documents related to reimbursement by Medicaid of prescription drugs, and not documents relating to other matters covered by the regulation in question.

5.     From 1985 to the present, all documents relating to the promulgation of a regulation concerning Medicaid reimbursement for prescription drugs, effective in 1987, including all comments on the proposed and final regulation, all drafts of the regulation, and all memoranda, correspondence, analyses and other documents concerning the regulation. (The

Notice of Proposed Rulemaking for the regulation was published at 52 Fed. Reg. 28,648 (July 31, 1987).)  This request seeks only documents related to reimbursement by Medicaid of prescription drugs, and not documents relating to other matters covered by the regulation in question.

6.      From 1985 to the present, all documents relating to the decision that Medicare covers prescription drugs provided incident to durable medical equipment, including all documents related to Section 2100.5 of the Medicare Carrier's Manual, and all revisions or modifications thereto.

7.      All documents relating to HCFA/CMS's actual or proposed use of its "inherent reasonableness" authority in connection with Medicare reimbursement of prescription drugs.

### Audits, Reviews, Analyses, Reports and Publications

8.      From 1985 to the present, all documents relating to OIG audits and reports regarding reimbursement or payment for prescription drugs by Medicare, Medicaid, the Department of Veterans Affairs or any other federal agency or federal health benefits program, including drafts, work papers, surveys, survey responses, interview summaries, correspondence, notes, and all responses and drafts of responses to OIG audits and reports.

9.      From 1985 to the present, all documents relating to reviews of drug purchase prices by pharmacies in Arkansas, Louisiana, New Mexico, Oklahoma and Texas, performed by HCFA Region VI and referenced in Louisiana v. Department of Health and Human Services, 905 F.2d 877, 882 (5th Cir. 1990).

10.     From 1985 to the present, all documents relating to efforts by HCFA or CMS, Carriers or other Medicare contractors to determine acquisition costs of drugs, including efforts to determine "estimated acquisition cost" pursuant to 42 C.F.R. § 405.517 (1992).

6

11.     All documents relating to a report prepared for CMS by PricewaterhouseCoopers entitled "A Study of Pharmaceutical Benefit Management" (June 2001), and referenced at 67 Fed. Reg. 10,285 (March 6, 2002), including the report, drafts of the report, correspondence relating to the report, and all documents relating to the engagement of PricewaterhouseCoopers to prepare the report.

12.     From 1968 to the present, all documents relating to a report prepared by the Task Force on Prescription Drugs, the Office of the Secretary, United States Department of Health, Education and Welfare, entitled "The Drug Makers and the Drug Distributor" and dated December 1968.

13.     From 1985 to the present, all OIG correspondence with Congress, including Semi-Annual Reports, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

14.     From 1985 to the present, all OIG Red Books and Orange Books relating to Medicare's or Medicaid's method of reimbursement for prescription drugs.

15.     All documents relating to committees or task forces within HHS that review, consider, establish, or alter policies for Medicare reimbursement for prescription drugs, including agendas and minutes of meetings, correspondence, memoranda, lists of members, and notes.

16.     All documents relating to efforts by CMS, HCFA or Carriers to base Medicare reimbursement for prescription drugs on the "least costly alternative" or any standard other than AWP.

17.     All documents relating to efforts by the Department of Justice to consider, calculate, or apply average wholesale prices that differ from the AWPs for the prescription drugs

7

published in pharmaceutical industry pricing compendia, such as the <u>Red Book</u> and <u>First Data</u> <u>Bank</u>.

18.    All documents relating to efforts by CMS, HCFA or Carriers to consider, calculate or apply average wholesale prices that differ from the published AWPs for the prescription drugs.

19.    From 1985 to the present, all documents considering hypothetical, proposed or actual federal legislation concerning Medicare or Medicaid reimbursement for prescription drugs.

20.    To the extent not covered above, from 1985 to the present, all HHS reviews, studies, analyses, audits and reports relating to the fact that AWP commonly exceeds the actual sales price or acquisition cost of a drug.

21.    To the extent not covered above, from 1985 to the present, all HHS reviews, studies, analyses, audits and reports relating to the fact that AWP commonly exceeds the actual average wholesale price of a drug.

<u>Communications with State Government Entities Regarding</u>
<u>AWP or Medicaid Drug Payments</u>

22.    From 1985 to the present, all written communications with any State Medicaid agency regarding Medicaid reimbursement for prescription drugs.

23.    From 1985 to the present, all documents relating to non-written communications, such as meetings or phone conversations, with any State Medicaid agency regarding Medicaid reimbursement for prescription drugs.

24.    From 1985 to the present, all documents relating to CMS, HCFA, or SRS policies, regulations, rules or standards related to Medicaid reimbursement for prescription drugs.

8

25. From 1985 to the present, all written communications with any State Medicaid agency regarding the possibility that CMS or HCFA might disapprove a State Medicaid plan due to the manner in which a proposed or existing State Medicaid program reimburses for prescription drugs.

26. From 1985 to the present, all documents relating to non-written communications, such as meetings or phone conversations, with any State Medicaid agency regarding the possibility that CMS or HCFA might disapprove a State Medicaid plan due to the manner in which a proposed or existing State Medicaid program reimburses for prescription drugs.

### Communications with Federal Government Entities or Government Contractors Regarding AWP or Medicare Drug Reimbursement

27. All written communications with any Carrier, Carrier Advisory Committees, or other Medicare contractor, regarding the method(s) by which Medicare reimburses for prescription drugs.

28. All documents relating to non-written communications, such as meetings or phone conversations, with any Carrier, Carrier Advisory Committees or other Medicare contractor regarding Medicare's method of reimbursement for prescription drugs.

29. All written communications with the Office of Management and Budget regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs, including the performance of surveys or other actions to determine the estimated acquisition cost of prescription drugs under 42 C.F.R. § 405.517 (1992).

30. All documents relating to non-written communications with the Office of Management and Budget regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs, including the performance of surveys or other actions to determine the estimated acquisition cost for prescription drugs under 42 C.F.R. § 405.517 (1992).

9

31.     All written communications with Members of Congress, their staff, or any Congressional committees regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

32.     All documents relating to non-written communications, such as meetings or phone conversations, with Members of Congress, their staff, or any Congressional committees regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

33.     All written communications with the Office of Technology Assessment regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

34.     All documents relating to non-written communications, such as meetings or phone conversations, with the Office of Technology Assessment regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

35.     All written communications with the General Accounting Office regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

36.     All documents relating to non-written communications, such as meetings or phone conversations, with the General Accounting Office regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

37.     All written communications with the Congressional Budget Office regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

38.     All documents relating to non-written communications, such as meetings or phone conversations, with the Congressional Budget Office regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

39.     All written communications with the Department of Justice regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

10

40.    All documents relating to non-written communications, such as meetings or phone conversations, with the Department of Justice regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

41.    All written communications with the Department of Justice regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

42.    All written communications with the Office of the President of the United States regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs, including all documents related to the Medicare prescription drug provisions of any President's annual proposed budgets and President Clinton's December 13, 1997 radio address to the nation.

43.    All documents relating to non-written communications, such as meetings or phone conversations, with the Office of the President of the United States regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs, including all documents related to the Medicare prescription drug provisions of any President's annual proposed budgets and President Clinton's December 13, 1997 radio address to the nation.

44.    To the extent not covered by the above requests, all written communications between HHS or any HHS constituent agency and any state or federal governmental entity outside HHS regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

45.    To the extent not covered by the above requests, all documents relating to non-written communications, such as meetings and phone conversations, between HHS or any HHS constituent agency and any state or federal governmental entity outside HHS regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

<u>Communications with Non-Governmental Entities Regarding</u>
<u>AWP or Medicare or Medicaid Reimbursement of Drugs</u>

11

46.   All written communications with pharmaceutical manufacturers or associations representing or consisting of pharmaceutical manufacturers regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

47.   All documents relating to non-written communications, such as meetings or phone conversations, with pharmaceutical manufacturers or associations representing or consisting of pharmaceutical manufacturers regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

48.   All written communications with publishers of pharmaceutical pricing compendia regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

49.   All documents relating to non-written communications, such as meetings and phone conversations, with publishers of pharmaceutical pricing compendia regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

50.   All written communications with pharmacists, pharmacies, or associations representing or consisting of pharmacies or pharmacists, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

51.   All documents relating to non-written communications such as meetings and phone conversations, with pharmacists, pharmacies, or associations representing or consisting of pharmacies or pharmacists, regarding Medicare's or Medicaid's method of reimbursement for prescription drugs.

52.   All written communications with health care providers, or associations representing or consisting of health care providers, including the American Society of Clinical Oncology and the American Urology Association, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

12

53.    All documents relating to non-written communications, such as meetings or phone conversations, with health care providers, or associations representing or consisting of health care providers, including the American Society of Clinical Oncology, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

54.    All written communications with health care providers regarding agreements between insurers and providers pursuant to which health care providers waive coinsurance or copayment amounts required under Medicare, including agreements between insurers and physicians that require physicians to waive Medicare copayment obligations as a condition of participation in insurance company networks.

55.    All documents relating to non-written communications, such as meetings or phone conversations, with health care providers regarding agreements between insurers and providers pursuant to which health care providers waive coinsurance or copayment amounts required under Medicare, including agreements between insurers and physicians that require physicians to waive Medicare copayment obligations as a condition of participation in insurance company networks.

56.    All written communications with cancer survivors or cancer patients, or associations representing or consisting of such individuals, the National Coalition for Cancer Survivorship, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

57.    All documents relating to non-written communications, such as meetings or phone conversations, with cancer survivors or cancer patients, or associations representing or consisting of such individuals, including the National Coalition for Cancer Survivorship, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

13

58.    All written communications with private insurers, Carriers, ERISA plan administrators, health maintenance organizations, Blue Cross organizations or other non-governmental third-party payors regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

59.    All documents relating to non-written communications, such as meetings or phone conversations, with private insurers, Carriers, ERISA plan administrators, health maintenance organizations, Blue Cross organizations or other non-governmental third-party payors regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

60.    To the extent not covered above, all written communications with non-governmental entities, including the press, healthcare providers, associations and members of the general public, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

61.    From 1985 to the present, copies of all Freedom of Information Act requests submitted to HHS or any HHS constituent agency seeking documents regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs, all responses thereto, and all documents produced in response to such requests.

<u>HHS Administrative and Judicial Litigation Concerning AWP</u>

62.    From 1985 to the present, all documents relating to Amendment 87-33 to the Louisiana State Medicaid plan. (To facilitate the search for responsive documents, note that HCFA published a Notice of hearing on this matter at 53 Fed. Reg. 29,381 (Aug. 4, 1988).)

63.    From 1985 to the present, all documents relating to <u>In re Disapproval of Louisiana State Plan Amendment No. 87-33</u>, No. 88-11 (HCFA Administrator June 9, 1989), including

14

briefs and other filings, exhibits, correspondence, hearing and other transcripts, rulings and opinions.

64. From 1985 to the present, all documents relating to <u>State of Louisiana v. United States Department of Health and Human Services</u>, No. 89-4566, opinion reported at 905 F.2d 877 (5th Cir. 1990), including briefs, exhibits, appendixes, the Administrative Record, all other filings, correspondence, and transcripts of oral argument.

65. From 1985 to the present, all documents relating to Amendment 88-05 to the Arkansas State Medicaid plan, including all documents relating to administrative proceedings regarding HCFA's decision to disapprove Amendment 88-05 to the Arkansas State Medicaid plan, such as briefs and other filings, exhibits, correspondence, hearing and other transcripts, rulings and opinions. (To facilitate the search for responsive documents, note that HCFA published a Notice of hearing on this matter at 53 Fed. Reg. 45,587 (Nov. 10, 1988).)

66. From 1985 to the present, all documents relating to administrative proceedings regarding HCFA's refusal to pay the federal portion for certain Arkansas Medicaid reimbursement for prescription drugs in 1989, including briefs and other filings, exhibits, correspondence, hearing and other transcripts, rulings and opinions. (To facilitate the search for responsive documents, note that the HHS Department Appeals Board issued decisions regarding this matter on Aug. 22, 1991 (Decision No. 1273) and Apr. 29, 1992 (Decision No. 1329).)

67. From 1985 to the present, all documents relating to an amendment to the Oklahoma State Medicaid plan submitted in October 1987, and revised in March 1988, concerning Oklahoma Medicaid reimbursement for prescription drugs.

68. From 1985 to the present, all documents relating to administrative proceedings regarding HCFA's decision to disapprove Amendment 87-18 to the Oklahoma State Medicaid

plan including but not limited to briefs and other filings, exhibits, correspondence, hearing and other transcripts, rulings and opinions. (To facilitate the search for responsive documents, note that HCFA published a Notice of hearing on this matter at 53 Fed. Reg. 38,979 (Oct. 4, 1988).)

69.    From 1985 to the present, all documents relating to an amendment to the Oklahoma State Medicaid plan submitted in April 1989 concerning Oklahoma Medicaid reimbursement for prescription drugs, including all documents relating to administrative proceedings regarding HCFA's refusal to pay the federal portion for certain Oklahoma Medicaid reimbursement for prescription drugs in 1989, such as briefs and other filings, exhibits, correspondence, hearing and other transcripts, rulings and opinions. (To facilitate the search for responsive documents, note that the HHS Department Appeals Board issued a decision regarding this matter on Aug. 13, 1991 (Decision No. 1271).)

70.    To the extent not requested above, from 1985 to the present, all documents relating to any administrative or judicial proceedings involving actual or threatened action by CMS/HCFA/SRS to disapprove a State Medicaid plan or plan amendment, or to disallow federal financial participation, due to alleged excessive Medicaid reimbursement for prescription drugs.

71.    To the extent not requested above, from 1985 to the present, all documents relating to any administrative or judicial proceedings concerning the appropriateness of AWP as a measure for reimbursement for prescription drugs.

### Medicare Reimbursement for Professional Services of Oncologists

72.    Copies of the federal supply schedule for drugs for each year.

73.    All documents relating to setting the Medicare fee schedule payments for professional services for the administration of chemotherapy or other drugs used in connection with treatment of cancer.

16

74.    All documents relating to whether Medicare adequately reimburses oncologists or other doctors for professional services for the administration of chemotherapy or other drugs used in connection with treatment of cancer.

75.    All documents relating to the computation of the practice expense component used or considered for use to derive the Medicare physician fee schedule for the administration of chemotherapy or other drugs used in connection with anticancer chemotherapy treatment.

### Home Drug Infusion Therapy and Nebulizer Treatments

76.    All documents relating to whether Medicare adequately reimburses providers for the provision of home drug infusion therapy services, including all documents evidencing that Medicare reimbursement for drugs is the means by which providers of professional services associated with home drug infusion therapy are reimbursed for such services.

77.    All documents relating to whether Medicare adequately reimburses providers for the provision of home nebulizer treatments, including all documents noting that Medicare reimbursement for drugs constitutes the means of reimbursing providers for professional services associated with home nebulizer treatments.

### HHS Organizational Documents

78.    All organizational charts for HHS, HHS Central and Regional Offices, HCFA/CMS, OIG and the Public Health Service.

79.    All document retention or destruction policies for HHS, HHS Central and Regional Offices, HCFA/CMS, OIG and the Public Health Service.

80.    Documents sufficient to describe the manner by which electronic documents, including e-mails, are preserved or deleted, for HHS, HHS Central and Regional Offices, HCFA/CMS and OIG.

17

81.    Documents sufficient to identify the name and address of all Medicare Carriers and fiscal intermediaries.

82.    Copies of contracts with Medicare Carriers and fiscal intermediaries.

83.    All documents relating to policies, procedures or practices of HHS, HHS Central and Regional Offices, HCFA/CMS or OIG, regarding the preservation or destruction of documents relating to Medicare's or Medicaid's method of reimbursement for prescription drugs.

84.    Documents sufficient to identify all efforts made by HHS, HHS Central and Regional Offices, HCFA/CMS or OIG to preserve documents relating to Medicare's or Medicaid's method of reimbursement for drugs.

85.    Documents sufficient to identify any document responsive to this subpoena that has been deleted, discarded or destroyed.

86.    Documents sufficient to describe the manner in which HHS electronic documents, including e-mails, are preserved or deleted, discarded or destroyed.

CHI99 4191096-1.023560.0042

18

AO 88 (Rev. 1/94) Subpoena in a Civil Case - SDNY WEB 4/99

**Issued by the**
# UNITED STATES DISTRICT COURT

DISTRICT OF _____ **Arizona**

IN RE: LUPRON MARKETING
AND SALES PRACTICES LITIGATION

**v.**

### SUBPOENA IN A CIVIL CASE

CASE NUMBER: [1]

MDL Docket No. 1430 Master File No. 01-CV-10861

TO:   Noridian Administrative Services LLC
c/o Marie Hawkin
5333 N. 7th St. Ste C-123
Phoenix, AZ  85014

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.regarding the topics identified on the attached Schedule A.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Fennemore Craig 3003 N. Central Avenue, Suite 2600, Phoenix, AZ 85012-2913 | 9:30 a.m. June 10, 2003 |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attached Schedule B.

| PLACE | DATE AND TIME |
|---|---|
| Attn. Timothy J. Burke, Fennemore Craig, 3003 N. Central Avenue, Suite 2600, Phoenix, AZ 85012-2913 | 9:30 a.m. April 21, 2003 |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | |
|---|---|
| Attorney for Defendant, TAP Pharmaceutical Products Inc., on behalf of all Defendants | March 26, 2003 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Kelly P. Glauberman, Jones Day, 77 West Wacker Drive, Suite 3500, Chicago, IL 60601; (312) 782-3939

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO 88 (Rev. 1/94) Subpoena in a Civil Case - SDNY WEB 4/99

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

_____

### Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that,

subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: LUPRON® MARKETING ) | |
| AND SALES PRACTICES LITIGATION ) | **MDL DOCKET NO. 1430** |
| ) | |
| ) | **Master File No. 01-CV-10861** |
| ) | |
| **THIS DOCUMENT RELATES TO** ) | **Judge Richard G. Stearns** |
| **ALL ACTIONS.** ) | |

**NOTICE OF DEPOSITION**

TO:

| | | |
|---|---|---|
| Thomas M. Sobol | Jeffrey L. Kodroff | Richard Cohen |
| HAGENS BERMAN LLP | SPECTOR, ROSEMAN & | LOWEY DANNENBERG |
| 225 Franklin Street, 26th Fl. | KODROFF | BEMPORAD & SELINGER, P.C. |
| Boston, MA 02110-2221 | 1818 Market St., Ste. 2500 | The Gateway |
| | Philadelphia, PA 19103 | One North Lexington Ave. |
| | | White Plains, NY 10601 |
| | | |
| Michael D. Hausfeld | Michael Hefter | Joseph R. Saveri |
| COHEN, MILSTEIN, HAUSFELD & TOLL | DEWEY BALLANTINE LLP | LIEFF CABRASER HEIMANN & |
| 1100 New York Avenue, NW, Ste. 500 | 1301 Avenue of the | BERNSTEIN |
| Washington, DC 20005 | Americas | 275 Battery Street, 30th Floor |
| | New York, NY 10019 | San Francisco, CA 94111 |

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, TAP Pharmaceutical Products Inc. ("TAP"), Abbott Laboratories ("Abbott"), and

Takeda Chemical Industries, Ltd. ("Takeda"), by their attorneys, will take the deposition upon

oral examination of Noridian Administrative Services, on June 10, 2003, beginning at 9:30 a.m.,

before a notary public or other person authorized by law to administer oaths, at the offices of

Fennemore Craig, 3003 N. Central Avenue, Suite 2600, Phoenix, Arizona 85012-2913, or some

other location to be mutually agreed upon by the parties. Pursuant to Rule 30(b)(6), Noridian

Administrative Services shall designate and produce at this deposition one or more officers,

CHI-1347028v1

directors, employees, managing agents, or other representatives who are most qualified to testify

on Noridian Administrative Services' behalf with respect to the examination subjects listed on

Schedule A attached hereto.

   The deposition will continue day to day thereafter until completed and may be

videotaped. You are invited to attend and cross-examine.

Dated: March 26, 2003

_Daniel E. Reidy_
Daniel E. Reidy
Tina M. Tabacchi
Kelly P. Glauberman
JONES DAY
77 West Wacker Drive
Chicago, IL 60601-1692
(312) 782-3939
(312) 782-8585 (facsimile)

Joseph F. Savage, Jr. (BBO# 443030)
TESTA, HURWITZ & THIBEAULT
High Street Tower, 125 High Street
Boston, MA 02110
(617) 248-7000
(617) 248-7100 (facsimile)

Attorneys for TAP Pharmaceutical Products Inc.

_Thomas P. Sullivan_
Thomas P. Sullivan
Mark D. Pollack
Robert F. Stauffer
Anthony Porcelli
Jenner & Block
One IBM Plaza
45th Floor
Chicago, Illinois 60611
(312) 222-9350

Martin F. Murphy
Bingham Dana LLP
150 Federal Street
Boston, Massachusetts 02110
617-951-8000

Attorneys for Takeda Chemical Industries, Ltd.

Joshua T. Buchman
McDermott Will & Emery
227 West Monroe
Chicago, Illinois 60606
(312) 372-2000

Donald R. Frederico
McDermott Wil l& Emery
28 State Street
34th Floor
Boston, Massachusetts 02109
(617) 535-4041

Attorneys for Abbott Laboratories

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served by Federal Express on the __ day of March, 2003 upon:

Thomas M. Sobol
HAGENS BERMAN LLP
225 Franklin Street, 26th Fl.
Boston, MA 02110-2221

Jeffrey L. Kodroff
SPECTOR, ROSEMAN &
KODROFF
1818 Market St., Ste. 2500
Philadelphia, PA 19103

Richard Cohen
LOWEY DANNENBERG
BEMPORAD & SELINGER, P.C.
The Gateway
One North Lexington Ave.
White Plains, NY 10601

Michael D. Hausfeld
COHEN, MILSTEIN, HAUSFELD &
TOLL
1100 New York Avenue, NW,
Ste. 500
Washington, DC 20005

Michael Hefter
DEWEY BALLANTINE LLP
1301 Avenue of the
Americas
New York, NY 10019

Joseph R. Saveri
LIEFF CABRASER HEIMANN &
BERNSTEIN
275 Battery St., 30th Floor
San Francisco, CA 94111

## SCHEDULE A

Noridian Administrative Services shall designate one or more persons to testify on its behalf on the matters set forth below:

1.      The corporate structure or ownership of Noridian Administrative Services from January 1, 1985 to the present.

2.      The members, activities, purpose and actions of the Noridian Administrative Services Carrier Advisory Committee or other equivalent group or committee.

3.      Noridian Administrative Services' internal or external communications relating to TAP or any of its products (including but not limited to Lupron®).

4.      Investigations or surveys undertaken by Noridian Administrative Services to determine the Average Wholesale Price ("AWP"), Wholesale Acquisition Cost ("WAC"), acquisition cost, direct price, list price or other cost of or price of Lupron®, Zoladex®, and/or any other drug reimbursed under Medicare Part B.

5.      The method(s) that Noridian Administrative Services now uses or has ever used to determine or calculate AWP, WAC, acquisition cost, direct price, list price, or other cost of or price for any Medicare-reimbursed drug, including Lupron®.

6.      The meaning of the terms "AWP," "Average Wholesale Price," "WAC," "Wholesale Acquisition Cost," "acquisition cost", "direct price" and/or "list price" as those terms are used by Noridian Administrative Services, including the history or origin of each term.

7.      Discussions and communications between Noridian Administrative Services and pharmaceutical pricing compendia, including but not limited to Red Book, First Data Bank, and Medispan, concerning the pricing of pharmaceutical products, including but not limited to communications regarding AWP.

8.      Noridian Administrative Services' procedures followed with respect to reimbursement of physicians and/or other health care practitioners or health care entities for Lupron®.

9.      The reasons for Noridian Administrative Services' decision to implement a "Least Costly Alternative" ("LCA") reimbursement policy for GnRH agonist in Arizona and Nevada, including but not limited to comments received from or made to outside sources by Noridian Administrative Services relating to the decision to implement LCA.

10.     The process by which Noridian Administrative Services implemented LCA for GnRH agonist or any other Medicare reimbursed drug in Arizona and Nevada.

11.     The process by which a Local Medical Review Policy ("LMRP") is introduced, debated and implemented by Noridian Administrative Services, including but not limited to comments received from outside sources.

12.     Noridian Administrative Services' procedures followed to implement the LMRP for GnRH agonist in Arizona and Nevada.

13.     Efforts undertaken by Noridian Administrative Services to recoup overpayments made to physicians and/or other health care providers or health care entities as a result of Noridian Administrative Services' implementation of LCA.

14.     Discussions or any other communications between Noridian Administrative Services and any governmental agency, including but not limited to, the United States Government, in connection with any investigation of TAP relating to the sale, marketing, distribution and/or pricing of Lupron®.

15.     Discussions or any other communications between Noridian Administrative Services and any local, state or federal governmental entities, including but not limited to

Congress of the United States or any state, HCFA, HHS, the Department of Health and Human Services' Office of the Inspector General, or other Medicare Carriers relating to Lupron®, Zoladex®, AWP or TAP.

16.    Knowledge on the part of Noridian Administrative Services regarding the difference between AWP and the acquisition cost for any drug (including Lupron®).

17.    Discussions or communications between Noridian Administrative Services and any health care provider or other Medicare carriers concerning the AWP, WAC, direct price and/or list price or reimbursement or allowable for Lupron®, Zoladex®, or any other Medicare-reimbursed drug.

18.    Any changes in or efforts to change Noridian Administrative Services' reimbursement procedure or policy for Lupron®, Zoladex®, and/or any other drug.

19.    Procedure by which Noridian Administrative Services enters into contracts with any federal, state, or local governmental entities or agents, including but not limited to CMS, HCFA, the Public Health Service, the Department of Defense, the Veteran's Administration and Noridian Administrative Services' duties and obligations pursuant to any such contract.

20.    Discussions or communications by Noridian Administrative Services concerning the use of AWP as a measure of reimbursement by Medicare, Medicaid or private insurers.

21.    Any lawsuits, administrative or legislative proceedings, and/or criminal or civil investigations, which Noridian Administrative Services and/or its agents have testified or consulted concerning the pricing of pharmaceuticals, including Lupron®.

22.    The documents sought and/or produced in the attached Document Rider.

## SCHEDULE B

## DEFINITIONS

1.      The term "TAP" shall mean and refer to TAP Pharmaceutical Products Inc.
(formerly known as TAP Holdings Inc. and TAP Pharmaceuticals Inc.), a Delaware corporation
with its principal place of business in Lake Forest, Illinois, and any and all current and former
officers, directors, employees, agents, attorneys and affiliates of TAP Pharmaceutical Products
Inc. (including TAP Pharmaceuticals Inc.).

2.      The term "Noridian Administrative Services" shall mean and refer to the entity
acting as a Medicare Carrier for Arizona and Nevada pursuant to a contract or other agreement
with HCFA or CMS for the processing of claims submitted under Part B of the Medicare
program by any health care provider.

3.      The term "Lupron®" shall mean and refer to the GnRH agonist sold by TAP,
which shall include all past and present formulations and dosages.

4.      The term "Zoladex®" shall mean and refer to the GnRH agonist sold by
AstraZeneca, which shall include all past and present formulations and dosages of Zoladex®.

5.      The term "Medicare" shall mean and refer to the Federal program enacted in 1965
under Title XVIII of the Social Security Act to pay for the costs of certain medical services and
care.

6.      The term "Medicaid" shall mean and refer to the jointly-funded Federal-State
health insurance program enacted in 1965 as an amendment to the Social Security Act to pay for
the costs of certain medical services and care.

7.      The term "Health Care Financing Administration" ("HCFA") and "Centers for
Medicare and Medicaid Services" ("CMS") shall mean and refer to the division of the United

States Department of Health and Human Services directly responsible for the administration of the Medicare program.

8.       The term "Medicare Carrier" shall mean and refer to any and all insurance companies or other entities that have ever contracted with HCFA or CMS, at any time from January 1, 1985 to the present, to process claims submitted under Part B of the Medicare program by any health care provider.

9.       The term "Medicare-reimbursed drugs" shall mean and refer to any and all drugs that have, at any point in time, been Medicare-reimbursed since January 1, 1985, including those drugs that no longer exist or are no longer Medicare-reimbursed.

10.      The term "health care provider" shall mean and refer to any and all persons or entities that render health care services, including but not limited to physicians, nurses, nurse practitioners, physicians' assistants, nursing home personnel, laboratory technicians, x-ray and other medical equipment technicians, and other hospital or physician-office personnel.

11.      The term "communication" shall mean any oral or written exchange of words, thoughts or ideas to another person or entity, whether in person, in a group, by telephone, by letter, by telex or by any other process, electric, electronic or otherwise. All such communications in writing shall include, without limitation, printed, typed, handwritten or other readable documents, whether in hardcopy, electronic mail or stored electronically on a computer disk or otherwise, contracts, correspondence, diaries, drafts (initial and all subsequent), forecasts, invoices, logbooks, memoranda, minutes, notes, reports, statements, studies, surveys and any and all non-identical copies thereof.

12.      The term "documents" shall mean all original written, recorded, or graphic matters whatsoever, and any and all non-identical copies thereof, including but not limited to

advertisements, affidavits, agreements, analyses, applications, appointment books, bills, binders, books, books of account, brochures, calendars, charts, checks or other records of payment, communications, computer printouts, computer stored data, conferences or other meetings, contracts, correspondence, diaries, electronic mail, evaluations, facsimiles, files, filings, folders, forms, interviews, invoices, jottings, letters, lists, manuals, memoranda, microfilm or other data compilations from which information can be derived, minutes, notations, notebooks, notes, opinions, pamphlets, papers, photocopies, photographs or other visual images, policies, recordings of telephone or other conversations, records, reports, resumes, schedules, scraps of paper, statements, studies, summaries, tangible things, tapes, telegrams, telephone logs, telex messages, transcripts, website postings, and work papers, which are in the possession of Noridian Administrative Services as defined above.  A draft or non-identical copy is a separate document within the meaning of this term.

13.     The term "between," when used in regard to the transmittal of information, shall mean any communication by, to, from, among, and for any individual(s) or entity(ies) specified in a particular request.

14.     The words "relate to" or any variation thereof shall mean refer to, regard, concern, describe, explain, state, evidence, record, constitute, pertain to, reflect, comprise, contain, embody, mention, show, support, contradict, and discuss, whether directly or indirectly, as required by the context to bring within the scope of the requests in this Schedule any documents that might be deemed outside their scope by another construction.

15.     The terms "and" and "or" shall mean "and/or."

16.     Any word written in the singular shall include the plural and vice versa.

17.     In case of doubt as to the scope of a clause including "and," "or," "any," "all," "each," and "every," the intended meaning is inclusive rather than exclusive.

18.     The terms "you" and "your" shall mean and refer to Noridian Administrative Services, its employees, agents, attorneys, and affiliates.

## INSTRUCTIONS

1.     In responding to each document request, you should conduct a diligent search for, and produce all documents in your possession, custody, or control that were created on or after January 1, 1985.

2.     If any document was, but is no longer, in your possession, custody, or control, or was known to you, but is no longer in existence, state, as to each document, its date, author(s), recipient(s) and what disposition was made of it or what became of it.

3.     When an objection is made to any request or any subpart thereof, state with specificity the part or subpart of the document request considered to be objectionable and all grounds for the objection.

4.     If you find the meaning of any term in this Schedule to be unclear, then you should assume a reasonable meaning, state what that assumed meaning is, and answer the request on the basis of that assumed meaning.

5.     Each request for documents seeks production of the document in its entirety, without abbreviation or redaction, including all attachments or other matters affixed thereto.

6.     With respect to each document that is withheld from production for any reason, or any portion of any document that has been redacted for any reason in connection with the production of a document, provide a statement setting forth:

    (a)     its date;

    (b)     its title;

(c)   its author;

(d)   its addressee;

(e)   the specific privilege under which it is withheld;

(f)   its general subject matter; and

(g)   a description of it that you contend is adequate to support your contention that it is privileged.

7.   All documents are to be produced as they are kept in the usual course of business, their relative order in such files, and how such files were maintained. All electronic files should be produced where possible in electronic form with along with any software needed to access to the information contained in the file and appropriate legends, keys or other information needed to access and understand the data.

## DOCUMENTS REQUESTED

1.   Any and all documents that describe or reflect the corporate structure of Noridian Administrative Services during the period, or any part of the period, from January 1, 1985 to the present.

2.   Any and all employee directories, organizational charts, or similar documents containing or constituting a list of the names, titles and/or job descriptions of any and all employees of Noridian Administrative Services during the period, or any part of the period, from January 1, 1985 to the present.

3.   Any and all documents sufficient to identify, from January 1, 1985 to the present, all members of Noridian Administrative Services' Carrier Advisory Committee or other equivalent group or committee, including but not limited to documents sufficient to identify each member's name, current or last known address, and if the member is a physician, the member's practice specialty.

4.      Any and all documents relating to any and all communications between Noridian Administrative Services and TAP.

5.      Any and all documents relating to any and all investigations, surveys or other efforts undertaken by Noridian Administrative Services to determine the Average Wholesale Price, AWP, Wholesale Acquisition Cost, WAC, acquisition cost, direct price, list price or other cost of or price for Lupron®, Zoladex®, and/or any other physician administered drug.

6.      Any and all documents relating to the methods Noridian Administrative Services now uses or has ever used to determine or calculate Average Wholesale Price, AWP, Wholesale Acquisition Cost, WAC, acquisition cost, direct price, list price or other cost of or price for Lupron®, Zoladex®, and/or any other physician administered drug.

7.      Any and all documents relating to the methods Noridian Administrative Services now uses or has ever used to determine Average Wholesale Price, AWP, Wholesale Acquisition Cost, WAC, acquisition cost, direct price, list price or other cost of or price for any Medicare-reimbursed drug.

8.      Any and all documents that define the term "AWP" or "Average Wholesale Price," as that term is used in pharmaceutical pricing compendia, including but not limited to Red Book, First Data Bank, and Medispan, the government, CMS, HCFA, the Department of Health and Human Services, Congress, Medicare Carriers, private insurers, and/or the pharmaceutical or health care industry.

9.      Any and all documents relating to the meaning of "AWP" or "Average Wholesale Price", including but not limited to the history or origin of the term "AWP" or "Average Wholesale Price."

10.     Any and all documents that define the term "WAC" or "Wholesale Acquisition Cost" for a drug as that term is used in pharmaceutical pricing compendia, including but not limited to Red Book, First Data Bank, and Medispan, the government, Medicare Carriers, private insurers, and/or the pharmaceutical or health care industry.

11.     Any and all documents relating to the meaning of "WAC" or "Wholesale Acquisition Cost," of a drug including but not limited to the history or origin of the term "WAC" or "Wholesale Acquisition Cost."

12.     Any and all documents that define the terms "acquisition cost," "direct price, " and/or "list price" as those terms are used in pharmaceutical pricing compendia, including but not limited to Red Book, First DataBank, and Medispan, the government, Medicare Carriers, private insurers, and/or the pharmaceutical or health care industry.

13.     Any and all documents relating to the meaning of "acquisition cost," "direct price," and/or "list price" including but not limited to the history or origin of the terms "acquisition cost," "direct price," and/or "list price."

14.     Any and all documents relating to any and all communications between Noridian Administrative Services and pharmaceutical pricing compendia, including but not limited to Red Book, First Data Bank, and Medispan concerning the pricing of pharmaceutical products, including but not limited to communications regarding AWP.

15.     Any and all documents relating to Noridian Administrative Services' decision to implement or not implement a "Least Costly Alternative" ("LCA") reimbursement for GnRH agonist in Arizona and Nevada, including but not limited to any and all comments collected from all sources regarding LCA, board minutes from Carrier Advisory Committee meetings where

LCA was considered, documents related to any and all meetings where LCA was considered, and memoranda and other reports relating to LCA.

16.     Any and all documents related to the process by which Noridian Administrative Services implemented the practice of "Least Costly Alternative" ("LCA") reimbursement for GnRH agonist in Arizona and Nevada, including but not limited to documents related to any and all grandfather clauses and information disseminated to physicians and/or other persons or entities regarding the implementation of LCA.

17.     Any and all documents relating to Noridian Administrative Services issuance of any and all Local Medical Review Policies ("LMRPs") relating to Lupron®, Zoladex®, Viadur, and/or Trelstar.  For each such LMRP issued by Noridian Administrative Services, provide documents related to the process Noridian Administrative Services used for approving and implementing the LMRP, including but not limited to comments collected from all sources regarding the LMRP, board minutes from Carrier Advisory Committee meetings where the LMRP was considered, documents related to any and all meetings where the LMRP was considered, and memoranda and other reports relating to the LMRP.

18.     Any and all documents related to Noridian Administrative Services procedure for reimbursing physicians and/or other health care practitioners or health care entities for Lupron® under the "Least Costly Alternative" ("LCA") system, including but not limited to any and all documents relating to any overpayments Noridian Administrative Services made to physicians and/or other health care practitioners or health care entities and any efforts made by Noridian Administrative Services to recover such overpayments.

19.     Documents in an Electronic Data Format sufficient to show individual claims processed by Noridian Administrative Services for Lupron®  and Zoladex® on behalf of any

Medicare beneficiary. This data should include all fields necessary to adjudicate claims,

including but not limited to the following data fields: encrypted member id, member age,

member state of residence, date of service, date of payment, amount billed, amount paid by

Noridian Administrative Services, amount paid by third party, ICD-9 code, CPT, HCPCS, NDC

or local code used by Noridian Administrative Services, physician id, claim status/adjudication

code. Fields containing confidential information (e.g. member name, social security number)

should be encrypted so as to allow the tracking of an individual beneficiary over time.

     20.     Any and all documents produced by Noridian Administrative Services to any

governmental agency, including but not limited to, the United States Government, in connection

with any investigation of TAP relating to the sale, marketing, and/or pricing of Lupron®.

     21.     Any and all documents relating to any and all communications between Noridian

Administrative Services and any current or former member, employee, agent, attorney, or

affiliate of any and all local, state, or federal governmental entities, including but not limited to

the Congress of the United States or any state, HCFA, CMS, the Department of Health and

Human Services' Office of Inspector General, and Medicare Carriers, relating to Lupron®,

Zoladex®, AWP, or TAP.

     22.     Any and all documents relating to the difference between AWP and acquisition

cost for any drug (including Lupron®), including but not limited to reports issued by any

government entity or agency, publications by Noridian Administrative Services or any other

Medicare Carrier, correspondence sent or addressed to, or sent by or received from any

government employee or agent, any employee or agent of Noridian Administrative Services or

any other Medicare Carrier, or any health care provider, legislative materials, newspaper and

magazine articles, television and radio broadcasts (or transcripts thereof), and transcripts of congressional testimony.

23.     Any and all documents relating to communications between Noridian Administrative Services and any health care provider concerning Average Wholesale Price, AWP, Wholesale Acquisition Cost, WAC, direct price and/or list price, or reimbursement or allowable for Lupron®, Zoladex®, or any other Medicare-reimbursed drug.

24.     All documents relating to any efforts by Noridian Administrative Services to change its reimbursement for Lupron® or Zoladex®.

25.     Any and all documents relating to any and all communications concerning or relating to TAP or any of its employees or products, including but not limited to Lupron®.

26.     Any and all documents relating to any and all internal communications, discussions or meetings at Noridian Administrative Services concerning the use of AWP as a measure of reimbursement by Medicare, Medicaid, or private insurers or the calculation of AWP.

27.     Any and all documents that relate to any and all internal discussions or meetings at Noridian Administrative Services concerning the use of some figure other than AWP as a measure of reimbursement by Medicare, Medicaid, or private insurers.

28.     Any and all documents relating to any and all proceedings, including but not limited to lawsuits, administrative or legislative proceedings, and/or criminal or civil investigations, which Noridian Administrative Services and/or its agents have testified concerning the pricing of pharmaceutical products.

29.     Any and all documents relating to any and all requests to Noridian Administrative Services from Congress, any state legislature, or any other federal or state government entity, for

information concerning reimbursement for pharmaceutical products, including but not limited to Lupron® and Zoladex®, by Medicare, Medicaid, or private insurers.

      30.     Any and all documents relating to any and all responses by Noridian Administrative Services to any and all requests from Congress, any state legislature, or any other federal or state government entity, for information concerning reimbursement for pharmaceutical products, including but not limited to Lupron® and Zoladex®, by Medicare, Medicaid, or private insurers.

      31.     Any and all documents relating to any and all requests to Noridian Administrative Services and responses from private parties or litigants, for information regarding Average Wholesale Price, AWP, Wholesale Acquisition Cost, WAC, direct price and/or list price for Lupron®.

      32.     Any and all documents relating to any and all contracts or agreements entered into between Noridian Administrative Services and any federal, state, or local governmental entities or agents, including but not limited to HCFA, CMS, the Public Health Service, the Department of Defense, and the Veteran's Administration relating to reimbursement for drugs under Medicare Part B.

      33.     Any and all documents relating to any and all document retention or destruction policies, procedures, or mechanisms now in place, or ever in place, at Noridian Administrative Services.

      34.     To the extent not already produced in accordance with a previous request, any and all documents relating to TAP or any of its products, including but not limited to Lupron®.