# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | Criminal Number _____ |
| | ) | **05** CR **10088** EFH |
| | ) | |
| v. | ) | VIOLATION: |
| | ) | |
| | ) | 18 U.S.C. § 371 - Conspiracy to commit an |
| **RUDOLPH J. LIEDTKE and RJL** | ) | offense against the United States |
| **SCIENCES, INC., d/b/a RJL SYSTEMS,** | ) | |
| **INC.,** | ) | |
| | ) | |
| Defendants. | ) | |

## I N F O R M A T I O N

The United States Attorney charges:

### PRELIMINARY ALLEGATIONS

At all times material hereto, unless otherwise alleged:

#### The Defendants

1.    The Defendant **RJL SCIENCES, INC., d/b/a RJL SYSTEMS, INC.** (hereinafter referred to as **RJL**) was a corporation organized under the laws of the state of Michigan and located in Clinton Township, Michigan.  **RJL** was engaged in the manufacture and sale of medical devices, including bioelectrical impedance analysis (hereinafter referred to as "BIA") devices and computer software for use in connection with the BIA devices.  Commencing in 1996, **RJL** manufactured and sold BIA devices and computer software together with, and pursuant to agreements with, others known and unknown to the United States Attorney.

2.    The Defendant **RUDOLPH J. LIEDTKE** (hereinafter referred to as **LIEDTKE**) was the President and principal owner of **RJL.  LIEDTKE** directed, participated in,

and controlled the manufacture and sale of BIA devices and computer software

devices **RJL** manufactured and sold together with, and pursuant to agreements with,

others known and unknown to the United States Attorney.

### Defendants' BIA and Software Devices

3.      The BIA device manufactured and sold by **RJL** and **LIEDTKE** consisted of a

portable device with two protruding electrodes to be attached to the hand and foot

of human test subjects.  The BIA measured the rate at which low levels of electrical

current pass through the body.  The BIA device measured the degree to which the

electrical current encountered "impedance" while passing through the body and

measured "resistance" and "reactance."  The resistance and reactance measurements

obtained by performing a BIA test on a human subject reflected the degree to which

the subject's body resisted the flow of the current and the extent to which the current

was stored in the body.

4.      The resistance and reactance measurements generated by the BIA device were used

to estimate the body composition of individual humans.  Estimates of body

composition were computed by applying the resistance and reactance measurements

generated by the BIA device to prediction equations.  Such prediction equations

were developed by mathematically calculating the statistical relationship between

the resistance and reactance measurements obtained by performing BIA tests on a

sample population of human subjects and actual measurements of body composition

for that population.  Prediction equations used to estimate body composition of

humans varied depending on the characteristics and size of the sample population

used to develop the equation and on the methodology used to measure the body composition within that population.

5.     Defendants **RJL** and **LIEDTKE** participated in the development and distribution of various BIA software devices, including computer software known as Body Comp, Weight Manager, Fluid & Nutrition, Cyprus, and computer software that will be referred to herein as "Y software," as alleged herein, for use in estimating body composition in humans.

6.     The BIA device was a medical device within the meaning of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 321(h), in that the BIA device was an impedance plethysmograph used to estimate human body composition by estimating "peripheral blood flow by measuring electrical impedance changes in a region of the body such as the arms and legs." 21 C.F.R. § 870.2770.

7.     The various packages of computer software used to convert the resistance and reactance measurements generated by the BIA device into estimates of body composition were medical devices within the meaning of the FDCA, 21 U.S.C. § 321(h).  BIA computer software was a device in that it was a "component, part, or accessory" to BIA devices pursuant to 21 U.S.C. § 321(h).

**FDA Regulation of Defendants' BIA and Software Devices**

8.     The U.S. Food & Drug Administration ("FDA") was the agency responsible for protecting the health and safety of the American public by ensuring, among other things, that medical devices designed for use in humans are safe and effective for their intended uses and are labeled accurately and in compliance with the law.

3

9.      Defendants could not legally sell BIA and computer software devices without first

obtaining premarket clearance and/or premarket approval from the FDA, depending

on the intended use of the devices.  The FDA could grant what is called a 510(k)

premarket clearance if it determined, following review of the data submitted in

support of the applicant's premarket notification, that a device was substantially

equivalent to a device (known as a "predicate device") that was marketed in

interstate commerce prior to May 28, 1976, the enactment date of the Medical

Device Amendments to the FDCA.  A device could only be found substantially

equivalent to a predicate device if, among other things, the intended use of the

current device was the same as the intended use of a predicate device.  If the

intended use of the device was different from the intended use of a predicate device,

substantial equivalence could not be found.  Under such circumstances, the

manufacturer could not legally market the device in interstate commerce unless the

FDA had first reviewed and approved a premarket application to market the device.

10.     FDA categorized devices into three classes -- Class I, Class II, and Class III --

depending on the degree of regulation necessary to ensure the safety and

effectiveness of the devices for their intended uses.  A device that was first

introduced into commercial distribution after May 28, 1976, was, by operation of

law, a Class III device.  21 U.S.C. § 360c(f)(1).  A Class III device, unless the

subject of a 510(k) premarket clearance, required premarket approval before it could

be legally marketed in interstate commerce.  21 U.S.C. § 360e.  Premarket approval

review by the FDA generally entailed, among other things, a review of clinical trials

4

and scientific data offered to confirm the safety and efficacy of the device as well as a review of the device's labeling, which must include adequate directions for use.

11.    In 1983, Defendants **RJL** and **LIEDTKE** filed a 510(k) premarket notification with the FDA's Center for Devices and Radiological Health ("CDRH") at the FDA relating to a Body Composition Analyzer ("BIA device" or "Body Comp Analyzer") manufactured and sold by **RJL**. In that 510(k) submission, Defendants **RJL** and **LIEDTKE** stated that the intended use of the BIA device was to estimate total body water, lean body mass (also known as fat free mass), and fat in healthy humans. **RJL's** BIA device was accompanied by a hand-held programmable calculator or computer to facilitate the computation of estimated total body water, lean body mass, and fat. After a review of the data submitted in support of the 510(k) submission, FDA found that the Body Comp Analyzer was substantially equivalent to a device that had been marketed prior to the FDCA medical device amendments of 1976 and granted premarket clearance to **RJL** to distribute the device on August 11, 1983, for the intended uses of estimating total body water, lean body mass, and fat in healthy humans.

12.    During an inspection of **RJL** by FDA in October 1984, following the 1983 grant of 510(k) clearance to market the BIA device, FDA discovered that **RJL** had been marketing a modified version of the BIA device as well as computer software devices that had not been previously reviewed by FDA as part of a 510(k) submission. Following a series of written exchanges with **RJL** and **LIEDTKE**, the FDA issued a Notice of Adverse Findings to Defendants **RJL** and **LIEDTKE** in

5

January 1986, informing **RJL** and **LIEDTKE** that the October 1984 inspection revealed that they had been marketing misbranded devices - specifically, the modified BIA device and the accompanying computer software device - in violation of the FDCA.

13.    In response to FDA's Notice of Adverse Findings, Defendants **RJL** and **LIEDTKE** submitted a 510(k) premarket notification for the modified BIA device as well as for the new computer software device accompanying the BIA device on June 24, 1986.  In that 510(k) submission and in ensuing correspondence with CDRH, **RJL** and **LIEDTKE** stated that the computer software only performed calculations that previously would have been done by hand to estimate body composition and that the Body Comp Analyzer and accompanying computer software had the same intended uses as the previously submitted BIA device for estimating total body water, lean body mass, and fat.  Defendants **RJL** and **LIEDTKE** further represented that the prediction equations in the computer software were based on a population consisting of 278 healthy and obese college students whose body composition was measured through hydrostatic weighing.  **RJL** and **LIEDTKE** also stated that total body water measurements of the college students were determined using deuterium oxide dilution.  Defendants **RJL** and **LIEDTKE** represented to CDRH that the intended uses of the BIA device and accompanying computer software did not include measuring body cell mass or diagnosing any disease state.

14.    Based on the representations made by Defendants **RJL** and **LIEDTKE** in their 510(k) submission and related communications, FDA's CDRH concluded that the

modified Body Comp Analyzer and accompanying computer software were substantially equivalent to a device marketed prior to the medical device amendments of 1976 and granted premarket clearance to **RJL** to distribute the Body Comp Analyzer and the accompanying computer software devices on February 3, 1987, for the intended uses of estimating total body water, lean body mass, and fat in healthy humans. At that time, the computer software device was called Body Comp. Later versions of **RJL** software with similar intended uses were called Weight Manager.

15.    Others known and unknown to the United States Attorney marketed and sold a drug known to the United States Attorney, referred to herein as "the drug," which was approved by the FDA to treat AIDS wasting, a condition involving profound involuntary weight loss in AIDS patients. At the time the FDA approved the drug, AIDS wasting was an AIDS defining condition.

16.    Immediately following launch of the drug, the incidence and prevalence of AIDS wasting began to decline. The demand for the drug began to drop significantly after it was launched.

### Development of Fluid & Nutrition Software and Initial Sales by RJL to others known and unknown to the United States Attorney

17.    Commencing in at least 1994, Defendants **RJL** and **LIEDTKE** assisted others known and unknown to the United States Attorney in developing a prediction equation that would calculate the BIA resistance and reactance readings into estimates of body cell mass. This equation (herein the "Z equation") estimated body

cell mass based upon measurements of total body potassium in a population referred to herein as the "ABC database" that consisted of approximately 332 humans, including individuals who were healthy and others who had been tested as HIV-positive.

18.    Commencing sometime during 1994, Defendants **RJL** and **LIEDTKE** developed new computer software for use in interpreting BIA test results that incorporated the Z equation and marketed the software under the name "Fluid and Nutrition Analysis," or "FNA." The FNA software purported to calculate the individual test subject's estimated body cell mass, total body water, intracellular and extracellular water, fat free mass, extracellular tissue, and fat. The FNA software also computed purported "normal" ranges for the individual test subject's total body water and intracellular and extracellular water. These "normal" ranges were calculated by Defendants **RJL** and **LIEDTKE** by comparing the individual's BIA test results to a select portion of the population included in the ABC database. This FNA software, pursuant to 21 U.S.C. § 351(f)(1)(B)(i), required FDA approval before it could be legally marketed. No application for premarket approval has been submitted to the FDA with respect to the FNA software, and the device has never been the subject of an approved application for premarket approval under 21 U.S.C. § 360e.

19.    In or about January, 1995, Defendants **RJL** and **LIEDTKE** met with others known and unknown to the United States Attorney regarding possible uses of BIA technology by others known and unknown to the United States Attorney. Thereafter, between September, 1995, and June, 1996, Defendant **RJL** shipped

8

approximately 25 BIA devices together with FNA Version 3.1 software packages to others known and unknown to the United States Attorney for use in evaluating body composition in AIDS patients.

### COUNT ONE

(CONSPIRACY)

#### The Conspiracy

20.    Commencing as early as September, 1996, and continuing thereafter until about January, 2002, the exact dates being unknown to the United States Attorney, within the State and District of Massachusetts and elsewhere, the Defendants

### RJL and LIEDTKE

and others known and unknown to the United States Attorney, knowingly and willfully combined, conspired, and agreed, to commit an offense against the United States, that is, to introduce or deliver for introduction, or to cause to be introduced or delivered for introduction into interstate commerce, and did in fact introduce and cause to be introduced and delivered for introduction into interstate commerce, with intent to defraud and to mislead, adulterated medical devices consisting of BIA computer software known as FNA, "Y software," and Cyprus for use in calculating body cell mass and/or diagnosing AIDS wasting based upon BIA resistance and reactance measurements, which were adulterated within the meaning of Title 21, United States Code, Section 351(f)(1)(B)(i), in that neither RJL, LIEDTKE, nor others known and unknown to the United States Attorney, had obtained premarket approval from the FDA to introduce such medical devices into interstate commerce.

all in violation of 18 U.S.C. § 371, 21 U.S.C. §§ 331(a) and 333(a)(2).

### Purpose of the Conspiracy

21.    It was the purpose of this conspiracy that **RJL** and **LIEDTKE** and others known

and unknown to the United States Attorney introduce or deliver for introduction or

cause to be introduced or delivered for introduction into interstate commerce

adulterated devices to increase the market for BIA devices and computer software

and to increase the market for the drug. To that end, **RJL** and **LIEDTKE** and

others known and unknown to the United States Attorney participated in the

development and dissemination of BIA computer software that purported to

measure body cell mass for use in diagnosing AIDS wasting based upon a test

subject's purported loss of body cell mass. The disease state of AIDS wasting, for

which the drug was tested and approved by FDA, consisted of profound involuntary

weight loss and loss of lean body mass in AIDS patients, and did not include loss of

body cell mass. Use of BIA computer software that purported to measure loss of

body cell mass enabled **RJL**, **LIEDTKE** and others known and unknown to the

United States Attorney to expand the market for the BIA devices and computer

software devices and to expand the market for the drug beyond the disease state for

which the drug was tested and approved.

### Manner and Means by which the Conspiracy Operated

22.    It was part of the conspiracy to disseminate BIA devices and FNA software to

others known and unknown to the United States Attorney in order to promote the

diagnosis of AIDS wasting as a disease state involving the loss of body cell mass

10

and to thereby promote the prescribing and sale of the drug.  The FNA software was

not submitted to the FDA for premarket approval and was not approved by the FDA

for shipment in interstate commerce for the intended use of measuring body cell

mass or diagnosing AIDS wasting.  The inclusion of the Z equation and the ABC

database in the FNA software, and the use of the computer software to measure

body cell mass and as a tool for diagnosing AIDS wasting, as alleged herein, were

new intended uses that required premarket approval from FDA before their

introduction or delivery for introduction into interstate commerce.

23.     It was part of the conspiracy to develop and disseminate the "Y software" to others

known and unknown to the United States Attorney in order to promote the diagnosis

of AIDS wasting as a disease state involving the loss of body cell mass and to

compute purported "ideal" levels of body cell mass and other body composition

parameters for individual BIA test subjects in order to promote the prescribing and

sale of the drug.  The "Y software" was not submitted to FDA for premarket

approval and was not approved by FDA for shipment in interstate commerce for the

intended use of measuring body cell mass or diagnosing AIDS wasting.  The

inclusion of the Z equation, employing the NHANES database as the population

base for computing "ideal" body composition values in the "Y software," and the

use of the computer software to measure body cell mass and as a tool for diagnosing

AIDS wasting, as alleged herein, were new intended uses, and required premarket

approval from FDA before introduction or delivery for introduction into interstate

commerce.

24.     It was part of the conspiracy to develop and disseminate the Cyprus software to others known and unknown to the United States Attorney in order to promote the diagnosis of AIDS wasting as a disease state involving the loss of body cell mass and to compute purported "normal" levels of body cell mass and other body composition parameters in order to promote the prescribing and sale of the drug. The Cyprus software was not submitted to FDA for premarket approval and was not approved by FDA for shipment in interstate commerce for the intended use of measuring body cell mass or diagnosing AIDS wasting. The inclusion of the Z equation, employing the NHANES database as the population base for computing purported "normal" body composition values in the software, and the use of the computer software to measure body cell mass and as a tool for diagnosing AIDS wasting, as alleged herein, were new intended uses, and required premarket approval from FDA before introduction or delivery for introduction into interstate commerce.

### Overt Acts

In furtherance of this conspiracy, the Defendants **RJL** and **LIEDTKE** and others known and unknown to the United States engaged in the following overt acts:

25.     In or about September, 1996, **RJL** and **LIEDTKE** met with others known and unknown to the United States Attorney in Clinton Township, Michigan, regarding possible uses of the BIA and FNA software devices by others known and unknown to the United States Attorney in marketing the drug.

26.     In or about October, 1996, Defendant **LIEDTKE** traveled together with employees

of Defendant **RJL** from Michigan to Massachusetts to meet with others known and unknown to the United States Attorney regarding the sale and delivery of BIA and FNA software devices.

27. In or about December, 1996, Defendants **RJL** and **LIEDTKE** manufactured and shipped from Michigan to Massachusetts to others known and unknown to the United States Attorney approximately 50 BIA devices accompanied by approximately 50 FNA software devices that included the Z equation. Defendants **RJL** and **LIEDTKE** affixed plates to the outside of the BIA devices bearing the name of others known and unknown to the United States Attorney, pursuant to their direction and specifications.

28. Commencing in or about February, 1997, others known and unknown to the United States Attorney provided the BIA devices and FNA software received from Defendants **RJL** and **LIEDTKE** to others known and unknown to the United States Attorney for use in measuring body cell mass, diagnosing AIDS wasting in humans who were potential candidates for receiving the drug, and promoting sales of the drug.

29. Commencing in or about March, 1997, employees of Defendant **RJL** traveled from Michigan to Massachusetts and elsewhere to train others known and unknown to the United States Attorney in performing BIA tests on humans.

30. Commencing in or about June, 1997, employees of Defendant **RJL** forwarded to others known and unknown to the United States Attorney training materials for use in training others known and unknown to the United States Attorney in performing

BIA tests on humans. These training materials included a training video for use in training others known and unknown to the United States Attorney in performing BIA tests on humans.

31. Commencing in or about June, 1999, employees of Defendant **RJL** forwarded to others known and unknown to the United States Attorney a "Body Composition Analysis Worksheet" for use in interpreting BIA tests and obtaining reimbursement for the drug.

32. In or about August, 1997, Defendants **RJL** and **LIEDTKE** and others known and unknown to the United States Attorney executed a written agreement governing the sale by Defendants **RJL** and **LIEDTKE** of BIA and computer software devices to others known and unknown to the United States Attorney. Pursuant to this agreement, Defendants **RJL** and **LIEDTKE**, and others known and unknown to the United States Attorney agreed, among other things, that **RJL** would provide "a specialized, private labelled model for [others known and unknown to the United States Attorney]" that included, among other things, "R.J.L.'s Fluid & Nutrition Analysis Clinical Software Program for medical reimbursement," and further agreed to cooperate "for the development of new software and/or hardware for the diagnosis and monitoring of AIDS Associated Wasting and monitoring treatment with [the drug]."

33. Commencing in or about August, 1999, Defendants **RJL** and **LIEDTKE** and others known and unknown to the United States Attorney collaborated in the creation of a BIA computer software package referred to herein as "Y software," which included

14

the Z equation for estimating body cell mass; calculated purported measurements of body cell mass, fat, extracellular mass, fat free mass, intracellular and extracellular water, and total body water calculations; and computed the individual test subject's measurements purported "ideal" amounts for each of these values. The Defendants **RJL** and **LIEDTKE** knew and understood that the "Y software" computed these "ideal" values by comparing the individual subject's BIA test results to a select portion of a database of humans derived from the National Health and Nutrition Examination Survey (NHANES), and that the "Y software" provided these "ideal" values as precise numerical amounts, rather than as ranges for these values. The Defendants **RJL** and **LIEDTKE**, in crafting the "Y software," had eliminated any standard deviation from the software pursuant to express directions from others known and unknown to the United States Attorney for the purpose of identifying purported candidates for receiving the drug, and promoting sales of the drug.

34.    Commencing in or about August, 1999, **RJL** transmitted various versions of the "Y software" to others known and unknown to the United States Attorney. Others known and unknown to the United States Attorney created copies of the computer software and affixed labels to this software identifying it as "Y software," and bearing the name of others known and unknown to the United States Attorney.

35.    Commencing in or about September, 1999, others known and unknown to the United States Attorney disseminated the "Y software" to others known and unknown to the United States Attorney for use in measuring body cell mass and diagnosing AIDS wasting in humans who were potential candidates for receiving

the drug, and promoting sales of the drug.

36.   Commencing in or about September, 1999, others known and unknown to the United States Attorney prepared and disseminated training materials regarding the "Y software," provided training to others known and unknown to the United States Attorney in the use of the software, and established a "Hotline" that others known and unknown to the United States Attorney could telephone to obtain guidance in using the "Y software."

37.   Commencing in or about September, 1999, Defendant **RJL**, at the direction of others known and unknown to the United States Attorney, prepared and posted a website which provided information and training regarding the use of the "Y software."

38.   Commencing in or about February, 2000, Defendants **RJL** and **LIEDTKE** and others known and unknown to the United States Attorney evaluated the possible use of versions of **RJL** computer software known as Cyprus. Pursuant to directions from others known and unknown to the United States Attorney, Defendants **RJL** and **LIEDTKE** created for the use of others known and unknown to the United States Attorney a version of the Cyprus software known as Cyprus 1.2 Condensed. This computer software package included the Z equation and purported to calculate body cell mass, fat, extracellular mass, fat free mass, total body water, intracellular water, and extracellular water. The Cyprus 1.2 Condensed software also computed purported precise "normal" amounts and "normal" ranges for these values for each individual by comparing the individual test subject's results to a select portion of a

16

database of humans derived from the National Health and Nutrition Examination Survey (NHANES), and included a standard deviation for these calculations.

39.     In or about September, 2000, others known and unknown to the United States Attorney determined to withdraw the "Y software" from use by others known and unknown to the United States Attorney. In place of the "Y software," others known and unknown to the United States Attorney disseminated the Cyprus 1.2 Condensed software for use in measuring body cell mass and diagnosing AIDS wasting in humans who were potential candidates for receiving the drug, and promoting sales of the drug.

40.     Commencing in or about September, 2000, and continuing until at least January 2002, the exact dates being unknown to the United States Attorney, others known and unknown to the United States Attorney disseminated the Cyprus software to others known and unknown to the United States Attorney for use in measuring body cell mass and diagnosing AIDS wasting in humans who were potential candidates for receiving the drug, and promoting sales of the drug.

All in violation of Title 18, United States Code, Section 371, Title 21, United States Code, Sections 331(a) and 333(a)(2).

MICHAEL J. SULLIVAN
United States Attorney

By:     _Mary Elizabeth Carmody_
MARY ELIZABETH CARMODY
Assistant U.S. Attorney

17

**05 CR 10088 EFH**

JS 45 (5/97) - (Revised USAO MA 6/29/...)

Criminal Case Cover Sheet                    U.S. District Court - District of Massachusetts

**Place of Offense:** Massachusetts     **Category No.** II          **Investigating Agency** FDA, HHS

**City** Norwell                        **Related Case Information:**

**County** Plymouth                     Superseding Ind./ Inf. _____ Case No. _____
                                        Same Defendant _____ New Defendant _____
                                        Magistrate Judge Case Number _____
                                        Search Warrant Case Number _____
                                        R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name  Rudolph J. Liedtke _____     Juvenile   ☐ Yes   ☒ No

Alias Name _____

Address    1004 Yorkshire Road, Grosse Point, Michigan 48230-1432 _____

Birth date (Year only): 1942  SSN (last 4 #): 1189  Sex M  Race: White       Nationality: U.S.A.

**Defense Counsel if known:**   Robert M. Kalec, Esq.      **Address:** 801 West Big Beaver Road, 5th Floor
                                                                       Troy, Michigan 48084

**Bar Number:** _____

**U.S. Attorney Information:**

**AUSA**  Mary Elizabeth Carmody _____     **Bar Number if applicable** 074500

**Interpreter:**      ☐ Yes  ☒ No       **List language and/or dialect:** _____

**Matter to be SEALED:**  ☐ Yes  ☒ No

          ☐ Warrant Requested           ☒ Regular Process          ☐ In Custody

**Location Status:**

**Arrest Date:** _____

☐ Already in Federal Custody as _____ in _____ .
☐ Already in State Custody _____  ☐ Serving Sentence  ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by _____  on _____

**Charging Document:**   ☐ Complaint      ☒ Information      ☐ Indictment

**Total # of Counts:**   ☐ Petty _____  ☐ Misdemeanor _____  ☒ Felony  1

Continue on Page 2 for Entry of U.S.C. Citations

☐       I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
        accurately set forth above.

Date:  3/30/05              Signature of AUSA:  _Mary Elizabeth Carmody_

&JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number  (To be filled in by deputy clerk):** _____

**Name of Defendant**    Rudolph J. Liedtke _____

## U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1  18 U.S.C. § 371 | Conspiracy to commit an offense against U.S. | One |
| Set 2 | | |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:**

℀JS 45 (5/97) - (Revised USAO MA 6/29/04)

**Criminal Case Cover Sheet**                                    **U.S. District Court - District of Massachusetts**

**Place of Offense:** Massachusetts     **Category No.** II          **Investigating Agency** FDA, HHS

**City** Norwell                        **Related Case Information:**

**County** Plymouth                     Superseding Ind./ Inf. _____     Case No. _____
                                        Same Defendant _____ New Defendant _____
                                        Magistrate Judge Case Number _____
                                        Search Warrant Case Number _____
                                        R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name   RJL SCIENCES, INC.,                   Juvenile   ☐ Yes   ☐ No

Alias Name   RJL SYSTEMS, INC.,

Address   339 55 Harber Avenue, Clinton Township, Michigan 48035-4218

Birth date (Year only): _____ SSN (last 4 #): _____ Sex ____ Race: _____ Nationality: _____

Defense Counsel if known:   Robert M. Kalec, Esq.        Address:  801 West Big Beaver Road, 5th Floor
                                                                   Troy, Michigan 48084

**Bar Number:** _____

**U.S. Attorney Information:**

AUSA   Mary Elizabeth Carmody                    Bar Number if applicable   074500

Interpreter:   ☐ Yes  ☒ No       List language and/or dialect: _____

Matter to be SEALED:   ☐ Yes  ☒ No

         ☐ Warrant Requested       ☒ Regular Process       ☐ In Custody

**Location Status:**

**Arrest Date:** _____

☐ Already in Federal Custody as _____ in _____ .
☐ Already in State Custody _____ ☐ Serving Sentence ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by _____ on _____

**Charging Document:**   ☐ Complaint   ☒ Information   ☐ Indictment

**Total # of Counts:**   ☐ Petty   ☐ Misdemeanor   ☒ Felony   1

**Continue on Page 2 for Entry of U.S.C. Citations**

☐   I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
     accurately set forth above.

Date:  3-30-05        Signature of AUSA:  _Mary Elizabeth Carmody_

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number**  (To be filled in by deputy clerk): _____

**Name of Defendant**      RJL Sciences, Inc., d/b/a RJL Systems, Inc.,   _____

## U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1   18 U.S.C. §371 | Conspiracy to commit an offense against U.S. | One |
| Set 2 | | |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:**