# EXHIBIT H

Plea Hearing Transcript.txt

                                                                        1

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3                         No. 05-cr-10088-EFH-1

4

5
      UNITED STATES OF AMERICA
6

7      vs.

8
      RUDOLPH J. LIEDTKE and RJL SCIENCES, INC.
9

10

11                          *********

12

13                      For Plea Hearing Before:
                      Honorable Edward F. Harrington
14

15
                       United States District Court
16                      District of Massachusetts (Boston.)
                        One Courthouse Way
17                     Boston, Massachusetts 02210
                       Tuesday, April 19, 2005
18

19                          ********

20

21
                    REPORTER: RICHARD H. ROMANOW, RPR
22                       Official Court Reporter
                      United States District Court
23         One Courthouse Way, Room 3507, Boston, MA 02210
                         (617) 737-0370
24

25


□                                                                       2

1                      A P P E A R A N C E S

2

      MARY ELIZABETH CARMODY, ESQ.
3        United States Attorney's Office
         John Joseph Moakley Federal Courthouse
4        One Courthouse Way, Suite 9200
                            Page 1

Plea Hearing Transcript.txt

```
      Boston, MA 02110
 5    (617) 748-3290
      Email: Mary.carmody@usdoj.gov
 6  and
    SONDRA L. MILLS, ESQ.
 7    Trial Attorney
      United States Department of Justice
 8    Office of Consumer Litigation
      P.O. Box 386
 9    Washington, D.C. 20044
      (202) 616-2375
10    For the United States of America

11

    SCOTT P. LOPEZ, ESQ.
12    Law Office of Scott P. Lopez
      24 School Street
13    Boston, MA 02108
      (617) 742-5700
14    Email: Lopez@lopezlaw.com
      For the Defendant
15  and
    ROBERT M. KALEC, ESQ.
16    Dean & Fulerson
      801 West Big Beaver Road, 5th Floor
17    Troy, MI 48084
      (248) 362-1300
18    For the Defendant, Pro Hac Vice
```

```
19

20

21

22

23

24

25
```

3

```
 1           P R O C E E D I N G S

 2           (Begins 2:00 p.m.)

 3           THE CLERK:  Criminal Action 05-10088, United States

 4  versus R. J. Liedtke, et al.

 5           THE COURT:  I'm sorry to be late.  I had a

 6  meeting.  But I'll hear from the Government.

 7           MS. CARMODY:  Good afternoon, your Honor.  My name

 8  is Mary Elizabeth Carmody, Assistant United States Attorney.

 9  And with me today is Sondra Mills, a trial attorney from the
```
                              Page 2

Plea Hearing Transcript.txt

10    Department of Justice.  We're here today for an arraignment and
11    an entry of a plea of guilty by the defendant, both the
12    corporation and the individual, to the information.  The
13    defendant has agreed to waive indictment, your Honor.  I have
14    simply forgotten to bring the form with us.  So that Counsel
15    has agreed that we will sign it and file it as soon the hearing
16    is concluded.  Other than that, your Honor, we're ready to go
17    forward on a Rule 11 hearing as well as an agreement.
18            THE COURT:  My understanding is that a Crawford
19    defendant is involved?
20            MS. CARMODY:  Yes, your Honor.
21            THE COURT:  And who is going to plea on behalf of
22    the Crawford defendant?
23            MR. LOPEZ:  Your Honor, good afternoon.  Scott
24    Lopez on behalf of Rudolph Liedtke, RJL Sciences, Inc.  I've
25    filed a notice of appearance in this matter and I've also filed

                                                                    4

1     a motion to admit Attorney Robert Kalec pro hac vice.  At this
2     time I would move to -- I would move this court to allow him to
3     appear pro hac vice.
4            THE COURT:  Okay.
5            MR. LOPEZ:  And with that I'll turn the microphone
6     over to Mr. Kalec, so to speak.
7            MR. KALEC:  Good afternoon, your Honor.
8     Mr. Liedtke appears today on his personal behalf and also as
9     President and principal owner of RJL Sciences and he will
10    represent the corporation, in its corporate capacity, today for
11    the plea.
12            THE COURT:  And how big a corporation is it?
13            MR. KALEC:  Including himself, it has six
14    employees, your Honor.
                            Page 3

Plea Hearing Transcript.txt

15          THE COURT:  And does anyone else own the

16   corporation?

17          MR. KALEC:  There are four other minority owners,

18   your Honor.

19          THE COURT:  And has the -- does it have a board of

20   directors?

21          MR. KALEC:  It does, your Honor.  And we had

22   submitted to the prosecution a corporate resolution authorizing

23   Mr. Liedtke to appear on behalf of the corporation and to enter

24   into the Rule 11 agreement.

25          MS. CARMODY:  And we filed a corporate resolution

                                                            5

1    today, your Honor.

2           THE COURT:  All right.  Prior to accepting any plea

3    of an individual nature or on behalf of the corporation, I wish

4    to ask the individual defendant certain questions.  You are

5    going to answer these questions both on your own behalf and on

6    behalf of the corporation.

7           THE DEFENDANT:  Yes, your Honor.

8           THE COURT:  I want to advise you as to certain

9    constitutional rights.  You have a constitutional right to a

10   speedy, public trial by jury.  Do you understand that?

11          THE DEFENDANT:  Yes.

12          THE COURT:  You have a constitutional right to see

13   and hear the evidence against you and to cross-examine

14   witnesses against you.  Do you understand that?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  You have a constitutional right to the

17   processes of this court to compel the attendance of witnesses

18   in your own behalf.  Do you understand that?

19          THE DEFENDANT:  Yes, your Honor.

Page 4

Plea Hearing Transcript.txt

20          THE COURT:  You have a constitutional right to the

21    assistance of counsel, which right you have exercised, and you

22    have a constitutional right to remain silent and not be

23    compelled to incriminate yourself or the corporation.  Do you

24    understand that?

25          THE DEFENDANT:  Yes.


                                                                6

1           THE COURT:  That in pleading guilty, you are giving

2     up all of those constitutional rights with the exception of the

3     right to counsel.  Do you understand that?

4           THE DEFENDANT:  Yes, your Honor.

5           THE COURT:  I wish, also, to advise you that you

6     are not required to establish your innocence, the innocence of

7     the corporation, um, but it's the duty of the Government to

8     prove their case beyond a reasonable doubt.  Do you understand

9     that?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  When you're pleading guilty, you are

12    giving up the so-called presumption of innocence.  Do you

13    understand that?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  Have you advised your attorney of all

16    the circumstances surrounding the charge pending against you

17    and the corporation?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  Has he advised you as to the nature of

20    those charges and any possible defense you or the corporation

21    might have?

22          THE DEFENDANT:  Yes, your Honor.

23          THE COURT:  What is the penalty provided by statute

24    for the offenses to which the individual defendant, the

                              Page 5

Plea Hearing Transcript.txt

25 corporate defendant is pleading guilty to?

&#9633; 7

1   MS. CARMODY:  Your Honor, on the charge of
2 conspiracy, the defendant is subject to a term of imprisonment
3 for five years, a fine of $250,000, a term of supervised
4 release of three years, and a mandatory special assessment of
5 100 dollars.  With respect to the corporation, your Honor, the
6 corporation is subject to a fine of $500,000, or twice the
7 gross gain or loss involved in the event, whichever is greater,
8 or both, and a special assessment of 400 dollars.
9   THE COURT:  You understand that that's the
10 statutory penalty provided for the offenses for which you and
11 the corporation are pleading guilty?
12   THE DEFENDANT:  Yes, your Honor.
13   THE COURT:  Has anyone threatened you to change
14 your plea to guilty?
15   THE DEFENDANT:  No, your Honor.
16   THE COURT:  Was there any plea bargain involved in
17 this case?
18   MS. CARMODY:  Yes, your Honor.
19   THE COURT:  And would you advise the Court what
20 that plea bargain consists of?
21   MS. CARMODY:  Yes, your Honor.  We have filed
22 earlier today with the Court a plea agreement for both the
23 individual, Rudolph J. Liedtke, as well as the corporation.
24 With respect to Mr. Liedtke, your Honor, there is a sentencing
25 guidelines calculation that would indicate that his guideline

&#9633; 8

1 range would be between 30 and 37 months.  Um, that the
2 Government's plea agreement calls for a base offense level of

Page 6

Plea Hearing Transcript.txt

 3    6, an enhancement of 16, for the amount of the fraud involved

 4    with respect to this case, your Honor.  Um, we have valued the

 5    loss at somewhere between, at least, approximately, I would

 6    say, your Honor, 2 million dollars, 2.63 million dollars.  With

 7    respect to the Government's recommendation, your Honor, we

 8    intend, based on the defendant's cooperation, to file a 5K-1

 9    motion.  Failing that, your Honor, the Government would

10    recommend a term of imprisonment at the low end of the

11    guidelines.  But we fully expect -- the defendant has agreed to

12    cooperate and that we will be filing that motion at the

13    appropriate time with respect to the individual.

14            THE COURT:  How about with respect to the

15    corporation, what is the recommendation, according to the plea

16    agreement, that you will make with respect to the corporate

17    entity?

18            MS. CARMODY:  With respect to the corporate entity,

19    your Honor, we have made a determination preliminarily based on

20    the corporate defendant's asserted inability to pay any fine,

21    and that they have provided documents that support that

22    assertion, that the recommendation under the plea agreement

23    would be that the corporation pay a fine in the amount of

24    $5,000.  Um, should the corporation be found to have the

25    ability to pay -- we haven't even determined the guidelines

                                                                       9

 1    based on the inability to pay.  But should that not be found to

 2    be the case down the end of the road, we will recommend a

 3    sentence at the low end of the guideline range.

 4            THE COURT:  A fine at the low end?

 5            MS. CARMODY:  A fine, yes.

 6            THE COURT:  Has this plea agreement been reduced to

 7    writing?

Plea Hearing Transcript.txt

8          MS. CARMODY:  It has, your Honor.  We have filed

9     both a copy of the individual and the corporate agreement with

10    the Court.

11          THE COURT:  I see.  And just so the record is

12    clear, did you sign that plea agreement with the full

13    understanding of its contents?

14          THE DEFENDANT:  Yes.

15          THE COURT:  And did you sign it after consulting

16    with your attorney?

17          THE DEFENDANT:  Yes.

18          THE COURT:  A reference has been made to a

19    sentencing commission guideline factor.  Um, as we know, as a

20    result of the Booker case, the guidelines, at this time, are

21    advisory, but they are a factor which the sentencing court will

22    take into consideration.  Do you understand that?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  Have you had an opportunity to discuss

25    with your attorney how the advisory sentencing commission

                                                                    10

1     guidelines might apply to your case?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  And has he advised you that the exact

4     guideline range applicable to your case cannot be specifically

5     decided until after a presentence report has been concluded?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  And you understand that the Court, um,

8     even though the guidelines are advisory, um, will take them in

9     consideration and either enhance the guideline sentence or

10    depart downward from that guideline range?

11          THE DEFENDANT:  I understand that.

12          THE COURT:  All right.  Is the plea that you're

                          Page 8

Plea Hearing Transcript.txt

13    offering here today, on behalf of yourself and on behalf of the
14    corporate entity, entirely free and voluntary?
15              THE DEFENDANT:  Yes, your Honor.
16              THE COURT:  Take the plea.
17              THE CLERK:  Rudolph J. Liedtke and RJL Sciences,
18    Inc., doing business as RJL Systems, Inc., as to Count 1 of an
19    information charging you with conspiracy to commit an offense
20    against the United States in violation of Title 18 USC Code
21    Section 371, how do you plead, guilty or not guilty?
22              THE DEFENDANT:  Guilty.
23              THE COURT:  I think the record, even at this stage,
24    should show that you understand that you have the
25    constitutional right to be charged by way of indictment, but

                                                                11

1     knowing that, you willingly waive to be prosecuted by way of
2     indictment.  Is that correct?
3               MR. KALEC:  By way of information.
4               THE COURT:  By way of information.  Are you willing
5     to be tried or to plea to an information, notwithstanding the
6     fact that you have a constitutional right to be prosecuted by
7     way of indictment, but you are pleading here to an
8     information.  You do that knowingly and willingly, realizing
9     that you have such a constitutional right?
10              THE DEFENDANT:  Yes, your Honor.
11              THE COURT:  I would ask the Government to briefly
12    set forth the evidence which it would have introduced were the
13    case to have gone to trial.  You may sit down.
14              MS. CARMODY:  Your Honor, I would like to say that
15    this is a medical device case and it's quite a complex case.
16    The parties have filed an agreed statement of facts with the
17    Court which sets forth the facts in great detail.  So without

Plea Hearing Transcript.txt

18    going into all of the details in the agreed statement of facts,

19    should the case have gone to trial, the Government would have

20    proved that the defendant, RJL Sciences, doing business as RJL

21    Systems -- and I'll refer to them as "RJL," is located in

22    Clinton Township, Michigan.  That RJL manufactured and sold

23    medical devices, including a Bioelectrical Impedance Analysis

24    known as a BIA device, and computer software for use in

25    connection with a BIA device.

                                                                    12

1     Commencing in 1996, RJL manufactured and sold the BIA

2     device and computer software together with and pursuant to

3     others who are not specifically named in the information, but

4     for whom the Court -- we have filed with the Court an in-camera

5     submission that will identify, for the Court's purposes, who

6     those entities are.  Mr. Liedtke was the President and

7     principal owner of RJL and Mr. Liedtke directed, participated

8     and controlled and manufactured the sale of the BIA devices as

9     well as the software devices.

10    The BIA device, manufactured by the defendant, is a

11    portable device.  It has two protruding electrodes.  And in

12    order to perform the BIA test, the electrodes are placed on the

13    hands and feet of a human test subject and there's a very low

14    level electrical current that's run through the body.  This

15    measures -- it encounters impedance and it measures the

16    reactance and resistance of the current as it flows through the

17    body.  These measurements, um, generated by the BIA device,

18    were used to estimate the body's composition of humans.

19    Estimates of body compositions were computed by applying these

20    measurements generated by the BIA device to predictive

21    equations.

22    In other words, your Honor, the test is performed on a

                                Page 10

Plea Hearing Transcript.txt

23   human and the device itself gives two measurements, reactance

24   and resistance and the individual performing the test then

25   takes those two numbers and transforms them, takes them and

                                                                    13

1    inputs them into a computer with computer software.

2    Incorporated in the computer software is a predictive equation

3    that then gives different values as a result of that test

4    measurement.  And those measurements are measures of human body

5    composition, lean body mass, fat free mass, and in some

6    instances with respect to this case body, cell mass and other

7    measurements.

8         These predictive equations, which actually give the

9    ultimate measurements, were developed mathematically,

10   calculating the statistical relationship between the resistance

11   and reactance measurement obtained by the BIA test on a sample

12   population of human subjects, actual measurements of body

13   composition for that population.  Prediction equations are used

14   to estimate the body composition of humans and it varies

15   depending on the characteristics and size of the sample

16   population used to develop the equation as well as on the

17   methodology used to measure the body composition within that

18   population.

19        The defendant participated in the development and

20   distribution of various BIA software devices and computer

21   software.  In other words, the device stayed essentially the

22   same, your Honor, but it's the computer software packages that

23   took the measurements and used them to -- with a predictive

24   equation to give other values.  Um, those changed over time.

25   And those computer software were known as -- one is known as

                                                                    14

1    "Body Comp," one is known as "Weight Manager," another is known

                              Page 11

Plea Hearing Transcript.txt

2      as "Fluid and Nutrition," another is known as "Cyprus," and

3      another computer software we'll refer to as the "Y Software,"

4      and they were all used to estimate body composition in humans.

5      The BIA, as well as the computer software devices, were each

6      medical devices within the meaning of the Federal Food, Drug

7      and Cosmetic Act, 21 USC Section 321(H).

8              In order to sell these devices, the defendants could not

9      sell them legally without first obtaining premarket clearance

10     and/or premarket approval from the U.S. Food & Drug

11     Administration.  And it depended -- that approval, whether or

12     not it was a clearance or an approval, depended upon the

13     intended use for which the device was to be put.  The FDA could

14     grant what was called a 510(K) premarket clearance if it

15     determined, following a review of the information submitted, it

16     supported the premarket notification that the device was

17     substantially equivalent to a device that was in existence and

18     marketed in interstate commerce prior to May 26th, 1976.  That

19     device would be known as a "predicate device."  In other words,

20     if the device preexisted the passage of this section of the

21     Food, Drug and Cosmetic Act, then the FDA could clear it.  But

22     that only happened if, among other things, the intended use of

23     the current device was the same intended use as the predicate

24     device.  So if the intended use of the device was different

25     from the predicate device, a substantial equivalent, which is

☐                                                                      15

1      what the FDA would have to find, it could not be cleared,

2      because it would be a different use.

3              Um, premarket approval and review by the FDA generally

4      entailed, among other things, a review of clinical trials and

5      scientific data offered to confirm the safety and the efficacy

6      of the device as well as a review of the device's labeling, and

Page 12

Plea Hearing Transcript.txt

7       it also has to include adequate directions for use.  In 1983,

8       the defendants, RJL and Liedtke, filed a 510(K) premarket

9       notification with the FDA's Center for Devices and Radiological

10      Health, seeking premarket clearance for a Body Composition

11      Analyzer, a type of BIA device that was manufactured and sold

12      by RJL.  In that 510(K) submission, the defendant stated that

13      the intended use of the BIA device was to estimate total body

14      water, lean body mass, also known as fat free mass, and fat in

15      healthy humans.  RJL's BIA device was accompanied by a hand-

16      held programmable calculator and computer to facilitate the

17      computation of the estimated total body water, lean body mass,

18      and fat.  After a review of the data submitted in support of

19      that 510(K) submission, the FDA found that the Body Comp

20      Analyzer was substantially equivalent to a device that had been

21      marketed prior to the FDCA Medical Device Amendments of 1976,

22      and they granted premarket clearance to RJL to distribute the

23      device on August 11th, 1983 for the intended use of estimating

24      total body water, lean body mass, and fat in healthy humans,

25      and that was the limitation.

                                                                    16

1           During a subsequent inspection of RJL, by the FDA, in

2       1984, the FDA discovered that RJL had been marketing a modified

3       version of the BIA device as well as a computer software device

4       that had not been previously reviewed by the FDA as part of a

5       510(K) submission.  The FDA issued a Notice of Adverse Findings

6       to the defendant, RJL and Liedtke, in January of 1986,

7       informing them that the 1984 inspection revealed that they had

8       been marketing misbranded devices, specifically the modified

9       BIA device and the accompanying computer software device in

10      violation of the FDCA.  In response to the Notice of Adverse

11      Findings, the defendant submitted another 510(K) premarket
                                Page 13

Plea Hearing Transcript.txt

12    notification for the modified BIA device as well as for the new

13    computer -- the computer software device, accompanying the BIA

14    device on June 24th, 1986.

15          RJL and Liedtke told the FDA that the computer software

16    only performed calculations that previously would have been

17    done by hand to estimate body composition and that the Body

18    Comp Analyzer and its accompanying computer software had the

19    same intended uses as that previously submitted BIA device for

20    estimating total body water, lean body mass, and fat.  The

21    defendants told the CDRH that the intended uses of the BIA

22    device, accompanying this computer software, did not include

23    measuring body cell mass or diagnosing any disease state.  The

24    defendants also described the methods used to develop the

25    prediction equations in the computer software and told CDRH

                                                                  17

1     that the equations were based on a population consisting of 278

2     healthy and obese college students whose body composition was

3     measured through hydrostatic weighing and that total body water

4     measurements of the college students were determined using

5     deuterium oxide dilution, in other words, underwater weighing,

6     your Honor.

7           Based on the representations made by the defendants, RJL

8     and Liedtke, in their 510(K) submission and related

9     communications, the CDRH concluded that the modified Body Comp

10    Analyzer and accompanying computer software were substantially

11    equivalent to a device marketed prior to the Medical Device

12    Amendments of 1976 and they granted premarked clearance to RJL

13    to distribute the Body Comp Analyzer and the accompanying

14    computer software devices on February 3rd, 1987 for the

15    intended uses of estimating total body water, lean body mass,

16    and fat in healthy humans.  At that time, the computer software
                              Page 14

Plea Hearing Transcript.txt

17   device was called "Body Comp."  Later versions of the RJL

18   software, with similar intended uses, were called "Weight

19   Manager."

20        Beginning in, at least, 1994, the defendant, RJL and

21   Liedtke, assisted others in developing a prediction equation

22   that would calculate the BIA resistance and reactance

23   measurements into estimated body cell mass.  This equation,

24   which we'll refer to as the Z equation, estimated body cell

25   mass based on measurements of total body potassium in a

                                                              18

1    population that we're going to refer to as the ABC database.

2    That database consisted of approximately 332 humans, including

3    individuals who were healthy, and others who had tested HIV

4    positive.  Beginning, again, in sometime during 1994, the

5    defendants, RJL and Liedtke, developed new computer software

6    for use in interpreting BIA test results that incorporated the

7    Z equation and marketed the software under the name "Fluid and

8    Nutrition Analysis" or FNA.  The FNA software purported to

9    calculate the individual test subject's estimated body cell

10   mass, total body water, intracellular and extracellular water,

11   fat free mass, extracellular tissue and fat.  The FNA software

12   also computed purported "normal ranges" for the individual test

13   subject's total body water and intracellular water and

14   extracellular water.  These normal ranges were calculated by

15   the defendant, RJL and Liedtke, by comparing the individual BIA

16   test results to a select portion of the population included in

17   this ABC database.

18        This FNA software, pursuant to 21 USC Section

19   351(F)(1)(B)(I) required FDA approval before it could be

20   legally marketed.  No application for premarket approval has

21   been submitted to the FDA with respect to the FNA software and

                              Page 15

Plea Hearing Transcript.txt

22   the device has never been the subject of an approved

23   application for premarket approval under 21 USC Section

24   350(E).  Others marketed and sold the drug known to the United

25   States Attorney and referred to herein as "the drug," which was

                                                              19

1    approved by the FDA to treat AIDS wasting, a condition

2    involving profound involuntary weight loss in AIDS patients.

3    At the time the FDA approved the drug, AIDS wasting was an

4    AIDS-defining condition.

5           On or about January of 1995, the defendants met with

6    others regarding the possible use of BIA technology by, um,

7    others known and unknown to the U.S. Attorneys.  Thereafter,

8    between September 1995 and June 1996, the defendant, RJL,

9    shipped approximately 25 BIA devices together with the FNA

10   Version 3.1 software packages to others known and unknown for

11   use in evaluating the body composition in AIDS patients.

12   Commencing as early as September 1996 and continuing thereafter

13   until about January 2002, the defendants, and others knowingly

14   -- and others, knowingly and willfully, combined and conspired

15   and agreed to commit an offense against the United States, that

16   is, the parties to this conspiracy agreed to introduce or

17   deliver for introduction or cause to be introduced or delivered

18   for introduction into interstate commerce and did, in fact,

19   introduce and cause to be introduced and delivered for

20   introduction into interstate commerce with the intent to

21   defraud and to mislead, adulterated medical devices, those

22   devices being the computer software packages that accompanied

23   the BIA device.

24          Specifically, these adulterated devices were BIA

25   computer software packages known as "FNA," known as "Y

Plea Hearing Transcript.txt
20

1    Software" and "Cyprus."  They were for use in calculating body
2    cell mass and/or diagnosing AIDS wasting based upon BIA
3    resistance and reactance measurements.  So that was a new
4    intended use, your Honor.  These devices were adulterated
5    within the meaning of Title 21, USC, Section 351(F)(1)(B)(I),
6    and that neither RJL nor Liedtke nor others obtained premarket
7    approval from the FDA to introduce such medical devices into
8    interstate commerce.  And this was all in violation of 18 USC
9    Section 371, Title 21, USC, Section 331(A) and 333(A)(2).
10        It was the purpose of this conspiracy that RJL and
11   Liedtke, with others, introduced or delivered for introduction
12   or caused to be introduced or to be delivered for introduction
13   into interstate commerce adulterated devices in order to
14   increase the market for BIA devices and computer software and
15   to increase the market for the drug.  To that end, RJL and
16   Liedtke and others participated in the development and
17   dissemination of BIA computer software that purported to
18   measure body cell mass for use in diagnosing AIDS wasting based
19   upon a test subject's purported loss of body cell mass.  The
20   disease state of AIDS wasting, which the drug was tested and
21   approved by the FDA, consisted of profound involuntary weight
22   loss and loss of lean body mass in AIDS patients and did not
23   include the loss of body cell mass.  The use of BIA computer
24   software that purported to measure the loss of body cell mass
25   enabled RJL and Liedtke and others to expand the market for BIA

21

1    devices and computer software devices and for others to expand
2    the market for the drug beyond this disease state for which the
3    drug was tested and approved.
4         This conspiracy operated through various manner and

Page 17

Plea Hearing Transcript.txt

5    means.  It was part of the conspiracy to disseminate BIA

6    devices and FNA software to others in order to promote the

7    diagnosis of AIDS wasting as a disease state involving the loss

8    of lean body mass and to thereby promote the prescribing and

9    sale of the drug.  The FNA software was not submitted to the

10   FDA for premarket approval.  It was not approved by the FDA for

11   shipment in interstate commerce for the intended use of

12   measuring body cell mass or diagnosing in AIDS wasting.  The

13   inclusion of the Z equation and the ABC database in the FNA

14   software and the use of the computer software to measure body

15   cell mass as a tool for diagnosing AIDS wasting were new

16   intended uses that required premarket approval from the FDA

17   before their introduction or delivery for introduction into

18   interstate commerce.  It was also part of the conspiracy to

19   develop and disseminate the Y software to others in order to

20   promote the diagnosis of --

21           THE COURT:  So, in essence, what you're saying is

22   that there has been a new intended use and that was not

23   approved?

24           MS. CARMODY:  Exactly, your Honor.  And there were

25   several versions of the software with respect to the BIA.  So

                                                              22

1    it continued through the FNA software, to the Y software, which

2    had a different population base, that employing the NHANES

3    database rather than the population base of the ABC database,

4    and it used "ideal" measurements and not "normal" measurements

5    in that software.  And that was a --

6           THE COURT:  Let me ask you this question.  Is an

7    application for this -- for these new intended uses that have

8    not been approved been sought?

9           MR. CARMODY:  No, your Honor.

                        Page 18

Plea Hearing Transcript.txt

10        THE COURT:  No new application whatsoever?

11        MR. CARMODY:  None, your Honor.

12        So it went through the Y software and then it continued

13   through the Cyprus software, which is the last version of the

14   software, again, using the equation and the NHANES database,

15   which was a new database.

16        Um, in addition, your Honor, the parties to the

17   conspiracy engaged in certain overt acts in furtherance of --

18        THE COURT:  You don't have to give me all the overt

19   acts.

20        MS. CARMODY:  Okay.  Generally, your Honor, there

21   were meetings here in Massachusetts, looking for the

22   Massachusetts connection, in which the company that sold the

23   drug is located here in Massachusetts and the defendants came

24   and met with employees of the company, here in Massachusetts,

25   to discuss and to take action with regard to the dissemination

                                                              23

1   of the adulterated devices.  And that continued through March

2   1997 and up through and including 2002.

3        THE COURT:  All right.  Let me ask counsel for the

4   defendant, you've heard the representations made by the United

5   States as to the acts which constitute the violation of law.

6   Is there anything that you wish to contest or to add?

7        MR. KALEC:  No, your Honor, outside of what was

8   submitted in the stipulated statement attached, which was not

9   read into the record by the Assistant United States Attorney.

10        THE COURT:  The entire statement of facts is part

11   of the record in the case, though, that's been submitted?

12        MS. CARMODY:  Yes, your Honor.  We have an agreed

13   statement of facts.  I have not read the entire statement of

14   facts, but I've read three quarters of it.  And it is filed in

Plea Hearing Transcript.txt

15    the record, your Honor.

16            THE COURT:  I understand that you can't promote or

17    sell medical devices that have not been approved.  That's the

18    core of the violation.  My additional question is, has this

19    device caused any harm, is it harmful, in addition to being not

20    approved?  Do you understand?  I understand that medical

21    devices have to be approved and the failure to have them

22    approved is itself a violation of law.  But sometimes, in

23    addition thereto, the device causes harm.  Is there any -- is

24    that factor here in this case or not?

25            MS. CARMODY:  The way it factors in, your Honor --

                                                              24

1     the test itself is harmless.  The test itself did not, in any

2     way, cause the patient pain or harm.  The harm is the fraud on

3     -- in particular, the Medicaid system.  This particular drug

4     was paid for, 75 to 80 percent, by the state Medicaid program

5     throughout the United States.  It was a very expensive drug.

6     And so patients, by virtue of this test, who got the drug when

7     they otherwise should either not have gotten the drug or would

8     not have qualified to get the drug, that, therein, lies the

9     harm, your Honor.

10            THE COURT:  Do you wish to add anything?

11            MR. KALEC:  No, your Honor.  There was no physical

12    harm to any patient.

13            THE COURT:  But the representation made by the

14    attorney for the Government is that there was, in a sense,

15    additional expenses paid for by the Medicaid system.  Is that

16    right?

17            MR. KALEC:  That is correct, your Honor.

18            THE COURT:  And that's when you say that the loss

19    or the financial harm is in the area of -- I think you

                            Page 20

Plea Hearing Transcript.txt

20     indicated 2 million dollars?

21          MS. CARMODY:  Well, that's an important point, your

22     Honor.  I want to make an important distinction here.  And you

23     can see, in the plea agreement, because we go into considerable

24     detail with respect to what was going on here, um, that the

25     defendant conspired with the company to disseminate the

                                                                  25

1     adulterated devices and that increased the sales of the drug.

2     And in the plea agreement, at Page 3, we talk about the fact

3     that -- and I think it's an important distinction here, that

4     the defendant committed some act with respect to the company,

5     but the company also committed independent acts of fraud that

6     were not reasonably foreseeable to this defendant.  So that in

7     terms of the sale of the devices from August 14th, 1995 through

8     January 15th, 2002, the total price paid by the company for the

9     sale of these devices was a little over a million dollars,

10     $1,031,583.25.  In Paragraph 4 on Page 3, it says, in

11     determining the guideline calculation:  "The Government

12     contends that from 1997 to 2002, the company received more than

13     100 million dollars in sales for this drug."  However, at the

14     end of that paragraph, the Government takes the position that

15     -- and the parties agree that it was reasonably foreseeable

16     that many of the acts of fraud committed by the company and its

17     employees were not known or reasonably foreseeable to this

18     defendant.  So that it was reasonably foreseeable, however,

19     that the sales of the drug would increase as a result of the

20     use of the devices.  It is impossible to calculate, your Honor,

21     exactly where you factor that in.  So that the parties have

22     agreed that the total fraud loss that was reasonably

23     foreseeable would have been at least equal to the amount of the

24     sale of the devices, otherwise the company wouldn't have

                              Page 21

Plea Hearing Transcript.txt

25   invested in a device where it was going to lose money,

                                                                      26

1    basically.  So that's where we come to a figure of

2    approximately 2 million dollars in fraud loss with respect to

3    the adulterated devices.

4              THE COURT:  Anything further?

5              MR. KALEC:  No, your Honor.

6              THE COURT:  All right.  I'd ask the defendant, are

7    you presently under a doctor's care?

8              THE DEFENDANT:  No, your Honor.

9              THE COURT:  Have you taken any medicine, pills or

10   drugs today?

11             THE DEFENDANT:  No, your Honor.

12             THE COURT:  Have you ever been under psychiatric

13   care?

14             THE DEFENDANT:  No, your Honor.

15             THE COURT:  So you understand the nature of these

16   proceedings and that you've pled guilty to the one count

17   information, both on your own behalf and on behalf of the

18   corporation?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  Counsel, do you know any reason why the

21   Court should not accept the pleas of guilty?

22             MR. KALEC:  None, your Honor.

23             THE COURT:  I'm going to ask the defendant.  Have

24   you had sufficient time to discuss this matter with your

25   attorney?

                                                                      27

1              THE DEFENDANT:  Yes, your Honor.

2              THE COURT:  And are you satisfied with his

3    representation of you?

Page 22

Plea Hearing Transcript.txt

4            THE DEFENDANT:  Yes, your Honor.

5            THE COURT:  I find that the pleas have been

6     voluntarily and knowledgeably offered with an understanding of

7     their possible consequences.  I further find that there is an

8     independent basis for accepting the pleas and therefore

9     I accept the pleas of guilty and order that they be entered in

10    this case.

11           Disposition in this case is set for -- what is the

12    date?  September 13th 2005 at 2:00.  Any need for bail?

13           MR. KALEC:  Your Honor, we met with Pretrial

14    Services this morning.  I have reviewed his report.  The

15    recommendation is personal recognizance with a condition that

16    Mr. Liedtke not apply for a passport and travel be limited to

17    the United States.  We'd ask the Court to accept the

18    recommendation from Pretrial.

19           MS. CARMODY:  No objection, your Honor.

20           THE COURT:  All right.  So ordered.  All right.

21    I'll see you on the 13th of September.

22           (Adjourned, 2:45 p.m.)

23

24

25

☐                                                          28

1                   C E R T I F I C A T E

2

3

4

5

6

7     I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do
      hereby certify that the foregoing record is a true and
8     accurate transcription of my stenographic notes on
                          Page 23

Plea Hearing Transcript.txt

9  Tuesday, April 19, 2005 before Honorable Edward F.
   Harrington, to the best of my skill and ability.

10

11

12

13

14

15  _____

16  RICHARD H. ROMANOW

17

18

19

20

21

22

23

24

25