# EXHIBIT J

<pre>
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2
      * * * * * * * * * * * * * *
 3    UNITED STATES OF AMERICA    *
                                  *
 4              vs.               *       CRIMINAL ACTION
                                  *       No. 04-10367-DPW
 5    ADAM STUPAK                 *
                                  *
 6    * * * * * * * * * * * * * *

 7            BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
                  UNITED STATES DISTRICT JUDGE
 8                       CHANGE OF PLEA

 9    A P P E A R A N C E S

10              OFFICE OF THE UNITED STATES ATTORNEY
                1 Courthouse Way, Suite 9200
11              Boston, Massachusetts 02210
                for the United States
12              By:  Mary Elizabeth Carmody, AUSA

13
                BODOFF & SLAVITT
14              225 Friend Street
                Boston, Massachusetts 02114-1812
15              for the defendant
                By:  Evan Slavitt, Esq.
16

17

18
                              Courtroom No. 1
19                            John J. Moakley Courthouse
                              1 Courthouse Way
20                            Boston, Massachusetts 02210
                              December 21, 2004
21                            9:20 a.m.

22

23            CAROL LYNN SCOTT, CSR, RMR
                    Official Court Reporter
24              One Courthouse Way, Suite 7204
                  Boston, Massachusetts 02210
25                      (617) 330-1377
</pre>

1          P R O C E E D I N G S

2              THE CLERK:  All rise.

3          This Honorable Court is now in session.  Please be

4      seated.

5          Calling the case United States versus Adam Stupak,

6      criminal No. 04-10367.

7              THE COURT:  Well, I have a copy of the plea

8      agreement between the parties.  But I do have a question,

9      Ms. Carmody, directed to you.

10          The plea agreement contemplates cooperation.  And I

11      assume that it also contemplates an extended period of time

12      for the sentencing.

13              MS. CARMODY:  Yes, Your Honor.

14              THE COURT:  Without obviously binding you, how

15      long?

16              MS. CARMODY:  It would require us to wait

17      until all the proceedings against the company and any

18      individuals that might be brought.  And that would be -- and

19      concluded, so I would say at least a year, Your Honor.

20              THE COURT:  Are there other cases now

21      outstanding that have been indicted?

22              MS. CARMODY:  There is nothing pending, Your

23      Honor.  The investigation is continuing.

24              THE COURT:  But the anticipation is that there

25      will be some further proceedings that could be concluded as

1    early as a year from now?

2              MS. CARMODY:  That's correct, Your Honor.

3              THE COURT:  Okay.  Now, that then brings me to

4    Section 3 of the plea agreement which the parties apparently

5    are satisfied to use the Sentencing Guidelines.

6              MS. CARMODY:  Yes.  We do have a sentence,

7    Your Honor, in the first paragraph, paragraph 3,

8    anticipating what the Court is going to say.  The last

9    sentence of the first paragraph says the parties agree that

10   this paragraph applies to any sentencing hearing that takes

11   place prior to any decision by the United States Supreme

12   Court on the Blakely issues.

13        So anticipating that the United States Supreme

14   Court will rule at some point between now and any sentencing

15   hearing with respect to Mr. Stupak, we expect that --

16   whether or not that changes or not, we do that in

17   anticipation of that consequence.

18              THE COURT:  Well, the likelihood is that the

19   Supreme Court will be ruling on these issues before the end

20   of the term.  And so if it does, then this paragraph, as it

21   is anticipated it will, this paragraph loses its force; is

22   that right?

23              MS. CARMODY:  If, in fact, they strike down

24   (ph.) Blakely, Your Honor.

25              THE COURT:  Now, the other aspect of the plea

1   agreement is Section 7 which deals with the waiver of rights

2   to appeal and bring collateral challenge.

3         It has been my practice not to accept such plea

4   agreement provisions here while in other sessions I think

5   they are accepted.  I will after a detailed examination see

6   whether I accept this.

7         My view is I wouldn't.  I don't know if the

8   government presses it.

9                **MS. CARMODY:**  If, in fact, the Court will not

10  accept it, Your Honor, the government would excise that

11  section from the plea agreement if necessary.

12               **THE COURT:**  Well, we can go through a very

13  elaborate hearing process on it.  If it is not critical from

14  the government's point of view, I simply say take it out.

15               **MS. CARMODY:**  We will take it out, Your Honor.

16               **THE COURT:**  Is that agreeable as well,

17  Mr. Slavitt?

18               **MR. SLAVITT:**  Yes, Your Honor.

19               **THE COURT:**  Okay.  So I am going to pass back

20  the original of the plea agreement and have both the

21  government and the defendant, witnessed by defendant's

22  counsel -- I am not sure I have the original.

23               **MR. SLAVITT:**  We just handed it up a few

24  moments ago.

25               **THE COURT:**  Is this the one -- oh, I'm sorry.

1    It is signed in black so I didn't recognize it as an

2    original.

3           I am striking out Section 7 of the plea agreement.

4    I ask that the original be initialed.

5           (Pause in proceedings.)

6           THE COURT:  With those preliminaries having

7    been dealt with, I will ask Ms. Rynne to swear Mr. Stupak so

8    I can ask him some questions.

9           THE CLERK:  Please stand and raise your right

10   hand.

11                    ADAM STUPAK, Sworn

12           THE CLERK:  Please be seated.

13           THE COURT:  Mr. Stupak, the purpose of this

14   hearing is to satisfy me that what appears to be your

15   intention to plead guilty to something called an information

16   is a knowing and voluntary act on your part.

17           In order for me to make that kind of determination,

18   I have to ask you some questions and some of those questions

19   are personal in nature.

20           Now, understand I am not trying to delve into your

21   personal life except as permits me to learn whether or not

22   you know what you are doing and what you are doing is

23   voluntary.

24           Do you understand?

25           MR. STUPAK:  Yes.

1          THE COURT:  Can you tell me how old a man you

2     are?

3          MR. STUPAK:  Forty.

4          THE COURT:  And how far did you get in school?

5          MR. STUPAK:  I have an MBA.

6          THE COURT:  Where?

7          MR. STUPAK:  At Delphi.

8          THE COURT:  And how long ago was that?

9          MR. STUPAK:  Eight years, nine years ago.

10          THE COURT:  And what have you been doing for a

11     living for the past eight or nine years?

12          MR. STUPAK:  I have been involved in -- excuse

13     me.

14          I've been in pharmaceuticals ever since two years

15     out of college.  And then I put myself through graduate

16     school.  And that's what I've been doing.

17          THE COURT:  And that was when you were living

18     in New York?

19          MR. STUPAK:  New York, yes.

20          THE COURT:  Okay.  For the past eight or nine

21     years what kind of jobs have you held in the pharmaceutical

22     industry?

23          MR. STUPAK:  I started out as a general sales

24     rep and went through hospital sales.  And then I went to

25     women's health care, different selling positions.  And I

1    went to Serono and became a salesperson.

2              And then they gave me more responsibility and then

3    they gave me -- I became a manager.  And after I left Serono

4    I went to a company called Novo Nordisk.  And I was a sales

5    manager for four years -- for three, about four years there.

6              And then I left and I went to Viacom to sell

7    advertising to pharmaceutical companies.

8              That's what I have done.

9                   THE COURT:  Do you have any difficulty

10   understanding what this case is about?  What it is that the

11   government is accusing you of?

12                  MR. STUPAK:  I understand.

13                  THE COURT:  Have you had an adequate

14   opportunity to discuss this case with your attorney

15   Mr. Slavitt?

16                  MR. STUPAK:  Yes.

17                  THE COURT:  And do you feel that you have

18   received the kind of legal advice that you need to make your

19   own decision about whether or not to plead guilty or not?

20                  MR. STUPAK:  Yes.

21                  THE COURT:  Now, I made mention of a plea

22   agreement between you and the government, the document that

23   I believe you signed today -- I'm sorry -- signed last week.

24   And I guess re-signed today as well and initialed as to the

25   exclusion of Section 7.

```
 1                    MR. STUPAK:  Yes.

 2                    THE COURT:  Have you had an adequate

 3       opportunity to review the plea agreement?

 4                    MR. STUPAK:  Yes.  I'm sorry.  Yes.

 5                    THE COURT:  And is this the entire agreement

 6       that you have with the government?

 7                    MR. STUPAK:  Yes.

 8                    THE COURT:  Did anybody threaten you to get

 9       you to plead guilty?

10                    MR. STUPAK:  (Shook head.)

11                    THE COURT:  You have to answer so that the

12       court reporter can take it down.

13                    MR. STUPAK:  Nobody threatened me.

14                    THE COURT:  Did anybody promise you something

15       that is not in this plea agreement to get you to plead

16       guilty?

17                    MR. STUPAK:  I don't think so, no.

18                    THE COURT:  When you say you don't think so --

19                    MR. STUPAK:  No.  No.  Nobody offered me

20       anything.  No, sorry.

21                    THE COURT:  Now, you understand that under

22       this plea agreement you are going to be pleading guilty to

23       three counts of federal criminal felonies.  And that each of

24       those counts have maximum penalties of imprisonment of not

25       more than five years, a fine of $250,000 -- excuse me --
```

1   $25,000, three years of supervised release.  And in addition

2   there is a mandatory special assessment of $100.

3         You understand that that's what the plea -- that's

4   what the potential penalty can be here?

5               MR. STUPAK:  Yes.

6               THE COURT:  And you understand as well that

7   there is some dispute about what the likely outcome is going

8   to be for the Sentencing Guidelines.  Those are a series of

9   directives that tell me how I assess the penalty.

10              MR. STUPAK:  Yes.

11              THE COURT:  In light of someone's background

12  and in light of the nature of the crime that is presented to

13  me.  And there is an agreement between you and the

14  government that you are prepared to go forward under the

15  Sentencing Guidelines, at least until and if they are

16  overturned.

17        (Whereupon, counsel conferred with the defendant.)

18              MR. STUPAK:  Yes, I understand.

19              THE COURT:  And have you had an adequate

20  opportunity to discuss the Sentencing Guidelines and the

21  potential that they will be overturned with Mr. Slavitt?

22              MR. STUPAK:  Yes.

23              THE COURT:  And so do you believe that you

24  know enough to make a reasoned judgment about whether or not

25  to let the Sentencing Guidelines apply in your case?

1                **MR. STUPAK:**  Yes.

2                **THE COURT:**  Yes?

3                **MR. STUPAK:**  Yes.

4                **MR. SLAVITT:**  Technically they only apply

5  until the Supreme Court tells us what the answer is.

6                **THE COURT:**  Well, there is also the

7  possibility the Supreme Court is going to say we are not

8  going to deal with the constitutionality of the Sentencing

9  Guidelines in these cases but maybe we will deal them in

10  some other case.

11               **MR. SLAVITT:**  I understand, Your Honor.  But

12  the point is there is a contingency, just for the record.

13               **THE COURT:**  I understand that.  But this much

14  is clear:  You have thought about this and thought about

15  making this part of your plea agreement; is that right,

16  Mr. Stupak?

17               **MR. STUPAK:**  Yes.

18               **THE COURT:**  You understand that I am not bound

19  by any agreement that you make?

20               **MR. STUPAK:**  I understand.

21               **THE COURT:**  I will make my own determination

22  about what I think the proper sentence should be under

23  whatever the governing law is at the time that I make that

24  sentence.

25               **MR. STUPAK:**  I understand.

1    THE COURT:  And you understand you don't get

2    to withdraw your plea if you don't like the sentence I

3    impose?

4    MR. STUPAK:  I understand.

5    THE COURT:  So you are pleading guilty in the

6    face of uncertainty, first about what the governing law is

7    going to be; and, second, what I am going to do with respect

8    to sentencing.

9    Do you understand that?

10    MR. STUPAK:  Yes.

11    THE COURT:  And in that plea agreement there

12    is a fair amount of discussion of your obligation to

13    cooperate --

14    MR. STUPAK:  I understand.

15    THE COURT:  -- with the government here.

16    And the government's position on this may be

17    affected, their position on the sentencing may be affected

18    by their assessment of your cooperation here.

19    Do you understand that?

20    MR. STUPAK:  Yes.

21    THE COURT:  Now, do you have any questions of

22    me regarding the plea agreement?

23    MR. STUPAK:  No, sir.

24    THE COURT:  Okay.  You understand that under

25    this plea agreement as well that you are agreeing not to

1    transfer or authorize the transfer of any assets that you

2    have, at least until sentencing, that -- except for assets

3    where there is some superior interest, superior to the

4    government, in which you have an equity interest of less

5    than $10,000?

6              MR. STUPAK:  Yes, sir.

7              THE COURT:  You are also agreeing that you

8    will not transfer any assets beyond your ordinary living

9    expenses which are set not to exceed $3,000 per month?

10             MR. STUPAK:  Yes.

11             THE COURT:  And, of course, your attorney's

12   fees.  Do you understand that?

13             MR. STUPAK:  Yes.

14             THE COURT:  Now, all of those are in place

15   even to the time of sentencing.  Do you understand that?

16             MR. STUPAK:  Yes.

17             THE COURT:  Okay.  Now, can you tell me, have

18   you ever had any problem with substance abuse yourself,

19   either drugs or alcohol?

20             MR. STUPAK:  Never.

21             THE COURT:  Have you ever had occasion to

22   consult with a mental health professional?  A psychiatrist,

23   a psychologist?

24             MR. STUPAK:  Yes, the last month.

25             THE COURT:  Okay.  Can you tell me the concern

1      that caused you to consult with such a person and what the

2      person's professional background was?

3                  MR. STUPAK:  I saw a psychiatrist and a

4      psychologist.  I never got in trouble my whole life, not

5      even a parking ticket, and now I'm sitting in front of a

6      federal judge.  It's not easy.

7                  I want children, but I saw my life flashing away

8      from me, so it's all because I went to work to try to do the

9      right thing for my family.  And that was why I needed to see

10     somebody.

11                 THE COURT:  So am I correct then that you saw

12     both a psychiatrist and a psychologist to deal with the

13     stress and strains brought on by this proceeding?

14                 MR. STUPAK:  Yes.

15                 THE COURT:  Now, one of the things I have to

16     satisfy myself about is that your decision here is

17     voluntary.

18                 MR. STUPAK:  Yes.

19                 THE COURT:  And I want to ask you very

20     specifically, is there anything about your consultation with

21     the psychiatrist or the psychologist that gives you any

22     pause about your ability to make your own reasoned judgments

23     about whether or not to deal with this case by pleading to

24     the information?

25                 MR. STUPAK:  Right.  No, no -- no.

1          **THE COURT:**  All right.  Now, you understand

2   you don't have to plead guilty at all.  And you certainly

3   don't have to plead to an information.  I want to be clear

4   about this.

5          This information that is attached to the plea

6   agreement is a device by which the government can charge an

7   individual directly with a felony violation.  But under our

8   Constitution any person who is going to be accused of such a

9   serious crime has a right to have a grand jury look at it.

10         A grand jury is a group of people, 21 in number,

11  who will make a determination themselves about whether or

12  not the government can go forward.  And if the grand jury

13  says no, then the government can't proceed unless the

14  individual agrees to an information.

15         And it happens from time to time that the grand

16  jury decides not to let the government go forward.  If the

17  government can't get a majority of that grand jury to agree

18  with them, then the case doesn't go any further as to that

19  individual.

20         **MR. STUPAK:**  I understand.

21         **THE COURT:**  Unless the individual gives up

22  that right.  You understand you are giving up the right to

23  have the grand jury screen this case to determine whether or

24  not the government has properly proceeded?

25         **MR. STUPAK:**  Yes, I understand that.

1          THE COURT:  And you have indicated a desire to

2     plead guilty.  You understand you don't have to plead guilty

3     here.  Under our system of justice any person who is accused

4     of a crime is entitled to have the case presented in court

5     and put the government to its proof.  The government bears

6     the entire burden of proving each essential element of the

7     offense against you beyond a reasonable doubt.  And unless

8     and until they do that, you can't be found guilty, again,

9     unless you plead guilty.

10          You have the right to look the government straight

11     in the eye and the say, Prove it.  And unless and until they

12     do, you can't be found guilty.

13          Do you understand that?

14          MR. STUPAK:  Yes, I understand.

15          THE COURT:  You also have the right to

16     challenge the government's case directly.  Mr. Slavitt could

17     cross-examine the government witnesses.  He could bring in

18     witnesses on your behalf.  If they won't come in

19     voluntarily, I would give him court process to get them to

20     come in here.

21          And you would have the right to take the witness

22     stand yourself and tell your side of the story.

23          Or, alternatively, you could choose not to.  You

24     could assert another valuable constitutional right that you

25     have, the right against self-incrimination.  And I would

1    tell the jury that.  And I would, of course, observe this

2    principle myself, that they can't hold that against you.

3    That that is a valuable constitutional right that serves to

4    underscore that the burden always rests with the government.

5    And they cannot directly or indirectly force you to help

6    them out in their criminal prosecution.

7          But by pleading guilty, you are giving up all those

8    rights.  Do you understand that?

9          MR. STUPAK:  I understand.

10          THE COURT:  Now, you understand as well that

11    apart from the potential punishment here, there is a

12    potential for what we call collateral effects on your life.

13    This may mean if you are convicted of a felony that you give

14    up the right to vote, give up the right to hold a firearm,

15    give up the right to hold certain public offices.  All of

16    those things may be affected.  And it may affect other

17    aspects of your life as you have anticipated.

18          Knowing all that, are you still prepared to change

19    your plea?

20          MR. STUPAK:  I understand.

21          THE COURT:  Okay.  But are you prepared to

22    change your plea?

23          MR. SLAVITT:  Technically we are not

24    changing --

25          THE COURT:  I am sorry.  You are prepared to

1    plead guilty?

2              MR. STUPAK:  I have no choice.  I'll take a

3    plea of guilty.

4              THE COURT:  Well, when you say you have no

5    choice, I want to be clear that this is a knowing decision

6    on your part, that you have discussed all the various

7    alternatives and decided that this is the best alternative

8    for you.

9              MR. STUPAK:  The best alternative.

10             THE COURT:  Okay.  Now, one of the things I

11   have to satisfy me about is whether or not the government

12   has sufficient evidence from which a finder of fact could

13   find you guilty of the offenses charged.  And the offenses

14   charged are basically under the Anti-kickback Statute.  And

15   that prohibits the willful and knowing, that is, you knew

16   what you were doing and you nevertheless went ahead and did

17   it, an offer or payment of any remuneration, including any

18   kickback or bribe or rebate directly or indirectly to induce

19   the purchase or order of a reimbursable item under a federal

20   health care program.

21        Now, have you discussed with Mr. Slavitt the

22   elements of the offense that the government has to prove?

23             MR. STUPAK:  Yes.

24             THE COURT:  Do you have any questions of me

25   about what the government has to prove?

1    MR. STUPAK:  No.  I did not know I was

2    breaking the rules.

3    THE COURT:  Well, when you say you didn't know

4    that you were breaking the rules, did you know that you were

5    engaged in either aiding and abetting, directly or

6    indirectly, yourself the offer or payment of remuneration to

7    induce the purchase or order of a reimbursable item under a

8    federal health care program?  And here I think the

9    government is alleging Medicare, Medicaid; is that right?

10   MS. CARMODY:  Medicaid, Your Honor.

11   THE COURT:  Medicaid.

12   Did you know you were doing that?

13   (Whereupon, counsel conferred with the defendant.)

14   THE COURT:  Let me put it to you again.

15   Listen very carefully, Mr. Stupak.

16   MR. STUPAK:  I'm sorry.

17   THE COURT:  Did you know, and nevertheless

18   knowing, intend that you would be involved in the offer or

19   payment of any remuneration, including any kickback, bribe

20   or rebate, directly or indirectly, to induce the purchase or

21   order of a reimbursable item under a federal health care

22   program?

23   (Whereupon, counsel conferred with the defendant.)

24   MR. STUPAK:  I knew I was asking the doctors

25   for a specific trip.  I thought it was a legitimate program

1  that marketing came up with.  I am not a marketer.  And

2  usually what happened in any business, in pharmaceuticals,

3  there is a marketing company, the marketers that deal with

4  the legal departments that deal with the regulatory.

5      I did not know -- we were called to a meeting, a

6  late night meeting.  They said this is the plan we came up

7  with.  I told everybody I felt very uncomfortable and I did

8  not ask many people.

9      In fact, one of the doctors decided not to go, for

10  whatever reason.  I didn't think -- I took the ticket back.

11  I sent it back to the company.  I thought it was a

12  legitimate trip.  I did not think I was doing anything

13  wrong.  And I didn't think I was breaking the law.  I was

14  just doing a job for a company.

15          THE COURT:  My question is not whether or not

16  you knew that there was a particular federal statute that

17  governs this.

18      My question is whether or not you knew, and

19  knowing, intended that you would be involved in the offer or

20  payment of any remuneration, including any kickback or bribe

21  or rebate, directly or indirectly, to induce the purchase or

22  order of a reimbursable item under a federal health care

23  program?

24          MR. STUPAK:  Yes.

25          THE COURT:  Did you?

1          **MR. STUPAK:**  Yes.

2          **THE COURT:**  Now, one of the things I am going

3  to do is I am going to ask Ms. Carmody to tell me briefly

4  what the evidence would be if this case went to trial.   I

5  want you to listen very carefully because when she is

6  through I am going to say is that what happened.

7          All right.

8          **MR. SLAVITT:**  Your Honor, before Ms. Carmody

9  goes forward, we have had a chance to review the information

10 and have no trouble with that.  Ms. Carmody was kind enough

11 to give us a preview of what she was likely to say.

12         And in substance I believe Mr. Stupak will agree to

13 the overall outline.  There are a few minor details that she

14 knows at the moment he does not specifically recall.

15         **THE COURT:**  Okay.

16         **MR. SLAVITT:**  So I'm just giving the Court a

17 little bit of an advance notice.

18         **THE COURT:**  All right.  I appreciate that.  I

19 will hear what Ms. Carmody has to say and then I would ask

20 Mr. Stupak questions to determine whether or not you are

21 pleading guilty knowingly to a violation of this particular

22 statute.

23         Ms. Carmody.

24         **MS. CARMODY:**  Thank you, Your Honor.

25         Your Honor, if the case were to proceed to trial

1  the government would prove the following:

2          Mr. Stupak worked for Serono from August of 1996

3  until November 15, 2000 when he was terminated by the

4  company.

5          From August of '96 until July 1997 he was a

6  clinical consultant and worked in the Brooklyn, New York

7  area.

8          In August of 1997 he was promoted to Regional

9  Director for what was called the Tri-State Region, which

10  included New York, New Jersey and Connecticut.

11          In January of 1998 the sales regions were realigned

12  and Mr. Stupak's territory was then limited to New York City

13  and his group was called the Empire Thunderbolts.

14          Serono is an international pharmaceutical and

15  bio-technology company with corporate headquarters in

16  Geneva, Switzerland and Serono headquarters here in

17  Massachusetts, located then in Norwell and now in Rockland.

18          At all times relevant, Mr. Stupak was responsible

19  for sales and implementing the marketing plans of Serono

20  with respect to the drug Serostim, which is the proprietary

21  name or trademark of the generic drug somatropin.

22          Somatropin is a recombinant human growth hormone,

23  consisting generally of growth hormone taken from an animal

24  and modified, using DNA technology, by the addition of a

25  human growth hormone gene.

1          Serono received accelerated approval from the U.S.

2    Food and Drug Administration, the FDA, for this drug.

3          In 1996 it was approved to treat AIDS wasting,

4    which is also known as cachexia which is a condition

5    involving profound involuntary weight loss in AIDS patients.

6    At the time the FDA approved Serostim, AIDS wasting was an

7    AIDS defining condition that constituted the leading cause

8    of death among AIDS patients.

9          Serostim came on the market concurrently with the

10   advent of protease inhibitor drugs.  These drugs are often

11   referred to as the Highly Active Anti-Retroviral Therapy, or

12   HAART, and dramatically curtailed in the United States the

13   proliferation of the AIDS virus itself, particularly when

14   used in combination with one another, commonly referred to

15   as AIDS cocktails.

16         Given the decreased viral loads in HIV patients

17   taking these drugs, the incidence and prevalence of AIDS

18   wasting began to markedly decline among these patients.

19   Consequently, the demand for Serostim began to drop

20   significantly immediately following its coming on the market

21   in the fall of 1996.

22         As part of his duties at Serono, Mr. Stupak

23   attended special training sessions and also would present at

24   sales training sessions, basic sales training sessions for

25   new hires at Serono from 1996 through the year 2000.

1    During these presentations, one recurring

2  presentation that was made to the new employees was called,

3  quote, Advertising and Promotion.  And this particular

4  presentation included a discussion of the laws affecting off

5  label marketing, the approval of marketing materials and the

6  Anti-Kickback Statute.

7    Mr. Stupak attended at least one of these sessions

8  prior to March of 1999.  In March of 1999 Serono's top

9  management of their Metabolic & Immune Therapy, which is

10  commonly called M & IT business unit, directed their

11  regional directors to offer their top scripting doctors and

12  a guest an all-expense-paid trip to the Third Annual

13  Conference on Nutrition and HIV Infection in Cannes, France

14  on April 22-26, 1999 in return for writing thirty

15  prescriptions for Serostim.

16    Mr. Stupak made the offer for the Cannes trip to

17  three doctors in New York.  And at the time he made these

18  offers he knew that they were illegal.

19    On or about March 1-2, 1999 Mr. Stupak made three

20  straight quid pro quo offers to Dr. O, Dr. G and Dr. W --

21  and we will refer to them as such during this

22  presentation -- to go to the Cannes conference in April of

23  1999.  He offered them the all-expense paid trip for them

24  and a guest at Serono's expense if they would write more

25  scripts of Serostim for Serono.

1          Specifically the evidence will prove that in

2     February of 1999, the first fiscal quarter of 1999, the

3     business unit which was known as M & IT, was falling short

4     of its sales forecast.  They only met approximately 80

5     percent of their goal nationwide by the end of February.

6          The president of the Swiss parent of Ares-Serono

7     was coming to the United States to meet with each business

8     unit in the United States, including M & IT in early March

9     of 1999, and was also planning to attend the national sales

10    meeting that was scheduled to be held in Boston in March of

11    1999.

12         Thus, in February and March of 1999 M & IT

13    management was heavily under the gun to produce more sales.

14    During the first quarter of 1999 the Serono sales force was

15    divided into six regions led by six regional directors with

16    the defendant Mr. Stupak in New York.

17         There were five other regional directors that were

18    responsible for the following sales territories.

19         In the Northeast the region included Massachusetts,

20    Maine, Connecticut, Vermont, New Jersey, parts of

21    Pennsylvania and New York State.

22         The Southeast region included Florida, Louisiana,

23    Mississippi, Alabama and Texas.

24         The Central region included Illinois, Wisconsin,

25    Missouri, Arkansas, Oklahoma, Kentucky, Michigan, Minnesota,

1   North Dakota, South Dakota, Nebraska, Iowa and Indiana.

2        The Western region included California, Oregon,

3   Washington, Arizona and Colorado.

4        And the Mid-Atlantic region included Maryland,

5   Delaware, Georgia, North Carolina, South Carolina, Ohio,

6   West Virginia and part of Pennsylvania.

7        On March 1st, 1999 the regional directors were

8   summoned unexpectedly to an emergency meeting that took

9   place in Boston at the Boston Harbor Hotel.  There will be

10  testimony that the meeting was intense and went late into

11  the night.  And that during that meeting and also after it

12  ended the regional directors sent their sales staff emails

13  and voice mail directing their activities within the next

14  week.

15       During this meeting the M & IT management were very

16  upset because the regional directors were not meeting their

17  sales quota.  The regional directors were told that they

18  were to, quote/unquote, dig their way out of this fiscal

19  situation.  They were told to target their top subscribers

20  and ask them to write scripts in a plan called, quote, the

21  "6m-6 Day Plan."  The six million dollars in six days plan.

22       And that plan is confirmed in detailed emails by

23  M & IT management as well as the regional directors to their

24  various sales personnel.

25       In this plan each regional director, including

1    Mr. Stupak, was required to identify the highest prescribing

2    physicians in their region.  The plan required the regional

3    directors, including the defendant Stupak, to target those

4    physicians with financial incentives in order to get the

5    required number of prescriptions to achieve the sales goals

6    of an increase of six million dollars in sales within six

7    days.

8          In particular it was part of this plan to offer

9    these key high prescribing doctors and a guest an all

10   expenses paid trip to the Third Annual International

11   Conference on Nutrition and HIV Infection to be held in

12   Cannes, France on April 22 to 26, 1999, in return for

13   writing within that one week thirty prescriptions.

14         It was the expectation of the regional directors

15   participating in this plan, including Mr. Stupak, that each

16   of the prescriptions for Serostim included in the offer was

17   for a 12-week course of treatment.  Serostim was approved

18   for a 12-week course of treatment so it's more than one

19   month.

20         The cost of each of these courses of treatment was

21   approximately $21,000.  And, therefore, thirty prescriptions

22   per doctor had an approximate market value of $630,000 per

23   doctor.

24         In a written directive a member of M & IT

25   management ordered each regional director to assign each

1    clinical consultant a specific list of physicians that they,

2    quote, are to live with until they get the required number

3    of prescriptions per targeted doctor.

4         This was a straight quid pro quo offer to the

5    doctors for the trip to Cannes in return for those scripts.

6         The details of the offer are corroborated both by

7    company documents as well as witness testimony.  The plan

8    called for a payment of the physician's expenses in exchange

9    for the scripts in one of two ways:

10        Either the doctors would be offered -- the doctors

11   were offered either a check in the amount of $4,000 for

12   their airfare to France, or Serono offered to make the

13   travel arrangements for the doctors.  It was also part of

14   the plan that Serono would make and pay for the hotel

15   lodging and accommodations and meals as well as

16   entertainment for the doctors and their guest.

17        The expected value of this trip per physician

18   varied depending on the travel arrangements from a low of

19   $5,000 to a high of approximately $10,000.

20        From March 3 to 11, 1999 M & IT Management required

21   each regional director, including Mr. Stupak, to report to

22   Serono headquarters daily the number of scripts that the

23   doctors wrote as a result of the visits made to the doctor

24   by the regional directors and their clinical consultants.  A

25   spreadsheet was specifically created for reporting this

1    data.  And the spreadsheets were used by the regional

2    directors to report the numbers to the company, including

3    Mr. Stupak.

4          On or about March 2nd, 1999 Mr. Stupak left Boston

5    and returned to New York.  His travel is confirmed by his

6    expense reports as are -- as is his telephone calls during

7    the next few days.

8          At the direction of M & It management on or about

9    March 2nd or 3rd, 1999, Mr. Stupak together with a sales

10   representative visited the office of Dr. O.  At the time

11   Dr. O practiced medicine in New York City and treated

12   patients that were HIV positive and/or suffering from AIDS.

13         During that meeting Mr. Stupak offered Dr. O the

14   trip to Cannes, the Cannes Conference in return for his

15   writing at least ten additional prescriptions of Serostim.

16   Dr. O did not immediately accept or decline the offer of the

17   Cannes trip.

18         On or about March 2nd or 3rd, Mr. Stupak, together

19   with another Serono sales representative, visited the office

20   of Dr. G.  Dr. G at that time was engaged in the practice of

21   medicine in New York and treated patients that were HIV

22   positive or suffering from AIDS.  During that meeting

23   Mr. Stupak offered Dr. G the trip to Cannes in return for

24   his writing at least ten additional prescriptions of

25   Serostim.  While Dr. G initially agreed to accept the offer,

1    he did not actually attend the conference.

2         Again, on or about March 2nd or 3rd, Mr. Stupak

3    also visited the office of Dr. W.  Dr. W at that time was

4    also engaged in the practice of medicine in New York City

5    and treated patients that were HIV positive and/or suffering

6    from AIDS.  During that meeting Mr. Stupak also offered

7    Dr. W the trip to Cannes in return for his writing at least

8    ten additional prescriptions of Serostim.  Dr. W agreed to

9    accept the offer and wrote additional Serostim scripts

10   during that week of March 3 to 11, 1999.  A $4,000 check for

11   the airfare was issued by Serono for Dr. W to attend the

12   Cannes conference.  The check was later voided when Dr. W

13   did not attend the Cannes conference.

14        Mr. Stupak's meetings and discussions with each of

15   these doctors are confirmed by competent (ph.) doctors and

16   witness testimony.

17        When Mr. Stupak made these offers, by all accounts

18   he was not his usual self.  He was uncomfortable.  He was

19   upset and angry that he had been asked to do this by the

20   M & IT Management.

21        During the presentation at the National Sales

22   Meeting, Serono's National Sales Meeting a few weeks later,

23   from March 15 to 19, 1999, the marketing department

24   announced the names of ten physicians who were,

25   quote/unquote, U.S. invitees to the Cannes Conference.

1        During that announcement the marketing department

2    also falsely stated in a slide presentation that each of

3    these physicians had committed to conducting two regional

4    speaking engagements to summarize the meeting proceedings

5    when, in fact, no such commitment had been requested or made

6    of these doctors.

7        Consistent with the six million dollars in six days

8    plan and its target of thirty twelve-week prescriptions of

9    the drug Serostim, the value of the business, including

10   those ten physicians that were listed on that one PowerPoint

11   presentation, totaled approximately $6,300,000 more or less.

12       At all times relevant the state of New York had a

13   Medicaid program that received federal funding and was a

14   federal health care program.

15       The defendant Mr. Stupak knew that the Medicaid

16   program paid for Serostim prescriptions.  In fact, Medicaid

17   paid for approximately 75 percent of all Serostim

18   prescriptions nationwide.  From 1996 through 1998, New York

19   Medicaid reimbursed claims for Serostim totaling

20   $23,739,816.

21       Doctors O, G and W were all providers to care for

22   Medicaid eligible patients suffering from AIDS.  Doctors O,

23   G and W prescribed at times Serostim to some of their

24   patients who were in the Medicaid program beneficiaries and

25   New York Medicaid paid for Serostim prescriptions for

1    certain of those doctor's patients.

2              And that's what the government would prove.

3              The meeting with respect to the directions of the

4    doctors who were here in -- excuse me -- the six million

5    dollar meeting was here at Boston Harbor Hotel on March 1st,

6    1999.  The checks for the travel or the travel arrangements

7    were made here in Massachusetts from the headquarters in

8    Norwell.

9              THE COURT:  That may affect the company and

10   that may affect the conspiracy charge but it doesn't affect

11   the defendant under these charges.  He is charged -- the

12   offer was made in New York.  It was the New York Medicare

13   system.

14             MS. CARMODY:  Your Honor, it's also aiding and

15   abetting the company's offer to the doctors.  And the

16   defendant has waived venue pursuant to the plea agreement.

17             THE COURT:  Where is it stipulated in the plea

18   agreement?

19             MS. CARMODY:  Oh, it's in the first paragraph,

20   Your Honor.  The last sentence, Freedom of Information.  The

21   defendant agrees to waive any applicable statute of

22   limitations and to waive any --

23             THE COURT:  Does that mean it doesn't charge a

24   crime if it's a waiver?

25             MS. CARMODY:  Excuse me?

1          THE COURT:  Does that mean it doesn't charge a

2     crime if it's a waiver?

3          MS. CARMODY:  No, I don't believe so, Your

4     Honor.  I think it's any de minimus mistake in the

5     information rather than any substantive mistake with respect

6     to the actual offense.

7          THE COURT:  Mr. Slavitt, is that the case that

8     the defendant waives issue with respect to the venue of

9     these charges?

10          MR. SLAVITT:  Yes, Your Honor.  To plead here

11     rather than New York, he does waive venue.

12          THE COURT:  Okay.  You understand, Mr. Stupak,

13     that the question that I am asking now, which is whether

14     this case could properly, as charged be properly brought in

15     Massachusetts as opposed to New York.

16          There are ways to charge this that would obviate

17     that particular problem.  The way in which it is charged now

18     raises to some degree this problem.

19          Do you recognize that?

20          MR. STUPAK:  Yes.

21          THE COURT:  And you understand that the choice

22     of using, say, the Southern District of New York, which is

23     where I gather that's where the offers were actually made,

24     and here is simply a choice of where the case is going to be

25     pursued.

1          Do you understand that?

2               MR. STUPAK:  Yes.

3               THE COURT:  And are you prepared to waive any

4    claim that you might have that the case should properly be

5    brought somewhere else but in any event has been brought in

6    Massachusetts?

7               MR. STUPAK:  Yes.

8               THE COURT:  Okay.  Now, you have heard what

9    Ms. Carmody has said.  Do you dispute that?

10              MR. STUPAK:  Yes.  Again, I did not think it

11   was illegal.  And Ms. Carmody mentions in there that I felt

12   uncomfortable doing it.  I don't know what else I can tell

13   you.  I did not feel it was illegal.  I did my job.  The

14   company I worked for, it was the third largest biotech

15   company in the world.

16              Why would I doubt them?  Why would I doubt a

17   company that was so big?

18              In pharmaceuticals you usually target your top

19   doctors, the A and B doctors.  That's normal business in

20   general.  You don't go to the doctor or the people who don't

21   have volume, who didn't see AIDS patients.  You go to the

22   top doctors.

23              And, yes, you tell the reps, you go with the

24   doctors who have volume.  And that's just normal business in

25   this business.

1    I never saw any anti-kickback laws, not probably

2 until 2000 when everything started to change in

3 pharmaceuticals.  This is seven years ago.  It's just --

4    (Whereupon, counsel conferred with the defendant.)

5    MR. STUPAK:  I just was a sales manager.  The

6 company implemented -- I had nothing to do with implementing

7 except telling my reps what to do and what not to do.  And

8 that usually came from above.  I had nothing to do with

9 marketing.  I had nothing to do with anything like that.

10 That was not my job.

11    THE COURT:  You said that you were

12 uncomfortable.  Why?

13    MR. STUPAK:  I told the FBI, and just to go

14 back, when they called me, I was very honest with them on

15 the phone.  I spoke to them.  I didn't say I'm going to hang

16 up, I'm going to call a lawyer.

17    In fact, I called her back a day later to say how

18 else can I help her.  I called the U.S. Attorney General to

19 ask if I can help.  I didn't think I did anything wrong but

20 I just -- I don't know.  I just didn't feel comfortable

21 asking somebody, you know, hey, do you want to go on a

22 marketing trip, for whatever reason.  I didn't feel it was

23 my -- you know, it was me.  I didn't feel -- we had a lot of

24 pressure in that company.

25    I told everybody it was the worst five years of my

```
1    life, four years of my life.  It was a living hell.  And,
2    you know, I can get more into depth if you'd like but that's
3    how -- it's just how I felt.  I just didn't feel it was
4    right.
5              After I asked Doctor -- my wife is going to get
6    upset at me in a second -- I went out, I smoked a cigarette.
7    I said I can't believe I just, you know, the way I felt.  I
8    just felt very uncomfortable.
9              THE COURT:  Is there any question that you
10   offered to these three doctors --
11             MR. STUPAK:  No, I offered it.
12             THE COURT:  -- the trip to Cannes?
13             MR. STUPAK:  It was positioned differently but
14   I did offer a trip, yes.
15             THE COURT:  It was conditioned upon their
16   purchase of a course of treatment for the drug; right?
17             MR. STUPAK:  That's -- yes, it was.  And it
18   was positioned because it was positioned to us as it was a
19   marketing program in Europe, in Cannes.  And the company
20   would pay a business class ticket to them and -- I don't
21   remember the particulars.  And that was basically it.
22             THE COURT:  And the purpose was to induce
23   their purchase?
24             MR. STUPAK:  Was to continue to get them to
25   write prescriptions because what happens is sometimes
```

1    people, in all businesses, you forget sometimes.  And, yes,

2    it was an incentive.  And I felt uncomfortable but --

3                THE COURT:  But it was to induce their

4    purchase of the drug?

5                MR. STUPAK:  Yes.

6                MR. SLAVITT:  Technically, Your Honor, the

7    doctors don't purchase the drug.  It was to write the

8    prescription so that the patients purchase the drugs.

9                THE COURT:  I understand that.  But it was to

10   induce that purchase under the Medicaid Program?

11               MR. STUPAK:  Yes.

12               THE COURT:  All right.  And you knew that that

13   is what you were doing and you intended to do it, no matter

14   what pressures you were under, you intended to do it; is

15   that right?

16               MR. STUPAK:  Yes, Your Honor.

17               THE COURT:  All right.  Based on that evidence

18   I have heard I am satisfied that there is sufficient

19   evidence for a finder of fact to find the plaintiff guilty

20   of the offenses charged here.

21               So having found that, Ms. Carmody, do you know of

22   any reason why I shouldn't accept the plea?

23               MS. CARMODY:  Excuse me, Your Honor?

24               THE COURT:  Do you know of any reason why I

25   should not accept the plea?

1          **MS. CARMODY:**  I know none, Your Honor.

2          **THE COURT:**  Mr. Slavitt?

3          **MR. SLAVITT:**  No, Your Honor.

4          **THE COURT:**  All right.  I will ask Ms. Rynne

5     to inquire of the defendant as to his plea in this case.

6          **THE CLERK:**  Please stand.

7          Adam Stupak, on criminal No. 04-10367-DPW, you are

8     charged in Counts 1 through 3 of a three-count information

9     with offering to pay illegal remuneration in violation of

10    Title 42, United States Code, Section 1320a-7(b)(2)(A), and

11    aiding and abetting in violation of 18 United States Code,

12    Section 2.

13         What say you now as to Counts 1 through 3, guilty

14    or not guilty?

15         **MR. STUPAK:**  Guilty.

16         **THE CLERK:**  Please be seated.

17         **THE COURT:**  Based on our discussion this

18    morning, Mr. Stupak, I am satisfied that your decision first

19    to plead to an information and then to plead guilty to that

20    information is a knowing and voluntary act on your part.

21         And as I've indicated, there is substantial

22    evidence by which a finder of fact could find you guilty and

23    you are now adjudged guilty of those offenses.

24         In the provisional sense, because as I understand

25    it there will be requests for a continuance likely in this

1    case, I am setting sentencing for March 15 at 2:30.

2         You should understand in advance of sentencing what

3    is going to happen is the Probation Office of the court will

4    prepare what we call a Presentence Report.  It's a document

5    I rely on very heavily in making my own judgment about what

6    the proper sentence should be.  It's very much in your best

7    interests and it is also your obligation to cooperate fully

8    with the Probation Department in the preparation of that

9    report.

10        Both you and Mr. Slavitt have an opportunity to

11   bring to their attention things you think I should know

12   before I impose sentence.  You are going to get a chance to

13   see the Presentence Report in its draft form.  If you are

14   not satisfied with the draft, you can ask the Probation

15   Office to make changes or corrections.

16        If they don't make the changes and corrections to

17   your satisfaction, you can bring the matter up to me at the

18   time of sentencing.  At the time of sentencing both

19   Mr. Slavitt and you will have a chance to speak to me

20   directly or orally in court with respect to the sentence.

21        Now, because this is your initial appearance, it is

22   necessary to deal with the question of security for your

23   continued appearances as ordered by the court.

24        What is the government's recommendation?

25              MS. CARMODY:  Your Honor, I think personal

1    recognizance.

2              THE COURT:  Okay.  I will make it personal

3    recognizance, unless Mr. Slavitt has some objection to this,

4    with a $5,000 personal recognizance obligation here.

5              MR. SLAVITT:  As an unsecured bond, no, we

6    have no objection, Your Honor.

7              THE COURT:  All right.

8         Now, is there anything else?

9              MS. CARMODY:  No, Your Honor.

10             MR. SLAVITT:  No, Your Honor.

11             THE COURT:  You should understand, Mr. Stupak,

12   you have an obligation to appear when ordered in court.  The

13   next formal time you have to appear in court is March 15,

14   unless that is changed, at 2:30.

15        In addition, as I indicated to you, you have an

16   obligation to meet with the Probation Office to prepare a

17   Presentence Report.  I don't believe you have met with

18   Pretrial Services as yet; is that right?

19             THE PRETRIAL SERVICES OFFICER:  Not yet.

20             THE COURT:  I am going to ask you to go right

21   down to Pretrial Services to meet with them as well.  And

22   they will execute a personal recognizance bond of $5,000.

23   Okay.  Unsecured.

24        If there is nothing further, we will be in recess.

25             THE CLERK:  All rise.

40

1          **MR. SLAVITT:**   Thank you, Your Honor.

2          **MS. CARMODY:**   Thank you, Your Honor.

3       (WHEREUPON, the proceedings were recessed at 10:35

4       a.m.)

# C E R T I F I C A T E

      I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

_____

CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377