# EXHIBIT 39

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------------------

IN RE: PHARMACEUTICAL     )
INDUSTRY AVERAGE          )
WHOLESALE PRICE           )
LITIGATION                )MDL Docket No.
                          )Civil Action 01CV12257PBS

------------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION OF

DOROTHY POULSEN

------------------------------------------------------------

9:00 a.m

February 22, 2006

PERKINS COIE

1201 Third Avenue, #4800

Seattle, Washington  98101


REPORTED BY:  Judith A. Robinson, CCR #2171

Page 40

1   BY MS. O'SULLIVAN:

2       Q.   Mrs. Poulsen, the court reporter has

3   handed you what's been marked Exhibit Poulsen 001.

4   It's a 1-page document, Bates number at the bottom,

5   NT013240.  A Bates number is a lawyer's phrase for a

6   number on a document --

7       A.   Okay.

8       Q.   -- that Mr. Lopez' firm put on that.

9            I'd like you to turn your attention to the

10  second half of Exhibit Poulsen 001 where it says,

11  "From Dorothy Poulsen."

12           Do you see that?

13      A.   Yes.

14      Q.   What is this document?

15      A.   It's an Email between me and Cody, who is

16  the pharmacy program officer in Minnesota.  I don't

17  know if he was yet at this point but he became

18  eventually.  Yes.  He was at this point.

19      Q.   If I could try to make my question even

20  more clear, is the bottom 1/3 of the document

21  something from you to NMPAAtalk at listbot.com?

22      A.   It is, yes.

1    Q.   I think I'll show you a document and make
2  it easier.
3    A.   Yeah.  Make it clear so I know what you're
4  talking about.
5  BY MS. O'SULLIVAN:
6    Q.   Exhibit Poulsen 005 is a multi-page
7  document Bates numbered MT004034 to 4043.  The first
8  page of which is entitled, "Testimony Outpatient
9  Drugs, January 6, 1998."
10        And it was produced to us attached to the
11 next document, which follows, "Notice of Public
12 Hearing of Proposed Adoption and Amendment."
13    A.   Okay.
14    Q.   I first want to ask you about the very
15 first page. But please take your time looking
16 through the exhibit.
17    A.   (Witness complies.)
18        MR. LOPEZ:  Again, I'll note for the
19 record, this appears to be a compound exhibit.
20        THE WITNESS:  Yes.
21 BY MS. O'SULLIVAN:
22    Q.   Okay.

1   A.   I guess I hadn't thought of this being
2   testimony. This would have been a rule hearing. One
3   of my responsibilities was, to make sure that the
4   rules -- what do you call it? The State rules that
5   we operated under were current and clear and so
6   forth.
7         And so in this -- in this case, we were
8   making some changes to the -- the rules that were
9   applied, you know, State rules and regulations that
10  applied to the pharmacy program.
11        I think, specific -- probably what we were
12  doing and probably what instigated this was a change
13  in the dispensing fee. That was generally the thing
14  that caused us to change rules was a change in the -
15  - a change in reimbursement.
16  Q.   Does the first page of Exhibit Poulsen 005
17  reflect the testimony that you gave at a public rule
18  hearing in January 1998?
19  A.   Yes. This would have been what I
20  presented.
21  Q.   Now that I know how to ask the question
22  properly, did you testify before other hearings

1   program in these cases is the dispensing fee rather
2   than the drug product."
3           What did you mean by that?
4           MR. LOPEZ: Object to form. It reads the
5   line out of context.
6   BY MS. O'SULLIVAN:
7       Q.   And I -- I don't intend to do so. I'm
8   asking what you meant by it?
9       A.   I think I know what I'm referring to here.
10          For generic drugs, there was a MAC
11  pricing, a Federal pricing limit that would minimize
12  the cost to the program. And generic drugs could be
13  very, very cheap. Especially per unit, it could be
14  very, very cheap.
15          If a pharmacy was dispensing on a daily
16  basis or on a weekly basis or maybe even on a
17  biweekly basis, then the -- the -- what we paid in a
18  dispensing fee might be more than what we were
19  paying for in the drug.
20          So if the drug was 2 cents a pill and we
21  were paying them $4.14, every time they dispensed a
22  -- dispensed for the prescription and if they only

1   took one pill a day, we were paying 2 cents for the
2   drug and $4.14 for the dispensing fee.
3          So the idea was to try to make sure that
4   they dispensed on a monthly basis, rather than a
5   less-frequent basis.  Especially on medications that
6   were chronic medications, where they were going --
7   acute diseases that require only a 1-week or 2-week
8   prescription.  That was one thing.
9          But -- but it's -- as this testimony says,
10  that -- referring to nursing home patients, use the
11  same drugs for months and years.  So to dispense on
12  a less-than-monthly basis would be unfair to the
13  program.
14      Q.   Looking at the bottom paragraph on the
15  first page of Exhibit Poulsen 005, 4 lines down
16  there's a sentence that begins, "Part" and I'm going
17  to read the whole sentence:
18          "Part(2)(b) changes the cap for the
19  dispensing to $4.14 to reflect the provider increase
20  passed by the legislature."
21      A.   Yes.
22      Q.   Do you recall what the dispensing fee was

Dorothy Poulsen                                February 22, 2006
                        Seattle, WA

                                                        Page 160

1        "The pharmacy should always bill their
2   usual and customary charge regardless of what
3   Medicaid pays," was that an accurate statement?
4        A.   Yes.
5        Q.   Where you wrote:
6        "Montana Medicaid adjudicates claims and
7   calculates an allowed reimbursement according to the
8   prices present on the Medicaid drug file," was that
9   accurate as well?
10       A.   Yes.
11       Q.   What are you referring to by the "Medicaid
12  drug file"?
13       A.   Consultec's PBM that adjudicated our
14  claims had a listing of all the drugs with pricing
15  on it.  And that is what we used and that is what I
16  referred to as the Medicaid drug file.  It
17  differentiates -- I don't know all the ways it
18  differentiated from their files for other groups
19  because they were at PBM for more than just
20  Medicaid.  But the Federal upper limits, I don't
21  think would have been specific to Medicaid.
22       Q.   If a pharmacist billed his or her usual

1  and customary charge and that was lower than the
2  price present on the Medicaid drug files that
3  Consultec's PBM had, Medicaid should have reimbursed
4  the pharmacy at the usual and customary charge?
5       A.   Exactly.  If the system was working
6  properly, that's what it would have done.
7       Q.   Do you know the percentage of
8  reimbursement by Montana Medicaid made at the usual
9  and customary?
10      A.   No.
11      Q.   Who would know that?
12      A.   I don't -- that would be a question -- you
13  would have to have Consultec go through and assess
14  their claim system.
15      Q.   Consultec/ACS' data would show that?
16      A.   Yeah.  Well, even then what the -- the
17  only way you would know -- well, I don't know of any
18  way that you would know for sure that someone was
19  billing at their usual and customary.  That's what
20  they were told to do.
21           If the reimbursement came in lower than
22  what it paid, but that's not true.  Because if they

Page 162

1  billed higher, that also could be usual and
2  customary. I'm not sure how you would -- how you
3  would determine it. If anybody would know, it would
4  be the PBM.
5      Q.   And your understanding was, it wasn't the
6  Consultec/ACS people in Helena but it was their PBM?
7      A.   It definitely wasn't the people in Helena.
8  The people Helena knew nothing about the PBM at the
9  time that I was doing it. It was all done through
10 Atlanta.
11     Q.   Did you have any interaction with the
12 Consultec ACS/PBM people?
13     A.   Yes.
14     Q.   What is the name or names of people at
15 that PBM who should be knowledgeable about billing
16 that came in at usual and customary versus what was
17 in the Medicaid drug file?
18     A.   The only name I can remember is Leslie
19 Bratton. And I know she's not even there anymore. I
20 don't remember names.
21     Q.   You heard the name, Brett Jackovac. Was
22 he in the Helena office?

Page 163

1  A. Yes.
2  Q. You can put that away. (Indicating)
3     As the pharmacy program officer for
4  Montana Medicaid, did you have any responsibility
5  regarding reimbursement for physician-administered
6  drugs?
7  A. No.
8  Q. Who did have that responsibility?
9  A. Randy Bowsher, B-O-W-S-H-E-R.
10 Q. I have some specific follow-up questions
11 on that.
12    We were told that was Randy Bowsher's
13 responsibility. And we took his deposition last
14 week and he said, no, actually, you would be the
15 knowledgeable person.
16    So let me follow up.
17 A. Sure.
18 Q. What was Randy Bowsher's responsibility
19 with respect to physician-administered drugs?
20 A. He was a program officer for the physician
21 program. And -- okay. So that's what he was.
22    MR. LOPEZ: I'm going to object to the

Page 166

1   the claims processing when there were issues with
2   claims.  And -- and she was the one -- that person
3   was generally a she.  She was the one who would
4   frequently come and ask me to look up a particular
5   drug and tell them what the AWP was on it.
6        Q.   Who were those people?
7        A.   Well, the only name that comes to mind is
8   Fran.  But I mean, it was a series of people.  It was
9   a series of -- there was more than one person who
10  came up.
11       Q.   I have an October 20th, 2000 DPHHS org.
12  Chart.
13       A.   Okay.
14       Q.   Will you please take a look at it?  I'm
15  not going to make an exhibit.  But see if there's --
16  if any name on there is a person who assisted Mr.
17  Bowsher with physician-administered drugs'
18  reimbursement?
19       A.   I don't think this goes deep enough.  I
20  don't even -- I don't even see my name on this.
21  Yeah.  This doesn't go down far enough.
22       Q.   We've asked the State's lawyers to tell us

1   who that knowledgeable person would be.
2           Were you familiar with the reimbursement
3   methodology for physician-administered drugs?
4       A.   Well, only to the extent that I worked
5   with them. I mean -- which was not to any great
6   extent.
7       Q.   And to that extent at a general level,
8   could you describe the reimbursement methodology?
9       A.   For their drugs. The physician would bill
10  in they had provided a number of units of a
11  particular drug and they would provide a charge.
12      Q.   Is it fair to say, that was different than
13  the reimbursement methodology for pharmacy-dispensed
14  drugs?
15      A.   Oh, yes.
16      Q.   When you talk about the physician
17  submitting units and a charge, do you know whether
18  that was an actual charge? I mean, do you know what
19  that charge represented?
20      A.   No, actually I don't.
21      Q.   Do you know the basis on which Montana
22  Medicaid would have reimbursed the physician for