# EXHIBIT 39

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

**CERTIFIED COPY**

---

IN RE: PHARMACEUTICAL      )

INDUSTRY AVERAGE           )

WHOLESALE PRICE            )

LITIGATION                 ) MDL Docket No.

                           ) Civil Action 01CV12257PBS

---

DEPOSITION UPON ORAL EXAMINATION OF

DOROTHY POULSEN

---

9:00 a.m

February 22, 2006

PERKINS COIE

1201 Third Avenue, #4800

Seattle, Washington  98101


REPORTED BY:  Judith A. Robinson, CCR #2171

56

1  at Average Wholesale cost less 10% plus a fee of
2  $2.55."
3      A.   Right.
4      Q.   Is it your understanding that was an
5  accurate statement of MedManagement's reimbursement?
6      A.   I'm -- yes.  I'm sure that that was
7  probably accurate.
8      Q.   And where he wrote, "Average Wholesale
9  cost," was it your understanding that he meant, AWP
10 less 10% plus a fee?
11     A.   Yes.  Because we were treating him or
12 treating MedManagement just like any other pharmacy,
13 which was that their reimbursement was AWP minus 10%
14 and plus a dispensing fee.
15     Q.   In Mr. Stark's letter that is Exhibit
16 Poulsen 003, does he propose changing that
17 reimbursement methodology for MedManagement?
18     A.   Yes.
19     Q.   And he writes in the first sentence of the
20 second paragraph:
21          "In order to make the reimbursement
22 equitable for everyone involved, it was proposed we

1  be reimbursed our actual acquisition cost plus a fee

2  equivalent to the amount we receive for other state

3  facility prescriptions."

4       A.    Right.

5       Q.    Did you agree that the change to

6  reimbursement methodology from AWP minus 10% to

7  actual acquisition cost occur for MedManagement?

8          MR. LOPEZ:  Object to the form.

9          THE WITNESS:  Yes.

10 BY MS. O'SULLIVAN:

11      Q.    Is it fair to say, that as of this time in

12 1997, you understood that AWP minus 10% did not

13 represent actual acquisition cost?

14      A.    Yes.

15      Q.    The court reporter has handed you Exhibit

16 Poulsen 004 Bates numbered MT018455, a 1-page

17 document dated July 30, 1997.

18          Is this a letter that you sent to Al Stark

19 of MedManagement?

20      A.    Yes, it is.

21      Q.    And comparing Exhibit Poulsen 003 to this

22 document has Exhibit Poulsen 004, is this your

1  -- and the institutions. The institutions came

2  together under the Department of Corrections and

3  they ran that show. So, I think -- so it wasn't a

4  contract that I had input into.

5      Q.   On the last line of that paragraph, the

6  full sentence is:

7           "Analysis by the department prior to

8  entering into the contract showed that the 2

9  reimbursement methodologies resulted in comparable

10 costs to the outpatient drug program."

11     A.   Right.

12     Q.   Do you have any reason to believe that

13 statement was not accurate?

14     A.   No. I'm pretty sure that one is accurate

15 because I did do the analysis.

16     Q.   My question was going to be, who did it?

17          How did you make that analysis?

18     A.   Again, remembering that this is a good

19 number of years ago. But as I recall, I looked at

20 what we had paid them.

21     Q.   "Them," meaning?

22     A.   MedManagement. For the prescriptions they

87

1   provided to Medicaid recipients.  Looked at the
2   number of prescriptions and separated it out from
3   the amount -- the drug costs, which would have been
4   easy because we were paying the same dispensing
5   fees.  I just had to subtract it out.  And then
6   said, okay, now, if we do it this other way, if pay
7   acquisitions cost plus this higher dispensing fee
8   would it come out the same.  They had their
9   acquisition costs, so I could compare.  I could set
10  it up and compare AWP minus 10% to their acquisition
11  costs and see what the differences where and then
12  add in the dispensing fee.  So I could determine
13  that the cost to the program would be no greater
14  under the new way of doing it than the old way of
15  doing it.
16      Q.  Do you remember what the form of your
17  analysis took?  Was it a memo?  Do you remember what
18  it looked like?
19      A.  Spreadsheet, probably.  I mean, no, I
20  don't remember.
21      Q.  Do you remember who you shared that
22  analysis with?

90

1  pharmacy services were typically paid for. So any
2  discussion with them was very difficult.
3      Q.  Who was that person at the Department of
4  Corrections?
5      A.  I have no recollection of her name. I
6  know it was a woman but I do not remember what her
7  name was.
8      Q.  I have some documents later that were some
9  of the contracts. I'm going to get to it as a
10 topic.
11     A.  Okay.
12     Q.  But you did testify that you did analysis,
13 comparing the reimbursement methodology used for
14 Medicaid with the reimbursement methodology that
15 MedManagement was going to use for these other
16 Montana state entities?
17     A.  Al Stark -- the way I recall it is that Al
18 Stark sent me information about what the acquisition
19 costs would be for the most common drugs we used or
20 that he used and that he dispensed. And I compared
21 -- I mean I couldn't compare every single drug in
22 existence. But I compared the most common things

91

1  that he dispensed and the price he was able to get

2  it at, so his acquisition cost. And what we would

3  pay probably under MAC. Because most of the time

4  these were generic drugs and so we were dealing with

5  the Federal upper limit.

6       Q.   So --

7       A.   It was his data and my data that I was

8  comparing. I don't recall getting any data from the

9  institutions or from corrections.

10      Q.   **But the person you were receiving the data**

11 **from was the contractor for the Department of**

12 **Corrections' pharmacy services?**

13      A.   Yes. He had a contract with them.

14      Q.   And so --

15      A.   He would also have been a provider for me.

16 For Medicaid, he would have been enrolled as a

17 provider.

18      Q.   **Because if I get this right, were certain**

19 **Medicaid beneficiaries in either the Department of**

20 **Corrections or these other institutions?**

21      A.   Particularly, the developmentally

22 disabled, yeah.

223

1  not the pharmacy program officer in 1993.  So I'm
2  not asking whether you received it then.
3       A.   But whether I ever did receive it?
4       Q.   Right.  Because Exhibit Poulsen 033, the
5  1999 document, the second page of which Ms. McGrorty
6  wrote:
7            "We are interested in reviewing the
8  original request for proposal."
9            And I'm trying to find out whether at some
10 point in 1999 you saw this original request for
11 proposal that's Exhibit Poulsen 034?
12      A.   And I don't remember for sure one way or
13 the other.
14      Q.   Do you remember something called the
15 Pharmacy Management Advisory Committee?
16      A.   Well, not immediately.  Maybe if you show
17 me something it will jog my memory.
18           (Whereupon, Pharmaceutical Management
19 - Advisory Committee Members, Department of
20 Corrections MT018330 was marked Exhibit Poulsen 035
21 for identification.)
22 BY MS. O'SULLIVAN:

                                                                  224

1    Q.   This is Exhibit Poulsen 035 Bates numbered
2    MT018330 labeled, "Pharmaceutical Management -
3    Advisory Committee Members."
4         Does this document refresh your
5    recollection about this committee?
6    A.   No, not really.  No.  Even though my name
7    is on it, I don't remember.
8    Q.   Do you remember any meetings with the
9    other individuals listed on Exhibit Poulsen 035?
10   A.   Yes.
11   Q.   What was the purpose of those meetings?
12   A.   Well, we were talking at that time about -
13   - about that contract and how they were going to
14   provide drugs for the different institutions.
15        And the one contract, I think it had
16   expired and been extended a couple of times and so
17   they needed to rewrite it.  They were rethinking
18   about how to do it.  Most of these people that you
19   see on this list were associated with the
20   institutions that would have been participating. My
21   only participation would have been because we were
22   paying some -- from some Medicaid clients who were

1   in some of these institutions.

2           So I know that there were a couple of

3   times that we met.  But as I indicated before, their

4   approach as to how we were going to do things was

5   considerably different than my approach for

6   Medicaid.

7       Q.   Did these meetings of -- well, consist of

8   people from the Montana Department of Corrections

9   and then administrators for the -- the Montana State

10  institutions?

11      A.   Or some portion or number of them.  Yes.

12  I don't remember that all of them were ever there at

13  the meetings that I went to.  I don't think they

14  were all there.  Some of the people.  You know,

15  Nancy McGrorty and I would have probably gone

16  together, simply because we were coming from the

17  same location.

18      Q.   Did anyone who was not an employee of the

19  State of Montana attend these meetings?

20      A.   Al Stark, I think was at these meetings on

21  occasion.

22      Q.   From MedManagement?

1   A.   From MedManagement.  Whether there was
2   anyone else -- there may have been someone else that
3   was from MedManagement or associated with that.
4       Q.   Is it fair to say, all the members that
5   attended these meetings were interested in
6   pharmaceutical management?
7           MR. LOPEZ:  Object to the form.
8   BY MS. O'SULLIVAN:
9       Q.   Is it your understanding, that all of the
10  people with whom you attended these meetings were
11  interested in pharmaceutical management?
12      A.   Well, most of these people were interested
13  in how they were going to get drugs for the clients
14  in their institutions, yes.
15      Q.   Is it fair to say, that one purpose of
16  these meetings was to share information about drug
17  purchasing across Montana agencies?
18      A.   No.  I don't think so.  Again, look at the
19  history of it, you had one department that had all
20  of these institutions in one place.  That's -- that
21  is when we started the contract.  Is all these
22  institutions were basically in one location.  And

227

1   then when, even though the department broke up or
2   the departments reorganized, that contract then
3   crossed departments. So I don't think that it was -
4   - it wasn't like people coming together and how can
5   we best work? It was, how do we maintain getting
6   our drugs for our clients?
7       Q.   So it is fair to say, that all of the --
8   it was your understanding that all of the members
9   attending these meetings were interested in access
10  to pharmaceuticals for their beneficiaries?
11      A.   So far as I know, yes. I think that's
12  accurate.
13      Q.   At the meetings, did you also attend the
14  reimbursement rate at which -- that was going to
15  apply in this new contract?
16      A.   Did we what?
17      Q.   Well, you started off by saying, there was
18  a contract that was expired and extended. And this
19  group was, if I understand you correctly, proceeding
20  on how to get a new contract?
21      A.   Right.
22      Q.   And what was the purpose of that new

                                                                    228

1   contract?

2       A.   Well, as I remember, there was some kind

3   of rule that you couldn't keep extending the

4   contract.  You had to go back out and get a request

5   for proposals and redo the process.  And this

6   contract had already been extended a couple of

7   times.  So they needed to do a new request for

8   proposals.  They needed to redo the contract.  That

9   was my understanding.

10      Q.   And this was a contract for pharmaceutical

11  management that would effect the Department of

12  Corrections and the Montana State institutions?

13      A.   Yes.

14      Q.   And would also effect Medicaid, insofar as

15  Medicaid beneficiaries were in those institutions?

16      A.   Yes.

17      Q.   Was the history at the beginning that the

18  Department of Corrections and the Department of

19  Institutions were at one point under the same

20  umbrella?

21      A.   Yes.  This was the Department of

22  Institutions.  It started out as Department of

229

1  Institutions and then in 1995, they had a huge

2  reorganization state government and Institutions

3  became Department of Corrections.  And all the other

4  parts left and became parts of different

5  departments. Although, basically most of them became

6  part of DPHHS.

7      Q.   Did this group, the Department of

8  Corrections and Institution, folks and you continue

9  to meet?

10     A.   Not with me.  I think I only met with them

11 2 or 3 times.  Because their interests were -- okay.

12 I had a mechanism for getting drugs to my clients

13 and that was through a pharmacy.  They wanted

14 pharmaceutical -- they wanted someone who would

15 manage their pharmacy and help contain drug their

16 costs.  And so they wanted a lot more out of it.

17 All I was doing was protecting Medicaid's interests,

18 in terms of the clients we served.

19             (Whereupon, Email Document MT018257

20 Through MT018258 was marked Exhibit Poulsen 036 for

21 identification.)

22 BY MS. O'SULLIVAN:

231

1  Town was out in the middle of the state.  And so by

2  the time they contacted Warm Springs to say, this is

3  what we need and -- and received the drugs, that

4  took a certain amount of time because there was a

5  lot of distance.

6           And so he wanted something that was close

7  and he could get drugs when he wanted it.  That and

8  the fact they didn't include him in those

9  discussions that were mentioned before.  So we were

10 working on a system for him to be able to do his

11 thing separately from the Department of Corrections'

12 contract.  So that's what I remember.

13      Q.   Did you have one file that you kept with

14 the Department of Corrections' pharmacy information

15 and another file you kept pertaining to the mental

16 health nursing care center pharmacy issues?

17      A.   Either that or I kept it all together.  It

18 wouldn't have been a very big file.

19      Q.   Where you wrote at the beginning of the

20 second paragraph, first sentence:

21           "Don't feel bad about having a difficult

22 time understanding what I did with Ron or the

                                                                    232

1   Department of Corrections.  They were really screwy

2   in how they did things and generally I just went

3   along."

4           What did you mean by saying, "they were

5   screwy in how they did things"?

6       A.   Well, they didn't do things the way we did

7   things. They really had a very different perspective

8   about providing pharmaceutical care.  This is

9   Corrections, a prison setting.

10          Whereas, my perspective was that my

11  responsibility was to make sure that people had the

12  drugs that they needed for their healthcare.  Their

13  perspective was they didn't want to give out any

14  more than they absolutely had to and they wanted to

15  give it at the lowest cost they possibly could.  We

16  just had different perspectives on therapy and

17  therapeutic usefulness of drugs.  And -- and the

18  person that I was working with there, the woman that

19  I -- that I don't remember the name of, I mean, her

20  focus was totally budgetary.  It wasn't at all

21  health related.  And so it was very difficult to

22  talk to them.  And then they did things. You know,

233

1   the way they set things up or the way they had --

2   they made decisions without keeping everybody in the

3   loop and that sort of thing.  That wasn't the way I

4   operated or Medicaid operated.

5       Q.   **As the pharmacy program officer for**

6   **Montana Medicaid, is it fair to say, your focus was**

7   **not totally budgetary?**

8       A.   Absolutely.

9       Q.   **And is it also fair to say, you were not**

10  **interested in the lowest cost you could possibly**

11  **acquire drugs?**

12          MR. LOPEZ:  Object to form.

13          THE WITNESS:  No.  That's not -- that

14  would not be true.  I was very interested in having

15  the lowest cost we could get drugs at.  But I wanted

16  to make sure that we had access to the drugs needed

17  by our clients.

18          You have 3 constituencies in that

19  position.  You have the client whose healthcare is

20  dependant upon you.  You have the providers, with

21  whom you want to have a good relationship and

22  cooperative relationship and you have the taxpayer.