# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                               )

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY | ) | |
| AVERAGE WHOLESALE PRICE | ) | MLD NO. 1456 |
| LITIGATION | ) | Civil Action No. 01-12257-PBS |
| _____ | ) | |
| | ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO | ) | |
| 01-CV-12257-PBS AND 01-CV-339 | ) | Chief Mag. Judge Marianne B. Bowler |
| _____ | ) | |

## OPPOSITION OF PLAINTIFF BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC. TO DEFENDANTS' MOTION TO COMPEL

## INTRODUCTION

Plaintiff Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBSMA") hereby

opposes the Defendants' Motion to Compel Production of Documents from Plaintiff Blue Cross

Blue Shield of Massachusetts, in which the Defendants seek to compel BCBSMA to produce

documents responsive to categories 2, 3, 5, 9, 16, 17, 22 and 27 contained in the subpoena served

on BCBSMA on or about December 9, 2005 (referred to hereinafter as the "Document

Requests").[1]

## SUMMARY OF BCBSMA'S POSITIONS ON INDIVIDUAL REQUESTS

For the Court's convenience, BCBSMA has provided a summary of its positions on each

of the individual Document Requests at issue in the Defendants' Motion.  A more detailed

explanation of the bases for these positions is set forth later in the Opposition:

**Request No. 2**: The production of tens of thousands of provider contracts, the majority of which
have no relevance to this litigation, is unwarranted.  BCBSMA has produced contract templates,
claims data, fee schedules and certain specific provider contracts, and has agreed to produce a
reasonable number of additional, relevant provider contracts (to the extent identified by the
Defendants).  *See infra*. pp. 10-13.

**Request No. 3**: BCBSMA has produced the templates that it has located in its possession,
custody or control.  *See infra*. pp. 9-10.

**Request No. 5**: Except for discussions concerning overall reimbursement methodologies, which
do not address specific drugs or services, BCBSMA is not aware of any "negotiations" with
providers concerning reimbursement for physician administered drugs or associated services.  To
the extent BCBSMA is aware of communications with providers concerning these issues, it has
produced the  documents it was able to locate.  *See infra*. pp. 14-17.

**Request No. 9**: Attempting to locate potentially responsive documents, somewhere in roughly
2000 boxes in storage, when the Defendants have failed to adequately identify the information
they are seeking or its relevance, is unduly burdensome.  *See infra*. p. 8.

---

[1] At the time the subpoena was served, BCBSMA had not been named as a class representative in this case.  Given
that BCBSMA is now serving in that capacity, BCBSMA has treated the subpoena as the equivalent of a request for
production pursuant to Rule 34.

- 1-

**Request No. 16**: The government investigation about which the Defendants seek documents is outside the scope of the request and is otherwise irrelevant to the issues in this litigation. *See infra*. pp. 19-20.

**Request No. 17**: The Defendants already have the drug sales data they purport to be seeking from BCBSMA, making it unnecessary for BCBSMA to review roughly 2000 boxes of documents to determine if it has duplicate information. *See infra*. pp. 6-8.

**Request No. 22**: BCBSMA has already provided claims data that contains quarterly expenditure data for the drugs at issue in this litigation, and has recently identified an analysis, which BCBSMA intends to produce, which also contains some of the requested data, but otherwise is unaware of any additional responsive documents. *See infra*. pp. 17-18.

**Request No. 27**: The request, as originally formulated, is hopelessly overbroad because it would require the production of every single analysis ever performed by BCBSMA in setting premiums; as now limited by the Defendants to analyses concerning physician administered drugs and associated services, BCBSMA does not have responsive documents. *See infra*. pp. 18-19.

## PRELIMINARY STATEMENT

From the Defendants' perspective, there does not appear to be any aspect of BCBSMA's business that does not, somehow, implicate reimbursement for physician-administered drugs and the Defendants' reporting of Average Wholesale Price ("AWP"). Thus, in the Defendants' Document Requests, they sought the production of the terms of every single benefit plan issued by BCBSMA from 1991 to the present (Mangi Decl., Ex. 4, Document Request No. 8), every single analysis ever conducted by BCBSMA in setting premiums from 1991 to the present (Mangi Decl., Ex. 4, Document Request No. 27), and every single contract entered into by BCBSMA with providers from 1991 to the present (Mangi Decl., Ex. 4, Document Request No. 2). Of course, the Defendants also requested every single document ever generated concerning the providers' costs in acquiring physician administered drugs (not limited to those at issue in this litigation) and BCBSMA's reimbursement for physician administered drugs (again, not limited to those at issue in this litigation) (Mangi Decl., Ex. 4, Document Request No. 7). Any resistance from BCBSMA in responding to the Defendants' Document Requests does not reflect

- 2-

any effort to avoid discovery obligations – BCBSMA has simply sought to bring some level of reasonableness to those requests.

From BCBSMA's perspective, during the time period in question, the use of AWP was not of particular significance.  As BCBSMA's witnesses have testified, AWP was the industry standard for drug reimbursement, which until recently was accepted and utilized by Medicare. *See, e.g.*, Deposition of Michael Mulrey, attached to the Declaration of Stephen L. Coco in Support of Opposition of Plaintiff Blue Cross and Blue Shield of Massachusetts, Inc. to Defendants' Motion to Compel, ("Coco Decl."), as Exhibit A, at p. 72, ln. 17 – p. 73, ln. 3; p. 60, ln. 16 – p. 63, ln. 7.  Thus, in the usual course of BCBSMA's business, BCBSMA did not devote many resources to understanding or analyzing AWP or do more than accept it when setting BCBSMA fee schedules.  *Id.*  As a result, no single department or location, or single person or group, within BCBSMA created or kept relevant documents, nor does BCBSMA have many documents that are, when the scope of relevant documents is viewed reasonably, relevant to this litigation.

While the Defendants criticize BCBSMA for producing only "three boxes of documents, claims data, and CDs," Defendants' Memorandum, at p. 2, the Defendants conveniently omit the fact that BCBSMA has produced much of its data and documents electronically.   For example, one of the CDs BCBSMA produced, which takes up little space in a box, contained 25,000 pages of documents.  Coco Decl., at ¶ 9.  Another CD contained an entire database of claims data for the physician administered drugs at issue in this litigation.  *Id.*  In addition, eight BCBSMA employees have already been deposed, and BCBSMA has proposed to make an additional six individuals available for deposition in the next two weeks.  *Id.*  at ¶ 10. Thus, at issue in this

- 3-

motion is not core, potentially relevant document discovery, but only that which is beyond

relevant or otherwise unduly burdensome to produce.

## ARGUMENT

### I.   THE PURPORTED BURDEN TO THE DEFENDANTS OF THE PLAINTIFFS' PRIOR DISCOVERY REQUESTS DOES NOT JUSTIFY IMPOSING AN UNDUE BURDEN ON BCBSMA

The Defendants base much of their Motion to Compel on the remarkable proposition that

BCBSMA must spend at least as much money, review at least as many documents, and

otherwise dedicate at least as many resources when responding to the Defendants' discovery

requests as the Defendants did when responding to the class plaintiffs' discovery previously. "Tit

for tat," however, is not the test for measuring whether discovery requests are reasonably likely

to lead to the discovery of admissible evidence or whether the need for the discovery justifies the

burden that will be imposed on a party to produce the documents.  This is so especially in a class

action such as this where the actions of one side – here, the Defendants – are more obviously

central to the core issues in the litigation than are the actions (and consequently, the documents

and testimony) of a single class member.

While the Federal Rules of Civil Procedure generally allow discovery of all "relevant"

documents, "Rule 26(b)(2) imposes general limitations on the scope of discovery in the form of a

'proportionality test.'"  *Convolve, Inc. v. Compaq Computer Corp.*, 223 F.R.D. 162, 167-168

(S.D.N.Y. 2004) (quoting *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 316 (S.D.N.Y.

2003)).  Rule 26(b)(2) requires the Court to balance the burden and expense of the requested

discovery against its likely benefits, taking into account "the needs of the case, the amount in

controversy, the parties' resources, the importance of the issues at stake in the litigation, and the

importance of the proposed discovery in resolving the issues."  Fed.R.Civ.P. 26(b)(2).

- 4-

Nothing in the Federal Rules of Civil Procedure requires parties to a case to spend the same amount of money or dedicate equivalent levels of resources to responding to discovery requests.  Instead, the Rules require a balancing of the burden of responding to a particular request and the potential benefits of the resulting document production.  In this case, the balancing requires that the Motion to Compel be denied or, at the very least, that the Defendants' document requests be limited to cover only those documents that are actually relevant to this litigation, and do not pose an undue burden on BCBSMA to produce.

## II.     THE MARGINAL (IF ANY) RELEVANCE OF THE REQUESTED DOCUMENTS DOES NOT JUSTIFY IMPOSING THE BURDEN ON BCBSMA TO PRODUCE THEM

Since BCBSMA was served with the Document Requests, BCBSMA has attempted to reach compromises with the Defendants on the requests at issue in this motion.  That is, where the requests were extremely overbroad, BCBSMA asked the Defendants to explain why they believed the documents were relevant, and then proposed a compromise which it believed addressed the Defendants' stated grounds for claiming the documents were relevant.  *See, e.g.*, Mangi Decl., Ex. 14.  Despite what BCBSMA believes are reasonable, practical solutions to the disputes, the Defendants have usually taken an all or nothing approach.  Accordingly, while BCBSMA remains committed to working with the Defendants to provide documents (even if the documents are only marginally relevant or not relevant at all), the Defendants are not entitled to the extreme relief they seek in this motion.

### A.     Documents Pertaining To BCBSMA's Former Staff Model HMO

There are, in effect, two requests related to BCBSMA's former staff model HMO. Document Request No. 9 seeks:

> Documents sufficient to identify any staff model HMO owned by or affiliated
> with you, the organizational structure of any such staff model HMO, and the
> terms of operation of the staff model HMO.

Mangi Decl., Ex. 4.  Document Request No. 17 seeks:

> All documents, including electronic transaction records and contracts, concerning
> your purchases of drugs from manufacturers, Wholesalers, Specialty Pharmacies
> or any other person or entity, including documents sufficient to determine the cost
> of the drugs purchased and how such costs were determined.

*Id.*  Document Request No. 17 implicates the staff model HMO to the extent the staff model

HMO purchased drugs from manufacturers, wholesalers, etc.  These requests raise different

issues and, accordingly, are addressed separately below.

As an initial matter, BCBSMA ceased operating the staff model HMO in 1998.  At that

time, all existing documents relating to the operation, contained in roughly 2000 boxes, were

sent to storage, and a general index was prepared.  Thus, well before this litigation commenced

and before there was any suggestion that BCBSMA would need to be able to find specific

documents related to drug purchases, BCBSMA had stored these documents.  Accordingly, as a

practical matter, the only way to determine exactly what is contained in each box is to open up

each box and, depending on the detail of the information sought, review each and every

document in the 2000 boxes.  As demonstrated below, the Defendants do not, in fact, need these

documents, and so there is no basis for imposing this burden on BCBSMA.[2]

### 1.    Document Request No. 17

The Defendants premise their relevance argument regarding staff model HMO

information on the notion that BCBSMA's former staff model HMO may have been sold

---

[2] The Defendants cite a number of cases, Defendants' Memorandum, at pp. 8-9, for the proposition that BCBSMA's
failure to maintain a more accurate index requires BCBSMA to undertake the burden of reviewing every one of the
2000 boxes in detail.  The facts of the cases cited are not applicable to the current situation.  Furthermore, in each of
those cases, the courts significantly limited the scope of the production and/or required the review of only the
relevant documents.

physician-administered drugs at some point prior to 1998.  In doing so, the Defendants omit a

key fact – whatever potentially relevant drug sales may have been made, the sales were made by

the Defendants in this case.  The Defendants already have records of the drug sales that they

purport to seek in the staff model HMO documents.  Specifically, in connection with the

Defendants' March 15, 2006 motion for summary judgment, the Defendants included the

Declaration of Dr. Eric M. Gaier.  This Declaration contains specific data from five different

defendants detailing drug sales to BCBSMA, i.e., the staff model HMO.  The Defendants

provide no justification or explanation for why they want to put BCBSMA to the burden of

combing through 2000 boxes of documents to search for information that the Defendants already

have.

Indeed, the Defendants' position directly contravenes Rule 26(b)(2), which permits the

court to limit discovery where "(i) the discovery sought is unreasonably cumulative or

duplicative, or is obtainable from some other source that is more convenient, less burdensome, or

less expensive."  Clearly, it is more convenient, less burdensome and less expensive for the

Defendants to rely on their own documents and data.[3]

Nevertheless, the Defendants' contention that BCBSMA refused to produce the

documents in question is inaccurate.  Rather, as indicated above, BCBSMA provided an index of

the staff model HMO boxes to the Defendants on February 22, 2006.  The Defendants have made

no effort to discuss with BCBSMA how the scope of the boxes to be reviewed could be

reasonably limited.  This fact, coupled with the Defendants' possession of this information

already, demonstrates that the Defendants cannot justify the burden they seek to impose on

---

[3] BCBSMA also objects to the Defendants' contention that the request would require BCBSMA to produce "the complete universe of its purchase contracts and data and comprehensive financial analysis relating to its purchases," Defendants' Memorandum, at p. 7, even if such documents exist.  Request No. 17 is specifically limited to "documents *sufficient to determine* the cost of the drugs purchased and how such costs were determined." (Emphasis added).  Mangi Decl., Ex. 4, at p. 8.

BCBSMA.  Nevertheless, BCBSMA remains willing to discuss some practical solution that does not require BCBSMA to review every page in these boxes.

### 2. Document Request No. 9

While the Defendants' Memorandum explains why the Defendants seek documents concerning actual drug purchases, which are the subject of Document Request No. 17, the Memorandum is devoid of any argument or explanation for the production of documents responsive to Document Request No. 9.  Indeed, from the start, BCBSMA has sought clarification as to what the Defendants believe is encompassed within the scope of the phrase "the terms of operation of the staff model HMO."  *See* Mangi Decl., Ex. 14, at pp. 6-7.  The statement in the Defendants' Memorandum that the Defendants are seeking "documents showing the structure and purchasing arrangements of the staff model HMO," is no more enlightening. Defendants' Memorandum, at p. 7.

More importantly, while it may be less burdensome to review a sub-set of the staff model HMO documents to determine if they contain data on drug purchases, any attempt to identify documents showing "the terms of operation of the staff model HMO," "the structure and purchasing arrangements of the staff model HMO," or similar types of inquiries will necessarily entail reading the substance of each document contained in each of the 2000 boxes to determine if they contain such information.  Given the Defendants' failure to explain why this information, rather than the drug purchase data, is relevant, they cannot justify imposing the burden of reviewing the voluminous boxes of documents to search for documents that may not even exist.

### B. Provider Contracts And Templates

Although the Defendants have grouped these two requests together, in fact, they present very different issues.  Accordingly, BCBSMA will address them separately.

### 1.      Provider Contract Templates

In December, 2005, as the Defendants indicated in the Defendants' Memorandum, at p.

10, BCBSMA provided the Defendants with roughly two boxes of "templates" for provider

contracts, dating back as early as 1994 (the earliest for which BCBSMA could find templates).[4]

In making this production, BCBSMA understood that it had satisfied its obligation under

Document Request No. 3:

> All templates or standard forms relating to contracts between BCBS and providers
> generated by BCBS or maintained in BCBS' files.

Mangi Decl., Ex. 4, at p. 6.  Thus, the Defendants' characterization that BCBSMA produced

"two boxes of randomly selected templates," is simply incorrect.  BCBSMA produced the

templates maintained in its provider contracting area that it could locate.  Likewise, as the list of

templates in each of the "Zip" files for 1999-2003 show, the documents produced include

templates for multiple individual physician or group physician contracts.  The Defendants'

statement that "most of [the templates] were hospital rather than physician contracts," is, again,

simply wrong.  Indeed, as recently as the deposition of Steve Fox, on March 8, 2006,

Defendants' counsel claimed that BCBSMA had produced "only about five [templates]."

Deposition of Steve Fox, Coco Decl., Ex. C, at p. 311, ln. 6-8.  As the screen shots attached to

the Coco Declaration as Exhibit B demonstrate, this statement is, likewise, incorrect.

Thus, the statements in BCBSMA's past letters do not indicate that BCBSMA is refusing

to produce templates or "insisting" that the "defendants must identify 'gaps' in [BCBSMA's]

production of templates to date."  Defendants' Memorandum, at p. 10.  Rather, BCBSMA cannot

reconcile the fact that it produced more than 2 boxes of documents reflecting templates from

1994 through the present, covering both physicians and hospitals, with the Defendants'

---

[4] A list of the titles of those templates is attached to the Coco Declaration as Exhibit B.

contentions that these are "randomly selected templates," "most of which were hospital rather than physician contracts," and amounted to only "five" templates. As the screen shots demonstrate, the Defendants are simply mistaken as to what BCBSMA has previously produced. Accordingly, there is nothing for the Court to compel, since BCBSMA has produced the "templates" that it has been able to locate.[5]

**2.      Actual Provider Contracts**

The Defendants' request for all provider contracts is hopelessly overbroad and the Defendants have made no effort to limit the request to documents that are necessary for purposes of this litigation. Accordingly, the Defendants cannot justify compelling BCBSMA to produce these documents. Nevertheless, if the Defendants are willing to limit the request to a reasonable number of relevant contracts, BCBSMA has previously stated that it would respond to that request.

In Document Request No. 2, the Defendants seek:

Final and signed copies of all contracts between BCBS and providers relating to
reimbursement for drugs or services associated with drug administration,
including all attachments and documents referenced in said contracts.

Mangi Decl., Ex. 4, at p. 6. BCBSMA currently has over 26,000 physicians under contract, and, during the period from 1991 to the present, had additional contracts that conceivably would fall within the scope of this request. Declaration of Steve Fox in Support of Opposition of Plaintiff Blue Cross and Blue Shield of Massachusetts, Inc. to Defendants' Motion to Compel ("Fox Decl."), at ¶ 2. The Defendants' purported justifications for obtaining all of these contracts – most of which are substantively identical – do not support their position and do not explain why data already provided to the Defendants does not provide the information the Defendants claim

---

[5] In this regard, BCBSMA notes that templates are just that, and that, when the templates are changed, there is no need to save prior versions. Thus, additional templates may have existed in the past, which BCBSMA no longer possesses. Nevertheless, BCBSMA produced all of the templates that it could locate.

the contracts would provide.  Furthermore, BCBSMA has repeatedly stated, and reiterated in its

February 17, 2006 letter, that:

> BCBSMA . . . is willing [to] revisit this issue and produce a reasonable number of
> provider contracts if, after reviewing the claims data, the defendants can articulate
> a legitimate need for a reasonable number of provider contracts.  Thus, given the
> defendants' purported basis for seeking the contracts, BCBSMA has provided a
> response which is specifically tailored to the professed relevance of the
> documents.

Mangi Decl. Ex. 14, at p. 9.  Thus, to the extent the Defendants are willing to tailor their request

to a reasonable number of contracts, BCBSMA is willing to consider that request.[6]

In early January, 2006, BCBSMA produced to the Defendants a database (which has

been supplemented a number of times since) providing data concerning the claims for the

physician administered drugs (and associated services) at issue in this litigation.  That database

identifies, among other things, the provider who submitted the claim.  Because the database was

produced electronically, the Defendants are able to sort the data in whatever format or categories

they believe are relevant.  The production of this database obviates many of the professed bases

for the production of individual contracts offered by the Defendants.

First, with respect to the argument concerning the purported relevance of the documents

to the definition of the class, BCBSMA addressed this argument in its February 17, 2006 letter:

> With respect to the fact that "plaintiffs' class is defined in terms of contracts," that
> definition does not justify the production of tens of thousands of individual
> provider contracts.  BCBSMA has a number of form contracts, which (as will be
> discussed below with respect to Request No. 3) BCBSMA believes it has
> produced to the defendants.  There is no need to provide each individual contract
> merely so that the defendants can see the information plugged into the form
> contract.  That is, whether reimbursement under a particular contract was based
> on AWP or not depends on the form, not the individual contract.

---

[6] For example, the Defendants' questioning during depositions has indicated that they are interested in certain
contracts that provide for reimbursement on a "capitated" basis.  Even though the Defendants have never made a
follow-up request for these specific contracts, BCBSMA has located and intends to produce the contracts.  Coco
Decl., ¶ 11.

Mangi Decl. Ex. 14, at. p. 9.  Indeed, BCBSMA estimates that 85% to 90% of the provider contracts are simply the templates with the provider information filled into the blanks.  Fox Decl., at ¶ 2.

In addition, by way of example only and without conceding that this constitutes a reasonable limitation to the request, the claims data demonstrates which providers submitted claims with respect to the physician administered drugs at issue in this litigation.  The fact that the Defendants have not even attempted to limit their request to these provider contracts demonstrates that their professed need for the documents is not justified.

Second, with respect to the statistical analysis the Defendants claim is necessary, BCBSMA's February 17, 2006 letter also addressed this issue:

> [I]n the first instance, BCBSMA generally understands that the defendants would need to examine the claims data to determine if there is even any support for the defendants' proposed criticism of the opinion and/or analytical method of the class' expert.  Thus, BCBSMA has expressly said that it is willing [to] revisit this issue and produce a reasonable number of provider contracts if, after reviewing the claims data, the defendants can articulate a legitimate need for a reasonable number of provider contracts.  Thus, given the defendants' purported basis for seeking the contracts, BCBSMA has provided a response which is specifically tailored to the professed relevance of the documents.

Mangi Decl., Ex. 14, at p. 9.  In addition, the claims data itself indicates the reimbursement methodology used to reimburse the claim.  There is no need to produce the individual contracts to determine the reimbursement methodology when that information is already in the Defendants' possession.

Perhaps the best way to illustrate why the Defendants' requests for further contracts is unnecessary is through example.  Using the same claims data that BCBSMA has provided to Defendants, BCBSMA (and the Defendants) can determine which providers have submitted the highest dollar volume of claims for the drugs in that data.  The provider contract for one

individual oncologist who has a high dollar volume of claims is attached to the Coco Declaration as Exhibit D.  This contract is an executed version of BCBSMA's PMSA4-96 contract.  *See id.* (lower left hand corner).  The PMSA4-96 contract was produced by BCBSMA as one of the "templates."  *See* Coco Decl., Exs. B and E.  Like virtually all of BCBSMA's physician contracts, this contract references BCBSMA's fee schedule which in turn implements the AWP reimbursement methodology.  *Id.* at p. 9 (Section 3.2).   BCBSMA has produced its fee schedules and the Defendants have had ample opportunity to question BCBSMA witnesses about those fee schedules in depositions.  Also, BCBSMA's claims data shows how claims for any individual physician were actually adjudicated and paid.   Defendants thus have multiple sources for the information that they purport to seek through the production of BCBSMA's individual provider contracts.  The production of additional, individual physician contracts would add nothing relevant, and BCBSMA should not be compelled to locate, retrieve, and copy hundreds of thousands of pages of irrelevant contract documents.

In the end, the Defendants have made no effort to limit their request to provider contracts that could potentially be relevant in this case.  In addition, even after having deposed a number of BCBSMA's senior contracting employees, Defendants have failed to demonstrate why the claims data and fee schedules on which reimbursement was based, which have already been produced to the Defendants, are insufficient to perform the analyses they claim are necessary, or what, precisely, the actual contract documents would add to those analyses.  Accordingly, the Defendants cannot justify compelling the production of these contracts.

**C.     Documents Concerning Provider Negotiations**

As an initial matter, in order to understand the overbreadth of the Defendants' request for "negotiation" documents, it is necessary to describe BCBSMA's typical contracts with providers.

BN1 35030319.3

Specifically, the vast majority (by number) of provider contracts are contracts in which the providers are reimbursed based on BCBSMA's fee schedule.  Fox Decl., at ¶¶ 2-3.  As Michael Mulrey, the manager of the provider reimbursement area within the actuarial department of BCBSMA, testified, BCBSMA does not negotiate its fee schedules with providers.  Deposition of Michael Mulrey, Coco Decl., Ex. A, at pp. 54, ln. 16 – p. 56, ln. 20.  *See also* Fox Decl., at ¶ 3.  Accordingly, since these types of arrangements do not involve negotiations about the fee schedules, let alone negotiations concerning reimbursement for physician administered drugs, there are no "negotiation" documents.  Indeed, BCBSMA is unaware of any circumstances where BCBSMA and a physician negotiated over the reimbursement methodology for any of the drugs at issue in this litigation.  Fox Decl., at ¶ 3.[7]

BCBSMA does have other types of reimbursement arrangements with other providers, including reimbursement methodologies such as capitation, withhold and percentage of charges.  Mulrey Deposition, Coco Decl., Ex. A, at p. 59, ln. 12 – p. 60, ln. 2; Cizauskas Deposition, Coco Decl., Ex. F, at p. 124, ln. 5-10.  While BCBSMA will "negotiate" with providers concerning these arrangements, BCBSMA is not aware of any instance where such negotiations involved discussions for reimbursement amounts for physician administered drugs in general or specific drugs in particular.  Rather, such "negotiations" were about the overall reimbursement methodology, and not, as described in Request No. 5:

> The negotiation of reimbursement to providers for physician administered drugs
> or the administration of physician administered drugs.

---

[7] To the extent that provider complaints or concerns about BCBSMA's reimbursement methodology for physician-administered drugs could be considered "negotiation," BCBSMA has complied with the request since BCBSMA has produced the documents it could locate concerning discussions between BCBSMA and physicians with respect to physician-administered drugs.

Mangi Decl., Ex. 4, at p. 6.[8]

In light of these facts, the purported "negotiation" documents which the Defendants contend they hope to find do not exist – because the provider contracting process does not work the way the Defendants wish to suggest it does.  There is no negotiation of reimbursement to providers for physician administered drugs or the administration of physician administered drugs, at least in the sense the Defendants are contending.

Nevertheless, BCBSMA offered a number of compromises on this issue, all of which the Defendants rejected.  For example, in a February 1, 2006 letter, BCBSMA proposed:

> If, upon reviewing that data, the Defendants believe that there is the need for documents concerning negotiations with specific providers *(with the understanding that BCBSMA is not currently aware of any "negotiations" or documents concerning such "negotiations")*, and the Defendants identify those providers, BCBSMA will consider producing such documents, *if any*, provided the number of providers identified is reasonable.

Mangi Decl., Ex. 9, at p. 2 (emphasis added).  In a February 17, 2006 letter, BCBSMA proposed again:

> It is my understanding that documents involving communications with providers are not kept in a single, centralized location.  Thus, attempting to review these communications to determine whether they include documents concerning "the negotiation of reimbursement to providers for physician administered drugs or the administration of physician administered drugs," is unduly burdensome.  As a compromise, where the defendants can demonstrate the relevance of potential negotiations with a particular provider, BCBSMA has offered to conduct a review of a reasonable number of files containing communications with those specific providers to determine if they include "negotiations."  We believe this position limits the undue burden that the defendants' current request seeks to impose while adequately addressing the defendants' purported need for these types of documents.

---

[8] The portions of the transcripts cited by the Defendants in their Memorandum at p. 14, are taken out of context. Furthermore, at no point in time did the Defendants ever lay a foundation or explain to the witnesses what was intended by the phrase "individualized negotiations," and the testimony was provided subject to BCBSMA's objection.  As the testimony, in context, indicates, the witnesses were referring to negotiations of overall reimbursement methodologies, and not negotiations specifically about physician administered drugs.  *See* Fox Deposition, Coco Decl., Ex. C, at pp. 95-108; Gorman Deposition, Coco Decl., Ex. G, at pp. 66-68.

Mangi Decl., Ex. 14. at p. 12.  The Defendants rejected these proposals.

The Defendants' reference to "negotiation files," Defendants' Memorandum, at p. 14, is misleading.  BCBSMA has files containing communications with providers.  To the extent "negotiations" occur, and BCBSMA has no reason to believe they do, the most likely location of those documents would be in files containing communications with providers.  Fox Decl., at ¶ 5. The Defendants' contention that BCBSMA has refused to describe the scope of those files is incorrect.  Rather, BCBSMA designated Steve Fox to testify concerning the following two Rule 30(b)(6) topics:

> 7. Whether and to what extent you set drug reimbursement for drugs administered and dispensed based on competitive negotiations with health care providers.
>
> 8. The substance of such negotiations, including whether and to what extent they expressly dealt with a distinction between the reimbursement of the drug itself and the reimbursement for the medical provider's administrative services, or referenced Medicare reimbursement rates.

Mangi Dec., Ex. 4, at pp. 12-13.  In connection with that designation, the Defendants' counsel was orally informed that Mr. Fox could provide details concerning the documents that BCBSMA maintained concerning "negotiations."  Coco Decl., at ¶ 12.  The Defendants elected not to ask Mr. Fox a single question during his deposition concerning such documents.  In fact, if Mr. Fox had been asked any questions, he could have provided significant details concerning the de-centralized location of the files, the volume of the files and the burden that would be incurred in order even to collect them.  Fox Decl., at ¶¶ 4-6.  As this Declaration indicates, even the process of collecting the provider communication files themselves, let alone reviewing them for "negotiation" documents, would impose an undue burden.  *Id*. at ¶¶ 4-5.  Nevertheless, in the event the Defendants can demonstrate a reasonable likelihood that the files, limited to a

- 16-

reasonable number, may contain relevant documents, BCBSMA would be willing to conduct that limited search.

### D.    Documents Concerning Expenditures on Physician Administered Drugs and Premium Setting

In an effort to support their motion to compel, the Defendants merge two disparate requests and claim that the requests justify the production of additional documents that are not within the scope of either request.  When the requests are viewed individually, the Defendants' supposed rationale falls apart.

### 1.    Documents Concerning Expenditures on Physician Administered Drugs

The Defendants are not entitled to any additional documents because BCBSMA has already produced the information requested which it has.  In Document Request No. 22, the Defendants sought:

> Documents sufficient to show your expenditures on physician-administered drugs on a quarterly basis since 1991.

Mangi Decl., Ex. 4, at p. 9.  As stated previously, BCBSMA produced all of its claims data electronically.  By simply sorting the data by date, the Defendants can obtain the quarterly information for the drugs at issue in this litigation.  There is no need for the Defendants to "[add] up millions of individual claims," Defendants' Memorandum, at p. 15, because this calculation will be performed automatically by the database when the data is sorted.

BCBSMA's counsel has recently learned that an individual in the actuarial department recently completed certain data analyses unrelated to this litigation that include quarterly analyses of spending for J-Code drugs.  Coco Decl., at ¶ 13.  BCBSMA intends to produce documents from that analysis responsive to this request.  Apart from those documents and the

claims data previously produced, BCBSMA has not located and is otherwise unaware of any documents responsive to this request.

2.      **Documents Concerning Premium Setting**

For the first time in their motion to compel, the Defendants limited the scope of Document Request No. 27 to BCBSMA's analysis of "amounts BCBSMA has been paying in reimbursement for physician administered drugs" and "the manner in which it factors drug costs into setting premiums it charges its customers."  After refusing to compromise on this issue, the Defendants should not be rewarded for striving to appear reasonable only for purposes of their motion to compel.

Specifically, in Document Request No. 27, the Defendants sought:

> Documents reflecting analysis performed by you in setting premiums, including comparisons of premium revenue to costs of reimbursement for drugs and physician services.

Mangi Decl., Ex. 4, at p. 10.  As this request indicates, while "comparisons of premium revenue to costs of reimbursement for drugs and physician services" is one sub-category in the request, the Defendants did not limit the request to that sub-category.  Indeed, after asserting objections, BCBSMA responded by stating:

> To the extent the request [No. 27] is properly confined to analyses of the impact of physician-administered drugs and related services on premiums, we are not aware of any such documents.

Mangi Decl., Ex. 12, at p. 3.  The Defendants specifically rejected BCBSMA's attempt to limit its response to "comparisons of premium revenue to costs of reimbursement for drugs and physician services."  Rather, in their February 13, 2006 letter, they stated:

> We have previously stated that the request [No. 27] contains no such limitation and that if responsive financial analyses exist at only a broader level then that must produced.

Mangi Decl., Ex. 13, at p. 3.  For the Defendants to come to this Court and argue that the request

is limited to the issue of "reimbursement for drugs and physician services" when they refused to

limit the request in that fashion in discussions with BCBSMA is disingenuous at best.

      Furthermore, as BCBSMA stated in its initial response, BCBSMA does not perform any

"comparisons of premium revenue to costs of reimbursement for drugs and physician services."

Mangi Decl., Ex. 6, at p. 21.  *See also* Declaration of Timothy P. Fitzgibbons in Support of

Opposition of Plaintiff Blue Cross and Blue Shield of Massachusetts, Inc. to Defendants' Motion

to Compel, at ¶ 2.  In any event, now that the Defendants have reasonably limited this Document

Request, BCBSMA can appropriately respond that it has no responsive documents.

### E.      Medicare Fraud Investigation

      The Defendants' motion to compel seeks to require BCBSMA to produce documents

concerning a government investigation that is neither within the scope of the Defendants'

document request, nor otherwise relevant to this litigation.  Document Request No. 16 seeks:

> All documents you produced in any other litigation, government investigation or
> inquiry related to (i) the use of AWP in Medicare, Medicaid or private
> reimbursement, or (ii) claims by providers concerning the adequacy of the
> reimbursement or disclosures you made.

Mangi Decl., Ex. 4, at p. 8.  As indicated in the description of the "Medicare fraud investigation"

contained in Mangi Decl., Ex. 24 that the Defendants rely on, the "Medicare fraud investigation"

is not within the scope of the request.  Specifically, the investigation related to claims that

BCBSMA "misrepresented and inflated *the number of claims and reviews* it processed in

periodic reports submitted to HCFA."  *Id*. (emphasis added).  Thus, the investigation did not

involve the "use of AWP," nor was it related to "claims by providers concerning the adequacy of

the reimbursement or disclosures you made."  Mangi Decl., Ex. 4, at p. 8.  Therefore, it is outside

of the scope of the request.

BN1 35030319.3

Even assuming the Defendants had properly requested documents concerning this investigation, the investigation is still irrelevant to this case.  Specifically, as indicated above, the investigation related to the alleged inflation of the number of Medicare claims and claim reviews that BCBSMA's Medicare B business area reported that it had conducted.  This has no relevance to reimbursement for physician administered drugs, amounts that BCBSMA was reimbursing for those drugs, or the standard under which reimbursement was being set.  Accordingly, since the investigation has no relevance to the issues in this case, there is no basis for compelling BCBSMA to produce documents concerning that investigation.  If the Court feels that it needs further information to conclude that the investigation is not relevant to the issues in this case, BCBSMA is prepared to submit documents for in camera review by the Court which will provide such details.

## CONCLUSION

For the above-stated reasons, BCBSMA respectfully request that this Court deny the Defendants' motion to compel production of documents.

Respectfully Submitted,
BLUE CROSS AND BLUE SHIELD OF
MASSACHUSETTS, INC.
By its attorneys,

/s/ Stephen L. Coco
Christopher P. Sullivan (BBO# 485120)
James S. Harrington (BBO# 543774)
Stephen L. Coco (BBO# 561169)
ROBINS, KAPLAN, MILLER & CIRESI, LLP
800 Boylston Street, 25th Floor
Boston, MA  02199-7610
Phone: (617) 267-2300
Fax: (617) 267-8288

Dated: April 4, 2006

BN1 35030319.3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I, Stephen L. Coco, an attorney, caused a true and correct copy of the foregoing OPPOSITION OF PLAINTIFF BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC. TO DEFENDANTS' MOTION TO COMPEL to be served on all counsel of record electronically, pursuant to Section D of Case Management Order No. 2, this 4th day of April, 2006.

/s/ Stephen L. Coco _____
Stephen L. Coco (BBO# 561169)
ROBINS, KAPLAN, MILLER & CIRESI, LLP
800 Boylston Street, 25th Floor
Boston, MA  02199-7610
Phone: (617) 267-2300
Fax: (617) 267-8288

- 21-