1      use this device with respect to body cell mass wasting.

2                  (Discussion off the record.)

3                  THE COURT:  Okay.

4                  MS. CARMODY:  Body cell mass, in terms of the

5      criteria the FDA looked at and the company looked at in the

6      testing trials, they looked at lean body mass and never looked

7      at body cell mass.  And body cell mass is not something that

8      can be seen, it's the only measure -- if there is a measure,

9      and there's a lot of difference of opinion even today in the

10     medical community whether or not there is any way to accurately

11     measure body cell mass in any individual.

12                 The software that the company developed with and

13     through RJL -- and RJL is a very small, less than ten person

14     operation just outside of Detroit.  It was one of the few

15     manufacturers of this kind of device in the country, and they

16     went -- the company went to RJL as early as 1995 and was

17     talking about the BIA device; but the conspiracy really began

18     in 1996 when they changed the software that was used to

19     accompany the BIA device.  And there were four different kinds

20     of software --

21                 THE COURT:  Did RJL do that software?

22                 MS. CARMODY:  RJL worked with the company to

23     develop the software.

24                 THE COURT:  Developed the software.

25                 Is RJL then a co-conspirator here?

1          MS. CARMODY:  RJL is a co-conspirator here, and

2     they have been charged in an information in a related case.

3     The company and the president have both pled guilty to an

4     information charging similar -- charging essentially this

5     conspiracy last April, and they're due for sentencing in

6     February of 2006.

7          THE COURT:  Okay.

8          MS. CARMODY:  They developed in 1994 the FNA

9     software.

10          And I won't go into the particulars of each

11     software.  I'll rely on the sentencing memorandum for that.

12          But the important parts of this particular

13     development, because it was the first in the long line of

14     development, was that the prediction equation that -- and in

15     order to get the readings from the BIA device, they have to put

16     the readings of reactants and resistance into the computer

17     software using a predictive equation based upon a particular

18     patient or population to determine how the person that's being

19     tested measured up to some kind of a normal or otherwise

20     population.

21          The predictive equation is used to estimate the BCM

22     based upon the measurements of total body potassium, that was

23     in the FNA software.  That's a different base than was used in

24     the prior device that the RJL had had approved by the FDA.

25          They also used a different patient population, a

1    different database, this time consisting of about 332 humans

2    who were either healthy or had tested for HIV.  Very different

3    patient population than the device had been approved for in the

4    1980s.

5              So RJL, together with Serono -- and there were

6    several people from Serono, people that worked in the marketing

7    department as well as people in the medical affairs department

8    that worked together to develop this computer software to see

9    whether or not they could determine body cell mass and whether

10   or not that could be used as a criteria to determine whether

11   someone was suffering from AIDS.

12             But this patient -- this equation, this device with

13   a different equation and a different database, was also being

14   used for a different purpose than the device was being used in

15   the 1980s; and that was specifically to determine whether

16   someone had the redefined AIDS wasting.  And that, in fact, was

17   the new and intended use that is the basis for the crime with

18   respect --

19             THE COURT:  Not approved by the FDA.

20             MS. CARMODY:  It was never approved -- they never

21   even applied for any kind of approval from the FDA.

22             So they went from FNA software that was being

23   used -- and, by the way, your Honor, not only were they using

24   it to define within the company, but what they did with the

25   devices was they sent the devices to physicians.  The company

1    had a different progression with respect to the devices.   The

2    devices themselves cost about -- on retail about $4,500,

3    $4,900.

4            The company made a major purchase where they paid

5    about $2,500 for each device, and they wanted first to lease it

6    or to sell it to doctors.   They didn't get enough interest in

7    doctors of leasing it and selling it, so they then decided to

8    give it away to doctors, because they had to put these devices

9    in the doctors' offices in order for the doctors to go beyond

10   that scale into body cell mass wasting.

11           So what they also did was train their employees not

12   only on how to do the tests, and the employees went in and both

13   showed doctors and their staffs how to perform the tests, but

14   also did the tests themselves.

15           The second software that was developed between the

16   company and RJL was in about 1998 it incorporated the same

17   equation that was used in the FNA software, but they measured

18   it against a different population base so that they would get

19   different results.   Because this was a database of humans

20   derived from something called the National Health and Nutrition

21   Examination Survey, often referred to as NHANES; and this new

22   software which was also used by company employees and

23   disseminated to doctors' offices, and this is throughout the

24   United States, was required premarket approval from the FDA

25   before its introduction, and no such approval was either sought

1   or obtained.

2           The next software was developed in about August of

3   1999, and that's the SomaScan software.  And I would point out

4   one thing, your Honor, because I think it's important.  We did

5   submit as part of the offense conduct, it's not public, but it

6   is referred to in the presentence report, the summary of the

7   total Medicaid reimbursement, not just for Medicaid but for

8   other federal programs, and it shows the sales over the years.

9           And your Honor will notice that the sales increased

10  in 1998 but went up exponentially in 1999 and 2000.  And this

11  was about the same time of the introduction of the SomaScan

12  software was being developed and disseminated to the employees

13  of Serono for their use and for doctors' use.

14          After this particular software, in addition to

15  using that same predictive equation again for estimating body

16  cell mass, among other things, it further computed the

17  purported precise ideal amounts for each of these measurements

18  for individual test subjects and compared them to this NHANES

19  database.  But the key here is they eliminated any standard

20  deviation from its calculations, which absolutely skewed the

21  results.

22          The results were so skewed that when employees were

23  given the software, they were told to retest patients so that

24  when they retested patients who had already tested and not

25  shown to be wasting, these new patients would actually -- were

1    actually shown to have been wasted.

2            This was also a new and intended use, and it

3    required premarket approval from the FDA before introduction

4    into interstate commerce, and no approval was sought or

5    obtained.

6            And, finally, the fourth variation on the software

7    was Cyprus 1.2 condensed.  It was introduced in February of

8    2000.  And during the period of time, especially, in

9    particular, in 1999, the problems with the SomaScan software

10   was something that was a priority at the company.  This was

11   something that was so out of whack, so to speak, with the

12   results that they had received previously, that it was a real

13   focus of attention.

14           So that they tried, again, to revise the software

15   to determine whether or not they could come up with anything

16   that would be the gold standard or validated results with

17   respect to these tests.

18           So Cyprus 1.2 then computed purported normal

19   amounts and normal ranges, again, using the Z equation, as we

20   call it; and this, again -- a portion of the NHANES database

21   but a different patient population in that NHANES database.

22           This was also a new and intended use.  It required

23   premarket approval, and no such approval was either submitted

24   or obtained.

25           What the company -- and I've already alluded to

1    it -- was doing with this software, which was its primary

2    marketing tool, and one particular document that stands out in

3    my mind in terms of company documents was one e-mail done by

4    the company's medical director that said -- referred to how

5    tests ought to be performed and said although we don't market

6    solely using the BIA test -- so even the medical affairs people

7    in the company, as well as the marketing and sales people, knew

8    that this device was being used to market its product.

9          The only purpose of this device was to redefine and

10   expand the definition of AIDS wasting into an area that the FDA

11   had never approved.  And they went as far as to measure amounts

12   of their employees' time as to how much time they were spending

13   doing BIAs; and, in particular, used something called the BIA

14   hit rate, which is measuring how many prescriptions they would

15   obtain after doing how many BIA tests.  So that they were

16   measuring the success of using this tool that had never been

17   approved by the FDA for the purpose for which they were using

18   it.

19          THE COURT:  And the point of this, as I understand

20   it, the government to be charging is the point of this device

21   is to show people that, notwithstanding how they looked, what

22   they -- the fact that they might be gaining weight, they still

23   had body wasting and they needed the drug.

24          MS. CARMODY:  Exactly, your Honor.

25          THE COURT:  And then they go out and buy the drug.

1          MS. CARMODY:  Exactly, your Honor.

2          Now, the primary -- and this is important

3    particularly with respect to the Court's comment at the

4    beginning of the hearing today, the primary customer for this

5    drug were the state Medicare agencies.

6          They were the ones who had to approve the

7    reimbursement, and the primary -- many of the people with AIDS

8    and HIV, as the Court so accurately pointed out, were the most

9    vulnerable people in our health care system; people that had

10   HIV and AIDS; people that didn't have the means to have their

11   own health insurance; and people that were really at the mercy

12   of our health care system.  And they got their drugs primarily

13   through the Medicaid systems, through the state that were

14   partially funded by the federal government.

15         And, by the way, the state Medicaid agencies for

16   the record are federal health care programs as defined in 18

17   USC section 24.

18         So these state Medicaid agencies had to approve the

19   drug.  The drug, as we mentioned and the Court mentioned, is a

20   very expensive drug, $21,000 for a 12-week course of treatment.

21         The company aggressively marketed and lobbied the

22   state Medicaid agencies, not just on putting the drug on the

23   formulary, but providing for them the criteria for

24   reimbursement; creating treatment guidelines; using experts

25   that were friends of the company, so to speak, to come

1  together, thought leaders, people respected in their field, to

2  develop guidelines for them to then take to state Medicaid

3  agencies so that the state Medicaid agencies would use as a

4  criteria for reimbursement the BIA test.

5          And they were very successful at doing this; and

6  they were very successful, in particular, in doing it in the

7  top two states that had the highest number of AIDS patients in

8  the country and paid the most for the drug, and that was both

9  California and Florida.

10          So they went to the state Medicaid agencies.  We've

11  spoken to the witnesses at the state Medicaid agencies to

12  determine, you know, how those BIA tests were used, and how the

13  criteria was changed to accommodate this BCM wasting.

14          One of the -- and I know we've talked about this,

15  but one of the -- a couple of the tools that the company used

16  to determine or to tell their sales force to talk to people

17  about was -- and, particularly, referring back to your comments

18  a moment ago that you couldn't tell somebody was wasting was a

19  difference -- looking at a muffin, you can't tell the

20  difference between a low fat and a fat-free muffin, but there's

21  a difference in the body composition of that muffin.

22          THE COURT:  May I interrupt you just a minute?

23  Because I think -- I don't want to have you tell the whole

24  story and not get to the other part of the case.  I'm not sure

25  you haven't covered the area of the conspiracy and the fact

1    that you have an adulterated medical device by saying none of

2    these use the --

3             MS. CARMODY:  Were approved by the FDA.

4             THE COURT:  -- were approved.  I've read the

5    details.  I'm not sure you need to add all the details you're

6    about to add.

7             If you think so, you can, but I'm not sure I

8    haven't heard at least the elements I need to determine;

9    namely, the conspiracy and the adulterated device.  So I'm

10   suggesting you might want to go on to the second count.  Maybe

11   you've already covered the second count.

12            MS. CARMODY:  I've covered it to a small point,

13   your Honor, and I will just refer, if there's anything that the

14   Court needs further, to the PSR and the sentencing memorandum

15   with respect to count one.

16            With respect to count two, I'll state it briefly.

17   In early 1999, sales were down with the company.  They needed

18   to kick start sales for a number of reasons, including the fact

19   that high-level officials in the company were coming from

20   Switzerland to the United States for a major meeting.  There

21   was an international conference on nutrition and HIV infection

22   that was held in Cannes, France on a semi-annual basis.  This

23   was the third conference.  It was to be held in April of 1999.

24            And in March -- March 1 of 1999, at the Boston

25   Harbor Hotel here in Boston, an emergency meeting was held.

1    Regional directors were coming for another purpose, but they

2    were also asked to come to an emergency meeting that was held

3    by the top management of the unit of Serono Labs that

4    specifically was responsible for the Serostim sales -- and

5    that's the metabolic and immune therapy unit at the time, often

6    called M&IT -- and the top management, which included the vice

7    president of sales, who was Mary Stewart, and the vice

8    president of marketing, who was John Bruens, both of them are

9    individuals who have been indicted in a related case on this

10   specific conspiracy.

11         Serono Labs knew that the offering and inducement

12   to a physician to get them to refer a patient or write

13   prescriptions for Serostim so they would then take it to a

14   pharmacy and had it filled, including at a Medicaid agency,

15   they knew that was wrong.  They had had training on kickbacks,

16   so they knew that.

17         But at the end of February of 1999, they were only

18   meeting 80 percent of their sales goal.  They needed to kick

19   start sales.  So on March 1st, they had a meeting.  The vice

20   president of marketing, the vice president of sales, and other

21   top management called together the regional directors.  The

22   country at that time for its sales purposes were divided into

23   six regions, each led by a regional director.

24         So they pulled in those regional directors, one of

25   whom was Adam Stupak, who has pled guilty in a related case and

Page 54

1  is awaiting sentencing; one of whom is a relator in a civil

2  case; and spoke to the regional directors about kick starting

3  sales, and, in particular, targeting high prescribers to go to

4  the conference in Cannes in return for writing -- at that time

5  the plan was writing 30 scripts for the trip.

6       The regional directors then, taking their orders

7  from top management, went out and some of the regional

8  directors did exactly what their top management told them to

9  do.  And, in particular, Adam Stupak would testify that he went

10 out and offered -- made the offer to three doctors in New York

11 and the doctors not just in New York but in other areas of the

12 country, some of them accepted it, some of them rejected it,

13 and some of them, you know, simply walked away from it.

14      Some of them accepted it and went, some of them

15 didn't accept it at first and went.  But the bottom line was

16 that two -- at least two of the doctors told their sales

17 representatives that this was not an appropriate offer and that

18 it was -- calling it -- so much as calling it a bribe.

19      And that information even went back to top

20 management through the regional directors and still they

21 continued on with the program.

22      Approximately 20 doctors were offered the trip, 13

23 accepted the trip.

24      I think that should be sufficient on count two,

25 your Honor.

Page 55

1    THE COURT:  Well, let me ask you.  I have a

2  question about count two, and the question is:  Who are the

3  conspirators?

4    MS. CARMODY:  The conspirators were the executive

5  vice president who led the marketing -- the Serostim business

6  unit, but in particular, the conspirators were Mary Stewart,

7  who was the vice president of sales; John Bruens, the vice

8  president of marketing; the regional directors; in particular

9  Adam Stupak; and the regional directors that are charged in a

10  related indictment, Marc Sirockman and Kimberly -- Melissa

11  Vaughn, excuse me.

12    THE COURT:  Help me understand.  These people all

13  work for the corporation.

14    MS. CARMODY:  Yes, your Honor.

15    THE COURT:  So they are agents of the corporation.

16    MS. CARMODY:  Yes, your Honor.

17    THE COURT:  The corporation acting only through its

18  agents.

19    The corporation is a co-conspirator -- is a

20  conspirator.  Are you saying that the individual people who

21  acted for the corporation are also the conspirators?  You

22  follow me?

23    MS. CARMODY:  I can tell you how the corporation

24  acted to -- your Honor, I think what you're asking me is are

25  they acting ultra vires?

1          THE COURT:  No, that's not what I'm asking.

2          I'm asking -- the defendant before me is the

3     corporation.

4          MS. CARMODY:  Right.

5          THE COURT:  And my question is, the defendant is

6     charged with conspiracy, there have to be two people, two

7     conspirators.  The corporation is a conspirator, and I'm asking

8     you who is the other conspirator or the other conspirators?

9     And your answer initially were these people who work for the

10    corporation; and as to that I'm just asking you if those people

11    can be conspirators, since they were, in fact, acting for the

12    corporation?

13         MS. CARMODY:  Yes, they can, I think, your Honor.

14         THE COURT:  Well, you think -- I mean, I don't --

15    is that right?  Can they be conspirators?  Maybe they can, I

16    guess I don't -- I guess I'm not saying they can't, I just need

17    to know that.

18         Mr. Depippo, you represent the corporation.  I just

19    need to understand this legal question.  I'm asking a legal

20    question.  I'm asking to both of you a legal question.

21         MR. DEPIPPO:  Judge, I always understood the

22    conspiracy to involve the corporation and certain physicians.

23    There are a number of people outside of the corporation --

24         THE COURT:  Perhaps they are.  The physicians, I

25    assume, were the offerees.  The conspiracy is charged as a

1   conspiracy to offer.  So the question, even with respect -- I

2   thought about your position.  The question I have is whether a

3   physician -- perhaps you're right, perhaps a person who is the

4   offeree can be a co-conspirator, but only -- I assume only can

5   be the person who accepts the offer.

6          MR. DEPIPPO:  Right.  And I think they've

7   articulated, at least the way I've always read count two, is

8   that certain physicians did accept the offer.

9          THE COURT:  I understand.  But you understand the

10  conspiracy crime is complete when -- at the conspiracy level,

11  not when the crime is carried out.

12         MR. DEPIPPO:  When the agreement is made.

13         THE COURT:  The agreement.  And the agreement is to

14  do an illegal act.  The illegal act charged is offering to pay

15  illegal remuneration.  As a kind of intellectual matter, I'm

16  having trouble understanding the offeree conspiring to offer.

17         MS. CARMODY:  I think I can help.

18         THE COURT:  Okay.

19         MS. CARMODY:  Corporate policy, the top management,

20  the vice president of sales and marketing held a meeting in

21  Boston where they told regional directors to go and make this

22  offer.

23         THE COURT:  Yes.

24         MS. CARMODY:  Now, they were employees of the

25  corporation, but they're also individuals.  They could choose,

1   that was their choice, the individual regional directors, to

2   participate in this conspiracy or not.  And, in fact, that was

3   the case.  Some regional directors went out and joined the

4   conspiracy, joined the agreement and went out and made the

5   offers to doctors and made the payments.  Not every regional

6   director has been charged in this case nor is it alleged that

7   every regional director participated.

8              THE COURT:  I see.

9              MS. CARMODY:  There were others that recognized the

10  wrongness of this corporate policy and decided and determined

11  not to participate in it.

12             THE COURT:  Okay.  Let me understand now.  So the

13  corporation, acting through its executives, the people you

14  identified, the exec --

15             MS. CARMODY:  John Bruens and Mary Stewart, among

16  others.

17             THE COURT:  Who are they?

18             MS. CARMODY:  They were the vice president of sales

19  and the vice president of marketing.

20             THE COURT:  So they act for the corporation.

21             MS. CARMODY:  Yes.

22             THE COURT:  They go to employees and they say go

23  out and make these offers.

24             The people whom they direct, understanding,

25  presumably, this is illegal to do this, agree with the

1   corporation through its executives to go out and make these

2   offers.

3               MS. CARMODY:  That's correct.

4               THE COURT:  Okay.  And so you say that when they

5   agree, they're acting as individuals, not as agents of the

6   corporation.

7               MS. CARMODY:  Because they're not corporate

8   officers; they're employees.

9               THE COURT:  Okay.  All right.

10              MS. CARMODY:  Okay.

11              THE COURT:  All right.

12              MS. CARMODY:  Does the Court have any other

13  question on count two?

14              THE COURT:  I don't think so.

15              MS. CARMODY:  Okay.  So I'll refer any other facts

16  that I have not stated in open court to the sentencing

17  memorandum incorporate that, and that would be our evidence on

18  count one and count two, your Honor.

19              THE COURT:  Mr. Depippo, do you have anything you

20  want to add?  This is the government's presentation.

21              You're satisfied with the explanation given to me

22  by Ms. Carmody that the conspiracy was the corporation

23  conspiring with certain of its employees to violate this

24  statute?

25              MR. DEPIPPO:  Judge, I would also -- and again, the

Page 60

1    way I always read that was that would include --

2              THE COURT:  Doctors.

3              MR. DEPIPPO:  Would include doctors.

4              THE COURT:  Well, I'll include them for this

5    purpose, because I am persuaded by the employees.  The doctors

6    I have a less comfort with, because, as I say, the doctors --

7    the charge is conspiring to offer.  This is not conspiring

8    to -- it's not a bribery conspiracy in the sense that -- maybe

9    it is, but I'm just looking at the language, the conspiracy to

10   offer.  Maybe the offeree can be a conspirator.

11             MR. DEPIPPO:  I was going to say I just read it

12   broadly, it's a conspiracy to violate the anti-kickback

13   statute, which certainly can be violated by a physician who

14   agrees to accept the payment.

15             THE COURT:  All right.  Fair enough.  It's just the

16   language of the information was a little -- I had a little

17   concern with the use of conspiracy, language of the

18   information.

19             Let me ask you, Mr. Gunning -- please, if you'll

20   stand again -- did you hear all the things that Ms. Carmody

21   said?

22             MR. GUNNING:  I did.

23             THE COURT:  Do you have any questions about

24   anything she said?

25             MR. GUNNING:  I don't.

1          THE COURT:  Do you agree; that is to say, do you

2     disagree with anything she said?

3          MR. GUNNING:  Yes.  We don't agree with all of the

4     facts in the information or the sentencing memo, but I did

5     understand your explanation of the material elements of the

6     crimes, and we agree to the facts that would support those

7     elements.

8          THE COURT:  You have the government's sentencing

9     memorandum?

10          MR. GUNNING:  As of yesterday afternoon, yes.

11          THE COURT:  And you read it?

12          MR. GUNNING:  Yes.

13          THE COURT:  What facts do you disagree with as

14     recited by Ms. Carmody and in the memorandum?

15          MR. GUNNING:  I can try to give some examples, but

16     I can't give you a laundry list --

17          THE COURT:  Well, I ask this question, because,

18     depending on what facts you disagree with, you may be

19     disagreeing with the crime that was committed.  It may be that

20     you're talking details, maybe this sale wasn't made, that sale

21     wasn't made, but some sales were made.  Maybe there were three

22     software packages, not four, details of that kind.  If that's

23     the thing you're talking about, okay -- I just need to know,

24     because I need to know whether you are actually admitting to

25     these crimes.

United States v. Serono Labs, Plea/Sentencing, 12/15/05

1          MR. GUNNING:  I think it's detail, I think if we go

2    on to some of the things we agree with --

3          THE COURT:  Maybe that would be helpful.  Yes, that

4    would be helpful.

5          MR. GUNNING:  I guess in the late 1990s we agree

6    that Serono Labs with RJL introduced the BIA machines that

7    contain software that was not approved by the FDA.

8          THE COURT:  Okay.  All right.  And how about with

9    respect to count two?

10         MR. GUNNING:  I guess as to count two, Serono

11   Laboratories also agreed to make payments to certain physicians

12   in the form of a trip to Cannes, France to attend a medical

13   conference.

14         THE COURT:  And this agreement was with the

15   employees, the regional directors --

16         MR. GUNNING:  The payments were made to physicians.

17         THE COURT:  The payments were made, but who is it

18   that you agreed with the regional directors that they should go

19   out and make these offers?

20         MR. GUNNING:  I guess on this point, at least as I

21   understand the information, it's a conspiracy to offer and pay

22   remuneration to physicians.

23         THE COURT:  All right.  Then let me ask you it this

24   way:  Ms. Carmody explained what happened.  There was a

25   meeting, two executives from the company came, and they

1    instructed regional directors to go out to get employees to

2    make these offers.  Have I summarized what you said?

3                    MS. CARMODY:  Yes, your Honor.

4                    THE COURT:  Do you agree with that much?

5                    MR. GUNNING:  Can I consult just for a minute?

6                    THE COURT:  You certainly may.

7                    (Discussion off the record.)

8                    MR. GUNNING:  I guess we acknowledge that Adam

9    Stupak, one of our former employees, has pled guilty.  We also

10   acknowledge -- understand that the other individuals that have

11   been charged are contesting their guilt.

12                   THE COURT:  Well, that's not the same thing as

13   agreeing that the corporation -- Ms. Carmody said that the two

14   executives of the corporation had a meeting at the Boston

15   Harbor Hotel and instructed or directed regional directors to

16   go out or have people working for the regional directors to go

17   out and make offers to physicians that if they were to

18   prescribe the drug -- Ms. Carmody?

19                   MS. CARMODY:  Yes, your Honor.

20                   THE COURT:   -- to prescribe the drug in sufficient

21   numbers, 30, I think, they would get this trip to this

22   conference in France; and that 20 of such offers were made

23   pursuant to this direction, and 13 people went to that

24   conference.  I think that's what you said.

25                   MS. CARMODY:  Yes, your Honor.

1          THE COURT:  All right.  Does the company agree --

2     does the company admit that that happened?

3          (Mr. Gunning conferred with counsel.)

4          MR. GUNNING:  The numbers and the details are -- I

5     have a hard time confirming those facts.  We do know that some

6     offers were made and some payments were made to physicians in

7     order to attend a conference in Cannes, France.

8          THE COURT:  Work with me, Mr. Gunning.  If the

9     company doesn't want to acknowledge a central fact, that's not

10    a problem for me.  Here's what I'm asking:  The government's

11    position is that the corporation conspired to make offers to

12    doctors.  And so the question I ask you, does the company admit

13    the facts as recited by Ms. Carmody relative to the conspiracy

14    to make this offer to physicians?  And the facts that she

15    recited are the ones I just mentioned, that this meeting was

16    held at the Boston Harbor Hotel.  That's part of what she

17    said.  A meeting -- sales were not going well, the meeting was

18    held at the Boston Harbor Hotel, regional directors were

19    invited, six regional directors -- I'll let you consult with

20    your lawyer if you want to, then I'll tell you what I want you

21    to hear from me.

22         MR. GUNNING:  I'm sorry, I'm being distracted.

23         THE COURT:  You consult and tell me when you're

24    ready.

25         (Mr. Gunning conferred with counsel.)

Page 65

1          THE COURT:  Okay, sir.

2          MR. GUNNING:  So let me give this a try.

3          Serono Laboratories also agrees that it and at

4    least one company employee conspired to make payments in the

5    form of a free trip to Cannes, France for physicians.

6          THE COURT:  Okay.  Thank you, sir.

7          MR. GUNNING:  Thank you.

8          Ms. Carmody, do you see any reason why I should not

9    take the plea of the corporation?

10          MS. CARMODY:  No, I do not.

11          THE COURT:  Mr. Depippo, do you see any reason why

12    I should not take the plea of the corporation?

13          MR. DEPIPPO:  No, your Honor.

14          THE COURT:  To these two counts?

15          MR. DEPIPPO:  No, your Honor.

16          THE COURT:  All right.  Mr. Gunning, please stand.

17          THE CLERK:  Mr. Gunning, Serono Laboratories has

18    been named in two counts in an information charging in count

19    one conspiracy to introduce into interstate commerce, with

20    intent to defraud and mislead, adulterated medical devices in

21    violation of Title 18 United States Code 371; and in count two

22    with conspiracy to offer to pay illegal remuneration to health

23    care providers in violation of Title 18 United States Code

24    section 371.

25          How do you plead to counts one and two of the

1    information, guilty or not guilty?

2              MR. GUNNING:  Guilty.

3              THE COURT:  It is the finding of the Court that

4    Mr. Tom Gunning is an officer of the defendant corporation

5    Serono Laboratories, Incorporated and that the board of

6    directors of that corporation empowered him to waive indictment

7    of the corporation of the two charges set forth in the

8    information; that Mr. Gunning is -- was likewise authorized by

9    the directors of the corporation to enter a plea of guilty to

10   the two counts of the information; and that the corporation is

11   financially able to pay the fine set forth in the plea

12   agreement between the United States and the corporation; that

13   the corporation is aware of the nature of the charges in the

14   information and the consequences of pleading guilty to those

15   charges; and, finally, that the plea of guilty that Mr. Gunning

16   has entered on behalf of the corporation is a knowing and

17   voluntary plea supported by an independent basis in fact

18   containing each of the essential elements of each of the

19   offenses charged in the information.

20             I will determine that the corporation may be found

21   guilty of these two offenses.  Acceptance of this plea,

22   however, I will await information that I receive in the

23   specific sentencing phase.

24             So let's proceed to the sentencing phase.

25             I normally ask, but I don't think it's really

1   necessary in this case, whether you, Ms. Carmody, have seen the

2   presentence report.

3              MS. CARMODY:  I have, your Honor.

4              THE COURT:  Mr. Depippo, have you seen it?

5              MR. DEPIPPO:  Yes, your Honor.

6              THE COURT:  And have you discussed it with the

7   corporation?

8              MR. DEPIPPO:  I have, your Honor.

9              THE COURT:  And specifically with Mr. Gunning?

10             MR. DEPIPPO:  I have, your Honor.

11             THE COURT:  Let me take a moment, first, to thank

12  our splendid probation office generally and particularly

13  Ms. Sinclair, who has worked on this presentence report.

14             This was not an easy report to do.  I see lots of

15  presentence reports.  Ms. Sinclair has worked with me in lots

16  of criminal cases and has prepared many, many splendid

17  presentence reports; but the work involved in this one was

18  enormous, and so I want to take a moment to thank her

19  particularly and the probation office for the fine work that

20  has gone into preparing this presentence report.

21             I want to thank Ms. Sinclair in particular for the

22  help she's giving me in understanding the presentence report,

23  to the extent I have any understanding of it -- let me say I

24  have some understanding of it.  As you know, I started off

25  getting the numbers wrong.  But after so many numerals, I'm

1  lost.  Math was not my best subject; arithmetic was not my best

2  subject, so whatever fault there is in my getting these numbers

3  mixed up in the beginning of this proceeding is my fault.  But

4  I want everybody to know that our probation office has done a

5  magnificent job here.  Ms. Sinclair has done a wonderful job

6  putting it all together and particularly in explaining to

7  somebody who is as dense as I am about these matters.

8           So I want to say that before we begin.

9           Let me then recite what the guidelines provide in

10  this case, starting with the offense level computation.

11           What page is that?

12           PROBATION OFFICER:  46.

13           THE COURT:  The guideline manual applicable to this

14  case is the manual in effect at the time of the commission of

15  the offense; that is to say, the manual of November 1, 2001.

16  The probation department has determined that these guidelines

17  are more beneficial to the corporation with respect to the loss

18  calculation and the number of victims than the guidelines --

19  the current guidelines or the guidelines at the time of

20  sentencing.

21           On the basis of the 2001 guideline manual, the

22  probation officer, using the procedures for determining

23  guidelines organizations, including the culpability score

24  computation, the probation officer has determined that the

25  total culpability score of this corporation in these

1  circumstances is six, taking account the offense level

2  computation of both of the two counts of conviction.

3          The culpability score of six results in a fine

4  multiplier of 1.2 at the minimum level and 2.4 at the maximum

5  level, and a statutory maximum of $228,224,000.

6          All right.  Have I stated that correctly as far as

7  the United States is concerned, Ms. Carmody?

8          MS. CARMODY:  Yes, your Honor.

9          THE COURT:  Mr. Depippo, have I stated that

10 correctly as far as the corporation is concerned?

11         MR. DEPIPPO:  Yes, your Honor.

12         THE COURT:  All right.  Now, are there objections

13 to the culpability score at all?  I guess I stated it

14 correctly, but I suppose I specifically should ask if there are

15 objections.

16         Does the government have any objection?

17         MS. CARMODY:  No, your Honor.

18         MR. DEPIPPO:  Not to this Court.

19         THE COURT:  I'm sorry, sir?

20         MR. DEPIPPO:  Not to this Court.

21         THE COURT:  You have objection to something?

22         MR. DEPIPPO:  No, your Honor.  We have no

23 objections to the presentence report that need to be resolved

24 by the Court.

25         THE COURT:  That's fine

Page 70

1          All right.  Then let me proceed to state that the

2   fine range as determined by the parties on this plea is

3   $136,935.  The fine --

4          MR. DEPIPPO:  Judge, I'm sorry, it's $136 million.

5          THE COURT:  I told you.

6          Thank you.  Don't let me do that again.  Somebody

7   stop me.

8          The guideline fine range as determined by the

9   parties in accordance with their agreement is $136,936,000 to

10  $2,868,800 is the range.  And the parties have agreed that the

11  fine to be paid by the corporation is $136,936,000.

12          Have I stated that correctly at long last,

13  Ms. Carmody?

14          MS. CARMODY:  Yes, you have, your Honor.  I just

15  want to make one point.  In fact, I think the parties agree on

16  this, that the fine range I think has to be capped with a

17  statutory maximum.

18          THE COURT:  Yes.  I should have said the range is

19  $136,936,000 to $273,868,800.  There's a statutory cap of

20  $228,224,000.

21          MS. CARMODY:  That's correct, your Honor.

22          THE COURT:  So the range in effect is $136,936,000

23  to $228,224,000.

24          MS. CARMODY:  That's correct, your Honor.

25          THE COURT:  Okay.

Page 71

1          Correct, Mr. Depippo?

2          MR. DEPIPPO:  Yes, your Honor.

3          THE COURT:  Okay.  Now, the parties have agreed

4    that the fine should be the low end of the guideline range, and

5    I won't recite the number again because I've said it correctly

6    once and I don't want to mess it up.

7          The special assessment, mandatory special

8    assessment on the two counts of conviction is $800.  There is a

9    guideline range of probation of one to five years, and the

10   parties have agreed that no probation is appropriate.

11          Have I stated that correctly, counsel?

12          MS. CARMODY:  Yes, your Honor.  And just to explain

13   to the Court the reason, the company has agreed as part of the

14   global resolution to enter into and has entered into a

15   corporate integrity agreement with the Office of Inspector

16   General for the Department of Health and Human Services; and

17   that term is at least five years.  And that oversight would be

18   essentially more, actually, than I think a probation officer

19   could do, and is more appropriate in these circumstances.

20          THE COURT:  I think that's right.

21          We come now to the question on whether I can accept

22   this plea on the basis of this agreement, and I have the

23   question that I raised earlier in the proceeding having to do

24   with the failure of the parties' agreement to take -- well,

25   that's not an accurate statement.  I'm sorry, Ms. Carmody and

Page 72

1    Mr. Depippo.  I was going to say the failure to take into

2    account the individuals, and I appreciate that you took them

3    into account.  That would be an inaccurate statement.

4              I understand that the position of the parties to be

5    that the complications of a restitution program for the

6    individuals outweigh -- or the value of the global arrangement

7    that the parties have entered into substantially outweighs the

8    omission, any consequence of omitting any provision for the

9    individual victims.  Have I stated at that correctly?

10             MS. CARMODY:  That's correct, your Honor.  That's

11   our position.

12             THE COURT:  Okay.  Mr. Depippo, can you speak to

13   this question?  Because it's -- if I am correct that some 9,000

14   individuals -- and I'm primarily concerned with the individuals

15   as opposed to the private corporate victims -- if there are

16   9,000 individuals who may have been injured, isn't there

17   something that might be done for those 9,000 that does not

18   unreasonably burden the parties in administering the program?

19             MR. DEPIPPO:  Judge, a couple of things.

20             I mean, first, you know, there's a substantial

21   portion of the restitution award in this case that relates to

22   civil theories that are outside of counts one and count two.

23             THE COURT:  I understand that.

24             MR. DEPIPPO:  And as part of that global civil

25   settlement, with respect to those theories, the company has not

1    admitted to any liability.  And so -- I mean, as an initial

2    matter, there certainly will be, you know, a question as to

3    whether those people have suffered any harm or any loss at

4    all.  And I think that there -- secondly, there would be a

5    mechanism whereby -- and, in fact, is a mechanism whereby any

6    harm would be redressed; and that is to say -- I'm not handling

7    it, I'm not fully up to speed, but I'm well aware there is a

8    civil suit that has been filed that purports to be a class

9    action suit at least -- and as I understand it, it is filed on

10   behalf of those that are the non-Medicaid payees of this drug.

11   And so it seems to me that not only are there all of the

12   complications, but there is also an alternative forum under

13   which anyone who has been harmed can seek compensation.

14            THE COURT:  I'm surprised I didn't think about the

15   class action mechanism.

16            All right.  I think you have addressed my problem,

17   because, as I say, I am satisfied that the private insurers can

18   take care of themselves; and oddly enough, Mr. Depippo -- not

19   oddly enough for him, oddly enough for me, I didn't think of

20   it, that there is a forum and the mechanism for the

21   individuals, and that is a class action.  Class action isn't

22   easy, but it may be the best mechanism for any person who

23   thinks of himself or herself injured by the company as a result

24   of this scheme, because there will be a judicial, as

25   distinguished from an administrative or alternative dispute

Page 74

1    resolution, mechanism available to such person.

2              There is one thing, however, that it seems to me

3    that should be -- and I just want to put this on the table, and

4    maybe I don't have to do this, because maybe the fact of this

5    plea and the fact of this global settlement will become public

6    knowledge; just because of the size and of the nature of it, it

7    will become public knowledge, but my thought had been that

8    there might some means by which the company could communicate

9    directly with people who may have been injured by providing

10   information for physicians who prescribed the drug pursuant to

11   this -- during the time of this conspiracy, a notice in the

12   doctor's office, for example, so that people know that if they

13   have claims, that they can make those claims before any statute

14   of limitation runs.

15             What about that?

16             MR. DEPIPPO:  Judge, as I understand it, when the

17   plea agreement was announced in October, it was done at the

18   highest levels, including the Attorney General of the United

19   States.  It received much fanfare in the media, and there has

20   been, if you will, a public dissemination of these proceedings.

21             THE COURT:  What does the United States think about

22   that, Ms. Carmody?

23             MS. CARMODY:  Well, your Honor, on October 17th,

24   Attorney General Gonzales did make the announcement of the

25   global resolution, including the government's agreement to

1    plead guilty in this case.

2              It did receive a lot of newspaper coverage, so that

3    individuals, particularly physicians who may have been

4    prescribing the drug, would have received or been able to

5    access the information with respect to this.

6              THE COURT:  If they happened not to be watching TV

7    that day or didn't read the newspaper, they don't know.

8              I guess I need to ask you, Ms. Carmody, as a

9    representative of the United States whether what I've just

10   suggested is so fractious to this understanding that I

11   shouldn't think about it any further?

12             MS. CARMODY:  I'm not sure that it fractures the

13   understanding, your Honor; but I think it's certainly

14   something -- I know that we have considered in the context of

15   our obligations with respect to the victims of the offense.

16             I think that certainly all the Medicaid agencies

17   are aware of it, all the insurers are aware of it.  With

18   respect to physicians, physicians are aware of this case.

19             THE COURT:  Well, you mean they're aware of it

20   because there's been a newspaper -- other publicity about it.

21             MS. CARMODY:  I think it's more than that, your

22   Honor.  In my experience in the investigation the number of

23   physicians who are physicians who would prescribe this drug are

24   not a lot in terms of all of the physicians in the United

25   States.  They're usually infectious disease doctors or doctors

1    who specialize in treating AIDS patients.  That is a very small

2    medical community in the context of the whole medical community

3    of the United States.  So that those doctors are very well

4    connected with respect to issues such as this.

5            There are a lot of AIDS activists and AIDS -- there

6    are several and very vocal groups of advocates for patients

7    with AIDS and HIV who have been -- in fact, one was a relator

8    in one of the civil actions in California, so that those AIDS

9    activist groups are very well aware of that settlement and take

10   on the role of advising patients who may be out there.

11           THE COURT:  Is there some nationally recognized

12   single or two or three --

13           MS. CARMODY:  Advocacy groups.

14           THE COURT:  Advocacy groups, I'm thinking about

15   something like the Muscular Dystrophy Association -- I don't

16   mean -- a group like that for people who are HIV and AIDS

17   infected.  Is there a group like that?  There must be.

18           MS. CARMODY:  There are regional groups, your

19   Honor, for sure.  And they're very activist groups,

20   particularly, for example, in California, New York, Florida,

21   some of the major payers for this drug.

22           I don't know of any one national agency, there must

23   be, and we can certainly -- I mean, even with respect to the

24   government's obligation, we could notify that -- whatever

25   groups, major groups that we could identify.  That would be not

1    be a burdensome task I would think.

2             THE COURT:  I think that as part of this

3    arrangement, and before I can accept the arrangement, and I

4    want to add a provision, which I should tell you, Mr. Gunning,

5    when I add it you will have the opportunity to withdraw this

6    plea, but I want to add a provision that requires the

7    cooperation with the United States and particularly with the

8    United States attorney's office in this district in

9    disseminating information -- I think if you tell me this will

10   be sufficient -- to appropriate advocacy organizations

11   throughout the United States about the proceedings here, that

12   there has been a plea of guilty to these counts, there is a

13   global settlement.  That's all you need to say.  Explain what

14   the plea is, what the global settlement seeks to accomplish in

15   some manner.  I think if the parties will agree to this, I can

16   agree to this plea, but I do think that I want -- ideally I'd

17   like it to go to all of these 9,000 people, but since there's

18   some difficulty in deciding who those 9,000 are -- isn't that

19   the problem?  You don't know who the 9,000 are?

20            MS. CARMODY:  We have not -- I don't know that we

21   can identify them specifically.  We have tried.  I've actually

22   had agents try to make some kind of a list to notify, that's

23   how we came up with the numbers that we do, but we know that

24   our list is woefully inadequate, your Honor; and I wouldn't

25   pretend to represent to the Court that I have an absolute list

1    of patients.

2              We have numbers from company documents.  Part of

3    the issue with AIDS patients is there's an awful lot of privacy

4    concerns.

5              THE COURT:  Of course.

6              MS. CARMODY:  So that we may not have names of

7    patients; and, in fact, in many instances, even when we got

8    patient records to review, names were not identified.

9              I think that we can manage -- and I haven't had a

10   chance to talk to Mr. Depippo and Mr. Gunning yet, but with

11   respect to -- I know our obligations under the victim/witness

12   statute we have ways to do a dissemination of information.  So

13   if we need to identify -- what I'm concerned about is what the

14   Court considers appropriate or sufficient.

15             THE COURT:  Well, you're right.  I haven't been

16   very specific, because I don't know how to be specific about

17   this.

18             You told me a minute ago that the medical community

19   regularly treating AIDS patients is relatively small.

20             MS. CARMODY:  When I say relatively small, I think

21   it's about --

22             (Discussion off the record.)

23             MS. CARMODY:  -- 50,000.

24             MR. DEPIPPO:  It's a close-knit group, and they

25   stay aware of developments.

1          As you know with AIDS, there's a new development

2    you know every other day.  It's not like some of these other

3    diseases.  And so they are -- I think that they're fairly

4    characterized as a group of physicians that stay on top of

5    things.

6          THE COURT:  Well, one group of physicians I wonder

7    can be those physicians who -- do we know who those physicians

8    are who --

9          MS. CARMODY:  The company has lists of physicians

10   that prescribe this drug.  There's absolutely no question about

11   that, your Honor.

12         THE COURT:  For purposes for which the government

13   claims were unlawful.

14         MS. CARMODY:  Yes.

15         THE COURT:  Why don't we use that list and send

16   this information to those physicians?

17         MS. CARMODY:  To those physicians?

18         THE COURT:  To those physicians.

19         MS. CARMODY:  Rather than advocacy groups?

20         THE COURT:  And advocacy groups.

21         MR. GUNNING:  Your Honor, I feel that my authority

22   is limited by what the board of directors has considered.

23         THE COURT:  I certainly understand that.

24         MR. GUNNING:  So I don't feel that I could make

25   that kind of commitment on behalf of the company.

1          I do -- we would not have an objection if the

2     government went with its press releases to the advocacy groups.

3          THE COURT:  Here's what I would like to do,

4     Mr. Gunning.  I understand your position.  Why don't I take a

5     recess until sometime next week, and you can consult, see if

6     you can get that authority.  Because I want that done.

7          I will accept this plea if I can get that done.  If

8     I can get the communication to the advocacy groups of the

9     doctors that the company has pleaded guilty and there has been

10    this global settlement -- and you show me what it is you're

11    going to tell me, and then I can be satisfied that the people I

12    think who have been -- who individually have been harmed know

13    about it, and they can take whatever action they want to take.

14         MS. CARMODY:  Your Honor, may I have a moment to

15    consult?  But I think we can do that in the U.S. Attorney's

16    Office.

17         THE COURT:  The government will undertake this?

18         MS. CARMODY:  I'd like to confirm that, but I think

19    we might be able to.

20         If I may just have a moment to confer.

21         THE COURT:  I'll take five minutes, a recess, and

22    you confer.

23         MS. CARMODY:  Thank you.

24         THE COURT:  And if the government will undertake

25    that responsibility -- understand I don't know who the advocacy

1    groups are, but you can find out; and I want the information

2    from the company to you as to whom the doctors were.

3              I'll take five minutes and you can tell me whether

4    you can do it.  We can wrap this up today.

5              MS. CARMODY:  Thank you, your Honor.

6              THE COURT:  Thank you.

7              (Recess taken.)

8              THE COURT:  Ms. Carmody, what can you --

9              MR. DEPIPPO:  Your Honor, may I address the Court?

10             THE COURT:  Yes.

11             MR. DEPIPPO:  Judge, I want to put on the record

12    what I think should satisfy the Court to conclude these

13    proceedings today, and I've had discussions with the

14    government; and that is, that the government and the company

15    will work together to identify and agree on the prescribing

16    physicians and appropriate AIDS advocacy groups to whom the

17    company will send a notice of the global settlement and this

18    plea.

19             THE COURT:  Okay.  That satisfies me.

20             I need to know how I implement this in terms of the

21    sentencing.  There's no term of probation, and so I -- maybe

22    it's enough that I have this representation on the record, and

23    that will be sufficient --

24             MR. DEPIPPO:  Judge, it's our view that is

25    sufficient as long as the government concurs on the record.

1          THE COURT:  Let me ask my expert here to my left.

2          PROBATION OFFICER:  It seems to me that it could be

3   sufficient, your Honor, because since it could have otherwise

4   been incorporated in the plea agreement as part of their other

5   agreements.  But I'm not certain.

6          MS. CARMODY:  Your Honor, we do could it by way of

7   an addendum to the plea agreement.

8          THE COURT:  That would be sufficient.  All right.

9   And since I am agreeing to accept this plea on the conditions

10  set forth in the plea agreement, if that is added to the plea

11  agreement, that will be a way to implement this added

12  provision.

13         Mr. Gunning, if you'll stand, please.  And thank

14  you and Mr. Depippo and Ms. Carmody for taking the few minutes

15  it took to satisfy me by adding that provision.

16         MR. GUNNING:  No problem.

17         THE COURT:  Now that you have added the provision,

18  I should formally ask whether with the condition that I've

19  added to -- that I insist be added to the plea agreement, does

20  the company wish to withdraw its plea?

21         MR. GUNNING:  No.

22         THE COURT:  All right.

23         Then, Ms. Carmody, do you see any reason why I

24  should not impose sentence?

25         MS. CARMODY:  No, your Honor.

Page 83

1          THE COURT:  Mr. Depippo.

2          MR. DEPIPPO:  No, your Honor.

3          THE COURT:  Pursuant to the Sentencing Reform Act,

4     Mr. Gunning, and having considered the sentencing factors

5     enumerated at Title 18 United States Code section 3553(a) and

6     the plea agreement of the parties, as modified in the way we

7     have just discussed on the record, it is the judgment of the

8     Court that the corporation, Serono Laboratories, Inc., shall

9     pay to the United States a fine of $136,936,000.  That fine

10    shall be paid within seven days of the imposition of this

11    sentence.

12          The fine is to be continued to be paid until the

13    full amount, including interest, has been paid.  And by that I

14    mean, if it's not paid within that seven days, those interest

15    penalties will continue to accrue.

16          It's further ordered that Serono Corporation shall

17    comply with the terms of the Rule 11(c)(1)(e) plea agreement as

18    modified --

19          MR. DEPIPPO:  Just for the record, that's Serono

20    Laboratories, Inc.

21          THE COURT:  What did I say?

22          MR. DEPIPPO:  You said Serono Corporation.

23          THE COURT:  Thank you.

24          It's further ordered that the defendant, Serono

25    Laboratories, Inc., shall comply with the terms of the

Page 84

1    Rule 11(c)(1)(e) plea agreement as modified today and the

2    settlement agreement entered into by the parties, including,

3    but not limited to, the payment to the United States and

4    participating -- Medicaid participating states collectively the

5    sum of $567,065,000 together with interest as set forth in

6    paragraph one of the settlement agreement.

7              It is further ordered that the defendant, Serono

8    Laboratories, Inc., shall pay the United States a required

9    special assessment of $800, which shall be due and payable

10   immediately.

11             Are there any questions of anyone?  Of me from

12   anyone?

13                  MR. GUNNING:  No.

14                  MS. CARMODY:  No, your Honor.

15                  THE COURT:  Let me advise -- no question.

16             Let me advise the corporation through you,

17   Mr. Gunning, that the corporation has the right to appeal this

18   conviction if the corporation finds there's some fundamental

19   defect in these proceedings not waived by the corporation's

20   guilty plea.

21             The corporation also has a right to appeal the

22   sentence to the extent that right has not been modified or

23   waived by the corporation in the plea agreement.

24             Any appeal that the corporation wishes to file must

25   be filed within ten days of judgment being entered in this

1      case.

2                  Is there anything further, counsel, and

3      Mr. Gunning?

4                  MR. GUNNING:  No.

5                  THE COURT:  If there's nothing further, then thank

6      you very much for your cooperation for getting this matter

7      settled.

8                  We are adjourned.

9                  (Court adjourned at 1:15 p.m.)

10                      i  i  i  i  i  i  i

11                  CERTIFICATION

12                  I certify that the foregoing is a correct

13     transcript of the record of proceedings in the above;entitled

14     matter to the best of my skill and ability.

15

16

17

18     _____      _____

19     Debra M. Joyce                 Date

20     Official Court Reporter

21

22

23

24

25