# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | )<br>)<br>)<br>)<br>) |
|  | MDL No. 1456 |
|  | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | )<br>)<br>)<br>)<br>) |
|  | Judge Patti B. Saris |

**SCHERING-PLOUGH CORPORATION'S AND WARRICK PHARMACEUTICALS CORPORATION'S RESPONSE TO PLAINTIFFS' L.R. 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR <u>PARTIAL SUMMARY JUDGMENT AGAINST ALL TRACK 1 DEFENDANTS</u>**

Pursuant to Local Rule 56.1, Defendants Schering-Plough Corporation ("Schering") and Warrick Pharmaceuticals Corporation ("Warrick") hereby respond to Plaintiffs' L.R. 56.1 Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment Against All Track 1 Defendants ("Plaintiffs' 56.1 Statement").

## <u>INTRODUCTION</u>

Plaintiffs' 56.1 Statement should be rejected for its blatant failure to comply with LR. 56.1. The requirements of this rule are simple: "a *concise* statement of the *material facts of record* as to which the moving party contends there is *no genuine issue to be tried*, *with page references to affidavits, depositions and other documentation*."  LR. 56.1 (emphases added).

Plaintiffs' 56.1 Statement is none of these things.  It fails to include a single citation for any of its 77 assertions, including the 14 assertions that might possibly relate to Schering or Warrick. This alone is grounds to deny the motion for summary judgment.  (*See* Joint Mem. Opp'n Pls.' Mot. Partial Summ. J. at 4-5.)  Further, the Statement fails to offer facts that are material.  Many of the purported "facts" are not "facts" at all:  as they are written, they are argumentative, conclusory, or irrelevant assertions.  Plaintiffs' 56.1 Statement also fails to offer facts supported by the record. Often, the record shows exactly the opposite of what Plaintiffs claim – something Plaintiffs obscure by failing to include any record citations.

In an attempt to excuse this error, Plaintiffs purport to "expressly incorporate[]" in their Statement the "references and source materials," as well as "record cites," from Part III of their Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment.  (Pls.' 56.1 Stmt. at 7.)  This is inconsistent with the terms of LR. 56.1:  The referenced portion of their memorandum is 116 pages of argument that refers to 304 exhibits comprising several thousand pages, including 40 exhibits totaling 194 pages offered against Schering and Warrick.  (*See* Pls.' Mem. Supp. Mot.

Partial Summ. J. Against All Track 1 Defs. at 3-116.)  Moreover, the referenced Part III of the

Plaintiffs' Memorandum is not independent of the rest of the memorandum; responding to this

section, titled "Plaintiffs' 56.1 Statement of Material Facts," would require responding to Plaintiffs'

entire brief.[1]  This would not narrow the issues before the Court, the purpose of LR. 56.1.  *See*

*Gosselin v. Webb*,  242 F.3d 412, 414 n.2 (1st Cir. 2001) (noting that, without compliance with LR.

56.1, "summary judgment practice could too easily become a game of cat-and-mouse").

Statements full of "[b]ombast and bluster, wholly detached from verified facts of record,"

are insufficient to support a motion for summary judgment.  *Corrada Betances v. Sea-Land Serv.,*

*Inc.*, 248 F.3d 40, 44 (1st Cir. 2001) (refusing to credit non-movant's statement of facts that lacked

citations and appeared in the memorandum).  Because of Plaintiffs' failure to comply with LR.

56.1, their Statement should be rejected, and their motion for summary judgment should be denied.

*See, e.g., Dale v. H.B. Smith Co, Inc.*, 910 F. Supp. 14, 20 (D. Mass. 1995) (denying summary

judgment motion when party made 56.1 statements that were argumentative, conclusory, and

unsupported by record evidence).

## SPECIFIC RESPONSES

As described in detail below, material facts exist that prevent entry of summary judgment

for Plaintiffs.  Sufficient facts are undisputed to permit entry of summary judgment for the

defendants as requested in the Track 1 Defendants' Motion for Summary Judgment and Schering

and Warrick's Motion for Summary Judgment as to Class 2 Claims; but the record refutes many of

the factual assertions put forward by the Plaintiffs in support of their motion for partial summary

---

[1] By asking the Court - and Defendants - to wade through a 116-page section in a Memorandum in order to locate support for 77 assertions in their Statement, Plaintiffs have "simply dumped an undigested record on the judge, expecting [her] to do counsel's job."  *Alsina-Ortiz v. Laboy*, 400 F.3d 77, 81 (1st Cir. 2005) (affirming summary judgment, in part, against party whose statements "buri[ed] the district court in a mass of supposedly material contested facts").  While Schering and Warrick address many of Plaintiffs' unsupported assertions in Schering's and Warrick's Memorandum in Opposition to Plaintiffs' Motion, Schering and Warrick reserve the right to respond to all of the record evidence, should Plaintiffs submit such evidence in compliance with LR. 56.1.

judgment, and it certainly controverts others that they contend are undisputed.  The below
numbered paragraphs correspond to the assertions in the Plaintiffs' 56.1 Statement.

**1.      AWP was the reimbursement benchmark for Part B Drugs under Medicare
during the class period.**

**Response:  Disputed as written.**

AWP was not "the" reimbursement benchmark for Part B drugs under Medicare during the
class period, nor did it operate the same way for all types of drugs throughout the class period.

There is no dispute that AWP was one of several potential bases for reimbursement under
Medicare Part B, as such reimbursement was determined by Congress, mandated by statute, and
administered by the Health Care Financing Administration ("HCFA") or the Center for Medicare &
Medicaid Services ("CMS") during the class period.  (*See* Track 1 Defs.' 56.1 Stmt. ¶¶ 24, 47, 61,
74-75, 89-90 (detailing statutory changes to Medicare reimbursement during class period).)

**2.  Each Track 1Defendant [*sic*] knew that AWP was the reimbursement mechanism
for Part B drugs during the class period.**

**Response:      Disputed as written, to the extent it relates to Schering or Warrick.[2]**

First, AWP was not "*the* reimbursement mechanism," however such a "mechanism" might
be defined.  As noted *supra* at Proposed Fact No. 1, AWP was one of several potential bases for
reimbursement under Medicare Part B.

Second, Plaintiffs' own exhibits demonstrate that, for certain periods for drugs such as
Integrilin, it was not known if or how AWP would form the basis of reimbursement.  (*See* E-mail

---

[2] When a proposed fact relates only to other parties, it cannot be material to Schering and Warrick and there is no
obligation to respond.  This is the case for proposed facts 4-34 and 41-71.  When a proposed fact purports to relate to
all Track 1 Defendants, Schering and Warrick respond only to the extent such a proposed fact may possibly relate to
Schering or Warrick.  This is true for proposed facts 2, 3, 39, and 40.

from Susan Lund to Patricia Grote (June 30, 2000) (attaching memorandum describing "a lot of confusion in the marketplace" regarding basis for reimbursement of Integrilin under Medicare Hospital Outpatient Prospective Payment System), attached as SP. Ex. 26 to Decl. of Steve W. Berman in Supp. of Plaintiffs' Mem. for Partial Summ. J. against All Track 1 Defs. ("Berman Decl.").)

Third, the reimbursement formula for multiple-source drugs produced considerable uncertainty about *whose* AWP would form the basis for reimbursement. Because the law mandated reimbursement based on the median AWP, it was not known at any given time which manufacturer's AWP would fall at the median and form the basis for reimbursement. For this reason, Warrick was not aware at any time what the Medicare reimbursement rate was for albuterol, nor did it ever attempt to calculate the reimbursement rate. (*See* Schering's and Warrick's 56.1 Stmt. ¶¶ 48, 63.)

There is no dispute, however, that Schering and Warrick knew that AWP was one of several potential bases for drugs reimbursable under Medicare Part B during the class period.

**3.     Each Track 1 Defendant caused AWPs to be published for each of their subject drugs.**

**Response:     Disputed as written, to the extent it relates to Schering or Warrick**.

For Schering and Warrick, Proposed Fact No. 3 is identical to Proposed Fact No. 38, a response to which is included *infra*.

**4-34.   No response necessary, as these do not relate to Schering or Warrick.**

**35.     Schering-Plough controlled and set the AWPs for its products.**

**Response:     Disputed as written.**

First, Plaintiffs fail to define "Schering-Plough," or to provide any basis for treating Schering and Warrick as one entity.  Plaintiffs establish a system of abbreviations for when evidence purportedly applies against Warrick Pharmaceuticals ("Warrick"), Schering-Plough Corporation ("SP"), or both subsidiary and parent ("SPW").  (Pls.' 56.1 Stmt. at 1 n.1.)  Yet, they fail to use – even once – these abbreviations.  Instead, Plaintiffs employ "Schering-Plough" throughout, in an apparent attempt to apply every proposed fact to Schering *and* Warrick.  Warrick and Schering are separate legal entities.  (*See* Decl. of Harvey J. Weintraub (Mar. 10, 2006) ("Weintraub Decl.") ¶¶ 3-5, attached as Ex. 1 to Schering's and Warrick's 56.1 Stmt.)  Plaintiffs have not – and cannot – demonstrate that evidence against one company should be evidence against the other, and their back-handed attempt to do so should be rejected.  *See Motorsport Engineering, Inc. v. Maseratti,* 183 F. Supp. 2d 209, 216 (D. Mass. 2001) (granting summary judgment against plaintiffs who failed to introduce sufficient evidence that one subsidiary should be held liable for the liabilities of another subsidiary).[3]

Second, Plaintiffs' own exhibits show there were certain instances in which a publisher "controlled" the AWP by performing its own calculations, despite what might have been reported by a manufacturer.  In 2003, Richard Zahn, former president of Schering Laboratories, testified:

> Q.  Why do you keep reporting it to First DataBank, AWP?
> A.  You know, I'm not sure how we do that.  I do know recently, though, we told them that they were misrepresenting it, that they arbitrarily took our AWPs up, just took them up.  And we said, 'Hey you -- what are you doing?  That's not our number.  We have no clue why you're doing this."  And we informed them of that.  They just took it up.

---

[3] This objection relates to proposed facts 35-37 and 72-77, all of which begin with the term "Schering-Plough." Tellingly, Plaintiffs' 56.1 Statement fails to include *any* assertion that could be construed as applying only to Warrick. *See* Proposed Fact Nos. 74 (Schering product), 75 (Schering sales representative), and 76 (Schering product).

(Zahn Dep. Tr. (Jan. 15, 2003) at 176, attached as SP. Ex. 4 to Berman Decl.)  Plaintiffs also attach a 2000 email from a Schering employee noting that: "it has been brought to my attention that the AWPs published in PriceAlert are NOT set by the manufacturers."  (E-mail from Debbie Kane to Greg Birch, et al. (May 5, 2000) (noting that First Data Bank surveys national wholesalers and that "discrepancies" have "recently" arisen between AWPs reported by manufacturers and wholesalers), attached as SP Ex. 2 to Berman Decl.)

There is no dispute, however, that Warrick and Schering typically set an AWP at the launch of their products.  (*See* Schering's and Warrick's 56.1 Stmt. ¶¶ 35-36, 41, 57.)

**36.     Schering-Plough reported pricing information for their medicines to pharmaceutical industry pricing publications.**

**Response:     Disputed as written**.

First, Schering and Warrick no longer report AWP.  (*See* Kane Dep. Tr. (July 3, 2005) at 50-51 (testifying that Schering stopped reported AWP in 2003 or 2004), attached as Ex. I[4]; Sherman Dep. Tr. (July 7, 2005) at 121-122 (testifying that he had not seen AWP on a price notification letter in a "very long time"), attached as Ex. J.)

Second, to the extent "pricing information" could possibly include a list price, Warrick did not typically report a list price to wholesaler (or WAC) to national pricing compendia.  (Schering's and Warrick's 56.1 Stmt. ¶ 39.)

---

[4] All citations to "Ex. __" will refer to exhibits to the Declaration of Eric P. Christofferson Transmitting Documents Relied upon in Schering's and Warrick's Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment Against All Track 1 Defendants.

Third, as noted *infra* at Proposed Fact No. 35, Plaintiffs fail to define "Schering-Plough," or to provide any basis for treating Schering and Warrick as one entity.

There is no dispute, however, Schering and Warrick reported certain pricing information to pharmaceutical industry pricing publications.  (*See* Schering-Plough Corp.'s Answer to Pls.' Third Am. Master Consolidated Class Action Cmplt. (Nov. 3, 2005) (Docket No. 1856) ("Schering Answer") ¶ 3; Warrick Pharmaceuticals Corp.'s Answer to Pls.' Third Am. Master Consolidated Class Action Cmplt. (Nov. 3, 2005) (Docket No. 1856) ("Warrick Answer") ¶ 3; *see also* Weintraub Decl. ¶ 11.)

**37.     Schering-Plough reported the AWPs for their medicines to pharmaceutical industry pricing publications.**

   **Response:     Disputed as written**.

First, Schering and Warrick have stopped reporting AWP, as noted *infra* at Proposed Fact No. 36.

Second, as noted *infra* at Proposed Fact No. 35, Plaintiffs fail to define "Schering-Plough," or to provide any basis for treating Schering and Warrick as one entity.

There is no dispute, however, that Schering and Warrick reported certain AWPs for their medicines to pharmaceutical industry pricing publications.  (*See* Schering Answer ¶ 3; Warrick Answer ¶ 3; Weintraub Decl. ¶ 11.)

**38.     Schering-Plough caused AWPs for all of its drugs to be published.**

   **Response:     Disputed as written**.

First, pharmaceutical pricing publications exerted some control over the AWP that was reported, as noted *infra* at Proposed Fact No. 35.

Second, Schering and Warrick have stopped reporting AWP, as noted *infra* at Proposed Fact No. 36.

Third, as noted *infra* at Proposed Fact No. 35, Plaintiffs fail to define "Schering-Plough," or to provide any basis for treating Schering and Warrick as one entity.

There is no dispute, however, that, Schering and Warrick reported certain pricing information for their medicines to pharmaceutical industry pricing publications, and that these publications reported pricing information.

**39.     The AWPs that each Track 1 Defendant caused to be published neither reflected an average nor included the discounts called for by OIG Guidelines.**

**Response:     Disputed, to the extent it relates to Schering or Warrick**.

For Schering and Warrick, Proposed Fact No. 39 is nearly identical to Proposed Fact No. 72, a response to which is included *infra*.

**40.     Each Track 1 Defendant manipulated and marketed spreads.**

**Response:     Disputed, to the extent it relates to Schering or Warrick**.

For Schering and Warrick, Proposed Fact No. 40 is nearly identical to Proposed Fact No. 73, a response to which is included *infra*.

**41-71.   No response necessary, as these do not relate to Schering or Warrick.**

**72.     Schering-Plough's AWPs neither reflected an average nor met OIG Guidelines**.

**Response:     Disputed.**

First, Plaintiffs fail to define what is meant by "average."  It is unclear if such an average was supposed to be the average of provider's costs or manufacturer's price.  (*See* Schering's and

Warrick's Mem. Opp'n Pls.' Mot. for Partial Summ. J. at 2-6.)  It is unclear if such an "average" was supposed to be calculated daily, weekly, monthly, quarterly, or annually.  It is unclear if such an "average" was supposed to take into account hospital discounts, government discounts, discounts given to class members, or volume-based rebates.

Second, any variation from "the average," however it is defined, is not material because it relates to information that Schering and Warrick did not know.  According to Plaintiffs' own exhibits, Schering and Warrick did not typically know the price at which their products were sold by wholesalers.  (*See* Ltr. of John Hoffman to L. Timothy Terry (Jun. 21, 2001) ("Hoffman Ltr.") at WAR 0006156 ("Warrick generally does not know the price charged by wholesalers to retailers for its products."), attached as SP Ex. 2 to Berman Decl.; Ltr. of B. Michael Kennedy to Michele Sylvestre (Apr. 9, 2003) ("Kennedy Ltr.") at WAR 0065610 ("Schering does not know the prices at which wholesalers resell its products."), attached as SP Ex. 40 to Berman Decl.)  Moreover, Warrick cannot report a single AWP that would have a uniform relationship to the many changing prices at which it sells its drugs.  (Schering's and Warrick's 56.1 Stmt. ¶ 38.)

Third, Schering's and Warrick's AWPs did not violate the OIG's voluntary guidance in any respect.  Plaintiffs have failed to demonstrate that such guidance is even material.  (*See* Joint Mem. Opp. Pls. Mot. Partial Summ. J. at 9-11.)

Fourth, as noted *supra* at Proposed Fact No. 35, Plaintiffs fail to define "Schering-Plough," or to provide any basis for treating Schering and Warrick as one entity.

To the extent that the meaning of AWP is material to the litigation, it is clear that Schering and Warrick have always understood AWP to be a benchmark or list price, which does not bear any relationship to actual prices.  (*See* Schering's and Warrick's 56.1 Stmt. ¶¶ 2-3.)  This is true even by the terms of Plaintiffs' own exhibits:

> Warrick has never understood that AWP reflects the actual wholesale prices at
> which all sales of its drugs are transacted.  Warrick would be astonished if anyone
> else in the pharmaceutical business, either buyer or seller, has such an understanding,
> as it has long been widely understood, including by the Federal and State governments,
> that AWP does not reflect actual wholesale prices at which transactions occur, but is
> in the nature of a list price.

Hoffman Ltr. at WAR0006156; *see also* Kennedy Ltr. at WAR 0065610 ("The AWP shown is not

an average of wholesale prices, nor does it reflect the price of any wholesale transaction.").

**73.      Schering-Plough purposely manipulated and marketed spreads.**

**Response:      Disputed.**

First, Warrick did not *manipulate* the spread.  Warrick suggests an AWP at launch and has,

in almost all instances, not changed AWP for the life of the product.  (Schering's and Warrick's

56.1 Stmt. ¶¶ 35-37.)  Warrick did not use Medicare reimbursement rate as a basis for adjusting

prices on its products.  (*Id.* ¶ 38.)  The AWPs for Warrick's albuterol have stayed the same since

1995.  (*Id.* ¶ 42.)  Warrick did not adjust its AWPs in response to a decline in market share.  (*Id.* ¶

44.)  Instead, Warrick competed on price in a competitive market. (*See id.* ¶¶ 28-34.)

Second, Warrick did not *market* the spread.  (*Id*. ¶ 47.)  At no time was Warrick even aware

of the Medicare reimbursement rate for albuterol, nor did it attempt to calculate that reimbursement

rate.  (*Id.* ¶ 48.)  Warrick competed based on product portfolio, production capacity, customer-

service levels, and price – *not* based on AWP.  (*Id.* ¶ 50.)  Again, perhaps Plaintiffs' exhibits are the

best guide.  They cite, but fail to attach, the deposition of Louis Manfredi, a sales representative at

Warrick.  (*See* Schering's and Warrick's Mem. Opp'n Pls.' Mot. for Partial Summ. J. at 7-8.)  The

omitted testimony demonstrates that Warrick did not market the spread:

> Q.   Do you know if -- are you aware if any
> manufacturers use that spread to market for their
> products?

> MR. McDONALD:  I object to the form.
> A.   I am not aware of that.
> Q.   In your experience in marketing generic pharmaceuticals and branded pharmaceuticals, do you ever use the spread to market pharmaceuticals?
> A.   No.  You use the direct price.
>
> ....
>
> Q.   While you were at Warrick, did you ever Manfredi - discuss reimbursement with any Warrick customer?
> A.   No.
> Q.   While you were at Warrick, did you ever discuss with any Warrick customer the difference between AWP and any reimbursement that customer may receive?
> A.   No.
> Q.   Previously you discussed the term "Marketing the Spread" with Ms. Solen.  Do you recall that?
> A.   Yes.
> Q.   While you were at work did you ever market the spread to any Warrick customer?
> A.   No.

(Manfredi Dep. Tr. (July 11, 2005) at 89-91, 103-104, attached as Ex. D.)

Third, Schering did not *manipulate* the spread.  Schering set and maintained AWPs at 20% to 25% above the manufacturer's "list price," which is referred to as "direct price" or WAC. (Schering's and Warrick's 56.1 Stmt. ¶ 57.)  Competition, not manipulation, drove prices down and caused the spread to increase over the life a particular product.  (*Id*. ¶ 56.)

Fourth, Schering did not *market* the spread.  (*Id.* ¶ 58.)  Schering did not instruct customers to calculate the spread when it sent out price notification lists.  (*Id.* ¶ 60.)  Schering sales representatives testified that discussions about reimbursement with physicians were rare and were primarily limited to questions about the Medicare reimbursement process by physicians who had not participated in the Medicare program.  (*Id.* ¶ 62.)

Fifth, as noted *supra* at Proposed Fact No. 35, Plaintiffs fail to define "Schering-Plough," or to provide any basis for treating Schering and Warrick as one entity.

**74.     Schering-Plough marketed Integrilin using off-invoice discounts and price protection orders that resulted in inflating the spread between acquisition cost and AWP.**

**Response:     Disputed**.

First, Schering did not market the spread, as demonstrated *supra* at Proposed Fact No. 73.

Second, reducing the price did not constitute "inflating the spread." In fact, Plaintiffs' own experts admit that discounting is perfectly appropriate response to competition. (*See* Rosenthal Dep. Tr. (Feb. 22, 2006) at 212-13, 322-23, attached as Ex. G; Hartman Dep. Tr. (Mar. 1, 2006) at 1193, attached as Ex. H.)

Third, Plaintiffs fail to establish that any such conduct is material. According to their own expert, there are no damages for Integrilin. (Decl. of Raymond S. Hartman in Supp. of Pls.' Claims of Liability and Damages (Dec. 15, 2005) ("Harman Decl.") ¶ 61, attached as Ex. B.)

Fourth, this is not evidence against Warrick, as established *supra* at Proposed Fact No. 35, since it involves conduct purportedly engaged in by Schering involving a Schering product.

**75.     Schering-Plough oncology drug sales representatives were trained to provide reimbursement information to the physicians and pharmacies that they called on**.

**Response:     Disputed**.

First, the use of the term "reimbursement information" is vague, ambiguous, and misleading. Plaintiffs cannot establish this is material because they cannot show any purported "training" led to marketing the spread. In fact, Schering sales representatives have repeatedly testified that they did not market the spread to physicians or pharmacies. (Schering's and Warrick's 56.1 Stmt. ¶ 58.) They have also testified that discussions about reimbursement with physicians

were rare and were primarily limited to answering questions about the mechanics of the Medicare reimbursement process by physicians who had not participated in the Medicare program.  (*Id.* ¶ 62.)

Second, this is not evidence against Warrick, as established *supra* at Proposed Fact No. 35, since it involves conduct purportedly engaged in by Schering sales representatives involving a Schering product.

**76.     In anticipation of generic competition in 1992 and the launch of albuterol generics in 1993, Schering-Plough increased the spread on Proventil in order to compete against other manufacturers.**

**Response:     Disputed.**

First, Plaintiffs fail to demonstrate that this proposed fact is material.  According to their own expert, Schering reduced the "ASP" – the price – for two Proventil solution NDCs from 1991 to 1992.  (*See* Hartman Decl. at Attach. G.6.a.)  As established *infra* at Proposed Fact No. 74, reducing price in response to competition is not actionable.  (*See also* Schering's and Warrick's 56.1 Stmt. ¶ 56 (stating that competitive forces drive prices down and increase the spread between AWP and ASP over the life of a particular product).)

Second, Plaintiffs have distorted the data.  According to their own expert, the AWP for Proventil NDCs stayed exactly the same in 1992, 1993, 1994, and 1995.  (*See* Hartman Decl. at Attach. G.5.b.)  If Schering were manipulating AWP during this period, it would have changed its AWP more than once out of five years.  (*See also* Decl. of Sumanth Addanki, Ph.D at Ex. 6A (showing AWPs for Proventil relatively stable between 2000 and 2004), filed with Mem. Supp. Schering's and Warrick's Mot. Summ. J.)

Third, the uncontroverted evidence demonstrates that Schering did not engage in any conduct that marketed based on any increase in the difference between AWP and ASP.  (*See* Schering's and Warrick's 56.1 Stmt. ¶¶ 58-62.)

Finally, this is not evidence against Warrick, as established in Proposed Fact No. 35, since it involves conduct purportedly engaged in by Schering involving a Schering product.

**77.     Schering-Plough established inflated AWPs with full knowledge that AWP was the benchmark for third-party payors' reimbursements to providers**.

**Response:     Disputed as written**.

First, this is not a proposed fact but an opinion.  It presumes that AWPs are "inflated" according to some mathematical standard, which Plaintiffs never define; it describes a level of knowledge – "full" – that is similarly opaque; and it evokes "the benchmark" language that was objectionable in Proposed Facts Nos. 1 and 2.

Second, as established *infra* at Proposed Fact No. 35, this is not evidence against Warrick.

There is no dispute, however, that Schering and Warrick established AWPs and knew that AWP was one potential bases for reimbursement, including for third-party payors providing supplemental insurance under Medicare Part B.

Schering-Plough Corporation and
Warrick Pharmaceuticals Corporation

By their attorneys,


/s/ Eric P. Christofferson
John T. Montgomery (BBO#352220)
Steven A. Kaufman (BBO#262230)
Eric P. Christofferson (BBO#654087)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

Dated:  April 7, 2006

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2006, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

/s/ Eric P. Christofferson_____
Eric P. Christofferson