# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Docket No. 01-12257-PBS

CITIZENS FOR CONSUMER JUSTICE, ET AL.
            Plaintiffs                  .
                                        .
                v.                      .
                                        .
ABBOTT LABORATORIES, et al              .
            Defendants                  .
. . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
HELD ON NOVEMBER 9, 2005

APPEARANCES:

For the plaintiffs: Sean Matt, Esquire, Hagens, Berman, Sobol, Shapiro, LLP, 1301 Fifth Avenue, Seattle WA  98101

John Macoretta, Esquire, Spector, Roseman & Kodroff, P.C., 1818 Market Street, Ste. 2500, Philadelphia, PA  19103.

David S. Nalven, Esquire, Hagens, Berman, Sobol, Shapiro, LLP, One Main Street, Cambridge, MA  02142.

For Shering-Plough:  John Montgomery, Esquire

For Pfizer and Pharmacia:  Scott Stempel, Esquire

For Johnson & Johnson:  Andrew Schau, Esquire, Adeel Mangi, Esquire, Patterson, Belknap, Webb & Tyler, LLP, 1133 Avenue of the Americas, New York, NY  10036-6710.

For Non-parties and Absent Class Members, Blue Cross Blue Shield of Vermont, et al:  Thomas J. Poulin, Robins, Kaplan, Miller & Ceresi, LLP, 1801 K Street, N.W., Ste. 1200, Washington, DC 20006

Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.

*MARYANN V. YOUNG*
Certified Court Transcriber
Wrentham, Massachusetts 02093
(508) 384-2003

1  you have the data.

2         MR. MACORETTA:  Are we using - I don't know if Your

3  Honor ordered us to use the definition Mr. Schau gave or are we

4  just agree to that or I'm not--

5         THE COURT:  Can you agree to it?

6         MR. MACORETTA:   I believe that we can, yes--

7         THE COURT:  All right.

8         MR. MACORETTA:  --Your Honor.  The request to admit

9  number four is the same thing, admissions to pharmacy benefit

10 managers.  That should be resolved by what you just said.  We -

11 with the request to admit number five is admitting about

12 Remicade, rebates that may have been paid to help maintenance

13 organizations and preferred provider organizations.  Subject to

14 that definition then I believe we can answer that as well.

15         Request to admit number six.  This is where things

16 change and it becomes more complicated.  Admit that from `98 to

17 the present, that's when Remicade came on the market, the

18 rebates that Centocor has paid on Remicade have reduced the net

19 reimbursement cost of Remicade for those payers that have

20 received rebates.  Well, net reimbursement costs is defined -

21 that's not a term the plaintiffs ever use by the way, is

22 defined by them to mean that the cost incurred by a payer such

23 as a patient, insurer or the government for a drug or biologic

24 product net of any rebates or other reimbursement or other

25 rebates or other price adjustments?  That is not a term the

13

1  plaintiffs ever use.  We have not attempted to figure it out

2  to date.

3      THE COURT:  It's pretty straightforward.

4      MR. MACORETTA:  Well, but, Your Honor, to do that we

5  would then need data from the entire class.  The net

6  reimbursement cost incurred by a payer such as an insurer or a

7  patient meaning what did that patient or payer ultimately pay?

8  We don't have that data from the entire class.  I mean, that's

9  - you're going to hear other motions today about discovery from

10 third party Blue's.  That's just simply that it's not available

11 to us.

12      THE COURT:  Well to the extent that you have the

13 data, what's your--

14      MR. SCHAU:  May I just say on this issue I don't

15 think they need to crunch a single number to answer this

16 question.  All we're trying to get at here is the fact that the

17 people who are paying for our drugs are the ones getting the

18 rebates so that it reduces their costs of having to reimburse

19 for our drugs.  We're not asking them to run any mathematical

20 number crunching calculations.  All they have to do is

21 understand that, you know, X minus Y is a lower number than X

22 plus Y.

23      MR. MACORETTA:  If that's the limitation then we can

24 probably do that but when we read this interrogatory it seemed

25 to indicate that we had to come up with some nationwide net

14

1   reimbursement cost.

2           THE COURT:  Let's take it with - you've heard it,

3   take it at that.

4           MR. MACORETTA:  That's fine.

5           THE COURT:  Next.

6           MR. MACORETTA:  Admit that from 1998 to the present

7   the rebates that Centocor has paid on Remicade have reduced the

8   spread.  Spread as defined by J&J is different than the way

9   plaintiffs have always defined the spread.  Spread here means

10  the difference between the net acquisition cost, which is

11  another term created by J&J and the net reimbursement cost.

12  Net acquisition cost is apparently what doctors ultimately pay

13  to acquire the drug.  We don't know what that is.  It's

14  completely irrelevant to our claims.  Every J&J witness we have

15  asked, do you know what doctors pay to acquire your drug, the

16  answer is no.  We know what we sell it to the wholesalers for.

17  We have no idea what the wholesalers mark-up is.  To answer

18  this we would know need to know the information that J&J

19  disclaims any knowledge of.

20          THE COURT:  What's your response?

21          MR. SCHAU:  I think again, this does not require them

22  to crunch any numbers, but I will tell you that if they will

23  say under oath that they have no idea what physicians pay for

24  Remicade and that that lack of information has no implications

25  for their case, I think that enhances my prospects for summary

15

1   judgment--

2          MR. MACORETTA:  Well--

3          MR. SCHAU:  --very significantly.

4          THE COURT:  Is that a--

5          MR. MACORETTA:  I don't know if we can make that

6   representation.  I mean, we still have expert reports.  I can

7   tell you right now that that's not part of our theory, but I

8   don't think we can make a representation under oath that that

9   has no relevance to anything.  You know, and our answer under

10  oath is we've conducted discovery on this from their witnesses

11  all of whom said they don't know.  So as we read this they're

12  asking us to come up with a formula using data that they admit

13  they don't have.  To do this we would have to depose

14  wholesalers who have resisted that and the time for that

15  discovery is over as well.

16         THE COURT:  Well, if you don't have the information

17  I'm not going to order further discovery on it.  Okay?

18         MR. MACORETTA:  Request to admit number eight is

19  going to go to the same issue because that says admit that from

20  `98 to the present the spread on Remicade has not exceeded the

21  difference between its public WAC and its published AWP.  Well,

22  the information that - we still have the information to figure

23  out spread as they used in that, which is same as the last

24  question.

25         MR. SCHAU:  Your Honor, there's no dispute that they

16

1   have all of the information on Remicade from the beginning of

2   time until the end of 2003.  If they want to say we can't admit

3   in 2004 because we never got that information in discovery and

4   never moved to compel it, I accept that.

5              THE COURT:  Okay.

6              MR. SCHAU:  But to say that they don't have the

7   information and, therefore, they can't make these calculations

8   is just simply untrue.  And I think the predicate of your last

9   ruling was that you accepted that representation, and I just

10  wanted to make it clear that--

11             THE COURT:  That's clear.

12             MR. SCHAU:  --we dispute that.

13             MR. MACORETTA:  We don't dispute that we have

14  information from J&J.  Our position is the information this

15  seeks is not information from J&J.  It's information from

16  someone else that we don't have.

17             THE COURT:  Well, set that out in your response then.

18             MR. MACORETTA:  All right.  The - interrogatory, now

19  we have some interrogatories that say from `98 to the present

20  state each published WAC and each published AWP for Remicade,

21  Remicade and the effective date of change in each of Remicade's

22  WAC and AWP.  Well, again, Your Honor, this is - there the ones

23  who set the AWP and the WAC, so this is an interrogatory that

24  says you tell us when we changed all of our prices.  At best

25  this would be set out, this would be better set out in the form

# EXHIBIT B

## FILED UNDER SEAL

# EXHIBIT C

## FILED UNDER SEAL

# EXHIBIT D

Page 1

```
 1

 2      IN THE CIRCUIT COURT OF KANAWHA COUNTY
                    WEST VIRGINIA
 3             Civil Action No. 01-C-3011
        - - - - - - - - - - - - - - -
 4
        STATE OF WEST VIRGINIA,
 5      DARRELL V. MCGRAW, JR.,
        ATTORNEY GENERAL,
 6
                    Plaintiff,
 7
            vs.                    DEPOSITION OF:
 8                                 LOUIS MANFREDI
        WARRICK PHARMACEUTICAL
 9      CORPORATION, SCHERING-PLOUGH
        CORPORATION, DEY, INC.,
10      ABBOTT LABORATORIES and
        ABBOTT LABORATORIES, INC.,
11
                    Defendants.
12
             - - - - - - - - - - - - - - -
13             TRANSCRIPT of the stenographic notes of
14      the proceedings in the above-entitled matter, as
15      taken by and before EILEEN HIMMER, a Certified
16      Shorthand Reporter and Notary Public of the State
17      of New Jersey, held at the HILTON SHORT HILLS
18      HOTEL,  401 JFK Parkway, Short Hills, New Jersey,
19      on July 11, 2005, commencing at 10:11 in the
20      forenoon.
21
22
23             HUDSON REPORTING & VIDEO, INC.
24                124 WEST 30TH STREET
25             NEW YORK, NEW YORK 10001
```

Page 82

Manfredi - direct

1  A.   I think LB may be an abbreviation for
2  Labetalol.
3      Q.   Does that help you in any way what Tie
4  in Code might mean?
5      A.   No.
6      Q.   Do you know if there was a list of all
7  of these codes and their descriptions when you
8  were at work?
9      A.   I don't know.  Tie in Codes may have
10  been on the pricing form.  There may have been a
11  box on the pricing form to check.
12     Q.   We are done with this document.
13         We discussed this a bit earlier, but
14  it's your recollection that the wholesaler class
15  of trade was designated as 912.  Is that correct?
16         MR. McDONALD:  I object to the form.
17     A.   I believe so from the one document that
18  you asked me to look at, because a chain began
19  with a 913 and the account that began with the 912
20  I recognized as a wholesaler, which led me to that
21  conclusion.
22     Q.   You also saw on that document, which
23  was Weintraub Exhibit 10, there was a generic
24  distributor on there that was 915, is that

Page 83

Manfredi - direct

1  correct?
2      A.   That's right.
3      Q.   I think that was Rugby Laboratories, is
4  that right, on the last page?
5      A.   Yes.
6      Q.   Do you know what a Systems Price File
7  is?
8          MR. McDONALD:  I object to the form.
9      A.   I believe the Systems Price File may be
10  referring to the documents, the exhibits that we
11  just looked at.
12     Q.   That was Weintraub Exhibit 10 and 13,
13  is that correct?
14     A.   13?  Yes.
15     Q.   I am going to hand you what was
16  previously marked as Weintraub Exhibit 19, Bates
17  numbered WWV 0057511 through 57522.  If you could
18  take a minute to look at that document and let me
19  know when you are done?
20     A.   Okay.
21     Q.   Have you seen this document before?
22     A.   Never.
23     Q.   Have you seen any document in this
24  format before?

Page 84

Manfredi - direct

1      A.   No.
2      Q.   Have you seen any document while you
3  were at Warrick that listed the average price for
4  Albuterol products as it is listed here?
5          MR. McDONALD:  I object to the form.
6      A.   No.
7      Q.   So you never saw a reference to an
8  average price while you were at Warrick?
9          MR. McDONALD:  I object to the form.
10     A.   The -- I can only go back to trying to
11  prepare a recommendation for an RFP.  As I was
12  developing pricing recommendations, I had to put
13  down a price.  I don't know what that column head
14  was.  It could said average, but it was a
15  reference -- it's more of a reference than
16  an average price in the context of preparing a
17  response for an RFP.
18     Q.   Where would you have gotten that
19  reference price from?
20         MR. McDONALD:  I object to the form.
21     A.   That pricing would have come from these
22  exhibits that we just referred to, number 13 and
23  number 10.
24     Q.   Those have a lot of numbers on them, a

Page 85

Manfredi - direct

1  lot of prices on them.  How would you determine
2  the reference price from those numbers?
3          MR. McDONALD:  I object to the form.
4      A.   By SKU, which is Exhibit 13, I would
5  look at the pricing for the main -- for the large
6  customers, the large -- if it's a wholesaler RFP,
7  we would look at the wholesaler prices, the most
8  current price that is reflected in this document.
9  That price, or those range of prices for those top
10  wholesaler accounts would be a reference for that
11  price for that SKU.
12     Q.   The range meaning you would take the
13  range and get an average, or the median, or --
14     A.   I don't recall if I put a range down,
15  or -- oftentimes the large accounts had very
16  similar prices.  So there may have been one price
17  that was put in there.
18     Q.   Would you have done the same for
19  chains?
20     A.   Yes.
21     Q.   Can you tell from this document?  It
22  just lists customer number 1 through customer 78.
23     A.   No.
24     Q.   Can you tell which of these customers

22 (Pages 82 to 85)

Page 86

1  Manfredi - direct
2  were wholesalers or distributors?
3      A.  I would have no idea.
4      Q.  I am done with that.
5          Do you know who would have been
6  responsible at Warrick for determining the initial
7  AWPs for Albuterol solution?
8          MR. McDONALD:  I object to the form.
9      A.  I believe at the time of products that
10 were launched while I was at Warrick, I believe
11 Harvey Weintraub made those determinations of AWP.
12     Q.  Do you know if the AWP for any of the
13 Albuterol solutions was ever increased while you
14 were at Warrick?
15     A.  I don't know.
16     Q.  I am going to hand you what was
17 previously marked Exhibit 22 for Weintraub's
18 deposition.  It's Bates numbered WWV 001210.
19         MS. SOLEN:  I don't have an extra, why
20 don't you look at this one.
21     Q.  Have you finished looking at it?
22     A.  Yes.
23     Q.  Have you ever seen this document
24 before?
25     A.  Not that I recall.

Page 87

1  Manfredi - direct
2      Q.  Do you know if you were at Warrick on
3  the date of this letter, February 23, 1995?
4      A.  I don't think so.  I think I was there
5  in March.
6      Q.  This document is a letter from
7  Mr. Weintraub to Ms. Beth Rader from Price Alert,
8  is that correct?
9      A.  She must be an employee of Price Alert
10 or First Data Bank, Ms. Rader.
11     Q.  Isn't it true this document says that
12 the price of Warrick Albuterol solution .5 percent
13 20 milliliter will increase to 13.95?
14         MR. McDONALD:  Objection to the form.
15     The document would speak for itself.
16     Donna, I really wish you would be
17 respectful to this witness.  He's taken time off
18 from his job, this document came out a year before
19 he was at Warrick.
20         MS. SOLEN:  He stated he started at
21 Warrick in March of 1995.
22         MR. McDONALD:  We can clear that up,
23 and you know from his last deposition, you told
24 him on the record a while ago that he previously
25 testified it was in March of 1996.  Regardless,

Page 88

1  Manfredi - direct
2  though, it's dated before he was there, he already
3  stated he has never seen it before.  I wish you
4  would be more respectful for this man's time.
5  He's not in any way being compensated for the time
6  he's taken away from his job today.
7      A.  Can I answer?
8      Q.  Yes.
9      A.  The document says there will be a price
10 increase on Albuterol solution .5 percent 20 ML
11 that would be effective on February 24 at 5:00.
12     Q.  Do you have any recollection of this
13 price increase?
14     A.  No.
15     Q.  I am handing you what has been marked
16 previously as Exhibit 23 from Mr. Weintraub's
17 deposition.  It's Bates numbered WWV 0011184.  Let
18 me know when you are done with that.
19     A.  I'm finished.
20     Q.  Have you ever seen this document
21 before?
22     A.  No.
23     Q.  This document also states that the AWP
24 was increased as of September 21, 1995 to 14.99.
25 Does this document refresh your recollection that

Page 89

1  Manfredi - direct
2  the AWP was increased at any time?
3      A.  No, it doesn't.
4      Q.  Thank you.  I am done with that.
5          Do you know if the AWP for any of the
6  Albuterol products was ever decreased?
7      A.  I don't believe so.
8      Q.  Have you heard of the term "Marketing
9  the Spread"?
10     A.  Have I heard of the term?
11     Q.  Yes.
12     A.  Yes.
13     Q.  Can you tell me what your understanding
14 of that term is?
15     A.  My understanding of the term marketing
16 the spread is the spread is the difference between
17 AWP and what the acquisition cost is for that
18 product.  So that difference between AWP and
19 acquisition cost is very commonly called the
20 spread.
21     Q.  Whose acquisition cost are you
22 referring to?
23         MR. McDONALD:  I object to the form.
24     A.  I believe the term would go back to the
25 retail pharmacy, who is seeking reimbursement.

23 (Pages 86 to 89)

Page 90

Manfredi - direct

1    Manfredi - direct
2        Q.   Do you know how that spread would be
3    used?
4            MR. McDONALD: I object to the form.
5        A.   Well, there are, again -- my basic
6    knowledge is that there are formulas for
7    reimbursement. AWP less a certain percentage. So
8    if AWP less 30 percent is what an item gets
9    reimbursed at, theoretically, and that is $10, and
10   an AWP for the product is set at $50, and the
11   acquisition cost is $20, and the difference there
12   is $30. The difference between the $10 and that
13   30 dollars is what the retailer comes out ahead of
14   the game with, if you will.
15       Q.   Do you know if -- are you aware if any
16   manufacturers use that spread to market for their
17   products?
18           MR. McDONALD: I object to the form.
19       A.   I am not aware of that.
20       Q.   In your experience in marketing generic
21   pharmaceuticals and branded pharmaceuticals, do
22   you ever use the spread to market pharmaceuticals?
23       A.   No. You use the direct price.
24       Q.   I hand you --
25           MS. SOLEN: I would like this marked.

Page 91

1    Manfredi - direct
2            (Manfredi-2, New Product Proposal,
3    Bates numbers WWV 0021914, is marked for
4    identification.)
5        Q.   Go ahead and take a look at Manfredi
6    Exhibit 2 that was just handed to you and let me
7    know when you are done. It's Bates numbered WWV
8    0021914.
9        A.   Okay.
10       Q.   Have you seen this document before?
11       A.   I don't know if I have seen this
12   document, but I have seen documents just like
13   this.
14       Q.   Is there a term for this document?
15       A.   Well, I think it says, "They are on it,
16   New Product Proposal."
17       Q.   Do you know Bill Roth at Cardinal?
18       A.   No. But as you mention the name, it
19   seems somehow familiar.
20       Q.   It says he's from Cardinal Managed
21   Source. Do you know what "Managed Source" means?
22       A.   Cardinal is a wholesaler, and they had
23   different flavors of business. They had -- I
24   forget what are their substitution program --
25   there were four different names, four different

Page 92

1    Manfredi - direct
2    prices that went to Cardinal for their programs.
3        Q.   As you see there is a column for AWP
4    listed in this document?
5        A.   Yes.
6        Q.   Do you know why that would be listed?
7            MR. McDONALD: I object to the form.
8        A.   I don't know why it would be listed.
9    The 1, 2, 3 -- all those four columns could be
10   obtained from any Price Alert or Red Book.
11       Q.   Did you ever create a new product
12   proposal, a draft one?
13       A.   This? No.
14       Q.   It wasn't in your job description?
15       A.   No.
16       Q.   But you do routinely see them, is that
17   correct?
18       A.   This document would have been the
19   communication back to the customer after a request
20   for a price change had come in. So I would have
21   seen this upstream from this process.
22       Q.   What policy did you have in a
23   customer's request for a price change?
24       A.   Ensuring that the system that was in
25   place for tracking a price change was adhered to.

Page 93

1    Manfredi - direct
2    That is, there is a form for every product that
3    has a price change, and there are signatory
4    sign-offs that have to be signed-off in order for
5    that to be an approved price change, and the
6    ultimate signature, the last signature who was the
7    president of the company.
8        Q.   What other signatures were required on
9    the price change?
10       A.   It was myself, either and or Harvey, I
11   don't know whether we both needed it, or whether
12   it was one or the other, and I believe the trade
13   director, who was the submitter of the -- the
14   trade director first, then Harvey or myself, then
15   I believe finance, and then Ray.
16       Q.   Whose role was it to determine whether
17   or not Warrick would make a price change.
18       A.   Ultimately Ray.
19       Q.   So would everyone below Ray make the
20   recommendation on whether or not to make the price
21   change?
22       A.   Yes.
23       Q.   The direct prices listed on the
24   right-hand column, does that include any rebates
25   that would be offered to Cardinal?

24 (Pages 90 to 93)

1 Manfredi - direct
2          MR. McDONALD: Objection to the form.
3     A.   I honestly don't recall if it's the net
4 one or the price before the rebates.
5     Q.   I am done with that.
6          MS. SOLEN: I am going to mark this as
7 Manfredi-3.
8          (Manfredi-3, A document entitled, "Now
9 Available, Albuterol Sulfate USP Inhaler Solution,
10 Bates numbers WWV 0013502, is marked for
11 identification.)
12     Q.   The court reporter has just handed you
13 a document marked as Manfredi Exhibit 3. It seems
14 this document may have predated your work. Just
15 let me know if this refresh your recollection that
16 you have seen this document while at Warrick?
17     A.   Yes. This is very closely analogous to
18 the exhibit we looked at, Exhibit 2.
19     Q.   Can you tell me what the generic source
20 program is?
21     A.   I believe the generic -- this is
22 Bergen/Brunswick -- I have to go by the date on
23 the memo, which is 2/15/95. A generic source
24 program predated the types of programs that I was
25 familiar with, which are called wholesaler auto

1 Manfredi - direct
2 substitution programs.
3          So I believe this was the program that
4 was in place where you would submit a completed
5 RFP to get on this program to be an exclusive
6 supplier of a particular SKU.
7     Q.   So this the predecessor program to the
8 wholesaler auto substitution program?
9          MR. McDONALD: I object to the form.
10     A.   I have to back into that response based
11 upon the dates and the title of the program,
12 because I know somewhere in the middle of '96 is
13 when every wholesaler had an auto substitution
14 program. I can only conclude that yes, this was a
15 predecessor.
16     Q.   But there wasn't a generic source
17 program in place when you were at Warrick?
18     A.   It had a different title.
19     Q.   That title was wholesaler auto
20 substitution program?
21          MR. McDONALD: Objection to the form.
22     A.   Yes. There may have even been a
23 particular name that Bergen had for its program,
24 and McKesson may have had a different name for
25 their program.

1 Manfredi - direct
2     Q.   For their auto substitution program?
3     A.   Yes.
4     Q.   I am done with that document.
5          MS. SOLEN: Let me mark this document
6 as Manfredi-4.
7          (Manfredi-4, A letter dated October 27,
8 1997, Bates numbers WPX 01908-01913, is marked for
9 identification.)
10          MR. McDONALD: As with the document we
11 looked at previously, this document apparently was
12 not produced to you in conjunction with this
13 lawsuit that you obtained it from some other
14 party. I believe it came from the Texas case.
15          We designate this, until I can figure
16 out what it is, highly confidential under the West
17 Virginia protective order, and again its use under
18 the Texas protective are order, but you already
19 said you would.
20     Q.   Mr. Manfredi if you can review Manfredi
21 Exhibit 4, WPX 01908 through 01913, and let me
22 know when you are done.
23     A.   Okay.
24     Q.   Can you tell me if you have seen this
25 document before?

1 Manfredi - direct
2     A.   I don't know if I have seen this
3 document before. I am familiar with the concept
4 of what is contained in the document.
5     Q.   If you will see on the second page the
6 bottom it says, "cc to R. Inserra and
7 L. Manfredi."
8     A.   Yes.
9     Q.   Do you have any reason why you wouldn't
10 have been cc'd on this?
11     A.   No, I don't.
12     Q.   Can you tell me whose handwriting is on
13 the first page?
14     A.   Up at the top.
15     Q.   Yes.
16     A.   That says R. Inserra.
17     Q.   Yes.
18     A.   I believe that looks like Harvey
19 Weintraub's handwriting.
20     Q.   You said you are familiar with the
21 concept of this document. Can you explain to me
22 what that is?
23     A.   Yeah. There was -- it was a new way to
24 partner with customers that included products that
25 were currently in the line, currently available

25 (Pages 94 to 97)

1   Manfredi - direct
2   for sale in the Warrick line, and a futures
3   products that you would say looking at other
4   products that were anticipated to become part of
5   the line.
6       So there would be an additional rebate
7   that a customer who signed this agreement could be
8   eligible for if they signed up for this plus some
9   of the future products.
10      Q.   Can you tell me why you would be copied
11  on a document like this?
12      A.   For my information.
13      Q.   Who is R. Inserra?
14      A.   That is Bob Inserra.  He was the
15  manager of finance for Warrick with for a period
16  of time when I was at Warrick.
17      Q.   If you could turn to the third page,
18  which is 01910.  It has a chart that says "CVS
19  Proposal" on top?
20      A.   Yes.
21      Q.   This chart lists many columns, one of
22  which is the AWP?
23      A.   Yes.
24      Q.   Do you know why this number would be
25  relevant on this list?

1   Manfredi - direct
2       MR. McDONALD:  I object to the form.
3       A.   Do I know why AWP would be relevant?
4       Q.   To CVS, correct?
5       MR. McDONALD:  Mark objection.
6       A.   No, I -- the first five columns are
7   pretty much standard fair and were, I think, even
8   part of a product catalogue that we had for
9   Warrick.  I just think they just stayed so you had
10  a full description of what the item was.
11      Q.   Then it says two columns over from the
12  AWP, "Net Invoice Price"?
13      A.   Yes.
14      Q.   Do you know where these numbers come
15  from?
16      MR. McDONALD:  I object to the form.
17      A.   I don't know whether this was part of
18  an RFP proposal, or whether this initiative about
19  having this total line rebate would have been off
20  cycle from the normal RFP process.
21      I would say that net invoice price
22  column would have been arrived at -- if it is not
23  an RFP, it would have been arrived at via a
24  process that was analogous to the RFP.
25      Q.   Do you know if the AWP listed here was

1   Manfredi - direct
2   relevant to CVS in their offer to them?
3       MR. McDONALD:  I object to the form.
4       A.   I don't know.
5       Q.   I will hand one more document.
6   Manfredi-5.
7       (Manfredi-5, A letter dated November
8   21, 1996, with attachment, Bates numbers WPX
9   00007-8, is marked for identification.)
10      Q.   Mr. Manfredi, the court reporter has
11  just handed you what has been marked as Manfredi
12  Exhibit 5.
13      A.   Yes.
14      Q.   Have you had a moment to look at that
15  document?
16      A.   I am looking at it right now.  Okay.
17      Q.   Have you seen this document before?
18      A.   Yes.
19      Q.   Do you recall seeing it, or do you
20  assume you have seen it?
21      A.   I assume I have seen it because it has
22  my name on it.
23      Q.   Is that your signature at the top?
24      A.   Yes.
25      Q.   Does this appear to be an accurate copy

1   Manfredi - direct
2   of a letter you would have sent to Mr. LaPilia --
3       MR. McDONALD:  I object to the form.
4       Q.   -- on October 21, 1996?
5       MR. McDONALD:  Objection.
6       A.   Without question, I created the cover
7   letter.  When I am looking at this document I have
8   a concern, because the cover document indicates a
9   bid proposal for the Care Group, and when I look
10  at the attachment, while Care Group is up at the
11  head of it, on the bottom left it says "Premier
12  Bid."  I am a little confused by what that means,
13  because the Premier Group is a different group.
14      Q.   Can you tell me what the Premier Group
15  is?
16      A.   It's one of the other distributor
17  groups that was managed by Bi-Coastal and Larry
18  LaPilia, who was the recipient of this
19  communication.
20      Q.   Could that just have been --
21      A.   It could be an error.  It should
22  perhaps say Care instead of Premier at the bottom.
23      Q.   In that bid proposal, again, there are
24  several columns, one listing the AWP.
25      Can you tell me again how the AWP would

26 (Pages 98 to 101)

Page 102

Manfredi - cross

1  be relevant for the Care Group?
2
3      MR. McDONALD: I object to the form.
4      A.   The relevance of AWP we discussed as
5  the same discussion that we had earlier about what
6  AWP is or may be would apply to this.  My
7  explanation wouldn't change.
8      MS. SOLEN: I am going to take five
9  minutes and see if I have any further questions.
10     MR. McDONALD: Before you go off the
11  record, I want to note that Exhibit 5 was not
12  produced in this case.  It may have been produced
13  to you in another form, but we will designate this
14  as confidential pursuant to the West Virginia
15  protective order.
16     MS. SOLEN: Let me take five minutes to
17  see if I have any other questions.
18     THE VIDEOGRAPHER: The time now is 1:08
19  p.m.  We are going off the record.
20     (A recess is taken.)
21     THE VIDEOGRAPHER: The time now is 1:17
22  p.m.  We are back on the record .
23     MS. SOLEN: I have no further questions
24  at this time.  I will pass the witness.
25  CROSS-EXAMINATION BY MR. McDONALD:

Page 103

Manfredi - cross

1
2      Q.   I have just a few questions for you.  I
3  will try to be very brief.
4      Let me show you a document I believe is
5  your resume that you produced in conjunction with
6  your last deposition.  Do you recognize that
7  document?
8      A.   Yes, I do.
9      Q.   Is that a document that you prepared?
10     A.   Yes.
11     Q.   To clear up when you worked at Warrick,
12  can you look at that document and does that pre.
13  fresh your recollection as to the years you worked
14  at Warrick?
15     A.   Yes, of course.  In 1998 – 1996 to
16  1998.
17     Q.   While you were at Warrick, did you ever
18  speak with any Warrick customer that was located
19  in the State of West Virginia?
20     A.   No.
21     Q.   While you were at Warrick, did you ever
22  speak with any person who represented the State of
23  West Virginia, or one of its agencies?
24     A.   No.
25     Q.   While you were at Warrick, did you ever

Page 104

Manfredi - cross

1
2  discuss reimbursement with any Warrick customer?
3      A.   No.
4      Q.   While you were at Warrick, did you ever
5  discuss with any Warrick customer the difference
6  between AWP and any reimbursement that customer
7  may receive?
8      A.   No.
9      Q.   Previously you discussed the term
10  "Marketing the Spread" with Ms. Solen.  Do you
11  recall that?
12     A.   Yes.
13     Q.   While you were at work did you ever
14  market the spread to any Warrick customer?
15     A.   No.
16     MR. McDONALD: That's all the questions
17  I have.
18     MS. SOLEN: I have one more question.
19  REDIRECT EXAMINATION BY MS. SOLEN:
20     Q.   On your resume does it state the months
21  you began and ended at Warrick?
22     A.   It doesn't.
23     Q.   Earlier you testified you believe you
24  began work at Warrick in March of 1995.  Does that
25  refresh -- do you know if you started in March of

Page 105

Manfredi - redirect

1
2  1996?
3      A.   I would believe it would be March of
4  1996.  I have pay stubs that I could verify the
5  first pay paycheck.  That would be the best.
6      MS. SOLEN: I have no further
7  questions.
8      MR. McDONALD: Thank you.
9      MS. SOLEN: Anyone on the phone.
10     MR. MITCHELL: This is Ryan Mitchell.
11  I couldn't hear what his position was when he was
12  at work, the title of it.
13     THE WITNESS: Management of new
14  business development.
15     MR. MITCHELL: That's all.  That's all
16  I got.
17     THE VIDEOGRAPHER: Before we go off the
18  line with the telephone counsel, could you please
19  stay on the line for a second after I stop the
20  videotape?
21     This concludes the videotape deposition
22  of Lou Manfredi, it concludes tape 2 of 2 tapes
23  the time is 1:25.  We are going off the record.
24     (The deposition concluded at 1:25 p.m.)
25

27 (Pages 102 to 105)

# EXHIBIT E

Brian Longstreet

August 30, 2005

Kenilworth, NJ

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

MDL NO. 1456

CIVIL ACTION: 01-CV-12257-PBS

Judge Patti B. Saris

# ORIGINAL

x-----------------------------x

IN RE: PHARMACEUTICAL INDUSTRY :        DEPOSITION OF:

AVERAGE WHOLESALE PRICE         :

LITIGATION                      :        BRIAN

_____ :        LONGSTREET

                                :

                                :

THIS DOCUMENT RELATES TO        :

ALL CLASS ACTIONS               :

                                :

x-----------------------------x

Brian Longstreet                                    August 30, 2005
                        Kenilworth, NJ

83

1   Debbie and they were the experts in that area.

2             MR. McNEELY:  If you would, please

3   mark this document as Exhibit Longstreet 018 and it

4   is Bates range numbered SPF00017106 through

5   SPF00017116.

6        And again, Mr. Longstreet, if you would,

7   take a moment to review Exhibit Longstreet 018 and

8   please identify and describe what that document

9   represents.

10  A.      Yes, sir.

11            (Documents bearing Bates numbers

12  SPF00017106 through SPF00017116 are received and

13  marked as Exhibit Longstreet 018 for identification.)

14            THE WITNESS:  The document is an

15  e-mail from Chuck McDonald who was in our trade

16  sales group -- actually, no I take that back.

17       It was from Mike Walsh, who was in our

18  trade sales group, to his colleagues who were

19  trade sales directors.  I was copied on the e-mail

20  basically indicating that Roche had launched

21  Pegasys.  It provides all of the information,

22  normal and customary in terms of the press release

Brian Longstreet                                        August 30, 2005

Kenilworth, NJ

84

1   regarding the launch, the announcement to the

2   wholesaler, a pricing comparison between the two

3   products.

4        The unique thing is that at the time Roche

5   also offered 15,000 patients free samples of

6   Pegasys for three months when they launched the

7   product.

8        Q.      What is your understanding of the

9   comment by Mike Walsh that the information,

10  important information below should be used

11  selectively where you think we have leverage.

12  What does that mean to you?

13  A.      I think the issue was that Roche was

14  providing a lot of free samples in the marketplace

15  which was essential taking away business from

16  wholesalers and specialty distributors.  You'd

17  have to ask Mike what he completely meant but what

18  I believe he's inferring is that, use this

19  information where you have good relationships and

20  where you think it might be an impact because they

21  were essentially taking money out of the wholesale

22  and distribution system.

Brian Longstreet                                    August 30, 2005
                        Kenilworth, NJ

                                                              85

1              MR. McNEELY: Would you please mark

2    that as Exhibit Longstreet 019 and that is, this

3    document has a beginning Bates number of SPF00017151

4    through SPF00017160.

5              (Documents bearing Bates numbers

6    SPF00017151 through SPF00017160 are received and

7    marked as Exhibit Longstreet 019 for identification.)

8         Q.      And as before, when you have an

9    opportunity to review it.

10   A.      Yes, sir.

11        Q.      And if you could identify it.

12   A.      Document is an e-mail sent from myself to

13   Olav Hellebo and Jim Robinson.  Basically talks

14   about the potential for retail trade program and

15   talks about some market research that had been

16   done in anticipation of the launch of a

17   competitive product, Copegus to Rebetol.  Talks

18   also about the Orange Book and how products are

19   rated.  And then, lastly, tries to talk to the

20   reimbursement process as it relates to Managed

21   Care organizations and potentially pharmacies.

22        Q.      Who is James Robinson?

Brian Longstreet                                   August 30, 2005
                    Kenilworth, NJ

                                                              86

1    A.     He, at the time, was my direct supervisor

2    within the Oncology Biotech Business Unit.

3           Q.     Direct your attention to the second

4    page under C.  Could you read that paragraph, that

5    one paragraph that's designated C?

6                  MR. KAUFMAN:  Out loud?

7                  MR. McNEELY:  Out loud for the

8    record, please.

9    A.     The first paragraph or the second

10   paragraph, sir?

11          Q.     It would be the paragraph, first

12   paragraph which is designated C which is the

13   second paragraph on that page.

14   A.     Sure.

15          "One other question that also was raised

16   relates to the financial implications of Rebetol

17   versus Copegus regarding pharmacies.  As

18   previously stated, there are few stakeholders in

19   the process of drug distribution, wholesalers,

20   pharmacies, doctors, patients, Managed Care/

21   insurance companies.  When it comes to pharmacies

22   they are driven by Managed Care or insurance

Brian Longstreet                                    August 30, 2005
                        Kenilworth, NJ

87

1    reimbursement, profit motive and state law.  A

2    Managed Care organization can mandate

3    reimbursement of a product versus another product.

4    If a generic is available either the MCO, Managed

5    Care Organization, or state can mandate generic

6    substitution.

7            In addition, pharmacies are paid a

8    dispensing fee plus the margin of whatever they

9    purchase the product minus the reimbursement rate,

10   usually AWP minus a percentage.  With generics the

11   acquisition cost is usually much lower than the

12   published AWP and creates a favorable spread

13   particularly when multiple generics exist.  The

14   acquisition price drops dramatically and the

15   published AWP does not."

16           Q.     Now, the word spread, in quotes,

17   that was your choice of words.  Is that correct?

18   A.      Within this memo, yes.

19           Q.     And as used in this memo, would you

20   please define what spread is?

21   A.      I think the -- it's the difference between

22   what a pharmacy purchases the product at versus

Brian Longstreet                                    August 30, 2005
                    Kenilworth, NJ

88

1    what they're reimbursed at.

2         Q.        And with regard, could you please

3    read the next paragraph?

4    A.        "Having a higher AWP and having

5    reimbursement being paid on a percentage of AWP

6    can be favorable to the pharmacies.  For example,

7    our recommended strategy of keeping the AWP and

8    NDP higher if Roche comes in with a lower net

9    direct price for Copegus actually could create a

10   favorable situation because the reimbursement rate

11   will be higher for our product.

12        Simple example, if the reimbursement rate

13   is AWP minus 15 for a hundred dollar AWP product,

14   the reimbursement is $85 compared to $70 AWP

15   product where the reimbursement is 59.50.  We just

16   need to neutralize Managed Care and the state from

17   influencing pharmacies by providing Managed Care

18   and state Medicaid greater discounts."

19        Q.        Now, there is an attachment to this

20   memorandum which is entitled Peg-Intron War Games

21   Top Line Report.  Is that correct?

22   A.        Correct.

Brian Longstreet

Kenilworth, NJ

August 30, 2005

89

1        Q.      And what was the purchase of the

2   War Games Top Line Report?

3   A.      It was to talk to physicians in three

4   geographic locations about their preference for

5   our product versus a competitive product, Pegasys.

6   And I think they also talked potentially about

7   Ribarvirin, Rebetol versus Copegus.

8                MR. McNEELY:  If you would please

9   mark the next exhibit as Exhibit Longstreet 020.

10               (An e-mail dated 12-10-02 is received

11  and marked as Exhibit Longstreet 020 for

12  identification.)

13       Q.      If you would, please, take a moment

14  to review that document Exhibit Longstreet 020 and

15  identify it and tell us what that represents.

16  A.      It's an e-mail from Olav Hellebo to myself

17  basically saying he sounds good, let me know if

18  you'd like any involve -- my involvement in any of

19  the discussions regarding that potential

20  Ribarvirin or Rebetol retail pharmacy strategy.

21       Q.      Can you tell me whether or not Mr.

22  Hellebo was involved in any follow-up discussions

Henderson Legal Services
(202) 220-4158

Brian Longstreet

Kenilworth, NJ

August 30, 2005

90

1   for further development of the retail pharmacy

2   strategy?

3   A.      Yes.  As was a previous exhibit, both he

4   and Mr. Zahn signed the approval memo.

5                 MR. McNEELY: Mark this as Exhibit

6   Longstreet 021.

7                 (An e-mail dated 12-10-02 is received

8   and marked as Exhibit Longstreet 021 for

9   identification.)

10       Q.      If you would, please, review

11  Exhibit Longstreet 021 and if you would identify and

12  explain what that document represents.

13  A.      It's an e-mail from Bob Gallo who at the

14  time was working for me.  One of the things that

15  we were looking at, and many different things, was

16  a retail pharmacy model as it relates to

17  Ribarvirin and we had run numerous scenarios.

18  This particular e-mail describes some scenarios

19  that was taking a look at reimbursement of Rebetol

20  versus Copegus from a retail pharmacy perspective.

21       Q.      And how was this information or

22  this model used, represented by Exhibit Longstreet 021?

Henderson Legal Services
(202) 220-4158