# EXHIBIT F

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - -

In Re: PHARMACEUTICAL        :

INDUSTRY AVERAGE WHOLESALE:

PRICE LITIGATION             :

                             :    MDL DOCKET NO.

-------------------------:    CIVIL ACTION #

THIS DOCUMENT RELATES TO: :    01CV12257-PBS

                             :

ALL ACTIONS                  :

-------------------------:

- - -

Oral deposition of GARY

BISHOP, taken pursuant to notice, at the Four

Points Sheraton, 3400 Airport Road, Room 235,

Allentown, Pennsylvania  18109, on Wednesday,

July 27th, 2005, beginning at approximately

8:00 a.m., before David Walsh, Registered

Professional Reporter and Notary Public, there

being present:

CERTIFIED COPY

Gary Bishop

July 27, 2005

Allentown, PA

87

1  in the second sentence which says, "using

2  Links Machine through OTN and reorders not

3  coming up exact and are concerned about losing

4  money on reimbursements."

5       Could you go through that sentence and

6  tell me what is meant by "using Links Machine

7  through OTN", what does that mean?

8  A.    OTN stands for Oncology Therapeutics

9  Network and OTN is probably the largest

10  provider of chemotherapeutic and supportive

11  care products for medical oncology offices.

12  Hence, the name Oncology Therapeutics Network.

13       And one of their technologies is called

14  the Links Machine and the Links Machine is a

15  dispenser of drugs that assists the individual

16  office in their inventory.

17       So, for instance, if they have an

18  Intron-A 50 million unit vial in their Links

19  Machine when they use it, the Links Machine

20  reorders that for them.  However, it will also

21  act as an inventory control system to make

22  sure that the amount of drug dispensed from

Gary Bishop                                                July 27, 2005

Allentown, PA

88

1   the machine is actually being used and that's

2   the last part of that sentence about losing

3   money was they were utilizing an amount of

4   million units of Intron from their Links

5   Machine, but were not able to actually

6   dispense to the patient the same amount that

7   was being issued from the Links Machine.

8   Q.    And did you know why -- was that a

9   problem or was there an error in either the

10  machine or the information or do you recall

11  what was the solution of that?

12  A.    I do exactly.  Kathy, who is the nurse

13  that presented this to me in that office, was

14  purchasing the 50 MIU or MU million unit vial,

15  which comes with one ML of diluent and is

16  meant to be a unit of use.

17        So, essentially she was buying the wrong

18  vial size.  She was trying to get like three

19  different doses or two different doses at

20  22 million units, as it turned out here, and

21  they weren't -- with such low volume diluent,

22  she was unable to pull the whole 50 million

Gary Bishop                                    July 27, 2005
                      Allentown, PA

89

1    units.  So, she would use two at 22 and say,

2    well, why can't I get -- where are the

3    additional six, for example?

4         And it just wasn't there.  When you

5    start splitting an ML into a syringe, she

6    clearly had chosen the wrong vial size.  She

7    was uneducated in terms of what vial she

8    should have been using.

9    Q.    Okay.  The next item, is that Dr.

10   Sieber?

11   A.    Correct.

12   Q.    And that's a date detailed of

13   January 9th, 2002?

14   A.    Um-hmm.

15   Q.    And there's a comment concerning, "big

16   issue with profit margins as well".

17        Do you see that?

18   A.    Yes, I do.

19   Q.    What was the big issue with profit

20   margins and how did you address that with this

21   doctor?

22   A.    As you read on then, you'll kind of see

Henderson Legal Services
(202) 220-4158

Gary Bishop                                          July 27, 2005
                          Allentown, PA

90

1    what I recommended.  There is really nothing I

2    could do.  I recognized that he had an issue

3    with what he considered to be margins on the

4    drug.  He was skeptical though as you look up

5    above as the rebuttals to the O'Donnell paper

6    based on numbers of patients and those

7    consulted for cystectomy.

8         My sense is that he probably just had a

9    preference to perform surgical cystectomy and

10   wasn't a big fan of the treatment to begin

11   with; however, there's nothing I could do in

12   terms of margin.  I wrote the word big because

13   it seemed to be his number one objection and

14   what I showed on the very last sentence, as

15   you read, is that there was a company called

16   Florida Infusion with trans specials to many

17   of these physicians that were doing bladder

18   installations and I simply directed them that

19   purchasing the drug through Florida Infusion

20   may actually save them money on their

21   purchase.

22   Q.     And how did you have information on

Gary Bishop                                    July 27, 2005

Allentown, PA

91

1   Florida Infusion and any potential cost

2   savings?

3   A.    That's just public information.  They

4   would fax to the offices, for example, the

5   dollar amounts of the vials that they were

6   charging.  It was kind of like going into a

7   retail pharmacy and saying how much do you get

8   for a pill of Claritin?  I mean it was just

9   public information.

10  Q.    Would that information come through your

11  product manager or from Schering-Plough in

12  anyway?

13  A.    No, it did not.

14  Q.    Would you get any feedback from any

15  managers or the Schering-Plough supervisors

16  concerning the information that you provided

17  to Dr. Sieber relative to cost savings and

18  addressing issues of profit margins?

19  A.    No, I did not.

20  Q.    Now, as an oncology representative, who

21  is your supervisor?

22  A.    Now?

Gary Bishop                                        July 27, 2005
                        Allentown, PA

                                                              92

1    Q.    Yes.

2    A.    David Peckman, P-E-C-K-M-A-N.

3    Q.    And have you had other supervisors since

4    2001?

5    A.    One.

6    Q.    Who?

7    A.    Mark Manzo.  He was my hiring manager.

8    He hired me in oncology in October of '01.

9    Q.    Do you ever get feedback from either

10   your managers or any other supervisors in

11   Schering-Plough relative to what you have

12   placed in call notes?

13   A.    No, very little.  It would only be on a

14   field contact if he happened to be with me in

15   the car and we opened up the lap top and we

16   looked at the call notes and I shared those

17   with him.  Otherwise, no, it is for us.  It is

18   really for us to establish the relationship

19   that we have with the office, the platform to

20   which we have established, and where we are

21   going to go forward with it.

22   Q.    Have you ever been instructed by your

Gary Bishop                                                July 27, 2005

Allentown, PA

93

1    manager or any other supervisor at

2    Schering-Plough to delete or destroy any of

3    your call notes?

4    A.      No, I have not.

5    Q.      Have you ever been told by your managers

6    of Schering-Plough to destroy marketing

7    material?

8    A.      No, I have not.

9    Q.      Have you ever participated in the

10   destruction of marketing material that you

11   have used to detail Schering-Plough products?

12   A.      No, I have not.

13   Q.      Now, you referred a couple times to the

14   O'Donnell data?

15   A.      Correct.

16   Q.      Does that have anything to do with

17   pricing or profitability of any of the

18   products?

19   A.      None, whatsoever.  It was strictly a

20   protocol to treat a specific disease state, a

21   specific urologic cancer, bladder cancer.

22   Q.      In the physician administered drug

# EXHIBIT G

**FILED UNDER SEAL**

# EXHIBIT H

## FILED UNDER SEAL

# EXHIBIT I

Debra Kane 30(b)6

Kenilworth, New Jersey                June 23, 2005

```
 1              UNITED STATES DISTRICT COURT        1
 2         DISTRICT OF MASSACHUSETTS
 3         MDL NO. 1456
           CIVIL ACTION: 01-CV-12257-PBS
 4         Judge Patti B. Saris
 5
           x------------------------------x
 6         IN RE: PHARMACEUTICAL INDUSTRY:      DEPOSITION OF:
           AVERAGE WHOLESALE PRICE
 7         LITIGATION                   :
                                        :       DEBRA KANE
           _____:
 8                                      :
           THIS DOCUMENT RELATES TO:    :
 9         ALL CLASS ACTIONS            :
                                        :
10         x------------------------------x
11
12
           C O M P U T E R I Z E D   T R A N S C R I P T  of
13         the stenographic notes of the proceedings in the
           above-entitled matter as taken by and before
14         MARY T. NOVAK, a Certified Shorthand Reporter and
           Notary Public of New Jersey, in the office of
15         SCHERING-PLOUGH, 2000 Galloping Hill Road,
           Building K-6, Kenilworth, New Jersey on Thursday,
16         June 23, 2005, commencing at twenty-five minutes
           after ten o'clock in the forenoon.
17
18
                   HENDERSON LEGAL SERVICES, INC.
19                  WORLDWIDE COURT REPORTING
                    1120 G. Street N.W., Suite 1010
20                   Washington, D.C. 20005
21
22
```

Debra Kane 30(b)6

Kenilworth, New Jersey

June 23, 2005

13 (Pages 46 to 49)

46

1  She'll explain the source of the lists I've given
2  you for Number 5.
3      You've agreed to accept Number 7, documents
4  in lieu of testimony.
5      MR. McNEELY: On all of the
6  documents I understand that everything that -- my
7  experience has been everything we practice in
8  good faith. I would reserve a final acceptance
9  based upon an examination, reserve any rights if
10  they were unsatisfactory, or if there's
11  deficiencies in any of these paper productions, we
12  reserve the right to come back and ask for either
13  additional documents or a designated
14  representative.
15      MR. KAUFMAN: Understood. I'm not
16  agreeing to your doing it but I understand that
17  and I don't think you're precluded from doing that
18  by accepting these documents.
19      MR. McNEELY: I understand. I just
20  want don't to give for the record that there's a
21  blanket acceptance.
22      MR. KAUFMAN: I understand that.

47

1  You haven't seen these documents before so you
2  can't say whether they are what they purport to
3  be.
4      MR. McNEELY: I think we're at a
5  meeting of the minds.
6      MR. KAUFMAN: So it's Number 1,
7  Number 4 and the source of the lists that were
8  given as Number 5, and that's it.
9      MR. McNEELY: Okay.
10      Q.  Miss Kane, I believe we're ready to
11  talk to you again. With regard to areas of
12  inquiry Number 1, and your attorney has described
13  or designated the three physician administered
14  drugs, and my questions, I'll start with the
15  Intron-A.
16      Can you tell me how the prices are
17  established on Intron-A?
18      A.  I think anything that I could tell you
19  establishing prices would be the same for any of
20  the drugs. There's no unique difference between
21  any of the products.
22      Q.  I thank you for that. Go ahead and

48

1  tell me and if the process or procedure has
2  changed historically, would you please give me a
3  time reference?
4      A.  Sure. Historically, the procedures around
5  establishing introductory pricing for products was
6  actually very vague. It was not -- there were no
7  really standard operating procedures around it.
8  So I think that pricing could come about, and it
9  was maybe an iterative process, let's say either
10  from the top down or the bottom up. The brand
11  teams would have input into pricing as well as
12  executive management. There wasn't really a lot
13  of structure around the process. I could tell you
14  that with our change in management, which took
15  place in, I guess it was 2004.
16      Q.  April 2003?
17      A.  April 2003 and continued on through 2004.
18  Just in terms of all our executive management team
19  turning over there was an introduction to a
20  process, RFC which stands for request for
21  concurrence, which puts significant discipline
22  around our establishment of the pricing as well as

49

1  any discount or rebate strategies.
2      Q.  I am familiar with your testimony
3  in your previous deposition and you described how
4  AWP as well as the RFCs were both historically and
5  since the new management began. You reviewed that
6  testimony?
7      A.  Yes.
8      Q.  Do you have anything more to add to
9  that testimony?
10      A.  I do not.
11      Q.  I don't want to just be duplicative
12  in that area.
13      A.  I do not.
14      MR. McNEELY: Now, with regard to
15  the next item number 4. Is that correct?
16      MR. KAUFMAN: Yes.
17      Q.  Communications oral or written with
18  publishers or any of the following. List price
19  AWP, net price, suggested wholesale price, WACO,
20  any other communication with publishers.
21      What information can you tell me about
22  communications to publishers relative to any of

Debra Kane 30(b)6                                June 23, 2005

Kenilworth, New Jersey

14 (Pages 50 to 53)

50

1  those prices?
2  A.   We provide written communications to the
3  third party pricing agencies with respect to
4  pricing notifications, whether it's introductory
5  pricing or list price changes.
6       Q.    And that would include AWP pricing?
7  A.   Historically it did include AWP. The
8  company no longer reports AWP.
9       Q.    When did the company cease
10 reporting AWP?
11 A.   I don't remember. I don't recall the exact
12 date.
13      Q.    I'm not asking for the exact date,
14 what year, if you can tell me?
15 A.   2003, 2004.
16      MR. KAUFMAN: I must say, Mr.
17 McNeely, in that box there are documents
18 illustrative as to her testimony as to Number 1.
19 There's a product log for Intron-A, a document
20 that describes the process for setting the price
21 of Intron-A. And also some documents that relate
22 to changes in price for drugs that have already

51

1  been launched. That's in a folder labeled number
2  one.
3       In Number 2, folder labeled number 2, there
4  are also communications, written communications
5  with pricing services that exemplify the
6  description and I believe you will be able to see
7  a change from an earlier time when AWP was
8  reported, to a later time when AWP was not, which
9  may give more indication of when the change
10 actually occurred.
11      Q.    And in connection with the comments
12 of your attorney, have you reviewed any of the
13 documents that are going to be --
14      MR. KAUFMAN: Thankfully, no.
15 A.   I have not.
16      Q.    For these introductory
17 notifications to publishers, historically, they
18 would include both AWP and a list price or net
19 direct price. Is that correct?
20 A.   Yes.
21      Q.    And the AWP, and I'll just use net
22 direct price, those were prices, both of those

52

1  prices were set by Schering-Plough. Is that
2  correct?
3  A.   The net direct price was set by
4  Schering-Plough and AWP was merely a calculation
5  off of the net direct price. Based upon the net
6  direct price.
7       Q.    What calculation was used by
8  Schering-Plough to arrive at an AWP?
9       MR. KAUFMAN: Objection. It's
10 outside the scope of her designation.
11      You may answer for yourself.
12 A.   Net direct price multiplied by 120 percent.
13      MR. McNEELY: Now, if I recall your
14 explanations earlier, there are no documents for
15 item Number 2.
16      MR. KAUFMAN: Yes. That's correct.
17 I'm sorry. My earlier comments were confusing.
18 Let me clarify my confused comments before.
19      The pricing documents to which I referred
20 are all within area of inquiry Number 1.
21      Number 2, the company does not market or
22 sell directly to physicians. Physicians do not

53

1  buy product from the company. So the company has
2  no records of the prices paid by physicians for
3  company products. That's not something the
4  witness is designated to testify to but that's my
5  representation to you as the spokesperson for the
6  company in this setting. Okay.
7       But there are no documents, it's impossible
8  for anyone to identify them. There aren't any.
9       Q.    Miss Kane, is it your understanding
10 that Schering-Plough or Warrick does not sell
11 directly to physicians or physicians' clinics?
12      MR. KAUFMAN: Objection. It's
13 outside the scope of her designation.
14      You may answer for yourself.
15 A.   We do not sell directly to physicians.
16 Schering-Plough does not sell directly to
17 physicians.
18      MR. McNEELY: With regard to item
19 Number 3, you're not designating her to respond to
20 that topic?
21      MR. KAUFMAN: That's correct. I've
22 given you a list of materials that the sales

Debra Kane 30(b)6

Kenilworth, New Jersey                     June 23, 2005

15 (Pages 54 to 57)

54

1  management has told us are the materials that we
2  would expect to have the salespeople keep but Miss
3  Kane is not in that function. She can't testify
4  to that. If, after looking at them, and after
5  talking to other sales reps, you want someone in
6  the company, some management in the company to say
7  that that's the right list, we can provide that.
8  But Miss Kane isn't the person.
9      Q.  This is the list that was handed to
10  me by Mr. Kaufman. Did you have anything to do
11  with preparation of that list?
12      MR. KAUFMAN: Objection. It's
13  outside the scope of her designation.
14      You may answer.
15  A.  No. I did not.
16      Q.  So that we know, the list will have
17  a connection with this deposition, I'd like to
18  have that marked as the next Exhibit Kane 002.
19      (A list of materials is received
20  and marked as Exhibit Kane 002 for identification.)
21      (A recess is taken.)
22      Q.  Now, with regard to item Number 5,

55

1  the identity and nature of the competitive drug
2  with respect to each physician administered
3  AWPID, which is now plaintiffs, identify some of
4  these drugs or all of these drugs, and I
5  understand you are going to -- this one is going
6  to be marked. I've been given two lists. One is
7  entitled June 16th notice number 5, 1 of 2. And
8  it refers to Intron-A. And I'm going to have it
9  marked as number 003 and ask you to look at that
10  and if you can provide the source of that
11  particular list?
12  A.  This is taken from IMS data.
13      Q.  Did you actually make that list?
14  A.  I did not.
15      Q.  How do you know that it's sourced
16  with IMS?
17  A.  All of the companies data, as it relates to
18  products and competitive information, is IMS.
19      Q.  And that would include
20  Schering-Plough. Is that correct?
21  A.  Yes.
22      Q.  And the next list is handwritten

56

1  designation June 16 notice number 2 and this
2  refers to Albuterol and I am going to -- this is
3  going to be marked 004.
4      Q.  Can you give me the source for that list?
5  A.  Again, this would be IMS data.
6      Q.  Again, did you prepare that list?
7  A.  I did not.
8      Q.  How do you know that it's IMS
9  generated?
10  A.  Again, IMS is the source that the company
11  uses for information like this, purchase the data
12  from IMS.
13      Q.  Do you know who prepared these
14  lists which are Exhibit Kane 003 and Exhibit Kane 004?
15  A.  It is my understanding that Harvey
16  Weintraub prepared the list.
17      (A list entitled Intron-A,
18  Immunologic Interferons is received and marked as
19  Exhibit Kane 003 for identification. A list entitled
20  Albuterol, Beta Agonist Neb Sol is received and
21  marked as Exhibit Kane 004 for identification.)
22      Q.  With regard to item 7 --

57

1      MR. KAUFMAN: She's not been
2  designated on that.
3      MR. McNEELY: You are on behalf of
4  Schering-Plough, as their attorney, you are
5  representing that there are documents in this box
6  that are responsive to that?
7      MR. KAUFMAN: Correct.
8      MR. McNEELY: That would be the same
9  with regard to 8, 9, 10?
10      MR. KAUFMAN: That's correct.
11      MR. McNEELY: And then we have to
12  talk about item 11. And then with regard to the
13  item 12 with the sales representatives, you
14  earlier stated that that would be produced
15  momentarily. Are we talking about this morning or
16  this afternoon?
17      MR. KAUFMAN: I can't say. It's
18  not I who is preparing it but it was supposed to
19  have been prepared before now to give to you right
20  now and I don't know why it hasn't been but it
21  can't take very long to do. So I can't say it
22  will be today, because I don't know, but it will

# EXHIBIT J

1

1          HIGHLY CONFIDENTIAL TRANSCRIPT

2          UNITED STATES DISTRICT COURT

3          DISTRICT OF MASSACHUSETTS

4                                        **CERTIFIED COPY**

5

6     IN RE:                    )MDL NO. 1456

7     PHARMACEUTICAL INDUSTRY    )Civil Action No. 01-CV-12257-PBS

8     AVERAGE WHOLESALE PRICE     )

9     LITIGATION                  )

10                                )

11          VIDEOTAPED DEPOSITION OF JEROME A.

12     SHERMAN, called as a witness on behalf of

13     the Plaintiffs, pursuant to the applicable

14     provisions of the Federal Rules of Civil

15     Procedure, before Jeanette N. Maracas,

16     Registered Professional Reporter and Notary

17     Public in and for the Commonwealth of

18     Massachusetts, at the Offices of Ropes &

19     Gray, LLP, One International Place, Boston,

20     Massachusetts, on Thursday, July 7, 2005,

21     commencing at 9:12 a.m.

22

Jerome A. Sherman   HIGHLY CONFIDENTIAL           July 7, 2005
Boston, MA

119

```
 1        1997.  If you would take a look at that and

 2        tell me if that is something you received

 3        and whether you use that in connection with

 4        your duties as a national sales director

 5        for Warrick Pharmaceuticals.

 6   A.   (Witness examines document)  This has to

 7        do more with advertising, promotional

 8        documents that would be going into

 9        advertising or used in a detail aid, FDA

10        guides.  I don't get involved in any of

11        this.

12   Q.   Have you ever received a copy of that

13        document in the past?

14   A.   No, I haven't.

15   Q.   Are there any procedure or practice manuals

16        other than what you've seen here that I've

17        just shown you that directs the activities

18        of the Warrick Pharmaceuticals national

19        sales directors?

20             MR. CHRISTOFFERSON:  Objection.  You

21        may answer.

22   A.   I'm not sure whether we haven't had a
```

Jerome A. Sherman   HIGHLY CONFIDENTIAL          July 7, 2005
Boston, MA

120

1          revision to the Warrick practices, like I

2          said, two, three years ago.

3     Q.   Is that the manual that you referred to that

4          you rarely resort to?

5     A.   I mean, I have been with Schering for a

6          number of years and policies do change, and

7          I'm aware of the policies as they change

8          and live by those policy changes.  So when a

9          policy change occurs, I know about it and

10         follow those rules.

11    Q.   How are you notified of changes in policy?

12    A.   I get documents from home office.

13    Q.   Do you preserve those documents, notices

14         from the home office relative to changes in

15         policy?

16    A.   I don't have them.  Yes, I suppose we do.

17    Q.   When was the last time you received that

18         type of document, a notice of a change in

19         policy?

20    A.   It was a few years ago when we got a change

21         in entertainment, what we could spend on

22         entertainment or what we could spend on

Jerome A. Sherman   HIGHLY CONFIDENTIAL       July 7, 2005
Boston, MA

121

1        meals on the road, things of that nature,

2        and this is Warrick I'm talking about.

3   Q.   Do you have a folder or file where you

4        have maintained those notices of change in

5        policy?

6   A.   No, I don't.

7   Q.   The price change notices that we have looked

8        at and marked as exhibits in this case, in

9        this deposition, that is a type of notice

10       that you send out on a regular basis; is

11       that not correct?

12            MR. CHRISTOFFERSON:   Objection.   You

13       may answer.

14   A.  When a price change occurs, certainly.

15   Q.   And would it be fair to say that that happens

16       many times a year where you send out that

17       type of notice to all your accounts?

18   A.   Only to those accounts that require a price

19       change.

20   Q.   And all of those notices, as far as you

21       can testify to, would include the price as

22       well as the new price as well as the AWP;

Jerome A. Sherman   HIGHLY CONFIDENTIAL          July 7, 2005
Boston, MA

                                                              122

1       is that correct?

2              MR. CHRISTOFFERSON:   Objection.  You

3       may answer.

4    A.  I haven't seen the AWP on those documents

5       for very long time.

6    Q.  When was the last time that you saw a

7       document notifying a price change where

8       AWP was not listed?

9    A.  Repeat that, please.

10   Q.  You said that you hadn't seen AWP on a

11      price change document in a very long time.

12      When did you start sending out price change

13      notices without AWP on it?

14   A.  I don't remember when that occurred.

15             (Exhibit Sherman 030 marked for

16      identification.)

17   Q.  Mr. Sherman, you've been handed a document

18      that has been marked Exhibit Sherman 030?

19   A.  Yes.

20   Q.  And this is a price change notification

21      from you to one of your accounts; is that

22      correct?

Jerome A. Sherman   HIGHLY CONFIDENTIAL         July 7, 2005
Boston, MA

123

1    A.    Yes.

2    Q.    And the effective date on this price change

3          is, appears to be May 8 of 2000.  Is that

4          how you read this document?

5    A.    Yes.

6    Q.    So as recent as, or at least the year 2000,

7          AWP was still being reported or shown

8          on price change notifications; is that

9          correct?

10               MR. CHRISTOFFERSON:  Objection.  You

11   may answer.

12   A.    Yes.

13   Q.    With regard to the spread, the difference

14         between the AWP and the direct price as

15         shown on this, is it not correct that as

16         the AWP -- strike that.

17               Would you agree that where the AWP

18         remains the same and the direct price is

19         decreased, that there's an increase in the

20         spread?

21               MR. CHRISTOFFERSON:  Objection.  You

22         may answer.

Jerome A. Sherman   HIGHLY CONFIDENTIAL          July 7, 2005
                          Boston, MA

                                                            124

1    A.   Yes.

2    Q.   And also, if the direct price is subject to

3         any rebates that would result in a decreased

4         price per unit, that would also result in a

5         spread; is that correct?

6              MR. CHRISTOFFERSON:  Objection.  You

7         may answer.

8    A.   Yes.

9    Q.   Now, having looked at this last exhibit,

10        which is in May of -- apparently, effective

11        date of the price change in May of 2000,

12        does that help or refresh your memory in

13        any way as to when AWP was discontinued

14        as an item on a price change notice?

15   A.   No, it doesn't.  It was, obviously,

16        subsequent to this time frame.

17   Q.   Mr. Sherman, are you familiar with a term,

18        "nominal pricing," for purposes of either

19        contracts or for selling product on behalf

20        of Warrick Pharmaceuticals?

21   A.   I've heard the term.

22   Q.   What is your understanding of nominal

Henderson Legal Services
(202) 220-4158