# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456<br>Civil Action No. 01-12257 PBS |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| *The City of New York v. Abbott Laboratories, Inc., et al.* S.D.N.Y.  Case No. 04-CV-06054<br>*County of Albany v. Abbott Laboratories, Inc., et al.* N.D.N.Y. Case No. 05-CV-0425<br>*County of Allegany v. Abbott Laboratories, Inc., et al.* W.D.N.Y. Case No. 05-CV-0236<br>*County of Broome v. Abbott Laboratories, Inc., et al.* N.D.N.Y. Case No. 05-CV-0456<br>*County of Cattaraugus v. Abbott Laboratories, Inc., et al.* W.D.N.Y. Case No. 05-CV-0256<br>*County of Cayuga v. Abbott Laboratories, Inc., et al.* N.D.N.Y. Case No. 05-CV-0423<br>*County of Chautauqua v. Abbott Laboratories, Inc., et al.* W.D.N.Y. Case No. 05-CV-0214<br>*County of Chenango v. Abbott Laboratories, Inc., et al.* N.D.N.Y. Case No. 05-CV-0354<br>*County of Fulton v. Abbott Laboratories, Inc., et al.* N.D.N.Y. Case No. 05-CV-0519<br>*County of Genesee v. Abbott Laboratories, Inc., et al.* W.D.N.Y. Case No. 05-CV-00267<br>*County of Greene v. Abbott Laboratories, Inc., et al.* N.D.N.Y. Case No. 05-CV-0474<br>*County of Herkimer v. Abbott Laboratories, Inc., et al.* N.D.N.Y. Case No. 05-CV-00415 | |

Caption Continues on Next Page

# NEW YORK COUNTIES CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE MNYCC

*County of Jefferson v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0715

*County of Madison v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-00714

*County of Monroe v. Abbott Laboratories, Inc., et al.*
W.D.N.Y. Case No. 05-CV-6148

*County of Nassau v. Abbott Laboratories, Inc., et al.*
E.D.N.Y. Case No. 05-CV-05126

*County of Niagara v. Abbott Laboratories, Inc., et al.*
W.D.N.Y. Case No. 05-CV-06296

*County of Oneida v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0489

*County of Onondaga v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0088

*County of Putnam v. Abbott Laboratories, Inc., et al.*
S.D.N.Y. Case No. 05-CV-04740

*County of Rensselaer v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-00422

*County of Rockland v. Abbott Laboratories, Inc., et al.*
S.D.N.Y. Case No. 03-CV-7055

*County of St. Lawrence v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0479

*County of Saratoga v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0478

*County of Steuben v. Abbott Laboratories, Inc., et al.*
W.D.N.Y. Case No. 05-CV-6223

*County of Suffolk v. Abbott Laboratories, Inc., et al.*
E.D.N.Y. Case No. 03-CV-12257

*County of Tompkins v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0397

*County of Warren v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0468

*County of Washington v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0408

*County of Wayne v. Abbott Laboratories, Inc., et al.*
W.D.N.Y. Case No. 05-CV-06138

*County of Westchester v. Abbott Laboratories, Inc., et al.*
S.D.N.Y. Case No. 03-CV-6178

*County of Yates v. Abbott Laboratories, Inc., et al.*
W.D.N.Y. Case No. 05-CV-06172

Plaintiffs, by and through their respective attorneys, submit this memorandum of law in opposition to Defendants' Joint Memorandum of Law In Support of Motion To Dismiss The Consolidated Complaint of New York City and Plaintiff New York Counties Other than Nassau and The Second Amended Complaint of Nassau County.[1]  For the reasons set below, Defendants' motion to dismiss should be denied in its entirety.

## INTRODUCTION

In their respective complaints, Plaintiffs allege that defendants manipulate the reported Average Wholesale Price ("AWP")[2] of pharmaceutical products in a manner that results in overcharges to and over payments by New York Medicaid, including the New York County Plaintiffs.  Consolidated Complaint ("CC") at ¶¶ 4-20, *et seq*.   New York's Medicaid Statute requires reimbursement at the rate of AWP less a certain discount for all drugs for which there is no federal upper limit ("FUL").[3]  CC at ¶ 87.  FUL is the reimbursement benchmark for generic drugs that have at least three suppliers.  Plaintiffs also allege that Defendants manipulate the FUL C.F.R. § 447.332; CC at ¶ 86.    The pricing information supplied by defendants is an essential element in the calculation leading to FUL. CC at ¶ 86   Defendants' submission of fraudulent prices results in a manipulated and artificially inflated FUL. .*Id*.  An exaggerated FUL, in  turn, leads to

---

[1] Plaintiffs in this action are the Captioned Counties.

[2] "AWP" is defined by New York statute as a proxy for "Estimated Acquisition Cost" (EAC).  CC at ¶ 88.  The estimated acquisition cost is what the retail pharmacy pays for the drug. N.Y. Soc.Serv.L. § 367-a(9)(b)(ii).

[3] Prior to April 15, 2003 the formula was AWP minus 10%.  From May 15, 2003 to April 1, 2004 the formula was AWP minus 12%.  SSL § 367-a(9)(b)(ii); CC at ¶ 88.  Effective April 1, 2004 the formula was amended to provide that brand name drugs are reimbursed at the rate of AWP minus 12.75% and generic drugs for which no FUL has been established are reimbursed at AWP minus 16% or at a maximum price determined by the New York State Commissioner of Health using "a similar methodology as that utilized by the Centers for Medicare and Medicaid

1

overcharges to and overpayments by New York County Medicaid Programs. *Id. See also* ¶¶ 282-284; 353-355; 459-461; 470-472; 538-539..

This Court previously held on three occasions that the New York Counties have properly alleged causes of action for (i) violation of New York Social Services Law (.SSL") § 145-b; violation of N.Y. General Business Law ("GBL") §349; and (iii) for unjust enrichment. *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, 339 F.Supp. 2d 165, 179-180; 181-183, (D. Mass 2004) ("Suffolk I"); *In re Pharmaceutical Industry Average Wholesale Price Litigation* 2004, 2004 WL 2387125 (D. Mass. October 26, 2004) ("Suffolk II") and April 8, 2004 Memorandum and Order ("Suffolk III"). The Court explicitly held that Fed R. Civ. P. 9(b) "does not apply to . . . unjust enrichment and implied causes (*i.e.*, N.Y. C.R.R. 515.2 and N.Y.Soc.Ser.L. §367-a(7), since these do not require a pleading of fraud or mistake." *Suffolk II*, 2004 WL 2387125 at \*2.

Defendants seek "a second bite of the apple" by making the same arguments previously rejected by the Court with regard to these issues. Law of the case and *stare decisis* principles apply to Defendants' renewed attacks on County standing to assert claims under SSL § 145-b, N.Y. GBL § 349, and unjust enrichment. Defendants have failed to demonstrate why these decisions should now be disturbed. Moreover, they have not satisfied their burden of demonstrating an intervening change of facts or change in the law sufficient to warrant re-visiting these rulings. Accordingly, Defendants' motion to dismiss these claims should be denied.

---

Services in establishing the federal upper payment limit." SSL. § 367-a(9)(e) and Laws 2004, Ct. 58, Part C, § 36;

Denying Defendants' prior motion to dismiss the § 349 cause of action, the Court noted that it might "revisit" the GBL § 349 after New York's highest Court issued a decision in *Blue Cross, etc.* (*Suffolk I*, 339 F. Supp. 2d at 182-183). The New York Court of Appeals has now issued a decision in *Blue Cross*. In their motion to dismiss, Defendants heavily rely upon the New York Court of Appeals decision in *Blue Cross* as a basis for dismissing Plaintiffs' GBL § 349 claim. Contrary to Defendants' assertion, the *Blue Cross* decision is inapplicable to this case   The *Blue Cross* decision suggests that entities with indirect or derivative injuries cannot pursue a claim under GBL § 349. In this case, however, the New York Counties possess standing because they sustained a direct economic injury each time they paid for a pharmaceutical product whose reimbursement price was manipulated by a Defendant. *Blue Cross*, 3 N.Y.3d at 204-206. (*See*, II below). Thus, Plaintiffs' GBL § 349 claim is factually distinguishable from *Blue Cross*. Plaintiffs address this argument at Points I and  II below.

In *Suffolk I*, the Court deferred ruling on the  N.Y. Health Regulation, 18 N.Y.C.R.R. §515.2(b)(4) and (5) and SSL § 367-a(7)(d) claims. *Suffolk I*, 339 F.Supp. 2d at 182. At Point III below we show the Counties can and do state causes thereunder.

In *Suffolk II*, Plaintiffs' § 145-b AWP claim was dismissed on Fed. R. Civ. P. 9(b) grounds as against the "Suffolk 13+6."[4]  *Suffolk II* 2004 WL 2387125 at 2*  The Court

---

CC at ¶ 89.

[4] Agouron Pharmaceuticals, Barr Laboratories, Berlex Laboratories, Inc., Biogen, Inc., Eli Lilly & Co., Forest Pharmaceuticals, Genentech, Inc., Ivax Corporation, Medimmune, Inc., Merck & Co, Inc., Purdue Pharma, L.P., Reliant Pharmaceuticals, Sanofi-Synthelabo, Inc ("Suffolk 13") plus Amgen, Inc., Chiron Corporation, Fujisawa Pharmaceutical Company, Ltd., Johnson & Johnson, Warrick Pharmaceuticals and Wyeth.

also sustained Suffolk's Best Price claims against Bayer Corporation[5], the GSK defendants[6], Abbott Laboratories[7], Pfizer, Inc.[8], TAP Pharmaceutical Products, Inc., and Schering Plough.[9]  *Suffolk II*, 2004 WL 2387125 at *2.

In *Suffolk III*, this Court dismissed Plaintiffs' fraud claims arising out of allegedly fraudulent Best Prices against certain defendants.  The Court dismissed Plaintiffs' fraud claims for failure to allege facts in accordance with Fed. R. Civ. P.  8(a) and 9(b).  *See Suffolk III* and a clarifying order dated November 23, 2004 ("*Suffolk IV*")(identifying the defendants who benefited from this ruling).    In their respective complaints, Plaintiffs have more than alleged facts with particularity concerning their fraud based claims Fed. R. Civ. P.  8(a) and 9(b).  *See* Point II below and Exhibit A hereto (comparing the Suffolk Amended Complaint and CC)

In *Suffolk I*, the Court dismissed the third-party beneficiary contract claim on grounds that the pleading failed to allege certain facts.  *Suffolk I,* 339 F.Supp.2d at 179. The Court held that Counties lack standing to assert third-party beneficiary claims arising from rebate agreements (*id*., at 178-179), remarking upon a failure to "show a clear indication in the face of the [Medicaid Rebate ("MRA")] contract of an intent either to benefit [a particular County] or to benefit a class that includes [Counties]".  *Id*., at 179. To satisfy standing requirements, a County plaintiff must show a "'clear indication' that

---

[5] As defined in the Complaints Bayer Corporation includes Bayer Pharmaceutical.
[6] As defined in the Complaints the GSK defendants include GlaxoSmithKline P.L.C., SmithKline Beecham Corporation d/b/a GlaxoSmithKline, and GlaxoWellcome, Inc.
[7] As defined in the Complaints, Abbott Laboratories includes Abbott Laboratories, Inc. and Abbott Pharmaceuticals.
[8] As defined in the Complaints the Pfizer group includes Pfizer, Inc., Pharmacia Corporation, Agouron Pharmaceuticals, Inc., and Greenstone, LTD.
[9] As defined in the Complaints the Schering Group includes Schering-Plough Corp., Schering Corporation, and Warrick Pharmaceuticals Corporation.

Counties (as opposed to states) were in the class of intended beneficiaries from the vantage point of either the pharmaceutical manufacturers or the federal government or in the text of the MRA". *Id*. The Court found also that there was no private right of action for Counties under the federal Best Price statute, 42 U.S.C. § 1396r-8 (*Suffolk I*, 339 F.Supp. at 176-177.[10]   The Court dismissed plaintiffs' claim for common law fraud with respect to Average Wholesale Prices ("AWP") for the identified drugs.

Dismissal of the § 145-b and § 349 claim was not on grounds that plaintiff could prove no set of facts that would entitle relief.  *Scheur v. Rhodes*, 416 U.S. 232, 236 (1974); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).   Rather, the allegations were deemed to have failed Fed.R.Civ.P. 8(a) ("8(a)") and 9(b) muster.

Nor are plaintiffs' claims as third party beneficiary for breach of contract precluded.  The dismissal of this claim, like the fraud claim, was not on the grounds that plaintiffs could prove no set of facts what would entitle relief,  *Scheur*, 416 U.S. at 236, but because Suffolk had not shown "a clear indication on the face of the contract" either to benefit the County or a class that included it." *Suffolk I*, 339 F.Supp.2d at 178-179. The court did dismiss a County fraud claim, but on concededly "terse" briefing. *Id.* at 180-81.  At Point V below, a fuller discussion makes clear that, a cause lies, because the misrepresentation directly injured the Counties.

In dismissing Suffolk County's RICO claim without prejudice, the Court cited its failure to sufficiently allege the publishers' role in the manufacturer-publisher

---

[10]     Plaintiffs oppose defendants' motion to dismiss this claim and preserve it for appeal, but given the Court's prior rulings in *Suffolk I*, and *In re Pharm. Indus.Average Wholesale Price Litig.,*   321 F. Supp.2d 187 D.

enterprises. *Suffolk I,* 339 F.Supp.2d at 175 *citing In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 203-05 (D. Mass. 2004) ("AMCC Order"). The County of Nassau has pled facts specifically with regard to this issue. *See, e.g.,* NSAC at ¶¶ 197, 221, 735, 737.

For the reasons set forth herein, Defendants' motion to dismiss should be denied in its entirety.[11]

## PROCEDURAL HISTORY

Suffolk County commenced this action on January 14, 2003 and filed an amended complaint on August 1, 2003.  Defendants filed a consolidated motion to dismiss, and numerous individual motions.  The Court ruled on these motions in a series of decisions, adverted to in the Introduction above and discussed again below.

Additional New York Counties and the City of New York filed individual complaints ("New York County complaints") thereafter.  These complaints, like all those in MDL 1456, including Suffolk's, allege that defendants submitted fraudulent inflated pricing information concerning their drugs and that Medicaid was overcharged as a result.

At an April 8, 2005, status conference the Court directed the Counties to file a consolidated complaint.  Tr. at 20-21.  Attached as Exhibit A to the Declaration of Joanne M. Cicala, sworn to April 17, 2006 and submitted in support of this motion.  ("Cicala

---

Mass.2004)**,** plaintiffs will rest on their pleadings and the Suffolk briefs previously addressing the issue.  MDL 1456 Docket Entries 591, 592, 625-1, 626-1.

[11]      Plaintiffs incorporate herein their oppositions to the individual motions to dismiss filed by defendants', particularly with regard to defendants' arguments concerning physician administered drugs (*see, for example*, Amgen MTD Opp) and FUL manipulation (*see, for example*, Sandoz MTD Opp).

Dec.")  That consolidated complaint was filed June 15, 2005[12], and is the subject of the instant motion to dismiss.[13]

By the April 8, 2005 status conference, one issue of defendants' motion to dismiss the *Suffolk* matter remained *sub judice*: whether Suffolk had satisfied 9(b) on its fraud-based AWP claims as against a particular subset of defendants, the "Suffolk 13 +6".   The Suffolk 13 + 6 was a group of drug manufacturers who, at the time, had never been sued in any AWP litigation.   During the April 8, 2005 conference, the Court stated that its ruling on this remaining question would be instructive on how the consolidated complaint should be pled.  Tr. at 15 *et seq.*  Cicala Dec., Exh. A.  At the same conference, the Court obliged the Counties to serve this unified complaint, and did not preclude the Counties from pursuing any cause of action. *Id.*, and at 20-21.

## I.  A Summary of the Court's Prior Decisions

In *Suffolk I*, 339 F. Supp. 2d 165 (D.Mass 2004), this Court *sustained* Suffolk's standing to assert claims for violation of N.Y. N.Y. Soc. Serv. L. § 145-b, of G.B.L. § 349, and both its AWP and rebate and unjust enrichment claims.[14]  *Id.* at 179-180; 181-183.  The Court *dismissed* Suffolk's claim for a violation of 42 U.S.C. §1396r-8 on the grounds that plaintiff did not "point to any provisions demonstrating a Congressional intent to create a remedy," *id.* at 177, and *dismissed* Suffolk's third-party beneficiary

---

[12]      A corrected Consolidated Complaint ("CC") was filed June 22, 2005 and it is that CC which defendants' motions concern.

[13]      Nassau County separately filed a Second Amended Complaint around the same time.

[14]      The court noted, "[l]eaving aside the thorny issue of whether Suffolk may recover from Defendants to the extent that the AWP fraud boosted their sales, the Court notes that Suffolk's claim that Defendants were 'saved from expense' when they fraudulently underpaid Best Prices rebates to the States, and consequently Suffolk, suffices to state a claim." *Suffolk I,* 339 F. Supp. at 181.

claim for breach of contract on the grounds that the County had not shown "a clear indication on the face of the contract" either to benefit the County or a class that included it." *Id.* at 178-179.  The Court also *dismissed* the stand-alone common law fraud claim on the grounds that third-parties cannot actually rely on misrepresentations.  *Id.* at 177-179; 180-181.  The Court deferred ruling on Suffolk's remaining state law causes of action (for violation of N.Y.C.R.R. § 515(b)(4) & (5) and violation of SSL § 367-a(7)(d)). *Id.* at  182 ("the Court declines to address the remaining state law issues at this time").

In *Suffolk II,* 2004 WL 2387125 (D. Mass. October 26, 2004), the Court considered the application of Fed. R. Civ. P. 9(b) to Suffolk's §349 consumer fraud AWP claim and to Suffolk's §145-b Medicaid fraud claim.  The Court held that "Rule 9(b) does *not* apply to Suffolk's remaining claims, unjust enrichment and implied causes of action,[15] since these do not require a pleading of fraud or mistake." *Id.* at *3 (emphasis supplied). The Court also considered whether Suffolk had satisfied Fed. R. Civ. P. 8(a) in respect of its Best Price claims, *i.e.* its unjust enrichment claim arising out of defendants' underpayment of Medicaid rebates and its claim for violation of .N.Y. Soc. Serv. L. § 367-a(7)(D).

---

[15]     New York Medicaid statutes and regulations SSL §367-a(7)(d) and N.Y.C.R.R. § 515.2(b)(4) and (5). *Suffolk II*, 2004 WL 2387125 at n.1.

With respect to the fraud-based AWP claims, the Court held that for all defendants but the Suffolk 13+6,[16] Suffolk had satisfied 9(b). *Id.*  With respect to the Suffolk 13 +6, the Court required a more definite statement regarding calculation of spread. *Id.* at *2. *See also*, Tr. at 18-19 (Cicala Dec., Exh. A).

With respect to the state law Best Price claims (Unjust Enrichment and for violation of SSL § 367-a(7)(d)), the Court sustained the pleading as to Bayer, the GSK defendants, Abbott Laboratories, Inc., Pfizer Inc, TAP Pharmaceutical Products, Inc. and Schering Plough, because for them Suffolk had set forth at least minimal facts with respect to "(1) the allegedly fraudulent or false price reported to the state for any specific drug; or (2) any information showing a company-wide scheme to misstate Best Prices". *Id.* at *3.   As shown at Argument Point II below**,** the Counties now surpass these pleading thresholds.

The third Suffolk ruling issued on April 8, 2005.  It concerned only whether Suffolk had satisfied 9(b) on its fraud-based AWP claims[17] as against the Suffolk 13 + 6. The Court held that the pleadings were not sufficiently particular for this group stating:. "The use of purported average differences between wholesale and retail" was inadequate, the Court stated, to calculate actual wholesale prices.  *Suffolk II*, 2004 WL 2387125 at 2; *see also*, Tr. at 18-19 (Cicala Dec., Exh. A). Plaintiffs' respective complaints do not rely on average pricing, but defendants own actual market prices.  The complaints thus satisfy

---

[16]     These are:  Abbott Laboratories, Amgen, AstraZeneca, Aventis, Bayer, Bristol/Myers Squibb, Chiron, Fujisawa, the GSK defendants, the Johnson & Johnson defendants, Novartis, Pfizer, Pharmacia, Schering-Plough, TAP, Warrick, Wyeth.

[17]     The Court specifically found that "Rule 9(b) does not apply to Suffolk's claims for unjust enrichment." *Suffolk II*, 2004 WL 2387125 at 2*.

the Court's pleading requirements. See Point II below and Exhibit A hereto which compares the Suffolk Amended Complaint with the CC.

The April 8, 2005 ruling on Fed. R. Civ. P. 9(b) in no way modified either the *Suffolk I* or the *Suffolk II* decisions.. Those decisions sustained Suffolk's unjust enrichment AWP claim against the Suffolk 13 +6 and Suffolk's claim for violation of N.Y.C.R.R. § 515.2 (b)(4) and (5) against the Suffolk 13 +6.  In *Suffolk II*, the Court expressly held that Fed. R. Civ. P. 9(b) did not apply to these claims, as they "do not require a pleading of fraud or mistake."  *Suffolk II,* 2004 WL 2387125 at *2.

Contrary to defendants' assertion, the Consolidated Complaint and Nassau County's Second Amended Complaints are not an out-of time motions for reconsideration of prior Suffolk rulings, as defendants intimate.  *See*, D. mem. at 1, n.2. These Complaints are authorized amendments completely consistent with the prior Orders of this Court. For example, at the April 8, 2005 conference, the Court expressly authorized the filing of amended complaints and did not limit Plaintiffs' ability to include any particular cause of action.  To the contary, the Court said it would rule quickly on the remaining piece of defendants' motion to dismiss "so [the Counties] can have some guidance…when you redraft your papers." Tr. at  20 Cical Dec. Exh. A.  Even if Suffolk alone were presenting renewed causes against the original defendants, leave to file is governed by Fed.R.Civ.P. 15(a) (leave to replead "shall be freely given when justice so requires), not reconsideration rules.[18]

---

[18]     Suffolk is not seeking leave at this time to replead against the original defendants, and has joined in the consolidated complaint only as against those defendants not named in Suffolk's prior complaint.  A Suffolk

**ARGUMENT**

I.    **PLAINTIFFS HAVE STANDING TO ASSERT VIOLATIONS OF
N.Y. SOC. SERV. L. § 145-b AND GBL §349, AS WELL AS
UNJUST ENRICHMENT**

**N.Y. Soc. Serv. L. §145-b**.   In the *Suffolk* matter, this Court ruled that the

Counties have standing under NYSSL § 145-b stating:[19]

> The language of [145-b] encompasses the AWP scheme alleged by
> Suffolk, that is, that a pharmaceutical company makes[s] a
> fraudulent statement regarding AWP in order to get a higher
> reimbursement rate for providers who purchase its drugs.   This
> scheme fits into 1(a) and (b), because Defendants' attempted to
> obtain "on behalf of" providers, payment from public funds
> through means of reporting false data (the AWPs) that served as
> the basis for the claims of the providers, for whom Defendants
> obtained payment.

*Suffolk I*, 339 F. Supp.2d at 179.

This Court has already ruled against defendants' motion on this point and

elementary principles of estoppel, *stare decisis*, and/or law of the case bar revisiting it.

*Gately v. Comm. Of Mass.*, 2 F.3d 1221, 1226 (1st Cir. 1993) (*stare decisis* [ ] "renders

---

initiative, if any, in that direction will await court rulings on these motions.  Doing so serves the interests of both
judicial and party economy.

[19]       N.Y. Soc. Serv. L. § 145-b provides that:

> 1 (a).  It shall be unlawful for any person, firm or corporation knowingly by means of a
> false statement or representation, or by deliberate concealment of any material fact or
> other fraudulent scheme or device, *on behalf of himself or others*, to attempt to obtain or
> to obtain from public funds for services or supplies furnished or purportedly furnished
> pursuant to this chapter.
> . . . .
> (b) . . . "[S]tatement or representation" includes, but is not limited to:  a claim
> for payment made to the state . . .; an acknowledgement, certification, claim,
> ratification, or report of data which serves as the basis for a claim or a rate of
> payment . . ."

> (c) [A] corporation has attempted to obtain or has obtained public funds when . .
> . any public funds are used to reimburse or make prospective payment to an
> entity from which payment was attempted or obtained . . .

the ruling of *law* in a case binding in future cases before the same Court or other Courts owing obedience to the decision.") (emphasis in original); *Christianson v. Colt Indus.*, 486 US 800, 816 (1988) (law of the case doctrine provides that, when a Court decides a question of law in a case, "that decision continues to govern the same issues in subsequent stages").

Defendants' motion offers no basis whatever to disturb any aspect of the Court's prior ruling on this claim.  Moreover, defendants fail to satisfy their heavy burden of establishing there has been a misapplication of law, or an intervening change of law or new facts to warrant revisiting the earlier decisions.

Defendants cite *New York v. Pharmacia Corp.*, Index Nos. 905-04, 1150-03 slip. op. (N.Y. Sup. Ct. June 1, 2004).  This Court already has distinguished that case: "the Court [there] did not address whether a fraudulent statement made 'on behalf of others' to assist them in procuring funds was a violation or address arguments under 1(c).  Plaintiff [Suffolk] asserts a colorable claim under the statute with respect to the alleged AWP fraud."  *Suffolk I*, 339 F. Supp. 2d at 180.

Defendants offer selective legislative history for the proposition that §145-b concerns only "Medicaid providers who defraud the state." Def. mem at 23.  The proposition has no good faith basis, for the statute expressly provides otherwise:
 "It shall be unlawful for *any person, firm or corporation* knowingly by means of a false statement or representation, or by deliberate concealment of any material fact or other fraudulent scheme or device, *on behalf of himself or others*, to attempt to obtain or to obtain from public funds for services or supplies furnished", N.Y. Soc. Ser. L. § 145-

b(1)(a)(emphasis added), *and* that " [A] corporation has attempted to obtain or has obtained public funds when . . . any public funds are used to reimburse or make prospective payment to an entity from which payment was attempted or obtained". *Id.* at (c) (emphasis supplied). This Court has found that the statute means what it says and accordingly upheld the claim. *Suffolk I*, 339 F. Supp. 2d at 180.

The decision is well reasoned and correctly applies the plain meaning of the statute, thereby obviating the need to resort to legislative history. [20]

**G.B.L. § 349**.   The Court previously denied defendants' motion to dismiss Suffolk's standing to assert a claim under N.Y. General Business Law § 349. *Suffolk I*, 339 F. Supp. 2d at 183 ("[T]he Court declines to dismiss the [349] claims"). The Court found defendants' representations (the AWPs) "consumer oriented" within the meaning of § 349, *Suffolk I*, 339 F. Supp. 2d at 182, and that "harm to public agencies impacts the public interest."   [T]he Court declines to dismiss the § 349 claim". The CC alleges a § 349 claim and with even greater particularity as to every named defendant. *See* Exhibit A hereto, and Point II.A below.

---

[20]     *See Majewski v. Broadalbin-Perth Cent. School Dist.* 91 N.Y.2d 577, 583, 673 N.Y.S.2d 966, 967 - 968 (N.Y.,1998) ("As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof. As we have stated: "In construing statutes, it is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or contradiction, there is no room for construction and courts have no right to add to or take away from that meaning"") (citation omitted) *See also Flores v. Lower East Side Service Center, Inc.* 4 N.Y.3d 363, 367, 795 N.Y.S.2d 491, 494 (2005) (adhering to the literal terms of the statute and declining to second-guess the policy choices made by the Legislature); *U.S. v. Ford*, 435 F.3d 204, 210 (2d Cir. 2006) cites *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993) ("[t]he starting point in interpreting a statute is its language, for if the intent of Congress is clear, that is the end of the matter .. Only where the language of a statute is ambiguous may we look to legislative history and purpose in interpreting it."); *Palimieri v. Nynex Long Distance Co.*, 437 F.3d 111, 115 (1st Cor. 2006) ("We have consistently held that when the plain meaning of a statute is clear, we are not to look beyond that text to discern legislative intent."

Defendants contend that plaintiffs do not have standing to sue under § 349, because they are only derivatively injured.  (Def. mem. at 15.)  The Counties are not "derivatively injured", as was plaintiff in *Blue Cross & Blue Shield of New Jersey, Inc. v. Phillip Morris USA*, ("*BCBSNJ*"), 3 N.Y. 3d 200 (2004).

Counties' injuries arise as a result of defendants' fraud directed at the Medicaid program, not the beneficiaries of the program.  CC at ¶ 2.  As County injuries are direct, they do not need to place themselves in beneficiary shoes to recover via subrogation. Here the Counties' injuries are exactly the same as those of the State, both in kind (economic injury as Medicaid payor) and in amount (the Counties and the State share Medicaid costs equally after the federal share is deducted, *see* N.Y. Soc. Serv. L. § 168-a).

In fact, it is not the State but the local districts that bear ultimate financial responsibility for medical assistance to the needy, even if those costs are not reimbursed by the State.  Under New York law, the City and each of the counties is constituted as a local social services district, also known as a local public welfare district.  N.Y. Soc. Serv. L. § 61.  Each local district is responsible for "furnish[ing] medical assistance to the persons eligible therefore who reside in its territory."  N.Y. Soc. Serv. L. § 365.

> [t]he counties of this State . . . may not shirk their responsibility to provide assistance to destitute persons merely because the higher levels of government refuse to share the cost. . . . The Legislature has stipulated: "each public welfare district shall be responsible for the assistance and care of any person who resides or is found in its territory and who is in need of public assistance and care which he is unable to provide for himself" (Social Services Law, § 62, subd 1; see, also, Social Services Law, § 131, subd 1). . . . It

> is clear that the county's duty to provide assistance is not dependent upon the receipt of equivalent money from the State . . . . Its duty to provide relief is, however, beyond doubt.

*Jones v. Berman*, 37 N.Y.2d 42, 54-55 (1975).  The local district obligation to provide assistance and care to the needy that is set forth in N.Y. Soc. Serv. L. § 62 includes the obligation to provide medical assistance.  *See* N.Y. Soc. Serv. L. § 2(18) (defining assistance and care).  Until the late 1970s or 1980s (depending on the district and the service), the local districts paid all Medicaid providers in the first instance, and then sought reimbursement of the State and federal shares from the State.[21]

Additionally, in administering the Medicaid program and other social services programs, the local district "is a part of and the local arm of the single State administrative agency" decreed by federal law.  *Beaudoin v. Toia*, 45 N.Y.2d 343, 347 (1978).  *See also* N.Y. Soc. Serv. L. § 61.  "The county commissioners are denominated by statute 'agents' of the State department . . . . [T]he local commissioners act on behalf of and as agents for the State."  *Id.*; N.Y. Soc. Serv. L. § 65(3) ("The county commissioner shall act as the agent of the department in all matters relating to assistance and care for which the count is responsible").[22]   The Social Services Law further

---

[21] Only with the enactment of N.Y. Soc. Serv. L. § 367-b in 1976 did the Legislature direct the development of a State-administered computerized payment system.  *See* 18 N.Y.C.R.R. § 540.6(b) (setting specific dates for changeover in billing from local district to State).  To this day, the Social Services Law continues to read as if the State reimburses the social services districts rather than the districts reimbursing the State.  *See, e.g.,* N.Y. Soc. Serv. L. § 368-a ("State reimbursement.  1.  The department shall review the expenditures made by social services districts for medical assistance for needy persons, and the administration thereof, before making reimbursement.").

[22] Consistent with this law, the New York State Department of Health has certified this litigation as a demonstration project pursuant to Section 5 of Part C of Chapter 58 of the Laws of 2005 and the counties have

mandates that each local district appoint a "professional director" with responsibility for supervising the Medicaid program in that district, including "taking all steps required or authorized by law or regulation to ensure that such activities are in compliance with the provisions of this chapter, the public health law and regulations promulgated thereunder." N.Y. Soc. Serv. L. §365-b.

Both State and federal statutes explicitly provide that localities may sue to recover Medicaid overcharges.  Federal law requires each State to include in its Medicaid Plan a provision "that the State *or local agency* administering such plan will take all reasonable measures to ascertain the legal liability of third parties" for any overcharges, and submit to the Secretary of Health and Human Services a plan for pursuing such claims.  42 U.S.C. § 1396a(a)(25)(A)).  Moreover, "in any case where such liability is found to exist . . . and where the amount of reimbursement the State can reasonably expect to recover exceeds the costs of such recovery, the State *or local agency* will seek reimbursement for such assistance."  42 U.S.C. § 1396a(a)(25)(B).  *See City of New York v. The Tobacco Institute, Inc.*, 1997 U.S. Dist. LEXIS 19415 (S.D.N.Y. 1997) (remanding to State court City's Medicaid recovery action against tobacco industry on grounds that these provisions do not create a federal cause of action).  Similarly, Social Services Law § 145-b(2) expressly provides the local district with a right to recover overcharges and treble damages.  Additionally, both State and federal law *require* that any local district recovery

---

executed  expressly "deputize[d] Kirby McInerny & Squire as representing the State of New York's interests for the purposes of [this] litigation."  Cicala Dec. Exhs.B & C.  This Court should defer to the state agency's interpretation of its own regulations.  *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984); *Matter of Howard v. Wyman,* 28 N.Y. 2d 434, 438 (1971); *Dunn Appraisal Co. v. Melton*, 79 A.D.2d 707 (2d Dept. 1980).

include the State and federal shares as well as the local share.  42 USC § 1396b(d)(3)(A) (requiring that federal government receive share of any State or local recovery); N.Y. Soc. Serv. L. §145-b(2) (requiring that the State receive share of local recovery).

In *Blue Cross*, 3 N.Y. 3d at 207, it was not plaintiff Empire that was injured by a deceptive business practice, but rather Empire's policyholders.  "Although Empire actually paid the costs incurred by its subscribers, its claims are nonetheless indirect because the losses it experienced arose wholly as a result of smoking related illnesses suffered by those subscribers."  *Id.*  Here, County injuries arise as a result of defendants' AWP and rebate misconduct directed at the program, not the beneficiaries of the program.  CC at ¶ 2.  The Counties do not bring these claims in place of Medicaid beneficiaries, 3 N.Y.3d at 206; they bring them as a result of direct injuries resulting from their participation in the New York Medicaid Program. Defendants' target is the Medicaid program, and it is the County payments in respect of that program that are the injuries.  This Court always has recognized this reality.

The County injuries are identical in amount and in kind to those of the State. Counties and State alike are each required to pay 50% of each County's Medicaid burden, after deducting the 50% federal share.  N.Y. Soc. .Serv. L. § 367-a; § 368-a; 42 USC § 1396(d)(b).  *Suffolk I*, 339 F.Supp.2d at 176.  (By statute Suffolk has suffered twenty-five percent of the damages suffered by the state" * * *  Suffolk is  "a governmental entity obliged to pay for prescription drugs…")  Thus, as this Court previously noted, there is no basis upon which to be concerned about double recovery.

17

*See Suffolk I*, 339 F.Supp. 2d at 176.  N.Y. Soc. Serv. L. § 145-b expressly gives Counties a right to sue.

In respect of Medicaid payments, County relationships with the State bear no resemblance to that of consumer and retailer.  The State does not acquire a product from a drug manufacturer, mark up the price, then pass along cost to the County.  The State is in effect a paying agent.[23]  *Id.*; CC at ¶ 2.  In short, in commercial reality and in the context of the New York Medicaid scheme, County indirect payments are a misnomer.

**Unjust Enrichment**.  In *Suffolk I*, the Court sustained County standing to assert Unjust Enrichment claims.  *Suffolk I*, 339 F. Supp. 2d at 181.  "Defendants were 'saved from expense' when they fraudulently underpaid Best Prices rebates to the state, and consequently, Suffolk suffices to state an unjust enrichment] claim").  The Court rejected defendants' contention that the claim fails for lack of standing (D. mem. at 24, n17).  *Suffolk II*, 339 F.Supp. 2d at 181 Law of the case and estoppel principles bar renewal of this argument and defendants offer no basis whatsoever for reversal.  *See*, Point I *supra*.

In a companion matter, the Court also rejected defendants' contention that an unjust enrichment claim requires privity or a relationship between the parties approaching a contractual relationship.  *See*, *The Commonwealth of Massachusetts v. Mylan Labs*, 357 F.Supp. 2d 314, 324 (D. Mass 2005)  "unjust enrichment does not require any contractual

---

[23]    Although not necessarily of *stare decisis* value because the "indirect purchaser" model is not on all fours with the Counties' role in the State Medicaid Agency, *Cox v. Microsoft*, 8 A.D. 3d 39, 40, 778 N.Y.S.2d 147, 149 (1st Dept. 2004) makes plain that even indirect purchasers have standing to assert unjust enrichment claims against manufacturers for goods acquired from intermediate retailers.

or fiduciary relationship between the parties" (*citing Greenwald v. Chase Manhattan Mortgage Corp.* 241 F.3d 76, 78. n1 (1ˢᵗ Cir. 2001.)  "Unjust enrichment does not require that a defendant receive direct payments from a plaintiff."  *Id.*  New York law is to the same effect.  *See Cox*, 778 N.Y.S. 2d at 40-41, *citing Manufacturers Hanover Trust Co. v. Chemical Bank*, 160 A.D. 2d 113, 117-118, 559 N.Y.S. 2d 704, *lv. denied*, 77 N.Y. 2d 803, 568 N.Y.S. 2d 15 ("Plaintiffs' allegations that Microsoft's deceptive practices caused them to pay artificially inflated prices for its products state a cause of action for unjust enrichment . . . it does not matter whether the benefit is directly or indirectly conveyed.") *See also, In re Cardzem Antitrust Litig.*, 105 F.Supp. 2d at 618, 669 (E.D.Mi. 2000) (claim of unjust enrichment does not arise out of an agreement entered into by the Parties; defendants' privity argument lacks merit.)[24]

Defendants cite *Reading Intern, Inc. v. Oakstreet Capital Management LLC*, 317 F. Supp 2d 301, 334, n. 23 (S.D.N.Y. 2003), and *Redtail Leasing , Inc. v. Bellezza*, 1997 WL 603496, 1997 U.S. Dist. LEXIS 14821 (S.D.N.Y. 1997), which they alleged "apply[ ] New York law."  Def. Mem. at 24, n.17.  However, *Reading* relies largely on *Redtail Leasing*, which in turn quotes a decision by the same judge in a related case, *In re Motel 6 Sec. Litig.*, 1997 WL 154011, 1997 U.S. Dist. LEXIS 3909 (S.D.N.Y. 1997).  None of these federal court decisions cite a single State court decision.  Instead, they concede that this requirement is merely implicit in the elements of an unjust enrichment claim.

---

[24]      Were something approaching a contractual relationship required, one can be implied by the court. *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 905 (2d Cir. 1997) ("Under the quasi-contractual doctrine of unjust enrichment, courts may infer the existence of an implied contract to prevent one person who has obtained a benefit from another . . . from unjustly enriching himself at the other party's expense.") (quoting *Chadirjian v. Kanian*, 506 N.Y.S.2d 880, 882 (2d Dep't 1986)).

Moreover, even assuming that some sort of privity were required, that requirement is met here. Each of the elements absent in those cases is present here. *See* CC, *e.g.* at ¶¶ 110-121 (allegations concerning rebate agreement and county interest in same); ¶¶ 82-91 (allegations concerning defendants' submission of false pricing information and plaintiffs' reliance on same).

Defendants argue in the alternative that an unjust enrichment claim is barred as a matter of law by the Rebate Agreements. D. Mem. at 24. n.17. This argument is based on the assertion that unjust enrichment is an inappropriate claim where there is a valid, enforceable contract in existence. *MacDraw v. CIT Group Equip. Fin*., 157 F.3d 956, 964 (2d Cir. 1998) (citations omitted). *Granite Partners LP v. Bear Stearns & Co., 17* F. Supp. 2d 275, 311 (S.D.N.Y. 1998). However, defendants also argue that the Counties are not third-party beneficiaries, and have no contractual relationship with plaintiffs. Defendants cannot have it both ways.  If, as defendants argue, plaintiffs are not third-party beneficiaries of the Rebate Agreements, then defendants' assertion that unjust enrichment cannot be obtained in the face of a valid, enforceable contract must also fail.

In any event, defendants' protest regarding plaintiffs' alternative pleading mischaracterizes its propriety, as defendants' own authority makes clear.  In *Waxman v. Vipco Pick Up & Processing Servs.,* 2003 WL 22439796 at *11 (S.D.N.Y. Oct. 28, 2003) (D. Mem. at 24, n.17): The Court held, "[W]here there is a bona fide dispute as to the existence of a contract or the application of a contract to the dispute in issue, a plaintiff may proceed on a theory of quasi-contract as well as breach of contract," and "plaintiff need not make a pretrial election between contractual and quasi-contractual theories of

recovery." *Id*. *See also* Fed.R.Civ.P. 8(e)(2)(pleading in the alternative). Accordingly, plaintiffs' unjust enrichment claim should not be dismissed.

## II. THE CONSOLIDATED COMPLAINT PLEADS COUNTY CAUSES ARISING UNDER § 145-b, § 349, AND UNJUST ENRICHMENT WITH SUFFICIENT SPECIFICITY

### A. §349 and §145-b

In *Suffolk II*, the Court denied defendants' efforts to dismiss "AWP claims under Section 145-b and Section 349" for those defendants where:

> Suffolk has alleged both the published AWP for a drug and what Suffolk believes is an accurate estimate of the actual wholesale price of that drug.

*Suffolk II*, 2004 WL 2387125 at \*3[25]. The Consolidated Complaint alleges the same cause and with greater particularity and as to each defendant.[26] The AWP allegations rest not an "industry average" (as concerned the Court in *Suffolk II* and *Suffolk III*), but a comparison of reported AWP against generally available actual market prices for defendants' drugs.

Thus, Exhibits A and B to the CC are tables that set out the manufacturer, drug name, dosage, alleged inflated AWP, the generally available actual market price or true AWP ("market price"), and inflation spreads. These tables satisfy the Court's pleading requirement of drug by drug specificity. *See Suffolk III*, at 2. Undergirding is the National Drug Code ("NDC") (CC ¶¶ 82-83); NSAC at ¶ 72. The NDC identifies drug

---

[25]     These are: Abbott Laboratories, Amgen, AstraZeneca, Aventis, Bayer, Bristol-Myers Squibb, Chiron, Fujisawa, the GSK defendants, the Johnson & Johnson defendants, Novartis, Pfizer, Pharmacia, Schering-Plough, TAP, Warrick, Wyeth.

[26]     *See* Exhibit A hereto which compares the Suffolk pleadings with the CC pleadings.

number, and manufacturer, drug, dosage and more, maintained by the Food and Drug Administration. *Id*. First Data Bank is the source of the AWP information.[27] The parties have advised the Court in a sealed filing of the source of the data that grounds the basis for the allegations that Exhibit B's market prices represent conservative estimates of true average whole prices. *See*, CC at ¶¶ 123-125; NSAC at ¶ 183; *see also* Plaintiffs' Response to Defendants' Request for Extension of Time and Further Relief in Order to Comply with July 8, 2005 Order (filed October 12, 2005). [Dkt 1780]. The "spread" column in CC Exhibit B and NSAC Exhibit A is a straight-forward mathematical calculation derived from preceding ones.

Where reimbursement was based on a federal upper limit ("FUL"), CC at ¶85; NSAC at ¶ 83[28], the complaint alleges that defendants manipulate FUL by failing to report the least costly therapeutic equivalents for their drugs. CC at ¶86; NSAC at ¶ 83. The complaint alleges specific FUL manipulation by those multi-source manufacturers for whom plaintiffs had particular pricing data at the time the CC was filed. *See*, *for example*, specific FUL allegations for Alpharma at CC ¶¶ 207-209; Barr at CC ¶¶ 282-284; Boehringer Group at CC ¶¶ 353-355 and CC at ¶¶ 358-359; Endo at CC ¶¶ 458-460; Ethex at CC ¶¶ 470-472; Ivax Group at CC ¶¶ 537-539; NSAC at ¶ 453-454 and Schering at NSAC ¶ 629.

---

[27]    First Data Bank collects and publishes prescription drug information including AWP, Direct Price, FUL, Wholesale List Price and WACs.  CC at ¶85; NSAC at ¶ 72.  No one takes issue with this.

[28]    Of the 11,418 NDCs llisted on Exhibit A to the CC, 5825 of them were at times reimbursed based on a FUL.  5593 were never reimbursed on FUL.  Cicala Dec. at n.1.

Through their own investigatory efforts, discovery from third parties and the cooperation of numerous State Attorneys General and the federal *qui tam* relator Ven-a-Care, since the filing of the consolidated complaint, plaintiffs have obtained substantially more detailed data in respect of actual generally available market prices. Cicala Dec., ¶9. That data demonstrates that every multi-source manufacturer named herein failed to report the generally available lower or lowest costs for therapeutically equivalent multi source drugs, which had the consequence of material inflation of FULs. *Id.*; *See also* Exhibit A to plaintiffs' opposition to the Sandoz MTD. Should the Court require further evidentiary particularity for the multi-source drugs reimbursed based on FUL, plaintiffs request leave to amend in this regard and within an abbreviated period of time.

There is more. The consolidated complaint presents for *every* named defendant "other allegations (e.g. government investigations or the company's own internal pricing documents) to support a claim of fraudulent pricing." *Suffolk II*, 2004 WL 2387125 at *2, *citing Karvelas,* 360 F.3d at 231, n. 11. Exhibit D to the CC summarizes, for each named defendant, the government investigations and suits concerning the same fraudulent pricing practices that are at issue in this case.

## B.    Unjust Enrichment

In *Suffolk I*, the Court sustained county standing to assert unjust enrichment claims. 339 F.Supp.2d at 181. In *Suffolk II*, the Court held that 9(b) did not apply to the unjust enrichment cause. *Suffolk II*, 2004 WL 2387125 at *2.[29] The Court then appeared

---

[29]    Defendants ignore this ruling entirely in their motion and offer no basis whatever for its reversal. *See* def. mem. at 24.

to sustain the cause against only Bayer, the GSK defendants, Abbott Laboratories, Pfizer, Inc., TAP and Schering Plough. *Id.*

Whatever the scope of the dismissal, it was on curable grounds: "insufficient facts alleged to state a claim showing entitlement to relief under any state causes of action." *Suffolk II*, 2004 WL 2387125 at *3. In sustaining claims against other specified defendants (*Id.* at *2), the Court made clear that it wanted plaintiffs to allege with specificity each drug, the allegedly false reported price and information bearing on company wide scheme. *Id.* Point III. The CC[30], including Exhibits A-D, and F, thereto provide all the Court required data.

Defendants contend that the unjust enrichment claim must be alleged with specificity because it is based on fraud. Def. Mem. at 24. The Court already has rejected this argument, *Suffolk I*, 339 F. Supp.2d at 181, n.6, and defendants offer no basis for *sua sponte* reversal. Defendants' two cases are distinguishable because they address fraudulent inducement, not unjust enrichment. In *Daly v. Llanes*, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998) (defendant induced plaintiff to deposit money with their bank under

---

[30] Specifically, Abbott, CC at ¶¶ 183-195; NSAC at ¶¶ 207-208; Alpharma, CC ¶¶ 206-209, 210-212; Amgen, CC ¶¶ 234-238, 243; NSAC at ¶¶ 232-234; AstraZeneca CC ¶ 270; NSAC at ¶¶ 250 Barr, CC ¶¶ 276-278, 285-286; NSAC at ¶¶ 270-271; Baxter, CC ¶¶ 297, 300-302, 304-306; NSAC at ¶¶ 283-284, 286; Bayer, NSAC at ¶¶ 298-299; Biogen Idec, CC ¶¶ 331-336; NSAC at ¶¶ 312-314; Boehringer, CC ¶¶ 355, 360, 361-365; NSAC at ¶¶ 331-338; the BMS Group, CC ¶¶ 381-386; NSAC at ¶¶ 355-359; Chiron, CC ¶¶ 393, 398; NSAC at ¶¶ 371; Dey, CC ¶¶ 425-426, 431, 432; Eli Lilly, CC ¶¶ 442-443, 444, 445; NSAC at ¶¶ 382-383; Endo, CC ¶¶ 454-455; Ethex, CC ¶¶ 467-469, 472, 473, 474-475; The Forest Group, CC ¶¶ 482-484; NSAC at ¶¶ 393-394; Fujisawa, CC ¶¶ 492, 495; NSAC at ¶¶ 402-404; GSK Defendants, NSAC at ¶¶ 418, 421-422; the Hoffman LaRoche Group, CC ¶¶ 526-529; NSAC at ¶¶ 440; Ivax, CC ¶¶ 534-536, 539, 544-548; NSAC at ¶¶ 451-452, 455-456; the J&J Group, CC ¶¶ 567, 569; NSAC at ¶¶ 470-472; the King Group, NSAC at ¶¶ 485-487; Merck, CC ¶¶ 601-607; NSAC at ¶¶ 504-506, 508; Mylan, CC ¶¶ 612-618, 619-622; NSAC at ¶¶ 518-521; Novartis, CC ¶ 634; NSAC at ¶¶ 533-535; Organon, CC ¶¶ 638-640; NSAC at ¶¶ 543-544; Par, CC ¶¶ 646, 649-654; NSAC at ¶¶ 557-558; Pfizer, NSAC at ¶¶ 563-574; Purdue, CC ¶ 690; NSAC at ¶¶ 593-594; Sanofi/Aventis, CC ¶¶ 704-706, 711; NSAC at ¶¶ 612-614; the Schering Group, NSAC at ¶¶ 635-638; TAP, NSAC at ¶¶ 657; Teva, CC ¶¶ 775-777, 782-785, 794; NSAC at ¶¶ 676-680; Watson, CC ¶¶ 801, 805-807, 809; NSAC at ¶¶ 694-697; and Wyeth, CC ¶¶ 815-824; NSAC at ¶¶ 711-712.

false pretenses); in *Ramapo Land Co., Inc. v. Consolidated Rail Corp.*, 918 F. Supp. 123, 128 (S.D.N.Y. 1996) (plaintiff fraudulently induced to enter an agreement).

## III.   THE COUNTIES HAVE STANDING TO ASSERT CAUSES OF ACTION UNDER NEW YORK HEALTH STATUTES AND REGULATIONS

Counts II and IV assert violations of the State rebate provision, SSL § 367-a(7)(d) and of Social Services regulations, 18 N.Y.C.R.R. § 515.2(b)(4) & (5).  Defendants assert that these counts must be dismissed because the statute and regulations at issue do not provide a private right of action.  The local districts are not, however, acting as private entities here, but rather as part of the Medicaid program as a whole.  The Court already has sustained County standing, subject to pleading specificity.  *Suffolk II* at *3. Defendants are estopped from contesting this ruling.  Moreover, they do not cite any authority for this proposition.  It appears such authority exists.

Defendants rely on testimony provided to the New York State Senate by Stephen J. Acquario, the director of the New York Association of Counties, a non-governmental organization that lobbies on behalf of the counties and has no authority to bind plaintiffs. Mr. Acquario's testimony stated that "the ability to enforce *administrative and criminal actions* against Medicaid providers remains with state and federal officials."  Acquario Testimony at 4.  Even if this were accurate, it says nothing with regard to whether the City and the counties can bring civil litigation against providers of drugs.  The statutes cited above unequivocally provide that the localities do have such power, 42 U.S.C. § 1396a(a)(25)(B), SSL § 145-b(2), and the City, for example, has brought such actions in

the past.  *See, e.g., City of New York v. The Tobacco Institute, Inc.*, 1997 U.S. Dist.

LEXIS 19415 (S.D.N.Y. 1997).[31]

Defendants argue that because SSL § 367-a(1)(1d) states that "[t]he *department*

may bring an action against the provider . . . for any claimed overpayments" (emphasis

added), the local districts may not do so.  The express statutory authorization of SSL 145-

b, makes defendants' argument obviously wrong.  The language relied on by defendants

only emphasizes the unitary nature of the local districts and the State in administering the

Social Services Law.  For example, the SSL § 364(1) provides that "[t]he department of

social services shall be responsible for (a) determining eligibility for care and services,"

but eligibility determinations are actually made by the local districts, not by the State.  18

N.Y.C.R.R. § 505.16(f)(2)(7).  Conversely, N.Y. Soc. Serv. L. § 365 provides that "each

public welfare district shall furnish medical assistance to the persons eligible therefore

who reside in its territory," but although the statute places ultimate responsibility on the

local districts, the services are provided by private parties who claim reimbursement from

the State.

Defendants argue that plaintiffs do not satisfy the criteria set forth in *Sheehy v. Big*

*Flats Cmty. Day, Inc*., 73 N.Y.2d 629, 632-22 (1989).  *Sheehy* governs whether a plaintiff

has a *private* right of action.  It has no application to those public entities.  This court

repeatedly has held that state law AWP and rebate claims are not preempted. *See, e.g.*, *In*

*re Pharmaceutical Industry Average Wholesale Price Litig.*, 321 F.Supp. 2d 187, 199 (D.

Mass. 2004)

---

[31]     While federal law requires that each state create a Medicaid Fraud Control Unit, 42 U.S.C. § 1396a(a)(61),

The Counties are not private persons seeking to assert an implied cause of action based on New York statutes and regulations.  As set forth at Point I, *supra*, the Counties function as an integral part of the State Medicaid program for the purpose of enforcing Social Services Law and SDOH regulations. To the extent that the Counties seek a determination under the State Social Services Law and SDOH regulations that defendants have violated provisions of that law, they do so in their capacity as an integral part of the State enforcement scheme.

Moreover, even assuming *Sheehy* to be applicable plaintiffs meet the *Sheehy* test. That test looks to the following "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme."  *Uhr v. East* Greenbush *Cent. Sch. Dist.*, 94 N.Y.2d 32, 38 (N.Y., 1999) (citing *Sheehy*, 73 NY2d 629).  The purpose of both the cited Social Services Law statutes and the SDOH regulations is to protect the government payors from the identified Unacceptable Practices and the consequent financial losses. Consistently, the relief sought by the Counties here is not a penalty or damages, let alone criminal sanctions, but rather a declaration that certain provisions of the Social Services Law and SDOH regulations have been violated.

Similarly, recognition of the Counties' rights to a declaratory judgment that defendants have violated the laws and provisions in question would promote the legislative purpose that all individuals receive appropriate medical care without

nothing prohibits the district attorneys in the various counties from prosecuting any crime within their jurisdiction.

bankrupting states and counties, and with a minimum of waste.  As the purpose of the specific regulations in question is to identify persons[32] who have engaged in fraudulent or otherwise unacceptable practices, local districts' right to the requested relief is consistent with the legislative purpose.

The shoal on which private right of action arguments most often founder is the third requirement, namely whether such a right is consistent with the legislative scheme. Where some other entity is empowered to enforce a statute, or some other enforcement vehicle is provided, courts often find that there is no private right of action.  *See, e.g., Pelaez v. Seide*, 2 N.Y.3d 186, 201 (2004); *Sheehy v. Big Flats Community Day, Inc.*, 73 N.Y.2d at 635-36 (1989).  Here, however, there is no inconsistency whatsoever between the local district's civil action and State enforcement.  Indeed, the State has endorsed this action and stated that the local districts are acting in its interests.[33]

## IV.   THE COUNTIES ADEQUATELY PLEAD THE THIRD PARTY BENEFICIARY CAUSE

---

[32]      Defendants state, with no support, that the SDOH regulations are aimed at providers of health services, not manufacturers of pharmaceuticals.  *See* Def. Br. at 20.  To the contrary, Section 515.2 does not limit its reach to providers but explicitly states that the enumerated unacceptable practices are conduct *by a person.* 18 N.Y.C.R.R. §515.2(a).  As corporate persons, Defendants are included in this broad net.  In any event, 18 N.Y.C.R.R. §504.1, which provides definitions for the regulations in question, defines provider, and such definition includes "any person who has enrolled under the medical assistance program to furnish . . .supplies." That provision further provides that "[a]ny person who furnishes. . . supplies for which payments under the medical assistance program are to be claimed. . . must enroll as a provider of services . . . " 18 N.Y.C.R.R. §504.1(b)(2).

[33]      Defendants argue that a standard for determining whether a private right of action exists even more stringent than that in *Sheehy* should be applied to Social Services Law §366-b because it is a criminal statute. However, the cases cited by Defendant relies on exactly the same test as that set forth in *Sheehy*. *See Watson v. City of New York*, 92 F.3d 31, 36-37 (2d Cir. 1996); *In re Integrated Resources, Inc. Real Estate Ltd. Partnership Sec. Litig.,* 881 F.Supp. 556, 564 (S.D.N.Y. 1994); *Schwartz v. F. S. & O. Inc.,* 1991 WL 208056 at *2, 1991 U.S. Dist. LEXIS 13592 at *4 (S.D.N.Y. 1991); *Sardanis v. Sumitomo Corp.,* 279 A.D.2d 225, 718 N.Y.S.2d 66, 69 (1st Dept. 2001).

In their complaints, plaintiffs allege that defendants breached contractual obligations pursuant to the Medicaid Rebate Agreements that each defendant signed in order for its products to be reimbursed through Medicaid.  *See, e.g.*, CC at ¶¶   875-886;NSAC ¶¶ 784-794..

This Court dismissed Suffolk version of this claim because the allegations in Suffolk's complaint did not demonstrate "a clear indication on the face of the contract of an intent either to benefit Suffolk or to benefit a class that includes Suffolk."  *Suffolk I*, 339 F. Supp. 2d at 178.  The Court also dismissed the claim because Suffolk did not allege "that it fulfill[ed] responsibilities pursuant to the [rebate] agreement."  *Id.* at 179.

It is well recognized and we do not dispute that a party to a contract cannot be ambushed by the appearance of a third party beneficiary.  The confusion and needless litigation that would ensue are obvious.   That is why the existence of a third party relationship must be clearly indicated, as the court noted in *Suffolk I,* above.  However that clear indication need not be explicit within the four corners of even an unambiguous agreement, and certainly may be discovered by parol evidence or the totality of circumstances in parsing an ambiguous one. *See, e.g.,*, Restatement (2d) of Contracts §302(b) (a beneficiary of a promise is an intended beneficiary if "the circumstances indicate that the promisor intends to give the beneficiary the benefit of the promised performance").  The aim is always to be sure that there was clear indication to the party being charged with third party responsibility of the presence of a third party beneficiary, and acknowledgement that duties were to run in favor of that third party.   Williston on Contracts, Chapter 37, §37:7.   In *Organization of Minority Vendors, Inc. v. Illinois*

*Central Gulf Railroad*, 579 F. Supp 574, 597 (N. D. Ill., 1983),  for example, the Court explained that it "must analyze each contract on a case by case basis, discerning the intent of the parties from first the contract itself and then, if necessary, from the surrounding circumstances. . . . . Nor is it necessary that a contract for the benefit of a third party identify that third party by name."

The peculiarity of relations among the parties here requires consideration of more than the four corners contract**.**   Here, defendants do not merely execute a Rebate Agreement.  Instead, as in *Organization of Minority Vendors*, they submit to (and benefit from) an entire scheme that at once embraces both the Rebate Agreement obligations and the state Medicaid statutory and regulatory universe. That universe has within it the County enforceability powers and the County as an agent of the State Medicaid Program acting on behalf of that program. *See* Point I, *infra.* The Rebate Agreement itself acknowledges the broader statutory and regulatory scheme surrounding it, stating in its General Provisions,   "The rebate agreement shall be construed in accordance with Federal common law and ambiguities . . . shall be interpreted in the manner which best effectuates the statutory scheme." *See* Master Rebate Agreement, Section IX General Provisions, sub (e) (Exhibit E to CC).

It is clear, therefore, that in entering into its relationship with the state, defendants *per force* recognize and acknowledge that there is not a "sole enforcer" and that the Counties are one of the enforcers.  *Suffolk I*, 337 F.Supp.2d at 329.  The federal statute itself provides that "the State *or local agency* administering [the State Medicaid] plan will take all reasonable measures to ascertain the legal liability of third parties for any

overcharges and submit to the Secretary of Health and Human Services a plan for pursuing such claims."  42 U.S.C. § 1396a (a)(25)(A) (emphasis added).  CC. at ¶ 116; N.Y. Soc. Serv. L. 145-b.  And, "[i]n any case where such a legal liability is found to exist . . . and where the amount of reimbursement the State can reasonably expect to recover exceeds the costs of such recovery, the State *or local agency* will seek reimbursement for such reimbursement to the extent of such legal liability.  42 U.S.C. 1396a (a)(25)(B)."  *Id.* at ¶ 117.

Under these circumstances, it seems premature to determine, as a matter of law, that there is no set of facts that could establish plaintiffs' standing to assert a contract cause. Denial of defendants' motion to dismiss the contract claim would appropriately permit a developed factual record on the question of whether the Counties were implied or incidental third party beneficiaries to the Rebate Agreements.

Defendants contend that plaintiffs are not entitled to replead and pursue this claim. The Court gave plaintiffs leave to replead their causes of action without limitation. *See* Tr. At 18 et seq. (Exhibit A to Cicala Dec.)  Defendants argument also is inconsistent with Fed. R. Civ. P. 15(a) which allows for liberal amendment of pleadings. Accordingly, defendants' motion to dismiss the breach of contract claim should be denied.

## V.   THIRD-PARTY RELIANCE IS SUFFICIENT TO SUPPORT A CLAIM OF COMMON LAW FRAUD IN NEW YORK

Relying on *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir. 1998), in

*Suffolk I*, 339 F.Supp.2d at 180-181, this Court, dismissed Suffolk's fraud claim on the grounds that New York law did not permit fraud claims based on third-party reliance. As the Court observed, the briefing on that motion was necessarily terse. *Id.* at 183. Decisions of New York's highest court, the New York Court of Appeals, as well as of the Appellate Divisions, both subsequent and prior to *Cement & Concrete Workers*, make plain that in New York a claim for common law fraud will lie where plaintiff was injured as a direct and immediate consequence of a misrepresentation to a third party.

The Court of Appeals reaffirmed that third-party reliance remains the law in New York in *Securities Investor Protection Corp.*["SIPC"] *v. BDO Seidman, L.L.P.,* 95 N.Y.2d 702, 723 N.Y.S. 2d 750 (2001), in deciding the following question certified to it by the Second Circuit , *id.*, 222 F.3d 63, 81 (2d Cir. 2000):

> May a plaintiff recover against an accountant for fraudulent misrepresentations made to a third party where the third party did not communicate those representations to the plaintiff, but where the defendant knew that the third party was required to communicate any negative information to the plaintiff and the plaintiff relied to his detriment on the absence of any such communication?

*Id.*, 95 N.Y.2d at 709. The SIPC alleged that it had been injured as a result of fraudulent misrepresentations made by defendant accountants to the National Association of Securities Dealers ("NASD"). Although the NASD was required to notify the SIPC if a broker was "in or . . . approaching financial difficulty," *id.* at 708, the NASD had failed to transmit to the SIPC the "considerable negative information" provided by the accountants. The Court of Appeals, citing *Tindle v. Birkett*, 171 N.Y. 520, 64 N.E. 210 (1902), reaffirmed the validity of "the principle that liability for fraud can be imposed

through communication by a third party," characterizing that principle as "unremarkable." *Id.* at 710. However, the Court rejected third-party reliance in the case before it because unlike in *Tindle*, there was no clear link between the misrepresentation and plaintiff's injury. In contrast to *Tindle*, in *SIPC* "the reporting system on which SIPC relied put too much discretion in the hands of NASD for SIPC to be able to claim any significant direct reliance on BDO. . . . *The regulatory framework involved in this case thus creates an insurmountable disconnect between BDO's representations and SIPC's purported reliance.*" *Id.* at 710-711 (emphasis added).

In numerous other decisions, New York courts uphold fraud claims where a misrepresentation made to a third-party had the direct effect of injuring plaintiff. As early as 1876, the Court of Appeals held:

> [I]t matters not whether the false representations be made to the party injured or to a third party, whose conduct is thus influenced to produce the injury, or whether it be direct or indirect in its consequences. Schemes of fraud may be so cunningly devised as to elude the eye of justice, but they must not escape condemnation and reparation when discovered.

*Rice v. Manley*, 66 N.Y. 82, 87 (1876). Defendant there had made a misrepresentation to plaintiff's supplier that caused the supplier to deliver to defendant instead of to plaintiff. More recently, in *Desser v. Schatz*, 182 A.D.2d 478, 581 N.Y.S. 2d 796 (1st Dept. 1992), the defendant fraudulently induced a bank to issue a satisfaction of a mortgage, wrongfully extinguishing plaintiff's interest therein. The court stated, "Reliance by Chemical, to the clear detriment of plaintiff, is manifest, and it is of no moment, in this

context, that the false representation was not made directly to plaintiff." *Id*. at 479-480. Numerous New York decisions concerning economic losses are to the same effect.[34]

This principle applies to other sorts of fraud as well. *Kuelling v Roderick Lean Mfg. Co.*, 183 NY 78, 85-86, 75 N.E. 1098 (1905), (concerning a defective product). The Court held that it was not "necessary that the [false representation] should have been made directly to the plaintiff." It was only necessary that

> the fraud and injury . . . be connected. The one must bear to
> the other the relation of cause and effect. . . . [I]t must appear
> in an appreciable sense that the damage flowed from the fraud
> as the proximate and note the remote cause.

*Id*. at 86. *Kuelling* has been followed in modern fraud cases.[35] In *City of New York v. Lead Industries Ass'n*, 241 A.D.2d 387 (1st Dept 1997), the City sought recovery in fraud for damage to property incurred as a result of lead paint, even though the City acknowledged that it had never relied on any misrepresentations by defendants. Indirect

---

[34]      In *Cooper v Weissblatt*, 154 Misc 522 (App. Term, 2d Dept. 1935), Cooper had successfully defended an action brought in Connecticut by Weissblatt based on Weissblatt's fraudulent procurement of a judgment from a rabbinical court. Cooper sued Weissblatt in New York to recover the costs he had incurred in defending the prior action. The court held: "It is an established rule of law that a false statement as to a material fact, made to induce a person to act and followed by actual damage, will support a cause of action." *See also Eaton, Cole & Burnham Co. v Avery*, 83 N.Y. 31, 33-34 (1880) (injury resulting from misrepresentation to a credit rating agency); *Buxton Mfg. Co. v. Valiant Moving & Storage*, 239 A.D.2d 452, 453-454 (2d Dept. 1997) (subcontractor injured as a direct result of false representation to a third party); *Semi-Tech Litigation, L.L.C. v. Ting*, 13 A.D.2d 185 (1st Dept. 2004) (accounting firm liable in fraud to third parties); *John Blair Comm., Inc. v. Reliance Capital Group, L.P.*, 157 A.D.2d 490, 492 (1st Dept. 1990) (accounting firm that "commits intentional fraud is liable to any person who is intended to rely upon the misrepresentation or omission and who does in fact so rely to his detriment"); *Caramante v. Barton*, 114 A.D.2d 680 (3d Dept. 1985) (buyer stated fraud claim where seller of home misrepresented septic system to bank that relied on misrepresentation in giving mortgage to buyer); *N.B. Garments (Pvt.) Ltd, v. Kids Int'l Corp.*, No. 03-8041, 2004 U.S. Dist. LEXIS 3774, at * 9-12 (S.D.N.Y. 2004) (cited by this Court in *Suffolk I*, 339 F. Supp.2d at 180); *Hyosung America, Inc. v. Sumagh Textile Co., Ltd.*, 25 F. Supp.2d 376 (S.D.N.Y. 1998); *Union Carbide Corp. v. Montell N.V.*, 9 F. Supp.2d 405, 411-412 (S.D.N.Y. 1998).

[35]      As *Kuelling* demonstrates, the citadel of privity began to crumble first in cases of intentional tort such as fraud, and only later in negligence cases. *Kuelling* was cited with approval by Judge Cardozo in his famous decision in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 385 (1916). *See also id*. at 393 (landlord who fraudulently leases a "tumble-down" house is liable in fraud to guests injured as a result of tenant's reliance).

reliance was sufficient.  *Id.* at 387-88.[36]  *See also Young v Robertshaw Controls Co.*, 104

A.D. 2d 84, 86, 481 N.Y.S. 2d 891 (3d Dept. 1984), *app. dismissed* 64 NY2d 885 (1985)

(same); *Ruffing v. Union Carbide Corp.*, 308 A.D.2d 526, 528, 769 N.Y.S. 2d 462 (2d

Dept. 2003) (employer's misrepresentation of workplace safety to plaintiff's mother,

causing harm to plaintiff in utero, gives rise to cause of action in fraud); *Catherwood v.*

*American Sterilizer Co.* 132 A.D.2d 938, 939, 518 N.Y.S. 2d 485 (4th Dept. 1987)

(misrepresentations made to plaintiffs' employers); *Angie v. Johns-manville Corp.*, 94

A.D.2d 939, 463 N.Y.S. 2d 956 (4th Dept. 1983) (misrepresentations by asbestos

manufacturers).

New York Appellate Division cases that reject fraud claims based on third-party

reliance do not reference the contrary authority of the Court of Appeals and of other

Appellate Division cases.  Regardless, as Judge Scheindlin has noted, and of greater

importance, in these cases the misrepresentation was not the direct cause of plaintiff's

injury.  Courts require direct reliance where indirect reliance would "present[] a risk of

far-flung liability for inchoate or unintended injuries."[37]  *Hyosung*, 25 F. Supp.2d at 383

n.9 & 383 (misrepresentations in *Cement & Concrete Workers* were "not the immediate

cause of plaintiffs' loss"); *Union Carbide v.. Montell*, 9 F. Supp. 2d at 413 (noting that

---

[36]     Defendants, in briefing their motion to dismiss in *Suffolk*, relied on *Brenner v. American Cyanamid Co.*, 288 A.D.2d 869 (4th Dept. 2001).  In that case, which alleged the same misrepresentations by the same lead pigment manufacturers, the Fourth Department, without citing the earlier First Department decision, and without any analysis, dismissed the fraud claim for lack of reliance.

[37]     *Cement & Concrete Workers* relies on prior federal court and Appellate Division cases that do not refer to any of the third-party reliance caselaw cited above.  In contrast, the Second Circuit's subsequent opinion in *SIPC v. BDO Seidman*, 222 F.3d 63, 76-82 (2d Cir. 2000), contains an extensive discussion of New York law on third-party reliance.

plaintiff's injury in *Shaw v. Rolex Watch, U.S.A.*, 673 F. Supp. 674 (S.D.N.Y. 1987) (cited by *Cement & Concrete Workers*, 148 F.3d at 197), was an "unintended or remote consequence of defendant's misrepresentations").

The guiding principle, therefore, is that the misrepresentation must be the proximate and "but-for" cause of plaintiff's injury. *SIPC*, 95 N.Y.2d at 710-11; *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 278 (2d Cir. 1992) ("reliance element of fraud is essentially causation in fact.").[38]   Here, as in *Hyosung* and *Union Carbide*, the relationship between misrepresentation and injury is direct.   Plaintiffs clearly allege that "defendants have engaged in actual fraudulent reporting of pricing information" and made "knowing and intentional submission of inflated AWPs or other wholesale pricing data," CC ¶ 897, ¶ 901.   Plaintiffs further state that they have "relied upon such misrepresentations," *id*. ¶ 898.   More particularly, plaintiffs allege that New York State and the local social service districts rely on AWP, *id*. ¶¶ 10, 91; that such reliance is required under New York State law, *id*. ¶¶ 80, 83; and that defendants "know and understand that third-party payors and PBMs rely on the First Data Bank ("FDB") and other publishers to determine the AWPs of the covered drugs," *id*. ¶ 144.   The consolidated complaint is replete with detailed factual allegations concerning defendants' fraudulent misrepresentations, *see id*. ¶¶ 122-154, as well as the plaintiffs' damages, *see id*. ¶¶ 826-828.   County injuries here flow immediately and necessarily from defendants'

---

[38]     As discussed in *SIPC*, the New York courts apply a different, and stricter, standard to claims of negligent misrepresentation than to claims of intentional misrepresentation.   Even in the negligence context, however, third party reliance may suffice. *See, e.g., Dorking Genetics v. United States*, 76 F.3d 1261, 1270-71 (2d Cir. 1996); *Kidd v. Havens*, 171 A.D.2d 336 (4th Dept. 1991) (both cited in *SIPC*, 222 F.3d at 80).

fraud.  In such situations, the "efficiency-enhancing policy of fraud regulation" would be undermined by insulating the defendants from liability as a matter of law.  *Union Carbide v. Montell*, 9 F. Supp. 2d at 412; *Hyosung*, 25 F. Supp. 2d at 384, n.10.  Accordingly, plaintiffs have provided the requisite allegations to sustain their common law fraud claim.

## VI.    NASSAU COUNTY'S RICO CLAIM SHOULD BE SUSTAINED

Plaintiff Nassau County has sufficiently pled a violation of the RICO statute. 18 U.S.C. 1962(c).  This Court has previously recited the well established four elements of a RICO claim: "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 203 (D. Mass. 2004) ("AMCC Order").  Nassau County meets each of these elements in its Second Amended Complaint.  Nassau County properly pleads the "conduct" by alleging Defendants published false and inflated AWPs that were relied upon by Plaintiffs in this action, NSAC at ¶¶ 744-45, and a "pattern of racketeering activity:"

> The Defendants' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their AWP Scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

*Id.* at ¶¶ 746-50.  The prior decisions in this case that have addressed this RICO claim have taken issue with the "enterprise" requirement, which Nassau County has pled with particularity in its complaint.

Defendants do not specify the exact grounds on which they moved to dismiss Nassau's RICO claim, but rather allege only that RICO claims were dismissed in two

other cases.  Def. Mem. at 11.  Defendants indicate that Nassau's claim should be dismissed for the same reasons as those expressed in the Suffolk Order at 175.  However, defendants ignore the fact that Suffolk's RICO claim was dismissed *without prejudice*, which gave it leave to replead its RICO case with more particularity.  *Barry v. St. Paul Fire & Marine Ins. Co.*, 555 F.2d 3, 13 (1st Cir. 1977) (where claim is dismissed under Rule 9(b) without prejudice, leave is granted to replead with greater particularity).  Suffolk's RICO claim was not dismissed because it failed as a matter of law.  Rather, the claim was dismissed because Suffolk failed to adequately plead an enterprise.  Nassau County has now pled its RICO claim adequately in the Second Amended Complaint.

The County of Nassau has also sufficiently pled the existence of RICO enterprises.  "The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  The entity can be either an organization such as a corporation or partnership, or more generally a group of individuals associated in fact, and it "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  *Id.* at 581-83.

Nassau County specifies enterprises for each Defendant in which individual manufacturers and publishers operated as a unit for the purpose of disseminating false AWPs.  NSAC at ¶ 734-735.  Defendants claim that the publishers were "primarily conduits" for the manufacturers, who controlled the prices at issue.  Def. Mem. at 11.  However, Nassau County has alleged that the publishers were significantly involved in the AWP scheme, not simply serving as a "conduit" for the transmission of fraudulent

AWPs, but receiving WACs and affirmatively converting them into AWPs. *Id.* at ¶ 735, 739-740 (Each enterprise's purpose "includes disseminating false and misleading AWPs which are often supplied by the Manufacturers as WACs and then converted by the Publishers into artificially inflated AWPs . . . .")   Further, these allegations are specifically pled in relation to Nassau County's RICO claim. *Id.* at ¶ 737.

In the Suffolk Order, this Court held that Suffolk County's statement that "each defendant has directly controlled the false and inflated AWPs that are reported in the *Redbook*," showed that publishers did not play a sufficient role in enacting the conduct of the enterprise. Suffolk Order, 339 F. Supp. 2d. at 175.  Defendants emphasize language in the NSAC, "The Publishers' entire product was reliant on the information supplied to them by the Manufacturers," Def. Mem. at 11, NSAC at ¶ 737, and equate it with this Court's language in the Suffolk Order.[39]   However, in the same paragraph quoted by Defendants, Nassau County states:

> The Manufacturers' ability to market the spread created by the publication of false and inflated AWPs depends on the cooperation of the Publishers, through both misfeasance in converting WACs into AWPs, and nonfeasance in not independently affirming the accuracy of the AWPs as they had in the past.

*Id.*  Defendants' reliance on the publishers is also demonstrated elsewhere:

> The manufacturing Defendants have this as a purpose because without the AWP scheme, they would not be able to push the spread.

---

[39]     Defendants misleadingly state that ¶ 737 (which is wrongly cited as ¶ 693) is the only relevant language in the Nassau Complaint that differs from the Suffolk Amended Complaint.  In fact, Nassau's Complaint differs significantly from the Suffolk Amended Complaint with respect to the RICO claim.  For example, the Nassau Complaint specifies each Defendant's individual involvement with the publishers in its relevant Manufacturer-Publisher enterprise, *i.e.* Nassau Cplt., ¶¶ 197, 221.  In addition, the Nassau Complaint emphasizes the publisher involvement in converting the WACs to AWPs. *Id.* at  ¶ 735.

*Id.* at ¶ 735.  The simple fact that the publishers relied on the manufacturers does not show that the manufacturers solely controlled each enterprise.  The manufacturers mutually relied on the publishers, without whom the fraudulent AWPs would not have been published.

## CONCLUSION

For all the foregoing reasons, defendants' consolidated motion to dismiss should be denied it its entirety.

Dated: April 17, 2006.

Respectfully submitted,

KIRBY McINERNEY & SQUIRE, LLP
830 Third Avenue
New York, New York 10022
(212) 371-6600

By:_____/s/Joanne M. Cicala_____
Joanne M. Cicala (JC 5032)
James P. Carroll Jr. (JPC 8348)
Aaron D. Hovan (AH 3290)
David E. Kovel (DEK 4760) (*pro hac* pending)

*Attorneys for the City of New York and all captioned New York Counties except Nassau.*

MICHAEL A. CARDOZO
Corporation Counsel of the
City of New York
John R. Low-Beer (JL 3755)
Richard J. Costa (RC 7278)
Assistant Corporation Counsel
100 Church Street, Room 3-162
New York, New York 10007
(212) 788-1007

*For the City of New York*

LORNA B. GOODMAN,
Peter J. Clines
Rachel S. Paster
Nassau County Attorney, by

MOULTON & GANS, P.C.

41

_____/s/ Nancy Freeman Gans____
Nancy Freeman Gans, BBO # 184540
55 Cleveland Road
Wellesley, Massachusetts 02481
Telephone: 781-235-2246
Facsimile: 718-239-0353

MILBERG WEISS BERSHAD
  & SCHULMAN LLP
Melvyn I. Weiss
Michael M. Buchman
Ryan G. Kriger
One Pennsylvania Plaza
New York, New York 10119-0165
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229

*Special Counsel for the County of Nassau*