UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br><br>CIVIL ACTION: 01-CV-12257-PBS<br><br>Magistrate Judge Marianne Bowler |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | |

## DECLARATION OF MARK E. DUXBURY

I, Mark Eugene Duxbury, declare as follows:

1.   My name is Mark Eugene Duxbury.

2.   The statements in this declaration are made upon my personal knowledge of information and events.

3.   I was employed by Ortho Biotech Products, LLP ("OBI") from February 1992 through July 1998.

4.   Initially, I was employed as an OBI Product Specialist and later became an OBI Key Account Specialist.

5.   In both positions, I was responsible for the promotion of Procrit in the Northwestern Region of the United States.

6.   When I started working at OBI, I learned that Amgen and OBI had entered into a Product License Agreement ("PLA") whereby Amgen licensed to OBI the right to

sell the Procrit® brand of Epoetin alfa for non-dialysis use in the United States and retained the right to sell the Epogen® brand of Epoetin alfa for dialysis use.

7. In 1992, I was selling Procrit to the vast majority of the non-dialysis market in my territory, which amounted to approximately $250,000 for the year.

8. It soon became obvious to me that, for all practical purposes, a significant non-dialysis market did not exist.

9. In early 1993, I was given a sales quota of $1.1 million, which was raised in mid-1993 to $1.6 million, neither of which I could meet without converting large Epogen dialysis accounts to Procrit. After meeting my 1993 quota, my 1994 quota was raised to $3.2 million, despite the fact that OBI management had strong evidence that my quotas were based on Dialysis business.

10. Epoetin alfa was the ultimate commodity because Epogen and Procrit were the identical substance and provided the same clinical benefits, and were reimbursed at the same or virtually the same amount in the dialysis and non-dialysis sectors. Therefore, to persuade customers to switch from Epogen to Procrit, OBI sales representatives, including myself, with the knowledge and approval of my superiors, promoted the clinical benefits and greater profit and margin available to the customer from Procrit based on the difference between acquisition cost and reimbursement.

11. I was very successful at converting Epogen dialysis business to Procrit, and received OBI awards for my productivity, including Ortho's Biosphere Award in 1993 and 1994, which is annually awarded to the top 10% of OBI's sales force.

12. In 1994, I was responsible for 40% of the Procrit sales growth in the Northwest Region, virtually all of which was the result of converting Epogen dialysis business to Procrit.

13. This was achieved by offering steep discounts (up to 14%), rebates and soft money in the form of unrestricted educational grants from OBI to hospitals and dialysis centers to lower their acquisition cost for Procrit below that of Epogen and thus create a greater profit margin from reimbursement.

14. For example, in the early days of the battle for market share, OBI conducted "fire sales" which offered steep discounts to large volume dialysis customers to create a larger spread between acquisition cost and reimbursement for Procrit.

15. Procrit purchasers in dialysis and/or non-dialysis areas knew that Medicare reimbursed for Epoetin alfa because it was generally their largest line item expense and they had no difficulty subtracting the purchase price from the reimbursement rate to figure out their profit margin. Per my training, I also instructed my accounts that, even with the lower purchase price, the amount of reimbursement that they would receive would not change.

16. OBI instructed its sales representatives that after offering a lower price to customers, to ask whether the price differential was enough to motivate the purchaser to switch from Epogen to Procrit.

17. I promoted Procrit in the same manner regardless of whether a customer was reimbursed under Medicare and private payers, or reimbursed solely under Medicare.

18. One of my greatest successes was the conversion of St. Joseph's Hospital in Tacoma, Washington from Epogen to Procrit.

19. With the knowledge of OBI management, I promoted Procrit to St. Joseph's at discounted prices considerably lower than the prices St. Joseph's was paying for Epogen.

20. As a promotional incentive to motivate St. Joseph's to purchase Procrit for its dialysis use, I also arranged, with OBI's management's knowledge and approval, to provide an unrestricted $10,000.00 grant to be paid to St. Joseph's Hospital, which was hand delivered by me to Robert Dimino, the dialysis pharmacist at St. Joseph's. Six months later, an unrestricted educational grant of $20,000 was paid to St. Joseph's to reward them for their $500,000 in purchases since their conversion to Procrit.

21. I received OBI's Regional Achievement Award for the St. Joseph's conversion of Epogen to Procrit.

22. Although there are not as many freestanding dialysis centers in the Northwestern Region of the United States as in other parts of the country, I did promote Procrit to freestanding dialysis centers when directed to do so by OBI management.

23. One such facility located in my territory was the Mid-Columbia Kidney Center operated by Dr. John L. Boykin in Richland, Washington.

24. I provided Dr. Boykin with a promotional flyer for Procrit created by Charise Charles Ltd., Inc. ("Charise"), which provided lower pricing on Procrit brand than could be found from other distributors for Epogen brand.

25. Charise received discounts from OBI that were more favorable than those provided to other wholesalers and Charise passed a portion of its discount along to its customers.

26. In addition, Charise included the OBI 8% physician's rebate in its promotional pricing, along with Charise's own rebate.

27. I considered Charise to be an OBI surrogate.

28. During my career at OBI, there was no policy prohibiting the sales force from marketing or promoting Procrit to customers based on profit or margin that could be derived from the spread between reimbursement and acquisition cost.

29. In fact, the sales force was trained by OBI managers to talk about the financial, as well as clinical, advantages of Procrit.

30. My Regional Managers directed the whole Western Region, including me, to discuss the profit physicians and practices could earn from reimbursement during sales calls to oncology clinics.

31. I recently worked as a consultant for the law firm of Hagens Berman Sobol Shapiro for approximately two and a half years. During that time, I served as a consultant on various matters relating to the drug industry but did not work on the AWP case as it relates to the drug Procrit as I was a plaintiff in a qui tam action against OBI that was under seal.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4-28-06                             *Mark E. Duxbury*
                                           Mark E. Duxbury