# Exhibit 3

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA ex rel. )
MARK EUGENE DUXBURY, )
)
      Plaintiff, )
)
      v. )
)
ORTHO BIOTECH PRODUCTS, L.P. )
)
      Defendant. )
)

Civil Action
No. 03-12189-RWZ

**Filed in Camera Under Seal**

## THE GOVERNMENT'S NOTICE OF ELECTION TO DECLINE INTERVENTION

Pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(4)(B), the United States notifies the Court of its decision not to intervene in this action.

Although the United States declines to intervene, we respectfully refer the Court to 31 U.S.C. § 3730(b)(1), which allows the relator to maintain the action in the name of the United States; providing, however, that the "action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." *Id.* Therefore, the United States requests that, should either the relator or the defendant propose that this action be dismissed, settled, or otherwise discontinued, this Court solicit the written consent of the United States before ruling or granting its approval.

Furthermore, pursuant to 31 U.S.C. § 3730(c)(3), the United States requests that all pleadings filed in this action be served upon the United States; the United States also requests that orders issued by the Court be sent to the Government's counsel. The United States reserves

its right to order any deposition transcripts and to intervene in this action, for good cause, at a later date.

Finally, the Government requests that the relator's Complaint, this Notice, and the attached proposed Order be unsealed. The United States requests that all other papers on file in this action remain under seal because in discussing the content and extent of the United States' investigation, such papers are provided by law to the Court alone for the sole purpose of evaluating whether the seal and time for making an election to intervene should be extended.

A proposed order accompanies this notice.

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

By:    PATRICIA M. CONNOLLY
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3278

MICHAEL F. HERTZ
JOYCE R. BRANDA
JAMIE ANN YAVELBERG
Attorneys
U.S. Department of Justice, Civil Division
Post Office Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone: 202-514-6514

Dated: July 12, 2005

-2-

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.<br>MARK EUGENE DUXBURY,<br><br>         Plaintiff,<br><br>         v.<br><br>ORTHO BIOTECH PRODUCTS, L.P.<br><br>         Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action
No. 03-12189-RWZ

**Filed in Camera Under Seal**

## ORDER

The United States having declined to intervene in this action pursuant to the False Claims

Act, 31 U.S.C. § 3730(b)(4)(B), the Court rules as follows:

IT IS ORDERED that,

1. the complaint be unsealed and served upon the defendant by the relator;

2. all other contents of the Court's file in this action remain under seal and not be made

public or served upon the defendant, except for this Order and The Government's Notice of

Election to Decline Intervention, which the relator will serve upon the defendant only after

service of the complaint;

3. the seal be lifted as to all other matters occurring in this action after the date of this

Order;

4. the parties shall serve all pleadings and motions filed in this action, including

supporting memoranda, upon the United States, as provided for in 31 U.S.C. § 3730(c)(3). The

United States may order any deposition transcripts and is entitled to intervene in this action, for

good cause, at any time;

5. all orders of this Court shall be sent to the United States; and that

6. should the relator or the defendant propose that this action be dismissed, settled, or otherwise discontinued, the Court will solicit the written consent of the United States before ruling or granting its approval.

IT IS SO ORDERED,

This 12th day of July, 2005.

_____
UNITED STATES DISTRICT JUDGE

# Exhibit 4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | |
| ) | |
| In Re: PHARMACEUTICAL ) | |
| INDUSTRY AVERAGE WHOLESALE ) | |
| PRICE LITIGATION ) | MDL No. 1456 |
| ) | |
| ) | Master File No. 01-CV-12257-PBS |
| ) | |
| THIS DOCUMENT RELATES TO: ) | Judge Patti B. Saris |
| (All Actions) ) | |

## DECLARATION OF LYNDON TRETTER

I, LYNDON TRETTER, declare as follows:

1.     I am a Member of Hogan & Hartson and represent defendants Bristol-Myers Squibb Company ("BMS"), Oncology Therapeutics Network Corp. ("OTN") and Apothecon, Inc. in this litigation.

2.     In April 2005 I attended the deposition of OTN employee Marsha Peterson, which was held at the offices of Hagens Berman in Seattle.

3.     Plaintiffs' counsel taking that deposition was Sean Matt of Hagens Berman. Mr. Matt was assisted at the deposition by one Mark E. Duxbury. Mr. Duxbury handed me a business card at the deposition identifying him as a "Senior Pharmaceutical Investigator/Consultant".

4.     I understand that Mr. Duxbury has attended at least one other deposition of a defendant in this case (that of BMS employee Douglas Soule) where he was similarly assisting plaintiffs' counsel and where his attendance was noted on the record.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Lyndon M. Tretter

Executed on this 30th day of August 2005

2

# Exhibit 5

Westlaw.

933 F.2d 1011                                                                 Page 1
933 F.2d 1011, 1991 WL 86286 (C.A.6 (Mich.))
**(Cite as: 933 F.2d 1011)**

**C**
NOTICE:      THIS     IS    AN    UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter.   Use FI CTA6
Rule 28 and FI CTA6 IOP 206 for rules regarding the
citation of unpublished opinions.)
United States Court of Appeals, Sixth Circuit.
WILL-O-WHEEL FARMS, Plaintiff-
Appellant/Cross-Appellee,
v.
A.O. SMITH HARVESTORE PRODUCTS, INC.
(89-1942 and 89-1977), Blue Water Harvestore
Systems, Inc. (89-1942 and 89-1978), Defendants-
Appellees/Cross-Appellants.
**Nos. 89-1942, 89-1977 and 89-1978.**

May 24, 1991.

On Appeal from the United States District Court for
the Eastern District of Michigan, No. 87-70043;
Cohn, J.
E.D.Mich.

AFFIRMED.

Before KRUPANSKY and MILBURN, Circuit
Judges, and CONTIE, Senior Circuit Judge.

PER CURIAM.
*1   Plaintiff-appellant/cross-appellee   Will-O-Wheel
Farms ("WOW") appeals from the summary
judgment granted after the district court set aside a
jury verdict for WOW by granting a new trial.
WOW challenges both the order granting a new trial
and the summary judgment entered in favor of
defendants-appellees/cross-appellants A.O. Smith
Harvestore Products, Inc. ("A.O. Smith") and Blue
Water Harvestore Systems, Inc. ("Blue Water").
A.O. Smith and Blue Water cross-appeal the district
court's denial of their motions for judgment
notwithstanding the verdict ("JNOV") in the same
order which granted the new trial.    For the reasons
that follow, we affirm.

I.

WOW is a partnership of brothers James, Dan, and

Paul Wheeler engaged in dairy farming in Michigan.
After deciding to expand the size of its dairy herd,
WOW purchased on February 24, 1982, a large silo
from Blue Water that was manufactured by A.O.
Smith.   Blue Water is A.O. Smith's distributor.   The
31  x 89  silo (the "3189") was much larger than its
predecessors on the farm and the first of its kind in
the state of Michigan.

According     to     the     Wheelers,     Blue    Water
representatives told them that the 3189 would work
as well or better than smaller A.O. Smith silos and
that the farm could expect an overall increase in milk
production.     Blue  Water  furnished  WOW  with
detailed projections regarding the 3189's capabilities
and the production scenario that could be expected.
Nevertheless, the only warranties explicitly made in
the purchase order were a warranty of repair or
replacement by A.O. Smith and a warranty of proper
installation by Blue Water.   The purchase order also
contained, on its reverse side, a disclaimer of all other
warranties and a limitation of remedies excluding any
recovery for consequential damages.    Also included
on the reverse side of the purchase order was a form
statement acknowledgment initialed by one of the
partners of WOW indicating that he had read and
understood   the   purchase   order   including   "the
warranties, disclaimers and terms and conditions
herein ..."

It is not seriously disputed in this appeal that the
unloading device, which came as part of the 3189
system, was defective.   Problems with the unloading
device necessitated that the bottom access doors of
the silo be open an inordinate amount of time.   This
compromised the air limiting design of the system,
creating a potential for damage to feed stored in the
silo.   The record also shows that the oxygen limiting
design was further compromised by the failure of the
assembly crew to properly assemble a valve situated
in the roof of the silo.

WOW's complaints about the unloading device
prompted A.O. Smith to reimburse WOW for
approximately $49,000 in lease payments on the
3189 silo and furnish WOW with a smaller silo as an
interim measure.   In return, A.O. Smith required the
Wheelers to sign a letter on January 19, 1984, which
purported to release A.O. Smith and Blue Water from
any consequential damages caused by the 3189 silo
"prior to or during the [one-year] period of [the]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

933 F.2d 1011                                                                                              Page 2
933 F.2d 1011, 1991 WL 86286 (C.A.6 (Mich.))
**(Cite as: 933 F.2d 1011)**

agreement."

*2 As time went on, WOW became even more dissatisfied with the 3189 and abandoned use of it altogether in April of 1985. WOW refused to return the smaller silo and this litigation ensued as a counterclaim to A.O. Smith's action to recover the smaller silo. WOW later filed a Chapter 11 bankruptcy proceeding, and the counterclaims were transferred to the district court for trial. After a jury trial on WOW's counterclaims, the jury returned a verdict for WOW of $1.7 million. The verdict was based upon a finding that the letter executed January 19, 1984, was not intended as a release of claims based on breach of warranty, together with findings of breach of a warranty of merchantability by A.O. Smith and breach of express and implied warranties by Blue Water.

Entry of judgment on the verdict was followed by defendants' motions for JNOV, or alternatively, a new trial. In ruling on these motions, the district court rejected arguments that the document executed January 19, 1984, was an effective release and that the disclaimer of warranties and limitation of remedies was effective. The district court further held that WOW's failure to tender consideration given for the release was not fatal since WOW agreed to offset the consideration against the amount of judgment. The district court also found an evidentiary basis for an express warranty by Blue Water.

Although the district court declined to grant JNOV on the basis of defendants' arguments that there was insufficient proof that a defect in the 3189 caused lost profits, the district court was persuaded to grant a new trial. The court found "no way to harmonize the verdict" of $1.7 million with WOW's expert's projection that the farm lost profits of approximately $1.1 million. In addition to the fact that the verdict was approximately $600,000 above the maximum calculated by plaintiff's expert, plaintiff's expert projected lost profits into 1988 despite WOW's abandonment of the 3189 silo in April 1985, and WOW's concession that milk production rebounds almost immediately upon curing feed deficiencies.

In granting a new trial, the district court cited speculative and conjectural proof of both damages and causation. The district court was highly critical of WOW's proof on causation holding in essence that plaintiff's expert, Dr. Thomas, did not establish "probability ... as opposed to mere supposition or possibility ..." Despite the district court's refusal to

grant JNOV on the issue of causation, it later granted summary judgment on the issue citing the same weaknesses as it had noted in ruling on the new trial motion.

Material produced during discovery in preparation for a second trial appears to have had little or no effect on the district court's disposition of the case, as the court stated in granting summary judgment, "It ... appears that plaintiff will offer at the second trial the same proofs on the issue of causation as at the prior trial...." The court further stated in granting summary judgment that "proofs at the prior trial were insufficient to support a verdict in plaintiff's favor." More particularly, the district court stated:

*3 Dr. Thomas failed to express an opinion on causation in terms of reasonable certainty or reasonable probability. The evidence at the first trial on causation, predicated on Dr. Thomas' opinion, failed to exclude other possible causative factors, so as to provide any basis for apportionment among several hypotheses. Without such basis in the evidence, the proofs on causation were speculative.

The proof on causation at the trial came primarily from the testimony of the plaintiff partners and Dr. John Thomas, a nationally recognized expert in dairy cattle nutrition. The partners testified that as soon as they began feeding out of the 3189, milk production dropped. While the 3189 was still in use on the farm, on occasions when the Wheelers purchased and fed silage from a source outside the 3189, they noticed an increase in milk production. According to the Wheelers, when they abandoned use of the 3189 altogether and began feeding their herd from other sources, they witnessed an increase in milk production. Jim Wheeler testified that at "every feeding" from the 3189 he removed blackened, molded feed "by the bushel, basketful." J.A. 954. The other Wheelers also testified about moldy feed coming from the 3189.

Thomas described the process whereby excess oxygen causes silage to undergo a chemical reaction which turns the material dark in color and reduces the nutritional value of the silage. Based upon his conversations with the Wheelers and his analysis of WOW's production records, Thomas was of the opinion that the decrease in milk production was caused by the 3189 silo because it "was the principal source of haylage over that time."

Thomas saw "no large obvious health problems" and no changes in management which would have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

933 F.2d 1011
933 F.2d 1011, 1991 WL 86286 (C.A.6 (Mich.))
**(Cite as: 933 F.2d 1011)**

Page 3

accounted for the decrease in production. Thomas noted a correspondence between the decrease in production and use of the 3189, and between an increase in production and abandonment of the 3189. However, in later deposition testimony, Thomas had difficulty tying the increase to abandonment of the silo. In fact, Thomas' deposition indicates that Thomas did not determine the cause of fluctuations in production from October 1984 forward.

Thomas admitted on cross-examination that some scholars in his field believe that a sudden expansion of a dairy herd, such as at WOW, creates the type of problems experienced by WOW. Thomas also admitted that he was not sure that the one laboratory sample showing nutritionally deficient feed from the Will-O-Wheel Farm could be attributed to the 3189 silo and that the analytical samples available to him indicated "[t]he material was generally good." Also, on cross-examination, Thomas was led through a litany of factors that could have affected milk production such as adverse weather, health problems in the herd, malfunctioning milking equipment, changed milking practices, time "in milk," and management practices, and Thomas admitted that on most of these factors he had too little information to rule them out.

**\*4** The record also contains evidence that during the last half of March, 1983, Will-O-Wheel Farms had an extensive mastitis outbreak. In January, February, and March of 1983 there was a decline in milk production at the farm. Veterinarian James Turbok testified that mastitis is one of the factors that can be expected to decrease milk production. Thomas did not believe that WOW's mastitis problems were caused by the feed.

The principal issues argued by WOW on appeal are (1) whether the district court erred in granting a new trial on the ground that the verdict could not be harmonized with the evidence and (2) whether the district court later erred in holding that the defendants were entitled to summary judgment on the issue of causation. On cross-appeal, both Blue Water and A.O. Smith raise the additional issues of (1) whether the district court erred in holding that WOW's claims were not barred by the release memorialized in the letter executed by the Wheelers on January 19, 1984, and (2) whether the district court erred in refusing to enforce the disclaimer of warranties in the purchase order.

II.

A.

Our review of a grant of summary judgment or a district court's ruling on a motion for JNOV is de novo. *Pinney Dock and Transp. Co. v. Penn Cent. Corp.,* 838 F.2d 1445, 1472 (6th Cir.), *cert. denied,* 488 U.S. 880 (1988); *Moody v. Pepsi-Cola Metro. Bottling Co.,* 915 F.2d 201, 208 (6th Cir.1990). Summary judgment is controlled by Federal Rule of Civil Procedure 56 and is appropriate where, viewing the facts and inferences in a light most favorable to the nonmoving party, a reasonable jury *could not* return a verdict for the nonmoving party. *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987). Although WOW's claims are based on Michigan law, the Michigan standard for granting JNOV is essentially identical to the federal summary judgment standard; *i.e.,* appropriate if "viewing the evidence and reasonable inferences therefrom in the light most favorable to the non-moving party and without considering the credibility of the witnesses or the weight of the evidence, the only reasonable conclusion is a verdict against the nonmovant." *Moody,* 915 F.2d at 208.

B.

We begin our discussion with the release issue because we are persuaded that this issue is, for all practical purposes, dispositive of the case. Defendants argue that this action is barred by the release signed on January 19, 1984, in which WOW agreed to hold defendants "harmless from any alleged claim for damages or consequential losses resulting from the use of their 3189 Harvestore structure and Atlas unloader prior to or during the [one year] period of [the] agreement." Defendants contend that WOW fairly and knowingly released all claims against them. Defendants also assert that there was no basis for the jury to consider the intent of the parties regarding the release because the intent was unambiguously stated within the four corners of the release. Defendants further argue that WOW's claims are barred by its failure to tender the consideration paid for the release prior to or simultaneously with the commencement of the proceedings.

**\*5** In *Stefanac v. Cranbrook Educ. Community,* 435 Mich. 155, ----, 458 N.W.2d 56, 58 (1990), the Michigan Supreme Court held that

933 F.2d 1011
933 F.2d 1011, 1991 WL 86286 (C.A.6 (Mich.))
**(Cite as: 933 F.2d 1011)**

Page 4

when a plaintiff has entered into a settlement agreement tender of consideration recited in the agreement must occur ... in all cases prior to or simultaneously with the commencement of any proceeding raising a legal claim in contravention of the agreement.

The court concluded that "this rule is necessary in order to preserve the stability of release agreements." _Id._ at ----, 458 N.W.2d at 66. The court stated, "The plaintiff is not entitled to retain the benefit of an agreement and at the same time bring suit in contravention of the agreement." _Id._

In the present case, WOW received approximately $49,000 and use of a 20 x 80 silo in consideration for releasing its claim for damages or consequential losses resulting from the use of the 3189 Harvestore structure and Atlas unloader prior to and during the period of the release agreement. WOW failed to tender the consideration recited in the release prior to or simultaneously with the filing of the present action. The district court held that WOW's agreement to offset the consideration recited in the release against the amount of the judgment was sufficient. Although there was some authority in the lower courts to support the district court's position, _Stefanac_ clearly applies to this case and renders the district court's holding erroneous.

WOW contends in its reply brief at page 3 that defendants waived any error in regard to the release because "[a]t no time during his directed verdict motion did counsel for Blue Water request judgment in his client's favor on the basis of a release." _See Gutzwiller v. Fenik,_ 860 F.2d 1317, 1330 (6th Cir.1988) (Fed.R.Civ.P. 50(b) is construed to preclude JNOV unless preceded by motion for directed verdict). The record belies WOW's argument. In arguing for directed verdict, counsel for Blue Water stated, "I feel that the Plaintiff's proofs were insufficient as a matter of law to establish any defense for the validity of that release." Tr. Vol. XI at 1385. At the close of all proof, Blue Water asked for a directed verdict on "the grounds ... raised before and especially the release." Tr. Vol. XVII at 2222.

At oral argument, WOW shifted its position somewhat, asserting that defendants only addressed the validity of the release and failed to specifically raise as an issue WOW's failure to tender the consideration. We believe that the failure to tender is an inherent part of the release issue. Under _Stefanac,_ WOW cannot even challenge the validity of

the release until it has tendered the consideration paid for the release. We also note that the district judge discouraged elaboration on the grounds raised in support of the directed verdict. Thus, it is perfectly understandable that defendants, who referred specifically to WOW's failure to tender consideration in their answer, their May 1987 summary judgment motion, their requested jury instructions, and their motion for JNOV, did not specifically elaborate on this ground in their motion for directed verdict. Under these circumstances, we are convinced that the purposes of requiring a motion for directed verdict prior to a motion for JNOV have been served. _Gutzwiller,_ 860 F.2d at 1331.

**\*6** WOW also contends that the failure to tender consideration was waived on appeal because it was raised initially in defendants' reply brief. Normally a party is not allowed to hold back an argument until its reply brief and then "ambush" the other party. _See Wright v. Holbrook,_ 794 F.2d 1152, 1156 (6th Cir.1986). This is not a case of "ambush."

First, as mentioned earlier, the tender of consideration is part and parcel of the release issue, and under _Stefanac_ WOW is obligated to tender consideration as a condition precedent to challenging the release. Second, _Stefanac_ was not decided until after defendants had filed their initial brief. Thus, by raising _Stefanac_ in their reply brief, defendants were essentially citing supplemental authority. This is permissible under Federal Rule of Appellate Procedure 28(j). Given an attorney's duty of competence (M.R.P.C. § 1.1) and candor to the courts (M.R.P.C. § 3.3), we believe that counsel for WOW may have been obligated to inform the court of the _Stefanac_ case, and we are confident that he was not "ambushed" by the defendants' citing the case in their reply brief.

Accordingly, under the Michigan Supreme Court's decision in _Stefanac,_ WOW's failure to tender the consideration bars any and all claims "for damages or consequential losses resulting ... prior to or during the period of [the] agreement"; _i.e.,_ prior to January 19, 1984, and continuing through January 19, 1985. Thus, recovery for lost profits would be limited to those incurred after January 19, 1985. As to the period of time following January 1985, we are persuaded that WOW utterly failed to prove causation. WOW's causation expert, Thomas, was asked specifically about this period of time in the following exchange during a deposition:

Q. What caused the-in your opinion, what caused the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

933 F.2d 1011                                                                                          Page 5
933 F.2d 1011, 1991 WL 86286 (C.A.6 (Mich.))
**(Cite as: 933 F.2d 1011)**

increase in milk production between October, 1984 and February, 1985, if you can reach an opinion to a reasonable degree of scientific certainty?

A. From October on, I don't know.

Q. Have you determined what caused the milk production to fall between February, 1985 and March, 1985?

A. No, sir....

Q. Didn't milk production rise between March and April, 1985, on the Wheeler farm?

A. It [the chart of milk production] so indicates.

J.A. 1073-1075.  Assuming arguendo that Thomas' testimony was otherwise sufficient to establish that WOW sustained lost production caused by the 3189, we believe that the above testimony effectively admits Thomas' failure to determine whether there was a causative link for the relevant period of time. See _Mulholland v. DEC Int'l Corp.,_ 432 Mich. 395, -- --, 443 N.W.2d 340, 350 n. 18 (1989) (plaintiff must introduce evidence which shows that conduct of defendant was more likely than not a cause in fact); _Hasler v. United States,_ 718 F.2d 202, 205 (6th Cir.1983) ("[A] conjecture is ... an explanation consistent with known facts ... but not deductible from them as a reasonable inference...."),  _cert. denied,_ 469 U.S. 817 (1984).

*7 We realize that the above deposition testimony came after the close of the trial;  however, it was foreshadowed by Thomas' heavy reliance at trial upon the temporal relationship between the installation of the 3189 and a downturn in production. Thomas was at a total loss at trial when asked to explain specific upturns or downturns in production. That Thomas' opinion was conjectural is illustrated by the following deposition testimony:

Q. You say that it's your opinion that the reason milk production fell in September, 1982 from what it had been in May, 1982 was because of feed from the 3189?

A. I would say that's one big factor.

Q. Are there other factors?

A. We don't know.

Q. Why not?  Have you explored other factors?

A. We don't know enough to even explore them so we have to make this one conclusion.

Thomas Deposition, January 20, 1989, at 320-21. The conjectural nature of Thomas' opinion is further illustrated by his lack of knowledge of the amount and composition of the rations fed to WOW's herd, and his failure to ascertain whether the one (of ten) protein deficient feed sample originated from the 3189.  In fact, Thomas admitted that the analytical reports of feed taken from the farm showed that "[t]he material was generally good."

In summary, this matter should not have proceeded to trial with regard to the time covered by the release; _i.e.,_ prior to January 19, 1984, and continuing through January 19, 1985.  As the consideration paid for the release has never been tendered to the defendants, the release is a complete bar as to that period of time.  With respect to the period of time the 3189 silo was used subsequent to the time covered by the release;  _i.e.,_ January 19, 1985, through April 1985, the plaintiffs utterly failed to prove causation.  Therefore, as there was no genuine issue of material fact with respect to the causation issue for the period of time not covered by the release, the district court properly granted summary judgment.  Because of our disposition of the case on the above grounds, we need not reach the other issues raised on appeal other than to say that the only abuse of discretion that we find in setting aside the jury's verdict by granting a new trial, if there was an abuse of discretion, was in the failure to grant JNOV.

III.

For the reasons stated, the judgment of the district court is AFFIRMED, although not for the reasons the district court relied upon. _Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.,_ 772 F.2d 214, 216 (6th Cir.1985) (per curiam).

> FN1. Jurisdiction in the district court was apparently based upon 28 U.S.C. § 1334 which gives district courts original jurisdiction in all civil proceedings "arising in or related to cases under title 11 [of the Bankruptcy Code]."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

933 F.2d 1011                                                                                    Page 6
933 F.2d 1011, 1991 WL 86286 (C.A.6 (Mich.))
**(Cite as: 933 F.2d 1011)**

FN2. The text of the written warranties and disclaimers provides, in relevant part:

WARRANTY OF MANUFACTURER AND SELLER

If within the time limits specified below, any product sold under this purchase order, or any part thereof, shall prove to be defective in material or workmanship upon examination by the Manufacturer, the Manufacturer will supply an identical or substantially similar replacement part from the Manufacturer's factory, or the Manufacturer, at its option, will repair or allow credit for such part. The Seller warrants only that the foundation will be properly installed and that the product will be erected in strict conformance with the Manufacturer's specifications....

SECOND DISCLAIMER

NO OTHER WARRANTY, EITHER EXPRESS OR IMPLIED AND INCLUDING A WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE HAS BEEN OR WILL BE MADE BY OR IN BEHALF OF THE MANUFACTURER OR THE SELLER OR BY OPERATION OF LAW WITH RESPECT TO THE EQUIPMENT AND ACCESSORIES OR THEIR INSTALLATION, USE, OPERATION, REPLACEMENT OR REPAIR. NEITHER THE MANUFACTURER NOR THE SELLER SHALL BE LIABLE BY VIRTUE OF THIS WARRANTY, OR OTHERWISE, FOR ANY SPECIAL OR CONSEQUENTIAL LOSS OR DAMAGE (INCLUDING BUT NOT LIMITED TO THOSE RESULTING FROM THE CONDITION OR QUALITY OF ANY CROP OR MATERIAL STORED IN THE STRUCTURE) RESULTING FROM THE USE OR LOSS OF THE USE OF EQUIPMENT AND ACCESSORIES. THE MANUFACTURER MAKES NO WARRANTY WITH RESPECT TO THE ERECTION OR INSTALLATION OF THE EQUIPMENT, ACCESSORIES, OR RELATED EQUIPMENT BY THE HARVESTORE DEALER, WHO IS AN INDEPENDENT CONTRACTOR, OR BY ANY OTHER INDEPENDENT CONTRACTOR. IRRESPECTIVE OF ANY STATUTE, THE BUYER RECOGNIZES THAT THE EXPRESS WARRANTY SET FORTH ABOVE, IS THE EXCLUSIVE REMEDY TO WHICH HE IS ENTITLED AND HE WAIVES ALL OTHER REMEDIES, STATUTORY OR OTHERWISE.

FN3. The letter, dated January 18, 1984, and executed the next day, provided in relevant part:

Will-O-Wheel Farms and [A.O. Smith] acknowledge that this agreement shall automatically terminate one year (365 days) from the acceptance date of this document. If, prior to automatic termination, both parties mutually agree that the Atlas unloader consistently delivers 200 pounds of feed per minute, then Will-O-Wheel Farms shall purchase or lease the 20 x 80 Harvestore structure and Goliath unloader ... and this agreement shall terminate....

Wheelers and [A.O. Smith] acknowledge that this document constitutes the only agreement between the parties and nullifies and makes void any previous agreement between them. Wheelers further agree that, by accepting this agreement and a check for $36,768.60, they indemnify and hold [Blue Water] and [A.O. Smith] harmless from any alleged claim for damages or consequential losses resulting from the use of their 3189 Harvestore structure and Atlas unloader prior to or during the period of this agreement.

FN4. As earlier stated, WOW abandoned the use of the 3189 silo in April 1985. Given WOW's concession that "the adverse effects of bad feed on the cows to whom it is fed is immediately reversed," Appellant's Brief at 35, we are convinced that any hypothetical losses would be limited to the time period between January 19, 1985, and April 1985.

C.A.6 (Mich.),1991.
Will-O-Wheel Farms v. A.O. Smith Harvestore Products, Inc.
933 F.2d 1011, 1991 WL 86286 (C.A.6 (Mich.))

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 6

Westlaw.

Not Reported in B.R.                                                                                          Page 1
Not Reported in B.R., 1992 WL 280788 (Bkrtcy.N.D.Ill.)
**(Cite as: Not Reported in B.R.)**

**H**
Only the Westlaw citation is currently available.
United States Bankruptcy Court, N.D. Illinois,
Eastern Division.
In re Antonio DEL GROSSO d/b/a T & A Trucking
and f/d/b/a Regal Trucking, Debtor.
Harry MILLER, Trustee for the estate of Antonio Del
Grosso, Plaintiff,
v.
Richard KANE, John Vinciguerra, Raymond Gilbert,
Susan Gilbert and Antonio Del Grosso, Defendants.
**Bankruptcy No. 89 B 06606.**
**Adversary No. 91 A 00713.**

Sept. 21, 1992.

Joseph J. Duffy, Eugene J. Geekie, Jr., Eric J.
Rosenbloom, Schiff Hardin & Waite, Chicago, Ill.,
Represents HarryS. Miller, Trustee.
Harry S. Miller, Chicago, Ill., Trustee.
Robert R. Benjamin, Benjamin & Berneman &
Brusch, Ltd., Chicago, Ill., Represents John
Vinciguerra, Raymond Gilbert and Susan Gilbert,
defendants.

MEMORANDUM OPINION
JOHN H. SQUIRES, Bankruptcy Judge.
**\*1** This matter comes before the Court on cross
motions for summary judgment. Each motion is
brought under Federal Rule of Civil Procedure 56,
which is applicable to these proceedings by virtue of
Federal Rule of Bankruptcy Procedure 7056. The
trustee/plaintiff in this proceeding, Harry S. Miller,
filed a motion for summary judgment as to six counts
(Counts V, VI, VII, VIII, IX and X) of a ten count
adversary complaint. Three defendants, John
Vinciguerra, Raymond Gilbert and Susan Gilbert,
filed a cross motion for summary judgment as to
eight of the ten counts (Counts I, II, V, VI, VII, VIII,
IX and X). For the reasons set forth herein, the
Court denies both motions.

I. JURISDICTION AND PROCEDURE

This Court has jurisdiction to entertain this adversary
proceeding pursuant to 28 U.S.C. § 1334 and
General Rule 2.33(A) of the United States District
Court for the Northern District of Illinois. This
matter constitutes a core proceeding under 28 U.S.C.

§ 157(b)(2)(A), (F), (H), and (O).

II. FACTS AND BACKGROUND

Some background information giving rise to the facts
underlying the present proceeding is contained in the
Court's prior decision of In re Del Grosso, 115 B.R.
136 (Bankr.N.D.Ill.1990). Antonio Del Grosso (the
"Debtor") operated a warehouse and trucking
business in which some of the Defendants invested
several thousands of dollars. Particularly, the Debtor
entered into three separate agreements with John
Vinciguerra ("Vinciguerra"), Raymond Gilbert ("R.
Gilbert") and Susan Gilbert ("S. Gilbert") sometime
in October 1988. (Defendants' Exhibits I, J, and K;
Plaintiff's 12(m) Statement, Exhibit No. 5). Under
these agreements, Vinciguerra invested $75,000.00;
R. Gilbert invested $50,000.00; and S. Gilbert
invested $25,000.00 in the Debtor's operations.
(Defendants' Exhibits I, J and K). In return,
Vinciguerra and R. Gilbert were each to receive five
percent and S. Gilbert was to receive three percent of
the gross revenue generated by the Debtor's
warehouse and trucking operations. (Defendants'
Exhibits I, J and K). Vinciguerra, R. Gilbert and S.
Gilbert were entitled to a percentage of revenues as
long as the Debtor was in business. (Defendants'
Exhibit L-4 and L-5). Pursuant thereto, the Debtor
paid $6,847.96 to Vinciguerra; $9,804.95 to R.
Gilbert; and $2,617.37 to S. Gilbert. (Plaintiff's
12(m) Statement, ¶ 3). The payments purportedly
represent the amounts due from gross profits.
(Plaintiff's 12(m) Statement, ¶ 3). At about the
same time these Defendants invested, the Debtor also
entered into a separate agreement ("State Street
Contract") with Vinciguerra and R. Gilbert for the
sale of real property located at 1751 State Street,
Chicago Heights, Illinois, for the sum of
$540,000.00.

Shortly after entering into these arrangements, the
Debtor filed a petition under Chapter 11 on April 19,
1989. (Defendants' Exhibit T-1, ¶ 1). His original
attorney of record is the other Defendant, Richard
Kane. On July 13, 1989, the Debtor's Chapter 11
case was converted to a Chapter 7 case and Harry S.
Miller (the "Trustee") was appointed trustee.
(Defendants' Exhibit T-1, ¶ ¶ 1 & 2). Shortly
thereafter, the Trustee conducted a preliminary
investigation on July 18, 1989 and discovered the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

State Street Contract.  (Defendants' Exhibit C-1).

**\*2** Thereafter, the Trustee telephoned R. Gilbert only to learn that the State Street Contract had terminated due to a lack of financing.  (Defendants' Exhibit C-1). The Debtor's subsequent attorney also informed the Trustee that he thought the State Street Contract had expired,  (Defendants' Exhibit E-2), but that Vinciguerra and R. Gilbert were still interested. (Defendants' Exhibit E-3).      Other evidence concerning the viability of the State Street Contract shows that a letter was mailed to the Trustee by an attorney for one of the Debtor's creditors, Harold E. Collins.     That letter stated that Vinciguerra and R. Gilbert were ready to close the State Street Contract pursuant to a loan commitment obtained pre-conversion.  (Defendants' Exhibit F-2).     Collins' deposition testimony also reveals that he told the Trustee toward the end of August 1989, that the Debtor and Kane had indicated that "Gilbert and Vinciguerra" were prepared to buy the State Street property. (Defendants' Exhibit G-3).

Pursuant to 11 U.S.C. § 365, the Trustee had the authority to assume or reject any executory contract such as the State Street Contract subject to court approval.   _Del Grosso, 115 B.R. at 138_.     The Trustee, however, failed to timely assume this contract within the time period prescribed under section 365(d), and consequently the contract was deemed rejected.   _Del Grosso, 115 B.R. at 141_. Exactly why the Trustee timely failed to assume the State Street Contract is a subject of dispute in the present proceeding.

On July 12, 1991, the Trustee filed a ten count complaint.   In Counts I and II, the Trustee contends that R. Gilbert and Vinciguerra, with the Debtor and Kane, committed a fraud and conspired to commit said fraud by concealing and misrepresenting the existence and continuing viability of the State Street Contract.   According to the Trustee, the Defendants misrepresented that the State Street Contract had expired, and based upon this representation the Trustee failed to timely assume same.   The present adversary proceeding also involves the requested avoidance of the pre-petition payments the Debtor made to Vinciguerra, R. Gilbert and S. Gilbert. Relying upon alternate theories in Counts V through X, the Trustee contends these payments were preferential transfers (Counts VI, VIII and X) or fraudulent conveyances (Counts V, VII and IX).   In response to the Trustee's complaint, Vinciguerra, R. Gilbert and S. Gilbert deny the Trustee's ultimate allegations and their liability asserted therein.

Counts III and IV are directed solely against Kane and are not subject to the pending cross motions at bar.

### III. APPLICABLE STANDARDS

#### A. _Standard for Summary Judgment_

In order to prevail on a motion for summary judgment, the movant must meet the statutory criteria set forth in Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056.  Rule 56(c) reads in part:
**\*3** [T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c);  see also _Donald v. Polk County, 836 F.2d 376, 378-379 (7th Cir.1988)_.     When evidentiary facts are in dispute or when conflicting evidence must be weighed, a full trial is necessary. See generally, Schwarzer, Hirsch and Barrans, _The Analysis and Decision of Summary Judgment Motions_ at 39 (Federal Judicial Center, 1991).

In 1986, the Supreme Court decided a trilogy of cases which encourage the use of summary judgment as a means to dispose of factually unsupported claims. _Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)_;   _Celotex Corp. v. Catrett, 477 U.S. 317 (1986)_; _Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)_.   "The primary purpose for granting a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact in dispute."   _Farries v. Stanadyne/Chicago Div., 832 F.2d 374, 378 (7th Cir.1987)_ (quoting _Wainwright Bank & Trust Co. v. Railroadmens Federal Sav. & Loan Ass'n, 806 F.2d 146, 149 (7th Cir.1986)_).     The burden is on the moving party to show that no genuine issue of material fact is in dispute.  _Anderson, 477 U.S. at 256;_  _Celotex, 477 U.S. at 322;_  _Matsushita, 475 U.S. at 585-586_.   There is no genuine issue for trial if the record, taken as a whole, does not lead a rational trier of fact to find for the non-moving party.  _Matsushita, 475 U.S. at 587_.  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."   _Anderson, 477 U.S. at 249-250_ (citations omitted);  see also _Valley Liquors, Inc. v._

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.1987), *cert. denied,* 484 U.S. 977 (1987). Credibility determinations involve the weighing of evidence and the drawing of legitimate inferences from the facts, and are jury functions, not those of a judge. *Anderson,* 477 U.S. at 255.

Once the motion is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon the mere allegations or denials in its pleadings, rather its response must show that there is a genuine issue for trial. *Anderson,* 477 U.S. at 248; *Celotex,* 477 U.S. at 323; *Matsushita,* 475 U.S. at 587; *Patrick v. Jasper County,* 901 F.2d 561, 564-566 (7th Cir.1990). Moreover, all reasonable inferences to be drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Davis v. Chicago,* 841 F.2d 186, 189 (7th Cir.1988); *Marine Bank, Nat. Ass'n v. Meat Counter, Inc.,* 826 F.2d 1577, 1579 (7th Cir.1987); *De Valk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987); *Bartman v. Allis-Chalmers Corp.,* 799 F.2d 311, 312 (7th Cir.1986), *cert. denied,* 479 U.S. 1092 (1987); *In re Calisoff,* 92 B.R. 346, 350-351 (Bankr.N.D.Ill.1988). Furthermore, the existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under the applicable law. *Donald v. Polk County,* 836 F.2d at 379; *Wallace v. Greer,* 821 F.2d 1274, 1276 (7th Cir.1987); *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.1983) (en banc), *cert. denied,* 464 U.S. 918 (1983).

**\*4** Rule 56(d) provides for the situation when judgment is not rendered upon the whole case, but only a portion thereof. The relief sought pursuant to subsection d is styled partial summary judgment. Partial summary judgment is available only to dispose of one or more counts of the complaint in their entirety. *Commonwealth Ins. Co. v. O. Henry Tent & Awning Co.,* 266 F.2d 200, 201 (7th Cir.1959); *Biggins v. Oltmer Iron Works,* 154 F.2d 214, 216-217 (7th Cir.1946); *Quintana v. Byrd,* 669 F.Supp. 849, 850 (N.D.Ill.1987); *Arado v. General Fire Extinguisher Corp.,* 626 F.Supp. 506, 509 (N.D.Ill.1985); *Capitol Records, Inc. v. Progress Record Distributing, Inc.,* 106 F.R.D. 25, 28 (N.D.Ill.1985); *In re Network 90°, Inc.,* 98 B.R. 821, 823 (Bankr.N.D.Ill.1989) *aff'd* 126 B.R. 990 (N.D.Ill.1991); *Strandell v. Jackson County,* 648 F.Supp. 126, 136 (S.D.Ill.1986). Rule 56(d) provides a method whereby a court can narrow issues and facts for trial after denying in whole or in part a motion

properly brought under Rule 56. *Capitol Records, Inc. v. Progress Record Distributing, Inc.,* 106 F.R.D. at 29.

Rule 12 of the General Rules of the United States District Court for the Northern District of Illinois, adopted by the General Order of the Bankruptcy Court on May 6, 1986, requires that the party moving for summary judgment file a detailed statement of material facts as to which they contend there is no genuine issue. The statement must include specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the summary judgment relief sought. Rule 12 also requires that the party opposing the motion file a statement of material facts as to which there is a genuine issue. If the opposing party's Rule 12 statement fails to deny the facts set forth in the movant's statement, those facts will be deemed admitted. In the present proceeding, both parties filed a Rule 12 statement. Neither party, however, correctly titled their respective statement of facts. Effective June 4, 1990, the General Order of May 30, 1990, designated the movant's statement of facts as a 12(m) statement. *Appley v. West,* 929 F.2d 1176, 1178 n. 5 (7th Cir.1991); *Weddington v. United States of America,* 1991 WL 94046, *8 n. 2 (N.D.Ill.1991). The opposing party's Rule 12 statement is designated a 12(n) statement. The Court will use the correct rule denomination when referring to the parties' respective statements.

### B. *11 U.S.C. § 547 Preferential Transfers*

Section 547(b) of the Bankruptcy Code states:
(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property-
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made-
(A) on or within 90 days before the date of the filing of the petition; or
**\*5** (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enabled such creditor to receive more than such creditor would receive if-
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                    Page 4
Not Reported in B.R., 1992 WL 280788 (Bkrtcy.N.D.Ill.)
**(Cite as: Not Reported in B.R.)**

11 U.S.C. § 547(b) (1988).

Thus, section 547(b) requires that five elements be proven to establish a voidable preference. The elements are as follows: 1) the debtor's interest in property was transferred to or for the benefit of a creditor; 2) the transfer was made for or on account of an antecedent debt; 3) the transfer was made while the debtor was insolvent; 4) the transfer was made within 90 days of filing or made to an insider between ninety days and one year of filing; and 5) the transfer enabled the creditor to receive more than it would have received if the transferred property had remained in the bankruptcy estate and was distributed under Chapter 7. *In re Energy Cooperative, Inc.*, 832 F.2d 997 (7th Cir.1987); *Barash v. Public Finance Corp.*, 658 F.2d 504, 507 (7th Cir.1981). All elements must be established for the Trustee to recover, and his failure to prove one or more of the required elements mandates denial of the summary judgment request.

The Trustee has the burden of proving the first, second, fourth and fifth elements by a preponderance of the evidence. *In re Prescott*, 805 F.2d 719, 726 (7th Cir.1986). As to the third element, as a matter of law, the Debtor is presumed insolvent during the ninety days prior to the filing of the petition. 11 U.S.C. § 547(f); *see also Barash*, 658 F.2d at 507. If beyond the ninety-day period, or if the Defendants rebut the presumption of insolvency, then the Trustee bears the burden of establishing the Debtor's insolvency on the date of the purportedly preferential transfer by a preponderance of the evidence. 11 U.S.C. § 547(g); *see* 11 U.S.C. § 101(32); *see also In re Taxman Clothing Co.*, 905 F.2d 166, 168 (7th Cir.1990). Determining a debtor's financial condition on a particular date under bankruptcy law requires the Court to look to the Debtor's balance-sheet. *Taxman Clothing*, 905 F.2d at 170; *see also* 11 U.S.C. § 547(g). All elements must be present in order for the Trustee to avoid a transaction as a preference. *In re Wey*, 854 F.2d 196, 198 (7th Cir.1988). Congress' intent in enacting section 547(b) was to promote equal distribution among a bankrupt's creditors. *See* H.R.Rep. No. 95-959, 95th Cong., 1st Sess. 178 (1977), *reprinted in* 5 U.S.Code Cong. & Admin.News 6138 (1978); *see also Barash*, 658 F.2d at 510. The parties are in dispute over the second, third and fourth elements of section 547(b).

C. *11 U.S.C. § 548 Fraudulent Conveyances*

Section 548 of the Bankruptcy Codes provides in pertinent part:

*6 (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily-
...
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was unreasonably small capital; or
(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
(b) The trustee of a partnership debtor may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of filing of the petition, to a general partner in the debtor, if the debtor was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

11 U.S.C. § 548(a) and (b) (1988).

In order for the Trustee to prevail in establishing a fraudulent conveyance under section 548(a), he must prove the following essential elements: (1) a transfer of the Debtor's property or interest therein; and (2) made within one year before the date of the filing of the bankruptcy petition; and (3) made with actual intent to hinder, delay or defraud a creditor of the Debtor; or (4) for which the Debtor received less than reasonably equivalent value in exchange for the transfer; and (5) either (a) the Debtor was insolvent when the transfer was made or was rendered insolvent thereby; or (b) the Debtor was engaged or about to become engaged in a business for which his remaining property represented an unreasonably small capital; or (c) the Debtor intended to incur debts beyond his ability to repay as they matured. *See In re Bundles*, 856 F.2d 815, 817 (7th Cir.1988). The parties dispute the third, fourth and fifth elements required under section 548(a).

On the other hand, showing a fraudulent conveyance under section 548(b) requires the Trustee to establish

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                    Page 5
Not Reported in B.R., 1992 WL 280788 (Bkrtcy.N.D.Ill.)
**(Cite as: Not Reported in B.R.)**

that: (1) the Debtor transferred an interest in property or incurred an obligation; (2) said transfer or obligation was made within one year before the date of the filing of the bankruptcy petition; (3) said transfer or obligation was made to a general partner of the Debtor; and (4) either the Debtor was insolvent when the transfer or obligation was made or was rendered insolvent thereby. The parties dispute the third and fourth elements required under section 548(b).

### IV. DISCUSSION

#### Counts I and II

The crux of Counts I and II of the complaint involves the alleged fraudulent concealment of the State Street Contract and facts relating thereto by R. Gilbert, Vinciguerra, the Debtor, and Kane. The Trustee contends that those Defendants conspired to and concealed and misrepresented the viability of the State Street Contract, which constituted fraud and caused his failure to timely assume the State Street Contract for the benefit of the estate. Under Illinois law, the Trustee must establish the following elements to prevail on a fraud based cause of action: (1) false statements of material fact rather than opinion; (2) known or believed to be false by R. Gilbert and Vinciguerra; (3) intent to induce the Trustee to act; (4) action by the Trustee in reliance on the truth of statement; (5) his justifiable reliance or right to rely; and (6) damage resulting from such reliance. *See, e.g., Talbot v. Robert Matthew Distributing Co.,* 961 F.2d 654, 661 (7th Cir.1992); *West v. Western Casualty & Surety Co.,* 846 F.2d 387, 393 (7th Cir.1988); *see Carl v. Galuska,* 785 F.Supp. 1283, 1287 (N.D.Ill.1992); *see also Dixie-Portland Flour Mills, Inc. v. Nation Enterprises, Inc.,* 613 F.Supp. 985, 990 (N.D.Ill.1985).

*7 R. Gilbert and Vinciguerra seek summary judgment and request the Court to summarily determine the reasonableness of the Trustee's conduct. They explain, for example, that the Trustee is obligated statutorily to conduct an investigation for unscheduled executory contracts or unexpired leases. Thus, the Trustee's failure to request an extension of time pursuant to 11 U.S.C. § 365(d)(1) in order to conduct such investigation was unreasonable. R. Gilbert and Vinciguerra conclude, therefore, that such failure by the Trustee precluded his assumption of the State Street Contract, not their purported fraudulent representations.

R. Gilbert and Vinciguerra, however, completely misconstrue the elements of fraud on which the Trustee has the burden of proof. To show as a matter of law that the Trustee cannot prevail, the Defendants must establish one of the following elements: (1) that neither of them made a false statement of material fact; (2) that neither Defendant knew nor believed such statements to be false; (3) that neither Defendant intended to induce the Trustee not to assume the State Street Contract; (4) that the Trustee failed to act based upon the alleged representations; (5) that the Trustee did not justifiably rely upon nor had a right to rely upon the alleged representations; or (6) that the Trustee was not damaged from any such reliance. *See Talbot,* 961 F.2d at 661. Nowhere does the Trustee's purported failure to investigate timely the facts and seek an extension of time under section 365(d)(1) to assume the State Street Contract, as a matter of law, rise to the level of defeating any element of the fraud based causes of action asserted against them.

R. Gilbert and Vinciguerra argue that the Trustee's reliance was not reasonable or justifiable. Thus, they conclude any reliance by the Trustee short of an actual investigation is unreasonable. The resolution of the issue of justifiable or reasonable reliance, however, "necessarily depends upon inferences to be drawn from all the facts and circumstances of the case." *Fisher v. Samuels,* 691 F.Supp 63, 69 (N.D.Ill.1988). The reasonableness or unreasonableness of the Trustee's reliance, therefore, typically is inappropriate for resolution on a motion for summary judgment. *Id.*

The reliance issue highlights the difficulty of drawing inferences and weighing credibility of witnesses to decide whether the Trustee's reliance was reasonable. The facts indicate that the Trustee conducted an investigation, which uncovered the State Street Contract. According to the Defendants' reasoning, the Trustee waited too long, and thus behaved unreasonably. The Court, however, cannot make such a finding on the limited record before it. Whether a person acted within a reasonable time or had reasonable cause is predominantly a factual question. *See, e.g., United States v. Warner,* 855 F.2d 372, 374 (7th Cir.1988); *Western American Inc. v. Aetna Casualty & Surety Co.,* 915 F.2d 1181, 1184 (8th Cir.1990). Resolution of such disputed questions should be made by the jury as finder of fact. The scope and extent of the alleged misrepresentations impact heavily upon deciding whether the Trustee acted reasonably in light of those

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 1992 WL 280788 (Bkrtcy.N.D.Ill.)
**(Cite as: Not Reported in B.R.)**

representations. The case law upon which the Defendants rely underscores this point.

**\*8** The Defendants point to *In re Tompkins,* 95 B.R. 722 (BAP 9th Cir.1989) to show the unreasonableness of the Trustee's reliance. There, the trustee learned of an existing lease-option contract at the first meeting of creditors which was held twenty days after the case was converted to Chapter 7. The trustee brought a motion to assume, more than sixty days after the conversion of the case. The court denied the trustee's motion explaining that the trustee had sufficient time to assume the lease or move for an extension of time once he became aware of the existence of the lease. The court held that once the sixty-day period has expired, the lease is deemed rejected and the court has no authority to revive same. The Defendants conclude that the Trustee, like the trustee in *Tompkins,* had sufficient facts to put him on notice of the existence of the State Street Contract, and his failure to assume or request an extension of time in order to assume timely the State Street Contract was not reasonable.

The *Tompkins* trustee's failure to assume the contract or request an extension of time, however, is distinct from the requested remedy sought for any purported misrepresentations. *Tompkins* involved a trustee's failure to timely assume even though the trustee had actual knowledge of a viable and assumable contract, albeit unscheduled. In contrast is the present proceeding where there is significant evidence showing that the Trustee had knowledge of the State Street Contract which he failed to timely assume, but all persons with whom the Trustee spoke represented that they believed the contract had terminated by its own terms. Thus, the *Tompkins* decision is inapposite and distinguishable from the Trustee's fraud claims.

The Defendants next point to this Court's ruling on May 14, 1990, as evidencing the Trustee's unreasonable reliance. In that ruling, the Court denied the Trustee's request to assume the State Street Contract under section 365 after the sixty-day period. (Defendants' Exhibit H-3-15). Although certain facts may have been concealed from the Trustee, the Court found that enough disclosure had been made to put "the trustee and all interested parties on notice to do something in a timely fashion given the very tight time constraints of section 365(d)(1)." (Defendants' Exhibit H-12). The Defendants contend this finding precludes the Trustee from pursuing these fraud based causes of action because such inaction arose from his own

dilatory conduct.

The Defendants, however, confuse separate requests for relief based on separate theories. The Court denied the Trustee's motion to assume the State Street Contract under section 365(d)(1) because the applicable sixty-day period had passed, and thus, that statute expressly deemed the State Street Contract rejected as a matter of law. Recognizing that facts and circumstances may have precluded an orderly assumption or request for extension of time to assume, the Court expressly reserved the Trustee's right to pursue any action to recover any damages from the persons causing the expiration. The Court noted the following:

**\*9** The denial of the trustee's application to assume the alleged executory contract is without prejudice of the trustee or the estate's rights to pursue the alleged other parties to the executory contract for any other claims or cause of action that the estate may have against it.

But I cannot and will not rewrite the clear language of the statute in derogation of that and the other controlling case authority.... My hands are tied.

(Defendants' Exhibit H-14). In sum, R. Gilbert and Vinciguerra simply have misapplied the Court's holding because the Court never held that the Trustee's reliance was unreasonable for purposes of his fraud claims which were not then before the Court.

The Court, therefore, finds that the Defendants have failed to establish that the Trustee cannot prevail on any element of the causes of action based on fraud. The Court further finds that a genuine issue of material fact regarding the reasonableness of the Trustee's reliance on the purported representations precludes the granting of summary judgment as a matter of law in favor of the Defendants on Counts I and II.

### *Counts VI, VIII and X*

The dispute surrounding Counts VI, VIII and X involves the characterization of the pre-petition payments made to the Defendants. It is undisputed that Vinciguerra, R. Gilbert and S. Gilbert entered into separate investment agreements with the Debtor. Further, it is undisputed that pursuant to the agreements, the Debtor made payments to Vinciguerra, R. Gilbert and S. Gilbert of $6,847.96, $9,804.95, and $2,617.37, respectively, beyond ninety-days but within one year prior to his filing a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                    Page 7
Not Reported in B.R., 1992 WL 280788 (Bkrtcy.N.D.Ill.)
**(Cite as: Not Reported in B.R.)**

Chapter 11 petition. The Trustee contends, however, these payments were preferential transfers to partners or "insiders" of the Debtor, and thus are avoidable. In order for the Trustee to prevail on his motion for summary judgment, therefore, he must establish all the essential elements of a preference and additionally show that the Defendants were insiders of the Debtor.

### Section 547(b)

Neither side disputes that the pre-petition payments to each Defendant constituted transfers of the Debtor's property to creditors made within the relevant periods. Thus, the first element under section 547(b) is met. Rather, the parties first dispute the second element of whether these payments were made on account of antecedent debts. The Trustee argues that because the agreements entitled the Defendants to respective portions of the gross revenues of the Debtor's operations in exchange for sums invested, the Debtor incurred an antecedent debt to each of them. The Defendants on the other hand argue that no antecedent debt existed because no transfer or sale of goods or real property then occurred.

Although the term "antecedent debt" is not defined by the Code, case law has construed the term to require a debt to precede the transfer. *In re Energy Cooperative, Inc.,* 814 F.2d 1226 (7th Cir.1987), *cert. denied,* 484 U.S. 928 (1987) (payment in compromise of breach-of-contract claim was made on account of antecedent debt). The Code defines the term "debt" as a liability on a claim, 11 U.S.C. § 101(12), and the term "claim" is defined as including a right to payment:

*10 whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal equitable, secured or unsecured....

11 U.S.C. § 101(5)(A) (1988 & Supp.1990). The term creditor and debt are thus statutorily congruent. *See In re Financial Partners, Ltd.,* 116 B.R. 629, 635 (Bankr.N.D.Ill.1989) ("The term debt and claim are coextensive."). The Debtor owed a "debt" to each of these Defendants inasmuch as he was liable on the Defendants' "claims" created by these agreements made with him. Claims characterized in contract law are likewise claims in bankruptcy. *See Financial Partners,* 116 B.R. at 635-636 (payments to investors were on account of an antecedent debt, and were recoverable by trustee as preferences).

Thus, the amounts paid to the Defendants would constitute payment on antecedent debts.

The Defendants contend, however, that the admitted pre-petition transfers were current payments which did not become due and payable until sometime after the execution of the investment agreements, and thus were not payments on account of an antecedent debt. For support the Defendants rely upon *In re White River Corp.,* 799 F.2d 631 (10th Cir.1986) and *In re Wall Tire Distributors, Inc.,* 116 B.R. 867 (Bankr.M.D.Ga.1990).

In *White River,* the trustee sought to avoid several pre-petition rental payments as preferences made some ninety days before bankruptcy. In order to circumvent the forty-five day period of section 547(c), the trustee argued that the lease agreement created an antecedent debt at the time of execution upon which the rental payments were made. The court disagreed finding that a monthly rental debt "was not incurred when the lease obligation was executed because the total lease obligation was not then due and payable." 799 F.2d at 633. The court held that "the debts were incurred under the lease in monthly increments on the actual dates the rent was due." *Id.*

The *White River* reasoning actually is contrary to the Defendants' position. In this proceeding, the Defendants invested money with the Debtor in return for a percentage of future gross receipts. At the time these agreements were executed no repayment obligation then existed because the Debtor had not then realized any gross receipts. In other words, the future gross receipts owed to the Defendants were due to be paid by the Debtor on the actual dates the gross receipts were realized, similar to the monthly rental obligations in *White River.* Accordingly, any disbursements from future gross receipts were made on account of antecedent debts owing under the three separate agreements. Thus, the second element under section 547(b)(2) is shown.

The *Wall Tire* decision underscores the timing element present in the *White River* decision and overlooked by Defendants. There, the debtor made two pre-petition rental payments in accord with an equipment lease agreement within ninety days of bankruptcy. The trustee sought to avoid these transfers as preferences, which the court denied. The court explained that the lease agreement provided that rent shall be paid in advance of the first day of each month. Because the rental payments were made prior to the beginning of the month, the court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                     Page 8
Not Reported in B.R., 1992 WL 280788 (Bkrtcy.N.D.Ill.)
**(Cite as: Not Reported in B.R.)**

concluded that the payments were not made on account of an antecedent debt. 116 B.R. at 871.

**\*11** Dissimilar is the present proceeding where the Debtor paid the Defendants after revenues were realized. In *Wall Tire,* for example, the debtor never incurred a debt because the debtor paid the rent prior to it being owed, thus an antecedent debt never existed. 116 B.R. at 871. In the present proceeding, however, gross receipts had to exist before any distribution by the Debtor could be made. Once gross receipts were realized, the payment obligations were triggered under the terms of the prior agreements, and any payment of same constituted payment on a pre-existing or antecedent debt. Thus, the Court finds that the investment agreements created antecedent debts respectively owed to each Defendant.

The third element the Trustee must establish involves the insolvency of the Debtor at the time of the transfers. The Trustee relies upon his sworn affidavit which states in pertinent part that:
The Debtor is insolvent as there are insufficient funds in the Bankruptcy Estate to pay unsecured creditors 100% of their debt.

(Plaintiff's Exhibit No. 6). Determining the Debtor's financial position on a particular date under section 547(b), however, requires the Court to look to the Debtor's solvency at that particular time. *In re Taxman Clothing Co.,* 905 F.2d 166, 168 (7th Cir.1990). The Trustee's affidavit regarding the bankruptcy estate's financial condition post-petition falls far short of establishing the Debtor's insolvency on each date of the particular pre-petition transfers, even if his affidavit is considered sufficient to meet the showing required by the fifth element under section 547(b)(5). Consequently, the Trustee has failed to carry his burden regarding the insolvency element under section 547(b)(3), and thus is unable to show all the elements of a preferential transfer. The Court is precluded, therefore, from granting summary judgment in favor of the Trustee on Counts VI, VIII and X.

### *Section 547(c)*

In their cross motion, the Defendants argue that summary judgment should be granted as a matter of law under Counts VI, VIII and X because these payments, even if made on account of an antecedent debt, were made in the ordinary course of business. The Defendants invoke section 547(c)(2) which

provides:
(c) The Trustee may not avoid under this section a transfer-
...
(2) to the extent that such transfer was-
(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms;

11 U.S.C. § 547(c)(2) (1988). This section precludes a trustee from avoiding a transfer: (1) made in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of both the debtor and transferee; (2) made in the ordinary course of business or financial affairs of the debtor and transferee; and (3) made according to ordinary business terms. The purpose of this exception is "to leave undisturbed normal financial relations." *See In re Colonial Discount Corp.,* 807 F.2d 594 (7th Cir.1986), *cert. denied,* 481 U.S. 1029 (1987) (purpose of § 547(c)(2) is to make sure normal transactions are not preferences). The Defendants bear the burden of proving these defenses to the Trustee's *prima facie* case by a preponderance of the evidence. 11 U.S.C. § 547(g); *Prescott,* 805 F.2d at 726.

**\*12** The Trustee argues, however, that the Defendants are precluded from raising section 547(c)(2) as a defense to the Trustee's action. First, the Trustee contends that the case law treats payments to investors as not being in the ordinary course of business. The decisions cited, however, involve a unique fact pattern wherein investors transferred funds to debtors who used the funds in ways not authorized-*e.g.,* a "Ponzi" scheme. The Trustee has failed to show that the Debtor was involved in such a scheme.

Next, the Trustee argues that Federal Rule of Civil Procedure 8(c) precludes the Defendants from raising section 547(c) as an affirmative defense. That rule provides:
In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. When a party has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 1992 WL 280788 (Bkrtcy.N.D.Ill.)
**(Cite as: Not Reported in B.R.)**

mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

Fed.R.Civ.P. 8(c). This rule has been incorporated within the Federal Rules of Bankruptcy Procedure by virtue of Rule 7008.

Pursuant to Bankruptcy Rule 7008(c), a party pleading to a preceding pleading, must set forth affirmatively any matter constituting an avoidance or an affirmative defense. Fed.R.Bankr.P. 7008(c). Failure to plead an affirmative defense results in the waiver of that defense and its exclusion from the case. *See Apponi v. Sunshine Biscuits, Inc.,* 809 F.2d 1210, 1215 (6th Cir.1987) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1278, at 339 (1969)); *In re Glenn,* 108 B.R. 70 (Bankr.W.D.Pa.1989); 2A J. Moore, *Moore's Federal Practice* ¶ 8.27[3] at 8-182 to 8-193 (1987). Any matter that does not tend to controvert the opposing party's prima facie case as determined by applicable substantive law should be pleaded as an affirmative defense, and is not put in issue by a denial made pursuant to Fed.R.Civ.P. 8(b). *See In re Fisher,* 100 B.R. 351, *amended,* 101 B.R. 507 (Bankr.S.D.Ohio 1989); 2A J. Moore, *Moore's Federal Practice* ¶ 8.27[3] at 8-182 (1987).

Under substantive bankruptcy law, section 547(c) "is never called into play unless a preference is found to exist...." *In re Fulghum Constr. Corp.,* 14 B.R. 293, 306 (M.D.Tenn.1981), *aff'd in part and vacated and remanded in part on other grounds,* 706 F.2d 171 (6th Cir.1983). Thus, the exceptions to avoidability listed in section 547(c) are in the nature of affirmative defenses and must be affirmatively pleaded or waived. The Defendants' failure to raise section 547(c)(2) prior to their cross motion for summary judgment constitutes a waiver, which now precludes their reliance on this defense to the Trustee's preference claims.

**\*13** The Defendants point to Fed.R.Civ.P. 15 as giving them the right to amend their pleading. This rule has been adopted by virtue of Bankruptcy Rule 7015, which allows an amendment once as a matter of course at any time before a responsive pleading is served or within twenty days after serving a pleading to which no responsive pleading is required. Fed.R.Bankr.P. 7015(a). The Defendants have failed to establish a right to amend as a matter of course. Rule 15(b) on the other hand, allows a party to amend a pleading at any time upon court approval or consent

of the other party. Again, the Defendants have failed to establish their compliance with this subsection. No motion to amend their answer was timely filed or allowed, and the Trustee obviously has not consented. Consequently, the Court finds that Rule 15 does not permit the Defendants to now raise section 547(c)(2) as a defense to the Trustee's motion for summary judgment.

Finally, even if the Defendants could raise section 547(c)(2) as a defense to the Trustee's actions, they would still not be entitled to summary judgment. Even if the Defendants had affirmatively pleaded section 547(c)(2), they have failed to show how the debt created by the investment agreements was incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and Defendants. The Code does not define the terms "ordinary course of business" and "ordinary business terms." To determine whether a preferential transfer was made in the ordinary course of business, the Court must determine what was subjectively ordinary between the Debtor and the Defendants as they have traditionally conducted business, and the Court must determine whether the transfer was made according to common practice in the industry. *In re Financial Partners, Ltd.,* 94 B.R. 537, 539 (Bankr.N.D.Ill.1988). The Defendants have failed to explain how each payment made to them was made according to ordinary business terms and made in the ordinary course of the business between the Debtor and each Defendant. The Court finds that the Defendants have not met their burden even if section 547(c)(2) were pleaded. The Court denies the Defendants' cross motion for summary judgment as a matter of law under section 547(c)(2) on Counts VI, VIII and X.

### *Section 547(b)(4)(B)*

The Defendants next attempt to defeat the Trustee's motion under section 547(b)(4)(B) by arguing that they were not "insiders" of the Debtor. The Code defines the term "insider" to include:
(A) if the debtor is an individual-
(i) relative of the debtor or a general partner of the debtor;
(ii) partnership in which the debtor is a general partner;
(iii) general partner of the debtor; ....

11 U.S.C. § 101(31) (1988 & Supp.1990). Such term has been held to refer to someone who has a sufficiently close relationship with a debtor whereby

Not Reported in B.R.
Not Reported in B.R., 1992 WL 280788 (Bkrtcy.N.D.Ill.)
(Cite as: Not Reported in B.R.)

Page 10

his conduct is subject to closer scrutiny than those who deal at arms length with the debtor. _In re Octagon Roofing,_ 124 B.R. 522, 529 (Bankr.N.D.Ill.1991). An "insider" is one who does not deal at arms length with the debtor. _In re Badger Freightways, Inc.,_ 106 B.R. 971, 980 (Bankr.N.D.Ill.1989). The determination of "insider" status is a question of fact which must be decided on a case-by-case basis. _Octagon Roofing,_ 124 B.R. at 529. The Trustee contends that the Defendants were general partners, and thus insiders of the Debtor. (Plaintiff's Exhibit No. 1, ¶ ¶ 4-6). The Defendants counter that they were merely "investors" in the Debtor's operations.

**\*14** Illinois law recognizes the sharing of gross profits as prima facie evidence of a partnership. Ill.Rev.Stat. ch. 106 1/2 , para. 7(4) (1988). Such profit sharing, however, "does not itself establish a partnership." Ill.Rev.Stat. ch. 106 1/2 , para. 7(3) (1988). To establish a partnership, therefore, the Trustee must show that the Defendants joined together: (1) to carry on trade or venture for common benefit; (2) each contributed property or services; and (3) they shared community of interest in profits. _Seidmon v. Harris,_ 172 Ill.App.3d 352, 526 N.E.2d 543 (1st Dist.1988). As between parties, existence of partnership is a question of intent based on facts and circumstances. _Id.; Laroia v. Reuben,_ 137 Ill.App.3d 942, 485 N.E.2d 496 (1st Dist.1985).

The Defendants rely upon the Debtor's January 18, 1991 deposition to portray themselves as investors, not general partners. At his deposition, the Debtor explained that the Defendants invested in his business in exchange for a percent of gross profits. (Defendants' Exhibit L-5). At no time, however, did he intend to convey an ownership interest. (Defendants' Exhibit M-2). The Debtor further testified that the parties had considered a partnership arrangement, but never prepared a written agreement. (Defendants' Exhibit M-2). Consequently, he never considered the Defendants to be general partners of his business, which is evidenced by the following dialogue:

Q. Did you reject the idea of becoming partners?
A. No.
Q. Did you consider Ray [Gilbert] and John [Vinciguerra] your partners?
A. Not at that time, no.
Q. At any time did you consider them your partners?
A. No. Because there was no papers draw [sic] yet for anything. Sometime we would talk about being a partner later but at that time, no.

(Defendants' Exhibit N-2). As further evidence that a partnership did not exist, the Defendants point to their lack of control over the financial affairs of the Debtor's business. The Defendants did not sign checks nor receive balance sheets (Defendants' Exhibit O-4), nor were they privy to other financial documents, like profit/loss or expense statements. (Defendants' Exhibits Q-2 and Q-3).

The above evidence, however, is directly contradicted by the Debtor's sworn affidavit dated August 1, 1991. That affidavit provides in pertinent part:

3. John Vinciguerra ("Vinciguerra") was a general partner of mine in my trucking and warehouse business, who had contracted to purchase the State Street property, and who had received several thousand dollars in partnership payments from me in the year prior to the Petition Date.

4. Raymond Gilbert ("R. Gilbert") was a general partner of mine in my trucking and warehouse business, who had contracted to purchase the State Street property, and who had received several thousand dollars in partnership payments from me in the year prior to the Petition Date.

5. Susan Gilbert ("S. Gilbert"), the wife of Raymond Gilbert, was a general partner of mine in my trucking and warehouse business, who had received several thousand dollars in payments from me in the year prior to the Petition Date.

**\*15** (Plaintiff's Exhibit C). Additionally, other portions of the Debtor's deposition testimony are further contradictory. For example, the Debtor stated at one point that the parties were not entitled to profit/loss or expense statements, but later he disclosed that the Defendants did receive some financial information regarding the Debtor's business operations:Q. And you testified that Mr. Gilbert came to the State Street property almost every Saturday, is that correct?
A. Yes.
...
Q. And you reviewed the documents, the invoices and the bills that your company sent out for its operations, didn't you?
A. Yes.
...
Q. So you were giving Mr. Gilbert access to financial records of the company, weren't you, or of your business?
A. Yes, if you want to call it that....

(Plaintiff's Exhibit C, pp. 282-283).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 1992 WL 280788 (Bkrtcy.N.D.Ill.)
(Cite as: Not Reported in B.R.)

The Trustee, however, proposes an alternate argument regarding the status of the Defendants as insiders. Seizing upon the Defendants' alleged "investor" status, the Trustee contends that the investment agreements were really stock purchase agreements. Relying upon *In re David Jones Builder, Inc.*, 129 B.R. 682, 693-94 (Bankr.S.D.Fla.1991), the Trustee concludes that the Defendants were not arms length creditors of the Debtor, and thus were insiders. In *Jones Builder*, Ginsburg, a chairman of the Board of Directors for FCB bank, transferred $1,000,000.00 to the debtor on July 11, 1988, in exchange for a sale of eighty-four shares of the debtor's stock. *Id.* at 685. Later, Ginsburg decided to become a lender rather than an investor, and the sale of stock was converted to a loan. *Id.* at 686. A promissory note was executed and back-dated to July 11, 1988. The primary reason Ginsburg transferred such a large sum to the debtor was neither to invest in the debtor nor to make a loan to the debtor, but rather to cover an overdraft in the debtor's operating account it had with FCB bank. *Id.* During the one year preceding bankruptcy, the debtor made several payments to Ginsburg. The trustee sought to avoid these payments as transfers to an insider.

Because of Ginsburg's unique relationship to the debtor via his position with FCB, the court considered Ginsburg as neither an innocent nor an arms length outside lender to the debtor. The court concluded, therefore, that the trustee could sustain a cause of action based upon insider status because "Ginsburg subjected himself to the one-year preference reach back period by deciding to initially become a shareholder, and thus, he became an insider of the debtor for Bankruptcy Code purposes." *Id.* at 694. Buttressing the insider relationship, the court pointed to Ginsburg's control "over the debtor after his transaction was changed to a loan." *Id.*

Dissimilar is the present proceeding where the Debtor's evidence concerning his relationship with the Defendants is contradictory at best and is for a jury as finder of fact to weigh as well as make credibility determinations. The Defendants invested several thousands of dollars in exchange for a percentage of gross revenues, as evidenced by the Debtor's uncontradicted testimony and documentary evidence. (Defendants' Exhibit M-2 and Plaintiff's Exhibit No. 5). Additionally, unlike the shareholder/lender in *Jones Builder*, the evidence fails to establish conclusively that the Defendants exerted control over the Debtor's operation by virtue of their interest in the Debtor's gross receipts. The

Court finds the *Jones Builder* case distinguishable from the facts of the present proceeding.

**\*16** Viewing the limited record before the Court in its entirety, the Court finds that such significant conflicts in the facts preclude this Court from weighing same rather than the jury which should determine what type of relationship actually existed among the parties. *See Anderson*, 477 U.S. at 255. Consequently, the Court is precluded from granting summary judgment as a matter of law on Counts VI, VIII and X.

### Counts V, VII and IX

Although the Trustee seeks relief under sections 548(a) and 548(b) through Counts V, VII and IX, the Trustee only moves for summary judgment under subsection (b). The Trustee contends that, because the Defendants were partners of the Debtor, he is entitled to recover all payments made one year preceding bankruptcy. The Trustee seeks to avoid payments made to Vinciguerra, R. Gilbert and S. Gilbert of $6,847.96, $9,804.95 and $2,617.37, respectively. The problem with the Trustee's position, however, is that the above discussed contradictory evidence fails to establish conclusively that such a partnership relationship actually existed. The evidence regarding the exact relationship between the Debtor and the moving Defendants is anything but undisputed. Likewise, the limited record before the Court does not establish the Debtor's insolvency on any of the dates of the transfers sought to be avoided or that he was rendered insolvent thereby. Consequently, the Court is precluded from granting summary judgment as a matter of law in favor of the Trustee on Counts V, VII and IX.

The Defendants move for summary judgment under section 548(a) on Counts V, VII and IX by arguing that they paid out far more than they received. The Defendants conclude that the Debtor received reasonably equivalent value. Whether a debtor has received reasonably equivalent value in exchange for a transfer is a question to determined on a case-by-case basis. *In re Bundles*, 856 F.2d 815, 824 (7th Cir.1988) ("Reasonable equivalence should depend on all the facts of each case."). Although the exact meaning of the term "reasonably equivalent value" is left undefined by the Code, section 548(d)(2) provides guidance as to the meaning of the term "value." The Code expressly states that:

"value" means property, or satisfaction or securing of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor....

11 U.S.C. § 548(d)(2)(A) (1988). Thus, a preference paid "in good faith" would not constitute a "fraudulent" transfer under section 548(a).

As previously explained, the Court has found that the pre-petition payments to the Defendants were on account of antecedent debts. Thus, the Defendants assume those payments are unavoidable under section 548(b). Finding "value," however, is not dispositive of the issue of whether such value was of "reasonable equivalence." In re Carr, 40 B.R. 1007, 1008 (D.Conn.1984). On the other hand, where it is established that value has been received for the transfer, that value may be found a reasonable equivalent in the absence of any evidence to the contrary. In re J.K. Chemicals, Inc., 7 B.R. 897, 898 (Bankr.D.R.I.1981). Finally, "reasonably equivalent value" is determined as of the date of the transfer. In re Robinson, 80 B.R. 455, 460 (Bankr.N.D.Ill.1987).

*17 In the present proceeding, the Trustee argues that the payments were not for reasonably equivalent value because the Defendants gave no value on the day of any of the admitted transfers. The record shows, for example, that Vinciguerra, R. Gilbert and S. Gilbert, invested with the Debtor the sums of $75,000.00, $50,000.00 and $25,000.00, respectively. In return, Vinciguerra and R. Gilbert were each to receive five percent of the Debtor's gross receipts while S. Gilbert was to receive three percent. Pursuant to these agreements, Vinciguerra, R. Gilbert and S. Gilbert, respectively later received $6,847.96, $9,804.95 and $2,617.37. The Trustee only focuses on the subsequent payments from gross receipts rather than the initial investments. Actually, the issue before this Court relates to whether the Debtor received reasonably equivalent value for his conveyance of the several interests in his gross receipts.

The Court, however, is unable to make any such determination because the limited record before the Court is insufficient. For example, at one point in time, Vinciguerra invested $25,000.00 more than R. Gilbert, but received an equal percentage interest in the gross receipts. Were either of the conveyances of interests reasonable and for equivalent value received by the Debtor? Further, even though Vinciguerra's interest equalled that of R. Gilbert, Vinciguerra's admitted pre-petition payment received from the Debtor was substantially less than the

amount the Debtor paid to R. Gilbert. What are the reasons for such discrepancies? The Court is unable to answer either query because the record is devoid of any evidence explaining how the percentages sold and amounts paid to the Defendants were calculated. Thus, the Court is unable to determine whether the payments made on account of such antecedent debts were of reasonably equivalent value. Of similar import is the lack of evidence showing that these Defendants were general partners of the Debtor, and the absence of evidence to establish the Debtor's insolvency at the time of the transfers sought to be avoided. Consequently, the Court is precluded from granting summary judgment as a matter of law in favor of either the Trustee or the Defendants on Counts V, VII and IX.

## V. CONCLUSION

For the foregoing reasons, the Court hereby denies both the Trustee's motion for summary judgment and the moving Defendants' cross motion for summary judgment.

The Court previously entered its Final Pretrial Order and set the matter for trial by jury to begin August 3, 1992, pursuant to the moving Defendants' timely demand therefor. Several weeks before that date, the majority opinion rendered by the Seventh Circuit Court of Appeals in In re Grabill Corp., 967 F.2d 1152 (7th Cir.1992), held that the bankruptcy court does not have statutory authority to conduct a jury trial in a core proceeding. Thus, on July 16, 1992, the Court, after hearing, struck this matter from its trial calendar. Counsel for the Trustee and the moving Defendants requested the Court to rule on their pending summary judgment motions. They indicated that after ruling and any denial of summary judgment, they would file the appropriate motion to withdraw the reference to the district court pursuant to 11 U.S.C. § 157(d). Accordingly, they are hereby directed to so proceed. The Final Pretrial Order remains in full force and effect pending withdrawal of the reference of this matter for trial by jury.

*18 This Opinion serves as findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

See written Order.

> FN1. The relevant time period of the Trustee's discovery is a subject of dispute

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 1992 WL 280788 (Bkrtcy.N.D.Ill.)
(Cite as: Not Reported in B.R.)

between the parties, which the Court addresses *infra* pp. 12-17.

FN2. The Defendants raise a new argument in their reply brief to the Trustee's responding brief. The Defendants contend that the Trustee cannot sustain a fraud based cause of action premised upon a legal opinion because such a statement is not a misstatement of fact. The Court will not entertain this new argument because the Trustee has not had a chance to respond. The nature of a reply brief is to address issues raised in the responding brief, which does not include new arguments-trial by ambush is not an acceptable form of litigation.

FN3. Section 547 allows a trustee to recover a transfer occurring between ninety days and one year before the filing of a bankruptcy petition, if such creditor was an "insider" at the time of the transfer. 11 U.S.C. § 547(b)(4)(B). *See infra.* p. 27 for the definition of the term "insider."

FN4. Pre-amendment section 547(c) provided:
The trustee may not avoid under this section a transfer-
(2) to the extent that such transfer was-
(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made not later than 45 days after such debt was incurred;
(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(D) made according to ordinary business terms....
11 U.S.C. § 547(c) (1982).

FN5. A "Ponzi" scheme is any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors. *See In re Bullion Reserve of North America,* 836 F.2d 1214, 1219 n. 8 (9th Cir.1988) and collected citations.

FN6. Case law typically disallows a defendant to simultaneously maintain that it is insulated from a section 548 attack because a transfer was in payment of a debt

and claim under section 547 that it did not receive a transfer on account of an antecedent debt. *In re Computer Universe, Inc.,* 58 B.R. 28, 32 (Bankr.M.D.Fla.1986).

Bkrtcy.N.D.Ill.,1992.
In re Del Grosso
Not Reported in B.R., 1992 WL 280788 (Bkrtcy.N.D.Ill.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.