## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION** | ) ) ) ) ) ) | MDL NO. 1456<br>Civil Action No. 01-12257-PBS<br>Judge Patti B. Saris |
| **THIS DOCUMENT RELATES TO:** | ) ) ) | Chief Magistrate Judge Marianne B. Bowler |
| *State of Montana v. Abbott Labs., Inc., et al.,*<br>CA No. 02-CV-12084-PBS | ) ) ) | REQUEST FOR ORAL ARGUMENT |

### DEFENDANT BAYER CORPORATION'S MOTION FOR LEAVE TO FILE A REPLY MEMORANDUM IN SUPPORT OF ITS FIRST MOTION TO COMPEL PLAINTIFF THE STATE OF MONTANA TO PRODUCE A RULE 30(B)(6) WITNESS

Pursuant to Local Rule 7.1(b)(3), Defendant Bayer Corporation ("Bayer") hereby moves for leave to file the attached Proposed Reply Memorandum in Support of Its First Motion to Compel Plaintiff the State of Montana to Produce a Rule 30(b)(6) Witness (the "Motion"). The Motion demonstrated that Bayer's 30(b)(6) Notice was timely served and seeks clearly relevant testimony. Montana's Opposition to Bayer's Motion includes misstatements of fact and misleading statements of law. By correcting these misstatements, the Reply Memorandum will aid the court in considering the issues raised by Bayer's Motion.

WHEREFORE, Bayer respectfully requests that the court grant Bayer leave to file the attached Reply Memorandum in Support of Its First Motion to Compel Plaintiff the State of Montana to Produce a Rule 30(b)(6) Witness.

## Certification Pursuant to Local Rules 7.1 and 37.1

Pursuant to Local Rules 7.1(a)(2) and 37.1 of this Court, the undersigned counsel certifies that counsel for Bayer has conferred unsuccessfully with Montana's counsel in an effort to reach a resolution on the Rule 30(b)(6) discovery request on which the parties have reached impasse.

May 5, 2006

                    ___/s/ Jaime L.M. Jones_____
                    Richard D. Raskin
                    Michael Doss
                    Jaime L.M. Jones
                    SIDLEY AUSTIN LLP
                    1 S. Dearborn Street
                    Chicago, Illinois  60603
                    312-853-7000 (tel.)
                    312-853-7036 (facsimile)
                    Attorneys for Defendant Bayer Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2006, I caused a true and correct copy of Defendants Bayer Corporation's Motion For Leave To File a Reply Memorandum in Support of Its First Motion to Compel Plaintiff the State of Montana to Produce a Rule 30(b)(6) to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 in MDL No. 1456.

/s/ Jaime L.M. Jones

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION** | ) ) ) ) ) ) | MDL NO. 1456 Civil Action No. 01-12257-PBS Judge Patti B. Saris |
| **THIS DOCUMENT RELATES TO:** | ) ) ) | Chief Magistrate Judge Marianne B. Bowler |
| *State of Montana v. Abbott Labs., Inc., et al.,* CA No. 02-CV-12084-PBS | ) ) ) ) | REQUEST FOR ORAL ARGUMENT |

## DEFENDANT BAYER CORPORATION'S PROPOSED REPLY MEMORANDUM IN SUPPORT OF ITS FIRST MOTION TO COMPEL PLAINTIFF THE STATE OF MONTANA TO PRODUCE A RULE 30(B)(6) WITNESS

Defendant Bayer Corporation's ("Bayer's") Motion seeks to compel Montana to designate a witness to testify concerning: (1) how Montana used or considered the Average Sales Price ("ASP") data Bayer provided to the State for *all Bayer's products* under Montana's 2001 Settlement Agreement with Bayer; and (2) communications between Montana and the National Association of Medicaid Fraud Control Units ("NAMFCU") concerning the 2001 settlement or the State's 2003 settlement with Bayer resolving different State claims. These subjects lie at the heart of Bayer's defenses in this matter. Montana has refused to name a single 30(b)(6) witness to testify on the State's behalf on these subjects.

Despite its sharp rhetoric, Montana's response does not dispute the central facts that justify granting the Motion. There is no dispute that (i) the 30(b)(6) Notice (attached hereto as Exhibit A) was served within the then-applicable fact discovery period set by Case Management Order ("CMO") 15; (ii) the Notice seeks testimony that is material to the issues in the case

against Bayer; and (iii) Montana has refused to designate *any* 30(b)(6) witness to testify on the identified subjects.

Rather than contest these facts, Montana instead attempts to justify its refusal to designate a 30(b)(6) witness on the ground that Montana's written discovery responses already provide the information sought through the 30(b)(6) Notice.  Yet Montana's one-paragraph response to an interrogatory concerning Bayer's ASP information comes nowhere near answering all the questions that may properly be posed to a 30(b)(6) witness on this subject.   Montana's fallback claim that the Motion should be denied because Bayer allegedly had "ample opportunity" to obtain its sought-after information at other depositions and failed to do so (Opp. at 5-6), is contradicted by its own claim that Montana has been unable to locate a witness with personal knowledge on the identified subjects (Opp. at 6.)  In any event, Bayer is not obligated to hunt among the various Montana witnesses who testified to try to find one with personal knowledge on the subjects in its 30(b)(6) Notice; and even if a witness could be found by Bayer to testify – a witness Montana claims it could not find – this would not satisfy Montana's 30(b)(6) obligation to designate a witness to speak for and bind the State itself on the 30(b)(6) Notice subjects.

Bayer's Motion to Compel should be granted, and Montana should be ordered to identify a 30(b)(6) witness on the identified subjects.

## ARGUMENT

### I.   Bayer's Rule 30(b)(6) Notice Was Timely And Seeks Relevant Testimony.

Although accusing Bayer of undue delay, Montana nonetheless concedes that Bayer's Notice was served within the time the Court originally set for fact discovery, under CMO 15 (which date was later extended by 60 days by CMO 23).  (Opp. at 2.)  Montana also does not contest the relevance of the testimony Bayer seeks.   Indeed, evidence that Montana has possessed ASP data for all of Bayer's drugs since 2001 but has not altered how it pays providers

2

of Bayer drugs under its Medicaid program contradicts the State's claim that it would have paid less for Bayer drugs had it been provided the very same data prior to 2001. Testimony concerning Montana's communications with NAMFCU would further underscore this point since NAMFCU told Montana Medicaid that ASP data would "provide you the basis for determining where and how Medicaid prices should be adjusted." (*See* Letter from NAMFCU to Medicaid Pharmacy Directors (January 29, 2001), attached hereto as Exhibit B, at 2.)

Because Bayer's 30(b)(6) request is timely and seeks relevant testimony, Montana must designate a representative to testify on the topics covered in the Notice.

## II.   Bayer's 30(b)(6) Notice Seeks Non-Duplicative Information That Is Reasonably Available To Montana.

Montana wrongly asserts (Opp. at 1, 5) that Bayer has previously received all of the information covered by its 30(b)(6) Notice through other discovery. The 30(b)(6) Notice requested Montana to designate deponents to testify on (1) the State's "use or consideration of Bayer ASP information"; and (2) any "Communications" between Montana and the NAMFCU concerning the 2001 or 2003 Bayer settlements. (Exhibit A, at 2.) Contrary to Montana's Opposition (at 3-4), its five-sentence response to a separate Bayer interrogatory does not relieve it of its obligation to produce a Rule 30(b)(6) deponent. The referenced interrogatory response simply asserts, without elaboration or explanation, that Montana "receives Bayer ASP information," but that, because it would require a "manual process" to incorporate ASP data into its pricing algorithm, Montana does not use that ASP information "as a benchmark in evaluating, revising or settling payments to Providers under the Montana Medicaid program."

Such a response comes nowhere near to answering the universe of questions Bayer might appropriately ask Montana's 30(b)(6) deponent concerning its "use or consideration of Bayer ASP information." For example, did Montana ever even consider or evaluate using Bayer's

ASPs as a benchmark in calculating Medicaid drug payments; if not, why not?  What "manual process" precluded Montana from utilizing Bayer's ASP information?  Did the same issues exist for the entire period covered by Montana's lawsuit such that having Bayer's ASP information during this entire period would have made no difference to Montana's calculation of Medicaid drug payments?  Where and how was the Bayer ASP data stored?  Did other state agencies or programs have access to this Bayer ASP data, and, if so, which agencies or programs accessed this information, when, and for what purpose?  This handful of sample questions – clearly relevant and appropriate for Bayer's defenses – are not answered by Montana's brief interrogatory response.  Bayer should have the opportunity to pose them to a Rule 30(b)(6) witness designated by Montana.

Montana also maintains (Opp. at 3-4) that a 30(b)(6) deposition would be duplicative because the State has previously responded to Bayer's request for production of "[a]ll Documents related to communications with [NAMFCU]" that it had searched and had been "unable to locate any responsive documents."  But Bayer's 30(b)(6) request is not limited to documentary evidence of communications, as was the request for production, but extends to any oral communication, as well as testimony concerning written communications for which there is no documentary record.

Nor can Montana avoid its discovery obligations merely by asserting (Opp. at 6) that "there is neither a current employee with information nor institutional knowledge of these topics beyond that which has already been provided."  Montana may not "subvert the beneficial purposes of [Rule 30(b)(6)] by simply incanting that no witness is available who personally has direct knowledge concerning all of the areas of inquiry." *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 638 (D. Minn. 2000).  Rather, Montana has an obligation to "make a reasonable

attempt to ascertain information reasonably available to [it]" and to use that information to prepare a witness to testify. *Big Top USA, Inc. v. The Wittern Group*, 183 F.R.D. 331, 339 (D. Mass. 1998) (Saris, J.). "If necessary, the deponent must use documents, past employees, and other resources in performing this required preparation." *Briddell v. St. Gobain Abrasives Inc.*, 233 F.R.D. 57, 60 (D. Mass. 2005). "Any other interpretation of the Rule would allow the responding [party] to 'sandbag' the depositional process 'by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial.'" *Prokosch*, 193 F.R.D. at 639 (quoting *United States v. Taylor*, 166 F.R.D. 356, 362 (M.D.N.C. 1996)).

Nothing in Montana's Opposition suggests that it has undertaken any effort to use available documentary and other sources to educate a witness to testify on the topics covered in the Notice. In addition, if after this searching effort Montana is still unable to prepare a witness on these topics, Rule 30(b)(6) requires that Montana designate a witness who can provide binding testimony to that effect and whom Bayer can question regarding the means used to prepare for the deposition. There is no other way for Bayer to "fully and fairly explor[e]" Montana's position on these issues in advance of trial. *Id.* at 639.

### III.   Montana Cannot Avoid Designating A 30(b)(6) Witness Simply Because Other Non-30(b)(6) Witnesses Were Not Questioned On The Same Subjects.

Although Montana asserts that no witness exists to testify on the State's behalf on the 30(b)(6) Notice subjects, it also seeks denial of the Motion because Bayer did not ask questions on these subjects from other (unidentified) witnesses. (Opp. at 5-6.) Bayer, however, is not obligated to hunt among the various Montana witnesses who testified to try to find one with personal knowledge on the subjects in its 30(b)(6) Notice. Moreover, even if a witness could be found by Bayer to testify on the Notice subjects – a witness Montana claims it could not find – this would not satisfy Montana's 30(b)(6) obligations. Bayer sought a 30(b)(6) witness on these

subjects to speak for and bind the State itself. *See Int'l Ass'n of Machinists & Aero. Workers v. Werner-Matsuda*, 390 F. Supp. 2d 479, 487 (D. Md. 2005). Any other non-30(b)(6) witness could testify only to their personal knowledge, which would not necessarily bind the State.

Moreover, any failure to coordinate the Bayer-specific 30(b)(6) deposition with the depositions of other State witnesses is the fault of Montana, not Bayer. On March 18, 2006, Bayer's counsel asked Montana's counsel by e-mail "whether any of the deponents for the already-scheduled depositions coming up over the coming weeks might appropriately also be designated a 30(b)(6) witness for the Bayer subjects." (See Affidavit of Michael Doss, attached hereto as Exhibit C, and 3/18/06 E-mail From M. Doss to J. Breckenridge, attached to the Affidavit as Exhibit 1.) If so, Bayer agreed to have its "30(b)(6) deposition tag along immediately after the individual deposition." (*Id.*) Despite this offer, Montana did not identify any of the following Montana witnesses as 30(b)(6) deponents on the Notice subjects.

At the time of Bayer's offer, those yet to testify included the director of Montana Medicaid from March 2001 to July 2003 (*see* 4/5/06 Deposition of Margaret Bullock, attached hereto as Exhibit D, at 19:14 to 20:12); her successor (*see* 4/18/06 Deposition of Charles L. Hunter, attached hereto as Exhibit E, at 16:18 to 17:9, 48:6-13); and Montana's current supervisor of Medicaid's pharmacy program (*see* 4/12/06 Deposition of Mary Dalton, attached hereto as Exhibit F, at 23:21 to 24:20). Montana's failure to designate and prepare one or more of these individuals as its 30(b)(6) deponents on the issues in Bayer's Notice should not prejudice Bayer's reasonable discovery request.

## IV.   Conclusion

For the foregoing reasons and those previously stated in the Motion, Bayer requests that the Court grant its Motion, and compel the State of Montana to produce a Rule 30(b)(6) witness on the topics identified in Bayer's Notice within 14 days of the Court's Order.

## Certification Pursuant to Local Rules 7.1 and 37.1

Pursuant to Local Rules 7.1(a)(2) and 37.1 of this Court, the undersigned counsel certifies that counsel for Bayer has conferred unsuccessfully with Montana's counsel in an effort to reach a resolution on the Rule 30(b)(6) discovery request on which, as identified above, the parties have reached impasse.

May 5, 2006

                      /s/ Jaime L.M. Jones
                      Richard D. Raskin
                      Michael Doss
                      Jaime L.M. Jones
                      SIDLEY AUSTIN LLP
                      1 S. Dearborn Street
                      Chicago, Illinois  60603
                      312-853-7000 (tel.)
                      312-853-7036 (facsimile)
                      *Attorneys for Defendant Bayer Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2006, I caused a true and correct copy of Defendants Bayer Corporation's Proposed Reply Memorandum In Support of Its First Motion to Compel Plaintiff The State of Montana To Produce A Rule 30(b)(6) Witness, together with accompanying exhibits, to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 in MDL No. 1456.

_____/s/ Jaime L.M. Jones_____

# EXHIBIT A



10466557
Jan 31 2006
6:25PM

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

MDL No. 1456
CIVIL ACTION: 01-CV-12257-PBS

Judge Patti B. Saris
Chief Magistrate Judge Marianne B. Bowler

THIS DOCUMENT RELATES TO
STATE OF MONTANA V. ABBOTT
LABORATORIES, ET. AL.
CA NO. 02-12084-PBS

## DEFENDANT BAYER CORPORATION'S NOTICE OF RULE 30(B)(6) DEPOSITION TO STATE OF MONTANA

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, Defendant Bayer Corporation ("Bayer"), by and through its counsel, will take the

deposition upon oral examination of a representative or representatives designated by the State of

Montana (hereinafter "Plaintiff") to testify on behalf of Plaintiff concerning all matters described

herein, before a Notary Public or other person authorized to administer oaths at the offices of

Gough, Shanahan, Johnson & Waterman, 33 S. Last Chance Gulch, P.O. Box 1715, Helena, MT,

59601, on February 23, 2006, at 9:30am. The deposition will be recorded by stenographic and/or

sound and visual means and will continue from day to day until completion.

Pursuant to Rule 30(b)(6), Plaintiff shall designate in writing to the undersigned counsel

for Bayer one or more officers, officials, employees, or other representative to testify on their

behalf who are most knowledgeable about and will testify as to matters known or reasonably

available to Plaintiff in regard to the matters set forth below. Plaintiff is further requested to set forth the matter or matters on which each such designated person will testify.

All terms used in this Notice, whether or not capitalized, shall be defined as stated in Defendant Bayer Corporation's First Set of Interrogatories and Requests for Production to the State of Montana.[1]

Unless otherwise specified, the relevant time period is the period from January 1997 to the present.

## AREAS OF INQUIRY

Plaintiff is requested to designate one or more persons who consent to testify on its behalf concerning the following matters:

1.  Plaintiff's use or consideration of Bayer ASP Information, including how or if such Bayer ASP Information has been used, relied upon, referenced, or considered in evaluating, revising, or setting payments to Providers under Plaintiff's Medicaid Program.

2.  Communications between Plaintiff and the National Association of Medicaid Fraud Control Units ("NAMFCU") concerning the Bayer 2001 Settlement or concerning the Bayer 2003 Settlement (or any investigation or inquiry that preceded those Settlements), including internal analysis, memoranda, reports, and reviews related to communications with NAMFCU.

---

[1] Such defined terms include the Bayer 2001 Settlement, the Bayer 2003 Settlement, and Bayer ASP Information.

CH1 3435653v.1

Dated: January 31, 2006

By:     /s/ Michael Doss
    Richard D. Raskin
    Michael Doss
    SIDLEY AUSTIN LLP
    One S. Dearborn Street
    Chicago, IL  60603
    Tele: (312) 853-7000
    Fax:  (312) 853-7036
    ***Counsel for Defendant Bayer Corporation***

3

CH1 3435653v.1

## CERTIFICATE OF SERVICE

I, Michael Doss, hereby certify that on January 31, 2006, I have caused a true and

accurate copy of the foregoing DEFENDANT BAYER CORPORATION'S NOTICE OF RULE

30(B)(6) DEPOSITION TO STATE OF MONTANA to be served on all counsel of record by

electronic service, pursuant to Paragraph 11 of Case Management Order No. 2, by sending a

copy to Lexis/Nexis for posting and notification to all parties.

Date:   Chicago, Illinois
        January 31, 2006


                                        _____/s/ Michael Doss_____
                                             Michael Doss

4

CHI 3435653v.1

# EXHIBIT B



NATIONAL ASSOCIATION OF MEDICAID FRAUD CONTROL UNITS
750 FIRST STREET NE  SUITE 1100
WASHINGTON, DC  20002
(202) 326-6020
(202) 326-0664 FAX

10959450
Apr 4 2006
12:55PM

BARBARA L. ZELNER
*Counsel*

PRESIDENT
ELLYN STERNFIELD
*Assistant Attorney General
Director, MFCU
Oregon Attorney General's Office*

VICE PRESIDENT
CHARLES W. GAMBRELL, JR.
*Assistant Deputy Attorney General
Director, MFCU
South Carolina Attorney General's
Office*

IMMEDIATE PAST PRESIDENT
L. TIMOTHY TERRY
*Senior Deputy Attorney General
Director, MFCU
Nevada Attorney General's Office*

January 29, 2001

Alaska Pharmacy Director
State Medicaid Agency
4501 Business Park Blvd.
Suite 24
Anchorage, Alaska 99503

Dear Medicaid Pharmacy Director:

The joint State and federal investigation of drug price misrepresentation by pharmaceutical manufacturers has resulted in the first concluded settlement with a manufacturer, Bayer, Inc. Under the terms of this settlement, Bayer will repay a total of $14 million to cover excess Medicaid payments made for its products, and will enter into a Corporate Integrity Agreement with the Office of the Inspector General of the U. S. Department of Health and Human Services, to ensure the future accuracy and integrity of drug price communications.

Most importantly, from your perspective, the agreement reached requires Bayer to submit to all Medicaid Pharmacy Directors* whose states have entered into the settlement, along with First DataBank and HCFA OIG, quarterly certified statements identifying the actual average sale prices of its products, weighted to reflect the volume of sales at each price. Indeed, it is our

---

* The average sale price information will be sent to the same address as this letter. If you wish to designate another address, please notify your State MFCU of your desire to do so.

intention to make the communication of certified pricing data a mandatory component of any subsequent resolutions of our drug pricing investigation with pharmaceutical manufacturers. This unprecedented access to true market prices will provide you an extraordinary opportunity to compare providers' real acquisition costs with Medicaid reimbursement prices and, we believe, provide you the basis for determining where and how Medicaid prices should be adjusted.

Obviously, while this data has enormous potential value, its true benefits can only be achieved through the efforts of State pharmacy directors to make use of it. *We emphasize that each State will be obliged to determine how this data can be accommodated into its existing pricing formula. Unless and until states take such efforts, and provide First DataBank with specific instructions as to how the data is to be used, this pricing information will have no effect.* Consequently, we write to inform you at the earliest stage possible of the nature and import of the pricing data you will be receiving soon from Bayer and subsequently from other manufacturers.

### The New Price Information You Will Receive

First, we wish to clearly communicate to you what the numbers you will be receiving represent. As set forth in the settlement, manufacturers will be submitting to each state:

> "...the average of all final sale prices charged by [the manufacturer] for the drug or biological product in the United States to all purchasers, excluding those sales exempt from inclusion in the calculation of "Best Price" for Medicaid Rebate Program purposes, pursuant to 42 USC § 1396r-8, and direct sales to hospitals...net of all the following: volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; rebates and all other price concessions provided by [the manufacturer]...that result in a reduction of the ultimate cost to the purchaser."

Thus, "average sale price" should be understood to mean exactly what it says; it is neither an Average Wholesale Price, nor a Wholesale Acquisition Cost, but the *average* of all prices charged to the overwhelming majority of customers. This average sale price will, moreover, be weighted to reflect the volume of sales at each price, *i.e.*, ten sales at $1.00 and one sale at $0.50 will produce, not a flat average of $0.75, but a weighted average sales price of $0.95.

Additionally, under the terms of the settlement, Bayer will refrain from submitting AWP information for purposes of setting Medicaid reimbursement for the following drugs:

- Koate-HP Antihemophilic Factor (Human)
- Kogenate Antihemophilic Factor (Recombinant)
- Konyne-80 Factor IX Complex (Human)
- Gamimune N, 5% Immune Globulin Intravenous (Human, 5%),
- Gamimune N, 10% Immune Globulin Intravenous (Human, 10%),
- Thrombate III Antithrombin III (Human).

First DataBank will consequently ascertain and communicate a Medicaid AWP for these products independently of any information from Bayer. Bayer will continue to submit AWPs for other drugs it manufactures, but we reemphasize that the average sale price information Bayer will provide to State Medicaid programs will encompass *all* of its products.

## Use of the Average Sale Price Data

A drug's average sale price will consequently afford you a reliable standard for determining what the true market price of a drug is, at least on an average basis. How this information may ultimately be used and what relationship this market price will or should bear to final reimbursement prices are, of course, questions properly left to you and other Program personnel. The Medicaid Fraud Control Units involved in this investigation have pursued the limited goals of halting the communication of false information, and ensuring that Medicaid Program staff have reliable information on which to make decisions. Once those goals have been achieved, the determination as to what levels of reimbursement ought to be, relative to a drug's average sale price, is appropriately left for consideration by Pharmacy Directors, Medicaid Program Directors and other policy makers. *Again, absent your direction to First DataBank, or any subsequent price reporting agency, as to how your state wishes use average sale price information, this data will have no impact on Medicaid prices and you will continue to be susceptible to any price misrepresentations by manufacturers.*

## The Impact on Bayer

Another matter we wish to address concerns Bayer, the initial manufacturer to reach a resolution of its AWP liability. As such, Bayer will be, at least for a time, the only manufacturer to provide you with certified average sale price information, and how that information is used may have a profound effect on our continuing investigation. Our inquiry has indicated that Medicaid providers who bill for pharmaceuticals maximize their reimbursement by migrating to drugs with a high "spread" between AWP and purchase price, and away from lower spread drugs. Consequently, the existing market exhibits the perverse effect of "punishing" the truthful reporter of price data, whose lower reimbursement cannot compete with the larger spread generated by dishonest competitors. Were the Bayer price data to be used to cause this same result – lowering the market appeal of its products relative to its competitors – the effect would be doubly perverse: truthful price reporting by the first company to reach a settlement with the Medicaid Fraud Control Units would operate only to its economic disadvantage. It could hardly be expected that, if this were the outcome, any other manufacturer would consider either providing accurate price data or entering into a settlement with the government.

Of course, we stress, this is not to suggest that the Bayer information not be used. On the contrary, we would *urge* that it be used, effectively and productively, but in a way that provides no competitive advantage to other manufacturers less cooperative and less truthful than Bayer is. Again, the means by which this might be accomplished, *e.g.*, by using Bayer data as a basis for setting State maximum prices, are subjects better left to your discretion.

As we indicated previously, we expect that our continuing investigation will result in more such negotiated resolutions with other pharmaceutical manufacturers in the future. It is our

intention that the provision of accurate information, enforced by the prospect of severe penalties for false submissions in every state, will enable Program reimbursements to be determined far more fairly and rationally than they are at present. We hope that you perceive the potential of this certified pricing data with an equally positive perspective.

Thank you for your continued cooperation and consideration in this matter.

Very truly yours,

For the NAMFCU Drug Pricing Team:

Patrick E. Lupinetti Special Assistant Attorney
General, New York MFCU
Kerry O'Brien, Director Maine MFCU
Thomas F. Staffa, Assistant Deputy Attorney
General, New York MFCU
L. Timothy Terry, Director Nevada MFCU,
David Waterbury, Director Washington MFCU

cc: State MFCU Directors

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* **PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br><br>*State of Montana v. Abbott Labs., Inc., et al.,*<br>  CA No. 02-CV-12084-PBS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

MDL NO. 1456
Civil Action No. 01-12257-PBS
Judge Patti B. Saris

Chief Magistrate Judge Marianne B. Bowler

### AFFIDAVIT OF MICHAEL DOSS

MICHAEL DOSS states on oath that:

1.      I am a partner at Sidley Austin LLP and represent Bayer Corporation ("Bayer") in the case of *State of Montana v. Abbott Labs, Inc., et al.*, CA No. 02-CV-12084-PBS, which is part of the multi-district litigation currently pending before the Court captioned *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, CA No. 01-12257-PBS.

2.      On January 31, 2006, I caused to be served on Plaintiff the State of Montana a Notice of Rule 30(b)(6) Deposition (the "Notice").

3.      On March 18, 2006, I sent an e-mail to Montana counsel Jeniphr Breckenridge asking her "whether any of the deponents for the already-scheduled depositions coming up over the coming weeks might appropriately also be designated a 30(b)(6) witness for the Bayer subjects." (3/18/06 E-mail From M. Doss to J. Breckenridge, attached hereto as Exhibit 1.)   I explained that Bayer "would not object to having [its] 30(b)(6) deposition tag along immediately after the individual deposition" and asked Ms. Breckenridge to please "tell us if this option will

work," and if not, to "please advise us what your plans are . . . regarding our 30(b)(6) notices." (*Id.*)

4.     At the time of my e-mail, the depositions of at least six present or former employees of the State were pending.   Nonetheless, the State did not identify any of these already-scheduled deponents as the 30(b)(6) witness for the Notice.

FURTHER AFFIANT SAYETH NOT

/s/ Michael Doss
Michael Doss

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois  60603
(312) 853-7000
(312) 853-7036

Dated:  May 5, 2006

Subscribed and sworn to before me
this fifth day of May, 2006.

/s/ Linda M. Vogel
Notary Public

Linda M. Vogel
Notary Public, State of Illinois
My Commission Expires August 15, 2009

# EXHIBIT 1
# (Doss Affidavit)

**From:**   Doss, Michael
**Sent:**   Saturday, March 18, 2006 9:54 PM
**To:**   'Jeniphr Breckenridge'
**Cc:**   Raskin, Richard D.
**Subject:**  Bayer Montana and Nevada I Discovery

Jeniphr,

I am writing to follow up on my voice mail of last week.  As you know, Bayer has served notices for 30(b)(6) depositions in the Montana and Nevada I AWP actions (on January 31, 2006) concerning issues specific to Bayer.  We continue to seek designations from you for deponents on the identified subjects.  One option to consider on this front is whether any of the deponents for the already-scheduled depositions coming up over the coming weeks might appropriately also be designated a 30(b)(6) witness for the Bayer subjects.  If so, we would not object to having our 30(b)(6) deposition tag along immediately after the individual deposition.

Please tell us if this option will work; if not, please advise us what your plans are in Nevada I and Montana regarding our 30(b)(6) notices.  I will be traveling next week, but should be able to discuss this issue by phone with you at your convenience.

Thanks.

-Mike

**Michael Doss**
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
mdoss@sidley.com
312-853-7920 (tel)
312-853-7036 (fax)

# EXHIBIT D

```
 1              THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MASSACHUSETTS

 3    -------------------------------x

 4    In re:  PHARMACEUTICAL          )

 5    INDUSTRY AVERAGE WHOLESALE      )

 6    PRICE LITIGATION                ) MDL DOCKET NO.

 7    _____) CIVIL ACTION

 8    THIS DOCUMENT RELATES TO:       ) 01CV12257-PBS

 9    ALL ACTIONS                     )

10    -------------------------------x

11

12             DEPOSITION OF MARGARET BULLOCK

13                   Phoenix, Arizona

14                   April 5, 2006

15                     9:00 a.m.

16

17    DEPOSITION OF MARGARET BULLOCK, commenced at

18    9:00 a.m. on April 5, 2006, at Phoenix, Arizona,

19    before Robin L. B. Osterode, RPR, CSR, Arizona

20    Certified Reporter No. 50695.

21

22
```

1        Q.   Let's go back to what I think my notes

2    indicate your first post-vocational rehabilitation

3    job with the State of Montana was, the program

4    director for developmental disabilities; do I have

5    that right?

6        A.   Uh-huh.  Yes.

7        Q.   Was there any involvement in that job with

8    prescription drugs or pharmaceutical benefits?

9        A.   The program that I oversaw, the

10   developmental disabilities program, did not directly

11   purchase pharmaceuticals for our clients.  Medicaid

12   was paying for those services, we did not purchase

13   them through our programs.

14       Q.   Okay.  Have you been involved with any

15   programs, any state programs, either in Arizona or

16   Montana, that directly purchased pharmaceuticals?

17       A.   Yes.

18       Q.   And what was that involvement?

19       A.   That involvement was the period of time

20   that I was the Medicaid director in Montana.

21       Q.   And what was the nature of the

22   involvement?

```
1          A.   I was the administrator of the Health

2     Policy and Services Division, which oversaw primary

3     and acute care Medicaid and public health, but

4     public health wasn't involved in this.

5          Q.   So the position Administrator of Health

6     Policy and Services Division was basically the

7     Medicaid administrator?

8          A.   It was the Medicaid director's position,

9     right.

10          Q.   And that would have been for the period

11     from March 2001 to July of 2003?

12          A.   Yes.

13          Q.   Now, you said public health wasn't

14     involved; what was the nature of the public health

15     part of your responsibilities?

16          A.   The public health part of my

17     responsibilities involved overseeing a variety of

18     programs, probably 50-plus different kinds of

19     programs, where we received -- the state received

20     federal dollars, and we contracted with local

21     entities like county health departments, to provide

22     things like abstinence education -- well, sex
```

# EXHIBIT E

4/18/2006  Hunter, Charles

```
 1              THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSSETTS

 3                       ---oOo---

 4      ----------------------------X

 5      In Re:  PHARMACEUTICAL        )   MDL DOCKET NO.

 6      INDUSTRY AVERAGE WHOLESALE    )    CIVIL ACTION

 7      PRICE LITIGATION              )    01CV12257-PBS

 8      ----------------------------X

 9      THIS DOCUMENT RELATES TO:     )

10      ALL ACTIONS                   )

11      ----------------------------X

12                 TELEPHONE DEPOSITION

13                        OF

14                 CHARLES L. HUNTER

15

16          Taken at 33 South Last Chance Gulch

17                 Helena, Montana

18          Tuesday, April 18, 2006 - 9:50 a.m.

19

20      Reported by Mary R. Sullivan, RPR, RMR, Freeland

21   Court Reporter, Notary Public, residing in Missoula,

22   Montana.
```

```
 1    graduate school. When I came back to Montana, I was
 2    employed as a management analyst with the Department
 3    of Administration with the State of Montana.  I left
 4    that job.  I worked in a wine distributing business
 5    for a period close to a year, returned to employment
 6    with the State of Montana as the Chief of the
 7    Contributions Bureau of the Unemployment Insurance
 8    Division, essentially the tax collection side of
 9    unemployment insurance.  In 1987 I became the
10    administrator of that division.  In 1991 I became
11    the administrator of what was called the Employment
12    Relations Division which had Workers Compensation,
13    wage and hour law, public sector collective
14    bargaining, human rights, public safety law. I
15    worked there until 1997.  In 1997 I became the
16    administrator of the Child and Family Services
17    Division, which is the child welfare system in the
18    State of Montana.  I stayed there until 2002.   In
19    2002 I took a job working on Medicaid financing in
20    the director's office of the Department of Public
21    Health and Human Services, worked there for
22    approximately a year.  At the end of that year, I
```

1    took over the--what was called then the Child and

2    Adult Health Resources Division, which is the

3    Medicaid division that I ran. It's not exclusively--

4    it's not the entire Medicaid program in the state of

5    Montana.  That division has the functions, really,

6    of primary and acute services for Medicaid, so it

7    doesn't have disability services, doesn't have

8    senior and long-term care services, but it had the

9    majority of Medicaid.

10        Q.   Going back to way back when when you

11   worked at the residential treatment center, did that

12   job in any way involve drug pricing or drug

13   reimbursement?

14        A.   No.

15        Q.   So am I correct that the first exposure

16   that you had to Medicaid-related issues was in 2002?

17        A.   Yes.

18        Q.   What was the exact start date?  Do you

19   remember the month?

20        A.   I think it was July.

21        Q.   And prior to that time, you hadn't had any

22   involvement with the State's coverage or payment for

1    filing of the lawsuit?

2         A.   No.

3         Q.   Did you receive any instruction about the

4    need to retain documents because of this lawsuit?

5         A.   No.

6         Q.   When you first became involved in 2002,

7    July of 2002 with the Medicaid program, do you

8    recall inheriting any files from anyone?

9         A.   There were all the files from the former

10   administrator there that related to Medicaid.

11        Q.   And who was the former administrator?

12        A.   Nancy Ellery actually, and Maggie Bullock

13   was my direct predecessor.  There were files from

14   both those people in my office.

15        Q.   Did you ever look through those files in

16   connection with your work responsibilities?

17        A.   Not really.  I did retain those files for

18   a period of time just to see if I would need them.

19   There were files that I kept in the office for about

20   six months, didn't find that I was in those files,

21   so they were moved to storage.

22        Q.   What happened with your files when you

# EXHIBIT F

4/12/2006  Dalton, Mary

```
1               THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3                        ---oOo---

4     -------------------------------X

5     In Re:  PHARMACEUTICAL        )    MDL DOCKET NO.

6     INDUSTRY AVERAGE WHOLESALE    )    CIVIL ACTION

7     PRICE LITIGATION              )    01CV12257-PBS

8     -----------------------------X

9     THIS DOCUMENT RELATES TO:     )

10    ALL ACTIONS                   )

11    -----------------------------X

12

13          Taken at 33 South Last Chance Gulch

14                   Helena, Montana

15        Wednesday, April 12, 2006 - 8:43 a.m.

16

17              TELEPHONE DEPOSITION OF

18                    MARY DALTON

19

20    Reported by Mary R. Sullivan, RPR, RMR, Freelance

21    Court Reporter and Notary Public, State of Montana,

22    residing in Missoula, Montana.
```

1    started. It was originally in the--in the director's

2    office, and it was moved into the quality assurance

3    division right around the time of the January 2003

4    session.  It would have been within a few months

5    either way.  I don't remember whether it was before

6    or after.

7         Q.    When you said originally it was in the

8    director's office, do you mean the director of--

9         A.    Department of Public Health and Human

10   Services.

11        Q.    And I have a few specific documents I may

12   show you later about the audit--

13        A.    Okay.

14        Q.    --issue.  The last box under your title

15   there of quality assurance division was licensure

16   bureau. That involved licensure of whom?

17        A.    Licensure of healthcare facilities, group

18   homes, daycares, both child and adult daycare,

19   personal care facilities.  Would have been facility

20   based providers.

21        Q.    And finally in your current position, that

22   is the health resources division administrator?

1        A.    Yes.

2        Q.    What are your basic duties in that

3     position?

4        A.    The health resources division has the

5     Medicaid programs for what would be considered to

6     be--actually be easier to say what it excludes.  It

7     contains the Medicaid programs except for the long-

8     term care as in the nursing home, the nursing home

9     waivers and the Home Health program.  DD services is

10    not in that division and mental health services for

11    adults are not in that division.  Other than that,

12    Medicaid services that Montana offers would be

13    located in that division along with the CHIP

14    program, Big Sky Rx program, some grants for

15    children's mental health that are--that are separate

16    from Medicaid.

17       Q.    And, so, in this position, do you still

18    have supervisory responsibility over the pharmacy

19    and physician programs?

20       A.    I do.

21       Q.    But when you were in the quality assurance

22    division, you did not?