# EXHIBIT A

PUBLIC LAW 105–33—AUG. 5, 1997          111 STAT. 251

*Public Law 105–33
105th Congress

## An Act

To provide for reconciliation pursuant to subsections (b)(1) and (c) of section 105 of the concurrent resolution on the budget for fiscal year 1998.

Aug. 5, 1997
[H.R. 2015]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Balanced Budget Act of 1997.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Balanced Budget Act of 1997".

**SEC. 2. TABLE OF TITLES.**

This Act is organized into titles as follows:

Title I—Food Stamp Provisions
Title II—Housing and Related Provisions
Title III—Communications and Spectrum Allocation Provisions
Title IV—Medicare, Medicaid, and Children's Health Provisions
Title V—Welfare and Related Provisions
Title VI—Education and Related Provisions
Title VII—Civil Service Retirement and Related Provisions
Title VIII—Veterans and Related Provisions
Title IX—Asset Sales, User Fees, and Miscellaneous Provisions
Title X—Budget Enforcement and Process Provisions
Title XI—District of Columbia Revitalization

# TITLE I—FOOD STAMP PROVISIONS

**SEC. 1001. EXEMPTION.**

Section 6(o) of the Food Stamp Act of 1977 (7 U.S.C. 2015(o)) is amended—

(1) in paragraph (2)(D), by striking "or (5)" and inserting "(5), or (6)";

(2) by redesignating paragraph (6) as paragraph (7); and

(3) by inserting after paragraph (5) the following:

"(6) 15-PERCENT EXEMPTION.—

"(A) DEFINITIONS.—In this paragraph:

"(i) CASELOAD.—The term 'caseload' means the average monthly number of individuals receiving food stamps during the 12-month period ending the preceding June 30.

"(ii) COVERED INDIVIDUAL.—The term 'covered individual' means a food stamp recipient, or an individual denied eligibility for food stamp benefits solely due to paragraph (2), who—

"(I) is not eligible for an exception under paragraph (3);

"(II) does not reside in an area covered by a waiver granted under paragraph (4);

---

*Note: This is a hand enrollment pursuant to Public Law 105–32.

part may implement changes relating to requirements for the submission of a claim for clinical diagnostic laboratory tests.

(4) USE OF INTERIM POLICIES.—After the date the Secretary first implements such national policies, the Secretary shall permit any carrier to develop and implement interim policies of the type described in paragraph (1), in accordance with guidelines established by the Secretary, in cases in which a uniform national policy has not been established under this subsection and there is a demonstrated need for a policy to respond to aberrant utilization or provision of unnecessary tests. Except as the Secretary specifically permits, no policy shall be implemented under this paragraph for a period of longer than 2 years.

(5) INTERIM NATIONAL POLICIES.—After the date the Secretary first designates regional carriers under subsection (a), the Secretary shall establish a process under which designated carriers can collectively develop and implement interim national policies of the type described in paragraph (1). No such policy shall be implemented under this paragraph for a period of longer than 2 years.

(6) BIENNIAL REVIEW PROCESS.—Not less often than once every 2 years, the Secretary shall solicit and review comments regarding changes in the national policies established under this subsection. As part of such biennial review process, the Secretary shall specifically review and consider whether to incorporate or supersede interim policies developed under paragraph (4) or (5). Based upon such review, the Secretary may provide for appropriate changes in the national policies previously adopted under this subsection.

(7) REQUIREMENT AND NOTICE.—The Secretary shall ensure that any policies adopted under paragraph (3), (4), or (5) shall apply to all laboratory claims payable under part B of title XVIII of the Social Security Act, and shall provide for advance notice to interested parties and a 45-day period in which such parties may submit comments on the proposed change.

(c) INCLUSION OF LABORATORY REPRESENTATIVE ON CARRIER ADVISORY COMMITTEES.—The Secretary shall direct that any advisory committee established by a carrier to advise such carrier with respect to coverage and administrative policies under part B of title XVIII of the Social Security Act shall include an individual to represent the independent clinical laboratories and such other laboratories as the Secretary deems appropriate. The Secretary shall consider recommendations from national and local organizations that represent independent clinical laboratories in such selection.

### SEC. 4555. UPDATES FOR AMBULATORY SURGICAL SERVICES.

Section 1833(i)(2)(C) (42 U.S.C. 1395l(i)(2)(C)) is amended by inserting at the end the following new sentence: "In each of the fiscal years 1998 through 2002, the increase under this subparagraph shall be reduced (but not below zero) by 2.0 percentage points.".

### SEC. 4556. REIMBURSEMENT FOR DRUGS AND BIOLOGICALS.

(a) IN GENERAL.—Section 1842 (42 U.S.C. 1395u) is amended by inserting after subsection (n) the following new subsection:

"(o)(1) If a physician's, supplier's, or any other person's bill or request for payment for services includes a charge for a drug

PUBLIC LAW 105–33—AUG. 5, 1997          111 STAT. 463

or biological for which payment may be made under this part and the drug or biological is not paid on a cost or prospective payment basis as otherwise provided in this part, the amount payable for the drug or biological is equal to 95 percent of the average wholesale price.

"(2) If payment for a drug or biological is made to a licensed pharmacy approved to dispense drugs or biologicals under this part, the Secretary may pay a dispensing fee (less the applicable deductible and coinsurance amounts) to the pharmacy.".

(b) CONFORMING AMENDMENT.—Section 1833(a)(1) (42 U.S.C. 1395l(a)(1)), as amended by sections 4315(b) and 4531(b)(1), is amended—

(1) by striking "and (R)" and inserting "(R)"; and

(2) by striking the semicolon at the end and inserting the following: ", and (S) with respect to drugs and biologicals not paid on a cost or prospective payment basis as otherwise provided in this part (other than items and services described in subparagraph (B)), the amounts paid shall be 80 percent of the lesser of the actual charge or the payment amount established in section 1842(o);".

(c) STUDY AND REPORT.—The Secretary of Health and Human Services shall study the effect on the average wholesale price of drugs and biologicals of the amendments made by subsection (a) and shall report to the Committees on Ways and Means and Commerce of the House of Representatives and the Committee on Finance of the Senate the result of such study not later than July 1, 1999.

42 USC 1395u note.

(d) EFFECTIVE DATE.—The amendments made by subsections (a) and (b) shall apply to drugs and biologicals furnished on or after January 1, 1998.

42 USC 1395l note.

SEC. 4557. COVERAGE OF ORAL ANTI-NAUSEA DRUGS UNDER CHEMOTHERAPEUTIC REGIMEN.

(a) IN GENERAL.—Section 1861(s)(2) (42 U.S.C. 1395x(s)(2)), as amended by sections 4104 and 4105, is amended—

(1) by striking "and" at the end of subparagraph (R); and

(2) by inserting after subparagraph (S) the following new subparagraph:

"(T) an oral drug (which is approved by the Federal Food and Drug Administration) prescribed for use as an acute anti-emetic used as part of an anticancer chemotherapeutic regimen if the drug is administered by a physician (or as prescribed by a physician)—

"(i) for use immediately before, at, or within 48 hours after the time of the administration of the anticancer chemotherapeutic agent; and

"(ii) as a full replacement for the anti-emetic therapy which would otherwise be administered intravenously.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to items and services furnished on or after January 1, 1998.

42 USC 1395x note.

SEC. 4558. RENAL DIALYSIS-RELATED SERVICES.

42 USC 1395rr note.

(a) AUDITING OF COST REPORTS.—Beginning with cost reports for 1996, the Secretary shall audit cost reports of each renal dialysis provider at least once every 3 years.

(b) IMPLEMENTATION OF QUALITY STANDARDS.—The Secretary of Health and Human Services shall develop, by not later than

# EXHIBIT B

| 105TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>105–149 |
|---|---|---|

# BALANCED BUDGET ACT OF 1997

## R E P O R T

OF THE

## COMMITTEE ON THE BUDGET
## HOUSE OF REPRESENTATIVES

TO ACCOMPANY

## H.R. 2015

A BILL TO PROVIDE FOR RECONCILIATION PURSUANT TO SUB-
SECTIONS (b)(1) AND (c) OF SECTION 105 OF THE CONCURRENT
RESOLUTION ON THE BUDGET FOR FISCAL YEAR 1998

together with

ADDITIONAL AND MINORITY VIEWS



JUNE 24, 1997.—Committed to the Committee of the Whole House on
the State of the Union and ordered to be printed

1354

provision is intended to promote efficiency, increase uniformity, and reduce administrative burdens in claims administration and billing procedures

*Effective Date* The provision is effective upon enactment

### Section 10615 Updates for ambulatory surgical services

*Current Law* Medicare pays for ambulatory surgical center (ASC) services on the basis of prospectively determined rates These rates are updated annually by the CPI–U OBRA 93 eliminated updates for ASCs for FY1994 and FY1996

*Explanation of Provision.* The provision would set the updates for FY 1998 through FY2002 at the increase in the CPI–U minus 2 0 percentage points

*Reason for change* This provision would contribute to slowing unsustainable growth in Part B expenditures

*Effective date* This provision is effective for services delivered on or after October 1, 1997

### Section 10616 Reimbursement for drugs and biologicals

*Current Law* Payment for drugs is based on the lower of the estimated acquisition cost or the national average wholesale price Payment may also be made as part of a reasonable cost or prospective payment

*Explanation of Provision.* The provision would specify that in any case where payment is not made on a cost or prospective payment basis, the payment shall be equal to 95 percent of the average wholesale price for the drug or biological involved.

*Reason for Change* The Inspector General for the Department of Health and Human Services has found evidence that over the past several years Medicare has paid significantly more for drugs and biologicals than physicians and pharmacists pay to acquire such pharmaceuticals For example, the Office of Inspector General reports that Medicare reimbursement for the top 10 oncology drugs ranges from 20 percent to nearly 1000 percent per dosage more than acquisition costs The Committee intends that the Secretary, in determining the average wholesale price, should take into consideration commercially available information including such information as may be published or reported in various commercial reporting services The Committee will monitor AWPs to ensure that this provision does not simply result in a 5% increase in AWPs

*Effective Date* The provision is effective January 1, 1998

### Section 10617 Coverage of oral anti nausea drugs under chemotherapeutic regimen

*Current Law* Medicare provides coverage for certain oral cancer drugs The Administration has specified that Medicare will pay for anti-emetic drugs when they are needed for the administration and absorption of primary Medicare covered oral anticancer chemotherapeutic agents when a high likelihood of vomiting exists.

*Explanation of Provision.* The provision would provide coverage, under specified conditions, for a self administered oral drug used as an acute anti-emetic used as part of an anticancer chemotherapeutic regimen It would have to be administered by or under the supervision of a physician for use immediately before,

1398

### Durable medical equipment, orthotics and prosthetics, and parenteral and enteral nutrition

Payment rates for durable medical equipment, and orthotics and prosthetics would be frozen at 1997 levels through 2002. Starting in 2003, payments would be updated by the CPI–U. Updated for parenteral and enteral nutrition (PEN) would be reduced to their 1995 level for fiscal years 1998–2002. These provisions would save $0.8 billion over the 1998–2002 period.

### Oxygen and oxygen equipment

Payments for oxygen and oxygen equipment would be cut by 20 percent in 1998 and frozen through 2002. This provision would result in $1.6 billion in savings between 1998 and 2002.

### Laboratory updates

Under the proposal, the payment update for laboratory services would be frozen through 2002. This provision would also reduce the laboratory payment limit from 76 percent of the median fee schedule amount to 72 percent of this amount. These changes would save medicare $2.5 billion cumulatively through 2002.

### Laboratory administrative simplification

The proposal would standardize the claims processing system for most laboratory services covered under Part B. The Secretary would select five regional carriers to process claims for all laboratory services, except those furnished in an independent physician's office. Claims would be processed by the regional carrier covering the area where the lab specimen was collected.

The Secretary would also be required to use a negotiated rule-making process to adopt uniform coverage, payment and administration policies for laboratory tests. The proposal would allow regional carriers to implement interim coverage policies in situations where no uniform national policy existed and carriers would be required to respond to excessive or fraudulent spending. The Secretary would review these interim policies every two years and decide whether to incorporate them into national policy. She would also periodically review proposals to change the uniform national policies.

Because there are no data indicating whether employing regional carriers and instituting uniform national policies would result in program costs or savings, CBO estimates that this provision would have no net budgetary effect.

### Pharmaceutical payments

This provision would change the payment basis for drugs and biologicals covered under Part B. Currently, Medicare pays the average wholesale price (AWP) for drugs, which is a price reported by the manufacturer. Under the proposal, Medicare would pay 95 percent of the AWP for all drugs and biologicals covered under Part B, except those paid on a cost or prospective basis. Because the provision has no mechanism for controlling inflation in drug prices, CBO assumes that manufacturers would raise the AWP for their products to compensate for the payment cuts. Nevertheless, the provision would save $0.4 billion over five years.

# EXHIBIT C

S. Hrg. 105–85

# PRESIDENT'S FISCAL YEAR 1998 BUDGET PROPOSAL FOR MEDICARE, MEDICAID, AND WELFARE

# HEARINGS

BEFORE THE

## COMMITTEE ON FINANCE
## UNITED STATES SENATE

ONE HUNDRED FIFTH CONGRESS

FIRST SESSION

WITH VIEWS FROM

CONGRESSIONAL ADVISORY COMMISSIONS;
CONGRESSIONAL BUDGET OFFICE; AND THE
GENERAL ACCOUNTING OFFICE

FEBRUARY 13 AND 27; MARCH 4 AND 5, 1997



Printed for the use of the Committee on Finance

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1997

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-055948-0

.46–CC

105S
FIN

# CONTENTS

**FEBRUARY 13, 1997**

OPENING STATEMENTS

Page

Roth, Hon. William V., Jr., a U.S. Senator from Delaware, chairman, Committee on Finance ........... 1
Moynihan, Hon. Daniel Patrick, a U.S. Senator from New York ........... 2

ADMINISTRATION WITNESSES

Shalala, Hon. Donna E., Ph.D, Secretary of Health and Human Services, Washington, DC ........... 3

**FEBRUARY 27, 1997**

OPENING STATEMENTS

Roth, Hon. William V., Jr., a U.S. Senator from Delaware, chairman, Committee on Finance ........... 39

CONGRESSIONAL WITNESSES

Newhouse, Joseph P., Ph.D., Chairman, Prospective Payment Assessment Commission, Cambridge, MA, accompanied by Donald Young, M.D., Executive Director, Prospective Payment Assessment Commission ........... 40
Wilensky, Hon. Gail R., Ph.D, chairman, Physician Payment Review Commission, Washington, DC, accompanied by Lauren Leroy, Executive Director, Physician Payment Review Commission ........... 44

**MARCH 4, 1997**

OPENING STATEMENTS

Roth, Hon. William V., Jr., a U.S. Senator from Delaware, chairman, Committee on Finance ........... 61

CONGRESSIONAL WITNESSES

Van de Water, Paul N., Ph.D., Assistant Director for Budget Analysis, Congressional Budget Office, Washington, DC, accompanied by Paul Cullinan, Ph.D., Unit Chief, Human Resources Cost Estimates, and Murray Ross, Ph.D., Chief, Health Cost Estimates Unit ........... 62
Ratner, Jonathan, Ph.D., Associate Director, Health Financing and Systems Issues, General Accounting Office, Washington, DC, accompanied by Katheryn Allen, Assistant Director and Richard Jensen, Senior Evaluator ........... 77

(III)

**COMMITTEE ON FINANCE**

WILLIAM V. ROTH, JR., Delaware, Chairman

JOHN H. CHAFEE, Rhode Island
JOHN C. DANFORTH, Iowa
ORRIN G. HATCH, Utah
ALFONSE M. D'AMATO, New York
FRANK H. MURKOWSKI, Alaska
DON NICKLES, Oklahoma
PHIL GRAMM, Texas
TRENT LOTT, Mississippi
JAMES M. JEFFORDS, Vermont
CONNIE MACK, Florida

DANIEL PATRICK MOYNIHAN, New York
MAX BAUCUS, Montana
JOHN D. ROCKEFELLER IV, West Virginia
JOHN BREAUX, Louisiana
KENT CONRAD, North Dakota
BOB GRAHAM, Florida
CAROL MOSELEY-BRAUN, Illinois
RICHARD H. BRYAN, Nevada
J. ROBERT KERREY, Nebraska

LINDY L. PAULL, Staff Director and Chief Counsel
MARK A. PATTERSON, Minority Staff Director and Chief Counsel

(II)

IV

## MARCH 5, 1997

### OPENING STATEMENTS

| | Page |
|---|---|
| Roth, Hon. William V., Jr., a U.S. Senator from Delaware, chairman, Committee on Finance | |
| Moynihan, Hon. Daniel Patrick, a U.S. Senator from New York | |

### PUBLIC WITNESSES

| | Page |
|---|---|
| Baumgarten, Jane, member of the board of directors, American Association of Retired Persons, North Bend, OR | 87 |
| Linden, Todd C., president and chief executive officer, Grinnell Regional Medical Center, Grinnell, IA, on behalf of the American Hospital Association | 88 |
| Nelson, Alan R., M.D., executive vice president, American Society of Internal Medicine, Washington, DC | 90 |
| Schwartz, Seymour I., M.D., chairman of the board of regents, American College of Surgeons, Washington, DC | 92 |
| Size, Tim, executive director, Rural Wisconsin Health Cooperative, Sauk City, WI, on behalf of the National Rural Health Association | 94 |
| | 96 |

### ALPHABETICAL LISTING AND APPENDIX MATERIAL SUBMITTED

| | Page |
|---|---|
| Baucus, Hon. Max: | |
| Letter from GAO, dated October 2, 1995 | 354 |
| Baumgarten, Jane: | |
| Testimony | 88 |
| Prepared statement | 367 |
| Chafee, Hon. John H.: | |
| Prepared statement | 121 |
| D'Amato, Hon. Alfonse: | |
| Prepared statement | 122 |
| Jeffords, Hon. James M.: | |
| Prepared statement | 122 |
| Linden, Todd C.: | |
| Testimony | 90 |
| Prepared statement | 123 |
| Responses to questions from Senator Hatch | 128 |
| Mack, Hon. Connie: | |
| Prepared statement | 128 |
| Moynihan, Hon. Daniel Patrick: | |
| Opening statements | 123 |
| Nelson, Alan R., M.D.: | |
| Testimony | 2, 88 |
| Prepared statement | 92 |
| Responses to questions from Senator Hatch | 130 |
| Newhouse, Joseph P., Ph.D.: | |
| Testimony | 140 |
| Prepared statement | 40 |
| Responses to questions from Senators Jeffords, Mack, and Moynihan | 143 |
| Ratner, Jonathan, Ph.D.: | |
| Testimony | 165 |
| Prepared statement | 77 |
| Roth, Hon. William V., Jr.: | |
| Responses to questions from Senator Murkowski | 170 |
| Opening statements | 181 |
| Schwartz, Seymour I., M.D.: | |
| Testimony | 1, 39, 61, 87 |
| Prepared statement | 94 |
| Shalala, Hon. Donna E., Ph.D.: | |
| Testimony | 183 |
| Prepared statement | 3 |
| Responses to questions from committee members | 203 |
| Size, Tim: | |
| Testimony | 252 |
| Prepared statement | 96 |
| Responses to questions from Senator Kerrey | 284 |
| | 310 |

V

| | Page |
|---|---|
| Van de Water, Paul N., Ph.D.: | |
| Testimony | 62 |
| Prepared statement | 313 |
| Responses to questions from Senators Kerrey, Baucus, and Murkowski | 322 |
| Wilensky, Hon. Gail R., Ph.D.: | |
| Testimony | 44 |
| Prepared statement | 323 |

### COMMUNICATIONS

| | Page |
|---|---|
| American Association of Eye and Ear Hospitals, et al. | 379 |
| Health Industry Distributors Association (HIDA) | 381 |

252

## Senator Rockefeller's Questions:

Q1. Your proposal would not eliminate the 50/50 rule until the Secretary develops a new system of quality measurement. What would you anticipate is the time frame for when you would be ready with these new quality standards?

A1. The answer to this question is as follows:

- The Administration's bill is proposed to replace the 50/50 rule with a quality performance measurement system. In the interim, the Secretary would have additional authority to waive the 50/50 rule (e.g., for plans with good track records) including broad, general waiver authority.

- The bill would require that a proposed rule for this quality performance measurement system be published by July 1998. The 50/50 rule would not be repealed until the final rule for the system is published.

- HCFA currently has several initiatives that address quality and performance improvement that will help us to develop a state-of-the-art quality measurement system that would replace the 50/50 rule.

These initiatives include --

- HEDIS. Medicare managed care plans are required to report on performance measures from the Health Plan Employer Data and Information Set 3.0 (HEDIS 3.0) including measures specific to the Medicare population.

- MEDICARE CAHPS. Medicare managed care plans also are required to participate in an independently administered Medicare beneficiary satisfaction survey, the Medicare version of the Consumer Assessments of Health Plans Study (Medicare CAHPS).

The HEDIS 3.0 and Medicare CAHPS requirements were effective January 1, 1997. Data reported from HEDIS 3.0 and Medicare CAHPS will be used to help Medicare beneficiaries choose among plans; to serve as a monitoring tool for HCFA and the Peer Review Organizations (PROs); and to facilitate internal quality improvement of plans.

- FAcct. The Foundation for Accountability (FAcct) is a new non-profit organization dedicated to helping purchasers and consumers obtain the patient-oriented quality information they need to make better decisions about health plans and providers. HCFA is one of the Federal liaisons to the FAcct Board of Trustees, which is comprised of public and private sector purchasers. FAcct

Rockefeller - 1

---

253

is dedicated to the proposition that the health care marketplace will function best if consumers make quality-oriented decisions. This will be achieved by providing consumers usable information on quality. Specifically, FAcct endorses and promotes a common set of patient-oriented measures of health care quality.

Together, HCFA and AHCPR have played major roles in the development of FAcct quality measures for depression, breast cancer and diabetes. HCFA and the Assistant Secretary for Planning and Evaluation also recently contracted with the RAND Corporation, a non-profit research organization, to refine and test three sets of outcome measures for implementation in 1998.

- MMCQIP. The Medicare Managed Care Quality Improvement Project (MMCQIP) is designed to enhance HCFA's ability to assess how well the ambulatory care process in managed care is meeting the needs of beneficiaries. At this time, we are evaluating the care received by Medicare managed care plan enrollees diagnosed with diabetes mellitus, and the incidence of screening mammography in a sample of enrolled beneficiaries. The Peer Review Organizations in five states (California, Florida, New York, Pennsylvania and Minnesota) and 23 Medicare-contracting HMOs are collaborating on MMCQIP.

- Medicare Choices Demonstration/Encounter Data. An important component of this demonstration is improvement in our comprehensive quality monitoring system. Under the Choices project, we will be developing and testing quality/outcomes and risk adjustment measurements systems that use encounter data (health care services received by enrollees); all participating plans will be required to provide 100 percent encounter data. We have contracted with the RAND Corporation to assist us in designing such a system, which will be refined further using the "Choices" data.

- QISMC. The objective of the Quality Improvement System for Managed Care (QISMC) project is to design a new approach to the oversight of the quality improvement activities of managed care plans that serve Medicare and Medicaid beneficiaries. QISMC will define and elaborate HCFA's expectations with regard to plans' quality improvement, with a particular focus on demonstrable, measurable improvement.

Q2. I would also be very interested in comments from HHS on the quality standards that Senator Frist and I have specified in our PSO legislation. Are there any deficiencies in our quality standards, and if there are, I would appreciate specific ideas for improving them.

A2. In general, the quality standards that you and Senator Frist have included in your PSO

Rockefeller - 2

255

legislation (S. 146) are consistent with the current standards that we apply to HMOs. However, we have concerns that your bill will place many of the standards that are now in regulations or manuals in statute, with unforeseeable consequences for how easily such standards can be revised to reflect future changes in the fields of quality improvement and performance measurement. Your bill would also require more than is currently required of other plan types with regard to making performance on outcome measures available to beneficiaries. HCFA has plans to make such information available in the future.

254

**Senator Baucus' Questions:**

Q1.   As you know, many rural hospitals in Montana are operating under a demonstration project called the Montana Medical Assistance Facility (MAF), which has been very successful. Does the Administration have details yet on what type of limited-service hospital program they propose? Will it be similar to the MAF? Please expand on the other rural health provisions in the President's budget.

A1.   The FY 1998 budget includes a limited-service hospital provision which expands the current Rural Primary Care Hospital program (RPCH) to all fifty states so that rural areas across the country could benefit from these services. This program incorporates many of the best features of the current RPCH and MAF programs. It broadens the current definition of eligible hospitals by increasing the size limitation for RPCHs to allow up to 15 inpatient beds. It also deletes the provision requiring that a RPCH had to have met the hospital requirements before applying for designation, and allows RPCHs to utilize all of their beds (up to a maximum of 15) as swing-beds if they have a swing-bed agreement. In addition, based on the MAF experience the limited service hospitals created under this provision would have an increased length of stay limitation of 96 hours, and expanded options for referral relationships and eliminating the Essential Access Community Hospital (EACH) designation while grandfathering current EACHs. All Montana Medical Assistance Facilities would be grandfathered as RPCHs. Other rural health provisions included in the budget include:

**Revised managed care payment methodology.** The payment methodology for HMOs would be modified so that those serving Medicare beneficiaries in rural areas would receive the greater of either a minimum payment amount ($350 in 1998) or a blend of their local rate and a national rate. The increasing payment rates in rural areas, combined with provisions in the President's Budget which allow Medicare to contract with provider sponsored organizations (PSOs) could encourage more managed care plans to enter rural markets and should result in increased availability of managed care in rural areas.

**Sole Community Hospital Rebasing.** Sole Community Hospitals (SCHs) are currently paid based on the highest of three base years: a 1982 hospital-specific rate, a 1987 hospital-specific rate or the Federal Rate. The Budget would add a fourth option for a base year which would consist of the average of 1994 and 1995 hospital-specific costs. This option would provide more updated payment rates for SCHs whose costs have significantly changed in recent years and would still allow hospitals to retain their more advantageous 1982 or 1987 hospital-specific rates.

**Medicare Dependent Hospital Reinstatement.** This would reinstate the Medicare Dependent Hospital program (MDH) for rural hospitals beginning with cost reporting periods on or after October 1, 1998. To be eligible, rural hospitals must have fewer than 100 beds and a Medicare share of inpatient days or discharges of 60 percent or more. This program was established under the Omnibus Budget Reconciliation Act of 1989, but lapsed September 1, 1994.

**Rural Referral Centers.** Rural Referral Centers (RRCs) designated as such on September 30, 1994 would continue to be designated as RRCs for FY 1995 and subsequent years. In addition, the budget would establish a tiered approach to exemption from the 108 percent threshold requirements for wage index reclassification for hospitals between 100 and 108 percent of the average wages in the rural area in which the RRC is located, thus facilitating their ability to be reclassified.

**Graduate Medical Education.** Medicare would have the authority to pay federally qualified health centers (FQHCs) and rural health clinics (RHCs) directly for certain graduate medical education (GME) expenses. Currently, Medicare only has authority to pay hospitals for GME expenses. To be eligible for these payments, FQHCs and RHCs would have to participate in an accredited GME program and pay the residents' salaries for time spent in the clinic setting.

**Payments for Midlevel Practitioners.** This provision would provide for direct payment by Medicare to physician assistants, nurse practitioners, and clinical nurse specialists in home and ambulatory settings in which a facility or provider fee is not billed. This will help attract and retain necessary allied health professionals to medically underserved areas.

**Q2.** Many Medicare reform proposals rely on managed care as a way to make the program more efficient. But as you know, there's not a lot of managed care in Montana. Moreover the Administration has compiled many reports concluding that healthier people tend to join HMOs. I'm worried that as more Medicare recipients move into managed care, seniors in Montana will have no choice but fee-for-service. And if favorable selection occurs in Medicare managed care, the fee-for-service program may become expensive to the Federal Government and the target for more cuts. Could you please elaborate on how the Clinton would address the flaw in Medicare's Payment methodology for managed care?

**A2.** There is widespread agreement that under the current methodology, Medicare overpays HMOs because, on average, beneficiaries in HMOs are healthier than the average Medicare beneficiary, a phenomenon known as "favorable selection." Research indicates that if HMO enrollees were receiving care under fee-for-service Medicare, Medicare's costs would be between 87.6 and 89.9 percent of costs of an average-fee-for-service beneficiary. Under the current methodology Medicare pays 95 percent of projected fee-for-service costs.

The General Accounting Office, the Physician Payment Review Commission (PPRC), and the Prospective Payment Assessment Commission (ProPAC) among others recommend changes to address this matter. The President's budget envisions a two-step approach to adjusting managed care plan payments for favorable selection. First, in 2000, the President proposed to reduce payments from 95 percent to 90 percent of projected fee-for-service costs. Second, we are developing a new payment methodology that incorporates health status adjusters. Under risk adjusters that we will be testing under our demonstration authority, payment would be significantly increased for sicker enrollees and reduced for healthy enrollees. Thus, incentives to enroll only healthy beneficiaries and to avoid enrolling

Baucus - 2

256

beneficiaries with health problems would be significantly reduced. For example, under one approach:

• For a 70-year old woman in poor health (with conditions like bladder cancer, cardiomyopathy and asthma), Medicare's payment would be almost 3 times the payment under a model similar to the current AAPCC (adjusted average per capita cost) methodology ($11,318 vs. $4,007).

• However, Medicare's payment for a 70-year old woman in good health would be about one-half the payment under the AAPCC-like model ($1,948 vs. $4,007).

We hope to have a proposal ready for Congressional action as early a 1999, with phase-in beginning as early as 2001.

The President's budget also includes provisions that would enable Provider-Sponsored Organizations (PSOs) and Preferred Provider Organizations (PPOs) to contract to enroll Medicare beneficiaries. We believe that increasing the types of entities that can contract to provide comprehensive services to Medicare beneficiaries should make managed care more widely available. In particular, many believe that the creation of a PSO option in Medicare will increase the availability of managed care in rural areas.

257

Baucus - 3

258

**Senator Breaux's Questions:**

**Q1.** What kind of long-term structuring of the Medicare system will the Administration propose to get us beyond 2007 when the real problems begin?

**A1.** The President's Budget proposal extends the life of the Hospital Insurance Trust Fund through the next ten years, without increasing costs to beneficiaries. Enacting the President's plan will extend Trust Fund solvency immediately and give Congress and the Administration time to develop and consider options for long-term solvency. Many groups, including the Medicare Trustees, have recommended the establishment of a national advisory group to help develop recommendations to address the long-term financing problem.

**Q2.** In addition to moving home health and skilled nursing facilities to a prospective payment system, what can the Administration do to prevent spiraling costs in other parts of Medicare?

**A2.** The Administration has a two-pronged strategy: first, to increase the number of Medicare beneficiaries enrolled with capitated risk plans and to increase the range and types of plan choices available to Medicare beneficiaries; and second, to be a more prudent purchaser in paying for services in fee-for-service Medicare.

The Administration can make more choices among capitated plans available to Medicare beneficiaries and increase the attractiveness of enrollment in settings where there are incentives to control the volume of services. The range of choice should include point-of-service HMOs, preferred provider plans, and physician hospital organizations as included in the President's budget plan. In addition, the Administration is exploring alternative ways to pay Medicare risk plans such as competitive bidding and risk adjustment strategies which are being explored in the Medicare Choices and our Competitive Bidding Demonstrations.

The Administration's goal with respect to reforming Medicare fee-for-service payment policies is to make Medicare an accountable purchaser of health care services by introducing ideas that have worked in the private sector, such as high cost case management and competitive bidding for lab services and durable medical equipment. To that end, Medicare payment policies are moving away from cost-based reimbursement. In addition to expanding prospective payment systems to include other providers, the Administration intends to develop an integrated prospective payment system for all post-acute care settings, including SNF, HH, and rehabilitation and long-term care hospitals.

In addition, we are proposing to re-define a hospital transfer to include transfers to other post-acute inpatient settings such as rehabilitation and long-term care (LTC) hospitals and SNFs. This will reduce the rate to recapture savings from changes in medical practice that have increased the use of post-acute care. These changes have resulted in Medicare paying twice for care that, in the past, would have been provided in the hospital; now we pay once in the hospital and again in the post-acute setting.

Furthermore, we are currently conducting demonstrations to test competitive bidding for durable medical equipment (DME) and competitive pricing for managed care contracts. The President's budget proposal would give HCFA permanent authority to implement competitive bidding for DME.

259

**Senator Kerrey's Questions:**

**Q1.** Please provide background information on your income-distribution statistics for the elderly. For example, what income sources are included in these figures? Do these statistics include all income available to the elderly, including Supplemental Security Income payment?

**A1.** More than three-quarters of elderly Medicare beneficiaries reported incomes of $25,000 or less, with 29 percent reporting incomes less than $10,000. In determining these figures, we define income to include all sources. Income represents total gross income, and includes pensions, Social Security Railroad Retirement, SSI and disability payments; the cash value of food stamps and public assistance payments; capital gains, annuities, VA and Workers' Compensation benefits; interest, dividends, and work-related income. We collect data on the income of the beneficiary, and spouse, if applicable.

**Q2.** I am extremely concerned about the impact your per capita cap proposal will have on States with high per capita growth rates like Nebraska. How will these States be able to live within the cap on Federal matching payments? How will States be able to cope with older, sicker beneficiaries-- particularly as the costs of care for these individuals continue to increase without regard to the growth rates that the cap would apply to Federal matching payments?

**A2.** Over the five year period of the President's budget, Medicaid spending in each State will be able to grow at an average of 5 percent based on 1996 spending. This growth rate is close to the annual growth rate CBO is projecting for private insurance on a per person basis.

Each State's aggregate cap would reflect the sum of per capita costs for the four categories: seniors, people with disabilities, adults and children. Each State would have a single total limit, so a State such as Nebraska with increased costs in a certain category, could use savings from one group to support expenditures for other groups or to expand benefits or coverage.

If enrollment in these categories increases, the total and Federal limit would increase automatically because the aggregate limit is calculated on a per-person basis. If enrollment shifts to more expensive populations such as seniors, then the total limit would increase automatically.

This analysis may be affected by policy changes negotiated in upcoming bipartisan budget talks.

**Q3.** How will States like Nebraska, which currently have little managed care in sparsely populated rural areas, be able to find sufficient savings to manage under limits to Federal matching payments?

Kerrey - 1

260

A3. The President's plan includes a provision to help foster managed care in rural areas by allowing States to restrict beneficiary choice of a plan as long as the beneficiary has choice of providers within a given plan. In addition, the President's plan improves State's flexibility to better manage their Medicaid programs. Under the President's plan, States would have greater flexibility with respect to provider payments, program eligibility, long-term care, and administrative requirements. Under the President's plan States would be allowed to target DSH payment to a range of essential community providers, to move populations into managed care, to move populations needing long-term care from nursing homes to home and community-based care. Furthermore, the President's plan repeals the "Boren amendment" for hospitals and nursing homes and mandatory cost-based reimbursement for health clinics. We believe this additional flexibility will help States reduce costs and operate more efficient Medicaid managed care programs.

Q4. Can you provide more detail on your proposal to reduce disproportionate share hospital (DSH) payments? What impact will this proposal have on low DSH states? On high DSH states?

A4. The Administration's policy as presented in the President's budget request, essentially freezes DSH spending in 1998 at 1995 levels, with a gradual decline to $8 billion in spending for FY 2000-2002. These DSH savings are achieved by taking an equal percentage reduction off of States' 1995 DSH spending levels, up to an "upper limit." If a State's DSH spending is greater than 12 percent of total Medicaid spending in that State (High DSH State), the equal percentage reduction is subtracted from the first 12 percent rather than the full DSH spending amount. This "upper limit" maintains the policy balance struck by Congress in the DSH provisions it enacted in 1991 and 1993, which recognized that some States' Medicaid programs are particularly dependent on DSH spending. Low DSH States would take the reductions from their annual DSH 1995 spending. This "upper limit" policy ensures that the few States with high DSH spending are not bearing a disproportionate share of the impact of the savings policy.

The Administration has always said that DSH dollars should be targeted to the providers that need them most: those hospitals and other providers that disproportionately serve a high volume of Medicaid patients, the uninsured, and low-income people. Our policy this year is no different. We support better targeting of DSH funds and look forward to working with Congress and interested parties to do this.

To respond to the special needs of critical safety net providers, the President's plan includes a temporary fund of about $1.4 billion to help cover the cost of care delivered in Federally Qualified Health Centers (FQHCs) and Rural Health Centers (RHCs). Also, there is a critical safety net provider pool of about $1 billion to assist States and safety net providers who are disproportionately affected by Medicaid savings. We believe these supplemental funds are necessary during the transition to a per capita cap, particularly in view of our proposal to end the requirement that States reimburse FQHCs and RHCs on a cost basis. This proposal would

261

become effective in FY 1999.

This analysis may be affected by policy changes negotiated in upcoming bipartisan budget talks.

Q5. You state that you will implement new quality data standards for Medicaid managed care plans. How will this data be used? Will you have any standards beyond data collection such as minimum plan performance standards or requirements for state-level quality assurance programs?

A5. We are developing new quality data standards as part of the President's 1998 Budget bill. The new quality data standards, developed in conjunction with States, would be used to measure plan and state performance with respect to Medicaid managed care. States would be required to provide HCFA with quality assurance plans which could include a number of elements such as a grievance process, a comparative report card of health plan performance; and reporting of encounter data.

Under the quality assurance plan, a number of indicators or performance standards would be monitored and assessed annually by States. Plans would be required to meet a range of "benchmarks" or "thresholds" that could be established for a given indicator, such as immunization rates, C-section rates, and low birth weight rates. The success of providers in meeting these quantifiable performance goals would affect the contractual relationship between the health plan and the State Medicaid program.

By requiring all States and all Medicaid managed care plans to report data on a core set of performance measures, HCFA can evaluate and compare Medicaid managed care plans within and across States. The new quality data standards would provide a better means for holding plans and States accountable for services provided under their Medicaid managed care programs.

Q6. In your testimony, you reference a new quality management system for Medicare and Medicaid and the use of "modern quality measures." Can you be more specific about what kind of quality information will be available to Medicare HMO enrollees? Will quality performance be a condition of contracting with the Medicare program?

A6. The Administration's bill proposed to replace the 50/50 rule with a state-of-the-art quality performance measurement system. In the interim, the Secretary would have additional authority to waive the 50/50 rule (e.g., for plans with good track records) including broad, general waiver authority.

• The bill would require that a proposed rule for this quality performance measurement system be published by July 1998. The 50/50 rule would not be repealed until the final rule for the system is published.

262

HCFA currently has several initiatives that address quality and performance improvement that will help us to develop this state-of-the-art quality measurement system.

These initiatives include --

- HEDIS. Medicare managed care plans are required to report on performance measures from the Health Plan Employer Data and Information Set 3.0 (HEDIS 3.0) including measures specific to the Medicare population.

- MEDICARE CAHPS. Medicare managed care plans are also required to participate in an independently-administered Medicare beneficiary satisfaction survey, the Medicare version of the Consumer Assessments of Health Plans Study (Medicare CAHPS).

The HEDIS 3.0 and Medicare CAHPS requirements were effective January 1, 1997. Data reported from HEDIS 3.0 and Medicare CAHPS will be used to help Medicare beneficiaries choose among plans; to serve as a monitoring tool for HCFA and the Peer Review Organizations (PROs); and to facilitate internal quality improvement of plans.

- FAcct. The Foundation for Accountability (FAcct) is a new non-profit organization dedicated to helping purchasers and consumers obtain the patient-oriented quality information they need to make better decisions about health plans and providers. HCFA is one of the Federal liaisons to the FAcct Board of Trustees, which is comprised of public and private sector purchasers. FAcct is dedicated to the proposition that the health care marketplace will function best if consumers make quality-oriented decisions; this will be achieved by providing consumers patient-oriented quality information. Specifically, FAcct endorses and promotes a common set of patient-oriented measures of health care quality.

Together, HCFA and AHCPR have played major roles in the development of FAcct quality measures for depression, breast cancer and diabetes. HCFA and the Assistant Secretary for Planning and Evaluation also recently contracted with the RAND Corporation, a non-profit research organization, to refine and test three sets of outcome measures for implementation in 1998.

- MMCQIP. The Medicare Managed Care Quality Improvement Project (MMCQIP) is designed to enhance HCFA's ability to assess how well the ambulatory care process in managed care is meeting the needs of beneficiaries. At this time, we are evaluating the care received by Medicare managed care plan enrollees diagnosed with diabetes mellitus, and the incidence of screening

263

mammography in a sample of enrolled beneficiaries. The PROs in five states (California, Florida, New York, Pennsylvania and Minnesota) and 23 Medicare-contracting HMOs are collaborating on MMCQIP.

- Medicare Choices Demonstration/Encounter Data. An important component of this demonstration is improvement in our comprehensive quality monitoring system. Under the Choices project, we will be developing and testing quality/outcomes and risk adjustment measurements systems that use encounter data (health care services received by enrollees); all participating plans will be required to provide 100 percent encounter data. We have contracted with the RAND Corporation to assist us in designing such a system, which will be refined further using the "Choices" data.

- QISMC. The objective of the Quality Improvement System for Managed Care (QISMC) project is to design a new approach to the oversight of the quality improvement activities of managed care plans that serve Medicare and Medicaid beneficiaries. QISMC will define and elaborate HCFA's expectations with regard to plans' quality improvement, with a particular focus on demonstrable, measurable improvement.

Before contracting with an HMO, HCFA conducts an on-site review including a review of the plan's quality assurance systems. Once a contract has been awarded, HCFA regularly monitors plans to ensure that quality care is delivered to beneficiaries. In addition, HCFA plans to utilize the performance measurements provided through Medicare HEDIS and CAHPS described above in its monitoring efforts.

Under the President's budget, plans that do not meet the requirements of the quality measurement system would be subject to termination.

265

**Senator Murkowski's Question:**

Q1:   What assurances can I get from HCFA that the President recognizes this program as a vital and efficient program for Alaskans?

A1:   The President's budget proposal to cap the number of residents on a hospital-specific basis is intended to stop the growth in the number of residents nationwide. However, we realize that because of the geographic maldistribution of physicians, particularly in rural areas, certain exceptions to this cap would be appropriate. We would not want this cap to inhibit creative solutions to recruiting physicians to underserved areas, which is why the Administration is currently working on a limited exceptions policy for the resident cap. We would be happy to work with your staff to ensure that this policy meets the needs of the Alaska residency program.

Murkowski - 1

264

**Senator Hatch's Questions:**

Q1:   The President's FY 1998 Budget proposes to reduce reimbursement for prescription drugs prescribed in a physician's office and reimbursed by Medicare. What is your rationale for this new policy?

A1:   While Medicare does not have an expansive outpatient drug benefit, it does cover outpatient injectable drugs that are furnished by a physician and certain drugs that are administered with durable medical equipment. In 1992, the Medicare-allowed charges for these drugs were $680 million. In 1995, allowed charges were $1.8 billion, an increase of over 250 percent in only three years.

Medicare pays the "average wholesale price" (AWP) for covered drugs. However, the AWP is not the average price actually charged by wholesalers to their customers. Rather, it is a "sticker" price set by drug manufacturers and published in several commercial catalogs. As a result, the HHS Inspector General estimates that Medicare currently pays 15 to 30 percent more because the physician is marking up the drug when the manufacturer charges the patient less than the average wholesale price. We believe that physicians should be paid for their professional services and not derive a profit from drugs furnished incident to their professional services. Also, the current payment rules for drugs allow an increase in the AWP even if the cost to the physician remains constant. This creates an incentive for physicians to furnish the most profitable drugs. Our proposal would remove this incentive so that the decision to furnish a particular drug is more directly based on medical considerations.

Q2:   How would this new policy work? How would HCFA determine acquisition costs? How would HCFA determine the median national cost that is to be the cap for payment on each drug? How will this program be administered and what will be the costs in dollars and FTEs?

A2:   Effective January 1, 1998, the Administration's proposal would eliminate the mark-up for drugs by basing Medicare's payment on the provider's acquisition cost of the drug. Effective January 1, 2000, payments for a particular drug would not be allowed to exceed the national median cost of that drug.

Under the proposed policy, physicians would report their acquisition cost for each drug on the claim submitted for reimbursement. Physicians, rather than HCFA, would determine the acquisition cost. The median limit would be implemented based on actual costs reported for each drug for 12-month periods beginning July 1, 1998. Median limits have been implemented for other Part B services (e.g., clinical diagnostic laboratory services and durable medical equipment). Carriers report the data to HCFA and the median is calculated for each code in HCFA Central Office. The median for each code is then furnished to all carriers to be used as part of the payment screens developed for the following January. We do not have dollar or FTE estimates for the costs of administering this policy, but since HCFA has

Hatch - 1