**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) ) ) ) | MDL NO. 1456 Civil Action No. 01-12257-PBS Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 ) ) ) ) |  |

**TRACK ONE DEFENDANTS' MEMORANDUM ADDRESSING
CLASS PLAINTIFFS' "PLAIN MEANING" ARGUMENT**

The Track One Defendants respectfully request permission to submit this very brief response to plaintiffs' contention at oral argument on May 23, 2006 that the Court should adopt a "plain meaning" construction of the term "average wholesale price" ("AWP") in the Medicare statute.

A.   Why "Plain Meaning" Makes No Sense

Four simple points illustrate why adoption of a "plain meaning" of the term AWP, *i.e.*, that Congress intended "AWP" to mean some actual average of wholesaler prices to customers, is fundamentally inconsistent with the statute and produces unreasonable results.[1]

**First**, if Congress intended AWP to refer to an actual average of wholesaler prices to physicians, it necessarily follows that Congress intended physicians would be reimbursed at 5% <u>less</u> than their average actual acquisition costs (95% of AWP) and in 2004 that physicians would be reimbursed at 15% <u>less</u> than their average actual acquisition costs (85% of AWP).[2] Such an approach, of course, would have destroyed the very purpose of Part B. Providers could

---

[1] *See e.g.*, *Rowland v. California Men's Colony,* 506 U.S. 194 (1993) (interpreting the meaning of the word "context" in 1 U.S.C. Sec. 1 in light of "the common mandate of statutory construction to avoid absurd results"); *American Tobacco Co. v. Patterson,* 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible."); *Perry v. Commerce Loan Co.*, 383 U.S. 392 (1966) ("When [the plain] meaning has led to absurd or futile results,… the court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one plainly at variance with the policy of the legislation as a whole the Supreme Court has followed that purpose, rather than the literal words."); *Greenwood Trust Co. v. Commonwealth of Mass.*, 971 F.2d 818, 824 (1st Cir. 1992) ("[W]e should not wear blinders: if there is 'good reason to believe' that Congress intended to deviate from the ordinary meaning of the language selected, then a reviewing court must follow the congressional lead.").

[2] These changes in reimbursement rates were an attempt to reduce the level of provider cost recovery given the previously reported size of provider spreads on certain drugs. *See* Balanced Budget Act of 1997, Report of the Committee on the Budget of the House of Representatives (June 24, 1997), Fowler Ex. 42; Joint 56.1 Stmt. ¶ 45 ("The Office of Inspector General reports that Medicare reimbursement for the top 10 oncology drugs ranges from 20 percent to nearly 1000 percent per dosage more than acquisition costs"). However, there is nothing to suggest that Congress sought to undermine the viability of the Part B system with a formula that reimbursed doctors at less than cost.

not have functioned under a system in which they were being reimbursed at less than even the pure acquisition cost of the drug (putting aside all of their other related costs).

**Second**, plaintiffs' proposed "plain meaning" construction of the term AWP in Part B would have created fundamentally contradictory reimbursement systems. Many contracts and programs in both the private and public sector were in 1997, as they are today, based on the understanding that AWP is significantly above acquisition cost. Private payors utilize AWP in establishing reimbursement levels based on a formula of AWP minus some percentage.[3] Reimbursement under state Medicaid statutes worked the same way.[4] It is not reasonable to suggest that Congress intended the industry to operate on different and contradictory understandings of AWP. Chaos would have ensued had this been Congress' intent. This did not happen because there was a <u>consistent</u> use of AWP by Congress, HHS, the states, and private payors.

**Third**, the industry has relied on the understanding that Congress intended to use AWP the way the industry uses it. If Congress had intended something different, one would have expected a very clear statement to that effect in the statute and comprehensive instructions on how to determine AWP. Nothing in Part B, by statute or regulation, provides any guidance as to how average wholesaler prices are supposed to be calculated or reported for purposes of Part B reimbursement. In stark contrast, when Congress adopted a "best price" requirement in 1991 for Medicaid and a reimbursement system based on "average selling price" ("ASP") in 2005 for Medicare Part B, extensive regulations and agency guidance were issued as to how "best price,"

---

[3] *See e.g.*, Report of Independent Expert Ernst R. Berndt to Judge Patti B. Saris ¶¶ 220-221

[4] *See, e.g.*, Idaho Admin. Code § 16.03.09.817.04 (reimbursement for prescription drugs shall be AWP minus 12 percent – plus the dispensing fee, or the pharmacy's usual and customary charge to the general public, including advertised specials); 907 Ky. Admin. Regs. 3:010 (reimbursement for physician administered drugs shall be the lesser of the "Actual billed charged" or "Average wholesale price (AWP) minus ten (10) percent"); Vt. Code R. 3303.3 (for drugs other than multiple source, "the price for ingredients will be 88.1 percent of the Average Wholesale Price (AWP less 11.9 percent)").

"Average Manufacturer Price" and ASP should be calculated and reported.  These are not simple tasks.  More than a year into ASP, OIG and CMS still cannot agree on how ASP should be calculated.  *See ASP Calculation Rankles IG; Drugs to Face Dropping Reimbursement Rates?,* "The Pink Sheet" May 8, 2006, at 9, attached as Exhibit 1 hereto.  Even assuming manufacturers could have gotten access to actual wholesaler prices to third parties, the relevant federal agencies would have been required to address a host of issues if plaintiffs' proposed "plain meaning" construction were correct.[5]

**Fourth**, the United States has represented in open court that Congress did not intend AWP to have a "plain meaning" of an actual average of wholesale prices.  In the Government's unsuccessful prosecution of a criminal case against individual employees of TAP, the lead prosecutor granted as a "historical fact" that Congress expected a spread between AWP and actual acquisition cost.  *See United States v. MacKenzie*, CR-01-10350-DPW (June 24, 2004) at pp. 67-68.

In fact, the Government in *MacKenzie* did attempt to argue that Congress meant AWP to be the published list price plus 25% and therefore, discounts to physicians below the published list price were unlawful kickbacks (absent disclosure by TAP to the government).  Judge Woodlock rejected this argument in charging the jury, given the existence of a long standing, express regulatory "safe harbor" for such discounts.  *See United States v. MacKenzie*, CR-01-10350-DPW (July 9, 2004) at pp. 50-51.  Moreover, as defendants demonstrated in their

---

[5]  For example, should AWPs be adjusted daily, weekly, monthly, quarterly, annually?  Should the adjustment take account of hospital discounts, government discounts, and discounts given to class members, or should these discounts be excluded?  How would one account for volume-based rebates where the ultimate selling price remains indeterminate until the end of the contract period when the volume of sales becomes known?  Should the adjusted AWPs be calculated on a per-unit basis for all NDCs in a product line, or should they be calculated separately for each NDC?  Is the adjusted AWP for private payors the same as the adjusted AWP for Medicaid?  Is it the same as the AWP for Medicare?

joint submissions, Congress understood that in some cases these discounts exceeded 1000% (*see, e.g.*, fn. 2, supra).

**B.     So What Did Congress Intend?**

When HCFA first used the term AWP in 1991 regulation and Congress used it in the Balanced Budget Act ("BBA") of 1997, they adopted a well-established and widely used industry term of art.  Thus, HCFA directed its carriers to use industry publications such as the Red Book to determine AWPs,[6] even though it understood that "the Red Book and other wholesale price guides substantially overstate the true cost of drugs."[7]  Similarly, in considering the BBA of 1997, the House Committee on the Budget stated:  "The Committee intends that the Secretary, in determining average wholesale price, should take into consideration commercially available information including such information as may be published or reported in various commercial publishing services" – even though it understood that this resulted in reimbursement that range "from 20% to nearly 1000% per dosage more than acquisition costs."[8]

Consistent with the foregoing, the Congressional Budget Office ("CBO") has stated:

> The AWP is a publicly available, suggested list price for sales of a drug by a wholesaler to a pharmacy or other provider.  <u>It is not the actual price that wholesalers charge</u> but serves more like a sticker price in the automobile industry.  <u>It was chosen as the reference price for this analysis because it is commonly used in pharmaceutical transactions</u>.[9]  (Emphasis added).

The CBO's statement is consistent with the way industry, private payors, state Medicaid offices, Congress, federal agencies and U.S. Presidents and their staffs have long used

---

[6]    Fowler Decl. Exh. 29.

[7]    Fowler Decl. Exh. 19 at 25.

[8]    Fowler Decl. Exh. 42 at 1354.

[9]    Edwards 4/28/06 Decl. Exh. D at 4.

the term "AWP."  Quite simply, neither HCFA nor Congress intended or understood AWP in Part B to refer to an "actual price that wholesalers charge."

                    Respectfully submitted,

                    /s John T. Montgomery
                    John T. Montgomery (BBO#352220)
                    Steven A. Kaufman (BBO#262230)
                    Eric P. Christofferson (BBO#654087)
                    Ropes & Gray LLP
                    One International Place
                    Boston, Massachusetts 02110-2624
                    (617) 951-7000

                    *Attorneys for Schering-Plough Corporation and Warrick Pharmaceuticals Corporation on behalf of the Track 1 Defendants*

Dated:  May 30, 2006

## CERTIFICATE OF SERVICE

       I certify that on May 30, 2006 a true and correct copy of the foregoing Track One Defendants' Memorandum Addressing Class Plaintiffs' "Plain Meaning" Argument was served on all counsel via Lexis/Nexis.

                                        /s/ Eric P. Christofferson
                                          Eric P. Christofferson