UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | M.D.L. No. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIV. ACTION NO. 01-12257-PBS |
|  | ) | |

## AFFIDAVIT OF KATHERINE KINSELLA

I, Katherine Kinsella, being duly sworn, hereby declare as follows:

1. I am President of Kinsella/Novak Communications, Ltd. ("KNC"), an advertising and notification consulting firm in Washington, D.C. specializing in the design and implementation of class action and bankruptcy notification programs to reach unidentified putative class members primarily in consumer and mass tort litigation. My business address is 2120 L Street, NW, Suite 205, Washington, D.C. 20037. My telephone number is (202) 686-4111.

2. I submit this affidavit at the request of Plaintiffs' Counsel in connection with *In Re: Pharmaceutical Industry Average Wholesale Price Litigation* pending in the United States District Court, District of Massachusetts.

3. This affidavit is based upon my personal knowledge and upon information provided by Plaintiff's Counsel, my associates and staff. The information is of a type reasonably relied upon in the fields of advertising, media and communications.

4. KNC has developed and directed some of the largest and most complex national notification programs in the country. The scope of the firm's work includes notification programs in antitrust, bankruptcy, consumer fraud, mass tort and product liability litigation. Specific cases have involved, among others, asbestos, breast implants, home siding and roofing products, infant formula, pharmaceuticals, polybutylene plumbing, tobacco and Holocaust claims. The firm has developed or consulted on over 250 notification programs, placing over $135 million in media notice. Selected cases include:

   **Antitrust**

   *In re Nasdaq Market-Makers Antitrust Litigation,* No. M21-68, 94 CV 3996,

   MDL No. 1203 (S.D.N.Y.) (securities)

1

*State of Connecticut v. Mylan Laboratories, Inc.*, MDL No. 1290, Misc. No. 99-276 (D.D.C.) (pharmaceuticals)

*In re Toys "R" Us Antitrust Litigation* MDL No. 1211, Master File No. CV-97-5750 (E.D.N.Y.) (toys and other products)

*State of Florida v. Nine West Group, Inc.*, Civil Action No. 00 CV 1707 (S.D.N.Y) (shoes)

*In re Cardizem Antitrust Litigation,* 200 F.R.D. 326 (E.D. Mich.) (Cardizem)

*In re Buspirone Antitrust Litigation,* MDL No. 1413 (S.D.N.Y.) (Buspar)

*State of Ohio vs. Bristol-Myers Squibb, Co.,* 1:02-CV-01080 (D.D.C.) (Taxol)

*Raz v. Archer Daniels Midland Co., Inc.,* No. 96-CV-009729 (Wis. Cir. Ct. Milwaukee County) (citric acid)

*In re Compact Disc Minimum Advertised Price Antitrust Litigation,* MDL No. 1361 (prerecorded music products)

*Kelley Supply, Inc. v. Eastman Chemical Co.,* No. 99CV001528 (Wis. Cir. Ct., Dane County) (Sorbates)

*Giral v. Hoffman-LaRoche Ltd.,* C.A. No. 98 CA 7467 (vitamins)

**Consumer**

*Burch v. American Home Products Corp.,* No. 97-C-204 (1-11) (W.Va. Cir. Ct., Brooke County) (Fen Phen)

*Woosley v. State of California,* No. CA 000499 (Cal. Super. Ct. Los Angeles County) (automobiles)

*Fettke v. McDonald's Corp.,* Case No. 044109 (Cal. Super. Ct., Marin County) and *BanTransFat.com v. McDonald's Corp.,* Case No. 034828 (Cal.

Super. Ct., Marin County) (trans fatty acids)

*Weiner v. Cal-Shake, Inc.*, J.C.C.P. No. 4208 (Cal. Super. Ct., Contra Costa County) (roofing product)

*Galanti v. The Goodyear Tire & Rubber Company*, Case No. 03-209 (D.N.J.) (radiant heating)

## Discrimination

*McNeil v. American General Life and Accident Insurance Co.*, No. 8-99-1157 (M.D. Tenn.) (insurance)

*Nealy v. Woodmen of the World Life Insurance Co.*, No. 3:93 CV-536 BN (S.D. Miss.) (insurance)

## Mass Tort

*In re Holocaust Victim Assets Litigation*, No. CV 96-4849 (Consolidated with CV-5161 and CV 97-461) (E.D.N.Y.) (Holocaust)

*Ahearn v. Fibreboard Corporation*, C.A. No. 6:93-CV-526 (E.D. Tex.), and *Continental Casualty Co. v. Rudd*, C.A. No. 6:94cv458 (E.D.Tex.) (asbestos injury)

*Georgine v. Amchem, Inc.*, C.A. No. 93-CV-0215 (E.D.Pa.) (asbestos injury)

*Engle v. RJ Reynolds Tobacco Co.*, No. 94-08273 CA 20 (Fla. Cir. Ct., Dade County) (tobacco injury)

*Backstrom v. The Methodist Hospital*, No. H-94-1877 (S.D. Tex.) (TMJ injury)

## Pension Benefits

*Forbush, Rhodes v. J. C. Penney Company, Inc. Pension*, Nos. 3:90-2719-X and 3:92-0109-X (N.D. Tex.)

*Collins v. Pension Benefit Guarantee Corp.*, No. 88-3406 and *Page v. Pension*

3

*Benefit Guarantee Corp.*, No. 89-2997 (D.D.C.)

**Product Liability**

*Cox v. Shell Oil Co.,* No. 18,844 (Tenn. Ch. Ct., Obion Co.) (polybutylene pipe)

*Naef v. Masonite Corp.,* No. CV-94-4033 (Ala. Cir. Ct. Mobile County) (hardboard siding product)

*In re Louisiana Pacific Corp. Inner Seal OSB Trade Practices Litigation,* MDL No. 1114, C 95-3178 (N.D. Cal.) (oriented strand board)

*Cosby v. Masonite Corp.,* No. CV-97-3408 (Ala. Cir. Ct., Mobile County) (siding product) and *Quin v. Masonite Corp.*, No. CV-97-3313 (Ala. Cir. Ct. Mobile County) (roofing product)

*Ruff v. Parex, Inc.,* No. 96-CvS 0059 (N.C. Super. Ct., Hanover County) (EIFS)

*Garza v. Sporting Goods Properties, Inc.,* No. SA 93-CA-1082 (W.D. Tex.) (gun ammunition)

*Richison v. Weyerhaeuser Company Limited,* No. 05532 (Cal. Super. Ct., San Joaquin County) (roofing product)

*Shah v. Re-Con Building Products, Inc.,* No. C99-02919 (Cal. Super. Ct., Contra Costa County) (roofing product)

*Hart v. Central Sprinkler Corp., No. BC 17627* (Cal. Super. Ct., Los Angeles County) and *County of Santa Clara v. Central Sprinkler Corp.,* No. CV 17710119 (Cal. Super. Ct., Santa Clara County) (sprinklers)

**Bankruptcies with Mass Tort Claimants**

*In re Johns-Manville Corp.,* 68 B.R. 618, 626 (Bankr. S.D.N.Y.) (asbestos)

*In re Dow Corning,* No. 95-20512 (Bankr. E.D. Mich.) (breast implant)

4

*In re U.S. Brass Corp.,* No.94-40823S (Bankr. E.D. Tex.) (polybutylene)

*In re The Celotex   Corp.,* Consolidated Case Nos: 90-10016-8B1 and 90-10017-

   8B1 (Bankr. M.D. Fla.) (asbestos)

*In re Raytech Corp.,* No. 5-89-00293 (Bankr. D. Conn.) (asbestos)

5. I have testified as an expert at trial and in a deposition in *Engle v. R. J. Reynolds Tobacco,* No. 94-08273 (Fla. Cir. Ct., Dade County). I have been deposed as an expert in *In re NASDAQ Market-Makers Antitrust Litigation,* M21-68 RWS), 94-CIV. 3994 (RWS), M.D.L. No. 123 (S.D.N.Y.), *In re Dow Corning,* No. 95-20512 (Bankr. E.D. Mich.), *Georgine v. Amchem, Inc. et al.,* C.A. No. 93-CV-0215 (E.D. Pa.), *In re W. R. Grace & Co.,* Chapter 11, No.01-01139 (JJF) (Bankr. D. Del.) and *Gross v. Chrysler Corp.,* No. 061170 (Md. Cir. Ct., Montgomery County). I have testified in court in *In re Swan Transportation Company,* Chapter 11, Case No. 01-11690, *Cox v. Shell Oil Co.,* No. 18,844 (Tenn. Ch. Ct., Obion County), *Ahearn v. Fibreboard Corporation,* C.A. No. 6:93cv526 (E.D. Tex.) and *Continental Casualty Co. v. Rudd,* C.A. No. 6:94cv458 (E.D. Tex.).

6. I am the author of *The Plain Language Tool Kit for Class Action Notice* published in the October 25, 2002 issue of <u>Class Action Litigation Report</u> and the author of *Quantifying Notice Results in Class Actions – the Daubert/Kumho Mandate* published in the July 27, 2001 issue of <u>Class Action Litigation Report</u> and the August 7, 2001 issue of <u>The United States Law Week</u>, both publications of the Bureau of National Affairs, Inc. In addition, I am author of *The Ten Commandments of Class Action Notice* published in the September 24, 1997 issue of the <u>Toxics Law Reporter</u> and co-author of *How Viable Is the Internet for Class Action Notice* published in the March 25, 2005 issue of <u>Class Action Litigation Report</u>, both also publications of the Bureau of National Affairs, Inc.

7. Several courts have commented favorably regarding my analysis of the effectiveness of notice plans and upon the plans of notice prepared by KNC. For example, in *Ahearn v. Fibreboard Corp.,* No. 6:93cv526 (E.D. Tex.) and *Continental Casualty Co. v. Rudd,* No. 6:94cv458 (E.D. Tex.), Chief Judge Robert M. Parker stated: "I have reviewed the plan of dissemination and I have compared them to my knowledge at least of similar cases, the notices that Judge Weinstein has worked with [in the *Agent Orange* litigation] and Judge Pointer [in the *Silicon Gel Breast Implant Litigation],* and it appears to be clearly superior." Similarly, in *In re Celotex Corp.,* Nos. 90-10061-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.), the Hon. Thomas E. Baynes, Jr. stated: "[T]he record should also reflect the Court's appreciation to Ms. Kinsella for all the work she's done, not only in pure noticing, but ensuring that what noticing we did was done correctly and professionally."

8. In *Cox v. Shell Oil Co.,* Civil Action No. 18,844 (Tenn. Ch. Ct., Obion County), a class action concerning polybutylene plumbing, Judge Michael Maloan, of the Tennessee Chancery Court, entered an Order approving the nationwide settlement and the notice plan, stating: "The Court finds the notice program is excellent. As specified in the findings below, the evidence supports the conclusion that the notice program is one of the most comprehensive class notice campaigns ever undertaken."

9. In approving the notice plan for implementation in the *In re Compact Disc Minimum Advertised Price Antitrust Litigation*, D. Me., MDL No. 1361, Judge D. Brock Hornby stated, "(the plan) provided the best practicable notice under the circumstances and complied with the requirements of both 15 U.S.C. 15c(b)(1).... the notice distribution was excellently designed, reasonably calculated to reach potential class members, and ultimately highly successful in doing so."

10. The Honorable Jeremy Fogel, U.S. District Court for the Northern District of California, San Jose Division in *Foothill/De Anza Community College District v. Northwest Pipe Company*, No. CV-00-20749-JF/EAI (N.D. Cal.) commended the notice program as follows: "The Court finds that the settling parties undertook a thorough and extensive notice campaign designed by Kinsella/Novak Communications, Ltd., a nationally-recognized expert in this specialized field. The Court finds and concludes that the Notice Program as designed and implemented provides the best practicable notice to the Class, and satisfied requirements of due process."

11. KNC was retained to design and implement the Class Action Pendency Notice Program to Consumers and Third-Party Payors in this litigation. I submit this affidavit to describe the elements of the Notice Program, attached as Exhibit A.

## **Proposed Notice Program**

12. The objective of the Notice Program is to provide adequate notice of the Class Action Pendency to potential Consumer and Third-Party Payor ("TPP") Class Members as defined in the Consolidated Order Re: Motion for Class Certification dated January 30, 2006.

13. A four-part notification program was designed and includes:

    (a.) Direct notice by first-class mail to all Consumers or TPPs whose names and addresses are readily identifiable and to all callers to the toll-free information line who request the *Notice of Class Action Pendency* as a result of seeing the Publication Notice.

    (b.) Broad notice through the use of paid consumer media, including magazines and newspaper supplements as well as trade publications to supplement the direct notice to Third-Party Payors.

    (c.) Earned media notice through a press release sent to major national print and electronic outlets.

    (d.) Electronic notice through a dedicated Web site.

14. The Notice Program calls for different long form and publication notices tailored to either the TPPs or Consumers. The *Notice of Class Action Pendency* designed specifically for TPPs will be sent to them. The *Notice of Class Action Pendency* designed specifically for Consumers will be directed to them. The Publication Notices will be similarly tailored.

15. The *Notice of Class Action Pendency* will be mailed to the appropriate entities, likely to be Class Members, in the proprietary TPP Database compiled by Complete Claim Solutions

("CCS"), the class administrator. The Database includes insurance companies, healthcare and welfare funds, employee benefit funds, third-party administrators, pharmacy benefit managers and other record keepers for noticing purposes in TPP class actions. The Database was compiled from contacting, researching and accessing the records of various databases and listings of affiliations, group insurance plans, self-insureds, ERISA funds, pharmacy benefit manager listings, etc. as follows:

    (a.)  Pharmacy Benefit Management Institute;

    (b.)  Benefits SourceBook;

    (c.)  Managed Care Information Centers;

    (d.)  Judy Diamond Associates;

    (e.)  AM Best Company;

    (f.)  Association of Managed Care Providers;

    (g.)  Society of Professional Benefit Administrators;

    (h.)  American's Health Insurance Plans;

    (i.)  Self-Insurance Institute of America; and

    (j.)  National Association of Insurance Commissioners.

16. Included in the Database are:

    (a.)  Approximately 29,000 companies with 100 or more employees that have self-funded (fully or partially) plans, derived from Form 5500 filings;

    (b.)  1,356 Third-Party Claim Administrators; and

    (c.)  1,300 member companies of American Health Insurance Plans that provide or administer health insurance benefits to over 200 million Americans, which represents 90 percent of the managed care market (HMOs, PPOs and POSs, etc.).

17. The Database is regularly updated with new entries from the above sources as well as TPPs identified through other class action litigations. To my knowledge, it is the most comprehensive TPP database available for notice purposes.

18. The appropriate *Notice of Class Action Pendency* will be sent to all callers to a toll-free information line who request it. A toll-free number for this information line will appear prominently in the Publication Notices. Class Members may also download the appropriate *Notice of Class Action Pendency* in PDF format from the Notice Web site.

19. To design the paid media segment of the notice plan to reach Consumers, KNC selected demographics that encompass the characteristics of these Class Members. Media vehicles were then analyzed and selected for their strength and efficiency in reaching this demographic target.

20. To develop profiles of the demographics and media habits of Consumer Class Members, KNC analyzed syndicated data available from the 2005 Doublebase Survey[1] from

---

[1] MRI produces an annual Doublebase, a study of 50,000+ adults consisting of two full years of data. The MediaMark sample consists of 26,000+ respondents. Fieldwork is done in two waves per year, each lasting six months and consisting of 13,000

MediaMark Research, Inc. ("MRI").  MRI is a nationally accredited media and marketing research firm that provides syndicated data on audience size, composition, and other relevant factors pertaining to major media including broadcast, magazines, newspapers, and outdoor advertising.  MRI provides a single-source measurement of major media, products, services, and in-depth consumer demographic and lifestyle/psychographic characteristics.

21. MRI provides specific data on medical insurance coverage and branded/generic prescription drug usage.  Based on this information, audiences were chosen that encompass these demographics. The media plan is based on reaching these specific consumers and not the general public.  All media purchased will be measured against these targets as indicated below.

22. The demographic targets as defined by MRI are as follows:

    (a.)   Individuals with medical insurance through Medicare ("Medicare Recipients").

    (b.)   Individuals who used any branded prescription or generic drug remedy to treat an ailment ("Branded/Generic Drug Users").

23. Published Notice to reach Consumers will be placed in the following national newspaper supplements:

    (a.)   A half-page ad (4-5/8") x 10-3/4") will be placed twice in *Parade*, with an estimated circulation of 33,900,000.

    (b.)   A half-page ad (4-5/8" x 10-6/7") will be placed twice in *USA Weekend*, with an estimated circulation of 23,300,000.

    (c.)   A half-page ad (4-5/8") x 10-1/5") will be placed twice in *American Profile*, with an estimated circulation of 8,100,000.

24. Published Notice will be placed in the following consumer magazines:

    (a.)   A two-thirds page ad (3-5/8" x 9-7/8") will be placed once in *AARP Bulletin*, with an estimated circulation of 22,000,000.

    (b.)   A two-thirds page ad (4-3/4" x 10") will be placed once in *Better Homes and Gardens*, with an estimated circulation of 7,600,000.

    (c.)   A full-page ad (4-5/16" x 6-1/2") will be placed once in *Jet*, with an estimated circulation of 900,000.

    (d.)   A full-page ad (5-3/4" x 9") will be placed once in *National Geographic*, with an estimated circulation of 5,250,000.

    (e.)   A full-page ad (7" x 10") will be placed twice in *People*, with an estimated circulation of 3,400,000.

---

interviews. At the end of the interview, the fieldworker presents a self-administered questionnaire that measures approximately 500 product/service categories, 6,000 brands, and various lifestyle activities. Resulting data is weighted to reflect the probabilities of selection inherent in the sample design and then balanced so that major study demographics match the most recent independent estimates.

       (f.)  A full-page ad (4-3/4" x 6-3/4") will be placed once in *Reader's Digest*, with an estimated circulation of 10,000,000.

       (g.)  A full-page ad (4-3/4" x 6-3/4") will be placed once in *Selecciones*, with an estimated circulation of 356,000.

25. To supplement direct notice to TPPs, the TPP Publication Notice will be placed in the following trade publications:

       (a.)  A full-age (7" x 10") placed once in *National Underwrite Life & Health*, with an estimated circulation of 41,200.

       (b.)  A full-page ad ( 8" x 10-7/8") will be placed once in *HR Magazine*, with an estimated circulation of 194,600.

26. The Notice Program is scheduled to commence June 26, 2006 with the mailing of the TPP direct notice and the activation of the Web site. Publications will begin appearing on July 9, and continue appearing through the end of August.

27. For the purpose of evaluating the strength and efficiency of the media, the newspaper supplements and consumer magazines were measured against the demographic targets to establish the following *reach*[2] and *frequency*[3] estimates[4]:

       (a.)  An estimated 85.7%[5] of Medicare Recipients will be reached with an average estimated frequency of 3.4 times, delivering 66,999,000 gross impressions[6].

       (b.)  An estimated 84.1% of Branded/Generic Drug Users will be reached with an average estimated frequency of 3.2 times, delivering 244,387,000 gross impressions.

28. If the trial date of September 25, 2006 is maintained for the AstraZeneca trial, the reach and frequency accumulation estimated as of September 10, 2006 will be as follows:

       (a.)  An estimated 83.1% of Medicare Recipients will be reached with an average estimated frequency of 2.9 times.

       (b.)  An estimated 81.6% of Branded/Generic Drug Users will be reached with an average estimated frequency of 2.9 times.

---

[2] Reach is the estimated percentage of a target audience reached through a specific media vehicle or combination of media vehicles.

[3] Frequency is the estimated average number of times an audience is exposed to an advertising vehicle carrying the message.

[4] MRI is a sample-based survey. Therefore, estimates of audience and/or demographics from these surveys are subject to sampling and non-sampling error. The use of mathematical values from those surveys should not be regarded as a representation that they are exact to the precise mathematical value stated.

[5] The readership estimates for *Parade* and *USA Weekend* are reflective of the broader readership measurement of the newspaper carrier groups into which these supplements are inserted. A recent custom study conducted by MRI indicates that the actual readership of the supplements is less than that of the carrier papers. While this study provided directional insight into the audience, the data provided is highly variable and insufficient for use in specific computation of reach and frequency. Therefore, the use of carrier paper readership for the newspaper supplements remains the accredited methodology and standard of the industry according to MRI and the Media Research Council.

[6] Gross impressions are the total number of times a media vehicle containing the Publication Notice is seen. This is a duplicated figure, as some viewers (readers) will see several media vehicles (publications) that contain the Publication Notice.

29. The Notice Program will also include earned media notice to augment the paid media plan. A press release will be distributed on US Newswire's Full National Circuit reaching over 2,000 media outlets. The press release will highlight the toll-free telephone number and Web site address that Class Members can call or visit for complete information.

30. Third-Party Notice will consist of distributing the press release to 21 organizations that provide information on diseases and conditions for which some of the Defendants drugs are used.

31. An informational Web site will be established and listed with major search engines to enable Class Members to get information on the litigation.

32. All print advertising and media will carry a toll-free telephone number, a Web site address and a mailing address for potential Class Members to request or access the appropriate *Notice of Class Action Pendency*.

33. KNC made the determination to use one Notice Program to reach all Class Members for all Covered Drugs for several reasons. First, the direct mail list of TPPs is identical for each Defendant. The target audiences (Medicare Recipients and Branded/Generic Drug Users) for the purchase of paid media are the same for each Defendant. Repeated mailings and publication notices essentially on the same legal issues, but involving different Defendants and drugs, could easily be confusing. It addition, separate notices would require multiple actions on the part of Class Members when only one response is needed if all Defendants are included in one notice effort. In addition, since the underlying issue of AWP pricing is Class-wide for all Defendants, it is unlikely that a Class Member would need to take separate or different actions regarding individual Defendants with respect to opting-out, remaining in the Class or making an objection or appearance.

34. It is my opinion that the reach of our target audiences and the number of exposure opportunities to the notice information is adequate and reasonable under the circumstances, and consistent with the standards employed by KNC in notification programs designed to reach identified and unidentified members of litigation. The Notice Plan as designed is fully compliant with Rule 23 of the Federal Rules of Civil Procedure.

I declare under penalty of perjury that the foregoing is true and correct. If called as a witness, I could and would competently testify thereto.

_Katherine Kinsella_                    _May 31, 2006_
Katherine Kinsella                         Date

SUBSCRIBED and SWORN before me on the 31st day of _May_ 2006.

_Debra L. Vaughan_

Notary Public In and For the District of Columbia

Debra L. Vaughan
Notary Public District of Columbia
My Commission Expires April 14, 2008

11

# EXHIBIT A



KINSELLA/NOVAK
COMMUNICATIONS, LTD.
A SOURCECORP® COMPANY

# Notice Program

## In Re: Pharmaceutical Industry Average Wholesale Price Litigation,

### Case No. MDL No. 1456
### (CA:01-CV-12257-PBS) (D.Mass.)

2120 L Street, NW | Suite 205 | Washington, DC 20037
Phone: 202.686.4111 | Fax: 202.293.6961 | Email: info@kinsella-novak.com | http://www.kinsella-novak.com

THE ART & SCIENCE OF LEGAL NOTIFICATION

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Firm Overview | 1 |
| Relevant Case Experience | 2 |
| Technical Approach | 3 |
| Situation Analysis | 5 |
| Class Definition | 6 |
| Proposed Notice Plan Overview | 8 |
| Direct Notice | 9 |
| Product Background | 10 |
| Paid Media Methodology | 11 |
| Target Audience | 12 |
| Demographics | 13 |
| Paid Media Program | 15 |
| Newspaper Supplements | 16 |
| Consumer Magazines | 18 |
| Trade Publications | 21 |
| Print Readership | 22 |
| National Media Delivery | 23 |
| Notice Design | 25 |

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

Third-Party Notice                                          26

Earned Media                                                27

Informational Web Site                                      28

Toll-Free Telephone Support                                 29

Exhibit 1 – Long Form Notice samples

Exhibit 2 – Affected Drugs

Exhibit 3 –Newspaper Supplements by Carrier Paper

Exhibit 4 – Publication Notice samples

Exhibit 5 – List of Third-Party Organizations

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

# FIRM OVERVIEW

Kinsella/Novak Communications ("KNC") provides nationally recognized expertise in the design of media-based legal notification programs for class actions and bankruptcies.

The firm has designed, implemented or consulted on over 250 class actions and bankruptcies and specializes in the most complex and often precedent-setting notice efforts. National and statewide notification programs include asbestos, breast implants, consumer fraud, home siding products, infant formula, polybutylene plumbing, tobacco, antitrust securities and Holocaust claims. The firm has selected and placed over $135 million in paid legal advertising.

KNC develops advertisements, press materials, Web sites, and other notice materials bridging the gap between litigation complexities and the need for a clear and simple explanation of legal rights. In addition to designing and producing notices in "plain language", all KNC notice programs are fully compliant with Rule 23 of the Federal Rules of Civil Procedure and comparable state guidelines. The firm employs industry-recognized tools of media measurement to quantify the adequacy of the notice for the court.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

# RELEVANT CASE EXPERIENCE

KNC has significant notification experience including consumer class actions involving pharmaceuticals.

## PHARMACEUTICAL CASES

➢ *State of Connecticut v. Mylan Laboratories, Inc.,*
   MDL 1290, Misc. No. 99-276 (TFH-JMF) (Lorazepam and Clorazepate)

➢ *In re Buspirone Antitrust Litigation,*
   MDL-1413 (S.D.N.Y.) (BuSpar)

➢ *In re Cardizem CD Antitrust Litigation,*
   99-MD-1278 (E.D. Mich.) (Cardizem)

➢ *State of Ohio v. Bristol-Myers Squibb, Co.,*
   1:02-cv-01080 (D.D.C.) (Taxol)

## OTHER SELECTED CASES

➢ *In re Nasdaq Market-Makers Antitrust Litigation,*
   No. M21-68 (RWS), 94 Civ. 3996 (RWS), MDL No. 1203 (S.D.N.Y.) (securities)

➢ *In re Compact Disc Minimum Advertised Price Antitrust Litigation,*
   MDL No. 1361 (D. Me.) (prerecorded music products)

➢ *In re Toys "R" Us Antitrust Litigation,*
   MDL No. 1211, Master File No. CV-97-5750 (E.D.N.Y.) (toys and other products)

➢ *Cox v. Shell Oil Co.,*
   No. 199,844 (Tenn. Ch. Ct., Obion County) (polybutylene pipe)

➢ *Naef v. Masonite,*
   No. CV-94-4033 (Ala. Cir. Ct., Mobile County) (hardboard siding)

➢ *In re Holocaust Victims Assets Litigation,*
   No. CV 96-4849 (Consolidated with CV-5161 and CV 97461) (E.D.N.Y.)

➢ *Ruff, et al. v. Parex, Inc.,*
   No. 96-CVS-0059 (N.C. Super. Ct., New Hanover County) (EIFS stucco)

➢ *Fettke v. McDonald's Corporation,*
   Case No. 044109 (Cal. Super. Ct., Marin County) (trans-fatty acids)

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# Technical Approach

KNC's technical approach is based on its expertise as a leading provider of notice in class actions, knowledge of court-approved notice programs at the state and federal levels and years of experience in designing and implementing legal notification programs both nationally and internationally.

KNC begins by conducting detailed research on the claim that is the subject of the class action and how it is related to a population, its location and temporal characteristics. This information identifies the demographic characteristics of class members — such as age, gender, income, and education level — and the geographic distribution of potential class members. This research provides the parameters for identifying and locating class members and shapes the scope of the notice program.

Specifically, KNC:

- ➢ Reviews demographic and product information provided by the client or independently researched and establishes a demographic profile of the target audience. All media selections are based on this profile in order to ensure the highest reach of potential class members and frequency of message exposure.

- ➢ Evaluates the effectiveness of media vehicles -- consumer magazines, newspapers, specialty publications, broadcast television, radio and the Internet -- in reaching the target audience.

- ➢ Analyzes publications using syndicated data sources and tools, such as the Audit Bureau of Circulation (ABC) statements, which certify how many readers buy or obtain copies of publications, and MediaMark Research ("MRI") which measures how many people open or read publications.

- ➢ Examines the geographic distribution of potential class members at the level of detail necessary to determine effective geographic coverage.

- ➢ Selects media available during the established notice period ensuring timely notice to class members.

- ➢ Creates and implements all notice communications, including: published notice, print, audio and video news releases, television and radio spots, Internet advertising and Web sites.

- ➢ Ensures that published notices and long form notices are written in "plain language."

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

➢ Uses established advertising relationships to negotiate the deepest available discounts on national advertising and secure optimum placement with respect to the media habits of the target audience.

➢ Designs and implements an "earned media" program to further supplement the published notice through print, audio and video news releases and non-paid media outreach. Tracks and verifies all media placements and press stories developed through "earned media."

➢ Designs and maintains a Web site to enable class members to access all relevant information including long form notices, claim forms and court documents. Provides registration and email capabilities on the site.

➢ Integrates all aspects of the notification program with selected claims administrators.

➢ Provides advice, affidavits, depositions and court testimony with respect to the design and implementation of the notification program.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# SITUATION ANALYSIS

The average wholesale price ("AWP") is the published price used to establish reimbursement rates for drugs industry-wide. Plaintiffs claim that the Defendants control the AWP for their drugs. Specifically, they claim that forty-two drug manufacturers artificially raised and falsely overstated the AWP of over 300 drugs. This resulted in inflated payments by consumers and other entities such as health and welfare plans and health insurers. Defendants deny these allegations.

The Court will conduct a two-phase trial beginning with four of the drug manufacturers. These companies (the "Defendants") are:

**AstraZeneca**
AstraZeneca
PLC, Zeneca, Inc.
AstraZeneca Pharmaceuticals L.P.
AstraZeneca U.S.

**The BMS Group**
Bristol-Myers Squibb Co.
Oncology Therapeutics Network Corp.
Apothecon, Inc.

**The Johnson & Johnson Group**
Johnson & Johnson
Centocor, Inc.
Ortho Biotech
McNeil-PPC, Inc.
Janssen Pharmaceutica Products, L.P.

**The Schering Plough Group**
Schering-Plough Corporation
Warrick Pharmaceuticals Corporation

Plaintiffs seek monetary compensation and a court order prohibiting the Defendants from inflating the AWP for their drugs.

# CLASS DEFINITION

The Class includes the following:

Class 1: Medicare Part B Co-Payment Class

All natural persons nationwide who made, or who incurred an obligation enforceable at the time of judgment to make, a co-payment based on AWP for a Medicare Part B covered Subject Drug that was manufactured by AstraZeneca (AstraZeneca, PLC, Zeneca, Incl., AstraZeneca Pharmaceuticals L.P., and AstraZeneca U.S.), the BMS Group (Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp., and Apothecon, Inc.), or the Johnson & Johnson Group (Johnson & Johnson, Centocor, Inc., Ortho Biotech, McNeil-PPC, Inc., and Janssen Pharmaceutica Products, L.P.). The states excluded from this Class are: Alabama, Alaska, Georgia, Iowa, Kentucky, Louisiana, Mississippi, Montana and Virginia

Class 2: Third-Party Payor MediGap Supplemental Insurance Class

All Third-Party Payors who made reimbursements for drugs purchased in Massachusetts, or who made reimbursements for drugs and have their principal place of business in Massachusetts, based on AWP for a Medicare Part B covered Subject Drug that was manufactured by AstraZeneca (AstraZeneca, PLC, Zeneca, Incl., AstraZeneca Pharmaceuticals L.P., and AstraZeneca U.S.), the BMS Group (Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp., and Apothecon, Inc.), the Johnson & Johnson Group (Johnson & Johnson, Centocor, Inc., Ortho Biotech, McNeil-PPC, Inc., and Janssen Pharmaceutica Products, L.P.), or the Schering Plough Group (Schering-Plough Corporation and Warrick Pharmaceuticals Corporation).

Class 3: Consumer and Third-Party Payor Class for Medicare Part B Drugs Outside of the Medicare Context, i.e., Medicare Part B Drugs Paid for by Contract

All natural persons who made or who incurred an obligation enforceable at the time of judgment to make a payment for purchases in Massachusetts, all Third-Party Payors who made reimbursements based on contracts expressly using AWP as a pricing standard for purchases in Massachusetts, and all Third-Party Payors who made reimbursements based on contracts expressly using AWP as a pricing standard and have their principal place of business in Massachusetts, for a physician-administered Subject Drug that was manufactured by AstraZeneca (AstraZeneca, PLC, Zeneca, Incl., AstraZeneca Pharmaceuticals L.P., and AstraZeneca U.S.), the BMS Group (Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp., and Apothecon, Inc.), the Johnson & Johnson Group (Johnson & Johnson, Centocor, Inc., Ortho Biotech, McNeil-PPC, Inc., and Janssen Pharmaceutica Products, L.P.), or the Schering Plough Group (Schering-Plough Corporation and Warrick Pharmaceuticals Corporation). Included within this Class are natural persons who paid coinsurance (i.e., co-payments

proportional to the reimbursed amount) for a Subject Drug purchased in Massachusetts, where such coinsurance was based upon use of AWP as a pricing standard. Excluded from this Class are any payments or reimbursements for generic drugs that are based on MAC and not AWP.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# PROPOSED NOTICE PLAN OVERVIEW

This plan is submitted by KNC in connection with *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, Case No. MDL No. 1456 (CA: 01-CV-12257-PBS) in the District Court of Massachusetts. The plan outlines procedures to provide notice of the certification of this case as a class action consistent with the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure.

Based upon information provided by Counsel, the results of research on Class Members and their response to media and the media habits of the target audiences, the following four-part notice program is recommended:

➢ Direct notice by first-class mail to all Consumers or Third-Party Payors whose names and addresses are readily identifiable and to all callers to the toll-free information line who request a *Notice of Class Action Pendency* as a result of seeing the Publication Notice.

➢ Broad published notice through the use of paid media, including consumer magazines and newspaper supplements. Trade publications will be used to supplement the direct notice to Third-Party Payors.

➢ Earned media notice through a press release sent to major national print and electronic outlets.

➢ Electronic notice through a dedicated Web site.

The Notice Program calls for different long form and publication notices tailored to either the TPPs or Consumers. The *Notice of Class Action Pendency* designed specifically for TPPs will be sent to them. The *Notice of Class Action Pendency* designed specifically for Consumers will be directed to them. The Publication Notices will be similarly tailored.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# DIRECT NOTICE

Direct mail notice to TTPs will consist of mailing the *Notice of Class Action Pendency* (Exhibit 1) to appropriate identifiable Class Members informing them of their legal rights and how they may participate in or opt-out of the class action. The *Notice of Class Action Pendency* will be sent to:

➢ Appropriate entities likely to be Class Members, in the proprietary TPP Database compiled by Complete Claim Solutions ("CCS"), the class administrator. The Database includes insurance companies, healthcare and welfare funds, employee benefit funds, third-party administrators, pharmacy benefit managers and other record keepers for noticing purposes in TPP class actions. The Database was compiled from contacting, researching and accessing the records of various databases and listings of affiliations, group insurance plans, self-insureds, ERISA funds, pharmacy benefit manager listings, etc. as follows:

- Pharmacy Benefit Management Institute;
- Benefits SourceBook;
- Managed Care Information Centers;
- Judy Diamond Associates;
- AM Best Company;
- Association of Managed Care Providers;
- Society of Professional Benefit Administrators;
- American's Health Insurance Plans;
- Self-Insurance Institute of America; and
- National Association of Insurance Commissioners.

Included in the Database are:

- Approximately 29.000 companies with 100 or more employees that have self-funded (fully or partially) plans, derived from Form 5500 filings;
- 1,356 Third-Party Claim Administrators; and
- 1,300 member companies of American Health Insurance Plans that provide or administer health insurance benefits to over 200 million Americans which represent 90 percent of the managed care market (HMOs, PPOs and POSs, etc.).

The database is regularly updated with new entries from the above sources as well as TPPs identified through other class action litigations.

➢ All callers to a toll-free information line who request the either the TPP *Notice of Class Action Pendency* or the Consumer *Notice of Class Action Pendency* (Exhibit 1). A toll-free number for this information line will prominently appear in the Publication Notice. Class Members may also download the Notice in PDF format from the Notice Web site.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# PRODUCT BACKGROUND

The first phase of the lawsuit involves the four drug manufacturers and 17 drugs that are used to treat a wide range of medical conditions and diseases. The drugs are used in the treatment of, among others: anemia, arthritis, asthma, blood clots, cancer of the cervix and uterus, heart failure, HIV, Leukemia, lung and testicular cancer, ovarian and stomach cancer, prostate and breast cancer, and shingles. Exhibit 2 lists the drugs by primary and secondary indicators, manufacturers and dosages.

The specific drugs are:

## AstraZeneca
Zoladex

## BMS Group
| | |
|---|---|
| Blenoxane | Paraplatin |
| Coumadin | Rubex |
| Cytoxan | Taxol |
| Etopophos | VePesid |

## Johnson & Johnson Group
| | |
|---|---|
| Procrit | Remicade |

## Schering-Plough Group
| | |
|---|---|
| Albuterol | Perphenazine |
| Integrilin | Proventil |
| Intron A | Temodar |

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# Paid Media Methodology

KNC notice plans directed to unidentified class members (1) identify the demographics of class members and establish a target audience; (2) outline the methodology for selecting the media and other plan elements and how they relate to product usage or exposure; and (3) provide results that quantify for the court the adequacy of the notice based upon recognized tools of media measurement.

In the wake of the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), and *Kumho Tire Company v. Carmichael*, 526 U.S. 137 (1999), the reliability of a notice expert's testimony should be tested against the standards developed within the media industry for determining whether, to what degree and at what frequency a target audience has been reached. In assessing the expert's reliability, the court must determine whether the testifying expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," (526 U.S. at 152). That showing would likely require evidence that the expert's data and methodology are similar to that used by professionals in the relevant field.

In keeping with the *Daubert* and *Kumho* rulings, KNC employs the methodology and measurement tools used in the media planning and advertising industry for designing and measuring the adequacy of a paid media program to reach a particular audience.

Choosing a target audience encompassing the characteristics of Class Members is the first step in designing the paid media program. Media vehicles are chosen based on their ability to provide effective and cost efficient reach among the target audience. The selected media vehicles are then measured against the target audience to establish the *reach* of the media program and the *frequency* of exposure to the media vehicles. *Reach* and *frequency* estimates are two of the primary measurements used to quantify the media penetration of a target audience.

- ➢ *Reach* is the estimated percentage of a target audience reached one or more times through a specific media vehicle or combination of media vehicles within a given period.

- ➢ *Frequency* is the estimated average number of times an audience is exposed to an advertising vehicle carrying the message within a given period of time.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

# TARGET AUDIENCES

To develop a profile of the demographics and media habits of potential Consumer Class Members, KNC analyzed syndicated data available from the 2005 Doublebase Survey[1] from MediaMark Research, Inc. ("MRI").

MRI is the leading U.S. supplier of multimedia audience research. As a nationally accredited research firm, it provides information to magazines, television, radio, Internet and other media, leading national advertisers and over 450 advertising agencies -- including 90 of the top 100 in the United States. MRI's nationally syndicated data are widely used by these companies as the basis for the majority of the media and marketing plans written for advertised brands in the United States.

Specifically, MRI provides data on audience size, composition and other relevant factors pertaining to major media vehicles. MRI presents a single-source measurement of major media, products, services and in-depth consumer demographic and lifestyle characteristics.

Using MRI data, KNC selected two demographics that encompass Consumer Class Members:

> ➢ Individuals with medical insurance through Medicare ("Medicare Recipients").

> ➢ Individuals who used any branded prescription or generic drug remedy to treat an ailment ("Branded/Generic Drug Users").

---

[1] The study, conducted since 1979, surveys persons 18 years of age and older in the contiguous 48 states. MRI conducts more than 26,000 personal interviews with consumers in two waves annually each lasting six months and consisting of 13,000 interviews. Produced annually by MRI, the Doublebase study consists of two full years of data drawn from over 50,000 respondents. Consumer information is recorded on 500 product/service categories, 6,000 brands and various lifestyle activities. Respondents are selected based on the ability to project their responses nationally.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# DEMOGRAPHICS

The chart below outlines the overall demographics of the two Consumer target audiences:

| DEMOGRAPHICS | MEDICARE RECIPIENTS | BRANDED/GENERIC DRUG USERS |
|---|---|---|
| **Gender** | | |
| Male | 42.8% | 40.8% |
| Female | 57.2% | 59.2% |
| **Age** | | |
| 18 - 24 | 2.9% | 9.4% |
| 25 - 34 | 3.4% | 14.5% |
| 35 - 44 | 3.9% | 19.3% |
| 45 - 54 | 6.6% | 20.6% |
| 55 - 64 | 10.8% | 16.4% |
| 65+ | 72.4% | 19.8% |
| **Education** | | |
| Graduated/Attended College | 35.9% | 54.0% |
| Graduated High School | 38.7% | 32.0% |
| **Household Income** | | |
| Under $10,000 | 10.2% | 5.9% |
| $10,000 - $29,999 | 42.0% | 20.4% |
| $30,000 - $49,999 | 23.9% | 20.3% |
| $50,000 - $74,999 | 13.9% | 20.1% |
| $75,000 - $99,999 | 5.4% | 13.6% |
| $100,000+ | 4.7% | 19.7% |
| **Ethnicity** | | |
| Caucasian | 84.0% | 82.5% |
| African-American | 11.0% | 10.1% |
| Hispanic | 5.7% | 9.0% |
| Asian | 1.2% | 1.9% |
| **Location[2]** | | |
| A & B Counties | 61.4% | 69.8% |
| C & D Counties | 38.6% | 30.2% |

[2] A Counties, as defined by A.C. Nielsen Company, are all counties belonging to the 25 largest metropolitan areas. These metro areas correspond to the MSA (Metropolitan Statistical Area) and include the largest cities and consolidated areas in the United States. B Counties, as defined by A.C. Nielsen Company, are all counties not included under A that are either over 150,000 population or in a metro area over 150,000 population according to the latest census. C Counties, as defined by A.C. Nielsen Company, are all counties not included under A or B that either have over 40,000 population or are in a metropolitan area of over 40,000 population according to the late census. D Counties are, essentially, rural counties in the Nielsen classification system of A, B, C, D counties.

As indicated in the chart above:

## AGE
➢ Medicare Recipients are considerably older than Branded/Generic Prescription Drug Users. 72.4% of Medicare Recipients are 65 years of age and older. 76.1% of Branded/Generic Drug Users are 35 years of age and older.

## INCOME
➢ 10.1% of Medicare Recipients have an income of $75,000+ while 33.3% of Branded/Generic Drug Users have an income of $75,000+. 52.2% of Medicare recipients have an income under $30,000 as compared to 26.3% of Branded/Generic Drug Users.

## EDUCATION
➢ Branded/Generic Drug Users are more educated than Medicare Recipients. 54% of Branded/Generic Drug Users attended or graduated while 35.9% of Medicare Recipients attended or graduated college.

## GENDER
➢ Both targets skew female.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

# Paid Media Program

As indicated, direct notice will be provided to all identifiable TPPs. To supplement the direct notice, ad placements in trade publications directed to TPPS will be used.

To reach unidentifiable Consumer Class Members, KNC recommends the use of measurable paid media. Paid media advertising is guaranteed to appear, allowing for control of the content, timing and positioning of the message, making it an invaluable part of any notice campaign. Newspapers, consumer magazines, television, radio and the Internet, among other sources, offer paid media opportunities.

In considering which media to use for this case, KNC evaluated the cost-effectiveness, exposure opportunities and reach potential of each media type. Television was not selected due to its high cost. Radio is a frequency medium best used locally. Print media was selected because of its wide spread use, and its value as a credible and tangible information source which allows for extended body copy.

In choosing which placements would be best for this case, KNC reviewed all available consumer publications for the compatibility of the editorial and the creative message. Consumer magazines and newspaper supplements offer efficient and cost-effective vehicles for reaching all demographic segments of the population. Given the broad scope of the Class in this notice program and the demographics and media habits of the target audiences, consumer magazines and newspaper supplements are recommended.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# NEWSPAPER SUPPLEMENTS

*Parade, USA Weekend* and *American Profile*, inserts known as newspaper supplements, are carried in weekend or weekly editions of 2,073 newspapers reaching every media market in the country (144 newspapers carry more than one supplement). These magazines, published on newsprint, contain articles written for broad, general appeal and they encourage readership through brevity. Issues are typically less than 30 pages. For this Notice Program, newspaper supplements are recommended because of their broad geographic and demographic reach capability. They provide coverage in all 50 states and the District of Columbia. (See Exhibit 3.)

KNC recommends the following activity:



> ➢ A half-page ad (4-5/8" x 10-3/4") will be placed twice in *Parade,* with an estimated circulation of 33,900,000.

> ➢ *Parade* is carried in the Sunday edition of 368 daily newspapers and is the highest circulating magazine in the world. Carrier newspapers serve major urban and suburban markets in the U.S.

> ➢ The average issue of *Parade* is read by 40.7% of Medicare Recipients and 40.3% of Branded/Generic Prescription Users.

---

> ➢ A half-page ad (4-5/8" x 10-3/4") will be placed twice in *USA Weekend*, with an estimated circulation of 23,300,000.

> ➢ *USA Weekend* is inserted in the weekend edition of 608 daily newspapers in major markets complementing the U.S. markets served by *Parade.*

> ➢ The average issue of *USA Weekend* is read by 27.3% of Medicare Recipients and 25.3% of Branded/Generic Prescription Users.

---

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# American Profile

- ➢ A half-page ad (4-5/8" x 10-1/2") will be placed twice in *American Profile,* with an estimated circulation of 8,100,000

- ➢ *American Profile* is carried in 1,241 weekly and daily newspapers that are published primarily in rural counties nationwide.  Editorial content is designed to appeal to small town Americans and their interests and activities.

- ➢ The average issue of *American Profile* is read by 13.6% of Medicare Recipients and 12.1% of Branded/Generic Prescription Users.

---

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

## CONSUMER MAGAZINES

Thousands of consumer magazines offer national advertising opportunities. Most adults read one or more magazines during an average month and nearly three out of five adults read or look into a magazine daily. Additionally, magazines published weekly quickly accumulate readership and provide timely and efficient notice to readers. The specific consumer magazines listed below were chosen because collectively they provide excellent reach of consumers.

KNC recommends the following activity:

# AARPBulletin

➤ A two-thirds page ad (3-5/8" x 9-7/8") will be placed once in *AARP Bulletin,* with an estimated circulation of 22,000,000.

➤ *AARP Bulletin* is published 11 times a year by the AARP, formerly the *American Association of Retired Persons.* It is directed exclusively to Americans 50 years of age and older. *AARP Bulletin* covers key issues confronted by older Americans, such as Medicare, Social Security, consumer protection, caregiving and pensions.

---



➤ A two-thirds page ad (4-3/4" x 10") will be placed once in *Better Homes and Gardens,* with an estimated circulation of 7,600,000.

➤ *Better Homes and Gardens* is the largest-circulating home service magazine. An average issue is read by 20.5% of Medicare Recipients and 22.7% of Branded/Generic Prescription Users. Published monthly, the magazine features a wide-range of home and family subjects, such as food and decorating.

---

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*



➢ A full-page ad (4-5/16" x 6-1/2") will be placed once in *Jet,* with an estimated circulation of 900,000.

➢ Published weekly, *Jet* is the leading newsweekly for the African-American community, combining national and global news with issues and information specific to the African-American community.

➢ Approximately 64% of *Jet* readers graduated college and approximately 46% of readers have a household income of $40,000+.

---



➢ A full-page ad (5-3/4" x 9") will be placed once in *National Geographic,* with an estimated circulation of 5,250,000.

➢ *National Geographic* is published monthly and provides coverage encompassing people and places of the world. Major topics include culture, nature, geography, ecology, science and technology.

➢ *National Geographic* readers spend an average of 56 minutes with each issue and tend to be educated and upper-income.

---



➢ A full-page ad (7" x 10") will be placed twice in *People*, with an estimated circulation of 3,400,000.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

- ➢ *People* covers contemporary personalities in entertainment, politics, business and other current events.

- ➢ Approximately 71% of *People* readers are female and approximately 71% are age 18-49.

- ➢ The average issue of *People* is passed-along to 10.9 or more different people.

---

# Reader's Digest

- ➢ A full-page ad (4-3/4" x 6-3/4") will be placed once *in Reader's Digest*, with an estimated circulation of 10,000,000.

- ➢ *Reader's Digest* is a monthly compendium of selected excerpts from other publications as well as original pieces.

- ➢ *Reader's Digest* readers skew female and older with 61% women readers and 52% over the age of 50.

---

# Selecciones

- ➢ A full-page ad (4-3/4" x 6-3/4") will be placed once in *Selecciones*, with an estimated circulation of 356,000.

- ➢ *Selecciones* is the world's leading Spanish-language magazine that combines editorial written specifically for the Hispanic market with articles from *Reader's Digest*.

---

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# TRADE PUBLICATIONS

Selected trade publications will be used to supplement the direct mail notice to TPPs as follows:



- ➢ A full-page ad (7" x 10") placed once in *National Underwriter Life & Health*, with an estimated circulation of 41,200.

- ➢ With a pass-along rate of 1.7 readers per copy, approximately 70,000 agents and brokers read the publication weekly. This includes 20,700 insurance company executives.

- ➢ *National Underwriter Life & Health* is the only weekly magazine serving the life, health and financial services market. It contains news and feature articles to help agents better understand products and markets, and insurance company executives identify new business opportunities. Topics covered include agency management, taxes, legislation, executive benefits, retirement planning and profitable sales ideas.

---

# HRMagazine

- ➢ A full-page ad (8" x 10-7/8") inserted once in *HR Magazine*, with an estimated circulation of 194,600.

- ➢ *HR Magazine* is the official publication of the Society for Human Resource Management. It is written for human resources professionals and executives and to further the professional aims of both the Society and the human resource management profession. The publication features new approaches and innovative best practices in all areas of HR management and informs on new models of ways of thinking. It is designed as a forum for trends and legal issues as well as new concepts used by human resources management professionals. It has the highest readership of any human resources publication.

---

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# Print Readership

Readership includes both primary readers and pass along readers. Primary readers purchased a publication or are members of a household where the publication was purchased. Pass-along readers are those who read the publication outside the home, in places such as a doctor's or dentist's office. The table below indicates the number of readers in each of the target audiences of an average issue of the magazine:

| PUBLICATION | INSERTIONS | MEDICARE RECIPIENTS | BRANDED/ GENERIC USERS |
|---|---|---|---|
| AARP Bulletin* | 1 | 8,220,000 | 14,573,000 |
| American Profile* | 2 | 3.099,000 | 10,764,000 |
| Better Homes and Gardens | 1 | 4,694,000 | 15,658,000 |
| Jet | 1 | 686,000 | 2,343,000 |
| National Geographic | 1 | 3,545,000 | 11,473,000 |
| Parade Carrier Newspapers | 2 | 9,296,000 | 27,784,000 |
| People | 2 | 3,075,000 | 13,870,000 |
| Reader's Digest | 1 | 6,430,000 | 15,530,000 |
| Selecciones* | 1 | n/a | n/a |
| USA Weekend Carrier Newspapers | 2 | 6,243,000 | 17,415,000 |

*The readership of *AARP Bulletin* and *American Profile* are estimates based on prototype reach curves as outlined in the National Media Delivery section. *Selecciones* is not measured by MRI and cannot be estimated with a prototype. Therefore, its contribution to the overall reach of the media is not calculated.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# National Media Delivery

The paid media program outlined above is designed to deliver the following estimated reach and frequency measurements[3]:

➢ An estimated 85.7%[4] of Medicare Recipients will be reached with an average estimated frequency of 3.4 times, delivering 66,999,000 gross impressions[5].

➢ An estimated 84.1% of Branded/Generic Drug Users will be reached with an average estimated frequency of 3.2 times, delivering 244,387,000 gross impressions.

The paid media program provides Class Members with multiple exposure opportunities to media vehicles carrying the Publication Notice.

| TARGET | % OF TARGET REACHED | AVERAGE FREQUENCY | GROSS IMPRESSIONS |
|---|---|---|---|
| Medicare Recipient | 85.7% | 3.4 | 66,999,000 |
| Branded/Generic Drug Users | 84.1% | 3.2 | 244,387,000 |

If the trial date of September 25, 2006 is maintained for the AstraZeneca trial, the reach and frequency accumulation estimates as of September 10, 2006 will be as follows:

➢ An estimated 83.1% of Medicare Recipients will be reached with an average estimated frequency of 3.0 times.

➢ An estimated 81.6% of Branded/Generic Drug Users will be reached with an average estimated frequency of 2.9 times.

The reach of *Selecciones* is not included in these estimates.

*American Profile* and *AARP Bulletin* are not measured directly by MRI. However, the publishers of both magazines have developed readership estimates for selected studies based on their circulation and the measured readership of similar publications. This data

---

[3] MRI is a sample-based survey. Therefore, estimates of audience and/or demographics from these surveys are subject to sampling and non-sampling error. The use of mathematical values from those surveys should not be regarded as a representation that they are exact to the precise mathematical value stated.

[4] The readership estimates for *Parade* and *USA Weekend* are reflective of the broader readership measurement of the newspaper carrier groups into which these supplements are inserted. A recent custom study conducted by MRI indicates that the actual readership of the supplements is less than that of the carrier papers. While this study provided directional insight into the audience, the data provided is highly variable and insufficient for use in specific computation of reach and frequency. Therefore, the use of carrier paper readership for the newspaper supplements remains the accredited methodology and standard of the industry according to MRI and the Media Research Council.

[5] Gross impressions are the total number of times a media vehicle containing the Publication Notice is seen. This is a duplicated figure, as some viewers (readers) will see several media vehicles (publications) that contain the Publication Notice.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

was provided in the Spring 2005 Survey and was used to develop total reach estimates in combination with other magazines through Telmar's Print Plan.

Analysis of weekly accumulations are performed through Telmar's Time Plan program, which uses measured MRI data and/or industry curves to estimate the build of audience over time. To develop accumulation estimates, it was necessary to estimate the rate of accumulation for the unmeasured publications. This was done using accumulation rates of comparable publications.

The proposed Notice Program Schedule is attached as Exhibit 4.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# NOTICE DESIGN

## PRINT DESIGN

The plain language Publication Notices will be designed to alert Class Members to the litigation through the use of a bold headline (Exhibit 5). This headline will enable Class Members to quickly determine if they are potentially affected by the litigation. Plain language text provides important information regarding the subject of the litigation, the Class definition and the legal rights available to Class Members.

Each advertisement will prominently feature a toll-free number, Web site and mailing addresses for Class Members to obtain the Long Form Notice and other information. The design of the Publication Notice takes into account empirical research developed over the past 30 years about how people read and assimilate information.

Recent revisions to Rule 23(c)(2) of the Federal Rules of Civil Procedure require class action notices to be written in "plain, easily understood language." KNC drafts and places plain language ads fully compliant with this revision. The firm maintains a strong commitment to adhering to the plain language requirement while drawing on its experience and expertise to draft notices that effectively communicate with class members.

Every Publication Notice in consumer magazines will be page dominant, increasing visibility to Class Members. Half-page ads will be used in newspaper supplements, two-thirds page and full-page ads will be used in consumer magazines and full-page ads will be used in trade publications. After reviewing the content and special sections of each publication, the best possible position will be negotiated for placement of the Publication Notice.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# Earned Media

The thrust of the earned media program is to amplify the notice to Class Members through the use of free media. The earned media portion of this notice program will augment the paid media plan developed to reach the Class. The third-party endorsement from reliable sources such as the news media can add immeasurable value to outreach efforts.

Outreach to print and electronic media will focus primarily on key daily newspapers, wire services, newspaper bureaus nationally and major television and radio outlets.

A press release will be distributed on US Newswire's Full National Circuit reaching over 2,000 media outlets.   The press release will highlight the toll-free telephone number and Web site address that Class Members can call or visit for complete information.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# THIRD-PARTY NOTICE

KNC identified 21 organizations that provide information on diseases and conditions for which some of the Defendants drugs are used. Exhibit 6 lists the primary indicator categories for which we were able to locate viable third-party organizations, the name of the organization and their communication vehicles. These organizations have online newsletters, trade publications, magazines and Web sites.

A press release will be sent to these organizations requesting them to disseminate the notice information to their constituencies. Follow-up phone calls will be made to encourage their participation in the notice efforts.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# INFORMATIONAL WEB SITE

An informational interactive Web site is a critical component of the Notice campaign. The URL is a constant information source instantly accessible to millions. The informational Web site utilizes the Internet's ability to serve as a key distribution channel and customer service bureau. Combining clean site design, consistent site navigation clues and built-in flexibility, the Web site provides Class Members with easy access to the details of the litigation.

## CLEAN DESIGN
The site is cleanly designed for ease of use and comprehension. Web pages on the site are simple, containing words, icons, documents and images.

A directory located in a column on the left-hand side of the page provides links to the information available on the Web site. These can include "Court Documents," "Long Form Notice," and "Questions/Links." The Web site can also feature a "Frequently Asked Questions" section answering commonly asked questions. If necessary, it will also provide a toll-free number for individuals seeking additional information and the address or email of Class Counsel,

## CONSISTENT NAVIGATION CUES
Wherever the user goes from the homepage to another part of the site, links to the homepage and subsections remain on the left side of all pages, while the case title and cite remains fixed on top.

## BUILT-IN FLEXIBILITY
Though simply designed, the Web site is not restrictive. The site's basic architecture enables updates and new features to be added quickly.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation*

# TOLL-FREE TELEPHONE SUPPORT

A toll-free interactive voice response system (IVR) will be established to service Class Members calling as a result of seeing the published notice. Callers requesting the *Notice of Class Action Pendency* will be prompted to input the telephone number of the residence where they would like to receive the Notice.

The system uses an address look-up database to locate the corresponding address of the resident. A portion of the address will be read back to the caller for address verification. For successful look-ups, the caller will be asked to speak the Class Member's full name and to spell the last name. If the look-up fails, is incorrect, or the call is placed from a rotary dial telephone, the caller will be prompted to speak the potential Class Member's name, address and telephone number.

The IVR system will provide an option for callers to speak to a live operator.