**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | Civil Action:  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO ALL ACTIONS. | Judge Patti B. Saris |

**PLAINTIFFS' MOTION FOR LEAVE TO FILE ONE-PAGE SUPPLEMENT TO THEIR
SUR-REPLY IN OPPOSITION TO
ASTRAZENECA'S MOTION FOR SUMMARY JUDGMENT
<u>DISCUSSING TWO DISCRETE ISSUES REQUESTED BY THE COURT</u>**

Plaintiffs, by their attorneys, respectfully request leave to file a one-page supplement to their Sur-Reply in Opposition to AstraZeneca's Motion for Summary Judgment Discussing Two Discrete Issues Before the Court ("Sur-Reply").  As grounds for this Motion plaintiffs state the following:

1.      On Friday, May 26, 2006, plaintiffs filed their Sur-Reply [Docket No. 2610] in order to address two discrete issues raised by the Court at the May 23, 2006 summary judgment hearing.  At the time they filed the Sur-Reply, plaintiffs did not yet have the benefit of a transcript of that hearing and therefore relied on their handwritten notes taken during that hearing (while oral argument was occurring) regarding the precise issues the Court wished plaintiffs to address.

2.      Plaintiffs have since had the opportunity to review that transcript of that hearing. Upon reviewing it, plaintiffs were able to see that AstraZeneca's counsel represented that *PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773 (Fla. 2003) ("*PNR*") and *Millennium Communs. & Fulfillment, Inc. v. Office of the Attorney General*, 761 So. 2d 1256 (Fla. Dist. Ct.

App. 2000) ("*Millennium*") held that the Florida Deceptive Uniform Trade Practices Act

("FDUTPA") contained a requirement that a representation be "likely to affect consumer

choice."  At page 44 of the rough (ASCII) transcript, the following exchange occurs:

> THE COURT:  So your point under Florida law is,
> there's nothing here that could have affected consumer
> choice?
>
> MR. WISE:  Correct, "likely to affect consumer
> choice."
>
> THE COURT:  And that comes out of the statute?
>
> MR. WISE:  Yes, and a case called Millennium and
> another case called PNR in the Florida courts, Page 14 and 15
> of our brief.

*See* Rough transcript of May 23, 2006 summary judgment hearing, attached as Exhibit A hereto.

When plaintiffs filed their Sur-reply, they did not recall AstraZeneca's specific reliance on those

two cases at oral argument.

3.      Neither *PNR* nor *Millennium* say anything about consumer choice.  Indeed, the

word "choice" does not appear anywhere in either opinion.  Nowhere in the FDUTPA do the

terms "consumer choice" appear.  Instead, AstraZeneca's counsel was quoting from *In re

Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (F.T.C. 1984), a Federal Trade Commission opinion in

which the Commission defines materiality in a number of ways, including, among many others,

a misrepresentation or practice "likely to affect consumer choice."  *Id.*, at *187.  Notably, ***not a

single Florida court has <u>ever</u> adopted this language in interpreting the FDUTPA.***

4.      Therefore, plaintiffs wish to file a one-page Supplement setting forth the holdings

of the two cases relied upon by AstraZeneca and making clear that neither those cases nor any

other Florida case establish a "likely to affect consumer choice" requirement under Florida law.

While plaintiffs hesitate to burden the Court with additional briefing, because AstraZeneca's representations were so far afield from what Florida law actually holds, plaintiffs believe the record needs to be clarified before this Court rules on AstraZeneca's motion for summary judgment.

WHEREFORE plaintiffs respectfully request leave to file a one-page supplement to their Sur-Reply in Opposition to AstraZeneca's Motion for Summary Judgment Discussing Two Discrete Issues Before the Court, and all other relief that this Court deems just and proper.  The proposed Supplement is attached as Exhibit B.

DATED:  June 5, 2006

By    **/s/ Steve W. Berman**
Thomas M. Sobol (BBO#471770)
Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Allan Hoffman
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Shanin Specter
Donald E. Haviland, Jr.
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA  19102
Facsimile:  (215) 772-1359
Telephone:  (215) 772-1000

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE**</u>
Docket No. MDL 1456

      I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on June 5, 2006, I caused copies of **PLAINTIFFS' MOTION FOR LEAVE TO FILE ONE-PAGE SUPPLEMENT TO THEIR SUR-REPLY IN OPPOSITION TO ASTRAZENECA'S MOTION FOR SUMMARY JUDGMENT DISCUSSING TWO DISCRETE ISSUES REQUESTED BY THE COURT** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.


       **/s/ Steve W. Berman**
      Steve W. Berman

# Exhibit A

00040672

0001
```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
        In re:                      )
 4      PHARMACEUTICAL INDUSTRY     ) CA No. 01-12257-PBS
        AVERAGE WHOLESALE PRICE     ) MDL No. 1456
 5      LITIGATION                  )
 6
 7
 8                    MOTION HEARING
 9       BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE
10
11
12
13
                     United States District Court
14                   1 Courthouse Way, Courtroom 19
                     Boston, Massachusetts
15                   May 23, 2006, 3:05 p.m.
16
17
18
19
20
21
22
                     LEE A. MARZILLI
23             CERTIFIED REALTIME REPORTER
              United States District Court
24             1 Courthouse Way, Room 3205
                  Boston, MA  02210
25                  (617)345-6787
```

0002
```
 1      A P P E A R A N C E S:
 2      For the Plaintiffs:
 3          KENNETH A. WEXLER, ESQ., The Wexler Firm, LLP,
        Suite 2000, One North LaSalle Street, Chicago, Illinois,
 4      60602.
 5          STEVE W. BERMAN, ESQ. and SEAN R. MATT, ESQ.,
        Hagens Berman Sobol Shapiro LLP, 1301 5th Avenue, Suite 2900,
 6      Seattle, Washington, 98101-1090.
 7          THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro LLP,
        One Main Street, Cambridge, Massachusetts, 02142.
 8
            DONALD E. HAVILAND, JR., ESQ., Kline & Specter, P.C.,
 9      1525 Locust Street, 19th Floor, Philadelphia, Pennsylvania,
        19102.
10
            JEFFREY L. KODROFF, ESQ., Spector, Roseman & Kodroff,
11      1818 Market Street, Suite 2500, Philadelphia, Pennsylvania,
        19103.
12
13      For the Defendants:
14          JOHN T. MONTGOMERY, ESQ., Ropes & Gray, LLP,
        One International Place, Boston, Massachusetts, 02110.
15
            D. SCOTT WISE, ESQ. and KIMBERLY D. HARRIS, ESQ.,
16      Davis, Polk & Wardwell, 450 Lexington Avenue, New York,
        New York, 10017.
17
            WILLIAM F. CAVANAUGH, JR., ESQ. and ANDREW D. SHAU,
18      ESQ., Patterson, Belknap, Webb & Tyler, 1133 Avenue of the
        Americas, New York, New York, 10036-6710.
```
                            Page 1

00040672
```
19
          STEVEN M. EDWARDS, ESQ., Hogan & Hartson, LLP,
20  875 Third Avenue, Suite 2600, New York, New York, 10012.
21
22
23
24
25
0003
 1               P R O C E E D I N G S
 2          THE CLERK:  In re:  Pharmaceutical Industry Average
 3  Wholesale Price Litigation, Civil Action No. 01-12257,
 4  MDL No. 1456, will now be heard before this Court.  Will
 5  counsel please identify themselves for the record.
 6          MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol
 7  for the MDL plaintiffs.
 8          MR. WEXLER:  Ken Wexler, your Honor, for the
 9  plaintiffs.
10          MR. BERMAN:  Steve Berman, your Honor.
11          MR. KODROFF:  Jeff Kodroff for the MDL plaintiffs.
12          MR. MATT:  John Matt, your Honor, representing
13  plaintiffs.
14          MR. HAVILAND:  Good afternoon, your Honor.  Don
15  Haviland for plaintiffs as well.
16          MR. MONTGOMERY:  John Montgomery, your Honor, for
17  Schering-Plough and Warrick.
18          MR. EDWARDS:  Steve Edwards for BMS.
19          MR. CAVANAUGH:  Bill Cavanaugh for Johnson &
20  Johnson.
21          MR. SHAU:  Andrew Shau, also for Johnson & Johnson.
22          MR. WISE:  Good afternoon, your Honor.  Scott Wise
23  for AstraZeneca.
24          MS. HARRIS:  Kim Harris, also for AstraZeneca.
25          THE COURT:  All right, we have a large number of
0004
 1  motions here.  We have cross-motions for summary judgment as
 2  well as company-specific motions.  I thought we would deal
 3  with the crosscutting motions first and then focus on -- I
 4  hate to do this to AstraZeneca -- AstraZeneca, since, as I
 5  remember, they are the first trial.  Is that right?  So at
 6  least get through AstraZeneca's and then see where we are.
 7          Do you have another game plan that you all had
 8  proposed?
 9          MR. BERMAN:  We were going to await your
10  direction.  We have no proposal for you.
11          THE COURT:  So I think that I should start -- did
12  you have something else, Mr. Montgomery?
13          MR. MONTGOMERY:  Your Honor, I didn't quite
14  understand what you meant, and I was asking for clarification
15  from my colleagues.  But I should ask you.  By crosscutting
16  issues, you meant the joint?
17          THE COURT:  Yes, the joint memos --
18          MR. MONTGOMERY:  I understand.
19          THE COURT:  -- which I think everyone joined in
20  on.  I don't know that we have time to go through each one of
21  the five defendants.  If we can, we can.  I know I want to
22  get through AstraZeneca's, since their trial is
23  mid-September.  And you have a motion for summary judgment on
24  AstraZeneca as well as on the affirmative defenses.  Is that
25  right?
0005
 1          MR. BERMAN:  As well as on the -- the partial on
 2  the issue of government knowledge and so forth.
 3          THE COURT:  All right, so why don't we begin.  Are
 4  you going to argue for everybody?
 5          MR. MONTGOMERY:  I am, your Honor.
```

00040672
```
 6              THE COURT:  Okay, terrific.
 7              MR. MONTGOMERY:  Your Honor, you may well have a
 8   notion in mind of how you'd like to address this.  My thought
 9   was to speak for just a bit about what the AWP system
10   actually is; and then, second, about what the government
11   meant when it adopted the AWP system in 1991 and then again
12   continued it by statute in 1997; and then, finally, address
13   the question, if we have any time, as to whether it has been
14   shown that the defendants actually duped the government into
15   maintaining the AWP system for the Medicare program and
16   caused injury.
17              THE COURT:  How long do you think your presentation
18   will be?
19              MR. MONTGOMERY:  Your Honor, I can do this in any
20   amount of time that --
21              THE COURT:  Just we have a lot of issues here.
22              MR. MONTGOMERY:  We do, we do.  I'm prepared to
23   just go free form, and I'm sure you have questions and --
24              THE COURT:  Well, why don't we do this.  Why don't
25   you begin, and I'm never shy.
0006
 1              MR. MONTGOMERY:  I realize that, your Honor, and
 2   I'd be glad to cut this off in fifteen minutes, twenty
 3   minutes, whatever is useful.
 4              THE COURT:  That sounds good.
 5              MR. MONTGOMERY:  Whatever is useful to you.
 6              With respect to the first question of what is the
 7   AWP system, we've been at this long enough, your Honor, that
 8   I suggest that there's not really very much dispute.  AWP is
 9   a benchmark price that's reported by pharmaceutical companies
10   to pricing compendia.  AWP is a fixed number.  There is one
11   AWP for each drug, and the AWP system provides a mechanism in
12   relation to which, or, if you think of it as an umbrella,
13   underneath which there is competition.  Competitive forces
14   dictate what the ultimate outcome over time might be with
15   respect to the actual acquisition costs borne by various
16   providers in various classes of trade.
17              The system, it appears, thinks that it needs an
18   AWP.  It has been a hardy and utilitarian device.  It's a
19   little bit like the prime meridian.  The starting point needs
20   to be somewhere, and you can't have everybody second-guessing
21   where the starting point is.  It doesn't have to be in
22   Greenwich, England; it could be in Boston; but you only have
23   one.  And then different payors, different providers, use AWP
24   in different ways, depending on their place in the
25   marketplace, their leverage, and different outcomes emerge
0007
 1   from that use of AWP.
 2              So that's what AWP is.  It's a reporting system,
 3   and there's a lot of behavior that is organized around that
 4   system.  It's not a system that was created by the
 5   pharmaceutical industry.  Quite to the contrary, it was
 6   created, it seems, by some interactions between payors and
 7   government agencies.  That seems to be a little bit lost in
 8   the midst of time, I'm not sure it's terribly relevant, but
 9   it's a system that has a lot of participants; and actually
10   one of the least active participants are the pharmaceutical
11   manufacturers, though for sure we set that AWP.  And AWP has
12   a known, predictable, and disclosed relationship in the
13   branded industry to WAC, the wholesale acquisition cost.
14              On the generic side of the market, AWP has a known
15   predictable relationship, within a modest range, to the
16   branded AWP at the time that the generic versions of that
17   product are launched into the marketplace.
18              THE COURT:  You know, Mr. Montgomery, as you know,
19   we've both read the same expert reports.  I have a sense of
```

Page 3

00040672
20   all of this.
21              MR. MONTGOMERY:  Right.
22              THE COURT:  So let's just jump to the fact it was
23   put into a statute.
24              MR. MONTGOMERY:  Yes.  Well, it was first put into
25   a regulation in 1991 by HCFA.  And so your question, I'm
0008
1    sure, is, well, what did HCFA mean?  And what HCFA meant, we
2    submit -- and we think the record is perfectly clear and
3    robust on this -- is that HCFA was adopting that system, that
4    commercial system that existed in the marketplace, to utilize
5    it in order to determine, for one particular federal program,
6    how the pricing system would work.
7               The very agency that made that decision in 1991 had
8    for twenty years or so had experience with AWP, understood
9    exactly what AWP was, and decided to adopt it in 1991 and
10   1992, after having decided two years earlier that it was not
11   appropriate to adopt a national Medicare fee structure for
12   pharmaceuticals.  They didn't want to do that.
13              Now, the very next year in 1990, they developed a
14   very elaborate program for the Medicaid prescription drug
15   program in the form of the AMP and best price provisions.  So
16   the government knew exactly how to go about creating a very
17   precise disclosure mechanism that would disclose exactly what
18   the least average acquisition prices might be.  They knew how
19   to do that.  But for a number of reasons with respect to the
20   Medicare program, the record in front of you -- and I know
21   we're all looking at the same record -- shows that they
22   decided not to do it.
23              THE COURT:  So it's put into a statute, and I have
24   to construe the statute.
25              MR. MONTGOMERY:  Correct.
0009
1               THE COURT:  And the statute generally, the way the
2    Supreme Court tells me to do it is look at the plain language
3    of the statute.  Okay, so that's where I'm starting from.  I
4    have to construe a statute.  Now, whether or not there was a
5    mutual misunderstanding or a mutual collaboration to construe
6    it differently may go to the issue of intent to defraud, but
7    why doesn't average wholesale price mean exactly that?
8               MR. MONTGOMERY:  Well, because if you want to
9    approach it from a plain-meaning perspective -- and I
10   actually don't agree that that's where you go.  I think this
11   is a specialized term in a specialized field, adopted by a
12   specialized agency, and that you actually treat it as a term
13   of art.
14              THE COURT:  Well, did HCFA define it by
15   regulation?
16              MR. MONTGOMERY:  HCFA did not define it.  It
17   adopted it, your Honor.  And so what it adopted was the
18   commercial term.  So I am quibbling, your Honor, with the
19   path that you take.  But let's leave my point aside.
20   Assuming you go through a plain-meaning exercise, I submit to
21   your Honor you're going to come back to exactly the same
22   place:  What did HCFA understand?
23              THE COURT:  No.  No, no, no.  No, no, no.  What did
24   Congress understand when they put in "average wholesale
25   price"?
0010
1               MR. MONTGOMERY:  Well, that didn't happen until
2    1997.  I'm back in 1991.
3               THE COURT:  So you're saying, if I construe the
4    class, as has been requested, as going back to 1991 -- so
5    that's an interesting point -- I should look at what the
6    agency intended and then jump to what Congress intended?
7               MR. MONTGOMERY:  Yes, exactly.  Exactly.  So I'm
                              Page 4

00040672

8   starting with the agency.
9           THE COURT:  All right, fair enough.
10          MR. MONTGOMERY:  But let's still follow the same
11  path.  So if you want to go through a plain-meaning exercise,
12  completely divorced from what we know about how this system
13  operates, I would suggest to your Honor that you actually
14  don't have a plain meaning, number one.  You have average
15  price.  What's average?  It could be a mean proportion.  It
16  could mean typical.  What does wholesale price mean?
17          THE COURT:  Well, "average" has a meaning.
18          MR. MONTGOMERY:  It does have a meaning, but it
19  does mean two things.  I don't want to press this point too
20  far, but it --
21          THE COURT:  Because under any definition, you
22  wouldn't need it, right, with AWP?  I mean, in other words,
23  let's say I took the most industry-favorable definition of
24  "average wholesale price," the average prices that the
25  wholesalers charge to providers.  Let's just say that.  And
0011
1   let's assume I gave you every break in how you did that.  It
2   still wouldn't reflect the drugs here, right?
3           MR. MONTGOMERY:  Well, it certainly would reflect
4   some of the drugs here because it depends on what you think
5   about wholesaler markups.  But it's a factual inquiry that
6   you would have to make.  But I take your point, that as a
7   result of the operation in the real world of the system,
8   there has been a considerable erosion for many drugs, from
9   average wholesale price to actual acquisition cost, so I take
10  your point.  But we're not looking at what actually happened;
11  we're just talking about what the words mean.  And I don't
12  want to take up too much of your time fighting about what the
13  word "average" means, but in the dictionary, it's either
14  mathematical or it's typical.  And "wholesale," that could
15  either be the manufacturer's price to the wholesaler or the
16  wholesaler's price to the retailer.  It's not clear.
17          But let's assume that and you say,
18  "No, I think it is exactly clear," you're still, I submit,
19  your Honor, going to have to test that plain meaning against
20  some reality:  Does it work?  Does it produce an appropriate
21  result consistent with the intent of the statute?  Does it
22  produce absurd results?  And the meaning of AWP suggested by
23  the plaintiffs can't bear the weight they put upon it because
24  they want, first of all, manufacturers to report that price.
25  Manufacturers don't exactly know, don't have access to
0012
1   information about average prices charged by wholesalers to
2   retailers.  That's --
3           THE COURT:  Why not?
4           MR. MONTGOMERY:  Well, there's an information gap.
5   We don't ask them.  That actually might raise some questions
6   under the antitrust laws.  There are a host of questions
7   implicated by the plain meaning.  Let me go through them.
8   What period of time does the average wholesale price cover?
9   What geography?  What channels of trade?
10          THE COURT:  Well, let's suppose I engaged in all
11  that with you.  I mean, right now we have average sales
12  price, we have average manufacturing price.  Let me just say
13  this:  There's a way of doing it.  And let's suppose I
14  engaged with you on that particular issue.  That isn't what
15  you want me to do because you claim it's totally untethered
16  from the marketplace.
17          MR. MONTGOMERY:  No, no, no, not at all.
18          THE COURT:  You're saying that they can charge --
19  for something that the wholesaler would charge a penny for,
20  you can charge $10.
21          MR. MONTGOMERY:  If the marketplace will permit

00040672

22    that, with therapeutic competition, because, remember, for
23    many drugs that you've seen in this case -- I mean, nothing
24    is universally agreed here, but actually at the beginning of
25    a life cycle of a drug, you might actually have a
0013
 1    relationship to WAC.  But, again, competition, the tether to
 2    the marketplace, erodes that relationship.
 3            THE COURT:  Tether to the marketplace, I mean some
 4    sort of reflection of acquisition cost.
 5            MR. MONTGOMERY:  That's right.  And if for the
 6    Medicare program the government had wanted a tether to actual
 7    acquisition cost, it could have designed it, and it chose not
 8    to.
 9            THE COURT:  Let me just put it this way:  I
10    understand your argument with respect to the period before
11    Congress got involved.
12            MR. MONTGOMERY:  Okay.
13            THE COURT:  But with respect to the time period
14    once Congress got involved, the language is the plain
15    statutory meaning.  Now, I understand, what does "average"
16    mean?  That's what judges do every day of the week.  What
17    does "wholesale" mean?  What do "prices" mean?  But it has
18    some bearing on acquisition cost.
19            Now, did the government collaborate somehow with
20    the industry for either good or bad reasons so that they just
21    shut a blind eye to what was happening?  That may go to just
22    intent to deceive, but I'm not going to just define it as
23    having no bearing whatsoever on what the average price was
24    charged by wholesalers.
25            MR. MONTGOMERY:  And I understand what you're
0014
 1    saying if you're going to pursue a plain-meaning route, but I
 2    submit, your Honor, this is a term of art.  It's a system.
 3    And it is not -- you're treating it, your Honor, as if it is
 4    intended to be a government-created regulatory regime.  I
 5    want to suggest it's actually the opposite.  It's the
 6    adoption by the government of a system which was not a
 7    regulatory regime.  And the government spent the better part
 8    of thirteen years debating whether to impose such a regime on
 9    the Medicare program.  Now that they've imposed it, they're
10    still debating it.
11            THE COURT:  Maybe.  I've rejected the political
12    question issue.  What I do as a matter of law is construe
13    statutory terms.
14            Now, I understand your point that it's a term of
15    art.  If so, it hasn't been defined by Congress to be that,
16    and there are no legislative hearings that anyone's cited to
17    me to define it as a term of art.  I have no basis for
18    construing it other than by what it means.  And when they
19    adopted it, it cannot mean what you say it means.
20            MR. MONTGOMERY:  Well, I would recommend, your
21    Honor, that you read -- and there's been some debate about
22    Mr. Scully's testimony before Congress, and the debate has
23    been about testimony in 2003 -- I suggest that you look at
24    Exhibit 63 to the Fowler affidavit, and the Exhibit 63 is
25    another bit of Scully testimony and dialogue in 2001 between
0015
 1    Mr. Scully, who's been with this since the '80s, and the
 2    Congressional committee.
 3            THE COURT:  And what's his other statement, the one
 4    that the plaintiffs are emphasizing?  What exhibit number?
 5            MR. MONTGOMERY:  It's Exhibit B to Mr. Berman's
 6    affidavit.
 7            THE COURT:  All right, so that's the
 8    point/counterpoint you want me to look at?
 9            MR. MONTGOMERY:  Well, actually, I think you can

Page 6

00040672

10  look at both of them.
11       THE COURT:  Okay.
12       MR. MONTGOMERY:  But I think what you'll find is
13  that Mr. Scully, at least the committee that he was
14  testifying before, that they understood exactly what had
15  happened.  What you see --
16       THE COURT:  Are there any legislative reports, any
17  conference committee reports, anything I should look at?
18       MR. MONTGOMERY:  Yes.  There's a 2003 House report
19  on the Medicare Modernization Act.
20       THE COURT:  At the time that AWP was put in.
21       MR. MONTGOMERY:  I'll have to submit something to
22  you identifying.  We did cite to your Honor and I think
23  provide in the record, but I don't have the exact cite to the
24  back-and-forth in 1997.
25       Remember, in 1997, the proposal that Congress was
0016
1   considering was to adopt an actual acquisition cost system.
2   They rejected it, and they went to 95 percent of AWP.  And in
3   2000, the administration proposed creating what it called a
4   "real AWP," and Congress put a moratorium on any adjustments
5   to the AWP system.  So even if you follow this plain-meaning
6   exercise for 1997, what do you do about 2000?
7        THE COURT:  So you want me to just freeze 2000 out
8   of the class?
9        MR. MONTGOMERY:  Well, I think you need to look at
10  2000.  Congress said, "No, HCFA, you may not change the
11  external AWP system that's embodied in the statute."
12       THE COURT:  Okay.  All right, so let's assume for a
13  minute that you don't win that point and we move on to plain
14  language.  We have a statutory scheme here where 80 percent
15  get paid off by the government and 20 percent as a copay by
16  the beneficiary.  And so you've tried, as I've read the case
17  law, to paint the government as an intermediary, just the way
18  like a car dealer would be to a consumer.
19       MR. MONTGOMERY:  Correct.
20       THE COURT:  But, actually, the way the statute is
21  set up is a little different because the doctor bills the
22  patient.
23       MR. MONTGOMERY:  Yes, but the price of admission is
24  defined by the government.  In other words --
25       THE COURT:  By statute.
0017
1        MR. MONTGOMERY:  By statute and by regulation.
2        THE COURT:  Right, the 20 percent of AWP.  It's not
3   like a --
4        MR. MONTGOMERY:  Well, it's 20 percent of the
5   entire cost, which includes as a component AWP.
6        THE COURT:  Fair enough.
7        MR. MONTGOMERY:  And includes, of course, the
8   service or dispensing cost, so we get to the cross-subsidy
9   point and the question of whether there's a causal connection
10  to any real injury here, because even if we lose on every
11  point with your Honor on AWP, they still have to prove some
12  injury.  And what was going on during this policy and
13  political discussion for the better part of thirteen years
14  was a debate whether we were going to focus on drug cost or
15  total cost.  And what the Medicare Modernization Act is, it's
16  an express embodiment of a compromise that said:  We're going
17  to look at the total cost.  We've already got the concept in
18  the statute, and that we're going to have to address both
19  elements.  And the failure to address administration costs is
20  what clearly, plainly prevented -- well, "prevent" is the
21  wrong word -- but led Congress not to adopt the acquisition
22  cost proposals that HCFA was presenting to them because they
23  didn't think that it was going to address issues of access

Page 7

00040672

```
24  for this vulnerable population.  They weren't convinced of
25  that.  And until HCFA was going to step up to the plate and
0018
 1  address total cost rather than just focusing on drug cost,
 2  there wasn't going to be any progress.  And if you look at
 3  the legislative reports that I've referred to you -- and I
 4  have another cite, Exhibit 42, which will take you back to
 5  1997, I believe.
 6              THE COURT:  Exhibit 42, and what's that?  That's
 7  useful.
 8              MR. MONTGOMERY:  It should be the Fowler
 9  affidavit.  It's a Congressional report that talks about --
10  it's one of the reports that we cite, your Honor, that talks
11  about spreads and the extent of spreads.  This is a
12  Congressional committee report that acknowledges there are
13  spreads between --
14              THE COURT:  At the time that the AWP was put into
15  the statute?
16              MR. MONTGOMERY:  I believe so, yes.  Yes, 500 to
17  1,000 percent in 1997, acknowledged by a Congressional
18  committee in connection with its consideration of the
19  adoption of 95 percent of AWP; again, the adoption of what we
20  believe to be plainly --
21              THE COURT:  So that was like a House report or
22  something?
23              MR. MONTGOMERY:  A house report -- an external
24  system.
25              THE COURT:  You know, I actually used to work in
0019
 1  Congress.  There was no term, you know, a section-by-section
 2  analysis that defines AWP anywhere?
 3              MR. MONTGOMERY:  There is no definition of AWP, and
 4  that's because, I think -- I think the explanation is, is
 5  because they were adopting something that was external.  And
 6  so if you look at the reports that we all debate back and
 7  forth and you look at them from a different perspective, they
 8  reflect an understanding that Congress was adopting something
 9  that it hadn't created.  It was in effect inheriting a
10  system, and, you know, for better or for worse.  And,
11  frankly, because it was a system that operated as an umbrella
12  over just a competitive mechanism, something we love to do in
13  our system -- you know, marry competitive systems with, you
14  know, quasi-regulatory systems -- it was pretty lumpy.  It
15  produced lots of results that attracted a lot of attention
16  and observations from government officials.
17              THE COURT:  You make a huge separate point on
18  causation in your briefs, and we don't have that much time.
19  So you try and cast the government as the intermediary that
20  stops the causation chain.
21              MR. MONTGOMERY:  Yes.
22              THE COURT:  That somehow is lessening it.
23              MR. MONTGOMERY:  Yes.  Well, there can be
24  deception.  I mean, if there was no deception by the
25  decision-maker, there can't be any loss.  The decision-maker
0020
 1  is the government.
 2              THE COURT:  This is what I wanted to talk about.
 3  In a sense, they're not the decision-maker because if I say
 4  the statute means X, they're not the decision-maker because
 5  it's not as if they set the rate.  In other words, it's not
 6  like FERC, the Federal Energy Regulatory Commission, or some
 7  of the other regulatory agencies that sets a rate.  They
 8  basically just pay off 80 percent of what the pharmaceutical
 9  company says is the AWP, and they tell the doctor to bill the
10  Medicare beneficiary for the other 20 percent.  So it's not
11  intermediary in the sense of the cases you've cited.
```

Page 8

00040672

12       MR. MONTGOMERY:  Well, except it's the same kind of
13  decision-making.  The government could have come to the same
14  result by using a fee schedule and a regulatory system which
15  it would impose.
16       THE COURT:  But they didn't, so they relied on the
17  integrity of the price report.
18       MR. MONTGOMERY:  That's right, but there's no
19  difference.  You've got to show that it made some difference
20  to the purchaser, and it didn't make any difference.  The
21  purchaser wasn't going to get to play unless they paid the
22  20 percent.  That was the government's decision.
23       THE COURT:  Of AWP?
24       MR. MONTGOMERY:  Of AWP.
25       THE COURT:  So it wasn't really -- the government
0021
1  isn't really an intermediary, by which I mean, CMS doesn't
2  act as an intermediary.
3       MR. MONTGOMERY:  Not in that sense, but they're the
4  organizer of the event.  You don't get a ticket to the
5  theater --
6       THE COURT:  Unless you pay 20 percent of the
7  average wholesale price.
8       MR. MONTGOMERY:  -- unless you pay 20 percent of
9  whatever is being charged.  And in this system, it's under
10  the AWP system, which, as I said, is constrained by
11  competition, but that's the entry mechanism.  And then we get
12  to the second element of causation, and that's the question
13  of total cost, which the plaintiffs don't address at all.
14  Dr. Hartman says, "I'm not looking at cross-subsidization.
15  I'm not looking at the legislative consideration of this
16  question of total cost.  It's not something that I've taken
17  into account at all."
18       So even if you get all -- I'm repeating myself, but
19  even if you get all the way through the analysis -- you know,
20  is there any harm to a particular individual in that payment
21  of 20 percent? -- I'm going to show you, if we get to the
22  Warrick portion of the argument, what happened to total
23  expenditures on a particular drug, and they went up under the
24  Medicare Modernization Act.
25       THE COURT:  But I have to follow the statutory
0022
1  scheme which has been set up; and while you may be right that
2  under the radar screen, the reason why Congress didn't have
3  the desire or they couldn't get a consensus to change it is
4  because they didn't want to overhaul the whole thing, I don't
5  think that that's legally relevant.  I have to follow the
6  statutory scheme that we've got.
7       MR. MONTGOMERY:  Well, except the statutory scheme
8  that we've got intended to confer a benefit on these
9  consumers at a price.  And I do think that if you ever get to
10  the subject of damages, you've got to look at whether there
11  was any damage.  The damage comes in the form of the
12  20 percent.  The 20 percent is not -- I mean, there are
13  component parts to it, but the consumer just writes out
14  20 percent.  It's an all-in number.
15       THE COURT:  Right.  So are there any other big --
16  those are the two big issues I focused on, what does AWP
17  mean, and what is causation in this regime?
18       MR. MONTGOMERY:  I think those are the big issues.
19  And, you know, I think what's going on here is that Congress
20  did fail to act.  This case is requiring or asking you to
21  impose a retroactive regulatory regime that requires a lot of
22  detail of the sort that I was mentioning earlier.  You know,
23  you'd have to create that regime in order to actually fashion
24  this mechanism.  And it's really absurd, your Honor, when
25  Congress chose not to do it.  And, remember, --

Page 9

00040672

0023
1           THE COURT:  Well Congress' failure to act is
2  different than a conscious decision as to what AWP meant
3  after the fact.  I mean, you can't look at a 2003 report on
4  what it evolved into and say that's what they meant in 1997.
5           MR. MONTGOMERY:  That's why you should read
6  Mr. Scully because Mr. Scully gives you a historical
7  perspective.
8           THE COURT:  I will do that.
9           MR. MONTGOMERY:  And remember, of course, the
10  pharmaceutical companies didn't get the money.  And what the
11  plaintiffs say is, "Oh, contrare.  You got market share."
12           This is summary judgment.  This is time for them to
13  come forth with some proof.  There is nothing in their papers
14  about market share, no correlations that they attempt to
15  analyze or draw to market share.  It's a construct, your
16  Honor, and it's a house of cards.  And at summary judgment
17  stage, they shouldn't be allowed to continue on such a basis.
18           THE COURT:  All right, thank you.  Plaintiffs?
19           MR. BERMAN:  Thank you, your Honor.
20           THE COURT:  So what does AWP mean?
21           MR. BERMAN:  It means the plain meaning that you
22  would give it in Black's Law Dictionary, an average price.
23           THE COURT:  And you're not pushing for the
24  statutory construction, which is confusing from your briefs,
25  for me to adopt this, "Well, the market understood

0024
1  30 percent" thing, Dr. Hartman?
2           MR. BERMAN:  Well, there's two issues.  Let me get
3  to Dr. Hartman.  We believe that if you follow the plain
4  meaning rule that you've been talking about -- and we've
5  cited the cases -- this is not one of the exceptions for a
6  technical term or art term to be employed -- that it can only
7  have one meaning, and that is, it was supposed to be the
8  national wholesale average.  And if you look at --
9           THE COURT:  For what year?  That's Mr. Montgomery's
10  question.  Well, how do I decide what that means?
11           MR. BERMAN:  Okay, you mean timewise?
12           THE COURT:  Yes.
13           MR. BERMAN:  If you look at -- I have a notebook
14  that I gave your Honor, and I have a chart.  And what I think
15  the chart will show you is that prior to the adoption of the
16  regulation in 1997, and in the first entry, for example,
17  Congress was basing reimbursement on actual acquisition cost.
18           THE COURT:  Which tab?
19           MR. BERMAN:  It's called History of AWP
20  Reimbursement.  I believe it's Tab 3.
21           THE COURT:  Tab?
22           MR. BERMAN:  Three.  It should be blue.
23           THE COURT:  All right.
24           MR. BERMAN:  What you see in at least the first
25  four or five entries is that every time Congress defined what

0025
1  it was trying to do, it said, "We're trying to gear our
2  payments to acquisition costs."  And acquisition costs, we
3  believe, if you look at Item 2, for example, is, quote, "very
4  similar to the Average Wholesale Price."  And then in Item 3,
5  "Medicare policy. . . has been to base payment for
6  'incident to' drugs on the estimated acquisition costs."
7  Then Item 4, "Estimated acquisition costs," according to HCFA
8  is, "or the national average wholesale price."
9           So if you look at Congress' intent prior to '97,
10  they were looking for estimated acquisition costs.  They
11  thought that it was the same thing as average wholesale
12  price, and they eventually adopted average wholesale price.
13  So from the get-go, the reason they adopted it was, they were

Page 10

00040672

14  finding it was difficult because of the lack of transparency
15  in defendants' records to find out what the real price was,
16  so they said, "Okay, we have to use the national average
17  wholesale price."
18          We have moved for summary judgment because I think
19  you hit the nail on the head when you said they aren't
20  contending, and they never have, that they meet this
21  definition.  They don't.  There's not one shred of
22  evidence -- and we've put in evidence to the contrary -- that
23  the reported AWPs were the national average wholesale price.
24  They weren't.  That's not a contested fact.
25          THE COURT:  What are you looking for summary
0026
1  judgment on?
2          MR. BERMAN:  I'm looking for summary judgment on
3  the following things:  First, that each defendant either
4  directly published or caused to be published the AWP.  Only
5  one defendant really contests that, that's BMS; and they
6  published the wholesale list price, which they knew would be
7  turned into AWP, and they knew the wholesale list price was a
8  phoney price.  The rest of them don't contest that.
9          Second, we want your Honor to rule as a matter of
10  summary judgment that the average wholesale price is defined
11  the way we interpret it in our briefs.  And I think you have
12  to do that --
13          THE COURT:  Without regard to Hartman?
14          MR. BERMAN:  Without regard to Hartman.  I think we
15  have to do that because that's not for the jury to decide.
16          THE COURT:  All right, so you want me to define it
17  as a matter of law?
18          MR. BERMAN:  Yes.
19          THE COURT:  All right, what's the third thing?
20          MR. BERMAN:  The third thing is that there is no
21  contested issue of fact that -- and maybe I've said this,
22  your Honor -- I apologize if I'm repeating myself -- that the
23  defendants did not -- that they caused false or deceptive
24  AWPs to be published, because, again, they're not contesting
25  that --
0027
1          THE COURT:  So you want me to just basically give
2  you summary judgment?  I mean, you basically want the whole
3  case to go away?
4          MR. BERMAN:  Except for one thing.
5          THE COURT:  What?
6          MR. BERMAN:  I think there's only one issue left.
7          THE COURT:  What?
8          MR. BERMAN:  Damages.  What is the damage?  I mean,
9  obviously there's an expert dispute on --
10          THE COURT:  Unfair and deceptive, is that a jury
11  call?
12          MR. BERMAN:  Well, I don't think the jury gets it
13  because I think you decide that, whether it's unfair and
14  deceptive.
15          THE COURT:  Under all state statutes?
16          MR. BERMAN:  It's a mix on that.
17          THE COURT:  Well, then I can't do it.  All right,
18  so unfair and deceptive remains a jury call.
19          MR. BERMAN:  But there could be a finding --
20          THE COURT:  And there may be some states in which
21  it's not, but unfair and deceptive does not come to me.
22          MR. BERMAN:  But there could be a finding, your
23  Honor, and I think there should be, that as a matter of
24  fact --
25          THE COURT:  I will not do that on summary
0028
1  judgment.  All right, I do think it's appropriate for me, and

Page 11

00040672

```
 2   I think both sides are urging me to do that, to define AWP as
 3   a matter of law.  And both sides, one wants it as a term of
 4   art which reflects just what the report says; one says I
 5   should do it sort of based on plain language.  That is for
 6   me.  That I will do.  I'll ask you about the cost to be
 7   published, whether that's disputed or not, in a second.
 8           And some, like Massachusetts, that's a judge call,
 9   right?
10           MR. BERMAN:  That's correct.
11           THE COURT:  You're saying you've looked at all the
12   remaining states that are left, and some of those are jury?
13           MR. BERMAN:  I believe so, your Honor.
14           THE COURT:  And you're going to at some point give
15   me that compendium.
16           MR. BERMAN:  Yes.  But as to Class 2, which is
17   Massachusetts only, we believe that based on the record we've
18   given you, that you can enter a summary judgment on all
19   issues but damages.
20           THE COURT:  Okay, and what's the next one?
21           MR. BERMAN:  That's it on summary judgment in our
22   favor, and obviously --
23           THE COURT:  You've also asked essentially on
24   statute of limitations all the affirmative defenses go out,
25   right?
0029
 1           MR. BERMAN:  Yes, and if you wanted us to address
 2   that, Mr. Haviland will address that.
 3           THE COURT:  All right, so we'll get to that in a
 4   minute.  So can you help me out?  Did you find any
 5   legislative reports back in -- when was it? -- 1997 that put
 6   into effect this AWP, what it means, what Congress meant?
 7           MR. BERMAN:  Other than these excerpts we've given
 8   you, when Congress seemed to relate AWP to estimated
 9   acquisition cost, the answer is "no."
10           THE COURT:  All right.
11           MR. BERMAN:  But to get to a couple of points that
12   Mr. Montgomery made, he said, you know, take a look at
13   Mr. Scully.  I think he referenced the fact that Mr. Scully
14   testified that AWP -- and this is Point 15 in my chart -- "is
15   intended to represent the average price at which the
16   wholesalers sell drugs to their customers, which includes
17   physicians and pharmacists."  And Mr. Montgomery was very
18   silent about the fact that you look to agency's
19   interpretation of its own mandate.  And the office of the
20   Inspector General and CMS have both said it's supposed to be
21   average wholesale price, and the OIG has said it's supposed
22   to include all the types of discounts, rebates, free goods
23   that we claim are not reflected in the published price.  So
24   not only are they not entitled to summary judgment, but we
25   believe, going back to where I was, that there's not much
0030
 1   left to try, particularly with respect to Class 2.
 2           THE COURT:  Have you done a compilation of the
 3   statutes in which actual reliance is required?
 4           MR. BERMAN:  We did that for you in our class
 5   certification papers.
 6           THE COURT:  So on those reliance statutes, do I
 7   carve those out?
 8           MR. BERMAN:  Well, we're proceeding on the
 9   theory -- remember how we unified this class -- that this was
10   an intentional fraud, and therefore we sweep in everyone.
11           THE COURT:  Regardless of reliance?
12           MR. BERMAN:  That's correct.  And in this case --
13           THE COURT:  I'm thinking that may be you're mixing
14   apples and oranges.
15           MR. BERMAN:  I am mixing up apples and oranges.  We
```

00040672

16    did not break out the reliance issue for you.  You know, we
17    could do that for you at a later date, but in most states,
18    when you have an omission of fact, you get a presumption of
19    reliance.  And in this state, reliance is not required.
20         THE COURT:  This state, under 93A, reliance is not
21    required.
22         MR. BERMAN:  That's right.
23         THE COURT:  That having been said, in most fraud
24    cases, you have to prove that someone would have relied on
25    the material fact omitted, so I think we need some analysis
0031
1    there.  But, anyway, so you've given me -- I think everyone
2    agrees I need to decide AWP as a matter of law.  I think I'm
3    unlikely to find that it's unfair and deceptive in cases that
4    require jury trials.  Otherwise I'll hear a trial benchwise
5    if I get that far.  Now, the argument --
6         MR. BERMAN:  Can I go back --
7         THE COURT:  Yes, is there anything else you wanted
8    to say?
9         MR. BERMAN:  Yes.  I want to go back to one cite,
10   and Mr. Montgomery, I think, said you should look at their
11   Exhibit 82 as the definitive exhibit.  If you look at that,
12   it's a House Ways and Means report --
13        THE COURT:  I don't have that down.  I have 63 and
14   42, right?  You have 82?
15        MR. BERMAN:  An additional one is 82.  It's in my
16   chart.
17        THE COURT:  And what is that?
18        MR. BERMAN:  It says -- this is a House Committee
19   on Ways and Means -- "AWP is intended to represent the
20   average price used by wholesalers to sell drugs to their
21   customers."
22        THE COURT:  In what year?
23        MR. BERMAN:  That's in 2003.
24        THE COURT:  Is there any other point that you want
25   to make?
0032
1         MR. BERMAN:  Well, I want to make the one point
2    very briefly, your Honor.  And I have a chart in the book,
3    and it goes to why we're asking for summary judgment.  This
4    is a chart that shows the average wholesale price for
5    Zolodex.  Zolodex is the AstraZeneca drug.
6         THE COURT:  Well, can we wait until we get Zolodex
7    up at bat?
8         MR. BERMAN:  All right, that's it for our
9    affirmative motion except for the affirmative defenses.
10        THE COURT:  Let me ask you this, Mr. Montgomery.  I
11   don't know if you're prepared to answer for everyone.  Is it
12   undisputed that the drug companies caused the AWP to be
13   published?
14        MR. MONTGOMERY:  Caused. . .
15        THE COURT:  In the publishing book?
16        MR. MONTGOMERY:  There may be a phrasing problem.
17   I think it's probably undisputed that we participate --
18        THE COURT:  That you either reported AWPs or you
19   gave a WAC and understood the percentage by which they would
20   be marked up?
21        MR. MONTGOMERY:  I don't think that I could concede
22   that.  I mean, there are a number of stories that I think
23   that you've seen at various points in these cases where one
24   company or another actually didn't cooperate in the AWP
25   system, and a price was reported anyway.
0033
1         THE COURT:  Fair enough.  I'm talking about the
2    five, or should I go through them one by one?
3         MR. MONTGOMERY:  Well, certainly as to certain

Page 13

00040672

4   drugs, we, I believe -- I'm looking at my colleagues here --
5   all participated in the system in one fashion or another.
6           THE COURT:  Is there anybody from the first five
7   that would contest that you substantially caused the AWP to
8   be published, either by reporting AWPs or WACs, or some
9   variation, understanding the formula that was going to be
10  used?
11          MR. EDWARDS:  Your Honor, for BMS, BMS reported a
12  list price.  The record is extensive that BMS did not control
13  the markup factor that the publications used to create the
14  AWP.
15          THE COURT:  So for you, it would be a fact
16  question.
17          MR. EDWARDS:  Excuse me?
18          THE COURT:  Well, let me ask you this:  When you
19  say not controlled, you would report the list price to which
20  publishing house, was it?
21          MR. EDWARDS:  All three of them, your Honor.
22          THE COURT:  All three of them.  Did you understand
23  the markup that was going to be used?
24          MR. EDWARDS:  Yes, your Honor, but we didn't
25  control it.  It was their decision what to do.
0034
1           THE COURT:  So then the issue really is, I guess,
2   what legal effect that had if you knew it was going to happen
3   but you didn't control it.  Is that --
4           MR. EDWARDS:  That's correct, your Honor, and we've
5   cited to you the evidence of the lack of control, and we've
6   cited to you a number of cases which demonstrate that control
7   is necessary, including the entanglement cases.  These are
8   cases that arise under the securities laws.
9           THE COURT:  Okay, so I need to focus on you.
10          MR. EDWARDS:  Yes.
11          THE COURT:  That would be the one fact?  You know,
12  I'm highly unlikely to rule on individual motions for summary
13  judgment until it's time for trial, which is why I would like
14  to focus right now on AstraZeneca, which, as I understand it,
15  is still the first trial.  Is that right.
16          MR. BERMAN:  That's correct, your Honor.
17          MR. CAVANAUGH:  Your Honor, Bill Cavanaugh on
18  behalf of Johnson & Johnson.  With respect to causing AWPs,
19  we would report them to the pricing services.  The pricing
20  services ultimately determined what they were going to do,
21  and let me give your Honor an example.  As your Honor knows
22  from the case in front of you, First DataBank, for our two
23  drugs, on Remicaid, we reported an AWP that was 130 percent
24  of the reported WAC, a 30 percent spread.  First DataBank
25  unilaterally took it down to 25 percent.  On Procrit, we
0035
1   reported a 20 percent spread, and First DataBank took it up
2   to 25 percent.
3           So, your Honor, the plaintiffs have been quite cute
4   in using the term "caused."  Manufacturers didn't cause those
5   to be published because there was an intermediary -- i.e.,
6   the pricing service -- which apparently ultimately determined
7   what number would be published.
8           THE COURT:  And I remember when this first came in,
9   everybody sort of, you all, for purposes of RICO said, "Well,
10  they couldn't have been a part of the enterprise because
11  there's no common purpose.  We just told them what to do, and
12  they did it."  So --
13          MR. CAVANAUGH:  Well, your Honor, the facts as to
14  First DataBank and those actions in 2004 are basically
15  undisputed that that's what they did in 2004.
16          THE COURT:  I just feel as if it's shifted a
17  little, but maybe that's true for everybody.  I just remember

Page 14

00040672

18  the argument being there couldn't be an enterprise because
19  there's no common purpose because the publishing companies
20  just were like the phone book; they just published what we
21  told them to.  And maybe you all weren't involved at that
22  point, but, in any event, let's get to AstraZeneca.
23          All right, you have some unique defenses, and one
24  of them had to do with one pill or one -- what was it called
25  now?  There was one of them where it was an agreed-upon
0036
1  judgment that it was unproven.
2          MR. WISE:  Oh, yes, your Honor, I think I know what
3  you're talking about.
4          THE COURT:  You know, I had never heard of it
5  before.  It's mostly for children, a kind of inhalant?
6          MR. WISE:  Thank you, your Honor.  Scott Wise for
7  AstraZeneca.
8          THE COURT:  So from right off the bat, everyone
9  agrees we throw that out, right?  What was the name of it?
10         MR. WISE:  Pulmicort Respules.  You're absolutely
11  right, everybody has agreed you don't have to worry about
12  that.
13         THE COURT:  Okay.  So now we go to the weeds of the
14  Oregon and Florida statutes.
15         MR. WISE:  For two seconds, though, could I just
16  make one plug, and it will only take 15 seconds, on the
17  statutory interpretation point?  I commend to you our brief,
18  it's a plug for our brief, AstraZeneca's individual
19  memorandum in opposition to plaintiff's motion for partial
20  summary judgment.  It's a ten-page section on the rules of
21  statutory construction and how we think you should go about
22  determining the meaning of the phrase in the statute "average
23  wholesale price."  It goes through plain meaning, term of
24  art, et cetera, very cogent, and I think it answers the
25  question and gets to the result that it's a term of art, that
0037
1  Congress adopted a term of art in use as --
2          THE COURT:  Thank you, because I will be reading in
3  depth your briefs.
4          MR. WISE:  And there's a footnote with a line of
5  cases going back to the 19th century about terms of art and
6  how they're used in statutory interpretation.  I promise it's
7  really, really good.
8          MR. BERMAN:  It's riveting.
9          (Laughter.)
10         MR. WISE:  It's the kind of thing that only lawyers
11  could get excited about.
12         Now, okay, so no Pulmicort.  And, finally, after
13  some period of time, we're getting this boiled down to
14  something you can get your arms around, one product, Zolodex.
15         THE COURT:  Right.
16         MR. WISE:  Two plaintiffs in the consumer class.
17         THE COURT:  Right.
18         MR. WISE:  One from Florida, one from Oregon.
19         Now, you remember, or at least certainly I remember
20  at least one, maybe more occasions where you have exhibited
21  some frustration in all the paper flying around your chambers
22  never adequately coming to grips with the core state law
23  problems in this case.  You now have a putative class
24  involving all sorts of different state laws, the prospect of
25  a multiweek, multimillion-dollar trial of a class action
0038
1  based on these components of state law.  So we tried to take
2  a little different tack here and tried to get at Florida and
3  Oregon law with respect to Mr. Howe, who is a prostate cancer
4  patient from Oregon, and Mr. Townsend, who is a similar
5  patient in Florida.

00040672
6            And it's not that complicated, but we think it's
7     pretty clear, when you look at the statutes and you compare
8     them to the facts that are really undisputed with respect to
9     these individual class representatives, there is really no
10    viable claim that should be permitted to go forward here
11    under these particular state schemes.
12           The first one, Oregon.  Oregon, it's not totally
13    unique, but it's unlike many of the other state statutes.  It
14    specifically proscribes 56 different business practices, and
15    then it says:  You have a claim, a private action, if as a
16    result of willful use and employment of an act or practice
17    declared unlawful by this chapter.  Okay, so they have a
18    system, they have 56 different categories; and you have a
19    claim if you're complaining about something that is described
20    in one of those categories.
21           This, however one describes this AWP case, does not
22    fit in any of the 56.  It simply does not fit.
23           And there is a catchall section in the Oregon
24    statute, by the way, which the plaintiffs may point to, but
25    there is a catchall of the catchall, which is, the catchall
0039
1     doesn't have any meaning unless the AG in that state conducts
2     a rule-making to establish under the catchall provision that
3     a different kind of practice needs to be prescribed.  So the
4     catchall has no affirmative meaning unless that rule-making
5     takes place; and there has been, at least as of this morning,
6     I can report, no AG rule-making in Oregon with respect to AWP
7     pricing.
8            THE COURT:  Or pricing.
9            MR. WISE:  Right, or pharmaceutical pricing.
10           THE COURT:  Is there anything in general about
11    pricing?  Does it have to be --
12           MR. WISE:  All sorts of stuff about pricing; you
13    know, whether you represent you have certain ingredients in
14    your product, or that it's real estate, or it's directed to
15    consumer advertising, claims that your products are more
16    effective than the other guy's products, all that kind of
17    stuff.  None of that -- you know, have your clerks look
18    through your -- we don't think any of the 56 remotely
19    describes, you know, a pricing dispute with respect to how
20    the federal government set up a medical reimbursement
21    program.
22           Okay, that's Oregon.  Let me just mention while I'm
23    up here --
24           THE COURT:  Well, suppose I agreed with you,
25    because I read the footnote where the statute was set forth,
0040
1     now, you would then say that knocks out that particular
2     plaintiff altogether as a class representative?  Is that it?
3     That's what that accomplishes, right?
4            MR. WISE:  I understand the question, but the only
5     claims before you in this case at the moment are the claims
6     being litigated by the class representatives.  They're the
7     only claims we have to address.
8            THE COURT:  Well, no, you've got the whole class.
9            MR. WISE:  We have a whole class, but the theory of
10    a class action is that the claims of all the class members
11    can be adjudicated through the prosecution of a
12    representative claim.  We're not trying a bunch of different
13    claims at the same time.
14           THE COURT:  I read the section, and I said, "Oh, I
15    know where Wise is coming from on this," right?  I mean --
16           MR. WISE:  They're the only claim we can address.
17    They're the only person that's came forward with a claim
18    against us, these two people.
19           THE COURT:  But suppose I agree with you.  Under
                              Page 16

00040672
```
20  class action law, I've got a whole class now, I've certified
21  the class.
22           MR. WISE:  There's no rep for the class perhaps.
23           THE COURT:  So the question that I run into is --
24  the class certification papers were huge, okay?  I don't
25  remember this being raised as something that didn't make this
0041
1   gentleman, whose name I forget, atypical.
2            MR. WISE:  Mr. Howe.
3            THE COURT:  Yes.  So is it now under class action
4   law too late for you to raise it?
5            MR. WISE:  No.  It's not a question of typicality,
6   I mean, although you'll recall these plaintiffs were being
7   added sort of the night before or the morning of the various
8   class certification proceedings.  I can't remember when
9   Mr. Howe joined --
10           THE COURT:  Right, they're old sick people, and
11  some of them were dying.
12           MR. WISE:  He's been here for a while.  But, no,
13  this is the first time we've ever had the opportunity to
14  address his claim on the merits of his claim under his state
15  law.  We've never had that opportunity before.
16           THE COURT:  But suppose I'm agreeing with you.
17  This is --
18           MR. WISE:  Then you would have to decide, I guess,
19  whether to permit some effort to find, if needed, another
20  class rep.  But the only claim before you now is this
21  person's claim; and if he has no claim, you know, or if the
22  two of them together have no claim, there is no class
23  representative for this class with respect to AstraZeneca.
24           THE COURT:  So then the natural result is, I can't
25  dismiss the class, I just certified it.  I give them a chance
0042
1   to run out and get someone else.  That's the concern I have.
2   It wasn't that you were raising something frivolous.  I mean,
3   I saw what you were talking about.
4            MR. WISE:  Well, the real question from your point
5   of view, it seems to me, one of the real questions -- there's
6   probably more than one -- is whether one wants to build a
7   nationwide class action trial on the strength of this
8   particular class rep claim.
9            THE COURT:  All right, so --
10           MR. WISE:  And if there isn't any merit to the
11  claim and it's dismissible on summary judgment, I think the
12  answer should be "no."  Now, how much time you give them or
13  where they go look for other potential class reps is a
14  subsidiary question.
15           THE COURT:  And the Florida suit, that was a
16  broader statute.
17           MR. WISE:  A little bit broader but interesting,
18  not -- different in structure but --
19           THE COURT:  That's more like ours that's here in
20  Massachusetts.
21           MR. WISE:  A little, but the case law -- let me
22  make a couple points -- makes it clear that in terms of
23  legislative history, sort of pronouncements of the Florida
24  courts, the law is directed to consumer transactions.  It
25  requires deception and materiality, the Florida Supreme
0043
1   Court; and it gets at practices, quote, "likely to affect
2   consumer choices."
3            THE COURT:  But aren't these patients consumers?
4            MR. WISE:  They are, but nothing we did was likely
5   to affect their choice.  In fact we had no communications
6   with them at all.
7            THE COURT:  So you're saying, because the drugs
```
Page 17

00040672
```
 8  were mandatory, in the sense that they're going to die if
 9  they don't take them, that there was no choice?
10          MR. WISE:  There was no conduct that AstraZeneca
11  entered into or performed that was designed to affect patient
12  choice, consumer choice.
13          THE COURT:  All right, so --
14          MR. WISE:  And if you look at the cases, Page 14
15  and 15 of our brief in support of our motion for summary
16  judgment --
17          THE COURT:  Because you're saying consumers really
18  doesn't have a choice here; they do whatever the doctors say?
19          MR. WISE:  Yes.  All of this conduct that's related
20  to pricing and dealing with the government and CMS, none of
21  it is directed at plaintiffs.  This is not advertising that
22  says, "Take our product because our average wholesale price
23  is a great price" or anything.  It's not consumer-directed
24  conduct.  Now --
25          THE COURT:  No, it's doctor-directed.  So you would
0044
 1  say that you can't call them the consumers?  Is that the
 2  legal argument?
 3          MR. WISE:  Yes, I think so.  I think there's a good
 4  argument, if you think about it, that a doctor-patient
 5  relationship probably doesn't even come within the concept of
 6  the consumer protection law of Florida.  That is, what goes
 7  on between doctor and patient I don't think probably is a
 8  consumer transaction.
 9          THE COURT:  So your point under Florida law is,
10  there's nothing here that could have affected consumer
11  choice?
12          MR. WISE:  Correct, "likely to affect consumer
13  choice."
14          THE COURT:  And that comes out of the statute?
15          MR. WISE:  Yes, and a case called Millennium and
16  another case called PNR in the Florida courts, Page 14 and 15
17  of our brief.
18          The only authority they come back with against our
19  arguments that their statute requires deception and
20  materiality, something that really means something to a
21  consumer, that influences their behavior, is a case from the
22  FTC involving Doan's pills.  Remember those pills, the
23  ancient pills?  Well, the case of the FTC --
24          THE COURT:  I'm not that ancient.
25          MR. WISE:  Claims about what the pill did; you
0045
 1  know, "It fixed my back better than the other guy's pills
 2  did," a false advertising case.  It's not a relevant case.
 3  It has nothing to do with construing what's required under
 4  the Florida statute.
 5          THE COURT:  So you're saying that the Florida
 6  statute is a lot broader than Oregon, but it's not quite as
 7  broad as Massachusetts because it has in it a requirement
 8  that it affect consumer choice?
 9          MR. WISE:  Yes.
10          THE COURT:  Okay, thank you.  So who's in charge of
11  Oregon?
12          MR. WEXLER:  I am.  Even though I'm from Illinois,
13  I guess I'm close enough.  Ken Wexler, your Honor.
14          I want to address this last point first and direct
15  your attention to the case Latman V. Costa Cruise Lines.
16          THE COURT:  You know, you're going to have to speak
17  up so that both the Court Reporter and -- you know what, if
18  you went up to that podium, all of the other people could
19  hear you.  Just pull down the mike and --
20          MR. WEXLER:  Thank you, your Honor.  The case of
21  Latman V. Costa Cruise Lines, 758 Southern 2nd 699, Florida
```
Page 18

00040672
22  District Court of appeals, the decision was in 2000.  And
23  that case involved a cruise line that was extracting an
24  excessive tax.  They were paying some to the government and
25  pocketing the rest.  And the court there recognized the need,
0046
1   number one, to liberally interpret the consumer fraud statute
2   of Florida.
3               THE COURT:  Is that the Florida Supreme Court?
4               MR. WEXLER:  No.  It's an appellate court, the
5   Florida District Court of Appeals.
6               THE COURT:  I should have learned that all through
7   the elections, but what is that?  That's like a --
8               MR. WEXLER:  It sounds like an intermediate court
9   to me.  But it said, "In the case of an overcharge," which is
10  what this case is about, people overpaying because of the
11  inflated AWP, "In the case of an overcharge, though people
12  actually paid, we would not hesitate to say that an
13  intentional overcharge of sales tax, which is kept by the
14  company itself, is an unfair and deceptive trade practice,
15  and that the consumer must be repaid.  That is so even though
16  the consumers were clearly willing to pay the price charged,"
17  which Mr. Townsend was because he was dying of cancer.  He
18  was clearly willing to pay the price charged.  It says, "Nor
19  would it make any difference that consumers paid no attention
20  to the sales tax amount," meaning the actual amount that he
21  had to pay.
22              So, you know, it's a nice construct to say that
23  it's between the doctor and the patient, and because there's
24  no choice, there's no liability for a fraudulent price; but
25  the Florida statute says simply that there has to be a --
0047
1               THE COURT:  So do I just read it out of the
2   statute?
3               MR. WEXLER:  It's a likelihood of deception.
4   There's no --
5               THE COURT:  Does the statute say "likely to --"
6               MR. WEXLER:  "Likely to deceive."
7               THE COURT:  It doesn't say "affect consumer
8   choice"?
9               MR. WEXLER:  I'm not familiar with that language.
10  It may have come from a case.  But the statute itself says
11  "likely to deceive."
12              THE COURT:  I see.  Okay, thank you.  Now let's get
13  into Oregon, because I was trying to shoehorn it into one of
14  those little statutory sections.
15              MR. WEXLER:  It's quite easy.
16              THE COURT:  Okay, go.
17              MR. WEXLER:  Section 646.608, 1(s), I can't believe
18  that we don't fall under this because it --
19              THE COURT:  Could you read it.
20              MR. WEXLER:  Yes.  I'll read it verbatim.  It says,
21  "A person engages in an unlawful practice when in the course
22  of the person's business, vocation or occupation the person
23  does any of the following," and (s) says, "Makes false or
24  misleading representations of fact concerning the offer and
25  price of. . ."
0048
1               THE COURT:  Well, at first I thought that,
2   the offering price, ah-ha, that's it.  But they cited some
3   cases that seemed to suggest that those were discounts.  In
4   other words, I think it was the reply memo, and I batted it
5   back and forth.  Did you look at the cases they cite that say
6   that that refers to misrepresentations about discounts?
7               MR. WEXLER:  Yes, and we don't think that's an
8   appropriate interpretation of those cases.  I mean, the
9   language is very straightforward.

Page 19

00040672

```
10              THE COURT:  Did the cases not say that?  I mean,
11    I --
12              MR. WEXLER:  I'm not sure.  I can't tell you right
13    now.  I don't recall standing right here, but we read the
14    cases and did not feel they were applicable at all.
15              THE COURT:  Right, so this is really helpful.
16    You're really narrowing yourself down to -- because this was
17    actually not briefed as well as some of the mega points
18    because -- I mean, not just you.  I mean back and forth.
19    We're really getting pretty refined here.
20              MR. WEXLER:  There is also Section (j) which refers
21    to "Makes false or misleading representations of fact
22    concerning the reasons for, existence of, or amounts of price
23    reductions."  Now, that may on its face not sound applicable,
24    but AstraZeneca has run around throughout this entire case
25    saying that "We had the lower AWP compared to Lupron.  We
0049
1     were the lower-cost alternative," okay?  It's an AWP -- they
2     will argue at trial it's a fact question.  I mean, they will
3     argue at trial that "We were the lower-cost alternative, and
4     therefore we shouldn't be --"
5               THE COURT:  But that's not price reduction; that's
6     competition.  Let me just say this:  Do you want a chance to
7     look at his case?  You didn't file a surreply on this, right?
8               MR. WEXLER:  We did not file a surreply.  I would
9     like the opportunity.
10              THE COURT:  It's actually a blessing, but on this
11    particular point, if you could -- I don't know if Mr. Wise
12    remembers those cases, but his firm -- the offering price is
13    the one that hit me, and then he cites several cases which
14    suggest that those have to do with misrepresentations about
15    how a discount was derived.  And that may be as we just keep
16    shaving off the issues --
17              MR. WEXLER:  Well, then I'm happy to supply a
18    surreply, and tell me when.
19              THE COURT:  Like two or three pages by Friday --
20              MR. WEXLER:  Fine.
21              THE COURT:  -- on whether or not you agree that
22    that's what the cases say, and if not, whether there's some
23    other cases that describe what "offering price" means.
24              MR. WEXLER:  I will tell you right now, I do not
25    agree that's what those cases say or --
0050
1               THE COURT:  I'm sure you don't.
2               MR. WEXLER:  -- and we will confine our case --
3               THE COURT:  Well, it just may be that there's a
4     split in the lower courts or that sort of thing.
5               Am I correct in asking that, Mr. Wise?
6               MR. WISE:  Yes.  The one other thing I would
7     mention, your Honor -- and I don't mean to interrupt too
8     much, but I will just briefly -- there is an elaborate set of
9     regulations which we also cite put out by the Oregon Attorney
10    General elaborating on Subsection (s), and that elaboration
11    makes it totally clear that what (s) is addressing is
12    advertised discounts.
13              THE COURT:  Okay.
14              MR. WISE:  And it's quite an elaborate thing, and
15    you can --
16              THE COURT:  It's just something, rather than having
17    my clerk, with all the things I have to do, start from the
18    get-go on Florida law, it would be very helpful if within a
19    week you gave us your version of what, since you say that's
20    the one that clearly applies.
21              Now, let's suppose we disagree with you, okay.
22    Now, I'm trying to understand as a practical matter what that
23    means.  So as a class, I would carve off Oregon.  I'd have to
```

Page 20

00040672

```
24   decide whether the Florida law captured it.  And if I decided
25   that it didn't capture it, I carve off two states, and you
0051
 1   have to go back and find your class representatives.  Is that
 2   the practical effect of all of this?
 3            MR. WEXLER:  Well, I wouldn't say that you would
 4   carve off Oregon yet, but, yes, if you granted summary
 5   judgments on the claims of these individual class members,
 6   yes, we would like the opportunity to find substitute class
 7   members.
 8            THE COURT:  What would you say -- and maybe it's
 9   unfair to turn to you, since you have a whole team here --
10   would be the broadest state consumer protection statute?
11            MR. BERMAN:  Massachusetts, your Honor.
12            THE COURT:  More than California?
13            MR. SOBOL:  Yes.
14            MR. BERMAN:  We may disagree, since I'm on the West
15   Coast, but they're pretty close.  I'd have to analyze it, but
16   they're almost identical.
17            THE COURT:  All right, because what I'm going to
18   have to do, which I'm dreading but I will have to do, is, if
19   this goes forward to trial in September, I need to find out
20   what the -- apart from whether individual class
21   representatives exist, I'm going to have to find out what are
22   the common questions that I'm going to give to a jury.  I
23   mean, it is time now to put your teams of summer law clerks
24   on figuring out what states are left.  And the reliance
25   question, if we get there, I mean, in other words, actual
0052
 1   reliance is not going to happen with any of these, with these
 2   classes.  That's not part of this case, if there's a
 3   requirement of actual reliance like in some of those
 4   advertising cases.  So we need to figure out from the get-go
 5   which cases to just carve off.  Some don't, I know that.
 6   Massachusetts is one of them.  It looks as if Florida is not
 7   one of them.  On the other hand, I have to deal with the
 8   consumer choice issue.  And in Oregon, I have to just figure
 9   out even whether this is an offering price case.
10            MR. BERMAN:  And on the class representative issue,
11   your Honor, we already have another representative.  If we
12   needed one, we could --
13            THE COURT:  On Zolodex?
14            MR. BERMAN:  On Zolodex.
15            THE COURT:  Is that already in the case?
16            MR. BERMAN:  It's not in the case yet.
17            THE COURT:  What state?
18            MR. BERMAN:  Texas.
19            THE COURT:  How broad is that statute?  In other
20   words, we can't keep -- I mean --
21            MR. BERMAN:  I understand that.
22            THE COURT:  I mean, this is September, September.
23            MR. BERMAN:  And I suspect -- we're about to give
24   you the class notice which comes out very shortly in order to
25   have the trial date hold, and I suspect in reaction to that
0053
 1   notice we will have quite a few new people identify
 2   themselves.
 3            THE COURT:  Well, it's one drug, right?
 4            MR. BERMAN:  That's right.
 5            MR. WEXLER:  It's one drug.
 6            THE COURT:  It's one drug.  And the issue at the
 7   end of the day is, even if I direct out Oregon and Florida,
 8   I've got a class certified.  So what does that do?  Has
 9   anyone looked up what that does to those two people as class
10   representatives?  Let's assume I say that the defendants are
11   exactly right, that there's no cause of action in Florida,
```

Page 21

00040672

12  but I've already certified a class.  Does that mean that they
13  are now -- what's the right word? -- no longer qualify as
14  class reps?  Or do they, because it wasn't raised before, do
15  they continue -- I'm going to have to look it up too -- do
16  they continue to be adequate class representatives?
17          MR. BERMAN:  I've seen some courts say that because
18  they no longer have a claim, they're no longer typical.  I've
19  seen some courts say that they still can represent the class
20  because they have the same incentives to protect that class.
21          THE COURT:  Do we know what the First Circuit has
22  done?  I think that's just something we probably should all
23  look at.
24          MR. BERMAN:  I think what the manual says, if that
25  happens, if you have a headless class because of this
0054
1  problem, that courts generally try to find another class
2  representative, since you've certified the class.
3          THE COURT:  All right, so that's what you're
4  telling me you would want to do rather than risk this --
5          MR. BERMAN:  Yes, your Honor.
6          THE COURT:  -- on a split court situation, is that
7  right?
8          MR. BERMAN:  That's correct.
9          THE COURT:  All right, if anyone wants to file a
10  two-page brief within a week, you know, just giving me a key
11  case or two on what happens if Mr. Wise is correct, we need
12  to do that.
13          Now, is there anything else you wanted to say?
14          MR. WEXLER:  No, not based on your questions, your
15  Honor.
16          THE COURT:  Anything else AstraZeneca wanted to
17  say?
18          MR. WISE:  No, thank you, your Honor.
19          THE COURT:  All right.  My theory of life is going
20  to be is that I have enough on my plate.  I will rule on the
21  crosscutting issues.  I will rule on the specific AstraZeneca
22  issues.  I am not likely to get to the other issues,
23  company-specific issues, until your company is up at bat in
24  terms of the trial, and then I'll be very focused.
25          This notice, class notice, when does that need to
0055
1  go out?
2          MR. BERMAN:  Well, in order to make the national
3  buys, we need to get it out --
4          THE COURT:  The national?
5          MR. BERMAN:  The national buy.  We're going to have
6  a national publication, so we have to notify those magazines
7  that we want to get space in their magazine, and there's a
8  certain lead time.
9          THE COURT:  Which is?  This is the first I've heard
10  about this.
11          MR. BERMAN:  So we need to get that notice to them,
12  you know, in the next three to four weeks and to begin
13  reserving time.  We could start doing that, I think.
14          THE COURT:  So -- this is getting my heart beating
15  very rapidly -- so this means I need to rule within a month.
16          MR. BERMAN:  Well, we've given them the form of the
17  notice.
18          THE COURT:  Well, yes, but what you're saying is,
19  you don't want to send it out until you see how I rule.
20          MR. BERMAN:  Well, we're trying to get it teed up
21  so that we can present it to your Honor for a ruling, that's
22  correct.  We can't send it out until you rule on the issue of
23  the form of the class notice.  On the issue of summary
24  judgment, we can get it out before you rule.
25          THE COURT:  Right, but we're now so close.

Page 22

00040672

0056
1           MR. BERMAN:  Well, if we wait until you rule -- I'm
2   not trying to pressure you into ruling -- then the problem
3   is, it may be so late, if you don't rule until July or so, we
4   have to give people an opportunity to opt out.
5           THE COURT:  I'm sorry, I've been so focused on
6   summary judgment.  So we haven't sent out a class notice
7   yet?
8           MR. BERMAN:  That's correct.
9           THE COURT:  And that's because you must have been
10  waiting till the summary judgment.
11          MR. BERMAN:  No.  We were waiting --
12          THE COURT:  Why haven't you --
13          MR. BERMAN:  Because we were hoping, because this
14  is a complicated process, to combine the notice of pendency
15  with the notice of -- involving another defendant, so we can
16  do two things at once.
17          THE COURT:  Who?  What do you mean "another
18  defendant"?
19          MR. BERMAN:  The defendant who's not arguing at the
20  moment of the original five.
21          THE COURT:  This is like The DaVinci Code, right?
22          (Laughter.)
23          THE COURT:  So this puts me in a bad spot.  So just
24  let me understand this, the dynamic here.  This may be the
25  most critical thing I do here.  So in order -- what do we
0057
1   have, a September 18 trial date?
2           MR. BERMAN:  September 28.
3           THE COURT:  So is there some rule I'm not familiar
4   with that says the notice has to go out X amount of time
5   before the trial?
6           MR. BERMAN:  No.  It's just a reasonable time to
7   give people time to opt out.
8           THE COURT:  Well, all right.  And what do the
9   courts say that's got to be?  That's got to be 30 days?  What
10  does it have to be, 60 days?  What is it typically?
11          MR. BERMAN:  Thirty to 60 days.
12          THE COURT:  I mean, these people, just as a matter
13  of definition, are older and sick.  Now, the third-party
14  payors can get out quickly.  I'm not so worried about them.
15  But at least with respect to the AstraZeneca people, which is
16  September 28, I need to give them, you know -- I think
17  30 days would be rough, particularly over the summer, right?
18          MR. BERMAN:  That's correct.
19          THE COURT:  So maybe 60 days, just working
20  backwards?  Does this all sound right to you?  So September,
21  August, July.  And when can you get it into the
22  publications?
23          MR. BERMAN:  We could get it into the publications
24  by July, early July.
25          THE COURT:  So when do I have to rule by?
0058
1           MR. BERMAN:  June, mid-June.
2           THE COURT:  Mid-June?
3           MR. BERMAN:  Not on summary judgment; on the form
4   of the notice.  We need to get your approval of what the
5   notice looks like and to how we're distributing the notice.
6           THE COURT:  With respect to the party that shall
7   not be named, can't that be a second notice?
8           MR. BERMAN:  Well, we were hoping it would not be.
9   It's not going that fast.  I've sent Mr. Wise a draft of the
10  pendency.  We hope to reach agreement.  If we can't reach
11  agreement in the next few days, we're going to file a motion
12  to get the process going.
13          THE COURT:  I guess at this point we're just so

Page 23

00040672
14    close, if you were to send out a notice and then if I were to
15    rule for summary judgment that way, that's sort of -- it's
16    not a good thing to do in terms of the justice system.
17         MR. BERMAN:  Well, but normally, when the notice
18    goes out, summary judgment is way down the line.  People have
19    no idea whether they're going to be, you know, in or out
20    because of an adverse summary judgment ruling.
21         THE COURT:  I know, but then people are opting out
22    of a class that doesn't exist anymore.  So you think I need
23    to rule by the end of June, is that it?
24         MR. BERMAN:  On the summary judgments?  Yes.
25         THE COURT:  So even just a thumbs up/thumbs down,
0059
1     even without an opinion?
2          MR. BERMAN:  If you think that's important for
3     people who are considering whether to opt out, yes.
4          THE COURT:  Well, you don't want to send it out and
5     then have people get all ginned up about it.  It's just not
6     the way you should run it now that we're so close up against
7     it.
8          MR. BERMAN:  I understand.
9          THE COURT:  So just so I understand, the drop-dead
10    date for the publication is when?
11         MR. BERMAN:  Early July.
12         THE COURT:  All right.  And people probably take
13    vacations around July 4, right?  So I just want to script
14    this in advance.  Have you exchanged with them the form of
15    the notice?
16         MR. BERMAN:  Yes.
17         THE COURT:  With and without the party that shall
18    not be named?
19         MR. BERMAN:  Yes.
20         THE COURT:  Okay.  Do they all know what you're
21    talking about?
22         MR. BERMAN:  Yes.  They should.
23         MR. WISE:  We do, your Honor.  We have just
24    recently gotten that within the last week or so, I think, and
25    there are a lot of issues, as you might imagine.  This is a,
0060
1     as you know, a bit of a novel class structure.  And the first
2     version of what we got from the plaintiffs attempted to be a
3     notice for all companies, for all products, for all of the
4     track one companies, and there are issues about whether that
5     would even work or whether it should be company by company
6     or -- and we have started that process to try to, you know,
7     gather our thoughts and sit down with them and see if we
8     can't come to a resolution what the notice should look like.
9     That process is starting.
10         THE COURT:  Well, that should happen, and any
11    disputes should come to me by when?
12         MR. BERMAN:  Middle of next week?
13         MR. WISE:  Maybe a couple of weeks?
14         THE COURT:  Here's the issue:  The good news is, my
15    son is graduating from college, but it really puts me out of
16    whack for the second week in June.  So what I don't want
17    is -- what's that?  So that puts us either within the next
18    two weeks or the third week in June.  And so if there are any
19    disputes, we need to get people back in here.
20         MR. BERMAN:  And I would prefer it to be sooner
21    rather than later.
22         THE COURT:  So can we say that any disputes will be
23    presented to me within fourteen days?
24         MR. WISE:  We could try to do that.
25         THE COURT:  On the notice?  Just the notice, so at
0061
1     least it will be ready to go regardless -- and if I moot it

Page 24

00040672

```
 2    out, it's mooted out; but if I say "go," it would go, but
 3    we're not starting then.  Does that seem reasonable?  Is
 4    anyone opposed to that in any of the tracks?  Or is this just
 5    going to be AstraZeneca?
 6              MR. WISE:  We'll have to talk about that.  It might
 7    make sense to make this a one-company project.
 8              MR. BERMAN:  Well, as we drafted it, it's for all
 9    of these as opposed to --
10              THE COURT:  Just the track one?
11              MR. BERMAN:  Track one, because we don't want to do
12    this five times.  It's very expensive.
13              THE COURT:  I hear you.  I'm understanding that.
14    And then there will probably be a second opt-out chance,
15    right, if there's either a -- how does the second opt-out
16    work?  There's a settlement and --
17              MR. BERMAN:  The second opt-out usually works in
18    the context of a settlement.
19              THE COURT:  And so the second opt-out is only a
20    settlement, right?
21              MR. WISE:  It's under the new Rule 23.
22              THE COURT:  Under the new rule.  I've not worked
23    with it before.  So I think that's right, there's a second
24    opt-out period.  So that would have to be provided for in the
25    notice?
0062
 1              MR. BERMAN:  Only if there was a settlement.
 2              THE COURT:  Right.
 3              MR. WISE:  Well, I think that probably is covered
 4    in the first notice as well.
 5              THE COURT:  Can I see you all at side bar for a
 6    minute.
 7              (Side-bar conference held.)
 8              THE COURT:  Okay, so you, Mr. Berman, were
 9    discussing with me --
10              MR. BERMAN:  Yes, your Honor.
11              THE COURT:  -- that there's a trial coming up, and
12    you wanted something.
13              MR. BERMAN:  Well, what we would like is, we're
14    thinking through just a lot of issues.  There's hundreds of
15    exhibits.  There's witness issues.  We think we need -- I
16    know you're very busy, but we need soon -- and I know I'm
17    being presumptuous because there's summary judgment motions
18    pending that haven't been decided -- but we need a trial
19    conference with your Honor, like an hour.
20              THE COURT:  All right, first I'm going to get
21    through summary judgment, and then I'm going to get through
22    the notice, and then you will get a trial conference,
23    probably sometime in July.  That's two months in advance.
24    Most pretrial conferences are a couple weeks in advance.
25              MR. BERMAN:  That's perfect.
0063
 1              THE COURT:  But I'm not prepared to do that right
 2    now, so --
 3              MR. HAVILAND:  Your Honor, on summary judgment, the
 4    plaintiffs have two affirmative motions that affect
 5    AstraZeneca, so if your Honor would like to hear on those
 6    two.  One is the affirmative defenses motion, which is
 7    already fully briefed, and I think the papers pretty much
 8    speak to the issues of what the Court has to do in terms of
 9    the nine remaining defenses.
10              THE COURT:  While you're doing it, it did strike
11    me -- we didn't focus on it because it only knocked out part
12    of the case -- but with respect to the third-party payors,
13    there would be, at the very least, a jury issue on what they
14    knew or should have known with respect to Zoledex.
15              MR. HAVILAND:  And that, your Honor, may be a
```

Page 25

00040672
```
16   Class 2 issue, not a Class 1 issue, by the defendants' own
17   admissions.
18            THE COURT:  But aren't I doing both of these?
19            MR. HAVILAND:  Yes, your Honor.
20            THE COURT:  So that's a serious issue.
21            MR. HAVILAND:  It may be.
22            THE COURT:  Do you know whether the third-party
23   payors, like Blue Cross-Blue Shield, were also purchasers of
24   Zoladex?
25            MR. HAVILAND:  Yes, your Honor.
0064
1            MR. BERMAN:  They were, your Honor.
2            THE COURT:  So why wouldn't that --
3            MR. BERMAN:  Because in this class that's going to
4   trial, they had no choice but to pay based off a statutory
5   scheme.  What they knew in Class 1 and 2 is not relevant.
6            THE COURT:  Well, yes, it is as to when they
7   brought the suit.  It wouldn't bar them from recovery, but it
8   would affect how far back they could recover.
9            MR. BERMAN:  Correct.
10            THE COURT:  So, I mean, that seems fair.  That's
11   why I was going to take it drug by drug.  And so with respect
12   to Zoladex, if in fact any company was purchasing, I'm going
13   to have to deal with the effects of that in a class because
14   that would put you on inquiry notice.  If you're paying one
15   price and you see that the statutory AWP price is a different
16   one, that would be inquiry notice.  What's it, the -- you
17   should have engaged in inquiry at that point, right?  So --
18            MR. HAVILAND:  That's the statute of limitations
19   defense, your Honor.
20            THE COURT:  Right.
21            MR. HAVILAND:  And obviously that issue would go to
22   the Class 2 plaintiffs.  There's been no contest, no evidence
23   that the plaintiffs in Class 1 knew or should have known at
24   any point in time.
25            THE COURT:  Right, Class 1 is different.
0065
1            MR. HAVILAND:  And if I may wrap up the argument on
2   the affirmative defenses, we're down to nine, mercifully.
3   We've gone from 58 to nine, so I think the housekeeping has
4   been done.  Five of those nine, though, your Honor, two of
5   which you addressed today, is the political question
6   doctrine.
7            THE COURT:  Right, that's gone.
8            MR. HAVILAND:  The other, the filed rate
9   doctrine --
10            THE COURT:  Gone.
11            MR. HAVILAND:  -- I believe five have been covered
12   by your Honor's ruling, the government action, state action.
13            THE COURT:  What's left?
14            MR. HAVILAND:  Superseding intervening cause, which
15   there's been some discussion of.
16            THE COURT:  Right.
17            MR. HAVILAND:  Preemption, which we believe --
18            THE COURT:  Those are all legal.  I've ruled on all
19   those.
20            MR. HAVILAND:  I believe so too, your Honor, so --
21            THE COURT:  But they need to preserve them for the
22   record for appeal, if they got that far.
23            MR. HAVILAND:  Understood.
24            THE COURT:  They can't drop them.  I'm just not
25   going to rewrite an opinion on them.  So what's left that I
0066
1   haven't ruled on?
2            MR. HAVILAND:  Of those, we have four:  Statute of
3   limitations, your Honor.  The failure to mitigate, again,
```

Page 26

00040672

4 there's no evidence on the part of Class 1 plaintiffs, or
5 even in the Class 2 plaintiffs, on failure to mitigate.  The
6 issue of statute of limitations overlaps, I suppose, in the
7 sense of when the case should have been brought, but there's
8 been no evidence put in the summary judgment record of a
9 failure to mitigate on anyone's part.  Again, as Mr. Berman
10 points out, in Classes 1 and 2, the statutory regime
11 governs.  It's the 20 percent copay class.  We pay based on
12 AWP.  There's no negotiation.
13          Compliance with regulation I believe is also
14 covered by prior rulings.
15          THE COURT:  And what's the last one?
16          MR. HAVILAND:  Good faith or conformity with
17 standard industry practice, I don't quite know what that one
18 is.
19          THE COURT:  Well, sure, it refutes it, the
20 deception and fairness, which will go to either a jury or me.
21          MR. HAVILAND:  And most of those issues, your
22 Honor, fall in that rubric.  They're really saying there's a
23 lack of proofs on the plaintiffs' part, not really a defense,
24 so --
25          THE COURT:  Were you planning on calling Scully or
0067
1 someone like that, some government witness to trial, either
2 side?
3          MR. HAVILAND:  We were not, your Honor.  We don't
4 believe that the government knowledge defense even comes into
5 the trial of the case.
6          THE COURT:  Well, it may be in terms of -- it may
7 not be a legal bar, but it may be relevant to their state of
8 mind.  I didn't know if either side was planning on calling a
9 government witness currently or a former government witness.
10 But don't forget about the regulations, if the person is
11 currently in the employ of the government, that that will
12 take two or three months to work through.  Do you know what
13 I'm referring to?  All right.
14          MR. HAVILAND:  Lastly, your Honor, the issue of the
15 plaintiffs' motion for partial summary judgment on
16 AstraZeneca's guilty plea.
17          THE COURT:  What do you want me to do with it?
18          MR. HAVILAND:  Well, your Honor, I think the law is
19 very clear that there's an estoppel that's appropriate here.
20 AstraZeneca pled guilty to conspiracy with doctors in three
21 states, three of which are in the class, and interestingly
22 the discussion of Florida law --
23          THE COURT:  But to hand out samples, right?
24          MR. HAVILAND:  Yes, your Honor, but we believe
25 that's the core part of the return-to-practice fraud that was
0068
1 alleged in the complaint.
2          THE COURT:  Well, what would be -- but, you know, I
3 had one of those doctors, actually, in the Lupron case.
4          MR. HAVILAND:  Oh, okay.
5          THE COURT:  So that tended to be handing out
6 samples and saying you can charge for them.  It was a
7 different kind of case than the AWP.  You're saying that
8 there's something that was directly an AWP plea of guilty?
9          MR. HAVILAND:  Well, it was absolutely the same
10 conduct, your Honor.
11          THE COURT:  The same conduct as what, the samples
12 or the AWP?
13          MR. HAVILAND:  Both.  Your Honor, they were
14 providing samples for a hundred percent return to practice.
15 In this case, we focused a lot on the spread.  Here we have a
16 zero acquisition cost, AWP, a hundred percent spread.  It was
17 another way these manufacturers in their marketing and sales

Page 27

00040672
18   fraud got doctors engaged in buying the product.
19          THE COURT:  But what's the summary judgment on?
20   What would I be granting it on?
21          MR. HAVILAND:  We think that the core facts in the
22   information, AstraZeneca's information, should be deemed
23   admitted; and they are that AstraZeneca engaged in a
24   conspiracy with doctors to provide samples, knowing and
25   expecting that they would bill for them, and in fact charged
0069
1   patients and the insurers in this class for those samples,
2   and ultimately caused economic harm.
3          THE COURT:  Well, that might be some evidence of
4   state of mind, but that's not on any element or claim in the
5   case.
6          MR. HAVILAND:  It is, your Honor, in terms of the
7   fact we have said that these are unfair and deceptive acts or
8   practices.  The marketing fraud in part is the fact that they
9   provided these samples for a hundred percent return, not just
10   spread.
11          THE COURT:  Well, that may be admissible.  Just I
12   don't think it resolves one of the claims.  In other words,
13   you don't win based on that.
14          MR. HAVILAND:  Oh, your Honor, I'm not suggesting
15   that.  I'm saying that what we're trying to avoid here is --
16   winnow down the trial so that what AstraZeneca has admitted
17   in its plea in Federal Court in Delaware does not get
18   relitigated.  We've had some testimony in the case by
19   AstraZeneca executives saying, "Well, I understand --"
20          THE COURT:  So you're not going to want any
21   testimony on this?
22          MR. HAVILAND:  Well, we were trying to avoid --
23          THE COURT:  So you don't want to introduce
24   testimony on this?
25          MR. HAVILAND:  Oh, I certainly do, your Honor.
0070
1          THE COURT:  That's what I thought.
2          MR. HAVILAND:  But I want to make sure that we
3   don't have to chase rabbits down holes in terms of where this
4   fraud went.  The Robinson case, your Honor, I'll direct to
5   your attention, it's the District of Maine decision, I think
6   really covers the issue we put before you.
7          THE COURT:  Thank you.  Did you want to say
8   anything about this?
9          MR. WISE:  Your Honor, just briefly.  On the
10   affirmative defense point, I think it's premature to be
11   seeking your time on that, I really do, particularly in light
12   of the fact that we're not quite sure who or what may be the
13   class representative with respect to us and what state law is
14   going to be advanced as the basis for his claim.  So I don't
15   think there's a need for you to spend time now.  I think
16   that's all premature.  We need to finally know who the
17   plaintiff is who's got a claim that we're evaluating before
18   we decide what state law defenses might be available to us.
19          On the plea, if you wanted more on the plea,
20   Ms. Harris is here, who's studied all the plea documents in
21   great detail and can address those issues.
22          THE COURT:  Well, just so you didn't come up here
23   for nothing.
24          (Laughter.)
25          MS. HARRIS:  Your Honor, I think your instincts are
0071
1   exactly correct, though.  There is nothing here on which to
2   grant personal summary judgment.  I mean, Rule 56(d) is
3   designed if you're going to establish or eliminate an element
4   of the claim or an element of the defense.  The very narrow
5   facts underlying AstraZeneca's plea allocution do not

00040672

```
 6  establish any element of the plaintiffs' claim, nor do they
 7  eliminate any defense from AstraZeneca.
 8          THE COURT:  Would they be admissible?
 9          MS. HARRIS:  Oh, we would argue at another time
10  when evidentiary questions are before your Honor that it's
11  not admissible because, number one, we don't think it's
12  relevant at all to their claims.  Their own expert does not
13  even discuss at all free samples in connection with his
14  evaluation on liability and damages on AWP "inflation."  So
15  it's not relevant to the claim that they're presenting to the
16  Court about excessive spreads and AWP inflation.  Their own
17  expert doesn't even evaluate it.
18          And Mr. Howe and Mr. Townsend, there's absolutely
19  no evidence in the record at all that either of those
20  plaintiffs, should they survive our summary judgment motion,
21  ever received or was billed for a sample.  So it's just not
22  relevant to the claims that are before your Honor at
23  AstraZeneca's trial.
24          And, moreover, even if it was relevant, we would
25  argue it's unfairly prejudicial for them to try to admit a
0072
 1  plea into the trial.  But, again, that's a question for a
 2  different day.  It's an evidentiary question, there's
 3  briefing on that, and it raises a whole host of different
 4  issues that their requests now for partial summary judgment
 5  are nothing.
 6          THE COURT:  Good.  All right, well, thank you.  I
 7  just wanted to make sure you came up here, said your piece.
 8  And what we'll do is, I'll take it under advisement.  We
 9  probably should set another hearing now, even if I cancel, on
10  the notice issue because you've got me worried, like the
11  third week in June?  Then you two can internally work out --
12  I think no one's going to want to be here July 4 week, so,
13  Mr. Alba, like that third week of June.  I'm going to say the
14  week of the 22nd, something like that?  We can either do 3:30
15  on June 22, or we could do pretty much any time the following
16  week.
17          MR. WISE:  Could I vote for the following week?
18          THE COURT:  How about 3:00 o'clock on the 26th?
19  It's a Monday.
20          MR. WISE:  Fine.
21          THE COURT:  Is that acceptable to people?  I'm
22  sparing you all 3:30 on a Friday afternoon.
23          MR. SOBOL:  June 26?
24          MR. WISE:  This is if we cannot reach a joint view
25  on how this should go --
0073
 1          THE COURT:  Right.  Otherwise I don't want you
 2  here.
 3          MR. WISE:  We'll get papers to you within two weeks
 4  of today, and we'll appear before you on that Monday
 5  afternoon?
 6          THE COURT:  Yes, if there's a dispute.  I don't
 7  know what else to do really.  All right, thank you very
 8  much.
 9          (Adjourned, 4:35 p.m.)
10
11
12
13
14
15
16
17
18
19
```

Page 29

00040672

```
20
21
22
23
24
25
0074
 1                    C E R T I F I C A T E
 2
 3
    UNITED STATES DISTRICT COURT )
 4  DISTRICT OF MASSACHUSETTS    )  ss.
    CITY OF BOSTON               )
 5
 6
 7
 8            I, Lee A. Marzilli, Official Federal Court
 9  Reporter, do hereby certify that the foregoing transcript,
10  Pages 1 through 73 inclusive, was recorded by me
11  stenographically at the time and place aforesaid in
12  Civil Action No. 01-12257-PBS, MDL No. 1456,
13  In re:  Pharmaceutical Industry Average Wholesale Price
14  Litigation, and thereafter by me reduced to typewriting and
15  is a true and accurate record of the proceedings.
16            In witness whereof I have hereunto set my hand this
17  30th day of May, 2006.
18
19
20
21
22
23            _____
              LEE A. MARZILLI, CRR
24            OFFICIAL FEDERAL COURT REPORTER
25
```

# Exhibit B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | Civil Action:  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO ALL ACTIONS. | Judge Patti B. Saris |

### PLAINTIFFS' ONE-PAGE SUPPLEMENT TO THEIR SUR-REPLY IN OPPOSITION TO ASTRAZENECA'S MOTION FOR SUMMARY JUDGMENT <u>DISCUSSING TWO DISCRETE ISSUES REQUESTED BY THE COURT</u>

Neither *PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773 (Fla. 2003) ("*PNR*") nor

*Millennium Communs. & Fulfillment, Inc. v. Office of the Attorney General*, 761 So. 2d 1256

(Fla. Dist. Ct. App. 2000) ("*Millennium*") hold that the Florida Deceptive Uniform Trade

Practices Act ("FDUTPA") contains a requirement that a representation be "likely to affect a

consumer's choice."  That language likewise does not appear in the FDUTPA or any other

Florida case interpreting the statute.

The requirement that a representation be "likely to affect a consumer's choice" is an

Federal Trade Commission standard stemming from *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110

(F.T.C. 1984), an opinion in which the Commission defines materiality in a number of ways,

including, among many others,  a misrepresentation or practice that is "likely to affect a

consumer's choice."  *Id.*, at *187.  ***No Florida court interpreting the FDUTPA has <u>ever</u>***

***adopted this language.***

It would also not make sense to use the language in *Cliffdale* to interpret the FDUTPA.

Because the FTC is acting in a law enforcement capacity and is not suing on behalf of a Class of

individuals or entities, the Commission has to "raise a presumption of reliance" by showing: (1)

the defendant made material misrepresentations likely to deceive consumers, (2) those

misrepresentations were widely disseminated, and (3) consumers purchased the entity's products.

*FTC v. Freecom Communs., Inc.*, 401 F.3d 1192, 1206 (10th Cir. 2005).  By virtue of having this

requirement, the FTC has been particularly strict in defining what representations are "material."

However, as plaintiffs showed in their Sur-Reply, Florida law has ***neither a***  reliance nor a

materiality requirement; therefore, the question of affecting consumer choice has no relevance in

interpreting Florida law in a case, like the one here, brought by private plaintiffs.

WHEREFORE plaintiffs respectfully request that this Court DENY AstraZeneca's

Motion for Summary Judgment.

DATED:  June 5, 2006

By____/s/ Steve W. Berman_____
Thomas M. Sobol (BBO#471770)
Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Allan Hoffman
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Shanin Specter
Donald E. Haviland, Jr.
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA  19102
Facsimile:  (215) 772-1359
Telephone:  (215) 772-1000

**CO-LEAD COUNSEL FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE</u>
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on June 5, 2006, I caused copies of **PLAINTIFFS' ONE-PAGE SUPPLEMENT TO THEIR SUR-REPLY IN OPPOSITION TO ASTRAZENECA'S MOTION FOR SUMMARY JUDGMENT DISCUSSING TWO DISCRETE ISSUES REQUESTED BY THE COURT** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.


     **/s/ Steve W. Berman**
Steve W. Berman

4