# EXHIBIT A

# TAB 1:

# Page 37-44 of the 7/24/1998 S-1 Statement for Dey, Inc.

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
T7Lwu2J2QI/BWf74XTvlSF/ywEWxIwgh8o6tv4k8vtNsem3FBVP/oBUB7bfXa7R7
/XE3AoAcuwq/h7SUIV6OXA==

<SEC-DOCUMENT>0000889812-98-001802.txt : 19980727
<SEC-HEADER>0000889812-98-001802.hdr.sgml : 19980727
ACCESSION NUMBER: 0000889812-98-001802
CONFORMED SUBMISSION TYPE: S-1
PUBLIC DOCUMENT COUNT: 5
FILED AS OF DATE: 19980724
SROS: NYSE

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: DEY INC
CENTRAL INDEX KEY: 0001066046
STANDARD INDUSTRIAL CLASSIFICATION: []
IRS NUMBER: 942463696
STATE OF INCORPORATION: DE
FISCAL YEAR END: 1231

FILING VALUES:
FORM TYPE: S-1
SEC ACT:
SEC FILE NUMBER: 333-59857
FILM NUMBER: 98671227

BUSINESS ADDRESS:
STREET 1: 2751 NAPPA VALLEY CORPORATE DRIVE
CITY: NAPPA
STATE: CA
ZIP: 94558
BUSINESS PHONE: 7072243200

MAIL ADDRESS:
STREET 1: 2751 NAPPA VALLEY CORPORATE DRIVE
CITY: NAPPA
STATE: CA
ZIP: 94558
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-1
<SEQUENCE>1
<DESCRIPTION>REGISTRATION STATEMENT
<TEXT>

<PAGE>

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON JULY 24, 1998

REGISTRATION STATEMENT NO. 333-

---

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

---

FORM S-1
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

---

DEY, INC.

(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| DELAWARE | 2834 | 94-2463696 |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (PRIMARY STANDARD INDUSTRIAL CLASSIFICATION CODE NUMBER) | (I.R.S. EMPLOYER IDENTIFICATION NUMBER) |

------------------------

2751 NAPA VALLEY CORPORATE DRIVE, NAPA, CALIFORNIA 94558, (877) 666-1534
(ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER, INCLUDING AREA CODE, OF REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)

------------------------

CHARLES A. RICE
* PAMELA R. MARRS *
DEY, INC.
2751 NAPA VALLEY CORPORATE DRIVE
NAPA, CALIFORNIA 94558
(877) 666-1534
(NAME, ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER, INCLUDING AREA CODE, OF AGENT FOR SERVICE)

------------------------

with copies to:

EDWIN S. MATTHEWS, JR., ESQ.
JEFFREY E. COHEN, ESQ.
COUDERT BROTHERS
1114 AVENUE OF THE AMERICAS
NEW YORK, NY 11036
(212) 626-4400

ROBERT M. CHILSTROM, ESQ.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
919 THIRD AVENUE
NEW YORK, NY 10022
(212) 735-3000

------------------------

APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO THE PUBLIC: As soon as practicable after this Registration Statement becomes effective

------------------------

If any of the securities being registered on this form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. / /

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. / / ------------------------

If this form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. / / ------------------------

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. / / ------------------------

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. / /

------------------------

CALCULATION OF REGISTRATION FEE

<TABLE>
<CAPTION>

square feet of manufacturing space, 16,300 square feet of laboratory space and 91,400 square feet of warehouse space. These facilities are owned by the Company. See '--Manufacturing.'

The Company has a distribution facility in Allen, Texas. This facility has 109,800 square feet of warehouse space and 14,200 square feet of office space. This facility is leased under an agreement expiring in 2003 with provisions for renewals.

INTELLECTUAL PROPERTY

The Company holds licenses from third parties for certain patents, patent applications and technology utilized in some of its products and products in development. The generic, sterile, unit dose inhalation solution products currently manufactured by the Company are not protected by patents.

The branded products sold by Dey are sold under a variety of trademarks. While the Company believes that it has valid proprietary interests in all currently used trademarks, only Dey-Pak(Registered) is registered with the United States government as a trademark in the name of the Company. However, Dey has filed applications with the United States government to register the trademarks EasiVent(Trademark), Accuvent(Trademark) and DuoNeb(Trademark). The Company in-licenses the trademarks EpiPen(Registered), Astech(Registered), ACE(Registered) and Curosurf(Registered).

The Company also relies upon trade secrets, unpatented proprietary know-how and continuing technological innovation to develop its competitive position. The Company enters into confidentiality agreements with certain of its employees pursuant to which such employees agree to assign to the Company any inventions relating to the Company's business made by them while in the Company's employ. See 'Risk Factors--Uncertainty of Enforceability of Patents, Proprietary Rights and Trademarks.'

COMPANY STRUCTURE

Dey, Inc. has two subsidiaries that were formed in 1993. Dey Limited Partner, Inc. is a Delaware corporation and is wholly-owned by Dey, Inc. Dey, L.P. is a Delaware limited partnership in which Dey, Inc. is the general partner with a 1% partnership interest and Dey Limited Partner, Inc. is a limited partner with a 99% partnership interest. All of Dey's business is conducted, and all of Dey's assets are held, by Dey, L.P.

COMPANY HISTORY

In 1977, Dey Laboratories, Inc. was incorporated as a California corporation and established a successful business manufacturing and marketing sterile, unit dose bronchodilators for inhalation, packaged in plastic vials, and unit dose sodium chloride solution.

* In 1988, Dey Laboratories, Inc. was acquired by Lipha Pharmaceuticals, Inc., a wholly-owned subsidiary of Lipha. Lipha Pharmaceuticals, Inc. was incorporated as a Delaware corporation in 1987. In 1988, Dey Laboratories, Inc. and Lipha Pharmaceuticals, Inc. were merged with the surviving entity being Lipha Pharmaceuticals, Inc., whose name was changed to Dey Laboratories, Inc. In 1991, E. Merck, a German partnership that now controls Merck KGaA (see 'Principal Shareholders'), acquired a majority interest in Lipha and subsequently increased its interest (through Merck KGaA) to essentially all of the shares of Lipha. In June 1998, the name of Dey Laboratories, Inc. was changed to Dey, Inc. *

In 1998, Lipha transferred all of its shares in Lipha Americas to Merck-Lipha, a 99.53% owned subsidiary of Merck KGaA.

MANAGEMENT

EXECUTIVE OFFICERS AND DIRECTORS

The executive officers and directors of the Company, and their ages as of July 15, 1998, are as follows:

<TABLE>

<CAPTION>

| NAME | AGE | POSITION |
|---|---|---|
| Charles A. Rice............ | 47 | Director, President and Chief Executive Officer |
| Pamela R. Marrs............ | 44 | Director, Executive Vice President and Chief Financial Officer |
| Robert F. Mozak............ | 57 | Executive Vice President, Sales & Marketing |
| Gary L. Michaud............ | 50 | Executive Vice President of Operations |
| Bernhard Scheuble.......... | 44 | Director |
| Jean-Noel Treilles......... | 53 | Director |
| Peter A. Wriede............ | 54 | Director |

</TABLE>

Charles A. Rice has been a director of the Company since January 1990 and has been President and Chief Executive Officer of Dey since August 1992. Prior to that, he served as Chief Operating Officer of Dey from 1991 to 1992, as Vice President of Operations from 1988 to 1991 and as Vice President of Quality Assurance from 1987 to 1988. Prior to joining Dey, Mr. Rice worked for Kendal-McGaw (formerly American-McGaw) in a variety of corporate and local quality assurance and quality control positions.

Pamela R. Marrs has been a director of the Company since July 1998 and has been Executive Vice President and Chief Financial Officer since February 1997. Prior to that, she was Vice President of Finance and Chief Financial Officer from 1989 to 1997. Prior to joining Dey, Ms. Marrs worked for Ernst & Young as a Senior Manager.

Robert F. Mozak has been Executive Vice President, Sales and Marketing since February 1997. Prior to that, he served as Vice President, Sales and Marketing of Dey from 1989 to 1996. Prior to joining Dey, from 1971 to 1989, Mr. Mozak worked for 3M Company and held various executive positions, including Director, Group Business Development (Healthcare Group), General Business Unit Manager (Personal Care Products Division) and Director, Sales and Marketing (Personal Care Products Division).

Gary L. Michaud has been Executive Vice President of Operations since July 1998. Prior to that, he was Vice President of Operations of Dey from 1993 to 1997, Director of Manufacturing from 1991 to 1993 and Director of Engineering from 1988 to 1991. Prior to joining Dey, Mr. Michaud worked for Baxter in a variety of engineering positions.

Prof. Dr. Bernhard Scheuble has been a director of Dey since July 1998. Prof. Dr. Scheuble is President and Chief Executive Officer of the Pharmaceutical Division of Merck KGaA and a General Partner and Member of the Executive Board of Merck KGaA and E. Merck. Prior to that, he was Deputy Member of the Executive Board of Merck KGaA in 1997, Senior Vice President and Head of the Ethical Pharmaceutical Division from 1996 to 1997, Vice President, Pharma International Business from 1995 to 1996 and General Manager, Liquid Crystals Unit, from 1993 to 1994. Prof. Dr. Scheuble is a member of the Board of Directors of Pharmaceutical Resources, Inc., an affiliate of Merck KGaA.

Jean-Noel Treilles has been a director of the Company since June 1991. Mr. Treilles has been Chairman, President and CEO of Merck-Lipha S.A. and of Lipha S.A. (formerly Laboratoires Albert Rolland), both French pharmaceutical companies, since 1993. He has been a Director of Lipha Americas since 1991 and Chairman and CEO of Lipha Americas since 1993.

Dr. Peter A. Wriede has been a director of the Company since July 1998. He is presently President and CEO of EM Industries, Inc., an affiliate of Merck KGaA, as well as the Regional Manager, North America for Merck KGaA. From 1994 to 1998 Dr. Wriede held the position of Divisional Director and Vice President for Merck KGaA in charge of the worldwide pigments and cosmetics division and, from 1987 to 1994, he was Group Vice President in charge of the specialty chemicals division of EM Industries, Inc.

38

<PAGE>

BOARD COMMITTEES

The Board of Directors has two standing committees, a Compensation Committee and an Audit Committee, each of which was formed in .

Audit Committee. The Audit Committee will meet with the Company's independent public accountants to discuss the scope and results of their examination of the books and records of the Company. It will also meet with the

independent public accountants to discuss the adequacy of the Company's accounting and control systems. The Committee will review the audit schedule and consider any issues raised by any member of the Committee, the independent public accountants, the internal audit staff, the legal staff or management. Each year it will recommend to the full Board of Directors the name of an accounting firm to audit the financial statements of the Company. The Audit Committee consists of Messrs. (Chairman), and .

Compensation Committee. The Compensation Committee will establish overall employee compensation policies and recommend major compensation programs to the Board. The committee will also administer the Company's incentive plan (see 'Employee Plans') and will review and approve compensation of directors and corporate officers, including bonus compensation and stock option and other stock awards. The Compensation Committee consists of Messrs. , and .

DIRECTOR COMPENSATION

Outside directors will receive a meeting fee of $3,000 for each meeting of the Board attended and a meeting fee of $1,000 for each meeting attended as a member of a Board committee at a time other than at a regular Board meeting.

EXECUTIVE OFFICER COMPENSATION

SUMMARY COMPENSATION TABLE

The following table sets forth the aggregate cash compensation paid to the Company's chief executive officer and the four other most highly compensated executive officers (the 'Named Officers') by the Company or its subsidiaries during 1997:

<TABLE>
<CAPTION>

| | ANNUAL COMPENSATION | | | | LONG-TERM | |
|---|---|---|---|---|---|---|
| NAME AND PRINCIPAL POSITION | YEAR | SALARY ($) | BONUS ($) | OTHER ANNUAL COMPENSATION ($) | PAYOUTS (PAYMENT OF VESTED PRIOR AWARDS) ($) | A |
| <S> | <C> | <C> | <C> | <C> | <C> | < |
| Charles Rice<br>President and CEO........ | 1997 | 244,583 | 165,632 | 10,250(2) | -- | |
| Alan Kaplan<br>Vice President of Research and Development(1).......... | 1997 | 188,102 | 91,000 | 202,732(3) | -- | |
| Robert Mozak<br>Executive Vice President of Sales and Marketing... | 1997 | 174,316 | 91,000 | 10,250(2) | -- | |
| * Pamela Marrs<br>Executive Vice President and CFO.................. | 1997 | 163,750 | 91,000 | 10,250(2) | -- | |
| Gary Michaud<br>Vice President of Operations.............. | 1997 | 149,460 | 91,000 | 10,250(2) | -- | |

</TABLE>

(Footnotes on next page)

<PAGE>
(Footnotes from previous page)

- ------------------

(1) Dr. Kaplan resigned in February 1998. Since resigning, Dr. Kaplan has served as a consultant to Dey in a research and development capacity.

(2) Represents car allowance.

(3) Represents $10,250 car allowance and $192,482 in relocation compensation.

EMPLOYEE PLANS

Lipha Americas Employees' Retirement Plan. The Lipha Americas Employees' Retirement Plan (the 'Retirement Plan') is a defined benefit plan for the

benefit of eligible employees, including employees of the Company. A participant's normal retirement benefit is equal to 32% of the participant's average pay up to the participant's covered compensation level plus 45% of such pay above the participant's covered compensation level, provided the participant has completed 20 years of service upon reaching his or her normal retirement date. The Retirement Plan defines normal retirement date as the later of age 65 or 5 years of participation. A participant may receive an actuarially reduced benefit once he or she attains age 55 and has completed 10 years of service. If a participant retires after his or her normal retirement date, his or her benefit is computed under the Retirement Plan's pension formula based on the participant's covered compensation, average pay and service as determined on the participant's actual retirement date. The Retirement Plan provides that a participant is not vested prior to his or her completion of 3 years of service, at which time the benefit becomes 20% vested. The participant continues to vest at a rate of 20% per year, becoming fully vested after the seventh year of service. If a participant is discharged or resigns before qualifying for retirement or disability benefits, he or she will be entitled to a vested benefit equal to a percentage of his or her accrued pension benefit, payable as of the first day of the month following his or her normal retirement date, provided he or she has completed 3 full years of service. Benefits may also be payable upon the death of a participant who has earned a vested percentage of his or her accrued pension. Amounts contributed under the Retirement Plan are invested and distributed by the plan's trustee, currently State Street Bank and Trust Company. The normal form of distribution for a single participant under the Retirement Plan is a pension payable for life. In the event of the participant's death before he or she receives 120 monthly payments, the same income will be payable to the participant's beneficiary for the balance of the 120 month period. If the participant is married and has a spouse living when he or she retires, the participant's retirement income will automatically be adjusted and paid under the joint and 50% survivor option with the participant's spouse as the beneficiary, although a participant may also elect the joint and 100% survivor option. A participant may also elect to waive the payment of retirement income to his or her spouse under the joint and survivor options by naming a beneficiary other than his or her spouse or by electing one of the alternative optional forms of payment available under the Retirement Plan. The Company made a contribution to the Retirement Plan in 1997 in the amount of $549,000.

Lipha Americas Savings and Investment Plan. The Lipha Americas Savings and Investment Plan (the '401(k) Plan') is a defined contribution plan maintained by Lipha Pharmaceuticals, Inc. for the benefit of its eligible employees and the employees of its affiliates, including the Company. Employees eligible to participate may elect to contribute, on a before-tax basis, an amount not to exceed 10% of their compensation, up to statutorily prescribed limits, to the 401(k) Plan as a savings contribution. The Company currently matches 50% of the pre-tax contributions made by a participant, up to 6% of the participant's compensation. The Company's contribution to the 401(k) Plan for the 1997 year was $300,000. A participant's interest in his or her pre-tax contributions, after-tax contributions and rollover contributions to the 401(k) Plan are 100% vested when contributed to the plan. A participant's interest in the Company's matching contributions generally vests at the rate of 25% per year commencing after the participant's completion of one year of service with the Company or with certain affiliates of the Company.

1998 Incentive Plan. The Company will adopt, effective as of the date of the Offering and subject to the approval of shareholders of the Company, the Dey, Inc. 1998 Incentive Plan (the 'Incentive Plan') for the benefit of eligible employees of the Company and its subsidiaries. Employees (including officers and, if not members of the Compensation Committee appointed to administer the Incentive Plan, directors) of the Company and its subsidiaries will be selected to participate in the Incentive Plan by the Compensation Committee of the

40
<PAGE>
Board of Directors of the Company. Under the Incentive Plan, participants may be awarded stock options, stock appreciation rights, restricted shares, stock units and performance awards payable in cash or property.

Subject to the terms of the Incentive Plan, the Compensation Committee has the sole discretion to administer the plan, including the discretion to make awards, and to determine the number of shares to be covered by an option, stock appreciation right, restricted shares or restricted stock unit awards, the exercise price with respect to options, the length of the restricted period with respect to restricted shares, the performance goals to be achieved with respect to performance awards and the form of payment thereof, vesting requirements and

other terms and conditions of the awards. The Incentive Plan provides that the aggregate number of shares of the Company's Common Stock which will be available under the Incentive Plan for award to participants will be 900,000. The number of shares with respect to which awards may be granted to any participant during any calendar year under the plan may not exceed shares. The maximum number of shares available for restricted stock awards under the plan is . In the event of any approved transaction, board change or control purchase (each as defined in the plan), all outstanding awards held by participants will vest fully, become immediately exercisable or payable or have all restrictions removed, as applicable.

The Compensation Committee is expected to grant, effective as of the date of the Offering and with an exercise price equal to the initial public offering price, option awards under the Incentive Plan to , with respect to shares, to , with respect to shares, and to , with respect to shares each, for a total option award to executives with respect to shares. In addition, the Compensation Committee is expected to grant, effective as of the date of the Offering and with an exercise price equal to the initial public offering price, option awards to managers with respect to approximately shares.

<PAGE>

CERTAIN TRANSACTIONS

FINANCIAL TRANSACTIONS WITH AFFILIATES

On July 20, 1998, the Company and Merck KGaA entered into a commitment letter under which, subject to the execution of a definitive agreement, Merck KGaA would provide the Company with a revolving credit facility of up to $220 million over a three year period (the 'Merck KGaA Credit Facility'). For this Facility, the Company would pay Merck KGaA an establishment fee of $100,000 and a commitment fee of 0.08% per annum on the undrawn balance. Amounts drawn on the Facility would bear interest payable quarterly in arrears at an interest rate of LIBOR plus 1% and would be repayable three years from the date of establishment of the Facility.

On June 26, 1998, the Company declared a dividend of $24,450,000 to Lipha Americas and paid $24,426,544 of such amount to Lipha Americas on June 30, 1998. On June 30, 1998, the Company declared a dividend of $4,900,000 to Lipha Americas payable on August 14, 1998. On July 21, 1998, the Company declared a dividend of $225,000,000 to Lipha Americas, payable on August 14, 1998. The Company intends to draw down on the Merck KGaA Credit Facility in order partially to fund the unpaid amount of the aforesaid dividends. The Company intends to declare an additional dividend of approximately $4,900,000 to Lipha Americas before September 30, 1998. The Company intends to apply the proceeds of the Offering to pay certain of the indebtedness of the Company under the Merck KGaA Credit Facility. See 'Use of Proceeds.'

On June 24, 1998, the Company advanced Lipha Americas $1,200,000, which advance bears interest at the applicable federal rate. The Company expects this advance to be repaid prior to August 14, 1998.

On December 17, 1997, the Company advanced Lipha Pharmaceuticals, Inc. (an affiliate of Lipha Americas) $750,000, which advance bears interest at the applicable federal short-term rate provided by the Internal Revenue Code for loans between related taxpayers. On March 31, 1998 this interest rate was 5.29%. The Company expects this advance to be repaid prior to August 14, 1998.

On May 22, 1997, the Company issued an unconditional guaranty of the performance of obligations of Allergy Free, L.P. (an affiliate of Lipha Americas) under a lease for 40,982 square feet of office and manufacturing space in Houston, Texas occupied by Allergy Free, L.P. The total rental obligation of Allergy Free, L.P. under such lease is $984,000. The lease expires on June 30, 2002.

On July 2, 1996, the Company advanced Allergy Free, L.P. $7,000,000, which advance bore interest at 5.88%. The advance was repaid on March 27, 1998. From June 1997 through February 1998, the Company advanced working capital loans to Allergy Free, L.P. totaling $1,550,000, which loans bore interest at the applicable federal rate. These loans were repaid on March 27, 1998.

On April 13, 1995, the Company advanced EM Industries, Inc. (an affiliate of Merck KGaA) $18,000,000, which advance bears interest at the applicable federal rate. EM Industries repaid $13,000,000 of the amount during 1996,

leaving a remaining balance of $5,000,000, which the Company expects to be repaid prior to August 14, 1998.

On July 26, 1994, Lipha Americas, the Company's sole stockholder, loaned $22,000,000 to the Company. This loan is evidenced by a Note dated July 31, 1997 which is due and payable on July 31, 1999 and bears interest payable quarterly in arrears at the applicable federal rate.

OTHER AGREEMENTS WITH AFFILIATES

Prior to the consummation of the Offering, the Company intends to enter into a license agreement with Lipha to obtain the exclusive right and license to manufacture and sell the Dey/Lipha DPI, under Lipha's patent rights, in the United States and Canada. The Company will undertake to pay Lipha a royalty of up to 3% on net sales until the expiration of Lipha's patent rights. See 'Business--Products in Development.'

The Company is currently, and after the Offering will be (so long as Lipha Americas beneficially owns at least 80% of the total voting power and value of the Company's outstanding Common Stock), included in Lipha Americas's consolidated group for federal income tax purposes. Prior to the consummation of the Offering, the Company intends to enter into a tax sharing agreement with Lipha Americas which, among other things, would require the Company to bear the federal, state, local and foreign income, franchise and similar taxes which would

<PAGE>
be payable, subject to certain adjustments, by the Company were it not affiliated with Lipha Americas. As the parent company of its consolidated group, Lipha Americas will have the exclusive authority to make most federal income tax elections and tax filings for, and deal with tax controversies concerning, all members of its consolidated group, including the Company. Moreover, each member of a consolidated group is jointly and severally liable to the Internal Revenue Service for the consolidated group's federal income tax liability (for any period such member was a member of such group).

The Company pays certain management fees to Lipha. Such fees totaled $286,000 in 1995, $271,000 in 1996 and $173,000 in 1997. Prior to consummation of the Offering, the Company intends to enter into a Management Services Agreement with each of Lipha Americas, Allergy Free, L.P. and EM Pharma, Inc., pursuant to which the Company would provide certain accounting and administrative services to such companies for a quarterly fee. All such Management Services Agreements would be terminable by the Company on thirty days' notice.

The Company intends to sell its line of hypothyroid products to EM Pharma, Inc. (an affiliate of Lipha Americas in process of formation) effective August 1, 1998, in consideration of the assumption by the purchaser of all liabilities and contractual obligations associated with this product line.

As of July 1, 1997, the Company purchased from EM Industries, Inc. all of EM Industries, Inc.'s rights to distribute worldwide the EpiPen(Registered) autoinjector, the Astech(Registered) Peak Flow Meter and the ACE(Registered) Holding Chamber. The Company's rights to distribute the EpiPen(Registered) autoinjector terminate on December 31, 2010. In consideration thereof, the Company has agreed to pay EM Industries a royalty at the rate of 16.5% on net sales of EpiPen(Registered), up to $31.5 million in any calendar year. The Company has also agreed to pay a royalty of 7% of net sales of the Astech(Registered) Peak Flow Meter. See 'Business--Dey's Current Products' and 'Business--Products in Development.'

On December 19, 1995, the Company entered an agreement with Genpharm Inc. and Alphapharm Parties Ltd. (affiliates of the Company) to co-develop a number of pharmaceutical products which were to be marketed in the United States by the Company. This agreement was terminated effective July 23, 1998.

The Company currently participates in two group insurance programs with other companies in the Merck KGaA group. The Company's properties are insured against certain risks of property damage and business interruption under such programs, for which the Company paid $242,000 in 1997. Risks of product liability above $6,000,000 of the Company are covered under an umbrella policy arranged by Lipha, for which the Company paid $446,000 in 1997.

<PAGE>
PRINCIPAL STOCKHOLDERS

Prior to the Offering, all 72,885,000 outstanding shares of Common Stock of the Company will be owned by Lipha Americas. After the Offering, Lipha Americas will continue to own such 72,885,000 shares of the Common Stock of the Company, or approximately 84% of the Common Stock outstanding (or approximately 82% of the Common Stock outstanding, if the Underwriters' over-allotment option is exercised in full).

Lipha Americas is a wholly-owned subsidiary of Merck-Lipha which, in turn, is a 99.53%-owned subsidiary of Merck KGaA. Merck KGaA is a publicly traded German pharmaceuticals, laboratory supplies and chemicals company. Merck KGaA is controlled by E. Merck, a German partnership, which holds approximately 74% of the shares of Merck KGaA.

The Company and Merck KGaA have agreed that the Company will not, and Merck KGaA will cause Lipha Americas not to, directly or indirectly, issue, sell, offer or agree to sell, grant any option for the sale of, pledge or otherwise dispose of or encumber and, in the case of Lipha Americas, otherwise create a put equivalent position in any shares of Common Stock (or any securities convertible into or exercisable or exchangeable for shares of Common Stock) for a period of 180 days from the date of this Prospectus without the prior written consent of Bear, Stearns & Co. Inc. See 'Underwriting.'

44
<PAGE>
DESCRIPTION OF CAPITAL STOCK

GENERAL

Pursuant to the Company's Certificate of Incorporation, the Company's authorized capital stock consists of 140,000,000 shares of Common Stock, par value $.01 per share, and 10,000,000 shares of preferred stock, par value $1.00 per share (the 'Preferred Stock'), of which 72,885,000 shares of Common Stock and no shares of Preferred Stock were outstanding immediately prior to the Offering. Upon completion of the Offering, there will be 86,985,000 shares of Common Stock outstanding (89,100,000 shares if the Underwriters' over-allotment option is exercised in full). The Company's Certificate of Incorporation provides that the Company may not issue more than an aggregate of 90,000,000 shares of Common Stock (including, without limitation, any shares of Common Stock reserved and/or in respect of options, warrants or other rights or in respect of any securities convertible into or exchangeable for Common Stock) without first receiving the consent in writing of any person who, directly and/or through any direct or indirect over fifty percent-owned subsidiary, owns over fifty percent of the Company's outstanding Common Stock.

The Certificate of Incorporation and By-laws contain certain provisions that are intended to enhance the likelihood of continuity and stability in the composition of the Board of Directors and which may have the effect of delaying, deferring or preventing a future takeover or change in control of the Company.

The following summary of certain provisions of the Company's capital stock describes provisions of, but does not purport to be complete and is subject to, and qualified in its entirety by, the Certificate of Incorporation and the By-laws of the Company that are included as exhibits to the Registration Statement of which this Prospectus forms a part and by the provisions of applicable law.

COMMON STOCK

Each holder of Common Stock is entitled to one vote for each share held on all matters on which holders of Common Stock are entitled to vote and, except as otherwise required by law and except for any voting rights applicable to any outstanding series of Preferred Stock, the holders of Common Stock possess all voting power held by stockholders of the Company. All holders of shares of Common Stock, subject to any preferences that may be applicable to any outstanding series of Preferred Stock, are entitled to receive ratably such dividends as may be declared by the Board of Directors out of funds legally available therefor. In the event of a liquidation, dissolution or winding up of the Company, holders of shares of Common Stock would be entitled to share ratably in the Company's assets remaining after the payment of liabilities and the satisfaction of any liquidation preference granted the holders of any outstanding shares of Preferred Stock. Holders of shares of Common Stock have no preemptive or other subscription rights. In addition, there are no cumulative

**TAB 2:**

**Exhibit 10.4 of the 10/2/1998 S-1A Statement for Dey, Inc.**

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
BgNEWUu9+vvOnSwI4hFPysOFQ34CcRQDoHs55tAV9adikoH4It+dCIIOxIh3UOmq
gPeus69NAxYP3rzFw7ENcA==

<SEC-DOCUMENT>0000889812-98-002392.txt : 19981005
<SEC-HEADER>0000889812-98-002392.hdr.sgml : 19981005
ACCESSION NUMBER: 0000889812-98-002392
CONFORMED SUBMISSION TYPE: S-1/A
PUBLIC DOCUMENT COUNT: 8
FILED AS OF DATE: 19981002
SROS: NYSE

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: DEY INC
CENTRAL INDEX KEY: 0001066046
STANDARD INDUSTRIAL CLASSIFICATION: PHARMACEUTICAL PREPARATIONS [2834]
IRS NUMBER: 942463696
STATE OF INCORPORATION: DE
FISCAL YEAR END: 1231

FILING VALUES:
FORM TYPE: S-1/A
SEC ACT:
SEC FILE NUMBER: 333-59857
FILM NUMBER: 98720288

BUSINESS ADDRESS:
STREET 1: 2751 NAPPA VALLEY CORPORATE DRIVE
CITY: NAPPA
STATE: CA
ZIP: 94558
BUSINESS PHONE: 7072243200

MAIL ADDRESS:
STREET 1: 2751 NAPPA VALLEY CORPORATE DRIVE
CITY: NAPPA
STATE: CA
ZIP: 94558
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-1/A
<SEQUENCE>1
<DESCRIPTION>PRE-EFFECTIVE AMENDMENT NO. 2
<TEXT>

<PAGE>

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON OCTOBER 2, 1998

REGISTRATION STATEMENT NO. 333-59857

---

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

AMENDMENT NO. 2

TO

FORM S-1
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

DEY, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

<TABLE>
<S> <C> <C>

| DELAWARE | 2834 | 94-2463696 |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (PRIMARY STANDARD INDUSTRIAL CLASSIFICATION CODE NUMBER) | (I.R.S. EMPLOYER IDENTIFICATION NUMBER) |

</TABLE>

---

2751 NAPA VALLEY CORPORATE DRIVE, NAPA, CALIFORNIA 94558, (877) 666-1534
(ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER, INCLUDING AREA CODE, OF REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)

---

CHARLES A. RICE
PAMELA R. MARRS
DEY, INC.
2751 NAPA VALLEY CORPORATE DRIVE
NAPA, CALIFORNIA 94558
(877) 666-1534
(NAME, ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER, INCLUDING AREA CODE, OF AGENT FOR SERVICE)

---

with copies to:

<TABLE>
<S> <C>

| EDWIN S. MATTHEWS, JR., ESQ.<br>JEFFREY E. COHEN, ESQ.<br>COUDERT BROTHERS<br>1114 AVENUE OF THE AMERICAS<br>NEW YORK, NY 11036<br>(212) 626-4400 | ROBERT M. CHILSTROM, ESQ.<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>919 THIRD AVENUE<br>NEW YORK, NY 10022<br>(212) 735-3000 |
|---|---|

</TABLE>

---

APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO THE PUBLIC: As soon as practicable after this Registration Statement becomes effective

---

If any of the securities being registered on this form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. / /

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. / /

---

If this form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. / /

---

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. / /

---

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. / /

---

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT WHICH SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(A) OF THE SECURITIES ACT OF 1933 OR UNTIL THIS REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE SECURITIES AND EXCHANGE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(A), MAY DETERMINE.

---

---

<PAGE>

PART II.
INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION.

The following table sets forth all expenses, other than underwriting discounts and commissions, payable by the registrant in connection with the sale of the Common Stock being registered. All the amounts shown are estimates.

performed utilizing STI approved testing procedures and test equipment. Sampling and testing of assembled autoinjectors is performed by STI on every batch of distributed product. Should the distributor/regulatory agency require additional functional testing, equipment must be purchased from STI to conduct these tests. Operating procedures for proper performance of these tests will be provided by STI.

<PAGE>

EXHIBIT B

PRODUCT PRICING

| Product | Price per unit |
|---|---|
| EpiPen(R) | $ * |
| EpiPen(R)Jr. | $ * |
| Epi E-Z Pen(TM) | $ * |
| Epi E-Z Pen(TM)Jr. | $ * |
| EpiPen(R)Trainer | $ * |
| Epi E-Z Pen(TM)Trainer | $ * |

Quantity Purchased/Prices(1)

| Product | * | * | * |
|---|---|---|---|
| EpiPen(R) | $ * | $ * | - |
| EpiPen(R)Jr. | $ * | $ * | $ * |
| Epi E-Z Pen(TM) | - | $ * | $ * |
| Epi E-Z Pen(TM)Jr. | - | $ * | $ * |

1 Reflects surcharge for custom packaging materials (French/English) and the price for the Training Device. Price does not reflect one time costs for Epi E-Z Pen(TM) (French/English) artwork.
2 All surcharges are based on allocating a partial lot from one batch intended for U.S. distribution, manufactured at the standard batch size.

* Confidential material omitted and filed separately with the Securities and Exchange Commission.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.4
<SEQUENCE>4
<DESCRIPTION>MANAGEMENT SERVICES AGREEMENT
<TEXT>

<PAGE>

MANAGEMENT SERVICES AGREEMENT

THIS MANAGEMENT SERVICES AGREEMENT (the "Agreement") is entered into this 1 day of September 1998, by and among Lipha Americas, Inc., a Delaware corporation with its head office at 1209 Orange Street, Willmington, DE (the "Company"), and Dey, L.P., a Delaware limited partnership with offices at 2751 Napa Valley Corporate Drive, Napa, CA 94558 ("Dey").

W I T N E S S E T H :

WHEREAS, the Company desires that Dey provide certain services to the Company on the terms and conditions set forth herein;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

THE SERVICES

Section 1.1 Services. Dey shall provide to the Company the services set forth on Exhibit A (the "Services"). Dey shall use its best efforts to complete the Services, but does not guarantee the achievement of any specific result from the Services.

Section 1.2 Fee. In exchange for the Services, the Company shall pay to Dey a flat fee of $5,000 paid quarterly in arrears. In addition, the Company shall reimburse Dey for any out-of-pocket costs and expenses incurred by Dey

* in providing the Services (including, without limitation, legal and accounting fees, telephone expenses and travel expenses) excluding administrative expenses and employment expenses of personnel performing the Services. *

Section 1.3 Reports. If requested by the Company, at the end of each calendar quarter, Dey shall report on the status of the Services.

Section 1.4 Level of Effort; Officers. Dey shall perform the Services * using the level of resources, including personnel, that Dey reasonably determines is appropriate to perform the Services on a timely basis. If * requested by the Company, Dey may provide personnel to act as officers of the Company in connection with the performance of the Services.

<PAGE>

ARTICLE II

TERM

Section 2.1 Term. The term of the Agreement shall commence on the date of this Agreement and continue indefinitely, unless either party terminates the Agreement in the manner set forth in Section 2.2 below.

Section 2.2 Termination. Either party may terminate the Agreement upon 30 days notice by a written statement signed by a duly authorized representative of the party. Either party may terminate the Agreement in full or in part, with respect to specific services. If the Agreement is terminated for specific services, the parties agree to renegotiate the quarterly fee set forth in Section 1.2 in good faith; the Agreement shall continue in full force and effect as to the remaining services.

ARTICLE III

MISCELLANEOUS

Section 3.1 Force Majeure. Any party hereto shall be entitled to suspend performance of this Agreement in the event that it is unable to perform by reason, directly or indirectly, of any act of God, war, riot, civil disturbance, fire, water, act of any government or authority, labor dispute, electrical shortage, failure of communications or common carrier, or any cause beyond the reasonable control of the non-performing party; provided that such non-performing party shall use its best efforts to resume its performance under this Agreement as soon as such event constituting an event of force majeure shall have ended or abated.

Section 3.2 Costs; Access to Facilities. The Company shall bear any costs or expenses of its employees in connection with the Services. Dey shall have the right for approved representatives to have reasonable access to the Company's files during usual business hours and with reasonable prior notice but only to the extent necessary to perform the delivery of any of the Services.

Section 3.3 Agency. Dey shall perform the services hereunder as an independent contractor and none of the provisions of this Agreement shall be deemed to constitute a relationship of partnership, agency or joint venturers among the parties.

Section 3.4 Communications. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if (a) personally delivered, (b) sent by facsimile transmission (with transmission confirmed), (c) sent by overnight courier (with delivery confirmed) or (d) mailed by United States first-class, certified or registered mail, postage prepaid, to the other party at the following addresses (or at such other address as subsequently shall be given in writing by any party to the other):

-2-

<PAGE>

* (a) If to the Company, to:
Lipha Americas, Inc.
2571 Nappa Valley Corporate Drive *
Attention: Chief Financial Officer

(b) If to Dey, to:
2751 Napa Valley Corporate Drive
Napa, CA 94558
Attention: President and Chief Financial Officer

Section 3.5 Nonassignability; Amendment; Waiver. This Agreement shall not be assignable by either of the parties hereto without the written consent of the other party. This Agreement may not be altered or otherwise amended except pursuant to an instrument in writing signed by the parties hereto.

Section 3.6 Binding Effect; No Third Party Beneficiaries. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and permitted assigns. Nothing in this Agreement expressed or implied is intended to confer on any other person, other than the parties hereto or their permitted assigns, any rights, remedies, agreements, undertakings, obligations or liabilities under or by reason of this Agreement.

Section 3.7 Article and Section Headings. The Article and Section headings contained in this Agreement are for reference purposes only and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction, interpretation or effect.

Section 3.8 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument

Section 3.9 Severability. If any provision of this Agreement shall finally be determined to be unlawful, then such provision shall be deemed to be deleted from this Agreement and the other provisions of this Agreement shall remain in full force and effect.

Section 3.10 Entire Agreement. This Agreement (including any Exhibits or other documents referred to herein) constitutes the entire agreement between the parties and supersedes all other prior agreements and understandings, both oral and written, between the parties, with respect to the subject matter hereof.

Section 3.11 Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York without regard to its conflicts of laws principles.

-3-

<PAGE>

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

LIPHA AMERICAS, INC.

By: /s/ Pamela R. Marrs

Name: Pamela R. Marrs
Title: Executive Vice President and Chief Financial Officer

DEY, L.P.
By: Dey, Inc., general partner

By: /s/ Charles A. Rice

Name: Charles A. Rice
Title: President and Chief Executive Officer

-4-

<PAGE>

EXHIBIT A

THE SERVICES

Finance & Accounting
Legal

TAB 3:

Page 3 of 4/01/2002 Par Pharmaceutical Inc. 10-K

<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<FILENAME>form10k.txt
<TEXT>

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10 - K

Annual Report pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934

For Fiscal Year Ended December 31, 2001

Commission File Number 1-10827

PHARMACEUTICAL RESOURCES, INC.
(Exact name of Registrant as specified in its charter)

| NEW JERSEY | 22-3122182 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| One Ram Ridge Road, Spring Valley, New York (Address of principal executive office) | 10977 (Zip Code) |

Registrant's telephone number, including area code: (845) 425-7100

Securities registered pursuant to Section 12(b) of the Act:

| Title of Class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | The New York Stock Exchange, Inc. |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding twelve months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days: Yes X No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

The aggregate market value of the voting stock and non-voting common equity held by non-affiliates of the Registrant was $672,209,753, as of March 21, 2002 (assuming solely for purposes of this calculation that all directors and executive officers of the Registrant are "affiliates").

Number of shares of the Registrant's common stock outstanding as of March 21, 2002: 32,056,122

DOCUMENTS INCORPORATED BY REFERENCE : NONE

<PAGE>

PART I

ITEM 1. BUSINESS.

*RESTATEMENT OF RESULTS

Certain items in the consolidated financial statements for fiscal years 2000 and 1999 have been restated to change the manner in which Pharmaceutical Resources, Inc. ("PRI" or the "Company") accounted for its transactions with Merck KGaA in fiscal year 1998. In June 1998, the Company sold Merck KGaA 10,400,000 shares of its Common Stock, and entered into a distribution agreement, dated March 1998, with Genpharm, Inc. ("Genpharm"), a Canadian subsidiary of Merck KGaA. Previously, the Company accounted for the sale of the Common Stock and the distribution agreement as separate transactions. In restating its consolidated financial statements, the Company has accounted for the two agreements as a single transaction under Emerging Issues Task Force Issue ("EITF") No. 96-18 "Accounting for Equity Instruments that are Issued to

regulatory approval and the FTC does not allow the Memorandum of Understanding to stand, Genpharm would enter the market during the exclusivity period. There can be no assurance that Genpharm or Andrx will prevail in the litigation or FTC review or that a full 180-days of exclusivity will be available at the time of launch.

* MERCK KGaA. On September 5, 2001, EMD, Inc. ("EMD" formerly known as Lipha Americas, Inc.), a subsidiary of Merck KGaA, Merck KGaA and Genpharm sold their entire ownership stake in PRI, which consisted of 13,634,012 shares of Common Stock, or approximately 43% of the total outstanding number of shares of Common Stock at the close of the transaction, to 53 unaffiliated institutional investors in a private placement. Such shares were registered with the Securities and Exchange Commission (the "Commission") pursuant to a registration statement on Form S-3 under the Securities Act of 1933, as amended, and became available for resale to the public. As a result of the transaction, four directors designated by EMD to serve on the Company's Board of Directors (the "Board") resigned. The Company has since filled three of the vacancies. Peter S. Knight was appointed to the Board on October 11, 2001 and Scott Tarriff and Ronald M. Nordmann were each appointed on December 14, 2001. They join current Board members John D. Abernathy, Mark Auerbach and Kenneth I. Sawyer. The Board is considering further nominations and expects to fill the additional vacancy with a qualified individual. *

ACQUISITION OF BMS PRODUCTS. On March 5, 2002 the Company acquired the U.S. rights to five products from BMS. The products include the antihypertensives Capoten(R) and Capozide(R), the cholesterol-lowering medications Questran(R) and Questran Light(R), and Sumycin(R), an antibiotic. Based on the Company's market research, these products are expected to generate annual net sales of approximately $10,000,000 in fiscal year 2002 and beyond. The product acquisition agreement is retroactive to January 1, 2002. To obtain the rights to the five products, Par will make total payments of $3,000,000 and agreed to terminate its outstanding litigation against BMS involving megestrol acetate oral suspension and buspirone.

TERMINATION OF ISP FINETECH ACQUISITION. On March 15, 2002, the Company announced the termination of negotiations with International Specialty Products Inc. ("ISP") concerning the previously announced proposed purchase of the ISP FineTech fine chemical business. ISP FineTech, based in Haifa, Israel and Columbus, Ohio, specializes in the design and manufacture of proprietary synthetic chemical processes used in the production of complex and valuable organic compounds for the pharmaceutical industry. The Company discontinued negotiations with ISP as a result of various events and circumstances that have occurred since the announcement of the proposed transaction. Pursuant to the termination of the purchase, the Company paid ISP a $3,000,000 break-up fee in March 2002, which is subject to certain credits and offsets. As part of the termination the Company received the rights to a raw material developed by ISP FineTech under a prior agreement.

PRODUCT LINE INFORMATION

The Company operates in one industry segment, namely the manufacture and distribution of generic pharmaceuticals. Products are marketed principally in solid oral dosage form consisting of tablets, caplets and two-piece hard-shell capsules. The Company also distributes one product in the semi-solid form of a cream and one oral suspension product.

Par markets approximately 61 products, representing various dosage strengths for 25 drugs that are manufactured by the Company and approximately 58 additional products, representing various dosage strengths for 26 drugs that are manufactured for it by other companies. Par holds ANDAs for the drugs it manufactures. Below is a list of drugs manufactured and/or distributed by Par. The names of all of the drugs under the caption "Competitive Brand-Name Drug" are trademarked. The holders of the trademarks are non-affiliated pharmaceutical manufacturers.

<PAGE>

| NAME | COMPETITIVE BRAND-NAME DRUG |
|---|---|
| CENTRAL NERVOUS SYSTEM: | |
| Biperiden Hydrochloride | Akineton |
| Benztropine Mesylate | Cogentin |
| Buspirone | BuSpar |
| Clonazepam | Klonopin |
| Doxepin Hydrochloride | Sinequan, Adapin |
| Fluoxetine | Prozac |
| Fluphenazine Hydrochloride | Prolixin |
| Imipramine Hydrochloride | Tofranil |
| Triazolam | Halcion |