Exhibit 4

1

1          THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

              MDL DOCKET NO. 01CV12257-PBS

3

4     *****************************

     IN RE:   PHARMACEUTICAL

5     INDUSTRY AVERAGE WHOLESALE

6     PRICE LITIGATION

     *****************************

7     THIS DOCUMENT RELATES TO:

8     ALL ACTIONS

     *****************************

9              C O N F I D E N T I A L

10               VOLUME: I

11    DEPOSITION of RAYMOND S. HARTMAN, Ph.D., a

     witness called on behalf of the Defendants

12    pursuant to the Federal Rules of Civil

13    Procedure, before Judith McGovern

14    Williams, Certified Shorthand Reporter,

15    Registered Professional Reporter,

16    Certified Realtime Reporter, and Notary

17    Public in and for the Commonwealth of

18    Massachusetts, at the offices of Ropes &

19    Gray, One International Place, Boston,

20    Massachusetts  02110, on Thursday,

21    October 7, 2004, commencing at 10:16 a.m.

22

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 7, 2004
AM Session                              Boston, MA

2 (Pages 2 to 5)

| | 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | HAGENS BERMAN L.L.P. |
| 4 | Thomas M. Sobol, Esquire |
| 5 | One Main Street, 4th Floor |
| 6 | Cambridge, Massachusetts 02142 |
| 7 | 617-482-3700 |
| 8 | tom@hagens-berman.com |
| 9 | on behalf of the Plaintiffs |
| 10 | |
| 11 | HOGAN & HARTSON L.L.P. |
| 12 | Steven M. Edwards, Esquire |
| 13 | Hoa T.T. Hoang, Esquire |
| 14 | 875 Third Avenue |
| 15 | New York, New York  10022 |
| 16 | 212-918-3506 |
| 17 | smedwards@hhlaw.com |
| 18 | htthoang@hhlaw.com |
| 19 | on behalf of the Defendant |
| 20 | Bristol-Myers Squibb |
| 21 | |
| 22 | |

| | 4 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | ROPES & GRAY L.L.P. |
| | Steven A. Kaufman, Esquire |
| 4 | One International Place |
| 5 | Boston, Massachusetts  02110-2624 |
| | 617-951-7000 |
| 6 | skaufman@ropesgray.com |
| 7 | on behalf of the Defendant Schering |
| 8 | Corporation/Schering-Plough |
| 9 | |
| 10 | SKADDEN, ARPS, SLATE, MEAGHER & |
| | FLOM L.L.P. |
| 11 | Katherine Armstrong, Esquire |
| 12 | Four Times Square |
| 13 | New York, New York  10036-6522 |
| 14 | 212-735-3000 |
| 15 | karmstro@skadden.com |
| 16 | on behalf of the Defendant Amgen |
| 17 | SHOOK, HARDY & BACON L.L.P. |
| | Joseph G. Matye, Esquire |
| 18 | 2555 Grand Boulevard |
| 19 | Kansas City, Missouri  64106-2613 |
| 20 | 816-474-6550 |
| 21 | on behalf of the Defendant Aventis |
| 22 | |

| | 3 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | KAYE SCHOLER L.L.P. |
| 4 | Saul P. Morgenstern, Esquire |
| 5 | 425 Park Avenue |
| 6 | New York, New York  10022-3598 |
| 7 | 212-836-7210 |
| 8 | smorgenstern@kayescholer.com |
| 9 | on behalf of the Defendant Novartis |
| 10 | Pharmaceuticals Corp. |
| 11 | |
| 12 | DAVIS, POLK & WARDWELL |
| 13 | D. Scott Wise, Esquire |
| 14 | 450 Lexington Avenue |
| 15 | New York, New York  10017 |
| 16 | 212-450-4000 |
| 17 | dwise@dpw.com |
| 18 | on behalf of the Defendant Astra |
| 19 | Zeneca Pharmaceuticals Corp. |
| 20 | |
| 21 | |
| 22 | |

| | 5 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | PATTERSON, BELKNAP, WEBB & TYLOR L.L.P. |
| 4 | William F. Cavanaugh, Jr., Esquire |
| 5 | 1133 Avenue of the Americas |
| 6 | New York, New York  10036-6710 |
| 7 | 212-336-2000 |
| 8 | wfcavanaugh@pbwt.com |
| 9 | on behalf of the Defendant |
| 10 | Johnson & Johnson |
| 11 | |
| 12 | |
| 13 | COVINGTON & BURLING |
| 14 | Mark Lynch, Esquire |
| 15 | 1201 Pennsylvania Avenue, N.W. |
| 16 | Washington, D. C.  20015 |
| 17 | 202-662-5544 |
| 18 | mlynch@cov.com |
| 19 | on behalf of GlaxoSmithKline |
| 20 | |
| 21 | |
| 22 | |

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only         October 7, 2004
AM Session                         Boston, MA

3 (Pages 6 to 9)

---

**Page 6**

1    APPEARANCES (Continued):
2
3    MORGAN, LEWIS & BOCKIUS L.L.P.
4      Scott A. Stempel, Esquire
5      1111 Pennsylvania Avenue, N.W.
6      Washington, D. C. 20004
7      202-739-5211
8      sstempel@morganlewis.com
9      on behalf of the Defendants Pfizer Inc.
10     and Pharmacia Corp.
11
12   ALSO PRESENT:
13     Janice H. Halpern, Leaf Group
14     Eric M. Gaier, Ph.D., Bates White
15
16   Reporter's note:  Additional parties
17   participated via telephone conference call
18
19
20
21
22

---

**Page 8**

1              E X H I B I T S
2    Number                          Page
3
4    Exhibit Hartman 004  Transcript of deposition of  109
5                Raymond S. Hartman, taken
6                May 25, 2004
7
8    Exhibit Hartman 005  Declaration of Stephen W.    138
9                Schondelmeyer in Support of
10               Plaintiffs' Motion for Class
11               Certification
12
13   Exhibit Hartman 006  Medicaid and Medicare Drug   147
14               Pricing:  Strategy to Determine
15               Market Prices, Final Report
16
17
18
19
20
21
22

---

**Page 7**

1              I N D E X
2    Witness                         Page
3    RAYMOND S. HARTMAN, Ph.D.
4      Direct Examination by Mr. Edwards     9
5
6              E X H I B I T S
7    Number                          Page
8
9    Exhibit Hartman 001  Two-page letter dated      12
10               February 3, 2003, to Mr. Sobol
11               from Mr. Hartman and one-page
12               attached Attachment A
13
14   Exhibit Hartman 002  Declaration of Raymond S.   40
15               Hartman in Support of
16               Plaintiffs' Motion for Class
17               Certification
18
19   Exhibit Hartman 003  Two-page Errata to Declaration 41
20               of Raymond S. Hartman in
21               Support of Plaintiffs' Motion
22               for Class Certification

---

**Page 9**

1            P R O C E E D I N G S
2                - - -
3           RAYMOND S. HARTMAN, first having
4    been duly sworn, testified as follows in
5    answer to direct examination by
6    MR. EDWARDS:
7                - - -
8    Q.  State your name, please.
9    A.  Raymond S. Hartman.
10   Q.  What is your address?
11   A.  My business address is Greylock McKinnon
12       Associates, One Memorial Drive, Cambridge,
13       Mass. 02142.
14   Q.  What is your home address?
15   A.  52 Greylock Road, Newton, Massachusetts
16       02465.
17   Q.  And by whom are you employed?
18   A.  I am self-employed, but I work with
19       Greylock McKinnon Associates and with a
20       variety of other firms.
21   Q.  Who owns Greylock McKinnon & Associates?
22   A.  I do.

---

Henderson Legal / Spherion
(202) 220-4158

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

4 (Pages 10 to 13)

10

1   Q.  Anybody else?
2   A.  No.
3   Q.  What have you been retained to do in this
4       case?
5   A.  I was retained by counsel to the
6       plaintiffs of the class in this case to
7       review the Complaint and the allegations
8       and to render an opinion if those
9       allegations were to be true whether there
10      would have been causation and impact,
11      classwide impact, injury, and damages, and
12      whether the extent of those damages could
13      be measured by standard formulaic
14      methodologies used by economists.
15  Q.  Is that the extent of your retention in
16      connection with this case?
17  A.  I would say broadly speaking that to date
18      has been what I have been asked to do.  I
19      may be asked to do other things.
20  Q.  Do you have any idea what you may be asked
21      to do?
22  A.  No.

11

1   Q.  And is there an engagement letter in
2       connection with your retention?
3   A.  There is.
4   Q.  And you have brought it with you to the
5       deposition?
6   A.  I have.
7          MR. EDWARDS:  Why don't we mark
8       this as Hartman Deposition Exhibit 1.  For
9       the record, it is a letter from Raymond
10      Hartman to Thomas Sobol dated February 3,
11      2003, with one attachment, and
12      unfortunately, we only have one copy at
13      this point, but we can make copies during
14      the break.
15         MR. SOBOL:  Could we just go off
16      the record one moment?
17         MR. EDWARDS:  Yes.
18      (Discussion off the record.)
19      (Two-page letter dated
20          February 3, 2003, to Mr. Sobol
21          from Mr. Hartman and one-page
22          attached Attachment A marked

12

1          Exhibit Hartman 001 for
2          identification.)
3       BY MR. EDWARDS:
4   Q.  I am going to hand you Hartman Deposition
5       Exhibit 1 and ask you if you can identify
6       that.
7          (Pause.)
8          (The witness viewing Exhibit
9       No. 001.)
10  A.  This is a copy of the retention letter
11      that was signed retaining us in this
12      matter -- retaining Greylock McKinnon
13      Associates and myself and any affiliates
14      of Greylock McKinnon that have been useful
15      to work on the matter.
16  Q.  What is your hourly rate?
17  A.  My hourly rate is $400 an hour.
18  Q.  That is what is stated in the engagement
19      letter?
20  A.  That's correct.
21  Q.  Is that in fact the hourly rate that you
22      have charged?

13

1   A.  That's correct.
2   Q.  Okay.  Have you submitted bills to the
3       plaintiffs in this case?
4   A.  We have.
5   Q.  And have all of those bills been paid at
6       this point?
7   A.  No, they have not.
8   Q.  Okay.  How much have you been paid at this
9       point?
10  A.  To this point we have been paid $150,000.
11  Q.  And how much have you billed?
12  A.  I would have to -- I would be guessing,
13      because of the last month's invoices I did
14      not have a chance to review.  My guess is
15      about 400 to 500 thousand dollars.
16  Q.  For how long has that additional $250,000
17      over the 150 that you have been paid been
18      outstanding?
19  A.  I mean it could be 250 to 350.
20         The -- I'm trying to recall.  We
21      have been consulting on the matter at a
22      low level over a period of time, and the

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

5 (Pages 14 to 17)

<table>
<tr><td>

**14**

1   150,000 had paid for work that had been
2   done since the retention, and probably at
3   the beginning of this year, and the --
4   probably the remainder of the billing is
5   for work that is or invoices -- the unpaid
6   invoices are for the work that has been
7   done in the last two to three months.
8  Q. Okay. Have you been submitting invoices
9      monthly?
10 A. Yes.
11 Q. And do you recall when you submitted your
12     first invoice?
13 A. I would assume it would have been any time
14     -- I don't remember exactly when. It
15     would probably have been sometime after
16     this retention letter date. So this was
17     February 3, 2003, and as I say, early on,
18     we consulted on this matter before it led
19     to any kind of written materials or any
20     declaration.
21 Q. Are you saying that you consulted on this
22     matter before you signed the engagement

</td><td>

**16**

1   take it, Tom, you are declining to produce
2   bills?
3        MR. SOBOL: Well, I don't think
4   the deposition is the time for us to iron
5   out questions about what is being produced
6   or not. I will be happy to discuss that
7   off line with you.
8  BY MR. EDWARDS:
9  Q. Do your bills include a breakdown of the
10     projects you have worked on on this case?
11 A. When -- I'm not sure I understand your
12     definition of the term "projects."
13 Q. Well, do they include a breakdown of the
14     activities you have engaged in?
15 A. Our bills are based on we track our time
16     daily by the quarter hour, and those are
17     submitted to our accounting department,
18     and those are aggregated to the level of
19     the staff member or the expert or the
20     affiliate that the invoice that goes
21     to counsel summarizes the hours by
22     individual and then a description of all

</td></tr>
<tr><td>

**15**

1   letter?
2  A. No. I am saying since -- before I
3      endeavored to undertake the work that
4      appears in my declaration, there was a
5      period of time since February of 2003
6      where we might consult on economic issues,
7      theories, issues that counsel wanted to
8      discuss, and at a low level, and then that
9      was going on since the time of the
10     retention.
11 Q. Have all of your bills for 2003 been paid?
12 A. I couldn't say. I would have to check. I
13     think they may have been.
14 Q. Have all of your bills for the first part
15     of 2004 been paid?
16 A. There is really no way for me to tell
17     unless I just get the invoices. I mean
18     the normal payments come in a chunk,
19     covering a number of -- of outstanding
20     invoices.
21        MR. EDWARDS: Now we requested
22     production of bills in our subpoena. I

</td><td>

**17**

1   of the work that is summarized from the
2   individual daily billing sheets. We keep
3   the daily billing sheets should counsel
4   ever request them, but we don't submit
5   that with the invoices.
6  Q. Do you separate out your expenses?
7  A. We do.
8  Q. And do you bill them at your own cost, or
9      is there a markup?
10 A. We bill them at cost.
11 Q. Have you disclosed to Mr. Sobol what your
12     profit margins are?
13 A. He hasn't asked.
14 Q. Do you think he would be able to negotiate
15     a better price from you if he knew that?
16 A. Perhaps.
17 Q. Do you think you are obligated to disclose
18     your profit margins to Mr. Sobol?
19 A. In terms of negotiating a price and what
20     my billing rate is, it is as with all of
21     the people that do the kind of work that I
22     do or that we do. There is an

</td></tr>
</table>

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only       October 7, 2004
AM Session                           Boston, MA

6 (Pages 18 to 21)

18

1    understanding of what our rates are
2    relative to what the profit margins are,
3    and the prices in my billing rate is a
4    signal as to what those are.
5        If I were to go to Lexecon and
6    see rates, I might be billing my rate at
7    $800 an hour at Lexecon. It would be a
8    different signal, but there would be
9    signals about what profit margins would be
10   that people understand, because in this
11   business, people have an understanding and
12   expectations of those billing rates and to
13   what the profit margins are.
14   Q. Have you consulted with plaintiffs'
15      counsel on their theory of the case?
16          MR. SOBOL: Objection to form.
17   A. I'm not quite sure. I mean they have
18      obviously, as I have stated in my
19      declaration, there is a set of allegations
20      that they will -- they plan to prove at
21      trial, and I have taken those, I have
22      accepted those as given, and based on

19

1    those, I have consulted as to the theory
2    of what the impacts would be given the --
3    that those -- that those allegations are
4    proved at trial. So I have consulted on
5    that aspect of it.
6    Q. Did you give them any advice on what they
7       should allege?
8    A. No.
9    Q. Did you review any drafts of any
10      Complaints?
11   A. Well, when I was writing my declaration, I
12      asked for the final amended master
13      consolidated Complaint so I knew what the
14      definition of the class was and what the
15      allegations were, but that was it.
16   Q. I take it you didn't review any draft
17      complaints before they were filed?
18   A. Not that I recall.
19   Q. Have you interviewed anybody in connection
20      with this case?
21   A. When you say "interviewed," do you mean
22      anybody, period? Do you mean anybody that

20

1    -- an interested party that I may want to
2    interview in a 30(b)6 context, like a
3    third-party payer or a manufacturer?
4    Q. Well --
5    A. I'm not quite sure what you mean by
6       "interview."
7    Q. Well, I am not talking about the formal
8       discovery process. I am talking about
9       gathering information outside of the
10      formal discovery process.
11          Have you attempted to gather
12      information outside of the formal
13      discovery process by interviewing anybody?
14   A. Well, you are saying "outside of the
15      formal discovery process." I have been
16      working on pharmaceutical litigation of
17      this sort for say the last 10 years, and
18      in the process, outside of this formal
19      proceeding, I have interviewed people, I
20      have spoken to people at the -- colleagues
21      at the Harvard School of Public Health,
22      issues have been discussed, structures of

21

1    markets have been discussed, how pricing
2    works has been discussed. I have talked
3    to distributors at times. I have -- I
4    have talked to insurers. So I have
5    interviewed people in this industry over
6    the last five to ten years that are
7    outside of this formal proceeding, but I'm
8    not -- is that --
9    Q. Well, have you interviewed anybody in
10      connection with your work on this case?
11   A. The -- since much of the work on this case
12      reflects what has gone on in this industry
13      over the last 10 years, or last 15, 20, 30
14      years, certainly the conversations and the
15      interviews that I have undertaken, that I
16      have participated in the past, have
17      relevance to this case, but they were done
18      before I had started this case, so they
19      weren't specifically for this case, but
20      they certainly shed light on the
21      allegations and the implications of those
22      allegations.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                          Boston, MA

7 (Pages 22 to 25)

22

1   Q.  So the answer to my question, I take it,
2       is you have not interviewed anybody
3       specifically in connection with your work
4       on this case?  Is that fair to say?
5   A.  Well, what -- if you would define -- we're
6       back at what -- it depends on what is
7       "is," for --
8   Q.  I don't know about Bill Clinton.
9           (Laughter.)
10  A.  What do you mean by "interview"?
11      Certainly with this case, I have talked to
12      people over at the Harvard School of
13      Public Health.
14  Q.  In connection with this case?
15  A.  In connection with this case.  If that's
16      an interview -- I took that as
17      discussions.  You know, if that is what
18      you are defining as an interview --
19  Q.  Who have you talked to at the Harvard
20      School of Public Health in connection with
21      this case?
22  A.  I have talked to Professor Joseph

23

1       Newhouse.  I have talked with Professor
2       Richard Frank.  I have talked with
3       Professor Meredith Rosenthal.  There are a
4       variety of postdocs working at Harvard.
5       One -- and I can give you their names, if
6       you want, if you want their names, but in
7       terms of gathering some data or doing some
8       work on this, I have had them do things,
9       and I have said, "What have you found in
10      regard to this?  What have you found in
11      regard to that?"  So if that fits under
12      the rubric of interview, I have
13      interviewed those people.
14  Q.  Okay.  Why don't you identify the postdocs
15      then.
16  A.  One is Ben Summers.  One is Doug Levy.
17      I'm trying to think if there were any
18      others.  There were probably others whose
19      names escape me now, but I can ascertain
20      those for you if that's important.
21  Q.  Have you taken any notes of those
22      interviews?

24

1   A.  No.
2   Q.  Are you relying on anything any of them
3       told you in connection with the opinions
4       expressed in your declaration?
5   A.  Well, in forming the opinions expressed in
6       my declaration, I clearly wanted to
7       evaluate and elucidate the structure, the
8       conduct, the performance of the entities
9       in this market, and so I would ask some --
10      I would ask them to find out -- to look at
11      the statutory history of Medicare,
12      Medicaid, and their reliance on AWP, and I
13      would ask them to do projects.  And so
14      they, being closer to that, those kinds of
15      issues, and having worked in those
16      markets, they know where to go to the
17      information more readily than some of my
18      other staff.  So I did talk with them.  I
19      had them do projects for me and bring back
20      materials that I could review.
21  Q.  Who is "they" there?
22  A.  They are all the people that I have

25

1       mentioned today.
2   Q.  Did they give you anything in writing?
3   A.  They essentially, if I said I want you to
4       summarize a document, they would -- I
5       would say, "Send me a copy of the
6       document, and, you know, tell me what's in
7       it."
8   Q.  I'm not sure you have answered my
9       question.  Did they give you anything in
10      writing?
11  A.  They would say --
12          MR. SOBOL:  Objection.  Asked
13      and answered.  Go ahead.
14  A.  They would send -- they would send a
15      paragraph or two summarizing what the
16      document showed.
17  Q.  Okay.  And do those documents still exist?
18  A.  Those documents appear as I reviewed them
19      and as I asked them to do them they appear
20      in my declaration.  They are -- they --
21      when I wanted a particular part of the
22      declaration outline filled in, I would

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

8 (Pages 26 to 29)

26

1    take that, I would read the sources that
2    they provided, and it appears in my
3    declaration.
4         MR. EDWARDS: I request
5    production of those materials.
6    A.  You know, I --
7         MR. SOBOL: That's to Sobol, not
8    Hartman.
9         THE WITNESS: I see. Oh, that's
10   why you are here.
11        MR. SOBOL: Every once in a
12   while.
13   BY MR. EDWARDS:
14   Q.  Other than the materials you just
15   mentioned, is everything you relied on in
16   reaching the opinions set forth in your
17   declaration identified in the declaration
18   itself?
19   A.  My standard operating procedures are. At
20   the beginning of a case of this sort, I
21   sit down with my staff and I say, "Look, I
22   need to -- I need to see stuff on this

27

1    area, this area, this area, this area,
2    this area." They will usually come back
3    with banker's boxes filled with documents
4    or related materials. I will generally
5    then -- and they know the subset from the
6    corpus of the entire set of documents to
7    show to me. So there was -- there were
8    hundreds of banker's boxes of documents at
9    counsel, counsel's offices. My kids went,
10   and they maybe brought back five or six.
11   I then went through those and said, "You
12   know, this -- I don't need this," or "this
13   is redundant. I don't need to look at
14   that."
15        The set that I -- so I have
16   reviewed more than what is listed in
17   attachment B, but what I ultimately ended
18   up relying on, I didn't -- I didn't list
19   redundant things that I didn't need to
20   rely on or that I did rely on. What is
21   listed in attachment B is what I
22   ultimately relied on to express the

28

1    opinions in my declaration.
2    Q.  So, in other words, what you are telling
3    me is everything you relied on is
4    identified in the declaration itself?
5    There may have been additional materials
6    that you considered, but you didn't rely
7    on them?
8    A.  That's right.
9    Q.  Okay. You mentioned your kids. I take it
10   you are not talking about your children?
11   A.  I'm -- I think of them as my children.
12        (Laughter.)
13   Q.  You are talking about your staff?
14   A.  I am talking about my staff, who, when you
15   get to be my age, they all look like kids,
16   so.
17   Q.  Who on your staff is working with you on
18   this?
19   A.  Staff members include Renee Rushnawitz.
20   Q.  Can you --
21        MR. SOBOL: Can you spell these
22   names as you go through, please?

29

1         THE WITNESS: R-E-N-E-E
2    R-U-S-H-N-A-W-I-T-Z; Michael Augustine --
3         MR. SOBOL: A-U-G-U-S-T-E-I-N?
4         THE WITNESS: No. There is a J
5    in there.
6         MR. SOBOL: No, there is not.
7    A.  I think if you just spelled it
8    A-U-G-U-S-T-I-N-E it will be close enough.
9    It is a Dutch name with a J and some
10   strange consonants, which I can never
11   spell.
12        Andrew Bechtel, Andrew is as you
13   would guess, and B-E-C-H-T-E-L, as you
14   would no doubt guess, too.
15        Oden, O-D-E-N, Bizan, B-I-Z-A-N.
16   That's all I can think of right now.
17   Q.  Is everybody on your staff working on this
18   matter?
19   A.  No.
20   Q.  Do you have additional staff members who
21   are working on other matters?
22   A.  Yes.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

9 (Pages 30 to 33)

30
1  Q.  How many staff members do you have
2      altogether?
3  A.  I have about, of the kids with B.A.s, six
4      or seven; one Master's degree, a person
5      with a Master's degree; and three Ph.D.'s
6      on the staff.
7  Q.  How many other matters are you working on
8      at this point?
9  A.  Me personally or the firm?
10 Q.  I will take both.
11 A.  I would guess me, maybe five or ten.  If
12     they settled, you know, I don't keep track
13     of them.
14         The firm, with our varieties of
15     affiliates, perhaps 40 or 50.
16 Q.  What percentage of the revenue of your
17     firm do you anticipate this matter will
18     account for?
19 A.  Of the firm, certainly less than
20     10 percent.
21 Q.  How about you?
22 A.  Five percent.

31
1  Q.  How about for you personally?
2  A.  For me personally?
3  Q.  Yes.
4  A.  You know, I would say it -- it is hard to
5      tell.  I am -- there is a number of -- you
6      know, I would say 10 percent maybe.
7  Q.  Have you given Mr. Sobol a budget in
8      connection with this case?
9  A.  No.
10 Q.  Or a work plan?
11 A.  We have certainly given a work plan --
12     well, we have discussed what needs to be
13     done, but there is no written outline of
14     the work, and there is --
15 Q.  Have you given him an estimate of the
16     amount you anticipate charging?
17 A.  I -- I -- if he had asked me for it, I
18     would say it is impossible to know,
19     because we get calls about settlement --
20     there is just so much that is -- that we
21     get asked to do that we have not
22     anticipated, and that involves looking at

32
1      data, helping get data, developing
2      settlement materials.
3  Q.  Have you agreed to any cap on your fees?
4  A.  Not to date.
5  Q.  Do you anticipate that you will do so in
6      the future?
7  A.  No.
8  Q.  Do you plan to rely on anything in
9      connection with your work in this case
10     that is not identified in your
11     declaration?
12 A.  Well, I certainly lay out at the end of my
13     declaration a variety of information that
14     I do want to see.  I suspect that there
15     is, of what I have relied on now in terms
16     of data, there is what I have looked at to
17     date is a minuscule part of the data that
18     will be required to implement the
19     formulaic methodologies that I have put
20     forward, and I assume there is going to be
21     additional materials that I will read,
22     characterizing the market, characterizing

33
1      behavior in the market.  I have -- since
2      this has been submitted, I see articles in
3      various industry magazines or journals
4      that I have noticed but that haven't been
5      reflected in what I have written.  So,
6      yes, there will certainly be, I think,
7      much more that I will rely on.
8  Q.  Well, is there anything that you have seen
9      since you submitted your declaration that
10     you know at this point you are going to be
11     relying on but it is not identified in
12     your declaration?
13 A.  That I know I will rely on?  No.  That I
14     might rely on?  Perhaps.  But I just don't
15     know.
16 Q.  Is any of the work that you have done in
17     the past of assistance to you in arriving
18     at your conclusions?
19 A.  Certainly.
20 Q.  Which work?
21 A.  All of it.
22 Q.  Okay.  Is any of your past work of more

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only           October 7, 2004
AM Session                              Boston, MA

10 (Pages 34 to 37)

34

1    assistance than others?
2    A.  Well, certainly the issues that arise here
3        arise in a variety of cases that purport
4        to lead to damages where prices are --
5        where there are overcharges, and so the
6        methodologies put forward here are
7        standard to work -- antitrust work that I
8        have done for a variety of industries in a
9        variety of markets over time.  So in that
10       case, the notion of the formulaic
11       methodologies, measurement of damage,
12       calculations of but-for, quantities, of
13       values, has been informed by 30 years of
14       doing this kind of work.
15             The specific work I have been
16       doing in the pharmaceutical industry
17       obviously has relevance to understanding
18       the structure and the behavior and the
19       incentives and how pricing works in this
20       market, and that's, if one looks at my CV,
21       it is all the work that has been done with
22       the pharmaceutical market, starting with

35

1        the brand name prescription drug case.
2    Q.  You worked on the brand name case?
3    A.  I did.
4    Q.  What is your understanding of what the
5        issues were in that case?
6    A.  In that case, it is -- it has been so long
7        that I wouldn't even want to try to
8        characterize them.  I worked specifically
9        with a group of Harvard faculty for one of
10       the wholesalers, and I was essentially
11       looking at pricing issues and how pricing
12       at wholesale worked.
13   Q.  Do you recall anything about the pricing
14       issues that you were looking at?
15   A.  I certainly recall the, you know, the --
16       the use of the prices, the benchmark
17       prices that are employed in the industry,
18       the use of AWP, the use of WAC, the use of
19       chargebacks, the negotiation of prices for
20       the pharmaceuticals, how the wholesalers
21       fit into that structure, what their
22       margins are, how -- how the allegations in

36

1        that matter redound on the wholesalers as
2        a group.
3    Q.  Do you recall whether you were working for
4        plaintiffs or defendants in that case?
5    A.  Defendants.
6    Q.  Have you ever submitted an affidavit in
7        connection with class certification on
8        behalf of a defendant?
9    A.  I have.
10   Q.  Can you identify those matters?
11   A.  Those matters have generally been
12       employment discrimination cases where a
13       class has been certified, and I have been
14       asked to assess the formulaic
15       methodologies of how damages are
16       calculated.
17   Q.  Have you ever submitted an affidavit on
18       behalf of defendants in the pharmaceutical
19       industry in connection with class
20       certification?  And by affidavit, I mean
21       report, declaration, --
22   A.  Right.

37

1    Q.  -- whatever.
2    A.  Right.
3            I don't think so.
4    Q.  Have you ever submitted a report in which
5        you concluded that a class should not be
6        certified?
7    A.  No.
8    Q.  Or that injury could not be determined on
9        a classwide basis?
10   A.  No.  As a matter of fact, the work that I
11       have done for defendants in those matters
12       and that appears in some of my published
13       work is that given the definition of
14       class, there are sophisticated formulaic
15       methodologies that allow one to calculate
16       variations in the quanta of damages across
17       different class members.
18   Q.  So you have never seen a proposed class
19       you didn't like?
20   A.  I don't know if that's true.
21   Q.  Can you identify any for me?
22   A.  Ask me that tomorrow.  I will think that

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only       October 7, 2004
AM Session                        Boston, MA

11 (Pages 38 to 41)

38

1   through.  As I sit here now, you know,
2   obviously -- no.  I have -- there probably
3   are classes that may not be -- should not
4   be certified, but I haven't -- I haven't
5   seen one.
6   Q.  Are any of your prior projects
7       confidential?
8   A.  As far as -- my understanding is that they
9       all are.
10  Q.  Okay.  So there are certain things you
11      will not be able to talk about in
12      connection with your prior projects
13      because you are subject to confidentiality
14      agreements?
15  A.  That's correct.
16  Q.  Do you rely on any economic principles or
17      theories in arriving at the conclusions in
18      your declaration?
19  A.  I rely on basic microeconomic principles
20      and theories.
21  Q.  Well, is there anything more specific that
22      you can identify other than the broad

39

1   general area of basic microeconomic
2   principles and theories?
3   A.  Well, microeconomic theories and
4       principles inform -- I mean there is --
5       there is a field of economics that deals
6       with individuals and entities, and hence
7       the name microeconomics.  It deals with
8       behavior in different situations, in
9       competitive, noncompetitive,
10      oligopolistic, various kinds of strategic
11      situations.  The application of those
12      principles to industries is a field called
13      industrial organization, and any economist
14      coming to any matter, whether it is
15      pharmaceutical or allegations of some kind
16      of illegal behavior in another market,
17      needs to bring the full throw weight of
18      that experience because each different
19      industry may require other various
20      specific aspects of the full corpus of
21      that -- of that training.
22  Q.  I take it you can't think of anything

40

1   specific within that broad category?
2           MR. SOBOL:  Objection to the
3   form.
4   A.  The specificity is found in what -- what
5       -- what I have -- what appears in my
6       declaration are the specific aspects that
7       I have drawn from microeconomic theory
8       that allows me to look at structure,
9       conduct, performance, incentives,
10      behavior.
11  Q.  Let's look at your declaration.
12          MR. EDWARDS:  We'll mark as
13  Exhibit 2 the Declaration of Raymond S.
14  Hartman in Support of Plaintiffs' Motion
15  for Class Certification dated September 3,
16  2004.
17          (Declaration of Raymond S.
18          Hartman in Support of
19          Plaintiffs' Motion for Class
20          Certification marked
21          Exhibit Hartman 002 for
22          identification.)

41

1           Mr. EDWARDS:  And to be fair to
2   the witness, we will mark as Exhibit 3 the
3   errata to the witness' declaration, which
4   I was provided with at the outset of this
5   deposition.
6           (Two-page Errata to Declaration
7           of Raymond S. Hartman in
8           Support of Plaintiffs' Motion
9           for Class Certification marked
10          Exhibit Hartman 003 for
11          identification.)
12  BY MR. EDWARDS:
13  Q.  Why don't you identify Exhibits 2 and 3
14      for me.
15          MR. EDWARDS:  There are copies
16  if you want to pass them down.
17          (Handing copies of Exhibit
18  No. 003 to all counsel.)
19          (Pause.)
20          (The witness viewing Exhibit
21  No. 002.)
22  BY MR. EDWARDS:

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

12 (Pages 42 to 45)

---

42

1   Q.  I will represent to you that it is a true
2       and correct copy of what plaintiffs'
3       counsel served on us.
4   A.  And I -- I honor your representation, and
5       I'm -- I'm sure I am going to come to the
6       same conclusion as I familiarize myself
7       with the fullness of my opinion.
8   Q.  Does that count against my time or Tom's
9       time?
10          (Laughter.)
11  A.  God, this is a good declaration.  I had
12      forgotten how good it was.
13          MR. SOBOL:  It is long enough.
14          THE WITNESS:  Yes.  It is
15      measured in --
16          (Further pause.)
17          (The witness continues to view
18      Exhibit No. 002.)
19  A.  I concur with your representation.
20  Q.  And Exhibit 3?
21  A.  I concur with that representation, too.
22  Q.  When did you create the errata sheet?

---

43

1   A.  Yesterday.
2   Q.  Okay.  What is it that prompted you to
3       create the errata sheet?
4   A.  I read my report.
5   Q.  So these particular items that are
6       reflected in the errata sheet did not come
7       to your attention until you read the
8       report yesterday?
9   A.  Well, I -- I have been -- I reviewed it
10      Monday and yesterday, and I started -- I
11      noticed a number of errata, and I started
12      tabulating them.  At the end of the day
13      yesterday, this is the sum total of errata
14      that I found.
15  Q.  Did counsel bring any errata to your
16      attention?
17  A.  No.
18  Q.  When did you first start to draft your
19      declaration?
20  A.  I would say sometime -- in -- it was in
21      the summer.  You know, whether it was --
22      when was it filed?

---

44

1   Q.  September 3rd.
2   A.  September 3rd?
3   Q.  It is dated September 3rd.
4   A.  I would say, you know, July and August
5       were the heavy lifting on that.  I mean
6       obviously we could -- well, I could
7       ascertain that more fully for you, but I,
8       you know, I would say over July and August
9       were the periods.
10  Q.  How much time did you spend working on
11      your declaration?
12  A.  My guess would be, oh, God, anywhere from
13      100 to 200 hours.
14  Q.  How many drafts did you go through?
15  A.  I -- the outline --
16          THE WITNESS:  Are we waiting for
17      somebody?
18          MR. MORGENSTERN:  No.  Somebody
19      got bored.
20          THE WITNESS:  How insulting.
21          (Laughter.)
22  A.  I really -- the outline of the declaration

---

45

1       was in my mind before I sat down, and I --
2       so it was one evolving draft.  I mean I
3       would be adding stuff.  As I said, I asked
4       one of our kids over at Harvard to get me
5       some information, and then I would weave
6       it in.  So he would send me a paragraph or
7       two.  I would weave it in and edit it into
8       the text of it.
9           So I don't know how to best --
10      you know, there was -- clearly it was
11      evolutionary.  This would not get written
12      from beginning to end and then come back
13      and revise and revise and revise.  It just
14      essentially continued to expand as I
15      continued to assimilate the materials that
16      I received from the various staff members
17      and the data analyses that I asked them to
18      do and that I was able to interpret.
19  Q.  Did anyone write any portion of your
20      declaration for you?
21  A.  Well, as I said, the -- I asked some of
22      the kids to tell -- to find out how, say,

---

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

13 (Pages 46 to 49)

46

1    federal upper limit is defined and how MAC
2    is defined, and give me four sentences,
3    and then the -- and then the underlying
4    regulations. I took those four sentences
5    and wove them into it. But that is the
6    only type of writing that was done. I
7    wrote every -- that wasn't based on a
8    specific idiosyncracy of either Medicare
9    or Medicaid or how AWP was used in a
10   certain situation, where I would ask them
11   to at least tell me what they read, and
12   then I would ascertain whether they were
13   right when I looked at the source
14   material.
15   Q.  Take a look at paragraph 11F of your
16       declaration, and that appears on page 10.
17           (Witness complying.)
18   Q.  In that paragraph, you are describing your
19       formulaic methodology, and you say, "This
20       type of methodology has been widely used
21       in scientific analysis of the penetration
22       of generic drugs."

47

1            And then you have a footnote and
2    a citation to a number of articles.
3            Do you see that?
4    A.  I do.
5    Q.  Are you saying that these articles discuss
6        your methodology?
7    A.  I'm saying that these articles use methods
8        that go to markets that predict how prices
9        and market share change under certain
10       competitive conditions, and they allow for
11       examining what prices would look like but
12       for certain -- certain situations. So
13       that the methodology that I proposed here
14       doesn't appear in here, but components of
15       the notion of calculating but-for prices,
16       but-for market results, where prices would
17       be different absent a certain -- certain
18       behavior, the bases, the methodological
19       bases for those kinds of analyses,
20       examples are found in that literature.
21   Q.  Does your methodology appear anywhere
22       other than in your report and other

48

1    reports that you have done?
2    A.   The methodology that I use is
3        fundamentally a methodology that
4        identifies what a but-for set of AWPs
5        would be absent the AWP scheme. And so
6        that methodology is common to all of
7        antitrust. It is common to the types of
8        analyses from which -- that would draw
9        from what is cited in footnote 24. It is
10       -- it is the same type of analysis -- it
11       is analogous to the analysis that are put
12       forward in footnote 25, formulaic
13       methodologies, and it is analogous to the
14       methodologies put forward in footnote 26
15       and essentially what those methodologies
16       are, in all of this kind of analyses are.
17       You are saying, look, there is a violation
18       of some sort, and it has interfered with
19       the way a market should work, and I'm
20       going to -- I'm going to develop a
21       methodology to come up with what a set of
22       prices or any economic verbals would be

49

1    absent those -- that -- that alleged
2    conduct.
3            And that's what I have done here
4    and adapted it to the facts of this case,
5    so it's exactly in the tradition of
6    standard methodologies used in these
7    matters.
8    Q.  Are you saying that these articles that
9        are cited in footnote 24 of your report
10       discuss your methodology for determining
11       but-for spreads?
12   A.  No.
13   Q.  Fine. And to the extent that --
14   A.  But let me clarify that.
15   Q.  -- your methodology differs from the
16       principles discussed by the authorities
17       cited in footnote 24, would you defer to
18       those authorities?
19           MR. SOBOL: Objection to the
20       form.
21           Do you need to clarify your
22       prior answer?

Henderson Legal / Spherion
(202) 220-4158

14 (Pages 50 to 53)

50

1        THE WITNESS:  I do need to
2   clarify my prior answer, but I can clarify
3   it in response to both of the questions.
4   A.  In any of these matters, in case -- in
5   Hatch-Waxman cases where we're talking
6   about allegations of alleged foreclosure
7   of generic entry, there are -- one has to
8   come to those markets and use the corpus
9   of microeconomics and industrial
10  organization to model what that market
11  would look like absent but for the alleged
12  violations.
13       The kinds of modeling that are
14  done here can be used to calculate but-for
15  prices under conditions that are absent
16  alleged violations, and so what I have
17  cited here is methods that are the basis
18  for coming up with but-for prices, say in
19  Hatch-Waxman matters, but the note -- the
20  fundamental important issue here is in a
21  variety of different types of alleged
22  illegal behavior, you bring to bear

51

1   economic principles and you calculate what
2   but-for -- what the -- what prices or
3   quantities would be absent violations.
4        The types of materials -- of --
5   of formulations in footnote 24 are aimed
6   at generic launches, generic penetration.
7   So they're not aimed at the allegations
8   here.  But they are -- they use basic
9   microeconomics and industrial
10  organization --
11       Let me finish --
12       -- to calculate but-for prices.
13       And the same is true in the
14  footnote -- what is cited in footnote 25,
15  and in going into footnote 26, where
16  they're talking about general methods of
17  using statistical or econometric methods,
18  the notion in all of these, each one of
19  the cases may be different, I mean there
20  may be a different allegations about
21  foreclosure, about conspiracy, about price
22  fixing, about cartel behavior, and if you

52

1   take the model from a cartel behavior and
2   apply it to some other foreclosure of an
3   entrant, you're going to have a different
4   model, the equations will look different,
5   but the fundamental issue is calculating
6   how the world would look and how prices
7   would be but for that violation, and this
8   -- what I have done here is exactly in the
9   tradition in that way of the articles that
10  are cited in footnote 24, 25, and 26.
11  Q.  Do any of these articles talk about a
12      methodology for calculating but-for AWPs?
13  A.  The -- in these matters -- in these
14      matters, the AWP wasn't the price subject
15      to the scheme or the allegations.
16  Q.  Do any of these articles talk about using
17      surveys as a method for determining market
18      expectations for the purpose of
19      calculating but-for AWPs?
20  A.  One would go to -- you know, let -- two
21      things to clarify.
22           If you are going to keep asking

53

1   me about but-for AWPs, none of these
2   articles, none of these cases here in the
3   Hatch-Waxman matters or what is discussed
4   generally with principles in footnote 26
5   are analyzing an AWP scheme, a fraud-
6   related AWP.  So they're not going to
7   mention AWP.  But that is irrelevant.
8        What these articles develop are
9   the fundamental methods for calculating
10  and using yardsticks to come up with
11  but-for calculations of other prices, and
12  so you're not going to find AWP mentioned
13  in here as a -- in terms of estimating as
14  a but for.  But the same principles apply
15  there as they do in this case.
16  Q.  Is it fair to say that you are the first
17      person you know of that has attempted to
18      calculate but-for AWPs?
19  A.  I wouldn't know.
20  Q.  You don't know of anybody else, I take it?
21  A.  I know that there are a variety of reports
22      conducted by the Office of the Inspector

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

15 (Pages 54 to 57)

54

1   General for DHHS that talk about
2   relationships between AWP and transactions
3   prices, acquisition costs, and these are
4   the types of studies and the types of
5   surveys that try and deal with what is a
6   relationship between an AWP.
7          Now those -- that's the -- what
8   I have done here is no different than what
9   all of these researchers are doing and
10  trying to understand the benchmark of the
11  AWP relative to acquisition costs and real
12  transaction prices in the market.
13  Q.  But as far as you are aware, no one else
14  has attempted to calculate but-for AWPs?
15  Is that correct?
16  A.  What I -- what I'm saying is --
17  Q.  Isn't it possible for you to answer my
18  question yes or no?
19  A.  Well, not if -- not if -- not if the --
20  not if it is -- the answer will be
21  misleading to the record.
22          The -- while the OIG calculates

55

1   relationships between AWP and other
2   transaction prices, they don't call it a
3   but-for price, because they're not doing
4   something in a litigation context, but
5   what they are doing is exactly what I am
6   doing.  So they just don't call it AWP.
7   Q.  So you are saying --
8   A.  I am saying but people are doing these
9   kinds of studies and relating this and
10  seeing what the yardstick means.  They
11  just don't call it a but-for AWP.
12  Q.  You are saying your methodology for
13  calculating AWPs was created for purposes
14  of litigation?
15  A.  What I am saying is that in -- in
16  innumerable legal cases, economists
17  develop but-for measures of regulated
18  rates in utility cases, but-for prices,
19  and the -- this is a standard way, this is
20  a standard methodology, in terms of coming
21  up with a measure of what the world would
22  look like absent the alleged behavior.

56

1          MR. EDWARDS:  Let's take a
2   break.
3          (Recess taken at 11:03 a.m.)
4          (Recess ended at 11:11 a.m.)
5   BY MR. EDWARDS:
6   Q.  Did anybody give you any comments on your
7   declaration other than counsel?
8   A.  I certainly discussed portions of the
9   declaration with Richard Frank.  I mean it
10  wasn't so much comments, as I would raise
11  the issues and my opinions, and we would
12  discuss them.  So Professor Richard Frank;
13  Professor Meredith Rosenthal.
14  Q.  Anybody else?
15  A.  No.
16  Q.  Did they look at your actual declaration
17  or a draft of your declaration, or are you
18  saying that you just discussed some of the
19  concepts with them?
20  A.  We certainly discussed concepts.  I can't
21  recall whether they saw a draft or not,
22  just because it was July and August, and

57

1   their being academics, they are usually
2   gone and don't have the time to focus.
3   Q.  Have you been retained by any of the
4   plaintiff firms in this case in connection
5   with any other matters?
6   A.  Well, there is -- there are probably
7   innumerable plaintiffs' firms attached to
8   this matter, and so it would be hard for
9   me to say.  The answer is probably yes,
10  but I probably would need to clarify
11  whether I could indicate which cases.
12  Q.  What do you mean?  When you say "clarify,"
13  what do you mean?
14  A.  Well, to name the cases, unless I have
15  been named as a witness, a testifying
16  expert.
17  Q.  You mean it might be confidential?
18  A.  It might be confidential.
19  Q.  Well, for those situations that are not
20  confidential, can you name the cases?
21  A.  I have submitted a declaration in support
22  of class certification for the Cipro

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

16 (Pages 58 to 61)

58
1   matter in California.
2           THE WITNESS:  Can I confer with
3       counsel?
4           (The witness and Mr. Sobol
5       conferring off the record.)
6   A.   There are some which I just, I mean I have
7       submitted declarations through damages,
8       but I don't know whether they have been
9       sealed.  A lot of this stuff is filed
10      under seal, so I will -- I will defer -- I
11      can ask counsel.
12          I have -- I have been retained
13      and have submitted declarations in the
14      Lupron matter, which I think you guys
15      know, since you got my report, and the
16      other ones, I just -- I have filed a
17      variety of declarations that go from class
18      cert. through damages and liability, but
19      until I find out whether they are under
20      seal or not, I can't answer.
21  Q.   Can you tell me how many matters there are
22      that you have worked with plaintiffs'

59
1       counsel on this case?
2   A.   Again speaking generally for all the, you
3       know, sometimes there are different
4       co-lead counsels with whom I am dealing,
5       but I understand there is a group, many of
6       them are a coalition, I would -- I would
7       say five to ten.
8   Q.   And can you give me a rough estimate of
9       the total revenues that have come to your
10      firm as a result of those cases?
11  A.   I would have to -- I would have to, you
12      know, get some calculation of that.  I
13      can't -- I couldn't say.
14  Q.   More than 100 million?
15  A.   100 million?
16  Q.   Yes.
17  A.   Oh, Jesus Christ.  Yes, we are doing 100
18      million every year.  No, no, no, no.
19          (Laughter.)
20  A.   100 million, we are not Lexecon.
21  Q.   More than 10 million?
22  A.   No.

60
1   Q.   More than 5 million?
2   A.   Now we are talking about my cases?  These
3       are my cases or the firm's?
4   Q.   These are revenues --
5   A.   Generally --
6   Q.   -- that have come to your firm in
7       connection with cases that you or your
8       firm have been retained by any of the
9       plaintiff counsel in this case.
10  A.   Are we talking now in like over the last
11      10 years or on an annual basis?
12  Q.   Sure.  Let's take five years.
13  A.   Oh, God.  Five million?  Five million over
14      five years?  That may be.  I don't know.
15      If it is, it is -- it ain't much over five
16      million.
17  Q.   Now you got your Ph.D. from MIT?  Is that
18      correct?
19  A.   That's correct.
20  Q.   Did you have a faculty advisor, something
21      like that?
22  A.   I had a variety of faculty advisors.

61
1   Q.   Do you recall who they were?
2   A.   On my thesis committee sat Jerry Houseman,
3       Morris Adelman, and I can't recall who the
4       third.  That was a while ago.
5   Q.   Did you have any interaction with Frank
6       Fisher while you were in graduate school?
7   A.   Certainly.
8   Q.   What was your relationship with him?
9   A.   It was -- it was good.  He recruited me to
10      join CRA a number of times or attempted
11      to.
12  Q.   But in what context did you interact with
13      him when you were in graduate school?
14  A.   Well, he was --
15  Q.   Was he your advisor?
16  A.   He was not an advisor.  He taught a
17      course.  He taught Principles in
18      Econometrics and Statistics and
19      Mathematics, some of which I took.  I
20      can't remember which ones.  And then he
21      was a colleague when I was a vice
22      president of the Charles River Associates.

62

1    He had offered me jobs at Charles River
2    Associates a number of times. So he is a
3    colleague and a former faculty -- a former
4    professor of mine.
5  Q.  What do you think of him as an economist?
6  A.  He is a good economist.
7  Q.  And what do you think of CRA?
8  A.  I think there are a set of firms that do
9    the kind of work that we do, and I think
10    CRA is in the -- might be one of the 15
11    firms in the top five.
12  Q.  Okay. Why did you --
13  A.  But, you know, this is not like the top
14    40. We don't sit down and rank these
15    things by beat and whether you can dance
16    to it or not.
17  Q.  Did you do any work with their
18    pharmaceutical group while you were there?
19  A.  No.
20  Q.  Why did you leave?
21  A.  I got a better offer.
22  Q.  Where did you go?

63

1  A.  I went to Cambridge Economics, Inc.
2  Q.  When did you first start doing work in
3    connection with the pharmaceutical
4    industry?
5  A.  As I said, I first got serious with work
6    in the pharmaceutical industry when I
7    worked with Richard Frank and Professor
8    Tom Maguire for -- in the brand name drug
9    pharmaceutical litigation.
10  Q.  And when was that?
11  A.  I would have to look at my CV. Dates
12    begin to -- mid to late '90s.
13        (Pause.)
14        (The witness viewing Exhibit
15    No. 002.)
16  A.  '96.
17        Wait a second. That is a
18    different one. So '95, '96.
19  Q.  When did you first hear about AWP?
20  A.  As soon as I started studying the
21    industry.
22  Q.  How did you find out about it?

64

1  A.  It is, as I say in my report, and I
2    thought in a very powerful way -- well, I
3    can't find it.
4        That it is essentially the glue
5    that binds the pricing system together.
6  Q.  My question is how did you find out about
7    it.
8  A.  Oh, I thought you said what did you find
9    out about it.
10  Q.  No. How did you find out about it?
11  A.  I found out about it just by merely
12    beginning to study the market. That is
13    one of the first things -- when one is
14    studying pricing and pricing behavior, it
15    is one of the first things that shows up
16    on the radar screen.
17  Q.  When did you first hear about WAC?
18  A.  The same time.
19  Q.  How long did it take you to figure out
20    that there was a difference between AWP
21    and WAC?
22  A.  Well, from given the information that I

65

1    was able to review and looking at
2    documentation that was subject to
3    confidentiality and a variety of things,
4    it was immediately clear it was less --
5    WAC was less than AWP.
6  Q.  What documentation are you talking about?
7  A.  Just case materials in the brand name
8    pharmaceutical litigation.
9  Q.  Are you talking about pleadings?
10  A.  Well, no. You look at contracts. You
11    look at price lists. You read about how
12    prices are negotiated.
13  Q.  Contracts of whom?
14  A.  Contracts of wholesalers, of manufacturers
15    -- with manufacturers, with third-party
16    payers.
17  Q.  How long did it take you to figure out
18    that manufacturers offered discounts below
19    WAC?
20        MR. SOBOL: Objection to the
21    form.
22  A.  I, you know, I really can't -- I can't say

18 (Pages 66 to 69)

66

1    when one realized that.  Obviously as soon
2    as you read a contract, you see that
3    pricing with various entities is AWP less
4    a certain percent plus a dispensing fee.
5    So you become aware of the fact that the
6    AWP is a benchmark for negotiations among
7    many entities in the market, and because I
8    could look at the proforma contracts that
9    led to the negotiations.
10   Q.  How long did it take you to figure out
11       that AWP is a benchmark for negotiations?
12           MR. SOBOL: Objection to the
13       form.
14   A.  You know, the way you are framing it -- it
15       is not a question of time.  It is a
16       question of when did I first see these
17       contracts, when did I get the contracts.
18       And I might have been shown the contracts
19       two years after I started doing the work.
20       I don't know the time, but it is once one
21       starts seeing contracts and starts
22       evaluating the behavior and the

67

1    negotiations that go on and the use of
2    chargebacks, one realizes that the role
3    WAC plays and the role that AWP plays.
4    Q.  Wasn't the basic issue in brand names the
5        fact that there are discounts below WAC?
6            MR. SOBOL: Objection to the
7        form.
8    A.  The -- that case is sufficiently receded
9        in my memory -- obviously there were
10       allegations of price discrimination, but
11       the part of the matter upon which I
12       focused didn't -- was -- was limited to
13       the financial performance of the
14       wholesalers, and so that I would hesitate
15       to say that, you know, to characterize it
16       the way you have characterized it.
17   Q.  What is your definition of AWP?
18           MR. SOBOL: Objection to the
19       form.
20   A.  Well, my definition is what -- I mean AWP
21       has -- is defined as the average wholesale
22       price, and my understanding and my

68

1    research and analysis of the use of AWP is
2    that it is a -- it is a list price from
3    which -- that is used as a benchmark from
4    whence all transactions prices are
5    ultimately negotiated.
6    Q.  Is it a price that relates to transactions
7        between wholesalers and pharmacies?
8            MR. SOBOL: Objection to the
9        form.
10   A.  Well, AWP and WAC for any manufacturer
11       almost uniformly has a set relationship, a
12       formulaic relationship, determined by the
13       manufacturer, and so AWP and WAC are two
14       focal prices, two benchmarks, that are
15       used in discussions of pricing throughout
16       the market, whether it is with third-party
17       payers, whether it is with retailers,
18       whether it is with PBMs.  So the -- it is
19       the glue that binds the system in the
20       sense that in the evidence I have reviewed
21       all discussions of pricing, however --
22       whatever the acquisition costs turn out to

69

1    be, whatever the reimbursement rates turn
2    out to be, they are based on AWP.
3    Q.  Take a look at attachment D to your
4        report.  What I want to do is direct your
5        attention to footnote one.
6            (Witness complying.)
7    Q.  Do you have it?
8    A.  I do.
9            MR. SOBOL: Did you say D or B?
10           MR. EDWARDS: D.
11           THE WITNESS: D.  It follows C.
12           MR. SOBOL: All right.
13   Q.  You cite an article by Dawn Gencarelli,
14       G-E-N-C-A-R-E-L-L-I, in which she
15       discusses AWP.  Do you agree with what she
16       said there?
17   A.  I do.
18   Q.  Now did it surprise you when you learned
19       that pharmaceutical manufacturers offered
20       discounts below AWP?
21           MR. SOBOL: Objection to form.
22   A.  I don't -- you know, I don't think there

Raymond S. Hartman, Ph.D.    Confidential - Attorneys' Eyes Only    October 7, 2004
AM Session                                    Boston, MA

19 (Pages 70 to 73)

70

1    is -- it -- "surprise" would not be the
2    word.
3    Q.  Are you aware of any industry in which
4    benchmarks or list price is used in which
5    the sellers do not discount?
6    A.  The -- that would be an empirical issue.
7    It is certainly clear that there are lots
8    of industries where there is a list price,
9    which is a starting point for -- is the
10   benchmark from whence discounting and
11   negotiations off of that benchmark are
12   negotiated by various members, various
13   entities at various stages of the vertical
14   structure of that market.
15   Q.  Are you aware of any industries in which
16   sellers disclose their discounts to the
17   general public?
18   A.  I know that there are -- there are
19   industries -- there are industries that
20   purport to provide information leading to
21   an understanding of what discounts might
22   be, the automobile industry being one

71

1    where they talk about rebates and upfront
2    payments and a variety of things off of a
3    sticker price.
4            So that there are -- there are
5    industries where some information is
6    provided.  There are -- there are groups
7    within certain markets where they try and
8    provide information and expectations and
9    inform consumers, say through consumer
10   reports, of the types of discounts that
11   are possible.  I know there has been --
12   there has been studies that have been put
13   out by the OIG here trying to indicate and
14   measure and measuring the types of
15   discounts that were being found between
16   the AWP -- the discounts off of AWP toward
17   an acquisition cost.
18           So, yes, I'm aware of industries
19   where discounts are offered.  I am aware
20   of industries where there is information
21   and expectations about what discounts are.
22   I am aware of groups that try and help

72

1    consumers and inform them as to those
2    discounts.
3            MR. EDWARDS:  I am going to move
4    to strike the answer insofar as it was not
5    responsive to my question.
6    Q.  My question to you, sir, --
7            MR. SOBOL:  Motion denied.
8    Q.  -- is are you aware of any industries in
9    which sellers disclose their discounts off
10   of list price to the public.
11   A.  And my -- my -- my answer is -- must be
12   then conditioned on the fact that I know
13   there is information that characterizes
14   those discounts.  From whence it is
15   gathered, I'm not always sure, but
16   certainly in the auto industry, some of it
17   is gathered from sellers.
18   Q.  Do you think that if you --
19           MR. SOBOL:  Are you finished
20   with your answer?
21   Q.  -- were to --
22           THE WITNESS:  Yes.

73

1            MR. SOBOL:  Okay.
2            MR. EDWARDS:  Excuse me.  I
3    didn't catch what Tom said.
4            (Prior record read.)
5            MR. EDWARDS:  Sorry.
6    BY MR. EDWARDS:
7    Q.  Do you think if you walked into a General
8    Motors dealer and asked that dealer to
9    tell you all the discounts that it had
10   given off of MSRP in the last year that
11   that dealer would tell you that?
12   A.  I would -- I would think that anyone
13   coming in off the street, having listened
14   to the Dodge Ram commercials or the Toyota
15   commercials or whatever, would have some
16   idea of what types of discounts were
17   available.
18           From reviewing sources, Kelly's
19   Blue Book and maybe some NITSA
20   documentation or Consumer Reports, there
21   would be some idea of what the dealer
22   acquisition cost is.  It is not going to

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only              October 7, 2004
AM Session                              Boston, MA

20 (Pages 74 to 77)

---

74

1    be a perfect idea. But there is going to
2    be expectations that there is some dealer
3    acquisition costs and there is a sticker
4    price, and you are going to go in, and
5    they're going to say, you know, the
6    Toyota, the list price is 23,500. And
7    there is, based on the information that is
8    available, that there is a dealer
9    acquisition cost that may be 25 percent
10   less or whatever, but you are not going to
11   know exactly what it is. And you are
12   going to negotiate between what your idea
13   of what that dealer acquisition cost is
14   related to the sticker price, between --
15           If I could finish?
16           -- between that dealer, your
17   understanding of the dealer acquisition
18   cost, and the sticker price. And so that
19   you have -- you have expectations and
20   information from the various sources about
21   what that is.
22           Now if -- well, period.

---

75

1    Q.   Would you agree as an economist that
2         discounting is good?
3              MR. SOBOL: Objection to the
4         form.
5    A.   Well, the -- I would agree as an
6         economist, you know, that consumer welfare
7         is enhanced when prices are reduced and
8         when -- when there is -- when there are
9         price reductions related to technological
10        progress, related to certain factors of
11        production costing less, and those are
12        passed on to consumers, that is -- that is
13        consumer -- that enhances consumer
14        welfare. If those price increases are
15        passed on to middle men and the prices to
16        the consumers do not reflect the
17        discounts, and indeed if the prices go up
18        to consumers, then it has not been -- then
19        discounts based on enhancing consumer
20        welfare are not good. They are bad.
21   Q.   Well, we can discuss that and debate that
22        I think for a while, but I will move on.

---

76

1    A.   Well, good for whom? You are talking
2         about -- you said are they good in
3         general?
4              MR. SOBOL: There is no question
5         before you.
6              THE WITNESS: Oh, sorry.
7    Q.   I take it, Dr. Hartman, that you do not
8         consider yourself to be an expert in the
9         pharmaceutical industry? Is that correct?
10   A.   Well, could you -- could you be more
11        specific?
12   Q.   Well, do you consider yourself to be an
13        expert on Medicare Part B?
14   A.   No.
15   Q.   You haven't analyzed the statutory history
16        of Medicare Part B; correct?
17   A.   Not in the depth that I could write a
18        learned journal paper on it or teach a
19        course in it. No.
20   Q.   And you don't consider yourself to be an
21        expert in Medicare regulation, do you?
22   A.   No.

---

77

1    Q.   Then you don't consider yourself to be an
2         expert on insurance reimbursement for
3         pharmaceuticals? Is that correct?
4    A.   I have -- I certainly have come to
5         understand and study insurance
6         reimbursement. But do I have a chaired
7         professorship in the area? No.
8    Q.   Well, I asked you whether you considered
9         yourself to be an expert on insurance
10        reimbursement.
11   A.   Well, the -- and I'm -- I will give you a
12        qualified no.
13   Q.   Nor are you an expert on the relationships
14        between payers, PBMs, pharmacies, and
15        manufacturers? Isn't that correct?
16   A.   I have certainly submitted an expert
17        declaration that draws on an understanding
18        of relationships between insurers and PBMs
19        and manufacturers, and I am expert enough
20        in, as an economist, to come to an
21        industry to render the opinions that I
22        have in my declaration.

---

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 7, 2004
AM Session                          Boston, MA

21 (Pages 78 to 81)

78

1   Q.  But you are not an expert on those
2       relationships in and of themselves, are
3       you?
4   A.  I am expert enough to render the
5       declaration I have rendered.
6   Q.  Well, that remains to be seen, but.
7   A.  Oh, now let's not get personal.
8           (Laughter.)
9   Q.  You do not consider yourself to be an
10      expert on the terms and conditions and the
11      interactions between payers and PBMs with
12      respect to prescription drugs; isn't that
13      true?
14          MR. SOBOL: Objection to the
15      form. Asked and answered.
16          THE WITNESS: Yes. Asked and
17      answered.
18  Q.  Well, as between you and Dr. Shandenmyer,
19      who do you think has the greater expertise
20      with respect to the pharmaceutical
21      industry?
22          MR. SOBOL: Objection to the

79

1       form.
2   A.  The -- Dr. Schondelmeyer's qualifications
3       as I understand them is that his -- his
4       teaching and his professorship is in a
5       department of pharmacology, and so the --
6       his -- the focus of his study is on
7       pharmacy-related issues, the extent to
8       which they go to the institutions and the
9       economics of insurers and PBMs, and he is
10      certainly expert enough to provide an
11      opinion, but I don't know -- I don't know
12      -- I don't know enough about his
13      background to say he is an expert on those
14      institutions.
15          Any -- any economist who is
16      trained in microeconomics and industrial
17      organization is generally asked to come to
18      markets that are widely different, and the
19      training is such that one understands that
20      institutions impact the operations and
21      economic principles and practices, and
22      that -- that level of expertise is what I

80

1       bring to this industry, and what
2       Dr. Schondelmeyer brings is from a
3       slightly different perspective, rooted in
4       pharmacology, but it still extends beyond
5       that to the economic structures that he
6       renders opinions about.
7   Q.  Well, as to any fact in connection with
8       the industry, would you defer to
9       Dr. Schondelmeyer if his understanding of
10      the facts was different from yours?
11          MR. SOBOL: Objection --
12  A.  It is not clear --
13          MR. SOBOL: -- to form.
14  A.  -- to me. It would depend on the facts.
15      It would depend on the situation.
16  Q.  Have you read his declaration in this
17      case?
18  A.  I have reviewed it.
19  Q.  Okay. Is there anything in his
20      declaration that you disagree with?
21          MR. SOBOL: Objection.
22  A.  I --

81

1           MR. SOBOL: Wait. I think that
2       if you are going to ask him that question
3       you ought to put the document before him
4       and give him an opportunity to read it.
5           MR. EDWARDS: Sure. Well, let
6       me reframe the question.
7           MR. SOBOL: Or you can do that.
8   BY MR. EDWARDS:
9   Q.  This question goes to --
10          MR. SOBOL: He is not going to
11      answer the question without reading it
12      first.
13          THE WITNESS: Reading it
14      thoroughly.
15  Q.  This question goes to your recollection,
16      Dr. Hartman. Do you recall whether when
17      you read Dr. Schondelmeyer's declaration
18      there was anything in it that you
19      disagreed with?
20          MR. SOBOL: Objection to the
21      form.
22  A.  With -- I reviewed his declaration,

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                            Boston, MA

22 (Pages 82 to 85)

82

1  somewhat quickly, and I -- and so I -- I
2  did not get to the level of individual
3  specific facts, any individual specific
4  facts, that I found contradicted anything
5  that I believed. But, as I say, I read it
6  in a somewhat cursory fashion, and if we
7  are going to get down to a specific
8  sentence or paragraph, you need to put it
9  in front of me.
10 Q.  Well, we may get there eventually, but I
11     think you have answered my question for
12     now. You have also read the paper he
13     recently wrote with --
14          MR. SOBOL: Ms. Wrobel.
15          MR. EDWARDS: Right.
16 Q.  -- Ms. Wrobel, Marion Wrobel?
17 A.  I have.
18 Q.  And you rely on that in your report?
19     Correct?
20 A.  I do.
21 Q.  And is there anything in that paper that
22     you disagree with --

83

1          MR. SOBOL: Well, again --
2  Q.  -- if you recall?
3          MR. SOBOL: I want the record to
4  reflect that the document is not in front
5  of the witness.
6  A.  For me to specifically respond to that, I
7     would like to read it closely again. I
8     can't recall. I read that a month or two
9     ago. I used it to give a -- to help
10    explicate a -- the structure of the
11    market.
12 Q.  You don't recall anything that you
13     disagreed with in that paper I take it?
14 A.  No.
15 Q.  Have you ever been subject to a Dalbert
16     motion?
17 A.  I thought lawyers tried to Dalbert every
18     economist that ever went to a deposition.
19 Q.  I take it the answer to that is yes?
20 A.  Yes.
21 Q.  Has one ever been granted?
22 A.  No.

84

1  Q.  Okay. Okay. Has a court ever criticized
2     your work in any way to your knowledge?
3  A.  I know a number of laudatory things said,
4     but I know of no criticism. I would be
5     glad to put forward laudatory examples, if
6     you would like.
7  Q.  Well, we will let Mr. Sobol get into that
8     subject on his nickel.
9          What I want you to do is turn to
10    your declaration now. Take a look at
11    paragraph 7.
12         (Witness complying.)
13 Q.  You see in the second sentence you say, "I
14    have been asked to analyze whether
15    causation, injury, and liability can be
16    proven on a classwide basis."
17         Have you been asked to give
18    separate opinions on each of those
19    elements?
20 A.  I have -- I have certainly been asked to
21    assume the liability as expressed in the
22    allegations and as laid out in the

85

1  allegations. I have been asked to, given
2  those allegations, and accepting them as
3  true, I have been asked whether liability,
4  causation, which I take to be impact,
5  injury, and damages can be and should be
6  proven on a classwide basis. So I have
7  thought about each of those separately and
8  jointly.
9  Q.  And are there separate opinions for each
10    of those elements --
11 A.  No.
12 Q.  -- in your declaration? What you are
13    saying is the general opinion stated in
14    your declaration covers all three
15    elements?
16 A.  The -- I would look to see where I have
17    stated exactly the set of conclusions and
18    how it covers it.
19         (Pause.)
20         (The witness viewing Exhibit
21    No. 002.)
22 A.  I would say that looking at paragraphs 10

Henderson Legal / Spherion
(202) 220-4158

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 7, 2004
AM Session                              Boston, MA

23 (Pages 86 to 89)

86
1   and 11 fully summarize the conclusions to
2   which I come regarding each jointly and
3   severally for those issues.
4   Q.  Okay. Where in this declaration do you
5       render an opinion with respect to
6       liability?
7           MR. SOBOL: Objection to the
8       form.
9           You can answer.
10  A.  The -- again the -- I have taken liability
11      to mean impact in my interpretation.
12  Q.  Okay.
13  A.  And the fact that there is a commonality,
14      that the alleged AWP scheme was
15      implemented through inflating an AWP,
16      which is common to all units of every NDC,
17      of every drug sold nationwide, and the
18      fact that the discounts were offered and
19      the fact that the spread, that that led to
20      a spread that was well beyond what would
21      be reasonably expected in this market, is
22      the basis for the fact that the impact was

87
1   classwide, and it is -- that's my
2   understanding of liability.
3   Q.  So you are assuming the facts alleged in
4       the Complaint to be true and you're
5       looking at impact? Is that correct?
6   A.  I have laid out my understanding of the
7       allegations in paragraph 8, and that's --
8       that is my summary of the allegations, and
9       I'm assuming that they're true. I am
10      assuming --
11  Q.  You are --
12  A.  -- that this scheme existed, and I am -- I
13      -- and I'm assuming that -- I am -- I
14      understand that the evidence will be
15      brought forward to -- directed at proving
16      those allegations, that I'm not being
17      asked to do that, but in the process of
18      doing what I'm doing, I'm looking for
19      corroboratory evidence of the allegations,
20      and I find that the facts in evidence that
21      I have been able to review to date
22      corroborate what I have been asked to

88
1   assume, but I don't take what I have done
2   as a report on liability proving those
3   allegations. I have merely assumed those
4   allegations for purposes of this report.
5   Q.  Have you talked to any class members to
6       determine whether the facts alleged in the
7       Complaint are true?
8   A.  I can't recall.
9   Q.  Do you recall that in your deposition in
10      the Lupron case you testified that if
11      someone knows the true facts then there
12      would not be a misrepresentation?
13          MR. SOBOL: Objection to the
14      form.
15  A.  You would have to show me the transcript
16      in the full --
17  Q.  Well --
18  A.  I mean I don't know what --
19  Q.  Well, do you agree with that proposition?
20      If somebody knows the true facts, then
21      there cannot be a misrepresentation?
22          MR. SOBOL: Objection to the

89
1   form.
2   A.  Well, if -- my understanding of that
3   question is -- is that it is a legal
4   matter. What is a fraudulent
5   misrepresentation or a concealment of
6   factual information that redounds to the
7   damage to a group of individuals or
8   entities, it is my understanding that
9   under the RICO statutes that is an
10  illegality, and so that the
11  misrepresentation is the basis for the
12  illegality.
13          Now whether under RICO people --
14  there was no misrepresentation, I don't
15  know. That is something for lawyers to
16  argue.
17  Q.  Are you saying that economic theory does
18      not address the issue of whether there is
19      fraud?
20          MR. SOBOL: Objection to the
21      form.
22  A.  Could you repeat that question?

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                    October 7, 2004
AM Session                              Boston, MA

24 (Pages 90 to 93)

90

1        MR. EDWARDS:  I will have the
2    reporter read it back.
3            (The pending question and
4    objection were then read.)
5    A.  Well, fraud -- as an economist, I can
6    think of no textbook that has a chapter on
7    fraud.  The -- obviously if there are
8    economic interactions and the participants
9    in a given market rely on certain
10    information, and information is a good
11    thing in economic markets for consumers,
12    and if they come to rely on that, and it
13    turns out that what they have relied on
14    has been misrepresented or fraudulently
15    concealed in some way, that does harm to
16    the persons and the entities in that
17    market that rely on that information.
18            Now as a threshold, an economic
19    threshold of something being fraud, that
20    seems to me to be a legal matter.  That is
21    not something that I as an economist have
22    rendered an opinion here.

91

1            I have taken the allegations of
2    fraud and seen what the implications are
3    relative to relationships between
4    benchmark prices and transactions prices,
5    and lo and behold, I see very large
6    deviations from what persons in the market
7    expected the information to mean, and it
8    affected the way they behaved and how they
9    -- how they interpreted the price signals
10    to their detriment.
11    Q.  Have you ever talked to any persons in the
12    market about what they expected the
13    information to mean?
14    A.  Well, I read a portion of the deposition
15    of the -- I think it was the -- there was
16    one of the senior administrators of Blue
17    Cross Blue Shield of Montana, and my
18    recollection of what her understanding of
19    AWP is was that it was an average
20    wholesale price, and that it reflected an
21    acquisition cost to providers in the
22    market, and it revealed a -- that there

92

1    were expectations, and it revealed -- and
2    that the facts deviated very considerably
3    from the expectations that she had as to
4    the meaning of AWP and what it meant.
5    Q.  So your opinion in this case is based on
6    one deposition?
7    A.  No.  I have looked at other depositions,
8    and, you know, I have -- certainly in
9    terms of doing the damage analysis, this
10    is much of what appears here is
11    illustrative and how it will be done, and
12    it is drawn from surveys that are publicly
13    known and are diffused within the
14    participants of this market with --
15    apparently with a great lag.  But
16    obviously during the damage phase of this,
17    I'm going to have to talk to a lot of Blue
18    Cross Blue Shield administrators and
19    people at Cigna and Aetna and a variety of
20    places.
21    Q.  And if there are depositions of class
22    members who have testified that they were

93

1    not misled and they understood the true
2    facts, does that impact your opinion in
3    any way?
4            MR. SOBOL:  Objection to the
5    form.
6    A.  And what are the -- I'm -- what are you
7    saying are the true facts?
8    Q.  What are you saying are the true facts?
9    A.  I am saying --
10            MR. SOBOL:  Objection to the
11    form.
12    Q.  You can't answer my question?
13            MR. SOBOL:  Objection to that --
14    to the form of that question also.
15            THE WITNESS:  Yes.
16            MR. SOBOL:  I haven't a clue
17    what the question is right now.
18            THE WITNESS:  Why don't --
19    BY MR. EDWARDS:
20    Q.  If a witness has testified in this case
21    that they were not misled, is that of
22    interest to you at all?

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 7, 2004
AM Session                          Boston, MA

25 (Pages 94 to 97)

94

1          MR. SOBOL:  Well, objection.
2     Will you provide him the deposition?  And
3     he can look at it and make -- and answer
4     the question.
5  A.  I will --
6          MR. SOBOL:  Well, I have got a
7     question.
8  Q.  You may answer the question.
9          MR. SOBOL:  All right.
10  Q.  It is an objection to the form.
11  A.  During the damage phase of this, should we
12     get to damages, these are precisely the
13     kinds of depositions that I need -- that I
14     have asked counsel to notice and to take,
15     and that I'm going to want to -- I'm going
16     to want to review.
17          Now you are saying if someone in
18     the deposition says they know the true
19     facts, does that mean that they weren't
20     misled or that -- that there was no fraud?
21     The woman whose deposition for Blue Cross
22     and Blue Shield of Montana thought she

95

1     knew the real -- the true facts.  She
2     didn't.
3          In order for one to know the
4     true facts, whether you are of any --
5     whether you are Cigna, whether you are as
6     well informed as someone from Cigna or
7     Aetna or you are someone who is not
8     well-informed, in order to know the true
9     facts, you are going to need to know all
10     of the -- all of the discounts, all of the
11     price offsets, all of the side payments.
12     You are going to need to have an
13     understanding of what the actual
14     acquisition cost or the ASP is in order to
15     come to some conclusion of whether the AWP
16     is a reasonable signal.  And I have --
17     some people will -- there may be
18     differences in the quanta of the extent of
19     the impact of the fraud for different
20     people, but -- and that will be determined
21     by how much they truly understand.
22  Q.  Well, if somebody testifies to all of

96

1     those things, all of those variables that
2     you just mentioned in your answer, and
3     states that they were not misled, does
4     that have an impact on your opinion?
5          MR. SOBOL:  Objection to the
6     form.
7  A.  The -- I am going to have to review it and
8     be able to pose, in reviewing it, be able
9     to pose my own questions.  I mean someone
10     can state they're not being misled, but I
11     need to see what they were asked to see
12     whether they were being misled or not.
13  Q.  So it could have an impact on your
14     opinion?
15  A.  The --
16          MR. SOBOL:  Objection to the
17     form.
18  A.  The -- my opinion that -- the allegations
19     that I have been asked to assume and which
20     I have corroborated, through the evidence
21     that I have been able to review and
22     corroborate, indicate -- have led me to

97

1     the conclusion that there was causation,
2     there was impact, it was classwide, there
3     was injury, and there was damages.
4          What you are getting at right
5     now is what was the quanta of that, of
6     those damages or those -- of those
7     injuries, and to -- that quanta may differ
8     depending on what people thought they knew
9     or how much they thought they were being
10     misled or whether they were being misled
11     or not, and that is something that has to
12     be addressed at an allocation phase, and
13     it is something that can't be ignored, but
14     it doesn't change my opinion as to
15     classwide causation or impact.
16  Q.  You are saying that even if someone was
17     not misled, there could still be impact?
18          MR. SOBOL:  Objection to the
19     form.
20  Q.  Is that your opinion?
21  A.  It's --
22          MR. SOBOL:  Objection to the

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only           October 7, 2004
AM Session                                    Boston, MA

26 (Pages 98 to 101)

98

1    form. Not misled about what?
2  A.  You have just said "not misled," and I
3      need to see what -- I need to -- what you
4      are characterizing as not being misled, I
5      have to see what leads to that conclusion
6      and what they knew, and someone could
7      claim that they were not being misled
8      about weapons of mass destruction, and
9      they didn't know. So, you know, it's -- I
10     need to -- that needs to be reviewed by me
11     in a way that I can -- I can probe to see
12     whether they really were misled. They may
13     not think they have been misled.
14 Q.  You need to understand the facts and
15     circumstances related to each class member
16     to determine whether they were in fact
17     misled?
18         MR. SOBOL: Objection --
19 Q.  Correct?
20         MR. SOBOL: -- to the form.
21 A.  No.
22 Q.  I thought you just said you would have to

99

1      read their testimony and understand
2      exactly what they said in order to form a
3      view as to whether it affects your
4      opinion?
5  A.  No. What I said was my opinions as to
6      causation, impact, injury, and damages
7      holds regardless of what I find in those
8      -- in those depositions. What that will
9      affect is the quanta of the injury across
10     the class members.
11 Q.  How can somebody be injured if they, by
12     fraud, if they were not misled?
13         MR. SOBOL: Objection to the
14     form.
15 A.  If someone fully knew -- and if as I'm --
16     as I'm looking at the class -- suppose the
17     class is certified and we have the class
18     as a whole, and I am able to go to a very
19     well-informed third-party payer. Let's
20     take Cigna, for example. They have got a
21     PBM. They have got a mail order facility.
22     So they have some idea of what, you know,

100

1      they are seeing some ASPs; they are seeing
2      some information. They have some idea,
3      better than someone who is running Blue
4      Cross Blue Shield in Montana has. But
5      they don't have -- they don't have retail
6      chains. They don't understand the
7      discounts. They don't understand the full
8      extent of all the information that is
9      required to fully know the acquisition
10     cost that for which the AWP is a signal.
11     And what I'm saying is the extent to which
12     they have knowledge needs to be
13     ascertained, and that will affect the
14     quanta of how they're impacted.
15         But it doesn't change the fact,
16     even if you have got somebody that well
17     informed, that they have been impacted.
18     It is the degree and the amount to which
19     they have been impacted that will -- that
20     will be informed by the kinds of
21     depositions that you're talking about and
22     the kinds of information that would come

101

1      forth in those depositions.
2  Q.  Why don't I put it to you very simply,
3      Dr. Hartman. Are you saying as a
4      professional economist that a person can
5      suffer injury if they have not been
6      misled?
7         MR. SOBOL: Objection to the
8      form.
9  Q.  And if you are saying that, then I want to
10     know the basis for that opinion.
11         MR. SOBOL: Objection to the
12     form.
13 A.  Well, let me -- let me parse your
14     definition of "not being misled.".
15         If we have the totality -- if
16     you are saying by "not being misled" they
17     were not injured, then by definition, if
18     they knew enough not to be injured, then
19     the measure of their damages -- their
20     injury is zero, in measuring the quanta of
21     their damages, if they knew everything
22     that was needed to be known.

Henderson Legal / Spherion
(202) 220-4158

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                               Boston, MA

27 (Pages 102 to 105)

102
1   Q.  And if there is no damage, there is no
2       impact?
3   A.  No.  There is impact.
4           MR. SOBOL:  Objection.
5   Q.  How is there impact if there is no damage?
6   A.  The -- this is -- this is a group of
7       purchasers -- the classes are all subject
8       and impacted by the AWP scheme since
9       they're all looking at the same AWP.  They
10      -- and since there are discounts that have
11      been offered that drive that, the
12      acquisition cost to -- to the system well
13      below that AWP and well below the
14      expectations that have been formed over 20
15      years in this market in relationship to
16      that benchmark price, the -- I have now
17      forgotten the question.
18          THE WITNESS:  Could you?
19          (The pending question was then
20      read.)
21          THE WITNESS:  Okay.  Thank you.
22  A.  The mere fact there is a manipulation of

103
1       this AWP impacts every transaction to
2       which the AWP is subject to, and so it is
3       going to impact everybody.
4           Now to the extent that it
5       damaged -- that damages them and injures
6       them will be determined to the extent by
7       which they had information and could
8       essentially deal with the scheme and not
9       be -- not be injured or diminish the
10      amount of the injury, and if they are
11      God-like and they know everything, and the
12      evidence I have seen to date indicates
13      that there was no such third-party payer
14      that exists, but if God were running one
15      of these third-party payers and knew
16      everything, then he would be impacted by
17      it.  He is still facing a fraudulently
18      concealed AWP, but he can mitigate -- he
19      can mitigate that impact such that the
20      injury is driven to zero.
21  Q.  How do you define "impact" in that answer?
22          MR. SOBOL:  Objection to the

104
1       form.
2   A.  I define "impact" as I have been asked to
3       assume that there was certain illegal
4       behavior.  That illegal behavior involved
5       fraudulently inflating an AWP, and at the
6       same time, offering substantial rebates,
7       discounts, invoice price offsets, off
8       invoice price offsets, sometimes hidden
9       price offsets and blandishments.
10  Q.  So you don't mean negative impact then?
11  A.  I mean impact that since that forms the
12      basis, these -- these God-like third-party
13      payers that you are talking about see the
14      inflation.  They are impacted by it.  They
15      have to do something about it.
16  Q.  When you talk about impact in your
17      declaration, you are talking about benign
18      impact as well as negative impact?
19          MR. SOBOL:  Objection.
20  Q.  Is that what you're saying?
21          MR. SOBOL:  Objection.
22  A.  I wouldn't call it benign.

105
1           MR. SOBOL:  Wait.  I had an
2       objection to the form of the question, and
3       if there is going to be a colloquy between
4       the questioner and the answerer, you ought
5       to give the stenographer time to write the
6       question down, there be an opportunity for
7       counsel to interpose their objection or
8       not, and then there be an answer.
9           THE WITNESS:  He is good.  You
10      know?  He is --
11          MR. EDWARDS:  The voice of
12      reason.
13          THE WITNESS:  He is the voice of
14      reason.
15      BY MR. EDWARDS:
16  Q.  Look, I am not an economist, but I am
17      wondering if you can refer me to some
18      authorities which will help me understand
19      how you can have negative impact from a
20      fraud where there is no damage.
21  A.  The --
22  Q.  Can you cite me any authorities?

Henderson Legal / Spherion
(202) 220-4158

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                    October 7, 2004
AM Session                              Boston, MA

28 (Pages 106 to 109)

106

1    A.  Well, but the -- when -- when I'm -- when
2        I'm reading the, what I have been asked to
3        analyze, I have been asked to analyze
4        causation, which I take to be impact,
5        injury, and damages, and the -- I haven't
6        been asked to find for all class members
7        negative impact.  I am looking for
8        classwide impact, and that is going to
9        differ across class members.  There is no
10       denying that.
11   Q.  What you are saying is that some class
12       members inevitably will not have suffered
13       any negative impact?
14           MR. SOBOL: Objection.
15   A.  No.  I am not saying that at all.
16   Q.  You are saying you have to look at the
17       individual --
18           MR. SOBOL: Objection.  Both of
19       you -- I am going to insist from the
20       witness, too.  When a question is asked,
21       there should be a pace, and I will object
22       or not, and then there will be an answer,

107

1        from both of you.
2        BY MR. EDWARDS:
3    Q.  What you are saying is you would have to
4        look at --
5            MR. SOBOL: Now I object to the
6        last question that was posed.  If it is
7        being withdrawn, you can tell me if it is
8        withdrawn?  Are you going to ask another
9        question?
10           MR. EDWARDS: I think I got an
11       answer to the question.
12   Q.  What you are saying then is --
13           MR. SOBOL: Then I object and I
14       move to strike.
15           THE WITNESS: Right.
16           MR. SOBOL: The answer, if in
17       fact there was -- I don't know -- I
18       haven't gone into the record whether there
19       was an answer or not, because again I will
20       insist that the questioner and the
21       answerer give Mr. Sobol a chance to
22       interpose his objections.

108

1            There is no reason for people to
2        be racing through questions and answers in
3        this deposition.  You have another day and
4        a half.
5            MR. EDWARDS: Well, unlike you,
6        I am going to let the judge rule on your
7        motion to strike.
8        BY MR. EDWARDS:
9    Q.  But I take it, Dr. Hartman, what you are
10       saying is you would want to look at the
11       facts and circumstances with respect to
12       each individual class member to determine
13       whether there has been a negative impact,
14       because in some cases, there could be, and
15       in some cases, there might not be;
16       correct?
17   A.  That is -- that is not what I said at all.
18   Q.  Let me ask you to take a look at your
19       testimony in the Lupron case.  It is your
20       deposition dated May 25, 2004.
21           MR. EDWARDS: We will mark this
22       as Exhibit 4.

109

1            (Transcript of deposition of
2            Raymond S. Hartman, taken
3            May 25, 2004, marked
4            Exhibit Hartman 004 for
5            identification.)
6            MR. SOBOL: Can we put on the
7        record my understanding is that counsel
8        for the defendants in the AWP MDL have
9        obtained the assent of all defendants in
10       the Lupron MDL for the disclosure of this
11       information in the AWP MDL.
12           MR. EDWARDS: That's my
13       understanding.
14           MR. SOBOL: And I also would at
15       least anticipate that then the Exhibit 4
16       is to be subject to the confidentiality
17       order entered in the AWP MDL.  I don't
18       know whether Tapp insisted on that or not,
19       but I am assuming that is the case, and
20       therefore, we should designate it as such.
21           MR. EDWARDS: So designated.
22       BY MR. EDWARDS:

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only     October 7, 2004
AM Session                          Boston, MA

29 (Pages 110 to 113)

110
1  Q.  Do you recall testifying in a deposition
2      in the Lupron case on or about May 25,
3      2004?
4  A.  Yes.
5  Q.  I want you to turn to your testimony at
6      pages 157 and 158.
7          (Witness complying.)
8  Q.  Beginning at line 21 on page 157,
9      Mr. Daley states:
10         "Question:  Now if you had been
11     with me driving in the car when I had the
12     accident and gone with me to get it
13     repaired and the body work and the paint
14     job and everything else, if we assume
15     that, and then you were buying my car,
16     and you asked me if I had any damage,
17     and I said no, would that be a
18     misrepresentation?
19         "THE WITNESS:  In other words,
20     if I knew everything you knew, would there
21     be a misrepresentation?
22         "Question:  Yes.

111
1          "Answer:  No."
2          Was that testimony true when you
3      gave it?
4  A.  In coming to an answer to your question, I
5      am just going to read the context in which
6      this answer is given
7          (Pause.)
8          (The witness viewing Exhibit
9      No. 004.)
10 Q.  Do you need more time?
11 A.  I'll let you know as soon as I am ready.
12 Q.  Well, we have already been at least a
13     minute.  Is this a tough question?
14 A.  No.  I want to see the context.  I am
15     reading three or four pages beforehand and
16     a little bit afterwards to see the context
17     in which I gave the answer, seeing if
18     there is other good stuff in here.
19 Q.  Look, if this question is too difficult
20     for you to answer, we can go on to another
21     question.
22         MR. SOBOL:  If you keep on

112
1      asking him questions when he is in the
2      middle of reviewing his testimony, how do
3      you expect him to review his testimony,
4      Steve?
5          THE WITNESS:  Give me a break.
6      Let me look at this.
7          (Further pause.)
8          (The witness continues to review
9      Exhibit No. 004.)
10 A.  I agree with my testimony as laid out in
11     that.
12 Q.  And is it still true today?
13 A.  It is.
14 Q.  And would you agree that if a class member
15     knew what the average selling price was
16     for a particular drug, there would not be
17     any causation --
18         MR. SOBOL:  Objection to the
19     form.
20 Q.  -- or impact?
21         MR. SOBOL:  Objection to the
22     form.

113
1  A.  What I have said is in re the car example,
2      if someone at Cigna were sitting on --
3      with the pricing group, the strategic
4      pricing group at Bristol-Myers Squibb or
5      at GSK or at any other drug manufacturer,
6      and had a full understanding of what ASP
7      was and how AWP was inflated relative to
8      that ASP through the various distribution
9      channels through which that drug may be
10     reimbursed and essentially knew
11     everything, then the -- that person would
12     be -- would understand the
13     misrepresentation that was going on, would
14     understand the impact, would be subject to
15     the impact, but would be able to mitigate
16     any injury therefrom.
17 Q.  Are you saying that the only way to avoid
18     impact is to have perfect knowledge?
19         MR. SOBOL:  Objection to the
20     form.
21 A.  I'm --
22 Q.  In other words, anybody in any industry

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

30 (Pages 114 to 117)

114

1   who doesn't have perfect knowledge has
2   been defrauded?  Is that your economic
3   theory here?
4        MR. SOBOL:  Objection to the
5   form.
6   A.  No.
7   Q.  There are many markets in which people
8   don't have perfect knowledge?
9   A.  That's correct.
10  Q.  Are you familiar with the concept of the
11  efficient market as it is used in
12  securities cases?
13  A.  I'm not an expert in it, but I -- I have a
14  -- a basic understanding of it.
15  Q.  What do you understand it to mean?
16  A.  Well, in -- with regard to securities --
17  the pricing of securities, when you have
18  enough people buying and selling a given
19  security based on all the information that
20  the various people have, that the
21  securities market will be the most
22  efficient way of incorporating all of the

115

1   information that is in the market into the
2   pricing of a particular equity.
3   Q.  And is the market that you are studying in
4   connection with this case an efficient
5   market?
6        MR. SOBOL:  Objection to the
7   form.
8   A.  I would say no.
9   Q.  Okay.  By the way, what is the market that
10  you are studying in this case, or are
11  there many markets?
12       MR. SOBOL:  Objection to the
13  form.
14  A.  And are you -- what -- your definition of
15  "market" is what?  Under the merger
16  guidelines or --
17  Q.  I don't know.  Do economists ever use the
18  term "market"?
19  A.  Sure.  They use it in a lot of different
20  ways.
21  Q.  Okay.  How would you use it in connection
22  with this case?

116

1        MR. SOBOL:  Objection to the
2   form.
3   A.  There is an area of -- there are sets of
4   markets that constitute the distribution
5   of pharmaceutical products from
6   manufacturers to the ultimate consumers,
7   and those markets may be as small as the
8   market for a given molecule in evaluating
9   certain kinds of economic events or
10  alleged violations, but I'm looking at the
11  global -- I am looking in the context of
12  the structure as laid out in Attachment C
13  as discussed by Schondelmeyer and Wrobel
14  in their Abt Associates' report, which
15  consists of the flow of all
16  pharmaceuticals from all manufacturers
17  through the distribution chains, through
18  the intermediaries, to the final
19  consumers, and then the reverse flow of
20  financial payments.
21  Q.  How many markets are there in this case?
22       MR. SOBOL:  Objection to form.

117

1   A.  Innumerable.
2   Q.  And the thing that causes you as an
3   economist to state that opinion is the
4   fact that there are differences among
5   various drugs and various methods of
6   distribution and various methods of
7   payment?  Is that correct?
8   A.  Well, I don't know if --
9        MR. SOBOL:  Objection to the
10  form.
11  A.  There is -- those differences exist.  I
12  don't know if that's the reason I have
13  said there are different markets, but.
14  Q.  Well, one reason you would draw the
15  conclusion that two products are not in
16  the same market is because there are
17  differences between the two products?
18  Right?
19  A.  Well, the --
20  Q.  The ultimate situation in which you have
21  got two products in the same market is
22  where the two products are exactly the

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

31 (Pages 118 to 121)

118

1      same?  Right?
2   A.  You are done?
3   Q.  Yes.
4   A.  Okay.
5          The -- let's take an example
6      that is orthogonal to the distribution
7      scheme and reimbursement and a variety of
8      things.  One can analyze whether different
9      molecules or different groups of molecules
10     as identified by IMS constitute antitrust
11     markets and whether they're subject to the
12     kinds of violations that are alleged under
13     Hatch-Waxman.  Now that -- those kinds of
14     allegations and that kind of analysis of
15     the market go on regardless of the
16     distribution chains that we're talking
17     about here in Schondelmeyer and Wrobel.
18     The fact is there is substitution among
19     products.  Whether they are bioequivalent,
20     whether they are therapeutically
21     equivalent, all of these things play into
22     the definition of a market.  And so if one

119

1      wanted to get down to the very microlevel
2      of different kinds of classes of drugs and
3      then different drugs within -- there must
4      be 22 classes of antihypertensives, and
5      all of them may constitute a market, all
6      of them different markets.  Each of the
7      molecules may constitute different
8      markets.
9   Q.  Would you agree with me that the
10     pharmaceutical industry is complex and has
11     a multiplicity of distribution and payment
12     entities?
13  A.  God, that sounds familiar.
14         I would agree that, as many
15     markets in modern industrial countries,
16     this is a -- this is a -- this is a
17     complicated market.  I wouldn't say it is
18     more complicated than other markets, but
19     it is -- it has -- it has distinct issues
20     and structural variations that need to be
21     accounted to -- for, and can be accounted
22     for using standard economic methods and

120

1      practices.
2   Q.  You mentioned IMS.  What is IMS?
3   A.  IMS is a -- data -- is a group that
4      gathers data on -- it is a -- it provides
5      information on a variety of different
6      types of products, prices, at retail, at
7      -- at wholesale, distributions of
8      consumption across states for different
9      drugs.  It provides information about the
10     industry.
11  Q.  To whom?
12  A.  Anybody that is willing to pay for it.
13  Q.  And is it the case that IMS data can be
14     used to determine discounts given to
15     different classes of trade in the
16     pharmaceutical business, such as
17     hospitals, HMOs, mail order, pharmacies,
18     government programs?
19         MR. SOBOL:  Objection to the
20     form.
21         You can answer.
22  A.  The IMS, as its competitor Scott Levin

121

1      that has recently been acquired by
2      Verispan, another data group, provide a
3      variety of surveys or products that focus
4      on different classes of trades or
5      different groups, and one can go to the
6      IMS and as a client say, "I want an
7      analysis of reimbursement rates in this
8      class of trade," or one can do a variety
9      of things.
10  Q.  One can go to IMS and get a sense of the
11     extent to which different classes of trade
12     are getting prices below the published
13     WAC?  Isn't that true?
14         MR. SOBOL:  Objection to the
15     form.
16  A.  One can go to IMS and get information
17     summarizing the retail acquisition cost by
18     certain classes of trade.  I don't know
19     how extensive, how many, whether it is all
20     of them, but certainly retail pharmacies
21     is one that I have made use of.
22  Q.  When you use the term "ASP" in your

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

32 (Pages 122 to 125)

122

1   declaration, are you talking about average
2   sales prices among all customer classes,
3   or do you think it is important to
4   distinguish between customer classes?
5   A.  Well, I think -- at the -- as I deal with
6       it in my formulation, and in terms of a
7       signal for -- that the AWP is a signal for
8       transactions prices, i.e., average sale
9       price, I am taking it as an average sale
10      price across all classes.
11  Q.  Okay.  Even though Dr. Schondelmeyer would
12      disagree with you on that?  Isn't that
13      true?
14          MR. SOBOL:  Objection to form.
15  A.  I don't know.  I don't -- I don't know
16      what he -- what his opinion -- before you
17      guys scurry to find it, let me -- it may
18      not be relevant.
19          I would not -- if he -- if his
20      -- if his contention is that there may be
21      different -- that their ASPs may vary
22      across classes of trade, I wouldn't

123

1   disagree with that, if that's what you are
2   going to turn to.
3          The -- I haven't read closely
4   enough his opinions as to how it differs,
5   the extent to which it differs, but it is
6   going to differ across classes of trade.
7   I am -- I am taking the average of those
8   averages across classes of trade.  I am
9   taking an average for all units sold,
10  which summarizes again the average of the
11  averages, and I'm relating the -- I am
12  taking that as a measure of a real
13  transaction price, and estimating a WAC --
14  a -- I am sorry -- a but-for ASP related
15  to that.  And so the application, there is
16  not to be multiple AWPs.  There is going
17  to be an AWP as a signal for the average
18  ASP, and then we know that ASPs will vary
19  among classes of trade.
20  Q.  Your basic approach, as I understand it,
21      is to compare actual spreads to but-for
22      spreads to determine whether there was

124

1   injury?  Is that correct?
2   A.  The -- briefly put, that is correct.
3   Q.  And injury is another way of saying
4       causation?  Is that correct?
5   A.  Causation and impact are classwide.
6       Injury is the result of that impact or
7       causation.
8   Q.  Two sides of the same coin?
9   A.  Well, I -- it's --
10  Q.  If there is no causation, you wouldn't
11      have injury?  Right?
12  A.  Well, if there is no allegations of any
13      kind of violations and there was no
14      illegality, you would have no impact or no
15      injury.  So I agree with that.
16  Q.  Now the but-for spread in your analysis
17      would be the difference between ASP and
18      the but-for AWP?  Is that correct?
19  A.  Well, the measure of the but-for spread would be
20      based upon the -- a relationship to ASP,
21      as -- as expected, reasonably expected, by
22      the information available.  If we're

125

1   talking about efficient markets the --
2   what information was available to people
3   generally, the -- it was -- the -- that is
4   the relationship for the but-for spread,
5   the but-for relationship, between AWP and
6   ASP.
7   Q.  And the way you calculate the but-for
8       spread is you develop what you call an
9       expectation yardstick and you apply that
10      to the ASP to arrive at a but-for AWP?  Is
11      that fair?
12  A.  In the illustrative presentation in my
13      declaration, that is true.  In the actual
14      damage analysis, I will do more to
15      quantify what -- what the but-for spread
16      is for drugs or for these drug
17      manufacturers during that period of time
18      not subject to the allegations or for
19      drugs and manufacturers during the class
20      period not subject to the allegations and
21      any other studies that are available.
22  Q.  And I believe you testified a moment ago

Henderson Legal / Spherion
(202) 220-4158

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                                  Boston, MA

33 (Pages 126 to 129)

126
1    that the ASP that you use in your
2    formulaic methodology is an ASP that cuts
3    across customer classes?
4  A.  For the purposes of what I have done here
5    in this illustration, it is, yes.  It is
6    the ASP over all.
7  Q.  And that is not a proper way to do it, is
8    it?
9          MR. SOBOL:  Objection to the
10   form.
11 Q.  I mean don't you have doubts about
12   applying that methodology?
13 A.  No.
14 Q.  In other words, what you are saying is if
15   a pharmacy is paying $20 and a hospital is
16   paying $10, then you would calculate an
17   ASP of $15 even though the class members
18   are purchasing drugs from pharmacies, not
19   hospitals?  Is that what you're doing
20   here?
21 A.  Could you repeat the question?
22         (The pending question was then

127
1    read.)
2  A.  Well, you are conflating -- there is a lot
3    of stuff you are conflating there.  I mean
4    the -- the class members purchase drugs
5    from hospitals and from pharmacies, but
6    the -- the purchases from hospitals are
7    subject to a per -- a capitation.  So that
8    they are not subject to AWP.
9          There are the -- you know,
10   obviously there is going to be some --
11   some class members that purchased -- and
12   when I look at the actual data of what
13   they purchased for that, that is going to
14   be available from the manufacturer's data,
15   what the ASPs are to the classes of trade.
16         I am merely looking at --
17   whatever that is, I am looking at the
18   other blade of the scissors.  I am looking
19   at how much more they paid than they
20   should have paid, and what the -- and that
21   is based on AWP and the but-for AWP, the
22   difference between the two, and how that

128
1    leads to a different reimbursement rate.
2    And that is what they paid out.
3  Q.  By the way, in your analysis, would the
4    but-for ASP be the same as the actual ASP?
5  A.  I don't mention a but-for ASP.  I am
6    saying there is an ASP, and it is what it
7    is, and it reflects what the transaction
8    reflects.  In the real world, there were
9    discounts.  There were all of these
10   financial considerations offered which
11   lowered the acquisition cost to
12   distributors, to PBMs, to providers, and
13   so they receive that in the real world,
14   and I am assuming they are going to
15   receive it in the but-for world.
16         In the but-for world, however,
17   they are going to reimburse at a lower
18   rate, because the AWP will not be -- it
19   will be -- it will conform with the
20   expectations of what -- of the
21   relationships between AWP and ASP.
22 Q.  You are saying that the ASP will be the

129
1    same in the actual and the but-for worlds,
2    aren't you?
3  A.  For purposes of what I have done here, I
4    have taken that to be the case.
5  Q.  Okay.  And is that your opinion?
6  A.  The --
7  Q.  I mean are you saying that you are going
8    to change your methodology down the road?
9  A.  I am saying that the -- there were -- the
10   allegations state two things:  that AWP is
11   inflated; and ASP was lowered through all
12   of these financial considerations.
13         And what I am going to look at
14   is given what they paid in those financial
15   considerations and how it was lowered,
16   what should the AWP have been had this
17   scheme not been in place.
18 Q.  But your opinion is that the ASP will stay
19   the same?
20 A.  That's right.
21 Q.  Okay.  And indeed, you express that
22   opinion on page 1 of Exhibit F to your

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 7, 2004
AM Session                                      Boston, MA

34 (Pages 130 to 133)

---

130

1   declaration, don't you?
2          (Pause.)
3          (The witness viewing Exhibit
4   No. 002.)
5   Q.  Is that correct?
6   A.  Well, for explication of what -- how the
7       method will work, I am essentially saying,
8       look, there were expectations that had
9       been created from the '60s through the
10      '80s of a relationship of the benchmark
11      price to ASP.  Now we get into the '90s,
12      and there is an alleged inflation of AWP
13      relative to the ASP that was actually
14      actual transaction price.
15          So I am saying, look, what would
16      the AWP -- what should the AWP have been
17      absent this scheme given that these are
18      the -- the ASPs were the actual
19      transaction prices.  So I am taking what
20      the ASPs were in the real world to be
21      those in the but-for world, and I'm coming
22      up with what the but-for AWPs should have

---

131

1       been and then the but-for reimbursement.
2              MR. SOBOL:  I am sorry.  On --
3   Q.  If the ASPs --
4              MR. SOBOL:  Can I ask a
5       question?  On Exhibit F, what portion of
6       the first page are we talking about where
7       the --
8              MR. EDWARDS:  Do you see where
9       it says, "The model"?
10             MR. SOBOL:  Yes.
11             MR. EDWARDS:  First page.  It
12      says, "ASP is given from invoice data and
13      will be the same in actual and but-for
14      worlds."
15             MR. SOBOL:  Okay.  Thank you.
16      BY MR. EDWARDS:
17  Q.  And if ASP is going to remain the same in
18      the actual and the but-for worlds,
19      wouldn't it follow from that that all you
20      are doing is simply predicting a
21      redistribution of prices among customer
22      classes?

---

132

1              (Mr. Cavanaugh entering the
2       deposition room.)
3   A.  AWP is the benchmark from whence all
4       prices flow.  Certainly that's the
5       definition of the class, and it is the
6       basis for negotiating all of the prices.
7              Now the ASP is as it is, and I'm
8       assuming it stays as it is, and I am
9       saying that absent the scheme, the wedge
10      or the spread between AWP and ASP would
11      have been -- would have been different.
12  Q.  But --
13  A.  And I am calculating what that AWP is, and
14      that AWP is going to -- that's the same
15      for all purchasers.  What differs when I
16      get into the claims data is whether
17      different groups were able to negotiate
18      AWP less 50 percent, AWP less 13 percent.
19      That is going to be an issue of the quanta
20      of injury, and that will differ across,
21      once -- once the -- once we get to the
22      claims administration phase, I will be

---

133

1       able to look at claims and see what they
2       have been, what they were paying, given
3       what the actual ASP, the transaction
4       price, was.
5   Q.  Was --
6   A.  And those impacts will be different for
7       different groups, depending on what they
8       have negotiated.
9   Q.  What you are saying is that at the end of
10      the day the average sales price, though,
11      is going to be the same?
12  A.  I'm saying that whatever discounts,
13      whatever these manufacturers felt was in
14      their profit-maximizing or volume-
15      maximizing interests to sell the product
16      at, the scheme that I have been asked to
17      assume existed essentially concealed that
18      ASP and the difference between the AWP,
19      and absent that scheme, the AWP would be
20      lower.
21  Q.  But I am not --
22  A.  So the ASP is what it was.

---

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 7, 2004
AM Session                                    Boston, MA

134

1    Q.  And what I want to do is focus on the
2        ASP --
3    A.  Okay.
4    Q.  -- part of the equation.
5    A.  Right.
6    Q.  And as I understand your testimony, you
7        are saying that at the end of the day, the
8        total dollars being paid or the average
9        dollars being paid for drugs is going to
10       be exactly the same in the but-for and
11       actual worlds?  Correct?
12           MR. SOBOL:  Objection to the
13       form.
14   A.  I am saying that had these manufacturers
15       sold the drugs exactly as they had sold
16       them at the prices that they sold them at,
17       at the ASP reflected as the average across
18       all sales, but they had not engaged in
19       this fraudulent concealment of the spread,
20       that they will get -- they will get what
21       they got anyway, but the third-party
22       payers will -- will have -- the overcharge

135

1        that they suffered, the impact and the
2        injury from their overcharge will be
3        accounted for.
4    Q.  Well, for the ASP to stay the same, it
5        must be the case then that in your but-for
6        world some people would pay more and some
7        people would pay less?
8           MR. SOBOL:  Objection to the
9        form.
10   A.  Well, I -- I have just -- I have just said
11       that that is -- whatever they were paid --
12       what the -- whatever discounts and
13       whatever -- whatever blandishments were
14       offered to these various people and
15       whatever they paid, they paid, and that is
16       reflected in their ASP and the average
17       ASP.
18           And those were paid, don't
19       forget, in many cases not to the
20       third-party -- not to the class members.
21       They were paid to the doctors.  They were
22       paid to the PBMs.  They were paid to the

136

1        retail chains.  And the companies are
2        going to get what they got before.  But
3        the -- the AWP -- the relationship to the
4        AWP, the relationship between the AWP and
5        that much lower ASP will reflect what
6        that relationship should have been absent
7        this scheme of hiding this information
8        from the class members.
9    Q.  Well, you said "that much lower ASP."  I
10       thought you testified that the ASP is
11       going to be the same?
12   A.  Relative --
13           MR. SOBOL:  Objection.
14       Objection to the form.
15   A.  Relative to the AWP.
16   Q.  So now you are saying that the ASP will be
17       different?
18   A.  No.
19           MR. SOBOL:  Objection to the
20       form.
21   A.  Here you have got --
22           MR. SOBOL:  There is no question

137

1        before you.
2    Q.  Let's take a look at Dr. Schondelmeyer's
3        declaration.
4           MR. EDWARDS:  We will mark this
5        as Exhibit 5.  It is a declaration of
6        Stephen Schondelmeyer.  By the way, is he
7        a doctor?  I have been calling him doctor.
8        Everybody is a doctor.
9           MR. SOBOL:  I have been calling
10       him doctor.
11           MR. EDWARDS:  This is a room of
12       doctors.
13           THE WITNESS:  Really?
14           MR. EDWARDS:  We are juris
15       doctors.  People don't consider our
16       degrees to be as worthy as yours.
17           THE WITNESS:  I do.  I do.
18           MR. EDWARDS:  It is dated
19       September 2, 2004.
20           (Declaration of Stephen W.
21           Schondelmeyer in Support of
22           Plaintiffs' Motion for Class

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 7, 2004
AM Session                              Boston, MA

36 (Pages 138 to 141)

138
1           Certification marked
2           Exhibit Hartman 005 for
3           identification.)
4           THE WITNESS:  Can I give my
5      Lupron stuff back, or should I hold on to
6      it?
7           MR. EDWARDS:  Sure.  We may give
8      it back to you later today.
9           (Handing Exhibit No.004 to
10     Mr. Edwards.)
11     BY MR. EDWARDS:
12  Q.  So take a look at paragraph 88 of the
13     Schondelmeyer declaration.
14        (Witness complying.)
15  Q.  Do you have that in front of you?
16  A.  Yes.
17  Q.  He says in the second to the last sentence
18     on page 36, quote, "Because class of trade
19     differentials exist and are outside of the
20     control of the purchaser, an accurate
21     approach to estimating actual acquisition
22     costs must take into account the class of

139
1      trade pricing practices of drug firms."
2           Do you agree with that?
3           MR. SOBOL:  Objection to the
4      form.
5  A.  You know, I am trying to understand -- now
6      when he is talking about classes of trade,
7      I am understanding him to mean mass
8      merchandisers, food stores, retail chains,
9      independent pharmacies, hospitals,
10     et cetera, et cetera, and not the class
11     members.  So we're talking about -- I am
12     going back to page 35, channels of
13     distribution, classes of trade, and he is
14     saying that --
15         MR. SOBOL:  You are mumbling.
16         THE WITNESS:  I am sorry.  Let
17     me say nothing.
18         (Pause.)
19         (The witness viewing Exhibit
20     No. 005.)
21     BY MR. EDWARDS:
22  Q.  The question is simple, Dr. Hartman.  Do

140
1      you agree with that?
2  A.  I am trying to understand it.
3  Q.  I will ask the question a different way.
4           MR. SOBOL:  You are withdrawing
5      the question?
6  Q.  Do you have any basis to disagree with
7      that?
8           MR. SOBOL:  That was helpful.
9           THE WITNESS:  Yes.  That helps.
10          (Laughter.)
11  A.  Well, the -- in order for me to really
12     render an informed opinion, I would need
13     to read this more closely.
14          Let me say the following:  that
15     my understanding of classes of trade
16     correspond to some of the distribution
17     channels that he mentions in paragraph 86:
18     Chain pharmacies, mass merchandisers,
19     pharmacies, food and drug pharmacies,
20     independent pharmacies, mail order
21     pharmacies, and health plan pharmacies.
22     So that is true.

141
1  Q.  Hospitals?
2  A.  And hospital pharmacies, and physicians
3     and clinics.
4  Q.  I have got you.
5  A.  Okay.
6          And there are going to be
7      differences --
8          THE WITNESS:  Is there a party
9      going on?
10         (Pause.)
11  A.  There are going to be -- the ability of
12     these different groups, as I have pointed
13     out in my own declaration in terms of who
14     is moving market share of which products,
15     whether we have got PBMs moving brand name
16     drugs, whether we have got retailers or
17     mail order pharmacies -- well, I am sorry,
18     let me go back.
19          Whether we have PBMs moving
20     market share for a single-source branded
21     pharmaceuticals, whether we have mail
22     order staff model HMOs moving multisource

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                          Boston, MA

37 (Pages 142 to 145)

142

1   branded products, whether we have
2   retailers moving generic drugs, whether we
3   have physicians moving injectable drugs,
4   physician-administered drugs, wherever
5   there are going to be those classes of
6   trade that or those groups as I have
7   identified them that are the ones that
8   need to be incentivized to move market
9   share, they will receive more of the price
10  offsets than others, which means that
11  there will be differentials across those
12  groups, and that is accounted for in what
13  I'm doing, and I'm assuming they are still
14  going to do that.
15  Q.  Is it your understanding that average
16      sales prices for hospitals is lower than
17      average sales prices for pharmacies?
18          MR. SOBOL:  Objection to the
19      form.
20  A.  The -- the acquisition cost to different
21      groups, depending on the various types of
22      price offsets offered to different groups

143

1   for different types of drugs -- you have
2   just made a very broad statement.  I don't
3   know if it is true for all drugs.  It
4   might be true for hospital inpatient types
5   of drugs, injectables.  It might not be
6   true for orals, but that's -- there are
7   going to be differences in various amounts
8   of price offsets and financial
9   considerations offered to those groups
10  that are being incentivized to move the
11  market share to increase -- to take
12  advantage and increase the spread beyond
13  what can be reasonably expected.
14  Q.  You don't recall that claim being made in
15      the name brand cases, that hospitals get
16      lower prices than pharmacies?
17          MR. SOBOL:  Objection to the
18      form.
19  A.  I am sure that hospitals get lower prices
20      than pharmacies on some drugs.  Whether it
21      is true for all drugs, I would need to
22      look at the data.

144

1   Q.  If you calculated your but-for AWP using
2       the pharmacy ASP only as opposed to
3       calculating an ASP across all customer
4       classes, don't you think it would be the
5       case that the spread would be or the
6       but-for AWP would be higher --
7           MR. SOBOL:  Objection.
8   Q.  -- than it would be using an ASP cutting
9       across all customer classes?
10          MR. SOBOL:  Objection to the
11      form.  Asked and answered.
12  A.  The -- one could calculate the but-for
13      spread in that fashion or the spread in
14      that fashion, but it would be wrong.
15  Q.  So you disagree with Schondelmeyer that
16      you have to distinguish between customer
17      classes?
18  A.  No.  I am saying that what he says is
19      true, and the -- what he -- the decisions
20      made by any given manufacturer to
21      incentivize different groups where they
22      are going to offer greater financial

145

1   considerations to one versus another is
2   summarized overall in the average sales
3   price for all units sold.
4       Now that average will be an
5   average of some ASPs that are higher and
6   some that are lower.  That is not -- that
7   is not relevant.
8       The point is we know what it
9   was.  It was sold for what it was sold
10  for.  It reflected what the discounts and
11  the profit-maximizing or volume-maximizing
12  strategic objectives of these companies.
13  Q.  Well --
14  A.  The point is once that was done, and you
15      add up these differentials that
16      Schondelmeyer rightly says are there, you
17      have an average sale price that summarizes
18      all of those strategies across the
19      different classes of trade, and that is
20      what the spread -- the fraudulent
21      concealment is the relationship of an
22      average transactions price to a single

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

38 (Pages 146 to 149)

146

1    AWP.
2    Q.  Well --
3    A.  You don't have multiple AWPs, a hospital
4        AWP, and a retailer AWP.
5    Q.  But if Mr. Schondelmeyer --
6        Dr. Schondelmeyer is saying you shouldn't
7        add them up, you shouldn't combine them,
8        are you saying he is wrong?
9            MR. SOBOL:  Objection to the
10       form.
11   A.  I don't -- I didn't see where he said you
12       shouldn't add them up, and I don't -- he
13       is -- I don't see a model that he is
14       developing.  To come up -- for me to draw
15       a conclusion and for -- to respond to a
16       question like that, I'm going to read his
17       thing fully, and I'm --
18   Q.  Well, let's take a look at his paper,
19       which you said you had read and you relied
20       on in your report.
21           MR. EDWARDS:  We will mark it as
22       Exhibit 6.  It is a document entitled

147

1        Medicaid and Medicare Drug Pricing:
2        Strategy to Determine Market Prices, Final
3        Report, June 21, 2004, and it looks like
4        it has a logo of Abt Associates on it.
5            (Medicaid and Medicare Drug
6            Pricing:  Strategy to Determine
7            Market Prices, Final Report
8            marked Exhibit Hartman 006
9            for identification.)
10           THE WITNESS:  Should I hang on
11       to this or should I --
12           MR. EDWARDS:  It is up to you.
13           (Handing Exhibit No. 005 to
14       Mr. Edwards.)
15           (Pause.)
16           (The witness viewing Exhibit
17       No. 006.)
18   BY MR. EDWARDS:
19   Q.  Can you identify this document?
20
21   A.  I am in the process of doing so.
22           (Further pause.)

148

1            MR. LYNCH:  Off the record.
2            (Discussion off the record.)
3            THE WITNESS:  Are we off the
4        record?
5            MR. SOBOL:  No.
6    Q.  All set?
7    A.  Close.
8            (Further pause.)
9            (The witness continuing to view
10       Exhibit No. 006.)
11   A.  Okay.  It looks to be the report upon
12       which I relied.
13   Q.  And if you look at the second paragraph of
14       the introduction, the third sentence, it
15       says, "After review and evaluation of the
16       options, the authors recommend that actual
17       acquisition costs be estimated by using
18       manufacturer supplied data on average
19       selling prices by class of trade."
20           Do you agree with that?
21   A.  And this is -- this is for Medicare
22       Part B, I take it, is what they're making

149

1        this recommendation for?
2    Q.  Well, it says Medicaid and Medicare
3        Part B, I believe.
4    A.  I would have -- I would have to know more
5        about what he is trying to do and more
6        about the full set of recommendations he
7        seems to be making before I would agree
8        with that.
9    Q.  So you can't embrace that sentence on its
10       face?
11   A.  No.
12   Q.  Okay.  Take a look at page 20.
13           (Witness complying.)
14   Q.  The last paragraph on the page is headed
15       Estimated Separately by Class of Trade,
16       and he says there, quote, "Because actual
17       acquisition costs vary by class of trade,
18       the estimation methodology must take into
19       account these differentials in order to
20       generate drug product payments that are
21       both accurate and reflect generally and
22       widely available prices."

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

39 (Pages 150 to 153)

150

1          Do you agree with that?
2   A.   Well, I agree that under my reading of the
3        Medicare statutes that they were designed
4        to -- for the third-party payers to
5        reimburse at the estimated acquisition
6        cost, which --
7   Q.   I am just asking you whether you agree
8        with it.
9   A.   Well, I'm -- I'm prefacing my remarks.
10  Q.   You can't answer my question yes, I do;
11       no, I don't; I agree with some of it, not
12       all of it; some answer that we can
13       understand?
14  A.   Oh, you can understand all of my answers.
15       It's --
16  Q.   Do you agree with it?
17          MR. SOBOL:  What is the "it"?
18          MR. EDWARDS:  That sentence that
19   I just read into the record.
20          MR. SOBOL:  Apart from the rest
21   of the document, or just that sentence,
22   you know, in isolation?

151

1          MR. EDWARDS:  Well, we could
2    spend a lot of time, but I think it is
3    pretty clear that Schondelmeyer thinks if
4    you are going to come up with a --
5          MR. SOBOL:  A new system?
6          MR. EDWARDS:  -- a new system
7    based on ASP pricing --
8          MR. SOBOL:  All right.
9          MR. EDWARDS:  -- you have got to
10   distinguish between classes of trade.
11         MR. SOBOL:  On a new system
12   going forward?  This isn't a damage model.
13         MR. EDWARDS:  But for a new
14   system.
15  A.   I'm not sure what he is proposing here and
16       in what context.  There are clearly a set
17       of prices, an average set of prices, at
18       which drugs are available from the
19       manufacturer that is represented by the
20       average for the manufacturer, and this --
21       he has an opinion to differentiate that
22       further.  Medicare Part B I have not seen

152

1        as requiring that differentiation.  So
2        there are proposals here and options about
3        the direction that he wants to go that
4        does not reflect in my mind what -- the
5        way the industry has worked over the last
6        20 years, and it is not a way that informs
7        the but-for understanding of relationships
8        between AWP and some measure of average
9        transaction prices.  This -- this is some
10       way of doing it, but it is -- it is
11       essentially running independent to, I
12       find, what I have done.
13  Q.   Well, if you were required to calculate
14       your but-for AWPs on the basis of ASPs on
15       a class of trade/class of trade basis,
16       would that have an impact on your opinion?
17  A.   So what you are saying is that you want me
18       to assume a hypothetical world, not in
19       evidence, and that doesn't exist, and it
20       is not the way the world has worked over
21       the last 40 years, but in a world where
22       there are differential AWPs by class of

153

1        trade?  You want me to consider that
2        world?
3   Q.   What I want -- one of the classes that you
4        are opining on is a class of third-party
5        payers who purchased drugs through PBMs.
6        Correct?
7   A.   I wouldn't call them a class of trade.  I
8        would call them -- they are a payer.
9        Class of trade is --
10  Q.   I wasn't calling them a class of trade.  I
11       was talking about the classes in this
12       case.
13  A.   I am sorry.  I thought I heard class of
14       trade.
15  Q.   One of the classes in this case being
16       alleged --
17  A.   Right.
18  Q.   -- proffered by plaintiffs in this case is
19       a class of third-party payers who
20       purchased drugs through PBMs.  Is that
21       right?
22  A.   That is right.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                               Boston, MA

40 (Pages 154 to 157)

154

1   Q.   Now if you were required in your analysis
2        to base your calculation of the but-for
3        AWPs for that class on the ASPs of
4        pharmacies, would that have an impact on
5        your opinion?
6   A.   Well, it would -- to -- to develop a model
7        or to develop a methodology or to develop
8        an approach to evaluate the extent of
9        injury and damages using the hypothetical
10       you proposed is totally orthogonal to the
11       world as it existed.  So if you want -- it
12       is not the way -- my assumption of the
13       but-for world is the world as it existed
14       absent the fraudulent activities, and that
15       consists of a world with a single AWP by
16       an NDC, and it doesn't get at this, and
17       there are -- you know, there are a variety
18       of ways of proposing options for changing
19       the world, but I'm not -- I'm not looking
20       at that.  I am looking at how the world
21       existed, and how the alleged activities
22       within the -- everything else being the

155

1        same but for this AWP scheme, what -- what
2        would the AWPs have looked like, and it
3        wouldn't -- they wouldn't have looked like
4        a world where there were different AWPs
5        for different -- for things sold through
6        different classes of trade.  That is not
7        the world we live in.
8   Q.   All right.  Well, the way we got into this
9        subject is I think I had asked you if you
10       would agree that if a class member knew
11       what the ASP was for a particular drug
12       would there be any causation, and I don't
13       recall what your answer was to that.  Do
14       you recall?
15            MR. SOBOL:  Objection to form.
16  A.   Why don't you propose -- say that again?
17       Have it read back?
18  Q.   If a class member knows what the ASP is
19       for a particular drug, would there be
20       causation?
21            MR. SOBOL:  Objection to the
22       form.

156

1   A.   The -- let's -- let's think of an example.
2        Let's think about Hatch-Waxman situations
3        these days when drugs go generic.
4   Q.   You can't answer that question yes or no?
5   A.   Read it back again, if you would, please.
6            (Prior record read.)
7   A.   This is -- we are back -- this is an asked
8        and answered dance that we have done
9        earlier.
10            The fact that a third-party
11       payer has an idea that ASP diverges
12       significantly from the AWP which is the
13       basis for its reimbursement rates -- I was
14       going to give you an example, but we won't
15       go to an example -- and they have
16       knowledge of that, they are impacted by
17       the fraudulent activities, because they
18       have to do something about it.  There is
19       an impact for them.  They have to respond.
20       The world is different.  And to the extent
21       that they know fully what -- what that
22       deviation is, they can negotiate more

157

1        aggressively.  To the extent they don't
2        know it, they can't negotiate.  So that
3        will affect the -- at the end of the day,
4        that is going to affect the quanta at the
5        claims administration phase.
6   Q.   And you have to understand the extent to
7        which they had that sort of knowledge in
8        order to determine whether there was any
9        impact at all?
10            MR. SOBOL:  Objection to the
11       form.
12  Q.   Isn't that correct?
13            MR. SOBOL:  Objection to the
14       form.  Asked and answered.
15  A.   Again, how many times --
16  Q.   Well, let's take a look at --
17            MR. SOBOL:  May I make a
18       suggestion?
19  Q.   Let's take a look at --
20            MR. SOBOL:  It is 1:06 right
21       now.
22            MR. EDWARDS:  Can I just ask a

Henderson Legal / Spherion
(202) 220-4158