Exhibit 5

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
P.M Session                               Boston, MA

166

```
1            THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF MASSACHUSETTS

2            MDL DOCKET NO. 01CV12257-PBS

3     * * * * * * * * * * * * * * * * * * * * * * * * * *

      IN RE:  PHARMACEUTICAL

4     INDUSTRY AVERAGE WHOLESALE

5     PRICE LITIGATION

6     * * * * * * * * * * * * * * * * * * * * * * * * * *

      THIS DOCUMENT RELATES TO:

7     ALL ACTIONS

8     * * * * * * * * * * * * * * * * * * * * * * * * * *

9              C O N F I D E N T I A L

10                 VOLUME:  I

11    DEPOSITION of RAYMOND S. HARTMAN, Ph.D., a

      witness called on behalf of the Defendants

12    pursuant to the Federal Rules of Civil

13    Procedure, before Jessica Williamson,

14    Certified Shorthand Reporter, Registered

15    Merit Reporters, Certified Realtime

16    Reporters, and Notary Public in and for the

17    Commonwealth of Massachusetts, at the

18    offices of Ropes & Gray, One International

19    Place, Boston, Massachusetts  02110, on

20    Thursday, October 7, 2004, commencing at

21    2:01 p.m.

22
```

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

2 (Pages 167 to 170)

167

1  APPEARANCES:
2
3  HAGENS BERMAN L.L.P.
4  Thomas M. Sobol, Esquire
5  One Main Street, 4th Floor
6  Cambridge, Massachusetts  02142
7  617-482-3700
8  tom@hagens-berman.com
9  on behalf of the Plaintiffs
10
11 HOGAN & HARTSON L.L.P.
12 Steven M. Edwards, Esquire
13 Hoa T.T. Hoang, Esquire
14 875 Third Avenue
15 New York, New York  10022
16 212-918-3506
17 smedwards@hhlaw.com
18 htthoang@hhlaw.com
19 on behalf of the Defendant
20 Bristol-Myers Squibb
21
22

168

1  APPEARANCES (Continued):
2
3  KAYE SCHOLER L.L.P.
4  Saul P. Morgenstern, Esquire
5  425 Park Avenue
6  New York, New York  10022-3598
7  212-836-7210
8  smorgenstern@kayescholer.com
9  on behalf of the Defendant Novartis
10 Pharmaceuticals Corp.
11
12 DAVIS, POLK & WARDWELL
13 D. Scott Wise, Esquire
14 450 Lexington Avenue
15 New York, New York  10017
16 212-450-4000
17 dwise@dpw.com
18 on behalf of the Defendant Astra
19 Zeneca Pharmaceuticals Corp.
20
21
22

169

1  APPEARANCES (Continued):
2
3  ROPES & GRAY L.L.P.
   Steven A. Kaufman, Esquire
4  One International Place
5  Boston, Massachusetts  02110-2624
6  617-951-7000
   skaufman@ropesgray.com
7  on behalf of the Defendant Schering
8  Corporation/Schering-Plough
9
10 SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM L.L.P.
11 Katherine Armstrong, Esquire
12 Four Times Square
13 New York, New York  10036-6522
   212-735-3000
14 karmstro@skadden.com
15 on behalf of the Defendant Amgen
16
17 SHOOK, HARDY & BACON L.L.P.
18 Joseph G. Matye, Esquire
19 2555 Grand Boulevard
20 Kansas City, Missouri  64106-2613
21 816-474-6550
22 on behalf of the Defendant Aventis

170

1  APPEARANCES (Continued):
2
3  PATTERSON, BELKNAP, WEBB & TYLOR L.L.P.
4  William F. Cavanaugh, Jr., Esquire
5  1133 Avenue of the Americas
6  New York, New York  10036-6710
7  212-336-2000
8  wfcavanaugh@pbwt.com
9  on behalf of the Defendant
10 Johnson & Johnson
11
12 COVINGTON & BURLING
13 Mark Lynch, Esquire
14 1201 Pennsylvania Avenue, N.W.
15 Washington, D. C.  20015
16 202-662-5544
17 mlynch@cov.com
18 on behalf of GlaxoSmithKline
19
20
21
22

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                                    Boston, MA

3 (Pages 171 to 174)

| 171 |
|---|
| 1    APPEARANCES (Continued): |
| 2 |
| 3    MORGAN, LEWIS & BOCKIUS L.L.P. |
| 4    Scott A. Stempel, Esquire |
| 5    1111 Pennsylvania Avenue, N.W. |
| 6    Washington, D. C. 20004 |
| 7    202-739-5211 |
| 8    sstempel@morganlewis.com |
| 9    on behalf of the Defendants Pfizer Inc. |
| 10    and Pharmacia Corp. |
| 11 |
| 12    ALSO PRESENT: |
| 13    Janice H. Halpern, Leaf Group |
| 14    Eric M. Gaier, Ph.D., Bates White |
| 15 |
| 16    Reporter's note:  Additional parties |
| 17    participated via telephone conference call |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |

172

1      I N D E X
2    Witness                    Page
3    RAYMOND S. HARTMAN, Ph.D.
4    Direct Examination by Mr. Edwards    173
5
6          E X H I B I T S
7
8    Number                    Page
9
10   Exhibit Hartman 007  Copy of an article from Barron's
11          dated June 10, 1996          196
12
13   Exhibit Hartman 008  Copy of a OIG report dated
14          August 10th, 2001          209
15
16   Exhibit Hartman 009  OIG report dated March 14, 2002   209
17
18   Exhibit Hartman 010  Copy of the deposition of Mike
19          Beaderstadt taken on September 17   230
20
21
22

173

1      AFTERNOON SESSION
2
3      (RAYMOND S. HARTMAN, Resumed.)
4      DIRECT EXAMINATION, Continued
5
6    BY MR. EDWARDS:
7    Q. Before we left off we were talking about
8       your methodology, and I believe in your
9       declaration you state that you intend to
10      calculate but-for spreads by using
11      yardsticks based on market expectations?
12   A. Based on market results that prevailed and
13      informed consumer expectations, third-party
14      payer expectations absent the A to BP scheme
15      during periods of time for drugs that were
16      not subject to that.
17   Q. You have calculated yardsticks for market
18      expectations?  Better way of putting it.
19   A. Are you asking whether I have or whether I
20      will?
21   Q. Well, I thought you had already done it.
22   A. Well, I've done some illustrative versions

174

1      of the kinds of information that one would
2      use, but I wouldn't say those are the final
3      yardsticks.  As I've said explicitly
4      therein, that they would need to be refined
5      through 30(b)(6) depositions and talking to
6      the people, a variety of people to help
7      clarify what those expectations were.
8    Q. Are you saying that it's doubtful that
9       you'll use any of these yardsticks at trial?
10   A. It's there -- they appear in my declaration.
11      They may be the final yardsticks that I do
12      rely on, but I'm certainly going to refine
13      them as best I can with whatever discovery
14      materials become available.
15   Q. And your yardstick spreads reflect industry
16      expectations regarding price ratios and
17      relationships absent operation of the AWP
18      scheme; is that correct?
19   A. They will.
20         (Discussion off the record.)
21   Q. Why don't you take a look at Paragraph 21 of
22      your declaration.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 7, 2004
PM Session                                    Boston, MA

4 (Pages 175 to 178)

175

1        (Witness reviews document.)
2            MR. EDWARDS:  Will the person who
3    just got on the phone identify themselves,
4    please?
5            MR. PALERMO:  Yeah.  It's Chris
6    Palermo for Defendant Day.
7            MR. EDWARDS:  Okay.
8    A.  I've looked at that paragraph.
9    Q.  As I understand it, you intend to develop
10       these yardsticks by using survey information
11       and by comparing AWPs and ASPs for drugs
12       unaffected by the scheme; is that correct?
13       Or the alleged scheme, I should say.
14   A.  I'm going to be using that and other --
15       whatever other information helps me inform
16       my yardsticks.
17   Q.  Well, are there other devices that you're
18       presently aware of that you intend to use
19       for this purpose?
20   A.  Other devices?  I'm not quite sure I
21       understand what you mean by that.
22   Q.  Well, other methods.  I mean, you've

176

1       mentioned two things in your declaration,
2       survey information --
3    A.  Uh-huh.
4    Q.  -- and comparisons, drugs affected by the
5       scheme to drugs not affected by the
6       scheme --
7    A.  Right.
8    Q.  -- correct?
9    A.  Right.
10   Q.  Is there anything else that you've thought
11       of at this point?
12   A.  I mention in Paragraph 29, in the bottom
13       paragraph of Page 21, as I've introduced the
14       notion of the yardsticks and discussed what
15       I have put together to date for this
16       illustration, I say, "Of course, finally
17       yardstick spreads to be used to determine
18       injury and damages during the damages phase
19       would take these yardsticks as points of
20       departure and refine them through 30(b)(6)
21       depositions regarding the date provided by
22       drug manufacturers and appropriate

177

1       personnel, third-party payers."
2            So I plan to do my own survey work to
3       the extent that I can and my own discovery
4       work with people whose expectations we're
5       talking about.
6    Q.  Well, have you identified at this point any
7       drugs that were not affected by the alleged
8       scheme?
9    A.  The alleged scheme and the class period
10       begin in 1991, so any drugs prior to that
11       period would be candidates for an
12       examination.  As to particular manufacturers
13       that are not listed, I've yet to really look
14       closely on who those manufacturers might be
15       and what the drugs may be, but I plan to do
16       that.
17   Q.  So the answer to my question is no, you have
18       not identified any drugs or manufacturers
19       unaffected by the alleged scheme?
20   A.  No.  My answer is yes.  I said all of the
21       manufacturers here prior to the time of the
22       alleged scheme, the class period beginning

178

1       January '91 I will look at the defendants'
2       data to the extent that it's available in
3       the '80s.
4    Q.  And so if that data shows that spreads prior
5       to 1991, in fact, were larger than spreads
6       after 1991, then there has been no impact?
7    A.  I have -- I've got to look at all the
8       information that is available to me and draw
9       my conclusions of what the appropriate
10       yardsticks will be.
11   Q.  I take it what you're saying is that you
12       don't think you'll be able to identify any
13       comparables for the class period?
14   A.  That's not true.
15   Q.  Okay.
16   A.  I haven't tried yet.
17   Q.  Is it the case that the drugs you would use
18       for that sort of a comparison, a comparison
19       within the class period, would have to be
20       drugs manufactured by companies other than
21       the defendants in this case?
22   A.  The selection of the manufacturers and the

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                                    Boston, MA

5 (Pages 179 to 182)

179
1  selections of the drugs will be based on
2  evidence that I have -- I assume is
3  forthcoming as to the scheme itself and how
4  the scheme was implemented and which I've
5  been asked to accept those allegations. And
6  so that it is my understanding there's going
7  to be evidence about which drugs and which
8  manufacturers from whence I can make some
9  judgment of whether there are some
10 manufacturers or there are some drugs for
11 the manufacturers that are listed here that
12 may not have been subject to that -- to the
13 scheme.
14 Q. Well, would the comparable drugs that we're
15 talking about have to be drugs that are
16 subject to patent protection and do not
17 compete with drugs that are part of the
18 alleged scheme?
19 A. You will notice that I've identified
20 yardsticks for single-source branded drugs.
21 I have identified yardsticks for multi-
22 source branded drugs and for physician

180
1  administered drugs and for generic drugs and
2  so that whatever specific drugs I can find
3  that will help inform the survey information
4  that -- substantial survey information
5  that's already done would be looking at
6  drugs that would fit into those categories
7  and face the kinds of competition that
8  patented -- you're asking about patented
9  drugs -- that patented therapeutic
10 substitutes would face within a particular
11 type of disease management regime.
12 Q. Yeah, but I'm talking about for the period
13 of time, that is, the class period of this
14 case --
15 A. Uh-huh.
16 Q. -- and I'm talking about drugs that you say
17 would be unaffected by the alleged scheme --
18 A. That I would say --
19 Q. -- that you say you would use as a basis for
20 developing yardsticks. Are you with me so
21 far?
22 A. It's not that I would say, that it would be

181
1  developed by evidence that I believe I will
2  receive as to the sets of drugs, whether the
3  scheme included all drugs of a manufacturer
4  or a subset of drugs. That's evidence that
5  I wait to receive.
6  Q. And is there a possibility that those drugs
7  could be drugs that are competitive with
8  drugs that are part of the alleged scheme?
9  A. You know, anything's -- I have to see what
10 they are. I can't render something as
11 impossible or possible without getting that
12 evidence.
13 Q. Well, if you found a drug that was not part
14 of the alleged scheme for purposes of
15 comparison, do you think the fact that it
16 was not part of the alleged scheme would
17 have any impact on the ability of that drug
18 to compete with drugs that are part of the
19 alleged scheme?
20 A. Well, if you're asking me the hypothetical,
21 are there two drugs whose clinical profiles
22 are sufficiently close to be considered

182
1  therapeutic substitutes on a formulary, and
2  these are both branded drugs subject to
3  patent protection, and one of them is
4  subject to the scheme and one of them is not
5  subject to the scheme, then the -- since the
6  scheme is to make use of the spread to move
7  market share, one would expect to find an
8  impact of -- in terms of market penetration
9  for those drugs, given the fact that the
10 spreads were much larger on a drug that was
11 a direct substitute that was comparable
12 enough so that you have to deal -- at the
13 therapeutic level you have to be thinking
14 about both clinical profiles and you have to
15 be thinking about price and spread.
16       And so that may be an issue, and it
17 may be something that is a possibility, and
18 I'll have to review that.
19 Q. Do you think an unaffected drug competes at
20 all?
21 A. Sure.
22 Q. How?

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 7, 2004
PM Session                                        Boston, MA

6 (Pages 183 to 186)

183

1   A. Clinical profiles. I mean, some drugs are
2       just -- whatever their price is, they're
3       going to be prescribed. Their clinical
4       profile, their safety, their efficacy, their
5       therapeutic effects dominate for certain
6       kinds of uses.
7   Q. If the clinical profiles were the same, in
8       other words, the two drugs in question were
9       therapeutic equivalents, do you think the
10      drug that was allegedly unaffected by the
11      scheme could compete at all against a drug
12      that was?
13  A. Are we talking now -- when you say their
14      therapeutic equivalents, are you talking
15      about generics, I mean, bioequivalent? What
16      do you mean by "therapeutic equivalent"?
17  Q. They're within the same therapeutic
18      category, but they're not generic
19      equivalents, like a multi-source.
20  A. Well, but you're saying -- an example in
21      your case would be anti-infectives where you
22      have penicillins, you have cephalus

184

1       sporings. You have a variety of
2       anti-infectives.
3   Q. Sure.
4   A. Broad spectrum, narrow spectrum?
5   Q. Statins?
6   A. Yeah, statins I don't know that much about.
7       The competition -- the therapeutic -- the
8       competition among patent innovator drugs --
9       patent and innovator drugs, therapeutic
10      substitutes, is going to depend on the full
11      extent to which they are similar or they
12      differ, the full range of the clinical
13      profiles, and so that's more than just, you
14      know, are they effective for this particular
15      staph infection? Or I mean do they interact
16      with other drugs? What are some of the side
17      effects for certain people with certain
18      other conditions? So that those things
19      enter in, along with the financial
20      considerations that are offered to the PBMs
21      that are putting drugs on their formulary.
22          Now, if everything else is equal, if

185

1       they're somehow exactly the same but one is
2       offering greater financial consideration,
3       that one will move more market share
4       relative to the other one.
5   Q. Don't you think it's unlikely that you're
6       going to be able to find any unaffected
7       drugs in the generic arena?
8           MR. SOBOL: Objection to the form.
9   A. There are already surveys that have
10      conducted studies on generic pricing
11      through -- in the '80s and the '90s, part of
12      it through the -- the early part of the
13      conspiracy and certainly part of it before
14      that already provide some yardsticks, and I
15      have yet to see. I mean, I'm going to look
16      at generic drugs earlier in the '90s, and
17      I'm going to look at generic drugs in the
18      '80s.
19  Q. And just so we're clear here, what criteria
20      would you use to determine whether a drug is
21      unaffected by the alleged scheme?
22  A. It's not going to be a criteria --

186

1           (Discussion off the record.)
2           MR. MORGENSTERN: Okay. We'll just
3       fix it at a break. I haven't gotten
4       anything since lunch.
5   Q. Do you need --
6   A. No, no. At this station of my retention
7       I've been not -- I've not been asked to put
8       forward any criteria. I've been informed
9       that there is evidence indicating which
10      drugs and which manufacturers, which
11      manufacturers participated in this type of
12      scheme and which drugs were affected, and
13      I'm looking at those. So I don't -- there's
14      not some threshold use to include them. I'm
15      being given a list and asked to look at
16      them.
17  Q. Let me ask it a different way. What would a
18      manufacturer have to do to get out of the
19      alleged scheme, as you define it?
20  A. Well, what -- to get out of or to not --
21  Q. Let's say my client came to me and said,
22      "You know, Steve, I'm tired of this case.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

7 (Pages 187 to 190)

187

1    They say we're doing something wrong. What
2    should I do? What should my client do, in
3    your view?"
4    A. In the legal remedies for that, I have not
5    been asked to render any opinion about that.
6    I've been asked to render an opinion about
7    causation, impact, injury and damages.
8    There is -- that's a prospective -- you're
9    asking me a prospective question that might
10   be part of injunctive relief that maybe Dr.
11   Schondelmeyer may have some opinions about,
12   but I haven't been asked to think about
13   that.
14   Q. In terms --
15        MR. SOBOL: I have some ideas.
16   Q. In terms of determining market
17   expectations -- which is what you're trying
18   to do through these yardsticks, right?
19   A. That's correct.
20   Q. -- isn't it better to determine market
21   expectations simply by talking to people?
22   A. Well, I think you want to talk to people,

188

1    and you want to go do survey research, and
2    we've been through a section where I
3    indicate that I do plan to talk to people.
4    Q. Okay. And who do you intend to talk to?
5    A. Let me refer you again back to Paragraph 29,
6    Page 21, and "Final yardstick spreads to
7    determine injury and damages during the
8    damages phase," et cetera, et cetera,
9    "refine them through further 30(b)(6)
10   depositions regarding the data provided by
11   defendant drug manufacturers and depositions
12   of appropriate personnel and third-party
13   payers and managed care organizations."
14   Q. So you do plan to talk to class members to
15   determine their expectations?
16   A. I plan to talk to class members. I plan to
17   talk to PBMs, a sample of PBMs, a sample of
18   retailers.
19   Q. So you would agree that the actual
20   expectations of class members are relevant
21   to your analysis?
22        MR. SOBOL: Objection to the form.

189

1    A. I would agree that the summary of -- that
2    whatever is used as a yardstick to define
3    the expectations in the market should take
4    advantage of as much information that's
5    available about what was forming those
6    expectations and what they were.
7    Q. Including information directly from the
8    horse's mouth, the class members themselves
9    whose expectations we're talking about here,
10   right?
11   A. That's correct.
12   Q. Now, the surveys you rely on in your report
13   don't deal with the expectations of class
14   members at all; isn't that correct?
15   A. Well, what they deal with is they deal
16   with -- it's not unlike the analogy that we
17   were talking about in the automotive case --
18   the automobile case. These surveys
19   essentially were conducted by the OIG of
20   DHHS in order to provide the kinds of
21   information about acquisition costs, average
22   acquisition costs versus AWP.

190

1         So this is the kind of information not
2    to just talk about expectations, but it's
3    what informs expectations. Many people
4    don't have a clue what that relationship is,
5    and some people think that AWP is, you know,
6    is the acquisition cost. Others don't.
7    These are the kinds of surveys that give
8    information to and help inform consumers,
9    the consumers being the class members.
10   Q. These are not surveys of class members,
11   correct?
12   A. That's correct.
13   Q. And when you say that the findings of these
14   reports form some part of the basis for the
15   beliefs of class members about the typical
16   spread, you're making an assumption,
17   correct?
18        MR. SOBOL: Objection to the form.
19   A. Do you have the paragraph in which -- are
20   you quoting me, or are you just -- are you
21   paraphrasing me?
22   Q. Well, actually, I was quoting you.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

8 (Pages 191 to 194)

191
1   A.  Good.  Why don't you point me to that.
2   Q.  You can look at Paragraph 24.  Ah, sorry.
3        Paragraph 24 of Attachment D.  These
4        attachments get me confused.
5   A.  You're just trying to mess with my mind.  I
6        know you lawyers.
7   Q.  You say in Paragraph 24, "It is reasonable
8        to expect that the findings of these reports
9        form some part of the basis for beliefs
10       about the typical spread between AWP and
11       actual acquisition costs of providers,
12       physicians and retail drugstores," correct?
13  A.  I do say so.
14  Q.  Okay.  And your statement that they form
15       some part of the basis for the beliefs of
16       the class is an assumption, correct?
17           MR. SOBOL:  Objection to the form.
18  A.  It is an informed assumption.
19  Q.  What is the assumption based on?
20           MR. SOBOL:  Objection as to form.
21  A.  Conversations with colleagues at the Harvard
22       School of Public Health.

192
1   Q.  Well, they're not class members, either, are
2        they?
3   A.  They are not class members --
4           MR. SOBOL:  Objection to the form.
5        I don't even know what "either" means there.
6           THE WITNESS:  Yeah, it is a little
7        confusing.  I was going to straighten it out
8        for you, but I'll let him straighten it out.
9   Q.  You have not talked to any class members to
10       determine whether these surveys have any
11       impact on their belief as to the typical
12       spread; isn't that true?
13  A.  I have requested that such talks be noticed
14       by counsel.  I have not done it yet.
15  Q.  So this particular part of your opinion is
16       just speculation on your part, correct?
17  A.  It is an informed assumption, as I said.
18  Q.  Informed by conversations with non-class
19       members?
20  A.  Informed by conversations with chaired
21       professors whose research focus is on
22       expectations, how they're formed and pricing

193
1        in this market.
2   Q.  Okay.  Who were those conversations with?
3   A.  I've given you the names.
4   Q.  Which ones?  You've given me a lot of names.
5   A.  I've given you Richard -- the chaired
6        professors are Richard Frank, Joseph
7        Newhouse and Meredith Rosenthal.
8   Q.  Okay.  And when did you have discussions
9        with them about the extent to which
10       government surveys had an impact on the
11       beliefs of class members with respect to
12       typical spreads?
13  A.  As I was developing and outlining this
14       section and the industry's reliance on AWP
15       as a benchmark.
16  Q.  So it would have been this summer?
17           MR. SOBOL:  He's in the middle of
18       answering the question, I think.
19           THE WITNESS:  Yes.
20           MR. SOBOL:  Have you finished
21       answering or no?
22           THE WITNESS:  I had finished

194
1        answering.
2   A.  And, yes, it would be this summer.
3   Q.  Okay.  And you talked to all three of them
4        about that?
5   A.  I don't recall.
6   Q.  How many times did you talk to them?
7   A.  I probably had conversation -- Meredith and
8        Richard -- well, Richard and I collaborate
9        on some research so we have conversations
10       every other day or so.  Meredith and I talk
11       about a variety of consulting assignments
12       and so we have conversations four or five
13       times a week, almost daily.
14  Q.  And you didn't take any notes on these
15       conversations?
16  A.  No.
17  Q.  Do you know whether Richard Frank talked to
18       any class members about what their beliefs
19       were or whether they had any beliefs based
20       on these government surveys?
21  A.  I know Richard Frank does research and a
22       variety of research is funded at Harvard by

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 7, 2004
PM Session                                    Boston, MA

9 (Pages 195 to 198)

195
1    third-party payers, and so I -- but to the
2    extent -- as we talked about this, I didn't
3    ask him, "Who did you talk to to base that
4    on?"
5  Q. That's just another assumption you're
6    making?
7        MR. SOBOL: Objection to the form.
8  A. An assumption that Richard Frank is on the
9    faculty at Harvard and that he speaks with
10   these --
11 Q. An assumption that Richard Frank had talked
12   to class members about whether they had any
13   expectations based on government surveys.
14 A. I have consulted with a variety of experts
15   who know this industry, and based upon that
16   consultation, I have come to put forward
17   informed assumptions about how -- about how
18   expectations are formed, and I'm going to
19   confirm that during the damages phase of
20   this litigation.
21       MR. EDWARDS: I'm goes to mark as
22   Exhibit 7 a copy of an article from Barron's

196
1    dated June 10, 1996.
2        (Document marked as Exhibit Hartman 007
3        for identification.)
4  Q. The reporter has handed you Exhibit 7. Have
5    you ever seen this document before?
6  A. I can barely see it now. God, they should
7    have done a little better job of Xeroxing
8    this. I have not seen this article, as far
9    as I know.
10 Q. If you look at the first full paragraph,
11   there's a sentence that says, "For many
12   drugs, especially the growing number coming
13   off patent and going generic, the drug
14   providers actually pay wholesale prices that
15   are 60 to 90 percent below so-called average
16   wholesale price or AWP used in reimbursement
17   claims."
18       Do you know whether any class members
19   were aware of this article?
20 A. From what I have seen in the litigation
21   that's occurred in this industry and the
22   history over the past five years, that this

197
1    kind of information started to be perceived
2    by third-party payers and by self-insured
3    groups. There are articles that I quote in
4    my -- and that we can turn to here where
5    they're finally saying, "Look, we know this
6    is going on. We didn't -- we've just become
7    aware of it. Where's our money?" And
8    they're either forming their own PBMs or
9    doing something else.
10       So that this certainly -- the numbers
11   that you're putting forward here correspond
12   in some way -- correspond partially to what
13   the OIG finds in their surveys past '97, and
14   they started to be reflected in the
15   consciousness of entities becoming aware of
16   the extent of an AWP scheme where the ASPs
17   do fall 60 to 90 percent. That's
18   certainly -- there's really no need to go to
19   this. I cited in my own document -- in my
20   own declaration reimbursement rates as I
21   have seen for generic drugs essentially fall
22   at -- to third-party payers 20 to 30 percent

198
1    with a generic launch while the actual
2    prices dropped this much. And the entities
3    have become aware of that over the last
4    several years, and it's been reflected in
5    the litigation.
6  Q. So you think that class members could have
7    seen this article, and it could have had an
8    impact on their expectations with respect to
9    the spread?
10       MR. SOBOL: Objection to the form.
11 A. I'm saying that it is information like this,
12   combined with an accumulation of practices
13   and procedures that have evolved over 30
14   years, that began to change expectations in
15   the -- at the turn of the century, that this
16   stuff started to become -- this started
17   hitting the radar screen in the late '90s in
18   the OIG reports and in reports of this sort;
19   however, it did not yet get reflected in the
20   ability of the third-party payers to get an
21   AWP that was representative of these
22   discounts. And that's the whole effect of

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

10 (Pages 199 to 202)

|  | 199 |
|---|---|
| 1 | the AWP scheme. |
| 2 | Q. What is your basis for that statement? |
| 3 | A. My basis for that statement is looking at |
| 4 | contracts with PBMs and with third-party |
| 5 | payers and with Medicaid that are talking |
| 6 | about generic pricing reimbursed at AWP less |
| 7 | 15 or 20 percent, which is -- these should |
| 8 | be -- to the extent that they acted on this, |
| 9 | it should have been that AWP less 60, 80 |
| 10 | percent. |
| 11 | Q. How do you know that these third-party |
| 12 | payers were not aware of the Barron's |
| 13 | article, and the deal they got was simply |
| 14 | the best deal they could negotiate? |
| 15 | MR. SOBOL: Objection to the form. |
| 16 | A. I take as a measure of their revealed |
| 17 | bargaining power and their revealed |
| 18 | understanding of the full landscape of all |
| 19 | these prices to be reflected in the rates |
| 20 | that they're able to negotiate, and if they |
| 21 | had known about it, they would have |
| 22 | negotiated more aggressively. |

|  | 201 |
|---|---|
| 1 | done to determine that? |
| 2 | A. I've looked at the contracts in which the -- |
| 3 | that they've entered into in 2001, 2002, and |
| 4 | they're not AW -- if they knew about this |
| 5 | and they felt that they could -- this was a |
| 6 | useful competitive fact, they would have |
| 7 | submitted -- they would have said to their |
| 8 | PBMs or to whoever was managing their |
| 9 | pharmacy benefits, they would say AWP is |
| 10 | inflated. I'm not -- I don't want AWP minus |
| 11 | 15 percent, I want AWP minus 90 percent, and |
| 12 | that's a revealed statement of the fact that |
| 13 | they knew what was going on and they could |
| 14 | defeat that scheme. They didn't do that. I |
| 15 | see the contracts. |
| 16 | Q. Just so we're clear on this, is it correct |
| 17 | that you don't know one way or another |
| 18 | whether members of the class saw this |
| 19 | Barron's article that we've marked as |
| 20 | Exhibit 7, correct? |
| 21 | MR. SOBOL: Objection to the form. |
| 22 | A. Have I asked for all the members of the |

|  | 200 |
|---|---|
| 1 | Q. And if it turns out that class members in |
| 2 | this case testify that they did know about |
| 3 | the Barron's article, how does that affect |
| 4 | your opinion? |
| 5 | MR. SOBOL: I'm sorry, objection. |
| 6 | What opinion? |
| 7 | Q. Well, you just opined that they couldn't |
| 8 | have known about it; otherwise, they |
| 9 | wouldn't have negotiated the contracts they |
| 10 | did, correct? |
| 11 | A. What I said was the contracts they |
| 12 | negotiated reflected the -- an accumulation |
| 13 | of an understanding of price relationships |
| 14 | based off of AWP, sporadic articles that |
| 15 | began to bubble to the surface about the |
| 16 | implications of the AWP scheme that showed |
| 17 | themselves in articles like this that were |
| 18 | still not pervasive enough or diffused |
| 19 | enough to affect their ability to avoid the |
| 20 | injury from the AWP scheme. |
| 21 | Q. How do you know they were not pervasive |
| 22 | enough or diffused enough? What have you |

|  | 202 |
|---|---|
| 1 | class or a substantial subset of the members |
| 2 | of the class whether they've seen this |
| 3 | article? No. |
| 4 | Q. And you would agree with me that if they did |
| 5 | see the article, it would have an impact on |
| 6 | their expectations with respect to the |
| 7 | spread, correct? |
| 8 | MR. SOBOL: Objection to the form. |
| 9 | A. Any piece of information of this sort the |
| 10 | OIG came out with information around this |
| 11 | time, 1997, '98 reports showing these kinds |
| 12 | of results, not quite to this extent. So |
| 13 | this information diffuses slowly through |
| 14 | market, and from what I see in the |
| 15 | negotiating tactics of the third-party |
| 16 | payers, it is not reflected quickly in what |
| 17 | they -- in what they do. |
| 18 | So even if they saw this, whether they |
| 19 | thought, well, this is so minor this might |
| 20 | have been a couple of drugs or how far they |
| 21 | pursued it, that's -- it is clear from what |
| 22 | they negotiated that they didn't -- that |

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only      October 7, 2004
PM Session                              Boston, MA

11 (Pages 203 to 206)

203

1    this didn't reflect enough of their changes
2    and the expectation for them to demand a
3    competitive response to reduce their
4    reimbursement rates off of an AWP that was
5    inflated.
6  Q. Well, don't you think it's important to talk
7    to them about whether they saw this article,
8    and if so, what impact it had on them, and
9    if it didn't have an impact on them, why it
10   didn't have an impact?
11        MR. SOBOL: Objection to the form.
12 A. See, you ask the questions, but you don't
13   listen to my answers, do you? I've -- can
14   we go back to Paragraph 29, Page 21? I'm
15   going to talk to these people through
16   3(b)(6) depositions, and I'm going to -- I
17   see these articles, academics see these
18   articles. The extent to which there was the
19   entire group of third-party payers is
20   reflected by their revealed behavior, which
21   I don't see. I've got to find out more
22   about that through the 30(b)(6) depositions

204

1    that I've asked to have noticed.
2  Q. Yeah, and you can't determine the impact on
3    your opinion until you make those inquiries,
4    right?
5  A. No. My opinion is as to causation, it's to
6    impact, it's to existence of injury, and
7    it's to the existence -- it's the existence
8    of damages and the ability to calculate it.
9    All of those things can be done on a class-
10   wide basis without going to each and every
11   third-party payer and asking whether they
12   know about this. I can -- there will be
13   enough information available in what they
14   paid in reimbursement rates to show how
15   close they were to measures of ASP. There
16   will be data that is easily and readily
17   available to show what their behavior
18   indicates they knew and how they behaved as
19   a result of that.
20 Q. If the information with respect to actual
21   expectations that you obtain during the
22   course of discovery is inconsistent with the

205

1    assumptions you've made by looking at
2    contracts, which wins out at the end of the
3    day, actual information as to actual
4    expectations or the assumptions you've made
5    by reading contracts?
6        MR. SOBOL: Objection.
7  A. What do you think would be my answer to
8    that? The --
9  Q. Actual information always trumps --
10 A. Yes.
11 Q. -- assumptions, correct?
12 A. The realty of what's going on in the market
13   is going to be -- I'm crying (sic) to get my
14   handing on that information. There is real
15   information already that corresponds to this
16   Barron's article and the OIG reports. I've
17   already cited it. I want more. The more,
18   the better. And if it contradicts it, then
19   it's going to change. The results will be
20   refined as the information indicates.
21 Q. Now, the OIG reports that you cite in your
22   declaration, you didn't actually read those

206

1    reports, did you?
2  A. I did read some of them.
3  Q. Well, in Footnotes 31 and 32 what you cite
4    are later reports --
5  A. Yeah. The --
6  Q. -- that purport to summarize the earlier
7    reports; is that correct?
8  A. I'm sorry, could you point me to the
9    footnote that --
10 Q. 31 and 32.
11 A. And are we in the main body or in the --
12 Q. No. We're in Attachment D.
13 A. And I'm sorry, footnote what again?
14 Q. Footnotes 31 and 32.
15 A. 31 in attachment -- oh, I'm sorry, I see it.
16   Even I'm confused.
17 Q. It's Page 8 of Attachment D.
18 A. I was just looking at the wrong attachment.
19   What I did when I learned of these OIG
20   reports is I asked to see every one we can
21   get our hands on, and some of the earlier
22   ones were just not easily accessible, is my

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                        Boston, MA

12 (Pages 207 to 210)

---

207

1    recollection, and so there were summaries in
2    the later ones of some of the earlier
3    results, and I relied on those summaries
4    given the fact that I took this effort to be
5    an illustrative presentation rather than the
6    final calculations for purposes of damages.
7  Q.  So Paragraph 21 of Attachment D of your
8    report refers to a 1984 OIG report and a
9    1989 OIG report, and you did not read those
10   actual reports, you read summaries of those
11   actual reports that appear in reports that
12   were issued in March of 2002 and August of
13   2001; is that correct?
14 A.  I'm not sure it's correct.  As I say, I had
15   asked for all of them, and as I initially
16   wrote this, I had the later ones.  I think
17   we got some of the earlier ones later, and I
18   just didn't say that I -- I didn't mention
19   that here, but I would have to...
20 Q.  Well, are you aware that those early reports
21   actually report a range of discounts --
22 A.  I do.

---

208

1  Q.  -- below AWP?
2  A.  I'm aware of that.
3  Q.  You purport in your declaration to come up
4    with an average discount; is that correct?
5  A.  Well, the discount -- I know that these -- I
6    mean, the rank as they were reported later
7    were for different groups of pharmacies
8    where the ranges occurred, and then there
9    was an average overall, and I reported the
10   average overall.  And that's true for the
11   2000 -- the '97 and the 2001, 2002.  I don't
12   know if that's the range you're talking
13   about.
14 Q.  And is it the case that the 1984, 1989
15   reports also combined brands and generics,
16   that didn't separate them out?
17 A.  That is correct.
18       MR. EDWARDS:  What I want to do is
19   mark as Exhibit 8 a copy of a OIG report
20   dated August 10th, 2001, and as Exhibit 9
21   we'll mark the OIG report dated March 14,
22   2002.

---

209

1       (Documents marked as Exhibit Hartman 008
2    and Exhibit Hartman 009 for identification.)
3       MR. EDWARDS:  And why don't we,
4    since we're marking that -- Saul, are you up
5    yet?
6       MR. MORGENSTERN:  No.
7       MR. EDWARDS:  Why don't we take a
8    break while one of our colleagues here gets
9    back on-line.
10      (Recess taken.)
11 Q.  Do you recognize Exhibits 8 and 9 to your
12   deposition?
13 A.  I do.
14 Q.  What are they?
15 A.  They are two of the OIG reports that I have
16   cited in my declaration.
17 Q.  Now, if you look at the 2001 report, Exhibit
18   8 --
19 A.  Right.
20 Q.  -- and turn to the executive summary, you'll
21   see that there are estimates of the
22   discounts below AWP for brand-name drugs in

---

210

1    1994 and 2001; is that correct?
2  A.  That is my understanding.
3  Q.  And what are those discounts?
4  A.  What I see for this report -- let me just
5    confirm --
6       MR. SOBOL:  Objection to the form,
7    but you may answer.
8  A.  -- that the -- well, let me just read it.
9    "We estimated that the actual acquisition
10   cost for brand-name drugs was a national
11   average of 21.84 percent below AWP.  Our
12   previous estimate for calendar year '94
13   showed a discount estimate of 18.3 percent."
14 Q.  And then if you look at Exhibit 9, there are
15   similar estimates for generics, correct?
16 A.  Correct.
17 Q.  What are those figures?
18 A.  In the particular analogous paragraph we
19   estimated that the actual generic drug
20   acquisition cost was a national average of
21   65.93 percent below AWP.  That is for the
22   2001/2002 survey.  Our previous estimate for

---

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only            October 7, 2004
PM Session                              Boston, MA

13 (Pages 211 to 214)

211

1    calendar year 1994 showed a discount of
2    42.45 percent below AWP for generic drugs.
3    Q. And you decided not to use those estimates
4        in developing your yardsticks; is that
5        correct?
6    A. No. Those estimates you'll see in my
7        paragraph -- well, I used them, but in the
8        fashion that I describe in Paragraph 21, and
9        that is that essentially these estimates,
10       which are discounts off of AWP, translate
11       into a formulaic relationship to the actual
12       acquisition cost, and I summarized those
13       results in Section -- in Attachment D, Page
14       8, summarizing for the -- I summarized the
15       OIG reports prior -- in the early part of
16       the period.
17           I talk about the -- finally in 2001
18       and 2002 the OIG issued their most recent
19       reports finding that the AWP was equal to
20       2.94 times the AAC for generic drugs which I
21       think will correspond to the number here for
22       generic drugs, and for AWP is the 1.28 times

212

1    the actual acquisition cost for branded
2    drugs.
3        And so in Paragraph B below I talk
4    about the range of the most recent reports,
5    and I talk about the range going back to the
6    '84 reports. And I say, "And it is my
7    belief, based on the evidence that I've seen
8    to date, that the expectations as revealed
9    in negotiated contracts were set by those
10   earlier relationships that we find in the
11   '84, the '87 and the '94 reports." The
12   '97 -- this report here for 2001/2002 is
13   reflecting information similar to what we're
14   finding here on your Barron -- in your
15   Barron's article, and this, again, based on
16   my observed behavior of negotiations
17   revealed in contracts, suggest that while
18   this was beginning to percolate into the
19   expectations and alter expectations, it by
20   no means set the basis for expectations for
21   the market.
22   Q. Well, let me see if I understand what you're

213

1    saying. You're saying that you rejected the
2    numbers that appear for '94 and 2001 in
3    Exhibits 8 and 9 because, as you state on
4    Page 8 of Attachment D in Subparagraph D of
5    Paragraph 21, quote, "Given the allegations
6    in this matter, the more recent and larger
7    spreads reflect the AWP scheme to an unknown
8    extent and are contaminated to an unknown
9    degree for use as yardsticks for
10   non-fraudulent pricing behavior," correct?
11   A. That's correct.
12   Q. And what do you mean by reflecting the AWP
13       scheme to an unknown extent and contaminated
14       to an unknown degree?
15   A. Well, we're looking at the notion and the
16       set of allegations that I've been asked to
17       assume are that a scheme was initiated, the
18       AWP scheme was initiated by the drug
19       manufacturers as named and the period of
20       time over which it was implemented and
21       effectuated started in January 1991. So the
22       damage period, the period of violation is

214

1    from 1991 on.
2        So if I'm observing measures of what
3    it is that I'm looking for in terms of
4    spread in a period but for the allegations,
5    I've got to be looking for a period prior to
6    '91. These numbers from '91 on are
7    reflecting exactly the -- they're
8    corroborating the allegations put forward by
9    the class and by plaintiffs, that indeed the
10   pricing did deviate in a way as people were
11   beginning to see this revealed information
12   from what the expectations were prior to the
13   period of the alleged violations.
14       When you're looking for a but-for
15   period, you want to look for expectations
16   and relationships in a period not subject to
17   the violations. The violations occurred in
18   at the '90s, so I would expect these spreads
19   to be increasing over time. This is a
20   measure of the fact that the allegations are
21   corroborated in the evidence.
22   Q. So are you saying that people in the class

Raymond S. Hartman, Ph.D.  Confidential - Attorneys' Eyes Only  October 7, 2004
PM Session  Boston, MA

14 (Pages 215 to 218)

215

1  could not have had expectations consistent
2  with the discounts off of AWP that were
3  reported at the time they would have had
4  those expectations, because their
5  expectations can only be based on
6  information that was reported prior to the
7  alleged scheme?
8      MR. SOBOL: Objection.
9  A. I am saying that I am looking for
10  information that tells me about the
11  relationship between the benchmark price in
12  this market and the underlying transaction
13  values, prices in this market, average sale
14  price.
15  Q. Okay.
16  A. And I'm saying I'm looking for relationships
17  that are unaffected by the alleged scheme.
18  And there are -- there was a period of time
19  when those expectations were formed when it
20  is my understanding that there is no scheme
21  alleged for that period of time. Now, that
22  would inform people's expectations about the

216

1  relationship of a benchmark price to all
2  other economic measures of value related to
3  that benchmark price.
4      Over the '90s there is an allegation
5  of this scheme that was -- would begin to
6  have effects as indicated in the Barron's
7  article and as indicated in the OIG reports,
8  but the extent to which people -- third-
9  party payers and entities and individuals
10  generally become aware of this type of
11  information, with some lag, and what -- the
12  work that I've been able to do in examining
13  the revealed behavior of people of
14  institutions and entities in the class
15  demonstrates to me that while they were
16  available -- that this information was
17  beginning to become available, there wasn't
18  sufficient enough basis to begin to
19  negotiate in ways or to undertake the types
20  of behavior that we see occurring over the
21  last two or three years in response to a
22  final understanding of these kinds of --

217

1  these alleged violations.
2  Q. Are you saying that you're using
3  expectations from a time period prior to the
4  alleged scheme in order to determine
5  expectations during the alleged scheme?
6  A. I am saying that as any model in any trust
7  damages or any model in economic damages,
8  one is -- one performs a before and after
9  type of analysis where there is some
10  allegation of illegal behavior, and then you
11  look for what the behavior was in a period
12  when it wasn't occurring. And there is a
13  period of alleged violation here that's '91
14  forward, and there is impact on prices that
15  occurred at that point.
16  Q. Well --
17  A. And in order to measure -- what's
18  formulating and forming the class's response
19  to that behavior are expectations that were
20  set when this scheme wasn't in operation,
21  which was the period beforehand.
22  Q. Well, let me make sure I understand what

218

1  you're saying. In determining or developing
2  your yardsticks for the class period, are
3  you looking at expectations during the
4  alleged scheme or during some other period?
5  A. I am looking for I relationship -- I am
6  looking for what the perceptions and the
7  reasonable expectations of the class members
8  were regarding AWP as a signal for drug
9  prices and values, a variety of other prices
10  that was untainted by and uncontaminated by
11  the scheme -- by the alleged AWP people, and
12  hence those yardsticks would come from a
13  period when the scheme wasn't going on, and
14  that would have been the '80s for one thing,
15  or it could have been drugs for which the
16  scheme was not going on or manufacturers
17  during the '90s.
18      The point that these spreads are
19  changing and increasing is exactly the
20  revelation -- and that are not reflected in
21  the third-party payers responding
22  aggressively and saying, "Wait a minute. I

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only             October 7, 2004
PM Session                                    Boston, MA

15 (Pages 219 to 222)

| 219 |
| --- |

1    want discounts reflecting this," is an
2    indication that their expectations were
3    adapting, with the lag. They were -- their
4    reasonable expectations were based on a set
5    of pricing that existed prior to it.
6    Information was becoming available slowly.
7    And the competitive landscape was complex
8    enough and the pricing was non-transparent
9    enough that it wasn't clear how to respond
10   to this type of information, and I assume
11   that we're seeing an ultimate response to
12   this information in the fact that we're
13   having this conversation.
14 Q. In other words, what you're saying is if
15   people in the class had expectations that
16   were consistent with the public reports
17   during that time period, they would have
18   been able to negotiate better deals?
19 A. I am saying that if third-party payers were
20   able to break through the veil of -- the
21   non-transparent veil between what AWP was
22   and what it -- what the true transaction

| 220 |
| --- |

1    prices turned out to be over this period of
2    time, their negotiating stances and the
3    contracts that had been put in place over
4    years would have been -- they would have
5    respond -- there would not have been the
6    misrepresentation or the fraudulent
7    concealment that I understand is the basis
8    for the legal allegations.
9 Q. So you're basing your opinion with respect
10   to expectations on the terms of the
11   contracts as opposed to evidence of what the
12   actual expectations were at the time,
13   correct?
14 A. Can we go back to Page 21, Paragraph 29 of
15   my report? And I plan to examine more
16   completely through those depositions how --
17   I want to know more about that, but the
18   revealed evidence that I find suggests that
19   those expectations were conditioned on
20   earlier relationships and the types of
21   information that fully understand the extent
22   of the scheme and to avoid the

| 221 |
| --- |

1    misrepresentation was unavailable to the
2    class.
3 Q. So you're making an assumption as an
4    economist that the terms that people are
5    able to negotiate are going to be consistent
6    with their expectations?
7 A. I'm making an assumption that as -- an
8    economist that as parties enter into
9    negotiations, the result of those
10   negotiations are going to depend crucially
11   on the extent to which they have information
12   and what they're negotiating about.
13 Q. Well, did it ever occur to you that
14   sometimes people don't achieve their
15   expectations?
16 A. Yeah.
17 Q. That happens in the real world, right?
18 A. It does.
19 Q. And that's something you would have to take
20   into account in doing a proper analysis of
21   impact here, correct?
22 A. It may be one of a variety of additional

| 222 |
| --- |

1    things that need to be addressed. And just
2    in closing along this line, both
3    expectations and data that reveals those
4    expectations and the contracts, what I do
5    make clear or hope to make clear in the
6    concluding paragraph of my declaration is
7    that an appropriately stratified sample of
8    information from a set of class members, so
9    a sampling of some large TPPs, some middle-
10   sized, some small ones, some retailers and
11   PBMs will provide all of the claims data
12   that one can differentiate these issues
13   across the class.
14 Q. Okay. You say sampling from class members.
15   How do you propose to gather those samples?
16 A. I propose to ask for claims data for all
17   drugs subject to the complaint from your
18   clients.
19 Q. Well, I believe you also testified that you
20   plan to --
21 A. I'm sorry, not from your clients, from our
22   clients and also from your clients.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                          Boston, MA

16 (Pages 223 to 226)

223

1   Q.  So you need claims data from class members,
2       correct?
3   A.  We need claims data from class members,
4       that's correct.
5   Q.  And you need to get information from class
6       members on what their expectations actually
7       were, correct?
8   A.  There will -- the -- let's be very clear
9       about class members.  What we're going to
10      need is a -- to identify using standard
11      statistical methods a number of selected
12      types of third-party payers and also PBMs
13      and also retailers differentiated in various
14      ways.  And we're going to get claims data
15      and data as to expectation and knowledge for
16      those representative entities to
17      characterize the class as a whole and the
18      transactions as a whole.
19  Q.  Do you intend to gather data or information
20      with respect to actual expectations from
21      surveys, or are you going to limit your
22      efforts to what is uncovered in the

224

1       discovery process?
2           MR. SOBOL:  Objection.
3   A.  I am going to push the discovery process as
4       aggressively as necessary to do it
5       correctly.
6   Q.  But it's conceivable that you might also do
7       some surveys?
8   A.  It's conceivable.
9   Q.  Okay.  And I take it that what you plan to
10      do is gather all of this information from
11      third-party payers, from PBMs, from
12      retailers, from others and then express some
13      opinions based on this information, correct?
14  A.  The claims data that, say, the third-party
15      payers tabulate and keep track of frequently
16      turns out to be similar claims data that is
17      exchanged with the retailers and the PBMs
18      and even your clients in their drug
19      utilization reviews for the payment of
20      rebates, so that we're going to have the
21      same data and corroborate this data from a
22      variety of sources.  And so we're going to

225

1       have that data, and we're going to observe
2       what was actually reimbursed by different
3       groups of class members.
4   Q.  And just to make sure we're clear here,
5       you're going to look at more than claims
6       data, right?  You're going to look at actual
7       evidence, testimony from people as to what
8       their expectations were, correct?
9   A.  I'm --
10          MR. SOBOL:  Objection to the form.
11      You've been using this expression of
12      "actual," and I think this has been like two
13      ships passing at night for a lot of the
14      questions.  I'll let you continue, but
15      that's why I keep on using the word
16      "objection."  I'm not sure if there's been a
17      meeting of the minds as what the colloquy
18      has been on a lot of those questions.
19          You can go ahead and answer.
20          MR. EDWARDS:  Not a proper
21      objection, Tom.
22  Q.  Go ahead.

226

1           MR. SOBOL:  I was trying to be
2       helpful, but I'll shut up.
3           THE WITNESS:  Are we done?
4           MR. SOBOL:  Yes, we're done, for
5       now.
6   A.  The actual reimbursements paid is something
7       that will be readily accessible from these
8       claim data from these various sources which
9       will reveal the result of -- the negotiated
10      result of the expectations of the class
11      members and the entities with whom they were
12      negotiating the contracts or paying -- to
13      whom the claim -- the reimbursement rates
14      were being paid.
15          To the extent that I am -- and that's
16      talking about -- when we're talking about
17      actual data, that's talking about actual
18      results.  We're talking about the actual
19      endpoint of negotiations toward whatever
20      discounts, et cetera, et cetera, or
21      rebates -- percentage discounts off of AWP
22      we find in the data, and to the extent that

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only   October 7, 2004
PM Session                              Boston, MA

17 (Pages 227 to 230)

227
1    it is possible to ascertain the
2    interpretation of the third-party payers to
3    the types of information we're referring to
4    here, that will be done.
5    Q. And if there are disputes as to what the
6    proper interpretation is, I gather what
7    we'll do is we'll put those third-party
8    payers on the witness stand and have at it,
9    right, direct examination,
10   cross-examination, and we can explore the
11   area of dispute, correct?
12         MR. SOBOL: Objection to the form.
13   A. I don't know what your legal strategy will
14   be or who you're going to want to depose,
15   and I assume you're going to depose whomever
16   you want to depose. I'm going to gather
17   this information, this claims information,
18   and a select -- and a sample from a sample
19   of third-party payers and others whatever
20   information is provided that will allow me
21   to refine my yardsticks. These yardsticks
22   themselves have ranges, too. So I'm not

228
1    coming up with something where I'm saying
2    it's 10 percent or 12 percent. We're coming
3    up with ranges.
4          And that's going to be the type of
5    evidence I'm going to look at, and then you
6    can do whatever you want to. You know, I
7    will present what evidence I have found that
8    tells me what people have done, what they've
9    negotiated, and the degree to which their
10   expectations were informed as they have
11   been -- as I've stated that they've been
12   informed.
13   Q. Well, would you agree that a fair way to do
14   it would be to put a number of these class
15   members on the witness stand, let the
16   lawyers examine them, and then you can
17   develop your yardsticks and your other
18   opinions with respect to expectations from
19   that testimony, and the defendants' experts
20   can do the same thing?
21         MR. SOBOL: Objection to the form.
22   Can you repeat that -- read back the

229
1    question? You're being asked what's fair.
2          THE WITNESS: No, no. I'm just --
3    I heard that. You don't have to object to
4    tell me...
5    A. Yeah, fair is -- I'm not being asked to be
6    fair here, I'm asked to be -- to do science.
7    And what I'm saying is I'm going to design
8    representative surveys or samples of
9    entities that represent certain parts of the
10   spectrum within the class, within PBMs,
11   within retailers, within mass merchandisers,
12   and perhaps for the manufacturers. I'm
13   going to get claims data that reveals what
14   actually happened, and I'm going to ask that
15   to the extent that it's scientifically
16   sensible and can be ascertained via a survey
17   about how their expectations were informed
18   relative to the data that I see in the
19   industry. And I assume your expert will do
20   a similarly scientifically based analysis,
21   and then we'll wrestle.
22   Q. Okay. But I take it there's no way of

230
1    getting around actually hearing from these
2    people directly; isn't that true?
3    A. No, I haven't --
4          MR. SOBOL: Objection to the form.
5    A. I haven't come to that conclusion. I'm
6    going to look -- any economist is going to
7    get as much information as they can, and
8    there are times when one can do surveys
9    where the surveys -- there are certain
10   biases or recollection biases or certain
11   kinds of hypothetical biases. One has to
12   decide to the extent that surveys are
13   reliable, and if surveys are reliable, then
14   it'll be something that I'll investigate.
15         MR. EDWARDS: What I want to do is
16   mark as Exhibit 10 a copy of the deposition
17   of Mike Beaderstadt of -- I think he's with
18   John Deere that was taken in this case on
19   September 17th.
20   (Document marked as Exhibit Hartman 010
21   for identification.)
22    (Discussion off the record.)

Henderson Legal / Spherion
(202) 220-4158

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

18 (Pages 231 to 234)

231

1  Q. Have you read this deposition?
2  A. Not to my recollection.
3  Q. Have you read any depositions in this case
4     other than the one you referred to earlier
5     today?
6  A. I have seen transcripts, but I can't recall
7     whose they were, and there were none that
8     were sufficiently compelling that I felt it
9     was useful to cite them, to rely on them in
10    my report.
11 Q. Okay. I want you to turn to Page 44 of this
12    deposition. Line 8, the question is:
13       "Is this the position of John Deere
14    that it has been misled by drug
15    manufacturers since 1991 as to the meaning
16    of AWP?
17       "ANSWER: No, I don't think so. It
18    wouldn't be my position, I guess. I don't
19    know that I can speak -- that John Deere has
20    a position on that."
21       Now, would you want to explore further
22    with Mr. Beaderstadt why he thinks he was

232

1     not misled as to the meaning of AWP?
2        MR. SOBOL: Objection to the form.
3     You may answer.
4  A. I'm not sure.
5  Q. Well, if Mr. Beaderstadt was not misled as
6     to the meaning of AWP, then he wouldn't have
7     been defrauded, correct?
8        MR. SOBOL: Objection.
9  A. This is such an open-ended question. In
10    order to understand the notion of
11    information being concealed and there being
12    misrepresentation or someone being misled,
13    you know, I would have to look at the rest
14    of this deposition to see whether the terms
15    have been fully defined, whether he really
16    knows, whether he's in a position to know
17    anything. You know, I don't know who this
18    guy is. It's clear if someone says they've
19    either been misled or they haven't been
20    misled you want to say, "Well, in what way?"
21       So you've given me one, two -- eight
22    sentences out of context. This may be

233

1     somebody -- if this is a small self-insured
2     group, there may be one of a sample of
3     self-insured third-party payers that we will
4     want to get data from and I will want to
5     talk to more, but I can't -- from this I can
6     judge nothing.
7  Q. Right. You would want to talk to him to
8     find out more about exactly what he means,
9     correct?
10 A. I would want to talk -- if for the sample
11    that I've talked about that represents
12    groups of self-insured entities, there are
13    some selected groups and entities therein
14    that I will identify, that I'm going to want
15    data from, and I'll also want to 30(b)(6)
16    them both as to the data and more about what
17    they knew. Whether it's Mr. Beaderstadt I
18    don't know.
19 Q. And if there is a dispute as to what they
20    knew, then that's something that the jury
21    has to resolve in the case, correct?
22       MR. SOBOL: Objection.

234

1  Q. Is that your understanding of how it takes
2     place --
3        MR. SOBOL: Objection.
4  Q. -- in America?
5  A. Oh, please. What I understand is the
6     following: I'm going to do some modeling.
7     I'm going to take standard economic
8     practices, principles and econometric and
9     statistical methods, should they be needed
10    and necessary, and I'm going to develop the
11    model that I've outlined in this text,
12    relying on this declaration, relying on a
13    sample of the data that I've discussed. And
14    that's what needs to be done for me as an
15    expert.
16 Q. Well, let's talk about data for a moment
17    here. As I understand it, the class is
18    defined in terms of people who purchased
19    drugs or entities that purchased drugs
20    pursuant to contracts that explicitly
21    referenced AWP; is that correct?
22 A. That's correct.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                 October 7, 2004
PM Session                                                Boston, MA

19 (Pages 235 to 238)

---

235

1  Q. And what are you going to do if the data,
2     the claims data that you're looking at is
3     inconsistent with AWP or inconsistent with a
4     hypothesis that the pricing was based on
5     AWP?
6         MR. SOBOL: Objection.
7  A. I'm not quite sure I understand -- I mean,
8     how could a claim -- some claims data be
9     inconsistent with -- I don't understand what
10    you mean by "inconsistency."
11 Q. Well, I mean, for example, what are you
12    going to do if the claims data suggests that
13    the prices varied all over the lot?
14 A. The --
15        MR. SOBOL: Objection.
16 A. You mean the reimbursement rates?
17        MR. SOBOL: Well, he didn't make
18    that clear.  He says, is this the price?
19    It's not reimbursements or prices to anybody
20    in the chain or anything else.
21 Q. Yes, reimbursements.
22 A. So what you're asking me now is, I go to a

---

236

1     group of third-party payers and suppose I
2     stratify a sample of two of the largest,
3     four of the mid-sized and 10 small ones or
4     whatever I ask it to be, and I ask for all
5     their claims data under their various drug
6     benefit plans, and I look at what those
7     reimbursement rates are relative to AWP?  Is
8     that -- that's your question?
9  Q. Yes.
10 A. Okay.  What I expect to find is
11    reimbursement rates will be related to AWP
12    based on analyses I've done in a variety of
13    other cases and this type of data that I've
14    reviewed in other cases.  And I expect to
15    find some differences in the relation -- the
16    relative discount off of AWP, 15 percent, 5
17    percent, that will usually be related to the
18    attributes of the drug benefit plan, the
19    closeness of the formularies, the aspects of
20    the formularies.  And I will be able to
21    explain that using statistical models that
22    will show me a relationship of reimbursement

---

237

1     rates to AWP that -- period.
2  Q. What are you going to do if the claims data
3     is inconsistent with your hypothesis?
4         MR. SOBOL: Objection.
5  A. That the only way that -- so the way that it
6     would be inconsistent is that AWP is not
7     a -- is in no way a determinant of the
8     reimbursement rate.  Is that what you're
9     saying?
10 Q. I mean, what -- let me give you an example.
11 A. That's the only way it could be
12    inconsistent.
13 Q. Let's say you're looking at a particular
14    drug and the AWP is a dollar?
15 A. Uh-huh.
16 Q. And let's say the contract calls for a
17    discount of 15 percent?
18 A. Off of AWP?
19 Q. Off of AWP.
20        So you would expect to see
21    reimbursements at 85 cents, right?
22 A. Perhaps.  There may be more to the contract.

---

238

1     There may be something that kicks in with
2     usual and customary that is still -- that's
3     driven by AWP, and then there are changes
4     that are introduced, but it's still related
5     to AWP.
6  Q. What are you going to do, for example, if
7     the actual reimbursement rates that you see
8     in the claims data ranges from 60 cents to
9     90 cents?
10 A. I would expect in the analysis of claims
11    data I've done before that I will find that,
12    and I will find that that's -- that can be
13    explained by the type of plan.  And when I
14    get the data from retailers where I'm able
15    to look at claims data over 300 or 400
16    third-party payers, I've been able to do
17    statistical work that demonstrates pricing
18    varies by particular groups, four or five
19    groups, that is very -- these contracts and
20    the various types of negotiations are not
21    customer-specific.  They vary by type of
22    third-party payer, and they're easily

---

Raymond S. Hartman, Ph.D.    Confidential - Attorneys' Eyes Only                October 7, 2004
PM Session                                        Boston, MA

20 (Pages 239 to 242)

239

1    groupable into a subset.
2    Q.  Well, one of the things that you could do is
3        talk to the payer to try to get a better
4        understanding of the data and how you can
5        reconcile it, correct?
6    A.  Well, certainly if I'm looking at
7        reimbursement and how it relates to AWP, I
8        don't need to talk to the payer.  I just
9        need to look -- the data -- he might not
10       even know what the data is.  I might want to
11       talk to the payer about other things, but
12       the data is going to tell me how his
13       reimbursement rates are related to AWP.
14   Q.  Okay.  But my hypothetical, if you'll stay
15       with me for a moment, is that you're looking
16       at reimbursement data, and even though the
17       contract data says AWP minus 15 percent and
18       you're looking at a drug for which the AWP
19       is a dollar, you see reimbursement rates
20       varying from 60 cents to 90 cents, don't you
21       think it would be useful to talk to the
22       payer to try to figure out how that could

240

1        have happened?
2    A.  Well, if I go to the payer, he's going to
3        put in front of me the pro forma contract,
4        and he's going to put in front of me the
5        kinds of levels of discounts that he has
6        paid or rebates that he has paid, and what
7        the percentages off AWP that's related to
8        characteristics of that third-party payer.
9        And I'll get that information from contracts
10       with the third-party payer.  The data
11       essentially will corroborate the extent to
12       which those contracts for different groups
13       of -- you know, I'm talking about across
14       third-party payers getting contracts from
15       these different groups is found in the
16       reimbursement area.
17   Q.  How do you know that?  Have you talked to
18       any payers in connection with this case
19       about their reimbursement data?
20   A.  Because I've done it in other cases and
21       talked to third-party payers in other cases.
22   Q.  You would agree with me, wouldn't you, that

241

1        it would be helpful to talk --
2    A.  Sure.
3    Q.  -- to the payers?
4    A.  Yeah, but it's unnecessary, but it would be
5        helpful, and I would want to do it.
6    Q.  There are some contracts which reference AWP
7        in part but not in whole; is that correct?
8            MR. SOBOL:  Objection to form.
9    A.  Yeah, I don't understand what you mean.
10   Q.  Well, I guess maybe I should get a better
11       understanding of what the claim is here.
12       When you say that the class will consist of
13       payers who pay for prescription drugs where
14       the contract expressly referenced AWP, what
15       if the contract references things in
16       addition to AWP?
17   A.  Well, you will usually see the contracts
18       relating reimbursement on branded and
19       generic drugs with a percentage off of AWP,
20       and -- for the generic drugs and -- for the
21       generic drugs.  Let's not talk about
22       multisource branded at the moment.  There is

242

1        clearly reference to AWP less a percentage
2        or usual and customary, or there is a third-
3        party payer's version of MAC, which is
4        usually expressed also as percentage off of
5        AWP, but just a larger percentage off of
6        AWP.
7    Q.  How do you know that?
8    A.  Because I've seen the pro forma contracts.
9    Q.  Which pro forma contracts?
10   A.  I cite a variety of them in my declaration.
11       Okay.  In Attachment D, Footnote 39 I cite a
12       variety of contracts, pro forma contracts
13       and specific contracts, with some of the
14       named plaintiffs.  The Bates numbers are
15       included therein.  There are Bates-numbered
16       documents and versions of contracts in
17       Footnote 49.  I have also reviewed and
18       remember seeing, since I've written this,
19       contracts between GSK and Diversified Health
20       Services with ESI that have also related
21       reimbursement and rebates in particular to
22       AWP -- I'm sorry, not reimbursements, just

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                           Boston, MA

21 (Pages 243 to 246)

243
1    rebates to AWP.
2         So I've seen contracts all of -- all
3    the extent to which have been based on these
4    notions of AWP.
5  Q.  Have you ever talked to a PBM about how they
6    go about establishing MAC pricing?
7  A.  I have talked to third-party payers that at
8    one time had been -- acted as PBMs, but I
9    haven't done it as thoroughly as I plan to
10   during the discovery process here.
11 Q.  And are you aware of the fact that each PBM
12   has its own unique MAC price list?
13 A.  It's my understanding that they purport to
14   have their own.
15 Q.  And are you aware of the fact that AWP is
16   only one factor that PBMs consider in
17   establishing their Mac price lists?
18 A.  Well, in the contracts I looked at, the MAC
19   price was expressed entirely as percentages
20   off of AWP, but it was also related to the
21   mix of the generics that were being used as
22   to what the percentages would be and what

244
1    the ultimate percent off of AWP would be on
2    average.
3  Q.  Well, if there are PBMs that base their MAC
4    price lists on a variety of factors in
5    addition to AWP, including subjective
6    factors, would the drugs that were subject
7    to that price list be out of the case?
8  A.  No.  They're still related to AWP.
9  Q.  So how are you going to go about determining
10   the impact of AWP on the price of those
11   drugs?
12 A.  I'm going to be able to look at claims data
13   relative to that PBM and through statistical
14   analysis see how -- for which drugs there is
15   different deviations and different
16   percentages off of AWP.
17 Q.  So even if in practice the PBM didn't
18   consider AWP at all in setting a MAC price,
19   if you can, by observing claims data,
20   demonstrate a relationship between AWP and
21   the MAC price, in your view, the MAC price
22   will have been part of the scheme?

245
1  A.  Well, if the contract explicitly says, as it
2    does in ESI's case, that it is a discount
3    off of AWP in whatever form, you know,
4    there's no further discussion.  If the
5    contract is mute about that, the data -- if
6    the data demonstrates a relationship to AWP,
7    there is -- it's either -- those
8    reimbursement rates are either related to
9    AWP or to something else, and that will be
10   subject to the analysis that will be
11   conducted as I examine the claims data and
12   the contracts.
13 Q.  And isn't the data always going to have a
14   relationship to AWP?
15 A.  If reimbursement rates are always related to
16   AWP, then, yeah, it will always have a
17   relationship.
18 Q.  Your age is going to have a relationship to
19   AWP?
20 A.  Not really.  Not for some --
21 Q.  I could --
22 A.  I'm willing to bet you I can give you a list

246
1    of generic drugs where the AWPs are flat,
2    they're constant for 10 years.  Take a look
3    at the ones for Prozac.  And my age is going
4    up.
5         MR. SOBOL:  Maybe you got something
6    there.
7  A.  So the correlation is not particularly good.
8    Maybe with branded drugs you're right, but
9    it's going to differ by drug.  You know,
10   this is subject to the analysis.
11 Q.  Let's go back to your declaration at
12   Paragraph 33.
13 A.  And do we have a specific context?
14 Q.  Page 24.
15 A.  Is it the main body?
16 Q.  Yes.
17        Now, for PBMs you say that the but-for
18   spread for single-source is 16 percent to 33
19   percent and the but-for spread for multi-
20   source is 10 percent to 20 percent; is that
21   correct?
22 A.  What I say is that based upon -- beginning

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

22 (Pages 247 to 250)

---

247

1  of that sentence in Paragraph 33 -- well,
2  let's start at Paragraph 32. Well, let's
3  start on Paragraph 31. That's why you need
4  to read this stuff in context. Paragraph 31
5  says, "The information discussed above,"
6  which is a variety -- which has to do with a
7  variety of these surveys and also what seems
8  to be the oral tradition about relationships
9  between AWP and WAC and RAC, the retail
10 acquisition cost, that in Paragraph 31 I
11 say, "The information discussed above
12 demonstrate the yardsticks can be calculated
13 for market expectations between AWP and ASP.
14 The information discussed above is
15 preliminary only and subject to the caveats
16 introduced and discussed. This information
17 will be supplemented during my damage
18 analysis with actual AWP and ASP data," et
19 cetera, et cetera.
20     Paragraph 32, "Once these permanent
21 yardsticks are refined through further
22 analysis and discovery, the analysis will

---

248

1  proceed as follows," and there it talks
2  about that. Paragraph 33 starts out, "Based
3  upon the preliminary information presented
4  above, and to be supplemented by other
5  survey information, additional discovery and
6  analysis of other yardstick drugs, the
7  preliminary estimates of the but-for spreads
8  for the groups of market entities identified
9  in Paragraph 28 are the following."
10     So given those provisos and the fact
11 that this is illustrative, yes, those are
12 the spreads, but I'm not sitting here now
13 saying that's the spread that's going to
14 inform the ultimate measure of damages in my
15 damage amount. I've merely pulled together
16 a variety of estimates from the lowest to
17 the highest in these -- in Paragraphs A
18 through G and put them next to the different
19 groups.
20 Q. You're saying that for now the judge
21 should ignore the numbers?
22 A. No.

---

249

1  Q. The numbers could be as high as 80 percent?
2  A. No. I'm saying this is based on information
3  that is a not insignificant amount of survey
4  information, but I'm -- before I'm going to
5  commit myself to something as important as
6  actual damages, I'm going to want to confirm
7  and refine these estimates. They may be
8  lower. They may be higher.
9  Q. Okay. And how did you calculate these
10 numbers?
11 A. I calculated these numbers as explained in
12 Paragraph 30 line by line for the different
13 groups of drugs.
14 Q. You calculated them from the government
15 surveys?
16 A. From the government surveys in Paragraphs A,
17 B, C and D. I take the government surveys.
18 I add on some anecdotal information about --
19 what's going on with this thing here? Oh,
20 this -- the copy that I'm reading here has
21 got typos. Paragraph B of -- I'm sorry,
22 Paragraph 30B -- and we sent you a PDF --

---

250

1  second sentence starting, "While I have
2  found the total rebates vary from 4 to 8
3  percent. For simplicity let me assume that
4  the market understands that rebates amount
5  to approximately 5 percent of AWP." Those
6  two periods should be an approximately
7  equals sign, a little squiggly equals sign,
8  and then the same thing with the two dots
9  before the 0.05 AWP.
10     So I don't know -- those did not
11 appear in my version of the document, and
12 I'm not quite sure why they're here.
13     THE WITNESS: (Indicating.)
14     MR. SOBOL: Very interesting.
15 A. So you're handing me a mickey here?
16 Q. This is what we got.
17     MR. SOBOL: It's not different from
18 the one I have in my hand.
19     THE WITNESS: And did they just
20 give you that, or did that come from us?
21     MR. SOBOL: No, this came from them
22 today.

---

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                          Boston, MA

23 (Pages 251 to 254)

---

251

1  A. Oh, you rascals. Okay. Well, in any case,
2     it doesn't matter. Do you have squiggly
3     lines or dots?
4  Q. I have dots. I have never had anything but
5     dots.
6        MR. MORGENSTERN: I have squiggly
7     lines.
8        MR. SOBOL: I have squiggly.
9  A. They should be squiggly lines, so please
10    refer to the squigglies. That's why I got
11    confused reading this.
12       MR. MORGENSTERN: It's a function
13    of which version of Adobe you have.
14 A. And you say the pharmaceutical industry is
15    complex. Look at computers and look at the
16    class actions of computers.
17       Okay. So the -- are we getting ready
18    to like have high tea?
19       MR. SOBOL: It is a question.
20    You're answering a question.
21 A. I have merely pulled together the
22    information from surveys as cited in

---

252

1     Paragraphs 30A through 30B -- D. I have
2     taken the regulatory language for Medicare
3     Part B for 30E. 30F and G merely take some
4     basic understandings that I have seen from
5     contracts, and as I've talked to people in
6     this market about what reimbursement rates
7     are related to AWP, and I've taken those to
8     come up with some measure of a relationship
9     between AWP and ASP.
10       And given those paragraphs, 30A
11    through G, for each category of drug when I
12    put the spread here of summarizing the
13    spreads, I took the lowest number from all
14    those paragraphs and the highest just to
15    give the range found in the expository
16    efforts in Paragraph 30 with the existing
17    survey information that is real information
18    that is good information as a beginning to
19    inform these yardsticks.
20 Q. And one of the things you come up with is
21    spreads for single-source drugs that are
22    greater than spreads for multi-source drugs,

---

253

1     correct?
2  A. That's correct.
3  Q. Isn't that counter-intuitive? Wouldn't you
4     assume that the spreads for multi-source
5     drugs would be greater because there's more
6     competition in connection with those drugs?
7  A. The multi-source spreads, I essentially took
8     the spreads from the earlier OIG reports,
9     and those were essentially 10 to 20 percent
10    range. You know, I'm not -- the individual
11    exact estimates were somewhere in between.
12    And that was for branded and generic drugs.
13    I had further information -- I took into
14    account in this multi-source branded drugs
15    they stopped paying rebates once a generic
16    launches, and the -- and I took account of
17    some other formulaic relationships for
18    branded drugs that expanded and changed the
19    spread range for the single-source that did
20    not show up in the multi-source. And that's
21    all explained in the -- in Paragraph 30, the
22    reasons therefrom.

---

254

1  Q. Are you saying that you used the 1992 OIG
2     report to come up with your spreads for
3     single-source drugs for PBMs?
4  A. I am saying that I used all the information
5     that I saw prior to the survey information
6     that was presented in the later '90s as the
7     basis for the but-for spreads as the -- in
8     this illustration.
9  Q. So you're --
10 A. As we discussed --
11 Q. So you're not able to tell me -- you're not
12    able to point to a particular document that
13    you used to come up with the 16 percent to
14    33 percent but-for spread for single-source
15    drugs?
16 A. Okay. Let's do this here: If you go to
17    Paragraph 30B, and I talk about the OIG
18    reports, and I talk about using the ones --
19    the reports prior to '97. Those suggest a
20    relationship between -- they report the
21    spread as a percentage of AWP. I want to
22    report it as a percentage of ASP. So it's

---

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

24 (Pages 255 to 258)

255

1    just a rearrangement of numbers, but I take
2    the spread there from those reports. I take
3    the broadest range of the numbers I found,
4    .91 to .83 AWP. I assume that there are
5    some rebates paid that would be reflected in
6    the ASP. I make an assumption about the
7    range of rebates that I have seen in other
8    matters for single-source branded drugs.
9    And based on that, I come up with a range of
10   a relationship of ASP to AWP of what you
11   see, and then a resulting spread for the
12   but-for AWP is 1.16 to 1.28, okay?
13       So now that's from the OIG reports
14   prior to '97 where I've taken the lowest
15   amount --
16   Q. Well, you --
17   A. Why don't you let me finish. And so I've
18   got 1.16 to 1.28. Now I do another exercise
19   here where in G I say, look, there's also
20   this understanding as you talk to people in
21   the industry relating to reimbursement rates
22   and retail acquisition costs that lead me to

256

1    a measure of -- that the AWP relationship to
2    ASP is 1.33. So I said, look, I'm going
3    to -- for now I'm going to take the broadest
4    endpoints of this range, 1.16 in B and 1.33
5    in G, and that's the 16 percent to the 33
6    percent.
7    Q. All right. You cite three OIG reports prior
8    to 1997 -- the 1984 report, the 1989 report
9    and the 1992 report, correct?
10   A. I do.
11   Q. And the 1984 report and the 1989 report both
12   combine generics and brands, correct?
13   A. That's correct.
14   Q. The only report that breaks out brands is a
15   '92 report, right?
16   A. The '97 and then the 2001, 2002 -- the 2001,
17   2002 break out the brand and generic.
18   Q. Are you saying now that you did decide to
19   use the '97 through 2002 reports to arrive
20   at these yardstick spreads even though you
21   testified earlier that you thought they were
22   contaminated?

257

1    A. Whatever that question was the answer is no.
2       What I've --
3    Q. Well --
4            MR. SOBOL: I'll move to strike
5    that.
6    Q. Here's my point, Dr. Hartman: What you've
7    done is you computed a yardstick spread for
8    single-source sold through PBMs based on an
9    OIG report that deals with oncology
10   products; isn't that what you've done?
11   A. The OIG reports that are in B are not
12   oncology products. That's in A. That's the
13   '92 report. That's the chemotherapy drugs
14   in A.
15   Q. Okay. So you're saying that --
16   A. I'm using B in the OIG reports, and it says
17   that -- this is as -- we've walked through
18   already in Attachment D where I cited all
19   the OIG reports, you know, from 1984 through
20   the 2001, 2002. I've admitted to the
21   increasing spreads that we're seeing in the
22   surveys that are in the 2001 and 2002

258

1    reports. And as I discuss in detail, and
2    we've read it into the record in Paragraph
3    21 of Attachment D, why I didn't -- why
4    those were in Paragraph 21D. Given the
5    allegations in this matter, the more recent
6    and larger spreads reflect the scheme to an
7    unknown extent and are contaminated to an
8    unknown degree or the use of yardsticks for
9    non-fraudulent behavior. We spent an hour
10   discussing why I did that.
11   Q. So did you --
12   A. So this is here -- all I'm doing is taking
13   exactly what I did back there and using
14   those yardsticks here.
15   Q. Did you or did you not use the 1997 through
16   2002 reports in arriving at the 16 to 33
17   percent spread for single-source?
18   A. No.
19            MR. SOBOL: Objection.
20   Q. Did you or did you not --
21   A. I did not.
22   Q. -- yes or no?

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

25 (Pages 259 to 262)

---

259

1          You did not, okay.
2    A. It says from the OIG reports prior to '97.
3       It's --
4    Q. So the only one available for you to use
5       prior to '97 for single-source was the 1992
6       report, correct?
7    A. Which 1992 report -- are you talking
8       about -- there's an '84 report. There's
9       like an '87 or '88 report. The '92 report
10      is on chemotherapy drugs, which I'm not
11      including there. That's in A. There was
12      also a '94 survey that had for single-source
13      drugs a measure very similar to this 10 to
14      20 percent.
15          Now, you know, if you would like me to
16      sit down and do a taxonomy of where each one
17      of these OIG reports come in to each
18      yardstick and where they appear here, I
19      would be glad to do that, but right now
20      we're just --
21   Q. Is it your understanding --
22          MR. SOBOL: Well, let's take a

---

260

1       break. It's 4:00.
2          MR. EDWARDS: Okay.
3          MR. SOBOL: We've been going for
4       two hours straight.
5          MR. EDWARDS: Fine.
6          (Recess taken.)
7    Q. Earlier in your deposition we talked about
8       the authorities you cite in Footnote 32 of
9       your declaration as a basis for your
10      methodology.
11   A. I'm sorry, wait. Footnote 32 of the report?
12   Q. Of the report.
13   A. It's -- I think that's not the right
14      footnote.
15   Q. Okay. Then I misremembered it. You're
16      right.
17   A. It's Footnote 24.
18   Q. Footnote 24?
19   A. Yeah.
20   Q. Do any of those authorities purport to
21      calculate a but-for list price for purposes
22      of determining impact or damages?

---

261

1    A. Again, the authorities -- the scientific
2       papers cited therein merely allude to
3       analogous types of research that gets at the
4       way the world might be absent certain
5       events. Now, whether they get list
6       prices -- so I say that merely to say I'm
7       not basing my methodology on their stuff,
8       I'm just saying this is -- what I'm doing is
9       similar to what they do but for different
10      reasons.
11          Now going to your question about list
12      prices, I would have to go back and review
13      all of them to see whether they did. I
14      couldn't -- most of them are focusing on
15      reimbursement rates using IMS data.
16   Q. Are you the first person that you're aware
17      of that has attempted to develop a
18      methodology for calculating a but-for list
19      price?
20   A. I wouldn't know.
21   Q. And is it fair to say that because you are
22      calculating a but-for list price as opposed

---

262

1       to a but-for transaction price, you are
2       required to get into the subject of market
3       expectations, correct?
4    A. Well, to the extent that I am taking the
5       following facts as given, that AWP is a
6       benchmark in this industry and that it's a
7       signal to various people for various related
8       prices, yes, I need to have some
9       understanding of what people understood what
10      that was a signal for.
11   Q. We were talking a moment ago about single-
12      source drugs, and am I correct in
13      understanding that at the beginning of the
14      distribution chain single-source drugs are
15      sold by manufacturers to wholesalers?
16   A. They are usually sold through wholesalers,
17      that's correct.
18   Q. And usually at WAC?
19   A. They're usually sold to the wholesalers at
20      WAC, that's correct.
21   Q. And then the wholesaler may sell those drugs
22      to a pharmacy at WAC plus a markup?

---

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                  October 7, 2004
PM Session                                Boston, MA

26 (Pages 263 to 266)

263

1   A. Well, usually the manufacturer negotiates
2       contracts with a variety of the distributors
3       that we're talking about, like a retail
4       pharmacy, and whatever that final price will
5       be will be negotiated off of AWP, which it
6       means the same thing in some relationship to
7       WAC. And whatever that turns out to be,
8       whether that price is less than WAC or more
9       than WAC, the manufacturer either debits or
10      credits the wholesaler with a chargeback to
11      make them whole for their purchase at WAC.
12  Q. Is it your testimony that manufacturers
13      enter into contracts with pharmacies with
14      respect to single-source drugs? That's your
15      understanding of the industry?
16  A. My understanding of the industry is that
17      manufacturers enter into contracts with a
18      variety of entities, PBMs and with others,
19      and the extent to which they are contracting
20      with the retail pharmacies I would have to
21      confirm.
22  Q. Well, is it correct that generally the

264

1       wholesaler will sell the drug to a pharmacy
2       at WAC plus a markup?
3           MR. SOBOL: Objection. Are we
4       still on single-source?
5           MR. EDWARDS: Yes.
6   A. It is my understanding that -- and now
7       whether we're talking about single-source or
8       multi-source or generic, let me step back
9       from that and just say the following: that
10      manufacturers of all of those drugs or some
11      subset of those drugs will negotiate the
12      prices with the -- with retail pharmacies.
13      To the extent that it is single-source
14      branded drugs where the contracts are not
15      with the PBMs and they might be directly
16      with a CVS, I would have to confirm those in
17      the contracts..
18          I can't quite recall the extensiveness
19      of those contracting -- of the contract.
20      But the final answer to the question is,
21      those contracts on whatever the drugs are
22      are usually some percentage off of or

265

1       related to WAC or AWP since they are
2       formulaically related to one another.
3   Q. Well, let's assume that I am correct that
4       manufacturers rarely discount single-source
5       drugs, okay? Just take that assumption for
6       a moment.
7   A. That they rarely discount?
8   Q. Single-source drugs. And let's assume that
9       they sell single-source drugs to wholesalers
10      at WAC and then WAC sells those drugs -- I'm
11      sorry, then wholesalers sell those drugs to
12      pharmacies at a markup over WAC. You with
13      me so far?
14  A. Yeah.
15  Q. And let's say that there is a fairly
16      constant relationship between WAC and AWP.
17      Is that your understanding?
18  A. That's my understanding.
19  Q. The publications arrive at AWP by marking up
20      WAC by 20 to 25 percent; is that your
21      understanding?
22  A. My understanding is that various drug

266

1       manufacturers either report AWP and a
2       formula for WAC or they report wholesale
3       list price, which is WAC, and then the
4       formula for AWP or they report both. But
5       essentially those two list prices and the
6       formula relating them is controlled by the
7       manufacturers.
8   Q. Is it your understanding that WAC is
9       reported by the publications, correct?
10  A. WAC is reported by the publications to the
11      industry. They are set by the
12      manufacturers.
13  Q. Well, if a payer understands that single-
14      source brands are rarely discounted and
15      there is a constant relationship between WAC
16      and AWP, wouldn't the relationship between
17      AWP and ASP be reasonably predictable in
18      that case?
19  A. Well, the relationship -- I mean, if --
20      assuming -- I mean, your question or your
21      hypothetical is assuming all prices are
22      related in the same way, wouldn't it be the

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 7, 2004
PM Session                              Boston, MA

27 (Pages 267 to 270)

267

1   case that all prices are related in the same
2   way? The issue is that the extent to which
3   there are discounts off of certain drugs,
4   single-source drugs, is something that is --
5   while they're within a certain range, I
6   can't say they're the same for all single-
7   source drugs. I've seen variation in
8   invoiced discounting and various kinds of
9   price offsets in addition to chargebacks
10  that make them whole with WAC. And there
11  are rebates that vary across drugs.
12      So there is a range of expectations
13  that is out there, and that is based -- that
14  I -- that the -- that I have assumed the
15  market relies on, but there's variation
16  within it, and it would be used to a
17  competitive advantage to move branded drugs
18  if that difference between the AWP and the
19  ultimate ASP as appearing through, in
20  addition, rebates, was sufficiently greater
21  than others.
22  Q. Is it your understanding that rebates are

268

1   paid on branded drugs that are subject to
2   patent protection? Is that --
3   A. It is my understanding.
4   Q. Is that your understanding of the way the
5   industry operates?
6   A. It is my understanding that rebates are paid
7   on innovator drugs generally until near or
8   shortly after generics launch.
9   Q. Why would a manufacturer do that if a
10  branded drug subject to patent is not facing
11  any competition?
12      MR. SOBOL: Objection.
13  A. Your -- first of all, you might want to ask
14  your clients why they do it, because they do
15  it. And I assume it makes good business
16  sense to do it, and I assume that they're
17  maximizing something in doing it and --
18  Q. Well, if you're incorrect --
19      MR. SOBOL: Have you finished with
20  your answer?
21      THE WITNESS: I am.
22  Q. And, in fact, they don't do it?

269

1   A. That they don't offer rebates?
2   Q. They don't offer rebates, or it is --
3   typically they do not offer rebates or
4   discounts on innovator drugs that are
5   subject to patent protection. Does that
6   affect your opinion?
7   A. Well, my -- you're asking opinions going to
8   ultimately the quanta of the effects. My
9   opinions so far, as laid out here, go to
10  causation and to impact and to injury and to
11  damages. In going to -- that's all --
12  that's a class-wide type of analysis.
13  That's a class-wide conclusion.
14      I've put together illustrative
15  examples of how one would look at, use the
16  analysis that I put forward once impact is
17  established and injury is established, and
18  lo and behold there are certain NDCs where
19  they do not exceed the illustrative upper
20  ends of my spreads. And I say in my -- in
21  the declaration that this may be a case
22  where these were -- drugs were either not

270

1   subject to these particular NDCs, were not
2   subject to the scheme or where the
3   manufacturers felt that the scheme targeted
4   at this group was not particularly effective
5   and the scheme was not used there.
6   Q. So there would be no damage with respect to
7   that particular drug, correct?
8   A. The quantum of the injury would be zero for
9   that drug should it be -- should it not be
10  greater than what the but fors would
11  suggest.
12  Q. And if a particular class member purchased
13  only that particular drug, then the quantum
14  of injury for that class member would be
15  zero as well, correct?
16  A. Well, at the time -- I assume should this go
17  forward and I do a damage methodology, I
18  will be able to, as I've demonstrated in
19  Tables 3A and B and 2A through 2C of the
20  declaration, that for certain NDCs for -- I
21  haven't really identified these by quarter,
22  but that the data will allow that. And

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                                    Boston, MA

28 (Pages 271 to 274)

271

1    there could be certain NDCs where it's not
2    reached the threshold of what the but for
3    would be, and if someone came forward with a
4    claim for a purchase of a drug -- for that
5    drug during that period of time, the amount
6    of the injury would be zero.
7    Q. You know, I wanted to ask you a little bit
8       about Table 3. Take a look at Table 3A,
9       which is Vepesid, V-E-P-E-S-I-D, a Bristol-
10      Myers Squibb drug. In Column 6, I believe
11      it is, you have the number of units?
12   A. In Column 6 I have the installation -- the
13      but-for -- the AWP inflation. Column 7 has
14      the units sold.
15   Q. Okay. How many of those units were sold
16      pursuant to contracts that expressly
17      mentioned AWP?
18   A. That I will ascertain more fully when I see
19      the contracts of third-party payers. From
20      what I have seen of the contracts to date,
21      all or substantially all of them were sold
22      subject to AWP.

272

1    Q. But you would have to exclude from this
2       number contracts or units that were sold
3       pursuant to contracts that did not expressly
4       reference AWP, correct?
5    A. The definition of the class is you belong in
6       the class if the reimbursement rate you paid
7       was related to AWP, and so to the extent
8       that in the damage analysis I'm able to
9       identify a subset that -- where there are
10      sales, a certain amount not subject to AWP,
11      that will be net the out.
12   Q. Do you know what percentage of these units
13      were sold to hospitals?
14   A. Not yet.
15   Q. Would it surprise you to know that more than
16      50 percent were sold to hospitals?
17   A. I don't think it would surprise me.
18   Q. Okay. And is it your understanding that
19      contracts with hospitals typically do not
20      reference AWP?
21   A. That is my understanding.
22   Q. Now, Vepesid is a Part B drug, correct?

273

1    A. I would assume it is.
2    Q. And Part B drugs are reimbursed pursuant to
3       J codes, not NDCs; is that correct?
4    A. They -- J codes are used. I would have to
5       confirm that.
6    Q. So in order to make this calculation, you
7       would not only have to take out hospitals,
8       but you would have to figure out how to
9       differentiate between units sold in the
10      private sector and units sold in the public
11      sector, and then you would further have to
12      figure out how to deal with the fact that
13      units sold in the public sector are priced
14      pursuant to J codes as opposed to NDCs,
15      correct?
16   A. What I would have to do here is exactly what
17      I did in the Lupron declaration that
18      you've -- I think you've had me look at or
19      we've cited. Yeah, I mean, there are ways
20      to do that allocation. There's data to
21      break out those distributions, and I
22      would -- the notion of having to do it by J

274

1    code, that I do not think is the case, but
2    it would be something that I would examine
3    at the time of damages.
4    Q. And the reimbursement -- I'm sorry, and
5       the -- with respect to units that are sold
6       under Medicare Part B, the plaintiffs in
7       this case are only making claims on behalf
8       of persons or entities who made co-payments,
9       correct?
10   A. That's right.
11   Q. So that would be 20 percent of the allowed
12      amount, correct?
13   A. That's correct.
14   Q. And you haven't made that calculation here,
15      either?
16   A. No.
17   Q. And if there were situations that a purchase
18      was covered with -- by Part B but the
19      provider did not base its charge on AWP, in
20      other words, the provider charged less than
21      AWP prior to 1997 or less than 95 percent of
22      AWP after 1997, you would have to figure

Henderson Legal / Spherion
(202) 220-4158

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 7, 2004
PM Session                                  Boston, MA

29 (Pages 275 to 278)

| 275 |
|---|
| 1    that out as well and exclude those purchases |
| 2    from the class, correct? |
| 3  A.  Well, what I would need to do is I would |
| 4    need to do an analysis of at what percent |
| 5    of -- I'm hearing you say that they didn't |
| 6    do it at 95 percent or at AWP.  I would need |
| 7    to do a review of the claims data or |
| 8    whatever information that I'm going to have |
| 9    to turn to to see if it was a percentage of |
| 10   AWP and related to AWP.  And then that would |
| 11   determine whether they would be included or |
| 12   not. |
| 13  Q.  So you're saying that with respect to a |
| 14   purchase under Part B, even if the provider |
| 15   billed Medicare at 50 percent of AWP, the |
| 16   plaintiffs would still have a claim for 20 |
| 17   percent of that 50 percent? |
| 18  A.  Well, if the practice of a provider was to |
| 19   bill at 50 percent AWP, it's a price with |
| 20   respect to AWP, and if that AWP is inflated |
| 21   relative to a but-for AWP, then the |
| 22   reimbursement should have been 50 percent of |

| 276 |
|---|
| 1     the but-for AWP. |
| 2  Q.  Well, how are you going to figure out |
| 3    whether the provider in fact based his or |
| 4    her charge on AWP?  You would have to talk |
| 5    to the provider, wouldn't you? |
| 6  A.  I'm going to have to see the -- either the |
| 7    claims data -- I'm going to have to look at |
| 8    the same kind of data and data sources that |
| 9    we've talked about for the other -- for the |
| 10   orals. |
| 11  Q.  You have to see the provider's contract, |
| 12   right? |
| 13  A.  I would assume the contract -- since it's |
| 14   Medicare Part B, whether -- I mean, this is |
| 15   a legal question.  I'm not even sure whether |
| 16   under Medicare Part B, given the fact that |
| 17   the reimbursement is supposed to be at AWP, |
| 18   95 percent of AWP or at least costly |
| 19   alternative or the estimated acquisition |
| 20   cost, I'm not sure that there is a contract |
| 21   directly in that regard as to the co-pay, |
| 22   but something has to be reported, and, you |

| 277 |
|---|
| 1    know, I'll have to confirm what that is. |
| 2  Q.  Well, let's suppose you're looking at a |
| 3    charge, and it's 50 percent of AWP. |
| 4  A.  Uh-huh. |
| 5  Q.  How do you know that the provider based that |
| 6    charge on AWP as opposed to just coming up |
| 7    with a number that happened to be 50 percent |
| 8    of AWP? |
| 9  A.  Well, that provider will have information -- |
| 10   I mean, suppose we're talking about an |
| 11   oncology group.  That oncology group will be |
| 12   administering a wide variety of Medicare |
| 13   Part B drugs, and the -- that's information |
| 14   that I will want to look at and see -- if |
| 15   he's billing everything at 50 percent AWP, |
| 16   it's telling me something about the |
| 17   percentage off of AWP.  If he's billing |
| 18   randomly and there is no relationship to the |
| 19   AWPs of all the drugs that he's |
| 20   administering under Medicare Part B, well, |
| 21   then apparently he's not.  If there's no |
| 22   statistical relationship, then he's throwing |

| 278 |
|---|
| 1    darts, and that would not be somebody that |
| 2    would be in the class. |
| 3  Q.  But you would have to look at provider data |
| 4    to get at that, correct? |
| 5  A.  I would -- |
| 6         MR. SOBOL:  Objection. |
| 7  A.  I would identify a sample of types of |
| 8    providers to analyze -- a representative set |
| 9    of providers to analyze how they're doing |
| 10   their pricing. |
| 11  Q.  Would there also be a situation under |
| 12   Medicare Part B that the co-payment was |
| 13   being made under Medicare + Choice? |
| 14  A.  There probably would be. |
| 15  Q.  And is it your understanding that |
| 16   co-payments made under Medicare + Choice are |
| 17   not based on AWP? |
| 18  A.  The payments under Medicare -- I mean, |
| 19   that's Medicare Part C, is what you're |
| 20   talking about, pro choice.  Those are |
| 21   contracted out to specific managed care |
| 22   organizations, and I would assume I would be |

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                        Boston, MA

30 (Pages 279 to 282)

279

1    looking at the contracts of those managed
2    care organizations to see what precisely
3    were the reimbursement practices.
4    Q. But if they're not based on AWP, then that
5    particular transaction would not be in the
6    case, either, correct?
7    A. Well, by the definition of the class, any
8    transactions or groups of transactions
9    characterized like sales to hospitals that
10   are not reimbursed, that are capitated and
11   not reimbursed by AWP or other groups will,
12   upon examination, if they're not related to
13   AWP, they won't be part of the class.
14   Q. And if the government is the insurer for the
15   co-payment, that would not be part of the
16   class, either, right?
17   A. That's my understanding.
18   Q. And there would be many cases, I take it, in
19   which the patient would have insurance to
20   cover that co-payment, correct?
21        MR. SOBOL: Objection.
22   A. You're talking about Medigap insurance?

280

1    Q. Medigap insurance.
2    A. Yes, there will be cases of that.
3    Q. And so you would have to look at the terms
4    and conditions of that Medigap insurance to
5    see whether the co-payment was based on AWP,
6    correct?
7        MR. SOBOL: Objection.
8    A. The types of drug reimbursement plans and
9    Medigap plans that exist are also a limited
10   set of types of arrangements that one can
11   apprise oneself of by looking at a sample of
12   them. So, yes, one would look at those --
13   that type of insurance the same way that I
14   would sample third-party payers generally
15   for the non-governmental-related
16   reimbursements on any type drug.
17   Q. And you would also have to determine whether
18   or not a co-payment was even made, correct?
19   There might be cases in which the doctor
20   didn't collect the co-payment?
21   A. It is my understanding that that's -- that
22   that is a legal question.

281

1    Q. Well, if the co-payment is not made, then
2    there would be no impact or damage, right?
3    A. In extrapolating from my experience in
4    Lupron, it is my understanding that the
5    co-payment was -- that oncologists were
6    required to bill it, and I was -- I took an
7    assumption from counsel interpreting that
8    stat -- that regulation. I assume I'll be
9    given instructions regarding that situation
10   in this case.
11   Q. Well, if it turns out to be the case that
12   there are situations in which the provider
13   just doesn't collect the co-payment, then
14   that's something you have to figure out,
15   right?
16        MR. SOBOL: Objection.
17   A. I haven't --
18        MR. SOBOL: Asked and answered.
19   A. Yeah, I mean, I've -- there's too many
20   things yet for me to be informed about in
21   terms of the legal theory and issues to know
22   whether that needs to be --

282

1    Q. Have you determined how many NDCs and J
2    codes you have to make all these
3    calculations for?
4    A. Well, first of all, I wouldn't do it by
5    J code just because J codes are combinations
6    of NDCs and we can work with the NDCs, so
7    you might as well work with the microdata
8    right off the bat.
9    Q. But in order to determine the Medicare Part
10   B co-pay, you need to figure out what the
11   J code is, right?
12   A. Well, no, the Medicare Part B -- the J code
13   translates into NDCs, so I'm just going to
14   go from -- I can go straight to the NDCs
15   applied in those J codes, and I'm going to
16   work with the NDCs as I have here. J codes
17   mix together too many NDCs to be of any real
18   precise unit to really start to do the
19   analysis at.
20   Q. Well, what's the AWP in those situations,
21   then?
22   A. The AWP is an AWP for the NDC.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

283

1  Q. But you've got multiple NDCs in a particular
2     J code.
3  A. Well, you've got --
4  Q. So you have multiple AWPs, right?
5  A. You've got amounts of units of NDCs sold --
6     if I've got one J code that has 10 NDCs and
7     they're all sold at, you know, the various
8     ASPs for those NDCs, which I could calculate
9     and I have calculated, and they're indicated
10    in these tables here, and I've got an AWP, I
11    can have a spread for each of those NDCs.
12    And it may turn out that within a J code
13    that has seven NDCs there's going to be --
14    I'll be able to be precise for the NDCs
15    within that J code.
16 Q. But you're going to have to have -- you're
17    going to have to look at 10 or seven or
18    however many NDCs you have AWPs, right?
19 A. Yes. It's easy. It's right here
20    (indicating). It's in these tables.
21    Working with NDCs is very easy.
22 Q. Now, I want to go back to brands subject to

284

1     patent sold through PBMs or purchased
2     through PBMs. Would you agree that for most
3     brand-name drugs still covered by patent
4     that the relationship between actual
5     transaction prices and AWP is reasonably
6     predictable?
7        MR. SOBOL: Objection.
8  A. I would say that the information that I have
9     reported as the preliminary basis for
10    yardsticks has suggested a certain range of
11    predictability, and to the extent that there
12    are deviations from that, and to the extent
13    that the AWP scheme influenced those drugs
14    remains to be seen from the analysis.
15 Q. But if the relationship is reasonably
16    predictable, then you wouldn't have a fraud
17    or causation or impact with respect to that
18    particular drug, correct?
19       MR. SOBOL: Objection.
20 A. If the relationship were reasonably
21    predictable and didn't lead to the types of
22    allegations that are arising in this case,

285

1     you wouldn't have the states of Vermont and
2     New York suing ESI for not sharing with them
3     all of the price offsets that have been paid
4     for certain drugs. There would be full
5     transparency.
6  Q. And you think those lawsuits are brand-name
7     drugs still covered by patents?
8  A. I think those lawsuits are about the lack of
9     transparency and understanding of all of the
10    price offsets paid by branded and generic
11    manufacturers for their pharmaceuticals.
12    I'm sorry, those lawsuits are related to all
13    branded and generic pharmaceuticals sold by
14    those manufacturers, reimbursed by
15    reimbursement rates related to AWP.
16 Q. I want you to take a look at the
17    Schondelmeyer declaration once again.
18 A. Do I have it?
19       MR. SOBOL: No. That's not it.
20       THE WITNESS: I know. I was going
21    to give that back to you.
22 Q. (Hands document to witness.) I want you to

286

1     take a look at Paragraph 89. The second
2     sentence says, "For most brand-name drug
3     products that are still covered by patent or
4     exclusivity terms the price relationship
5     between list prices, AWP and WAC and actual
6     transaction prices (actual acquisition costs
7     or average selling price) for a given class
8     of trade is reasonably predictable."
9        Do you agree with that?
10 A. Well, I agree with it to the following
11    extent: that I think it is relative to
12    physician-administered drugs and to multi-
13    source innovator drugs and to generic drugs.
14    I think that is correct if that's what he's
15    making it reasonably predictable relative
16    to.
17 Q. And --
18 A. That's as far as I would go with that.
19 Q. Two sentences down he says, "In such
20    occasions a payment policy using AWP as a
21    benchmark (e.g. usually AWP minus a certain
22    percent) may be relatively accurate."

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                        Boston, MA

32 (Pages 287 to 290)

287

1      Do you agree with that?
2  A. I will only be able to agree or disagree
3      after I've done the damage analysis.
4  Q. And it follows from that that if using AWP
5      as a benchmark is relatively accurate, then
6      there would not be any impact or injury,
7      correct?
8          MR. SOBOL: Objection.
9  A. You keep coming back to this, and the impact
10     and injury and causation is there for all
11     drugs sold at a price based on the AWP. The
12     size of the injury or impact, if this turns
13     out to be true -- these numbers are close to
14     yardsticks that I've tentatively put
15     forward. And if they turn out to be true,
16     then they're -- for those drugs, the quantum
17     of that injury will turn out to be zero.
18 Q. Now, in determining whether a particular
19     customer of a PBM has been injured, would
20     you want to look at that customer's contract
21     with the PBM?
22 A. Now you're talking about when we get to the

288

1      claims administration phase of the
2      litigation?
3  Q. No. I'm talking about at trial in this
4      case.
5  A. Are you talking about dealing at trial with
6      issues of causation and impact?
7  Q. Yes.
8  A. No, we wouldn't.
9  Q. You would not look at a customer's contract?
10 A. Well, I would look at it -- if someone comes
11     forward and they have a contract that I says
12     I'm buying this stuff at $10, period,
13     there's no mention of AWP, I would look at
14     it to that extent. If someone came forward
15     where the contract had not mentioned AWP,
16     they would not be members of the class.
17     Otherwise, that's all I would need to know
18     whether there was an implicit or explicit
19     contract such that reimbursement rates were
20     related to AWP.
21 Q. By the way, have you ever testified about
22     your formulaic methodology at an actual

289

1      trial?
2  A. I've testified about --
3          MR. SOBOL: Actual trial?
4          MR. EDWARDS: Yes.
5  A. As opposed to a but-for trial?
6  Q. A mock trial. You're dealing with the
7      American College of Pretrial Lawyers here,
8      except me.
9          MR. SOBOL: I've never heard of
10     that. That's good.
11 A. I have testified at trial and before
12     administrative law judges for or about
13     formulaic methodologies not unlike this,
14     getting at other industries and other
15     impacts.
16 Q. Not about the pharmaceutical industry,
17     though, I take it?
18 A. Apparently that's in the works, but not yet,
19     no.
20 Q. It's in the works? Which case?
21 A. Have I already mentioned this? I guess I
22     have. Cipro California.

290

1          MR. SOBOL: C-I-P-R-O.
2          THE WITNESS: Oh, I thought you
3      were talking to me.
4  Q. You've looked at some ESI contracts?
5  A. I have.
6  Q. Have you looked at any Caremark contracts or
7      Medco contracts or Advance PCS contracts?
8  A. You know, I've put forward in the
9      declaration some Advance PCS presentation
10     materials. I think I have looked at them
11     very quickly, but not closely enough to have
12     relied on them. I mean, I just had a pile
13     of contracts, and I focused on one set
14     because I had a complete set, and -- of the
15     ESI materials.
16 Q. And have you observed that those contracts
17     typically have prices for branded drugs?
18 A. They usually -- the contracts for ESI are --
19     the contracts for ESI --
20 Q. For PBMs generally.
21 A. Well, PBMs generally state that the price,
22     the reimbursement rates on the part of the

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only     October 7, 2004
PM Session                              Boston, MA

33 (Pages 291 to 294)

291

1    third-party payers will be AWP less XX
2    percent to be negotiated or at UNC, or I
3    guess ESI doesn't call it MAC, they call it
4    something else, maximum reimbursable amount
5    or something, MRA. So, yes, I've looked at
6    that.
7    Q. And these contracts have provisions relating
8       to rebates?
9    A. I don't -- I would assume -- oh, yeah, they
10      do. Some of them do. I'm trying to think
11      whether it was a separate set of contracts
12      or not. Or no, wait. Actually, I'm
13      confused. I'm not sure whether it's the
14      manufacturers' contracts I'm thinking about
15      or the PBMs' contracts, so I want to defer.
16      I would have to go back and look it up.
17      I've seen too many contracts.
18   Q. Contracts between payers and PBMs have
19      provisions relating to dispensing fees?
20   A. They do.
21   Q. And clinical service fees?
22   A. They do.

292

1    Q. Transition fees?
2    A. There's a -- you can name a laundry list
3       here. There are many services that PBMs
4       provide, and they -- maybe you know -- not
5       all of them will offer all of these
6       services, but there's a vast amount of
7       formulary design and network formation and
8       various services and drug utilization, et
9       cetera.
10   Q. And administrative fees, have you seen those
11      in contracts?
12   A. I know that there are administrative fees.
13   Q. And do you know whether there are trade-offs
14      between and among these factors or these
15      variables in the negotiations between payers
16      and PBMs?
17   A. I would certainly assume there was.
18   Q. And don't you need to consider those trade-
19      offs before you can determine whether a
20      particular class member has been injured?
21   A. No.
22   Q. Have you ever testified or submitted a

293

1    report in a case involving a bundle of
2    services in which there were trade-offs or
3    variations in those bundles from customer to
4    customer?
5    A. A bundle of services. You know, I may have,
6       but I can't recall.
7    Q. Do you recall the Kennett case?
8    A. Oh, God, you're reaching back into history.
9       Yeah, I remember the name.
10   Q. What do you recall about that case?
11   A. That's it.
12   Q. Well, do you recall that --
13   A. Here, let me -- I'll inform myself. Let me
14      lack at my CV. It lists all these things.
15          (Witness reviews document.)
16   A. Okay. I have informed my recollections.
17   Q. What do you recall about that case?
18   A. That was a case involving price fixing among
19      piano movers in the State of Massachusetts.
20   Q. Involving bundles of services, correct?
21   A. It involved moving pianos.
22   Q. And you testified that based on your

294

1    methodology, injury could be determined on a
2    class-wide basis, correct?
3    A. Well, based on methods not unlike what I
4       have developed in my paper in the Journal of
5       Law, Economics & Organization about the use
6       of hedonic analysis for certification and
7       damage calculations in class action
8       complaints. The methods that I put forward
9       in Kennett were similar to what's in that
10      paper.
11   Q. And the Court ultimately determined that a
12      class could not be certified because of the
13      variations in the trade-offs among the
14      bundle from customer to customer. Do you
15      recall that?
16   A. I don't recall how that -- I'm assuming that
17      your knowledge of the ultimate resolution of
18      that case is better than mine.
19   Q. Well, I believe you already agreed with me
20      that there are trade-offs between and among
21      the various pricing terms of contracts
22      between payers and PBMs, correct?

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

34 (Pages 295 to 298)

295

1   A.  That's right.
2   Q.  Okay.  And so it would follow from that that
3       if a but-for AWP were reported and had an
4       impact on the discount off of AWP in the
5       pricing term, there would also have to be an
6       impact on the other elements of the contract
7       as well?
8            MR. SOBOL:  Objection.
9   A.  I have no evidence upon which to base that
10      conclusion.
11  Q.  Well, are you assuming that in the but-for
12      world the only thing that would change is
13      the benchmark from which the discount off of
14      AWP is calculated?
15  A.  In the but-for world I have been asked to
16      focus entirely upon the impact on prices,
17      and that's what I've done.
18  Q.  How can you determine the impact on prices
19      without also looking at the other elements
20      of the contract as to which there are trade-
21      offs with respect to price?
22           MR. SOBOL:  Objection.  You can

296

1       answer if you can.
2   A.  The relationship of the -- or the but-for
3       relationship and the yardsticks upon which
4       the model relies reflect a period of time
5       when there were services being offered of a
6       variety of different types.  And the period
7       of alleged violations occurred in a period
8       of time where there were a variety of
9       services also offered, and I am taking the
10      but-for relationship as a relationship
11      between that component of the drugs, the
12      drug component of what's being sold and how
13      it's being sold and then assuming and taking
14      that to describe what it would be in the
15      19 -- in the 1990s if there hadn't been
16      this -- the AWP scheme.
17           So that I'm taking information from a
18      period when a variety of services were
19      offered, and I'm applying them to another
20      period when a variety of services were
21      offered, but I haven't taken it to the point
22      of -- I haven't been asked to take it to the

297

1       point of saying would they have changed what
2       they're charging for clinical services in
3       the but-for world.  And I haven't been asked
4       to, and I see no reason to.
5   Q.  Well, if the components are interrelated,
6       though, and there are trade-offs among the
7       components, don't you have to take that into
8       account in determining whether there's been
9       impact?
10           MR. SOBOL:  Objection, asked and
11      answered.
12  A.  If the -- in the examples we're looking at,
13      say, in my automobile -- in the paper that's
14      in the Journal of Law, Economics &
15      Organization or in the piano move matter,
16      there were distinct negotiation -- there was
17      a single price offer related to a variety of
18      attributes.  That's not the case here.
19      There's a variety of services offered, and
20      there's cost -- there's payments for each of
21      these services.  You're paying three bucks
22      for this service, or you run this claims

298

1       audit.  It's going to cost this much.  And
2       all of these are priced out, and drugs are
3       just one of merely a set of the practices
4       that are all priced and priced with
5       reflection to the services that are offered
6       such that I do not believe that the -- well,
7       period.
8   Q.  Well, I mean, let's take ingredient cost and
9       dispensing fee.  If the price for the
10      ingredient cost goes down, wouldn't it be
11      logical to assume that the price for the
12      dispensing fee will go up?
13  A.  It is possible, and I don't want to say that
14      it's probable, but it is possible that in
15      the but-for world in the illustrative
16      examples that I've given that the percentage
17      off AWP might be different or the dispensing
18      fee might be different.  And to the extent
19      that that's -- there is evidence to support
20      that finding, they can be accommodated by
21      this analysis and by that calculation.
22  Q.  So you would have to look at each of the PBM

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 7, 2004
PM Session                                    Boston, MA

35 (Pages 299 to 302)

299

1    contracts, consider the relationship among
2    all of these components as to which there
3    are trade-offs, and then take all of that
4    into account in doing your analysis in this
5    case, correct?
6    A.  No.  I would take into account the
7    pharmaceutical benefit plans that are being
8    offered, which are summarized fully in the
9    claims data where they identify -- normally
10   they identify AWP, they identify the
11   reimbursement amount, they identify the
12   co-pay, they identify the dispensing fee,
13   and I will be able -- to the extent that
14   that proves to be something that needs to be
15   looked at, I can see whether co-pays or
16   dispensing fees may vary in a but-for world,
17   whether they were different, whether they --
18   in your conjecture they went down because
19   these spreads went up as part of the
20   conspiracy.
21        Well, I can go back into the '80s and
22   check that hypothesis out.  That's a very

300

1    straightforward thing to assess and to
2    accommodate within the damage model.
3    Q.  You think you're going to have a lot of PBM
4    contracts to look at from the '80s in order
5    to make that assessment?
6        MR. SOBOL:  Objection.
7    A.  You're not hearing me.  I'm not saying
8    contracts.  I'm saying data.
9    Q.  You think you're going to have a lot of PBM
10   data from the 1980s?
11       MR. SOBOL:  Objection.
12   A.  I'm going to get as much data as I can get.
13   Q.  Do you have any understanding as to when the
14   PBM industry came into existence?
15   A.  In the 1980s.
16   Q.  When?
17   A.  When was the first PBM issued the first
18   contract?  Sometime in the 1980s.
19   Q.  As I understand your theory, if a customer
20   has a discount of AWP minus 14 percent in
21   the actual world, you're assuming that
22   they're going to get that same discount off

301

1    of AWP in the but-for world?
2    A.  For the simplistic illustration that I've
3    put forward in Equations 1A through 2B I
4    have kept the discount off AWP and the
5    dispensing fee to be the same in the actual
6    world and the but-for world.  To the extent
7    that I find, just what I'm saying, they can
8    easily be made to differ.  And this
9    difference will be modified slightly but
10   very slightly.
11       And I can put in -- I can put in the
12   subscripts right here and come up with the
13   differences and do statistical analysis
14   drawing from claims information to see,
15   given whatever data is available, how those
16   measures of percentages off of AWP or
17   dispensing fees varied pre and during the
18   conspiracy period to the effect that they
19   varied at all.
20   Q.  So you think the discount off of AWP could
21   very well be different in the but-for world?
22   A.  I have not done any research to conclude

302

1    that.
2    Q.  And the only thought that you have at this
3    point as to how you might do that research
4    is to look at a period of time pre-1991?
5        MR. SOBOL:  Objection.  Is there a
6    part of the report you're talking about?
7        MR. EDWARDS:  No, there isn't.
8        MR. SOBOL:  I'm lost.
9        MR. EDWARDS:  There isn't part of
10   the report talking about that.  That's why
11   I'm asking the question.
12       MR. SOBOL:  No, I'm asking if you
13   were talking about a part of the report.
14   I'm sorry, go ahead.
15       MR. EDWARDS:  I'm talking about his
16   testimony.
17   BY MR. EDWARDS:
18   Q.  Can you answer my question?
19   A.  If I can remember it.  Actually, why don't
20   you repeat the question.
21       MR. SOBOL:  I think you need to go
22   a couple back.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 7, 2004
PM Session                                    Boston, MA

36 (Pages 303 to 306)

303

1      (Record read.)
2    A. Well, let's put it this way: I've looked at
3       reported spreads of the negotiated
4       reimbursement rates off of AWP. Going back,
5       it's my belief I will -- I have seen
6.      evidence talking about what the discounts
7       were off of AWP for drugs going back into
8       the '80s and up to the present, looking at
9       contracts that I'm seeing. And they -- and
10      all of them characterize X percent as
11      somewhere between 13 and 17 percent
12      beside -- in spite of the fact that there
13      has been a vast change given the allegations
14      in this matter of -- in the actual world
15      relative to the but-for world as to the AWP.
16      So I'm not seeing a heck of a lot of
17      movement in the numbers you're saying are
18      going to move so substantially to overwhelm
19      this change in AWP.
20         Now, with expensing fees I've looked
21      at patterns also, but I -- this would be
22      something that I would -- I'm planning to

304

1.   confirm during the damage phase to see how
2    those have changed over whatever periods of
3    time for which I can get a hold of those
4    contracts or those kinds of claims data.
5    And I've seen those dispensing fees range
6    from a buck fifty to three bucks. I've not
7    seen any changes in the numbers that you're
8    talking about that could be different, but I
9    have -- there's nothing that seems to
10   indicate to me that they're different in any
11   substantial way relative to the types of
12   overcharges we're seeing implied by the
13   spreads in the -- between the AWP and the
14   but-for AWP which are, you know, in the 50,
15   $60 for some drugs.
16      So, yes, there's possible -- it is
17   possible there could be some differences. I
18   plan to try and inform this model as fully
19   as to those differences. My initial review
20   of the evidence indicates that they're a
21   second order of importance at most, but they
22   will be something that I will certainly want

305

1    to look at as fully as the data allows me.
2    Q. Let me make sure I understand your
3       testimony. Are you saying that there would
4       be impact no matter what the discount off of
5       AWP?
6          MR. SOBOL: Objection.
7    Q. I mean, let's say, for example, there is a
8       payer that had negotiated a contract with a
9       25 percent discount off of AWP.
10   A. And this is in the actual world right now?
11   Q. This is in the actual world.
12   A. Somebody we've seen?
13   Q. Yeah. Would that person have been impacted?
14         MR. SOBOL: Objection.
15   A. By the AWP scheme as alleged and as I've
16      taken as alleged?
17   Q. Yes.
18   A. Yes.
19   Q. By 25 percent?
20   A. No. He's been impacted, but the -- if you
21      look at the calculation, the X percent that
22      is off of AWP doesn't translate into the

306

1       percentage --
2    Q. You're right. You're right.
3    A. -- in the reimbursement rates.
4    Q. What if the discount is 30 percent? Still
5       impacted?
6    A. To the extent that the actual AWP is larger
7       than the but-for AWP, that produces a wedge
8       in the allowed amount, the reimbursement
9       rate paid by the third-party payer whether
10      the discount is 10 percent, 20 percent, 30
11      percent, 40 percent, 50 percent, if that.
12   Q. 75 percent, still impacted?
13   A. If the AWP is higher and it's -- and the
14      discount -- and the percentage change
15      remains the same in the but-for and the
16      actual world, and that's something that
17      still is subject to the analysis during the
18      damage calculation.
19   Q. Even if the discount off of AWP were 99
20      percent, I take it you would say that that
21      payer is still impacted?
22   A. Can you point to an example to me where the

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 7, 2004
PM Session                                    Boston, MA

37 (Pages 307 to 310)

---

307

1      discount is 99 percent AWP?
2   Q. So you're willing to give me 99 percent?
3         MR. SOBOL: Objection.
4   A. I'm willing to give you nothing, sir.
5   Q. That's what I thought.  I want to make sure
6      I understand your theory as to this
7      overcharge that results from what you call
8      the AWP scheme.
9   A. I don't call it that.  Plaintiffs' counsel
10     calls it that.
11  Q. Okay.  You wouldn't agree with that, right?
12  A. No, I would agree -- well, I would just take
13     it as what they have asked me to assume.
14  Q. Okay.  For all you know, we're completely
15     innocent, right?
16        MR. SOBOL: I could have called it
17     a racketeering scheme here, but I'm trying
18     to be nice.
19  Q. Let's take a hypothetical situation, if you
20     will, and assume we're talking about a
21     particular drug for which the WAC is a
22     dollar, okay?

---

308

1   A. Uh-huh.
2   Q. And let's assume that the markup is 25
3      percent so the AWP would be $1.25, right?
4   A. Yeah, if you want to call that the markup.
5      It's the -- that's the relationship between
6      the two list prices, one could call a markup
7      over the ASP.  I just want to make sure
8      we're using the same terminology.
9   Q. And then let's assume that the manufacturer
10     sells the drug to a wholesaler at WAC.
11  A. Uh-huh.
12  Q. That would be $1, correct?
13  A. Uh-huh.
14  Q. Then let's assume that the wholesaler turns
15     around and sells it to a pharmacy for a
16     markup of 5 percent.  That would be $1.05,
17     correct?
18  A. Can I propose something to help us here?
19  Q. Sure.
20  A. We have some materials directly from a PBM
21     that does this example for you, that will
22     just make the numbers easier for both of us

---

309

1      to follow.
2   Q. Well, I would like to use my numbers if you
3      don't mind, and then if --
4   A. Okay.  Well, then let me write them down.
5   Q. Okay.  Go ahead.  So WAC is a dollar.
6   A. Okay.  AWP is $1.25.  Okay.
7   Q. Then the manufacturer then sells to the
8      wholesaler at WAC?
9   A. All right.
10  Q. And the wholesaler then sells to the
11     pharmacy at WAC plus a 5 percent markup?
12  A. Okay.
13  Q. And then let's assume --
14  A. A 5 percent markup on WAC, so it's a dollar
15     five.
16        MR. SOBOL: A dollar five.
17  Q. Right.  And you would expect the pharmacy to
18     charge the PBM something more than the
19     dollar five that it paid for the drug,
20     correct?
21  A. I would assume that the pharmacy will cover
22     its costs for the pharmaceutical.

---

310

1   Q. So let's say that the pharmacy charges the
2      PBM AWP minus 15 percent.  If my
3      calculations are correct, that would be
4      $1.06?
5   A. Where's my calculator?  Can I trust this
6      man?
7   Q. I had a calculator.
8   A. I knew you were going to do that to me, so I
9      brought one along.  So you're saying, I'm
10     sorry, they sell it to the PBM at AWP
11     less -- what was it?
12  Q. At 15 percent.
13  A. Okay.  So it's, as you said, a dollar six
14     three, a dollar six.
15  Q. And then let's say that the payer pays the
16     PBM or the PBM charges the payer AWP minus
17     14 percent?
18  A. The PBM charges the payer AWP minus 14
19     percent.  Okay.
20  Q. And that would be basically a dollar and
21     seven and a half cents?
22  A. That's right.

---

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                    October 7, 2004
PM Session                                    Boston, MA

38 (Pages 311 to 314)

311

1   Q. Now, you agree with me that so long as the
2       manufacturer charges the wholesaler WAC, the
3       payer is not going to be able to get the
4       drug for less than approximately a dollar
5       and seven and a half cents?
6           MR. SOBOL: Objection. You can
7       answer.
8   A. I'm sorry, as long as -- say it again.
9   Q. In other words, the only way the price to
10      the payer is going to go down in my
11      hypothetical is if the manufacturer lowers
12      the price at which it sells the drug to the
13      wholesaler?
14          (Interruption.)
15          (Discussion off the record.)
16  A. The whole -- suppose all of the calculations
17      that you have put forward to date are based
18      on two quantities, an AWP of $1.25 and a WAC
19      of a dollar and the fact that AWP is 25
20      cents above WAC, 25 percent above WAC. What
21      the allegations in this matter state are
22      that the AWP and WAC at those levels, given

312

1       what the real trans -- there was an
2       expectation of an average sale price or a
3       real value to the manufacturer selling that
4       product into the distribution system
5       reflected by the ASP that had some
6       relationship to AWP being $1.25 and WAC
7       being a dollar, and that ASP may have been
8       95 cents, whatever it happened to be. That
9       was what the yardsticks are getting at, a
10      relationship of AWP to ASP. And as soon as
11      you have a relationship of AWP to ASP, you
12      have a relationship of WAC to ASP.
13          What the allegations of the complaints
14      say and what my model, my formulaic
15      methodology -- not mine, what standard
16      formulaic methods, standard microeconomics
17      would state is given those yardsticks, given
18      those expectations, if the ASP were not 95
19      cents, which is what the allegations of the
20      expectations were for the yardstick from an
21      AWP of $1.25, but if the ASP were actually
22      50 cents and that spread between AWP and ASP

313

1       was 75 cents, that that is the causation and
2       that is the impact and that is the injury
3       and that the AWP should have actually been
4       lower than $1.25 and WAC should have been
5       lower than a dollar, and then every price
6       that you've calculated as a percentage
7       either of WAC or AWP would have been less.
8           And the reimbursement rate paid by the
9       third-party payer AWP less 16 percent or 14
10      percent, whatever it was to get to $1.75, if
11      that was off of an AWP of 75 cents or 80
12      cents related to an ASP of 50 cents, that is
13      what the allegations of this -- of the
14      complaint are, and that is what the
15      formulaic methodologies that I have put
16      forward allow me to estimate the extent of
17      that deviation.
18  Q. But let's assume that in the but-for world
19      the AWP is 75 cents, 50 cents, whatever you
20      want to make it. The payer, the class
21      member is not going to get that drug for
22      less unless the manufacturer charges the

314

1       wholesaler less than a dollar?
2   A. Well, he's --
3   Q. Isn't that true?
4   A. What's true is if the system works different
5       than it does in reality, it's not the dollar
6       that's important here, the wholesaler had to
7       be paid WAC, and if the AWP is 75 -- is 85
8       cents -- let's say WAC is -- that's going to
9       be 25 cents above WAC, and WAC will not be a
10      dollar any longer. It's going to be
11      whatever it turns out to be. I can
12      calculate that for you.
13  Q. What is your basis for assuming that the
14      manufacturer is going to lower the price
15      that it charges the wholesaler in that
16      scenario?
17          MR. SOBOL: Objection.
18  A. The allegations in this matter that I've
19      been asked to assume is that defendants
20      entered into an AWP scheme which led to an
21      inflation of AWP relative to the true
22      acquisition cost of the relevant

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 7, 2004
PM Session                          Boston, MA

39 (Pages 315 to 318)

315

1   pharmaceuticals by the distributors or by
2   the providers or by the intermediaries,
3   whomever, in the system. And so that rather
4   than there being a predictable relationship
5   between AWP and the acquisition cost or ASP,
6   there was a much larger spread that was
7   induced by this scheme.
8       This fact that they inflated the AWP
9   meant that they inflated WAC because WAC is
10  20 percent in your example of AWP. So if
11  AWP is too high, WAC is too high. And
12  you're saying that they would have used WAC
13  of a dollar. In the but-for world if the
14  AWP were really at the relationship that it
15  could have been reasonably expected by the
16  class members absent the scheme, AWP would
17  be lower and related by the yardsticks to
18  ASP, and the WAC would be 20 percent below
19  that.
20  Q. So what you're saying is, based on the way
21  this industry works and the way people
22  understand the relationship between WAC and

316

1   AWP, AWP by definition has to be higher than
2   WAC, correct?
3       MR. SOBOL: Objection.
4   A. And any -- look in any of the price
5   compendia and tell me if you find a WAC
6   that's higher than AWP. They're all --
7   they're -- AWP is always 20 to 25 percent
8   above WAC, and the manufacturer makes it
9   clear what that percentage is.
10  Q. So in my hypothetical --
11      MR. SOBOL: Objection.
12  Q. -- even if the ASP when you take into
13  account all customer classes is 50 cents, so
14  long as the manufacturer is selling the drug
15  to the wholesaler at a dollar, WAC is going
16  to be a dollar and AWP is going to be $1.25,
17  and those are accurate prices?
18      MR. SOBOL: Objection.
19  A. I just do not follow that question.
20  Q. Well --
21      MR. SOBOL: It's 5:26 now.
22      MR. EDWARDS: Let me ask one more

317

1   question.
2       MR. SOBOL: No, you can't. We were
3   going to end at 5:15. I've scheduled some
4   other things.
5       MR. EDWARDS: Can I just ask one
6   more question, and that's --
7       MR. SOBOL: No. I gave you one
8   more question six times before lunch, okay?
9   We'll take a break now, and we'll take it up
10  again in the morning.
11      MR. EDWARDS: Just one more
12  question?
13      MR. SOBOL: No.
14      MR. EDWARDS: Please?
15      MR. SOBOL: No.
16      MR. EDWARDS: Please? Oh, come on.
17  One more question?
18      MR. SOBOL: No.
19      MR. EDWARDS: I would like to get
20  this witness's --
21      THE WITNESS: Be your best friend.
22      MR. EDWARDS: -- spontaneous

318

1   answer.
2       MR. SOBOL: I've been sitting here
3   for the past 10 minutes. I let you have the
4   one more answer, Steve, okay?
5       MR. EDWARDS: All right. You know
6   the gander rule, Tom.
7       MR. LYNCH: Just give him one, Tom.
8       MR. SOBOL: Every once in a while I
9   have to be like not the good guy.
10      MR. LYNCH: I mean, one more, and
11  then you can break.
12      MR. SOBOL: All right. One more
13  question. It's one question, Steve.
14      THE WITNESS: You have to clarify
15  the question.
16      MR. SOBOL: No, this is a -- go
17  ahead.
18  BY MR. EDWARDS:
19  Q. In my hypothetical where the manufacturer is
20  selling the drug to the wholesaler at a
21  dollar --
22  A. Uh-huh. WAC is a dollar?

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
PM Session                              Boston, MA

40 (Pages 319 to 320)



319

1   Q.  The price is a dollar.
2   A.  That's WAC?
3   Q.  You can call it WAC.  You can call it
4       whatever you want.
5           MR. SOBOL:  Stop asking questions.
6       He's got one more question.  Let him ask the
7       question, and then you can answer it, Ray.
8   Q.  Do you have any basis for offering an
9       opinion as a professional economist that the
10      manufacturer is going to be willing to sell
11      that drug for less than a dollar if the
12      pricing benchmark for reimbursement changes?
13          MR. SOBOL:  Objection.  You may
14      answer if you understand the question.
15  A.  I don't understand the question.
16          MR. SOBOL:  Let's call it a day.
17  Q.  So you have no basis?
18          MR. SOBOL:  Shh.
19      (Whereupon the deposition was
20      Suspended at 5:29 p.m.)
21
22

320

1   The United States District Court
2   for the District of Massachusetts
3
4       I, Jessica L. Williamson, Registered,
    Merit Reporter, Certified Realtime Reporter
5   and Notary Public in and for the
6   Commonwealth of Massachusetts, do hereby
7   certify that RAYMOND S. HARTMAN, Ph.D., the
8   witness whose deposition is hereinbefore set
9   forth, was duly sworn by me and that such
10  deposition is a true record of the testimony
    given by the witness.
11      I further certify that I am neither
12  related to or employed by any of the parties
    in or counsel to this action, nor am I
13  financially interested in the outcome of
14  this action.
15      In witness whereof, I have hereunto set
16  my hand and seal this 7th day of October,
17  2004.

18      _____
19      Jessica L. Williamson, RMR, RPR, CRR
20      Notary Public, CSR No. 138795
21      My commission expires: 12/18/2009
22