Exhibit 6

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

321

```
 1          THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MASSACHUSETTS

              MDL DOCKET NO. 01CV12257-PBS

 3      *****************************

 4      IN RE:  PHARMACEUTICAL

        INDUSTRY AVERAGE WHOLESALE

 5      PRICE LITIGATION

 6      *****************************

 7      THIS DOCUMENT RELATES TO:

 8      ALL ACTIONS

 9      *****************************

10            C O N F I D E N T I A L

11                        VOLUME: II

               CONTINUED DEPOSITION of RAYMOND S.

12      HARTMAN, Ph.D., a witness called on behalf

13      of the Defendants pursuant to the Federal

14      Rules of Civil Procedure, before Judith

        McGovern Williams, Certified Shorthand

15      Reporter, Registered Professional

16      Reporter, Certified Realtime Reporter, and

17      Notary Public in and for the Commonwealth

18      of Massachusetts, at the offices of Ropes

19      & Gray, One International Place, Boston,

20      Massachusetts  02110, on Friday,

21      October 8, 2004, commencing at 9:36 a.m.

22
```

Raymond S. Hartman, Ph.D. · Confidential - Attorneys' Eyes Only                October 8, 2004
Volume II                                          Boston, MA

2 (Pages 322 to 325)

|  | 322 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | HAGENS BERMAN L.L.P. |
| 4 | Thomas M. Sobol, Esquire |
| 5 | One Main Street, 4th Floor |
| 6 | Cambridge, Massachusetts 02142 |
| 7 | 617-482-3700 |
| 8 | tom@hagens-berman.com |
| 9 | on behalf of the Plaintiffs |
| 10 | |
| 11 | HOGAN & HARTSON L.L.P. |
| 12 | Steven M. Edwards, Esquire |
| 13 | Hoa T.T. Hoang, Esquire |
| 14 | 875 Third Avenue |
| 15 | New York, New York 10022 |
| 16 | 212-918-3506 |
| 17 | smedwards@hhlaw.com |
| 18 | htthoang@hhlaw.com |
| 19 | on behalf of the Defendant |
| 20 | Bristol-Myers Squibb |
| 21 | |
| 22 | |

|  | 324 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | ROPES & GRAY L.L.P. |
| 4 | Steven A. Kaufman, Esquire |
| | One International Place |
| 5 | Boston, Massachusetts 02110-2624 |
| 6 | 617-951-7000 |
| 7 | skaufman@ropesgray.com |
| | on behalf of the Defendant Schering |
| 8 | Corporation/Schering-Plough |
| 9 | |
| 10 | SKADDEN, ARPS, SLATE, MEAGHER & |
| 11 | FLOM L.L.P. |
| | Katherine Armstrong, Esquire |
| 12 | Four Times Square |
| 13 | New York, New York 10036-6522 |
| 14 | 212-735-3000 |
| 15 | karmstro@skadden.com |
| 16 | on behalf of the Defendant Amgen |
| 17 | |
| 18 | SHOOK, HARDY & BACON L.L.P. |
| | Joseph G. Matye, Esquire |
| 19 | 2555 Grand Boulevard |
| 20 | Kansas City, Missouri 64106-2613 |
| 21 | 816-474-6550 |
| 22 | on behalf of the Defendant Aventis |

|  | 323 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | KAYE SCHOLER L.L.P. |
| 4 | Saul P. Morgenstern, Esquire |
| 5 | 425 Park Avenue |
| 6 | New York, New York 10022-3598 |
| 7 | 212-836-7210 |
| 8 | smorgenstern@kayescholer.com |
| 9 | on behalf of the Defendant Novartis |
| 10 | Pharmaceuticals Corp. |
| 11 | |
| 12 | DAVIS, POLK & WARDWELL |
| 13 | D. Scott Wise, Esquire |
| 14 | 450 Lexington Avenue |
| 15 | New York, New York 10017 |
| 16 | 212-450-4000 |
| 17 | dwise@dpw.com |
| 18 | on behalf of the Defendant Astra |
| 19 | Zeneca Pharmaceuticals Corp. |
| 20 | |
| 21 | |
| 22 | |

|  | 325 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | PATTERSON, BELKNAP, WEBB & TYLOR L.L.P. |
| 4 | William F. Cavanaugh, Jr., Esquire |
| 5 | 1133 Avenue of the Americas |
| 6 | New York, New York 10036-6710 |
| 7 | 212-336-2000 |
| 8 | wfcavanaugh@pbwt.com |
| 9 | on behalf of the Defendant |
| 10 | Johnson & Johnson |
| 11 | |
| 12 | COVINGTON & BURLING |
| 13 | Mark Lynch, Esquire |
| 14 | 1201 Pennsylvania Avenue, N.W. |
| 15 | Washington, D. C. 20015 |
| 16 | 202-662-5544 |
| 17 | mlynch@cov.com |
| 18 | on behalf of GlaxoSmithKline |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

Raymond S. Hartman, Ph.D.    Confidential - Attorneys' Eyes Only    October 8, 2004
Volume II                              Boston, MA

3 (Pages 326 to 329)

326

1  APPEARANCES (Continued):
2
3  MORGAN, LEWIS & BOCKIUS L.L.P.
4     Scott A. Stempel, Esquire
5     1111 Pennsylvania Avenue, N.W.
6     Washington, D. C. 20004
7     202-739-5211
8     sstempel@morganlewis.com
9     on behalf of the Defendants Pfizer Inc.
10    and Pharmacia Corp.
11
12  ALSO PRESENT:
13    Janice H. Halpern, Leaf Group
14
15  Reporter's note:  Additional parties
16  participated via telephone conference call
17
18
19
20
21
22

327

1              INDEX
2  Witness                    Page
3  RAYMOND S. HARTMAN, Ph.D.
4     Direct Examination by Mr. Edwards    332
5     Cross Examination by Mr. Kaufman     574
6     Cross Examination by Mr. Cavanaugh   602
7
8              EXHIBITS
9  Number                     Page
10
11  Exhibit Hartman 011  Multipage Pharmacy Benefit    330
        Program Proposal, production
12      numbers ESI-277-00002066
13      through ESI-277-00002077
14  Exhibit Hartman 012  Multipage Caremark, Inc.    330
15      Prescription Benefit Management
        Agreement, production numbers
16      CMK-AWP-002818 through
17      CMK-AEP-002844
18  Exhibit Hartman 013  Multipage AdvancePCS Health,  331
19      L.P. Managed Pharmacy Benefit
20      Services Agreement, production
21      numbers CMK-AWP 003724 through
22      CMK-AWP 003749

328

1              EXHIBITS
2  Number                     Page
3
4  Exhibit Hartman 014  Multipage Integrated    331
5      Prescription Drug Program
6      Master Agreement, production
7      numbers UFCW 00747 through
8      UFCW 00766
9  Exhibit Hartman 015  One-page memorandum dated    331
10     September 1, 1999, to
11     Ms. Davidson from Ms. Goldstein
12     and attached multipage
13     Preliminary Agreement,
14     production numbers CVH 000052
15     through CVH 000135
16  Exhibit Hartman 016  Three-page Statement of the    399
17     Federal Trade Commission in the
18     Matter of Caremark RX,
19     Inc./AdvancePCS, File
20     No. 031 0239
21  Exhibit Hartman 017  Deposition of Raeann Maxwell  418
22

329

1              EXHIBITS
2  Number                     Page
3
4  Exhibit Hartman 018  Deposition of David Joyner    425
5
6
7  Exhibit Hartman 019  Health Plan Payment for    546
8      Physician-Administered Drugs,
9      Dyckman & Associates, August
10     2003, No. 3-5
11  Exhibit Hartman 020  Survey of Health Plans    548
12     Concerning Physician Fees and
13     Payment Methodology dated
14     August 2003, No. 3-7
15  Exhibit Hartman 021  Nine-page Government's    566
16     Memorandum Regarding RTP as a
17     Kickback Under Paragraph 55(b)
18     of the Conspiracy Charged in
19     Count I
20  Exhibit Hartman 022  Copy of transcript in United  570
21     States versus Alan MacKenzie
22     et al dated June 24, 2004

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 8, 2004
Volume II                              Boston, MA

4 (Pages 330 to 333)

330

1        P R O C E E D I N G S
2        (Prior to the commencement of
3    the deposition, the following exhibits
4    were marked:
5        (Multipage Pharmacy Benefit
6        Program Proposal, production
7        numbers ESI-277-00002066
8        through ESI-277-00002077 marked
9        Exhibit Hartman 011 for
10       identification.)
11       (Multipage Caremark, Inc.
12       Prescription Benefit Management
13       Agreement, production numbers
14       CMK-AWP-002818 through
15       CMK-AEP-002844 marked Hartman
16       Exhibit Hartman 012 for
17       identification.)
18       (Multipage AdvancePCS Health,
19       L.P. Managed Pharmacy Benefit
20       Services Agreement, production
21       numbers CMK-AWP 003724 through
22       CMK-AWP 003749 marked

331

1        Exhibit Hartman 013 for
2        identification.)
3        (Multipage Integrated
4        Prescription Drug Program
5        Master Agreement, production
6        numbers UFCW 00747 through
7        UFCW 00766 marked
8        Exhibit Hartman 014 for
9        identification.)
10       (One-page memorandum dated
11       September 1, 1999, to
12       Ms. Davidson from Ms. Goldstein
13       and attached multipage
14       Preliminary Agreement,
15       production numbers CVH 000052
16       through CVH 000135 marked
17       Exhibit Hartman 015 for
18       identification.)
19           - - -
20           RAYMOND S. HARTMAN, Ph.D.,
21   having been previously duly sworn,
22   testified as follows in answer to

332

1    continued direct examination by
2    MR. EDWARDS:
3            - - -
4    Q.  How are you today, Dr. Hartman?
5    A.  I am fine.  How are you doing?
6    Q.  Have you thought at all about your
7        testimony yesterday?
8    A.  I guess.
9    Q.  Is there anything you would like to
10       change?
11   A.  No.
12   Q.  Is there any aspect of your declaration
13       you would like to change as a result of
14       the things we discussed yesterday?
15   A.  No.  There was one addition, actually,
16       that might be relevant.  That I realized
17       it is also publicly available -- publicly
18       known is that another case in which I have
19       submitted testimony that is going to trial
20       is the Terazosin matter in which class has
21       been certified, which I hadn't mentioned,
22       besides the Cipro case.

333

1    Q.  Now in this case at this point, you have
2        not talked to any class members; is that
3        correct?
4    A.  I don't think I have, no.
5    Q.  And you have not talked to any PBMs; is
6        that correct?
7    A.  So far, not in this case, no.
8    Q.  You have not talked to any manufacturers
9        so far in this case?  Correct?
10   A.  I have been present when there has been
11       discussions of exchanges of data and
12       invoice data and setting forth an
13       understanding, a pre-30(b)(6)
14       conversation, and so that there were
15       people representing defendants who were --
16       understood their claim -- their data, but
17       that is the extent of it.
18   Q.  And you haven't talked to any pharmacies
19       in connection with this case; is that
20       correct?
21   A.  Not in connection with this case.
22   Q.  Nor have you talked to any wholesalers in

334

1    connection with this case?
2    A.  Not to date.
3    Q.  Have you talked to any physicians in
4    connection with this case?
5    A.  Not to date.
6    Q.  Have you talked to any benefit consultants
7    in connection with this case?
8    A.  It is my recollection over the history of
9    the retention in this matter that there
10   were conversations that involved benefit
11   consultants in -- in meetings or in a
12   conference call, but I couldn't recall the
13   names of those persons.
14   Q.  Okay.  Do you recall what was discussed?
15   A.  Issues of the use of AWP and WAC and
16   pricing in this industry.
17   Q.  Now did you take notes on that discussion?
18   A.  No.  None that I have.
19   Q.  Is there any reason why you did not
20   mention that discussion in your report?
21   A.  There -- no reason -- it was not necessary
22   beyond what I do indicate that I have

335

1    relied on, that I learned nothing more
2    from that discussion than I was learning
3    from the materials upon which I relied.
4    Q.  Okay.  And is it fair to say that you are
5    going to need information from all of the
6    entities that I have just mentioned in
7    order to complete your work in this case?
8        MR. SOBOL:  Objection to form.
9    A.  Well, it is fair to say that I will need
10   and have already begun the effort to
11   identify a representative sample of
12   individuals in that group such that the
13   data that they will provide, say if we're
14   talking about a third-party payer, say a
15   Cigna or an Aetna, that the data that they
16   will provide will, given the size of the
17   institution, allow me to view
18   reimbursement rates and claims data over a
19   very -- over a considerable percentage of
20   scripts for which reimbursement was paid,
21   so that I will essentially design samples
22   of members of each of those groups that

336

1    will be limited, and taking the claims
2    data that will inform me as to what
3    reimbursements were and asking a number of
4    limited questions of each of them, will
5    characterize the information that needs to
6    be characterized for me to implement my
7    formulaic methodology.
8    Q.  You are going to need information from
9    payers in order to develop your
10   expectation yardsticks; correct?
11       MR. SOBOL:  Objection to form.
12   A.  I am going to, as I have done in the
13   implementation of these types of formulaic
14   methodologies in other matters, past
15   matters where class has been certified and
16   it is going to trial, I am going to
17   require a, as in all economics, I am going
18   to require the identification of a sample
19   of members in these groups that will be
20   sufficient to characterize the behavior
21   for the groups as a whole, and this is
22   what statisticians and econometricians do,

337

1    design samples.
2        So, yes, I will need to talk to
3    members, a limited number of members, and
4    get data from those entities or
5    individuals in the groups that you have
6    identified, and that is something that is
7    a common practice and procedure, and
8    that's what I will do.
9    Q.  If you are talking about expectations,
10   isn't it the case that every individual
11   payer will have its own individual
12   expectation?
13       MR. SOBOL:  Objection to form.
14   A.  It is the case that as -- as in any
15   analysis of any economic market, there may
16   be slight differences among a variety of
17   individuals in whatever aspect of that
18   market you are analyzing, and by taking a
19   sample, there is no statistical study that
20   is done by any economist that when the
21   sample is large enough that they go out
22   and they survey the population of all the

338

1  interested parties.
2       There are methods of identifying
3  subsets of people that are representative
4  for expectations and looking at the claims
5  data, more importantly, looking at the
6  claims data and the reimbursement rates
7  paid, a reflection of what the result of
8  their expectations and the market led to
9  in terms of their reimbursement.
10 Q. Can you refer me to any authoritative
11    literature for the proposition that you
12    can determine the expectations of
13    individuals within a population by
14    sampling?
15 A. The -- if -- if you would like, I can put
16    together a bibliography of articles where
17    sampling is done for a variety of
18    purposes, and whether it is aimed at
19    expectations or beliefs or whether it is
20    aimed at -- I mean how do you think they
21    do the surveys about who is going to vote
22    for Kerry or for Bush?  They have a

339

1  representative sample of 500 or 1,000
2  people, and they developed a set of
3  questions about what their expectations
4  are.
5       That's what statisticians do.
6  They identify subsets of people that
7  represent populations at large.  And they
8  are able then to characterize, quite
9  precisely, from very small samples, how a
10 country will vote or how a state will
11 vote.  That's what is done, whether its
12 intentions, buying purposes, what they
13 did, what their intentions are, what their
14 beliefs were.
15 Q. Can you identify any instance for me in
16    which an economist has attempted to
17    determine expectations with respect to a
18    list price or a benchmark price by
19    surveying a sample of a population?
20 A. The question as posed makes little sense
21    in the following respect:  the -- surveys
22    are designed to elicit responses about

340

1  beliefs in a whole range of different --
2  for different economic variables, for
3  behavior in different ways, and whether
4  there is something about a survey of list
5  prices, I can't say that right now.  I can
6  certainly do a Google search and find out
7  the extent to which that is done, but
8  there is fundamentally no difference in
9  doing the kind of research or surveying
10 that we are talking about doing there than
11 surveying other types of expectations or
12 understandings about certain either events
13 or economic variables or some fact.
14 Q. Have you attempted to determine the size
15    of the population for which you are doing
16    the sampling?
17 A. Well, certainly the census department and
18    a lot of the work that is done by the DHHS
19    and Medicare and Medicaid as they're doing
20    their sampling, and you look at NAMCS's
21    data which I use and I cite in my -- in
22    attachment -- well, I forget where I have

341

1  cited it in there -- they use very small
2  -- they might use a one percent, two
3  percent sample, but.
4  Q. But one percent or two percent of what?
5  A. Of --
6  Q. What is the total universe that you're
7     looking at for which you are trying to
8     derive a sample?
9  A. Well, I'm assuming --
10      MR. SOBOL:  Objection to form.
11      You may answer.
12 Q. Maybe another way to ask the question is
13    how many persons or entities do you think
14    are in the proposed classes here?
15 A. The important phenomenon to observe here,
16    the important issues to get at, is how the
17    yardstick beliefs affected claims data,
18    reimbursement data on claims.  So the
19    importance is covering a sufficient number
20    of claims and the -- and talking to the
21    people for whom those claims and the
22    expectations had some effect on what they

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only   October 8, 2004
Volume II                    Boston, MA

7 (Pages 342 to 345)

342

1  believed were appropriate AWPs and WACs
2  and what the ASP was for those claims, and
3  by going to and including in one's sample
4  a number of large entities like Cigna and
5  Aetna, one can, with a very parsimonious
6  set of individuals, cover a spectrum by
7  size or different attributes, say of
8  insurers, third-party payers, or
9  retailers, large chains, mass
10 merchandisers, small independent
11 pharmacies, and looking -- and at that
12 point, what you are aggregating is claims,
13 and one can come up with a 5, 10,
14 15 percent sample of all claims, and one
15 is going to be able to see, and that's --
16 that's a -- that is -- by any standard of
17 statistical modeling, that is a very large
18 sample to draw conclusions about the
19 population at large.
20 Q.  I thought you were looking at
21     expectations, not claims?
22 A.  I am looking at -- the important thing

343

1  here is how reimbursement shows itself on
2  claims.
3  Q.  Well, if you limit your sample to Cigna
4      and Aetna, that is only two entities for
5      whom you are going to be attempting to
6      determine your expectation yardstick?
7  A.  What I think my previous answer will
8      indicate is that I said I will look at
9      some large insurers, third-party payers; I
10     am going to identify a set of mid-sized
11     third-party payers, different types of
12     payers, Blue Cross/Blue Shields; I am
13     going to identify some small third-party
14     payers; and I am going to identify a
15     sample that gets at the -- at different
16     individuals within different entities and
17     review their claim and see their claims
18     data and ask a number of questions that
19     will characterize what their understanding
20     of what the relationship between AWP, WAC,
21     and ASP was.
22 Q.  You may have anticipated my next question,

344

1  which is:  To the extent that you are
2  trying to develop yardsticks with respect
3  to expectations, expectations of what?
4  A.  In --
5          THE WITNESS:  Well, just share
6  it with me, and I can --
7          (Laughter.)
8          (Handing documents to the
9  witness.)
10         THE WITNESS:  Well, I'm not sure
11 that helps actually, but I --
12         MR. SOBOL:  I'm not sure either.
13 I don't know whether the question is about
14 your report or something else, so.
15 A.  Well, it's --
16         MR. EDWARDS:  The record should
17 reflect that plaintiffs' counsel just
18 handed the witness a copy of his
19 declaration.
20         THE WITNESS:  Okay.  And I guess
21 it should also record that the witness
22 said "I'm not quite sure why I need this

345

1  at the moment, but."
2  A.  Look, what we are -- the notion of this
3      model is that there -- my understanding is
4      -- I am not a lawyer, but my understanding
5      of what it means to bring a RICO claim or
6      for a RICO violation is that there is a
7      misrepresentation or a concealment or some
8      kind of deceptive behavior regarding some
9      types of -- that essentially lead to the
10     taking of money or property from the
11     plaintiffs, and what does
12     misrepresentation mean?  It means that
13     what you are representing in terms of
14     particular benchmarks that you are
15     reporting to the market have some meaning
16     toward prices.  So there are -- I have
17     listed a variety of sources that have
18     characterized the types of information
19     that people could believe -- would inform
20     what they felt the AWP benchmark signaled
21     about the entire spectrum of list prices
22     and actual transactions prices, and those

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                    October 8, 2004
Volume II                                  Boston, MA

8 (Pages 346 to 349)

**346**

1  are the expectations I'm talking about,
2  and those are the -- and it was the
3  allegations as I have -- as they have been
4  put in front of me is that given those
5  expectations defendants misrepresented and
6  distorted that relationship, leading to
7  the reimbursements that were inflated and
8  the damage that occurred.
9  Q.  Okay.  You still haven't told me the size
10     of the population that you are sampling.
11         MR. SOBOL:  Objection to form.
12     Is that a question or a --
13  A.  That -- that's a different question.  We
14     were talking about -- are we going back to
15     a different line of questioning now?
16  Q.  Yes.  I am going back to my earlier
17     question.
18  A.  So --
19         MR. SOBOL:  There is no question
20     before you.
21         MR. EDWARDS:  I am sorry.  There
22     is a question.

**347**

1  Q.  You still haven't told me the size of the
2     population that you are sampling.  Can you
3     tell me the number of people or entities
4     in the population for which you are
5     sampling?
6  A.  I will design a survey and identify a set
7     of -- a number of institutions that I --
8     for whose data I am going to want to see
9     and whom I am going to want to interview,
10    and I am going to see to the extent the
11    variability -- I am going to look at the
12    data itself, and the data will inform me
13    whether I need more information or not.
14        This is precisely the way I have
15    done damages in the Terazosin matter, and
16    this type of sampling, this is precisely
17    the way economists do these kinds of
18    modeling for any multitude of different
19    types of issues.
20  Q.  Let me see if I can cut through this.  As
21    I understand it, when you do a sample, you
22    have two things that you look at:  you

**348**

1  have the number of people or entities in
2  the sample; and then you have the
3  population, the total population for which
4  you are doing the sample.  Can you give me
5  those two numbers?
6         MR. SOBOL:  Objection to the
7  form.
8  A.  Preliminarily, for example, I will request
9     claims data and the ability to ask a
10    number of questions, five to seven
11    questions, about understandings about what
12    they're paying -- what their
13    reimbursements rates were paid and what
14    the ASP really was, to understand what
15    their understanding of the benchmark was,
16    and how close it accorded with what was
17    publicly known.  For the third-party
18    payers, I will identify two to four large
19    institutions.  I will identify probably
20    three to five mid-sized entities, perhaps
21    differentiated along different
22    institutional lines.  And I will identify

**349**

1  five to seven small third-party payers.
2  And I will -- and as that data comes in, I
3  will review it as to the consistency of
4  the answers it is leading to to see
5  whether there is variability or a lack of
6  variability and decide whether that is a
7  sufficient sample upon which to base the
8  ultimate calculations.
9  Q.  What you have told me, I think, is that
10    you are going to have a sample size of 26
11    persons or entities.  Can you tell me the
12    size of the population for which you are
13    doing the sample so that I can assess
14    whether your sample is going to have any
15    statistical confidence level?
16  A.  I will tell you the following:  that I
17    intend that my sample represent at least
18    10 percent of claims submitted for these
19    drugs, and so I am looking at
20    reimbursements paid.  I am looking at
21    actual claims and basing it on the
22    percentage of all claims submitted and

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                    October 8, 2004
Volume II                                Boston, MA

9 (Pages 350 to 353)

350

1     reimbursements made.
2   Q.   I guess the thing I don't understand is
3        you keep talking about claims, and I'm
4        trying to ask you about expectations.  It
5        seems to me that expectations exist in the
6        real world on an entity-by-entity basis as
7        opposed to a claim-by-claim basis.  Do you
8        disagree with me?
9   A.   I -- what -- the claims exist as they
10       exist.  The expectations are what they
11       are.  The claims data is going to
12       characterize the result of what
13       expectations are, and as they have been --
14       as they have revealed themselves in actual
15       reimbursement for a statistically
16       sufficiently large group from which to
17       draw understandings about claims as a
18       whole.
19  Q.   Okay.  I am going to give you one more
20       chance to tell me what the total
21       population is, and if you are not going to
22       answer the question, I will move on and

351

1        assume that you are not able to answer the
2        question.
3            MR. SOBOL:  Well, I object to
4        that.  I mean you can assume whatever you
5        would like, but, you know, the prelude is
6        not necessary at all.
7   A.   I'm --
8            MR. SOBOL:  I think that --
9            There is no question before you.
10           -- his answers have been
11       responsive, and let a fact-finder decide
12       that.
13           BY MR. EDWARDS:
14  Q.   Are you going to tell me how many persons
15       or entities are in the total population
16       that you're trying to sample here?
17           MR. SOBOL:  Objection.  Asked
18       and answered.
19  A.   I have told you how I am going to design
20       the survey and the sample, and it accords
21       with standard methods, and that's as far
22       as I'm going to take it.

352

1   Q.   Every entity that you talk to could
2        potentially have its own unique
3        understanding with respect to the
4        yardstick; correct?
5            MR. SOBOL:  Objection to the
6        form.
7   A.   You are asking a speculative -- I have --
8        I have no reason to think that they all
9        have a different one or they all have very
10       similar ones.  My guess is that they all
11       have very similar ones.
12  Q.   But you don't know at this point?
13  A.   Well, based on the survey information that
14       I have seen from a -- from -- that already
15       exists, it is my guess, and looking at the
16       fairly consistent types of discounts that
17       are built into contracts and the fairly
18       regular patterns of a variety of
19       reimbursement patterns in this market, it
20       -- all evidence points to me that there is
21       a consistent set of expectations, and I'm
22       going to see whether that is confirmed by

353

1        the survey that I'm going to initiate, and
2        if as part of that analysis, standard
3        analysis, which I have already done in
4        litigation, proves to indicate that other
5        information may be required, then I will
6        undertake whatever sampling is necessary
7        to do this correctly.
8   Q.   How many surveys of class members have you
9        seen with respect to their expectations?
10           MR. SOBOL:  Objection to the
11       form.
12  A.   It's -- I have seen many surveys.  I have
13       seen many surveys with respect to
14       expectations.  I have seen surveys with
15       respect to what has been done.
16           Have I seen -- what you are
17       asking is --
18  Q.   Have you seen any surveys of class members
19       with respect to what their expectations
20       were in connection with the yardstick that
21       you're developing?
22  A.   Not that I can think of to date.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                Boston, MA

10 (Pages 354 to 357)

354

1  Q.  Now in addition to the fact that each
2      person or entity in the survey may have
3      their own unique expectation as to the
4      yardstick, you also have to determine the
5      expectation with respect to each
6      individual drug?  Correct?
7              MR. SOBOL:  Objection to the
8      form.
9  A.  The -- the yardsticks that I have
10     identified that are sufficient for the
11     analysis at hand are for the groups of
12     drugs, as I put forward in my -- in my --
13     in my methodology, in my declaration.
14 Q.  Well, you group drugs basically into four
15     categories, as I understand it:  single
16     source, multisource -- I am sorry -- five
17     categories.
18             Why don't you take a look at
19     page 24 of your declaration.
20 A.  Do you want me to look at Mr. Sobol's
21     copy, or do you want to give me the court
22     copy?

355

1  Q.  That is Exhibit 2.
2              (Handing Exhibit No. 002 to the
3      witness.)
4  A.  And which page are you on?
5  Q.  On page 24 of your declaration, you
6      propose five yardsticks --
7  A.  That's --
8  Q.  -- as I understand it:  one for single
9      source drugs in the PBM realm; one for
10     multisource drugs in the PBM realm; one
11     for Medicare Part B; one for physician-
12     administered drugs in the private sector;
13     and one for generic drugs in the retail
14     sector.
15             Is that correct?
16 A.  That is correct.
17 Q.  And so you are going to lump all drugs
18     into those five categories?  Is that
19     correct?
20             MR. SOBOL:  Objection to form.
21 A.  I am going to follow the general practices
22     within this market of treating drugs as

356

1      fitting into these categories, and that
2      expectations as to what the yardstick was
3      -- what the AWP as a benchmark was telling
4      third-party payers and other entities in
5      the market revolved around their
6      categorization within these classes.
7  Q.  What are you going to do if a payer tells
8      you that its expectation with respect to
9      the yardstick differed for each drug?
10 A.  The -- you are posing a hypothetical
11     question.  I have no reason to anticipate
12     yet how there will be response.  If there
13     is a response that I am finding in the
14     surveys that I do that there are
15     yardsticks for each different NDC, which
16     sounds profoundly implausible to me, but I
17     will let -- none of the studies or the
18     surveys that have been done have even
19     taken it to that level.  You have
20     criticized some of the OIG report because
21     they have lumped branded drugs and
22     generics together.  The expectations in

357

1      this market are framed around groups of
2      drugs and not the 38 NDCs or the 24 NDCs
3      of Lupron, per se.
4              But to the extent that that
5      proves to be revealed in a survey
6      question, it will be something that if it
7      needs to be accommodated, something that
8      will have to be reflected in the analysis,
9      but I -- that's -- in my opinion, that is
10     profoundly unlikely.
11             (Mr. Cavanaugh entering the
12     deposition room at 10:09 a.m.)
13 BY MR. EDWARDS:
14 Q.  I am not criticizing anybody at this
15     point.  I am just a modest tiller of the
16     facts.
17             But what I am trying to get at
18     here is what do you plan to do if after
19     conducting the surveys you learn that each
20     of the survey participants had a different
21     expectation with respect to the
22     relationship between AWP and ASP for each

358

1    different drug?
2            MR. SOBOL:  Objection to the
3    form.
4  Q.  In other words, are you going to average
5    them?  Are you going to try to account for
6    all the differences?  How are you going to
7    address that?
8            MR. SOBOL:  Objection.  If you
9    understand the question, you may answer.
10  A.  In putting forth a model of this sort,
11    which again is not unlike any type of
12    model that is done for any market, whether
13    it is at a business level or for academic
14    purposes or for litigation, there are --
15    one looks at the data that does exists and
16    sets up a structure of a model, and one
17    wants to refine that, as I said I am going
18    to do with 30(b)(6) depositions.
19            You have -- you have put forward
20    hypothetical findings in these -- in what
21    the surveys may lead to that are
22    antithetical to what I see in the surveys

359

1    to date and my -- and my understanding of
2    the market.
3            Now should it turn out to be the
4    case that in the analysis that I do that
5    that turns -- that that becomes apparent,
6    anyone doing modeling will respond to the
7    facts and adapt the model to take account
8    of those issues.  So if there is some
9    variation, variation is subject -- is
10    found in any --
11            I like to feel like I am talking
12    to you rather than --
13  Q.  I am listening.
14  A.  No, you weren't.
15            So variation can be
16    accommodated.  The whole notion of doing
17    these types of models is to allow for
18    variation and using expectations, first
19    moments, averages that are -- that provide
20    accurate calculations for aggregate
21    impacts, and if the highly unlikely event
22    occurs that you're talking about, I will

360

1    address it there.  I mean this is a --
2    this is not unlike the questions about
3    whether this could be done in other drug
4    cases with variability, and it can be
5    done, and it has been demonstrated that it
6    can be done.
7  Q.  So what you are saying is you are going to
8    come up with an average expectation for
9    the purpose of developing your yardstick?
10  A.  The --
11            MR. SOBOL:  Objection to the
12    form.
13  A.  I'm -- as the OIG studies themselves did,
14    they came up with an average.  They
15    stratified their -- the markups that they
16    saw over acquisition costs across
17    different types of pharmacies, different
18    types of classes of trade as you were
19    talking -- as you and Dr. Schondelmeyer
20    were talking about yesterday, and they
21    came up with an average, and the average
22    was pretty close to the differences for

361

1    all of the different types of urban or
2    rural chains, independent pharmacies.
3            I am -- all of these models use
4    average, and this model will use averages
5    to come up with aggregate calculations of
6    what yardsticks should be and what
7    ultimately then damages are.  As I have
8    demonstrated in attachment F, the use of
9    averages when done appropriately will give
10    you an exact calculation of a summation,
11    individual by individual, of what the
12    damages are.
13  Q.  How is the Court supposed to deal with
14    class members whose expectations differ
15    from the average?
16            MR. SOBOL:  Objection to the
17    form.
18            You may answer.
19  A.  The -- at this point, I have been asked to
20    put forward a methodology to calculate
21    aggregate damages.  I have indicated in
22    attachment F how I can look at the damages

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

12 (Pages 362 to 365)

<table>
<tr><td>

362

1    in the overcharges related to individual
2    groups of class members based on one
3    measure of variation.
4          I have not yet been -- I have
5    not yet been asked to deal with all
6    aspects of what will be needed at the
7    allocation phase, and whether that is an
8    issue is right now totally unclear to me.
9    To the extent that it is, it will be
10   something that if needed will be
11   addressed. I will address it if asked to.
12   Q. Has it occurred to you that some class
13       members may have had no expectation as to
14       what the relationship was between AWP and
15       ASP?
16            MR. SOBOL: Objection to the
17       form.
18   A. I don't quite understand. By "no
19       expectation," you mean they saw an AWP and
20       they never thought anything about it?
21       What does that mean? What do you mean by
22       "no expectation"?

</td><td>

364

1    Q. What do you do about that class member?
2            MR. SOBOL: Objection to the
3        form.
4    Q. Let me give you a concrete example. We'll
5        take a look here at the deposition of
6        Mr. Beaderstadt, which we have previously
7        marked as Exhibit 10.
8            (Handing Hartman Exhibit No. 010
9        to the witness.)
10   Q. I want you to turn to page 72.
11   A. I am at 72. I am going to peruse just a
12       little before -- to get some of the
13       context.
14   Q. Let me show you some of the testimony that
15       I am interested in here, and then you can
16       peruse all you want. Beginning at line 18
17       on page 72, we have the following
18       testimony:
19            "Question: All right,
20       Mr. Beaderstadt. Can I ask you generally
21       what is your understanding of the term
22       average wholesale price?

</td></tr>
<tr><td>

363

1    Q. Well, let me refine it a bit. They saw an
2        AWP, and it was their belief --
3    A. That it --
4    Q. -- that it had nothing whatsoever to do
5        with the ASP.
6            MR. SOBOL: Objection to the
7        form.
8    Q. How do you deal with that class member in
9        your formulaic methodology?
10   A. Well, as I understand your hypothetical,
11       you are saying that they -- if a class
12       member saw an AWP, had no idea what it --
13       how it related to ASP, that essentially it
14       had no concern about ASP, and it -- it
15       just -- it used AWP as if it were a real
16       price?
17   Q. No. What I am saying is that the class
18       member saw an AWP and understood and
19       believed that it had no relationship to
20       ASP.
21            MR. SOBOL: Objection to the
22       form.

</td><td>

365

1            "Answer: Generally my
2        understanding is that it is a benchmark
3        that we use to price specific drugs in the
4        physician's office and the pharmacies.
5            "Question: Do you understand it
6        to have a relationship to any actual
7        acquisition cost?
8            "Answer: I don't believe it has
9        any relationship that is a consistent
10       relationship."
11            How are you going to deal with
12       that class member --
13            MR. SOBOL: Objection to the
14       form.
15   Q. -- in your formulaic methodology?
16   A. Well --
17            MR. SOBOL: Objection to the
18       form.
19            If you understand the question,
20       "How are you going to deal with that class
21       member," you may answer.
22   A. I'm -- I'm now going to take a look at a

</td></tr>
</table>

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 8, 2004
Volume II                                      Boston, MA

366

1  bit of the preceding deposition testimony.
2        (Pause.)
3        (The witness viewing Hartman
4  Exhibit No. 010.)
5  A.  The -- should a -- once -- once the
6  aggregate damages are calculated, as put
7  forward in my declaration, and should a
8  class member come forward with this set of
9  beliefs, this is someone who, because
10 of his lack of understanding of the
11 relationship of AWP to ASP was
12 particularly harmed by the alleged AWP
13 scheme.  This is someone who, if -- if in
14 the next question you had said to him, if
15 I told you that AWP -- that you use for
16 your reimbursement on AWP less 17 percent,
17 and AWP was 100 bucks, and you are paying
18 83 -- and suppose I told you that the AWP
19 was 10 dollars, and you would say, holy
20 God, this is somebody who was particularly
21 vulnerable to this scheme, and the AWP --
22 the -- whatever the inflation was, that

367

1  inflation led to an overcharge for this
2  person, and if the AWP should have been
3  20 percent less whatever he knew, those
4  are damages that he suffered.
5  Q.  You don't know that that's going to be his
6  answer to the next question?  You have to
7  ask him the next question to figure out
8  what his answer is going to be?  Isn't
9  that true?
10 A.  It is --
11       MR. SOBOL:  Objection to the
12 form.
13 A.  It is true that had the defendants not
14 engaged in the conduct that has been
15 alleged here that the AWP would have
16 reflected a more consistent relationship
17 to ASP, and what is true is, absent the
18 alleged violations, the AWP would be
19 lower.  Whatever this guy knew, and
20 whatever he tells me he knew, the AWP
21 would have been lower.  The discounts that
22 were reflected in ASP, whatever he knows,

368

1  were not being passed on to him.  They
2  should have been passed on to him through
3  an AWP that reflects -- that was a
4  reasonably -- that was a list price that
5  the public -- and this person seems
6  particularly uninformed -- could rely on,
7  and there was information concealed such
8  that that AWP did not reflect the pattern
9  of prices, and he paid that AWP when,
10 absent that concealment, the market as a
11 whole would have led to lower AWPs,
12 whatever he knew about ASP or AWP.
13 Q.  What is your expectation yardstick going
14 to be for Mr. Beaderstadt if he shows up
15 in your survey and provides that answer?
16       MR. SOBOL:  Objection to the
17 form.
18 A.  The -- the meaning of and the information
19 built into the AWP as a signal for other
20 list prices and for transactions prices
21 reflect the sum of the results of
22 expectations for everybody as things -- as

369

1  prices are negotiated and given the
2  information that they have or what is
3  concealed from them, and so
4  Mr. Beaderstadt is someone who clearly has
5  very little information to give regarding
6  market expectations and what the reality
7  is between -- of what the relationship --
8  of the benchmark of AWP is to WAC or to
9  ASP.  He doesn't know.  He has no
10 information to provide.
11       I'm looking for what the market
12 generally believed was the relationship
13 and could rely on given what was the
14 announced AWP of a drug and given what was
15 the actual transaction cost.
16 Mr. Beaderstadt obviously has no
17 information to bring to bear on what the
18 market thought, because he has done no
19 thinking about it.  He is aware of
20 nothing.  He is not aware of anything.
21 Q.  So are you saying that you would provide
22 an expectation yardstick of 16 to

Raymond S. Hartman, Ph.D.  Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                    Boston, MA

14 (Pages 370 to 373)

370

1    33 percent to him even though he testified
2    that he didn't believe that AWP had any
3    consistent relationship with ASP?
4          MR. SOBOL:  Objection to the
5    form.
6  A.  Here is a man whose position I don't know.
7    He is -- what is his -- is he -- is he the
8    -- one of the chief officers of a small
9    third-party payer?  Is he a self- --
10   represents a self-insured group?  Who is
11   he?
12 Q.  You have developed the opinions you have
13   developed in this case without reading any
14   of the depositions; is that correct?
15         MR. SOBOL:  I take it you are
16   withdrawing the prior question?
17         MR. EDWARDS:  No, I'm not.
18         MR. SOBOL:  Well, then what
19   question do you want him to answer?
20         MR. EDWARDS:  We will have the
21   reporter read back the prior question,
22   because I would be very interested in

372

1    -- if Mr. Beaderstadt had any interest in
2    this market, he would have -- he would
3    already know something here.
4          So this is someone who, because
5    he has very little understanding of the
6    market as a whole, and what the market
7    generally knows and reports the value to
8    be between -- and the differences between
9    AWP, WAC and ASP -- here is someone who
10   knows nothing about that.  And here is
11   someone who is totally vulnerable to an
12   inflation in AWP, because he has no idea
13   what it means.  He is taking it on faith.
14         This is the type of person that
15   if there were a securities fraud
16   allegation, and you said in the perfect
17   information example, does he have any
18   information?  He has none.  He is not even
19   thinking about it.  A salesman could come
20   in and take a stock off the New York Stock
21   Exchange and say it is worth twice what it
22   is selling for, and based on what I am

371

1    getting an answer to the prior question.
2          THE WITNESS:  Can we finish what
3    we are on here?
4          MR. SOBOL:  No, no.
5          MR. EDWARDS:  Let's have the
6    reporter read back the prior question.
7          (The reporter then read back as
8    follows:
9          "Question:  So are you saying
10   that you would provide an expectation
11   yardstick of 16 to 33 percent to him even
12   though he testified that he didn't believe
13   that AWP had any consistent relationship
14   with ASP?")
15 A.  The yardsticks that I ultimately develop
16   are going to characterize the yardsticks
17   for the market as a whole.  They're going
18   to characterize the relationships that
19   whatever information was out there and how
20   people viewed that information.  The --
21   and that -- I have already started to do
22   that with survey information that informed

373

1    reading here, he is -- he is not -- he is
2    uninformed.
3          And I am characterizing a single
4    -- a yardstick that characterizes the
5    average of the market understanding of the
6    difference between AWP, WAC, and ASP.  So
7    it is him, it is going to be the same --
8    the yardstick is going to be the same for
9    everybody.
10 Q.  So the answer to my question is yes, you
11   would apply the average yardstick to
12   Mr. Beaderstadt and other class members
13   even though they may have had expectations
14   that were different from the average?
15         MR. SOBOL:  Objection.
16 A.  I'm going to apply the yardstick for the
17   market as a whole to characterize the AWP
18   as a whole to the market as a whole and
19   for everybody:  for Mr. Beaderstadt, for
20   Mr. Jones who is the CFO of CIGNA, and the
21   -- each of those -- those -- those two
22   individuals have -- have different

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only         October 8, 2004
Volume II                              Boston, MA

15 (Pages 374 to 377)

374

1    knowledge, different abilities to
2    negotiate. This is clearly someone who,
3    given the inflation in AWP, has no idea
4    how badly he is being gored by an
5    overcharge.
6    Q. You testified a moment ago that discounts
7       should have been passed on to
8       Mr. Beaderstadt and they weren't. What
9       discounts were you talking about?
10   A. Did I say that? Do we have that in the --
11      where I said the discounts should have
12      been passed on?
13   Q. You don't recall saying that?
14   A. I recall discussing ASP. I recall
15      discussing AWP. I recall discussing the
16      fact that the AWP was higher for
17      Mr. Beaderstadt when he was negotiating
18      reimbursement rates. And so if I said a
19      discount, the -- what I -- if -- then I
20      misspoke.
21            What he -- he should have been
22      facing the AWP that the firm -- that the

375

1    defendants should have been setting,
2    absent the alleged scheme, would have been
3    in line with the market expectations, the
4    yardsticks that I will use, and the AWP
5    would have been lower -- if the AWP had
6    been a hundred to him in the actual class
7    period, and based on what the AWPs were
8    and what the relationship that the market
9    understood was between ASP and AWP, the
10   AWP for Mr. Beaderstadt should have been
11   $75.
12         That difference would have been
13   reflected in a discount to him. He would
14   have been paying 100 minus let's say AWP
15   less 17 percent, he would be paying
16   83 percent. In the but-for world, he
17   would have been paying $75 less
18   17 percent. And that's the discount --
19   that's the reduction -- those are the
20   overcharges that he would not have been
21   overcharged, and if I called that a
22   discount, I didn't -- I should have

376

1    referred to it as an overcharge.
2    Q. Are you saying that Mr. Beaderstadt's
3       company would have been able to acquire
4       the drug from the PBM that they deal with
5       for a price less than the PBM paid for it?
6    A. No.
7    Q. Okay. Are you saying that the PBM would
8       have been able to acquire the drug from
9       the pharmacy that dispensed the drug at a
10      price that is less than the pharmacy paid
11      for it?
12           MR. SOBOL: Objection to the
13      form.
14   A. We seem to be returning to the
15      hypothetical that you were articulating at
16      the end of the day yesterday, and the
17      point of all of this and the, as I recall
18      the hypothetical, I don't have the numbers
19      in front of me, you were saying, well,
20      look, AWP is at 125 -- $1.25 -- let's say
21      125. It makes things easier. WAC is 100,
22      and then there were various discounts

377

1    below. And then I said in the but-for
2    world AWP would have been $85, and there
3    would have been a reimbursement off of the
4    but-for AWP. And you kept saying, well,
5    but wait. WAC -- they are still buying it
6    at 80 -- 100 dollars. How could they be
7    buying it at 100 dollars and selling it
8    for 87 -- 85, 87, less the percentage?
9          The point is WAC and AWP are
10   joined at the hip, so that if AWP goes
11   down for Mr. Beaderstadt, WAC is going to
12   go down, because it is a formulaic -- it
13   is 80 percent of AWP for the drugs that
14   have that relationship.
15         The but-for AWP leads to a but-
16   for WAC leads to a reduction in those list
17   prices from the manufacturer through the
18   wholesaler 'hrough the retailer through
19   the PBM to the third-party payer, and all
20   of those prices -- WAC and AWP would have
21   been lower, and the discounts that were
22   offered to the middlemen would have

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 8, 2004
Volume II                                    Boston, MA

16 (Pages 378 to 381)

---

378

1  reached the class members because the AWP
2  was in line with the ASP, the WAC was in
3  line with the ASP, and all the
4  negotiations off of AWP and WAC that are
5  reflected in the contracts between the
6  various entities would have been lower by
7  that amount.
8          MR. EDWARDS: I am going to ask
9  the reporter to read back the question --
10  well, strike that.
11         I am going to move to strike the
12  answer on the ground that it is not
13  responsive.
14         I am going to ask the reporter
15  to read back the question, and insert the
16  question again in the record, and I'm
17  going to ask the witness to give me a
18  responsive answer to the question.
19         MR. SOBOL: Well, objection to
20  the form. Asked and answered.
21         (The reporter then read back as
22  follows:

---

379

1          "Question: Okay. Are you
2  saying that the PBM would have been able
3  to acquire the drug from the pharmacy that
4  dispensed the drug at a price that is less
5  than the pharmacy paid for it?")
6          MR. SOBOL: Objection. Asked
7  and answered.
8  BY MR. EDWARDS:
9  Q.  Can you give me a more responsive answer
10     to that question?
11         MR. SOBOL: I object to that
12     question.
13  A.  And I am sorry. Read it back. I was
14     expecting another sentence, and then I
15     was --
16         (The reporter then again read
17  back as follows:
18          "Question: Okay. Are you
19  saying that the PBM would have been able
20  to acquire the drug from the pharmacy that
21  dispensed the drug at a price that is less
22  than the pharmacy paid for it?")

---

380

1          MR. SOBOL: Objection. Asked
2     and answered.
3  A.  No. Asked and answered.
4  Q.  Are you saying that the pharmacy would be
5     able to acquire the drug from the
6     wholesaler at a price that is less than
7     the wholesaler paid for it?
8          MR. SOBOL: Objection. Asked
9     and answered.
10  A.  The — no.
11  Q.  And I believe you testified yesterday that
12     you have no basis for opining that the
13     manufacturer in your but-for world would
14     sell the drug to the wholesaler at a price
15     that is less than the price that the
16     manufacturer sells the drug to the
17     wholesaler for in the actual world.
18     Correct?
19          MR. SOBOL: Objection.
20     Mischaracterizes the testimony.
21  A.  No. I never said that.
22  Q.  Well, do you agree with that?

---

381

1          MR. SOBOL: Objection. Asked
2     and answered.
3  A.  It has been asked and answered.
4  Q.  Well, your theory is that the ASP in the
5     but-for world and the actual world would
6     be the same? Correct?
7  A.  Correct.
8  Q.  And in order for the ASP to be the same,
9     it would follow that the price that the
10     manufacturer charges the wholesaler in the
11     hypothetical we're dealing with here would
12     also have to be the same?
13  A.  No.
14  Q.  Correct?
15  A.  Are we talking about -- when we say "the
16     price," are you talking about WAC?
17  Q.  I am talking about the dollars that the
18     wholesaler actually pays the manufacturer
19     for the drug. Forget about WAC. I am
20     talking about the dollars.
21  A.  The --
22          MR. SOBOL: Well, objection.

---

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                    October 8, 2004
Volume II                                        Boston, MA

382
1        You can answer, if you can.
2   A.   The dollars -- under contract, what the
3        wholesaler pays the manufacturer is WAC,
4        and then there is an adjustment with
5        chargebacks, depending on other
6        negotiations, and WAC would be lower.
7   Q.   You're not suggesting, are you, that the
8        net price that the wholesaler pays would
9        be lower?
10  A.   The -- I am suggesting that WAC would be
11       lower.  I am not just suggesting it.  I'm
12       averring it.  And to the extent that the
13       chargebacks would vary in a particular way
14       is -- has not been relevant to the
15       calculation needed to relate AWP to ASP.
16  Q.   Let's say we're talking about a drug for
17       which there are no chargebacks.  In that
18       situation, are you saying that the
19       manufacturer would lower its price to the
20       wholesaler?
21            MR. SOBOL:  Objection to form.
22            You may answer.

383
1   A.   Institutionally wholesalers buy at WAC.
2        WAC is wholesale acquisition cost.  And in
3        the but-for world, I can't have said it
4        more explicitly.  WAC and AWP are related
5        -- are tied at the hip formulaically.  And
6        given that there was an AWP scheme, an AWP
7        inflation scheme, there was a WAC
8        inflation scheme.
9            So absent the scheme in the
10       but-for world, whatever the ASP was, I
11       want to know what the but-for WAC and AWP
12       were, and that's what the yardsticks will
13       inform, and WAC will be lower.
14            And so if you are -- under your
15       -- the question you just asked, there are
16       no chargebacks; there are no other
17       financial consideration, flows between the
18       wholesaler and the manufacturer.  WAC will
19       be lower, and the wholesalers will acquire
20       it at a lower cost.
21  Q.   So the manufacturers will take in less
22       revenue?

384
1   A.   The revenue the manufacturers are taking
2        in is related to the ASP.
3   Q.   And that's going to remain the same?
4   A.   That's going to remain the same.
5   Q.   I think you testified yesterday that it
6        was your understanding that the pharmacy
7        class of trade generally pays more for
8        drugs than the hospital class of trade?
9            MR. SOBOL:  Objection to the
10       form.  Mischaracterizes the testimony.
11  Q.   Is that correct?
12            MR. SOBOL:  Objection.  It
13       mischaracterizes the testimony.
14  A.   I would -- I would want to look at the
15       data again.  It has been too long.
16  Q.   Do you agree that in many cases pharmacies
17       pay more than hospitals?
18  A.   I wouldn't -- there are clearly
19       differences across classes of trade, and
20       your proposition sounds correct to me, but
21       I would want to go back and check the data
22       that I reviewed in that regard, and it has

385
1        been a number of years since I looked at
2        that question in particular.
3   Q.   Well, in the hypothetical we have been
4        talking about with Mr. Beaderstadt's
5        company, John Deere, dealing with a PBM
6        and a pharmacy, are you suggesting that in
7        the but-for world the manufacturer would
8        give the pharmacy the same discount that
9        the hospital gets?
10            MR. SOBOL:  Objection to the
11       form.
12  A.   I'm taking the actual world as the actual
13       world, and I'm taking the discounts and
14       all the price offsets we're paying -- that
15       were paid as having been paid, and what
16       I'm looking for is had there not been a
17       misrepresentation of the relationship of
18       those prices, which reflected whatever
19       differential payments there were, averages
20       in the average sale price by class of
21       trade is reflected in the average to the
22       company as a whole times the units sold,

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only   October 8, 2004
Volume II                          Boston, MA

18 (Pages 386 to 389)

386

1    and that's the total revenue earned.
2          What I am saying is that the
3    drug companies started discounting drugs
4    to all their classes of trade -- well, to
5    classes of trade over the '90s such that
6    the ASP declined, and there were
7    discounts, and discounts are good when
8    they're passed on to the end payers, when
9    they are passed on to the consumers.
10         The point is that because of
11   this lack of transparency, the AWPs did
12   not decline. They remained inflated. So
13   I am taking the actual revenues that the
14   companies earned and whatever they did pay
15   -- whether it was to John Deere -- you
16   know, whether it affected John Deere
17   differentially, whatever -- it is coming
18   up -- I am taking the overall summary of
19   all the manufacturers' behavior and what
20   they did and what they earned, and they
21   would have earned the same amount, and
22   what I am saying is that they were willing

388

1    structure didn't pass on those discounts
2    to consumers.
3    Q.  Who --
4    A.  They passed them on to middle persons.
5    Q.  Who overcharged the class members?
6    A.  The allegation is, as I have been asked to
7        assume, that AWPs and WACs are set by the
8        manufacturers, which my research and
9        analysis have corroborated, and, hence,
10       since they're setting that benchmark price
11       and it is not reflecting the real
12       discounts that they're willing to offer
13       and the real revenues, that's the source
14       of the increased divergence that was
15       concealed from the class.
16   Q.  I asked you who.
17   A.  And I said the source was the AWPs and the
18       people who set the AWPs.
19           THE WITNESS:  Can we take a one-
20       minute break?
21           MR. EDWARDS:  Sure.
22           (Recess taken at 10:48 a.m.)

387

1    to offer those discounts, and that is
2    reflected in their revenues, which is
3    total average sale price times total
4    number of units sold to all the classes of
5    trade, and -- and -- I'm saying what
6    happened to reimbursements given these
7    discounts that were offered? Well, did
8    they get to customers? Did they get to
9    third-party payers? And the answer is
10   based on the fact that this -- there is
11   this spread that increased as considerably
12   that it did and the fact that the
13   third-party payers didn't understand the
14   extent of this that they were overcharged.
15         So I am taking into account what
16   John Deere was paying, and whether
17   hospitals got the breaks they did, that is
18   built in to -- in my but-for world, I take
19   the revenues as given. They would have
20   earned exactly what they would have
21   earned, which is what they wanted to earn.
22         The point is the reimbursement

389

1            (Recess ended at 10:56 a.m.)
2    BY MR. EDWARDS:
3    Q.  Are you saying that certain discounts were
4        not passed on by the middle men to the
5        class members?
6    A.  That, I am saying that. I am saying that
7        evidence indicates that. Yes. I am
8        saying recent litigation indicates that.
9    Q.  And so what you are saying is that in the
10       but-for world the class members would pay
11       less and the middle men were making less?
12           MR. SOBOL:  Objection to the
13       form.
14   A.  I'm saying in the but-for world that the
15       AWP would have a -- would have had a
16       relationship to ASP that was expected and
17       understood to be the case by the class,
18       and it would have been lower, and the
19       reimbursements paid would have been less.
20   Q.  Do you know what pharmacy margins are?
21           MR. SOBOL:  Objection to the
22       form.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                            Boston, MA

**390**

1    A.  I have been curious to find that out.  I
2        hope to.
3    Q.  Is the pharmacy business competitive to
4        your knowledge?
5    A.  "Competitive" is a -- is a broad term.  I
6        mean is it Adamistically competitive?  Is
7        it oligopolistically competitive?  I mean
8        what kind of competition are you talking
9        about?
10   Q.  I am just asking you a question.  Is it
11       competitive or not?  Are you saying it is
12       not competitive?
13   A.  I --
14           MR. SOBOL:  Objection to the
15       form.
16   A.  I am saying there are so many types of
17       competition.  There is oligopolistic
18       competition.  There is Adamistic
19       competition, each of which has different
20       implications about profit margins, and I'm
21       not sure.  So that unless you are more
22       specific, I can't follow a line of

**391**

1        questions unless I know what type of
2        competition you are referring to.
3    Q.  Is it competitive in any way?
4    A.  Do -- do you mean does Eckard attempt to
5        increase and grow and make profits
6        relative to CVS?  Yes.  It is competitive
7        in that way.
8    Q.  Have you done an analysis of market shares
9        in the pharmacy business?
10   A.  I have preliminarily asked for such
11       information and have not been able to
12       develop it sufficiently to the point at
13       which I submitted the declaration.
14   Q.  This is something you intend to do for
15       purposes of your testimony in this case?
16   A.  If needed.
17   Q.  Why would it be relevant to know whether
18       the pharmacy sector is competitive?
19   A.  The implications of the allegations say
20       certain things about margins of retail
21       pharmacies.
22   Q.  So, in other words, if --

**392**

1           MR. EDWARDS:  Strike that.
2    Q.  What do they say?
3    A.  Well, they say that if there are discounts
4        paid, let us -- and let's take a specific
5        example, generic drugs, wherein -- as I
6        as I say in my report, there is evidence
7        that ASPs drop by 80 to 90 percent of the
8        prelaunch branded price.  They drop
9        considerably.  And when one looks at
10       reimbursement rates, looking at either
11       data directly from retailers or from
12       third-party payers or from the IMS
13       national prescription audit, it shows that
14       reimbursement rates drop to 20 -- 15 to
15       30 percent.  So it is fair to say that
16       what is being paid by the class, the types
17       of discounts that occur there, are much
18       less than the amounts that the retailers
19       -- the discounts at which the drugs are
20       available to retailers.  Now if they are
21       able to retain part of that spread, it
22       will have implications for the

**393**

1        profitability of the retailers.
2    Q.  I notice you made that same point in
3        paragraph 13C of your report at page 13.
4    A.  Can I return the Beaderstadt transcript
5        for now?
6    Q.  Sure.
7           (Handing Hartman Exhibit No. 010
8        to Mr. Edwards.)
9    A.  I am sorry.  You said page 13 of the
10       main body of my report?
11   Q.  Yes.
12   A.  Yes.  Okay.
13          (Witness complying.)
14   Q.  Subparagraph 13C.  What is the basis for
15       those numbers where you say, "Over the
16       past decade as multiple generics have
17       launched, generic manufacturer average
18       prices have fallen by 80 to 90 percent.
19       At the same time, however, average
20       reimbursement rates paid by retailers --
21       paid to retailers by end payer class
22       members have fallen by only 20 to

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

20 (Pages 394 to 397)

394

1    30 percent"?  What is the basis for that?
2  A.  In the work that I have done over the last
3    decade with respect to this industry, both
4    publicly-available data and data that has
5    been subject to seal, I have been able to
6    review, and this summarizes the
7    information that I have found from both of
8    those sources.
9  Q.  Well, there is -- this particular
10    statement in your report is not footnoted.
11    Can you identify the specific sources from
12    which you derive that information?
13  A.  I certainly can't identify the cases from
14    whence I have observed that, the matters
15    of litigation in which I have submitted
16    testimony.
17  Q.  Why is that?
18  A.  Well, they are subject to seal.
19        Now the judge in the Terazosin
20    matter and in Cipro have issued their own
21    opinions.  I don't know whether that makes
22    the other damage analyses I have done -- I

395

1    don't know if that makes them public or
2    not.  It is my understanding that that --
3    that that is all subject to seal.
4        I have looked at data for 10, 15
5    drugs in Hatch-Waxman matters and a
6    variety of cases where there have been
7    generic launches, and I have gotten real
8    manufacturer data over the past 10 years.
9    I have also looked at publicly-available
10    information.  I mean your Barron's article
11    that you put in front of me yesterday said
12    the same thing.  So I could go to that 60
13    to 90 percent in the Barron's article and
14    the IMS data, which I could buy -- you or
15    I could buy -- and will show you that the
16    reimbursement rates that they are talking
17    about have not fallen 60 to 90 percent.
18        So it is confirmed by popular
19    press.  It is confirmed by IMS.  It is
20    confirmed by data from manufacturers, you
21    know, from their own sales data.
22  Q.  You're not able to be more specific than

396

1    that?
2        MR. SOBOL:  Well, I will say
3    that if the defendant manufacturers will
4    waive the confidentiality restrictions on
5    their data from the other cases, including
6    your clients, we could consider disclosure
7    of it, but, you know, many of the
8    defendants here, as counsel know, were
9    defendants in the multiple matters that
10    Dr. Hartman has just now testified about,
11    and if they would be willing to, you know,
12    assent to the release of the information,
13    then we can also deal with the co-lead
14    counsel for those other cases and make it
15    available to you.  BMS in particular has
16    provided significant information about a
17    drug in which Dr. Hartman's testimony is
18    germane.
19  BY MR. EDWARDS:
20  Q.  If Dr. Schondelmeyer is of the opinion
21    that the pharmacy business is highly
22    competitive and margins are thin, would

397

1    you defer to him in that regard?
2  A.  No.
3  Q.  You would disagree with him?
4  A.  I wouldn't defer to him.  I would have to
5    look at whatever analysis he has done.  It
6    runs counter to my understanding.
7    Dr. Schondelmeyer is an expert in his area
8    of pharmacology.  To the extent that he is
9    an economist and to the extent that his
10    notion of being very competitive and what
11    the particular margins he is looking at,
12    you know, I just don't know what he is
13    basing it on.  I would have to review
14    that.  You know, what he -- he could have
15    said that in some context.  I have seen
16    two duopolists that are pricing at almost
17    at monopolist price, and say, "Jesus, is
18    this really a competitive industry?"  I
19    would have to see the context and
20    understand what he is basing that on.
21  Q.  Is the PBM business competitive?
22        MR. SOBOL:  Objection to the

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                    Boston, MA

21 (Pages 398 to 401)

---

398

1    form.
2    A.  The PBM business does compete -- it -- by
3        offering products to, complex products, to
4        third-party payers to try and get the
5        third-party payers to join -- to join that
6        PBM or have that PBM be their -- to be --
7        to get them to be a client to that PBM.
8    Q.  Have you seen the statement of the FTC in
9        connection with the Caremark/AdvancePCS
10       merger?
11   A.  I don't recall.  It is not here, I take
12       it.
13           MR. EDWARDS:  We are going to
14       mark it as Exhibit 16.  For the record, it
15       is a statement of the Federal Trade
16       Commission in the matter of Caremark RX,
17       Inc./AdvancePCS, file number 031 0239.
18           (Three-page Statement of the
19           Federal Trade Commission in the
20           Matter of Caremark RX,
21           Inc./AdvancePCS, File
22           No. 031 0239 marked

---

399

1            Exhibit Hartman 016 for
2            identification.)
3        BY MR. EDWARDS:
4    Q.  Have you ever seen this document before?
5    A.  I do not think so.  I am sorry.  It is
6        dated when?  Do we know this?
7    Q.  You know, this particular copy does not
8        have a date.
9    A.  It is citing things in the footnote as of
10       Web searches as of 2004, which would lead
11       me to think it is fairly recent, but
12       whether that might have been added
13       afterwards, I don't know.
14   Q.  Have you ever done any work with the FTC?
15   A.  I have.
16   Q.  Do you know what the FTC does in analyzing
17       a merger?
18   A.  Generally.
19   Q.  What does it do?
20   A.  Well, it assesses -- it does the standard
21       types of merger analysis that the DOJ or
22       would be done by government authorities in

---

400

1        terms of defining relevant markets,
2        looking at using the merger guidelines to
3        assess structural measures of
4        concentration, and that may be -- it may
5        -- that may occur as a result of the
6        merger.  It looks at competitive issues
7        that may be relevant and more important
8        than the structural aspects of the merger.
9        It is interested in allowing mergers to
10       go forward that are procompetitive but
11       stopping those that will be anti-
12       competitive.
13   Q.  One of the things it will do is obtain
14       documents from the merging parties?
15       Correct?
16   A.  That's correct.
17   Q.  Sometimes hundreds of thousands of pages
18       of documents?
19   A.  It could be first requests, second
20       requests.  There could be many levels of
21       amounts of documents required, depending
22       on the complexity of the merger.

---

401

1    Q.  It takes or it can take testimony from
2        witnesses in connection with the merger?
3    A.  I would -- yes.
4    Q.  And the FTC has economists on staff to
5        analyze the economic effects of a merger?
6    A.  They do.
7    Q.  Are you in a position to disagree with the
8        statement made in footnote 6 on page 3 of
9        this document, quote, "We anticipate that
10       competition among PBMs will remain
11       vigorous in the wake of the Caremark/
12       AdvancePCS acquisition, and that this
13       competition is likely to cause PBMs to
14       pass on at least some of their cost
15       savings to their customers in order to
16       gain or retain their business"?
17           MR. SOBOL:  Objection to the
18       form.
19   A.  I have read that footnote.
20   Q.  Do you disagree with that footnote?
21   A.  The -- I would frame it as follows.
22       First, here is a statement of the Federal

---

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only   October 8, 2004
Volume II                    Boston, MA

22 (Pages 402 to 405)

402

1    Trade Commission.  I'm not sure at what
2    stage of pleading this is.  I know in
3    matters -- say in other matters related to
4    Hatch-Waxman cases, say the drug K-dur,
5    there were opinions about what was
6    anticompetitive and procompetitive.  I
7    don't know if this was the final decision
8    of the commission or what this reflects
9    and at what stage this is, so whether this
10   is the final conclusion.  So that is
11   number one.
12          Since I have, you have -- you
13   have given me a footnote out of a document
14   that is a three-page summary, which -- the
15   providence of which is -- I see no header
16   or footer.  It just says statement of the
17   Federal Trade Commission.  So I put the
18   footnote in that context, whether this is
19   the final decision of the Federal Trade
20   Commission, since there are appeals and
21   there are changes that can occur over
22   time.

403

1          Secondly, there is academic work
2    that has been done that indicates that
3    while the PBM industry or the group of
4    PBMs appear to compete, in order to get
5    insured lives and to get TPP members that
6    there is a great opportunity for post
7    contractual opportunistic behavior which
8    given the veil of relationships of pricing
9    is unclear to the customers, to the
10   clients, for whom they have apparently
11   competed.  So that there -- the notion of
12   competition here in terms of
13   precontractual competition may be quite
14   different than the results of the post
15   contractual implementation, and the post
16   contractual implementation may look far
17   different from what would be felt to be a
18   competitive result.
19          And, thirdly, I have seen
20   litigation that we have talked about
21   yesterday on the State of Vermont and New
22   York State, and this is -- this has been

404

1    recent litigation -- it has been reported
2    on in 2004 -- where they believe that
3    their PBM -- they are not receiving
4    whatever the competition was for the
5    rebates.  They believe they're not
6    receiving their full share of those
7    rebates.  So while there was competition,
8    they are feeling it is not being passed on
9    the way to which it had been agreed.
10          I have also read in that same
11   journal, a Drug Cost Management Report, of
12   a very recent effort on 50 of the Fortune
13   500 companies that are essentially forming
14   their own PBM because even though they say
15   they're getting competitive offers,
16   they're saying, "We don't see the results
17   of whatever you are promising, and we have
18   seen this kind of evidence, and we're not
19   getting our discounts."
20          And there was another article I
21   wanted to cite I have now forgotten.
22   Q.  Well, one of the things that payers can do

405

1    if they don't like the deals they're
2    getting from PBMs is they can form their
3    own PBMs?  Correct?
4    A.  The -- one of the things that is my
5    interpretation -- I -- this is -- I have
6    been asked to assume allegations; I have
7    looked for corroboration.  One of the
8    corroborating factors of the allegations
9    are exactly that effort:  that the
10   understanding of the extent to which this
11   AWP inflation scheme was occurring has
12   finally reached the level of strategic
13   planning of the self-insured groups large
14   companies, and they're saying forget it.
15   This is not -- for 10 years, we're not
16   getting the results of what you said were
17   competitive contracts, and they are either
18   forming their own, or they are forcing
19   Caremark or other PBMs to offer more
20   transparent -- the new -- the new product,
21   as I understand it, in the PBM world is
22   greater transparency.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 8, 2004
Volume II                                    Boston, MA

23 (Pages 406 to 409)

---

406

1       So suddenly after 10, 15 years
2   of an alleged scheme and information that
3   is suddenly -- that is slowly affecting
4   expectations and understanding, so that
5   the concealment is now -- the genie is out
6   of the bottle. There are these responses.
7   But the notion that there has been
8   competition over the last five or ten
9   years is certainly belied by this kind of
10  activity of forming their own PBMs now or
11  deciding that they have to specifically
12  force the PBMs -- that they now understand
13  what it is they have to do with the PBMs
14  to get the transparency so they understand
15  the wedge between reimbursement rates and
16  what it is costing the PBMs or the
17  retailers to get the pharmaceuticals.
18  Q.  So a payer that has formed its own PBM
19      would not be injured by the AWP scheme, at
20      least once it formed its own PBM? Is that
21      what you are saying?
22          MR. SOBOL: Objection to form.

---

407

1   A.  I am saying that a set of payers that were
2       sufficiently capable of piercing the veil
3       of this lack of -- this nontransparency,
4       the spreads that were going on, can begin
5       to reduce and perhaps if, with enough
6       information, eliminate the overcharge once
7       they have gotten into that position, and I
8       -- however, that is something that I, as I
9       understand it, has started this year, and
10      the extent of the success of that
11      implementation is still unclear to me, and
12      I think it is an evolving part of this
13      industry.
14  Q.  You say it is your understanding that it
15      started this year. How do you know that
16      there are not payers out there who started
17      it earlier than this year?
18          MR. SOBOL: Objection.
19  A.  The literature searches that I have asked
20      my staff to do have found most of this
21      activity in the very recent, the last
22      couple of years.

---

408

1   Q.  So you are basing that opinion on
2       literature searches?
3   A.  I --
4           MR. SOBOL: Objection.
5   A.  I am basing that -- this opinion on the
6       identification -- the ability for me to
7       identify PBMs or purchasing groups, GPOs,
8       that were working for third-party payers
9       that performed a PBM's function, and the
10      finding, and my understanding is that to
11      the extent that it may have happened -- in,
12      you know, in small numbers of cases, the
13      real -- the real change, the real
14      watershed has been maybe since the Lupron
15      sentencing memorandum and since the
16      industry has become to understand -- has
17      come to understand how vastly different
18      acquisition costs are from what they are
19      reimbursing.
20  Q.  I take it you have not conducted any
21      independent inquiry to determine the
22      extent to which the phenomenon that you

---

409

1       just described occurred prior to the last
2       year or two?
3           MR. SOBOL: Objection. Asked
4       and answered.
5   A.  I have not done a formal inquiry
6       identifying the number of insured lives
7       that have or the percentage of the total
8       insured lives that have been subject to
9       that type of institutional change.
10  Q.  And is it your testimony that the impact
11      of the allegedly fraudulent scheme ended
12      once the Lupron sentencing memo came out?
13  A.  No.
14  Q.  What about after the Complaint in this
15      case was filed? Once the Complaint in
16      this case was filed, were the plaintiffs
17      who filed that Complaint still victims of
18      the allegedly fraudulent scheme?
19          MR. SOBOL: Objection to the
20      form.
21          You may answer.
22  A.  The fraudulent scheme is alleged -- the --

---

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                Boston, MA

24 (Pages 410 to 413)

---

**410**

1    my focus on the fraudulent scheme begins
2    with the alleged class period starting
3    January 1, 1991, and a measure of the
4    impact of and injury is going to be
5    looking at actual versus yardstick
6    spreads, nonfraudulent spreads.
7          The conclusion that injury no
8    longer is occurring will be -- will --
9    will result -- will be demonstrated to me
10   by an analysis of spreads and when they no
11   longer are at levels that are -- that
12   reach the threshold levels as developed in
13   my declaration.
14   Q.  Were spreads that were negotiated by the
15       plaintiffs in this case after the
16       Complaint was filed nonfraudulent spreads?
17             MR. SOBOL:  Objection.
18             Can you read that question back,
19       please?
20             (The pending question was then
21       read.)
22   A.  When was the Complaint filed?

---

**411**

1    Q.  The first Complaint was filed I think in
2        around October 2001.
3             (Pause.)
4             (The witness viewing Hartman
5        Exhibit No. 002.)
6    A.  Looking for data of one of the fast track
7        defendants' drugs in table 3A, Vepesid,
8        conditioned on the types of issues that we
9        talked about yesterday about identifying
10       the portion that was sold to hospitals,
11       et cetera, it is still the case that the
12       spreads were well above the yardstick
13       spreads through the end of 2002, and so I
14       would look to the spreads.  They're
15       relative to quarter 2 of 2000, quarter 1
16       -- quarter 3 of 2001, they have declined
17       some.  On average, they have declined some
18       from '98 and '99.  But they have by no
19       means achieved a level that would say that
20       the -- that these overcharges on this
21       inflation has been squeezed out of the
22       system.

---

**412**

1    Q.  Do you plan to use post Complaint spreads
2        as a benchmark in this case?
3    A.  I would not think so.
4    Q.  Why not?
5    A.  Because the filing of the Complaint -- I
6        have seen -- if I see evidence the filing
7        of the Complaint led to a dissipation or
8        elimination of the AWP inflation scheme
9        that may qualify my answer, but I have
10       seen no evidence to that to date nor have
11       I been directed by counsel to make any
12       such assumption.
13   Q.  Well, if the spreads during the class
14       period were the same as the spreads during
15       a nonfraudulent benchmark period, what
16       conclusion would you draw from that?
17   A.  If the spreads were the same during --
18       from 1991, say, through 2000, relative to
19       1984 through 1990, if they were the same,
20       I would draw a conclusion that the scheme,
21       while impacting the AWPs, had little or no
22       -- caused little or no economic injury.

---

**413**

1    Q.  Are you saying that you are only going to
2        use the period prior to the class period
3        for benchmarking purposes?
4             MR. SOBOL:  Objection.
5    Q.  You are not going to use the period after
6        the class period?
7             MR. SOBOL:  Objection.  Asked
8        and answered.
9    A.  I have been directed by counsel in
10       paragraph 6 to assume -- the three class
11       periods are so identified.
12             I am sorry.  Did I say three
13       class periods?
14             The three classes are so
15       identified.  And the class period is
16       identified as January 1991 to the present.
17       And that's what I'm -- that's what I'm
18       taking.
19   Q.  So it is your testimony as an economist
20       that the fraud continued even after the
21       Complaint was filed?
22             MR. SOBOL:  Objection.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                    Boston, MA

25 (Pages 414 to 417)

414

1   A.   I have not been asked to study the
2        liability issues of the fraud. I have
3        been told -- I have been asked to assume
4        that this fraud existed over this period
5        of time. That's what -- those are the --
6        that's my point of departure as given to
7        me by counsel.
8   Q.   You have been asked to --
9   A.   I have examined economic data to
10       corroborate, to assess the veracity of
11       those allegations, and I have looked at
12       data from 1991 through as recent as -- as
13       recent a period of time as defendants have
14       been willing to provide to me, and I have
15       seen nothing in the evidence to date that
16       suggests that the filing of this
17       Complaint, that the behavior screeched to
18       a stop, and that all of the alleged
19       activities terminated on that day, and
20       suddenly the AWP dropped to its but-for
21       level. And it -- given the institution,
22       given the fact that contracts have two- or

415

1        three-year lifetimes in this industry with
2        PBMs and manufacturers, whatever -- what
3        is going to happen here in response to
4        either the filing of this Complaint or
5        injunctive relief will happen with some
6        lag, and so there is nothing that I
7        have -- you know, I would be shocked to be
8        able to see in the data that the date this
9        Complaint was filed everything
10       suddenly sat up and flew straight.
11  Q.   Well, focusing for a moment on contracts
12       that were negotiated after the Complaint
13       was filed, is it your testimony that you
14       have been asked by counsel to assume that
15       the plaintiffs in this case continued to
16       be defrauded after they filed the
17       Complaint?
18            MR. SOBOL: Objection to form.
19            You may answer.
20  A.   Isn't that what my -- isn't that what
21       paragraph 6 says?
22  Q.   So just to make sure I understand your

416

1        testimony, it's your testimony that a
2        payer can be defrauded and can suffer
3        impact even though the payer knows the
4        true facts?
5            MR. SOBOL: Objection.
6   Q.   Is that your testimony?
7            MR. SOBOL: Objection.
8   A.   My testimony is that the true facts are
9        out there. They will be unearthed by
10       analysis. There will be -- additional
11       information will be provided for these
12       facts by the Medicare Modernization Act
13       and the moves towards transparency. This
14       will happen with some lag. And the
15       understanding of the class members and how
16       quickly they can respond and how they can
17       use -- and how well they can use this
18       information is only going to occur slowly
19       and over time, and this is still subject
20       to litigation. I doubt that defendants or
21       other people will necessarily start to
22       change their behavior until they find out

417

1        what some of the -- what the resolution to
2        this is, and that -- so there is -- this
3        is an ongoing process right now, and if --
4        if all of the information I am going to
5        see from you gentlemen's clients were
6        available to the public or to the
7        third-party payers, then -- then there
8        might be a screeching halt to the way that
9        negotiations go on.
10  Q.   Can you direct me to any authoritative
11       literature which supports the proposition
12       that someone can suffer injury from an
13       alleged fraud even though they know the
14       true facts?
15            MR. SOBOL: Objection to the
16       form.
17  A.   You don't think that is a legal question?
18       That is something left to my lawyers to
19       tell me what to assume or not.
20            MR. EDWARDS: I want to mark as
21       Exhibit 17 a copy of Volume 2 of the
22       deposition of Raeann Maxwell taken in this

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

26 (Pages 418 to 421)

418

1    case on September 10, 2004.
2         (Deposition of Raeann Maxwell
3         marked Exhibit Hartman 017
4         for identification.)
5         THE WITNESS:  Can I return 16 to
6    you?
7         MR. EDWARDS:  Sure.
8         (Handing Hartman Exhibit No. 016
9    to Mr. Edwards.)
10   BY MR. EDWARDS:
11   Q.  Do you have Exhibit 17?
12   A.  I do.
13   Q.  Have you read this deposition?
14   A.  I do not think so.
15   Q.  I want to direct your attention to the
16       testimony that begins on line 20 of
17       page 128.
18            "Question:  And from your
19       perspective" --
20   A.  I am sorry.  I am sorry.  I just wanted to
21       put this in context.  So Raeann is -- we
22       are starting in '94 I see for UPMC Health

420

1    have said line 20.  Yes, there it is.
2         (Pause.)
3         (The witness viewing Hartman
4    Exhibit No. 017.)
5    Q.  What would your expectation yardstick be
6        for Ms. Maxwell?
7             MR. SOBOL:  Objection to form.
8    A.  Well, my expectation for Mrs. --
9        Ms. Maxwell -- I mean I would need to put
10       this a little more in context.  But as I
11       read it, on page 128, what I understand
12       the line of questions to be is "Do you
13       have an understanding that Medicare on a
14       going forward basis will reimburse drugs
15       under Part B on an ASP basis -- ASP plus
16       basis rather than AWP minus basis?"  And
17       the ASP basis for Medicare Part B drugs is
18       precisely the yardstick that I have
19       included in my set of yardsticks.
20            Now I took it as the regulation
21       said ASP as the actual acquisition cost,
22       and the -- and what the regulations are

419

1    Plan.  Does she work for UPMC Health Plan?
2    I am asking you.  Do you know that?  Or
3    can you enlighten me as to her -- in
4    response to the question, I would like to
5    know who she is, if I -- if I could.
6    Q.  She works for UPMC Health Plan.
7    A.  Okay.  Thank you.
8    Q.  So the testimony beginning at line 20 on
9        page 128 is as follows:
10            "Question:  And from your
11       perspective, would it make any difference
12       as to the amount of reimbursement whether
13       or not UPMC calculated that reimbursement
14       on an ASP plus basis rather than an AWP
15       minus basis?
16            "Answer:  Not to my knowledge."
17   A.  I am sorry.  Could you say where that was
18       again?  I heard the page and the line, and
19       I think I -- I conflated the two.  What
20       page was it?
21   Q.  Pages 128 and 129.
22   A.  Oh, I was looking at page 120.  You must

421

1    now changing in the Medicare Modernization
2    Act and what they are talking about is
3    rather that they are taking as the
4    estimated acquisition cost, they are not
5    saying ASP, but ASP plus 6 percent or
6    something else.  But it is essentially
7    this is someone who is -- understands that
8    -- that there is an ASP basis, and the --
9    you know, I don't -- to -- as I read that,
10   she understands that there are two
11   formulas, and that it has been used in the
12   past, either the estimated acquisition
13   cost or AWP or 95 percent of AWP, and I'm
14   assuming that she understands that.  She
15   seems to understand something about
16   Medicare.  And so I'm assuming that not --
17   that the world hasn't changed in her view
18   except for this slight variation on ASP,
19   and she is assuming that she is getting
20   the correct price, but if -- that's --
21   unless I know more of the context of this,
22   I -- that's how I am interpreting what I

Raymond S. Hartman, Ph.D.    Confidential - Attorneys' Eyes Only                October 8, 2004
Volume II                                      Boston, MA

27 (Pages 422 to 425)

422

1    see.
2    Q.  So you agree with Ms. Maxwell's testimony?
3         MR. SOBOL:  Objection.
4    A.  I -- what I agree with is what I just
5        said.  I agree with the little bit I have
6        read here in the context I have read it.
7        In order for me to place within context
8        the "not to my knowledge" and everything
9        that has been said, I would need to read
10       the deposition -- the entire transcript or
11       more of the transcript than I have.  But
12       as I understand it here, she says that,
13       "Do you have an understanding that
14       Medicare on a going forward basis will
15       reimburse drugs on Part B on an ASP plus
16       basis rather than an AWP minus basis?"
17       And she knows the understandings of ASP.
18   Q.  And then read the question that begins at
19       line 14.  Go ahead.  Read it into the
20       record.
21   A.  "Has UPMC given any consideration of
22       whether to shift to an acquisition cost

423

1        plus methodology for reimbursing
2        prescription drugs dispensed by pharmacies
3        or administered by physicians?"
4    Q.  "Answer:  Not currently"?
5    A.  "Not currently.  We have not thought of
6        that."
7    Q.  Question?
8    A.  "Then from your perspective, would it make
9        any difference as to the amount of
10       reimbursement whether or not UPMC
11       calculated that reimbursement on an ASP
12       basis rather than an AWP minus basis?"
13       And it -- "Not to my knowledge"
14       is her answer.
15   Q.  So you agree with that testimony?
16        MR. SOBOL:  Objection to the
17       form.
18   A.  I -- I -- what I see here is what she has
19       testified to.  What I can either agree or
20       disagree to is what that tells me about
21       what she knows without reading all of the
22       testimony more fully.

424

1    Q.  Do you have any basis to disagree with
2        Ms. Maxwell's testimony?
3         MR. SOBOL:  Objection.
4    A.  At -- well, the -- you haven't given me
5        anything to agree or disagree to.  You
6        have asked me to read eight to ten
7        sentences out of a context of which I'm
8        not fully aware, and certain statements
9        are made.
10       Now I can interpret this as
11       saying there is a system that relies on
12       AWP or estimated acquisition cost, and --
13       and she is -- and there is reimbursement
14       patterns that are based on those two
15       numbers, and it doesn't matter to her,
16       because it is being enforced correctly,
17       and they are -- they are charging it --
18       and the reimbursement is set according to
19       regulation.
20       Now that is one thing, that she
21       knows what is going on.
22       Or, alternatively, she has no

425

1        idea that AWP minus is -- diverges
2        considerably, substantially, from ASP.
3        I can't tell from those eight
4        sentences the level of how much the
5        inflation scheme has -- has affected her
6        reimbursement practices.
7    Q.  Let me show you a copy of the deposition
8        of David Joyner taken in this case on
9        September 23.
10        MR. EDWARDS:  We will mark this
11       as Exhibit 18.
12        (Deposition of David Joyner
13         marked Exhibit Hartman 018
14         for identification.)
15        (The witness handing Hartman
16       Exhibit No. 017 to Mr. Edwards.)
17       BY MR. EDWARDS:
18   Q.  Have you read this deposition?
19        (Handing Hartman Exhibit No. 018
20       to the witness.)
21        (Pause.)
22        (The witness viewing Hartman

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

28 (Pages 426 to 429)

426

1       Exhibit No. 018.)
2   A.  I think this deposition was sent to me,
3       but I don't think I had a chance to do
4       anything more but skim it very quickly.
5   Q.  All right. I will represent to you that
6       Mr. Joyner is the head of sales for
7       Caremark, and I want you to take a look at
8       the testimony that begins on page 154 at
9       line 14:
10          "Question: Well, does it follow
11      from that that if" --
12  A.  I am sorry. If you just let me get there.
13      154?
14  Q.  Line 14.
15          (Witness complying.)
16  A.  Okay.
17  Q.  "Question: Well, does it follow from that
18      that if the manufacturers do not change
19      their prices at the top of the chain it is
20      not going to make any difference in the
21      price your client pays if a benchmark
22      other than AWP is used for pricing?"

427

1       "Answer: That's correct. The
2   marketplace needs a benchmark to set its
3   pricing off of.
4       "Question: In other words, if
5   you use some other benchmark like WAC plus
6   or ASP plus, the ultimate price would end
7   up to be the same?
8       "Answer: It's exactly right.
9   But I know of no other pricing source that
10  is as comprehensive and as accepted across
11  the country as AWP."
12      Do you agree with that
13  testimony?
14      MR. SOBOL: Objection. You said
15  "country." I think you meant "industry."
16  But even with that qualification.
17      MR. EDWARDS: Sorry.
18  A.  Is it the case -- if I might before
19  responding to that understand a little bit
20  more -- is it not a fact that Caremark was
21  acquired by AdvancePCS sometime in this
22  year?

428

1   Q.  I think it was the other way around, but
2       yes.
3   A.  And is it not a fact that they are a
4       defendant in this matter?
5   Q.  They are not defendants in this matter.
6   A.  Or associations in fact in this matter?
7   Q.  They are not.
8       MR. SOBOL: They are not what?
9       MR. EDWARDS: They are not
10  associations in fact.
11  A.  As alleged in the Complaint, PBMs?
12  Q.  Well, as alleged in the Complaint. Well,
13      you have read the Complaint. You can
14      figure that out for yourself.
15  A.  I can't recall, but it is my recollection
16      that they were.
17  Q.  So what you are going to tell me then is
18      you see what Mr. Joyner says but you are
19      not going to accept that because you think
20      the testimony is tainted in some way?
21  A.  I haven't said that yet. I just was
22      trying to --

429

1   Q.  Okay.
2   A.  -- ascertain the facts and put this in a
3       context.
4       MR. SOBOL: Steve, since the
5   question from the testimony that you began
6   starts with, "Well, does it follow from
7   that," would it be all right to put into
8   the record whatever it is that the "that"
9   is that the question was relating to?
10      MR. EDWARDS: Well, the witness
11  can certainly read it.
12      MR. SOBOL: If you don't want it
13  in the record, then fine. I object to the
14  form.
15  A.  Well, I am sorry. Now -- yes. So let's
16  -- as we started talking about the --
17  Q.  My question --
18  A.  -- Caremark -- you have read a section to
19  me here. Now what? So and the question
20  was?
21  Q.  Do you agree with that testimony?
22  A.  Okay. And that testimony again started --

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 8, 2004
Volume II                                    Boston, MA

29 (Pages 430 to 433)

430

1        where am I here?  It was on page?
2   Q.  Page 154 line 14 through page 155 line 4.
3   A.  I see.  We're on this side.  No wonder I
4        was getting lost.
5            (Pause.)
6            (The witness viewing Hartman
7        Exhibit No. 018.)
8   A.  The -- what the deponent here is
9        expressing is that there is a benchmark
10       that is the AWP, and that the marketplace
11       needs a benchmark to set its pricing off
12       of, and then he says, if you use some
13       other benchmark, such as WAC plus, would
14       the results be the same.
15           Now obviously your interest is
16       in or average sale price plus, would the
17       results be the same, and it -- he says,
18       "It's exactly right.  But I know of no
19       other pricing source that is as
20       comprehensive and as accepted across the
21       country as the AWP."
22           Now I certainly agree that the

431

1        AWP is a benchmark from whence all
2        information and notions of pricings flow
3        -- pricing flows, specifically WAC, and if
4        the relationship between AWP, WAC, and the
5        average sale price conforms with the
6        information as the market understood it to
7        be, that relationship to be, then there
8        would be -- then AWP would be a signal for
9        WAC and for ASP.  The entire allegations
10       in this matter are that the scheme
11       interrupted that relationship, and the --
12       one could talk about a relationship of
13       ASP, but it is much different than it
14       would have been in the but-for world.
15   Q.  So you can't determine from the size of
16       the spread between ASP and AWP alone
17       whether there has been any impact?
18           MR. SOBOL: Objection.
19   Q.  In order to determine impact, you also
20       have to establish your expectation
21       yardstick and do a comparison?  Is that
22       correct?

432

1            MR. SOBOL: Objection.
2   A.  It seems -- what I have done in my
3        declaration, and it seems very explicit,
4        is that there is a -- there are spreads,
5        and there are spreads that were expected
6        as a matter of business practices in this
7        market, and that there is sufficiently
8        nontransparent contract transactions among
9        all the middlepersons that that spread
10       changed, which I observe, and which has
11       been alleged, and I have been asked to
12       assume.  And so I am always going to look
13       at a spread versus what a spread would be
14       absent the AWP inflation scheme that I
15       have been directed to assume as alleged.
16   Q.  The mere fact that a spread between AWP
17       and ASP may be 25 percent or 50 percent or
18       75 percent or 100 percent doesn't really
19       tell you anything?  It is not until you
20       have developed your expectation yardstick
21       that you can draw any conclusions with
22       respect to impact?  Correct?

433

1            MR. SOBOL: Objection.
2   A.  As I have stated very explicitly, there
3        needs to be yardstick spreads developed to
4        determine the size of the injury and the
5        damages.
6   Q.  And if your theory with respect to
7        expectation yardsticks is faulty, then
8        your entire opinion with respect to impact
9        collapses?  Is that correct?
10           MR. SOBOL: Objection.
11   A.  No.
12   Q.  What is the basis for that answer?
13   A.  Impact flows -- if the allegations are
14       true and AWP has indeed been subject to
15       the manipulations and the
16       misrepresentations as alleged, that has
17       affected the AWP of every NDC of every
18       drug sold, and that is impact on every
19       unit sold to whoever -- whoever ultimately
20       reimburses for that.  I can't see any more
21       clear implications for impact, common
22       impact, when reimbursements are related to