Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

30 (Pages 434 to 437)

**434**

1   an AWP that is subject to what I have been
2   asked to assume that it has been
3   fraudulently inflated.
4           Now what you are asking me is
5   what is the extent of -- won't -- isn't
6   there some importance to the yardsticks,
7   and there are, and that is going to be --
8   that is going to be a measurer to the
9   extent that this impact has revealed
10  itself in monetary damages, injury to the
11  class members.
12          So impact is there, and the
13  spread will -- the but-for spread, I will
14  come to a conclusion based on a set of
15  standard scientific procedures to
16  ascertain that yardstick. Your expert
17  will perhaps do something similar and come
18  to a different conclusion. Impact will be
19  there. We may diverge on the extent to
20  which the injury occurred, and that will
21  then be determined by the work done in
22  supporting those yardsticks by your expert

**435**

1   and the work done by me.
2   Q.  So you are saying now that your opinion
3       with respect to impact does not depend on
4       your expectation yardsticks?
5           (Pause.)
6           (The witness viewing Hartman
7       Exhibit No. 002.)
8           MR. SOBOL:  May the record
9       reflect I didn't give him his report this
10      time.
11  A.  As I state in paragraph 10A of my report,
12      pages 6 and 7, that "As a matter of basic
13      economics and business practices in these
14      markets, in pharmaceutical markets, if the
15      allegations are true, the following
16      consequences occur," and A, 10A, says, "A
17      course of conduct designed to artificially
18      inflate the AWP of a given drug will
19      artificially inflate the AWP of all units
20      of that drug sold."
21          Then the last sentence of that
22      paragraph says, "The reimbursement rates

**436**

1   paid by all or substantially all members
2   of the proposed class consequently will be
3   artificially inflated, since their
4   reimbursement rates are formulaically
5   driven by the AWP."
6           That is impact, and that has no
7   reference yet to the but for. The but for
8   is merely going to allow me to go from
9   impact to measuring aggregate damage --
10  the size of injury of that impact on the
11  AWP of all NDCs sold as alleged, as I have
12  been asked to assume.
13          So I have -- that has been my
14  position from the beginning.
15  Q.  So you are assuming impact based on your
16      assumption that the allegations in the
17      Complaint are correct?
18  A.  No, I am not assuming impact. It follows
19      as an implication of the allegations I
20      have been asked to assume. If the
21      allegations are true and they are proven
22      so at trial that the AWP was inflated,

**437**

1   then I don't assume impact. As a matter
2   of the business practices in this
3   industry, if AWP is inflated, it affects
4   all units of that drug and all contracts
5   written subject to that AWP. Impact
6   couldn't be clearer.
7   Q.  But you have also conceded, have you not,
8       that it is possible that some class
9       members did not suffer any impact?
10          MR. SOBOL:  Objection.
11  A.  No. What I have conceded is that impact
12      -- all class -- all class members were
13      subject to impact. The size of the injury
14      flowing from that impact may vary. It may
15      not. That is going to be something
16      subject to -- that will be addressed in
17      the damage analysis and more importantly
18      at a claims administration phase. But the
19      -- they are all impacted. It is whether
20      the size -- what the size of the injury
21      flowing from that impact is.
22  Q.  And what econometric analysis can you

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                          Boston, MA

31 (Pages 438 to 441)

---

438

1    point me to in your declaration that
2    demonstrates that proposition?
3  A.  Which proposition now?
4  Q.  That everybody is impacted, no matter
5    what, no matter what they think, no matter
6    what they know, no matter what.  That's
7    what you are telling me; right?
8         MR. SOBOL:  Objection to the
9    form.
10 A.  The -- let's put it -- let's put it this
11   way.  If I walk over to the thermostat for
12   this room and turn it up 20 degrees, we
13   will all be impacted.  Now each of us may
14   mitigate that.  Some of us may be
15   delighted by that.  Some of us may go
16   topless and shirtless, and it will
17   mitigate the impact.  There can be
18   different measures of injury, but we will
19   all be impacted.
20        Now I have been asked to assume
21   that the manufacturers went to the AWP
22   thermostat and raised it, and that AWP is

---

439

1    the basis.  That's the definition of the
2    class.  The reimbursement rates or
3    reimbursement regime is driven by AWP.
4    And I don't need econometrics to tell me
5    that if the allegation is that the AWPs of
6    these drugs have been inflated, English --
7    it is a matter of English.
8  Q.  So you are assuming then that the AWPs
9    have been inflated?
10 A.  I have been asked to assume that the --
11   that the defendants entered into schemes,
12   implemented schemes, to inflate the AWP,
13   as described in the declaration.
14 Q.  You are not going to perform any economic
15   analysis to establish that the AWPs are
16   inflated?
17        MR. SOBOL:  Objection to the
18   form.
19 A.  The --
20 Q.  In other words, your sole basis for saying
21   that the AWPs have been inflated is your
22   assumption --

---

440

1         MR. SOBOL:  Objection.
2  Q.  -- based on what is stated in the
3    Complaint?
4         MR. SOBOL:  Objection.  I also
5    instruct the witness not to testify
6    regarding confidential settlement
7    discussions or materials learned in the
8    context of that.
9         MR. EDWARDS:  I object to that
10   objection.
11        THE WITNESS:  Guys --
12        MR. EDWARDS:  If you got the
13   hint.
14        THE WITNESS:  It just didn't
15   matter.  I wasn't planning to.
16 A.  I have been given, as is standard in any
17   situation like this, in any situation of
18   class that I have been -- in which I have
19   been involved, there are a set of
20   allegations, which you take as if proven
21   at trial, what are the consequences
22   thereof.

---

441

1         The consequences thereof are as
2    I said:  the AWP was inflated, and if the
3    AWP is inflated, that affects everyone who
4    is looking at that AWP or using it.  So I
5    am not going to try to prove that.
6         I have, however, corroborated
7    the extent to which that inflation did
8    indeed occur by looking at spreads and
9    looking at yardsticks, and if I had gone
10   to the data that is presented in the
11   tables and found that they were all within
12   the ranges of the yardsticks, I would have
13   had to say to counsel, "These allegations,
14   you know, the data is not going to support
15   your allegations."  But one has to go to
16   the data.  One has to go to the facts and
17   see whether -- what one finds.
18 Q.  So you have to use the yardsticks then to
19   establish from an economic perspective
20   that the AWPs have been inflated?
21 A.  No.
22 Q.  How do you establish that AWPs are

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                          Boston, MA

32 (Pages 442 to 445)

442

1  inflated without reference to the
2  expectation yardsticks other than to make
3  the assumption that counsel has asked you
4  to make?
5  A.  The assumption -- counsel has alleged a
6  conspiracy, and by logic and economic
7  principles, it leads to the conclusion of
8  impact.
9        What I will have to look at is
10  whether defendants were sufficiently
11  attuned to imposing this scheme on all
12  NDCs of all drugs.  I will be looking at
13  spreads by NDCs or by J codes to see the
14  extent to which this scheme led to real
15  injury and damages.  And so I will be
16  looking at economic data.  But it will
17  measure the quantum of damages and injury
18  by NDC or by J code, and it may turn out
19  that there are some manufacturers for some
20  NDCs they felt were unimportant, and they
21  -- they -- they didn't subject those drugs
22  -- they were untainted by -- by the

443

1  scheme, and the data will demonstrate to
2  me the extent that that -- that the scheme
3  did not lead to injury on purchases of
4  those NDCs.
5  Q.  In other words, if the but-for spreads are
6  equal to or less than the actual spreads,
7  you would not have real injury or damages
8  as you just used those terms?
9  A.  I have said as much in my declaration in
10  discussing the illustrative examples of
11  using the spreads and using the
12  yardsticks.
13  Q.  And you have to determine that on a
14  case-by-case basis?  Right?
15        MR. SOBOL:  Objection to the
16  form.
17  A.  I don't know what you mean by case-by-case
18  basis.
19  Q.  Let's look at page 15 of attachment C to
20  your declaration.
21        (Witness complying.)
22  Q.  I want to direct your attention to

444

1  paragraph 35, the second paragraph within
2  that section, third sentence, which
3  states, quote, The spread must be
4  increased secretly, because if such
5  spreads were understood to exist,
6  competitors would behave to eliminate
7  them, close quote.
8        What did you mean by that?
9  A.  Well, what I meant by that is let's take a
10  particular example.  Let's take Lupron.
11  The spreads that flowed from that -- from
12  that fraudulent behavior as admitted to by
13  TAP were well in excess of what Medicare
14  believed the relationship was and what
15  third-party payers believed the
16  relationship was.
17        Now the spreads -- the extent to
18  which that conspiracy to move market
19  share, as discussed in the sentencing
20  memorandum, it made very clear some NDCs
21  were affected more aggressively by that,
22  and the quantum of damages by the NDCs

445

1  sold to urologists were different than
2  those say for pediatric uses and for
3  gynecological uses, but one could measure
4  that injury by NDC, and when one -- if one
5  knew what those spreads really were,
6  Medicare finally got wise and started
7  toward the Medicare Modernization Act, but
8  throughout that sentencing memorandum, it
9  is clear that TAP kept telling its
10  providers, "Jesus, don't tell anybody
11  this, or we won't be able to keep offering
12  this to you."  That's what the secrecy.
13        And so, yes, that's the same.
14  That in a nutshell is what was occurring
15  if there were discounts being offered to
16  retail pharmacies on generic drugs.  If a
17  third-party payer knew that the AWP for
18  the generic drug was 90 cents and the
19  manufacturer was selling it to him for
20  10 cents and yet they were reimbursing at
21  an AWP less 25 cents because the PBM said,
22  "It's a generic.  We are really going to

Case 1:01-cv-12257-PBS   Document 2715-2   Filed 06/16/06   Page 4 of 21
Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

33 (Pages 446 to 449)

446

1   give you a deal. We are going to move you
2   from AWP less 15 to AWP less 25." If they
3   knew that even at that reimbursement rate
4   ASP was 10 cents, they would have been,
5   "Hey, you're not giving me the -- I'm not
6   seeing the real price of this."
7        And the -- that's the secrecy
8   that existed in -- that was attempted to
9   be maintained. It is certainly in the
10  physician-administered drugs. And that is
11  essentially what is going on in this
12  litigation against PBMs now for sharing
13  the discounts, because they are hidden in
14  certain ways, or rebates, because they are
15  hidden as administrative fees rather than
16  rebates.
17       The allegations are all -- that
18  there are -- there is a veil of what is
19  understood, and there is a nontransparency
20  that is finally -- that people are finally
21  becoming aware of, so that what has been
22  secret will be -- will not be secret or

447

1   will be less secret such that the
2   discounts, as in a competitive market,
3   will end up being passed on to the
4   third-party payers in ways that they have
5   not as a result of this AWP scheme.
6   Q.  It is interesting that you used a Medicare
7       Part B example to explain this sentence.
8       Is this sentence related only to Medicare
9       Part B?
10          MR. SOBOL: Objection to the
11      form.
12  A.  I think I mentioned both rebates on the
13      part of PBMs, which are branded single-
14      source drugs for which rebates are paid in
15      that answer, and I also talked about
16      generics through retail pharmacies. So I
17      didn't -- I -- the evidence that has been
18      put -- that is publicly available is -- to
19      date focuses and reveals the incentives
20      and the incentives for the veil in order
21      to keep the incentives to move market
22      share because that's where the litigation

448

1   and the injunctive relief and the plea
2   agreements have been entered.
3   Q.  Well, you say --
4   A.  The -- we are now getting in as part of
5       this litigation, we will be dealing with
6       the -- with the branded drugs that are
7       through which there are price offsets to
8       the PBMs, and it is not clear how they are
9       shared with their -- with their insured
10      life members, and with the discounts
11      offered to retail chains or retailers for
12      generic drugs.
13  Q.  You said, "The spread must be increased
14      secretly, because if such spreads were
15      understood to exist, competitors would
16      behave to eliminate them."
17           What do you mean by "such
18      spreads" in the non-Medicare Part B
19      context? Are you talking about spreads in
20      excess of the expectation yardstick?
21  A.  If we go to table 3B, where I had not been
22      able at the time of putting this

449

1   declaration together, had received data
2   from Schering-Plough in order to calculate
3   ASP; however, I did have data on the AMP
4   that they report to CMS for their
5   reporting practices --
6   Q.  Can't you just answer my question?
7   A.  I am, in the fullness of the factual
8       setting.
9           There are spreads here on the --
10      if -- if a third-party payer knew that the
11      spreads --
12  Q.  All I am asking you -- I am sorry to
13      interrupt, Dr. Hartman.
14  A.  No. You are asking me where is the
15      pressure going to come from.
16  Q.  No, no, no. I am asking you to define the
17      term "such spreads."
18  A.  Okay. Thank you. Such --
19  Q.  Are --
20  A.  Let me.
21  Q.  In the non-Part B context, am I correct in
22      understanding that the phrase, quote, such

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

34 (Pages 450 to 453)

450

1      spreads, close quote, refers to spreads in
2      excess of your expectation benchmark?
3               MR. SOBOL: Objection to the
4      form.
5   A.  As in table B, it refers to spreads such
6      as we see on a generic drug sold at retail
7      that is a non-Medicare Part B drug that is
8      well in excess of what the third-party
9      payers understood or expected those
10     spreads to be. That if third-party payers
11     knew that the spreads were that much, that
12     ASP was that much below AWP, they would
13     say, "Listen, I'm moving elsewhere with my
14     purchases unless there is some sharing of
15     this."
16  Q.  Well, you say competitors would behave to
17     eliminate them. How would competitors
18     behave to eliminate them?
19  A.  We're seeing it right now with Fortune 500
20     companies that are attempting at a larger
21     scale than I understand has occurred in
22     the past to develop PBMs for their most --

451

1      their 50 most reimbursed drugs. We're
2      seeing it in litigation on the part of
3      states saying we're not getting all of the
4      spread that is out there. And in that
5      article that -- from Forbes Magazine about
6      Drug Barron, and I guess that was also the
7      article that reported on the litigation of
8      ESI, there is an understanding of these
9      large spreads on the generic drugs, and
10     the -- the moves toward competitive
11     changes are going to occur slowly. These
12     things are not like a Chicago school,
13     perfect competition, everything readjusts.
14     (The witness snapping his fingers.) There
15     is going to have to be pressures to move
16     to other institutional entities. They're
17     talking about new PBMs or new PBM programs
18     that are purely price transparent. Those
19     are the kinds of competitive pressures
20     that are occurring outside of the Medicare
21     Part B world.
22               MR. EDWARDS: Can we take a

452

1      couple of minutes for a comfort break and
2      then come back and do a segment before
3      lunch?
4               (Recess taken at 12:21 p.m.)
5               (Recess ended at 12:32 p.m.)
6   BY MR. EDWARDS:
7   Q.  Dr. Hartman, I want to talk to you a
8      little bit about PBM rebates and direct
9      your attention to paragraph 30D of your
10     declaration at page 22.
11              (Witness complying.)
12  A.  To 30D, you said? Okay. In the report,
13     page 22.
14  Q.  Paragraph 30D?
15  A.  Yes.
16  Q.  You say in the last sentence, "Review of
17     PBM contracts in discovery materials
18     produced to date suggest that such rebates
19     may not be shared with TPPs."
20              TPP is third-party payer?
21  A.  That's correct.
22  Q.  What is the basis for that statement?

453

1   A.  The basis for that statement -- and you
2      will notice that I say "suggests" -- I
3      haven't come to my final conclusion in
4      this illustrative discussion of yardsticks
5      -- but I think the basis is what you have
6      already very conveniently put out for
7      me -- let me just check -- as the ESI
8      contracts, Bates numbers 2066 to 2077,
9      Exhibit 11.
10              And on page 2070 thereof, there
11     is language in the contract after having
12     introduced the pricing formulations under
13     different benefit plans and the
14     percentages off of AWP to be negotiated
15     and MRA, usual and customary, they talk
16     about some formulary management, and then
17     they get down to miscellaneous pricing,
18     and then they say, "Notwithstanding the
19     preceding pricing, certain injectable,
20     biotech and compounded drugs," and then it
21     lists two, "are priced separately as
22     detailed on pages X and X of this proposal

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

35 (Pages 454 to 457)

454

1    due to the specialized manufacturer
2    processes, limited or extraordinarily
3    dispensing and/or shipping requirements.
4    Rebates, if applicable, are retained by
5    Express Scripts."
6  Q.  To what extent does your opinion in this
7    case depend on the sentence that appears
8    in your report that such rebates may not
9    be shared with TPPs?
10       MR. SOBOL:  Objection to form.
11 A.  The -- my -- the -- the formulaic
12   methodologies put forward in my
13   declaration takes the ASPs as they were
14   during the period of time and takes the --
15   takes a contract that would be of this
16   nature, where the rebates are not being --
17   are not being shared, and would
18   essentially calculate whatever the AWP is,
19   and then focus on the overcharges related
20   to the AWP inflation, and, whether the
21   rebates were retained or not, the -- the
22   issue is calculating the, what the but-for

455

1    AWP would be relative to a -- the ASP.
2        MR. SOBOL:  Excuse me.  I am
3    sorry.  I have to take a break.  Hopefully
4    it will be a couple of minutes.
5        MR. EDWARDS:  Any time, Tom.
6        MR. SOBOL:  Or we can take 45
7    minutes for lunch.
8        (Discussion off the record,
9    followed by luncheon recess taken at
10   12:37 p.m.)
11
12
13
14
15
16
17
18
19       AFTERNOON SESSION
20         1:24 P.M.
21   CONTINUED DIRECT EXAMINATION OF
22        DR. HARTMAN

456

1        BY MR. EDWARDS:
2  Q.  Dr. Hartman, before the break, we were
3    talking about the sentence that appears in
4    paragraph 30D of your report that states,
5    quote, "Review of PBM contracts in
6    discovery materials produced to date
7    suggest that such rebates may not be
8    shared with TPPs," and I take it from your
9    answer to the last question your report
10   does not depend on the accuracy of that
11   sentence?
12       MR. SOBOL:  Objection.
13 A.  Does not depend on the accuracy of that
14   sentence?
15 Q.  For your opinion?
16 A.  What I have said here, this -- this
17   sentence appears in my opinion.  I stand
18   by it.  And it is part of my -- my report,
19   my declaration.
20 Q.  And if that sentence is incorrect, what
21   impact does that have on your conclusions?
22 A.  If this -- if this impact -- if this -- I

457

1    am sorry -- if this sentence is incorrect,
2    the relationship -- what I am going to
3    understand about the relationship of ASP
4    and AWP is untouched by whether this turns
5    out to be true or not.  I will ascertain
6    whether this is the case by looking at
7    these contracts and being able to depose
8    people to see what precisely this sentence
9    means.  The -- you know, as I say, it is
10   talking about what it defines to be
11   rebates.  It is defining them in terms of
12   extraordinary dispensing or shipping
13   requirements almost as if they are costs.
14       I need to understand a little
15   bit more about what this is saying, but
16   what I am saying is that for some drugs, I
17   have used a percentage that -- of rebates
18   that have come from oral drugs, and to the
19   extent that that is useful in and relevant
20   in for physician-administered drugs, I
21   need more discovery information to clarify
22   that.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                    Boston, MA

36 (Pages 458 to 461)

458

1   Q.  In other words, rebates count against the
2       defendants irrespective of whether they
3       are shared by the PBMs with class members?
4   A.  Well, whether they are shared by PBMs with
5       class members is a contractual matter
6       between the PBMs and the class members and
7       what they had agreed on and whether that
8       had been violated or not.
9           What is important -- the focus
10      of what I have been asked to do is to look
11      at reimbursement in a reimbursement regime
12      related to AWP and relate that to ASP
13      whereas ASP has been influenced by a whole
14      variety of rebates and discounts and price
15      offsets, all of which are netted off of
16      the gross invoice amount, to get ASP.  And
17      so my whole approach here given the
18      allegations have been to focus on
19      reimbursements and what AWP would have
20      been in the but-for world given what ASP
21      was, that is, what manufacturers were
22      willing to be paid to sell their product.

459

1   Q.  In other words, for every dollar of
2       rebates that the manufacturers pay to
3       PBMs, there will be an additional dollar
4       in damages even if the PBM passes that
5       rebate on to the class member?
6           MR. SOBOL:  Objection.
7   A.  No.
8   Q.  What is wrong with my statement?
9           MR. SOBOL:  Objection.
10  A.  The -- my -- the damage methodology here
11      is not determined -- the overcharge is not
12      determined by the dollars of rebates paid
13      or the dollars less that ASP is.  It is
14      determined by what the AWP would have been
15      given what manufacturers were willing to
16      sell their product for, and that's all the
17      dollars they received minus all the other
18      stuff that they use to incentivize the
19      people to move their product.
20  Q.  What you are saying is that rebates go
21      into the calculation of the ASP, and to
22      the extent that a manufacturer offers or

460

1       pays a rebate, then the ASP will go
2       down?
3   A.  When a manufacturer offers any type of
4       price offset, it lowers the average ASP
5       for that manufacturer.
6           MR. EDWARDS:  We have to dial
7       these people in.  I am sorry.
8           (Pause.)
9       BY MR. EDWARDS:
10  Q.  What other price offsets in addition to
11      rebates go into the calculation of ASP in
12      your methodology?
13  A.  Whatever the manufacturers report as
14      debits against gross revenues, selling
15      expenses, whatever they have to do to sell
16      the product, to market the product, to
17      move market share, those are selling
18      expenses that as a matter of economics net
19      out to a measure of what the net unit
20      revenue is on a unit on the product sold.
21  Q.  So you would include the salaries of
22      salespeople in your calculation of ASP?

461

1   A.  It would depend.  I would want to see how
2       it was treated by the manufacturers, but
3       in general, I would think not.
4   Q.  What specific items would you include in
5       your calculation of ASP?
6           MR. EDWARDS:  Or strike that.
7   Q.  Why don't you explain to me your
8       methodology for calculating ASP in this
9       case.
10  A.  Well, the --
11          MR. SOBOL:  Well, objection to
12      form.
13          Go ahead.
14  A.  The method will differ by the drug and by
15      the manufacturer.  For example, let's take
16      TAP Pharmaceutical.  TAP was, in terms of
17      coming up with the average sales price,
18      one could look at their invoice data and
19      see what the gross invoice amount was.
20      There were line items in their invoice
21      database that listed all types of
22      discounts, early pay discounts, just

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

37 (Pages 462 to 465)

462

1     general discounts, a variety of credits.
2     I don't know if there were chargebacks in
3     that matter, but you will usually find
4     that, in an invoice database, you will
5     find all the debits that they treat as
6     debits off of the revenue that they earn
7     on the gross invoice amount.
8            Now separately there is --
9     companies normally keep a rebate database
10    that relates to amount of rebates paid
11    relating to amounts of product sold, and I
12    have found can be allocable -- allocable,
13    that's the right word -- to the products
14    sold and are based on the volume of those
15    products sold as kept track of by the
16    manufacturer.
17           In a matter such as Lupron,
18    there were additional payments where you,
19    when we were talking about could we take
20    into account sales, sales force payments,
21    there were line item accounting
22    expenditures there related to certain

463

1     kinds of consulting expenses, and there
2     were irregular accounting amounts that
3     appeared in their accounting data which
4     seemed to mirror the kinds of payments to
5     which could have been sales payments of
6     some sort to oncologists and oncology
7     groups and the kinds of junkets and off
8     invoice and nonrebate payments that are
9     described in detail in the sentencing
10    memorandum.
11           Now all of those are types of
12    payments that as a matter of economics
13    would be taken as some kind of incentive
14    off of the gross price to incentivize the
15    market to purchase that product. So one
16    would include those and allocate those to
17    the units sold.
18           In some -- looking at in Hatch-
19    Waxman matters where it is a branded drug
20    or a generic drug, it is usually simpler,
21    in that the invoice database has -- keeps
22    track of all of the price offsets, and

464

1     then there is a rebate database that in
2     many cases allocates the total rebates --
3     rebate payments paid to different entities
4     by the -- by product, and so that would be
5     the data that I would look at to use.
6            So I would -- each company may
7     report that differently. They may call
8     one thing a discount that somebody else
9     might have a different name for. It will
10    be driven by what data, how they keep
11    their data, and what I learn in the
12    30(b)(6) depositions about how they keep
13    their data.
14  Q.  Is there any authority you can cite that
15       would support your methodology for
16       calculating ASPs?
17  A.  I would say that the way I have calculated
18       ASPs is as I have, in the work that I have
19       done in the pharmaceutical industry,
20       mirrors identically the way that the
21       company thinks of ASP.
22  Q.  Which company?

465

1     A.  Oh, I don't know which. You can look at
2         the drugs I have worked on in my -- in my
3         CV and begin to guess.
4     Q.  How many ASPs are you going to have to
5         calculate here?
6     A.  I would calculate ASPs for all NDCs of all
7         drugs subject to the Complaint.
8     Q.  Do you know how many that is?
9     A.  It is, given the -- given the fact that we
10        live in an age of computers, it is
11        irrelevant. It could be a thousand. It
12        is something that you turn the machine on.
13        At the end of the day, you have got them
14        all by NDC by quarter, by month, depending
15        on the data that we get.
16    Q.  Going back to the sentence in
17        paragraph 30D of your declaration that
18        "review of PBM contracts in discovery
19        materials produced to date suggests that
20        such rebates may not be shared with TPPs,"
21        your support for that is what we have
22        marked as Exhibit 11? Is that correct?

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                     October 8, 2004
Volume II                                         Boston, MA

38 (Pages 466 to 469)

466

1    A.   That is correct.
2    Q.   And Exhibit 11, for the record, is a
3         pharmacy benefit proposal -- I am sorry --
4         Pharmacy Benefit Program Pricing Proposal
5         from Express Scripts, Bates numbered
6         ESI 277 2066 through 2077, and the
7         particular page that you have reference to
8         in footnote 47 of your declaration as
9         supporting the statement made in paragraph
10        30D is page 2070. Is that correct?
11   A.   That is correct, as it states in my
12        footnote 47.
13   Q.   And that page talks about certain
14        injectable, biotech, and compounded drugs.
15        Correct?
16   A.   That's correct.
17   Q.   And if you turn to the very next page, it
18        describes two options under which rebates
19        would be shared with the customer. Isn't
20        that true?
21        (Pause.)
22        (The witness viewing Hartman

467

1         Exhibit No. 011.)
2    A.   That is true.
3    Q.   Take a look at --
4         MR. SOBOL: Could we go off?
5    Q.   -- the document we marked as --
6         MR. SOBOL: Before you -- off
7    the record.
8         (Discussion off the record.)
9         MR. EDWARDS: Back on the
10   record.
11   BY MR. EDWARDS:
12   Q.   Take a look at what we have marked as
13        Exhibit 12, which is a Caremark
14        Prescription Benefit Management Agreement,
15        Bates stamped CMK-AWP 002818 through 844.
16        (Witness complying.)
17   Q.   Have you ever seen this document before?
18        (Pause.)
19        (The witness viewing Hartman
20   Exhibit No. 012.)
21   A.   I'm not sure that I have. I have taken a
22        little time to, just in case I hadn't, to

468

1         see whether it was similar to ones that I
2         have seen.
3    Q.   Take a look at page 2838 of this document.
4         (Witness complying.)
5    Q.   That page sets forth a provision whereby
6         the rebate would be shared with the
7         customer? Is that correct?
8         MR. SOBOL: Which subparagraph
9    would that be, Steve?
10        MR. EDWARDS: The entire page.
11   Page 2838 of Exhibit 12.
12        (Pause.)
13        (The witness viewing Hartman
14   Exhibit No. 012.)
15   Q.   Do you have this in front of you?
16   A.   Yes, I do. I am reading the various
17        paragraphs and what they're saying about
18        the issue at large.
19        (Further pause.)
20        (The witness continues to view
21   Hartman Exhibit No. 012.)
22   A.   Okay.

469

1    Q.   Can you answer my question?
2    A.   I don't remember the question now besides
3         would you take a look at it, that page.
4    Q.   Is it correct that the provisions set
5         forth on that page relates to sharing the
6         debate between the PBM and the customer?
7    A.   It does.
8    Q.   Okay. Take a look at Exhibit 13.
9         (Witness complying.)
10   Q.   For the record, this is a document
11        entitled AdvancePCS Health L.P., Managed
12        Pharmacy Benefit Services Agreement. The
13        stamp is CMK-AWP 003724 through 3749.
14        Have you reviewed this document
15        in connection with your work on this case?
16        (Pause.)
17        (The witness viewing Hartman
18   Exhibit No. 013.)
19   A.   I have now reviewed it, and I think this
20        may have been sent to me, but I don't
21        recall reviewing it in any detail.
22   Q.   Take a look at the page with the Bates

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                          Boston, MA

39 (Pages 470 to 473)

470

1      number 3747.
2          (Witness complying.)
3   A.  Okay.
4   Q.  Do you see under the heading "Other fees"
5       in section 1.9 there is an item entitled
6       "AdvancePCS' Rebate Percentage"?
7   A.  I do see that.
8   Q.  And that percentage amount is not filled
9       in?
10  A.  That's correct.
11  Q.  That suggests that that is a subject of
12      negotiation between the PBM and the
13      customer?
14  A.  Well --
15  Q.  Would that be fair?
16  A.  It would -- two things are fair from
17      summarizing these other fees, and that is,
18      one, that many of the services on which
19      PBMs compete and offer contracts are not
20      based on a bundled price but an unbundled
21      price per service performed under the
22      other fees; and the second thing would be

471

1       what you said, that there is a blank by
2       the rebate percentage that would indicate
3       to me that is something subject to
4       negotiation, and I just want to confirm
5       that interpretation with other parts of
6       the document where I saw rebates
7       mentioned.
8   Q.  Yes. Let me see if I can help you. Why
9       don't you turn to Section 1.9D.
10  A.  Just where I was turning.
11  Q.  Bates number 3728.
12          (Witness complying.)
13  Q.  Do you see where it says, quote, Subject
14      to the terms and conditions of this
15      agreement, on behalf of customer,
16      AdvancePCS will receive the rebates paid
17      by manufacturers to customer. Within 60
18      days of the beginning of each calendar
19      quarter, AdvancePCS will remit to customer
20      all rebates received by AdvancePCS during
21      the prior calendar quarter, if any, net of
22      fees retained by AdvancePCS pursuant to

472

1       Section 2 and as set forth in Exhibit B"?
2   A.  I do see that.
3   Q.  So what this provides is that the customer
4       will get all of the rebates subject to or
5       except for a rebate percentage which
6       AdvancePCS will negotiate with the
7       customer? Is that your understanding?
8   A.  Well, my understanding is that a PBM has a
9       number of categories of payments that it
10      receives from manufacturers that are
11      characterized as rebates and
12      administrative fees, and I think there is
13      another category, and I also understand
14      that there is some contention about
15      whether amounts that actually reflect
16      rebates actually get reported as
17      administrative fees.
18          Given that understanding and
19      reading what you have just asked me to
20      look at, what I see as being expressed
21      here is that there is a rebate percentage
22      to be negotiated on page 3747, and so that

473

1       there is going to be a line item for
2       manufacturers that is going to be called
3       "rebates" as opposed to "administrative
4       fees" and other things paid to the PBM,
5       and of that percentage of total rebates
6       that have been negotiated to be paid to
7       the third-party payer that is subject to
8       this contract, Section D on page 3748 is
9       saying that within 60 days of the
10      beginning of each calendar quarter
11      AdvancePCS will remit to consumers all
12      rebates.
13          By that, I mean that is the
14      percentage of total rebates received by
15      AdvancePCS, which is a subset of all the
16      payments from the manufacturers, and
17      that's my understanding of those two
18      pages.
19  Q.  Well, you mentioned that the PBM might get
20      administrative fees from the manufacturer?
21      Right?
22  A.  That's right.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only            October 8, 2004
Volume II                          Boston, MA

40 (Pages 474 to 477)

474

1  Q.  And there is a disclosure in this contract
2      with respect to administrative fees?
3      Isn't that true?
4          MR. SOBOL:  Objection to the
5      form.
6  Q.  Paragraph 1.9F?
7          MR. SOBOL:  Objection to the
8      form.
9  A.  Oh, how -- how handy.
10          (Pause.)
11          (The witness viewing Hartman
12      Exhibit No. 013.)
13  A.  There is a disclosure as to administrative
14      fees in paragraph 1.9F.
15  Q.  And the disclosure also states that, "The
16      administrative fees will not exceed
17      3 percent of the aggregate cost of the
18      pharmaceutical products dispensed to the
19      members"?  Correct?
20  A.  That's what this contract does indeed say.
21  Q.  Now if a customer agreeing to this
22      contract can negotiate with the PBM over

475

1      how much of the rebate it will receive and
2      how much of the rebate the PBM will
3      receive, how can that customer be injured
4      by the alleged fraudulent scheme?
5  A.  Well, the -- to the extent that all of the
6      information described here is transparent
7      to the third-party payers, the clients of
8      the PBM, that will allow for an informed
9      understanding of what -- of some notion of
10      the relationship between AWP and what
11      their actually -- what their actual
12      reimbursement rates are.
13          The whole focus of much of the
14      litigation that we've talked about in
15      other cases has been precisely -- and
16      there is academic research that has been
17      conducted -- that while these contracts,
18      precontractual discussions occur, there is
19      opportunity for postcontractual strategic
20      behavior on the part of the PBM to either
21      hide total rebate dollars, to classify
22      rebate dollars as administrative fees, and

476

1      it is my understanding that the reason you
2      are finding third-party payer clients
3      being unsatisfied with PBMs is precisely
4      because they feel they're not getting
5      enough audited information to be able to
6      ascertain whether what they have agreed to
7      here is occurring in reality.
8  Q.  Well, if there were a right to audit the
9      rebate information, would that help
10      matters?
11  A.  I think there is a right to audit rebate
12      information.
13  Q.  Right.
14  A.  It doesn't seem to have helped matters.
15  Q.  Well, take a look at paragraph 4.4B on
16      page 3733.
17          (Witness complying.)
18  Q.  That provision gives the customer the
19      right to audit records directly related to
20      rebates; correct?
21  A.  It does.  I can only conclude that this
22      paragraph appears in this contract and

477

1      most likely appears in most contracts of
2      PBMs with their clients, and yet I'm
3      finding that there are sufficient number
4      of clients that have come to believe that
5      they do not -- that these rights do not
6      give them enough information to be fully
7      informed.
8  Q.  You say you have made some sort of
9      finding?
10  A.  I have said I have observed in articles
11      that we've talked about in -- that I have
12      cited in my declaration and in the Drug
13      Cost Management Report where we're finding
14      litigation, even where there is a right to
15      audit, where clients of third-party payers
16      -- of PBMs are believing in spite of the
17      audits that things have been hidden from
18      them, or that even in spite of the audits
19      dealing with a PBM is not working for
20      them; they are going to form their own; or
21      they want a form of a PBM that offers a
22      product that is a much more transparent

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                        Boston, MA

41 (Pages 478 to 481)

478

1     product than what these products have
2     been.
3  Q.  So you are saying that if it happens in
4     one case it must happen in all cases?
5  A.  I'm saying that -- I'm saying that there
6     -- the allegations in this case are based
7     on the fact that there is nontransparency
8     between the benchmark prices and ASPs, and
9     part of that nontransparency and the
10     ability for that fraudulent concealment to
11     take place is that incentive payments are
12     paid where the ultimate consumer does not
13     understand those incentive payments and
14     does not understand the degree to which
15     discounts off of manufacturer prices are
16     offered, and I am saying that that reality
17     has begun to show itself in litigation
18     from the Lupron matter through other
19     matters that we -- that we have cited in
20     the popular press.
21  Q.  You are not saying that all PBM customers
22     have sued their PBMs for fraud, are you?

479

1  A.  No, I don't think I have said that.
2  Q.  Only some have made that allegation?
3     Correct?
4  A.  I'm -- I've -- I've pointed to examples.
5  Q.  And some have not?
6  A.  I -- I would presume so. If you -- if you
7     would like to list them, that's fine.
8  Q.  And the only way to determine which payers
9     have been defrauded by their PBMs and
10     which payers have not is to take it on a
11     payer-by-payer basis? Isn't that true?
12         MR. SOBOL: Objection.
13  A.  No.
14  Q.  Doesn't the evidence that you have before
15     you suggest that the PBMs are competing
16     with one another with respect to how much
17     of the rebate is going to be passed on to
18     the customer?
19  A.  The evidence put before me is that there
20     has been some form of product
21     differentiation competition among PBMs
22     over the last 10 years, and that the --

480

1     the ability to understand -- and that that
2     competition, that the differentiation of
3     the products and the bundles of services
4     that are offered priced by service differ,
5     and the contracts are very complex, and
6     health plan benefit consultants review
7     them, and companies review them, and large
8     insurers review them, and there are
9     students of this industry that say that in
10     spite -- that looking closely at that,
11     these contracts are sufficiently complex
12     that the possibilities for opportunistic
13     behavior on the part of the PBMs once the
14     contracts have been entered into, it is
15     very difficult to fully audit these
16     contracts and to really know whether the
17     product that you felt has been a
18     competitive product is delivering what you
19     thought it would deliver.
20  Q.  Wouldn't economic theory predict that
21     competition among the PBMs would dissipate
22     any effects of the alleged AWP fraud?

481

1         MR. SOBOL: Objection.
2  A.  Ah-ha, the Chicago school.
3         Competition is a powerful
4     motivator. It is a powerful force.
5     However, for it to work, there has to be
6     sufficient information for the customers
7     to be able to understand what -- what are
8     the products being offered to them and
9     whether they are benefiting therefrom.
10         And what is clear, the
11     allegations in this case say that the PBMs
12     have not been able or that the customers
13     have not been able to generate competition
14     on the part of the PBMs sufficient to
15     defeat the AWP inflation scheme.
16         The spreads that I see as I try
17     and corroborate those allegations and look
18     at the data and illustrate how one would
19     go about measuring injury and damages
20     demonstrate that while competition does
21     work in an area with this complexity, it
22     works slowly, and is subject to

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                    October 8, 2004
Volume II                                    Boston, MA

42 (Pages 482 to 485)

482

1     opportunistic behavior of the
2     intermediaries.
3  Q. I take it you haven't studied at this
4     point how competition has worked in this
5     area over the time period that is at issue
6     in this case?
7             MR. SOBOL: Objection.
8  Q. Correct?
9  A. I don't understand that question.
10 Q. Well, you have not studied the level of
11    competition that has existed among PBMs
12    throughout the class period, have you?
13 A. In the consulting that I have performed
14    for -- in support of litigation in this
15    industry and in declarations that I have
16    written and in some academic research
17    undertaken, the competitive behavior of
18    all entities in this market has been
19    subject to scrutiny -- my scrutiny,
20    whether -- I have certainly not published
21    a paper on the degree to which PBMs are
22    sufficiently competitive and sufficiently

483

1     subject to the scrutiny of their customers
2     so that their customers could make
3     informed decisions and switching decisions
4     that lead to competitive results.
5  Q. You have not prepared a study of
6     competition among PBMs in connection with
7     this case? Correct?
8  A. I have cited the -- what studies have been
9     done and what information I have felt is
10    relevant.
11 Q. And that's the Langenfeld and Maness
12    article?
13 A. Could you direct me to the page that is
14    on?
15 Q. I will try, if I can find it. Take a look
16    at note 34.
17 A. And is that in the main report, or is that
18    in an attachment?
19 Q. It is in the main report, page 14.
20            (Pause.)
21            (The witness viewing Hartman
22    Exhibit No. 002.)

484

1  A. Okay. I have found that footnote and also
2     reviewed a bit more of my declaration. So
3     your question again was?
4  Q. Well, you keep referring to studies and
5     literature. The studies and literature
6     are Langenfeld and Maness? Right?
7  A. Well, Langenfeld and Maness is a paper
8     that has been -- is the basis of research
9     that has been done on PBM behavior, in
10    particular self dealing. The -- certainly
11    PBM behavior had been the subject of the
12    Levy -- the Levy report for the FTC for
13    the Bureau of Economics, so it was a
14    different aspect of PBM behavior, that
15    also discussed possibilities for
16    opportunistic behavior, behavior that
17    would redound negatively to the class.
18            If you turn to footnote 30 of
19    attachment C and actually look a little
20    more fully at attachment C, section C.1,
21    paragraphs 16 through 26, I examine
22    literature and factual evidence regarding

485

1     the PBM, the market, or the structure of
2     the providers of PBM services, and so that
3     is citing things much more than just the
4     Levy report or the Langenfeld and Maness
5     paper.
6             If you turn to footnote 30, the
7     Langenfeld and -- and this is again in
8     attachment C -- but some of the other
9     exhibits of the difficulties of consumers
10    feeling that they are able to discipline
11    PBMs through competitive bidding, which is
12    what you are telling me should have
13    occurred, has been cited in the one
14    article in the Drug Cost Management Report
15    on the coalition of the 50 Fortune 500
16    companies.
17            There are other selected
18    articles from 2004 in the Drug Cost
19    Management Report talking about how in
20    light of the evidence that has become
21    clear to third-party payers there is an
22    attempt to better discipline PBMs in ways

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only   October 8, 2004
Volume II                                  Boston, MA

43 (Pages 486 to 489)

486

1   that were not done during the '90s in the
2   major part of the class period and the
3   desires for the pricing transparency.
4        So the footnotes to that section
5   are clearly much more substantial than
6   just the Langenfeld and Maness report, and
7   all of them are getting at issues that are
8   relevant to what we're talking about.
9   Q.  But for this proposition, you are simply
10      relying on articles by others?  You
11      haven't done any independent analysis of
12      your own?
13  A.  Not to date.
14       MR. SOBOL:  Objection.
15  Q.  And are you aware that the Langenfeld and
16      Maness article has been refuted in an
17      article by Wosinska and Huckman in Health
18      Affairs?
19  A.  Huckman has found that Langenfeld is
20      wrong?
21       MR. SOBOL:  Can we get the
22      spelling of these people?

487

1        MR. EDWARDS:  H-U-C-K-M-A-N.
2   Q.  You don't believe it; right?
3   A.  No, no.  I --
4   Q.  I mean if Huckman thinks Langenfeld is
5       wrong, he must be wrong?
6   A.  Yes.  Huckman is a main man.
7   Q.  Okay.
8        MR. SOBOL:  Well --
9        THE WITNESS:  This is --
10       MR. SOBOL:  No.
11       THE WITNESS:  This is playful.
12      That -- that was all playful.
13       MR. SOBOL:  Well, I want -- all
14      right.
15       THE WITNESS:  Please.
16  A.  I would have to review Messrs. John Doe
17      and Huckman -- I don't remember the first
18      name.  You will notice in footnote 25 on
19      page 9 of attachment C where I mention
20      again the Langenfeld and Maness paper.  I
21      put a sentence at the end of that, "It
22      should be noted that these conclusions are

488

1   subject to ongoing empirical analysis,"
2   and I am aware of the fact that this
3   particular aspect of opportunistic
4   behavior, the papers that I understand are
5   following the Langenfeld and Maness paper,
6   do not have to do with structural issues
7   about PBMs, competitiveness generally.
8   They have to do with two major conclusions
9   here:  whether there is a shift to generic
10  substitution that is more aggressive by
11  PBMs with their own mail order pharmacy
12  relative to those that are not; and also
13  substitution toward other unit dose
14  versions, NDCs, of particular drugs.
15       And so it is a limited paper as
16  to what the opportunistic behavior is, and
17  I'm not -- I would have to look at what
18  Huckman and his colleague have written to
19  judge the efficacy of their findings and
20  to put that in the context of many more
21  articles and insights and discussions of
22  this industry and this group of entities

489

1   within this industry than a dispute
2   between Langenfeld and Maness and Huckman
3   et al.
4   Q.  What role do benefit consultants play in
5       relationships between class members and
6       PBMs?
7        MR. SOBOL:  Objection.
8        You may answer.
9   A.  It is my understanding that benefit
10      consultants help third-party payers
11      understand the -- to try and make
12      transparent the less-than-transparent
13      contracts being offered by PBMs to the
14      third-party payers.
15  Q.  So if a benefit consultant understood the
16      relationship between the reported AWPs and
17      ASPs, that would vitiate any effects of
18      the alleged fraud?  Correct?
19       MR. SOBOL:  Objection.
20  A.  The effects of the fraud would be vitiated
21      if the actual spreads equaled or came
22      within the but-for ranges, and since

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

44 (Pages 490 to 493)

490

1    benefit consultants exist and have
2    existed, my observations of the spreads
3    are that they have not been able to
4    effectively communicate everything that is
5    necessary to vitiate the effects of that
6    fraud.
7  Q.  Well, what if a benefit consultant
8    testifies that they knew exactly what the
9    spread was; they knew what the reported
10   AWP was; they knew what the ASP was; and
11   they went out and got the best deal they
12   could --
13 A.  Can I --
14 Q.  -- for their client.
15 A.  Can I clarify?  Can I ask a question about
16   your question?
17 Q.  Sure.
18 A.  Because you said "the spread."  Do you
19   mean the spread on every NDC for every
20   drug?  Or when you say "the spread," what
21   does that mean?
22 Q.  Yes, yes.

491

1  A.  So you mean they knew everything about
2    every drug; they knew what the AWP was;
3    they knew the ASP by NDC for every drug?
4  Q.  Right.
5  A.  Okay.
6  Q.  And they went out and negotiated the best
7    deal they could for their customer.  Would
8    you agree that that particular class
9    member would not be injured by the fraud?
10   MR. SOBOL:  Objection.
11 A.  No.
12 Q.  Why not?
13 A.  Well, in order for them to be not injured
14   by the fraud, the result of that
15   negotiation would have to lead to a PBM
16   being willing to offer a contract that was
17   that transparent, and I know of no PBM
18   that has done so in the past.  That the
19   PBMs have a lot of who we are in this --
20   in this -- in this bargaining situation.
21 Q.  What you are saying is so long as the
22   actual spread exceeds the but-for spread

492

1    there must be injury irrespective of what
2    anybody knew?
3        MR. SOBOL:  Objection.
4        You may answer.
5  Q.  Is that what you are saying?
6        MR. SOBOL:  Objection.
7        You may answer.
8  A.  I am saying that as long as the but-for --
9    the actual spreads exceeded the yardsticks
10   by the orders of magnitude that I have
11   illustrated occurred for generics and
12   physician-administered drugs, that the
13   market as a whole, that the PBMs, even if
14   there was a shining light, one point of
15   light, one benefit consultant that knew it
16   all and said, "This is what you've got to
17   negotiate," they would have to get some
18   PBM to agree to that, and I don't think
19   you have -- you have -- you have
20   stipulated or you have hypothesized the
21   existence of such a person.  I don't think
22   there is such a person.  But should there

493

1    have been such a person, they would need
2    more than just that information.
3        They would need to be able to
4    involve enough customers or their
5    customers such that in the negotiations
6    with the PBM they could go to that line on
7    that contract page and write down the
8    percentage and that PBM would agree to it
9    such that it reflected all of that
10   information by NDC, and that is -- the
11   fact that that has not happened is clear
12   by the simple illustrative spreads that I
13   have already pulled together, and it will
14   become clearer when I get the full data
15   from the manufacturers.
16 Q.  Have you considered whether there could be
17   another explanation for why a spread, an
18   actual spread, would exceed the but-for
19   spread --
20       MR. SOBOL:  Objection.
21 Q.  -- other than fraud?
22       MR. SOBOL:  Objection.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

45 (Pages 494 to 497)

494

1  A.  There could be possibilities.  However,
2       those possibilities -- that is why there
3       is not a single but-for -- a single
4       yardstick.  There are variations in those
5       yardsticks and those spreads which reflect
6       things other than fraud.  You will get
7       some differentiation other than pricing
8       for clinical attributes, but that's --
9       that leads to a range in the but-for in
10      the yardstick spreads.
11  Q.  You are not in a position to eliminate
12      those other possibilities at this point?
13            MR. SOBOL:  Objection.
14  A.  At this point, I have been asked to
15      indicate how I would develop yardsticks
16      that by taking the upper bound of those
17      yardsticks would allow for the greatest
18      desirability in the product or the
19      clinical attributes of that product or the
20      competitive -- relative competitive
21      attributes of that product.
22            For example, the spreads that I

495

1       talk about on page 24 for single-source
2       brand name drugs range from 16 to 33
3       percent.  As I do my more complete damage
4       analysis, I will refine that spread -- the
5       spread of the yardsticks, and the -- there
6       is -- what this is saying is that there
7       could be some brand name drugs whose
8       spreads are 16 percent and some that are
9       twice that.
10            Well, a spread that is at the
11      upper end of that range no doubt has other
12      competitive advantages that allows for --
13      that could allow for higher prices, the --
14      or could allow for lower -- could affect
15      what that spread is.  It could go either
16      way.
17            And I'm going to -- I am
18      allowing, as I -- in any of the
19      calculations I have done, I have taken the
20      upper range of that spread to be
21      conservative of the but-for spreads.
22  Q.  Are you saying that if class members knew

496

1       what the ASP for a particular drug was
2       they would be able to negotiate a greater
3       share of the rebates from the PBMs?
4             MR. SOBOL:  Objection.  You may
5       answer.
6  A.  I am saying that if -- if I am Cigna and
7       I'm negotiating with my -- well, I have my
8       PBM, so let's get one with an arm's
9       length.
10            I am some third-party payer.  I
11      am Blue Cross/Blue Shield in some state,
12      and I am negotiating with my PBM, and
13      we're talking about percentages of
14      rebates, and we're talking about this and
15      that, and we're talking about whether when
16      a generic is available do I go to AWP
17      minus 20 percent from AWP minus 30 percent
18      for the branded drug, and if in that
19      conversation the third-party payer -- and
20      -- and the PBM is saying, you know, we are
21      going to keep it at 13 percent,
22      17 percent, and here is the AWP, it is

497

1       like a buck, and so you are going to be
2       paying, you know, maybe 80 to 87 cents,
3       and I'm the third-party payer, and I say
4       what the hell are you talking about?  It
5       is -- you are paying -- you are paying, or
6       the retailer that is getting this drug,
7       what is being paid for this drug, what the
8       manufacturer is selling it for is
9       10 cents, and you are making me pay
10      90 cents?  That would -- that would allow
11      for real pressure, informed pressure, to
12      push the basis of that reimbursement down.
13            Now to go back to the car
14      example that we started with yesterday, we
15      talked about sticker prices and list
16      prices, and we talked about a Toyota, and
17      we said, you know, look, the sticker price
18      would be about 23,000 or so, and maybe the
19      dealer -- and there is information that
20      would suggest that the dealer acquisition
21      cost is about 18,000, say 20 percent below
22      in relationship with WAC and AWP, sticker

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                    Boston, MA

46 (Pages 498 to 501)

498

1    price and dealer acquisition cost.
2           THE WITNESS: Do we need to take
3    a break?
4           MR. EDWARDS: I have no idea
5    what is going on.
6           (Pause.)
7    A.  Now if my information --
8           MR. EDWARDS: I think the record
9    should reflect that there was some
10   activity in the room, and so there is --
11   the witness said, "Do we need to take a
12   break," and I said, "I have no idea what
13   is going on," that is with respect to the
14   activity in the room.
15          THE WITNESS: I believe he was
16   referring to my testimony, but.
17          MR. EDWARDS: That, too.
18          (Laughter.)
19   A.  So that I walk in. I am a young -- I am a
20   young lady, and dealers want to take --
21   are going to take advantage of me. They
22   think they are going to out-negotiate me,

500

1    from the sticker price is, well, it must
2    be close to $18,000. In that case, it is
3    a sucker price. It is not a sticker
4    price. And what is happening here is you
5    need to know that information.
6           And what I am saying is these
7    people don't know that information. If
8    they did know that information, and if I
9    knew that information negotiating a price,
10   I would be able to use it to get a better
11   reduction off of AWP for the drugs.
12          When I am filling out the
13   percentage -- when I am filling in this
14   client proposal here, and I know what the
15   ASP is, I'm going to say, "13 percent?
16   Give me a break. I want 60 percent off of
17   that AWP."
18          MR. SOBOL: May the record
19   reflect the exhibit you were referring to.
20          THE WITNESS: I was referring to
21   page 2067 of the ESI Pharmacy Benefit
22   Program Pricing Proposal for client X date

499

1    and I say, you know -- we're settling on
2    price, and, you know, I offer a price, and
3    again the guy says, "You are killing me.
4    I can't cover my cost." And you have some
5    idea that the dealer acquisition cost is
6    18,000 or whatever, and you negotiate
7    somewhere what your reimbursement to him
8    is going to be. And this is not a
9    reimbursement scheme. This is just in a
10   normal market -- a reimbursement scheme,
11   this is even more of a difficult issue,
12   because the middle person is involved,
13   but the point is you are able with that
14   kind of understanding to come up and
15   negotiate some price where a customer can
16   benefit if there are changes in the
17   sticker price or whatever.
18          Now suppose alternatively you
19   go, and the guy is selling Toyotas and
20   Ugos, and he has the same sticker price on
21   the Ugo, and the dealer acquisition cost
22   is 5,000 for that, but your understanding

501

1    X, Bates numbered range ESI 27700002066 to
2    2077.
3    BY MR. EDWARDS:
4    Q.  You say that one of the things that you're
5    going to do is you're going to compare
6    discounts below AWP that were negotiated
7    during time periods that were affected by
8    the alleged fraud with discounts below AWP
9    that were negotiated during time periods
10   not affected by the alleged fraud? Fair?
11          MR. SOBOL: Objection. Asked
12   and answered.
13   A.  It is unfair. I'm going to compare
14   relationships between AWP and ASP, which
15   is a sum of all price offsets prior to the
16   alleged fraud and compare those that
17   actually occurred during the fraud to
18   those that either occurred prior to or
19   occurred during the period of the alleged
20   scheme but were drugs manufactured by
21   nondefendants or were drugs manufactured
22   by defendants that lawyers -- that counsel

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                    Boston, MA

502

1    indicates to me were not subject to the
2    scheme.
3  Q.  You say you are going to compare what
4      happened during periods affected by the
5      alleged fraud to what happened during
6      periods that were not affected by the
7      alleged fraud?
8  A.  I'm --
9  Q.  Is that fair?
10 A.  What is fair to say is I'm going to
11     compare spreads and what happened to
12     pricing during the periods of alleged
13     fraud to yardsticks for what would have
14     happened during the alleged fraudulent
15     period absent the AWP scheme.
16 Q.  And what would your conclusion be if in
17     comparing those two time periods you came
18     across a particular drug for which the AWP
19     was identical and the discount below AWP
20     in the contract was identical?
21 A.  So you are -- to understand the question
22     right now, the -- as I have looked at --

503

1    and we're talking about contracts. I'm
2    not sure which contract we are talking
3    about. PBM contracts with third-party
4    payers?
5  Q.  We can talk about PBM contracts. Just to
6      simplify it, period A is the fraud period.
7      Period B is the nonfraud period. And
8      let's say we have got an AWP for a
9      particular drug of $100.
10 A.  And when you say AWP for a particular
11     drug, you mean an NDC for that drug?
12 Q.  Sure. An NDC for that drug with a
13     reported AWP of $100 in both cases the
14     contract with the PBM calls for
15     reimbursement at AWP minus 15 percent.
16     What conclusion would you draw from that
17     scenario?
18 A.  So to be, perfectly understand what you're
19     asking, I'm looking at an actual spread,
20     and from -- and that -- and in that actual
21     spread involves both an AWP and an ASP,
22     and I go to my yardstick, which is a

504

1    relationship of the but-for AWP to that
2    ASP, both the same ASP, for that NDC of
3    that manufacturer, and so that the but-for
4    is from period B; the actual is from
5    period A, as you are saying the fraud, the
6    subject of the fraud; and for that
7    particular NDC, do we want to say in a
8    particular year, in a particular quarter,
9    or for the --
10         Two things. If it turns out
11     that the AWP is not inflated relative to
12     what the but-for relationship should be,
13     then the impact, the injury, and the
14     damages -- not the impact -- the injury
15     and damages flowing from the scheme for
16     that NDC for that -- for that contract
17     would be zero.
18         However, I have seen -- the
19     second important point is I have not seen
20     -- I certainly haven't looked at all the
21     contracts, but I have seen no contract to
22     date where the AWP in the spread is broken

505

1    out by NDC. It is just an aggregate over
2    everything and all types of drugs, and I
3    would need to take into account that fact.
4    I mean your hypothetical is not -- is
5    counter to the evidence to the way
6    contracts are written.
7  Q.  Do you have any understanding of the
8      extent to which RFPs are used in
9      connection with the negotiation of
10     contracts between payers and PBMs?
11 A.  I would assume that they -- if -- if they
12     weren't used, they should be used.
13 Q.  And if they are used, does that have any
14     impact on your opinion?
15         MR. SOBOL: Objection.
16 A.  We're talking about events that have
17     occurred over the past 15 years that have
18     led to my conclusion about the
19     corroboration of the allegations, and all
20     of those negotiations in my understanding
21     were subject to RFP -- well, a lot of them
22     were subject to RFPs. Certainly large

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                   Boston, MA

48 (Pages 506 to 509)

506

1    third-party payers doing due diligence
2    would submit RFPs to a set of PBMs to get
3    competitive bids --
4    Q.  We were talking --
5    A.  -- or what they felt were competitive
6    bids.
7    Q.  We have been talking about rebates.  Do
8    you know whether manufacturers pay rebates
9    on generics?
10   A.  It is my understanding --
11        MR. SOBOL:  Objection to form.
12   A.  It is my understanding that they don't in
13   general.
14   Q.  And I believe you testified yesterday that
15   generics are often priced under an MAC's
16   price list or at U & C; is that correct?
17        MR. SOBOL:  Objection to the
18   form.
19        You may answer.
20   A.  There is certainly the impetus on the part
21   of federal groups with a federal upper
22   limit and state MACs and PBM contracts to

507

1    identify a maximum allowable cost which is
2    initiated at some point after a certain
3    number of generics are available in the
4    market.
5    Q.  Take a look at the class definition which
6    you quote in paragraph 6 of your
7    declaration, pages 4 and 5.
8        (Witness complying.)
9    Q.  Do you have that in front of you?
10   A.  I do.
11   Q.  The second class is a third-party and
12   co-payer class, and it refers to or it
13   states that, "Included within the
14   class" --
15        MR. EDWARDS:  I am sorry.
16   Strike that.
17   Q.  The second class identified there is a
18   third-party and co-payer class, and that
19   class is defined as third-party payers who
20   made reimbursements for any drug
21   manufactured by AstraZencoa, the BMS
22   Group, PBN, J & J, GSK, or the

508

1    Schering-Plough Group based on contracts
2    that expressly use AWP as a pricing
3    standard.  Is that correct?
4    A.  That is correct to the extent --
5    Q.  So the litmus test is contracts that
6    expressly use AWP as a pricing standard?
7    Correct?
8    A.  That's correct.
9    Q.  And so generics that are priced pursuant
10   to an MAC list or U & C would not be part
11   of the class here because MAC and
12   U & C are not AWP?  Correct?
13        MR. SOBOL:  Objection.
14   Objection to the form.
15   A.  No.  Incorrect.
16   Q.  So are you redefining the class here?
17   A.  No.
18   Q.  What is your understanding of the phrase
19   "expressly use AWP as a pricing standard"?
20   A.  I was disagreeing with your statement that
21   MAC and U & C are unrelated to AWP, not
22   the statement of the class.

509

1    Q.  Well, that wasn't my statement, though.
2    My statement -- my question to you, sir,
3    was isn't it the case that a contract that
4    bases the pricing of generic drugs on MAC
5    would not be a definition of a contract
6    that expressly uses AWP?
7    A.  And I'm saying no to that statement, that
8    -- and that's only if MAC itself is
9    expressed orthogonally or irrelevantly or
10   has no relationship to AWP, and that's not
11   my understanding.
12   Q.  What if it does not have a consistent
13   relationship to AWP?
14        MR. SOBOL:  Objection.
15   Q.  How are you going to deal with that?
16        MR. SOBOL:  Objection.
17   A.  I have no idea what you mean by "a
18   consistent relationship."
19   Q.  Well, let's take a hypothetical here.
20   Let's say you have got a drug for which
21   the AWP is a dollar and the MAC is
22   50 cents.  Would you say that that drug

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 8, 2004
Volume II                                       Boston, MA

49 (Pages 510 to 513)

510

1    has a relationship to AWP?
2    A.  I need more information than one -- one
3        claim for one drug.
4    Q.  What information would you need?
5    A.  Well, let's -- let's turn, if we might,
6        again to the ESI document last cited, the
7        Pharmacy Benefit Program Pricing Proposal,
8        Bates numbered ESI 2774444 -- I am sorry
9        -- 00002066 to 2077, where ESI has done us
10       the favor of defining what they mean by
11       MAC, and they mean it to be the maximum
12       price for generic drugs which is
13       equivalent to -- not inconsistent or the
14       terms you were using -- is equivalent to a
15       discount off of generic AWP up to
16       80 percent, with an average range of
17       40 percent to 60 percent depending upon
18       the client's actual generic drug mix.
19            I see a definition of MAC for
20       ESI, and I am -- it is my guess that the
21       other contracts will have similar language
22       that relates the MAC price to AWP.  It is

511

1    equivalent to.  It is not inconsistent
2    with.  And I will be able to observe
3    actual payments for and reimbursements
4    under MAC when there are enough generics
5    on the market to see whether it was at
6    50 percent or whatever it was.  It will be
7    in the claims data.  So it certainly says
8    it is equivalent to a generic off of AWP.
9    So they would be in the class in my
10   reading of the class definition.
11   Q.  Well, it says, "Equivalent to a discount
12       off of generic AWP up to 80 percent with
13       an average range of 40 to 60 percent
14       depending upon the client's actual generic
15       drug mix."
16            That's a pretty big range, isn't
17       it?
18   A.  The -- for the branded drugs we're talking
19       about a range that is not listed in here
20       but is listed elsewhere of 13 to 17 to
21       20 percent.  That's an order of magnitude
22       of two.  The order of magnitude we're

512

1    talking about, 40 to 80 percent, is an
2    order of magnitude of two.
3            The claims data will show me by
4    third-party payer and by PBM what indeed
5    that percentage is relevant -- relative to
6    the AWP by NDC.
7    Q.  But you are going to have to consider the
8        range in every case, and you are going to
9        have to consider the client's generic drug
10       mix in every case in order to determine
11       what the impact of AWP is; isn't that
12       true?
13            MR. SOBOL:  Objection.
14   A.  I am going to observe what the average
15       spread is, and that will translate, as in
16       my attachment F where I deal with just the
17       X percent off of AWP, the extent to which
18       there are variations from 80 percent to
19       40 percent will reveal themselves very
20       simply in the claims data and directly
21       when that claims data is made available to
22       me, and that will determine the quantum of

513

1    damages to different groups at the claims
2    administration phase.  It is not going to
3    affect -- it is going to have no relevance
4    to a conclusion of impact and causation.
5    It is going to have no relevance to the
6    calculation of aggregate damages.  It will
7    come to bear at the allocation of damages
8    of how aggressively different groups had
9    negotiated those discounts.
10   Q.  What are you going to do if it turns out
11       that the MAC price is below ASP?  If the
12       MAC price is below ASP, has that customer
13       been injured?
14   A.  If the customer has -- the injury occurs
15       as the result of reimbursement under a
16       reimbursement scheme, and if that customer
17       paid more than he should have paid based
18       on the formulas for reimbursement for that
19       customer, then there will be injury.  If
20       it turns out that it is zero or -- then
21       there be the measure of injury will be
22       zero.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                         Boston, MA

50 (Pages 514 to 517)

---

514

1       THE WITNESS: Can I just
2   interrupt you for one second? Please
3   let's not go to lunch or to the bathroom.
4   I just need some more water.
5       MR. EDWARDS: Okay.
6       THE WITNESS: You can even ask
7   it to me while I am moving.
8       (Pause.)
9       THE WITNESS: Thank you.
10  BY MR. EDWARDS:
11  Q.  So under your theory, a class member can
12      suffer injury even if it pays ASP?
13  A.  Under my -- what I have been asked to look
14      at is given the allegations and the
15      reimbursement mechanisms in place have
16      customers, have third-party payers, have
17      class members been overcharged in their
18      reimbursement, and that's what I am
19      focusing on.
20  Q.  Can you answer my question yes or no?
21      MR. SOBOL: Objection.
22  A.  I have told you what my -- what the --

---

515

1   what my methodology will do.
2   Q.  And under your methodology, is it possible
3       for a customer who paid ASP to have
4       suffered injury?
5   A.  I haven't addressed -- I have addressed
6       the issue of overcharges and
7       reimbursement. To the extent that there
8       is an occurrence as you have hypothesized
9       that occurs in the damage analysis, it
10      will be something that will -- I will need
11      to address in the allocation phase.
12  Q.  Take a look at Exhibit 15, which we've put
13      in front of you.
14      (Witness complying.)
15  Q.  For the record, it is a copy of a contract
16      between Coventry Healthcare and Caremark
17      dated July 12, 1999. The Bates numbers
18      are CBH 52 through 136.
19      (Pause.)
20      (The witness viewing Hartman
21      Exhibit No. 015.)
22  Q.  Have you reviewed this contract before?

---

516

1   A.  No. I am amused to find that all the
2       signatures are all by Dale Wolf, however.
3       It makes me very suspicious about the
4       whole document. He has got every title in
5       the company.
6       (Laughter.)
7       THE WITNESS: I am sorry. It is
8   getting late.
9   Q.  I want to direct your attention to the
10      pages with Bates number 63 and 64.
11      (Witness complying.)
12  A.  I am so directed.
13  Q.  Do you see that there is a definition of
14      maximum reimbursable amount, or MRA, or
15      maximum allowable cost, or MAC, at the
16      bottom of the page there?
17  A.  I do see that.
18  Q.  And it says, "MRA or MAC shall mean the
19      maximum price for certain generic and
20      multisource brand prescription drugs
21      established by Caremark or Coventry as the
22      case may be from time to time using a

---

517

1   variety of factors, including but not
2   limited to First Data Bank/Medispan's
3   published baseline price and the maximum
4   allowable cost determined by the Health
5   Care Financing Administration."
6       Now with respect to an MAC list
7   developed by Coventry, how are you going
8   to go about figuring out what the impact
9   of AWP may or may not have been on that
10  list?
11      MR. SOBOL: Objection to the
12  form.
13      You may answer.
14  A.  I will need to clarify in my mind what
15      First Data Bank's definition of baseline
16      price is, which is my -- which it is my
17      guess is also formulaically related to WAC
18      or AWP, but I will have to ascertain that,
19      since what Data Bank -- what First Data
20      Bank generally gathers are those list
21      prices that are essentially tautologies.
22      So that would tell me that there is some

---