Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 8, 2004
Volume II                                Boston, MA

51 (Pages 518 to 521)

518

1   relationship to AWP, subject to my being
2   able to confirm that via deposition.
3         It is also my understanding
4   under the HCFA maximum allowable cost as
5   cited here is related to one of the
6   definition, of whether it is FUL or MAC.
7         The -- the HCFA or the -- the
8   HCFA price that is being referred to here
9   I would need to confirm whether that is
10  indeed the federal upper limit as
11  described in footnote 55 of attachment D,
12  which is section 4 of attachment D, and
13  for those purposes, MAC or the federal
14  upper limit essentially is a formulaic
15  percent of published price in the Blue
16  Book, in Medispan, or in the Red Book, and
17  it is of the least costly generic
18  substitute.
19        Now they talk about relating
20  that to a price, a list price, in one of
21  those books, in one of those price
22  compendia.  It is unclear to me as I read

519

1   it whether it was AWP or WAC, but if it is
2   either, again there will be a formulaic
3   relationship to AWP.
4         So that in any of those cases,
5   once I have estimated my but-for AWP based
6   on the yardsticks, I will have a but-for
7   WAC and a but-for baseline as reported in
8   the list prices, and I will assess how
9   that would be counted into a MAC that is
10  formulaic related to an AWP but just to
11  the but-for AWP.
12  Q.  What if the customer testifies that its
13      particular MAC list is not formulaically
14      related to an AWP?  Where are you at that
15      point?
16  A.  Well, if --
17          MR. SOBOL:  Objection to form.
18          You may answer.
19  A.  Well, as we have discussed and as you have
20      explored in the definition of the class, a
21      third-party payer or an individual is a
22      member of either of these classes if

520

1   they've reimbursed at a rate related to
2   AWP.  So if there are potential class
3   members who can demonstrate that AWP did
4   not enter into a calculation of
5   reimbursement rate, it is my understanding
6   that they're not in the class.
7   Q.  The only way that you can determine that
8       is by asking them? Is that correct?
9   A.  The way that I would understand one would
10      determine that is that at the time of
11      claims administration when one would come
12      forward and they could not demonstrate
13      that they were part of the class, they
14      would not be able to submit a claim or
15      recover a claim under the litigation.
16  Q.  Exactly what would you have to do during
17      this allocation exercise to determine
18      whether a particular class member has been
19      damaged?
20  A.  During the damage phase of the analysis, I
21      expect to receive claims data from -- from
22      a variety of third-party payers, from a

521

1   selected, stratified sample of retailers
2   that will summarize claims across all
3   third-party payers, and based on that
4   claims information, I will be able to see
5   what reimbursements were relative to AWP,
6   relative to the but-for AWP, relative to
7   ASP, and I will be able to determine
8   whether that relationship differed by
9   different groups of third-party payers
10  such as large third-party payers who own
11  their own PBM and their own mail order,
12  such as Cigna and Aetna, relative to
13  third-party payers, such as the Blues,
14  that do not.  This is precisely the type
15  of analysis that I have done with claims
16  data in damage calculations and going
17  toward allocation analysis in Hatch-Waxman
18  matters.
19  Q.  So when a particular class member comes in
20      to perfect its damage claim, the first
21      thing you are going to have to do is
22      figure out all the ASPs for all the drugs

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only      October 8, 2004
Volume II                                    Boston, MA

52 (Pages 522 to 525)

522

1    that it bought?  Right?
2    A.  That -- not necessarily.  It's -- it -- to
3        the extent that the number can be
4        generalized to a percentage on total
5        reimbursements by type of end payer, it
6        will be made as simple as possible or as
7        detailed as is necessary to be reasonably
8        accurate and equitable.
9    Q.  Or you are going to have to determine an
10       expectation yardstick for all of the drugs
11       that a particular customer bought?
12       Correct?
13   A.  No.
14   Q.  Okay.  So you don't need an expectation
15       yardstick in order to determine the extent
16       to which a particular customer or a
17       particular class member has been damaged?
18   A.  The yardsticks are calculated for the
19       groups of drugs as defined and as we've
20       discussed, and I will always choose the
21       yardstick that is most conservative, and
22       that will be the yardstick for that class

523

1        of drugs.  There will not be a separate
2        yardstick by NDC or by customer.
3    Q.  Right.  But there will be a yardstick for
4        that customer?
5    A.  There will be an amount that that customer
6        reimbursed or paid, and there will be a
7        percentage overcharge on that
8        reimbursement.
9    Q.  Well, first you have to have the
10       yardstick?  Right?
11           MR. SOBOL:  Objection.
12   A.  The marketwide yardstick.
13   Q.  Well, that's the way you propose to do it;
14       right?
15   A.  That's --
16           MR. SOBOL:  Objection.
17   A.  -- what I thought I was testifying -- I am
18       testifying to my proposal here.
19   Q.  And then you have to have the individual
20       customer's contract; right?
21           MR. SOBOL:  Objection to the
22       form.

524

1    A.  The -- the allocation subject to the
2        analysis, which I have yet to do -- as I
3        say, I have done these in the past, and
4        sometimes they can turn out to be very
5        simple -- but depending on what the
6        statistical analysis shows, it is possible
7        or likely that there will be a
8        proportional overcharge by perhaps types
9        of drugs or just by type of end payer.
10   Q.  Well, don't you have to have a customer's
11       contract --
12           MR. SOBOL:  I am sorry.
13   Q.  -- to determine if it specifically
14       references AWP?
15           MR. SOBOL:  He was trying to say
16       something.
17           Had you finished your answer?
18           THE WITNESS:  What?
19           MR. SOBOL:  Had you finished
20       your answer?
21           THE WITNESS:  I don't know.  You
22       guys got into it.  I got --

525

1            MR. EDWARDS:  Go ahead, Tom.  I
2        want to reask my question anyhow.  Go
3        ahead and make your objection.
4            MR. SOBOL:  I just want to make
5        sure he has a chance to finish answering
6        these questions.  That's all, Steve.
7        BY MR. EDWARDS:
8    Q.  Don't you have to look at the contract of
9        each customer to determine whether it
10       expressly references AWP?
11           MR. SOBOL:  Objection.
12   A.  I would assume -- and in terms of claims
13       management, it is not something I'm an
14       expert on -- but that would be how someone
15       qualifies as being a class member, and
16       what they need to show, it will be
17       determined by something other than what
18       I've been asked to do.
19           I have been asked to assume that
20       for those who were subject to an AWP
21       pricing regime, to come up with methods
22       for calculating what the overcharge was,

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                    Boston, MA

53 (Pages 526 to 529)

526

1   and -- and to do it most appropriately as
2   a percentage overcharge, and so how --
3   when the class member comes forward, I'm
4   going to assume that whoever does that
5   kind of -- designs that kind of threshold
6   or that kind of determination will have
7   made that determination, and what will be
8   put before me are dollars of amounts of
9   drugs reimbursed under AWP.
10  Q.  So you think all of those determinations
11      are going to be made during the liability
12      phase of the case?
13              MR. SOBOL: Objection.
14  A.  No.
15  Q.  Well, when are they going to be made?
16              MR. SOBOL: Objection.
17  A.  The -- you are asking me legal questions.
18      The -- my understanding of a matter of
19      this sort is there a classwide impact,
20      and was there injury, and are there
21      formulaic methodologies for getting at
22      aggregate classwide damages, and are there

527

1   methods, formulaic methods, that can deal
2   with assisting counsel in allocating
3   aggregate damages to class members.
4   Q.  Well, the --
5   A.  And that's -- that's what I've done, and
6       my conclusion is in the affirmative. My
7       understanding of normal proceedings -- but
8       that may -- that may be based on antitrust
9       litigation, and not on RICO litigation --
10      is that there is a liability phase where I
11      have been asked to assume these
12      allegations occurred. I assume the trier
13      of fact has to see some facts about this
14      and things. But I don't know that. I am
15      merely conjecturing from what my
16      understanding of the progress is. And if
17      liability is found and class is certified,
18      then I will be asked to actually calculate
19      damages, and once I have calculated
20      damages, it will be at that stage while I
21      am doing so that I will start to put in
22      place the methodologies to do the

528

1   appropriate allocations.
2   Q.  One of the things you are going to need to
3       do is if the customer's contract has MAC
4       pricing for generics or certain brands,
5       you are going to have to determine how
6       that MAC pricing worked? Correct?
7              MR. SOBOL: Objection to the
8       form.
9   A.  To the extent that MAC pricing or any
10      discounts off of AWP are reflected in
11      reimbursement rates relative to existing
12      AWPs, I'll need to document that with --
13      through statistical methods to then relate
14      what those discounts would be relative to
15      but-for AWPs or any other list price
16      related to AWP if it happens to be the
17      baseline price or WAC.
18  Q.  And just to make sure --
19              MR. SOBOL: Let's take the
20      afternoon break now. Okay?
21  Q.  -- I understand your testimony --
22              MR. SOBOL: This emergency has

529

1   arisen again. Okay? Thank you.
2              (Recess taken at 3:07 p.m.)
3              (Recess ended at 3:23 p.m.)
4   BY MR. EDWARDS:
5   Q.  I would like to talk to you a little bit
6       about physician-administered drugs in the
7       private sector. Okay?
8   A.  Okay.
9   Q.  You deal with that in your declaration; is
10      that correct?
11  A.  I certainly deal with physician-
12      administered drugs. That's correct.
13  Q.  You deal with physician-administered drugs
14      in the public sector as well as the
15      private sector? Correct?
16  A.  And by that you mean the fact that I have
17      different yardsticks therefor? Is that
18      what you mean by dealing with them?
19  Q.  Well, that is one way to look at it.
20  A.  That is correct.
21  Q.  You base your opinion that causation can
22      be demonstrated on a classwide basis for

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                    Boston, MA

54 (Pages 530 to 533)

---

530

1   physician-administered drugs in the
2   private sector on the Med. PAC study; is
3   that correct?
4          MR. SOBOL:  Objection to form.
5   A.  I base my conclusions about impact on the
6   allegations I have been directed to
7   assume, and the fact that they as a result
8   of those allegations imply that the
9   standard benchmark price for all products
10  sold, subject to public or private
11  reimbursement, are related to AWP.
12  Q.  And you rely on the Med. PAC study?  Is
13  that correct?
14  A.  Well, I do rely on that in part, yes.
15  Q.  Look at attachment D, paragraph 30,
16  page 11.
17         (Witness complying.)
18  Q.  I am sorry.  Page 10.
19         (Witness complying.)
20  A.  Okay.
21  Q.  You state beginning in paragraph 29, "A
22  variety of evidentiary materials

---

531

1   demonstrate that private sector third-
2   party payers negotiate reimbursement rates
3   for both physician-administered and oral
4   pharmaceuticals based on AWP or
5   equivalently WAC.  For example, the
6   Medicare Payment Advisory Commission, Med.
7   PAC, contracted with Dyckman & Associates
8   in 2002 to conduct a survey of private
9   health plans regarding their payments for
10  physician-administered drugs."
11         Have you read that study in its
12  entirety?
13  A.  I am sorry.  I got distracted.  Now you
14  were reading from paragraph 30 or from
15  footnote 39?
16  Q.  I was reading from paragraph 30.
17  A.  And you just read that paragraph to me?
18  Q.  Yes.
19  A.  Okay.  It went on longer than I thought I
20  had written it.
21         I certainly have relied on that
22  study as one source for the opinions put

---

532

1   forward in my declaration.
2   Q.  Have you read the entire study?
3          MR. SOBOL:  I object to the
4   form.
5   A.  I do not recall.  I read -- I certainly
6   read the chapter on Medicare-related
7   reimbursement or Medicare Part B drug or
8   reimbursement by private sector -- let me
9   step back.
10         I read the chapter related to
11  reimbursement for physician-administered
12  drugs, chapter 9 thereof, is my
13  recollection, most closely.
14  Q.  And the study refers to a survey.  Have
15  you talked to the people who did the
16  survey?
17  A.  I didn't talk to the people.  I think I
18  have seen a copy of the survey.  And let's
19  see whether I have cited that in the
20  documents relied on.
21         (Pause.)
22         (The witness viewing documents.)

---

533

1   A.  I guess I have not cited it, unless it is
2   not listed under Dyckman but another.  Oh,
3   yes -- oh, no, it is not listed.
4          The -- I don't remember who --
5   Dyckman did that for a group that --
6   perhaps Ms. Halpern could help us out
7   here.
8          THE WITNESS:  Do you know who
9   Dyckman --
10         MR. EDWARDS:  I don't think that
11  is a permissible --
12         THE WITNESS:  Question?
13         MR. EDWARDS:  -- question.
14         THE WITNESS:  I wanted to help
15  you out.
16  BY MR. EDWARDS:
17  Q.  I just asked you a very simple question,
18  which is whether you have ever talked to
19  the people who did the survey.
20  A.  Did I call them up and talk to them?  No.
21  Q.  You never talked to them about how they
22  did the survey?

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 8, 2004
Volume II                                    Boston, MA

55 (Pages 534 to 537)

534

1           MR. SOBOL: Objection.
2   A.   I reviewed the summary in the Med. PAC
3        report, and it is my recollection I got a
4        copy of the Dyckman report that may be
5        listed here.  Because it was conducted by
6        a group, that it might be listed under
7        that name, but I didn't go so far as to
8        critically interview any of the
9        participants in the actual survey
10       research.
11  Q.   And you are in no position at this point
12       to testify as to the reliability of the
13       survey?  Isn't that true?
14          MR. SOBOL: Objection.
15  A.   The description and its appearance in the
16       Med. PAC report suggests to me that it is
17       reliable.  It is a report to Congress.  It
18       is not the journal of irreproducible
19       results.  So I -- there is certain
20       gravitas in the -- where it has appeared
21       that would lead me to think that it wasn't
22       done by, you know, three undergraduates on

535

1        a street corner or something.
2   Q.   What are you going to do if it turns out
3        that it is not reliable?
4          MR. SOBOL: Objection.
5   A.   Well, I think it is pretty clear how the
6        class is defined.  That if it cannot be
7        demonstrated, and as I will look more
8        closely during the damage analysis, that
9        AWP does not enter into reimbursements for
10       a particular group, if what you are trying
11       to say is that the surveyed third-party
12       payers about which he, Dyckman, is
13       reporting survey results were befuddled,
14       confused, or the survey was
15       inappropriately designed, well then it
16       would be unreliable.
17          It appeared in a report that
18       would be subject to a certain amount of
19       peer review that made me think that it had
20       been vetted to enough of an extent that I
21       could rely on the quote that I have put
22       forward here.

536

1   Q.   Do you know anything about how physicians
2        are reimbursed for injectables in the
3        private sector?
4   A.   I have seen claims on the part of
5        oncologists for a particular
6        physician-administered drug to public and
7        private sector insurers.
8   Q.   That's in the Lupron case?
9   A.   That's correct.
10  Q.   Other than that, do you have any knowledge
11       of how physicians are reimbursed for
12       injectables --
13          MR. SOBOL: Objection.
14  Q.   -- in the private sector?
15          MR. SOBOL: Objection.
16  A.   And incidentally what I observed in the
17       Lupron case accorded precisely with this
18       -- with the Dyckman results.
19          Have I looked at other -- have I
20       done the kind of work that I have looked
21       at actual claims data by physicians
22       submitted to third-party payers?  That is

537

1        part of the sample that I have asked to
2        see as I have asked to see samples of
3        other groups to see exactly what those
4        claims submissions are and for both a
5        calculation of damages but also to assess
6        whether they are related to AWP.
7   Q.   Have you looked at any such claims data
8        with respect to the drugs at issue in this
9        case?
10          MR. SOBOL: Objection.
11  A.   I have -- I have asked for those
12       depositions to be noticed, and they have
13       yet to be noticed as far as I know.
14  Q.   Have you looked at any contracts between
15       physicians and third-party payers with
16       respect to physician-administered drugs?
17  A.   I don't recall.
18  Q.   Do you know whether coverage for
19       physician-administered drugs is part of
20       the medical benefit?
21  A.   In some cases, it can be.
22  Q.   And in other cases?

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 8, 2004
Volume II                              Boston, MA

56 (Pages 538 to 541)

538

1    A.   I mean it is either going to be under the
2         pharmacy benefit or the medical benefit.
3    Q.   But you don't know which?
4    A.   I think generally --
5              MR. SOBOL:  Objection.
6    A.   I have yet to fully ascertain that, but my
7         understanding to date is that it is
8         usually under a medical benefit.
9    Q.   Do you have any understanding as to how
10        third-party payers go about negotiating
11        contracts with physicians and other
12        providers for physician-administered
13        drugs?
14   A.   That is a subject to be fleshed out during
15        the damage analysis.
16   Q.   Do you know whether insurance companies
17        and other third-party payers negotiate
18        with physicians for the reimbursement rate
19        that they're going to pay for the services
20        as well as the drug?
21   A.   I do understand that.
22   Q.   Okay.  Do you know anything about the

539

1         trade-offs between the two?
2    A.   Well, I know that, and it is my
3         understanding, that in a negotiation
4         process they negotiate reimbursement for
5         services, and they negotiate reimbursement
6         for the drugs that are administered during
7         as part of those services.
8    Q.   And do you know whether there are
9         trade-offs between those two elements?
10   A.   Well, as my direction from counsel at this
11        point has been to focus on the fraud
12        constituted by the pharmaceutical aspects
13        of any mix of that grouping of payments,
14        and I have not been asked to focus on
15        whether the fraud slipped over, could have
16        been traded off in other ways.
17   Q.   So you are assuming for now that there are
18        no trade-offs between the rate for the
19        services and the rate for the drugs in the
20        negotiation process?
21   A.   For now, I'm taking as given what has been
22        negotiated, and I'm looking at what the

540

1         reimbursement rates would have been had
2         the AWP scheme not been put in place.
3    Q.   And if there are trade-offs, will that
4         have an impact on your opinion?
5    A.   Which opinion?
6    Q.   Your opinion that you can determine
7         whether there is classwide impact in
8         connection with physician-administered
9         drugs in the private sector.
10             MR. SOBOL:  Objection.
11   A.   No.
12   Q.   Do you have any understanding of the
13        extent to which third-party payers in that
14        particular sector have knowledge of the
15        spread?
16             MR. SOBOL:  Objection.
17   A.   My information is anecdotal at best, and
18        that is related to the Lupron matter.
19   Q.   Did it ever occur to you that insurance
20        companies have a pretty good handle on the
21        spread and that they agree to base
22        reimbursement on AWP so they can avoid the

541

1         transaction cost of a prolonged
2         negotiation over the service?
3              MR. SOBOL:  Objection to form.
4    A.   I understand that negotiations go -- or I
5         would -- well, I would assume negotiations
6         go on between third-party payers and
7         oncologists, let's say, or whoever the
8         particular specialty is for the
9         physician-administered drug in the same
10        way that negotiations go on as we have
11        looked at proforma contracts before, and I
12        would assume a number of things enter into
13        them, and it is my understanding and the
14        data that I have seen in Lupron indicates
15        that there is a relationship of those
16        price -- of the reimbursement rates to
17        AWP, and I have -- I have focused on that
18        aspect of the negotiations or the results
19        of the negotiations as they appeared in
20        what was paid relative to AWP.
21   Q.   Is it your understanding that each
22        negotiation is potentially unique?

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only       October 8, 2004
Volume II                                    Boston, MA

57 (Pages 542 to 545)

542

1         MR. SOBOL: Objection to form.
2  A.  The -- the unique -- I guess I am not
3      quite sure what you mean about -- by
4      "unique." That each particular -- you are
5      saying that at the end of the day every
6      individual -- every third-party payer that
7      comes and negotiates with every physician
8      that is administering physician-
9      administered drugs has a different
10     reimbursement contract with different
11     percentages off of AWP? That there is for
12     every -- for every unique agreement
13     between an insurer and a physician or an
14     oncology group, there is a different
15     resulting set of terms?
16 Q.  What I am asking you is whether --
17         MR. EDWARDS: Strike that.
18 Q.  What I am asking you is whether in
19     connection with each individual
20     negotiation there is a negotiation over
21     the price of the drug, there is a
22     negotiation over the price of the service,

543

1      there is a negotiation over other terms,
2      there is a negotiation over the trade-offs
3      among all of those variables, and it is
4      difficult to predict in advance how any
5      particular negotiation is going to turn
6      out? It depends on the facts and
7      circumstances?
8  A.  I would say that the type of uniqueness
9      you are talking about is also
10     characteristic of negotiations between
11     third-party payers and PBMs and -- and an
12     important "and," spelled capital A,
13     capital N, capital D -- that uniqueness is
14     bound very narrowly, within very
15     closely-set parameters, that lead to
16     results such that the final negotiations
17     of AWP less a percent ranges from 13 to
18     17 percent, and although you have a
19     different individual wearing a different
20     suit on a given day and driven by unique
21     factors, there are a set of proforma
22     channels in which these negotiations run

544

1      that are standard, and so the uniqueness
2      is lost very quickly in the standard
3      practices and procedures of what is
4      articulated in these contracts.
5  Q.  How can you say that when you have never
6      reviewed any contracts between PBMs and
7      payers and you have never reviewed any
8      contracts between physicians and payers?
9         MR. SOBOL: Objection to the
10     form.
11        You may answer.
12 A.  I can say that by having reviewed -- by
13     looking at the proforma contracts that you
14     have put in front of me, where there is a
15     blank in front of the AWP less blank
16     percent, and then looking at data that
17     summarize at the end of the day what that
18     percent is, and that tells me that it is
19     13 to 17 percent for single source drugs.
20        I can -- I can say that because
21     across a variety of industries there are
22     -- there are standards -- every

545

1      negotiation is, quote, unique, unquote,
2      but there are various ranges in which
3      salaries are negotiated or prices are
4      negotiated if information is fully under
5      -- is understood or is thought to be
6      understood, given the set of information
7      that is there, such that the results are
8      predictable.
9  Q.  So the validity of your opinion depends on
10     the extent to which it is appropriate to
11     focus on only one factor or one variable
12     contained in the contract, i.e. the price
13     for the drug and whether it is a
14     percentage off of AWP, and you would
15     ignore the other factors?
16        MR. SOBOL: Objection.
17 A.  I would not ignore the other factors, and
18     I think in response to one of the
19     questions, I discussed those factors and
20     what the charges were by different type of
21     service, and one would observe those, and
22     I have observed those, and I have -- and

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

58 (Pages 546 to 549)

546

1    observations will be made to the extent
2    that they vary with the negotiation off of
3    AWP, but I have seen nothing -- I have
4    seen no evidence to date indicating to me
5    that that is a determining factor in that
6    negotiation.
7          (Mr. Mayte exiting the
8    deposition room at 3:44 p.m.)
9    BY MR. EDWARDS:
10   Q.  Have you ever seen the supplemental
11   Dyckman study?
12   A.  I don't think so.
13         MR. EDWARDS:  Let's mark as
14   Exhibit 19 a copy of a document entitled
15   Health Plan Payment for Physician-
16   Administered Drugs, Dyckman & Associates,
17   August 2003, No. 3-5.
18         (Health Plan Payment for
19         Physician-Administered Drugs,
20         Dyckman & Associates, August
21         2003, No. 3-5 marked
22         Exhibit Hartman 019 for

547

1          identification.)
2    BY MR. EDWARDS:
3    Q.  Have you ever seen this document before?
4          (Pause.)
5          (The witness viewing Hartman
6    Exhibit No. 019.)
7    Q.  My question to you, sir, was simple.  Have
8    you ever seen this before?
9    A.  I was so interested in reading it, I am
10   sorry, I got lost.
11         I'm not sure.  Can I see the
12   original?
13   Q.  Do you mean the Dyckman report that you
14   rely on?
15   A.  Yes.
16   Q.  Okay.
17         MR. EDWARDS:  Why don't we mark
18   this as Exhibit 20.  For the record, this
19   is a report entitled Survey of Health
20   Plans Concerning Physician Fees and
21   Payment Methodology dated August 2003,
22   No. 3-7.

548

1          THE WITNESS:  So they are both
2    dated the same date.
3          (Survey of Health Plans
4          Concerning Physician Fees and
5          Payment Methodology dated
6          August 2003, No. 3-7 marked
7          Exhibit Hartman 020 for
8          identification.)
9          (Handing Hartman Exhibit
10   No. 020 to the witness.)
11   A.  Because the table I am looking at looks
12   awfully damn similar to the one that I
13   have seen in the original Dyckman.
14         (Pause.)
15         (The witness viewing Hartman
16   Exhibit No. 020.)
17   A.  Okay.  I'm -- what I have found and why I
18   asked to see the original is that
19   certainly what I had referred to in the
20   original report, which I think is probably
21   Exhibit 13 --
22         (Pause.)

549

1          (The witness viewing Hartman
2    Exhibit No. 013.)
3    A.  Well, it is mentioned in the Med. PAC
4    report.
5          In any case, my recollection of
6    what I relied on in Med. PAC is page 17 of
7    the study numbered -- well, the study
8    dated the same month, same year, number
9    03-7, Exhibit 13, which shows distribution
10   of health plans distributed by drug
11   pricing by AWP formula, and that is the
12   set of numbers that I remember occurring
13   -- appearing in the Med. PAC report, and
14   in the document you just gave me, I am
15   seeing that same table as Exhibit 2, but
16   so --
17   Q.  That's on page?
18   A.  Page 3 of Exhibit --
19   Q.  19?
20   A.  -- 19.
21   Q.  Why don't you take a look at page 4 of
22   Exhibit 19.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                          Boston, MA

550

1    (Witness complying.)
2  A.  Okay.  And now what?
3  Q.  There is a section headed "Characteristics
4      of Payment Systems for Drugs and
5      Administration fees," and it states,
6      "There are several patterns and trends
7      regarding payment system characteristics
8      that can be inferred from the health plan
9      survey responses," and the first bullet
10     is, quote, "There is a general
11     understanding among health plans that
12     physicians purchase drugs at prices that
13     are below 95 percent of AWP, and given
14     that health plan prices are generally at
15     or above this rate, the sale of drugs is a
16     profit center for physicians," close
17     quote.
18        Did you consider that in
19     developing the opinions you developed in
20     your report with respect to the impact of
21     the alleged scheme on reimbursement rates
22     for physician-administered drugs in the

551

1      private sector?
2  A.  Yes.
3  Q.  So this may be a situation similar to the
4      one we discussed in attachment C where you
5      talked about whether if spreads were
6      understood to exist, competitors would be
7      in a position to behave to eliminate them?
8        MR. SOBOL:  Objection.
9  Q.  Is that correct?
10       MR. SOBOL:  Objection.
11 A.  No.  The -- what this is saying and given
12     the fact that WAC is below AWP, this is
13     saying for all drugs by formula, so what
14     does this say?  It says, "There is a
15     general understanding among health plans
16     that physicians purchase drugs at prices
17     that are below 95 percent of AWP," and it
18     is under the yardsticks that I have used
19     in everything but for Medicare.  The
20     yardsticks are such that it is understood
21     that ASP is more than five percent below
22     AWP.

552

1        What this is saying is everyone
2      knows that ASP is lower than AWP, and that
3      is what all my yardsticks show, again
4      except for the regulation -- as written by
5      regulation.  The issue here is how much
6      below it is.
7        And, yes, it is below, but I see
8      nothing here that indicates that there is
9      any understanding of how much below it is,
10     that is the levels of spreads of three to
11     four hundred percent that we saw in
12     Lupron, and it was only at that point that
13     when that information became available
14     that the government got exercised and
15     persons got exercised.
16        So this is perfectly consistent
17     with what I have put forward, and this is
18     not enough information to know how badly
19     below, how far below AWP ASP is, the
20     actual acquisition cost, how much of a
21     profit center that is for those third-
22     party payers to start to take the

553

1      competitive actions that have since
2      started to occur say with Lupron, when
3      that understanding was much -- made much
4      clearer than kind of the general
5      understanding that they are below
6      95 percent of AWP.
7  Q.  And this is not enough information to
8      enable you to determine the extent to
9      which third-party payers understood the
10     extent of the spread between ASP and AWP?
11     Correct?
12 A.  Certainly not.
13 Q.  You would have to make further inquiry in
14     order to determine that?  Correct?
15 A.  Well, the inquiry I would have to make is
16     what I have laid out in my declaration.
17 Q.  In the last bullet on this page, it
18     states, quote, "Approximately half of the
19     health plans planning to reduce drug
20     prices will consider raising fees for drug
21     administration codes."
22        What do you understand that to

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

60 (Pages 554 to 557)

554
1    mean?
2    A.  I understand that to mean that as of
3        August 2003 and as of the state of
4        understanding of pricing and expectations
5        and a knowledge of occurrences in the
6        industry, that at that time when this
7        survey was done approximately half of the
8        health plans were planning to reduce
9        prices or who are planning to reduce
10       prices will consider raising fees for drug
11       administration codes.
12   Q.  So does this suggest to you that there is
13       a connection between the price of the drug
14       and the price of the service with respect
15       to physician-administered drugs in the
16       private sector?
17           MR. SOBOL:  Objection to the
18       form.
19           You may answer.
20   A.  Well, on the face of it what it says to me
21       is that at the end of 2003, about a year
22       ago, only half of the plans, not all of

555
1        the plans, will consider, having done so,
2        doing something about changing their drug
3        prices and their fees, and they may link
4        them, or how they are going to do that, it
5        is not particularly clear.  I am seeing
6        that there is an understanding by this
7        survey based on what was known in the
8        market at that time that there was a
9        necessity to do something about drug
10       pricing and how they were reimbursing for
11       drugs, and at the same time they were
12       going to do that, there is a consideration
13       of raising fees, and I -- there is not
14       enough here for me to learn whether they
15       are tied or how they are trading that off
16       or what that means; and, secondly, this is
17       going from -- you know, they are talking
18       about doing this in -- they will consider
19       it in 2003.  Whether they are doing that
20       now in 2004, we're at the end of the class
21       period.  I -- this -- I am not seeing as a
22       characterization of so far of how the

556
1        world worked during the class period.
2    Q.  Don't you have to consider the
3        relationship between the cost of the drug
4        and the cost of the service in determining
5        whether there has been an impact --
6            MR. SOBOL:  Objection.
7    Q.  -- from the alleged scheme?
8            MR. SOBOL:  Objection.
9    A.  No.
10   Q.  Let's assume that in the actual world a
11       payer pays $10 for the drug and $10 for
12       the service, and then in the but-for world
13       the payer pays $5 for the drug and $15 for
14       the service.  Has that payer been injured?
15           MR. SOBOL:  Objection.
16   A.  You -- you have asked me a different
17       question.  Your last question was did that
18       change my opinion or have any influence on
19       my opinion about impact.  Now you have
20       just asked a question about injury.
21           Which do you -- which one are
22       you asking me to answer?

557
1    Q.  I am asking you to answer my last
2        question.
3    A.  Okay.  So we're not talking about impact
4        now.  You are asking me a question about
5        injury.  And in that context, could you
6        repeat the question, or can I have it read
7        back?
8            MR. EDWARDS:  Go ahead and read
9        it back.
10           (The reporter then read back as
11       follows:
12           "Question: Let's assume that in
13       the actual world a payer pays $10 for the
14       drug and $10 for the service, and then in
15       the but-for world the payer pays $5 for
16       the drug and $15 for the service.  Has
17       that payer been injured?")
18           MR. SOBOL:  Same objection.
19   A.  Without a broader context, I -- the
20       hypothetical is too -- too stark for me to
21       feel that it fits the facts.  I mean you
22       are --

558

1   Q.  What broader context would you need?
2   A.  The -- the -- you have posited a situation
3       where the drug cost is the same as the
4       physician services.  You have -- I would
5       need to know whether the, as I look at
6       the, as I say, the contracts for the PBMs
7       and their clients, drug costs relative to
8       the other services are much smaller, and
9       whether that would influence those line-
10      by-line costs, the -- whether they are
11      related would depend on that.  You are
12      asking me about now a relationship in a
13      particular context where it is $10, $10.
14      It's the same.
15          I will answer as follows:  that
16      what I have been asked to do is examine
17      the impact of what the -- specifically the
18      AWP inflation scheme, what that impact and
19      injury and -- injury and damages, what the
20      impact was, and what the injury and
21      damages were, and I am focusing on that
22      specifically.

559

1   Q.  Now I want to talk to physician-
2       administered Part B.  As I understand it
3       with respect to Part B drugs, your but-for
4       spread is zero.  Is that correct?
5   A.  That is correct.
6   Q.  And you say that that is by regulation?
7       Is that correct?
8   A.  That is as a matter of my interpretation
9       of the regulations.
10  Q.  You are not an expert on Medicare
11      regulations?  Correct?
12  A.  I am not an expert on statutory
13      complexities of Medicare regulations.
14  Q.  You don't have a law degree?  Is that
15      correct?
16  A.  No.
17  Q.  And in footnote 48 where you explain this
18      -- that is footnote 48 on page 22 -- you
19      seem to be saying that AWP should equal
20      ASP because the regulations set
21      reimbursement at the lesser of AWP or EAC.
22      Is that right?

560

1   A.  Well, the -- what I say there is that
2       Medicare reimbursement for all
3       Part B-covered drugs was set at the lesser
4       of the estimated acquisition cost, which I
5       have seen described separately as the
6       average acquisition cost, or -- and if
7       we're talking about an average acquisition
8       cost, averaged over a large number of
9       acquirers, that is going to be equal to
10      the average price at which it was sold to
11      those broad number of acquirers at the
12      average cost at which they acquired it.
13      So that the supply and demand curve will
14      intersect, and that the average
15      acquisition cost will equal the average
16      sale price.
17          Oh, I am sorry.  And you are
18      saying or the --
19          I am taking the average
20      acquisition cost as equal to the average
21      sale price, and then the continuation of
22      the sentence -- I now see the confusion on

561

1       your face -- is "or the national average
2       wholesale price."
3           Should I reanswer that question?
4   Q.  That would be fine, because you have
5       completely lost me.
6           MR. SOBOL:  Not bad.  You made
7       it after four o'clock on day 2 until that
8       happened.
9           (Laughter.)
10          MR. SOBOL:  We could read back
11      your answer, if you want.
12          THE WITNESS:  Actually the
13      answer is irrelevant.  Why don't you read
14      back the question.
15      BY MR. EDWARDS:
16  Q.  I am trying to understand your basis for
17      opining that the but-for spread under
18      Medicare Part B should be zero.
19  A.  That's what I was getting at.  I just was
20      getting ahead of myself.
21          Essentially as I read the
22      regulations, I read the regulations that

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only       October 8, 2004
Volume II                                    Boston, MA

62 (Pages 562 to 565)

562

1    under Medicare Part B from the period of
2    1992 through 1997 that Medicare Part B
3    would reimburse at the lesser of the
4    estimated acquisition cost, which I take
5    as equal to the average acquisition cost,
6    or the alternative is the national average
7    wholesale price, whichever is -- well, the
8    lesser of.
9          That later changed to 95 percent
10   of AWP, and then when relevant, changed to
11   the AWP of the least costly alternative as
12   the other possible price that it was
13   lesser of: estimated acquisition cost or
14   any of those alternatives.
15         And what I am saying is that
16   throughout this period as a matter of
17   economics an average acquisition cost for
18   all purchases of a Medicare Part B is
19   given by the average sale price of that
20   NDC as it is sold, and so the -- the -- it
21   -- if that is what the estimated
22   acquisition cost should be, and it is my

563

1    opinion that that is what is meant, as is
2    what is reflected actually in the
3    sentencing memorandum and to what TAP has
4    agreed to do -- that what they should have
5    been charging and what the reimbursement
6    rate should have been set at was ASP. So
7    the markup above ASP was zero, and that is
8    the but-for markup. In other words, the
9    but-for AWP equals the ASP.
10   Q.  Doesn't the fact that the regulation
11       distinguishes between AWP and EAC suggest
12       that HCFA knew there was a difference
13       between the two?
14              MR. SOBOL: Objection.
15              You may answer.
16   A.  I don't know what HCFA knew. I know what
17       I read in the summaries of the regulations
18       as I have read them. I have also read the
19       portions of the sentencing memorandum
20       saying what TAP said it was going to
21       report going forward to accommodate its
22       behavior to the sentencing memorandum into

564

1    which it entered, and it was going to
2    report the ASP.
3          So I think -- I think people
4    understood that the ASP and WAC were less
5    than AWP, and why they wrote the
6    regulations as they did I don't know, but
7    I read the regulations, and if it is the
8    estimated acquisition cost as what it is
9    sold as, it is not sold -- they don't
10   acquire it -- the physicians don't acquire
11   it at AWP. They acquire it at an
12   estimated acquisition cost.
13   Q.  Do you think the government lawyers who
14       wrote the sentencing memo in the TAP case
15       are an authoritative source for what
16       government policy was when the regulations
17       in question were adopted?
18   A.  I -- I have -- I have no ability to -- I
19       have no idea what their expertise was or
20       was not. I understand that there was an
21       allegation of fraudulent behavior in
22       marketing practices. I understand that

565

1    people pled guilty to them. I understand
2    that a settlement amount of $875 million
3    was paid to the government. I understand
4    that TAP admitted to certain practices and
5    that they stopped those practices. And in
6    responding to stopping those practices,
7    they said that they would report their
8    ASPs.
9          Now that to me says whatever
10   those lawyers knew, the interpretation was
11   not dissimilar to what this seems to be
12   saying, if that's what their -- if they
13   are going to be reporting ASP and that's
14   what they are going to be reimbursing at,
15   that that was what was in the minds of
16   those of the legislature or when these
17   regulations were written, and I can only
18   take them at face value and read what I am
19   assuming the government is saying those
20   reimbursement rates should be.
21              MR. EDWARDS: I am going to mark
22       as Exhibit 21 a copy of the government's

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

63 (Pages 566 to 569)

566
1   memorandum regarding RTP as a kickback in
2   the United States v. MacKenzie case.
3              (Nine-page Government's
4              Memorandum Regarding RTP as a
5              Kickback Under Paragraph 55(b)
6              of the Conspiracy Charged in
7              Count I marked Exhibit Hartman 021
8              for identification.)
9   BY MR. EDWARDS:
10  Q.  Have you heard of the McKenzie case?
11  A.  Not to my knowledge.  What is this dated?
12  Q.  June 24, 2004.
13  A.  I was out of town.
14  Q.  Do you see it is signed by Michael Loucks?
15  A.  I do.
16  Q.  He is the same person that signed the
17      sentencing memo that you have been
18      referring to?
19  A.  That's my recollection.
20  Q.  And on the first page of this document, it
21      states, quote, "Every purchaser of Lupron
22      was able to obtain a list price for the

567
1   drug which was lower than the average
2   wholesale price, AWP, and the spread
3   between list price and AWP was known to
4   the government in various ways and assumed
5   by the Medicare reimbursement system."
6              Now does that cause you to
7   reconsider your opinion that the but-for
8   AWP for Medicare Part B should be equal to
9   ASP?
10              MR. SOBOL:  Well, may he be
11  permitted to read the sentence that
12  follows it?
13              MR. EDWARDS:  He can read
14  anything he wants.
15              (Pause.)
16              (The witness viewing Hartman
17  Exhibit No. 021.)
18  A.  The -- in what I have reviewed of the
19  sentencing memorandum and of the Complaint
20  in Lupron and the data of TAP's detailed
21  invoice and off invoice data and data from
22  oncology groups billing for Lupron was the

568
1   following:  first of all, the sentence
2   following the one that you asked me to
3   look at where the allegations made in
4   Lupron are laid out in that, those next
5   sentences and in the next paragraph were
6   certainly found to be the case and were
7   subject to the sentencing memorandum and
8   the plea agreement, and those are also
9   clearly the notion of marketing spread and
10  moving market share, the basis for the
11  allegations in this matter.
12              And finally, returning to the
13  sentence of interest, what I can say is
14  that I have observed summaries by the
15  government, by lawyers, and it is my
16  recollection by TAP where spreads were
17  listed, and the spreads and the return to
18  practice were expressed with the AWP
19  relative to the ASP, and it was clear as
20  day, and that's -- and that's what much of
21  the argument revolved around.
22              Now to the extent that

569
1   Mr. Loucks is now coming back and saying
2   the spread between list price and AWP was
3   known to the government in various ways
4   and assumed by the Medicare system, I
5   don't know what to make of that.  I know
6   that the RTP scheme was based on a
7   comparison between AWP and ASP, and I know
8   that the participants in the fraud and the
9   oncologists that pled guilty were billing
10  at AWP.  And -- and that there was -- what
11  was the fundamental issue here was not
12  that there was -- that there was -- that
13  the list price was lower, but it is
14  exactly what is the next sentence:  "That
15  it was neither assumed or known to the
16  government that it was that much lower,"
17  and that's the source of the damages.
18  Q.  What he is saying is that the but-for
19  spread, in your terminology, should be
20  25 percent; correct?
21              MR. SOBOL:  Objection.
22  A.  I see no number coming out of this spread.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only            October 8, 2004
Volume II                                Boston, MA

64 (Pages 570 to 573)

|  | 570 |
|---|---|
| 1 | Q. Let me show you a number. |
| 2 | MR. EDWARDS: We will mark as |
| 3 | Exhibit 22 a copy of a transcript in |
| 4 | U.S. v. MacKenzie for June 24, 2004. |
| 5 | (Copy of transcript in United |
| 6 | States versus Alan MacKenzie |
| 7 | et al dated June 24, 2004 |
| 8 | marked Exhibit Hartman 022 |
| 9 | for identification.) |
| 10 | BY MR. EDWARDS: |
| 11 | Q. I want you to turn to page 68 of this |
| 12 | transcript. |
| 13 | (Witness complies.) |
| 14 | Q. Beginning on line 4 -- |
| 15 | A. Prior to answering your question, if I |
| 16 | might, who are the defendants in this |
| 17 | matter? Who is Alan MacKenzie? |
| 18 | Q. These were, as I understand it, TAP |
| 19 | employees -- |
| 20 | A. Okay. |
| 21 | Q. -- and others, but primarily TAP |
| 22 | employees. |

|  | 571 |
|---|---|
| 1 | A. Okay. And I am sorry. Which page did you |
| 2 | direct me to? |
| 3 | Q. I directed you to page 68, beginning at |
| 4 | line 4, where Mr. Loucks says, "And the |
| 5 | 25 percent, everyone gets that. That's |
| 6 | there. That is what Congress expected |
| 7 | with AWP." |
| 8 | Does that affect your opinion |
| 9 | that the but-for spread for Medicare |
| 10 | Part B should be zero by regulation? |
| 11 | MR. SOBOL: Objection to the |
| 12 | form. |
| 13 | A. The -- my interpretation -- actually |
| 14 | before I venture forth, let me just again |
| 15 | read the -- |
| 16 | Q. Can't you just answer that yes or no? I |
| 17 | don't need your interpretation. A yes or |
| 18 | no answer would be just fine. |
| 19 | A. In order for me to answer yes or no, |
| 20 | counselor, I must read -- my |
| 21 | interpretation, to give that yes or no, I |
| 22 | want to read a few sentences prior and |

|  | 572 |
|---|---|
| 1 | after. |
| 2 | (Pause.) |
| 3 | (The witness viewing Hartman |
| 4 | Exhibit No. 022.) |
| 5 | (Ms. Halpern exiting the |
| 6 | deposition room at 4:21 p.m.) |
| 7 | A. Having read this, I can only conclude -- I |
| 8 | conclude the following. Mr. Loucks is an |
| 9 | attorney. He is talking -- he himself is |
| 10 | talking about that essentially -- the |
| 11 | estimated acquisition cost was taken to be |
| 12 | five percent below AWP, and that his |
| 13 | description of what was happening in the |
| 14 | world I did not find confirmed by claims |
| 15 | submitted by physicians to Medicare for |
| 16 | Lupron and injections, and if indeed the |
| 17 | regulations were not followed and |
| 18 | estimated acquisition cost turned out to |
| 19 | be 25 percent, and that was really what |
| 20 | was being paid, well, then that should be |
| 21 | the spread. But I have seen no evidence |
| 22 | of that. |

|  | 573 |
|---|---|
| 1 | I see he is saying it is a |
| 2 | historical fact not proven to this jury. |
| 3 | It has not been proven to me either. And |
| 4 | I don't think it has been -- I don't see |
| 5 | it proven in the record here. And it |
| 6 | certainly was not in oncology claims data |
| 7 | that I have seen in the Lupron matter. |
| 8 | Q. So you are not going to give me a yes or |
| 9 | no answer to my question? |
| 10 | A. (No audible response.) |
| 11 | MR. SOBOL: Objection. Asked |
| 12 | and answered. |
| 13 | Q. Is it your opinion that estimated |
| 14 | acquisition cost and average wholesale |
| 15 | price as used in the Medicare |
| 16 | reimbursement regulations mean the same |
| 17 | thing? |
| 18 | A. No. You said average wholesale price? |
| 19 | Q. Yes. |
| 20 | A. And estimated acquisition cost? |
| 21 | Q. Yes. |
| 22 | A. No. |

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 8, 2004
Volume II                                    Boston, MA

65 (Pages 574 to 577)

574

1      MR. EDWARDS: There are a couple
2  of the other defendants, Tom, that want to
3  ask some questions. I don't think they
4  will be very long, but I will yield the
5  floor to them at this point.
6      MR. SOBOL: Rock on.
7      THE WITNESS: Oh, God. There is
8  more?
9      (Laughter.)
10     MR. KAUFMAN: I will be very
11  quick.
12     CROSS EXAMINATION
13  BY MR. KAUFMAN:
14  Q. So, Dr. Hartman, I want to give you a
15  hypothetical and then just follow through
16  on some of the consequences.
17  A. Okay.
18  Q. We have a WAC of 100 and an AWP of 125 and
19  an ASP of 60.
20  A. I am going to just write this down --
21  Q. That is fine.
22  A. -- so it will just help me out here. We

575

1  have the AWP of 125, a WAC of 100, and an
2  ASP of -- what was it?
3  Q. 60.
4  A. Okay.
5  Q. What is the but-for AWP?
6      MR. SOBOL: Objection to the
7  form of the question.
8      MR. KAUFMAN: What is wrong with
9  the form, Mr. Sobol?
10     MR. SOBOL: It has insufficient
11  information upon which he may be able to
12  render an opinion.
13  BY MR. EDWARDS:
14  Q. You tell me if that is insufficient. You
15  tell me whether you can give me the answer
16  to this question or not.
17  A. I have insufficient information. Is it a
18  branded drug, single source, multisource,
19  is it a physician injected, or is it a
20  generic drug?
21  Q. All of those factors would bear on the
22  answer to that question? Is that so?

576

1  A. Of those categories, I have made that
2  clear in my declaration. Yes.
3  Q. But it is that fact about your declaration
4  I don't understand. The ASP -- let's say
5  that this is sold to a wholesaler by a
6  drug company. The WAC is the wholesaler
7  list price. Correct?
8  A. Correct.
9  Q. And so what is said by WAC is this is the
10  price we charge to wholesalers. Correct?
11  A. That's correct.
12  Q. And that's the price we charge to
13  wholesalers no matter what the wholesalers
14  later do? Right?
15     MR. SOBOL: Objection.
16  A. The wholesalers are usually constrained by
17  the manufacturers who negotiate the
18  ultimate prices, which they are made whole
19  by the chargeback system. So the
20  wholesalers are -- have very little
21  strategic maneuvering room here. They are
22  -- they are -- they are beaten up by the

577

1  manufacturers in terms of pricing and what
2  they can do, but.
3  Q. And all of that reflects or is reflected
4  in ASP? Correct?
5      MR. SOBOL: Objection.
6  A. All of what is reflected in ASP?
7  Q. ASP is net of all factors affecting the
8  price at which the drug is sold? Correct?
9  A. ASP is -- you would take -- I might bill
10  out a drug and get a gross invoice amount
11  that is not necessarily related to AWP or
12  WAC. WAC is merely what I sell -- that's
13  what I sell it to and which the
14  wholesalers take possession of that drug
15  to turn around and resell it for me. And
16  ASP is merely the gross amount that I
17  receive plus all the payments that I
18  make --
19  Q. Right.
20  A. -- to the various middlepersons along the
21  way, including the wholesalers.
22     If indeed the wholesalers sold

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 8, 2004
Volume II                                    Boston, MA

66 (Pages 578 to 581)

578

1      it for less than WAC, I have to make them
2      whole.
3  Q.  Right.
4  A.  So I have to pay them a chargeback. And
5      then I offer discounts to, potentially to
6      third-party payers, to PBMs. I offer
7      discounts to retail chains, to docs.
8  Q.  And ASP is net of all that; correct?
9  A.  Correct.
10 Q.  Which is what I said in the first place.
11     Right?
12         MR. SOBOL: Objection.
13 A.  I'm not sure -- I agree with that. I
14     don't know what you said in the first
15     place.
16 Q.  ASP is the amount that is left in the drug
17     company's pocket after all of that you
18     have just described has occurred?
19 A.  That is certainly true.
20 Q.  Okay.
21 A.  It is what they are willing to sell their
22     drug for, the unit revenue which they are

579

1      willing to sell their drug for given the
2      strategic position of their drug.
3  Q.  And that is 60 in my hypothesis?
4  A.  Correct.
5  Q.  And the WAC in my hypothesis is 100?
6  A.  That's correct.
7  Q.  Okay. Now the but-for AWP you say cannot
8      be determined from those numbers?
9  A.  You have given me a hypothetical, and
10     according to this hypothetical, the spread
11     would be greater than 100 percent.
12 Q.  Whatever it is, what is the but-for AWP in
13     that hypothetical?
14         MR. SOBOL: Objection.
15 A.  The but-for --
16         MR. SOBOL: The same objection I
17     had before.
18 A.  The but-for AWP, I would take that ASP,
19     and without a calculator I am lost, so I
20     will just show you the equations into
21     which I would plug it.
22 Q.  On page 24 of your report?

580

1  A.  Actually, a little bit before that, but
2      close. The but-for AWP would be
3      calculated by the difference between the
4      spread implied by the numbers you just
5      gave me, and that spread is 125 minus 60
6      over 60.
7  Q.  Right. And that is a definite number?
8      Correct?
9  A.  That is a definite number.
10 Q.  So you have that number. What other
11     numbers would you need?
12 A.  I would need the -- and I would need the
13     but-for spread, which would be, if this --
14     this number is whatever it turns out to
15     be, in excess of 100 percent.
16         The but-for spreads, depending
17     on which type of drug this would be, would
18     be as illustrated by the information put
19     forward so far among -- if it is a
20     single-source branded drug, it would range
21     from 16 to 33 percent.
22 Q.  But now a single-source branded drug is

581

1      also sometimes administered by physicians?
2      Correct?
3  A.  A single-source branded drug I'm taking as
4      one that is not administered via
5      physician. I am taking -- I am taking --
6      I am looking -- I would -- I am going to
7      break out by NDC those drugs that are not
8      administered by physicians.
9  Q.  So those categories of drugs for which you
10     calculate at this point preliminary
11     spreads are all mutually exclusive?
12 A.  That's correct.
13 Q.  And collectively exhaustive?
14 A.  They will be.
15 Q.  But no drug falls into more than one of
16     those categories?
17 A.  Are you talking about an NDC or a drug? I
18     mean there are some NDCs that appear in
19     oral form and some in injectable form, and
20     some of those could be sold at retail or
21     through PBMs, and some could be
22     administered -- and there is one example

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only         October 8, 2004
Volume II                                    Boston, MA

67 (Pages 582 to 585)

582
1    in my table, and I think it is cytoxan,
2    where there is a powder for solution which
3    is -- which is a physician-administered
4    drug, and then there is also a tablet, and
5    there are quite distinct and different
6    actual spreads for those two drugs based
7    on this very preliminary use of the data,
8    and there are different yardsticks to
9    which I would compare them to.
10   Q.  And the yardsticks you will ascertain by
11       looking at actual data to see the
12       difference in actual terms between the
13       listed AWP for the drug you are studying
14       and the sale price, the actual sale price
15       for that drug to that class of trade?
16          MR. SOBOL:  Objection.
17   Q.  Is that correct?
18          MR. SOBOL:  Objection.
19   A.  You asked about the yardsticks.  Right?
20   Q.  Yes.
21   A.  The yardsticks, I am going to look -- I am
22       going to refine -- the yardsticks that

583
1    have been reported to date focus on that
2    type of information for those different
3    categories, exclusive categories of drugs
4    in the past.  I am going to refine it as
5    much as I can with actual data beyond that
6    survey data, if that is possible.  I am
7    going to try and refine that with data for
8    non -- for drug manufacturers that are I
9    am informed were not subject to the
10   allegations, if such manufacturers exist.
11   And so whatever information that does
12   exist or additional survey information I
13   will use, plus whatever information I am
14   able to gather through the depositions I
15   have asked to be noticed I will use to
16   refine those yardsticks.
17   Q.  Now in the case of generic drugs, some at
18       least have no WAC?  Correct?
19   A.  I am -- I would have to -- that would be
20       something that would be subject to
21       something I would have to check.  I would
22       assume that WAC is less important for a

584
1    generic drug.  They have AWPs, but I don't
2    recall examining closely WACs for generic
3    drugs.
4    Q.  So in the case of generic drugs that don't
5        have WACs, which may be all generic drugs
6        or just some, there is no manufacturer-
7        endorsed indication of a relationship
8        between wholesaler price and the price
9        charged to retailers by wholesalers?
10       Correct?
11          MR. SOBOL:  Objection.
12   A.  There is an endorsement of an AWP, and
13       that is primarily the endorsement that I
14       am most familiar with.
15   Q.  Now in your but-for world, you keep
16       constant the relationship between AWP and
17       MAC for branded drugs -- not MAC, I am
18       sorry, WAC -- wrong consonant.  Okay?  You
19       do, don't you?
20   A.  I don't keep it constant.  The drug
21       companies do.
22   Q.  And you do in your but-for world.  That's

585
1    what I said.  In your but-for world, you
2    keep that same relationship?
3    A.  In my but-for world, the ultimate price of
4        issue is AWP.
5    Q.  Well, please.  Do you keep constant in the
6        but-for world the relationship between AWP
7        and WAC?
8    A.  If I -- if I need -- if it is needed --
9        but, I will have to look at that, but --
10   Q.  That's a matter of arithmetic?  That is a
11       consequence of the arithmetic you do or
12       not?
13          MR. SOBOL:  Objection.
14   A.  I have drawn no conclusion about whether
15       that arithmetic would stay the same
16       between AWP and WAC in the but-for world
17       or not.  My assumption would be that it
18       would, but it is not something I have
19       needed for -- the reimbursement rates on
20       all the contracts we have looked at have
21       been related through AWP primarily --
22       well, universally, what I have seen.

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                     Boston, MA

68 (Pages 586 to 589)

586

1      So to the extent that I would
2    need WAC, then I would have to turn to an
3    assumption about the constancy of that
4    relationship.
5  Q.  In the arithmetic you have done and
6    exemplified in your report, the
7    relationship between AWP and WAC in the
8    real world is reflected in the
9    relationship of AWP to WAC in the but-for
10   world?  Correct?
11 A.  That's correct.
12 Q.  Are you saying that just as statistical
13   artifact?
14 A.  I am saying that as a matter of business
15   practice. Drug manufacturers, since they
16   started making use of the pricing
17   compendia, have listed and made use of
18   list prices that include a wholesale
19   price, a wholesale list price in the case
20   of BMS, or WAC in the case of other
21   companies, and AWP, and they have
22   maintained relationships between those

587

1    prices, and sometimes they changed
2    slightly over time, but they have remained
3    fairly uniformly constant by manufacturer,
4    and that -- those facts exist.
5  Q.  And those are facts that you take into
6    account in creating the but-for world?
7    Correct?
8  A.  In terms of creating the but-for world,
9    the fact that I take into account, that's
10   a secondary fact.
11 Q.  But it turns out to be a fact in the
12   but-for world that the relationship is
13   maintained?
14 A.  For every drug that is -- that lists an
15   AWP that is subject to the allegations in
16   the conspiracy, it is irrelevant for the
17   calculation of the injury and the damages
18   what WAC is.
19 Q.  Nothing happens by accident in arithmetic?
20   Will you give me that?
21 A.  Well, no. But what I am trying to say is
22   that what we're getting at is there is a

588

1    relationship. The relationship -- the key
2    relationship here, what is driving the
3    alleged conspiracy, is AWP as the
4    benchmark price.  And, yes, there is an
5    arithmetic relationship to WAC.  But the
6    key issue here is the signal of what AWP
7    is for ASP.
8      Now for a drug where WAC is
9    20 percent below or 25 percent below, it
10   is not going to matter to me.  I am still
11   going to be looking at what AWP is going
12   to be relative to ASP and whether that AWP
13   was a good signal for ASP.
14     And so for different companies,
15   they might have 20 percent or 25 percent.
16   That is not relevant.  I am looking at
17   AWP.  Since that -- since the third-party
18   payers are reimbursing off AWP, I need to
19   find out what the expectations, as Loucks
20   says in the MacKenzie memorandum and
21   brief, that people didn't know how much --
22   how deep those discounts were.  They

589

1    didn't know how far below AWP ASP really
2    was.  And that's the key relationship.
3    And I am looking for yardsticks for
4    AWP/ASP.
5  Q.  I have been here listening to you.
6  A.  Okay.
7  Q.  I am trying not to make you say what I
8    have heard you say several times before.
9  A.  Then I am sorry.  I am --
10 Q.  That is fine.  I don't want to argue with
11   you.
12     Where there is a WAC as well as
13   an AWP, there is a measurement that the
14   audience can use to look at the difference
15   between the two?  Correct?  It is just a
16   matter of you can do arithmetic; right?
17 A.  Yes.  If --
18 Q.  Where there is no WAC, that arithmetic
19   comparison is not possible?  Right?
20 A.  If -- if the Blue Book doesn't list WAC
21   and it just lists an AWP, then you can
22   either assume the math that you are

Raymond S. Hartman, Ph.D.  Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                              Boston, MA

69 (Pages 590 to 593)

590

1    talking about, or you would have to look
2    for it, but --
3    Q.  Well, actually what you would assume is,
4        and in fact what people do assume, is that
5        there is no constant relationship between
6        ASP and AWP for generic drugs?  Correct?
7            MR. SOBOL:  Objection to the
8        form.
9    A.  I'm not -- no.
10   Q.  How do you know?
11   A.  Well, I have already seen surveys from the
12       OIG that have related --
13   Q.  No.  Those relate reimbursement rates with
14       ASP?
15   A.  No.  They relate AWP to acquisition costs.
16   Q.  Yes.  But any two numbers can be compared?
17   A.  Right.
18   Q.  Any two numbers?  Right?
19   A.  Right.
20   Q.  In fact the proverbial spurious
21       correlation is the standing of the
22       St. Louis Cardinals and the price of rice

591

1    in China; right?  Those two numbers can be
2    compared.  Any two numbers can be
3    compared.
4        The question is whether anybody
5    has expectations about the acquisition
6    cost of a generic from the AWP.
7        Now in the case of a branded
8    drug, expectations could conceivably be
9    generated by a comparison between two
10   numbers, AWP/WAC.  There is no possibility
11   for that comparison in the case of
12   generics?  Correct?
13       MR. SOBOL:  Objection to the
14   form.
15   A.  The -- there are possibilities for the
16   generic to form expectations.  There is
17   information that informs such
18   expectations.  And there are documents
19   that we have reviewed that have indicated
20   how much ASP was below AWP that
21   essentially said, my God, our expectations
22   were so far off the radar charts.  So

592

1        there were expectations.
2    Q.  No, no, no.  See, that's where I want --
3        what I wanted to explore with you for as
4        much time as I have remaining.  Okay?  I
5        understand that you can do arithmetic,
6        too, and you can look at the actual
7        selling price for drugs, or the OIG can,
8        anybody can.  It is just arithmetic.  The
9        actual selling price, the reimbursement
10       rate, AWP, people can compare numbers all
11       over the place.  I am now talking about
12       subjective expectations.  Expectation is
13       not arithmetic.  An expectation is a
14       prediction about the future, a projection,
15       in somebody's mind.
16           And the question I am asking you
17       is what reason you have to believe that
18       anyone had in mind when negotiating the
19       reimbursement rate for generics some view
20       as to the relationship between AWP and
21       ASP.
22   A.  Let me, if I might, turn your attention --

593

1    I have got this thing all --
2        (Pause.)
3        (The witness viewing Hartman
4    Exhibit No. 002.)
5    A.  I am going to just cite one of the
6    documents, and I am sorry.  When I put my
7    declaration back together, I got it out of
8    order.
9        Footnote one, to attachment D,
10   the meaning of average wholesale price and
11   an analysis of industry reliance on it.
12   And there is the article stated by --
13   authored by Dawn Gencarelli,
14   G-E-N-C-A-R-E-L-L-I, in an article
15   entitled "Average wholesale price for
16   prescription drugs:  Is there a more
17   appropriate pricing mechanism?"  And she
18   states, quote, "Though imperfect, the AWP
19   has come to represent a starting point for
20   determining prescription drug
21   reimbursement for public and private
22   payers.  The AWP, or average wholesale

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only                October 8, 2004
Volume II                              Boston, MA

70 (Pages 594 to 597)

594

1 price, of prescription drugs was intended
2 to represent the average price at which
3 wholesalers sell drugs to physicians,
4 pharmacies, and other customers."
5         And then she goes on to describe
6 how that has changed.
7 Q. Right.
8 A. But what I am saying is that AWP for
9 drugs, there is no distinction here
10 between branded and generic. That was
11 interpreted by the market over time
12 starting with Medicare, statutory
13 enablements, and the use of various
14 pricing mechanisms and signals.
15         AWP had a meaning for both
16 branded and generic drugs, and it was
17 taken to mean just what has been written
18 -- what I read to you.
19 Q. But you keep --
20 A. And that has changed over time.
21         (Mr. Wise exiting the deposition
22 room at 4:45 p.m.)

595

1 Q. I understand that somebody else had that
2 opinion, and maybe that is your opinion,
3 too. My question has to do with how you
4 can discern what relationship was expected
5 from actual arithmetic results. That is
6 putting the cart before the horse. There
7 is no way to know what was in somebody's
8 mind by what they did, because as I think
9 Mr. Edwards pointed out, you could have
10 done the same thing for any number of
11 reasons.
12         The fact that they -- in fact,
13 don't you think it is curious -- tell me
14 this. Don't you think it is curious that
15 the signal is different depending upon who
16 is receiving it? That for one class of
17 drugs people expect AWP to be so many
18 percent higher than acquisition cost,
19 whereas other people have a different
20 expectation? The manufacturer is putting
21 one AWP, but different people interpret it
22 differently. You don't think that is

596

1 curious?
2         MR. SOBOL: Objection to form.
3 A. I don't think the yardsticks that we see
4 reflect how drugs have been -- have been
5 marketed, and in the past, and how the
6 expectations of AWP reflected the whole
7 array of prices below AWP in the 1980s,
8 and once the allegation -- the alleged
9 scheme began or was undertaken by
10 defendants, one sees the spreads diverging
11 differently for different types of drugs
12 from the different yardsticks to begin
13 with, and the divergence that I see in the
14 actual spreads reflect exactly what I have
15 described in attachment E, which is that
16 the manufacturers would use this scheme,
17 these price reductions, these price
18 offsets, these incentive payments, to
19 focus on particular groups that were able
20 to move market share for their particular
21 drugs. So if I am a big manufacturer of
22 cytoxan and the docs are my main guys, and

597

1 I want to move market share of cytoxan
2 overall, well, I will, and most of the
3 NDCs are in injectable form or in
4 physician- administered form, what the, as
5 a matter of economics you would expect
6 that the incentives would be channeled for
7 most of the units of that drug sold, and
8 the data is showing that the actual
9 spreads indeed comport and corroborate the
10 incentives that are the basis for the
11 allegations.
12 Q. See, I think this is where we are seeing
13 things from two different points of view.
14 If you were to do a study of the extent to
15 which good bargainers --
16         MR. SOBOL: I am sorry?
17 Q. -- good bargainers, good bargainers,
18 people who know how to negotiate, the
19 extent to which they are able to negotiate
20 discounts from MSRP, compared to people
21 like me or Schleps, take your choice,
22 there would be a difference. That

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                    Boston, MA

71 (Pages 598 to 601)

598

1   difference is because of the difference in
2   the market power of the buyer, not because
3   of anything deceptive on the part of the
4   seller. Right?
5   A.  No. Wrong.
6   Q.  Wrong? It is my hypothetical? Can't I
7       make it up.
8           (Laughter.)
9   A.  I didn't know you were making up a
10      hypothetical.
11  Q.  What do you mean it is wrong?
12  A.  I thought you were describing the world.
13  Q.  I think it is the world. Certainly
14      there --
15  A.  Okay. That's a big difference. You think
16      it is the world.
17          MR. SOBOL: One at a time.
18  Q.  You give me a class. I am sure you can
19      find a class of buyer that has stronger
20      power than a given seller and stronger
21      than another class of buyer, and the
22      stronger class of buyer will prevail to a

600

1   branded drugs of different therapeutic
2   capabilities. You have really got one
3   very good drug. And what I have done with
4   my yardsticks is I have looked to a period
5   that allows for the variations in
6   bargaining that you are talking about, and
7   allows for variations across maybe the
8   types of branded drugs, and leads to
9   yardsticks that differ by orders of
10  magnitude. These are -- these are orders
11  of magnitude of 100 percent.
12  Q.  But you are attributing --
13  A.  But let me finish.
14  Q.  Okay.
15  A.  You have --
16  Q.  Yes. I have asked. So go ahead, please.
17  A.  So I take account of the variations of the
18      sort you're pointing to that has been
19      revealed in the data that has purported to
20      measure what it is you are getting at, the
21      differences in the ability of people to
22      negotiate.

599

1   greater extent over a seller than will the
2   weaker class of buyer. You will not infer
3   from that -- because I know you are a good
4   economist -- you will not infer from that
5   some difference or some scheme on the part
6   of the seller. It is in the power of the
7   buyer.
8           You don't know from looking at
9   the result whether the result is a matter
10  of the power of the buyer, the weakness of
11  the seller, the price of the rice in
12  China, the standing of the St. Louis
13  Cardinals? You don't know anything from
14  the result except that it is the result?
15  It is just arithmetic?
16  A.  One needs not be -- one needs not be
17      hypothetical. One need not be
18      hypothetical to state that there will be
19      differential abilities of different
20      entities in negotiations and there will be
21      differential results related to discounts
22      paid that might be reflected for different

601

1           If we pull out one of those OIG
2   reports you are going to see AWP and you
3   are going to see acquisition of cost
4   across different types of pharmacies:
5   large ones, small ones, chains,
6   independents, rural, urban. All of them
7   have different negotiating power, and they
8   come up with spreads, and I have taken the
9   range of those spreads and put them into
10  the range of the yardsticks that I have
11  used, and to be conservative, I have used
12  the highest yardstick to give -- to give
13  the greatest benefit of the doubt on these
14  drugs. I haven't taken an average, and I
15  have taken -- I have taken the -- I have
16  assumed they are the worst guy bargaining
17  and they are subject to the highest
18  spread, and I have let them be the one --
19  the individual most screwed.
20          And then I have compared the
21  actual spreads that I observe in the
22  1990s, and by God, compared to the spreads

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only   October 8, 2004
Volume II                                    Boston, MA

72 (Pages 602 to 605)

602

1    of the poorest Schlep here in terms of
2    bargaining or some small rural drugstore
3    in the OIG report that might be in -- what
4    is the town in New Hampshire where they do
5    the first vote?  What notch is it?  I
6    don't think it's Pinkham Notch.
7  Q.  They are not to be belittled anyway.
8  A.  No.  They are --
9  Q.  Anyway I have got your points.  I have got
10   your points.  I do.  I have been told by
11   my trusted advisor that I should just let
12   it lie.  We will resume I think at some
13   other occasion, I think, when I have more
14   time.
15 A.  Okay.  That would be delightful.
16            CROSS EXAMINATION
17   BY MR. CAVANAUGH:
18 Q.  Dr. Hartman, my name is Bill Cavanaugh.  I
19   represent Johnson & Johnson.
20        Doctor, you gave some testimony
21   today about the Cipro and Terazosin cases.
22   Those are antitrust cases?

603

1  A.  They are Hatch-Waxman matters.  That is
2    correct.
3  Q.  And am I correct that in those cases you
4    opine that you could determine a but-for
5    competitive price in the absence of the
6    alleged antitrust violation?
7  A.  I have put forward declarations in support
8    of class, and class has been certified,
9    indicating that I could calculate but-for
10   prices for the branded and the generic
11   drugs absent the alleged violation, and I
12   have implemented it for the Hytrin matter
13   and the Terazosin matter.
14 Q.  And those cases involved a single product;
15   correct?  A single molecule?
16 A.  They did involve a single molecule.
17 Q.  The allegation in those cases, the alleged
18   antitrust violation, was preventing the
19   entry of a competitive generic into the
20   market resulting allegedly in higher brand
21   name prices?  Is that a fair summary?
22 A.  I would -- I would -- I would summarize it

604

1    slightly differently.  That essentially it
2    -- prices overall for both the generic and
3    the branded drugs were maintained at
4    supracompetitive levels by the fact that
5    generic entry was postponed.
6  Q.  And the way you went about determining
7    your but-for price in the absence of the
8    alleged antitrust violation was by looking
9    at pricing when the generics actually
10   entered the market?  Is that correct?
11 A.  I developed yardsticks in that case that
12   looked as close to the market I was
13   analyzing, whether it was the Terazosin
14   launch in the year in which that took
15   place and the type of drug that was, an
16   antihypertensive, and I developed
17   yardsticks and proposed yardsticks for
18   Ciprofloxacin, and so yes.  I developed
19   yardsticks, different yardsticks depending
20   on the facts of the drugs and when the
21   entry would have taken place.
22 Q.  But the way you derived those yardsticks

605

1    was by looking at actual data based on
2    when the generics came into the market?
3    Correct?
4  A.  That's correct.
5  Q.  Let's turn to a different subject.
6        What percentage of sales of
7    brand name drugs to retail pharmacies do
8    you believe are subject to chargeback
9    arrangements?
10 A.  I may have -- I can't recall that number
11   now.  I have reviewed information like
12   that, but I can't recall at this point.
13 Q.  Is it a fairly significant number?
14 A.  I really would be speculating.
15 Q.  Small?  Large?
16 A.  You are asking me to speculate, and I
17   don't do that.
18 Q.  All right.  And just so we understand,
19   when we refer to a chargeback arrangement,
20   that is an arrangement where a
21   manufacturer will distribute a drug
22   through a wholesaler, but it has

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 8, 2004
Volume II                                Boston, MA

73 (Pages 606 to 609)

606

1    negotiated a price lower than what the
2    wholesaler pays with the ultimate
3    customer?
4  A. That's correct.
5  Q. Are you familiar with the brand names
6    antitrust case?
7  A. I am.
8  Q. As a matter of fact, you were involved in
9    that case assisting Professor Franks who
10   was the expert for the wholesalers?
11   Correct?
12 A. That is correct.
13 Q. And --
14 A. I am trying to remember if it was for all
15   of the wholesalers or a subset, but let's
16   say a or the wholesalers.
17 Q. Would you agree with me the essential
18   premise in that case was that
19   manufacturers and wholesalers had
20   conspired not to give discounts to retail
21   drugstores?
22       MR. SOBOL: Objection to the

607

1    form.
2  A. The premise and the allegations and the
3    subtleties of the findings have receded
4    sufficiently in my memory that, you know,
5    I wouldn't even want to start framing or
6    responding to that.
7        The focus of the particular
8    consulting I was doing was not looking so
9    much at that as really focusing on the
10   positions of the wholesalers and did they
11   benefit from the conspiracy and what was
12   their margins and --
13 Q. In connection with your work in this case,
14   did you ever go back and look at the
15   allegations made in the brand name case
16   and some of the pricing disparities that
17   the retail drugstores pointed to?
18 A. I have not reviewed the findings of that
19   case in that regard. No.
20 Q. Would you agree that the market clearing
21   price of a product sold by a manufacturer
22   to a particular buyer will ordinarily

608

1    reflect the relative bargaining power of
2    each party?
3        MR. SOBOL: Objection.
4        You may answer.
5  A. Are we talking about this market, or are
6    we talking about any market?
7  Q. In general. In general. In this case
8    specifically, but just as a general
9    principle.
10 A. The -- one would have to take into account
11   more than just relative size or relative
12   bargaining. You would need to know how
13   many buyers there were. You would need to
14   know if there is 50 large buyers or one
15   large buyer and 50 small buyers.
16 Q. But whether there were 50 or one would all
17   go to either one side or the other's
18   relative bargaining power, wouldn't it?
19 A. That's right. I mean you would need to
20   understand -- I thought you were asking
21   about a single -- a single buyer's. I
22   mean you would need to know the context

609

1    overall.
2  Q. Sure. Because you would need to know how
3    many other buyers are out there, and that
4    would go to determining in any particular
5    transaction how much bargaining power
6    existed on one side or the other?
7    Correct?
8  A. That could possibly have an effect.
9  Q. Would you agree with me that the average
10   selling price of brand name drugs to
11   hospitals reflect a balance of bargaining
12   power between hospitals and manufacturers?
13       MR. SOBOL: Objection to the
14   form.
15 A. I would expect that the rebates and the
16   discounts that are offered to any group of
17   purchasers if they have certain power or
18   certain information over drugs would
19   affect what those -- what those discounts
20   are -- those price offsets would be from
21   AWP.
22 Q. So whether it is hospitals, doctors, PBMs,

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 8, 2004
Volume II                              Boston, MA

74 (Pages 610 to 613)

610

1    mail order pharmacies, if we looked at the
2    average selling price for any one of those
3    entities, that would be reflective of the
4    balance of bargaining power between that
5    entity and a manufacturer of a brand name
6    drug?
7          MR. SOBOL: Objection to the
8    form.
9    A.  It would certainly give us some
10   information.
11   Q.  Now in connection with your work in this
12   case, have you looked at average selling
13   prices by category of purchasers?
14   A.  At -- to -- to this point, that -- that
15   analysis has been unnecessary.
16   Q.  So just so we're clear, you have not
17   looked at the average selling price to
18   retail pharmacies as compared to the
19   average selling price to mail order
20   pharmacies as compared to the average
21   selling price to hospitals?
22   A.  I have some notion of and have looked at

611

1    that in the past, and the measure to which
2    I am looking to now is the average of
3    those averages.
4    Q.  But you have not determined particular
5    average selling prices within a particular
6    category of purchasers and compared those
7    to other categories of purchasers?
8    Correct?
9    A.  I have certainly looked at differential
10   price offsets paid to different groups,
11   which is the flip side of what you are
12   getting at. So, for example, in cytoxan,
13   because I am proceeding by NDC, and
14   because I am looking at measures of
15   spreads, the fact that I am seeing much
16   different spreads to one group, i.e., the
17   physicians, relative to those sold through
18   PBMs, they are -- they are quite
19   different, which tells me something about
20   the price offsets and which tells me
21   something about the relative ASPs.
22   Q.  Have you done it for drugs other than

612

1    cytoxan?
2    A.  I have -- I am not at that stage yet. I
3    have just done illustrative calculations
4    Q.  Would it be fair that you have not
5    systematically looked at average selling
6    prices within a particular group of like
7    buyers compared to other different groups
8    of buyers --
9          MR. SOBOL: Objection to the
10   form.
11   Q.  -- such as hospitals compared to retail
12   pharmacies compared to PBMs compared to
13   mail order?
14          MR. SOBOL: Objection to form.
15          You may answer.
16   A.  I, to date, I have not been able to notice
17   sufficiently complete 30(b)(6) depositions
18   that I could fully calculate the average
19   sale prices to those groups without more
20   information from each of the defendants.
21   Q.  You raise an interesting subject. You
22   have not calculated average selling prices

613

1    for my client Johnson & Johnson. Is that
2    correct?
3          MR. SOBOL: Objection.
4    A.  As of the writing of this declaration, I
5    did -- I had received -- I would have to
6    check precisely. I know I had received
7    data from two defendants, and either there
8    was some either contamination of the files
9    or some missing data that made it
10   impossible for me to do illustrative
11   calculations for J & J and for GSK.
12   Q.  Did you attempt to do any for any Johnson
13   & Johnson products?
14          MR. SOBOL: Objection to the
15   form. It assumes he had the data to do
16   it.
17   A.  I asked my staff to take the data that we
18   had received and take it to a point where
19   I could do some comparisons similar to
20   what has been put forward -- have been put
21   forward in tables 2 and 3 in the
22   declaration, and I was told that there was

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only            October 8, 2004
Volume II                                      Boston, MA

75 (Pages 614 to 617)

614

1   not sufficient data. I know we had AWPs.
2   Q. I am sorry. That there was not what?
3   A. There was not sufficient data that we
4     could understand to accurately calculate
5     all components, and since we had AWPs for
6     a number of the drugs from the appendices
7     to the Amended Master Complaint, my
8     understanding was that we did not
9     sufficiently understand the data to
10    calculate reasonable ASPs, nor did we have
11    AMPs that were reported to us.
12  Q. Do you understand that there are a number
13    of representative named class plaintiffs
14    in this case?
15  A. The -- oh, yes. I do.
16  Q. Have you gone back and looked at their
17    particular contracts with PBMs?
18  A. I think I have seen contracts with ESI,
19    but I'm not sure.
20  Q. To your knowledge, have any of those named
21    plaintiffs since they filed this lawsuit
22    signed new agreements with any PBMs?

615

1   A. I have no knowledge of that fact.
2   Q. Now a named plaintiff in this case would
3     certainly be aware of the allegation that
4     there are inflated AWPs throughout the
5     pharmaceutical industry? Correct?
6   A. Certainly.
7   Q. And if they are good business people, they
8     would certainly take that into
9     consideration in negotiating a new
10    contract with the PBM, wouldn't they?
11  A. I would expect they would try to to the
12    best of their ability.
13  Q. So have you asked your counsel to get you
14    any new contracts that named class
15    plaintiffs have signed with PBMs from
16    after the period of time when the lawsuit
17    was filed so you could compare them to
18    what these contracts looked like before
19    the lawsuit was filed?
20  A. In order for me to --
21  Q. I think you can answer that one yes or no.
22  A. Well, I want to put -- put that in

616

1   context.
2         In order for me to make sense of
3     the response to that of -- if -- asking
4     them to do that and what -- whether I
5     would see them and then understand those
6     contracts, I would need to be able to know
7     whether the named plaintiffs had some idea
8     not that they were just inflated but of
9     the extent of the inflation that is being
10    documented by the confidential information
11    that I'm seeing, and that's not being
12    released to them, so I have yet to
13    ascertain with named plaintiffs how badly
14    their expectations were off target,
15    because I can't share that kind of
16    information.
17        Now if --
18  Q. Didn't the Complaint in this case provide
19    examples of what the plaintiffs contend
20    are extraordinary inflations of AWP?
21  A. Now that you have mentioned that, my
22    recollection is that there are examples,

617

1     but that --
2   Q. So wouldn't a knowledgeable and
3     sophisticated --
4         MR. SOBOL: Are you finished
5     with your answer?
6         THE WITNESS: I think so. Yes.
7   Q. So wouldn't a sophisticated named
8     plaintiff in this case, armed with that
9     information, negotiate an entirely
10    different PBM contract?
11  A. It would depend upon how sophisticated the
12    named plaintiff is. It would depend on
13    the extent to which the drugs that were
14    cited in the Complaint were drugs subject
15    to those self-insured groups. It would
16    depend upon a variety of things which
17    would require some analysis on my part
18    before drawing that -- a conclusion or
19    conducting the analysis that you are
20    asking me to do.
21  Q. But just so we can agree on context, the
22    context is you haven't asked for that