Exhibit 7

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

629

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

IN RE:  PHARMACEUTICAL              MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE          01CV12257-PBS

PRICE LITIGATION

* * * * * * * * * * * * * * * * * * * * * * * * * * *    FEBRUARY 27, 2006

THIS DOCUMENT RELATES TO:           VOLUME: III

ALL ACTIONS                         PAGES: 629-904

* * * * * * * * * * * * * * * * * * * * * * * * * * *

                C O N F I D E N T I A L

        CONTINUED VIDEOTAPED DEPOSITION OF

             RAYMOND S. HARTMAN, PH.D.

CONTINUED DEPOSITION of RAYMOND S. HARTMAN, Ph.D., a

witness called on behalf of the Defendants pursuant to

the Federal Rules of Civil Procedure, before Judith

McGovern Williams, Certified Shorthand Reporter,

Registered Professional Reporter, Certified Realtime

Reporter, and Notary Public in and for the Commonwealth

of Massachusetts, at the offices of Dwyer & Collora,

600 Atlantic Avenue, Boston, Massachusetts 02110, on

Monday, February 27, 2006, commencing at 9:42 a.m.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                     February 27, 2006
Boston, MA

---

630

1  APPEARANCES:
2
3  HAGENS BERMAN SOBOL SHAPIRO L.L.P.
4    Thomas M. Sobol, Esquire
5    One Main Street, 4th Floor
6    Cambridge, Massachusetts  02142
7    617-482-3700
8    tom@hagens-berman.com
9    on behalf of the Plaintiffs
10
11  HOGAN & HARTSON L.L.P.
12    Steven M. Edwards, Esquire
13    Hoa T.T. Hoang, Esquire
14    James S. Zucker, Esquire
15    875 Third Avenue
16    New York, New York  10022
17    212-918-3000
18    smedwards@hhlaw.com
19    htthoang@hhlaw.com
20    jszucker@hhlaw.com
21    on behalf of the Defendant Bristol-Myers Squibb
22

---

632

1  APPEARANCES (Continued):
2
3  SHOOK, HARDY & BACON L.L.P.
4    James P. Muehlberger, Esquire
5    Tiffany Westphal Killoren, Esquire
6    2555 Grand Boulevard
7    Kansas City, Missouri  64108-2613
8    816-474-6550
9    jmuehlberger@shb.com
10    tkilloren@shb.com
11    on behalf of the Defendant Aventis Pharmaceuticals
12
13  PATTERSON, BELKNAP, WEBB & TYLER L.L.P.
14    Adeel A. Mangi, Esquire
15    1133 Avenue of the Americas
16    New York, New York  10036-6710
17    212-336-2000
18    aamangi@pbwt.com
19    on behalf of the Defendant Johnson & Johnson
20
21
22    (CONTINUED)

---

631

1  APPEARANCES (Continued):
2
3  DAVIS POLK & WARDWELL
4    Michael S. Flynn, Esquire
5    450 Lexington Avenue
6    New York, New York  10017
7    212-450-4766
8    michael.flynn@dpw.com
9    on behalf of the Defendant AstraZeneca
10  Pharmaceuticals Corp.
11
12  ROPES & GRAY L.L.P.
13    Steven A. Kaufman, Esquire
14    One International Place
15    Boston, Massachusetts  02110-2624
16    617-951-7540
17    steven.kaufman@ropesgray.com
18    on behalf of the Defendant Schering Corporation/
19    Schering-Plough
20
21
22    (CONTINUED)

---

633

1  APPEARANCES (Continued):
2
3  DECHERT L.L.P.
4    Frederick G. Herold, Esquire
5    1117 California Avenue
6    Palo Alto, California  94304-1106
7    650-813-4930
8    frederick.herold@dechert.com
9    On behalf of GSK
10
11  MORGAN, LEWIS & BOCKIUS L.L.P.
12    John Clayton Everett, Jr., Esquire
13    1111 Pennsylvania Avenue, N.W.
14    Washington, D.C.  20004
15    202-739-5860
16    jeverett@morganlewis.com
17    on behalf of Pharmacia Corporation of the
18    State of Connecticut
19
20
21
22    (CONTINUED)

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

634

1   APPEARANCES (Continued):
2
3   KIRKLAND & ELLIS L.L.P.
4     Helen E. Witt, Esquire
5     200 East Randolph Drive
6     Chicago, Illinois  60601
7     312-861-2148
8     hwitt@kirkland.com
9     on behalf of the Defendant Roxane in the
10    Connecticut case
11
12
13  ALSO PRESENT:
14
15    Eric M. Gaier, Ph.D.
16    Bates White
17    2001 K Street, N.W., Suite 700
18    Washington, D. C.  20006
19    202-216-1142
20    ericgaier@bateswhite.com
21
22    (CONTINUED)

635

1   APPEARANCES (Continued):
2
3     William B. Tye
4     The Brattle Group
5     44 Brattle Street
6     Cambridge, Massachusetts  02138-3736
7     617-864-7900
8     btye@brattle.com
9
10    Timothy S. Snail, Principal
11    CRA International
12    John Hancock Tower
13    200 Clarendon Street, T-33
14    Boston, Massachusettss 02116-5092
15    617-425-3000
16
17    Ralph Scopa, Videographer
18
19
20
21
22

636

1                    I N D E X
2   WITNESS                            PAGE
3   RAYMOND S. HARTMAN, PH.D.
4     Direct Examination by Mr. Edwards............. 642
5
6                  E X H I B I T S
7   NUMBER        DESCRIPTION              PAGE
8   Exhibit Hartman 023,  Multipage Declaration of
9                 Raymond S. Hartman in
10                Support of Plaintiffs'
11                Claims of Liability and
12                Calculation of Damages:
13                Addendum................... 643
14  Exhibit Hartman 024,  Multipage Supplemental
15                Declaration of Raymond S.
16                Hartman in Support of
17                Plaintiffs' Claims of
18                Liability and Calculation
19                of Damages: Addendum....... 644
20  Exhibit Hartman 025,  Errata to Declarations of
21                Raymond S. Hartman, two
22                pages...................... 644

637

1                  E X H I B I T S
2   NUMBER        DESCRIPTION              PAGE
3   Exhibit Hartman 026,  Multipage Report to the
4                 Congress, Variation and
5                 Innovation in Medicare..... 692
6   Exhibit Hartman 027,  Multipage Department of
7                 Health and Human Services,
8                 Office of Inspector
9                 General, Physicians' Costs
10                for Chemotherapy Drugs,
11                November 1992.............. 726
12  Exhibit Hartman 028,  Deposition transcript of
13                Mickie Brown taken
14                March 9, 2005.............. 740
15  Exhibit Hartman 029,  Deposition transcript of
16                Thomas E. Greenbaum taken
17                January 14, 2005........... 744
18  Exhibit Hartman 030,  Deposition transcript of
19                Jill A. Herbold taken on
20                January 14, 2005........... 755
21
22    (CONTINUED)

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

638

1          E X H I B I T S
2    NUMBER         DESCRIPTION         PAGE
3    Exhibit Hartman 031,  Deposition transcript of
4              Joe Spahn taken on
5                November 30, 2004.......... 760
6    Exhibit Hartman 032,  Deposition transcript of
7              Edward Lemke taken on
8                January 11, 2005........... 769
9    Exhibit Hartman 033,  Excerpt from Cancer
10             Economics, March 1997...... 796
11   Exhibit Hartman 034,  Letter dated October 2,
12             Mr. Bentley et al.......... 807
13   Exhibit Hartman 035,  Multipage analysis of CMS
14             Average Wholesale Price
15             Reform, February 7, 2004... 829
16   Exhibit Hartman 036,  Deposition transcript of
17             Mr. Mulrey taken
18                January 5, 2006........... 830
19   Exhibit Hartman 037,  Deposition transcript of
20             John Killion taken
21                January 6, 2006........... 838
22   (CONTINUED)

639

1          E X H I B I T S
2    NUMBER         DESCRIPTION         PAGE
3    Exhibit Hartman 038,  Excerpt from Federal
4             Register................... 878
5    Exhibit Hartman 039,  Two-page letter dated
6             November 4, 1994, to
7             Ms. S. Stewart from
8             Mr. Camozzi................ 889
9    Exhibit Hartman 040,  42 CFR 405.517............. 897
10
11
12
13
14
15
16
17
18
19
20
21
22

640

1              P R O C E E D I N G S
2         THE VIDEOGRAPHER:  Good morning. We are
3    now recording and on the record. My name is Ralph
4    Scopa. I am a legal video specialist for G & M
5    Court Reporters Limited. Our business address is
6    42 Chauncy Street, Suite 1A, Boston, Mass. 02111.
7         Today's date is February 27, 2006. The
8    time is 9:42 A.M.
9         This is the deposition of Mr. Raymond
10   Hartman in the matter of In Re:  Pharmaceutical
11   Industry Average Wholesale Price Litigation, U. S.
12   District Court of Massachusetts, Civil Action 01-
13   CV-12257-PBS.
14         This deposition is being taken at 600
15   Atlantic Ave, Boston. The court reporter is Judy
16   Williams.
17         Counsel will state their appearances,
18   and the court reporter will administer the oath.
19         MR. EDWARDS:  Steve Edwards, Hogan &
20   Hartson, for Bristol-Myers Squibb.
21         MS. HOANG:  Hao Hoang of Hogan &
22   Hartson, for Bristol-Myers Squibb.

641

1         MR. HEROLD:  Fred Herold of Deckert, for
2    GSK.
3         MR. MANGI:  Adeel Mangi of Patterson,
4    Belknap, Webb & Tyler, for Johnson & Johnson.
5         MR. ZUCKER:  Jim Zucker of Hogan &
6    Hartson, for Bristol-Myers Squibb.
7         MR. SNAIL:  Timothy Snail of CRA
8    International, also present.
9         MR. FLYNN:  Michael Flynn of Davis, Polk
10   & Wardwell, on behalf of Astra Zeneca.
11         MR. KAUFMAN:  Steve Kaufman on behalf of
12   Schering-Plough from Ropes & Gray.
13         MR. SOBOL:  Tom Sobol, Hagens, Berman,
14   Sobol & Shapiro, for the class plaintiffs.
15         MR. MUHLBERGER:  Jim Muhlberger, of
16   Shook, Hardy & Bacon, for Aventis Pharmaceuticals.
17         MS. KILLOREN:  Tiffany Killoren of
18   Shook, Hardy & Bacon, for Aventis Pharmaceuticals.
19         MR. GAIER:  Eric Gaier, also present,
20   from Bates White.
21         MR. TYE:  Bill Tye, from The Brattle
22   Group.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

642

1          MS. WITT: Helen Witt, Kirkland & Ellis,
2    on behalf of Roxane in the Connecticut case.
3              - - - - -
4          RAYMOND S. HARTMAN, PH.D., first having
5    been duly sworn, testified as follows in answer to
6    continued direct examination by MR. EDWARDS:
7              - - - - -
8      Q.  Dr. Hartman, have you reread the prior
9    transcripts of your deposition?
10     A.  I don't recall.
11     Q.  Are you aware of anything in those
12   transcripts that you would like to change?
13     A.  No.
14     Q.  Is there anything in your prior reports
15   on class certification that you would like to
16   change?
17     A.  No.
18     Q.  What I want to do, first of all, is mark
19   your merits report and supplemental report.
20         MR. EDWARDS:  We will mark those as
21   Exhibit Hartman 023 and Exhibit Hartman 024 to
22   your deposition.

643

1          THE WITNESS:  If I may interrupt
2    briefly, I have errata to my current report to
3    hand out.  Is now the time to do that, or is it -
4    -
5          MR. EDWARDS:  Now is as good a time as
6    any.
7          THE WITNESS:  Okay.
8          MR. EDWARDS:  Thank you.
9          THE WITNESS:  There are 10 copies in
10   there.
11         MR. EDWARDS:  The record should reflect
12   that the witness just handed me errata to his
13   declarations.
14         Now let's have the court reporter mark
15   that document first, if you don't mind.  This will
16   be 23.  It is the declaration of Raymond Hartman
17   dated December 15.
18         (Multipage Declaration of Raymond
19   S. Hartman in Support of Plaintiffs' Claims of
20   Liability and Calculation of Damages marked
21   Exhibit Hartman 023 for identification.)
22         (Handing Exhibit Hartman 023 to the

644

1    witness.)
2          MR. EDWARDS:  We will mark the
3    supplemental declaration as Deposition Exhibit
4    Hartman 024.
5          (Multipage Supplemental Declaration
6    of Raymond S. Hartman in Support of Plaintiffs'
7    Claims of Liability and Calculation of Damages:
8    Addendum marked Exhibit Hartman 024 for
9    identification.)
10         (Handing Exhibit Hartman 024 to the
11   witness.)
12         MR. EDWARDS:  Why don't we go ahead and
13   mark the errata that Dr. Hartman just handed to me
14   as Deposition Exhibit Hartman 025.
15         (Errata to Declarations of Raymond
16   S. Hartman, two pages marked Exhibit Hartman 025
17   for identification.)
18   BY MR. EDWARDS:
19     Q.  Now, Dr. Hartman, you have your
20   declaration of December 15, 2005, your
21   supplemental declaration of -- let me see if I can
22   get the date on that -- February 3, 2006, and

645

1    errata that you just handed me for those
2    declarations in front of you.  Is there anything
3    in your December 15 declaration or your February
4    3rd declaration that you would like to change
5    other than what you have indicated in errata
6    sheet?
7      A.  Well, as I said in the declaration
8    itself, that there were certain data that I had
9    asked of defendants and that I had not received as
10   of the time that I wrote this report, so the - - I
11   consider this report as ongoing to a certain
12   extent, and should I receive that data, I would
13   change it.
14         But beyond that, there is nothing that I
15   can think of that I would want to change.
16     Q.  There is nothing that you want to change
17   at this point?
18     A.  As of today, no.  That's right.
19     Q.  Are there any inaccuracies in either of
20   these declarations that you're aware of?
21     A.  No.
22     Q.  Why don't you take a look at your

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

646

1  declaration of December 15, which is Exhibit
2  Hartman 023. What I want to do is direct your
3  attention to paragraph 4.
4       (Witness complying.)
5       Q.  Do you have that in front of you?
6       A.  I do.
7       Q.  For subclass 1, you indicate that it is
8  Massachusetts only.  Is that a typo?
9       (Pause.)
10      (The witness viewing Exhibit
11 Hartman 023.)
12      A.  That certainly does appear to be a typo.
13      Q.  Okay.  And is the same typo replicated
14 in your supplemental declaration, which is Exhibit
15 Hartman 024?
16      A.  I'm embarrassed to say that it seems to
17 be.
18      Q.  Okay.  So that data that you are
19 indicating here for subclass 1 is the -- we refer
20 to it as a nationwide class, but I think it is
21 what? 44 states? Something like that?
22      A.  It is the -- it is a nationwide class

647

1  for the states that were considered relevant to
2  the matter, and it is for subclass 1, and the
3  delineation of Massachusetts was inadvertent, and
4  I'm embarrassed by the inadvertency, but there it
5  is.
6       Q.  Now is the supplemental declaration a
7  replacement for the December 15th declaration or
8  an alternative?
9       A.  It --
10      MR. SOBOL: Objection to the form.
11      A.  Well, I think what its title is.  It is
12 supplemental. It is a second set of calculations
13 that allow for a different notion or definition of
14 liability and allow for a different calculation
15 for the average sale price. It is -- so it is
16 supplemental. It provides a different way of
17 approaching damages, and I was asked by counsel to
18 do that supplemental.
19      Q.  I think you have anticipated my next
20 question, which is why did you create a
21 supplemental declaration.
22      A.  Because I was -- I understood there were

648

1  issues of liability that still were to be decided
2  in this matter by the Court and by -- in the
3  trial, and that this would help inform that - -
4  those -- that decision- making process.
5       Q.  Does your supplemental declaration rely
6  on any data that was not available to you when you
7  proffered your initial declaration of December
8  15th?
9       A.  We have continued to try to refine the
10 data that we have received from the manufacturers
11 with questions to counsel, questions to
12 defendants, and I can't recall whether there was
13 an improved understanding of certain definitions
14 in the data that we relied upon from defendants,
15 and I know that those conversations were ongoing,
16 and I just don't know -- I would have to find that
17 out.
18      Q.  I take it it wasn't the existence of new
19 information that caused you to proffer a
20 supplemental declaration; is that correct?
21      A.  That -- that was not the motivating
22 factor.

649

1       Q.  Now what exactly are the differences
2  between your supplemental declaration and your
3  original declaration of December 15th?
4       A.  Well, in the original declaration, I was
5  asked by counsel to look for a measure of
6  liability that had to do with a market
7  understanding of what the relationship between AWP
8  and transactions prices were, and it was based on
9  that -- that analysis and that definition and that
10 notion of liability.
11      The supplemental did not use that notion
12 of liability or that threshold of liability.  It
13 essentially said I'm not going to -- I am just
14 going to look at in the Medicare context any drug
15 that where the spread exceeded what by statute the
16 reimbursement rate should be under Medicare.
17      Q.  You used the term "a market
18 understanding." What do you mean by that?
19      A.  I think I have laid that out fairly
20 clearly in the report.  It is the discussion and
21 the analysis that leads to the threshold for
22 liability that I derive in the declaration, and

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

650

1   that threshold is a 30 percent spread of AWP over
2   ASP, and that is based on a variety of analyses of
3   comparator drugs, of survey information, of some
4   of the testimony of some of your own witnesses,
5   and probably some other information, but it is
6   essentially what characterized what the
7   understanding was of a relationship of a list
8   price for a sticker price to transactions prices
9   for which that was a signal.
10      Q.  By the way, if the spread falls right at
11  the 30 percent point, which side of the line is
12  that on?
13          MR. SOBOL: Objection to the form.
14      A.  Well, if it -- if it falls right at the
15  30 percent line, I mean I think the way to think
16  of the threshold of liability in that case is very
17  much like a speed limit. I mean you are -- if you
18  are exceeding a speed limit, then that is a
19  threshold of liability, and you are speeding. You
20  may be speeding a little bit.  You may be right at
21  the speed limit.
22          If you fall at the level of 30 percent,

651

1   in the declaration itself I do not recall whether
2   we included those -- we said that that was --
3   whether we excluded those people right at 30
4   percent, those drugs right at 30 percent or we
5   included them.  If we included them, their damages
6   were zero.
7          So the -- so that -- that's the answer.
8      Q.  What if you did both, in some cases you
9   included them and in some cases you excluded them?
10  Can you enlighten us on exactly when the speed
11  limit is exceeded?
12      A.  Well --
13          MR. SOBOL: Objection. Objection.
14      Q.  What was your intent?
15          MR. SOBOL: Objection to the form.
16      A.  The intent -- obviously the allegations
17  in this matter are that manufacturers used spread
18  to move market share in a way that was not clear
19  to the people who were paying for the drugs, and
20  so the intent was to use a speed limit to identify
21  those people that were really speeding, and if
22  someone was at the -- at 30 percent, they were

652

1   right at the speed limit, and it -- the idea was
2   that if you were above that, you know, above that
3   speed limit, then you were speeding. Whether you
4   were speeding a little bit or a lot, that was
5   reflected in the extent of the damages.
6      Q.  So if you were right at 30 percent, you
7   were not speeding?  Fair?
8      A.  You -- I think it is fair to say -- I
9   haven't -- it could go --
10         I would say if you are at 30 percent,
11  that's the threshold as I have defined it.  So if
12  you are at 30 percent, you are speeding.  So you
13  need to be below the speed limit.  You have to be
14  29.99999.
15     Q.  Why don't you take a look at paragraph
16  59E of your December 15th declaration, Exhibit
17  Hartman 023.
18         MR. SOBOL: Is there a page?
19         MR. EDWARDS: That is page 40.
20            (Witness complying.)
21     A.  Okay.
22     Q.  If you look at the last sentence, you

653

1   say there, "Specifically, if a manufacturer either
2   raises its AWP and/or lowers its ASP, such that
3   the realized spread exceeds 30 percent for a given
4   NDC for a given period of time (I choose a year),
5   I conclude that the manufacturer has fraudulently
6   increased the spread on that NDC in that period to
7   move market share."
8          So are you now changing the threshold
9   from the way it is stated here in paragraph 59E of
10  your declaration?
11         MR. SOBOL: Objection.
12         You may answer.
13     A.  The reason that I phrased it the way I
14  did is that -- and I hesitated, because I gave
15  directions to my staff to use the 30 percent
16  threshold, and I don't -- in -- as it is written
17  here is the way I have been thinking about it,
18  exceeding 30 percent, but in the way that my
19  analytic team implemented it, I would have to go
20  back and check whether they actually cut it off
21  right at 30 percent.
22         I would assume that the examples of the

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

654

1    times when it was exactly equal to 30 percent were
2    in the minority, but 30 percent is -- it -- I
3    think we are quibbling here very much, whether you
4    are at 30 percent, or 3.0001, that would exceed 30
5    percent, if you are at 30 percent and that exceeds
6    29.99999.
7         30 percent is a level that I have taken
8    as an upper bound for all of the information that
9    I have seen that would support a finding of what
10   the market understanding was, and I have, as I
11   have expressed it here, is the way I think about
12   it. I hesitated before, because I would have to
13   look at the math in the tables of how they
14   actually implemented it, whether they implemented
15   it as greater than or equal to, or greater than.
16        Q. So just so we are clear on this, if you
17   are at 30 percent, you are okay; correct?
18        A. For what I have done here, I have taken
19   a conservative estimate of what this -- what a
20   legal or anticipated or expected spread was is 30
21   percent, and if you are at 30 percent, you are at
22   the speed limit. You are not exceeding it.

655

1         Q. I believe you said another way in which
2    your supplemental declaration is different from
3    your initial declaration is a change in the
4    calculation of the ASP?
5         A. That --
6         MR. SOBOL: Objection to form.
7         A. That is correct.
8         Q. And what was that change?
9         A. Well, in the original declaration, I
10   focused on calculating the ASP for the providers
11   of physician-administered drugs, so I gave
12   directions to my staff to take the data that we
13   received from defendants, to talk to defendants,
14   to get as much information from defendants as we
15   could, and that information is reflected in the
16   attachments, and how ASP was calculated, and how
17   different groups were excluded, but the focus was
18   to define the ASP as the ASP of providers of
19   physician-administered drugs.
20        That -- that ASP will generally be
21   larger than the ASP overall, because the
22   preponderance of the remainder of physician-

656

1    administered drugs are sold to hospitals, and they
2    are used inpatient and in some cases outpatient,
3    and I excluded those from the class.
4         So those ASPs overall are lower.
5         So in this particular, in the original
6    declaration, I used a 30 percent threshold for
7    liability, and I used the ASPs of providers,
8    because certainly the Medicare statutes describe
9    reimbursement in terms of the acquisition cost of
10   providers or the average sale price to providers,
11   and this is a conservative estimate overall for
12   damages. It is -- I understand as a matter of law
13   that there may be an interpretation of what ASP
14   should be used in this and whether it should be
15   the ASP overall, and so I was asked by counsel to
16   recalculate the ASPs and introduce those in the
17   spreads in the supplemental damages.
18        Q. In the report that you proffered in
19   connection with class certification, you defined
20   ASPs as encompassing all customer classes; is that
21   correct?
22        A. I would have to go back and look at

657

1    that. That sounds correct.
2         Q. And then you narrowed it in your
3    original declaration on merits by defining ASPs
4    for providers of physician-administered drugs
5    only; correct?
6         MR. SOBOL: Objection to the form. Asked
7    and answered.
8         A. Well, we have -- we have -- I would have
9    to go back -- the original declaration, the
10   affirmative declaration, and when you refer to
11   declarations on merits, just so I get the legal
12   terms straight, I understand we are referring to
13   this report here right here?
14        Q. Right. Exhibit Hartman 023.
15        A. All right.
16        Certainly in the original declaration, I
17   was focusing on self- administered drugs, and I
18   was focusing on physician-administered drugs, and
19   I was talking about ASPs in a much broader
20   context.
21        The Court, in making their -- its
22   decisions regarding the focus of the classes and

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

658

1  the definition of the classes, has certainly
2  narrowed what the economic issues are as to
3  reimbursement and what is required for
4  reimbursement, and based on that, I narrowed the
5  definition of ASP in Exhibit Hartman 023.
6        I was asked to broaden it to the all
7  units sold as I think was defined in my original
8  affirmative declaration in -- I have done that in
9  the supplemental declaration (pointing to Exhibit
10 Hartman 024).
11     Q.  Again you may have anticipated my next
12 question, which was why did you change the way you
13 calculated ASPs from the class certification
14 report to your original merits report?
15        MR. SOBOL: Objection. Asked and --
16     Q.  Was that in response to something that
17 the Court said?
18        MR. SOBOL: Objection. Asked and
19 answered.
20     A.  The Court identified a set of drugs and
21 classes that were going to -- that were the
22 subject of the ongoing analysis, and under

659

1  Medicare, the acquisition costs that are relevant
2  to reimbursement are the acquisition costs of the
3  providers, so I was interested in the acquisition
4  costs of the providers.
5        I also take the but-for AWP, or a
6  relationship of what the AWP as a signal for is
7  the ASP, and I used an ASP here that was defined
8  for Medicare reimbursement rates to also deal with
9  issues of what the AWP might be and for what it
10 was a signal for.  I knew that was conservative,
11 because this ASP to providers was higher than was
12 -- than the ASP overall.
13        So it was -- it was partially -- it was
14 in response to the Judge's narrowing of the class
15 to providers, and it was also in the spirit of
16 being conservative as to the damage estimates that
17 I calculated spreads and did analyses with an ASP
18 -- the provider ASP, which was a larger, a higher
19 ASP than the overall ASP.
20     Q.  So if I understand what you're saying
21 correctly, it is your testimony that the narrower
22 ASP is more consistent with the Medicare statute?

660

1        MR. SOBOL: Objection.
2     A.  If you look at footnote -- footnote 13
3  and footnote 14, the Medicare statutes have been
4  formulated in terms of a reimbursement rate off of
5  an AWP or an estimated acquisition cost or actual
6  charge and where the actual charge is reasonably
7  interpreted as an acquisition cost.
8        So as I'm looking at the Medicare
9  statutes and how they say reimbursements should be
10 done, they are talking about acquisition costs of
11 providers, so the focus there is on the
12 acquisition cost of providers.
13        MR. SOBOL: Motion to strike. The
14 question was a yes or no question.
15        MR. EDWARDS: Why don't we ask the
16 reporter to reread the question, and perhaps the
17 witness can give us a yes or no answer.
18        MR. SOBOL: Or "I don't understand what
19 you're asking."
20        (The prior question and objection
21 were then read.)
22     A.  Obviously, given the long answer that I

661

1  gave, the short answer is yes.
2     Q.  Okay.  Now which ASP did you use to
3  determine Medicare liability and Medicare damages
4  in your supplemental report?
5     A.  In the supplemental report, the ASP
6  definition throughout is the overall ASP.
7     Q.  So you are using an ASP in your
8  supplemental report that is inconsistent with your
9  interpretation of the Medicare statute; correct?
10        MR. SOBOL: Objection.
11     A.  The ASP that is used in the supplemental
12 report is a broader definition of acquisition
13 costs than are found in Medicare.
14     Q.  Now I want to turn back again to the
15 liability yardstick in your original report versus
16 your supplemental report. In the original report,
17 the December 15th report, which is Exhibit Hartman
18 023, the liability yardstick would be the same for
19 both Medicare and private payers; correct?
20     A.  That's correct.
21     Q.  And in the supplemental report, it would
22 be different? It would be zero for Medicare and

Raymond S. Hartman, Ph.D.  CONFIDENTIAL
Boston, MA

February 27, 2006

662

1    30 percent for private payers; correct?
2        A.  That's correct.
3        Q.  How would that work in the real world?
4    Are you saying that in the real world there could
5    have been a system in which there were two
6    different AWPs?
7        A.  No.
8        Q.  Do you plan to proffer both
9    methodologies at trial?  And by "both
10   methodologies," I mean the methodology in your
11   original report and the methodology in your
12   supplemental report.
13       MR. SOBOL:  Objection.
14       A.  First of all, I wouldn't say they are
15   two different methodologies.  They're the same
16   methodology with different assumptions about
17   components or parameters within the methodology.
18   So the methodologies are identical except for an
19   interpretation of several parameters.
20       Q.  Okay.  Do you plan to testify about both
21   approaches?
22       A.  I have been asked by counsel to do two

663

1    analyses and as an economist look at the market
2    and draw the conclusions that would be drawn under
3    those sets of assumptions.
4        I really have not been told what I would
5    be asked to testify to at trial.  I have put them
6    forward, so I assume they are going to enter the
7    record, and they will be before the Court.
8        Q.  Do you think that one approach is better
9    than the other?
10       A.  I have drawn no conclusions about that.
11   It is my understanding that some of those issues
12   are legal issues, and so I -- that's not -- I'm
13   not a lawyer to --
14       Q.  Well, you are not saying that the
15   approach outlined in your December 15 declaration
16   was inappropriate, are you?
17       A.  I'm -- I'm saying both of these
18   approaches are appropriate to the set of
19   assumptions that I have been asked to take as
20   points of departure.
21       Q.  Why did you take the approach outlined
22   in your December 15 declaration first as opposed

664

1    to the other approach that counsel asked you to
2    do?
3        MR. SOBOL:  Objection to form.
4        A.  In the -- the initial declaration, I was
5    asked to do an economic analysis of this market,
6    of these markets, to draw conclusions about
7    understandings, price expectations, to draw
8    conclusions, to develop formulaic methodologies,
9    to identify if the alleged inflated prices did
10   exist what the implications were for damages.
11       While doing that and looking at the
12   understanding of the entities and the payers in
13   the market, it was also clear that by statute
14   there were certain relationships under Medicare
15   that -- regarding reimbursement and the AWP and
16   the -- and the ASP or the acquisition cost, and so
17   the -- in the -- the -- there was some discussion
18   of going either way, early on, and the first one
19   that I had done was just basically to say, "Okay,
20   we're not going to do -- we're not going to look
21   at a zero percent liability for threshold for
22   Medicare.  We're going to go with a 30 percent

665

1    overall."
2        But as I had done the original report,
3    it didn't mean that I hadn't also thought about
4    this (pointing to Exhibit Hartman 024).
5        Just this is what was decided to do
6    (pointing to Exhibit Hartman 023).
7        Q.  Well, in the original report you didn't
8    say anything about the approach taken in your
9    supplemental report; correct?
10       A.  Not -- I -- I can't recall.  I would
11   have to look precisely, but I don't recall.
12       Q.  Are you willing to stand by your
13   December 15 report as a reasonable determination
14   of liability and damages in this case?
15       A.  I stand by my report that should the
16   Court come to the decision that the -- that a
17   finding of liability is related to the
18   expectation, the pricing expectations in the
19   market, then I would -- I would stand by this
20   report of a threshold, of a liability threshold of
21   30 percent.
22       Q.  "This" report?

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

666

1    A.  Being --
2    Q.  You are pointing to the original?
3    A.  The December, the original December 2005
4  report.
5    Q.  Okay.
6    A.  Should the Court find differently as to
7  what the reimbursement rate would be under
8  Medicare and whether -- whether under -- under the
9  law there -- there is no -- that the threshold of
10  liability for those reimbursements are zero, that
11  is something that, as I understand it, is a legal
12  issue, and it is not for me as an economist to
13  render an opinion. I can describe what the
14  implications are from either of those.
15    Q.  Well, is it fair to say that your
16  December 15 report is more conservative --
17      MR. SOBOL:  Objection to form.
18    Q.  -- than the supplemental report?
19      MR. SOBOL:  Objection to the form.
20    A.  It is certainly more conservative in
21  that there are drugs for which damages occur in
22  the supplemental report that do not occur in the

667

1  original December report. So it is conservative
2  in that way.
3      It is conservative also in the
4  calculation of the ASP. It is a higher ASP, and
5  so that filters through the analysis and what
6  leads to lower damages.
7      So certainly the December report is more
8  conservative on a number of fronts in terms of
9  damages and impact and causation.
10    Q.  Okay. I want to change the subject a
11  little bit. Just so we're clear on this for the
12  record, would you explain your methodology?
13      MR. SOBOL:  In what?
14    Q.  Your methodology for determining
15  yardsticks?
16    A.  There are a variety of yardsticks
17  included herein for damages and for liability. Can
18  you be more specific or --
19    Q.  Well, I meant to encompass both.
20    A.  Oh, okay.
21      Well, I think, just to --
22    Q.  And I'm not asking for a long answer. I

668

1  am --
2    A.  I know.
3    Q.  I am just asking for a concise, clear
4  answer.
5      MR. SOBOL:  Why ask for any answer? It
6  is right in his report.
7      THE WITNESS:  Yes.
8    A.  I want to point you to where it is --
9  where you will get the complete, you know --
10  certainly the description of the findings for a
11  liability yardstick are first introduced in
12  paragraph 22, and essentially what I'm talking --
13  what I introduce there is I am going to look for
14  comparator drugs, and I am going to look for a
15  number of pieces of information that will allow me
16  to draw conclusions for the levels of spread that
17  manufacturers would use if they weren't using the
18  spread to move market share in a way that was --
19  that exceeded what the market understood them to
20  be. And so I look at comparator drugs, and I
21  indicate the drugs that I had asked for in table
22  3.

669

1      I have also looked at studies that have
2  been done, survey work that has been done, which I
3  mention in paragraph B of that paragraph, and this
4  is the OIG report and the ASCO report, which
5  indicate those liability thresholds.
6      There are studies that have been done
7  that reveal the preferences of payers and what
8  they have negotiated with physician groups,
9  provider groups that we see summarized in the
10  Medpac report, which summarizes the Dyckman
11  report, and also a report by the University of
12  Chicago and NORC, so I look to those, those, that
13  information to form the basis of what the
14  yardstick for liability is and what the
15  understanding is in the market for spreads for
16  single-source physician- administered drugs and
17  then for multi- source physician-administered
18  drugs.
19      And I expand on that later, which I
20  won't go to the paragraphs. I will let you read
21  those.
22    Q.  Well, why didn't you conclude that AWP

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

---

670

1  should equal ASP?
2      A.  Because the industry knows that it
3  doesn't.
4      Q.  Okay.  Are you aware of the fact that in
5  certain other cases that have been filed against
6  these defendants, the plaintiffs are alleging that
7  AWP should equal ASP?
8      A.  The -- you know, I don't know -- I would
9  have -- you are asking me about cases that I
10 haven't read the full Complaint.  I don't know
11 what the context is.
12         You are also raising an issue where I'm
13 not sure whether you are talking about a liability
14 issue or you are talking about a damages issue.
15 Certainly under Medicare, the reimbursement rate
16 is to be the lesser of the ASP or some fraction of
17 AWP.
18         Now that doesn't mean that AWP should be
19 equal to ASP, but under Medicare, it means that
20 the reimbursement rate should have been at ASP.
21 Now maybe some people interpret that to mean that
22 the AWP should be at ASP, but that is not what I

---

671

1  interpret.
2      Q.  Outside of the Medicare context, would
3  you agree with me that to the extent that
4  plaintiffs in other cases are alleging that AWP
5  should equal ASP, that is simply incorrect?
6      A.  I -- I really can't comment on cases
7  that I know nothing about.  I mean --
8      Q.  It is inconsistent with what your
9  understanding of the market expectation is;
10 correct?
11     A.  Certainly for purposes of what I have
12 done here and looking at market expectations,
13 looking at the many deponents that Mr. Young
14 cites, which I have summarized in attachment K
15 here, and I have dealt with in my rebuttal
16 reports, there is an understanding that AWP is a
17 sticker price.  And I mean this is more than just
18 those deponents.  It is anybody that writes about
19 this market.  And that there is an ASP that is
20 below that that allows some margin to be earned by
21 retail pharmacies for self-administered drugs or
22 some retail margin to be earned by physicians, and

---

672

1  that's quoting Mr. Young, that would imply that
2  AWP is greater than ASP, and greater than WAC, and
3  so I don't know what -- that is what is built into
4  -- into my analysis here.  That is my
5  understanding of this market, and that's what is
6  reflected in my yardsticks.
7      Q.  Well, you keep referring to a market
8  understanding.  Do you have any reason to believe
9  that the government doesn't have the same
10 understanding?
11     A.  The government has -- you need to be
12 more -- well, let me answer this briefly.
13         The government has set reimbursement
14 rates that reflect an understanding that is
15 comparable to what I would say is the -- in my
16 yardsticks.
17     Q.  Well, leaving aside for the moment your
18 yardstick, which I understand is based on your
19 interpretation of a statute which we'll get to in
20 a moment, what I want to focus on is --
21     A.  I am sorry?
22     Q.  -- what the government --

---

673

1      A.  Which yardstick?  My yardstick is not -
2  - the yardstick for liability --
3         MR. SOBOL:  Let's not have a
4  conversation here.
5         THE WITNESS:  Okay.
6         MR. SOBOL:  Let's have questions and
7  answers.
8         MR. EDWARDS:  Now I have lost my train
9  of thought.
10        THE WITNESS:  I am sorry.  It was very
11 rude of me.
12        MR. SOBOL:  Now there is more
13 conversation.
14 BY MR. EDWARDS:
15     Q.  You are not -- in terms of the market
16 understanding of the difference between AWP and
17 ASP, you are not saying that the government's
18 understanding was any different from the
19 understanding in the private sector, are you?
20     A.  I am saying that if anything with
21 physician-administered drugs the private sector
22 looked to Medicare and Medicare approaches to

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

---

674

```
 1   reimbursement and their -- they did not spend the
 2   amount of time focusing on independent research,
 3   and so that their understanding and their reliance
 4   on AWP reflected very much what Medicare was
 5   doing.
 6       Q.  Okay.  So you're not saying that the
 7   private sector had a better understanding than the
 8   government had?
 9           MR. SOBOL:  Objection to the form.
10       A.  I'm saying that the industry as a whole
11   had understandings that were reflected ultimately
12   in the revealed rates that were negotiated -- the
13   revealed approaches that were discussed in
14   Congress, that were reflected in studies, and that
15   were reflected in the contracts that were
16   negotiated by third-party payers, and so whether
17   it is a better or worse understanding, you know, I
18   didn't -- I didn't do a calculation -- an analysis
19   of that issue.
20       Q.  Well, would you agree with me that the
21   government had as much, if not more, knowledge of
22   spreads as third-party payers?
```

675

```
 1           MR. SOBOL:  Objection to the form.
 2       A.  I would -- the government certainly
 3   initiated analyses and studies to try and identify
 4   what spreads were, some of which informed the
 5   private sector and some of which I have relied
 6   upon, and -- I'm trying to think of whether any --
 7   there has been any private sector studies that did
 8   the same kind of information.  I would assume that
 9   there was -- there had been some private sector
10   analyses, but for the most part, we have got to
11   remember that this set of drugs fits very strongly
12   into that group that Professor Berndt designated
13   as being related to the importance of being
14   unimportant.  I mean physicians -- pharmaceuticals
15   generally were getting less focus by payers
16   overall, because they were a much smaller part of
17   total managed care in managing those dollars.
18       Q.  I don't mean to interrupt, but I am just
19   asking you whether in your view the government
20   would have had as much knowledge of spreads, if
21   not more knowledge of spreads, than the private
22   sector.
```

676

```
 1       A.  I --
 2           MR. SOBOL:  Objection to the --
 3       Q.  It is not a complicated question.
 4           MR. SOBOL:  Well, I don't understand the
 5   question.  So it may not be complicated, but it is
 6   incomprehensible at least to me.  So he was in the
 7   middle of an answer to the question.  So don't
 8   tell him you didn't intend to interrupt when you
 9   did.
10           He is just asking the exact, you the
11   exact same question.  You can give him the exact
12   same answer if you would like.
13       A.  My answer is that the -- both groups
14   were no doubt trying to understand this.  The
15   private sector was probably getting the least
16   attention, and, you know, I can't say who had a
17   better understanding, but certainly the government
18   probably looked at it more, as far as I know and
19   have seen studies, than I have seen for the
20   private sector.
21       Q.  Now you are familiar with the term WAC;
22   right?
```

677

```
 1       A.  I am.
 2       Q.  And what is your understanding of the
 3   relationship between WAC and AWP?
 4           MR. SOBOL:  Objection to the form.
 5       A.  Well, the WAC is a -- is a -- is another
 6   list price or sticker price that is formulaically
 7   related to the AWP by manufacturer, and it is --
 8   the -- I think there has been people who -- I
 9   think the article by Don Gencarelli that I cited
10   in my original affirmative declaration listed AWP
11   as kind of the sticker price and WAC as a catalog
12   price.
13           I mean it was essentially the -- it is a
14   price that is used with wholesalers, the wholesale
15   acquisition cost, and it is a fixed percentage of
16   AWP by manufacturer and by -- over time.
17       Q.  Well, is it your understanding that AWP
18   generally reflects a markup of 20 or 25 percent
19   over WAC?
20           MR. SOBOL:  Objection to the form.
21       A.  WAC can be 20 to 25 percent below AWP or
22   the various, 20 to 25 percent above.  There is a
```

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

678

1    fixed relationship between the two.
2        Q.   So to the extent that your expectation
3    yardstick is 30 percent, would it be fair to say
4    that no one was deceived by the difference between
5    WAC and AWP?
6            MR. SOBOL:  Objection to the form.
7        A.   I guess I don't understand the question.
8    I mean it's -- the industry understood that WAC
9    was lower than AWP and that the markup was in the
10   range we're talking about.  I'm -- they know that
11   certainly, and they -- the spread I'm talking
12   about has to do with ASP and whether ASP was, the
13   actual acquisition cost or the sale price, was
14   lower than WAC.
15       Q.   Well, are you saying that the market
16   understood that ASP was lower than WAC?
17       A.   I'm saying that based on the analyses
18   that I have and what I have used as the yardstick
19   that the spreads that I'm seeing above ASP were
20   higher than the spreads relative to WAC, so that
21   ASP would be below WAC generally.
22       Q.   And that's the difference between a 30

679

1    percent markup and a 20 or 25 percent markup?
2            MR. SOBOL:  Objection.
3        Q.   Correct?
4            MR. SOBOL:  Objection to the form.
5        A.   They differ in that regard.  I -- the -
6    -
7        Q.   You are saying that the market expected
8    a markup of up to 30 percent; correct?
9        A.   I am saying that when I look at the
10   drugs that were -- the comparator drugs that I
11   used, and when I look at the survey research, when I
12   look at the contracts, it tells -- it tells me
13   that the -- there were a range of understandings
14   of what the relationship between AWP and ASP was
15   or the relationships were, for a variety of
16   different contexts, and they ranged anywhere from
17   11 to 25, 26 percent, and I -- I took a yardstick
18   that was well above -- well, it was above the
19   upper bound of what those relationships were, and
20   so WAC -- I'm -- the focus of my yardstick is on
21   ASP, which is in, obviously if it is -- my spread
22   is 30 percent, it is above -- and I'm looking at

680

1    spreads here that are 25 percent, and in the range
2    that they are, that -- that is a spread larger
3    than the spread relative to WAC.
4        Q.   Well, if the expectation yardstick is 30
5    percent and the markup of AWP over WAC is 20 or 25
6    percent, would it be fair to say that no one is
7    deceived by the difference between WAC and AWP?
8        A.   Deceived by the difference between WAC
9    and AWP?
10       Q.   Yes.
11       A.   The -- the understanding -- you know, I
12   -- the WAC and AWP are formulaically set by the
13   manufacturer and the price listing agencies with -
14   - that they use, and in some cases, they have been
15   20 percent.  In some cases, they have been changed
16   to 25 percent.  And I'm not sure that payers
17   understood that.  But there is an understanding of
18   a formulaic relationship that is admitted to by
19   almost anyone who studies this industry about a
20   range of discounts of WAC below AWP.
21       Q.   Well, take my client, Bristol-Myers
22   Squibb, for a moment.  Bristol-Myers Squibb

681

1    reported a wholesale list price to industry
2    publications.  Are you aware of that?
3        A.   I know that different -- different
4    defendants, different manufacturers, have called
5    WAC different things, and I would have to confirm
6    that, but I'll, subject to me checking that, I
7    think that sounds right.
8        Q.   And the wholesale list price was similar
9    to WAC?  That's what you are saying; correct?
10       A.   I think that's right.
11       Q.   And what BMS did was it reported a
12   wholesale list price to industry publications who
13   then applied a markup factor of 20 to 25 percent
14   to arrive at AWP?  Is that consistent with your
15   understanding?
16           MR. SOBOL:  Objection to the form.
17       A.   It's generally consistent with the way
18   this -- the reporting process takes place, whether
19   AWP is reported or WAC or wholesale list price.
20       Q.   And in reporting that wholesale list
21   price to the industry publication, BMS did not
22   have to be concerned that the markup factor was

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    February 27, 2006
Boston, MA

682

1   misleading, because the market understood that
2   there could be a 30 percent difference between ASP
3   and AWP? Is that fair?
4      A.  I'm not sure I understand the question.
5      Q.  You have testified that the market
6   expected that there could be a difference of 30
7   percent between AWP and ASP; correct?
8      A.  That's right.
9      Q.  And so a markup factor of 20 or 25
10  percent is within that 30 percent range; correct?
11     MR. SOBOL: Objection to the form.
12     A.  Well, you are talking about a different
13  spread than the one I'm -- I am talking about a
14  spread defined as AWP relative to ASP. You are
15  talking about WAC.
16     Now in order to go from WAC to ASP, I
17  need to know a variety of things about chargebacks
18  and discounts and rebates and other - - other
19  kinds of payments. So, you know, the relationship
20  between WAC and AWP is not strongly relevant to
21  the ultimate issue here, and that is what is --
22  what are the -- what is the signal that the list

683

1   price is, whether it is AWP or WAC, what was it
2   telling, and what did people think it was telling
3   them about acquisition cost, and what was the real
4   relationship between those sticker prices and
5   acquisition costs.
6      Q.  If all a manufacturer did was create a
7   markup of 20 to 25 percent, that would be within
8   your 30 percent expectation yardstick and there
9   would be no liability under your theory; correct?
10     A.  That -- you have left out the entire
11  issue of what is leading to liability in this
12  matter, and I mean a case in point would be a drug
13  like Lupron or Zolodex, where there was an AWP and
14  there was a WAC. I mean the major -- and, you
15  know, that could have been within the yardstick.
16  The point was that there were -- there were
17  inducements offered, financial inducements, that
18  made the actual spread, you know, two to four
19  hundred percent.
20     So the important thing here is not WAC
21  and AWP. It is what is going on on the part of a
22  manufacturer to allow a spread to be inflated

684

1   between the AWP and the ASP, because the ASP is
2   what drives a doctor's -- a provider's choice in
3   using a drug. If they can get it for a low
4   amount, and if they can turn around and get
5   reimbursement at a high rate, it doesn't matter
6   what the relationship of WAC to AWP is.
7      Q.  But what I'm trying to do here is
8   isolate out the WAC to AWP part of it, and I'm
9   simply trying to confirm that if that is all that
10  had happened, all a manufacturer had done is
11  created a spread of 20 to 25 percent between WAC
12  and AWP, you would not have found liability;
13  correct?
14     MR. SOBOL: Objection to form.
15     A.  You're not listening to me, are you? The
16  --
17     Q.  I understand you are saying they did
18  other things, but I'm trying to get you to leave
19  those other things aside for the moment and just
20  determine whether the markup between WAC and AWP
21  would give rise to liability standing alone in
22  your view.

685

1      MR. SOBOL: Objection to the form.
2      A.  There is nothing in my declaration that
3   talks about the fact that the relationship between
4   WAC and AWP drives either liability or damages
5   here. There is a formulaic relationship, and the
6   -- what is important is what other things are
7   being done by the manufacturer to increase what
8   has been called return to practice or the spread
9   to levels that are artificially inflated by what
10  payers understood or the market understood.
11     So whether -- whatever WAC is, we know
12  that WAC is below it, and so it is not -- it is
13  not relevant. It is not -- it doesn't even enter
14  into this. It is not something I would even look
15  at.
16     Q.  If ASP were equal to WAC or within 5
17  percent of WAC, there would be no liability under
18  your analysis; is that correct?
19     A.  Under my analysis if WAC were -- if the
20  relationship between WAC and AWP were such that
21  ASP was within a certain percentage of WAC and the
22  spread relative to that ASP in my December

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

686

1    declaration did not exceed 30 percent, then they
2    did not exceed the liability threshold that is
3    incorporated -- that is implemented in that
4    declaration.
5        Q.   Now your methodology is based on an
6    analysis of market expectations as to the
7    difference between ASP and AWP; correct?
8        A.   That's one of the things it is based on.
9        Q.   Okay.  And what did you do to determine
10   actual or expectations in the marketplace?
11       A.   Well, as I said, that is one of the
12   things I looked at.  I also looked at comparator
13   drugs and other things.
14            But in terms of looking at expectations
15   and what people understood was going on, I looked
16   at the surveys that I have mentioned in paragraph
17   22B, and that is expanded in paragraph --
18   paragraph 57 through 59.  I looked at those
19   surveys.  I looked at contracts, whatever
20   contracts I could -- I could review.  I looked at
21   deponent testimony that was appended to
22   defendants' experts. I think Dr. Gaier and Mr.

687

1    Young had various deponents and third-party payers
2    that were -- the testimony that was included.  And
3    I looked at their actual declarations of how they
4    summarized what was going on with reimbursements
5    relative to Medicare and what reimbursements --
6    what the third-party payers believed was the
7    issue, the case, when they were reimbursing at
8    AWP.
9            So those were the types of, the set of
10   things that I looked at to summarize what the
11   understanding was in the market.
12            Now did I also mention the contracts --
13       Q.   You did.
14       A.   -- summarized in Medpac?  And the NORC,
15   the University of Chicago?  Okay.
16       Q.   The surveys and contracts that you
17   mentioned are not analyses of actual expectations
18   in the market, are they?
19       A.   Well, expectations in the market vary.  I
20   mean there is a distribution of expectations.
21            What you -- what you are going to find
22   is summary measures of what those expectations are

688

1    that are what are revealed by either -- either in
2    a survey -- then you are going to get the range of
3    expectations or range of understandings -- or what
4    are agreed to in contracts, where -- what -- you
5    are looking for actual behavior confirmed in
6    something contractual or an agreement to reimburse
7    at certain rates.  So in any market, there are
8    distributions of expectations, but those
9    expectations cluster around what is revealed in
10   surveys and in contracts.
11       Q.   Well, the surveys that you're talking
12   about, though, are not surveys of payers to
13   determine what their expectations were, are they?
14       A.   They are surveys of what they have
15   agreed -- what they have agreed -- let's take the
16   Dyckman survey that is one of the surveys that
17   supported the Medpac results.  It is essentially
18   what those third-party payers agreed to in terms
19   of what their reimbursement off AWP would be. And
20   so that tells me an expectation of what they
21   believe a relationship is relative to ASP.
22       Q.   Are you saying that the Dyckman report

689

1    surveyed expectations of payers?
2        A.   No.  I am saying it surveyed what --
3    what the discounts off of AWP were in the
4    reimbursement -- in -- how they reimbursed for
5    physician-administered drugs and that that --
6    those reimbursement rates were agreed to based on
7    what their expectations were as to what prices
8    were, what spreads were.
9            MR. EDWARDS:  Let's take a look at the
10   Dyckman report, which was marked as Exhibit
11   Hartman 019 on a previous day of your deposition.
12            THE WITNESS:  Is it possible at the same
13   time to see the Medpac?  Do you have the Medpac?
14            MR. EDWARDS:  Sure.
15            THE WITNESS:  Summary of that report?
16   Good.
17            MR. EDWARDS:  We will dig these out.
18   BY MR. EDWARDS:
19       Q.   While we're waiting for these documents
20   --
21            (Handing Exhibit Hartman 020 to the
22   witness.)

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                     February 27, 2006
Boston, MA

690

1      Q.  -- let me ask you a question.  As a
2   matter of economics --
3           MR. EDWARDS:  No.  It is the wrong
4   document, this document.
5      Q.  As a matter of economics, does a buyer
6   or seller always agree to a price that meets their
7   expectations?
8           MR. SOBOL:  Objection to the form.
9      A.  Does a buyer or seller always agree to a
10   price?
11     Q.  That meets their expectations.
12          MR. SOBOL:  Objection to the form.
13     A.  That -- I would say as a general
14   principle in economics, consumers come to a market
15   with expectations about what prices should be, and
16   make decisions of whether, and based on that, they
17   reveal their preferences by buying at a certain
18   price, and so there is -- there are distributions
19   of expectations that any given consumer may have,
20   and the final price that he or she agrees to is
21   going to reflect that distribution, and whether
22   they buy at all will reflect that, that

691

1   distribution.
2      Q.  Okay.  What I am going to do is hand you
3   what has previously been marked as Exhibit Hartman
4   019 to your deposition.
5           (Handing Exhibit Hartman 019 to the
6   witness.)
7           MR. EDWARDS:  For the record, it is a
8   document by Dyckman & Associates entitled "Health
9   Plan Payment for Physician-Administered Drugs
10   dated August 2003."
11          THE WITNESS:  Is it possible to see --
12   BY MR. EDWARDS:
13     Q.  I want to ask you whether there is
14   anything in this document that talks about payer
15   expectations.
16     A.  I --
17     Q.  I am sorry?
18     A.  I thought I was also going to get the
19   Medpac chapter in which this was summarized if
20   that is possible.
21     Q.  Sure.  We can do that.  This would be
22   Exhibit Hartman 026.  It is a document entitled

692

1   "Report to the Congress, Variation and Innovation
2   in Medicare," and I believe what we have done is
3   we have just excerpted chapter 9 --
4      A.  All right.
5      Q.  -- which is the chapter that contains
6   the information that you referred to in your
7   report.
8           THE WITNESS:  Does that need to be
9   marked?
10          THE REPORTER:  That will be 26.
11          MR. EDWARDS:  Do you have it?
12          MR. SOBOL:  Yes.
13          THE WITNESS:  He came packed.
14          (Multipage Report to the Congress,
15   Variation and Innovation in Medicare marked
16   Exhibit Hartman 026 for identification.)
17          (Handing Exhibit Hartman 026 to the
18   witness.)
19          THE WITNESS:  What is summarized in
20   table 9-2 of the Medpac report is Exhibit 2 on
21   page 3 of the Dyckman & Associates study.
22          And I am trying to see how this differs

693

1   from the first one you gave me, Exhibit Hartman
2   020 and Exhibit Hartman 019.
3           In any case, I am looking at Exhibit
4   Hartman 019, and this is a distribution of what
5   health plans have agreed to.  This is a summary of
6   what their expectations were as to what spreads
7   were in -- and what they understood spreads were,
8   that they would -- they would essentially agree to
9   these types of reimbursement percentages off of
10   AWP.
11     Q.  You say that Exhibit 2 is a summary of
12   what expectations were of what spreads were?
13     A.  I'm saying that what we find here are
14   the reimbursement rates that are and the formula
15   and the discount off of AWP to which this group of
16   third-party payers, I think it is some 33, and I
17   think they probably summarize some 25 percent of
18   insured lives at the time the survey was done,
19   that they have agreed -- they have agreed to
20   reimbursement rates related to AWP, and this is
21   essentially the -- when I walk in and I offer a
22   certain price to a car dealer, this is reflecting

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

694

1  my understanding of the spread of the distribution
2  of what it -- what the ASP might be and its
3  relationship to the sticker price, and this is
4  what I commit to.
5          And so this is a summary -- they didn't
6  ask them about expectations. Questions about
7  expectations are notoriously suspicious.
8          This is a reflection of the revealed
9  preference to reimbursement rates that they agreed
10  to, and these reflect an understanding or what
11  they -- their understanding was about what those
12  spreads would be.
13      Q.  And by spreads, you are talking about
14  the spreads between ASP and AWP?
15      A.  That's correct.
16      Q.  So, for example, if you take the first
17  segment in Exhibit 2, 85 to 90 percent of AWP, if
18  a health plan had a contract that called for
19  reimbursement at 85 percent of AWP, you would
20  conclude that that payer's expectation of the
21  spread between ASP and AWP was 15 percent?
22          MR. SOBOL: Objection.

695

1      Q.  Correct?
2          MR. SOBOL: Objection to form.
3      A.  No.
4      Q.  Explain that.
5      A.  What this tells me is that there are 22
6  percent of the plans essentially agreed to this -
7  - to reimburse at this discount off of AWP. That
8  says to me that their expectations about what the
9  acquisition cost was, that the spread was -- was -
10  - was larger than that, was larger than 15
11  percent, but it was within the realm of what
12  comparator drugs tell me and what surveys tell me
13  for single-source physician-administered drugs,
14  that the spreads were thought to be anywhere from
15  15 to 25 percent.
16          So it is saying that they have -- they -
17  - they are agreeing to a reimbursement rate that
18  they feel is fair, given that the, in the words of
19  Mr. Young, that the provider can earn some part of
20  a retail margin, but it is indicating to me that
21  their understanding of spreads were within the
22  realm of what I have used as the basis for my

696

1  yardstick.
2          It certainly is indicating to me that if
3  -- this was based on an understanding that spreads
4  were 200 to 400 to 1000 percent, that they
5  wouldn't have agreed to this reimbursement rate.
6      Q.  So you would agree that a payer would
7  expect that the spread is greater than the
8  discount off of AWP specified in the contract?
9          MR. SOBOL: Objection to the form.
10      A.  I would -- I would say that there -- as
11  I have developed in my declaration at the various
12  points that we can go into the different data that
13  I looked at, that the market understanding was
14  that the spreads ranged from anywhere from 11 to
15  25, 27 percent, and that was the understanding of
16  the spreads.
17          And the negotiations that went on here,
18  various -- you can see various payers negotiated
19  something slightly different.  So there was some
20  variation in negotiations, fairly tight
21  distribution of variation in negotiations.  Most
22  of it is centered between 85 percent and 100

697

1  percent of AWP.  But that -- that was the
2  understanding, the general understanding, and each
3  of -- and these various payers had some, as they
4  negotiated, had some understanding of that
5  summarizing the market, and this is what they
6  ended up being able to negotiate given their
7  situation and given the negotiations that
8  occurred.
9      Q.  So you are saying that payers would have
10  understood that drugs were a profit center for
11  providers?
12          MR. SOBOL: Objection.
13      A.  What I'm -- what I'm saying is that
14  payers generally understood that there was -- that
15  with the yardsticks that I'm talking about that
16  there was that range of difference, and that when
17  the drugs were sold to the providers directly as
18  in the words of your expert Mr. Young that the
19  physicians were able to earn the retail margin, so
20  that there was some amount, a small amount of
21  margin, that the expectations were that the
22  physicians were earning, and that was the

Raymond S. Hartman, Ph.D.  CONFIDENTIAL           February 27, 2006
Boston, MA

698

1  understanding that is reflected in the survey work
2  and in the contracts to which these third- party
3  payers agreed.
4      Q.  Well, where in this document does
5  Dyckman & Associates discuss the extent of that
6  margin that you just referred to?
7      A.  The range that I'm -- the -- the range
8  that I raise in my declaration, you are saying
9  where do they discuss the range that I have put
10 forward here?  I will try that question.
11     MR. SOBOL:  Objection to the form.
12     A.  I would assume --
13     MR. SOBOL:  When you say "here," what
14 are you talking about?
15     THE WITNESS:  Here in my December -- I
16 said in my declaration -- oh, in my December
17 declaration.
18     A.  I don't know to what extent they ask
19 those questions.  I looked at this as the revealed
20 preferences to what they negotiated, what they
21 were willing to contract to.  That's what tells me
22 what their beliefs were and what their

699

1  expectations were, so this is the main focus.
2       So the extent it gets into this notion
3  of did they know that there were a Osco study and
4  I think -- I think it is a ASCO study.
5      Q.  Osco is a drugstore.
6      A.  Osco is a pharmacy.  That's right.
7       And the NORC report, I -- I haven't read
8  this closely enough to go back and see whether
9  that or to recall whether it is reflected in the
10 survey.  It may have been, but I was -- I was
11 looking more importantly at what they committed
12 to, which is a more important piece of evidence.
13     Q.  But I think you have already testified
14 that you would agree that payers understood that
15 providers were going to earn a profit from the
16 drugs, and the real question then becomes how much
17 of a profit; correct?
18     MR. SOBOL:  Objection.
19     A.  The -- as is built into my yardsticks,
20 the -- there is a spread that is allowed at which
21 providers earn -- are able to earn some amount of
22 money on that, in my liability yardstick.

700

1      Q.  And there is nothing in the Dyckman
2  report that supports your conclusion that the
3  yardstick should be 30 percent as opposed to some
4  other percentile; correct?
5      A.  Well, I don't see -- I don't see anybody
6  that is -- I see that 30 percent is quite
7  conservative relative to what they have committed
8  to here (pointing to Exhibit Hartman 019).  I mean
9  they have committed to spreads that are, you know,
10 around 15 percent, the discount is 15 percent.  So
11 the -- they -- that -- my -- my yardstick is
12 conservative to what they have committed to.
13     Q.  Well, take a look at page 4 of Exhibit
14 Hartman 019.
15     (Witness complying.)
16     Q.  Under the heading "Characteristics of
17 payment systems for drugs and administration
18 fees," the first bullet states, quote, "There is a
19 general understanding among health plans that
20 physicians purchase drugs at prices that are below
21 95 percent of AWP, and given that health plan
22 prices are generally at or above this rate, the

701

1  sale of drugs is a profit center for physicians."
2       Do you see that?
3      A.  I do.
4      Q.  So to the extent that Dyckman &
5  Associates asked payers about their expectations,
6  payers said that they understood that drugs would
7  be a profit center for physicians; correct?
8      A.  They are certainly saying here what I'm
9  saying the market knew generally.
10     Q.  Right.
11     A.  That --
12     Q.  And they are not quantifying the extent
13 of that profit in this survey; correct?
14     A.  In that particular bullet, they're not.
15     Q.  Wouldn't you agree with me, Dr. Hartman,
16 that the best way to determine payer expectations
17 is simply to ask them what their expectations are?
18     A.  The surveys of expectations can be
19 useful and the surveys -- the fact here that in
20 this bullet they talk about the fact that there
21 are an expectation that the average sale price or
22 the acquisition cost is below 95 percent of AWP

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

702

1  indicates that they asked something about that.
2  But the -- the -- the notion of surveying
3  expectations or surveys of contingent valuation,
4  where you don't have to commit to an actual
5  economic transaction, are notoriously suspect.
6      So, yes, surveys could be useful to look
7  at, but it would be something lower on my list of
8  evidence and indicia that I would use to come up
9  with what the yardstick would be for the market as
10 a whole.
11     Q.  Well, at your last deposition, you
12 testified that you were going to conduct surveys
13 of payers to determine their expectations.  Do you
14 recall that?
15     MR. SOBOL:  Objection to the form.
16     A.  I don't recall the precise Q and A, so
17 if you would refresh my memory.
18     Q.  Do you recall saying, "It is important
19 to get it from the horse's mouth"?
20     MR. SOBOL:  Objection.
21     A.  I --
22     MR. SOBOL:  What is the "it"?

703

1      THE WITNESS:  I was thinking I was
2  talking about attorneys at that point.
3          (Laughter.)
4      Q.  Take a look at pages 188 and 189 of your
5  prior deposition.
6          (Handing transcript Volume I to the
7  witness.)
8      Q.  What I will do is I will start on page
9  187 at line 20, and I asked the following
10 question.
11     "Isn't it better to determine market
12 expectations simply by talking to people?
13     "Answer:  Well, I think you want to talk
14 to people and you want to do survey research, and
15 we have been through a section where I indicate
16 that I do plan to talk to people.
17     "Question:  And who do you intend to
18 talk to?
19     "Answer:"
20     And you refer there to a paragraph of
21 your report, final yardstick spreads to determine
22 injury and damages during the damage phase, et

704

1  cetera, et cetera.
2      "We find them through further 30(b)(6)
3  depositions regarding the data provided by
4  defendant drug manufacturers and depositions of
5  appropriate personnel and third-party payers in
6  managed care organizations?
7      "Question:  So you do plan to talk to
8  class members to determine their expectations?
9      "Answer:  I plan to talk to class
10 members.  I plan to talk to PBMs, a sample of
11 PBMs, a sample of retailers.
12     "Question:  So you would agree that the
13 actual expectations of class members are relevant
14 to your analysis?
15     "Answer:  I would agree that the summary
16 of that whatever is used as a yardstick to define
17 the expectations in the market should take
18 advantage of as much information as is available
19 about what was forming those expectations and what
20 they were.
21     "Question:  Including information
22 directly from the horse's mouth, the class members

705

1  themselves whose expectations we're talking about
2  here?  Right?
3      "Answer:  That's correct."
4      Now you didn't conduct any surveys of
5  payers; correct?
6      A.  What I did following the initial
7  affirmative effort was I had asked to see as much
8  information as I could from payers.  I also had a
9  chance to reveal -- review in much greater detail
10 a variety -- a number of depositions put forward
11 by defense experts that allowed me to get at some
12 of this information that I'm talking about, which
13 I addressed at some length in its usefulness about
14 expectations in my -- in my rebuttal reports, both
15 to the rebuttal reports and then the surreply of
16 Mr. Young.
17     So the -- it turned out that I was
18 blessed with a variety of information that was
19 provided by your experts that helped me look at,
20 focus on these expectations and see what was
21 there.
22     I did ask to have some additional

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

706

1    conversations with third-party payers, and there
2    was talk of arranging that, but it did not occur.
3    For whatever reasons, I was -- it was un -- I did
4    not know. But it turned out that that became less
5    important given what I was -- what I had received
6    in detail from defense experts.
7        Q.   Just so we're clear, you did not conduct
8    any surveys; correct?
9            MR. SOBOL:  Objection to the form. Asked
10   and answered.
11       A.   Correct.
12       Q.   And you say you did not conduct any
13   surveys because you had access to the information
14   contained in the reports of defendants' experts
15   that was derived from depositions in the case?
16       A.   That's correct.
17       Q.   And so I take it you agree with the
18   analysis of defendants' experts concerning the
19   deposition record in this case?
20       A.   So you haven't read my rebuttal reports,
21   have you? I mean I don't agree, and I - - and I
22   have used -- and I find in that, in the deposition

707

1    testimony mischaracterizes, significant
2    mischaracterizations of that deposition testimony,
3    and I find that it supports the yardsticks and the
4    approach and the reliance on AWP that I had
5    proffered in my affirmative declaration, and I go
6    into some detail in those rebuttal reports citing
7    whole sections of deposition testimony and the
8    conclusions drawn by defense experts that were
9    inappropriate.
10       Q.   Well, other than what you say in your
11   rebuttal reports, is there any deposition
12   testimony that you claim supports your
13   determination of a 30 percent yardstick in this
14   case?
15       A.   Well, certainly in attachment K to this
16   declaration, I review -- just so I am precise on
17   which expert I reviewed, I think it was entirely
18   Mr. Young.
19           (Pause.)
20           (The witness viewing Exhibit
21   Hartman 023.)
22       Q.   Maybe I can shortcircuit it. I am just

708

1    trying to define the boundaries here.
2            Is it your testimony that to the extent
3    that you claim that there is deposition testimony
4    that supports your calculation of a 30 percent
5    yardstick, that testimony is identified in your
6    rebuttal declaration on class certification and
7    attachment K to your December 15 report?
8        A.   The -- the amount of deposition
9    testimony I was able to review and find as
10   supporting my yardstick and my analysis is
11   discussed here. I did not have the time to fully
12   review everything that was -- was -- that they had
13   sent to me, but that's -- that is certainly true,
14   that that is part of what I have been able to
15   review of theirs.
16       Q.   And just to close the loop on this, in
17   attachment B to your December 15 report, you
18   purport to list the materials you have relied on
19   in arriving at your conclusions; correct?
20       A.   I do.
21       Q.   And you do not identify any depositions;
22   is that correct?

709

1        A.   I certainly reviewed -- identified the
2    deposition transcripts in the footnotes to the
3    declarations or to attachment K appearing herein.
4    So to the extent that that didn't get
5    incorporated, that was an oversight.
6            I cite in footnote 2 of attachment K the
7    deposition testimony from Mr. Young's Exhibit 1A,
8    Nancy Rollin of Willmark Blue Cross/Blue Shield,
9    John Rogers of Independent Health. So it is
10   possible that my analytic team neglected to pull
11   forward citations that were in some of these
12   attachments.
13           Certainly there are paragraphs in Mr.
14   Young's report that I cite that also rely on
15   certain deponents, which I probably did not bother
16   reciting, and they would be cited in Mr. Young's
17   testimony, and I certainly make clear where --
18   where in Mr. Young's testimony I'm referring to.
19       Q.   Well, is it fair to say that if it isn't
20   in your rebuttal report and it isn't in your
21   current report in either a footnote or attachment
22   K there are no depositions that you rely on to

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

710

1  support your opinions with respect to a 30 percent
2  yardstick?
3      A.  There are no doubt additional
4  depositions I have reviewed, but I didn't rely on
5  them for the -- I -- I generally review a broader
6  set of material than what I am ultimately relying
7  on in the report, and so that what is listed in
8  attachment B is what I relied on, and it -- the
9  oversight of including those citations in
10 attachment K, I apologize for that.  That should
11 have been in there.  I certainly reviewed other
12 things, but I didn't rely on them for this report,
13 and what I relied on for the two rebuttal reports
14 are listed therein.
15     Q.  Well, let's take a look at the two
16 depositions you mentioned in attachment K, Nancy
17 Rollin and John Roberts.  Where in that testimony
18 that you cite is there support for your opinion
19 that the market expected that AWP would exceed ASP
20 by a range no greater than 30 percent?
21     A.  Well, what is cited and what I develop,
22 the chain of logic in this particular declaration

711

1  -- this attachment is to address Mr. Young's
2  assertion, which is repeated in paragraph -- well,
3  it's in 1A, and then it is in two, "Most
4  commercial payers did not negotiate with
5  physicians based on their acquisition costs, and
6  even if they did, they did not premise those
7  negotiations on the view that the AWP was a signal
8  for acquisition costs."
9          And so what I show in the next paragraph
10 is that Mr. Young and the deponents that he cites
11 indicate that the reimbursement rates of some
12 percentage off of AWP allow for, in the self-
13 administered context, for pharmacies to make some
14 margin, and what these two deponents say is, you
15 know, look, is it your understanding that in, for
16 Rollin, where I have highlighted it, that there is
17 some margin above the costs that they pay for the
18 drugs.  It is saying at reimbursement of AWP plus
19 13 to 18 percent that there is some acquisition
20 cost of the pharmacies, maybe an ASP of AWP minus
21 20, 22 percent, that gives them some margin on the
22 drugs.

712

1          And John Rogers agrees with that.
2          Now Mr. Young goes on to say in section
3  -- in paragraph C, he extends the understanding
4  from the self-administered drugs to physician-
5  administered drugs, saying at his paragraph 160
6  that the physicians are earning the retail margin
7  that has been understood and identified by Nancy
8  Rollin and John Rogers under Medicare.
9          Now that again suggests to me a
10 relationship between AWP minus 13 and 18 percent
11 and an acquisition cost that is well within the
12 yardsticks that I have -- that I have used.
13         And I go on to explain.  There is more
14 quotes from Mr. Young that demonstrate that there
15 was an understanding and a belief that the -- some
16 relationship between AWP allowed some margin to
17 the physicians, and so that's -- that tells me
18 something between a reimbursement rate at AWP less
19 5, AWP less 15, and an acquisition cost on the
20 part of providers in this case.
21     Q.  Well, all they are saying is that, even
22 when you take the discount off of AWP specified in

713

1  the contract, we assume that providers are still
2  earning a profit?
3      A.  It is -- it is telling me what they
4  believe and their expectations about what these
5  prices are and what the acquisition costs are.  It
6  is telling me what they believe about the market.
7      Q.  It is not telling you how much of a
8  profit they believe the provider is earning;
9  correct?
10     A.  It certainly is -- when it says in --
11 for John Rogers, "And did Independent Health have
12 any expectation about what the margin pharmacies
13 would earn on the drugs would be?"
14         "I don't think we had any specific
15 information.  We don't want the pharmacists to go
16 out of business."
17         What that tells to me, says to me, is
18 from what they can see they are earning something,
19 but they're not -- they're not getting rich, and
20 it tells me that there is some margin, and, you
21 know, and Nancy Rollin doesn't say an incredible
22 margin.  She says, "There is some margin above

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                 February 27, 2006
Boston, MA

714

1   cost."
2        And so this tells me something about the
3   expectations of payers related to the acquisition
4   costs of pharmacies, and Mr. Young goes on to say,
5   you know, and he is an accountant studying this
6   industry, that that is essentially under Medicare
7   they allow the doctors to earn that retail margin,
8   which is some margin, some margin so they don't go
9   out of business.
10        So, yes, there is a profit center there.
11  It is saying there is not a lot of profit there
12  from these expectations, what they were thinking
13  those reimbursement rates implied off of AWP.
14       Q.  Well, for AWP to be a signal for
15  acquisition cost or ASP, there would have to be a
16  consistent relationship between AWP and ASP;
17  correct?
18       A.  I -- the -- the relationship to -- for
19  there to be a signal, it is the signal that I --
20  that has been built into the survey research, the
21  contracts that I have cited, the drugs that I have
22  looked at, and the deponents that have been put

715

1   forward by your experts talking about what the
2   profit was, either by the pharmacies or by the
3   doctors, and so there is going to be some
4   variation, but it is a very small variation
5   compared to the kinds of overcharges that are
6   implied -- that have been alleged in this
7   litigation.
8        Q.  Would you agree that one premise of your
9   theory is that payers have expected that AWP is
10  larger than ASP by a reasonably predictable
11  amount?
12       A.  That is --
13       Q.  And if that language sounds familiar to
14  you --
15       A.  It is my language?
16       Q.  Take a look at paragraph 13 of your
17  report.
18            (Pause.)
19            (The witness viewing Exhibit
20  Hartman 023.)
21       A.  It certainly sounds familiar to me,
22  because it is -- it is my language.

716

1            Now I would like to also point out that
2   it seems to be the Court's understanding that
3   while there is some variation in what third-party
4   payers might negotiate, that, now quoting in
5   paragraph 15, "'There is no evidence that third-
6   party payers purchase physician- administered
7   drugs or know of the mega- spreads that exist for
8   these drugs'."
9            That says to me that the Court in
10  reviewing all of the evidence has come to the same
11  conclusion relative to the information and what
12  the spreads would be and what was predictable or
13  what was not predictable and what was a mega-
14  spread.
15           And I might also point you to -- if you
16  will bear with me --
17           (Pause.)
18           (The witness viewing Exhibit
19  Hartman 023.)
20       A.  -- to my footnote 60.
21       Q.  What page?
22       A.  On page 39 and 40, where Dr. Gaier

717

1   actually in reviewing my work says that -- states
2   that Dr. Schondelmeyer and I are somehow at odds
3   in our understanding of what this means. Dr.
4   Schondelmeyer has written in the paragraph that I
5   quote in that footnote, "For most brand name
6   products that are still covered by patent or
7   exclusivity, the price relationship between list
8   prices and WAC and the actual transaction
9   prices...is reasonably predictable." And then at
10  the bottom, "In such cases, a payment policy using
11  AWP as a benchmark may be relatively accurate."
12           This is merely talking about this
13  reasonable predictability that the Judge has
14  found, that Dr. Schondelmeyer -- that Mr.
15  Schondelmeyer -- maybe Dr. -- oh, it is Dr.
16  Schondelmeyer, that I am saying informs the market
17  and that Mr. Young is finding in the deponents
18  that he cites.
19       Q.  Well, that is in the context of a
20  statement by Dr. Schondelmeyer that the
21  relationship between AWP and ASP when there is
22  therapeutic or generic competition is not

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

---

718

1   reasonably predictable? Isn't that true?
2       A.  I -- I don't know.  I -- this is in --
3   this is -- the context that this is is -- this, I
4   think this quote came directly from Dr. Gaier's
5   report, so I'm not -- the full context in which
6   that quote appears from Dr. Schondelmeyer, you
7   will have to show me, but this is telling me that
8   for this set of drugs, for brand name drugs, he is
9   telling -- there -- he is -- he is also saying
10  there is reasonable predictability between an AWP
11  and a WAC and the ASP, which is what my yardsticks
12  are summarizing, and which Mr. Young's deponents
13  are supporting.
14      Q.  Well, if it turns out that the Judge or
15  the jury in this case concludes that the market
16  did not expect that AWP would be larger than ASP
17  by a reasonably predictable amount, what does that
18  do to your conclusions?
19      A.  That is such a broad -- I -- you would
20  need to be more specific.  I mean are you saying
21  that if the -- if the jury finds that -- if the
22  jury is shown information that is cited in

---

719

1   paragraph 53 of my December report, which recites
2   from Medpac, that talk about a hearing before the
3   House Energy and Commerce Subcommittee on Health,
4   that they find that kind of spread between AWP and
5   an ASP sold to physicians -- an AWP of 740 and an
6   ASP of 750, which is a markup of close to 10,000
7   percent, if the jury finds that that is not a
8   problem or people didn't -- that people understood
9   that and that was what informed the market and it
10  didn't matter, if -- I would find that would -- as
11  certainly going against what is found in the
12  Lupron settlement agreement and is - - and has
13  been put forward elsewhere. But, you know, I mean
14  -- if the jury finds that I'm wrong, the jury
15  finds that I'm wrong. But that would be wrong.
16      Q.  Well, you have stated here, as a
17  premise, if you will, that payers have expected
18  that AWP is larger than ASP by a reasonably
19  predictable amount. What is the effect on your
20  conclusions if that premise turns out to be
21  incorrect?
22      A.  I haven't analyzed that.

---

720

1       Q.  Well, if that premise turns out to be
2   incorrect, you couldn't have deception, could you?
3           MR. SOBOL: Objection to form.
4       A.  If -- if you are telling me that if we
5   look at the various deponent testimony that is
6   here, we look at the surveys, and we look at the
7   Congressional record and the discussion of what
8   has gone on in pricing and what it means, and we
9   put before a jury that there -- that the
10  information on what -- that I have summarized
11  here, that characterizes a reasonable spread, and
12  Dr. Schondelmeyer said there is a reasonable
13  spread, and the Judge seems to think that there is
14  some spread that is not a mega-spread that is --
15  that is reasonable, as I interpret it, if you are
16  saying if the jury decides any spread is possible,
17  well, then that's what's they decide. You know,
18  that's -- that's what the trial is about.
19      Q.  Well, you can't rely on AWP as a signal
20  for ASP if it doesn't have a reasonably
21  predictable relationship to ASP; isn't that
22  correct?

---

721

1       A.  What -- what I have put -- what I have
2   put forward here is, at various places, and we can
3   start to list them, and I won't burden the record
4   with that right now, and in my rebuttal
5   declarations, is that AWP is like a sticker price
6   in any other industry and is a signal for ASP and
7   for transactions costs, and -- and if it turns out
8   -- and if it -- if it -- if the jury decides that
9   it is not, then -- then it -- then that's --
10  that's what they decide.
11      Q.  If the jury decides that there was no
12  expectation of a reasonably predictable
13  relationship, then it would follow from that that
14  the market would not have construed it as a signal
15  for ASP; correct?
16          MR. SOBOL: Objection to the form.
17      A.  If the jury finds contrary to the
18  substantial evidence put forward by your own
19  deponents and what I have cited that there is no
20  relationship at all, that there is -- that this is
21  a list price that, you know, you can -- people can
22  do whatever the heck they want and it has no

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                 February 27, 2006
Boston, MA

722

1    information content, then that certainly would cut
2    against the economics of most markets, and if they
3    decide that, then that's what they decide.
4         Q.  And it would cut against the economics
5    of what you're saying; correct?
6             MR. SOBOL: Objection. Objection to the
7    form.
8         A.  If the jury decides that -- that there
9    is -- that there is -- that there could be any
10   spread whatever, which means there is no -- that's
11   exactly what you are saying, that the spreads
12   could be as large as they wanted to be, then the
13   price, that they could do whatever they wanted to
14   do with this listing of an AWP, setting that for
15   Medicare, and then -- and then pushing down ASP,
16   if the jury decides that that's what's they --
17   that that's what this industry can -- is allowed
18   to do, then that's what they decide.
19        Q.  Well, you are the one who is saying
20   there is a reasonably predictable relationship?
21        A.  I am among --
22            MR. SOBOL: Objection.

723

1         A.  -- a variety, many others.
2         Q.  That is your opinion; correct?
3             MR. SOBOL: Objection to form.
4         Q.  That payers understood or thought that
5    there was a reasonably predictable relationship
6    between AWP and ASP; correct?
7         A.  It's --
8             MR. SOBOL: Objection to form.
9         A.  -- mine and many other people's.
10        Q.  I mean another way of putting it is the
11   perception of a reasonably predictable
12   relationship between ASP and AWP is necessary in
13   order to establish a causal connection between
14   AWPs and any conclusion that there was deception
15   here; correct?
16            MR. SOBOL: Objection.
17        A.  My assumption is that AWP has
18   information content. You are telling me that
19   under the assumption it has no information content
20   then anything goes, and if -- if -- if the market
21   believes -- and I have seen nothing that tells me
22   that anyone says that the market believes that AWP

724

1    has no information content -- there may be people
2    at some, with some third- party payers that say
3    they don't care what acquisition cost is or this
4    or that, but that's not -- that -- those are very
5    -- these are people, you know, wailing in the
6    wilderness.
7             The industry as a whole and everything
8    that has been written about this industry talks
9    about AWP has information content about prices,
10   and that's what is being understood.  If the jury
11   looks at the evidence and says, no, there is no
12   information content, well, then anything goes.
13        Q.  And you base your opinion on what the
14   marketplace believes in part on the various
15   government reports that you cite in your
16   declaration; correct?
17        A.  I base it on everything that we have
18   been talking about and everything that I have
19   cited. Yes.  I mean that's -- in part that's one
20   of the things I look at.
21        Q.  Including the 1992 OIG report; correct?
22        A.  Including the 1992 OIG report.

725

1         Q.  Okay.
2             MR. EDWARDS: The videographer has
3    handed me a note saying his tape is about to run
4    out. I am happy to let him replace the tape and
5    continue, but if you want to use this as a time to
6    take a break, that's fine with me.
7             Tom, that was a question to you.
8             MR. SOBOL: I thought you were talking
9    to Ray.
10            Let's take a five-minute break.
11            MR. EDWARDS: A five-minute break.
12            THE VIDEOGRAPHER: The time is 11:39.
13   This is the end of cassette one. We are off the
14   record.
15            (Recess taken at 11:39 a.m.)
16            (Recess ended at 11:49 a.m.)
17            THE VIDEOGRAPHER: The time of is 11:49.
18   This is the beginning of cassette number 2 in the
19   deposition of Raymond Hartman. We are on the
20   record.
21            (Multipage Department of Health and
22   Human Services, Office of Inspector General,

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

726

1  Physicians' Costs for Chemotherapy Drugs, November
2  1992 marked Exhibit Hartman 027 for
3  identification.)
4  BY MR. EDWARDS:
5      Q.  Dr. Hartman, I have asked the court
6  reporter to mark as Exhibit Hartman 027 a copy of
7  the OIG report on Physicians' Costs for
8  Chemotherapy Drugs dated November 1992.
9          (Handing Exhibit Hartman 027 to the
10  witness.)
11     Q.  Do you have that report in front of you?
12     A.  I do.
13     Q.  And is this the report that you cite in
14  your declaration?
15     A.  I think that it is.
16         (Pause.)
17         (The witness viewing Exhibit
18  Hartman 027.)
19     A.  I am quite sure that it is.
20     Q.  I think you identify it in paragraph 22B
21  on page 16?
22     A.  Right.  Yes.  I think I -- I do.  I

727

1  don't cite it there, but I have cited it before,
2  so I think this is the same one.  I mean I cite
3  it, but I don't have the full citation.  I know
4  there is always a number of these studies that
5  they put out, but this looks like the one.
6      Q.  And it is your testimony that this
7  report helped to inform market expectations as to
8  the relationship between ASP and AWP?
9      A.  It summarized what -- what those -- what
10  spreads were and helped inform that relationship,
11  yes.
12     Q.  And it helped inform the market
13  expectation that AWP is larger than ASP by a
14  reasonably predictable amount?
15     A.  For single-source physician-
16  administered drugs, it does -- it did, yes, as I
17  say in that paragraph.
18     Q.  Okay.  Why don't you take a look at page
19  2 of Exhibit Hartman 027.  I want to direct your
20  attention to the statement that appears at the top
21  of the page, quote, "Our results indicate that for
22  the physicians surveyed the 13 chemotherapy drugs

728

1  can be purchased at amounts below AWP and that AWP
2  is not a reliable indicator of the cost of a drug
3  to physicians."
4          Do you see that?
5      A.  I do.
6      Q.  Does that have any impact on your
7  opinion that the marketplace expected that AWP is
8  larger than ASP by a reasonably predictable
9  amount?
10     A.  By "mine," I take it you mean mine and
11  everyone else that I have cited as comporting with
12  my understanding.
13         What -- what is being summarized here,
14  it seems to me, is unfocused in that I think the -
15  - one needs to go to the actual data where the
16  amounts are cited, and that is provided in
17  Appendix III, where it lists the invoice costs
18  relative as a percentage of AWP, the invoice cost
19  for branded manufacturers and to oncology
20  wholesalers, and for single-source drugs, what you
21  see there is either under the branded
22  manufacturer, the oncology wholesalers, there is

729

1  for the single- source drugs, and that was what
2  I'm referring to in that particular paragraph, a
3  fairly -- a fairly tight relationship between AWP
4  and the invoices of the branded manufacturers of
5  the oncology wholesalers that ranges anywhere from
6  12, what I am seeing here, 12 to 20 percent.
7          Now there certainly are a few multi-
8  source drugs listed here where the AWP is --
9  varies more than that, and I'm assuming that is
10  probably what they're referring to, and what --
11  what I'm -- what I have said here is that I'm
12  looking at single-source drugs, and single-source
13  drugs were at the beginning of the 1990s, the
14  beginning of this damage period, certainly those
15  were the ones that were the most prevalent and
16  what -- what was informing people's opinions about
17  drug relationships, and I think with the drugs in
18  the class in my table 2, I think almost all of
19  them were single source in 1990, 1991, and 1992
20  when this was done.  They became -- several of
21  them became multi-source over the period.
22          But as Dr. Berndt has said, that the

629

        THE UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

IN RE:  PHARMACEUTICAL              MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE          01CV12257-PBS

PRICE LITIGATION

* * * * * * * * * * * * * * * * * * * * * * * * * *     FEBRUARY 27, 2006

THIS DOCUMENT RELATES TO:           VOLUME: III

ALL ACTIONS                         PAGES: 629-904

* * * * * * * * * * * * * * * * * * * * * * * * * *

            C O N F I D E N T I A L

        CONTINUED VIDEOTAPED DEPOSITION OF

            RAYMOND S. HARTMAN, PH.D.

CONTINUED DEPOSITION of RAYMOND S. HARTMAN, Ph.D., a

witness called on behalf of the Defendants pursuant to

the Federal Rules of Civil Procedure, before Judith

McGovern Williams, Certified Shorthand Reporter,

Registered Professional Reporter, Certified Realtime

Reporter, and Notary Public in and for the Commonwealth

of Massachusetts, at the offices of Dwyer & Collora,

600 Atlantic Avenue, Boston, Massachusetts 02110, on

Monday, February 27, 2006, commencing at 9:42 a.m.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

---

**630**

```
 1   APPEARANCES:
 2
 3   HAGENS BERMAN SOBOL SHAPIRO L.L.P.
 4   Thomas M. Sobol, Esquire
 5   One Main Street, 4th Floor
 6   Cambridge, Massachusetts  02142
 7   617-482-3700
 8   tom@hagens-berman.com
 9   on behalf of the Plaintiffs
10
11   HOGAN & HARTSON L.L.P.
12   Steven M. Edwards, Esquire
13   Hoa T.T. Hoang, Esquire
14   James S. Zucker, Esquire
15   875 Third Avenue
16   New York, New York  10022
17   212-918-3000
18   smedwards@hhlaw.com
19   htthoang@hhlaw.com
20   jszucker@hhlaw.com
21   on behalf of the Defendant Bristol-Myers Squibb
22
```

**632**

```
 1   APPEARANCES (Continued):
 2
 3   SHOOK, HARDY & BACON L.L.P.
 4   James P. Muehlberger, Esquire
 5   Tiffany Westphal Killoren, Esquire
 6   2555 Grand Boulevard
 7   Kansas City, Missouri  64108-2613
 8   816-474-6550
 9   jmuehlberger@shb.com
10   tkilloren@shb.com
11   on behalf of the Defendant Aventis Pharmaceuticals
12
13   PATTERSON, BELKNAP, WEBB & TYLER L.L.P.
14   Adeel A. Mangi, Esquire
15   1133 Avenue of the Americas
16   New York, New York  10036-6710
17   212-336-2000
18   aamangi@pbwt.com
19   on behalf of the Defendant Johnson & Johnson
20
21
22   (CONTINUED)
```

**631**

```
 1   APPEARANCES (Continued):
 2
 3   DAVIS POLK & WARDWELL
 4   Michael S. Flynn, Esquire
 5   450 Lexington Avenue
 6   New York, New York  10017
 7   212-450-4766
 8   michael.flynn@dpw.com
 9   on behalf of the Defendant AstraZeneca
10   Pharmaceuticals Corp.
11
12   ROPES & GRAY L.L.P.
13   Steven A. Kaufman, Esquire
14   One International Place
15   Boston, Massachusetts  02110-2624
16   617-951-7540
17   steven.kaufman@ropesgray.com
18   on behalf of the Defendant Schering Corporation/
19   Schering-Plough
20
21
22   (CONTINUED)
```

**633**

```
 1   APPEARANCES (Continued):
 2
 3   DECHERT L.L.P.
 4   Frederick G. Herold, Esquire
 5   1117 California Avenue
 6   Palo Alto, California  94304-1106
 7   650-813-4930
 8   frederick.herold@dechert.com
 9   On behalf of GSK
10
11   MORGAN, LEWIS & BOCKIUS L.L.P.
12   John Clayton Everett, Jr., Esquire
13   1111 Pennsylvania Avenue, N.W.
14   Washington, D.C.  20004
15   202-739-5860
16   jeverett@morganlewis.com
17   on behalf of Pharmacia Corporation of the
18   State of Connecticut
19
20
21
22   (CONTINUED)
```

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

---

634

1   APPEARANCES (Continued):
2
3   KIRKLAND & ELLIS L.L.P.
4     Helen E. Witt, Esquire
5     200 East Randolph Drive
6     Chicago, Illinois  60601
7     312-861-2148
8     hwitt@kirkland.com
9     on behalf of the Defendant Roxane in the
10    Connecticut case
11
12
13  ALSO PRESENT:
14
15    Eric M. Gaier, Ph.D.
16    Bates White
17    2001 K Street, N.W., Suite 700
18    Washington, D. C.  20006
19    202-216-1142
20    ericgaier@bateswhite.com
21
22    (CONTINUED)

---

635

1   APPEARANCES (Continued):
2
3     William B. Tye
4     The Brattle Group
5     44 Brattle Street
6     Cambridge, Massachusetts  02138-3736
7     617-864-7900
8     btye@brattle.com
9
10    Timothy S. Snail, Principal
11    CRA International
12    John Hancock Tower
13    200 Clarendon Street, T-33
14    Boston, Massachusettss 02116-5092
15    617-425-3000
16
17    Ralph Scopa, Videographer
18
19
20
21
22

---

636

1          I N D E X
2   WITNESS                    PAGE
3   RAYMOND S. HARTMAN, PH.D.
4     Direct Examination by Mr. Edwards............ 642
5
6          E X H I B I T S
7   NUMBER      DESCRIPTION        PAGE
8   Exhibit Hartman 023,  Multipage Declaration of
9              Raymond S. Hartman in
10             Support of Plaintiffs'
11             Claims of Liability and
12             Calculation of Damages:
13             Addendum................... 643
14  Exhibit Hartman 024,  Multipage Supplemental
15             Declaration of Raymond S.
16             Hartman in Support of
17             Plaintiffs' Claims of
18             Liability and Calculation
19             of Damages: Addendum....... 644
20  Exhibit Hartman 025,  Errata to Declarations of
21             Raymond S. Hartman, two
22             pages...................... 644

---

637

1          E X H I B I T S
2   NUMBER         DESCRIPTION      PAGE
3   Exhibit Hartman 026,  Multipage Report to the
4              Congress, Variation and
5              Innovation in Medicare..... 692
6   Exhibit Hartman 027,  Multipage Department of
7              Health and Human Services,
8              Office of Inspector
9              General, Physicians' Costs
10             for Chemotherapy Drugs,
11             November 1992............. 726
12  Exhibit Hartman 028,  Deposition transcript of
13             Mickie Brown taken
14             March 9, 2005.............. 740
15  Exhibit Hartman 029,  Deposition transcript of
16             Thomas E. Greenbaum taken
17             January 14, 2005........... 744
18  Exhibit Hartman 030,  Deposition transcript of
19             Jill A. Herbold taken on
20             January 14, 2005........... 755
21
22    (CONTINUED)

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

---

638

1            EXHIBITS
2   NUMBER          DESCRIPTION          PAGE
3   Exhibit Hartman 031,  Deposition transcript of
4             Joe Spahn taken on
5                November 30, 2004.......... 760
6   Exhibit Hartman 032,  Deposition transcript of
7             Edward Lemke taken on
8                January 11, 2005........... 769
9   Exhibit Hartman 033,  Excerpt from Cancer
10            Economics, March 1997...... 796
11  Exhibit Hartman 034,  Letter dated October 2,
12            Mr. Bentley et al.......... 807
13  Exhibit Hartman 035,  Multipage analysis of CMS
14            Average Wholesale Price
15            Reform, February 7, 2004... 829
16  Exhibit Hartman 036,  Deposition transcript of
17            Mr. Mulrey taken
18                January 5, 2006........... 830
19  Exhibit Hartman 037,  Deposition transcript of
20            John Killion taken
21                January 6, 2006........... 838
22  (CONTINUED)

---

639

1            EXHIBITS
2   NUMBER          DESCRIPTION          PAGE
3   Exhibit Hartman 038,  Excerpt from Federal
4             Register.................. 878
5   Exhibit Hartman 039,  Two-page letter dated
6             November 4, 1994, to
7             Ms. S. Stewart from
8             Mr. Camozzi................ 889
9   Exhibit Hartman 040,  42 CFR 405.517............. 897
10
11
12
13
14
15
16
17
18
19
20
21
22

---

640

1            PROCEEDINGS
2        THE VIDEOGRAPHER:  Good morning. We are
3   now recording and on the record. My name is Ralph
4   Scopa.  I am a legal video specialist for G & M
5   Court Reporters Limited.  Our business address is
6   42 Chauncy Street, Suite 1A, Boston, Mass. 02111.
7        Today's date is February 27, 2006.  The
8   time is 9:42 A.M.
9        This is the deposition of Mr. Raymond
10  Hartman in the matter of In Re:  Pharmaceutical
11  Industry Average Wholesale Price Litigation, U. S.
12  District Court of Massachusetts, Civil Action 01-
13  CV-12257-PBS.
14        This deposition is being taken at 600
15  Atlantic Ave, Boston.  The court reporter is Judy
16  Williams.
17        Counsel will state their appearances,
18  and the court reporter will administer the oath.
19        MR. EDWARDS:  Steve Edwards, Hogan &
20  Hartson, for Bristol-Myers Squibb.
21        MS. HOANG:  Hao Hoang of Hogan &
22  Hartson, for Bristol-Myers Squibb.

---

641

1        MR. HEROLD:  Fred Herold of Deckert, for
2   GSK.
3        MR. MANGI:  Adeel Mangi of Patterson,
4   Belknap, Webb & Tyler, for Johnson & Johnson.
5        MR. ZUCKER:  Jim Zucker of Hogan &
6   Hartson, for Bristol-Myers Squibb.
7        MR. SNAIL:  Timothy Snail of CRA
8   International, also present.
9        MR. FLYNN:  Michael Flynn of Davis, Polk
10  & Wardwell, on behalf of Astra Zeneca.
11        MR. KAUFMAN:  Steve Kaufman on behalf of
12  Schering-Plough from Ropes & Gray.
13        MR. SOBOL:  Tom Sobol, Hagens, Berman,
14  Sobol & Shapiro, for the class plaintiffs.
15        MR. MUHLBERGER:  Jim Muhlberger, of
16  Shook, Hardy & Bacon, for Aventis Pharmaceuticals.
17        MS. KILLOREN:  Tiffany Killoren of
18  Shook, Hardy & Bacon, for Aventis Pharmaceuticals.
19        MR. GAIER:  Eric Gaier, also present,
20  from Bates White.
21        MR. TYE:  Bill Tye, from The Brattle
22  Group.

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

642

1        MS. WITT: Helen Witt, Kirkland & Ellis,
2   on behalf of Roxane in the Connecticut case.
3                - - - - -
4        RAYMOND S. HARTMAN, PH.D., first having
5   been duly sworn, testified as follows in answer to
6   continued direct examination by MR. EDWARDS:
7                - - - - -
8        Q.  Dr. Hartman, have you reread the prior
9   transcripts of your deposition?
10       A.  I don't recall.
11       Q.  Are you aware of anything in those
12  transcripts that you would like to change?
13       A.  No.
14       Q.  Is there anything in your prior reports
15  on class certification that you would like to
16  change?
17       A.  No.
18       Q.  What I want to do, first of all, is mark
19  your merits report and supplemental report.
20       MR. EDWARDS: We will mark those as
21  Exhibit Hartman 023 and Exhibit Hartman 024 to
22  your deposition.

643

1        THE WITNESS: If I may interrupt
2   briefly, I have errata to my current report to
3   hand out. Is now the time to do that, or is it -
4   -
5        MR. EDWARDS: Now is as good a time as
6   any.
7        THE WITNESS: Okay.
8        MR. EDWARDS: Thank you.
9        THE WITNESS: There are 10 copies in
10  there.
11       MR. EDWARDS: The record should reflect
12  that the witness just handed me errata to his
13  declarations.
14       Now let's have the court reporter mark
15  that document first, if you don't mind. This will
16  be 23. It is the declaration of Raymond Hartman
17  dated December 15.
18       (Multipage Declaration of Raymond
19  S. Hartman in Support of Plaintiffs' Claims of
20  Liability and Calculation of Damages marked
21  Exhibit Hartman 023 for identification.)
22       (Handing Exhibit Hartman 023 to the

644

1   witness.)
2        MR. EDWARDS: We will mark the
3   supplemental declaration as Deposition Exhibit
4   Hartman 024.
5        (Multipage Supplemental Declaration
6   of Raymond S. Hartman in Support of Plaintiffs'
7   Claims of Liability and Calculation of Damages:
8   Addendum marked Exhibit Hartman 024 for
9   identification.)
10       (Handing Exhibit Hartman 024 to the
11  witness.)
12       MR. EDWARDS: Why don't we go ahead and
13  mark the errata that Dr. Hartman just handed to me
14  as Deposition Exhibit Hartman 025.
15       (Errata to Declarations of Raymond
16  S. Hartman, two pages marked Exhibit Hartman 025
17  for identification.)
18  BY MR. EDWARDS:
19       Q.  Now, Dr. Hartman, you have your
20  declaration of December 15, 2005, your
21  supplemental declaration of -- let me see if I can
22  get the date on that -- February 3, 2006, and

645

1   errata that you just handed me for those
2   declarations in front of you. Is there anything
3   in your December 15 declaration or your February
4   3rd declaration that you would like to change
5   other than what you have indicated in errata
6   sheet?
7        A.  Well, as I said in the declaration
8   itself, that there were certain data that I had
9   asked of defendants and that I had not received as
10  of the time that I wrote this report, so the - - I
11  consider this report as ongoing to a certain
12  extent, and should I receive that data, I would
13  change it.
14       But beyond that, there is nothing that I
15  can think of that I would want to change.
16       Q.  There is nothing that you want to change
17  at this point?
18       A.  As of today, no. That's right.
19       Q.  Are there any inaccuracies in either of
20  these declarations that you're aware of?
21       A.  No.
22       Q.  Why don't you take a look at your

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

646

1    declaration of December 15, which is Exhibit
2    Hartman 023. What I want to do is direct your
3    attention to paragraph 4.
4          (Witness complying.)
5       Q.  Do you have that in front of you?
6       A.  I do.
7       Q.  For subclass 1, you indicate that it is
8    Massachusetts only.  Is that a typo?
9          (Pause.)
10         (The witness viewing Exhibit
11   Hartman 023.)
12      A.  That certainly does appear to be a typo.
13      Q.  Okay.  And is the same typo replicated
14   in your supplemental declaration, which is Exhibit
15   Hartman 024?
16      A.  I'm embarrassed to say that it seems to
17   be.
18      Q.  Okay.  So that data that you are
19   indicating here for subclass 1 is the -- we refer
20   to it as a nationwide class, but I think it is
21   what?  44 states?  Something like that?
22      A.  It is the -- it is a nationwide class

647

1    for the states that were considered relevant to
2    the matter, and it is for subclass 1, and the
3    delineation of Massachusetts was inadvertent, and
4    I'm embarrassed by the inadvertency, but there it
5    is.
6       Q.  Now is the supplemental declaration a
7    replacement for the December 15th declaration or
8    an alternative?
9       A.  It --
10         MR. SOBOL:  Objection to the form.
11      A.  Well, I think what its title is.  It is
12   supplemental.  It is a second set of calculations
13   that allow for a different notion or definition of
14   liability and allow for a different calculation
15   for the average sale price.  It is -- so it is
16   supplemental.  It provides a different way of
17   approaching damages, and I was asked by counsel to
18   do that supplemental.
19      Q.  I think you have anticipated my next
20   question, which is why did you create a
21   supplemental declaration.
22      A.  Because I was -- I understood there were

648

1    issues of liability that still were to be decided
2    in this matter by the Court and by -- in the
3    trial, and that this would help inform that - -
4    those -- that decision- making process.
5       Q.  Does your supplemental declaration rely
6    on any data that was not available to you when you
7    proffered your initial declaration of December
8    15th?
9       A.  We have continued to try to refine the
10   data that we have received from the manufacturers
11   with questions to counsel, questions to
12   defendants, and I can't recall whether there was
13   an improved understanding of certain definitions
14   in the data that we relied upon from defendants,
15   and I know that those conversations were ongoing,
16   and I just don't know -- I would have to find that
17   out.
18      Q.  I take it it wasn't the existence of new
19   information that caused you to proffer a
20   supplemental declaration; is that correct?
21      A.  That -- that was not the motivating
22   factor.

649

1       Q.  Now what exactly are the differences
2    between your supplemental declaration and your
3    original declaration of December 15th?
4       A.  Well, in the original declaration, I was
5    asked by counsel to look for a measure of
6    liability that had to do with a market
7    understanding of what the relationship between AWP
8    and transactions prices were, and it was based on
9    that -- that analysis and that definition and that
10   notion of liability.
11         The supplemental did not use that notion
12   of liability or that threshold of liability.  It
13   essentially said I'm not going to -- I am just
14   going to look at in the Medicare context any drug
15   that where the spread exceeded what by statute the
16   reimbursement rate should be under Medicare.
17      Q.  You used the term "a market
18   understanding."  What do you mean by that?
19      A.  I think I have laid that out fairly
20   clearly in the report.  It is the discussion and
21   the analysis that leads to the threshold for
22   liability that I derive in the declaration, and

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

650

1    that threshold is a 30 percent spread of AWP over
2    ASP, and that is based on a variety of analyses of
3    comparator drugs, of survey information, of some
4    of the testimony of some of your own witnesses,
5    and probably some other information, but it is
6    essentially what characterized what the
7    understanding was of a relationship of a list
8    price for a sticker price to transactions prices
9    for which that was a signal.
10       Q.  By the way, if the spread falls right at
11   the 30 percent point, which side of the line is
12   that on?
13       MR. SOBOL:  Objection to the form.
14       A.  Well, if it -- if it falls right at the
15   30 percent line, I mean I think the way to think
16   of the threshold of liability in that case is very
17   much like a speed limit. I mean you are -- if you
18   are exceeding a speed limit, then that is a
19   threshold of liability, and you are speeding. You
20   may be speeding a little bit.  You may be right at
21   the speed limit.
22       If you fall at the level of 30 percent,

651

1    in the declaration itself I do not recall whether
2    we included those -- we said that that was --
3    whether we excluded those people right at 30
4    percent, those drugs right at 30 percent or we
5    included them.  If we included them, their damages
6    were zero.
7        So the -- so that -- that's the answer.
8        Q.  What if you did both, in some cases you
9    included them and in some cases you excluded them?
10   Can you enlighten us on exactly when the speed
11   limit is exceeded?
12       A.  Well --
13       MR. SOBOL:  Objection. Objection.
14       Q.  What was your intent?
15       MR. SOBOL:  Objection to the form.
16       A.  The intent -- obviously the allegations
17   in this matter are that manufacturers used spread
18   to move market share in a way that was not clear
19   to the people who were paying for the drugs, and
20   so the intent was to use a speed limit to identify
21   those people that were really speeding, and if
22   someone was at the -- at 30 percent, they were

652

1    right at the speed limit, and it -- the idea was
2    that if you were above that, you know, above that
3    speed limit, then you were speeding. Whether you
4    were speeding a little bit or a lot, that was
5    reflected in the extent of the damages.
6        Q.  So if you were right at 30 percent, you
7    were not speeding?  Fair?
8        A.  You -- I think it is fair to say -- I
9    haven't -- it could go --
10       I would say if you are at 30 percent,
11   that's the threshold as I have defined it.  So if
12   you are at 30 percent, you are speeding.  So you
13   need to be below the speed limit.  You have to be
14   29.99999.
15       Q.  Why don't you take a look at paragraph
16   59E of your December 15th declaration, Exhibit
17   Hartman 023.
18       MR. SOBOL:  Is there a page?
19       MR. EDWARDS:  That is page 40.
20       (Witness complying.)
21       A.  Okay.
22       Q.  If you look at the last sentence, you

653

1    say there, "Specifically, if a manufacturer either
2    raises its AWP and/or lowers its ASP, such that
3    the realized spread exceeds 30 percent for a given
4    NDC for a given period of time (I choose a year),
5    I conclude that the manufacturer has fraudulently
6    increased the spread on that NDC in that period to
7    move market share."
8        So are you now changing the threshold
9    from the way it is stated here in paragraph 59E of
10   your declaration?
11       MR. SOBOL:  Objection.
12       You may answer.
13       A.  The reason that I phrased it the way I
14   did is that -- and I hesitated, because I gave
15   directions to my staff to use the 30 percent
16   threshold, and I don't -- in -- as it is written
17   here is the way I have been thinking about it,
18   exceeding 30 percent, but in the way that my
19   analytic team implemented it, I would have to go
20   back and check whether they actually cut it off
21   right at 30 percent.
22       I would assume that the examples of the

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                 February 27, 2006
Boston, MA

654

1    times when it was exactly equal to 30 percent were
2    in the minority, but 30 percent is -- it -- I
3    think we are quibbling here very much, whether you
4    are at 30 percent, or 3.0001, that would exceed 30
5    percent, if you are at 30 percent and that exceeds
6    29.99999.
7         30 percent is a level that I have taken
8    as an upper bound for all of the information that
9    I have seen that would support a finding of what
10   the market understanding was, and I have, as I
11   have expressed it here, is the way I think about
12   it. I hesitated before, because I would have to
13   look at the math in the tables of how they
14   actually implemented it, whether they implemented
15   it as greater than or equal to, or greater than.
16        Q. So just so we are clear on this, if you
17   are at 30 percent, you are okay; correct?
18        A. For what I have done here, I have taken
19   a conservative estimate of what this -- what a
20   legal or anticipated or expected spread was is 30
21   percent, and if you are at 30 percent, you are at
22   the speed limit. You are not exceeding it.

655

1         Q. I believe you said another way in which
2    your supplemental declaration is different from
3    your initial declaration is a change in the
4    calculation of the ASP?
5         A. That --
6         MR. SOBOL: Objection to form.
7         A. That is correct.
8         Q. And what was that change?
9         A. Well, in the original declaration, I
10   focused on calculating the ASP for the providers
11   of physician-administered drugs, so I gave
12   directions to my staff to take the data that we
13   received from defendants, to talk to defendants,
14   to get as much information from defendants as we
15   could, and that information is reflected in the
16   attachments, and how ASP was calculated, and how
17   different groups were excluded, but the focus was
18   to define the ASP as the ASP of providers of
19   physician-administered drugs.
20        That -- that ASP will generally be
21   larger than the ASP overall, because the
22   preponderance of the remainder of physician-

656

1    administered drugs are sold to hospitals, and they
2    are used inpatient and in some cases outpatient,
3    and I excluded those from the class.
4         So those ASPs overall are lower.
5         So in this particular, in the original
6    declaration, I used a 30 percent threshold for
7    liability, and I used the ASPs of providers,
8    because certainly the Medicare statutes describe
9    reimbursement in terms of the acquisition cost of
10   providers or the average sale price to providers,
11   and this is a conservative estimate overall for
12   damages. It is -- I understand as a matter of law
13   that there may be an interpretation of what ASP
14   should be used in this and whether it should be
15   the ASP overall, and so I was asked by counsel to
16   recalculate the ASPs and introduce those in the
17   spreads in the supplemental damages.
18        Q. In the report that you proffered in
19   connection with class certification, you defined
20   ASPs as encompassing all customer classes; is that
21   correct?
22        A. I would have to go back and look at

657

1    that. That sounds correct.
2         Q. And then you narrowed it in your
3    original declaration on merits by defining ASPs
4    for providers of physician-administered drugs
5    only; correct?
6         MR. SOBOL: Objection to the form. Asked
7    and answered.
8         A. Well, we have -- we have -- I would have
9    to go back -- the original declaration, the
10   affirmative declaration, and when you refer to
11   declarations on merits, just so I get the legal
12   terms straight, I understand we are referring to
13   this report here right here?
14        Q. Right. Exhibit Hartman 023.
15        A. All right.
16        Certainly in the original declaration, I
17   was focusing on self- administered drugs, and I
18   was focusing on physician-administered drugs, and
19   I was talking about ASPs in a much broader
20   context.
21        The Court, in making their -- its
22   decisions regarding the focus of the classes and

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

658

1   the definition of the classes, has certainly
2   narrowed what the economic issues are as to
3   reimbursement and what is required for
4   reimbursement, and based on that, I narrowed the
5   definition of ASP in Exhibit Hartman 023.
6          I was asked to broaden it to the all
7   units sold as I think was defined in my original
8   affirmative declaration in -- I have done that in
9   the supplemental declaration (pointing to Exhibit
10  Hartman 024).
11     Q.  Again you may have anticipated my next
12  question, which was why did you change the way you
13  calculated ASPs from the class certification
14  report to your original merits report?
15         MR. SOBOL: Objection. Asked and --
16     Q.  Was that in response to something that
17  the Court said?
18         MR. SOBOL: Objection. Asked and
19  answered.
20     A.  The Court identified a set of drugs and
21  classes that were going to -- that were the
22  subject of the ongoing analysis, and under

659

1   Medicare, the acquisition costs that are relevant
2   to reimbursement are the acquisition costs of the
3   providers, so I was interested in the acquisition
4   costs of the providers.
5          I also take the but-for AWP, or a
6   relationship of what the AWP as a signal for is
7   the ASP, and I used an ASP here that was defined
8   for Medicare reimbursement rates to also deal with
9   issues of what the AWP might be and for what it
10  was a signal for. I knew that was conservative,
11  because this ASP to providers was higher than was
12  -- than the ASP overall.
13         So it was -- it was partially -- it was
14  in response to the Judge's narrowing of the class
15  to providers, and it was also in the spirit of
16  being conservative as to the damage estimates that
17  I calculated spreads and did analyses with an ASP
18  -- the provider ASP, which was a larger, a higher
19  ASP than the overall ASP.
20     Q.  So if I understand what you're saying
21  correctly, it is your testimony that the narrower
22  ASP is more consistent with the Medicare statute?

660

1          MR. SOBOL: Objection.
2      A.  If you look at footnote -- footnote 13
3   and footnote 14, the Medicare statutes have been
4   formulated in terms of a reimbursement rate off of
5   an AWP or an estimated acquisition cost or actual
6   charge and where the actual charge is reasonably
7   interpreted as an acquisition cost.
8          So as I'm looking at the Medicare
9   statutes and how they say reimbursements should be
10  done, they are talking about acquisition costs of
11  providers, so the focus there is on the
12  acquisition cost of providers.
13         MR. SOBOL: Motion to strike. The
14  question was a yes or no question.
15         MR. EDWARDS: Why don't we ask the
16  reporter to reread the question, and perhaps the
17  witness can give us a yes or no answer.
18         MR. SOBOL: Or "I don't understand what
19  you're asking."
20         (The prior question and objection
21  were then read.)
22     A.  Obviously, given the long answer that I

661

1   gave, the short answer is yes.
2      Q.  Okay. Now which ASP did you use to
3   determine Medicare liability and Medicare damages
4   in your supplemental report?
5      A.  In the supplemental report, the ASP
6   definition throughout is the overall ASP.
7      Q.  So you are using an ASP in your
8   supplemental report that is inconsistent with your
9   interpretation of the Medicare statute; correct?
10         MR. SOBOL: Objection.
11     A.  The ASP that is used in the supplemental
12  report is a broader definition of acquisition
13  costs than are found in Medicare.
14     Q.  Now I want to turn back again to the
15  liability yardstick in your original report versus
16  your supplemental report. In the original report,
17  the December 15th report, which is Exhibit Hartman
18  023, the liability yardstick would be the same for
19  both Medicare and private payers; correct?
20     A.  That's correct.
21     Q.  And in the supplemental report, it would
22  be different? It would be zero for Medicare and

Raymond S. Hartman, Ph.D.  CONFIDENTIAL          February 27, 2006
Boston, MA

662

1    30 percent for private payers; correct?
2        A.  That's correct.
3        Q.  How would that work in the real world?
4    Are you saying that in the real world there could
5    have been a system in which there were two
6    different AWPs?
7        A.  No.
8        Q.  Do you plan to proffer both
9    methodologies at trial?  And by "both
10   methodologies," I mean the methodology in your
11   original report and the methodology in your
12   supplemental report.
13       MR. SOBOL:  Objection.
14       A.  First of all, I wouldn't say they are
15   two different methodologies.  They're the same
16   methodology with different assumptions about
17   components or parameters within the methodology.
18   So the methodologies are identical except for an
19   interpretation of several parameters.
20       Q.  Okay.  Do you plan to testify about both
21   approaches?
22       A.  I have been asked by counsel to do two

663

1    analyses and as an economist look at the market
2    and draw the conclusions that would be drawn under
3    those sets of assumptions.
4        I really have not been told what I would
5    be asked to testify to at trial.  I have put them
6    forward, so I assume they are going to enter the
7    record, and they will be before the Court.
8        Q.  Do you think that one approach is better
9    than the other?
10       A.  I have drawn no conclusions about that.
11   It is my understanding that some of those issues
12   are legal issues, and so I -- that's not -- I'm
13   not a lawyer to --
14       Q.  Well, you are not saying that the
15   approach outlined in your December 15 declaration
16   was inappropriate, are you?
17       A.  I'm -- I'm saying both of these
18   approaches are appropriate to the set of
19   assumptions that I have been asked to take as
20   points of departure.
21       Q.  Why did you take the approach outlined
22   in your December 15 declaration first as opposed

664

1    to the other approach that counsel asked you to
2    do?
3        MR. SOBOL:  Objection to form.
4        A.  In the -- the initial declaration, I was
5    asked to do an economic analysis of this market,
6    of these markets, to draw conclusions about
7    understandings, price expectations, to draw
8    conclusions, to develop formulaic methodologies,
9    to identify if the alleged inflated prices did
10   exist what the implications were for damages.
11       While doing that and looking at the
12   understanding of the entities and the payers in
13   the market, it was also clear that by statute
14   there were certain relationships under Medicare
15   that -- regarding reimbursement and the AWP and
16   the -- and the ASP or the acquisition cost, and so
17   the -- in the -- the -- there was some discussion
18   of going either way, early on, and the first one
19   that I had done was just basically to say, "Okay,
20   we're not going to do -- we're not going to look
21   at a zero percent liability for threshold for
22   Medicare.  We're going to go with a 30 percent

665

1    overall."
2        But as I had done the original report,
3    it didn't mean that I hadn't also thought about
4    this (pointing to Exhibit Hartman 024).
5        Just this is what was decided to do
6    (pointing to Exhibit Hartman 023).
7        Q.  Well, in the original report you didn't
8    say anything about the approach taken in your
9    supplemental report; correct?
10       A.  Not -- I -- I can't recall.  I would
11   have to look precisely, but I don't recall.
12       Q.  Are you willing to stand by your
13   December 15 report as a reasonable determination
14   of liability and damages in this case?
15       A.  I stand by my report that should the
16   Court come to the decision that the -- that a
17   finding of liability is related to the
18   expectation, the pricing expectations in the
19   market, then I would -- I would stand by this
20   report of a threshold, of a liability threshold of
21   30 percent.
22       Q.  "This" report?

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

666

1    A.  Being --
2    Q.  You are pointing to the original?
3    A.  The December, the original December 2005
4  report.
5    Q.  Okay.
6    A.  Should the Court find differently as to
7  what the reimbursement rate would be under
8  Medicare and whether -- whether under -- under the
9  law there -- there is no -- that the threshold of
10  liability for those reimbursements are zero, that
11  is something that, as I understand it, is a legal
12  issue, and it is not for me as an economist to
13  render an opinion. I can describe what the
14  implications are from either of those.
15    Q.  Well, is it fair to say that your
16  December 15 report is more conservative --
17        MR. SOBOL:  Objection to form.
18    Q.  -- than the supplemental report?
19        MR. SOBOL:  Objection to the form.
20    A.  It is certainly more conservative in
21  that there are drugs for which damages occur in
22  the supplemental report that do not occur in the

667

1  original December report. So it is conservative
2  in that way.
3        It is conservative also in the
4  calculation of the ASP. It is a higher ASP, and
5  so that filters through the analysis and what
6  leads to lower damages.
7        So certainly the December report is more
8  conservative on a number of fronts in terms of
9  damages and impact and causation.
10    Q.  Okay. I want to change the subject a
11  little bit. Just so we're clear on this for the
12  record, would you explain your methodology?
13        MR. SOBOL:  In what?
14    Q.  Your methodology for determining
15  yardsticks?
16    A.  There are a variety of yardsticks
17  included herein for damages and for liability. Can
18  you be more specific or --
19    Q.  Well, I meant to encompass both.
20    A.  Oh, okay.
21        Well, I think, just to --
22    Q.  And I'm not asking for a long answer. I

668

1  am --
2    A.  I know.
3    Q.  I am just asking for a concise, clear
4  answer.
5        MR. SOBOL:  Why ask for any answer? It
6  is right in his report.
7        THE WITNESS:  Yes.
8    A.  I want to point you to where it is --
9  where you will get the complete, you know --
10  certainly the description of the findings for a
11  liability yardstick are first introduced in
12  paragraph 22, and essentially what I'm talking --
13  what I introduce there is I am going to look for
14  comparator drugs, and I am going to look for a
15  number of pieces of information that will allow me
16  to draw conclusions for the levels of spread that
17  manufacturers would use if they weren't using the
18  spread to move market share in a way that was --
19  that exceeded what the market understood them to
20  be. And so I look at comparator drugs, and I
21  indicate the drugs that I had asked for in table
22  3.

669

1        I have also looked at studies that have
2  been done, survey work that has been done, which I
3  mention in paragraph B of that paragraph, and this
4  is the OIG report and the ASCO report, which
5  indicate those liability thresholds.
6        There are studies that have been done
7  that reveal the preferences of payers and what
8  they have negotiated with physician groups,
9  provider groups that we see summarized in the
10  Medpac report, which summarizes the Dyckman
11  report, and also a report by the University of
12  Chicago and NORC, so I look to those, those, that
13  information to form the basis of what the
14  yardstick for liability is and what the
15  understanding is in the market for spreads for
16  single-source physician- administered drugs and
17  then for multi- source physician-administered
18  drugs.
19        And I expand on that later, which I
20  won't go to the paragraphs. I will let you read
21  those.
22    Q.  Well, why didn't you conclude that AWP

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

---

670

1   should equal ASP?
2       A.  Because the industry knows that it
3   doesn't.
4       Q.  Okay.  Are you aware of the fact that in
5   certain other cases that have been filed against
6   these defendants, the plaintiffs are alleging that
7   AWP should equal ASP?
8       A.  The -- you know, I don't know -- I would
9   have -- you are asking me about cases that I
10  haven't read the full Complaint.  I don't know
11  what the context is.
12        You are also raising an issue where I'm
13  not sure whether you are talking about a liability
14  issue or you are talking about a damages issue.
15  Certainly under Medicare, the reimbursement rate
16  is to be the lesser of the ASP or some fraction of
17  AWP.
18        Now that doesn't mean that AWP should be
19  equal to ASP, but under Medicare, it means that
20  the reimbursement rate should have been at ASP.
21  Now maybe some people interpret that to mean that
22  the AWP should be at ASP, but that is not what I

---

671

1   interpret.
2       Q.  Outside of the Medicare context, would
3   you agree with me that to the extent that
4   plaintiffs in other cases are alleging that AWP
5   should equal ASP, that is simply incorrect?
6       A.  I -- I really can't comment on cases
7   that I know nothing about.  I mean --
8       Q.  It is inconsistent with what your
9   understanding of the market expectation is;
10  correct?
11      A.  Certainly for purposes of what I have
12  done here and looking at market expectations,
13  looking at the many deponents that Mr. Young
14  cites, which I have summarized in attachment K
15  here, and I have dealt with in my rebuttal
16  reports, there is an understanding that AWP is a
17  sticker price.  And I mean this is more than just
18  those deponents.  It is anybody that writes about
19  this market.  And that there is an ASP that is
20  below that that allows some margin to be earned by
21  retail pharmacies for self-administered drugs or
22  some retail margin to be earned by physicians, and

---

672

1   that's quoting Mr. Young, that would imply that
2   AWP is greater than ASP, and greater than WAC, and
3   so I don't know what -- that is what is built into
4   -- into my analysis here.  That is my
5   understanding of this market, and that's what is
6   reflected in my yardsticks.
7       Q.  Well, you keep referring to a market
8   understanding.  Do you have any reason to believe
9   that the government doesn't have the same
10  understanding?
11      A.  The government has -- you need to be
12  more -- well, let me answer this briefly.
13        The government has set reimbursement
14  rates that reflect an understanding that is
15  comparable to what I would say is the -- in my
16  yardsticks.
17      Q.  Well, leaving aside for the moment your
18  yardstick, which I understand is based on your
19  interpretation of a statute which we'll get to in
20  a moment, what I want to focus on is --
21      A.  I am sorry?
22      Q.  -- what the government --

---

673

1       A.  Which yardstick?  My yardstick is not -
2   - the yardstick for liability --
3         MR. SOBOL:  Let's not have a
4   conversation here.
5         THE WITNESS:  Okay.
6         MR. SOBOL:  Let's have questions and
7   answers.
8         MR. EDWARDS:  Now I have lost my train
9   of thought.
10        THE WITNESS:  I am sorry.  It was very
11  rude of me.
12        MR. SOBOL:  Now there is more
13  conversation.
14  BY MR. EDWARDS:
15      Q.  You are not -- in terms of the market
16  understanding of the difference between AWP and
17  ASP, you are not saying that the government's
18  understanding was any different from the
19  understanding in the private sector, are you?
20      A.  I am saying that if anything with
21  physician-administered drugs the private sector
22  looked to Medicare and Medicare approaches to

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

674

1  reimbursement and their -- they did not spend the
2  amount of time focusing on independent research,
3  and so that their understanding and their reliance
4  on AWP reflected very much what Medicare was
5  doing.
6      Q.  Okay.  So you're not saying that the
7  private sector had a better understanding than the
8  government had?
9          MR. SOBOL:  Objection to the form.
10     A.  I'm saying that the industry as a whole
11  had understandings that were reflected ultimately
12  in the revealed rates that were negotiated -- the
13  revealed approaches that were discussed in
14  Congress, that were reflected in studies, and that
15  were reflected in the contracts that were
16  negotiated by third-party payers, and so whether
17  it is a better or worse understanding, you know, I
18  didn't -- I didn't do a calculation -- an analysis
19  of that issue.
20     Q.  Well, would you agree with me that the
21  government had as much, if not more, knowledge of
22  spreads as third-party payers?

675

1          MR. SOBOL:  Objection to the form.
2      A.  I would -- the government certainly
3  initiated analyses and studies to try and identify
4  what spreads were, some of which informed the
5  private sector and some of which I have relied
6  upon, and -- I'm trying to think of whether any --
7  there has been any private sector studies that did
8  the same kind of information.  I would assume that
9  there was -- there had been some private sector
10  analyses, but for the most part, we have got to
11  remember that this set of drugs fits very strongly
12  into that group that Professor Berndt designated
13  as being related to the importance of being
14  unimportant.  I mean physicians -- pharmaceuticals
15  generally were getting less focus by payers
16  overall, because they were a much smaller part of
17  total managed care in managing those dollars.
18     Q.  I don't mean to interrupt, but I am just
19  asking you whether in your view the government
20  would have had as much knowledge of spreads, if
21  not more knowledge of spreads, than the private
22  sector.

676

1      A.  I --
2          MR. SOBOL:  Objection to the --
3      Q.  It is not a complicated question.
4          MR. SOBOL:  Well, I don't understand the
5  question.  So it may not be complicated, but it is
6  incomprehensible at least to me.  So he was in the
7  middle of an answer to the question.  So don't
8  tell him you didn't intend to interrupt when you
9  did.
10         He is just asking the exact, you the
11  exact same question.  You can give him the exact
12  same answer if you would like.
13     A.  My answer is that the -- both groups
14  were no doubt trying to understand this.  The
15  private sector was probably getting the least
16  attention, and, you know, I can't say who had a
17  better understanding, but certainly the government
18  probably looked at it more, as far as I know and
19  have seen studies, than I have seen for the
20  private sector.
21     Q.  Now you are familiar with the term WAC;
22  right?

677

1      A.  I am.
2      Q.  And what is your understanding of the
3  relationship between WAC and AWP?
4          MR. SOBOL:  Objection to the form.
5      A.  Well, the WAC is a -- is a -- is another
6  list price or sticker price that is formulaically
7  related to the AWP by manufacturer, and it is --
8  the -- I think there has been people who -- I
9  think the article by Don Gencarelli that I cited
10  in my original affirmative declaration listed AWP
11  as kind of the sticker price and WAC as a catalog
12  price.
13         I mean it was essentially the -- it is a
14  price that is used with wholesalers, the wholesale
15  acquisition cost, and it is a fixed percentage of
16  AWP by manufacturer and by -- over time.
17     Q.  Well, is it your understanding that AWP
18  generally reflects a markup of 20 or 25 percent
19  over WAC?
20         MR. SOBOL:  Objection to the form.
21     A.  WAC can be 20 to 25 percent below AWP or
22  the various, 20 to 25 percent above.  There is a

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

---

678

1    fixed relationship between the two.
2        Q.  So to the extent that your expectation
3    yardstick is 30 percent, would it be fair to say
4    that no one was deceived by the difference between
5    WAC and AWP?
6            MR. SOBOL:  Objection to the form.
7        A.  I guess I don't understand the question.
8    I mean it's -- the industry understood that WAC
9    was lower than AWP and that the markup was in the
10   range we're talking about.  I'm -- they know that
11   certainly, and they -- the spread I'm talking
12   about has to do with ASP and whether ASP was, the
13   actual acquisition cost or the sale price, was
14   lower than WAC.
15       Q.  Well, are you saying that the market
16   understood that ASP was lower than WAC?
17       A.  I'm saying that based on the analyses
18   that I have and what I have used as the yardstick
19   that the spreads that I'm seeing above ASP were
20   higher than the spreads relative to WAC, so that
21   ASP would be below WAC generally.
22       Q.  And that's the difference between a 30

---

679

1    percent markup and a 20 or 25 percent markup?
2            MR. SOBOL:  Objection.
3        Q.  Correct?
4            MR. SOBOL:  Objection to the form.
5        A.  They differ in that regard.  I -- the -
6    -
7        Q.  You are saying that the market expected
8    a markup of up to 30 percent; correct?
9        A.  I am saying that when I look at the
10   drugs that were -- the comparator drugs that I
11   used, and when I look at the survey research, when I
12   look at the contracts, it tells -- it tells me
13   that the -- there were a range of understandings
14   of what the relationship between AWP and ASP was
15   or the relationships were, for a variety of
16   different contexts, and they ranged anywhere from
17   11 to 25, 26 percent, and I -- I took a yardstick
18   that was well above -- well, it was above the
19   upper bound of what those relationships were, and
20   so WAC -- I'm -- the focus of my yardstick is on
21   ASP, which is in, obviously if it is -- my spread
22   is 30 percent, it is above -- and I'm looking at

---

680

1    spreads here that are 25 percent, and in the range
2    that they are, that -- that is a spread larger
3    than the spread relative to WAC.
4        Q.  Well, if the expectation yardstick is 30
5    percent and the markup of AWP over WAC is 20 or 25
6    percent, would it be fair to say that no one is
7    deceived by the difference between WAC and AWP?
8        A.  Deceived by the difference between WAC
9    and AWP?
10       Q.  Yes.
11       A.  The -- the understanding -- you know, I
12   -- the WAC and AWP are formulaically set by the
13   manufacturer and the price listing agencies with -
14   - that they use, and in some cases, they have been
15   20 percent.  In some cases, they have been changed
16   to 25 percent.  And I'm not sure that payers
17   understood that.  But there is an understanding of
18   a formulaic relationship that is admitted to by
19   almost anyone who studies this industry about a
20   range of discounts of WAC below AWP.
21       Q.  Well, take my client, Bristol-Myers
22   Squibb, for a moment.  Bristol-Myers Squibb

---

681

1    reported a wholesale list price to industry
2    publications.  Are you aware of that?
3        A.  I know that different -- different
4    defendants, different manufacturers, have called
5    WAC different things, and I would have to confirm
6    that, but I'll, subject to me checking that, I
7    think that sounds right.
8        Q.  And the wholesale list price was similar
9    to WAC?  That's what you are saying; correct?
10       A.  I think that's right.
11       Q.  And what BMS did was it reported a
12   wholesale list price to industry publications who
13   then applied a markup factor of 20 to 25 percent
14   to arrive at AWP?  Is that consistent with your
15   understanding?
16           MR. SOBOL:  Objection to the form.
17       A.  It's generally consistent with the way
18   this -- the reporting process takes place, whether
19   AWP is reported or WAC or wholesale list price.
20       Q.  And in reporting that wholesale list
21   price to the industry publication, BMS did not
22   have to be concerned that the markup factor was

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

---

682

1    misleading, because the market understood that
2    there could be a 30 percent difference between ASP
3    and AWP? Is that fair?
4        A.  I'm not sure I understand the question.
5        Q.  You have testified that the market
6    expected that there could be a difference of 30
7    percent between AWP and ASP; correct?
8        A.  That's right.
9        Q.  And so a markup factor of 20 or 25
10   percent is within that 30 percent range; correct?
11       MR. SOBOL:  Objection to the form.
12       A.  Well, you are talking about a different
13   spread than the one I'm -- I am talking about a
14   spread defined as AWP relative to ASP.  You are
15   talking about WAC.
16       Now in order to go from WAC to ASP, I
17   need to know a variety of things about chargebacks
18   and discounts and rebates and other - - other
19   kinds of payments. So, you know, the relationship
20   between WAC and AWP is not strongly relevant to
21   the ultimate issue here, and that is what is --
22   what are the -- what is the signal that the list

---

683

1    price is, whether it is AWP or WAC, what was it
2    telling, and what did people think it was telling
3    them about acquisition cost, and what was the real
4    relationship between those sticker prices and
5    acquisition costs.
6        Q.  If all a manufacturer did was create a
7    markup of 20 to 25 percent, that would be within
8    your 30 percent expectation yardstick and there
9    would be no liability under your theory; correct?
10       A.  That -- you have left out the entire
11   issue of what is leading to liability in this
12   matter, and I mean a case in point would be a drug
13   like Lupron or Zolodex, where there was an AWP and
14   there was a WAC. I mean the major -- and, you
15   know, that could have been within the yardstick.
16   The point was that there were -- there were
17   inducements offered, financial inducements, that
18   made the actual spread, you know, two to four
19   hundred percent.
20       So the important thing here is not WAC
21   and AWP. It is what is going on on the part of a
22   manufacturer to allow a spread to be inflated

---

684

1    between the AWP and the ASP, because the ASP is
2    what drives a doctor's -- a provider's choice in
3    using a drug. If they can get it for a low
4    amount, and if they can turn around and get
5    reimbursement at a high rate, it doesn't matter
6    what the relationship of WAC to AWP is.
7        Q.  But what I'm trying to do here is
8    isolate out the WAC to AWP part of it, and I'm
9    simply trying to confirm that if that is all that
10   had happened, all a manufacturer had done is
11   created a spread of 20 to 25 percent between WAC
12   and AWP, you would not have found liability;
13   correct?
14       MR. SOBOL:  Objection to form.
15       A.  You're not listening to me, are you? The
16   --
17       Q.  I understand you are saying they did
18   other things, but I'm trying to get you to leave
19   those other things aside for the moment and just
20   determine whether the markup between WAC and AWP
21   would give rise to liability standing alone in
22   your view.

---

685

1        MR. SOBOL:  Objection to the form.
2        A.  There is nothing in my declaration that
3    talks about the fact that the relationship between
4    WAC and AWP drives either liability or damages
5    here. There is a formulaic relationship, and the
6    -- what is important is what other things are
7    being done by the manufacturer to increase what
8    has been called return to practice or the spread
9    to levels that are artificially inflated by what
10   payers understood or the market understood.
11       So whether -- whatever WAC is, we know
12   that WAC is below it, and so it is not -- it is
13   not relevant. It is not -- it doesn't even enter
14   into this. It is not something I would even look
15   at.
16       Q.  If ASP were equal to WAC or within 5
17   percent of WAC, there would be no liability under
18   your analysis; is that correct?
19       A.  Under my analysis if WAC were -- if the
20   relationship between WAC and AWP were such that
21   ASP was within a certain percentage of WAC and the
22   spread relative to that ASP in my December

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

686

1   declaration did not exceed 30 percent, then they
2   did not exceed the liability threshold that is
3   incorporated -- that is implemented in that
4   declaration.
5       Q.  Now your methodology is based on an
6   analysis of market expectations as to the
7   difference between ASP and AWP; correct?
8       A.  That's one of the things it is based on.
9       Q.  Okay.  And what did you do to determine
10  actual or expectations in the marketplace?
11      A.  Well, as I said, that is one of the
12  things I looked at.  I also looked at comparator
13  drugs and other things.
14          But in terms of looking at expectations
15  and what people understood was going on, I looked
16  at the surveys that I have mentioned in paragraph
17  22B, and that is expanded in paragraph --
18  paragraph 57 through 59.  I looked at those
19  surveys.  I looked at contracts, whatever
20  contracts I could -- I could review.  I looked at
21  deponent testimony that was appended to
22  defendants' experts. I think Dr. Gaier and Mr.

687

1   Young had various deponents and third-party payers
2   that were -- the testimony that was included.  And
3   I looked at their actual declarations of how they
4   summarized what was going on with reimbursements
5   relative to Medicare and what reimbursements --
6   what the third-party payers believed was the
7   issue, the case, when they were reimbursing at
8   AWP.
9           So those were the types of, the set of
10  things that I looked at to summarize what the
11  understanding was in the market.
12          Now did I also mention the contracts --
13      Q.  You did.
14      A.  -- summarized in Medpac?  And the NORC,
15  the University of Chicago?  Okay.
16      Q.  The surveys and contracts that you
17  mentioned are not analyses of actual expectations
18  in the market, are they?
19      A.  Well, expectations in the market vary. I
20  mean there is a distribution of expectations.
21          What you -- what you are going to find
22  is summary measures of what those expectations are

688

1   that are what are revealed by either -- either in
2   a survey -- then you are going to get the range of
3   expectations or range of understandings -- or what
4   are agreed to in contracts, where -- what -- you
5   are looking for actual behavior confirmed in
6   something contractual or an agreement to reimburse
7   at certain rates.  So in any market, there are
8   distributions of expectations, but those
9   expectations cluster around what is revealed in
10  surveys and in contracts.
11      Q.  Well, the surveys that you're talking
12  about, though, are not surveys of payers to
13  determine what their expectations were, are they?
14      A.  They are surveys of what they have
15  agreed -- what they have agreed -- let's take the
16  Dyckman survey that is one of the surveys that
17  supported the Medpac results.  It is essentially
18  what those third-party payers agreed to in terms
19  of what their reimbursement off AWP would be. And
20  so that tells me an expectation of what they
21  believe a relationship is relative to ASP.
22      Q.  Are you saying that the Dyckman report

689

1   surveyed expectations of payers?
2       A.  No.  I am saying it surveyed what --
3   what the discounts off of AWP were in the
4   reimbursement -- in -- how they reimbursed for
5   physician-administered drugs and that that --
6   those reimbursement rates were agreed to based on
7   what their expectations were as to what prices
8   were, what spreads were.
9           MR. EDWARDS:  Let's take a look at the
10  Dyckman report, which was marked as Exhibit
11  Hartman 019 on a previous day of your deposition.
12          THE WITNESS:  Is it possible at the same
13  time to see the Medpac?  Do you have the Medpac?
14          MR. EDWARDS:  Sure.
15          THE WITNESS:  Summary of that report?
16  Good.
17          MR. EDWARDS:  We will dig these out.
18  BY MR. EDWARDS:
19      Q.  While we're waiting for these documents
20  --
21          (Handing Exhibit Hartman 020 to the
22  witness.)

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

690

1      Q.  -- let me ask you a question.  As a
2   matter of economics --
3           MR. EDWARDS:  No.  It is the wrong
4   document, this document.
5      Q.  As a matter of economics, does a buyer
6   or seller always agree to a price that meets their
7   expectations?
8           MR. SOBOL:  Objection to the form.
9      A.  Does a buyer or seller always agree to a
10  price?
11     Q.  That meets their expectations.
12          MR. SOBOL:  Objection to the form.
13     A.  That -- I would say as a general
14  principle in economics, consumers come to a market
15  with expectations about what prices should be, and
16  make decisions of whether, and based on that, they
17  reveal their preferences by buying at a certain
18  price, and so there is -- there are distributions
19  of expectations that any given consumer may have,
20  and the final price that he or she agrees to is
21  going to reflect that distribution, and whether
22  they buy at all will reflect that, that

691

1   distribution.
2      Q.  Okay.  What I am going to do is hand you
3   what has previously been marked as Exhibit Hartman
4   019 to your deposition.
5           (Handing Exhibit Hartman 019 to the
6   witness.)
7           MR. EDWARDS:  For the record, it is a
8   document by Dyckman & Associates entitled "Health
9   Plan Payment for Physician-Administered Drugs
10  dated August 2003."
11          THE WITNESS:  Is it possible to see --
12  BY MR. EDWARDS:
13     Q.  I want to ask you whether there is
14  anything in this document that talks about payer
15  expectations.
16     A.  I --
17     Q.  I am sorry?
18     A.  I thought I was also going to get the
19  Medpac chapter in which this was summarized if
20  that is possible.
21     Q.  Sure.  We can do that.  This would be
22  Exhibit Hartman 026.  It is a document entitled

692

1   "Report to the Congress, Variation and Innovation
2   in Medicare," and I believe what we have done is
3   we have just excerpted chapter 9 --
4      A.  All right.
5      Q.  -- which is the chapter that contains
6   the information that you referred to in your
7   report.
8           THE WITNESS:  Does that need to be
9   marked?
10          THE REPORTER:  That will be 26.
11          MR. EDWARDS:  Do you have it?
12          MR. SOBOL:  Yes.
13          THE WITNESS:  He came packed.
14          (Multipage Report to the Congress,
15  Variation and Innovation in Medicare marked
16  Exhibit Hartman 026 for identification.)
17          (Handing Exhibit Hartman 026 to the
18  witness.)
19          THE WITNESS:  What is summarized in
20  table 9-2 of the Medpac report is Exhibit 2 on
21  page 3 of the Dyckman & Associates study.
22          And I am trying to see how this differs

693

1   from the first one you gave me, Exhibit Hartman
2   020 and Exhibit Hartman 019.
3           In any case, I am looking at Exhibit
4   Hartman 019, and this is a distribution of what
5   health plans have agreed to.  This is a summary of
6   what their expectations were as to what spreads
7   were in -- and what they understood spreads were,
8   that they would -- they would essentially agree to
9   these types of reimbursement percentages off of
10  AWP.
11     Q.  You say that Exhibit 2 is a summary of
12  what expectations were of what spreads were?
13     A.  I'm saying that what we find here are
14  the reimbursement rates that are and the formula
15  and the discount off of AWP to which this group of
16  third-party payers, I think it is some 33, and I
17  think they probably summarize some 25 percent of
18  insured lives at the time the survey was done,
19  that they have agreed -- they have agreed to
20  reimbursement rates related to AWP, and this is
21  essentially the -- when I walk in and I offer a
22  certain price to a car dealer, this is reflecting

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

694
1  my understanding of the spread of the distribution
2  of what it -- what the ASP might be and its
3  relationship to the sticker price, and this is
4  what I commit to.
5          And so this is a summary -- they didn't
6  ask them about expectations. Questions about
7  expectations are notoriously suspicious.
8          This is a reflection of the revealed
9  preference to reimbursement rates that they agreed
10  to, and these reflect an understanding or what
11  they -- their understanding was about what those
12  spreads would be.
13      Q.  And by spreads, you are talking about
14  the spreads between ASP and AWP?
15      A.  That's correct.
16      Q.  So, for example, if you take the first
17  segment in Exhibit 2, 85 to 90 percent of AWP, if
18  a health plan had a contract that called for
19  reimbursement at 85 percent of AWP, you would
20  conclude that that payer's expectation of the
21  spread between ASP and AWP was 15 percent?
22          MR. SOBOL: Objection.

695
1      Q.  Correct?
2          MR. SOBOL: Objection to form.
3      A.  No.
4      Q.  Explain that.
5      A.  What this tells me is that there are 22
6  percent of the plans essentially agreed to this -
7  - to reimburse at this discount off of AWP. That
8  says to me that their expectations about what the
9  acquisition cost was, that the spread was -- was -
10  - was larger than that, was larger than 15
11  percent, but it was within the realm of what
12  comparator drugs tell me and what surveys tell me
13  for single-source physician-administered drugs,
14  that the spreads were thought to be anywhere from
15  15 to 25 percent.
16          So it is saying that they have -- they -
17  - they are agreeing to a reimbursement rate that
18  they feel is fair, given that the, in the words of
19  Mr. Young, that the provider can earn some part of
20  a retail margin, but it is indicating to me that
21  their understanding of spreads were within the
22  realm of what I have used as the basis for my

696
1  yardstick.
2          It certainly is indicating to me that if
3  -- this was based on an understanding that spreads
4  were 200 to 400 to 1000 percent, that they
5  wouldn't have agreed to this reimbursement rate.
6      Q.  So you would agree that a payer would
7  expect that the spread is greater than the
8  discount off of AWP specified in the contract?
9          MR. SOBOL: Objection to the form.
10      A.  I would -- I would say that there -- as
11  I have developed in my declaration at the various
12  points that we can go into the different data that
13  I looked at, that the market understanding was
14  that the spreads ranged from anywhere from 11 to
15  25, 27 percent, and that was the understanding of
16  the spreads.
17          And the negotiations that went on here,
18  various -- you can see various payers negotiated
19  something slightly different. So there was some
20  variation in negotiations, fairly tight
21  distribution of variation in negotiations. Most
22  of it is centered between 85 percent and 100

697
1  percent of AWP. But that -- that was the
2  understanding, the general understanding, and each
3  of -- and these various payers had some, as they
4  negotiated, had some understanding of that
5  summarizing the market, and this is what they
6  ended up being able to negotiate given their
7  situation and given the negotiations that
8  occurred.
9      Q.  So you are saying that payers would have
10  understood that drugs were a profit center for
11  providers?
12          MR. SOBOL: Objection.
13      A.  What I'm -- what I'm saying is that
14  payers generally understood that there was -- that
15  with the yardsticks that I'm talking about that
16  there was that range of difference, and that when
17  the drugs were sold to the providers directly as
18  in the words of your expert Mr. Young that the
19  physicians were able to earn the retail margin, so
20  that there was some amount, a small amount of
21  margin, that the expectations were that the
22  physicians were earning, and that was the

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

698

1    understanding that is reflected in the survey work
2    and in the contracts to which these third- party
3    payers agreed.
4        Q.  Well, where in this document does
5    Dyckman & Associates discuss the extent of that
6    margin that you just referred to?
7        A.  The range that I'm -- the -- the range
8    that I raise in my declaration, you are saying
9    where do they discuss the range that I have put
10   forward here?  I will try that question.
11       MR. SOBOL:  Objection to the form.
12       A.  I would assume --
13       MR. SOBOL:  When you say "here," what
14   are you talking about?
15       THE WITNESS:  Here in my December -- I
16   said in my declaration -- oh, in my December
17   declaration.
18       A.  I don't know to what extent they ask
19   those questions.  I looked at this as the revealed
20   preferences to what they negotiated, what they
21   were willing to contract to.  That's what tells me
22   what their beliefs were and what their

699

1    expectations were, so this is the main focus.
2        So the extent it gets into this notion
3    of did they know that there were a Osco study and
4    I think -- I think it is a ASCO study.
5        Q.  Osco is a drugstore.
6        A.  Osco is a pharmacy.  That's right.
7        And the NORC report, I -- I haven't read
8    this closely enough to go back and see whether
9    that or to recall whether it is reflected in the
10   survey.  It may have been, but I was -- I was
11   looking more importantly at what they committed
12   to, which is a more important piece of evidence.
13       Q.  But I think you have already testified
14   that you would agree that payers understood that
15   providers were going to earn a profit from the
16   drugs, and the real question then becomes how much
17   of a profit; correct?
18       MR. SOBOL:  Objection.
19       A.  The -- as is built into my yardsticks,
20   the -- there is a spread that is allowed at which
21   providers earn -- are able to earn some amount of
22   money on that, in my liability yardstick.

700

1        Q.  And there is nothing in the Dyckman
2    report that supports your conclusion that the
3    yardstick should be 30 percent as opposed to some
4    other percentile; correct?
5        A.  Well, I don't see -- I don't see anybody
6    that is -- I see that 30 percent is quite
7    conservative relative to what they have committed
8    to here (pointing to Exhibit Hartman 019).  I mean
9    they have committed to spreads that are, you know,
10   around 15 percent, the discount is 15 percent.  So
11   the -- they -- that -- my -- my yardstick is
12   conservative to what they have committed to.
13       Q.  Well, take a look at page 4 of Exhibit
14   Hartman 019.
15           (Witness complying.)
16       Q.  Under the heading "Characteristics of
17   payment systems for drugs and administration
18   fees," the first bullet states, quote, "There is a
19   general understanding among health plans that
20   physicians purchase drugs at prices that are below
21   95 percent of AWP, and given that health plan
22   prices are generally at or above this rate, the

701

1    sale of drugs is a profit center for physicians."
2        Do you see that?
3        A.  I do.
4        Q.  So to the extent that Dyckman &
5    Associates asked payers about their expectations,
6    payers said that they understood that drugs would
7    be a profit center for physicians; correct?
8        A.  They are certainly saying here what I'm
9    saying the market knew generally.
10       Q.  Right.
11       A.  That --
12       Q.  And they are not quantifying the extent
13   of that profit in this survey; correct?
14       A.  In that particular bullet, they're not.
15       Q.  Wouldn't you agree with me, Dr. Hartman,
16   that the best way to determine payer expectations
17   is simply to ask them what their expectations are?
18       A.  The surveys of expectations can be
19   useful and the surveys -- the fact here that in
20   this bullet they talk about the fact that there
21   are an expectation that the average sale price or
22   the acquisition cost is below 95 percent of AWP

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

702

1   indicates that they asked something about that.
2   But the -- the -- the notion of surveying
3   expectations or surveys of contingent valuation,
4   where you don't have to commit to an actual
5   economic transaction, are notoriously suspect.
6        So, yes, surveys could be useful to look
7   at, but it would be something lower on my list of
8   evidence and indicia that I would use to come up
9   with what the yardstick would be for the market as
10  a whole.
11       Q.  Well, at your last deposition, you
12  testified that you were going to conduct surveys
13  of payers to determine their expectations.  Do you
14  recall that?
15       MR. SOBOL:  Objection to the form.
16       A.  I don't recall the precise Q and A, so
17  if you would refresh my memory.
18       Q.  Do you recall saying, "It is important
19  to get it from the horse's mouth"?
20       MR. SOBOL:  Objection.
21       A.  I --
22       MR. SOBOL:  What is the "it"?

703

1        THE WITNESS:  I was thinking I was
2   talking about attorneys at that point.
3            (Laughter.)
4        Q.  Take a look at pages 188 and 189 of your
5   prior deposition.
6            (Handing transcript Volume I to the
7   witness.)
8        Q.  What I will do is I will start on page
9   187 at line 20, and I asked the following
10  question.
11       "Isn't it better to determine market
12  expectations simply by talking to people?
13       "Answer:  Well, I think you want to talk
14  to people and you want to do survey research, and
15  we have been through a section where I indicate
16  that I do plan to talk to people.
17       "Question:  And who do you intend to
18  talk to?
19       "Answer:"
20       And you refer there to a paragraph of
21  your report, final yardstick spreads to determine
22  injury and damages during the damage phase, et

704

1   cetera, et cetera.
2        "We find them through further 30(b)(6)
3   depositions regarding the data provided by
4   defendant drug manufacturers and depositions of
5   appropriate personnel and third-party payers in
6   managed care organizations?
7        "Question:  So you do plan to talk to
8   class members to determine their expectations?
9        "Answer:  I plan to talk to class
10  members.  I plan to talk to PBMs, a sample of
11  PBMs, a sample of retailers.
12       "Question:  So you would agree that the
13  actual expectations of class members are relevant
14  to your analysis?
15       "Answer:  I would agree that the summary
16  of that whatever is used as a yardstick to define
17  the expectations in the market should take
18  advantage of as much information as is available
19  about what was forming those expectations and what
20  they were.
21       "Question:  Including information
22  directly from the horse's mouth, the class members

705

1   themselves whose expectations we're talking about
2   here?  Right?
3        "Answer:  That's correct."
4        Now you didn't conduct any surveys of
5   payers; correct?
6        A.  What I did following the initial
7   affirmative effort was I had asked to see as much
8   information as I could from payers.  I also had a
9   chance to reveal -- review in much greater detail
10  a variety -- a number of depositions put forward
11  by defense experts that allowed me to get at some
12  of this information that I'm talking about, which
13  I addressed at some length in its usefulness about
14  expectations in my -- in my rebuttal reports, both
15  to the rebuttal reports and then the surreply of
16  Mr. Young.
17       So the -- it turned out that I was
18  blessed with a variety of information that was
19  provided by your experts that helped me look at,
20  focus on these expectations and see what was
21  there.
22       I did ask to have some additional

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

706

1   conversations with third-party payers, and there
2   was talk of arranging that, but it did not occur.
3   For whatever reasons, I was -- it was un -- I did
4   not know.  But it turned out that that became less
5   important given what I was -- what I had received
6   in detail from defense experts.
7       Q.  Just so we're clear, you did not conduct
8   any surveys; correct?
9           MR. SOBOL:  Objection to the form.  Asked
10  and answered.
11      A.  Correct.
12      Q.  And you say you did not conduct any
13  surveys because you had access to the information
14  contained in the reports of defendants' experts
15  that was derived from depositions in the case?
16      A.  That's correct.
17      Q.  And so I take it you agree with the
18  analysis of defendants' experts concerning the
19  deposition record in this case?
20      A.  So you haven't read my rebuttal reports,
21  have you?  I mean I don't agree, and I - - and I
22  have used -- and I find in that, in the deposition

707

1   testimony mischaracterizes, significant
2   mischaracterizations of that deposition testimony,
3   and I find that it supports the yardsticks and the
4   approach and the reliance on AWP that I had
5   proffered in my affirmative declaration, and I go
6   into some detail in those rebuttal reports citing
7   whole sections of deposition testimony and the
8   conclusions drawn by defense experts that were
9   inappropriate.
10      Q.  Well, other than what you say in your
11  rebuttal reports, is there any deposition
12  testimony that you claim supports your
13  determination of a 30 percent yardstick in this
14  case?
15      A.  Well, certainly in attachment K to this
16  declaration, I review -- just so I am precise on
17  which expert I reviewed, I think it was entirely
18  Mr. Young.
19          (Pause.)
20          (The witness viewing Exhibit
21  Hartman 023.)
22      Q.  Maybe I can shortcircuit it.  I am just

708

1   trying to define the boundaries here.
2           Is it your testimony that to the extent
3   that you claim that there is deposition testimony
4   that supports your calculation of a 30 percent
5   yardstick, that testimony is identified in your
6   rebuttal declaration on class certification and
7   attachment K to your December 15 report?
8       A.  The -- the amount of deposition
9   testimony I was able to review and find as
10  supporting my yardstick and my analysis is
11  discussed here.  I did not have the time to fully
12  review everything that was -- was -- that they had
13  sent to me, but that's -- that is certainly true,
14  that that is part of what I have been able to
15  review of theirs.
16      Q.  And just to close the loop on this, in
17  attachment B to your December 15 report, you
18  purport to list the materials you have relied on
19  in arriving at your conclusions; correct?
20      A.  I do.
21      Q.  And you do not identify any depositions;
22  is that correct?

709

1       A.  I certainly reviewed -- identified the
2   deposition transcripts in the footnotes to the
3   declarations or to attachment K appearing herein.
4   So to the extent that that didn't get
5   incorporated, that was an oversight.
6           I cite in footnote 2 of attachment K the
7   deposition testimony from Mr. Young's Exhibit 1A,
8   Nancy Rollin of Willmark Blue Cross/Blue Shield,
9   John Rogers of Independent Health.  So it is
10  possible that my analytic team neglected to pull
11  forward citations that were in some of these
12  attachments.
13          Certainly there are paragraphs in Mr.
14  Young's report that I cite that also rely on
15  certain deponents, which I probably did not bother
16  reciting, and they would be cited in Mr. Young's
17  testimony, and I certainly make clear where --
18  where in Mr. Young's testimony I'm referring to.
19      Q.  Well, is it fair to say that if it isn't
20  in your rebuttal report and it isn't in your
21  current report in either a footnote or attachment
22  K there are no depositions that you rely on to

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

710

1  support your opinions with respect to a 30 percent
2  yardstick?
3      A.  There are no doubt additional
4  depositions I have reviewed, but I didn't rely on
5  them for the -- I -- I generally review a broader
6  set of material than what I am ultimately relying
7  on in the report, and so that what is listed in
8  attachment B is what I relied on, and it -- the
9  oversight of including those citations in
10  attachment K, I apologize for that.  That should
11  have been in there.  I certainly reviewed other
12  things, but I didn't rely on them for this report,
13  and what I relied on for the two rebuttal reports
14  are listed therein.
15      Q.  Well, let's take a look at the two
16  depositions you mentioned in attachment K, Nancy
17  Rollin and John Roberts.  Where in that testimony
18  that you cite is there support for your opinion
19  that the market expected that AWP would exceed ASP
20  by a range no greater than 30 percent?
21      A.  Well, what is cited and what I develop,
22  the chain of logic in this particular declaration

711

1  -- this attachment is to address Mr. Young's
2  assertion, which is repeated in paragraph -- well,
3  it's in 1A, and then it is in two, "Most
4  commercial payers did not negotiate with
5  physicians based on their acquisition costs, and
6  even if they did, they did not premise those
7  negotiations on the view that the AWP was a signal
8  for acquisition costs."
9          And so what I show in the next paragraph
10  is that Mr. Young and the deponents that he cites
11  indicate that the reimbursement rates of some
12  percentage off of AWP allow for, in the self-
13  administered context, for pharmacies to make some
14  margin, and what these two deponents say is, you
15  know, look, is it your understanding that in, for
16  Rollin, where I have highlighted it, that there is
17  some margin above the costs that they pay for the
18  drugs.  It is saying at reimbursement of AWP plus
19  13 to 18 percent that there is some acquisition
20  cost of the pharmacies, maybe an ASP of AWP minus
21  20, 22 percent, that gives them some margin on the
22  drugs.

712

1          And John Rogers agrees with that.
2          Now Mr. Young goes on to say in section
3  -- in paragraph C, he extends the understanding
4  from the self-administered drugs to physician-
5  administered drugs, saying at his paragraph 160
6  that the physicians are earning the retail margin
7  that has been understood and identified by Nancy
8  Rollin and John Rogers under Medicare.
9          Now that again suggests to me a
10  relationship between AWP minus 13 and 18 percent
11  and an acquisition cost that is well within the
12  yardsticks that I have -- that I have used.
13          And I go on to explain.  There is more
14  quotes from Mr. Young that demonstrate that there
15  was an understanding and a belief that the -- some
16  relationship between AWP allowed some margin to
17  the physicians, and so that's -- that tells me
18  something between a reimbursement rate at AWP less
19  5, AWP less 15, and an acquisition cost on the
20  part of providers in this case.
21      Q.  Well, all they are saying is that, even
22  when you take the discount off of AWP specified in

713

1  the contract, we assume that providers are still
2  earning a profit?
3      A.  It is -- it is telling me what they
4  believe and their expectations about what these
5  prices are and what the acquisition costs are.  It
6  is telling me what they believe about the market.
7      Q.  It is not telling you how much of a
8  profit they believe the provider is earning; ·
9  correct?
10      A.  It certainly is -- when it says in --
11  for John Rogers, "And did Independent Health have
12  any expectation about what the margin pharmacies
13  would earn on the drugs would be?"
14          "I don't think we had any specific
15  information.  We don't want the pharmacists to go
16  out of business."
17          What that tells to me, says to me, is
18  from what they can see they are earning something,
19  but they're not -- they're not getting rich, and
20  it tells me that there is some margin, and, you
21  know, and Nancy Rollin doesn't say an incredible
22  margin.  She says, "There is some margin above

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

714

1   cost."
2       And so this tells me something about the
3   expectations of payers related to the acquisition
4   costs of pharmacies, and Mr. Young goes on to say,
5   you know, and he is an accountant studying this
6   industry, that that is essentially under Medicare
7   they allow the doctors to earn that retail margin,
8   which is some margin, some margin so they don't go
9   out of business.
10      So, yes, there is a profit center there.
11  It is saying there is not a lot of profit there
12  from these expectations, what they were thinking
13  those reimbursement rates implied off of AWP.
14      Q.  Well, for AWP to be a signal for
15  acquisition cost or ASP, there would have to be a
16  consistent relationship between AWP and ASP;
17  correct?
18      A.  I -- the -- the relationship to -- for
19  there to be a signal, it is the signal that I --
20  that has been built into the survey research, the
21  contracts that I have cited, the drugs that I have
22  looked at, and the deponents that have been put

715

1   forward by your experts talking about what the
2   profit was, either by the pharmacies or by the
3   doctors, and so there is going to be some
4   variation, but it is a very small variation
5   compared to the kinds of overcharges that are
6   implied -- that have been alleged in this
7   litigation.
8       Q.  Would you agree that one premise of your
9   theory is that payers have expected that AWP is
10  larger than ASP by a reasonably predictable
11  amount?
12      A.  That is --
13      Q.  And if that language sounds familiar to
14  you --
15      A.  It is my language?
16      Q.  Take a look at paragraph 13 of your
17  report.
18          (Pause.)
19          (The witness viewing Exhibit
20  Hartman 023.)
21      A.  It certainly sounds familiar to me,
22  because it is -- it is my language.

716

1       Now I would like to also point out that
2   it seems to be the Court's understanding that
3   while there is some variation in what third-party
4   payers might negotiate, that, now quoting in
5   paragraph 15, "'There is no evidence that third-
6   party payers purchase physician- administered
7   drugs or know of the mega- spreads that exist for
8   these drugs'."
9       That says to me that the Court in
10  reviewing all of the evidence has come to the same
11  conclusion relative to the information and what
12  the spreads would be and what was predictable or
13  what was not predictable and what was a mega-
14  spread.
15      And I might also point you to -- if you
16  will bear with me --
17          (Pause.)
18          (The witness viewing Exhibit
19  Hartman 023.)
20      A.  -- to my footnote 60.
21      Q.  What page?
22      A.  On page 39 and 40, where Dr. Gaier

717

1   actually in reviewing my work says that -- states
2   that Dr. Schondelmeyer and I are somehow at odds
3   in our understanding of what this means. Dr.
4   Schondelmeyer has written in the paragraph that I
5   quote in that footnote, "For most brand name
6   products that are still covered by patent or
7   exclusivity, the price relationship between list
8   prices and WAC and the actual transaction
9   prices...is reasonably predictable." And then at
10  the bottom, "In such cases, a payment policy using
11  AWP as a benchmark may be relatively accurate."
12      This is merely talking about this
13  reasonable predictability that the Judge has
14  found, that Dr. Schondelmeyer -- that Mr.
15  Schondelmeyer -- maybe Dr. -- oh, it is Dr.
16  Schondelmeyer, that I am saying informs the market
17  and that Mr. Young is finding in the deponents
18  that he cites.
19      Q.  Well, that is in the context of a
20  statement by Dr. Schondelmeyer that the
21  relationship between AWP and ASP when there is
22  therapeutic or generic competition is not

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                     February 27, 2006
Boston, MA

718

1  reasonably predictable? Isn't that true?
2      A.  I -- I don't know.  I -- this is in --
3  this is -- the context that this is -- this, I
4  think this quote came directly from Dr. Gaier's
5  report, so I'm not -- the full context in which
6  that quote appears from Dr. Schondelmeyer, you
7  will have to show me, but this is telling me that
8  for this set of drugs, for brand name drugs, he is
9  telling -- there -- he is -- he is also saying
10 there is reasonable predictability between an AWP
11 and a WAC and the ASP, which is what my yardsticks
12 are summarizing, and which Mr. Young's deponents
13 are supporting.
14     Q.  Well, if it turns out that the Judge or
15 the jury in this case concludes that the market
16 did not expect that AWP would be larger than ASP
17 by a reasonably predictable amount, what does that
18 do to your conclusions?
19     A.  That is such a broad -- I -- you would
20 need to be more specific.  I mean are you saying
21 that if the -- if the jury finds that -- if the
22 jury is shown information that is cited in

719

1  paragraph 53 of my December report, which recites
2  from Medpac, that talk about a hearing before the
3  House Energy and Commerce Subcommittee on Health,
4  that they find that kind of spread between AWP and
5  an ASP sold to physicians -- an AWP of 740 and an
6  ASP of 750, which is a markup of close to 10,000
7  percent, if the jury finds that that is not a
8  problem or people didn't -- that people understood
9  that and that was what informed the market and it
10 didn't matter, if -- I would find that would -- as
11 certainly going against what is found in the
12 Lupron settlement agreement and is - - and has
13 been put forward elsewhere. But, you know, I mean
14 -- if the jury finds that I'm wrong, the jury
15 finds that I'm wrong.  But that would be wrong.
16     Q.  Well, you have stated here, as a
17 premise, if you will, that payers have expected
18 that AWP is larger than ASP by a reasonably
19 predictable amount. What is the effect on your
20 conclusions if that premise turns out to be
21 incorrect?
22     A.  I haven't analyzed that.

720

1      Q.  Well, if that premise turns out to be
2  incorrect, you couldn't have deception, could you?
3      MR. SOBOL:  Objection to form.
4      A.  If -- if you are telling me that if we
5  look at the various deponent testimony that is
6  here, we look at the surveys, and we look at the
7  Congressional record and the discussion of what
8  has gone on in pricing and what it means, and we
9  put before a jury that there -- that the
10 information on what -- that I have summarized
11 here, that characterizes a reasonable spread, and
12 Dr. Schondelmeyer said there is a reasonable
13 spread, and the Judge seems to think that there is
14 some spread that is not a mega-spread that is --
15 that is reasonable, as I interpret it, if you are
16 saying if the jury decides any spread is possible,
17 well, then that's what's they decide. You know,
18 that's -- that's what the trial is about.
19     Q.  Well, you can't rely on AWP as a signal
20 for ASP if it doesn't have a reasonably
21 predictable relationship to ASP; isn't that
22 correct?

721

1      A.  What -- what I have put -- what I have
2  put forward here is, at various places, and we can
3  start to list them, and I won't burden the record
4  with that right now, and in my rebuttal
5  declarations, is that AWP is like a sticker price
6  in any other industry and is a signal for ASP and
7  for transactions costs, and -- and if it turns out
8  -- and if it -- if it -- if the jury decides that
9  it is not, then -- then it -- then that's --
10 that's what they decide.
11     Q.  If the jury decides that there was no
12 expectation of a reasonably predictable
13 relationship, then it would follow from that that
14 the market would not have construed it as a signal
15 for ASP; correct?
16     MR. SOBOL:  Objection to the form.
17     A.  If the jury finds contrary to the
18 substantial evidence put forward by your own
19 deponents and what I have cited that there is no
20 relationship at all, that there is -- that this is
21 a list price that, you know, you can -- people can
22 do whatever the heck they want and it has no