Raymond S. Hartman, Ph.D.  CONFIDENTIAL          February 27, 2006
Boston, MA

**726**

1  Physicians' Costs for Chemotherapy Drugs, November
2  1992 marked Exhibit Hartman 027 for
3  identification.)
4  BY MR. EDWARDS:
5      Q.  Dr. Hartman, I have asked the court
6  reporter to mark as Exhibit Hartman 027 a copy of
7  the OIG report on Physicians' Costs for
8  Chemotherapy  Drugs dated November 1992.
9          (Handing Exhibit Hartman 027 to the
10  witness.)
11     Q.  Do you have that report in front of you?
12     A.  I do.
13     Q.  And is this the report that you cite in
14  your declaration?
15     A.  I think that it is.
16         (Pause.)
17         (The witness viewing Exhibit
18  Hartman 027.)
19     A.  I am quite sure that it is.
20     Q.  I think you identify it in paragraph 22B
21  on page 16?
22     A.  Right.  Yes.  I think I -- I do.  I

**728**

1  can be purchased at amounts below AWP and that AWP
2  is not a reliable indicator of the cost of a drug
3  to physicians."
4          Do you see that?
5      A.  I do.
6      Q.  Does that have any impact on your
7  opinion that the marketplace expected that AWP is
8  larger than ASP by a reasonably predictable
9  amount?
10     A.  By "mine," I take it you mean mine and
11  everyone else that I have cited as comporting with
12  my understanding.
13         What -- what is being summarized here,
14  it seems to me, is unfocused in that I think the -
15  - one needs to go to the actual data where the
16  amounts are cited, and that is provided in
17  Appendix III, where it lists the invoice costs
18  relative as a percentage of AWP, the invoice cost
19  for branded manufacturers and to oncology
20  wholesalers, and for single-source drugs, what you
21  see there is either under the branded
22  manufacturer, the oncology wholesalers, there is

**727**

1  don't cite it there, but I have cited it before,
2  so I think this is the same one.  I mean I cite
3  it, but I don't have the full citation.  I know
4  there is always a number of these studies that
5  they put out, but this looks like the one.
6      Q.  And it is your testimony that this
7  report helped to inform market expectations as to
8  the relationship between ASP and AWP?
9      A.  It summarized what -- what those -- what
10  spreads were and helped inform that relationship,
11  yes.
12     Q.  And it helped inform the market
13  expectation that AWP is larger than ASP by a
14  reasonably predictable amount?
15     A.  For single-source physician-
16  administered drugs, it does -- it did, yes, as I
17  say in that paragraph.
18     Q.  Okay.  Why don't you take a look at page
19  2 of Exhibit Hartman 027.  I want to direct your
20  attention to the statement that appears at the top
21  of the page, quote, "Our results indicate that for
22  the physicians surveyed the 13 chemotherapy drugs

**729**

1  for the single- source drugs, and that was what
2  I'm referring to in that particular paragraph, a
3  fairly -- a fairly tight relationship between AWP
4  and the invoices of the branded manufacturers of
5  the oncology wholesalers that ranges anywhere from
6  12, what I am seeing here, 12 to 20 percent.
7          Now there certainly are a few multi-
8  source drugs listed here where the AWP is --
9  varies more than that, and I'm assuming that is
10  probably what they're referring to, and what --
11  what I'm -- what I have said here is that I'm
12  looking at single-source drugs, and single-source
13  drugs were at the beginning of the 1990s, the
14  beginning of this damage period, certainly those
15  were the ones that were the most prevalent and
16  what -- what was informing people's opinions about
17  drug relationships, and I think with the drugs in
18  the class in my table 2, I think almost all of
19  them were single source in 1990, 1991, and 1992
20  when this was done.  They became -- several of
21  them became multi-source over the period.
22          But as Dr. Berndt has said, that the

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

730

1   information on the relationship of AWP and ASP for
2   multi-source physician- administered drugs is --
3   there has been little that really has helped make
4   that very clear, and here is some -- some
5   information, but it's -- it is mostly aimed at
6   some generic drugs, and even some of the generic
7   drugs fall within the -- within the 11 to 20
8   percent.  There is interferon is at 9 to 14
9   percent on the oncology.
10       So there are -- there are several multi-
11  source drugs where that relationship deviates from
12  what I am talking about here, but I have focused
13  this on single-source drugs, since that has been
14  the focus of much of the damage period in many of
15  the drugs.
16       Q.  Is it your testimony that a payer
17  reading this report would conclude that multi-
18  source drugs are different from single- source
19  drugs and there is not a predictable relationship
20  between AWP and ASP with respect to multi-source
21  drugs?
22       A.  It's -- it's my opinion that as to

731

1   physician-administered drugs, private sector
2   third-party payers for the most part look to
3   Medicare and how Medicare was developing its
4   relationships, and the Medpac report confirms that
5   reliance.
6        So there -- there is some limited
7   information, but in -- as in any kind of market,
8   there is -- pieces of information start to come to
9   light, but they don't -- they don't start to
10  affect expectations for a while.  These markets
11  are slow to respond to this, and you see the same
12  thing with the OIG studies of the relationship --
13  the spreads on self- administered drugs, generics
14  and branded, and they -- they weren't recognizing
15  until later in the '90s that the generic spreads
16  were that large.
17       So in answer to your question, there is
18  some information here, but it is, as far as I can
19  see from the contracts and everything else, this
20  did not affect what -- how Medicare was ending up
21  setting its reimbursement rates nor how third-
22  party payers were.  This was the beginning of an

732

1   understanding that finally culminated in say 2004
2   with the Medicare -- with the Prescription Drug
3   Modernization Act.
4        Q.  Well, are you saying that the
5   marketplace had a different expectation for multi-
6   source drugs than it had for single-source drugs?
7        A.  We're talking about physician-
8   administered drugs now; is that right?
9        Q.  Yes.
10       A.  I'm saying that for the -- for the focus
11  of third-party payers negotiating reimbursement
12  rates for different, whether it is for self-
13  administered drugs, whether they are working with
14  their PBMs, whether they are working with
15  providers for physician-administered drugs, that
16  physician-administered drugs was one of the
17  categories of costs that was the smallest speck on
18  the radar screen, and they paid little attention
19  to it, and this is -- this is corroborated or that
20  -- this opinion is certainly put forward by Dr.
21  Berndt, that drugs generally were not on the radar
22  screen.  Physician- administered drugs were a much

733

1   smaller part.  And multi-source were even a
2   smaller part of physician-administered drugs going
3   into the 1990s.
4        So this kind of information, it was
5   starting to pop up, but this was not shaping
6   general expectations as I see in contracts and in
7   revealed preferences from the sources that I have
8   cited.
9        Q.  I believe you testified that it is your
10  testimony that this report is one of the things
11  that informed the market expectations that you
12  found in your analysis; correct?
13       A.  For single-source physician-
14  administered drugs.
15       Q.  So your testimony that a payer reading
16  the language, quote, "AWP is not a reliable
17  indicator of the cost of a drug to physicians,"
18  close quote, would conclude that AWP is larger
19  than ASP by a reasonably predictable amount?
20       A.  It is my conclusion that anyone who was
21  a -- that the only person that would read this
22  report and read that one sentence would be --

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

---

730

1  information on the relationship of AWP and ASP for
2  multi-source physician- administered drugs is --
3  there has been little that really has helped make
4  that very clear, and here is some -- some
5  information, but it's -- it is mostly aimed at
6  some generic drugs, and even some of the generic
7  drugs fall within the -- within the 11 to 20
8  percent. There is interferon is at 9 to 14
9  percent on the oncology.
10       So there are -- there are several multi-
11  source drugs where that relationship deviates from
12  what I am talking about here, but I have focused
13  this on single-source drugs, since that has been
14  the focus of much of the damage period in many of
15  the drugs.
16       Q.  Is it your testimony that a payer
17  reading this report would conclude that multi-
18  source drugs are different from single- source
19  drugs and there is not a predictable relationship
20  between AWP and ASP with respect to multi-source
21  drugs?
22       A.  It's -- it's my opinion that as to

---

731

1  physician-administered drugs, private sector
2  third-party payers for the most part look to
3  Medicare and how Medicare was developing its
4  relationships, and the Medpac report confirms that
5  reliance.
6       So there -- there is some limited
7  information, but in -- as in any kind of market,
8  there is -- pieces of information start to come to
9  light, but they don't -- they don't start to
10  affect expectations for a while. These markets
11  are slow to respond to this, and you see the same
12  thing with the OIG studies of the relationship --
13  the spreads on self- administered drugs, generics
14  and branded, and they -- they weren't recognizing
15  until later in the '90s that the generic spreads
16  were that large.
17       So in answer to your question, there is
18  some information here, but it is, as far as I can
19  see from the contracts and everything else, this
20  did not affect what -- how Medicare was ending up
21  setting its reimbursement rates nor how third-
22  party payers were. This was the beginning of an

---

732

1  understanding that finally culminated in say 2004
2  with the Medicare -- with the Prescription Drug
3  Modernization Act.
4       Q.  Well, are you saying that the
5  marketplace had a different expectation for multi-
6  source drugs than it had for single-source drugs?
7       A.  We're talking about physician-
8  administered drugs now; is that right?
9       Q.  Yes.
10       A.  I'm saying that for the -- for the focus
11  of third-party payers negotiating reimbursement
12  rates for different, whether it is for self-
13  administered drugs, whether they are working with
14  their PBMs, whether they are working with
15  providers for physician-administered drugs, that
16  physician-administered drugs was one of the
17  categories of costs that was the smallest speck on
18  the radar screen, and they paid little attention
19  to it, and this is -- this is corroborated or that
20  -- this opinion is certainly put forward by Dr.
21  Berndt, that drugs generally were not on the radar
22  screen.  Physician- administered drugs were a much

---

733

1  smaller part.  And multi-source were even a
2  smaller part of physician-administered drugs going
3  into the 1990s.
4       So this kind of information, it was
5  starting to pop up, but this was not shaping
6  general expectations as I see in contracts and in
7  revealed preferences from the sources that I have
8  cited.
9       Q.  I believe you testified that it is your
10  testimony that this report is one of the things
11  that informed the market expectations that you
12  found in your analysis; correct?
13       A.  For single-source physician-
14  administered drugs.
15       Q.  So your testimony that a payer reading
16  the language, quote, "AWP is not a reliable
17  indicator of the cost of a drug to physicians,"
18  close quote, would conclude that AWP is larger
19  than ASP by a reasonably predictable amount?
20       A.  It is my conclusion that anyone who was
21  a -- that the only person that would read this
22  report and read that one sentence would be --

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL     February 27, 2006
Boston, MA

734

1  would be a lawyer trying to make a point.
2       This -- someone reading this report
3  would take -- and someone who is focusing on what
4  payers are thinking about, what is going on -- is
5  going to read the whole report, and if it is 1992
6  and I'm looking at this and I look at all the
7  drugs in our class -- and I am willing to bet that
8  almost all of them were single source in 1991-'92
9  -- I have got it in a footnote, we can check that,
10 but certainly almost all of them were -- someone
11 looking at this would say ah-ha, you know, in the
12 early '90s physician-administered drugs, a lot of
13 them had not gone generic yet. They were single
14 source. A few did.
15      What am I looking at here? I am reading
16 the whole thing. I am looking at single- source
17 drugs. Well, this characterizes most of what I'm
18 getting in my claims, and I am looking at what
19 relationships are, and I'm -- that's what I'm
20 seeing.
21      Q.  Do you have any factual basis for
22 concluding that only a lawyer would read the

735

1  language that I quoted and a payer would not?
2       A.  Well, if a payer went to a report and
3  read one line and read nothing more, then whoever
4  is in charge of doing -- designing reimbursement
5  rates should be fired, because that's -- you don't
6  read one sentence. You need to know the full
7  context of what is going on and what the
8  implications are. You don't -- you don't -- the
9  people that are doing this stuff and designing
10 reimbursement rates do more than read one line in
11 a report.
12      Q.  Do you think a payer would read the
13 conclusions to this report?
14      A.  I think the payer would read the whole
15 report.
16      Q.  Well, take a look at the conclusions
17 which appear on page 11.
18          (Witness complying.)
19      Q.  The second bullet point is, quote, "AWP
20 is not a reliable indicator of the cost of a drug
21 to physicians," close quote.
22      Is your testimony that a payer would

736

1  read that statement and conclude that AWP is
2  larger than ASP by a reasonably predictable
3  amount?
4       A.  I would -- if -- if a payer came and
5  read -- read the first sentence that you read, and
6  then read the conclusion in that bullet, and read
7  no more than that, then that's what -- then that's
8  -- then that -- then that's grounds for
9  incompetence in reimbursement design, and it -- I
10 -- it's -- it would reflect that, you know, the
11 people that are doing this kind of reimbursement
12 design are nerds like me. They go to the data. And
13 if one looks at the single-source drugs here, that
14 is where they would look at. Oh, they would say,
15 "Here is what they mean by not a reasonable guide.
16 It is a few multi-source that are really not on
17 our radar screen."
18      Q.  Are you saying that OIG didn't know what
19 it was talking about when it made that statement?
20      A.  I am saying if I am characterizing this
21 table as a whole and trying to generalize that,
22 that for all of these drugs, speaking very

737

1  broadly, that when you include multi-source and
2  branded physician-administered drugs in the same
3  way as when you do that with self- administered
4  drugs, there is -- there is -- there is wide
5  variation between AWP and ASP.
6       But one would look at that then, and get
7  -- would look -- would start at that point and
8  then start to peel back the onion and look at the
9  details and see where it was appropriate or not.
10      Q.  So are you saying that you can't always
11 rely on OIG's conclusions? You have to look at
12 the details?
13      A.  I am saying that anyone attempting to
14 understand the results of a survey wants to look
15 at -- you will -- someone who is doing a survey,
16 you will look at the results and you will look at
17 the details. You will look at -- you will look at
18 all aspects of it that you can in order to be as
19 informed as you can.
20      Q.  Let's take a look at Appendix III to
21 this report, and I want to direct your attention
22 to the last sentence on the page where it states,

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

---

**738**

1 quote, "Considering that we also found that there
2 is no single discount rate which can be applied to
3 the AWP to provide a reasonably consistent
4 estimate of physicians' acquisition cost, we do
5 not feel that AWP provides a useful measure of the
6 acquisition cost for a drug to physicians."
7         Is it your testimony that a payer
8 reading that statement would nevertheless conclude
9 that AWP is larger than ASP by a reasonably
10 predictable amount?
11     A.  It is again the drug you're pointing to
12 is one of the multi-source drugs.  It is
13 methotrexate sodium.  And we find that there is -
14 - there is much greater variation in the multi-
15 source drugs, and -- I've -- I've -- I haven't
16 used those for that purpose.  The data on
17 characterizing a relationship between AWP and ASP
18 for multi-source drugs is -- that kind of survey
19 information is much more spotty, as has been
20 recognized by Dr. Berndt and as I cite in my
21 report, and so, you know, this is just summarizing
22 the same thing.

**739**

1     Q.  Isn't it a fact, Dr. Hartman, that a
2 number of payers have testified to exactly what is
3 stated in this OIG report, that they understood
4 that there was no reasonably predictable
5 relationship between AWP and ASP?
6         MR. SOBOL:  Objection to the form.
7     A.  Well, I know that --
8         MR. SOBOL:  Objection to the form.
9         THE WITNESS:  That was a double
10 objection.
11         MR. SOBOL:  Sorry.
12     A.  There were a variety of depositions of
13 payers that I reviewed, well, that were put
14 forward by Mr. Young and Dr. Gaier that purported
15 to demonstrate that payers didn't rely on AWP,
16 that they had -- that they didn't give a damn
17 about what the acquisition cost was, and there --
18 and stated a variety of things, and I have -- I
19 have responded to -- to a large group of those in
20 my rebuttal -- two rebuttal reports.  I would have
21 to see whether what you are going to put in front
22 of me is one of those quotes.

**740**

1         But again, a quote from a deponent, I
2 would have to see what the full context was, what
3 that person knew, whether that person was really
4 the person that was in charge of reviewing data
5 and understanding what acquisition costs were and
6 setting reimbursement rates.  But given those
7 caveats, I would be glad to read any depositions
8 you want to put in front of me.
9         MR. EDWARDS:  Well, let's mark as
10 Exhibit Hartman 028 to this deposition a copy of
11 the transcript of Mickie Brown.
12         THE WITNESS:  Are we done with this one?
13 Can I give this one back to you, the OIG?
14         MR. EDWARDS:  You can put that one down.
15         (Deposition transcript of Mickie
16 Brown taken March 9, 2005 marked Exhibit Hartman
17 028 for identification.)
18 BY MR. EDWARDS:
19     Q.  I want to direct your attention to page
20 126 of the deposition.
21     A.  Could you tell me who Mickie Brown is?
22     Q.  I believe he was with Blue Cross/Blue

**741**

1 Shield of Mississippi.
2     A.  And could you tell me what his job was
3 there?  Where does it describe what he is doing
4 there?
5     Q.  I don't have that information at my
6 fingertips.  I take it you're not aware of the
7 answer to that either; is that correct?
8     A.  Without -- I mean I may have looked at
9 this in my rebuttal stage, but I don't remember
10 precisely, so I am seeing Blue Cross of
11 Mississippi on page 9, he left in '96.
12     Q.  I take it you have never read this
13 deposition; is that correct?
14     A.  I don't recall whether I have or not.
15     Q.  I believe on page 16 he testifies that
16 he is the director of provider networks, but I
17 want to direct your attention to the testimony
18 that begins at line 20 on page 126.  Do you have
19 that?
20     A.  Let me turn to that.  Line?  I am sorry.
21 What page?  I am sorry.  I didn't hear the page.
22     Q.  Page 126, line 20.

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL
Boston, MA

February 27, 2006

742

1          (Witness complying.)
2      A.  Okay.
3      Q.  "Question:  Well, certainly we can agree
4  that the AWP for any given drug bears no fixed
5  relationship to acquisition cost for that drug;
6  correct?
7          "Answer:  As I have said before, I don't
8  know where average wholesale price comes from, so
9  the relationship of average wholesale price to
10  acquisition cost is not something that I'm
11  familiar with, so I don't know how I can agree or
12  disagree with your statement.
13      "Question:  Then it is certainly fair to
14  say that you have no particular expectation that
15  there will be a fixed relationship between AWP and
16  acquisition cost?
17      "Answer:  Average wholesale price is a
18  point of reference that we use. Its relation to
19  acquisition cost, I'm not familiar with, so I mean
20  I don't have an expectation -- I don't have an
21  expectation one way or the other on that."
22      How do you reconcile that testimony with

743

1  your opinion that payers have expected that AWP is
2  larger than ASP by a reasonably predictable
3  amount?
4      MR. SOBOL:  Objection to the form.
5      A.  My conclusion and those of the other
6  persons cited in my report that there is a
7  reasonable expectation characterizes the market as
8  a whole. You are going to have market entities
9  out there that are -- are unaware of a
10  relationship and essentially are going to follow
11  in terms of negotiating an acquisition cost -- I
12  am sorry -- a reimbursement rate, they're going to
13  follow some rule of thumb, percentage off AWP, and
14  these are precisely -- these -- the -- those
15  payers and those payers designing reimbursement
16  rates for third-party payers that actually have no
17  understanding of this relationship are at the
18  mercy of, one, what the market expectation --
19  well, they are unaware of what the market
20  expectations are, but these are precisely the
21  payers that are most easily gouged by the alleged
22  fraud, because they have no idea. They are just -

744

1  - they just -- they assume, well, AWP is what
2  Medicare is using. 95 percent of AWP. I'm --
3  that seems to be what the government is doing.
4  They must know what they are doing.
5          So there is going to be people with no
6  expectations. It is like someone walking into a
7  car dealer and seeing what the sticker price is
8  and saying, "Well, okay, I will take it at that,
9  I'm not going to negotiate it with you," doesn't
10  look up on Carfacts, doesn't do any research. I
11  read this as an uninformed payer that -- this
12  doesn't mean that there is not a set of
13  relationships that inform the market. This just
14  means that there is one person that is not aware
15  of it.
16          MR. EDWARDS:  I will mark as Exhibit
17  Hartman 029 a copy of the deposition transcript of
18  Thomas E. Greenbaum taken on January 14, 2005.
19          (Deposition transcript of Thomas E.
20  Greenbaum taken on January 14, 2005 marked Exhibit
21  Hartman 029 for identification.)
22      A.  You know, I would like to follow up with

745

1  just one further response on this previous
2  exhibit.
3          You know, the -- it says that he is
4  currently director of provider networks, but again
5  we are pulling out -- you are pulling out one page
6  of this fellow's deposition. I have no idea
7  whether this is the person, you know, someone who
8  is director of provider relationships, or provider
9  networks, whether he is the person doing the
10  negotiations. This doesn't really tell me what
11  this entity, this payer, you know, unless I know
12  this is the guy that is negotiating, you know,
13  there is many a management person that is sitting
14  there director of something and the details are
15  left to somebody else.
16          So in addition to this person, whether
17  he knew or not and whether he was being gouged or
18  not, he may not be -- they may have a very good
19  idea, this entity, of what the acquisition cost
20  is. This person doesn't (pointing to Exhibit
21  Hartman 028). He may not be the person who is
22  going to know anything about that.

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

---

746

1    Q.  Do you know how Mr. Brown was chosen as
2    a witness?
3       A.  My guess would be that he was designated
4    in response to a 30(b)6 that said, "We would like
5    to speak to somebody who knows about reimbursement
6    rates."
7       Q.  It says, "Please produce the person most
8    knowledgeable about this subject."
9       A.  Um-hmm.
10      Q.  Is that consistent with your
11   understanding?
12      A.  I have not --
13         MR. SOBOL:  Objection to the form of the
14   question.
15         THE WITNESS:  Yes.
16      A.  I have not seen -- I have -- I have been
17   on the requesting end of many 30(b)(6)s where I
18   have asked for a person in that context and gotten
19   someone who didn't know what it was, but I -- I
20   would assume you have asked for somebody who did
21   know.
22         I don't know whether this person -- I

---

747

1    don't -- I would have to read this fully to
2    establish his bona fides to establish whether he
3    really does know.
4       Q.  Blue Cross/Blue Shield of Mississippi is
5    a class member in this case; correct?
6       A.  I would assume so.
7       Q.  These are the people that Mr. Sobol
8    represents; correct?
9       A.  The -- Mr. Sobol represents the third-
10   party payers and the beneficiaries, the class as
11   it is defined.
12      Q.  They are the people who are alleging
13   that these defendants should be held liable and
14   should be required to pay money; correct?
15      A.  They are -- they are one of the -- one
16   of the subclasses.  They are subclass 2 and part
17   of subclass 3.  They are not in subclass 1.
18      Q.  So it is certainly not in their interest
19   to bend over backwards to help the defendants
20   here; correct?
21         MR. SOBOL:  Objection to the form.
22      A.  I'm -- it is certainly reasonable to

---

748

1    believe that whomever they would produce it would
2    be somebody who would help in this particular --
3    help in understanding an area where they are a
4    stakeholder.  I don't know whether they have or
5    not.  I -- that --
6       Q.  I want you to take a look at the
7    transcript of the deposition of Thomas Greenbaum,
8    which we have marked as Exhibit Hartman 029.
9         (Handing Exhibit Hartman 029 to the
10   witness.)
11      Q.  He is from Cigna.  Cigna is a large,
12   sophisticated payer; is that correct?
13      A.  They are a -- they are a large payer.
14   That's true.
15      Q.  I want to direct your attention to the
16   testimony that begins at line 12 on page 75.
17      A.  You know, before I get directed to any
18   testimony, I just want to see who this person is
19   besides his name.
20         (Pause.)
21         (The witness viewing Exhibit
22   Hartman 029.)

---

749

1       Q.  Take a look at page 6, line 9.  "I'm the
2    chief operating officer of CIGNA pharmacy."
3       A.  Okay.  I just want to look at kind of
4    his background a bit here.
5         (Pause.)
6         (The witness viewing Exhibit
7    Hartman 029.)
8       A.  So this is -- I mean I am looking at a
9    little bit more of his background, and it -- it
10   sounds like Brownie of FEMA.  I mean I go to the
11   bottom of page 8, and it says -- or I am sorry --
12   of 6 and 7 -- "Can you tell me in broad terms
13   prior to coming to Cigna three years ago about
14   your employment background?"
15         "I worked as a general manager of the
16   Book of the Month Club.  Prior to that I was chief
17   operating officer of Marvel Entertainment and
18   prior to that I worked for an entertainment
19   products company in Wisconsin."
20         So it would be correct to say that prior
21   to coming to Cigna three years ago you had not
22   previously worked in the healthcare insurance

---

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    February 27, 2006
Boston, MA

750

1   industry; is that true?
2        Okay.  So conditioning that on that
3   person's understanding of this industry, what is
4   it that you want me to look at?
5        Q.  Well, when you compare this person to
6   Brownie of FEMA, what did you have in mind?  Are
7   you trying to infer that this person is somehow
8   incompetent?
9        A.  No.  I am saying that as with, I think,
10  Mr. Brown's bona fides were that he had been head
11  of the Arabian Horse Society prior to being placed
12  as head of FEMA, and that that experience did not
13  give him a nuanced deep understanding of what was
14  necessary for the job into which he was placed,
15  and I -- so I look at this, and I see that someone
16  does not have a -- I mean he is the COO of Cigna,
17  but I'm not seeing a long history of understanding
18  the nuances of all that is -- Cigna is a big
19  company, and it is doing -- it is doing
20  reimbursement for physicians and for hospitals, it
21  is doing all kinds of information management, and
22  along with prescription reimbursement and

751

1   reimbursement for physician- administered drugs,
2   and I just wanted to see what -- this is a
3   background that doesn't argue a nuanced deep
4   understanding to me, but, and I just wanted to get
5   that in the record. I just wanted to know what his
6   background was.
7        Q.  Well, is it your testimony that to the
8   extent that any payer claims it was injured here
9   it is because they were not competent, like
10  Brownie here?
11       A.  No.  It is my testimony that there --
12  there were -- there were expectations in the
13  market, and there were -- that -- that essentially
14  those expectations that developed in the late
15  '80s, early '90s, relative to these particular
16  drugs, physician-administered drugs, and the
17  relationship of AWP to acquisition costs of the
18  providers was set in Medicare's mind and in third-
19  party payers' minds in the early '90s, and they
20  changed very slowly, and people weren't aware,
21  weren't aware of all of that.
22       And so the -- it is -- it is very easy

752

1   for even knowledgeable third- party payers that
2   haven't -- are not paying attention to this one
3   particular aspect of things, where this is an area
4   that can be abused easily by manufacturers, as we
5   see in the Vincasar matter that I cited earlier in
6   my report in the paragraph that quotes Medpac or
7   that were exploited in the Lupron matter. These
8   were -- these were drugs that were low on the
9   radar reimbursement rates that were low on the radar
10  screen in Professor Berndt's nomenclature, and so
11  someone that is relatively well informed would not
12  notice the abuse of this spread, and certainly
13  someone who has little background in it is easily
14  duped or could be -- the alleged fraud would be
15  particularly easy to impose upon someone -- a
16  payer like this if this is the person negotiating
17  reimbursement rates.
18       Q.  So it is your testimony that Cigna was
19  duped?
20       A.  It is my testimony as I read -- you have
21  put a deposition in front of me.  I am looking at
22  the background of the person, because you are

753

1   asking me a question about what he knew, and I am
2   looking at his background, and I see that his
3   background suggests to me that he hasn't spent a
4   lot of time studying this market to know that
5   much, and that's all I am saying.
6        And so --
7        Q.  Take a look at page 75 beginning at line
8   12.
9        (Witness complying.)
10       Q.  And this is part of a question:
11       "Would the same statement that you just
12  made hold true for the actual acquisition cost,
13  that Cigna does not have an expectation of a
14  relationship between average wholesale price or
15  actual acquisition cost but in fact those are two
16  separate pieces?"
17       And then there are a series of
18  objections.
19       "Answer:  Yeah.  I mean I think that our
20  acquisition costs are separate from AWP, and we
21  don't have any expectations of what the
22  relationship is between what we purchase the drug

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

---

754

1  for and what AWP is."
2      Now given that testimony, do you think
3  that your opinion that payers have expected that
4  AWP is larger than ASP by a reasonably predictable
5  amount simply doesn't apply to Cigna?
6      MR. SOBOL: Objection to the form.
7      A.  I'm saying -- I am saying that the
8  expectations that I have framed and analyzed and
9  put forward in my report summarize the market as a
10 whole for those -- for those groups who have been
11 surveyed, for those payers for which contracts
12 have been negotiated, and there are going to be --
13 I would like to see Cigna's contracts with -- with
14 -- with an oncology group to see what was actually
15 negotiated.
16     The -- you know, I am seeing -- I am
17 sorry. I was trying to see whose all of these
18 names here were.
19     This is a person who I would assume when
20 negotiating contracts -- this is a senior person
21 that is not close to those details given his
22 background and given the response.

755

1      So this -- this is again -- has no
2  evidentiary value that I see really even about
3  what Cigna was doing or what Cigna knew.
4      Q.  So are you saying that when you
5  summarize expectations in the marketplace you
6  ignore all evidence that is contrary to your
7  hypothesis?
8      MR. SOBOL: Objection to the form.
9      A.  No. I seek evidence wherever I can get
10 evidence of someone knowledgeable about what it is
11 I'm analyzing, and from what I see here, this
12 deponent has little credibility as to an
13 understanding of what expectations were, relations
14 were, period.
15     Q.  I want to show you the deposition of
16 Jill Herbold taken January 14, 2005, which I will
17 mark as Exhibit Hartman 030.
18     (Deposition transcript of Jill A.
19 Herbold taken on January 14, 2005 marked Exhibit
20 Hartman 030 for identification.)
21     MR. EDWARDS: And I apologize to anybody
22 who might listen to the audio of this deposition

756

1  for constantly coughing on the record. I just
2  can't help it.
3      THE WITNESS: Can I offer you a Halls?
4      MR. EDWARDS: Maybe at the break.
5  BY MR. EDWARDS:
6      Q.  You said --
7      A.  Could I just take a second, if you would
8  bear with me?
9      (Pause.)
10     (The witness viewing prior
11 exhibit.)
12     A.  I just want to review one of the prior
13 exhibits that you had put before me.
14     (Further pause.)
15     (The witness continues to view
16 prior exhibits.)
17     A.  Okay. I am sorry.
18     Q.  Now you testified a moment ago when I
19 was asking you questions about Mr. Greenbaum that
20 you would like to see Cigna's contracts in order
21 to evaluate his testimony about the relationship
22 between AWP and ASP; correct?

757

1      A.  And I -- I think you have been very good
2  in finding me a person who might help in that
3  regard.
4      I did say that. Yes.
5      Q.  I take it you have never asked
6  plaintiffs' counsel to provide you with copies of
7  Cigna's contracts, have you?
8      A.  I have asked for contracts, and I forget
9  what was provided. It is my recollection that we
10 did not receive -- I did not receive a lot of
11 contracts. I certainly relied on some contracts
12 that were put forward by Mr. Young, but I did ask
13 for contracts. I didn't -- I don't think I
14 received any, but I would have to look. I can't
15 recall.
16     Q.  Well, you identify contracts for
17 physician-administered drugs that you rely on in
18 attachment C --
19     A.  I do, yes.
20     Q.  -- to your declaration; correct?
21     A.  That's correct.
22     Q.  And basically you identified four

---

Raymond S. Hartman, Ph.D. CONFIDENTIAL                February 27, 2006
Boston, MA

758

1  contracts; correct?
2      A.  And I think those four contracts were
3  ones that I was able to get from defendants.
4      Q.  None of those are Cigna contracts;
5  correct?
6      A.  I would assume not, but I -- I am trying
7  to think whether --
8          (Pause.)
9          (The witness viewing Exhibit
10  Hartman 023.)
11     A.  -- in my rebuttal reports I had seen
12  Cigna contracts, but that is something I can
13  check.
14     Q.  Okay.  Let's go back to Ms. Herbold's
15  deposition.  She is also with Cigna; correct?
16     A.  Yes.  It appears that as far as I can
17  tell she is responsible for strategy and policy as
18  well as financial analysis for practitioner
19  reimbursement, and so she is an assistant VP
20  practitioner reimbursements.  She has been that
21  since 2004, so she has been doing that job since
22  fairly recently, and --

759

1      Q.  I want to direct your attention to page
2  21 of this deposition beginning at line 8.
3          (Witness complying.)
4      Q.  "Question:  Can you tell me the range
5  below AWP that these rates and the Cigna national
6  standard injectable reimbursement rate was varied?
7      "Answer:  Typically 15 percent.  We have
8  codes that are up to 45 percent below AWP."
9      Do you see that?
10     A.  I do.
11     Q.  So Cigna's contracts do not fall within
12  the plus or minus 15 percent of AWP range on which
13  you premise your report; correct?
14         MR. SOBOL:  Objection to form.
15     A.  Well, certainly their typical contract
16  does.  Now they claim they have codes up to 45
17  percent below AWP, and I would assume that is for
18  a multi-source, and I would have to -- I would
19  have to -- as to typicality, I see 15 percent.  As
20  to whether -- how much of an exception 45 percent
21  is, and this is again as of 2004, and there
22  certainly have been more multi-source drugs

760

1  recently, in the last five years of the physician
2  administered, so I would assume that that applies
3  to multi-source.
4      Q.  So that would be another example of
5  payer expectation with respect to multi-source
6  differing from the expectation with respect to
7  single source?
8      A.  This is one piece of evidence regarding
9  as of 2004 what a relationship would be for a
10  multi-source product.
11     Q.  Next I want to show you the transcript
12  of the deposition of Joe Spahn taken November 30,
13  2004.
14         MR. EDWARDS:  This will be Exhibit
15  Hartman 031.
16         (Deposition transcript of Joe Spahn
17  taken on November 30, 2004 marked Exhibit Hartman
18  031 for identification.)
19         (Handing Exhibit Hartman 031 to the
20  witness.)
21  BY MR. EDWARDS:
22     Q.  Mr. Spahn is with Anthem.  Do you know

761

1  what Anthem is?
2      A.  It is my recollection that Anthem is a
3  Blue Cross/Blue Shield, but I would have to
4  confirm that.  Oh, yes.  There it is.  Anthem Blue
5  Cross/Blue Shield.
6      Q.  Anthem is an amalgamation of a number of
7  Blue Cross/Blue Shield entities; correct?
8      A.  That -- it's -- I think that's correct.
9  I don't know how many, and I would have to confirm
10  that.
11     Q.  Do you know whether Anthem is at this
12  point the largest payer in the country?
13     A.  As of today, you mean?
14     Q.  Yes.
15     A.  I don't know.
16     Q.  What I want to do is direct your
17  attention to the testimony that begins at page 93,
18  line 6.
19     "Question:  Now you testified earlier
20  that Anthem has -- does not know exactly what
21  providers are paying to acquire drugs; correct?
22     "Answer:  Correct.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

762

1        "Question: That is not something that -
2    - withdraw that.
3            "Anthem does not require providers to
4    disclose their acquisition cost for drugs as part
5    of their contracts with those providers; correct?
6            "Answer: Correct.
7            "Question: So providers' acquisition
8    costs for drugs do not form part of Anthem's
9    determination of what it will reimburse them in
10   relation to drugs?
11           "Answer: Correct.
12           "Question: The reimbursement is driven
13   entirely by the fee schedule?
14           "Answer: Correct.
15           "Question: Regardless of what the
16   specific providers' acquisition cost for those
17   drugs may be?
18           "Answer: Correct.
19           "So if, for example, Anthem were to
20   learn that a particular provider were getting a
21   discount or a rebate on a particular drug that
22   lowered his acquisition cost for that drug, that

763

1    wouldn't change the amount that Anthem is
2    reimbursing that practice in relation to that
3    drug; right?
4            "Answer: No.
5            "Because the reimbursement amount is
6    tied to the fee schedule?
7            "Answer: Right.
8            "Question: And if Anthem were to learn
9    that providers in a region were getting a discount
10   or rebate from a drug manufacturer in relation to
11   a particular drug, again that wouldn't change the
12   amount that Anthem reimburses because that is tied
13   to the fee schedule?
14           "Answer: That's correct.
15           And then continuing on page 97,
16   beginning with line 17, "Prior" -- question:
17           "Prior to the break, we were talking
18   about providers' acquisition cost and the fact
19   that they are not relevant to Anthem's
20   reimbursement amounts. Do you recall that
21   testimony?
22           "Answer: Yes.

764

1        "Question: Okay. And part of that was
2    that Anthem has no information about the
3    providers' acquisition costs? Right?
4            "Answer: Correct.
5            "Question: So it is fair to say that
6    Anthem has no particular expectation that
7    providers' costs would be, you know, 10 percent,
8    30 percent, 50 percent, something more, something
9    less than the amount they're reimbursed in
10   relation to those drugs? Right?
11           "Answer: Yes."
12           Now based on that testimony, would it be
13   fair to say that your opinion that payers have
14   expected that AWP is larger than ASP by a
15   reasonably predictable amount would not apply to
16   Anthem?
17       A.  What this says to me is what occurred
18   over the '90s and into the early 2000s, and that
19   is that there were a set of expectations going
20   into that period of time of what the relationship
21   was, and that formed expectations as cited by Mr.
22   Young as laid out in the 1992 OIG report for

765

1    single-source drugs, as reflected in contracts
2    that were negotiated over this entire period of
3    time, and what was also the discussions that were
4    going on Congressionally about Medicare. That
5    there were expectations in place that governed
6    reimbursement of both Medicare and third-party
7    payers looked to Medicare and discounts off of AWP
8    and how they reimbursed. There was a growing
9    awareness with both the legal action and once
10   managed healthcare dealt with some of the larger
11   cost issues, like hospitalization and physician
12   costs, they started focusing on issues about
13   prescription drugs and then physician-
14   administered drugs.
15           And this says to me that Anthem, going
16   into this, that they didn't -- they don't have the
17   information they need to know more than relying on
18   the general kinds of rules of thumb that have
19   characterized this market and that has been able
20   to be abused by the manufacturers, and so they
21   have locked into a computer system and a
22   reimbursement system a set of AWPs and

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

766

1   reimbursements off of AWPs, and I know there are
2   private third-party payers that are starting to
3   evaluate this kind of issue now and starting to
4   learn that there is a bigger gap than they
5   thought, but this is something that is only
6   recent, and it hasn't been -- this is precisely
7   why this has been a lucrative area to exploit by
8   the kind of behavior that is alleged on the part
9   of manufacturers.
10      Q.  If you look at pages 8 and 9 of this
11  deposition, you will see that Mr. Spahn testifies
12  that he has served as senior healthcare consultant
13  to Anthem since 1992.  Do you see that?
14      A.  I do.
15      Q.  And he doesn't say in the testimony that
16  we just read that his views of this matter have
17  changed over the period of time since 1992 to the
18  present, does he?
19      A.  He -- you are asking -- there is --
20  there is -- there is hundreds -- there is 174
21  pages of deposition here, and for -- I'm not going
22  to attempt to characterize that particular set of

767

1   quotes.
2           What page was that again?  Oh, here we
3   go.
4       Q.  The quotes we read were from --
5       A.  No.  I see it.  I have got it.
6       Q.  -- I think 93 to 97.
7       A.  The quotes?
8       Q.  Or 98.  Pages 93 to 98.
9       A.  Okay.  I thought -- yes.  Not years.
10          Yes.  I mean I am -- I am -- I would
11  assume that as of now, 2004-2005- 2006, that these
12  -- that providers are beginning to realize that
13  these expectations, the expectations that they
14  have relied on to write their contracts, that is
15  reflected in all of the testimony that I have
16  cited and the surveys that I have cited and what
17  the Judge has relied on, reflected a period of
18  time where the spreads have obviously been
19  exploited in very dramatic fashion, as recognized
20  by Dr. Berndt, and payers are beginning to say,
21  you know, there is something -- we need to be
22  thinking about acquisition costs.  I don't know

768

1   what it is right now, and because our systems of
2   reimbursement are hard wired to AWP, I don't know
3   what it is.  We can't work with that.  But I know
4   that third-party payers are beginning to try to,
5   precisely because they -- the extent of the
6   problems alleged in this matter are becoming
7   clear.
8       Q.  What is the basis for your testimony
9   that Mr. Spahn's expectations have changed since
10  1992?
11          MR. SOBOL:  Objection to the form.
12      A.  I didn't say Mr. Spahn's.  I am saying
13  that the -- as a -- as a matter of information,
14  that is -- that is compelling, we have talked
15  about this 1992 OIG report that the -- how much
16  that was disseminated as to the multi-source
17  spreads is unclear -- is unclear to me, but what
18  is clear and has become clear, as I have said in
19  paragraph 53A, and these are events where we have
20  had the Lupron behavior becoming known, that was
21  behavior going on in the '90s, and exploiting
22  understandings of reimbursement in the '90s, and

769

1   it became clear in 2000 -- with the litigation,
2   and then with the settlement agreement with 2001,
3   the sentencing memorandum, there were hearings
4   before the House Energy Subcommittee, and if you
5   will give me leeway to find one more.
6           (Pause.)
7           (The witness viewing Exhibit
8   Hartman 023.)
9       Q.  Would you agree with me that --
10      A.  I would like to get just this one last
11  statement in the record, if I could.
12          (Further pause.)
13          (The witness continues to view
14  Exhibit Hartman 023.)
15      A.  And there is probably a time limit at
16  some point.
17          MR. EDWARDS:  While you are looking, why
18  don't I have the reporter mark the next deposition
19  exhibit, which is Exhibit Hartman 032.
20          (Deposition transcript of Edward
21  Lemke taken on January 11, 2005 marked Exhibit
22  Hartman 032 for identification.)

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

770

1       THE WITNESS:  Yes.  I can't find it.
2       MR. EDWARDS:  It is the deposition of
3   Edward Lemke, taken on January 11, 2005.
4       THE WITNESS:  Oh, wait.  I found it.  It
5   is also the quote put forward by Dr. Berndt at
6   page 42 of his report where again he is stating
7   fairly recent understandings, and he says, this is
8   in footnote 12, he says, "In a different industry
9   publication, an executive of Advanced PCS reports
10  that in his experience health plans become
11  flabbergasted on what they are paying for years on
12  drugs on the medical side because of dramatic
13  price markups."
14      So this is again another summary of a
15  recent understanding of what has occurred over the
16  period of the '90s.
17      Q.  Take a look at the deposition of Edward
18  Lemke of Humana, which we have marked as Exhibit
19  Hartman 032.
20          (Handing Exhibit Hartman 032 to the
21  witness.)
22      Q.  Have you read this deposition before?

771

1       A.  I think I -- I think I have seen parts
2   of it.  I think in terms of reviewing defendants'
3   experts, I had read part of this, but I can't
4   recall.
5       Q.  I just want to direct your attention --
6       A.  I am sorry.  I just want to find out who
7   this person is before we --
8       Q.  You may want to look at page 18, where
9   Mr. Lemke states that he is director of fee
10  schedule management for Humana.
11          (Witness complying.)
12      A.  Okay.  Humana.  Okay.
13      Q.  Let me ask you to look at page 123,
14  beginning at line 17.
15          (Witness complying.)
16      Q.  "Question:  Is it Humana's expectation
17  that the amounts that providers pay to acquire
18  drugs are a fixed percentage less than the amount
19  Humana reimburses in relation to those drugs?
20      "Answer:  The expectation that first of
21  all that it's fixed, no.  The expectation that
22  good business practice, and assuming providers

772

1   that we do business with practice good business
2   practices, is that they would only accept payment
3   that is at or above their costs."
4       A.  I --
5       Q.  "That is my only expectation --"
6       A.  Counsel, I am sorry.  I missed the -- I
7   thought I had the page, and I have been looking
8   for the words.  Could you tell me?
9       Q.  Sure.
10      A.  Just start me.
11      Q.  It starts at 123.
12      A.  Page 123, okay.
13      Q.  Line 17.
14      A.  Okay.  I am sorry.
15      Q.  And what I just read you is line 17 on
16  page 123 through line 4 on page 124.
17      A.  Okay.
18          (Pause.)
19          (The witness viewing Exhibit
20  Hartman 032.)
21      Q.  Where he says it is his only expectation
22  that they would want payment at or above their

773

1   costs.
2       And then continuing on:
3       "Question:  And certainly you have no
4   fixed expectation as to how much higher it would
5   be than their acquisition cost; correct?
6       "Answer:  Correct.
7       "Question:  And indeed that would vary
8   from provider to provider depending on what they
9   paid to acquire drugs and what Humana reimburses
10  them for drugs?
11      "Answer:  Correct.
12      "Question:  The percentage could be 10
13  percent in one case, 50 in another, 100 in
14  another; correct?
15      "Answer:  Could be."
16      Now, Dr. Hartman, is it fair to say that
17  your conclusion that payers have expected that AWP
18  is larger than ASP by a reasonably predictable
19  amount does not apply to Humana?
20      A.  No.
21      Q.  Well, if the Court or the jury finds
22  that the testimony of Mr. Brown, Mr. Greenbaum,

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

774

1  Mr. Spahn, and Mr. Lemke is more representative of
2  market expectations than the sources you have
3  cited for market expectations, what does that do
4  to your report?
5       MR. SOBOL: Objection to the form.
6    A.  Well, right now there has been quotes
7  from people about -- about very general kinds of
8  statements, you know, that -- that tell me that
9  this person doesn't really know and is relying on
10  the general rules of thumb that have characterized
11  this market for physician- administered drugs.
12  The fact that it is 10 percent, 50 or 100, he
13  said, "Could be," I would want to see the
14  contracts.  I would want to see, before I would
15  introduce this into evidence, here I have got -- I
16  have got contractual information; I have got
17  survey information on what people pay.
18       He is talking about again there, just
19  like what we were saying before, there could be a
20  variety of thoughts about what could be the case
21  of what I'm going to pay.  When you step up to
22  the, belly up to the bar and you sign a contract,

775

1  then you see what it is for the different kinds of
2  drugs.
3       And so I see 10 percent.  I don't know.
4  50 percent, 100 percent.  In a multi-source
5  context?  This is again in 2005 when the
6  information was much different than the
7  preponderance of the class period.  2005 is not
8  even in my damage calculations.
9    Q.  Would you --
10    A.  So -- so I want to see contracts.  I
11  would want to see the contracts of these
12  companies.
13    Q.  Would you agree with me that Mr. Lemke
14  at least did not believe that AWP is larger than
15  ASP by a reasonably predictable amount?
16       MR. SOBOL: Objection to the form.
17    A.  I don't think the question is -- I -- I
18  can't judge from this, this set of responses and
19  this set of questions.  It is too general and too
20  diffuse.  It is -- it --
21    Q.  Where he agrees that the percentage
22  could be 10 percent in one case, 50 in another,

776

1  100 in another, is it your testimony that that is
2  consistent with your opinion that payers believe
3  that AWP is larger than ASP by a reasonably
4  predictable amount?
5    A.  My opinion goes to single-source
6  physician-administered drugs, as I have said, in
7  basing it on the information that I have looked
8  at, I extended to multi- source later, and discuss
9  how I -- how that -- what my assumptions are
10  therein.
11       But this is so broad and diffuse, this,
12  this doesn't tell me -- I don't know what he is
13  talking about.  I don't know if it is single
14  source.  I don't know if it is multi-source, if it
15  is a particular type of drug.  I don't know if
16  it's -- I don't know what -- it is too -- it is
17  too -- too broad, too general.
18    Q.  Your opinion that payers have expected
19  that AWP is larger than ASP by a reasonably
20  predictable amount is what an economist would call
21  a hypothesis; correct?
22       MR. SOBOL: Objection.

777

1    A.  It is -- it -- it could be called a
2  hypothesis.  It could also be called a conclusion.
3  And I've -- I approached this with a hypothesis
4  and came to a conclusion that it is the case.
5    Q.  Okay.  And the thing that gets you from
6  a hypothesis to a conclusion is an examination of
7  the evidence; correct?
8    A.  That's right.
9    Q.  And yet you are rejecting the evidence
10  that I have put forward to you from the
11  depositions of Mr. Brown, Mr. Greenbaum, Mr.
12  Lemke, and Mr. Spahn, and you are adhering to your
13  conclusions; correct?
14    A.  No.  I am -- the -- this is not evidence
15  as to what the actual -- what the reimbursement
16  rate, what the -- the contractual discounts off of
17  AWP would reflect whatever this understanding
18  would be, that -- that -- that's -- those are when
19  you survey it and you look at the actual numbers,
20  as I have cited in here, you look at what the
21  contracts say, there is going to be very -- it is
22  like flying, getting on an airline. There are --

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

---

778

1   there are list prices, and there are lots of
2   different discounts, and you are going to
3   negotiate, and you are going to -- and there is
4   going to be a list price that is going to reflect
5   certain things, and you may -- you may have -- it
6   could be anything.
7          But what is going to finally count is
8   what you pay, what you set that rate at. And so I
9   don't know what this says about -- I want to see
10  the contracts of this, for this payer, to know
11  what -- how the very vague understandings that are
12  articulated here are reflected in a real decision
13  that is made contractually or in real data. I
14  mean this is -- you are -- this is very ill-formed
15  hearsay.
16      Q.  So you are saying that --
17          MR. SOBOL:  Wait, wait, wait.
18      Q.  -- the evidence --
19          MR. SOBOL:  It is one o'clock. Let's
20  take lunch.
21          MR. EDWARDS:  Could I ask just two more
22  questions on this line?

---

779

1          MR. SOBOL:  Actually, no, because I have
2   a call.
3          MR. EDWARDS:  Please?
4          MR. SOBOL:  No.  Not even if you say
5   "pretty please."
6          THE VIDEOGRAPHER:  The time is 1:02. We
7   are off the record.
8          (Luncheon recess taken at 1:02
9   p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22

---

780

1          AFTERNOON SESSION          1:47 P.M.
2
3          THE VIDEOGRAPHER:  The time is 1:47.
4   We're back on the record.
5
6          CONTINUED DIRECT EXAMINATION OF DR.
7   HARTMAN BY MR. EDWARDS:
8      Q.  Dr. Hartman, a while ago we were talking
9   about the possibility of conducting surveys that
10  you had mentioned in your prior deposition, and I
11  believe you testified that you decided not to
12  conduct those surveys in part because you had
13  deposition evidence available; is that correct?
14      A.  That was one of the reasons, yes.
15      Q.  What were the other reasons?
16      A.  Well, the other reason was really to get
17  at the issues involved would require just
18  implementing and designing an appropriate survey
19  would take time and would be involved to do
20  properly and do scientifically, and also to try
21  and do a survey going back where you are just
22  trying to get at expectations rather than revealed

---

781

1   behavior, going back that far is very hypothetical
2   and very speculative. So it -- it was more useful
3   to look at the information that I looked at and
4   look at the depositions that I looked at.
5      Q.  Did you discuss the possibility of
6   conducting surveys with counsel for the
7   plaintiffs?
8      A.  You know, I think I raised it as a
9   possibility early on, as I was clear in the
10  declaration.  The decision not to do it came from
11  me, not from them.  So, yes, there was some
12  discussion, but.
13      Q.  What was their position on that?
14      A.  I don't recall.
15      Q.  And just so the record is clear, it is
16  your testimony that the testimony of payers that
17  we have reviewed thus far, the Brown deposition,
18  the Greenbaum deposition, the Lemke deposition,
19  the Spahn deposition, does not have an impact on
20  the conclusions you have expressed in your report?
21      A.  Those -- those opinions as they are
22  expressed and as they are discussed and as they

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

726

1  Physicians' Costs for Chemotherapy Drugs, November
2  1992 marked Exhibit Hartman 027 for
3  identification.)
4  BY MR. EDWARDS:
5      Q.  Dr. Hartman, I have asked the court
6  reporter to mark as Exhibit Hartman 027 a copy of
7  the OIG report on Physicians' Costs for
8  Chemotherapy  Drugs dated November 1992.
9          (Handing Exhibit Hartman 027 to the
10 witness.)
11     Q.  Do you have that report in front of you?
12     A.  I do.
13     Q.  And is this the report that you cite in
14 your declaration?
15     A.  I think that it is.
16         (Pause.)
17         (The witness viewing Exhibit
18 Hartman 027.)
19     A.  I am quite sure that it is.
20     Q.  I think you identify it in paragraph 22B
21 on page 16?
22     A.  Right. Yes. I think I -- I do.  I

727

1  don't cite it there, but I have cited it before,
2  so I think this is the same one. I mean I cite
3  it, but I don't have the full citation.  I know
4  there is always a number of these studies that
5  they put out, but this looks like the one.
6      Q.  And it is your testimony that this
7  report helped to inform market expectations as to
8  the relationship between ASP and AWP?
9      A.  It summarized what -- what those -- what
10 spreads were and helped inform that relationship,
11 yes.
12     Q.  And it helped inform the market
13 expectation that AWP is larger than ASP by a
14 reasonably predictable amount?
15     A.  For single-source physician-
16 administered drugs, it does -- it did, yes, as I
17 say in that paragraph.
18     Q.  Okay.  Why don't you take a look at page
19 2 of Exhibit Hartman 027.  I want to direct your
20 attention to the statement that appears at the top
21 of the page, quote, "Our results indicate that for
22 the physicians surveyed the 13 chemotherapy drugs

728

1  can be purchased at amounts below AWP and that AWP
2  is not a reliable indicator of the cost of a drug
3  to physicians."
4          Do you see that?
5      A.  I do.
6      Q.  Does that have any impact on your
7  opinion that the marketplace expected that AWP is
8  larger than ASP by a reasonably predictable
9  amount?
10     A.  By "mine," I take it you mean mine and
11 everyone else that I have cited as comporting with
12 my understanding.
13         What -- what is being summarized here,
14 it seems to me, is unfocused in that I think the -
15 - one needs to go to the actual data where the
16 amounts are cited, and that is provided in
17 Appendix III, where it lists the invoice costs
18 relative as a percentage of AWP, the invoice cost
19 for branded manufacturers and to oncology
20 wholesalers, and for single-source drugs, what you
21 see there is either under the branded
22 manufacturer, the oncology wholesalers, there is

729

1  for the single- source drugs, and that was what
2  I'm referring to in that particular paragraph, a
3  fairly -- a fairly tight relationship between AWP
4  and the invoices of the branded manufacturers of
5  the oncology wholesalers that ranges anywhere from
6  12, what I am seeing here, 12 to 20 percent.
7          Now there certainly are a few multi-
8  source drugs listed here where the AWP is --
9  varies more than that, and I'm assuming that is
10 probably what they're referring to, and what --
11 what I'm -- what I have said here is that I'm
12 looking at single-source drugs, and single-source
13 drugs were at the beginning of the 1990s, the
14 beginning of this damage period, certainly those
15 were the ones that were the most prevalent and
16 what -- what was informing people's opinions about
17 drug relationships, and I think with the drugs in
18 the class in my table 2, I think almost all of
19 them were single source in 1990, 1991, and 1992
20 when this was done.  They became -- several of
21 them became multi-source over the period.
22         But as Dr. Berndt has said, that the

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

730

1   information on the relationship of AWP and ASP for
2   multi-source physician- administered drugs is --
3   there has been little that really has helped make
4   that very clear, and here is some -- some
5   information, but it's -- it is mostly aimed at
6   some generic drugs, and even some of the generic
7   drugs fall within the -- within the 11 to 20
8   percent.  There is interferon is at 9 to 14
9   percent on the oncology.
10       So there are -- there are several multi-
11  source drugs where that relationship deviates from
12  what I am talking about here, but I have focused
13  this on single-source drugs, since that has been
14  the focus of much of the damage period in many of
15  the drugs.
16      Q.  Is it your testimony that a payer
17  reading this report would conclude that multi-
18  source drugs are different from single- source
19  drugs and there is not a predictable relationship
20  between AWP and ASP with respect to multi-source
21  drugs?
22      A.  It's -- it's my opinion that as to

731

1   physician-administered drugs, private sector
2   third-party payers for the most part look to
3   Medicare and how Medicare was developing its
4   relationships, and the Medpac report confirms that
5   reliance.
6        So there -- there is some limited
7   information, but in -- as in any kind of market,
8   there is -- pieces of information start to come to
9   light, but they don't -- they don't start to
10  affect expectations for a while.  These markets
11  are slow to respond to this, and you see the same
12  thing with the OIG studies of the relationship --
13  the spreads on self- administered drugs, generics
14  and branded, and they -- they weren't recognizing
15  until later in the '90s that the generic spreads
16  were that large.
17       So in answer to your question, there is
18  some information here, but it is, as far as I can
19  see from the contracts and everything else, this
20  did not affect what -- how Medicare was ending up
21  setting its reimbursement rates nor how third-
22  party payers were.  This was the beginning of an

732

1   understanding that finally culminated in say 2004
2   with the Medicare -- with the Prescription Drug
3   Modernization Act.
4        Q.  Well, are you saying that the
5   marketplace had a different expectation for multi-
6   source drugs than it had for single-source drugs?
7        A.  We're talking about physician-
8   administered drugs now; is that right?
9        Q.  Yes.
10       A.  I'm saying that for the -- for the focus
11  of third-party payers negotiating reimbursement
12  rates for different, whether it is for self-
13  administered drugs, whether they are working with
14  their PBMs, whether they are working with
15  providers for physician-administered drugs, that
16  physician-administered drugs was one of the
17  categories of costs that was the smallest speck on
18  the radar screen, and they paid little attention
19  to it, and this is -- this is corroborated or that
20  -- this opinion is certainly put forward by Dr.
21  Berndt, that drugs generally were not on the radar
22  screen.  Physician- administered drugs were a much

733

1   smaller part.  And multi-source were even a
2   smaller part of physician-administered drugs going
3   into the 1990s.
4        So this kind of information, it was
5   starting to pop up, but this was not shaping
6   general expectations as I see in contracts and in
7   revealed preferences from the sources that I have
8   cited.
9        Q.  I believe you testified that it is your
10  testimony that this report is one of the things
11  that informed the market expectations that you
12  found in your analysis; correct?
13       A.  For single-source physician-
14  administered drugs.
15       Q.  So your testimony that a payer reading
16  the language, quote, "AWP is not a reliable
17  indicator of the cost of a drug to physicians,"
18  close quote, would conclude that AWP is larger
19  than ASP by a reasonably predictable amount?
20       A.  It is my conclusion that anyone who was
21  a -- that the only person that would read this
22  report and read that one sentence would be --

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                          February 27, 2006
Boston, MA

730

1  information on the relationship of AWP and ASP for
2  multi-source physician- administered drugs is --
3  there has been little that really has helped make
4  that very clear, and here is some -- some
5  information, but it's -- it is mostly aimed at
6  some generic drugs, and even some of the generic
7  drugs fall within the -- within the 11 to 20
8  percent.  There is interferon is at 9 to 14
9  percent on the oncology.
10      So there are -- there are several multi-
11  source drugs where that relationship deviates from
12  what I am talking about here, but I have focused
13  this on single-source drugs, since that has been
14  the focus of much of the damage period in many of
15  the drugs.
16      Q.  Is it your testimony that a payer
17  reading this report would conclude that multi-
18  source drugs and there is not a predictable relationship
19  drugs and there is not a predictable relationship
20  between AWP and ASP with respect to multi-source
21  drugs?
22      A.  It's -- it's my opinion that as to

731

1  physician-administered drugs, private sector
2  third-party payers for the most part look to
3  Medicare and how Medicare was developing its
4  relationships, and the Medpac report confirms that
5  reliance.
6      So there -- there is some limited
7  information, but in -- as in any kind of market,
8  there is -- pieces of information start to come to
9  light, but they don't -- they don't start to
10  affect expectations for a while.  These markets
11  are slow to respond to this, and you see the same
12  thing with the OIG studies of the relationship --
13  the spreads on self- administered drugs, generics
14  and branded, and they -- they weren't recognizing
15  until later in the '90s that the generic spreads
16  were that large.
17      So in answer to your question, there is
18  some information here, but it is, as far as I can
19  see from the contracts and everything else, this
20  did not affect what -- how Medicare was ending up
21  setting its reimbursement rates nor how third-
22  party payers were.  This was the beginning of an

732

1  understanding that finally culminated in say 2004
2  with the Medicare -- with the Prescription Drug
3  Modernization Act.
4      Q.  Well, are you saying that the
5  marketplace had a different expectation for multi-
6  source drugs than it had for single-source drugs?
7      A.  We're talking about physician-
8  administered drugs now; is that right?
9      Q.  Yes.
10      A.  I'm saying that for the -- for the focus
11  of third-party payers negotiating reimbursement
12  rates for different, whether it is for self-
13  administered drugs, whether they are working with
14  their PBMs, whether they are working with
15  providers for physician-administered drugs, that
16  physician-administered drugs was one of the
17  categories of costs that was the smallest speck on
18  the radar screen, and they paid little attention
19  to it, and this is -- this is corroborated or that
20  -- this opinion is certainly put forward by Dr.
21  Berndt, that drugs generally were not on the radar
22  screen.  Physician- administered drugs were a much

733

1  smaller part.  And multi-source were even a
2  smaller part of physician-administered drugs going
3  into the 1990s.
4      So this kind of information, it was
5  starting to pop up, but this was not shaping
6  general expectations as I see in contracts and in
7  revealed preferences from the sources that I have
8  cited.
9      Q.  I believe you testified that it is your
10  testimony that this report is one of the things
11  that informed the market expectations that you
12  found in your analysis; correct?
13      A.  For single-source physician-
14  administered drugs.
15      Q.  So your testimony that a payer reading
16  the language, quote, "AWP is not a reliable
17  indicator of the cost of a drug to physicians,"
18  close quote, would conclude that AWP is larger
19  than ASP by a reasonably predictable amount?
20      A.  It is my conclusion that anyone who was
21  a -- that the only person that would read this
22  report and read that one sentence would be --

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

734

1   would be a lawyer trying to make a point.
2         This -- someone reading this report
3   would take -- and someone who is focusing on what
4   payers are thinking about, what is going on -- is
5   going to read the whole report, and if it is 1992
6   and I'm looking at this and I look at all the
7   drugs in our class -- and I am willing to bet that
8   almost all of them were single source in 1991-'92
9   -- I have got it in a footnote, we can check that,
10  but certainly almost all of them were -- someone
11  looking at this would say ah-ha, you know, in the
12  early '90s physician-administered drugs, a lot of
13  them had not gone generic yet. They were single
14  source. A few did.
15        What am I looking at here? I am reading
16  the whole thing. I am looking at single- source
17  drugs. Well, this characterizes most of what I'm
18  getting in my claims, and I am looking at what
19  relationships are, and I'm -- that's what I'm
20  seeing.
21     Q.  Do you have any factual basis for
22  concluding that only a lawyer would read the

735

1   language that I quoted and a payer would not?
2      A.  Well, if a payer went to a report and
3   read one line and read nothing more, then whoever
4   is in charge of doing -- designing reimbursement
5   rates should be fired, because that's -- you don't
6   read one sentence. You need to know the full
7   context of what is going on and what the
8   implications are. You don't -- you don't -- the
9   people that are doing this stuff and designing
10  reimbursement rates do more than read one line in
11  a report.
12     Q.  Do you think a payer would read the
13  conclusions to this report?
14     A.  I think the payer would read the whole
15  report.
16     Q.  Well, take a look at the conclusions
17  which appear on page 11.
18        (Witness complying.)
19     Q.  The second bullet point is, quote, "AWP
20  is not a reliable indicator of the cost of a drug
21  to physicians," close quote.
22        Is it your testimony that a payer would

736

1   read that statement and conclude that AWP is
2   larger than ASP by a reasonably predictable
3   amount?
4      A.  I would -- if -- if a payer came and
5   read -- read the first sentence that you read, and
6   then read the conclusion in that bullet, and read
7   no more than that, then that's what -- then that's
8   -- then that -- then that's grounds for
9   incompetence in reimbursement design, and it -- I
10  -- it's -- it would reflect that, you know, the
11  people that are doing this kind of reimbursement
12  design are nerds like me. They go to the data. And
13  if one looks at the single-source drugs here, that
14  is where they would look at. Oh, they would say,
15  "Here is what they mean by not a reasonable guide.
16  It is a few multi-source that are really not on
17  our radar screen."
18     Q.  Are you saying that OIG didn't know what
19  it was talking about when it made that statement?
20     A.  I am saying if I am characterizing this
21  table as a whole and trying to generalize that,
22  that for all of these drugs, speaking very

737

1   broadly, that when you include multi-source and
2   branded physician-administered drugs in the same
3   way as when you do that with self- administered
4   drugs, there is -- there is -- there is wide
5   variation between AWP and ASP.
6         But one would look at that then, and get
7   -- would look -- would start at that point and
8   then start to peel back the onion and look at the
9   details and see where it was appropriate or not.
10     Q.  So are you saying that you can't always
11  rely on OIG's conclusions? You have to look at
12  the details?
13     A.  I am saying that anyone attempting to
14  understand the results of a survey wants to look
15  at -- you will -- someone who is doing a survey,
16  you will look at the results and you will look at
17  the details. You will look at -- you will look at
18  all aspects of it that you can in order to be as
19  informed as you can.
20     Q.  Let's take a look at Appendix III to
21  this report, and I want to direct your attention
22  to the last sentence on the page where it states,

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

738

1    quote, "Considering that we also found that there
2    is no single discount rate which can be applied to
3    the AWP to provide a reasonably consistent
4    estimate of physicians' acquisition cost, we do
5    not feel that AWP provides a useful measure of the
6    acquisition cost for a drug to physicians."
7          Is it your testimony that a payer
8    reading that statement would nevertheless conclude
9    that AWP is larger than ASP by a reasonably
10   predictable amount?
11        A.  It is again the drug you're pointing to
12   is one of the multi-source drugs.  It is
13   methotrexate sodium.  And we find that there is -
14   - there is much greater variation in the multi-
15   source drugs, and -- I've -- I've -- I haven't
16   used those for that purpose.  The data on
17   characterizing a relationship between AWP and ASP
18   for multi-source drugs is -- that kind of survey
19   information is much more spotty, as has been
20   recognized by Dr. Berndt and as I cite in my
21   report, and so, you know, this is just summarizing
22   the same thing.

739

1         Q.  Isn't it a fact, Dr. Hartman, that a
2    number of payers have testified to exactly what is
3    stated in this OIG report, that they understood
4    that there was no reasonably predictable
5    relationship between AWP and ASP?
6          MR. SOBOL:  Objection to the form.
7          A.  Well, I know that --
8          MR. SOBOL:  Objection to the form.
9          THE WITNESS:  That was a double
10   objection.
11        MR. SOBOL:  Sorry.
12        A.  There were a variety of depositions of
13   payers that I reviewed, well, that were put
14   forward by Mr. Young and Dr. Gaier that purported
15   to demonstrate that payers didn't rely on AWP,
16   that they had -- that they didn't give a damn
17   about what the acquisition cost was, and there --
18   and stated a variety of things, and I have -- I
19   have responded to -- to a large group of those in
20   my rebuttal -- two rebuttal reports.  I would have
21   to see whether what you are going to put in front
22   of me is one of those quotes.

740

1         But again, a quote from a deponent, I
2    would have to see what the full context was, what
3    that person knew, whether that person was really
4    the person that was in charge of reviewing data
5    and understanding what acquisition costs were and
6    setting reimbursement rates.  But given those
7    caveats, I would be glad to read any depositions
8    you want to put in front of me.
9          MR. EDWARDS:  Well, let's mark as
10   Exhibit Hartman 028 to this deposition a copy of
11   the transcript of Mickie Brown.
12         THE WITNESS:  Are we done with this one?
13   Can I give this one back to you, the OIG?
14         MR. EDWARDS:  You can put that one down.
15         (Deposition transcript of Mickie
16   Brown taken March 9, 2005 marked Exhibit Hartman
17   028 for identification.)
18   BY MR. EDWARDS:
19        Q.  I want to direct your attention to page
20   126 of the deposition.
21        A.  Could you tell me who Mickie Brown is?
22        Q.  I believe he was with Blue Cross/Blue

741

1    Shield of Mississippi.
2         A.  And could you tell me what his job was
3    there?  Where does it describe what he is doing
4    there?
5         Q.  I don't have that information at my
6    fingertips.  I take it you're not aware of the
7    answer to that either; is that correct?
8         A.  Without -- I mean I may have looked at
9    this in my rebuttal stage, but I don't remember
10   precisely, so I am seeing Blue Cross of
11   Mississippi on page 9, he left in '96.
12        Q.  I take it you have never read this
13   deposition; is that correct?
14        A.  I don't recall whether I have or not.
15        Q.  I believe on page 16 he testifies that
16   he is the director of provider networks, but I
17   want to direct your attention to the testimony
18   that begins at line 20 on page 126.  Do you have
19   that?
20        A.  Let me turn to that.  Line?  I am sorry.
21   What page?  I am sorry.  I didn't hear the page.
22        Q.  Page 126, line 20.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

742

1          (Witness complying.)
2      A.  Okay.
3      Q.  "Question:  Well, certainly we can agree
4    that the AWP for any given drug bears no fixed
5    relationship to acquisition cost for that drug;
6    correct?
7          "Answer:  As I have said before, I don't
8    know where average wholesale price comes from, so
9    the relationship of average wholesale price to
10   acquisition cost is not something that I'm
11   familiar with, so I don't know how I can agree or
12   disagree with your statement.
13       "Question:  Then it is certainly fair to
14   say that you have no particular expectation that
15   there will be a fixed relationship between AWP and
16   acquisition cost?
17       "Answer:  Average wholesale price is a
18   point of reference that we use. Its relation to
19   acquisition cost, I'm not familiar with, so I mean
20   I don't have an expectation -- I don't have an
21   expectation one way or the other on that."
22       How do you reconcile that testimony with

743

1    your opinion that payers have expected that AWP is
2    larger than ASP by a reasonably predictable
3    amount?
4        MR. SOBOL:  Objection to the form.
5      A.  My conclusion and those of the other
6    persons cited in my report that there is a
7    reasonable expectation characterizes the market as
8    a whole. You are going to have market entities
9    out there that are -- are unaware of a
10   relationship and essentially are going to follow
11   in terms of negotiating an acquisition cost -- I
12   am sorry -- a reimbursement rate, they're going to
13   follow some rule of thumb, percentage off AWP, and
14   these are precisely -- these -- the -- those
15   payers and those payers designing reimbursement
16   rates for third-party payers that actually have no
17   understanding of this relationship are at the
18   mercy of, one, what the market expectation --
19   well, they are unaware of what the market
20   expectations are, but these are precisely the
21   payers that are most easily gouged by the alleged
22   fraud, because they have no idea. They are just -

744

1    - they just -- they assume, well, AWP is what
2    Medicare is using. 95 percent of AWP. I'm --
3    that seems to be what the government is doing.
4    They must know what they are doing.
5        So there is going to be people with no
6    expectations. It is like someone walking into a
7    car dealer and seeing what the sticker price is
8    and saying, "Well, okay, I will take it at that,
9    I'm not going to negotiate it with you," doesn't
10   look up on Carfacts, doesn't do any research. I
11   read this as an uninformed payer that -- this
12   doesn't mean that there is not a set of
13   relationships that inform the market. This just
14   means that there is one person that is not aware
15   of it.
16       MR. EDWARDS:  I will mark as Exhibit
17   Hartman 029 a copy of the deposition transcript of
18   Thomas E. Greenbaum taken on January 14, 2005.
19       (Deposition transcript of Thomas E.
20   Greenbaum taken on January 14, 2005 marked Exhibit
21   Hartman 029 for identification.)
22     A.  You know, I would like to follow up with

745

1    just one further response on this previous
2    exhibit.
3        You know, the -- it says that he is
4    currently director of provider networks, but again
5    we are pulling out -- you are pulling out one page
6    of this fellow's deposition. I have no idea
7    whether this is the person, you know, someone who
8    is director of provider relationships, or provider
9    networks, whether he is the person doing the
10   negotiations. This doesn't really tell me what
11   this entity, this payer, you know, unless I know
12   this is the guy that is negotiating, you know,
13   there is many a management person that is sitting
14   there director of something and the details are
15   left to somebody else.
16       So in addition to this person, whether
17   he knew or not and whether he was being gouged or
18   not, he may not be -- they may have a very good
19   idea, this entity, of what the acquisition cost
20   is. This person doesn't (pointing to Exhibit
21   Hartman 028). He may not be the person who is
22   going to know anything about that.

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

---

746

1      Q.  Do you know how Mr. Brown was chosen as
2   a witness?
3      A.  My guess would be that he was designated
4   in response to a 30(b)6 that said, "We would like
5   to speak to somebody who knows about reimbursement
6   rates."
7      Q.  It says, "Please produce the person most
8   knowledgeable about this subject."
9      A.  Um-hmm.
10      Q.  Is that consistent with your
11   understanding?
12      A.  I have not --
13      MR. SOBOL:  Objection to the form of the
14   question.
15      THE WITNESS:  Yes.
16      A.  I have not seen -- I have -- I have been
17   on the requesting end of many 30(b)(6)s where I
18   have asked for a person in that context and gotten
19   someone who didn't know what it was, but I -- I
20   would assume you have asked for somebody who did
21   know.
22      I don't know whether this person -- I

---

747

1   don't -- I would have to read this fully to
2   establish his bona fides to establish whether he
3   really does know.
4      Q.  Blue Cross/Blue Shield of Mississippi is
5   a class member in this case; correct?
6      A.  I would assume so.
7      Q.  These are the people that Mr. Sobol
8   represents; correct?
9      A.  The -- Mr. Sobol represents the third-
10   party payers and the beneficiaries, the class as
11   it is defined.
12      Q.  They are the people who are alleging
13   that these defendants should be held liable and
14   should be required to pay money; correct?
15      A.  They are -- they are one of the -- one
16   of the subclasses.  They are subclass 2 and part
17   of subclass 3.  They are not in subclass 1.
18      Q.  So it is certainly not in their interest
19   to bend over backwards to help the defendants
20   here; correct?
21      MR. SOBOL:  Objection to the form.
22      A.  I'm -- it is certainly reasonable to

---

748

1   believe that whomever they would produce it would
2   be somebody who would help in this particular --
3   help in understanding an area where they are a
4   stakeholder.  I don't know whether they have or
5   not.  I -- that --
6      Q.  I want you to take a look at the
7   transcript of the deposition of Thomas Greenbaum,
8   which we have marked as Exhibit Hartman 029.
9      (Handing Exhibit Hartman 029 to the
10   witness.)
11      Q.  He is from Cigna.  Cigna is a large,
12   sophisticated payer; is that correct?
13      A.  They are a -- they are a large payer.
14   That's true.
15      Q.  I want to direct your attention to the
16   testimony that begins at line 12 on page 75.
17      A.  You know, before I get directed to any
18   testimony, I just want to see who this person is
19   besides his name.
20      (Pause.)
21      (The witness viewing Exhibit
22   Hartman 029.)

---

749

1      Q.  Take a look at page 6, line 9.  "I'm the
2   chief operating officer of CIGNA pharmacy."
3      A.  Okay.  I just want to look at kind of
4   his background a bit here.
5      (Pause.)
6      (The witness viewing Exhibit
7   Hartman 029.)
8      A.  So this is -- I mean I am looking at a
9   little bit more of his background, and it -- it
10   sounds like Brownie of FEMA.  I mean I go to the
11   bottom of page 8, and it says -- or I am sorry --
12   of 6 and 7 -- "Can you tell me in broad terms
13   prior to coming to Cigna three years ago about
14   your employment background?"
15      "I worked as a general manager of the
16   Book of the Month Club.  Prior to that I was chief
17   operating officer of Marvel Entertainment and
18   prior to that I worked for an entertainment
19   products company in Wisconsin."
20      So it would be correct to say that prior
21   to coming to Cigna three years ago you had not
22   previously worked in the healthcare insurance

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

750

1   industry; is that true?
2        Okay.  So conditioning that on that
3   person's understanding of this industry, what is
4   it that you want me to look at?
5        Q.  Well, when you compare this person to
6   Brownie of FEMA, what did you have in mind?  Are
7   you trying to infer that this person is somehow
8   incompetent?
9        A.  No.  I am saying that as with, I think,
10  Mr. Brown's bona fides were that he had been head
11  of the Arabian Horse Society prior to being placed
12  as head of FEMA, and that that experience did not
13  give him a nuanced deep understanding of what was
14  necessary for the job into which he was placed,
15  and I -- so I look at this, and I see that someone
16  does not have a -- I mean he is the COO of Cigna,
17  but I'm not seeing a long history of understanding
18  the nuances of all that is -- Cigna is a big
19  company, and it is doing -- it is doing
20  reimbursement for physicians and for hospitals, it
21  is doing all kinds of information management, and
22  along with prescription reimbursement and

751

1   reimbursement for physician- administered drugs,
2   and I just wanted to see what -- this is a
3   background that doesn't argue a nuanced deep
4   understanding to me, but, and I just wanted to get
5   that in the record. I just wanted to know what his
6   background was.
7        Q.  Well, is it your testimony that to the
8   extent that any payer claims it was injured here
9   it is because they were not competent, like
10  Brownie here?
11       A.  No.  It is my testimony that there --
12  there were -- there were expectations in the
13  market, and there were -- that -- that essentially
14  those expectations that developed in the late
15  '80s, early '90s, relative to these particular
16  drugs, physician-administered drugs, and the
17  relationship of AWP to acquisition costs of the
18  providers was set in Medicare's mind and in third-
19  party payers' minds in the early '90s, and they
20  changed very slowly, and people weren't aware,
21  weren't aware of all of that.
22       And so the -- it is -- it is very easy

752

1   for even knowledgeable third- party payers that
2   haven't -- are not paying attention to this one
3   particular aspect of things, where this is an area
4   that can be abused easily by manufacturers, as we
5   see in the Vincasar matter that I cited earlier in
6   my report in the paragraph that quotes Medpac or
7   that were exploited in the Lupron matter. These
8   were -- these were drugs that were low on the
9   reimbursement rates that were low on the radar
10  screen in Professor Berndt's nomenclature, and so
11  someone that is relatively well informed would not
12  notice the abuse of this spread, and certainly
13  someone who has little background in it is easily
14  duped or could be -- the alleged fraud would be
15  particularly easy to impose upon someone -- a
16  payer like this if this is the person negotiating
17  reimbursement rates.
18       Q.  So it is your testimony that Cigna was
19  duped?
20       A.  It is my testimony as I read -- you have
21  put a deposition in front of me.  I am looking at
22  the background of the person, because you are

753

1   asking me a question about what he knew, and I am
2   looking at his background, and I see that his
3   background suggests to me that he hasn't spent a
4   lot of time studying this market to know that
5   much, and that's all I am saying.
6        And so --
7        Q.  Take a look at page 75 beginning at line
8   12.
9        (Witness complying.)
10       Q.  And this is part of a question:
11       "Would the same statement that you just
12  made hold true for the actual acquisition cost,
13  that Cigna does not have an expectation of a
14  relationship between average wholesale price or
15  actual acquisition cost but in fact those are two
16  separate pieces?"
17       And then there are a series of
18  objections.
19       "Answer:  Yeah.  I mean I think that our
20  acquisition costs are separate from AWP, and we
21  don't have any expectations of what the
22  relationship is between what we purchase the drug

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

754

1   for and what AWP is."
2       Now given that testimony, do you think
3   that your opinion that payers have expected that
4   AWP is larger than ASP by a reasonably predictable
5   amount simply doesn't apply to Cigna?
6       MR. SOBOL: Objection to the form.
7       A.  I'm saying -- I am saying that the
8   expectations that I have framed and analyzed and
9   put forward in my report summarize the market as a
10  whole for those -- for those groups who have been
11  surveyed, for those payers for which contracts
12  have been negotiated, and there are going to be --
13  I would like to see Cigna's contracts with -- with
14  -- with an oncology group to see what was actually
15  negotiated.
16      The -- you know, I am seeing -- I am
17  sorry. I was trying to see whose all of these
18  names here were.
19      This is a person who I would assume when
20  negotiating contracts -- this is a senior person
21  that is not close to those details given his
22  background and given the response.

755

1       So this -- this is again -- has no
2   evidentiary value that I see really even about
3   what Cigna was doing or what Cigna knew.
4       Q.  So are you saying that when you
5   summarize expectations in the marketplace you
6   ignore all evidence that is contrary to your
7   hypothesis?
8       MR. SOBOL: Objection to the form.
9       A.  No. I seek evidence wherever I can get
10  evidence of someone knowledgeable about what it is
11  I'm analyzing, and from what I see here, this
12  deponent has little credibility as to an
13  understanding of what expectations were, relations
14  were, period.
15      Q.  I want to show you the deposition of
16  Jill Herbold taken January 14, 2005, which I will
17  mark as Exhibit Hartman 030.
18      (Deposition transcript of Jill A.
19  Herbold taken on January 14, 2005 marked Exhibit
20  Hartman 030 for identification.)
21      MR. EDWARDS: And I apologize to anybody
22  who might listen to the audio of this deposition

756

1   for constantly coughing on the record. I just
2   can't help it.
3       THE WITNESS: Can I offer you a Halls?
4       MR. EDWARDS: Maybe at the break.
5   BY MR. EDWARDS:
6       Q.  You said --
7       A.  Could I just take a second, if you would
8   bear with me?
9       (Pause.)
10      (The witness viewing prior
11  exhibit.)
12      A.  I just want to review one of the prior
13  exhibits that you had put before me.
14      (Further pause.)
15      (The witness continues to view
16  prior exhibits.)
17      A.  Okay. I am sorry.
18      Q.  Now you testified a moment ago when I
19  was asking you questions about Mr. Greenbaum that
20  you would like to see Cigna's contracts in order
21  to evaluate his testimony about the relationship
22  between AWP and ASP; correct?

757

1       A.  And I -- I think you have been very good
2   in finding me a person who might help in that
3   regard.
4       I did say that. Yes.
5       Q.  I take it you have never asked
6   plaintiffs' counsel to provide you with copies of
7   Cigna's contracts, have you?
8       A.  I have asked for contracts, and I forget
9   what was provided. It is my recollection that we
10  did not receive -- I did not receive a lot of
11  contracts. I certainly relied on some contracts
12  that were put forward by Mr. Young, but I did ask
13  for contracts. I didn't -- I don't think I
14  received any, but I would have to look. I can't
15  recall.
16      Q.  Well, you identify contracts for
17  physician-administered drugs that you rely on in
18  attachment C --
19      A.  I do, yes.
20      Q.  -- to your declaration; correct?
21      A.  That's correct.
22      Q.  And basically you identified four

Henderson Legal Services
(202) 220-4158