Raymond S. Hartman, Ph.D. CONFIDENTIAL                February 27, 2006
Boston, MA

**758**

1    contracts; correct?
2        A.  And I think those four contracts were
3    ones that I was able to get from defendants.
4        Q.  None of those are Cigna contracts;
5    correct?
6        A.  I would assume not, but I -- I am trying
7    to think whether --
8            (Pause.)
9            (The witness viewing Exhibit
10   Hartman 023.)
11       A.  -- in my rebuttal reports I had seen
12   Cigna contracts, but that is something I can
13   check.
14       Q.  Okay.  Let's go back to Ms. Herbold's
15   deposition.  She is also with Cigna; correct?
16       A.  Yes.  It appears that as far as I can
17   tell she is responsible for strategy and policy as
18   well as financial analysis for practitioner
19   reimbursement, and so she is an assistant VP
20   practitioner reimbursements.  She has been that
21   since 2004, so she has been doing that job since
22   fairly recently, and --

**759**

1        Q.  I want to direct your attention to page
2    21 of this deposition beginning at line 8.
3            (Witness complying.)
4        Q.  "Question:  Can you tell me the range
5    below AWP that these rates and the Cigna national
6    standard injectable reimbursement rate was varied?
7            "Answer:  Typically 15 percent.  We have
8    codes that are up to 45 percent below AWP."
9            Do you see that?
10       A.  I do.
11       Q.  So Cigna's contracts do not fall within
12   the plus or minus 15 percent of AWP range on which
13   you premise your report; correct?
14           MR. SOBOL:  Objection to form.
15       A.  Well, certainly their typical contract
16   does.  Now they claim they have codes up to 45
17   percent below AWP, and I would assume that is for
18   a multi-source, and I would have to -- I would
19   have to -- as to typicality, I see 15 percent.  As
20   to whether -- how much of an exception 45 percent
21   is, and this is again as of 2004, and there
22   certainly have been more multi-source drugs

**760**

1    recently, in the last five years of the physician
2    administered, so I would assume that that applies
3    to multi-source.
4        Q.  So that would be another example of
5    payer expectation with respect to multi-source
6    differing from the expectation with respect to
7    single source?
8        A.  This is one piece of evidence regarding
9    as of 2004 what a relationship would be for a
10   multi-source product.
11       Q.  Next I want to show you the transcript
12   of the deposition of Joe Spahn taken November 30,
13   2004.
14           MR. EDWARDS:  This will be Exhibit
15   Hartman 031.
16           (Deposition transcript of Joe Spahn
17   taken on November 30, 2004 marked Exhibit Hartman
18   031 for identification.)
19           (Handing Exhibit Hartman 031 to the
20   witness.)
21   BY MR. EDWARDS:
22       Q.  Mr. Spahn is with Anthem.  Do you know

**761**

1    what Anthem is?
2        A.  It is my recollection that Anthem is a
3    Blue Cross/Blue Shield, but I would have to
4    confirm that.  Oh, yes.  There it is.  Anthem Blue
5    Cross/Blue Shield.
6        Q.  Anthem is an amalgamation of a number of
7    Blue Cross/Blue Shield entities; correct?
8        A.  That -- it's -- I think that's correct.
9    I don't know how many, and I would have to confirm
10   that.
11       Q.  Do you know whether Anthem is at this
12   point the largest payer in the country?
13       A.  As of today, you mean?
14       Q.  Yes.
15       A.  I don't know.
16       Q.  What I want to do is direct your
17   attention to the testimony that begins at page 93,
18   line 6.
19           "Question:  Now you testified earlier
20   that Anthem has -- does not know exactly what
21   providers are paying to acquire drugs; correct?
22           "Answer:  Correct.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

---

762

1     "Question: That is not something that -
2     - withdraw that.
3           "Anthem does not require providers to
4     disclose their acquisition cost for drugs as part
5     of their contracts with those providers; correct?
6           "Answer: Correct.
7           "Question: So providers' acquisition
8     costs for drugs do not form part of Anthem's
9     determination of what it will reimburse them in
10    relation to drugs?
11          "Answer: Correct.
12          "Question: The reimbursement is driven
13    entirely by the fee schedule?
14          "Answer: Correct.
15          "Question: Regardless of what the
16    specific providers' acquisition cost for those
17    drugs may be?
18          "Answer: Correct.
19          "So if, for example, Anthem were to
20    learn that a particular provider were getting a
21    discount or a rebate on a particular drug that
22    lowered his acquisition cost for that drug, that

---

763

1     wouldn't change the amount that Anthem is
2     reimbursing that practice in relation to that
3     drug; right?
4           "Answer: No.
5           "Because the reimbursement amount is
6     tied to the fee schedule?
7           "Answer: Right.
8           "Question: And if Anthem were to learn
9     that providers in a region were getting a discount
10    or rebate from a drug manufacturer in relation to
11    a particular drug, again that wouldn't change the
12    amount that Anthem reimburses because that is tied
13    to the fee schedule?
14          "Answer: That's correct.
15          And then continuing on page 97,
16    beginning with line 17, "Prior" -- question:
17          "Prior to the break, we were talking
18    about providers' acquisition cost and the fact
19    that they are not relevant to Anthem's
20    reimbursement amounts. Do you recall that
21    testimony?
22          "Answer: Yes.

---

764

1     "Question: Okay. And part of that was
2     that Anthem has no information about the
3     providers' acquisition costs? Right?
4           "Answer: Correct.
5           "Question: So it is fair to say that
6     Anthem has no particular expectation that
7     providers' costs would be, you know, 10 percent,
8     30 percent, 50 percent, something more, something
9     less than the amount they're reimbursed in
10    relation to those drugs? Right?
11          "Answer: Yes."
12          Now based on that testimony, would it be
13    fair to say that your opinion that payers have
14    expected that AWP is larger than ASP by a
15    reasonably predictable amount would not apply to
16    Anthem?
17       A.  What this says to me is what occurred
18    over the '90s and into the early 2000s, and that
19    is that there were a set of expectations going
20    into that period of time of what the relationship
21    was, and that formed expectations as cited by Mr.
22    Young as laid out in the 1992 OIG report for

---

765

1     single-source drugs, as reflected in contracts
2     that were negotiated over this entire period of
3     time, and what was also the discussions that were
4     going on Congressionally about Medicare. That
5     there were expectations in place that governed
6     reimbursement of both Medicare and third-party
7     payers looked to Medicare and discounts off of AWP
8     and how they reimbursed. There was a growing
9     awareness with both the legal action and once
10    managed healthcare dealt with some of the larger
11    cost issues, like hospitalization and physician
12    costs, they started focusing on issues about
13    prescription drugs and then physician-
14    administered drugs.
15          And this says to me that Anthem, going
16    into this, that they didn't -- they don't have the
17    information they need to know more than relying on
18    the general kinds of rules of thumb that have
19    characterized this market and that has been able
20    to be abused by the manufacturers, and so they
21    have locked into a computer system and a
22    reimbursement system a set of AWPs and

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL          February 27, 2006
Boston, MA

766

1  reimbursements off of AWPs, and I know there are
2  private third-party payers that are starting to
3  evaluate this kind of issue now and starting to
4  learn that there is a bigger gap than they
5  thought, but this is something that is only
6  recent, and it hasn't been -- this is precisely
7  why this has been a lucrative area to exploit by
8  the kind of behavior that is alleged on the part
9  of manufacturers.
10      Q.  If you look at pages 8 and 9 of this
11  deposition, you will see that Mr. Spahn testifies
12  that he has served as senior healthcare consultant
13  to Anthem since 1992.  Do you see that?
14      A.  I do.
15      Q.  And he doesn't say in the testimony that
16  we just read that his views of this matter have
17  changed over the period of time since 1992 to the
18  present, does he?
19      A.  He -- you are asking -- there is --
20  there is -- there is hundreds -- there is 174
21  pages of deposition here, and for -- I'm not going
22  to attempt to characterize that particular set of

767

1  quotes.
2          What page was that again?  Oh, here we
3  go.
4      Q.  The quotes we read were from --
5      A.  No.  I see it.  I have got it.
6      Q.  -- I think 93 to 97.
7      A.  The quotes?
8      Q.  Or 98.  Pages 93 to 98.
9      A.  Okay.  I thought -- yes.  Not years.
10  Yes.  I mean I am -- I am -- I would
11  assume that as of now, 2004-2005- 2006, that these
12  -- that providers are beginning to realize that
13  these expectations, the expectations that they
14  have relied on to write their contracts, that is
15  reflected in all of the testimony that I have
16  cited and the surveys that I have cited and what
17  the Judge has relied on, reflected a period of
18  time where the spreads have obviously been
19  exploited in very dramatic fashion, as recognized
20  by Dr. Berndt, and payers are beginning to say,
21  you know, there is something -- we need to be
22  thinking about acquisition costs.  I don't know

768

1  what it is right now, and because our systems of
2  reimbursement are hard wired to AWP, I don't know
3  what it is.  We can't work with that.  But I know
4  that third-party payers are beginning to try to,
5  precisely because they -- the extent of the
6  problems alleged in this matter are becoming
7  clear.
8      Q.  What is the basis for your testimony
9  that Mr. Spahn's expectations have changed since
10  1992?
11      MR. SOBOL:  Objection to the form.
12      A.  I didn't say Mr. Spahn's.  I am saying
13  that the -- as a -- as a matter of information,
14  that is -- that is compelling, we have talked
15  about this 1992 OIG report that the -- how much
16  that was disseminated as to the multi-source
17  spreads is unclear -- is unclear to me, but what
18  is clear and has become clear, as I have said in
19  paragraph 53A, and these are events where we have
20  had the Lupron behavior becoming known, that was
21  behavior going on in the '90s, and exploiting
22  understandings of reimbursement in the '90s, and

769

1  it became clear in 2000 -- with the litigation,
2  and then with the settlement agreement with 2001,
3  the sentencing memorandum, there were hearings
4  before the House Energy Subcommittee, and if you
5  will give me leeway to find one more.
6          (Pause.)
7          (The witness viewing Exhibit
8  Hartman 023.)
9      Q.  Would you agree with me that --
10      A.  I would like to get just this one last
11  statement in the record, if I could.
12          (Further pause.)
13          (The witness continues to view
14  Exhibit Hartman 023.)
15      A.  And there is probably a time limit at
16  some point.
17      MR. EDWARDS:  While you are looking, why
18  don't I have the reporter mark the next deposition
19  exhibit, which is Exhibit Hartman 032.
20          (Deposition transcript of Edward
21  Lemke taken on January 11, 2005 marked Exhibit
22  Hartman 032 for identification.)

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

---

770

1      THE WITNESS:  Yes.  I can't find it.
2      MR. EDWARDS:  It is the deposition of
3  Edward Lemke, taken on January 11, 2005.
4      THE WITNESS:  Oh, wait.  I found it.  It
5  is also the quote put forward by Dr. Berndt at
6  page 42 of his report where again he is stating
7  fairly recent understandings, and he says, this is
8  in footnote 12, he says, "In a different industry
9  publication, an executive of Advanced PCS reports
10  that in his experience health plans become
11  flabbergasted on what they are paying for years on
12  drugs on the medical side because of dramatic
13  price markups."
14      So this is again another summary of a
15  recent understanding of what has occurred over the
16  period of the '90s.
17      Q.  Take a look at the deposition of Edward
18  Lemke of Humana, which we have marked as Exhibit
19  Hartman 032.
20      (Handing Exhibit Hartman 032 to the
21  witness.)
22      Q.  Have you read this deposition before?

---

771

1      A.  I think I -- I think I have seen parts
2  of it.  I think in terms of reviewing defendants'
3  experts, I had read part of this, but I can't
4  recall.
5      Q.  I just want to direct your attention --
6      A.  I am sorry.  I just want to find out who
7  this person is before we --
8      Q.  You may want to look at page 18, where
9  Mr. Lemke states that he is director of fee
10  schedule management for Humana.
11      (Witness complying.)
12      A.  Okay.  Humana.  Okay.
13      Q.  Let me ask you to look at page 123,
14  beginning at line 17.
15      (Witness complying.)
16      Q.  "Question:  Is it Humana's expectation
17  that the amounts that providers pay to acquire
18  drugs are a fixed percentage less than the amount
19  Humana reimburses in relation to those drugs?
20      "Answer:  The expectation that first of
21  all that it's fixed, no.  The expectation that
22  good business practice, and assuming providers

---

772

1  that we do business with practice good business
2  practices, is that they would only accept payment
3  that is at or above their costs."
4      A.  I --
5      Q.  "That is my only expectation --"
6      A.  Counsel, I am sorry.  I missed the -- I
7  thought I had the page, and I have been looking
8  for the words.  Could you tell me?
9      Q.  Sure.
10      A.  Just start me.
11      Q.  It starts at 123.
12      A.  Page 123, okay.
13      Q.  Line 17.
14      A.  Okay.  I am sorry.
15      Q.  And what I just read you is line 17 on
16  page 123 through line 4 on page 124.
17      A.  Okay.
18      (Pause.)
19      (The witness viewing Exhibit
20  Hartman 032.)
21      Q.  Where he says it is his only expectation
22  that they would want payment at or above their

---

773

1  costs.
2      And then continuing on:
3      "Question:  And certainly you have no
4  fixed expectation as to how much higher it would
5  be than their acquisition cost; correct?
6      "Answer:  Correct.
7      "Question:  And indeed that would vary
8  from provider to provider depending on what they
9  paid to acquire drugs and what Humana reimburses
10  them for drugs?
11      "Answer:  Correct.
12      "Question:  The percentage could be 10
13  percent in one case, 50 in another, 100 in
14  another; correct?
15      "Answer:  Could be."
16      Now, Dr. Hartman, is it fair to say that
17  your conclusion that payers have expected that AWP
18  is larger than ASP by a reasonably predictable
19  amount does not apply to Humana?
20      A.  No.
21      Q.  Well, if the Court or the jury finds
22  that the testimony of Mr. Brown, Mr. Greenbaum,

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

782

1  are developed don't provide sufficiently
2  scientific evidence to be incorporated into what I
3  have done here (pointing to Exhibit Hartman 023).
4      Q.  Is there any literature that you can
5  cite to me to support the proposition that in
6  determining market expectations you should
7  disregard the testimony of participants in the
8  market as to what their expectations were?
9      MR. SOBOL:  I object to the form.
10     A.  The -- I think there is a literature
11  that -- certainly there is a whole class of
12  literature that is aimed at what is known as
13  contingent valuation, which is what -- which is a
14  set of surveys and survey designs that attempt to
15  elicit the feelings of market participants about
16  their expectation or their valuation without
17  having to buy that -- actually enter into an
18  economic transaction that would make -- that
19  would reveal what the final result of those
20  expectations were, and it has been demonstrated
21  that those kinds of surveys and that kind of
22  information can be very unreliable, and that's a

783

1  form of expectations or beliefs about what
2  willingness to pay or certain things.
3      So the -- as a general rule, economists
4  will look to revealed preferences and what is
5  revealed in actual transactions, contracts,
6  prices, what is actually paid, what has actually
7  been written into a contract as the summary of
8  expectations.
9      Q.  Well, are there particular economists
10  that you can identify who have expertise in this
11  area of contingent valuation that you just
12  mentioned?
13     A.  There is -- there are economists that
14  have implemented it -- and I can't really remember
15  the names now.  There are economists that have
16  argued against the validity of that kind of work,
17  and there is a -- there is a paper -- there is a
18  monograph out that includes some authors, Jerry
19  Hausman and some other authors.  I forget.  I
20  think it is called -- it is -- I can't remember
21  the press name.
22      Dr. Gaier probably knows the press name.

784

1  Where is he?
2      THE WITNESS:  He doesn't know the press
3  name.
4      A.  North Holland is -- and it is a critique
5  of contingent valuation.
6      Q.  And I take it that this theory of
7  contingent valuation is one of the things that you
8  would rely on in rejecting the deposition
9  testimony of Mr. Brown, Mr. Greenbaum, Mr. Lemke,
10  and Mr. Spahn that we have discussed earlier
11  today?
12      MR. SOBOL:  Objection.
13     A.  What?  I'm not quite sure the -- the --
14  the approach of contingent valuation is to survey
15  persons and say, "Well, what do you think you
16  would do in this situation, what would you pay,
17  what would you be willing to pay."
18      And that has -- that is not unlike, you
19  know, what did you think the costs were?
20      And there has been -- so I am not
21  proposing -- I am saying that that is an approach
22  that would say, "Go after expectations."

785

1      I am saying that a lot of economists
2  have found that that is -- that there are problems
3  with that, and it is not reliable.  Once you allow
4  persons that express expectations or valuations to
5  actually put money on the table and sign a
6  contract or pay a price that it differs quite --
7  quite a bit from what the expectations were.
8  There is expectations that inform a final
9  decision, but what I focused on here was evidence
10  on final decisions, and I was focusing on evidence
11  in the -- in the '90s, not the depositions you are
12  telling -- you are pointing out to me are all, you
13  know, very recent, and expectations have changed
14  over the last 15 years.
15     Q.  Can you identify any payer who has
16  testified that it was his expectation that AWP
17  exceeded ASP by a range that did not exceed 30
18  percent?
19     A.  I just cited to in the -- in attachment
20  K that were -- that were dealing with self-
21  administered drugs.
22     Q.  And that is as good as you can do?

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                                February 27, 2006
Boston, MA

782

1   are developed don't provide sufficiently
2   scientific evidence to be incorporated into what I
3   have done here (pointing to Exhibit Hartman 023).
4        Q.  Is there any literature that you can
5   cite to me to support the proposition that in
6   determining market expectations you should
7   disregard the testimony of participants in the
8   market as to what their expectations were?
9        MR. SOBOL:  I object to the form.
10       A.  The -- I think there is a literature
11   that -- certainly there is a whole class of
12   literature that is aimed at what is known as
13   contingent valuation, which is what -- which is a
14   set of surveys and survey designs that attempt to
15   elicit the feelings of market participants about
16   their expectation or their valuation without
17   having to buy that -- actually enter into an
18   economic transaction that would make -- that
19   would reveal what the final result of those
20   expectations were, and it has been demonstrated
21   that those kinds of surveys and that kind of
22   information can be very unreliable, and that's a

783

1   form of expectations or beliefs about what
2   willingness to pay or certain things.
3        So the -- as a general rule, economists
4   will look to revealed preferences and what is
5   revealed in actual transactions, contracts,
6   prices, what is actually paid, what has actually
7   been written into a contract as the summary of
8   expectations.
9        Q.  Well, are there particular economists
10   that you can identify who have expertise in this
11   area of contingent valuation that you just
12   mentioned?
13       A.  There is -- there are economists that
14   have implemented it -- and I can't really remember
15   the names now.  There are economists that have
16   argued against the validity of that kind of work,
17   and there is a -- there is a paper -- there is a
18   monograph out that includes some authors, Jerry
19   Hausman and some other authors.  I forget.  I
20   think it is called -- it is -- I can't remember
21   the press name.
22       Dr. Gaier probably knows the press name.

784

1   Where is he?
2        THE WITNESS:  He doesn't know the press
3   name.
4        A.  North Holland is -- and it is a critique
5   of contingent valuation.
6        Q.  And I take it that this theory of
7   contingent valuation is one of the things that you
8   would rely on in rejecting the deposition
9   testimony of Mr. Brown, Mr. Greenbaum, Mr. Lemke,
10   and Mr. Spahn that we have discussed earlier
11   today?
12       MR. SOBOL:  Objection.
13       A.  What?  I'm not quite sure the -- the --
14   the approach of contingent valuation is to survey
15   persons and say, "Well, what do you think you
16   would do in this situation, what would you pay,
17   what would you be willing to pay."
18       And that has -- that is not unlike, you
19   know, what did you think the costs were?
20       And there has been -- so I am not
21   proposing -- I am saying that that is an approach
22   that would say, "Go after expectations."

785

1        I am saying that a lot of economists
2   have found that that is -- that there are problems
3   with that, and it is not reliable.  Once you allow
4   persons that express expectations or valuations to
5   actually put money on the table and sign a
6   contract or pay a price that it differs quite --
7   quite a bit from what the expectations were.
8   There is expectations that inform a final
9   decision, but what I focused on here was evidence
10   on final decisions, and I was focusing on evidence
11   in the -- in the '90s, not the depositions you are
12   telling -- you are pointing out to me are all, you
13   know, very recent, and expectations have changed
14   over the last 15 years.
15       Q.  Can you identify any payer who has
16   testified that it was his expectation that AWP
17   exceeded ASP by a range that did not exceed 30
18   percent?
19       A.  I just cited to in the -- in attachment
20   K that were -- that were dealing with self-
21   administered drugs.
22       Q.  And that is as good as you can do?

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

786

1          MR. SOBOL: Objection to form.
2          A.  I would have to -- the -- and then I
3    have also extended Mr. Young's discussion to the
4    issues of Medicare, so in terms of as good as I
5    can do, I would also appeal to whomever Mr. Young
6    was relying on, and I would want to review my
7    rebuttal declarations in the affirmative matter,
8    because there were the same -- the same kind of
9    selective quoting was done by your witnesses in
10   that set of pleadings, and when -- when looked
11   more closely at the whole context of the
12   deposition, I was finding -- I found that they
13   didn't support what was being contended they
14   supported.
15         So you have showed me some -- you have
16   showed me a few quotes, and I -- they -- they
17   don't tell me anything that contradicts this here,
18   except some people didn't know what the
19   acquisition cost was at some point in time.
20         Q.  But as you sit here today, you cannot
21   identify any third-party payer who has testified
22   that he or she expected that AWP exceeded ASP by

787

1    30 percent; correct?
2          A.  The -- the contracts that I have
3    reviewed that are in my attachment C, the
4    contracts that are reviewed in the Dyckman report,
5    the contracts that are reviewed in the University
6    of Chicago NORC survey or analysis all indicate to
7    me that the expectations were that the -- that the
8    spreads were within the yardstick that I have put
9    forward.  So what has been revealed by their
10   contracting behavior tells me that that is what
11   they have expected.
12         Q.  I am looking for a name, Dr. Hartman.
13   Can you identify by name any third-party payer who
14   has testified in this case that they expected AWP
15   to exceed ASP by a range that did not exceed 30
16   percent?
17         MR. SOBOL: Objection to the form.
18         A.  I would have to go back and look at that
19   -- those materials.  I can't come up with a name
20   right now.
21         Q.  We were talking earlier about the
22   methodology that economists use, and I believe you

788

1    testified that basically what you do is you start
2    with a hypothesis and then you test to determine
3    whether that hypothesis is correct or incorrect.
4    Is that the case?
5          A.  If you're talking about hypothesis
6    testing and formulation of hypotheses, that is
7    something that economists do.
8          Q.  What would it take to prove that your
9    expectation theory is incorrect?
10         A.  If I saw contracts -- if I saw contracts
11   that were saying we are now going to reimburse at
12   acquisition cost, if I saw contracts as -- if I
13   saw the end of a revealed preference exercise that
14   occurred at Medicare and will no doubt lead
15   private third-party payers to start reevaluating
16   the way they are doing their reimbursement and
17   what their expectations are, when I see they start
18   to say, look, we want to reimburse on acquisition
19   cost and there is a definition of what that means,
20   that will say to me that they have -- that they
21   are now revealing an understanding of the fact
22   that these spreads are well above what the -- what

789

1    we thought they were.
2          Q.  Well, but what if it's not their
3    approach to reimburse based on acquisition cost?
4          MR. SOBOL: Objection to the form.
5          A.  Well, you just asked me what would be a
6    piece of evidence that would indicate that -- what
7    would indicate to me that -- that they -- that
8    they realized that these spreads were larger than
9    what -- what the evidence that I have put forward
10   shows, is if they're doing their job, they're not
11   -- the -- they're going to change the way they're
12   reimbursing for physician- administered drugs, and
13   I am going to see that in the contracts, in the
14   way that I see it -- in the way that -- what we
15   are finding in the physician- administered drug
16   area is that the private third- party payers seem
17   to follow the lead of Medicare, and Medicare has
18   finally made a move, and I would expect third-
19   party payers are beginning to evaluate the
20   implications of that kind of move.
21         Q.  Well, you said if they realized that the
22   spreads were not what they thought they were.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL       February 27, 2006
Boston, MA

790

1  Would knowledge of the spreads disprove your
2  hypothesis?
3      A.  Knowledge of the spreads acted upon
4  through changes in the way contracts are written
5  and reimbursement is paid would indicate to me
6  that they have -- they have -- they have
7  understood it and they have acted -- and they have
8  -- and they have -- and their behavior has been
9  affected by it.
10     Q.  Well, what if a payer had knowledge of
11 the spreads but simply decided not to act on them
12 because they had other objectives that they wanted
13 to achieve with their contracts?
14     MR. SOBOL:  Objection.  What is the
15 question?
16     A.  I mean what -- what is the question?
17     Q.  Would that disprove your expectation
18 theory?
19     MR. SOBOL:  Objection.
20     A.  It is -- let's be more specific.  I mean
21 let me try to translate this so I can understand
22 what you're saying.

791

1      If I'm -- I'm a third-party payer
2  reimbursing for Lupron, let's say, and I realize
3  that the spread is 400 percent, and I just say,
4  "Oh, screw it, this is accomplishing, you know, I
5  want them to have the money," is that -- is that
6  the notion of the hypothetical you are putting
7  forward?
8      And then the question is what?  Does that
9  disprove?  Could you finish your question with
10 that?
11     Q.  Well, it's your theory that payers
12 understood the spread to be 30 percent or less;
13 correct?
14     MR. SOBOL:  Objection to form.
15     A.  They expected and believed the spread to
16 be less than 30 percent.
17     Q.  So if a payer said, "Well, I expected
18 the spreads to be greater than 30 percent," would
19 that disprove your hypothesis?
20     MR. SOBOL:  Objection.
21     A.  The -- if certain payers -- no.  It
22 would have to be -- it would have to be -- there

792

1  would have to be behavior that would reflect
2  acting on that.
3      Q.  So mere knowledge of the spreads is not
4  enough?
5      A.  Well, suspicion -- you are -- you are -
6  - you are in an area of psychoanalysis that there
7  is -- are you saying to me that someone observes
8  the sentencing memorandum with Lupron and starts
9  to say -- and says, "God, maybe we're getting
10 screwed here," and so there is some -- there is
11 some growing expectation, that I am hearing you
12 say, but they don't immediately turn out the next
13 day and change their reimbursement pattern, does
14 that mean that there is no liability, whatever?
15 No, it doesn't.
16     I mean there has to be -- there is a
17 whole set of ways that a company has to act on
18 that, and there is whole systems, information
19 processing systems that are based on AWP and
20 reimbursement off of AWP that have to be altered
21 and changed, so that I might learn something in
22 the market like that and see a particular example,

793

1  but the fact that I don't shift everything right
2  away doesn't mean that I'm still -- that I am
3  saying, "Oh, take whatever you want from me." I'm
4  not a victim of this -- of the behavior.
5      Q.  So is it your testimony that mere
6  knowledge is not enough?  There has to be conduct
7  as well as knowledge?
8      MR. SOBOL:  Objection to form.
9      A.  It has to start with knowledge.
10     Q.  And you are saying that because you
11 don't observe conduct in the marketplace that
12 would eliminate the effects of the spread then
13 there must not have been knowledge of the spread
14 either?
15     MR. SOBOL:  Objection.
16     A.  That's one possibility.
17     Q.  You say in your report, "Had the
18 existence of mega-spreads been perceived and
19 understood by third-party payers, those payers
20 would have negotiated more aggressively than they
21 did, leading to lower reimbursement rates."
22     Do you recall that?

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    February 27, 2006
Boston, MA

794

1      A.  Could you give me the page and the
2   paragraph?
3      Q.  Yes.  I think you say it at paragraph
4   10.
5           (Pause.)
6           (The witness viewing Exhibit
7   Hartman 023.)
8           MR. MUHLBERGER:  Page 10.
9           THE WITNESS:  Oh, page 10?
10          MR. EDWARDS:  Was it page 10?
11          THE WITNESS:  Thank you.
12      A.  Yes.  Certainly the first, you know, it
13   is like a nine-step program.  The first step has
14   to be understanding the extent to which you are
15   overpaying for the drugs.  The -- because
16   reimbursement is institutionally -- can change
17   only slowly institutionally.  The -- one has to
18   evaluate the costs and the benefits of moving to
19   eliminating those mega-spreads and negotiating in
20   this way, but knowledge is the first step, but it
21   doesn't mean that the -- that as soon as you have
22   a glimmer in your eye, that the lightbulb goes off

795

1   on Lupron, you come to the conclusion and know the
2   full extent across all the drugs for which you are
3   reimbursing.  It is sufficiently rational for you
4   and cost effective for you as a third-party payer
5   to switch the system and change your information
6   processing systems to do it.
7      Q.  So you don't know one way or another
8   whether payers were actually knowledgeable about
9   the spreads?
10          MR. SOBOL:  Objection.
11      A.  Everything that I have seen, either
12   where there is some statement about what the --
13   what the margins that were being made by doctors,
14   the margins that were being made by retailers,
15   people that talked about those types of issues,
16   demonstrate to me that there was an understanding
17   of what the spread was.
18          I see deponent testimony, as you have
19   put in front of me, that I really can't make much
20   sense out of because I don't know -- they are not
21   getting specific enough.  There needs to be a set
22   of follow ups questions on those, for those

796

1   deponents.
2      Q.  But you are not in a position to say
3   that at least some payers did not understand that
4   there were mega-spreads?
5          MR. SOBOL:  Objection.
6      A.  It -- you are saying -- I cannot -- I
7   cannot make the statement that no one, no payer,
8   knew that there weren't mega-spreads.  I, you
9   know, I don't know whether they did or they
10   didn't.
11      Q.  Okay.
12          MR. EDWARDS:  And indeed let's take a
13   look at an article from the March 1997 issue of
14   Cancer Economics, which I will mark as Exhibit
15   Hartman 033.
16          (Excerpt from Cancer Economics,
17   March 1997 marked Exhibit Hartman 033 for
18   identification.)
19          (Handing Hartman Exhibit Hartman
20   033 to the witness.)
21   BY MR. EDWARDS:
22      Q.  Have you ever seen this article before,

797

1   Dr. Hartman?
2      A.  I have not that I recall.
3      Q.  Do you know who Dr. Lee Newcomer is?
4      A.  I am trying to find that name.  Is it on
5   the front page here?  Lee Newcomer?  Is he the
6   author of this?
7      Q.  If you will look at the second
8   paragraph.
9      A.  The second paragraph?
10      Q.  It says --
11      A.  Oh, I see.  The second paragraph.
12      Q.  I want to direct your attention to the
13   article entitled --
14      A.  The second paragraph that is underlined.
15   I have got you.
16      Q.  If you look at the paragraph entitled
17   "Insurers are Eliminating Markup on Cancer Drugs,
18   Official Says," and in the second paragraph, it
19   says, "'You are going to have to make chemotherapy
20   a cost-neutral equation,' Lee Newcomer, chief
21   medical officer at United HealthCare Corp. of
22   Minneapolis said in a keynote address at the NCCN

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

---

798

1  Guideline Conference on March 3rd."
2      A.  Right.
3      Q.  Have you ever heard of Dr. Newcomer
4  before?
5      A.  No, I have not.
6      Q.  The article goes on to say that Dr.
7  Newcomer was an oncologist before he became chief
8  medical officer of United HealthCare.
9      A.  I see that.
10     Q.  So since the chief medical officer of
11 United HealthCare was an oncologist who acquired
12 chemotherapy drugs directly from manufacturers,
13 wouldn't it be safe to assume that United
14 understood as of 1997 that there could be mega-
15 spreads to the extent that they existed at the
16 time?
17         MR. SOBOL:  Objection.
18     A.  The -- what -- what this says to me is
19 that Lee Newcomer understood the allegations in
20 this matter and was making his voice heard, and
21 there -- I'm -- as -- there are no doubt other
22 students and experts in this area that also

---

799

1  realized to some extent the amount of the kind of
2  spreads that were going on and that they wanted to
3  make them cost neutral.
4      This is the type of evidence that
5  gathers over time that will ultimately lead to
6  sufficient information to -- for entities to move,
7  like third-party payers, to change and respond to
8  what they realize is -- is a problem, is a
9  situation.
10     Q.  But if United knew of mega-spreads as of
11 1997, then United could not have been deceived; is
12 that correct?
13         MR. SOBOL:  Objection to the form.
14     A.  I -- the -- I don't know which drugs. I
15 don't know if this says all the drugs. I see that
16 it says, "You are going to have to make
17 chemotherapy" -- no, I don't see the list of drugs
18 here.
19         (Pause.)
20         (The witness viewing Exhibit
21 Hartman 033.)
22     A.  So I see it talks about some of the

---

800

1  administrative issues that would be involved in
2  terms of the accounting issues.
3      Is this the same?  I don't know. It is a
4  different article.
5      Q.  Would you agree with me, Dr. Hartman,
6  that if a payer knew of mega-spreads then that
7  payer could not have been deceived by mega-
8  spreads?
9         MR. SOBOL:  Objection to form.
10     A.  I would agree with the following:  that
11 if -- if over this period of time there is
12 sufficient information that a given payer came to
13 realize that there were mega-spreads and that they
14 were -- they essentially covered the spectrum of
15 physician-administered drugs, that that payer
16 would begin to understand -- to realize that there
17 was -- they were being damaged to the extent that
18 these spreads were leading it to pay more than it
19 should have paid, should be paying for the drugs,
20 and that over some period of time that would end
21 up being reflected in decisions that at a
22 corporate level of how to change reimbursement

---

801

1  that has been tied to AWP for 20 years.  And so
2  there is -- there is a realization of for some
3  drugs, and then there is a realization of how
4  uniform, how consistent it is over all the other
5  drugs, and then are we going to -- how are we
6  going to change our system and do a cost
7  effectiveness analysis to protect ourselves.
8      And all through that process,
9  realization to finally acting on it, which is what
10 I am saying is that revealed behavior that I want
11 to see, they are being damaged -- they are still
12 being damaged by a set of expectations that
13 started, and they haven't -- they can't turn on a
14 dime.
15     Q.  Dr. Hartman, I asked you whether a payer
16 who knew of mega-spreads could have been deceived
17 by mega-spreads.  Can you give me a direct answer
18 to that question?
19         MR. SOBOL:  Objection.
20         You don't need to answer that question.
21     A.  A payer who came --
22         MR. SOBOL:  You don't need to answer

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                     February 27, 2006
Boston, MA

802

1    that question. You just -- he just asked you the
2    question. You gave an answer. He now asked for a
3    direct answer. You gave him a direct answer.
4          THE WITNESS: I guess I don't have to
5    answer that question.
6          MR. EDWARDS: You are instructing the
7    witness not to answer?
8          MR. SOBOL: Yes.
9    BY MR. EDWARDS:
10   Q.  Do you know how many --
11         MR. SOBOL: I can make a record why. We
12   only have so much time. You can't ask him to
13   answer the same question twice in a row. We are
14   trying to save some time here, Steve.
15   Q.  Do you know how many third-party payers
16   have chief medical officers?
17   A.  I would assume that it -- I would hope
18   that it would be a common practice.
19   Q.  And do you know the extent to which
20   payers have chief medical officers or other
21   employees who were oncologists?
22   A.  I don't know the exact representation.

803

1    Q.  Do you know the percentage of covered
2    lives that United represents in the United States
3    today?
4    A.  Are we talking now about covered lives
5    for all medical services? For self- administered
6    drugs? For -- for the percentage of physician-
7    administered drugs? What -- what is your -- what
8    is the focus we're getting at here?
9    Q.  Do you know the answer to any of those?
10         MR. SOBOL: Objection.
11   A.  They're big.
12   Q.  They are one of the biggest; right?
13   A.  That's right.
14   Q.  In fact, it is between United and Anthem
15   as to which one is the biggest at the present
16   time; correct?
17   A.  Well, United -- is this United as a PBM
18   or United as a payer?
19         (Pause.)
20         (The witness viewing Exhibit
21   Hartman 033.)
22   A.  It is a big organization.

804

1    Q.  Do you know whether Medicare was aware
2    of mega-spreads in 1997?
3          MR. SOBOL: Objection.
4    A.  I know there was increasing information
5    regarding the extent to which reimbursement based
6    on AWP was leading to payments that were felt to
7    be out of -- to be too high.
8    Q.  And would you agree with me that if
9    Medicare knew of mega-spreads then it could not
10   have been deceived by mega-spreads?
11         MR. SOBOL: Objection.
12   A.  No. The -- the -- I think the OIG
13   report you are referring to in '97 is a
14   calculation of what the overcharges for Medicare -
15   - on Medicare drugs were, and, yes, there were
16   overcharges.
17         The extent to which those were mega-
18   spreads -- that talks about spreads being higher
19   than what they had anticipated they were and that
20   they were higher than -- I don't think they
21   necessarily came to the conclusion they raised,
22   reached the level of Vincasar and Lupron that we

805

1    saw, but they began to realize that the
2    reimbursement at AWP was a profit center and an
3    increasing profit center to physicians, and it was
4    costing Medicare money, and so there was
5    information out there, and as I have said,
6    information gathers, and it alters expectations in
7    a -- in a -- in a slow way that is ultimately
8    reflected in behavioral changes, and we see a
9    Medicare understanding of what is going on, a
10   understanding that what their earlier expectations
11   have put them in a position where they're paying
12   too much, and by the time they're able to change
13   those kinds of reimbursement policies, it is 2005.
14         So yes, there can be some understanding,
15   but it doesn't mean that they didn't have -- their
16   earlier expectations was what guided their
17   decision to get into that reimbursement policy to
18   begin with, and it takes a long time to change
19   those kinds of things around. So, yes, they began
20   to understand it, but it doesn't men they got --
21   that they suddenly -- that they were free of the
22   impacts and the damages of this, of the alleged

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

806

1    inflation.
2        Q.  Now once they understand it, they are no
3    longer deceived, assuming they were deceived
4    before; correct?
5        MR. SOBOL:  Objection.
6        A.  They are locked into a situation that
7    they're paying more than they thought they would
8    be when they originally entered into that kind of
9    reimbursement scheme.
10       Q.  Do you know why it took Medicare the
11   amount of time it took to change the reimbursement
12   scheme as you just testified to a moment ago?
13       A.  I haven't studied the statutory history
14   closely.
15       Q.  Well, would it surprise you to learn
16   that Medicare wanted to change the reimbursement
17   scheme but Congress wouldn't let them?
18       MR. SOBOL:  Objection.
19       A.  I haven't, you know, I haven't focused -
20   - I haven't done an analysis of that.
21       Q.  And I take it that it is not within the
22   purview of your testimony to second-guess the

807

1    policy decisions of Congress, is it?
2        MR. SOBOL:  Objection.
3        A.  I have -- I have not been asked to do
4    any analysis of the Congressional record.
5        Q.  Nor are you suggesting that the Court
6    should second-guess the policy decisions of
7    Congress, are you?
8        MR. SOBOL:  Objection.
9        A.  I -- I am making no suggestion one way
10   or the other.
11       Q.  Okay.
12       MR. EDWARDS:  What I want to do is mark
13   as Exhibit Hartman 034 a copy of a letter from
14   Zachary Bentley and Mark Jones to Dr. Bruce
15   Vladeck dated October 2, 1996. The Bates numbers
16   are HHCOO 3- 0479 through 0484.
17       (Letter dated October 2, 1996 to
18   Dr. Vladeck from Mr. Bentley et al, production
19   numbers HHCOO 3-0479 through 3-0484 marked Exhibit
20   Hartman 034 for identification.)
21       (Handing Exhibit Hartman 034 to the
22   witness.)

808

1    BY MR. EDWARDS:
2        Q.  Have you ever seen this document before?
3        (Pause.)
4        (The witness viewing Exhibit
5    Hartman 034.)
6        A.  Not that I recall.
7        Q.  If you look at the second paragraph, it
8    states, quote, "Enclosed with this letter you will
9    find two volumes of exhibits that substantiate and
10   support the fact that the Medicare and Medicaid
11   programs are continuing to make excessive
12   reimbursements to providers for infusion and
13   inhalation pharmaceuticals," close quote.
14       Would you agree with me that to the
15   extent that those exhibits documented alleged
16   mega-spreads as of October 2, 1996, then Medicare
17   could not have been deceived by alleged mega-
18   spreads as of that date?
19       MR. SOBOL:  Objection.
20       A.  You are -- you -- your notion of
21   deception I think is faulty in the sense that the
22   commitment on the part of Congress and on the part

809

1    of third-party payers reflected an understanding
2    in terms of reimbursement design and information
3    processing design that permeated this industry
4    that was based on understandings earlier in the
5    1990s, and that turned out to be incorrect, and
6    that turned out, the changes, the fraudulent
7    behavior is based on those understandings and
8    changes in movements away from those
9    understandings and abuses of those understandings.
10       Now I look at this second paragraph
11   here, and it says, "excessive reimbursements," so
12   I don't see mega-spreads there yet.
13       I don't know.  Maybe they are mega-
14   spreads.  I need to look.
15       But what was clear, and if one looks at
16   the fact record in Lupron, what became clear over
17   the '90s is what started as some slightly
18   overstated reimbursements, seeing how the system
19   could be gamed, increased and increased until
20   spreads became mega-spreads, as resulted in the
21   Vincasar example before that subcommittee.
22       So, you know, this notion of being

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

---

810

1  deceived or not deceived, the issue that I'm
2  getting at here is that there was a set of
3  expectations incorporated into a set of
4  reimbursement practices and procedures that was
5  based on facts and information that reflected
6  pricing in the early '90s and up through the mid
7  '90s, and those things were changed and abused by
8  defendants in this case, as is alleged.
9      Q.  Take a look at the second paragraph on
10 page 3 of this document.
11          (Witness complying.)
12     Q.  The third sentence of that paragraph
13 says, quote, "Based on these results, we found
14 that Medicare's reimbursement was excessive and in
15 many cases provided profit margins of more than
16 500 percent and in some instances more than a
17 thousand percent."
18         Are those mega-spreads?
19     A.  Well, they're getting large.  I would
20 say Vincasar had a mega-spread.  These are getting
21 to be big spreads.  These are spreads that are
22 abusing the system.

---

811

1      Q.  And Medicare certainly had knowledge of
2  the information contained in this letter and the
3  exhibits to this letter; is that correct?
4      MR. SOBOL:  Objection to form.
5      A.  I -- I see a -- I see a memo here
6  directed to Dr. Vladeck at HCFA, and so, yes, the
7  understanding of what was going on with these
8  prices -- with prices became richer and deeper and
9  more complete over the decade of the '90s.  I
10 agree.
11     Q.  So Medicare could not have been deceived
12 by the mega-spreads or alleged mega- spreads
13 identified in this document; correct?
14     MR. SOBOL:  Objection.
15     A.  Medicare was locked into a reimbursement
16 system that for whatever reason they were in terms
17 of information coming in like this to the extent
18 that it fully reached all the -- those members
19 that were necessary to make a change and revealing
20 preferences in the way the reimbursements were
21 paid, this was -- this was part of that growing
22 understanding.  But I don't know -- to say -- to

---

812

1  characterize Medicare was not deceived, Medicare -
2  - if Medicare knew everything that it knew and
3  could move, it would have moved earlier than 2005,
4  given the realities in which it was operating.
5      Q.  Take a look at --
6      MR. EDWARDS:  Strike that.
7      Q.  Well, is it your testimony that if a
8  payer has accurate information about a spread but
9  fails to act on that information then the payer is
10 still deceived?
11     MR. SOBOL:  Objection.
12     A.  If a payer has entered into a
13 reimbursement contract and contracts are -- are
14 long-term agreements of how -- what the terms of
15 operation are, that if they enter into a contract
16 that is based on one understanding and they come
17 to understand or they begin -- they start to see
18 information that makes them wonder whether their
19 initial understanding is correct or incorrect,
20 that doesn't mean that they have -- they are still
21 not being harmed, economically harmed, by an
22 agreement or a set of agreements into which they

---

813

1  have based their decision-making on that reflected
2  a different state of relationships between prices.
3      Q.  I asked you whether they are still being
4  deceived.
5      MR. SOBOL:  Objection to the form.
6      Q.  Are they still being deceived?
7      MR. SOBOL:  Objection to the form.
8      A.  Whether they're being deceived or not is
9  irrelevant.  They are being harmed economically.
10     Q.  So you are not in a position to say that
11 a payer who knows of the spread is being deceived?
12     MR. SOBOL:  Objection to the form.
13     A.  I don't know what your economic
14 definition of deceived is.  There is a set of
15 expectations that have informed what in general
16 payers and Medicare's thought relationships were,
17 and there may be -- there may be information on
18 one drug, a few sets of -- a few sets of claims.
19 Everybody seems to be moving around.
20     MR. EDWARDS:  The tape is about to run
21 out.
22     THE WITNESS:  Okay.

---

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

---

814

1        THE VIDEOGRAPHER:  The time is 2:32.
2   This is the end of cassette 2.  We are off the
3   record.
4             (Recess taken at 2:32 p.m.)
5             (Recess ended at 2:39 p.m.)
6        THE VIDEOGRAPHER:  The time is 2:39.  We
7   are back on the record.  This is the beginning of
8   cassette number 3.
9   BY MR. EDWARDS:     .          .
10       Q.  I want to direct your attention to the
11  fourth page of Exhibit Hartman 034, the bottom of
12  the page.
13            (Witness complying.)
14       Q.  Do you see where it talks about a drug
15  called Vepesid?
16       A.  I do.
17       Q.  That is a Bristol-Myers drug?
18       A.  It is, I think.
19       Q.  And Vepesid had an AWP of $136.49?
20       A.  I do see that, yes.
21       Q.  And then if you look at the next page,
22  the authors of this document talk about how

---

815

1   generic competition for Vepesid has caused the
2   price to plummet to $18?
3        A.  Of the -- of -- of the generic?  Or is
4   that the price --
5        Q.  It says the price for -- Vepesid is an
6   Etoposide; right?
7        A.  I -- I would have to check on that.  I
8   forget what -- if that is the case, but I will
9   take -- assuming that is true, I will accept your
10  claim that that's true.
11       Q.  Okay.  And so this document says that,
12  quote, "The price for 100 milligrams of Etoposide
13  has plummeted to $18," close quote?
14       A.  Yes.
15       Q.  Correct?
16       A.  Yes.
17       Q.  And would a spread between $136.49 and
18  $18 be a mega-spread in your view?
19       A.  It is a -- it is a large spread.
20       Q.  And is there any doubt that as of the
21  date of this letter Medicare was aware of that
22  mega-spread?

---

816

1        A.  The -- you are talking about Medicare -
2   - you are talking -- are you talking about Bruce
3   Vladeck?  Or are you talking about Medicare?  Is
4   Bruce -- is he the --
5        Q.  He is the administrator?
6        A.  He is the administrator of HCFA.
7        Q.  Do you know if HCFA has anything to do
8   with Medicare?
9        A.  I know HCFA has been subsumed under CMS,
10  and they were the -- yes, I guess they would have
11  been running as CMS does Medicare.
12            So clearly there were cases that were
13  being brought to the attention of administrators
14  within HCFA that was a problem, and to the
15  extent that HCFA and Medicare understood that this
16  was a global problem as of yet, I can't tell from
17  this letter.
18       Q.  Do you know where in the hierarchy of
19  HCFA the administrator's position stood?
20       A.  No, I don't.
21       Q.  So you're not aware that Dr. Vladeck was
22  the head of HCFA at this time?

---

817

1        A.  I assume he is the administrator from
2   the letter, and I don't know him personally, and I
3   don't know the org. chart of Medicare at that
4   point, so.
5        Q.  You haven't studied the industry
6   extensively enough to be aware of that sort of
7   fact; is that correct?
8        A.  I haven't memorized the heads of
9   Medicare or HCFA going back to 1990, no.
10       Q.  Now do you know whether information
11  about alleged mega-spreads for Vepesid was
12  available to the public generally?
13       A.  Well, one of the things that we should
14  keep in mind here is, you know, there is -- there
15  is -- and this is again the notion about what is
16  deception, what is information, what -- how do
17  people finally act on things.
18            Right now we're talking about an issue
19  of a multi-source drug and what is the appropriate
20  -- how that should be billed by doctors and
21  whether they are billing it at what they should be
22  billing it at, which is the median of the generic

---

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

**818**

1  price, or the lesser of ASP or the median of the
2  generic price or the branded -- the lowest branded
3  price. That could be the fraud we're talking
4  about here.
5       This -- the fact that this is going on
6  with multispread drugs doesn't tell me that HCFA
7  or Medicare became aware of mega-spreads for
8  single-source drugs and the kind of fraud that
9  we're -- is also -- is the major focus of what I
10  have been examining.
11       So, you know, we -- you are throwing
12  around spreads of this and that, but we need to be
13  careful about what we're attributing this to and
14  what -- what information content this has for what
15  aspect of whatever deception you're talking about.
16     Q.  So you would agree with me that at least
17  as of October 2, 1996, there was no longer a case
18  for liability with respect to Vepesid based on
19  alleged mega-spreads?
20       MR. SOBOL: Objection.
21     A.  No.
22     Q.  Correct?

**819**

1     A.  No.
2     Q.  Let's take a look at a document we
3  previously marked as Exhibit Hartman 007 to your
4  deposition. It is an article from --
5     A.  Exhibit Hartman 007?
6     Q.  -- from the June 10, 1996 issue of
7  Barron's.
8     A.  Oh, I am sorry. I thought I already had
9  it.
10       (Handing Exhibit Hartman 007 to the
11  witness.)
12     A.  Are we marking? Oh, we are not marking
13  this. It has already been marked.
14     Q.  It has already been marked.
15     A.  I see. Oh, God. I can't read that.
16     Q.  The article is entitled "Hooked on
17  Drugs," and I want to direct your attention to
18  page 16 of the article, or it is actually the page
19  with the number 16 at the top.
20     A.  The page with the number 16?
21     Q.  It is the third page --
22     A.  Here is 15.

**820**

1     Q.  --of the document.
2     A.  Oh, 16. I see.
3       (Witness complying.)
4     Q.  Do you see where it talks in the left-
5  hand column there about the drug Vepesid?
6     A.  Right. I am starting to see that. It
7  became a generic.
8     Q.  The last full paragraph?
9     A.  Right.
10     Q.  It says that Vepesid had an AWP of about
11  $136?
12     A.  I see that.
13     Q.  And if you continue on to the right-
14  hand column, it says, "Today the market price for
15  100 milligrams of an Etoposide is around $35"?
16     A.  Um-hmm. I see that.
17     Q.  This would be as of June 10, 1996.
18     A.  Right.
19     Q.  Now is that in your view a mega-spread,
20  the difference between an AWP of $136 and a market
21  price of $35?
22     A.  Well, you are -- the examples you are

**821**

1  bringing up here is a fraud different than the
2  fraud that -- that is alleged in this matter, and
3  in this matter, it is NDC specific. It is
4  individual manufacturers raising and trying to
5  move market share of, with its AWP relative to its
6  price.
7       Now you are comparing the AWP of Vepesid
8  with the price -- the market price for a Gensia
9  product, and so if -- if it is a fraud of
10  submitting reimbursement when you are doing the
11  generic and when you are administering the generic
12  and you are using the AWP of the branded drug,
13  that's -- that's different than what we're talking
14  about here with -- of the spreads within NDC,
15  within company.
16       I mean that being said, we can continue
17  talking about this, but I'm trying to get a sense
18  of where -- it is -- this is a different spread
19  you are asking me to look at than the ones that I
20  have looked at in my report.
21     Q.  Well, assuming that the price that
22  Bristol-Myers was charging for Vepesid was around

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

822

1   $35 at that time, would it be fair to say that any
2   payer who was aware of the information in this
3   Barron's article would not have been deceived by
4   any mega-spread with respect to Vepesid?
5        MR. SOBOL: Objection.
6        A.  As -- I mean we can look at a variety of
7   these, and the point is that there are -- this is
8   the kind of information that and these are the
9   venues, as are the OIG reports and the letters to
10  HCFA and what appears in Barron's, that started to
11  make payers and make the industry understand what
12  was the effects of the allegations -- the price
13  allegations, the price inflation allegations in
14  this matter.
15       So it is not a question of whether they
16  were deceived on the whole. It is -- it is one
17  small piece of information that goes toward making
18  a decision about what you would -- how you would
19  change your reimbursement to avoid this situation,
20  and they were still locked into a reimbursement
21  practice and procedure that a piece of information
22  like this was just something they said, "Okay,

823

1   we've get got to start watching this and looking
2   at the accumulated information.
3        Q.  Well, you said they started to
4   understand. When did they understand?
5        MR. SOBOL: Objection.
6        A.  As a matter for an economist, one finds
7   that preferences and expectations are revealed
8   when behavior is exhibited, and when there is a
9   shift in the way reimbursement is paid or
10  contractually the way -- what kinds of discounts
11  are offered off of AWP or whether it is related to
12  ASP. That then shows that there has been enough
13  information that they come to an
14  understanding that is sufficient to make them move
15  to avoid the problems that are slowly becoming
16  clear to them.
17       I mean it is like the Vietnam war.
18  People said that was a mistake in the beginning.
19  It took 10 years for the country to come to a
20  conclusion about that.
21       Information is slowly. It builds.
22  Decisions get made, and preferences are revealed.

824

1        Q.  I wanted to make sure I understand what
2   you mean when you talk about revealed preferences.
3   What is the theory of revealed preferences?
4        MR. SOBOL: Objection.
5        A.  Well, the notion of revealed preferences
6   are that economic entities, economic consumers,
7   perhaps producers, for a variety of economic
8   agents, have preferences, have distributions of
9   preferences, and one really understands what those
10  preferences are when they are revealed through an
11  actual economic act or action, a purchase, a
12  purchase at a price, and there you have a
13  revelation of what might be perceived to be a
14  distribution of motives or beliefs or utility
15  valuations, but you reveal your preference given
16  all that you know, given the information you have,
17  given the facts in the market.
18       Q.  Well, I think we established earlier
19  payers understand that providers earn profits on
20  drugs; correct?
21       A.  Correct.
22       Q.  Did it ever occur to you that the reason

825

1   payers did not change their conduct even though
2   they knew about alleged mega-spreads is because
3   they wanted the providers to make profits on
4   those drugs?
5        A.  It's -- it's a possibility that I
6   considered, but the information that I revealed
7   suggested that was not what -- what was the -- the
8   drive -- the reason that they hesitated.
9        And, secondly, I would think as a matter
10  of business practices, the -- at some level, if
11  that is what is motivating their decisions, then
12  they're -- then that is something that needs to be
13  known to the customers, their customers.
14       Q.  Well, you say that it is a possibility
15  that you considered. How did you consider it?
16       A.  Well, I looked at, like the Young -- as
17  we have gone through in attachment K, what people
18  believed about Medicare, what Young was saying,
19  how reimbursements worked under Medicare, what it
20  implied about the margins, the retail margins that
21  were being earned by the providers, that when the
22  discussions in Congress were going on about

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

826

1    reducing the reimbursement rate from 100 percent
2    to 95 percent of AWP, that everybody said, "Oh, my
3    God, the providers are going to be killed by
4    this," and which to me suggests they had no idea
5    how much money was being made on this drug, that
6    they were just making basically a retail margin.
7        So I can look at the discussion and the
8    description of your own experts, summarizing what
9    the debate looked like, and that informs me that
10   they didn't -- while there is -- there is limited
11   information, there is little pieces, little
12   nuggets of information that come to the surface,
13   the overriding notion of this importance of being
14   unimportant was really prevailed in spades for
15   physician- administered drugs and reimbursement.
16   This stuff appeared, but managed care
17   organizations and third-party payers were worrying
18   about a lot of other big ticket items, that this
19   was something that got put on a back burner.
20       Q.  Can you cite to me any evidence that
21   would enable you to conclude -- I am sorry -- that
22   would enable you to reject the possibility that

827

1    providers did not act on mega-spreads because they
2    wanted -- I am sorry.
3        MR. EDWARDS:  Let me start that whole
4    question all over again.  Strike that question.
5        Q.  Can you cite to me any evidence that
6    would enable you to reject the possibility that
7    payers did not act on mega-spreads because they
8    understood that providers were making a profit on
9    those mega-spreads and they were willing to let
10   that continue?
11       A.  That sounded like one of my answers.
12   That was -- that was long and involved.
13       MR. SOBOL:  Objection -- to the
14   question.
15       (Laughter.)
16       A.  What I am hearing you say is do I know
17   of any evidence that where it is demonstrated that
18   the providers said, "Hey, we are paying these guys
19   a boat load, and screw our -- screw our
20   policyholders.  We're just going to keep paying
21   them this boat load."  And you're saying have I
22   seen any evidence where they knew that and they

828

1    said, "Ah, this is great, we love the providers,
2    let's do it."
3        I have seen no evidence that would
4    support that, or I have seen no evidence that
5    would reject that.  I have seen no evidence that
6    is along those lines.
7        Q.  Are you familiar with Blue Cross/Blue
8    Shield of Massachusetts?
9        A.  I am.
10       Q.  It is your understanding that they're a
11   class representative in this case?
12       A.  I didn't know that, but it is good to
13   find that out.
14       Q.  Have you read the depositions of the
15   representatives from Blue Cross/Blue Shield of
16   Massachusetts?
17       A.  I forget.
18       Q.  Mr. Mulrey, Mr. Killion?
19       A.  I have a feeling your associate is about
20   to bring them for me.  I don't remember.
21       Q.  Are you aware of the fact that Blue
22   Cross/Blue Shield of Massachusetts actually did a

829

1    study in which they considered moving from a
2    reimbursement formula of AWP minus a percentage to
3    ASP plus six percent but decided not to?
4        A.  And when was this study done, may I ask?
5        Q.  I believe it was 2004.
6        A.  So this comports with my hypothesis that
7    private sector payers will start to do these
8    studies in view of what they have observed with
9    Medicare.
10       I am not aware of that study, no.  But I
11   would like -- I would be interested to see the
12   materials related to it.
13       Q.  Well, let's take a look at Mr. Mulrey's
14   transcript and Exhibit 2 to his deposition.
15       MR. EDWARDS:  First we will mark as
16   Exhibit Hartman 035 a copy of a document entitled
17   "Analysis of CMS Average Wholesale Price Reform"
18   dated February 7, 2004.  It was previously marked
19   as Exhibit 2 to Mr. Mulrey's deposition.
20       (Multipage analysis of CMS Average
21   Wholesale Price Reform, February 7, 2004 marked
22   Exhibit Hartman 035 for identification.)

Raymond S. Hartman, Ph.D. CONFIDENTIAL                February 27, 2006
Boston, MA

830

1          (Handing Exhibit Hartman 035 to the
2     witness.)
3     BY MR. EDWARDS:
4          Q.   The reporter has handed you Exhibit
5     Hartman 035?
6          A.   Yes, she has.
7          Q.   Have you ever read this document before?
8          A.   No, I have not.
9          MR EDWARDS:   What I want to do is mark
10    as Exhibit Hartman 036 a copy of the transcript of
11    Mr. Mulrey's deposition dated January 5, 2006.
12          And I should state that a lot of the
13    documents and depositions we are using have been
14    marked "Confidential," so to the extent that those
15    materials are referred to in this deposition, the
16    deposition should be treated confidential as well.
17          (Deposition transcript of Mr.
18    Mulrey taken January 5, 2006 marked Exhibit
19    Hartman 036 for identification.)
20          (Handing Exhibit Hartman 036 to the
21    witness.)
22    BY MR. EDWARDS:

831

1          Q.   Let's look first of all at the
2     deposition transcript. I want to direct your
3     attention to the testimony that begins at page 71,
4     line 13.
5          "Question: --
6          A.   I am sorry. Please just let me get
7     there. I am a little bit behind here.
8          (Pause.)
9          (Witness complying.)
10         A.   Okay. Good.
11         Q.   "Question: So in 2004 you learned that
12    Medicare had reimbursed drugs at an amount that
13    was intended to subsidize -- or cross subsidize I
14    believe is the term used -- the inadequate
15    reimbursement of the servicing fee; correct?
16         "Answer: Yes.
17         "And based upon your analysis, you
18    determined that following Medicare to the ASP
19    methodology, that would result in a decrease in
20    overall reimbursement afforded to physicians; is
21    that correct?
22         "Answer: Yes.

832

1          "And as a consequence of your analysis,
2     is it correct that Blue Cross/Blue Shield of
3     Massachusetts elected not to shift to the ASP
4     reimbursement methodology?
5          "Answer: At this time, yes.
6          So Blue Cross/Blue Shield of
7     Massachusetts had access to the AWPs that
8     manufacturers currently report to CMS; correct?
9          MR. SOBOL: Objection.
10         A.   I'm sorry. Say that again, if you
11    would, please?
12         Q.   Blue Cross/Blue Shield of Massachusetts
13    had access to the AWP -- ASPs that manufacturers
14    currently report to CMS; correct?
15         MR. SOBOL: Objection.
16         A.   It's -- it's -- it seems to suggest that
17    they do. I -- they are talking about ASPs.
18    Whether they are guessing them or whether they
19    have -- I don't know -- I don't know what
20    information.
21         Q.   Well, is it your understanding that ASPs
22    are available to the public now from CMS?

833

1          MR. SOBOL: Objection to the form.
2          A.   I don't -- the -- I know they are
3     provided to CMS, but I don't know what -- whether
4     it is like AMPs, that they are subject to
5     proprietary types of provisions. I don't know
6     what the legal standing is or the proprietary
7     nature is and how -- how that is shared.
8          If you want to tell me that they are
9     shared and this is what is being reported to CMS
10    from the manufacturers, then I will -- I will take
11    that as then that that's the case. I don't know
12    what the legal requirements are on the part of CMS
13    to release that kind of information to payers,
14    but.
15         Q.   And what Mr. Mulrey is saying in his
16    testimony is that we considered switching to an
17    ASP-based system but decided not to; correct?
18         A.   He is certainly -- he is saying that,
19    yes.
20         Q.   And he is suggesting in this testimony
21    that one of the reasons they decided not to is
22    because they understood that the profit that the

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

834

1  physician earned on the drug compensated for an
2  underpayment to the physician on the services;
3  correct?
4       MR. SOBOL: Objection to form.
5    A.  Well, what I'm seeing, again putting a
6  little -- into a little bit of context, which I
7  find is helpful to me and maybe to the Court, I
8  mean looking back at page 69 about Mr. Mulrey's
9  involvement in this project, he is asked whether
10 he had any understanding under Medicare whether it
11 was adequate -- whether the service fees were
12 inadequate or not and about -- whether drug
13 reimbursements provide that margin, and I see that
14 he says he didn't really have much of an
15 understanding, and that the information that was
16 brought, he started reading about it, that he
17 understood these kinds of differences, which
18 indicate again to me the fact that this is
19 information that various people in at the policy
20 level come to be aware of this will at different
21 times, that it can affect decisions, and here is
22 clearly a time when it is affecting, some

835

1  preferences can be revealed.
2       As we have talked about revealing
3  preferences, and I don't know what ASPs are being
4  focused on here, but certainly as they are
5  revealing a preference, they -- what I am seeing
6  is being said here as of -- so they learned it in
7  2004, and so now they are trying to make a
8  decision -- I don't know if this is for 2005 or
9  when this is for -- that they are going to
10 continue to live with an inflated spread and
11 overpayments for the reason of a cross
12 subsidization.
13      So that is -- is what I see this is
14 reflecting.
15   Q.  So the Blue Cross/Blue Shield of
16 Massachusetts situation demonstrates that it is
17 possible for a payer not to be deceived as to
18 spreads and yet decide to continue to reimburse on
19 the basis of AWP the way it always has?
20      MR. SOBOL: Objection.
21   A.  What I read this as saying is that by
22 2004 they're finally becoming aware of this. It is

836

1  on their radar screen that they want to make a
2  decision about it. And they have decided to
3  continue to pay -- they understand that they have,
4  for the past 10, 15 years, have been paying more
5  than they should have. They have been locked into
6  a reimbursement schedule, and that -- that they
7  were still -- they were in it, and they were going
8  to -- they -- they elected to stay in that
9  schedule. They intended to continue to overpay
10 for those pharmaceuticals, and as a -- that would
11 cross subsidize other payments to physicians.
12   Q.  By the way, you referred earlier to what
13 you called the long-term agreements in the
14 industry. Have you done an analysis of the terms
15 or the term period of agreements between payers
16 and providers with respect to physician-
17 administered drugs?
18   A.  I have reviewed contracts generally, and
19 I have seen contract lengths anywhere from a year
20 to three years. There may be ones that were
21 shorter and longer.
22   Q.  And are you aware that many of those

837

1  contracts have termination provisions that would
2  enable either side to terminate on a specified
3  number of days' notice, such as 60 or 90 days?
4    A.  I forget what the term -- what the
5  termination notices might have been.
6    Q.  You're not in a position to opine that
7  the length of the contracts between payers and
8  providers prevents payers from reacting to
9  information they find out about concerning the
10 spreads, are you?
11      MR. SOBOL: Objection --
12   A.  No.
13      MR. SOBOL: -- to form.
14   A.  No.
15   Q.  Do you know whether other payers have
16 considered moving to an ASP-based reimbursement
17 system but have rejected it?
18   A.  I know of no other specific payers that
19 have done this analysis and have come to this
20 conclusion.
21      MR. EDWARDS: Let's take a look at Mr.
22 Killion's deposition, which we will mark as

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

838

1  Exhibit Hartman 037. This was taken on January 6,
2  2006.
3         (Deposition transcript of John
4  Killion taken January 6, 2006 marked Exhibit
5  Hartman 037 for identification.)
6         (Handing Exhibit Hartman 037 to the
7  witness.)
8  BY MR. EDWARDS:
9     Q.  I want to direct your attention to page
10  89 of this deposition, beginning at line 2.
11        "Question" --
12     A.  I am sorry. Mr. Killion is? So he is
13  at Blue Cross/Blue Shield of Massachusetts also?
14  Okay. I see.
15     Q.  He is senior director, ancillary
16  services of Blue Cross/Blue Shield of
17  Massachusetts. That appears on page 6.
18     A.  Okay. And I am sorry. The page that
19  you directed me to?
20     Q.  Page 89.
21        (Witness complying.)
22     Q.  It reads, "Question: You had mentioned

839

1  that Blue Cross/Blue Shield had made the
2  determination not to reduce reimbursement under
3  the ASP methodology. Is it your understanding
4  that the industry standard is to maintain
5  reimbursement at 95 percent of AWP?
6        "Answer: My understanding is not to --
7  the industry standard is not to move to ASP at
8  this point in time.
9        "Question: Right. My question is a
10  little different. Is it your understanding that
11  the industry standard is to maintain reimbursement
12  at 95 percent of AWP?
13        "Answer: For the most part, yes. That's
14  correct."
15        Dr. Hartman, isn't the fact that Blue
16  Cross/Blue Shield of Massachusetts and most of the
17  rest of the industry has decided not to go to an
18  ASP-based reimbursement system, notwithstanding
19  the availability of ASPs to the marketplace,
20  inconsistent with your revealed preference
21  analysis?
22        MR. SOBOL: Objection to the form.

840

1     A.  No.
2     Q.  Do you want to answer my question?
3     A.  I just did. No.
4        It was, I know, a very short answer, so
5  it probably surprised you.
6     Q.  Well, is it your testimony that Blue
7  Cross/Blue Shield of Massachusetts and the other
8  payers who have not decided to go to an ASP-based
9  system are deceived?
10     A.  It is my opinion that we are at a stage
11  when this information has become sufficiently
12  prevalent that it is starting to rise to the
13  surface where entities are beginning to understand
14  the extent to which the AWP-based reimbursement is
15  leading to mega-spreads, and they are -- there is
16  -- there are -- the phenomenon of the importance
17  of being unimportant, that this essentially has
18  been one of the last things that gets turned to,
19  the notion of status quo bias where, for various
20  institutional reasons and information technology
21  reasons you are locked into a certain
22  reimbursement system that was based on other

841

1  expectations, that these payers are starting to
2  make those decisions, and these decisions are
3  being made right now, and this man is reflecting
4  something as of 2006, and as we have seen over the
5  -- as we have seen from 1994, '3, you were giving
6  me information that was informing Medicare. It
7  took them 10 years to finally institutionally
8  understand and reveal the preferences of moving to
9  an ASP system.
10        So this doesn't contradict anything that
11  has been put forward here. They have yet to reveal
12  how they are going to respond when they commit to
13  changing the -- a system that has been put in
14  place based on older expectations that have since
15  been violated.
16     Q.  You characterize your report as a report
17  on liability; correct?
18     A.  My report deals with issues of
19  liability, thresholds of liability, and measures -
20  - measures of causation of when spreads will
21  exceed a measure of liability and a calculation of
22  damages.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

842

1    Q.  So you are rendering an opinion on
2  liability in this case?
3    A.  I am rendering an opinion where the
4  economic facts that are revealed in this market
5  demonstrate certain results that exceed thresholds
6  of liability that I have been asked to assume.
7  One is a -- the understanding of what the sticker
8  price, how it was a signal for transactions
9  prices, and how that became hard wired into a
10  reimbursement system for what turns out to be a
11  small item on the -- on payers' radar screens, and
12  I have also been asked to apply that methodology
13  to another threshold of liability that has to do
14  with Medicare reimbursement where a threshold is a
15  zero spread.
16    Q.  You just said that you have been asked
17  to render an opinion on the thresholds of
18  liability that you have been asked to assume. Are
19  you assuming liability here?
20    A.  No. I am -- let me clarify. I don't
21  know if that is exactly what I said. If it is, it
22  should be nuanced a little bit more.

843

1        I have been asked to render an opinion
2  on observations of pricing behavior and what an
3  understanding and expectation of the relationship
4  between a list price and transactions prices that
5  informed reimbursement rates over this -- over the
6  class period. I have been asked to look at
7  measures of those prices to see whether they
8  exceeded measures that reflected what was
9  reasonably expected as a relationship between that
10  sticker price, that list price, and transactions
11  prices.
12      So I was first asked to look at the
13  facts, look at how -- whether those prices and
14  those spreads exceeded a measure that defined a
15  market understanding.
16      I have also been asked to look at the
17  same set of facts -- so that was the first -- I
18  wasn't told to look at 30 percent. I was told go
19  and find out what was a reasonable expectation of
20  this relationship, what did the data suggest, what
21  was revealed, and I did that.
22      I was also asked in my supplemental

844

1  report to look at a different level of threshold,
2  and that was a zero threshold, that relates to the
3  Medicare statute.
4    Q.  Are you rendering an opinion on
5  deception in this case --
6        MR. SOBOL: Objection.
7    Q.  -- on whether payers have been deceived?
8        MR. SOBOL: Objection.
9    A.  I am rendering an opinion on whether
10  manufacturers altered the relationship between
11  their list price and transaction prices in ways
12  that were not understood by payers and ways that
13  deviated from what payers had understood those
14  relationships to be in order to effectuate their
15  own market strategies.
16    Q.  So you are not rendering an opinion on
17  whether payers have been deceived?
18    A.  The -- if -- if the payers didn't
19  understand -- I have just -- I essentially told
20  you what I am rendering an opinion on. You can
21  call it deception or whatever you want.
22        There was a set of expectations that

845

1  were built in, and did manufacturers exploit an
2  understanding that was hard wired into a
3  reimbursement system that permeated physician-
4  administered drugs up until about 2004.
5    Q.  So the answer to my question is, yes, I
6  am rendering an opinion on whether payers were
7  deceived?
8        MR. SOBOL: Objection to the form.
9    A.  I just -- I gave you the -- my answer.
10  That's what it is.
11        You like the -- you seem to love the
12  word "deceived." I have put it in my words, in
13  the words of an economist.
14    Q.  Do you have a definition of deception?
15    A.  I have a -- I am an economist. I am not
16  a lexicographer. I have given my description of
17  the economics that I observed here and how the
18  economics deviate from what the understanding of
19  the payers were, and that's -- that's my
20  understanding of what -- what I was asked to
21  explore and see if there was such a deviation and
22  that that was a measure of damages and injury, and

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

---

846

1    if you want to call that deception, then -- then
2    that --
3        Q.  So you don't have a definition of
4    deception that you are using in connection with
5    your testimony in this case?
6        MR. SOBOL:  Objection.
7        A.  I -- my definitions and my analysis, I
8    have just summarized.  I don't -- I'm -- I don't
9    know where in my report I talk about deception.
10       Q.  Is it your testimony that Blue
11   Cross/Blue Shield of Massachusetts and other
12   payers who had access to ASPs but decided not to
13   go to an ASP-based reimbursement system were
14   deceived?
15       MR. SOBOL:  Objection.
16       A.  It is my opinion that -- let's -- let's
17   bring it home specifically to Blue Cross/Blue
18   Shield of Massachusetts.
19       That for a long period of time, these
20   payers, the little bits I have read, the snippets
21   I have read, I haven't read the whole thing, they
22   have come to look at this more closely very

---

847

1    recently, so the extent to which these spreads
2    were mega-spreads or were large or the payments
3    were excessive is only something that they have
4    recently been able to systematically understand
5    and factor into their decision-making process, and
6    so this is -- they now -- they -- they understand
7    what the real -- what the real spread is, and if
8    you want to call it that they were deceived
9    before, they -- they had a -- they had an
10   understanding of what the spreads were.  Suddenly
11   they revealed, oh, they are different than that.
12       You can -- you can use whatever
13   adjective you want for that state of their mind -
14   - state of their institutional mind.  And now they
15   are making some decision about what do they want
16   to reveal, what preferences will be revealed in
17   how they are going to alter their reimbursement
18   rates and whether they are going to continue to
19   allow themselves to pay -- to abide by a system
20   that was institutionalized when they had one set
21   of expectations and continue to overpay because
22   they want to use those funds to cross subsidize

---

848

1    some other activity, some other service.
2        Q.  You just said in that last answer that
3    they understand what the real spread is, so it
4    would follow from that that, at least at this
5    point, they are not deceived; correct?
6        MR. SOBOL:  Objection.
7        A.  They -- I don't know what CMS is allowed
8    to release legally.  I see a mention of ASPs here.
9    I don't know whether they have looked at all their
10   drugs.  I see some -- I see some bullet points,
11   and I see there is some analysis.  I don't know how
12   thorough it is.  It is clear they now feel like
13   they have a better feel for what ASPs or some ASPs
14   or the majority of their ASPs are, and they have
15   come to some conclusion that they are paying more
16   than they thought, and, ah-ha, okay, so what are
17   we going to do about this, and they have decided
18   to continue to pay more than they thought they
19   were paying, and that those overpayments will
20   essentially cross subsidize some other activity.
21       Q.  So the Blue Cross/Blue Shield of
22   Massachusetts example demonstrates that it is

---

849

1    possible for a payer to have an understanding of
2    what the real spread is but not change its conduct
3    for other reasons?
4        MR. SOBOL:  Objection.
5        A.  Well, the primary thing it demonstrates
6    to me is that until 2005 no payer could really
7    understand what the spreads were on any drug
8    because the ASPs weren't really available
9    systematically, so there couldn't really be an
10   informed decision along any lines, if this is in -
11   - this seems more informed than other decisions.
12       You have put in front of me selective
13   things along this drug there is this spread or
14   that spread, but that is not enough for a payer to
15   alter a reimbursement system that was put in place
16   10 or 15 years ago based on an understanding of
17   the market.
18       This is systematic, and this is telling
19   me that if CMS now offers these ASPs to payers,
20   they can start to evaluate that, but they are only
21   able to finally systematically evaluate that now
22   since 2005.

---

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D. CONFIDENTIAL                          February 27, 2006
Boston, MA

850

1          (Pointing to Exhibit Hartman 037.)
2      Q.  If a payer does not change its conduct
3   in response to new information, then that would be
4   inconsistent with your inference that payers did
5   not change their conduct because they did not have
6   information with respect to the spreads?
7      A.  Could you read?  I didn't understand
8   that question.
9      Q.  Well, you are making an inference that
10  because in the '90s payers did not change their
11  conduct with respect to reimbursement rates they
12  must not have had information as to the actual
13  spreads; correct?
14     A.  I --
15     Q.  That is how your revealed preference
16  theory works in this case?
17     A.  What I am saying is that I find that
18  over that period of time that there wasn't major
19  shifts in -- in the information that I'm seeing
20  revealed in -- that I use for my yardsticks.
21         Now if I were to see in contracts and
22  negotiations and in surveys that Medpac undertook

851

1   or whatever that there were -- that the people
2   reimbursing at ASP, that some of their third-
3   party payers were reimbursing at AWP
4   less 60 percent, but I am not.
5          I am seeing it is the same -- they are
6   revealing the same kind of contractual
7   reimbursement rates that were reflective of 10
8   years before that.
9          And so I am not -- that's the behavior I
10  observe.  Now what -- it is clear that underlying
11  that there was a growing awareness anecdotally, a
12  Barron's article here on one drug, another set of
13  drugs here, the OIG would do several multi-source
14  drugs in '92, they would look at a set of drugs,
15  let's say, in '96 and '97, but the kind of
16  systematic data that allows a company to do a
17  strategic evaluation, like Mr. Killion has done, I
18  am assuming this means that CMS releases these
19  ASPs, and finally one can do this.
20         All I am saying is that I don't see --
21  and here they have decided not to do it.  Now
22  maybe no one will decide to do it.

852

1          But what I am saying is I look in the
2   past.  I don't see any revealed movement away from
3   a system based on the -- what the old
4   understanding was, and I don't see any ability to
5   get systematic transparent information on all the
6   ASPs that payers will pay for in order to
7   understand the implications.
8      Q.  Doesn't the example of Blue Cross/Blue
9   Shield of Massachusetts reveal that contract
10  prices don't tell you anything about payer
11  expectations with respect to the spread?
12         MR. SOBOL:  Objection.
13     A.  No.  It tells me -- where was the page
14  that you had me look at, if you could be so kind?
15  Do we have that in the record?
16     Q.  I believe it was Mr. Killion's
17  deposition.
18     A.  Yes.  I have Mr. Killion's.  The page I
19  was curious about, I can't remember where that
20  was.
21     Q.  Page 89.
22     A.  Thank you.  Actually, that couldn't have

853

1   been the page, unless I'm -- well, that interim
2   discussion about what he knew when that just
3   preceded the discussion that I had read into the
4   record, I'm not finding that relative to page 89.
5          So I am sorry.  Let's not bother going
6   there.
7          What was -- is there a question pending?
8   I have kind of forgotten where we were, because I
9   can't find the particular quote that I was looking
10  for.
11         (Prior question was then read.)
12         MR. EDWARDS:  I think you have answered
13  the question --
14         THE WITNESS:  Oh, good.
15         MR. EDWARDS:  -- to my satisfaction,
16  unless you want the question read back again.
17         THE WITNESS:  No.
18  BY MR. EDWARDS:
19     Q.  Now I believe you acknowledged that one
20  reason Blue Cross/Blue Shield of Massachusetts may
21  have decided not to change its reimbursement
22  formula is because they wanted the providers to

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

854

1  make a profit on the drugs in order to make up for
2  underpayment on the services portion of it;
3  correct?
4      A.  My recollection was that they wanted to
5  cross subsidize services fees.
6      Q.  Okay.
7      A.  I don't know if it was to make up for
8  underpayments or --
9      Q.  And another reason a payer might decide
10  not to change from an AWP-based reimbursement
11  system is they simply want to use the prospect of
12  profitability as an inducement to providers to get
13  them to join their network; correct?
14      A.  Well, certainly the entire notion on the
15  part of manufacturers, as I have developed in my
16  affirmative declaration, is that the use of
17  increasing spread is to move market share.  So the
18  more -- the greater there is this ability to have
19  that kind of -- that kind of spread that you can
20  use to cross subsidize certain activities and get
21  more doctors in and get more patients and sell,
22  that would be part of moving market share.

855

1      Q.  Is it your understanding that payers
2  compete for physicians?
3      A.  I have not looked closely enough at that
4  issue to draw an opinion.
5      Q.  You haven't looked at competition among
6  payers at all?
7      A.  Well, I have looked at competition among
8  payers in the broad context of the structure of
9  the industry, but for the specific example of
10  whether they are competing for doctors to join
11  their networks, I -- I -- I haven't looked at that
12  issue.
13      Q.  Let's take a look at another Medpac
14  report.  This one was previously marked in your
15  deposition as Exhibit Hartman 020.
16          (Handing Exhibit Hartman 020 to the
17  witness.)
18          THE WITNESS:  Yes, I have got one.
19      Q.  Have you ever read that document before?
20      A.  At one point, I reviewed this in my --
21  in -- in developing my original affirmative
22  declaration, but it has been a while since I

856

1  looked at it.
2      Q.  I want to direct your attention to page
3  17 of this document, the section headed "Factors
4  that Influence Fee Change Decisions."
5          (Witness complying.)
6      Q.  And do you see that there is a
7  description of an analysis Dyckman & Associates
8  did of the factors that influence fee change
9  decisions among payers; correct?
10      A.  I -- I see that it -- there is that
11  section, and -- and I am turning to the
12  accompanying Exhibit 14.  Okay.
13      Q.  And do you see that the top three
14  factors are the impact of fee changes on claims
15  cost and premiums, the impact on the plan's
16  ability to maintain an adequate provider network
17  that meets customers' access requirements, and
18  parity consistency with competitor fee levels?  Is
19  that consistent with your understanding?
20      A.  I am going to -- let me just look at
21  this a little more -- with a little more
22  background so that I fully understand it.

857

1          (Pause.)
2          (The witness viewing Exhibit
3  Hartman 020.)
4      Q.  Dr. Hartman, do you know anything about
5  how payers negotiate with providers for physician-
6  administered drugs?
7      A.  I --
8          MR. SOBOL:  Was the other question
9  withdrawn?
10          MR. EDWARDS:  Yes.  I will withdraw the
11  prior question.
12          THE WITNESS:  I was getting into this.
13          MR. SOBOL:  Just roll with it.
14          THE WITNESS:  It's a joke.  It's a joke.
15      A.  Oh, we are into the second question.
16          I have looked at proforma contract offer
17  sheets pulled together either by PBM's or third-
18  party payers that are starting points of
19  negotiation with other entities, and I have looked
20  at the -- at some of the things that are reflected
21  in the negotiation, so that I -- but so that I
22  have a general understanding, but -- but I don't

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
Boston, MA

858

1   recall precisely what they were.
2       Q.  Do you recall whether these things that
3   you looked at related to negotiations between
4   payers and providers for physician-administered
5   drugs?
6       A.  I certainly saw some for physician-
7   administered drugs is my recollection.
8       Q.  Can you identify them?
9       A.  Do you have my -- my rebuttal
10  declarations here?  I bet you do.
11      Q.  You can't identify them off the top of
12  your head?
13      A.  Well, I -- I -- they are cited -- I
14  think they are cited therein, and I think I have
15  got examples therein, but I don't -- I don't
16  remember, of the many entities that I have looked
17  at in the various contexts, I don't keep a
18  tabulation of them.  It is more --
19      Q.  Other than what you say in your rebuttal
20  report on class certification, I take it you have
21  not done a study or an analysis of how payers
22  negotiate with providers for physician-

859

1   administered drugs; is that correct?
2       A.  Beyond what I have just said, in looking
3   at these offer sheets and how they start doing it
4   and reviewing the materials that had been cited
5   elsewhere, I have done no independent study, no.
6       Q.  And I take it you are not in a position
7   to dispute the conclusion of Dyckman & Associates
8   in Exhibit Hartman 020 to your deposition on page
9   18 that "one of the most important things payers
10  are interested in is the ability to maintain an
11  adequate provider network that meets customers'
12  access requirements"?
13      A.  No, I would not.  I would think that
14  that is important.
15      Q.  And "one way in which a payer might
16  induce a provider to join its network is by
17  assuring the provider that it can make a profit on
18  the relationship"; correct?
19      A.  The -- there are many avenues in which
20  doctors can be -- providers can be incentivized,
21  and that is one of them, as is the return to
22  practice on the part of manufacturers, so, yes, it

860

1   is obviously -- a provider is not going to enter
2   into an arrangement with a payer if it is derisory
3   or does not allow for a reimbursement.
4       Q.  So the desire to have an adequate
5   provider network might be another reason why a
6   payer would not change its reimbursement formula
7   even though it had knowledge of actual ASPs;
8   correct?
9       A.  I'm -- I have not done enough of a study
10  to be able to assess or respond to that.  I mean
11  the -- the particular physicians that we are
12  talking about are specialists in various sorts,
13  and they essentially have considerable market
14  power, and for them to rely strongly on a provider
15  -- a plan's -- oh, I see this is to maintain
16  adequate, meets customers' access requirements?
17      You know, the abilities -- the
18  particular monopoly power or the market power on
19  this side of this negotiation in my view would be
20  with the providers as opposed to the payers, but
21  it is clearly important to the payers, too.
22      Q.  You think providers have market power?

861

1       A.  I think providers that have a specialty
2   such as urologists or oncologists, dealing with
3   let's say prostate cancer, yes, they -- I think
4   they are -- they have -- they have market power.
5       Q.  What impact does that market power have
6   on reimbursement rates for drugs?
7       A.  Well, certainly the fact that physicians
8   have or providers -- well, let's say physicians --
9   have market power is why they are targeted as the
10  movers of market share by the manufacturers, by
11  the AWP and price inflation that is alleged in
12  this matter.
13      The reason that doctors can shift their
14  patients from Lupron to Zolodex or back again is
15  certainly what was the most compelling aspect
16  about those companies using return to practice to
17  try and move market share, and that was based on
18  the fact that the doctors were in a, with the
19  physician- administered drugs, the relationship is
20  particularly important, the physician's position
21  in terms of prescribing a therapy and implementing
22  that therapy, and that is something that usually

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 27, 2006
                        Boston, MA

862

1   would not be second-guessed by a payer, and those
2   decisions are made by docs, and docs have the
3   power to make those decisions and shift patients.
4       Q.  So the market power of doctors is one
5   reason payers would permit doctors to earn a
6   profit on drugs; correct?
7       A.  I -- the -- I haven't looked at -- I
8   know of no studies that have focused on why they
9   would allow them to do that.  The -- my
10  understanding and what we're certainly seeing when
11  the -- when the providers -- when the payers learn
12  that there is an abuse of on the part of the
13  providers is that there is a response to that.  So
14  it is -- if you are telling me that all payers are
15  trying to accommodate this market power, I don't -
16  - I'm --
17      Q.  Well, are you saying that there is no
18  relationship between the market power of doctors
19  and the reimbursement rates that payers pay for
20  drugs?
21      A.  I'm saying that the reimbursement rates
22  that doctors -- that payers reimburse for

863

1   physician-administered drugs, doctors have had
2   this market power for the last 15 years, the last
3   20 years, and there has been a difference in how
4   that -- this market power has been used and
5   strategically incentivized, and it hasn't been on
6   the part of payers responding to physicians or in
7   some regard some strategic behavior there.  I am
8   seeing it on the part of the manufacturers
9   offering return to practice to the doctors, and
10  I'm seeing that the payers -- part of the reason
11  that they may have not responded as quickly is
12  that they -- that they don't know what these ASPs
13  are and the doctors have the information and they
14  have the market power.
15      Q.  Changing the reimbursement formula is
16  not going to change the market power that
17  providers have in negotiating contracts with
18  payers, is it?
19      A.  Changing the reimbursement formula will
20  change the ability of incentivizing providers to
21  use -- to move market share for certain
22  pharmaceuticals using the spread.  It will be on a

864

1   price-based basis.
2       Q.  But the providers' market power is a
3   constant; right?  It will remain the same
4   irrespective of the reimbursement formula that is
5   used?
6       A.  I haven't -- I haven't done an analysis.
7   I can't render an opinion on that.
8       Q.  Well, in connection with your
9   reimbursement or expectation yardstick, you
10  suggest that payers are willing to reimburse
11  providers for an amount that is up to 30 percent
12  greater than ASP; correct?
13      A.  I'm saying that that's what the market
14  information that I have relied upon demonstrates
15  to me.
16      Q.  Payers are willing to let providers make
17  a profit of at least 30 percent on the drugs;
18  correct?
19      A.  It -- depending on the reimbursement.  I
20  mean if it is AWP less 15 percent, then it is not
21  going to be 30 percent.  If they are reimbursing
22  at AWP, then it would be 30 percent. If they were

865

1   reimbursing at AWP plus 10 percent, it would be
2   40. More.  But it depends on the reimbursement,
3   the formula, the reimbursement formula, which we
4   find in Medpac.
5       Q.  Right.  And that allowed profit, if you
6   will, is something that results from the
7   providers' market power?
8           MR. SOBOL:  Objection.
9       A.  The market power is the fact that the
10  types of physicians that are making use of
11  physician-administered drugs, administering them
12  in their office, usually oncologists, these are
13  specialty drugs.  They are specialists.
14          The market power arises from that kind
15  of specialty and those kind of credentials and
16  that ability to attract patients as such that the
17  patients will come to them for whatever, for their
18  problems, and then they will accept their opinions
19  as to the appropriate drugs to be administered in
20  their -- in their treatment.
21      Q.  Right.  In other words, the first 30
22  percent above ASP is attributable to physician