Exhibit 8

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 28, 2006
Boston, MA

905

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

*****************************

| | |
|---|---|
| IN RE:  PHARMACEUTICAL | MDL DOCKET NO. |
| INDUSTRY AVERAGE WHOLESALE | 01CV12257-PBS |
| PRICE LITIGATION | |

****************************      FEBRUARY 28, 2006

THIS DOCUMENT RELATES TO:         VOLUME: IV

ALL ACTIONS                       PAGES: 905-1168

****************************

C O N F I D E N T I A L

CONTINUED VIDEOTAPED DEPOSITION OF RAYMOND S.

HARTMAN, PH.D., called as a witness by and on behalf

of the Defendants, pursuant to the applicable

provisions of the Federal Rules of Civil Procedure,

before P. Jodi Ohnemus, Notary Public, Certified

Shorthand Reporter, Certified Realtime Reporter, and

Registered Merit Reporter, within and for the

Commonwealth of Massachusetts, at the offices of Dwyer

& Collora, LLP, 600 Atlantic Avenue, Boston,

Massachusetts, on Tuesday, 28 February, 2006,

commencing at 9:33 a.m.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 28, 2006
Boston, MA

---

906

1  APPEARANCES:
2
3  HAGENS, BERMAN, SOBOL & SHAPIRO
4  BY: Edward Notargiacomo, Esq.
5  David Nalven, Esq.
6  One Main Street, 4th Floor
7  Cambridge, MA  02142
8  617 402-3700
9  ed@hbsslaw.com
10  For the Plaintiffs
11
12  HOGAN & HARTSON, L.L.P
13  BY: Steven M. Edwards, Esq.
14  Hoa T.T. Hoang, Esq.
15  James S. Zucker, Esq.
16  Colleen Scott, Esq. (Via telephone)
17  875 Third Avenue
18  New York, NY  10022
19  212 918-3506
20  smedwards@hhlaw.com / htthoang@hhlaw.com
21  jszucker@hhlaw.com
22  For Defendant Bristol-Myers Squibb

---

907

1  APPEARANCES: (Continued)
2
3  DAVIS, POLK & WARDWELL
4  BY: Michael S. Flynn, Esq.
5  450 Lexington Avenue
6  New York, NY  10017
7  212 450-4000
8  michael.flynn@dpw.com
9  For Defendant Astra Zeneca Pharmaceuticals Corp.
10
11  ROPES & GRAY, L.L.P.
12  BY: Steven A. Kaufman, Esq.
13  One International Place
14  Boston, MA  02110-2624
15  617 951-7000
16  steven.kaufman@ropesgray.com
17  For Defendant Shering Corporation/
18  Shering Plough
19
20
21
22  (CONTINUED)

---

908

1  APPEARANCES: (Continued)
2
3  SHOOK, HARDY & BACON, L.L.P.
4  BY: James P. Muehlberger, Esq.
5  Tiffany W. Killoren, Esq.
6  2555 Grand Boulevard
7  Kansas City, MO  64108-2613
8  816 474-6550
9  jmuehlberger@shb.com
10  tkilloren@shb.com
11  For Defendant Aventis Pharmaceuticals
12
13  PATTERSON, BELKNAP, WEBB & TYLER, L.L.P.
14  BY: Adeel A. Mangi, Esq.
15  1133 Avenue of the Americas
16  New York, NY  10036-6710
17  212 336-2000
18  aamangi@pbwt.com
19  For Defendant Johnson & Johnson
20
21
22  (CONTINUED)

---

909

1  APPEARANCES: (Continued)
2
3  DECHERT L.L.P.
4  BY: Frederick G. Herold, Esq.
5  1117 California Avenue
6  Palo Alto, CA  94304-1106
7  650 813-4800
8  frederick.herold@dechert.com
9  For GlaxoSmithKline
10
11  MORGAN, LEWIS & BOCKIUS, L.L.P.
12  BY: J. Clayton Everett, Jr., Esq.
13  1111 Pennsylvania Avenue, N.W.
14  Washington, DC  20004
15  202 739-5860
16  jeverett@morganlewis.com
17  For Pharmacia Corporation of the
18  State of Connecticut
19
20
21
22  (CONTINUED)

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                     February 28, 2006
Boston, MA

910

1   APPEARANCES:  (Continued)
2
3   KIRKLAND & ELLIS, L.L.P.
4   BY:  Helen E. Witt, Esq.
5   200 East Randolph Drive
6   Chicago, IL  60601
7   312 861-2148
8   hwitt@kirkland.com
9   For Defendant Roxane in the Connecticut case
10
11   APPEARING VIA TELEPHONE:
12
13   COVINGTON & BURLING
14   BY:  Mark Lynch, Esq.
15   1201 Pennsylvania Avenue NW
16   Washington, DC  2004-2401
17   202 662-5685
18   mlynch@cov.com
19   For GlaxoSmithKline
20
21
22        (CONTINUED)

911

1   ALSO PRESENT:
2
3   Eric M. Gaier, Ph.D.
4   Bates White
5   2001 K Street, N.W, Suite 700
6   Washington, D.C.  20006
7   202 216-1142 / ericgaier@bateswhite.com
8
9   William B. Tye
10   The Brattle Group
11   44 Brattle Street
12   Cambridge, MA  02138-3736
13   617 864-7900 / btye@brattle.com
14
15   Timothy S. Snail, Principal
16   CRA International
17   John Hancock Tower
18   200 Clarendon Street, T-33
19   Boston, MA  02116-5092
20   617 425-3000
21
22   Ralph Scopa, Videographer

912

1            INDEX
2
3   TESTIMONY OF:                     PAGE
4   RAYMOND S. HARTMAN, Ph.D.
5     (Cont'd by Mr. Edwards)..................... 914
6     (By Mr. Flynn)............................... 1108
7
8
9          EXHIBITS
10   NUMBER          DESCRIPTION        PAGE
11   Exhibit Hartman 041, HHC 908-1217-0177.......... 915
12   Exhibit Hartman 042, HHC 0010359-362............ 919
13   Exhibit Hartman 043, HHC 001-0363.............. 927
14   Exhibit Hartman 044, "Comparing Drug
15        Reimbursement: Medicare
16        Department..."............. 951
17   Exhibit Hartman 045, "Medicare Reimbursement of
18        Prescription Drugs"........ 951
19   Exhibit Hartman 046, "Excessive Medical
20        Payments..."............... 975
21   Exhibit Hartman 047, Report of Ernst R. Berndt.. 996
22   Exhibit Hartman 048, Excerpt.................... 1019

913

1        EXHIBITS  (CONTINUED)
2   NUMBER          DESCRIPTION        PAGE
3   Exhibit Hartman 049, Beaderstadt deposition
4        Transcript................. 1030
5   Exhibit Hartman 050, Deposition of Christopher
6        Eddy...................... 1032
7   Exhibit Hartman 051, Deposition transcript of
8        David Morris............... 1036
9   Exhibit Hartman 052, Deposition transcript of
10        Robert Farias.............. 1059
11   Exhibit Hartman 053, "National Center for Health
12        Statistics"................ 1092
13   Exhibit Hartman 054, Letter, 2/6/06............. 1120
14
15
16
17
18
19
20
21
22

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D.  CONFIDENTIAL
Boston, MA

February 28, 2006

914

1    VIDEO OPERATOR: Good morning. We are now
2    recording and on the record. This is a continuation
3    of the deposition of Raymond Hart.
4
5        RAYMOND S. HARTMAN, Ph.D.
6    having been previously sworn, testified as follows
7    to direct interrogatories
8
9    BY MR. EDWARDS:
10   Q. How are you today, Doctor Hartman?
11   A. Good. How are you?
12   Q. Fine, thanks. When we left off yesterday,
13   we were talking about EAC, and I want to ask you
14   whether you knew that not only did HCFA not
15   implement EAC, but it told its carriers that there
16   should be no drugs paid based on EAC.
17   A. And I -- I think I -- you -- I responded
18   to that that I had known that the surveys had not
19   been conducted so that it would be, there were no
20   EAC estimates to use, and hence the reliance -- the
21   reliance was on the AWP independent of that
22   equation.

915

1    Q. But HCFA also decided that even to the
2    extent that there were estimates on a case-by-case
3    basis, reimbursement could not be based on EAC. Were
4    you aware of that?
5    A. I have not seen that general policy
6    statement to that effect.
7        MR. EDWARDS: What I want to do is mark as
8    Exhibit Hartman 041 to this deposition a copy of a
9    letter from Darlene Debus, D-e-b-u-s, to Grant
10   Stefan and, the Bates Nos. are HHC 9081217. There
11   is an attachment to this exhibit as well which is
12   from Grant Stefan and to all the physicians who
13   wrote about Lupron, and the Bates number on that is
14   HHC 014-0177.
15       (HHC 908-1217-0177 marked Exhibit
16   Hartman 041.)
17   Q. Are you familiar with this document?
18   A. (Witness reviews document.) I don't
19   recall whether I saw this document in this matter or
20   in the Lupron matter. I don't recall seeing it. I
21   may have. I may not have.
22   Q. Take a look at the third page. It's a

916

1    memorandum from Grant Stefan who apparently was with
2    Medicare to all the physicians who wrote in about
3    Lupron, dated August 6, 1996, correct?
4    A. Well, I see that the letter is addressed
5    to Grant Stefan and at Blue Cross Blue Shield of
6    North Dakota.
7    Q. I'm asking you to look at the third page.
8    A. I know, but you were saying did I see that
9    he was with Medicare, and I'm -- I'm trying to -- I
10   see a -- I see a Medicare heading to this memo, and
11   I see Grant Stefan's name on it. I'm trying to make
12   consistent the fact that I see him at a Blue Cross
13   Blue Shield of North Dakota on the first page of
14   what you gave me, and then something where it seems
15   as if there's --
16   Q. Right. It would appear that he's a
17   carrier or he works with a carrier.
18   A. Yeah. That's what I mean, so that I
19   didn't -- I thought you were saying he was somebody
20   at Medicare. It seems that he's with a carrier to
21   me.
22   Q. Right.

917

1    A. Okay.
2    Q. I agree with that.
3    A. Okay.
4    Q. And if you look at the first sentence of
5    his memorandum to all physicians who wrote in about
6    Lupron he says, "The regional office of HCFA has
7    instructed me to write this letter retracting my
8    request for invoices made in my memo to you of July
9    11, 1996." Do you see that?
10   A. I do.
11   Q. And then if you look at the letter itself,
12   on the first page in the third paragraph he says in
13   the fourth sentence, "Therefore, at this time, there
14   should be no drugs paid based on EAC."
15   A. Or the -- in the letter now. I'm sorry.
16   Okay. I was still back on the memo. I'm sorry.
17   Where?
18   Q. Do you see where he says in the third
19   paragraph, "Therefore, at this time, there should be
20   no drugs paid based on EAC."
21   A. I see that in that paragraph. Let me just
22   look a bit at the -- (Witness reviews document.)

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 28, 2006
Boston, MA

---

**918**

1    Q.  Does this have any impact on your opinion
2  that the federal policy at this time was EAC?
3    A.  Well, what I think it -- it accords
4  precisely with what I had said, that I see in the
5  second paragraph that there's -- there's a
6  suspension of any data collection efforts through
7  surveys, and as I mentioned before, the surveys were
8  not going on, and so that if there was no survey
9  data available for the EAC, they did not know what
10  it was, and, therefore, the reliance fell back on
11  AWP.  And I've expressed that in my -- in my report,
12  and it -- it doesn't change what the statute says,
13  and it doesn't change how I've interpreted the
14  historical facts surrounding the statute as laid out
15  in my declaration.  So, this doesn't change my
16  opinion.
17    Q.  So, it's your opinion that, even though
18  this document says there should be no drugs paid
19  based on EAC, it was federal policy at this time to
20  reimburse based on EAC.
21    A.  I am -- I am not a lawyer or I have not --
22  I am not an expert on the interpretations of the

---

**919**

1  Medicare statute.  I understand the facts to be as
2  I've stated them in my declaration, and they accord
3  with what I see in this -- in this letter and this
4  memo.
5       MR. EDWARDS:  I'm going to mark as Exhibit
6  Hartman 042 a copy of a letter from Donna Shalala to
7  Tom Bliley, chairman of the House Commerce
8  Committee, dated May 31, 2000.  The Bates numbers
9  are HHC 0010359 through 0362.
10       (HHC 0010359-362 marked Exhibit
11  Hartman 042.)
12       MR. EDWARDS:  We're just waiting --
13       THE WITNESS:  I understand.
14       MR. EDWARDS:  -- for the document.
15    A.  (Witness reviews document.)
16    Q.  Have you ever seen this document before?
17    A.  I don't recall among the many documents
18  that I've seen whether -- that this has been one of
19  them.
20    Q.  Do you know who Donna Shalala was?
21    A.  She was a -- my recollection is that she
22  was a Clinton cabinet member, and she may have been

---

**920**

1  the director of HHS.  I can't really recall.
2    Q.  And HCFA was part of HHS, correct?
3    A.  That's my understanding, yes.
4    Q.  And Medicare was part of HCFA?
5    A.  That's correct.
6    Q.  Correct.  If you look at the third
7  paragraph on the first page of this document, she
8  says, "Because the estimated acquisition cost
9  approach had proved unworkable in 1997, the
10  President proposed legislation to pay physicians
11  their actual acquisition costs."  Are you familiar
12  with that legislation?
13    A.  The legislation is -- given that it's
14  talked about proposals and proposed legislation, and
15  if it appeared in any of the CFR materials that I've
16  cited in the footnotes relating to Medicare or some
17  of the documents leading up to that, I may have read
18  it.  I don't know.  This proposed legislation is too
19  general for me to be able to know exactly what she
20  means by this.
21    Q.  She goes on to say, "Physicians would tell
22  Medicare what they pay for drugs and be reimbursed

---

**921**

1  that amount rather than the administration
2  developing an estimate of acquisition costs and
3  basing payment on the estimate."
4       So, the proposal was to reimburse
5  physicians at their actual acquisition cost,
6  correct?
7    A.  That's how I read those two sentences.
8    Q.  And do you know why this legislation would
9  have been necessary if it already was federal policy
10  as you have testified to reimburse physicians based
11  on estimated acquisition cost?
12    A.  Well, the federal policy to which I've
13  referred to is -- are merely the CFR and the
14  Medicare regulations as they -- as they stand as
15  written and as you've given them to me.  So, I take
16  that as an expression of congressional policy and
17  regulation.
18       We do know and we've all agreed that the
19  estimated acquisition survey that -- the surveys to
20  estimate the acquisition cost proved unworkable, as
21  they're saying here.  And so, the President is
22  asking that -- that rather than a survey being done,

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL          February 28, 2006
Boston, MA

922

1 that there's a self-reporting on the part of
2 physicians that they pay -- the estimated
3 acquisition cost would really be the acquisition
4 costs of the physician. So, they're asking them to
5 do the billing at the acquisition cost, the average
6 of which would be the estimated acquisition cost
7 overall.
8     So, this fits in with the fact that the
9 surveys proved unworkable, and I see in the next
10 sentence it says that it did not adopt the
11 Administration's proposal, and they continued to
12 relate it to an AWP-based reimbursement rate, which
13 I understand to be the case, and I think I've
14 probably cited that fact in my declaration or
15 somewhere in one of my declarations.
16    Q.  So, it's your testimony that the spread
17 for Medicare was zero by statute when Congress, in
18 fact, adopted -- I'm sorry -- rejected a statute
19 that would have made it zero.
20    MR. NOTARGIACOMO:  Objection. You can
21 answer the question.
22    A.  Could you rephrase that -- that question.

923

1    Q.  Is it your testimony that it was federal
2 policy that the appropriate spread was zero by
3 statute, even though Congress rejected a statute
4 that would have made it zero?
5     MR. NOTARGIACOMO:  Same objection.
6    A.  I have based my spreads on my reading of -
7 - of the expression of Congress in the CFRs relating
8 to what reimbursement should be. And I -- and I
9 know there's -- there's a -- a mountain of -- of
10 legislative and statutory history behind that, and I
11 have not examined that in any way to draw any
12 conclusion other than to take the regulations as I
13 see them written and as expressed in my footnote.
14    Q.  Doesn't the fact that --
15     MR. NOTARGIACOMO:  Objection. He's not
16 finished with his answer.
17    A.  Yeah, let me just -- I just want to make -
18 - I just wanted to cite which footnote it was indeed
19 in. In Footnote 13.
20    Q.  Doesn't the fact that Congress rejected
21 zero by statute in the Balanced Budget Act of 1997
22 suggest that your interpretation of the words

924

1 "actual charge" in the regulation as meaning
2 acquisition cost is incorrect?
3     MR. NOTARGIACOMO:  Objection.
4    A.  No. My interpretation stands as it does
5 and as supported by the footnotes that I've -- I've
6 cited.
7    Q.  So, it's your testimony that, even though
8 Congress rejected zero by statute, HCFA went ahead
9 and adopted regulation implementing zero by statute.
10    MR. NOTARGIACOMO:  Objection.
11    A.  You're posing a question to me, the
12 antecedent of which I don't know whether is true or
13 not. I see a paragraph here where it's saying
14 Congress did not adopt this proposal in one letter.
15 I don't -- I don't know if there was a letter
16 following this that -- that refined this. I look at
17 the statutes as they are stated, and that's --
18 that's as far as I've taken it.
19    Q.  You don't have the requisite expertise to
20 testify definitively in this area, correct?
21    MR. NOTARGIACOMO:  Objection.
22    A.  I am not an expert on the statutory

925

1 history of -- of Medicare, period.
2    Q.  Do you have Exhibit Hartman 040 there in
3 the stack?
4    A.  I do.
5    Q.  This was the regulation implementing the
6 Balanced Budget Act that we discussed yesterday. Do
7 you recall that discussion?
8    A.  I do.
9    Q.  And we had a discussion about the meaning
10 of the words "actual charge" in that regulation,
11 correct?
12    A.  We did.
13    Q.  Now, are you going to make any further
14 inquiry to determine what those words mean and how
15 they were interpreted by the medical community?
16    A.  If asked to, I may. I -- I point out that
17 in the -- in the paragraph that we just read, it is
18 certainly the case that Ms. Shalala is making the --
19 the argument that the amount charged should be the
20 amount that physicians pay. You're telling me that
21 that was -- that alternative was rejected. I -- I
22 see support in this -- in the letter of Ms. Shalala

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 28, 2006
Boston, MA

---

926

1  that the charged amount is what they were talking
2  about, what the physicians paid for the drugs. Now,
3  whether that was implemented as an alternative or
4  whether Congress repudiated that or didn't allow it
5  or didn't implement that, that's -- that's something
6  that I don't have the -- have knowledge about.
7      Q.  Well, you said if asked to, you may make
8  further inquiry as to the meaning of the words
9  "actual charge" in the regulation.  If I ask you to,
10  will you do it?
11      MR. NOTARGIACOMO:  Objection.
12      A.  If you ask -- ask me to, I'd be delighted
13  to consider that and ask the -- my counsel whether
14  they would want me to do it.
15      Q.  Well, I'm asking you to do it, okay?  And
16  I'm also asking you whether if you learn as a result
17  of your inquiry that your interpretation of those
18  words was incorrect, you will correct your report.
19      MR. NOTARGIACOMO:  Objection.
20      A.  I -- I would have to defer to my counsel
21  for what they would want me to do.
22      Q.  You wouldn't insist on correcting your

---

927

1  report, just as a matter of personal pride?
2      A.  I don't take my report to be incorrect as
3  it stands.
4      MR. EDWARDS:  I'll mark one more document
5  in this series.  This will be Exhibit Hartman 043.
6  It's a letter from Nancy-Ann Min DeParle to
7  Congressman Pete Stark, dated January 26th, 1998.
8  The Bates Stamp is HHC 001-0363
9          (HHC 001-0363 marked Exhibit Hartman
10  043.)
11      A.  May I inquire as to the province of this -
12  - I see a stamp of January 26th, 1998.  Was that the
13  date the letter was sent or is that something that
14  was added afterwards, do you know?
15      Q.  I don't know.
16      A.  Okay.
17      Q.  Do you know?
18      A.  Do I know?  I wouldn't have asked if I
19  knew.
20      Q.  So, in this letter, Ms. DeParle talks
21  about the proposal?
22          (Computer sounds.)

---

928

1      THE WITNESS:  The last two days have been
2  erased.
3      MR. EDWARDS:  The record should reflect
4  that a computer just started to squeak and squeal,
5  but we're okay.
6      Q.  In the second paragraph of this letter,
7  Ms. DeParle talks about the proposed legislation
8  that would have removed the markup currently being
9  paid above the true marketplace wholesale price. Do
10  you see that?
11      A.  Well, I -- I see in the first paragraph it
12  says that, "While Medicare policy is to pay the AWP,
13  the prices reported by commercial sources of this
14  information do not reflect -- the prices reported --
15  " oh. "The commercial sources do not actually
16  reflect the true wholesale price or the true price -
17  -" she calls it a wholesale price "-- in the
18  marketplace."  Is that what you're getting at?  Is
19  that or the sentence?
20      Q.  Well, I was referring to the second
21  paragraph.  You're reading from the first paragraph?
22      A.  Okay.

---

929

1      Q.  The third paragraph says, "The proposal,
2  which OIG supported did not survive the legislative
3  process."  Does that remove any doubt that you may
4  have had in your mind as to whether zero by statute
5  was rejected by Congress?
6      A.  As I say, the -- I read the Medicare
7  statutes as they appear in the CFR or the Medicaid
8  regulations -- or the Medicare, I'm sorry,
9  regulations.  If, indeed, Congress had not intended
10  to introduce a measure of reimbursement that was the
11  lesser of several measures, and if all of these
12  individual letters that you've pulled out from what
13  must be a voluminous record back and forth of what
14  was going on was saying that they -- that there was
15  -- that any reliance on anything but AWP is -- is
16  not going to be allowed, I don't understand why it
17  appears in the -- in the CFR.  I've taken the CFR as
18  a statement of what Congress meant, as I -- I know
19  there were letters going back and forth and debates
20  about what should be what, and I've looked at the
21  final regulations that have appeared, and I know
22  that there was concerns that AWP allowed for margins

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 28, 2006
Boston, MA

930

1  that were too high and there were motions to move to
2  ASP that only were finally implemented in 2005, and
3  that the -- going to 95 percent of AWP at 85 percent
4  of AWP were movements in that direction, but if what
5  you're telling me is that the legislative process
6  has continued to reject any kind of bill charge
7  acquisition cost, then I don't understand why it
8  appears in the CFR and in the regulations that talk
9  about reimbursement. But again, I'm not an expert
10 on -- on the -- on this -- on the statutory
11 implementation of -- of or the statutory
12 articulations of these standards. I see the
13 standards as they appear in the record.
14     Q.  Well, Ms. DeParle -- DeParle says, "The
15 proposal which OIG supported did not survive the
16 legislative process. Instead, Congress provided in
17 Section 4556 of the Balanced Budget Act of 1997 that
18 program payment be made at 95 percent of the AWP.
19 Do you think she would have said that if the
20 Balanced Budget Act of 1997 had, in fact,
21 implemented zero by statute?
22     MR. NOTARGIACOMO: Objection.

931

1      A.  Well, again, when you're saying "zero by
2  statute," you know, let's -- let's be clear of what
3  that means. It's -- when you're saying "zero by
4  statute" you're saying that they -- that they
5  wouldn't have implemented a statute that says you
6  pay the lesser of AWP or 95 percent of AWP or the
7  actual bill charged or the estimated acquisition
8  cost.
9      So, you know, if -- if Congress had
10 decided this and this was what was to be written
11 into -- into the regulations, I don't know how the
12 Medicare regulations read as they do read.
13     Q.  Unless you --
14     A.  And that's something I will leave to
15 someone who's an expert on the Medicare regulations.
16 It's not my -- I can only read what they state and
17 what they imply for reimbursement.
18     Q.  It goes on to say, "Furthermore, no
19 provision was made for controlling any rise in the
20 AWP." Are you aware of the discussions that were
21 had at the time of the adoption of the Balanced
22 Budget Act of 1997 concerning situations where a

932

1  manufacturer might increase AWP in order to create
2  spread?
3      A.  There were certainly cases where that was
4  occurring, which have -- have been cited in my
5  report. There certainly was an attempt to begin to
6  control costs on the part of managed care of
7  prescription drugs. And the focus of that -- those
8  efforts were the AWPs of self-administered and
9  physician-administered drugs. So, yeah, I'm aware
10 that that was going on.
11     Q.  You say there were cases where that was
12 occurring, and HCFA was aware that that was
13 occurring, correct?
14     MR. NOTARGIACOMO: Objection.
15     A.  I'm saying it was occurring, and as we
16 look back now, we can see that it was occurring.
17     Q.  And do you know whether HCFA and Congress,
18 for that matter, were aware that that was occurring?
19     MR. NOTARGIACOMO: Objection.
20     A.  Well, I think we've plowed a field of
21 anecdotal citations yesterday where increasing
22 information was becoming clear that reimbursement

933

1  based on AWP allowed for large spreads, large
2  returns to practice. And over the '90s, culminating
3  in the litigation that we find in the early 2000s
4  that that understanding became more pervasive and it
5  -- it stimulated the Congress to act as they finally
6  did in 2 -- in the -- in the prescription --
7  Medicare Prescription Drug Improvement and
8  Modernization Act and in third-party payers
9  beginning to assess how they were doing
10 reimbursement.
11     Q.  There are two ways to create spread,
12 correct? One way is to discount the transaction
13 price; the other way is to increase the AWP, is that
14 right?
15     A.  That's right.
16     Q.  And HCFA was aware of both ways in the
17 1990s, correct?
18     MR. NOTARGIACOMO: Objection.
19     A.  I -- that -- those types of activities
20 were occurring in the '90s. I'm obviously looking
21 for a particular discussion of this -- of these
22 examples. I mean, it -- at Page 53, I describe the

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 28, 2006
Boston, MA

934

1  -- both of the issues that you're talking about, and
2  this is a summary from MedPac that is talking about
3  reimbursement, and it -- it shows exactly. It's
4  stating exactly, Paragraph --
5      Q.  Did you say Page 53?
6      A.  Paragraph -- if I said Page 53, I'm sorry.
7  Paragraph 53, Page 36.
8      Q.  And you're referring to your report?
9      A.  I'm referring to my December 16th
10 declaration.  And I've -- in 53-A I cite, and with
11 emphasis in bold, that there were two -- two
12 alternative strategies.  You could either -- to
13 increase market share.  You could either raise the
14 AWP and leave your ASP unchanged, which would be the
15 preferable strategy, but that was -- it was clear to
16 manufacturers that AWP was becoming a focal point,
17 and that increasing AWP might draw attention of
18 regulators, and then the alternative way is lowering
19 the ASP and keeping the AWP constant.  And that
20 would also increase the spread, and that's discussed
21 as an alternative method by MedPac.  And so this --
22 this -- this behavior -- obviously when we look back

935

1  at Lupron, this behavior was going on between Lupron
2  and Zoladex starting in the mid -- early to mid
3  '90s, and awareness was permeating the industry, but
4  not everyone was aware of it.  Not everyone was
5  aware of the -- that the completeness of it and how
6  pervasive it was; that they acted on it in the ways
7  that they have since that awareness has solidified
8  and galvanized statutory changes and -- and
9  reevaluations of how private third-party payers do
10 reimbursement.
11     Q.  I take it you're not in a position to
12 testify that HCFA was deceived by any of this,
13 correct?
14     A.  Well, I think we're -- we're returning to
15 the -- the -- you're -- your word of choice
16 yesterday is "deceived" or "deception."  The -- the
17 question that un -- the notion of the inflation of
18 the AWP and its implications were that prices were
19 sufficiently nontransparent; that the extent -- the
20 extent of the spread across all the drugs was not
21 understood by the -- the payers in this market.
22      And so, when you -- when you talk about

936

1  deception, I am -- I would guess HCFA may have seen
2  a report sometime in the -- in the middle of the
3  '90s where on a particular drug they said look at
4  these spreads.  Look what's going on.  But there was
5  -- it was not clear how pervasive that was.  This was
6  -- this was one of the -- again, placing it within
7  this -- this context of the importance of being
8  unimportant, this was one of the issues that was
9  receiving less scrutiny than other areas for managed
10 care.  And so, there was probably an awareness of
11 some of these spreads for some drugs.  Does that mean
12 HCFA was not deceived or deceived?  The -- the
13 question of finally acting to change your behavior
14 and reveal your preferences and reveal your
15 understanding is to change either your reimbursement
16 formula, as we talked about in terms of revealed
17 behavior, or to change the statutes.
18      And so HCFA started to understand this.
19 This is not a -- this notion of being deceived, it's
20 -- it's as if you're -- someone's telling you a lie,
21 and one day they say I'm lying to you and suddenly
22 the next day you know.  This is something where

937

1  evidence accumulates over time over a broad cross-
2  section of drugs, and your realization is a slow
3  one, because the information comes in slowly to
4  ultimately alter your behavior to reveal different
5  preferences or different economic strategies.
6      Q.  You don't know what HCFA knew, do you?
7      A.  Do I know day to day what HCFA knew?  Was
8  I present in HCFA meetings and have I -- have I
9  reviewed all the memos of HCFA and everything else?
10 No, I have not.  I have not done that.
11     Q.  So, you're not in a position to say
12 whether HCFA was deceived?
13      MR. NOTARGIACOMO:  Objection.
14      A.  I think I've stated what I'm in a position
15 to say.
16     Q.  Well, take a look at Paragraph 56 of your
17 report.  I think this is Exhibit Hartman 023 to this
18 deposition.  You say, "The basis for my finding of
19 causation and liability is empirical.  It requires a
20 comparison of actual spreads with yardstick
21 spreads," correct?
22      A.  Oh, yeah, I'm sorry.  I was looking at the

Raymond S. Hartman, Ph.D.  CONFIDENTIAL          February 28, 2006
Boston, MA

938

1    second paragraph. That's correct.
2        Q.  So, the basis for any opinion on liability
3    you may give is simply a comparison of actual
4    spreads with yardstick spreads, correct?
5        A.  That's correct.
6        Q.  And you're not in a position to go a step
7    further and render an opinion on whether HCFA was
8    actually deceived by any of those spreads.
9        A.  On a --
10       Q.  Correct?
11       A.  I -- I think I've said what -- what I --
12   what I can say about what HCFA believed or what --
13   and what was motivating HCFA.
14       Q.  I believe we established yesterday that
15   HCFA was aware of megaspreads as a result of the
16   Ven-A-Care letter, correct?
17       MR. NOTARGIACOMO:  Objection.
18       A.  I'd need to look at the Ven-A-Care letter
19   again.  You've shown me -- I have it here.  Okay.
20   So, I have this in front of me, and I know we spoke
21   about several specific paragraphs.  If you could
22   direct me back to those paragraphs.

939

1        Q.  Well one paragraph we looked at in
2    particular was the second paragraph on the third
3    page, third sentence where it says, "Based on these
4    results, we found that Medicare's reimbursement was
5    excessive and in many cases provided profit margins
6    of more than 500 percent, and in some instances more
7    than a thousand percent."
8        A.  I do see that.  I see that the sentence
9    says that the Medicare program -- that the focus
10   there was on fusion and inhalation drugs.  So there
11   clearly were a set of drugs that Medicare was
12   receiving information that the types of information
13   -- this was a letter dated in '96 -- which would
14   probably start to reflect understandings and
15   reimbursement strategies in such discussions in '97.
16   So, in the mid '90s to the mid late '90s,
17   Medicare was getting more letters and seeing more of
18   this -- this kind of data and information that was
19   leading to the discussions that -- that ultimately
20   changed the reimbursement policy.
21       Q.  HCFA would have been aware of the Medicaid
22   best prices, correct?

940

1        MR. NOTARGIACOMO:  Objection.
2        A.  The -- the best prices would be reported
3    to CMS under the Medicaid program.
4        Q.  HCFA also would have been aware of the FSS
5    prices, correct?
6        A.  The -- the statutory enablement of sharing
7    that information is un -- I don't know.  As a matter
8    of fact, I'm not sure that with the best prices
9    reported under the Medicaid statute, whether there
10   is -- there are proprietary reasons why those are
11   not shared with Medicare.  I -- I don't know how
12   much information sharing is -- goes across those
13   different groups that deal with those different
14   prices -- administrative prices.
15       Q.  This is not within --
16       A.  So the extent of awareness is not
17   something that I'm an expert in the sharing of that
18   information.
19       Q.  This is not an area in which you have
20   expertise?
21       A.  In terms of CMS practices, procedures,
22   operations, information sharing, day-to-day running

941

1    of the bureaucracy, no.
2        Q.  Do you know what the FSS price is?
3        A.  The Federal Supply Schedule price.
4        Q.  Yeah, but do you know what it's based on?
5        A.  I know that it is a -- a price that's
6    negotiated with the government for particular
7    government purchasing programs, but what do you mean
8    "is based on"?
9        Q.  You've read the MedPac report, correct?
10       A.  I have.
11       Q.  In fact, you rely on it quite heavily,
12   correct?
13       A.  Well, I certainly rely on the section that
14   deals with physician-administered drugs.
15       Q.  And you don't recall reading in the MedPac
16   report a discussion of the FSS?
17       A.  I don't at the moment.  We can visit that
18   chapter, if you'd like.
19       Q.  Do you have the MedPac report?
20       A.  I do.
21       Q.  I'm not sure what exhibit number it is.
22       MR. EDWARDS:  Do you know what exhibit

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 28, 2006
Boston, MA

942

1  number this is?
2      A.  I think we had it from a former exhibit
3  and we have a new exhibit of it.
4          MR. SNAIL:  Is it Exhibit Hartman 020?
5      A.  I've got Exhibit Hartman 026 here.
6      Q.  What I'm referring to, yes, that's it.
7  Exhibit Hartman 026.
8      A.  That's right.
9      Q.  Take a look at Page 165 of the MedPac
10 report.
11         Actually, let's look at 163.
12     A.  Well, I think -- I mean, it's -- 165 is a
13 useful page to look at in terms of setting -- I
14 mean, my understanding of what the FSS is is exactly
15 what is stated in the third paragraph on the left
16 there, that it's -- prices paid by the VA are
17 affected by various factors. The VA administers the
18 Federal Supply Schedule, and that's what governs the
19 purchases and the prices and certainly bulk
20 discounts are given under the Federal Supply
21 Schedule. So that being said, do you want to
22 redirect me to 163?

943

1      Q.  Yes.
2      A.  Okay.
3      Q.  In the second paragraph it says, "Another
4  way to create a new benchmark would be for Medicare
5  to base its payments on the FSS prices.  Generally,
6  under the FSS, the price for a drug may not be
7  higher than the lowest contracted price paid to a
8  manufacturer by any nonfederal purchaser." Is that
9  consistent with your understanding?
10     A.  I -- I understood the FSS to be as stated
11 on Page 165 and what it did and that it was -- it
12 was a -- when I've looked at the prices on the FSS,
13 they -- the FSS, they are certainly prices that are
14 lower than many -- most of the other prices.  The
15 fact that they are based on the lowest contracted
16 price paid to a manufacturer by any nonfederal
17 purchaser, I didn't -- did not know that that was
18 how they essentially negotiated that price. But I
19 knew that it -- it led to the -- to the low prices
20 that we see. So -- and, again, this is -- I see
21 this in a section of methods based on alternative
22 benchmarks, all of which are showing that in 2003

944

1  it's reflecting the growing industrywide awareness
2  over the past seven to ten years of the problems of
3  a reliance on AWP and the alternatives are ASP and
4  the Average Manufacturer Price. The AMP, which it
5  is my -- well, the AMP and here they're saying the
6  FSS.
7      Q.  If Medicare had adopted the FSS, would you
8  conclude that there was no liability and no damages
9  for Classes 1 and 2 in this case?
10         MR. NOTARGIACOMO:  Objection.
11     A.  I think my -- my description of my
12 liability threshold is -- is fairly clear in what
13 it's based on, and we've spent a lot of time talking
14 about that yesterday. And if the prices -- if the
15 prices were charged under Medicare -- or
16 reimbursements were paid under Medicare such that
17 those reimbursements led to spreads that would --
18 did not exceed the 30 percent liability threshold,
19 then they would not attain liability under -- they
20 would not reach that speed limit, as we described it
21 yesterday, of 30 percent in my -- that's used in my
22 declaration.

945

1      Q.  Well, I -- I believe you've testified that
2  under your revealed preferences theory, knowledge of
3  spreads is not enough. There has to be knowledge
4  plus conduct.
5      A.  Well, knowledge is a -- is a difficult --
6  difficult thing to quantify, and there's different
7  levels of knowledge, and people may know a lot of
8  things about a market. And knowing that doesn't
9  necessarily mean that that's where the market has to
10 -- the equilibrium conditions have to gravitate to.
11         You have to reveal -- you ultimately have
12 to commit to something based on what knowledge you
13 have or what knowledge you don't have. And that's
14 when you finally step into the market and you say
15 okay, this is what I'm doing. These are the prices
16 I'm going to pay or these are the reimbursements I'm
17 going to agree to. And so, it is based on
18 knowledge, and the more knowledge there is, the more
19 informed that revelation of preferences or behavior
20 is.
21     Q.  And is it your testimony that the conduct
22 of HCFA in 1997 in trying to get Congress to pass a

Raymond S. Hartman, Ph.D.  CONFIDENTIAL           February 28, 2006
Boston, MA

946

1  statute that would have based reimbursement on
2  acquisition cost is not sufficient conduct to
3  satisfy your revealed preferences theory?
4     A.  The -- certainly the conduct that the
5  information that we see and the -- that is -- was
6  gathered and accumulated over this period of time
7  was reflected in much discussion that we see in the
8  -- in the documents, but it led to decisions about
9  reimbursement at the times those decisions were made
10 and implemented as I read them in the -- in the CFR.
11    Q.  Do you think it's fair to blame the
12 manufacturers because Congress wouldn't let HCFA
13 change the reimbursement formula?
14    MR. NOTARGIACOMO:  Objection.
15    A.  Well, I -- you know, I've -- I'm not an
16 expert on fairness or blame.  I'm -- I'm an
17 economist.  I'm coming -- I come to a market.  I see
18 how expectations are formalized into agreements to
19 reimburse at certain rates.  I see what the
20 historical precedence for that is and what -- how
21 third-party payers agree to pay and how Medicare
22 agrees to pay and how they might be struggling with

948

1  avoid any kind of over payments that -- that were
2  generated by that.  And that's what I've been asked
3  to evaluate.
4     Q.  Well, HCFA was sufficiently agile, but
5  Congress wouldn't let them.  Do you think it is
6  appropriate, from an economic standpoint, to hold
7  the manufacturers responsible for a legislative
8  policy decision?
9     A.  You're asking an ethical or a fairness
10 question.  I'm not -- I'm not a philosopher in
11 fairness or equity.  I'm -- I'm describing a market.
12 I'm describing what happened with that market, and
13 I'm describing the implications of that market, and
14 I haven't been asked to render any kind of opinion
15 about fairness or --
16    Q.  No, I'm asking for your views as an
17 economist.  As an economist do you think it is good
18 economic policy to hold private actors liable for
19 federal government policy decisions?  I mean, as an
20 economist, doesn't that make your hair stand on end?
21    A.  I -- the -- my -- the expertise that I've
22 been asked to render in this case is not normative.

947

1  that payment, and then I'm -- I'm asked to look at
2  what manufacturers did, observing a certain payment
3  structure and a certain set of behaviors, and I'm
4  asked -- I was asked to evaluate whether those
5  discussion and those -- the limited information or
6  the growing information but the revealed preferences
7  as they existed, whether the manufacturers took
8  advantage of that.
9        (Computer sounds.)
10    THE WITNESS:  You're just doing that to
11 rattle me, aren't you.
12    A.  Whether --
13    Q.  See, whenever I don't like an answer, I've
14 made a little arrangement here.
15    A.  I think it was the question that it was
16 responding to.  I've been asked to -- you know,
17 there are allegations of manufacturer behavior of a
18 -- of did they do -- was there a -- an inflation of
19 prices, an increase of spread or increase of return
20 to practice such -- such that the market was not
21 sufficiently agile to respond to that so that they -
22 - that they could -- that that -- that they could

949

1  It's not -- is it -- is it welfare improving?  Is it
2  -- is this Pareto optimal?  Is this fair or anything
3  like that?  It's purely positive.  I'm just saying
4  look, what's the state of the world?  How did people
5  price and -- and strategically make use of a system
6  of reimbursement practices?  The -- you know, that
7  question can be turned on its end.  You can look at
8  the paragraph that we just looked at, Paragraph 53,
9  where there are these very large spreads that were
10 revealed by manufacturers for the drugs Vincasar and
11 for Lupron and Zoladex.  And so, I mean, is it fair
12 to allow companies to take advantage of a system
13 when the system is -- responds the way it does to
14 information and slowly -- and slowly adjusts the way
15 it does, and that it's not -- that it hasn't -- it
16 hasn't responded adeptly enough.  Is it fair for
17 these companies to exploit it in this way -- that is
18 well documented.  And I haven't been asked to render
19 a question about that -- fairness there either.
20 I've been asked to render a question merely what are
21 the economic impacts of those -- of that behavior.
22 That's all I have a done.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 28, 2006
Boston, MA

---

950

1      Q.  Do you know whether HCFA ever considered
2   implementing the Federal Supply Schedule as a
3   reimbursement rate?
4      A.  I would assume you -- we've already
5   established the fact that I'm not -- I was not on
6   the distribution list of all of the HCFA memorandum
7   and memos that dealt with alterations in the
8   reimbursement rate.  So, I -- I wouldn't know
9   whether they did or not.  I would assume it would be
10  one thing that -- that they've -- that many people
11  probably proposed a variety of alternative methods
12  to do it, and so that, yeah, it wouldn't surprise me
13  if they did.
14      MR. EDWARDS:  Let me mark as Exhibit
15  Hartman 044 and Exhibit Hartman 045 two reports, one
16  is an OIG report entitled "Comparing Drug
17  Reimbursement:  Medicare and Department of Veterans
18  Affairs," November 1998.  Exhibit Hartman 045 will
19  be OIG, "Medicare Reimbursement of Prescription
20  Drugs," January 2001.
21      ("Comparing Drug Reimbursement:
22  Medicare and Department of Veterans Affairs" marked

---

951

1   Exhibit Hartman 044.
2       ("Medicare Reimbursement of
3   Prescription Drugs" marked Exhibit Hartman 045.)
4       A.  (Witness reviews document.)
5       Q.  Have you seen either of these documents
6   before?
7       A.  I think I have.  It's -- at some point I -
8   - I just had all the OIG documents -- well, not all,
9   but relevant ones -- I asked to have them produced
10  for me, and I -- and I skimmed them, but I, you
11  know, I can't say specifically.
12      Q.  And if you look at Page 8 of Exhibit
13  Hartman 044, there is a comparison of what the VA
14  pays for 14 drugs to what Medicare pays, correct?
15      A.  That's correct.
16      Q.  And in some cases, Medicare pays over a
17  thousand percent more than the VA pays for
18  particular drugs, correct?
19      A.  That's correct.
20      Q.  Do you know what happened to the proposal
21  that HCFA based its reimbursement rates on the FSS?
22      A.  It -- it clearly hasn't been articulated

---

952

1   in any reimbursement standard put forward by
2   Medicare.  So I know that.
3       Q.  These indication -- indications of spreads
4   of more than a thousand percent for particular drugs
5   acquired by the VA would suggest that that would be
6   the difference between the lowest contracted price
7   paid to a manufacturer by a nonfederal purchaser and
8   the AWP, correct?
9       A.  That or 95 percent of the -- I -- I'd have
10  to see the exact date.
11      Q.  Right, 95 percent.
12      A.  95 percent of the AWP.
13      Q.  I think you're right.
14      A.  Yeah.  That's right.  So, this -- these
15  spreads will certainly be more than the -- a spread
16  based on the average sale price or the average
17  acquisition cost, because it's based on the lowest
18  sale price in that distribution.
19      Q.  It --
20      A.  But they're large spreads that, again, are
21  informing HCFA and Medicare that AWP based
22  reimbursement rate is costing them money.  It's

---

953

1   costing the taxpayers money.
2       Q.  And this information was also available to
3   private payers, correct?
4       A.  To private payers that were focusing on
5   this particular -- I mean, it was -- this was
6   publicly-available information.
7       Q.  Well, FSS prices are publicly available,
8   aren't they?
9       A.  I am not sure.  I would assume -- I don't
10  know.
11      Q.  Well, take a look at the MedPac study
12  again, Page 163, Exhibit Hartman 026.
13      A.  And I'm sorry.  What page was it?  Did you
14  give me a page?
15      Q.  163.  In the third paragraph, last
16  sentence, it says, "Administrative burdens would be
17  modest, since FSS prices are publicly available."
18      A.  I'm sorry.  In the -- 163.
19      Q.  Last sentence of the third paragraph.
20      A.  Of the third -- oh, there, okay.  Yeah.
21  Yeah, so certainly at the time of this -- this
22  writing, it -- this is -- you know, MedPac is saying

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL
Boston, MA

February 28, 2006

954

1 this over -- I -- the reason I hesitated is that I
2 know with best price for Medicaid that -- that that
3 is something that's proprietary and has been. There
4 may be changes in that, too, with the changes that
5 have been occurring with the -- with recent Medicare
6 revisions. So, yeah, as of the writing of this,
7 it's saying they were publicly available. I would
8 have to look at the stat -- at the practices and
9 procedures of whether this was also considered
10 something that was proprietary and, I don't know, of
11 strategic importance to a given manufacturer.
12      Q.  Does the fact that there was publicly-
13 available information on thousand percent spreads
14 have any impact on your determination that the
15 appropriate expectation yardstick is 30 percent?
16      A.  The -- the yardsticks that are built into
17 my determination of liability are what is reflected
18 as they've been described in revealed preferences
19 for what was agreed to be reimbursed. And we're
20 seeing changes in -- and that's what governed
21 reimbursement for a long period of time as more and
22 more of this information became available. And so,

955

1 the fact that this one document appeared did not
2 mean that everybody went out and said we're going to
3 change our reimbursement practice so that we can
4 defeat this spread.
5      What the -- the allegations in this case
6 are that there were a set of expectations that are
7 revealed by how people reimburse, and the
8 manufacturers, knowing that, said, we can take
9 advantage of this with return to practice.
10      And so, you -- you continue to show me
11 information that I fully agree was out there, and,
12 you know, whether the Federal Supply Schedule, in my
13 opinion, is not one that is -- is a useful document
14 to get at spreads, but it's just one of many saying
15 that spreads are high measuring in a variety of ways
16 for a variety of drugs, and the full extent of that
17 only became clear fairly recently within a number of
18 years -- by "fairly clear," it was sufficiently
19 knowledgeable that it was broad enough over all the
20 drugs and it became -- it goes to the radar screens
21 of the payers to say it's time we dealt with this,
22 and that it revealed itself in changes in the

956

1 reimbursement practices.
2      Q.  You say that various government reports
3 inform market expectations, correct?
4      A.  I have said that various government
5 reports that have -- yeah, I mean, all government
6 reports inform expectations.
7      Q.  Including the reports we just looked at
8 which talk about spreads in excess of a thousand
9 percent, correct?
10      A.  I've just admitted this kind of
11 information has been slowly informing expectations
12 so that we see an actual behavioral change in what
13 is reimbursed and what people agree to reimburse.
14 And so that what informed expectations and revealed
15 what was the revealed preferences at the beginning
16 of this class period and what was hardwired into the
17 reimbursement rates over much of the class period
18 were what was reflected in the early '90s.
19      Q.  And you can't rule -- excuse me, you can't
20 rule out the possibility that private payers were
21 thinking, well, my expectation is that spreads vary
22 all over the place. There may be a thousand-percent

957

1 spreads, but my preference as revealed in my
2 contracting practices is to reimburse at AWP minus
3 15 percent.
4      A.  If -- you've shown me a document --
5      Q.  You can't rule out the possibility --
6      MR. NOTARGIACOMO:  Objection.
7      A.  Can I --
8      Q.  -- payers went through that thought
9 process?
10      MR. NOTARGIACOMO:  Let him answer one
11 question at a time. Which question do you want him
12 to answer, the first one or the one you just
13 posited?
14      A.  I mean in direct response to the question
15 of ruling that out, you put in front of me yesterday
16 Exhibit Hartman 035 where we see in 2004, and I
17 think there was concomitant deposition testimony
18 which I don't remember who it was but it's not
19 really relevant. Oh, Mulroy. It's -- if I found
20 over the period of the '90s that these kinds of
21 analyses were going on and -- and people were
22 focusing broadly across all the drugs and realizing

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 28, 2006
Boston, MA

958

1 this is a -- this is a difficulty, and we're going
2 to -- we're going to choose to continue to allow
3 these spreads to be this high, that would indicate
4 that there was more -- a cognizance of that -- that
5 fact and an acquiescence into the impact that the --
6 the impact of the overcharges.  It wouldn't change
7 the fact that the overcharges were taking place.
8 But I have -- I've seen -- as with the discussions
9 in HCFA and the statutory discussions in Congress,
10 there -- the government was beginning to realize
11 that there were these -- these problems with
12 spreads.  I'm finally seeing it in very recent
13 third-party payer documentation.  And I see one
14 where they're making some decision saying for now,
15 we're not ready to change.  That doesn't mean that
16 they're not going to reveal their preferences a year
17 from now, but they're starting to focus on this part
18 that is of -- as Professor Berndt has said of all of
19 the subjects of managed care is one of the smallest
20 and least subject to scrutiny, and so the -- I don't
21 see any evidence that there was enough of an
22 understanding to characterize the kind of

959

1 acquiescence you're saying.  We know these spreads.
2 Let's embrace them.  We want -- do we want to pay
3 more?  We want to be screwed.
4     Q.  You can't rule out the possibility that
5 the type of analysis that Blue Cross Blue Shield of
6 Massachusetts went through in 2004 was being
7 undertaken by payers all over the place in prior
8 years, correct?
9     A.  I have seen countless discovery documents
10 that demonstrate that when third-party payers are --
11 when it's made clear to them how much they're paying
12 for a physician-administered drug under a medical
13 benefit, in the words of Ernie Berndt, they're
14 flabbergasted.  I've seen document after document of
15 that.  Now, I haven't seen any that say oh, yeah, we
16 knew that.  We love it.  We want -- we want to pay -
17 - we wish they'd raise the -- we wish they'd raise
18 the prices more.  I've seen nothing like that.
19     Q.  Do you cite any of those documents in your
20 report?
21     A.  I've -- I've -- I've cited -- I -- I would
22 think so, but I'd have to -- I mean, I can't

960

1 remember the citations.
2     Q.  Can you point any out to me?
3     A.  Well I just gave you Ernie Berndt's
4 citation.  So, there's one.  And Doctor Berndt has
5 been retained by the independent expert of this
6 court, which seems to think that he understands and
7 has done a thorough review of the documents, the
8 facts, and the issues at point in this court.  And
9 in Paragraph 12, the court cites him at Pages 29 and
10 31, and then also, Doctor Berndt at Page 42 of his
11 report again describes the lack of information
12 characterizing payer understandings of actual
13 spreads, and he says, "In a different industry
14 publication, the executive Advanced PCS --" we're
15 talking about CIGNA being a well-informed payer.
16 We're talking about I think it was United Health
17 Care.  Advanced PCS is also a -- a large player in
18 this area.  And it reports that in his experience,
19 health plans become flabbergasted as what they've
20 been paying for years for drugs on the medical side
21 because of these dramatic price markups.  That's the
22 types of information that I've seen.  And I would

961

1 have to go back and count the citations in my
2 affirmative and in my rebuttal declarations, and in
3 this -- and if -- if I'm asked to do that, I -- I
4 can do that.
5     Q.  Have you read the depositions of the
6 people from Advanced PCA that were taken in this
7 case?
8     A.  I have read deposition -- a lot of
9 deposition transcripts.  I can't recall whether I
10 read -- I read those.
11     Q.  And do you recall that at least one of
12 them testified that it doesn't matter what
13 reimbursement scheme you adopt, the prices are
14 determined by market forces, and they're going to
15 stay the same.
16     A.  I -- I don't know what -- that's a -- para
17 -- I'd like to see the quote.  I'd like to see the
18 context I don't know what.
19     Q.  You don't recall discussing that at your
20 earlier deposition?
21     A.  Apparently we -- we must have had -- had a
22 long colloquy.  I don't recall it, I'm sorry to say.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 28, 2006
Boston, MA

962

1     Q.  Let's look at Exhibit Hartman 027.
2          MR. EDWARDS:  For the record, this is the
3     OIG report on physicians' costs for chemotherapy
4     drugs November 1992.
5     A.  Oh, that helps.  I'm look for a deposition
6     transcript.
7     Q.  Doctor Hartman, this is one of the
8     documents that you rely on for your 30 percent
9     yardstick, correct?
10    A.  That's correct.
11    Q.  How do you get from the information in
12    this document to 30 percent?
13    A.  Well, this is laid out in introductory
14    fashion.  The materials that I've looked at for my
15    liability yardstick is introduced in Paragraph 22,
16    and then the -- the detail of that introductory
17    the detail of implementing what is introductory
18    there in terms of using comparator drugs is laid out
19    in Paragraph 59 of the declaration and that includes
20    citing the -- the OIG report and the -- the NOR --
21    the University of Chicago NORC report -- no, I'm
22    sorry.  The OIG report is found and it's not cited

963

1     specifically.  It's in Paragraph 59-B referring back
2     to 22-B.
3          So, this is one of -- of a variety of
4     materials that I examined and upon which I based the
5     yardstick, which was an upper bound of a range of
6     spreads for single-source physician-administered
7     drugs.
8     Q.  Where is the support for 30 percent in
9     this document?
10    A.  This -- in this document I look at
11    Appendix 2, and I look at single-source physician-
12    administered drugs, and I look at the spread on
13    invoice cost relative --
14    Q.  Do you mean -- I'm sorry, do you mean
15    Appendix 3?  I think you may have --
16    A.  I'm sorry, what did I say?  Yeah, Appendix
17    3.  Did I say --
18    Q.  You said Appendix 2.
19    A.  I'm sorry.  I misspoke.  Appendix 3.
20    Q.  Sorry.
21    A.  My fault.  So, the single-source drugs
22    that I have used and I've looked at spreads that --

964

1     on the invoice cost of the brand name manufacturers,
2     their ASPs, and -- or the oncology wholesalers I see
3     ranges anywhere from 12 to 20 percent below the AWP.
4     And so, again, I'm looking at the single-source
5     physician-administered drugs, which is what I have
6     been focusing on in developing the yardsticks, which
7     is what is made clear in -- in detail in Paragraph
8     59.
9     Q.  Well, let's take a look at Doxorubincin.
10    A.  The multi-source drug Doxorubicin.
11    Q.  It says 56 to 59 percent.
12    A.  Right.  That's a multi-source drug.
13    Q.  Where does it say that was a multi-source
14    drug?
15    A.  There's a column there that says, "single
16    source," and it's yes or no.  And so, I have -- so I
17    have looked at those drugs where they're single
18    sources, yes.  So, the Cyclophosphamide is not --
19    officer if I had a mind is a multi-source.
20    Doxorubincin is a multi-source, as is -- well, you
21    can -- you can read them just as easy as I can.
22    Q.  Do you know who manufactures Doxorubicin?

965

1     A.  Not that I can recall.
2     Q.  This document has information on both
3     single source and multi-source, correct?
4     A.  It does.
5     Q.  But it's your testimony that the
6     marketplace would not have paid any attention to the
7     multi-source information in this document?
8     A.  Well, in this -- in this particular
9     aspect, I concur with Professor Berndt in that the -
10    - the information on multi-source physician-
11    administered drugs is less reliable, and that's his
12    summary of his review of the evidence, and I agree
13    with that.  And I see some of the multi-source --
14    multi-source drugs here like Interferon are well
15    below the range.  It's 9 to 14 percent.  There's
16    nothing -- a number of the multi-source -- well, a
17    number of the multi-source drugs have spreads that
18    are -- say relative to the oncology wholesalers I'm
19    looking at here, the Interferon where there's that
20    information and the Cyclophos -- the Cyclophos --
21    whatever is -- is close to 20 percent in terms of
22    the oncology wholesalers.  But I -- I agree with

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 28, 2006
Boston, MA

966

1  Professor Rubin -- Professor Berndt that the
2  information that -- what characterized physician-
3  administered drugs in the early '90s for the most
4  part were single source. The pricing and the
5  information on multi-source was even less
6  scrutinized or understood, and so my focus has been
7  on single source.
8      Q.  Do you rely on anything other than Doctor
9  Berndt for your opinion that the marketplace would
10 not have paid attention to the multi-source
11 information in this document?
12     A.  Well, I think Doctor Berndt has -- I mean,
13 he's raised that in a number -- in a number of
14 contexts with his article on the importance of being
15 unimportant and his review of the data. It's also
16 based on my review of what drugs were out there and
17 what was single source and how important single-
18 source drugs were. So it's based on my review of
19 the -- of the documentary evidence.
20     Q.  What --
21     A.  And -- and Doctor Berndt's --
22     Q.  One of these drugs has a spread of 68

967

1  percent to 83 percent, correct?
2      A.  The -- and could you point me to -- so
3  that's to the oncology wholesalers that you're
4  talking about that -- that you're talking about
5  Methotrexate sodium?
6      Q.  Yes.
7      A.  That is a multi-source drug, and it does
8  show those -- that spread.
9      Q.  And that is below AWP, correct. This is a
10 calculation of the discount below AWP, correct?
11     A.  Since I did not rely on those spreads --
12 let me -- it is relative to AWP. I want to see if
13 it's the AWP of the generic or the branded. I want
14 to see if it tells me -- if it makes that clear
15 here. (Witness reviews document.) It doesn't make
16 clear. It's relative to an AWP. Whether it's the
17 AWP of the branded version for which it's a generic
18 or its own AWP, I can't tell from it -- the
19 documentation here.
20     Q.  Well, if you have a discount of 83 percent
21 below AWP, if you do the math, what would be the
22 percentage markup above the invoice price that the

968

1  AWP represents?
2      A.  If you have this discount below the AWP
3  for the multi -- for this -- for this multi-source
4  drug, the spread over the ASP, if reimbursement is
5  based on AWP for the multi-source drugs,
6  reimbursement is based under Medicare on meet -- we
7  didn't get into -- I don't know which spread we're
8  talking about or whatever under Medicare, it's based
9  on the median of the generic AWPs, depending on the
10 period of time we're looking at.
11         But if I'm going to just -- if I'm going
12 to assume that this is the AWP for that drug and --
13 and this is the -- the price -- on -- the spread --
14 the amount to the oncology wholesaler, the spread
15 would be somewhat larger than these numbers.
16     Q.  Well, in your expectation yardstick you
17 talk about a percentage markup above ASP, correct?
18     A.  That's correct.
19     Q.  And assuming for the moment that we're
20 talking about a comparison of AWP to ASP here, a
21 discount of 83 percent below AWP would represent a
22 percentage markup over ASP in excess of 400 percent,

969

1  correct?
2      A.  I'd -- I'd want to write that equation
3  down, but it would be bigger than 83 percent. Now,
4  the issue here is that this is not a comparison to
5  ASP. It's to the -- the brand manufacturers' prices
6  are not listed. There was no observation. So, it's
7  a -- it has to do with oncology wholesalers. I'd --
8  you know, I'd -- I'd need to know the spreads. You
9  know, I'd need more information. But it would be
10 higher -- certainly higher than 83 percent.
11     Q.  Yeah, well, we've done the math, and it's
12 actually 488 percent. So, is it your testimony that
13 you looked at this document, you saw markups of 488
14 percent, and you concluded that the appropriate
15 expectation yardstick was 30 percent?
16         MR. NOTARGIACOMO: Objection.
17     A.  I looked at this document and I looked at
18 my primary focus in looking for yardsticks, say,
19 with comparator drugs, were to find drugs that did -
20 - and to get a yardstick that informed relationships
21 of an AWP to transactions prices that were not going
22 to be subject to spread competition; that were free

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 28, 2006
Boston, MA

970

1  of spread competition, because it's where the spread
2  competition occurs where -- that's where Defendants
3  have been alleged and have -- and some have been
4  demonstrated to abuse the reimbursement pattern.
5       So, in the comparator drugs, I looked at
6  single-source patented drugs that were unique, and
7  for which the AWP provided a reasonable indicator, a
8  reasonable sticker price -- an indicator for the
9  transaction prices. The same thing I tried to do
10  with the single source physician-administered drugs,
11  and I also mention in Paragraph 59-C that Doctor
12  Gaier and I are in agreement of a yardstick for
13  single-source innovator drugs, and this is for all
14  innovator drugs, so it includes self-administered of
15  20 to 25 percent.
16       Now, I'm -- I'm looking for -- for my
17  yardstick, I'm looking for drugs that are not
18  affected -- that -- that provide a -- where the AWP
19  provides some reliable knowledge of what the ASP is,
20  and those are single-source drugs. We know with
21  generics that's not the case. I'm not going to --
22  'cause I -- in generics that's when the spread

971

1  starts to be used to -- and the -- and the AWP is no
2  longer a signal, even though it may be used for
3  reimbursement.
4       So, in this particular document, I went to
5  the single-source drugs because -- for all the
6  reasons I've put forth in Paragraph 59.
7       Q.  Are you saying that the marketplace
8  doesn't know that spread competition occurs?
9       A.  I'm saying that the marketplace
10  understands that -- now understands that spread
11  competition occurs -- has certainly come to
12  understand it in the late '90s. But in terms of
13  what got set into place for reimbursement practices
14  and policies for physician-administered drugs, in
15  the beginning of -- of this class period, it is my
16  guess that all but one or two of the class drugs
17  were single source, and that's what was reflected in
18  how people were thinking AWP was a signal for price.
19  And so, that's what informed those decisions about
20  reimbursement and over -- certainly over the '9Os,
21  by the late '90s, the OIG reports in self-
22  administered drugs were showing that there was

972

1  spread competition -- that generic spreads were
2  quite -- were much higher than they understood them
3  to be in the early '90s.
4       Q.  What is the basis for your opinion that
5  the marketplace did not know that spread competition
6  occurs?
7            MR. NOTARGIACOMO:  Objection.
8       A.  I -- I didn't say that the market didn't
9  know that it occurred. I'm saying that what -- I
10  didn't -- don't put words in my mouth. I didn't say
11  that.
12       Q.  So the marketplace does know that spread
13  competition occurs?
14            MR. NOTARGIACOMO:  Objection.
15       A.  The marketplace has come to understand, as
16  we've discussed at great length, that spread
17  competition has been abused to move market share.
18  And they are now at both the Congressional level and
19  at the private sector level reevaluating how they're
20  going to reimburse -- coming to -- coming to that
21  awareness, which has taken -- a consolidated
22  awareness -- which has taken close to ten years to

973

1  be reflected in the -- in the ability to reveal
2  preferences and reveal behavior that changes
3  reimbursement patterns.
4            MR. NOTARGIACOMO:  We've been going about
5  an hour and a half --
6       Q.  Are you saying that the marketplace, in
7  looking at information such as the information
8  relating to Methotrexate sodium which show spreads
9  of more than 400 percent -- would not have been able
10  to conclude that, hey, there must be some
11  competition going on here based on spreads?
12       A.  I -- I am saying that this -- this is
13  information that was -- one limited piece of
14  information that helped inform -- begin to inform
15  the market what was happening and that physician-
16  administered drugs were a very small component of --
17  on my radar screen of any -- of any payers in the
18  early '90s, and the multi-source component of that
19  was -- was very small, was much, much smaller than
20  even physician-administered drugs.
21       So, when you start to talk about being
22  aware of, this data is out there, but you need to

Raymond S. Hartman, Ph.D.  CONFIDENTIAL          February 28, 2006
Boston, MA

974

1  have payers saying, okay, we're going to -- we've
2  got to make some decisions about changing what we're
3  doing about how we reimburse for multi-source drugs.
4  And you didn't have -- you didn't have people doing
5  that, because it was -- it was a small component of
6  everything. It was the -- the least -- one of the -
7  - it had very -- it had small importance in the
8  costs they were managing. It was one of -- the
9  multi-source physician-administered drugs were in a
10  minority. And so, it would be a waste of the
11  resources of payers to focus on such small ticket
12  items. They might see this and they say, oh, I've
13  got some more important things to deal with. So,
14  yeah, this stuff was out there. It was -- it was
15  not as important to payers as many other things in
16  managed care were over the '90s, and it's become --
17  now that managed care has addressed those other
18  issues, it's started to become important that there
19  are -- that this kind of information is being
20  processed.
21       MR. NOTARGIACOMO: We've been going about
22  an hour and a half. I'd like to take a break.

975

1       MR. EDWARDS: Sure.
2       VIDEO OPERATOR: The time is 11:07. This
3  is the end of Tape No. 1. We are off the record. .
4       (Short recess taken.)
5       VIDEO OPERATOR: The time is 11:20. This
6  is the beginning of Cassette to 2 in the deposition
7  of Raymond Hartman. We are on the record.
8       MR. EDWARDS: I'm going to mark as Exhibit
9  Hartman 046 a copy of an OIG report entitled
10  "Excessive Medicare Payments For Prescription
11  Drugs," dated December 1997.
12       ("Excessive Medicare Payments For
13  Prescription Drugs" marked Exhibit Hartman 046.)
14       A.  (Witness reviews document.)
15       Q.  Have you ever read this document before?
16       A.  I have.
17       Q.  If you turn to Page 8 it suggests that for
18  the particular --
19       A.  If you can -- I'm sorry. If you can just
20  give me a second here. I just want to make a note.
21       Q.  Is that a grocery list?
22       A.  Just my laundry. I forgot to pick it up.

976

1       Q.  If you turn to Page 8 of Exhibit Hartman
2  046, Doctor Hartman, you'll see that there is a
3  chart depicting spreads of 114 percent to 900
4  percent, is that correct?
5       A.  By J-Code, that is correct.
6       Q.  And this document would have informed the
7  marketplace in the same way that the 1992 report
8  that we have marked as Exhibit Hartman 027 would
9  have informed the marketplace, is that correct?
10       A.  Well, it's -- let me -- just responding a
11  little more -- we keep -- we keep bringing these
12  documents up in a Barron's article for this or that
13  and what we're informing or not informing. I mean,
14  all of these documents that you're putting in front
15  of me are consistent with what I've testified, that,
16  over the period of the '90s, more and more
17  information -- we're talking about informing the
18  marketplace that there were a set of reimbursement
19  rates that were put in place in the early '90s and
20  which characterized most of the '90s, toward the end
21  of the '90s, and into the early 2000s that
22  characterized reimbursement and characterized what

977

1  the individuals thought as revealed in their
2  reimbursement rates and their reimbursement
3  contracts and by which reimbursement was paid.
4       And so, information like this became
5  available in various places, but it -- it was -- it
6  was -- it was slow to be -- for that information to
7  be assimilated by the -- by the various payers and
8  by Medicare. And we're talking about what did they
9  know of, what didn't they know of, what were they
10  deceived about, whether they weren't deceived?
11  Information continues to be available. The question
12  is, when is it sufficient for -- when is enough of
13  it available to trigger a revealed set of behavioral
14  changes, revealed preferences and changes in the --
15  so that institutionally you become sufficiently
16  aware to act on it.
17       It's like Japanese automobiles in this
18  country. They were slow -- information slowly
19  gathered over time on the quality of those
20  automobiles. The quality was there. Everybody
21  didn't switch overnight. The -- for institutions
22  and for groups of consumers and payers to ultimately

Raymond S. Hartman, Ph.D.  CONFIDENTIAL              February 28, 2006
Boston, MA

978

1    respond, they have to institutionally be
2    sufficiently aware of it that there is a -- there is
3    a decision that is preferred and acted upon. And so,
4    yes, this information was available, and it informed
5    the market as one more bit of information, but until
6    there are revealed preferences and acting on it, it
7    doesn't change the fact that certain expectations
8    were hardwired into reimbursement formulas that are
9    reflected in my yardstick.
10       Q.   What you're saying is information was
11   available, but it was the revealed preference of the
12   marketplace not to act on it.
13       A.   I'm saying as in any market that is
14   subject to dynamic change and subject to different
15   events, different changes in pricing, that the --
16   the events in -- the understanding of that information
17   in many markets is -- is diffused and slow to be
18   understood, and particularly in markets where there
19   -- it is not a perfectly competitive market.  There
20   are institutional constraints on -- on information
21   being exchanged; there is asymmetric information
22   that the -- the information becomes available, but

979

1    it doesn't mean that you can change the -- that you
2    change overnight; that there has to be enough of the
3    information it becomes clear that institutionally in
4    this case payers would act to change what has
5    happened.
6        So that only when they finally do that
7    have they revealed that it is -- they've become
8    sufficiently aware of what's coming -- what has --
9    what the -- the implications of the -- of these
10   kinds of spreads are.
11       Q.   Well, let's take what we've been talking
12   about as a hypothesis.  Information was available
13   but the marketplace decided not to act on it.  What
14   evidence do you have to disprove that hypothesis?
15       A.   That they decided -- that they were fully
16   informed -- you're saying do I have evidence --
17       Q.   They were fully informed, but they decided
18   for other reasons, such as cross subsidization, such
19   as attracting providers to their networks, such as
20   is not being concerned about the particular spread
21   on individual drugs, but being concerned about
22   provider profitability overall. For all of those

980

1    reasons, they decided not to change reimbursement
2    rates.  What evidence do you have to disprove that
3    hypothesis?
4            MR. NOTARGIACOMO:  Objection.  Go ahead.
5        A.   I've seen no evidence put forward by any
6    of your experts proving that hypothesis.  I've seen
7    evidence that I've cited indicating that -- that
8    when it got down to it, payers did not understand
9    the full implication of this and were flabbergasted
10   when they fully did understand it.
11       So if such evidence exists, I -- I assume
12   you will put that forward.  I -- I didn't see any.
13       Q.   Who do you think has the burden of proof
14   in this case, Plaintiffs or the Defendants?
15       A.   That's a legal issue.  I'm -- I'm just
16   doing my -- I'm a mere tiller of truth in the garden
17   of the health care industry.
18       Q.   I take it there is nothing in Exhibit
19   Hartman 046 which depicts spreads of 114 percent to
20   900 percent that supports your 30 percent yardstick.
21       A.   There's nothing in this document that
22   contradicts my use of my yardstick.

981

1        Q.   Can you identify any economic literature
2    that supports the methodology by which you arrive at
3    your 30 percent yardstick?
4        A.   That supports the -- the finding of 30
5    percent or that supports finding a yardstick,
6    whatever it may be?
7        Q.   That supports the methodology that you use
8    for determining that market expectations of the
9    spread between AWP and ASP were that it did not
10   exceed 30 percent?
11       A.   Well, the finding of the 30 percent is
12   specific to this industry and this set of drugs on
13   this particular period of time in this particular
14   institution.  30 percent is not necessarily going to
15   be a yardstick in other situations, but yardstick
16   analyses are -- are very common in economics.  I've
17   cited a variety -- you know, a very small subset of
18   -- of the -- of the tradition of yardstick
19   methodologies in my Footnote 19.  And I mean,
20   yardsticks are used to determine but-for situations
21   in a -- in many, many contexts, and we can go
22   through the examples.  So that the basic -- my basic

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 28, 2006
Boston, MA

982

1  yardstick approach is very common, and it's
2  supported -- you know, I can add 50 more citations
3  if you'd like.
4      Q.  Well, do any of these --
5      A.  The finding of -- the finding of applying
6  the yardstick here, every -- every application --
7  you can do it for ratesetting for utilities, and
8  that will differ by -- state by state, depending on
9  the regulatory institutions in that state, what the
10 public utility commission is going to be.  So, it
11 could be different -- different numbers.
12     Q.  Do any of the articles you cite discuss
13 expectation yardsticks?
14     A.  (Witness reviews document.)  The -- in the
15 -- in the various citations that appear in Footnote
16 19, the yardsticks are created to measure a variety
17 of things, managerial performance, levels of --
18     Q.  I was asking you about expectations.
19     A.  I know.  I'm trying to get there if you'd
20 -- if you'll give me that latitude.  Now, the extent
21 to which expectations enter into insurance profits
22 in premia and performance of Social Security, I'd

983

1  have to look more closely to see the -- expectations
2  enter into lots of different industries, and how
3  those expectations -- you know what I'm talking
4  about are the expectations as to what shows itself
5  in actual prices.  And so, to the extent that
6  expectations are a part of these yardsticks, I would
7  have to look more closely to see -- to answer that
8  question more fully.
9      Q.  So, as you sit here today, you're not able
10 to identify any economic literature that supports
11 your methodology for determining expectation
12 yardsticks?
13     MR. NOTARGIACOMO:  Objection.
14     A.  Well, there's -- there's ones that I
15 didn't list, there are -- there are surveys about
16 what -- you know, the consumer confidence indices
17 and expectations that are -- that are surveyed in a
18 variety of different measures in macroeconomics
19 where people measure what expectations are.  And
20 those expectations could be used as yardsticks.  So
21 that expectations are not some magical thing that is
22 isolated to -- this report.  I -- the -- there

984

1  probably could be yardstick studies about what --
2  about what expectations would be, consumer
3  confidence levels, given certain macroeconomic
4  trends that one could develop that.  I haven't
5  looked for that type of thing, but measures of
6  expectations are common, and the yardsticks could be
7  developed therefrom if that were a market and those
8  were issues that one was interested in.
9      Q.  I'm -- I'm still waiting for a specific
10 article.  Do you have one?
11     A.  I -- I don't have one at this -- right at
12 this point.
13     Q.  And your theory seems to be that you're
14 going to come up with a yardstick to measure market
15 expectations, but to the extent that there are
16 expectations that haven't been reflected in actual
17 contracts or reimbursement rates and actual
18 contracts, you're going to disregard those
19 expectations, is that correct?
20     MR. NOTARGIACOMO:  Objection.
21     A.  I'm not disregarding any expectations.  I'm
22 -- I'm looking at patterns of drug prices that have

985

1  -- that have -- that exist for certain types of
2  comparator drugs and types of spreads that have
3  existed for single-source drugs, and I'm looking at
4  the -- the history of Medicare reimbursement and how
5  that's been reflected in reimbursement rates.
6      Now, that's -- there are -- there's --
7  there's changing information over time, and the --
8  when third-party payers say we're reimbursing on ASP
9  or AWP less 70 percent, that that will reveal to me
10 that enough of this information has been reflected
11 in -- in their behavior.
12     Q.  Take a look at Paragraph 60-G on Page 42
13 of your report.  You say, "Despite the fact that
14 publicly-available information suggesting increased
15 spreads became more prevalent in the latter years of
16 the damage period, TPPs were not able to act on such
17 information for the reasons cited above."
18     What are the reasons cited above?
19     A.  Well, the reasons cited above are all of
20 the analyses put forward in -- in the declaration.
21     Q.  Can you summarize those reasons for me so
22 I can find them in the declaration?

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 28, 2006
Boston, MA

---

986

1    A.  Well, certainly we've talked about -- we
2    have talked -- I've -- I've cited the -- the
3    information and the analysis found in the -- the
4    judge's memorandum and order in Paragraph 13 about
5    what was the evidence of the -- that third-party
6    payers really knew of in an institutional context
7    what the spreads were for these drugs.
8         I've cited the -- in Paragraph 16 the --
9    the fact that prices were not transparent and it was
10   difficult for payers to know what was going on, and
11   this is something that the -- the judge admits to
12   and Doctor Berndt admits to in terms of J-Code
13   issues.
14   Q.  So, you're not offering an independent
15   opinion here.  You're just opining on what you think
16   the judge has already said?
17   A.  No.  You're asking me for what -- my
18   independent opinion has been summarized from my
19   affirmative declaration on.  And everything that is
20   reflected here is reflected in that description
21   about how this market works, how information is
22   processed, whether it's transparent or not

---

988

1    for for data, but I received -- I did -- I didn't
2    receive -- I received very little of that.  And so I
3    had to use the data that -- that was provided, and
4    it was essentially drugs that met the criteria of a
5    drug that would not need to use spread in a
6    nontransparent way to compete; that it would compete
7    on its own merits.  And the AWP would be a -- a
8    signal for the transactions prices of a drug not
9    requiring that kind of spread competition.
10   Q.  You said you were also going to look at
11   drugs not subject to this litigation.  What happened
12   to that?
13   A.  The -- the list that I had put together
14   was -- the data just was not -- I was told the
15   companies were not going to provide it or we
16   couldn't get that ASP information.
17   Q.  Well, do you recall making a request for
18   IMS data in order to do the analysis of comparator
19   drugs that you wanted to do?
20   A.  I recall asking for IMS data, and I'd have
21   to go back and look at that request.  The IMS data
22   turned -- I was -- I was interested in that when --

---

987

1    transparent, how broadly available people act on it.
2    So -- so that's what that's -- that's what that's
3    based on and -- oh, are we still --
4    Q.  That's the end of your answer?
5    A.  I think that's enough.
6    Q.  I want to talk a little bit about your use
7    of comparator drugs.  Originally -- I think at your
8    last deposition you said one of the things -- one of
9    the things you were going to do is look at
10   comparator drugs for the pre1991 time period.  Do
11   you recall that?
12   A.  I recall hoping to look at drugs pre --
13   preclass period and for drugs not subject to the
14   litigation, that's correct.
15   Q.  And what happened to that exercise?
16   A.  Well, the -- either the -- the Defendants
17   didn't provide the information going back far enough
18   for me to do that or I was -- I had put in a request
19   and some of the requests were for companies that
20   were not subject to this particular declaration, and
21   I -- that data was not forthcoming.  And I list in
22   Table -- Table 3-A and 3-B drugs that I had asked

---

989

1    when the self-administered drugs that were sold at
2    retail were more at an issue.  And so, I was
3    interested in that data in that regard more than in
4    the physician-administered side.  The type of IMS
5    data I was asking for -- I was still asking for IMS
6    data for these drugs in another context, which I
7    haven't -- I have yet to receive from Defendants.
8    Q.  Can self-administered drugs serve as
9    comparator drugs for physician-administered drugs?
10   A.  If -- if self-administered drugs meet --
11   meet a criteria where they don't need to compete on
12   spread competition, it would be something that I
13   would -- I would consider looking at.
14   Q.  Do you recall that one of the drugs you
15   sought data on was Pravachol, which is a BMS drug?
16   A.  I don't recall specifically.
17   Q.  And do you recall that BMS produced the
18   IMS data with respect to that drug?
19   A.  I don't -- I'd have to check with -- with
20   the team.
21   Q.  But it does not appear in Table 3 as a
22   comparator drug.  Can you tell me why?

---

Henderson Legal Services
(202) 220-4158