Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 28, 2006
Boston, MA

990

1    A.  Well, the Table 3 was identified to find
2  drugs that were sufficiently unique that when they
3  launch they -- their -- they did not need to offer
4  spread in order to -- to -- they did not need to
5  make use of a -- a discount off of AWP that was not
6  understood by the market to achieve market
7  penetration.
8       So, these were drugs like Prilosec.  It
9  was the first Proton pump inhibitor or Closaril.  It
10  was the first atypical antipsychotic.  And I was
11  looking for drugs here where they were the first
12  drug in the market.  This is a case where they did
13  not need to compete on spread, either
14  nontransparently or transparently, and this is a
15  case where you'd see a relationship between AWP as a
16  signal for the transactions prices, i.e., for drugs
17  not requiring a nontransparent competition on
18  spread.
19       Now if Pravachol -- these were a set of
20  indications and a set of problems where drugs could
21  be identified, and I asked some of our consultants
22  at the Harvard School of Public Health to identify

991

1  different areas where there were drugs of that sort
2  and -- and I -- I took, as my point of departure,
3  their identification of those lists.  Pravachol must
4  not have appeared on any of those lists.  It was not
5  dropped for any reason where it was singled out.  I
6  -- I began this process by identifying what were --
7  were drugs that didn't need any kind of fraudulent
8  spread competition.  And I tried to get the data on
9  these drugs, and obviously, I couldn't get the data
10  on all of these drugs.  And some of them are good --
11  in Table 3-A are self-administered drugs.
12    Q.  So, you were looking for drugs -- sole-
13  source drugs that did not face therapeutic
14  competition and -- basically --
15    A.  I was looking for -- you're
16  mischaracterizing.
17    Q.  Okay.
18    A.  I was looking for sole-source drugs that
19  did not need to use nontransparent spread
20  competition to -- to capture market share.  They
21  were the only drug in the category.  And that
22  reflected then a relationship between AWP and the

992

1  transactions prices that was not in any way tainted
2  by any kind of alleged fraudulent spread
3  manipulation.
4    Q.  Well, when you say they were the only drug
5  in the category, is that another way of saying they
6  didn't face therapeutic competition?
7    A.  They didn't face -- that's one of the
8  characteristics of it.
9    Q.  So, you were looking for drugs that did
10  not face competition to use as comparators to drugs
11  that did face competition.
12    A.  I was looking for drugs of a certain type
13  that did not require the use of spread to capture
14  market share.  So that the relationship between an
15  AWP and an ASP and the transactions prices for which
16  it were a signal was not -- was not going to be
17  affected by the need to try and offer hidden
18  inducements.
19    Q.  So, your comparison would not work if the
20  marketplace was aware that the spreads for drugs
21  that faced competition are larger than the spreads
22  for drugs that do not, correct?

993

1    A.  My what wouldn't work?
2       MR. EDWARDS:  I'll have the reporter read
3  the question back.
4       (Question read back.)
5    A.  No, my -- my approach here works
6  precisely, and my comparator drugs work precisely to
7  get at that.  The problem that -- we see a drug like
8  Zofran.  When it's not facing any kind of
9  therapeutic competition, it's pricing at yardstick
10  levels, 18 to 22 percent above -- where the signal
11  of AWP is reflecting an understood signal where Mr.
12  Young and a variety of people have talked about what
13  does AWP signal for?  You reimburse at AWP less 13
14  to 18 percent.  There's some margin for pharmacies.
15  You look at Zofran.  It's right in that sweet spot.
16  It's the only game in town.  It doesn't need to
17  offer -- it doesn't need to raise its AWP to attract
18  any kind of regulatory oversight, nor does it need
19  to lower its ASP to reduce its -- its marginal
20  revenue on that unit or reduce its average revenue
21  overall.
22       So we see spreads for that drug of 18 to

**994**

1   22 percent. As soon as Kytril came on the market,
2   there's -- in my Attachment F, I -- I present a
3   variety of internal documentation saying we've got
4   to use the spread to compete. We'd better offer the
5   docs this, we've got to do this, we've got to do
6   that. They're doing exactly what has been alleged
7   as soon as there's been that therapeutic
8   competition. So this thing is designed precisely to
9   take into account when therapeutic competition, when
10  the pricing formulation -- when the reimbursement
11  formulae -- formulae are in place and there is
12  therapeutic competition, they're going to abuse this
13  system, and that's the case of Lupron/Zoladex; it's
14  the case of Vincasar; it's the case of
15  Zofran/Kytril. So my spread is precisely aimed at
16  seeing when that kind of competition takes advantage
17  of a reimbursement system.
18      Q. I want to direct your attention to
19  Paragraph 60-F of your declaration, Page 42 you say,
20  "There is no evidence that the yardsticks for TPP
21  price expectations for multi-source physician-
22  administered drugs were any different than those for

**995**

1   single-source physician-administered drugs."
2       Are you aware of any evidence that would
3   support your opinion that third-party payers were
4   not aware of the difference in spreads between drugs
5   that faced competition and drugs that did not?
6       MR. NOTARGIACOMO: Objection. You can
7   answer the question.
8       A. Well, what I've said in -- in that
9   paragraph -- in that subparagraph and in the -- and
10  then also referred to Doctor Berndt's opinion on
11  this matter, there was not the -- that the
12  literature in the public domain is -- it's -- his
13  point is not helpful in the area of generic drugs
14  administered by physicians, i.e., multi-source
15  drugs.
16      Now, what that says is that there -- you
17  know, there's limited information, but that there --
18  it is from -- my reading of the information that is
19  available, and Doctor Berndt's, apparently, there is
20  insufficient information to draw conclusions about
21  what a spread would be for multi-source. And in an
22  absence of -- of more complete, full information, as

**996**

1   I look at the way reimbursement contracts are
2   formulated and entered into, the rule of thumb would
3   be the single-source spread -- yardstick.
4       Q. Didn't Doctor Berndt, in fact, observe
5   that payers are willing to let providers earn
6   additional spreads on generics as a way of
7   encouraging generic use?
8       A. You'd have to show that testimony to me.
9       Q. While we're getting that document, why
10  don't you take another look at the Killion
11  deposition. I forget which exhibit it was, but
12  maybe you can tell us?
13      A. I can. It's Exhibit Hartman 037.
14      MR. EDWARDS: Well we found the Berndt
15  document. Let's do that one first.
16      THE WITNESS: Okay.
17      MR. EDWARDS: We'll mark this as Exhibit
18  Hartman 047. It's Doctor Berndt's report.
19      (Report of Ernst R. Berndt marked
20  Exhibit Hartman 047.)
21      Q. I want to direct your attention to
22  Paragraph 52. Doctor Berndt says, "In the context

**997**

1   of generic drugs, one widely understood reason
2   third-party payers have long been willing to allow
3   pharmacies to enjoy a considerable spread on their
4   generic drugs is that whenever a generic version of
5   a drug is dispensed, instead of its brand version,
6   the third-party payer typically saves a substantial
7   amount of money, recall the earlier discussion on
8   average brand prescription prices being considerably
9   --
10      A. Sir.
11      Q. -- considerably less than average generic
12  prescription prices."
13      A. I'm sorry. Did you say Page 52 or
14  Paragraph 52.
15      Q. Paragraph 52?
16      A. I'm sorry. I'm at Page 52 and I wasn't
17  seeing anything you were reading. Okay. So, if we
18  could start again.
19      Q. In Paragraph 52, Doctor Berndt is saying
20  that "Third-party payers have long been willing to
21  allow pharmacies to enjoy a considerable spread on
22  generic drugs as a way of encouraging their use."

**998**

1  Isn't that inconsistent with your statement that
2  there is no evidence that yardstick -- yardsticks
3  for TPP price expectations for multi-source drugs
4  was the same as for single-source drugs?
5      A.  No. I mean, in this context, Doctor
6  Berndt is talking about self-administered drugs, and
7  he's talking about pharmacies, and the -- certainly
8  self-administered drugs is a much larger body of
9  drugs than physician-administered drugs, and how the
10  -- what the behavior -- the reason that -- it's my
11  understanding -- that Judge Saris and the court have
12  carved out the classes we're looking at is the
13  differences between self-administered and physician-
14  administered drugs.
15      So, this tells me about data and
16  understandings and what third parties knew about
17  self-administered drugs, which were -- is a much
18  larger percentage of the total drug bill and so this
19  tells me nothing about what we're talking about with
20  physician-administered.
21      Q.  So, you're saying that payers were aware
22  of spread-based competition for self-administered

**999**

1  drugs but not for physician-administered drugs?
2      MR. NOTARGIACOMO: Objection.
3      A.  I'm saying that if one looks at the -- if
4  we had -- I don't cite Doctor Berndt in enough
5  detail, but the -- the type of generic spreads that
6  were revealed for self-administered drugs, you're
7  seeing generic competition there. You're seeing
8  spreads for multi-source physician-administered
9  drugs, but third -- when you look at the -- at the
10  hierarchy of costs faced by managed care
11  organizations, you're looking at hospitals' costs,
12  you're looking for physicians' costs, you're looking
13  at a lot of other costs, and prescription drugs
14  account for 5 to 8 percent over the last decade, but
15  of prescription drugs, the physician-administered
16  drugs are a couple -- are a few percent of that
17  total amount of all those drugs.
18      So that I'm saying that third-party payers
19  certainly dealt with the issue of self-administered
20  drugs and reimbursements, therefore, to a much
21  greater extent and were much more -- seeing more
22  data informing that than they certainly were for

**1000**

1  physician-administered drugs, given that it was a --
2  physician-administered drugs is a very small part of
3  what they reimbursed for and --
4      Q.  You were --
5      A.  -- and secondly, the physician-
6  administered drugs were a type of drug where a
7  third-party payer is more loathe to get involved in
8  trying to deal with formularies and trying to get
9  them to do substitution. It's something that's left
10  to the physician.
11      Q.  We're talking about the same payers here,
12  right?
13      A.  We are.
14      Q.  There are payers that --
15      A.  We are.
16      Q.  -- pay for both self-administered drugs
17  and physician-administered drugs, correct?
18      A.  And for hospitals and for doctors and for
19  many other things.
20      Q.  And you're saying that it is your expert
21  opinion that even though a payer may have been aware
22  of spread-based competition for generic drugs on the

**1001**

1  self-administered side, it never would have occurred
2  to that payer that the same sort of competition
3  would take place on the physician-administered side?
4      MR. NOTARGIACOMO: Objection.
5      A.  I'm saying I'm agreeing with Doctor
6  Berndt. I'm saying that the self-administered would
7  get more focus, more understanding, more -- more
8  strategic response to and decision about than on the
9  physician-administered drugs where Doctor Berndt
10  himself says there's very little information on what
11  this is for physician-administered multi-source
12  drugs, not for generic drugs generally. And it's a
13  different kind of drug where it's -- the -- the
14  substitution from a -- from a branded to a generic
15  and the bioequivalency thereof in pharmacies and
16  based on formularies with PBMs is driven by a whole
17  different set of circumstances than what a doctor
18  decides to do in what its administering and whether
19  a third-party payer is going to sit back and -- and
20  leave that decision and be -- and focus on what can
21  be accomplished through -- through multi-source
22  competition.

1002

1  Q. Can you cite me any evidence that would
2  support your opinion that payers were not aware of
3  spread-based competition for multi-source drugs on
4  the physician-administered side?
5  A. We've -- we've already said that there's -
6  - there's been limited information that has appeared
7  throughout this period of time from mid '90s to
8  recently, and to the extent that it has affected an
9  understanding of -- of what the relationship should
10 be, the -- there is no consistent information that I
11 see that will -- that would suggest to me that, as a
12 rule of thumb, the 30 percent should be altered.
13 Q. I asked you for evidence, citations,
14 depositions.
15 A. You're asking me for evidence to the
16 contrary. I haven't seen any.
17 Q. Documents.
18 A. So if there's some that I should see you
19 should -- you should show them to me.
20 Q. Well, if I were to show you evidence that
21 payers were aware of spread-based competition for
22 multi-source drugs on the physician-administered

1003

1  side, would that affect your opinion?
2  A. I would need to see sufficient information
3  that this was understood and institutionally, so
4  that it wasn't just anecdotal information or one --
5  or one deponent who says, oh, if the spread happened
6  to be this or, yeah, I think it's this or that, I'd
7  need to see a much more well-informed and
8  scientifically-designed survey, and I'd need to see
9  some revealed -- real -- revealed behavior in those
10 regards before I would -- but if -- and if that
11 exhibit -- evidence exists, I would like to review
12 it.
13 Q. Evidence that it was common knowledge
14 would be of interest to you, correct?
15 A. Evidence that the reimbursements should
16 change as a result of the fact that -- that the --
17 the patterns that have been put in place should be
18 altered to eliminate the amounts of money that were
19 being made, that that should be changed, that would
20 be of interest to me.
21 Q. So, evidence that it was common knowledge
22 would not have an impact on your opinion?

1004

1  A. Well, I don't know what -- I'd need to
2  know -- I'd -- if you -- if there are surveys of
3  what the knowledge is and -- and the numbers of
4  insured lives and the percentages of insured lives
5  and whether that was being evaluated as to how to --
6  to alter reimbursement rates, that would be -- that
7  would be informative.
8  Q. Let's take a look at Mr. Killion's
9  deposition, which is Exhibit Hartman 036. And as
10 you may recall, Mr. Killion is with Blue Cross Blue
11 Shield of Massachusetts, one of the class
12 representatives here. I want to direct your
13 attention to Page 122 of the deposition. Do you
14 have that in front of you?
15 A. I don't yet. If you'd give me a second, I
16 will have it shortly. I'm sorry. What page were
17 you saying?
18 Q. 122.
19 A. 122. Okay.
20 Q. "Question: Was it also your understanding
21 at the time that when competition came into the
22 market for brand name drugs, i.e., multi-source

1005

1  competition, there were also discounts and rebates
2  that were provided on those drugs? Answer: That's
3  correct. Question: So, typically -- so it was your
4  understanding then in the 1998 time frame that when
5  a brand name drug first came to market, there
6  typically were no incentives associated with the
7  drug but then as competition entered the market,
8  first multi-source and then with generics, more
9  incentives were provided for the drug, correct?
10 Answer: Correct. Question: And that is what led
11 to your understanding that AWP was an artificial
12 price because it didn't bear a relationship to the
13 acquisition cost, correct? Answer: Correct."
14     Now, does that have any impact on your
15 opinion that TPPs, third-party payers, did not
16 believe that there was any difference in the spreads
17 of multi-source drugs versus single-source drugs?
18 A. No. This -- this fits within the -- the
19 contours of just what we've been talking about of
20 more people becoming -- understanding the extent to
21 which there were these kinds of deviations. And
22 where there was competition on spread, and that they

**1006**

were unaware of but that they became aware of and that led to -- to -- that kind of information needed to be institutionalized in a response, and just knowing of some of this doesn't say that -- that the -- a given institution was able to rearrange its reimbursement policy to avoid being over-charged by the reimbursement rate -- reimbursement policies that were put into place 12 years later.

Now, you've also -- we've also seen some documents where people started making institutional decisions about -- saying, oh, God, this is happening, and that's where you start to see preferences being revealed. Right here I'm just seeing, again, the understanding that they're -- look, there's -- there's either with certain branded drugs, there's -- there's spread competition that leads to reimbursement rates that are -- are higher than acquisition costs than what we had thought they were. And this is the same thing with the -- with the generic. But it has yet to be institutionally responded to where they've revealed this -- this -- in the response to their change in reimbursement

**1007**

formula.

Q. Well, it may have been institutionally responded to through MAC pricing, correct?

A. If -- if they -- if they -- if they switch to MAC pricing on -- and they were pushed -- and they pushed them to MAC pricing, that is one way that there was a response, and my model has taken that into account, that as soon as there are the multi-source in a nonMedicare setting, as soon as there are multiple generics, I dropped them from any analysis because the MAC pricing -- because under the -- I think that's under the guidance of the judge, saying that under MAC pricing there's an assumption that it's not formally related to AWP.

So, yeah, I mean, when there's MAC pricing, I dropped them out of any kind of finding of -- or calculation of damages.

Q. Well, you dropped them out of any calculation where there could have been MAC pricing. You don't conduct any investigation to determine whether the payer actually engaged in MAC pricing, correct?

**1008**

A. The -- I make the assumption that -- let me just make sure I don't misspeak. (Witness reviews documents.) Sorry. This is taking this amount of time. So put this here.

Okay. For -- in Paragraph 63 and 64 where I talk about calculating damages in Paragraph B of 63, I use my 30 percent spread when single -- and allow that single-source drugs remain subject to damages, and that when there's multiple -- when there's multi -- multiple generics launch, unless I have information to the contrary, I assume that it's multiple generics; and that I assume MAC pricing is introduced and damages that are calculated are essentially set to zero. They're not calculated. I assume they don't reference AWP. So they -- so the spreads may be greater than that, but once there's multi-source, I dropped them from any kind of measure of damages.

Q. By assuming that MAC pricing could have been introduced, you're basically saying that the revealed preference of payers in that circumstance would either be the implementation of MAC pricing or

**1009**

a decision to permit providers to earn whatever profit they're earning on the spreads for generic drugs, correct?

A. When third-party payers saw the types of prices that were being paid in the market for generics, that -- MAC pricing was a response to that, and that was a revealed contractual response as to that -- to that phenomenon.

Q. I want to go back to the Killion deposition, Paragraph 36 -- I'm sorry. Exhibit Hartman 036, Page 126.

A. And, I'm sorry, which page? 1 -- the Killion deposition, which -- did you give me a page or not?

MR. NOTARGIACOMO: 126.

Q. 126.

A. 126.

Q. Beginning at Line 9. "Question: Was it your understanding at the time that it was basically common knowledge that acquisition costs varied depending on whether a drug was brand or multi-source or generic, given the level of competition in

**1010**

1   the marketplace for the drugs? Answer: Yes."
2       A. Okay. Can I --
3       Q. Does that affect your opinion that there's
4   no evidence that payers expected that the spreads
5   for generics and multi-source would be any different
6   than the spreads for single source?
7       A. I'm -- I'm looking back to see the context
8   of whether this is self-administered, whether this
9   is all drugs, whether this is focused on physician-
10  administered per se. (Witness reviews document.)
11  So, so far I'm seeing that these are all self-
12  administered drugs that they're talking about. I'm
13  seeing pharmacies and the use of PBMs and all of
14  which did affect MAC pricing and was more aggressive
15  for the self-administered drugs.
16      So, I'm seeing your -- the citations that
17  you're -- the quotes that you're getting at are
18  really not even directed to our group of drugs since
19  PBMs generally are uninvolved with -- with
20  physician-administered drugs and the pharmacies are
21  generally uninvolved with physician-administered
22  drugs.

**1011**

1       So, I don't know what this tells me about
2   what -- some knowledge about self-administered
3   drugs, because, as I said, that's a much different
4   kettle of fish than has been recognized by this
5   court and recognized generally by students of the --
6   of the industry.
7       Q. Well, the witness in that answer doesn't
8   distinguish between self-administered drugs and
9   physician-administered drugs, does he?
10      A. Well, if you go back, I mean, that's why I
11  went back to -- to the preceding pages, and I went
12  back to Page 120 and he -- they're talking about --
13  you had discussions with other individuals at Tufts
14  at that time regarding the fact that AWP was
15  artificial. And then the answer -- "we had concerns
16  with regards to AWP as the price in which we
17  reimbursed for drugs at the retail pharmacy and
18  encouraged our physicians to utilize generics."
19      Now I see that as pharmacy-related stimuli
20  to physicians to move drugs, and then the mention of
21  the PBMs is on Page 125, and all of this is in the
22  context of PBMs and pharmacy decisions, and I -- so

**1012**

1   I -- I don't see where this -- I mean, it -- you may
2   be able to contextually relate it prior to Page 121.
3   And this set of Q&A as I see it just focused on
4   self-administered.
5       Q. So, are you now changing your testimony
6   and saying that a self-administered drug would not
7   be a good comparator for a physician-administered
8   drug?
9       A. No.
10          MR. NOTARGIACOMO: Objection.
11      A. I looked at self-administered drugs of
12  innovator drugs, single source unique drugs. We're
13  talking about generic competition in self-
14  administered drugs. That's not -- that's orthogonal
15  to my opinions that I've put forward.
16      Q. Would you agree with me that after the
17  introduction of generic drugs the prices of generic
18  drugs follow a predictable trajectory from the pre-
19  generic launch brand name price toward variable
20  production cost as more generics come into the
21  market?
22      A. That sounds like a -- like a -- a very-

**1013**

1   well crafted sentence.
2       Q. So you would agree with that sentence.
3       A. I would. But I would -- I would qualify
4   it for self-administered drugs. There's not much
5   evidence available for physician-administered drugs
6   that I am aware of or that Doctor Berndt is aware of
7   to make characterizations that I would -- that I --
8   for which I agree with that.
9       Q. Certainly payers who purchase drugs
10  directly from manufacturers would be knowledgeable
11  about spread-based competition, depending on the
12  extent to which there are alternatives for a
13  particular drug. Would you agree?
14      A. And are we -- to try and give specificity
15  to this, are we talking to -- about staff model
16  HMOs, something like Kaiser, or is that what you're
17  asking about, someone like Kaiser?
18      Q. Sure.
19      A. Yes. They would -- they would have more
20  information, and I would point out that we've
21  excluded -- I've excluded those sales to those
22  entities from the damage analysis.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 28, 2006
Boston, MA

**1014**

1  Q. Well, those entities are also third-party
2  payers, correct?
3  A. They're third -- a Kaiser is both -- deals
4  with insurance and deals with the administration of
5  the drug, and they were not considered part of the
6  class as being indirect -- indirect payers and the -
7  - as I have -- when -- when we were doing the
8  analysis of the units that were subject to damages,
9  sales to those types of entities, I asked my staff
10 to exclude, and they did the best they could given
11 the interpretation of the customer names and the
12 classes of trade codes that were found in
13 Defendant's data.
14 Q. So, let me make sure I understand what
15 you're saying. You understand that many third-party
16 payers also own their own HMOs, correct?
17 A. I know that -- that some third-party
18 payers are affiliated with H -- with -- do you mean
19 PBMs or what --
20 Q. No. I'm talking about HMOs or hospitals.
21 A. The precise affil -- set of affiliations
22 between payers and how many are integrated with

**1015**

1  hospital, I have not done sufficient analysis of to
2  really comment on.
3  Q. Well, a payer that owns an HMO or a
4  hospital and purchases drugs directly from a
5  manufacturer would know about spread-based
6  competition, correct?
7  A. A third-party payer that -- one of whose
8  subsidiaries buys drugs directly hopefully should be
9  informed by those subsidiaries to the --
10 Q. Okay. So, in the case of Kaiser
11 Permanente or other payers like that, you're not
12 simply excluding the sales to the HMO from your
13 damage calculation. You're excluding all
14 reimbursements made by that payer, correct?
15 A. What I have done in my declaration and
16 asked my staff to implement in the damage
17 calculation is to identify those sales -- unit sales
18 -- to clinics, to oncology groups, to GPOs that are
19 unaffiliated with payers, that are essentially
20 providers.
21 Q. So --
22 A. That are -- that are then going to submit

**1016**

1  the reimburse -- claims for reimbursement to third-
2  party payers.
3  Q. So, you only exclude from your damage
4  calculation then the sales to the provider operation
5  of that payer. You don't exclude all reimbursements
6  by that payer, correct?
7  A. I'm not quite sure I understand. If -- if
8  a given -- if -- say Kaiser is one example. We
9  exclude all sales to Kaiser and we exclude all sales
10 to any hospital, even though we know some of them
11 will be subject to reimbursement by third-party
12 payers in an outpatient context. It -- precisely to
13 avoid some issues of -- to be conservative.
14 Q. Well, let's take Blue Cross Blue Shield of
15 Massachusetts. Did you understand that for a period
16 of time Blue Cross Blue Shield of Massachusetts
17 owned an HMO?
18 A. I know there was an issue. It is my
19 recollection that there was an issue about -- about
20 that and which years it -- that was relevant, but I
21 forget the details at the moment.
22 Q. So, assuming your staff carried out your

**1017**

1  instructions properly and they had adequate
2  information, they should have excluded from the
3  damage calculation the sales to that HMO, correct?
4  A. If there were sales to what we've
5  classified and -- and I asked the staff to -- as --
6  as staff model HMOs like a Kaiser, they attempted to
7  do so as best they could with the -- with the names
8  that -- the data that was given to us.
9  Q. And the reason you excluded those sales is
10 because, as a direct purchaser from a manufacturer,
11 that HMO would know about the spreads. In fact,
12 that HMO would be one of the entities out there
13 getting the discounts that create the spreads,
14 correct?
15 A. The -- the guiding decision, and I'm
16 looking back here at the class definition, was to
17 focus, in my recollection, it's not stated here
18 specifically, on indirect payers. And so by
19 definition, a Kaiser is a direct purchaser and -- in
20 a staff model HMO. I think correct.
21 Now, I don't see that as being stated here
22 within this Subclass. And so I should perhaps go

Raymond S. Hartman, Ph.D. CONFIDENTIAL        February 28, 2006
Boston, MA

**Page 1018**

1 back and look at the earlier complaint to see
2 whether my understanding is consistent with that.
3    Q. Isn't it inconsistent to exclude the sales
4 to the HMO but include all of the reimbursements by
5 the same company? In other words, let's take Blue
6 Cross Blue Shield of Massachusetts. Let's take a
7 particular drug. My client, BMS, Vepesid, and let's
8 assume that BMS sold a million dollars worth of
9 Vepesid to the Blue Cross Blue Shield of
10 Massachusetts HMO and Blue Cross Blue Shield of
11 Massachusetts also reimbursed providers for $100
12 million in sales of Vepesid. You would exclude the
13 million dollars paid by the HMO from your
14 calculation, but you would include the $100 million
15 paid as a third-party payer in your damage
16 calculation, correct?
17        MR. NOTARGIACOMO: Objection.
18    A. I would -- in situations of that sort --
19 you've -- you've identified one more type of payer
20 that has some information -- maybe it's more, maybe
21 it's less than what's -- what appears in Medicare,
22 but the fact that it its reimbursement schedules are

**Page 1019**

1 based on revealed negotiations from an earlier
2 period of time and a revealed understanding of what
3 the relationship between AWP and transactions costs
4 were, and there is some information here that that's
5 to Blue Cross Blue Shield of Massachusetts but that
6 they haven't acted on it, it means that
7 institutionally they have yet to assimilate that and
8 -- and be able to have moved to insulate themselves
9 from the -- the abuse alleged in the matter.
10    Q. Let's take some additional examples of
11 this.
12        MR. EDWARDS: What I want to do is mark as
13 Exhibit Hartman 048 an excerpt from the BMS charge-
14 back database for Customer Code 26.
15        (Excerpt marked Exhibit Hartman 048.)
16    Q. Did you exclude sales to Customer Code 26
17 from your damage calculation?
18    A. This is for BMS?
19    Q. Right.
20    A. (Witness reviews document.) Yes, I did.
21    Q. And Customer Code 26 would include CIGNA,
22 HIP of greater New York --

**Page 1020**

1    A. Well it's CIGNA pharmacies in Los
2 Alamitos, California. It's -- in Arizona and
3 Florida. Are you saying CIGNA overall or.
4    Q. Well three of the CIGNA plans.
5    A. Okay, right.
6    Q. Right?
7    A. Right.
8    Q. Lots of HIP --
9    A. Right.
10    Q. -- entities. Do you want to go through
11 them all?
12    A. No. No. No. I'm --
13    Q. Okay.
14    A. The --
15    Q. And indeed you've got HMO Blue at GMA,
16 correct?
17    A. Hey.
18    Q. And Humana?
19    A. We made it. God. We're right there with
20 --
21    Q. And Kaiser?
22    A. Right. Can I keep this?

**Page 1021**

1    Q. Sure.
2    A. No, I'm just kidding.
3    Q. You exclude direct sales to all of these
4 entities from your damage calculation, but you don't
5 exclude these entities from the third-party payer
6 class, correct?
7    A. We exclude certainly the direct sales and
8 then the charge-back related data, but that is true
9 to the extent that there are indirect reimbursements
10 to these entities, they are included.
11    Q. You include them in the class, even though
12 they were obviously knowledgeable about the spreads?
13        MR. NOTARGIACOMO: Objection.
14    A. Well, it --
15        MR. NOTARGIACOMO: You can answer the
16 question.
17    A. There's -- they purchased these drugs and
18 to the extent -- I can't -- until I see that they
19 have either responded to it with the contract
20 change, such as MAC, or they've responded to it
21 institutionally and said we're going to just ignore
22 this, I have no information that whatever kind of --

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 28, 2006
Boston, MA

**1022**

1  that this particular line item of costs that are
2  borne that were -- whoever's paying for these drugs
3  and then using them in their staff model context,
4  whether that is fully communicated and made clear to
5  the -- to those that are reimbursing other
6  providers, that they have -- there's no evidence
7  that they have been able to institutionally make a
8  decision of how to avoid the excess spreads.
9      Q.  You're not saying that these guides are
10 stupid, are you?
11     MR. NOTARGIACOMO:  Objection.
12     A.  No.
13     Q.  Take a look at Page 8 of your declaration,
14 Paragraph 13.
15     A.  Okay.  You will.
16     Q.  You'll see there's some quoted language
17 there where you're quoting Judge Saris stating that,
18 "There is no evidence that TPPs purchased physician-
19 administered drugs."  With all due respect, would
20 you agree with me that that statement is not
21 correct?  There is evidence that TPPs purchased
22 physician-administered drugs -- we just looked at

**1023**

1  it.
2      A.  Do we have a copy of the memorandum and
3  opinion?
4      Q.  I don't believe I have one with me.
5      A.  Okay.  I wanted to see whether indeed that
6  was an order there.  The -- you've shown me, you
7  know, evidence for this customer code on the part of
8  BMS.  The -- you know, my -- my understanding of the
9  judge's statement here is that the -- that third-
10 party -- that there's no evidence that third-party
11 payers purchased physician-administered drugs in a
12 sufficient amount to make this of matter to them or
13 to make the knowledge of the megaspreads reach a
14 sufficient level for them to alter reimbursement
15 practices put in process to avoid the overcharges
16 that exist.
17     Q.  Do you know the dollar value of the drugs
18 that Kaiser Permanente purchases from these
19 Defendants every year?
20     A.  Yeah, and I would assume that the amount
21 of -- of drugs that Kaiser Permanente reimburses for
22 that are from other providers is -- is much smaller

**1024**

1  than that.  And so, they are -- they're doing --
2  they're focusing on what they purchase and use in
3  their own context, and that's -- that's going to be
4  the primary focus of their -- of certainly their
5  cost analyses for physician-administered drugs
6  within that institution.
7      Q.  Well, let's -- let's see if we can get a
8  definitive answer here.  Would you agree with me
9  that there is evidence that TPPs purchased
10 physician-administered drugs?
11     A.  You have -- you have --
12     Q.  Can you answer that question yes or no?
13     MR. NOTARGIACOMO:  Objection.
14     A.  Well, I want to -- I want to -- you've
15 handed me some documentation from which you've asked
16 me to draw a conclusion, and I want to make sure I
17 fully understand it.  You know, it's -- I'm not
18 going to answer a question that I don't understand.
19 I will agree that there are third-party payers who
20 have a division of -- who have a -- a staff model-
21 like division which purchases physician-administered
22 drugs.

**1025**

1      Q.  And Judge Saris goes on to say, "There is
2  no evidence that TPPs know of the megaspreads that
3  exist with these drugs."  There's evidence of that
4  as well, correct?
5      MR. NOTARGIACOMO:  Objection.
6      A.  Not in an institutional way that they've
7  acted upon it or made -- or revealed attempts to act
8  upon it or -- period.
9      Q.  Would you -- strike that.  Have you
10 considered whether there are ways that third-party
11 payers can protect themselves even if they have no
12 knowledge of the spreads?
13     A.  Ways that they could protect -- they -- so
14 what you're asking me is they're being gouged, let's
15 say, or they're paying --
16     Q.  Well you're assuming the conclusion.  I'm
17 asking you to back up before you reach a conclusion.
18     A.  Oh, I'm sorry, could we have the question
19 reread?
20     Q.  And what I'm asking you is whether you
21 considered whether there are ways that TPPs, third-
22 party payers, could protect themselves, even if they

**1026**

1  didn't know what the spreads were?
2  A. Well, how can I consider that without
3  starting with the premise they're being -- they're
4  being gouged but don't know it. Sounds like you're
5  saying are there ways -- they're not -- they're --
6  they don't know that they're being overcharged,
7  isn't that -- that's the premise. Are there ways to
8  protect themselves, even though this is going on and
9  they don't know it? Is that -- is that the
10 question?
11 Q. Are -- are you aware of the economic
12 literature which demonstrates that a buyer can enter
13 into a transaction at a competitive price, even if
14 the buyer doesn't know the seller's costs because
15 the buyer is protected by competitive forces?
16 A. So, the question is you have a competitive
17 market that's operating competitively. Competition
18 really works and all that that implies in terms of
19 information and knowledge and what's built into the
20 assumptions therefor and someone walks into that
21 market and buys at the market-clearing price.
22 Q. No. Every buyer has to be knowledgeable

**1027**

1  if they're in a competitive market, correct?
2  A. It's --
3  Q. I mean there's a lot of economic
4  literature about that, isn't there?
5  A. You need to -- you'd need -- once you
6  start drawing gray lines, it's going to have to be
7  how much, how large, what kind of effect does that
8  have? I mean it's -- the paradigm you're talking
9  about, a competitive market has -- raises certain
10 assumptions. Now, in -- a noncompetitive or a
11 partial -- or imperfectly competitive market -- I'm
12 hearing you talking about a perfectly competitive
13 market. Are you talking about an imperfectly
14 competitive market? I mean there is imperfect
15 competition and that has certain implications.
16 Q. Isn't that exactly what Doctor Berndt
17 concluded with respect to self-administered drugs?
18 Didn't he conclude that there either was no fraud or
19 no harm from any fraud with respect to self-
20 administered drugs because competitive forces would
21 have dissipated any of those effects?
22 A. With respect to physician-administered

**1028**

1  drugs?
2  Q. I said self-administered drugs.
3  A. Oh, self-administered drugs. Doctor
4  Berndt -- I'd have to go back and -- why don't you
5  show me the sections where -- where -- to which
6  you're referring to.
7  Q. You don't have any recollection --
8  A. I remember --
9  Q. -- of him reaching that conclusion?
10 A. I remember him discussing competition. I
11 remember him discussing the -- the bid process with
12 -- with PBMs and the -- and the results of that type
13 of competition. I also seem to recall -- well, let
14 me pull him up.
15 Q. I know, I want to move on if that's okay
16 with you?
17 A. Okay. I would say that he did not put
18 forward -- he certainly talked about competition. He
19 also talked about the fact that competition among
20 PBMs allowed for a -- some protection from the
21 spread, but he also said that, you know, that there
22 -- that certainly not all of the -- it's my

**1029**

1  recollection that he -- that he said not all of the
2  -- that the consumers weren't protected entirely;
3  that -- that payers were willing to give up -- that
4  they -- if -- if the discounts on generic drugs were
5  80 percent and third-party payers got a 30 percent
6  discount, they were happy with that. So, there was
7  a -- it certainly was conditioned, as opposed to
8  saying that they're fully protected.
9      So that your -- your characterization of
10 it is that third-party payers are protected in a
11 self-administered context is a -- is a very limited
12 one. It's the -- the effect of spread competition
13 is -- the full impact of it is diminished to a
14 certain extent, but not eliminated I would -- is how
15 I would characterize it.
16 Q. Have you attempted to analyze the extent
17 to which competition has dissipated any of the
18 effects of the alleged deception that you say exists
19 with respect to physician-administered drugs?
20 A. I haven't had the -- the data nor I -- I
21 haven't been asked to do that, no.
22     MR. EDWARDS: I want to mark as Exhibit

1030

1. Hartman 049 a copy of the deposition of Mike
2. Beaderstadt. Actually, I think this was previously
3. marked but let's go ahead and mark it again 'cause
4. it will be quicker.
5.     (Beaderstadt Deposition Transcript
6. marked Exhibit Hartman 049.)
7.    Q. I want to direct your attention to Page
8. 75, beginning at Line 22.
9.    A. I'm sorry. Before I go to any -- I want
10. to just see who this -- who Michael is? (Witness
11. reviews document.) Okay. And I'm sorry. So, go
12. ahead.
13.    Q. Beginning at Line 22, question --
14.    A. But of which page? I'm sorry.
15.    Q. 75.
16.    A. Line -- Page 75.
17.    Q. "Question: In your experience at John
18. Deere, have you ever doubted AWP as an accurate
19. source for reimbursement? Answer: We have never
20. used AWP in the pharmaceutical world as a source for
21. reimbursement. We used it as a source to calculate
22. our reimbursement. Question: Correct. Have you

1031

1. ever doubted AWP as a basis or benchmark for
2. reimbursement in the pharmacy world? Answer: My
3. perspective is that we always try to get that price
4. as low as possible that still puts together a
5. reasonable network, and we'd go to minus 25 percent
6. and nobody would sign it, and we'd try minus 13
7. percent and everybody signed up, so we knew we had
8. to have it somewhere in between there. And minus 20
9. is our latest venture there. And that has produced
10. some headaches for us, but we have been able to put
11. together a reasonable network based on that. So,
12. again, it's simply a basis for negotiation and we
13. try to do as well as we can to lower our costs for
14. acquiring those drugs."
15.    Have you considered whether that process
16. that Mr. Beaderstadt describes takes place in the
17. physician-administered side of the business?
18.    A. I've seen -- I've seen a lot of testimony
19. of this sort, which certainly does demonstrate that
20. AWP is a yard -- is a benchmark measure for pricing
21. and for -- for reimbursement and also indicates that
22. there's a -- the -- how negotiations try to lead to

1032

1. some reimbursement rate that's going to be somewhat
2. above cost.
3.    I haven't seen this type of testimony with
4. respect to physician-administered drugs.
5.    Q. This was testimony elicited by Plaintiffs'
6. counsel in this case, is that correct?
7.    A. I -- I wouldn't know. I assume you would
8. be able to tell me better than I'm able to tell me.
9.    MR. EDWARDS: What I want to do is mark as
10. Exhibit Hartman 050 a copy of the deposition of
11. Christopher Eddy, held on October 6th, 2004.
12.     (Deposition Transcript of Christopher
13. Eddy marked Exhibit Hartman 050.)
14.    Q. Mr. Eddy is from Empire, Empire Blue
15. Cross.
16.    A. Okay.
17.    Q. That's the Blue Cross company in New York
18. or it was the Blue Cross company in New York.
19.    A. Right.
20.    Q. It has now been acquired by Anthem
21. Wellpoint. I want to direct your attention to Page
22. 74, Line 19. "Question: How do you decide whether

1033

1. to accept an offer of a different fee schedule from
2. a provider? Answer: Specifically when a doctor
3. puts something to us in writing, we review the
4. request and we look if there is a network need for
5. the provider or if that provider left our network
6. would we have providers that still maintain our
7. patients, see our patients, and in some areas, they
8. are the only providers available. So, we need to
9. keep them in our network. So we look at their -- at
10. their proposal and we work with them and try to come
11. up with something mutually-agreeable to both parties
12. and that is presented to my boss with the
13. information to get approval for that.
14.    "Question: How do you decide if it's
15. agreeable to Empire? Answer: That would be
16. actually once I spoke to the group and we've
17. mutually agreed to something, I would have to
18. present that to my boss to see if that is something
19. that the company would agree upon with the data that
20. I have available and discussion with the doctor's
21. office and the reasonings why we had to negotiate.
22. They look at a lot of different variables and as for

1034

their decision, they may come back and ask more questions. They make the final decision on what I am presenting to them. Question: What factors do you consider? Answer: I consider -- the biggest factor I consider to me when I negotiate with a group is the member -- is if I don't have this doctor, what's going to happen to my patients and their satisfaction with the network, and that's my biggest consideration I look to do a negotiation."
   Now, does that suggest to you that the same kind of economic forces that Mr. Beaderstadt was describing in his deposition also apply to the physician-administered side of the business?
   A. Well, on the physician-administered side of the business you're going to have payers approaching providers and there's -- there's going to be a -- a set of -- of issues that will enter into and inform that negotiation and the -- the MedPac report gets into what some of those different things are. The University of Chicago in the NORC report on the -- for the various stakeholders of -- of how those -- that negotiation occurs, and there's

1035

a -- there's a number of things that enter into that negotiation, and clearly patient satisfaction is one, and we have -- we have data on revealed results from those negotiations in those two studies in that we find reimbursement -- negotiated reimbursement rates of AWP plus or minus 15 percent or so.
   So, this says to me that if you've got a doctor that's a -- really a hot ticket out there, that doctor may be -- we find reimbursement rates of AWP plus 10.5 percent, they might be able to negotiate a higher rate. You find some with less negotiating power. It may be AWP less 12 percent. There's a number of things go into the negotiation.
   I would say that negotiations occur. I wouldn't necessarily characterize it as the same size of the -- the amounts of money involved, the same number of competitors, the same number of players. In the self administered drugs you've got national PBMs. When you're a provider you're looking at local doctors with more market power. But in either of those cases, negotiations go on; payers come in with a -- with an offer sheet of ranges of

1036

things that they're going to agree to or that they're willing to trade on, and we see the results of that in the physician-administered drugs that are part of my yardsticks.
   Q. Isn't the kind of thing we're talking about here where a payer can negotiate a competitive price, even if they have no knowledge of spreads, simply Economics 101?
   A. No.
   MR. EDWARDS: Let's take a look at Mr. Morris' deposition which we'll mark as Exhibit Hartman 051.
   (Deposition Transcript of David Morris marked Exhibit Hartman 051.)
   MR. NOTARGIACOMO: When do we plan on taking a break for lunch? It's 1 o'clock. We've been going over an hour and a half.
   THE WITNESS: They're not going to let me take lunch. They're going to chain me to this chair.
   MR. EDWARDS: I just have something quick on this document and then we can break. My voice is

1037

also giving out.
   Q. Mr. Morris is from Anthem. I want to direct your attention to Page 68 of his deposition.
   A. Okay. Just --
   Q. Beginning at Line 12.
   A. I'm sorry. Before I'm going to look at anything I'm just going to look a bit at his position in Anthem. I just -- (Witness reviews document.) Okay. So now, which page?
   Q. 68.
   A. 6 --
   Q. Beginning at Line 12.
   A. 68. Okay.
   Q. "Question: To what extent did Anthem analyze the cost to a pharmacist compared to the total reimbursement amount being given to a pharmacist in terms of for a particular product? Answer: Are you asking, you know, did we look to try and determine what their profit margins were based on our network reimbursement? Question: Yes. Answer: We did not ever do any type of analysis. Question: Why not? Answer: Probably because we

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                          February 28, 2006
Boston, MA

**1038**

1   didn't want to. I mean, we had no access to --
2   ready access to wholesale acquisition costs or
3   individual pharmacy agreements with wholesalers or
4   suppliers and so, it would have been impossible for
5   us to really accurately have estimated what a
6   pharmacy was paying for its product. You know, at
7   the point you stop having pharmacies participate in
8   your network you know you've gone too far, and we
9   were nowhere close to that in my opinion. So they
10  were still making money at AWP minus 15 or AWP minus
11  16.
12         "Question: So, would I be correct that
13  the way that you determined what your reimbursement
14  rates would be was not so much based upon what their
15  actual acquisition costs were but based on how you
16  saw pharmacists reacting to the reimbursement rates
17  you put out there? Answer: What the market -- what
18  will the market bear, yes, I mean it's all Economics
19  101. At the point they stop or scream too loudly,
20  you know you've gone too far. They tie their
21  reimbursement drugs to things other than cognitive
22  services and counseling, and that's a whole separate

**1039**

1   topic but" -- we won't go into that topic but my
2   question to you, sir, is whether you agree with Mr.
3   Morris' statement here?
4      A. Well, I think this is really a topic for
5   Economics 1, not 101, but that -- putting that
6   aside, you know, what -- he's talking here about
7   physician -- about self-administered drugs. He's
8   talking about pharmacies. He's talking about a
9   situation where the negotiations are subject, on
10  both sides of the negotiation, to countervailing
11  market power with PBMs, with large retailers and the
12  -- what he's saying here is that, again, AWP is a
13  benchmark. They're negotiating at reimbursement
14  rates for -- and I'm seeing this -- AWP minus 15 or
15  16. That used to characterize everything until it
16  became clear that generics were -- self-administered
17  generics were on the market, and then there was a
18  revealed change toward MAC and they were able to
19  protect themselves on spreads there that would
20  differ from these -- these spreads, and this is --
21  this is for self-administered drugs, and that's
22  subject to -- it is -- it is more subject to a

**1040**

1   workable market than the physician-administered
2   drugs are, but you know, you're talking about
3   negotiations here and this certainly wouldn't --
4   doesn't protect them from -- from spreads on multi-
5   source drugs, AWP minus 15 or 16.
6         So, this is a very -- very specific quote
7   you've brought up for a very specific issue, but it
8   -- it doesn't have general relevance to the -- to
9   every aspect of the market in physician-administered
10  drugs in all negotiations in every context.
11     Q. Can you cite me any evidence that would
12  support the proposition that the negotiation
13  dynamics that apply to provider negotiations on the
14  physician-administered side differ from the
15  negotiation dynamics that would apply to
16  negotiations with pharmacies on the self-
17  administered side?
18     A. I am a large payer and I'm negotiating for
19  -- with PBMs and they're large national PBMs and you
20  know, there could be five to seven dominant ones and
21  a variety of other ones, and I can get RFPs from a
22  lot of PBMs for different types of reimbursement

**1041**

1   schedules, different types of MAC; I can ask for --
2   for those RFPs. That's -- that's the dynamic we're
3   talking about with self-administered. I'm now a
4   doctor -- I'm not a third-party payer that's
5   thinking of my provider network, and I'm thinking
6   about an oneologist or an oncology group in upstate
7   New York. There are very few oncology groups in
8   upstate New York. There's market power by these
9   specialists that provide these kinds of drugs. They
10  are able to negotiate much more aggressively vis-a-
11  vis -- or refuse to accept certain positions, vis-a-
12  vis a payer. They have market power. They are one
13  of the few games in town.
14     Q. I asked for evidence. Do you have
15  evidence?
16     A. Well, are you telling me that that's not -
17  - that's not factually correct? That's a summary of
18  my -- my knowledge of -- of the -- of what the self-
19  administered side of the market looks like and the
20  physician-administered side when negotiations take
21  place.
22     Q. Are -- are you telling me that the

1042

1  principle of negotiating a transaction that is what
2  the market will bear does not apply on the
3  physician-administered side?
4        MR. NOTARGIACOMO: Objection.
5    A.  No, you're -- you're totally mischaracter
6  -- I'm saying the market differs, so what the market
7  will bear will differ. The negotiations will take
8  place, and whatever the market will bear will be
9  what the market will bear. But the market structure
10 and performance and dynamics are much different when
11 payers are negotiating with national PBMs and what
12 they can negotiate. That market will lead to
13 something different than a market negotiating with
14 local oncology groups or local specialists.
15   Q.  But payers do have the ability to
16 determine what the market will bear on the
17 physician-administered side, correct?
18   A.  And MedPac has shown the -- and has shown
19 the results of what -- what those negotiations have
20 led to.
21        MR. EDWARDS: Okay. Why don't we break
22 for lunch.

1043

1        VIDEO OPERATOR: The time is 1:10. This
2  is the end of Cassette 2. We are off the record.
3        (Whereupon the deposition recessed at
4  1:10 p.m.)

1044

1        AFTERNOON SESSION (1:59 p.m.)
2
3        VIDEO OPERATOR: The time is 1:59 p.m.
4  This is the beginning of Cassette No. 3 in the
5  deposition of Raymond Hartman. We are on the
6  record.
7    Q.  Doctor Hartman, I'd like you to turn to
8  the charts that appear after Page 19 of your report.
9  I believe it's Figure 1-A, 1-B, and 1-C.
10   A.  I have done so.
11   Q.  Can you explain these figures?
12   A.  Well, what I was doing here is indicating
13 that among payers we do find variation in
14 reimbursement, summarized by the spreads that I have
15 -- that have been revealed in contract negotiations
16 and reimbursements paid. And that looking at those
17 spreads, looking at that variation, looking at that
18 that -- around there -- in Figure 1-B would show
19 reimbursement rates related to an AWP that is
20 artificially inflated when the actual ASP is much
21 lower. And what I have shown there is that if one
22 were -- if the negotiations had been relative to a

1045

1  benchmark price that was an appropriate signal for
2  the ASP that was within the yardstick spread of the
3  ASP, which is the AWP but for, that the
4  reimbursement rates would have been negotiated; that
5  there still would have been the ability to extract
6  different percentages off of AWP by large oncology
7  groups or particular providers that were very
8  important to a payer, but that distribution would be
9  around a lower AWP, and the variation that one
10 observes in reimbursement rates is relatively small
11 or quite small compared to the extent of the alleged
12 -- or the size of the actual spreads that we
13 observed in the -- in the data.
14   Q.  Are there any particular characteristics
15 that you attribute to payers at one end of the curve
16 as opposed to payers at the other end of the curve?
17   A.  Well, I point out in Footnote 11 that
18 Doctor Gaier and Mr. Young and I and I think any
19 student of the industry understands that the size of
20 -- of a particular insurer will allow those payers
21 to -- if I'm -- if I'm a large payer and I bring a
22 lot of persons to a particular provider, that that

**1046**

1  will enter into my ability to be able to have
2  bargaining strength on my side; that the -- what we
3  talked about before about the specialties and a
4  particular doctor that has monopoly power or market
5  power in terms of delivering patients would -- would
6  be -- would affect that kind of negotiation. So,
7  those are two of -- two of the things that would
8  affect that -- that variation.
9      Q.  Are you saying that payers at the top end
10 of the curve -- payers who pay AWP plus 15 percent -
11 - would be smaller payers who are not knowledgeable?
12     A.  I'm saying that there are a variety of --
13 of factors that will affect this distribution, and
14 the size of the payer will be one thing. So that a
15 large payer may use that position to negotiate
16 aggressively and say, look, if you join -- if I'm --
17 if I'm -- if I'm going to be a payer for you or if
18 you're going to be submitting your reimbursement
19 claims to me, I'm going to -- I want you -- I want
20 to reimburse you at AWP less 10 percent, 12 percent.
21     So, largeness could be something that
22 would lead toward a -- a payer being on the left-

**1047**

1  hand side of that distribution. There might be
2  certain aspects of a payer that -- that they decide
3  that they want to offer somewhat more around that
4  AWP, and it -- a large payer might be on the -- on
5  the other end of the distribution. This is -- this
6  is -- this is a distribution that's affected by a
7  variety of things. As I said, this is a negotiation
8  that both -- it reflects what the payer -- the
9  payer's bargaining strength and their preferences
10 and the provider, and it's going to be a mix of
11 things that will determine where on that
12 distribution that that -- that that reimbursement
13 rate will fall.
14     Q.  When you say a large payer may want to
15 offer somewhat more around that AWP, what do you
16 mean?
17     A.  If -- if I'm a payer and you were talking
18 about how does -- how is there negotiations and
19 where is there negotiating strength, and suppose
20 there's an oncology group in New York City that is -
21 - that is world class and -- and I would like to be
22 -- for that -- for that oncology group, I would like

**1048**

1  to be supporting that oncology group and have --
2  have the patients -- have that oncology group be
3  part of my system, that -- that payer may say, well,
4  look, we will -- in respect -- in response to that
5  position, we will -- we'll reimburse you at AWP
6  rather than AWP less 15, or we'll reimburse you at
7  AWP plus 5. And so, that's what that means.
8      Q.  That oncology group is able to use its
9  market power to induce the payer to pay a certain
10 price for drugs, correct?
11     A.  In these negotiations, the negotiated
12 discount off of AWP reflects the -- the negotiating
13 strengths and positions taken by both sets of
14 negotiators, the payers and the providers.
15     Q.  And that negotiated discount ultimately
16 gets translated into dollars that the provider
17 receives, correct?
18     A.  That's correct. That's right.
19     Q.  And let's assume that you've got a very
20 attractive, unique oncology group that is able to
21 persuade payers to pay it X dollars in the actual
22 world, okay?

**1049**

1      A.  Are we talking about --
2      Q.  If you --
3      A.  -- X dollars relative to an AWP? I'm not
4  --
5      Q.  Well that the AWP -- the reimbursement
6  rate translates into X dollars. We can put a dollar
7  figure on it. We can say $10 million.
8      A.  I didn't know whether you were saying
9  they're offering an up-front payment of $100,000.
10     Q.  No. What I'm --
11     A.  You're talking about per claim there's a
12 dollar amount associated.
13     Q.  What I'm saying is let's say you've got a
14 relationship between Payer A and Oncology Group B,
15 and Oncology Group B is an attractive, unique
16 oncology group.
17     A.  Uh-huh.
18     Q.  And I want you to assume that on an annual
19 basis Payer A pays Oncology Group B X dollars --
20     A.  Uh-huh.
21     Q.  -- as reimbursement for drugs, okay.
22     A.  Okay. This is the total reimbursement

**1050**

1  amount --
2      Q.  Right.
3      A.  -- that they're paying, okay.
4      Q.  It can be a million.  It can be 10
5  million.
6      A.  Right.  Okay.
7      Q.  We'll call it X.
8      A.  Okay.
9      Q.  Okay.
10     A.  Uh-huh.
11     Q.  What is your basis for assuming that that
12 payer would pay that oncology group or that oncology
13 group would accept anything less than X dollars in
14 the but-for world?
15     A.  The reason that --
16     Q.  I mean, don't you think it's likely that
17 the oncology group is going to say hey --
18         MR. NOTARGIACOMO:  I'm going to object.
19 He's in the middle of answering your question.
20     Q.  -- I got X dollars from you last year.  I
21 want X dollars this year or I'm taking a hike.
22         MR. NOTARGIACOMO:  I'm going to ask you

**1051**

1  let the witness answer the question you asked.
2      A.  I'm now -- could we have -- could I have
3  the first question read back to me, please.
4         (Question read back.)
5      A.  Well, what we know in the real world is
6  and what we've seen in the evidence is that the
7  provider -- there's asymmetric information.  The
8  provider knows how much they can make with a spread.
9  The payer doesn't realize and hasn't realized that
10 the spreads are as in excess of the -- of the
11 yardstick.  And so, right now the -- the providers
12 are able to take advantage of that asymmetric
13 information and their market power and be able to
14 get that X -- that X dollars from the -- from the
15 payers.  If the payers understood the extent to
16 which those spreads exceeded what they'd -- what
17 their expectations were and what they'd contracted
18 for and they -- I mean, what we're finding in the --
19 in the discovery materials and in the MedPac report
20 is that when -- when it becomes clear the extent of
21 the returns to practice, the various -- the
22 participants in the market say hey, wait a minute.

**1052**

1  We're not going to pay that.  So the doctors can no
2  longer get away with that because the -- the
3  providers are -- the payers are digging in and
4  saying we're not going to offer that.
5      Q.  Where does it say that in the MedPac
6  report?
7      A.  Actually, it says it in the -- in the
8  sections that I've quoted.  The -- in Paragraph 53 I
9  cite two examples that -- well, I -- there's a --
10 several examples in there, but it essentially cites
11 what the abuses were that were found relative to
12 these drugs and what the response was once there was
13 a -- a sufficient enough understanding of the extent
14 of that spread, and you see a response on the part
15 of regulators and on the part -- on the part of the
16 market.  And as you have in the case of TAP, you
17 found that payers -- if one looks at the litigation
18 history in the sentencing memorandum, there were
19 attempts by payers to -- not to pay the amount of
20 the return to practice, and there were -- there was
21 certain information that was -- that was explicitly
22 designed to be hidden from the payers so that they -

**1053**

1  - TAP informed the providers, through their various
2  memoranda, and as the payers learned about it, there
3  was more of a resistance to pay that.
4      Q.  Where does it say in the MedPac report in
5  words or substance that a provider would take less
6  than X in the but-for world?
7         MR. NOTARGIACOMO:  Objection.
8      A.  The -- we're talking about X now from your
9  hypothetical?  I mean, what -- what are we talking
10 about here?  Are you saying that there's -- is there
11 -- where does it say in the MedPac report where it
12 would say that they would accept nothing less than a
13 certain amount?  It -- I -- I'm sorry.  Are we back
14 in the hypothetical or a different question?
15     Q.  Your whole thesis is that in the but-for
16 world a provider who is receiving X in the real
17 world will be willing to do the same work for less
18 than X.  What is your basis for that?
19     A.  Well, it's -- it's basic economics that
20 one will essentially provide some product or some
21 service up to the point of its reservation value or
22 its reservation price or its reservation cost.  And

Raymond S. Hartman, Ph.D.   CONFIDENTIAL                    February 28, 2006
Boston, MA

**1054**

1  if the acquisition cost of a drug is a certain
2  amount of money and there -- and that's what a -- a
3  provider is paying for that drug, then certainly
4  they're not going to take less than that.
5      Now, if they're being paid 500 times that
6  or 400 times that, you're saying is there anything
7  in -- in the -- in the Medicare report that I can
8  point to that said that they wouldn't? And I'd have
9  to look closely to see if I can find a sentence like
10 that. I think it -- to say that someone who is --
11 who is making thousands of percent on a particular
12 purchase would not be willing to take several
13 hundred percent is -- is -- doesn't accord with --
14 if the reality of the market changed and there is --
15 and there is information provided and payers can
16 respond to that and will -- are unwilling to pay
17 certain amounts and providers can't get anymore than
18 that and they're still making money on it, as a
19 matter of economics they will continue to accept
20 that much less.
21    Q. Well, they may accept less for the drug
22 price, but they would want more for the

**1055**

1  administration of the drug. Isn't that what MedPac
2  found?
3      MR. NOTARGIACOMO: Objection.
4     A. MedPac and a variety of deponents we've
5  looked at have said that there are a number of
6  things that enter into reimbursement. Services and
7  physician services administration and -- and the
8  pharmaceutical -- the cost of the pharmaceuticals.
9  It is my -- I've been asked to focus on the
10 pharmaceuticals. I've been asked to focus on what
11 the impacts of the alleged fraudulent manipulation
12 are for those prices, and I've been told as a matter
13 of law that that -- that there's not -- that there's
14 not a recourse of allowing a cross subsidization
15 from some overcharge to pay other -- some other
16 amount of money. Now, I haven't -- whether that's
17 necessary or not, I don't know.
18     Certainly in -- as a matter of economics,
19 if there were enough oncologists out there, if we
20 start hypothesizing how a market could change, if
21 there's enough oncologists out there, payers can --
22 can negotiate -- and there's information about what

**1056**

1  those acquisition costs are so that they can
2  negotiate with full information and a full
3  understanding, they're going to say, look, I can
4  hire anybody else to give this shot. I can hire a
5  nurse practitioner or whatever would be allowed, and
6  I can -- I know this drug only costs this much. This
7  is all I'm going to give you. And these doctors
8  will compare that to what the other value of their
9  time, and they will come to another equilibrium, but
10 it will be lower than the one that we find under the
11 alleged manipulation.
12    Q. What is your support for that?
13    A. Basic.
14    Q. That certainly didn't happen in the case
15 of Blue Cross Blue Shield of Massachusetts, did it?
16    A. What didn't happen in the --
17    Q. They considered lowering the reimbursement
18 rate and decided not to because the oncologists
19 wouldn't go for it.
20     MR. NOTARGIACOMO: Objection.
21    A. The --
22    Q. How do you explain that example?

**1057**

1     A. Well, let's go back and look at it. My
2  recollection of that example was that they
3  considered it, and they decided that at this point
4  they weren't going to do it. Now, that doesn't say
5  to me that they didn't think that the doctors would
6  accept it. Where do -- where does it say in these
7  slides that they say that the doctors would not
8  accept this? Could you point that to me?
9     Q. Well, do you recall the reasons
10 articulated in the depositions that I showed you
11 yesterday for why Blue Cross Blue Shield of
12 Massachusetts decided not to change its
13 reimbursement structure?
14    A. I don't necessarily -- I'm not necessarily
15 able to recall whether -- what precise one that we
16 looked at yesterday. I know that there was -- there
17 was deposition testimony about the -- the provider
18 network and -- and keeping it happy or something
19 along those lines. So, it's -- it's clear that
20 payers are interested in keeping providers happy.
21 They don't want to lose providers, but that doesn't
22 mean that -- that -- well, period. That that's

**1058**

1 clear. Now what --
2    Q.  Is --
3    A.  What's --
4    Q.  Isn't it a fact that all the testimony in
5 the case suggests that if you change the
6 reimbursement formula, you're not going to change
7 the total amount that providers receive? They're
8 still going to insist on getting X.
9       MR. NOTARGIACOMO: Objection.
10       THE WITNESS: Could you -- could you
11 please repeat that question.
12       (Question read back.)
13       THE WITNESS: That's enough. Thank you.
14    A.  All the testimony in the case suggests
15 that providers are not going to accept anything less
16 than what they're getting now? I haven't seen any
17 testimony in the case that suggests that. I've seen
18 testimony in the case that says there's trade-offs,
19 but you're telling me that all the testimony in this
20 case says that they're not going to accept anything
21 less than they're getting now? That's --
22    Q.  Well, can you cite to me any testimony

**1059**

1 which suggests that they would accept anything less
2 than they're getting now?
3    A.  Well, can you cite any -- you're the one
4 that brought it up and said it's all in the
5 testimony. Could you cite one document that shows
6 that they won't take less?
7    Q.  Okay. Well, take a look at the deposition
8 of Robert Farias of Harvard Pilgrim.
9       MR. EDWARDS: We'll mark this deposition
10 as Exhibit Hartman 052.
11       (Deposition of Robert Farias marked
12 Exhibit Hartman 052.)
13    Q.  Do you have that in front of you, Doctor
14 Hartman?
15    A.  I do. I'm still finishing up the last
16 strategic slide that we were --
17    Q.  I want to direct your attention to Page
18 152 of the Farias deposition.
19    A.  Okay. Hang on a second. Let me see who
20 Doctor -- who Mr. Farias or Doctor Farias is.
21 (Witness reviews document.)
22    Q.  Beginning at Line 7.

**1060**

1    A.  I'm sorry. I'm still --
2    Q.  "Question: And Harvard Pilgrim doesn't
3 have any knowledge --"
4       MR. NOTARGIACOMO: Objection. He's still
5 --
6    A.  You can read as you'd like. I'm still --
7 I'm not ready to turn yet to the page that you want
8 me to turn to. I'm still --
9    Q.  You haven't read this deposition before?
10    A.  I don't remember the details of this
11 deposition if I did read it. Okay, so now you'd
12 like me to look where?
13    Q.  Page 152, Line 7. "Question: And Harvard
14 Pilgrim doesn't have any knowledge about what
15 providers' acquisition costs are, right? Answer:
16 No. Doesn't require them to disclose those. Answer:
17 No. Question: And if it learned that those were
18 higher or lower than it currently thinks they are,
19 that wouldn't change the fact that it reimburses
20 that methodology which is 95 percent of AWP.
21 Answer: Correct. Question: Indeed, if it learned
22 that in a particular instance physicians were

**1061**

1 getting a particular drug at a -- were getting a
2 rebate or a discount from a manufacturer on a
3 particular drug, that wouldn't change the fact that
4 Harvard Pilgrim's standard across-the-board
5 methodology is 95 percent of AWP. Answer: Correct."
6       Doesn't that suggest to you, Doctor
7 Hartman, that in your but-for world the provider
8 would still get X?
9    A.  The -- no. This suggests a number of
10 things. First of all, the Farias -- I'm -- I'm
11 reading some of his background. I don't know
12 whether he's the person that negotiates with
13 providers in changing the rates or deciding what
14 they are. This could be somebody who has some
15 administrative position and knows that there's a 95
16 percent of AWP; that's how they reimburse, period;
17 and is told that -- and it doesn't have any idea
18 that acquisition costs are as much below the AWP as
19 they are. But this is a question of -- right now
20 this is they're -- this is what they're paying. It's
21 not saying whether -- whether providers would shift.
22 It's merely saying that they don't -- they don't --