**1102**

Q. Now, you had missing data for BMS, correct?

A. There were as I recall, missing data from all Defendants, and we had to deal with that in -- in the ways that we felt were most reflective of the patterns we were seeing, and let's see where I discuss that. (Witness reviews document.) Okay. Yeah, okay. I have that now. It's at -- the discussion of the treatment of missing data that appears on Page 3 of Appendix A-6, so.

Q. So, let's take Vepesid, for example, how did you account for the missing data for Vepesid?

A. Well, what we -- the general practices were as follows: We often had data missing at the -- the front part, the early part of the period or for 2003/2004 or just for 2004. And for those -- for those early or later periods, we could observe some trend line that either seemed to be a trend or was -- was a random set of -- it was -- the damages were going up, going down, reflected the summation of all the measures year by year, and via inspection, we didn't do any formal econometric

**1103**

modeling, if -- if it appeared that there were trends over a period of time, we estimated a trend line, because it seemed to fit better -- fit the data. And if they were bouncing around or flat, we just took a simple average over a period of time.

Q. So, what did you do for Vepesid?

A. For Vepesid, '91, '92 were set equal to the damages for '93. So -- so for Vepesid -- Vepesid (Witness reviews document.) So, what we saw -- well, what it says there is we took '91 and '92, we looked at '93, the -- Medicare damages are set equal -- oh, this is 2003. (Witness reviews document.)

So, looking at Vepesid, I looked there and I see that in '93 we have damages of 722,000. I see in '94 they drop down to 380 -- 382. I see them going up to about -- to 495, 496, 500,000. Then I see them going up to 600,000. So, I'm seeing a -- a bit of a nonlinearity here. This could have -- I couldn't tell from this whether the damages were coming down from an earlier period and then they were going back up, where it was on a trend line

**1104**

that was a decline through 1993. We had 1993 data that reflected the information we had, and we said, look, rather than putting above it, we could have maybe taken an average over five years, as a sensitivity analysis. I thought that there was a trend downward, and so, I wasn't going to make it higher than that.

If it had gone down and essentially stayed at 300,000, I may have come to a different decision, but I saw it bouncing back up.

Q. Do you know when Vepesid lost its exclusivity?

A. I have that listed somewhere, but I don't -- but I'm sure you're going to tell me right now. When was it?

Q. 1993. Assuming Vepesid was a sole-source drug in '91 and '92, and it did not face therapeutic competition, don't you think your method of allocating damages from 1993 to 1991 and '92 is inappropriate?

A. Let me help understand that a little bit further. When in 1993 did it lose its exclusivity?

**1105**

Q. I can't tell you the precise date.

A. Okay. Well, that would matter in the decision. Secondly, if the loss of exclusivity -- what we've -- what we've found is that -- that spreads usually increase with the loss of exclusivity. And so, that's when there's going to be -- when there's other competition that there's going to be -- when you see the spreads going up. If you look at Zofran and Kytril, those examples, Taxol, so there's --

Q. I'm telling you there wasn't competition in '91 and '92.

A. I know, and what I'm saying is when there's not competition, that's when there's no need to have very large spreads. So what I'm saying is that if you're telling me the competition disappeared, that it came on -- there was no competition in '91 and '92, then -- then you're right. Those are -- those are high.

The -- but the -- but let me step back for a second here, because if there was competition in '94, '95 I would -- you'd need to do more analysis,

**1106**

1  because I'm seeing with the spreads going up, then
2  I'm seeing them going down again. The -- if -- if
3  BMS -- we -- we did the best we could with the
4  analyses that we could apply here with the data we
5  received. If BMS would give us that data, we could
6  estimate this precisely. And we can do -- we could
7  do sensitivity analysis of whether an average might
8  be a better number, but given that there's
9  competition in '94, as you say, and it's only
10 382,000, and then it's going up to 500,000 and
11 600,000, there are other things going on here, and
12 we had to do things arbitrary when we weren't given
13 the data by Defendants. I'd be glad to correct that
14 if you could provide the data to us.
15      Q.  At your last deposition we talked about
16 the financial arrangements between you and
17 Plaintiffs' counsel for this case. Have those
18 arrangements changed in any way?
19      A.  No.
20      Q.  How much have you been paid by Plaintiffs
21 to date?
22      A.  I'd -- I'd have to look to the invoices. I

**1107**

1  just -- I don't keep track of that, and I probably
2  should have brought the -- the invoices.
3       Q.  How much have you billed Plaintiffs to
4  date?
5       A.  Well, the same answer.
6       Q.  Have all of your bills been paid?
7       A.  I think most --
8           MR. NOTARGIACOMO: Think very carefully
9  when you answer that one. I'm sorry.
10      A.  I think we're close. I mean, as far as
11 clients go.
12          MR. EDWARDS: Okay. I'm going to yield
13 the chair at this time to one of my co-counsel.
14          MR. NOTARGIACOMO: We've been going about
15 a little over an hour and a half. I think it makes
16 sense to take a five-minute break while we switch
17 off.
18          MR. EDWARDS: I'm sorry. I'm frankly a
19 little deaf. I didn't hear you.
20          MR. NOTARGIACOMO: I think we've been
21 going about an hour and a half. I think it makes
22 sense to take a short break before we switch off.

**1108**

1           MR. EDWARDS: Okay. Sure.
2           VIDEO OPERATOR: The time is 3:35. This
3  is the end of Cassette 3. We are off the record.
4           (Short recess taken.)
5           VIDEO OPERATOR: The time is 3:50. This
6  is the beginning of Cassette 4 in the deposition of
7  Raymond Hartman. We are on the record.
8
9           FURTHER EXAMINATION BY MR. FLYNN:
10      Q.  Afternoon, Doctor Hartman. New face.
11 Michael Flynn --
12      A.  Good afternoon, Mr. Flynn.
13      Q.  -- from Davis Polk representing Astra
14 Zeneca in this matter. Could you pull out the
15 attachments to your supplemental declaration, which
16 is Exhibit Hartman 024, and Attachment A, the Astra
17 Zeneca-related attachments. Do you have Page 1-A in
18 front of you?
19      A.  I do have Page A-1. I have Attachment A-
20 1.
21      Q.  Right. The first page of that attachment?
22      A.  Right, I have it.

**1109**

1       Q.  Can you confirm for the court, Doctor,
2  that with respect to Class 3 you assign no liability
3  and no damages for Pulmicort respules?
4       A.  For Subclass 3, there are -- there is --
5  there are no damages and so that my -- that would
6  indicate to me, absent a calculation error, that
7  there was -- yeah, there were no damages or
8  liability under -- for those drugs in that context.
9       Q.  With respect to Classes 1 and 2, the first
10 page of Attachment 1 shows that you assign damages
11 for Pulmicort respules beginning in the year 2000,
12 do you see that?
13      A.  I do.
14      Q.  Can you tell me why you started with the
15 year 2000?
16      A.  Well, I would have to -- I think the best
17 bet for me to -- these are summaries that I had my
18 staff do, and I would have to go and look at the
19 specific calculations underlying those -- those
20 results, and I am seeing in -- in so -- all of
21 Attachment A-1, sub little A through whatever the
22 ultimate letter is deals with AZ drugs, and these

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 28, 2006
Boston, MA

1110

1  are showing that -- these are actually damages. Let
2  me actually -- just to make sure. What I'm
3  interested in is the spreads and whether the drug
4  had actually -- when it had launched, and I'm
5  turning to my -- this December 15th report to be
6  able to ascertain that.
7      Q.  If you can just identify for the record
8  what you're referring to when you get there, that
9  will be helpful.
10     A.  I most certainly will do so. (Witness
11 reviews document.) Okay. I am looking in my
12 December 15th, 2005 declaration, Attachment G and G-
13 1 is Astra Zeneca, and so, what I'm seeing here is
14 essentially that Pulmicort respules appear in our
15 data, and I have to assume that they launched in
16 2000, because I have annual average sale prices at
17 that point. I'm assuming we weren't missing any
18 data, because I haven't seen it mentioned or any
19 kind of approximation thereof. The AWPs associated
20 with those drugs are found in G-1-B for the
21 Pulmicort respules, and then the spreads are found
22 in G-1-C of that report.

1111

1      Q.  And so in G -- in G-1-C, which you are
2  looking at now, you show spreads for Pulmicort
3  respules beginning in 2000 of 21.61 percent; 2001,
4  20.92 percent; 2002, 26.98 percent; 2003, 25.31
5  percent; and 2004, 24.71 percent for the first NDC
6  mentioned for Pulmicort respules, right?
7      A.  That's correct.
8      Q.  And then right below that, I won't have to
9  repeat them, are the spreads you have calculated for
10 the next NDC for Pulmicort respules, is that right?
11     A.  That's correct.
12     Q.  Okay. If you -- if you turn, Doctor, a
13 couple of pages in in your -- in your December 15th
14 report in the attachments, just to clarify for the
15 record, if you go to Attachment -- I guess it's I.1
16 where you have Xs in the boxes where the drug is
17 subject to liability or not.
18     A.  Right. I have done so.
19     Q.  And in your first report on liability and
20 damages, the December 15th report, Exhibit Hartman
21 023, I take it that this attachment reflects the
22 fact that you found no liability with respect to

1112

1  either NDC of Pulmicort respules, is that correct?
2      A.  Given the threshold of liability and that
3  yardstick in that December report, that's correct.
4      Q.  And if you turn to Attachment J-1 in that
5  same report --
6      A.  Right.
7      Q.  -- if you look for each Subclass, Class 1,
8  Class 2, and Class 3, I'm correct, am I not, Doctor,
9  that you find no damages for Pulmicort respules at
10 all in your analysis?
11     A.  Relative to that -- that yardstick for
12 liability, that's correct.
13     Q.  Now, let's return, Doctor, to the
14 attachments to your supplemental report, Exhibit
15 Hartman 024, if we could. And having -- having
16 looked at the materials you wanted to reference,
17 I'll reiterate my question. Why is it that you
18 started assigning damages to Pulmicort respules in
19 your supplemental report beginning in the year 2000?
20     A.  As I discuss in the -- the first paragraph
21 or two of the supplemental declaration, I was asked
22 by counsel that I was not -- I was going to

1113

1  calculate these damages subject to an interpretation
2  of Medicare that didn't take account of that -- the
3  yardstick spread of the -- the drug inflation and
4  just look at the -- the wording of the statute.
5      So, these do not take account of -- they
6  do not net out the -- well, they don't take account
7  of the fact that the spreads were below the 30
8  percent. These are the damages implied by the fact
9  that the spreads were not -- that the AWP was in
10 excess of the ASP.
11     Q.  Other than your minimal threshold of
12 liability, the 30 percent yardstick, is there any
13 other assumption in forming your decision to start
14 assigning damages to Pulmicort respules in the year
15 2000?
16     A.  Conditional on the assumption that we
17 received a lot of this data and we processed it
18 quickly, and that this is the -- the summary of the
19 correct data, that I would say that that's right.
20     Q.  So, no other assumptions.
21     A.  No other assumptions.
22     Q.  Do you assume for damages for Class 1 and

**1114**

1  Class 2 in your supplemental report for Pulmicort
2  respules that Pulmicort was being reimbursed through
3  Medicare Part B?
4      A.  These are the sales -- the unit sales that
5  were attributable to -- to Medicare, as calculated
6  in the same methods -- using the same methods as
7  discussed in the December 15th declaration.  So, the
8  units -- it's assuming the same units would have
9  been prescribed and reimbursed.
10     Q.  So, so I'm clear, the answer to the
11 question is that you're assuming in calculating
12 damages for Pulmicort in your supplemental report in
13 the years 2000 and 2001 that Pulmicort was
14 reimbursed through Medicare Part B, correct?
15     A.  Well, I -- I assume that -- it was
16 reimbursed through Medicare Part B in both -- in
17 both reports under -- for the Medicare beneficiary,
18 Subclass 1 and 2.
19     Q.  And you assume that there was Medicare
20 Part B reimbursement for Pulmicort respules in the
21 year 2000 and 2001 under Medicare Part B, correct?
22     A.  Yes.

**1115**

1      Q.  What's -- what's the basis for that
2  assumption?
3      A.  The basis for that assumption is how I
4  determined whether a drug was reimbursed under
5  Medicare, that it had issued J-codes, that I saw in
6  -- in the NAMCS data wherever I looked for data when
7  I pulled up the -- a doctor's visit for a certain
8  drug that -- that it appeared there, and it -- so
9  it's the same criteria that I've used for all of the
10 drugs that are put forward in the December
11 declaration.
12     Q.  So I understand, the basis for your
13 assumption is that there's a J-Code corresponding to
14 Pulmicort respules and that the NAMCS data shows you
15 what percentage was reimbursed under Medicare Part B
16 for Pulmicort respules, correct?
17     A.  The basic -- as I looked at various NDCs,
18 I looked whether there was a J-Code to determine
19 whether they were essentially subject to Medicare
20 HCPCS codes so that they would fall under the
21 purview of Medicare when that was the case, and I
22 looked at when they were -- when they were sold in

**1116**

1  the market, and then I -- so that that tells me they
2  launched in 2000 based on the data I received, and I
3  looked at the NAMCS data, if it existed for
4  Pulmicort.  That tells me that when a patient visits
5  -- that all the patient visits to doctors' offices
6  in which Pulmicort was administered, that Medicare
7  was the primary reimburser.  And that's the same
8  practice I've used for every drug --
9      Q.  What --
10     A.  -- assuming that data was there for those.
11     Q.  Can you tell me what your citation or
12 support is for your assumption that Pulmicort
13 respules had a J-Code starting in 2000?
14     A.  I would have to -- I'd have to provide
15 that for you.  I had my staff -- I set a set of
16 criteria and that was one of them, and so they'd
17 have to provide that to me.
18     Q.  Sitting here today you can't provide me?
19     A.  Not --
20     Q.  If -- if you were to learn, Doctor, that
21 Pulmicort did not have a J-Code corresponding to it
22 in the years 2000 and 2001, this analysis of damages

**1117**

1  for 2000 and 2001 would be incorrect, is that right?
2      A.  Well, I'd want to -- I would certainly
3  want to look more closely at -- I mean, there's J-
4  codes.  There's Q-Codes.  There's a variety of codes
5  that are interim codes and -- for inhalants and for
6  various types of different durable medical equipment
7  codes.  So I'd have to look more closely and say --
8  but if you're telling me that the criteria which I
9  used to identify what were physician-administered
10 drugs or reimbursed under Medicare Part B, if the
11 claim is that in 2000/2001 they weren't, I would
12 have to have my team go back and -- and revisit
13 those -- the factual evidence and clarify whether
14 there was something that wasn't interpreted
15 correctly or there were some missing information.
16     Q.  And that's because you would go and
17 correct your report because the assumption on which
18 damages for Pulmicort in 2000 and 2001 are based is
19 that it was reimbursed through Medicare Part B,
20 correct?
21     A.  Yes.
22     Q.  Now, Doctor, with respect to Pulmicort

1118

1  respules, putting aside the issue that we've just
2  been talking about -- about when it became eligible
3  for Medicare Part B reimbursement, you're assuming
4  in your damage calculations in your supplemental
5  report a certain percentage of Pulmicort sales being
6  reimbursed through Medicare Part B, correct?
7    A.  I -- I'm sorry.  Maybe it's getting late.
8  It sounded like you were asking me the same
9  question.  I mean, I'm -- my -- the assumptions --
10  I've made no assumptions about any of these drugs
11  before going to the data to confirm am I seeing J-
12  codes?  Is it something that would be classified as
13  a Part B or a physician-administered drug?  Is it
14  related to a DMERC?  Do I find in NAMCS that there
15  are reimbursements that are paid under those --
16  under those categories of reimburser.  So --
17    Q.  You use NAMCS to extrapolate a percentage
18  of sales that would fall into the Medicare Part B
19  bucket as opposed to the private payer bucket,
20  correct?
21    A.  Correct.
22    Q.  And you did -- you have an assumption,

1119

1  whether based on NAMCS or something else, with
2  respect to the sales of Pulmicort respules, correct?
3    A.  That's correct.
4    Q.  And what is that assumption as to the
5  division of sales that fall into the Medicare
6  bucket, as opposed to the nonMedicare bucket --
7    A.  Well --
8    Q.  -- for Pulmicort respules?
9    A.  If -- what the NAMCS data does -- do, what
10  the NAMCS data do is it's a -- it's a survey of
11  doctors' visits, physician office visits, and it
12  says, look, you've had someone visit, and as part of
13  the diagnosis and for a particular problem, you've
14  prescribed Pulmicort, Pulmicort respules, and you've
15  submitted reimbursement thereto.  And the NAMCS data
16  says, okay, what was the primary insurance coverage
17  -- primary payer in this matter?  Was it a private
18  insurer?  Was it Medicaid?  Was it other?  Was it
19  self pay?  And was it Medicare?  And that's -- in
20  all cases, the NAMCS data, which are discussed in --
21  in greater detail in Attachment J-7 of my December
22  declaration describes those data.  So, I would look

1120

1  to NAMCS.  And we had NAMCS data on a year-to-year
2  basis if it were available where I could draw those
3  percentages.
4    Q.  Do you have any recollection of whether or
5  not there was NAMCS data for Pulmicort respules?
6    A.  Let me see if -- let me check.
7    MR. FLYNN:  Maybe I can help just to cut
8  through it.  Let me mark this I don't know what
9  exhibit number we're up to but whatever the next one
10  is.
11    (Letter, 2/6/06 marked Exhibit
12  Hartman 054.)
13    MR. FLYNN:  I don't have 20 copies.
14    Q.  I'm going to direct your attention,
15  Doctor, to Page 7 of this letter.  Let me just
16  identify for the record what this is.  This is a
17  February 6, 2006 letter from Plaintiffs' counsel,
18  Mr. Berman to Mr. James Zucker of Hogan & Hartson.
19    A.  Uh-huh.
20    Q.  Is that correct?
21    A.  It seems to be.
22    Q.  Would you turn to Page 7, Paragraph 21 of

1121

1  this letter.  Do you see Paragraph 21 says, "As
2  stated in the notes, where NAMCS data were not
3  available approximations were used based on
4  anecdotal information if available.  If no anecdotal
5  information was available, an arbitrary 50/50 share
6  between Medicare and nonMedicare is used.  In the
7  case of Pulmicort, based on industry experience, it
8  is understood that these NDCs are indicated
9  primarily for nonMedicare patients, therefore, a 10
10  percent/90 percent share between Medicare and
11  nonMedicare was used."
12    A.  I do see that.
13    Q.  Okay.  Does that refresh your recollection
14  as to how you came up with the percentage for
15  Pulmicort respules of -- as between Medicare and
16  nonMedicare?
17    A.  It does.
18    Q.  Now if you look at that letter that I just
19  read from, it says, "In the case of Pulmicort, based
20  on industry experience, it is understood that these
21  NDCs are indicated primarily for nonMedicare
22  patients."  Then it goes on to say, "Therefore, a 10

**1122**

1  percent/90 percent share between Medicare and
2  nonMedicare was used."
3       Can you explain to me, Doctor, the basis
4  for the 10 percent/90 percent share.
5     A.  That was a -- a best approximation,
6  pooling, thinking among -- among the staff and among
7  some of the affiliates at Harvard of what that share
8  might be.
9     Q.  Do you --
10    A.  So it was -- this was not -- we couldn't
11 get hard data, so it was our, you know, best -- best
12 guess.
13    Q.  Did you look at any deposition testimony
14 of any Astra Zeneca witnesses to try to help
15 determine what percentage of Pulmicort respules were
16 subject to Medicare reimbursement?
17    A.  We did not have a chance to do that, no.
18    Q.  Okay.  And is there anything you can cite
19 to me to support your 10 percent, other than what
20 you've testified to?
21    A.  No.
22    Q.  And in your mind, it could have just as

**1123**

1  easily been 5 percent, correct?
2     A.  If it had been 5 percent/95 percent, the -
3  - my reliance here came more from my colleagues at
4  Harvard that are familiar with these types of drugs,
5  familiar with this type of reimbursement that do
6  Medicare, that do nonMedicare payer analyses.  And
7  so, this was something that was discussed, and the
8  shared experience of however many years of research
9  were reflected in this.  But it was -- it was a
10 number that I essentially said, can you guys give me
11 a better number that 50/50.
12      So I think it was -- I think it's better
13 than 5 and 95, because if it was 5 and 95, they
14 would have told me that.  But it's based on their --
15 the oral tradition and the experience that they've -
16 - they've had.
17    Q.  And who are these people we're talking
18 about?
19    A.  We're talking about Professor Rosenthal,
20 Professor Joe Newhouse, Professor Tom Maguire,
21 Professor Richard Frank.  These are various people
22 that are affiliates of my firm and that I talk to.

**1124**

1     Q.  And is it your testimony that -- that
2  these people all gave you an opinion as to the
3  percentage breakout?
4     A.  It's my testimony that -- that these
5  issues were talked about with them, and I -- with
6  different -- with them at different times, and this
7  was the best numbers that -- that we could come to,
8  based on that -- that peer -- that informal peer
9  review.  And to the extent we can refine this
10 through a review of deposition testimony, that would
11 be a desirable thing.
12    Q.  Is it significant to you at all, Doctor,
13 that Pulmicort respules are not tracked in NAMCS?
14    A.  It's -- I don't know what to draw from
15 that.  I'd need to -- to know more.
16    Q.  And you didn't do any independent work
17 other than the conversations -- the general
18 conversations you've testified to with members of
19 your staff to try to figure out the breakout for
20 Pulmicort, correct?
21    A.  Well, I did for all of the -- all of the
22 drugs in the -- in the -- subject to the complaint,

**1125**

1  I did ask Defendants for the IMS NDTI data, which,
2  as I understand it, is a much more comprehensive
3  sample of office visits that I thought could help
4  inform further what the percentages were for those
5  drugs where I either had NAMCS data or where I
6  didn't.  So, I would still -- before I read
7  anybody's deposition, I'd like to get that IMS data
8  from Defendants, and I think that would help refine
9  these numbers considerably.
10    Q.  But this is just a number picked out of
11 thin air by people on your staff as far as you know,
12 right?
13        MR. NOTARGIACOMO:  Objection.
14    A.  No, it's not picked out of thin air.
15    Q.  Did they show you any documentation to
16 support it?
17    A.  They don't.  They don't need to show me
18 documentation in the sense that they deal with
19 dispensing patterns; they deal with reimbursement
20 patterns; they deal with issues of where inhalants
21 are -- NDCs that can either be a nebulizer,
22 something that's used in a doctor's office or an

Raymond S. Hartman, Ph.D.  CONFIDENTIAL					February 28, 2006
Boston, MA

**1126**

inhalant. What would be subject to Medicare, what wouldn't be subject to Medicare. They have decades of experience among them. So, this is not like asking four people on the subway. They know something. Now, it would be much more preferable for me -- for you to give me the IMS data from -- from your firm to let me check with -- what those numbers are for Pulmicort, and I could refine these numbers very easily.

Q. Do you know if those numbers are tracked in the IMS data?

A. I understand that the IMS tracks -- that they survey doctors' visits for a broad cross-section of drugs. I haven't been able to see whether those appear there because I haven't gotten the data.

Q. Do you know whether or not Pulmicort is administered by doctors in their offices?

A. It's my understanding that it can be administered via nebulizer or as an inhalant, so I'm not sure.

Q. You don't know whether or not it's

**1127**

administered by doctors as opposed to being administered by patients at home, do you?

A. It's my understanding it can be both.

Q. Do you have any data to suggest the prevalence of -- of how it happens?

A. Well, the data is -- somewhat has to do with whether it's a Medicare Part B or the -- or a nonMedicare drug.

Q. Why is that?

A. Well, if it's -- if it's Part B, it's -- then it's -- this is clearly not something that's injected by a doctor. It's a nebulizer that would be done in a doctor's office. And the -- the percentage of that -- if it's prescribed by doctors in a nonMedicare context, that would mean that it's more of an inhalant and it's not done in a doctor's office. They might get the prescription at the pharmacy.

Q. You just said in your answer that it's a nebulizer done in a doctor's office. What's the basis for your statement that it's done in a doctor's office, as opposed to being done outside of

**1128**

a doctor's office through the use of durable medical equipment?

A. It's -- it's my understanding that it can be either, but that it is -- under Medicare it's billed as if it were the former.

Q. Why is it billed as if it were the former?

A. Because the -- it's my understanding that drugs of that -- of that sort are treated as Part B drugs and they've been grandfathered under Medicare reimbursement.

Q. Whether they're part -- whether they're treated as Part B drugs or not does not tell you anything about whether or not they were administered in a doctor's office, is that right?

A. The -- certainly the -- the part -- the physician-administered drugs has come to be thought of and designated as a Part B drug. So, the drugs that are Part B drugs have that association, but you're right, it doesn't have to be in a -- in a doctor's office.

Q. And you don't know and can't cite to me any statistics as to the percentage of Pulmicort

**1129**

respules that are actually administered by a doctor as opposed to being administered by a patient through durable medical equipment outside of a doctor's care.

MR. NOTARGIACOMO: Objection. Asked and answered.

A. We've -- you've got the best estimates I have from the sources upon which I relied.

Q. And I don't -- can you point me to what are you referring to specifically as to the --

A. The 10 percent/90 percent.

Q. But that doesn't tell me, as we just established, anything about whether the physician administered Pulmicort or whether it was administered by the patient using durable medical equipment, is that right?

A. That's right.

Q. Doctor Hartman, are you aware to whom my client, Astra Zeneca, sells Pulmicort respules?

A. Uhm.

Q. I'm looking for -- I'm looking for a category of person in the drug distribution process.

**1130**

1  A. No, I don't.
2  Q. Do you have any -- any idea of whether or
3  not Astra Zeneca sells Pulmicort respules to
4  doctors?
5  A. I would be speculating.
6  Q. So the answer is no?
7  A. Let me reflect upon this. It -- it would
8  be my assumption that Pulmicort respules, some
9  Pulmicort respules are sold to doctors, more
10 specialty pharmacies.
11 Q. Can you quantify for me the percentage of
12 sales to doctors of Pulmicort respules?
13 A. No.
14 Q. Okay. Did you take into consideration in
15 performing your analysis in this case or in
16 rendering your opinions to whom Astra Zeneca sold
17 Pulmicort respules?
18 A. Are you talking about did I take into
19 account whether it's a pediatric drug, whether it's
20 a drug for the elderly? Are you taking   what --
21 Q. No. What I'm asking is we've just
22 established you don't know to whom my client sells

**1131**

1  Pulmicort respules, whether it be wholesalers or
2  doctors. You testified that you think some are sold
3  to doctors, but you can't quantify for me how much.
4  I'm asking in your analysis in establishing and
5  assigning liability and damages in your supplemental
6  report for Pulmicort respules, did you consider the
7  audience to whom Astra Zeneca was selling Pulmicort
8  respules and the percentage of sales to those
9  entities?
10 A. In -- in including Pulmicourt and in
11 treating the units that we did treat, Pulmicort, as
12 all of the drugs that appear in the report were
13 reviewed by this group of -- at the Harvard School
14 of Public Health and my staff, and whatever
15 documents they saw, such that whatever units were
16 sold were -- and to whatever -- to whomever they
17 were sold ended up being reflected in the types of
18 reimbursement patterns that are reflected by that 10
19 percent/90 percent. So I have to assume that that
20 has been looked at by the team that was going drug
21 by drug in doing this assessment, but they -- I -- I
22 relied on their -- their insights and their

**1132**

1  decisions in that regard.
2  Q. I'm talking as a conceptual matter did you
3  consider whether or not your methodology was
4  applicable to Pulmicort respules on a conceptual
5  basis. I know that you took into account the 10
6  percent figure you assumed.
7  A. The -- I -- the methodology that I have
8  taken in -- that I have developed here is applicable
9  to physician-administered drugs or Part B drugs, and
10 if this is not a physician-administered drug or a
11 Part B drug, then it would not -- if that -- if this
12 does not appear in that context, then my -- then my
13 -- my staff that did the evaluations and identified
14 what percentage of sales were subject to this effort
15 have -- haven't used all the information that would
16 be available, and if you could -- if that could be
17 put forward by Astra Zeneca, we would be glad to
18 refine these calculations.
19 Q. Put aside the calculations and the 10
20 percent. I'm asking you as a conceptual matter did
21 you take into account the fact that Pulmicort
22 respules were sold to wholesalers and not doctors in

**1133**

1  deciding whether or not this yardstick approach that
2  you've developed is applicable to Pulmicort
3  respules?
4  A. If the -- if the ultimate purchaser who
5  determines the reimbursement and who -- who
6  determines what drug is used -- what drug is
7  dispensed, and there's an average sale price,
8  whether it's sold through wholesalers or whatever
9  means, if it's subject to the same types of -- of
10 incentives that we're talking about with physician-
11 administered drugs, and a number of the physician-
12 administered drugs are sold through specialty
13 pharmacies, that -- then it belongs in -- in this
14 group. And that was a question I asked of the staff
15 vetting each of these drugs and the NDCs of each of
16 these drugs, and the ones that are -- are left met
17 that criteria as they implemented it.
18 Q. You don't have any independent basis for
19 that other than what your staff may have told you?
20 A. Well, I'm not an expert in -- in Pulmicort
21 respules or the diseases for which it's treated.
22 There are people that know more about that at

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 28, 2006
Boston, MA

**1134**

1  Harvard School of Public Health that helped --
2  helped me in developing these -- these variables.
3      Q.  Assume for a second, Doctor, that there
4  was no J-Code for Pulmicort respules prior to 2002,
5  do you think it would have been a valuable analysis
6  to do to compare the pricing decisions with respect
7  to Pulmicort respules before and after Pulmicort
8  received J-Code status?
9      A.  I would -- the -- since the J-codes --
10 well, if indeed there were no J-Code in 2000 and
11 2001, and if there were no Q-Code or if there was no
12 intermediary code that was recognized by Medicare,
13 and you're just telling me that the only things that
14 were available were NDCs, one, I'd want to see
15 whether billings under -- on Medicare claims were
16 based on an NDC basis in that situation, and if they
17 were, then there would be no information to be
18 gained between looking prior to 2002 or after 2002,
19 because once they go to a J-Code, it's going to be
20 dosage specific, and there will be an NDC -- an AWP
21 related to an NDC or a fundamental billing unit
22 that's related to an NDC.  So I'd have to see more

**1135**

1  closely how Medicare dealt with that and to -- to do
2  that assessment.
3      Q.  Do you know which party in the drug
4  distribution process is responsible for negotiating
5  reimbursements for Pulmicort respules under Medicare
6  Part B or otherwise?
7      A.  The -- negotiating the reimbursements paid
8  to -- to the providers or paid -- paid to whom?  What
9  reimbursement rates are we talking about?
10     Q.  Well, some -- somebody provides Pulmicort
11 respules to an end user --
12     A.  Right.
13     Q.  -- correct?  And the person who provides
14 those Pulmicort respules to an end user get -- gets
15 reimbursed, correct?
16     A.  Uh-huh.
17     Q.  Did you -- do you know who it is who
18 negotiates for the reimbursement of Pulmicort
19 respules?  Somebody negotiates with payers for that
20 reimbursement.  Do you know which -- which entities
21 in the drug distribution chain that is with respect
22 to Pulmicort respules?

**1136**

1      A.  I would assume that physicians are one of
2  the entities, and the other entities I haven't
3  examined in -- in detail.
4      Q.  What's your basis for the assumption that
5  physicians are involved in negotiating with payers
6  for the reimbursement of Pulmicort respules?
7      A.  Well, it's my -- my assumption that this
8  drug appears as a Part B drug that is -- that is
9  subject to physician-administration under some --
10 either in the office or as a part -- as a Part B
11 drug outside of the office.
12     Q.  And if it's a Part B drug outside of the
13 office, would a physician be involved in negotiating
14 for the reimbursement for that drug?
15     A.  I'm not -- I'm not sure.
16     Q.  So you don't -- your testimony is you
17 really don't know who negotiates for reimbursement
18 with respect to Pulmicort respules.  You don't know
19 if it's doctors.  You don't know if it's
20 pharmacists.  You don't know if it's wholesalers, is
21 that right?
22     A.  Well I'm -- my guess is it's a mix of the

**1137**

1  three.
2      Q.  But it's just a guess.
3      A.  It's -- it's in -- I would say an informed
4  guess.
5      Q.  Okay.  It's informed by, again, your
6  staff?
7      A.  Informed by my staff, informed by the --
8  the value added in the thinking that they have
9  brought to bear on the issue.
10     Q.  And I assume you would agree with me,
11 Doctor, that it is doctors who control the
12 prescription decisions as to whether or not
13 Pulmicort respules are prescribed as opposed to a
14 competitor drug.
15     A.  That is my understanding.
16     Q.  Okay.  And to the extent that doctors are
17 not involved in the negotiation over reimbursement
18 rates because they don't administer Pulmicort
19 respules, there's a division between the entity that
20 is responsible for the prescription decision and the
21 entity that negotiates the reimbursement with payers
22 as to Pulmicort respules, is that right?

Henderson Legal Services
(202) 220-4158

**1138**

1  A. That would be correct to the extent that's
2  true.
3  Q. Did you take that into account at all in
4  rendering opinions with respect to Pulmicort
5  respules in this case?
6  A. The assumption in -- built into this --
7  into the modeling has been that the physician is the
8  -- is the entity, the provider that is primarily
9  responsible for that negotiation.
10  Q. And to the extent that assumption is
11  incorrect, you would want to revisit your analysis
12  with respect to Pulmicort, is that right?
13  A. That's correct.
14  Q. Okay. Doctor, did you do any analysis of
15  the extent to which over the years Astra Zeneca sold
16  Zoladex to physicians at the WAC price?
17  A. I've certainly looked at patterns of sales
18  of Zoladex. I can't say that I focused on those
19  sales at WAC.
20  Q. And you can't tell me and you didn't
21  analyze what percentage of sales of Zoladex occurred
22  at WAC in 1991, '92, '93, or any of the years of the

**1139**

1  class period, is that right?
2  A. Now, you're saying sold to the providers
3  at WAC?
4  Q. Correct.
5  A. I would assume the data would be able to
6  tell me that.
7  Q. But you haven't studied that?
8  A. Well, I mean, if we want to look at the --
9  what the spreads were, we would know what the spread
10  from WAC AWP would be, and I would look at the
11  spread to see whether the ASP was reflecting -- to
12  the extent that it was sold at WAC, that's one of
13  the -- the ASP would be WAC in that case for that --
14  for that set of sales. So it would figure into the
15  average ASP year by year. So, it's -- if you're
16  telling me in any given year that 20 percent, 50
17  percent was sold at WAC, that appears in my numbers.
18  Q. But that doesn't affect your conceptual
19  framework for assigning liability and damages in
20  this case, correct?
21  A. Of course it does. It affects the overall
22  spread on all the units sold.

**1140**

1  Q. Again I asked you conceptually, Doctor. If
2  -- if it turns out that Astra Zeneca sold zero units
3  of Zoladex to doctors at WAC, that wouldn't make any
4  difference to you conceptually if it's compared to
5  10 percent or 20 percent of Zoladex sales at WAC.
6  It makes no difference to your conceptual liability
7  and damage model, correct?
8  A. The spreads that I calculated on an annual
9  basis take account of AWP and an acquisition at an
10  average sale price that -- some of which may be WAC,
11  some of which may be discounts off of WAC or off
12  other types of discounts. So, if zero percent of
13  them were at WAC or 5 percent or 10 percent, I'm
14  looking at the overall summary of the pricing
15  strategy of Astra Zeneca for that year.
16  Q. Aside from the numerical impact of the
17  calculation of spread as you have calculated it, you
18  haven't taken into consideration the implications on
19  a conceptual level of sales at WAC, correct?
20     MR. NOTARGIACOMO: Objection. Asked and
21  answered.
22  A. What I -- what I hear you asking me is

**1141**

1  have I identified unit by unit whether Astra
2  Zeneca's decided to have a spread on a sale that --
3  that is -- that might be one, based on WAC, and on
4  another unit, based on ASP. And I'm saying that
5  that's -- that's not a meaningful way to think about
6  this as an economist, and you're looking at all of
7  the sales, and I -- it's not a really a relevant
8  question to what we're -- I'm getting at in my
9  declaration.
10  Q. Well, you have a theory, Doctor, am I
11  correct, that explains the reason for the spreads
12  between ASPs and AWPs, is that right, for the drugs
13  you've studied in this case?
14  A. I -- that's -- it's -- certainly spreads
15  enter into my formulate methodology.
16  Q. And you have -- your -- your view, I take
17  it, and what you've been talking to Mr. Edwards
18  about for the last day and a half, is that drug
19  manufacturers in this case inflated their AWPs
20  relative to ASPs in order to try to compete and move
21  market share, right?
22  A. That's correct.

**1142**

1   Q. Okay. Did you take into account any other
2   possible alternative reasons why manufacturers would
3   want there to be a spread between AWP and ASPs,
4   particularly in situations where there's therapeutic
5   competition?
6   A. I've -- I've dealt with the reliance on
7   spread and what the meaning is and how it is used as
8   a strategic variable when there is therapeutic
9   competition. I guess I'm not understanding what you
10  mean. Are you saying there's some other reason --
11  Q. I'm asking --
12  A. -- besides competing on spread that might
13  be the cause of increasing spread?
14  Q. I'm asking whether you considered if there
15  were.
16  A. I didn't -- I didn't -- I didn't -- I
17  didn't see any. I -- I'd -- the -- in terms of --
18  if you didn't have to compete on spread and in a
19  spread that was not nontransparent, you're going to
20  either uselessly raise your AWP -- I mean if you
21  don't have to compete on -- if you don't have to use
22  spread to compete, there's going to be no reason to

**1143**

1   raise your AWP. And so, I wouldn't see why anybody
2   would just raise their AWP and perhaps invite
3   scrutiny of -- of the Justice Department. And I see
4   no reason to lower what you're making per unit, the
5   ASP, unless you were using it strategically.
6       So, as a matter of economics, I don't see
7   that there is any other reason. Doing either of
8   those -- of what you do to increase the spread would
9   only get you in trouble, it seems to me.
10  Q. So, in doing your analysis in this case,
11  you didn't hypothesize alternative explanations for
12  the spreads between AWPs and ASPs and then try to
13  figure out whether or not there were ways to say
14  that those were not valid reasons.
15  A. Well, I -- I hypothesized them, but I --
16  but as a matter -- as a matter of economics, I found
17  that they weren't reasonable.
18  Q. What were the alternative explanations
19  that you hypothesized and ruled out?
20  A. Well, one could just -- one could lower
21  the -- the ASP, and if that's not going to increase
22  your market share, you're just essentially

**1144**

1   diminishing your total revenue. So, the only reason
2   that you would lower your -- the -- your unit
3   revenue, your average sale price would be to take
4   advantage of being able to move market share. I
5   don't see -- I mean, another reason might be to be
6   charitable. I don't -- I don't believe that
7   business entities are in the business of being
8   charitable and dropping their prices. I -- I didn't
9   see rational economic reasons that would -- or
10  policy reasons, business strategy reasons to just
11  raise the AWP unless it increased the spread so you
12  could -- you could move market share, 'cause that
13  would only get you in trouble.
14  Q. Do you know, Doctor, that AWP goes up
15  formulaically when a company like Astra Zeneca
16  increases its WAC price?
17  A. Of course.
18  Q. Did you consider whether or not there was
19  any economic reason why Astra Zeneca would want to
20  increase its WAC price over time?
21  A. The WAC and the AWP are essentially the
22  same -- the same benchmark. I mean, they're --

**1145**

1   they're joined at the hip, except for when a price
2   information reporting agency would change a reported
3   spread from 20 to 25 percent, but they're
4   essentially overseen by manufacturers and they're
5   different -- they're different list prices. One's a
6   -- one's a sticker price and one's a catalog price,
7   I think, as Dawn Gencarelli says.
8       So the notion of saying that there was
9   some real meaning to WAC is -- that doesn't have
10  economic meaning to an economist. It's a list
11  price. It's used as a list price.
12  Q. So do you --
13  A. It's used to communicate information.
14  Q. I take it by your answer you did consider
15  whether or not there was a legitimate economic
16  reason for my client, Astra Zeneca, to raise its WAC
17  price over the class period and you ruled that out.
18  A. I considered -- my focus was on AWP and
19  whether there were legitimate reasons to increase
20  the deviation between AWP and ASP. Since WAC is
21  tied to AWP, any change in AWP implies a change in -
22  - in WAC. And whether you report WAC or AWP to a

**1146**

1  pricing reporting group, you're reporting the other
2  one. So, changes in either of those were reflecting
3  changes in list prices that were -- that were
4  signals and that were taken as signals to the
5  market, and were inappropriate signals to the extent
6  that they deviated the way they did from ASP.
7       Q. So let me just -- I just want to make sure
8  I understand what you just said. You did consider
9  whether or not it was legitimately economically
10 rational for Astra Zeneca to increase its WAC price
11 over the class period, and you determined that it
12 did not provide a legitimate alternative basis for
13 the differences between AWPs and ASPs.
14      MR. NOTARGIACOMO: Objection.
15      A. I considered -- I have considered AWPs,
16 WACs, changes thereto, how they were related and
17 tied to one another for the preponderance of the
18 drugs in the period and how they were related to ASP
19 and I -- I reflected on different reasons that any
20 manufacturer would want to increase the spread, and
21 I -- I found none that made rational economic sense
22 to me, changing AWP or WAC, that was anywhere as

**1147**

1  important as attempting to move market share.
2       Q. So --
3       A. And I could think of none, actually.
4       Q. So, you can think of no legitimate
5  economic reason why Astra Zeneca would want to
6  increase WAC over the class period, is that what you
7  said?
8       A. I'm talking about spreads and if I'm
9  looking over a period of 15 years and I'm looking at
10 list prices, then list prices can go up as a
11 reflection of transaction prices going up. So, yes,
12 AWP can go up and -- and as long -- when it's --
13 when it's a list price it's a reflection of
14 transaction costs and it's something upon which
15 people -- you're using as information. As costs may
16 go up, as factors may change, then there could be
17 legitimate reasons where AWP and WAC would go up
18 reflecting that. I'm talking about how that is
19 changing relative to ASP is the important thing.
20      Q. So -- so I take it now you have considered
21 whether it would be normal economic behavior for a
22 manufacturer to raise its WAC price because there

**1148**

1  are customers who are willing to pay WAC?
2       A. No, the -- I'm -- you were talking -- when
3  I was hearing you talk about changing WAC, it was
4  holding everything else constant. I'm saying that
5  in a period where costs are going up, things --
6  there's changes in demands, there are other kinds of
7  broad economic changes going on. A list price could
8  go up, a list -- a catalog price could go up
9  reflecting changes in demand and costs, and that's
10 also reflected in sales prices.
11      What I'm getting at is that I can --
12 there's no economic reason that I see moving those
13 when the sales price -- the average sale price, the
14 actual transactions costs don't go up, except to
15 move market share.
16      Q. So there is -- there is in your mind a
17 legitimate economic reason to increase your list
18 price, whether you call it WAC or AWP, for reasons
19 of inflation, increased cost, the fact that
20 customers are willing to pay that, is that correct?
21      A. WAC -- list price can change, reflecting
22 economic conditions, and WAC is a list price, yes.

**1149**

1       Q. And one of -- one of the conditions that
2  would be legitimate for manufacturers to take into
3  account is how many customers are willing to pay an
4  increased WAC price, correct?
5       A. Well, when we -- when we talk about
6  customers -- WAC price is what is the -- is the
7  price that is the transaction price between
8  wholesalers and manufacturers. I mean, the --
9  essentially, the prices to the ultimate customers
10 are contract prices that are -- where the
11 wholesalers are made whole with -- with respect to
12 the charge-backs. So, changing the WAC price, yes,
13 that's -- that's raising something that is the --
14 the internal price between wholesalers and
15 manufacturers, but are you talking about that WAC
16 price is influencing a contract price of a -- of an
17 ultimate consumer?
18      Q. Your testimony is not, Doctor, that no
19 doctors paid WAC for Zoladex during the class
20 period, is it?
21      A. That no doctors --
22      Q. Paid --

1150

1  A. -- paid WAC.
2  Q. -- WAC price for Zoladex during the class
3  period, is that right?
4  A. No, it's possible that the -- that some
5  doctors did pay -- their ASP was equal to WAC.
6  Q. And WAC is not a price just reserved for
7  wholesalers with respect to physician-administered
8  drug, is it?
9  A. WAC is a very -- WAC means wholesale
10 acquisition cost, so it may be the case that a
11 doctor got it at the wholesale acquisition cost and
12 the dollar amount is -- happened to be what is
13 listed as the wholesale acquisition cost, but I
14 don't think that the manufacturers think of WAC as
15 something that is a provider cost. It just so
16 happens they might have sold it to a provider at
17 WAC.
18 Q. And what's your basis for that?
19 A. My -- the -- my study of this market since
20 the brand -- prescription brand name drug case.
21 Q. If a manufacturer were to raise its WAC
22 because a customer, meaning a provider, is willing

1151

1  to pay that price, that would be normal economic
2  behavior, even if the overall ASPs were going down,
3  isn't that right?
4  A. Well, if -- I don't -- I don't -- if the
5  ASPs were going down, that would mean the provider
6  could get it if the ASP's going down. Why would he
7  want to pay WAC that's higher than the ASPs? I mean
8  the ASPs are to providers.
9  Q. Well, what if there were some providers
10 who are willing to pay WAC?
11 A. Well, there's going to be a -- there's a -
12 - the average sale price is the average sale price.
13 Some providers are going to pay a little bit more,
14 some are going to pay a little bit less. So there's
15 a distribution around the average sale price.
16 Q. And if you can get some providers to pay
17 WAC price on an increased basis over time, it's in -
18 - it's economically rational and legitimate to raise
19 your WAC price, isn't it?
20 A. Well, what you're raising is your ASP. Are
21 you telling me that you're -- you're trying to get
22 doctors to pay this price, but you're calling it a

1152

1  WAC price that's to wholesalers that you're also
2  raising while you're raising the -- the acquisition
3  cost to providers?
4  MR. FLYNN: Can you just read back my
5  question.
6  (Question read back.)
7  A. So, if you can get some providers to pay
8  the WAC price, it's -- it's in your interest to keep
9  those providers paying the WAC price. If you raise
10 your WAC -- you don't know if -- that's not talking
11 about everybody else who's buying at WAC. If there's
12 a whole bunch of other people buying at WAC and you
13 raise it, they might not buy at WAC. Your
14 hypothetical is looking at a subset of customers,
15 and you say you can raise the price to them but then
16 you're raising a list price that's WAC to everybody.
17 Well, that's going to have effects on other people
18 that might be price sensitive in the other
19 direction. I don't -- I don't hear you taking that
20 into account. The average sale price is what
21 summarizes the distribution of all these customers,
22 some that are willing to pay at WAC, some that will

1153

1  say I'm only going to pay at WAC less 15, and that's
2  what the average sale price is.
3  Q. But you would agree with me that if you
4  can get some providers to pay WAC, it's in your
5  interest to charge them WAC, right?
6  A. If you can get some providers to pay more
7  than they're paying, and if they're paying less than
8  WAC, and by doing that you can -- and you say why
9  don't you pay WAC, which is a higher price, well
10 then you want to raise your price. That's -- if
11 that doesn't shift other demand and other -- and
12 have other effects elsewhere.
13 Q. And with respect to those who are
14 sensitive, you can give them discounts off of WAC;
15 don't you achieve both at the same time?
16 A. Well, but if you're giving discounts --
17 that's why you need to look at the average sale
18 price. You're telling me you're making money by
19 raising WAC to one group and you're taking -- then
20 you're taking that money and giving it to another
21 group with higher discounts. It's a net -- you're
22 in a net -- you haven't gained anything. I mean it

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 28, 2006
Boston, MA

**1154**

1  depends on trading off those groups of consumers you
2  just told --
3      Q.  Well that depends on the volumes you're
4  able to achieve through discounts.
5      A.  Well, of course.
6      Q.  And the volumes you're able to achieve
7  through WAC.
8      A.  Of course.  That's why average sale price
9  summarizes that.  It tells you how much -- all units
10 you've sold to all the different groups and what
11 they were willing to pay.
12     Q.  And you would agree with me, Doctor, that
13 there are some providers who are willing to pay WAC,
14 even though ASP for a manufacturer is going down,
15 correct?
16     A.  The -- I -- I'm not sure I understand.
17     Q.  I mean, I think you said before that, you
18 know, in the distribution of prices, there will be
19 some providers, take Zoladex for example, who are
20 willing to pay WAC, even though, as you show in your
21 analysis under your calculations, the ASP for
22 Zoladex is going down.  At the same time there are -

**1155**

1  - there are some percentage of providers who are
2  willing to and pay -- who are willing to pay an
3  increased WAC price over that same period of time.
4      MR. NOTARGIACOMO:  Objection.  Asked and
5  answered.
6      A.  All I'm saying is that ASP is going down,
7  and there's a distribution of prices that are paid
8  around that, and I haven't done a comparison of --
9  of that distribution.  Whether some of that might be
10 at WAC or the -- an average sale price assumes what
11 you've sold to everybody averaged over the units
12 sold.
13     Q.  And so, you're -- sitting here today you
14 wouldn't be surprised to know that there were sales
15 of Zoladex at WAC throughout the class period, is
16 that right?
17     A.  I -- I have no opinion -- I -- the --
18 whatever the dollar amount of the WAC is, it -- it
19 wouldn't surprise me that some providers -- it -- I
20 don't know if it would surprise me or not.  I
21 haven't formed an opinion of it -- had purchased
22 that at WAC when WAC was higher than the ASP, and

**1156**

1  that other providers purchased it for less than the
2  ASP.
3      Q.  Okay.  If you pull back the -- out the
4  attachments to your December 15th report, Exhibit
5  Hartman 023, the Astra Zeneca attachments.
6      A.  I'm sorry, Exhibit --
7      Q.  Exhibit Hartman 023, Attachment G-1-C.
8      A.  G -- Attachment G -- G-1?  Attachment G-1-
9  C, Attachment -- in my December -- this is G-1-C.
10     Q.  I think that's right.
11     A.  Okay and I'm sorry.  You said --
12     Q.  You have that right.
13     A.  Okay.  And I'm sorry, I thought I heard --
14 I thought I heard you say a page or something.
15     Q.  No, just G-1-C.
16     A.  Okay.
17     Q.  Doctor, if you look at the spreads you've
18 calculated for Zoladex for 1991, '92, '93 and '94,
19 those all fall below your minimum liability
20 threshold, is that right?
21     A.  That's correct.
22     Q.  Okay.  Now, during those years you're

**1157**

1  aware, are you not, that the competitor drug to
2  Zoladex was Lupron?
3      A.  I am.
4      Q.  And Lupron on the market at that point in
5  time, was a therapeutic competitor to Zoladex?
6      A.  That's correct.
7      Q.  Okay.  And I think your testimony before
8  was that where there's therapeutic competition,
9  that's when the increase in the spreads occur,
10 correct?
11     A.  That is certainly a time when we see that.
12     Q.  Okay.  Do you have -- what is your
13 explanation for the fact that during the years 1991
14 through 1994 when there was a therapeutic competitor
15 to Zoladex, Lupron, that we don't see spreads in --
16 in excess of your liability threshold?
17     A.  Well, I would -- I would want -- like to
18 do a more detailed case study, but looking at this
19 from the level at which we're summarizing this
20 annual aggregate data, and in the -- the context of
21 the Lupron litigation, what certainly is -- became
22 clear in that litigation was that Lupron and Zoladex

1158

were therapeutic competitors during -- during the '90s, and that Lupron -- '91, '92, '93, '94 -- started to exploit the return to practice and the use of spread to move market share very aggressively. And that behavior was essentially the subject of the sentencing memorandum in 2001 in the plea agreement.

And that the documentation that I think is -- also appears in Attachment F here deals with the fact that -- that Zoladex began to lose market share due to Lupron's activities and use of the spread, illegal use of the spread was leading to a loss of market share and that Astra Zeneca had to respond.

And if I might just look at the documents that I've cited from -- if I have -- (Witness reviews document.) So, I think -- if you look at Page 11 of Attachment F where it has some of your own internal documents, it talks about the -- the realization and the need to compete on spread and how to start to do that, and that we're seeing data and documents here from '94, '95 that started to be translated into the increased spreads that I find in

1159

-- in '95 going forward. So, what this says to me is that the -- there was this -- this -- for whatever reason there was, the strategic decision was not taken immediately, and you were -- and there was a loss of market share, and that was something that was of -- clearly of concern. And that there's clearly descriptions here about profits per month by oncologists on Page 13 and getting at precisely the allegations in this matter.

So it seems to me the answer to your question is that -- that in those years it hadn't been clear what precisely TAP was doing and how aggressively they were doing it. And once it became clear, in order to protect yourselves, you had to do the same thing.

MR. NOTARGIACOMO: Five-minute warning. We're at 5 of 5.

MR. FLYNN: I think if it's okay I may run a couple of minutes over, but I'll finish my examination.

MR. NOTARGIACOMO: Give you a few minutes.

MR. FLYNN: Okay.

1160

Q. So, your best analysis, Doctor, is that Astra Zeneca responded competitively to what TAP was doing in connection with use of the spread, but didn't do so initially, and when they started to do so, that's when you start seeing increase in the spread between AWP and ASP.

A. Well, I'm -- I have certainly seen in the Lupron documents the strategic direction to -- to bill for free samples, to increase return to practice, to do a variety of things and not let payers know that this is going on, and I'm seeing less of an initiation of that in the materials that I've -- the discovery materials I've read. But I've seen a realization that that was becoming a strategic issue to AZ overall and that they had to respond in kind and take advantage of that -- that alleged illegal use of return to practice in order just to protect themselves.

Q. Turn to the next page, Doctor. It's Attachment G-1-D, which is notes on the Astra Zeneca electronic data calculation.

A. Okay.

1161

Q. Do you have that in front of you?

A. I do.

Q. And is that a -- is that a complete and accurate list of the sources of data that you considered and reviewed in rendering your opinions in this case from Astra Zeneca?

A. As with all of the data listed here, we had put together as comprehensive a list as we normally ask in matters of this sort to get transactions prices, and I can't recall whether there were any data that we did not receive, but this is what we did receive and were able to -- to analyze.

Q. So, for example, at the top, AZ 0682114, Zoladex sales, Zoladex direct and indirect sales, you looked at that database and considered it in rendering your opinions and calculations in this case, right?

A. All of these sources -- this list was looked at, and then the data -- the sources of the data that were chosen and used in a standard way that we do and in the way an economist would do it

**1162**

1  are reflected in the descriptions of the data used
2  thereby in G-1-D throughout, and then later in G how
3  we calculate the spreads, it's also -- there are
4  notes there, too.
5      Q.  Doctor Hartman, you said several times
6  yesterday and today in response to questions by Mr.
7  Edwards that, in sum or substance, actual contracts,
8  actual transactions are the more important piece of
9  evidence that you consider in your theory of
10 revealed preferences and expectations, correct?
11     MR. NOTARGIACOMO:  Objection.
12     A.  Certainly what consumers reveal and what
13 they contract for to reimburse and what they're
14 ready to pay tells me more about their overall
15 understanding and how they weight all kinds of noisy
16 information that is in the marketplace.
17     Q.  And so, you consider actual transaction
18 prices and contractual terms more important than
19 testimony about someone's expectation at a
20 particular point in time, correct?
21     A.  Well if I -- if there's someone -- if
22 there's testimony about -- it's always useful to

**1163**

1  hear testimony of someone's expectations, but it has
2  to be done carefully to avoid -- there could be
3  hypothetical bias.  The way questions are asked in
4  those kind of cases are very important and can lead
5  to biased results.  And in a question of -- of
6  expectations in past periods of time, they have to
7  be very careful that people can remember that
8  correctly.
9      Q.  And that's why in your opinion
10 transactions in contract terms are more reliable
11 indicators of expectations and preferences, correct?
12     A.  Well, it's -- it's why comparator drugs
13 and what they actually did for their pricing as I've
14 done and the kinds of information that I've looked
15 at for my liability yardsticks are more important to
16 me than whether someone says, well, I had this
17 expectation, or I saw one piece of data for one drug
18 in an OIG report.
19     Q.  Because there's something tangible about
20 the contract.  There's something tangible about the
21 transaction and the prices at which drugs are
22 transacted for, right?

**1164**

1      MR. NOTARGIACOMO:  Objection.
2      A.  In the information that I've looked at
3  there's a -- there's a statement of -- there has
4  been a commitment to, look, we're committing to this
5  contract or we're committing to this drug price.
6  So, strategy and based on all the diffuse
7  information is institutionally -- institutionally
8  formalized.
9      Q.  Are you familiar with IMS data?
10     A.  I am.
11     Q.  Okay.  And you've asked for it in this
12 case, I take it?
13     A.  I've asked for subsets of it, that's
14 right.
15     Q.  And you asked for IMS NSP data, National
16 Sales Perspective data, is that right?
17     A.  At one time I did, that's right.
18     Q.  And you're aware that you received that
19 for Zoladex?
20     A.  I forget.  As it turned out, we relied on
21 the manufacturer data.
22     Q.  Did you -- do you have any recollection of

**1165**

1  whether you considered the IMS NSP data for any of
2  the drugs in this case?
3      A.  The -- the IMS data that we had requested
4  was directed more at the self-administered drugs
5  through the retail channels, and once those -- those
6  classes were eliminated, we focused less on that and
7  went to the manufacturer data.
8      Q.  Your testimony is not that you did not
9  request Zoladex NSP data, did you, from IMS?
10     A.  No, I'm -- I'm sure we -- we request as
11 much data as we can get.  And I know in the process
12 of doing this report we asked for NSP data, and we
13 were continually negotiating with Defendants -- my
14 recollection is I asked the staff.  They were
15 saying, well, no, we're not going to give you this
16 but maybe we'll give you this, you know, and there
17 was a time when we had to give up certain data to
18 get the NDTI data.  And my recollection was that I -
19 - that I said, well, we have manufacturer data here,
20 so for spread measures, and if Defendants are
21 reluctant to respond to all our IMS requests, I want
22 to get the -- the National Disease and Therapeutic

**1166**

1  Index data, rather than the other data, 'cause
2  that's important for the -- that other part of the
3  analysis to enhance the NAMCS data.
4      Q.  But other than that there's no reason that
5  you chose not to rely on IMS data, NSP IMS data?
6      A.  The -- for what? Are you --
7      Q.  For anything. You asked for it and you
8  chose in your report not to rely on it, it appears.
9  I'm just wondering if you made any conscious
10 decision in that regard?
11     A.  As this unfolded and the analysis was
12 conducted as it was, it was not necessary to make
13 use of it in my opinion.
14     Q.  But there was no reason, other than it
15 just became unnecessary, that you chose not to rely
16 on NSP data from IMS, right?
17     A.  I felt we -- it didn't -- it didn't help
18 this analysis. So, I didn't add -- add an analysis
19 of that data.
20         MR. FLYNN: That is all the questions I
21 have at this time.
22         MR. NOTARGIACOMO: Well, we're adjourned

**1167**

1  until tomorrow.
2          VIDEO OPERATOR: The time is 5:07. This
3  deposition is suspended. This is the end of
4  Cassette 4. We're off the record.
5          (Deposition recessed at 5:07 p.m.)
6
7
8
9
10
11         _____
11         RAYMOND S. HARTMAN, Ph.D.
12
13 Subscribed and sworn to and before me
14 this _____ day of _____, 20____.
15
16
17 _____
18     Notary Public
19
20
21
22

**1168**

1  Commonwealth of Massachusetts
2  Middlesex, ss.
3      I, P. Jodi Ohnemus, Notary Public in and for the
4  Commonwealth of Massachusetts, do hereby certify that there
5  came before me on the 28th day of February, 2006, the deponent
6  herein, who was duly sworn by me; that the ensuing examination
7  upon oath of the said deponent was reported stenographically
8  by me and transcribed into typewriting under my direction and
9  control; and that the within transcript is a true record of
10 the questions asked and answers given at said deposition.
11     I FURTHER CERTIFY that I am neither attorney nor
12 counsel for, nor related to or employed by any of the parties
13 to the action in which this deposition is taken; and, further,
14 that I am not a relative or employee of any attorney or
15 financially interested in the outcome of the action.
16     IN WITNESS WHEREOF I have hereunto set my hand and
17 affixed my seal of office this 28th day of February, 2006, at
18 Waltham.
19         _____
20         P. Jodi Ohnemus, RPR, RMR, CRR
21         Notary Public, Commonwealth of Massachusetts
22         My Commission Expires: 4/21/2007

Word Index