Exhibit 9

Raymond S. Hartman, Ph.D. CONFIDENTIAL                          March 1, 2006
Boston, MA

1169

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

******************************

IN RE:  PHARMACEUTICAL            MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE        01CV12257-PBS

PRICE LITIGATION

*****************************     MARCH 1, 2006

THIS DOCUMENT RELATES TO:         VOLUME: V

ALL ACTIONS                       PAGES: 1169-1469

*****************************

C O N F I D E N T I A L

CONTINUED VIDEOTAPED DEPOSITION OF RAYMOND S.

HARTMAN, PH.D., called as a witness by and on behalf

of the Defendants, pursuant to the applicable

provisions of the Federal Rules of Civil Procedure,

before P. Jodi Ohnemus, Notary Public, Certified

Shorthand Reporter, Certified Realtime Reporter, and

Registered Merit Reporter, within and for the

Commonwealth of Massachusetts, at the offices of Dwyer

& Collora, LLP, 600 Atlantic Avenue, Boston,

Massachusetts, on Wednesday, 1 March, 2006,

commencing at 9:46 a.m.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    March 1, 2006
Boston, MA

|  | 1170 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | HAGENS, BERMAN, SOBOL & SHAPIRO |
| 4 | BY: Edward Notargiacomo, Esq. |
| 5 | David S. Nalven, Esq. |
| 6 | One Main Street, 4th Floor |
| 7 | Cambridge, MA  02142 |
| 8 | 617 402-3700 |
| 9 | ed@hbsslaw.com / davidn@hbsslaw.com |
| 10 | For the Plaintiffs |
| 11 | |
| 12 | HOGAN & HARTSON, L.L.P |
| 13 | BY: Steven M. Edwards, Esq. |
| 14 | Hoa T.T. Hoang, Esq. |
| 15 | James S. Zucker, Esq. |
| 16 | Colleen Scott, Esq. (Via telephone) |
| 17 | 875 Third Avenue |
| 18 | New York, NY  10022 |
| 19 | 212 918-3506 |
| 20 | smedwards@hhlaw.com / htthoang@hhlaw.com |
| 21 | jszucker@hhlaw.com |
| 22 | For Defendant Bristol-Myers Squibb |

|  | 1172 |
|---|---|
| 1 | APPEARANCES: (Continued) |
| 2 | |
| 3 | SHOOK, HARDY & BACON, L.L.P. |
| 4 | BY: James P. Muehlberger, Esq. |
| 5 | Tiffany W. Killoren, Esq. |
| 6 | 2555 Grand Boulevard |
| 7 | Kansas City, MO  64108-2613 |
| 8 | 816 474-6550 |
| 9 | jmuehlberger@shb.com |
| 10 | tkilloren@shb.com |
| 11 | For Defendant Aventis Pharmaceuticals |
| 12 | |
| 13 | PATTERSON, BELKNAP, WEBB & TYLER, L.L.P. |
| 14 | BY: Adeel A. Mangi, Esq. |
| 15 | William Cavanaugh, Esq. |
| 16 | 1133 Avenue of the Americas |
| 17 | New York, NY  10036-6710 |
| 18 | 212 336-2000 |
| 19 | aamangi@pbwt.com |
| 20 | For Defendant Johnson & Johnson |
| 21 | |
| 22 | (CONTINUED) |

|  | 1171 |
|---|---|
| 1 | APPEARANCES: (Continued) |
| 2 | |
| 3 | DAVIS, POLK & WARDWELL |
| 4 | BY: Michael S. Flynn, Esq. |
| 5 | 450 Lexington Avenue |
| 6 | New York, NY  10017 |
| 7 | 212 450-4000 |
| 8 | michael.flynn@dpw.com |
| 9 | For Defendant Astra Zeneca Pharmaceuticals Corp. |
| 10 | |
| 11 | ROPES & GRAY, L.L.P. |
| 12 | BY: Steven A. Kaufman, Esq. |
| 13 | Kim B. Nemirow, Esq. |
| 14 | John Montgomery, Esq. |
| 15 | One International Place |
| 16 | Boston, MA  02110-2624 |
| 17 | 617 951-7000 |
| 18 | steven.kaufman@ropesgray.com |
| 19 | kim.nemirow@ropesgray.com |
| 20 | For Defendant Shering Corporation/ |
| 21 | Shering Plough |
| 22 | |

|  | 1173 |
|---|---|
| 1 | APPEARANCES: (Continued) |
| 2 | |
| 3 | DECHERT L.L.P. |
| 4 | BY: Frederick G. Herold, Esq. |
| 5 | 1117 California Avenue |
| 6 | Palo Alto, CA  94304-1106 |
| 7 | 650 813-4800 |
| 8 | frederick.herold@dechert.com |
| 9 | For GlaxoSmithKline |
| 10 | |
| 11 | MORGAN, LEWIS & BOCKIUS, L.L.P. |
| 12 | BY: J. Clayton Everett, Jr., Esq. |
| 13 | 1111 Pennsylvania Avenue, N.W. |
| 14 | Washington, DC  20004 |
| 15 | 202 739-5860 |
| 16 | jeverett@morganlewis.com |
| 17 | BY: Jason Baranski, Esq. |
| 18 | 1701 Market Street |
| 19 | Philadelphia, PA 19103 |
| 20 | jbaranski@morganlewis.com |
| 21 | For Pharmacia Corporation of the |
| 22 | State of Connecticut |

Raymond S. Hartman, Ph.D. CONFIDENTIAL                March 1, 2006
Boston, MA

---

1174

1  APPEARANCES: (Continued)
2
3  KIRKLAND & ELLIS, L.L.P.
4  BY: Helen E. Witt, Esq.
5  200 East Randolph Drive
6  Chicago, IL 60601
7  312 861-2148
8  hwitt@kirkland.com
9  For Defendant Roxane in the Connecticut case
10
11  APPEARING VIA TELEPHONE:
12
13  COVINGTON & BURLING
14  BY: Mark Lynch, Esq.
15  1201 Pennsylvania Avenue NW
16  Washington, DC 2004-2401
17  202 662-5685
18  mlynch@cov.com
19  For GlaxoSmithKline
20
21
22  (CONTINUED)

---

1175

1  APPEARING BY TELEPHONE: (Continued)
2  ALSO PRESENT:
3  Chris Stromberg, Esq.
4  Bates White
5  2001 K Street, N.W, Suite 700
6  Washington, D.C. 20006
7  202 216-1142 / chrisstromberg@bateswhite.com
8
9  William B. Tye
10  The Brattle Group
11  44 Brattle Street
12  Cambridge, MA 02138-3736
13  617 864-7900 / btye@brattle.com
14
15  Timothy S. Snail, Principal
16  CRA International
17  John Hancock Tower
18  200 Clarendon Street, T-33
19  Boston, MA 02116-5092
20  617 425-3000
21
22  Ralph Scopa, Videographer

---

1176

1           I N D E X
2  TESTIMONY OF RAYMOND S. HARTMAN, Ph.D.:      PAGE
3  (Examination By Mr. Cavanaugh)..................... 1178
4  (Examination By Mr. Herold)..................... 1239
5  (Examination By Mr. Kaufman)................... 1370
6
7           E X H I B I T S
8  EXHIBIT        DESCRIPTION            PAGE
9  Exhibit Hartman 055, Declaration, 2/13/06....... 1246
10  Exhibit Hartman 056, "Hypothetical"............. 1252
11  Exhibit Hartman 057, "Calculation of Damages
12           to Connecticut"........... 1265
13  Exhibit Hartman 058, Revised Complaint, 3/5/04.. 1284
14  Exhibit Hartman 059, Attachment I.3:
15           GlaxoSmithKline Drugs
16           Subject to Liability"...... 1289
17  Exhibit Hartman 060, Disclosure, 11/1/05......... 1317
18  Exhibit Hartman 061, Letter, 2/13/06......... 1323
19  Exhibit Hartman 062, CT 0052728-754............. 1329
20  Exhibit Hartman 063, 1999 Redbook............... 1409
21  Exhibit Hartman 064, Warrick Medicaid Spreads... 1416
22  Exhibit Hartman 065, Revised Complaint, 3/5/04.. 1430

---

1177

1        VIDEO OPERATOR: Good morning. We are
2  now recording and on the record. Today's date is
3  March 1st, 2006. This is the continuation of the
4  deposition of Dr. Raymond Hartman.
5        MR. NALVEN: We have presented Doctor
6  Hartman for two days in the MDL proceeding. The
7  State of Connecticut designated today as a day for
8  Connecticut-specific questioning of Doctor
9  Hartman. The MDL Defendants have taken the
10  position that they are entitled to continue with
11  Doctor Hartman's deposition today, notwithstanding
12  that they have had two days to depose Doctor
13  Hartman in connection with class cert. and two
14  additional days to depose him most recently. Mr.
15  Cavanaugh is occupying the questioner's chair, and
16  so, we will permit Doctor -- the MDL Plaintiffs to
17  continue their questioning until the next break
18  this morning, at which time we will reconsider
19  whether the MDL questioning has become so
20  burdensome and so objectionable as to cause us to
21  require that it end.
22        We did represent both to the Connecticut

---

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

---

1178

1 Defendants and, in turn, to the Court that today
2 would be available for Connecticut-specific
3 questioning, and we intend to abide by that
4 commitment. So, Mr. Cavanaugh, you're free to
5 proceed.
6      MR. CAVANAUGH: Let me just note, Mr.
7 Cavanaugh occupied the seat at 9:20, was prepared
8 to begin questioning the witness at 9:30. It's
9 now 9:46.
10
11      RAYMOND S. HARTMAN, Ph.D., having
12 been previously sworn, testified as follows to
13 interrogatories
14
15 BY MR. CAVANAUGH:
16   Q. Good morning, Doctor Hartman. Doctor
17 Hartman, your initial and supplemental reports
18 with respect to Johnson & Johnson address two
19 physician-administered drugs sold by Johnson &
20 Johnson Companies, Remicade and Procrit, correct?
21   A. Let me check to confirm that. That's
22 correct.

---

1179

1   Q. Is it your understanding that Remicade
2 was introduced in 1998?
3   A. I will look to see when I have data from
4 the company.
5   Q. Why don't you pull out G-4 with -- the
6 section dealing with Johnson & Johnson.
7   A. That's just where I was going.
8   Q. Okay.
9   A. I have Section G-4. I'm seeing Remicade
10 appearing in the -- from the invoice data that we
11 received from Johnson & Johnson, and it is my
12 understanding, based on this and no additional
13 notes -- let me just check whether there was
14 missing data -- (Witness reviews document.)
15   Q. Doctor Hartman, to save time, for
16 purposes of my question, simply assume that
17 Remicade was introduced in 1998.
18   A. Okay.
19   Q. Okay? Did the various pricing services
20 such as Redbook and First Data Bank report an AWP
21 and a WAC for Remicade?
22   A. The -- the various sources, both Redbook

---

1180

1 and I would -- and First Data Bank certainly
2 reported an AWP. I would assume they reported a
3 WAC. I don't know whether they reported a WAC.
4   Q. Would you agree with me that the
5 information in Redbook and First Data Bank with
6 respect to Remicade, its AWP, and its WAC was
7 information that was widely available?
8   A. I would.
9   Q. And would you agree with me that is
10 certainly information that was available to third-
11 party payers?
12   A. Yes.
13   Q. Was that also information that third-
14 party payers would review from time to time?
15      MR. NALVEN: Objection.
16   A. I would -- I would assume -- it was
17 information available. To the extent they
18 reviewed it, I can't comment. I'd be speculating.
19   Q. Doctor Hartman, is it your opinion that
20 the published information on Remicade's AWP and
21 WAC was the type of information that contributed
22 to the expectation of third-party payers as to the

---

1181

1 prices at which physicians were acquiring
2 Remicade?
3   A. As I've stated throughout the AWP and
4 WAC are list prices that are signals that -- that
5 inform the expectations as to transactions prices,
6 such as acquisition costs.
7   Q. Is it your opinion that third-party
8 payers expected that physicians were buying
9 Remicade at or about the published WAC?
10   A. The -- the expectations that -- of
11 physicians regarding any physician-administered
12 drugs, I have -- I've summarized the information
13 that is the basis for my yardstick, and that
14 summarizes what was the understanding, and the
15 market informed the reimbursement policies that
16 reflected an understanding what the acquisition
17 cost was.
18   Q. Doctor Hartman, I'm asking you
19 specifically with respect to Remicade, is it your
20 opinion that third-party payers expected that
21 physicians were buying Remicade at or about the
22 published WAC?

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    March 1, 2006
Boston, MA

1182

1    MR. NALVEN: Asked and answered.
2    A.  If WAC were within the -- the
3  yardsticks, then that would -- that would mean
4  that it -- that was their expectations.
5    Q.  Is it your opinion that third-party
6  payers expected that physicians, on average, were
7  acquiring Remicade at prices a few percentages
8  below the published WAC?
9    A.  I've laid out what my expectations are.
10  It's -- they're related to what an acquisition
11  cost is and AWP.
12    Q.  Is it your opinion that third-party
13  payers which directly received rebates on Remicade
14  would understand that physicians may have also
15  been acquiring Remicade below WAC based on
16  receiving rebates?
17    MR. NALVEN: Objection.
18    A.  It's my understanding that for the drugs
19  that reached providers -- physician-administered
20  drugs reaching providers, that the extent that
21  rebates were paid to third-party payers were --
22  were quite small.

1183

1    Q.  And so, would it have been reasonable
2  for a third-party payer to believe that physicians
3  may have been receiving rebates in that same range
4  as the third-party payers?
5    MR. NALVEN: Objection.
6    A.  I've laid out what my -- what my
7  expectations are for all physician-administered
8  drugs, and we've discussed it at length the last
9  two days.
10    Q.  What was the published spread between
11  WAC and AWP for Remicade?
12    A.  I don't have -- I could -- I could find
13  that out, but I haven't -- and I may have looked
14  at that, but I don't recall.
15    Q.  I'm going to ask you to assume that it's
16  30 percent, okay?
17    A.  Okay.
18    Q.  So that -- would you agree with me that
19  that information was certainly available to third-
20  party payers?
21    MR. NALVEN: Objection.
22    A.  If that was the spread, then that --

1184

1  third-party payers would understand that, that's
2  correct.
3    Q.  Did Centocor provide rebates to
4  physicians?
5    A.  Centocor as --
6    Q.  I'm sorry.  Do you understand that
7  Centocor is the Johnson & Johnson company that
8  sells Remicade?
9    A.  I -- I understood that Centocor was one
10  of the -- was related -- was a subsidiary or a --
11  in the family of Johnson & Johnson.  I didn't
12  realize they were the ones that distributed
13  Remicade.  So, that being established, please --
14    Q.  Did Centocor provide rebates to
15  physicians with respect to Remicade?
16    A.  In the data that I've reviewed across
17  the physician-administered drugs, I found that
18  rebate amounts were de minimis in the -- rebates
19  characterized as rebates.  Whether they paid other
20  kinds of price offsets or other kinds of payments
21  -- but in the traditional definition of rebates as
22  the kinds of payments offered to PBMs or third-

1185

1  party payers, those kinds of payments were quite
2  small for across the board.
3    Q.  Were you aware that the Plaintiffs in
4  this case have admitted that Centocor provided no
5  rebates to physicians on Remicade?
6    MR. NALVEN: Objection.
7    A.  I don't recall one way or the other.
8    Q.  So, that's not information that was
9  shown to you by the Plaintiffs?
10    MR. NALVEN: Objection.
11    A.  Well, it was information --
12    MR. NALVEN: You can answer.
13    A.  In terms of the data, the data was -- we
14  asked for the data on rebates from Johnson &
15  Johnson and Centocor.  So, we received data on all
16  rebates paid and any payments -- any other
17  payments, and those are reflected in the ASP
18  calculation.  So that I certainly asked for that
19  information.  It was produced to me.  I -- I
20  wanted to incorporate it.  Did I look at that data
21  specifically from Centocor for that drug?  I had
22  my staff incorporate that into the definitions of

Raymond S. Hartman, Ph.D. CONFIDENTIAL
Boston, MA

March 1, 2006

1186

1 the -- of the ASP and the spreads there --
2 thereto.
3      Q.  So, you've -- so, your conclusion that
4 rebates were paid to physicians on Remicade is
5 based upon the ASP analysis you've done in G-4?
6      A.  To the extent that there have been any
7 price offsets offered by Centocor/Johnson &
8 Johnson for any of their drugs and for Remicade in
9 particular, they would be reflected and
10 incorporated into the calculations of ASP, as done
11 in -- in the -- in the declaration.
12      Q.  Did you at any point look to see what
13 the discovery record was on whether, in fact,
14 rebates had been provided to physicians?
15         MR. NALVEN:  Objection.
16      A.  I certainly asked my staff to do an
17 analysis drug by drug on what was the extent to
18 which rebates appeared in the invoice or rebate
19 databases that we received, and I reviewed -- I
20 reviewed them drug by drug, but I -- you know, I
21 don't remember anything in terms of deposition
22 material that I -- that I focused on specifically.

1187

1 I looked at -- I let the numbers tell me what was
2 going on.
3      Q.  Now, if you saw an admission by the
4 Plaintiffs that based on their review of the
5 discovery record no rebates had been provided to
6 physicians on Remicade, would that have caused you
7 to go back and look a little bit more carefully at
8 your Remicade calculations?
9         MR. NALVEN:  Objection.
10      A.  Well, you're -- there's -- rebates are
11 one of many ways that manufacturers can provide
12 financial incentives to providers, and, you know,
13 there's the -- in the matter of Lupron, there were
14 payments in terms of consulting fees and
15 educational grants and a whole variety of
16 financial incentives offered that looked like a
17 rebate.  They were dollar amounts.  They weren't
18 called rebates, so --
19      Q.  It's --
20      A.  -- I've looked at all the types of
21 financial incentives that were offered on these
22 drugs and maybe they were called rebates or maybe

1188

1 not.
2      Q.  What financial incentives were provided
3 to physicians --
4      A.  The -- the --
5      Q.  -- on Remicade?
6      A.  I would have to -- the -- let's go back
7 and look at the data that was presented for your
8 client.  (Witness reviews document.)  Okay.  So,
9 we have the data file -- I'm looking at Page 2 of
10 G.4.D., which is a description of the file list
11 and sources of data that we had received from
12 Johnson & Johnson, and I'm looking through what we
13 received -- we received information on direct
14 sales for Remicade.  Then there are charge-back
15 data that we received, and there are charge-back
16 data files and contracts relating to Remicade on
17 Page 7 of that attachment.
18      Q.  Doctor Hartman, would I be correct that
19 your calculation of the ASP for Remicade in your
20 initial report sought to exclude charge-backs,
21 discounts provided to any class of trade other
22 than physicians?

1189

1      A.  The -- the types of rebate -- any kind
2 of financial incentives that did not go to
3 providers using the information you provided us,
4 we attempted to exclude them.  That's correct.
5 But that --
6      Q.  So --
7      A.  -- means that I still see rebate data
8 here, I see charge-backs, and wherever any of
9 those did relate to -- to Remicade, those were
10 included.  And for me to answer your question, I'd
11 have to have them -- have my staffing back and
12 reproduce whatever those data files told me were
13 the amounts.
14      Q.  So, it was not your intention to include
15 in charge-back or rebate data, charge-back and
16 rebates given to entities such as Humana or
17 Kaiser?
18      A.  We excluded staff HMOs or direct
19 purchasers like Kaiser.
20      Q.  And it would not have been your
21 intention to include contracts which provided for
22 charge-backs or rebates that Centocor may have had

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    March 1, 2006
Boston, MA

---

1190

1  with the federal government?
2      A.  We excluded the federal government.
3      Q.  And the same would be true with respect
4  to contracts with the public health service?
5      A.  That's correct.
6      Q.  And if any of those -- if any of that
7  data made its way into your calculation, that
8  would be an error, wouldn't it, Doctor?
9          MR. NALVEN:  Objection.
10     A.  It -- it would be something I would want
11 to look at and see -- again, we did -- we tried to
12 accomplish just what we've just said based on
13 information we received from each of the
14 Defendants.  And I'd have to see how precise that
15 information were.  If it -- if we were provided
16 with the sufficient information and we didn't act
17 on it, that would be an error.  If we didn't get
18 sufficient information, then it was something we
19 couldn't -- couldn't do.
20     Q.  Let me ask you to turn to your -- to
21 G.4.C, which is your calculation of the spreads
22 for Remicade.

---

1191

1      A.  I'm there.
2      Q.  And I'd ask you to assume that the
3  published spread in the pricing services between
4  AWP and WAC was 30 percent, okay?
5      A.  I'm -- yeah.  We've already assumed
6  that.
7      Q.  Is it your opinion that given that there
8  was a 30-percent spread published and available to
9  third-party payers, that 30 -- third-party payers
10 would have been, in your own words, flabbergasted
11 to learn that the spread between the actual
12 selling price and AWP was actually 31.9 percent in
13 the year 2000?
14         MR. NALVEN:  Objection.
15     A.  Well, a number of -- of comments
16 thereto. First of all --
17     Q.  Can you answer that question --
18     A.  -- flabbergasted --
19     Q.  -- that question yes or no?
20         MR. NALVEN:  Objection.
21     A.  It's -- it's not a question that can be
22 answered yes or no.

---

1192

1      Q.  Okay.
2      A.  The -- you're talking -- first of all,
3  you've said, in my words, flabbergasted.  Those
4  are not my words.
5      Q.  You used the word "flabbergasted"
6  yesterday, Doctor.
7      A.  Citing an Advance PCS staff member who
8  was reviewing spreads and was put in front of him.
9  So, it's not my words.  I was using words of
10 people in this industry that were flabbergasted.
11 And secondly, the kinds of spreads for which they
12 were flabbergasted, this is not a flabbergasting
13 spread.  It is a spread in excess of the yardstick,
14 and the -- the industry un -- let me finish.  The
15 industry does understand that there are
16 transaction -- there are list prices, AWP, and
17 WAC, but the industry also understands that there
18 are other financial incentive payments, either off
19 or on top of or reducing that or increasing the
20 ASP around WAC or whatever it happens to be that
21 are not transparent to payers, and those are --
22 those are special deals between the manufacturer

---

1193

1  and the people to whom Centocor sells Remicade.
2  And so, the fact that there's a spread of 31.9
3  indicates that this -- on this drug -- Centocor
4  was exceeding the speed limit by a small amount,
5  not a flabbergasting amount.  This is not -- this
6  wouldn't merit a speeding ticket of $500 as a
7  flabbergasting spread might, but there is -- there
8  is -- there is a -- the -- on these spreads they
9  do exceed what the payers understood the
10 relationship between AWP and ASP to be.
11     Q.  Well, Doctor, we're assuming now that
12 the published spread -- if I go to a pricing
13 service, I see the published spread on Remicade
14 between AWP and WAC is 30 percent --
15     A.  Right.
16     Q.  -- and you've just told me that third-
17 party payers understood that there's transactional
18 discounts and other things provided that -- of a
19 couple of percentage points, correct?
20         MR. NALVEN:  Objection.
21     Q.  So, wouldn't it be reasonable for a
22 third-party payer to have assumed that if you have

---

Raymond S. Hartman, Ph.D. CONFIDENTIAL
Boston, MA

March 1, 2006

1194

1 a published spread of 30 percent, that the actual
2 acquisition price might vary by a couple of
3 percentage points off of WAC?
4 　　　MR. NALVEN: Objection.
5 　　A. We've -- we've already established the
6 fact that there are -- there are list prices in
7 this market. We've already, secondly, established
8 the fact that payers focus primarily for list
9 prices and reimbursement not on WAC but on AWP.
10 　　　The analyses that I have focused on and
11 developed -- for which I've developed yardsticks
12 are a relationship between AWP and ASP. The fact
13 that there's -- that there is a WAC available may
14 provide certain information, but it's also clear
15 that there's -- there's a variety of payments that
16 are unclear to third-party payers that -- there's
17 an understanding of what the -- what they -- the
18 levels that they might be. But the key thing is
19 the third-party payers would not know what those
20 are, and the spreads -- even though the WAC is --
21 is -- was -- the relationship between WAC and AWP
22 was 30 percent, it could turn out that the ASP

1195

1 might have been 29 percent.
2 　　　It's -- there -- whatever the kinds of
3 payments that were -- or incentives or financial
4 arrangements between Centocor and the doctors is
5 what's not transparent to the payers.
6 　　　And so, all they can ultimately look --
7 think about is what's the relationship to the
8 acquisition cost, which is not -- not necessarily
9 WAC. It's going to be ASP. And that's what I've
10 -- that's what I focused on.
11 　　Q. And so, a relationship -- do you think
12 it is reasonable for third-party payers to have
13 believed that the relationship between WAC and ASP
14 might differ by a couple of percentage points?
15 　　　MR. NALVEN: Objection.
16 　　A. The -- the relationships that I focused
17 on have been the relationships between AWP and
18 ASP, and given the fact that there is strict
19 formulaic relationship by drugs between AWP and a
20 WAC, and the usual ones are 20, 25 percent above -
21 - above WAC, you're -- you're saying that it's a
22 30-percent yardstick relationship. There's --

1196

1 there will be a relationship to WAC, and ASP may
2 differ from WAC, and that would be something one
3 would find on a case-by-case basis. But the --
4 the yardsticks and the -- and the information
5 that's -- that is central to reimbursement is not
6 WAC.
7 　　　What gets hardwired into the computers
8 for paying these claims is AWP. And frankly, this
9 is knowledge that may have been out there, you
10 know, in the -- it certainly was -- I guess was --
11 is -- was published and would have been listed.
12 　　　There are some cases when one of the
13 prices is not listed. It might not be -- it might
14 be one or -- I think AWP is always listed.
15 Whether WAC is listed or not, I'm not sure. But
16 certainly the programs are going to be
17 computerized on the part of the payer's part
18 toward AWP.
19 　　Q. Doctor Hartman, did you ever look at
20 what the published spread was between AWP and WAC
21 for Remicade?
22 　　A. I recall that I did.

1197

1 　　Q. So, you knew it was 30 percent before
2 you came in here today.
3 　　　MR. NALVEN: Objection.
4 　　A. I -- the -- the fact that this is a
5 focal point of this set of questions seems to
6 remind me that I'd looked -- remembered seeing a
7 drug where there was a difference between WAC and
8 AWP of 30 percent, and I can't recall that it's
9 Remicade, but given that you're -- we're talking
10 as much about Remicade, I'm assuming that was the
11 drug where I noticed that.
12 　　Q. And do you have an opinion as to how
13 third-party payers would have reacted to learning
14 that physicians were actually acquiring Remicade
15 at anywhere from 1.9 to 6 percent below the
16 published WAC?
17 　　　MR. NALVEN: Objection. Asked and
18 answered.
19 　　A. Yeah. I mean, it's -- I think it's been
20 asked and answered.
21 　　Q. Would it be reasonable for a third-party
22 payer that was receiving rebates of 1 to 5 percent

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

1198

1   on Remicade to understand that physicians may well
2   have also been receiving discounts in that same
3   range --
4         MR. NALVEN: Objection.
5      A.  Your --
6      Q.  -- off of WAC?
7         MR. NALVEN: Objection.
8      A.  The -- your hypothetical is counter to
9   my understanding of how rebates are paid for
10  physician-administered drugs; that third-party
11  payers do not receive -- significant rebates are
12  not being paid or --
13     Q.  Doctor, you keep talking about
14  significant. We're looking here at differences
15  off of WAC of 1 to 6 percent. You'd agree with me
16  those are not significant, right?
17     A.  If -- let's put this -- why don't we put
18  this -- what we're talking about here is whether -
19  - whether the -- what the bright line of the
20  threshold of liability is, and you're telling me,
21  you know, look, there's relationships across drugs
22  of -- between AWP and WAC of 20 percent, and also

1199

1   of 25 percent. Now, that's -- so, there's a
2   difference there, and that's known.
3         Now, the question is if -- if there's
4   some other rebates paid or some other financial
5   incentives paid, does that push the -- the
6   understanding between -- of what payers had
7   thought the relationship between AWP and ASP was,
8   is it -- does it lead to a value above the
9   threshold of liability that I've used for liability?
10        And so, the fact that it goes from 20 to
11  25 percent doesn't suddenly change things
12  substantially. There are -- there are a range of
13  relationships between AWP and WAC that have
14  essentially informed how reimbursement rates are
15  set, and the fact that Remicade has come along and
16  set their WAC -- their AWP relationship -- AWP/WAC
17  relationship at 30 percent, it's -- they could
18  have been -- there could have been financial
19  transactions or payments that would have dropped
20  the spread down to 29.7 percent or raised it here
21  to -- we have 31.9 percent.
22        You -- you are correct in saying that

1200

1   for the drug Remicade, they are very -- they're
2   close to the -- the threshold of liability that
3   has been -- that I have used and developed in my
4   declaration and they're --
5      Q.  That --
6      A.  -- exceeding it by -- so you're saying,
7   look, should Remicade be given a ticket because
8   they exceeded the speed limit by -- by 2 percent?
9      Q.  Doctor, you want to focus on your
10  yardstick. I'm focusing on the publicly-available
11  information which was that the relationship
12  between AWP and WAC was 30 percent. You told me
13  in the beginning that was information that was
14  known to third-party payers, correct?
15        MR. NALVEN: Objection.
16     A.  The -- that was information that was
17  published. If you're telling me did -- did third-
18  party payers spend the time to look at every
19  physician-administered drug and raise to the level
20  of -- of their consciousness and reimbursement
21  formula about how -- what they're going to do and
22  what they're going to pay and how -- what they

1201

1   think the relationship to ASP is, that, bang,
2   Remicade popped up, and this was a matter for
3   their committees to make decisions about altering
4   the reimbursement rates or what their
5   understanding of the relationship of AWP to ASP
6   was, I'd say, even though that's published that
7   that was not something that was -- was a major
8   determinant in how reimbursement rates were to be
9   -- be related to ASP.
10     Q.  Doctor Hartman, can you -- can you tell
11  us the third-party payers that you spoke to with
12  respect to Remicade.
13     A.  The -- I have -- I have not spoken to a
14  single third-party payer regarding Remicade.
15     Q.  Well, you just told us that you have an
16  opinion as to how third-party payers dealt with
17  the fact that there was a published spread of 30
18  percent on Remicade --
19        MR. NALVEN: Objection.
20     Q.  -- didn't you?
21     A.  I -- I did.
22     Q.  But you didn't actually talk to a third-

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

1202

1  party payer about Remicade, did you?
2       MR. NALVEN: Objection.
3       A.  One -- what -- that question is about as
4   -- makes about as much sense as saying that
5   someone who studies any industry, the steel
6   industry, who studies the automotive industry and
7   studies a -- a variety of documentation and
8   discovery materials coming from a variety of
9   different sources about all types of different
10  products, and then suddenly saying -- and being
11  able to see summaries of how a market works, what
12  the structure and the performance of that market
13  is, and then saying, Oh, now you can't draw a
14  conclusion about how -- how the -- how BMW dealt
15  with its -- its 330 series, because you didn't
16  talk to a dealer about the BMW 330.
17      There are -- one can go to the documents
18  that I have reviewed and the analyses that have
19  been incorporated and listed in great detail from
20  the beginning of my -- my class cert. declaration
21  to understand what is important generally to
22  third-party payers and to the various entities in

1203

1   this market. And I'm basing it on that. And I
2   don't need to -- I didn't -- I didn't talk to the
3   third-party payers about the -- one particular NDC
4   of Procrit or another particular NDC of another
5   drug. That doesn't mean I can't draw conclusions
6   about it or any economist can't draw conclusions
7   in that fashion.
8       Q.  Doctor Hartman, is it more expensive to
9   administer Remicade in the hospital setting or in
10  a physician's office?
11      MR. NALVEN: Objection.
12      A.  Since we have excluded all
13  administration through hospitals, it was something
14  that I -- we didn't -- we didn't focus on.
15      Q.  In setting a reimbursement rate for
16  Remicade administration in a physician's office,
17  is -- would a third-party payer consider the
18  relative cost to it of administering it in a
19  hospital as opposed to in a physician's office?
20      A.  Are you saying when a physician -- when
21  a provider is negotiating with payers to -- when
22  it's going to be administering Remicade, does it

1204

1   take into account how difficult it is to
2   administer in terms of negotiating the -- the
3   service fees?
4       Q.  Will a -- will a third-party provider
5   look at whether it is --
6       A.  A third-party provider or payer?
7       Q.  Payer, I'm sorry -- whether it would be
8   more expensive or less expensive to administer it
9   in a hospital, as opposed to in a physician's
10  office?
11      MR. NALVEN: Objection.
12      A.  The -- a third-party payer is going to
13  negotiate contracts with providers, and those
14  providers are oncology groups, and physician
15  groups. And those are the -- those are the groups
16  that have been included in the -- the sales
17  through which all of these drugs are administered.
18  And so, a negotiation with a third-party payer
19  with a hospital, I would assume, is different than
20  with a single doctor or with a group of -- a group
21  practice or an oncology group.
22      Q.  Assume that it costs less to administer

1205

1   Remicade in a physician's office than in a
2   hospital. Would this provide an incentive to
3   third-party payers to allow physicians to make a
4   profit on Remicade?
5       MR. NALVEN: Objection.
6       A.  If -- you're saying if it's -- if it's
7   cheaper to administer Remicade in a provider's
8   office rather than in a hospital and the -- and so
9   you're -- would it make sense for --
10      Q.  Would it make sense for the third-party
11  payer to provide an incentive for in-office
12  utilization of Remicade, as opposed to hospital
13  utilization?
14      A.  The -- if -- if third-party payers were
15  focused -- focusing on Remicade and making -- and
16  trying to incentivize providers to -- to
17  administer it in the office setting rather than as
18  an inpatient, and as an inpatient seems like it
19  would -- that's determined by totally different --
20      Q.  No, I'm talking about a hospital
21  outpatient clinic setting.
22      A.  Okay. Which, again, we've excluded from

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

1206

1    our damage calculations here, but if there are
2    certain venues through which a payer felt it was
3    cheaper to do, there would be -- there would be --
4    it could be in their interest to negotiate
5    incentives to try and get physicians to do that.
6        Q.  Did third-party payers expect that
7    physicians were making a profit on Remicade?
8        A.  I would assume and what has been built
9    into my yardstick that third-party payers assumed
10   that physicians were making what Mr. Young has
11   characterized the retail margin or some -- some
12   margin on -- on the drugs being reimbursed in the
13   provider setting.  The problem with this -- with
14   the -- the alleged inflation -- fraudulent
15   inflation here was that they didn't understand the
16   extent of that profit.
17       Q.  So, for Remicade, payers understood that
18   a profit was being made up to a -- strike that.
19   So, am I correct that third-party payers
20   understood that within a framework of a spread of
21   30 percent, there was some physician profit built
22   into it?

1207

1        A.  Payers understood that overall the --
2    their -- their understanding was that at a -- at
3    reimbursement rates of anywhere from 20 to 27
4    percent of AWP -- of discounts off of AWP, that
5    there is going to be some profit for the
6    physicians.  And that's across all drugs.  Now,
7    some would offer a little more.  Some would offer
8    a little less.  And I'm not sure that Remicade
9    entered onto the radar screen saying we're going
10   to -- we're going to focus our -- our average
11   reimbursement policy that's going to cover all
12   physician-administered drugs that you're doing in
13   your -- in a -- in a particular physician setting
14   that -- based only on what you know about the
15   profit being made on Remicade.
16       Q.  Well, you'd agree with me, wouldn't you,
17   Doctor, that Remicade was a little different from
18   other physician-administered drugs in that it was
19   being administered by rheumatologists?  And there
20   are not many physician-administered rheumatology
21   drugs, are there?
22       A.  The extent to the number of rheumatology

1208

1    drugs that are available, I -- I couldn't say.
2        Q.  Let me just ask you a few questions
3    about your data.  Can you turn to Page 9.
4        A.  9 of the declaration or of the -- of the
5    --
6        Q.  Of G-4.
7        A.  G -- okay.  Okay.
8        Q.  You say in the third bullet point,
9    "Charge-backs were not excluded where COT codes
10   did not match with a customer number."  What --
11       A.  I'm sorry.
12       Q.  Why didn't you exclude those?
13       A.  I'm sorry.  Let me just see where --
14       Q.  Page 9.
15       A.  Right.  Which bullet?  How many down?
16       Q.  Third.
17       A.  Third bullet down.  Okay.  Got it.
18       Q.  You see, "Charge-backs were not excluded
19   where COT codes did not match with a customer
20   number."  And my question is, why wouldn't you
21   exclude them if you don't -- if you don't, in
22   fact, know the customer number associated with

1209

1    that charge-back?
2        A.  Just give me a chance, 'cause it has --
3    it's fitting into the whole context of the -- of
4    the analysis.  I just want to follow -- (Witness
5    reviews document.)  I'm sorry.  I haven't
6    committed all of these particular calculations to
7    memory.  This is something I will have to -- I'd
8    have to check with my analytic team.  I can't
9    interpret this sufficiently right now without
10   inquiring of them what -- what procedure they were
11   basing this on.  They -- they were on the phone
12   with -- with Defendants with some regularity
13   trying to work through the various databases.  So,
14   I can easily let you know that, but I can't answer
15   that at the moment.
16       Q.  Can you turn to Page 3.
17       A.  Let me just make a note of this so that
18   I --
19       Q.  Sure.
20       A.  -- do respond to it.  Incidentally,
21   there were errata that were passed out for some of
22   the calculations and some of the data, but it

Raymond S. Hartman, Ph.D. CONFIDENTIAL                          March 1, 2006
Boston, MA

1210

1   certainly didn't address this. Okay. I'm sorry.
2   Go ahead.
3        Q.  Turn to Page 3.
4        A.  Okay.
5        Q.  Under the heading "All Drugs Analysis,"
6   am I correct that there were instances in which
7   there were multiple COT codes for a unique
8   customer code?
9        A.   And you're basing that on reading
10  where? Which bullet?
11       Q.  The first bullet point --
12       A.  Yeah.
13       Q.  -- I believe suggests that.
14       A.  It says, "Files containing customer
15  numbers, customer names, and class of trade codes
16  were combined into one data set, keeping only one
17  record per customer number." And so, what that
18  says to me is that for a given customer name and
19  customer -- and class of trade code, one record
20  was kept so that a given customer number could
21  appear with the -- in a different classes of
22  trade, and it would be kept in the data unless it

1211

1   were blank.
2        But if you want me to confirm that in
3   greater --
4        Q.  Well, that -- well, let me ask you this
5   question: Were there instances in which you had
6   multiple COT codes for a unique customer code?
7        A.  For a customer name or a customer number
8   -- customer code?
9        Q.  Customer code.
10       A.  I would assume there would have been,
11  and they would have been kept, but for -- the one
12  number per customer code is how I'm reading that.
13       Q.  Then how did you determine what class of
14  trade to put that customer in?
15       A.  Well, it was the sales to the class of
16  trade. There's going to be different sales to --
17  I would assume there are going to be some
18  customers that could appear in different classes
19  of trade, and there will be certain units that
20  you're attributing to each of those based on your
21  accounting practices and procedures.
22       If that is an incorrect interpretation

1212

1   of -- of our understanding of your data based on
2   our conversations, then we would like to know
3   that, and we can -- we can respond accordingly.
4        Q.  So, is it your understanding that where
5   you had a unique customer code with multiple COTs,
6   you would allocate that customer sales in
7   different classes of trade?
8        A.  Well, the -- it's -- this is keeping
9   only one record per customer name within a class
10  of trade, and so, I'm assuming -- I'm reading this
11  and assuming that my staff were given instructions
12  that there could have been sales to some specific
13  customers that could -- and certain sales were
14  classed as part of -- within one class of trade or
15  another class of trade. And both of those -- and
16  that those sales were separated by your accounting
17  practices and procedures for reasons that were
18  important to you, and we -- we treated it as such.
19       Q.  Were -- were there instances in --
20       A.  But let me just write that one down, and
21  I can confirm --
22       Q.  Okay.

1213

1        A.  -- that understanding for you. Okay.
2        Q.  Were there instances in which there was
3   a unique customer code that had varying customer
4   names?
5        A.  I would have to ask my staff to do a run
6   to check that.
7        Q.  So, you don't -- if that situation
8   exists, you don't know how that was addressed.
9        A.  If you want me to take the time, the --
10  the staff was given directions to approach this in
11  a consistent manner, and it's reflected in this
12  description. If it's not -- if it's not fully
13  clarified herein, we can either respond to written
14  questions, and we'd be glad to tell you how that
15  is -- was treated. But obviously, if -- if this
16  is not enough for me to fully see it, it's -- it's
17  because, in response to whatever questions they
18  asked of -- of you and your clients, we -- we
19  could use the data to the extent that we did, but
20  it wouldn't surprise me that we could have used
21  further information. And I know we were always in
22  the process of trying to get further information.

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

1214

1    So, if -- if there's a question pending,
2  I'd be glad to respond to it in a follow-up. Do
3  you want me to --
4    Q.  Yeah.  I'll take you up on your offer to
5  accept some written questions on -- with respect
6  to data.
7    Let me ask you to turn to Page 11.
8  Under Table 1, these are the classes of trade
9  codes that you excluded from your calculation of
10 ASP, correct?
11   A.  That's right.
12   Q.  All right.  And your intention here
13 would have been to exclude, for example, all --
14 all federal government contracts?
15   A.  That's correct.
16   Q.  So, it would have been your intention to
17 exclude codes that related to the public health
18 service, VA Depot, military allocation, correct?
19   A.  We -- as I've discussed in the -- in the
20 text, there were -- we were -- we tried -- we
21 focused this on -- on providers that would submit
22 reimbursement to third-party payers.  And so, we

1216

1    A.  If we're talking about an ASP-calculated
2  overall sales, well, then as part of that ASP
3  you'd include rebates across all sales.  And so,
4  if I'm including hospitals and other things and
5  everything except government, then I would include
6  charge-backs and all the other things that were
7  excluded before, which I explicitly identified --
8    Q.  I understand the difference, but I'm
9  talking about the -- is there any reason why with
10 respect to the same managed care entities you
11 would come up with different rebate levels --
12 rebate amounts in your first report and in your
13 second report?
14   A.  In the -- to the extent that we were
15 attempting to identify a subset of units sold in a
16 conservative fashion and exclude all -- all
17 possible -- excluding all hospitals so that we --
18 so we're losing some sales and being conservative
19 with respect to actual outpatient units that were
20 reimbursed, there may have been some -- some of
21 the entities you're talking about where some
22 portion of those sales -- where we based them on

1215

1  excluded hospitals.  We excluded government.  We
2  excluded the -- the categories that you're talking
3  about.  We excluded direct purchasers like -- and
4  staff model HMOs like Kaiser.
5    We used the class of trade codes where
6  we could to do that.  We used account names where
7  the -- we felt that gave us additional exclusions.
8    Q.  The -- we've noted a difference in the
9  managed care rebates in your Declaration 1 and
10 Declaration 2.  Would there be any reason why the
11 managed -- your calculation of managed care
12 rebates would be any different in the two
13 declarations?
14   A.  You mean the supplemental and the --
15   Q.  Yes.
16   A.  The -- the instructions I was given for
17 the supplemental declaration to inform that
18 analysis I've expressed fairly explicitly, and
19 they were directions --
20   Q.  But is there any reason why the rebate,
21 the actual calculation of rebate dollars would be
22 -- would be different?

1217

1  charge-back data or we did some allocation -- were
2  excluded.  Some stayed in.
3    Then once we went to the full, we just
4  said look, we're including everything except
5  government in the supplemental report, then all of
6  those rebates came back in.  So the rebate dollars
7  could differ.
8    Q.  Okay.
9    A.  And I'd have to -- I'd have to look
10 exactly at the -- at the entities excluded and
11 then included and what those rebate dollars were.
12   Q.  All right.  Turn to Table 2.
13   A.  Yeah.
14   Q.  Am I correct Table 2 is a -- is an
15 attempt to exclude -- strike that.  Table 2 is a
16 list of the entities for which rebate data was
17 excluded from your ASP calculation, correct?
18   A.  These were -- that's true.
19   Q.  And it would be appropriate in each year
20 to exclude these entities, correct?
21   A.  And to the extent that we were able to,
22 we did so.  To the extent the data allowed us to,

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

1218

1  that would have been our --
2      Q.  Okay.
3      A.  -- what was our attempt.
4      Q.  Let me ask you to turn to G.4.C, the
5  calculation of the spreads.
6      A.  Okay.
7      Q.  See for the year 1993 --
8      A.  I do.
9      Q.  -- for a particular NDC you calculate a
10  spread of 221 percent.
11      A.  I do see that.
12      Q.  And for another one, 51 percent.
13      A.  I do see that.
14      Q.  Would you agree with me that looking at
15  the approximately more than 125 spread entries you
16  have for Procrit on this page, those truly stand
17  out?
18      MR. NALVEN:  Objection.
19      A.  They are certainly larger than the other
20  spreads, but I see other spreads -- I see a spread
21  for 66 percent in 2003 for a -- for another one.
22  There are -- but the -- the extent to which the

1219

1  spreads for Procrit over this period of time on an
2  annual basis exceed the -- the threshold of
3  liability that -- that I've used, are -- are
4  limited.
5      Q.  Would -- would you agree with me --
6  well, let me ask this:  When you saw spreads like
7  221 percent for a given year when for that NDC the
8  spreads then range from 20 to 24 percent, did you
9  go back and say maybe there's an error in the data
10  here?  Let me double-check that?  Did you do that?
11      A.  We attempted to check all the data that
12  we received and -- well, we did.  We did check all
13  the data that we received.
14      Q.  No, I'm asking about you.  When you
15  looked at these, did you say, Wow, that 221
16  percent spread really stands out here, let me go
17  back and make sure the data's right?  Did you do
18  that?
19      A.  Did I go drug by drug, company by
20  company and say, well, let's see, I'm seeing a
21  pattern here where one spread was large and then
22  might have drifted down and then dropped below and

1220

1  then might have changed, or there might have been
2  a spike in the spread, and did I then say, Let's
3  need to look at the data underlying that and try
4  and get further confirmation of that data?  We did
5  not follow up with that kind of analysis where we
6  proceeded year by year, drug -- NDC by NDC.
7      We -- we checked the data that we
8  received several times.  And if there was -- if
9  there was something wrong -- and we -- in order to
10  be conservative and look at spread calculations as
11  a strategic matter that is unsullied by month-to-
12  month or quarter-to-quarter variation, we took an
13  annual spread amount.
14      Now, if there is something in a
15  particular spread here in a given year that is
16  based on something wrong with the data we received
17  -- we weren't in a position to correct data that
18  we received from Defendants.
19      Q.  Doctor --
20      A.  And if this is the case, I assume your
21  expert will clarify this in rebuttal.
22      Q.  Doctor Hartman, my question was very

1221

1  simple.  Did you -- you, not we -- did you, when
2  you saw a 221-percent spread for the year 1993,
3  and for that NDC, all the other spreads are
4  between 20 and 24 percent, did you go back to your
5  staff and say, Hey, this doesn't look right, let's
6  go back and look at the data?  Did you do that,
7  Doctor?
8      MR. NALVEN:  Objection.
9      A.  Well, you're premising -- you're
10  premising that that it didn't look right.
11      Q.  Well, does it look right to you?
12      A.  I don't know what J&J was trying to do
13  that particular year.  I've seen spreads with
14  Lupron.  I've seen in some of this litigation
15  where Lupron has jacked up the spreads for certain
16  NDCs to 4 or 500 percent and then dropped them
17  down to zero or to negative amounts over years
18  when they start pushing other NDCs.  So, I'm not
19  going to second-guess your data.  That's -- I've
20  looked at some -- I've looked at different
21  patterns of spreads across the various Defendants,
22  and if there was something that stood out, I would

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

---

1222

1   have it checked a second time. But I was not
2   going to change that, and I had no information
3   upon which to say what that should be.
4          And I assume that will be what your
5   expert will do.
6      Q.  Now, if we look at the Procrit numbers -
7   - I think I counted there's roughly over 125
8   entries here.
9      A.  You know, I'll --
10         MR. NALVEN:  It is what it is.
11     A.  It is what it is.
12     Q.  Just assume --
13     A.  Let's assume --
14     Q.  And would you agree with me that less
15  than 10 percent of them are over your -- your
16  yardstick of 30 percent?
17         MR. NALVEN:  Objection. The document
18  speaks for itself. It is what it is.
19     Q.  Well, okay. So, assume for purposes of
20  my question that less than 10 percent of them are
21  above the 30 -- your 30-percent yardstick, would
22  you agree with me that as you look at Procrit, you

---

1223

1   don't see a pattern of behavior in exploiting the
2   spread?
3      A.  Certainly more of the -- the -- the
4   spreads here are below the -- the yardstick for
5   liability than are above it. And, I mean, we
6   could count it and find out whatever percentage it
7   is and --
8      Q.  Well, I've asked you to assume for
9   purposes of my question that it's less than 10
10  percent of the over 125 entries -- spread entries
11  -- that you have on this page.
12         If my math is right, would you agree
13  with me that there is no pattern of behavior on
14  the part of Johnson & Johnson in exploiting the
15  spread on Procrit?
16         MR. NALVEN:  Objection.
17     A.  I wouldn't character -- I wouldn't
18  characterize that there's no pattern. There's --
19  the pattern is what it is. It's the limited --
20  whatever number -- whatever percentage you're
21  giving me, that's what the pattern is.
22     Q.  Well, you testified yesterday that, in

---

1224

1   looking at certain drugs, you observed a pattern
2   of behavior of exploiting the spread. My question
3   to you is, based on the data you see here for
4   Procrit, do you see a pattern of behavior in
5   exploiting the spread?
6          MR. NALVEN:  Objection.
7      A.  I see an exploitation of the spread here
8   that is certainly -- there are times -- there are
9   times when the spread has been exploited. And it
10  is -- it is -- if one is comparing this pattern
11  relative to other patterns that I've seen, it is -
12  - there is certainly less exploitation of the
13  spread here than I've seen for -- in other -- for
14  other manufacturers.
15     Q.  Well, maybe I need to get your
16  definition of the word "pattern," because we may
17  have different definitions. What's your
18  definition of the word "pattern"?
19     A.  Well, I'm -- I am looking -- it's --
20  it's fairly simple. It's exceeding the -- the
21  thresholds of liability and what that means.
22     Q.  So, if --

---

1225

1      A.  And I can look at -- I could look at a
2   pattern in a quilt where there's a few spots of
3   color or there's lots of spots of color. This is
4   one where there's -- there are certainly fewer
5   times when the -- when the threshold of liability
6   is exceeded.
7      Q.  Let me just turn back to Remicade for a
8   moment. In your opinion, would third-party payers
9   change their reimbursement rate for Remicade upon
10  learning that the spread was 31.9 percent instead
11  of 30 percent?
12         MR. NALVEN:  Objection.
13     A.  For -- for Remicade -- you're -- you're
14  saying would they change their reimbursement for
15  Remicade per -- alone --
16     Q.  Yeah.
17     A.  The -- as -- as we've discussed at some
18  length over the last two days, what gets
19  formalized in an institutional understanding of
20  what the spreads are, what the reimbursement rates
21  that are agreed to, AWP less a certain percent.
22  And the -- the notion that they're going to

---

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

1226

1    observe a spread of 31.9 in one particular year,
2    if they were to observe that -- again, they'd have
3    to have the data that -- the manufacturing data
4    that we have. We've already talked at some length
5    about limited information from the OIG that said,
6    Oh, spread on this particular drug in this year
7    was this level or something else. All of that did
8    not lead to a change in the reimbursement
9    policies, and I don't -- and for physician -- the
10   -- payers do not negotiate contracts, as far as I
11   understand, for specific drugs in what their
12   reimbursement policies are. They're AWP less
13   something for physician-administered drugs.
14        So, to know that for one year, it would
15   be -- the -- you'd need to know the kinds of
16   information that we've talked about much more
17   broadly that's led to the changes in reimbursement
18   formulae that -- recently.
19        Q. All right. Let me go back to Procrit
20   for a moment. Assume for the moment that there's
21   roughly 125 spread entries here. How many have to
22   be above 30 before there is a pattern, in your

1227

1    view?
2        MR. NALVEN: Objection.
3        A. I haven't -- I haven't been asked to
4    render an opinion of -- of whether -- what's a
5    pattern or what's not a pattern. What I've been
6    asked to render an opinion on is what's -- what's
7    a violation of -- of -- under the -- the
8    allegations in this matter, given the
9    understanding of the market, as reflected in
10   reimbursement rates. So that, if I looked at a
11   given manufacturer with a drug that has a 2,000 --
12   200 entries here, and there's only 5 percent of
13   the time where that -- that manufacturer exploited
14   the spread for whatever reason for those years,
15   then that's -- that's the threshold for that year.
16        I have not said at any place that in
17   order for there to be finding of liability the --
18   the threshold needed to be exceeded five straight
19   years.
20        Q. So, when -- when you were referring to
21   a pattern of behavior yesterday, you're not really
22   giving any opinions with respect to patterns of

1228

1    behavior here? That was just rhetorical flourish
2    on your part?
3        MR. NALVEN: Objection.
4        A. It was not rhetorical flourish. There -
5    - I've referred to patterns, and the patterns are
6    spreads that are in excess of 30 percent. And
7    some of the patterns are more. There's a more
8    predominant finding of spreads in excess of 30
9    percent. In some, there's less. It's a different
10   -- it's a different pattern.
11        Q. Well, for Procrit, show me the pattern.
12        A. Well, I'm finding in particular years
13   that there was -- if -- if the data that we have
14   received is correct, there were reasons that the
15   firm -- that Johnson & Johnson -- used the spread
16   to move market share in those years. And they --
17   for whatever strategic reasons; I don't know why
18   they -- why they backed off of -- for that
19   particular NDC that we've looked at for 221.
20        There are other -- there's movements and
21   I see increases in spreads for other NDCs for
22   Procrit. If I look below that at the NDC that has

1229

1    a spread of 23.3 in 1993, I'm seeing that as the
2    spread for the NDC that had the -- the spread of
3    221 percent, that declines.
4        Now, I'm seeing a spread for this -- the
5    -- this other drug that started at 23.3 rise.
6    Now, there's a pattern to me there --
7        Q. And then --
8        A. -- of using spread to shift sales and
9    move market share of particular NDCs that I've
10   seen used to greater extremes by other Defendants,
11   but there's patterns of movement here that --
12        Q. Well, let's talk about that 23.3 that
13   you're talking about, which is the Procrit 3,000,
14   25s.
15        A. That's right.
16        Q. So, in '93 it's 23.3; then in '94, it's
17   27, still within your -- still within your
18   yardstick; '95, still within your yardstick; '96
19   goes above your yardstick by 1 percent; and then
20   for the next one, two, three, four -- four years
21   it's below your yardstick; then it goes over it by
22   .4, and then it's below it. So, for how many

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

1230

1   years are we talking about? We're talking about
2   one, two, three, four, five, six, seven, eight,
3   nine, ten.
4          So, for ten years you have -- you go
5   over your yardstick. One year by .4 percent, and
6   one year by 1 percent. What's the pattern there,
7   Doctor?
8          MR. NALVEN: Objection.
9          A. Well, the pattern there is, first of
10  all, I can't observe whether there were -- what --
11  what -- whether we received the data or whether
12  there were sales of the 2,000 milliliter -- am I
13  looking -- the 2,000 milliliter six-pack? I guess
14  they're sixes of the 221 percent.
15         I'm seeing here that in 1993 -- whether
16  this had launched prior to that, I don't know.
17  Whether we got the data, I don't know. I'd have
18  to look at whether we did some extrapolation there
19  or not. But this suggests to me that there were
20  certain -- in this particular year, '93, there
21  were certain NDCs that -- we see the one for 51
22  percent.

1231

1          Now, I'm seeing the pattern here is a
2   strategic move toward the 4,000 milliliter sixes,
3   if I've got the right line. I'm sorry. It's the
4   3,000 milliliter 25s, and we're seeing that that
5   spread is increasing but remaining within what
6   expectations were. So that it hasn't -- it hasn't
7   violated the -- the expectations of the market.
8   They're still competing on spread, but they're
9   doing it within the bounds that are subject to my
10  -- to my legal threshold.
11         Q. So --
12         A. They did push it above that in '96, but
13  it's -- it's clear they were -- relative to the
14  2,000 milliliters where they were reducing the
15  spread down to 24, they were using higher spreads
16  on the 3,000s, and that suggests to me that
17  there's a pattern there of moving market share of
18  one versus the other.
19         Q. In the NDC that we were just talking
20  about where we were talking about a ten-year
21  period, one year they went over by 1 percent and
22  one year they went over by .4 percent of your --

1232

1   your yardstick threshold. Are you saying that
2   Johnson & Johnson made a decision in those two
3   years by going over by .4 and 1 percent to commit
4   fraud, and in the other eight years they decided
5   not to commit fraud?
6          MR. NALVEN: Objection.
7          A. The -- what -- what I'm saying is that
8   relative -- when -- when we've talked spreads that
9   would flabbergast people, these would not
10  flabbergast people. The point -- but given the
11  expectations of the market and what was understood
12  by the market, the -- the -- as they -- as they
13  moved up and started to try and move market share,
14  they nudged against the speed limit. They pushed
15  it a little further than what expectations were.
16         And they didn't exceed it by much, and
17  so the damages are not -- you know, the damages on
18  this amount are not going to be a whole heck of a
19  lot, as the speeding ticket would not be a whole
20  heck of a lot. They did not -- this is not an
21  example of the exploitation of spread to the
22  extent that other manufacturers have used. But it

1233

1   still is a use of spread in excess of what payers
2   understood. They were keeping it well under
3   radar. It was not -- it was not an exaggerated
4   exploitation.
5          MR. NALVEN: Mr. Cavanaugh, if I may, at
6   the beginning of this session you said you had
7   about 45 minutes of questioning.
8          MR. CAVANAUGH: And I have about three
9   more questions for the minutes.
10         MR. NALVEN: It's been about 75 minutes
11  now.
12         Q. Doctor Hartman, in your speeding analogy
13  which you've used many times here, where was the
14  speeding limit posted on the street that said do
15  not exceed 30? Can you tell us where is it
16  posted?
17         A. It was posted in -- well, let's step
18  back about what was posted. There were a set of
19  expectations which characterized what people were
20  -- what payers thought were being -- what
21  relationships were and what providers were
22  receiving and paying as acquisition costs for

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    March 1, 2006
Boston, MA

1234

1  drugs. And so, the speed limit was an implicit
2  understanding built into the reimbursement formula
3  -- formulae -- of payers and -- of payers.
4      Q.  Are you saying that manufacturers
5  understood that there was a speed limit of 30?
6      A.  I'm saying that manufacturers understood
7  that payers had certain expectations, and the
8  upper bounds -- I'm using an upper bound of what
9  those expectations were. I'm saying that the
10  expectations ranged anywhere from 18 to 26
11  percent, 27 percent. I'm being conservative to
12  say, okay, let's take 30 percent. But that they
13  understood that and that that was -- that knowing
14  that, and knowing that the -- that the payers were
15  not going to know that they were speeding or that
16  they were -- they were exceeding that, that was
17  the reason that the -- the alleged fraud allowed
18  them to -- to use that inflation to move market
19  share.
20      Q.  If -- if we use your -- stick with your
21  speeding analogy for a moment, would it be fair to
22  characterize it as there was a -- a sign -- this

1235

1  implicit sign posted that said 30 miles an hour
2  for private payers, and for government, the speed
3  limit was zero?  Is that a fair characterization
4  of your -- of your analysis here in -- in your
5  speeding context?
6          MR. NALVEN:  Objection.
7      A.  A fair -- a fair analysis of my speeding
8  context -- of my speeding context was that there
9  was a relationship between AWP and ASP, the
10  maximum of which I've taken as 30 percent, a
11  conservative upper bound. That was -- that was
12  for all units sold. So that's for government and
13  for nongovernment. That's what the understanding
14  was in the market.
15      Q.  Well, I thought your -- your opinion is
16  that with respect to government it was zero.
17      A.  No, my understanding with respect to
18  government is that if -- in my declaration of
19  December 15th, that if a drug exceeds the speed
20  limit, then there is -- there are statutory -- if
21  they don't exceed the speed limit, then it's not
22  zero. The speed limit is what it is. And it only

1236

1  becomes subject to liability if it exceeds the
2  speed limit.
3          Under the Medicare regulations, as
4  reiterated in my Footnote 13, that indicates the
5  extent to which damages would occur if the speed
6  limit is exceeded. And that's -- that is a --
7  that's a -- those damages are not the threshold of
8  behavior or liability. That's just a damage
9  calculation, which is a different calculation,
10  which has that zero in it based on my reading of
11  the -- of the CFR.
12      Q.  But in order to be -- in order to be
13  subject to damages for Medicare Part B sales, you
14  have to violate your speed limit of 30, right?
15      A.  In my December 15th declaration, that
16  was the approach, yes.
17      Q.  Okay. And have you altered that view?
18      A.  I have no view of what -- that is a
19  legal view. In my supplemental declaration I was
20  asked to assess what the implication would be for
21  damages and liability if -- if the zero threshold
22  applied for Medicare, but that's not -- that was

1237

1  something I was asked to do by counsel, and I have
2  --
3      Q.  So --
4      A.  I have a view as what market
5  expectations were and what everyone in the market
6  understood transactions costs were relative to
7  posted AWPs.
8      Q.  So, if we have your zero -- based on
9  your supplemental report, if you have a zero
10  liability threshold and a 30-percent threshold
11  liability, again, using your speeding analogy,
12  there are two different speed limits posted on the
13  road, right?
14      A.  The -- the speed limit that's posted on
15  the road is the understanding of the relationship
16  of a list price and transactions price. And
17  that's what's posted.
18          Now, the -- how policemen have enforced
19  that speed limit, what that's -- there's -- it's a
20  different -- the analogy would be in the
21  supplemental I've been asked to assume that even
22  though the -- the speed limit is 30 percent, we

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

---

1238

1   are going to -- we are going to look at certain
2   payers, i.e., Medicare payers, and if -- if they
3   are going zero miles an hour, if they're standing
4   still on the highway, if the -- if we take the
5   regs as they are written, which it's my
6   understanding is a legal analysis and something
7   subject for you to -- to argue -- that that is the
8   way damages would be calculated.
9         MR. CAVANAUGH:  Thank you, Doctor
10  Hartman.
11        THE WITNESS:  They're lined up like
12  planes in LaGuardia.
13        MR. NALVEN:  Let's take a break.
14        VIDEO OPERATOR:  The time is 11:05.
15  This is the end of Cassette 1.  We are off the
16  record.
17        (Recess was taken.)
18        VIDEO OPERATOR:  The time is 11:17.
19  This is the beginning of Cassette 2 in the
20  deposition of Raymond Hartman.  We are on the
21  record.
22        FURTHER EXAMINATION

---

1239

1   BY MR. HEROLD:
2     Q.  Good morning, Doctor Hartman.  My name
3   is Fred Herold with the law firm of Dechert.  I
4   represent GlaxoSmithKline in this case.
5     A.  Good morning, Fred.
6     Q.  Good morning.  I'm going to be asking
7   you some questions this morning, both about the
8   MDL case -- about the work you did in the MDL, as
9   well was about the Connecticut case, because
10  GlaxoSmithKline is a Defendant in both cases.  I
11  want to start, Doctor Hartman, with some follow-up
12  on the questions about your expectations that Bill
13  Cavanaugh just asked you.  First of all, I think
14  you -- you testified that it's your opinion as an
15  economist that everyone in the market, all
16  different payer types understood the way the
17  market worked with respect to your expectations
18  yardstick, is that right?
19    A.  No.
20    Q.  Okay.  Why isn't that right?
21    A.  Well, it -- the various payers and
22  various entities in the market had varying

---

1240

1   expectations, which -- which we see through
2   revealed behavior as different contracts have been
3   able to be negotiated for reimbursement off of
4   AWP.  So, part of that negotiation was informed by
5   different beliefs, different amounts of
6   information.  What I've taken for my yardstick is
7   an upper bound of what I saw as a range of what
8   the under -- the various understandings and
9   beliefs were about that.
10        So, they -- everybody in the market
11  didn't hold the same belief or expectation.  They
12  varied, and I -- I took an upper bound of what
13  that -- what that range was.
14    Q.  Okay.  Fair enough.  Is it your opinion,
15  however, that the different types of payers
16  generally held the same expectations?  In other
17  words, what I'm getting at is you testified or you
18  -- you've testified at length that it's your
19  opinion as an economist that both third-party
20  payers and Medicare would be subject to the same
21  30 percent expectation, is that right?
22    A.  I'm -- I've testified that the -- that's

---

1241

1   a summary -- an upper bound of expectations in the
2   market.  So, that's everybody.
3     Q.  All right.  And when you say,
4   "everybody," it would include governmental payers
5   as well as private payers.
6     A.  That's correct.
7     Q.  All right.  And you, in fact, rely on
8   the same studies, comparator drugs, government
9   studies, I believe ASCO and other things in your
10  report in determining the expectations of the
11  different segments of the market, i.e., government
12  versus private, is that correct?
13    A.  I look to those studies that were done
14  by the government -- inform not only the
15  government but inform the private sector to the
16  extent that the private sector avails themselves
17  of those types of studies for this very
18  specialized group of drugs.  So, the -- again,
19  there's information out there and -- and it's --
20  it's -- it's available to payers to the extent
21  that they want to make it available.
22        I mean, for a case in point, you're

---

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    March 1, 2006
Boston, MA

---

**1242**

1  saying are types of third-party payers.  I know we
2  introduced deposition testimony yesterday that
3  included a deponent from CIGNA.  And the -- as I
4  had reviewed -- or maybe this was on Monday.  As I
5  looked at that deponent's credentials, they were -
6  - there did not seem to be a lot of experience in
7  the health care area.  There was perhaps very
8  capable experience elsewhere.  And that would be
9  someone who might have less of an understanding --
10 you know, there's information out there, but it
11 might be someone who studied it less, is less
12 familiar with the nuances.
13      So, the information set is there.  It's
14 developed.  It's how various people assimilate
15 that and it's how it's reflected in the
16 institutional formulations regarding the
17 reimbursement.
18     Q.  And with respect to your opinions about
19 liability, I just want to make sure I understand
20 the different visions we have here.  With respect
21 to your opinions about liability, am I correct
22 that it's your testimony that for third-party

---

**1243**

1  payers there's no liability as long as the spread
2  on a drug does not exceed your 30-percent
3  yardstick, is that right?
4      A.  In my -- in the December report I have -
5  - my finding is that -- that 30 percent is a
6  reasonable upward bound for -- to - for a spread,
7  and if it -- if the pricing is below that, then
8  there's not a finding of liability for that -- for
9  that NDC in that year.
10     Q.  Okay.  And am I correct that in your
11 December 15th report you rendered the same opinion
12 with respect to the acceptable spread or the upper
13 bound as it applied to Medicare payers, is that
14 right?
15     A.  That -- that spread is for -- for all,
16 you know, the understanding of the pricing
17 relationships for all drugs.  And that's right.  I
18 -- in the December report I applied it to all
19 payers.
20     Q.  Right.  And then am I correct that in
21 your subsequent report in the MDL -- I believe
22 it's a February report in the MDL --

---

**1244**

1      A.  In the MDL or the Connect --
2      Q.  In the MDL.
3      A.  My subsequent report to the December --
4      Q.  Correct.  Your supplemental report in
5  the MDL.
6      A.  I thought that was -- oh, I'm sorry.  I
7  thought -- I thought we jumped to Connecticut.
8      Q.  We're still on the MDL.
9      A.  Excuse me.  I'm -- too many reports.
10 Got it.  I'm there.
11     Q.  Okay.  In your supplemental report in
12 the MDL, am I correct that you render a different
13 opinion with respect to the acceptable spread for
14 liability purposes for Medicare based on the
15 request of your counsel that you render such a
16 different opinion?
17      MR. NALVEN:  Objection.
18     A.  Well, issues of liability really are the
19 -- are the purview of counsel in this matter.  I
20 mean, I'm an economist.  I can come to this
21 market, I can talk about what informs
22 expectations, what relationships between prices

---

**1245**

1  are, how they're formed, what -- how that gets
2  formalized into reimbursement rates, and what's an
3  upper end of what's reflected in what has been
4  formalized as a -- as a level of -- of what the
5  market understood or expected was a relationship
6  between a list price and a transactions price.
7  And so, I can do that as an economist, and then I
8  can say are there drugs that have exceeded that?
9      And in my December 15th declaration, I
10 was asked by counsel to use that -- those economic
11 facts as a measure of liability.  In the --
12 whether that really is a measure -- whether that's
13 a liability for fraud or whatever, that seems to
14 me something that will be -- is a legal question.
15 It's -- I can deal with the economics.
16      In the supplemental report I was asked
17 to also do an analysis looking only at the
18 economics of it, and not using that finding, but
19 just looking at the -- the actual language of the
20 Medicare regulations in calculating what the
21 damages were and not allowing for this
22 (indicating) economic analysis of the 30 percent.

---

Henderson Legal Services
(202) 220-4158