**1246**

1  So, notions of what is liability is, to
2  me -- you know, I'm not a lawyer. It -- I can
3  talk about expectations, what -- what payers paid,
4  what they were agreed to pay, what that implies
5  their understandings were, but the liability seems
6  to be something up to you gentlemen.
7      Q. All right. Now, I do want to move to
8  Connecticut for just one second.
9      MR. HEROLD: And I want to mark as the
10  next exhibit your declaration, which is dated
11  January 19th, 2006, and which I note for the
12  record was not served on the Defendants until, I
13  believe, February 13th of 2006.
14          (Declaration, 2/13/06 marked
15  Exhibit Hartman 055.).
16      Q. Now, Doctor Hartman, am I correct that
17  in the exhibit I've just given you, Exhibit
18  Hartman 055, that is the first time that you
19  expressed an opinion as to the amount of damages
20  for each Defendant involved in the Connecticut
21  case?
22      MR. NALVEN: Objection.

**1247**

1      A. I guess I would frame it that in the
2  November expert disclosure I disclosed the -- the
3  methodology that I would use to calculate damages.
4  I'm trying to remember whether there was any --
5  any effort to do any interim calculations or
6  preliminary calculations, since we were still
7  getting some data, for that matter.
8      But this is certainly the first time
9  that the -- data that we did receive -- some of
10  which we received in December, and I think we had
11  the final stipulation as to the -- your data as of
12  October 31st, that we -- that I can use that data
13  and -- and build it into -- into the calculations
14  for -- for all the Defendants in as best way as I
15  can -- could -- given the understanding of the
16  data.
17      Q. All right. In this Exhibit Hartman 055,
18  your Connecticut declaration, did you express an
19  economic expectations opinion with respect to the
20  Medicare copay parts of the case? And I'll refer
21  you, just to refresh your recollection, to
22  Paragraph 12.

**1248**

1      MR. NALVEN: Objection.
2      A. Again, subject to the same caveats that
3  we talked about before, about what -- what is a
4  reading of liability or whether that's my
5  determination to make, I do use -- for the -- the
6  Connecticut supplemental Medicare coverage -- the
7  30-percent yardstick that we've spent our time
8  discussing in the MDL matter.
9      Q. And am I correct that you used that, at
10  least in this report, both with respect to
11  Connecticut consumers who make their own
12  copayments under Medicare, as well as situations
13  where Connecticut Medicaid makes a copayment for
14  Medicare?
15      MR. NALVEN: Objection.
16      A. That's correct.
17      Q. Now, Doctor Hartman, in this same report
18  do you express an opinion based on your economic
19  expectations theory -- the 30-percent yardstick
20  theory -- with respect to payments made by any
21  Connecticut state program? That is, Connecticut
22  Medicaid or any of the other state Connecticut

**1249**

1  programs?
2      MR. NALVEN: Objection.
3      A. For the state Medicaid programs or any
4  of the -- the state programs, the medical
5  assistance programs, I look to the statutory
6  language in the statutes for the -- the definition
7  of damages, without doing any kind of yardstick
8  analysis for those drugs.
9      Q. So, you don't do your 30-percent
10  yardstick analysis for the Connecticut program --
11  Medicaid program drugs.
12      A. That's correct.
13      Q. All right. And I'd like to refer you
14  now to Paragraph 11 of this same exhibit where you
15  state sort of in the middle, "I have been directed
16  by counsel to assume a finding of causation and
17  liability if actual reimbursement related to AWP
18  exceeds the ASP." Did I read that correctly?
19      A. You did.
20      Q. And so, am I correct that, with respect
21  to the -- you call it Connecticut MAP or
22  Connecticut Medical Assistance Program portion of

**1250**

1  the Connecticut case, you were directed by counsel
2  to assume a finding of liability if the actual
3  reimbursement exceeded the ASP, is that right?
4     A. That's correct, with the proviso that I
5  was asked to also review the statutory language to
6  see if it was in that -- if it fit -- if that --
7  what I was directed to assume fit within that
8  language. But I was directed to assume that.
9     Q. And am I correct that -- I believe you
10 testified to this already but I just want to make
11 sure -- that you are not rendering an expert
12 opinion on interpretation of statutory language in
13 this case, is that correct?
14        MR. NALVEN: Objection.
15    A. That's correct. That's correct.
16    Q. Now, Doctor Hartman, I want to ask you
17 some questions.
18    A. I'm sorry. I'm sorry to interrupt. I
19 was -- had a --
20        THE WITNESS: Can I hear that question
21 back again of what --
22        (Question read back.)

**1251**

1     A. And you mean expert legal opinion or --
2  or an economic interpretation of -- of statute? I
3  mean, this is where I realize that there may be a
4  little more nuance to the question. Certainly, as
5  I -- we've just been talked about -- talking about
6  the reading of -- of what -- of Paragraph 11 and
7  what I was asked to assume by counsel, I did cite
8  in Paragraph 13 some of the statutory language,
9  and I do render some opinion of how an economist
10 would interpret those terms. So, just to make
11 sure that I've been fully responsive to that
12 question, I do look at that and see what it --
13 what it says and see whether it corroborates what
14 I've been asked to assume.
15    Q. All right. So, I -- we've covered this
16 before --
17    A. Okay.
18    Q. -- so I don't want to go back over it.
19    A. Okay.
20    Q. I'd like to ask you some questions
21 relating to how the world would work if the
22 alternative liability yardsticks that you used in

**1252**

1  your second report in the MDL for Medicare and in
2  your Connecticut report for Medicaid, how the
3  world would work if those alternative yardsticks
4  were applied. And to do that, I've prepared a --
5  a brief document that I want to hand to you to
6  help us get through this discussion, which I'd
7  like to mark as the next exhibit.
8     A. Is this a pop quiz?
9         ("Hypothetical" marked Exhibit
10 Hartman 056.)
11    Q. Doctor Hartman, I've handed you what I
12 believe has been marked as Exhibit Hartman 056.
13 It's a document that I've prepared to help us
14 explore this area in the deposition containing a
15 hypothetical, and I just want to go over that with
16 you --
17    A. Okay.
18    Q. -- to make sure we're on the same page.
19        MR. NALVEN: Just note my objection to
20 the exhibit.
21        MR. HEROLD: All right.
22    Q. The hypothetical posit that the AWP for

**1253**

1  a drug is 100 and that the ASP for the drug is 80.
2  Am I correct that under that hypothetical in the
3  way you look at spreads there would be a 25
4  percent spread?
5     A. That is correct.
6     Q. All right. And am I also --
7         MR. NALVEN: Excuse me. Can we give
8  Doctor Hartman a moment to look at the entire
9  document --
10        MR. HEROLD: Sure.
11        MR. NALVEN: -- before you question him?
12        MR. HEROLD: Sure.
13        MR. NALVEN: Thank you.
14    A. (Witness reviews document.) Well,
15 perhaps I'll defer looking at the document in
16 total. Let's see how it evolves and -- and see
17 where we go from there.
18    Q. That's fine. So, am I correct that the
19 25 percent spread presented by this hypothetical
20 is within your less-than-30-percent-spread-
21 expectations yardstick?
22    A. That's correct.

Raymond S. Hartman, Ph.D. CONFIDENTIAL
Boston, MA
March 1, 2006

**1254**

1  Q. All right. Am I correct that under your
2  December MDL report there would be no liability to
3  either third-party payer class or either of the
4  Medicare classes with this hypothetical spread?
5  A. Well, it's my understanding that's for
6  the court or the jury to decide. It certainly is
7  less than the -- the expectations that I have
8  found, and we can say that -- that much.
9  Q. Well, let me put it another way: Does
10 it meet your liability threshold?
11 A. It does not exceed my liability
12 threshold.
13 Q. Or the 30 percent speed limit -- 30-
14 mile-an-hour speed limit we've been talking about?
15 A. That's correct.
16 Q. All right. And one of the things that I
17 tried to figure out based on your testimony is you
18 said -- you've said that the AWP sends a signal to
19 the market about what the ASP should be, is that
20 correct?
21 A. It is a list price that indicates what
22 transactions prices would be or signals what

**1255**

1  transactions prices would be.
2  Q. All right. And again, I tried to do the
3  math, but if the AWP is a hundred and you allow
4  for a 30-percent spread between ASP and AWP, I
5  believe, under your methodology, the signal that
6  would be sent by an AWP of a hundred would be that
7  the ASP would be no lower than 76.9. Why don't
8  you take a minute and tell me if that's correct.
9         THE WITNESS: Does someone have a
10 calculator?
11        MR. KAUFMAN: Just on my Blackberry.
12 You're supposed to go ahead and do this in your
13 head.
14        THE WITNESS: No, I can't balance my
15 checkbook. I always use a calculator.
16        MS. NEMIROW: Here you go.
17        THE WITNESS: Thank you.
18 A. (Performs calculation.) That is
19 correct.
20 Q. All right. And am I correct that the --
21 under your expectations yardstick approach, an AWP
22 of a hundred would send the same signal to all

**1256**

1  payers that the ASP should be no lower than 76.9?
2  A. No. Remember, what I've said is this is
3  the lower bound of the expectations of all payers.
4  There's going to be a range. Some people may look
5  at that AWP and think, oh, you know, the ASP might
6  be 80, 84. There's -- there's ranges of what this
7  -- what this is and how -- how informed various
8  payers may be. But it's saying that within the
9  information that was available and what was
10 reflected in contracts and what was reflected in
11 the way manufacturers priced drugs where they
12 didn't need to compete on spread, that that spread
13 would not exceed 30 percent. And so, the ASP
14 would not be lower than 76.9, not that everybody's
15 going to know that.
16 Q. All right.
17 A. But --
18 Q. Fair enough. But all payer types,
19 generally, would get the same signal, is that
20 correct?
21 A. The -- I think what -- if we go back to
22 the Figure 1-A through 1-C in my declaration, it

**1257**

1  shows that there -- when there's a -- an AWP and
2  an ASP, and there are -- there's a spread, what
3  you're finding is various people are on that
4  frequency distribution around the discounts off of
5  AWP, and so, that's what you find characterizing
6  all payers. You know, it's -- it's that
7  distribution.
8  Q. Okay. Just one quick digression. I
9  believe you testified earlier today that it's your
10 understanding that the commercial publishing
11 services such as First Data Bank and Redbook
12 published a -- an AWP and a WAC, typically, for
13 drugs, is that correct?
14        MR. NALVEN: Objection.
15 A. The -- an AWP is produced by both price-
16 reporting services. It is my understanding that
17 some companies report an AWP and a WAC. Some
18 report just a WAC, and that there's an understood
19 formula of how much that -- what the set markup is
20 by manufacturer. So that, in essence, by
21 manufacturer it may not -- WAC may not be
22 reported. AWP is reported, and WAC may be

**1258**

1 reported. I'm not sure about whether WAC's
2 reported for all drugs.
3     Q. All right. Well, do you have an
4 understanding that GSK reports a WAC?
5     A. I would assume GSK reports enough
6 information such that a WAC and an AWP are
7 available.
8     Q. Right. And I'm focusing now not so much
9 on what the company reports, but on what is
10 published publicly in the commercial reporting
11 services. And what I'm trying to get at is, as
12 you testified this morning with respect to
13 Remicade, am I correct or is it your understanding
14 that both an AWP and a WAC are typically reported
15 by both First Data Bank and Redbook and the other
16 commercial reporting services?
17     MR. NALVEN: Objection.
18     A. I'd -- it seems asked and answered, but
19 I -- AWP is reported. WAC can be reported. I'm
20 just not sure whether WAC is reported for 90
21 percent of the drug -- WAC for 95 percent of the
22 drugs or 75 percent of the drugs, and I would have

**1259**

1 to go back and check whether for GSK they report
2 both, but they certainly report both for lots of
3 companies and lots of drugs.
4     Q. All right. And I believe you also
5 testified earlier that there's typically a
6 relationship between WAC and AWP of anywhere
7 between 20 and 25 percent with some exceptions, is
8 that right?
9     MR. NALVEN: Objection.
10    A. Of ASP above WAC, that's right, or some
11 express it at 16, 21 percent of WAC below AWP,
12 but, yes, of the spread relative to WAC, it
13 generally has been 20 to 25 percent.
14    Q. I think you misspoke. I think you said
15 ASP and WAC. I think what you meant was as
16 between WAC and AWP?
17    A. Yeah, if I said it, I'm sorry. I --
18 yeah I meant between AWP and WAC, WAC is -- AWP is
19 generally 20 to 25 percent above WAC or some
20 people say, Well, WAC is 16 to 21 percent below
21 AWP, it depends on -- it's the same calculation.
22    Q. All right.

**1260**

1     A. Same relationship.
2     Q. All right. Now, returning to the
3 hypothetical, I want to look at how your various
4 liability opinions impact a hypothetical --
5     A. Can I destaple this?
6     Q. Yes, you can -- if you don't follow the
7 30-percent yardstick consistently, and that's what
8 the second page is designed to help us talk
9 through. And just for the record, on the second
10 page of this document, Exhibit Hartman 056, we're
11 sticking with the same ASP of 80 and AWP of a
12 hundred. Do you see that?
13    A. I do.
14    Q. And I just want to understand the result
15 under your alternative yardsticks with respect to
16 liability with that same set of assumptions about
17 ASP and AWP. And am I correct that under all of
18 the reports that you've written, if the ASP is 80
19 and the AWP is a hundred, there would be no
20 liability to the third-party payer class, is that
21 correct?
22    MR. NALVEN: Objection.

**1261**

1     A. I'm -- okay. Let's -- so, we're -- I
2 was starting to think ahead. So, could you start
3 again. I'm sorry.
4     Q. Yeah. Am I correct that if the ASP is
5 80 and the AWP is a hundred that you've
6 consistently taken the position in all of your
7 reports that there would be no liability to the
8 third-party payers -- the private third-party
9 payers -- because you consistently stick with your
10 30-percent yardstick for that type of payer, is
11 that correct?
12    MR. NALVEN: Objection.
13    A. As I -- as I said, I've -- in terms of
14 being asked to do the calculations for damages,
15 under all of the different analyses that I've put
16 forward, it has been the case that I've -- I've
17 been asked to use the -- the 30-percent yardstick
18 for expectations for nonMedicare reimbursement.
19 That -- that's correct.
20    Q. All right. Now, when you say you've
21 been asked to use a 30-percent yardstick, isn't it
22 your opinion as an economist in this case that the

### 1262

1  30-percent yardstick is the appropriate yardstick
2  to use for this market to estimate third-party
3  payer expectation?
4      A.  It is my opinion, as laid out in great
5  detail, that -- that a 30-percent yardstick
6  represents a reasonable up -- upper bound of what
7  was understood in the market of that relationship
8  between AWP and transactions prices for the market
9  as a whole.  And what that implies for liability
10 seems to be a legal issue under different
11 statutes, but that will -- I take it that far.
12     So, I mean, I've described it as
13 expectations and exceeding what was -- what was
14 understood and reflected in pricing and contracts.
15     Q.  All right.  And am I correct that with
16 respect to your alternative yardsticks that were
17 expressed first in the MDL -- well, that were
18 expressed in the MDL in your second report for
19 Medicare, and were also expressed --
20     A.  Let's -- let's stay there.  I can't keep
21 all of these hypotheticals in my mind.  So, let's
22 -- so, we're in the MDL.

### 1263

1      Q.  Right.
2      A.  Okay.  And now you're saying I'm now
3  being asked to look at the world where the -- for
4  Medicare I'm not evaluating damages subject to
5  that 30-percent threshold.  I just do it subject
6  to the statute.
7      Q.  The world I'm trying to get you into is
8  the world that you opined about in your second MDL
9  report --
10     A.  Right.
11     Q.  -- in February of 2006 --
12     A.  Uh-huh.
13     Q.  -- in which you took the position, as I
14 understand it, that for the Medicare classes you
15 would not apply the 30-percent yardstick either
16 for liability or damages as requested by counsel?
17         MR. NALVEN:  Objection.
18     Q.  Are we in the same world?
19     A.  We are in the same world.
20     Q.  All right.  And am I correct that if
21 we're in that world, under this hypothetical where
22 the ASP is 80 and the AWP is 100, there would be a

### 1264

1  finding of liability?
2         MR. NALVEN:  Objection.
3      A.  There would be -- in this world, there
4  would be damages assessed to reimbursements under
5  Medicare.
6      Q.  When you say damages would be assessed,
7  am I not correct that in your second report, as
8  compared to your first one, you swept in a number
9  of additional drugs for most, if not all, of the
10 Defendants for the Medicare part of the case by
11 applying a different liability threshold of zero,
12 as opposed to a liability threshold of a 30-
13 percent spread?
14         MR. NALVEN:  Objection.
15     A.  Certainly when -- I do not exclude drugs
16 based on a 30-percent threshold.  More drugs will
17 be subject to a damage calculation as they were in
18 the supplemental report.
19     Q.  All right.  So, to use your words then,
20 under this hypothetical where the ASP is 80 and
21 the AWP is a hundred, in your second MDL report
22 you would find that there would be damages to the

### 1265

1  Medicare classes, even though the ASP is within
2  the expectations of Medicare payers, is that
3  correct?
4         MR. NALVEN:  Objection.
5      A.  There are damages assessed, even though
6  that threshold is not exceeded, which means that
7  the relationship -- there are damages assessed
8  even when that -- the spread is -- does not exceed
9  what people expected it to be.
10     Q.  All right.  And am I correct that you
11 applied that same liability threshold in your
12 supplemental declaration in Connecticut, dated
13 February 9th, 2006, with respect to the Medicare
14 portions of the Connecticut case?
15         MR. NALVEN:  Objection.
16     A.  In the supplemental to the -- that's
17 correct.
18         MR. HEROLD:  All right.  And just for
19 the record, I want to mark that.
20         ("Calculation of Damages to
21 Connecticut" marked Exhibit Hartman 057.)
22     Q.  And looking at your supplemental

## 1266

1  Connecticut report, which is dated February 9,
2  2006, if you look at Paragraph 1-B on the first
3  page, am I correct that that reflects your change
4  in your liability threshold for the Medicare parts
5  of the case from applying a 30-percent spread
6  yardstick to a zero-spread yardstick?
7       MR. NALVEN: Objection.
8    A. Well, it's -- it's -- I would
9  characterize it the way I characterize it there,
10 and that I -- it's -- that I -- that I don't use
11 the 30 percent, but that the Medicare statute
12 regarding reimbursement were binding and --
13   Q. Okay. Now, turning for a second to your
14 opinions with respect to the Connecticut Medicaid
15 program and other Connecticut public health
16 programs, am I correct that under the hypothetical
17 that we've been discussing where ASP is 80 and AWP
18 is a hundred, you would find that the liability
19 threshold has been exceeded and there is
20 liability?
21   A. Under the Medicaid reimbursements, that
22 is correct.

## 1267

1    Q. All right.
2    A. Well, that there are -- essentially,
3  that there are -- I've been asked to assume that
4  for the Medicaid spending that the Medicaid -- the
5  statutes regarding reimbursement were binding. So
6  that as it's stated in -- just as we talked about
7  before at Paragraph 11, that reimbursement should
8  have been at the estimated acquisition cost or the
9  ASP -- just to word it precisely.
10   Q. Well, to word it precisely, as you said
11 in your declaration, you have been "Directed by
12 counsel to assume a finding of causation and
13 liability if factual reimbursement related to AWP
14 exceeds ASP," is that correct?
15   A. That's correct, and if that's how -- if
16 that's the rubric under which you want to continue
17 to say, "liability" that that is within that
18 sentence. It's governed by that sentence.
19   Q. That's what I --
20   A. Okay.
21   Q. That's what I have been trying to do.
22   A. Okay. Sorry.

## 1268

1    Q. Now, again, under Connecticut Medicaid
2  in the opinions that you expressed, for a
3  hypothetical where you just said that you would
4  find liability if the ASP is 80 and the AWP is a
5  hundred?
6    A. Can you help me out? Are we on -- we're
7  back here on this page now?
8    Q. Yes.
9    A. Page 2?
10   Q. Yes. Let me start all over just so the
11 record's clear.
12   A. Okay.
13   Q. With respect to Connecticut Medicaid
14 where you have just testified that -- that you
15 would find liability as directed if the ASP is 80
16 and the AWP is a hundred, am I correct that your
17 finding of liability in that circumstance would
18 exist, despite the fact that the spread is within
19 the 30-percent yardstick that was expected by
20 payers?
21   A. That's correct.
22   Q. And am I correct that you would find

## 1269

1  liability under that scenario for drugs that you
2  used as "comparator drugs" in developing your 30-
3  percent yardstick, such as Zofran before there was
4  competition from Kytril, that you would find
5  liability under that Connecticut Medicaid
6  scenario, even for those comparator drugs, is that
7  correct?
8    A. The measures of the damages that we'd
9  have to look at really are driven a little bit
10 more by not just the AWP, but if you will look at
11 Paragraphs 13 through 16, you'll notice that in,
12 let's say, Paragraph 13-C, the third bullet on
13 Page 6, that there were certain periods of time
14 when the estimate of the estimated acquisition
15 cost was AWP minus 40 percent for certain
16 generics. And there was -- well, it was 12
17 percent for branded.
18      So that there were certain cases here
19 where it -- the -- the damages would have -- there
20 would have been no damages, even at spreads larger
21 than the yardstick, based on these types of
22 calculations. But for the -- for the most part,

1270

1  subject to the caveat that the actual calculations
2  were determined a little more closely by -- it
3  wasn't just AWP minus ASP, but it was a proportion
4  of -- I know it's 92 percent, 88 percent, 60
5  percent of AWP. That's certainly the case for
6  when it was 60 percent of AWP that would -- there
7  would be no damages if -- at -- in excess of the
8  30-percent spread.
9     Q. All right. Let -- let me go back to
10 what I was trying to ask you.
11    A. Okay.
12    Q. You testified yesterday, am I correct,
13 that you looked at drugs including Zofran that had
14 no therapeutic competition at the time when Zofran
15 was first launched, and you looked at those drugs
16 which you called comparator drugs to help frame a
17 reference for your 30 percent liability yardstick,
18 is that correct?
19    A. That's right.
20    Q. And that you took the position in
21 looking at those drugs that the market would
22 expect the kinds of spreads you see on a brand

1271

1  name innovator drug shortly after launch, correct?
2     A. That's right.
3     Q. And that Zofran was one of those
4  comparator drugs.
5     A. Right.
6     Q. And then for that drug, therefore, on
7  your expectations theory in your December 15th
8  report, you would find no liability, correct?
9     A. That's right.
10    Q. All right. Now, I want to turn your
11 attention to Exhibit Hartman 057, the supplemental
12 declaration in Connecticut. One more question
13 before I direct you to a page. Do you have an
14 understanding that Zofran had a market monopoly
15 and was the kind of comparator drug that you
16 selected in the year 1993?
17    A. It's my understanding, and let me enrich
18 that understanding just by --
19       MR. NALVEN: You just want to ask him to
20 assume that, Fred?
21    A. Do you want me to assume? I mean, I --
22 I wanted to look as what the spreads were and how

1272

1  they compared to Kytril. I mean, if we're getting
2  to a date when Kytril launched and when spread
3  competition occurred --
4     Q. Well, I can tell you -- ask you to
5  assume that Kytril was not launched until sometime
6  in 1994.
7     A. Okay. Let's -- we'll keep going and
8  see.
9     Q. All right. So, on the assumption which
10 I represent is a fact that in 1993 Zofran had no
11 direct therapeutic competition and that you have,
12 in fact, stated in your earlier affidavit that
13 Zofran was a comparator drug for that time period,
14 now I want to direct you to portions of the
15 supplemental Connecticut report in which you made
16 determinations with respect to whether there
17 should be liability or damages for Zofran.
18       And in particular I want to -- want to
19 direct you to the -- Page 19. It's the second-to-
20 last page entitled "Table 3-C Medicare Copay
21 Damages -- Consumers." Do you see that?
22    A. I do.

1273

1     Q. And am I correct that you are expressing
2  an opinion in this particular document that for
3  the year 1993 when Zofran was a comparator drug
4  with no therapeutic competition, you are still
5  finding liability and damages, is that right?
6        MR. NALVEN: Objection.
7     A. Subject to -- to the sentence in
8  Equation 11, that's correct.
9     Q. Do you see anything inconsistent between
10 selecting Zofran as a comparator drug for your
11 yardstick and market expectations analysis and yet
12 at the same time rendering an opinion that GSK is
13 liable for damages for the spreads on Zofran
14 during that same period?
15       MR. NALVEN: Objection.
16    A. It -- it seems like that's a legal
17 question that -- I mean, I've framed my
18 understanding and my use of Zofran in the ways
19 that I have and how an economist would use those
20 and draw conclusions therefrom. The extent to
21 which statutes require reimbursement in one form
22 or another is something -- whether the legal

**1274**

1  issues trump the economic issues or -- I can only
2  offer an economic opinion.
3     Q. All right. Now, I want to take you back
4  to the hypothetical, and the last portion of it on
5  Page 2 asks you to consider what would happen in
6  the market if your alternative liability standards
7  were applied. And we start with the assumption in
8  the hypothetical that the ASP for the drug is 80.
9  Do you see that?
10    A. I do.
11    Q. And am I correct that under your method
12 of analysis, the ASP is 80, then, at least with
13 respect to third-party payers, publishing an AWP
14 of 100 would not subject the manufacturer to
15 liability, is that correct?
16    A. That's correct.
17       MR. NALVEN: Note my objection.
18    A. Under -- under -- yeah, under the
19 hypothetical.
20    Q. All right. And however, under your
21 alternative theory for Medicare in which you find
22 damages and assume liability, if the AWP -- if the

**1275**

1  ASP and the AWP are not within 5 percent of each
2  other, am I correct that if the ASP is 80 for a
3  drug, and you publish an AWP of a hundred, there
4  would be liability, is that right?
5     A. To the extent that the AWP or a -- the
6  percentage off of AWP -- 95 percent or 85 percent
7  -- we're talking about -- now about Medicare --
8  we're in the MDL world now?
9     Q. Well, we're in the world where you are
10 expressing an alternative opinion as directed that
11 for Medicare there is liability if the ASP and the
12 AWP aren't within 5 percent of each other.
13       MR. NALVEN: Just note my objection to
14 the continuing use of the word "opinion" in
15 connection with these reports. Doctor Hartman
16 made clear that these are calculations that were
17 performed at the direction of counsel.
18    A. Yes. I mean, again, all of this is
19 under the -- the instructions we've identified in
20 that sentence in Paragraph 11 in that your -- you
21 use the notion of my notion of liability. I've --
22 that's, again, for what I think the court is going

**1276**

1  determine here.
2       You know, I've talked about economic
3  descriptions here, but it is certainly the case
4  that, as a matter of economics and what the AWP
5  signals, that, given an ASP of 80, that a list
6  price of a hundred, an AWP of a hundred would not
7  be a signal that would -- would lead to some kind
8  of fraudulent manipulation of -- of expectations.
9       However, if there were a drug of that
10 sort and yet, under the Medicare statutes Medicare
11 was to reimburse at the -- what is written into
12 the regulations -- at AWP or 95 percent of AWP or
13 the lesser of that, an ASP, then that drug that
14 falls within those expectations would still be
15 subject to damages under the calculations that
16 I've done and that I've been asked to do.
17    Q. All right. And I'm trying to get at
18 what a manufacturer -- a manufacturer would do in
19 the real world, given the liability framework that
20 your counsel has asked you to assume, and I
21 appreciate the clarification for Medicare. If the
22 ASP was 80 and it wanted to publish an AWP that

**1277**

1  would not subject it to liability, what would the
2  AWP have to be?
3     A. The AWP, in order for a -- for a
4  manufacturer to avoid exceeding the expectations
5  that I've found governed -- in just all the ways
6  we've talked about -- just insert here the tape of
7  those discussions -- the AWP of a hundred -- if
8  they posted that of a hundred -- would not exceed
9  those expectations.
10      And whether that is subject to liability
11 under the -- my December report or whether that
12 makes Medicare reimbursement subject to liability
13 under the alternative assumptions is something
14 that I -- I don't have an opinion about. That's
15 something that I understand is an issue that is a
16 legal and regulatory issue.
17    Q. All right. But what I'm trying to get
18 at is I'm trying to get at your opinion as an
19 economist or somebody who understands this market
20 about what a manufacturer would do if your
21 counsel's version of alternative liability is
22 adopted in -- in terms of trying to figure out

## 1278

1  with an ASP of 80 what AWP it should publish to
2  avoid liability under those -- those alternative
3  theories for Medicare.
4     A. You know, I just haven't been asked to
5  do that kind of analysis. And if I were asked to
6  do it, I'd direct -- as directed and how it needs
7  to fit into legal interpretations -- I'd -- I
8  would need -- I would do that, but I haven't been
9  asked to do that. And so, I wouldn't -- I'd just
10 be speculating now and speculating on a mix of
11 economics and the law, and that would need to be
12 something that would be done -- I would want to do
13 more carefully, and it's something that I could do
14 in a rebuttal stage, if -- if I'm asked to and --
15    Q. Well, isn't this a matter of simple
16 mathematics? If -- assuming the liability
17 standard, as you state, for Medicare is that ASP
18 has to be no less than 95 percent of AWP. If you
19 know what the ASP is and it's 80, can't you simply
20 calculate what the AWP would have to be to avoid
21 liability under that standard? And I've tried to
22 do it here in this hypothetical, and, according to

## 1279

1  my math, in order to get an ASP of 80, the AWP
2  would have to be no higher than 84.2. Have I done
3  my math right?
4     A. I will assume that you have done your
5  math right. However, I'm not suggesting or
6  drawing an economic conclusion that, based on the
7  fact that calculations of damages have been done
8  in the way that I've asked that they be done, that
9  that would change the way -- the market has used
10 the list price of AWP and it's reflected
11 transactions prices that have reflected a history
12 of -- of these markets for the last 30 years or
13 so. And it certainly culminated in reimbursement
14 contracts and reimbursement rates and statutory
15 language that was reflected in the -- at the
16 beginning of this damage period.
17    The -- if you're asking me as an
18 economist should -- in order to avoid that
19 particular calculation of damages, the whole
20 notion of the industry and reporting should
21 change, I'm not ready to render that -- that
22 opinion, and that would need to be something that

## 1280

1  you're -- you're talking about a counterfactual
2  world that runs against the way this industry has
3  worked for the last 30 years, and I -- and it's
4  something that may be entertaining to reflect
5  upon, but I'd need to -- to give an expert
6  opinion, I'd need to do more than just do that
7  calculation.
8     Q. Am I correct that for the last 30 years,
9  manufacturers -- for -- for manufacturers' drugs,
10 the reporting services had reported a single AWP
11 for each NDC, is that right?
12    A. There have been --
13    MR. NALVEN: Objection.
14    A. -- there have been AWPs reported -- the
15 Redbook will report an AWP for -- for the NDCs of
16 -- of drugs, and as it received information from
17 manufacturers, it will change that. First Data
18 Bank also posts an AWP for drugs. In some cases,
19 given the calculations, the AWP might be slightly
20 different, but they're very close, and -- and
21 different -- different entities look to one source
22 or the other, but it's still within the range of

## 1281

1  the expectations and the calculations that I've
2  done, and I've made that clear in my description
3  of the comparator drugs.
4     Q. Okay. I appreciate the clarification
5  and my question wasn't precise enough --
6     A. Okay.
7     Q. -- so let me try to ask a better
8  question. My question is, if you take a single
9  reporting service, let's say First Data Bank, and
10 I take a single point in time, am I correct that
11 for that reporting service for that point in time
12 there is only one AWP reported for each NDC, not
13 multiple AWPs for different markets?
14    A. That -- that's correct.
15    Q. All right. Now, am I correct that if
16 the 30-percent-yardstick view that you express in
17 your December 15th report, which you have
18 repeatedly said would apply to different types of
19 payers, if that were adopted as a liability
20 standard, then you wouldn't have this issue or
21 problem of the manufacturers having to post
22 different AWPs depending on which payer we're

**1282**

1  dealing with, is that right?
2      A.  Well, I don't think -- it's certainly
3  not my testimony or my opinion that the
4  manufacturers should or did post different AWPs.
5  I'm -- it's my opinion that an AWP is a list
6  price, and it's been understood to be a list
7  price, and as a matter of any -- any market
8  structure, legally can be a list price that's a
9  signal for transactions prices.  And so, I've not
10 proposed that, nor entertained that, nor recommend
11 that, nor been asked to analyze that there should
12 be some different way of posting AWPs for
13 different types of payers.
14     Q.  All right.  Turning back again to
15 Connecticut, with respect to your opinions
16 expressed in both Exhibits that we've been looking
17 at with respect to Connecticut Medicaid and
18 medical assistance programs --
19     MR. NALVEN:  Objection.
20     Q.  -- did you undertake any effort to
21 determine liability or calculate damages using
22 your 30-percent expectations yardstick for that --

**1283**

1      MR. NALVEN:  Objection.
2      Q.  -- type of payer?
3      A.  For the Medicaid portion of it and for
4  the programs under the Medical Assistance Program,
5  no.
6      Q.  Why not?
7      A.  I wasn't asked to.
8      Q.  Could you -- could you do that?
9      A.  The -- one could do that, but if -- if
10 you recall from my -- and I'm sure it's emblazoned
11 in your memory -- from my affirmative declaration
12 on class, the variations of AWP and how the
13 signals work for self-administered drugs may
14 differ from physician-administered drugs.  So, one
15 would have to think about what those signals were
16 in that context, whether they were the same,
17 whether they -- I've developed yardsticks for
18 expectations for physician-administered drugs.
19 So, one could -- one could do that kind of
20 analysis, but that was, given the Court's opinion,
21 I -- I did not pursue that analysis.  So, that is
22 something that is subject to economic analysis.

**1284**

1      Q.  All right.  Am I correct that with
2  respect to GSK, the Connecticut case involves
3  physician-administered drugs, including, in
4  particular, Kytril and Zofran?
5      A.  You are correct.
6      MR. HEROLD:  In fact, just so the
7  record's clear, we'll mark the Connecticut
8  complaint as the next exhibit.
9      (Revised Complaint, 3/5/04 marked
10 Exhibit Hartman 058.)
11     MS. WITT:  Fred, so the record is clear,
12 which complaint is that?
13     MR. HEROLD:  This is the State of
14 Connecticut versus GSK.
15     MR. NALVEN:  The revised complaint dated
16 March 5th, 2004.
17     MR. HEROLD:  Correct.  Thank you,
18 revised complaint.
19     Q.  Do you have that in front of you --
20     A.  I do.
21     Q.  -- Doctor Hartman?  Now, if you'll turn
22 to Page 28, the table.

**1285**

1      A.  I have done so.
2      Q.  You see there listed the drugs Ventolin,
3  Zofran, Navelbine, Kytril and Hycamtin, is that
4  correct?
5      A.  It is correct.
6      Q.  And is it your understanding that those
7  are the drugs for GSK that are subject to the
8  claims in the Connecticut case?
9      A.  It is my understanding those were the
10 drugs -- well, it's -- it's clear that those are
11 the drugs included in the complaint.  The subset
12 of drugs that -- that I was asked to look at seems
13 to be a smaller subset than that.  And there --
14 there may have been other revised -- as I read
15 that revised complaint, those are the drugs
16 listed.
17     I see that in my actual damage analysis
18 I only focused on Kytril and Zofran.  So, I would
19 have done that at direction of counsel, I would --
20 I would guess.  So, yes, that's what I see in this
21 table.  Whether that -- whether this is the final
22 word on it, I know I've seen a variety of

1286

1  complaints and evolution of -- but given that this
2  is the final revised complaint and these are the
3  drugs that are listed, then that would seem to be
4  the case.
5     Q. All right. So, am I correct, as you
6  just pointed out, that as of this date you have
7  not rendered any opinion as to liability or
8  damages for Ventolin, Navelbine, and Hycamtin?
9        MR. NALVEN: Objection.
10    A. That's correct.
11    Q. And so --
12       MR. NALVEN: When you say, "rendered an
13 opinion," what do you mean?
14    Q. I mean have not provided any expert
15 opinion in any report or otherwise in the
16 Connecticut case with respect to liability or
17 damages for Ventolin, Hycamtin, and Navelbine, is
18 that correct?
19    A. Well, I guess the way -- the way I'd
20 answer that is, in my expert disclosure I put
21 forward methods that could be used for all those
22 drugs, and as it came time to finalize the -- the

1287

1  drugs that were to be included, they did not
2  include those drugs. The formulaic methodology
3  was designed to include any -- any drugs of GSK
4  that I would have been asked to do. But in -- as
5  this -- the timing of this particular disclosure
6  was reaching maturity, those were the drugs I was
7  asked to -- to look at and did not include a
8  detailed analysis of -- or any analysis of the
9  other drugs.
10    Q. All right. So, stated another way, in
11 the Connecticut case, you have rendered opinions
12 as to liability and damages only with respect to
13 Kytril and Zofran, is that correct, for GSK?
14       MR. NALVEN: Objection.
15    A. The -- it's -- my report stands as it
16 stands, and it only includes those drugs for GSK.
17    Q. And am I correct that both Zofran and
18 Kytril, in their injectable forms, are physician-
19 administered drugs?
20    A. That's correct.
21    Q. So, I want to go back to my prior
22 question, which is, why didn't you provide an

1288

1  analysis that showed the application of your 30-
2  percent yardstick to Kytril and Zofran, both
3  physician-administered drugs, in the Connecticut
4  case?
5     A. You are asking whether in the damages
6  calculated for the Connecticut programs that
7  included the physician -- that -- not -- not the -
8  - the Medicare copay part of the analysis, but
9  you're talking about what was part of the MAP
10 analysis and the drugs that were reimbursed under
11 -- under that program.
12    Q. That's correct.
13    A. And that was, again, subject to that
14 sentence in Paragraph 11.
15    Q. That is at the direction of counsel?
16    A. Direction of counsel, that's correct.
17    Q. And I want to again ask my other
18 question, which I tried to ask before, which is,
19 could you, as you sit here today, conduct an
20 analysis of how the 30-percent yardstick would
21 affect liability and damages for Kytril and Zofran
22 for the Connecticut Medicaid programs?

1289

1     A. I could -- I could do a supplemental
2  analysis of -- of expenditures under the medical
3  assistance programs of Connecticut for those drugs
4  with -- with that 30-percent threshold if I were
5  asked to do so.
6     Q. Now, I want to turn for a second to your
7  first declaration in the MDL, and I have an
8  excerpt from it which I'll give you just to make,
9  hopefully, it easier.
10         (Attachment I.3: GlaxoSmithKline
11 Drugs Subject to Liability" marked Exhibit Hartman
12 059.)
13    Q. Doctor Hartman, for the record, I've
14 handed you what's been marked as Exhibit Hartman
15 059, which I will represent is an excerpt of two
16 pages taken from your first liability report in
17 the MDL, and they were Attachment I.3 entitled
18 "GlaxoSmithKline Drugs Subject to Liability," and
19 Attachment J.3.A entitled "GlaxoSmithKline
20 Medicare Damages Beneficiary Subclass 1 by NDC."
21 Do you have that?
22    A. I do.

1290

1   Q. And focusing now on Attachment I.3, the
2   first page of Exhibit Hartman 059, am I correct
3   that that is a chart that was prepared under your
4   direction which contains an X for each instance
5   under which you found in your December 15th report
6   GlaxoSmithKline drugs were subject to liability?
7   A. That they exceeded the 30-percent
8   threshold, that's correct.
9   Q. So, am I also correct that if there is
10  no X for a given NDC in a given year on this same
11  attachment, then it would be your opinion under
12  the December 15th report that there would be no
13  liability with respect to that NDC in that year,
14  is that correct?
15  A. Subject to the caveat that I would need
16  to check our coverage of data and whether or not,
17  indeed, we had data -- I see Xs in 2003. Now, I'm
18  assuming the data production from GSK was -- was a
19  complicated one, and there were lots of files, and
20  I'd need to confirm whether we have -- we had
21  comparable data through 2003 for all the drugs,
22  but certainly for those years, yeah, if we had the

1291

1   data and there's not an X, then that -- that's
2   true.
3   Q. All right. I notice in here that you do
4   not have any entries for the year 2004, is that
5   correct?
6   A. That is correct.
7   Q. And why is that?
8   A. Turning to the attachments to my
9   December 15th declaration, in particular
10  Attachment G.3.A, it lists the ASPs that we were
11  able to calculate for the Glaxo drugs for the
12  period of time for which we were able to do so.
13  And so, you will notice that -- and this is why I
14  was talking about the concern about say 2003 for -
15  - for Alkeran, my examination of G.3.A tells me we
16  did not have sufficient data to calculate the
17  ASPs, and hence the spreads, that would allow me
18  to do that analysis for that year or else you no
19  longer offered the drug that year, and I'm trying
20  to see here in the summary of the -- the Glaxo
21  data provided to us that it says on Page 1 of
22  G.3.D, "Description of Electronic Data" that

1292

1   "Note: In general, data are available for all
2   drugs from '97 to 2002. Note: In addition, to
3   the extent that the drugs existed, data are
4   available for Kytril, Ventolin, and Zofran, 1993
5   through 2003." So, we didn't receive data for
6   2004, and we didn't receive data for -- for a
7   number of drugs prior to '97, and we didn't
8   receive data for a number of drugs post '92 --
9   2002. I'm sorry.
10  So that would -- if we couldn't make a
11  finding, we -- we didn't make a finding.
12  Q. All right. And am I correct that you
13  did not make an attempt to extrapolate for years
14  for which you had no data?
15  A. We did make attempts to extrapolate if -
16  - once we calculated damages, if we saw patterns
17  of damages that were -- we did -- we could have
18  extrapolated and interpolated in a variety of
19  contexts, but it is my recollection, and we can go
20  back and look more specifically, if there were a
21  pattern of damages -- whoops. Let me keep all
22  this together. (Witness reviews document.) Well,

1293

1   let me just -- rather than -- if we want to go
2   look at it, we can look at it -- time being of the
3   essence. There -- once damages were calculated, if
4   I noted -- there were -- and it's described in
5   detail -- the extrapolation methods and decisions
6   that were made so that your experts can thoroughly
7   vet those.
8   Say for the Alkeran IV, the 50
9   milligrams, if there were damages over a period of
10  time of five years where there was a -- whatever
11  that pattern was, I would either take averages or,
12  if they were going to zero, I'd leave them at
13  zero. I would look at the pattern of what was
14  implied at the final stage of -- of the
15  calculations, rather than at each of the
16  individual interim points.
17  Q. All right. And am I correct that your
18  opinion, subject to these data limitations and
19  including any extrapolations that you did with
20  respect to whether there are -- there's liability
21  and damages for the GSK drugs in the MDL is -- are
22  -- with respect to Medicare, I'm sorry -- are

### Page 1294

1   summarized in the exhibit that we've marked as
2   Exhibit Hartman 059? Is that a fair description
3   of Exhibit Hartman 059?
4       A.  Subject to the 30-percent threshold and
5   subject to those -- the caveats regarding the
6   data, that's correct --
7       Q.  All right.
8       A.  -- for the Medicare beneficiary -- for
9   Subclass 1.
10      Q.  Right.
11      A.  Yeah.
12      Q.  Now, if I could ask you just for a
13  second to take a look at the -- your second report
14  in the MDL, and I want to refer you to your
15  calculations of alternative damages in Attachment
16  A.3.A.
17      A.  Now, will it pay for me to leave some of
18  this open and compare or not? Am I -- are we
19  going to do -- do I want to leave this, or do I
20  want to fold this up?
21      Q.  I think you can fold that up.
22      A.  Okay. Okay. And you were saying to --

### Page 1295

1   you had the --
2       Q.  It's Attachment A.3.A, which is entitled
3   -- this is under your alternative liability
4   standards --
5       A.  Right.
6       Q.  -- entitled "GlaxoSmithKline Medicare
7   Damages Beneficiaries Subclass 1 by NDC." Do you
8   have that?
9       A.  Right, I do.
10      Q.  And I just have a couple of questions on
11  this document. If you look at Ventolin, the first
12  entry, "Ventolin Solution Inhaler," do you see
13  that?
14      A.  I do.
15      Q.  Do you see that -- in fact, for both
16  Ventolin formulations, am I correct that you do
17  not have any damage numbers for the year 2001,
18  2002, 2003, is that right?
19      A.  At this stage of the analysis, I do not.
20  That's correct. But give me just a -- well --
21  okay. Go ahead with your question.
22      Q.  Is it your understanding that Ventolin

### Page 1296

1   is a multi-source drug?
2       A.  Given the number of drugs that are in
3   this -- in the class -- I have to go back and
4   check my notes whether it is or not. I can't
5   recall.
6       Q.  If I represent to you that Ventolin is
7   Albuterol sulfate, will that help you determine
8   whether that's a multi-source drug?
9       A.  That would help me, yes.
10      Q.  And what would the answer be?
11      A.  The answer would be yes, if -- subject
12  to that.
13          MR. HEROLD: David, I have about 15
14  minutes with another area, and then I'll be done
15  with the MDL completely, all right? Are you okay
16  to go for another 15 minutes or so?
17          THE WITNESS: I may have to visit a
18  men's room for two minutes.
19          MR. NALVEN: Well, then let's take a
20  two-minute break.
21          MR. HEROLD: You want to, that's fine.
22          MR. NALVEN: Let's take a two-minute

### Page 1297

1   break.
2           MR. HEROLD: Okay.
3           VIDEO OPERATOR: The time is 12:35.
4   We're off the record.
5           (Recess was taken.)
6           VIDEO OPERATOR: The time is 12:39.
7   We're back on the record.
8       Q.  Doctor Hartman, before we move into a
9   different area, it's been pointed out to me that
10  there is an error in Exhibit Hartman 056, the
11  hypothetical. And I think it's inconsistent with
12  your testimony, and I want to make sure we
13  straighten that out. Do you have that in front of
14  you?
15      A.  Okay.
16      Q.  If you'd turn to the second page, at the
17  top where we're talking about results under your
18  alternative yardsticks, do you see where it says,
19  "If the ASP is 80, the AWP is a hundred, there
20  would be liability to the Medicare classes because
21  ASP is greater than Medicare reimbursement rate."
22  Am I correct that that ought to be less than not

**Page 1298**

1  greater?
2  A. You are correct.
3  Q. Could you just take a pen and fix that
4  and make that less than.
5  A. How embarrassing.
6  Q. For me.
7  A. I know.
8  Q. And then on the one right after that
9  where it says, "Liability for Connecticut Medicaid
10 because ASP is greater than published Connecticut
11 reimbursement rate for PADs," that should be less
12 than, too, right?
13 A. I see that, yes.
14 Q. Does it now accurately reflect your
15 testimony?
16 A. It does -- it's more accurate now, yes.
17 MR. NALVEN: Plaintiffs move for a
18 default judgment.
19 MR. HEROLD: Some of us can admit our
20 mistakes.
21 Q. With respect to your method of
22 calculating damages in the MDL --

**Page 1299**

1  A. So I can put the state --
2  Q. For now.
3  A. No. No. No, I mean just for -- you
4  opened that one page up. I can fold that up.
5  Q. Okay.
6  A. Okay.
7  Q. I want to ask you some questions about
8  various aspects of your damage calculation, some
9  of which are relatively technical, but I'll try to
10 get through it quickly. First, am I correct that
11 you changed your method of calculating ASP in your
12 alternative calculations as presented in your
13 reports?
14 A. If we could refer to this as my December
15 15th and the supplemental report, it's easier,
16 then I know we're on the same page. The -- the
17 calculation of ASP in the supplemental report is
18 different, yes.
19 Q. All right. And are you expressing an
20 opinion as to which of the two methods that you
21 used to calculate ASP, i.e., that in your original
22 report where you did not include hospitals in an

**Page 1300**

1  effort to calculate ASP, and that in your
2  supplemental report in which you did include
3  hospitals? Are you expressing an opinion as to
4  which of those two methods of calculating ASP is
5  most appropriate for determining an ASP in the
6  clinic physician market?
7  A. Well, I -- I will say that the -- the
8  AWP is a -- as a matter of economics and as a
9  matter of my opinion -- is a benchmark for all
10 transactions prices. So, it's a -- it's a
11 benchmark for the ASP of all units sold. It will
12 be a benchmark for the units -- all units sold to
13 the -- to nongovernmental units.
14 Certainly the preponderance of the ASPs
15 calculated for sales just to providers are greater
16 than the ASPs overall, because overall there's
17 more hospital sales included and there's greater
18 discounts and rebates or price offsets paid there.
19 So, the AWP is a signal for -- for transactions
20 prices generally.
21 For the notion of reimbursement rates to
22 physicians where we're talking about their

**Page 1301**

1  acquisition costs, the ASPs that I have chosen are
2  the ones that reflect the ASPs for -- for those
3  particular providers.
4  The spreads -- if calculated for the ASP
5  generally, which the AWP is a signal for, is -- is
6  -- would lead to larger spreads for the
7  preponderance of -- of the -- of the drugs, the
8  NDCs.
9  Q. All right. I think I heard you say that
10 the ASPs that you calculated for the physician
11 providers would be a more accurate reflection of
12 acquisition costs for physician providers, and
13 when I say, "The ASP you calculated," I mean the
14 ones that you calculated in your December 15th
15 report, is that correct?
16 A. That's correct, yes.
17 Q. Now, with respect to the Medicare
18 classes and payers, as well as the Medicaid
19 payers, am I correct that when you did your damage
20 calculations throughout all your reports you did
21 not provide a "credit" for the 30-percent spread?
22 A. In the December 15th declaration, if a

1302

1   drug did not exceed the 30 percent, they were
2   excluded from the damage calculation entirely.
3   So, there was that credit -- I mean, there was
4   that -- if you want to think of it as a credit.
5   I'm not quite sure I understand what you're saying
6   about a credit. I mean, are you -- could you be
7   more specific?
8       Q.  Sure. All right. Well, let's -- let's
9   focus on the December 15th report --
10      A.  Right.
11      Q.  -- for the Medicare classes, and you've
12  already testified that -- in your December 15th
13  report if the spread was less than 30 percent, you
14  were done. There would be no further analysis, is
15  that right?
16      A.  That's right.
17      Q.  But if -- am I correct that if the
18  spread was more than 31 percent, i.e., -- more
19  than 30 percent, i.e., let's say it was 31
20  percent, that when you calculated your damages,
21  you calculated damages for that entire spread up
22  to the Medicare reimbursement rate, is that right?

1303

1       A.  As discussed in the strict definition of
2   the damage calculations, if they exceeded that --
3   that 30-percent threshold, I turned to the
4   Medicare regulatory language to calculate damages
5   so that it -- if it was -- it might not have been
6   30 -- 30 percent, but if the -- if, in that period
7   of time, reimbursement should have been the lesser
8   of ASP and AWP, then I didn't take into account a
9   30-percent threshold. When it was 95 percent of
10  AWP less -- or ASP or 85 percent, I took the
11  strict statutory language for the calculation of
12  what the implied reimbursement rates were, given
13  that they weren't at acquisition cost.
14      Q.  Wouldn't it be a reasonable approach to
15  the Medicare classes in calculating damages to
16  provide the same credit for the "expected spread"
17  that you applied for the third-party payers?
18          MR. NALVEN: Objection.
19      A.  You're asking me to -- to render a legal
20  -- a legal opinion. I mean, I -- I understand --
21  the market works the way it works, and I -- and I
22  observe pricing behavior and spreads, and I look

1304

1   to the statutes or the regulations to indicate
2   what the implied damages are, and it doesn't call
3   for a credit of that sort. So, I've -- I've left
4   it only at -- at the regulations.
5       Q.  As you interpret them.
6       A.  As I interpret them, that's correct.
7       Q.  Now, in the MDL, am I correct that you
8   had to -- for purposes of your damage analysis --
9   allocate units of each drug to each of the three
10  classes?
11      A.  I did, yes.
12      Q.  And in particular you had to come up
13  with some method to attempt to allocate sales of a
14  drug -- let's say Zofran -- to those sales which
15  were reimbursed by, on the one hand, third-party
16  payers -- private third-party payers, on the other
17  hand, individual copayers, and on the third hand,
18  to use a Yogi Berra expression, to Medigap
19  insurers, is that right?
20      A.  I -- I did have to allocate units to
21  groups of payers.
22      Q.  And am I correct that you -- that you

1305

1   did so, as explained in your December 15th
2   declaration, by relying on the NAMCS survey data?
3       A.  Once I --
4           MR. NALVEN: Objection.
5       A.  Once I had excluded those sales that
6   were not relevant to the class, as best I could,
7   given the data that I received from Defendants, I
8   then used the NAMCS data when they were available
9   or information from a group -- there was a group
10  of people at the Harvard School of Public Health
11  in my team that gathered the NAMCS data that we
12  could. We tried to get the IMS data and that --
13  and also looked to their own experience as to what
14  some of these mixes might be. And then -- and
15  then we looked at the Kaiser Foundation data and
16  Eppig and Chulis. There's a variety of data that
17  we looked at in those allocations, but NAMCS was
18  one of the things that we relied on, that's right.
19      Q.  All right. And with respect to the
20  NAMCS data, am I correct that in order to
21  determine the percentages paid for by each of the
22  three classes in the MDL, you looked to specific

**1306**

1  encounters for the NDCs involved in the case?
2      MR. NALVEN: Objection.
3      A.  What I looked to were -- there are drugs
4  that are -- are included in the -- in the matter,
5  and I looked to the NAMCS data for physician
6  visits that involved dispensing that -- that drug.
7  That that was listed in the NAMCS data on their
8  reporting of those doctors' visits.
9      Q.  All right.  Did you take into account,
10 in your efforts to allocate between payer classes,
11 any other NAMCS data besides the specific
12 encounter data that listed a specific drug?
13     A.  I -- the -- the people that were close
14 to the -- to the NAMCS data and did -- did the --
15 the allocations upon which I relied, and you know,
16 I'm -- one of the things I'm -- just take a second
17 to turn to -- not that anything ever takes a
18 second -- but the -- the NAMCS data, and this is
19 why I'm -- just to make sure that I fully
20 understand this.  The NAMCS data is laid out in
21 Attachment J.7.A, and that includes -- and it's --
22 and it's the doctors' visits panel that we're

**1307**

1  talking about, and it includes the insurers and
2  the groups that we're talking about, but it also
3  includes other groups in terms of self-pay,
4  Worker's Comp, Medicaid, which I did take account
5  of and dealt with and netted out.  And then I did
6  supplemental analyses about purchases by DOD,
7  which is Column 12 of the -- of that -- of J.7.A.
8      Q.  Uh-huh.
9      A.  And I did an analysis based on the --
10 the coverage of -- of governmental employees
11 through private third-party payers, as laid out in
12 J.7.B. so that the NAMCS data and the panel on the
13 doctors' visits was the point of departure.  I
14 found as much additional information as I could to
15 -- to better refine the NAMCS data.
16     It is my understanding from the team
17 members that were supporting this work at Harvard
18 that there were no additional NAMCS data that
19 could help us with this.
20     Q.  Well, let me ask you a question about
21 your efforts to find additional data.  For -- do
22 you understand, first of all, that Kytril and

**1308**

1  Zofran are both antiemetics, which are used to
2  treat nausea and vomiting associated with
3  chemotherapy?
4      A.  That is my understanding.
5      Q.  All right.  Am I correct that the NAMCS
6  data includes data -- in fact, many data points on
7  cancer encounters as a category?
8      A.  Well, one can certainly sort the NAMCS
9  data on a number of different -- I mean, a
10 doctor's visit is delineated by ICD 9 codes, by a
11 variety of disease codes, by a variety of
12 different ways of sorting the data, and I sorted
13 by the data relative to the drug and when it was -
14 - when it was prescribed.  So that I didn't
15 necessarily look at the subset of cancer patients
16 to do that.  I looked at all the times that Zofran
17 or Kytril were administered, which I would assume
18 is generally in conjunction with a cancer
19 treatment.
20     Q.  Would you think it would be a reasonable
21 check, if you will, on the approach you took to
22 look at all cancer encounters involving

**1309**

1  chemotherapy and see how the payer mix breaks up
2  for all cancer encounters in the NAMCS data?
3      MR. NALVEN: Objection.
4      A.  The -- and I'm hoping that this will be
5  something that can be done by -- by my rebuttal
6  time.  I mean, I've -- I've looked -- I've wanted
7  to get the IMS data of this -- of the same sort to
8  help corroborate what has been put forward here so
9  that what I've put forward here is something that
10 I -- I feel is reliable.  But to the extent that
11 one could run some alternative cuts of the data,
12 that -- that might be informative.  It might not
13 be.
14     Q.  Okay.  Do you have access to the CMS
15 data concerning actual Medicare reimbursements for
16 drugs?
17     A.  I -- one could get that.
18     Q.  That's publicly available, correct?
19     A.  That's correct.
20     Q.  All right.  Would you agree with me that
21 in determining the percentage of units that were
22 paid for by Medicare copayers, one approach would

**1310**

1. be to get the actual Medicare payment data from
2. CMS and compare that to the total number of units?
3.    A. The -- in order to implement any
4. particular calculation, one needs to think
5. carefully about the data and one needs to think
6. about the consistency of all of the sources and --
7. and the -- my use of the NAMCS data, as it's done
8. here, draws all information. So that most of
9. these administrations of Kytril and Zofran turn
10. out to be in conjunction with chemotherapeutic
11. applications, that would still pop out the -- the
12. dispensing of the Zofran and Kytril would still
13. reveal itself.
14.    So, starting to look at some other
15. percentages in some different ways, there's a --
16. there's a number of ways of trying to come at this
17. and trying to enrich one's estimates. I'm
18. confident in the approach that I've done. I'm
19. also confident that additional data and additional
20. analysis could help. Just positing it the way you
21. have now, I'd want to think about that and how it
22. fit within the whole mix of the other nonMedicare

**1311**

1. sectors and what it was picking up and --
2.    Q. Okay. But it's a reasonable approach to
3. think about looking at this kind of exercise where
4. you're trying to determine an allocation from data
5. to look at various different data sources and
6. think about their usefulness, and if a
7. determination is made that they are useful, to
8. cross-check one data source against another data
9. source, is that correct?
10.    MR. NALVEN: Note my objection. It's
11. been asked and answered. The breadth of the term
12. "reasonable" depends on the context in the
13. assignment, etcetera.
14.    A. Given world enough and time, any
15. quantitative economist would like to look at all
16. data available and come at it from every
17. direction. And so, additional data is never a --
18. well, no, sometimes additional data can be a bad
19. thing. One has to review, you know, one could
20. tell me to look at something crazy, too. You
21. know, I'd have to evaluate what -- what it might
22. be and whether it was sufficiently helpful.

**1312**

1.    This was -- this is certainly a -- this
2. is certainly data used as I'm using it that's used
3. in the scientific literature and is used -- is one
4. of the most frequently used databases, and one can
5. always do better with different surveys and to --
6. or, you know, one component, but it has to see how
7. it fits within everything else, and I think the
8. IMS data will be helpful to get --
9.    Q. Okay. Did you undertake any effort in
10. using the NAMCS data to determine whether the
11. encounters for the GSK drugs, which include more
12. than Kytril and Zofran, whether there were a
13. sufficient number of such encounters to make
14. statistically significant extrapolations from the
15. data?
16.    A. The -- we took whatever NAMCS data we
17. could get. So, I -- there -- there's going to be
18. some encounters where there are not many visits,
19. and unfortunately, that's the best data you have
20. relative to no data. So, there may be a
21. particular drug -- NDC or a particular cell where
22. there were four doctors' visits, and I'd certainly

**1313**

1. like to rely on 300 doctors' visits, but when four
2. is all you have, it's better than saying it's
3. 50/50 for purposes of not having any data.
4.    Q. Okay. But you would agree that if the -
5. - if you only have four, the chances of that being
6. accurate, statistically, are lower than if you
7. have, say, 300, is that right?
8.    A. You'd always want to have more visits
9. than less.
10.    Q. All right. Now, shifting a second to
11. your calculation of the units for each drug
12. involved in your damage calculations, am I correct
13. that you made an effort in the MDL and in
14. Connecticut for physician-administered drugs --
15.    A. Could we -- could we just stick with
16. MDL?
17.    Q. You're right. That's a bad question.
18.    A. Yeah.
19.    Q. Let's stick with MDL.
20.    A. Okay.
21.    Q. Am I correct in trying to determine the
22. number of units involved in the case in the MDL

**1314**

1   for physician-administered drugs, your goal was to
2   pull out of the databases the units that, in fact,
3   ended up in a physician clinic, is that right?
4      A.  We included oncology clinics. We -- we
5   excluded hospitals. I have -- I'm speaking
6   generally and -- well, specifically for hospitals.
7   For staff model HMOs, we excluded those -- those
8   units, and the exclusions are -- are clear in the
9   description of the data that we used and how we
10  got at the units. If it was an oncology clinic,
11  that was -- and who submitted for reimbursement to
12  third-party payers we -- they were included, we
13  attempted to include those.
14     Q.  Okay. When you had a situation in the
15  database where you saw a sale to a wholesaler --
16  and before I ask my question, let me just ask a
17  side question -- am I correct that that often
18  happens --
19     A.  It --
20     Q.  -- many sales are directly to
21  wholesalers?
22     A.  Speaking generally -- generally, for all

**1315**

1   drugs many sales are to wholesalers, yes.
2      Q.  All right. When you had a situation in
3   the GSK data for Kytril and Zofran, the
4   antiemetics where the sale was to a wholesaler and
5   there was no charge-back that could trace it to a
6   clinic physician market, there was no specialty
7   distributor involved. It's simply a wholesaler
8   sale, and you couldn't trace that sale to a
9   hospital or any other market, would you have
10  included or excluded those units in your analysis?
11     A.  I would need -- we obviously used --
12  well, we -- not obviously, but as made clear in
13  the discussion and in the attachments, we used the
14  data from the wholesaler level, in re: charge-
15  backs and a variety of measures to try and -- and
16  to see what were sales that were either going to
17  oncologists and doctors and which were going
18  elsewhere. If there were a residual category for
19  which we did not know, I would have to -- I'd have
20  to confirm -- that would have to be a question I'd
21  have to either look closely to the notes or
22  confirm with my team.

**1316**

1      Q.  All right. Am I correct, though, if
2   there is a residual wholesaler sale category where
3   you can't trace it to a physician clinic market,
4   your goal would be to use whatever evidence you
5   could only to include those wholesaler sales that
6   ended up in the clinic physician market? Is that
7   consistent with your approach?
8      A.  In the provide -- in physician clinic
9   provider market, that's correct.
10     MR. HEROLD:  This is a good time to take
11  a break.
12     MR. NALVEN:  Do you believe that you've
13  finished with your MDL questioning?
14     MR. HEROLD:  Yes.
15     MR. NALVEN:  Okay. Great.
16     VIDEO OPERATOR:  The time is 1:05. This
17  is the end of Cassette 2. We are off the record.
18     (Whereupon the deposition recessed
19  at 1:05 p.m.)

**1317**

1      AFTERNOON SESSION  (1:37 p.m.)
2
3      VIDEO OPERATOR:  The time is 1:37. This
4   is the beginning of Cassette 3 in the deposition
5   of Mr. Raymond Hartman. We are on the record.
6      Q.  Good afternoon, Doctor Hartman.
7      A.  Good afternoon.
8      Q.  I want to turn now to some questions
9   about Connecticut, and I want to mark for the
10  record your initial disclosure in Connecticut,
11  dated November 1st, 2005.
12     (Disclosure, 11/1/05 marked Exhibit
13  Hartman 060.)
14     Q.  Doctor Hartman, is Exhibit Hartman 060
15  your initial disclosure report in Connecticut?
16     MR. NALVEN:  This is counsel's
17  disclosure, Fred.
18     MR. HEROLD:  Okay.
19     A.  (Witness reviews document.) This seems
20  to be counsel's disclosure.
21     Q.  Did you review that document before it
22  was served in the Connecticut litigation?

## Page 1318

1  A. I did.
2  Q. You did not?
3  A. I did.
4  Q. You did.
5  A. Yeah, I did.
6  Q. Okay. Thank you. Now, Doctor Hartman,
7  I think we established this morning that this
8  particular document, this disclosure in the
9  Connecticut case dated November 1st, 2005 does not
10 contain drug-by-drug damage estimates applicable
11 to the Connecticut case, is that correct?
12     MR. NALVEN: Objection.
13 A. It -- the calculations that I had
14 submitted in January and February -- the
15 calculation of damages, the first -- to
16 Connecticut -- the first declaration in that
17 calculation and then the supplemental, those were
18 performed essentially using the methodologies put
19 forward in this, but the -- they obviously are not
20 contained in this -- in this disclosure.
21 Q. And why is it that you did not perform
22 the damage calculations contained in your

## Page 1319

1  subsequent report prior to November 1st?
2     MR. NALVEN: Objection.
3  A. At the time that the -- the expert
4  disclosure was submitted and I reviewed it, it
5  formed the basis of my opinions and the methods I
6  would use. I was still waiting to receive data
7  from some of the Defendants on some of the drugs
8  and still waiting to finalize certain
9  understandings of the data so that the
10 calculations could not be performed as they appear
11 in the January and February submittals with the
12 expert disclosure.
13 Q. Am I correct that with respect to GSK,
14 you had received several computer databases
15 containing GSK data, and in fact, all the GSK data
16 that you relied upon ultimately in your January
17 and February reports by February 25th, 2005?
18 A. I cannot recall the precise time. I
19 could, of course, find that out when we did
20 receive the data from -- from GSK. I -- an
21 important part of the process of analyzing that
22 data and making it ready for a calculation of

## Page 1320

1  damages that -- to be subject to -- to put before
2  a court required the quality control on that data
3  in terms of our being able to talk with members of
4  -- of your client's staff and -- and anyone who
5  could tell us more about the data.
6     It's my recollection that a final
7  stipulation as to our understanding of all of the
8  GSK data wasn't -- wasn't -- was not entered into
9  until the day before this was due.
10    So, we were still -- while we had gotten
11 the disks and the diskettes, there was a lot that
12 was unclear to us with that data. We finally
13 received a stipulation as of the day before this
14 was due, and then obviously, I was still using the
15 GSK data in -- for the MDL calculations that were
16 submitted in -- in the December 15th report of
17 2005.
18    So, yes, we had the data, but it still
19 was not ready for a -- a reasonable -- the quality
20 control needed to be imposed upon it in order to
21 rely on it for a calculation of damages.
22 Q. As of November 1st, 2005, had you

## Page 1321

1  received utilization data from the State of
2  Connecticut with respect to any of GSK's drugs?
3  A. Again, I forget. I'd have to check with
4  the staff. I don't remember the timing of when we
5  were -- when.
6  Q. Have you received utilization data from
7  the State of Connecticut as we sit here today?
8  A. Have we received utilization data from
9  the State of Connecticut?
10 Q. Yes.
11 A. Yes.
12 Q. All right. And -- but you don't
13 remember when you got it.
14 A. No. And that was also an evolving
15 production. I mean, we'd receive some, and then
16 we would talk to them and say, We looked at the
17 CMS Web site. It doesn't look like that. And
18 let's get this straight. And so, that was an
19 ongoing process that had to be meshed with the
20 process of the quality control on the manufacturer
21 data that we received.
22 Q. Do you remember when you began receiving

## 1322

1  utilization data from either the State of
2  Connecticut or its vendor, EDS?
3  A. I'd have -- I'd have to check with our -
4  - no, I can't. No, I don't recall.
5  Q. Would you have a record of that that you
6  could share with us?
7  A. I would have to look.
8  MR. HEROLD: Well, Counsel, I'm going to
9  ask for that, and we'll follow up.
10  MR. NALVEN: Noted.
11  Q. Now, with respect to your January 19th
12  report in the Connecticut case, which I believe is
13  marked as Exhibit Hartman 055, am I correct that
14  you signed that report on or about January 19th,
15  2006?
16  A. You are correct.
17  Q. Do you know when this particular report
18  was provided to the Defendants in the Connecticut
19  case?
20  A. If -- again, the -- there -- a variety
21  of cases going on. If this is like any other
22  case, it was provided to them the day before. It

## 1323

1  goes down to the wire, you're checking numbers,
2  you're doing triple and quadruple checking. So, I
3  would assume it was -- we're never able -- never
4  able to get declarations done weeks ahead of time
5  and let them sit on the shelf. That doesn't seem
6  to be the way we are able to do it.
7  MR. HEROLD: All right. All right. I'd
8  like to mark another exhibit.
9  (Letter, 2/13/06 marked Exhibit
10  Hartman 061.)
11  Q. Doctor Hartman, I've marked for the
12  record as Exhibit Hartman 061 a letter from your
13  counsel, David Nalven, dated February 13th, 2006
14  to a number of attorneys who are among those
15  attorneys who represent the Defendants in the
16  Connecticut case. Have you ever seen this before?
17  A. I don't recall seeing it. I -- you
18  know, it's whether -- I don't recall -- I don't
19  recall seeing it.
20  Q. I'll ask you to take a second to read
21  the brief text on the first page.
22  A. (Witness reviews document.) Here.

## 1324

1  Okay. I'm done with that.
2  Q. Okay.
3  A. Did you want me to go on?
4  Q. Yeah. My question is, are you aware or
5  were you aware prior to this moment that your
6  January 19th, 2006 report was not provided to the
7  Defendants in the Connecticut case until this
8  February 13th letter was sent out by overnight
9  mail?
10  A. I don't really recall, you know, I'm
11  sorry to say.
12  Q. Do you know any reason why that delay
13  would have occurred?
14  A. No.
15  Q. And if you'll just take a look at the
16  paragraph marked No. 4 on the second page, which
17  lists as one of the items enclosed your February
18  9th, 2006 report. Do you see that?
19  A. I do.
20  Q. Were you aware that your February 9th,
21  2006 report in the Connecticut case was provided
22  to the Defendants along with and at the same time

## 1325

1  as your January 19th report, both of which were
2  provided by overnight mail on February 13th, 2006?
3  A. No, I did not.
4  Q. Was there any discussion with respect to
5  not -- with you -- with respect to not providing
6  the January 19th report until the February 9th
7  alternative report had been completed?
8  A. No.
9  Q. Am I correct that the decision to
10  prepare and submit the February 9th, 2006 report
11  was communicated to you after you had already
12  completed your January 19th, 2006 report?
13  A. I -- again, there's -- there are many
14  cases going on, but I would -- I can't imagine
15  that it -- that wasn't the case, but I don't -- I
16  can't recall precisely.
17  Q. All right. So, you don't have -- do you
18  have any recollection that before you signed off
19  on your January 19th report on or around January
20  19th, your counsel said, Well, I'm going to ask
21  you to do another one after this one's finished?
22  Do you have any recollection of that kind of