**1326**

1  conversation?
2     A. No, I really don't.
3     Q. All right. Now, I note for the record
4  that I have reviewed the three Connecticut reports
5  that we've marked to find any references to
6  depositions that were taken in the Connecticut
7  case, and I have been unable to see any such
8  reference. I may have missed it, but I haven't
9  seen it. And my question is, as you sit here
10 today, do you have a recollection of reviewing any
11 of the deposition transcripts in the Connecticut
12 case prior to this moment?
13    A. I received the Connecticut complaints of
14 -- say the -- copies of the revised complaints by
15 the manufacturers a while ago and additional
16 materials I -- there was a lot of AWP materials
17 coming and going. I don't recall whether there
18 was something specific to the Connecticut -- the
19 Connecticut depositions or not.
20    Q. And as you sit here -- we can look at it
21 but I don't want to take all of our time.
22    A. Uhm.

**1327**

1     Q. Do you have a recollection of listing as
2  material reviewed in any of your reports any
3  Connecticut deposition?
4     A. I -- I'd have to -- I'd have to look. I
5  can't recall listing that without checking whether
6  I listed it. And you probably could tell me
7  better than I can whether I listed it or not.
8     Q. Yeah, as I said, I've reviewed --
9        MR. NALVEN: The documents say what they
10 say.
11       MR. HEROLD: They say what they say, all
12 right.
13    Q. So, am I correct that you have not up
14 until this moment reviewed depositions of
15 Connecticut Medicaid officials to seek to
16 determine what understanding, if any, they may
17 have had with respect to the meaning of AWP?
18       MR. NALVEN: Objection.
19    A. Not that I can recall.
20    Q. Would you find that such testimony to be
21 instructive to your opinions or not?
22    A. It would depend on the testimony. I --

**1328**

1  I mean, it might be. It might not be. I can't
2  tell until I would read it.
3     Q. Do you recall reviewing any testimony in
4  a deposition taken in the Connecticut case with
5  respect to the views of Connecticut Medicaid
6  officials concerning what reimbursement rate for
7  Connecticut Medicaid programs would help assure
8  access to care by Connecticut Medicaid patients?
9        MR. NALVEN: Objection. Asked and
10 answered.
11    A. Yeah, not that I -- not that I can
12 recall.
13    Q. Do you recall reviewing, in connection
14 with preparing of any of your reports in
15 Connecticut, any documents relating to the
16 reimbursement rates under the Connecticut Medicaid
17 programs for specific drugs that were actually
18 used by the State of Connecticut programs?
19    A. Not that I recall personally. Again, my
20 staff was talking with Connecticut people about
21 their utilization data, and in the process,
22 whatever those conversations entailed would be

**1329**

1  communicated to me if they were -- if it was
2  pertinent. But I -- I didn't speak with them
3  myself.
4     Q. All right. I want to show you a
5  document.
6        (CT 0052728-754 marked Exhibit
7  Hartman 062.)
8     Q. Doctor Hartman, I've placed before you
9  what's been marked as Exhibit Hartman 062, which
10 was an exhibit to a deposition taken of a witness
11 named McGinley in the Connecticut case. Have you
12 ever seen this document before?
13    A. I do not think so.
14    Q. Just to be accurate, I should say that
15 Exhibit Hartman 062 is the first page of that
16 prior deposition exhibit, plus two other pages
17 which contain information on two GSK drugs,
18 granisetron hydrochloride and ondansetron
19 hydrochloride. It's not the complete document,
20 but I just want the record to be clear.
21       But with that clarification, do you
22 remember seeing this document or some longer

1330

1 version of it before?
2    A. I -- as I say, the -- my staff may have
3 in the process of dealing with accumulating and
4 assimilating the utilization data from the state,
5 but I don't remember seeing this.
6    Q. Now, if you'd turn to the second page,
7 which deals with certain information relating to
8 granisetron hydrochloride, do you see that?
9    A. I do.
10    Q. Are you aware that granisetron
11 hydrochloride is also known as Kytril?
12    A. I was not.
13    Q. Okay. Well, let's assume for the
14 purposes of the deposition that we're talking
15 about Kytril here.
16    A. Okay.
17        (John Montgomery entered the room.)
18    Q. Are you aware, as you sit here today,
19 that the State of Connecticut produced in
20 discovery this document, along with the
21 representation that it contained information about
22 the actual allowed charge by Connecticut Medicaid

1331

1 during various periods for the drug Kytril?
2    A. Well, what I'm -- what I'm seeing here
3 is -- I mean, I -- the data that I have seen is
4 the aggregate numbers for these drugs by periods
5 where it's been aggregated over the paid amounts
6 or the -- the reimbursements or the allowed
7 charge. So, I've -- I've not -- I've seen
8 aggregations of these, but I don't -- I don't
9 remember seeing this individual document that
10 would be one part of that aggregation.
11    Q. I'm not sure what you mean by
12 "aggregations." Can you clarify that?
13    A. Well, I see here that there were what
14 I'm interpreting to be -- as of April 1st, 2005,
15 there was an administration of Kytril with an
16 allowed charge of $7.09, and then I'm seeing that
17 in 2004, close to a year before, it was 15.62.
18 All of this is for the same -- same dosage. And
19 I'm seeing a pattern of -- of allowed amounts.
20 Now, what I have seen in the data that we could
21 look at is -- in the backup tables here, it would
22 be total dollar amounts spent under the different

1332

1 Medicaid programs that would be a sum of all of
2 these allowed charges for -- for granisetron
3 hydrochloride for Kytril for the period of time
4 that are included in my reports on the calculation
5 of damages.
6        So, this I'm assuming are -- I'm not
7 sure what level this is or if this is one provider
8 or what this is summarizing, but what I've asked
9 to see are the aggregations over all the claims
10 that were being submitted, subject to -- to the --
11 to -- to Medicaid's -- if this was appearing in
12 the MAPs program -- in the MAP program.
13    Q. Now, did you make any efforts during the
14 course of your analysis of damages and liability
15 in the Connecticut case to determine whether the
16 allowed amount under the Connecticut Medicaid
17 programs was related in any way to AWP?
18    A. I looked at the -- the statutory
19 language as it is cited in the -- my January
20 declaration that talks about what should be the
21 basis for a claim or for an allowed amount. In
22 reviewing and doing my MDL analysis, I submitted a

1333

1 -- back at the affirmative stage on the class, I
2 submitted an Attachment D that dealt with the
3 reliance upon AWP under Medicaid and under
4 Medicare and a variety of things.
5        So, I looked to statutory -- what was
6 enabled by statute to be allowed, and I didn't do
7 a detailed analysis to see whether they -- that
8 they followed the statute or not.
9    Q. All right. So, as you sit here today,
10 you do not know whether the allowed amounts for
11 Kytril for the period reflected on this Exhibit
12 Hartman 062 are related to AWP or not --
13        MR. NALVEN: Objection.
14    Q. -- is that right?
15    A. The -- under -- I can't -- I can't judge
16 whether these are paid at -- at the rate's that
17 enabled -- that's related to AWP, just looking at
18 this, without looking at other information.
19    Q. Now, if you -- you could determine that,
20 though, right, by looking at the actual AWP that's
21 published and then comparing -- doing whatever
22 unit conversions you have to do, and then

Page 1334

1  comparing those -- that number to the allowed
2  charges listed for the State of Connecticut,
3  correct?
4     A.  That could be done.
5     Q.  And would it affect your opinion if,
6  after doing that, you discovered that the
7  relationships between the Connecticut allowed
8  charge and AWP ranged between 56 percent and 137
9  percent, depending on which of these numbers is
10 used?
11    A.  I'm sorry.  The -- the -- what was it a
12 percentage of?  You -- you said these numbers
13 range between 50 --
14    Q.  Between 56 percent --
15    A.  -- percent.
16    Q.  -- of AWP --
17    A.  Oh, of AWP.
18    Q.  -- and 137 percent of AWP, would that
19 affect your opinion as to the impact, if any, of
20 AWP on Connecticut's allowed charges?
21    A.  Well, I would need to see this type of
22 data -- five data points for this drug.  I'd want

Page 1335

1  to see many more data points than this, but this
2  is information that could help inform the -- the
3  reliance on the Medicaid reimbursement formulae.
4     Q.  Did you --
5         (Discussion off the record.)
6     Q.  Are you aware, Doctor Hartman, based on
7  your work in this field, that at times the
8  statutory or regulatory reimbursement formula, for
9  example, for a state Medicaid program, are not, in
10 fact, applied in practice?
11    A.  I've -- I've not done a study of -- of
12 that particular issue that I could render an
13 opinion.
14    Q.  So, you have no opinion on that issue as
15 you sit here today?
16    A.  Well, the opinion that I have is the
17 statute is what directs reimbursement, and I would
18 assume that that informs the reimbursement
19 decisions.  And I would be surprised to learn that
20 reimbursement decisions and allowed amounts were
21 totally random, but in terms of narrowing and
22 doing -- looking at a set of claims for -- say,

Page 1336

1  for this drug -- we're looking at claims here that
2  are over a period of six years, and there are only
3  five claims.  I mean, I'd like to see -- I assume
4  there's a lot more claims than just these claims.
5         So, I mean, I'd like to see a little
6  more data.  I don't know -- I don't know what the
7  source of this is or if this is just all the
8  claims that -- are these all the claims that
9  Connecticut paid for Kytril over six years?
10    Q.  Well, do you think it would be important
11 for you to know, for example, that there is a
12 document that has been produced in the Connecticut
13 case called a "Pricing File," which has been
14 represented through Connecticut witnesses to the
15 Defendants to contain the information in
16 Connecticut's actual computer systems that are
17 used to pay claims?  Would it be important to know
18 about that document?
19        MR. NALVEN:  Objection.
20    A.  It would have been my understanding that
21 that -- that data would exist somewhere.
22    Q.  Okay.

Page 1337

1     A.  I've worked with that kind of data for
2  other states.
3     Q.  And I believe, in fact, you testified, I
4  think, yesterday or the day before -- or possibly
5  both -- that often a number goes into a system or
6  a computer, and it's in there.  Do you remember
7  all that testimony?
8     A.  Sure.
9     Q.  All right.  And --
10    A.  If we're referring to the same
11 testimony, but --
12    Q.  Okay.
13        MR. NALVEN:  Objection.
14    Q.  And if I represent to you that
15 Connecticut witnesses have told us the numbers
16 contained on this Exhibit Hartman 062 for Kytril
17 and Zofran are the actual allowed charge numbers
18 that were put into Connecticut's computer systems
19 to determine what to pay on claims, would you
20 agree with me that that would be an important
21 piece of data for you to take into account?
22        MR. NALVEN:  Objection.

1338

1  A.  There's no way to judge the importance
2  of it without getting the entire claims database
3  for all of these drugs and -- and running that
4  kind of analysis for every NDC. As we saw in --
5  in my responses in the MDL matter, for various J-
6  codes, various NDCs were grouped together, and one
7  had claims that ranged from zero to $5,000, and
8  that -- so, I -- the -- there are five points that
9  are here. I'd need to -- I'd -- I'd -- if -- if I
10 were directed to take all of the Medicaid claims
11 data for the state and do a type of detailed
12 claims analysis, that would be a very time-
13 consuming, involved process, which would be --
14 which would be informative.
15  Q.  Okay. Well, would you agree with me
16 that for purposes of calculating whether the State
17 of Connecticut has overpaid for Kytril and Zofran,
18 and if so, the amount, it would be important to
19 know what the state has actually paid.
20  A.  If the state is not paying what are
21 designated as the reimbursement rates as a
22 percentage of AWP or the estimated acquisition

1339

1  cost, although they -- they have just taken as
2  their estimate of the estimated acquisition cost a
3  percentage off of AWP, and there's -- there are
4  allowed amounts that are unrelated to what they've
5  been statutorily told to do, that would have
6  implications, clearly, for the reliability of --
7  of the damage calculations.
8  Q.  And what kind of implications would that
9  have?
10  A.  I would only be able to say that on --
11 by getting the data until I could over -- it could
12 mean that some of the damages were overstated,
13 understated. I'd need to see what -- what -- how
14 closely they were adhering to what they were
15 required to do under the statute. And if they
16 were allowing more or less, you've said it ranged
17 anywhere from 50 percent to 130 percent. I don't
18 know whether -- whether most of them are 130
19 percent. I mean, these are five points. I just
20 don't know. I need to see all of the data to know
21 the extent to which that was a factor and -- and
22 do that kind of an analysis on a major claims-

1340

1  based basis.
2  Q.  All right. And as opposed to doing
3  that, I just want to make sure I understand, for
4  the Connecticut Medicaid programs, the way you did
5  do the damage analysis is you compared an ASP that
6  you developed to the Connecticut regulatory or
7  statutory reimbursement rate for the drug at
8  issue, and then you determined the spread, and
9  then you determined the number of units that would
10 be applicable to that spread, and you multiplied.
11 Is that basically right?
12  A.  Well, a better way of putting it is that
13 I looked at reimbursement dollars. Given the fact
14 that I didn't go to units -- what was provided to
15 me was total levels of reimbursement, and if you
16 want to walk through the equation, I essentially
17 took the ratio of what the -- of what the -- what
18 -- how much -- by how much the -- what the drug
19 should have cost relative to what it was
20 reimbursed at if it were reimbursed at -- at the
21 statutory rate, and multiplied that -- so, let's
22 say it should have been 40 percent less -- I'm

1341

1  sorry. Probably in many cases it doesn't make
2  sense to look at a formula. But actually looking
3  at this formula might just make it simpler.
4  Q.  I'd be willing to bet on that.
5  A.  Really. I think you can -- you can
6  handle this. The -- I'm looking at Page 3 of the
7  -- of the January 19th submittal, and there's a
8  whole bunch of, you know, a lot of hieroglyphics
9  with these equations, but the key thing is that
10 we're talking about spreads there in Equation 2-D,
11 an actual spread and a but-for spread. And that
12 translates in equation 3-A into a ratio of a but-
13 for spread and an actual spread. And the but-for
14 spread is going to end up being related to
15 reimbursement at the ASP; and the but-for spread
16 in the nominator is the 92 percent of AWP or 88
17 percent of whatever. And so, I essentially -- it
18 turns out to be a fractional multiplication in 3-B
19 times dollars. So, I don't multiply it by units.
20 I say, Look, in a given year the state reimbursed
21 under one of the MAP programs $100,000, but that
22 was 20 percent too high, based on this ratio of

1342

1  spreads.
2      So, you go to the next equation, and you
3  just -- the overcharges are the actual minus the
4  but-for. So, I didn't look to find units anywhere
5  from state data. I just took the dollars spent
6  for each drug and said, Oh, it was 20 percent too
7  high, depending on what that spread analysis did.
8  I don't know if that helps.
9      Q. Okay. It does help. So, let me just
10 make sure I understand this. If, in fact, the
11 state had been reimbursing at a level that was 56
12 percent of AWP instead of 90.25 percent of AWP,
13 what implication would that have for your findings
14 of liability and damage in Connecticut, if any?
15     A. It would depend on what -- if the state
16 were reimbursing at 56 percent of AWP -- now,
17 let's remember that the range of the spreads you
18 gave me on five data points was 130 to 50. So
19 we're taking the low end of that spread. I don't
20 really know what the data would show, but --
21     Q. For -- for a one-year period. Just
22 assume that for a one-year period --

1343

1      A. It was --
2      Q. -- for every Kytril unit the state
3  reimbursed at 56 percent of AWP, how would that
4  affect your analysis of damages?
5      A. And this is --
6      Q. For that year.
7      A. This is a period of time when the Kytril
8  was multi source or is -- I see it listed here by
9  its molecular name, and so, I'm wondering whether
10 over any period of this time it was multi source.
11 Now, I can check that, but I don't remember those
12 things. Do you know whether it was multi source
13 at that time?
14     Q. I do.
15     A. And what -- what was the answer to that?
16     Q. It was not.
17     A. It was not.
18     Q. Let's make this a little simpler and
19 look at Zofran.
20     A. Well, no, no, we can stick --
21     Q. Well, the only reason I want to do that
22 is 'cause if we're talking in my own hypothetical

1344

1  about 2005, my client is not involved, because it
2  no longer owned Kytril. So, let's switch to
3  Zofran in 2005, and let's make the same
4  assumptions that for Zofran in the year 2005 --
5      A. Am I looking at something here now or
6  are we looking at a different hypothetical?
7      Q. You can -- it's the next page.
8      A. It's the -- I didn't realize that's the
9  molecular name.
10         MR. NALVEN: Can I make a suggestion?
11 This is the first time he's seeing a document. If
12 you want to pose a hypothetical to him and ask him
13 to assume --
14         MR. HEROLD: That's fine. I'll just
15 make -- I agree with you. I'll make it a
16 hypothetical. If you assume that in the year 2005
17 Connecticut reimbursed for Zofran -- for each unit
18 of Zofran at 56 percent of AWP instead of 92 --
19 92.5 percent of AWP, how would that affect your
20 analysis of liability and damages, if at all?
21     A. Well, it would depend on what the ASP
22 was. I'd need to look at -- at the end of the day

1345

1  that ratio that we just looked at turns out to be
2  a ratio. So, in 2005 -- I'm looking at Paragraph
3  15 of the January 15 -- D, under "Medicaid," under
4  "MAP," the -- the reimbursement rate that was
5  allowed by statute was -- there was a but-for --
6  there was a spread -- the actual spread should
7  have been -- if this is .9 -- I -- I'd need to
8  know what the ASP is in that calculation. I mean,
9  the -- I would -- I'd want to -- I'd want to --
10 I'd want to work that out to come up with an exact
11 answer to that.
12     Q. By the way, do you provide anywhere in
13 connection with your January 19th Connecticut
14 report the ASPs for any of the GSK drugs or any of
15 the other drugs, for that matter?
16     A. The ASPs would be those found in the MDL
17 report for the drugs that appeared in the MDL
18 report. So, certainly for your client, that would
19 be the case.
20     Q. Okay.
21     A. So, you know, I'm not -- I'm not ready,
22 without thinking about this a little more

1346

1  carefully, to answer that question.
2     Q. Well, stepping aside from damages for a
3  second, would it affect your opinion at all with
4  respect to the basic issue of whether the State of
5  Connecticut was defrauded by an AWP that it was,
6  in fact, reimbursing at 56 percent of AWP in one
7  year and 84 percent of AWP in another year and 137
8  percent of AWP in another year? Would that affect
9  your opinion or not?
10       MR. NALVEN: Objection.
11    A. It -- it would be something I would like
12  to consider.
13    Q. And you have not considered that at this
14  point, is that correct?
15    A. That's right.
16    Q. Okay. I want to ask you a few questions
17  about how you determined utilization, and I think
18  your January 19th report at Page -- at Appendix B
19  might help us on that. And I'm trying to
20  understand what you did.
21    A. Okay.
22    Q. By the way, one thing you say in various

1347

1  places in this report is that in determining the
2  AWPs, you used First Data Bank, is that correct?
3     A. That's correct.
4     Q. Why did you use First Data Bank and not
5  Redbook?
6     A. For the purposes here we -- we found
7  that with -- First Data Bank is generally easier
8  to use, and because we were extending the number
9  of drugs beyond the -- the MDL setting, and we had
10  needed it to -- we were doing this as we were
11  getting final data between the submission of the
12  expert disclosure and the -- the calculation of
13  damages, the First Data Bank was just easier to
14  work with.
15    Q. Am I -- I believe you testified earlier
16  about this, but am I correct that during the last
17  few years, the AWPs reported by First Data Bank
18  have often been higher than the AWPs reported by
19  Redbook for the same NDCs?
20       MR. NALVEN: Objection.
21    A. There have been differences. It's --
22  it's -- it's interesting to note that sometimes

1348

1  Redbook is higher. The -- the spread between WAC
2  and AWP has changed and moved up in First Data
3  Bank in a period of time from 20 to 25 percent,
4  but because of the timing of the reporting in
5  Redbook and it -- they don't update it -- I mean,
6  there might be a point in time where you look at
7  Redbook, it is actually higher than First Data
8  Bank, and it just has to do with reporting and --
9  to Redbook and how they update their data. So,
10  that's -- I couldn't -- I wouldn't want to make a
11  general statement of that.
12    Q. All right. Do you know whether the
13  State of Connecticut, in obtaining information
14  about drug pricing, used First Data Bank or
15  Redbook or some other service?
16    A. My guess would be -- well, I don't want
17  to guess, so I'd have to say I'm not sure.
18    Q. Okay. Now, with respect to what you
19  call "Connecticut MAP damages" on -- in Appendix B
20  --
21    A. Right.
22    Q. -- I'm still struggling to understand

1349

1  how you determined the number of units of, for
2  example, Zofran that were paid for by Connecticut
3  Medicaid programs during the relevant period. Can
4  you explain that to me.
5     A. I -- I would be glad to. Let me see if
6  it's presented in a way -- (Witness reviews
7  document.) Okay. Let's -- let's turn, if you
8  would, to Page 3 of Attachment B.
9     Q. I'm with you.
10    A. Got that? So, by the programs under
11  MAP, the Medicaid reimbursement damages, the GA
12  reimbursement damages, Saga, S-a-g-a and ConnPace,
13  we had data sources that were total dollar amounts
14  paid, either by NDC or it could be by J-Code. And
15  so, it was total dollars. It was units times
16  allowed amount, and the -- given those total
17  dollars, if you now return to the belly of the
18  beast that are the equations back on Page 3, we
19  calculate spreads on 3-A and 3-B -- well, 3-A,
20  where we have the spreads related to the
21  acquisition cost calculation -- the ASPs -- we
22  have the actual spreads in the denominator based

**1350**

1  on a percentage of AWP -- 92 percent of AWP, 90.5
2  percent of AWP, depending on the drug, the multi
3  source, single source, the year, and there's that
4  -- that creates a ratio in 3-A, which in 3-B we
5  multiply by total dollar amounts, which are the
6  sums that are -- these total reimbursement dollars
7  that are the source data here, claims dollars,
8  rather than claims units -- paid amount on Page 3
9  Appendix B.
10         And so, we have -- we essentially say,
11 look, here's the total amount they paid, and based
12 on the statutory interpretation of the acquisition
13 cost and AWP and the percentages off of AWP and
14 assuming that's what's informing reimbursement on
15 average, that's going to mean that the actual --
16 the but-for reimbursements may have -- may be 75
17 percent of actual reimbursements. So that it
18 should have been 25 percent less or it -- maybe it
19 was -- maybe it's 10 percent of actual
20 reimbursement. Should have been 90 percent less.
21 That's determined by these -- the two sets of
22 spreads here which come from the ASPs, the spread

**1351**

1  calculations that come out of the materials that
2  are in the -- for the ASPs for your -- for GSK's
3  drugs in the MDL report.
4     Q. Okay. So, you mention that you got data
5  by either NDC or J-Code with total reimbursement
6  numbers, correct?
7     A. That's right.
8     Q. What was the source of that data?
9     A. The source is from the state, and you
10 will see on Page 3, Appendix B, the text files,
11 source data, 1993 to 1997 and 1998 to 2003, these
12 were by NDC, they were reported to us, total
13 dollars amount spent by the state under the MAP
14 program.
15         These were files that were just sent to
16 us we corroborated for some subset of years. We
17 tested them against what was listed on the CMS Web
18 site and found that they were sufficiently
19 corroborative, and the same for the general
20 assistance amounts. Those are -- there are the
21 text files, which I assume we've produced for you.
22 I'm assuming you asked for them, and they've been

**1352**

1  produced. Dollar amounts by year under Saga, by
2  NDC and then for ConnPace.
3     Q. Do you know whether EDS was the source
4  of this -- of these files?
5     A. I'd have to -- I could find that out. I
6  don't know.
7     Q. Do you understand that EDS is the --
8     A. I do.
9     Q. -- data vendor?
10    A. I do.
11    Q. What's the right word?
12    A. Electric Data Systems. I think it's
13 Ross Perot's former company, but it's --
14    Q. Right.
15    A. Yeah. I mean, it's -- EDS is what it's
16 known as, and they're a data processing group that
17 --
18    Q. Right. I believe they play a part in
19 the Connecticut Medicaid program -- that they
20 administer the data --
21    A. Uh-huh.
22    Q. -- for the program. Is that your

**1353**

1  understanding?
2     A. I didn't -- I know who -- I've heard of
3  EDS and who they used to be, whether they're now
4  what they used to be or been assimilated by
5  someone else, I don't know whether these were
6  internal numbers or a vendor or what. We just --
7  I asked my staff to get these numbers. They got
8  the numbers, and we subjected them to the quality
9  control while we could, and --
10    Q. Okay.
11    A. -- and found them reliable.
12    Q. Do you know when you got this data from
13 the state?
14    A. It was -- this was, again, also a
15 rolling production. I mean, I would ask, and they
16 would say, Well, we got this year and that year,
17 but we couldn't get this year and -- and I don't
18 know what -- I didn't pay attention, now in
19 retrospect, that I kept a timeline on that.
20         MR. HEROLD: That's another thing we're
21 going to specifically ask for is when Doctor
22 Hartman received the data that we've just been

**1354**

1  referring to here in Appendix B from the state.
2     MR. NALVEN: It's noted.
3     MR. HEROLD: Thank you.
4  A. You'll notice that some data we still
5  didn't -- haven't received from the state. We --
6  say the ConnPace data, we only received data from
7  '98 through 2003. We didn't get any data '93
8  through '97. So, we didn't get data for the
9  general assistance going back to '93.
10 Q. Okay.
11 A. Oh -- or '9 -- (Witness reviews
12 document.) Oh, there were two years for which it
13 wasn't available, '93 and '97 for general
14 assistance.
15    So, this was the type of issues. We'd
16 get a few years, and we'd say, We need the rest of
17 them, let's get it. And then it would -- it would
18 come to us, but I didn't track precisely when it
19 came in.
20 Q. Okay. All right. Now, I want to shift
21 for just a second to your methodology for
22 determining the damage numbers for consumers in

**1355**

1  the State of Connecticut. Am I correct first that
2  you sought to determine a damage number for two
3  types of consumers in the State of Connecticut,
4  the first type being consumers covered by Medicare
5  who make copays, and the second type being
6  consumers who were uninsured, is that right?
7  A. That's -- we tried to -- to make
8  calculations of damages for as many groups as we
9  could, but those are the ones that we ended up
10 where the data allowed us to do that.
11 Q. All right. Let's start with the --
12 well, first of all, am I correct that you
13 presented the results of your damage estimates for
14 both Medicare copay consumers and uninsured
15 consumers in the same tables in your reports, is
16 that right?
17    MR. NALVEN: In the damages
18 calculations?
19 A. We're talking about the January damages
20 calculations?
21 Q. Yeah, okay. I think I know the answer
22 to that question, which is no, that's not right,

**1356**

1  because I'm now looking at them. So let me
2  withdraw that question. Let me ask another
3  question. Let's stick with the Medicare copay
4  damages for consumers. How did you go about
5  determining the number of consumers in the State
6  of Connecticut who made Medicare copay payments
7  for Zofran?
8  A. If you look at attach -- Appendix B --
9  Q. Uh-huh.
10 A. -- Page 4 --
11 Q. Uh-huh.
12 A. -- we received data from the state, and
13 whether they received it from CMS, I don't know,
14 or whether they -- how this sharing occurred, but
15 if you look at -- under the description of the
16 calculations in Table 3-B, "Medicare Copay Damages
17 --"
18 Q. Uh-huh.
19 A. -- we essentially had data that
20 calculated or we were told calculated the total
21 amount of Medicare payments by J-Code for
22 different drugs for the state in the amount that

**1357**

1  was approved and the amount that was paid. The
2  amount that was approved was the total amount, and
3  the amount paid was the 80 percent. And we were
4  instructed by the state that the difference is the
5  -- was the 20 percent remainder copay that had to
6  be covered somewhere.
7     And so, that -- that -- those two
8  numbers from the state, which I -- well, okay,
9  which -- which we received from the state -- and
10 as I say, I would assume are available to you --
11 are the basis for both Table 3-B and 3-C, because
12 essentially, we're saying, Look, Medicare
13 generated -- Medicare reimbursement, what was
14 filed with Medicare out of your state was -- was
15 so much, and we've allowed -- we've approved 100
16 percent of it. We've paid 80 percent of it.
17 There's 80 -- there's 20 percent unpaid.
18    And so, if we go back to the schematic
19 in the MDL report where I do the damages from the
20 top down and we do the Medicare branch and the
21 nonMedicare, and Medicare breaks into the 80
22 percent and then the 20 percent copay, what this

**1358**

1 subtraction is is the 20 percent copay related to
2 amounts that were reimbursed in the State of
3 Connecticut, as we were told the data informed us.
4    Q. Okay. So, the data that you got on this
5 issue you got from the State of Connecticut with a
6 representation that the data reflected the number
7 of Connecticut Medicare payments made in the State
8 of Connecticut.
9    A. The dollar amount -- this was CMS data,
10 so it was shared -- I mean, so I'm assuming it's
11 both CMS and Connecticut. And what direction it
12 came from, I don't know. But it was the -- the
13 amount of Medicare reimbursements by -- by drug
14 that -- that occurred in a given year and that
15 were approved by Medicare and has paid, and that
16 takes care -- and they paid the 80 percent on that
17 schematic. 20 percent remained. When we take the
18 difference between approved minus amount paid, we
19 were told that was the remaining amount of 20
20 percent copay related to all reimbursements that
21 were tracked by CMS for Connecticut for those
22 drugs in that year.

**1359**

1    Q. Okay. So, is it your understanding that
2 the CMS Medicare data sorts by state?
3    A. It's my understanding that the CMS data
4 allows us to do this calculation, or Connecticut
5 wouldn't have told us that that's what it meant.
6    Q. Well, have you -- have you -- you can
7 look at the CMS data yourself, correct?
8    A. One can, yes.
9    Q. And can one look at the CMS data and if,
10 in fact, it can be sorted by state, sort it by
11 state yourself? Could you have done that?
12    A. We were -- we had asked Connecticut to
13 supply this information to us, and -- and it was
14 supplied, and we were given no grounds to be told
15 that this may not be the correct information or
16 the correct interpretation.
17       So, we have taken it as given that this
18 is reliable. Now, if you're telling me -- I mean,
19 we did confirm certain things, but that was
20 something we didn't have the time to confirm, nor
21 were we told it was something that was likely that
22 needed confirming. So, we took it as what we were

**1360**

1 told it meant. Should, on rebuttal, your experts
2 find that those are numbers that need to be looked
3 at more closely, that's something that can be
4 done, clearly. But that's -- that's what we were
5 informed, and we took -- we were directed to use
6 it; that it was reliable, and we've assumed that.
7    Q. All right. So, in other words, you
8 didn't test yourself whether or not the CMS
9 Medicare data you got from Connecticut was, in
10 fact, sorted by CMS so that it was just
11 Connecticut data or, for example, whether
12 Connecticut took the CMS data as a whole on copays
13 and applied some percentage to estimate the number
14 of Connecticut copays?
15    A. No, they didn't do it on copays.
16       MR. NALVEN: Objection.
17    Q. Or on Medicare payments. I'm sorry.
18    A. Yeah, they did it on payments.
19    Q. Right.
20    A. And amount paid.
21    Q. Right.
22    A. And the copay is the residual, and I

**1361**

1 think I've answered the question you're asking. I
2 -- I've -- I assumed they knew what they were
3 doing and they were giving us the right number.
4    Q. Do you have a -- do you have the data
5 that they got -- I'm sorry. Strike that. Do you
6 have the data on Medicare -- Connecticut Medicare
7 payments that Connecticut gave to you, along with
8 whatever explanations of that data provided to you
9 by the State of Connecticut?
10    A. We must.
11    Q. Do you know whether that's been produced
12 to the Defendants in this case?
13    A. I would have assumed that it had been or
14 that you guys would have been hammering on us with
15 -- with gusto, but I -- but I don't know. We can
16 --
17    Q. We've only had since February 14th to
18 hammer, so --
19    A. But you're very good at hammering.
20    Q. There might be more hammering ahead.
21 Okay. Now, let's turn to the last category that
22 is damages that you calculated for nonMedicare

**1362**

1  uninsured consumers in the State of Connecticut.
2  And I direct your attention to Page 5 -- well,
3  it's the last page of your January 19th report.
4      Can you tell us how you went about
5  calculating damages to nonMedicare uninsured
6  consumers in the State of Connecticut?
7      A.  This was very much the way -- this is
8  essentially the -- the methodology as described in
9  the MDL report, start -- because we had -- there
10 were -- one of the Defendants for which we had
11 national data. We could start at -- at the
12 national sales, break it out to Medicare,
13 nonMedicare, using the percentages of NAMCS and
14 the various types of calculations that we -- that
15 we did in the MDL report. We -- we looked at in
16 this -- in the January 2006 set of calculations we
17 looked at those units where the spread exceeded
18 the 30-percent threshold on -- for nonMedicare,
19 and we -- the -- so, the Connecticut units were --
20 well, Connecticut units times the uninsured
21 consumer proportion and the uninsured consumer
22 proportion came from the NAMCS survey, and the

**1363**

1  allocation to Connecticut units of the national
2  units was the 1.35 percent based on our best --
3  the best data we could get our hands on. That
4  happened to be Kaiser Foundation data relating to
5  retail sales of prescription drugs.
6      So, essentially, we went from the
7  national to the state using an analogous approach
8  as in the MDL.
9      Q.  So, that's the same data set, the Kaiser
10 Foundation data relating to retail prescription
11 drugs that you described yesterday when you talked
12 about the data set that you used to estimate the
13 size of the Massachusetts-only class, is that
14 right?
15     A.  Right. And it's --
16     Q.  Okay.
17     A.  -- the Massachusetts class, I think, was
18 like 2.3 percent, and this is 1.35 percent. So,
19 the retail sales of total prescriptions filled,
20 you know, are -- one could use -- absent detailed
21 data from you folks on how many units you sell by
22 state and percentages, we're going to have to look

**1364**

1  at population, we're going to have to look at data
2  on physician-administered drugs and all retail
3  drugs.
4      Q.  Uh-huh.
5      A.  And they probably track fairly well with
6  population, but we use retail sales as a measure
7  of all sales of drugs.
8      Q.  Okay. Okay. So, I want to make sure I
9  understand a couple of other things about this.
10 First of all, with respect to your January 19th
11 report, am I correct is it -- I believe it says
12 here on Page 5 that in calculating liability in
13 damages for this particular group of payers, the
14 uninsured consumers, I applied the 30-percent
15 yardstick?
16     A.  For the calculation --
17         MR. NALVEN: Objection.
18     A.  -- of damages. We're talking about
19 damages here. I was -- it was in excess of --
20 anything in excess of 30 percent --
21     Q.  Okay.
22     A.  -- for the nonMedicare --

**1365**

1      Q.  Consumer.
2      A.  -- consumer.
3      Q.  So, that would be basically the person
4  out there with no insurance, is that right? It
5  says, "uninsured."
6      A.  That's right.
7      Q.  All right. And then am I correct that
8  in your subsequent Connecticut report,
9  supplemental report dated February 9th, 2006, you
10 did not apply the 30-percent yardstick to this
11 portion of the group being analyzed, but instead,
12 applied what we've come to call the zero
13 yardstick, is that right?
14     A.  We've -- what has been termed by some as
15 the "zero yardstick," and I've termed it as a
16 strict reading of the Medicare reimbursement
17 guidelines.
18     Q.  All right. Now, let's talk about the
19 uninsured consumer a little bit, 'cause I -- I
20 want to try to understand your logic here.
21         If we're talking about an uninsured
22 consumer purchasing a physician-administered drug

**1366**

1  such as Zofran or Kytril, they would walk into the
2  doctor's office; they would get the drug; they
3  would get a bill; and they would pay the bill or
4  not pay the bill, is that right?
5  A. Uhm.
6  Q. No insurance involved.
7  A. That's right.
8  Q. Now, how does spread have any impact on
9  that transaction at all?
10  A. The -- it assumes that the doctor bills
11  the uninsured person as it would bill any -- any
12  payer. So, essentially, I'm -- I'm a doc, someone
13  comes in, I send out an invoice, and I'm relating
14  it to AWP, and it's an AWP that's in excess of 30
15  percent, and I discovered that ten of my 1,500
16  patients in a given year were uninsured, and that
17  bill went to them where I was doing my
18  reimbursement as I normally would for the
19  uninsured -- for the nonMedicare group of payers.
20  Q. Have you undertaken any effort to
21  determine whether doctors do, in fact, charge
22  uninsured patients at AWP?

**1367**

1      MR. NALVEN: Objection.
2  A. I have found anecdotal information, but
3  I've really not been asked to do a comprehensive
4  enough analysis to draw conclusions about that.
5  Q. So, you're making an assumption here for
6  purposes of your analysis, but you haven't studied
7  it sufficiently to determine whether it's just an
8  assumption or whether it's an assumption that has
9  a basis in fact, is that right?
10      MR. NALVEN: Objection.
11  A. I'm making an assumption, and I've seen
12  no evidence that leads me to conclude one way or
13  the other whether that's a good assumption or not
14  or a sufficient amount of evidence to make me come
15  to -- that allowed me to come to the conclusion.
16  Q. With respect to your last Connecticut
17  report dated February 9th, am I correct that you
18  changed the way you calculated ASP so that you
19  included hospitals, as opposed to your earlier
20  report where your ASPs did not include hospitals?
21  A. That's correct. The -- the complete
22  description of that change is in Paragraph 1-A.

**1368**

1  Q. Okay. Now, in including hospitals in
2  calculating your ASP, was it your intention, when
3  calculating damages under the second report, to
4  include units that were actually administered in a
5  hospital or not?
6  A. In both cases the data that we -- that
7  I've relied on for the reimbursement under the --
8  under the MAP set of programs were dollar
9  reimbursements. So, that was dollars times units.
10      For the -- for the Medicare copay, it
11  was also the same dollar amounts of units. So
12  that that base data didn't change. For the -- for
13  the uninsured nonMedicare consumer, we maintained
14  the same units that we had before. So, it was --
15  we didn't change the number of units that went
16  through the hospitals. It was still the same
17  units that were subject to the -- to the January
18  report.
19  Q. Okay. So, the -- so your intention was
20  certainly to keep the same units, is that correct?
21  A. That's correct.
22  Q. All right. And if it turns out that it

**1369**

1  -- by mistake when you changed the ASP to include
2  sales to hospitals, you also inadvertently
3  imported units that were administered in
4  hospitals, you would agree that that's something
5  that should be corrected for purposes of your
6  damage analysis, correct?
7      MR. NALVEN: Objection.
8  A. If information -- if any information is
9  brought forward that shows that -- in our
10  interpretation or use of your data, which your
11  client is certainly closer to than ours, we will
12  be glad to take that -- those refinements into
13  account should they prove to be merited and should
14  they be needed.
15      MR. HEROLD: Okay. That's all I have.
16  Thank you.
17      MR. NALVEN: Let's take five.
18      VIDEO OPERATOR: The time is 2:51. This
19  is the end of Cassette 3. We are off the record.
20      (Recess was taken.)
21      VIDEO OPERATOR: The time is 3:01 p.m.
22  This is the beginning of Tape No. 3 in the

### 1370

1 deposition of Dr. Raymond Hartman. We are on the
2 record.
3
4           FURTHER EXAMINATION
5 BY MR. KAUFMAN:
6     Q.  Doctor Hartman, computing the
7 reimbursement for a generic drug under Medicare
8 between 1992 and 2003 involved computing the
9 median AWP for that drug, correct?
10    A.  At a minimum.
11    Q.  Yes, that's right. It's one step. Now,
12 it's the median in what class?
13    A.  It's the median in the class of
14 generics.
15    Q.  Not all generics, though, right?
16    A.  Well, it's generics within that -- that
17 dosage or that are -- that are equivalent or that
18 are considered within that group.
19    Q.  So, is it all NDCs within the same J-
20 Code?
21    A.  It is my understanding that it is all --
22 yes, I think that would be a fair way of saying

### 1371

1 it.
2     Q.  But is that what you did?
3     A.  What we did was we got as much
4 information as we could on all the generics that
5 was -- that -- information that were feasible to
6 work with, and we used Ready Price to do that so
7 that Ready Price had a subset of the generics.
8 So, we generally had a pretty good cross-section
9 such that the median that we were able to estimate
10 from our sample we found and believed to be
11 representative of the median of the broader set.
12    Q.  But median is a matter of count, not
13 just average, correct?
14    A.  It's a matter of count and average.
15 It's a matter of distribution and count.
16    Q.  So, in order to know whether you had the
17 median, you had to know the count.
18    A.  We had to know the count of the drug --
19 we were looking for a median of the sample of
20 drugs for which we had generic AWPs. We didn't
21 look for a count of all the ones for those -- for
22 which we didn't have an AWP, 'cause we wouldn't

### 1372

1 know where to place that in the -- in the
2 hierarchy without that data.
3     Q.  Now, calculating the but-for
4 reimbursement for a Medicare generic likewise
5 involved computing the but-for median AWP,
6 correct?
7     A.  In -- in the periods of time -- are we
8 talking now under -- under a Medicare
9 reimbursement formulation? What are you --
10    Q.  Yes. Medicare is what I'm talking
11 about.
12    A.  Okay, under Medicare. Under Medicare
13 the but-for reimbursement rate when we would be
14 looking are to -- when we went in 2004 when it
15 went to 85 percent of the AWP and it just didn't
16 look at the -- as you were saying -- through 2003,
17 it would require calculating but-for AWPs for all
18 of the generics.
19    Q.  That year you found you didn't have the
20 data sufficient to compute the median AWP,
21 correct?
22    A.  In that year we would have needed data

### 1373

1 from at least a substantial number of generic
2 companies to do that calculation, and we didn't --
3 we didn't do that.
4     Q.  Why -- why wasn't that also required for
5 the earlier years from '92 through 2003?
6         MR. NALVEN: Objection.
7     A.  Because under Medicare the reimbursement
8 rate was the estimated acquisition cost or the
9 median of the generic -- of the generic prices,
10 and so, the drugs were out there, as they were,
11 and we weren't -- we weren't calculating but-for
12 AWPs for all the other drugs.
13    Q.  Let's take a particular NDC of
14 Albuterol, a generic drug. In 1997 you find that
15 the spread is greater than 30 percent, and
16 therefore, its AWP has to be recomputed to the
17 but-for AWP -- this is in 1992. You find that its
18 AS -- you know its ASP. In order to determine what
19 the but-for AWP is for that NDC of Albuterol,
20 don't you have to find -- or the reimbursement
21 rate for it -- don't you have to find the median
22 but for AWP?

**1374**

1  A. No.
2  Q. Why not?
3  A. What -- in -- in looking at -- in
4  proceeding sequentially in a threshold -- with the
5  threshold, I first look at whether Albuterol
6  exceeded the threshold of the expect -- the market
7  expectations we've been talking about, the upper
8  bound, the 30 percent. If -- if it did, then it
9  was in the -- in the December 15th analysis it was
10 included for damages under Medicare, and if it was
11 included for damages under Medicare, what I'm --
12 I'm just saying that in that case it had exceeded
13 the threshold of liability; the damage
14 calculations are formulaically set out; they don't
15 require another but-for analysis. They've already
16 -- they've exceeded the -- the spread in that
17 threshold, and now, if that has been the case,
18 then the damages are calculated as the -- the CFR
19 indicates.
20 Q. And the CFR indicates that you reimburse
21 at the lower of the median AWP for the generics in
22 a J-Code or EAC, right?

**1375**

1      MR. NALVEN: Objection.
2  A. That's right.
3  Q. So, you'd have to find the median AWP
4  for all of the generics in the J-Code.
5  A. The -- what we did was we looked for as
6  many median generics within the J-Code that were
7  available in Ready Price that were easily
8  accessible with -- and so, we -- we pulled those
9  together, and what that would -- you know, in some
10 years I've looked at Albuterol, you know, we were
11 -- there were 10 or 15 --
12 Q. Uh-huh.
13 A. -- different generic formulations
14 available. Some years Ready Price didn't have all
15 of them, but it was impossible for us in the time
16 frame to go to Redbook or to pull this information
17 up from all of the Redbook sources and the median
18 that came from the subset of drugs provided a
19 sufficiently reliable calculation to do -- to do
20 the analysis of what the difference was between
21 what the payment should have been under Medicare
22 and the estimated acquisition cost.

**1376**

1  Q. Let me ask this question a different
2  way, 'cause I think we're not communicating.
3  Let's suppose that the particular NDC that you say
4  was overpriced -- its AWP was more than 30 percent
5  higher than its ASP.
6  A. Uh-huh.
7  Q. It was below the median. So, in
8  historical fact, it was reimbursed at the AWP of a
9  different drug, the median.
10 A. (Witness nods.)
11 Q. Now, in the but-for world, its AWP is
12 lowered yet more to reflect what you say its AWP
13 should have been. It's now even farther below the
14 median, but it's not being reimbursed at its AWP.
15 It's being reimbursed at the median.
16 A. Well --
17 Q. Right? Isn't that correct?
18 A. Well, let's -- let's focus on that --
19 Q. Yes.
20 A. -- because I'm not --
21 Q. Please, I'd like us to do --
22 A. We are talking past one another. Let's

**1377**

1  come up with some alternative situations.
2  Q. No. No. Please, just answer my
3  question. Isn't it true that it should have been
4  reimbursed at the median AWP of the NDCs in the J-
5  Code, correct? Correct?
6  A. A given drug should be reimbursed at the
7  median AWP of the J-Code.
8  Q. And if changing the AWP of this
9  particular NDC does not affect the median, it does
10 not affect reimbursement, correct?
11 A. If the -- if a given drug -- the --
12 there's two things going on there. You said if
13 changing the AWP affected something --
14 Q. No. No. No. I never said that.
15 A. You said if changing -- I heard you say
16 --
17 Q. Let me say it again then.
18 A. Okay.
19 Q. If changing the AWP does not affect the
20 median, then it does not affect reimbursement.
21 A. Okay. Well, you're not -- you know,
22 you're choosing what you're saying. You didn't

Raymond S. Hartman, Ph.D. CONFIDENTIAL
Boston, MA
March 1, 2006

1378

1 say that, and it doesn't change things. If
2 changing the AW -- we're looking at a state of the
3 world here. Let's see. There's a number of
4 things changing at one time. So, suppose we have
5 a set of drugs here, and we have a version of
6 Albuterol, and suppose it's your version of
7 Albuterol.
8     Q.  Okay. So far we agree.
9     A.  Okay. And suppose now I look at the
10 median AWP, and its spread is 35 percent, let's
11 say.
12    Q.  Spread from what, from a median ASP?
13    A.  I'm saying its own -- I'm looking at its
14 own pricing. I'm not looking at reimburse -- I'm
15 looking at its pricing behavior of how it -- it
16 sets AWP and the signals for its own drugs. I'm -
17 - -- the --
18    Q.  Go ahead. This is your -- you're the
19 witness. You go ahead.
20    A.  Okay. I'm glad you're going to allow me
21 that. You can ask the questions, but let me
22 answer them. I'm looking at manufacturer behavior

1379

1 in setting AWPs and whether that's a signal for
2 what the underlying ASPs is. So far we're not
3 talking anything about a Medicare reimbursement.
4 It's how AWP is set. And so, AWP is one of the
5 many AWPs that are going to enter into this
6 median, okay? So, so far we're together.
7     Now, suppose your client -- suppose the
8 median -- another drug company out there is
9 setting its AWP in excess of the 30-percent
10 threshold. That's the median, okay?
11    Q.  Okay.
12    A.  Well, I mean that you're --
13    Q.  Well, the median is a number. It might
14 be one drug company's or it might be six?
15    A.  Okay.
16    Q.  There may be six, there may be 12, and
17 their spreads may all be different. The median is
18 just a number that is midway between, with as many
19 on top as below. It's not a particular company.
20 It's a number, right?
21        MR. NALVEN: Objection.
22    A.  You --

1380

1     Q.  This is arithmetic. This is not
2 economics. This is arithmetic.
3     A.  I'm -- let's -- let's slow this down
4 here so that it makes -- so that it's a record
5 that I understand that comports with what has been
6 stated in my -- in my opinion -- in my opinions.
7         Right now there may be ten drugs; there
8 may be 15 drugs; there may be 20 drugs. Five of
9 them may have the same AWP. 10 of them may have
10 the same AWP. It can encompass any variation of
11 what you're doing. You come to that set of drugs
12 and, bang, we pick the median, okay?
13        Now, for -- per your hypothesis or your
14 hypothetical, I'm understanding you to say that
15 that median is whatever it is, but Shering's drug
16 is below that median.
17    Q.  Yes.
18    A.  Okay.
19    Q.  That's the hypothesis.
20    A.  Please, let's not add any detail. Let
21 me just -- let me stay -- let's keep going from
22 there. Thank you. Okay. Now, if that -- if

1381

1 Shering's AWP and how they are setting that
2 relative to ASP determines its behavior. I mean,
3 that -- well, it's setting its ASP. It's not
4 setting the median. It has no control over the
5 median, although in a -- in drug companies where
6 you have a small number of competitors there is
7 going to be some indeterminacy among all of the
8 prices. But if there's a median AWP that's out
9 there and it happens to be that Shering's is below
10 that, and Shering's relationship to its ASP is
11 less than 30 percent --
12    Q.  That's not my hypothesis.
13    A.  Well, I'm just -- I'm going through
14 alternative.
15    Q.  Why don't you go through mine first.
16    A.  I see. So, you want to go -- you want
17 to make it above 30 percent?
18    Q.  It's above 30 percent.
19    A.  Okay. So, you're saying it's above 30
20 percent, and so, they've -- according to the --
21 according to the expectations, they've exceeded
22 the threshold of -- of liability, and under the --

### Page 1382

once they've done that, they've tripped the speed limit. Now, it -- you happen to be in the analogy we had before. You happen to have not just one car exceeding the speed limit, but you have, like, five drag racing, and the ticket price is set to the guy who's speeding -- or the median speeder.

So, you've exceeded the -- you're -- the threshold of your drug has been exceeded, but under Medicare, the damages are set by a rule that is geared toward the median AWP.

Q. So, tell me how to compute the damages in that situation.

A. The damages in that situation are the median AWP, if that's -- if -- if we're in a year when it's the lesser of the median AWP and the estimated acquisition cost, then it's -- the damages are the median AWP, minus the estimated acquisition cost, and that -- times the number of units.

Q. That's because you're assuming your interpretation of the regulation in that instance that makes EAC identical with ASP, despite the

### Page 1383

fact that Medicare was telling everyone not to do that. So, assume for me for now --

A. Well, what --

Q. Let's just --

A. Wait a minute. What --

Q. Let's just assume --

A. That's not -- you've -- you've just introduced something.

Q. But I haven't asked you a question. So, you should wait until I do.

MR. NALVEN: Let him ask the question.

Q. My question --

A. You've characterized --

Q. My question -- you can characterize me afterwards.

MR. NALVEN: Let him ask the question.

Q. Right now let me ask you the question.

MR. NALVEN: And give me an opportunity to object to all the assumptions in the question.

THE WITNESS: Okay.

MR. NALVEN: And then you can answer the question.

### Page 1384

THE WITNESS: Okay.

Q. Okay. Here's the situation: You're wrong in thinking that EAC is an alternative to median AWP as a basis for reimbursing generic drugs from '92 to '97. You're wrong.

A. Is this an assumption?

Q. Yes. This is an assumption.

A. Okay.

Q. This is an assumption. And you're also wrong when you think that actual charge from 1998 to 2003 is the amount charged to the physician, rather than the amount charged by the physician. So that in that whole time period, from 1992 through 2003, the actual reimbursement regime in effect under Medicare for generic drugs is to reimburse at the median of the AWPs for the generics within the J-Code. Okay. That's the assumption. On that assumption -- okay, on that assumption you are to tell me, please, how do you compute damages for Shering's having priced its Albuterol at more than 30 percent of its ASP when still its AWP is below the median?

### Page 1385

MR. NALVEN: Objection.

Q. Okay. Do you understand the hypothesis?

A. Well, let me see. What I'm understanding you to ask me to assume is -- not that I'm wrong globally or --

Q. No.

A. -- or as a human being, but in my interpretation of the Medicare statute that it was not the lesser of the estimated acquisition cost and the median AWP, but it was only the median AWP, and that was the amount charged. Is -- is that -- and that -- is that --

Q. That is the --

A. That's the way you're saying the statute really did work or that's --

Q. That was the regulation at that time, I'm asking you to assume. And in that context, Shering's Albuterol has an AWP that's greater than -- more than 30 percent.

A. Uh-huh.

Q. Higher than its ASP, but still below the median AWP for the J-Code. In that situation,

**1386**

1  what damages are properly assessed against --
2  Warrick. It is actually not Shering. Okay, please
3  tell me that.
4       MR. NALVEN: Objection.
5       A. My -- my damage is subsidiary to the
6  threshold calculation, and if you're telling me
7  that a -- the proper interpretation of the
8  Medicare statutes never had a reliance upon
9  acquisition cost as an alternative or as a lesser
10 of, and that it was always going to be at the
11 median AWP, and that the -- that essentially --
12 then -- then -- certainly the damages would be --
13 would be different than the way I've calculated
14 them.
15      Q. Yes, that I -- I would say so, too. And
16 how would they differ? What would they be?
17      A. If in this state of the world the only
18 thing that changes -- you've got the dispersion of
19 prices, the AWPs as they exist, and doctors are
20 reimbursing at the median, and there's -- and they
21 were not supposed -- and that's exactly what they
22 were supposed to be using, and -- and that's --

**1387**

1  subject to the law, then they would -- they would
2  -- under -- they would have exceeded the
3  threshold, but you'd still be calculating the
4  reimbursement rates the same way. So, the damages
5  under that set of assumptions, which I understand
6  are contrary to the regulations, the calculation
7  would be zero.
8       Q. Okay. And I understand you don't
9  endorse the assumptions. I'm not asking you to.
10 But I believe you also admitted that you are not
11 an expert on those assumptions, on the meaning of
12 the Medicare regulation or statutes.
13      MR. NALVEN: Objection.
14      Q. Did I understand that correctly?
15      A. You did understand that correctly.
16      Q. Going now to NAMCS data, which -- about
17 which you wax poetic --
18      MR. NALVEN: Note my objection.
19      MR. KAUFMAN: Yes, I do.
20      Q. If you look at J.7.A, --
21      A. I like to think of it as waxing poetic.
22      Q. -- your December 15th MDL report,

**1388**

1       A. Okay. I'm sorry. Let me turn to that.
2       Q. Yes, please. I think that's Exhibit
3  Hartman 023.
4       A. And I'm sorry. Which --
5       Q. J.7.A.
6       A. J.7.A. Okay.
7       Q. It's almost at the end.
8       A. Right. Okay.
9       Q. Okay. Near the bottom -- let me just
10 make sure I understand correctly and the record is
11 clear what this page does. I understand this page
12 to show your allocation of usage of the products
13 listed among the several categories of users,
14 including Medicare, nonMedicare, Medicaid and
15 excluded. It does that.
16      A. The J.7.A is -- is in three pages, and
17 the first page reiterates the NAMCS categories
18 through Column 11, with additional adjustments
19 later. But the first page lists the data that is
20 available from NAMCS and that certain adjustments
21 need to be made to that to exclude government
22 reimbursement under -- to just the NAMCS -- the

**1389**

1  raw data -- to come up with the categories that
2  are relevant to the damages.
3       Q. Okay. If you turn then to the third
4  page where there are the Columns 23 through 32, do
5  you see that?
6       A. I do.
7       Q. Yes. Okay. That's where I meant to be,
8  in the columns farthest to the right, 30, 31, and
9  32. You have them labeled "Medicare, nonMedicare,
10 Medicaid," and "Exclude." And then in each of
11 those columns there are percentages, is that
12 correct?
13      A. That's correct.
14      Q. And those percentages are percentages of
15 what?
16      A. Those are percentages of units
17 reimbursed under those types of payers, period.
18      Q. Okay. So, for the product that's first
19 listed under Shering-Plough near the bottom of
20 that page --
21      A. Yes.
22      Q. -- Albuterol, if you go farthest to

**1390**

1   Column 30 it says, 75 percent under Medicare.
2   That says that 75 percent of the units of
3   Albuterol manufactured by Shering-Plough -- it's
4   actually Warrick -- were used by Medicare, is that
5   correct?
6       A.   It says 75 percent of those units
7   administered in a physician's office --
8       Q.   Okay.
9       A.   It's not globally, because I'm focusing
10  on providers here. And given the fact that it --
11  on Page 1 that the -- we didn't have NAMCS -- we
12  didn't have NAMCS data for Albuterol. The -- this
13  is a -- this is an informed proration based on the
14  team that I had constituted to pull the NAMCS data
15  together and then to -- to value add that to get
16  the best estimates we could.
17      Q.   Okay. I understand that, and I'll come
18  back in a minute to how you arrived at the numbers
19  you did. I'm trying now to understand what you
20  mean by the numbers that you've got there.
21      A.   Okay.
22      Q.   So, the 75 percent is -- signifies that

**1391**

1   -- by your account -- 75 percent of the physician-
2   administered units of Shering -- of Warrick's
3   Albuterol were administered to Medicare patients?
4       A.   That's correct.
5       Q.   Okay. And for what period of time is
6   this? Is this the whole class period?
7       A.   This is -- this data we gathered
8   probably for as much of the class period as we
9   could get. The observations there -- there from
10  NAMCS, if the NAMCS data were available.
11      Q.   Okay.
12      A.   So, that's saying over the -- over the
13  class period, for those -- for those doctors'
14  visits in which Albuterol was administered, based
15  on the information we have, 75 percent of those
16  units visits were reimbursed under Medicare and 25
17  percent under nonMedicare setting.
18      Q.   Okay. Leaving zero reimbursed under
19  Medicaid and others.
20      A.   Under the Medicaid and Exclude, that's
21  correct.
22      Q.   But what -- well, the Exclude is -- well

**1392**

1   --
2       A.   That's right and others to be excluded.
3       Q.   Okay.
4       A.   There's others in -- well, that's --
5       Q.   Well, the Exclude would include all of
6   the Connecticut programs under the Medical
7   Assistance Program, right?
8       A.   That -- that is correct.
9       Q.   Okay. So, what this says is Connecticut
10  didn't reimburse any Warrick Albuterol from '91
11  through 2003 through any of its medical assistance
12  programs, correct?
13      A.   This is saying that -- that the NAMCS
14  data and our analyses refining that data picked up
15  on the radar screen none that was reimbursed or
16  dispensed through Medicaid or Connecticut-type
17  program.
18      Q.   Well, not even just Connecticut. This
19  is any state.
20      A.   That's -- that's right.
21      Q.   Okay. And you used these percentages to
22  compute damages for the MDL, correct?

**1393**

1       A.   That's correct.
2       Q.   For the whole class period.
3       A.   That's correct.
4       Q.   And yet in Connecticut, in your January
5   19th report -- let's go to that. I'm going to
6   find the pages Page 1 of 20 in the calculation of
7   damages included in your January 19th report --
8       A.   Page 1 of 20. Okay.
9       Q.   -- shows that for Warrick, SP -- that's
10  Shering-Plough, right?
11      A.   That's correct.
12      Q.   There's a total during the period
13  covered there from '93 to 2005 of almost $16
14  million.
15      A.   That's over -- that's right, over that
16  period, '93 to 2005 an estimate of 15.8 million.
17      Q.   Okay. And it's broken down by year, so
18  we can see for which years you say there were
19  damages. Some were for 2005 and 2004, which I
20  think were not covered by your MDL calculation.
21      A.   The --
22          MR. NALVEN: Objection. I mean, the

## Page 1394

1  numbers are what they are.
2   A. Oh, you're --
3   Q. Can you tell us so we know whether your
4  MDL calculations included damages for 2004 or 2005
5  for Albuterol?
6      MR. NALVEN: Objection.
7   A. Under Medicare, given that it was multi
8  source, there would have been no Medicare damages
9  in those two years.
10  Q. Okay. But in 2003?
11  A. For a multi-source drug.
12  Q. Okay. This is for --
13  A. Not for Shering-Plough necessarily.
14  Q. Right. But in 2003, 2002 and so on, you
15  were using your zero percent allocability to
16  Medicaid in your MDL report to calculate damages
17  for the MDL, right?
18  A. In the MDL report, the data that -- that
19  we had provided no estimate of reimbursement under
20  Medicaid for Albuterol.
21  Q. And so, you assumed and calculated
22  damages assuming that all of the usage of

## Page 1395

1  Albuterol was for Medicare or private?
2   A. After -- after examining the information
3  that -- that we had, that -- that is the final
4  allocation that -- that we did, remembering the
5  following. (Witness reviews document.)
6   Q. Yes.
7   A. I'm turning --
8   Q. Yes, I'm waiting to see.
9   A. It takes a while to -- it takes a while
10  to get to -- (Witness reviews document.) What I'm
11  looking for is exclusion of units from the MDL
12  matter where we tried to exclude all units
13  reimbursed either -- either in direct sales to
14  governmental entities or that were paid for by
15  governmental entities, and I'm trying to see
16  whether we were able at that -- in that
17  calculation to do an exclusion for Medicaid-
18  related sales based on the rebate data and rebates
19  paid by your client, and until I'm able to fully
20  examine that, I can't tell for sure here whether
21  we were able to -- whether your data permitted us
22  to net out units reimbursed under Medicaid before

## Page 1396

1  we applied the 75 percent/25 percent, but I --
2  that's why I'm looking at my MDL list of your --
3  your data here and the codes that we used to -- to
4  exclude units wherever we could. And we knew that
5  there were Medicaid units involved. We excluded
6  them at the top of the chain when we could. So,
7  I'm trying to just see if that -- if we were able
8  to do that for your client.
9   Q. Okay.
10  A. Well, I can't -- I'd have to look more
11  closely to be able to -- and that's something I
12  can do for --
13  Q. Well, let me ask you this: Is there
14  anyplace outside your report itself where that
15  information would be shown, or are you looking
16  only within your report itself?
17  A. I am -- for some manufacturers we have
18  been able, with the extended invoices with the --
19  with the invoice database, with the charge-back
20  database, with the rebate database -- identify
21  numbers of units that received Medicaid rebates
22  and were able to net those out of units that would

## Page 1397

1  be subject to class impact, and we -- and we've
2  used that. Now, I don't know whether that data
3  was available for -- for your client, so I can't
4  say that we --
5   Q. No, but I'm asking where you would find
6  out. Would I find out by looking through this
7  report itself?
8   A. You would, yes.
9   Q. Okay.
10  A. Okay.
11  Q. Okay. Then I'm confident you won't find
12  it, because it's not there.
13  A. Well, it's either --
14  Q. You can -- that's fine.
15  A. No. No.
16  Q. As long as we all know where to look.
17  A. We know where to look.
18  Q. And it's there or it isn't.
19  A. Right.
20  Q. Okay. Fine. Now, just you can satisfy
21  yourself, I won't make you look, but I can assure
22  you -- and you can assure yourself if you want --

### 1398

1  that Albuterol NDCs that are included in the MDL
2  are also included in your Connecticut Medicaid
3  calculations. And I could -- I'll read them off
4  for the record, then you won't even have to go
5  look for yourself. I'll tell you which they are,
6  but I can't read them. 5993015.1504, 59930150006,
7  59930150008, 59930151701, 59930151702. So, when
8  you get the transcript, you'll be able to look and
9  satisfy yourself that those same NDCs which you
10 say were sold 75 percent to the feds/25 percent to
11 private payers, you also say in Connecticut were
12 sold to Connecticut.
13     A.  I see what you're referring to, and --
14 and, yes, I will -- I will look at that.
15     Q.  Also, in -- did that not occur to you
16 before, before today?
17     MR. NALVEN: Objection.
18     A.  What -- what occurred to me before today
19 is that in modeling a market at the level of
20 complexity that we were doing it in the MDL, we
21 needed to take a lot of things into account, and
22 we needed to get the best estimates that we could

### 1399

1  at the level at which we were conducting the
2  damage analysis. So, we pulled the best data that
3  was easily accessible. There was data we asked
4  for that could have helped us identify just what
5  you're getting at, such as the IMS NDTI data,
6  which we weren't given. We had asked for data
7  from Defendants, we did not receive that. That
8  may have told us something more about Medicaid
9  visits and for -- for Albuterol, but at the level
10 of the MDL analysis, it proceeded at an aggregate
11 level for the country as a whole and then dealt
12 with a national class of beneficiaries under
13 Medicare, and then -- and then state class of --
14 Subclasses 2 and 3. So, it proceeded at a -- at
15 that level and did so using appropriate methods
16 and appropriate assumptions for the analysis at
17 that point.
18     Now, you're -- you're asking me did it
19 occur to me to go to Connecticut, but frankly,
20 we've been --
21     Q.  Oh. No. No. That's not what I was
22 asking.

### 1400

1     A.  Well, what I heard you ask is -- and let
2  me -- you said -- did it -- you just said didn't
3  it occur to me to think about whether that there
4  could be some inconsistencies, that I'm seeing
5  NDCs here that are appearing in damages that we're
6  finding in Connecticut for -- for NDCs that I'm
7  not subtracting away or netting out of the -- the
8  MDL matter. And if that's not what you're asking
9  that -- that's what I would think you should be
10 asking, but --
11    Q.  And I'll hear the answer, go ahead.
12    A.  And the answer is, we -- at the level of
13 the MDL, we proceeded, as is appropriate, for an
14 analysis at that level of aggregation. We -- I
15 would have loved to have taken another year and
16 gotten Medicaid's claims data from every state and
17 processed that data and done this by state so that
18 I could have come back and done a state-specific
19 calculation of -- of refining these data, but we
20 did not have the time to do it. And does that
21 mean that having seen this here there might be
22 some refinement that could be introduced here?

### 1401

1  Perhaps. I'd need to -- I'd need to look at it
2  more closely.
3     Q.  How did you arrive at the 75 percent/25
4  percent allocation for the MDL?
5     A.  One last --
6     Q.  Okay.
7     A.  -- comment on the other thing is that
8  probably one of the more useful steps before I
9  were to undergo a state-by-state analysis of the
10 Medicaid data would be for me to get the -- the
11 NDTI data from Defendants to look at what they're
12 attributing to Medicaid to try and enrich the
13 NAMCS data before I would even consider doing
14 something like this, and we are still waiting on
15 that.
16    Now, if -- proceed with the next
17 question.
18    Q.  Well, let me -- let me give you the
19 chance to make a little more of a speech on that.
20 Why didn't you subscribe to that data yourself?
21    MR. NALVEN: Objection.
22    Q.  You knew it was there for years. Why

**1402**

1  didn't you ask for it, direct it?
2      A. Because it has been our experience that
3  when we approach IMS in a -- in a position of --
4  that's adverse to pharmaceutical companies, they
5  won't -- they don't sell it to us.
6      Q. So, you've tried and they've declined?
7      A. Well, we've read their contract. Their
8  contract is it can't be -- it can't be -- we
9  couldn't buy it to use it in litigation, so we
10 don't. We can't buy it.
11     Q. Don't we have the same contract that
12 would prevent our giving it to you for use in
13 litigation?
14     MR. NALVEN: Objection.
15     Q. Okay.
16     A. I think we're getting on legal things
17 but under --
18     MR. NALVEN: Let's move on to the next
19 question.
20     THE WITNESS: Yeah.
21     Q. So, tell me the allocation, how did you
22 arrive at 75 percent/25 percent allocation of

**1403**

1  Albuterol sales manufactured by Warrick?
2      A. I asked the team of -- of affiliates
3  that we have at the Harvard School of Public
4  Health, Doctor Rosenthal being one of them, to
5  look at the -- there -- in terms of the research
6  they've done, the types of drugs they've looked at
7  to look at the profiles of drugs that are
8  reimbursed in different contexts, to try and
9  enrich the NAMCS data and improve upon it where --
10 where we could.
11     We did so by introducing the -- the DOD
12 purchases, using -- with supplemental calculations
13 that appear in Attachment J.2.B -- J.7.B, I'm
14 sorry, and the indirect purchases through private
15 third-party payers. The -- given the -- the time
16 frame and the -- the information we had, we did
17 the best adjustments we could, and it appears and
18 what's -- that's the result of that process for
19 Albuterol.
20     Q. Well, for Intron A, which is a Shering
21 product, there were fewer data points in the NAMCS
22 data than there were for Albuterol, yet you relied

**1404**

1  on the NAMCS data for Intron A and rejected it for
2  Albuterol. How come?
3      MR. NALVEN: Objection.
4      A. Well, because we were interested in the
5  Albuterol for Shering-Plough and it was not -- it
6  was just Albuterol specific rather than Shering-
7  Plough specific.
8      Q. So, you couldn't tell from the NAMCS
9  data which were Shering-Plough or Warrick and
10 which were other manufacturers?
11     A. We couldn't decipher from the NAMCS
12 data, among -- what manufacturer of the drug was
13 provided in a multi-source context.
14     Q. And is that true for all generics?
15     A. I've -- this was something that was told
16 to me by -- I'd have to -- I'd have to check with
17 the staff on that.
18     Q. But there would be no difference between
19 Albuterol and any other generic, would there?
20     MR. NALVEN: Objection.
21     A. I would have to check with -- with the
22 staff on that. There are people closer to the

**1405**

1  NAMCS data than I am and --
2      Q. Did you --
3      A. -- and they're the people that ran it.
4      Q. Did you rely on the NAMCS data for other
5  generics?
6      A. The -- I would have to -- I cannot be
7  sure which one of all of these are generics or
8  not. Since you know the answer to the question,
9  why don't you point them out to me.
10     Q. No, I don't know. I would like you to
11 tell me.
12     A. Well, I'm -- I --
13     MR. NALVEN: Objection.
14     A. I asked my staff to do what they could
15 with the NAMCS data to be specific for
16 manufacturers, and I was told that that -- that
17 they couldn't do that for Albuterol, and so, I'm
18 curious whether --
19     MR. NALVEN: Mr. Kaufman isn't asking
20 you to guess.
21     Q. That's right. If you don't know, then
22 you should tell me you don't know. Did Doctor