Raymond S. Hartman, Ph.D. CONFIDENTIAL                March 1, 2006
Boston, MA

1406

1   Rosenthal contribute to your decision to make the
2   75 percent/25 percent allocation?
3       A.  She, along with a variety of people,
4   contributed to that decision.
5       Q.  And in particular you remember that she
6   did contribute to that one?
7           MR. NALVEN: Objection.
8       A.  She was involved in -- in conversations
9   regarding a variety of data issues, as were a
10  number of -- of my colleagues at Harvard.  So, I -
11  - I can't remember whether Albuterol was her
12  primary focus.
13      Q.  I didn't ask whether it was or not.  Did
14  she venture an opinion, provide any information
15  that you used in making the 75 percent/25 percent
16  allocation?
17      A.  I asked my staff to look at this data
18  and -- and -- and do the -- gather whatever data
19  it was possible to do within a period of time in
20  which we -- we were allowed to give his most
21  refined a set of estimates for these allocations
22  we could get, and this is what I received.

1407

1       Q.  Right.  And did Doctor Rosenthal say
2   anything or venture an opinion that was used by
3   you or your staff in arriving at the 75 percent/25
4   percent allocation?
5           MR. NALVEN: Objection.
6       A.  I think I've -- I think I've answered.
7       Q.  No, I think you haven't.
8       A.  She's -- she's part of a group that led
9   to these results.
10      Q.  Did anything she did lead to that result
11  in particular?
12      A.  I don't know.
13      Q.  Okay.  That's an answer.  Now, you --
14  are you aware that under the Connecticut Medical
15  Assistance Programs, at least some of them,
16  reimbursement may be at the federal upper limit?
17      A.  I am.
18      Q.  The methodology you described to Mr.
19  Herold would not have allowed you to identify
20  which payments historically had actually been made
21  at the upper -- the federal upper limit rather
22  than on the basis of AWP, is that correct?

1408

1           MR. NALVEN: Objection.
2       A.  If you let me check one thing.  (Witness
3   reviews document.)  Since I'm looking at -- in
4   Connecticut I'm looking at Attachment D to that --
5   to the -- to my expert disclosure of November 1st,
6   2005, and I'm looking at -- this was submitted as
7   Attachment D to my affirmative declaration in
8   support of class in this matter.
9       Q.  "This matter" the MDL?
10      A.  The MDL.
11      Q.  Well, we're talking Connecticut now.
12  But whatever.  Go ahead.
13      A.  You -- it is my understanding that the
14  federal upper limit is required to be set at an
15  amount of 150 percent of a published AWP -- of the
16  lowest AWP or WAC in a standard pricing
17  compendium.  And as I've observed for most drugs,
18  150 percent of the lowest AWP is usually above the
19  estimated acquisition cost in a generic setting
20  where there are three generics.
21          So, when I read the Connecticut statutes
22  to say that reimbursement is going to be the

1409

1   lesser of FUL or usual or customary or the
2   estimated acquisition cost, the lowest of those
3   prices are invaluably the estimated acquisition
4   costs.
5           So, yes, I know that FUL was cited there
6   and if -- if that were used in a particular case,
7   then it was used in -- in contravention to how I
8   read what the enabling Connecticut statutes were
9   for that reimbursement, which I have taken as the
10  basis for reimbursement for Connecticut.
11      Q.  Well, let's -- let's look at some FULs
12  that were actually in place during this period --
13      A.  Okay.
14      Q.  -- for drugs that you actually compute
15  damages for without regard to them.
16      A.  Okay.
17          MR. NALVEN: Objection.
18          MR. KAUFMAN: So, this will be the next
19  exhibit.  I don't know what that is.
20          (1999 Redbook marked Exhibit
21  Hartman 063.)
22      Q.  If you turn to the first page of what

Raymond S. Hartman, Ph.D. CONFIDENTIAL                 March 1, 2006
Boston, MA

1410

1  I've just handed you, I'm telling you I don't
2  expect you to know that this is an excerpt from
3  the 1999 Redbook that says on the first page after
4  the cover, "The following list provides federal
5  upper limit prices for Medicaid reimbursement of
6  multiple source drugs effective September 1,
7  1998."
8        And then underneath in the column to the
9  left, there's Albuterol listed. The first item
10 under it is A-R-D-I-H 90 MCG17GM, and then the FUL
11 listed there is $7.47." Do you see that?
12     A.  I do.
13     Q.  Okay. If you turn to two pages after
14 that -- I'm going to get this right -- let me see.
15 (Witness reviews document.) Yeah. Two pages
16 after that, two items down "Warrick --" it says
17 there, "Warrick, ARDIH .09 MG per INH," and then
18 it gives an NDC number. And it lists the AWP for
19 that NDC --
20     A.  I'm sorry. I'm sorry. I'm trying to
21 see the dosage comparison here.
22     Q.  Yeah, I think that's on the page in

1411

1  between.
2       A.  They're slightly different units.
3       Q.  I know. This is hard to follow. Sorry.
4  And then on the second -- if you go to the third
5  page of the document -- so, the cover page, the
6  first page --
7       A.  No -- yeah. I see that price.
8       Q.  Okay. There's an Albuterol, HCFA --
9  okay. That's 747. 90 MCG. The next page gives
10 you the -- the 21 -- $21.41 for the AWP and an
11 NDC.
12       Now, if we look at -- let's see --
13      A.  (Witness reviews document.) I'm -- can
14 I --
15      Q.  Yes, I haven't finished taking you
16 anywhere yet, because I have to put a lot of
17 things together, but go ahead if you have a
18 question.
19      MR. NALVEN: Steve, it might be helpful
20 if you held up the document and pointed to the
21 specific entry that you wanted him to look at.
22      MR. KAUFMAN: Okay.

1412

1       A.  Well, let me just ask, I'm seeing on the
2  first page we're talking about the federal upper
3  limit, Page what's 7 -- Page 79, and under ARDIH,
4  90 MCG, 17 grams, $7.47.
5       Q.  Which is the upper limit, right?
6       A.  It says that that's the federal upper
7  limit.
8       Q.  Then if you go down a little bit -- yes,
9  okay. Right.
10      A.  Okay. So, let's -- if we're sticking
11 with that, then I'm seeing on the next page where
12 it seems you were going.
13      Q.  Above the gray in the middle column?
14      A.  Right. I'm seeing ARDIH, 90 MCG 17
15 grams.
16      Q.  17 grams. The same $7.47 upper limit?
17      A.  Which is here characterizing it as the
18 AWP at the top of the column, which I don't.
19      Q.  No, I don't understand that, because the
20 next one, AWP for that same one is $21.41.
21       Does it say AWP? (Reviews documents.)
22 Yeah, I think this is -- this is not clear.

1413

1       A.  I think that's fair to say.
2       Q.  I think the AWP is -- you'll remember
3  that Medicare defines reimbursement for multi-
4  source drugs as the AWP, which it defines to be
5  the lesser of FUL or median AWP for all NDCs in
6  the J-Code.
7       So, AWP on the second page is AWP for
8  reimbursement purposes, which, by definition in
9  Medicare, is FUL or median AWP.
10      A.  Wait. Wait. Wait. Wait. Are we
11 talking about --
12      MR. NALVEN: Let me --
13      A.  -- Medicare or --
14      MR. NALVEN: Excuse me. Is there a
15 question pending, or are you asking Doctor Hartman
16 to look at something specifically on the document?
17 'Cause -- 'cause I'm lost at this point.
18      MR. KAUFMAN: I know, because we're -- I
19 would like him to see that there is an FUL for an
20 NDC that is included in his calculation of damages
21 for Connecticut.
22      A.  And I will certainly acquiesce to my

Raymond S. Hartman, Ph.D. CONFIDENTIAL
Boston, MA

March 1, 2006

---

1414

1  understanding that there are FULs for -- for
2  multi-source drugs that meet the criteria under
3  the -- what I had just read in the footnote --
4      Q.  Okay.
5      A.  -- to Attachment D.
6      Q.  Now, this FUL might have been the basis
7  for reimbursement historically, right?  $7.47.
8  Whether it was or not depends on whether it was
9  lower than the median AWP for the J-Code in which
10 Albuterol figures for Medicare purposes, right?
11     MR. NALVEN:  Objection.
12     A.  What -- you're mix -- are we talking
13 about med -- you were talking to me about Medicaid
14 and FUL and Medicaid statutes.
15     Q.  Yes, that's right.  For Medicaid it
16 would be the lower of FUL or, say, 12 percent off
17 or 8 percent off of AWP, right?
18     MR. NALVEN:  Objection.
19     Q.  For Connecticut Medicaid.
20     MR. NALVEN:  Objection.
21     A.  It would be -- it's -- it's -- it's laid
22 out in Paragraph 13-C under the -- under the

---

1415

1  Connecticut statutes.  What I state there -- I
2  mean, it's in the report.
3      Q.  Right.
4      A.  "Statutes refer to a variety of pricing
5  bases including but not limited to the federal
6  upper limit."  So, yeah, that's something that's a
7  possible price; "Usual and customary amount and
8  amount billed."  And then it goes on to describe
9  what it is my understanding has been the billing
10 practices under Medicaid based on relationships
11 between FUL and what acquisition costs were and
12 ASP.  And so, that's -- that's stated there, and
13 yes, I know that FUL is a -- is a possibility
14 'cause I -- I admit to it.
15     Q.  Right.  And the FUL for this inhaler --
16 this is an Albuterol inhaler, NDC 599301560-01 is
17 $7.47 as --
18     MR. NALVEN:  Are you asking him to read
19 the document?
20     Q.  -- as can be determined from looking at
21 Exhibit Hartman 063.
22     A.  So, let me look at Exhibit -- Exhibit

---

1416

1  Hartman 063, oh.  But I want to look at Exhibit
2  Hartman 055 to see whether that -- you've just
3  given me a J-Code -- I'm sorry -- an NDC and I'm
4  not seeing an NDC here.  I'm just seeing it as
5  product description that I want to relate to a J-
6  Code --
7      Q.  Okay.
8      A.  -- or to an NDC.
9      Q.  To an NDC?
10     A.  And so -- and -- (Witness reviews
11 document.)  And there's not enough.  I think this
12 is a question that would need more foundation for
13 me to track what I'm seeing here in the
14 Connecticut report.
15     Q.  Right.  It's not in your report.  It's
16 only in the backup material to your report, which
17 I'll give you right now.
18     MR. KAUFMAN:  Let's mark the backup.
19     (Warrick Medicaid Spreads marked
20 Exhibit Hartman 064.)
21     Q.  Now, do you recognize this?
22     A.  It -- have I seen this particular backup

---

1417

1  spreadsheet and did I ask my staff to print this
2  out for me?  I looked at various ones.  I don't
3  know if I -- if I saw this one for Albuterol.
4      Q.  Okay.  I'll tell you that -- so that
5  it's clear on the record, we printed this off the
6  CD --
7      A.  Right.
8      Q.  -- that you provided as the material on
9  which you relied in preparing your reports in
10 Connecticut.
11     A.  Okay.
12     Q.  Okay?  Now, where is the NDC?  (Reviews
13 documents.)  If you look at the first page of --
14 Exhibit Hartman 064 this is --
15     A.  First page, right.
16     Q.  -- there's an inhaler, Warrick inhaler,
17 90 MCG ACT.  The NDC is 59930156001.
18     A.  ACT.  Now --
19     Q.  Do you see that, though?  At least do we
20 see that?
21     A.  Well, I see that.  I'm trying to confirm
22 that that is the same -- it has the 90 MCG.  I

---

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

1418

1   don't know -- I don't know if it's 17 grams. I'm
2   trying to see --
3       Q.  Uh-huh.
4       A.  -- whether I'm seeing these different
5   things with the -- you can have different
6   percentages of micrograms and then grams. So, I'm
7   --
8       Q.  Yeah.
9       A.  I see that. I mean, I'm not -- I can't
10  -- I can't confirm that that's a one for one.
11          MR. NALVEN: Let him ask the questions.
12  We've been on this line of questioning for 15 or
13  20 minutes, and I'm not sure we're getting
14  anywhere.
15          MR. KAUFMAN: We are. Slowly. So,
16  you'll just have to be patient. I'm trying to --
17  par.
18          (Counsel confer.)
19      Q.  Okay. Yes. If you look down at the
20  bottom of the second page --
21      A.  Right.
22      Q.  -- to that same NDC number.

1419

1       A.  So, it's the 6001.
2       Q.  6001, yes.
3       A.  Right. Okay.
4       Q.  If you go over to the columns with years
5   --
6       A.  Right.
7       Q.  -- you'll see 21.41.
8       A.  Yeah.
9       Q.  That's an AWP.
10      A.  Right. It certainly is.
11      Q.  If you go back to Exhibit Hartman 063 to
12  the fourth page where there is the second item
13  down from the top, ARDIH 09 MG/INH, 17 grams,
14  there's that same NDC, and the same AWP, 21.41.
15      A.  I see that. Again, it's -- it's -- the
16  point -- so, it -- it looks like that is the --
17  the 90 micrograms, and whether it's the MCG and
18  the MG that -- you know, I -- subject to checking
19  that these are the same dosages, that's -- this is
20  .09 milligram -- MG -- per inhaler, and the other
21  version that you're pointing out to me is 90 MCG.
22  But let's just say right now those are the same --

1420

1   same amounts. You know, I'd have to check that to
2   --
3       Q.  That's fine.
4       A.  But I'm willing to -- I'll -- I'll
5   assume that's the case.
6       Q.  Good. Thank you. If it's the case --
7   if it's the case, as I think you'll confirm that
8   it is, there is an FUL of $7.47 in 1999 applicable
9   to that. That's what's said on the first page
10  after the cover in Exhibit Hartman 063, FUL $7.47.
11  Do you see that?
12      A.  That's right. I see that.
13      Q.  If you go back to Exhibit Hartman 064
14  and you look at the ASPs that you compute, which
15  are on the last page of that exhibit, for 1999,
16  you compute an ASP of 1.16. Do you see that?
17      A.  I do.
18      Q.  7.47 is higher.
19      A.  The -- I'm sorry. 1 --
20      Q.  1 --
21          MS. NEMIROW: It's 2.10.
22      Q.  Oh. 2.10 I'm looking at the wrong one.

1421

1   Sorry. 2.10.
2       A.  1999 you're talking about.
3       Q.  1999. That's right.
4       A.  Okay.
5       Q.  Now, the actual reimbursement was
6   supposed to have been at the lower of the FUL or
7   the percentage off of AWP --
8       A.  No --
9       Q.  -- for Medicaid, what was actually
10  reimbursed by Connecticut in 1999 for this product
11  was supposed to have been the lower of FUL, which
12  is $7.47 --
13      A.  Right.
14      Q.  -- or 92 percent of AWP. Now, 92
15  percent of AWP is a lot higher than $7.47. AWP is
16  $21.41, right?
17      A.  The --
18      Q.  So, the amount actually that should
19  actually have been reimbursed was $7.47.
20      A.  No.
21      Q.  Why not?
22      A.  Because if you look at Paragraph 13-C,

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

1422

1   my reading of the statutes, and I'm not -- not a
2   lawyer, was that the -- in the -- the various
3   places in which alternative prices are used for
4   what reimbursements take place at is -- it's the
5   lesser of the price for AWP, FUL, usual or
6   customary, amount billed, or the estimated
7   acquisition cost.
8       Q.  That's right.  So, let's apply that to
9   Albuterol inhaler -- this Albuterol inhaler in
10  1999 in Connecticut.
11      A.  Right.
12      Q.  How many of the dollars that were in
13  that lump sum dollar figure you got from the
14  state, how many of those dollars were attributable
15  to a unit of this inhaler, $7.47 probably, not 92
16  percent of $21.41?
17      MR. NALVEN:  Objection.
18      A.  Well --
19      Q.  Right.
20      A.  Where -- on what do you base that?  What
21  -- according to the statute, what should have been
22  reimbursed was $2.10 on the -- on the third page.

1423

1       Q.  That's what you're -- in your but-for
2   world.  I'm trying to figure out how much was
3   actually paid.
4       A.  Right.
5       Q.  How much was actually paid by the state
6   --
7       A.  Right.
8       Q.  -- when it paid for this product under
9   its Medical Assistance Program in 1999.
10      A.  Uh-huh.
11      Q.  How much?  Well, it should have been the
12  lower of the AWP then in effect, less the discount
13  --
14      A.  Uh-huh.
15      Q.  or the FUL, which was $7.47.  Since
16  the discount from AWP is higher than $7.47, the
17  amount that should have been paid for this was
18  $7.47, from which you might subtract some other
19  number that you think is the right number, but
20  you're subtracting it from $7.47, not 92 percent
21  of $21.41, right?
22      MR. NALVEN:  Objection.

1424

1       A.  When I -- when I see --
2       THE WITNESS:  Did we not include Table
3   D-1 into this -- into this thing?
4       MR. NALVEN:  You can respond to Mr.
5   Kaufman.
6       A.  The -- the reimbursement formulation as
7   I have assumed for Connecticut is reflected in
8   both the statutes that I've reviewed -- the
9   statutory language and statutes I've reviewed in
10  the complaints; it's been based on my review of
11  the Medicaid reimbursement formulae that I have
12  seen and I have put forward in Attachment D to my
13  declaration on class certification, the attachment
14  of which is appended to the expert disclosure
15  here, but the -- the particular table that is not
16  attached here, and what shows that under Medicaid
17  what the State of Connecticut was reimbursing was
18  AWP -- was precisely what I have in the paragraphs
19  13 through 15, that they were reimbursing for a --
20  for a multi-source drug, AWP less 12, from 1995
21  through 2003, and then AWP less 40 percent
22  starting in 2003.  And that's what I find the CMS

1425

1   stating the reimbursement under Medicaid should
2   be, and I find that, yeah, the statute says it
3   should have been lower than FUL.  It should have
4   been lower than that still.  That it should have
5   been at ASP, the acquisition cost.
6       But I find that the statutes that I read
7   that I've been asked to take as given and the CMS
8   description of what the reimbursement rates under
9   Medicaid should be listed on the CMS Web site in
10  2004 says you're going to reimburse a multi-source
11  drug like Albuterol at AWP less 40 percent.  And
12  there is the additional statutory requirement here
13  for certain physician-administered drugs, AWP less
14  90.25 percent.
15      So, I've been -- this is what is the --
16  the price that -- I'm assuming that the price that
17  was used is what appears in -- in the statutes and
18  that I've seen summarized in the Medicaid and that
19  I've seen summarized here, and that it should have
20  been the lesser of a variety of prices, but I've
21  seen nothing in -- and that's what I've been asked
22  to implement in the damage calculation.  But I

Raymond S. Hartman, Ph.D. CONFIDENTIAL                                 March 1, 2006
Boston, MA

1426

1  haven't seen anything that tells me that your
2  description of the world is -- that -- that
3  they've -- that they've overridden the AWP less 40
4  percent with the FUL in any of the materials I've
5  seen.
6      Q.  Well, for $7.47 is not more than $21.41,
7  is it?
8          MR. NALVEN: Objection. I'm going to
9  instruct you not to answer. That's just a
10 harassing question.
11         MR. KAUFMAN: Well, I don't think that.
12         MR. NALVEN: Please move on.
13         MR. KAUFMAN: I would like to. Thank
14 you.
15     Q.  $7.47 is the FUL for this product in
16 1999. The AWP was $21.41, right?
17     A.  And the ASP was $2.10.
18     Q.  Right. And did anyone tell you that
19 Connecticut did not follow the rule you say
20 describes the world as it was in 1999? Namely,
21 that they reimbursed at the lesser of FUL or 12
22 percent off AWP?

1427

1      A.  Materials that I have reviewed tell me
2  that they relied on AWP less the percentages that
3  I put forward in my -- in my declaration as it
4  appears and as stated. If you have information
5  that they -- otherwise, I didn't see it, and
6  please, by all means, have your expert put it
7  forward.
8      Q.  Well, let me just make sure I understand
9  what you did. I thought you --
10     A.  You under -- we've just gone through
11 what I've done very clearly. You understand what
12 I've done.
13     Q.  Then let me make it clear for the record
14 what you've done, which is to ignore a statutory
15 basis for reimbursement and assume it didn't occur
16 without any basis for that assumption, is that
17 correct?
18     A.  No, that's --
19         MR. NALVEN: Objection.
20     A.  That -- I'm astounded by that question.
21     Q.  Flabbergasted, maybe flabbergasted?
22     A.  Flabbergasted.

1428

1          MR. NALVEN: Objection.
2      A.  Flabbergasted. That's a spread that
3  violates several speed limits.
4          MR. NALVEN: Doctor Hartman, let Mr.
5  Kaufman ask an appropriate question.
6      Q.  Okay. So, your methodology would not
7  have detected payments that were not based on AWP,
8  correct?
9      A.  My methodology has taken the CMS that I
10 have seen and the contractual information that I
11 have seen and the discovery information that I
12 have seen that tells me that they've reimbursed at
13 AWP less a certain percent, depending on the year
14 and the drug.
15     Q.  And your methodology would not have
16 detected payments that were not based on AWP,
17 correct?
18         MR. NALVEN: Objection.
19     A.  My methodology did not do a claim-by-
20 claim analysis to demonstrate if there was a -- a
21 consistent deviation from the reimbursement
22 formula that -- formulae that I see built into the

1429

1  -- in the statutes and into the CMS regulations.
2      Q.  And it would not have detected payments
3  that were not based on AWP, correct?
4          MR. NALVEN: Objection.
5      A.  It didn't -- it didn't look for them.
6      Q.  And didn't -- it wouldn't have detected
7  them if they had occurred --
8          MR. NALVEN: Objection.
9      Q.  -- correct?
10     A.  The -- this methodology has been
11 developed to reflect the reliance on AWP that is
12 discussed in the -- throughout the MDL filings.
13 Now, if -- if you're saying, does my methodology
14 detect wide variations from that type of
15 reimbursement policy, I've seen no evidence to
16 suggest that that's the case. And my methodology
17 is not designed to look for that. So, I mean, if
18 -- if you're saying is my method that's -- my
19 methodology was not -- was not looking for that.
20     Q.  And wouldn't have found it if it had
21 occurred, right?
22     A.  It didn't look for it.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    March 1, 2006
Boston, MA

1430

1   MR. NALVEN: Objection. Asked and
2  answered.
3     Q.  Well, if you could see things that you
4  weren't looking for, you would not have detected
5  payments that were not based on AWP following your
6  methodology, correct?
7     MR. NALVEN: Objection. Asked and
8  answered.
9     A.  It -- it -- it didn't look for it.
10    Q.  Okay. We'll stop on that line.
11    MR. KAUFMAN: Would you mark this,
12 please.
13       (Revised complaint, 3/5/04 marked
14 Exhibit Hartman 065.)
15    Q.  All right. I've shown you, Doctor
16 Hartman, the revised complaint in the case of
17 State of Connecticut against Dey, Roxane, Warrick,
18 and others. Do you see that?
19    A.  It has been placed in front of me, yes.
20    Q.  You're welcome to look through it to
21 satisfy yourself that it is what I say it is or
22 you can take my word for it, that's up to you.

1431

1     A.  I take your word for it.
2     Q.  If you look at Page 75, you'll see a
3  Table 1-3 that lists the drugs and NDC numbers
4  that are -- of Warrick -- that are challenged in
5  this lawsuit. Do you see that?
6     A.  I do.
7     Q.  All right. Now, was it your
8  understanding that you're opinions in this case
9  should relate to those drugs that are challenged
10 in the case?
11    A.  We're talking about -- my opinions were
12 put forward in -- regarding methodology were put
13 forward in my expert disclosure. Are we talking
14 about the calculations that I was asked to do in -
15 - are you talking about the calculations in
16 January and February?
17    Q.  Well, we'll -- I understood -- let me
18 just go slowly here. I think you told Mr. Herold
19 that you had reviewed the November 1st disclosure
20 before it was made.
21    A.  That's right.
22    Q.  And you believed it accurately

1432

1  summarized the opinions that you held in this
2  matter.
3     A.  That's right.
4     Q.  And the matter is the Connecticut case,
5  right?
6     A.  It's the Connecticut case. It -- it
7  didn't identify specific drugs at that point.
8     Q.  No, I understand.
9     A.  Okay. Well, you're asking me.
10    Q.  I'm going one step at a time.
11    A.  Okay.
12    Q.  And January 19th, was it your
13 understanding that you were to have addressed in
14 that declaration the drugs that were accused in
15 the cases in Connecticut?
16    A.  It was my understanding I was to put
17 forward a general methodology that could address
18 any drugs, and at the time that actual
19 calculations were requested, that that list of
20 drugs was narrowed for reasons that were not
21 shared with me.
22    Q.  Okay. So that not all of the drugs

1433

1  originally accused were the subjects of your
2  damage calculations.
3     A.  That's correct.
4     Q.  Were there drugs not accused that were
5  the subjects of your damage calculations?
6     A.  The drugs that were the subject of my
7  damage analysis appear in my damage -- in my
8  damage calculations.
9     Q.  Yes. So, how did you pick them? Why
10 those?
11    A.  Counsel asked me to -- to address those
12 drugs.
13    Q.  Did you understand them to include drugs
14 that were not accused in the Connecticut cases?
15    MR. NALVEN: The document speaks for
16 itself.
17    MR. KAUFMAN: Yes, and I'm asking for
18 his understanding of the document.
19    A.  What --
20    Q.  Did you understand your assignment to
21 include the calculation of damages as to drugs for
22 which there had been no complaint?

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    March 1, 2006
Boston, MA

1434

1      A.  (Witness reviews document.)  I
2  understood my assignment as follows:  That the
3  initial expert disclosure summarized and reflected
4  the formulaic methodology to -- to conduct the
5  damage analysis, and the damage analysis itself
6  was implemented in January and February for drugs
7  that were identified and singled out to me.
8      I did not make any type of comparison
9  between drugs that could appear in this document
10  and this.  I'd -- I followed the direction of
11  counsel.
12     Q.  So counsel told you which NDCs you
13  should -- for which ones you should compute
14  damages?
15     A.  They told me which drugs to -- to focus
16  on.
17     Q.  Did they tell you to the level of NDC?
18     A.  I don't recall.
19     Q.  Do you know that you included in the
20  Connecticut calculations NDCs that are not accused
21  in the Connecticut complaint?
22     A.  I --

1436

1  given to me at a certain time when to -- what to
2  focus and how to implement -- what -- what
3  calculations to actually undertake.  And at that
4  point I -- I did what -- what was -- what counsel
5  directed me to do.
6      Q.  And so, the answer is that you did know
7  or you didn't?
8      A.  It is something that -- its possibility
9  was implicit, but I didn't spend a lot of time
10  reflecting on that or feeling any need to do
11  anything along the way to take that into account.
12     Q.  Okay.  And you didn't take it into
13  account?
14     A.  Take what in, that I might be asked to
15  look at some other drugs?
16     Q.  That you were.  Well, let me -- let me
17  direct your attention to Page 5 of 20 of your
18  supplemental declaration in Connecticut.
19     A.  Supplemental.  So, we're talking Exhibit
20  Hartman 056.
21     Q.  5 of 20.  This is the February 9th
22  supplemental declaration.

1435

1      Q.  You must have figured I was going to ask
2  you, eh?  But go ahead.
3      MR. NALVEN:  Objection.  The documents
4  speak for themselves.
5      MR. KAUFMAN:  No.  This is him.
6      Q.  Did you know when you computed damages?
7      MR. NALVEN:  No.  No.  No.  The
8  documents speak for themselves.
9      Q.  Did you know --
10     MR. KAUFMAN:  No document tells me that.
11     Q.  Did you know, Doctor Hartman, when you
12  were computing damages in January and in February
13  that you were computing damages for NDCs that had
14  not been accused in the Connecticut complaints?
15     A.  When I laid out the -- the formulaic
16  methodology in my opinions about how damages were
17  to be calculated as summarized in November, they
18  were -- they were generic.  They could be -- they
19  could be applied and used for any drug.  And it
20  was my assumption at that point -- I mean, I had -
21  - it was my understanding that drugs were in play
22  and NDCs were in play and directions would be

1437

1      MR. NALVEN:  Is it your intention to ask
2  Doctor Hartman to confirm that there are damages
3  calculations for NDCs that are not set forth in
4  Connecticut's revised complaint?
5      MR. KAUFMAN:  You'll hear it in a
6  second.
7      MR. NALVEN:  If you've got a question
8  that can be answered other than by reference to
9  the documents, you can go ahead, but otherwise,
10  you're just wasting time.
11     Q.  Would you turn to Page 5 of 20.  Do you
12  see the -- sorry.  Are you there?
13     A.  I am.
14     Q.  The Albuterol tabs.
15     A.  Yes, I see the Albuterol tabs.
16     Q.  Now, those are not in the complaint.
17  And I can see that.  Everybody will see that.  Why
18  did you compute spreads and damages for those
19  NDCs?
20     A.  (Witness reviews document.)  The -- so,
21  this is not just in the supplemental.  This is in
22  the actual January one, too, right?  And I'm

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

1438

1  looking at --
2      Q.  Maybe I didn't look in the January one
3  for them.
4      A.  So, they're in both, and as I said when
5  I -- they are in both, and when I -- when I
6  rendered an opinion about how one is to think
7  about this market and to measure damages under the
8  -- the various definitions and thresholds that
9  I've used, I -- I looked at it as being perfectly
10  general. And when I was -- when I was -- the time
11  came to actually -- the data was sufficiently
12  reliable to begin calculating these --
13  implementing these calculations, these were the --
14  the drugs I was asked to use.
15      And they're the same in January and
16  February when I had started -- when -- I saw the -
17  - the revised complaint. Oh, here it is. The
18  fact that the -- that the tabs did not appear
19  there, those are the ones that are of particular
20  interest to you, is that the --
21      Q.  I'm asking -- well, they are of interest
22  because you calculated damages on them, even

1439

1  though nobody's accused them of everything and
2  they happen to have among the biggest spreads?
3      A.  The -- I've told you what directions I
4  received and -- and --
5      Q.  Was the size of the spread a factor in
6  your including it in your January and February
7  submissions?
8      A.  No.
9      Q.  Did you include every NDC for Albuterol?
10      A.  I would have to -- I would have to -- to
11  check.
12      Q.  Well, what criteria do you remember
13  following in deciding which NDCs to address?
14      A.  I was asked by counsel to address sets
15  of drugs, and I forget what the -- if there were
16  any other criteria. I don't recall. I -- I was
17  asked to do it, and I did it.
18      Q.  Now, when you computed ASPs, did you
19  include, as part of the calculation, the prompt
20  payment discount when it was granted?
21      A.  The -- the dis -- which are we -- what
22  world are we in now? Could you tell me, are we in

1440

1  physician-administered?
2      Q.  Well --
3      A.  Are we in Connecticut?
4      Q.  I didn't know there was a difference to
5  that question, but if there is, then let's take
6  them one at a time. Let's start with Medicare and
7  the MDL.
8      A.  Okay. For Medicare and the MDL,
9  whatever discounts appeared related to the units
10  that we tracked to the distribution system to the
11  providers that provided the physician-administered
12  Part B drugs were -- were netted out.
13      Q.  So, that's true of any allowance or
14  price concession.
15      A.  That's correct.
16      Q.  Now, do you agree that wholesalers
17  provide services to the manufacturer in the
18  distribution channel?
19      A.  I do.
20      Q.  And isn't their compensation their
21  return on their investment, which is affected by,
22  say, the prompt payment discount?

1441

1      MR. NALVEN:  Objection.
2      A.  The -- how the prompt payment discount
3  would -- which -- who -- who we're talking about
4  as paying promptly? We're talking about the
5  wholesalers paying promptly? What -- which -- I
6  mean, there's various people that can be paying
7  promptly here.
8      Q.  Well, I understand the regular routine
9  in the pharmaceutical industry to be --
10      A.  Right.
11      Q.  -- that if wholesalers pay promptly,
12  then they are given a discount on what they buy
13  from the manufacturer as part of the reimbursement
14  for the services that the wholesalers provide in
15  the distribution channel.
16      So, let's -- that's who I'm talking
17  about. That prompt payment discount is
18  compensation, among other items, for the services
19  provided by wholesalers?
20      A.  And to the -- I would -- I would want to
21  look at the invoice data that we have to see
22  precisely how that particular financial incentive

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
                          Boston, MA

1442

1   was -- was tracked and whether it was included in
2   the charge-back or not, but --
3       Q.  I think it's a discount rather than a
4   charge-back rebate.
5       A.  Yeah, and if it was --
6           MR. NALVEN:  Objection.
7       A.  If it was -- I'd have to look at how it
8   was -- how it was treated, but would the --
9       Q.  And how would that affect your answer --
10  the question I have pending -- let me just make it
11  clear, because your counsel is justifiably
12  criticizing me for jumping all over.  Let me just
13  make sure what the question is.  Isn't it -- as an
14  economic matter, isn't it fair for the
15  manufacturers to be compensating the wholesalers
16  for services that the wholesalers provide to the
17  manufacturer in the distribution scheme?
18          MR. NALVEN:  Objection.
19      A.  The -- the distribution, as discussed at
20  length in -- in my affirmative declaration in
21  support of class consists of a -- of a -- of
22  institutional linkages that -- that are known and

1443

1   understood, and there are certain discounts paid
2   along the way and certain discounts that
3   ultimately track themselves out into ASPs or are
4   reflected in offsets to prices.
5       Q.  Right.  I understand that.
6       A.  Uh-huh.
7       Q.  And aren't some of them attributable to
8   services provided by the wholesalers to the
9   manufacturers that, as an economic matter, warrant
10  compensation?
11      A.  There are -- the wholesalers provide
12  services.
13      Q.  And from what you know of the
14  pharmaceutical industry and its distribution
15  mechanisms, isn't one form of compensation by the
16  manufacturer to the wholesaler for those services
17  the prompt payment discount?
18      A.  A prompt payment discount is -- is
19  offered in this -- in this market and in many
20  markets for prompt payment.
21      Q.  And in the but-for world, you don't give
22  any credit to that element of price concession as

1444

1   payment for a service, do you?
2       A.  No, in the but-for world I assume that
3   they're prompt paying the same way that they were
4   before; that that discount is offered, and it's --
5   and it's paid, and -- but now the -- and it's part
6   of the 30 percent that reduces it to the -- to the
7   targets that we see.  So, whatever it was before,
8   it's the same in the but-for world.
9       Q.  I notice that in your calculation of
10  prejudgment interest you use a different interest
11  for -- this is in the MDL particularly, you use a
12  different interest rate for Class 2 than for Class
13  1?
14      A.  I do.
15      Q.  And why is that?
16      A.  I try and be conservative in both cases,
17  but I take into account the fact that they are
18  different entities with different opportunity
19  costs of capital and that the opportunity cost to
20  consumers or the rate at which the -- the
21  opportunities they might have for their
22  overcharges and their investments is something

1445

1   very conservative like a Treasury Bill, treasury
2   note.
3           Whereas, I assume that a business has
4   returns -- marginal returns that they can invest
5   that is closer to their threshhold investment
6   targets that are represented by costs of capital
7   that are at least at prime rate or higher.  So
8   that it reflects the investment opportunities and
9   the value of the funds of those overcharges.  So
10  that a dollar lost -- an opportunity loss of a
11  dollar loss to a consumer I'm saying has less of a
12  present value inflation than it might be to a
13  business that could invest it differently than a
14  consumer could.
15      Q.  When were you engaged to start working
16  on the Connecticut case or cases?
17      A.  I don't -- it's my recollection, and I'm
18  -- I think sometime early in 2005, but I can't
19  really recall.
20      Q.  By whom are you engaged?
21      A.  By the law firm of Hagens, Berman,
22  Sobol, Shapiro.

Raymond S. Hartman, Ph.D. CONFIDENTIAL
Boston, MA

March 1, 2006

1446

1    Q.  And what were you engaged to do, your
2    charter?
3        A.  My charter was to develop a formulaic
4    methodology to -- to assess the impacts of the AWP
5    inflation upon reimbursements that were applicable
6    to the state that have been -- and to consumers
7    for -- in the state.
8        Q.  And what investigation did you make in
9    order to discharge that assignment?
10       MR. NALVEN:  Objection.  Asked and
11   answered.
12       Q.  I don't know the -- I don't remember the
13   answer, so, please, tell me again.  What did you
14   do?
15       MR. NALVEN:  Objection.  Asked and
16   answered.
17       MR. KAUFMAN:  I know what he said he was
18   hired to do.  I don't know what he said he did.  I
19   didn't ask him that.
20       Q.  What did you do?
21       A.  I did that.
22       Q.  How?

1447

1        A.  I reviewed all the materials that I
2    could review in connection with the MDL matter
3    which involved national types of matters of how
4    markets work nationally, how they work at the
5    state level. It involved valuations of pricing for
6    federal -- a federal agency such as -- such as
7    Medicare and for Medicaid.  It involved
8    reimbursement by states.  It was the -- the MDL
9    was very broadly focused on -- on issues in this
10   industry, structural and behavioral and
11   performance measures that are standard for
12   economists, both nationally and among states.
13       Q.  Apart from understanding the industry as
14   it worked in Connecticut as well as nationally,
15   what did you do to inform yourself about the
16   reimbursement regimes that were at issue or in
17   play in context during the period?
18       MR. NALVEN:  Objection.  Asked and
19   answered.
20       A.  I reviewed as much material as I could
21   about Medicaid, Medicaid reimbursement, Medicaid
22   reimbursement over time, the materials that I had

1448

1    received with the complaints for Connecticut,
2    which there were materials that confirmed what I
3    had already been seeing in the MDL matter, because
4    I was seeing state-specific types of -- when I was
5    doing the MDL matter, there were certainly state-
6    related issues that arose and least costly
7    alternative under Lupron, and there are a variety
8    of types of reimbursement issues that involved
9    variation across states.  So, I've -- I've been
10   focusing on materials for reimbursement in this
11   market, both nationally and at the state level,
12   for the past three or four years.
13       Q.  What did Connecticut do during this
14   period, from '93 to date, to balance access by its
15   constituencies against price?  In other words,
16   what trade-offs did Connecticut consciously make
17   as part of the political process to retain as many
18   pharmacies and physicians and other providers in
19   its system as it could or as it needed to to
20   supply needs to its people while still trying to
21   keep costs down?  What did -- what did Connecticut
22   do?

1449

1        MR. NALVEN:  Objection.
2        A.  I didn't do an analysis of that -- of
3    that question.
4        Q.  What legislative proposals were
5    considered to balance those objectives --
6        MR. NALVEN:  Objection.
7        Q.  -- in Connecticut?
8        MR. NALVEN:  Objection.
9        A.  The --
10       MR. NALVEN:  This is well beyond the
11   scope of his opinions.
12       MR. KAUFMAN:  Well, they inform the
13   reliability of his opinions.
14       Q.  Please, answer.
15       A.  The evolution of --
16       MR. NALVEN:  Objection.  Go ahead.
17       A.  -- of the reimbursement formulas and the
18   thinking about reimbursement over time I examined
19   and -- and any related materials that arose in
20   that review I did not take -- and I observed what
21   the implications were in the revealed preferences
22   of -- of what was articulated in the statutes

Raymond S. Hartman, Ph.D. CONFIDENTIAL
Boston, MA

March 1, 2006

1450

1 regarding reimbursement. I didn't do a -- nor was
2 asked to do a -- any type of involved analysis of
3 a balancing of stakeholder benefits and costs with
4 the evolution of those reimbursement changes over
5 time.
6    Q.  You didn't interpret the reimbursement
7 rates enacted by Connecticut as indicative of
8 Connecticut's expectations as to provider cost,
9 did you?
10    A.  I certainly saw them as reflecting an
11 environment in which there were understandings
12 about provider costs.
13    Q.  What was it about what you saw that gave
14 you that impression?
15    A.  That -- that these are adults that read
16 the newspaper and read magazines and have
17 lobbyists talking to them.
18    Q.  And engage in political processes that
19 have lots of other factors at stake, correct?
20    MR. NALVEN:  Note my continuing
21 objection.
22    A.  What do you -- what do you want me to

1451

1 say? Where are we going with this?
2    Q.  I would like you to answer my question.
3    A.  I don't really understand what your
4 question is any longer.
5    Q.  There are a lot of factors affecting the
6 political process other than the participants'
7 estimates of providers' cost, correct?
8    A.  You just asked me a question, there are
9 a lot of other factors affecting the political
10 process besides the manufacturers' costs.
11    Q.  Beside --
12    A.  Yes, my answer to that is yes.
13    Q.  The participants in the political
14 process that led to reimbursement rates in
15 Connecticut, those participants were moved by many
16 things other than their estimate or assessments or
17 expectations about provider costs, correct?
18    MR. NALVEN:  Objection. I mean, if you
19 want to ask him the things that he considered in
20 forming his opinion, that would be an appropriate
21 question, but to ask a blunderbuss question as to
22 whether there are any factors in the world,

1452

1 including the temperature or the seismic quakes in
2 Connecticut, isn't an appropriate question. So,
3 if you'll focus, he'll try to answer.
4    MR. KAUFMAN:  I think he should answer
5 what I've asked.
6    Q.  Will you answer?
7    MR. NALVEN:  Note my objection.
8    MR. KAUFMAN:  Yes. Well, I think
9 everybody knew your objection.
10    Q.  Go ahead.
11    MR. NALVEN:  Objection.
12    THE WITNESS:  Could we have the question
13 read back to the assembly, please.
14    (Question read back.)
15    A.  Provider costs were one of many things
16 that would affect a -- an ultimate set of
17 decisions regarding reimbursement rates.
18    Q.  Now, did you rely -- in reaching any of
19 the opinions in the November 1st disclosure, the
20 January 19th declaration, or the February 9th
21 supplement, any materials other than those you've
22 provided to the Defendants who requested the

1453

1 materials on which you relied?
2    A.  The materials that I relied upon I
3 expect were identified and -- and those I would
4 have, I would have provided. There -- in -- as I
5 begin any endeavor of this sort, I ask my analysis
6 team to gather a much broader set of documents and
7 -- and I review certain things and say, Well, that
8 -- I'm not going to rely on that. It's not
9 sufficiently important here. And so, what I
10 relied on, I assume we've provided.
11    Q.  You don't know of anything that wasn't
12 provided on which you relied?
13    A.  That's correct.
14    Q.  Now, the point you made earlier about
15 your view that Connecticut did not reimburse at
16 FUL, what was the basis for that opinion of yours?
17    A.  Was -- I don't know how many times I
18 have to say it.
19    Q.  Well, forgive me, because I can't keep
20 in mind so much of what you've said. So, please,
21 tell me again.
22    MR. NALVEN:  Objection.

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

1454

1    A. I have reviewed the practices and
2    procedures as they have been implemented in --
3    into Medicaid and as I've read about them in the
4    CMS, the literature, and -- and how they vary
5    across states and how different states have
6    responded in implementing these -- these
7    reimbursement practices and procedures. I've
8    reviewed the statutes as they applied in the
9    evolution in Connecticut, and those are two of the
10   things that I can recall. There probably were
11   other things.
12       Q. Did you talk to anybody who was
13   instrumental in operation of the Connecticut
14   Medical Assistance Program?
15       A. No.
16       Q. Did you talk to anyone who represented
17   Connecticut in the Medical Assistance Program?
18       A. My staff did.
19       Q. To whom did they speak?
20       A. I would have to -- I'd have to ask them.
21   I --
22       Q. Well, you might also know. Do you know

1455

1    to whom they spoke?
2        A. I would have -- I might know, but if I
3    knew, I'd tell you. I would have to ask them.
4        Q. Did you rely on anything you were told
5    about what they said?
6        A. To the extent that there was data and
7    reimbursements levels and other information that
8    was incorporated into the damage calculations, I -
9    - I relied on their ability to -- to talk with the
10   people in Connecticut in finding out about what
11   the -- what their -- what the utilization rates
12   were, and -- and the relevance and appropriateness
13   to the -- to the efforts that I was undertaking.
14       Q. Now, have you received any academic --
15   formal academic training in pharmaceutical
16   marketing?
17       MR. NALVEN: Objection. Asked and
18   answered.
19       A. No.
20       Q. Have you any experience in setting
21   prices for pharmaceuticals or designing
22   reimbursement programs?

1456

1        MR. NALVEN: Objection. Doctor
2    Hartman's qualifications have been gone through in
3    this deposition at some length.
4        MR. KAUFMAN: Not in this -- not in
5    Connecticut.
6        Q. Please go ahead.
7        MR. NALVEN: Well, in connection with
8    the three-day session that we've been here,
9    including in which your client has been
10   represented.
11       MR. KAUFMAN: I've been here for these
12   three days, and no one's asked him these
13   questions.
14       MR. NALVEN: Well, Doctor Hartman's
15   qualifications has been gone through at length.
16       Q. Okay. So would you answer these
17   questions, please. Do you have any experience
18   setting prices for pharmaceuticals or designing
19   reimbursement programs?
20       A. I have not assisted in designing
21   reimbursement programs in -- in pharmaceutical
22   markets. I have certainly been involved with

1457

1    designing reimbursement or payment systems in
2    other regulated industries, in energy industries,
3    in a variety of regulated industries which take
4    the same types of principles and thinking into
5    account.
6        In terms of setting prices, I've
7    consulted to industry -- to a variety of different
8    types of manufacturers. I've -- I've consulted to
9    medical device manufacturers and supported
10   litigation work related to medical devices and to
11   pricing of medical devices. And so, I've
12   certainly done that kind of work for medical
13   devices. And I don't see that as being any
14   different than the issues that arise here. As a
15   matter of fact, the issues of pricing
16   reimbursement here are fairly standard to any
17   economist that's trained in industrial
18   organization -- industrial organization and
19   microeconomics. There are very -- very specific
20   types of regulatory issues that may arise, and
21   that's certainly why I pull in colleagues at the
22   Harvard School of Public Health should there be an

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

1458

1  idiosyncratic aspect of this industry that
2  requires specialized knowledge.
3      Q.  Your consulting with medical device
4  manufacturers was before products were launched
5  about the prices at which they would be launched,
6  was it?
7          MR. NALVEN: Objection.
8      A.  Yeah.
9      Q.  Who?  With whom did you consult?
10     A.  I can't reveal that.  It's -- well, this
11 is patent litigation subject -- I'd have to find
12 out whether I can -- this is done in patent
13 litigation, and I'm not -- I'm not free to
14 disclose.
15     Q.  It's a litigation context you mentioned
16 earlier that gave me pause, because that's not
17 beforehand.  What I'm interested in is whether the
18 consulting you did with that temporally predated
19 the launch and was about the price at which they
20 would launch?
21     A.  It certainly dealt with those issues in
22 an ex-post sense and may have dealt with it in an

1459

1  ex-ante sense.  I'd have to think back whether the
2  notion of inventing around a patent was -- were
3  some of the issues that were addressed.  These are
4  cases that I've done over a period of ten, 15
5  years.
6      Q.  Were they all patent cases?
7          MR. NALVEN: Objection.
8      A.  In -- I mean, there could have been a
9  strategic pricing case, but I can't recall right
10 now.
11     Q.  Okay.  Have you consulted with the
12 federal or any state government on pharmaceutical
13 reimbursement?
14         MR. NALVEN: Objection.
15     A.  I have consulted to the FTC regarding
16 drug pricing, and I've consulted to the DOJ
17 regarding reimbursement in -- in regulated
18 industries that were not pharmaceutical but that
19 dealt with similar issues, and to state
20 governments and public utility commissions.
21     Q.  On utility rate setting?
22     A.  That's correct.

1460

1      Q.  And with the FTC, what was the subject
2  of your consultancy?
3      A.  That was litigation in re: Cardizem.
4      Q.  And the regulated industry or regulated
5  work for the DOJ was outside the pharmaceutical
6  area?
7      A.  From my recollection to date, that's
8  true.  I'm currently in conversations with DOJ to -
9  - to enter into consulting about rate setting in
10 the pharmaceutical area.
11     Q.  Rate setting.  Well, that's frightening.
12 Okay.
13         MR. NALVEN: Mr. Kaufman, it's 10 to 5
14 now.  I have a sense that you're wrapping up from
15 the way you're flipping through your outline, is
16 that correct?
17         MR. KAUFMAN: I'm coming -- five
18 minutes.  I think probably five minutes should be
19 enough.
20         THE WITNESS: Oh, he's got hours left.
21     Q.  Let me just ask one follow-up question
22 on the 2 percent, if you don't mind, the prompt

1461

1  payment discount.  That was factored in as among
2  the impact -- the factors that reduced price to
3  whatever the ASP actually was?
4      A.  That -- that's correct.
5      Q.  Okay.  So, you just looked at the net
6  bottom line which already bore the affect of the 2
7  percent discount.
8      A.  That's correct.
9      Q.  Okay.  All right.  I have one question
10 about the effect of rebates and then that will be
11 the end of this line of questioning.  Okay.  You
12 say in your reports that the but-for rebates will
13 be the same as the real world rebates and so,
14 you've eliminated consideration of them, is that
15 right?
16     A.  Are you being purposefully that -- are
17 we -- we're talking about in the Connecticut
18 matter and we're talking about Medicaid rebates,
19 right?  I mean, a rebate is a very broad topic.
20     Q.  Yes, I believe you say that in the
21 Connecticut --
22     A.  That -- that's correct.

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

---

1462

1    Q. Okay. You say that it's for that reason
2  that you don't consider rebates in your
3  calculation of damages; that they would be the
4  same in the real world and in the but-for world.
5    A. I'm saying that they are related to AMP
6  or to ASP and would be substantially the same,
7  would -- would be of third order of importance so
8  that, really, would net themselves out and are not
9  sufficiently important to change the damage
10 calculations that I have put forward.
11   Q. Now, if the world were as you say it
12 should be, that in Connecticut manufacturers would
13 be reimbursed at ASP for what they sell to
14 Connecticut Medicaid programs?
15   A. I haven't said the way the world should
16 be in anything. I'm just --
17   Q. But for?
18   A. I described --
19   Q. You haven't described a but-for world --
20 a but-for pricing mechanism?
21   A. I've described what the world would be
22 like but for the -- the AWP inflation. Okay. So,

---

1463

1  in that context you --
2    Q. In that world -- in that world --
3    A. Right.
4    Q. -- Medicaid would reimburse at ASP.
5    A. Well, in the but-for world, they -- the
6  but-for spread is 30 percent. So, in the but-for
7  world there wouldn't be an inflation such that the
8  -- that the AWP would be more than 30 percent
9  above the ASP. That's the but-for -- that's the
10 world without the AWP inflation. I -- the -- what
11 the implications for calculations of damages under
12 the Connecticut -- Connecticut Medicaid statutes
13 or under Medicare derive from my reading of those
14 statutes and my understanding of how they're
15 implemented. But I don't have a -- I'm not -- the
16 but-for world is -- let's be very clear about that
17 -- it's just the -- there's -- there's a spread
18 between that has been alleged to be illegal when
19 this spread is used to move market share and take
20 advantage of nontransparent spreads, but --
21   Q. If you take all my five minutes, I won't
22 be five minutes.

---

1464

1    A. Well, that's --
2    Q. If you -- whatever the rebates are, they
3  would reduce the spread you think is permissible
4  in the but-for world, right?
5    A. Well, there are rebates already in the
6  spread.
7    Q. So, the spread would be net of the
8  rebates? In other words, rebates, the prices both
9  would be permissible to charge in the but-for
10 world would be a difference between ASP -- well, a
11 difference between the amount the manufacturer
12 received in the first instance and its -- I can't
13 think of how to say this right -- it's the effect
14 after the rebates that is the measure of the 30
15 percent, is that your testimony?
16   MR. NALVEN: Objection. Mr. Kaufman,
17 could you frame the question, again, please. I
18 don't understand the question.
19   Q. Do you understand the question?
20   A. I really don't. No, I don't.
21   Q. Is the 30-percent spread inclusive of
22 the effect of rebates?

---

1465

1    A. The -- let's -- we -- we keep jumping,
2  you know, back and forth between Connecticut and
3  the MDL. The -- the 30-percent spread that we've
4  been talking about and which I've discussed at
5  length and its bases are relative to physician-
6  administered drugs for which rebate payments are -
7  - are very small. And the types of price offsets
8  that exist, there's not payments -- there's not
9  rebates to PBMs to move market share of physician-
10 administered drugs.
11   So, this notion of what would happen
12 with rebates or not for the 30-percent spread for
13 physician-administered drugs, there's -- there's
14 very little paid in the way of rebates right now.
15   Are you trying to say there will be some
16 new thing with rebates?
17   Q. Let me go back to the question I
18 originally asked you then. In Connecticut you say
19 that you don't take into account the effect of
20 rebates.
21   A. Of Medicaid rebates.
22   Q. Right. And in Connecticut the Medical

---

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D. CONFIDENTIAL                    March 1, 2006
Boston, MA

1466

1  Assistance Program covers pharmacy-dispensed drugs
2  in large measure, some physician-administered
3  drugs, also, but mostly pharmacy-dispensed drugs,
4  correct?
5      A.  Correct.
6      Q.  On which large rebates are paid.
7      A.  Correct.
8      Q.  Correct.  What is the pricing that would
9  avoid damages to the Connecticut Medical
10 Assistance Program in your but-for world?
11     A.  I haven't developed a but-for world for
12 --
13     Q.  Okay.  What --
14     A.  -- for self-administered drugs.  I have
15 looked at the -- what the pricing was, and I've
16 looked at the -- the statutory reimbursements that
17 are allowed for self-administered orals under
18 Medicaid, but I haven't been using the 30 percent
19 for -- for self-administered drugs.
20     Q.  Right.  You use zero spread, right?
21     A.  I use --
22     Q.  Zero spread.

1467

1      A.  I look at the -- what the --
2      Q.  Don't you say zero spread?
3      MR. NALVEN:  Objection.
4      Q.  And if it's zero spread and there are
5  rebates, the manufacturers are actually losing
6  money, correct?
7      MR. NALVEN:  Objection.  Objection.
8      A.  I don't understand your question.
9      Q.  The spread that you think is permissible
10 for reimbursement purposes in Connecticut is a
11 zero spread between ASP and AWP, correct?
12     A.  The spread that I -- under the
13 Connecticut Medicaid statutes, there are -- that I
14 read as -- that the reimbursement is to be at the
15 lesser of what is a formulaically-based
16 reimbursement rate related to AWP and the ASP, the
17 estimated -- the acquisition cost, that difference
18 is a measure of damages under the Medicaid statute
19 for the state.
20     MR. KAUFMAN:  Okay.  I've heard you.  I
21 think I -- I think I'll stop.  I have nothing
22 further.  Others in Connecticut have not yet

1468

1  begun, obviously, and so, we'll have to come back.
2  When will the witness be available?
3      MR. NALVEN:  Well, you know, we'll
4  compare calendars, and we'll make the witness
5  available at a convenient time for everybody.
6      MR. KAUFMAN:  That's appreciated.  Thank
7  you, Doctor Hartman.
8      THE WITNESS:  Thank you.
9      VIDEO OPERATOR:  The time is 4:59.  This
10 deposition is concluded.  This is the end of
11 Cassette 4.  We are off the record.
12      (Whereupon the deposition recessed
13 at 4:59 p.m.)
14
15      _____
16      RAYMOND S. HARTMAN, Ph.D.
17
18 Subscribed and sworn to and before me
19 this _____ day of _____, 20___.
20
21 _____
22    Notary Public

1469

1  Commonwealth of Massachusetts
2  Middlesex, ss.
3      I, P. Jodi Ohnemus, Notary Public in and for the
4  Commonwealth of Massachusetts, do hereby certify that there
5  came before me on the 1st day of March, 2006, the deponent
6  herein, who was duly sworn by me; that the ensuing examination
7  upon oath of the said deponent was reported stenographically
8  by me and transcribed into typewriting under my direction and
9  control; and that the within transcript is a true record of
10 the questions asked and answers given at said deposition.
11      I FURTHER CERTIFY that I am neither attorney nor counsel
12 for, nor related to or employed by any of the parties to the
13 action in which this deposition is taken; and, further, that I am
14 not a relative or employee of any attorney or financially
15 interested in the outcome of the action.
16      IN WITNESS WHEREOF I have hereunto set my hand and affixed
17 my seal of office this 1st day of March, 2006, at Waltham.
18
19      _____
20 P. Jodi Ohnemus, RPR, RMR, CRR
21 Notary Public, Commonwealth of Massachusetts
22 My Commission Expires: 4/21/2007

Raymond S. Hartman, Ph.D.          CONFIDENTIAL                    March 1, 200
                                    Boston, MA

| | | | | |
|---|---|---|---|---|
| **A** | 1431:22 | **add** 1380:20 | 1415:14 | 1246:4 |
| **aamangi@pbwt....** | **accused** 1432:14 | 1390:15 | **admitted** 1185:4 | **ahead** 1210:2 |
| 1172:19 | 1433:1,4,14 | **addition** 1292:2 | 1387:10 | 1255:12 1261:2 |
| **abide** 1178:3 | 1434:20 1435:14 | **additional** 1177:14 | **adopted** 1277:22 | 1295:21 1323:4 |
| **ability** 1455:9 | 1439:1 | 1179:12 1215:7 | 1281:19 | 1361:20 1378:18 |
| **able** 1202:11 | **acquiesce** 1413:22 | 1264:9 1307:14 | **adults** 1450:15 | 1378:19 1400:11 |
| 1217:21 1240:3 | **acquiring** 1181:1 | 1307:18,21 | **Advance** 1192:7 | 1408:12 1411:17 |
| 1291:11,12 | 1182:7,15 | 1310:19,19 | **advantage** 1463:20 | 1435:2 1437:9 |
| 1320:3 1323:3,4 | 1197:14 | 1311:17,18 | **adverse** 1402:4 | 1449:16 1452:10 |
| 1323:6 1339:10 | **acquisition** 1181:6 | 1326:15 1388:18 | **affect** 1288:21 | 1456:6 |
| 1371:9 1395:16 | 1181:16 1182:10 | 1425:12 | 1334:5,19 1343:4 | **Albuterol** 1296:7 |
| 1395:19,21 | 1194:2 1195:8 | **address** 1178:18 | 1344:19 1346:3,8 | 1373:14,19 |
| 1396:7,11,18,22 | 1233:22 1267:8 | 1210:1 1432:17 | 1377:9,10,19,20 | 1374:5 1375:10 |
| 1398:8 | 1269:14 1301:1 | 1433:11 1439:13 | 1442:9 1452:16 | 1378:6,7 1384:21 |
| **absent** 1363:20 | 1301:12 1303:13 | 1439:14 | 1461:6 | 1385:18 1389:22 |
| **academic** 1455:14 | 1338:22 1339:2 | **addressed** 1213:8 | **affidavit** 1272:12 | 1390:3,12 1391:3 |
| 1455:15 | 1349:21 1350:12 | 1432:13 1459:3 | **affiliates** 1403:2 | 1391:14 1392:10 |
| **accept** 1214:5 | 1373:8 1375:22 | **Adeel** 1172:14 | **affirmative** | 1394:5,20 1395:1 |
| **acceptable** 1243:12 | 1382:16,18 | **adhering** 1339:14 | 1283:11 1333:1 | 1398:1 1399:9 |
| 1244:13 | 1385:9 1386:9 | **adjustments** | 1408:7 1442:20 | 1403:1,19,22 |
| **access** 1309:14 | 1408:19 1409:2,3 | 1388:18,20 | **affixed** 1469:16 | 1404:2,5,6,19 |
| 1328:8 1448:14 | 1415:11 1422:7 | 1403:17 | **afternoon** 1317:1,6 | 1405:17 1406:11 |
| **accessible** 1375:8 | 1425:5 1467:17 | **administer** 1203:9 | 1317:7 | 1410:9 1411:8 |
| 1399:3 | **act** 1190:16 | 1204:2,8,22 | **agency** 1447:6 | 1414:10 1415:16 |
| **accomplish** | 1417:17,18 | 1205:7,17 | **aggregate** 1331:4 | 1417:3 1422:9,9 |
| 1190:12 | **action** 1469:13,15 | 1352:20 | 1399:10 | 1425:11 1437:14 |
| **account** 1204:1 | **ACTIONS** 1169:9 | **administered** | **aggregated** 1331:5 | 1437:15 1439:9 |
| 1215:6 1303:8 | **actual** 1191:11 | 1204:17 1207:19 | **aggregation** | **Alkeran** 1291:15 |
| 1306:9 1307:4 | 1194:1 1215:21 | 1287:19 1308:17 | 1331:10 1400:14 | 1293:8 |
| 1337:21 1369:13 | 1216:19 1245:19 | 1368:4 1369:3 | **aggregations** | **allegations** 1227:8 |
| 1391:1 1398:21 | 1249:17 1250:2 | 1390:7 1391:2,3 | 1331:8,12 1332:9 | **alleged** 1206:14 |
| 1436:11,13 | 1270:1 1285:17 | 1391:14 1465:6 | **ago** 1326:15 | 1234:17 1463:18 |
| 1444:17 1457:5 | 1309:15 1310:1 | 1465:10 | **agree** 1180:4,9 | **allocability** |
| 1465:19 | 1330:22 1333:20 | **administering** | 1183:18 1198:15 | 1394:15 |
| **accounting** | 1336:16 1337:17 | 1203:18,22 | 1207:16 1218:14 | **allocate** 1212:6 |
| 1211:21 1212:16 | 1341:11,13 | **administration** | 1219:5 1222:14 | 1304:9,13,20 |
| **accumulating** | 1342:3 1345:6 | 1203:13,16 | 1222:22 1223:12 | 1306:10 |
| 1330:3 | 1349:22 1350:15 | 1331:15 | 1309:20 1313:4 | **allocation** 1214:18 |
| **accurate** 1298:16 | 1350:17,19 | **administrations** | 1337:20 1338:15 | 1217:1 1311:4 |
| 1301:11 1313:6 | 1384:10,14 | 1310:9 | 1344:15 1369:4 | 1363:1 1388:12 |
| 1329:14 | 1421:5 1432:18 | **admission** 1187:3 | 1378:8 1440:16 | 1395:4 1401:4 |
| **accurately** 1298:14 | 1437:22 | **admit** 1298:19 | **agreed** 1225:21 | 1402:21,22 |

Raymond S. Hartman, Ph.D.  CONFIDENTIAL  March 1, 200
Boston, MA

1406:2,16 1407:4
**allocations** 1305:17
1306:15 1406:21
**allow** 1205:3
1255:3 1291:17
1378:20
**allowance** 1440:13
**allowed** 1217:22
1234:17 1330:22
1331:6,16,19
1332:2,16,21
1333:6,10 1334:1
1334:7,20
1335:20 1337:17
1339:4 1345:5
1349:16 1355:10
1357:15 1367:15
1406:20 1407:19
1466:17
**allowing** 1245:21
1339:16
**allows** 1359:4
**altered** 1236:17
**altering** 1201:3
**alternative**
1251:22 1252:3
1260:15 1262:16
1274:6,21
1275:10 1277:13
1277:21 1278:2
1294:15 1295:3
1297:18 1299:12
1309:11 1325:7
1377:1 1381:14
1384:3 1386:9
1422:3 1448:7
**Alto** 1173:6
**Americas** 1172:16
**amount** 1193:4,5
1220:13 1232:18
1246:19 1332:16
1332:21 1338:18

1349:16 1350:8
1350:11 1351:13
1356:21,22
1357:1,2,2,3
1358:9,13,18,19
1360:20 1367:14
1384:11,12
1385:11 1408:15
1415:7,8 1421:18
1422:6 1423:17
1464:11
**amounts** 1184:18
1187:17 1189:13
1216:12 1221:17
1240:5 1331:5,19
1331:22 1333:10
1335:20 1339:4
1349:13 1350:5
1351:20 1352:1
1358:2 1368:11
1420:1
**AMP** 1462:5
**analogous** 1363:7
**analogy** 1233:12
1234:21 1237:11
1237:20 1382:2
**analyses** 1194:10
1202:18 1261:15
1307:6 1392:14
**analysis** 1186:5,17
1209:4 1210:5
1215:18 1220:5
1235:4,7 1238:6
1245:17,22
1249:8,10
1273:11 1274:12
1278:5 1283:20
1283:21,22
1285:17 1287:8,8
1288:1,8,10,20
1289:2 1291:18
1295:19 1302:14

1304:8 1307:9
1310:20 1315:10
1332:14,22
1333:7 1338:4,12
1339:22 1340:5
1342:7 1343:4
1344:20 1367:4,6
1369:6 1374:9,15
1375:20 1399:2
1399:10,16
1400:14 1401:9
1428:20 1433:7
1434:5,5 1449:2
1450:2 1453:5
**analytic** 1209:8
**analyze** 1282:11
**analyzed** 1365:11
**analyzing** 1319:21
**anecdotal** 1367:2
**annual** 1219:2
1220:13
**answer** 1185:12
1189:10 1191:17
1209:14 1286:20
1296:10,11
1343:15 1345:11
1346:1 1355:21
1377:2 1378:22
1383:21 1400:11
1400:12 1405:8
1407:13 1426:9
1436:6 1442:9
1446:13 1449:14
1451:2,12 1452:3
1452:4,6 1456:16
**answered** 1182:1
1191:22 1197:18
1197:20 1258:18
1311:11 1328:10
1361:1 1407:6
1430:2,8 1437:8
1446:11,16

1447:19 1455:18
**answers** 1469:10
**antiemetics** 1308:1
1315:4
**anybody** 1454:12
**anyplace** 1396:14
**Apart** 1447:13
**appear** 1210:21
1211:18 1319:10
1403:13 1433:7
1434:9 1438:18
**APPEARANCES**
1170:1 1171:1
1172:1 1173:1
1174:1
**appeared** 1186:18
1345:17 1440:9
**appearing** 1174:11
1175:1 1179:10
1332:11 1400:5
**appears** 1403:17
1425:17 1427:4
**appended** 1424:14
**Appendix** 1346:18
1348:19 1350:9
1351:10 1354:1
1356:8
**applicable** 1169:14
1318:10 1340:10
1420:8 1446:5
**application** 1288:1
**applications**
1310:11
**applied** 1236:22
1243:13,18
1252:4 1265:11
1274:7 1303:17
1335:10 1360:13
1364:14 1365:12
1396:1 1435:19
1454:8
**apply** 1263:15

1281:18 1365:10
1422:8
**applying** 1264:11
1266:5
**appreciate** 1276:21
1281:4
**appreciated** 1468:6
**approach** 1213:10
1236:16 1255:21
1303:14 1308:21
1309:22 1310:18
1311:2 1316:7
1363:7 1402:3
**appropriate**
1217:19 1262:1
1300:5 1399:15
1399:16 1400:13
1428:5 1451:20
1452:2
**appropriateness**
1455:12
**approved** 1357:1,2
1357:15 1358:15
1358:18
**approximately**
1218:15
**April** 1331:14
**ARDIH** 1410:17
1412:3,14
1419:13
**area** 1242:7
1252:14 1296:14
1297:9 1460:6,10
**argue** 1238:7
**arithmetic** 1380:1
1380:2
**arose** 1448:6
1449:19
**arrangements**
1195:4
**arrive** 1401:3
1402:22