Exhibit 12

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO.  1456 |
| | CIVIL ACTION:  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS | Judge Patti B. Saris |

## MERITS REPORT AND DECLARATION OF GREGORY K. BELL, Ph.D., ON BEHALF OF TRACK 1 DEFENDANTS

**March 22, 2006**

Contains Highly Confidential Material – Subject to Protective Order

# Outline of PAD Merits Report

**I.    Introduction** ................................................................................................ 1

**II.   Summary of Allegations and Opinions** ........................................................ 3

    **A.**    Summary of allegations ........................................................................... 3
    **B.**    Summary of opinions .............................................................................. 6

**III.  The Hartman Expectations Methodology** ..................................................... 9

    **A.**    Information available................................................................................ 11
    **B.**    Product lifecycle and the economics of the pharmaceutical industry.............. 15
    **C.**    Payors accept reimbursement rates in excess of acquisition cost................... 18
        **i.**    Site of care.................................................................................... 18
        **ii.**    PAD reimbursement and cross-subsidization of physician services................ 22
    **D.**    Increased transparency would not be efficient or in the public interest................ 26
    **E.**    Conclusion ............................................................................................ 29

**IV.   Evolution of Medicare Part B** ..................................................................... 30

    **A.**    Public payors supported AWP as a benchmark for reimbursement.................. 31
    **B.**    Evolution of Medicare Part B reimbursement rates ..................................... 34
        **i.**    Prior to 1992 ................................................................................. 34
        **ii.**    1992:  Medicare Part B adopts AWP as a reimbursement benchmark........................ 37
        **iii.**    1997:  Balanced Budget Act reduces reimbursement to 95 percent of AWP ............. 39
        **iv.**    2003:  Medicare Prescription Drug, Improvement, and Modernization Act................. 45
    **C.**    Conclusion:  No expectation that AWP was equal to acquisition cost.............................. 46

**V.    Private Payors** ......................................................................................... 48

    **A.**    Information available............................................................................... 48
        **i.**    Industry structure and information ...................................................... 54
    **B.**    Competition and negotiation among TPPs and physicians ............................. 59
        **i.**    Disadvantages of transparency .......................................................... 64
        **ii.**    Conclusions ................................................................................... 65
    **C.**    Payors condone a profit on PADs .............................................................. 65
        **i.**    Payors must attract and retain providers ............................................. 67

**VI.   Flaws in Plaintiffs' Liability and Damages Analyses** ................................ 69

    **A.**    Calculating "spread".............................................................................. 69
        **i.**    Calculation of Hartman ASPs ............................................................ 70
        **ii.**    Variation in AWP ............................................................................ 71
        **iii.**    Rationale for reimbursement in excess of acquisition cost ....................... 72
        **iv.**    Medicare Part B expectation of reimbursement .................................... 72
    **B.**    Exclusions from liability........................................................................... 73
        **i.**    Medicaid enrollment ....................................................................... 74
        **ii.**    Flat and uncollected co-payments...................................................... 75
        **iii.**    Alternate benchmarks and capitated contracts ..................................... 76

**iv.** Purchases by TPPs ............................................................................... 76

**v.** Missing data........................................................................................ 76

**vi.** Composition of Class 1 ....................................................................... 77

**Appendices**

Appendix A: Information on Pharmaceutical Pricing from Governmental Sources

Appendix B: History of Medicare Part B

Appendix C: Information on Pharmaceutical Pricing from Non-Governmental Sources

**Exhibits**

Exhibit A: Curriculum Vitae of Gregory K. Bell, Ph.D.

Exhibit B: Materials Relied Upon

Exhibit C: Discount and "Spread" Calculations by Drug Type and Competition

Exhibit D: Pharmaceutical Pricing Terms

Exhibit E: Payor Vertical Integration

Exhibit F: Physician Acquisition Cost Calculation

Contains Highly Confidential Material – Subject to Protective Order

## I.   INTRODUCTION

1.    I am a Group Vice President at CRA International, an economics and management consulting firm.  My education includes a master's of business administration and a doctorate in business economics, both from Harvard University.  Details of my professional experience, publications, and past testimony are described in my curriculum vitae, a copy of which is attached as Exhibit A.  CRA receives compensation for my time at a rate of $600 per hour. Neither CRA nor I have any financial interest in the outcome of this litigation.

2.    For the past eleven years, I have directed the Pharmaceuticals practice within the Business Consulting group at CRA.  In this capacity, I have led many projects concerning the economics of business strategy in the pharmaceutical industry. Most of my work has focused on product pricing, contracting strategy for managed care organizations and hospitals, influences on physician prescribing behavior, and product launch strategy.  In addition, I have submitted numerous expert reports and given testimony in a wide range of cases involving patent disputes, licensing, antitrust and other issues in the pharmaceutical industry.  In this matter, with Professor Fiona Scott Morton, I prepared an expert tutorial entitled, "An Orientation to the Acquisition of and Reimbursement for Prescription Drugs," submitted on December 3, 2004 ("Tutorial"), and provided testimony to the Court on December 7, 2004.[1]

3.    Plaintiffs have alleged an industry-wide "scheme" that spanned both self-administered drugs ("SADs") and physician-administered drugs ("PADs").[2]  I understand that certification of a class of third-party payors who made payments or reimbursements for SADs was denied; three classes related to claims for the reimbursement of PADs have been certified:  a nationwide class of Medicare Part

---

[1]    I have also submitted an expert report in this matter on behalf of the Bristol-Myers Squibb Company and Oncology Therapeutics Network Corporation, dated March 15, 2006.

[2]    See Third Amended Master Consolidated Class Action Complaint Amended to Comply with Court's Class Certification Order, October 17, 2005 ("Third Amended Complaint"), pp. 2–3, 199–200.

Contains Highly Confidential Material – Subject to Protective Order

B beneficiaries who paid co-payments based on AWP ("Class 1"),[3] a Massachusetts class of third party payors ("TPPs") who offered "Medigap-type supplemental insurance" for PADs under Medicare Part B and paid based on AWP ("Class 2"), and a Massachusetts class for consumers and TPPs who paid for PADs based on contracts expressly using AWP outside of the Medicare Part B context ("Class 3"). The class period spans January 1, 1991 to January 1, 2005 for Classes 1 and 2 and January 1, 1991 to the present for Class 3.[4]

4. I have been asked by counsel for the Defendant pharmaceutical manufacturers to respond to Plaintiffs' allegations in general as described below in section two of this report and in particular as presented in liability reports submitted by Plaintiffs' experts Dr. Raymond Hartman and Dr. Meredith Rosenthal.[5]

5. In preparing this report, I have reviewed the materials listed in Exhibit B and cited throughout this report. I understand that discovery is continuing in this case, as is my analysis. I will update my analysis as additional information becomes available. Further, I reserve the right to supplement or modify my opinions, if warranted, and to prepare additional supporting materials, such as summaries, graphical exhibits, or charts.

---

[3] Four Subclasses of Class 1 have been certified: one for each of AstraZeneca, PLC., Zeneca, Inc., AstraZeneca Pharmaceuticals L.P., and AstraZeneca U.S. ("AstraZeneca"); the BMS Group (Bristol-Meyers Squibb Co., Oncology Therapeutics Network Corp., and Apothecon, Inc.) ("BMS"); SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK"), and the Johnson & Johnson Group (Johnson & Johnson, Centocor, Inc., Ortho Biotech, McNeil-PPC, Inc., and Janssen Pharmaceutica Products, L.P.) ("J&J"). A Subclass for the Schering-Plough Group (Schering-Plough Corporation and Warrick Pharmaceuticals Corporation) ("Schering-Plough") was not certified, and residents of Alabama, Alaska, Georgia, Iowa, Kentucky, Louisiana, Mississippi, Montana, and Virginia are excluded from Class 1, as are all Medicare beneficiaries who paid flat co-payments or who were or had the right to be fully reimbursed for their co-payments. (Judge Saris, Memorandum and Order Re: Motion for Class Certification, January 30, 2006 ("Class Certification Order"), pp. 1–3.)

[4] Class Certification Order, pp. 1–7.

[5] Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages, December 15, 2005 ("Hartman Liability Report"); Supplemental Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages: Addendum, February 3, 2006 ("Hartman Liability Report Supplemental"); and Liability Report of Dr. Meredith Rosenthal, December 15, 2005 ("Rosenthal Liability Report").

Contains Highly Confidential Material – Subject to Protective Order

6.      My report is organized as follows.  The next section presents a summary of Plaintiffs' allegations and my opinions with respect to those allegations.  The third section examines Plaintiffs' expectations theory primarily from the perspective of Classes 1 and 2, the Medicare Part B claimants, and demonstrates the inconsistencies of this theory with respect to the wealth of information that was available to payors, the product lifecycle economics of the industry, and the rationale for payors to reimburse providers at rates that are in excess of acquisition cost for PADs.  The fourth section examines the evolution of reimbursement rates under Medicare Part B, showing that Plaintiffs' assumption regarding expectations of reimbursement at provider acquisition cost are simply wrong and that instead, the Medicare Part B reimbursement rates have been established consistent with a policy to provide incentives for these healthcare services to be offered in the lower-cost environment of the physician's office and in full recognition of the sometimes significant differences that can exist between AWP and acquisition cost.  The fifth section examines Plaintiffs' claims with respect to private payors, focusing on the negotiation of reimbursement rates among competing payors and competing physicians.  The sixth section addresses some of the problems inherent in Plaintiffs' attempts to quantify damages in a manner consistent with their fundamentally flawed theory of liability.

## II.     SUMMARY OF ALLEGATIONS AND OPINIONS

## A.     Summary of allegations

7.      I understand that Plaintiffs allege an industry-wide scheme consisting of fraud, concealment, and improper marketing of pharmaceutical products that affected class members since 1991.[6]  Specifically, Plaintiffs and their experts allege the following.

8.      Plaintiffs and their expert Dr. Hartman allege that "Defendant Drug Manufacturers report to trade publications a drug price—the Average Wholesale Price—that for many drugs is deliberately set far above the prices that these drugs

---

[6]      Third Amended Complaint, ¶¶ 2–8, 555.

Contains Highly Confidential Material – Subject to Protective Order

are available in the marketplace";[7] the "AWP, or its formulaic equivalent the WAC (wholesale acquisition cost), is interpreted by the industry as the signal for the underlying structure of list and transaction prices for almost all drugs";[8] Defendant manufacturers have taken advantage of payor reliance on AWP as a price signal "by artificially inflating the reported AWP relative to the actual drug transaction prices and acquisition costs for which the AWP has been taken as a signal";[9] payors expected AWP to be larger than ASP by a reasonably predictable amount;[10] and that "[g]iven the lack of pricing transparency in this industry, … the AWP has served as a pricing reference point for market expectations about the manufacturers' ASPs and providers' and other intermediaries' AACs."[11]  Dr. Hartman contends that payors were deceived when the difference between the AWP of a drug and his calculation of an average selling price (the "Hartman ASP") for that drug was larger than 30 percent of the Hartman ASP.[12]

9.   Dr. Hartman alleges that the statutory language for the Medicare Part B program and Medicare carriers considered AWP to be equivalent to acquisition cost, at least through 2003.  He alleges that the statutory language specifying the equivalence of AWP to acquisition cost was removed in 2004.[13]

10.   Dr. Hartman opines that the "spreads," defined by Plaintiffs as the difference between AWP and the dispensers' actual acquisition cost,[14] on "single-source comparator pharmaceuticals" can be used to determine by how much the average acquisition cost would have differed from the AWP—for both single-source and

---

[7]     Third Amended Complaint, ¶ 3.

[8]     Rebuttal Declaration of Dr. Raymond S. Hartman in Support of Plaintiff's Motion for Class Certification, December 16, 2004 ("Hartman Class Rebuttal, 2004"), ¶ 3 (a).

[9]     Hartman Class Rebuttal, 2004, ¶ 3 (b).

[10]    Declaration of Dr. Raymond S. Hartman in Support of Plaintiff's Motion for Class Certification, September 3, 2004 ("Hartman Class Declaration, 2004"), ¶ 10 (b).

[11]    Hartman Class Rebuttal, 2004, ¶ 15 (f) (i).  The Hartman Class Rebuttal, 2004, defines ASP and AAC as Average Sales Price and Actual Acquisition Cost, respectively.  See also Testimony of Meredith Rosenthal, Tutorial Evidentiary Hearing, December 6, 2004 ("Rosenthal Tutorial"), p. 11.

[12]    Hartman Liability Report, ¶¶ 4, 59 (e).

[13]    Hartman Liability Report, ¶¶ 18–19, 63 (a).

[14]    Third Amended Complaint, ¶¶ 4–5; Hartman Liability Report, ¶ 15.

Contains Highly Confidential Material – Subject to Protective Order

multi-source drugs—had manufacturers not fraudulently manipulated AWP. Under Plaintiffs' theory, Defendants' drugs that demonstrate differences between AWP and acquisition cost in excess of expectations have spreads that are not "reasonably predictable" and thus are liable for fraudulent pricing. In circumstances where liability is found, Plaintiffs' experts contend that TPPs are damaged by the amount that the actual difference between AWP and acquisition cost exceeds their expectations.[15]

11.   Plaintiffs and Dr. Hartman allege that the "spread" is created by inflation of AWP and hidden price concessions, and that "[t]hose discounts are not used by the Defendant Drug Manufacturers in calculating the published AWPs, resulting in their inflation."[16]  Dr. Hartman claims that there is no evidence that payors were aware of so-called "mega-spreads," and that negotiations between TPPs and physicians "simply could not have been shaped in any significant way by the existence of the "mega-spreads."[17]  It is further alleged that "[h]ad the existence of the 'mega-spreads' been perceived and understood by TPPs, those payors would have negotiated more aggressively than they did, leading to lower reimbursement rates."[18]

12.   Plaintiffs allege that Defendant manufacturers attempt to increase the sales and market shares of their drugs by manipulating the spread, through fraudulently inflating the AWP or lowering acquisition cost via hidden discounts. As a result, it is alleged that providers and intermediaries (such as wholesalers, pharmacies, and pharmacy benefit managers ("PBMs")) benefit from the spread.[19]  "This, in turn, motivates the providers to sell and administer the drugs with the most inflated AWPs."[20]  Finally, Plaintiffs allege that "[m]anufacturers often promote

---

[15]   Hartman Liability Report, ¶ 22, Table 3.
[16]   Third Amended Complaint, ¶ 4; Hartman Class Declaration, 2004, ¶ 10 (b).
[17]   Hartman Liability Report, ¶ 15.
[18]   Hartman Liability Report, ¶ 15.
[19]   Third Amended Complaint, ¶¶ 4–5; Rosenthal Liability Report, ¶ 9.
[20]   Third Amended Complaint, ¶ 3. See, also, Rosenthal Liability Report, ¶ 24.

Contains Highly Confidential Material – Subject to Protective Order

their drugs not based on lower prices, but by use of reimbursement rates based on a fictitious and inflated AWP."[21]

## B.   Summary of opinions

13.   The use of AWP as a reimbursement benchmark was practiced by and may have originated with payors in the public sector more than twenty years before the beginning of the class period and was not a 'scheme' hatched by manufacturers "solely to cause Plaintiffs and the Class Members to overpay for Covered Drugs"[22] or "designed and implemented to move market share relative to the therapeutic competitors."[23]  While there is no substantive statutory definition of AWP, it was generally understood to be:  (1) a benchmark price rather than an "average" of "wholesale prices," and (2) a price that does not reflect price concessions.  Payors did not expect AWP to be a "reasonably predictable" measure of acquisition cost, a fact confirmed by numerous health plan deponents in this matter,[24] government agencies and institutions,[25] and the literature upon which Dr. Hartman relies.[26]

14.   Nonetheless, Plaintiffs and their experts principally allege fraud and concealment whereby payors were kept unaware of large differences between AWP and physician providers' acquisition costs—knowledge which allegedly would otherwise have led to reduced reimbursement rates and lower healthcare costs.  It

---

[21]   Third Amended Complaint, ¶ 6.  See, also, Rosenthal Liability Report, ¶ 9.

[22]   Third Amended Complaint, ¶ 212.

[23]   Hartman Liability Report, ¶ 22 (a).

[24]   See, for example:  Deposition of Mike Beaderstadt, Director of Provider Relations, John Deere Heath, September 17, 2004 ("Beaderstadt (John Deere) Deposition"), pp. 72–73; Deposition of John M. Killion, Senior Director, Ancillary Services, Blue Cross Blue Shield ("BCBS") Massachusetts, January 6, 2006, pp. 118–120, 136–139; and Deposition of Margaret M. Johnson, R.Ph., Executive Pharmacy Director, Horizon BCBS of New Jersey, September 22, 2004, p. 218.

[25]   "… the AWP bears no consistent or predictable relationship to the prices actually paid by physicians and suppliers to drug wholesalers in the marketplace."  Donna E. Shalala, Secretary, Department of Health and Human Services ("DHHS"), *Report to Congress:  The Average Wholesale Price for Drugs Covered Under Medicare*, 1999, HHC902-0801 through 0818 at 0809.

[26]   "There is no single discount rate which can be applied to the AWP to provide a reasonably consistent estimate of the physician's acquisition cost…"  Office of Inspector General ("OIG"), *Physicians' Costs for Chemotherapy Drugs*, A-02-91-01049, November 1992 ("OIG November 1992"), Appendix II.  This report is cited by the Hartman Liability Report in the context of expected discounts from AWP at ¶ 22 (b).

Contains Highly Confidential Material – Subject to Protective Order

is not evident, however, that any payors were deceived; there was widespread information regarding substantial differences between AWP and acquisition costs. In fact, the very same studies that Plaintiffs cite as evidence of market expectations which suggest no more than a 30 percent difference between AWP and acquisition cost, include several examples of differences that are several times larger than 30 percent as well as examples of differences that increase over the lifecycle of a pharmaceutical.

15.    Further, it is not evident that reduced reimbursement rates and lower healthcare costs would have been the result of more information regarding acquisition costs. Medicare Part B reimbursement rates were the result of policy decisions that were reaffirmed over the years; Congress decided to base reimbursement on AWP in the face of numerous studies documenting the sometimes substantial differences between AWP and acquisition cost. Commercial reimbursement rates are the product of competition, a marketplace negotiation among competing payors and competing providers. In general, private payors were not even able to negotiate reimbursement rates as low as Medicare Part B and the Medicare Part B reimbursement rates were widely known. Of course, if private payor reimbursement rates as negotiated in a competitive environment are informed by, but generally exceed, Medicare Part B reimbursement rates, then Medicare Part B reimbursement rates cannot be presumed to be inflated.

16.    It would appear that Plaintiffs and their experts assume that payors would not have condoned spreads. The Medicare program, however, recognized that providing Part B care in the physician's office would be less expensive and likely preferred by patients as opposed to providing that care in a hospital setting. Accordingly, policy governs Medicare Part B reimbursement rates. They have been set to support the shift in site of care and to cross-subsidize for physician services and practice expenses that are recognized as being un- or under-reimbursed. The result is lower total healthcare costs. Dr. Hartman is simply wrong in asserting that these rates were set intending to be equal to physician acquisition costs. With respect to private payors, their negotiations with

physicians were governed by interests beyond pharmaceutical cost minimization, including building viable provider networks and maintaining physicians' participation in them, cross-subsidizing un- or under-reimbursed physician services and practice expenses that were incidental to dispensing the pharmaceutical, and supporting the shift in site of care away from the higher costs of a hospital setting to the lower costs of a physician clinic setting.

17. Dr. Hartman's expectations theory is also inconsistent with the economics of the pharmaceutical industry. One would expect price competition to evolve over the lifecycle of a pharmaceutical as it confronts therapeutic and generic competition. In a perversion of basic economic principles, Dr. Hartman's theory of liability views competition that lowers drug acquisition costs as fraudulent if the resulting difference from AWP exceeds a certain threshold. On the contrary, such circumstances lead to expected profits for providers that are competed away, to the extent possible, by the payors in the negotiation over reimbursement rates. As a result, such price competition among pharmaceutical manufacturers leads to reduced costs to payors and lower healthcare costs to society.

18. Further, Plaintiffs and their experts seem to argue that it is inappropriate for pharmaceutical manufacturers to inform physician providers of the impact of acquisition cost and reimbursement rates on the profitability of a physician's practice.[27] From my perspective as an expert in the economics of business strategy for the pharmaceutical industry, such prohibitions exemplify neither good business nor good economics. From a business-to-business marketing perspective, the reason for offering a preferred provider a cheaper price on a product is so that the preferred provider can be more profitable as a result. Furthermore, it is entirely reasonable and expected to inform the preferred provider of the impact that the cheaper price will have on profitability. If pharmaceutical manufacturers were to be precluded from explaining the effect of product pricing and reimbursement to physicians, that action would reduce the

---

[27] Rosenthal Liability Report, ¶¶ 29–34. Rosenthal Tutorial, pp. 13, 16, 17.

Contains Highly Confidential Material – Subject to Protective Order

incentive to lower pharmaceutical prices to preferred physician providers, leading to an increase in healthcare costs.

19.    In addition to my disagreement with the expectations theory advanced by Plaintiffs' expert, Dr. Hartman, I find the following specific faults in his liability and damages analysis. I conclude that Dr. Hartman's methodology inappropriately finds liability where none may exist and results in inflated estimates of alleged damages.

19.1.    Dr. Hartman commits four types of errors when calculating "spread." First, Dr. Hartman fails to calculate the Hartman ASPs appropriately by including in his calculations the effect of sales to classes of trade that are not at issue in the litigation. Second, Dr. Hartman fails to consider variation in AWP. For instance, to the extent that the AWP differs among the pricing publications, the determination of alleged liability and damages can depend upon the pricing publication chosen for the AWP. Third, Dr. Hartman makes no attempt to assess the extent to which reimbursement rates would increase for related services and administration fees if the reimbursement rate for PADs were to decline. Fourth, with respect to Medicare Part B, Classes 1 and 2, Dr. Hartman incorrectly assumes that reimbursement was always intended to be equal to acquisition cost.

19.2.    Dr. Hartman also fails to properly confine his analyses to the classes at issue. Adjustments must be made to account for product sales that are excluded by the class definition, reimbursements by TPPs that were aware of pharmaceutical pricing behavior based on their actual purchase or contracting for pharmaceuticals, and speculation with respect to missing data.

## III.    THE HARTMAN EXPECTATIONS METHODOLOGY

20.    To identify alleged instances of liability, Dr. Hartman proposes an expectations-based methodology. Dr. Hartman maintains that payors expected there to be a

"reasonably predictable" relationship between the AWP for a drug and its acquisition cost. Dr. Hartman opines that a "conservative" assumption of the expected difference between AWP and acquisition cost is 30 percent of the Hartman ASP and accordingly concludes on liability in those instances where the difference between AWP and the Hartman ASP is greater than 30 percent of the Hartman ASP.[28]

21.   I am not aware of any deposition testimony, documents produced in this case, or other information that would suggest that payors held any such expectations. In fact, Dr. Hartman was unable to identify a third party payor that expected AWP to exceed ASP by less than 30 percent.[29] Further, I am not aware that Congress determined the reimbursement rates for Medicare Part B drugs based on such expectations nor that private payors negotiated with physician practices to reimburse for PADs based on such expectations. It is my opinion that the expectations methodology as advanced by Dr. Hartman is inconsistent with the information on acquisition costs that was available to payors; is inconsistent with the economics of the pharmaceutical industry, in particular the product lifecycle; and is inconsistent with the objectives that payors maintained for the reimbursement rates set for PADs. It is also my opinion that a remedy of increased transparency regarding price concessions on PADs, as apparently advocated by Dr. Hartman,[30] would be contrary to the public interest, likely leading to an increase in healthcare costs.

---

[28]   Hartman Liability Report, ¶ 59 (e). Dr. Hartman reports "spread" values as the difference between AWP and Hartman ASP as a percentage of ASP (i.e., "spread" = (AWP – Hartman ASP) / Hartman ASP). Most publicly available literature, including that relied upon by Dr. Hartman, reports pharmaceutical pricing terms as a percentage of AWP (i.e., discount = (AWP – ASP) / AWP). As a result of this reporting difference, Dr. Hartman's "spread" of 30 percent based on ASP is equivalent to 23 percent based on AWP. Consistent with the relevant literature and industry convention, I report price concession values in terms of AWP. See also Deposition of Raymond S. Hartman, February 27 through March 1, 2006 ("Hartman Liability Deposition"), p. 1255.

[29]   Hartman Liability Deposition, p. 787.

[30]   Hartman Liability Report, footnote 63.

Contains Highly Confidential Material – Subject to Protective Order

**A.      Information available**

22.      Dr. Hartman does not explain how payors developed their expectations, if any,
regarding the differences between AWP and acquisition cost.  In his September 3,
2004 declaration ("Hartman Class Declaration"), Dr. Hartman concluded that
surveys by the Office of the Inspector General ("OIG") of the Department of
Health and Human Services ("DHHS") over the period 1984–2002 are examples
of information that would be sufficient to summarize the market's understanding
of the relationship between AWP and acquisition costs for the purposes of
calculating "yardstick" spreads, and that these estimates could be further refined
with manufacturers' data and depositions of TPPs and managed care
organizations.[31]  The Hartman Liability Report chooses three PADs that were
"successful 'break-through' innovator drugs [to] serve as reasonable yardsticks
for 'but-for' spreads" and, "as a cross-check," Dr. Hartman reviews "a variety of
publicly-available survey research" ostensibly summarizing the "market"
expectations of spreads.[32]

23.      In this review of publicly available survey research, Dr. Hartman principally cites
a 1992 study from the OIG on the relationship between acquisition costs and
AWPs for chemotherapy drugs.  Dr. Hartman ignores the OIG findings that
manufacturer price concessions on single-source drugs (20 percent discount) were
lower and less variable than price concessions on multi-source drugs (20 to 83
percent discounts).[33]  Furthermore, using Plaintiffs' definition of spreads, the

---

[31]      Hartman Class Declaration, 2004, ¶ 29.

[32]      Hartman Liability Report, ¶ 22 and ¶ 59 (a).  I note that Dr. Hartman calculates his "yardstick
spreads" for the three products (Blenoxane, Taxol, and Zofran) by considering only the period
during which the products were not subject to generic competition.

[33]      See OIG November 1992, Appendix III.  Dr. Hartman's use of single-source information alone is
also inconsistent with his class certification analysis, where he initially noted that an expectations
model should have a different yardstick for single- and multi-source drugs (Hartman Class
Declaration, 2004, ¶ 19).  In liability analysis, Dr. Hartman rejected the necessity of multi-source
information:  "there are several multi-source drugs where that relationship deviates from what I
am talking about here, but I have focused this on single-source drugs, since that has been the focus
of much of the damage period in many of the drugs." (Hartman Liability Deposition, p. 730).

Contains Highly Confidential Material – Subject to Protective Order

study announced that "spreads" were as high as 488 percent for these chemotherapy drugs.[34]

24.    Plaintiffs' theory of liability is predicated on the assumptions that AWP was the only price "signal" publicly available to payors and that payors were unable to obtain information on the price concessions that certain providers obtained.[35] However, by acknowledging that publicly-available survey research informed "market expectations," Dr. Hartman has acknowledged that payors had access to, and apparently used, information regarding the relationships between physician acquisition costs and AWPs.[36] This acknowledgement regarding available information is fundamentally irreconcilable with an economic theory of fraud.

25.    Perhaps most damaging to Dr. Hartman's expectations theory, however, is one of the OIG's main findings in the study: "There is no single discount rate which can be applied to the AWP to provide a reasonably consistent estimate of the physician's acquisition cost ...."[37] This finding is diametrically opposed to Dr. Hartman's theory that payors expected a "reasonably predictable" relationship between AWP and acquisition cost.

26.    Nonetheless, Dr. Hartman concludes that "[t]here is no evidence that the yardsticks for TPP price expectations for multi-source physician-administered drugs were any different from those for singe-source [sic] physician-administered drugs"[38] and "There is no survey information of which I am aware that has documented spreads on generic physician-administered pharmaceuticals."[39] Both of these conclusions are clearly refuted by the very study that he references, let

---

[34]    The reported discounts of 20 and 83 percent correspond to "spread" values of 25 and 488 percent, respectively. As defined in footnote 28, "spread" = (AWP – ASP) / ASP, so "spread" = 0.83 / (1 – 0.83) = 488.2 percent.

[35]    Hartman Class Rebuttal, 2004, ¶ 15 (f) (i).

[36]    Hartman Class Declaration, 2004, ¶¶ 30–31; Hartman Liability Deposition, p. 731. Dr. Rosenthal also agrees that payors had access to, and apparently used, information regarding the relationships between physician acquisition costs and AWPs. (See Deposition of Meredith Rosenthal, February 22-23, 2006 ("Rosenthal Liability Deposition"), pp. 55–57.)

[37]    OIG November 1992, Appendix II.

[38]    Hartman Liability Report, ¶ 60 (f).

[39]    Hartman Liability Report, footnote 63.

Contains Highly Confidential Material – Subject to Protective Order

alone being refuted by several other studies that were performed and became
publicly-available during the class period.

27.    Exhibit C summarizes the pharmaceutical price concessions documented in 31
studies available between 1984 and 2004 that commented on pharmaceutical
acquisition cost, AWP, and reimbursement rates.[40] Not all studies considered
both single- and multi-source drugs, nor did every study consider SADs and
PADs.  However, considering each drug in each study, there are more than 1,000
examples of pharmaceutical price concessions in general, as well as how specific
circumstances (e.g., therapeutic or generic competition, drug type) affect price
concessions.

28.    This summary of publicly-available information demonstrates two key points.
First, there is substantial variation in the reported price concessions.  Second, the
price concessions frequently exceed the 30 percent "spread" liability threshold
advocated by Dr. Hartman.  I find that the publicly-reported distribution of
acquisition costs for single-source PADs ranged from 53 percent of AWP to 87
percent of AWP;[41] I find that the acquisition costs for multi-source PADs ranged
from 15 percent of AWP to 84 percent of AWP.[42]  In my opinion, such
information does not give rise to a set of expectations that there would be a
"reasonably predictable" relationship between the AWP for a drug and its
acquisition cost.  Further, such information does not give rise to expectations that
the differences between AWP and acquisition costs would not be expected to
exceed 30 percent of the Hartman ASP.  For instance, the difference between
acquisition cost and AWP for single-source PADs ranged from 15 percent of
acquisition cost (10th percentile) to 88 percent of acquisition cost (90th percentile);

---

[40]    Exhibit C reports the price concessions both in terms of discounts (i.e., as a percentage of AWP)
and "spreads" (i.e., as a percentage of ASP). So, for example, the 30.4 percent discount for the
25th percentile of the multi-source PADs corresponds to a 43.7 percent "spread."

[41]    Calculated as 100 percent less the discount reported in Exhibit C.

[42]    These values are based on the 10th and 90th percentiles of discounts as a percentage of AWP that
are reported in Exhibit C. (The 10th percentile means that only 10 percent of the observations are
at or below this level of price concession; similarly, the 90th percentile means that 90 percent of
the observations are at or below this level of price concession.)

Contains Highly Confidential Material – Subject to Protective Order

for multi-source PADs the difference ranged from 18 percent (10th percentile) of acquisition cost to 586 percent (90th percentile) of acquisition cost.

29.    Based on the information presented in Exhibit C, a payor forming expectations regarding the relationship between AWP and acquisition costs would not reach the conclusion claimed by Dr. Hartman.  Instead, such a payor would realize at least three points related to acquisition cost.  First, the price concessions offered by drug vary substantially.  Second, 30 percent of ASP is not a reasonable expectation of the possible difference between acquisition cost and AWP, even for a single-source PAD.[43]  As demonstrated by the statistics in Exhibit C, a "spread" value that characterized at least 75 percent of the single-source PAD observations would need to be at least 41.7 percent.  Third, the price concessions increase substantially, in both level and variation, as competition increases and a measurement based on single-source products would not be expected to apply to multi-source products.[44]

30.    In addition to the government-produced information regarding pharmaceutical prices and the Medicare and Medicaid programs, other government programs provided additional information to payors and other industry participants regarding the existence and potential magnitude of price concessions.  The schedule of prices and contracts for supplies and services frequently purchased by the federal government (and select other public agencies) is known as the Federal Supply Schedule ("FSS").  The Veteran's Administration ("VA") negotiates FSS prices for pharmaceuticals with manufacturers.  Admittedly, the VA has an important lever in this negotiation—in addition to the volume of purchases

---

[43]    In addition to ignoring publicly-available studies, Dr. Hartman's theory also ignores available information conveyed by other pricing terms.  For example, despite recognizing a "formulaic" relationship between AWP and wholesale acquisition cost ("WAC") in which AWP is often 20 to 25 percent greater than WAC, Dr. Hartman does not consider how payor expectations would change for a drug that did not display these characteristics.  (Hartman Liability Deposition, pp. 676-677).

[44]    Note that the variation in price concessions across the product lifecycle, as noted in the OIG November 1992 study, demonstrates that the benchmark PADs selected by Dr. Hartman cannot characterize the "expected" difference between acquisition cost and AWP, even if such a concept existed.

Contains Highly Confidential Material – Subject to Protective Order

represented by those agencies authorized to purchase from the FSS, Medicaid sales for *any* of a manufacturer's products require that *all* of that manufacturer's products be included in the FSS program.[45] As a result, the VA has been able to negotiate prices that are estimated at 52 percent of AWP, or about 15 percent less than the Medicaid rebate program's best price.[46]

31.    The FSS prices that result from these negotiations are publicly available and include both SADs and PADs.[47] For example, the 2005 FSS price of $161.05 for Zoladex, a PAD for prostate cancer marketed by AstraZeneca, represents a 68 percent discount on the AWP of $469.99.[48] As a result, since at least 1993, payors and other industry participants were able to observe the price a major purchaser of pharmaceuticals was able to negotiate with manufacturers. While other purchasers were not eligible for these prices, they would know that they could not expect to negotiate lower prices than the FSS, making these prices the 'floor' for acquisition costs. For more on different publicly available price schedules, see Exhibit D.

**B.    Product lifecycle and the economics of the pharmaceutical industry**

32.    Dr. Hartman's expectations approach does not comport with the economics of the industry. Dr. Hartman's expectations theory implies that payors expected the difference between AWP and physician acquisition cost would not exceed 30 percent of the Hartman ASP, that payors expected this relationship to hold across

---

[45]    Under Section 603 of the Veterans Health Care Act of 1992, manufacturers are required to list all of their brand name drugs on the FSS as a condition of having their drugs covered and reimbursed by the Medicaid program. See William H. von Oehsen, III, *Pharmaceutical Discounts Under Federal Law: State Program Opportunities*, Public Health Institute, May 2001, p. 15.

[46]    Congressional Budget Office ("CBO"), Prices for Brand-Name Drugs Under Selected Federal Programs, June 2005. The Medicaid Best Price is defined as the greater of a 15.1 percent reduction in the average manufacturer price ("AMP") of a pharmaceutical or the best price provided by a pharmaceutical manufacturer to a commercial payor (adjusted for inflation). The Medicaid Best Price is not publicly available.

[47]    Pharmacy Benefits Management, Strategic Healthcare Group, U.S. Department of Veterans Affairs, Drug and Pharmaceutical Prices, http://www.pbm.va.gov/PBM/prices.htm (accessed February 23, 2006).

[48]    Based on 3.6 mg injectable Safesystem Syringe, NDC 00310-0950-36, http://www.pbm.va.gov/PBM/prices.htm (accessed March 1, 2006); Red Book, 2005 Edition, Thomson Micromedex, p. 670.

Contains Highly Confidential Material – Subject to Protective Order

time and across drugs, and that payors determined physician reimbursement rates based on their understanding of the relationship between AWP and physician acquisition costs.  Yet, nowhere does Dr. Hartman address the economics of the industry and the rational expectation of the emergence of price competition during a product's lifecycle as it is exposed to therapeutic and generic substitution.

33.     Branded pharmaceutical manufacturers set the list price for a product at launch, based on the product's relative clinical attributes, market research, and other commercial conditions.  Over time, these list prices tend to increase, often reflecting a growing baseline of use, the arrival of new indications, and the price of competing products.  As Dr. Hartman points out, manufacturers of brand name pharmaceuticals that face neither therapeutic nor generic competition have no incentive to offer significant price concessions on their products.[49]  Nonetheless, some price concessions may be offered to certain preferred purchasers, such as a prestigious teaching hospital in order to help establish the product in the prescribing habits of new physicians.  Then, as competition evolves, other products may be launched.  Due to patent protection, these products would not be the same chemical entity, but they may be part of the same broad category of compounds and act as possible therapeutic substitutes.  As a result, one would expect the pharmaceutical manufacturers to engage in price competition to become the preferred product for preferred purchasers.  In general, this competition does not manifest as a decrease in price to all purchasers, but as a decrease in price to preferred purchasers.  Thus, these price concessions could vary by purchaser, for instance larger purchasers might be able to negotiate lower prices.  Accordingly, one could certainly observe a general increase in the price of a product to all purchasers at the same time as there is a decrease in the net price to one or more preferred purchasers.  Finally, net price competition could become even more intense with the launch of generic versions of the product.  Some purchasers may continue to pay the price for the branded version of the product; other purchasers may shop around for the lowest acquisition cost.

---

[49]     See Hartman Liability Report, ¶¶ 58-59; and Hartman Class Rebuttal, ¶ 19.

Contains Highly Confidential Material – Subject to Protective Order

34.     In my opinion, payors expected price concessions to vary across the lifecycle by
product and by purchaser.  Not only is this a standard expectation of business, but
such competition was the foundation for the pricing behavior observed for SADs
as payors established formularies, negotiated with manufacturers for rebates based
on formulary position, and instituted maximum allowable cost ("MAC") policies
once generics were available.[50]  For example, when the Health Care Financing
Administration ("HCFA", the predecessor to the Centers for Medicare and
Medicaid Services ("CMS"), the regulatory body that administers the Medicare
program) began to implement the Outpatient Prospective Payment System
("OPPS"), it determined acquisition costs for a number of "transitional pass-
through" drugs, estimating that average price concessions increased from 32 to 39
percent of AWP when a single-source drug encountered therapeutic competition,
and increased from 39 to 57 percent of AWP when drugs encountered generic
competition.[51]  In terms of the metrics employed by Dr. Hartman, price
concessions of 32 to 39 percent correspond to "spreads" of 47 to 64 percent, while
price concessions of 39 to 57 percent correspond to "spreads" of 64 to 133
percent.  In fact, there is a wealth of government and academic literature devoted
to demonstrating the existence, potential values, and rate of change for
pharmaceutical price concessions due to changing competitive circumstances.[52]

---

[50]     As an example with respect to PADs, I note that in 2000, Florida added 400 NDCs for injectable
drug products to its state MAC price listing.  (The Florida Senate, *Review of Medicaid
Prescription Drug Pricing*, Interim Project Report 2005-141, November 2004, p. 5.)  Other states
such as Montana and Wisconsin have also included PADs in their MAC lists.  (Administrative
Rules of Montana, Department of Public Health and Human Services, Section 37.86.105(4)
available at http://arm.sos.state.mt.us/37/37-19835.htm; Wisconsin Department of Health and
Family Services, Budget Change Items, p. 244, available at
http://www.pswi.org/government/Fiscal%20Bureau%20Budget%20Analysis.pdf.)

[51]     Health Care Financing Administration, "Office of Inspector General; Medicare Program;
Prospective Payment System for Hospital Outpatient Services," 65 FR 18434, April 7, 2000 at 65
FR 18481.

[52]     For government publications reporting changes in price concessions over the product lifecycle,
see, for example, OIG November 1992, pp. 6-7, Appendix III.  For a survey of academic literature
evaluating the effects of therapeutic or generic competition, see, for example, Sara Fisher Ellison,
"What Prices Can Tell Us About the Market for Antibiotics," MIT working paper, July 1998 and
Don-Churl Suh, Willard G. Manning, Jr., Stephen Schondelmeyer, and Ronald Hadsall, "Effect of
Multiple-Source Entry on Price Competition After Patent Expiration in the Pharmaceutical
Industry," Health Services Research 35:2 (June 2000).  Note that the studies upon which Dr.
Hartman relies to justify his benchmark approach to damages (Hartman Class Declaration,

Contains Highly Confidential Material – Subject to Protective Order

## C.  Payors accept reimbursement rates in excess of acquisition cost

35.  Dr. Hartman assumes that payors determine reimbursements based on an expected relationship between acquisition cost and AWP, while ignoring other economic factors affecting reimbursement.[53]  On the contrary, payors had incentives to shift patient care from the higher-cost setting of the hospital to the lower-cost setting of the physician office reward physicians, payors needed to motivate physicians to participate in their networks, and payors needed to reimburse for un- or under-reimbursed services that were ancillary to the use of PADs.

### i.  Site of care

36.  Payors, however, have strong incentives to shift patient care out of the hospital and into physicians' offices in order to reduce the total cost of care.  Cancer care by dedicated and specialized staff using streamlined office-based practices is considered to be more efficient and cost-effective than cancer care in the hospital setting.[54]  One oncologist was quoted as saying that "[t]he biggest difference is in efficiency…the same treatment that lasts three hours in the community [cancer center] will take three to four times longer in the hospital."[55]  According to Gary Owens, the Vice President Medical Management and Policy at Independence Blue Cross, it costs less to have a drug administered in the physician's office than in a hospital setting.[56]  The cost-effectiveness of outpatient care relative to inpatient hospital care has been recognized by Medicare and managed care organizations, which have generally encouraged substitution of outpatient services, including drug therapies, for inpatient care.[57]  For example, insurers

---

footnote 24) apply benchmarks to characterize the price competition that results from generic entry.

[53]  See, for example, Hartman Liability Deposition, pp. 825, 855, 860, and 864.

[54]  Herzlinger, Regina E., Cancer Care in America, Description and Implications of Outpatient Community-Based Cancer Care, Boston Healthcare Associates, Inc., 2002 ("Herzlinger 2002"), p. 13.  See also Deposition of Jill Herbold, CIGNA, January 14, 2005 ("Herbold (CIGNA) Deposition"), p. 76.

[55]  Herzlinger, 2002, p. 13, quoting "an oncologist from South Carolina."

[56]  Deposition of Gary Owens, Independence Blue Cross ("IBC"), July 22, 2005 ("Owens (IBC) Deposition"), pp. 127–128.

[57]  See Joshua P. Cohen, "PBMs and a Medicare Prescription Drug Benefit," *Food and Drug Law Journal*, Vol. 55,  2000, p. 312 and Patricia M. Danzon and Mark V. Pauly, Health Insurance and

Contains Highly Confidential Material – Subject to Protective Order

recognize that Remicade therapy provided in the physician office is significantly less expensive than Remicade therapy provided in a hospital, and as a consequence have been willing to pay physicians a substantial administration fee. Some private insurers have assigned higher copayments to cancer care delivered in the hospital setting to extend this cost incentive to patients.[58]

37.   "Improvements in oncology patient care, including new and more effective chemotherapy and adjuvant therapies and improved symptom management, have evolved over the past 25 years."[59]  New chemotherapies have shorter infusion times, allowing infusion to be completed during an outpatient visit.[60] Additionally, as supportive care agents such as the anti-anemia products (Procrit and Aranesp) and anti-emetics (Anzemet, Kytril, Zofran) have reduced the toxic side effects of chemotherapy, it has become easier to treat patients in a community setting, allowing patients to receive treatment close to home rather than having to travel to major medical centers or specialty cancer hospitals to receive treatment.[61]  The consequent increased access to care in outpatient community cancer practices reduces the burden of treatment on patients, caregivers, and family members, especially for patients in rural areas.[62]  As a result, whereas most chemotherapy was administered in a hospital setting as recently as the late 1980s, the "Centers for Disease Control and Prevention (CDC) data currently [as of 2003] indicate that more than 80 percent of all chemotherapy

---

the Growth in Pharmaceutical Expenditures, *Journal of Law and Economics*, Vol. XLV, October 2002, pp. 587–613 at 606–607.  See also Barton C. McCann and Julia A. James, *The Impact of Medicare Payment Policies on Patient Access to Quality Cancer Care*, Health Policy Alternatives, Washington, D.C., June 1999 ("McCann and James 1999"), p. 4.

[58]  Herzlinger 2002, p. 16.

[59]  Siegel, Jerry, "Back to the Future:  An Oncology Case Study," Pharmaceutical Reimbursement: Keeping Up with Changing Times, Proceedings of an educational symposium during the 39th ASHP Midyear Clinic Meeting, December 5, 2004 ("Siegel 2004"), www.ashpadvantage.com/website_images/pdf/reimburse.pdf , p. 15 (accessed September 16, 2005).

[60]  Herzlinger 2002, p. 3.

[61]  Siegel 2004, p. 15.

[62]  Siegel 2004, p. 17.

Contains Highly Confidential Material – Subject to Protective Order

treatment encounters occur in non-hospital outpatient settings (freestanding oncology physicians' offices and community cancer centers)."[63]

38.     Further, it has been known throughout the alleged damages periods that reimbursement rates can encourage physicians to shift care to outpatient settings. For example, in 1992 the General Accounting Office ("GAO") released a study of Medicare chemotherapy reimbursement in inpatient and outpatient settings. It found that the amount that oncologists were reimbursed by Medicare could affect the treatment setting and therefore the total costs to Medicare for the patient's care.[64] A similar relationship between reimbursement rates and the physician's choice of site of care has been observed for private payors.[65]

39.     Despite acknowledged incentives to shift care out of the hospital, if physicians are not adequately compensated for specific PADs and associated costs (e.g., cancer treatment), they may cease treating these patients in their offices, forcing the patients back to hospital settings.[66] For example, 34 percent of health plans surveyed in 2004 reported increasing non-drug reimbursements to physicians to compensate for lost revenue associated with pharmaceutical reimbursement.[67]

---

[63]    Oncology Nursing Society, Reimbursement vs. Reality: A Discussion Paper on Medicare Payments for Cancer Treatment, 2003 ("ONS 2003"), p. 1, http://www.ons.org/lac/pdf/Reimbursement.pdf. See, also, Herzlinger 2002, p. 8. Community-based cancer care has also increased patients' access to clinical trials for novel treatments. (Herzlinger 2002, p. 14.)

[64]    GAO, *Medicare: Reimbursement Policies Can Influence the Setting and Cost of Chemotherapy*, GAO/PEMD-92-98, July 1992 ("GAO 1992"), pp. 1-5. See also McCann and James 1999, p. 4.

[65]    Groves, Anita, "The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and Changes in the Outpatient Prospective Payment System: Assessing the Impact on Your Health System," *Pharmaceutical Reimbursement: Keeping Up with Changing Times*, Proceedings of an educational symposium during the 39th ASHP Midyear Clinical Meeting, December 5, 2004 ("Groves 2004"), accessed at http://www.ashpadvantage.com/website_images/pdf/reimburse.pdf, p. 6.

[66]    A report produced for the Medicare Payment Advisory Commission ("MedPAC") provides an example: "In one case, physicians closed down their office-based practices for three months and shifted treatment to the hospital outpatient department. This raised the cost of a chemotherapy session from $3,000 to $5,000." See "Physician-Administered Drugs: Distribution and Payment Issues in the Private Sector; A study conducted by NORC at the University of Chicago and Georgetown University for the Medicare Payment Advisory Commission," August 2003 ("NORC Report 2003"), p. 18.

[67]    Baker, Thomas, "Specialty Therapies Lose Special Status," *Pharmaceutical Executive*, September 1, 2004 ("Baker 2004"), accessed at http://www.pharmexec.com/pharmexec/article/articleDetail.jsp?id=123007.

Contains Highly Confidential Material – Subject to Protective Order

Oncologists and rheumatologists faced with the loss of pharmaceutical reimbursement through use of specialty pharmacy programs have opted for alternate therapies, changed the site of care, or, in the case of rheumatologists, abandoned physician-administered therapies (like J&J's Remicade) in favor of self-administered therapies (such as Enbrel (Immunex Corporation) and Humira (Abbott Laboratories)).[68]

40.     Recent changes in reimbursement[69] illustrate the regression of outpatient care into the hospital due to reduced payments to physicians:  short-stay oncology admissions at Cedars-Sinai Medical Center and the nationwide experience with immune globulin infusion patients.

    40.1.   A recent analysis of short-stay oncology admissions at Cedars-Sinai Medical Center in Los Angeles suggests that a shift in site of care from the physician clinic to the hospital is already occurring.  The analysis found "a trend in which if an oncologist's office did not obtain favorable reimbursement terms from a managed care contract, then the office-based patient was admitted to the hospital for treatment."[70]  There is also concern that such a shift may lead to overcrowding in hospitals.  In fact, the pharmacists at Cedars-Sinai spoke with the doctors who were admitting patients for chemotherapy and asked them to stop doing so, in order to "ensure that beds remain available for acutely ill patients."[71]

    40.2.   Patients receiving immune globulin infusions to prevent life-threatening infections have been forced to seek care in hospitals rather than treatment in physicians' offices in response to lower Medicare reimbursement rates

---

[68]    Baker 2004.

[69]    These changes refer to the shift to ASP-based reimbursement as a result of Medicare reforms in 2003, a topic discussed in the next section.

[70]    Shane, Rita, "A Proactive Approach to MMA:  Improving Outpatient Revenue Cycle Management," *Pharmaceutical Reimbursement:  Keeping Up with Changing Times*, Proceedings of an educational symposium during the 39th ASHP Midyear Clinical Meeting, December 5, 2004 ("Shane 2004"), p. 10, accessed at http://www.ashpadvantage.com/website_images/pdf/reimburse.pdf.

[71]    Shane 2004, p. 10.

Contains Highly Confidential Material – Subject to Protective Order

to physicians.  Under ASP-based reimbursement, Medicare reduced reimbursement rates to physicians for the drug from $66 per gram to $39 per gram in powder form and $56 per gram for liquid form, while hospitals are reimbursed for the drug at $80 per gram.  According to the largest distributor of the drug, the cheapest powdered brands cost $44 per gram and can reach prices of $90 per gram, making it cost-ineffective for physicians to administer the drug in their offices and forcing patients into hospitals.[72]  This reimbursement reduction has had numerous negative effects:  it has decreased access to care, increased total costs of treatment, and put patients at risk.[73]  For many patients, treatment has been delayed or refused by hospitals that reportedly lack adequate treatment facilities or supplies of the drug.[74]  The Immune Deficiency Foundation, in response to this crisis, suggested that a solution would be for immune globulin to be treated like a blood product, in which case its reimbursement would "revert to the traditional Average Wholesale Price (AWP) methodology."[75]

## ii.    PAD reimbursement and cross-subsidization of physician services

41.    The gross revenues associated with PADs must cover a variety of expenses specifically associated with the drug:  acquisition cost, inventory management and temperature-controlled storage, hazardous waste disposal, and wastage, among others.[76]  Drug administration and preparation (often requiring special procedures

---

[72]    Neergaard, Lauran, "HEALTHBEAT:  Patients Scramble for Lifesaving Drug in Wake of Medicare Payment Change," *Associated Press*, June 13, 2005 (BC Cycle).

[73]    "Healthcare Crisis Hits Medicare Patients Needing Immune Globulin—Medicare Modernization Act has unintended but devastating repercussions for seriously ill beneficiaries," Immune Deficiency Foundation Media Release, May 16, 2005 ("IDF 2005"), p. 1, accessed at www.primaryimmune.org/media/releases/IVIGMedRel-Testimonials-Fact%20Sheet.pdf.

[74]    IDF 2005, p. 3.

[75]    IDF 2005, p. 4.

[76]    Community Oncology Alliance ("COA"), The Cancer Care Comprehensive Coding Task Force, Recommendations on the Reimbursement of Cancer Care Services Provided to Medicare (Part B) Recipients in Community Cancer Practices, June 2, 2004 ("COA 2004a"), pp. 10-12; COA, Cancer Care Comprehensive Coding Task Force, Overview Report on Coding Costs (CPEP), 2004 ("COA, 2004b"); "ANCO Responds to Slanted NY Times Article About Drug Reimbursement

Contains Highly Confidential Material – Subject to Protective Order

for toxic chemotherapeutics) expenses have generally been characterized as being inadequately reimbursed, with these expenses cross-subsidized by the difference between the drug's acquisition cost and its reimbursed amount.[77] Thus, when payors introduce reforms that reduce reimbursement for PADs, they generally must also make other changes in reimbursement for services to compensate fairly physicians.[78]

42.    Other services that the physician might provide, including cancer treatment planning and cancer therapy management, are not separately coded for reimbursement.[79] In addition, there are the unreimbursed supportive services that form the backbone of oncology care, including patient nutrition counseling, psycho/social counseling services, family education, and financial counseling.[80] These are all services deemed to be essential for safe and effective cancer care.[81] Then there are all of the practice expenses that must be covered. These include the costs of pre-certifying the use of chemotherapy drugs with payors, appointment scheduling, follow-up on missed appointments, claims submission, billing and collecting co-payments from patients, and indirect office expenses (e.g., rent, utilities, supplies).[82] Reimbursement for these services and expenses must come from the reimbursement for those services that are specifically

---

[77]    and Cancer Doctors," January 28, 2003 ("ANCO 2003"), accessed at http://www.californiaoncology.org/assns/ancoresp12603.htm.

See McCann and James 1999, pp. 1, 4, and discussion by Joan Sokolovsky, MedPAC, at the MedPAC 2003 Public Meeting, March 21, 2003 ("MedPAC 2003 Public Meeting"), p. 4.

[78]    This is precisely what CMS did when Medicare Part B moved to an ASP-based reimbursement and the potential for the Competitive Acquisition Program ("CAP") was introduced, as I discuss below. Private payors also considered how to change administration fees if reimbursements fell as a result of converting to an ASP-based reimbursement system. See Deposition of Joe Spahn, Senior Health Care Consultant, Anthem BCBS, November 30, 2004 ("Spahn (Anthem BCBS) Deposition"), pp. 107-109.

[79]    COA 2004a, p. 10.

[80]    McCann and James 1999, p. 1; "MCOs Oncology Strategies Focus on Provider Issues," *Specialty Pharmacy News,* April 2005; Dawn Gencarelli, "Average Wholesale Price for Prescription Drugs: Is There a More Appropriate Pricing Mechanism?" *NHPF Issue Brief,* No. 775, June 7, 2002 ("Gencarelli 2002"), p. 5; COA 2004a, pp. 9-11.

[81]    COA 2004a, pp. 10-13.

[82]    COA 2004a, p. 13.

Contains Highly Confidential Material – Subject to Protective Order

indicated or through the cross-subsidization that is provided by the difference between the acquisition cost and reimbursement for the oncolytics.[83]

43.   As such, the difference between the physician's reimbursement for a PAD and the acquisition cost is not simply "pocketed" as profit.  Further, for many practices, this difference on oncology drugs is part of what enables the practice to offer quality care to those not able to pay.[84]  For example, many Medicare patients do not have supplemental insurance and it can be difficult for oncology practices to collect patient co-payments.  Thus, when treating these patients the practices may receive only gross revenues for 80 percent of the Medicare reimbursement rate.[85]  For instance, the Community Oncology Alliance ("COA") completed a survey in 2004 that found that 25.3 percent of Medicare patient co-payments are uncollectible and written off as bad debt.[86]  According to the Medical Group Management Association ("MGMA"), the typical physician office experiences a non-collection rate equivalent to 7.5 percent of allowable reimbursement.[87]

44.   For years, oncologists have expressed concerns that service reimbursement rates from Medicare and private payors are insufficient to cover the costs of care.[88]  After it became evident in the mid-1980s that the more cost-effective and patient-friendly approach to chemotherapy was administration in freestanding facilities as compared to hospitals, Congress requested a study on possible Medicare reimbursement changes to more accurately reflect the costs associated

---

[83]   See also Northwest Georgia Oncology Centers Video, February 2005, accessed at http://www.communityoncology.org.

[84]   Note that some patients are able to access the drug manufacturers' compassionate care programs to pay for their oncology products.  For example, GlaxoSmithKline announced in 2001 that it was creating a national discount program for low-income elderly people without prescription drug coverage.  ("GlaxoSmithKline Plans Drug Discount Program for Low-Income Elderly," *YourHealthDaily*, October 3, 2001.)  Other compassionate care programs include RX Outreach, developed by Express Scripts Specialty Distribution Services for those under the Federal Poverty Level, and the Merck Prescription Discount Program, developed for all uninsured patients. ("Health Care Program—Resources on Pharmaceutical Costs and Access," 2005 Edition, National Conference of State Legislatures, December 20, 2005.)

[85]   COA 2004a, p. 17.

[86]   COA, "A Letter to Mark B. McClellan," December 7, 2004 ("COA 2004c"), p. 5.

[87]   ONS 2003, p. 4.

[88]   McCann and James, 1999, p. 1.

Contains Highly Confidential Material -- Subject to Protective Order

with providing chemotherapy in physicians' offices.[89]  In 1988, HCFA recognized that payment for the administration of chemotherapy may be inadequate.[90]  HCFA also responded directly to the concerns of oncologists in the *Federal Register* on November 25, 1992, stating:  "We were also persuaded by the data we received during the comment period that the practice expense RVUs do not adequately cover the cost of supplies for these services."[91]  The Medicare Payment Advisory Commission also acknowledged that the Medicare physician fee schedule rates for drug administration may be too low, particularly for chemotherapy.[92]

45.    A 1999 study estimated the profitability of a seven-physician oncology practice under various Medicare reimbursement scenarios.[93]  The study found that if drugs had been reimbursed at AWP, the practice would have earned an estimated $149,865 annually on Medicare business, which amounts to $21,409 on average per physician and $166 per Medicare patient.  If reimbursement rates were reduced to 95 percent of AWP the practice would lose an estimated $162,058, or $23,151 per physician and $180 per Medicare patient.  A proposal at that time to reduce reimbursement rates to 83 percent of AWP would have resulted in estimated losses of $910,680, or $130,097 per physician and $1,010 per patient.  The key finding of the study is that surpluses generated by drug reimbursement levels at the time (i.e., AWP minus 5 percent) were not sufficient to overcome the underpayment for professional services, resulting in a net loss on Medicare business.[94]

---

[89]    ONS 2003, p. 1.

[90]    53 FR 39644, October 11, 1988.

[91]    57 FR 55914, November 25, 1992.

[92]    MedPAC, *Report to the Congress:  Medicare Payment Policy*, March 2003 ("MedPAC March 2003"), pp. 157–159.

[93]    McCann and James, 1999, pp. 13–17.

[94]    McCann and James, 1999, pp. 2-3, 16.  See also Gemma M. Tarlach, "Domino Effect:  Will new rule drive patients from doctors to hospitals?" *Drug Topics*, April 6, 1998, p. 29 (1).

Contains Highly Confidential Material – Subject to Protective Order

**D.    Increased transparency would not be efficient or in the public interest**

46.    One logical implication of Dr. Hartman's theory is that Plaintiffs would have been better off had there been no uncertainty regarding the acquisition costs for PADs. In my opinion, Plaintiffs would not have been better off.  Economic literature recognizes that price concessions are more likely when other purchasers are unaware of the concessions.[95]  If manufacturers were forced to disclose price concessions, then the incentives to provide such concessions would be reduced— the cost of providing a price concession to one buyer is increased if that concession becomes shared with all buyers.  As a result, greater transparency could be expected to lead to greater reluctance on the part of pharmaceutical manufacturers to offer price concessions leading to an increase in the healthcare costs, not a decrease.[96]  As one payor noted at a public hearing conducted by the Federal Trade Commission ("FTC") and the Department of Justice ("DOJ"), "We believe that price competition can best be achieved when negotiated prices and rebates are kept confidential.  Widespread public disclosure of prices is unnecessary to assure that the ultimate payer receives most of the benefit of drug rebate arrangements."[97]  In fact, as government regulatory agencies charged with protecting competition and consumer welfare, the FTC and DOJ issued a joint report in which they recognized that market competition, rather than regulation, is more likely to arrive at "an optimal level of transparency."[98]  Considering that the

---

[95]    "There is a long tradition in economics suggesting that in such environments, 'the best deals are secret deals.'"  Expert Report of Professor Ernst R. Berndt to Judge Patti B. Saris, MDL No. 1456, Civil Action No 01-12257-PBS, United States District Court of Massachusetts, February 9, 2005 ("Berndt Report"), ¶ 166.

[96]    See, for example:  MedPAC, *Report to the Congress: Variation and Innovation in Medicare*, June 2003 ("MedPAC June 2003"), p. 161 (Medicare context); Letter from FTC to Assembly Member Greg Aghazarian, September 7, 2004 (PBM context); and Daniel P. O'Brien and Greg Shaffer, "The Welfare Effects of Forbidding Discriminatory Discounts:  A Secondary Line Analysis of Robinson-Patman," *Journal of Law, Economics, & Organization*, Vol. 10, No. 2, pp. 296-318 (theoretical context).

[97]    Anthony Barrueta, Senior Counsel for the Kaiser Foundation Health Plan, FTC/DOJ Joint Hearings, Health Care and Competition Law and Policy, Pharmacy Benefit Management Companies (PBMs), June 26, 2003.

[98]    In the context of SADs and PBMs, the FTC and DOJ noted:  "Vigorous competition in the marketplace for PBMs is more likely to arrive at an optimal level of transparency than regulation of those terms. ... Just as competitive forces encourage PBMs to offer their best price and service combination to health plan sponsors to gain access to subscribers, competition also encourages

Contains Highly Confidential Material – Subject to Protective Order

provision of health insurance is traditionally considered to be a competitive market,[99] such increases in costs to insurers would ultimately result in higher costs to plan sponsors and employers.

47. This fact was illustrated by the implementation of the Medicaid Best Price and rebate regulations. Notably, government research indicated that a principal effect of the Medicaid Best Price provisions introduced in the Omnibus Budget Reconciliation Act of 1990 ("OBRA 90") was to increase costs as a result of reduced price concessions. Manufacturers could no longer offer a large discount to a single customer without incurring the costs of extending the discount to all purchasers under the Medicaid program. For example, a 1991 GAO study found increases in prescription drug prices paid by the VA and the Department of Defense ("DOD") after the enactment of OBRA 90.[100] As a result of these findings, Congress passed the Medicaid Drug Rebate Amendments in 1992, amending the OBRA 90 rebate provisions to exclude prices charged under the FSS in the calculation of the Medicaid Best Price.[101] According to the CBO, the number of single-source drugs with a best price discount as high as 50 percent fell from nearly one-third in 1991 to nine percent in 1994, and the average best price discount declined from more than 36 percent to 20 percent over the same period.[102]

---

disclosure of the information health plan sponsors require to decide on the PBM with which to contract." FTC and DOJ, "Improving Health Care: A Dose of Competition," July 2004 ("Dose of Competition"), Chapter 7, p. 17.

[99] The FTC and DOJ hosted a series of hearings on competition in health care services in 2002 and 2003, noting that, "Many hearing participants testified that health insurance markets in most geographic areas enjoy robust competition, with 'multiple health insurer competitors and several product options, including HMO, PPO, POS, and consumer directed health plans.'" (Dose of Competition, Chapter 6, p. 7, quoting Fred Dodson, Vice President, Network Management, PacifiCare of California (Appendix A, p. A-8).)

[100] GAO, *Medicaid: Changes in Drug Prices Paid by VA and DOD Since the Enactment of Rebate Provisions*, GAO/HRD-91-139, September 1991, pp. 1-2.

[101] Medicaid Drug Rebate Amendments of 1992 (House Report 102-384 (II)), September 22, 1992, p. 8.

[102] CBO, *How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry*, January 1996, pp. ix, 28. The 9, 20, 36, and 50 percent discounts correspond to "spreads" of 10, 25, 56, and 100 percent, respectively.

Contains Highly Confidential Material – Subject to Protective Order

48.   Further, there is already research recognizing that reimbursements based on
Medicare's publicly-available ASPs is expected to lead to higher prices, by
eliminating some price concessions.[103]  Thomas Scully, former CMS
Administrator, anticipated in 2005 that the ASP system would put inflationary
pressure on pricing by creating an incentive for sponsors to set prices as high as
possible.[104]

49.   The most telling reference of the effect of additional transparency, however,
might come from CMS itself.  As part of the MMA, the Competitive Acquisition
Program provided an alternative to the traditional "buy-and-bill" responsibilities
for physicians, where physicians can choose to obtain a PAD from the CAP in
return for administration fees rather than purchasing the PAD and being
reimbursed based on ASP plus six percent.  Pharmaceutical manufacturers would
compete (through a bidding process) for their drugs' inclusion in the CAP
program.  An early issue in the implementation of the CAP program was whether
CAP sales should be included in the manufacturers' ASP calculations.  Under an
interim final rule issued November 21, 2005, CMS noted:

> "We find good cause to waive the requirement for publication of a notice
> of proposed rulemaking and public comment on the grounds that it is
> contrary to the public interest.  We have re-examined our statutory
> authority and have determined that both the CAP and ASP payment
> methodologies are best served by excluding units supplied under the CAP
> from the calculation of ASP for an initial period of 3 years.  We believe
> that excluding CAP drug units from the ASP calculation will give
> manufacturers an incentive to provide discounts to approved CAP vendors
> that will, in turn, result in lower prices under the CAP."[105]

50.   As indicated by this decision, CMS explicitly recognizes that the ASP-based
reimbursement method could be expected to constrain the price concessions that
pharmaceutical manufacturers might otherwise grant.  CMS's requirement that

---

[103]   Danzon, Patricia M., Gail R. Wilensky, and Kathleen E. Means, "Alternative Strategies for
Medicare Payment of Outpatient Prescription Drugs–Part B and Beyond," *American Journal of
Managed Care*, March 2005, p. 179.

[104]   "Average Sales Price Creates Inflationary Pressure, Former CMS Head Says," *The Pink Sheet*,
June 27, 2005, p. 25.

[105]   70 FR 70480, November 21, 2005.

Contains Highly Confidential Material – Subject to Protective Order

pharmaceutical manufacturers use data provided by CAP vendors for the purposes of excluding CAP sales in ASP calculations has also been cited as a disincentive to discounting.[106]

51.    Thus, there is a compelling public interest in maintaining the current levels of price transparency in the pharmaceutical reimbursement system.  Increasing price transparency might also reduce price differentials across classes of trade, contrary to the decision in *In Re: Brand Name Prescription Drugs* that there is a compelling economic reason for allowing variation in prices across different classes of trade.[107]  If these price differentials were eliminated, then certain market segments would see increased prices, which might preclude access to treatment.

## E.    Conclusion

52.    Dr. Hartman's expectations theory thus fails to consider the following:

52.1.    Payors have access to a wealth of information about the difference between acquisition cost and AWP.

52.2.    Payors expect that the difference between acquisition cost and AWP would vary by drug and over time, depending on competitive circumstances.

52.3.    Payors intended reimbursement rates to exceed acquisition costs in order to provide and maintain incentives for care to be administered as appropriate in the physician's office as compared to the hospital.

---

[106]    Pharmaceutical Research and Manufacturers Association ("PhRMA"), a trade group for innovator pharmaceutical manufacturers, has noted that this CMS requirement may "discourage manufacturer discounts because prices would be included in the ASP if drugs sold to CAP vendors are not administered ultimately to a beneficiary by a participating physician." ("Streamlined Method for Exempting CAP Drugs From ASP Urged by PhRMA, BIO," *The Pink Sheet*, February 20, 2006, p. 24.)  See also "End of Aranesp, Procrit Pricing War Illustrates Inflationary Impact of ASP," *The Pink Sheet*, February 13, 2006, p. 11.

[107]    "In re Brand Name Prescription Drugs Antitrust Litigation," The United States Court of Appeals for the Seventh Circuit, MDL No. 997, Argued June 25, 1997, Decided August 15, 1997, Opinion Authored by Chief Judge Posner.

Contains Highly Confidential Material – Subject to Protective Order

52.4.   One would not necessarily expect payors to benefit from a system in which there was more transparency regarding acquisition costs.

## IV.   EVOLUTION OF MEDICARE PART B

53.   In calculating damages, Dr. Hartman suggests that the Medicare Part B statutes intended there to be no difference between acquisition costs and reimbursed amounts, pointing to the statute that calls for reimbursements to be based on estimated acquisition cost ("EAC").[108] However, government officials have repeatedly acknowledged that the Part B reimbursement methodology produced a spread on drug purchases, that the spread acted to cross-subsidize inadequately reimbursed services performed by oncologists and their staffs, and that generic and therapeutic competition caused spreads for drugs facing such competition to be larger than those for single-source and first-in-class compounds.

54.   To the extent that Medicare Part B reimburses for pharmaceuticals at rates that exceed acquisition costs, that is the result of a deliberate policy choice on the part of the government.  As discussed above, over the past 35 years, the government has commissioned at least 30 reports concerning the acquisition costs and reimbursement of prescription pharmaceuticals.  Policy makers have always been aware of differences, sometimes substantial, between acquisition costs and AWP.  Nonetheless, the government has repeatedly affirmed its reimbursement policies as it sought to move care for Medicare Part B recipients out of the higher-cost hospital environment and into physician offices.  The acknowledged profits that physicians make on dispensing pharmaceuticals help to compensate for other under- or un-reimbursed services that are provided.

55.   For Medicare Part B, unlike in the private sector, competition cannot effectively constrain reimbursement rates.  Yet, the Medicare Part B reimbursement rates tend to be less than the private payor rates, which do benefit from competition among payors and physician providers.  If private payors had been able to negotiate lower reimbursement rates, presumably they would have done so.  In

---

[108]   Hartman Class Declaration, 2004, ¶ 33, footnote 52; Hartman Liability Report, ¶ 19.

Contains Highly Confidential Material – Subject to Protective Order

fact, private payors were aware of the generally lower reimbursement rates being paid through Medicare Part B and yet were still only able to negotiate reimbursement schedules that tended to exceed Medicare Part B rates. Accordingly, it cannot be the case, as Plaintiffs claim, that the pharmaceutical manufacturers have perpetrated a fraud on Medicare Part B recipients and their Medigap insurers.

56.     In this section, I first discuss the role that public payors played in the evolution of AWP as a benchmark for pharmaceutical reimbursement.  Then, I discuss the evolution of reimbursement rates under Medicare Part B, focusing on the information available and the policy choices made by government regarding reimbursement of PADs.

## A.     Public payors supported AWP as a benchmark for reimbursement[109]

57.     Plaintiffs allege that pharmaceutical manufacturers created an AWP "scheme" "solely to cause Plaintiffs and the Class Members to overpay for Covered Drugs."[110]  In fact, one of the first uses of AWP as a reimbursement benchmark occurred in the public sector more than twenty years before the start of the class period.

57.1.   In 1969, the California Medicaid program ("Medi-Cal") sought to standardize its system for reimbursing pharmacists.  Rather than continue to reimburse on the basis of billed charges which could vary by dispensing location, Medi-Cal decided to base reimbursement on a consistent benchmark ingredient price (AWP) plus a dispensing fee, generating immediate administrative efficiencies.[111]

---

[109]    See Appendix A for a more extensive discussion of the information on pharmaceutical pricing that was available from government publications prior to and during the class period.

[110]    Third Amended Complaint, ¶ 177.

[111]    Pennebaker, George, "The Rest of the AWP Story," *Contemporary Pharmacy Management*, January-February 1998 ("Pennebaker 1998"), p. 6; Written Testimony of Edward H. Stratemeier, Esq. (Aventis), Before the Subcommittee on Oversight and Investigation Committee on Energy and Commerce on AWP-Based Reimbursement for Prescription Drugs by Medicaid, December 7, 2004 ("Stratemeier Testimony, 2004").

Contains Highly Confidential Material – Subject to Protective Order

58.     Since that time, other public and private payors have acknowledged the efficiency
        of using AWP as a reimbursement benchmark.  It is administratively easier to
        calculate reimbursement rates by referencing a benchmark, such as AWP, than to
        negotiate individual reimbursement rates for a multitude of products.  The
        adoption and continued use of the AWP benchmark in reimbursement
        methodologies was determined by public and private payors—who are class
        members—not the Defendant manufacturers.

59.     In 1997, decades after its first use as a reimbursement benchmark, Congress, as
        part of BBA 1997, specified that published AWPs were to be used as the sole
        reimbursement benchmark for Medicare Part B.[112]  In 2000, Congress decided not
        to change the Medicare AWP-based reimbursement methodology until
        cross-subsidization issues were resolved.[113]  MedPAC summarized the position of
        the government:

>           "AWP has never been defined in statute or regulation.  Individual AWPs
>           are compiled and reported in compendia like the Red Book and First
>           Databank, largely on the basis of information supplied by manufacturers.
>           Because there is no official calculation method, CMS potentially can use
>           alternate sources of information like market surveys to establish new
>           AWPs for setting Medicare payment rates.  These rates could be tied to
>           actual transactions prices."[114]

---

[112]   HCFA, "Medicare Program; Revisions to Payment Policies and Adjustments to the Relative Value Units Under the Physician Fee Schedule for Calendar Year 1999," 63 FR 58814, November 2, 1998 at 58849.

[113]   In 2000, Congress imposed a moratorium on "… any direct or indirect decrease in reimbursement for drugs under the current payment methodology …," effective for drugs distributed after January 1, 2001, and directed the GAO to study Medicare reimbursement for drugs and biologicals and also study whether the practice expense component was adequate compensation for administration of these drugs.  (Congressional Research Service ("CRS"), Memo from Thomas Nicola to the House Committee on Energy and Commerce regarding Regulatory and Legislative History of Medicare Drug Reimbursement Based on Average Wholesale Price, August 31, 2001 ("CRS August 2001"), p. CRS-7.)

[114]   Statements on Introduced Bills and Joint Resolutions, By Mr. Ashcroft (for himself, Mr. Hagel, and Mr. Abraham), Statement regarding S. 3003, the Cancer Care Preservation Act, Congressional Record – Senate, September 5, 2000, S8022-8023 ("Ashcroft Statement September 2000"), p. S8022.

Contains Highly Confidential Material – Subject to Protective Order

60.    Furthermore, there is no requirement that AWP reflect prices at which actual sales by manufacturers take place.[115] Members of Congress,[116] the President,[117] and CMS[118] have acknowledged that AWP differs from physicians' acquisition costs and Congress and CMS have acknowledged that these margins help cover the costs of inadequately reimbursed professional services.[119] In addition, Congress has explicitly rejected reforms proposed by Medicare administrators and the President that would make reimbursement rates more reflective of acquisition costs.[120]

---

[115]    "The reality is, however, that AWP is neither an average nor a price that wholesalers charge. Because the term AWP is not defined in law or regulation, there are no requirements or conventions that AWP reflect the price of any actual sale of drugs by a manufacturer." GAO, *Medicare: Challenges Remain in Setting Payments for Medical Equipment and Supplied Covered Drugs*, Statement of Leslie G. Aronovitz, Testimony Before the Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, U.S. Senate, GAO-02-833T, June 12, 2002 ("Aronovitz 2002"), p. 7.

[116]    Ashcroft Statement September 2000.

[117]    "Last week, the Department of Health and Human Services confirmed that our Medicare program has been systematically overpaying doctors and clinics for prescription drugs. … Now, these overpayments occur because Medicare reimburses doctors according to the published average wholesale price—the so-called sticker price—for drugs. Few doctors, however, actually pay the full sticker price. In fact, some pay just one tenth of the published price." (The White House Office of Communications, *Weekly Radio Address to the Nation 12/13/97*, Remarks by the President in Radio Address to the Nation, 1997 WL 767416 ("White House"), p. 2.)

[118]    See, for example, HCFA's notification to Medicare carriers of changes resulting from the Balanced Budget Act of 1997. "Effective January 1, 1998, pay for drugs and biologicals not paid on a cost or prospective basis at the lower of the billed charge or 95 percent of the AWP. This change in payment allowance recognizes the fact that the AWP is not a true discounted price and, therefore, does not reflect the cost to the physician or supplier furnishing the drug to the Medicare beneficiary." (HCFA Program Memorandum, Intermediaries/Carriers, Transmittal No. AB-97-25, *Implementation of the New Payment Limit for Drugs and Biologicals*, January 1998.)

[119]    "As we have gathered information on many of the drugs reviewed by DOJ, we have concluded that Medicare payments for services related to the provision of chemotherapy drugs and clotting factors used to treat hemophilia and similar disorders are inadequate. Therefore, in addition to instructing carriers not to use the DOJ data for the 17 drugs related to chemotherapy and clotting factors, we plan to take administrative action on chemotherapy administration payments and work with Congress to enact legislation regarding clotting factors." Letter to Members of Congress from Nancy-Ann Min DeParle, HCFA Administrator, reproduced in *Medicare Part B Resource: Focused Information for Medicare Part B Providers in Maine, Massachusetts, New Hampshire, and Vermont*, October/November 2000, published by the National Heritage Insurance Company of Hingham, Massachusetts ("DeParle Letter to Congress 2000"), pp. 17-18.

[120]    These proposed reforms have included greater reductions from AWP (85 percent proposed in June 1991) and reimbursement based on EAC. See Testimony of Thomas A. Scully on Medicare Payment for Drugs, Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services Before the House Energy and Commerce Subcommittees on Oversight & Investigations and Health, September 21, 2001 ("Scully Testimony 2001"),

Contains Highly Confidential Material – Subject to Protective Order

61. Thus, it is apparent that Defendant manufacturers did not hatch AWP as a "scheme." The adoption and continued use of the AWP benchmark in reimbursement methodologies has been determined by public and private payors, not pharmaceutical manufacturers. Indeed, for the duration of the class period, AWP has been understood to be a reimbursement benchmark that does not include adjustments for discounts, rebates, purchasing allowances, or other forms of price concessions and therefore not to be a "reasonably predictable" measure of acquisition costs. Further, this understanding has been shared by all significant elements involved in the distribution and reimbursement of pharmaceuticals, including manufacturers, wholesalers, retailers, hospitals and clinics, PBMs, insurers and third-party payors, benefits consultants, and the government.[121]

## B.   Evolution of Medicare Part B reimbursement rates[122]
### i.   Prior to 1992

62. Reimbursement under standard Medicare Part B is the lower of the charges submitted or a statutory maximum. Prior to 1992, the statutory maximum was a reasonable and customary charge as determined by the local Medicare carrier. The Medicaid program, however, was reimbursing pharmacies using AWP as a benchmark, despite numerous studies indicating that AWP was not a measure of a pharmacist's acquisition costs.

63. In May 1967, the Task Force on Prescription Drugs was established to study the costs of prescription drugs under Medicare. The Task Force considered determining reimbursement rates using actual costs as verified by audit, "usual

---

[121] http://www.cms.hhs.gov/apps/media/press/testimony.asp?Counter=612 (accessed, February 26, 2006).

According to Professor Berndt: "To knowledgeable industry observers, it has long been widely understood that in the US pharmaceutical industry the term "average wholesale price" (hereafter, "AWP") is a misnomer: it is not a measure of prices generally paid by wholesalers to manufacturers, it is not a measure of prices frequently paid by retail or mail order pharmacies to wholesalers, nor is it some average of these" and this has been true at least since the Brand Name Prescription Drug Litigation in 1994. (See Berndt Report, ¶¶ 14–15.) Dr. Hartman concurs: "Anyone who knows this industry knows that almost no one pays AWP and that AWP diverges from transaction prices" and "It is true that some Class members (indeed any knowledgeable Class member) knew that AWP was greater than ASP and/or AAC." See Hartman Class Rebuttal, 2004, ¶¶ 25 (d), 17 (i), respectively.

[122] See Appendix B for a discussion of the history of the Medicare program.

Contains Highly Confidential Material – Subject to Protective Order

and customary" charges, listed wholesale prices, or a fixed program payment. In findings released in 1969 (nearly 25 years prior to the beginning of the class period), the Task Force concluded that published AWPs "rarely had any realistic relationship with actual acquisition costs" but that these differences would be offset by lower administrative costs in comparison to the alternatives.[123] In the 1975 final rule on Medicaid reimbursement for prescription drugs, HCFA stated that "...published wholesale prices often are not closely related to the drug prices actually charged to, and paid by, providers,"[124] and required ingredient costs for certain multiple-source drugs to be the lower of the MAC or the acquisition cost of the drug.[125]

64.   Despite earlier efforts to encourage states to calculate Medicaid reimbursements using a discount from AWP, the OIG determined in 1984 that many states continued to reimburse at AWP. The report reiterated the apprehensions about reimbursing at 100 percent of AWP, stating:

> "...pharmacies do not purchase drugs at the AWP published in the 'Bluebook,' 'Redbook,' or similar publications. Thus, AWP cannot be the best—or even an adequate—estimate of the prices providers generally are paying for drugs. AWP represents a list price and does not reflect several types of discounts, such as prompt payment discounts, total order discounts, end-of-year discounts and any other trade discounts, rebates, or free goods that do not appear on the pharmacists' invoices."[126]

65.   A 1987 GAO study discussed establishing a Medicare outpatient prescription drug benefit and acknowledged that "AWPs do not reflect many types of discounts and rebates available to pharmacies, and thus, tend to overstate pharmacies' drug costs."[127] Then, in 1989, the OIG concluded that "AWP is not a reliable price to

---

[123]   U.S. Department of Health, Education, and Welfare, Office of the Secretary, Memorandum from Philip R. Lee, Assistant Secretary for Health and Scientific Affairs, February 7, 1969, in Prescription Drugs Under Medicare, 2001 ("Task Force Report"), pp. 30, 146–148.

[124]   40 FR 32284, July 31, 1975, at 32293.

[125]   40 FR 32284, July 31, 1975, at 32294.

[126]   OIG, *Changes to the Medicaid Prescription Drug Program Could Save Millions*, A-06-40216, 1984 ("OIG 1984"), p. 22.

[127]   GAO, *Issues Related to Possible Coverage of Outpatient Prescription Drugs Under Medicare*, Statement of Michael Zimmerman, GAO/T-HRD-87-15, June 2, 1987, p. 3.

Contains Highly Confidential Material – Subject to Protective Order

be used as a basis for making reimbursements for either the Medicaid or Medicare programs."[128]   In a 1990 report to Congress, the Office of Technology Assessment ("OTA") noted, "Some Medicare carriers may be using the AWP to derive an approved charge for physicians who administer recombinant erythropoietin in their offices" and warned that AWPs are "usually list prices instead of the transaction prices that providers actually pay for pharmaceuticals."[129]

66.   In an attempt to ensure that federal and state governments were not paying more for pharmaceuticals than were other purchasers, Congress created the Medicaid drug rebate program as part of the Omnibus Budget Reconciliation Act of 1990 ("OBRA 90").   Under the Medicaid rebate program, manufacturers of single-source or innovator multi-source[130] drugs agreed to pay as rebates the greater of 15.1 percent of the Average Manufacturer Price ("AMP") or the difference between AMP and the lowest price ("best price") charged to purchasers other than Medicaid.[131]   Generic manufacturers must provide a rebate of 11.0 percent of the AMP per unit.[132]   The passage and implementation of the Medicaid rebate program was a major event in the pharmaceutical industry, generating

---

[128]   Management Advisory Report from Richard Kusserow, Inspector General, OIG, to Louis B. Hays, Acting Administrator, HCFA, October 3, 1989, A-06-40216, p. 7.

[129]   Office of Technology Assessment ("OTA"), *Recombinant Erythropoietin: Payment Options for Medicare*, OTA-H-451, May 1990.  In addition, while reporting the FSS discounts for pharmaceuticals, the report noted that "The AWP is an inappropriate benchmark, however, since it is a list price and is not usually charged to any purchaser." (Footnote 30.)

[130]   "Innovator multi-source" refers to a "drug marketed by a cross-licensed producer or distributor under the approved new drug application."  DHHS, Health Resources and Services Administration, "Pharmacy Affairs & 340B Drug Pricing Program: Glossary of Pharmacy-Related Terms," accessed at http://www.hrsa.gov/opa/glossary.htm, citing to Section 1927(k)(7)(A)(ii) of the Social Security Act.

[131]   For virtually all products, the Medicaid rebate would lead to at least a 41.3 percent spread. (This calculation assumes that AWP is only a 20 percent mark-up over WAC and WAC is equal to AMP.)  The Medicaid rebate percentage could be even higher if the rate of inflation of the drug's price exceeded a predetermined rate.  AMP is defined as the average price paid to a manufacturer of a drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, net of customary prompt pay discounts. (OIG, *Comparison of Medicaid Federal Upper Limit Amounts to Average Manufacturer Prices*, OEI-03-05-00110, June 2005, p. i.)

[132]   DHHS, CMS, "Medicaid Drug Rebate Program: Overview," http://www.cms.hhs.gov/MedicaidDrugRebateProgram/01_Overview.asp#TopOfPage (accessed March 20, 2006).

Contains Highly Confidential Material – Subject to Protective Order

considerable press review[133] and affecting the negotiations between payors (public and private) and manufacturers.

67.    As a result of these studies, regulators and private payors were aware that manufacturers offered price concessions and that AWP was not a measure of acquisition cost.  That public and private payors implemented reimbursement measures in the 1980s based on their knowledge of the differences between acquisition costs and AWP is well documented.[134]

**ii.    1992:  Medicare Part B adopts AWP as a reimbursement benchmark**

68.    OBRA 1989 sought to bring major changes to the charge-based system of reimbursing physicians under Medicare Part B.  The Act established the Resource-Based Relative Value Scale ("RBRVS") for physicians; the intention was to ensure that payments for physicians' services were appropriately based on the resources used to provide the services.[135]  The RBRVS was phased in over five years beginning in 1992.  In 2002, Thomas Scully, the CMS Administrator, acknowledged that the "transfer and cross subsidy from AWP for oncologists has resulted in our RVRBS payments being somewhat artificially low for practice expenses."[136]

69.    As part of the new reimbursement system for Medicare Part B, HCFA proposed, in June 1991, that payments for Medicare Part B drugs be the lower of EAC or 85 percent of the AWP, as published in the *Red Book* or similar price listings.[137]

---

[133]    Conlan, Michael F., "Now Come Some Serious Medicaid Cuts," *Drug Topics*, September 17, 1990, p. 45; "Drug Makers' Efforts to Cut Costs Not Enough, Prior Says," *Arkansas Democrat-Gazette*, September 3, 1990; Milt Freudenheim, "Business and Health; Medicaid Fight by Drug Makers," *The New York Times*, July 31, 1990, Section D, p. 2.

[134]    See also David Kreling, "A Comparison of Pharmacists' Acquisition Costs and Potential Medicaid Prescription Ingredient Cost Reimbursement in Wisconsin," *Journal of Research In Pharmaceutical Economics*, 1991, p. 26.

[135]    RBRVS sets forth a uniform national fee schedule based around three components—physician work, practice expenses, and malpractice expenses—that were subject to regional adjustment multipliers.  See GAO, *Medicare Physician Payments: Need to Refine Practice Expense Values During Transition and Long Term*, GAO/HEHS-09-30, February 1999, p. 18.

[136]    Scully Senate Testimony 2002, p. 13.

[137]    56 FR 25800, June 5, 1991.  HCFA also stated that "the Red Book and other wholesale price guides substantially overstate the true cost of drugs."

Contains Highly Confidential Material -- Subject to Protective Order

Thomas Scully later acknowledged that he was involved in this attempt to "fix AWP" by setting Part B reimbursement at 85 percent of AWP.[138]  However, HCFA noted that it "received a great many comments on this issue, primarily from oncologists indicating that our 85 percent standard was inappropriate."[139] HCFA "decided to modify the proposed policy.  Payment for drugs would be based on the lower of the national AWP or the Medicare carrier's estimate of actual acquisition cost."[140]

70.    In November 1991, HCFA published its final rule for Medicare Part B drug reimbursement, stating that drug reimbursement was to be based on the lesser of EAC or AWP for single-source drugs and the lesser of EAC or the median of wholesale generic prices for multi-source drugs.[141]  HCFA specified that EAC "would be based on individual carrier estimates of the costs that physicians or other providers, as appropriate, actually pay for the drugs."[142]

71.    Then, in November 1992, OIG issued a study of 13 high dollar volume Medicare Part B chemotherapy drugs, six of which are at issue in this litigation.  This was the study noted above that was cited by Dr. Hartman.  The study found that the drugs could be purchased at amounts below AWP and that AWP was "not a reliable indicator" of the cost of a drug to physicians.[143]

---

[138]    Scully Senate Testimony 2002, pp. 6–7.

[139]    56 FR 59524, November 25, 1991.  The "estimated acquisition costs would be based on individual carrier estimates of the costs that physicians, or other providers as appropriate, actually pay for the drugs.  Carriers could survey a sample of the physicians who furnish the drugs to obtain cost information.  As an alternative, carriers could request that physicians periodically provide cost information when they submit claims for payment for the drugs.  For certain types of drugs, such as chemotherapy drugs, there may be significant indirect costs such as inventory costs, waste, and spoilage.  Carriers may consider these costs, if documented, as part of the acquisition cost of a drug."

[140]    56 FR 59524, November 25, 1991.  HCFA came to an identical conclusion with respect to ESRD drugs, where proposed reimbursement of 85 percent of AWP was rejected in favor of the lower of estimated acquisition cost or the national AWP.  (56 FR 59525, November 25, 1991).

[141]    OIG November 1992, p. 4.

[142]    CRS August 2001, p. CRS-2, citing 56 FR 59525, June 5, 1991.

[143]    OIG November 1992, p. 5.  Physicians obtained drugs from manufacturers at 20 to 83 percent below AWP; see pp. 5–6 and Appendix III.

Contains Highly Confidential Material – Subject to Protective Order

72.     The surveys to support EAC were never completed; the project was shelved due
to a violation of the *Paperwork Reduction Act*.[144]  Nonetheless, it would appear
that the proposed definition of EAC was likely to include costs that were
incidental to the purchase of the drug, including costs of breakage and storage.
For example, in April 1993 CIGNA Corporation ("CIGNA"), in its capacity as a
Medicare carrier, informed all of the payors administering the Medicare program
that, "Our current reimbursement policy for chemotherapy drugs is to pay the
average wholesale price taken from the Redbook plus an additional 20%.  This
additional allowance is added to consider spoilage, waste, and other overhead
expenses."[145]  Then, in a June 1994 memorandum to Medicare carriers, HCFA
wrote:

> "In addition to the EAC, consider allowing an additional fee for the
> overhead of handling or dispensing drugs.  For example, you might
> determine that an overhead allowance of 10% above the material costs
> would be equitable in establishing EAC.  However, in no case can the cost
> of the drug plus a dispensing fee exceed the AWP for the drug."[146]

iii.   **1997:  Balanced Budget Act reduces reimbursement to 95 percent of AWP**

73.     According to Nancy Min DeParle, the HCFA Administrator,

> "In 1997, the Administration proposed to pay physicians and suppliers
> their acquisition costs for drugs, but Congress did not adopt the
> Administration's proposal.  Instead the Balanced Budget Act ("BBA")
> reduced Medicare payments for covered drugs from 100 percent to 95
> percent of the average wholesale price."[147]

74.     A December 1997 OIG study of 22 high dollar volume Medicare Part B drugs,
eight cited in this litigation, found that Medicare's reimbursement allowances

---

[144]   HHC015-1693 to 1694 (Hartman Liability Deposition, Exhibit 39); CRS August 2001, p. CRS-1,
note 1.

[145]   CIGNA 00013677 (also stamped AWP056-1410).

[146]   HCFA, Regional Carrier Letter No. 94-19, "Determination of Costs of Drugs – Action," June 8,
1994, p. 4.

[147]   DeParle Letter to Congress 2000, pp. 17-18.  In actuality, the reimbursement rate changed to "the
lower of the actual billed amount or 95 percent of the AWP, effective January 1, 1998." (HCFA,
"Medicare Program; Revisions to Payment Policies and Adjustments to the Relative Value Units
Under the Physician Fee Schedule for Calendar Year 1999," 63 FR 58814, November 2, 1998.

Contains Highly Confidential Material – Subject to Protective Order

were 2 to 10 times the actual prices from wholesalers and GPOs.[148]  After the release of this OIG report, Congress considered proposals to set Medicare Part B drug payment rates at 83 percent of AWP, a compromise between the average discount found by the OIG and 95 percent of AWP.[149]  Then, in 1999 and 2000, President Clinton revived the proposal to reduce Medicare Part B drug reimbursement to 83 percent of AWP.  Congress rejected these proposals.[150]

75.   The BBA of 1997 mandated that CMS develop an Outpatient Prospective Payment System ("OPPS").  To do so, HCFA had to classify hospital outpatient services to be reimbursed under the new system into groups called Ambulatory Payment Classifications ("APCs").[151]  The reimbursement rates for APCs were based on outpatient claims cost data for 1996.  For some pharmaceuticals, acquisition cost data were available from an external survey,[152] but when acquisition cost data were not available for a particular drug, HCFA assumed the following ratios of acquisition cost to AWP:  68 percent for drugs with one manufacturer (single-source innovator drugs), 61 percent for (innovator multi-source), and 43 percent for multi-source drugs with generic competitors (multiple-source).[153]  These assumptions lead to the following "spreads":  47 percent for single-source, 64 percent for innovator multi-source, and 133 percent for multi-

---

[148]   "Total allowed charges for the 22 drugs would have been reduced by 29 percent ($447 million of $1.5 billion) if actual wholesale prices rather than AWP were the basis for Medicare reimbursement."  (See OIG, *Excessive Medicare Payments for Prescription Drugs*, OEI-03-97-00290, December 1997 ("OIG December 1997"), p. 7.)

[149]   Scully Senate Testimony 2002, p. 94.

[150]   Pear, Robert, "Administration Plans Cuts in Some Drug Payments," *New York Times*, August 6, 2000, Section 1, p. 12.

[151]   Each APC group consists of a cluster of services provided during a particular outpatient procedure.  Services in each APC are "clinically similar and require comparable resources."  (See MedPAC, *Report to the Congress: Selected Medicare Issues*, June 2000 ("MedPAC June 2000"), p. 37).

[152]   "Hospitals were found to purchase drugs at significant discounts to the so-called 'average wholesale price' (AWP). ... Average hospital acquisition cost for single-source innovator drugs was found to be 67% of AWP, with a standard deviation of 12%.  Multi-source drugs were heavily discounted from AWP, with an average acquisition cost of 42% of AWP, and a standard deviation of 24%."  Kathpal Technologies, "High Cost Drugs Under the Outpatient Prospective Payment System," Draft, prepared for the Health Care Financing Administration under contract by Myers and Stauffer LC, October 27, 1999 ("Kathpal Report"), p. 4.

[153]   HCFA, "Office of Inspector General; Medicare Program; Prospective Payment System for Hospital Outpatient Services," 65 FR 18434, April 7, 2000 at 65 FR 18481.

Contains Highly Confidential Material – Subject to Protective Order

source drugs with generic competitors. Thus in its implementation of OPPS, HCFA explicitly recognized that AWP exceeded acquisition cost.

76.    HCFA and Congressional implementation of OPPS identifies three flaws in Dr. Hartman's expectations theory. First, HCFA had access to acquisition cost data. Second, the acquisition cost discounts from AWP used by HCFA exceed Dr. Hartman's 30 percent liability threshold. Third, the acquisition cost discount from AWP used by HCFA was significantly higher for multi-source (57 percent) than for single-source (32 percent) drugs.

77.    In 1998, despite the attention placed upon AWP, the OIG proposed that HCFA expand the use of AWP to the calculation of Medicaid rebates.

> "We recommend that HCFA develop and submit a legislative proposal to the Congress that would require drug manufacturers participating in the Medicaid outpatient prescription drug program to pay Medicaid drug rebates based on AWP. We recognize that the opportunity exists that manufacturers could manipulate such a new system but believe that the normal competitive pressures on drug prices in the marketplace would discourage manufacturers from inordinately raising drug prices. However, we are also recommending that if our recommended change is enacted, HCFA should establish safeguards as part of the new rebate process to discourage manufacturers from inordinately raising drug prices to pay for the cost of the additional rebates and at the same time raising AWP to cover the amount of the increased cost to the pharmacies."[154]

78.    In 2000, there was another attempt to reduce Medicare Part B reimbursement rates using data on actual acquisition costs. As a result of investigations by the DOJ, HCFA was "compiling better information about what prices wholesalers are actually paying, and we intend to get that out to our carriers, the private insurance companies that pay Medicare's bills, so they can start using those prices and reimbursing at that rate."[155]

---

[154]    OIG, *Need to Establish Connection Between the Calculation of Medicaid Drug Rebates and Reimbursement for Medicaid Drugs*, A-06-97-00052, May 1998.

[155]    Testimony of Nancy-Ann Min DeParle, Hearing Before the Committee on Ways and Means, House of Representatives, 106th Congress, Second Session, re Legislation to Cover Prescription Drugs Under Medicare, June 13, 2000, p. 104.

79.   Use of the so-called DOJ AWPs was decried by members of Congress as an
      attempt to circumvent prior congressional actions.[156]  Further, Congress noted that
      the DOJ AWPs "do not take into account the fact that oncologists are chronically
      underpaid for their drug administration services in treating cancer patients, a fact
      that is widely recognized" and that "many physicians will be unable to continue
      providing cancer care in their offices, and patients will be deprived of a humane,
      convenient and cost-effective treatment option."[157]  Pharmacy, medical, and
      patient groups also protested against the proposed change.  For example, the
      National Home Infusion Association claimed that in some cases the proposed
      reimbursement would be below the acquisition cost.[158]

80.   Nonetheless, on September 8, 2000, HCFA issued Transmittal AB-00-86, which
      provided "an alternative source of average wholesale price data for certain drugs,"
      based on wholesale prices of drugs as determined by the DOJ and the National
      Association of Medicaid Fraud Control Units ("NAMFCU").[159]  In this
      Transmittal, the carriers were told to take these DOJ AWPs into account when
      updating reimbursements for January 2001 for 32 drugs, but not including 14
      oncology drugs and three clotting factors.  With respect to these excluded
      products, HCFA noted that, "we have some concern about access to care related
      to the DOJ's wholesale prices ...."[160]  Further with respect to these excluded
      products, the HCFA Administrator noted that the payments for Part B drug
      administration were inadequate and "the right approach to addressing Medicare

---

[156]  "We see no basis for such action in any of our previous legislation, and certainly the Department's
       unilateral declaration of a new definition of AWP, with no regulatory process, is inappropriate."
       (Letter from Members of U.S. Congress to Donna E. Shalala, Secretary, DHHS, July 28, 2000
       ("Congressional Letter to Shalala 2000"), p. 2.)
[157]  Congressional Letter to Shalala 2000, p. 1.
[158]  "Revamped ASP for Medicare and Medicaid criticized," *Drug Topics*, June 10, 2000.
[159]  Program Memorandum Intermediaries/Carriers, Transmittal AB-00-86, "An Additional Source of
       Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare
       Program, September 8, 2000 ("Transmittal AB-00-86").
[160]  Transmittal AB-00-86, p. 2.

profits on drugs" is to couple reductions in drug markups with increased drug administration fees.[161]

81.   On November 17, 2000, HFCA rescinded Transmittal AB-00-86, saying, "Congressional action may preclude the use of this alternative source [of AWPs]."[162]   According to a CRS Report for Congress, the Benefit Improvement and Protection Act of 2000 ("BIPA"), enacted December 21, 2000, prohibited the Secretary of Health and Human Services from implementing any payment reduction for drugs until GAO prepared, and the Secretary reviewed, a report on revised payment methodologies for drugs.[163]

82.   The results of the GAO study mandated under BIPA were sent to Congress on September 21, 2001.  The GAO had studied the twenty highest dollar volume Medicare Part B drugs, four of which are at issue in this litigation.  The GAO found that:  (1) the average discount from AWP for PADs ranged from 13 to 34 percent, equating to "spreads" of 15 to 52 percent; (2) that two PADs had discounts of 65 and 86 percent, equating to "spreads" of 186 to 614 percent; and (3) that two durable medical equipment ("DME") drugs had discounts of 78 and 85 percent, equating to "spreads" of 355 to 567 percent.[164]

83.   Another OIG study in 2001 found that Medicare carriers used inconsistent methodologies to establish J-code-based reimbursements for the 24 most costly PADs, resulting in differences of 10 percent or more for some drugs and as high as a two-fold difference in rates.[165]  Thus, although Medicare Part B specifies a

---

[161]   "As we suggested in May, the right approach to addressing Medicare profits on drugs identified by DOJ is to pay correctly for the drugs, and at the same time make changes, as necessary, to assure that Medicare adequately pays for services related to the provision of the drugs." DeParle Letter to Congress 2000, pp. 17-18.

[162]   DHHS and CMS, Program Memorandum, Transmittal AB-00-115, November 17, 2000; "HCFA Shelves 'new' Medicare AWPs under pressure from Congress," *Drug Topics*, December 11, 2000.

[163]   O'Sullivan, Jennifer, "Medicare:  Payments for Covered Prescription Drugs," Report for Congress, CRS, May 21, 2002 ("CRS 2002"), CRS-7.

[164]   GAO, *Medicare – Payments for Covered Outpatient Drugs Exceed Providers' Cost*, GAO-01-1118, September 2001, p. 4.

[165]   OIG, *Medicare Reimbursement of Prescription Drugs*, OEI-03-00-00310, January 2001 ("OIG January 2001"), p. ii.

Contains Highly Confidential Material – Subject to Protective Order

"formula" for calculating the drug payment rates associated with J-codes (as a percentage of the AWP benchmark), carriers implemented the methodology differently, which resulted in "wide variation" in payment rates. Carriers differed in their methods for choosing among AWPs for the multiple NDCs associated with a J-code (i.e., multi-source drugs, or single-source drugs with multiple forms, strengths, or packaging), as well as in the frequency of updating AWPs.[166] Thus, effectively there may have been no explicit, formulaic relationship between AWP and Medicare Part B reimbursement rates in many circumstances as may be required under the class definitions for this litigation.[167] Further, I note that to the extent that private payors have modeled their PAD reimbursement methodologies on the Medicare system, many of those reimbursements may similarly exhibit no explicit, formulaic relationship with AWP.[168]

84.     Regarding cross-subsidization, in 2002, the chairman of MedPAC wrote to the CMS Administrator about the series of GAO and OIG studies that "have provided ample evidence that Medicare pays far more than market price for the outpatient prescription drugs that it covers under Part B," and acknowledged the cross-subsidization of inadequate payments for some services with drug payments.[169] In the same year, the Senate held hearings concerning reimbursement and access to prescription drugs under Medicare Part B. Thomas Scully, the CMS Administrator, discussed administration fees for oncologists, end-stage renal disease ("ESRD") clinics, hemophilia agencies, and DME providers, acknowledging that, "Many of these providers rely on cross subsidies to survive,

---

[166]    MedPAC June 2003, p. 152.

[167]    Class Certification Order, pp. 75-76. Note that CMS established a Single Drug Pricer program, effective January 1, 2003, under which one carrier determines reimbursement rates and these rates are disseminated to the other carriers on a quarterly basis. See DHHS and CMS, Program Memorandum, Transmittal AB-02-174, December 3, 2002 ("Transmittal AB-02-174"), Attachment.

[168]    For instance, I note that CIGNA obtained AWPs for J-Codes from First DataBank and that First DataBank created AWPs for J-Codes by averaging the AWPs for the NDCs that fall under that J-Code. If the J-Code included generic products, First DataBank would report the lower of the average AWP for the generics and the average AWP for the brand-name products. (See Herbold (CIGNA) Deposition, pp. 40–42.)

[169]    Letter from Glenn M. Hackbarth, Chairman of MedPAC, to Thomas Scully, Administrator of CMS, October 4, 2002, p. 5.

Contains Highly Confidential Material – Subject to Protective Order

basically, in the Medicare business."[170]  He also explained that while the Administration or Congress could reduce payments for Medicare Part B drugs, only Congress had the means to adjust drug administration fees in a budget neutral way.[171]  Finally, CMS acknowledged that "numerous studies had established that Medicare was paying for these drugs under a statutory formula that resulted in payment far in excess of the physician's acquisition costs" and proposed rules to reduce Part B cross-subsidization.[172]

iv.    **2003: Medicare Prescription Drug, Improvement, and Modernization Act**

85.    The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") established a new Medicare outpatient prescription drug benefit, effective in 2006; changed the 2004 reimbursement percentages for most drugs under Medicare Part B to 85 percent of AWP;[173] and introduced the Average Sales Price ("ASP") as a new reimbursement benchmark for these drugs beginning in 2005.  For 2004, the MMA also dictated that 20 single-source and 9 multi-source drugs be reimbursed at the greater of 80 percent of AWP or the average discount from AWP as per the most recent GAO and OIG studies.[174] Seven of the single-source and one of the multi-source drugs at issue in this case fell into this category.

86.    The MMA also authorized CMS to study physician practice expenses and revise payments for drug administration.

> "Reimbursement by CMS for injectable drugs involves what has long been understood by the CMS, providers, and the drug industry as an arbitrary but necessary cross-subsidy:  Physicians in certain specialties (predominantly oncology, rheumatology, endocrinology, and nephrology)

---

[170]    Scully Senate Testimony 2002, pp. 6–7.

[171]    Scully Senate Testimony 2002, pp. 8–9.

[172]    CMS, Competitive Acquisition Program Interim Final Rule (CMS-1325-IFC), June 27, 2005; See also, 70 FR 39022, June 6, 2005.

[173]    Under the MMA for 2004, most Part B drugs were reimbursed at 85 percent of the AWP in effect on April 1, 2003.  Blood clotting factors, drugs that were not available for Medicare payment on October 1, 2003, vaccines, drugs for ESRD, and infusion drugs used with DME were reimbursed at 95 percent of the AWP in effect on October 1, 2003.  (69 FR 1086, January 7, 2004.)

[174]    69 FR 1089-90, January 7, 2004.

Contains Highly Confidential Material – Subject to Protective Order

are reimbursed for their evaluation and management of patients at rates that do not cover their incomes and practice expenses; these shortfalls are recovered by the margin between what these providers are reimbursed for the injectable drugs they administer to patients and what they actually pay to purchase those drugs."[175]

87.     Acknowledging the cross-subsidization, Congress implemented a commensurate increase in drug administration fees to offset the reduction in drug payments under the MMA.[176]  Policymakers were aware of the potential consequences of ignoring this cross-subsidization in reducing Medicare Part B reimbursement rates—physicians might find it financially impractical to provide PADs in their offices, forcing patients to seek treatment in the hospital where the costs of care are higher.  In the late 1980s, reductions in Medicare Part B reimbursement for chemotherapy had precisely this effect.[177]

88.     The provisions of the MMA required drug manufacturers to begin submitting quarterly ASP data to CMS on April 30, 2004.[178]  These data have since been publicly reported and updated on a quarterly basis.  Nonetheless, Dr. Hartman concludes that the Medicare Part B program and private payors were deceived about spreads throughout 2004 and later for private payors.

## C.     Conclusion:  No expectation that AWP was equal to acquisition cost

89.     A fundamental assumption in Dr. Hartman's theory is that prior to 2004 policymakers expected that the Medicare Part B drug reimbursement rates were

[175]  Kleinke, J.D., "Re-Naming and Re-Gaming:  Medicare's Doomed Attempt to Reform Reimbursement for Injectable Drugs," *Health Affairs*, December 8, 2004, p. W4.

[176]  "[T]he MMA required CMS to decrease the Medicare payment for drugs and increase the payments for administering them, as outlined below.  New payments for drugs and their administration were published in January, and reflect an estimated increase of $510 million for drug administration and a reduction in drug reimbursement of $510 million—an exact offset."  See Johnson, Kjel, "Medicare Reimbursement will Affect Specialty Payouts; MMA Pays Less for Drugs, but More for Administering Them," *Managed Healthcare Executive*, July 1, 2004.  Also see testimony of Michael McMullan, Deputy Director, Center for Beneficiaries Choices, CMS before the Senate Committee on Governmental Affairs, "Does CMS Have the Right Prescription? Implementing the Medicare Prescription Drug Program," April 8, 2004, accessed at http://www.cms.hhs.gov/apps/media/press/testimony.asp?Counter=1010.

[177]  Dougherty, Elizabeth and Dawn Hagin, "Market Memo:  Move Quickly, But Cautiously in Outpatient Cancer Care," *Health Care Strategic Management*, February 1989 ("Dougherty and Hagin 1989"), p. 18.

[178]  69 FR 17935, April 6, 2004.

Contains Highly Confidential Material – Subject to Protective Order

equal to the physician's acquisition costs. The assumption is demonstrably incorrect.

90.    Through the studies and policy debates noted above, Medicare policymakers gained insight into the pricing practices of the pharmaceutical industry. Government publications from before and during the class period revealed the prevalence of price concessions for both SADs and PADs; these concessions were sometimes substantial in magnitude for particular drugs. Thus, contrary to Plaintiffs' and Dr. Hartman's assertions, Medicare policymakers had ample evidence of so-called "mega-spreads," which are a natural result of price discounting under competition.

91.    In the period from 1991 to 1998, Medicare Part B drug reimbursement was equal to the lesser of the billed charge and 100 percent of AWP or EAC. Congress explicitly distinguished between EAC and AWP. In addition, it would appear that EAC could include costs such as wastage, non-collection of coinsurance amounts, and carrying costs, which would clearly make EAC greater than actual acquisition costs.

92.    In fact, Congress has repeatedly made clear its intent to avoid reducing Medicare Part B drug reimbursement to the level of actual acquisition costs.[179] In so doing, Congress (as well as HCFA/CMS, DHHS, MedPAC, and others) acknowledged that Medicare Part B drug reimbursement cross-subsidized un- and under-reimbursed drug administration services and other practice expenses.

---

[179]    "Because the estimated acquisition cost approach had proved unworkable, in 1997, the President proposed legislation to pay physicians their actual acquisition costs. Physicians would tell Medicare what they pay for drugs and be reimbursed that amount, rather than the Administration developing an estimate of acquisition costs and basing payment on the estimate. Unfortunately, Congress did not adopt the Administration's proposal." Letter from Nancy Ann Min DeParle, Administrator, HCFA, to June Gibbs Brown, Inspector General, June 13, 2000, produced as Exhibit E to OIG, *Medicare Reimbursement of Albuterol*, OEI-03-00-00311, June 2000.

Contains Highly Confidential Material – Subject to Protective Order