Exhibit 13

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 |
| | | CIVIL ACTION: 01-CV-12257-PBS |
| | ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) ) ) | Chief Magistrate Judge Marianne B. Bowler |
| | ) ) | |
| | ) ) | [Contains Highly Confidential Materials Subject to Protective Order] |

## MERITS REPORT AND DECLARATION OF ERIC M. GAIER, PH.D.

March 21, 2006

# Table of contents

I. Introduction ............................................................................................................. 1

    I.1. Summary of qualifications ................................................................................ 2

    I.2. Scope of charge .............................................................................................. 2

    I.3. Materials considered ........................................................................................ 3

II. Summary of opinions ............................................................................................. 4

III. Medicare Part B .................................................................................................... 9

    III.1. Medicare is a knowledgeable and sophisticated payor .............................. 11

    III.2. Medicare possesses competitive leverage ................................................ 25

    III.3. Medicare relies on drug reimbursements to subsidize underpayment for
           physician services ...................................................................................... 31

    III.4. Manufacturers had no incentive to manipulate AWPs for multi-source drugs ...................... 40

    III.5. Conclusion ................................................................................................. 41

IV. Drugs reimbursed by TPPs outside the Medicare context ................................... 43

    IV.1. TPPs are typically knowledgeable and sophisticated ................................ 45

    IV.2. TPPs possess competitive leverage .......................................................... 65

    IV.3. TPP drug reimbursements cannot be considered in isolation from other
           payments and contract terms ..................................................................... 76

    IV.4. Numerous smaller payors benefited from the knowledge, sophistication, and
           competitive leverage of the larger TPPs ..................................................... 80

    IV.5. Conclusion ................................................................................................. 82

V. Dr. Hartman's yardstick methodology is unreliable ............................................. 83

    V.1. Dr. Hartman ignores well-known and legitimate economic factors ............. 85

    V.2. Dr. Hartman's methodology is premised on a flawed assumption that TPPs
          expected AWP to be a signal for acquisition cost ....................................... 93

    V.3. Dr. Hartman's application of yardsticks is arbitrary and unreliable ............. 94

    V.4. Dr. Hartman erroneously applies overcharges to units not reimbursed based
          upon AWP ................................................................................................... 97

    V.5. Conclusion ................................................................................................ 104

Appendix A: Materials considered ......................................................................... 107

Appendix B: Additional examples of drugs purchased by Massachusetts TPPs ...... 123

Appendix C: Adjustments for purported damages, by manufacturer and drug ........ 134

Appendix D: Description of electronic data .............................................................. 142

# Table of figures

Figure 1: 1997 OIG findings regarding physician-administered drug acquisition costs in 1995 and 1996 .......................................................................................................................... 14

Figure 2: Zoladex prices to Massachusetts TPPs .......................................................... 50

Figure 3: Vepesid prices to Massachusetts TPPs ........................................................... 50

Figure 4: Zofran prices to Massachusetts TPPs............................................................... 51

Figure 5: Procrit prices to Massachusetts TPPs .............................................................. 51

Figure 6: Intron prices to Massachusetts TPPs ............................................................... 52

Figure 7: Health Net median reimbursements for drug J9000 (doxorubicin) and most often associated service 90780 (IV infusion therapy, 1 hour) ......................................... 79

Figure 8: Pulmicort (NDC 00186198804) ...................................................................... 123

Figure 9: Zoladex (NDC 00310096130) ......................................................................... 124

Figure 10: Blenoxane (NDC 00015301020) ................................................................... 124

Figure 11: Cytoxan (NDC 00015050301) ....................................................................... 125

Figure 12: Cytoxan (NDC 00015054841) ....................................................................... 125

Figure 13: Paraplatin (NDC 00015321530) .................................................................... 126

Figure 14: Vepesid (NDC 00015309145) ....................................................................... 126

Figure 15: Kytril (NDC 00029414901) ........................................................................... 127

Figure 16: Kytril (NDC 00029415105) ........................................................................... 127

Figure 17: Zofran (NDC 00173044202) .......................................................................... 128

Figure 18: Procrit (NDC 59676030401) .......................................................................... 128

Figure 19: Procrit (NDC 59676031001) .......................................................................... 129

Figure 20: Procrit (NDC 59676032001) .......................................................................... 129

Figure 21: Albuterol (NDC 5993015008) ........................................................................ 130

Figure 22: Intron (NDC 00085076901) ........................................................................... 131

Figure 23: Intron (NDC 00085118402) ........................................................................... 132

Figure 24: Perphenazine (NDC 59930160501) .............................................................. 132

Figure 25: Proventil (NDC 00085020802) ...................................................................... 133

Figure 26: Proventil (NDC 00085020901) ...................................................................... 133

# Table of tables

Table 1: Percentage changes in drug and service payments resulting from the MMA ........................ 37

Table 2: Massachusetts health plans by number of enrollees ............................................................. 46

Table 3: Dollar volumes of subject drugs purchased directly by Massachusetts TPPs, by manufacturer ...................................................................................................................... 48

Table 4: Dollar volumes of subject drugs purchased directly by Massachusetts TPPs, by year ......... 49

Table 5: Drug spending as a percentage of total 2003 Medicare expenditures ................................... 64

Table 6: Massachusetts health plans reporting number of physicians ................................................. 70

Table 7: Total number of physicians and physicians per capita in Massachusetts .............................. 74

Table 8: Physician compensation for selected specialties ................................................................. 75

Table 9: Dollar sales and percent of total dollar sales transacted at list price ..................................... 91

Table 10: Adjustments for purported damages to Classes 1 and 2 ..................................................... 95

Table 11: Adjustments for purported damages for Class 3 ................................................................. 97

Table 12: Non-hospital providers reimbursed at "unclear" amounts ................................................... 100

Table 13: "Unclear" reimbursements to non-hospital providers according to Dr. Hartman's methodology applied to Oxford Health data ......................................................................... 101

Table 14: Units from claims with an allowed amount equal to billed charge ....................................... 101

Table 15: Units administered by out-of-network providers ................................................................ 103

Table 16: Adjustments for purported damages to Classes 1 and 2 for AstraZeneca drugs .............. 134

Table 17: Adjustments for purported damages to Class 3 for AstraZeneca drugs ........................... 134

Table 18: Adjustments for purported damages to Classes 1 and 2 for Bristol-Myers Squibb drugs .. 135

Table 19: Adjustments for purported damages to Class 3 for Bristol-Myers Squibb drugs ............... 136

Table 20: Adjustments for purported damages to Classes 1 and 2 for GlaxoSmithKline drugs ........ 137

Table 21: Adjustments for purported damages to Class 3 for GlaxoSmithKline drugs ..................... 138

Table 22: Adjustments for purported damages to Classes 1 and 2 for Johnson & Johnson drugs ... 139

Table 23: Adjustments for purported damages to Class 3 for Johnson & Johnson drugs ................ 139

Table 24: Adjustments for purported damages to Classes 1 and 2 for Schering-Plough drugs ........ 140

Table 25: Adjustments for purported damages to Class 3 for Schering-Plough drugs ..................... 141

Table 26: Purchasing entities related to top Massachusetts TPPs ................................................... 157

Declaration of Eric M. Gaier, Ph.D.

# I. Introduction

## I.1. Summary of qualifications

(1)     I am a Partner and founding Member of Bates White, LLC ("Bates White"), a professional
services firm that performs economic and statistical analysis in a variety of industries and
forums. Since I have previously described my qualifications to this Court, I will not repeat
them here.[1]

## I.2. Scope of charge

(2)     Plaintiffs allege that defendants engaged in a fraudulent scheme to "inflate" the Average
Wholesale Price ("AWP") for certain prescription drugs that was designed to cause putative
class members to overpay for those prescription drugs. Plaintiffs' counsel offered several
putative classes for certification, but Judge Saris' January 30, 2006 *Consolidated Order Re:
Motion for Class Certification* ("Consolidated Order") certified only the following classes:[2]

- Medicare Part B
  - Nationwide class of consumers paying co-insurance based on AWP for a Medicare
    Part B covered Subject Drug ("Class 1")
  - Massachusetts statewide class of third-party payors ("TPPs") making reimbursements
    based on AWP for a Medicare Part B covered Subject Drug ("Class 2")
- Physician-administered drugs reimbursed by TPPs outside of the Medicare context
  (collectively these are "Class 3")
  - Massachusetts statewide class of consumers paying co-insurance based on AWP as a
    pricing standard for a physician-administered Subject Drug
  - Massachusetts statewide class of TPPs making reimbursements based on contracts
    expressly using AWP as a pricing standard for a physician-administered Subject Drug

---

[1]     Declaration *of Eric M. Gaier, Ph.D. in Support of Defendants' Opposition to Class Certification,* U. S.
District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257-PBS, October
25, 2004 ("Gaier Declaration"), p. 4. Also see Gaier Declaration, Appendix A.

[2]     *Consolidated Order Re: Motion for Class Certification,* U. S. District Court for the District of
Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257, January 30 2006 ("Consolidated Order").

(3)    I have been retained by counsel for the manufacturers to perform an economic analysis of whether the alleged "AWP scheme" caused putative class members to overpay for prescription drugs and therefore caused economic harm to the putative class members. I have also been asked to evaluate the opinions offered by plaintiffs' experts Dr. Raymond S. Hartman and Dr. Meredith Rosenthal.

## I.3. Materials considered

(4)    I have previously submitted three declarations in relation to this case. On October 25, 2004, I submitted a declaration supporting defendants' opposition to class certification, on January 21, 2005, I submitted a sur-reply to the analysis of plaintiffs' expert Dr. Raymond S. Hartman, and on March 15, 2006 I submitted a declaration in support of Track 1 Defendants' Joint Motion for Summary Judgment.[3] I have reviewed the December 15, 2005 declarations of plaintiffs' experts Drs. Raymond S. Hartman and Meredith Rosenthal as well Dr. Hartman's February 3, 2006 addendum to his declaration. I have also reviewed additional materials, both publicly available and provided through discovery. A list of the materials I considered is attached as Appendix A.

(5)    As described above, Judge Saris' Consolidated Order certified several classes comprised exclusively of Massachusetts TPPs and consumers, as well as one nationwide class of consumers paying co-insurance under Medicare Part B. For purposes of the Massachusetts-only classes, I have focused my attention on the Massachusetts evidence to the extent possible given current discovery. However, non-Massachusetts evidence can also be informative because important aspects of markets for prescription drugs are not Massachusetts-specific.

(6)    I reserve the right to supplement or revise my analysis based on additional information that may become available.

---

[3]    I include these previous declarations by reference here.

Declaration of Eric M. Gaier, Ph.D.

# II. Summary of opinions

(7)    Consumers (Class 1) and TPPs (Class 2) that make coinsurance payments under Medicare
Part B did not overpay for physician-administered drugs as a result of the alleged AWP
scheme and therefore did not suffer economic harm. By rule, consumers and TPPs who make
coinsurance payments under Medicare Part B pay 20 percent of the amounts Medicare
reimburses for drugs and services. Therefore, assessment of whether these consumers and
TPPs were harmed by the alleged AWP scheme is equivalent to an assessment of whether
Medicare was harmed. I find that:

- Throughout the relevant time period, Medicare is a large and sophisticated payor that
  knows about the differences between AWP and providers' acquisition costs, is generally
  aware of the magnitude of these differences, knows that these differences vary
  substantially from drug to drug, and does not believe that AWP is a reliable signal for
  providers' acquisition costs.

- Medicare's leverage, in conjunction with its knowledge about acquisition costs, enables it
  to achieve competitive outcomes by implementing take-it-or-leave-it offers to providers
  and thereby set reimbursements it considers appropriate to balance the desire to minimize
  costs with the need to maintain access to Medicare-participating providers for its
  beneficiaries.

- As shown by the implementation of the Medicare Prescription Drug Improvement and
  Modernization Act of 2003 ("MMA") and other evidence, Medicare's drug
  reimbursements have historically subsidized underpayment for physician services.
  Therefore, drug reimbursements cannot be analyzed in isolation from physician service
  fees and other contract terms for purposes of determining economic harm from the
  alleged AWP scheme.

- With respect to multi-source drugs in particular, manufacturers have no incentive to
  manipulate their AWPs as plaintiffs allege because Medicare reimbursements are based
  upon the median AWP for all relevant National Drug Codes ("NDCs").

On the basis of Medicare's extensive knowledge and sophistication, competitive leverage,
desire to maintain access to Medicare-participating providers for its beneficiaries, desire to
reduce utilization of higher-cost alternatives such as hospitalization, historic reliance on drug
payments to subsidize underpayment for provider services, and reimbursement methodology

for multi-source drugs, I conclude that Medicare did not overpay for subject drugs as a result of the alleged AWP scheme and therefore did not suffer economic harm. It therefore follows that Medicare beneficiaries and TPPs that make coinsurance payments under Medicare Part B also did not overpay for subject drugs as a result of the alleged AWP scheme or suffer economic harm.

(8)   Numerous TPPs making reimbursements and consumers making coinsurance payments for physician-administered drugs outside of the Medicare Part B context (Class 3) would not have overpaid as a result of the alleged AWP scheme. Consumers paying coinsurance pay a percentage of the amount that their TPPs pay for physician-administered drugs. Therefore, assessing whether these consumers were harmed by the alleged AWP scheme is equivalent to assessing whether the TPPs were harmed. I find that:

- TPPs in Massachusetts and elsewhere are typically large and sophisticated organizations that are aware of the differences between AWP and providers' acquisition costs, generally understand the magnitude of those differences, know that these differences vary substantially from drug to drug, and do not believe that AWP is a reliable signal for providers' acquisition costs.

- To the extent that knowledgeable and sophisticated TPPs choose to base reimbursements on AWP despite their extensive knowledge about the widely varying differences between AWP and provider acquisition costs, it demonstrates a fundamental flaw in Dr. Hartman's appeal to the theory of "revealed preference."

- TPPs in Massachusetts and elsewhere exert considerable leverage over providers to achieve competitive reimbursements that balance their desire to minimize costs with their need to maintain network access for their beneficiaries.

- As with Medicare, TPP drug reimbursements have historically subsidized underpayment for physician services. Therefore, drug reimbursements cannot be analyzed in isolation from physician service fees and other contract terms for purposes of determination of economic harm from the alleged AWP scheme.

- Numerous smaller payors in Massachusetts and elsewhere also benefit from the knowledge, sophistication, and leverage of the larger TPPs because they contract with

larger TPPs for network administrative services and therefore enjoy the same competitive reimbursements.

On the basis of TPP knowledge and sophistication, competitive leverage, and use of drug reimbursements to subsidize underpayment for physician services, I conclude that numerous TPPs would not have overpaid for subject physician-administered drugs as a result of the alleged AWP scheme and would not have suffered economic harm. It therefore follows that those beneficiaries that make coinsurance payments under coverage from these TPPs also would not have suffered economic harm as a result of the alleged AWP scheme. Moreover, none of the evidence I have reviewed leads me to conclude that any TPP would have overpaid for physician-administered drugs as a result of the alleged AWP scheme.

(9)     Dr. Hartman's yardstick methodology is unscientific and unreliable because it cannot distinguish the alleged scheme from economic factors, including those discussed by Dr. Berndt, that provide manufacturers with legitimate incentives to maintain and raise AWPs (or Wholesale Acquisition Costs "WACs") and lead to legitimate differences between AWP and Average Selling Price ("ASP"). Indeed, the pricing patterns that plaintiffs' experts Drs. Hartman and Rosenthal assert result from the alleged AWP scheme are consistent with well-known features of legitimate price competition in many markets, including pharmaceutical markets. Therefore, Dr. Hartman's yardstick methodology amounts to an assumption that the observed patterns are the result of the alleged AWP scheme. Moreover, Dr. Hartman's use of yardsticks based upon Single Source Innovator Drugs ("SSIDs") facing no therapeutic competition to draw conclusions about drugs facing therapeutic and generic competition is inappropriate because it confounds the purported effects of the alleged AWP scheme with legitimate competitive pricing factors.

(10)    Dr. Hartman's yardstick methodology is inappropriate because it is premised on an incorrect assumption that TPPs expected AWP to have a reasonably predictable relationship to acquisition costs. As discussed in Section IV.1, the evidence demonstrates that numerous TPPs did not believe that AWP was a reliable signal for acquisition costs. Thus, Dr. Hartman's expectation approach is not appropriate.

Contains highly confidential materials—subject to protective order

(11)    It is possible to demonstrate the arbitrary and unreliable nature of Dr. Hartman's average expectation approach by applying his methodology using yardsticks that reflect the information available to payors during the class period. For example, I use the information from the 1992 and 1997 Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") reports, as well as information available to TPPs through their direct purchases of physician-administered drugs to construct alternative yardsticks. Doing so, I reduce the purported damages Dr. Hartman calculates by 40 to 99 percent for Classes 1 and 2 and by 27 to 99 percent for Class 3. I therefore conclude that Dr. Hartman's yardstick methodology is arbitrary, unreliable, and overstates the purported damages he calculates.

(12)    Contrary to Dr. Hartman's flawed analysis of a single payor, a more thorough review of the available evidence demonstrates that a significant portion of reimbursements would not have been based upon AWP as a pricing standard. Dr. Hartman's failure to identify and exclude reimbursements not based upon AWP as a pricing standard renders his methodology unreliable and causes him to overstate the purported damages he calculates by an amount unknowable without substantial individualized inquiry.

(13)    The remainder of this Declaration proceeds as follows:

- In Section III, I discuss consumers and TPPs that make coinsurance payments under Medicare Part B (i.e., Classes 1 and 2).

- In Section IV, I discuss consumers and TPPs that reimburse for physician-administered drugs outside the Medicare context (i.e., Class 3).

- In Section V, I discuss Dr. Hartman's yardstick methodology.

Declaration of Eric M. Gaier, Ph.D.

# III. Medicare Part B

(14)    Consumers (Class 1) and TPPs (Class 2) that make coinsurance payments under Medicare
        Part B did not overpay for physician-administered drugs as a result of the alleged AWP
        scheme and therefore did not suffer economic harm. By rule, consumers and TPPs who make
        coinsurance payments under Medicare Part B pay 20 percent of the amounts Medicare
        reimburses for drugs and services. Therefore, assessment of whether these consumers and
        TPPs were harmed by the alleged AWP scheme is equivalent to an assessment of whether
        Medicare was harmed. I find that:

- Throughout the relevant time period, Medicare is a large and sophisticated payor that
  knows about the differences between AWP and providers' acquisition costs, is generally
  aware of the magnitude of these differences, knows that these differences vary
  substantially from drug to drug, and does not believe that AWP is a reliable signal for
  providers' acquisition costs.

- Medicare's leverage, in conjunction with its knowledge about acquisition costs, enables it
  to achieve competitive outcomes by implementing take-it-or-leave-it offers to providers
  and thereby set reimbursements it considers appropriate to balance the desire to minimize
  costs with the need to maintain access to Medicare-participating providers for its
  beneficiaries.

- As shown by the implementation of the MMA and other evidence, Medicare's drug
  reimbursements have historically subsidized underpayment for physician services.
  Therefore, drug reimbursements cannot be analyzed in isolation from physician service
  fees and other contract terms for purposes of determining economic harm from the
  alleged AWP scheme.

- With respect to multi-source drugs in particular, manufacturers have no incentive to
  manipulate their AWPs as plaintiffs allege because Medicare reimbursements are based
  upon the median AWP for all relevant NDCs.[4]

---

[4]    A multi-source drug is defined as a drug "marketed or sold by two or more manufacturers or labelers, or a
       drug marketed or sold by the same manufacturer or labeler under two or more different brand names. This
       category includes both generic and brand name drugs." A single source drug is defined as a drug "marketed
       or sold by only one manufacturer or labeler under one brand name." See
       http://www.medpac.gov/publications/congressional_reports/June03_Ch9.pdf, p. 153.

On the basis of Medicare's extensive knowledge and sophistication, competitive leverage, desire to maintain access to Medicare-participating providers for its beneficiaries, desire to reduce utilization of higher-cost alternatives such as hospitalization, historic reliance on drug payments to subsidize underpayment for provider services, and reimbursement methodology for multi-source drugs, I conclude that Medicare did not overpay for subject drugs as a result of the alleged AWP scheme and therefore did not suffer economic harm. It therefore follows that Medicare beneficiaries and TPPs that make coinsurance payments under Medicare Part B also did not overpay for subject drugs as a result of the alleged AWP scheme or suffer economic harm.

## III.1. Medicare is a knowledgeable and sophisticated payor

(15)    Dr. Hartman and I agree that knowledge regarding the differences between AWP and acquisition costs, according to economic theory, would protect payors from overpaying for prescription drugs as a result of the alleged AWP scheme.[5] However, Dr. Hartman and I disagree about the extent of Medicare's knowledge in setting drug reimbursements. The evidence overwhelmingly demonstrates that Medicare is a sophisticated payor that knew there were widely varying differences between AWP and acquisition costs and generally was aware of the magnitude of those differences. This knowledge protected Medicare from overpaying for drugs due to the alleged AWP scheme and therefore from economic harm. Dr. Hartman erroneously asserts that the but-for reimbursements for Medicare were, by regulation, equal to Estimated Acquisition Cost ("EAC") through 2003.[6] In fact, the evidence

---

[5]    Dr. Hartman states, "Had the existence of the 'mega-spreads' been perceived and understood by TPPs, those payors would have negotiated more aggressively than they did, leading to lower reimbursement rates." *Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages*, U. S. District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257-PBS, December 15, 2005 ("Hartman Liability and Damages Declaration"), p. 10. Dr. Hartman also states, "The spread must be increased secretly, because if such spreads were understood to exist, competitors would behave to eliminate them." *Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification*, U.S. District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257-PBS, September 3, 2004 ("Hartman Declaration"), Attachment C, p. C-15.

[6]    Hartman Liability and Damages Declaration, pp. 13–14. For 2004, Dr. Hartman asserts that the "but-for spread" for Medicare was 30 percent, the same as the TPP yardstick. See Hartman Liability and Damages

---

demonstrates that Medicare understood AWP did not equal or constitute a reliable proxy for EAC and, yet, instructed its carriers not to implement EAC-based reimbursements.

(16)   Medicare gathers knowledge from a variety of sources, such as numerous reports and communications from government agencies, including those agencies that oversee the Medicare program. Throughout the relevant time period, OIG conducted a number of key studies that were communicated to the Health Care Financing Administration ("HCFA")— the federal agency responsible for overseeing Medicare.[7] These reports were often undertaken at the request of HCFA to provide information on physicians' costs to acquire drugs covered by Medicare and therefore studied the very issue for which plaintiffs now complain. For example, a 1997 OIG report has the stated purpose:

> To compare Medicare allowances for prescription drugs with drug acquisition prices currently available to the physician and supplier communities.[8]

Through these reports, Medicare gained substantial knowledge regarding the widely varying differences between AWP and acquisition costs for physician-administered drugs reimbursed under Medicare. Dr. Berndt states:

> …what is clear is that through these published reports and inter-agency public information exchanges, the fact that pharmacies' and providers' acquisition costs were typically less than AWP has long been made very visible and public. It has not been a secret, at least to active observers and health care industry participants.[9]

(17)   Figure 1 below depicts the findings from the 1997 OIG report. Specifically, the figure illustrates the substantial and widely varying differences between AWP and provider

---

[7] Declaration, pp. 44–45.
   In 2001, HCFA changed its name to the Centers for Medicare and Medicaid Services ("CMS"). See http://www.amda.com/federalaffairs/newsletters/august2001/hcfa_cms.htm.
[8] "Excessive Medicare Payments for Prescription Drugs," Department of Health and Human Services Office of Inspector General, December 1997, p. 1.
[9] *Report of Independent Expert Professor Ernst R. Berndt to Judge Patty B. Saris*, U. S. District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257-PBS, February 9, 2005, pp. 35–36.

Declaration of Eric M. Gaier, Ph.D.

acquisition costs for physician-administered drugs expressed as a markup over provider acquisition costs (in the manner analyzed and reported by Dr. Hartman). The overall reported markups range from 16 to 899 percent for 1995 and from 15 to 672 percent for 1996. For single-source drugs, the reported markups range from 16 to 162 percent for 1995 and from 15 to 154 percent for 1996. For multi-source drugs, the reported markups range from 71 to 899 percent for 1995 and from 76 to 672 for 1996. Qualitatively similar ranges were reported by OIG in 1992. Specifically, the reported markups in 1992 range from 14 to 488 percent overall, from 14 to 25 percent for single-source drugs, and 10 to 488 percent from multi-source drugs.

**Figure 1: 1997 OIG findings regarding physician-administered drug acquisition costs in 1995 and 1996[10]**



Percentage markup of AWP above acquisition cost

Source: "Excessive Medicare Payments for Prescription Drugs," Department of Health and Human Services Office of Inspector General, December 1997, Appendix B. OIG reported Average Medicare Allowed Amounts and "Actual Average Wholesale Prices"—the percentage differences between AWP and acquisition costs shown above are calculated.

(18)    In addition to reporting to HCFA the substantial and widely varying differences between
        AWP and acquisition costs for high-volume chemotherapy drugs, the 1992 OIG report stated:

> Our review of invoices revealed that the 13 chemotherapy drugs can be
> purchased at amounts below AWP. This fact indicated that AWP is not a
> reliable indicator of physician cost; indeed, Red Book officials confirmed that
> the AWP is not designed to reflect physicians' costs…We also found that the

---

[10]   The 1997 report estimated provider acquisition costs in 1995 and 1996 through pricing lists and catalogs
       for seven wholesale drug companies and seven group purchasing organizations. See "Excessive Medicare
       Payments for Prescription Drugs," Department of Health and Human Services Office of Inspector General,
       December 1997, p. 4.

relationship between AWP and cost for multiple-source drugs varies, depending in large part on the manufacturer.[11]

Similarly, the 1997 OIG report summarized its findings as follows:

> Medicare allowed between 2 and 10 times the actual average wholesale prices offered by drug wholesalers and group purchasing organizations for 8 of the 22 drugs reviewed. Medicare allowed at least 20 percent more than the actual average wholesale price for over 80 percent of the 22 drugs. For every one of the 22 drugs reviewed, Medicare allowed amounts were more than the actual average wholesale price in both 1995 and 1996. Not only did Medicare pay more than the actual average wholesale price, the program allowed more than the highest average wholesale price for every drug.[12]

In its response to the 1997 OIG report, HCFA stated:

> The published AWPs currently used by Medicare Carriers to determine reimbursement do not resemble the actual wholesale prices which are available to the physician and supplier communities that bill for these drugs.[13]

This evidence clearly demonstrates that Medicare was aware of the substantial and widely varying differences between AWP and acquisition costs and knew that AWP was not a reliable signal of acquisition costs for physician-administered drugs.

(19)   In addition to the evidence described above regarding the differences between AWP and acquisition costs, numerous reports from government agencies, including those agencies that oversee the Medicare program, have advised Medicare that AWP was not a reliable signal for acquisition costs. In particular, numerous reports determine that the relationship between

---

[11]  "Physicians' Costs for Chemotherapy Drugs," Department of Health and Human Services Office of Inspector General, November 1992, p. 5.

[12]  "Excessive Medicare Payments for Prescription Drugs," Department of Health and Human Services Office of Inspector General, December 1997, p. II.

[13]  "Excessive Medicare Payments for Prescription Drugs," Department of Health and Human Services Office of Inspector General, December 1997, Appendix D-2.

AWP and acquisition costs varies widely across drugs, and that if Medicare were trying to base reimbursements on provider acquisition costs, AWP was not an appropriate proxy. For example:

- As early as 1969, a report of the Task Force on Prescription Drugs of the Department of Health Education and Welfare ("HEW") noted that:[14]

  > Ostensibly, wholesale prices are listed in company catalogs and price lists, but these generally represent maximum prices. They serve merely as an umbrella beneath which actual prices are set by quantity discounts, hospital discounts, government discounts, two-for-the-price-of-one deals, rebates, and other special arrangements.

  > …these listed prices rarely have any realistic relationship with actual acquisition costs.[15]

- In 1974, HEW reported, "Red Book data, Blue Book data…such standard prices…are frequently in excess of actual acquisition costs."[16]

- In 1977, HCFA stated: "However, the Department is not convinced that those States which continue to reimburse at average wholesale price (AWP), or wholesale invoice cost, have made a real effort to approach AAC [actual acquisition cost]."[17]

- A 1984 General Accounting Office ("GAO") report regarding pharmacy acquisition costs states:

  > Our examination of 1,127 direct purchase invoices showed that prices to pharmacies averaged 21.2 percent below AWP; ranging from as little as 6.3

---

[14] HEW was the predecessor to the HHS. See http://en.wikipedia.org/wiki/United_States_Department_of_Health,_Education_and_Welfare. CMS (formerly HCFA) is a division of HHS. See http://en.wikipedia.org/wiki/United_States_Department_of_Health_and_Human_Services.

[15] "Prescription Drugs Under Medicare," February 1969, p. 148. See http://www.haworthpressinc.com/store/SampleText/J063.pdf.

[16] Federal Register 39(230), November 27, 1974, p. 41180. Also see Federal Register 40(159), August 15, 1975, p. 34518.

[17] "Title XIX Social Security Act: Limitation on Payment Reimbursement for Drugs: Estimated Acquisition Cost (EAC)," HCFA Action Transmittal 77-13, MMB, Dec. 13, 1977.

---

percent below AWP to as much as 41.8 percent below AWP…Thus, AWP
cannot be the best—or even an adequate—estimate of the prices providers
generally are paying for drugs.[18]

- A 1989 OIG report addressed to HCFA states:

    We continue to believe that AWP is not a meaningful payment level and that
    it should not be used for making reimbursements in either the Medicaid or the
    new Medicare drug program…For Medicare, we are recommending that
    HCFA consider using a reimbursement method other than AWP or discounted
    AWP similar to the Medicaid approach.[19]

- In its 1991 Physician Fee Schedule final rule, HCFA reports:

    We received a great many comments on this issue, primarily indicating that
    our 85 percent standard was inappropriate. The thrust of most of the
    comments was that many drugs could be purchased for considerably less than
    85 percent of AWP—particularly multi-source drugs—while others were not
    discounted.[20]

- In 1992, OIG reported to HCFA that physician-administered chemotherapy drugs can be
  purchased by providers at discounts from AWP ranging from 9 to 83 percent, which
  corresponds to markups over acquisition cost of 10 to 488 percent.[21]

- In 1996, OIG reported substantial differences between AWP and acquisition costs for
  albuterol sulfate and recommended that HCFA reexamine its Medicare drug
  reimbursement methodology.[22]

---

[18]  "Changes to the Medicaid Prescription Drug Program Could Save Millions," Office of Inspector General,
      Office of Audit, 1984, pp. 10, 22.

[19]  "Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare
      Prescription Drug Program," Office of Inspector General, October 1989.

[20]  Department of Health and Human Services, Health Care Financing Administration, Final Rule, Medicare
      Program: Fee Schedule for Physicians' Services, Federal Register, November 25, 1991, p. 59524.

[21]  "Physicians' Costs for Chemotherapy Drugs," Department of Health and Human Services Office of
      Inspector General, November 1992, Appendix III.

[22]  "Suppliers' Acquisition Costs for Albuterol Sulfate," Department of Health and Human Services Office
      of Inspector General, June 1996, p. i.

- A 1996 letter from Ven-A-Care of the Florida Keys to HCFA describes the margins providers receive on physician-administered drugs:

  > Enclosed with this letter you will find two volumes of exhibits that substantiate and support the fact that Medicare and Medicaid programs are continuing to make excessive reimbursements to providers.

  > We found that Medicare's reimbursement was excessive and in many cases provided profit margins of more than 500% and, in some instances, more than 1000%.[23]

- In 1997, OIG reported to HCFA that drugs covered by Medicare Part B can be purchased by providers at discounts from AWP ranging from 13 to 90 percent, which corresponds to markups over acquisition cost of 15 to 899 percent.[24]

- In February 1999, a posting on HCFA's website indicated that AWP "is, in fact, a 'sticker price' that is often far in excess of the actual price paid by providers."[25]

- A September 1999 report prepared for HCFA assessed the appropriateness of hospital outpatient reimbursements:

  > Hospitals were found to purchase drugs at significant discounts to the so-called 'average wholesale price' (AWP). Distinct pricing patterns were identified for single-source and multisource drugs. Average hospital acquisition costs for single-source innovator drugs was found to be 67% of AWP with a standard deviation of 12%. Multisource drugs were heavily discounted with an average acquisition cost of 42% of AWP, and a standard deviation of 24%. This higher standard deviation reflects the broad

---

[23]  Ven-A-Care letter to Bruce Vladeck, Administrator of HCFA, pp. 1, 3. October 2, 1996.

[24]  "Excessive Medicare Payments for Prescription Drugs," Department of Health and Human Services Office of Inspector General, December 1997, Appendix B. OIG reported Average Medicare Allowed Amounts and "Actual Average Wholesale Prices"—the percentage differences between AWP and acquisition costs are calculated.

[25]  McCann, Barton C. and Julia A. James. "The Impact of Medicare Payment Policies on Patient Access to Quality Cancer Care," *Health Policy Alternatives*, sponsored by the Coalition for Access to Quality Cancer Care, June 1999, p. 12.

distribution of acquisition costs, which ranged from 10% to 85% of AWP [equivalent to an 18 to 900 percent markup].[26]

This evidence demonstrates that throughout the class period Medicare was aware of the substantial and widely varying differences between AWP and acquisition costs and knew that AWP was not a reliable signal of acquisition costs for physician-administered drugs.

(20)   Medicare also had access to pricing sources that would have provided knowledge about the magnitude of the difference between AWP and acquisition costs for numerous drugs. For example, Medicare has had access to the prices paid by the Department of Veterans Affairs ("VA") for drugs bought directly from manufacturers under the Federal Supply Schedule ("FSS") since 1966.[27] In comparing Medicare's reimbursements to FSS acquisition costs, at which the VA purchases drugs for its facilities, OIG found:

- In 1998, "Medicare allowed between 15 and 1600 percent more than the Department of Veterans Affairs paid for the 34 drugs reviewed."[28]

- In 1999, "Medicare paid more than double the VA price for 12 of the [24] reviewed drugs."[29]

(21)   Moreover, at various times during the class period, HCFA and the federal government have proposed changes to Medicare reimbursement policies that demonstrate their knowledge about the differences between AWP and provider acquisition costs. Specifically:

---

[26]   "High Cost Drugs Under the Outpatient Prospective Payment System", Prepared for the Health Care Financing Administration, Kathpal Technologies, Prepared under contract by Myers and Stauffer LC, Draft, September 8, 1999, p. 4.

[27]   Medicare Payment Advisory Commission ("MedPac") reports that FSS prices are publicly available. See MedPAC, "Report to the Congress: Variation and Innovation in Medicare," June 2003, p. 163, available online at http://www.medpac.gov/publications/congressional_reports/June03_Ch9.pdf. FSS drug price information has been available through the Freedom of Information Act ("FOIA") request since July 4, 1966. Phone discussion with Donna Nash, FSS FOIA officer, on October 19, 2005. According to Ms. Nash the FSS drug information has existed more or less in its current form since the 1950s and this data has been available via FOIA request since the enactment of FOIA on July 4 1966. See http://oig.hhs.gov/oei/reports/oei-03-97-00293.pdf, p. 9. Also see http://veterans.house.gov/hearings/schedule106/july00/7-25-00/rbetz.htm.

[28]   http://oig.hhs.gov/oei/reports/oei-03-97-00293.pdf, p. 7.

[29]   http://oig.hhs.gov/oei/reports/oei-03-00-00310.pdf, p. ii.

- In June 1997, the House of Representatives Committee on the Budget offered legislation to reduce reimbursements from 100 percent of AWP to 95 percent of AWP because:

   > The Inspector General for the Department of Health and Human Services has found evidence that over the past several years Medicare has paid significantly more for drugs and biologicals than physicians and pharmacists pay to acquire such pharmaceuticals. For example, the Office of Inspector General reports that Medicare reimbursement for the top 10 oncology drugs ranges from 20 percent to nearly 1000 percent per dosage more than acquisition costs.[30]

- Similarly, a 1998 letter from HCFA to Congressman Pete Stark states:

   > Thank you for your letter concerning the payment allowances for drugs covered under the Medicare program. As you note, the Office of Inspector General (OIG) studied this area of the program and reported that while Medicare policy is to pay at the average wholesale price (AWP) for drugs, the prices reported by the commercial sources of this information do not accurately reflect the true wholesale price in the marketplace.

   > We have been aware of this problem and, as a result, included a legislative proposal in the President's fiscal year 1998 budget to require providers and suppliers who bill Medicare for drugs not paid on a cost of prospective payment basis to bill the program at their cost for the drug. This would remove the markup currently being paid above true marketplace wholesale price.

   > The proposal, which OIG supported, did not survive the legislative process. Instead, Congress provided, in section 4556 of the Balanced Budget Act of 1997, that program payment be made at 95 percent of the AWP. Furthermore, no provision was made for controlling any rise in the AWP. The President

---

[30]   Balanced Budget Act of 1997. Report of the Committee on the Budget, House of Representatives, p. 1354.

acknowledged in his radio message of December 13, 1997, that Congress addressed this issue, but that it did not go far enough.[31]

- A letter in 2000 from Donna Shalala, Secretary of Health and Human Services, to the House of Representatives Commerce Committee states:

> Indeed, the HHS Inspector General found payments based on average wholesale price data to be 11 to 900 percent greater than the prices available to the physician community. Therefore, in 1998, the President again proposed paying physicians their actual acquisition cost to 'ensure that doctors are reimbursed no more, and no less, than the price they themselves pay for the medicines they give Medicare patients.' However, no Congressional action was taken.[32]

Thus, the evidence demonstrates that the federal government chose to base Medicare reimbursement on AWP with extensive knowledge of the widely varying differences between AWP and provider acquisition costs. Moreover, according to Dr. Hartman's application of revealed preferences, which I discuss in Section IV.1, Medicare's attempts to change reimbursement are precisely the type of evidence he asserts would be an indication of payor knowledge regarding the alleged scheme.[33]

(22)   In addition to government publications, information concerning the widely varying differences between AWP and acquisition costs for physician-administered drugs also appeared in the public press. For example, in June 1996 *Barron's* concluded:

> For many drugs, especially the growing number coming off patent and going generic, the drug providers actually pay wholesale prices that are 60%-90%

---

[31]   HHC001-0363.

[32]   Donna Shalala (HHS) Letter to Tom Bliley (Commerce Committee), May 2000, pp. 1–2.

[33]   As I discuss in Section IV.1, I do not endorse Dr. Hartman's purported application of the theory of revealed preferences.

below the so-called average wholesale price, or AWP, used in reimbursement
claims [equivalent to a 150 to 900 percent markup].[34]

I note that *Barron's* collected price quotes from several leading wholesalers, an option
presumably available to Medicare and TPPs.

(23)   Notwithstanding the overwhelming evidence that Medicare had extensive knowledge about
the varying differences between AWP and provider acquisition costs and knew that AWP was
not a reliable signal for provider acquisition costs throughout the class period, Dr. Hartman
asserts that the yardstick for reimbursements made by Medicare was zero percent from 1991
to 2003.[35] That is, Dr. Hartman assumes that any difference between AWP and provider
acquisition cost, with respect to Medicare reimbursements, is solely the result of the AWP
scheme plaintiffs allege. I note that this is inconsistent with Dr. Hartman's own assertion that
there would be "spreads" in the but-for world.[36] Apparently Dr. Hartman bases his yardstick
assertion on the regulation requiring Medicare Carriers to set reimbursements at the lesser of
an AWP-based formula (e.g., 95 percent of AWP) or EAC.[37] However, Dr. Hartman ignores
evidence that Medicare knew AWP did not equal and was not a reliable proxy for EAC, and
did not pursue an EAC reimbursement methodology for reasons unrelated to the alleged
conduct. As Dr. Berndt states:

> Even though legislative and implementation guidelines mandated that
> Medicare reimburse based on the lesser of an estimated acquisition cost
> ("EAC"), 'Usual & Customary' charges or some other 'reasonable charge,'
> for a variety of reasons the *de facto* benchmark for Medicare Part B

---

[34]   Alpert, B., "Hooked on drugs," *Barron's*, June 1996, p. 1.

[35]   Hartman Liability and Damages Declaration, pp. 44–45. Dr. Hartman asserts a but-for yardstick for 2004
Medicare reimbursements of 30 percent. For the reasons discussed in Section V.1, I also find this yardstick
to be unreliable.

[36]   Deposition of Raymond S. Hartman ("Hartman deposition"), Volume IV, p. 1099. Dr. Rosenthal expresses
a similar opinion. See Deposition of Meredith Rosenthal, Volume II, p. 322.

[37]   Hartman Liability and Damages Declaration, pp. 13–14.

reimbursement was 100% of AWP up until 1998, and then 95% of AWP until
2003.[38]

After 1998, based on his interpretation of the regulations, Dr. Hartman further assumes that
"billed charge" is equal to EAC.[39] However, my understanding is that "billed charge" is a
term of art that refers to the charge a provider submits on a claim form, not the provider's
acquisition cost.[40]

(24)    A 1996 letter from a HCFA regional office to a Medicare Carrier demonstrates that HCFA
explicitly instructed Carriers not to survey provider acquisition costs to calculate EAC:

> Through your letter, it has been brought to our attention that you have been
> requesting invoices from physicians to price the drugs Zoladex and Lupron
> applying what you believe to be the EAC criteria. On August 12, 1994, our
> Regional Information Letter (RIL) 94-435 instructed you to immediately
> suspend any data collection efforts through surveying the physicians until we
> could obtain the required approval from the Office of Management and
> Budget (OMB). No further instructions have been released since then. We
> believe that your letter soliciting invoices from these physicians is essentially
> a survey and would require OMB approval. Therefore, we request that you
> send out another letter to the same physicians who received your letter dated
> July 11, 1996 and retract your request for invoices.
>
> …at this time, there should be no drugs paid based on EAC. Effective
> immediately, you should revise your pricing for Zoladex to allow the AWP.
> Additionally, if you do receive any invoices as a result of your letter, you may
> not use them to price these drugs.

---

[38]   Berndt Report, p. 35. Internal citations omitted.

[39]   Hartman Liability and Damages Declaration, pp. 12–13.

[40]   A CMS-contracted intermediary and carrier defines billed charge as follows: "The amount a physician or
       other practitioner actually bills for a particular medical service or procedure." See
       http://www.oknmmedicare.com/medicare_glossary.htm#B.

...You also asked us if you could request an invoice if you believe that the AWP was extremely inflated. Under no circumstances should you be requesting invoices to determine pricing for drugs.

...Unfortunately, we cannot move forward on implementing EAC at this time. However, we would appreciate receiving any data you may have which demonstrates the inequity between the AWP and acquisition costs.[41]

Finally, I note that in 1996 *Barron's* concluded:

Under its current regulations, Medicare provides reimbursement for those drugs at the lesser of either its estimate of what the drugs cost the doctors or the Average Wholesale Price...But, Medicare's attempts to survey doctors for their costs have been stymied by federal paperwork rules, so it reimburses at the AWP.[42]

(25)   On the basis of the overwhelming evidence that Medicare knew about the widely varying differences between AWP and provider acquisition costs, that Medicare knew that AWP was not a reliable signal for provider acquisition cost, and that Medicare never believed that AWP was equal to EAC, I conclude that Dr. Hartman's assertion that the yardstick for reimbursements made by Medicare should be zero percent is incorrect, unreliable, and inconsistent with his own assertion that there would be "spreads" in the but-for world.[43] Dr. Hartman's methodology amounts to an assumption that any difference between AWP and provider acquisition costs, with respect to Medicare reimbursements, is solely the result of the alleged AWP scheme. However, as I discuss in Section V.1 below, there are a variety of legitimate economic factors, unrelated to the alleged AWP scheme, that result in differences between AWP and average provider acquisition cost. Dr. Hartman's failure to account for these legitimate economic factors renders his methodology unscientific and unreliable.

---

[41]   HHC908-1217-18.

[42]   Alpert, B., "Hooked on drugs," *Barron's*, June 1996, p. 1.

[43]   Hartman deposition, Volume IV, p. 1099.

Contains highly confidential materials—subject to protective order

(26)    In contrast with Dr. Hartman's erroneous assertions, Medicare's knowledge, in conjunction
with its competitive leverage and its reliance on drug reimbursements to subsidize
underpayment for physician services, ensured that it did not overpay for prescription drugs as
a result of the alleged AWP scheme and therefore suffered no economic harm.[44] It therefore
follows that individuals and TPPs that made co-payments for Medicare reimbursements did
not suffer economic harm as a result of the alleged AWP scheme.

## III.2. Medicare possesses competitive leverage

(27)    In my previous declarations I have highlighted the important role that competition between
providers (and previously PBMs and pharmacies) plays in ensuring that payors would not
suffer economic harm as a result of the alleged AWP scheme.[45] Dr. Berndt has also
highlighted the importance of competition in his discussion of self-administered drugs.[46] Also
in the context of his discussion of self-administered drugs, Dr. Hartman acknowledges that,
in theory, competition between intermediaries can protect payors from economic harm.[47]
However, Dr. Hartman fails to acknowledge that, as a result of its significant competitive
leverage and extensive knowledge of provider acquisition costs, Medicare is able to obtain
competitive reimbursements by implementing a well-known form of competition by making
take-it-or-leave offers to providers. In this way, Medicare ensures that it does not overpay for
prescription drugs as a result of the alleged AWP scheme and therefore does not suffer

---

[44]    In Section V, I also demonstrate that even partially accounting for Medicare's actual knowledge, within the
context of Dr. Hartman's yardstick methodology, significantly reduces the damages Dr. Hartman purports
to calculate for Classes 1 and 2.

[45]    Gaier Declaration, Section IV.3. Also see *Sur-Reply Declaration of Eric M. Gaier, Ph.D. in Support of
Defendants' Opposition to Class Certification*, U. S. District Court for the District of Massachusetts, MDL
No. 1456, Civil Action: 01-CV-12257-PBS, October 25, 2004 ("Gaier Sur-Reply Declaration"), Section
IV.

[46]    Dr. Berndt states, "If competition among PBMs is vigorous, even if the self-administered AWPIDs were
artificially inflated, injury and damages to third party payors do not follow, particularly on a class-wide
basis. Since lack of competition among PBMs is crucial to Plaintiff's theory, this would appear to
undermine their allegations, and certainly their assumption of class-wide injury and damages." Berndt
Report, p. 111.

[47]    Dr. Hartman states, "Competition is a powerful motivator. It is a powerful force...And what is clear, the
allegations in this case say that the PBMs have not been able or that the customers have not been able to
generate competition on the part of the PBMs sufficient to defeat the AWP inflation scheme." See
Deposition of Raymond S. Hartman ("Hartman deposition"), Volume II, p. 481.

---

economic harm. Moreover, Medicare does not unambiguously prefer lower reimbursements, but rather sets reimbursements that balance its desire for lower costs with its need to maintain access to Medicare-participating providers for its beneficiaries.

(28)   There is economic literature that concludes that large and sophisticated payors with a captive base of beneficiaries can use their competitive leverage relative to providers to achieve competitive outcomes.[48] An effective way for large payors to exercise their competitive leverage is to implement take-it-or-leave-it offers to providers.[49] Economic theory of bargaining predicts that a knowledgeable buyer implementing a take-it-or-leave-it offer will achieve competitive outcomes.[50] Medicare is an example of a buyer with extensive knowledge, a large captive base of beneficiaries, and significant competitive leverage. As stated in the textbook *Health Care Economics*:

> Medicare is such a large purchaser of physician services (accounting for about 20 percent of total physician expenditures), that it is a monopsonist, that is, Medicare is a price setter because it can set the price it pays for physician services...the physician is thus a 'price taker' in the Medicare (and Medicaid) markets...[51]

(29)   Medicare's competitive leverage stems from its ability to channel a large number of beneficiaries. Medicare is the largest payor for physician-administered drugs and services:

- Throughout the relevant time period, Medicare Part B covered more than 15 percent of the U.S. population covered by insurance.[52] In comparison, WellPoint, Inc., the nation's

---

[48]   See for example Sorensen, Alan T., "Insurer-Hospital Bargaining: Negotiated Discounts in Post-deregulation Connecticut," *Journal of Industrial Economics*, Volume 51, Number 4, December 2003, p. 488.

[49]   For a discussion of buyer market power and take-it-or-leave-it offers in the health industry, see Roger D. Blair and Jeffrey L. Harrison, 1993, *Monopsony: Antitrust Law and Economics*, Princeton U. Press, Princeton, pp. 23, 73–75.

[50]   Tirole, Jean, *The Theory of Industrial Organization*, MIT Press 1994, p. 23. I note that obtaining competitive outcomes through take-it-or-leave-it offers does not require payors to be knowledgeable. See Section IV.2.

[51]   Feldstein, Paul J., *Health Care Economics, 6th Edition*, Thompson, Clifton Park, 2005, p. 233.

[52]   Data for total population insured from http://www.census.gov/hhes/www/hlthins/historic/hihistt4.html. Data for Medicare Part B enrollment from Center for Medicare and Medicaid Studies, "Medicare

largest private managed-care organization, insured 26 million beneficiaries, representing 11 percent of the U.S. population covered by insurance in 2004.[53]

- Throughout the class period, Medicare covered between 15 and 18 percent of the insured population in Massachusetts.[54]

- Throughout the class period, Part B expenditures constituted approximately six to seven percent of national health care expenditures.[55] In 2003, Medicare spent more than $120 billion for Part B benefits, over seven percent of national health care expenditures for that year.

- In 2002, Medicare's spent $8.5 billion on Part B prescription drugs, nearly five percent of national prescription drug spending for that year.[56]

Moreover, Medicare expenditures constitute a large portion of many physicians' revenues. In 2003, Medicare patients accounted for 25 percent of patient-care revenue generated by office physicians.[57] For some physician specialties, Medicare plays an even more significant role. For example, more than half of oncologists responding to a survey claimed that Medicare beneficiaries represented 40 percent or more of their patients.[58] Similarly, Dr. Berndt cites a

---

Enrollment: National Trends1966–2003, Supplementary Medical Insurance." See http://new.cms.hhs.gov/MedicareEnRpts/Downloads/SMI.pdf.

[53] http://www.aishealth.com/MarketData/MCEnrollment/MCEnrol_mc01.html.

[54] State population data from http://www.census.gov/hhes/www/hlthins/historic/hihistt4.html. State Medicare enrollment data from http://www.cms.hhs.gov/MedicareEnRpts/Downloads/Trends99-03.pdf, http://www.cms.hhs.gov/MedicareEnRpts/Downloads/Trends96-99.pdf, http://www.cms.hhs.gov/MedicareEnRpts/Downloads/Trends85-95.pdf, http://www.cms.hhs.gov/MedicareEnRpts/Downloads/01All.pdf, http://www.cms.hhs.gov/MedicareEnRpts /Downloads/02All.pdf, and http://www.cms.hhs.gov/ MedicareEnRpts /Downloads/03All.pdf.

[55] National health expenditures data from http://www.cms.hhs.gov/NationalHealthExpendData/downloads/nhe2004.zip. Medicare Part B expenditures data from http://www.cms.hhs.gov/ReportsTrustFunds/downloads/tr2005.pdf, p. 181.

[56] http://www.medpac.gov/publications/congressional_reports/Jun05DataBookSec11.pdf, p. 173. Also see http://www.uspharmacist.com/index.asp?show=article&page=8_1148.htm.

[57] U.S. Census Bureau: Table 8.12. Selected Health Care Services (NAICS 621, 622, and 623)—Estimated Revenue for Employer Firms by Source, 1998 Through 2003. See http://www.census.gov/svsd/www/sas62-5.pdf.

[58] http://www.asco.org/portal/site/ASCO/menuitem.c543a013502b2a89de912310320041a0/ ?vgnextoid=dad28c393c458010VgnVCM100000ed730ad1RCRD.

2001 American Society of Clinical Oncology ("ASCO") article in stating that, "notably, about half of all cancer patients are covered by Medicare."[59]

(30)   Unlike TPPs, Medicare does not risk losing beneficiaries to other health plans. Medicare, which provides health care coverage primarily to the elderly and disabled, covers a demographic group very different from groups covered by private TPPs. Its beneficiaries represent 98 percent of the population over 65 years of age and have lower average incomes than those of beneficiaries covered by private TPPs.[60] CMS reports that 70 percent of Medicare beneficiaries have income levels below $25,000.[61] At a 1998 meeting before the National Bipartisan Commission on the Future of Medicine, Paul Rogers of the National Coalition on Health Care asserted that Medicare beneficiaries could not afford private health insurance:

> However, Congress should not raise the Medicare eligibility age without assuring that 65 and 66 year olds will be able to obtain affordable health insurance…The reasons for this are well known to the Commission. Affordable health insurance is simply not available in the private individual health insurance market to people in this age bracket.[62]

As a result, most Medicare beneficiaries see no alternative to Medicare insurance, and are hence captive to Medicare policies. This gives Medicare a strong ability to channel its large number of beneficiaries and, according to economic theory, significant competitive leverage.

(31)   Medicare is able to implement take-it-or-leave-it contracting because of its competitive leverage relative to providers. Providers merely can elect to participate or not to participate in the Medicare program.[63] Those that agree to participate accept Medicare's allowed amounts

---

[59]   Berndt Report, p. 49, citing American Society of Clinical Oncology, "Reform of the Medicare Payment Methods for Cancer Chemotherapy," Alexandria, VA, May 2001, p. 2.

[60]   Center for Medicare and Medicaid Studies, "Medicare Enrollment: National Trends1966–2003, Hospital and/or Supplementary Medical Insurance" and U.S. Census Data, 2000.

[61]   CMS, Office of Research, Development and Information, Data from the Medicare Current Beneficiary Survey (MCBS), Access to Care File, 2000, slide 63.

[62]   http://thomas.loc.gov/medicare/rogerstest.html, p. 3.

[63]   http://www.cms.hhs.gov/cmsforms/downloads/cms460.pdf.

as payment in full as there is no provision for further negotiation between providers and Medicare.[64] Non-participating providers receive lower reimbursements from Medicare than participating providers and face increased collection risk for the balance, which they must recover directly from the beneficiaries.[65] Because beneficiaries pay more to non-participating providers than participating providers, they have strong incentives to patronize participating providers. As a result, physicians have strong incentives to participate with Medicare in order to attract Medicare beneficiaries. Indeed, during 2005, 90 percent of physicians and other practitioners administering services to Medicare beneficiaries were billing under a participation agreement.[66]

(32)   To achieve its policy objectives Medicare sets reimbursements in order to maintain access to Medicare-participating providers for its beneficiaries and to reduce other higher-cost forms of treatment.[67] The risk to Medicare in setting office-based reimbursement too low is that physicians will shift patients to the more expensive hospital setting. The evidence shows that, throughout the class period, Medicare was aware of the implications of insufficient reimbursements.

- A 1992 GAO report stated:

---

[64]   I understand that in some infrequent cases, Medicare beneficiaries may elect to pay out of pocket for treatment from providers that opt-out of Medicare. From 1998 to 2002, 0.42 percent of physicians and other practitioners eligible for Medicare opted out. See Health Care Financing Review, Winter 2004–2005, Volume 26, Number 2, p. 47. See http://www.cms.hhs.gov/apps/review/04winter/04winterpg43.pdf.

[65]   Providers contracting with Medicare may be participating, and accept Medicare's allowed charge as payment in full for all of their Medicare patients, or may elect to be non-participating, which permits providers to make assignment decisions on a case-by-case basis. Under a non-participating arrangement, Medicare approves only 95 percent of its Part B payment ("approved amount"), but the provider may bill patients for up to 115 percent of the approved amount (in effect, the allowed charge is 115 percent of 95 percent, or 109.25 percent, of the normal fee). The patient is responsible for paying the difference between the provider charge and the Medicare approved amount. Finally, providers may choose to opt-out, meaning that they receive no payments from Medicare for any patients for two years. See http://www.ama-assn.org/ama1/pub/upload/mm/395/particating_options.doc, pp. 2–3.

[66]   http://www.cms.hhs.gov/cmsforms/downloads/cms460.pdf, p. 1.

[67]   Feldstein writes, "The impetus for changes in [Medicare's] physician reimbursement came from two sources. The first, and most important, was the federal government, whose interest was (and still is) in reducing Medicare Part B expenditures...The government, however, was constrained in achieving this objective by not having a large number of physicians drop their Medicare participation." Feldstein, Paul J., *Health Care Economics, 6th Edition*, Thompson, Clifton Park, 2005, p. 249.

…oncologists we interviewed consistently stated that their choice of treatment setting (once patient welfare is taken into account) often hinges on whether they expect reimbursement to be adequate if treatment is provided in the office setting…HCFA's reimbursement policies for chemotherapy have unintended consequences that extend beyond whether and how much oncologists are reimbursed by Medicare. Specifically, the policies may affect where a cancer patient gets treated and, as a result, Medicare costs for the patient's care.[68]

- A 2002 American Medical Association ("AMA") article states, "If Medicare payments are not adequate, physicians will likely refer their chemotherapy patients to other settings."[69]

- In 2004, Leslie Norwalk, acting deputy administrator of CMS, addressed the issue of adequate reimbursements: "I want to pay the physician the right amount to keep the patient in the physician's office."[70]

(33)   In some instances, Medicare's proposed decreases in reimbursements have been met with significant resistance from providers. For example, a 2003 ASCO survey in response to a Medicare proposal to lower payments showed 73 percent of oncologists would send patients to hospitals, 53 percent would reduce patient intake, 44 percent would retire early, and 19 percent would stop seeing patients altogether.[71] With respect to the same proposal, MedPAC reported, "For 2003, payments should remain adequate as long as the Congress changes current law to prevent the 4.4 percent payment reduction from taking effect."[72]

(34)   Consistent with economic theory, the evidence demonstrates that Medicare uses its extensive knowledge of provider acquisition costs and significant competitive leverage to obtain

---

[68]   GAO Report to the Chairman, Committee on Finance, U.S. Senate, "Medicare: Reimbursement Policies Can Influence the Setting and Cost of Chemotherapy," GAO/PEMD-92-28, July 1992, pp. 3, 5.

[69]   American Medical Association, "Medicare drug pricing fix could threaten physician pay," April 2002, p. 2.

[70]   Harris, Gardiner, "Among Cancer Doctors, a Medicare Revolt," *nytimes.com*, March 11, 2004, p. 3.

[71]   http://www.asco.org/portal/site/ASCO/menuitem.c543a013502b2a89de912310320041a0/?vgnextoid=dad28c393c458010VgnVCM100000ed730ad1RCRD.

[72]   MedPAC, "Report to Congress (March 2003)," p. 72. See http://www.medpac.gov/publications/congressional_reports/Mar03_Ch2B.pdf.

competitive outcomes that balance Medicare's desire for lower reimbursements with its need to maintain access to Medicare-participating providers for its beneficiaries. Medicare achieves these competitive outcomes by implementing a take-it-or-leave-it approach to provider reimbursements. Thus, Medicare ensures that it does not overpay for prescription drugs as a result of the alleged AWP scheme and therefore that it did not suffer economic harm. It follows that individuals and TPPs making co-payments under Medicare also would not have suffered economic harm.

## III.3. Medicare relies on drug reimbursements to subsidize underpayment for physician services

(35)    Dr. Hartman and I agree that Medicare Part B drugs are furnished incident to physicians' services.[73] We disagree as to whether payments for physicians' services must be considered for purposes of determining economic harm associated with the alleged AWP scheme. The MMA and other evidence demonstrate that Medicare's drug reimbursements have historically subsidized underpayment for physician services. This cross subsidy creates interdependency between payments for drugs and services, which precludes a determination of economic harm by analyzing drug reimbursements in isolation. Indeed, the evidence demonstrates directly that if Medicare had set reimbursements commensurate with Dr. Hartman's but-for yardstick, payments for physician services would have increased significantly to maintain access. Dr. Hartman's analysis fails to account for this interdependency and is therefore unreliable and overstates the purported damages he calculates.

(36)    Throughout the class period, Medicare's drug reimbursements have subsidized underpayment for services. This cross subsidization was widely recognized by both Medicare and other government agencies:

- As Dr. Berndt highlights, in response to June 1991 HCFA proposal to base payment for drugs at 85 percent of AWP:

---

[73]   Hartman Liability and Damages Declaration, p. 28.

...oncologists argued that reimbursing them at less than AWP would not cover chemotherapy administration costs, such as mixing powdered toxic chemotherapies in an appropriate solution, 'pushing' or infusing the drugs into the patient, consulting with the patient providing family and grief counseling, managing patient side effects, and maintaining proper inventories.[74]

- A 2000 HCFA letter states:

  The right approach to addressing Medicare profits on drugs identified by the DOJ is to pay correctly for the drugs, and at the same time make changes, as necessary, to assure that Medicare adequately pays for services related to the provision of the drugs...We have concluded that Medicare payments for services related to the provision of chemotherapy drugs and clotting factors used to treat hemophilia and similar disorders are inadequate.

  We intend to propose modifications...that would increase payments for cancer chemotherapy administration. Our goal would be to have more accurate pricing for both chemotherapy drugs and chemotherapy administration in place at the same time.[75]

- A 2000 letter from Senators Bond and Ashcroft to HHS addresses the difference between reimbursements and acquisition costs:

  According to our oncologists...this margin pays for wastage, spillage, and administrative costs...for which they say they are inadequately reimbursed. They tell us that, although Medicare makes a payment for chemotherapy administration services, the payment is only a fraction of what is necessary to cover their expenses and they use payment amounts for drugs to help cover these expenses.[76]

---

[74]  Berndt Report, pp. 50–51. Internal citations omitted.
[75]  AWP041-0946.
[76]  Letter from Senators Christopher S. Bond and John Ashcroft to Secretary of HHS, Donna E. Shalala, August 3, 2000.

Contains highly confidential materials—subject to protective order

- In 2001, HCFA acknowledged reimbursements for drugs "subsidize associated, non-reimbursed costs, such as storage and administration" and "provide other important services that are not adequately compensated."[77]

- In 2002, Tom Scully, former administrator for CMS, acknowledged:

  Providers rely on cross-subsidies to survive in the Medicare business.

  The basis for service payments does not fully...consider all the practice expenses for oncologists because of the acknowledged cross subsidy from AWP overpricing.[78]

- A 2002 GAO report stated:

  If drug payments are tied closer to providers' likely acquisition costs, Medicare would need to ensure that separate and appropriate payments are made to pay for the administration and delivery of covered drugs.[79]

(37)   Notwithstanding the overwhelming evidence that Medicare's drug reimbursements have historically subsidized underpayment for physician services, Dr. Hartman inappropriately asserts that interdependencies can be ignored, stating:

  If, during negotiations, incomplete or incorrect signals are given for individual components of the medical service to be provided, the total reimbursement rate allowed for the medical benefit will be incorrect.[80]

However, Dr. Hartman's assertion rests on an incorrect assumption that AWP was understood by Medicare (and TPPs) to be a reliable signal for provider acquisition costs. More

---

[77]  "Medicare Reimbursement of Prescription Drugs," Office of Inspector General, January 2001, Appendix F.
[78]  See citation of Tom Scully's testimony before the Senate, "Medicare drug pricing fix could threaten physician pay," http://www.ama-assn.org/amednews/2002/04/01/gvse0401.htm.
[79]  Dummit, Laura A., "Medicare Outpatient Drugs: Program Payments Should Better Reflect Market Prices," GAO-02-531T, March 2002, p. 13.
[80]  Hartman Liability and Damages Declaration, Attachment K, p. 8. Dr. Hartman also relies on understanding from counsel that "the fact that a fraud is committed to subsidize other activities does not immunize it from legal scrutiny." I will not comment on legal questions.

importantly, the implementation of the MMA explicitly demonstrates that Dr. Hartman's assertion is incorrect. Specifically, if Dr. Hartman were correct that interdependencies can be ignored, one would not expect Medicare to raise its payments for physician services to offset the reduction in drug reimbursements associated with the change to ASP-based reimbursements. Yet, this is exactly what has occurred, which demonstrates that if Medicare had set drug reimbursements commensurate with Dr. Hartman's but-for yardstick, payments for physician services would have increased significantly to maintain access. Therefore, Medicare's drug reimbursements cannot be considered in isolation for purposes of determining economic harm associated with the alleged AWP scheme. Dr. Hartman ignores evidence of and fails to account for this interdependency, which renders his approach unreliable and causes him to overstate the purported damages he calculates.

(38)   In 2003, Congress passed the MMA, which decreased drug reimbursements and increased service payments through a change from an AWP-based methodology to an ASP-based methodology. The MMA underscores Medicare's historical cross subsidization of drugs and services and demonstrates that drug reimbursements cannot be considered in isolation from service payments for purposes of establishing whether Medicare overpaid for prescription drugs as a result of the alleged AWP scheme. Dr. Berndt states:

> What is apparently clear is that in recognition of the AWP-related cross-subsidy provided physicians administering Medicare Part B drugs, Medicare is also increasing physician service fees; in the case of inhalation drugs delivered by nebulizers, for example, the dispensing fee has increased from $5 to $57.[81]

In the remainder of this section, I detail the changes mandated by the MMA, discuss the intent of the MMA to reduce the interdependency of drug and service payments, and analyze the changes in drug and service payments that have resulted to date from the MMA.

(39)   The MMA implemented the following policy changes to take effect from 2004 to 2006:

---

[81]   Berndt Report, p. 52. Internal citations omitted.

- Effective January 2004, drug reimbursements decreased from 95 to 85 percent of the AWP.[82] Simultaneously, payments for services were increased through components of the Physician Fee Schedule ("PFS"), such as increased relative value units ("RVUs") for certain drug administration services and a 32 percent "transitional adjustment" for some drug administration services.[83]

- Effective January 2005, drug reimbursements are set at 106 percent of the ASP.[84] Again, service payments increased through changes to the PFS, such as coding revisions for certain drug administration services.[85] Supplementing this PFS change under MMA, CMS also established a $300 million demonstration program in which oncologists received $130 per patient per day for asking four questions regarding patient comfort.[86]

- From 2004 to 2006, budget neutrality requirements were waived, exempting certain changes under the MMA from maintaining service payments within $20 million of the previous year.[87] This waiver allows for larger increases in service payments than in previous years.

(40)   Through the MMA policy changes summarized above, MMA sought to eliminate the historical interdependency of drug prices and physician service reimbursements:

- In 2004, the House of Representatives Committee on Ways and Means stated, "In order to address the underpayment for drug administration and the overpayment for drugs, the MMA makes a number of changes in reimbursement for cancer care."[88]

---

[82]   The AWP used for 2004 reimbursements was fixed to the April 1, 2003 AWP. See Federal Register 69(4), January 7, 2004, p. 1086.

[83]   Federal Register 69(4), January 7, 2004, p. 1099.

[84]   As stipulated by Medicare, ASPs are based on data reported from two quarters prior and are calculated as sales to all purchasers (exempting sales related to Medicaid Best Price and rebate) less discounts and rebates, divided by total units. For single-source drugs, the applicable ASP is the lesser of the ASP and WAC. See http://thefederalregister.com/d.p/2005-03-04-05-3992 and http://www.communityoncology.org/Portals/coa/Documents/HR4098_Section_Analysis.doc.

[85]   See Federal Register 69(219), November 15, 2004, pp. 66406–66407.

[86]   http://www.cms.hhs.gov/media/press/release.asp?Counter=1244.

[87]   MMA Sec 303(a)(1)(A)(ii). Also see http://www.cms.hhs.gov/media/press/release.asp?Counter=712.

[88]   http://waysandmeans.house.gov/media/pdf/healthdocs/awpreform.pdf.

Declaration of Eric M. Gaier, Ph.D.                                                        Medicare Part B

- In 2004, CMS "estimated that the one-year decrease in drug payments and increase in physician fee schedule payments…will produce virtually no net change in total Medicare payments for oncologists."[89]

- A CMS press release announced that the 2005 proposed rule for raising physician payments under the MMA "is also an important step in implementing changes in law to improve the accuracy of Medicare's payments for Part B-covered drugs and the critical administration services that these drugs require." The press release quoted CMS administrator, Mark B. McClellan, "We now have new tools to pay appropriately for each drug as well as the valuable services that go along with administering drugs, rather than having an overpayment for one subsidize an underpayment for the other."[90]

(41)     The actual changes observed in Medicare's reimbursements reflect its intention to increase service payments in response to decreases in drug payments in order to preserve access to Medicare-participating providers for its beneficiaries and prevent providers from treating patients in the more costly hospital setting. Based on CMS' calculation of Medicare's reimbursements before and after the implementation of the MMA, payments for services increased while payments for drugs decreased. Table 1 shows percentage changes in drug and service payments for the first two years after MMA implementation.[91] The table illustrates the interdependency of drug and service payments, demonstrating that drug payments cannot be analyzed in isolation for purposes of determining whether Medicare overpaid for prescription drugs as a result of the alleged AWP scheme. The table also demonstrates that if Medicare had set drug reimbursements commensurate with Dr. Hartman's but-for yardstick, payments for physician services would have increased significantly.

---

[89]   Federal Register 69(4), January 7, 2004, p. 1108.

[90]   http://www.cms.hhs.gov/media/press/release.asp?Counter=1134, p. 3.

[91]   CMS calculates annual average changes in service fees and drug reimbursements from 2003 to 2005, weighted by 2003 utilization, for specialties receiving a significant amount of their revenue from drug reimbursements: hematology/oncology, infectious disease, obstetrics/gynecology, rheumatology, and urology. The percentage changes listed in the table are weighted across specialties by 2003 allowed charges. See Federal Register 69(4), January 7, 2004, pp. 1108-1109. Also see Federal Register 69(219), November 15, 2004, p. 66410. Also see http://www.cms.hhs.gov/MedicareFeeforSvcPartsAB/Downloads/Specialty03.pdf.

Declaration of Eric M. Gaier, Ph.D.                                                Medicare Part B

Table 1: Percentage changes in drug and service payments resulting from the MMA

| Years compared | Drugs | Services |
|---|---|---|
| 2003–2004 | -12.6% | 24.6% |
| 2004–2005 | -22.4% | 5.6% |

Source: Federal Register 69(4), January 7, 2004, pp. 1108-1109 and Federal Register 69(219), November 15, 2004, p. 66410.
Also see CMS' 2003 Expenditures and Services by Specialty.

(42)   CMS estimates that, holding utilization constant, overall payment levels will be lower in
2005 than in 2003.[92] In a recent press release, however, CMS recognizes that these payment
levels may not be sufficient:

> The current system is not sustainable, and the payment reduction [scheduled
> for 2006] offers further proof that we must move to a payment system that
> ensures adequate payments to physicians, but also supports high quality and
> efficient health care services. We want to continue to work with Congress
> toward a payment system that is more sustainable.[93]

(43)   Under the MMA, Medicare's reimbursements to office-based physicians are based upon an
ASP that is sometimes below the acquisition cost of those physicians. In particular, hospitals
pay significantly less than office-based physicians but are nonetheless included in Medicare's
ASP calculation. If the below-cost reimbursement results in office providers no longer
dispensing a manufacturer's drugs, the manufacturer may be forced to reduce discounts to
hospitals in order to ensure that providers receive sufficient reimbursement. The resulting
upward shift in ASP would raise costs for the entire healthcare system. Indeed the potential
for greater price transparency to lead to higher prices is a well-known phenomenon in
economics, which Dr. Berndt characterizes as "the best deal is a secret deal."[94] Specifically,
Dr. Berndt states:

---

[92]   Federal Register 69(4), January 7, 2004, p. 1108. Also see Federal Register 69(219), p. 66410.
[93]   http://www.cms.hhs.gov/media/press/release.asp?Counter=1709.
[94]   Berndt Report, p. 77.

Contains highly confidential materials—subject to protective order

> If manufacturers have reason to believe *ex ante*, however, that a potential
> purchaser is likely to report publicly and truthfully the 'secret' prices tendered
> to it, the manufacturers are less likely to offer 'secret' discounts in the first
> place.[95]

(44)   Survey results underlying a recent OIG report reveal that Medicare's current reimbursement
       scheme does not adequately reimburse physicians for some drugs.[96] Although OIG concludes
       that cancer-specialty physicians "could generally purchase drugs for the treatment of cancer
       patients at less than the MMA-established reimbursement rates," this is not true for all
       drugs.[97] The most significant example of this is paclitaxel (Taxol), a widely used cancer
       treatment drug. According to the OIG study, Medicare's reimbursement for paclitaxel was on
       average five percent less than the price at which practices could acquire it.[98]

(45)   In response to potentially inadequate reimbursements under the MMA, Medicare may
       already be experiencing oncologist flight and diversion of patients to hospitals:

> Some [cancer doctors] have begun eliminating nurses and other
> staff...Practices in some areas have started closing satellite offices...other

---

[95]   Berndt Report, p. 78.

[96]   Office of Inspector General, "Adequacy of Medicare Part B Drug Reimbursement to Physician Practices
       for the Treatment of Cancer Patients," September 2005, p. 6. See
       http://oig.hhs.gov/oas/reports/region6/60500024.pdf.

[97]   OIG implicitly recognizes that cross subsidies persist in Medicare reimbursement. Only three out of 39
       drugs in OIG's study could be purchased by practices at prices below Medicare's reimbursement 100
       percent of the time. For the other 36 drugs, some practices at some points in time paid more to acquire the
       drug than the amount they were reimbursed by Medicare. In order to conclude "reimbursement was
       generally adequate," OIG implicitly acknowledges that below-cost reimbursement for some drugs in some
       months is offset by above-cost reimbursement for those or other drugs in other months. See Office of
       Inspector General, "Adequacy of Medicare Part B Drug Reimbursement to Physician Practices for the
       Treatment of Cancer Patients," September 2005, Appendix F. See
       http://oig.hhs.gov/oas/reports/region6/60500024.pdf.

[98]   J9265 (Paclitaxel) was reimbursed at $15.85 in the first quarter of 2005, while practices spent $16.71 on
       average for that drug. See Office of Inspector General, "Adequacy of Medicare Part B Drug
       Reimbursement to Physician Practices for the Treatment of Cancer Patients," September 2005, Appendix
       D8. See http://oig.hhs.gov/oas/reports/region6/60500024.pdf.

doctors say they have stopped administering chemotherapy to certain patients for good, forcing some to check into the hospital to get their treatments.[99]

A document from plaintiff Blue Cross Blue Shield of Massachusetts ("BCBS-MA") entitled, "Analysis of CMS Average Wholesale Price Reform: Reimbursement for Part B Drugs," indicates that adopting CMS's ASP reimbursement methodology may have "high impact to certain provider types (i.e., Oncology)" and could result in a "potential shift to facility setting (Oncologists)."[100] Another document from plaintiff BCBS-MA regarding a meeting with the Massachusetts Society of Clinical Oncologists ("MSCO") reveals:

> The group [of oncologists] is extremely concerned about the new changes enacted by CMS. The [sic] feel that they are dangerous to member care. They are currently refusing to treat some CMS members in their offices.[101]

(46)   Medicare is facing similar issues with urologists. Luteinizing Hormone-Releasing Hormone ("LHRH") agonists, such as Zoladex, are the most commonly administered drugs in the treatment of advanced prostate cancer. Reductions in reimbursements under the MMA for these drugs may be resulting in provider flight:

> Many urology practices have stopped administering LHRH to their patients in the office setting. They have department of the hospital or sent the patient to the pharmacy with a written prescription, shifting the cost of the drug to the patient, or their prescription drug insurance program.[102]

Continued provider flight in response to the net decrease in overall reimbursements may force Medicare to increase physician fees further to maintain access to Medicare-participating providers and keep patients out of the more costly hospital setting.

---

[99]   http://www.accesswatch.org/access/wrapper.jsp?PID=3080-25&CID=3080-021404A. Also see
       http://www.acponline.org/journals/news/apr04/cancer.htm.
[100]  BCBSMA-AWP-11606.
[101]  BCBSMA-AWP-12678.
[102]  Scionti, Stephen M., "Medicare Reform—A Major Economic Impact on Private Urological Practice,"
       *Business Briefing: US Kidney & Urological Disease*, 2005, p. 86.

(47)    While the current state of the MMA changes may not be sustainable for maintaining desired
        access to Medicare-participating providers, it nevertheless demonstrates Medicare's historical
        reliance on drug reimbursements to subsidize underpayment for physician services. The
        experience of the MMA clearly demonstrates that Medicare's drug reimbursements cannot be
        considered in isolation for purposes of evaluating economic harm resulting from the alleged
        AWP scheme. The experience also demonstrates that if Medicare had set drug
        reimbursements commensurate with Dr. Hartman's but-for yardstick, payments for physician
        services would have increased significantly to maintain access. Since Dr. Hartman ignores
        the fact that drug reimbursements were used historically to subsidize underpayment for
        physician services, I conclude that his methodology is unreliable and overstates the purported
        damages he calculates.

## III.4. Manufacturers had no incentive to manipulate AWPs for multi-source drugs

(48)    During the class period, Medicare reimbursements for multi-source drugs were generally
        based on the median AWP for all generic NDCs associated with a given J-code.[103] Under this
        reimbursement regime, manufacturers gain no advantage relative to competitors by
        manipulating their AWPs because the reimbursements for all NDCs for a given J-code are
        identical. Therefore, manufacturers would not have any incentive to manipulate their AWPs
        as plaintiffs allege. According to Dr. Hartman, manufacturers could still effectuate the alleged
        AWP scheme by reducing their acquisition prices.[104] However, as I discuss in Section V.1,
        there are a variety of legitimate economic factors that provide manufacturers an incentive to
        lower provider acquisition prices.[105] Dr. Hartman's failure to distinguish between these

---

[103]   From 1992 through 1997, reimbursements for multi-source drugs were based on the lesser of 100 percent of
        the median generic AWP or EAC (although EAC was never implemented). From 1998 through 2003,
        reimbursements for multi-source drugs were 95 percent of the lesser of the median generic AWP or the
        lowest brand AWP. See http://www.nhpf.org/pdfs_ib/IB775_AWP_6-7-02.pdf and
        http://www.cbo.gov/showdoc.cfm?index=1845&sequence=15. I note that under these regulations,
        Medicare's reimbursements would not necessarily have been affected by the defendant manufacturers'
        AWP. Moreover the calculation of the median AWP varies significantly among Medicare Carriers. See
        "Excessive Medicare Payments for Prescription Drugs," Department of Health and Human Services Office
        of Inspector General, December 1997, p. 9.

[104]   Hartman Liability and Damages Declaration, p. 38.

[105]   Consistent with my discussion, Dr. Rosenthal asserts that offering discounts is a common feature of other

legitimate economic factors and the purported effects of the alleged AWP scheme renders his analysis unscientific and unreliable.

(49)    To calculate damages for Classes 1 and 2, Dr. Hartman relies on his assumption that Medicare implemented generic drug reimbursements based upon the lesser of the median AWP or EAC before 1998 and his interpretation that "billed charges" represent provider acquisition costs thereafter.[106] Dr. Hartman calculates damages by taking the difference between the ASP for a particular subject NDC and the median AWP for a set of NDCs within the corresponding J-code.[107] Dr. Hartman acknowledges that if his assumption concerning Medicare's implementation of EAC or his interpretation of "billed charges" were incorrect, his damage methodology would be inappropriate:

> …if you're telling me that a—the proper interpretation of the Medicare statutes never had a reliance upon acquisition cost as an alternative or as a lesser of, and that it was always going to be at the median AWP, and that the—that essentially—then—then—certainly the damages would be—would be different than the way I've calculated them.[108]

## III.5. Conclusion

(50)    On the basis of Medicare's knowledge, competitive leverage, desire to maintain access to Medicare-participating providers for its beneficiaries, desire to reduce utilization of higher cost alternatives such as hospitalization, historical reliance on drug payments to subsidize underpayment for physician services, and reimbursement methodology for multi-source drugs, I conclude that Medicare did not overpay for drugs as a result of the alleged AWP scheme and suffered no economic harm. It therefore follows that Medicare beneficiaries and

---

markets. See *Liability Report of Dr. Meredith Rosenthal*, U. S. District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257-PBS ("Rosenthal Liability Report"), p. 14.

[106]   Dr. Hartman acknowledges that he is not an expert on the interpretation of Medicare regulations or statutes. See Hartman Deposition, Volume V, p. 1387.

[107]   Hartman Deposition, Volume V, p. 1382. Dr. Hartman acknowledges that he was not able to determine the median AWP for a particular J-code since he did not have information regarding the AWPs for all NDCs within a J-code. See Hartman Deposition, Volume V, p. 1371.

[108]   Hartman Deposition, Volume V, p. 1386.

Declaration of Eric M. Gaier, Ph.D.                                                   Medicare Part B

TPPs that make coinsurance payments under Medicare Part B also suffered no economic harm as a result of the alleged AWP scheme.

Declaration of Eric M. Gaier, Ph.D.

# IV. Drugs reimbursed by TPPs outside the Medicare context

(51)     Numerous TPPs making reimbursements and consumers making coinsurance payments for physician-administered drugs outside of the Medicare Part B context (Class 3) would not have overpaid as a result of the alleged AWP scheme. Consumers paying coinsurance pay a percentage of the amount that their TPPs pay for physician-administered drugs. Therefore, assessing whether these consumers were harmed by the alleged AWP scheme is equivalent to assessing whether the TPPs were harmed. I find that:

- TPPs in Massachusetts and elsewhere are typically large and sophisticated organizations that are aware of the differences between AWP and providers' acquisition costs, generally understand the magnitude of those differences, know that these differences vary substantially from drug to drug, and do not believe that AWP is a reliable signal for providers' acquisition costs.

- To the extent that knowledgeable and sophisticated TPPs choose to base reimbursements on AWP despite their extensive knowledge about the widely varying differences between AWP and provider acquisition costs, it demonstrates a fundamental flaw in Dr. Hartman's appeal to the theory of "revealed preference."

- TPPs in Massachusetts and elsewhere exert considerable leverage over providers to achieve competitive reimbursements that balance their desire to minimize costs with their need to maintain network access for their beneficiaries.

- As with Medicare, TPP drug reimbursements have historically subsidized underpayment for physician services. Therefore, drug reimbursements cannot be analyzed in isolation from physician service fees and other contract terms for purposes of determination of economic harm from the alleged AWP scheme.

- Numerous smaller payors in Massachusetts and elsewhere also benefit from the knowledge, sophistication, and leverage of the larger TPPs because they contract with larger TPPs for network administrative services and therefore enjoy the same competitive reimbursements.

On the basis of TPP knowledge and sophistication, competitive leverage, and use of drug reimbursements to subsidize underpayment for physician services, I conclude that numerous TPPs would not have overpaid for subject physician-administered drugs as a result of the

alleged AWP scheme and would not have suffered economic harm. It therefore follows that those beneficiaries that make coinsurance payments under coverage from these TPPs also would not have suffered economic harm as a result of the alleged AWP scheme. Moreover, none of the evidence I have reviewed leads me to conclude that any TPP would have overpaid for physician-administered drugs as a result of the alleged AWP scheme.

## IV.1. TPPs are typically knowledgeable and sophisticated

(52)   As I noted in Section III.1 above, Dr. Hartman and I agree that knowledge regarding the differences between AWP and provider acquisition costs, as a matter of economic theory, would protect payors from overpaying for prescription drugs as a result of the alleged AWP scheme and therefore insulate them from economic harm. Specifically, Dr. Hartman states:

> Had the existence of the 'mega-spreads' been perceived and understood by TPPs, those payors would have negotiated more aggressively than they did, leading to lower reimbursement rates.[109]

Judge Saris also recognizes the importance of knowledge and sophistication of TPPs. Specifically, she states:

> Some TPPs may have greater sophistication because they purchase self-administered drugs, but there is no evidence that TPPs purchase physician-administered drugs or know of the mega-spreads that exist for these drugs.[110]

It is therefore appropriate to focus on the question of what TPPs in Massachusetts knew about the differences between AWP and provider acquisition costs, and in particular on whether they would have gained knowledge through purchases of physician-administered drugs. The evidence demonstrates that TPPs covering approximately 70 percent of

---

[109]   Hartman Liability and Damages Declaration, p. 10.

[110]   *Memorandum and Order Re: Motion for Class Certification,* U. S. District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257, August 16, 2005 ("Saris' Class Certification Order"), p.59.

beneficiaries in Massachusetts bought physician-administered drugs throughout the class period. Through those purchases and other sources of evidence discussed below, Massachusetts TPPs knew of the widely varying differences between AWP and provider acquisition costs, generally knew the magnitude of these differences, and were aware of those differences since at least 1991.

(53)    The provision of health insurance in Massachusetts is relatively concentrated, with approximately 86 percent of the covered lives insured by five TPPs. Indeed, plaintiff BCBS-MA is the largest TPP in Massachusetts, insuring approximately 46 percent of the covered lives in 2004. BCBS-MA also offers Medicare Supplemental Insurance ("Medigap") plans to beneficiaries in Massachusetts.[111] It is instructive to also examine other large plans in Massachusetts; Table 2 summarizes the covered lives for the largest TPPs in Massachusetts.

**Table 2: Massachusetts health plans by number of enrollees**

| Health plan | Total enrollees (1,000s) | Share of covered lives |
|---|---|---|
| Blue Cross Blue Shield of Massachusetts | 2,288 | 46% |
| Tufts Associated Health Plan ("Tufts") | 803 | 16% |
| Harvard Pilgrim Health Care, Inc. ("Harvard Pilgrim") | 766 | 15% |
| CIGNA HealthCare of Massachusetts, Inc. ("CIGNA") | 229 | 5% |
| Fallon Community Health Plan ("Fallon") | 187 | 4% |
| Other (10 plans with more than 1,000 enrolled) | 695 | 14% |
| **Total** | **4,969** | **100%** |

Source: AIS database, 2004.

(54)    Sales data provided by defendants demonstrate that four of the top five Massachusetts TPPs—plaintiff BCBS-MA, Harvard Pilgrim, CIGNA, and Fallon—purchased physician-administered drugs directly through contracts with manufacturers, through Group Purchasing Organizations ("GPOs"), or through drug wholesalers. These purchases were made by organizations that provided medical care, required a supply of drugs for their operation, and

---

[111]   http://www.mass.gov/doi/Consumer/HealthLists/medicare_2006.PDF.

were owned by these TPPs.[112] For example, Harvard Pilgrim and Fallon were staff/group-model Health Maintenance Organizations ("HMOs"), which are vertically integrated entities that provide both health care and insurance services. Although this form of integrated health plan arrangement is less prevalent today, many insurers owned, or operated such entities during the 1990s and would have purchased physician-administered drugs.[113]

(55)     The available evidence from manufacturers shows that these TPPs purchased significant volumes of physician-administered drugs, including many of the drugs in this litigation. Table 3 lists dollar volumes of subject physician-administered drugs purchased by these payors, by manufacturer. In addition, those TPP drug purchases were made over an extended period, spanning the entire class period, and starting at least as early as 1991 (the earliest time period for which data have been provided by defendants). Table 4 lists dollar volumes of subject physician-administered drugs purchased by these TPPs over time.

---

[112]   See Appendix D for documentation of entities operated by these Massachusetts TPPs for which manufacturers report sales of physician-administered drugs.

[113]   See Kongstvedt, Peter R., *The Managed Care Handbook,* Aspen Publishers, Gaithersburg, 2001, pp. 34–36 for a description of this type of organization.

Contains highly confidential materials—subject to protective order

**Table 3: Dollar volumes of subject drugs purchased directly by Massachusetts TPPs, by manufacturer**

| Manufacturer | Time coverage of available data | BCBS-MA[114] | CIGNA[115] | Fallon[116] | Harvard Pilgrim[117] |
|---|---|---|---|---|---|
| AstraZeneca | 1991–2004 | | $1,725,836 | $1,275,699 | $1,231,925 |
| Bristol-Myers Squibb | 1993–2002 | $138,389 | $1,099,332 | $942,688 | $706,249 |
| GlaxoSmithKline | 1997–2001 | $195,951 | $3,933,904 | $875,213 | $1,371,627 |
| Johnson & Johnson | 1991–1999 | $511,377 | $3,595,116 | $1,077,477 | $1,172,335 |
| Schering-Plough | 1991–2004 | $96,549 | $5,178,432 | $2,591,897 | $2,048,990 |
| **Total** | | **$942,265** | **$15,532,620** | **$6,762,975** | **$6,531,127** |

Source: AstraZeneca, Bristol-Myers Squibb, GlaxoSmithKline, Johnson & Johnson, and Schering-Plough indirect sales data.

---

[114]   I include all purchases in which plaintiff BCBS-MA or its related entities are listed as customers or contract owners in manufacturer chargeback data. Plaintiff BCBS-MA-related entities purchasing subject drugs directly from manufacturers include HMO Blue, Medical East, and Medical West.

[115]   I include all purchases in which CIGNA or its related entities are listed as customers or contract owners in manufacturer chargeback data. CIGNA-related entities purchasing subject drugs directly from the manufacturers include CIGNA Healthplan, CIGNA Pharmacy, Connecticut General Life Insurance Company, INA Healthplan, Lovelace, Tel-Drug, EQUICOR, and Healthsource.

[116]   I include all purchases in which Fallon or its related entities are listed as customers or contract owners in manufacturer chargeback data. Fallon-related entities purchasing subject drugs directly from manufacturers include Fallon Community Health Care, Fallon Clinic, and Fallon Central Pharmacy.

[117]   I include all purchases in which Harvard Pilgrim or its related entities are listed as customers or contract owners in manufacturer chargeback data. Harvard Pilgrim-related entities purchasing subject drugs directly from manufacturers include Harvard Pilgrim Healthcare, Harvard Community Health Plan, Harvard Vanguard, and Rhode Island Group Health (also known as Harvard Community Health Plan of New England).

Declaration of Eric M. Gaier, Ph.D.                    Drugs reimbursed by TPPs outside the Medicare context

**Table 4: Dollar volumes of subject drugs purchased directly by Massachusetts TPPs, by year**

| Year | BCBS-MA | CIGNA | Fallon | Harvard Pilgrim |
|------|---------|-------|--------|-----------------|
| 1991 | $873 | $333,323 | $36,258 | $79,334 |
| 1992 | $24,757 | $676,409 | $60,983 | $153,853 |
| 1993 | $56,739 | $969,456 | $182,672 | $224,164 |
| 1994 | $97,608 | $1,252,642 | $296,381 | $349,408 |
| 1995 | $123,943 | $1,525,829 | $187,848 | $514,739 |
| 1996 | $204,843 | $1,549,650 | $426,002 | $908,120 |
| 1997 | $275,633 | $1,739,627 | $785,632 | $1,331,506 |
| 1998 | $104,916 | $2,218,061 | $1,100,364 | $1,142,811 |
| 1999 | $27,136 | $1,850,194 | $1,185,501 | $870,944 |
| 2000 | $20,829 | $1,444,482 | $949,111 | $371,965 |
| 2001 | $4,989 | $1,191,893 | $959,915 | $379,568 |
| 2002 | | $583,350 | $539,284 | $142,822 |
| 2003 | | $154,352 | $45,639 | $47,424 |
| 2004 | | $43,352 | $7,385 | $14,469 |
| **Total** | **$942,265** | **$15,532,620** | **$6,762,975** | **$6,531,127** |

Source: AstraZeneca, Bristol-Myers Squibb, GlaxoSmithKline, Johnson & Johnson, and Schering-Plough indirect sales data.

(56)     Importantly, these Massachusetts TPPs purchased physician-administered drugs at discounted prices generally at, and in many cases below, the ASPs calculated by Dr. Hartman. Therefore, these TPPs would have known about the widely varying differences between AWP and provider acquisition costs and would have known about the magnitude of these differences for the very drugs for which Dr. Hartman purports to find damages. Figure 2 to Figure 6 below depict the AWP and ASP reported by Dr. Hartman along with the average discounted prices paid by the Massachusetts TPPs for a sample of the physician-administered drugs for which Dr. Hartman finds damages. Appendix B contains corresponding figures for additional subject drugs purchased by Massachusetts TPPs.[118]

---

[118]    See Appendix D for a discussion of the electronic data sources and procedures used in this analysis.

**Figure 2: Zoladex prices to Massachusetts TPPs**



Source: AstraZeneca indirect sales table—NDC 00310096036

**Figure 3: Vepesid prices to Massachusetts TPPs**



Source: Bristol-Myers Squibb indirect sales data—NDC 00015309520

Declaration of Eric M. Gaier, Ph.D.          Drugs reimbursed by TPPs outside the Medicare context

**Figure 4: Zofran prices to Massachusetts TPPs**



Source: GlaxoSmithKline indirect sales tables—NDC 00173044200

**Figure 5: Procrit prices to Massachusetts TPPs**



Source: Johnson & Johnson indirect sales table—NDC 59676031201

---

Contains highly confidential materials—subject to protective order

**Figure 6: Intron prices to Massachusetts TPPs**



Source: Schering-Plough indirect sales tables—NDC 00085053901

(57)     The manufacturers' sales data demonstrate that at least four of the largest five TPPs in
         Massachusetts—including plaintiff BCBS-MA and collectively representing approximately
         70 percent of the beneficiaries in Massachusetts—had knowledge that the subject physician-
         administered drugs were available to providers at substantial discounts from AWP and knew
         the magnitude of those discounts since at least 1991. This is the very information that Dr.
         Hartman concedes would have caused payors to have "negotiated more aggressively than
         they did, leading to lower reimbursement rates."[119]

(58)     In addition to procuring physician-administered drugs directly from manufacturers and
         wholesalers, there are a variety of other techniques TPPs use to gain knowledge about
         provider acquisition costs. For example, many TPPs hire personnel with experience working
         in the provider community, where they would have had visibility of drug prices. Specifically,
         the evidence demonstrates that many of the individuals with responsibility for managing
         provider networks within TPPs have previous experience in clinical or hospital
         administration or were practicing physicians or pharmacists. For example:

---

[119]   Hartman Liability and Damages Declaration, p. 10.

- Phillip Boulter, MD, FACE, Senior Vice President and Chief Medical Officer at Tufts Health Plan, has responsibility for strategic planning, utilization management, and clinical services. Prior to joining Tufts Health Plan, Dr. Boulter served in a range of leadership positions in a large multi-specialty group practice. He was previously Medical Director for the Hitchcock Clinic-Concord Division in New Hampshire for nine years and was responsible for incorporating managed-care practices into clinical operations.[120]

- John Fallon, M.D., Chief Physician Executive at BCBS-MA, oversees the company's medical policies, acts as the main liaison with the plan's provider network, and manages the regional medical directors. Most recently, Dr. Fallon was CEO of Clinical Affairs at SUNY Downstate Medical Center. Prior to joining BCBS-MA, Dr. Fallon was the chairman of Partners Community HealthCare Inc., the physician network of PHS. In his role as Chairman, Dr. Fallon interacted directly with community physicians and academic medical centers to integrate them into risk and non-risk contracts. He also oversaw payor negotiations and developed programs to deal with escalating pharmacy costs.[121]

- Paul Mendis, M.D., Chief Medical Officer at Neighborhood Health Plan, has been with Neighborhood Health Plan since 1999. Dr. Mendis serves on the Board of Directors for Dimock Community Health Center. Prior to joining Neighborhood Health Plan, Dr. Mendis served as the Medical Director for First Seniority, Harvard Pilgrim Health Care's Medicare + Choice program. Dr. Mendis was also a local and regional medical director in the multi-specialty group practice, Harvard Vanguard Medical Associates, for 12 years ending in 1996.[122]

- Lee Newcomer, M.D., Business Leader of Oncology Services at United HealthCare, has been associated with United HealthCare since 1991. He is also currently Chairman of Park Nicollet Health Services, an integrated system of more than 650 physicians. Prior to joining UHG, Dr. Newcomer was Medical Director for CIGNA Health Care of Kansas City. Dr. Newcomer is also a board-certified medical oncologist with nine years of practical experience.[123] In a 1997 article, while serving as the chief medical officer at

---

[120]  http://www.tmci.org/prog_serv_prod/FacultyBio04CaseManagerConf.html.
[121]  http://www.mahp.com/news/fallonbio.html.
[122]  http://www.nhp.org/apps/pub/corporate.nhp?file=corporate/about/bios/mendis.xml.
[123]  http://www.communityonc.com/app/homepage.cfm?appname=100474&moduleID=2994&LinkID=20724.

United HealthCare, Dr. Newcomer stated his awareness of the markups on chemotherapy drugs.[124] With respect to this awareness, Dr. Hartman states:

> …what this says to me is Lee Newcomer understood the allegations in this matter and was making his voice heard, and…there are no doubt other students and experts in this area also realized to some extent the amount of the kind of spreads that were going on…this is the type of evidence that gathers over time that will ultimately lead to sufficient information…[125]

- John Rowe, M.D., Executive Chairman at Aetna Inc., Massachusetts, has been with Aetna since 2000. During his time at Aetna, Dr. Rowe also served as a member of MedPAC until April 2004. In January 2003, Dr. Rowe participated in a public MedPAC meeting in which Medicare Part B drug payments were described as far exceeding provider costs.[126] Prior to joining Aetna, Dr. Rowe had been president of The Mount Sinai Hospital and the Mount Sinai School of Medicine since 1988 and then became President and Chief Executive Officer of Mount Sinai NYU Health.[127]

The organizations employing these individuals therefore had the advantage of their experience in the provider community.

(59)   Direct evidence from TPPs further demonstrates that they knew that the difference between AWP and provider acquisition costs varied significantly across drugs and that physician-administered drugs were generally available from manufacturers at substantial discounts from AWP. For example:

- In a letter to US Oncology, Trigon Healthcare ("Trigon") states:[128]

---

[124]   "Insurers are Eliminating Markup on Cancer Drugs, Official Says," *Cancer Economics*, March 1997.

[125]   Hartman deposition, Volume III, pp. 798–799.

[126]   MedPAC, "Public meeting: Exploring alternatives to AWP-pricing for Medicare-covered drugs," January 16, 2003.

[127]   http://www.aetna.com/presscenter/rowe.htm.

[128]   Prior to its 2002 acquisition by Anthem Healthcare, Trigon administered Blue Cross health plans in the state of Virginia and held 35 percent share of covered lives in that state. See, for example, http://www.forbes.com/2002/04/29/0429anthem.html.

> Trigon recognizes that your acquisition cost for drugs is highly variable when expressed as a percent of the AWP. Ninety percent of AWP should provide you with substantial margins for some drugs and nearly zero margins for others. As you know, acquisition cost as a percent of AWP is much lower for the older and more established generics and multi-source brands. These relatively low-cost drugs provide substantial margins and are prominent in the established combination regimens for common malignancies…[129]

- Similarly, based upon his experience with Tufts Health Plan pharmacy, John Killion, Senior Director of Ancillary Services at plaintiff BCBS-MA, states:

  > Q. Was it also your understanding at the time that when competition came into the market for brand name drugs, i.e., multisource competition, there were also discounts and rebates that were provided on those drugs?
  >
  > …
  >
  > A. That's correct.
  >
  > Q. So typically—so it was your understanding then in the 1998 time frame that when a brand name drug first came to market there typically were no incentives associated with the drug, but then as competition entered the market, first multisource, and then with generics, more incentives were provided for the drug; correct?
  >
  > …
  >
  > Correct.
  >
  > Q. And that is what led to your understanding that AWP was an artificial price because it didn't bear a relationship to the acquisition cost; correct?
  >
  > A. Correct.[130]

- Jill Herbold, Assistant Vice President Practitioner Reimbursement at CIGNA, states:

  > Q. Can you tell me the range below AWP that these rates and the Cigna national standard injectable reimbursement rate was varied?

---

[129] Excerpt of letter from Keane Chan, Provider Network Consultant at Trigon to Karen Ford Manza, Regional Director, Managed Care, at US Oncology regarding a contractual agreement, dated January 5, 2000. See A-VA 03010065-A-VA 03010068.

[130] Deposition of John Killion of BCBS-MA ("Killion deposition"), p. 122.

Contains highly confidential materials—subject to protective order

      A. Typically 15 percent. We have codes that are up to 45 percent below AWP.[131]

- Hal Goldman, Vice President of Pharmacy Operations at Vista Healthplan, states:

      Q. And how does Vista compensate Florida I.V. Services for those drugs?

      A. It's based on what's written here. It's AWP or acquisition cost plus 10 percent, whichever may be higher.

      Q. And how does Vista determine the acquisition cost?

      A. A. It's here again, it's the wholesale acquisition cost at what Florida I.V. would pay. We have a right to audit their invoices anytime we choose.[132]

(60)    The foregoing evidence demonstrates the inappropriateness of Dr. Hartman's assertion that payors expected the differences between AWP and provider acquisition costs to be equivalent for single-source drugs with no therapeutic competition, single-source drugs with therapeutic competition, and multi-source drugs. Specifically, Dr. Hartman states:

> There is no evidence that the yardsticks for TPP price expectations for multi-source physician administered drugs were any different than those for single-source physician-administered drugs. Indeed, in light of the preceding facts, there is no reason to expect that they would be or could be.[133]

In fact, the evidence reviewed above is inconsistent with Dr. Hartman's assertion. In Section V.2 below, I demonstrate that Dr. Hartman's incorrect assertion causes him to overstate purported damages significantly and renders his yardstick methodology unreliable.

(61)    Many TPPs also did not believe that AWP was a reliable signal for acquisition cost. For example:

- Edward Lemke, Director of Fee Schedule Management for Humana, states:

---

[131]  Deposition of Jill Herbold of CIGNA ("Herbold deposition"), p. 21.
[132]  Deposition of Hal Goldman of Vista Healthplan ("Goldman Deposition"), pp. 39–40.
[133]  Hartman Liability and Damages Declaration, p. 42.

Q.  Is it Humana's expectation that the amounts that providers pay to acquire drugs are a fixed percentage less than the amount Humana reimburses in relation to those drugs?

A.  The expectation that—first of all, that it's fixed, no. The expectation that good business practice and assuming providers that we do business with practice good business practices, is that they would only accept payment that is at or above their costs. That's my only expectation.

Q.  And certainly, you have no fixed expectation as to how much higher it would be than their acquisition costs, correct?

A.  Correct.

Q.  And indeed, that would vary from provider to provider, depending on what they paid to acquire drugs and what Humana reimburses them for drugs?

A.  Correct.

Q.  The percentage could be 10 percent in one case, 50 in another, 100 in another, correct?

…

A.  Could be.[134]

- Mike Beaderstadt, Director of Provider Relations at John Deere Health ("John Deere"), states:

Q.  All right. Mr. Beaderstadt, can I ask you generally, what is your understanding of the term average wholesale price?

A.  Generally my understanding is that it's a benchmark that we use to price specific drugs in the physician's office and the pharmacies.

Q.  Do you understand it to have a relationship to any actual acquisition cost?

A.  I don't believe it has any relationship that is a consistent relationship.[135]

- Mickey Brown, Director of Provider Networks at Blue Cross Blue Shield of Mississippi, states:

---

[134]  Deposition of Edward Lemke of Humana ("Lemke Deposition"), pp. 123–124.
[135]  Deposition of Mike Beaderstadt of John Deere ("Beaderstadt deposition"), pp. 72–73.

Q.  Then it's certainly fair to say you have no particular expectation that there will be a fixed relationship between AWP and acquisition cost?

....

A.  Average wholesale price is a point of reference that we use. It's relation to acquisition cost, I'm not familiar with. So, I mean, I don't have an expectation one way or the other on that.[136]

- Joseph Spahn, Senior Health Care Consultant for Anthem Midwest, states:

Q.  So providers' acquisition costs for drugs do not form part of Anthem's determination of what it will reimburse them in relation to drugs?

A.  Correct.

Q.  The reimbursement is driven entirely by the fee schedule?

A.  Correct.

Q.  Regardless of what the specific provider's acquisition costs for those drugs may be?

A.  Correct.

Q.  So if, for example, Anthem were to learn that a particular provider were getting a discount or a rebate on a particular drug that lowered his acquisition costs for that drug, that wouldn't change the amount that Anthem is reimbursing that practice in relation to that drug, right?

A.  No.

Q.  Because the reimbursement amount is tied to the fee schedule?

A.  Right.

…

Q.  So it's fair to say that Anthem has no particular expectation that providers' costs would be, you know, 10 percent, 30 percent, 50 percent, something more, something less than the amount they're reimbursed in relation to those drugs, right?

…

B.  Yes.[137]

---

[136]   Deposition of Mickey Brown of BCBS Mississippi ("Brown deposition"), pp. 126–127.
[137]   Deposition of Joseph Spahn of Anthem Midwest ("Spahn deposition"), pp. 93–98.

(62)    There is also a variety of publicly available information that TPPs could have referenced regarding the meaning of AWP and the differences between AWP and provider acquisition costs.[138] Primary among these are the reports, fee schedules, regulatory statements, and other documents published in association with Medicare and Medicaid by government entities such as HCFA, CMS, HHS OIG, and GAO. As I noted above, Dr. Berndt concludes:

> …what is clear is that through these published reports and inter-agency public information exchanges, the fact that pharmacies' and providers' acquisition costs were typically less than AWP has long been made very visible and public. It has not been a secret, at least to active observers and health care industry participants.[139]

(63)    Moreover, TPPs often follow Medicare's reimbursement methodologies. For example, a study conducted for MedPAC in 2002 concludes that many private payors follow Medicare's Resource-Based Relative Value Scale ("RBRVS") system and reimburse for physician-administered drugs based on Medicare's methodology.[140] Dr. Hartman concedes:

> Reimbursement patterns for most physician-administered drugs, whether administered under Medicare or under private commercial payor coverage, are driven primarily by Medicare reimbursement practices.[141]

In this way, Medicare's knowledge and sophistication allows TPPs to achieve competitive reimbursements.

(64)    To the extent that these knowledgeable and sophisticated TPPs choose to base reimbursements on AWP despite their extensive knowledge about the widely varying

---

[138]   Gaier Declaration, Section IV.4.

[139]   Berndt Report, pp. 35–36.

[140]   Dyckman & Associates, "Survey of Health Plans Concerning Physician Fees and Payment Methodology," August 2003, pp. 12, 17.

[141]   Hartman Liability and Damages Declaration, p. 40. I also note that Dr. Hartman concedes that "contracts negotiated by commercial payors with provider groups offer less information about 'revealed preference' or 'revealed expectations' about spreads than do TPP contracts with PBMs for single-source self-administered orals."

differences between AWP and provider acquisition costs, it demonstrates a fundamental flaw in Dr. Hartman's appeal to the theory of "revealed preference" to corroborate his yardsticks. In particular, Dr. Hartman asserts that the reimbursements TPPs pay providers for physician-administered drugs reveal their knowledge or expectations about the differences between AWP and acquisition costs. Dr. Hartman states:

> A basic theory of economics is that of revealed preferences. Simply stated, economic agents reveal their preferences, and implicitly the information they relied on, by their actual market decisions and behavior.[142]

Contrary to Dr. Hartman's assertion, information about actions does not necessarily reveal information about expectations or knowledge. In fact, the theory of revealed preferences narrowly states that when a consumer chooses one good among alternatives, the consumer reveals a preference for that good over the others only if the chosen good is at least as expensive as the alternatives.[143] There is nothing in the revealed preference literature that links preferences to knowledge or expectations. Therefore, I conclude that Dr. Hartman's appeal to the theory of revealed preference is inappropriate.

(65)   For example, in deciding how to respond to Medicare's implementation of ASP-based drug reimbursements, plaintiff BCBS-MA undertook a detailed analysis of CMS' transition to an ASP-based methodology and considered four options for updating its own contracting–one of which was to adopt ASP-based contracts like Medicare. Based on its analysis, plaintiff BCBS-MA found that a transition to ASP-based reimbursements would be "administratively easy to maintain" and would save over $6 million per year.[144] However, despite this comprehensive knowledge about the differences between AWP and ASP, plaintiff BCBS-MA chose to continue with AWP-based drug reimbursements and, in fact, extended its use of AWP-based reimbursements to the hospital outpatient setting in October of 2005.[145] [146] Based

---

[142]   Hartman Rebuttal Declaration, p. 63.

[143]   See, for example, Varian, Hal. R., *Intermediate Microeconomics, A Modern Approach, Fifth Edition*, W.W. Norton & Co., 1999, pp. 120–121.

[144]   BCBSMA-AWP-11606.

[145]   Deposition of Michael Mulrey or BCBS-MA ("Mulrey deposition"), p. 139.

[146]   Deposition of Sheila R. Cizauskas of BCBS-MA ("Cizauskas deposition"), p. 125.

upon its actions (i.e., continuing to reimburse based on AWP), Dr. Hartman would erroneously conclude that plaintiff BCBS-MA still believes that AWP is a reliable signal for provider acquisition costs, when in fact it has analyzed the ASPs reported to Medicare, understood the savings available to it under this methodology, and noted the ease with which it could maintain an ASP-based system.

(66)   Appropriately applied, the theory of revealed preferences demonstrates that plaintiff BCBS-MA's continued use of AWP reveals its preference for this reimbursement methodology over alternatives. As discussed more fully below, there are numerous explanations why TPPs would choose to reimburse based on AWP despite knowledge of the differences between AWP and acquisition costs. In effect, Dr. Hartman is assuming that there is no explanation, other than the alleged AWP scheme, for the observed differences between drug reimbursements and provider acquisition costs.

(67)   Dr. Hartman asserts that even if TPPs understood the differences between AWP and acquisition costs, they would be slow to respond because of their inability to change reimbursement systems that are "hard-wired" to AWP.[147] Dr. Hartman states:

> I mean there has to be—there is a whole set of ways that a company has to act on [knowledge of spreads], and there is whole systems, information processing systems that are based on AWP and reimbursement off of AWP that have to be altered and changed…They are locked into a situation that they're paying more than they thought they would be when they originally entered into that kind of reimbursement scheme.[148]

(68)   Contrary to Dr. Hartman's assertion, many payors updated their reimbursement systems on a regular basis or possessed the capability to do so.[149] For example:

---

[147]   See, for example, Hartman deposition, Volume III, pp. 767–768, 844–845.

[148]   Hartman deposition, Volume III, pp. 792, 806.

[149]   Even if those systems are "hard wired" to AWP, reimbursements can be raised or lowered easily by adjusting the discount from AWP.

- The pricing unit of plaintiff BCBS-MA is generally able to make fee schedule changes, including those that reflect individually negotiated rates, within 30 days.[150] In some instances, fee schedule changes requiring updates to "thousands of codes" could take up to six months. Such updates to the fee schedule have occurred on an annual basis since BCBS-MA began following the RBRVS methodology in 1995.[151]

- Based on an external review of its competitive position, CIGNA adjusts its overall reimbursement level up or down to remain competitive.[152]

- On an annual basis, John Deere sent new fee schedules, which included fees for injectable drugs, to its participating physicians.[153]

- BCBS Mississippi performs an annual update of its professional reimbursement schedule, adjusting "individual codes based on market concerns."[154]

(69)    Other payors have demonstrated that more substantial changes can be made to their drug reimbursement methodology. For example, John Deere made several changes to its reimbursement methodology over the course of the class period. John Deere adopted an AWP-based payment system in 1993 or 1994, prior to which John Deere was paying based on physicians' charges. In 2002, John Deere changed reimbursements from 110 percent to 87 percent of AWP. At that time, it also contracted with a specialty pharmacy to supply physicians unable to acquire drugs at or less than 87 percent of AWP.[155] Had other payors wanted to make similar changes to decrease reimbursements, they could have done so.

(70)    Finally, despite the evidence that TPPs had considerable information available to them about physician-administered drug costs and would have had the ability to alter their reimbursements, Dr. Berndt suggests that those costs were historically insufficient to merit specific attention:

---

[150]   Deposition of Lisa Gorman of BCBS-MA, p. 143.
[151]   Deposition of Steven Fox of BCBS-MA ("Fox deposition"), pp. 259, 261.
[152]   Herbold deposition, p. 79.
[153]   Beaderstadt deposition, pp. 65–67.
[154]   Brown deposition, p. 43.
[155]   John Deere paid 84 percent of AWP to acquire drugs from the specialty pharmacy. See Beaderstadt deposition, pp. 45–51, 57–60.

> There is a phenomenon called 'the importance of being unimportant' which, in the current context, suggests that other things being equal, it may well be rational for budget managers to focus most of their attention on the larger budget items, and pay little heed to the smaller items. As a proportion of total spending, expenditures on physician-administered drugs have simply not been very important. That makes them more likely not to be on cost cutter's radar screens. … With minimal vigilance, the possibility for unnoticed abuse and mischief is enhanced.[156]

Dr. Rosenthal expresses a similar concern:

> During the Class Period, specialty pharmaceuticals represented no more than 1–2% of private health insurance spending and thus would not have been the subject of much analysis by payers.[157]

(71)    However, I find that spending on physician-administered drugs is neither small nor unimportant because the dollar amounts involved were large and rising rapidly. For example, between 1998 and 2003 Oxford Health Plans ("Oxford") annually processed an average of approximately 214,000 physician-administered drug claims worth approximately $70 million.[158] During that time, its spending on those drugs rose at a rate of 12 percent per year. Meanwhile, plaintiff BCBS-MA, which has nearly 50 percent more beneficiaries than Oxford, likely spent considerably more on drugs.[159] It is unlikely that such statistics would have escaped the notice of the TPPs' management. Indeed, in his discussion of Medicare reimbursements, Dr. Berndt acknowledges that rapidly rising costs attract "considerable attention."[160] Moreover, TPPs would have found it worthwhile to invest the resources to be

---

[156]  Berndt Report, p. 99.

[157]  Rosenthal Liability Report, p. 21.

[158]  Oxford operates in New York, New Jersey, and Connecticut and represented 1.51 million covered lives in 2001. See Oxford 2001 SEC 10K filing and medical reimbursement data.

[159]  AIS's Directory of Health Plans, 2004, MCOs table. Because plaintiff BCBS-MA provided data for only 34 selected J-Codes, it is not possible to do an analysis of its overall physician-administered drug spending. It nevertheless spends up to $14.7 million per year on those 34 J-codes, and realized more than a ten-fold increase in spending on them over the eight years from 1995 to 2003.

[160]  Berndt Report, p. 47.

vigilant. For example, a modest one percent savings on physician-administered drugs at Oxford would have exceeded the typical salary for a managerial staff person by a factor of seven.[161]

(72)    Utilization of the drugs at issue in this case is concentrated within certain specialties, which further raises their profile. As Table 5 illustrates, Medicare's drug costs in 2003 exceeded 40 percent of total spending for the top three specialties administering drugs at issue in this case. As Trigon's letter to US Oncology (introduced above) demonstrates, these drugs did receive particular attention from TPPs during negotiations with providers.[162]

**Table 5: Drug spending as a percentage of total 2003 Medicare expenditures**

| Specialty | Drug spend as percentage of total spending |
|---|---|
| Hematology/Oncology | 77% |
| Urology | 43% |
| Rheumatology | 49% |
| Obstetrics/Gynecology | 15% |
| Infectious Disease | 7% |

Source: Federal Register 69(4), January 7, 2004, p. 1109 and Federal Register 69(219), November 15, 2004, p. 66410.

(73)    Based upon the "importance of being unimportant," Dr. Hartman asserts that information concerning multi-source drugs would not have attracted attention from TPPs. In particular, Dr. Hartman asserts that TPPs would not have focused on OIG's explicit statements that AWP was not a reliable indicator of provider acquisition costs and would have ignored information in OIG's reports regarding the differences between AWP and acquisition costs for multi-source drugs.[163] Contrary to Dr. Hartman's assertion, however, multi-source drugs represent a significant portion of physician-administered drug spending. For instance, the 1992 OIG

---

[161]   Based on mean private industry annual salary of $98,027 for executive, administrative, and managerial staff surveyed in April 2004. See "New York–Northern New Jersey–Long Island, NY–NJ–CT–PA National Compensation Survey–April 2004," Bureau of Labor Statistics, December 2004, p. 18.

[162]   Excerpt of letter from Keane Chan, Provider Network Consultant at Trigon to Karen Ford Manza, Regional Director, Managed Care, at US Oncology regarding a contractual agreement, dated January 5, 2000. See A-VA 03010065-A-VA 03010068.

[163]   Hartman deposition, Volume III, p. 736.

report, which found significant and widely varying differences between AWP and acquisition costs for many multi-source drugs, specifically analyzed "high dollar volume" chemotherapy drugs.[164] Therefore, it is more reasonable to conclude that all drugs analyzed would have attracted the attention of TPPs. Similarly, the 1997 OIG report demonstrated that drugs with differences between AWP and acquisition costs greater than 30 percent represented more than $464 million in Medicare allowances for 1996, constituting more than 30 percent of the total drug allowances for the drugs surveyed.[165] Based upon this evidence, I find that Dr. Hartman's assertion that TPPs would have ignored information on multi-source drugs is not credible.

(74)    In summary, Dr. Hartman and I agree that knowledge regarding the differences between AWP and provider acquisition costs would, according to economic theory, protect TPPs from the effects of the alleged AWP scheme. The evidence demonstrates that TPPs in Massachusetts and elsewhere had knowledge of the widely varying differences between AWP and provider acquisition costs, generally knew the magnitude of these differences, and did not believe that AWP was a reliable signal for provider acquisition costs. Most notably, four of the largest five TPPs in Massachusetts purchased significant volumes of subject physician-administered drugs during the class period and paid prices that were generally at, and in many cases below, the ASPs calculated by Dr. Hartman. On the basis of this evidence and other evidence about TPP knowledge and sophistication, I conclude that numerous TPPs would not have overpaid for physician-administered drugs.

## IV.2. TPPs possess competitive leverage

(75)    As I discussed in Section III.2, competition between providers in conjunction with the competitive leverage of large and sophisticated payors can, according to economic theory, ensure that payors do not suffer economic harm as a result of the alleged AWP scheme. In fact, the evidence demonstrates that competition is widespread in provider markets and TPPs

---

[164] "Physicians' Costs for Chemotherapy Drugs," Department of Health and Human Services Office of Inspector General, November 1992, p. 1.

[165] "Excessive Medicare Payments for Prescription Drugs," Department of Health and Human Services Office of Inspector General, December 1997, Appendix C-3.

in Massachusetts and elsewhere are able to exert significant leverage over providers to achieve competitive reimbursements that balance their desire to minimize costs with their need to maintain network access for their beneficiaries. Moreover, the evidence presented by Drs. Hartman and Rosenthal does not support the claim that certain providers have sufficient market power to effectuate the AWP scheme. Therefore, as a result of the competitive leverage exerted by TPPs, I conclude that numerous TPPs would not have overpaid for physician-administered drugs as result of the alleged AWP scheme.

(76)     TPPs compete against one another for the business of employer groups. In order to obtain and retain employer groups, TPPs must offer a quality health care product at a competitive premium. TPPs therefore have a strong incentive to develop an attractive network that minimizes reimbursement costs.[166] Oxford recognizes the importance of achieving low premiums:

> The cost of providing benefits is in many instances the controlling factor in obtaining and retaining employer groups, and certain of Oxford's competitors have set premium rates at levels below Oxford's rates for comparable products. Oxford anticipates that premium pricing will continue to be highly competitive.[167]

However, to attract and retain employer groups, TPPs must balance their desire to minimize costs with the need to maintain network access for their beneficiaries. For example, Oxford states, "The Company believes that the network of providers under contract with Oxford is an important competitive factor."[168] Therefore, TPPs need to balance between these objectives to compete effectively.

---

[166] "Employers' increased sensitivity to health care costs has forced insurers to seek ways to lower costs through effective bargaining with providers," Brooks, J. M., A. Dor, and H. S. Wong. "Hospital-Insurer Bargaining: An Empirical Investigation of Appendectomy Pricing," *Journal of Health Economics* Volume 16, 1997, p. 417.

[167] Oxford 2001 SEC 10K filing.

[168] Oxford 2001 SEC 10K filing.

(77)   Summarizing its 2003 hearings on competition in payor markets, the Federal Trade
        Commission ("FTC") and Department of Justice ("DOJ") reported:

> Health insurance markets in most geographic areas enjoy robust competition,
> with 'multiple health insurer competitors and several product options,
> including HMO, PPO, POS, and consumer directed health plans.'[169]

The environment for payors in Massachusetts has been particularly competitive:

> In the early 1990s, the market for HMO enrollment became increasingly
> competitive and HMO plans merged, increasing pressure for expensive
> compatible data and financial systems. In addition, purchaser pressure to rein
> in premium costs contributed to declining plan profit margins.[170]

As a result, medical insurance premiums in Massachusetts rose at roughly half the rate of
overall medical inflation in the ten years from 1990 to 2000.[171]

(78)   Those TPPs that have remained viable tend to be large, sophisticated organizations (see Table
        2).[172] In 2004, nearly 80 percent of beneficiaries covered by managed-care organizations in
        Massachusetts were enrolled in plans with more than half a million statewide enrollees, and
        more than 90 percent were enrolled in plans with more than 100,000 enrollees.[173]
        Nationwide, two thirds of all beneficiaries were enrolled in plans with more than half a
        million statewide enrollees, and more than 90 percent were enrolled in plans with more than
        100,000 enrollees.[174]

---

[169]   FTC and DOJ, *Improving Health Care: A Dose of Competition*, A Report by the FTC and the DOJ, July
        2004, Ch. 6, p. 7. See http://www.ftc.gov/reports/healthcare/040723healthcarerpt.pdf.

[170]   "Massachusetts Health Care Trends: 1990–2001," Massachusetts Division of Health Care Finance and
        Policy, March 2003, p. 31. Internal citations omitted.

[171]   "Massachusetts Health Care Trends: 1990–2001," Massachusetts Division of Health Care Finance and
        Policy, March 2003, p. 26.

[172]   There are several economic factors that reward size in health insurance markets. For example, there is
        evidence of a minimum efficient scale for claim processing and provider network management. See
        Feldstein, Paul J., *Health Care Economics, 6th Edition*, Thomson, New York, 2005, chapter 9.

[173]   AIS's Directory of Health Plans, 2004, MCOStateEnrollment table.

[174]   AIS's Directory of Health Plans, 2004, MCOStateEnrollment table.

(79)   Large, sophisticated TPPs have significant competitive leverage relative to providers and utilize it to lower costs. For example, many TPPs employ cost-containment methods, which follow three basic models: utilization management, aligning the incentives of providers with those of the payor, and fostering competition among providers. Utilization management is an administrative procedure imposed by the payor to enhance the fiscal accountability of providers by directly managing the use of costly resources. These programs are widespread, and can involve such measures as prior authorization and high-cost case management.[175] I note that plaintiff BCBS-MA has made participation in its utilization management program mandatory for contracting providers.[176]

(80)   Contracts that align incentives between TPPs and providers are widespread, and serve to resolve the "asymmetric information" concern raised by Dr. Rosenthal.[177] In some cases a payor uses a capitation contract, where it pays a fixed per-member-per-month fee to the provider regardless of the services performed or drugs administered. Under capitation arrangements utilization risk is borne by the provider and, for those that include drug utilization, there is no incentive to participate in the effectuation of the alleged AWP scheme. I note that plaintiff BCBS-MA and other Massachusetts TPPs (e.g., Harvard Pilgrim) utilized capitated contracts, inclusive of drug utilization, during the class period.[178] In other cases, a withhold clause may be employed to provide TPPs with recourse if provider billings exceed specified targets.[179] Under such arrangements, the purported incentives of the alleged AWP

---

[175]   Institute of Medicine, *Controlling Costs and Changing Patient Care*, Washington, National Academy Press, 1989, Chapter 1.

[176]   Plaintiff BCBS-MA contracts produced on CD-ROM Bates-numbered BCBSMA-AWP 0005.

[177]   Rosenthal Liability Report, pp. 12–13. Indeed, contractual solutions to the asymmetric information concern are well acknowledged in economic literature. See, for example, Laffont, Jean-Jacques, and David Martimort, *The Theory of Incentives*, Princeton Univ. Press, Princeton, 2002, pp. 1–6.

[178]   See, for example, Mulrey deposition, p. 39. Also see Deposition of Deborah Devaux of BCBS-MA ("Devaux deposition"), pp. 26–27. Prior to her employment at BCBS-MA, Ms. Devaux was responsible for contracting with payors on behalf of the New England Medical Center, a Massachusetts hospital affiliated with Tufts School of Medicine.

[179]   A withhold is a portion of reimbursements that is held by the payor for a specified period of time. If the provider's utilization remains below target, the withhold is paid. However, if utilization exceeds the target, the payor may retain up to the full amount of withhold. Withholds can be substantial. A survey among managers of HMOs states that two thirds of HMOs use withholds, which are mostly between 11 to 20 percent of total income. See Hillman, Pauly, Kerman and Martinek, "HMO Managers' views on financial incentives and quality," *Health Affairs*, Winter 1991, p. 210.

scheme would be significantly reduced or eliminated. I note that plaintiff BCBS-MA includes withholds in its provider contracts.[180]

(81)     A key cost-containment measure implemented in managed-care plans is the limited access provider network, which encourages physicians to compete with one another and accept lower reimbursements in exchange for higher anticipated patient volumes.[181] As the FTC and DOJ state:

> Selective contracting intensifies price competition and allows payors to negotiate volume discounts and choose providers based on a range of criteria…When insurers have a credible threat to exclude providers from their networks and channel patients elsewhere, providers have a powerful incentive to bid aggressively.[182]

Because TPP networks are generally large, the services of individual physicians are often considered substitutable, making the presence of any single physician relatively unimportant from the payor's perspective.[183] Indeed, the typical TPP generally has thousands of physicians to choose from when assembling its network. For example, according to Atlantic Information Services, Inc. ("AIS"), in Massachusetts, the typical plan has close to 5,000 physicians in its network while the largest plans have networks that are as much as four times larger (see Table 6).[184]

---

[180]   Plaintiff BCBS-MA contracts produced on CD-ROM Bates-numbered BCBSMA-AWP 0005.

[181]   Town, R., and G. Vistnes, "Hospital Competition in HMO Networks," *Journal of Health Economics* 20, 2001, pp. 733–753.

[182]   FTC and DOJ, *Improving Health Care: A Dose of Competition*, A Report by the FTC and the DOJ, July 2004, Ch. 1, p. 4. See http://www.ftc.gov/reports/healthcare/040723healthcarerpt.pdf.

[183]   Describing the formation of limited access PPO networks by insurers, Feldstein writes: "Insurers viewed all physicians within a specialty as being close substitutes and selected physicians according to their willingness to discount their fees. Demand curves facing physician-firms became highly elastic." Feldstein, Paul J., *Health Care Economics, 6th Edition*, Thomson, New York, 2005, p. 240.

[184]   In Massachusetts, of the seven plans reporting the number of physicians in their network, the median is nearly 4,900 and the average number of physicians per plan is over 9,600, which also reflects the presence of several very large health plans. See AIS's Directory of Health Plans, 2004, MCOs table.

**Table 6: Massachusetts health plans reporting number of physicians**

| Health plan | Total physicians |
|---|---|
| Harvard Pilgrim Health Care, Inc. | 21,135 |
| Tufts Associated Health Plan | 19,515 |
| BCBS Massachusetts | 17,395 |
| CIGNA HealthCare of Massachusetts, Inc. | 17,173 |
| Fallon Community Health Plan | 4,895 |
| Neighborhood Health Plan, Inc. | 1,800 |
| CIGNA HealthCare, Inc. (Rhode Island) | 1,500 |
| Health New England, Inc. | 1,448 |

Source: AIS database, 2004, plaintiff BCBS-MA website (HMO physicians only).[185]

(82)   The ability of TPPs to leverage competition among providers is also reflected in their standard provider contracts. For example, plaintiff BCBS-MA states:

> A. [W]e provide our providers with a contract and fee schedules, and it is their decision whether or not they choose to sign it.
>
> Q. What negotiation of the fee schedule amounts does Blue Cross Blue Shield of Massachusetts engage in with physicians, if any?
>
> A. None.[186]

Additionally, many contracts give TPPs the ability to "deselect" high-cost providers from their network. An AETNA contract states, "This Agreement may be terminated without cause by Company upon at least 90 days prior written notice to the Provider."[187] [188] Evidence shows that such agreements are enforced. For example, the New York Times reports:

---

[185]   "Just the Facts." See http://www.bcbsma.com/common/en_US/aboutUsIndex.jsp?headerRepId=%2Fcommon%2 Fen_US%2Frepositories%2FHeaderButtons%2FaboutUs.xml&levelOneCategory=GENERAL&targetTem plate=titleBody.jsp.

[186]   Mulrey deposition, pp. 54–55.

[187]   AET 004446.

---

Contains highly confidential materials—subject to protective order

> Many doctors say they cannot reject contract terms for fear of being dropped
> by plans that control hundreds of their patients. 'Physicians tell me they
> cannot negotiate with the insurer,' said Dr. William Mahood, a
> gastroenterologist in Abington, Pa., and a trustee of the American Medical
> Association.[189]

The AMA also noted the relatively poor negotiating position of physicians:

> As we have testified previously, the reality is that physician reimbursement
> rates are often contractually imposed by powerful health plans in a take-it-or-
> leave-it manner.[190]

Payors also acknowledge these practices:

> Among the plethora of complaints BCBS faced in 2001 were that it refused to
> negotiate contract terms with medical practices and instead proposed take-it-
> or-leave-it contracts...[191]

Indeed, plaintiff BCBS-MA has been characterized as a monopsonist in provider markets and
faced legal challenges based on its take-it-or-leave-it pricing practices.[192]

(83)   Knowledge and sophistication are not required for TPPs to achieve competitive
       reimbursements. In fact, the repeated nature of the contracting process and the large number
       of available providers allows TPPs to make successive take-it-or-leave-it offers and observe

---

[188]   A Humana contract states, "... either party may terminate this Agreement without cause by giving the other
        party written notice of termination at any time at least sixty 60 days prior to the effective termination date."
        See HUM2268.

[189]   Freudenheim, Milt, *nytimes.com*, June 28, 1998, p. 2.

[190]   American Medical Association, statement to the Federal Trade Commission and Department of Justice,
        Hearings on Health Care Competition Law and Policy Washington, D.C. September 24, 2003, available at
        http://www.ftc.gov/os/comments/healthcarecomments2/030924ama.pdf, p. 1.

[191]   Blue Cross Blue Shield of Texas ("BCBS-TX") reproduces Walt Borges "Mo' Better Blues: Critics Say
        Blue Cross and Blue Shield Has Improved," *Texas Medicine*. See
        http://www.bcbstx.com/about/pdf/MoBetterBluesarticle.pdf, p. 1.

[192]   See Roger D. Blair and Jeffrey L. Harrison, *Monopsony: Antitrust Law and Economics*, Princeton,
        Princeton U. Press, 1993, p. 75.

the responses of providers.[193] If too many providers accept the offer, then the offer was too generous. If too many providers reject the offer, then the offer was not generous enough. In this manner, TPPs can achieve competitive reimbursements even without knowledge of the providers' costs. In the context of its pharmacy network, Mike Beaderstadt, Director of Provider Relations for John Deere illustrates this point:

> …we'd go to minus 25 percent and nobody would sign it and we'd try minus 13 percent and everybody signed up, so we knew we had to have it somewhere in between there. And minus 20 is our latest venture there, and that has produced some headaches for us, but we have been able to put together a reasonable network based on that.[194]

(84)    The increasing bargaining position of the TPPs is also reflected in the decreasing reimbursement trend observed in Massachusetts in the face of rising costs for physicians.

> Physician practices have suffered 10 [1990 to 1999] years of flat or declining reimbursements from managed care companies, Medicaid, and Medicare…Unless this trend is reversed, many practices are on a collision course with financial disaster.[195]

> Professional practice expenses have been rising very rapidly. In 1998 alone, the average physician practice in Massachusetts saw its expenses rise 29%, compared to a national average of 15%.[196]

Such decreasing reimbursements coupled with rising costs have led to lower operating margins for office-based providers.

---

[193]   As a matter of economic theory, sophisticated organizations are more likely to engage in a search for lower prices. Such price searching is ensured in an environment with repeated transactions and experienced buyers and sellers as observed in these markets. See for example Stigler, G. J., "The Economics of Information," *The Journal of Political Economy*, Volume 69, Number 3, June 1961, p. 219.

[194]   Beaderstadt deposition, p. 76.

[195]   Massachusetts Medical Society, "Critical Condition: Physician Practices and the Future of Massachusetts Health Care," 2001, p. 3.

[196]   Massachusetts Medical Society, "Critical Condition: Physician Practices and the Future of Massachusetts Health Care," 2001, p. 10.

Contains highly confidential materials—subject to protective order

(85)    Also, similar to Medicare, TPPs face the risk that physicians will shift patients to the hospital setting if reimbursements are set too low. The evidence demonstrates that TPPs and their beneficiaries prefer patient care in the office-based setting, for example:

- Jill Herbold, Assistant Vice President Practitioner Reimbursement at CIGNA, states:

    Q. For example, if a particular drug could be administered in a physician's office but could also be administered in a hospital outpatient department, does Cigna have any preference over the site of care?

    …

    A. The answer to that is that our preference, if it was medically appropriate to do so, for that injectable to be administered in a physician's office because it generally is better for the member as well as the lower medical costs.[197]

- Hal Goldman, Vice President of Pharmacy Operations at Vista Healthplan, identifies three reasons why Vista and its beneficiaries prefer the office-based setting to hospitals:

    Number one, of course, there is a higher cost of doing an infusion in an outpatient or hospital setting. There's also a time for a member. Traditionally, with infusions in a physician's office you don't have the long waiting period; so less time lost from work, less time lost from family time. The third thing is, putting somebody into an infusion center or a hospital to get an infusion exposes them to a lot more germs than you do in a doctor's office.[198]

(86)    Dr. Rosenthal asserts that competition between providers is constrained because of barriers to entry imposed by the AMA in the form of limits on medical school capacity and other aspects of medical education and licensing.[199] However, Dr. Rosenthal fails to acknowledge that the number of physicians has been growing rapidly throughout the class period. Since 1980, the per-capita number of physicians in the United States has grown by 40 percent while the per-capita number of specialists like radiation oncologists has grown by almost 100 percent.[200] In

---

[197] Herbold deposition, pp. 75–76.
[198] Goldman deposition, p. 59.
[199] Rosenthal Liability Report, p. 13.
[200] See U.S. Department of Health and Human Services, Health Resources and Service Administration, *United*

Massachusetts, the number of physicians per capita has increased by 54 percent while the aggregate number of physicians has grown by almost 70 percent over the same period (see Table 7). Thus, as Feldstein points out, "their excess capacity made physicians more willing to discount their fees for an increase in patients."[201] As a result, "the decline in physician fees during the 1990s was likely the result of increasing competitive pressures occurring among physicians."[202]

**Table 7: Total number of physicians and physicians per capita in Massachusetts**

|  | 1980 | 2000 | Growth |
|---|---|---|---|
| Active MDs | 15,564 | 26,500 | 70% |
| MDs (per 100,000 pop.) | 271 | 417 | 54% |

Notes: Only non-federal physicians are included. Medical Specialists are calculated as total physicians minus general practice physicians. General Practice physicians are office-based.
Source: Area Resource File 2004 and U.S. Census.

(87)    Dr. Rosenthal also asserts that oncologists' high incomes are consistent with margins purportedly earned by those physicians from the alleged AWP scheme and cites two statistics.[203] Specifically, Dr. Rosenthal reports that medical oncologists made upwards of $479,000 in 2001 and that two thirds of the income of practice-based medical oncologists comes from reimbursements for injectable drugs. With respect to the first statistic, Dr. Rosenthal fails to acknowledge that high incomes among oncologists are consistent with high incomes earned by other specialty physicians, in which large investments in education and training are required (see Table 8). With respect to the second statistic, Dr. Rosenthal misrepresents the study's conclusion. In fact, the study concludes that two thirds of oncologists' income stems from drug reimbursements and associated administrative service fees, not simply from drug reimbursements.[204] Since administrative service fees are not based on AWP, the figures cited by Dr. Rosenthal do not support her claims. Therefore, the income

*States Health Workforce Personnel Factbook*, Table 202, based on AMA Physicians' Professional Data. Available at http://bhpr.hrsa.gov/healthworkforce/reports/factbook02/FB102.htm.

[201]   Feldstein, Paul J., *Health Care Economics, 6th Edition*, Thomson, New York, 2005, p. 243.

[202]   Feldstein, Paul J., *Health Care Economics, 6th Edition*, Thomson, New York, 2005, p. 243.

[203]   Rosenthal Liability Report, p. 14.

[204]   Smith et al., "Why Academic Divisions of Hematology/Oncology Are in Trouble and Some Suggestions for Resolution," *Journal of Clinical Oncology*, Volume 19, Number 1, 2001, pp. 260, 261.

statistics cited by Dr. Rosenthal are actually consistent with legitimate competitive explanations.

**Table 8: Physician compensation for selected specialties**

| Specialty | Compensation | | |
|---|---|---|---|
| | Average | Lowest | Highest |
| Cardiovascular surgery | 558,719 | 351,108 | 852,717 |
| Neuro surgery | 438,426 | 279,655 | 713,961 |
| Orthopedic surgery | 357,224 | 237,731 | 540,524 |
| Cardiology | 317,500 | 205,000 | 450,607 |
| Urology | 285,356 | 180,808 | 375,000 |
| Hematology/oncology | 269,298 | 155,475 | 473,000 |

Source: Physician Compensation Survey. Considers base salary, no benefits. Based on over 2900 responses from physicians with at least 3 years in practice. Available at http://www.physicianssearch.com/physician/salary2.html.

(88)   I conclude that TPPs in Massachusetts and elsewhere are able to exert leverage over providers to achieve competitive reimbursements that balance their desire to minimize costs with their need to maintain network access for their beneficiaries. Moreover, the evidence presented by Drs. Hartman and Rosenthal fails to demonstrate that certain providers have sufficient market power to effectuate the AWP scheme.[205] Therefore, as a result of the competitive leverage exerted by TPPs in Massachusetts, I conclude that numerous TPPs would not have overpaid for physician-administered drugs as result of the alleged AWP scheme.

---

[205]   Even if some providers did have market power, Dr. Hartman has not offered a viable approach to distinguish the effects of the alleged AWP scheme from effects caused by providers' market power.

## IV.3. TPP drug reimbursements cannot be considered in isolation from other payments and contract terms

(89)    As discussed in Section III.3, Dr. Hartman and I agree that physician-administered drugs are furnished incident to physicians' services.[206] We disagree as to whether payments for physicians' services must be considered for purposes of determining economic harm associated with the alleged AWP scheme. As with Medicare, however, the evidence demonstrates that TPP drug reimbursements have historically subsidized underpayment for physician services. This cross subsidy creates interdependency between payments for drugs and services, which precludes a determination of economic harm by analyzing drug reimbursements in isolation. As I discuss in Section III.3, Dr. Hartman inappropriately dismisses these interdependencies because he incorrectly asserts that payors relied on AWP as an accurate signal for provider acquisition costs. As with the MMA experience, however, Dr. Hartman's assertion is demonstrably false in light of the evidence that TPPs offered higher payments for physician services to offset reductions in drug reimbursements when switching to ASP-based methodologies. Since Dr. Hartman's analysis fails to account for this interdependency, I conclude that his analysis is unreliable and overstates the purported damages he calculates.

(90)    Contracts between providers and TPPs are typically negotiated on a bottom-line basis that includes payments for drugs, services, and other contract terms. Elements of the fee schedule, such as individual drugs, are rarely the focus of these negotiations and are typically considered irrelevant as long as the total reimbursement is acceptable to both parties.[207] Moreover, since many TPPs emulate Medicare's RBRVS reimbursement scheme, cross subsidies between drug reimbursements and administrative service fees are common.[208] In this contracting environment, many TPPs explicitly acknowledge that reimbursements for drugs and administration service fees are interdependent. Specifically:

- Jill Herbold, Assistant Vice President Practitioner Reimbursement at CIGNA, states:

---

[206]   Hartman Liability and Damages Declaration, p. 28.

[207]   See for example Herbold deposition, pp. 61–62, Lemke deposition, pp. 83–84, and Deposition of David Thomas of Three Rivers, p. 145.

[208]   Dyckman & Associates, "Survey of Health Plans Concerning Physician Fees and Payment Methodology," August 2003, pp. 12, 17.