Tuesday from University Medical Center in Lubbock

A fireball erupting from the explosion swept through the family's campsite along the Pecos River early Saturday morning, turning sand into glass and parts of a nearby bridge into powder

Chapman and other relatives have kept a vigil for the sole survivor, Amanda Smith

She remains in critical condition in the hospital's burn unit suffering from burns more than 20 percent of her body and smoke inhalation that has caused heart and kidney problems.

Amanda Smith's brother, Jerry Rackley, said those who died are together again after doing what they loved best camping, fishing and being with family.

Killed were Amanda Smith's parents, Don and Glenda Sumler, her father-in-law, Bobby Smith, her husband, Terry Smith, her son, Dustin; her daughter Kirsten, her brother- and sister-in-law, Roy and Amy Heady; and their three children.

The losses have been staggering for everyone involved, but they will most likely be the hardest for Amanda Smith, Rackley said

"We need her," Chapman said weeping "She is my son's wife She is my daughter."

A similar vigil was kept for Bobby Smith, Amanda's father-in-law, who died Monday.

Chapman said the family has managed to face each day by sharing prayers and memories, knowing that those who died are now together with God "That is why so many of us have left this earth together," Chapman said. "When we were placed on this earth we were already genetically linked Our lives were already intwined by God."

El Paso Natural Gas, which owned the pipeline, has put the family up in hotels, fed them, clothed them and made sure they go without any wants or needs

Rackley said extended family members who have traveled to the hospital have eased everyone's pain.

"There are faces here that I've never seen before," he said. "But they are family They have a place in my heart and they always will"

[From A service of the Albuquerque Journal, September 5, 2000]

LAST PIPELINE VICTIM DIES

CARLSBAD, N.M.—Amanda Smith, the only survivor of a pipeline explosion that killed 11 members of her extended family Aug 19, died Tuesday in a Lubbock hospital

Smith, 25, lost her husband and two children in the fiery blast that engulfed the family's campsite near Carlsbad

Her brother and Smith family members were with her when she died at 12:35 p.m CDT, said Gwen Stafford, vice president of University Medical Center in Lubbock

Stafford said Smith never regained consciousness at the Texas hospital

The pipeline owned by El Paso Energy Company blew up along the Pecos River 25 miles south of Carlsbad, sending a 350 foot-fireball into the sky and billows of flame into the nearby campsite

Amanda Smith and her father-in-law, Bobby Smith, 43, were sent to he Lubbock hospital, where Bobby Smith died August 21.

Also killed were Amanda Smith's husband, Terry, 23, his 3-year-old son, Dustin, her daughter, Kirsten Sumler, 5; her parents, Don Sumler and Glenda Sumler, 47, of Loving, and Roy Lee Heady, 20 his wife Amy, 18, of Artesia and their three daughters 22-month-old Kelsey and 6-month-old twins Timber and Tamber.

National Transportation Safety Board Investigators have not determined what caused the explosion and said it could take up to a year to prepare a report However, they said investigators at the scene found that corrosion inside the damaged pipeline had eaten away half of the pipe's wall in places.

Bobby Smith's wife, Jennifer, filed a federal lawsuit Aug 30 in Albuquerque, alleging El Paso Natural Gas "failed to properly comply with state and federal rules, regulations, opinions and orders while operating an interstate gas transmission line" near the intersection of the Delaware and Pecos rivers in Eddy County

The gas company also failed to "properly inspect, maintain, and operate their interstate gas transmission line," which led to the explosion and fire, the lawsuit said

By Mr. ASHCROFT (for himself, Mr HAGEL, and Mr. ABRAHAM):

S. 3003. A bill to preserve access to outpatient cancer therapy services under the medicare program by requiring the Health Care Financing Administration to follow appropriate procedures and utilize a formal nationwide analysis by the Comptroller General of the United States in making any changes to the rates of reimbursement for such services; to the Committee on Finance.

CANCER CARE PRESERVATION ACT

Mr. ASHCROFT. Mr. President, in recent years, our nation has achieved tremendous advances in its War on Cancer—including developing breakthrough therapies and expanding the cancer care delivery system of convenient and low-cost community settings This progress has enabled us to achieve an unprecedented reduction in American cancer deaths, which began in 1998.

Today, 90% of all chemotherapy treatments are delivered in community settings like doctors' offices and outpatient hospital settings. Two important components of Medicare reimbursement for outpatient cancer treatments support these community care sites payment for drugs themselves; and payment for the services of the physicians, nurses, and other caregivers who treat patients with cancer.

Unfortunately, the Health Care Financing Administration has targeted outpatient cancer therapy services for deep budget cuts. HCFA has proposed to reduce drastically Medicare reimbursement rates for cancer drugs by unilaterally changing the definition of "average wholesale price," which is at the heart of the current reimbursement formula. While there are indications that drug reimbursements have often exceeded doctors' and hospitals' costs, these margins have been used to help cover costs for professional services, which are inadequately reimbursed according to the cancer community, the General Accounting Office, and HCFA itself. Yet HCFA has not made any adjustments in these professional services payments.

The planned cuts in Medicare reimbursement rates threaten to force doctors to send seniors with cancer out of the community settings where they now receive care and into more expensive in-patient settings As a result, seniors may lose the option of receiving cancer treatments from the caregivers of their choice in settings that are close to the support structure of family, friends, and community. In addition, since the cost of cancer treatments are generally higher in hospital in-patient settings than they are in outpatient settings, this ill-conceived proposal to force seniors into hospitals will actually cause Medicare spending to rise.

Mr President, I have heard from many Missourians—doctors, patients, and hospital officials—about how the Administration's planned cuts in Medicare outpatient cancer care reimbursement rates will negatively impact patient care. I would like to share with my colleagues what some of them have told me.

Dr. Burton Needles of St Louis wrote to me to say that his patients prefer receiving chemotherapy in his office rather than in the hospital, but that the planned cuts would make it impossible for him to continue treating Medicare cancer patients in his office. On the other side of the state in Kansas City, Dr. Christopher Sirridge said that the result would be less accessible care for seniors with cancer, and even higher costs for the Medicare program

In Columbia, officials at the Ellis Fischel Cancer Center have told me that HCFA's change in reimbursement rates would make it extremely difficult for them to continue to be a source of chemotherapy and supportive care for cancer patients.

And, finally, Mr. President, let me share the words of a cancer patient, Darlene Bahr, from St. Louis Ms. Bahr wrote to me: "I have been fighting cancer for 18 years. This is the fourth time I have cancer. I have been on a total of four years of chemo, which had been successful I am now on chemo and hope it will be successful again." Ms. Bahr continues: "If the physician's office and the hospital cannot afford to give me these drugs, where will I get them? Does Medicare want to eliminate cancer care?"

Mr President, Medicare beneficiaries like Ms Bahr—who are facing battles against cancer—must not be saddled with the added burden of worrying about whether they will receive the care they need, in the setting they choose. Many doctors have communicated to HCFA and Congress that the Administration's plan to cut payments for cancer-fighting drug treatments will likely prevent doctors from delivering outpatient cancer care—leaving thousands of seniors without this preferred, and lower cost, option.

Congress must act to ensure that our progress in cancer treatment is not undermined by bureaucratic, inappropriate changes to Medicare reimbursement rates for cancer care

Therefore, Mr. President, today, I am introducing the Cancer Care Preservation Act, which will guarantee that HCFA cannot implement any reductions to Medicare reimbursement for outpatient cancer treatment unless those changes are developed in concert

*September 5, 2000*   CONGRESSIONAL RECORD — SENATE   S8023

with the General Accounting Office, the Medicare Payment Advisory Commission, and representatives of the cancer care community, including patients, survivors, nurses, physicians, and researchers, provide for appropriate payment rates for outpatient cancer therapy services, based upon the determinations made by the General Accounting Office; and are authorized by an act of Congress.

My legislation also will require GAO to complete a formal nationwide analysis to determine the physician and non-physician clinical resources necessary to provide safe outpatient cancer therapy services. In addition, GAO must determine the appropriate payment rates for such services under the Medicare program.

Medicare beneficiaries with cancer must be confident that they will continue to receive the care they need, in the setting they choose, without risk of arbitrary and unexpected reductions in reimbursement that may force their doctors to cease offering treatment or refer them to a different facility for treatment.

So today, I urge my colleagues to join with me in ensuring that our seniors receive full access to the life-saving therapies they need in the settings they choose, by cosponsoring the Cancer Care Preservation Act.

Mr. President, I ask unanimous consent that the Cancer Care Preservation Act be printed in the RECORD immediately following my remarks.

I yield the floor.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 3003

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE.

This Act may be cited as the "Cancer Care Preservation Act of 2000".

SEC. 2. FINDING.

Congress finds that in light of the tremendous advances achieved by this Nation in its war on cancer, including the development of breakthrough therapies, the expansion of the cancer care delivery system to convenient and low-cost community settings, and the unprecedented annual reduction in American cancer deaths beginning in 1998, legislation is needed to ensure that these advances are not undermined by inappropriate changes to rates of reimbursement for outpatient cancer therapy services under the medicare program under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq)

SEC. 3. PRESERVATION OF REIMBURSEMENT RATES FOR OUTPATIENT CANCER THERAPY SERVICES.

Notwithstanding any other provision of law, the Administrator of the Health Care Financing Administration may not implement any reduction to the rates of reimbursement for outpatient cancer therapy services under the medicare program under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.), unless such reductions—

(1) are developed in consultation with the Comptroller General of the United States the Medicare Payment Advisory Commission established under section 1805 of such Act (42 U.S.C. 1395b-6) (in this Act referred to as "MedPAC"), and representatives of the cancer care community, including patients, survivors, nurses, physicians, and researchers,

(2) provide for appropriate payment rates for outpatient cancer therapy services, based upon the determinations made by the Comptroller General of the United States in the nationwide analysis required under section 4 of this Act, and

(3) are authorized by an Act of Congress

SEC. 4. FORMAL NATIONWIDE ANALYSIS OF CLINICAL RESOURCES NECESSARY TO PROVIDE SAFE OUTPATIENT CANCER THERAPY SERVICES.

(a) ANALYSIS —

(1) IN GENERAL —The Comptroller General of the United States shall conduct a nationwide analysis to determine the physician and non-physician clinical resources necessary to provide safe outpatient cancer therapy services and the appropriate payment rates for such services under the medicare program under title XVIII of the Social Security Act (42 U S C 1395 et seq)

(2) ISSUES ANALYZED.—In conducting the analysis under paragraph (1), the Comptroller General of the United States shall determine—

(A) the adequacy of practice expense relative value units associated with the utilization of those clinical resources,

(B) the adequacy of work units in the practice expense formula; and

(C) the necessity for an additional reimbursement methodology for outpatient cancer therapy services that falls outside the practice expense formula

(3) CONSULTATION —In conducting the analysis under paragraph (1), the Comptroller General of the United States shall consult with Administrator of the Health Care Financing Administration, MedPAC, and representatives of the cancer care community, including patients, survivors, nurses, physicians and researchers

(b) REPORT.—Not later than 1 year after the date of enactment of this Act, the Comptroller General of the United States shall submit a report to Congress on the analysis conducted under subsection (a) together with recommendations for such legislative and administrative action as the Comptroller General of the United States determines appropriate

---

By Mr. INOUYE.

S. 3004 A bill to amend the Internal Revenue Code of 1986 to provide tax relief for the conversion of cooperative housing corporations into condominiums; to the Committee on Finance.

TO PROVIDE TAX RELIEF FOR THE CONVERSION OF COOPERATIVE HOUSING CORPORATIONS INTO CONDOMINIUMS

Mr INOUYE. Mr. President, today I rise to introduce legislation that would amend the Internal Revenue Code of 1986 to allow Cooperative Housing Corporations (Co-ops) to convert to condominium forms of ownership without any immediate tax consequences.

Under current law, a conversion from cooperative shareholding to condominium ownership is taxable at a corporate level as well as an individual level. The conversion is treated as a corporate liquidation, and therefore taxed accordingly In addition, a capital gains tax is levied on any increase between the owner's basis in the co-op share pre-conversion and the market value of the condominium interest post-conversion. This double taxation dissuades condominium conversion because the owner is being taxed on a transaction that is nothing more than a change in the form of ownership. While the Internal Revenue Service concedes that there are no discernible advantages to society from the cooperative form of ownership, it does not view Federal tax statutes as having the flexibility to allow co-ops to re-organize freely as condominiums.

In cooperative housing, real property ownership is vested in a corporation, with shares of stock for each apartment unit, that are sold to buyers. The corporation then issues a proprietary lease entitling the owner of the stock to the use of the unit in perpetuity. Because the investment is in the form of a share of stock, investors sometimes lose their entire investment as a result of debt incurred by the corporation in construction and development. In addition, due to the structure of a cooperative housing corporation, a prospective purchaser of shares in the corporation from an existing tenant-stockholder has difficulty obtaining mortgage financing for the purchase. Furthermore, tenant-stockholders of cooperative housing also encounter difficulties in securing bank loans for the full value of their investment.

As a result, owners of cooperative housing are increasingly looking toward conversion to condominium ownership regimes. Condominium ownership permits each owner of a unit to directly own the unit itself, eliminating the cooperative housing dilemmas of corporate debt that supersedes the investment of cooperative housing share owners, and other financial concerns

The legislation I introduce today will remove the penalty of double taxation from the cooperative housing to condominium ownership, and will greatly benefit co-op owners across the Nation. I urge my colleagues' consideration and support for this measure

Mr. President, I ask unanimous consent that the text of this bill be printed in the RECORD

There being no objection, the bill was ordered to be printed in the RECORD as follows:

S. 3004

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. NONRECOGNITION OF GAIN OR LOSS ON DISTRIBUTIONS BY COOPERATIVE HOUSING CORPORATIONS.

(a) IN GENERAL —Section 216(e) of the Internal Revenue Code of 1986 (relating to distributions by cooperative housing corporations) is amended to read as follows

"(e) DISTRIBUTIONS BY COOPERATIVE HOUSING CORPORATIONS.—

"(1) IN GENERAL —Except as provided in regulations—

"(A) no gain or loss shall be recognized to a cooperative housing corporation on the distribution by such corporation of a dwelling unit to a stockholder in such corporation if such distribution is in exchange for the stockholder's stock in such corporation and

"(B) no gain or loss shall be recognized to a stockholder of such corporation on the transfer of such stockholder's stock in an exchange described in subparagraph (A)