Page     1

:ation                    Found Document    Rank(R) 1 of 1       Database
2 WL 399357 (F.D.C H.)                                            USTESTIMONY

Federal Document Clearing House
Copyright (c) 2002 EMediaMillWorks, Inc.

Testimony
March 14, 2002

Senate
Finance
Health Care

"Reimbursement and Access to Prescription Drugs Under Medicare Part B"

Statement of

THOMAS A. SCULLY ADMINISTRATOR CENTERS FOR MEDICARE & MEDICAID SERVICES

on REIMBURSEMENT & ACCESS TO' PRESCRIPTION DRUGS UNDER MEDICARE PART B

before the SENATE FINANCE COMMITTEE SUBCOMMITTEE ON HEALTH

March 14, 2002

.irman Rockefeller, Senator Snowe, distinguished Committee members, thank you for inviting me to discuss Medicare payment for outpatient prescription drugs. As you know, prescription drugs have become an increasingly important component of modern health care, particularly for Medicare beneficiaries. The President has taken a number of steps to provide immediate relief to America's seniors and disabled from high drug costs, and we are continuing to work closely with Congress to modernize Medicare to include a comprehensive prescription drug benefit as we discussed at the hearing before this Committee just last week It also is critically important, as the President's budget proposal provides, that we improve the payment system for the limited outpatient drugs that are now covered by Medicare  It is clear that this system, based on average wholesale price, or "AWP," is seriously flawed and I appreciate the Committee's interest in this issue. I look forward to working with you and your colleagues to ensure that Medicare and beneficiaries pay competitive prices for these prescription drugs and Medicare beneficiaries have access to the drugs they need.

Medicare pays more than many other purchasers for the drugs we cover because of Medicare's payment policies and the way that drug manufacturers report their prices. We all agree that Medicare should pay appropriately for all of Medicare's benefits, including the limited drugs the program currently covers. The
 ·rent system, which results in Medicare and beneficiaries

Copr (C) West 2002 No Claim to Orig. U S Govt. Works

02 WL 399357 (F.D.C.H.)

paying excessive prices for certain prescription drugs, must be
fixed. At the same time, we need to be certain that Medicare pays
providers appropriately for their services when they furnish
drugs to beneficiaries.

By law, Medicare does not pay for most outpatient prescription
drugs. However, there are some specific exceptions where Medicare
covers pharmaceuticals, such as those drugs that are not self
administered and furnished incident to a physician's covered
services. In these cases, the law requires that Medicare pay
physicians and other providers based on the lower of the billed
charge or 95 percent of the drugs' AWP  Numerous studies have
indicated that the industry's reported wholesale prices, the data
on which Medicare drug payments are based, are vastly higher than
the amounts drug manufacturers and wholesalers actually charge
providers. That means Medicare beneficiaries, through their
premiums and cost sharing, and U.S. taxpayers, are spending far
more than the "average" price that we believe the law intended
them to pay. Some affected physicians and providers have
suggested that they need these Medicare "drug profits" to cross
subsidize what they believe are inadequate Medicare payments for
services related to furnishing the drugs, such as the
administration of chemotherapy for cancer. A better approach is
to pay appropriately for both the drugs and the services related
  furnishing those drugs, and we need to take action this year
  implement an appropriate payment system.

Clearly, Medicare drug pricing is complex. Over the years,
numerous legislative efforts have made progress toward developing
an effective alternative to AWP. These efforts have aimed at
ensuring that Medicare and its beneficiaries do not pay more than
they should for the limited number of prescription drugs that
Medicare covers, and that providers are compensated appropriately
for their services. We continue to believe that an effective
legislative remedy to this problem would be acceptable, and we
intend to work with Congress to implement effective legislation.
However, if necessary, we are prepared to build on the strong
evidence and best ideas for reform developed in Congress by
taking action under the Medicare, Medicaid, and SCRIP Benefits
Improvement and Protection Act of 2000 (BIPA), which provided
some authority for the Secretary to act after reviewing the
General Accounting Office (GAO) report to Congress. Under BIPA,
we could move to a market-based system for drugs and adjust
payments for services related to furnishing drugs such as
practice expenses for oncology administration. As we look to the
future, particularly as we add broader prescription drug coverage
to Medicare, it is even more important to develop marketbased,
competitive pricing systems for drugs so that we do not repeat
the past mistakes of overpayment. We are committed to working
with you, and all of Congress to ensure that Medicare pays
  ropriately for all benefits, including the limited drugs

Copr. (C) West 2002 No Claim to Orig. U S. Govt. Works

~02 WL 399357 (F.D C.H.)

Medicare now covers.

MEDICARE'S LIMITED DRUG BENEFIT

The Centers for Medicare & Medicaid Services (CMS) pays most of the health care expenses of almost 40 million Medicare beneficiaries. If we were creating the Medicare program today, we would certainly include a prescription drug benefit. However, in 1965 when the Medicare program was enacted, prescription drugs played a less prominent role in health care than it does today. The emphasis in 1965 was on ensuring access to inpatient hospital care in Medicare Part A and providing access to physicians in Medicare Part B. Today, Medicare beneficiaries rely on prescription drugs as an integral part of their health care. Although by law, Medicare does not generally cover over-the-counter or outpatient prescription drugs, Medicare does cover some drugs, including:

-Drugs that are not self-administered and furnished "incident to" a physician's service, such as prostate cancer drugs;

-Certain self-administered oral cancer and anti-nausea drugs;

-Certain drugs used as part of durable medical equipment or fusion devices, (e g., the albuterol that is put into nulizers, which are devices used by asthma patients);

-Immunosuppressive drugs, which are used following organ transplants;

-Erythropoietin (EPO), far and away the drug Medicare spends the most money on, is used primarily to treat anemia in end stage renal disease patients and in cancer patients; and -Osteoporosis drugs furnished to certain beneficiaries by home health agencies.

These drugs are typically provided in hospital outpatient settings, dialysis centers, or doctors' offices, and are purchased directly by the physician or provider. Additionally, vaccines for diseases like influenza, pneumonia, and hepatitis are considered drugs and are covered by Medicare.

By law, we generally pay for these drugs based on the actual charge or 95 percent of the AWP, whichever is lower. This adds up to more than $5 billion a year for currently covered drugs, approximately 80 percent of which is paid for from the Medicare Trust Funds. In general, Medicare beneficiaries must also share in the cost of purchasing these drugs through their Part B premiums, and except for the flu and pneumonia vaccines, the $100 Part B annual deductible, and a 20 percent coinsurance.

DICARE PAYMENT FOR CURRENTLY COVERED DRUGS

Copr. (C) West 2002 No Claim to Orig U.S. Govt. Works

2002 WL 399357 (F.D.C.H.)

The AWP is intended to represent the average price at which wholesalers sell drugs to their customers, which include physicians and pharmacies. Traditionally, AWP has been based on prices reported by drug manufacturers and published in compendia such as the Red Book, which is published by Medical Economics Company, Inc. However, manufacturers and wholesalers increasingly give physicians and providers competitive discounts that reduce the actual amount the physician or provider actually pays for the drugs. But Medicare's regulated payment system leaves the program behind in obtaining competitive discounts for drugs. These discounts are not reflected in the published price and reduce the amount providers actually pay to levels far below those prices published in the Red Book. Furthermore, use of the AWP, as reported by manufacturers to companies which compile such prices, creates a situation where a manufacturer can, for certain drugs, arbitrarily increase the reported AWP and, in turn, offer physicians a deeper "discount."

This Committee, CMS, the Department's Office of the Inspector General (IG), and others have long recognized the shortcomings of AWP as a way for Medicare to reimburse for drugs. The IG has published numerous reports showing that true competitive market prices for the top drugs billed to the Medicare program by physicians, independent dialysis facilities, and durable medical equipment suppliers were actually significantly less than the AWP reported in the Red Book and other publications. As competitive discounts have become widespread, the AWP mechanism has resulted in increasing payment distortions. However, Medicare has continued to pay for these drugs based on the reported AWP amount. The deep competitive discounts offered to physicians and providers by drug manufacturers, compared to the reported AWP, could give physicians and providers an incentive to use the manufacturer's products for Medicare beneficiaries. It is simply unacceptable for Medicare to continue paying for drugs in an outdated, noncompetitive way that costs beneficiaries and the program far more than it should

In the past, the Agency has attempted to remedy disparities between Medicare payments based on AWP and the amount actually paid competitively by physicians and providers. However, these efforts have not been successful. For example, the Agency's proposed June 1991 physician fee schedule included payments based on 85 percent of AWP. The Agency also proposed that certain very high volume drugs be reimbursed at levels equal to the lesser of 85 percent of AWP or the physician's or provider's estimated acquisition cost. The Agency received many comments, primarily from oncologists, indicating that an 85 percent standard was inappropriate. Most comments indicated that while many drugs could be purchased for less than 85 percent of AWP, other drugs were not discounted. Others suggested that while pharmacies and perhaps large practices could receive substantial discounts on

Copr. (C) West 2002 No Claim to Orig. U.S. Govt. Works

02 WL 399357 (F.D.C.H.)

...eir drug prices, individual physicians could not. As an
alternative, beginning with 1992, a policy was established for
Medicare to pay the AWP or the estimated acquisition cost,
whichever was less.

Since the Estimated Acquisition Cost approach proved to be
unworkable, subsequent legislation was proposed that would have
required Medicare to pay physicians their actual acquisition cost
for drugs. Under this proposal, physicians would tell Medicare
what they paid for the drugs and be reimbursed that amount,
rather than the Agency developing an estimate of acquisition
costs and paying physicians based on that estimate. After
considering this proposal, Congress adopted an alternative
approach in the Balanced Budget Act of 1997 (BBA), setting
Medicare's payment for drugs at the lesser of the billed charge
or 95 percent of AWP. While this brought Medicare payments closer
to the prices that physicians and providers pay for drugs,
Medicare payments were still significantly greater than the
competitive discounts obtained by physicians. The system still
tied Medicare payments to the artificially inflated industry-
reported list prices. In fact, in a December 1997 report, the IG
found payments based on AWP to be substantially greater than the
prices available to the physician community. As an alternative to
actual acquisition costs, Congress considered proposals to pay
   1 Medicare drugs at 83 percent of AWP, a compromise between 95
   rcent of the AWP and the average discount found by the IG.

In May 2000, the Department of Justice (DOJ) and the National
Association of Medicaid Fraud Control Units made accurate market
wholesale prices for 49 drugs covered by Medicaid available to
State Medicaid programs and to First Data Bank, a drug price
compendium owned by the Hearst Corporation. These wholesale
prices, culled from wholesale catalogs circulated among the
provider community, reflected the actual Average Wholesale Prices
for these drugs far more accurately than the drug manufacturers'
AWP. In 2000, the Agency sent this new information to Medicare
carriers and instructed them to consider these alternative
wholesale prices as another source of AWP data in determining
their January 1, 2001 quarterly update for many of these drugs.
However, due to concerns about Medicare reimbursement for the
administration of the chemotherapy and clotting factor drugs, the
Administration instructed our carriers not to use the data for
those drugs at that time. The Agency postponed Medicare carriers'
use of the DOJ data, because in December 2000, Congress enacted
the Medicare, Medicaid, and SCHIP Benefits Improvement and
Protection Act (BIPA), which established a moratorium on
decreases in Medicare drug reimbursement rates, while the GAO
conducted a study of Medicare drug pricing and related payment
issues. BIPA also provided some authority for the Secretary to
address AWP after reviewing the GAO's findings.

Copr. (C) West 2002 No Claim to Orig. U.S Govt Works

02 WL 399357 (F.D.C.H.)

... I stated, the Administration wants to work with Congress on a legislative remedy that benefits from competition in drug pricing. However, I am sure you will agree that needed improvements in Medicare's drug payment system are overdue, and the Administration is prepared to take action. Let me reiterate that we are committed to providing assistance to this Committee and Congress as you seek solutions to AWP and we look forward to working with you in the weeks ahead.

CONCLUSION

Medicare beneficiaries rely on prescription drugs, and the coinsurance they pay for covered drugs is tied directly to the prices that Medicare pays. We must find a competitive way to ensure that Medicare beneficiaries and taxpayers are no longer paying excessive prices for drugs that are far above the competitive discounts that are widely available today. We need to pay appropriately for all Medicare benefits, including the prescription drugs we cover and the services required to furnish those drugs We look forward to working with you Mr. Chairman, this Committee, and the Congress to revise Medicare's payment policy for currently covered drugs. Thank you for the opportunity to discuss this important topic with you today, and I am happy to answer your questions.

   THOMAS A. SCULLY
   Administrator
   Centers for Medicare & Medicaid Services
2002 WL 399357 (F D.C.H.)
END OF DOCUMENT

Copr (C) West 2002 No Claim to Orig. U.S Govt. Works