# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) |
| | MDL No.  1456 |
| | ) |
| | ) Civil Action No. 01-12257-PBS |
| | ) |
| THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS | ) Judge Patti B. Saris |
| | ) ) ) |

### TRACK 1 DEFENDANTS' MEMORANDUM IN SUPPORT
### OF THEIR MOTION TO PRECLUDE THE EXPERT TESTIMONY OF
### DR. RAYMOND HARTMAN IN CONNECTION WITH CLASSES 1 AND 2

## Table of Contents

Table of Authorities ..................................................................................................................iii

Preliminary Statement...........................................................................................................1

Statement of Facts.................................................................................................................2

    A.     Hartman's Theory .................................................................................2

    B.     Hartman's Supplemental Report.........................................................4

    C.     Hartman's Methodology .....................................................................4

    D.     Defendants' Experts............................................................................6

Argument ..............................................................................................................................8

I.      STANDARD OF REVIEW ..................................................................................8

    A.     The Daubert Standard ........................................................................8

    B.     The Scientific Method.........................................................................9

II.     HARTMAN'S 30% EXPECTATION YARDSTICK IS COMPLETELY
    LACKING IN ANY SCIENTIFIC BASIS........................................................10

    A.     It Is Based On A Premise That Is Demonstrably Incorrect ...........10

    B.     Hartman's 30% Yardstick Ignores, And Is Inconsistent With, The
        Evidence Of Actual Expectations ....................................................13

    C.     Hartman's Use Of Comparator Drugs Is Flawed...........................16

    D.     The Reports On Which Hartman Relies Actually Contradict
        What He Says...................................................................................17

    E.     Hartman's Revealed Preference Theory Is Flawed ......................19

    F.     Hartman's Expectation Yardstick Is Nothing More Than An
        Unsupported Assumption..................................................................22

III.    HARTMAN'S SUPPLEMENTAL REPORT SHOULD BE STRICKEN ..............23

    A.     There Is No Basis For Hartman's Zero By Statute Theory ...........23

    B.     Hartman's ASP Definition Is Wrong...............................................24

IV.    HARTMAN'S DAMAGE THEORY IS FLAWED....................................................25

    A.    There Is No Support For Hartman's Zero Damages Yardstick ....................25

    B.    There Is No Proof That Payments Would Be Any Different In The But For World .......................................................................................26

    C.    Hartman Inflates Damages In Various Other Ways ......................................28

    D.    Individual Company Issues...........................................................................28

Conclusion    .........................................................................................................................30

**Table of Authorities**

**Cases**                                                                                          **Page(s)**

*American Booksellers Ass'n., Inc. v. Barnes & Noble, Inc.*,
    135 F. Supp. 2d 1031 (N.D. Cal. 2001) ..........................................................24, 26

*Aspinell v. Philip Morris Cos.*,
    442 Mass. 381, 813 N.E.2d 476 (2004) .............................................................25

*Claar v. Burlington Northern R.R. Co.*,
    29 F.3d 499 (9th Cir. 1994) ...............................................................................13

*Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*,
    175 F.3d 18 (1st Cir. 1999).............................................................................8, 23

*Country Road Music, Inc. v. MP3.com, Inc.*,
    279 F. Supp. 2d 325 (S.D.N.Y. 2003)...............................................................19

*Damon v. Sun Co.*,
    87 F.3d 1467 (1st Cir. 1996)...........................................................................8, 16

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)................................................................................. passim

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) .............................................................................22

*Ed Peters Jewelry Co. v. C & J Jewelry Co.*,
    124 F.3d 252 (1st Cir. 1997).................................................................................8

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    No. 94 C 89, MDL 997, 1999 WL 33889 (N.D. Ill. Jan. 19, 1999),
    *aff'd in part and vacated in part*, 186 F.3d 781 (7th Cir. 1999)...........................23

*In re Pharm. Indus. AWP Litig.*,
    230 F.R.D. 61 (D. Mass. 2005)........................................................................2, 16

*Jones v. Harris Assocs.*,
    No. 04 C 8305, 2006 WL 1005100 (N.D. Ill. Apr. 14, 2006)...............................24

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999).................................................................................. passim

*Microstrategy Inc. v. Business Objects, S.A.*,
    429 F.3d 1344 (Fed. Cir. 2006)..........................................................................13

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.,*
    188 F.3d 11 (1st Cir. 1999)...................................................................8, 13

*Sutera v. Perrier Group of Am., Inc.,*
    986 F. Supp. 655 (D. Mass. 1997) ..........................................................9

*Wagner v. Hesston Corp.*
    No. 05-3232, 2006 WL 1549004 (8th Cir. June 8, 2006.)...................21

## **Rules**

Fed. R. Evid. 702 ......................................................................................8

Fed. R. Civ. P. 30(b)(6).............................................................................13

## **Article**

Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound:*
    *It Should Not Be Amended*, 138 FRD 631 (1991)....................................9

The Track 1 Defendants respectfully submit this memorandum in support of their motion to preclude the expert testimony of Dr. Raymond Hartman ("Hartman") with respect to Classes 1 and 2 pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

<u>Preliminary Statement</u>

In its case management order of January 31, 2006, the Court indicated that it did not anticipate expert reports on liability in connection with Classes 1 and 2.[1]  Nevertheless, in connection with the briefing on summary judgment for Classes 1 and 2, plaintiffs submitted Hartman's expert report of December 15, 2005 ("Hartman 12/15/05 Rpt."),[2] as well as a Declaration in Opposition to Defendants' Motions for Summary Judgment dated April 6, 2006 ("Hartman 4/6/06 Decl.") and a Reply Declaration in Support of Plaintiffs' Motion for Summary Judgment dated April 27, 2006 ("Hartman 4/27/06 Decl.").[3]  In their briefs, plaintiffs also relied on Hartman's testimony that "where there was a marketplace expectation, that expectation was of a 30%-or-less spread between AWP and actual price."[4]

Assuming Hartman's testimony is not rendered moot by the Court's rulings on the pending motions for summary judgment,[5] his testimony should be precluded on the ground that it fails to satisfy minimum *Daubert* standards.  Hartman's theory that payors – including the

---

[1] That order states: "The Court is not aware of any possible *Daubert* motions on expert testimony for Class 1 and Class 2.  If a *Daubert* motion is likely, the parties shall confer and propose a briefing schedule."  (CMO 20, ¶ 6.) Defendants' counsel tried to confer with plaintiffs' counsel about this, but they refused to discuss it.  (Declaration of Steven M. Edwards, dated June 15, 2006 ("Edwards Decl."), ¶ 2 and Exh. 1.)

[2] Edwards Decl. Exh. 2.

[3] The declarations submitted in connection with the summary judgment motions are in reality unauthorized expert reports.  Since they do not change the substance of Hartman's testimony, they will not be addressed separately here. In addition, Hartman submitted a supplemental expert report on February 3, 2006 ("Hartman 2/3/06 Rpt."), which will be addressed in this motion.  (Edwards Decl. Exh. 3.)

[4] Plaintiffs' Memorandum in Opposition to the BMS Defendants' Motion for Summary Judgment, dated April 7, 2006, at 14; *see also* Plaintiffs' Memorandum in Opposition to Track 1 Defendants' Joint Motion for Summary Judgment, dated April 7, 2006, at 11-12.

[5] CMO 20 calls for *Daubert* motions in connection with Class 3 to be made on July 14, 2006. (CMO 20, ¶ 7.)  Since the Court's schedule does not call for that motion to be decided until after the first trial, this motion is being made now.  Defendants still intend to file a motion for Class 3.

government – had an expectation that AWP would not exceed average sales prices ("ASP") by more than 30% is not supported by any credible evidence, is inconsistent with evidence of actual expectations in the marketplace and is completely lacking in any scientific basis.  Furthermore, Hartman admits that he is not qualified to render the opinions he has expressed on the meaning of the Medicare statutes.  Finally, his damage analysis is riddled with inconsistencies and errors.

<u>Statement of Facts</u>

A.    <u>Hartman's Theory</u>

Hartman's theory is that the marketplace expected AWP to exceed ASP by a "reasonably predictable amount."  (Hartman 12/15/05 Rpt. ¶ 13.)  That amount did not exceed 30%, which he calls his "speed limit."  (*Id.* ¶ 59(e); Hartman Dep. Tr. 650, 652, 1235-38, 1241, 1243.)[6]  According to Hartman, that expectation was the same for the government and for payors in the private sector.  (Hartman Dep. Tr. 661, 672-74, 1235, 1241, 1243) (672: "The government has set reimbursement rates that reflect an understanding that is comparable to . . . my yardsticks.").

Using his 30% "yardstick," Hartman determines liability by comparing the actual difference, or "spread," between AWP and ASP with the "but for" spread.  (Hartman 12/15/05 Rpt. ¶¶ 56-60.)  The "but for" spread is based on a hypothetical AWP that does not exceed ASP by more than 30%.  (*Id.* ¶ 59(e).)  If the actual spread exceeds the "but for" spread for any NDC in a given year, Hartman concludes that there is liability for that NDC in that year.  (*Id.*)

Hartman obtains AWPs from industry publications such as the Redbook.  (*Id.* ¶ 56 n. 57.) He calculates ASPs by using manufacturer data to determine the average price to "physicians, physician groups, oncology groups, clinics, long-term care facilities, nursing homes

---

[6] In his expert report on class certification, Hartman's expectation yardstick for physician-administered drugs was 33%.  *See In re Pharm. Indus. AWP Litig.,* 230 F.R.D. 61, 88 n.27 (D. Mass. 2005).  Hartman does not explain the change from 33% to 30%.

and certain others," *excluding* customer classes such as "hospitals, government entities, managed care dispensaries, and those units distributed through wholesalers which are not later distributed to the physician providers who in turn administer to the Class." (*Id.* ¶ 61.)  At his deposition, Hartman explained that he employs this approach in order to approximate the acquisition cost of providers who are reimbursed pursuant to Medicare Part B.  (Hartman Dep. Tr. 655, 658-59, 1301.)

Once Hartman determines liability, he calculates damages differently for class members in the private sector and class members whose payments are governed by Medicare Part B.  For the private sector, damages are limited to the extent to which spreads between AWP and ASP exceed 30%.  (Hartman 12/15/05 Rpt. ¶ 63.)  For class members whose payments are governed by Medicare Part B – Classes 1 and 2 – once Hartman's 30% liability yardstick is satisfied, Hartman includes as damages any amount by which the spread between AWP and ASP exceeds 0.  (*Id.*)[7]

Hartman's rationale for using a yardstick of 0 for determining damages for Classes 1 and 2, even though he uses a yardstick of 30% for determining liability, is that the Medicare statute requires it.  (Hartman 12/15/05 Rpt. ¶¶ 18 n.13 and 19; Hartman Dep. Tr. 1303-04.)  Hartman readily admits that he does not have any expertise with respect to that statute.  (Hartman Dep. Tr. 666.)  He uses this approach for calculating damages because plaintiffs' counsel told him to do it.  (Hartman Dep. Tr. 647.)

---

[7] In other words, if the AWP is $130 but the ASP is $90, damages for Classes 1 and 2 will be $40 per unit but damages for Class 3 will be $10 per unit.  Moreover, defendants will have to pay damages on every unit sold even if some sales were at $100 or more.  (Hartman Dep. Tr. 1094-99.)

B.     Hartman's Supplemental Report

Hartman submitted a supplemental report on February 3, 2006.[8]  That report

differs from the original report in two major ways:  (1) it lowers the liability threshold for class

members whose payments are governed by Medicare Part B – Classes 1 and 2 – from 30% to

zero,[9] and (2) it expands the definition of ASP to include all customer classes.[10]  (Hartman 2/3/06

Rpt. ¶ 2.)  This has the effect of increasing total damages for the Track 1 Defendants by more

than $500 million.  (*Id.* ¶ 3.)

At his deposition, Hartman was very clear that he created his supplemental report

at the request of counsel.  (Hartman Dep. Tr. 647, 656, 1236-37, 1249, 1267.)  He continued to

stand by his original report, which he characterized as an economic (as opposed to legal) analysis.

(*Id.* at 664, 665, 1245.)  Moreover, Hartman was unwilling to express any view on the validity of

his supplemental report, and he was careful to note that the premises underlying the

supplemental report are matters as to which he has no expertise.  (*Id.* at 666, 1244, 1277.)

C.     Hartman's Methodology

Hartman purports to calculate his 30% expectation yardstick by using three

techniques:  (1) comparing "comparator" drugs that are supposedly unaffected by the fraud with

"subject" drugs allegedly affected by the fraud; (2) relying on what he characterizes as "publicly

available sources" concerning the relationship between AWP and ASP; and (3) implementing

what he calls "a revealed preference analysis" of actual contract reimbursement rates.  (Hartman

12/15/05 Rpt. ¶ 22.)

---

[8] Plaintiffs did not seek leave to file a supplemental report.

[9] In other words, there is liability for any drug whose AWP exceeds its ASP, thus increasing the number of NDCs
and time periods for which there is liability.  (Hartman Dep. Tr. 664-65.)

[10] In other words, instead of limiting ASP to customer classes that are reimbursed pursuant to Medicare Part B,
Hartman includes all customer classes, which has the effect of increasing the spread.  (Hartman Dep. Tr. 1301.)

For comparator drugs, Hartman compares drugs that do not face therapeutic competition with drugs that do.  (Hartman 12/15/05 Rpt. ¶ 22(a); Hartman Dep. Tr. 969-70.) The comparator drugs include self-administered drugs that are not at issue in the case, as well as subject drugs during the time that they were covered by patents and did not face therapeutic competition.  (Hartman 12/15/05 Rpt., Table 3.)  Hartman's assumption is that payors rely on the spreads for drugs that do not face therapeutic competition to form expectations for drugs that do face therapeutic competition.  (Hartman 12/15/05 Rpt. ¶ 22(a); Hartman Dep. Tr. 992.)  As discussed more fully below, there is no basis for that assumption.

For publicly available sources on the relationship between AWP and ASP, Hartman relies on a 1992 report by the Office Of Inspector General ("OIG") of the Department of Health and Human Services entitled *Physicians' Costs For Chemotherapy Drugs* (the "1992 OIG Report") and a 2001 report by the American Society of Clinical Oncology ("ASCO") that contains similar information.[11]  (Hartman 12/15/05 Rpt. ¶ 22(b).)  Some of the spreads in the 1992 OIG Report exceed 400%, but Hartman dismisses those spreads on the ground that they only relate to multi-source drugs.  (Hartman Dep. Tr. 729-31.)  Hartman assumes that payors only consider single source drugs, not multi-source drugs, in arriving at reimbursement rates for multi-source drugs.  (*Id.* at 733, 966.)  As discussed more fully below, there is no basis for that assumption either.

Hartman's third technique – "revealed preferences" – is an economic theory which posits that actors reveal their beliefs through economic acts such as the purchase of products.  (Hartman Dep. Tr. 824.)  For revealed preferences, Hartman relies on four contracts that are identified in his report and a June 2003 Report to the Congress by the Medicare Payment

---

[11]  Edwards Decl. Exhs. 21 and 33.

Advisory Committee ("MedPAC") entitled *Variation and Innovation in Medicare* (the

"MedPAC Report").[12]   (Hartman 12/15/05 Rpt. ¶ 22(c) and Attach. C.)  These documents

identify reimbursement rates that range from AWP minus 15% to AWP plus 15%.  (*Id.*)  In

relying on these documents for his "revealed preference" analysis, Hartman assumes that payors

wanted to limit provider profits to 30% per drug.  (Hartman Dep. Tr. 697, 699, 866, 868.)  Again,

as discussed more fully below, there is no basis for that assumption.

      D.     <u>Defendants' Experts</u>

          In support of their challenge to Hartman's testimony, defendants proffer the

expert Declaration of Daniel L. McFadden, a Nobel Prize winner in economics, dated March 21,

2006 ("McFadden Rpt.").[13]   After analyzing Hartman's reports, McFadden concludes:

> "I find that Dr. Hartman's analysis of causation, liability, and
> damages is unreliable and incorrect.  Dr. Hartman's reports do not
> support a scientific finding of his central hypothesis that payors
> shared a common 'market expectation' of the spread between
> AWP and ASP for all NDCs, class members, and time periods,
> measured by a 'yardstick' of 30%.  Even if fraud is assumed for
> purposes of damages, Dr. Hartman's damages analysis overstates
> the quantum of damages that result.  My review shows that Dr.
> Hartman's assumptions and conclusions contradict basis economic
> theory and are inconsistent with the evidence he presents."

(McFadden Rpt. ¶ 10.)  Among other things, McFadden discusses standard economic theory and

scientific techniques and demonstrates that Hartman's analysis is inconsistent with both.  (*Id.* at

6-22.)  McFadden further finds that there is no evidence supporting Hartman's expectation

analysis; his analysis is inconsistent with the available evidence; and there is no reason to believe

that reimbursement rates would be any different in the absence of the alleged fraud.  (*Id.* at 23-

55.)

---

[12]  Edwards Decl. Exh. 36.
[13]  Edwards Decl. Exh. 11.

Defendants have proffered other expert reports that also undermine Hartman's analysis.[14]  Dr. Gregory K. Bell concludes that Hartman's theory is inconsistent with the economics of the pharmaceutical industry and ignores price concessions resulting from therapeutic and generic competition, fails to explain how payors developed their expectations, disregards the OIG findings, and fails to consider that Medicare and payors were aware of the magnitude of price concessions given to the government through the Federal Supply Schedule ("FSS").  (Bell Rpt. ¶¶ 17, 20-34.)  Dr. Eric Gaier finds Hartman's methodology unreliable because it cannot distinguish the alleged scheme from legitimate price competition, and, by using yardsticks based upon single-source innovator drugs facing no competition to draw conclusions about drugs facing therapeutic and generic competition, Hartman confounds the purported effects of the alleged AWP scheme with legitimate price competition.  (Gaier Rpt. ¶¶ 9, 97, 100-01, 103-04.)  Dr. Fiona Scott Morton observes that Hartman's assumption that Medicare and private payors would benefit from transparent pricing is incorrect; as matter of economics, price transparency would destroy incentives for price competition among drug manufacturers leading to higher provider reimbursement.  (Morton Rpt. ¶¶ 43, 46-47.)  Finally, Dr. Linda M. Haegele, a practicing oncologist, demonstrates that oncologists would not undertake the investment and risk of establishing office based clinics for the administration of chemotherapy drugs if they could not earn a profit on that activity.  (Haegele Rpt. ¶¶ 43-70.)

---

[14] Declarations of Gregory K. Bell, dated March 22, 2006 ("Bell Rpt.") (Edwards Decl. Exh. 12); Eric M. Gaier, dated March 21, 2006 ("Gaier Rpt.") (Edwards Decl. Exh. 13); Fiona M. Scott Morton, dated March 22, 2006 ("Morton Rpt.") (Edwards Decl. Exh. 14); and Report of Linda A. Haegele, dated March 20, 2006 ("Haegele Rpt.") (Edwards Decl. Exh. 15).

<u>Argument</u>

I.      STANDARD OF REVIEW.

    A.      <u>The Daubert Standard</u>

        Under Rule 702, a witness may testify concerning scientific, technical, or other specialized knowledge if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  The word "knowledge", however, "connotes more than subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.  "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method," a requirement necessary to ensure "evidentiary reliability."  *Id.*

        Before allowing an expert to testify, a court must determine (1) "whether the reasoning or methodology underlying the testimony is scientifically valid" and (2) "whether the reasoning or methodology properly can be applied to the facts in issue."  *Id.* at 592-93.  In other words, the Court must determine whether the proposed expert testimony "rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597.  This standard applies to both non-scientific as well as scientific expert testimony submitted pursuant to Fed. R. Evid. 702.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 175 F.3d 18, 34 n.12 (1st Cir. 1999) ("The district court's gatekeeping function extends to all expert evidence, including economic analysis.").

        In performing its gatekeeping function, a district court must ensure that the expert's opinion is based on a legally sufficient evidentiary foundation.  *Damon v. Sun Co.*, 87 F.3d 1467, 1474 (1st Cir. 1996).  "Expert testimony that offers only a bare conclusion is insufficient to prove the expert's point."  *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999).  Moreover, in assessing the sufficiency of the foundation for an expert's opinion, the court should determine whether it is reliable.  *Ed Peters Jewelry Co. v. C &*

*J Jewelry Co*., 124 F.3d 252, 259-60 (1st Cir. 1997) (expert testimony that was "internally inconsistent and unreliable" excluded).

> Among the factors that a court should consider in assessing reliability are:
>
> "(1) whether the opinion can be or has been tested; (2) whether the theory or technique on which the opinion is based has been subjected to peer review and publication; (3) the technique's known or potential error rate; (4) the existence and maintenance of standards controlling the technique's operations; and (5) 'general acceptance'."

*Sutera v. Perrier Group of Am., Inc.*, 986 F. Supp. 655, 661 (D. Mass. 1997).  These factors are not exhaustive.  *See Kumho Tire*, 526 U.S. at 150-51.  Moreover, the relevant factors may vary from case to case.  *See id.* at 150.

If the expert's opinion is unsupported, inconsistent with the evidence or unreliable, it should be excluded.  *Daubert*, 509 U.S. at 590.  Serious flaws in an expert's analysis are not merely a question of weight.  As one jurist has explained:

> "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."

Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991).

 B. <u>The Scientific Method</u>

McFadden discusses the scientific method as it is used in economics.  According to McFadden, there are four basis steps:

> "i. Specifying a clear model or hypothesis to be evaluated or tested, including identification of critical assumptions;
>
> ii. Collecting reliable data and information;

  iii. Analyzing the model or hypothesis using data, including calibrating the model, estimating unknown parameters, and testing of hypothesis; and

  iv. Reaching reliable conclusions, forecasts, findings, predictions, and inferences based on the previous steps."

(McFadden Rpt. ¶ 43.)  A critical part of the analysis is formulating a plausible hypothesis and determining whether there is strong evidence that would enable the economist to rule out a contrary hypothesis with confidence.  (*Id.* ¶¶ 46-47.)  In the context of this case, this includes investigating whether payors in fact believed that there was a predictable relationship between AWP and ASP; whether they believed that relationship did not exceed 30%; and whether surrogate sources such as comparator drugs, published reports and revealed preferences can be reliably used to determine expectations.  (*Id.* ¶¶ 49-54.)

## II. HARTMAN'S 30% EXPECTATION YARDSTICK IS COMPLETELY LACKING IN ANY SCIENTIFIC BASIS.

  A. <u>It Is Based On A Premise That Is Demonstrably Incorrect</u>

   Hartman's theory is that payors viewed AWP as a "signal" for ASP and they were deceived if their understanding of that signal was incorrect.  (Hartman Dep. Tr. 721, 1254-55.)  Thus, he says that payors, including Medicare, "have expected that AWP is larger than ASP by *a reasonably predictable amount*."  (Hartman 12/15/05 Rpt. ¶ 13 (emphasis in original).)  If that premise is incorrect, then Hartman's entire theory collapses.

   Hartman bases his opinion, in part, on the 1992 OIG Report (Hartman Dep. Tr. 724, 727), but that report in fact says exactly the opposite.  Among other things, it states:

   "Our results indicate that, for the physicians surveyed, the 13 chemotherapy drugs can be purchased at amounts below AWP and that *AWP is not a reliable indicator of the cost of a drug to physicians.*

       \*  \*  \*

> *AWP is not a reliable indicator of the cost of a drug to physicians.*
>
> \*　　\*　　\*
>
> Considering that we also found that there is no single discount rate which can be applied to the AWP to provide a reasonably consistent estimate of the physician's acquisition cost, *we do not feel that AWP provides a useful measure of the acquisition cost for a drug to physicians.*"

(1992 OIG Report at 2, 5, 11 and App. II (emphasis added).)  Numerous other government reports say the same thing.[15]

At his deposition, Hartman dismissed these statements by suggesting that "the only person that would read this report and read that one sentence would be – a lawyer trying to make a point."  (Hartman Dep. Tr. 733-34.)  He added that any payor designing reimbursement rates who relied on that sentence "should be fired."  (*Id.* at 735.)  Numerous payors testified, however, that they did not have an expectation that there was a predictable relationship between AWP and ASP.

For example, Mickey Brown of Blue Cross/Blue Shield of Mississippi testified that he did not "have an expectation one way or the other" on whether there is a relationship between acquisition cost and AWP.  (Brown Dep. Tr. 127.)[16]  Thomas Greenebaum of CIGNA testified:  "[W]e don't have any expectations of what the relationship is between what we purchase the drug for and what AWP is."  (Greenebaum Dep. Tr. 76.)[17]  Joe Spahn of Anthem testified:

> "Q.  So it's fair to say that Anthem has no particular expectation that providers' costs would be, you know, 10 percent, 30 percent,

---

[15] *Task Force On Prescription Drugs – Final Report* at 90 (1969) (Edwards Decl. Exh. 17); OIG, *Changes to the Medicaid Prescription Drug Program Could Save Millions* at 22 (1984) (Edwards Decl. Exh. 18)*;* Secretary's Report to Congress, *The Average Wholesale Price For Drugs Covered Under Medicare* at 2, 8 (1999) (Edwards Decl. Exh. 29); GAO, *Medicare:  Challenges Remain in Setting Payments for Medical Equipment, Supplies and Covered Drugs* at 7 (2002) (Edwards Decl. Exh. 35).

[16] Edwards Decl. Exh. 38.

[17] Edwards Decl. Exh. 44.

> 50 percent, something more, something less than the amount
> they're reimbursed in relation to those drugs, right?
>
> [Objection omitted.]
>
> A.  Yes."

(Spahn Dep. Tr. 98.)[18]  Edward Lemke of Humana testified:

> Q.  Is it Humana's expectation that the amounts that providers pay
> to acquire drugs are a fixed percentage less than the amount
> Humana reimburses in relation to those drugs?
>
> A.  The expectation that -- first of all that it's fixed, no.  The
> expectation that good business practice and assuming providers
> that we do business with practice good business practices, is that
> they would only accept payment that is at or above their costs.
> That's my only expectation.
>
> Q.  And certainly you have no fixed expectation as to how much
> higher it would be than their acquisition costs, correct?
>
> A.  Correct.
>
> *          *          *
>
> Q.  The percentage could be 10 percent in one case, 50 in another,
> 100 in another, correct?
>
> A.  Could be."

(Lemke Dep. Tr. 123-24.)[19]

When confronted with this testimony, Hartman had no explanation other than to suggest that the witnesses did not know what they were talking about.  (Hartman Dep. Tr. 743-82.)  In one case, he compared the witness to "Brownie of FEMA."  (*Id.* at 749.)  In other cases he dismissed the testimony as "too general and too diffuse."  (*Id.* at 774-75.)  He also questioned the selection of these witnesses, even though they had been designated by class members

---

[18] Edwards Decl. Exh. 51.
[19] Edwards Decl. Exh. 48.

pursuant to Fed. R. Civ. P. 30(b)(6) as the persons most knowledgeable to testify about the subject.  (*Id.* at 746-47.)

As McFadden points out, Hartman failed to develop and rule out the alternative hypothesis – that payors had no expectations – and did not introduce any surveys or identify any deposition evidence demonstrating that the class members had market expectations about spreads. (McFadden Rpt. ¶¶ 50, 56-59, 87.)  For an expert's testimony to be reliable, the expert must adequately account for obvious alternative explanations.  *Microstrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1355-56 (Fed. Cir. 2006); *Claar v. Burlington Northern R.R. Co.,* 29 F.3d 499, 502 (9th Cir. 1994) (testimony excluded where expert failed to consider other obvious causes for plaintiffs' injuries).  The expert's theory must also be based on a premise that is supported by the facts.  *SMS Sys. Maint. Servs.,* 188 F.3d at 25 ("[A]n expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession.").  Hartman's testimony is neither.

B.      Hartman's 30% Yardstick Ignores, And Is Inconsistent With, The Evidence Of Actual Expectations

In addition to the lack of any basis for Hartman's premise that payors expected AWP to exceed ASP by a reasonably predictable amount, there is no basis for his theory that the amount was 30%.  At his class certification deposition, Hartman testified that he intended to conduct surveys of payors to determine his expectation yardstick.  (Hartman Dep. Tr. 92, 187-88, 223, 229.)  In preparing his report on the merits, however, he did not conduct any surveys.  (*Id.* at 705-06.)

Instead, Hartman testified that he relied on depositions to derive his expectation yardstick.  Significantly, however, Hartman was unable to identify a single witness who

supported his yardstick of 30%.  (Hartman Dep. Tr. at 709-14, 785-87.)[20]  Indeed, after avoiding

the question for pages at his deposition, Hartman testified as follows:

> "Q.  I am looking for a name Dr. Hartman.  Can you identify by
> name any third-party payor who has testified in this case that they
> expected AWP to exceed ASP by a range that did not exceed 30
> percent?"
>
> [Objection omitted.]
>
> A.  I would have to go back and look at that – those materials.  I
> can't come up with a name right now."

(*Id*. at 787.)

In fact, there is evidence that payors, including Medicare, were aware of spreads

in excess of 30%.  In March 1997, Lee Newcomer, the Chief Medical Officer of United

Healthcare, gave a speech in which he stated that employers were asking him about what United

was doing about oncologists who were making too much money on drugs, and he observed: "The

markups for chemotherapy medicines are getting to be so high that the public is beginning to

react."  (Cancer Economics, *Insurers Are Eliminating Markup on Cancer Drugs, Official Says* at

3 (March 1997).)[21]  Newcomer's speech was preceded by an article that appeared in a June 1996

issue of Barron's which depicted spreads in excess of 700%.  (Bill Alpert, *Hooked on Drugs*

(June 10, 1996).)[22]  Similarly, in October 1996, Ven-A-Care sent a letter to the head of the

Health Care Financing Administration ("HCFA") enclosing two volumes of exhibits and stating

that "we found that Medicare's reimbursement was excessive and in many cases provided profit

margins of more than 500% and, in some instances, more than 1000%."  (Z. Bentley and T.

---

[20] Hartman testified that the deposition testimony he relied on is identified in Attachment K to his report.  (Hartman Dep. Tr. 707.)  None of that testimony even mentions, much less supports, an expectation that the spread between AWP and ASP was 30%.

[21] Edwards Decl. Exh. 24.

[22] Edwards Decl. Exh. 22.

Jones to B. Vladeck at 3 (Oct. 2, 1996).)[23]  The exhibits depict spreads that are consistent with, and in some cases greater than, the spreads found by Hartman.[24]

When he was asked how he reconciled this evidence with the statement in his report that payors were not aware of "mega-spreads," Hartman was forced to concede:

> "I cannot make the statement that no one, no payor, knew that
> there weren't mega-spreads.  I, you know, I don't know whether
> they did or they didn't."

(Hartman Dep. Tr. 796.)  Hartman acknowledged that "Lee Newcomer understood the allegations in this matter and was making his voice heard . . . . " (*Id.* at 798).  He also agreed that "there were cases that were [   ] brought to the attention of administrators within HCFA that this was a problem . . . . " (*Id.* at 816.)

Hartman nevertheless continued to adhere to his 30% expectation yardstick notwithstanding the evidence that the marketplace, including the government, was aware of spreads substantially in excess of 30%.  (Hartman Dep. Tr. 800-05.)  He had no explanation for the inconsistency between the evidence and his expectation yardstick other than the fact that payors had not changed their reimbursement rates notwithstanding knowledge of the spread.  (*Id.* at 800-01.)  When asked whether a payor who knew of mega-spreads could be deceived by mega-spreads, plaintiffs' counsel instructed him not to answer the question.  (*Id.* at 801-02.)

As is the case with the law, direct evidence of a proposition is always more probative than indirect evidence from an economic standpoint.  (McFadden Rpt. ¶¶ 46-48.)  Hartman's approach is to ignore direct evidence and substitute speculation instead.  (*Id.* ¶¶ 58, 83-87.)  Furthermore, his opinion is inconsistent with the evidence.  (*Id.* ¶ 59.)  That does not

---

[23] Edwards Decl. Exh. 23.
[24] Edwards Decl. Exh. 53.

satisfy *Daubert*.  *See Damon*, 87 F.3d at 1474 ("An expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation.").

        C.      <u>Hartman's Use Of Comparator Drugs Is Flawed</u>

        In his class certification deposition, Hartman said that he would compare (a) subject drugs during the class period to subject drugs prior to the class period and (b) subject drugs during the class period to non-subject drugs during the class period that were not tainted by the alleged fraud.  (Hartman Dep. Tr. 173, 176-77.)  If the spreads of comparator drugs were 30% or less, that would provide some support for Hartman's yardstick.  (*Id.* at 412.)  The key to that analysis, as both Dr. Berndt and the Court recognized, is to choose drugs that are truly comparable.  *In re Pharm. Indus. AWP Litig.*, 230 F.R.D. at 90.

        Contrary to what he promised during the class certification phase of the case, Hartman did not look at the pre-class period or examine comparable drugs that are not subject to this litigation.  (Hartman Dep. Tr. 987-88.)  Instead, he compared drugs that face competition with drugs that do not face competition.  (*Id.* at 969-70.)  Hartman contends that payors base their expectations of the spreads for drugs that *do* face competition on their knowledge of spreads for drugs that *do not*.  (*Id.* at 991-92.)

        Hartman's theory does not work unless payors do not know that competition causes spreads to increase.  Hartman concedes, however, that he has no basis for concluding that the marketplace did not know that competition causes discounts, which in turn cause spreads to increase.  (Hartman Dep. Tr. 972-73, 995.)  In fact, there is extensive testimony that payors were aware that competition increases spreads.  (Cannon Dep. Tr. 35-36; Herbold Dep. Tr. 85-86; Kenney Dep. Tr. 12-13, 15; Killion Dep. Tr. 122, 126)[25]  In addition, Dr. Ernst R. Berndt

---

[25] Edwards Decl. Exhs. 39, 45-47.

expressed the view that it is common knowledge that multi-source drugs have larger spreads than single-source drugs.  (Berndt Rpt. ¶ 52.)[26]

        At his deposition, Hartman had no explanation for this evidence.  (Hartman Dep. Tr. 998-1000, 1005.)  He simply continued to maintain that he could determine expectations by comparing drugs that do not face competition with drugs that do – even though the marketplace understands that it is competition that causes manufacturers to offer discounts that create spreads. (MedPAC Report at 156.)  There is no valid scientific basis for Hartman's testimony. (McFadden Rpt. ¶ 83.)

       D.     The Reports On Which Hartman Relies Actually Contradict What He Says

        As noted above, Hartman relies on the 1992 OIG Report for his 30% expectation yardstick (Hartman 12/15/05 Rpt. ¶ 22(b)), but he was unable to explain at his deposition how he derived that yardstick from the 1992 OIG Report.  (Hartman Dep. Tr. 962-64.)  In fact, that report includes spreads that exceed 400%.  (1992 OIG Report at App. III.)[27]  Hartman dismisses those spreads on the ground that they relate to multi-source drugs, which he claims were not "scrutinized or understood."  (Hartman Dep. Tr. 966.)  But Hartman was unable to articulate any basis for that assumption.  (*Id.* at 967-74.)

        Nor was Hartman able to reconcile his opinion that Medicare did not expect that spreads would exceed 30% with numerous other government reports depicting spreads significantly exceeding that amount.  (Hartman Dep. Tr. 804-06, 951-52.)  For example, the OIG issued a report in 1997 depicting spreads of up to 1000%.  (OIG, *Excessive Medicare Payments*

---

[26] Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris, dated February 9, 2005 ("Berndt Rpt.") (Edwards Decl. Exh. 16).
[27] The report depicts invoice costs that are up to 83% below AWP.  Converted to Hartman's methodology, which is to express spreads as a percentage above ASP, that translates into a number in excess of 400%.  (Hartman Dep. Tr. 967-69.)

*for Prescription Drugs*, at 8 (Dec. 1997).)[28]  OIG also issued reports in 1998 and 2001

identifying spreads in excess of 1000% for Medicare reimbursement compared to the prices that

the Veteran's Administration paid.  (OIG, *Comparing Drug Reimbursement: Medicare and the*

*Department of Veterans Affairs* at ii (Nov. 1998); OIG, *Medicare Reimbursement of Prescription*

*Drugs*, at ii (Jan. 2001).)[29]  In 1997, Congress issued a report stating that the spreads for some

drugs ranged from 20% to 1000%.  (Report of Budget Committee at 1354 (June 24, 1997).)[30]

The Ven-A-Care letter, sent to the head of HCFA in October 1996, is consistent with these

reports.[31]

   Reviewing this evidence, McFadden concluded that, assuming these government

reports in fact reflect payor expectations – a proposition Hartman has not demonstrated – they

reveal that spreads exceeded 30%.  (McFadden Rpt. ¶¶ 64-67.)  Bell also observed that

government publications and policy debates before and during the class period revealed the

prevalence of price concessions for both self-administered and physician-administered drugs.

(Bell Rpt. ¶ 90.)  In addition, Gaier concluded that the various OIG reports, legislative history

and HCFA correspondence demonstrated that the federal government chose to base Medicare

reimbursement on AWP with extensive knowledge of the widely varying differences between

AWP and provider acquisition costs.  (Gaier Rpt. ¶¶ 15-21.)

   Hartman cannot be permitted to testify under these circumstances.  "Where an

expert's opinion 'is based on data, a methodology, or studies that are simply inadequate to

support the conclusions reached', or assumptions 'that present a complete break' with the

evidence in the record, it should be excluded, and 'nothing … requires a district court to admit

---

[28] Edwards Decl. Exh. 26.

[29] Edwards Decl. Exhs. 28, 32.

[30] Edwards Decl. Exh. 25.

[31] Edwards Decl. Exh. 23.

opinion evidence that is connected to existing data only by the ipse dixit of the expert.'" *Country Road Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 330-31 (S.D.N.Y. 2003) (internal citations omitted).

      E.      <u>Hartman's Revealed Preference Theory Is Flawed</u>

      As noted above, Hartman was forced to concede at his deposition that payors, including Medicare, knew that spreads exceeded 30%. (Hartman Dep. Tr. 796, 811, 815-16.) He nevertheless continued to maintain that payors such as Medicare were deceived because they did not change their reimbursement rates. (*Id.* at 790, 792-93, 800-01, 804-06, 811.) When asked to explain how a payor could be deceived if it knows the truth, Hartman fell back on his theory of revealed preferences. (*Id.* at 733, 850-51, 935-36, 945, 972-74, 1006.)

      According to Hartman, unless and until payors change their reimbursement rates to reflect acquisition costs (he used AWP-70% as an example), he will continue to conclude that they were deceived. (Hartman Dep. Tr. 788, 985.) Even if payors are aware of 1000% spreads, according to Hartman, their injury continues because their reimbursement formulas are "hardwired." (*Id.* at 956, 978, 1100.) He cannot explain how he gets from contractual reimbursement rates to a 30% expectation (as opposed to some other amount); nor can he explain how his theory works after 1997, when Congress changed the reimbursement rate to 95% of AWP *after* it became aware of 1000% spreads. (*Id.* at 687-89, 700, 806-07, 978-79.)

      At bottom, Hartman's theory of revealed preferences assumes that payors wanted to limit provider profits to 30% per drug. (Hartman Dep. Tr. 825.) As he admitted at his deposition, however, he has no evidence to support that assumption. (*Id.* at 828.) In fact, the evidence is overwhelming that it was the "revealed preference" of payors -- including Medicare -- not to limit provider profits to 30% per drug.

There are a number reasons for that.  First, a number of payors testified that they did not care about the profits on individual drugs; all they cared about was the overall amount that they paid for drugs and services on an annual basis.  (Baederstadt Dep. Tr. 76; Dragalin Dep. Tr. 15-16; Farias Dep Tr. 152; Herbold Dep. Tr. 74-75.)[32]  Hartman had no answer for this type of testimony other than to question the witnesses' credentials.  (Hartman Dep. Tr. 1061-62.)

Second, payors, including Medicare, understood that there were interdependencies between drugs and services and the profits on drugs were being used to subsidize underpayments on services.  (56 Fed. Reg. 59524 (Nov. 25, 1991); N. Min DeParle to Congress at 2 (Sept. 8, 2000); 146 Cong. Rec. at S8022 (Sept. 5, 2000); Testimony of T. Scully, Senate Hearing Tr. 12 (March 2002).)[33]  Hartman conceded that such interdependencies exist. (Hartman Dep. Tr. 1058.)  He nevertheless testified that he did not take them into account because he was instructed not to do so by counsel.  (*Id.* at 1055, 1063, 1065-66.)[34]

Third, there is evidence that many payors, including Medicare, affirmatively use the profitability on drugs to induce providers to join their networks and undertake the investment and risk of setting up their own clinics to administer drugs outside of the hospital.  (56 Fed. Reg 59524 ("Without adequate compensation . . .  many physicians would perform the service in hospital outpatient departments at substantially higher costs."); GAO, *Medicare Reimbursement Policies Can Influence the Setting and Cost of Chemotherapy* at 4, 5 (July 1992); Eddy Dep. Tr. 74; Goldman Dep. Tr. 58-59; Herbold Dep. Tr. 75-76; Morris Dep. Tr. 68-69.)[35]  Hartman acknowledged at his deposition that forming a provider network and inducing providers to

---

[32] Edwards Decl. Exhs. 37, 40, 42, 45.

[33] Edwards Decl. Exhs. 19, 31, 30, 34.  *See also* Bell Rpt. ¶¶ 41, 45; Gaier Rpt. ¶¶ 35-47; Morton Rpt. ¶ 75.

[34] Somewhat inconsistently, he testified that he could not analyze how much of the spread is attributable to provider market power without considering the interdependencies between drugs and other aspects of payor contracts with providers.  (Hartman Dep. Tr. 873.)

[35] Edwards Decl. Exhs. 19-20, 41, 43, 45, 49.

administer drugs outside of the hospital could be important payor objectives.  (Hartman Dep. Tr. 979, 1057, 1205-06.)  He conceded, however, that he did not consider them in his analysis.  (*Id.* at 979-80.)

The proposition that reimbursement rates alone do not indicate revealed preferences is perhaps best illustrated by Blue Cross/Blue Shield of Massachusetts ("BCBS/MA"), the Class 2 representative.  After ASPs became publicly available as a result of the Medicare Modernization Act ("MMA"), BCBS/MA considered whether to abandon its AWP-based reimbursement approach.  (Killion Dep. Tr. 87-89; Mulrey Dep. Tr. 71-73.)[36] BCBS/MA decided not to change because it was using the profit on drugs to attract a provider network and subsidize low payments on services.  (*Id.*)

Hartman acknowledged that BCBS/MA decided to continue to reimburse providers for drugs based on AWP -- even though ASPs were available -- because it wanted to use the profit on drugs to maintain its network and cross-subsidize payment on services. (Hartman Dep. Tr. 833-36, 848, 853-54, 1055, 1058.)  Moreover, he was unable to cite to any evidence to refute the hypothesis that payors, including Medicare, were fully informed but their revealed preference was to permit providers to earn profits on the spreads because they had other objectives -- such as cross-subsidization, attracting providers to their networks and encouraging administration outside of the hospital setting.  (*Id.* at 979-80.)  Nevertheless, Hartman stubbornly continued to maintain his position that expectations with respect to spreads can be determined from reimbursement rates.

McFadden concludes that Hartman's revealed preference theory is "incorrect." (McFadden Rpt. ¶ 74.)  At most, it reveals only Hartman's personal expectation, not the

---

[36] Edwards Decl. Exhs. 47, 50.

expectations of payors.  (McFadden Rpt. ¶ 75-76.)  Furthermore, as Hartman himself has acknowledged, reimbursement rates reflect other factors such as the relative bargaining power between payors and physicians, as well as the payors' interest in keeping providers in their networks.  (*Id.* ¶¶ 77-80.)

Expert testimony must be based on more than subjective belief or unsupported speculation.  *Daubert*, 509 U.S. at 590.  It cannot be based on a theory concocted for purposes of litigation.  *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (on remand).  To satisfy *Daubert*, the testimony must flow naturally from the expert's research; it is not reliable if it is nothing more than a theory developed for a particular case.  *Wagner v. Hesston Corp.*, ___ F.3d ___, No. 05-3232, 2006 WL 1549004, at *2 (8th Cir. June 8, 2006).

F.   Hartman's Expectation Yardstick Is Nothing More Than An Unsupported Assumption

At his deposition, Hartman was repeatedly asked if there was any support for his 30% expectation yardstick.  He was completely unable to identify a single payor who supports his theory.  (Hartman Dep. Tr. 785-87.)  Nor was he able to identify any economic literature that discusses expectation yardsticks.  (*Id.* at 981-84.)

At the end of the day, even though he purports to express an opinion on liability, Hartman was forced to concede that he is not in a position to express an opinion on whether any payor has actually been deceived.  (Hartman Dep. Tr. 813.)  That includes the federal government as well as private payors.  (*Id.* at 940-41.)  In Hartman's words:

> "Do I know day to day what HCFA knew?  Was I present in HCFA meetings and have I -- have I reviewed all the memos of HCFA and everything else?  No, I have not.  I have not done that."

(*Id.* at 937.)

At one point in his deposition, Hartman admitted that he is not offering an opinion about deception.  (Hartman Dep. Tr. 846) ("I don't know where in my report I talk about deception.")  In his view, "whether [payors] are being deceived or not is irrelevant."  (*Id.* at 813.)  The basis for any opinion on liability that Hartman may give is simply a comparison of actual spreads with yardstick spreads.  (*Id.* at 938.)  He has invented a yardstick out of whole cloth and has rendered an opinion about "certain results that exceed thresholds of liability *that I have been asked to assume*."  (*Id.* at 842; emphasis added.)

McFadden has described Hartman's approach as a "*per se*" theory of deception.  (McFadden Rpt. ¶ 93.)  Hartman relies on flawed assumptions to create a series of yardsticks which he then uses to measure the spreads.  (*Id.* ¶ 59.)  It does not provide a reliable basis for determining deception or fraud.  (*Id.* ¶¶ 37-48.)

III.   HARTMAN'S SUPPLEMENTAL REPORT SHOULD BE STRICKEN.

A.   There Is No Basis For Hartman's Zero By Statute Theory

As noted above, Hartman's supplemental report is based on the assumption that the only permissible spread under Medicare was zero -- what he calls his "zero by statute" theory.  (Hartman Dep. Tr. 876-77, 884.)  Hartman admits that he is not an expert on Medicare and he has no expertise with respect to statutory interpretation.  (*Id.* 879, 897, 918, 924-26, 930-31, 1387.)  He prepared a supplemental report based on his "zero by statute" assumption because that is what counsel asked him to do.  (*Id.* at 647, 656, 1236-37, 1249, 1267.)

It is well-established that an expert opinion based on assumptions provided by counsel does not pass muster under *Daubert*.  For example, in *In re Brand Name Prescription Drugs Antitrust Litig.,* No. 94 C 89, MDL 997, 1999 WL 33889 (N.D. Ill. Jan. 19, 1999), *aff'd in part, vacated in part,* 186 F.3d 781 (7th Cir. 1999), the plaintiffs proffered a Nobel Prize winner as their expert.  After conducting a *Daubert* hearing, however, the Court excluded the testimony

on the ground that the expert's opinions were not based on any evidence and, in fact, were inconsistent with much of the evidence.  In the court's words, the expert "abdicated entirely the concept of the independence of expert witnesses and simply became the sponsor for the Class Plaintiff's theory of the case."  1999 WL 33889 at *11.[37]

In *Jones v. Harris Associates*, No. 04 C 8305, 2006 WL 1005100, at *3 (N.D. Ill. Apr. 14, 2006), the court excluded testimony that was based on assumptions provided by counsel on the ground that it "was not based on a reliable methodology within [the expert's] purported expertise."  Similarly, in *American Booksellers Ass'n., Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001), the court excluded an expert's testimony that was based on assumptions provided by counsel on the ground that it "contains entirely too many assumptions and simplifications that are not supported by real-world evidence."  Quoting *Kumho Tire*, 526 U.S. at 157, the court noted that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Id.*

Here, Hartman's supplemental report is based solely on assumptions provided by counsel.  Indeed, he candidly admitted that it is not an economic analysis.  (Hartman Dep. Tr. 1245.)  An economic analysis would not conclude that AWP should equal ASP "[b]ecause the industry knows that it doesn't."  (*Id*. at 669-70.)

B.    Hartman's ASP Definition Is Wrong

The whole point of Hartman's spread analysis is to determine the expectation that payors, including Medicare, had with respect to the difference between AWP and the acquisition costs of providers who were reimbursed under Medicare Part B.  (Hartman Dep. Tr. 658-59.)  By

---

[37] On appeal, Judge Posner noted that he would not have reached this issue because the expert's opinion was irrelevant.  186 F.3d at 786.

defining ASP in his supplemental report to include the acquisition costs of providers who were not reimbursed under Medicare Part B, Hartman has completely subverted the analysis.  As he admitted at his deposition, the primary effect of this change is to make the spreads larger.  (*Id.* at 1301.)

This change, again, was prompted by counsel.  (Hartman Dep. Tr. 647.)  It was not based on any new information that Hartman did not have when he wrote the original report.  (*Id.* at 648.)  Furthermore, Hartman continues to stand by his original report as an appropriate analysis.  (*Id.* at 665.)

The definition of ASP that Hartman employs in his supplemental report is inconsistent with the definition of ASP in his initial report.  It is not based on any thing other than a request by counsel.  It should be excluded under *Daubert*.

## IV.   HARTMAN'S DAMAGE THEORY IS FLAWED.[38]

### A.   There Is No Support For Hartman's Zero Damages Yardstick

The measure of damages in a consumer protection case is the difference between what the plaintiffs paid and what they would have paid in the absence of the alleged deception.  *Aspinell v. Philip Morris Cos.*, 442 Mass. 381, 399, 813 N.E.2d 476, 490 (2004).  As noted above, for Classes 1 and 2, Hartman uses a zero damages yardstick, even though his liability yardstick is 30%.  (Hartman 12/15/05 Rpt. ¶ 63.)  In other words, even though Hartman concedes that Medicare expected a spread between AWP and ASP of at least 30%, he nevertheless calculates damages based on the assumption that AWP should have equaled ASP.  (Hartman Dep. Tr. 661, 1303-04.)

---

[38] CMO 17 called for the parties to file expert reports on liability only.  Nevertheless, Hartman's expert report addresses damages as well as liability, and defendants' experts have addressed Hartman's damage analysis without providing an alternative calculation on behalf of defendants.  Even though it appears that the initial trials for Classes 1 and 2 will not include damages, this motion addresses Hartman's damage theory insofar as it relates to Classes 1 and 2.

There is no basis for Hartman's bifurcated approach to liability and damages.  In fact, the approaches are inconsistent with each other.  If Medicare expected a spread between AWP and ASP of at least 30%, there is no basis for believing that the reimbursement rates governing plaintiffs' payments would have been based on any amount less than 30% above ASP in the absence of any fraud – what courts sometimes refer to as the "but for" world.  *See Coastal Fuels*, 175 F.3d at 24 n.3.  To put it differently, those spreads that exceeded 30% in the real world would have been 30% in the but for world.  There is no economic basis for assuming they would have been zero.  (McFadden Rpt. ¶ 89.)

Indeed, Hartman conceded at his deposition that there would be spreads in the but for world.  (Hartman Dep. Tr. 1099.)  Nevertheless, he has not done anything to net out those spreads:

> "I haven't done anything like that.  I haven't netted out the 30%.  I haven't done anything for – for Medicare.  I've taken that statute as it stands."

(*Id.* at 1101.)  His explanation:  "I haven't been asked to model that or give any credit for – for that." (*Id.* at 1100.)

B.     There Is No Proof That Payments Would Be Any Different In The But For World

Even if a jury were to agree with Hartman that there is liability for spreads above 30% because Medicare did not expect that spreads would exceed that amount, it does not follow that damages can be calculated based on the extent to which spreads exceeded 30%.  As noted above, Hartman has conceded that there is an interdependency between the reimbursement for drugs and the reimbursement for services, and it is common knowledge that throughout the class period the high reimbursement rates for drugs were used to cross-subsidize low reimbursement rates for services.  (Hartman Dep. Tr. 873.)  Indeed, HCFA has repeatedly acknowledged that reimbursement for services was "inadequate" during that time, and it increased reimbursement

for services when reimbursement for drugs was decreased under the MMA.  (N. Min DeParle to Congress at 2 (Sept. 8, 2000); Gaier Rpt. ¶¶ 37-46.)[39]

Since there is a 20% co-payment for services as well as drugs under Medicare Part B,[40] any analysis of what plaintiffs would have paid in the but for world must account for the increase in service reimbursement that would have occurred if drug reimbursement had been limited to 30% above ASP.  (Gaier Rpt. ¶ 47.)  Hartman has not considered that.  (Hartman Dep. Tr. 1063.)  For that reason, his damage analysis is flawed.

Furthermore, there is every reason to believe that drug prices generally would be higher in the but for world.  There are several reasons for this.  First, if spreads were limited to 30%, it would be relatively easy for the marketplace to determine average transaction prices, and it is a well-known economic phenomenon that if average transaction prices are publicly known, there will be less discounting.  (Morton Rpt. ¶ 92, 155, 180-89.)  Second, if spreads are limited to 30%, then the most effective way for manufacturers to compete on the basis of price would be to raise them -- because 30% (which represents the provider's profit) on a larger number is greater than 30% on a smaller number.  (McFadden Rpt. ¶ 106.)[41]

Hartman did not take any of this into consideration in his damage analysis. (Hartman Dep. Tr. 1063.)  For this reason, his analysis is flawed.  An expert's damage analysis, to get to the jury, must take into account all factors that would have affected prices in the but for world.  *See*, *e.g., Barnes & Noble*, 135 F. Supp. 2d at 1038, 1040-42.

---

[39] At his deposition, Hartman testified that he was not even aware that reimbursement for services had been increased under the MMA.  (Hartman Dep. Tr. 1064-65.)

[40] Haegele Rpt. ¶ 51.

[41] If the regime of zero spreads envisioned by Hartman's supplemental report were a reality, then prices would skyrocket because manufacturers would have no incentive to offer discounts to providers.  A physician who is reimbursed at cost will be relatively indifferent as to whether the price of the drug is $10 or $100.  (*See* MedPAC Report at 163.)

C.      Hartman Inflates Damages In Various Other Ways

It is well known that, in 20% to 30% of cases, the doctor does not collect a co-payment.  (Bell Rpt. ¶ 152.)  In addition, some doctors may charge an amount that is lower than AWP.[42]  Furthermore, if there is a flat co-payment, as would be the case with Medicare + Choice, there is no basis for recovery because the payment is not based on AWP.  (*Id.* ¶ 151.)  Moreover, Hartman bases his damage calculation on a class that includes 50 states even though the Court has excluded 12 states from Class 1.  (*Id.* ¶ 156.)

Hartman has not taken any of this into account in his damage analysis.  (Hartman Dep. Tr. 1089.)  He claims that the impact would be small, but he has not articulated any basis for that claim.  (*Id.*)  As noted above, expert testimony cannot be based on the mere *ipse dixit* of the expert.  *Kumho*, 526 U.S. at 157.

D.      Individual Company Issues

In some cases, Hartman had to make assumptions to account for missing data. Instead of making conservative assumptions, however, he made assumptions that unrealistically inflate the amount of damages.  For example, Hartman does not have data relating to 1991 and 1992 for the BMS drug Vepesid because BMS no longer stores that data in accessible form.  He compensates for that by using 1993 data and extrapolating backwards.  Prior to 1993, however, Vepesid was protected by a patent and did not face therapeutic competition.  Thus, faced with a need to make an assumption to account for missing data, Hartman made an assumption that inflates the damages and is inconsistent with the facts.  Hartman acknowledged at his deposition that this approach could artificially inflate the amount of damages.  (Hartman Dep. Tr. 1105.)

---

[42] From 1999-2004, the reimbursement rate was the *lower* of the doctor's charge or 95% of AWP. 42 C.F.R. § 405.517 (Edwards Decl. Exh. 27).

Furthermore, by his own admission, Hartman does not know whether his damages calculations with respect to two Johnson & Johnson drugs at issue are correct.  The Johnson & Johnson Defendants submitted a detailed expert declaration in support of their motion for summary judgment.  (Declaration of Jayson S. Dukes in Support of the Johnson & Johnson Defendants' Motion for Summary Judgment as to Class 1 and Class 2, Corrected.)  Johnson & Johnson's expert showed that Hartman's ASP calculations for Procrit and Remicade were incorrect, and that Hartman's calculations systematically overstated the spread between ASP and AWP.

In response, Hartman claimed that he needed "more and better data" before the could venture "an opinion concerning the correctness or incorrectness of [Johnson & Johnson's expert's] assertions regarding the J&J data."  (Hartman Opp. Decl. ¶ 25.a.)  Thus, in Johnson & Johnson's case, Hartman's damages estimates do not even qualify as his "opinion," let alone an opinion grounded on a reliable and scientifically valid evidentiary foundation.

There are additional flaws in Hartman's damage analysis, but it is not practical to address them here.  If the Court grants this motion, it is clear that Hartman's damage analysis would have to be completely redone.  If the Court is willing to permit plaintiffs to submit a new damage analysis under those circumstances, defendants will respectfully request an opportunity to address that analysis if and when it is proffered.

Conclusion

For the foregoing reasons, Hartman should not be permitted to testify in any trial of Class 1 and Class 2 claims.

Dated:   Boston, Massachusetts
         June 16, 2006

                                        Respectfully Submitted,


                                        By:   /s/ Thomas E. Dwyer (BBO No. 139660)
                                              Thomas E. Dwyer (BBO No. 139660)
                                              Jacob T. Elberg (BBO No. 657469)
                                              **DWYER & COLLORA, LLP**
                                              600 Atlantic Avenue
                                              Boston, MA  02210
                                              Tel: (617) 371-1000
                                              Fax: (617) 371-1037
                                              tdwyer@dwyercollora.com
                                              jelberg@dwyercollora.com


                                              Steven M. Edwards (SE 2773)
                                              Lyndon M. Tretter ((LT 4031)
                                              Admitted *pro hac vice*
                                              **HOGAN & HARTSON LLP**
                                              875 Third Avenue
                                              New York, NY  10022
                                              Tel: (212) 918- 3640

                                        Attorneys  for  Defendant  Bristol-Myers  Squibb
                                        Company



**CERTIFICATE OF SERVICE**

I certify that on June 16, 2006 a true and correct copy of the forgoing document was served on all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.


                                              /s/ Lyndon M. Tretter
                                              Lyndon M. Tretter