**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| _____ | ) | |
| IN RE PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION NO. 01-CV-12257-PBS |
| _____ | ) | |
| | ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO | ) | |
| ALL ACTIONS | ) | |
| _____ | ) | |

**ASTRAZENECA PHARMACEUTICALS LP'S MEMORANDUM REGARDING
FORMS AND MANNER OF NOTICE PURSUANT TO
THE COURT'S REQUEST AT THE JUNE 5, 2006 HEARING**

Pursuant to the Court's request at the June 5, 2006 hearing, AstraZeneca Pharmaceuticals LP ("AstraZeneca" or "Defendant") submits this memorandum on the scope and content of the class notice to be given in this matter.

Counsel for AstraZeneca, along with counsel for the other Track I Defendants, have met and conferred with counsel for Plaintiffs in an effort to narrow areas of disagreement. Much progress has been made to date, although some disagreements remain. In order to facilitate the Court's review of the forms of notice and the remaining areas of disagreement, we have attached as Exhibit 1[1] the forms of notices (if combined notices for all Defendants are used) in annotated form to highlight the remaining areas of difference and the alternative language suggestions of the parties. Because AstraZeneca, as well as the other Track 1 Defendants, continue to believe

---

[1] All exhibits referenced in support of this Memorandum are attached to the Declaration of Lucy Fowler submitted herewith.

that Defendant-specific notices are more appropriate and will better inform class members of their rights and obligations, AstraZeneca also submits forms of notices applicable to the AstraZeneca Classes. Those forms are attached as Exhibit 2 and, as explained below, AstraZeneca submits that an AstraZeneca-specific set of notices is necessary here in view of the nature of the classes certified and the unique user profile of the one AstraZeneca drug (Zoladex) that is scheduled to be tried shortly.

Set forth below are AstraZeneca's reasons for proposing its forms of notice to the Court for approval, as well as AstraZeneca's arguments as to why Plaintiffs' proposed forms of notice and notice program are deficient under Rule 23.

## I. THE UNDISPUTED LEGAL PRINCIPLES UNDERLYING NOTICE

On June 2, 2006, AstraZeneca submitted a memorandum summarizing basic legal principles underlying notice for Rule 23(b)(3) class actions. Plaintiffs have not and cannot dispute those governing legal principles. As shown below, these governing principles are not just abstractions, but can and should inform the actual content and manner of notice.

### A. Actual Notice is Required When Addresses Can Be Obtained

The names and addresses of the members of nationwide Medicare Part B classes are available from CMS. In the wake of the June 5 hearing, at the Court's directive, Plaintiffs sent a subpoena to CMS for this information. Plaintiffs' counsel has informed counsel for AstraZeneca and the other Track 1 Defendants that CMS is agreeable to providing the names and addresses of the Medicare recipients of Defendants' drugs. In light of this development, AstraZeneca believes that Plaintiffs now acknowledge that actual mail notice to the nationwide Medicare Part

B classes must occur.[2]  While long overdue, Plaintiffs' concession on this point was inevitable in light of Rule 23.  Indeed, the Court is charged with ensuring that absent class members receive the best notice practicable in order to protect their due process rights.  Under well-established Supreme Court precedent, this means that the Court must use actual, individual notice whenever class members' names and last known addresses can be obtained.  See e.g., Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173, 176 (1974); In re Nissan Motor Corporation Antitrust Litigation, 552 F.2d 1088 (5th Cir. 1977).  Publication notice is not a substitute for actual notice.  Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 315 (1950).

### B. Any Publication Notice Must Reach the Particular Class

To the extent that publication notice is used to supplement individual notice, the program must be designed to actually reach absent class members and inform them of their rights.  In evaluating a publication plan, the court should first consider the class of persons the notice is intended to reach.  E.g., West Virginia v. Chas. Pfizer & Co., 44 F.2d 1079, 1091 (2d Cir. 1971).  Here, there are separate classes for each Defendant manufacturer.  The separate AstraZeneca class involves only one drug (Zoladex) used in the Medicare demographic overwhelmingly to treat advanced prostate cancer.  Attached as Exhibit 8 is a Declaration of Greg Looney, the Brand Director for the Prostate Cancer Team at AstraZeneca, which sets forth the (undisputed) user profile for Zoladex.  Two of the three components of AstraZeneca absent Class 1 members are virtually all older men (at least 65) with advanced prostate cancer.  The ultimate test of

---

[2] At the June 5, 2006 hearing, Plaintiffs' counsel admitted that they had made no effort to contact CMS or attempt to identify the names and addresses of absent class members in this case.  Plaintiffs' expert, Katherine Kinsella, admitted at her deposition that, prior to proposing the notice plan in this case, neither she nor anyone at her firm undertook any effort to determine whether names and addresses of Class 1 members were obtainable or what steps it would take to obtain such information.  Exhibit 3 (Deposition of Katherine Kinsella ("Kinsella Dep.") at 38-41).

Plaintiffs' notice program is whether it is tailored to the group of persons it purports to reach. As discussed below, AstraZeneca is extremely concerned that Plaintiffs' proposed program is not sufficiently targeted to the users of Zoladex in Class 1.

### C. Content of Notice Must Be Fair, Balanced, and Straightforward

The notice to absent Class members comes not from the parties, but from the Court. Notice is intended to provide absent class members with the opportunity to exercise their due process rights and formulate an informed opinion about whether they wish to remain in the class and be bound by the outcome of the trial. Accordingly, this Court must evaluate the content of the notice to ensure that it is fair, balanced, accurate, neutral and straight-forward. E.g., Nissan, 552 F.2d at 1088; Payton v. Abbott Labs, 86 F.R.D. 351, 352 (D. Mass. 1980); Lamb v. United Sec. Life Co., 59 F.R.D. 25, 42 (S.D. Iowa 1972). Failing to provide an accurate and complete description of the lawsuit, who is a class member, and what the rights and obligations of class members are denies absent class members and AstraZeneca their rights. For the reasons explained below, AstraZeneca submits that, in certain respects, Plaintiffs' proposed publication notices do not satisfy the rigorous standard imposed by Rule 23 in this regard.

### II. PLAINTIFFS' CLASS 1 PROPOSED NOTICES

The two most basic goals of any notice program must be to: (1) reach class members; and (2) supply information sufficient for class members to make a decision regarding whether they wish to remain in the Class or not. Plaintiffs' proposed notice falls far short of both of these goals.

Contrary to the legal objectives of notice to which she referred in her prior writings and at her deposition, Plaintiffs' retained consultant on notice,[3] Katherine Kinsella, conceded that Plaintiffs' notice program was not the best way to reach absent class members, but rather, merely enough effort to reach what she felt might be "an adequate number of people."  Exhibit 3 (Kinsella Dep. at 73).  In fact, Kinsella testified that she may have exerted greater efforts to actually inform absent class members if this were a settlement notice, comparing this notice program to a much more extensive program she developed in one settlement notice program. Exhibit 3 (Id. at 71; see also id. at 78); Exhibit 4 (Katherine Kinsella, *Notification and Settlement Administration: Integrating Media and Direct Notice Through Third Parties* (2001)).

AstraZeneca disagrees with Ms. Kinsella's view of the importance of providing the "best notice practicable" in this case.  See e.g., Carlough v. Amchem Products Inc., 158 F.R.D. 314, 325 (E.D. Pa. 1993) ("the requirements of Rule 23(c)(2) are stricter than the requirements of Rule 23(e)").  This Court has repeatedly emphasized the importance of protecting the rights of absent class members.  The due process rights of absent class members require more than merely what Ms. Kinsella says are "adequate" efforts.

### A.     Plaintiffs' Publication Plan Is Not Targeted at AstraZeneca Class 1 Members

Plaintiffs' publication plan attempts to cover a widespread class—consisting of a dispersed population with various demographic characteristics—by building their notice campaign toward two extremely broad demographic categories— called Medicare Recipients

---

[3] The Federal Rules of Civil Procedure require "the best notice under the circumstances including individual notice to all members who can be identified through reasonable effort."  Exhibit 3 (Kinsella Dep. at 32-33); Exhibit 5 (Katherine Kinsella, Quantifying Notice Results in Class Actions, Class Action Litigation Report, Vol. 2, No. 14 (2001)).

and individuals who have taken any brand name or prescription drug.[4] While Plaintiffs tout a 83% reach within these two categories by utilizing the "most widely circulating publications" in the country, Exhibit 3 (Kinsella Dep. at 91-92), that figure is meaningless when it comes to the question this Court must answer before approving Plaintiffs' plan—what is the reach among Zoladex users?

Zoladex users within Class 1 are only a small percentage of the makeup of the broad targets Ms. Kinsella and the Plaintiffs have selected. Indeed, just 42.8% of the Medicare population Kinsella purports to target are even men; fewer still are men 65 years of age or more. Exhibit 9 (Kinsella Aff., Exhibit A at 13.) And just 19.8% of Kinsella's Branded/Generic Drug User target are 65 years of age or more; fewer still are men over 65 years old. Exhibit 9 (Id.) Thus, while an 83% reach may sound impressive, it is 83% of the wrong target. The correct target, as the attached Declaration of Mr. Looney reflects, is males over the age of 65. (Looney Decl. at ¶5.)

Kinsella has not performed any research to determine the reach of her program for the Zoladex class members. Exhibit 3 (Id. at 67-68). Nor has she provided any data on the reach of her program with respect to the male Medicare population over 65. Exhibit 3 (Id.) Accordingly,

---

[4] Kinsella premised the notice program on the indices that a third party (MRI) decided to call "Medicare Recipients" and "branded and generic drug users." These titles sound impressive. But when asked about these indices, Kinsella did not have specifics on how these were created, their accuracy, completeness, components, or mathematical or statistical accuracy. Exhibit 3 (Kinsella Dep. at 36-37). Therefore, for all the Court knows, a "Medicare Recipients" index may be 30%, or 50%, wrong, and the branded/generic drug user" index may track aspirin and cold remedy users. Unless there is a factual basis, from MRI, explaining what these indices are and other such fundamentals, this Court cannot rely on the mere title a third party gives to something to accept the giant assumption it is, and does, what the title might (or might not) reflect.

this Court has no basis to conclude that Plaintiffs' program provides the "best practicable" notice to the Class members whose trial is most imminent.

(1) Demographics

According to Plaintiffs' notice consultant, the most critical step in developing a publication notice program that will successfully reach absent class members is understanding the *target audience*.  See also Exhibit 6 (Katherine Kinsella, *The Ten Commandments of Class Action Notice*, 12 TOXICS L. REP. 488 (Sept. 24, 1997)).  The more specifically the target audience is defined, the more effectively one can tailor a media program that is likely to reach the target. Exhibit 6 (Id.)  At her deposition, however, Kinsella admitted that she made absolutely no effort to research the user profile of Zoladex or any other drug at issue in this litigation, despite the fact that she could have done so.  Exhibit 3 (Kinsella Dep. at 49, 64) Accordingly, she is unable to provide any opinion as to the likelihood that notice under her program will reach Zoladex users.  Exhibit 3 (Id. at 49)

In fact, Kinsella not only failed to research Zoladex, she designed the program under a false presumption about the typical Zoladex consumer.  She stated that Zoladex was a treatment for:

> [P]rostate, breast cancer and endometriosis, and what that tells me is that you have a breadth of potential age demographics here, you have two gender demographics here, that these are not necessarily drugs that affect a particular income level, particular household income level, et cetera . . .

Exhibit 3 (Id. at 55, 59).  This assumption about the Zoladex user, which underpins Kinsella's media plan, is inaccurate.  Indeed, the only document produced by Kinsella that indicates any attempt to determine the user profile for Zoladex indicates that the user profile is women.

Exhibit 7 (Feb. 14, 2006 Email from Tim McHugh to Katherine Kinsella).  While Kinsella ultimately backed away from this document as a non-final draft, Exhibit 3 (Kinsella Dep. at 59), she also conceded that she had (and has) no knowledge of the user profile for Zoladex.  Exhibit 3 (Id. at 59-60).  The truth is that, during the Class Period, over 90% of AstraZeneca's sales of Zoladex were for the treatment of prostate cancer.  Exhibit 8 (Declaration of Gregory Looney ("Looney Decl.") at ¶5).[5]  Thus, with respect to Class 1, Zoladex was overwhelmingly used by men over the age of 65.  Exhibit 8 (Id.)

Kinsella also admitted that she did not become aware that the Class included heirs or legal successors of Zoladex users until after she created the notice program.  Accordingly, nothing in the notice program is designed to reach this significant and growing component of AstraZeneca Class 1.  Exhibit 3 (Kinsella Dep. at 90).  On the spot, during her deposition, Kinsella suggested that the wide circulation of certain magazines she chose for other purposes would capture these people, but there is no support in the record for such an assertion, and Kinsella conceded that she had not studied the issue.  Exhibit 3 (Id. at 91-92).

        (2) Media Choices

Kinsella's media choices were thus driven by incorrect perceptions of the AstraZeneca Class 1 demographics.  Consequently, Plaintiffs have not offered any evidence of the reach of their publication plan for the Zoladex user profile, which consists predominately of elderly males.  Defendant's own analysis of Plaintiffs' program suggests that it is unlikely to reach a significant proportion of Zoladex Class members.

---

[5] Although Zoladex is currently indicated for treatment of endometriosis and advanced breast cancer, those indications were not approved until February 2, 1993 and December 18, 1995, respectively.  Exhibit 8 (Looney Decl. at ¶4).

First, many of the print publications in Kinsella's program are skewed toward a female readership. For instance, Better Homes & Gardens has a 79.1% female readership; People magazine has a 71% female readership; and Readers Digest has a 61% female readership. Exhibit 9 (Affidavit of Katherine Kinsella, Ex. A at 20); Exhibit 10 (Better Homes & Gardens MRI Profile); Exhibit 11 (National Geographic Audience Profile). The female focus is most likely the result of Plaintiffs' choice of target audience, as Kinsella's research indicates that Medicare Recipients are 57.2% female and Branded/Generic Drug Users are 59.2% female. Moreover, they reach, respectively, only 72.4 % and 19.8 % of persons over 65. Exhibit 9 (Kinsella Aff., Ex. A at 13). Unlike the demographics of the Plaintiffs' target audience, however, Zoladex users are overwhelmingly older (over 65) males. At her deposition, Kinsella admitted that while it was possible to provide reach and frequency figures for the male portion of her target audience, she had not done so. The heavily skewed female readership of many of the publications selected calls into question whether the media campaign is properly focused on the correct target – i.e., users of Zoladex under Medicare Part B. As the Looney Declaration demonstrates, this correct target is not women, but rather men 65 years of age and older. Exhibit 8 (Looney Decl. at ¶ 5).

Second, the media plan consists entirely of print publication, primarily contained in newspaper supplements. Even a layman's limited media knowledge would suggest that elderly individuals suffering from serious illness are unlikely to be heavy newspaper readers, let alone newspaper supplements.[6] Furthermore, Plaintiffs did not investigate the use of television,

---

[6] Furthermore, Kinsella equates the estimated reach of the newspaper supplements with that of the Newspapers themselves. However, a recent study conducted by MRI indicates that the actual readership of the
(…continued)

despite the fact that Kinsella had previously conducted research in another case which revealed that Medicare recipients were *heavy* television users.  Exhibit 3 (Kinsella Dep. at 71.)  In one case, Kinsella crafted a television based notification campaign because she concluded that "it is unlikely that the [Medicare] target audience would see a summary notice, for example, if placed in 200 newspapers nationwide."  Exhibit 3 (Id. at 69-70); Exhibit 4 (Kinsella, *Notification and Settlement Administration: Integrating Media and Direct Notice Through Third Parties*, at 5).  If print media is used exclusively, some effort should be made to use large font in the print notices in light of the advanced age of the target audience.  Exhibit 12 (Katherine Kinsella, *The Plain Language Toolkit for Class Action Notice*, CLASS ACTION LITIGATION REPORT, Vol. 3, No. 20 (2002).)

Third, of the 1,974 newspapers utilized in Plaintiffs' program, 321 newspapers are solely circulated in the 9 states previously excluded from this action.  Thus, any reliance on these publications to reach class members is entirely misplaced.

### B.     Content of Plaintiffs' Published Notice

The content of Plaintiffs' proposed publication notice for Class 1 fails to meet the constitutional requirements set forth in the controlling Supreme Court cases.  AstraZeneca has submitted its own proposed form of notice for AstraZeneca Class 1, which it submits adequately informs class members of the upcoming lawsuit in order to allow them to properly preserve their rights.  The major short-comings of Plaintiffs' publication notice are highlighted below and further reflected in Exhibits 1 and 2.

---

(continued…)
supplements is less than that of the carrier papers.  Exhibit 9 (Affidavit of Katherine Kinsella ("Kinsella Aff."), Exhibit A, p.23 Fn. 4).

(1) <u>Class Composition:  Who Is In Class 1</u>?

The most fundamental aspect of notice is that it is directed at people.  At the very least, notice must instruct a reader how he or she may determine whether he or she is even a member of the class.

- AstraZeneca Class 1 is presently composed of three different groups:  Part B beneficiaries who paid for Zoladex; successors to the legal rights of the foregoing, by state successor law ("heirs"); and persons who are under a "legal obligation."

- Plaintiffs' Class 1 published notice is not clear in this regard.

- There is no information in Plaintiffs' notice informing a reader what this means, how to determine the status of a successor, or what "legal obligation" means or how to go about determining whether the reader has a "legal obligation" and therefore will have "legal rights" affected.

- AstraZeneca's proposed notice suggests that a reader may be a member of a class based on state intestacy laws, suggesting that such a reader contact a lawyer to determine whether or not he or she may be a member of the class.

(2) <u>Description of the Case</u>

Class notice must provide a complete description of the case which includes an unbiased presentation of both the allegations and the defenses in order to allow class members to determine whether to remain in the class.  After discussions on this issue, it appears that the parties are close to agreement.[7]

(3) <u>Class Members' Rights Are Not Protected</u>

Because notice is intended to allow class members to exercise their due process rights it is vital that the notice fairly and clearly present class members with information sufficient to determine whether or not they are members of the class, apprise them of their options in neutral

---

[7] BMS and Plaintiffs have not reached agreement on the description of the case as it relates to the publication of AWPs.

terms, instruct them how to opt-out should they choose to do so, and fairly represent the method by which class counsel is to be compensated. Various additional deficiencies in Plaintiffs' proposed notices are remedied by Defendants' proposed notice, which uses the legal principles required by Rule 23 and fulfills class members' due process rights.  A few examples follow.

        a.    <u>Opt Out Rights</u>

- Plaintiffs' proposed notice lacks a clear, simple and efficient method for opting-out, putting the onus on the class member to determine the best method for doing so and creating hurdles for a class member who wishes to exercise this right.

- AstraZeneca's proposed notice provides an easy-to-use and standardized opt-out form, allowing a convenient method for a class member to opt-out should he so wish.  Absent an opt-out form in both the published and actual notices, no one will know which of the <u>three</u> separate Class 1 classes the person excluded him- or herself from.

        b.    <u>Drug Specific Notice</u>

- Plaintiffs' proposed notice applies to all subject drugs, rather than Zoladex specifically, resulting in a confusing notice which may not properly alert class members that they have rights at stake. By lumping all the drugs into a single notice, class members may be misled and fail to realize that liability as to each Defendant and for each drug will be based on entirely separate trials and resolution of issues by the Court. The only way class members could learn that separate trials will be held for different drugs is by seeking out more information. <u>See</u> Exhibit 3 (Kinsella Dep. at 138) ("they can make that determination by asking questions.  They have complete ability to call and ask that question").  Further, Plaintiffs have no evidentiary basis for their claim that there is significant overlap in usage of the drugs involved in this case.

- AstraZeneca's proposed notice focuses solely on Zoladex users, ensuring that the target class members realize their rights are affected by the lawsuit.

**III.   Additional Important Issues Related To Notifying The Consumer Classes**

    **A.**    **The Non-Payors in Class 1**

The scope and content of notice to AstraZeneca Class 1 repeatedly focuses on an oddity: the Class 1 is said to include persons who allegedly overpaid for Zoladex allegedly caused by "inflated AWP" for Zoladex, and paradoxically, those who paid nothing for Zoladex with no nexus to "inflated AWP."

These two components of Class 1 result from the Class Certification Order entered on January 30, 2006, which includes in Class 1 both Medicare Part B beneficiaries who paid their doctors for Zoladex and those who had <u>not</u> <u>paid</u> but who "incurred an obligation. . . to make a co-payment based on AWP for" Zoladex.[8] (Class Certification Order, January 30, 2006 at 1-2).

The inclusion of the Non-Payors in the Class 1 definition suggests that the Medicare statute obligated Part B beneficiaries to make the "20% co-payment," and that obligation would cease only when a federal statute of limitations had run. As shown below, that is not the case and, accordingly, AstraZeneca submits that any notice to the Class must clarify this issue, and make plain that the Court has not determined that Non-Payors have any obligation to make payments under federal law.

The Medicare statute is devoid of any provision that requires or creates a legal obligation for a beneficiary to make a "co-payment" for a Part B drug. Rather, the statute speaks in terms of payments the Medicare Trust Fund will make to the provider for a Part B drug or biological

---

[8] The issue of Medicare Part B beneficiaries who had <u>not</u> <u>paid</u> their doctors for Zoladex ("Non-Payors") was not raised by the pleading and was not the subject of Rule 23 briefing or this Court's certification decision. Rather, the issue only arose without any notice, factual support or legal justification 11 days earlier. Plaintiffs' counsel asserted at a hearing that "many" Part B beneficiaries had <u>not</u> been billed by their doctors for covered Part B drugs, or had been billed but did not pay their doctors. (January 19, 2006 Hearing at 64). This Court then expressed the view that the Non-Payors be included in Class 1; the Court asked what the federal statute of limitations on that obligation was (plaintiffs' counsel did not respond) and then implied that Non-Payors would be in Class 1 until the statute of limitations on their liability had run. (<u>Id</u>. at 64-65).

13

and, in turn, the provider's right to bill the beneficiary. Indeed, the statute states only that a provider may charge a beneficiary up to 20% of the provider's charges for a Part B drug. See 2 U.S.C.§ 1395cc(a)(2)(A) (provider of services may charge such individual or other person… an amount equal to 20 per centum of the reasonable charges for such items and services (not in excess of 20 per centum of the reasonable charges for such items and services by such provider) for which payment is made under part B of this subchapter").[9]

Congress may have assumed that doctors, acting in their economic self-interest, would use the permissive authority to bill Part B beneficiaries the maximum amount (20%) of the doctor's charge for a Part B drug such as Zoladex. But the Medicare Act does not even require doctors (or other providers) to bill beneficiaries for anything. The federal law does not require, or impose any obligation on, Medicare Part B beneficiaries to make any payment (much less a "20% co-payment") for Part B drugs. Because the federal statute does not impose any obligation on a beneficiary to make any "co-payment," it contains no statute of limitations dictating when the Part B beneficiary's (non-existent) obligation of co-payment ends.[10]

---

[9] See e.g., 42 U.S.C.S § 1395l(a)(1) (A) ("An organization which provides medical and other health services… on a prepayment basis (and either is sponsored by a union or employer, or does not provide, or arrange for the provision of, any inpatient hospital services) may elect to be paid 80 percent of the reasonable cost of services … if the organization undertakes to charge such individuals no more than 20 percent of such reasonable cost ); 42 U.S.C.S § 1395l(a)(1)(S) ("with respect to drugs and biologicals… the amounts paid shall be 80 percent of the lesser of the actual charge or the payment amount established in [42 U.S.C.S. § 1395u(o)]); 42 U.S.C.S §1395k(a) (sets forth the scope of benefits and includes entitlements to have payments made on individuals' behalf as set forth by the statute, but includes no language discussing the beneficiary's co-payment responsibility).

[10] There are many practical and understandable reasons why a doctor may choose not to bill, or to bill but not try to collect, an amount from a patient for Zoladex. Simple humanity and compassion for not "well to do," let alone seemingly indigent, patients (who were both elderly and battling advanced cancer) could well motivate a doctor to forego the right under Medicare to bill the patient up to the permitted 20%. Of course, less-altruistic rationales may similarly underlie a doctor's conscious decision to refrain from collecting what federal law permitted from a Part B patient. For example, if the doctor bills an amount to the patient but the patient does not pay the doctor, that amount becomes bad-debt loss for tax purposes that the doctor can write off for tax-purposes. 47 Fed. (…continued)

14

### B. Additional Content Must Still Be Developed and Reviewed

Plaintiffs have failed to develop the AWP Website and Toll Free Hotline that will accompany the notice and provide information to class members.  In order to be fair and measured, as Plaintiffs' expert agreed, not only must that content be developed prior to notice, but those materials should be vetted by the Court and the parties prior to their usage.  Exhibit 3 (Kinsella Dep. at 156 ("I think that the materials that are used should be viewed by the court and by all parties.")).  To date Plaintiffs have failed to make Defendants privy to such information.  Thus, Defendants lack information sufficient to agree to Plaintiffs' proposed inclusion of such Toll Free Hotlines and Websites in the notice.

---

(continued…)

Reg. at 6568.  Even if a doctor did bill the Part B patient and wanted to collect, the doctor may refrain from suing, in consideration of his reputation and his competition (being known or talked of as an uncaring oncologist who sues cancer patients would help neither), let alone as the expense and how such claims would fare in small claims court.

### IV.     PLAINTIFFS' CLASS 2 PROPOSED NOTICES

Plaintiffs' proposed notices for the Third Party Payors suffer from deficiencies similar to the notice proposals addressed to consumers. In addition, two unique issues arise with respect to Plaintiffs' proposed notice to the TPP class members. First, Plaintiffs purport to obtain the names and addresses of TPP Class Members through a service called Complete Claims Solutions ("CCS"). Exhibit 3 (Kinsella Dep. at 177). While Kinsella discussed CCS in her affidavit and her deposition, the record on the propriety, accuracy and nature of this service remains scant. See e.g., Exhibit 3 (Kinsella Dep. at 179) (for example, Kinsella was unsure how many TPPs in the database had their principal place of business in Massachusetts). Further, Kinsella makes no mention of ensuring that the General Counsel of the TPPs receive the notice. See Exhibit 3 (Id. at 181) (the addressees would be "the people [CCS] has identified as the person to provide notice to through the other 13 cases that they worked on, or short of that, it would be the chief executive officer"). Without more information about CCS, Defendant and the Court have no guarantee that the proposed notice plan will achieve the best notice practicable.

An additional problem with Plaintiffs' proposed Notice, unique to the TPP context, is Plaintiffs' characterization of the two TPP classes. While AstraZeneca does not object to using a single notice for all the TPP class members against AstraZeneca, AstraZeneca does object to Plaintiffs' characterization of the "Massachusetts" class in its TPP Notices. The TPP classes are comprised of the Class 2 MediGap class, which includes TPPs that provide supplemental insurance to Medicare Part B recipients, as well as Class 3 TPPs that make reimbursements on the basis of contracts that use AWP as a benchmark, but are outside of the Medicare Part B context. In the Classes this Court certified, regardless of whether a TPP is a MediGap TPP or a

Class 3 TPP it must either have its principal place of business in Massachusetts, or have made reimbursements for Zoladex payments made in Massachusetts. However, in its proposed Notice Plaintiffs refer to Class 3 TPPs as the "Massachusetts Class." This nomenclature is misleading and likely to cause confusion, as, presumably, both Class 2 and Class 3 TPPs could be considered "Massachusetts Classes" given the Class definitions ordered by this Court. By referring to Class 3 TPPs at the "Massachusetts Class" the Notice suggests that MediGap TPPs need not fulfill the criteria establishing a nexus to Massachusetts as set forth by the Court. See Exhibit 3 (Kinsella Dep. at 183) (agreeing that the class could be called something different).

## CONCLUSION

For all of the foregoing reasons, Defendant AstraZeneca Pharmaceuticals LP's proposed forms of Notice should be utilized by the Court.

Dated:   Boston, Massachusetts
         June 21, 2006

                                        Respectfully Submitted,

                                        By:  /s/ Lucy Fowler
                                             Nicholas C. Theodorou (BBO # 496730)
                                             Lucy Fowler (BBO #647929)
                                             FOLEY HOAG LLP
                                             155 Seaport Blvd.
                                             Boston, Massachusetts 02210
                                             Tel: (617) 832-1000

                                          D. Scott Wise
                                          Michael S. Flynn
                                          Kimberley Harris
                                          DAVIS POLK & WARDWELL
                                          450 Lexington Avenue
                                          New York, New York 10017
                                          Tel: (212) 450-4000

                                          Attorneys for AstraZeneca
                                          Pharmaceuticals LP

## **CERTIFICATE OF SERVICE**

      I certify that a true and correct copy of the foregoing was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by sending on June 21, 2006, a copy to LexisNexis File & Serve for posting and notification to all parties.

                                          /s/ Lucy Fowler_____
                                          Lucy Fowler