# EXHIBIT 3

# PART I

Page 1

1          UNITED STATES DISTRICT COURT

2           DISTRICT OF MASSACHUSETTS

3   MDL Docket No. 01CV12257-PBS

4   - - - - - - - - - - - - - - - - - - x

5   IN RE:

6

7   PHARMACEUTICAL INDUSTRY AVERAGE

8   WHOLESALE PRICE LITIGATION

9   - - - - - - - - - - - - - - - - - - x

10                  June 16, 2006

11                  12:00 p.m.

12

13     DEPOSITION OF KATHERINE KINSELLA, held at Hagens

14   Berman Sobol Shapiro LLP, One Main Street, Cambridge,

15   Massachusetts.

16

17

18

19

20

21

22   Reporter:  Lisa A. Moreira, RMR/CRR

Page 2

1    A P P E A R A N C E S

2

3         HAGENS BERMAN SOBOL SHAPIRO LLP

4         (BY: EDWARD NOTARGIACOMO, ESQ.)

5         One Main Street, Fourth Floor

6         Cambridge, Massachusetts 02142

7         (617)482-3700

8         ed@hbsslaw.com

9         Counsel for class plaintiffs

10

11        DAVIS POLK & WARDWELL

12        (BY: MICHAEL S. FLYNN, ESQ., and

13             AIMEE HECTOR, ESQ.)

14        450 Lexington Avenue

15        New York, New York 10017

16        (212) 450-4000

17        mflynn@dpw.com

18        Counsel for AstraZeneca Pharmaceuticals

19

20

21

22

Page 3

```
 1    A P P E A R A N C E S  (Continued)

 2

 3       HOGAN & HARTSON

 4       (BY : LYNDON M. TRETTER, ESQ.)

 5       875 Third Avenue

 6       New York, New York 10022

 7       (212) 918-3000

 8       lmtretter@hhlaw.com

 9       Counsel for Bristol-Myers Squibb

10

11

12

13

14

15

16

17

18

19

20

21

22
```

Page 4

```
 1                    I N D E X

 2   WITNESS:                              PAGE

 3   KATHERINE KINSELLA

 4   (By Mr. Flynn)                        006

 5

 6               E X H I B I T S

 7   NO.            DESCRIPTION            PAGE

 8   Exhibit Kinsella 001  Affidavit of Katherine

 9                         Kinsella        009

10   Exhibit Kinsella 002  Various form of published

11                         notice          013

12   Exhibit Kinsella 003  AWP-KIN-00002 and AWP-KIN-

13                         00003           016

14   Exhibit Kinsella 004  Article, "Quantifying

15                         Notice Results in Class

16                         Actions - the Daubert/Kumho

17                         Mandate"        035

18   Exhibit Kinsella 005  AWP-KIN-00153 and AWP-KIN-

19                         00154           058

20   Exhibit Kinsella 006  Article, "Notification of

21                         Settlement Administration"  075

22
```

Katherine Kinsella          HIGHLY CONFIDENTIAL          June 16, 2006
                              Cambridge, MA

Page 5

```
 1   Exhibit Kinsella 007   Article, "The Plain Language
 2                          Tool Kit for Class Action
 3                          Notice"                       095
 4   Exhibit Kinsella 008   AWP-KIN-00001                 147
 5   Exhibit Kinsella 009   Better Homes & Gardens
 6                          profile                       194
 7   Exhibit Kinsella 010   National Geographic profile   194
 8   Exhibit Kinsella 011   AWP-KIN-00148                 197
 9   Exhibit Kinsella 012   AWP-KIN-00315 through AWP-
10                          KIN-00319                     197
11   Exhibit Kinsella 013   AWP-KIN-00326 and AWP-KIN-
12                          00327                         197
13
14   *Originals returned to Attorney Flynn
15
16
17
18
19
20
21
22
```

HIGHLY CONFIDENTIAL
                                              Cambridge, MA

1    actually start it this way.

2              Are you aware that my defendant,

3    AstraZeneca, has filed summary judgment papers with

4    the court setting forth its views as to why the

5    claims in this case should not go forward?

6         A.   Yes, you told me that.

7         Q.   Other than my telling you that?

8         A.   I'm, yes, generally aware.

9         Q.   But just to recap so we're on the same page,

10   you didn't take the positions that my client,

11   AstraZeneca, has espoused in those papers into

12   account in formulating the content of the notice,

13   correct?

14        A.   I did not.

15        Q.   Do you know who the Class 1 class

16   representatives are for my client, AstraZeneca, with

17   respect to the case that's scheduled to be tried

18   against my client, AstraZeneca, on September 25th?

19        A.   I do not.  That would not be information

20   that would have any bearing on my work.

21        Q.   And why wouldn't it?

22        A.   Because what I'm looking at is finding the

Page 32

1    best demographic target, the most accurate target to

2    develop a notice plan -- to develop a media plan

3    against.   And the name of the person who's a class

4    representative has no bearing on that whatsoever.

5        Q.   Is anything about the class representative,

6    the types of claims, when they were exposed to my

7    client's product, their geography, anything about

8    them in specific in your view important for the

9    class to know in deciding whether or not to opt out

10   or not?

11       A.   I don't think that -- no, I don't believe it

12   would be important, nor have I, in the years that

13   I've been doing this that I can remember, come

14   across the name of a class representative in any

15   summary notice document.   Sometimes it occasionally

16   could be in a long form notice, but it's not

17   something that is usually put in by myself or other

18   notice experts.

19       Q.   Put aside the name of the class

20   representative.   Do you think it's important for

21   potential members of the class to know under what

22   state consumer protection laws the class

Page 33

1    representative's case will be tried?

2        A.   I don't think they'd understand it, for the

3    most part.   It could be included.   I find it

4    oftentimes extremely dense and confusing to people

5    who aren't lawyers.   I think that that information

6    can be gotten successfully in any other documents

7    that exist in the case, like the complaint, which is

8    oftentimes filed on the website, or it can be

9    obtained by writing or calling for it.

10            But I don't think that's really, in the

11   most part, material to people.   They essentially

12   want to know, did I take this drug?   Do I have --

13   would I possibly have a claim in this?   And if it's

14   a settlement, filling out the claim form and putting

15   the pertinent information in that way.

16       Q.   In this case the notice with respect to my

17   client, AstraZeneca, is a notice not of settlement;

18   is that right?

19       A.   That's correct.

20       Q.   And do you believe that the content of the

21   notice should inform the potential class members as

22   to both sides' -- both plaintiffs' and defendants'

Page 34

1      -- views off the claims and the defenses?

2          A.   Yes.

3          Q.   And it should do so in a neutral way,

4      correct?

5          A.   Yes.

6          Q.   And how can one determine the position of

7      the defendants if you're preparing the content of

8      the notice without reviewing the position of the

9      defendants in the case?

10         A.   In the notices that I have drafted and have

11     been approved by courts, there usually is a sentence

12     or two or a paragraph about what the claims are.

13     That's subject to review and negotiation, I would

14     assume, between -- and mediation by the court, and

15     if you want that put in, I assume that you will

16     speak to the plaintiffs about that.  I drafted it as

17     I normally draft all my long form notices.

18         Q.   And you don't have -- as a professional

19     advising and giving opinions on these notices, you

20     do not have a problem with including a statement

21     that the defendants want in terms of their position

22     on the claims?

1      A.  If it is approved by the court, no.

2      Q.  I talked about the class representatives for

3  Class 1 for my client, AstraZeneca.  I take it,

4  based on your answers, you don't know what state

5  consumer protection laws govern their claims.

6      A.  I do not know.

7      Q.  Okay.  We talked about the summary judgment

8  papers that my client, AstraZeneca, filed that you

9  haven't read.  How about more broadly the summary

10  judgment papers of defendants on joint issues in the

11  case?  Have you read those?

12      A.  No, I have not.

13      Q.  Ms. Kinsella, would you agree with me that

14  actual notice should be sent to all class members

15  whose names and addresses can be obtained through a

16  reasonable effort?

17      A.  Yes.

18      MR. FLYNN:  Can we mark this.

19          (Exhibit Kinsella 004 marked for

20  identification)

21      Q.  Now, as we're getting that marked, the notice

22  plan that you put forth in this case does not --

Katherine Kinsella                    HIGHLY CONFIDENTIAL                    June 16, 2006
                                        Cambridge, MA

Page 36

1          MR. NOTARGIACOMO:   Off the record.

2              (Pause)

3      Q.   The notice plan that you put forth in this

4    case does not call for actual notice in the first

5    instance to members of Class 1; is that right?

6      A.   That's correct.

7      Q.   You do propose sending actual notice, what

8    you call a long form notice, to members of Class 1

9    if they take some action to ask for it after seeing

10   the published notice; is that right?

11     A.   Correct.

12     Q.   But in the first instance there's no mailing

13   to potential members of Class 1, right?

14     A.   That's correct.

15     Q.   Could you identify what's in front of you,

16   Exhibit Kinsella 004?

17     A.   It's an article that I wrote in 2001 in the

18   Class Action Litigation Report, and it was -- it's

19   entitled "Quantifying Notice Results in Class

20   Actions - the Daubert/Kumho Mandate."

21     Q.   If you look at the first paragraph starting

22   with the second sentence, you write, "The Federal

HIGHLY CONFIDENTIAL
Cambridge, MA

1   Rules of Civil Procedure require 'the best notice

2   under the circumstances, including individual notice

3   to all members who can be identified through

4   reasonable effort,'" and you cite to the Federal

5   Rules.  Do you see that?

6      A.  Yes, I do.

7      Q.  And that is just saying what you just

8   testified to, that in your view you should send

9   actual notice to people if you can obtain their

10  names and addresses through a reasonable effort.

11     A.  Correct.

12     Q.  Okay.  The next sentence goes on to refer to

13  the Eisen case, and you write that that case "makes

14  clear that this requirement is quite unforgiving, as

15  '[t]here is nothing in Rule 23 to suggest that the

16  notice requirements can be tailored to fit the

17  pocketbooks of particular plaintiffs.'"  Do you see

18  that?

19     A.  Yes, I do.

20     Q.  And you believe that statement?

21     A.  Yes, I do.

22     Q.  Okay.  Prior to your signing your affidavit

Katherine Kinsella                    HIGHLY CONFIDENTIAL                    June 16, 2006
                                         Cambridge, MA

Page 38

1    on May 31, 2006, I think we determined, did you or

2    anyone at your firm take any steps to determine what

3    it would entail to receive the names and addresses

4    of at least some portion of Class 1?

5        A.  No, I did not.

6        Q.  So you didn't talk to personally --

7            (Interruption)?

8        MR. FLYNN:  We're just breaking for a second.

9    Counsel for B-MS has entered.

10       Q.  So I take it you did not talk to CMS to

11   determine what it would take to get the names?

12       A.  I did not.

13       Q.  You didn't talk to any organization to

14   determine what it would take to get names?

15       A.  I was under the understanding that the data,if

16   it existed, would only be with CMS, and that based on

17   a previous case, that it would be not only difficult

18   but, perhaps, impossible to get that, and I was asked

19   to develop a notice program that utilized published

20   notice.

21       Q.  So you were asked not to even consider trying

22   to attempt to determine what steps it would take to

Katherine Kinsella             HIGHLY CONFIDENTIAL                June 16, 2006
                                  Cambridge, MA

Page 39

1    get the names and addresses?

2        A.   I was not charged with getting that -- getting

3    that information.

4        Q.   So you have no knowledge based on any work

5    that you did to say one way or another whether the

6    names and addresses of members of Class 1 could be

7    obtained and what it would take to obtain those names?

8        A.   Not on my own.

9        Q.   Was it plaintiffs' counsel who told you to

10   assume that the names and addresses could not be

11   obtained through reasonable efforts?

12       A.   I was told, as I just stated, that it would

13   be difficult, if not impossible, and I should proceed

14   to put together a published notice program. I was

15   also told that if the names were to be made available,

16   that that would be part of the notice program as well.

17       Q.   And it was plaintiffs' counsel who told you

18   these things?

19       A.   That's correct.

20       Q.   Who in particular?

21       A.   Mr. Notargiacomo.

22       Q.   You were at the -- you were in attendance at

Page 40

1    the June 5, 2006 conference in front of Judge Saris

2    in this case; is that right?

3        A.   That's correct.

4        Q.   And do you recall at that hearing Mr.

5    Notargiacomo indicating that in this case

6    plaintiffs' counsel had made no contact with CMS to

7    determine what it would take?

8        A.   I heard that.

9        Q.   In addition to taking no effort on your own

10   to determine whether or not it would be reasonable

11   to obtain the names from CMS, did you do any

12   research or conduct any inquiry to determine whether

13   or not the names of certain members of Class 1 could

14   be obtained through third-party payors of any kind?

15       A.   No, I did not.

16       Q.   You didn't talk to any third-party payors?

17       A.   I don't think I would have had time, even if

18   I had a year, to talk to all the third-party payors

19   involved.

20       Q.   I don't think I said "all."  Did you talk to

21   any?

22       A.   No, I didn't.

Page 41

1      Q.  Did you conduct any research into how one

2   might go about trying to develop lists of names and

3   addresses of Medicare recipients?

4      A.  No, I did not.

5      Q.  Did you talk to any state attorney generals

6   who represent, in their parents' patriarch capacity,

7   potential members of Class 1 as to whether or not

8   names and addresses of those potential members of

9   Class 1 could be obtained?

10      A.  I did not.  Had I thought about doing that,

11   I still would not have done that, because I don't

12   believe there's any way possible that you could have

13   had a complete list of the names of those

14   individuals, even through third-party payors, that

15   would be consequential enough not to have to do a

16   very thorough published notice program, and you

17   wouldn't be able to quantify how well you were

18   reaching those people by those fragmented lists.

19      Q.  Do I take it by your answer that your

20   standard for whether or not you try to find the

21   actual names and addresses of members of a consumer

22   class like Class 1 is whether you can find them all?

Page 42

1      A.   Well, you have issues of overinclusive and

2   underinclusive lists.  Usually you will have lists

3   that are available in a form that is reasonable and

4   practical to get your hands on.  I don't think -- I

5   couldn't go into a court and say to the judge that

6   the list we got from six out of 50 some-odd

7   cooperating AGs or 10 out of 1,000 or 2,000 or

8   10,000 third-party payors would be worth the effort

9   or would be adequate under the circumstances but

10  then knowing, also, that I was able to reach those

11  people through a published notice program of

12  significant weight.

13     Q.   You don't have any basis in this particular

14  case to make any statements about what that effort

15  would have entailed, do you?

16     A.   No, but I know it would be significant.

17     Q.   But you've done nothing in this particular

18  case to support your statements as to the difficulty;

19  is that right?

20     A.   Not in this particular case, but I have a

21  number of years of experience of having to look at

22  lists of published notice and how difficult it is to

Katherine Kinsella

HIGHLY CONFIDENTIAL
Cambridge, MA

June 16, 2006

Page 48

1      Q.   Is there any difference in approach in terms

2   of either the means of publication or the content of

3   the notice that you take into account in a litigated

4   situation when you're approaching a notice program?

5      A.   Not really.

6      Q.   You're familiar with the term

7   "demographics," I take it.

8      A.   Yes.

9      Q.   Would you agree with me that individuals in

10   the general population consume media differently

11   depending on income?

12      A.   Yes.

13      Q.   Depending on gender?

14      A.   Yes.

15      Q.   Education level?

16      A.   Yes.

17      Q.   What else?

18      A.   Ethnicity, basically any general demographic

19   that you'd ascribe to someone.

20      Q.   And you've written -- and we'll look at it

21   in a second.  You've written that notice programs

22   must establish a clear demographic target or targets

Page 49

1    in order to select the appropriate media; is that

2    right?

3        A.   That is correct.

4        Q.   And one of the targets you've put forward in

5    this case that you're trying to reach are Medicare

6    recipients, right?

7        A.   That's correct.

8        Q.   And when you're dealing with a

9    pharmaceutical product and trying to reach people

10   who used a particular pharmaceutical product, it's

11   important to know who used it, where they were, over

12   what period of time, and you've written about all

13   those sorts of things in your study of effective

14   notice programs; is that right?

15       A.   That is correct.

16       Q.   And it's important to be specific because

17   otherwise you might miss your target audience,

18   right?

19       A.   It's important to have a target audience or

20   a target that reflects your audience.

21       Q.   And a target that is too broad is

22   susceptible to not selecting the right media; is

Page 50

1    that right?

2        A.   No.

3        Q.   If you have a target that includes everybody

4    in the United States, you might select media that's

5    not specific to a subsection of that target; is that

6    right?

7        A.   That's a possibility with a target the size

8    of adults 18-plus, and there -- you will always find

9    within that kind of target people who have

10   differences, but that's why we measure.  We measure

11   the reach of a specific target that has within it

12   subsets of individuals and demographics, and the

13   more narrow the target, the more likely it is

14   that -- if it's a number, in this case, like the

15   Medicare Part B people, and there are a number of

16   drugs involved, if you were too specific you would

17   not have an effective notice because you'd be losing

18   the breadth.

19            But that's why we -- that's why we're

20   basically suggesting that the reach that we have

21   here is adequate for that.  And you can assume this

22   as a rule of thumb in media planning, that you're --