# EXHIBIT 3

# PART II

Page 54

1    one that is used by the majority of advertising

2    agencies, and it is very well respected and

3    accredited, and I can't get into all of their actual

4    minutiae of how they conduct those.

5         Q.   But you rely on what they -- the information

6    they give to you?

7         A.   Absolutely.

8         Q.   Are you familiar with the product Zoladex?

9         A.   I'm not.

10        Q.   Do you have any idea what it's used for?

11        A.   I did, but I'd have to look it up.  There

12   were quite a few drugs, 17 drugs as I recall.  I'd

13   have to go look at it again.

14        Q.   If you look at your declaration, one of the

15   attachments to it, I think, has the list of drugs.

16   If you could find that, that would be helpful.

17        A.   Yes, it would be helpful to me, too.  Yes.

18        Q.   Do you have anything on Zoladex there?

19        A.   Yes, I do.  Exhibit Kinsella 002.

20        Q.   And Zoladex is a drug manufactured by my

21   client, AstraZeneca; is that right?

22        A.   Yes, that's correct.

Page 55

```
 1      Q.   Did you do anything or did your firm do

 2   anything to research the user profile and

 3   demographic of Zoladex users?

 4      A.   I did not.

 5      Q.   You did not look at any particular materials

 6   as to whom that drug is prescribed?

 7      A.   I didn't -- I did not look at the

 8   demographics through MRI.  There was only one of the

 9   17 drugs that was measured by MRI.

10      Q.   Okay.  So you didn't go outside and do any

11   research to figure out the typical age, gender,

12   geographic location, any other demographic for

13   Zoladex users?

14      A.   The research was done by my staff that

15   indicated that the treatment was for prostate,

16   breast cancer and endometriosis, and what that tells

17   me is that you have a breadth of potential age

18   demographics here, you have two gender demographics

19   here, that these are not necessarily drugs that

20   affect a particular income level, particular

21   household income level, et cetera.

22                And so first of all, I didn't have it
```

Page 56

1    available in MRI, but I did look at each of these.

2    I don't remember much about them today, but I did

3    look at these.   I knew a lot of them were cancer

4    drugs, et cetera, which is why we ended up

5    looking -- because I was not able to measure against

6    individual drugs, that's why I chose the Medicare

7    Part B.

8        Q.   Your testimony is that there's no sources

9    available to identify specific target audiences for

10   particular drugs?

11       A.   No, I'm not saying that, but I need to be

12   able to have a measurable target available to me to

13   be able to opine to the court that I'm reaching that

14   target.

15       Q.   And you can't -- sitting here today, you

16   can't tell me what the target audience is in terms

17   of age or gender for members of Class 1 who were

18   prescribed Zoladex; is that right?

19       A.   Based on some of the other work that I've

20   done previously and what I have read in some of the

21   work that I did in a number of the cases, I know

22   that breast cancer and prostate cancer are likely to

Page 58

1          (Exhibit Kinsella 005 marked for

2    identification)

3      Q.  Are you familiar with that e-mail and the

4    attached drug list?

5      A.  I haven't reviewed it recently, but it goes

6    back to February 14th.  This is from Tim McHugh.

7      Q.  And that exhibit lists the various drugs and

8    it actually has a column called "User Profile," do

9    you see that?

10     A.  Yes, I do.

11     Q.  And do you see for Zoladex it says the user

12   profile is women?

13     A.  Right.

14     Q.  Do you believe that to be true?

15     A.  No.

16     Q.  You don't believe that to be true?

17     A.  No.  This is work product that was done in

18   February.

19     Q.  Okay.  And is there anything that you recall

20   will give you more updated information on the user

21   profile for Zoladex?

22     A.  The ones that we attached to our documents,

Page 59

1    our -- the one I just looked at, Exhibit Kinsella

2    002, was certainly an updated -- this was the very

3    first iteration that was done by my office.

4        Q.  Well, what I'm trying to distinguish is, the

5    indications on the e-mail I just showed you for

6    Zoladex are the same indications that you mentioned

7    that are attached to your final affidavit, namely

8    breast cancer, prostate cancer, and endometriosis.

9    Those haven't changed.

10       A.  No, they haven't.

11       Q.  But the user profile listed on this document

12   for Zoladex is women, and my question to you is,

13   what is the basis for that conclusion, that the user

14   profile for Zoladex is women?

15       A.  This was not my conclusion.  This was a

16   document prepared by a staff member, and as you --

17   it was updated with more information.  This is one

18   of the first cuts that we did on any work for this.

19   This is not a final document and was not necessarily

20   one upon which I relied.

21       Q.  But you don't have a basis to tell me, as

22   you testified before, whether it's true or not that

Page 60

```
 1    the user profile for Zoladex is women as opposed to

 2    men?

 3         A.   I don't.

 4         Q.   And that is not important to your notice

 5    program in this case, is that what you testified?

 6         A.   Let me take my answer back.  Just that I --

 7    if you're saying that I can't tell you whether women

 8    take Zoladex more than men take Zoladex, I can't

 9    tell you that, but I can tell you that I know that

10    men have prostate cancer and women have breast

11    cancer.  That I do know.

12         Q.   But you have no basis and you've done no

13    research to quantify the percentages of uses of

14    Zoladex as between men and women?

15              MR. NOTARGIACOMO:  Objection, asked and

16    answered.  Go ahead.

17         A.   I have to reach both of them.  It doesn't

18    matter to me.

19         Q.   If you can just answer my question.

20         A.   Okay.

21         Q.   You have done no research to determine the

22    relative proportions over this class period of
```

Page 61

1    whether members of Class 1 who took Zoladex are

2    predominantly men or predominantly women?

3        A.   I have not done that research, and it's not

4    material because I have to reach them both.

5        Q.   Just so we're clear, for none of the drugs

6    of any of the defendants in this case have you

7    undertaken any research to determine the specific

8    demographic targets for particular drugs?

9        A.   That's correct.

10       Q.   Are you aware that this case against my

11   client, AstraZeneca, is being tried as a separate

12   trial against AstraZeneca?

13       A.   Yes, I'm aware of that.

14       Q.   Are you of the view that what happens at the

15   trial of another defendant, B-MS or J&J, has any

16   impact on what happens to the class against my

17   client?

18       A.   In terms of the notice, I'm charged with

19   giving effective notice to the class members.  I'm

20   assuming that there will be class members who are

21   taking different kinds of drugs.  One class member

22   can be taking more of one of these drugs and have

Page 63

1      A.   It's a chart that looks at the Medicare --

2   demographics of Medicare recipients and also the

3   branded/generic drug users, and it looks at it by

4   various categories of gender, age, education,

5   household income, ethnicity and location.

6      Q.   Okay.  And for gender, your research has

7   indicated that 57.2 percent of Medicare recipients

8   are female as opposed to male; is that right?

9      A.   That's correct.

10      Q.   And that 59.2 percent of branded/generic

11   drug users are females as opposed to males; is that

12   right?

13      A.   That's correct.

14      Q.   And those determinations as to that

15   demographic breakdown in part drives your notice

16   program and the media you select; is that right?

17      A.   Repeat that one more time.

18      Q.   The demographics here, male versus female,

19   not to the exclusion of all others, but the male

20   versus female breakdown here is important to you in

21   some way in selecting the media that is used for the

22   publication notice in this matter, right?

Page 64

```
 1      A.   Actually, both of these targets skew

 2   slightly female.  Because we can measure how well

 3   we're doing against these two targets, I don't

 4   necessarily run a -- I don't do an MRI run against

 5   women only or against men only.  I use this for

 6   direction.

 7            And if you look on Page 14, the reason

 8   I'm doing this is to look at how these two targets

 9   might differ from each other so that I can make sure

10   that I'm choosing media that would effectively reach

11   both targets, and I cull out what I see as the

12   differences.

13            I'm not -- I don't sit there and say,

14   This skews mostly female; therefore, I'm only going

15   to use Better Homes & Gardens, and I'm not going to

16   use Parade magazine or I'm not going to use Sports

17   Illustrated.

18            Because the media that I have selected

19   or that we oftentimes find useful in these programs

20   are media with the largest circulations in

21   readership in the country, you're reaching a very

22   significant number of both men and women.  Unless it
```

Page 65

```
 1    is a particular one that skews only to females,

 2    sometimes we put a more -- one that skews a little

 3    more female in our program.

 4              In this particular instance we chose to

 5    put Jet and Selecciones in there.  We can't measure

 6    Selecciones, but we put it in there because we

 7    wanted to have some Hispanic coverage even though

 8    those people who read Jet and Selecciones read the

 9    other papers.

10              So it's not driven by this.  These are

11    guidelines and a direction for us.

12        Q.  But it does have some impact, as you

13    described?

14        A.  We always measure.  We always measure the

15    target; and, therefore, that's subsumed into that

16    measurement.

17        Q.  Now, if you look on Page 18 to 20 of your

18    same template, I notice you selected, at least in

19    part, some magazines that do have heavy female

20    readership; Better Homes & Gardens, for instance.

21    Do you have information as to what the profile is of

22    users of Better Homes & Gardens?
```

HIGHLY CONFIDENTIAL
Cambridge, MA

Page 66

1     A.   Yes, but I don't have it with me.

2     Q.   And People, I think you actually list on

3   Page 20, approximately 71 percent of People readers

4   are female.

5     A.   Yes.

6     Q.   And the 71 are age 18 to 49?

7     A.   That's correct.

8     Q.   Is that right?

9          The 18 to 49 aspect of that, that would

10  mean that the overwhelming majority of people -- of

11  persons who read People would not be part of a

12  Medicare target; is that right?

13    A.   That's correct.

14    Q.   Okay.  Reader's Digest, 61 percent women

15  readers?

16    A.   Correct.

17    Q.   Now, we're going back to Page 14, I guess.

18  I'm sorry, 13, sorry.  Your research indicates that

19  roughly 42 percent of Medicare recipients are male;

20  is that right?

21    A.   Roughly, yes.

22    Q.   And elsewhere in these papers you indicate

Page 67

```
 1    that your publication program will reach 83.1

 2    percent of Medicare recipients prior to the

 3    AstraZeneca trial beginning --

 4         A.   Correct.

 5         Q.   -- is that right?

 6         A.   83.1 of Medicare.

 7         Q.   Do you know how many -- what percentage of

 8    male Medicare recipients your notice program will

 9    reach?

10         A.   I don't, but I could calculate that.

11         Q.   Would it be -- would it just be 42 times 83

12    percent.  Is that how you get that number?  42

13    percent are male, it's a reach of 83, you multiply

14    those?

15         A.   No.  No, because you would look at the --

16    you would have to do a calculation based on each

17    publication.  I mean, this -- as you went through

18    these publications, you could see that they were

19    selected or you could assume that it could be seen

20    that they were selected for different reasons to

21    balance the reach of the two targets.  And in some

22    of these instances, like National Geo, it skews
```

Page 68

1    male.  Reader's Digest and People skew female.  And

2    so against that target you are looking at it, but we

3    could do a run that would look at the gender.

4         Q.  And you haven't done that?

5         A.  No, because my target was Medicare

6    recipients.

7         Q.  And the reason you selected, as you say, a

8    balance of some magazines that skew male, some that

9    skew women, is because you've decided that your

10   target audience includes all Medicare Part B

11   recipients and all branded/generic drug users,

12   right?  You're covering a broad spectrum?

13        A.  I would find the class members within those

14   two targets.

15        Q.  And if you were doing a class target

16   specifically for Zoladex, you wouldn't approach it

17   that way, would you?

18        A.  If it was Medicare Part B?

19        Q.  If this was just a class action, my client

20   was the only defendant, it was one drug, you

21   wouldn't necessarily try to find balances of targets

22   that didn't meet the user profile of Zoladex, would

HIGHLY CONFIDENTIAL
Cambridge, MA

1    you?

2        A.   Are you saying there is no Medicare Part B

3    at all identification with the hypothetical

4    situation?

5        Q.   Well, tell it to me both ways.  If there

6    were -- why don't we take that first.  A solely

7    Medicare Part B case against my client, AstraZeneca,

8    with respect to Zoladex.

9        A.   If I were doing no Medicare Part B, I would

10   look at the demographics and probably choose --

11   because I can't measure Zoladex, I would choose a

12   demographic that represented that.

13             In this case, based on what I have --

14   you know, the description of the drug and its usage,

15   I would likely have several targets.

16       Q.   And that is because -- but you don't have

17   any basis for that because if, for example, the

18   overwhelming 90 percent of the users were a

19   particular gender, you wouldn't necessarily want to

20   deal with the gender that's not part of that target,

21   would you?

22       A.   Well, I think if I picked only male-only

HIGHLY CONFIDENTIAL
Cambridge, MA

```
 1    publications, I would open myself up to making a

 2    decision that women should not receive notice, so I

 3    would be looking at, you know, a broader group of

 4    publications, and I would measure it.

 5         Q.  But you would want a balance.

 6         A.  But I --

 7         Q.  You would want to balance it as against the

 8    actual user profile?

 9         A.  Yes, I would.

10         Q.  And the reason that all of these magazines

11    that are listed in your first exhibit are in there

12    is because you're trying to reach not just Zoladex

13    users, you're trying to reach users of a number of

14    other products; is that right?

15         A.  I'm reaching people whose demographics are

16    very similar because they're Medicare, and they're

17    certainly -- their ages -- for the most part, their

18    ages are going to be very similar.  They're either

19    one of two genders, and we can see by these

20    demographics that there's a mix of male and female.

21    I could look very specifically at that, but I think

22    by the time I finished looking at it it would be
```

Page 71

1    very close to what I developed here.

2        Q.  But you don't have any basis for that, do

3    you?

4        A.  No, but I could do that.

5        Q.  I think you said before in your answer you

6    couldn't figure out what the Zoladex user profile

7    is.  What's your basis for that statement?

8        A.  That I couldn't figure out...?

9        Q.  You couldn't figure out a specific user

10   profile for Zoladex.  I think you may have mentioned

11   that in one of your answers.  You don't have any

12   basis for that answer, do you?

13              MR. NOTARGIACOMO:  Objection.

14       A.  I think I should have my answer read back.

15       Q.  I think it was in the context -- we can --

16   do you have any basis for concluding that you can't

17   determine a user profile for the specific drug

18   Zoladex?

19              MR. NOTARGIACOMO:  Objection.

20       A.  Would you repeat that one more time.

21       Q.  Do you have any basis for concluding that it

22   is not possible to develop a specific user profile

HIGHLY CONFIDENTIAL
                                    Cambridge, MA

```
 1    for the drug Zoladex?

 2         A.   No, I do not.

 3         Q.   So let's go back, 42 percent are male of

 4    your target audience.   57 percent are women.   Your

 5    program in your view will reach 83 percent of

 6    Medicare recipients, so is it fair to say that it

 7    will reach some lower portion of male Medicare

 8    recipients?

 9         A.   It will reach -- it will reach 83 percent

10    of -- I can't say that.   I'd have to look at that.

11         Q.   But you haven't done that yet?

12         A.   No, I haven't done that yet.

13         Q.   Okay.   Same question for the branded/generic

14    drug users.   The breakout you have here is 59

15    percent are female and 40 percent are male.   Can

16    you -- you estimate a reach of 81.6 percent to that

17    target audience in your papers.

18         A.   That's correct.

19         Q.   Can you tell me what the reach would be for

20    male generic/branded drug users?

21         A.   Not from here.   Not from here.   But I could

22    tell that.   I think when you -- particularly you're
```

Page 73

1    reaching a level of 83 percent of a particular

2    target, that's a significant amount.  It would be

3    very hard to reach 83 percent if all of a sudden

4    you're only reaching 20 percent of the men in that

5    target versus 90 percent of the women in that

6    target.  Your results would be extremely different.

7         Q.  But you haven't done that work to

8    determine -- you haven't made any representations to

9    the court as to the reach for male Medicare users or

10   the reach for male branded/generic users?

11        A.  I have not, but I believe it would be

12   proportional to this.

13        Q.  And by "proportional," you mean what?

14        A.  I don't think we would be reaching more

15   women than is proportional to this target than we'd

16   be reaching men.

17        Q.  But you haven't done the work to determine

18   that?

19        A.  No.

20        Q.  Okay.

21             MR. NOTARGIACOMO:  When you get to a

22   good stopping point.

Page 74

1              MR. FLYNN:  Yes, sure, whenever you want

2     to take a break is fine.  Do you want to take one

3     now?

4              MR. NOTARGIACOMO:  Sure.

5              MR. FLYNN:  How long do you want?

6              MR. NOTARGIACOMO:  Ten minutes.

7              MR. FLYNN:  Sure.

8              (Recess taken)

9       BY MR. FLYNN:

10      Q.  Ms. Kinsella, we talked a little bit before

11    about the lack of TV and radio as part of your

12    notice here, and am I correct that the lack of that

13    is a reflection of your view that you do not need

14    that type of media to reach Medicare recipients in

15    this case?

16      A.  It's my view that I was effectively reaching

17    them through the print program.

18      Q.  Are you familiar with research that

19    concludes that Medicare recipients are

20    overwhelmingly female, low income with low education

21    levels?

22      A.  I know that -- actually, no.  I have some

Page 77

1    moderate magazine readers, et cetera.  This

2    information provided direction to the media

3    selections and ensured that the media used actually

4    reached the target audience."  Do you see that?

5         A.  I do.

6         Q.  That's a correct statement of how you go

7    about determining what media to use, right?

8         A.  It provides direction.  It doesn't provide

9    your choices.

10        Q.  And the last sentence says, "It is unlikely

11   that the target audience would see a summary notice,

12   for example, if placed in 200 newspapers nationwide

13   when the Settlement Group is composed of low-

14   education, low-income consumers who are not

15   newspaper readers," correct?

16        A.  Where is that?  I'm sorry?

17        Q.  It's the last sentence of Page 4, carryover

18   to 5.

19        A.  Yes.  In newspapers, yes, that is correct.

20        Q.  And magazines are different than newspapers?

21        A.  And newspaper supplements are different than

22   newspapers.

Katherine Kinsella                      HIGHLY CONFIDENTIAL                      June 16, 2006
                                             Cambridge, MA

Page 78

 1        Q.   And so did you do research in this case, our

 2   case, to determine whether or not the Medicare

 3   population were heavy users of TV as opposed to

 4   heavy users of other forms of media?

 5        A.   I think there are some quintile reports in

 6   here, I believe.

 7        Q.   What did you conclude?

 8        A.   I'd have to go back and look at that again.

 9        Q.   If you would, please.

10        A.   But let me just make a statement, if I could

11   here.  And I don't want to interrupt your line of

12   questioning, but the -- there are a number of ways

13   you can reach people.  You have people who are light

14   users of newspapers or heavy users of TV or vice

15   versa.  The regions that I have against our target

16   audience are calculated specifically against a

17   demographic of Medicare people, and it is an

18   estimated 83.1 percent reach.  Even if they are

19   heavy television viewers, I could not get to 83 if

20   they were only heavy television viewers.  I have the

21   data and the survey material that supports those

22   runs and those reach figures.

Katherine Kinsella        HIGHLY CONFIDENTIAL        June 16, 2006
Cambridge, MA

Page 79

1    Q.   But in this Mylan case you concluded that

2    the Medicare population were heavy TV users, and you

3    tailored your program to use TV because of that; is

4    that right?

5    A.   I tailored mine for several reasons.  Number

6    one, this was a settlement notice.  This was a

7    settlement notice in which the attorneys general

8    that I was working with, the antitrust divisions of

9    the states that were involved, wanted to ensure as

10    many claims as they possibly could get.  That is not

11    what my focus is in here in the settlement.

12        My focus is to provide due process

13    notice of someone's rights in a litigation.  Then

14    they will have an opportunity to take another action

15    in terms of filing a claim if, in fact, there's a

16    settlement or the court rules in favor of the

17    plaintiffs.

18    Q.   So your testimony is that in the Mylan case,

19    you developed a publication notice program that went

20    above and beyond the call?

21    A.   Yes.  When you have reaches, as I'm looking

22    at here -- it has been a while since I've looked at

Page 89

1    sense with you, if the plaintiffs' position is that

2    the notices they sent us earlier this week are the

3    operative notices, we'll look at those, as opposed

4    to the ones attached to Ms. Kinsella's declaration.

5    Is that fair?

6              MR. NOTARGIACOMO:  I have no problem

7    with that.  Just for the record, those were sent to

8    defendants to give them an opportunity -- to give

9    plaintiffs and defendants an opportunity to try to

10   come to -- as the court instructed us, to try to

11   come to some sort of common ground on the language

12   of those notices before we submit something to the

13   court.

14             MR. FLYNN:  Right, and they were sent,

15   just for the record, I think Monday or Tuesday of

16   this week.

17   Q.  And you have before you Exhibit Kinsella 003.

18   It's Exhibit Kinsella 002, I'm sorry.  It's Exhibit

19   Kinsella 002.

20             I'd like to turn --

21             MR. TRETTER:  Can we go off the record

22   for a second?

Page 90

1           (Pause)

2      Q.   One question before we -- one topic area

3   before we head to those particular notices.  Are you

4   aware that members of Class 1 include not just

5   Medicare recipients with respect to the various

6   drugs listed, but also heirs and survivors of those

7   recipients?

8      A.   I am now aware of that.

9      Q.   And is it accurate to say that nothing in

10  your publication notice program was developed in any

11  way to target such heirs or executors of those

12  Medicare recipients?

13     A.   That is correct.  I developed these notices,

14  except for the minor changes that were just done,

15  without that knowledge.

16     Q.   Okay.  And I take it that consistent with

17  that, you did not undertake any research to try to

18  determine, with respect to Zoladex users, whether or

19  what proportion of class members fall into the

20  category of living persons as opposed to executors

21  and heirs?

22     A.   I did not.

HIGHLY CONFIDENTIAL
Cambridge, MA

1    Q.  Did you do any work to determine the

2    mortality rate of men with advanced prostate cancer

3    during the class period?

4    A.  No, I did not.

5    Q.  So you can't tell us anything about the

6    reach of your publication notice on members of Class

7    1 who happen to be heirs of Zoladex users or

8    executors of Zoladex users?

9    A.  I didn't do any specific runs, but I can

10   tell you that the publications that were selected

11   here are the most broadly circulated publications in

12   the country and have the highest reach against

13   almost all targets, including adults 18-plus.

14   Q.  But, again, no -- you're not giving any

15   opinions about the reach with respect to the portion

16   of Class 1 that are heirs?  And, in fact, you didn't

17   even know when you undertook your program that a

18   portion of Class 1 could be heirs and executors,

19   right?

20   A.  I know for a fact that the publications I've

21   selected, I've chosen to measure those against the

22   targets in this case that I chose, but I also know,