# EXHIBIT 3

# PART III

Katherine Kinsella                    HIGHLY CONFIDENTIAL                    June 16, 2006
                                            Cambridge, MA

Page 92

1    based on 13 years of work, that these are the most

2    widely circulating publications and have a very

3    strong reach, more so than any other publications,

4    against adults 18-plus, which includes all -- I

5    would assume that your heirs and executors are 18-

6    plus.

7        Q.   But you didn't do any work to determine and,

8    in fact, did not know that Class 1 consisted also of

9    heirs and executors?

10       A.   Didn't do any what kind of work?

11       Q.   Any work to develop your media program to

12   target that portion of Class 1?

13       A.   When I learned that there were heirs

14   involved in that, I could have had the choice of

15   going back and adjusting it, and I didn't, because I

16   know the media that we used in here and I know how

17   effective it is against all age groups; and,

18   therefore, it was not necessary.

19       Q.   But you haven't given any opinion to the

20   court as to what percentage of that audience you're

21   reaching, whether -- you didn't consider whether

22   there were other alternatives in the media to reach

1    that audience?

2        A.    What is the audience?

3        Q.    You tell me.    You didn't do any research to

4    determine what it was, did you?

5        A.    An heir and an executor is going to be an

6    adult.    It could be a male.    It could be a female.

7    It could be at any particular age.    It's likely

8    they're going to be older, but I do know that the

9    media that I've selected reaches deeply into adults

10   18-plus.    It's the highest circulating publications

11   available; not all of them, but almost all of them.

12       Q.    And you can't tell us what those numbers

13   are, those reach numbers?

14       A.    There is no such thing as a target for, you

15   know, people who are heirs and executors.    There's

16   just -- it's not a measurable target.    I have to

17   deal with measurable targets for the courts.    I know

18   the media I've selected is reaching it based on 13

19   years of work.

20       Q.    And you make that determination after the

21   fact.    It's just you got lucky because you didn't

22   even know it when you developed your program, did

Katherine Kinsella                HIGHLY CONFIDENTIAL                June 16, 2006
                                        Cambridge, MA

Page 137

1    Q.  It says, "If you do not wish to participate

2    in either or both of the Classes, you must mail a

3    personally signed, written request to be excluded to

4    the address below."

5            It doesn't give any details about what

6    should be included in any exclusion request.  Is

7    there a reason for that?

8    A.  Yes, this is a summary notice.

9    Q.  It doesn't suggest or allow for the

10   possibility that a member of the class against my

11   client, AstraZeneca, could make different decisions

12   if that person happened to use Zoladex but also

13   happened to be a member of another class.  It

14   doesn't allow for that, does it?

15   A.  Do you mean -- is what you're asking if

16   somebody wanted to -- who took Zoladex and another

17   drug covered in these classes, if they wanted to opt

18   out in one, they would not be able to opt out in the

19   other?

20   Q.  Uh-huh.  Doesn't it suggest that it's all or

21   nothing?

22   A.  Yes, to some -- I mean, it suggests that if

Page 138

1    the claims in this are that these average wholesale

2    prices were allegedly reported false and inflated,

3    that that's true, it's a class-wide consideration

4    unless the judge rules that in the first trial or

5    the second trial and the third trial that that's not

6    true for a specific defendant.

7        Q.  So your publication process here and content

8    assumes that people will not make individual

9    decisions based on the particular drug they were

10   exposed to in terms of their opt-out decision?

11   Generally they opt in for all or opt out for all?

12       A.  Well, they can make that determination by

13   asking a question.  They have complete ability to

14   call and ask that question.

15       Q.  But they'd have to do that in order to

16   figure out what they should say in their opt out

17   exclusion letter to effect the particular outcome

18   that they want; is that right?

19       A.  They would have to get the long form notice,

20   which is how published notice works.

21       Q.  Now, does the long form notice allow for

22   opt-out decisions based on particular manufacturers

Page 139

1    or particular drugs?

2        A.   No, it does not, but I thought you were

3    referring to what they should include in their

4    letter for exclusion.

5        Q.   And in order to be excluded from one class

6    and not another, there's nothing in the publication

7    notices, either long form or short form, that

8    suggests that is a possibility; is that right?

9        A.   Right, and I don't think that the judge said

10   that it was a possibility.  I mean, if the judge

11   thinks that that's the way it should be, that people

12   should have the opt-out right by drug, then that's

13   something that the judge has to tell me, and I will

14   do what I'm supposed to do.

15            But I didn't see anything in the

16   certification order that said you were opting out of

17   classes, you weren't opting out of certain drug

18   usage.

19       Q.   So in your view, this is not a separate

20   class action against my client, AstraZeneca, with

21   respect to Zoladex, correct?

22       A.   It will be in terms of the trial for -- and

Page 155

```
 1              Once again, this is a summary.  It can
 2  go -- I have no issues with it not being in there.
 3      Q.  Would it be better?
 4      A.  It would give a fuller picture.
 5      Q.  Page 4 of the notice, "A lawsuit has been
 6  filed against a number of drug companies on behalf
 7  of people who paid for one or more of the drugs --
 8  called 'Covered Drugs' -- see Question 11," does
 9  that sentence make --
10              MR. NOTARGIACOMO:  I'm sorry, you're on
11  Page 4?
12              MR. FLYNN:  Page 4.
13              MR. NOTARGIACOMO:  Where on Page 4?
14      Q.  First line, "Why did I get this Notice?"
15  First sentence.
16              Does that first sentence make sense to
17  you grammatically?  What's it saying?
18      A.  Well, the way this was intended -- and it
19  certainly could be wordsmithed in a better way, if
20  you choose.  They've already got a bullet on the
21  first page that says, "The Court has said that the
22  lawsuit can go forward on behalf of 'two Classes' or
```

HIGHLY CONFIDENTIAL
Cambridge, MA

1   groups of people that made co-payments for certain

2   drugs," and then they have the designation of

3   covered drugs.

4               In here, "A lawsuit has been filed

5   against a number of drug companies on behalf of

6   people who paid for one or more of the drugs," and

7   we could have put a period there and said, "These

8   are called 'Covered Drugs,'" and repeat what we said

9   on the first page, "See Question 11."

10      Q.  So your testimony is that you could see some

11  wordsmithing --

12      A.  It could be wordsmithed in a different way,

13  but I don't think it's grammatically incorrect.  "A

14  lawsuit has been filed against a number of drug

15  companies on behalf of people who paid for one or

16  more of the drugs -- called 'Covered Drugs.'"  This

17  is an obvious reference back to the fact that we

18  defined what the covered drugs were earlier on in

19  this notice.

20      Q.  So on balance, would you --

21      A.  I could put a period in there.  I'd be happy

22  to do that.

Page 157

1      Q.   Then it says, "You received this Notice

2  because you may have made a co-payment for a Covered

3  Drug between either January 1, 1991 and December 31,

4  2004 or January 1, '91 and June 1, 2006."  Now,

5  those time periods in that sentence, they overlap.

6      A.   They do overlap.

7      Q.   Is there a reason why you think it's less

8  confusing to write it this way given the overlap?

9      A.   We kept it according to the exact definition

10  in the class.  It could be written differently.

11      Q.   Again, this is a function of the fact that

12  this notice is trying to deal with both Class 1 and

13  Class 3?

14      A.   That doesn't mean that's why it's confusing.

15  I mean, once again, there are four bullets on the

16  front page.  The way this is written, this document

17  flows from those -- it flows from the headline into

18  the key bullets into a summary chart of your rights,

19  then it goes on in detail according to certain

20  questions.  So in that bullet on the first page, it

21  defines the two different classes and the two

22  different time periods.

Katherine Kinsella                    HIGHLY CONFIDENTIAL                    June 16, 2006
                                         Cambridge, MA

Page 176

1    way or another as to whether or not it would be

2    difficult to do that?

3         A.   I have done a lot of focus panels, but not

4    around class notice, primarily around very small

5    communications.  I think it would be very difficult

6    to have -- establish a focus group that would be --

7    that would go through a document of this length.  I

8    think it's just -- I think focus groups are very

9    useful for certain things.  I'm not sure it would be

10   useful for this.

11        Q.   How about the short form notice?

12        A.   Short form notice you could do it.

13        Q.   Class 2 for a moment, if we could just

14   switch gears to that.  I think in your papers you

15   have a definition that the court has adopted for

16   Class 2.  If you just want to look at that so you

17   can refresh your recollection and know what that is.

18        A.   You're talking third-party payor long form

19   notice?

20        Q.   No, I'm talking Class 2, which is the

21   Massachusetts MediGap class.

22        A.   Right, sorry, yes.  And what other document

Page 177

1   am I looking at now?

2      Q.  I was just asking you to refer -- I'm not

3   going to ask you a particular question about the

4   definition, but just so you have it in mind, I think

5   the definition is included in your notice program,

6   which is an attachment to your declaration.

7      A.  Yes, it is.  That's the long -- yes, it is,

8   absolutely.

9      Q.  On Page 6 of Exhibit A you have the

10  definition of Class 2.  Now, with respect to that

11  class, your program does call for actual notice in

12  the first instance to that class; is that right?

13     A.  That's correct.

14     Q.  And your affidavit indicates in Paragraph

15  15, if you'd like to turn to it, that the notice of

16  class pendency to Class 2 will be mailed directly to

17  these entities and that, to compile the names and

18  addresses of these entities, you will use the

19  proprietary TPP database compiled by Complete Claim

20  Solutions, the class administrator.

21     A.  Uh-huh, yes.

22     Q.  Do you know how that database was compiled

 1    that CCS uses?

 2        A.   Yes.   I don't know every detail about it,

 3    but I did ask them a lot of questions about this.

 4    Initially they used these sources that are listed

 5    there, A through J, as a way of developing a base.

 6    Then they add it to that.   And this would be an

 7    overall base that would include both fully insured

 8    as well as self-insured and HMOs and PBMs and

 9    third-party -- other third-party payors.   And they

10    developed that originally, and they have added to it

11    through the class actions that they have noticed and

12    administered, and I think they've done about 13

13    third-party payor class actions.

14             In my working with them on this, I asked

15    them to please verify for me the information they

16    had and to update any lists that they had, and the

17    database grew over time.   In the last two class

18    actions they did, Hytrin and Paxil, their database

19    expanded.   And during this situation I asked them to

20    go back in and look and be very clear with me about

21    the self-funded versus the fully insured entities

22    that were in there and to make sure they had updated

```
1    lists.
2              So this -- their overall database with
3    all their information in there is about 65,000.  Of
4    that we've identified to mail certainly to 16A, B,
5    and C, as well as additional entities that they have
6    in that database that they have identified over the
7    course of the litigations that they've been involved
8    in.
9       Q.  Do you know how many of the entities -- do
10   you know overall how many entities are in the
11   database?
12      A.  I think it's about 65,000, but they're not
13   all -- there's different groupings.  As I said,
14   fully insured and self-insured, but I think it's
15   roughly about 65,000 at this point.
16      Q.  Do you know how many entities in the
17   database have their principal place of business in
18   Massachusetts?
19      A.  I do not know.
20      Q.  Do you know if it's determinable?
21      A.  I don't know that.  I think it could be with
22   some work.
```

1     Q.   Under your plan will the notice be mailed to

2   every entity in the database?

3     A.   No, it will be mailed to the -- in Paragraph

4   No. 16 -- approximately 29,000 companies with 100 or

5   more employees, the third-party claim

6   administrators, and the 1,300 member companies of

7   the AHIP plans, and I think we're looking at

8   probably around 40,000, 42,000, 43,000 entities.

9     Q.   How do you determine which of those entities

10   made reimbursements for drugs purchased in

11   Massachusetts, if you can?

12     A.   We are not going to do that.  We are, to the

13   best of our ability, identifying anybody who may be

14   in Class 2 and using available data to mail them.

15     Q.   But there's no -- as far as you know,

16   there's no -- there's no effort underway to isolate

17   it to a Massachusetts principal place of business or

18   those who reimburse for drugs in Massachusetts?

19     A.   No, there isn't.

20     Q.   Okay.  Is there any effort underway to

21   figure out who the proper addressee at these

22   institutions should be?

Page 181

1      A.  I asked that question myself.  It is either

2   the people they have identified as the person to

3   provide notice to through the other 13 cases that

4   they worked on, or short of that, it would be to the

5   chief executive officer.

6      Q.  And, again, the schedule suggests that these

7   would be mailed out beginning on June 26th, and that

8   was assuming a prior series of determinations by the

9   court; is that right?

10     A.  Yes.  We started -- we talked about now

11  starting on the 26th and going through the next,

12  well, total three weeks.

13     Q.  That schedule now no longer holds?

14     A.  I believe it no longer holds.

15     Q.  Let's go quickly to the short form of notice

16  for that class, Class 2.  This short form, again,

17  talks about two different classes.  Do you see that?

18     A.  Yes.

19     Q.  A MediGap TPP class and a Massachusetts

20  class.

21     A.  Uh-huh.

22     Q.  What is the distinction between those two

Katherine Kinsella                    HIGHLY CONFIDENTIAL                    June 16, 2006
                                          Cambridge, MA

Page 182

1    classes?

2      A.   Let me just look at the definitions and see

3    if I can...  Well, I can't -- well, it appears --

4    I'll do my best to answer this, that the -- it

5    appears that the Class 3 says third-party payors who

6    made reimbursements based on contracts expressly

7    using AWP as a pricing standard for purchases in

8    Massachusetts, and all third-party payors who made

9    reimbursements on contracts expressly using AWP as a

10   pricing standard and have their principal place of

11   business in Massachusetts.

12             In Class 2, it says based on AWP for a

13   Medicare Part B coverage subject drug, so that Class

14   2 concerns Medicare.

15             Class 3 includes people who bought their

16   drugs outside the Medicare context.  That's my

17   understanding.

18     Q.   So for either class the TPP has to either be

19   based in or have beneficiaries in Massachusetts; is

20   that right?

21     A.   That's correct.

22     Q.   But for some reason one is called the

Page 183

1    Massachusetts class and the other is not.  Do you

2    think that's confusing at all?

3        A.  Well, if they read on -- I think if they had

4    any confusion at all it would be cleared up in the

5    paragraph right above what are their rights, because

6    it says, "In order to be a member of either the

7    MediGap TPP Class or the Massachusetts Class, the

8    reimbursements must have been for a beneficiary in

9    Massachusetts or the TPP must have its principal

10   place of business in Massachusetts."  You could call

11   it something else.

12       Q.  Let me ask you to turn to your declaration.

13   Affidavit, I'm sorry.  Paragraph 33, the very last

14   paragraph.  Take a minute to take a look at that.

15       A.  May I just go to the bathroom real quick?

16       Q.  Absolutely.

17           (Recess taken)

18   BY MR. FLYNN:

19       Q.  Paragraph 33 provides your reasons for why

20   the publication notices in this case are for all the

21   defendants and not separated out for each defendant;

22   is that right?

Katherine Kinsella                    HIGHLY CONFIDENTIAL                    June 16, 2006
                                         Cambridge, MA

Page 184

```
 1      A.   That is right.

 2      Q.   Do you have anything to add as a reason for

 3   that decision to what is contained in Paragraph 33?

 4      A.   No, I do not.

 5      Q.   The first reason says that the direct mail

 6   list of TPPs is identical for each defendant; is

 7   that right?

 8      A.   Yes.

 9      Q.   That is not a reason why the consumer

10   notices are combined, right?

11      A.   No.

12      Q.   That has no impact as to why you would have

13   multiple as opposed to a single publication notice

14   for the consumer class?

15      A.   That is correct.

16      Q.   You also say that the target audiences,

17   which you define as Medicare recipients and

18   branded/generic drug users, for the purchase of paid

19   media are the same for each defendant.

20      A.   Right.

21      Q.   And we've talked about that before, and that

22   is given what you've defined as your target
```

Page 192

1      A.   It's not included in here.

2           MR. TRETTER:  Have a good weekend,

3   everybody.

4           (Mr. Tretter leaves proceedings)

5      Q.   The next one you have is USA Weekend.

6      A.   Correct.

7      Q.   Average issue of USA Weekend is read by 27.3

8   percent of Medicare recipients and 25.3 percent of

9   branded/generic prescription drug users.  Same

10  question, do you know the percentage of men who read

11  those publications?

12     A.   I do not for any of these publications, but

13  I can get that information.

14     Q.   Okay.  And the same question, you don't know

15  and it's not included in your materials as to the

16  percentage of Medicare recipients who are men who

17  read those things?

18     A.   No.

19     Q.   And that would be the same for any of these

20  newspapers that are included there.  Same with

21  American Profile; is that right?

22     A.   Right.

HIGHLY CONFIDENTIAL
Cambridge, MA

Page 193

1       Q.   Turning to the magazines, can you tell me

2   for any of the magazines listed what is the

3   readership of men over 65?

4       A.   I don't have that information with me.

5       Q.   But it is something that could be found?

6       A.   Yes, it's something that could be found.

7       Q.   People magazine is indicated that the

8   readership is 71 percent female, as we've talked

9   about before; is that right?

10      A.   That's correct.

11      Q.   And 71 percent age 18 to 49; is that

12  right?

13      A.   That's correct.

14      Q.   Reader's Digest, 61 percent female

15  readership, correct?

16      A.   That is correct.

17      Q.   Better Homes & Gardens, you don't have a

18  percentage in there.  I think I have a document that

19  provides that.

20          MR. FLYNN:  Can we just mark this quickly,

21  see if that's consistent with your view. This will be

22  Exhibit Kinsella 009.

Page 194

1              (Exhibit Kinsella 009 and Exhibit

2       Kinsella 010 marked for identification)

3          Q.   I've handed you Exhibit Kinsella 009 and

4       Exhibit Kinsella 010, which are printouts from

5       websites showing percentage breakdowns of the

6       demographics for readership of Better Homes & Gardens

7       and National Geographic.  For Better Homes & Gardens

8       it indicates that at least in the fall of 2005 that

9       readership was 79.1 percent women.  Is that consistent

10      with your understanding of Better Homes & Gardens?

11         A.   This is an MRI profile that would be

12      consistent, correct.

13         Q.   National Geographic has 46.8 percent female

14      and 37.7 percent over the age of 55, is that what

15      that document shows?

16         A.   Yes.  It shows that this skews male, and it

17      shows that it skews slightly younger.

18         Q.   And is that -- do you have -- have you

19      worked with National Geographic before?

20         A.   Yes.

21         Q.   Is that consistent with your understanding

22      of their profile?

Katherine Kinsella                    HIGHLY CONFIDENTIAL                    June 16, 2006
                                            Cambridge, MA

Page 195

```
1       A.   It is consistent.

2       Q.   Okay.  Now, you talk about trade

3   publications, National Underwriter and HR Magazine.

4       A.   Yes.

5       Q.   Do you have any information as to what their

6   distribution is in Massachusetts?

7       A.   No, I do not.

8       Q.   In terms of --

9       A.   Oh, actually, I might.  Yes, I do.  Yes, I

10  do.  I haven't looked at it, but I do have it.  It's

11  in the descriptions that I've provided.

12      Q.   Can you point me to where?  Oh, in the

13  produced documents?

14      A.   Yes, in the produced documents.  It will

15  only take me a moment to find it.  There is a

16  geographical breakdown in both of these kits here

17  of -- by state.

18      Q.   Do you want to just identify that by the

19  Bates numbers?

20           MS. HECTOR:  129 through 136.

21           MR. NOTARGIACOMO:  It's AWP-KIN-00133.

22           THE WITNESS:  That should be it.  Let me
```