# EXHIBIT 4

## Notification and Settlement Administration:
### Integrating Media and Direct Notice Through Third Parties

**By Katherine Kinsella, Kinsella Communications, Ltd.
and Richard H. Redfern, Rust Consulting, Inc.**

' 2001 Kinsella Communications, Ltd. and Rust Consulting, Inc.

In many consumer class action cases, only a percentage, if any, of the class member names and addresses are available through lists retained by the defendant company. Rule 23(c)(2) provides that settling parties  shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.   This case study describes how Kinsella Communications ( Kinsella ) and Rust Consulting ( Rust ) worked closely with the attorneys general of 50 states to develop a successful, comprehensive notice program to meet Rule 23(c)(2) objectives by, among other things, enlisting the help of third parties.

### The Action

*State of Connecticut v. Mylan Laboratories, Inc.,* M.D.L. 1290, Misc. No. 990276 (TFH/JMF), involves claims concerning two generic prescription drugs  lorazepam and clorazepate  manufactured and sold in tablet form throughout the United States by Mylan Laboratories, Inc. ( Mylan ).  Mylan is a United States corporation in the business of developing, licensing, manufacturing, marketing, and distributing, *inter alia*, at least 91 generic drugs.

Lorazepam is used to treat anxiety, tension, agitation, and insomnia, and as a preoperative sedative.  Because lorazepam is used to treat chronic conditions and is heavily prescribed for nursing home and hospice patients, lorazepam users tend to stay on the drug for long periods of time.  Over 18 million prescriptions per year are written for lorazepam tablets.  Clorazepate is used to treat anxiety as well as hypertension, and in adjunct therapy for nicotine and opiate withdrawal.  Doctors issue over 3 million prescriptions a year for clorazepate.

The action focuses on the impact of an exclusive agreement between Mylan and Profarmaco, a subsidiary of Cambrex and a major supplier of the active pharmaceutical ingredients (APIs) used to manufacture lorazepam and clorazepate.  On or about January 12, 1998, Mylan entered into an exclusive agreement with Profarmaco, which provided that Profarmaco, through its U.S. representative Gyma, would limit all of its sales of lorazepam and clorazepate API sold in the United States to Mylan.  After entering into this agreement with Profarmaco, Mylan raised the price of clorazepate

tablets to consumers[1], state Medicaid programs, wholesalers, retail pharmacy chains, and other customers by amounts ranging from 1,900% to over 3,200%. On or about March 3, 1998, Mylan raised the price of lorazepam tablets to these same customers by amounts ranging from 1,900% to over 2,600%.

The States and the District of Columbia, through their attorneys general, joined by the Federal Trade Commission alleged that as a result of the exclusive agreement, Mylan and other defendants could deny competitors the ingredients they needed to make lorazepam and clorazepate, substantially lessening competition in each generic drug market and enabling Mylan to significantly increase its prices. The lawsuit filed by the state attorneys general, seeking damages and restitution on behalf of consumers and state agencies, asserted claims against all settling defendants for violations of the Sherman Antitrust Act, 15 U.S.C. 1 and 2, and pendent state antitrust and consumer laws. The lawsuit filed by the FTC asserted claims against all settling defendants for violations of the Federal Trade Commission Act 45 and 53(b), entitling the Commission to the equitable remedy of disgorgement of profits.

The defendants have denied and continue to deny the claims and contentions alleged.

On April 27, 2001, the United States District Court for the District of Columbia granted preliminary approval to the $100 million proposed settlement. In connection with this settlement, the attorneys general represent all consumers residing in the U.S. who purchased the generic drugs lorazepam and/or clorazepate from January 1, 1998, through December 31, 1999.


**The Plan**

Working with the attorneys general, Kinsella and Rust developed a multifaceted notification strategy that included:

- Broad publication notice
- Internet postings
- Third-party direct notice
- Third-party notice


**Defining the Settlement Group**

The Settlement Group consisted of all persons and individuals who purchased the generic drugs lorazepam and clorazepate from January 1, 1998, through December 31, 1999 ( Relevant Period ), an estimated 500,000 individuals who would benefit from the injunctive relief to be imposed under the Settlement.

Within the Settlement Group were two classes of purchasers who are alleged to have paid higher prices for lorazepam and clorazepate during the Relevant Period and

---

[1] *The Dallas Morning News* of December 7, 1999, reported: In November 1997, a prescription for 500 clorazepate tablets  was $11.37 a bottle. Then, two months later, the cost suddenly shot up to $377.00.

therefore are entitled to make a claim for a refund payment: (1) cash customers, and (2) insured customers whose co-pay was variable.

Cash customers included the uninsured, many of whom were senior citizens on Medicare. Their prescription drug expense was not covered by any type of insurance or government program. Cash customers also included insured consumers whose prescription drug coverage had fixed annual dollar limits and those whose insurance policies provided that the beneficiary pay out-of-pocket for prescriptions up to a set dollar amount. In each of these instances, the consumer was a cash customer for a portion of the coverage year.

Insured consumers whose co-pays were variable are those consumers whose prescription drug coverage required a co-payment to the pharmacy based on a percentage of the drug cost, frequently 20%. Thus, as the cost of the drug increased, the customer s co-payment increased.

Further, the members of the Settlement Group were not identifiable; there were no direct mail lists available for notice.

### Identifying the Target Audience Through Product Use Research

To identify the demographic profile of the Settlement Group, Kinsella examined product information and use. Because all media should be purchased on the basis of demographics, notice programs should establish a clear demographic target or targets in order to select media to reach a specific audience. How an exposure occurred or how a product was used, for or by whom, where, and over what period of time provides critical information in identifying the demographic characteristics of class members  age, gender, income and educational level  as well as the geographic distribution of potential class members. This research provides the parameters for identifying and locating class members and shapes the scope of the notice program.

According to the Third Amended Complaint, doctors issue six times the number of prescriptions per year for lorazepam as for clorazepate. Both drugs treat anxiety, with lorazepam used extensively for nursing home and hospice patients. Clorazepate is also used to treat hypertension and as an adjunct therapy for nicotine and opiate withdrawal. The information provided by Plaintiffs  Counsel indicated that the majority of individuals in the Settlement Group are likely to be middle-aged or older women with low incomes.

Further, Kinsella reviewed the demographic information from several studies including Medicaid studies and an American Association of Retired Persons study. General information about the two drugs found on several drug and medical web sites was also reviewed.

Because individuals without insurance and those on Medicare would have suffered the greatest damage, the demographics of these individuals were examined using syndicated data from MediaMark Research Inc. ( MRI ). MRI is a nationally accredited media and marketing research firm that provides syndicated data on audience size, composition, and other relevant factors pertaining to major media including broadcast, magazines, newspapers, and outdoor advertising. MRI regularly surveys consumers nationally through in-person interviews and questionnaires, and provides measurements

of major media, products, services, and in-depth consumer demographic and lifestyle/psychographic characteristics.

From this research, Kinsella concluded that Medicare recipients are overwhelmingly low-income, elderly females with low education levels, and individuals without medical insurance are younger, have higher incomes and are slightly better educated than Medicare recipients, although significant percentages are older with low household incomes and education levels.

### Targeting the Audience Demographic

Based on available information and in accordance with the results of the previously mentioned research, Kinsella selected several demographic targets for purposes of purchasing and measuring media. Given that lorazepam is used extensively in treating anxiety for the elderly in nursing homes and hospice care, as well as the fact that 18 million prescriptions are written per year versus 3 million for clorazepate, Kinsella decided to focus more on elderly women than adults in general.

All usage studies of lorazepam and clorazepate and the Texas Medicaid study, which looked at the usage of the two prescription drugs by Medicaid recipients in the calendar year 1999, supported Kinsella s selection of the demographic targets. Although the Texas study involved Medicaid patients rather than Medicare patients, the study is helpful in that it examines age and gender factors. The Texas Medicaid data supported other evidence of the high usage of these drugs by elderly women regardless of insurance status.

- Lorazepam was prescribed 5.5 times more than clorazepate.
- 78.49% of those who took clorazepate were women.
- 66.38% of women who took clorazepate were 50 years of age or older.
- 70.87% of those who took lorazepam were women.
- 75.55% of women who took lorazepam were 55 years of age or older.

Because of the variety of uses for clorazepate and lorazepam, Kinsella selected three demographic targets to take into consideration not only the elderly female users, but also adults who may be younger. The three selected targets were:

1. Primary Target Women 55 years of age and older ( Women 55+ )
2. Secondary Target Women 65 years of age and older ( Women 65+ )
3. Tertiary Target Adults 35 years of age and older ( Adults 35+ )

### Selecting Media Based on Demographics

The next step in the development of Kinsella s notice program involved selecting the appropriate media. MRI data was used to determine if the product users are light newspaper readers, heavy television viewers, moderate magazine readers, etc. This information provided direction to the media selections and ensured that the media used actually reached the target audience. It is unlikely that the target audience would see a summary notice, for example, if placed in 200 newspapers nationwide when the

Settlement Group is composed of low-education, low-income consumers who are not newspaper readers.

Using MRI, the media habits of these three target audiences were examined. All three targets are heavy users of television. The MRI data clearly indicated that television is the best way to reach potential individuals in the Settlement Group by a significant margin. This correlates with lower education and household income as well as an increased likelihood of Medicare insurance or a lack of medical insurance.

Using a quintile analysis of the MRI data for Adults 35+, Women 55+ and Women 65+ with Medicare or no insurance, the top two quintiles[2] (heaviest and next heaviest usage) for each type of media follow. All media indexes were well below the average (100), with the exception of television and the second heaviest quintile for newspaper readership. This is illustrated in the chart below:

| Media | Adults 35+ No Medical Ins. | Adults 35+ Medicare | Women 55+ No Medical Ins. | Women 55+ Medicare | Women 65+ No Medical Ins. | Women 65+ Medicare |
|---|---|---|---|---|---|---|
| **Magazine** | | | | | | |
| Quintile 1 | 89.0 | 63.7 | 65.0 | 56.6 | 48.3 | 54.1 |
| Quintile 2 | 82.1 | 79.8 | 72.0 | 80.1 | 61.4 | 79.5 |
| | | | | | | |
| **Newspaper** | | | | | | |
| Quintile 1 | 84.6 | 117.3 | 94.9 | 126.0 | 84.6 | 128.0 |
| Quintile 2 | 102.7 | 156.5 | 125.2 | 154.9 | 137.5 | 158.9 |
| | | | | | | |
| **Radio** | | | | | | |
| Quintile 1 | 93.7 | 64.0 | 70.1 | 65.1 | 54.3 | 65.8 |
| Quintile 2 | 86.8 | 74.5 | 69.9 | 74.7 | 53.0 | 76.3 |
| | | | | | | |
| **Television** | | | | | | |
| Quintile 1 | 129.9 | 190.7 | 187.5 | 181.7 | 213.1 | 183.6 |
| Quintile 2 | 100.4 | 117.6 | 107.1 | 127.0 | 93.9 | 126.5 |

**Notice Program**

The paid notice portion of the notice program relied on television as the primary notice vehicle in combination with advertising in the highest circulating national print publications.

---

[2] Quintiles are the division of any sample of respondents into five equal-sized groups ranging from the heaviest to the lightest amount of exposure to the medium.

5

Television provides mass reach and immediate response. The use of different media vehicles allows the lower users of one type of media to be reached through another type of media. Notice in newspaper supplements provides immediate exposure with broad national coverage in all major media markets. The recommended consumer publication with a female readership provides notice over time.

Media recommendations were as follows:

Television: Advertising spots 30 seconds in length were aired over a two-week period on network television in early morning news, daytime, and early news segments.

Newspaper Supplements: The Summary Notice, designed as a half-page ad, was placed twice in *Parade* and twice in *USA Weekend*. These newspaper supplements are inserted in the Sunday edition of 898 newspapers nationwide.

Consumer Magazine: A full-page ad was placed one time in *Reader s Digest*.

Notice packages were mailed to all individuals who requested notice through the P.O. Box or toll-free number as a result of seeing the notice ads. The package could also be downloaded from a web site.

**Media Delivery**

Measurement of the notice program was provided in terms of reach and frequency. Reach is the estimated percentage of a target audience reached through a specific media vehicle or combination of media vehicles. Frequency is the estimated average number of times an audience is exposed to advertising vehicles carrying the message. The media delivery is expressed in terms of age and gender because television viewing is measured by these narrow demographics. Although magazine readership can be measured by other demographics such as income and education, in media programs that combine television with print, the measurements are expressed on the narrower demographics of age and gender.

The notice program outlined above provided the following estimated reach and frequency exposure[3]:

- 95.7% of Women 55+ were reached with an average 5.6 time frequency of exposure.

- 95.8% of Women 65+ were reached with an average 5.3 time frequency of exposure.

- 92.7% of Adults 35+ were reached with an average 3.6 time frequency of exposure.

---

[3] Because television is measured against gender and age only, all reach and frequency measurements are estimated against these broad demographics when combining print and television.

**Online Computer Posting**

To extend the reach of the notification program, the more traditional television and print publication campaign was supplemented with a web site that would be used to some degree by the younger target audience or children of elderly parents who are responsible for parental care. Kinsella established the web site, www.agsettlement.com, and listed it with the major search engines. The web site allowed individuals to read and download an introduction to the case, a long-form notice, a claim form, a list of questions and answers about the settlement, a description of the distribution plan, and a copy of the amended complaint. The web site also provided an e-mail response option so that questions could be sent directly to the settlement administrator.

During the course of the notice period, the web site recorded more than 100,000 downloads of the claim form document and more than 42,000 downloads of the notice document. E-mail queries totaled more than 2,600.

**Direct Notice Through Pharmacies**

The attorneys general, Kinsella and Rust began meeting early in the settlement process. While they knew the print and broadcast notices would identify many members of the Settlement Group, the attorneys general wanted to find some means of directly notifying group members.

The attorneys general began talking with large pharmacy chains about the availability of prescription records of customers with prescriptions for lorazepam and clorazepate with the goal of obtaining targeted mailing lists. Although the prescription information necessary for determining whether a customer met the eligibility requirements was accessible, the pharmacists were unwilling to release customer names and addresses because of privacy concerns. As a result, a variety of direct notice programs that could be administered by the pharmacy chains themselves were developed. The chains could determine the level of assistance that Kinsella and Rust would provide to them including which materials they wanted to receive and in which format, i.e., pre-printed mail pieces or text in an electronic format that they could print themselves.

Targeting the major pharmacy chains, the attorneys general presented the plans. Still, the chains hesitated because of the effort and expense that would be required even if they were supplied with the notice materials.

The attorneys general were persistent. After many discussions and many different plans, two pharmacy chains entered agreements with the attorneys general. Each chain negotiated its own contract for reimbursement of expenses relating to the direct notice program including database searches, mail handling and postage. In the contracts, the pharmacy chains agreed that Rust would supply customized, chain-specific notice materials for distribution.

Once satisfactory agreements were reached with two of the large pharmacy chains, 10 more followed suit, each negotiating a separate agreement and each receiving customized materials.

These pharmacies reviewed their prescription records based on date of purchase and method of payment. Each compiled a list of customers who purchased lorazepam and/or clorazepate during 1998 or 1999 using a method of payment that entitled them to cash refunds under the settlement. While the materials sent by the pharmacies differed in some respects, each letter included a release and waiver the customer could sign and send to the settlement administrator. The release and waiver provided the pharmacy permission to release the signing customer s settlement-related prescription information to the settlement administrator. The settlement administrator, Rust, would then log the receipt of the completed and signed release into a database for the particular pharmacy chain, electronically forward the data to the chain, and receive from the chain a record of the claimant s purchases of the two drugs. From that record, Rust acquired the information necessary for scoring and paying claims.

As a result of this direct notice program, the pharmacy chains mailed more than one million release and waiver forms to customers whose records indicated that they were likely to be eligible for a cash settlement. The pharmacy chains  cooperation helped gain benefits for their customers, created good will for their stores, and took the burden off prescription counter personnel who would have been asked to provide printouts by individual claimants. It also provided ease of claim filing for all claimants, a factor especially important for elderly consumers.

Three other large chains took part in the notice effort in a less direct manner. They were provided short-form notices along with release and waiver forms that customers could ask for when they visited each chain s pharmacies. These release and waiver forms were handled by the settlement administrator in the same manner as those from other chains.

### Indirect Notice Through Pharmacies

While the third-party direct notices reached many group members, the attorneys general, Kinsella and Rust developed an indirect notice campaign, again enlisting the help of the nation s pharmacies. The indirect notice campaign focused on individual pharmacies including those that participated in the direct notice program.

Each of 55,000 pharmacies was sent a package containing a letter from its state s attorney general that explained the settlement and requested assistance. The letters provided a toll-free number for pharmacists to contact if they had any questions or required additional materials for their stores. The accompanying package contained a point-of-purchase display easel containing a tear-off pad; a supply of informational brochures containing a short-form notice, an eligibility criteria checklist and the answers to 10 commonly asked questions; and a supply of prescription bag stuffers. Also included in the package was a supply of long-form notices and claim forms, which the pharmacies could mail or hand to customers. All customer materials carried the web site address and a toll-free number that customers could access for more information.

### Consumer Toll-Free Telephone Information

As group members had questions, the notice, display and advertising materials directed them to the web site (www.agsettlement.com) discussed above and a toll-free telephone

9

number.  When consumers called the toll-free number, they reached a dedicated call center at Rust.  Callers could leave name and address information on an automated call system and have a notice sent.

Callers also had the option of talking to customer service representatives trained to answer questions about the settlement.  Rust s call center handled more than 600,000 phone calls during the notice period.  Call rates were especially high immediately following television advertisements about the settlement.

Notice packages were mailed on request.  Each package contained a summary letter, a 12-page notice, questions and answers about the settlement, and a claim form.  The claim form required group members to attach proof of purchase such as receipts or a printout of purchases from a pharmacist.  Those who did not have a proof of purchase could request an affidavit to attest to their purchases.

### Summary

From the beginning of the settlement process, the attorneys general, Kinsella and Rust were determined to locate as many class members as reasonably possible.  In addition to a comprehensive program of published and broadcast notices and a web site notice, they worked with third parties to develop direct and indirect third-party notice plans that met the varying needs of the third parties involved.

The result was a successful, highly targeted and comprehensive notice program.

This program reached previously unidentified Settlement Group members through more than one million direct notices and 300,000 notices mailed in response to the media and indirect notice campaigns.  Consumers responded with over 200,000 claims.

# EXHIBIT 5



# BNA, INC.

# CLASS ACTION LITIGATION

*BNA Employee-Owned Since 1947*

**VOL. 2, NO. 14**   PAGES 531-534      **REPORT**      **JULY 27, 2001**

## Analysis&Perspective

Judges charged with approving class action notification plans need to understand how best to determine and reach the target audience, according to author Katherine Kinsella, a specialist in notification programs. Advertisements in national newspapers will not reach class members who get most of their news from television, for example. A common sense "I know it when I see it" approach is insufficient for approving notice plans.

Courts need testimony from top experts to help them evaluate the plans, and they must apply the gatekeeping rules set out in *Daubert* and *Kumho Tire* to evaluate the experts, Kinsella argues. These experts should be held to the same standards of other media professionals and be knowledgeable about the requirements of Rule 23, she says. Not only does good notice practice suggest that a judge have the right tools to evaluate proposed notification plans, but the rulings in *Daubert* and *Kumho* require that courts subject notice experts to this higher level of scrutiny.

## Quantifying Notice Results in Class Actions – the *Daubert/Kumho* Mandate

**BY KATHERINE KINSELLA**

### Providing the Courts With Quantifiable Notice Results

The federal class action rules require close judicial supervision of class action litigation and, in particular, notice to absent, and often unwitting, class members whose rights are being adjudicated. The Federal Rules of Civil Procedure require "the best notice under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2). The *Eisen* case makes clear that this requirement is quite unforgiving, as "[t]here is nothing in Rule 23 to suggest that the notice requirements can be tailored to fit the pocketbooks of particu-

lar plaintiffs." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 (1974).

In many Rule 23(b)(3) class actions, and in most product liability, mass tort, and consumer class cases, the members are not readily identifiable. In cases where warranty registrations or claim forms and the like exist, direct mail notice is possible to some percentage of the class. More often, in cases ranging from Fen/Phen and asbestos to house siding and breast implants, class members must be reached through published notice that includes magazines, newspapers, TV, radio, the Internet, and the like.

Having designed and implemented notice programs in over 95 class actions in state, federal district, and bankruptcy courts, I believe that judges and lawyers need a better understanding of how media penetrates demographic audiences, how it is measured, and the reasoning behind media choices in order to properly evaluate the adequacy of published notice.

Notice experts are often required to provide affidavits and court testimony attesting to the adequacy of the notice. For experts, the methodology used to design a notice program as well as the qualifications of the no-

---

*Katherine Kinsella, President of Kinsella Communications Ltd. in Washington, D.C., is a nationally recognized specialist in class action and bankruptcy notification programs in the mass tort and product liability arenas. Kinsella has developed and directed some of the largest and most complex national notification programs in the country. Her firm has developed or consulted on over 95 notification programs involving nonreadily identifiable class members. She can be reached at kkinsella@kinsella.com.*

---

[1] Discussion of the application of the notice requirement to Fed. R. Civ. P. 23(b)(1) and (b)(2) classes is beyond the scope of this discussion. *See generally, Newberg On Class Actions*, "Notice to Class Members" (Third Edition, 1992) at §§ 8.13 and 8.14. For the tension between the notice requirements established by the Rule 23 Advisory Committee's Rule 23(c)(2) and constitutional due process requirement, *see id.* at § 8.04. While notice may not be required in a Rule 23(b)(1) or (b)(2) case, notice is frequently given. *Id.* at § 8.05, 8-18.

COPYRIGHT    2001 BY THE BUREAU OF NATIONAL AFFAIRS, INC., WASHINGTON, D.C. 20037    ISSN 1529-0115

tice provider are of paramount importance. Indeed, *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), require more rigorous scrutiny of plans using published notice to class members who are otherwise unidentifiable.

Notice plans directed to unidentified class members must (1) identify the demographics of class members and establish a target audience, (2) outline the methodology for selecting the media and other plan elements and how they relate to product usage or exposure, and (3) provide results that quantify for the court the adequacy of the notice based upon recognized tools of media measurement.

Without an understanding of these three factors, the court has no firm basis upon which to form an opinion with regard to the adequacy of media-based notice. "I know it when I see it" is no longer a sustainable position.

## The Role of Paid Advertising

Each class action obviously requires a notice program tailored to the case. Factors such as the demographics of class members, the distribution of product or exposure, the number of readily identifiable class members, the anticipated class size, and whether the case is statewide or national influence the direction and scope of the notice program.

Although there are many means of communication, paid media *must* be the basic component of any notice plan to reach unidentifiable class members. It is targetable to specific demographic groups, measured by accredited marketing research firms for audience reach and frequency, and contractually guaranteed to appear on a certain date.

Notice by press release, video news release, or letters to third parties who may have contact with class members are valuable but not certain. Earned media can never provide guaranteed coverage given the lack of a contract for services, a time frame within which the story must run, and a guarantee that such critical information as toll-free numbers and other contact information will be displayed. The court must be satisfied *before* approving a notice program that an adequate percentage of the class will have an opportunity to see the notice.[2]

---

[2] In large and important settlements, the biggest press exposure occurs with the announcement of the settlement. It is far more difficult to get earned media coverage during the notice phase after national media coverage of a settlement has occurred. However, advance planning and preparation can turn the early press coverage into a notice advantage.

In conjunction with the press conference announcing the settlement in the fen/phen diet drug case, a Web site and toll-free number were established to make sure that potential class members could get information. The toll-free number and the Web site provided information about the forthcoming notice process and allowed individuals to register to receive direct notice.

Oftentimes, however, the announcement of a settlement precedes the notice by many months leaving potential class members frustrated with their inability to obtain further information. In the diet drug case, over 80,000 potential class members called the toll-free number or logged onto the Web site as a result of media coverage of the press conference where they were assured that they would get notice at the appropriate time.

## Identifying a Target Demographic and Selecting Media

Individuals within the general population consume media differently based on income, gender, age, education, and the like. Notice programs, therefore, must establish a clear demographic target or targets in order to select media to reach a specific audience. How a product was used or an exposure occurred, to or by whom, where, and over what period of time provides critical information in identifying the demographic characteristics and geographic distribution of class members. This research provides the parameters for identifying and locating class members and shapes the notice program.

In asbestos cases, for example, occupational exposure is the overwhelming source of injury. The period of time that asbestos was in the workplace, the professions that had exposure (for example, building and construction trades, shipbuilding industries, and naval crew members or merchant marines), and the latency period for disease manifestation help provide a demographic profile of class members that is predominantly male, blue-collar, and at or over age 45. In addition, the extraordinary use of asbestos insulation in shipbuilding during wartime pinpoints specific geographic areas where enormous numbers of class members are likely to be located even years after the exposure.

---

**It is not adequate notice if summary notices appear in hundreds of newspapers nationwide when the class is comprised of low-educated, low-income consumers who are not newspaper readers.**

---

Nationally accredited media and marketing research firms such as Simmons Market Research Bureau Inc. (Simmons), and MediaMark Research Inc. (MRI), provide syndicated data on audience size, composition, and other factors pertaining to major media including broadcast, print, and outdoor advertising. They provide a single source measurement of major media, products, services, and in-depth consumer demographic and lifestyle/psychographic characteristics. These research companies regularly survey consumers nationally through in-person interviews and questionnaires.

Simmons and MRI provide demographic profiles of individuals who use a specific service or product. For example, the data allows us to identify the demographics of homeowners, cigarette smokers, individuals who bought insurance in the last twelve months, or diet drug users. In many instances, product usage by brand or type is available.

In addition, the media habits of these product users or demographic targets can be further evaluated. It can be determined if they are light newspaper readers, heavy television viewers, moderate magazine readers, and the like. Different types of media can be compared for audience penetration and cost. For example, TV penetration of a particular target audience can be compared to that of radio, magazines, and newspapers. In addition, each media vehicle—a specific television show, a radio program, or a magazine—is indexed with

respect to its penetration of the target audience. This information provides direction to the media selections and ensures that the media used actually reaches the target audience.

It is not adequate notice, for example, if summary notices appear in hundreds of newspapers nationwide when the class is comprised of low-educated, low-income consumers who are not newspaper readers.

Simmons and MRI also measure the readership, as distinct from circulation, of over 200 consumer publications and national newspapers, allowing the calculated estimation of audience reach through a print media schedule. Neilsen Media Research Inc., and Arbitron provide audience measurements against age and gender demographics that enable television and radio audience estimates. ABC audit statements provide definitive circulation information for print media.

## Measuring the Published Notice

There are a number of ways to measure media penetration. Two of the most basic are *reach* and *frequency*. Reach is the estimated percentage of a target audience reached through a specific media vehicle or combination of media vehicles. Frequency is the estimated average number of times an audience is exposed to an advertising vehicle carrying the message.[3]

Reach and frequency calculations are estimates within a standard margin of error that provide the advertiser—whether Coca Cola, McDonald's, the Sierra Club, or the court—with a reliable basis upon which to judge penetration of target audiences by media.

Software programs created by the media industry allow reach and frequency estimates to be calculated. Statistical formulas factor out duplication of readership or viewership among the target audience and allow reach and frequency, as well as other media measurements, to be calculated. This allows the net audience reach of a media schedule using various kinds of print and broadcast media to be determined.

There is no set reach or frequency standard. In some instances, a 95 percent reach of the target audience with a 3+ frequency is appropriate; in other cases, a much lower reach and frequency is adequate. Reach and frequency targets depend upon a number of factors that guide how extensive a paid media program should be within the context of what is reasonable and practicable. Among the factors are the type of relief (injunctive or damages, whether direct or *cy pres*/fluid recovery), seriousness of the tort, size of the settlement, and percentage of class to be reached through media versus direct mail.

In addition, it is not always reasonable to achieve a high national reach in a nationwide class action when the class members live for the most part in specific geographic areas. For example, in *Richison v. Weyerhaeuser Co.*, (No. 005532 Cal. Super. Ct., San Joaquin Cnty.), five states had 95 percent of the product distribution even though this was a nationwide class. National notice was achieved through *Parade* and *USA Weekend* with a nearly 70 percent reach of the targeted audience. Additional media was purchased in the five

states providing reaches from 91.1 percent to 97.5 percent with frequencies of 2.1 to 3.1 exposures.

## Determining the Adequacy of Notice

When paid media is being used for notice, the tools available for measuring the reach and frequency of the media must be used. Reach and frequency estimates are standard methods used by every major advertising and public relations firm in the country to help select media to reach particular targets and to measure the reach of those targets and how often they may have the opportunity to be exposed to the message.

The use of these tools is not imposing an "advertising standard" on notice programs. The tools are simply providing a measurement of the media's ability to reach class members. There is, moreover, no advertising or media standard for notice programs. Each case is different; consequently, reach and frequency goals will be different. These measurements are simply the calculation of what the media is delivering.

---

**Without using industry-recognized standards of measurement, courts do not have the expertise to evaluate published notice programs.**

---

Some talk of achieving a "legal standard" for notice programs. A notice is deemed "adequate" if a court approves it. However, without using industry-recognized standards of measurement, courts do not have the expertise to evaluate published notice programs. Circulation figures and the number of advertising placements or press articles alone are insufficient guides for assessing whether notice was actually or likely received by absent class members.

*USA Today*, for example, is often used as a standalone national class action notice. However, the 18 and older readership of *USA Today* is only 4,612,000 out of a total 196,328,000 adults nation-wide. National distribution should not be confused with national notice when less than a 2 percent penetration of an audience could never be deemed adequate. (*USA Today* is, however, frequently a useful component of a national notice program. As they say, necessary but not sufficient.)

## Expert Defense of the Notice Plan

In the wake of the U.S. Supreme Court's decisions in *Daubert* and *Kumho*, the reliability of a notice expert's testimony should be tested against the standards developed within the media industry for determining whether and to what degree a target audience has been reached and how often. In performing the "gatekeeping" function of determining the reliability and relevance of the testimony, courts can be expected to reject expert testimony that does not rely on accepted data and methodology.

As expected, the Supreme Court's decisions in *Daubert* and *Kumho* have led to increased scrutiny of expert testimony. A recent study released by the Federal Judicial Center on the effect of these decisions indicates that judges are far more cautious about admitting expert

---

[3] For a discussion of reach and frequency, see Sissors and Bumba, "Reach, Frequency, and Effective Frequency," *Advertising Media Planning.* 4th ed. (Lincolnwood: NTC Business Books, 1993).

testimony and more probing about the basis for the expert's reliability.[4]

While *Daubert* addressed scientific expertise, *Kumho* makes clear that the same principles apply to all expert testimony and not just scientific evidence. According to the Court, "Daubert's general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." 526 U.S. at 141.

A federal judge performs this gatekeeping function by ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. In order to determine reliability, the court must analyze the data and facts upon which the expert relies and the methodology used to support the conclusions.

In assessing the expert witness's reliability, the court must determine whether the testifying expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152. That showing would likely require evidence that the expert's data and methodology are similar to that used by professionals in the relevant field.[5]

In the wake of *Daubert* and *Kumho*, experts on class action notice who testify to the adequacy of a notice program should be held to the standards of other media professionals in addition to being knowledgeable about the requirements of Federal Rule 23, its state equivalents, and prior court approval of particular notice programs.

---

[4] The study, "Expert Testimony in Federal Civil Trials: A Preliminary Analysis," is available on the Federal Judicial Center's Website at http://www.fjc.gov. (The Federal Judicial Center is the research arm of the federal courts.)

[5] For a more expansive discussion of the application of *Daubert* and *Kumho, see* Geller and Lackey, *Leader's Product Liability Law and Strategy,* Volume XVII, No. 10, (April 1999).

Good notice practice dictates that the court be provided with the tools to judge the adequacy of a media-based notice program including the breadth of reach and the opportunities class members have to be exposed to the notice. *Daubert* and *Kumho* now make it imperative.

---

**ARTICLE SUBMISSIONS WELCOMED**

Attorneys, law professors, and others in the legal community are invited to submit articles for publication.

We are especially interested in Analysis and Perspective articles of interest to all attorneys who handle class action and multiparty litigation. Analysis and Perspective articles are lengthy articles analyzing a trend, strategy, case, or key issue, or offering an opinion on a hot topic. We seek articles on procedural maneuverings and legal issues common to all types of class action and multiparty litigation, including pieces on class certification strategies; unusual litigation, settlement, or trial techniques; fee disputes, key interlocutory rulings, and other issues of importance. We also welcome articles expressing a point of view, or responding to a viewpoint already published.

The editors also seek Practice Tips, which are short articles offering practical guidance on some aspect of class action and multiparty practice.

Article submissions or queries should be directed to Senior Legal Editor; *Class Action Litigation Report;* 1231 25th St., NW; Washington, D.C 20037; (202) 452-4430 (phone); (202) 331-5190 (fax); or nmoore@bna.com (e-mail).

---

COPYRIGHT © 2001 BY THE BUREAU OF NATIONAL AFFAIRS, INC., WASHINGTON, D.C.   CLASS   ISSN 1529-0115

# EXHIBIT 6

1 of 1 DOCUMENT

Copyright © 1997 The Bureau of National Affairs, Inc.
Toxics Law Reporter

**September 24, 1997**

*12 Toxics L. Rep. (BNA) 488*

**LENGTH:** 43 words

**SECTION: ANALYSIS AND PERSPECTIVE.**

Class action law is in the midst of a sea change. Whether it be congressional curtailing of securities litigation, judicial limitations on the more expansive use of the class device, or the work of the Advisory Committee on Civil Rules, change is underway.

Federal mass tort class actions, in particular, are reeling from a series of split decisions that strike down the settlement class action in one case and affirm it in another. n1 Courts at all levels are agonizing over a number of issues with respect to certification, the binding of future claims, and immature mass torts. n2

n1 Georgine v. Amchem Prod., 878 F. Supp. 716 (E.D. Pa. 1994), rev'd, 83 F.3d 610 (3d Cir.), aff'd 117 S. Ct. 2231 (1997) (striking down asbestos class action settlement); Ahearn v. Fibreboard, No. 6:93cv526 (E.D. Tex. 1995), aff'd sub nom, Flanagan v. Ahearn, 90 F.3d 963 (5th Cir. 1996) (where Fifth Circuit upheld asbestos class action settlement); vacated in light of Amchem sub nom Ortiz v. Fibreboard.

n2 See Georgine, Ahearn and Castano v. American Tobacco, 150 F.R.D. 544 (E.D. La. 1995), rev'd, 84 F.3d 734 (5th Cir. 1996).

Among the issues in flux, **notice** is of increasing concern, particularly in mass tort, product liability, and other class actions where class members are not readily identifiable. This concern is not unfounded given the wide range of judicial interpretations of adequacy.

**TITLE: THE TEN COMMANDMENTS OF CLASS ACTION NOTICE.**

**AUTHOR:** Katherine Kinsella *

* Katherine Kinsella is president of Kinsella Communications Ltd., an advertising and communications firm specializing in legal notification for class actions and mass tort bankruptcies.

**TEXT:**

Rule 23(b)(3) of the Federal Rules of Civil Procedure stipulates that direct **notice** by mail is required when class members are identifiable. In class actions where the majority of class members are not readily identifiable, published **notice** is mandated. n3

n3 See Fed.R.Civ.Pro. Rule 23(c)(3), "The court shall direct to the members of the class the best **notice** practicable under the circumstances. . . ."

But "published" **notice** is actually a misnomer, having expanded from simple newspaper **notice** to encompass nearly the whole spectrum of media—including broadcast vehicles and the Internet. In fact, publishing **notice** today requires not only an understanding of the law, but also an understanding of a complex and changing media environment.

Ten key principles, or "commandments," should guide the development and implementation of a **notice** program. Although not carved in stone, these principles are grounded in advertising methodology and measurable outcomes that provide accountability and ensure adequacy of **notice**.

© BNA, Inc. Toxics Law Reporter, September 24, 1997

## COMMANDMENT # 1

### Base Notice Program On Specifics

Every class action is unique and requires a **notice** program tailored to the specifics of the case.

Factors such as the demographics of class members, the distribution of product, the number of readily identifiable class members, anticipated class size, and jurisdictional breadth (national versus statewide) can and must influence the direction and scope of the **notice** program.

A cookie-cutter approach to **notice** ignores the facts of the individual case.

## COMMANDMENT # 2

### Know The Product

Knowing how a product was used or consumed, by whom, over what period of time, and where provides information essential to the effective design of a **notice** program.

In some cases, the identification of manufacturing plants, geographic sales and distribution patterns, and third-party involvement with the product or class members are relevant factors. This product information provides insight into the demographic characteristics of class members, likely geographic distribution of future claims, and how a media plan should be constructed.

In asbestos cases, for example, occupational exposure is the overwhelming source of injury or exposure. The period of time that asbestos was in the workplace, the professions exposed (building and construction trades, shipbuilding industries, and naval or merchant marines), and the latency period for disease manifestation help provide a demographic profile of class members—male, blue-collar workers, aged 45+. In addition, the extraordinary use of asbestos insulation in shipbuilding during wartime pinpoints specific geographic areas where enormous number of class members are likely to be located.

## COMMANDMENT # 3

### Define Your Target Audience

In designing a **notice** campaign, the critical first question should not be: Where should we place the **notice**? but rather: Whom do we have to reach?

All measured media is bought on the basis of demographics. Online syndicated market research companies such as Simmons Market Research Bureau Inc. and MediaMark Research Inc., regularly survey consumers with respect to product usage and media habits. These data permit the identification of demographic characteristics and groups and provides information on the penetration of demographic groups by specific media vehicles within each medium.

In *Cox v. Shell Oil Co.*, n4 a polybutylene plumbing products liability class action, the product was used extensively in mobile homes and lower-to medium-priced houses. Using syndicated data, a national analysis of homeowners with homes that were valued at less than $100,000 indicated that the main target was adults, aged 35+, with household incomes of less than $45,000 and a high school education or less.

n4 *No. 18,844, 1995 WL 775363 (Tenn. Ch. 1995).*

## COMMANDMENT # 4

### Use Demographic Profiles To Buy Media

Once a demographic profile is established, the media can be identified to reach the targeted audience. Syndicated market research enables different types of media to be compared for audience penetration and cost. For example, TV penetration of a particular target audience can be compared to that of radio, magazines and newspapers. In addition, each media vehicle—a specific television show, a radio program, or a magazine—is indexed with respect to its penetration of the target audience.

In *Nealy v. Woodmen* of the World Life Ins. Co., n5 an insurance discrimination case, the insurance product was sold to African-Americans in the South. Using Simmons Market Research Bureau data, demographic profiles were

© BNA, Inc. Toxics Law Reporter, September 24, 1997

constructed by race and census area for purchasers of annuities, term, and life insurance policies.

n5 No.3:93 CV536 BN (S.D. Miss).

These demographics were cross-referenced with the media consumed by the identified demographic group. The original contemplated newspaper-based **notice** plan became a more effective television-based **notice** plan became a more effective television-based plan for essentially the same budget.

## COMMANDMENT # 5

### Target Notice Campaign Geographically

Although a class action may be national in scope, because of product distribution and usage, the majority of class members may reside in discrete geographic areas. Targeting a national **notice** campaign geographically has three benefits: it directs the media to areas and markets where class members are most likely to be found, makes media expenditures more cost-efficient, and allows individuals most likely to be class members to be exposed to the **notice** multiple times.

In *Backstrom v. The Methodist Hospital,* n6 a temporo-mandibular joint (TMJ) disease/disorder class action, product sales records were analyzed by zip code, enabling the paid media program to be highly targeted and weighted to areas where the TMJ product was used. The resulting **notice** program provided national **notice** with multiple exposures to class members in geographic areas where they were most likely to be located.

n6 No. H941877 (S.D. Tex.).

## COMMANDMENT # 6

### Use Paid Advertising

Paid media should be the basic component of a **notice** plan to reach unidentifiable class members because it is targetable to specific demographic groups, is measured by accredited marketing research firms for audience reach and message exposure, and is contractually guaranteed to appear.

**Notice** by press release, video news release, or letters to third-parties who may have contact with mass tort claimants can be extremely valuable, but is not certain **notice.** The court must be satisfied before approving a **notice** program that the **notice** will reach class members.

The problem with unpaid, or "earned," media is not whether the class action is reported in the media. Instead, the problem is its effectiveness as a primary **notice** vehicle. Contact information—which must be conveyed for the **notice** to be successful—is often not included in news articles. A news story may provide general information on a class action but may not provide sufficient information for a class member to have access to the complete **notice.**

Both third-party **notice** to individuals or organizations who have a connection to class members and earned media efforts can increase awareness of the class action and result in **notice** to some class members. Their role, however, should be supplemental.

## COMMANDMENT # 7

### Use Reach And Frequency Measurements

The advertising industry has a language of its own, including terms such as: gross impressions, gross rating points, reach, and frequency. These measurements are all important but reach and frequency are the essential measurements for the purpose of gauging adequacy of **notice.**

Reach is the percentage of a target audience reached through a specific media vehicle or combination of media vehicles.

Frequency is the average number of times an audience is exposed to a message. Some individuals who are heavy consumers of media may see an ad five times, others in the target group may only see it once or not at all.

© BNA, Inc. Toxics Law Reporter, September 24, 1997



The figures are important because they are the national standard rates of measurement in the advertising industry and because they quantify for the court the percentage of audience reached and the number of opportunities class members had to see the **notice**.

Unfortunately, not all media are measured. For example, community newspapers and trade publications are not included in national readership surveys. However, most national media are measured and, when possible, reach and frequency measurements should be used. Providing these statistics will help ensure that the **notice** process will withstand attack either in the trial court or on appeal.

## COMMANDMENT # 8

### Design Notice To Attract Attention

Although securities class actions have a high percentage of well-educated class members, that is not the case with most consumer-oriented or mass tort class actions where many class members have a high school education or less.

The most critical element of the published **notice is the headline.** There is absolutely no incentive for a "general" consumer to stop and read a legal advertisement that uses the case caption in tiny print as the **headline.** There are only a few seconds to capture the attention of a reader. The **headline** must be sufficiently broad to allow individuals who may potentially be class members to read further and determine if they should seek additional information.

The summary **notice** should provide the most salient information points—what the suit is about, who the suit involves, what their rights are, what action is necessary, and most importantly, how to get more information—which should explain the details of the litigation in understandable language.

Whenever possible, **notice** should use simple language versus "legal" language to explain the litigation and the rights of class members. Obviously, class members must receive the full **notice** as it has been approved by the court. However, a reader-friendly summary of the key elements of the **notice,** a question-and-answer document that allows individuals to access the information from their frame of reference, or even the use of topical subheads within the text of a **notice** to guide readers will render the **notice** more understandable.

## COMMANDMENT # 9

### Integrate All Facets Of Notice Campaign

Providing adequate **notice** involves more than just mailing **notice** to readily identifiable class members and placing a few ads in selected publications. Individuals get their information from multiple sources at different times and in different ways. The **notice** process also consists of cost-effective printing and mailing in a reasonable time-frame, sophisticated toll-free telephone systems, and prompt recognition and addressing of problems that will inevitably arise.

The adage about too many cooks, especially inexperienced cooks, certainly pertains to **notice** programs. All facets of the notification process including direct **notice,** toll-free telephone systems, paid and unpaid media, and record keeping should be integrated and centrally coordinated.

In class actions for settlement purposes, **notice** initiates the claims process. Thinking through and integrating the **notice** and claims processes at or before certification eliminates problems and saves time and money.

## COMMANDMENT # 10

### Guide Court Through Notice Plan

Grasping media concepts and understanding advertising language and techniques is not intuitive. They can be explained, however, in a **notice** plan that guides the court through the who, why, and how of **notice.** In addition, the use of recognized measurements and projected outcomes, as previously discussed, provides the court with real tools to evaluate the adequacy of any **notice** program.

In an era of exploding information and communication technologies, it is vital that individual legal rights—and awareness of those rights—not become a casualty to either today's media complexity or yesterday's anachronistic traditions.

Just as law evolves through practice and court interpretation, **notice** standards are evolving. The most important step toward a standard of adequacy is that **notice** be delivered in a manner in which the class members have an

© BNA, Inc. Toxics Law Reporter, September 24, 1997

opportunity to actually see and understand the **notice.** Approaching the requirement of **notice** with a methodology based on principles that not only ensures delivery of **notice,** but also measures adequacy, is the first step toward establishing a standard that protects the legal rights of class members.