Exhibit 37

Mike Beaderstadt

Moline, IL

September 17, 2004

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MASSACHUSETTS

3

4    IN RE PHARMACEUTICAL          )

5    INDUSTRY AVERAGE WHOLESALE )   MDL No. 1456

6    PRICE LITIGATION              )   Civil Action: 01-CV-12257-PBS

7    THIS DOCUMENT RELATES TO      )

8    ALL CLASS ACTIONS             )

9

10

11        Deposition of MIKE BEADERSTADT, taken before

12   GREG S. WEILAND, CSR, RMR, CRR, Notary Public,

13   pursuant to the Federal Rules of Civil Procedure for

14   the United States District Court pertaining to the

15   taking of depositions, at Suite 300, 1630 Fifth

16   Avenue, in the City of Moline, Illinois, commencing

17   at 9:07 o'clock a.m., on the 17th day of September,

18   2004.

19

20

21

22

EXHIBIT

Mike Beaderstadt                                                      September 17, 2004

Moline, IL

---

Page 2

1    PRESENT:

2

3    HEINS, MILLS & OLSON, P.L.C., by

4    MS. SUSAN E. MacMENAMIN (via telephone)

5    3550 IDS Center

6    80 South Eighth Street

7    Minneapolis, Minnesota 55402

8    (612) 338-4605

9    E-mail: esmacmenamin@heinsmills.com

10       On behalf of the Plaintiffs;

11

12   PATTERSON, BELKNAP, WEBB & TYLER, LLP, by

13   MR. ERIK HAAS

14   1133 Avenue of the Americas

15   New York, New York 10036-6710

16   (212) 336-2117

17   E-mail: ehaas@pbwt.com

18       On behalf of the Defendants;

19

20

21

22

---

Page 3

1    MS. LAURA J. KNOLL

2    1300 River Drive, Suite 200

3    Moline, Illinois 61265

4    (309) 765-1365

5    E-mail: KnollLauraJ@JohnDeere.com

6        On behalf of the Witness.

7    Also Present:  Ms. Carol Sidwell.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

---

Page 4

1                   INDEX

2    September 17th, 2004

3    MIKE BEADERSTADT

4                        PAGE

5    Examination by Mr. Haas ......................    5

6    Examination by Ms. MacMenamin .................   72

7

8           DEPOSITION EXHIBITS

9

10   NUMBER              DESCRIPTION              PAGE

11

12   Exhibit Beaderstadt 001 Series of e-mails, Bates

13           labeled JDH 000289 through

14           000291                    63

15

16

17

18

19

20

21

22

---

Page 5

1               (Witness sworn.)

2             MIKE BEADERSTADT

3    after being first duly sworn, testified as follows:

4                EXAMINATION

5    BY MR. HAAS:

6      Q.  Please state your name for the record.

7      A.  Mike Beaderstadt.

8      Q.  Mike, my name is Erik Haas.  I'm with

9    Patterson, Belknap, Webb & Tyler.  We represent the

10   defendants in this action, and particularly I

11   represent Johnson & Johnson and its various

12   subsidiaries that have been named in this action.

13        If you would, Mr. Beaderstadt, could you

14   start by providing me with a description of your

15   educational background after high school.

16     A.  Okay.  I have a Bachelor's of business

17   administration from the University of Iowa, major in

18   accounting, 1975.

19     Q.  If you would for me run down your

20   employment history after high school.

21     A.  I started out working for a local CPA firm

22   in the Des Moines area.  One of the partners of that

---

Henderson Legal / Spherion
(202) 220-4158

Mike Beaderstadt                                                                    September 17, 2004

Moline, IL

Page 6

1  firm left and I followed him for another three
2  years, so from 1975 to 1981 worked at CPA firms in
3  Des Moines.
4       In 1981 I worked for the Family Practice
5  Residency Program in the Quad Cities in Davenport,
6  which was sponsored by the hospitals in the
7  community.  I was the administrator and part of the
8  faculty there.
9       In 1991, I joined what was then Heritage
10 National Health Plan, which has become John Deere
11 Health Plan, John Deere Health Care.
12      Q.   Family Practice Residency Program, what is
13 that?
14      A.   After medical school, individuals who
15 decide to specialize in family practice spend three
16 years in a residency program, and as part of that
17 residency program, they rotate with various
18 subspecialists in the community and have their own
19 practice, which is a model office, if you will, that
20 I was the administrator for.
21      Q.   When you say administrator, what does that
22 mean?

Page 7

1       A.   Was in charge of hiring, firing the
2  nurses, the office personnel, purchasing,
3  accounting, those sorts of things, billing.
4       Q.   What was your position when you joined
5  Heritage National Health Plan in 1991?
6       A.   I started out in our medical services area
7  as a data analyst, spent about six months there.
8            Do you want me to go on?
9       Q.   Yes, please.
10      A.   Spent another six months or so on a
11 special project looking at a Medicare pilot program,
12 and then spent the next two years back in the
13 medical services area as the manager of utilization
14 review overseeing our efforts to manage care, I
15 guess, at the home office.
16      In 1993, I left and spent the next six
17 years in one of our operation sites in Bettendorf
18 with increasing responsibilities for what became --
19 started out in just the Quad Cities area.  During
20 the term there, added Dubuque and southeast Iowa,
21 Peoria and Rockford to that.
22      Q.   What was your position at that time, your

Page 8

1  title at that time?
2       A.   The final title was executive director.
3  It went from operation manager to area manager to
4  executive director during those six years.
5       Q.   Okay.  Let's walk through these
6  individually then.
7       A.   Okay.
8       Q.   So the first six months you were a data
9  analyst in the medical services area?
10      A.   Yes.
11      Q.   What did that entail?  What data were you
12 analyzing?
13      A.   Looking at utilization data, ways to
14 compare providers to one another.
15      Q.   When you say providers, what entities are
16 we talking about at that time?
17      A.   Physicians primarily, although we did do
18 some hospital work as well.  We subcontracted with
19 some firms that did some medical records extraction
20 to compare facilities as well.
21      Q.   What were you attempting to elicit from
22 the comparison?

Page 9

1       A.   Simply to identify on an objective basis
2  largely costs of dealing with certain diseases, how
3  providers handled specific diseases differently and
4  which ones were most cost effective and quality
5  oriented, but it was pretty crude back then.
6       Q.   Did part of it entail analysis of whether
7  a, say, course of therapy treatment was more or less
8  expensive than, say, the administration of drugs in
9  lieu thereof?
10      A.   We didn't get into that kind of detail
11 back then.
12      Q.   Did any of that work involve the analysis
13 of cost of drugs?
14      A.   Not during those first six months, no.
15      Q.   Okay.  Thereafter you spent another six
16 months in the Medicare pilot program.
17           What did that entail?
18      A.   Medicare had dangled a little bit to
19 Deere & Company the possibility of being its own
20 Medicare intermediary.  We were exploring that.
21 Ultimately, we did not pursue it.
22      Q.   Without necessarily getting into too many

3 (Pages 6 to 9)

Mike Beaderstadt                                                    September 17, 2004

Moline, IL

Page 10

1  details, did any of that analysis that you were
2  involved in entail the evaluation of drug costs?
3      A.  No.
4      Q.  So from the period, what was it, 1992 to
5  1993, you were then in managed care utilization
6  review; is that correct?
7      A.  Yes.
8      Q.  Would you tell me a little bit more about
9  what you did there?
10     A.  We did have some specific drug activity
11 there during that time.  We developed a report that
12 we sent to providers on a quarterly basis that
13 showed their generic utilization as compared to
14 their peers.  We suggested when they were using
15 brand names that had a generic alternative that
16 there were generics available and gave them the list
17 of those opportunities.
18        We also talked about how well they
19 complied with our formulary, and when they were
20 using a nonformulary agent, we suggested the
21 formulary agent in a report to them and told them
22 how often they had used those drugs during that

Page 11

1  period.
2      Q.  Again, now, is this focused still with
3  physicians, or was it also pharmacies?
4      A.  This was with physicians.
5        There were other duties there as well in
6  terms of oversight of our hospital management
7  program, inpatient stays, utilization management,
8  some continuing efforts in terms of comparing
9  physicians' practice patterns to one another, those
10 efforts.
11     Q.  Did any of that analysis at that time
12 involve an evaluation of the cost to John Deere as a
13 managed care company of administering drugs in the
14 outpatient center of a hospital versus in doctors'
15 offices?
16     A.  No.
17     Q.  Did there come a point in time where you
18 were involved in that sort of analysis?
19     A.  We have been involved in that analysis
20 since those days, yes, but not at that time.
21     Q.  Okay.  You used the term managed care and
22 I used the term managed care, and just so we're on

Page 12

1  the same page, what does that mean to you or what
2  did that mean to you at that time?
3      A.  Simply an opportunity to provide feedback
4  to providers about the way in which they were
5  handling different episodes of care to suggest that
6  we try to get more evidence based, although evidence
7  based probably wasn't a word that we used at that
8  time, but they were following prescribed guidelines
9  and looking at the appropriate lengths of stay.
10 Back then that was where the real opportunities
11 were.  That was the low-hanging fruit, as we say,
12 that we could reduce lengths of stay and save money
13 versus our competition.
14     Q.  More generally, would the term managed
15 care be properly defined or used to mean the
16 management of your relations with your providers in
17 order to minimize costs?
18     A.  Yes, working together with them, peer
19 review, quality improvement committees.
20     Q.  So from 1993 to 1999, you were then
21 involved at the operations site from an operations
22 manager to an executive director position; is that

Page 13

1  correct?
2      A.  Yes.
3      Q.  Again, just walk through for me what your
4  responsibilities were over time and how they changed
5  and evolved.
6      A.  Yeah, we are structured so that we have a
7  local presence in all the communities in which
8  John Deere Health is present.  The local presence
9  includes a local marketing staff, a local medical
10 services area, quality improvement area that was
11 responsible for utilization management, case
12 management, various sorts of managed care, nursing
13 staff that oversee that, a customer service area and
14 provider contracting area.  The local contacts in
15 developing the provider contracts are done in the
16 local operations site.
17        So I started off simply in our Bettendorf
18 office, which was responsible for about four
19 counties, two in Iowa, two in Illinois, and
20 eventually had the operations managers in Dubuque
21 and Burlington and Peoria and Rockford reporting to
22 me as well.  All of those would do the same thing in

4 (Pages 10 to 13)

Mike Beaderstadt                                                    September 17, 2004

Moline, IL

Page 14

1    their local areas.
2        Q.   So did each of the local areas have their
3    own discretion with respect to the methodology for
4    reimbursing providers, for example?
5        A.   Not so much in the methodology but in the
6    amounts that they might be paid.  They would
7    obviously negotiate on a local basis based on what
8    the local expectations were.
9        Q.   So the concept was that the competitive
10   dynamics varied by geographic area, and so it made
11   sense --
12       A.   Yes.
13       Q.   -- to negotiate on a local basis the
14   provider contracts?
15       A.   That's true.
16       Q.   How many of these local areas were there
17   and are there?
18       A.   There were several more at that time than
19   there are today.  There were in the neighborhood of
20   20 of them back at that time.  Today I think we're
21   down to nine or ten.  We have consolidated many of
22   them.

Page 15

1        Q.   Today do you still have the contracting,
2    provider contracting function carried out at this
3    local entity level?
4        A.   The negotiation function, yes, as it was
5    then.
6        Q.   Now, in this context when we're talking
7    about provider contracting, are we talking about
8    just the physicians or as well the pharmacies?
9        A.   The physicians have always been focused at
10   the operations site.  The other entities with whom
11   we might negotiate have over time evolved and moved
12   to the operation site, and much of that was done
13   from the home office during some of that period of
14   time.
15       Q.   So at the same time we have had
16   consolidation of local areas, we have had more
17   increased responsibilities provided to the local
18   areas with respect to contracting; is that correct?
19       A.   Yes, that's true.
20       Q.   What was your position with John Deere
21   after 1999?
22       A.   Since 1999, I've been the director of

Page 16

1    provider relations at our home office in Moline.
2        Q.   What are your responsibilities in that
3    position?
4        A.   There are several different categories
5    there.  We are responsible -- we are the group who
6    prepares the contracts to reflect the deals that
7    have been negotiated and have the standards for
8    that.  We are also the group that takes the deal
9    that has been negotiated and loads those fees and
10   rates and deals into our claims adjudication system.
11   We do -- we have a group that does financial
12   analysis to provide insight to the field on what the
13   pro forma will look like with the deal that's being
14   contemplated, to understand the current arrangement
15   and to understand what the impact would be in a
16   change in that arrangement.
17           We have a group that oversees our national
18   contracting for organizations like pharmacies, which
19   is Carol's responsibility, and in the last few
20   months she has added other national areas as well,
21   including DME providers, home health agencies, our
22   capitated mental health vendor, other national

Page 17

1    contracts which we have.
2        Q.   Based upon your experience throughout the
3    1990s and since 1991, at this point do you consider
4    yourself an expert in the field of provider
5    reimbursement?
6        A.   I think I know a fair amount.  I don't
7    know what qualifies as an expert these days, but
8    yeah.
9        Q.   Sure.  I won't hold you to a technical
10   definition of expert.  That's not why I asked it.
11       A.   Okay.
12       Q.   Your lawyer graciously didn't object to
13   the form of that question.
14       A.   Okay.
15       Q.   I'll just make that representation.
16           What I was getting at is, what do you do
17   in your role in order to maintain and develop that
18   knowledge base?
19       A.   Certainly there's just a lot of experience
20   learning what -- hearing anecdotally from our
21   providers what our competition is doing.  There's
22   seminars, educational events that I've attended over

Mike Beaderstadt

September 17, 2004

Moline, IL

Page 18

1  the years.  There's certainly knowledge about what
2  Medicare is doing, how they are reimbursing
3  providers, trying to follow that.
4       Medicare has increasingly become a
5  benchmark for us.  We have been using the RBRBS
6  system that Medicare introduced for many years.  We
7  have discussed DRGs increasingly for our hospital
8  contracting.  We're embarking on the use of APCs for
9  outpatient pricing.
10      So Medicare is something that all
11  providers understand very well, and so when we go in
12  and speak Medicare with them, typically we can have
13  a common language to discuss a deal.
14      Q.   And was that the rationale for moving
15  towards Medicare as a benchmark, to have a common
16  language to be able to communicate with your
17  providers on?
18      A.   That certainly is part of it.  The other
19  part is that adjudication systems and other
20  infrastructure is often predicated on what is
21  becoming an industry standard in those areas.
22      Q.   So for administrative simplicity, it makes

Page 19

1  sense to look to the Medicare standard?
2      A.   Yes.
3      Q.   What do you do to maintain your expertise
4  with respect to the Medicare system?  Are there
5  certain publications you get?  Is there something
6  you do routinely?
7      A.   Yeah.  I don't necessarily receive those
8  directly, but members of my staff are frequent
9  visitors to the web site.  There is a publication.
10  There's a mailing list that we're part of that keep
11  us posted of what changes Medicare is making in
12  their reimbursement.
13      Q.   Are you a member of any professional
14  organizations that involve provider reimbursement?
15      A.   We are -- we're all members, and I
16  specifically get information from what is now
17  American Institute of Health Plans.  What is the
18  acronym any more for AHB?
19      MS. KNOLL:  American Health Insurance
20  Program Plan, something like that.
21      THE WITNESS:  Yes, so we're a member of
22  that.

Page 20

1       I also, because of my history as a
2  practice administrator, I was very active in the
3  Iowa Medical Group Management Association, was
4  president of that organization just prior to leaving
5  that field and joining John Deere Health, so I've
6  stayed active in that organization and get their
7  publications to learn about the provider side, the
8  physician side I guess of issues.
9       Also have dealt -- have a lot of
10  relationships with a lot of people in a lot of
11  facilities that we continue to talk to and work with
12  on a daily basis.
13  BY MR. HAAS:
14      Q.   That's an interesting point.
15      When you said to get familiar with the
16  physician side of the issues, what do you mean by
17  that?
18      A.   The Medical Group Management Association
19  is an organization of clinic practices that join
20  together to -- they have a political action lobby.
21  They have educational meetings, they have annual
22  conferences, and they do that both at the state and

Page 21

1  national level.
2       I have attended even in my new role
3  several of the state meetings, many friends amongst
4  the ranks of clinic managers, so I read their
5  publications and follow what's going on in their
6  world.
7      Q.   That's interesting, and I'll ask this
8  question, I'll ask a couple questions here because I
9  found this differs by various healthcare plans.
10      Let me start by asking, would you agree
11  that there's an inherent tension between the
12  physicians' perspective and the health plan's
13  perspective with respect to reimbursement in that
14  physicians typically want more and health plans
15  typically want to manage that to some degree?
16      A.   Yes.
17      Q.   What would you say is John Deere's
18  philosophy with respect to working with physicians
19  or negotiating with physicians to arrive at a proper
20  reimbursement amount?
21      A.   That's a tough question because I'm not
22  certain that John Deere's philosophy of late is the

6 (Pages 18 to 21)

Mike Beaderstadt

Moline, IL

September 17, 2004

**Page 22**

1  same as my philosophy currently, so I'll try to give
2  you what I see has been John Deere's philosophy over
3  the years in its evolution.
4       I think for many years John Deere felt
5  that it was the physician who ultimately controlled
6  all of the healthcare dollar in terms of admissions
7  and prescribing habits and utilization of ancillary
8  services, and so therefore they felt that they
9  needed to have and desired to have a very close
10  working relationship with physicians.
11       I think that has changed over the years as
12  physicians have either become employed by those same
13  organizations that we once were working together to
14  control their costs or they have banded together and
15  had more professional administration than they had
16  in the past, and so they are looking at it a little
17  bit differently.
18       So I think that John Deere's philosophy
19  now is increasingly becoming one that the physician
20  component of healthcare cost is yet another
21  commodity that we need to work to reduce there.
22       Q.   What would you say would be the time frame

**Page 23**

1  when there was that switch in the mentality or
2  philosophy?
3       A.   I think that's evolved over the last five
4  years or so, probably concurrent with my leaving
5  operations in part.
6       Q.   And concomitant with that evolution, would
7  you say there was a greater emphasis placed at
8  John Deere on managed care of physicians' groups and
9  greater scrutiny of costs at that time?
10       A.   Yes, and that's not only because of the
11  philosophy, that's also because as we worked with
12  providers to lower lengths of stay, they naturally
13  did that for all third-party payers, not just for
14  John Deere Health. So in order to maintain some
15  sort of competitive edge in the marketplace, we
16  needed to work towards things that were less low
17  hanging to be able to manage more and more of the
18  components of cost of care.
19       Q.   Let's talk a little bit about John Deere's
20  background so we're on the same page what we're
21  talking about.
22       What is John Deere?

**Page 24**

1       A.   Deere is a worldwide manufacturer of farm
2  equipment and construction equipment and commercial
3  equipment.
4       Q.   With respect to this deposition, we're
5  focused on the health plan aspect, so I guess that
6  would be John Deere Health Plan, Inc., so let me ask
7  that.
8       Health care, Inc.?
9       A.   John Deere Health Care, Inc., is a
10  subsidiary of Deere & Company. Health Plan, Inc. is
11  a subsidiary of John Deere Health Care, Inc.
12       Q.   Okay. What is John Deere Health Care,
13  Inc.?
14       A.   As a said, it's a subsidiary of
15  Deere & Company. Deere has had a long history of
16  managing its own healthcare costs and began with
17  starting a claims unit many years ago to pay its own
18  claims, got together with other employers in the
19  '80s to encourage the use of IPAs and started what
20  was then called Quad City Health Plan and Blackhawk
21  Area Health Plan I believe in the Waterloo area, two
22  major manufacturing areas for Deere.

**Page 25**

1       Subsequently in about 1985, they formed
2  what was then Heritage National Health Plan to
3  manage that relationship for Deere & Company, and
4  then also went with other commercial employers and
5  marketed their HMO product to them as well.
6       Q.   Would you characterize John Deere Health
7  Care, Inc., as an HMO?
8       A.   John Deere Health Plan, Inc., is the HMO,
9  and again, that's today's world. That's not -- when
10  I used the word Heritage, I think we had Heritage
11  National Health Plan that was an HMO, Heritage
12  National Health Plan Services that was the TPA back
13  then.
14       Q.   Aside from being the parent of John Deere
15  Health Plan, Inc., does John Deere Health Care,
16  Inc., provide any healthcare services?
17       A.   They are the administrator in a
18  third-party arrangement with self-funded employers.
19       Q.   So the customers of John Deere Health
20  Care, Inc., are typically large employers?
21       A.   Yes.
22       Q.   Do they have any union benefit funds as

7 (Pages 22 to 25)

Mike Beaderstadt                                                          September 17, 2004

Moline, IL

Page 26

1   customers?
2       A.   I don't believe any union benefit funds.
3   They work with employers who have negotiated deals
4   with their unions, including Deere & Companies.
5       Q.   Who are the top five customers of
6   John Deere Health Plan, Inc., John Deere Health
7   Care, Inc.?
8       A.   If I could use both entities.
9       Q.   Just for the ease of communication, when
10  we're referring to John Deere, we're referring to
11  the healthcare-related entities and subsidiaries of
12  John Deere the parent, and that would include
13  John Deere Health Plan, Inc., and John Deere Health
14  Care.
15      A.   And typically we wrap them into John Deere
16  Health.
17      Q.   We will use that then.  We will use
18  John Deere Health.
19      A.   The top five will be Deere & Company, the
20  State of Tennessee as an employer, TennCare, which
21  is the Tennessee Medicaid program essentially but
22  it's more than that, Eastman Chemical Company in

Page 27

1   Tennessee is probably in the top five, and I don't
2   know who else I might throw into there.
3       Q.   Okay.  In the 1980 time frame, I think you
4   said it was 1985 that Heritage National Health Plan
5   was born.
6           How did John Deere's predecessor,
7   Heritage, manage its healthcare benefit at that
8   time?  Was it an indemnity insurance type
9   relationship?
10      A.   Once they formed Heritage?
11      Q.   Yes.
12      A.   And again, I wasn't employed by them, so
13  I'm recounting to you what I know from history and
14  also as a provider in that world.  They actually had
15  an HMO at that time, and they worked almost
16  exclusively with independent physicians'
17  associations, IPAs, and if there wasn't one, they
18  would help form one at that time.
19      Q.   So by HMO as you're using the term, that
20  would mean a closed network?
21           You're smiling.
22      A.   Well, it's confusing.

Page 28

1       Q.   Why don't you tell me what you mean by the
2   term HMO, because when I use the term HMO, I start
3   with one end of the spectrum, which would be a staff
4   model HMO, and then to the other end, which is a
5   closed model.
6           So why don't you give me your definition
7   of HMO.
8       A.   We use HMO as our license entity, as our
9   regulation.  We are licensed as a health maintenance
10  organization.
11          I think, however, our implementation of
12  that has been more PPO like historically, and for
13  all the world we often look like a PPO.
14          We did have a brief venture in looking at
15  a staff model with establishing some primary care
16  practices that were staff model HMO in John Deere
17  Family Health Plan, Inc., in 1993, I believe, where
18  we actually built buildings and hired physicians to
19  serve as our gatekeepers there, and that really
20  changed in the late '90s to making those independent
21  practices again and modeling them or contracting
22  with them in that fashion.

Page 29

1       Q.   For that staff model HMO, you said from
2   1993 to the late 1990s, is that --
3       A.   Yeah.  I don't know when John Deere
4   Medical Group became independent of Deere & Company,
5   but '98, '97, somewhere in there I suspect, maybe
6   '99 even.
7       Q.   For drugs for the HMO, where did
8   John Deere purchase the drugs from?
9       A.   Carol will give you more specific answers
10  about that.  I believe in general because it was a
11  staff model HMO they were purchasing them at those
12  kinds of rates back then, but Carol will know that
13  better than I do.
14      Q.   Okay.  How many members does John Deere
15  currently have?
16      A.   About 510,000, I believe.
17      Q.   Where does it currently operate?
18      A.   We're licensed in Iowa, Illinois,
19  Tennessee and Virginia.  We have some self-funded
20  Deere members in Wisconsin as well.
21      Q.   Who would you consider to be John Deere's
22  competitors?

8 (Pages 26 to 29)

Mike Beaderstadt

September 17, 2004

Moline, IL

Page 30

1      A.   In Iowa, it's primarily Blue Cross Blue
2  Shield Wellmark of Iowa.  There are local HMOs in a
3  couple of communities that are competitors, Medical
4  Associates in the Dubuque area, OSF Health Plans in
5  the Peoria area, and then TPAs who offer benefits
6  throughout the state.
7           In Tennessee, once again it's Blue Cross
8  Blue Shield of Tennessee, Cariten, which is a
9  locally owned organization, United and CIGNA have
10  some presence down there, and they are gaining some
11  presence in Iowa as well but not major competitors
12  at this point.
13      Q.   From John Deere's perspective, would you
14  say it's a competitive market for customers at this
15  time?
16      A.   Very competitive.
17      Q.   How does the process work by which you
18  obtain a customer?  Is there typically a bidding
19  war?
20      A.   Depending again on the size of the
21  customer, I wouldn't call it a war, but many of them
22  will issue an RFP that we will receive and we will

Page 31

1  respond to.  If we're selected as one of the
2  finalists, we will be quoting rates and displaying
3  the things that we think differentiate us from our
4  competition encouraging them to choose us.
5           Much of our business these days is
6  actually sold through the broker community, so
7  that's our channel of distribution.  So small groups
8  particularly are sold through brokers, and many of
9  our large groups have a broker involved in the
10  process as well.
11      Q.   When you say broker, what does that mean?
12      A.   Brokers are insurance agents out there who
13  deal with individual employers' needs from health
14  and accident to liability to a variety of things,
15  and they are in a sense our marketing agents.  They
16  are the advisors for insurance needs for many
17  companies.  And they take a cut in terms of
18  commission then.
19      Q.   In the bidding process where there's a
20  broker involved, do they act on your behalf or do
21  they act on the customer's behalf or both?
22      A.   They are on the customer's behalf, and

Page 32

1  they will get quotes typically from two or three
2  different insurers to see what we can offer to the
3  group that they are representing.
4      Q.   Now, these are distinct from, say, a
5  benefit consultant type role?
6      A.   Yeah.  The benefit consultant typically is
7  paid -- I don't know exactly how they are paid.  I
8  think oftentimes they are just retained and they
9  don't necessarily get a commission based on their
10  recommendation.
11      Q.   When there is a broker involved, do you
12  deal only with the broker or both with the broker
13  and the client customers?
14      A.   Again, depending on the size of the
15  organization, the smaller the organization, the more
16  likely we are just to deal exclusively with the
17  broker, but we will -- once they join us, we will
18  have direct communications with the group as well.
19           The broker/employer relationship is one
20  that we try not to get in the middle of because it's
21  the broker who brought us the business.  So the
22  larger the company, the more likely we are to deal

Page 33

1  directly with their HR department or whoever is
2  responsible for managing their health benefits.
3      Q.   Now, you said it was a very competitive
4  market.
5           How long has it been a competitive market
6  of this type or significantly competitive?
7      A.   Always.
8      Q.   Always?
9      A.   Yes.
10      Q.   Since you've been involved --
11      A.   Yes.
12      Q.   -- since 1991?
13      A.   Yes.
14      Q.   So when you say that you or John Deere
15  attempts to differentiate itself, how does it do so?
16      A.   In a variety of ways.  We believe that we
17  excel in customer service with our local presence,
18  which differentiates us from many of our
19  competitors.  We have quality scores through the
20  National Committee for Quality Assurance and their
21  HEDIS ratings that demonstrate that our members
22  receive better care than our competitors.  I think

9 (Pages 30 to 33)

Mike Beaderstadt                                                      September 17, 2004

Moline, IL

Page 34

1   the latest one shows that 85 percent of the time in
2   many of the quality measures John Deere Health is
3   leading our competitors.
4          It's many of the same values that
5   Deere & Company has in their tractors.  They believe
6   that they put out not necessarily the least
7   expensive tractor but it's one that's going to have
8   a good value over the lifetime, and we think
9   John Deere Health does the same thing.
10    Q.   You've sort of anticipated my next
11  question then.
12         So would you say that price alone is not
13  the only dispositive or determining factor in
14  determining who gets the customer?
15    A.   That's often what we try to sell.  We
16  don't always convince the employer of that, but just
17  as many people will go out and buy a less expensive
18  lawn tractor for the short term, we hope that we add
19  value and we try to be very competitive on price as
20  well.
21    Q.   When going out to the customer or through
22  a broker to make your proposal to the customer, do

Page 35

1   you emphasize the strength of your networks --
2     A.   Yes.
3     Q.   -- in coverage?
4     A.   Yes.
5     Q.   Is that an important factor for customers
6   these days?
7     A.   More all the time.  Choice of the
8   individual employee to use the provider of their
9   choice is very important to them.
10    Q.   Now, we touched on this when you said
11  John Deere is often perceived as a PPO.
12         What are the specific types of health
13  plans or products that John Deere offers?
14    A.   We currently have four different products
15  that we offer commercially.  We have a Choice
16  Network, which is pretty inclusive of all providers,
17  allows members to go directly to a specialist
18  without any referral, has restrictions on going out
19  of the area, needs a preauthorized referral for
20  that.
21         We have a Select product that is based on
22  a somewhat more limited panel, although not as much

Page 36

1   as it used to be, but requires some sort of
2   gatekeeper process that a primary care provider must
3   refer to a specialist to receive access to a network
4   specialist, the same sort of rules for going out of
5   network.
6          We have introduced in some markets what
7   we're calling Select Advantage, which does away with
8   all referral requirements and simply places certain
9   providers in a different benefit level no matter how
10  you get there.  So if you're going to a contracted
11  provider locally, you'll have one benefit.  If you
12  go to the University of Iowa, which is a major
13  tertiary center for these markets, no matter how you
14  get there, you pay a different, you have a different
15  benefit level, and if you go to a noncontracted
16  provider, you have yet a lower benefit to go there.
17         And then finally we have just built at
18  Deere & Company's request something that we will
19  also be offering commercially, what we call our
20  Premier Network, which is a network that
21  significantly reduces the panel size.  In
22  communities where there are two or more hospitals,

Page 37

1   we have chosen one of those as our anchor hospital
2   and a subset of the providers in the community and
3   put that alongside a point-of-service benefit that
4   significantly reduces the benefit if you choose to
5   use other than that limited panel.
6          We also have networks for Medicaid and
7   Medicare in the southeast.
8     Q.   Is your Medicare product a Medicare plus
9   choice product?
10    A.   Yes, becoming Medicare Advantage in the
11  southeast.  We also have a cost contract in the
12  Midwest for Deere & Company primarily,
13  Deere & Company retirees.
14    Q.   When you say a cost contract, what do you
15  mean?
16    A.   The cost contract is one that we simply
17  serve as a primary payer for Part B services, and at
18  the end of the year we file a cost report with
19  Medicare, who reimburses us for our costs of
20  administering that product.  There aren't very many
21  of them around any longer.
22    Q.   Does John Deere provide a Medi-gap type

10 (Pages 34 to 37)

Mike Beaderstadt

September 17, 2004

Moline, IL

Page 38

1  program?
2      A.   No.
3      Q.   Of the four commercial products, are they
4  essentially tradeoffs as you go from one to four as
5  you described between the flexibility to the member
6  in going outside a particular panel versus the cost
7  to the individual member?
8      A.   Yes, I think that's a fair generalization.
9      Q.   I think I know the answer to this based
10 upon how you described it, but with respect to the
11 provider's perspective, whether it's a pharmacy or a
12 physician, does the amount of reimbursement they get
13 for drugs either administered or dispensed to
14 John Deere's members depend upon the type of plan
15 that the member belongs to?
16     A.   At the injectable level in the provider's
17 office it would be consistent, I believe, in every
18 case without regard to the commercial membership.
19 There might be some differences in our Medicare or
20 Medicaid product, but even then I think it will be
21 pretty consistent.
22     Q.   What about on the pharmacy side?

Page 39

1      A.   The pharmacy side, I'll let Carol address
2  that because we have some nuances there.
3      Q.   These four commercial plans that you've
4  described, do they all have built into them both the
5  medical and the drug benefit, or are they two
6  separate components which the member can elect to
7  choose one or the other or both?
8      A.   The employer can elect to choose one or
9  the other or both.  Most often we prefer to sell
10 them both together because managing medical care is
11 often dependent on understanding what pharmacy
12 they're utilizing.  We can manage asthma better if
13 we know they are taking certain medications.
14          So we prefer to manage both, but
15 occasionally the employer will want only one
16 benefit.  We never sell only the pharmacy benefit at
17 this point.
18     Q.   From John Deere's perspective, do you try
19 to manage both medical and the drug benefit?  When I
20 say the drug benefit, I'm talking about the
21 reimbursement for drugs dispensed by pharmacies.  Do
22 you try to manage those together?

Page 40

1      A.   We certainly know that there's an
2  interrelationship, and so we have many of our
3  initiatives that actually encourage the use of more
4  pharmaceuticals to reduce our medical costs.
5          For example, the asthma piece that I just
6  mentioned, if we discover that an asthmatic is not
7  taking all the medications that we think are
8  appropriate to treat asthma, we will encourage the
9  physician and the member to begin taking those
10 medications.  Likewise with a diabetic, if we don't
11 think we're managing the care appropriately, we may
12 encourage the use of further medications.  After a
13 heart attack, we encourage the use of beta blockers,
14 the cholesterol lowering drugs.
15     Q.   From a structural viewpoint, I think I
16 know the answer to this just because you're sitting
17 at the table, but are the pharmacy relationships and
18 the provider relationships managed in the same
19 department?
20     A.   The pharmacy relationship is managed at
21 the home office.  The relationships with physicians
22 by and large are managed in our operation sites.

Page 41

1      Q.   From a strategic viewpoint respecting, for
2  example, setting methodology for drug reimbursement,
3  is that managed in the same department at the home
4  office?
5      A.   Yes.
6      Q.   That department is the department that
7  you're the head of; is that correct?
8      A.   Yes.
9      Q.   The provider relations department?
10     A.   Yes.
11     Q.   Does the provider relations department
12 meet together as a group to discuss strategic issues
13 such as drug reimbursement?
14     A.   Yes.
15     Q.   Is that a formal process whereby you have
16 meetings with minutes and that sort of thing?
17     A.   No, it's more just our staff meeting,
18 getting together with managers of the various areas
19 I described to you in the beginning.
20     Q.   How large is the provider relations
21 department at John Deere?
22     A.   There are about 25 people there today.

11 (Pages 38 to 41)

Mike Beaderstadt                                                    September 17, 2004
                              Moline, IL

Page 42

1    Q.   Within that department, I take it your
2  ultimately responsible for the provider relations?
3  When I say provider, I mean relations with doctors
4  and hospitals.
5    A.   Well, I'm more responsible for the
6  activities that I described.  The actual
7  relationships with providers are handled in the
8  operation sites, and we may give advice, but it may
9  or may not be followed.
10   Q.   Okay.  With respect to the strategic
11 decision-making process for drug reimbursement on
12 the pharmacy side, who has the responsibility in the
13 provider relations department?
14   A.   Carol will do that, reporting through me.
15 Carol is our expert there.
16   Q.   Okay.
17   A.   And I use that term very concisely there.
18 Carol is an expert.  I don't know about me.
19   Q.   Does John Deere negotiate with
20 manufacturers for rebates in the drugs dispensed or
21 administered to its members?
22   A.   Yes.

Page 43

1    Q.   Who has responsibility for that function?
2  Who is responsible for that function?
3    A.   Carol's area.  Joanne Hill reports to
4  Carol, and Joanne Hill manages that process.
5    Q.   With respect to the benefit side of the
6  health plan business, who is responsible for
7  developing the terms and conditions of the benefit
8  plans?
9    A.   Our product delivery area.
10   Q.   Is that a separate department?
11   A.   Yes.
12   Q.   Who is the head of that?
13   A.   Rich Nelson oversees that today.
14   Q.   Okay.  I want to jump into the discussion
15 about the physician reimbursement, but before I do,
16 do you have an understanding of what this case is
17 about?
18   A.   I believe so.
19   Q.   Describe for me what your understanding
20 is.
21   A.   My understanding is that there's a group
22 that feels like AWP has been misrepresented as an

Page 44

1  acquisition price and therefore has caused folks to
2  pay more than they might have otherwise paid for
3  drugs.
4    Q.   Where did you obtain that understanding?
5    A.   From our legal counsel.
6    Q.   Is that John Deere's position as well?
7    A.   What do you mean as a position?
8    Q.   Is it the position of John Deere that it
9  has been misled by drug manufacturers since 1991 as
10 to the meaning of AWP?
11   A.   No, I don't think so.  It wouldn't be my
12 position I guess.  I don't know that I can speak
13 that John Deere has a position on that.
14   Q.   Would it be John Deere's position that
15 drug manufacturers colluded with pharmacy benefit
16 managers to somehow inflate AWP in order to defraud
17 payers?
18   A.   Once again, it wouldn't be my position
19 with that.
20   Q.   Let me ask it a little differently.
21       Do you have any evidence to suggest that
22 manufacturers have colluded with pharmacy benefit

Page 45

1  managers to inflate AWP in a way that would defraud
2  payers?
3    A.   I have no evidence of that.
4    Q.   Do you have any evidence that
5  manufacturers have colluded with pharmacies or
6  physicians to inflate AWP in a way that would
7  mislead or defraud payers?
8    A.   No.
9    Q.   To your knowledge, has John Deere been
10 involved in any pricing litigation related to AWP?
11   A.   No.
12   Q.   I think you testified already that
13 John Deere's health plans or products all provide
14 drug coverage for drugs administered in physicians'
15 offices; is that right?
16   A.   That's correct.
17   Q.   Has John Deere always provided that
18 coverage?
19   A.   I believe so.
20   Q.   Describe for me, if you would, since
21 you've been here in 1991 how it is that John Deere
22 reimburses for drugs administered through

12 (Pages 42 to 45)

Mike Beaderstadt                                                                          September 17, 2004

Moline, IL

Page 46

1   physicians.
2       A.   Okay.  It's changed over the years.  Do
3   you want an evolution?
4       Q.   Yes, that's what I'm looking for, a
5   chronology and evolution.
6       A.   In the beginning when we were focused on
7   managing inpatient stays and that was our
8   differentiator, I believe we paid the charges for
9   those injectable drugs.  At some point along the way
10  when we were looking for ways to further control
11  costs, we introduced a program that based the price
12  of those costs on AWP and paid at that time
13  110 percent of AWP.  We arrived at the 110 percent
14  of AWP because we have a 10 percent withhold on
15  physician payments, so the 110 percent minus the
16  10 percent withhold that we would have would
17  approximate AWP, and we believed that all providers
18  would be able to obtain their drugs at that cost or
19  less, and so we believed that that was a fair
20  reimbursement.
21          Beginning about two years ago, we further
22  learned that -- we got involved in a program with

Page 47

1   McKesson, who offered to supply drugs directly to
2   providers' offices at a price that approximated
3   87 percent of AWP, and so we rolled out a program to
4   our providers saying that this will be our new
5   reimbursement, and that wasn't accepted, and I'm
6   talking now generally, that wasn't accepted
7   everywhere, but we lowered our reimbursement to
8   87 percent of AWP and told our providers that if
9   they were unable to acquire drugs at that price,
10  that they could get them through McKesson and rolled
11  out that program to them.
12          And so that's our current state is that by
13  and large we pay about 87 percent of AWP for
14  injectable drugs in the office.
15      Q.   Now, let me back up.
16          With respect to when AWP was adopted as a
17  basis for paying physician reimbursement, when was
18  that?
19      A.   I don't know exactly.  It was sometime
20  while I was in operations, and I believe early on in
21  that, so it was probably '93 or '94.
22      Q.   So between 1991 and 1993 approximately,

Page 48

1   John Deere was paying physicians for drugs
2   administered to its members based upon what the
3   physician billed?
4       A.   Yes, and prior to '91, I believe.
5       Q.   Just logistically how did that work?  Did
6   the physician bill John Deere directly, or was it an
7   indirect billing process?
8       A.   The physician would bill on the claim form
9   that they submitted with their other services, and
10  those claims would be paid at billed charges.  We
11  would not have a fee schedule in place for those.
12      Q.   Now, I hear the term usual and customary
13  and reasonable and customary.
14          Is that the same thing as charged amount?
15      A.   No.
16      Q.   Okay.  What's the difference in your view?
17      A.   The charge amount is what that specific
18  provider has billed for that specific service.  The
19  usual and customary would be an average or a
20  benchmark for that service that many providers have
21  established or that the payer has established to
22  reimburse for that service.

Page 49

1       Q.   So when you paid at billed charges from
2   1991 through 1993, there was no limitation based
3   upon the usual and customary or reasonable charges?
4       A.   Certainly not to our contracted providers,
5   and I'm not certain how we handled our noncontracted
6   providers who might have given an injectable drug.
7       Q.   Now, in 2002 I think you said, two years
8   ago, there was a change to a reimbursement at
9   87 percent of AWP.  You had mentioned that it was,
10  quote, not accepted everywhere.
11          What did you mean by that?
12      A.   Certain providers with whom we already had
13  a contract for a given price objected to our or
14  resisted our ability to change that unilaterally,
15  and so it had to be negotiated with providers.
16      Q.   I notice there was some material produced
17  in the discovery process referring to an arbitration
18  regarding the ability to reduce reimbursement
19  unilaterally, and it's my understanding that
20  John Deere prevailed in that arbitration?
21      A.   That was with a PHO in the Galesburg area,
22  yes, which I had forgotten about when I answered

13 (Pages 46 to 49)

Mike Beaderstadt                                                                            September 17, 2004
                                    Moline, IL

1  your question earlier.
2      Q.   Did that arbitration decision confirm
3  John Deere's position that it had the discretion to
4  unilaterally change its reimbursement rates?
5      A.   I have not seen that decision.  As I
6  understand it, it would be specific though to that
7  community and that contract.
8      Q.   Let me ask it more generally then.
9          Is it John Deere's general position based
10  upon its contracting today that for most of its
11  providers it had the discretion to unilaterally
12  change reimbursement?
13      A.   Yes.  Most of our contracts were actually
14  silent as to how we would reimburse for that.  We
15  had established a pattern of paying the 110 percent,
16  but we didn't specify that.
17          That being said, we also had providers who
18  had the ability to terminate their contract with us
19  if they didn't like it, and many oncologists
20  specifically objected to the lowering of
21  reimbursement in that area.
22      Q.   So what I think I hear you saying is that

1  John Deere's election to exercise its right to
2  unilaterally lower reimbursement was conditioned by
3  the practical concern that if they did so they may
4  face an adverse reaction from the provider groups
5  with which they contracted?
6      A.   That's much more eloquent than the way I
7  said it, but that's true, yes.
8      Q.   And that was something that's of concern
9  to John Deere obviously because they want to
10  maintain a robust network for the purposes of
11  providing an impressive bid for customers, right?
12      A.   That's correct.
13      Q.   In 1993 or around that time frame when
14  John Deere shifted to the AWP-based methodology of
15  reimbursement for physician-administered drugs, did
16  John Deere also impose a usual and customary or
17  reasonable and customary limitation at that time?
18      A.   We wouldn't have referred to it as
19  reasonable and customary or usual and customary.  We
20  would simply say that our policy was to reimburse
21  these drugs at this price.
22      Q.   So there would only be one basis for

1  calculating price at that time?  It wouldn't be a
2  matter of comparing whatever your AWP was to, say,
3  some other benchmark or some other amount derived
4  from some U&C table or something?
5      A.   No, it was based on AWP and a crosswalk
6  between the drug prices and the codes that
7  physicians typically use to submit those services.
8  And the only time we would ever use usual and
9  customary language is with our noncontracted
10  providers, so as I speak today, I'm speaking about
11  our contracted providers.
12      Q.   Okay.  Now, when you shifted to this
13  87 percent of AWP, I think I heard you say that
14  John Deere also provided an option to the doctors to
15  obtain the drugs from McKesson; is that correct?
16      A.   That's correct.
17      Q.   So as an alternative to taking title
18  directly themselves, the doctors could obtain the
19  drugs from McKesson as a specialty provider?
20      A.   That's correct.
21      Q.   And so the 87 percent of AWP reimbursement
22  amount would be only for those instances in which

1  the doctor elected not to obtain the drugs from
2  McKesson on, say, an as-needed basis, right?
3      A.   Yes, that's correct.
4      Q.   So essentially this is an example as an
5  alternative to a buy and bill methodology?  In other
6  words, rather than the doctor having to take title
7  to the drug and then seek reimbursement from
8  John Deere, John Deere is saying we will take title
9  or make the drug available through McKesson and,
10  Doctor, you don't have to bother with acquiring the
11  drugs, putting out money for the drugs, incurring
12  the risk of loss on the acquisition, but rather just
13  order the drugs on an as-needed basis from McKesson,
14  we will supply the drug; is that right?
15      A.   That's correct.
16      Q.   Was it important for John Deere in
17  reducing the reimbursement amount to 87 percent of
18  AWP to have that alternative supply source available
19  to the doctors?
20      A.   Yes.  We wanted to make certain that we
21  knew that while we didn't want injectable drugs to
22  be a profit center in a physician's office, we also

Henderson Legal / Spherion
(202) 220-4158

Mike Beaderstadt                                          September 17, 2004

Moline, IL

Page 54

1  didn't feel like it should be a loss to the
2  providers, so we needed to know that they could
3  acquire those drugs at that price or have somebody
4  else -- we could acquire those drugs at that price.
5      Q.   I've also seen references in the documents
6  to a separate reimbursement rate for I believe it's
7  the southeast division of 95 percent of AWP?
8      A.   Yes.
9      Q.   Is that correct?
10     A.   Again, because we have a withhold on some
11 of the payments, the southeast went with a
12 95 percent, which when you subtract the 10 percent
13 withhold comes closer to the 87 percent, and then so
14 we got the 87 percent if the withhold wasn't
15 returned.  The withholds were returned, and we
16 actually -- I guess you could trace it back and say
17 we paid more.  That was part of the negotiation
18 process with physicians down there.
19     Q.   What do you mean when you refer to the
20 withhold?
21     A.   As an HMO, one of the other things that
22 differentiates us probably from a PPO is that we

Page 55

1  retain a percentage of a physician's fees, and then
2  based on -- and track the member's care that that
3  group of physicians is responsible for.  If that
4  fund that those members are in perform profitably,
5  we return the withhold at the end of the year.  If
6  that fund loses money, depending on the amount of
7  the loss, some or all of the withhold may be
8  retained at the end of the year to pass some of the
9  risk on to the providers.
10     Q.   Okay.  Let me see if I understand how this
11 works.
12          John Deere sets up a fund to reimburse
13 providers in a certain area, correct?
14     A.   Go ahead and I'll -- I think you're close,
15 but it's not how I would have said it.
16     Q.   And to fund that fund, John Deere
17 contributes a fixed capitated amount per patient; is
18 that right?
19     A.   Let me describe it a little bit
20 differently.
21          We take our membership in a given area
22 that the physicians in a given area are responsible

Page 56

1  for.  We put into that fund for the members who are
2  in there the premium that we have received from
3  employers.  We subtract from it an administrative
4  fee that is contracted for with the physician.  We
5  subtract from it then all the claims that are paid
6  on behalf of those members and capitations,
7  et cetera, and at the end of the year, if that fund
8  has a surplus, then we return the withhold.  If that
9  fund has a deficit, then based on the amount of the
10 deficit and the amount of the withhold, we either
11 return a portion of the withhold or none of the
12 withhold to the providers at the end of the year.
13     Q.   What happens in a situation in that the
14 costs based upon the claims of the fund exceed the
15 balance such that there's a deficit in the fund?
16     A.   If that deficit is a percentage of the
17 total withhold that was returned or retained on
18 those claims, we will subtract that deficit and pay
19 the providers the remaining withhold.  If that
20 deficit exceeds the withhold that is retained on
21 those claims, we will not return any withhold.
22     Q.   In any circumstances is the physician

Page 57

1  group at risk for any deficit amount?
2      A.   They are at risk for the deficit amount
3  but only up to the amount of their withhold.
4      Q.   Prior to this across-the-board reduction
5  in cost from AWP to AWP minus 87 percent, is it
6  correct that John Deere first reduced the
7  reimbursement for three particular drugs?  I believe
8  it was Remicaid, Lupron and Synagis.
9      A.   Yes, although I don't know that we reduced
10 the -- I'm not certain if we reduced the
11 reimbursement to the provider's office or simply
12 required that the sourcing of those drugs be from
13 one of our contracted providers, which I think it's
14 the latter.
15     Q.   Okay.  When did that happen?
16     A.   That happened over a period of time.  I
17 think each of the drugs were introduced at a
18 different time, and Carol may know that better than
19 I do.  '99, 2000, I don't know.
20     Q.   What was the alternative source of those
21 drugs to the physician's office?
22     A.   I think our first supplier there was

Henderson Legal / Spherion
(202) 220-4158

Mike Beaderstadt

September 17, 2004

Moline, IL

Page 58

1  Caremark, but again Carol may contradict me. That
2  initiative was done through our care delivery
3  management area and our case management for those
4  cases.
5      Q.   What would be the reimbursement that
6  John Deere would make to Caremark for those drugs?
7  Would it be 87 percent of AWP?
8      A.   Yes.
9      Q.   And likewise, when there was a shift
10 across the board for drugs from AWP to AWP -- to
11 87 percent of AWP, John Deere would be reimbursing
12 McKesson at 87 percent of AWP as well?
13     A.   That's the contract that we struck with
14 them, yes.
15          No?  No.  Carol will give you more details
16 on that.
17     Q.   Okay.  Were there exceptions to the --
18     A.   You're right.  We set the 87 percent at
19 the physician level, but we actually had McKesson at
20 a lower level, that's correct.
21     Q.   Do you know what that level is?
22     A.   Was it 83, 82?

Page 59

1          MS. SIDWELL:  84.
2          THE WITNESS:  84 is what I know it to be.
3  BY MR. HAAS:
4      Q.   So from John Deere's perspective, its cost
5  of drugs from McKesson was 84 percent of AWP then;
6  is that correct?
7      A.   Yes.
8      Q.   In addition, did John Deere also receive
9  rebates from manufacturers with respect to the drugs
10 it purchased from McKesson?
11     A.   I don't know.  I'll defer to Carol on that
12 for specifics.
13     Q.   When John Deere did the across-the-board
14 reduction from AWP to 87 percent of AWP for
15 reimbursement in doctors' offices, it maintained an
16 AWP reimbursement for immunizations; is that
17 correct?
18     A.   Yes, immunizations remained at 110 percent
19 and radiopharmaceuticals, I believe.
20     Q.   Why was that?
21     A.   We didn't want to do anything with the
22 immunization to discourage the use of immunizations.

Page 60

1  We had programs that encouraged our members to
2  receive them.  We have HEDIS measurements about how
3  well we're doing with childhood immunizations.  So
4  we were willing to pay for that because of the clear
5  return on investment of those sorts of injections.
6          The radiopharmaceuticals, I don't know why
7  they were excluded specifically.
8      Q.   Was any consideration given to having an
9  additional carve out, for example, for oncology
10 drugs?
11     A.   What we attempted to do, in most cases
12 we're successful, is when the oncologist complained
13 about the reimbursement, rather than changing the
14 reimbursement for the drug itself, we changed the
15 reimbursement for the administration of that drug,
16 which is a separate CPT code.
17     Q.   We have been talking about how, in fact,
18 John Deere reimbursed.  I want to shift the focuses
19 a little bit to what John Deere said in its
20 contracts.
21          And I'll show you an e-mail in a second,
22 but just as a general proposition, what degree did

Page 61

1  John -- to what degree did John Deere specify in its
2  contracts the terms of reimbursement of doctors for
3  drugs administered in the office to John Deere's
4  members?
5      A.   In the beginning, we were mostly silent
6  about that.  In recent years, particularly as we
7  have embarked on this program through McKesson, we
8  have been more explicit about that.
9      Q.   Is it fair to say that before -- is that
10 me?
11          (Whereupon, an off-the-record
12          discussion was held.)
13     MR. HAAS:  Back on the record.
14          Could you just read the last question and
15 answer for me.
16          (Record read.)
17     MR. HAAS:  For the record, we will mark as
18 John Deere Deposition Exhibit Number 1 a document
19 that has been Bates stamped JDH 289 through JDH 291.
20 It purports on its face to be an e-mail string.
21     MS. MacMENAMIN:  Excuse the interruption.
22 In the documents that I have, there's sort of two

16 (Pages 58 to 61)

Mike Beaderstadt                                      September 17, 2004

Moline, IL

Page 62

1  overlapping JDH sets with the same numbers.
2          Is that what's in front of you as well?
3          MR. HAAS:  Not that I'm aware of, but is
4  it an issue with respect to JDH 289?
5          MS. MacMENAMIN:  Well, the thing is
6  there's two JDH 289s.
7          MR. HAAS:  Let me give you a little more
8  clarification for the record and see if you can find
9  it.
10         MS. MacMENAMIN:  That is not one of the
11  overlapping ones.  They start overlapping at JDH
12  811, just for your information.  So until we get to
13  those numbers, just give me a second so I can make
14  sure I've got the right one.
15         But I've got 289 now.  That's fine.
16         MR. HAAS:  For the record, this purports
17  to be an e-mail string, the last of which is an
18  e-mail from Jeff Coughlin, C-o-u-g-h-l-i-n, to
19  Richard McMullen, M-c-M-u-l-l-e-n, dated
20  September 19th, 2002, and the relevant e-mail that I
21  want to talk to you about is the one dated
22  December 18th, 2002, from Jeffrey Coughlin to a

Page 63

1  string of individuals.
2          (Exhibit Beaderstadt 001 marked as
3          requested.)
4  BY MR. HAAS:
5      Q.  Mr. Beaderstadt, I'll refer you to the
6  e-mail that begins in the middle of the page.
7  That's the Wednesday, September 18, 2002, which is
8  to a series of individuals including yourself, and I
9  ask that you just take a moment to read the e-mail
10  and tell me whether you remember it.
11     A.  I don't remember this specific e-mail, but
12  it certainly looks -- I mean, it's consistent with
13  what I would expect to receive.
14     Q.  Who is Jeffrey J. Coughlin?
15     A.  Jeff is our manager of data analysis and
16  reports to me.
17     Q.  Do you recall that there were questions
18  being raised in or around the time frame when there
19  was a consideration of changing the reimbursement
20  rate for physician-administered drugs concerning how
21  the physician contracts that John Deere had
22  reflected the amount of reimbursement for

Page 64

1  physicians?
2      A.  Yes.
3      Q.  And does this description of the state of
4  John Deere's contracts accurately reflect to your
5  recollection what the status of those contracts were
6  at that time?
7      A.  Yes.
8      Q.  And specifically, in the answer to
9  Question 1 at the bottom of the page, the question
10  being is reimbursement for physician-administered
11  drug codes specifically addressed in the contract
12  language, the answer states, contract language
13  generally excludes a description of how JDH will
14  reimburse drug codes.
15         Do you see that?
16     A.  Yes.
17     Q.  And is that accurate --
18     A.  Yes.
19     Q.  -- to your recollection?
20     A.  I think that's consistent with my earlier
21  response too.
22     Q.  Now, the language speaks in terms of the

Page 65

1  fact that the contracts generally excluded any
2  reference to how drugs were reimbursed in
3  physicians' offices.
4          Do you recall that there were particular
5  contracts that may have made reference to how drugs
6  were reimbursed in office?
7      A.  I think we had a small subset of providers
8  in Peoria who had some specific language about this
9  in their contract and as a matter of fact differed
10  from our standard of 110 percent, and I think there
11  may have been a pocket of providers in our
12  Knoxville, Tennessee area that had some specific
13  contract language we were aware of.
14     Q.  And when you say that the reimbursement
15  rate differed for those doctors from the standard
16  AWP plus 10 percent, to what extent and how did the
17  reimbursement rates differ?
18     A.  I don't know the specifics, but generally
19  they were higher than the 110 percent.
20     Q.  Do you recall why that was?
21     A.  Peoria is a market where we are -- don't
22  have much leverage with providers.  We have a

17 (Pages 62 to 65)

Mike Beaderstadt                                                      September 17, 2004

Moline, IL

Page 66

1  relatively small market share, and in order to get
2  the oncologists, I believe, signed up, they insisted
3  that we pay them more than 110 percent.
4      Q.   So in that case, the premium that you paid
5  was just a function of the market dynamics?
6      A.   Yes.
7      Q.   It goes on in the next page, Page 290, to
8  refer to a rate schedule, I believe, a rate exhibit
9  that John Deere would provide at a doctor's request.
10          Is that correct?
11     A.   Yes.
12     Q.   What is that referring to?
13     A.   We have two separate documents.  We have
14  contracts with our physicians which are evergreen
15  typically, and many of the contracts at that point
16  in time indicated that we would update the fees
17  annually.
18          And so on an annual basis we would send
19  them our new fee schedule for the upcoming year, and
20  those fee schedules often included the J codes,
21  which signify our reimbursement for injectable
22  drugs.

Page 67

1      Q.   To the extent those schedules included an
2  amount of reimbursement for a particular drug, would
3  that reimbursement have been expressed as a dollar
4  amount per particular unit, or would it have been
5  expressed as some formula amount driven by, for
6  example, AWP?
7      A.   It would have been expressed in the dollar
8  amount.
9      Q.   So is it fair to say that there were two
10  contractual or related documents that were sent to
11  the doctors that expressly referenced AWP as a means
12  of reimbursing doctors for drugs administered in
13  office prior to, say, the 2003 time frame?
14     A.   With the couple of exceptions I mentioned,
15  yes.
16     Q.   Throughout the 1990s and setting aside
17  particular outliers such as oncology clinics, to
18  what degree was the drug reimbursement a component
19  of the entire medical reimbursement to physicians?
20     A.   You're looking for a percentage?
21     Q.   I'm trying to get --
22     A.   Relatively small.

Page 68

1      Q.   How significant was the drug spend to the
2  reimbursement of doctors under the medical benefit
3  programs that John Deere offered?
4      A.   The injectable drug spend would be a very
5  small percentage of what we paid for physicians
6  overall.
7      Q.   When John Deere was negotiating provider
8  contracts with the physicians, how much time was
9  devoted to the issue of drug spend versus the other
10  medical issues?
11     A.   In the '90s, virtually not at all.
12     Q.   And is that because the drug spend was a
13  relatively small component of the overall medical
14  benefit?
15     A.   Yes.
16     Q.   In 1991 when you came aboard, was
17  John Deere managing internally its claims processing
18  system for the physician-administered drugs?
19     A.   Yes, for all claims.
20     Q.   For all claims including pharmacy
21  dispensed drugs?
22     A.   Maybe for pharmacy at that time too, yes.

Page 69

1  I don't know specifically.  I believe so in '91
2  though.
3      Q.   Interesting.  Does John Deere still manage
4  internally the claims processing function of the
5  claims administration for physician-administered
6  drugs?
7      A.   Yes, when they are sent from the
8  physician.
9      Q.   As opposed from Caremark --
10     A.   Yes.
11     Q.   -- or McKesson?
12          In the case where the claim comes from
13  Caremark or McKesson, does it go through the same
14  administrator that manages today the pharmacy
15  claims?
16     A.   Yes.
17     Q.   Who is that today?
18     A.   Well, we use what in essence is a service
19  bureau.  ProCare is the service bureau.  We,
20  however, load the rules and the reimbursement rates
21  and the contracted amounts and the benefit plans for
22  that matter into the ProCare system to administer

18 (Pages 66 to 69)

Mike Beaderstadt                                                                September 17, 2004

Moline, IL

Page 70

1  that process.
2      Q.   Okay.  I want to shift over now to talk
3  about the pharmacy side.  Should we switch over to
4  Carol?  Is that the best thing to do?
5      A.   Probably.  She will have all the
6  information I have and more.
7      MR. HAAS:  Okay.
8      MS. MacMENAMIN:  Will Mr. Beaderstadt be
9  available for questioning later on, or is he
10 leaving?
11     MR. HAAS:  No, he's sitting here.  We will
12 come back to him with some top-level questions.
13     MS. MacMENAMIN:  Sounds good.
14          (Whereupon, an off-the-record
15          discussion was held.)
16 BY MR. HAAS:
17     Q.   Okay.  One follow-up question for Mike.
18     With respect to the transition from AWP to
19 AWP -- 87 percent of AWP that we discussed earlier,
20 without going back to the documents, is it correct
21 that that project first began in the fall of 2001?
22     A.   Yes.

Page 71

1      Q.   Aside from the contracts with Caremark and
2  McKesson that we have discussed, did John Deere have
3  any other contracts with specialty pharmacies or
4  specialty supply houses or PBMs for the supply of
5  drugs?
6      A.   For me?  Yes.  We had several different
7  home health agencies, others who would be dispensing
8  those types of drugs, some of them national.  Not
9  all of the names will come to me.
10     Q.   Was the relationship with those specialty
11 providers similar to that of McKesson in that
12 John Deere would reimburse the specialty provider
13 for drugs provided on an as-needed basis to the
14 physician?
15     A.   Yes.
16     Q.   Do you have an idea of when the particular
17 time frame that those specialty pharmacies and
18 specialty providers entered into these relationships
19 with John Deere?
20     A.   My recollection is that they may have been
21 entered into for some time.  It was though probably
22 late in '99 or somewhere in '99 when we first

Page 72

1  started insisting that they be sourced from that
2  supplier.
3      Q.   So prior to 1999, doctors had the option
4  of utilizing that alternative to the buy-and-bill
5  methodology, and it was starting in 1999 that
6  John Deere required that?
7      A.   Yes, approximately '99.
8      MR. HAAS:  Okay.  I have no further
9  questions.
10     MS. MacMENAMIN:  I actually have some
11 follow-up questions for Mr. Beaderstadt.  I didn't
12 know you were going to go straight there.  And one
13 follow-up question for Carol, for Ms. Sidwell.
14          (Whereupon, an off-the-record
15          discussion was held.)
16          EXAMINATION
17 BY MS. MacMENAMIN:
18     Q.   All right.  Mr. Beaderstadt, can I ask you
19 generally what is your understanding of the term
20 average wholesale price?
21     A.   Generally my understanding is that it's a
22 benchmark that we use to price specific drugs in the

Page 73

1  physician's office and the pharmacies.
2      Q.   Do you understand it to have a
3  relationship to any actual acquisition cost?
4      A.   I don't believe it has any relationship
5  that is a consistent relationship.
6      Q.   Are you aware of who establishes or sets
7  AWP?
8      A.   I don't know exactly how it's established.
9  I know that we get different numbers from a variety
10 of sources.
11     Q.   In your time at John Deere, was it ever
12 your responsibility or your role to negotiate
13 pharmacy reimbursement contracts?
14     A.   Indirectly in my oversight of Carol's
15 role.
16     Q.   Was it ever your role to negotiate rebates
17 or discounts with drug manufacturers?
18     A.   Once again, indirectly.
19     Q.   Was it ever your role or responsibility to
20 negotiate contracts with PBMs?
21     A.   No.
22     Q.   In your oversight of the pharmacy and

19 (Pages 70 to 73)

Mike Beaderstadt                                              September 17, 2004

Moline, IL

Page 74

1  manufacturer contracts, to your knowledge, were
2  these contracts -- as AWP or WAC -- strike that.
3          In your role as an oversight of
4  negotiation of these pharmacy and manufacturer
5  contracts, was AWP a component of all contracts?
6      A.  Certainly of all pharmacy contracts.  The
7  rebate, the manufacturer contracts, not always.
8      Q.  Do you know why the AWP benchmark was
9  used?
10         MR. HAAS:  Objection.
11         THE WITNESS:  My understanding is that
12 it's provided an objective source for us to price
13 our drugs, the price reimbursement that we will pay
14 for those drugs.
15 BY MS. MacMENAMIN:
16     Q.  To the best of your knowledge, do you know
17 who chose or designated that AWP as the benchmark?
18     A.  I believe it to be an industry standard.
19     Q.  Do you know of any other benchmarks
20 available for pharmacy reimbursement?
21     A.  I'm aware of WAC.  I'm aware that there's
22 a lot of discussion about changing some things, and,

Page 75

1  in fact, our recent contracts have included some
2  language that indicate that should that be a new
3  standard in the future, some new standard arise, we
4  will go to that.
5      Q.  Can you tell me more about what you just
6  referred to as discussion about changing the
7  standards?  Do you know, what is the source of that
8  information?
9      A.  Just from what we have learned in
10 conferences, what we have learned in reading, what
11 we have -- a general buzz in the industry.  I guess
12 wherever we pick those things up, we know that there
13 are those who are questioning AWP.
14     Q.  Do you know why they are questioning AWP?
15     A.  No.  I mean, I could speculate, but I
16 don't know exactly why they are doing that.
17     Q.  Are they questioning AWP as an accurate
18 source for reimbursement?
19         MR. HAAS:  Objection to form.
20         THE WITNESS:  I don't know.
21 BY MS. MacMENAMIN:
22     Q.  In your experience at John Deere, have you

Page 76

1  ever doubted AWP as an accurate source for
2  reimbursement?
3          MR. HAAS:  Objection to form.
4          THE WITNESS:  We have never used AWP in
5  the pharmaceutical world as a source for
6  reimbursement.  We have used it as a source to
7  calculate our reimbursement.
8  BY MS. MacMENAMIN:
9      Q.  Correct.  Have you ever doubted AWP as a
10 basis or benchmark for reimbursement in the pharmacy
11 world?
12     A.  My perspective is that we always try to
13 get that price as low as possible that still puts
14 together a reasonable network, and we'd go to minus
15 25 percent and nobody would sign it and we'd try
16 minus 13 percent and everybody signed up, so we knew
17 we had to have it somewhere in between there.  And
18 minus 20 is our latest venture there, and that has
19 produced some headaches for us, but we have been
20 able to put together a reasonable network based on
21 that.
22         So again, it's simply a basis for

Page 77

1  negotiation, and we try to do as well as we can to
2  lower our costs for acquiring those drugs.
3      Q.  I want to skip to part of your testimony
4  regarding certain drugs called Remicaid, Lupron and
5  Synagis I believe it's called.
6      A.  Yes.
7      Q.  And at some point there was a change in
8  the reimbursement benchmark for these drugs.
9          Can you tell me, can you first of all just
10 describe for me that change and what went on?
11     A.  Essentially, and again I'm recalling here
12 something that I wasn't directly involved in, but we
13 knew that we could acquire that drug.  Those are
14 very expensive, high-cost drugs that are used in
15 very specific cases, very specific diseases.  Most
16 of those patients who require those drugs are going
17 through our case management program, being medically
18 managed in some other fashion.
19         So rather than purchase those at prices
20 that we would pay under our physician contracts, we
21 made the decision that we wanted to source those
22 drugs exclusively from specialty pharmacy

20 (Pages 74 to 77)

Mike Beaderstadt                                                    September 17, 2004

Moline, IL

Page 78

1  manufacturers at prices that we had negotiated that
2  were significantly lower than what we would pay a
3  physician's office, so we insisted that all those
4  drugs be sourced from one of those specialty
5  pharmacy outfits.
6      Q.   Now, prior to that change, were you
7  reimbursing physicians' offices for those drugs,
8  Remicaid, Lupron and Synagis, based on the AWP
9  benchmark?
10     A.   I think so, although I don't know how long
11  even those drugs have been available, so some of
12  them are fairly new, and as they became more
13  prevalent in their use, I don't know how much
14  reimbursement we actually had to physicians at that
15  point.
16     Q.   So you think that they were based on AWP,
17  the reimbursement was based on AWP?
18         MR. HAAS:  Objection to form.
19         THE WITNESS:  At which level?  At the
20  physicians, when we paid physicians directly?  In
21  both cases they were probably based on AWP.
22  BY MS. MacMENAMIN:

Page 79

1      Q.   So you stated earlier that you found much
2  cheaper prices by going through a specialty
3  wholesaler, and is it fair to say that the AWP for
4  those drugs was much higher than what you could get
5  somewhere else?
6         MR. HAAS:  Objection.
7         THE WITNESS:  The AWP would be the
8  constant.  The percentage of AWP that we paid a
9  particular supplier, we could pay a specialty
10  pharmacy much less, a much smaller percentage of AWP
11  than we were paying physicians' offices at the time.
12  BY MS. MacMENAMIN:
13     Q.   Okay.  So the acquisition cost for you was
14  lower through the specialty pharmacy?
15     A.   That's correct.
16     Q.   You testified earlier that in
17  approximately 1992 or 1993 there was a change in the
18  manner in which physicians' offices were reimbursed
19  for drugs, and I'll describe what I understood as
20  that change, and you please correct me if I'm wrong;
21  that before 1992 or '93, it was based on their
22  billed charges, and after that time it changed to an

Page 80

1  AWP-based system.
2         Is that correct?
3      A.   That's correct.
4      Q.   Did anyone at John Deere analyze or
5  compare costs of drugs before and after that change?
6      A.   I imagine so, but I don't know.
7      Q.   So you don't know whether prices generally
8  went up or down after switch to an AWP-based system?
9         MR. HAAS:  Objection to form.
10         THE WITNESS:  We certainly did it because
11  we were saving money on it.  With the newer system,
12  to reimburse at 110 percent minus the withhold was
13  less expensive for us than paying billed charges.
14  BY MS. MacMENAMIN:
15     Q.   And then later there was another switch to
16  McKesson, which you described in your earlier
17  testimony, and that was another AWP-based system but
18  a different percentage of AWP?
19     A.   That's correct.
20     Q.   In that testimony, you said, you indicated
21  that you didn't want doctors to be profiting from
22  drugs, and that was part of your reason for the

Page 81

1  switch?
2         MR. HAAS:  Objection to form.
3         THE WITNESS:  I think I said that we
4  didn't want the use of injectable drugs to be a
5  profit center, just as we would prefer that their
6  use of laboratory, for example, is not a profit
7  center.  We want to cover the reasonable cost of
8  providing care, but we don't look for those things
9  to be a profit center.
10  BY MS. MacMENAMIN:
11     Q.   Did you have reason to believe that that
12  was a profit center for physicians?
13     A.   We certainly believe that physicians could
14  acquire drugs at lower costs than we were paying
15  them at the time, yes.
16     Q.   Now, in your testimony regarding the
17  contracts with physicians over the years, you said
18  that with a few exceptions, until 2000 and 2003, AWP
19  was not a contractual term of the physician
20  contract?
21     A.   Not regularly.
22     Q.   But from how I understand your testimony,

21 (Pages 78 to 81)

Mike Beaderstadt                                                    September 17, 2004

Moline, IL

---

Page 82

1  you also testified that you've been reimbursing
2  based on AWP since approximately 1992 or '93.
3        What is the source for that reimbursement
4  factor?
5      A.  While the contracts did not mention how we
6  arrived at the price, the actual fee schedules that
7  would be annually attached to those contracts would
8  have a price for the drugs, the injectables, that we
9  would have internally calculated at that 110 percent
10  of AWP, but the methodology to get that price was
11  not disclosed in the contract.
12      Q.  Okay.  Now, you also testified that when
13  you made this change to the McKesson I think it was
14  87 percent of AWP, you did not include any
15  immunizations, or I can't remember the term, radio
16  something drugs?
17      A.  Radiopharmaceuticals.
18      Q.  Radiopharmaceuticals.  And the reason you
19  gave is that or one of the reasons was that you
20  didn't want to discourage immunizations.
21        How would the reimbursement factor
22  discourage immunizations?

---

Page 83

1      A.  Well, we are very interested in the
2  patient's primary care physician providing those
3  immunizations for many reasons, so we don't want an
4  individual physician's office to say that our
5  reimbursement is such that they can no longer
6  provide immunizations in his or her office and have
7  to send them to another place where we will lose the
8  record, lose the accounting of those immunizations
9  being given.
10        So because we are committed to childhood
11  immunizations, we decided not to tinker with the
12  reimbursement there that might create a level where
13  they were disincented to provide them.
14        We do that with many different procedures.
15  As a matter of fact, recently, there's a lab test
16  that we think is important, and we have raised the
17  price of that lab test to encourage physicians to
18  use it.
19      MR. HAAS:  Can I just go off the record
20  for a second here.
21        (Whereupon, an off-the-record
22        discussion was held.)

---

Page 84

1  BY MS. MacMENAMIN:
2      Q.  So going back to your testimony about the
3  immunizations and such, so is it fair to say that if
4  doctors were paid less or you changed the
5  reimbursement factor they would lose incentive to
6  provide those immunizations?
7      A.  If a physician reported to us that his
8  acquisition cost of the immunization and the storage
9  and the spoilage and everything else was higher than
10  the reimbursement and so therefore they were going
11  to stop giving immunizations to John Deere Health
12  patients and send them elsewhere for those, that
13  would be a bad thing for us.
14      Q.  But it's not a practice of John Deere to
15  provide a monetary incentive as in a profit in order
16  to incentivize doctors to use drugs?
17      A.  Well, that's a different question.  I
18  think there certainly are some arrangements that we
19  have that encourage the appropriate use of
20  medications to treat diseases that have some
21  incentives associated with them.
22      MR. HAAS:  Can we go off the record for a

---

Page 85

1  second.
2        (Whereupon, an off-the-record
3        discussion was held.)
4      MR. HAAS:  Susan, go ahead.
5  BY MS. MacMENAMIN:
6      Q.  Okay.  We're just wrapping up here.
7        Mr. Beaderstadt, you testified that you do
8  not have any evidence that manufacturers or PBMs
9  colluded in inflating AWPs.
10        Is it also fair to say that you do not
11  have any evidence one way or the other?
12      MR. HAAS:  Objection to form.
13      THE WITNESS:  That's true.
14  BY MS. MacMENAMIN:
15      Q.  And along those lines, is it also fair to
16  say that you do not have any evidence one way or the
17  other that AWPs were or were not fraudulently
18  inflated?
19      MR. HAAS:  Objection to form.
20      THE WITNESS:  I have no evidence.
21      MS. MacMENAMIN:  I think that's it.  Thank
22  you guys very much.

---

22 (Pages 82 to 85)

Mike Beaderstadt

Moline, IL

September 17, 2004

| Page 86 | Page 88 |
|---|---|
| 1    MR. HAAS:  Thanks, Susan. | 1    this 20th day of September, 2004. |
| 2    Off the record. | 2 |
| 3           (Whereupon, the deposition was | 3    GREG S. WEILAND, CSR, RMR, CRR |
| 4           concluded.) | 4    License No. 084-003472 |
| 5 | 5 |
| 6 | 6 |
| 7 | 7 |
| 8 | 8 |
| 9 | 9 |
| 10 | 10 |
| 11 | 11 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |

Page 87

1    STATE OF ILLINOIS  )
2                ) SS:
    COUNTY OF C O O K  )
3           The within and foregoing deposition of the
4    witness, MIKE BEADERSTADT, was taken before GREG S.
    WEILAND, CSR, RMR, CRR, Notary Public, at Suite 300,
5    1630 Fifth Avenue, in the City of Moline, Illinois,
    commencing at 9:07 o'clock a.m., on the 17th day of
6    September, 2004.
7           The said witness was first duly sworn and was
    then examined upon oral interrogatories; the
8    questions and answers were taken down in shorthand
    by the undersigned, acting as stenographer and
9    Notary Public; and the within and foregoing is a
10   true, accurate and complete record of all the
11   questions asked of and answers made by the
12   aforementioned witness at the time and place
13   hereinabove referred to.
14         The signature of the witness was waived by
15   agreement of counsel.
16         The undersigned is not interested in the
17   within case, nor of kin or counsel to any of the
18   parties.
19         Witness my official signature and seal as
20   Notary Public in and for Cook County, Illinois, on
21
22

23 (Pages 86 to 88)