Exhibit 38

Mickey Brown                    Highly Confidential                    March 9, 2005
                                Jackson, MS



1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
2

    IN RE:  PHARMACEUTICAL INDUSTRY
3   AVERAGE WHOLESALE PRICE
    LITIGATION              MDL NO. 1456
4

    THIS DOCUMENT RELATES TO:
5   ALL CLASS ACTIONS   MASTER FILE NO. 01-CV-12257-PBS
6   ───────────────────────────────
7   IN THE SUPERIOR COURT OF THE STATE OF ARIZONA IN AND
    FOR THE COUNTY OF MARICOPA
8

    ROBERT J. SWANSTON, INDIVIDUALLY AND
9   ON BEHALF OF HIMSELF AND ALL
    OTHERS SIMILARLY SITUATED              PLAINTIFF
10

    VERSUS                          NO. CV2002-004988
11

    TAP PHARMACEUTICAL PRODUCTS,
12  INC.; ET AL.                          DEFENDANTS
13  *****************************************************
14

              DEPOSITION OF MICKEY BROWN
15

16  *****************************************************
17           APPEARANCES NOTED HEREIN
18        TAKEN AT INSTANCE OF: DEFENDANTS
             DATE: MARCH 9th, 2005
19     PLACE: BRUNINI, GRANTHAM, GROWER & HEWES
             POST OFFICE DRAWER 119
20       JACKSON, MISSISSIPPI 39205-0119
              TIME: 10:00 a.m.
21

22

Mickey Brown                    Highly Confidential                    March 9, 2005
                                    Jackson, MS

Page 2

1    APPEARANCES:
2
3      FOR THE PLAINTIFFS
4        Elizabeth Fegan, Esquire
5        Hagens Berman Sobol Shapiro, LLP
6        60 West Randolph, Suite 200
7        Chicago, IL 60601
8
9      FOR THE DEFENDANTS
10       Philip D. Robben, Esquire
11       Kelley, Drye & Warren, LLP
         101 Park Avenue
12       New York, NY 10178-0002
13
         Adeel Mangi, Esquire
14       Patterson, Belknap, Webb & Tyler, LLP
         1133 Avenue of the Americas
15       New York, NY 10036-6710
16       Gerald K. Bates, Esquire
         Shook, Hardy & Bacon, LLP
17       2555 Grand Blvd
         Kansas City, Missouri 64108
18
19
20
21
22

Page 3

1              TABLE OF CONTENTS
2
3    Appearances                          2
4    Examination by Mr. Robben            4
5    Examination by Mr. Mangi           105
6
7    Exhibit Brown 001                    6
8
9    Conclusion of Deposition           163
10   Certificate of Reporter            164
11
12
13
14
15
16
17
18
19
20
21
22

Page 4

1                * * * * * *
2              MICKEY BROWN,
3    after having first been duly sworn, was
4    examined and testified under oath as follows,
5    to-wit:
6           E X A M I N A T I O N
7    EXAMINATION BY MR. ROBBEN:
8       Q    Good morning, Mr. Brown.  My name is
9    Philip Robben.  I represent one of the defendants in
10   this case, Dey, Inc., and I'm here to ask you some
11   questions today.  Have you ever given a deposition
12   before?
13      A    Yes.
14      Q    How many times?
15      A    Three.
16      Q    Three times.  About how -- do you
17   remember the approximate dates of those
18   examinations?
19      A    I don't.
20      Q    Okay.
21      A    I did one within the last three or four
22   months, and the others have been a couple of years

Page 5

1    ago.
2       Q    Okay.  The one you did a few months ago,
3    was that in connection with your employment?
4       A    Yes.
5       Q    Do you remember what the general nature
6    of the case was?
7       A    It had to do with code editing.
8       Q    Okay.
9       A    Procedure code editing.
10      Q    Okay.  And then the depositions before
11   that, were they in connection with your employment?
12      A    They were.
13      Q    Okay.  At the time were you employed by
14   Blue Cross/Blue Shield of Mississippi?
15      A    Yes, sir.
16      Q    Okay.  All right.  As you probably
17   remember from those -- but I'll just go over it just
18   for the record.  We're being recorded by a written
19   record.  There's a stenographer.  We have to give a
20   verbal response, and I have to ask verbal questions.
21   She can't take down nods of the head and things like
22   that, so I'd ask that you speak.  I'll try not to

2 (Pages 2 to 5)

Mickey Brown                  Highly Confidential                  March 9, 2005
                                 Jackson, MS

Page 6

1  interrupt you when you're giving your answer.
2      If at any time you don't understand a
3  question I've asked, I'd ask that you let me know
4  that so I can try and clarify it so that we can get
5  the best possible answer.
6      Now, my understanding is that you're
7  being produced today to give testimony on behalf of
8  Blue Cross/Blue Shield of Mississippi; is that
9  correct?
10     A   Yes.
11     Q   And do you understand that you're giving
12 testimony on behalf of the company?
13     A   Yes.
14  (DOCUMENT MARKED AS DEPOSITION Exhibit Brown 001
15     AND ATTACHED.)
16 MR. ROBBEN: (Continuing.)
17     Q   Okay.  Now, we've previously marked one
18 exhibit which I'd like to show you.  It's a
19 February 4th, 2005 letter that I sent to your
20 attorney, Mr. Donnell.  And at the last two pages of
21 the exhibit are a rider, and I'd just ask you to
22 take a look at that and let me know if you've ever

Page 7

1  seen that letter before.
2      A   I've not seen the letter portion, but I
3  have seen the questions or the rider topics.
4      Q   Okay.  So you --
5      A   But it had a different heading when I --
6  when I reviewed it.
7      Q   Okay.  Can you look through -- in the
8  exhibit there, there are topics 1 through 25.  Can
9  you look through those and let me know whether
10 you're prepared to testify as to all those topics
11 today.
12         MR. DONNELL:  Do you mean in your
13         question does he have relative
14         information on these topics, or is he
15         prepared to just respond to questions
16         regarding these topics?
17         MR. ROBBEN:  Well, I mean,
18         in the -- is he prepared to give
19         testimony on those topics as a 30(b)(6)
20         designee of the company?
21     A   I don't understand what that -- what
22 that means, what you just said, 30(b)(6).  And I

Page 8

1  don't know if that's different than what our
2  attorney just asked.  I'm confused with now what the
3  question is.
4          MR. DONNELL:  I asked you, Philip,
5          whether you were asking him if he had
6          relevant information with regard to all
7          of these topics.  If your question is
8          can he respond to all of these, I'd ask
9          that you clarify that, whether it's
10         30(b)(6).
11         But if you are asking him whether
12         he has information regarding each of
13         these topics, I'd ask that you make that
14         clarification as well.
15 MR. ROBBEN: (Continuing.)
16     Q   Well, do you have relevant information
17 as to each of the topics on this -- on this list?
18     A   If you mean do I have knowledge and the
19 ability to answer questions related to these, the
20 answer is yes.  If you mean do I have documentation
21 with me, the answer is no.
22     Q   Okay.  Is there anybody that you're

Page 9

1  aware of that has -- or strike that.
2      Are you the most knowledgeable to testify
3  as to these 25 topics?
4      A   I'm as knowledgeable as anyone else.
5      Q   Okay.  Can you give testimony that
6  reflects the knowledge of Blue Cross/Blue Shield of
7  Mississippi as to these topics?
8      A   Yes.
9      Q   Okay.  Can you give that testimony
10 for -- well, what period of time can you give
11 testimony on behalf of the company as to these
12 topics?
13     A   I have been employed with Blue Cross of
14 Mississippi in total for 11 years.  I was hired in
15 1991 and remained employed through 1996.  I left
16 Blue Cross and worked for other employers from late
17 '96 to the middle of 1999, and have been employed in
18 my current capacity since -- I believe it was July
19 of 1999 to present.  So I can provide my knowledge
20 of those time periods.
21     Q   Okay.  For the period when you weren't
22 with Blue Cross/Blue Shield of Mississippi, can

3 (Pages 6 to 9)

Mickey Brown                   Highly Confidential                          March 9, 2005
                                  Jackson, MS

---

Page 10

1  you -- do you have any knowledge about the company's
2  practices at that -- during that period of time?
3       A   Yes, I do.
4       Q   Okay.  Did you do anything to prepare
5  for today?
6       A   I spoke with our external counsel and
7  our internal legal staff.
8       Q   Okay.  How many -- about how many times
9  did you speak to each of those?
10      A   Three or four, somewhere around that.  I
11  don't believe it was more than that.
12      Q   Okay.  Did you review any documents?
13      A   Just these -- these statements in this
14  attachment to the letter.
15      Q   Okay.  So just the Exhibit 1?
16      A   Yes.  I'm sorry.
17      Q   Just the rider?
18      A   Just the rider to Exhibit 1, yes, sir.
19      Q   Okay.  Have you ever spoken to anybody
20  representing the plaintiffs in this litigation, to
21  your knowledge?
22      A   Not that I'm aware of.

---

Page 11

1       Q   Okay.  I'd like to just ask you some
2  questions about -- about your background.  I assume
3  you graduated from high school?
4       A   Yes.
5       Q   That's an easy one.  Did you go on to
6  any education after high school?
7       A   I have a four-year college degree.
8       Q   Okay.  What college or university did
9  you obtain that from?
10      A   Millsaps College in Jackson,
11  Mississippi.
12      Q   What year did you graduate?
13      A   I graduated in 1991.
14      Q   Did you have a -- let me strike that.
15          What's your degree?
16      A   History.  I have a BA in history.
17      Q   Okay.  When you were in college, did you
18  take any courses that were related to the healthcare
19  industry or healthcare in general?
20      A   Not that I remember.
21      Q   Okay.  Fair enough.  After graduating
22  from college, what was your first employment?

---

Page 12

1       A   I was employed by Blue Cross/Blue Shield
2  of Mississippi as a health underwriter.
3       Q   Okay.  Was -- I should ask, were you
4  employed during college?
5       A   Yes.
6       Q   Who was your employer then?
7       A   I had various employers.  I worked as a
8  waiter in a restaurant, Perkins Family Restaurant.
9  I worked as a runner in various law firms.  I don't
10  remember the names, and, in fact, I don't think many
11  of them still are firms.
12      Q   Okay.  Well, how about this, were any of
13  in the -- in the insurance or healthcare fields?
14      A   I have no idea what their fields were.
15  I just delivered the mail.
16      Q   Oh, okay.  I meant did your employers
17  work in healthcare or in --
18      A   I worked for a restaurant and for law
19  firms, and I'm not sure what the law firms did.  I
20  just delivered the mail.
21      Q   Fair enough.  Okay.
22      A   I also worked for a bank.

---

Page 13

1       Q   Okay.  So in 1991, you began at Blue
2  Cross/Blue Shield of Mississippi as a -- you said it
3  was a health underwriter?
4       A   Health underwriter.
5       Q   Okay.  Now, how long did you hold that
6  position?
7       A   I don't remember the exact dates.  I
8  believe I did that for roughly two years.
9       Q   Um-hum.  Okay.  And then what was your
10  position after that?
11      A   I worked as a network product
12  coordinator.
13      Q   Okay.  And then how long did you hold
14  that position?
15      A   Around -- around eight months, six
16  months, something like that.  And then I was moved
17  into a position called managed care coordinator.
18      Q   Okay.  How long did you hold that
19  position?
20      A   I did that until I left in October of
21  1996.
22      Q   Okay.  And then when you -- when you

---

Mickey Brown                    Highly Confidential                    Marc
                                   Jackson, MS

Page 14

1  left Blue Cross/Blue Shield of Mississippi, where
2  did you go after that?
3       A   I went to a company called Diversified
4  Services, Incorporated, which was a wholly-owned
5  subsidiary of the Mississippi Hospital Association,
6  as their director of managed care.
7       Q   Okay.  And how long did you hold that
8  position?
9       A   I did that for about 11 months, and then
10 I went to a company called United Healthcare of
11 Mississippi.
12      Q   Okay.
13      A   And I did that until I came back to Blue
14 Cross in June or July of 1999.
15      Q   Okay.  What was your position with
16 United Healthcare?
17      A   I was the manager of hospital
18 contracting.
19      Q   Okay.  Now, after you worked for United
20 Health, did -- well, strike that.
21           Did you work as the manager of hospital
22 contracting the entire time you were with them?

Page 15

1       A   Yes.
2       Q   Okay.  Now, after that -- that time with
3  United Healthcare, you returned to Blue Cross/Blue
4  Shield?
5       A   Yes.  I returned to Blue Cross/Blue
6  Shield, and my position was manager of the AHS state
7  network.
8       Q   Did you say HHS?
9       A   AHS.  A as in apple.
10      Q   What does AHS stand for?
11      A   AHS stands for Advanced Health Systems,
12 which is a wholly-owned subsidiary of Blue
13 Cross/Blue Shield of Mississippi, though I was
14 technically a Blue Cross/Blue Shield of Mississippi
15 employee.
16      Q   Okay.  And how long did you hold that
17 position?
18      A   I held that position for, I think, a
19 year, and then I was promoted to the director of
20 provider contracting.  I'm sorry I don't have firm
21 dates.  I'm trying to recall some of these.
22      Q   Okay.

Page 16

1       A   There weren't formal transitions, but it
2  was around a year that I did AHS state network, and
3  then I was promoted to director of provider
4  contracting, a position that -- well, my title
5  recently changed in December of last year to
6  director of provider networks, though I still have
7  the same area of responsibility with -- with an
8  additional area.
9       Q   Okay.  So you're currently director of
10 provider networks?
11      A   I'm currently director of provider
12 networks.  Although my business cards haven't
13 changed, my job title has.
14      Q   Okay.  Now, if I can bring you back to
15 your first job where you were a health underwriter,
16 your first position at Blue Cross/Blue Shield.  What
17 were your responsibilities in that position?
18      A   I evaluated the health risk of
19 individual applicants for individual health
20 insurance products to determine whether they were an
21 acceptable health risk for a policy with Blue Cross.
22      Q   Now -- then your job changed to

Page 17

1  network product coordinator.  What were your
2  responsibilities in that position?
3       A   My responsibility was to develop managed
4  care type insurance products, benefit plans, and
5  provider networks to support those plans.
6       Q   Um-hum.  At that point did Blue
7  Cross/Blue Shield have managed care plans, or did
8  you work on the first plans that were developed?
9       A   Well, I would really have to ask for
10 your definition of managed care, because it really
11 is a broad spectrum and -- to give you an accurate
12 answer.  What do you -- can you define what you mean
13 by managed care?  And then I can tell you whether we
14 meet that -- met that criteria before I was in that
15 position.
16      Q   Right.  I think we might come back to
17 this.
18      A   Okay.
19      Q   So I'll -- I'll come back.
20           Now, your next position was managed care
21 coordinator, what was your response -- what were
22 your responsibilities in that position?

5 (Pages 14 to 17)

Mickey Brown

Highly Confidential
Jackson, MS

March 9, 2005

Page 18

1    A    Similar to what I had as network product
2  coordinator, but more focused on management of
3  provider networks rather than benefit plans.  As I
4  was focused -- as the network product coordinator.
5    Q    What was -- what is -- at that time what
6  was the provider network?
7    A    Provider network at that time would have
8  been physicians and hospitals, certain what we call
9  Allied health providers, would have been the bulk of
10  our provider networks at that time.
11    Q    Then you switched to diversified
12  services and were director of managed care, correct?
13    A    Yes.
14    Q    What did you -- what were your
15  responsibilities in that position?
16    A    Diversified services had contracted
17  with -- I believe it was 14 individual hospitals to
18  create an insurance company, to manage an insurance
19  company for them.  And I was responsible for
20  provider contracting and various managed care
21  activities of that insurance company.
22          Ultimately, the insurance company was

Page 19

1  never successfully operated and acted more as a
2  third-party administrator for self-insured plans.
3  Had very little underwritten business, and it mainly
4  functioned as third-party claims administrator.  But
5  that's what I was hired to do, was to do the
6  provider contracting for those 14 hospitals.
7    Q    Okay.  Did it administer third-party
8  claims at any time for Blue Cross/Blue Shield of
9  Mississippi?
10    A    Not that I'm aware of.
11    Q    Okay.  Okay.  Then you came back to Blue
12  Cross/Blue Shield, and you were manager of AHS state
13  network?
14    A    No.  Actually, I went to United
15  Healthcare as the manager of hospital contracting.
16    Q    Correct.  Sorry about that.  What was
17  your -- what were your duties in that position?
18    A    To negotiate reimbursement contracts
19  with participating hospitals for their hospital
20  network.  That also included ambulatory surgery
21  centers and hospitals.
22    Q    What type of a business was United

Page 20

1  Healthcare?
2    A    It's a licensed HMO.
3    Q    Okay.  Then you returned to Blue
4  Cross/Blue Shield of Mississippi?
5    A    Correct.
6    Q    And took the position as manager of AHS
7  state network?
8    A    Correct.
9    Q    And what were your duties in that
10  position?
11    A    Advanced Health Systems had been
12  contract -- had won a contract with the Mississippi
13  State and School Employee Health Plan to develop and
14  implement an exclusive preferred provider network
15  for state and school employees.  And my job was that
16  development and implementation and ongoing
17  management of all of the network activities.  And it
18  was exclusive to state and school employees for the
19  State of Mississippi.
20    Q    Okay.  Then you moved into the director
21  of provider contracting position?
22    A    Correct.

Page 21

1    Q    Now, what were your responsibilities in
2  that role?
3    A    Well, I retained the responsibilities in
4  my previous position, but in addition, I became
5  responsible for the provider contracting activities
6  for Blue Cross/Blue Shield of Mississippi.
7    Q    When you say provider contracting,
8  that's -- well, how do you -- how do you define
9  that?
10    A    You mean the types of providers?
11    Q    Yes.
12    A    Physicians, hospitals, and Allied health
13  providers.
14    Q    What is an Allied health provider?
15    A    It's a non-physician, non-hospital,
16  provider.  Like an ambulatory surgery center, a home
17  infusion provider, a home health provider, durable
18  medical health equipment provider.  Those sorts of
19  providers.
20    Q    And now -- and now you're currently
21  director of provider networks, correct?
22    A    Correct.

6 (Pages 18 to 21)

Mickey Brown                    Highly Confidential                    March 9, 2005
                                 Jackson, MS

Page 22

1    Q    And how have your responsibilities
2  changed from your last position to today?
3    A    Well, I've retained all of my past
4  responsibilities and have added responsibility for
5  external provider services. We have a staff that
6  travels around the state and service -- and provides
7  service in office to the various providers in our
8  networks and. Then I also have responsibility for
9  our electronic claims and electronic provider
10 remittance functions. We have a -- call center
11 that services those telephonically. I'm responsible
12 for that area.
13   Q    Okay. Now, in your -- in your
14 current -- well, strike that.
15        During your prior positions -- or should
16 I say in any of your positions, have you been
17 responsible for pharmaceutical reimbursement?
18   A    Yes. I have in former -- former
19 positions. Depending on the type of provider, there
20 would be pharmaceutical reimbursement involved.
21   Q    Okay. Have you ever had any
22 responsibility for reimbursement to pharmacies?

Page 23

1    A    No direct responsibility for
2  reimbursement to pharmacies.
3    Q    So your prior responsibility would be
4  reimbursement to physicians and those types of
5  providers?
6    A    Correct.
7    Q    Okay. Now, have you had any -- any
8  responsibility with contracting at any point with
9  PPMs?
10   A    No.
11   Q    Okay. Now, during the course of your
12 employment, have you ever heard the term "AWP"?
13   A    Yes.
14   Q    Okay. What's your understanding of AWP,
15 what it means?
16   A    What AWP stands for, the acronym stands
17 for?
18   Q    Well, I understand it stands for average
19 wholesale price. Do you agree with that?
20   A    I understand that the acronym AWP
21 represents average wholesale price. Is that what
22 you're asking me?

Page 24

1    Q    Yes. But what -- what is your
2  understanding of what -- what's your understanding
3  of what the -- strike that.
4        What's your understanding of what it --
5  what it means in day-to-day usage?
6        MS. FEGAN: Object to the form.
7  MR. ROBBEN: (Continuing.)
8    Q    You can answer.
9    A    Well, what it means in day-to-day usage
10 for Blue Cross/Blue Shield is it's a point of
11 reference that we use in establishing reimbursement
12 for drugs, pharmaceuticals. Now, is that -- I'm
13 not -- I'm not -- still not sure that I'm clear on
14 the question.
15   Q    Well, do you understand it to be a -- a
16 price that is -- that represents the cost of
17 pharmaceuticals to any particular purchaser?
18        MS. FEGAN: Objection to form.
19 MR. ROBBEN: (Continuing.)
20   Q    You can answer.
21   A    Okay. I -- again, I think, you know,
22 for purposes at Blue Cross, it's strictly a point of

Page 25

1  reference, what the actual cost of acquisition is.
2  It's -- it's not -- it's not really something that
3  we consider. We use it as a point of reference in
4  establishing our reimbursement.
5    Q    Okay. Is that your current -- when you
6  say use as a point of reference, that's your current
7  usage of it today?
8    A    That's our current usage of it today, is
9  as a point of reference.
10   Q    Okay. Has your understanding of that
11 term changed over time?
12   A    No.
13   Q    Okay. Do you have any -- do you
14 subscribe or does Blue Cross/Blue Shield subscribe
15 to any newsletters or industry publications that
16 deal with -- with pharmaceutical pricing?
17   A    We subscribe to numerous publications,
18 and I'm sure that pharmaceutical pricing is
19 addressed in those publications. Specifically on
20 that topic, you know, I'm not a -- I'm not aware of
21 if we do or if we don't.
22   Q    Okay. Are you aware that there are

Henderson Legal Services
(202) 220-4158

Mickey Brown

Highly Confidential
Jackson, MS

March 9, 2005

Page 26

1 pricing compendia in the industry, such as First
2 Data Bank and Red Book and others?
3      A    Yes.  We do -- now, if that's what
4 you're asking, that's -- back to the original
5 question.  We do subscribe to Red Book.
6      Q    Just -- just Red Book?
7      A    Oh, I know that we get Red Book and that
8 we have another AWP pricing that's loaded to our --
9 to our computer system, again, as a point of
10 reference, but I'm not sure if it's First Data Bank
11 or Red Book.
12      Q    Okay.  Now, do you know how long Blue
13 Cross/Blue Shield has subscribed to those compendia?
14      A    I have no idea.
15      Q    Okay.  Do you know how they decided
16 which subscription to obtain?
17      A    I have no idea.
18      Q    And any --
19      A    Nor do I think anybody else would
20 recall.  It's been -- we've had -- we've accessed
21 those resources for many years, and I'm not sure if
22 anyone would remember how the decision was arrived.

Page 27

1      Q    In the course of your work, do you have
2 reason to refer to those publications?
3      A    As I said before, we use it as a point
4 of reference in our reimbursement decision-making,
5 so I do have access and do use the information.
6 But, again, as -- simply as a point of reference.
7      Q    Okay.  I'd like to ask you some
8 questions about the type of products that Blue
9 Cross/Blue Shield of Mississippi provides and some
10 background on the company itself.
11           Do you know when the company was founded?
12      A    1949.
13      Q    Okay.  Now, what's your area of coverage
14 in terms -- in other words, where do your -- where's
15 your membership base?
16      A    We cover the entire state of
17 Mississippi.
18      Q    Okay.  Do you cover any persons or
19 companies outside of that state?
20      A    We may have members that reside outside
21 of Mississippi, but they would be associated with an
22 employer or maybe a dependent child of a resident of

Page 28

1 Mississippi.  We don't -- we don't sell products to
2 groups or to individuals that reside outside of
3 Mississippi.
4      Q    Okay.  So if I live in, say, Alabama but
5 I work for a company in Mississippi, you might cover
6 me, but it's only because my employer that bought
7 the policy is a Mississippi company?
8      A    Correct.
9      Q    Okay.  Now, do you -- does the -- does
10 Mississippi Blue Cross/Blue Shield provide anything
11 other than health insurance?
12      A    We provide dental insurance and through
13 a subsidiary company, we provide life insurance.
14      Q    Do you know the name of that sub?
15      A    Blue Bonnet.  And we also provide
16 third-party administration services, which in my
17 mind, is different than health insurance.  We're a
18 claims administrator.
19      Q    Okay.  Do you know who those services
20 are provided for?
21      A    Various self-insured plans across
22 Mississippi.

Page 29

1      Q    Do you have -- do you know the names of
2 any of those self-insured plans?
3           MR. DONNELL:  This is -- let me
4           interject here.  We're getting a little
5           far afield of the deposition topic list,
6           the rider.  If we could steer back
7           towards that, I would appreciate it.
8           MR. ROBBEN:  Okay.
9 MR. ROBBEN:  (Continuing.)
10      Q    How many -- how many lives are covered
11 by Blue Cross/Blue Shield of Mississippi's products?
12      A    I -- I don't -- I would have to -- to
13 guess.  I'm not sure of the exact number.
14      Q    Would you say it's more than a million?
15      A    No.
16      Q    Is it less than -- is it more than
17 500,000?
18      A    My guess would be it's between 500,000
19 and a million, but exactly where, I don't know.
20      Q    Fair enough.  Now, can you give me --
21 can you tell me what types of health insurance plans
22 you offer?

8 (Pages 26 to 29)

Mickey Brown                    Highly Confidential                    March 9, 2005
                                Jackson, MS

Page 30

1    A    Do you mean the types of policies that
2   we offer?
3    Q    Yes.
4    A    I am not an expert on benefit plans that
5   we currently offer, but very generally we offer what
6   we call a comprehensive plan and a -- a network
7   plan, the difference being that one has an in and
8   out of network differential.  If you use the network
9   provider, you get a higher benefit level.  If you
10  use a non-network provider, lower.
11       Whereas the comprehensive generally
12  doesn't have those features in it.  That would be
13  the striking difference between the two.  But beyond
14  that, the subcategories of those, I'm not really
15  familiar with how -- you know, the benefit details.
16   Q    Okay.  And the -- on -- where you have
17  the network plan, are there networks of -- I assume
18  there's networks of providers such as doctors?
19   A    Yes.
20   Q    Are there also pharmacy networks?
21   A    Yes.
22   Q    Do you know if Blue Cross/Blue Shield of

Page 31

1   Mississippi offers any type of what might be called
2   an indemnity plan, a plan where a beneficiary would
3   pay out of their own pocket for services and
4   subscriptions and -- receive a check for
5   reimbursement after the fact?
6    A    Well, I'm not sure I'm clear on the
7   question.  Because any of our policies, that sort of
8   transaction could happen.  Can you --
9    Q    Well, yes.
10   A    Can you be more specific on an indemnity
11  policy?
12   Q    Are there any policies where that's the
13  sole method of making a claim.  In other words,
14  there is no -- where the -- the claim is submitted
15  by the beneficiary, and then the -- the benefits are
16  paid directly to the beneficiary?
17       MS. FEGAN:  Objection to the form.
18   A    Are you asking are there benefit plans
19  where the provider would never submit the claim?
20  MR. ROBBEN: (Continuing.)
21   Q    Yes.
22   A    I'm not aware of any, but, again, I'm

Page 32

1   not an expert on benefit plans.
2    Q    Okay.  Do you know if under the plans
3   that are in place, your members pay any kind of
4   coinsurance or copay?
5    A    I know that they do, yes.
6    Q    Do you know -- do you know if it's a --
7   have you ever heard the term "coinsurance"?
8    A    Yes.
9    Q    What's your understanding of that?
10   A    My understanding of coinsurance is that
11  the -- the plan pays a percentage, and the member
12  pays a percentage.  And the percentage that the
13  member pays is their coinsurance.
14   Q    Okay.  As opposed to a copay?
15   A    In our terminology, coinsurance is a
16  percentage, and a copay is a fixed dollar amount.
17   Q    So it's flat no matter what the cost of
18  the underlying service or prescription would be?
19   A    It's -- it's flat, but it might be
20  tiered based on the service.  I'll provide an
21  example as a way to explain.  A primary care
22  physician may have a $15 copay, whereas a specialist

Page 33

1   physician is a $25 copay.
2        So it's a flat -- if you -- whatever
3   primary care physician you use, it would be $15.
4   And whatever specialist you use, it's $25, but it's
5   not flat across the board no matter what type of
6   physician you use.
7    Q    Okay.  Are there -- are there any Blue
8   Cross/Blue Shield beneficiaries that pay based on a
9   percentage of the cost of the services they -- they
10  obtain?  In other words, a coinsurance involved?
11   A    Again, I'm not an expert on benefits,
12  but there are -- I have Blue Cross insurance, so
13  from my policy, I pay a coinsurance for certain
14  services and a copay for other services.
15   Q    Do you know whether -- well, let me back
16  up.
17       I assume that the -- or let me ask you
18  directly.  Do the plans offered by Blue Cross/Blue
19  Shield of Mississippi provide a prescription drug
20  benefit?
21   A    To the best of my knowledge, yes.
22   Q    Okay.  Do the beneficiaries of those

9 (Pages 30 to 33)

Mickey Brown

Highly Confidential
Jackson, MS

March 9, 2005

Page 34

1  prescription drug benefits pay a coinsurance or a
2  copay?
3      A   I think it would depend on the plan.
4  There -- there's probably a possibility that it's
5  both, depending on what plan you have.  One may be a
6  copay; one may be a coinsurance.  To the best of my
7  knowledge, though, most of our plans have a copay, a
8  fixed dollar amount.
9      Q   Okay.  Now, does Blue Cross/Blue Shield
10  Mississippi own any of its -- own any pharmacies?
11      A   Not that I'm aware of.
12      Q   Do you have any doctor groups that
13  you -- that you own?  In other words, a group of
14  doctors or a hospital that is owned by the plan?
15          MR. DONNELL:  Again, we're getting
16      a little bit far afield of the rider.
17          MR. ROBBEN:  Well, I mean, I think
18      that this is --
19          MR. DONNELL:  Ownership of
20      providers is nowhere found in the rider
21      that we agreed to submit a witness for.
22          MR. ROBBEN:  Well, I think -- I

Page 35

1      think that it goes to -- whether they
2      own a hospital or a plan, I think, can
3      affect how they reimburse for various
4      services and their knowledge of
5      reimbursements.  So I'm really only
6      getting into it as background.
7          MR. DONNELL:  Okay.  Again, if you
8      want to ask about the methodologies for
9      those providers, that's fine.  Whether
10      Blue Cross owns or has any interest in
11      those is a little far afield.  But I
12      don't mind going through a little bit of
13      background, which we've done to this
14      point, but...
15          MR. MANGI:  This is Adeel Mangi on
16      the phone.  I'll just add ownership of
17      hospitals is also relevant -- directly
18      relevant to the plan's knowledge of
19      acquisition costs for drugs.  So we
20      would join counsel in submitting that
21      the question is pertinent.
22          MR. ROBBEN:  To the extent I ask

Page 36

1      him about ownership of hospitals or
2      physician groups or pharmacies, are you
3      going to direct him not to answer?
4          MR. DONNELL:  You know, if you
5      limit -- limit it to that or get
6      directly into the methodologies or how
7      they -- their understanding of
8      acquisition costs or acquisition price,
9      average wholesale price, or whatever,
10      that's fine.  But limit it to those
11      areas.
12          And I think you could craft your
13      questions in a way that would satisfy
14      that without getting into the private
15      business of Blue Cross/Blue Shield.
16      We're not putting Blue Cross/Blue Shield
17      up today to explore their -- their
18      ownership interests in other companies.
19          MR. ROBBEN:  Well, I mean, to the
20      extent your concern is confidentiality,
21      we -- we have a strong and broad
22      protective order in the case.

Page 37

1          MR. DONNELL:  Well --
2          MR. ROBBEN:  And, you know, I'd be
3      happy to -- you know, you can designate
4      the whole -- the whole deposition highly
5      confidential, and only attorneys are
6      going to see it from that point forward
7      and the Court.
8          MR. DONNELL:  Well, that's still
9      outside of our agreement.  So, you know,
10      if you could craft your questions to
11      mold within this agreement, that's fine.
12      But anything beyond that was not agreed
13      to and should not be gotten into today.
14          MS. FEGAN:  This is Beth Fegan.
15      You know, I -- actually, I join in the
16      witness's attorney's objections.  I
17      think we spent a lot of time on a lot of
18      things that are very irrelevant and
19      irrelevant to AWP and methodology for
20      reimbursement and acquisition costs.
21      So, you know, I think we can move along
22      if we focus on those, and I think you'll

Mickey Brown

Highly Confidential
Jackson, MS

March 9, 2005

---

Page 38

1  end up getting the answers that you
2  need.
3          MR. ROBBEN:  All right.
4          MR. DONNELL:  So, yes, to answer
5  your earlier question, I will instruct
6  him not to answer insofar as it goes
7  beyond this topic list.
8          MR. ROBBEN:  All right.  Well, how
9  about this?
10 MR. ROBBEN: (Continuing.)
11      Q    Are you aware of the methodologies that
12 Blue Cross/Blue Shield of Mississippi has used to
13 reimburse for doctor-administered pharmaceuticals
14 from 1991 to the present time?
15      A    Yes.
16      Q    Okay.  What is that methodology?  Or let
17 me -- let me -- strike that.
18          Has that methodology changed over time?
19      A    Reimbursement for injectable drugs can
20 change annually.  So the methodology has probably
21 stayed roughly the same, but the reimbursement
22 itself changes -- can change annually.  Or it can

---

Page 39

1  actually change as needed throughout the course of
2  an individual year.
3      Q    Can the methodology be reduced to a --
4  to a formula?
5      A    No.
6      Q    How -- how is the -- what is the
7  methodology?  Is it -- for example, is it linked to
8  AWP?  Is it linked to some other benchmark or --
9          MS. FEGAN:  Objection to form.
10 MR. ROBBEN: (Continuing.)
11      Q    You can answer.
12      A    Okay.  Again, we use -- as I said in the
13 earlier part of the deposition, we use AWP as a
14 reference point.  Reimbursement is established based
15 on -- based on our needs as a company to present
16 fair and reasonable reimbursement to the provider
17 community and fair and reasonable reimbursement to
18 Blue Cross/Blue Shield of Mississippi and our
19 subscribers.
20          We do use AWP as a point of reference.
21 We -- we reimburse for physician-administered
22 pharmaceuticals, in the physician's office using the

---

Page 40

1  various HCPC codes assigned to the type of service
2  they provide.  You know, a HCPC code, a J code, and
3  I believe a G code -- there's a few other types of
4  HCPC codes -- can have multiple drugs assigned to
5  that -- to that -- to that J code or other HCPC
6  code.
7          And -- and we will choose either -- we'll
8  choose the lesser of the lowest-priced brand using
9  AWP for the -- to determine that or the low -- or
10 the median generic, whichever is less.  And then we
11 apply some -- either a markup or markdown, just
12 depending on our business need, to produce fair
13 reimbursement to the folks I mentioned earlier.
14          So it's -- it's used in the calculation
15 as a point of reference, a starting point for us to
16 develop what we think is fair to the physician
17 community, to Blue Cross to our subscribers.
18      Q    Okay.  Let me -- let me back up a little
19 bit, because I think you said a lot of things there,
20 and I want to understand it correctly.
21          Now, am I correct that when you -- that
22 doctors submit their claims for drugs that they

---

Page 41

1  administer by J code?
2      A    Or other HCPC code.  There are other
3  HCPC codes that --
4      Q    That might take in --
5      A    That might take into account an
6  injectable drug or a physician-administered drug.
7      Q    Okay.  Now, when you get that claim in
8  with that code, what's your next step?
9      A    We have a set allowance for that
10 particular HCPC code.  We apply that allowance to
11 the claim, then apply the subscriber's benefits, and
12 we process the claim.  Now, the -- the technical of
13 how that flows, I'm not -- definitely not an expert
14 in that area, but that's generally how it works.
15      Q    Okay.  How do you --
16      A    So we have an established allowance for
17 that.
18      Q    Okay.  How do you establish that
19 allowance amount?
20      A    We take the -- using the J code and a
21 crosswalk to the NDC number for all of the drugs
22 that -- that tie to that J code, we take the median

---

11 (Pages 38 to 41)

Mickey Brown
Highly Confidential
Jackson, MS
March 9, 2005

Page 42

1  generic or the lowest brand, whichever is less, and
2  then we apply either a markup or a markdown, just
3  depending on -- again, back to fair and reasonable
4  reimbursement and what's acceptable in our
5  marketplace.
6      Q    Okay.  Now, when you say you take the
7  lowest brand of the median generic, you're talking
8  about the lowest brand or median generic's AWP?
9      A    Correct.
10     Q    Now -- now, what's your source for the
11 AWP?
12     A    I believe it's Red Book.
13     Q    Okay.  Now, when you're dealing with
14 generics, where do you find the median generic
15 price?
16     A    Every -- every NDC number ties to a J
17 code in that range of drugs.  So we take the average
18 wholesale price for all of those national drug code
19 numbers, and we determine the median internally.
20     Q    So it's something you do in-house?
21     A    Correct.
22     Q    Okay.  So, for example, I know, just

Page 43

1  from my own work, that albuterol sulphate is a -- is
2  a drug made by a number of manufacturers.  So if you
3  have a claim for that drug, that J code that deals
4  with albuterol sulphate, correct me if I'm wrong,
5  you'll find all the applicable AWPs, and
6  you'll take the median AWP; and that's the
7  reimbursement benchmark?
8          MS. FEGAN:  Objection to form.
9      A    No.  That's -- that's -- it's not on a
10 claim-by-claim basis.  We do an annual update to our
11 professional reimbursement schedule, which includes
12 the HCPC codes.  So once a year we go in, and we
13 calculate our standard allowance for the particular
14 HCPCS code.
15         So it doesn't -- it's is not on a
16 claim-by-claim basis.  We -- we do an annual
17 adjustment.  We will -- we will periodically make
18 adjustments to individual codes based on market
19 concerns.  But there's no quarterly, monthly, or
20 claim-by-claim adjustment that's made.
21         We do an annual update.  We do an --
22 excuse me.  We do an annual review.  There may not

Page 44

1  even be an update each year to mean change.  We
2  review it annually and determine is it still fair
3  and reasonable to Blue Cross, to the provider, and
4  to our subscribers.  And if it is, we'll leave it
5  alone.  If it's not, we make adjustments.
6  MR. ROBBEN:  (Continuing.)
7      Q    Okay.  So the amount that you're
8  reimbursing, other than when you've updated your
9  database won't change from claim to claim for the
10 same J code or other code?
11     A    Correct.
12     Q    Okay.
13     A    Unless we make an adjustment to that fee
14 schedule mid year.
15     Q    Okay.
16     A    You know, based on -- on market need.
17     Q    Okay.  Now, what might -- what would be
18 the type of event or concern that would cause you to
19 readdress an individual code?
20     A    You know, the standard concern would be
21 communication back from our -- our provider partners
22 that -- concern that reimbursement is low for a

Page 45

1  particular drug or on the rare occasion that it's
2  high for a particular drug.  And then we do some
3  investigation from that point to -- again, back to
4  fair and reasonable, or is it fair and reasonable,
5  the price that we've established?  If the answer to
6  that is no, then we'll make an adjustment.
7      Q    Okay.  Can you think of any -- just
8  sitting here, can you think of any particular codes
9  that have been revised due to that market concern, I
10 think you referred to?
11     A    I can't.  I mean, I don't remember any
12 particulars, and I'm not -- I'm not even really
13 familiar with the drug names that correspond to
14 the -- to the J code.  You know, I look at it at the
15 J code level and not the individual drug names.
16     Q    Uh-huh.
17     A    So I'm not -- I don't recall.  I mean, I
18 know that we've done it, but I don't remember a
19 particular code that we've changed.  But I -- you
20 know, I know that we do it.
21     Q    Okay.  Now, you said occasionally
22 there'll be some information you'll receive that --

12 (Pages 42 to 45)

Mickey Brown

Highly Confidential
Jackson, MS

March 9, 2005

Page 46

1 that a reimbursement is too low.
2       How frequently, in your experience, has
3 that happened?
4       A   I would say it's infrequent.  I mean,
5 it's occasional.  It's not once a month.  It's
6 not -- you know, it's not consistent.  It's just --
7 it's very infrequent.  And I don't have a way -- a
8 better way to describe it.  It's -- it's as needed,
9 and it's very infrequent.
10      Q   Okay.  Now, you said that once you
11 obtained either the -- once you -- you have in your
12 system this lowest brand name or median generic, and
13 then you -- I think you said you either add or
14 subtract to that figure.
15      What is the amount that you either add or
16 subtract?
17      A   That -- that varies depending on what
18 we -- our corporate needs and what we think is fair
19 and reasonable for the provider community.  And it's
20 just driven by -- driven by the market.
21      Q   Does that amount vary by code?
22      A   Generally, it does not.  It's generally

Page 47

1 across the board.  It doesn't -- I mean, we don't --
2 we don't look at it at the code level detail.  We
3 don't -- we're not -- we deal more big picture fee
4 schedule reimbursement, not the individual -- you
5 know, detail analysis of each individual code.  And,
6 you know, because of our experience and our
7 marketplace and our close relationship with the
8 provider community, we have an understanding of what
9 we think is fair and reasonable, and we set that
10 number there.  That number can change year to year,
11 but it's not a standard plus or minus.
12      Q   Okay.  Now, you said that the -- that
13 the -- the -- if I can call it the AWP side of this
14 reimbursement methodology is updated on the -- some
15 basis.  I think you said yearly basis?
16      A   No.  The fee schedule is reviewed
17 annually, and -- and has the opportunity to be
18 updated annually.  The AWP side of that -- you know,
19 the -- we get updates -- I guess it's quarterly --
20 to the system that says, Here's the new AWPs.
21      We don't go back and evaluate those on a
22 professional fee side quarterly to see what the

Page 48

1 difference is.  We -- we set it annually.  And at
2 the end of that year, we go back and evaluate again.
3 So it's not -- the AWPs continue to change, is my
4 understanding.  But we don't go back and apply those
5 back to the fee schedule continually.
6       We -- we establish an amount for each
7 individual HCPC code, and it stays that amount
8 unless someone alerts us to some issue with that
9 price.  We do an evaluation, and we may make an
10 adjustment to that individual code.  But it wouldn't
11 be based on changes to AWP.
12      Q   Now, the amount that you -- that you add
13 or subtract from the code -- from the AWP that you
14 get from the code, is that modifying amount changed
15 on any regular -- regular basis?
16      A   It's not changed on a regular basis.
17 It's, again, back to our expertise and close
18 relationship with our provider partners to
19 understand what's fair and reasonable to that
20 adjustment.  And it's not -- it's not necessarily
21 changed annually.
22      Q   Now, does that -- does the reimbursement

Page 49

1 that's provided under your fee schedule, does -- is
2 that the same for all providers, or can it vary from
3 provider to provider?
4       A   It's -- it's the same for all
5 professional providers:  Physicians, nurse
6 practitioners, those types of providers that provide
7 injectable drugs.  Hospitals are reimbursed under a
8 different reimbursement model.  Home infusion
9 providers have a different reimbursement model.
10      Q   Okay.  So all -- all physicians, all
11 doctors --
12      A   All doctors.
13      Q   -- will receive the same reimbursement
14 at the same -- for the same drug during the same
15 period?
16      A   For the same HCPC code, they'll receive
17 the same price, same allowable.
18      Q   Okay.
19      A   Now, again, you have to apply benefits
20 to actually calculate payment on a claim.  And that
21 may vary by patient depending on what their benefits
22 are.  But what is allowed for that particular HCPC

Mickey Brown                    Highly Confidential                    March 9, 2005
                                Jackson, MS

Page 50

1  code would be the same regardless of specialty or
2  geography for the providers that -- in Mississippi.
3      Q    Now, are there any types of -- of
4  physicians -- let's say specialists -- that obtain a
5  different reimbursement than another physician?
6      A    Could you clarify that -- what you mean
7  by that question?
8      Q    Well, is there -- is there any type of
9  provider -- well, strike that.  Strike that.
10         Now, you did say that there could be
11  variations between different types of providers.
12  Hospitals, I think you gave as an example.
13      A    What I said is there different
14  reimbursement models.
15      Q    Okay.  What's the reimbursement model
16  for a hospital?
17      A    Hospitals are paid -- we have -- we have
18  a few different types of models.  We have a DRG
19  model.  We have a per diem model.  And then for the
20  very, very small hospitals, typically less than ten
21  admissions a year, we have a percentage of charge
22  model.  And all of that is for inpatient.

Page 51

1         On the outpatient side, we have what's
2  called APG, and then we have percentage of charge,
3  again, for the very small hospitals.
4         DRG and APG are similar models, although,
5  technically different in what they -- but the reason
6  that they're similar is that they -- they group all
7  of the services on the claim to create a package
8  price for that claim.  So it basically groups an
9  encounter, and it doesn't pay on an individual line
10  level, but packages a price for that claim.
11         So, obviously, on discount from charge,
12  that's based on what the provider charges us.  We
13  discount that and pay that amount.  Again, very
14  small hospitals, probably less than 2 percent of the
15  actual dollars that come in the door are paid that
16  way, inpatient and outpatient.
17         Inpatient, probably 90 percent of the
18  dollars that we pay go to hospitals under the DRG
19  model.  The other 10 percent would go to -- or
20  probably 8 percent would go to per diem hospitals,
21  and, again, 2 or so on percentage of charge
22  hospitals.

Page 52

1         But they're basically fixed reimbursement
2  systems that pay package provides for services that
3  are provided.  So they don't pay this code equals
4  this amount.  It's this code in combination with all
5  the other services that you do are packaged to
6  create a price.
7         So it's not an individual line item like
8  a professional claim is.  Not an individual line
9  item, J blank equals this.  J blank equals that.
10  It's outpatient chemotherapy is this package price,
11  and it goes out that way.
12      Q    Okay.  So is it fair to say under those
13  models, there is no specific reimbursement for any
14  specific drug dispensed to that patient during that
15  encounter?
16      A    There's no specific reimbursement for a
17  specific drug.  The only situation where the drug is
18  actually -- comes into play is if a claim is
19  appealed for an exceptional circumstance because of
20  the way it groups it.  It's an averaging system.
21  And there's always the opportunity for someone to be
22  well outside of the average, and we -- we will

Page 53

1  adjust claims on appeal using AWP as a point of
2  reference, again, for reimbursement.
3         But that's -- that's probably less than
4  2 percent of all claims.  I know it's less than 2 --
5  less than 1 percent of all claims are appealed in
6  that manner.  But the standard reimbursement model
7  does not pay a set reimbursement for a particular
8  drug.  It's a package price for an encounter.
9      Q    Okay.  So the -- is it fair to say,
10  then, in addition, that because you're paying a
11  package price, the AWP of the drugs administered
12  during that encounter is irrelevant to the amount
13  that you pay?
14      A    I think that's fair to say, yes.
15      Q    Now, are there any other types of
16  providers other than the professionals and the
17  hospitals?  What other types of providers are there?
18      A    You have home infusion providers, home
19  health providers, ambulatory surgery centers,
20  durable medical equipment providers, chiropractors,
21  physical therapists, optometrists, dentists.  While
22  we don't contract with them, we do pay claims for

14 (Pages 50 to 53)

Mickey Brown                      Highly Confidential                      March 9, 2005
                                  Jackson, MS

Page 54

1  dentists. I mean, on down the line, you know, who's
2  licensed to provide healthcare services. I mean, we
3  pay claims on those.
4      Q    Now, are -- is the -- is the methodology
5  for reimbursement different for each of these
6  different types of providers?
7      A    Professional Allied providers like
8  chiropractors, nurse practitioners, physical
9  therapists, the reimbursement models are the same.
10  They actually are reimbursed off the fee schedule as
11  physicians.
12      Ambulatory surgery centers is -- is a
13  package pricing system. It doesn't reimburse
14  separately for pharmaceuticals provided during the
15  ambulatory surgery stay. It's based on what
16  surgical procedure is performed. You get a package
17  price for the surgical procedures that you perform.
18      Home health companies get a set amount
19  per day to visit patients. Home infusion companies
20  get a set amount per day, but they're also
21  reimbursed separately for the drugs they provide
22  based on the -- the J code that they submit.

Page 55

1      Q    When they're reimbursed based on the J
2  code that they submit, is the reimbursement similar
3  to the reimbursement of a physician for a J code
4  that they submit?
5      A    It's -- it is different in that
6  physicians are updated once a year unless there's an
7  individual code that's adjusted. Home infusion
8  companies actually price using the updates of the
9  AWP. They're paid for the actual drug they provide;
10  whereas, physicians are reimbursed for the J code
11  they provide.
12      So it's a different system, but it's --
13  again, I have to go back to fair and reasonable. We
14  establish the reimbursement rate to what we think is
15  fair and reasonable to the physician, to Blue Cross,
16  and to the patient. So in -- in the philosophy,
17  it's the same. The structure and functionality may
18  be slightly different.
19      Q    Now, did you -- did you mention durable
20  medical equipment providers?
21      A    I did.
22      Q    How -- remind me, how are they

Page 56

1  reimbursed?
2      A    They're reimbursed on a fee schedule,
3  the same fee schedule that physicians are reimbursed
4  on. I'm not aware of any pharmaceuticals that they
5  provide. It's typically canes, crutches,
6  wheelchairs, commode seats.
7      Q    Okay.
8      A    That sort of thing.
9      Q    Okay. Now, you mentioned a number of
10  times that fair and reasonable is, I guess, what
11  you're trying to achieve. Is that fair to say?
12      A    That is fair to say, yes.
13      Q    Okay. What are the factors that you
14  look at when you're trying to achieve whether you've
15  obtained a fair and reasonable amount?
16      A    Well, we have -- we have a very close
17  relationship with our providers in the marketplace.
18  We have -- we have numerous committees that -- while
19  not related to reimbursement, are related to other
20  functions.
21      We have an office manager's committee
22  that looks at administrative efficiencies, what

Page 57

1  is -- how can we be better partners for them
2  administratively. And -- and through all that
3  intelligence, we -- in our 50-plus years of
4  experience in this market selling health insurance,
5  we have, you know, a fair amount of intelligence of
6  what is acceptable in the marketplace, and that's --
7  that's a very good barometer for us of what's fair
8  and reasonable.
9      Because we have these close
10  relationships, the committees that we've created
11  that -- that really provide input opportunities for
12  physicians. And, again, while they're not fee
13  schedule committees, they clearly have our ear when
14  they're here to help us with other topics. We use
15  those as barometers for what's fair.
16      Again, we've been in this market 50
17  years, so we've -- and we've had provider contracts,
18  oh, since some point in the '80s of varying types.
19  We have a very good feel for it. And then, you
20  know, there's always feedback that you get from the
21  provider community that we take into account. But
22  just generally, our experience and understanding of

15 (Pages 54 to 57)

Mickey Brown                          Highly Confidential                                    March 9, 2005
                                         Jackson, MS

Page 58

1   our marketplace helps us to gauge what's fair.
2        Q    Well, what type of feedback do you -- do
3   you get?
4        A    Well, generally it's positive, thus the
5   good relationships that we have.  But the sort of
6   feedback that we would get is generally very, very
7   candid.  And I can't perform that service for at or
8   less what you pay me for it.  It would be general,
9   and we would have very open discussions around those
10  topics to get more to the matter of the issue.
11       I mean, we -- we have those discussions.
12  We have -- as I mentioned before, I have
13  representatives that travel around the state and
14  service physicians in their office.  So they're
15  there, and that's an opportunity for feedback.
16       We have corporate medical advisor that
17  runs our physician committees who until recently was
18  a practicing physician.  He's obviously a good
19  opportunity for physicians to provide candid
20  feedback.
21       And we -- and we really seek that
22  feedback.  We don't -- we don't -- we try and make

Page 59

1   it easy for our providers in the community to
2   communicate with us their concerns, and we work with
3   them to -- to try and resolve those.  So it's --
4   it's very much an open give and take to get to that.
5        And I'll go back to those good provider
6   partnerships that we have.  We -- we expend a lot of
7   effort to produce positive relationships with the
8   provider community.
9        Q    Is -- strike that.
10       Well, how do you -- how is the -- what is
11  the process of contracting with providers like -- I
12  mean, do you -- do they make a presentation or do
13  they -- do they -- do you submit RFPs to them?  Do
14  they submit them to you?  How do you -- how do you
15  sign up providers for your -- for your network?
16       A    Well, we've had a physician network
17  since 1987, '88, around that time.  And, you know,
18  so the development period is a lot different.  There
19  were a lot more on-site meetings and discussions.
20  The current process is very routine and almost an
21  automated process.
22       We have one statewide fee schedule.  We

Page 60

1   don't -- we don't individually negotiate fee
2   schedules with individual physician practices.  So
3   there's not a sit-down -- there's no RFP.  If a
4   physician is new to the community or -- that's
5   generally what happens.  Or for whatever reason
6   isn't currently participating and wants to begin
7   participating, they call and request an application.
8   They fill out an application.  We credential them
9   based on our criteria for participation, and they're
10  either approved or rejected.
11       There's no sit-down with each individual
12  physician.  And we have -- the majority of the
13  physicians in Mississippi participate, so we don't
14  have to do a lot of active recruiting.  So it's just
15  a very routine process.  We don't sit down and
16  individually negotiate fees.
17       If we determine through these
18  relationships that we have an issue with
19  reimbursement on a particular code, if we make an
20  adjustment, the adjustment is made for everybody,
21  not just the one individual practice.  That's -- to
22  us, that's back to trying to be fair and reasonable.

Page 61

1        Q    Uh-huh.  (Affirmative response.)
2        A    If -- if there's something that's --
3   that needs to be adjusted in our schedule, it's
4   adjusted for everybody without -- without a formal
5   request from them.
6        Q    Does -- and this goes back somewhat to
7   your prior testimony.  When you're setting your --
8   your fee schedule for pharmaceutical products, does
9   the -- does Medicare's fee schedule play any part in
10  your thinking?
11       A    Well, we're certainly aware of what
12  Medicare is doing.  And, again, it provides another
13  point of reference, but it is not -- we don't set
14  our prices based on what Medicare does.
15       You know, we like to be aware of what's
16  going on in the healthcare marketplace so,
17  obviously, we would monitor what they're doing.  But
18  we don't -- we don't factor in what their
19  reimbursement -- we don't -- we don't use their
20  reimbursement to establish ours.  We just have an
21  awareness of what they're doing.
22       Q    Is there any drug or are there any

16 (Pages 58 to 61)

Page 62

1    physicians that get paid an administration fee in
2    addition to the drug reimbursement?
3         A   I'm not sure I understand your question.
4         Q   Well, is there any -- other than the --
5    well, strike that.
6         If a -- let's say a physician submits a
7    claim for a drug administered to a patient, do they
8    get the drug reimbursement alone, or do they get the
9    drug reimbursement and also an additional fee for
10   administering the drug?
11        A   That would depend on CPT coding
12   guidelines.  We follow the CPT coding rules for
13   that.  And there is an opportunity to be paid an
14   administration fee in addition to the drug
15   reimbursement, but it all depends on CPT coding
16   rules in that area, which I am not an -- necessarily
17   an expert on CPT coding rules.  But it would all
18   depend on that, but there is that opportunity as
19   long as it complies with those rules.
20        Q   Have you ever had a provider just
21   decline to participate in your -- in your network or
22   to contract with you because they thought that the

Page 63

1    reimbursement rates were too low?
2         A   I'm sure that we have.
3         Q   When you're setting the reimbursement
4    rate, does the -- do geographic considerations ever
5    play into that -- into what you consider to be fair
6    and reasonable?
7         A   We have one statewide fee schedule.  So
8    it's -- it's not really feasible to make geographic
9    adjustments inside the state of Mississippi.  So
10   they're not generally considered.
11        Q   Okay.  Does -- does Blue Cross/Blue
12   Shield of Mississippi have competitors in the state?
13        A   I don't market products, so I'm not
14   sure.  I know that we have competitors, but who they
15   are, I don't know.
16        Q   In -- in determining what fair and
17   reasonable reimbursement is, is what other insurers
18   might pay a consideration?
19        A   Well, we don't have access to the
20   information on what they pay.  You know, so it
21   doesn't -- it doesn't factor in directly.  I mean, I
22   don't have -- I know that United Healthcare is a

Page 64

1    competitor because I used to work for them, but
2    beyond that, I don't know the names of the companies
3    that are out there.  And we don't have access to
4    their fee schedules, so it would not be directly
5    involved in establishment of our fee schedule.  In
6    fact, our fee schedule is developed independent of
7    what they're doing.
8         Q   Do you -- is -- is determining the fee
9    schedule and the fair and reasonable nature of it --
10   do you ever use any outside consultant, or do you
11   just rely on in-house people for all of that?
12        A   We rely on in-house staff for that.
13        Q   Now, has there been any -- any effort
14   over time to lower reimbursement for -- for
15   pharmaceutical products?
16        A   We adjusted our pharmaceutical
17   reimbursement last year.  And for the most part,
18   reimbursement was decreased, but it's not been a
19   long-standing effort to drive those down.
20        Q   Okay.  So that's not part of a general
21   strategy or plan to keep driving those
22   reimbursements lower?

Page 65

1         A   No.  The strategy would be to evaluate
2    annually to make decisions, you know, based on our
3    latest intelligence from the marketplace, and that's
4    what -- why the -- how the decision was made then.
5         Q   Now, in setting the rate, the fair and
6    reasonable -- in going through your fair and
7    reasonable analysis, do you take into account what
8    the providers are able to obtain the products --
9    what price they're able to acquire those at?
10            MS. FEGAN:  Could you repeat the
11        question, please?
12            MR. ROBBEN:  Could you read it
13        back?
14       (Previous question read back by the court
15        reporter.)
16            MS. FEGAN:  Objection to form.
17   MR. ROBBEN:  (Continuing.)
18        Q   Do you understand my question?
19        A   Could you rephrase it?
20        Q   Sure.
21        A   Make sure I'm clear.
22        Q   Well, when you're -- when you're

17 (Pages 62 to 65)

Mickey Brown

Highly Confidential
Jackson, MS

March 9, 2005

---

Page 66

1 deciding what you're going to reimburse
2 pharmaceuticals at, does the provider's acquisition
3 cost for that pharmaceutical play into that
4 analysis?
5      A   Well, we don't know their acquisition
6 cost, and further complicating it is that multiple
7 drugs tie to a single J code or HCPC code. So, you
8 know, first, we don't know what they've acquired the
9 drug for, but we really don't even know, because of
10 the coding system in place, what drug they've
11 actually provided.
12      You may have ten drugs that tie to one J
13 code, and they're going to provide one of those ten
14 and file it using the one corresponding J code. But
15 we don't know which of those ten they actually
16 administered, other than it's in this category that
17 ties to the J code.
18      So when we do our analysis, we're looking
19 at the actual HCPC code that comes in. We don't --
20 we don't acquire the NDC number on the HCPC claim
21 form. So we wouldn't know which drug they actually
22 administer, other than that it falls into the

---

Page 67

1 category tied to that J code.
2      Q   Have you ever considered looking into
3 what provider acquisition costs are?
4      A   I don't know that it's ever been
5 considered by Blue Cross. I mean, that would seem
6 to be a much bigger effort than we're willing to
7 undertake.
8      Q   Is there -- well, strike that.
9      A   Is the -- is the cost that they're able
10 to obtain the drug at relevant at all to your -- to
11 your setting the reimbursement amount?
12      A   It's not relevant doing our annual
13 update. It would become relevant if we receive
14 numerous inquiries from the physician community
15 saying, I can't acquire the drug for at or above
16 what your -- or at or below what you're paying for
17 it.
18      And that's a concern to us. We're --
19 we're not in this business to -- to ask providers to
20 provide healthcare at their own cost or free. We --
21 you know, we understand that providers are --
22 particularly professional providers are there to

---

Page 68

1 make a living, and we don't -- we don't have any
2 qualms with that.
3      So if we're provided information that
4 shows that the actual cost of the drug is more than
5 what we've set for the allowance, then we -- we'll
6 consider an adjustment at that point. Now, again,
7 there are multiple NDC numbers that tie to one J
8 code, so that has to be factored in.
9      They could be buying the most expensive
10 drug out of the list of ten that are available to
11 that corresponding J code. All of that's factored
12 in, and we'll -- we share that information back of
13 how our allowance -- you know, what -- where the
14 reference point was for establishing that allowance.
15      And so there's definitely some give and
16 take there. But as far as the annual update
17 process, we don't -- we don't have the knowledge of
18 what the actual acquisition cost is for that
19 particular J code at this point.
20      Q   Do you think it would be
21 administratively feasible to obtain that acquisition
22 cost?

---

Page 69

1      A   It would not -- I'll have to speak in --
2 for my opinion here. I don't see that it would be
3 feasible to survey the physician community in
4 Mississippi to determine the acquisition cost for
5 each drug. I mean, from -- with current staffing
6 levels, without a lot of expense on our part, I
7 don't think it's feasible.
8      Q   Okay. Do you know how many doctors you
9 contract with in Mississippi -- or providers, let's
10 say?
11      A   I'll have to give you a rough estimate.
12 I would say around 4,000.
13      Q   Does that include all sorts of
14 specialists and -- as well as general practitioners
15 and your other non-doctor providers?
16      A   No. That includes just physicians.
17      Q   Just physicians?
18      A   If you add non-physician providers, I
19 mean, the total panel is probably close to 8 or
20 9,000 of all -- excluding pharmacies, all providers.
21 You know, pharmacies add to that number
22 significantly because of chains and things that are

---

18 (Pages 66 to 69)

Mickey Brown                              Highly Confidential                              March 9, 2005
                                          Jackson, MS

Page 70

1  contracting.
2      Q    Do you think it's fair to say if you had
3  more knowledge about acquisition costs, it
4  wouldn't -- it wouldn't necessarily lower your
5  reimbursement?
6              MS. FEGAN:  Objection to form.  I
7          don't know what you're talking about in
8          terms of more information.
9  MR. ROBBEN:  (Continuing.)
10     Q    You can answer.  If you understand, you
11 can answer.
12     A    Well --
13     Q    Well, here, I'll rephrase it.  I'm
14 sorry.
15         If you had more information about
16 provider acquisition costs, do you think it would
17 have any effect on our reimbursement level?
18             MS. FEGAN:  Same objection.
19     A    Well, I can say that, again, our goal
20 would be fair and reasonable reimbursement.  I don't
21 know if -- I don't have any information on the
22 actual acquisition cost to know how it would affect

Page 71

1  our reimbursement or how our reimbursement compares.
2  But our end goal would be fair and reasonable
3  reimbursement to the -- to the provider community.
4          It would -- again, it would probably just
5  be another point of reference.  You know, you would
6  have just an additional point of reference to ensure
7  that what we're doing is fair and reasonable.  What
8  the end result is, I have no idea.
9  MR. ROBBEN:  (Continuing.)
10     Q    Okay.  By the way, if you want a break,
11 just let me know, and we'll take a break at any
12 point.
13     A    Okay.
14             MR. ROBBEN:  Okay.  We're going to
15         take a five-minute break.
16             (Off the record.)
17 MR. ROBBEN:  (Continuing.)
18     Q    Now, from what I hear you say, Blue
19 Cross/Blue Shield of Mississippi has used AWP as a
20 point of reference in its reimbursement.
21         Have you ever considered using a
22 different point of reference?

Page 72

1      A    I'm not sure what other point of
2  reference would be available, but not -- not that
3  I'm aware of.
4      Q    Okay.  Switch gears a little bit.  Now,
5  does Blue Cross/Blue Shield of Mississippi have a
6  relationship or a contract with any PBM?
7      A    We're our own PBM.
8      Q    Your own.  Do you have an internal PBM?
9      A    We have an internal pharmacy staff that
10 operates our PBM.
11     Q    Okay.  How long have you used that?  How
12 long has that internal staff been performing that
13 function?
14     A    Oh, it would strictly be a guess on my
15 part.  I'm not sure how long that's been.  It's been
16 since my employment with Blue Cross.
17     Q    Okay.  What's their -- what is the
18 pharmacy staff's role?
19     A    Their role is contracting with
20 pharmacies for reimbursement.  But then they're also
21 integral part of our medical management and disease
22 management team involved in those sorts of programs.

Page 73

1              MR. ROBBEN:  Could you read that
2          back?
3              (Whereupon, the question was read back by
4          the court reporter.)
5  MR. ROBBEN:  (Continuing.)
6      Q    Do they create -- does that pharmacy
7  staff create or maintain a formula?
8      A    We have a formulary that they're
9  involved in the development of.  We also have a
10 pharmacy and therapeutics committee that oversees
11 that process.
12     Q    Who are the members of the pharmacy and
13 therapeutic committee?
14     A    I don't know who they are.  It would be
15 practicing physicians, but I don't know any of their
16 names.
17     Q    Okay.  And do you know the structure of
18 the formulary?
19     A    Could you clarify what you're asking?
20     Q    Well, is it a tiered -- do you have
21 several tiers of drugs on the formulary, or is it
22 just, you know, one size fits all?  How does it

Henderson Legal Services
(202) 220-4158

Mickey Brown                    Highly Confidential                    March 9, 2005
                                   Jackson, MS

Page 74

1   work?
2       A    Well, it's -- it's a preferred and
3   non-preferred list. I'm not sure what you mean by
4   tiered.
5       Q    Well, is there a -- is there -- when you
6   say preferred and non-preferred, is there a
7   different responsibility on the part of the member
8   for drugs that fall into one of those categories.
9           MS. FEGAN: Objection to form.
10      A    As I -- as I mentioned before, I'm not a
11  benefit expert, but my understanding is that there
12  would be different copay amounts for preferred and
13  non-preferred.
14  MR. ROBBEN: (Continuing.)
15      Q    Okay.
16      A    And actually a different copay amount
17  for generic drugs.
18      Q    Okay. Would the generic copay be the
19  lowest?
20      A    Typically.
21      Q    Do you know what factors go into the
22  creation of that formulary?

Page 75

1       A    The pharmacy and therapeutics committee
2   assigns preferred and non-preferred and the clinical
3   effectiveness of the drug. If a drug is, you know,
4   a single source type of drug -- no other drugs are
5   available -- then I think the final consideration is
6   price of the drug. If -- all things being equal, if
7   one drug costs more than the other, the lower price
8   drug would be in the preferred category versus
9   non-preferred.
10      Q    Does Blue Cross/Blue Shield of
11  Mississippi obtain rebates from pharmaceutical
12  manufacturers?
13          MR. DONNELL: I'm going to object
14      to that because that's outside of the
15      scope of our agreement.
16          MR. ROBBEN: Well, I think whether
17      they obtain rebates is directly tied to
18      how they reimburse for the drugs,
19      particularly in how they put together a
20      formulary. So I think it -- I think it
21      relates directly to reimbursement.
22          MR. DONNELL: Tie that to one of

Page 76

1           the agreed-upon topics.
2           MR. ROBBEN: Well, one, two.
3           MR. DONNELL: If you ask him
4       whether any rebates were -- are used in
5       considering the establishment of any
6       methodologies, that might be a question,
7       but I just -- it's a little bit far
8       afield.
9   MR. ROBBEN: (Continuing.)
10      Q    Well, in putting together the formulary,
11  was the -- was the payment of rebates by
12  pharmaceutical manufacturers a factor that was
13  considered?
14          MS. FEGAN: Objection. Calls for
15      speculation.
16      A    I don't sit on the pharmacy and
17  therapeutics committee, so I'm not -- I'm not
18  certain how that -- that factors in. I know price
19  of the drug is a consideration, but I'm not sure
20  whether rebates are involved in that or not.
21  MR. ROBBEN: (Continuing.)
22      Q    Okay.

Page 77

1           MR. DONNELL: Are you asking about
2       rebates that pharmacies get?
3           MR. ROBBEN: No. Right now I'm
4       asking about rebates that the plan gets.
5           MR. DONNELL: Okay.
6   MR. ROBBEN: (Continuing.)
7       Q    So does Blue Cross/Blue Shield of
8   Mississippi directly contract with retail
9   pharmacies?
10      A    Yes. Let me -- can I -- let me change
11  that answer a little bit.
12      Q    Sure.
13      A    There are subsidiary company events,
14  health systems, we contract with retail pharmacies.
15      Q    Okay. Are those contracts entered into
16  to provide a network for the -- for the
17  beneficiaries of Blue Cross/Blue Shield
18  Mississippi's members?
19      A    I don't know what you mean by
20  beneficiaries. If you mean plan participants --
21      Q    Right.
22      A    -- or members of our insurance products,

Highly Confidential
Jackson, MS

Page 78

1  then the answer is yes.
2      Q   Okay.  Now, how -- how do you go about
3  recruiting pharmacies to join or to contract with
4  Blue Cross/Blue Shield?
5      A   Well, like the physician network, the
6  network has been established for many years.  I
7  don't know how long.  So currently it's -- it's just
8  an administrative process.  We get a call from a
9  pharmacy to request an application.  We send them
10 the application.  They sign an agreement, and then
11 they're in the network.  There's not -- we don't
12 actually actively recruit for that network any --
13 anymore.
14     Q   Okay.
15     A   It's not a closed network, but we don't
16 actively recruit it.
17     Q   Now, do you have any understanding of
18 where retail pharmacies obtain the products that
19 they sell, the pharmaceutical products that they
20 sell?
21     A   No.
22     Q   Do you have any understanding of the

Page 79

1  basis on which those products are priced when they
2  acquire them?
3      A   No.
4      Q   Okay.  Now, can you tell me about the
5  methodology by which Blue Cross/Blue Shield of
6  Mississippi reimburses pharmacies for dispensed
7  pharmaceuticals?
8      A   We -- they submit the NDC number for the
9  drug.  We determine the average wholesale price, and
10 then we discount that based on contract negotiations
11 with the pharmacy at various rates.  And then they
12 also get a dispensing fee that's negotiated with the
13 individual pharmacies.
14     Q   Okay.  Now, is the -- is the discount
15 from AWP a standard discount that applies to every
16 pharmacy, or is that individually negotiated?
17     A   Well, we have a standard discount, but
18 we may, based on market need, make an adjustment
19 depending on who the pharmacy is.
20     Q   Do you know what the standard amount is?
21     A   I don't.
22     Q   Okay.  Has that changed over time, the

Page 80

1  standard amount I'm talking about?
2      A   Oh, it's -- it's -- it changed at some
3  point in the mid '90s, but it's been pretty well
4  consistent throughout.  And I don't know whether it
5  went up or down.  I just know that it changed.
6      Q   Okay.  Has this methodology been in
7  place since the mid '90s?
8      A   Well, let me -- let me step back because
9  I left out one component of that.  Generic drugs are
10 paid based on a fee schedule versus AWP that we
11 acquire.  My understanding is it's one that's
12 developed by CMS.  And we acquire that.  It's called
13 a maximum allowable charge schedule, MAC.  And we
14 use the MAC to price generic drugs.
15         I'm not sure what CMS uses it for, but
16 they compile it; and we purchase it through some
17 vendor.  Brand drugs are paid based on the AWP minus
18 a percentage.  And I'm not sure how long that
19 methodology has -- has been in place or if there
20 were any significant changes in the mid '90s to how
21 it worked.
22     Q   Okay.  Now, is there -- now, let me make

Page 81

1  sure I understand this.  For generics, you use the
2  CMS MAC schedule?
3      A   Correct.
4      Q   And, now, do you pay a dispensing fee in
5  connection with generics?
6      A   I believe we do.
7      Q   Okay.  Do you know -- in either case,
8  brands or generics, do you know what the dispensing
9  fee is?
10     A   Again, it can vary by facility, and I
11 don't know what the standard is.
12     Q   Okay.  So that's a -- is that a
13 negotiated term?
14     A   Insomuch as if we had to negotiate it,
15 it would be a negotiable term.
16     Q   Now, in negotiating that either discount
17 off of AWP or the dispensing fee, what are the
18 factors that go into that negotiation?
19     A   The exact same factors that go into any
20 of our reimbursement, the fair and reasonableness of
21 the reimbursement.
22         You know, there's -- just our experience

21 (Pages 78 to 81)

Mickey Brown                         Highly Confidential                    March 9, 2005
                                        Jackson, MS

Page 82

1   in the marketplace, what the market will bear and
2   your standard negotiations, give and take with the
3   pharmacies, if we have to negotiate. But our close
4   relationships with our small local pharmacies helps
5   us to have a feel for what's fair and reasonable in
6   the marketplace.
7       Q   Um-hum. Now, when we were talking about
8   the physician-administered reimbursement for drugs,
9   you said that you didn't know what the acquisition
10  cost was of the providers. Correct me if I'm wrong,
11  but I think that's what you said.
12      A   I think that's correct.
13      Q   Okay. Do you similarly not know the
14  acquisition costs of the pharmacies?
15      A   No, I don't know.
16      Q   Okay. Would it make any difference to
17  you to know the acquisition cost?
18      A   I'm not sure I understand the question.
19      Q   Well, have you ever asked any pharmacies
20  what their acquisition costs are?
21      A   Not that I'm aware of.
22      Q   Okay. Is it at all relevant in your

Page 83

1   determination of reimbursement what their
2   acquisition costs are?
3       A   What's relevant in determining our --
4   what we're going to pay for those pharmaceuticals is
5   back to fair and reasonable. You know, we don't
6   know what the acquisition cost is. How it would
7   factor in what we do, I don't know, because we don't
8   know what it is.
9           You know, again, our goal is to be fair
10  and reasonable. And if that information showed that
11  what we were providing wasn't fair and reasonable,
12  it would have some effect. If it showed that what
13  we were doing was fair and reasonable, it would have
14  no effect. It would be pure speculation on my part,
15  which I'm not really one to do, because I don't
16  know.
17      Q   Have you ever heard of the term "WAC",
18  wholesale acquisition cost?
19      A   Just through course of preparing for
20  this, reading this document.
21      Q   I mean, is that a -- a term or a factor
22  in any of the decision-making of Blue Cross/Blue

Page 84

1   Shield of Mississippi?
2       A   No.
3       Q   Now, in connection with brand drug
4   reimbursement, you said that it's AWP minus a
5   certain percentage. Why has AWP been chosen as the
6   benchmark?
7       A   It's just the point of reference that we
8   chose. Honestly, I'm not sure what else would -- is
9   available to be utilized, but it's the point of
10  reference that Blue Cross/Blue Shield of Mississippi
11  said was what we were going to use. I mean...
12      Q   Is it strictly a matter of
13  administrative convenience?
14      A   I would think that that factors into why
15  we use it. You know, that's -- it's served its
16  purpose for us over the years, and it's readily
17  available information. And it's over the years been
18  really the best point of reference available. So
19  that would all factor in.
20      Q   Now, do you have an understanding that
21  AWP is higher than the acquisition cost of the
22  pharmacies?

Page 85

1       A   I don't -- I don't know how AWP stands
2   in relation to actual acquisition cost.
3       Q   Do you have any expectation of a -- of a
4   relationship between AWP and acquisition cost?
5       A   Well, I mean, I -- you know, I would --
6   I would have to assume that it costs less to acquire
7   the drug than AWP because they accept reimbursement
8   at less than AWP. I mean, I'm a reasonably
9   intelligent person and can draw that conclusion.
10  But what the actual acquisition cost is, I don't
11  know.
12      Q   Is there any -- is there any -- is the
13  pharmacy group that you discussed earlier that does
14  the PBM function -- are they responsible for
15  negotiating the contracts with pharmacies?
16      A   Insomuch as negotiation -- like I said,
17  it's -- it's become a very routine process for us,
18  and it's typically handled through an administrative
19  area that just handles the paperwork. There's very
20  little negotiation that goes on any longer. If we
21  made a decision to recontract, there would probably
22  be several areas involved in that, but the pharmacy

22 (Pages 82 to 85)

Mickey Brown                    Highly Confidential                    March 9, 2005
                                     Jackson, MS

Page 86

1    area would be -- have primary responsibility for it.
2        Q    Do you know, does that department, that
3    administrative area have a name?
4        A    Provider administration.
5        Q    Now, you said it's fairly routine.  I
6    mean, how -- do you have any understanding of
7    how the -- what the mechanics are of the
8    negotiation?
9        A    Well, I think what I was trying to
10   express is that there's very, very little
11   negotiation that actually takes place.  Provider
12   administration is a clerical staff that basically
13   processes paper.  A pharmacist calls and asks for an
14   application to participate.  We send them all the
15   standard information.
16            The typical process in probably 99 out of
17   a hundred sign it and mail it back as standard
18   course.  If there were questions about contract
19   language, of course, our legal staff would be
20   involved.  If there's questions about reimbursement,
21   the pharmacy staff would review it.  But I work very
22   closely with that area, and I can't remember the

Page 87

1    last time we actually negotiated a pharmacy
2    contract.  It's fairly standard.
3        Q    Is it -- is -- do most of the pharmacies
4    in the state that you contract with obtain the same
5    reimbursement for the same drugs?
6        A    Again, I'd speculate.  I don't know what
7    each individual pharmacy has.  But I would think
8    it's fairly consistent.
9        Q    Okay.  Is it within a fairly small
10   range?  Is that fair to say?
11       A    I would think so, yes.
12       Q    Okay.  Do -- do pharmacies -- strike
13   that.
14            Does geography play any role in
15   determining what reimbursement you'll pay to a given
16   pharmacy?
17       A    I don't believe so.
18       Q    Does the size of the pharmacy play any
19   role?  I guess what I'm getting at, does a small
20   pharmacy garner large -- maybe a larger
21   reimbursement or a smaller reimbursement as compared
22   to a big chain?

Page 88

1        A    I don't have the reimbursement here to
2    compare.  You know, again, it would be speculation
3    on my part.  I would think that size of the pharmacy
4    and community need might factor in.  You know, if
5    you're a single pharmacy in a single county in rural
6    Mississippi, there's more community need, and that
7    may factor into reimbursement more than actual size
8    of the pharmacy.
9            But, actually, location and need, some of
10   those things would factor in.  But like I said, it's
11   pretty standard, and I don't know that there would
12   be many exceptions for that.
13       Q    Are those -- are -- are issues such as
14   community need something that's taken into account
15   generally in your reimbursement rate making?
16       A    It's involved in all the decision-making
17   that we do.  We have subscribers that look to us to
18   provide comprehensive coverage, and so it factors
19   in.  Now, how it affects negotiations really depends
20   on the situation in the area.  And I wouldn't
21   consider it the primary factor in any discussion
22   that we have.  We try to be -- I'll have to go back

Page 89

1    to fair and consistent -- I mean fair and
2    reasonable.  And that -- part of that has to be
3    consistency.
4        Q    Okay.  Now, you testified about the use
5    of the MAC list before.  Is that same MAC list or
6    whatever you want to call it, fee schedule -- is
7    that applied to every pharmacy across the board, or
8    does it -- or do you have more than one?
9        A    We have -- we have one, and it -- I
10   believe it applies to all.  But, you know, there --
11   I'm not familiar with every individual pharmacy
12   contract, but I -- it's -- to the best of my
13   knowledge, it applies to all.
14       Q    Okay.  Now, I think the answer to this
15   is probably no, based on your prior testimony, but
16   does Blue Cross/Blue Shield of Mississippi use a
17   usual and customary charge in any of its
18   reimbursement formula or methodology?
19       A    No.
20       Q    Okay.  Have you ever --
21       A    Let me -- let me clarify that statement,
22   though.

23 (Pages 86 to 89)

Page 90

1    Q   Sure.
2    A   The state and school employee health
3 plan which we administer claims for does apply a
4 usual customary reasonable schedule to out-of-state
5 providers. That's a decision that was made by the
6 State of Mississippi, not Blue Cross, as part of our
7 contract with them.
8    Q   Okay. If -- does Blue Cross/Blue Shield
9 of Mississippi reimburse pharmacies outside of its
10 network in any circumstances?
11   A   That would all depend on the subscriber
12 contract and speculation on my part, and I don't
13 feel comfortable doing that. I mean, it all depends
14 on those subscriber contracts, and I don't know if
15 any of them have benefits for non-participating
16 providers or not.
17   Q   Okay. When you're setting the fee
18 schedule or the rate, the methodology for
19 reimbursement of pharmaceuticals for drug stores, do
20 you expect -- do you expect that the pharmacy is
21 going to make some margin on each prescription that
22 they fill?

Page 91

1    A   Well, like I said in earlier testimony,
2 we -- we are not trying to pay less than cost to any
3 provider. I mean, we understand that most
4 providers -- you know, they're are obviously
5 not-for-profit entities in the world, but most
6 providers like pharmacies are in business to make a
7 living. And we're not trying to deny anybody that
8 living. So, yes, it would be our expectation that
9 they do make -- make money on what they provide.
10   Q   Um-hum.
11   A   But we -- again, we're -- I'll have to
12 go back to fair and reasonable. That's our only
13 expectation is that what we're paying is fair to us
14 and to them and to our subscribers.
15   Q   Now, in terms of the -- the dispensing
16 fee portion of the reimbursement, is -- I'd like to
17 better understand how you -- how you view that --
18 that portion of the reimbursement. And I -- and
19 what I'm getting at is, do you see that as a -- just
20 another part of a reimbursement that leads to a
21 given dollar amount, or do you see these as distinct
22 in that the AWP minus reimbursements of the drug and

Page 92

1 the fee reimburses the actual cost of dispensing the
2 prescription?
3        MS. FEGAN: Please repeat the
4    question back.
5        MR. ROBBEN: Can you read it back?
6    I think I'll ask it again.
7        MS. FEGAN: Okay.
8        MR. ROBBEN: Or I'll change it.
9 MR. ROBBEN: (Continuing.)
10   Q   When you pay a dispensing fee as part of
11 your reimbursement, do you understand that that fee
12 is covering the actual cost to the pharmacy of
13 dispensing that prescription?
14   A   I just consider it a -- part of the
15 component for reimbursement for pharmaceutical. I
16 mean, it -- my assumption would be that that's --
17 covers the cost of providing that -- or filling that
18 prescription. But, you know, in the -- in the
19 global sense, I mean, I'm looking at overall
20 reimbursement pharmaceuticals. It's just one
21 component of it.
22        So I don't -- I mean, I don't give a

Page 93

1 whole lot of individual consideration to does this
2 actually cover the cost. I make an assumption that
3 it -- that that along with what we pay for the drug
4 combined provides -- pays for the drug and covers
5 the cost plus, you know, some margin to the pharmacy
6 for providing that service to our subscriber.
7 That's the way we would consider it.
8    Q   Now, in setting reimbursement rates for
9 the pharmacy-dispensed portion of the market, have
10 you ever looked to any studies or publications to
11 see what's being said in the literature about
12 pharmacy costs, what's reasonable reimbursement,
13 issues along those lines?
14   A   I mean, as a company, we -- we obviously
15 read publications and literature that's out there.
16 Just as part of -- or the intelligence gathering
17 that's necessary in being in the business that we're
18 in. I can't quote specific sources because I
19 don't -- I can't call them to mind right at this
20 point. But it would obviously keep our -- we're
21 obviously -- because of the business we're in, we're
22 reading literature and -- insofar as gathering

24 (Pages 90 to 93)

Mickey Brown                    Highly Confidential                    March 9, 2005
                                Jackson, MS

Page 94

1    intelligence about our business.
2        Q    But no one study or one publication
3    stands out to you sitting here?
4        A    Not sitting here, no.
5        Q    Okay.  Now, I think I asked you this in
6    the -- on the physician-administered reimbursement
7    side, but is there any overall plan or strategy to
8    try and drive your reimbursement cost down on the
9    pharmacy side?
10       A    Well, there -- there's no strategy to
11   reduce what we pay for any particular prescription.
12   Now, of course, we're -- like every insurance
13   company, we're concerned with trend -- our
14   healthcare trend, and so we've got programs like a
15   disease specific pharmacy program that looks at
16   extremely high cost drugs and implements a prior
17   authorization program to make sure that the people
18   that are getting the drugs are the people that need
19   those particular drugs and that all the criteria is
20   met.  Those sorts of programs are in place.
21            We have a disease management program
22   built around diabetes that is not just focused on

Page 95

1    pharmacy costs, but overall costs of diabetics.  Our
2    big initiative at Blue Cross for the foreseeable
3    future is to make Mississippi healthier, and part of
4    that is going to be pharmaceuticals, not necessarily
5    driving the costs down, but making sure that people
6    are getting the meds they need at the right times to
7    help reduce other things.
8            So we're looking at pharmacy costs, but
9    not -- not necessarily how to drive it down, but how
10   to spend pharmacy dollars more appropriately.
11   That's really our focus.
12       Q    Okay.  Now, does Blue Cross/Blue Shield
13   of Mississippi have any contracts of what are
14   commonly known as specialty pharmacies?
15       A    Yes.
16       Q    You do?  What's the -- what specialty
17   pharmacy do you contract with?
18            MR. DONNELL:  Are you asking the
19       type of specialty or what specific
20       specialty pharmacy?
21            MR. ROBBEN:  Do you -- do you have
22       a concern about the specific name?

Page 96

1            MR. DONNELL:  Yes.  It's a private
2        contract between private entities that
3        should not be disclosed.
4            MR. ROBBEN:  Okay.
5    MR. ROBBEN: (Continuing.)
6        Q    What -- what type of specialty pharmacy
7    services do they provide?
8        A    One of them provides some sort of
9    hemophilia drug.  Another provides some sort of drug
10   for pediatric respiratory issues.  I don't know the
11   specifics of what drugs they actually provide, but
12   that's general categories.  A few provide biotech
13   drugs, hepatitis C drugs, those sorts of drugs.
14       Q    Okay.  How are those -- are these
15   very -- are these different entities, or are is it
16   one entity that provides all of these service?
17       A    I believe there's a few different
18   entities.  Some provide more than one drug.  Some
19   provide one single drug.
20       Q    Okay.  Now, do you know the process by
21   which these specialty pharmacies are selected?
22       A    There was some sort of request for

Page 97

1    information or request for proposal-type process,
2    but I honestly was not involved in that process.
3        Q    Okay.
4        A    And then others, I guess, if they're
5    single source -- I mean, it's a direct contractual
6    negotiation.
7        Q    Do you know how -- do you know the
8    methodology by which drugs dispensed through these
9    speciality pharmacies -- do you know that
10   methodology?
11       A    Most of the drugs that are in that
12   program are dispensed in the physician's office.
13       Q    Uh-huh.
14       A    But the physician would contact the
15   specialty pharmacy and order the drugs.  The
16   pharmacy would bill us directly, and we would pay
17   them based on the NDC code using an AWP minus some
18   percentage formula.  I do not believe there's a
19   dispensing fee involved in those arrangements.
20       Q    Okay.  Is that -- is the minus in AWP
21   minus, is that percentage negotiated?
22       A    It's -- it would be negotiated, yes.

25 (Pages 94 to 97)

Mickey Brown                      Highly Confidential                      March 9, 2005
                                      Jackson, MS

Page 98

1    Q    Do you know the factors that go into
2    that negotiation?
3    A    I'm not sure what you mean by factors.
4    Q    Well, is the goal of the negotiation for
5    Blue Cross/Blue Shield of Mississippi just to pay
6    the least amount possible?
7    A    I don't know that I could characterize
8    the goal of negotiation to be that. I mean, it's
9    obviously one of the factors in -- in negotiating
10   with a -- with a specialty pharmacy is to receive
11   better reimbursement than you could get by opening
12   it up to everybody. My assumption would be, you
13   know, part of that is just volume buying type -- you
14   know, standard business practice arrangements.
15        But I think really the more important
16   goal is some of the other things that we gain by
17   using specialty pharmacies like provider education,
18   prior approval processes where they have clinical
19   staff that evaluates the patient to make sure that
20   they're the right match for that drug, and then
21   patient education component.
22        I mean, take hepatitis C for an example.

Page 99

1    I mean, it's a very, very terrible disease that
2    people need a lot of education to understand the
3    importance of getting your drugs at the right time,
4    that you're educating the providers on, you know,
5    what intervals the drugs have to be administered.
6         So the goal of the negotiation would be
7    all of those things together. And in the end, you
8    know, there's -- there's an effort to try and get
9    the best price possible obviously. But that's not
10   the sole intent of the negotiation. We look for
11   other things as well.
12   Q    Is it fair to say you're -- when you're
13   contracting with a specialty pharmacy, you're not
14   just contracting to obtain the drug at the best
15   price. You're contracting for sort of a bundle of
16   various services and price might be a factor?
17   A    I think that's a fair assessment.
18   Q    Okay. Now, do you have any -- how long
19   have these specialty pharmacies been contracting
20   with Blue Cross/Blue Shield?
21   A    I have to guess. I mean, it's been less
22   than ten years, but probably around six.

Page 100

1    Q    Okay.
2    A    And as more drugs come out, pharmacies
3    are added. You know, as you get a biotech drug or
4    something that comes out that has a very specific
5    niche of patient, we want to make sure -- we
6    don't -- we want the patients who need the drug to
7    get the drug, but we don't want it wasted on people
8    that don't need it.
9         So we will -- we will put those sorts of
10   programs in as those drugs emerge. And it's
11   probably been within the last ten years that we've
12   really started to see those sorts of drugs emerge --
13   or at least on our landscape.
14   Q    Well, what -- you might have answered
15   this, but how are these particular drugs -- and I
16   know you don't understand -- you don't have a full
17   knowledge of all of them. But how were these chosen
18   as drugs that you need a specialty pharmacy to -- to
19   dispense them?
20   A    I'm not -- I'm not involved in those
21   decisions. Our clinical staff looks at that.
22   Pharmacy staff, our medical management staff, our

Page 101

1    medical director, our corporate medical advisor,
2    they're all involved in those.
3         And they -- you know, I'm a reimbursement
4    person, so I'm not necessarily looking at emerging
5    pharmaceutical technology; but those -- those people
6    are. They're looking at -- at disease states.
7    Hepatitis C is a good example because of the
8    transplant rate. People that have hepatitis C -- I
9    mean, it's clear that you had a program that
10   revolves around patient and physician education.
11   And in the end, because it's expensive, you try and
12   get the best price possible.
13        But those -- those folks are looking at
14   those things saying, you know, where -- you know,
15   where are the real opportunities to -- they're case
16   management opportunities also. These patients
17   don't just need drugs. They have other health
18   issues. So our case managers would get involved to
19   help them maximize their health insurance benefits.
20   So it's an integrated effort from our clinical team,
21   which I include the pharmacy staff in that team.
22   Q    Um-hum. How is the -- how has the

26 (Pages 98 to 101)

Mickey Brown

Highly Confidential
Jackson, MS

March 9, 2005

Page 102

1  reimbursement paid by Blue Cross/Blue Shield
2  Mississippi changed from the period before you had
3  the specialty pharmacies to the period after?  Were
4  you paying more?  Were you paying less?
5      A    I don't know the answer to that.
6      Q    Okay.
7      A    And to qualify why I don't know, I mean,
8  that's not really the end goal.  That's just a
9  component.  The success of those programs is not
10  driven by savings, but -- our pharmaceutical
11  savings, but education and all of those other things
12  that we're trying to do.  So while you may not see a
13  reduction in pharmaceutical costs, you may see
14  savings in other areas because you avoided hospital
15  admissions, transplants, and some other things.  But
16  to be honest, I don't know the answer.
17      Q    Okay.  Now, do you have any contracts,
18  or do you have a relationship with a mail-order
19  pharmacy?
20      A    I know that we have in the past.  I
21  don't know if it's currently operating.
22      Q    Do you know -- do you know why that

Page 103

1  relationship ended?
2      A    I don't know that it did.
3      Q    Oh, okay.
4      A    I just -- I think it -- that really
5  depends on the group and the benefits and those
6  sorts of things.  But I don't think we have a strong
7  mail order presence if we have one at all.
8      Q    Okay.  Do you have any familiarity with
9  drug wholesalers?
10      A    I don't.
11      Q    You don't?  Okay.  So you -- strike
12  that.
13          Well, let me just ask for the record, do
14  you have any awareness of how they buy their
15  products and the prices for which they obtain them?
16      A    No.
17      Q    Now, in this case, there's various
18  allegations about drug manufacturers trying to
19  artificially inflate the AWP of various drugs.
20          Do you have any knowledge of any activity
21  by drug manufacturers to inflate the AWP of their
22  drugs?

Page 104

1      A    No.
2      Q    Now, do you -- in a similar vein, do you
3  have any knowledge of any pharmacy or doctor or PBM
4  conspiring with a drug manufacturer to inflate or
5  change the drug's AWP?
6          MS. FEGAN:  Objection to form.  It
7          calls for legal conclusion.
8  MR. ROBBEN:  (Continuing.)
9      Q    You can answer.
10      A    No.
11      Q    Now, has Blue Cross/Blue Shield of
12  Mississippi been involved in any litigation
13  regarding AWP, to your knowledge?
14      A    Not that I'm aware of.
15      Q    Okay.  Are you aware of a study
16  called -- generally known as the Dyckman study?
17      A    No.
18          MR. ROBBEN:  Now, I don't -- I
19          don't have anything else; although, some
20          of the people on the phone may.
21          MR. MANGI:  Yeah.  This is Adeel
22          Mangi at Patterson Belknap for J & J.  I

Page 105

1          do have some questions.  Shall I do them
2          first, or would counsel for the
3          plaintiffs prefer to go?
4          MS. FEGAN:  You can go ahead
5          because it's probably still part of
6          direct, right?
7          MR. DONNELL:  Let's take a
8          five-minute break.  This is counsel for
9          Blue Cross.  Just five minutes.
10          (Off the record.)
11      E X A M I N A T I O N
12  EXAMINATION BY MR. MANGI:
13      Q    Mr. Brown, my name is Adeel Mangi.  I'm
14  an attorney with Patterson, Belknap, Webb & Tyler in
15  New York.  We represent the J & J defendants in this
16  case.
17          A couple of preliminary points.  First, I
18  apologize I can't be there in person.  If you have
19  any trouble hearing me, please let me know, okay?
20      A    Okay.
21      Q    Secondly, I'm going to do my best to
22  avoid repeating anything Mr. Robben has already

27 (Pages 102 to 105)

Mickey Brown                           Highly Confidential                        March 9, 2005
                                          Jackson, MS

Page 106

1  asked you about.  But there may be areas we touch
2  upon, so I'll ask for your indulgence as we go
3  through those, okay?
4      A   Okay.
5      Q   First of all -- now, as I understand it,
6  Blue Cross/Blue Shield of Mississippi reimburses for
7  drugs both when they're administered in physicians'
8  offices and when they're dispensed through
9  pharmacies, correct?
10     A   I think that's very general, but, yes,
11 correct.
12     Q   Can you estimate the percentage of total
13 reimbursement dollars that Blue Cross/Blue Shield of
14 Mississippi pays that relate to drugs reimbursed --
15 for drugs administered in physicians' offices versus
16 through pharmacies?
17     A   I don't have that information available.
18     Q   Do you know whether it's a small
19 percentage or a large percentage?
20     A   I'm not sure.  I mean, I don't know that
21 I could characterize small or large.  I don't -- I
22 don't have the information in front of me.

Page 107

1      Q   And it's fair to say the amount in
2  dollar terms that Blue Cross/Blue Shield of
3  Mississippi reimburses to physicians' offices is a
4  significant amount regardless of whether or not it's
5  a large percentage of overall reimbursement dollars?
6          MS. FEGAN:  Objection to form.
7          MR. DONNELL:  Let me step in
8          there.  That's -- that's outside of the
9          scope of the agreement that we had as
10         well.
11         MR. MANGI :  Actually directly
12         relevant because it goes to the issue of
13         active management of reimbursement and
14         setting of methodologies.  It's a quick
15         question, and I won't be staying long on
16         the topic.
17     A   I'm not sure I understand the question.
18 Can you repeat it, please?
19 MR. MANGI: (Continuing.)
20     Q   Blue Cross/Blue Shield of Mississippi
21 does have a fee schedule by reference to which it
22 reimburses physicians for drugs administered in

Page 108

1  office, correct?
2      A   Correct.
3      Q   That fee schedule is changed or updated
4  either annually or sometimes more frequently,
5  correct?
6      A   It is reviewed annually and updated
7  periodically.
8      Q   So it's fair to say, then, that Blue
9  Cross/Blue Shield of Mississippi does pay some
10 careful attention to the amounts that it's
11 reimbursing physicians in relation to drugs
12 administered in office, correct?
13     A   Well, as I said before, our goal is to
14 provide fair and reasonable reimbursement, so we
15 take great care in all of our reimbursements.
16     Q   By fair and reasonable, I wrote down
17 your testimony earlier.  I believe you said that you
18 understand providers are there to make a living, and
19 you don't have any qualms with that, correct?
20         MS. FEGAN:  Objection.  If you're
21         just asking him to verify if that was
22         his exact quote, I have a problem with

Page 109

1          that.  It should be read back by the
2          court reporter.  So I'm going to object
3          to mischaracterization.
4          MR. MANGI:  Fine.
5  MR. MANGI: (Continuing.)
6      Q   The question is, do you recall that
7  testimony?
8      A   I don't recall exactly what I said, but
9  I recall something similar to that.
10     Q   Okay.  Is it fair to say that by fair
11 and reasonable reimbursement, Blue Cross/Blue Shield
12 of Mississippi intends to reimburse providers at an
13 amount that will cover their costs and enable them
14 to make some profit?
15     A   Well, as I said before, it's not our
16 goal to pay below cost and that we understand
17 that -- that providers have need to make a living.
18 And so all of that is in -- is factored into our
19 reimbursement schedules.
20     Q   So you agree with my statement?
21     A   Well, repeat your statement.
22         MR. MANGI:  Would the court

28 (Pages 106 to 109)

Page 110

1   reporter mind reading back my previous
2   question?
3   (Previous question read back by the court
4   reporter.)
5   MS. FEGAN:  Objection to form.  It
6   mischaracterizes the witness's
7   testimony.
8   MR. MANGI:  You can answer.
9   A   I mean, I would say that that is -- that
10  is a good summary of what I said, yes.
11  MR. MANGI:  (Continuing.)
12  Q   Now, you also said AWP is a point of
13  reference in establishing reimbursement.  Do I
14  understand correctly that -- well, withdraw that
15  question.
16  Let me ask you this.  You don't know what
17  any particular providers are paying to acquire
18  drugs, correct?
19  A   I mean, not unless they provide the
20  information to us in the form of a request for a
21  change in reimbursement on a particular code.  But
22  globally what's paid for a particular drug, no, we

Page 111

1   don't know that.
2   Q   You would only get that information in
3   isolated instances where a provider is complaining
4   reimbursement is too low and doesn't cover his
5   costs, correct?
6   A   That's correct.
7   Q   And, indeed, you are aware that
8   acquisition costs for drugs will vary from physician
9   to physician, correct?
10  A   Well, I mean, I would assume that, but I
11  don't have information back to what they've acquired
12  the drugs for.  I don't have actual information as
13  to what each individual physician paid to acquire a
14  particular drug, but it would be my assumption that
15  that takes place.
16  Q   Well, certainly, you're aware that no
17  one pays AWP to acquire drugs in the market; is that
18  correct?
19  A   Well, I don't -- I don't -- I'm not sure
20  that I can say that.  Because I -- again, I don't
21  know what they acquire it for.  And I think your
22  question was that I -- that I could safely say that

Page 112

1   nobody does.  I don't know that to be true because I
2   don't know that everybody acquires the drug for.
3   Q   That goes, then, to the reimbursement
4   methodology.  Now, you testified earlier that Blue
5   Cross/Blue Shield of Mississippi reimburses
6   physicians in relations -- in relation to drugs
7   administered in office using J codes, correct?
8   A   Correct.  J codes and other HCPC codes.
9   Q   Oh, a HCPC codes, which may be a --
10  which is usually a J code, but also could be a Q
11  code, for example, right?
12  A   I believe that it could be a Q code,
13  yes.
14  Q   Okay.  Now, a J code is not specific to
15  a particular NDC, correct?
16  A   Correct.
17  Q   One J code, for example, can include
18  different branded drugs within it, right?
19  A   I think we talked about that earlier,
20  yes.
21  Q   J code can also include a brand of drug
22  and its generic competitors, correct?

Page 113

1   A   Correct.
2   Q   Or a J code could include just different
3   generic competitors, right?
4   A   Well, before I go too far -- farther
5   with this, let me say I'm not an expert on NDCs and
6   how they're tied to specific J codes, but it's my
7   understanding that that's correct.
8   Q   Now, it's fair to say, isn't it, that
9   when you receive a claim from a physician in
10  relation to a drug they've administered in office,
11  on that claim, you only receive a J code and not an
12  NDC, correct?
13  A   We either -- we receive a HCPC code,
14  correct.
15  Q   Right.  And your reimbursement is also
16  by reference to that HCPC code, correct?
17  A   Correct.
18  Q   So it's impossible to relate your
19  reimbursement to the particular AWP of any
20  particular NDC.  Is that a fair statement?
21  A   I'm not -- I'm not sure I understood
22  your question.

29 (Pages 110 to 113)

Mickey Brown

Highly Confidential
Jackson, MS

March 9, 2005

Page 114

1      Q    Well, let me rephrase it.  When a
2  physician administers a drug, that drug is a
3  particular drug that has a particular NDC associated
4  with it, correct?
5      A    I think in general, that's correct.
6      Q    Okay.  And if it's a branded drug, it
7  will have an AWP associated with that NDC.  As a
8  general matter, you will agree with that, right?
9      A    It should, yes.
10     Q    The amount that Blue Cross/Blue Shield
11 of Mississippi reimburses that physician in relation
12 to that drug when it is issued to a patient is not
13 tied to that NDC, correct?
14     A    It's -- no.  It's -- it's -- it would
15 not be tied to a particular NDC.  We wouldn't -- we
16 wouldn't have any idea what NDC -- the NDC number
17 for the drug that was actually administered.  All we
18 would know is the HCPC code that they submitted for
19 that drug.
20     Q    Oh, so you don't even know what
21 particular NDC drug was administered to the patient,
22 right?

Page 115

1      A    That's correct.  Unless for some -- for
2  some reason they submitted medical records with the
3  claim for another processing purpose, we would not
4  know that.
5      Q    This would be an isolated exception?
6      A    That would be a -- you know, the rare
7  exception.
8      Q    Well, certainly, Blue Cross/Blue Shield
9  of Mississippi, when reimbursing physicians for
10 drugs administered in office, does not relate its
11 reimbursement to the AWPs of any particular drug's
12 NDCs.  Is that a fair statement.
13         MS. FEGAN:  Objection to form.
14     A    Can you repeat that, please?
15         MR. MANGI:  Could the reporter
16     please read back my question?
17         (Whereupon, the question was read back by
18     the court reporter.)
19     A    Well, I mean, again, AWP is used as a
20 point of reference in calculating the AW -- excuse
21 me -- the allowance for a particular HCPC code.
22 But, again, we don't know what particular drug was

Page 116

1  administered.  We just know the corresponding HCPC
2  code, and we would reimburse our set rate for that
3  HCPC code.  It would not be tied to the NDC of the
4  actual drug that they supplied.
5  MR. MANGI: (Continuing.)
6      Q    You mentioned the role of AWP in
7  generating the amounts paid.  You're referring there
8  to generation of the fee schedule, correct?
9      A    I'm sorry.  I didn't understand what you
10 asked.
11     Q    All right.  Well, let me rephrase the
12 question.  Reimbursement of two physicians for drugs
13 administered in office is made by Blue Cross/Blue
14 Shield of Mississippi by reference to a fee
15 schedule, right?
16     A    Right.
17     Q    Does Blue Cross/Blue Shield of
18 Mississippi generate that fee schedule?
19     A    Yes.
20     Q    Are there more than one fee schedule at
21 any given time, or is there just one?
22     A    Well, based on the date of service of

Page 117

1  the claim, there would just be one.  But we
2  obviously have iterations of that schedule based on
3  runout of claims.  And to further explain that, you
4  know, the new fee schedule would be updated
5  effective, you know, today, but if we got claims for
6  yesterday, they would pay on the previous iteration.
7  So there are three iterations that are kept so that
8  we can -- that we can process runout of claims.  But
9  for a given date of service, there's only one fee
10 schedule.
11     Q    How is that fee schedule generated?
12     A    It's developed internally.
13     Q    Who's responsible for that process?
14     A    Me.
15     Q    How do you go about generating the fee
16 schedules?  What information do you consider, and
17 what calculations do you perform?
18     A    I'm not sure what you're asking me.
19     Q    Well, I'm trying to figure out how you
20 go about physically putting together a fee schedule.
21 Can you describe that process for me, please?
22     A    We would take the existing schedule.  We

30 (Pages 114 to 117)

Mickey Brown                    Highly Confidential                    March 9, 2005
                                  Jackson, MS

Page 118

1  would pull actual claims utilization by procedure
2  code. We would look at our -- our relevant market
3  intelligence of our understanding of our current
4  schedule. We would look at various points of
5  reference.
6         We talked about Medicare. We have an
7  understanding of where they are, though we don't use
8  it to develop the schedule. We would look at the
9  average wholesale price, prices for the drugs
10 corresponding to the individual HCPC codes. And
11 from there, we would use our own knowledge and
12 understanding of the marketplace to establish an
13 allowance.
14        I mean, the calculation in and of itself
15 can be different per year based on what we
16 understand or our understanding of the marketplace.
17 But those -- all those factors are considered. Then
18 we would prepare various models of changes, run
19 utilization through it to see the impact of those
20 changes to both us and to the provider community. I
21 would develop a recommendation and then submit it to
22 executive management for their approval.

Page 119

1      Q   Is it fair to say, then, that AWP is
2  just one of many factors that you consider when
3  developing a fee schedule?
4          MS. FEGAN: Objection to form.
5      A   I would say it's -- it's one factor that
6  we look at. It's not the sole factor for our
7  decision.
8  MR. MANGI: (Continuing.)
9      Q   It's one of the points of reference that
10 you use, correct?
11     A   That is correct.
12     Q   You also use other points of reference,
13 such as CNS, right?
14     A   Correct.
15     Q   And there are other factors which are
16 not points of reference, but are building blocks of
17 information that you use to generate the fee
18 schedule?
19     A   Well, the difference between a point --
20 a point of reference and a building block, I'm not
21 sure what you mean by that. But I think they're all
22 integral components that are used to develop that

Page 120

1  schedule or to evaluate it.
2         I mean, as I've said before many times,
3  there aren't changes that are made because we're
4  comfortable with what our reimbursement is, and our
5  provider community is -- finds it acceptable; and so
6  we don't make changes. But all of those components
7  that you mentioned are used in evaluating the
8  existing schedule and preparing proposed revisions
9  for executive sign off.
10     Q   AWP is just one of those factors?
11     A   That's correct.
12     Q   Now, you mentioned earlier that the drug
13 component of the fee schedule -- in other words, the
14 amount that Blue Cross/Blue Shield of Mississippi
15 reimbursed physicians for the drugs they administer
16 in office is not subject to negotiation, correct?
17     A   Well, what I said is we have one
18 statewide fee schedule and that if -- if there were
19 individual concerns regarding particular
20 reimbursement on a J code, that if -- if we found it
21 necessary to make an adjustment, then all physicians
22 and providers that use that fee schedule would

Page 121

1  receive that adjustment.
2      Q   So there are no individual negotiations
3  that only impact the amount reimbursed to an
4  individual physician, correct?
5      A   Correct.
6      Q   Does that apply also to the service
7  component of the fee schedule? In other words, is
8  there individual negotiation of reimbursement for
9  services?
10     A   I don't know what you mean by services.
11     Q   Well, Blue Cross/Blue Shield of
12 Mississippi reimburses physicians not just for
13 drugs, but also for the services -- the medical
14 services that they provide, correct?
15     A   That's correct.
16     Q   For example, if an injectable drug is
17 being administered to a patient, Blue Cross/Blue
18 Shield of Mississippi will reimburse the physician
19 an amount in relation to the drug and an amount in
20 relation to administering the drug, correct?
21     A   Provided that CPT coding rules allow for
22 that.

31 (Pages 118 to 121)

Page 122

1    Q   All right.  Provided that there is a
2  code for the service that's at issue, right?
3    A   And provided that the service being
4  provided is a covered service under the subscriber's
5  contract, the answer to that would be yes.
6    Q   All right.  Now, those services -- in
7  other words, components of the fee schedule other
8  than the purely drug components, are those subject
9  to negotiation?
10    A   We have one statewide fee schedule
11  that's applicable to all physicians.  So similarly
12  to J code reimbursement or HCPC reimbursement, if we
13  found it necessary to make an adjustment to an
14  individual code, the adjustment would be made for
15  all physicians.
16    Q   And the adjustments are made in cases
17  where either providers give you information saying
18  the amounts they're reimbursed are too low or where
19  they say the amounts they're reimbursed are too
20  high; is that correct?
21    A   That's correct.  While the latter
22  doesn't happen very often, it does happen.

Page 123

1    Q   How often has that happened, where a --
2  where providers tell you that the amounts you're
3  reimbursing are too high?
4    A   Well, I don't -- I couldn't tell you how
5  often it happens.  It's very rare, but it has
6  happened.
7    Q   Has it happened more than five times, to
8  your knowledge?
9    A   In the span of how long?
10    Q   Since you've been work --
11    A   Since 1949 or since I've been working
12  there or --
13    Q   If you know since 1949, I'd be happy to
14  know, but if you don't, since the time you've been
15  working there?
16    A   I would just say a handful.
17    Q   Okay.  Give me just a moment.  Flipping
18  a few pages here.
19       Now, the amounts that physicians pay to
20  acquire drugs only come to your attention when a
21  physician makes a complaint, correct?
22    A   Well, I'm not sure I'd characterize it

Page 124

1  as a complaint, but when they communicate that
2  information to us.
3    Q   Okay.  Now, if Blue Cross/Blue Shield of
4  Mississippi were to discover that a particular
5  physician were getting a rebate or a discount from a
6  manufacturer that substantially lowered their
7  acquisition costs, that wouldn't result in a change
8  of reimbursement to that individual physician,
9  correct?
10         MS. FEGAN:  I'm sorry.  Could the
11       question be read back, please?
12       (Whereupon, the question was read back by
13       the court reporter.)
14         MS. FEGAN:  Objection to form.
15    A   As I stated before, we have one
16  statewide fee schedule, and I've not been faced with
17  that situation to know -- I mean, to have experience
18  on how it would be handled.  But, again, we would
19  have to evaluate the -- the fee schedule from a
20  global perspective from all of our physicians,
21  and -- because we don't pay individual schedules to
22  individual physicians.

Page 125

1       We would have to do some evaluation of
2  the actual allowance and does the allowance continue
3  to be fair and reasonable to all physicians and to
4  Blue Cross and our subscribers.  Depending on all
5  those results, you know, a decision would be made.
6  But I don't -- I can't speculate on what the
7  decision would be without all of that information.
8  MR. MANGI: (Continuing.)
9    Q   Well, if some physicians were getting a
10  rebate from a manufacturer on a particular drug and
11  others were not, then Blue Cross/Blue Shield of
12  Mississippi would not change the reimbursement
13  because you want to be fair and reasonable to all
14  the physicians including those who are getting the
15  rebate.  Is that a fair statement?
16         MS. FEGAN:  Objection to form.
17    A   Well, again, I'm not sure that I can
18  answer your question because I'm not faced with that
19  situation and able to evaluate that.  I mean, our
20  current practice is one statewide fee schedule.
21  Would we change that practice if we determine
22  something like that was taking place?  I can't

32 (Pages 122 to 125)

Mickey Brown                    Highly Confidential                    March 9, 2005
                                    Jackson, MS

Page 126

1   answer that because I'm not faced with that
2   decision.
3        I don't know how -- I don't know that the
4   practice happens or is prevalent or how that affects
5   what is fair and reasonable. All of those questions
6   would have to be answered before I think I could
7   answer the question that you've asked.
8   MR. MANGI: (Continuing.)
9        Q   Do you know whether or not physicians
10  contract in any cases with manufacturers to get
11  rebates and discounts on drugs?
12       A   I don't have any idea.
13       Q   Now, I believe you agreed earlier that
14  acquisition costs for drugs could vary from
15  physician to physician, correct?
16       A   I think what I said is that I didn't
17  know whether it did or didn't. My assumption would
18  be that it does. But I don't know whether it does
19  or doesn't.
20       Q   Well, certainly, we can agree that the
21  AWP for any given drug bears no fixed relationship
22  to acquisition costs for that drug, correct?

Page 127

1        A   As I've said before, I don't know where
2   average wholesale price comes from. So the relation
3   of average wholesale price to acquisition cost is
4   not something that I'm familiar with. So I don't
5   know that I can agree or disagree with your
6   statement.
7        Q   Then it's certainly fair to say you have
8   no particular expectation that there will be a fixed
9   relationship between AWP and acquisition cost?
10       MS. FEGAN: Objection to form.
11       A   Average wholesale price is a point of
12  reference that we use. It's relation to acquisition
13  cost, I'm not familiar with. So, I mean, I don't
14  have an expectation one way or the other on that.
15  MR. MANGI: (Continuing.)
16       Q   Certainly, you don't have an expectation
17  that acquisition costs will be 20 percent less than
18  AWP, 40 percent, 80 percent. You just have no
19  expectation at all about that; is that a fair
20  statement?
21       MS. FEGAN: Objection to form.
22       A   I mean, I -- all I can -- all I can

Page 128

1   answer to answer honestly is I have no understanding
2   of the relation between the two. And to speculate
3   on, you know, what is and what isn't the
4   relationship, I'm not comfortable doing.
5   MR. MANGI: (Continuing.)
6        Q   So it's fair to say, then, certainly you
7   have no expectation of what the relationship is
8   either, correct?
9        A   I think it's fair to say I don't know
10  what the relationship between the two is. And we
11  strictly use AWP as a point of reference, and that's
12  really all I feel comfortable responding to.
13       Q   On a separate note, you mentioned that
14  CMS fee schedules are used as a point of reference
15  in generating your fee schedules, correct?
16       A   I said it is another source that we look
17  at just so that we have an understanding of what's
18  going on in the marketplace. It's not a point of
19  reference in the same sense that average wholesale
20  price is. Our -- our reimbursement is not based on
21  what Medicare's reimbursement is.
22       Q   Do you -- does Blue Cross/Blue Shield of

Page 129

1   Mississippi act as a Medicare carrier?
2        A   Blue Cross/Blue Shield of Mississippi
3   has a subsidiary company called Tri-span that is a
4   part A intermediary.
5        Q   Are you involved at all with the
6   activities of Tri-span?
7        A   I am not.
8        Q   Does Blue Cross/Blue Shield of
9   Mississippi offer any Medicap or Medigap or other
10  supplement insurance?
11       A   We offer Medicare supplement policies.
12       Q   And is that -- are those policies
13  intended to cover the copayment due from Medicare
14  beneficiaries?
15       A   I think I mentioned before that I'm not
16  an expert on benefit plans, and I -- I'm even less
17  an expert on Medicare supplements. It's my
18  understanding that those are standardized plans,
19  that the government standardized those plans, and we
20  apply whatever those standard benefits are. But
21  what those are, I have no idea.
22       Q   So you don't know what percentage of the

33 (Pages 126 to 129)

Mickey Brown                  Highly Confidential                  March 9, 2005
                              Jackson, MS

Page 130

```
 1   copay those policies cover; is that correct?
 2       A   I have no idea.
 3       Q   Switching to another area again, does
 4   Blue Cross/Blue Shield of -- I'll withdraw that.
 5           We can agree that there are some drugs
 6   that can be administered either in a physician's
 7   office or in a hospital setting, correct?
 8       A   I can't answer that question.  I'm not a
 9   clinician.  I don't -- I don't -- I don't know what
10   particular drugs -- I don't even know what -- I
11   don't know what they do.  I'm strictly
12   reimbursement.
13       Q   Well, do you -- do you reimburse both
14   hospitals and physicians in relation to any of the
15   same drugs?
16       A   Well, I'm not sure I'm clear on your
17   question.  I mean, there -- I'm sure there are drugs
18   that are given in physician's offices that can also
19   be given in a hospital.  But are they given for the
20   same reason, et cetera, I don't -- I don't know all
21   of that.  But I guess it is safe to say that if a
22   drug is clinically appropriate to be given in a
```

Page 131

```
 1   hospital or a physician's office, that we would
 2   reimburse both places.
 3       Q   In those instances where a drug can be
 4   administered in either setting, does Blue Cross/Blue
 5   Shield of Mississippi have a preference as to the
 6   site of care?
 7       A   The most appropriate setting.  That
 8   would be our preference.
 9       Q   Assuming that there are no clinical
10   factors requiring administration in one setting or
11   the other, has Blue Cross/Blue Shield of Mississippi
12   ever assessed the relative costs?
13       A   At -- at the prescription drug level?
14   At the -- at the injectable drug level?
15       Q   In relation to the drug component, yes.
16       A   No.
17       Q   How about in relation to the drug plus
18   service component?
19       A   Not -- not -- not focused in on
20   prescription drugs or -- or injectable
21   pharmaceuticals.  We've not looked at it at that
22   level that I'm aware of.
```

Page 132

```
 1       Q   Well, let me ask the question a bit more
 2   broadly to ensure that we understand each year.
 3   Does Blue Cross/Blue Shield of Mississippi or has it
 4   ever assessed whether it's more cost effective
 5   overall to the health plan if a drug is administered
 6   in a physician's office versus in a hospital?
 7       A   Well, I can't answer that question
 8   because I think there are other factors that are
 9   involved.  Again, our preference is the most
10   appropriate setting, whether that's the hospital or
11   the physician's office.
12       Q   I'll ask you to assume that there is no
13   clinical reason for one setting versus the other.
14       A   I -- we've not done that study, so I
15   can't answer the question.  I mean, again, our
16   preference is the most appropriate setting, and
17   then, you know, I would think at some -- at some
18   level, you know -- I mean, our clinicians are the
19   ones that determine -- you know, would be involved
20   in what's the most appropriate setting.  And I think
21   that's really the most important piece for us.
22           Typically, members have physician office
```

Page 133

```
 1   copays versus deductible and coinsurance in a
 2   hospital.  So I would think from that standpoint,
 3   the member would be more interested in doing it in a
 4   physician's office.  But, again, back to -- from our
 5   standpoint, the first criteria would be the most
 6   clinically appropriate setting.  And I'm not sure
 7   that -- I mean, I -- I don't know enough about
 8   prescription -- or pharmaceuticals to know
 9   if they're -- if a hospital and a physician's office
10   can be -- both be the most appropriate setting.
11       Q   Now, turning to another area again,
12   earlier today you -- you used a phrase.  You stated
13   that Blue Cross/Blue Shield of Mississippi deals
14   with the big picture fee schedule.  Do you recall
15   using that phrase?
16       A   I think when I was saying that is that I
17   deal in the big picture fee schedule.
18       Q   Okay.
19       A   But I'm not sure -- I don't remember in
20   relation to what discussion we were having.
21       Q   Can you -- can you help me understand
22   what you mean by that phrase in dealing with the big
```

34 (Pages 130 to 133)

Mickey Brown                        Highly Confidential                        March 9, 2005
                                        Jackson, MS

Page 134

1   picture fee schedule?
2        A    I would need to know the context of the
3   testimony to -- to know what I was talking about.
4        Q    Let me back up and ask you the question
5   more broadly, then.  When -- when Blue Cross/Blue
6   Shield of Mississippi is assessing the amounts it
7   pays in reimbursement or carrying out the reviews
8   that we have discussed, does it look at the drug
9   component of its fee schedule in isolation, or does
10  it consider the fee schedule as a whole?
11       A    Well, we take -- we -- there are several
12  components to an overall fee schedule, not just the
13  drug component.  And we'll look at each component
14  but then look at the overall component.  So we
15  don't -- I mean, none of it's done in a vacuum.  I
16  mean, it's all an integral part.
17            Back to -- to being fair and reasonable,
18  you can't be -- you can't be unfair in a certain
19  area and then try to get back to being fair overall.
20  I mean, we have -- we do look at components, but in
21  the end, we're evaluating the overall reasonableness
22  of our professional provider reimbursement.

Page 135

1        Q    It's fair to say that -- then that -- to
2   use your phrase, we're looking at the bottom line,
3   what's paid for reimbursement as a whole.  Is that a
4   fair statement?
5        A    Well, I think it's fair to say that
6   that's definitely part of the overall analysis, but
7   we do look at individual components; and we do look
8   at individual specialties.  Again, our overriding
9   goal is to be fair and reasonable.  And to do that,
10  you have to understand the effect of changes that
11  you make down to the individual speciality level.
12            So we do that, but we are focused on the
13  big picture of the fee schedule reimbursement.  We
14  have to -- that's back to being fair and reasonable
15  to -- to our participants and to Blue Cross.  So I
16  think -- I think they're both individual components.
17            And, again, I don't remember the context
18  of the discussion where I said the big picture to
19  know if that's what we were talking about.
20       Q    Now, Blue Cross/Blue Shield of
21  Mississippi does have competitors in the Mississippi
22  market, correct?

Page 136

1        A    As I said before, I'm not familiar with
2   who they are, but I know that there are some out
3   there, yes.
4        Q    Is strength of provider network one
5   grounds of competition?
6        A    I didn't -- I didn't understand your
7   question.  I'm sorry.
8        Q    Blue Cross/Blue Shield of Mississippi
9   has to sell its products to customers, right?
10       A    Right.
11       Q    When it seeks to market its products,
12  one aspect of marketing is the strengths of going
13  with Blue Cross/Blue Shield of Mississippi as
14  against its competitors?
15            MR. DONNELL:  Are you getting to a
16       deposition topic that we've agreed upon?
17            MR. MANGI:  Yeah, absolutely.
18            MR. DONNELL:  Okay.  Which one?
19            MR. MANGI:  It is the factors that
20       go into the settings of reimbursement
21       methodologies.  And if you'll allow me
22       to ask two more questions, you'll see

Page 137

1        the relevance of it.
2             MR. DONNELL:  Okay.  He has
3        asked -- he has been asked that question
4        over and over and over, what
5        methodologies and factors he's
6        considered.  Competition was not among
7        them.  So if you'd like to move on, I'd
8        appreciate it.
9             MR. MANGI:  With respect, that's
10       exactly the question that I'm getting
11       at, as to whether or not strength of
12       provider network is a factor that's used
13       in selling products as a -- as a grounds
14       of competition.  It's certainly
15       encompassed by the deposition topics.  I
16       intend to spend no more than a minute on
17       it, sir.
18            MR. DONNELL:  Okay.  Well, he's
19       asked -- he's been asked that and
20       answered that.  But if you would move
21       quickly through that, I'd appreciate it.
22            MR. MANGI:  I will.

35 (Pages 134 to 137)

Page 138

1    A   I -- you know, I don't know that I can
2  answer that question.  I don't market Blue Cross
3  products.  I don't sell health insurance.  So the
4  marketing strategy, I'm really pretty well removed
5  from.
6  MR. MANGI: (Continuing.)
7    Q   Okay.  Well, let me ask you this, then.
8  When you conduct reviews of the fee schedule, is one
9  factor you consider the strength of your network
10 relative to your competitors?
11   A   I can tell you I'm completely unaware of
12 their networks.  I don't -- I'm not -- I am not
13 concerned with their networks.  I am concerned with
14 my network.  And as I've mentioned before, we have
15 very strong relationships with our providers, and I
16 am more concerned with those relationships than I am
17 with what our competitors are doing in the
18 marketplace.
19        I mean, it really -- at this point -- and
20 not to say that in the future it won't -- it won't
21 factor in.  But at this point, I've never considered
22 what our competitors are doing when developing our

Page 139

1  reimbursement rates.
2    Q   Give me just a moment.  Let me flip
3  through a few pages here.
4        Now, I'd like to turn to the -- the
5  pharmacy side from the physician's side where we've
6  been so far.  You mentioned that the standard
7  reimbursement methodology, AWP minus a percentage
8  plus a --
9    A   I'm sorry.  You cut out.
10   Q   I'm sorry.  Let me repeat the question.
11 In relation to how Blue Cross/Blue Shield
12 Mississippi reimburses pharmacies for drugs
13 administered to members, for branded drugs the
14 methodology at present is AWP minus a percentage
15 plus a dispensing fee, correct?
16   A   Correct.
17   Q   What is that percentage at present?
18   A   I don't know.  It varies.
19   Q   Okay.  So is there one percentage that
20 applies in most cases, or is there a broad
21 variation?
22   A   I don't know what it is.

Page 140

1    Q   Okay.  But you're aware of the fact that
2  there is variation; is that a fair statement?
3    A   There is variation, yes.
4    Q   That variation is based on individual
5  negotiations between Blue Cross/Blue Shield of
6  Mississippi and pharmacies; is that a fair
7  statement?
8    A   Yes.
9    Q   What sort of factors would give one
10 pharmacy greater leverage as against another?
11   A   I don't know what you mean by leverage.
12   Q   Well, if there is a variation, that
13 means that different pharmacies are getting
14 different deals through a bargaining process,
15 correct?
16   A   Well, I mean, I -- I didn't sit down and
17 negotiate those pharmacy contracts, so I can't
18 assume that -- that all got better reimbursement
19 because of what you call leverage.  There could have
20 been other factors to consider.
21        But as I said, I didn't sit down and
22 negotiate those, so I would have to assume that --

Page 141

1  that some were able to get better pricing for
2  various reasons like I talked earlier.  Geography,
3  you're the only pharmacy in town.  There may be a
4  need to make a different deal to include them.
5        But, I mean, there's a variety of factors
6  that go into that negotiation, and because I wasn't
7  present in those negotiations, I couldn't tell you
8  what went into them.
9    Q   Okay.  So you're saying there that you
10 don't know exactly what factors do impact those
11 negotiations because you don't play a part in them;
12 is that correct?
13   A   That is correct.
14        MR. MANGI:  For the record, based
15        on the fact that this witness does not
16        have knowledge regarding reimbursement
17        methodologies employed in relation to
18        reimbursing pharmacies or the factors
19        that go into setting those
20        methodologies, we will reserve our right
21        to seek another witness who does have
22        knowledge of these areas that are

36 (Pages 138 to 141)

Page 142

1    encompassed by the deposition subjects.
2         If you'll give me a moment, I'll
3    just look through a few more papers
4    here.
5    BY MR. MANGI
6         Q    Who is responsible for that negotiation
7    process between Blue Cross/Blue Shield of
8    Mississippi and pharmacies?
9         A    Our director of pharmacy would be
10   responsible for those, you know, in the event that
11   that took place.  As I said before, the process is
12   very standard, and we don't -- I mean, I can't
13   recall the last time we've had to negotiate with
14   pharmacy.
15        Q    Well, there is variation, isn't there?
16        A    I think I've said that before, yes.
17        Q    So if the basis for that variation is
18   not negotiation, what is it?
19        A    Well, as I said, we haven't done that in
20   quite a while.  Now, we've had contracts in place
21   for many years.  When those contracts were
22   established, I assume that there was some

Page 143

1    negotiation that took place.  I'm talking more --
2    more recent.  We haven't recontracted our pharmacies
3    in many years.
4         Q    Now, in relation to generics,
5    reimbursement is by reference to a MAC list; is that
6    correct?
7         A    Yes.
8         Q    How is that MAC list generated?
9         A    We purchased it.  It's -- it's produced
10   by CMS.  The basis for it, I don't know how they
11   create it, but that's who we use.
12        Q    In relation to reimbursement to a
13   pharmacy, you follow a -- one MAC list that's
14   generated by CMS?
15        A    Correct.
16        Q    Also pay a dispensing fee in relation to
17   those generic drugs?
18        A    I believe so, yes.
19        Q    How is that -- that generic dispensing
20   fee calculated?
21        A    It -- I believe it's the same dispensing
22   fee as the brand.  We have one dispensing fee, to

Page 144

1    the best of my knowledge.
2         Q    Do you know whether reimbursements to
3    pharmacies in relation to both branded and generic
4    is only by reference to AWP minus or MAC or are
5    those some benchmarks amongst others in that
6    reimbursement formula?
7         A    I didn't understand your question.
8         Q    Yeah.  Let me -- let me make it a bit
9    clearer.  Let's take generic drugs first.  Is the
10   reimbursement to pharmacies expressed simply as the
11   MAC for that drug, or is it the MAC or another
12   benchmark, whichever is lower, something like that?
13        A    I believe it's just the MAC.  I'm not
14   aware of any other Benchmark.
15        Q    And in relation to branded drugs, is
16   just AWP minus a percentage, or is it that or the
17   lower of some other benchmark or price?
18        A    There's no other benchmark.  So it's
19   just AWP minus.
20        Q    Are you familiar with the term --
21        A    I couldn't hear you.  You cut out.
22        Q    I'm sorry.  Are you familiar with the

Page 145

1    term "ASP"?
2         A    Yes.
3         Q    What is your understanding of what ASP
4    stands for?
5         A    Average sales price.
6         Q    What is average sales price?
7         A    My understanding is CMS is collecting
8    information from various sellers and purchasers of
9    the actual acquisition cost of a drug and that
10   they -- they are publishing that in the federal
11   register and using that for basing Medicare's
12   reimbursement for physician office administered
13   drugs.
14        Q    Now, leaving aside the use of ASP in
15   relation to Medicare reform and present, do you know
16   whether ASP has had a standard meaning over time?
17             MR. DONNELL:  Does this relate to
18   anything that we've agreed to?  And if
19   so, point to it.
20             MR. MANGI:  Again, this relates to
21   consideration of alternative benchmarks
22   in reimbursement.

37 (Pages 142 to 145)

Mickey Brown

Highly Confidential
Jackson, MS

March 9, 2005

Page 146

1          MR. DONNELL:  Has he -- has he
2    testified that he has considered ASP
3    before now?
4          MR. MANGI:  That's precisely
5    the -- the area that we're getting at.
6          MR. DONNELL:  Why don't you ask
7    him that question?
8          MR. MANGI:  Well, all right.
9    Let's start with that.
10  MR. MANGI: (Continuing.)
11    Q   Has Blue Cross/Blue Shield of
12  Mississippi ever considered using ASP as a basis for
13  reimbursement?
14    A   Well, to the best of my knowledge, ASP
15  was just recently released January 1 of this year by
16  Medicare.  As I've said before, we -- we monitor
17  what Medicare is doing, but, you know, to this
18  point, we've not considered converting or using ASP
19  as our primary point of reference.
20         Will we consider it in the future?  I
21  can't answer that.  We haven't made a decision to do
22  that or not do that.  We will continue to monitor

Page 147

1  what Medicare does so that we better understand the
2  marketplace.  At some point in the future, we may
3  consider that.  But right now, there's not an
4  evaluation ongoing to determine to make a change.
5        I mean, we're familiar with what it is.
6  We're monitoring it, as we did Medicare's old
7  reimbursement system.  But no decisions have been
8  made to use ASP in calculation at this point.
9    Q   Now, the dispensing fee component of
10  reimbursement to pharmacies, does Blue Cross/Blue
11  Shield of Mississippi have any knowledge as to
12  whether that dispensing fee alone taken apart from
13  reimbursement for the drug is sufficient to cover
14  pharmacies' overhead costs?
15        MS. FEGAN:  Objection to the form.
16  Calls for speculation.
17        MR. DONNELL:  Also asked and
18    answered.
19  MR. MANGI: (Continuing.)
20    Q   You can answer.
21    A   Well, as I've said before, I don't know
22  what it cost for the pharmacy to acquire the drug,

Page 148

1  and I don't know what it cost for them to dispense
2  the drug.  You know, again, my -- our goals in our
3  provider reimbursement programs is fair and
4  reasonable reimbursement.
5        So for providers to agree to accept our
6  reimbursement, I have to assume the combination of
7  our drug prices and our dispensing fee covers their
8  costs and allows them to make the margins that they
9  need to stay in business and to make a living.  But
10  knowledge of whether it does or doesn't, I don't
11  have any way of knowing that.
12    Q   In other words, your assumption is that
13  the total bundle of reimbursement is sufficient to
14  cover costs and provide some margin of profit,
15  correct?
16    A   That's my assumption based on the fact
17  that pharmacies agree to our reimbursement programs.
18    Q   And indeed, that's equally true on the
19  physician's side, isn't it, the -- Blue Cross/Blue
20  Shield of Mississippi's assumption is that the
21  overall bundle of reimbursement should be sufficient
22  to cover overhead costs and provide some margin of

Page 149

1  profit to the physician?
2    A   As I said before, our goal is fair and
3  reasonable reimbursement.  We are not trying to make
4  providers provide services at their cost or less.
5  We understand that they're in business to make a
6  living and that we have no problem with that.
7        So in a sense, when we look at the fee
8  schedule, it's our opinion that it is fair and
9  reasonable and offers enough to cover their costs
10  and to make the margins that they need to make a
11  living.
12    Q   Well, you mentioned earlier that Blue
13  Cross/Blue Shield of Mississippi does subscribe to
14  Red Book; is that correct?
15    A   Correct.
16    Q   Do you use Red Book in your day-to-day
17  work?
18    A   My personal day-to-day work?
19    Q   Uh-huh.
20    A   No.
21    Q   Have you ever seen Red Book?  Have you
22  had occasion to look through it?

38 (Pages 146 to 149)

Mickey Brown                    Highly Confidential                    March 9, 2005
                                    Jackson, MS

Page 150

1     A   Oh, yeah.  But not day to day.
2     Q   Are you aware of the fact that Red Book
3  lists AWPs for drugs?
4     A   Yes.
5     Q   Are you aware of the fact that Red Book
6  also lists wholesale acquisition prices or direct
7  prices for drugs?
8     A   I was not aware of that.  I strictly
9  look at the average wholesale price.  Again, that's
10 our point of reference.
11    Q   Are you aware of any prices that are
12 reported in Red Book or other price reporters other
13 than AWP?
14    A   No.  Again, that's -- that's our point
15 of reference, so that's what I'm familiar with.
16    Q   Have you ever heard AWP referred to as
17 "ain't what's paid"?
18    A   I'm sorry.  I didn't hear what you said.
19    Q   Have you ever heard AWP referred to as
20 "ain't what's paid" as average wholesale price?
21    A   You mean -- no.  I -- no.  I've never
22 heard of that.  It's funny though.

Page 151

1     Q   It is, isn't it?
2     A   I've never heard of that, though.
3     Q   Well, do you think there's -- do you
4  think there's any truth to that?
5     A   I have no idea.  I don't -- as I've said
6  before, I have no idea what they pay to acquire the
7  drug.  Again, because some of our reimbursement
8  programs pay less than AWP, I have to assume that
9  they can acquire the drug for less than AWP.  But,
10 again, that's an assumption.
11         I'm not there to run their business, but
12 I have to assume that they're paying less than AWP.
13 But I've never heard that.  It just -- it was just
14 sort of humorous.
15    Q   I'm just about done.  If you could give
16 me a couple of minutes, I will -- I should be able
17 to wrap up pretty shortly.
18         All right.  Now, in relation to PBM
19 services, Blue Cross/Blue Shield of Mississippi, has
20 it always had an internal PBM since the time you've
21 been there?
22    A   Since I've been here, we -- we've

Page 152

1  managed our own pharmacy benefits, yes.
2     Q   And you've also mentioned your own
3  contracting with pharmacies, with retail pharmacies?
4     A   As long as I've been at Blue Cross, yes.
5     Q   You've also managed your own contracting
6  with manufacturers?
7     A   I'm not -- I don't know what you mean by
8  that.
9     Q   Do you know whether or not Blue
10 Cross/Blue Shield of Mississippi contracts with
11 manufacturers?
12         MR. DONNELL:  Do you know what
13    part of the agreement that relates to?
14         MR. MANGI:  I'm sorry.  Which
15    agreement are you referring to?
16         MR. DONNELL:  The agreement that
17    was provided before this deposition took
18    place.
19         MR. MANGI:  Oh, the list of
20    topics.  Yeah, absolutely.  The rebates
21    received from manufacturers are directly
22    relevant to amounts paid in

Page 153

1  reimbursements because they lower Blue
2  Cross/Blue Shield of Mississippi's
3  overall costs of reimbursement, their
4  inflow versus outflow.
5         They're also integral to
6  plaintiff's case and have formed a basis
7  of testimony in every deposition.
8  Indeed there have been individual
9  witnesses provided on this topic
10 by numerous health plans.  So defendants
11 will insist on the relevance of this
12 topic.
13         MR. DONNELL:  Okay.  I don't find
14    it relevant to the -- any of the
15    deposition subjects that we agreed to,
16    and we'll instruct the witness not to
17    answer.
18         MR. MANGI:  For the record, it's
19    relevant to topics including 1, 2, 4, 8
20    and 21.
21         MR. DONNELL:  How is it relevant
22    to No. 8?  That just caught my eye when

39 (Pages 150 to 153)

Mickey Brown

Highly Confidential
Jackson, MS

March 9, 2005

Page 154

1    you -- you were you running through the
2    list.  I looked down and looked at 8.
3           MR. MANGI:  Relationships with any
4    PBM --
5           MR. DONNELL:  There is no
6    relationship to any PBM, which he has
7    already testified to.  How is that
8    relevant to No. 8?
9           MR. MANGI:  There is a
10   relationship.  It's a relationship based
11   on a subsidiary relationship or an
12   internal PBM.  And it's the terms of
13   that arrangement and the role of the
14   internal PBM that we're probing.
15          Look, for the record, if you're
16   insisting that the witness not answer
17   the question, that's certainly within
18   your rights, but we will, then, be
19   forced to move to compel and get another
20   witness on that topic which has already
21   been found relevant in this case.
22          My questions on it are brief.  If

Page 155

1    you'd like him to answer them, that's
2    fine.  If not, we can move forward along
3    the lines I've --
4           MS. FEGAN:  I'm not going to take
5    a position one way or another on this,
6    but I just would note for the record
7    that I don't know what you're referring
8    to when you say it's already been found
9    to be relevant.  But...
10          MR. DONNELL:  Yeah.  We're going
11   to move on anyway.
12          MR. MANGI:  I'm sorry.  What was
13   that?
14          MR. DONNELL:  We're going to more
15   forward anyway.  We're not going to
16   answer those questions.
17          MR. MANGI:  Is it your position
18   that you will not allow the witness to
19   answer any questions pertaining to
20   rebates -- contracts or rebate
21   arrangements between Blue Cross/Blue
22   Shield of Mississippi and manufacturers?

Page 156

1           MR. DONNELL:  That's correct.
2    Because it was not -- it's not listed in
3    those subjects which we agreed to
4    provide a witness for.
5           MR. MANGI:  We obviously disagree
6    on that, but we'll move on.
7    MR. MANGI:  (Continuing.)
8        Q    Turning to specialty pharmacy
9    arrangements.  I believe you -- you stated that Blue
10   Cross/Blue Shield of Mississippi reimburses
11   specialty pharmacies at AWP minus a percentage
12   formula; is that correct?
13       A    Yes.
14       Q    Now, if -- is there a particular list of
15   drugs that are delivered to physicians only through
16   specialty pharmacies as opposed to allowing
17   physicians to buy and bill?
18       A    I think currently all of our subscriber
19   contracts allow the physician to continue to supply
20   the drugs themselves without going through the
21   disease-specific pharmacy arrangements.  We -- we
22   just encourage their participation in those.

Page 157

1        Q    Has Blue Cross/Blue Shield of
2    Mississippi ever considered making the use of
3    specialty pharmacies by physicians to acquire drugs
4    mandatory?
5        A    I haven't been involved in those
6    discussions, so I don't know whether they've taken
7    place or not.
8        Q    Who does have responsibility for
9    specialty pharmacies of Blue Cross/Blue Shield of
10   Mississippi?
11       A    Our director of pharmacy would have that
12   responsibility.  But as I said earlier, they work
13   very closely with our -- with our clinical area, our
14   medical management, our medical director.  So they
15   would be responsible for the programs, but those
16   discussions would have taken place in that arena,
17   not as much in a contracting capacity.
18       Q    Are you aware of any physician
19   communications to Blue Cross/Blue Shield of
20   Mississippi regarding the desirability of a
21   mandatory specialty pharmacy arrangement?
22       A    Did you say am I aware of any physicians

40 (Pages 154 to 157)

Mickey Brown                Highly Confidential                March 9, 2005
                             Jackson, MS

Page 158

```
 1   sending letters to Blue Cross requesting a
 2   mandatory --
 3       Q   No.  Just discussing the desirability or
 4   not of a mandatory arrangement.
 5       A   I don't know if they've sent letters to
 6   us requesting that or not.
 7       Q   Now, in relation to mail order, I
 8   believe you mentioned that mail order is not a
 9   significant part of Blue Cross/Blue Shield of
10   Mississippi's business; is that correct?
11       A   Right.  Not that I'm aware of.
12       Q   Is mail order handled through the
13   internal PBM or through an external PBM?
14       A   Well, I think mail order would be
15   handled through an external vendor.  I don't know if
16   they would fall under the definition of PBM.  The
17   claims would be paid by our PBM, but we don't have
18   the facilities to actually dispense and mail
19   pharmaceuticals.
20           So it -- it would be -- it would be an
21   external pharmacy, but the benefits would be managed
22   through our internal staff.
```

Page 159

```
 1       Q   Is there an external vendor with whom
 2   Blue Cross/Blue Shield contracts at the present?
 3       A   I'm not sure if we're still doing mail
 4   order or not.
 5       Q   Okay.  Are you aware of any past mail
 6   order contracts with external vendors?
 7       A   I know that we used to offer mail order,
 8   but I don't know who the vendor was.
 9       Q   Do you know what methodology Blue
10   Cross/Blue Shield of Mississippi employed to
11   reimburse that vendor in relation to mail order
12   scripts?
13       A   I don't.
14       Q   Blue Cross/Blue Shield of Mississippi so
15   chose would it be practical to try and reimburse
16   pharmacies by reference to their individual
17   acquisition costs for drugs.
18           MS. FEGAN:  Could you please
19       repeat the question?
20           MR. MANGI:  Madam Court Reporter,
21       would you mind?
22       (Previous question read back by the court
```

Page 160

```
 1   reporter.)
 2           MS. FEGAN:  Objection to form and
 3       asked and answered.
 4   MR. MANGI:  (Continuing.)
 5       Q   You can answer.
 6       A   I mean, to say whether it's practical or
 7   not, I don't know because we don't know what the
 8   acquisition costs are for the drugs currently, and
 9   I'm not sure that we have, from a current staffing
10   level, the ability to survey all pharmacies for
11   every individual drug to see what they acquired it
12   for.
13           So in my own personal opinion, it doesn't
14   sound practical, but I would have to do some
15   evaluation of that process to know for certain.
16       Q   Are you -- are you done with that
17   answer?
18       A   I think so.
19       Q   Certainly, we can agree that it would
20   require an amount of manpower to actually get
21   individual acquisition prices for individual drugs
22   from every pharmacy in the Blue Cross/Blue Shield of
```

Page 161

```
 1   Mississippi network, correct?  And that would be
 2   a -- that would be a substantial undertaking,
 3   wouldn't it?
 4       A   It would seem to me to be a substantial
 5   undertaking, yes.
 6       Q   Does the use of AWP as a reimbursement
 7   benchmark from which a discount is negotiated
 8   provide practical benefits to Blue Cross/Blue Shield
 9   of Mississippi, allowing it to avoid the logistical
10   hurdles that would be intending on reimbursing by
11   reference to actual acquisition?
12       A   AWP is a -- is a good point of reference
13   for us for establishing fair and reasonable
14   reimbursement in absence of other points of
15   reference.  So, I mean, I'm not sure that I
16   understand what you're asking me in that question.
17           But as I said, I think it would be
18   impractical to survey every pharmacy for their
19   acquisition costs of every drug that's available,
20   you know, in the United States.  So practically
21   speaking, average wholesale price administratively
22   is easier to use, if that gets to the heart of your
```

41 (Pages 158 to 161)

Mickey Brown                    Highly Confidential                    March 9, 2005
                                   Jackson, MS

Page 162

1   question.
2   Q   That does answer my question, thank you.
3        MR. MANGI:  Thank you, sir.
4   That's all the questions I have for you
5   at this time.
6        MS. FEGAN:  This is Beth Fegan.  I
7   don't have any questions.
8        MR. ROBBEN:  Anyone else?
9        MR. BATES:  This is Gerald Bates.
10  I don't have any questions either.
11       MR. ROBBEN:  Okay.  All right.
12  This is Philip Robben.  I don't either.
13  I would just like to thank Mr. Brown for
14  coming today and answering our
15  questions.
16       Counsel for Blue Cross/Blue Shield
17  of Mississippi, Mr. Donnell, has
18  indicated to me that they would like to
19  have the transcript designated highly
20  confidential, so that's taken care of.
21  And we have reserved our right, as the
22  defendants have, to seek additional

Page 163

1   witnesses, and Blue Cross/Blue Shield of
2   Mississippi obviously takes issue with
3   that.
4        MR. DONNELL:  I only take issue to
5   the extent that it goes into the
6   information that was testified to today,
7   to the extent it goes to retail
8   pharmacies -- provider contracting with
9   retail pharmacies, specialty pharmacies,
10  and mail order pharmacies.  The rest
11  will not be brought back up.
12       Any information regarding anything
13  else in the agreement will not be
14  allowed for renotice of deposition
15  without a court order.  That's it.
16       MR. ROBBEN:  Okay.  Off the
17  record.
18  (CONCLUSION OF DEPOSITION.)
19
20
21
22

Page 164

1        CERTIFICATE OF REPORTER
2
3        I, AMANDA MAGEE WOOTTON, Court Reporter and
4   Notary Public for the State of Mississippi, do
5   hereby certify that the above and foregoing pages
6   contain a full, true and correct transcript of the
7   proceedings had in the aforenamed case at the time
8   and place indicated, which proceedings were recorded
9   by me to the best of my skill and ability.
10       I also certify that I placed the witness
11  under oath to tell the truth and that all answers
12  were given under that oath.
13       I certify that I have no interest,
14  monetary or otherwise, in the outcome of this
15  case.
16
17       This the 18th day of March 2005.
18
19
20       AMANDA M. WOOTTON
21  My Commission Expires:
22  December 15, 2006

42 (Pages 162 to 164)