Exhibit 39

1

```
1              IN THE DISTRICT OF MASSACHUSETTS

2

3                              -O-

4

5    IN RE:                        :

6    PHARMACEUTICAL INDUSTRY           MDL No. 1456

7    AVERAGE WHOLESALE PRICE     :   01-CV-1225

8    LITIGATION

9

10        30(b)(6) DEPOSITION OF:   IHC HEALTH PLANS

11

12                    ERIC CANNON

13

14                         -O-

15

16              Place:        IHC Health Plans

17                            4646 West Lake Park Blvd.

18                            Salt Lake City, Utah 84120

19              Date:         September 13, 2004

20                            9:40 a.m.

21              Reporter:     Vickie Larsen, CSR/RPR

22                            -O-
```

Eric Cannon                   Highly Confidential          September 13, 2004
30(b)(6)                      Salt Lake City, UT

2 (Pages 2 to 5)

| | 2 |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | For the Plaintiff: |
| 4 | Mr. Ed Natargiacomo |
| 5 | HAGENS, BERMAN LLP |
| 6 | One Main Street, 4th Floor |
| 7 | Cambridge, Massachusetts 02142 |
| 8 | (617) 482-3700 |
| 9 | |
| 10 | For the Defendant: |
| 11 | Mr. J. Clayton Everett, Jr. |
| 12 | MORGAN, LEWIS & BOCKIUS LLP |
| 13 | 1111 Pennsylvania Avenue, NW |
| 14 | Washington, DC 20004 |
| 15 | (202) 739-5860 |
| 16 | (202) 739-3001 (fax) |
| 17 | |
| 18 | For IHC Health Plans: |
| 19 | Mr. Kevin Lawlor |
| 20 | IHC Health Plans |
| | 4646 West Lake Park Blvd. |
| 21 | Salt Lake City, Utah 84120 |
| 22 | (801) 442-4678 |

| | 4 |
|---|---|
| 1 | -oOo- |
| 2 | |
| 3 | E X H I B I T S |
| 4 | No.            Description          Page |
| 5 | |
| 6 | Exhibit Cannon 003  Prescription Drug and Pharmacy  79 |
| 7 | Services Agreement, Chain |
| 8 | Pharmacy Version (Bates No. IHC |
| 9 | AWP 000139 through IHC AWP 000152) |
| 10 | Exhibit Cannon 004  Prescription Drug and Pharmacy  79 |
| 11 | Services Agreement, Independent |
| 12 | Pharmacy Version (Bates No. IHC |
| 13 | AWP 000153 through IHC AWP 000166) |
| 14 | Exhibit Cannon 005  Prescription Drug and Pharmacy  79 |
| 15 | Services Agreement, Rural Pharmacy |
| 16 | Version (Bates No. IHC AWP 000167 |
| 17 | through IHC AWP 000180) |
| 18 | Exhibit Cannon 006  Amendment A Durable Medical     100 |
| 19 | Equipment and Miscellaneous |
| 20 | Medical Supplies (Bates No. IHC |
| 21 | AWP 000182 through IHC AWP 000186) |
| 22 | |

| | 3 |
|---|---|
| 1 | -oOo- |
| 2 | |
| 3 | I N D E X |
| 4 | |
| 5 | Witness                    Page |
| 6 | |
| 7 | ERIC CANNON |
| 8 | Examination by Mr. Everett              7 |
| 9 | -oOo- |
| 10 | |
| 11 | |
| 12 | E X H I B I T S |
| 13 | No.          Description          Page |
| 14 | |
| 15 | Exhibit Cannon 001  Amended Notice of Deposition     9 |
| 16 | dated September 9, 2004 |
| 17 | |
| 18 | Exhibit Cannon 002  IHC Health Plans Maximum     62 |
| 19 | Allowable Cost List dated |
| 20 | 5-24-2004 (Bates No. IHC AWP |
| 21 | 000006 through IHC AWP 000026) |
| 22 | |

| | 5 |
|---|---|
| 1 | -oOo- |
| 2 | |
| 3 | E X H I B I T S |
| 4 | No.            Description          Page |
| 5 | |
| 6 | Exhibit Cannon 007  Provider Agreement dated August 1,  118 |
| 7 | 2003 (Bates No. IHC AWP 000028 |
| 8 | through IHC AWP 000043) |
| 9 | Exhibit Cannon 008  IHC Home Care Services-Injectable  126 |
| 10 | Drugs Effective January 1, 2004 |
| 11 | (Bates No. IHC AWP 000136 through |
| 12 | IHC AWP 000138) |
| 13 | Exhibit Cannon 009  Participating Provider Agreement  137 |
| 14 | (Outpatient Dialysis Services) |
| 15 | (Bates No. IHC AWP 000056 through IHC |
| 16 | AWP 000075) |
| 17 | Exhibit Cannon 010  Participating Provider Services   142 |
| 18 | Agreement (Bates No. IHC AWP 000103 |
| 19 | through IHC AWP 000133) |
| 20 | Exhibit Cannon 011  IHC Health Plans, Inc. Final95j   156 |
| 21 | |
| 22 | |

Eric Cannon                    Highly Confidential              September 13, 2004
30(b)(6)                        Salt Lake City, UT

3 (Pages 6 to 9)

```
                                    6                                                    8
1              -oOo-                        1      Q.    And because there is a court reporter
2                                           2   here who's taking down everything that's said, it's
3           E X H I B I T S                 3   important that you wait until I finish my question
4   No.        Description       Page       4   before answering.
5                                           5      A.    Okay.
6   Exhibit Cannon 012  1999maf      159    6      Q.    Do you understand?
7                                           7            And that you speak out loud.  The court
8   Exhibit Cannon 013  2001 HPI Physician Fee  164  8  reporter can't take down head nods.
9           Schedules                       9      A.    Yes.
10                                          10     Q.    If you don't understand anything in any
11             -oOo-                         11  of my questions, feel free to ask me to clarify.  I'm
12                                          12  happy to do that.
13                                          13     A.    Okay.
14                                          14     Q.    And if you need to take a break, let me
15                                          15  know and I'm happy to do that as well, as long as
16                                          16  there's not a question that is pending.
17                                          17     A.    Okay.
18                                          18           MR. LAWLOR:  Clay, then just for purposes
19                                          19  of the protective order, we'd like to consider
20                                          20  everything that Eric says here highly confidential.
21                                          21           MR. EVERETT:  Okay.
22                                          22     Q.    Mr. Cannon, you understand that you're
```

```
                                    7                                                    9
1   September 13, 2004           9:40 a.m.  1   here today testifying on behalf of IHC Health Plans?
2                                           2      A.    Yes.
3         P R O C E E D I N G S             3      Q.    And that my questions today will go to
4                                           4   the knowledge of the company, unless I indicate that
5            ERIC CANNON,                   5   I'm asking for your personal knowledge.  Do you
6   called as a witness, having been duly sworn,  6  understand that?
7       was examined and testified as follows:  7     A.    Yes.
8                                           8      Q.    Okay.  I'm going to hand you what I'm
9            EXAMINATION                    9   marking as IHC Deposition Exhibit 1.
10  BY MR. EVERETT:                         10  (Exhibit Cannon 001 was marked for identification.)
11     Q.    Would you please state your name and  11     Q.    BY MR. EVERETT:  Which is the Amended
12  current position for the record.        12  Notice of Deposition of IHC Health Plan that was sent
13     A.    My name is Eric Cannon.  I am Director of  13  out last week.  Are you familiar with this document?
14  Pharmacy Services for IHC Health Plans.  14     A.    I have seen it before.
15     Q.    Mr. Cannon, have you been deposed before?  15     Q.    On Pages 3 through 6 of the document are
16     A.    No.                            16  a list of deposition subjects.  Have you seen these
17     Q.    Let me just run through some of the  17  deposition subjects before?
18  basics of the deposition.               18     A.    Yes, I have.
19           First of all, as I'm sure you realize  19     Q.    Are you prepared today to testify about
20  now, you are under oath.  So it's just like you're in  20  IHC Health Plans' knowledge with regard to each of
21  a courtroom.  Do you understand that?    21  these deposition items?
22     A.    Yes.                           22     A.    Yes, I am.
```

Eric Cannon                 Highly Confidential              September 13, 2004
30(b)(6)                    Salt Lake City, UT

4 (Pages 10 to 13)

10

1    Q.    Are you the person at IHC Health Plans,
2    Inc. that is most knowledgeable about each of these
3    subjects?
4    A.    Yes.
5    Q.    Okay. By way of background, would you
6    please describe for me your education after high
7    school.
8    A.    After high school I spent approximately
9    three years working on undergraduate work at the
10   University of Utah, at which time I transferred to
11   Idaho State University where I worked on and completed
12   my Doctorate of Pharmacy Degree.
13   Q.    Have you taken any -- any other courses
14   after receiving your Doctorate of Pharmacy Degree?
15   A.    Formal courses through the universities,
16   no.
17   Q.    Okay. After graduating from Idaho State
18   what was the first job that you held?
19   A.    The first job I held I worked as a retail
20   pharmacist.
21   Q.    For what company?
22   A.    Holiday Pharmacy.

11

1    Q.    Where is that located?
2    A.    Salt Lake City.
3    Q.    And what were your responsibilities?
4    A.    I worked as a staff pharmacist doing the
5    dispensing of prescriptions. I had responsibility to
6    work on contracts with managed care companies. Also
7    worked on business with assisted living facilities and
8    nursing homes.
9    Q.    What year did you begin that?
10   A.    1993.
11   Q.    Okay. And while you were in that
12   position did you have occasion to learn the prices
13   paid by Holiday Pharmacy for pharmaceutical products?
14   A.    Yes, I did.
15   Q.    Okay. Were you involved at all in the
16   purchase of pharmaceutical products for Holiday
17   Pharmacy?
18   A.    Yes, I was.
19   Q.    And what did your duties with regard to
20   the purchase of pharmaceutical products involve?
21   A.    It involved purchasing either from a
22   wholesaler or directly from an intermediary in the

12

1    cases of generic drugs, or directly from the
2    manufacturers products that we would use on a daily
3    basis to dispense prescription store clientele.
4    Q.    How large is Holiday Pharmacy?
5    A.    In terms of volume of prescriptions?
6    Square footage of the store?
7    Q.    Fair question. In terms of volume of
8    prescriptions.
9    A.    We did, on average, 300 to 500
10   prescriptions a day.
11   Q.    In your position as a retail pharmacist
12   for Holiday Pharmacy were you able to negotiate
13   discounts off of list prices for pharmaceutical
14   products purchased?
15   A.    List price. Define list price.
16   Q.    Well, in the context of pharmaceutical
17   products what do you understand the term "list price"
18   to mean?
19   A.    I would assume list price to be the
20   acquisition price, listed wholesale acquisition cost,
21   or in the case of generics that may vary widely. So
22   in terms of purchasing products from the wholesaler

13

1    there was no opportunity to negotiate off of list
2    price. In terms of direct manufacturer contracts
3    there would be, at times, opportunities to purchase
4    products at a reduced price.
5          In terms of generics, we would often be
6    contacted by intermediaries that would have prices
7    greatly reduced from what you could purchase them, say
8    through a wholesaler.
9    Q.    Okay. Which intermediaries did you deal
10   with for generic products?
11   A.    I cannot recall.
12   Q.    Okay. Did you negotiate any charge back
13   contracts with manufacturers?
14   A.    As in rebate discounts or -- no.
15   Q.    Okay. You mentioned before that you
16   understood list price in the context of purchases by
17   pharmacies to equate generally to wholesale
18   acquisition cost; is that correct?
19   A.    Yes.
20   Q.    And is that also known as WAC?
21   A.    Yes.
22   Q.    In general what was the relationship

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

5 (Pages 14 to 17)

14

1   between the prices at which Holiday Pharmacy was able
2   to purchase pharmaceutical products and WAC?
3       A.   I don't know, quite honestly. I don't
4   know that I -- we ever did a comparison between WAC
5   per se from the standpoint of how we look at databases
6   today and say this is AWP price, this is WAC price.
7   It just, you know, you kind of knew what a good price
8   was.
9       Q.   And what is -- what was a good price?
10      A.   It would depend by product and market
11  factors. It would depend if product was in short
12  supply. Would depend on the dating of the product.
13  If a product was going to expire in six months or 12
14  months you may be able -- you had a shorter period of
15  time in which that product could be sold and utilized
16  by a patient. You had to be able to drive that volume
17  and get rid of that product quickly. All of those
18  things affected the price you could purchase.
19      Q.   How long did you work for Holiday
20  Pharmacy?
21      A.   I worked for Holiday Pharmacy until
22  August of 1997.

15

1       Q.   Did you hold the same position at Holiday
2   Pharmacy the entire period?
3       A.   Yes, I did.
4       Q.   What was your next job?
5       A.   I then took a position in November of
6   1997 with IHC Health Plans as pharmacy utilization
7   coordinator.
8       Q.   What were your duties as pharmacy
9   utilization coordinator?
10      A.   I would assist in the review and
11  evaluation of products used by IHC Health Plans'
12  members. I would make recommendations to the Pharmacy
13  Therapeutics Committee on formulary decisions. I
14  worked closely with our PBM on how products were set
15  up in the system, whether they were set up to pay as
16  formulary or non-formulary. Whether they had a prior
17  authorization. I would help resolve member issues and
18  initiate prior authorizations.
19      Q.   Okay. What were your duties with regard
20  to recommendations regarding formularies?
21      A.   With regard to formulary decisions my
22  responsibilities included the clinical evaluation of

16

1   products within a therapeutic category or for a
2   therapeutic use. We would look at utilization
3   patterns, prescribing patterns by physicians. We
4   looked at available discounts from manufacturers, how
5   that would impact net cost. We looked at detailing
6   and marketing efforts by manufacturers as to how
7   utilization was being driven in one direction or
8   another.
9            We would look at benefit design as to
10  whether a category was covered under current
11  relationships with employers. Is this a product that
12  would be used in excluded categories, such as weight
13  loss. That's about it.
14      Q.   Okay.
15      A.   And then we'd make recommendations to the
16  P&T committee.
17      Q.   How did utilization patterns enter into
18  the analysis of creating a formula?
19      A.   Utilization patterns would enter into
20  formulary decisions in that a product may be sold or
21  marketed by the pharmaceutical company as a once a day
22  product, may have an approved dosage as 20 milligrams.

17

1   Yet in clinical practice the drug needs to be used
2   twice a day or a dose -- the recommended dose may be
3   20, but physicians can't get the clinical effect they
4   want at 20 milligrams. They need to go to 40
5   milligrams.
6            And then looking at other products where
7   instead of having to use two capsules a day or two
8   tablets a day you could use one tablet a day.
9       Q.   I see. And that analysis of utilization
10  patterns would affect the treatment of different drugs
11  on the formulary; is that correct?
12      A.   Yes, it would.
13      Q.   You mentioned discounts from
14  manufacturers were one thing that was considered in
15  making formulary decisions; is that correct?
16      A.   Yes.
17      Q.   How did those discounts enter into the
18  analysis?
19      A.   Discounts would be evaluated based on,
20  first of all, how the discount was structured. Was it
21  a flat discount? Did we receive a flat discount
22  regardless of utilization? Was that discount

Eric Cannon                Highly Confidential             September 13, 2004
30(b)(6)                    Salt Lake City, UT

6 (Pages 18 to 21)

18
1  structured as part of a therapeutic market basket?
2  Did we have -- how many drugs were in that market
3  basket? What percentage share of that market basket
4  would we have to obtain in order to receive the
5  discount? Was the discount structure with an up front
6  discount and then a performance discount based on
7  increase and use of a product?
8       If you can dream it, we had to evaluate
9  it.
10     Q.    And how did you find out about these
11 discounts?
12     A.    That took place during negotiations with
13 the manufacturers.
14     Q.    So IHC Health Plans negotiated directly
15 with manufacturers?
16     A.    Yes.
17     Q.    And those negotiations took place back in
18 1997?
19     A.    Yes, they did.
20     Q.    To your knowledge did IHC Health Plans
21 negotiate directly with manufacturers for discounts
22 prior to 1997?

19
1      A.    Yes, they did.
2      Q.    Do you know when IHC Health Plans began
3  to negotiate with manufacturers for discounts?
4      A.    I do not know the exact date. To the
5  best of my recollection it would have taken place as
6  early as 1993, '94.
7      Q.    Prior to 1993 or '94 when IHC Health
8  Plans began directly negotiating with manufacturers,
9  how was the process for formulary decision making
10 different?
11     A.    I'm unaware of how that took place prior
12 to 1993.
13     Q.    Okay. You mentioned that therapeutic
14 market baskets were taken into account in making
15 decisions about discounts. What do you mean by
16 "therapeutic market baskets"?
17     A.    Market basket or therapeutic market
18 basket may be, if I, for example, want to treat high
19 cholesterol. That therapeutic market basket may
20 include all drugs that would be considered in the
21 statin category.
22          It could go beyond that category to

20
1  include other products that would inhibit the
2  absorption of cholesterol or may speed the elimination
3  of cholesterol.
4          So depending on how that market basket is
5  defined to include as few as three or four drugs and
6  as many as ten or 15 drugs.
7      Q.    And how did the definition of the
8  therapeutic market basket in each case affect your
9  formula decisions?
10     A.    If the market basket was defined as being
11 very broad with many products in it and the market
12 share required for a particular product was required
13 to be very high, that would make achieving those
14 discounts more difficult and would factor into the
15 evaluation to say how realistic is it that we could
16 attain this market share given this market basket.
17     Q.    Okay. How long did you hold the position
18 of pharmacy utilization coordinator?
19     A.    I don't know. I was pharmacy utilization
20 coordinator up until sometime in I think 1999, at
21 which time my title changed to manager of pharmacy
22 services, which coincided more specifically with our

21
1  bringing many of the PBM functions that were then
2  being performed by Medco in house. Which increased my
3  responsibilities as to operations, contract
4  negotiation with pharmacies, claims processing, system
5  setup responsibilities.
6      Q.    Okay. Stepping back to your duties as
7  pharmacy utilization coordinator. To whom did you
8  report?
9      A.    I reported to Christina Heiner.
10     Q.    What was her title?
11     A.    Director of pharmacy services.
12     Q.    How many people reported to you?
13     A.    Between 1997 and when I became manager of
14 pharmacy services, none.
15     Q.    And how many people reported directly to
16 Ms. Heiner?
17     A.    One.
18     Q.    And that would be you?
19     A.    That would be.
20     Q.    All right. In 1999 you became manager of
21 pharmacy services. You mentioned that your
22 responsibilities increased for operations?

Eric Cannon                    Highly Confidential              September 13, 2004
30(b)(6)                       Salt Lake City, UT

7 (Pages 22 to 25)

22

1    A.    Yes.
2    Q.    What do you mean by "operations"?
3    A.    Operations would be setting up the
4    system. We had to hire one person to set up the
5    pharmacy system within the claim system. Our claims
6    would adjudicate the rules of adjudication.
7          We had to hire one person to help set up
8    the pharmacy network in the claims system. We hired
9    four people to take incoming phone calls from
10   pharmacies and physicians. We had an additional staff
11   of initially probably six to eight people that took
12   phone calls from members.
13         We also had -- IHC had a pharmacy call
14   center that was in place in 19 -- started in 1996,
15   roughly -- that may not be accurate -- but that call
16   center included a pharmacist and some technicians that
17   contacted members or physicians to switch products to
18   formulary products or preferred products. That was
19   brought in to be included in the internal PBM within
20   IHC.
21   Q.    What do you understand the functions of a
22   PBM to be?

23

1    A.    The functions of the PBM, as I understand
2    them, would include and can include all --
3    encompassing all aspects of managing a pharmacy
4    benefit or as few responsibilities as simply an
5    intermediary that processes claims.
6    Q.    And in soliciting contracts from PBMs can
7    a managed care entity like IHC Health Plans choose the
8    functions that it wants an outside PBM to perform?
9    A.    Yes.
10   Q.    And is there, in your opinion, strong
11   competition among external PBMs?
12   A.    In my opinion, yes, there is strong
13   competition between external pharmacy benefits
14   managers.
15   Q.    And was that true in 1997?
16   A.    Yes, it was.
17   Q.    Is it still true today?
18   A.    Yes, it is.
19   Q.    So in 1999 you changed positions and
20   expanded your responsibilities. To whom did you
21   report in 1999 when you were manager of pharmacy
22   services?

24

1    A.    Christina Heiner.
2    Q.    Were you still her only direct report?
3    A.    In 1999, roughly thereabouts, contracting
4    responsibilities also resided with IHC Corporate
5    Pharmacy Services. And those contracting
6    coordinators -- at the time there was one contracting
7    coordinator -- then started to report into the health
8    plan. And so as I recall Christina had two direct
9    reports in 1999. Myself and our contract coordinator.
10   Q.    What is IHC Corporate Pharmacy Services?
11   A.    IHC Corporate Pharmacy Services is a
12   department within the IHC corporate central office
13   that coordinated pharmacy issues across a continuum of
14   the IHC system. They coordinated pharmacy purchasing
15   for, and continue to coordinate pharmacy purchasing,
16   for our 21 hospitals, the physician clinics, clinical
17   programs within the hospitals, formulary within the
18   hospitals, and up until 1999 also had contracting
19   responsibilities for IHC Health Plans.
20   Q.    How did they coordinate the purchasing of
21   pharmacy products?
22   A.    Coordination of purchasing of pharmacy

25

1    products by the central offices is done through
2    coordination meetings with the pharmacy directors.
3    Evaluation of products as they're available to us
4    through Amerinet, which is our third-party buying
5    group, hospital buying group.
6          Looking at and coordinating efforts
7    through McKesson, which was then our wholesaler and is
8    our wholesaler today. Checking to make sure the
9    contract prices are loaded into the wholesale system.
10   Looking at utilization patterns in the hospitals.
11   Working directly with pharmacy directors, pharmacy
12   staff and administrators in the hospitals.
13   Q.    How often were there coordination
14   meetings with pharmacy directors?
15   A.    Monthly.
16   Q.    Is that true for the entire period that
17   you worked for IHC Health Plans?
18   A.    Yes.
19   Q.    Do you know if it was true prior to 1997?
20   A.    Yes, I believe it was. Up until -- let
21   me correct that.
22         I think the corporate pharmacy services

Eric Cannon                Highly Confidential            September 13, 2004
30(b)(6)                   Salt Lake City, UT

8 (Pages 26 to 29)

26

1   group was established approximately in 1995. It would
2   have been at that point in time that the director
3   meetings and those meetings started to take place.
4       Q.    Prior to 1995 what did IHC generally as a
5   general corporate entity do to coordinate pharmacy
6   purchasing?
7       A.    At that time -- prior to that period
8   coordination was done through Amerinet. The buying
9   group IHC had one pharmacist that would work directly
10  with the facilities to coordinate purchasing.
11      Q.    What is Amerinet?
12      A.    Amerinet is a buying group that combines
13  the buying power of the hospitals and facilities
14  within the IHC system of other health systems across
15  the United States. By pooling the buying power they
16  increase the volume to achieve greater discounts.
17      Q.    How is Amerinet affiliated with IHC?
18      A.    IHC and Amerinet -- Amerinet was
19  established in a partnership with IHC and some other
20  health systems. Initially I believe IHC was 50
21  percent shareholder in the stock of Amerinet. As time
22  has progressed IHC now I think approximately owns only

27

1   25 percent of Amerinet.
2       Q.    What other health systems are partners in
3   Amerinet currently?
4       A.    I don't know that.
5       Q.    Do you know approximately how many other
6   health systems are currently partners in Amerinet?
7       A.    No, I don't.
8       Q.    Do you know historically who the partners
9   in Amerinet were?
10      A.    No, I don't.
11      Q.    Okay. Were the discounts that were
12  negotiated by Amerinet passed through to IHC Health
13  Plans?
14      A.    I don't know that.
15      Q.    You mentioned that in the -- that one of
16  the things that the pharmacy purchasing coordination
17  unit did was to make clear which Amerinet products
18  were available?
19      A.    Yes.
20      Q.    What did that involve?
21      A.    It would involve from a system standpoint
22  -- when I speak of "system," I would define that as

28

1   facilities, physician offices, surgery centers and
2   hospitals. They would look at, within categories of
3   drugs, the prices of those products, the clinical use
4   patterns of those products, and say these are the
5   prices that are available. And after the director
6   meeting and hospital P&T committees they would work
7   towards selecting products that were most cost
8   effective based on clinical evidence, safety and cost.
9       Q.    And those coordination meetings where
10  there was discussion of the cost of pharmaceutical
11  products also involve -- also were attended by the
12  director of pharmacy for IHC Health Plans; is that
13  correct?
14      A.    Yes.
15      Q.    And that was true throughout the period
16  that you worked for IHC Health Plan?
17      A.    Yes. Now let me clarify that, in that
18  many meetings if there were not health plan issues to
19  be discussed a pharmacy director or health plan
20  representative would not attend those meetings or may
21  only attend for 30 minutes to an hour.
22      Q.    But IHC Health Plans director of pharmacy

29

1   would have been aware of the prices paid for
2   pharmaceutical products by the other branches of IHC?
3       A.    Not all pharmaceutical products, but
4   occasionally one or two products, yes.
5       Q.    And which one or two products would that
6   -- not in terms of brand names but --
7       A.    It would depend on the products
8   discussed. You've got upwards of 50,000 drugs
9   available in any one meeting. You may only discuss
10  one.
11      Q.    Okay. Aside from the meetings was there
12  any mechanism for the director of pharmacy of IHC
13  Health Plans to become aware of the prices paid by
14  other branches of IHC Health Plan?
15      A.    Up until 2002 or 2003, I'm not sure
16  which, IHC Health Plan pharmacy and IHC corporate
17  pharmacy services were jointly located and shared
18  office space in downtown Salt Lake. And if you had a
19  desire to know what the system was paying for a
20  particular product you could ask a contract manager or
21  someone that had the ability to look up those prices.
22      Q.    So if you wanted to find out the pricing

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

9 (Pages 30 to 33)

---

30

1 of products purchased by IHC Health Services you'd
2 just pick up the phone or walk across the hall?
3     A.   Yes.
4     Q.   Okay. So you became manager of pharmacy
5 services at some point in 1999?
6     A.   Yes.
7     Q.   How long did you hold that position?
8     A.   At some point my title was changed to
9 assistant director of pharmacy services. That was
10 more -- no additional responsibility, just simply my
11 personal desire. And then in late 2000 or early 2001,
12 I'm not exactly sure, Christy Heiner left IHC and I
13 was made director of pharmacy.
14     Q.   How did your responsibilities change when
15 you assumed your new position as director of the
16 pharmacy?
17     A.   I was then responsible for all aspects of
18 pharmaceutical use within IHC Health Plans.
19     Q.   Were you also responsible in that
20 position for physician administered drugs?
21     A.   Physician administered drugs, up until
22 and presently -- I guess we need to divide this a

---

31

1 little bit.
2     The responsibility of contracting
3 directly with physicians still remains within the
4 provider relations, provider contracting department of
5 IHC Health Plans. In the early 2000 sometime we
6 switched to -- prior to that period of time we had not
7 specifically looked at the prices we were paying for
8 pharmaceuticals, and at that point in time pharmacy
9 services or my department became involved in setting
10 and looking at prices that we paid in physician
11 offices.
12     Q.   What changed to make IHC Health Plans
13 look more closely at the prices it was paying for
14 prescriptions drugs at physician offices?
15     A.   I think in the early -- late '90s, early
16 2000 we saw more biologic products come onto the
17 market. We saw the cost of drugs administered in our
18 physician's office start to rise dramatically. The
19 number of products available to be used in a
20 physician's office was also increasing.
21     It was an area that possibly could have
22 had more time and attention devoted to it. Resources

---

32

1 had not existed prior to really delve into what we
2 were paying in opportunities to decrease cost. We
3 became more of an entity within the corporation. The
4 opportunities did increase to take action and look at
5 decreasing what we pay or provide better cost
6 effective care.
7     Q.   So am I correct that prior to the 2000
8 period when you began to look more closely at the
9 prices paid for physician administered drugs, the lack
10 of attention was driven primarily by the fact that
11 physician administered drugs were not a large expense
12 of IHC Health Plans?
13     A.   I don't know that. And I don't think
14 that's correct in saying they were not a large part of
15 IHC Health Plans' expense. They had not had any
16 attention or focus placed on them.
17     Q.   Okay. Are some physician administered
18 drugs also sold through pharmacies?
19     A.   Yes.
20     Q.   And if the director of provider relations
21 had been interested to know the prices paid by IHC
22 Health Plans to pharmacies for those drugs, he could

---

33

1 have -- he or she could have determined that
2 information by speaking to someone from the pharmacy
3 services?
4     A.   Yes.
5     Q.   Were there, to your knowledge, any such
6 informal communications between the provider relations
7 department and the pharmacy services department about
8 prescription drug pricing prior to 2000?
9     A.   Yes.
10     Q.   How often did those types of informal
11 discussions occur?
12     A.   Not frequently. As I recall more times
13 than not it would be this is what we're currently
14 paying. Is this in line with what we should be
15 paying? Maybe discussions like that would take place
16 two, three times a year.
17     We had more discussions on claims review
18 as a claim would come in and the price would seem as
19 though we'd been over charged and the people
20 administering the claims review area would then ask is
21 this an appropriate price to pay for this prescription
22 in this setting?

---

Eric Cannon                    Highly Confidential                  September 13, 2004
30(b)(6)                       Salt Lake City, UT

10 (Pages 34 to 37)

34

1    Q.    And did the prices paid to providers for
2    prescription drugs ever changed as a result of these
3    informal discussions?
4    A.    Yes, they did.
5    Q.    Are you aware of any specific examples
6    where prices changed?
7    A.    I cannot think of any specific examples.
8    Q.    Were prices usually decreased as a result
9    of the discussions?
10   A.    As many times as prices were decreased I
11   would imagine we also increased them.  It goes both
12   ways.
13   Q.    Okay.  In your current job as the
14   director of pharmacy services is it important to you
15   to keep up to date on prescription drug pricing
16   issues?
17   A.    Yes, it is.
18   Q.    And what do you do to keep up to date on
19   those issues?
20   A.    In order to keep up to date on pricing
21   issues we first of all load into our system on a
22   weekly basis databases from either First Data Bank or

35

1    Medispan that include pricing information.  We talk
2    with vendors about pricing changes, price increases.
3    We receive from manufacturers notification when prices
4    are raised.
5        We track closely the number of
6    manufacturers that may be selling a generic product
7    that would indicate price competition in a specific
8    category.  We monitor communications that may take
9    place through newsletter groups or journal articles or
10   internet or wherever information -- wherever we can
11   find information, we'll take it.
12   Q.    One of the things that you mentioned is
13   that you keep track of the number of companies selling
14   generic products?
15   A.    Yes.
16   Q.    Why is the number of companies selling a
17   generic product important?
18   A.    The number of companies selling a generic
19   product is important to us in that as the number of
20   companies selling a particular product increases, so
21   does competition.  Generally speaking as price or as
22   competition increases within a category, the price

36

1    then begins to drop.
2    Q.    Are you familiar with the term "AWP" or
3    "average wholesale price" in the context of
4    prescription drugs?
5    A.    Yes, I am.
6    Q.    And you mentioned that you subscribe to
7    First Data Bank and/or Medispan databases; is that
8    correct?
9    A.    Yes.
10   Q.    Are AWPs published in those?
11   A.    Yes.
12   Q.    Are AWPs for generic products also
13   published?
14   A.    Yes.
15   Q.    In your experience does the AWP for a
16   generic product tend to decrease when additional
17   sellers of generic products enter the market?
18   A.    No, it does not.
19       MR. EVERETT:  Let's go off the record.
20       (There was a break taken.)
21       MR. EVERETT:  Let's go back on the
22   record.

37

1    Q.    When we went off the record we were
2    talking about things that you do as director of
3    pharmacy to keep up to date on drug pricing issues.
4    And you mentioned that you read a newsletter groups
5    and journal articles.  What newsletter groups does IHC
6    Health Plan subscribe to or receive?
7    A.    We receive The Pink Sheet.  We get a
8    newsletter called Generic Line.  We belong to a group
9    that provides updates on injectable pricing called
10   R.J. Health.  They provide a newsletter, the title of
11   which I'm unaware.
12   Q.    Okay.  What other periodicals?
13   A.    Those are the main periodicals I can
14   think of.
15   Q.    Okay.  What is The Pink Sheet?
16   A.    The Pink Sheet is a -- it's fairly big
17   and I'm not sure who the publisher is -- but it
18   provides updates on issues as they go through the FDA
19   or other issues as it relates to pharmaceuticals.
20   Q.    You also mentioned that you subscribe to
21   First Data Bank and/or Medispan for the pricing.  Are
22   there any other industry pricing compendia?

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

11 (Pages 38 to 41)

38

1    A.    Blue Book is the other one I can think
2  of.
3    Q.    How do you choose which compendia to use
4  for pharmaceutical pricing?
5    A.    I don't know that there is any set method
6  for determining which you use.  When we were with
7  Medco they used First Data Bank.  For the clinical
8  systems and pharmacy systems within our hospitals and
9  many of the retail pharmacies they use First Data
10  Bank.
11        When we switched to bring pharmacy claims
12  processing in house, the prospective health the
13  organization we went with for that software and
14  service, they use Medispan.  Up until recently
15  Medispan and First Data Bank had similar ownership.  I
16  don't know that there's a lot of method to the madness
17  of picking which one.
18    Q.    Are there differences between them?
19    A.    ·You will see slight pricing variations in
20  AWP and WAC between the manufacturers -- or
21  suppliers -- excuse me -- of those tables.
22    Q.    You said "slight pricing variations."

39

1  Can you give an estimate of the percentage variation?
2    A.    I would guess that not more than one or
3  two, three percent.
4    Q.    What information is provided in the
5  databases that you receive from First Data Bank and/or
6  Medispan?
7    A.    There is everything from clinical
8  information, codes that would relate to drug
9  interactions, safety alerts, interactions based on age
10  of a patient.  There is manufacturer information on
11  products, so by product you know the manufacturer, you
12  know how it is supplied, packages, package sizes.  Is
13  it in a bulk bottle?  Is it unit dose?
14        And then you receive price information
15  for the branded products.  That is AWP and WAC.  For
16  generic prices we receive AWP, WAC, and then on some
17  products there is an average generic price.
18    Q.    Do you know how the average generic price
19  is calculated?
20    A.    I do not.
21    Q.    How long has IHC Health Plans subscribed
22  to First Data Bank and/or Medispan?

40

1    A.    We've had First Data Bank as long as I've
2  been here, and would imagine that that goes back
3  probably quite a ways in time.  I can't tell you
4  exactly.  First Data Bank is used in the facility
5  systems.  First Data Bank was, and still is, used by
6  our actuary in looking at products and names and
7  therapeutic classes.  In 1999 we also purchased
8  Medispan because that's what we were processing our
9  claims with.
10    Q.    And throughout the period that IHC Health
11  Plans subscribed to or purchased First Data Bank data
12  did it have access to WACs?
13    A.    Yes.
14    Q.    Are you a member of any industry
15  associations?
16    A.    Yes, I am.
17    Q.    Which ones?
18    A.    The Academy of Managed Care Pharmacy, The
19  American Society of Health System Pharmacists, Utah
20  Pharmaceutical Association, and up until 1998 or 1999
21  the National Community Pharmacy Association.
22    Q.    Have there been any presentations or

41

1  discussions about AWP or average wholesale price for
2  pharmaceutical price at any of the meetings of those
3  associations that you've attended?
4    A.    I can't say with any certainty.
5    Q.    Do any of those industry associations
6  produce periodicals or reports?
7    A.    They all produce periodicals and reports.
8    Q.    Do you receive all of those?
9    A.    Yes.
10    Q.    Do you recall if any reports or
11  periodicals from any of those industry associations
12  discussed AWP or average wholesale price for
13  pharmaceutical products?
14    A.    There is discussion occasionally in those
15  as new products come out or focus on specific
16  therapeutic categories is written about or are written
17  about that, they're -- the average wholesale price of
18  a product or products in comparison with each other
19  will be listed.  It's uncommon to have a review of
20  antidepressants.  The drugs are listed and their
21  average wholesale price.
22    Q.    At any of the meetings of any of those

Eric Cannon                    Highly Confidential                September 13, 2004
30(b)(6)                       Salt Lake City, UT

12 (Pages 42 to 45)

---

42

1  industry associations have there been discussions or
2  presentations about reimbursement methodologies
3  utilized for pharmaceutical products?
4      A.   Yes.
5      Q.   Now what were the context of those
6  presentations?
7      A.   The context of those presentations would
8  include reviews of savings opportunities, whether in
9  negotiations with pharmacies, physicians or hospitals
10 as it relates to potential discounts off of AWP.
11     Q.   Do you recall the earliest presentation
12 that you saw about potential savings off of AWP that
13 was made at any of these industry associations?
14     A.   No, I do not.
15     Q.   All right. Let's talk a little bit about
16 the structure of IHC now that we've touched on it a
17 little bit already. IHC Health Plans is a managed
18 care organization; is that correct?
19     A.   Yes, it is.
20     Q.   What other companies are affiliated with
21 IHC Health Plans?
22     A.   Under the structure of Intermountain

---

43

1  Health Care there is an umbrella or parent management
2  company. Under that is IHC Health Systems, Inc.,
3  which includes the hospitals and the physician
4  clinics. IHC Health Plans, Inc. is a separate
5  corporate entity under the parent umbrella company.
6      Q.   How many hospitals are owned by IHC
7  Health Systems, Inc.?
8      A.   I believe it's 21, although it changes --
9  or has changed.
10     Q.   How about physician clinics?
11     A.   Exactly, I don't know. Approximately 50
12 plus. 55, 56.
13     Q.   Are any of the physician clinics -- do
14 any of the physician clinics provide oncological
15 services?
16     A.   Yes, they do.
17     Q.   Are there any rheumatologists employed by
18 IHC Health Systems, Inc.?
19     A.   Yes, there are.
20     Q.   In what geographic area does IHC operate?
21     A.   It operates in Utah, primarily. We have
22 one facility in Idaho. We had a few more facilities

---

44

1  in Idaho and Wyoming. Currently the bulk of our
2  membership and our facilities are in Utah.
3      Q.   Does IHC Health Plans, Inc. have any
4  members in states other than Utah and Idaho?
5      A.   Yes, we do.
6      Q.   Do you know which states?
7      A.   All 50, as I understand it. Many of the
8  companies we contract with have employees outside the
9  state of Utah or retirees in other states.
10     Q.   And they still receive health insurance
11 from IHC Health Plans?
12     A.   Yes, they do.
13     Q.   What products are marketed by IHC Health
14 Plans?
15     A.   We currently have as our main products
16 IHC Care and IHC SelectMed. We have IHCMed, which is
17 a more limited product, smaller panel. We have IHC
18 Direct, which is more of a PPO, POS type product.
19     Q.   What do you mean by "PPO"?
20     A.   That's more in the IHC Direct. You're
21 now leaving my pharmaceutical knowledge base and going
22 to insurance that is not good. It operates more with

---

45

1  a broader panel, more discounted fee for service, more
2  ability to go outside the network and receive
3  benefits.
4      Q.   Are pharmaceutical products covered in
5  all of those plans?
6      A.   Yes, they are.
7      Q.   Are there differences in the way that
8  pharmaceutical products are covered in each of the
9  plans?
10     A.   With respect to outpatient oral
11 medications, no. We administer the pharmacy benefit
12 and the formulary exactly the same across all
13 products.
14          With regard to injectable products, the
15 fee schedule is slightly higher, and I believe it's
16 under IHC Direct. But I cannot say for sure which of
17 those -- I believe it's IHC Direct we have one fee
18 schedule that's slightly higher.
19     Q.   Are there different co-pays or
20 co-insurance that members have to pay for
21 pharmaceutical products -- let me start over. That's
22 not a good question.

---

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

13 (Pages 46 to 49)

46

1    Do the plans have different co-pays or
2    co-insurance for pharmaceutical products?
3        A.   Yes, they do.
4        Q.   Do any of the plans have co-insurance for
5    pharmaceutical products?
6        A.   Yes, they do.
7        Q.   Which plans?
8        A.   Within each plan you will have varying
9    levels of co-insurance, co-pay. That's something that
10   takes place at the time that IHC plan sells a product
11   to an employer group. And as we look at that product,
12   recommendations may be made or an employer may request
13   a certain benefit structure or co-pay or co-insurance
14   level.
15       And then we, through underwriting and
16   actuary, evaluate that and rate the plan. The
17   employer is the one that makes the ultimate decision
18   on what their co-pay levels are and co-insurance
19   levels are.
20       Q.   So it varies by contract with an
21   employer?
22       A.   Yes, it does.

47

1        Q.   Roughly how many variations are there on
2    the co-insurance or co-pay levels for pharmaceutical
3    products?
4        A.   Five, six hundred.
5        Q.   Are co-pays flat co-pays or co-insurance
6    payments for pharmaceutical products more common?
7        A.   Presently co-pays. Co-insurance on
8    injectable drugs is more common.
9        Q.   Has that changed over time?
10       A.   No.
11       Q.   Are they different co-pays for different
12   formulary contracts?
13       A.   There are different co-pays for formulary
14   products based on the differences that employers may
15   select. Employer A may have a $15 co-pay for
16   preferred formulary products. Employer B may have a
17   $20 or $25 co-pay.
18       Q.   Does IHC Health Plans create its own
19   formularies?
20       A.   Yes, we do.
21       Q.   Are those formularies tiered?
22       A.   Yes, they are.

48

1        Q.   How many tiers are there?
2        A.   Three.
3        Q.   What is the difference between the tiers?
4        A.   Presently we have Tier 1 being generic
5    products and some branded products. Tier 2 is branded
6    products that are preferred or on formulary. Tier 3
7    is branded, non preferred products.
8        Q.   Are there any products that are excluded
9    from the formulary?
10       A.   Yes, there are.
11       Q.   From a reimbursement standpoint how do
12   the tiers differ?
13       A.   Reimbursement to a contracted pharmacy or
14   -- the reimbursement is the same as a percent off AWP.
15       Q.   Do the co-pays or co-insurance paid by
16   members differ based on the tier and the formulary?
17       A.   Yes, they do.
18       Q.   And that, again, is decided ultimately by
19   an employer who's purchasing the product?
20       A.   Yes, it is.
21       Q.   Who are IHC's main competitors? IHC
22   Health Plans?

49

1        A.   The main competitors at IHC Health Plans
2    is, or are, Altius Health Plans, United Health Care,
3    Regence Blue Cross Blue Shield of Utah, Cigna, and
4    then locally a plan called Educator's Mutual.
5        Q.   Within the state of Utah what's the size
6    of IHC Health Plans relative to its competitors?
7        A.   Relative to competitors IHC Health Plans
8    has the largest HMO population. Total membership,
9    Regence Blue Cross Blue Shield has the most
10   membership.
11       Q.   In terms of total membership is IHC
12   Health Plans the second largest managed care entity in
13   Utah?
14       A.   I don't know. I would say we're probably
15   the largest managed care organization, with Regence
16   being the largest provider of insurance.
17       Q.   Does the size of IHC Health Plans help it
18   to negotiate higher discounts in pharmaceutical
19   manufacturers or wholesalers?
20       A.   Yes, it does.
21       Q.   In terms of marketing the products of IHC
22   Health Plans, is it important to provide the best

Eric Cannon                    Highly Confidential                September 13, 2004
30(b)(6)                       Salt Lake City, UT

14 (Pages 50 to 53)

50
1    possible product for the lowest possible rate?
2         A.    Yes, it is.
3         Q.    And do the customers of IHC Health Plans
4    care about the cost of the products that they
5    purchase?
6         A.    Products being insurance products? Yes,
7    they do.
8         Q.    So it's important from a competitive
9    standpoint for IHC Health Plans to keep its cost down?
10        A.    Yes.
11        Q.    Is it important also to keep the -- its
12   pharmaceutical costs down?
13        A.    Yes.
14        Q.    What do you do to control pharmaceutical
15   costs?
16        A.    We control pharmaceutical costs through
17   contracting with providers, whether it be pharmacies,
18   home health agencies, nursing agencies, physician
19   offices. We keep prices down by contracting with
20   manufacturers. We keep costs down by controlling
21   utilization or over use of products. We try and keep
22   costs down by controlling inappropriate use of

51
1    pharmaceuticals.
2         Q.    What contracts does IHC Health Plans have
3    with pharmaceutical manufacturers?
4         A.    We currently have contracts with all the
5    major pharmaceutical companies on those products that
6    we have on our preferred list.
7         Q.    Those are contracts for rebates?
8         A.    Yes, they are.
9         Q.    How long has IHC Health Plans contracted
10   directly with manufacturers for rebates?
11        A.    Since at least 1996. I have no knowledge
12   before that.
13        Q.    Did it contract with manufacturers for
14   rebates even while it had a contract with an external
15   PBM?
16        A.    Yes, it did.
17        Q.    During the period of time that IHC Health
18   Plans utilized an external PBM, did the PBM separately
19   contract with manufacturers for rebates?
20        A.    On the products used by our members? No.
21        Q.    All right. That PBM is more a little
22   later. You mentioned before that you heard of the

52
1    term AWP or average wholesale price in the context of
2    pharmaceutical products?
3         A.    Yes.
4         Q.    What do you understand that term to mean?
5         A.    Average wholesale price or AWP, as I
6    understand it, is a price set which is similar to --
7    and this is an explanation I've heard given --
8    suggested retail price. It is not reflective of the
9    cost at which a pharmacy or a physician purchased the
10   drug.
11              And I have heard it explained in two
12   ways; that the manufacturer set the AWP, and I've
13   heard manufacturers say First Data Bank and Medispan
14   set the AWP. On average what we've seen is AWP runs
15   approximately 21 to 22 percent higher than WAC,
16   although that varies by manufacturer, where we have
17   seen some manufacturers with variability down around
18   the 17, 18 percent.
19        Q.    You mentioned that you had heard AWP
20   referred to at some point as suggested retail price.
21   Do you remember the context of that conversation?
22        A.    I think that may have been in a

53
1    presentation somewhere. And my recollection is not
2    clear as to where. But in the context of explaining
3    to an employer or purchaser what does AWP mean.
4         Q.    A presentation by someone employed by
5    IHC?
6         A.    And I cannot remember if it was someone
7    employed by IHC, if it was a PBM, I -- it stuck
8    because, you know, having worked in retail pharmacy
9    you used AWP as kind of your benchmark of price.
10        Q.    You mentioned that AWP bears a certain
11   relationship to WAC; is that correct?
12        A.    Yes.
13        Q.    Do you have any estimate of the
14   relationship between AWP on average and prices
15   actually paid by pharmacies?
16        A.    No, I do not.
17        Q.    Is it important for you to understand the
18   differences between AWP and actual acquisition costs
19   of pharmacists?
20        A.    I think it's important from my position
21   now that I understand that AWP is not the price that a
22   pharmacy or provider pays to acquire the drug.

54

1    Q.    Do you think it's common knowledge in the
2  industry that AWP does not equal an average of actual
3  acquisition cost?
4    A.    Yes, I do.
5    Q.    And what's the basis for that belief?
6    A.    The basis for that belief would come from
7  just years of experience in working with pharmacies
8  and working in pharmacies and knowing that AWP was a
9  number that didn't reflect what we paid.
10   Q.    For other managed health care entities
11 that may or may not employ persons who previously
12 worked in pharmacies, do you believe that those --
13 that's a terrible question.  Let me start over.
14         Do you believe that there's a basis for
15 others who do not have your background working
16 directly for pharmacies to understand that AWP does
17 not reflect actual acquisition cost by pharmacies?
18   A.    Yes.
19   Q.    And what would that basis be?
20   A.    That basis would be based on
21 conversations I've had with benefits consultants that
22 understand that AWP is not what pharmacies purchase

55

1  the drug for.  That would be based on conversations
2  and presentations I have seen given by PBMs to
3  employers that indicate that AWP is not what
4  pharmacies purchase the drug for.
5    Q.    Have you had any conversations with
6  benefits consultants prior to, say, 1998 that
7  suggested that the benefits consultants understood
8  that AWP did not equal an average of actual
9  acquisition cost?
10   A.    The benefit consultants, no.
11   Q.    The same question for PBMs?
12   A.    Yes.
13   Q.    How early have you seen presentations or
14 had discussions with PBMs where it was clear that they
15 understood that AWP does not equal an actual average
16 of acquisition cost?
17   A.    I've had those discussions with our PBM,
18 Medco at the time in 1997, as I work as a retail
19 pharmacy between 1993 and 1997 as we would negotiate
20 contracts off of AWP.  In those conversations it was
21 clear that PBM knew that we did not purchase our
22 product at AWP.

56

1    Q.    Does IHC Health Plans reimburse for any
2  pharmaceutical products utilizing AWP as a benchmark?
3    A.    Yes, we do.
4    Q.    Why does it use AWP?
5    A.    I don't know.  AWP has been the standard
6  benchmark within the industry as long as I've been
7  involved.  And contracts from PBMs were a discount --
8  initially were a discount of AWP plus a percentage,
9  and over time that has drawn into current market rates
10 of an AWP minus discount.
11   Q.    When you use AWP as a benchmark for
12 pharmaceutical reimbursement, do you nonetheless try
13 to negotiate the lowest possible price you can get
14 from pharmacies?
15   A.    Yes, we do.
16   Q.    And do you, nonetheless, negotiate the
17 lowest possible price that you can get from providers?
18   A.    Yes, we do.
19   Q.    Do you believe that using AWP as a
20 benchmark for pharmaceutical reimbursement has
21 increased the prices that IHC Health Plans paid for
22 pharmaceutical products over what it would have paid

57

1  if it had not used AWP?
2    A.    No, I did not.
3    Q.    Does IHC Health Plans currently reimburse
4  pharmacies for pharmaceutical products at some
5  discount off of AWP?
6    A.    Yes, we do.
7    Q.    Do you believe that pharmacies,
8  nonetheless, earn some margin on their sales of
9  pharmaceutical products?
10   A.    Yes, I do.
11   Q.    Do you have any estimate of what that
12 margin is?
13   A.    No, I do not.
14   Q.    Is it important for you in negotiating
15 contracts with pharmacies to have a knowledge of the
16 pharmacy's actual acquisition cost for pharmaceutical
17 products?
18   A.    It is important from the standpoint that
19 we know how far or how deep we -- or how hard we can
20 push in those negotiations.
21   Q.    In typical business negotiations do you
22 typically have an understanding of the cost structure

Eric Cannon                Highly Confidential              September 13, 2004
30(b)(6)                   Salt Lake City, UT

16 (Pages 58 to 61)

58

1  of the party with whom you're negotiating?
2      A.   We have -- in negotiations we have a
3  ballpark -- not ballpark -- but we have an idea where
4  they may be in that, with most wholesalers and with
5  most brand name products. There's not a lot of
6  purchasing difference between chain pharmacies. We
7  assume they're all fairly close in what they can
8  purchase products for. Independent retail pharmacists
9  may, based on the fact they may not have the size or
10 the volume to drive deeper discounts, but we assume
11 that they are purchasing close to WAC.
12     Q.   In your negotiations with pharmacies have
13 you ever asked a pharmacy directly what they were
14 paying for pharmaceutical products?
15     A.   No, I have not.
16     Q.   Would you expect the pharmacies to tell
17 you?
18     A.   No, I would not.
19     Q.   In your negotiations with manufacturers
20 have you ever asked manufacturers what they charge
21 wholesalers for pharmacies -- for pharmaceutical
22 products?

59

1      A.   No, I have not.
2      Q.   Would you expect them to tell you if you
3  asked?
4      A.   No.
5      Q.   And why is that?
6      A.   I would assume that is proprietary to
7  their business model and not relative -- relevant to
8  my negotiations with them.
9      Q.   Have you ever heard AWP referred to as
10 "aint what's paid"?
11     A.   Yes, I have.
12     Q.   When?
13     A.   I have no idea.
14     Q.   Is, in your experience, AWP referred to
15 as "aint what's paid" generally in the managed care
16 industry?
17     A.   I would say that the idea or the notion
18 of what is conveyed in the meaning of "aint what you
19 paid" is generally recognized and understood within
20 the managed care industry.
21     Q.   What did you understand the term
22 "wholesale acquisition cost" or "WAC" to mean?

60

1      A.   I assume, and my understanding of
2  wholesale acquisition cost is more of a manufacturer
3  sales price to a pharmacy.
4      Q.   Do you believe that WAC reflects actual
5  prices charged?
6      A.   No, I do not.
7      Q.   Do you believe that WAC is higher than or
8  lower than the actual prices charged to pharmacies in
9  general?
10     A.   In general I would say it is higher.
11     Q.   Is WAC also used for generic drugs?
12     A.   WAC -- we use WAC with generic drugs as a
13 benchmark in looking at setting a maximum allowable
14 cost for generic drugs.
15     Q.   Is your understanding of the meaning of
16 the term "WAC" different for generic drugs than it is
17 for branded drugs?
18     A.   No. I believe that generally WAC more
19 accurately reflects the acquisition cost of a product
20 than does AWP. And that holds true also with generic
21 drugs. Possibly not to the same degree that it does
22 with branded drugs.

61

1      Q.   Okay. What's the basis for your
2  understanding of the meaning of the term "WAC"?
3      A.   Just working within the pharmacy industry
4  for -- since 1993.
5      Q.   Did IHC Health Plans ever consider using
6  WAC as a basis for reimbursement instead of AWP?
7      A.   No.
8      Q.   Do you think that using WAC instead of
9  AWP would have changed the amount paid by IHC Health
10 Plans?
11     A.   No, I do not.
12     Q.   Are you familiar with wholesalers for
13 pharmaceutical products?
14     A.   I'm aware they exist, yes.
15     Q.   Who are the big wholesalers?
16     A.   McKesson, Cardinal, Amerisource Bergen.
17 I'm sure there's others.
18     Q.   Do you have any understanding of the
19 margins that wholesalers earn on their sales of
20 pharmaceutical products?
21     A.   No, I do not.
22     Q.   Switch to a different term. Have you

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

17 (Pages 62 to 65)

62

1   ever heard of the term "MAC" or "maximum allowable
2   cost"?
3        A.   Yes, I have.
4        Q.   And what do you understand that term to
5   mean?
6        A.   Maximum allowable cost, or MAC, is a
7   price set by a PBM, managed care organization or an
8   insurance company to indicate the maximum cost they
9   will pay for a particular generic product.
10       Q.   Does IHC Health Plans use MAC for any of
11  its pharmaceutical reimbursement?
12       A.   Yes, we do.
13       Q.   For what types of products?
14       A.   It's for generic products only.
15       Q.   I'm going to hand to you what I'm marking
16  as IHC Exhibit 2.
17  (Exhibit Cannon 002 was marked for identification.)
18       Q.   BY MR. EVERETT:  Which is a document
19  bearing the Bates Numbers IHC AWP 6 through IHC AWP
20  26.  And just so that you and Kevin understand, we
21  took the documents that were produced by IHC Health
22  Plans in response to subpoena and added numbers to

63

1   them so that they're easy reference -- for easy
2   reference in the bottom corner of the document.
3        Are you familiar with IHC Exhibit 2?
4        A.   Yes, I am.
5        Q.   What is it?
6        A.   This is the IHC MAC list or list of
7   generic products and their maximum allowable cost.
8        Q.   There's a date at the bottom in the
9   center of the first page.  Is that the date that this
10  MAC list was created?
11       A.   That would be the date that it was last
12  updated or printed.
13       Q.   Just for the record, that date is
14  May 24th, 2004.
15       Is IHC Exhibit 2 a document that was
16  created by IHC Health Plans in the ordinary course of
17  its business?
18       A.   Yes, it is.
19       Q.   And was it maintained by IHC Health Plans
20  in the ordinary course of its business?
21       A.   Yes, it is.
22       Q.   Okay.  The far left-hand column is titled

64

1   "GPI."  What is GPI?
2        A.   GPI is a Medispan term for generic
3   product ID.
4        Q.   Does it correspond to an NDC number?
5        A.   It does or can have several NDC numbers
6   that roll up under it.  Generic product ID is a ten
7   digit number that is first -- if you go to the far
8   left and follow those digits across, they roll into
9   therapeutic categories.  So the 33 -- you look at the
10  first one, 33 may indicate the therapeutic category
11  for that product.
12       As you go further over you start going
13  down into specific drugs and categories of drugs
14  within that product.  So if you look at the first
15  number on the sheet, that's specific to Acebutolol
16  Hydrochloride 200 milligrams.  If the two digits on
17  the end were to change, as you can see below, then you
18  move into a different strength.
19       Q.   Okay.  About halfway down the list on the
20  first page is an entry for acetaminophen; oxycodone
21  hydrochloride.  And under the column for "IHC MAC"
22  there's the notation "Off MAC."  Do you see that?

65

1        A.   Yes, I do.
2        Q.   What does that mean?
3        A.   That means that we have removed the MAC
4   for that product and will be paying it as an AWP
5   discount.
6        Q.   What explains the change?
7        A.   I cannot specifically tell you why that
8   would have gone off MAC.  The product may be in short
9   supply.  There may be production issues and pharmacies
10  are now -- there may be only one manufacturer of the
11  product currently and pharmacies cannot purchase at
12  the price that was set originally, which looks to be
13  19 cents a tablet.
14       Q.   And how would you find out that
15  pharmacies can no longer purchase at the price set in
16  the IHC Health Plans' MAC list?
17       A.   We will receive phone calls from
18  pharmacies saying, you're killing me.  We will
19  generally, based on the number of phone calls we
20  receive or the amount of communication between
21  ourselves and our contracted pharmacy network, then
22  proceed to investigate.  Is there -- is this the case?

Eric Cannon                    Highly Confidential           September 13, 2004
30(b)(6)                       Salt Lake City, UT

18 (Pages 66 to 69)

---

66

1   Can they not purchase for where we've sent the
2   product?
3       Q.   How often does it happen that you get
4   telephone calls from pharmacies indicating that the
5   MAC prices published and paid by IHC Health Plans are
6   too low?
7       A.   Frequently.  It may be weekly, may be
8   daily.  I can't say specifically.
9       Q.   How often are products included on IHC
10  Health Plans' MAC list taken off MAC?
11      A.   I would say it's infrequent that we take
12  something off MAC.  We may adjust the price based on
13  market dynamics that are influencing the purchasing of
14  the pharmacies.
15      Q.   Do products taken off MAC ever get put
16  back on the MAC list?
17      A.   Yes, they do.
18      Q.   So the same product may be reimbursed
19  based on IHC Health Plans' MAC price or based on a
20  discount off of AWP, depending on the time at which it
21  was purchased?
22      A.   Yes.

---

67

1       Q.   The fourth line from the bottom on the
2   first page is an entry for albuterol sulfate.  The old
3   price in the far right corner is indicated to be a
4   unit price of .349 cents?
5       A.   Yes.
6       Q.   The new price in the third to right
7   column is much lower; is that correct?
8       A.   Three cents is lower than 34 cents.
9       Q.   What explains the large price drop?
10      A.   I don't know.
11      Q.   In general what would cause IHC Health
12  Plans to lower their MAC prices?
13      A.   Awareness that there are multiple
14  manufacturers, that there is competition that is
15  driving down the price, what albuterol solution, in
16  this case, or syrup could be purchased for.
17      Q.   And what, in general, would cause IHC
18  Health Plans to raise its MAC price for a product?
19      A.   Indications that the price is raised.
20      Q.   And by indications of that the price is
21  raised do you mean the prices to -- prices paid by
22  pharmacies?

---

68

1       A.   Yes.
2       Q.   How often is the IHC Health Plans' MAC
3   list updated?
4       A.   We try and update it on a quarterly
5   basis, although based on prices going up and down we
6   generally try not to lower prices more than once a
7   quarter.  Although if prices do go up, we will raise
8   prices more frequently.
9       Q.   How does IHC Health Plans determine the
10  MAC prices that are published in it's MAC list?
11      A.   We try and make a best guess at the
12  actual acquisition cost of products by the pharmacies.
13  And that will involve and entail a line by line
14  evaluation of the products in comparison with
15  information we may obtain from people that work for us
16  and also work in pharmacies.  Information based on an
17  aggregate looking at WAC and average generic price in
18  Medispan, or in discussions we may have with our
19  colleagues at IHC Health Systems, Inc. indicating the
20  price is dropping.
21      Q.   Is there any particular formula that is
22  used by IHC Health Plans to calculate MAC?

---

69

1       A.   No.  It's a random shot in the dark.
2       Q.   MAC is also used by other managed care
3   organizations; is that correct?
4       A.   Yes, it is.
5       Q.   And other managed care organizations also
6   reimburse for pharmaceutical -- generic pharmaceutical
7   products based on MAC?
8       A.   Yes.
9       Q.   To your knowledge is there a standard
10  formula for MAC used by managed care organizations?
11      A.   No.
12      Q.   Does each managed care organization come
13  up with its own MAC prices?
14      A.   Each managed care organization comes up
15  with their own MAC pricing based on the arrangements
16  they may have either with their PBM or how they
17  process claims internally.  They may like to use
18  MAC -- the MAC of their PBM.  They elect to use the
19  MAC that's set by HCFA.  It varies by plan.
20      Q.   Why does IHC Health Plans not produce a
21  MAC list for branded products?
22      A.   Because the variation between AWP and

---

70
1 what the pharmacies purchase, because it does not vary
2 to the degree that it does with generic drugs, there
3 is no need to produce a brand name MAC list.
4      Q.   Why is there a closer relationship
5 between prices paid by pharmacies for branded products
6 and AWP and the -- than there is for prices paid by
7 pharmacies for generic products?
8      A.   Branded products face no competition for
9 their specific chemical entity or product that they
10 sell. Thus they're branded products with patten
11 protection. Generic products don't enjoy the same
12 luxury as branded products as far as competition.
13      Q.   How do you define "generic product"?
14      A.   I define generic product based and -- and
15 we at IHC define it -- based on the indication given
16 to it from Medispan or First Data Bank. Medispan or
17 First Data Bank says it's generic, then we believe it
18 is generic.
19      Q.   Are any generic products sold under a
20 brand name?
21      A.   There are branded products that are --
22 there are generic products that are -- just ignore all

71
1 that mumbling.
2      There are generics that are branded by
3 their generic manufacturer. So you may have a
4 manufacturer's particular brand of oxycontin that we
5 talked about earlier, that may carry a manufacture.
6 That manufacturer has branded it with its particular
7 name.
8      Q.   Do any products start out as branded
9 products and then become generic products?
10      A.   I would believe it's possible, but can't
11 think of any examples.
12      Q.   Okay. Have you heard of the term "usual
13 and customary"?
14      A.   Yes, I have.
15      Q.   And what do you understand that term to
16 mean?
17      A.   Usual and customary is the charge that a
18 pharmacy would sell a product to its cash paying
19 customers. That would be their usual and customary
20 charge for a particular product.
21      Q.   Do any IHC members or beneficiaries ever
22 pay usual and customary for pharmaceutical products

72
1 that are dispensed by pharmacies?
2      A.   It is possible that they do. Our
3 contracts and adjudication logic within our claims
4 system requires that pharmacies also submit to us
5 their usual and customary charge for a particular
6 prescription. We then look at the negotiated AWP
7 discount or MAC in comparison with their usual and
8 customary charge and pay the lesser of.
9      Q.   In general are usual and customary
10 charges higher than the negotiated rates that you have
11 with pharmacies?
12      A.   Yes.
13      Q.   But occasionally they are lower?
14      A.   Yes.
15      Q.   Have you heard of the term "FUL" or
16 "federal upper limit"?
17      A.   Yes.
18      Q.   What do you understand that to mean?
19      A.   I would understand that to be the federal
20 limit that under HCFA they are willing to pay for a
21 product.
22      Q.   For what types of products?

73
1      A.   My understanding was generics.
2      Q.   Does IHC Health Plans use FUL in
3 determining the price that it pays for any products?
4      A.   No.
5      Q.   Are you familiar with the term "ASP" or
6 "average sales price" in the context of pharmaceutical
7 products?
8      A.   Yes, I am.
9      Q.   And what's your understanding of the
10 meaning of that term?
11      A.   As I understand average sales price it is
12 a reimbursement logic that will be incorporated as a
13 result of the Medicare Modernization Act and will be a
14 price set through a third-party contractor of how the
15 human services that will then establish what the
16 average sale price of a product is.
17      As I understand average sales price,
18 manufacturers will be required to submit to the
19 federal government what the sale price -- actual sale
20 price of a drug to their providers or to their
21 customers is. And that average sale price will be all
22 inclusive of discounts, whether they're given up front

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

20 (Pages 74 to 77)

| | 74 |
|---|---|
| 1 | or as rebates. |
| 2 | Q.    To your knowledge has average sales price |
| 3 | been utilized by any private entity for reimbursing |
| 4 | for pharmaceutical products? |
| 5 | A.    To my knowledge, no. |
| 6 | Q.    Has IHC Health Plans ever considered |
| 7 | using average sales price as a basis for its |
| 8 | reimbursement in pharmaceutical products? |
| 9 | A.    At this point in time, no. |
| 10 | Q.    You mentioned previously that you had had |
| 11 | conversations with benefits consultants; is that |
| 12 | correct? |
| 13 | A.    Yes. |
| 14 | Q.    Has IHC Health Plans ever contracted the |
| 15 | services of any benefit consultant? |
| 16 | A.    No. |
| 17 | Q.    Has it considered using benefits |
| 18 | consultants in the past? |
| 19 | A.    No. |
| 20 | Q.    Why not? |
| 21 | A.    As a plan we have -- and let me take some |
| 22 | of that back, in that we have in the past contracted |

| | 75 |
|---|---|
| 1 | with and used Milliman U.S.A. to provide us with fee |
| 2 | schedules from across the country.  And we have used |
| 3 | those fee schedules as provided for Milliman in |
| 4 | setting reimbursement more on procedure and facility |
| 5 | codes, DRG's.  To my knowledge at this point we have |
| 6 | not used any of the Milliman data to establish fee |
| 7 | schedules around pharmaceutical products. |
| 8 | Q.    And what context did you previously have |
| 9 | discussions with benefits consultants about the |
| 10 | meaning of AWP? |
| 11 | A.    That would be in meetings that I attend |
| 12 | that may also be attended by benefit consultants. |
| 13 | That may be in the context of my meeting with an |
| 14 | employer who has hired a benefits consultant to help |
| 15 | them in their contract negotiation or RFP process for |
| 16 | a health insurer.  That may be as the benefit |
| 17 | consultants are doing presentations, either in |
| 18 | conjunction with pharmaceutical company or at |
| 19 | conferences. |
| 20 | Q.    Are benefits consultants available for |
| 21 | hire to provide consulting advice regarding |
| 22 | pharmaceutical benefits? |

| | 76 |
|---|---|
| 1 | A.    Yes, they are. |
| 2 | Q.    Are they available for hire by managed |
| 3 | care organizations? |
| 4 | A.    Yes, they are. |
| 5 | Q.    Are they available for hire by employers? |
| 6 | A.    Yes, they are. |
| 7 | Q.    Let's take another ten-minute break, if |
| 8 | that's all right. |
| 9 | A.    That's fine. |
| 10 | (There was a break taken.) |
| 11 | MR. EVERETT:  Back on the record. |
| 12 | Q.    How does IHC Health Plans reimburse for |
| 13 | pharmaceutical products sold through pharmacies? |
| 14 | A.    For products sold through pharmacies we |
| 15 | reimburse off an AWP minus or MAC pricing.  Injectable |
| 16 | drugs dispensed in a pharmacy fall under our |
| 17 | injectable drug fee schedule, which is typically based |
| 18 | on or around AWP. |
| 19 | Q.    I guess you testified previously that you |
| 20 | only use MAC prices for generics; is that correct? |
| 21 | A.    Yes, we do. |
| 22 | Q.    Are any generics reimbursed based on AWP? |

| | 77 |
|---|---|
| 1 | A.    Yes, they are. |
| 2 | Q.    Which generics? |
| 3 | A.    I couldn't tell you. |
| 4 | Q.    What leads you to reimburse pharmacies |
| 5 | for some generic products based on AWP instead of MAC? |
| 6 | A.    We -- products are reimbursed based off |
| 7 | of MAC when it becomes apparent to us that there's |
| 8 | significant price differences between AWP or WAC and |
| 9 | what the pharmacy is purchasing the product for. |
| 10 | Q.    How does it become apparent to you that |
| 11 | there is a significant difference between AWP or WAC |
| 12 | and actual acquisition cost? |
| 13 | A.    As we track the market for generics and |
| 14 | there become numerous manufacturers of that, we may |
| 15 | see in a newsletter or something that an additional |
| 16 | generic manufacturer is now going to be supplying a |
| 17 | product through The Pink Sheet. |
| 18 | We may see that additional manufacturers |
| 19 | also got approval to market a generic, and then as |
| 20 | competition grows within that particular category for |
| 21 | that particular drug we then know the price will drop. |
| 22 | We may receive information from pharmacies or |

Eric Cannon      Highly Confidential      September 13, 2004
30(b)(6)      Salt Lake City, UT

21 (Pages 78 to 81)

78

1   physicians that price is significantly lower.
2      As I'm shopping at Costco I may notice
3   that a particular generic drug is listed on their
4   board at a very low price. I may have physicians tell
5   me that. I may have members tell me that. And we
6   adjust our prices according.
7     Q.   And IHC Health Plans reimburses for
8   branded products at a discount off of AWP?
9     A.   That is correct.
10     Q.   How does IHC Health Plans determine what
11   discount to offer off of AWP?
12     A.   I think we try and set that discount off
13   of AWP at whatever the market will bear, and we come
14   to those pricing determinations through negotiations
15   with our pharmacy partners that are contracted in our
16   network.
17     Q.   So there's a negotiation process
18   associated with the prices charged by IHC Health
19   Plans?
20     A.   Yes, there is.
21     Q.   And every price charged by IHC Health
22   Plans for branded pharmaceutical products is the

79

1   result of negotiations with pharmacies?
2     A.   Yes.
3     Q.   I'm going to hand to you three documents
4   that have been marked as IHC Deposition Exhibits 3, 4
5   and 5.
6   (Exhibit Cannon 003, Exhibit Cannon 004, Exhibit Cannon 005
7   were marked for identification.)
8     Q.   BY MR. EVERETT: For the record, IHC
9   Deposition Exhibit 3 is a document bearing the Bates
10   Numbers IHC AWP 139 through IHC AWP 152. Deposition
11   Exhibit 4 is a document bearing the Bates Numbers IHC
12   AWP 153 through IHC AWP 166. And IHC Deposition
13   Exhibit 5 is a document bearing the Bates Numbers IHC
14   AWP 167 through IHC AWP 180. Take a moment and look
15   through those exhibits.
16     MR. LAWLOR: I'm wondering if -- there
17   seems to be, on these exhibits, there seems to be a
18   numbering issue on -- at least on these two.
19     MR. EVERETT: Okay.
20     MR. LAWLOR: I think there's 153 then
21   168.
22     MR. EVERETT: I think maybe the title

80

1   page got reversed. Is that the case also on the ones
2   that you have there?
3     THE WITNESS: No, it goes --
4     MR. LAWLOR: It's probably just mine
5   then.
6     Q.   BY MR. EVERETT: Have you had a chance to
7   look at those three documents?
8     A.   Yes.
9     Q.   Are you familiar with those three
10   documents?
11     A.   Yes, I am.
12     Q.   What is IHC Exhibit 3?
13     A.   IHC Exhibit 3 is our standard contract
14   template as used with the chain pharmacies that
15   participate in our pharmacy network.
16     Q.   And was that document created and
17   maintained by IHC Health Plans in the ordinary course
18   of its business?
19     A.   Yes, it was.
20     Q.   Have you used the template in IHC
21   Deposition Exhibit 3 in any negotiations with chain
22   pharmacies?

81

1     A.   Yes, we have.
2     Q.   Has IHC Health Plans entered into any
3   contracts using the terms of IHC Exhibit 3?
4     A.   Yes, we have.
5     Q.   All right. Are you familiar with the
6   document that has been marked as IHC Exhibit 4?
7     A.   Yes, I am.
8     Q.   And what is that document?
9     A.   That is the document we use with
10   independent pharmacies or pharmacies that are owned by
11   a sole proprietor that are not affiliated with other
12   pharmacies.
13     Q.   Okay. And the same question: Is IHC
14   Exhibit 4 a document that was created and maintained
15   by IHC Health Plans in the ordinary course of its
16   business?
17     A.   Yes.
18     Q.   And has IHC Health Plans used that
19   contract template in its negotiations with any
20   independent pharmacies?
21     A.   Yes, we have.
22     Q.   Has IHC Health Plans entered into any

Eric Cannon                    Highly Confidential              September 13, 2004
30(b)(6)                       Salt Lake City, UT

22 (Pages 82 to 85)

---

**82**

1  contracts with the terms that are set out in IHC
2  Deposition Exhibit 4?
3      A.   Yes, we have.
4      Q.   IHC Deposition Exhibit 5. Are you
5  familiar with that document?
6      A.   Yes, I am.
7      Q.   And what is that?
8      A.   That's the contract template used with
9  rural pharmacies.
10     Q.   Is IHC Deposition Exhibit 5 a document
11 that was created and maintained by IHC health plans in
12 the ordinary course of its business?
13     A.   Yes.
14     Q.   Has IHC Health Plans entered into any
15 contracts with rural pharmacies having the terms that
16 are set out in IHC Deposition Exhibit 5?
17     A.   Yes.
18     Q.   When were these contract templates
19 created?
20     A.   These were created in 1999. At that time
21 we were bringing pharmacy benefit management services
22 in house. We would no longer be using the pharmacy

---

**83**

1  network that had been contracted by Medco.
2      Q.   Are these templates still used in
3  negotiations with pharmacies?
4      A.   Yes, they are.
5      Q.   Prior to 1999 did IHC Health Plans
6  contract directly with any pharmacies?
7      A.   Between and probably prior to 1993, but
8  up until 1996, IHC did contract directly with
9  pharmacies. In 1996 IHC Health Plans made the
10 decision to switch PBMs and go with Medco. As part of
11 that PBM negotiation there was a change. IHC Health
12 Plans made the decision to use the Medco pharmacy
13 network.
14     Q.   The reimbursement terms for the -- for
15 IHC Deposition Exhibit 3 are set out on Page IHC AWP
16 149. Would you turn to that page.
17     A.   Yes.
18     Q.   At the bottom of the page there are some
19 pricing terms. Do you see those?
20     A.   Yes, I do.
21     Q.   And those pricing terms are for brand
22 name drugs payment at AWP minus 15 percent plus $2, or

---

**84**

1  MAC plus $2; is that correct?
2      A.   Yes.
3      Q.   And for generic drugs it indicates that
4  the price paid will be either the lower of AWP minus
5  15 percent plus $2.50 or MAC plus $2.50; is that
6  correct?
7      A.   Yes.
8      Q.   Will you turn to Page IHC AWP 163 in
9  Deposition Exhibit 4. And Deposition Exhibit 4 is the
10 contract template that IHC Health Plans uses with
11 independent pharmacies; is that correct?
12     A.   Yes, it is.
13     Q.   And pricing terms are, again, set out at
14 the bottom of IHC AWP 163; is that correct?
15     A.   Yes.
16     Q.   And those pricing terms are identical to
17 the pricing terms for chain pharmacies that are set
18 out in IHC AWP 149, except that the discount off of
19 AWP is 13.5 percent instead of 15 percent; is that
20 correct?
21     A.   Yes, it is.
22     Q.   Would you please turn to Page IHC AWP 177

---

**85**

1  in deposition -- IHC Deposition Exhibit 5. IHC
2  Deposition Exhibit 5 is the contract template that IHC
3  plan uses with rural pharmacies; is that correct?
4      A.   Yes, it is.
5      Q.   The pricing terms that are set out on
6  Page IHC AWP 177 are identical to pricing terms that
7  are set out in the contract templates for chain
8  pharmacies and independent pharmacies, except that the
9  discount off of AWP is ten percent instead of 13.5
10 percent or 15 percent; is that correct?
11     A.   Yes, it is.
12     Q.   Are there any other differences between
13 the contract templates besides the difference -- the
14 discounts off of AWP?
15     A.   No, there is not.
16     Q.   Okay. And AWP minus 15 percent
17 represents a lower price paid by IHC Health Plans than
18 AWP minus ten percent; is that correct?
19     A.   Yes, it does.
20     Q.   Why does IHC Health Plans pay a lower
21 price to chain pharmacies than it does to independent
22 pharmacies?

---

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

23 (Pages 86 to 89)

86

1    A.    We pay a lower price to chain pharmacies
2  because we were able to negotiate a lower rate with
3  chain pharmacies.  Some of that revolves around the
4  business model of a chain pharmacy versus an
5  independent pharmacy.  Independent pharmacies are less
6  likely to be reliant on revenue from the front end of
7  their store in things that are not prescription drug
8  to keep their business profitable.
9         There is some belief, although I have no
10  evidence of it, that because of the size of the chain
11  pharmacies, the fact that they have warehouses, that
12  their purchasing power is greater and they may be able
13  to acquire the products for less money.
14    Q.    Okay.  And why does IHC Health Plans pay
15  less to independent pharmacies than it pays to rural
16  pharmacies?
17    A.    Or why do we -- you got it reversed.
18    Q.    Did I get it reversed?
19    A.    We pay less to rural pharmacies than we
20  do independent pharmacies, in that we define a rural
21  pharmacy as a pharmacy that does not have any
22  competition within a 25 to 30 mile radius.

87

1         In that instance, and specifically within
2  Utah, Idaho, Wyoming, there are very small towns that
3  are reliant upon a single pharmacist to provide
4  pharmaceuticals into that community.  That pharmacist
5  may not have the volume growth opportunity or the
6  ability to have volume to make his revenue that even
7  an independent pharmacy or a chain pharmacy has in a
8  larger metropolitan area.
9         Also based on the fact that he has no
10  competition.  It puts us in a tighter negotiation
11  situation in that we need that pharmacist in our
12  network to provide coverage for our members.
13    Q.    Let me see if I can characterize a little
14  bit that testimony.
15         Is one of the factors that leads IHC
16  Health Plans to pay more to rural pharmacies the
17  competitive -- the competitive leverage that is
18  exercised by rural pharmacies?
19    A.    Yes.
20    Q.    And does the variation in payments made
21  by IHC Health Plans to chain pharmacies, independent
22  pharmacies and rural pharmacies reflect, in part, IHC

88

1  Health Plans' estimate of the acquisition costs of
2  those pharmacies?
3    A.    Yes, it does.  Although we would also
4  estimate that because a rural pharmacy is trying to
5  survive on a much smaller volume in a much smaller
6  community, that they may not be able to garner the
7  purchasing power of a pharmacy in a larger
8  metropolitan area.
9    Q.    Each of the pricing terms that we went
10  through previously for the contract templates has a
11  discount off of AWP plus some fixed dollar amount; is
12  that correct?
13    A.    Yes, it does.
14    Q.    What does the fixed dollar amount
15  represent?
16    A.    The fixed dollar amount represents a
17  dispensing fee for dispensing that prescription.  We
18  are looking at, in the first part of the equation, the
19  AWP minus or in the MAC establishing a discount for
20  the cost of the product.  The dispensing fee is in
21  place in those situations where we need additional
22  dollars to cover the labor or the bottled or the

89

1  services provided by that pharmacy to our member in
2  addition to the cost of the product.
3         We may have a product that we have
4  discounted it AWP minus 15 percent.  In a prescription
5  the pharmacist may dispense one, two or three tablets,
6  not allowing enough revenue to cover the cost of the
7  services that were provided.
8    Q.    Do you believe that the dispensing fees
9  that you just discussed are sufficient to cover the
10  pharmacy's costs of providing pharmaceutical pharmacy
11  services?
12    A.    No, I do not.
13    Q.    Do you believe that pharmacies earn some
14  margin on their sales of pharmaceutical products?
15    A.    Yes, I do.
16    Q.    Do you believe that pharmacies mark up
17  their pharmaceutical products that they dispense and
18  charge IHC Health Plans more than they paid to
19  purchase those products?
20    A.    Yes, I do.
21    Q.    Why is the dispensing fee for generic
22  products higher than the dispensing fee for branded

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

24 (Pages 90 to 93)

**90**

1  products?
2      A.    Generic products cost less, and so if you
3  go into the example I gave earlier of two or three
4  tablets, or even 30 tablets, there's less -- and with
5  an aggressive MAC price there's less opportunity to
6  make revenue on the generic product. And we believe
7  that the pharmacist is entitled to make money on those
8  prescriptions.
9          They also provide services for our
10  members beyond simply giving them a prescription.
11  They may be imparting knowledge, reviewing their
12  pharmaceutical history, evaluating a patient's profile
13  for drug interactions, drug age interactions, drug
14  food interactions. And we need to provide
15  compensation for those additional services provided.
16          We also pay more for generics on the
17  dispensing fee in that generics cost less money.
18  It is in our best interest to incentivize pharmacists
19  to dispense you generic drugs because it works towards
20  our overall goal of keeping pharmaceutical costs down.
21      Q.    Do you think that the margin that
22  pharmacists earn on their sales of the pharmaceutical

**91**

1  products differs based on the product?
2      A.    Yes.
3      Q.    IHC Health Plans pays pharmacies a
4  standard for branded products at a standard discount
5  off of AWP; is that correct?
6      A.    Yes, we do.
7      Q.    And in some cases that payment will
8  represent a larger spread between the price that IHC
9  Health Plans is paying and the price that the pharmacy
10  purchased it than for other products; is that correct?
11      A.    Yes.
12      Q.    In setting the reimbursement rate for
13  pharmacies is IHC health plans interested in the
14  margins that the pharmacy may earn on a product by
15  product basis?
16      A.    No.
17      Q.    In setting the reimbursement rates for
18  pharmacies is IHC Health Plans interested instead in
19  ensuring that pharmacies earn a reasonable margin on
20  all of their -- the pharmaceutical products that they
21  dispense?
22      A.    Yes.

**92**

1      Q.    All right. I have some particular
2  questions about the agreements.
3          If you would turn, please, to IHC AWP
4  140, which is in Exhibit 3. The last line of the
5  first paragraph reads:
6              "This agreement does not apply to the
7              IHCMed product unless Pharmacy has
8              signed the separate IHCMed addendum."
9          Do you see that?
10      A.    Yes, I see that.
11      Q.    Why is the IHCMed product exempted from
12  the contract?
13      A.    The IHCMed product, as you'll recall from
14  earlier discussions, is a limited network product in
15  that we've attempted to reduce the size of that
16  network to garner greater control over it and deeper
17  discounts.
18          The IHCMed discount is AWP minus 15
19  percent plus $2 or 2.50 on generics. So technically
20  all chain pharmacies, based on accepting an AWP minus
21  15 percent discount, would also accept automatically
22  that AWP minus 15 percent discount for IHCMed.

**93**

1          Independent pharmacies have to express
2  greater willingness to participate in that network and
3  accept that AWP minus 15 percent. That's a product
4  that's only offered along the Wasatch Front, which
5  would be 30 to 40 miles north of Salt Lake and 30 to
6  40 miles south of Salt Lake, and in the Park City
7  area. So in that metropolitan area there are no rural
8  pharmacies.
9      Q.    About how many pharmacies have signed the
10  separate IHCMed addendum?
11      A.    I don't know. Most.
12      Q.    Most pharmacies. Have most independent
13  pharmacies as well as chain pharmacies?
14      A.    Yes.
15      Q.    In the definition of average wholesale
16  price on Page IHC AWP 140, the contract template
17  indicates that:
18              "The AWP shall be based on the
19              quantity ordered by the Pharmacy
20              (100, 500, 1,000) and not the price
21              of a lower quantity."
22          Do you see that?

94

1    A.    Yes, I do.
2    Q.    Does the AWP for a product differ based
3  on quantity?
4    A.    Yes, it does.
5    Q.    How substantial, in your experience, are
6  those differences?
7    A.    Small, although I think there may be
8  instances where if you went from a package size of 100
9  and looked at the per unit cost compared to the
10 package size of a 5,000 count you may have as high as
11 seven or eight percent difference.
12   Q.    Is the -- is this definition referring to
13 the quantity that is purchased by the pharmacy or the
14 quantity that's dispensed by the pharmacy?
15   A.    It's referring to the quantity purchased
16 by the pharmacy.  Did they purchase that product in a
17 bottle of 100 or was it in a bottle of 500?  Was it in
18 a bottle of 1,000?
19   Q.    Why is this qualification recommended to
20 the definition of average wholesale prices?
21   A.    First so that we obtain any price
22 differential or discount in those pharmacies that are

95

1  purchasing in bigger bottles.  Secondly, so that we
2  have an audit mechanism.  We have contract language
3  around what we expect the pharmacy to do.
4    Q.    And have you audited any of the
5  pharmacies with which you have contracts?
6    A.    Yes, we have.
7    Q.    What did you explore in those audits?
8    A.    We explore in those audits was the
9  product for which we were billed.  Was it actually
10 dispensed to the member?  Is there evidence that the
11 member picked up the prescription?  If we were billed
12 for a product coming out of a bottle with a quantity
13 of 100, is that actually the bottle or the purchase
14 history of the pharmacy?
15        We will look to see that a pharmacy may
16 continually bill us for product coming out of the
17 bottle size or bottle count of 100, yet on their
18 shelves in the pharmacy they can still have bottles of
19 1,000 or 5,000.
20   Q.    How do you determine the purchase history
21 of a pharmacy?
22   A.    We may ask for their purchase records.

96

1    Q.    To have pharmacies provide IHC Health
2  Plans their purchase records?
3    A.    In the past during audits we have not
4  asked to see purchase records.  Although based on the
5  belief of an auditor, we may go back to a pharmacy and
6  ask them to justify why we were billed with a bottle
7  count of 100, yet upon audit they didn't have any
8  bottle counts of 100 on the shelf.
9    Q.    Does IHC Health Plans employ outside
10 auditors for these audits?
11   A.    We have used pharmacists that are
12 employed by IHC Health Plans and we have contracted
13 with outside auditors for these audits.
14   Q.    So there are pharmacists who are employed
15 by IHC Health Plans?
16   A.    Yes, there are.
17   Q.    In what capacity are they employed by IHC
18 Health Plans?
19   A.    I have currently a manager of pharmacy
20 services that replaced me.  I have two clinical
21 pharmacists that work on more product by product
22 reviews.  They function much in the role I did as

97

1  pharmacy utilization coordinator, looking at prior
2  authorization, reviewing products for the pharmacy
3  therapeutics committee, working with physicians on
4  prescribing patterns or dissemination of clinical
5  information.
6    Q.    If you would turn now in the same exhibit
7  to Page IHC AWP 144.  In Section 3.8, which is titled
8  "Formulary" the second to last sentence reads:
9         "Pharmacy agrees to comply with
10        additional formulary and compliance
11        programs implemented by IHC Health
12        Plans."
13        Do you see that?
14   A.    Uh-huh.
15   Q.    What formulary compliance plans have been
16 implemented by IHC Health Plans?
17   A.    We have -- and I think this language is
18 more out of asking the pharmacy to participate and
19 accept our designation between formulary and non
20 formulary.  Specific programs are hard, in my mind, to
21 come by.  Although if you go back to 1997, '98 and
22 '99, we had, and you'll recall in our structure, my

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

26 (Pages 98 to 101)

---

98

1 explaining that we had a pharmacy call center.
2 Formulary compliance programs would have been calling
3 and saying such and such a patient has agreed, along
4 with their physician, to switch from Product A to
5 Product B. And this language is to make sure that
6 that pharmacy is also willing to comply with that
7 switch.
8     Q.   Okay. Does IHC Health Plans reimburse
9 for any non formulary pharmaceutical products?
10    A.   Yes, we do.
11    Q.   What's the basis of that reimbursement?
12    A.   It's the same and -- is that a rate
13 question or is that a why question?
14    Q.   No. It is a rate question. At what rate
15 does IHC Health Plans reimburse for non formulary to
16 products dispensed?
17    A.   We reimburse at the same rate for non
18 formulary product that we reimburse for formulary
19 products.
20    Q.   Are the co-payments paid by members
21 different for non formulary products than they are for
22 formulary products?

---

99

1     A.   Yes, they are.
2     Q.   What is the difference?
3     A.   That would depend on the plan or the
4 co-pay differentials purchased by that employer.
5     Q.   In general are the co-payments for non
6 formulary products higher than for formulary products?
7     A.   Yes, they are.
8     Q.   These are all template contracts,
9 Exhibits 3, 4 and 5. And Exhibits 3, 4 and 5 all have
10 pricing terms in them. Has IHC Health Plans entered
11 into any contracts with pharmacies that have pricing
12 terms different than those set out in the template
13 contracts?
14    A.   For products reimbursed under the
15 pharmacy benefit, no.
16    Q.   Are some pharmaceutical products
17 reimbursed under a medical benefit?
18    A.   Yes.
19    Q.   Are those products -- are there any
20 products dispensed by pharmacies that are reimbursed
21 in the medical benefit?
22    A.   Yes.

---

100

1     Q.   Has IHC Health Plans entered into any
2 contracts with pharmacies for products reimbursed
3 under medical benefit that have different pricing
4 terms than those set out in Exhibits 3, 4 and 5?
5     A.   Yes, we have.
6     Q.   Which contracts?
7     A.   There is an addendum to this contract
8 that includes miscellaneous DME supplies and
9 injectable drugs.
10    Q.   I'm handing to you now a document that's
11 been marked as IHC Deposition Exhibit 6.
12    (Exhibit Cannon 006 was marked for identification.)
13    Q.   BY MR. EVERETT: Which is a document
14 bearing the Bates Numbers IHC AWP 182 through IHC AWP
15 186. Do you recognize this document?
16    A.   Yes, I do.
17    Q.   What is it?
18    A.   This is the amendment to the current
19 retail pharmacy agreement that would include durable
20 medical equipment, miscellaneous medical supply and
21 injectable drugs.
22    Q.   Is this the addendum to which you were

---

101

1 just referring?
2     A.   Yes, it is.
3     Q.   Is IHC Deposition Exhibit 6 a document
4 that was created and maintained by IHC Health Plans in
5 the ordinary course of its business?
6     A.   Yes, it is.
7     Q.   Has IHC Health Plans entered into any
8 contracts with the terms that are set out in IHC
9 Deposition Exhibit 6?
10    A.   Yes, we have.
11    Q.   When was this amendment created?
12    A.   My best guess -- I apologize that it's a
13 guess -- is late 2002, early 2003. Possibly before
14 that.
15    Q.   And has IHC Health Plans offered to enter
16 into contracts with pharmacies on the basis of the
17 terms set out in IHC Deposition Exhibit 6 since late
18 2002 or early 2003 when the document was first
19 created?
20    A.   Yes, we have.
21    Q.   Has -- has IHC Health Plans offered to
22 enter into contracts having the terms set out in IHC

---

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

27 (Pages 102 to 105)

102

1   Deposition Exhibit 6 with all of the retail pharmacies
2   with which it has contracts?
3       A.   No, we have not.
4       Q.   To which retail pharmacies has IHC Health
5   Plans offered to enter into an agreement along the
6   lines of IHC Deposition Exhibit 6?
7       A.   Those pharmacies that have expressed an
8   interest in the ability to supply injectable drugs or
9   miscellaneous medical supplies to our members. In
10  general that has been limited to a few independent
11  pharmacies. The retail pharmacies owned and operated
12  by IHC, and to the best of my knowledge we don't
13  currently have any chain pharmacies that are
14  participating with this amendment.
15      Q.   Prior to 2002 did IHC Health Plans
16  reimburse for any durable medical equipment or
17  miscellaneous medical supplies that were sold by
18  pharmacies?
19      A.   We would reimburse solely on the basis of
20  a member paying cash or the full price to the pharmacy
21  and then submitting the receipts to us.
22      Q.   And for cash paying members were they

103

1   paying what we previously referred to as usual and
2   customary?
3       A.   I would assume they were. I have no
4   knowledge as to what they actually paid.
5       Q.   And would IHC Health Plans reimburse its
6   members for the full amount of payments they made to
7   pharmacies for these types of products?
8       A.   We would, less their co-insurance for
9   member responsibility.
10      Q.   Why did IHC Health Plans begin in late
11  2002 or early 2003 to offer this contract amendment?
12      A.   We had very expensive injectable drugs
13  that members could not afford to pay for up front that
14  we needed to be able to provide reimbursement for. By
15  nature of the fact that they were expensive injectable
16  drugs, we wanted to be able to make sure we were
17  paying our fee schedule and not just billed charges
18  from a pharmacy.
19      Q.   Are the injectable drugs that are covered
20  by IHC Exhibit 6 injected by physicians in their
21  offices?
22      A.   No.

104

1       Q.   These products are -- how are these
2   products administered?
3       A.   These products would be self-administered
4   injectables, and that we would assume the member could
5   inject themselves with it or a family member could
6   inject them.
7       Q.   Let's talk a little bit about IHC Health
8   Plans' previous relationships with PBMs.
9            You've testified previously that IHC
10  Health Plans had a contract with Medco; is that
11  correct?
12      A.   Yes, that is correct.
13      Q.   When did IHC Health Plans enter into that
14  contract?
15      A.   1996. Effective date on the contract was
16  1996.
17      Q.   What were the terms of the contract, if
18  you recall?
19      A.   As I recall the terms of the contract
20  were for pharmacy claims processing services. And we
21  paid Medco a per claim fee to process those claims,
22  provide a contract pharmacy network and reimburse the

105

1   pharmacies. We paid them as part of the term of that
2   contract to provide help desk support for pharmacies
3   and members as they may have questions or claims
4   problems.
5       Q.   Merck Medco -- or Medco created its own
6   pharmacy network; is that correct?
7       A.   They had a network in place at the time
8   the contract was signed.
9       Q.   Did IHC Health Plans contract directly
10  with pharmacies during the period of time that it had
11  a contract with Medco?
12      A.   No, we did not.
13      Q.   Did Medco contract with those pharmacies?
14      A.   Yes, they did.
15      Q.   Do you know the basis of payments made by
16  Medco to the pharmacies of its network for
17  pharmaceutical products dispensed to members of IHC
18  Health Plan?
19      A.   No, I do not.
20      Q.   Did you ask Medco what it was paying
21  pharmacies for products dispensed to members of IHC
22  Health Plan?

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

28 (Pages 106 to 109)

---

106

1    A.   Yes, I did.
2    Q.   And what did they tell you?
3    A.   That pharmacies were being paid what I
4  was being charged, which at the time was AWP minus the
5  13 percent plus $2 or 2.50.  And the AWP minus was the
6  lower of AWP minus or MAC.
7    Q.   Did you believe Medco?
8    A.   No.
9    Q.   Why not?
10   A.   Based on conversations with pharmacists
11 they would tell me that they were being reimbursed
12 less. It was my recollection, although not perfect
13 recollection at the time, that when I worked in the
14 community we were being reimbursed less. And at the
15 same time I knew there were also pharmacies that were
16 being reimbursed more.
17   Q.   Did you believe that the per claim fee
18 paid by IHC Health Plans was sufficient to cover the
19 costs associated with all of the services provided by
20 Medco to IHC Health Plans?
21   A.   Yes, I did.
22   Q.   Is there a competitive market for

---

107

1  providing pharmacy benefit management services?
2    A.   Yes.
3    Q.   Prior to entering into a contract with
4  Medco in 1996, did IHC Health Plans have contractual
5  relationship with any other PBM?
6    A.   Yes, they did.
7    Q.   Which PBM?
8    A.   Argus.
9    Q.   For what period of time did IHC Health
10 Plans have a contract with Argus?
11   A.   1993 through the end of 1995.
12   Q.   Why did IHC Health Plans decide to change
13 from Argus at the end of 1995?
14   A.   I don't know. That's prior to my coming
15 to IHC.
16   Q.   At the end of 1995 did IHC Health Plans
17 solicit bids from more than one PBM?
18   A.   I would assume they did. I don't know.
19   Q.   Do you know if IHC Health Plans made a
20 formal request for proposal from PBMs at the end of
21 1995?
22   A.   No, I do not.

---

108

1    Q.   Do you know the terms of the contract
2  that IHC Health Plans had with Argus?
3    A.   The terms of that contract included a per
4  claim fee to cover the processing of claims. All
5  pharmacy help desk services, member help desk
6  services, were internal to IHC. IHC contracted the
7  pharmacy network and paid the pharmacy network. Under
8  that arrangement Argus was, from the best I can tell,
9  simply processing the claims.
10   Q.   Do you know the terms of IHC's contracts
11 with pharmacies in the period prior to 1996?
12   A.   I know generally where they were,
13 although it's been quite some time since I've actually
14 looked at those contracts. They were in the range of
15 AWP minus ten percent to 20 percent.
16   Q.   And the contract that IHC Health Plans
17 entered with Medco in 1996 -- strike that.
18        Under the contract that IHC Health Plans
19 had with Medco starting in 1996, IHC Health Plans paid
20 Medco AWP minus 13 percent for drugs dispensed through
21 pharmacies; is that correct?
22   A.   That is correct.

---

109

1    Q.   And so IHC Health Plans was paying less
2  for products dispensed through pharmacies under its
3  contract with Medco than it was prior to its contract
4  with Medco; is that correct?
5    A.   Yes, that's correct.
6    Q.   Did the contract with Medco have any
7  provisions dealing with rebates from manufacturers?
8    A.   Under the contract with Medco, as I
9  recall there were to be no rebates collected from
10 manufacturers by Medco. That all manufactured
11 contracting and rebates were to be handled by IHC
12 internally.
13   Q.   And as you testified previously IHC
14 Health Plans, during the period from 1996 to 1999 when
15 it had a contract with Medco, independently contracted
16 with pharmaceutical manufacturers for rebates; is that
17 correct?
18   A.   Yes, that is correct.
19   Q.   And those rebates had the affect of
20 decreasing the cost of pharmaceutical products paid by
21 IHC Health Plans; is that correct?
22   A.   Yes.

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

29 (Pages 110 to 113)

110

1    Q.    When did the contract with Medco expire?
2    A.    It expired December 31st of 1988 and was
3    extended through September 30th of 1999.
4    Q.    Just to clarify, it expired at the end of
5    1998?
6    A.    Yes. It was '96, '97, and '98. So three
7    year contract. In October, November of 1998 we made a
8    decision to more closely evaluate our current
9    arrangement with PBM. In the fall of 1998 we did
10   issue an RFP looking at PBM vendors and data service
11   center providers that might meet our needs. And then
12   in January of '99 the contract was extended for nine
13   months to accommodate our switching.
14   Q.    How many responses did you receive to the
15   RFP that was sent out at the end of 1998?
16   A.    Five or six.
17   Q.    Is that five to six responses from PBMs?
18   A.    That would be from four or five true
19   PBMs, and then one response from Prospective Health,
20   which was more a software vendor service center
21   provider.
22   Q.    Did the responses by the four to five

111

1    PBMs to IHC Health Plans RFP vary?
2    A.    Yes.
3    Q.    In what way did they vary?
4    A.    They varied in the level of services that
5    could be provided. They varied in the flexibility of
6    the platform they offered for claims adjudication.
7    They varied in terms of pharmacy network size, levels
8    of discounts that could be garnered. They varied in
9    the level of performance guarantees they were willing
10   to offer. They varied in the level of services they
11   were willing to provide for IHC or the control they
12   were willing to allow IHC to have over the
13   adjudication of claims.
14   Q.    Did any of the RFP's -- strike that. I'm
15   sorry.
16          Did any of the responses to the RFP
17   indicate that a PBM intended to earn a margin between
18   the price at which it paid the pharmacies for
19   pharmaceutical products and the price that it charged
20   IHC Health Care?
21   A.    Yes.
22   Q.    Which PBM?

112

1    A.    MedImpact.
2    Q.    Do you recall what terms it was offering
3    in that respect?
4    A.    I think we had asked for a -- I can't
5    exactly recall what terms we had asked for in the RFP,
6    or if we had even asked for specific terms. I do
7    recall that within the RFP we had a question asking
8    how the PBM would document and guarantee to us that
9    the terms negotiated with the pharmacy were actually
10   the terms that IHC Health Plans would pay for claims.
11          And the template contract -- and I can't
12   remember the exact explanation to the question from
13   MedImpact -- but I do remember discussions that we had
14   on the phone with MedImpact at the time over language
15   in the template contract or boiler plate contract that
16   was in the RFP that indicated that if MedImpact could
17   achieve deeper discounts from pharmacies, they would
18   guarantee an overall network rate to us, but deeper
19   discounts or a spread they were allowed to keep.
20   Q.    And is that a pricing term that was
21   attractive to IHC?
22   A.    No.

113

1    Q.    Were MedImpact's other fees lower as a
2    result of the potential to earn a spread?
3    A.    No.
4    Q.    The other responses to the RFP indicated
5    that the PBM responding to the RFP did not intend to
6    earn a spread on pharmaceutical products that were
7    reimbursed to the pharmacies?
8    A.    I don't recall. I think, quite honestly,
9    in looking at some of the pricing terms over the size
10   of some of the PBMs or going off of past history with
11   previous PBMs, some of those questions did not come up
12   because the true willingness of IHC to ultimately go
13   with that provider probably didn't exist.
14   Q.    In deciding which PBM to contract with
15   was it important for IHC Health Plans to evaluate all
16   of the terms in the contract?
17   A.    Yes.
18   Q.    Including level of services?
19   A.    Yes.
20   Q.    Including the flexibility of their
21   platforms?
22   A.    Yes.

Eric Cannon                      Highly Confidential                September 13, 2004
30(b)(6)                         Salt Lake City, UT

30 (Pages 114 to 117)

114

1    Q.    Including the size of their pharmacy
2    networks?
3    A.    Yes.
4    Q.    Including any performance guarantees that
5    were offered as part of the contract?
6    A.    Yes.
7    Q.    Ultimately IHC Health Plans decided not
8    to contract with the PBM in 1999; is that correct?
9    A.    Yes, that is.
10   Q.    And how did IHC Health Plans decide to
11   essentially take the pharmacy benefit management
12   services in house?
13   A.    In looking at the arrangement that we had
14   at the time with Merck Medco, in looking at an
15   evaluation of our claims that had been processed by
16   Medco, we came to the determination that there were
17   various areas by which we could save money if we were
18   to switch away from Medco and correct some of those
19   ongoing issues.
20   Q.    In which areas did IHC Health Plans
21   believe it could save money compared to its contract
22   with Medco?

115

1    A.    We had, at the time, documented lost
2    money based on system setup issues with Medco. The
3    designated products to process one way when they
4    should have processed another. So we had some money
5    that we believed we could save there.
6          At the time I was doing an evaluation of
7    generic products and what they were being purchased
8    for and what Medco was reimbursing them at or were
9    they at their MAC price set. We believed there was
10   opportunity in a deeper discount. We believed that
11   there was money to be saved in the administration
12   charge that was being charged to IHC by Medco. So in
13   the per claim fee we paid we believed we could reduce
14   the amount we paid.
15         Medco had a standard protocol in place
16   that only allowed pharmacies a 15 day window in which
17   they could reverse claims. So if a physician called a
18   pharmacy and said, you know, I want to renew this
19   prescription for Member XYZ, and that member never
20   came to pick it up, the pharmacy only had 15 days to
21   reverse it.
22         Having worked in retail it's not standard

116

1    practice to reverse your claims every 15 days. You'll
2    usually give someone, depending on the type of drug,
3    up to 30 days to come in and pick that up.
4          We felt that there was -- there were many
5    products that were going that ultimately had never
6    been delivered to members, but because of processing
7    parameters within Medco those charges were never being
8    reversed back to us. We believed there were savings
9    in increasing the discount to the -- that we were
10   getting from the pharmacies. We believed there were
11   savings in being able to have your flexibility in the
12   way the system was set up.
13   Q.    Okay. Does IHC's size in the Utah market
14   influence its ability to negotiate lower payment rates
15   with pharmacies?
16   A.    In negotiating with pharmacies our size
17   is helpful in that we represent a large number of the
18   patients. At the same time as we negotiated contracts
19   our size was also, to a certain degree, a hindrance in
20   that because we represented so many of the patients,
21   that one of the arguments we heard from the pharmacies
22   in negotiation was, you know, you represent such a

117

1    large portion of my business that, you know, if I take
2    this big reduction in revenue it will ultimately
3    affect my bottom line.
4    Q.    On net do you think that smaller managed
5    care organizations or insurance companies could
6    negotiate better rates with pharmacies than IHC Health
7    Plans?
8    A.    No.
9    Q.    Do you believe that smaller managed care
10   organizations or insurance companies in Utah could
11   negotiate better rates with pharmacies than were being
12   offered by PBMs?
13   A.    No.
14   Q.    During the period of time that IHC Health
15   Plans had a contract with Medco, did it ever audit
16   Medco?
17   A.    Yes, we did.
18   Q.    What types of audits were performed?
19   A.    We would audit in the system setup. That
20   was the main type of audit that was performed, where
21   we would look at when we communicated to them the
22   status or processing parameters for a certain drug,

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

31 (Pages 118 to 121)

118

1  and then we would audit to make sure that actually
2  took place and was happening.
3      Q.   Does IHC also own pharmacies?
4      A.   IHC Health Systems, Inc. owns pharmacies.
5      Q.   How many?
6      A.   Presently 19.
7      Q.   For how long has it owned pharmacies?
8      A.   There's been some number of pharmacies
9  owned by IHC as long as I've been at IHC.
10     Q.   Do you gather information from the IHC
11 Health Services pharmacies in making your educated
12 guess about acquisition costs of the pharmacies with
13 which IHC Health Plans contracts?
14     A.   Yes.
15     Q.   Would it be possible to estimate
16 acquisition costs for MAC pricing purposes even in the
17 absence of ownership of pharmacies?
18     A.   Yes, it would.
19 (Exhibit Cannon 007 was marked for identification.)
20     Q.   BY MR. EVERETT:  I am handing to you a
21 document that's been marked as IHC Deposition
22 Exhibit 7.  And for the record that is a document

119

1  bearing the Bates Numbers IHC AWP 28 through IHC AWP
2  43.  Take a moment and look through that document.
3      Are you familiar with that document?
4      A.   Yes, I am.
5      Q.   And what is the document?
6      A.   This is a contract between IHC Health
7  Plans and Accredo.
8      Q.   Is this a document that was created and
9  maintained by IHC Health Plans in the ordinary course
10 of its business?
11     A.   Yes, it is.
12     Q.   What is Accredo Health?
13     A.   Accredo Health is a supplier of specialty
14 injectable products.
15     Q.   Is it also known as a specialty pharmacy?
16     A.   Yes, it is.
17     Q.   The contract is dated August 1st, 2003;
18 is that correct?
19     A.   Yes, it is.
20     Q.   What -- how did IHC reimburse for the
21 special fee pharmacy products that are subject to this
22 agreement prior to August 1st, 2003?

120

1      A.   Prior to August 1st, 2003, they were
2  still -- they were reimbursed under an injectable fee
3  schedule that for pharmacies of this nature would
4  receive reimbursement at AWP plus five percent.
5      Q.   And what is the reason that IHC Health
6  Plans entered into the contract with Accredo?
7      A.   It provided us an opportunity to decrease
8  the amount we pay for these products.
9      Q.   Are these products dispensed through
10 pharmacies or by providers?
11     A.   These products are dispensed through
12 pharmacies, for the most part.
13     Q.   You mentioned that prior to August 1st,
14 2003, IHC Health Plans reimbursed pharmacies for these
15 specialty pharmaceutical products at AWP plus five
16 percent; is that correct?
17     A.   Yes.
18     Q.   During the same period of time IHC Health
19 Plans had contracts with pharmacies to reimburse them
20 for other pharmaceutical products at a discount off of
21 AWP; is that correct?
22     A.   Yes.

121

1      Q.   Why was IHC Health Plans reimbursing
2  pharmacies at a higher rate for these specialty
3  pharmaceutical products than for other pharmaceutical
4  products?
5      A.   These products involved more education
6  with the member on how to use it.  They require that
7  the pharmacy is willing to bill us on a paper claim or
8  a HCFA 1500 form.  Most of these products have
9  specialized storage or dispensing requirements that
10 make them much more complicated to provide than your
11 traditional pharmaceutical products.  And they're
12 much more expensive.  And under an AWP minus scenario,
13 most pharmacies would not be able to make money
14 dispensing these products.
15     Q.   IHC Health Plans' willingness to pay more
16 for these products was driven by the desire to make
17 sure that the pharmacies earned sufficient margin to
18 cover the costs associated with providing services
19 associated with these products; is that correct?
20     A.   No.  I don't know that we paid more
21 simply to allow the pharmacies to make a margin or not
22 make a margin, but make a bigger margin.  I think

Eric Cannon        Highly Confidential        September 13, 2004
30(b)(6)            Salt Lake City, UT

32 (Pages 122 to 125)

---

**122**

1    IHC's willingness to pay more for these products was
2    out of market dynamics that we had to pay more for
3    these products so that we could meet the clinical
4    needs and health needs of the patients for whom we
5    insure.
6        Q.    Pharmacies were unwilling to accept less
7    for these products than IHC Health Plans paid; is that
8    correct?
9        A.    Yes.
10        Q.    Under your contract with Accredo how are
11    pharmaceutical products that are the subject of the
12    agreement dispensed?
13        A.    They're dispensed out of a pharmacy, and
14    I think there may be -- I don't recall.  There may be
15    some locally here.  No, they're not.  They're
16    dispensed out of one of the pharmacies that Accredo
17    owns and then shipped to a member after an order from
18    a physician.
19        Q.    Okay.  If you turn to Pages IHC AWP 35
20    through 36.  There is a list of drugs and a price
21    list; is that correct?
22        A.    Yes.

---

**123**

1        Q.    And the far right-hand column of the
2    price list is titled "AWP Discount"; is that correct?
3        A.    Yes.
4        Q.    Do those discounts vary?
5        A.    By product?
6        Q.    Yes.
7        A.    Yes.
8        Q.    What explains the variation in the
9    discount off of AWP by product?
10        A.    That would indicate the ability of them
11    to get deeper discounts for manufacturers on their
12    acquisition cost of those products.
13        Q.    In your opinion is Accredo earning a
14    margin on their drug sales to IHC Health Plans
15    pursuant to this contract?
16        A.    Yes, they are.
17        Q.    So its net purchase price from
18    manufacturers is, in your opinion, lower than the
19    price paid by IHC Health Plans?
20        A.    Yes.
21        Q.    Is there any means of paying Accredo
22    pursuant to the contract other than the difference in

---

**124**

1    the price paid by IHC Health Plans and the price paid
2    by Accredo to manufacturers or wholesalers?
3        A.    Ask me that again.
4        Q.    Yeah.  The contract between Accredo and
5    IHC Health Plans only includes price terms for the
6    purchase of pharmaceutical products; is that correct?
7        A.    Yes.
8        Q.    Are there any other payments made
9    pursuant to the contract?
10        A.    No.
11        Q.    Okay.  Let's take one more break, because
12    this is a pretty good breaking point for me.  And then
13    I want to turn to some contracts that you produced
14    regarding providers.
15            (There was a break taken.)
16            MR. EVERETT:  Let's go back on the
17    record.
18        Q.    I'd like to talk about the physician
19    administered drugs.  Are you familiar generally with
20    the reimbursement methodologies used by Intermountain
21    Health Care for physician administered drugs?
22        A.    Yes, I am.

---

**125**

1        Q.    To your knowledge are physician
2    administered drugs reimbursed by IHC Health Plans on
3    the basis of a discount off of AWP?
4        A.    Yes, they are.
5        Q.    Has that been true as long as you have
6    been working for IHC Health Plans?
7        A.    When I initially started with IHC in 1997
8    we paid physicians a percent of billed charges for
9    business administered drugs.
10        Q.    When did -- sorry.
11        A.    Sometimes -- and I'm -- I can't remember
12    exactly when -- we moved towards a AWP based
13    reimbursement for physicians.
14        Q.    Do you know why IHC Health Plans moved to
15    an AWP discount for reimbursing physicians for
16    physician administered drugs?
17        A.    It was a better discount for us, more
18    reflective of the cost of the product dispensed or
19    used in the office.
20        Q.    Do you know whether in general the billed
21    charges of physicians for physician administered drugs
22    is higher than or lower than AWP?

---

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

33 (Pages 126 to 129)

126

1      A.    It was higher than AWP.
2   (Exhibit Cannon 008 was marked for identification.)
3      Q.    BY MR. EVERETT: I'm going to hand to you
4   now a document that has been marked IHC Deposition
5   Exhibit 8. For the record it's document bearing the
6   Bates Numbers IHC AWP 136 through IHC AWP 138. Have
7   you had a chance to look at this document?
8      A.    Yes, I have.
9      Q.    And are you familiar with the document?
10     A.    Yes, I am.
11     Q.    What is it?
12     A.    This is the fee schedule for injectable
13  drugs at IHC Home Care Services. IHC Home Care is the
14  home health care provider for IHC Health Plans, and
15  also in the context of specialty pharmacy acts as our
16  primary specialty pharmacy vendor.
17     Q.    Is IHC Home Care Services affiliated with
18  Intermountain Health Care?
19     A.    Yes, it is.
20     Q.    In what way?
21     A.    IHC Home Care is a facility within the
22  IHC Health Systems, Inc. corporation.

127

1      Q.    So it is, in essence, a sister company to
2   IHC Health Plans; is that correct?
3      A.    Yes.
4      Q.    When was this contract entered?
5      A.    We entered into this contract at the same
6   time that we entered into the agreement with Accredo.
7   Negotiations took place simultaneously.
8      Q.    Is there a reason that you negotiated
9   this contract at the same time as the contract with
10  Accredo?
11     A.    Even though we may be brothers and
12  sisters within the IHC family, we're still driven by
13  competitive market forces. And Accredo was pushing
14  very hard to obtain and garner some of the IHC Health
15  Plans' business. It provided an opportunity by which
16  we could sit down and establish competitive market
17  prices for these injectable drugs, even though it was
18  with a sister company.
19     Q.    Prior to entering into this agreement
20  what arrangements, if any, did IHC Health Plans have
21  with IHC Home Care Services?
22     A.    We paid IHC Home Care Services billed

128

1   charges.
2      Q.    And what, in general, was the
3   relationship between IHC Home Care Services billed
4   charges and AWPs for the products that are the subject
5   of this agreement?
6      A.    I think it varied. There were some
7   products that were more than likely already being
8   reimbursed at, even though they were -- we were paying
9   billed charges they were still being reimbursed or
10  paid at rates similar to these other products. Their
11  billed charges would have been higher and not as
12  competitive with those of other specialty providers.
13     Q.    Do you have a general understanding of
14  the prices that IHC Home Care Services pays for these
15  drugs?
16     A.    No, I really do not.
17     Q.    Through the coordination procedures that
18  we discussed previously, do you have an understanding
19  generally of the prices paid by IHC services generally
20  for pharmaceutical products?
21     A.    Under that understanding I would assume
22  they're purchasing the products for less. Much closer

129

1   to WAC or even based off of arrangements with
2   wholesalers and other vendors for less than WAC.
3      Q.    Have you ever asked representatives of
4   IHC Home Care Services what they pay for
5   pharmaceutical products?
6      A.    On some products, yes.
7      Q.    In what context did you have those
8   discussions?
9      A.    I think initially we discussed -- we've
10  had ongoing discussions with IHC Home Care over the
11  years about the products they supply to our members
12  and the most cost effective way of supplying those, or
13  can they provide products competitively with
14  competitors in the marketplace.
15            Specifically I think we had discussions
16  about what they could purchase growth hormone for
17  versus what we were paying for it. And even to the
18  point as we looked at growth hormone products, there
19  are five in the category, and could we standardize to
20  two. That would provide cost savings for IHC Health
21  Plans.
22     Q.    How do your negotiations with other IHC

Eric Cannon                    Highly Confidential              September 13, 2004
30(b)(6)                       Salt Lake City, UT

34 (Pages 130 to 133)

130

1   entities differ from negotiations with entities with
2   which IHC doesn't -- in which IHC doesn't have an
3   ownership interest?
4       A.    They're more difficult.  I think as in
5   negotiations that occur in a family between brothers
6   and sisters there's some sense that they deserve more
7   and the negotiations become harder and more drawn out.
8   And because it is a sister company we have a desire
9   to -- to work with them; maintain a cordial
10  relationship.  Many tactics that one would normally
11  undertake in a business negotiation are more taxing
12  under that situation than in a normal negotiation.
13      Q.    At the end of the day do you think that
14  IHC Health Services got a good deal with this
15  contract?
16      A.    IHC Health Services was able to maintain
17  volume going through IHC Health Plans with this
18  contract.  I don't know that I'm in a position to say
19  they got a good deal one way or the other.
20      Q.    And do you think that IHC Health Plans
21  got a good deal from this contract?
22      A.    Yes, I do.

131

1       Q.    The contract has pricing that pays a
2   discount off of AWP varying from AWP minus ten percent
3   to AWP minus 47 percent; is that correct?
4       A.    Yes, that is correct.
5       Q.    What explains the variation in AWP
6   discounts?
7       A.    The variation in discounts is driven by
8   their ability to purchase that product for less, much
9   less than AWP and still, I would assume, maintain a
10  profit margin.
11      Q.    Most of the prices in the contract are
12  AWP minus 14 percent?
13      A.    Yes.
14      Q.    What did you use to determine that
15  discount for the majority of the products?
16      A.    I think that discount was determined
17  based on as we looked at the contract we actually sent
18  a list of these products in the form of an RFP to IHC
19  Home Care.  Accredo also received the RFP and several
20  other specialty providers, and we asked them to
21  provide us with the discounts that they could provide
22  on these products.  AWP minus 14 percent on most of

132

1   these products is what IHC Home Care came back to us
2   with.
3       Q.    So the payment rates that are reflected
4   in this contract are the result of competition?
5       A.    Yes, they are.
6       Q.    Okay.  Some particular questions about
7   the contract.  On Page IHC AWP 136.
8       A.    Yes.
9       Q.    In the middle of the paragraph at the top
10  of the page it indicates that:
11              "All pharmaceuticals and supplies
12              (such as needles, syringes and
13              alcohol swabs) associated with
14              therapy are included in the AWP
15              reimbursement pricing."
16              Do you see that?
17      A.    Yes, I do.
18      Q.    The prices that are identified in the
19  contract are intended to pay not only for the
20  pharmaceutical products, but also these other
21  supplies; is that correct?
22      A.    Yes, it is.

133

1       Q.    How would you determine how much of each
2   payment was for the drug itself as opposed to the
3   associated supplies?
4       A.    I can't.
5       Q.    So you'd have to look at it just as a
6   bundle?
7       A.    Yes.
8       Q.    Does IHC Home Care Services also provide
9   services associated with these pharmaceutical
10  products?
11      A.    Yes, they do.
12      Q.    And are those services also included in
13  the price lists that's identified in this contract?
14      A.    No, they are not.
15      Q.    And how are those services paid for?
16      A.    Nursing services, education services, are
17  paid under a separate arrangement.
18      Q.    Okay.  The next sentence in that
19  paragraph reads:
20              "All other injectable therapies not
21              listed specifically in the table
22              below will be reimbursed at 75% of

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

35 (Pages 134 to 137)

134

1        billed charges until a specific
2        discount off AWP is agreed upon and
3        amended into this Agreement."
4            Is that correct?
5        A.   Yes.
6        Q.   Are there products for which IHC Health
7    Plans pays IHC Home Care Services as a percentage of
8    billed charges?
9        A.   Yes, there are.
10       Q.   In general how many products are paid on
11   that basis?
12       A.   A lot.  You know, I have no way of saying
13   an exact number.  There are several that are paid
14   under that mechanism.
15       Q.   If one were to look in the claims data of
16   IHC Health Plans would you be able to differentiate
17   between products paid on the basis of AWP and products
18   that, subject to this agreement, were paid as a
19   percentage of billed charges?
20       A.   If you didn't have this list of codes you
21   would not be able to determine or ascertain as to why
22   a claim or what rate it was paid at.

135

1        Q.   So the claims database just indicates a
2    price paid for a product; is that correct?
3        A.   Yes.
4        Q.   And doesn't indicate the basis for that
5    price?
6        A.   Right.
7        Q.   Okay.  The prices that are identified in
8    IHC Deposition Exhibit 8 are based on HCPC codes; is
9    that correct?
10       A.   Yes, it is.
11       Q.   To your knowledge do HCPC codes for
12   pharmaceutical products often incorporate within them
13   products that would be separately identified by
14   different NDC numbers?
15       A.   Yes, they do.
16       Q.   And are AWPs published based on NDC
17   numbers?
18       A.   Yes.
19       Q.   How do you determine what AWP to use when
20   reimbursing for a pharmaceutical product based on a
21   HCPC code?
22       A.   We currently purchase from a company

136

1    called R.J. Health a methodology or fee schedule that
2    takes all NDC numbers and rolls them to their
3    particular J-codes and says this NDC number applies to
4    this J-code.
5        Q.   Okay.  If there are differences in AWP
6    prices based on an NDC code and a J-code includes
7    several NDC numbers, how do you decide which AWP price
8    to use in making payment pursuant to this agreement?
9        A.   R.J. Health has a methodology by which
10   they roll those NDC codes together and take an average
11   of those.  Their method varies between brand and
12   generic, and even in some instances throws out the
13   high and the low, as I understand it, although I don't
14   intimately know the specifics of that methodology.
15       Q.   Okay.  Do you know how it varies between
16   brand and generic?
17       A.   And if in a -- in a category there's
18   branded products and a generic products, the price is
19   set based on the generic products, not the branded
20   products.  If there's a generic available we're going
21   to reimburse for the generic and the similar provider
22   should use the generic product.

137

1        Q.   Okay.  If you were to look in the claims
2    database kept by IHC Health Plans would you be able to
3    determine what AWP was used as the basis for
4    reimbursement pursuant to this contract for any
5    particular item?
6        A.   You would be able to look in the claims
7    database and based on the allowed for that particular
8    product and extrapolate backwards based on does that
9    fall under an AWP minus 14 percent reimbursement you
10   could get at the AWP that was used.
11       Q.   But it would involve some further
12   investigation; is that correct?
13       A.   It would be very difficult.
14   (Exhibit Cannon 009 was marked for identification.)
15       Q.   BY MR. EVERETT:  I'm handing to you now a
16   document that's been marked as IHC Deposition
17   Exhibit 9.  It's a document bearing the Bates Numbers
18   IHC AWP 56 through IHC AWP 75.  Take a couple minutes
19   and look at the document.
20       A.   Okay.
21       Q.   Are you familiar with this document?
22       A.   I have seen it before.

Eric Cannon                    Highly Confidential           September 13, 2004
30(b)(6)                       Salt Lake City, UT

36 (Pages 138 to 141)

138

1    Q.    Okay. Can you tell me what it is.
2    A.    It is a participating provider agreement
3    between IHC Health Plans and Total Renal Care for
4    outpatient dialysis services.
5    Q.    Was this document created and maintained
6    by IHC Health Plans in the ordinary course of its
7    business?
8    A.    Yes.
9    Q.    What's the date of this?
10   A.    The term is from sometime in 1999 to -- I
11   have to look at the date exactly. It's from
12   September 1st, '99, through December 31st, 2004.
13   Q.    Do you know if IHC Health Plans had a
14   contract or contracts for the provision of outpatient
15   dialysis prior to 1999?
16   A.    I do not know.
17   Q.    If you would turn, please, to Page IHC
18   AWP 66. Paragraph 1 appears to indicate that IHC
19   Health Plans will pay a fixed dollar amount of $239
20   for hemodialysis treatment, including all routine
21   drugs and routine laboratory tests; is that correct?
22   A.    That is correct.

139

1    Q.    And that flat fee would include payment
2    for the routine drugs that are identified in Exhibit
3    B-1 or Schedule B-1 to the contract; is that what the
4    paragraph indicates?
5    A.    Yes, it does.
6    Q.    Is there any way, to your knowledge, to
7    determine what portion of the $239 flat payment is
8    made for the routine drugs that are dispensed as part
9    of the hemodialysis treatment and what portion relates
10   to other products and services?
11   A.    To my knowledge there is no way.
12   Q.    How did IHC Health Plans determine the
13   amount of the payment it was going to make pursuant to
14   this contract?
15   A.    That I don't know as I was not party to
16   the negotiations on this contract.
17   Q.    In general what factors does IHC Health
18   Plans take into account in setting prices that it pays
19   to providers?
20   A.    The general practice would be in this
21   instance to look at other competitive providers,
22   possibly. But I'm not certain. An RFP would be

140

1    issued to get a competitive feel for what the prices
2    are in the market. They'd look at the costs we were
3    currently paying versus the costs that were outlined
4    in this contract and do an evaluation.
5    Q.    Are the rates paid to providers driven by
6    competition?
7    A.    Yes.
8    Q.    And IHC Health Plans tries to negotiate
9    for the lowest price that it can pay to providers; is
10   that correct?
11   A.    Yes, that is correct.
12   Q.    Again on Page IHC AWP 66, if you look at
13   Paragraph 3 it indicates that non routine drugs will
14   be paid at the lesser of plans then applicable fee
15   schedule or the amount charged and billed. Do you see
16   that?
17   A.    Yes, I do.
18   Q.    What is the fee schedule to which that
19   provision of the contract is referring?
20   A.    That would apply to the general fee
21   schedule that we have in place for outpatient
22   physician clinics in other infusion centers or

141

1    facilities of this nature.
2    Q.    Does IHC Health Plans have different fee
3    schedules for different types of providers?
4    A.    Yes, we do.
5    Q.    Does IHC Health Plans have different fee
6    schedules for its different products?
7    A.    Yes, we do.
8    Q.    Do those -- do all of those fee schedules
9    reimburse providers for pharmaceutical products based
10   on AWP?
11   A.    Generally speaking they all reimburse
12   providers based on AWP. Currently in the injectable
13   fee schedules for outpatient use all of the products,
14   except 51 codes, are reimbursed at AWP plus five
15   percent. And there are, under IHC Direct, there is
16   one fee schedule that the fee schedule reimburses at
17   AWP plus ten percent.
18        The 51 excluded codes are oncology codes
19   or oncological products that are reimbursed at a
20   percent off billed charges.
21   Q.    Are some payments pursuant to this
22   contract made on the basis of billed charges instead

Eric Cannon                Highly Confidential              September 13, 2004
30(b)(6)                   Salt Lake City, UT

37 (Pages 142 to 145)

142

1  of the fee schedules that are published by IHC Health
2  Plans?
3      A.    On this contract with Total Renal Care?
4      Q.    That's right.
5      A.    I'd have to look and see if they're
6  billing us for any of the oncology products that are
7  in that 51 codes. I don't know.
8      Q.    Okay. Well the contract itself indicates
9  that the payment will be the lesser of the applicable
10  fee schedule or billed charges.
11      A.    And the applicable fee schedule would be
12  for each one of the codes there is set an AWP plus
13  five percent fee or a corresponding percent of billed
14  charges.
15      Q.    I see.
16      (Exhibit Cannon 010 was marked for identification.)
17      Q.    BY MR. EVERETT: I'm going to hand to you
18  a document that has been marked as IHC Deposition
19  Exhibit 10. It's a document bearing the Bates Numbers
20  IHC AWP 103 through IHC AWP 134. And just so you
21  know, it's a two-sided copy.
22      A.    What you gave me is an additional copy of

143

1  the --
2          MR. LAWLOR: I got the same thing.
3      Q.    BY MR. EVERETT: Take a moment and look
4  through that contract.
5      A.    Okay.
6      Q.    Are you familiar with this document?
7      A.    Yes.
8      Q.    And what is it?
9      A.    This is the standard participating
10  provider agreement between IHC Health Plans and
11  physicians.
12      Q.    To your knowledge was this document
13  created and maintained by IHC Health Plans in the
14  ordinary course of its business?
15      A.    Yes.
16      Q.    Did IHC Health Plans enter into any
17  actual contracts with providers based on the terms
18  that are set out in IHC Deposition Exhibit 10?
19      A.    Yes.
20      Q.    Did IHC Health Plans enter into contracts
21  with providers that used different terms than those
22  set out in IHC Deposition Exhibit 10?

144

1      A.    That I don't know.
2      Q.    The footer at the bottom of each page has
3  what looks to me to be a date. Do you see that?
4      A.    Yes.
5      Q.    And what do you understand 8/97 to mean?
6      A.    I would assume that's when this contract
7  was drafted and initiated.
8      Q.    And do you understand -- strike that.
9          Has this form contract been used by IHC
10  Health Plans, to your knowledge, since August of 1997?
11      A.    Yes.
12      Q.    And if the form contract had changed
13  since August of 1997 there would be a different date
14  at the bottom of the contract; is that correct?
15      A.    Yes.
16      Q.    If you will turn, please, to IHC AWP 113.
17  And Section 3.01 the contract indicates:
18          "Fee schedules and/or formulas for
19          determining fee amounts may provide
20          for different payments for the same
21          procedures depending on the number of
22          Members seen by Provider in a

145

1          specified period of time or other
2          specified criteria."
3          Do you see that?
4      A.    Yes.
5      Q.    How does the number of members seen by a
6  provider affect fee amounts paid by IHC Health Plans?
7      A.    We have providers that based on the
8  volume they see with us receive a different fee
9  schedule. Now I don't understand or know the entire
10  methodology by which they calculate which fee schedule
11  to use. I don't know if that methodology is currently
12  in place or being used.
13      Q.    Based on the methodology that you've just
14  described generally, would it be possible that a
15  physician would be reimbursed different amounts and
16  different times based on the number of members that he
17  has seen at a particular time?
18      A.    For a physician administered drug, no.
19      Q.    And why are physician administered drugs
20  treated differently?
21      A.    I don't know that they are. But my
22  knowledge is on the pharmaceutical products, not on

Eric Cannon                    Highly Confidential           September 13, 2004
30(b)(6)                        Salt Lake City, UT

38 (Pages 146 to 149)

146

1    the other services or procedures provided in a
2    physician's office.
3        Q.    Does IHC Health Plans have any capitation
4    contracts with the providers?
5        A.    Not currently that I am aware of.
6        Q.    Did it have capitation contracts with
7    providers in the past?
8        A.    I'm unaware.
9        Q.    If you will turn, please, to IHC AWP 121.
10   At the bottom of the page and carrying over into
11   Page 122 indicates that:
12               "Provider will be paid [at] the
13               lesser of [the] Provider's current
14               prevailing fee or the amounts on the
15               Health Choice Maximum Allowable Fee
16               Schedule."
17           Do you see that?
18       A.    Uh-huh.
19       Q.    Are prescription drugs included on the
20   maximum allowable fee schedules?
21       A.    Yes, they are.
22       Q.    And are there different maximum allowable

147

1    fee schedules for prescription drugs for different
2    products sold by IHC?
3        A.    Yes, there are.
4        Q.    Did IHC Health Plans understand that
5    providers were earning some margin on their sales of
6    physician administered drugs?
7        A.    Yes.
8        Q.    Are there any particular groups of
9    physicians that are must haves for the IHC Health
10   Plans now?
11       A.    IHC Health Plans must maintain a provider
12   network that meets the medical needs of our patients.
13   So we must have adequate numbers of primary care
14   physicians that would include internal medicine,
15   family practice, pediatricians.  We must have adequate
16   numbers of specialty providers, whether they are
17   orthopedic surgeons, hematologists, oncologists,
18   rheumatologists, neurologists.
19           Is anyone of those providers a must have
20   over the other?  I don't think, although from time to
21   time there may be a specialty with whom we are more
22   challenged to have access than another.

148

1        Q.    Are there separate negotiations with
2    providers about fee schedules?
3        A.    Yes.
4        Q.    Do different providers -- are different
5    providers paid based on different fee schedules by IHC
6    Health funds?
7        A.    For injectable drugs all providers are
8    paid off the same fee schedule -- or physician -- it
9    would be better if I said physician administered drugs
10   as opposed to injectables.
11       Q.    So there's a single fee schedule for all
12   physician administered drugs?
13       A.    Yes.
14       Q.    Have any providers threatened to leave
15   IHC Health Plans network due to the amount that's
16   included on the fee schedule for physician
17   administered drugs?
18       A.    Yes.
19       Q.    And how did IHC Health Plans respond to
20   that threat?
21       A.    The threats that I'm thinking of were in
22   response to our negotiating over lowering the price we

149

1    currently paid or changing the reimbursement
2    methodology for injectable drugs, and it centered
3    around rheumatologists.
4        Q.    And did IHC Health Plans maintain its
5    contractual relationship with those rheumatologists?
6        A.    Yes, we did.
7        Q.    Did IHC Health Plans change its
8    methodology or lower its payment for physician
9    administered drugs to those rheumatologists?
10       A.    No, we did not.
11       Q.    Did IHC Health Plan try to figure out
12   providers cost in determining the amounts that they
13   would agree to reimburse based on a fee schedule for
14   physician administered drugs?
15       A.    Can you repeat that.
16       Q.    Sure.  Did you try to figure out what
17   physicians were paying for drugs that were reimbursed
18   by IHC Health Plans?
19       A.    I don't think we tried to figure out what
20   they were paying.  I think we had a ballpark idea of
21   what they were paying.  Did we do an analysis or go to
22   a lot of work to figure out?  No.

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

39 (Pages 150 to 153)

150

1    Q.    And what was your ballpark idea what
2  they're paying?
3    A.    I think we estimated that they were more
4  than likely paying WAC or a small discount off of WAC
5  for those products.
6    Q.    I know you've testified about this
7  previously, but what do you believe is the
8  relationship between WAC and AWP?
9    A.    WAC being a closer representation of
10  actual price, purchase price of the product. AWP
11  being more a suggested retail price or resale price.
12    Q.    And in terms of -- is AWP a standard
13  markup over WAC?
14    A.    Yes, or could be.
15    Q.    Of approximately how much?
16    A.    I think our understanding is in the
17  neighborhood of 21, 22 percent for most manufacturers,
18  with some manufacturers as low as 17.
19    Q.    And according to its fee schedules, IHC
20  Health Plans reimburses providers for physician
21  administered drugs at AWP plus five percent,
22  generally; is that correct?

151

1    A.    Yes.
2    Q.    And your ballpark idea of what providers
3  were paying was approximately WAC or slightly lower;
4  is that correct?
5    A.    Yes.
6    Q.    So you believed that providers were
7  earning a margin on their physician administered drug
8  sales of approximately 25 percent?
9    A.    Yes, that's fair.
10    Q.    Why was IHC Health Plans willing to
11  afford providers a margin that large?
12    A.    I would guess you need to talk to various
13  people, because some people may say that's a very
14  large margin. If you're talking to somebody selling
15  jewelry that marks their product up 200 percent, they
16  would say that's not a very big margin.
17        So I think we have come to the conclusion
18  that the margin we've allowed is a fair margin for the
19  services provided by the physician.
20    Q.    And in general does IHC Health Plans
21  reimburse providers at the lowest rate that the
22  competitive dynamics of the market will allow?

152

1    A.    Yes.
2    Q.    Is it more expensive to IHC Health Plans
3  to reimburse for drugs administered through hospitals
4  or in an outpatient setting?
5    A.    That I don't know. We've never
6  undertaken that analysis.
7    Q.    In general does IHC Health Plans have a
8  preference between outpatient administration of drugs
9  and inpatient administration of drugs?
10    A.    No, we do not.
11    Q.    The dispensing of pharmaceutical products
12  by providers -- strike that.
13        Are there services associated with
14  dispensing pharmaceutical products by providers?
15    A.    Yes, there are.
16    Q.    And are those services separately
17  reimbursed by IHC Health Plans?
18    A.    Yes, they are.
19    Q.    Do you have any understanding of whether
20  the amount paid for administration services associated
21  with physician administered drugs are sufficient to
22  cover provider's costs associated with those services?

153

1    A.    In the providers we've worked with and
2  talked to, depending on the product being supplied,
3  the circumstances of the patient, they may be
4  sufficient to cover the costs associated with
5  providing those services.
6        In other instances -- and oncology is one
7  that comes to mind -- where the fees paid for infusion
8  services or ancillary services in conjunction with the
9  drug, it is the belief of the providers that it is not
10  enough to cover the additional services provided.
11    Q.    And does -- is IHC Health Plans willing
12  to pay more for physician administered drugs in part
13  to subsidize the provision of services associated with
14  administering those drugs?
15    A.    We know that's a reality of what we have
16  to deal with.
17    Q.    Okay. Are the fee schedules for
18  procedures and services, other than the prescription
19  drugs, based on Medicare fee schedules, do you know?
20    A.    The fee schedule that exists today for
21  injectable drugs provided in a physician's office that
22  was originally negotiated or discussed was that we

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

40 (Pages 154 to 157)

154

1  would pay the Medicare rate plus ten percent.  As I
2  understand the current Medicare rate on injectable
3  drugs it's AWP minus five percent.  So at our current
4  rate of AWP plus five percent we are paying Medicare
5  plus ten percent.
6      Q.   Are you familiar with media reports that
7  the federal government believes it is over paying for
8  physician administered drugs reimbursed by Medicaid?
9      A.   Yes, I am.
10     Q.   And yet IHC Health Plans still reimburse
11 at the Medicare rate plus ten percent; is that
12 correct?
13     A.   Yes, we do.
14     Q.   Why?
15     A.   I think you've asked the question or
16 raised the issue several times.  Competition.  What do
17 we need to do, what do we need to pay to provide
18 services for our members?  And during the course of
19 ongoing negotiations with physicians and as market
20 dynamics change, I would hope we can reduce what we
21 pay.  But currently the current market dynamics we
22 exist within require us to pay those rates.

155

1      Q.   Are you familiar with the documents
2  produced and the electronic data produced by IHC in
3  response to the subpoena in this case?
4      A.   Yes.
5      Q.   Included in the production were two CD
6  ROMs.  One that had a 2004 injectables fee schedule
7  and one that had a maximum allowable fee schedule for
8  a number of years.
9      A.   Yes.
10     Q.   Are you familiar with all of the files on
11 those two CD ROMs?
12     A.   Not intimately familiar with the files,
13 but generally, and the information contained therein,
14 yes.
15     Q.   Okay.  For all of that electronic data --
16 strike that.
17          Was all of the information included on
18 those two CD ROMs created and maintained by IHC Health
19 Care in the ordinary course of its business?
20     A.   Yes.
21     Q.   Were the fee schedules included in
22 electronic form on those two CD ROMs used by IHC

156

1  Health Care in reimbursing providers for services and
2  products that they provided to IHC Health Care's
3  members?
4      A.   Yes.
5      Q.   Are physician administered drugs included
6  -- strike that.
7           Is the payment rate from IHC Health Plans
8  identified anywhere in the maximum allowable fee
9  schedules that are generally published by IHC Health
10 Plans?
11     A.   Yes.
12     Q.   Is there a separate fee schedule for
13 physician administered drugs?
14     A.   No.
15 (Exhibit Cannon 011 was marked for identification.)
16     Q.   BY MR. EVERETT:  I'm going to hand to you
17 now a document marked as IHC Deposition Exhibit 11.
18 And I will represent to you that this is a printout of
19 the first page of an Excel spreadsheet titled "final
20 95j" that was included on the CD ROM of maximum
21 allowable fee schedules produced by IHC.
22          Do you recognize generally this document?

157

1      A.   Yes.
2      Q.   I just have some questions about the
3  meanings of some of the headings.
4           On the far left is a heading titled "CPT
5  Code."  Do you see that?
6      A.   Yes.
7      Q.   What does that mean?
8      A.   CPT would be the procedure code or the
9  HCPC code tied to that procedure code or tied to that
10 -- that make sense?
11     Q.   And what does "PCDDS," which is the
12 heading of the next column, mean?
13     A.   That is the description of that procedure
14 code or that CPT code.
15     Q.   The next column is headed "Count," and
16 what is that intended to capture?
17     A.   I am not familiar with that.  I don't
18 know if that's a count of codes billed or -- I don't
19 know.
20     Q.   The next column is headed "RVU."  What
21 does that stand for?
22     A.   The RVU is a volume or work load factor.

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

41 (Pages 158 to 161)

**158**

1   Q.   And what does that mean?
2   A.   And that would be used, as I understand
3   it, in that reimbursement when we talked about the
4   rider contract that said, you know, volume -- based on
5   volumes you may be.
6   Q.   I see.  Next column is headed "1995
7   50%tile of Billed."  And what does that mean?
8   A.   That would be the 15th percentile of
9   billed charges coming in.
10   Q.   The next column is "1996 HC RVU Conv."
11   Do you have an understanding of what that is intended
12   to capture?
13   A.   I don't know on that.  I would assume
14   it's a conversion based on their converting the RVU
15   factor from 1995 over to 1996.
16   Q.   The next two columns refer to "HC MAF."
17   Am I correct in assuming that is intended to refer to
18   IHC Health Plans maximum allowable fee?
19   A.   Yes.
20   Q.   And that would equate to allowed charges?
21   A.   Yes.
22   Q.   And then the last column is headed "1996

**159**

1   HC % of Billed."  What is that intended to capture?
2   A.   That would reflect the percent off of
3   billed that we will pay, or the percent of billed that
4   we will pay.
5   Q.   And how does that relate to the allowed
6   charge?
7   A.   You will see either we have an allowed
8   dollar amount, which if you go down those two columns
9   you'll see the little zeros indicating that we haven't
10   set a fixed dollar amount, and that instance then we
11   will -- will be paying off a percent of billed.
12   Q.   Okay.  If the same -- the same terms
13   appear in other fee schedules produced by IHC Health
14   Plans but they have the same meaning --
15   A.   Yes.
16   Q.   -- in this document.  Okay.
17   (Exhibit Cannon 012 was marked for identification.)
18   Q.   BY MR. EVERETT:  I'm going to hand you a
19   document that's been marked as IHC Deposition
20   Exhibit 12.  And this is a printout of the first page
21   of the Excel spreadsheet labeled "1999 MAF."  Do you
22   recognize this document?

**160**

1   A.   Yes.
2   Q.   And is this a document that's kept in the
3   ordinary course of IHC Health Plans' business?
4   A.   Yes.
5   Q.   All right.  Again there are various
6   headings at the top of the document, and I just have
7   questions about the meanings of those headings.  What
8   does "MOD" in the second to left column mean?
9   A.   I don't know.
10   Q.   And the next column over says "Work RVU"?
11   A.   All these RVU fields would be some volume
12   adjustment.
13   Q.   Mechanically do you know how those volume
14   adjustments would affect the allowed charges that are
15   identified elsewhere in the fee schedule?
16   A.   No, I do not.
17   Q.   What is the "HC Conversion Factor"?
18   A.   HC would stand for Health Choice.
19   Q.   Okay.  And what is it converting?
20   A.   I would imagine it's converting the old
21   fee schedule from the year previous, but I can't
22   comment.

**161**

1   Q.   There are different conversion factors
2   for HC, IHC Care and SelectMed.  Does that mean that
3   there are different conversions -- conversion factors
4   for IHC Health Plans' different products?
5   A.   Yes.
6   Q.   What is the difference between HC non
7   facility MAF and HC facility MAF?
8   A.   By facility I would assume we're talking
9   about a hospital or infusion center.  Non facility I
10   would assume we're talking about a physician's office.
11   Q.   Does IHC Health Plans reimburse for any
12   services or products received by its members from
13   providers that are not part of the IHC Health Plan
14   network?
15   A.   That depends on the product purchased by
16   the employer.  There are some products that require
17   all services and procedures to be provided in panel,
18   and in those instances there is one rate.  There are
19   some plans that we call plus plans, but they allow
20   members to swing outside the network.
21        In those situations services are
22   reimbursed at what we call standard benefits.  So if