Exhibit 40

1

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2              IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 3
 4      --------------------------------x
        In Re: PHARMACEUTICAL          )
 5                                      )
        INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
 6                                      )
        PRICE LITIGATION                ) CIVIL ACTION NO.
 7                                      )  01-CV-12257-PBS
                                        )
 8      ------------------------------)
        THIS DOCUMENT RELATES TO        )
 9      ALL ACTIONS                     )
        --------------------------------x
10
11
12
13        30(b)(6) DEPOSITION OF DAN DRAGALIN, M.D.
14              New York, New York
15           Friday, September 17, 2004
16
17
18
19
20
21
22
```

Dan Dragalin, M.D       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY       September 17, 2004
New York, NY

2 (Pages 2 to 5)

---

2

1  Reported by:
2  Frank J. Bas, RPR
3
4
5
6              September 17, 2004
7              10:30 a.m.
8
9        30(b)(6) deposition of MultiPlan by
10  DAN DRAGALIN, held at the offices of
11  MultiPlan, 115 Fifth Avenue, New York, New
12  York, pursuant to Notice, before Frank J.
13  Bas, a Registered Professional Reporter and
14  Notary Public of the State of New York.
15
16
17
18
19
20
21
22

---

4

1
2              I N D E X
3
4  Witness:                        Page
5  DAN DRAGALIN, M.D.
6      (By Mr. Wells)              5, 99
7      (By Mr. Macoretta)            84
8
9
10         TO BE FURNISHED
11  Who was in charge of network prior
12  to Dr. Dragalan.......................... 42
13
14
15          E X H I B I T S
16  Exhibit Dragalin 001, document entitled
17  J-code Tutorial, June 10, 2003...............17
18
19  Exhibit Dragalin 002, document Bates-numbered
20  MP AWP 000001 through 51, series of e-mails...54
21
22

---

3

1  A P P E A R A N C E S :
2
3      (Appearing Telephonically)
4  SPECTOR, ROSEMAN & KODROFF, P.C.
5  Attorneys for Plaintiffs
6          1818 Market Street, Suite 2500
7          Philadelphia, Pennsylvania 19103
8  BY:  JOHN A. MACORETTA, ESQ.
9
10
11  MORGAN, LEWIS & BOCKIUS, LLP
12  Attorneys for Pharmacia and Pfizer
13          1111 Pennsylvania Avenue, NW
14          Washington, D.C.  20004
15  BY:  GREGORY F. WELLS, ESQ.
16
17
18  MULTIPLAN
19  115 Fifth Avenue, 7th Floor
20  New York, New York 10003-1004
21  BY:  MARCY E. FELLER, ESQ.
22

---

5

1
2  (Time noted: 10:33 a.m.)
3  D A N  D R A G A L I N,
4          stating his business address as
5  MultiPlan, 115 Fifth Avenue, New York, New York,
6  having been duly sworn by the Notary Public
7  (Frank J. Bas), was examined and testified as
8  follows:
9  EXAMINATION BY
10  MR. WELLS:
11      Q.   Good morning, Dr. Dragalin.
12      A.   Good morning.
13      Q.   Thank you for taking time out of your
14  schedule to come and talk to us today about the
15  matters in this case.  Have you ever been deposed
16  before?
17      A.   Yes.
18      Q.   And how many times have you been
19  deposed?
20      A.   I want to say two or three.
21      Q.   Okay.  And can you tell me generally
22  what the circumstances of those were?

---

Dan Dragalin, M.D    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    September 17, 2004
New York, NY

3 (Pages 6 to 9)

**6**

1    A.   Generally it occurred when I was the
2   corporate medical director of Prudential in
3   the '80s, and there were a number of insurance
4   issues, suits, et cetera.
5    Q.   Okay.
6        MS. FELLER:  Excuse me.  Who is on
7   the phone?
8        MR. MACORETTA:  I'm sorry, this is
9   John Macoretta from Spector, Roseman & Kodroff
10   for the plaintiffs.  Good morning.
11        MS. FELLER:  Good morning.  This is
12   Marcy Feller.  John, can you spell your last
13   name?
14        MR. MACORETTA:  Sure.  Macoretta.
15   M-a-c-o-r-e-t-t-a.
16        MS. FELLER:  Thank you.
17        MR. MACORETTA:  Dr. Dragalin, can you
18   just move the phone a little closer or speak up?
19        THE WITNESS:  All right.  There you
20   go.
21        MR. MACORETTA:  That's much better.
22   Thank you.

**7**

1   MR. WELLS:
2    Q.   Okay, we were talking about your
3   prior depositions.  Obviously I think you know
4   the rules and how this works.  I'm going to ask
5   you questions, you're going to answer them, the
6   reporter is going to write everything down.  For
7   that reason it's really important that we take
8   turns and not talk over each other so that we can
9   get a clear transcript.  It's also important that
10   we give verbal answers as opposed to nodding the
11   head and that sort of thing as you might do in
12   casual conversation so that the reporter can get
13   everything down.
14        My task today is to try to ask you
15   clear questions that you can answer.  I assure
16   you at some point I will not do that, there will
17   be a question that you don't understand.  If and
18   when I do that, just let me know and I'll try to
19   rephrase it or ask it another way.
20        If you need a break for any reason,
21   just let me know.  And I don't think John was on
22   the phone, but I think we're going to take an

**8**

1   early lunch around 11:30 so that Dr. Dragalin can
2   step out for a quick conference call, and then
3   reconvene somewhere shortly after noon.
4        MR. MACORETTA:  That's fine.
5    Q.   Also you're here testifying, as you
6   know, as a representative of MultiPlan, and
7   throughout the deposition I'll probably use the
8   term "you" in some of my questions, and when I
9   use that I'm going to be referring to MultiPlan
10   as a company, not necessarily you as an
11   individual.  So if there's information that you
12   have that might be from documents or other people
13   in the company, if you could provide that as
14   well, that would be appreciated.
15        Do you understand that?
16    A.   Yes.
17    Q.   Okay.  Dr. Dragalin, what is your
18   educational background?
19    A.   I went to undergraduate school at the
20   Georgia Institute of Technology, got a BS in
21   applied biology.
22        I went to medical school at

**9**

1   Georgetown University, got an M.D. there.  I did
2   my residency, pediatric internship and residency
3   at Emory University in Atlanta.
4        Board certified in pediatrics.  And
5   then at Emory I received a master's in public
6   health.  And there's a couple of fellowships
7   thrown in there somewhere.
8    Q.   And what is your position at
9   MultiPlan?
10    A.   Executive vice president in charge of
11   the network.
12    Q.   And how long have you held that
13   position?
14    A.   About a year and three months.
15    Q.   And what did you do before that?
16    A.   I was the president of the Northeast
17   region for Great West Life Insurance.
18    Q.   And what generally were your
19   responsibilities at Great Western Life?  Great
20   West Life?
21    A.   I had a 13-state region covering the
22   whole northeast, down through Virginia, and I had

Dan Dragalin, M.D      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY      September 17, 2004
New York, NY

4 (Pages 10 to 13)

| 10 |
|---|
| 1 responsibility for all of the insurance |
| 2 operations for Great West, which is domiciled in |
| 3 Denver, except for sales. |
| 4     Q.   Did that include contracting with |
| 5 medical providers? |
| 6     A.   They reported to me. |
| 7     Q.   And what about pharmaceuticals or |
| 8 prescription drugs? |
| 9     A.   They reported to me. |
| 10     Q.   And how long did you hold that |
| 11 position at Great West Life? |
| 12     A.   About four years. |
| 13     Q.   And how about before that? |
| 14     A.   Before that I was president of the |
| 15 Atlantic region for New York Life.  The same |
| 16 responsibilities, except it was New York Life |
| 17 instead of Great West Life, and the region was |
| 18 narrower.  It just consisted of New Jersey, |
| 19 Pennsylvania, Virginia, and that was about three |
| 20 years. |
| 21     Q.   And did you deal with healthcare |
| 22 products? |

| 12 |
|---|
| 1     Q.   What were those? |
| 2     A.   During the entire decade of the '80s |
| 3 I was the national medical director for |
| 4 Prudential. |
| 5     Q.   And what were your responsibilities |
| 6 in that position? |
| 7     A.   I had responsibilities over all of |
| 8 the clinical activity for both the PPO and the |
| 9 family of HMOs.  We had 72 group model HMOs in |
| 10 the country and then a very large national PPO. |
| 11 I had responsibility for coordinating the |
| 12 activities of the, we had about 500 nurses, 70 or |
| 13 80 medical directors.  So it was clinical |
| 14 practices, clinical protocols, quality of care, |
| 15 medical necessity decisions, coverage issues. |
| 16     Q.   Did coverage issues include physician |
| 17 administered drugs? |
| 18     A.   Yes. |
| 19     Q.   And that was back to at least 1980? |
| 20     A.   4. |
| 21     Q.   1984, okay. |
| 22     A.   And before that I was associate |

| 11 |
|---|
| 1     A.   The same thing.  The same exact |
| 2 thing.  Except I had sales also.  That was the |
| 3 only difference. |
| 4     Q.   And how about before New York Life? |
| 5     A.   I was president of HMO Blue for four |
| 6 years.  HMO Blue is the HMO subsidiary of Blue |
| 7 Cross/Blue Shield New Jersey.  And it was |
| 8 essentially the same job except not sales. |
| 9     Q.   And before that? |
| 10     A.   I was the clinical practice leader |
| 11 for Towers Perrin out of Manhattan and |
| 12 Washington, and that was about three years. |
| 13 They're a healthcare consulting firm. |
| 14     Q.   Did you do any sort of benefits |
| 15 consulting with them? |
| 16     A.   Yes.  That was my job. |
| 17     Q.   And how long were you in that |
| 18 position? |
| 19     A.   Three years. |
| 20     Q.   Any other health plans that you |
| 21 worked for before that? |
| 22     A.   Yes. |

| 13 |
|---|
| 1 medical director of Southeastern Health Services, |
| 2 which was a group model HMO exclusively owned by |
| 3 Prudential in Atlanta, for three years.  And that |
| 4 involved the actual practice of medicine as well |
| 5 as the coordination of the four satellite |
| 6 clinics. |
| 7     Q.   Okay. |
| 8     A.   And before that I was the medical |
| 9 director of the Fulton Dekalb County Hospital |
| 10 Authority Satellite Clinic System. |
| 11     Q.   Okay.  Have you ever worked for a |
| 12 pharmaceutical company? |
| 13     A.   No. |
| 14     Q.   And have you ever held a position |
| 15 with a government agency? |
| 16     A.   No.  Well, I might have consulted to |
| 17 a few with Towers Perrin, but... |
| 18     Q.   And if you remember, in that |
| 19 consulting were there any pharmaceutical benefits |
| 20 issues that came up? |
| 21     A.   There were pharmaceutical benefits |
| 22 issues that came up with regard to payers all the |

Dan Dragalin, M.D   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   September 17, 2004
New York, NY

5 (Pages 14 to 17)

---

**14**

1 time when I was with Towers Perrin. You know,
2 self-funded employers, et cetera.
3    Q.   And did any of those issues relate to
4 how the payers would reimburse physicians for
5 physician administered drugs?
6    A.   Yes.
7    Q.   And what about for pharmacy drugs?
8    A.   Yes.
9    Q.   Do you remember any specific advice
10 that you gave to payers about physician
11 administered drugs?
12    A.   Well, there were numerous, depending
13 on the payor, there were numerous conversations
14 over reimbursement levels, you know, by specific
15 code. Whether or not to pay for -- whether or
16 not and how much to pay for actual
17 administration. So you have the cost of the drug
18 and the administration.
19        Whether or not to supply the
20 physicians with the drug and reimburse it that
21 way. I mean there were just a wide variety of
22 discussions over a decade.

---

**15**

1    Q.   Did you ever have specific
2 discussions about whether any payor should
3 reimburse based on average wholesale price or
4 AWP?
5    A.   Yes.
6    Q.   And what were the nature of those
7 discussions?
8    A.   Well, again, depending on the payor,
9 it was just a discussion of AWP, and it was
10 always a balancing act between a cost effective
11 payment methodology versus a network disruption,
12 secondary to provider dissatisfaction. I mean
13 that's always -- that always was the question.
14    Q.   And when you say network disruption
15 as a result of provider dissatisfaction, what do
16 you mean by that?
17    A.   Not paying the providers their
18 perception of what is enough for the drug.
19    Q.   Does their perception of what is
20 enough for a drug include a profit margin?
21    A.   Absolutely. Well, I mean most of the
22 time. I mean sometimes the insurance

---

**16**

1 reimbursement was small enough that it
2 potentially wouldn't even cover the cost of the
3 drug, and so there were those issues, too.
4 Immunizations are a good example.
5    Q.   What do you understand the term
6 average wholesale price to mean?
7    A.   Average wholesale price is a number
8 that is published on almost a monthly basis that
9 theoretically reflects -- well, not
10 theoretically -- that reflects the pharmaceutical
11 manufacturer's claim, unsubstantiated in most
12 cases, of what the cost is of the drug, to them.
13    Q.   And when you say "them" --
14    A.   To the manufacturer. To the
15 pharmaceutical -- well, to the wholesaler, I
16 should say.
17    Q.   And when you say -- first you said
18 theoretically and then you changed --
19    A.   Well, not theoretically. I meant --
20 the number is a subjective number. It's not an
21 objective number. That's what I meant to say.
22 And it's a subjective number that is largely

---

**17**

1 determined by the wholesaler.
2        MR. MACORETTA:  Could you repeat your
3 last answer or could the court reporter read it
4 back?
5        (The Reporter read back as follows:
6        "Answer:  Well, not theoretically. I
7 meant -- the number is a subjective number. It's
8 not an objective number. That's what I meant to
9 say. And it's a subject number that is largely
10 determined by the wholesaler.")
11        MR. MACORETTA:  Thank you.
12        MR. WELLS:  I would like to mark an
13 exhibit as Exhibit 1. This is a document
14 entitled J-code Tutorial, June 10, 2003. John,
15 your copy will bear the Bates numbers
16 MP AWP 000052 through 53. I think my copies may
17 not have that on there, but --
18        MR. MACORETTA:  I have it, thank you.
19        MR. WELLS:  Okay.
20        (Exhibit Dragalin 001, for
21 identification, document entitled J-code
22 Tutorial, June 10, 2003.)

---

Dan Dragalin, M.D      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY      September 17, 2004
New York, NY

6 (Pages 18 to 21)

18

1    Q.   Dr. Dragalin, have you seen this
2  document before?
3    A.   Yes.
4    Q.   And did you have any role in creating
5  it?
6    A.   I created it.
7    Q.   And did anyone else at MultiPlan have
8  any input in creating it?
9    A.   No.
10   Q.   Has anyone outside of MultiPlan seen
11  this document?
12   A.   Seen it?  Well, only one -- well, to
13  my knowledge, one individual.
14   Q.   And who is that?
15   A.   Dr. Tom -- I'll have to get you his
16  name.  He was our consultant on this.  I'll
17  remember his name sometime during this.
18   Q.   No problem.  Do you know what entity
19  or firm he worked for?
20   A.   Yeah, he's the medical director of
21  Matria, which is a disease management company.
22   Q.   And what role did they play as a

19

1  consultant for MultiPlan?
2    A.   Well, they didn't.  He consulted
3  privately to us on -- I asked him to organize a
4  one-hour seminar to be delivered by
5  teleconference to the MultiPlan negotiating team
6  to better understand J-codes.
7    Q.   Okay.  If you look at this document,
8  under the heading of Level III, and it is the
9  sixth bullet point down, it reads: "The
10  foundation of pricing for J/Q-codes is AWP
11  (average wholesale price); this is simply a price
12  that the drug manufacturer submits to the
13  government; it is heavily affected by discounts
14  and rebates and has little basis in reality."
15       Is that an accurate statement of your
16  understanding of AWP?
17   A.   Yes.
18   Q.   And have you always understood AWP to
19  mean that?
20   A.   Yes.
21   Q.   Including going back as far as the
22  1980s, when you were working with Prudential?

20

1    A.   Well, it was a little less of an
2  issue, because the -- the level of the drug costs
3  back then were less.  So it didn't really pop up
4  in a lot of cases as a cost issue.  I mean a
5  pharmaceutical in general didn't really begin to
6  occupy the center of the stage as a cost problem
7  until, I would say, the late '80s.  So in the
8  beginning of the '80s it was okay.  I mean there
9  wasn't that much discussion of AWP, at least in
10  the circles I traveled.
11   Q.   Okay.  Can you give an estimate of
12  when you came to understand that AWP is heavily
13  affected by discounts and rebates and has little
14  basis in reality?
15   A.   Well, I became increasingly convinced
16  of it toward the end of the '80s.  I can't tell
17  you exactly when, though.
18   Q.   And did you use that knowledge in
19  your dealings at your job at that point in time?
20   A.   With our clients, yes.
21   Q.   And that includes when you were a
22  consultant at Towers Perrin --

21

1    A.   Yes.
2    Q.   -- for various payors?
3    A.   Yes.
4    Q.   And have you ever thought that AWP
5  was an average of actual prices?
6    A.   No.  Well, it is an average of actual
7  prices, but the prices are not a statistically
8  significant, in most cases a statistically
9  significant sampling of the actual pricing that
10  the wholesaler does for that drug.
11   Q.   And is that because of the available
12  discounts and rebates?
13   A.   That's correct.  It's very convoluted
14  methodology.
15   Q.   Are the availability of such
16  discounts and rebates well known --
17   A.   Yes.
18   Q.   -- in your industry?
19   A.   Yes.
20   Q.   Do you know how you came to discover
21  that AWP is, quote, "heavily affected by
22  discounts and rebates and has little basis in

Henderson Legal / Spherion
(202) 220-4158

Page 22

1  reality"?
2      MR. MACORETTA: Objection to the
3  form.
4      A.   What's that?
5      Q.   He made an objection for the record,
6  so you can answer the question.
7      A.   All right. I really can't honestly
8  tell you. I'm assuming it's through both the
9  literature and conferences that I went to.
10  That's the way I usually gained my knowledge.
11     Q.   If we look back at Exhibit 1 in that
12  same bullet point, it says, and I quote:
13  "However, the AWP is published and used by
14  pharmacies, physicians and facilities as a basis
15  for charges." Is that an accurate statement?
16     A.   Yes. Not as black and white as it's
17  written, though. I mean it's not always used as
18  the basis for charges, but in a large number of
19  cases that I've dealt with, it has been used as a
20  basis for charges.
21     Q.   Is it fair to say then that AWP works
22  as a benchmark to negotiate reimbursement rates?

Page 23

1      A.   Yes.
2      Q.   If we look back at Exhibit 1 and move
3  on to what is the seventh bullet point again on
4  the first page, it reads, and I quote: "The
5  Medicare and Medicaid programs pay suppliers AWP
6  minus 5% for J and Q codes. These drugs are
7  available in pharmacies in general at AWP or AWP
8  plus 5%. In general, physicians and facilities
9  secure these drugs from wholesalers at AWP minus
10  15%, but the discount may be much larger."
11     A.   Yes.
12     Q.   Is that an accurate statement?
13     A.   That is my -- my belief, yes. And I
14  can't give -- you're going to ask me where I got
15  it from. That's just always been my general
16  impression.
17     Q.   Do you know for how long you believed
18  that physicians and facilities can secure drugs
19  from wholesalers at AWP minus 15 percent?
20     A.   At least since the beginning of
21  1980s, because I did it myself in the group
22  model. And it was our belief back then that the

Page 24

1  lowest we could go was AWP minus 17 percent.
2      Q.   There's a reference in Exhibit 1
3  that, quote, "the discount may be much larger."
4  Do you know what circumstances would be that the
5  discount would be larger?
6      A.   Volume based circumstances.
7      Q.   So a provider that purchases a large
8  volume of drugs would get a greater discount?
9      A.   Well, and it's not only that, but
10  there's a web. In a discussion like this, you
11  can't isolate the conversation to one drug
12  because the prices of one drug are connected to
13  another drug. So if, for example, I agree to buy
14  drug A at a certain price, they'll give me -- the
15  pharmaceutical wholesaler will give me AWP, let's
16  just say, minus 10.
17         If I also agree to buy drugs B, C and
18  D at a certain volume, they might decrease the
19  price of that drug I just negotiated to AWP minus
20  20 or 30. So it's an interconnected web. You
21  have to look at the total package of products
22  that you're buying from a single wholesaler.

Page 25

1      Q.   If we look at the last bullet point
2  on the first page of Exhibit 1, it reads, and I
3  quote: "Some large insurance companies,
4  including Great West Life, have recently
5  installed AWP minus based payment systems for J
6  and Q codes; because of the complexity of J and Q
7  code pricing, such processes are necessarily
8  manual."
9         Is that an accurate statement?
10     A.   Yes.
11     Q.   And did you have any role in
12  installing the AWP minus based payment system at
13  Great West Life?
14     A.   Yes.
15     Q.   And what role did you play in that?
16     A.   Well, at that time that was the last
17  year of my tenure with Great West Life, and I was
18  simultaneously the president of the northeast and
19  the national medical director. And so I helped
20  with the process of the installation -- I didn't
21  actually do the calculations or draw up the
22  procedures, that was done by one of the other

Dan Dragalin, M.D     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     September 17, 2004
New York, NY

8 (Pages 26 to 29)

26

1   medical directors.
2       Q.   Do you know why Great Western Life
3   moved to the AWP minus based payment system?
4       A.   Yes, it's largely for the purposes of
5   cost containment.  And to decrease the fairly
6   substantial variability in pricing that occurs
7   between providers, for the same drug.
8       Q.   And what causes that pricing
9   variability?
10      A.   Lack of regulation.
11      Q.   The pricing variability you're
12  talking about is under a bill charges system?
13      A.   That's correct.
14      Q.   So different providers bill different
15  amounts?
16      A.   That's correct.
17      Q.   And is it true that having a uniform
18  system based off of a benchmark could alleviate
19  that?
20      A.   Yeah, well, it would decrease the
21  variability.
22      Q.   If we look at the first bullet point

27

1   on the second page of this exhibit, it reads, and
2   I quote: "The initiation of such fee schedules
3   invokes very little adverse response from
4   physicians and facilities who clearly understand
5   that normal J-code charges are grossly excessive,
6   but continue to generate revenue from all of the
7   payors unable to process J-codes appropriately.
8   In fact, 50 to 60 percent of the income of the
9   average oncologist is based on J-code revenues."
10      Is that an accurate statement?
11      A.   I believe so.
12      Q.   And for how long have you believed
13  that to be true?
14      A.   At least the decade of the '90s.
15      Q.   And do you know how you came to know
16  that?
17      A.   Well, the installation of the J-code
18  repricing methodology, for example, at Great West
19  Life, caused very little attrition in physician
20  network, and in some cases we were cutting the
21  reimbursement by, you know, several hundred
22  percent, so -- and there were very few

28

1   individuals that resigned as a result of that.
2   And, of course, any physicians are free to resign
3   if they don't like what they're getting
4   reimbursed, in a panel.
5       Q.   We talked briefly earlier about
6   discounts and rebates that are available on
7   drugs.  Has MultiPlan ever received any rebates
8   from a pharmaceutical manufacturer?
9       A.   No, we don't deal with -- well,
10  MultiPlan as a corporation does not deal with
11  pharmaceutical benefits.  There is a piece, or a
12  subsidiary of the corporation called HealthEOS in
13  Wisconsin, which is a primary -- which is a
14  primary network, confined to Wisconsin, pretty
15  much, that uses pharmaceutical rebates as a
16  portion of, well, it's hard to explain -- it uses
17  pharmaceutical rebates as a fund to subsidize,
18  allowing providers who are part of our network up
19  there to have access to a software program that's
20  focused on the quality of care.
21      So it doesn't have anything to do
22  per se with benefit plans, but rather it's a

29

1   financing methodology for us, in this very
2   limited piece of the company.
3       Q.   And is that an agreement with a
4   specific manufacturer?
5       A.   I can't honestly tell you how many
6   manufacturers are involved.
7       Q.   In any of your other positions at
8   health plans, have you ever --
9       A.   Do you want to know who to depose?
10  Never mind.
11      Q.   If you'll tell me.  In your positions
12  at other health plans, have you -- have your
13  companies received pharmaceutical rebates?
14      A.   Yes.  Yes, all of them.
15      Q.   And what about other incentives that
16  pharmaceutical manufacturers might provide to
17  medical providers, such as grants and free
18  samples and that sort of thing; are you aware
19  that that occurs?
20      A.   Absolutely.
21      Q.   And for how long have you been aware
22  of that?

Dan Dragalin, M.D     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     September 17, 2004
New York, NY

9 (Pages 30 to 33)

30

1      A.   Since I was a freshman in medical
2   school.
3      Q.   And do you know if those type of
4   incentives vary by provider types?
5      A.   Yes.
6      Q.   And how so?
7      A.   Well, they vary by pharmaceutical
8   manufacturer and they vary by provider. They're
9   essentially individual deals. I don't mean
10   they're unique to the individual, but like to
11   medical students, it might be free conferences or
12   free medical texts, or free equipment, just to
13   promote the use of the drug. To practitioners it
14   could be free samples or free conferences or
15   lunches, or dinners. But this is -- a lot of
16   this -- this was especially prevalent, and
17   intense, in the late '70s and all through the
18   decade of the '80s. There were a number of
19   legislative -- there was a lot of legislative
20   activity that came to be, I guess, if I remember
21   correctly, around the beginning of the '90s,
22   maybe a little bit before that, that put a halt

31

1   to a lot of this activity and attempted to bring
2   it under some degree of control.
3      Q.   But have there still been some level
4   of incentives available to medical providers
5   after that?
6      A.   Yes.
7      Q.   Are you familiar with the term WAC,
8   or wholesaler acquisition costs?
9      A.   Is that the same thing as AP,
10   acquisition price?
11      MR. MACORETTA: He'll get to ask the
12   questions.
13      A.   I'm not familiar with that term, no.
14      Q.   What about the term MAC, or maximum
15   allowable cost?
16      A.   Yes.
17      Q.   What does that term mean?
18      A.   Now you're pulling me back. The
19   maximum allowable cost is -- I don't know. I've
20   based negotiations on that in my past lives, but
21   I can't exactly tell you what the definition is.
22   But I'm very familiar with the term.

32

1      Q.   Do you know if MAC is used primarily
2   for particular types of drugs?
3      A.   I can't remember.
4      Q.   What about usual and customary
5   charges or U & C, are you familiar with that?
6      A.   Yes.
7      Q.   And what does that mean?
8      A.   It's a semi-objective baseline for
9   reimbursement that's primarily used, to my
10   knowledge, that's primarily used outside of the
11   pharmaceutical arena, primarily for physician or
12   other practitioner services. And it has to do
13   with -- it's geographic specific, and has to do
14   with the, sort of the average reasonable general
15   charge for the practitioners of that specialty
16   for that procedure in that geographic area.
17      Q.   Can you give me a brief description
18   of MultiPlan's business?
19      A.   Yes. MultiPlan is primarily a
20   network, a national network of practitioners,
21   hospitals and ancillary facilities and
22   practitioners.

33

1      Q.   Does it include any pharmacies?
2      A.   No.
3      Q.   So MultiPlan doesn't reimburse for or
4   reprice any pharmacy dispensed drugs?
5      A.   You know, it might be possible that
6   HealthEOS, that primary group I told you about,
7   may be involved in pharmaceutical reimbursement,
8   but I'm not sure.
9      Q.   But as far as the primary MultiPlan
10   line of business --
11      A.   No.
12      Q.   Okay. Who does MultiPlan market its
13   network to?
14      A.   Anybody that will listen. But
15   primarily third-party payers, TPAs, large
16   self-funded employers, commercial insurance
17   companies.
18      Q.   And why do those types of
19   organizations do business with MultiPlan?
20      A.   To decrease claims costs.
21      Q.   And how does that work?
22      A.   We have discount arrangements in

Dan Dragalin, M.D      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY      September 17, 2004
New York, NY

10 (Pages 34 to 37)

34

1   place with all of the providers that I mentioned.
2   And through various methodologies some or all of
3   those discounts are passed on to the payor.
4        Q.   And how is MultiPlan compensated by
5   these payor customers?
6        A.   There's a variety of methodologies.
7   One is called shared savings, where the payor
8   pays MultiPlan as an administrative fee a
9   percentage of the difference between the charge
10  and the negotiated discount.
11            Another methodology is called PMPE,
12  where it's a flat access fee that's based on a
13  per employee life access.  Those are the two
14  major ways.
15       Q.   Are these compensation terms
16  typically in a contract that the payor signs with
17  MultiPlan?
18       A.   Yes.
19       Q.   Are those contracts standard for all
20  payers?
21       A.   No, they're -- well, there's a
22  standard band of contracts, but there are a

35

1   number of unique contracts also.  And there's a
2   number of modifications to the standard contract.
3        Q.   And what types of variation are there
4   among the different contracts?
5        A.   There's a -- well, it depends on the
6   client.  There's a wide degree of variation.  I
7   mean it just depends.
8        Q.   Is there variation that deals with,
9   at all with physician administered drugs?
10       A.   That would be rare.  It's not
11  impossible, but it would be rare.
12       Q.   In doing business with MultiPlan, did
13  the payers negotiate for better terms with you
14  guys?
15       A.   Yes.
16       Q.   How did they do that?
17       A.   Usually at the time --
18            MS. FELLER:  Can we be clear as to
19  what payment -- payment of whom, for what?
20            MR. WELLS:  Certainly.
21       Q.   When MultiPlan does business or seeks
22  to sign up a third-party payor or a self-funded

36

1   employer group or something like that, how do
2   they negotiate the terms of the contract with
3   MultiPlan?
4            MS. FELLER:  You're referring to
5   payment by the payor to MultiPlan for MultiPlan's
6   services, not reimbursement to providers?
7            MR. WELLS:  Well, I --
8            MS. FELLER:  That's what I'm trying
9   to get at.
10       Q.   Both the payments that they're
11  willing to make and the services that they seek
12  from you, how they negotiate those terms?
13       A.   Well, it's negotiated between the
14  sales representative that we have on our side,
15  and the representative on that side.  I don't
16  know exactly -- I don't know what -- I'm having
17  trouble with the question.
18       Q.   I might come back to that later.
19            MS. FELLER:  It seems to me that it
20  is outside the scope of what was disclosed to us
21  for this deposition.
22            MR. WELLS:  Okay.  I think definitely

37

1   the relationships with your customers is a topic
2   that's in there.  I think if I --
3            MS. FELLER:  Our financial
4   arrangements with clients is not something that
5   we anticipated being relevant to this deposition.
6            MR. WELLS:  I think if I ask the
7   question at a different time, it may make more
8   sense.  So let me come back to that.
9            MS. FELLER:  Okay.
10           MR. WELLS:  It will, I think, be
11  easier to get at.
12  BY MR. WELLS:
13       Q.   Does MultiPlan enter into contracts
14  with medical providers to become part of the
15  network?
16       A.   Yes.
17       Q.   And do your customers have visibility
18  of those contracts?  Are they able to see them,
19  or the terms of what's in those contracts?
20       A.   Well, they can certainly -- they can
21  certainly be supplied with generic contracts.
22  With regard to individual contracts with

Dan Dragalin, M.D    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    September 17, 2004
New York, NY

**38**

1  individual providers, I've never been asked for
2  one, and I don't know what the -- I don't know
3  what the company policy is on that actually, to
4  tell you the truth. I mean they're confidential
5  documents, SO I would assume that they cannot be
6  shared with the clients, but I don't really know.
7      Q. Does MultiPlan have any competitors
8  in selling these networks?
9      A. Yes.
10     Q. And who are they?
11     A. Well, there's a wide variety of
12 competitors out there. Anyone that's in the
13 market, whether it be nationally or regionally,
14 selling a network of providers, any kind of a
15 network of providers, hospitals or practitioners
16 or both, is a competitor of MultiPlan's, in
17 general. I mean do you want names?
18     Q. Could you give a few examples?
19     A. Beach, PHCS; Plan Vista. Coalition
20 America. Interplan.
21     MR. WELLS: Could we actually go off
22 the record for just a second.

**39**

1      (Discussion off the record.)
2      MR. WELLS: Back on the record.
3      Q. Is it fair to say that the market for
4  selling provider networks is competitive?
5      A. Yes.
6      Q. And does MultiPlan want to provide
7  the best product for the lowest rates?
8      A. That's a generic goal. The lowest
9  rates part of it is a generic goal, yes. But it
10 just depends on the marketplace itself.
11     Q. And do your customers care about the
12 cost of the product that you provide?
13     A. Yes.
14     Q. And how do they show that?
15     A. By potentially using one of our
16 competitors, if we have a rate that's too high.
17     Q. So is it important for MultiPlan to
18 keep its costs down?
19     A. Yes.
20     Q. And does that include any portion of
21 the benefit that might relate to physician
22 administered drugs?

**40**

1      MR. MACORETTA: Could you say that
2  again? I didn't hear that, Greg.
3      Q. Does that relate to any portion of
4  the benefit that may relate to physician
5  administered drugs?
6      A. Yes. Well, as long as a medical
7  claim is produced. We don't deal with
8  pharmaceutical claims. So -- and physician
9  administered drugs can come in as a medical claim
10 or a pharmaceutical claim. So if it's in the
11 medical claim area, then they're concerned --
12     MS. FELLER: Can we go off the record
13 for a second?
14     MR. WELLS: Sure.
15     (Discussion off the record.)
16     (Lunch recess taken at 11:23 a.m.)
17
18
19
20
21
22

**41**

1
2      A F T E R N O O N  S E S S I O N
3      (12:09 p.m.)
4  D A N  D R A G A L I N, resumed as a witness,
5  having been previously sworn by the Notary
6  Public, was examined and testified further as
7  follows:
8      A. I just wanted to make sure that I
9  didn't in any way give the impression that
10 MultiPlan paid claims or took any kind of risk.
11 Because we take no risk. All we do is reprice
12 claims for mostly self-funded payors and they
13 take the risk. They make the claims payments.
14     Q. Okay. I think I understand that. I
15 do want to ask a couple of mop-up questions and
16 then see if I can clarify what I was trying to
17 get at. First of all, how long has MultiPlan
18 been in business?
19     A. 30 years.
20     Q. And do you know who was in charge of
21 the network before you?
22     A. It was a little bit looser, in terms

Dan Dragalin, M.D    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    September 17, 2004
New York, NY

12 (Pages 42 to 45)

42

1  of an organization. I believe there was a guy
2  named Larry Morrisy that was in charge prior to
3  me, who I have never met. He was sort of in
4  charge of the overall organization of the
5  network.
6        MS. FELLER: I'll be happy to provide
7  that information, if you want it.
8        MR. WELLS: Okay.
9        MS. FELLER: He doesn't have that
10  information.
11        MR. WELLS: Okay.
12  TO BE FURNISHED: _____
13  _____
14     Q. Before we went off the record, we
15  were discussing people previously in charge of
16  the MultiPlan network and Ms. Feller said that
17  she was going to provide that information?
18        THE WITNESS: Yes.
19        MR. WELLS: I just wanted to make
20  sure that that request gets on the record.
21  BY MR. WELLS:
22     Q. Dr. Dragalin, is it fair to say that

43

1  you haven't had any discussions with those people
2  about the meaning of average wholesale price?
3     A. Correct.
4     Q. In trying to attract payor clients to
5  use your products, does MultiPlan market its
6  ability to control or reduce the amount that
7  those payors ultimately reimburse providers for
8  medical claims?
9     A. Yes.
10     Q. And does that marketing, at least
11  potentially, relate to the amount that the payor
12  clients ultimately reimburse providers for
13  physician administered drugs?
14     A. Not generically. If the discussion
15  comes up during the sales process, there might be
16  some discussion, but it's not -- it's not
17  something that we use as a front runner in
18  advertisement, if you will. So it's not a part
19  of the standard presentation, is what I'm saying.
20     Q. But the general amounts that your
21  payor clients have to reimburse to medical
22  providers is?

44

1     A. Yes.
2     Q. And if one of your competitors came
3  up with a better or more effective way to reduce
4  or control those costs that the third-party
5  payers ultimately have to pay or reimburse to
6  medical providers, then there would be a risk
7  that MultiPlan would lose clients to that
8  competitor; is that correct?
9     A. Yes.
10     Q. How does MultiPlan contract with the
11  providers that are in its network?
12     A. Well, we have a contracting staff
13  that's out in the field, and we approach the
14  three different types of providers, that is the
15  hospitals, practitioners and the ancillary
16  facilities a bit differently from a recruiting
17  standpoint. It's all contractual relationships.
18  The contracts are specific to the provider.
19  First of all, they're specific to provider type,
20  and then, of course, they're specific to the
21  provider. We do some of our work by
22  telerecruiting and some of our work by direct

45

1  face-to-face interaction.
2     Q. With respect to the hospitals in the
3  network, is there a standard contract that those
4  hospitals sign?
5     A. Yes, there is.
6     Q. But is there also variation in the
7  terms of, some of the terms of those contracts?
8     A. There could be.
9     Q. And what about for practitioners, is
10  there variation in the terms of those contracts?
11     A. The same. Probably less so, but yes.
12     Q. Do providers compete among themselves
13  to be part of your network?
14     A. We have very few exclusives. There
15  are a few markets in which the providers have
16  sort of set up their own exclusives, so that --
17  the only time we get involved in an exclusive in
18  general is if the provider demands it. So if
19  there's two sets of providers in a marketplace
20  and they're at odds with each other and they're
21  constantly battling each other for market
22  penetration and they say that if you sign up the

Dan Dragalin, M.D        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY      September 17, 2004
New York, NY

13 (Pages 46 to 49)

46
1    other one you can't have us, then we have to make
2    a decision, obviously. But we don't -- as a
3    general rule we don't do exclusives.
4        Q.   How are the providers compensated for
5    being in the MultiPlan network?
6        A.   Well, in general they're compensated
7    by having their claims made paid by the payor in
8    a timely manner. And the second compensation,
9    which is indirect, is a potential increase in
10   volume as a result of our advertising of the fact
11   that they're in our network.
12       Q.   And by agreeing to become part of the
13   MultiPlan network, do the providers have to agree
14   to adhere to any sort of fee schedule?
15       A.   Yes.
16       Q.   And how are those fee schedules
17   created?
18       A.   Are you talking about practitioners?
19       Q.   Yes, let's limit this to
20   practitioners.
21       A.   There's a number of fee schedules.
22   The fee schedules tend to be specific to the

47
1    geographic location of the provider, and in
2    general -- there is a standard fee schedule, in
3    fact there's two or three standard fee schedules
4    for each geographic location. It's entirely
5    possible that the provider will not agree to take
6    one of those and we have to build a unique fee
7    schedule if we want that provider badly enough.
8        Q.   So there are some providers that are
9    sufficiently important to have in your network
10   that you will individually negotiate a fee
11   schedule?
12       A.   Yes.
13       Q.   What do the fee schedules cover?
14       A.   All provider services. In general,
15   by CPT code.
16       Q.   And does that include the amount that
17   the provider will charge for physician
18   administered drugs?
19       A.   Yes.
20       Q.   And in general, what are the terms
21   that the providers accept in terms of what
22   they're charged for physician administered drugs?

48
1        A.   Well, that -- so that's not a CP --
2    well, that's a part of the HCPCS code system. In
3    general, when we look at CPT codes, we go on the
4    RBRVS national basis, and do some percentage of
5    RBRVS. The HCPCS codes, on the other hand, we in
6    general do a straight discount off the charges.
7    So just for the sake of argument, anywhere
8    between, say, 25 and 35 percent off of charges.
9        Q.   How did MultiPlan arrive at the 25 to
10   35 percent off of those charges figures?
11       A.   First of all, that's not constant
12   across the country. It depends on the
13   marketplace you're in. And it's really what the
14   market will bear. So it's an iterative process
15   over the years.
16       Q.   Have you ever had any communications
17   with any of your payor clients about this
18   particular provision in the fee schedule?
19       A.   About what?
20       Q.   About the amount that -- about the
21   amount that the provider will charge for
22   physician administered drugs?

49
1        A.   Yes. Selected payors.
2        Q.   Are there any specific examples, that
3    you can remember?
4        A.   Great West Life is a good example.
5        Q.   And what was the nature of that
6    discussion?
7        A.   Well, for their own primary networks
8    they have a very well developed J-code pricing
9    methodology, and they essentially would like us
10   to match that methodology in here. And so we've
11   had discussions back and forth about that. And
12   there are other payors that we've had the same
13   kinds of discussions.
14       Q.   Does the fee schedule, or schedules
15   that the providers agree to, do those allow for
16   separate billing for physician administered drugs
17   and the administration of those drugs?
18       A.   In general, no. They're swept into
19   the same percentage of whatever the generic
20   formula is.
21       Q.   So if I'm an oncologist and I inject
22   somebody with a chemotherapy drug and I submit a

Dan Dragalin, M.D     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     September 17, 2004
New York, NY

14 (Pages 50 to 53)

50

1  claim through the MultiPlan network, and it's a
2  medical claim, the, say, 70 percent -- I agree to
3  accept 70 percent of my bill charged to cover
4  both the cost of the drug and my time and
5  services in administering it as a bundle?  Is
6  that right?
7      A.   We don't bundle or unbundle.  We
8  simply reprice line items.  So if you submit the
9  cost of the drug as one line item and you submit
10 an administration charge, we will reprice both of
11 those at the, whatever the discount rate is.
12 What the payor does with that when they get it is
13 a different issue, and that depends on the
14 payor's own internal protocol.
15     Q.   Do you know how the payors generally
16 treat those types of claims?
17     A.   It really depends on the payor.  So I
18 can't -- you know, you would have to go on a
19 specific basis there.
20     Q.   But there are at least some claims
21 that are made that are bundled?
22     A.   Absolutely.  Not by us, but

51

1  absolutely, right.
2      Q.   Have any customers, by that I mean
3  your third-party payor type customers, have they
4  ever complained about the amount that MultiPlan
5  has for physician administered drugs and its fee
6  schedules?
7      A.   Yes.
8      Q.   And what were the nature of those
9  complaints?
10     A.   They felt the charges were excessive,
11 on a claim specific basis.
12     Q.   Earlier you used the term repricing.
13 Can you explain what that process is?
14     A.   Yes.  Essentially we take a claim
15 that's generally delivered to us electronically,
16 and on a line-by-line basis we take the
17 provider's charges and we reduce those charges by
18 the contractual discounted amount, and then we
19 send that claim off to the payor for payment.
20     Q.   And by agreeing to your fee
21 schedules, the providers in your network are
22 essentially consenting to this repricing process?

52

1      A.   Yes.
2      Q.   Is repricing something that's
3  generally requested by your payor customers?
4      A.   Do you mean as a function from us, as
5  a part of the package?
6      Q.   Yes.
7      A.   In general yes.  There are those
8  customers that we have that do their own
9  repricing, either by accessing our system through
10 the web, or by accepting a download of prices
11 from us on a quarterly basis.  But the majority
12 of our clients have us do the repricing directly.
13     Q.   Is the ability to reprice provider
14 claims something that makes your network more
15 attractive to your payor customers?
16     A.   Yes.
17     Q.   Has MultiPlan ever actually
18 specifically repriced physician administered
19 drugs?
20     A.   Differently from our normal HCPCS
21 repricing?
22     Q.   Yes.

53

1      A.   No.
2      Q.   Have you considered doing so?
3      A.   Yes.
4      Q.   And was that in 2003?
5      A.   Yes.
6      Q.   Why did MultiPlan consider repricing
7  J-code drugs in 2003?
8      A.   Two main reasons.  One was the
9  variability in provider charges for the same drug
10 across the United States.  And the second reason
11 was a belief that, from some of the providers,
12 the charges were excessive.
13     Q.   So if the charges were excessive,
14 repricing those drugs would reduce the amount
15 that the payor clients had to pay; is that
16 correct?
17     A.   Yes.
18     Q.   So that would make your network more
19 attractive to them?
20     A.   Yes.
21     MR. WELLS:  I would like to mark a
22 second exhibit here.  This is a series of e-mails

Dan Dragalin, M.D      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY      September 17, 2004
New York, NY

15 (Pages 54 to 57)

54

1  that your counsel forwarded to us. The entire
2  document bears the Bates number MP AWP 000001
3  through 51.
4        MR. MACORETTA:  Okay, you're marking
5  that as Exhibit 2, right?
6        MR. WELLS:  Yes, that's Exhibit 2.
7        MR. MACORETTA:  Okay.
8        MR. WELLS:  Again, I think we have
9  the issue that the copy that I printed out does
10  not have the Bates numbers on it.  I think it got
11  cut off or something.  But we're also going to
12  have to jump around a little bit so that we can
13  try to do these in chronological order and
14  hopefully we'll be able to accomplish this.
15        (Exhibit Dragalin 002, for
16  identification, document Bates-numbered MP
17  AWP 000001 through 51, series of e-mails.)
18    Q.   The first e-mail I would like to look
19  at is on what is page 13 of the document.
20        MR. WELLS:  Off the record.
21        (Discussion off the record.)
22    Q.   Before we proceed, I think it may not

55

1  have gotten on the record, but Dr. Dragalin, you
2  remembered the name of the consultant, Tom, that
3  you spoke of earlier?
4    A.   Yes.
5    Q.   What was his last name?
6    A.   It's Morrow.  M-o-r-r-o-w.
7  Physician; MD.
8    Q.   Okay.  Looking at Exhibit 2, and if I
9  can draw your attention to page 13, there is an
10  e-mail from you to Michael Ferrante with the
11  subject J-codes, and dated June 4, 2003.
12    A.   Yes.
13    Q.   Did you send this e-mail?
14    A.   Yes.
15    Q.   And to quote the e-mail, it says:
16  "As you may be aware, Steve Casner is initiating
17  a dialysis center contracting/re-contracting
18  effort nationally.  That project set me to
19  thinking about Procrit and J-codes for expensive
20  drugs in general."
21        First of all, who is Steve Casner?
22    A.   He was in charge of our national

56

1  ancillary contracting effort.
2    Q.   And what was his dialysis center
3  project?
4    A.   He was looking at the possibility
5  of -- we are contracted with a number of national
6  dialysis vendors -- two or three, or four -- and
7  he was looking at the possibility of decreasing
8  the number and making our contracts a little more
9  exclusive in order to increase, potentially
10  increase the discount.
11    Q.   And as I noted, it also says, "that
12  project set me to thinking about Procrit and
13  J-codes for expensive drugs in general."  It
14  continues:  "You are probably aware that these
15  drugs are billed out for as much as 40 times
16  acquisition costs and that they all tend to be
17  relatively expensive (i.e., $1,000 per month.)"
18        Is this the first time that MultiPlan
19  thought about repricing J-codes?
20    A.   It's the first time since I've been
21  here.  I can't answer for before that.
22    Q.   And is it fair to say that in this

57

1  e-mail it shows that you know that bill charges
2  exceed acquisition costs?
3    A.   Yes.
4    Q.   And has MultiPlan ever done any
5  studies of acquisition costs for drugs that
6  providers administered?
7    A.   No.  Well, on a claim specific basis
8  that has happened.
9    Q.   And what were the circumstances of
10  investigating it on a claim specific basis?
11    A.   In general, we would get a complaint
12  from a payor about a line item that would be a
13  J-code and we would go back and look at the AWP
14  and, you know, have a discussion with the payor.
15    Q.   Would you also go back to the
16  provider to try to find out what their
17  acquisition cost was?
18    A.   No, we would be able to get the AWP
19  ourselves.  And we in some cases would go back to
20  the provider and essentially say to the provider
21  we understand that we have a contract, and we
22  repriced it at this, but we believe the charge

Dan Dragalin, M.D      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY      September 17, 2004
New York, NY

16 (Pages 58 to 61)

58

1  would be excessive, and we would use the AWP
2  knowledge to substantiate our claim, our charge.
3      Q.   And what were the providers' typical
4  reactions to that?
5      A.   Too bad for you.
6      Q.   And this e-mail continues later, and
7  I quote: "It is also not difficult to convince
8  providers (principally oncologists, nephrologists
9  and endocrinologists, dialysis centers and home
10  infusion agencies) to accept, as payment in full,
11  some variation of average wholesale price (AWP)
12  (or- 10%) since they know they have been ripping
13  off the payor community for decades."
14      Is that an accurate statement?
15      A.   Yes.
16      Q.   Why do you believe that the doctors
17  knew that they were "ripping off the payor
18  community for decades"?
19      A.   Well, because they know what they get
20  the price for.  I mean they know what they buy
21  the drug for and they know what they're charging
22  the drug out for.  And in general their attitude

59

1  is, especially -- I mean the oncologists are the
2  most egregious -- their attitude is that by
3  substantially overcharging for the drug, they're
4  making up for the underpayment they receive for
5  the rest of their services.  So to them it's a
6  balance that they evoke.
7      Q.   Did you ever have any discussions
8  with your payor clients about that?
9      A.   With selected ones, yes.
10      Q.   Did you ever specifically discuss the
11  idea that some providers felt that the
12  reimbursement levels were appropriate to
13  compensate them for undercompensation for their
14  services?
15      A.   Yes.
16      Q.   And what were the payors' reactions
17  to that?
18      A.   Well, they varied, but there were
19  proposals such as, well, you know, why don't we
20  increase the administrative portion of the bill
21  so that we can, you know, so that a decrease in
22  the AWP -- or a decrease in the reimbursement for

60

1  the actual drug, it would be more palatable.
2      Q.   And did any payors, to your
3  knowledge, actually go in that direction?
4      A.   Not through us.  They might have
5  through their own primary networks, but not
6  through us.
7      Q.   Did any payors say something along
8  the lines of yes, we understand that we're
9  providing a margin on a drug to compensate these
10  providers for their services?
11      A.   Yeah, they all agreed to that.  It's
12  the size of the margin that's the issue here.
13  Well, the size and the variability of the margin,
14  I should say.
15      Q.   Is it fair to say that different
16  payors had different expectations of what those
17  margins should be?
18      A.   Yes.
19      Q.   I would like to move on to a second
20  e-mail here, this one is on page 12, and it's the
21  second e-mail, actually, on the page from you to
22  a group of people beginning with Andrea Rowe, and

61

1  dated June 16 of 2003.  Do you see that?
2      A.   Yes.
3      Q.   And it, No. 2 in this e-mail makes a
4  proposal to, quote, "reprice all J and Q codes at
5  AWP and determine additional potential savings."
6      Why did you recommend to reprice at
7  AWP?
8      A.   Well, the recommendation was not to
9  reprice at AWP, rather, it was to run an analysis
10  repricing at AWP, and by finding out the
11  difference between AWP generically and what we
12  were repricing at, we would then have the margin,
13  if you will, and then we could analyze applying
14  various factors to the margin -- you know, plus
15  10 percent, plus 20 percent, et cetera.  So it
16  was an analytic exercise, not a recommendation
17  that we reprice at AWP.
18      Q.   And if we could look at the third
19  e-mail, which is on page 24 of Exhibit 2.  It's
20  an e-mail to you from Karen M-u-c-c-i-n-o dated
21  June 16 of 2003.
22      A.   Right.

Henderson Legal / Spherion
(202) 220-4158

Dan Dragalin, M.D     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     September 17, 2004
New York, NY

17 (Pages 62 to 65)

62

1    Q.   And it reads, I'll quote: "Just as a
2    side note: Some of our Group and IPA agreements
3    require either mutual consent for any fee change,
4    or advance notice. Therefore, those groups would
5    either need to be notified in writing of the
6    change or their agreements require amendments.
7    There is no tracking mechanism in place."
8         First of all, who is Karen Muccino?
9    A.   She's the vice president of the
10   Pacific region. She's -- in terms of -- we have
11   six regions; for the purposes of the negotiators,
12   we divide the country up.
13   Q.   And is her statement about the group
14   and IPA agreements accurate?
15   A.   Yes.
16   Q.   And that statement says some of our
17   group and IPA agreements require either mutual
18   consent or advance notice.
19   A.   Yes.
20   Q.   Why do only some of them require
21   that?
22   A.   It's a -- it's a bargaining point.

63

1    Q.   Is it fair to say that these type of
2    agreements were an impediment to MultiPlan
3    repricing on an AWP basis?
4    A.   Well, they will require effort to
5    work through. I mean we will have to communicate
6    with a number of our group, as well as a number
7    of our individual practitioners, as well as a
8    number of our hospitals, to let them know what
9    our intent is and see where we go. It's an
10   impediment, but it's not a showstopper.
11   Q.   If we can move to another e-mail
12   which is on page 9 of Exhibit 2, which is an
13   e-mail from you to a John Caruso dated July 24,
14   2003.
15   A.   Okay.
16   Q.   And it reads, and I'll quote: "I had
17   a conversation with Marty Rosenbaum at Great West
18   Life and Ron Katz on this issue. After some
19   research, we finally established that Great West
20   is 'selectively' pricing claim lines with J-codes
21   using their AWP payment methodology. The
22   remainder of the codes on the claim are then

64

1    repriced according to the MPI contract. They are
2    doing this based on their interpretation that our
3    discount does not apply to drugs. Along with
4    that interpretation, of course, comes the fact
5    that the physician may balance bill a member for
6    the remainder of the J-code."
7         First of all, who is Mr. Rosenbaum?
8    A.   He is an executive at Great West
9    Life, who is in charge of a variety of things,
10   including their relationship with pharmaceutical
11   wholesalers.
12   Q.   And do you know who Ron Katz is?
13   A.   He was a former sales executive here
14   who was in charge of the Great West Life account.
15   Q.   Can you explain what you meant when
16   you said that Great West Life is "selectively
17   pricing claim lines with J-codes using the AWP
18   payment methodology"?
19   A.   Yeah. If a Great West Life claim
20   came in to us, we repriced it as per usual by
21   line item, including the J-codes, depending on
22   the percentage discount that we had, each line

65

1    would receive a 20 percent discount or whatever
2    it was, and send it back. And what they would do
3    is pick out the line that contained a J-code and
4    they would reprice that line selectively -- leave
5    the rest of the claim alone but reprice that line
6    selectively according to their J-code repricing
7    methodology that they used internally for their
8    own proprietary network.
9    Q.   And do you know what that payment
10   methodology was?
11   A.   AWP minus 10 percent. Wait, I'm
12   sorry. AWP plus 10 percent. Well, I'm sorry.
13   Great West Life is divided up into six regions
14   also. Each region had their own AWP factor,
15   depending on what the market would bear. When I
16   left Great West Life a year-and-a-half ago, there
17   were probably three different factors that were
18   being used that ranged from minus 5 percent to
19   minus -- no, that ranged from plus 5 percent to
20   plus 15 percent. And I don't know whether in the
21   last year or so there's been a decrease in that
22   variability.

Henderson Legal / Spherion
(202) 220-4158

Dan Dragalin, M.D    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    September 17, 2004
New York, NY

18 (Pages 66 to 69)

66

1    Q.   So when you say selectively repricing
2  J-codes, you mean selectively in the context of
3  all of the claims --
4    A.   Yes.
5    Q.   -- not that they were selectively
6  doing some J-codes and not others?
7    A.   Right, correct.
8    Q.   The e-mail makes reference to a Great
9  West Life interpretation that the MultiPlan
10  discount does not apply to drugs. Did MultiPlan
11  agree with that interpretation?
12      MR. MACORETTA: I object to the form.
13    A.   I think it's safe to say that there
14  is a divided opinion within MultiPlan on this.
15  It's a contractual interpretation, and we just
16  have a divided opinion.
17    Q.   Is there a majority view within
18  MultiPlan?
19    A.   Well, we're allowing them to do it.
20    Q.   The last line of that paragraph that
21  I read references the fact that a physician may
22  balance bill a member for the remainder of the

67

1  J-code. Could you explain what that means?
2    A.   In our contracts with the physician,
3  when we reprice a claim line there's a
4  contractual stipulation that the physician
5  therefore accepts as payment in full the amount
6  that we have repriced that claim. If Great West
7  Life is interpreting that our contract with the
8  physician does not apply to drugs, then therefore
9  they no longer fall under the contractual
10  stipulation of not being able to balance bill the
11  patient, and not accepting as payment in full.
12  So if they want to, they can balance bill the
13  payment, at least according to our contract.
14  They're not violating our contract. If that's
15  what Great West is interpreting it. And if we
16  agree with that interpretation.
17    Q.   Is balance billing something that
18  MultiPlan tries to avoid?
19      MS. FELLER: Wait a second. Again
20  this seems to me to be far afield of the items
21  listed on the document you provided to me as to
22  what the topics are.

68

1      MR. WELLS: I mean it's something
2  that's said in a document. It certainly is a
3  subject that reserves our right to ask about the
4  documents.
5      MS. FELLER: Well, he has explained
6  what balanced billing is.
7    A.   Well, contractually we exclude our
8  providers from balance billing in most cases. Of
9  covered services that we have repriced.
10    Q.   Have your payor clients ever
11  expressed a preference for trying to avoid their
12  members being balance billed?
13    A.   Absolutely.
14    Q.   Is that contract provision with
15  providers something that you market to potential
16  payor clients?
17    A.   Yes.
18    Q.   If we can look at another e-mail,
19  which is on page 43 of Exhibit 2. I guess the
20  header is actually at the bottom of page 42, and
21  it's an e-mail from you to Michael Ferrante dated
22  January 21, 2004. And it reads, I'll quote: "I

69

1  remain very uncomfortable about the non-progress
2  of the J-code project. I thought Operations was
3  to produce a 'matrix' of the difficulties
4  involved with the J-code repricing based on an
5  AWP methodology? I am just not sure what the
6  next steps are and Don intermittently asks about
7  the project. We both know that there could be
8  potentially be substantial revenue associated
9  with selective actions - especially with the
10  addition of BCE providers in the future. What
11  can we do with this?"
12      First of all, who is Mr. Ferrante?
13    A.   He is chief operating officer.
14    Q.   And who is the "Don" that's
15  referenced?
16    A.   Don Rubin is the owner of the
17  company.
18    Q.   What did you mean when you said that
19  you were very uncomfortable about the
20  non-progress of the J-code project?
21    A.   Well, I had been an advocate of
22  changing our pricing -- our repricing methodology

Dan Dragalin, M.D      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY      September 17, 2004
New York, NY

19 (Pages 70 to 73)

70

1  for J-codes for a number of months, especially
2  since I was being pushed by Great West Life, who
3  is our third largest customer to do that. But I
4  thought it was a good idea anyway. And I thought
5  I had secured the agreement of all parties in
6  here involved, and the project just wasn't
7  progressing as fast as I would have liked to have
8  seen it progress.
9      Q.   Did you ever find out what happened
10 to delay the project?
11     A.   Yes.
12     Q.   And what was that?
13     A.   The issue -- the central issue is
14 that repricing a J-code using an AWP factor is
15 relatively complex. It in general involves three
16 different sources of information about the drug
17 that have to come together, and it's a very
18 manual process. Which means that you have to
19 take that line item and pull it out of the claim,
20 and first of all get more data on that line item
21 than you normally do, like the number of units of
22 drug, which normally is not in a -- not in the

71

1  claim information that we get. So you have to go
2  back to the provider and ask questions. Which
3  means you can't autoadjudicate the claim. You
4  have to take it off manually, you have to ask the
5  provider questions and you have to manually
6  reprice the claim.
7          That would disturb the flow of
8  autoadjudication for the payor, it would slow
9  down claims payment and introduce a new process.
10 We can certainly -- "we," MultiPlan, can do the
11 manual repricing, it would take a little bit
12 longer, but the main problem is convincing our
13 clients that do their own repricing to put
14 those -- to flag those claims and then instead of
15 autoadjudicating them or do whatever they do to
16 them, flag those claims, take them outside their
17 process and send them to us for manual repricing,
18 or send them back. So it introduces a complexity
19 that interferes with the claims flow process that
20 causes pause among some of the sales folks. And
21 so that's the issue. And that continues to be
22 the issue.

72

1      Q.   The e-mail says, and I'll quote it
2  again, "We both know that there could potentially
3  be substantial revenue associated with selective
4  actions, especially with the addition of BCE
5  providers in the future."
6          First of all, who is BCE?
7      A.   That's BCE, Emergis, a company that
8  we acquired on March 1. They had their own
9  network. We acquired their network.
10     Q.   That's March 1 of this year?
11     A.   Yes.
12          MS. FELLER: March 4.
13     A.   March 4, I'm sorry.
14     Q.   In this e-mail when you said that
15 there could potentially be substantial revenue
16 associated with selective actions, what did you
17 mean by that?
18     A.   Instead of repricing by a discount
19 methodology, as we are doing currently, if we
20 repriced by an AWP plus a factor, there obviously
21 would be a -- in select cases -- depending on
22 what the charges were, there would be a much

73

1  deeper discount.
2      Q.   And that revenue would go to your
3  payor clients unless they were in an agreement
4  that had the shared savings that you talked about
5  earlier?
6      A.   Well, the revenue always go to the
7  payor clients. It's just how much of the revenue
8  goes to them. So the increase -- it depends on
9  how they pay us. If they pay us on a PMPE basis
10 it's neutral, it all goes to them essentially.
11 Well, I shouldn't say it all goes to them. It
12 also goes to the member, because it has to do
13 with defraying the costs, the coinsurance, the
14 deductible, et cetera.
15     Q.   If we can look at the next e-mail on
16 the same page, which is from you to a Warren
17 Handelman, Dale White, and Adam Altkin, dated
18 March 25 of 2004. And I'll draw your attention
19 to the sentence towards the end of the first
20 paragraph that says, and I quote, "Medicare" --
21 I'm sorry, let me start with the one before that.
22 "We would set the price at AWP plus 10%, a common

Dan Dragalin, M.D     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     September 17, 2004
New York, NY

20 (Pages 74 to 77)

74

1    industry benchmark. Medicare pays AWP minus 5%
2    and the acquisition cost to the physician is
3    generally AWP minus 20% to 30%."
4        A.   Yes?
5        Q.   Is it accurate that the acquisition
6    costs to physicians is generally AWP minus
7    20 percent to 30 percent?
8        A.   I believe it is.
9        Q.   And if you set your repricing at AWP
10   plus 10 percent, you would be giving physicians a
11   margin above their acquisition costs on drugs of,
12   in some cases, as much as 40 percent; is that
13   correct?
14       A.   Potentially. Can we go off the
15   record for a minute?
16       Q.   Absolutely.
17           (Discussion off the record.)
18           (Recess.)
19           MR. WELLS: Let's go back on the
20   record, then.
21       Q.   We were looking at the e-mails on
22   page 43 and I got a little bit ahead of myself,

75

1    out of chronological order. So could we back up
2    to one that's on page 2 of Exhibit 2, and it's
3    the -- it's from you to the group starting with
4    Anita Magovac, dated February 24 of 2004. And in
5    the first bullet point it states, and I quote:
6    "I would suggest that we wait until October, when
7    all of the dust should have settled, and
8    everything else, and then communicate with
9    oncologists, gastroenterologists, and
10   dermatologists, that we will be repricing J-codes
11   at AWP plus, say, 15%. What do you think?"
12           First of all, what does the "dust
13   settling" reference refer to?
14       A.   Is this 2004?
15       Q.   Yes.
16       A.   Yes, it is. The dust settling is the
17   integration of MultiPlan and the company that we
18   acquired, which was Emergis, which was supposed
19   to be largely completed October 1.
20       Q.   And is that the only company that you
21   guys have acquired in the last two years?
22       A.   No.

76

1        Q.   What are the others?
2        A.   In the last two years?
3        Q.   Yes.
4        A.   Marcy could probably answer that
5    better than I can.
6            MS. FELLER: The only other one is
7    the one you know about.
8        A.   Oh, right, New England Health. There
9    was nothing before -- I was going the other way.
10           MS. FELLER: No.
11       A.   New England, NE -- New England
12   Healthcare Associates.
13       Q.   And is that another provider network?
14       A.   Yes.
15       Q.   In this, can you explain why you made
16   the suggestion to reprice J-codes at AWP plus
17   15 percent?
18       A.   Well, from my knowledge, the
19   benchmark, if you're going to do this, is
20   generally plugged -- it's somewhere between plus
21   10 and plus 20. So I was just using a middle
22   value. Again, we're trying to balance provider

77

1    pushback with cost savings.
2        Q.   And to achieve that balance, you were
3    looking at repricing at AWP plus 15 percent even
4    though you believed that provider acquisition
5    costs were closer to AWP minus 20 or 30 percent?
6        A.   Well, I don't believe that's the
7    general provider acquisition cost. I don't know
8    what that is. But I do know that there are
9    instances in which when providers -- those
10   providers that do buy large volumes of the drug,
11   that the acquisition costs can be at that rate.
12           I can't say that that's what the
13   average provider acquisition cost is, because I
14   don't know that.
15       Q.   If we can look at another e-mail
16   that's on page 6 of this document. This is an
17   e-mail to you from Rick Z-u-z-e-n-a-k dated
18   February 26, 2004. And it states, "As you
19   stated, BCE does it the same as us so there is no
20   deadline; I have no problem doing it late. I
21   would like to know if we go to 15% and lower
22   HCPCS, how much money we could recoup. If it is

Dan Dragalin, M.D    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    September 17, 2004
New York, NY

21 (Pages 78 to 81)

78

1  sizable as I think it will be, then we should
2  push it up sooner for all."
3       First of all, who is Mr. Zuzenak?
4    A.  He's vice president for network
5  development for the western region.
6    Q.  And the reference to BCE is another
7  reference to the company that you acquired?
8    A.  Yes.
9    Q.  And prior to that acquisition is it
10 fair to say BCE was a competitor of MultiPlan?
11   A.  Yes.
12   Q.  Do you know what Mr. Zuzenak meant
13 when he said BCE does it the same as us?
14   A.  Yeah.  They also used the standard
15 discount off of charges.
16   Q.  Do you know how long they've been
17 using that?
18   A.  Well, that was their standard process
19 for as long as they've been in existence.
20   Q.  Do you know if they ever did or
21 considered repricing J-codes?
22   A.  I don't know that.

79

1    Q.  In this e-mail Mr. Zuzenak says, "I
2  would like to know if we go to 15 percent and
3  lower HCPCS how much money we could recoup."
4  What does he mean by lower HCPCS?
5    A.  It's not clear to me whether he was
6  referencing that we should lower our discount to
7  all HCPCS codes or whether he's alluding
8  specifically to J-codes.  Simultaneous with this
9  we were looking at going from a general
10 25 percent discount on HCPCS in general to
11 35 percent discount.  I can't exactly remember
12 where this message was in that process.  So I'm
13 not sure whether he's talking about that or
14 J-codes.
15   Q.  This doesn't have anything to do with
16 the idea of lowering drug reimbursement and
17 simultaneously increasing reimbursement for
18 administration services?
19   A.  No, that's a separate issue.
20   Q.  Do the MultiPlan provider contracts
21 allow the payors to require the providers to use
22 specialty pharmacies?

80

1    A.  No.
2    Q.  The MultiPlan network includes both
3  practitioners and hospitals, correct?
4    A.  Yes.
5    Q.  Does MultiPlan have any understanding
6  of whether the administration of drugs is more
7  costly at hospitals versus in a practitioner's
8  office?
9    A.  No.
10   Q.  Have any payors of your -- have any
11 of your payor clients asked of you or suggested
12 to you that you should increase or maintain a
13 higher level of reimbursement for provider
14 administered drugs to deter them from referring
15 people to hospitals?
16   A.  No.
17   Q.  The second company that MultiPlan
18 acquired, New England Healthcare Associates, do
19 you know what basis they reimburse providers on?
20   A.  For J-codes?
21   Q.  Yes.
22   A.  No.  I actually don't.  We just

81

1  recently closed that acquisition, so we're just
2  getting to know each other.
3    Q.  The dust is still settling?
4    A.  Yes.
5    Q.  None of MultiPlan's contracts with
6  its payors involved any sort of risk-sharing type
7  arrangement?
8    A.  I do not believe so.
9    Q.  We had talked a little bit about the
10 amount of the MultiPlan discount, and if I recall
11 correctly you said it was typically in the range
12 of 25 to 35 percent.  Did that discount vary
13 across providers?
14   A.  Yes.  I mean it could be subject to
15 an individual unique contract.
16   Q.  And what factors would affect that
17 variation?
18   A.  Well, the provider demand for revenue
19 versus our need for the provider in that
20 particular geographic area.
21   Q.  And have the MultiPlan discount off
22 of billed charges varied over time going back to,

Dan Dragalin, M.D   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   September 17, 2004
New York, NY

22 (Pages 82 to 85)

82

1  say, the early '90s?
2    A.   Yes.
3    Q.   Can you give me some idea of what the
4  variations were?
5    A.   Well, are you talking about HCPCS
6  codes now?
7    Q.   Yes.
8    A.   I think the standard that we were
9  using was about a discount of around 25 percent
10  for some length of time before I got here, and I
11  don't really know how long that was, and then, I
12  don't know, about six or seven months ago we
13  started to use as a standard 35 percent. That
14  doesn't mean that everybody flipped to 35,
15  because a lot of the contracts required
16  negotiation, and so there's 30's in there,
17  there's 25's in there, there's -- you know, but
18  somewhere between 25 and 35 now on the average.
19    Q.   And what caused the change from
20  25 percent as the baseline to 35 percent?
21    A.   Well, a desire to intensify our cost
22  containment abilities for our clients and a

83

1  desire to attempt to neutralize medical inflation
2  over the years.
3    Q.   And the J-code repricing discussion
4  that we talked about, that was actually never
5  implemented, correct?
6    A.   That's correct. We're still arguing.
7    Q.   And you said that one of the reasons
8  that you and others in MultiPlan were in favor of
9  the repricing system is to decrease the level of
10  variability that providers are getting for the
11  same drug across the country?
12    A.   Yes.
13    Q.   So is it fair to say that because the
14  argument about repricing continues, that
15  variability is also continuing?
16    A.   Yes.
17    Q.   And in general what factors are there
18  that contribute to the variability?
19    A.   Well, again there's a lack of a
20  standard, there's a lack of regulation, there's a
21  lack of oversight on provider pricing, drug
22  pricing, and so they can actually charge whatever

84

1  they want to charge. And they generally charge
2  whatever the market will bear. And the market
3  bears a lot more in some places than other
4  places.
5    Q.   Dr. Dragalin, those are all of the
6  questions that I have for you. I thank you again
7  for taking time out of your day to talk with us.
8  I'll turn it over, if Mr. Macoretta has any
9  questions, and that we should hopefully be out of
10  here shortly.
11        MR. MACORETTA: I do have a couple of
12  questions. Can you give me about a minute to
13  just organize my thoughts here?
14        THE WITNESS: Sure.
15  EXAMINATION BY
16  MR. MACORETTA:
17    Q.   Dr. Dragalin, let me start with this.
18  So I understand, prior to your conversion you
19  were paying physicians for physician administered
20  drugs under some J-code related system, is that
21  right? Or did I get it backwards?
22    A.   No. We're paying them currently the

85

1  same way we've always been paying them, which is
2  a straight percentage discount. This is for all
3  HCPCS codes, including J-code drugs.
4    Q.   Okay. So your contemplation or plan
5  to move to some AWP based system, the reason
6  you're doing that is because you know that it
7  will save you money, right?
8    A.   Yes.
9    Q.   And just so I can clarify this.
10  MultiPlan is not at all involved in pharmacy
11  benefits; is that right, with the exception of
12  your subsidiary in Wisconsin?
13    A.   That's correct.
14    Q.   Okay. So if I'm an employer, or one
15  of your clients, and I want to provide pharmacy
16  services to my employees, I have to do that
17  through somebody else?
18    A.   Correct.
19    Q.   Let me ask you to turn back to
20  Exhibit 1, which is my Bates numbers 52 and 53.
21    A.   Which one?
22    Q.   Exhibit 1, the J-code tutorial.

Dan Dragalin, M.D      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    September 17, 2004
New York, NY

23 (Pages 86 to 89)

<table>
<tr><td colspan="2">

86

1    A.   Okay.
2    Q.   Do you have that in front of you?
3    A.   I do.
4    Q.   All right. And I'm looking at the
5   sixth bullet point that I think Mr. Wells talked
6   to you about. The last sentence of that talks
7   about, or says, "A more realistic 'cost' of the
8   drug is the AP or figures price. This number is
9   not published."
10   A.   Right.
11   Q.   Is that your belief?
12   A.   Yes.
13   Q.   Acquisition price, is that your term
14  or is that a term that's used in the industry?
15   A.   It's not my term. It's a term that's
16  used in the industry, I believe. I'm not as
17  familiar with acquisition price as I am with AWP.
18  And I got that from the consultant.
19   Q.   From what consultant?
20   A.   Tom Morrow, I had mentioned his name.
21  The person that had helped us with this tutorial.
22   Q.   And that's not a price that's

</td><td colspan="2">

88

1   a basis of reimbursement, right?
2    A.   I'm sorry, could you repeat that?
3    Q.   Would you agree with the idea that
4   AWP is a widely used basis of reimbursement for
5   drugs?
6    A.   I don't know how widely used it is,
7   but it's conventional in the industry, yes.
8    Q.   Okay. Other than AWP, what other
9   conventional or widely used bases of drug
10  reimbursement are there?
11   A.   Well, there's negotiated prices that
12  are just line item prices. There is percentage
13  discounts, and upcoming there's ASP.
14   Q.   There's what?
15   A.   ASP.
16   Q.   You're talking about Medicare ASPs?
17   A.   Well, yeah.
18   Q.   Now, is it your understanding that
19  they will be available to plans like yourself?
20   A.   That's my understanding, starting
21  next year.
22   Q.   Okay. When they become available

</td></tr>
<tr><td colspan="2">

87

1   available to you?
2    A.   That is my understanding.
3    Q.   If something like acquisition price
4   became available to you, would you be interested
5   in knowing what that was?
6    A.   Yes.
7        MR. WELLS: I want to object to --
8   what do you mean by "available"?
9        MR. MACORETTA: Okay. I'm sorry, who
10  just said "what do you mean by available"?
11       MR. WELLS: I'm sorry, that's me,
12  Mr. Wells.
13       MR. MACORETTA: Okay.
14   Q.   If you considered acquisition price
15  to be a more realistic cost of drugs, and you had
16  access to acquisition prices, would you then
17  contemplate using that as the basis for
18  reimbursement?
19   A.   It would be one of the options.
20   Q.   And other than -- by the way, without
21  debating your earlier definition of AWP, it's
22  fair to say that AWP is one price that's used as

</td><td colspan="2">

89

1   will you -- do you intend to look at those as
2   another basis to determine drug prices?
3    A.   We certainly intend to analyze them.
4   I haven't heard great things about them, though.
5    Q.   What do you mean you haven't heard
6   great things about them?
7    A.   Well, I haven't seen them, but I
8   understand that they are very deep, in terms of
9   the discounts, and my understanding at this point
10  is that it's going to be very difficult to get
11  providers to agree to go along with them. But
12  that's just my preliminary understanding.
13   Q.   Okay. So your concern is not that
14  they're not accurate, it's just that providers
15  may not be willing to accept them?
16   A.   Yes.
17   Q.   Just because this was confusing,
18  again could you tell me what your understanding
19  of AWP is?
20   A.   Well, my understanding is it's the --
21  it's a published -- it's a published price per
22  drug, it changes as much as on a monthly basis,

</td></tr>
</table>

Dan Dragalin, M.D     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     September 17, 2004
New York, NY

24 (Pages 90 to 93)

90
1  if not more, and it's a price that's actually
2  submitted by the manufacturer, I guess, for
3  publication.
4      Q.   And what does the price represent?
5      A.   Well, theoretically it's supposed to
6  be the -- the average price that's charged to
7  purchasers of the drug. But my understanding is
8  that it doesn't account for things like rebates,
9  for example, which would dramatically obviously
10 impact the overall revenue, certainly.
11     Q.   So aside from things like rebates,
12 you understand that the AWP -- are you saying
13 that your understanding is that the AWP is
14 calculated from some average of prices charged by
15 someone for a particular drug?
16     A.   Yes, yes --
17         MR. WELLS: Objection to the form.
18     A.   Well, yes. But my understanding also
19 is that they're selected purchasers that are
20 excluded from that average, like Medicaid, for
21 example.
22     Q.   But your idea is that someone sits in

91
1  a room or on a computer somewhere and calculates
2  an average, right?
3      A.   Yes.
4      Q.   And that's an average of prices -- of
5  what prices? Prices that companies sell to
6  wholesalers, wholesalers sell to others, or
7  something else?
8      A.   My understanding is it's the average
9  of prices that come to the manufacturer.
10     Q.   So the prices at which the
11 manufacturers sell the drug?
12     A.   Yes.
13     Q.   Earlier you talked about how since
14 the '80s you had -- your understanding of AWP is
15 pretty much the same as it was in the late '80s?
16 Is that correct?
17     A.   You mean the calculation methodology?
18     Q.   Well, we talked about your definition
19 of AWP and I think you said you had formed it in
20 the late '80s. I'll ask you again. What you
21 just told me you understand what the AWP to mean,
22 is that always what you've understood it to mean?

92
1      A.   Pretty much.
2      Q.   Just so I understand. Mostly the
3  kind of drugs that MultiPlan pays for are drugs
4  administered in a doctor's office?
5      A.   No, not necessarily. We have drugs
6  that are administered in an institutional setting
7  also.
8      Q.   Fair enough. But pills or things
9  that are sold through pharmacies, has MultiPlan
10 ever paid for them?
11     A.   No.
12         MS. FELLER: Once again, I have to
13 bring to your attention, MultiPlan is not a
14 payor.
15         MR. MACORETTA: I understand.
16         MS. FELLER: We've thrown that term
17 around loosely, but it's important that we be
18 clear. We reprice, and our customers are payors.
19         MR. MACORETTA: No, I understand.
20         MS. FELLER: Okay.
21     Q.   Do you reprice prescription drugs
22 that are bought in a pharmacy?

93
1      A.   Generally no.
2      Q.   So it's, I'll just pick a drug, so
3  it's unlikely that you would be involved in any
4  claims for Paxil, for example, unless it was
5  given in a hospital?
6      A.   Correct.
7      Q.   Just so I understand. Acquisition
8  costs for drugs, has MultiPlan ever undertaken
9  any study or tried to figure out what they are?
10     A.   No.
11     Q.   Do you know how you would be able to
12 conduct such a study if you wanted to?
13         MR. WELLS: Objection.
14     A.   Do I know how we would get AWPs?
15     Q.   No, no, not AWP. Acquisition price.
16 Let me try again.
17     A.   No, I don't know how to do that.
18     Q.   Okay.
19     A.   That doesn't mean that we couldn't
20 get a consultant that might know. As I said in
21 this tutorial, I was under the impression that
22 acquisition price is not obtainable.

Dan Dragalin, M.D     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     September 17, 2004
New York, NY

25 (Pages 94 to 97)

94

1    Q.   Back to Exhibit 1, page 53. The
2  second page of Exhibit 1, I should say. The
3  second bullet point that talks about J-code
4  repricing is complex.
5    A.   Okay.
6    Q.   It says there are three separate
7  sources, the Physician's Desk Reference, the Red
8  Book and the HCPCS Coding Book must be used.
9  What do you use the Red Book for there?
10   A.   The actual price. That's where the
11 price comes from. The unit cost, I should say.
12 The unit price. I'm sorry.
13   Q.   So the AWP? Or some other price?
14   A.   Yeah, I think that's AWP. I've never
15 personally done the calculation, but that's where
16 the price comes from, because the number of
17 standard units would come from the PDR. The code
18 would come from the HCPCS. And the price would
19 come from the Red Book.
20   Q.   Okay. Well, let me try it this way:
21 When anybody in MultiPlan seeks to determine the
22 AWP price for a drug, where do you get that

95

1  information?
2    A.   I don't know where the reference
3  comes from. Operations actually does it.
4    Q.   Give me one second. I'm checking my
5  notes here. Do you ever use as a pricing
6  calculator the term U & C or usual and customary?
7    A.   Not personally, but yes, the company
8  does.
9    Q.   In what context do they use it?
10   A.   Well, we use it for analyses
11 sometimes. We don't -- none of our reimbursement
12 formulas are set by U & P.
13   Q.   Okay. U & P -- is U & P the same as
14 U & C?
15   A.   Yes. I'm sorry, yes, it is.
16   Q.   Okay.
17   A.   So none of them are actually set by
18 that. But many of our payor clients use U & C,
19 you know, if they didn't have a contract with us,
20 they would normally pay up to U & C. In a few of
21 them use a combination of U & C and our
22 discounts. So we occasionally get involved, you

96

1  know, in calculating differences, because we have
2  to explain it to our providers. And that's done
3  by -- we have a unit that does that.
4    Q.   So I understand this, the way this
5  would flow is billing or claims would come in
6  from whoever the provider is, you would do
7  whatever analysis or repricing it is, and then
8  you would pass that repricing information along
9  to your client. Is that right?
10   A.   Not exactly. The claim goes to the
11 client first, goes to the payor first. The payor
12 then sends the claim to us, usually
13 electronically. We then reprice it, send it back
14 to the payor. The payor cuts the check, pays the
15 claim.
16   Q.   And your computer system tells you
17 what rates or what methods your various payors
18 are going to use to pay these claims, right?
19   A.   The computer system just tells us
20 what the discount is with the provider. It does
21 not tell us what the payor is going to pay.
22 Because we, you know, the various payors have

97

1  different methodologies with regard to bundling
2  and unbundling, and what's covered and what's not
3  covered, et cetera. So we don't actually know
4  what the payor pays.
5    Q.   But you know what the methodology is?
6    A.   No, because each payor has a
7  different methodology.
8    Q.   Okay.
9    A.   I mean there's a standard
10 methodology, but everybody's got modifications.
11   Q.   Do you know if any of your customers,
12 which is what we're calling payors, right, first
13 of all?
14   A.   Yes.
15   Q.   Do you know if any of your customers
16 pay for any drugs that you process at a price
17 calculated on AWP?
18   A.   I know of one customer that does
19 that.
20   Q.   What is the methodology or formula?
21   A.   AWP plus -- well, it's Great West
22 Life, and it's -- a year ago it was region

Dan Dragalin, M.D    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    September 17, 2004
New York, NY

26 (Pages 98 to 101)

98

1  specific into five regions, and it varied from
2  AWP plus 5 to AWP plus 15 percent. I don't know
3  what it is today with them, but they do pay based
4  on AWP.
5      Q.   Have you ever had a conversation with
6  them about how AWP -- well, let me strike that.
7          Tell me when you were at Towers
8  Perrin, Dr. Dragalin?
9      A.   Early '90s. Like '90 to '92 or '3.
10 Something like that.
11     Q.   I asked you that because their
12 deposition is coming up as well. And when you
13 left you were in charge of the practice group
14 that was involved with drug pricing, drug
15 purchasing issues; is that fair?
16     A.   I wasn't actually the clinical
17 practice leader. There wasn't a group. You
18 know, there was a variety of disciplines -- well,
19 there was a variety of disciplines that would get
20 involved with drug pricing, so it wasn't
21 necessarily one cohesive unit. There was a bunch
22 of people involved, you know, depending on

99

1  what -- there were a lot of officers, a lot of
2  Towers Perrin officers, depending on who had the
3  client.
4      Q.   Okay. I think that's all the
5  questions I have for you, Dr. Dragalin.
6          THE WITNESS: Okay, great.
7          MR. MACORETTA: Thank you.
8          MR. WELLS: Based on one of those
9  answers, I want to ask maybe two or three
10 follow-up questions.
11 EXAMINATION (Cont'd)
12 MR. WELLS:
13     Q.   You said, Dr. Dragalin, that you
14 understood AWP to mean an average of the prices
15 from the manufacturers to the wholesalers. Is
16 that correct?
17     A.   Right. That's what I understand.
18     Q.   And you also understood that in some
19 circumstances providers were able to acquire the
20 drugs at 20 to 30 percent less than AWP from the
21 wholesalers. Is that correct?
22     A.   Yes.

100

1      Q.   And does that mean that if the
2  wholesaler was actually purchasing the drug at
3  AWP, he would be selling it to the provider at a
4  20 to 30 percent loss?
5      A.   Well, that's certainly possible, but
6  it's usually done in a package, so that there's a
7  constellation of drugs that are sold, and he
8  would have to be making up the revenue with the
9  other drugs, obviously, if they were going to
10 sell one at a loss, but that's not unheard of.
11     Q.   Would it also be possible that the
12 wholesaler was able to reduce his price through
13 rebates and other discounts?
14     A.   Absolutely. It's a very convoluted
15 payment methodology.
16         MR. WELLS: Thank you. Those are all
17 of my questions.
18         MR. MACORETTA: I have no further
19 questions.
20         (Whereupon, at 1:47 p.m., the
21 deposition was concluded.)
22

101

1          C E R T I F I C A T E
2
3  STATE OF NEW YORK     )
4                        ) ss.:
5  COUNTY OF SUFFOLK     )
6
7          I, FRANK J. BAS, a Registered
8  Professional Reporter and Notary Public within
9  and for the State of New York, do hereby certify:
10         That I reported the proceedings in
11 the within-entitled matter, and that the within
12 transcript is a true record of such proceedings.
13         I further certify that I am not
14 related by blood or marriage, to any of the
15 parties in this matter and that I am in no way
16 interested in the outcome of this matter.
17         IN WITNESS WHEREOF, I have hereunto
18 set my hand this 17th day of September, 2004.
19
20
21         FRANK J. BAS, RPR
22

Dan Dragalin, M.D    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    September 17, 2004
New York, NY

1

| A | | | | |
|---|---|---|---|---|
| **abilities** 82:22 | **accepting** | **actual** 13:4 | **advice** 14:9 | 60:11 61:4 |
| **ability** 43:6 | 52:10 67:11 | 14:16 21:5,6 | **advocate** 69:21 | 62:8 64:7 |
| 52:13 | **accepts** 67:5 | 21:9 60:1 | **affect** 81:16 | 66:3 69:12 |
| **able** 37:18 | **access** 28:19 | 94:10 | **affected** 19:13 | 70:5,20 72:6 |
| 54:14 57:18 | 34:12,13 | **actually** 25:21 | 20:13 21:21 | 73:10,11 |
| 67:10 93:11 | 87:16 | 38:3,21 | **afield** 67:20 | 75:7,12 78:2 |
| 99:19 100:12 | **accessing** 52:9 | 52:17 60:3 | **after** 8:3 31:5 | 78:3 79:7 |
| **about** 5:14 7:2 | **accomplish** | 60:21 68:20 | 63:18 | 84:5 85:2,10 |
| 9:14 10:7,12 | 54:14 | 80:22 83:4 | **again** 15:8 | 86:4 97:13 |
| 10:13,19 | **according** 64:1 | 83:22 90:1 | 23:3 40:2 | 99:4 100:16 |
| 11:4,12 | 65:6 67:13 | 95:3,17 97:3 | 54:8 67:19 | **alleviate** 26:18 |
| 12:12 14:7 | **account** 64:14 | 98:16 100:2 | 72:2 76:22 | **allow** 49:15 |
| 14:10 15:2 | 90:8 | **Adam** 73:17 | 83:19 84:6 | 79:21 |
| 26:12 28:5 | **accurate** 19:15 | **addition** 69:10 | 89:18 91:20 | **allowable** |
| 29:15 31:14 | 22:15 23:12 | 72:4 | 92:12 93:16 | 31:15,19 |
| 32:4 33:6 | 25:9 27:10 | **additional** | **agencies** 58:10 | **allowing** 28:18 |
| 39:11 43:2 | 58:14 62:14 | 61:5 | **agency** 13:15 | 66:19 |
| 45:9 46:18 | 74:5 89:14 | **address** 5:4 | **ago** 65:16 | **alluding** 79:7 |
| 48:17,19,20 | **achieve** 77:2 | **adhere** 46:14 | 82:12 97:22 | **almost** 16:8 |
| 48:20 49:11 | **acquire** 99:19 | **administered** | **agree** 24:13,17 | **alone** 65:5 |
| 51:4 55:19 | **acquired** 72:8 | 12:17 14:5 | 46:13 47:5 | **along** 60:7 |
| 56:12,19 | 72:9 75:18 | 14:11 35:9 | 49:15 50:2 | 64:3 89:11 |
| 57:12 59:8 | 75:21 78:7 | 39:22 40:5,9 | 66:11 67:16 | 96:8 |
| 62:13 68:3 | 80:18 | 43:13 47:18 | 88:3 89:11 | **also** 7:9 8:5 |
| 69:1,6,19 | **acquisition** | 47:22 48:22 | **agreed** 60:11 | 11:2 24:17 |
| 70:16 73:4 | 31:8,10 | 49:16 51:5 | **agreeing** 46:12 | 35:1 45:6 |
| 76:7 79:13 | 56:16 57:2,5 | 52:18 57:6 | 51:20 | 54:11 56:11 |
| 81:9 82:5,9 | 57:17 74:2,5 | 80:14 84:19 | **agreement** | 57:15 58:7 |
| 82:12 83:4 | 74:11 77:4,7 | 92:4,6 | 29:3 70:5 | 65:14 73:12 |
| 83:14 84:12 | 77:11,13 | **administering** | 73:3 | 78:14 83:15 |
| 86:6,7 88:16 | 78:9 81:1 | 50:5 | **agreements** | 90:18 92:7 |
| 89:4,6 91:13 | 86:13,17 | **administrati...** | 62:2,6,14,17 | 99:18 100:15 |
| 91:18 94:3 | 87:3,14,16 | 14:17,18 | 63:2 | **Altkin** 73:17 |
| 98:6 | 93:7,15,22 | 49:17 50:10 | **ahead** 74:22 | **always** 15:10 |
| **above** 74:11 | **across** 48:12 | 79:18 80:6 | **all** 1:9 6:19 | 15:13,13 |
| **absolutely** | 53:10 81:13 | **administrative** | 10:1 12:7 | 19:18 22:17 |
| 15:21 29:20 | 83:11 | 34:8 59:20 | 13:22 22:7 | 23:15 73:6 |
| 50:22 51:1 | **act** 15:10 | **advance** 62:4 | 27:6 29:14 | 85:1 91:22 |
| 68:13 74:16 | **ACTION** 1:6 | 62:18 | 30:17 34:1,2 | **am** 69:5 86:17 |
| 100:14 | **actions** 1:9 | **adverse** 27:3 | 34:19 35:9 | 101:13,15 |
| **accept** 47:21 | 69:9 72:4,16 | **advertisement** | 41:11,17 | **amendments** |
| 50:3 58:10 | **activities** 12:12 | 43:18 | 44:17,19 | 62:6 |
| 89:15 | **activity** 12:8 | **advertising** | 47:14 48:11 | **America** 38:20 |
| | 30:20 31:1 | 46:10 | 55:21 56:16 | **among** 35:4 |

Henderson Legal / Spherion
(202) 220-4158

Dan Dragalin, M.D       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY       September 17, 2004
New York, NY

2

| | | | | |
|---|---|---|---|---|
| 45:12 71:20 | 80:5,10,10 | 37:6 41:15 | 23:7 28:6 | 89:19 90:12 |
| **amount** 43:6 | 81:6 84:8 | 68:3 71:2,4 | 31:4 87:1,4,8 | 90:13 91:14 |
| 43:11 47:16 | 93:3,9 97:11 | 85:19 91:20 | 87:10 88:19 | 91:19,21 |
| 48:20,21 | 97:15,16 | 99:9 | 88:22 | 93:15 94:13 |
| 51:4,18 | 101:14 | **asked** 19:3 | **Avenue** 2:11 | 94:14,22 |
| 53:14 67:5 | **anybody** 33:14 | 38:1 80:11 | 3:13,19 5:5 | 97:17,21 |
| 81:10 | 94:21 | 98:11 | **average** 1:5 | 98:2,2,4,6 |
| **amounts** 26:15 | **anyone** 18:7,10 | **asks** 69:6 | 15:3 16:6,7 | 99:14,20 |
| 43:20 | 38:12 | **ASP** 88:13,15 | 19:11 21:5,6 | 100:3 |
| **analyses** 95:10 | **anything** 28:21 | **ASPs** 88:16 | 27:9 32:14 | **AWPs** 93:14 |
| **analysis** 61:9 | 79:15 | **associate** 12:22 | 43:2 58:11 | **a.m** 2:7 5:2 |
| 96:7 | **anyway** 70:4 | **associated** 69:8 | 77:13 82:18 | 40:16 |
| **analytic** 61:16 | **anywhere** 48:7 | 72:3,16 | 90:6,14,20 | |
| **analyze** 61:13 | **AP** 31:9 86:8 | **Associates** | 91:2,4,8 | **B** |
| 89:3 | **Appearing** 3:3 | 76:12 80:18 | 99:14 | **B** 4:15 24:17 |
| **ancillary** 32:21 | **applied** 8:21 | **assume** 38:5 | **avoid** 67:18 | **back** 12:19 |
| 44:15 56:1 | **apply** 64:3 | **assuming** 22:8 | 68:11 | 17:4,5 19:21 |
| **Andrea** 60:22 | 66:10 67:8 | **assure** 7:15 | **aware** 29:18 | 20:3 22:11 |
| **Anita** 75:4 | **applying** 61:13 | **Atlanta** 9:3 | 29:21 55:16 | 23:2,22 |
| **another** 7:19 | **appreciated** | 13:3 | 56:14 | 31:18 36:18 |
| 24:13 34:11 | 8:14 | **Atlantic** 10:15 | **AWP** 4:20 | 37:8 39:2 |
| 63:11 68:18 | **approach** | **attempt** 83:1 | 15:4,9 17:16 | 49:11 57:13 |
| 76:13 77:15 | 44:13 | **attempted** 31:1 | 19:10,16,18 | 57:15,19 |
| 78:6 89:2 | **appropriate** | **attention** 55:9 | 20:9,12 21:4 | 65:2 71:2,18 |
| **answer** 7:5,15 | 59:12 | 73:18 92:13 | 21:21 22:13 | 74:19 75:1 |
| 17:3,6 22:6 | **appropriately** | **attitude** 58:22 | 22:21 23:5,7 | 81:22 85:19 |
| 56:21 76:4 | 27:7 | 59:2 | 23:7,9,19 | 94:1 96:13 |
| **answers** 7:10 | **area** 32:16 | **Attorneys** 1:1 | 24:1,15,19 | **background** |
| 99:9 | 40:11 81:20 | 3:5,12 | 25:5,12 26:3 | 8:18 |
| **anticipated** | **arena** 32:11 | **attract** 43:4 | 54:2,17 | **backwards** |
| 37:5 | **arguing** 83:6 | **attractive** | 57:13,18 | 84:21 |
| **any** 7:20 11:14 | **argument** 48:7 | 52:15 53:19 | 58:1,11 | **bad** 58:5 |
| 11:20 13:19 | 83:14 | **attrition** 27:19 | 59:22 61:5,7 | **badly** 47:7 |
| 14:3,9 15:2 | **around** 8:1 | **Authority** | 61:9,10,11,17 | **balance** 59:6 |
| 18:4,8 25:11 | 30:21 54:12 | 13:10 | 63:3,21 | 64:5 66:22 |
| 28:2,7 29:7 | 82:9 92:17 | **autoadjudic...** | 64:17 65:11 | 67:10,12,17 |
| 33:1,4 38:7 | **arrangement** | 71:3 | 65:12,14 | 68:8,12 |
| 38:14 39:20 | 81:7 | **autoadjudic...** | 69:5 70:14 | 76:22 77:2 |
| 40:3 41:9,10 | **arrangements** | 71:15 | 72:20 73:22 | **balanced** 68:6 |
| 43:1 46:14 | 33:22 37:4 | **autoadjudic...** | 74:1,3,6,9 | **balancing** |
| 48:16,17 | **arrive** 48:9 | 71:8 | 75:11 76:16 | 15:10 |
| 49:2 51:2 | **aside** 90:11 | **availability** | 77:3,5 85:5 | **band** 34:22 |
| 57:4 59:7 | **ask** 7:4,14,19 | 21:15 | 86:17 87:21 | **bargaining** |
| 60:2,7 62:3 | 23:14 31:11 | **available** 21:11 | 87:22 88:4,8 | 62:22 |
| | | | | **Bas** 2:2,13 5:7 |

Henderson Legal / Spherion
(202) 220-4158

Dan Dragalin, M.D      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY      September 17, 2004
New York, NY

3

| | | | | |
|---|---|---|---|---|
| 101:7,21 | 46:22 54:14 | **before** 2:12 | **bill** 26:12,14 | **bundling** 97:1 |
| **based** 15:3 | 55:16 56:16 | 5:16 9:15 | 50:3 57:1 | **business** 5:4 |
| 24:6 25:5,12 | 57:12,18 | 10:13,14 | 59:20 64:5 | 32:18 33:10 |
| 26:3,18 27:9 | 58:1 60:1,17 | 11:4,9,21 | 66:22 67:10 | 33:19 35:12 |
| 31:20 34:12 | 62:5 67:20 | 12:22 13:8 | 67:12 | 35:21 41:18 |
| 64:2 69:4 | 69:7,8 71:21 | 18:2 30:22 | **billed** 56:15 | **but** 7:22 13:17 |
| 85:5 98:3 | 72:3,15,21,22 | 41:21 42:14 | 68:12 81:22 | 17:17 21:7 |
| 99:8 | 74:10 75:10 | 54:22 56:21 | **billing** 49:16 | 22:18 23:10 |
| **baseline** 32:8 | 75:19 77:11 | 73:21 76:9 | 67:17 68:6,8 | 24:9 27:6 |
| 82:20 | 78:1 81:14 | 82:10 | 96:5 | 28:22 30:10 |
| **bases** 88:9 | 84:9 87:4,15 | **begin** 20:5 | **biology** 8:21 | 30:15 31:3 |
| **basis** 16:8 | 87:19 88:19 | **beginning** 20:8 | **bit** 30:22 41:22 | 31:20,22 |
| 19:14 20:14 | 89:10,15 | 23:20 30:21 | 44:16 54:12 | 33:8,9,14 |
| 21:22 22:14 | 90:6 92:17 | 60:22 | 71:11 74:22 | 34:22 35:11 |
| 22:18,20 | 93:3,11 94:8 | **being** 37:5 | 81:9 | 38:6 39:9 |
| 48:4 50:19 | 100:3,8,11 | 46:5 65:18 | **black** 22:16 | 43:16,20 |
| 51:11,16 | **Beach** 38:19 | 67:10 68:12 | **blood** 101:14 | 45:6,11 46:2 |
| 52:11 57:7 | **bear** 17:15 | 70:2 | **Blue** 11:5,6,6 | 50:20,22 |
| 57:10 63:3 | 48:14 65:15 | **belief** 23:13,22 | **Board** 9:4 | 52:11 54:11 |
| 73:9 80:19 | 84:2 | 53:11 86:11 | **BOCKIUS** | 55:1 57:22 |
| 87:17 88:1,4 | **bears** 54:2 | **believe** 27:11 | 3:11 | 59:18 60:5 |
| 89:2,22 | 84:3 | 42:1 57:22 | **Book** 94:8,8,9 | 63:10 65:5 |
| **Bates** 17:15 | **became** 20:15 | 58:16 74:8 | 94:19 | 70:3 71:12 |
| 54:2,10 | 87:4 | 77:6 81:8 | **both** 12:8 22:8 | 77:8 82:17 |
| 85:20 | **because** 20:2 | 86:16 | 36:10 38:16 | 88:7 89:7,11 |
| **Bates-numb...** | 21:11 23:21 | **believed** 23:17 | 50:4,10 69:7 | 90:7,18,22 |
| 4:19 54:16 | 24:12 25:6 | 27:12 77:4 | 72:2 80:2 | 92:8,17 |
| **battling** 45:21 | 41:11 58:19 | **benchmark** | **bottom** 68:20 | 94:15 95:7 |
| **BCE** 69:10 | 73:12 77:13 | 22:22 26:18 | **bought** 92:22 | 95:18 97:5 |
| 72:4,6,7 | 82:15 83:13 | 74:1 76:19 | **break** 7:20 | 97:10 98:3 |
| 77:19 78:6 | 85:6 89:17 | **benefit** 28:22 | **brief** 32:17 | 100:5,10 |
| 78:10,13 | 94:16 96:1 | 39:21 40:4 | **briefly** 28:5 | **buy** 24:13,17 |
| **be** 4:10 7:17 | 96:22 97:6 | **benefits** 11:14 | **bring** 31:1 | 58:20 77:10 |
| 8:9,12,14 | 98:11 | 13:19,21 | 92:13 | **buying** 24:22 |
| 19:4 23:10 | **become** 37:14 | 28:11 85:11 | **BS** 8:20 | |
| 24:3,4,5 | 46:12 88:22 | **best** 39:7 | **build** 47:6 | **C** |
| 27:13 30:11 | **been** 5:6,15,18 | **better** 6:21 | **bullet** 19:9 | **C** 3:1 24:17 |
| 30:14,20 | 22:19 23:15 | 19:6 35:13 | 22:12 23:3 | 32:5 95:6,14 |
| 33:5,7 35:10 | 29:21 31:3 | 44:3 76:5 | 25:1 26:22 | 95:18,20,21 |
| 35:11,18 | 38:1 41:5,18 | **between** 15:10 | 75:5 86:5 | 101:1,1 |
| 37:10,21 | 56:20 58:12 | 26:7 34:9 | 94:3 | **calculated** |
| 38:5,13 42:6 | 65:21 69:21 | 36:13 48:8 | **bunch** 98:21 | 90:14 97:17 |
| 42:12 43:15 | 78:16,19 | 61:11 76:20 | **bundle** 50:5,7 | **calculates** 91:1 |
| 44:6 45:8,13 | 85:1 | 82:18 | **bundled** 50:21 | **calculating** |
| | | | | 96:1 |

Henderson Legal / Spherion
(202) 220-4158

Dan Dragalin, M.D     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     September 17, 2004
New York, NY

4

| | | | | |
|---|---|---|---|---|
| calculation 91:17 94:15 | cases 16:12 20:4 21:8 | 98:13 charged 47:22 | clarify 41:16 85:9 | 40:9 70:17 91:9 94:17 |
| calculations 25:21 | 22:19 27:20 57:19 68:8 | 50:3 90:6,14 charges 22:15 | clear 7:9,15 35:18 79:5 | 94:18,19 96:5 |
| calculator 95:6 | 72:21 74:12 | 22:18,20 | 92:18 | comes 43:15 |
| call 8:2 | Casner 55:16 | 26:12 27:5 | clearly 27:4 | 64:4 94:11 |
| called 28:12 | 55:21 | 32:5 48:6,8 | client 35:6 | 94:16 95:3 |
| 34:7,11 | casual 7:12 | 48:10 51:10 | 96:9,11 99:3 | coming 98:12 |
| calling 97:12 | caused 27:19 | 51:17,17 | clients 20:20 | commercial |
| came 13:20,22 | 82:19 | 53:9,12,13 | 37:4 38:6 | 33:16 |
| 20:12 21:20 | causes 26:8 | 57:1 72:22 | 43:4,12,21 | common 73:22 |
| 27:15 30:20 | 71:20 | 78:15 81:22 | 44:7 48:17 | communicate |
| 44:2 64:20 | center 20:6 | charging 58:21 | 52:12 53:15 | 63:5 75:8 |
| can 5:21 6:12 | 55:17 56:2 | check 96:14 | 59:8 68:10 | communicati... |
| 6:17 7:8,12 | centers 58:9 | checking 95:4 | 68:16 71:13 | 48:16 |
| 7:15 8:1 | central 70:13 | chemotherapy | 73:3,7 80:11 | community |
| 20:11 22:6 | certain 24:14 | 49:22 | 82:22 85:15 | 58:13,18 |
| 23:18 32:17 | 24:18 | chief 69:13 | 95:18 | companies |
| 35:18 37:20 | certainly 35:20 | chronological | Clinic 13:10 | 25:3 29:13 |
| 37:20 40:9 | 37:20,21 | 54:13 75:1 | clinical 11:10 | 33:17 91:5 |
| 40:12 41:16 | 68:2 71:10 | circles 20:10 | 12:8,13,14 | company 8:10 |
| 49:3 51:13 | 89:3 90:10 | circumstances | 98:16 | 8:13 13:12 |
| 54:12 55:9 | 100:5 | 5:22 24:4,6 | clinics 13:6 | 18:21 29:2 |
| 59:21 63:11 | certified 9:4 | 57:9 99:19 | closed 81:1 | 38:3 69:17 |
| 64:15 67:12 | certify 101:9 | CIVIL 1:6 | closer 6:18 | 72:7 75:17 |
| 68:18 69:11 | 101:13 | claim 16:11 | 77:5 | 75:20 78:7 |
| 71:10,10 | cetera 6:4 14:2 | 40:7,9,10,11 | Coalition | 80:17 95:7 |
| 73:15 74:14 | 61:15 73:14 | 50:1,2 51:11 | 38:19 | compensate |
| 76:5,15 | 97:3 | 51:14,19 | code 14:15 | 59:13 60:9 |
| 77:11,15 | change 62:3,6 | 57:7,10 58:2 | 25:7 47:15 | compensated |
| 82:3 83:22 | 82:19 | 63:20,22 | 48:2 94:17 | 34:4 46:4,6 |
| 84:12 85:9 | changed 16:18 | 64:17,19 | codes 23:6 | compensation |
| cannot 38:5 | changes 89:22 | 65:5 67:3,6 | 25:6 48:3,5 | 34:15 46:8 |
| can't 20:16 | changing | 70:19 71:1,3 | 61:4 63:22 | compete 45:12 |
| 22:7 23:14 | 69:22 | 71:6 96:10 | 79:7 82:6 | competitive |
| 24:11 29:5 | charge 4:11 | 96:12,15 | 85:3 | 39:4 |
| 31:21 32:3 | 9:10 32:15 | claims 33:20 | Coding 94:8 | competitor |
| 46:1 50:18 | 34:9 41:20 | 40:8 41:10 | cohesive 98:21 | 38:16 44:8 |
| 56:21 71:3 | 42:2,4,15 | 41:12,13 | coinsurance | 78:10 |
| 77:12 79:11 | 47:17 48:21 | 43:8 46:7 | 73:13 | competitors |
| care 12:14 | 50:10 55:22 | 50:16,20 | combination | 38:7,12 |
| 28:20 39:11 | 57:22 58:2 | 52:14 66:3 | 95:21 | 39:16 44:2 |
| Caruso 63:13 | 64:9,14 | 71:9,14,16,19 | come 5:14 | complained |
| case 5:15 | 83:22 84:1,1 | 93:4 96:5,18 | 36:18 37:8 | 51:4 |

Dan Dragalin, M.D        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY        September 17, 2004
New York, NY

5

| | | | | |
|---|---|---|---|---|
| complaint 57:11 | consultant 18:16 19:1 | 45:7,10 56:8 67:2 79:20 | 83:5,6 85:13 85:18 91:16 | 44:20 64:4 court 1:2 17:3 |
| complaints 51:9 | 20:22 55:2 86:18,19 | 81:5 82:15 contractual | 93:6 99:16 99:21 | cover 16:2 47:13 50:3 |
| completed 75:19 | 93:20 consulted | 44:17 51:18 66:15 67:4,9 | correctly 30:21 81:11 | coverage 12:15 12:16 |
| complex 70:15 94:4 | 13:16 19:2 consulting | contractually 68:7 | cost 14:17 15:10 16:2 | covered 68:9 97:2,3 |
| complexity 25:6 71:18 | 11:13,15 13:19 | contribute 83:18 | 16:12 20:4,6 26:5 31:15 | covering 9:21 CP 48:1 |
| computer 91:1 96:16,19 | contained 65:3 containment | control 31:2 43:6 44:4 | 31:19 39:12 50:4,9 57:17 | CPT 47:15 48:3 |
| concern 89:13 | 26:5 82:22 | Cont'd 99:11 | 74:2 77:1,7 | created 18:6 46:17 |
| concerned 40:11 | contemplate 87:17 | conventional 88:7,9 | 77:13 82:21 86:7 87:15 | creating 18:4,8 Cross/Blue |
| concluded 100:21 | contemplation 85:4 | conversation 7:12 24:11 | 94:11 costly 80:7 | 11:7 currently |
| conduct 93:12 | context 66:2 95:9 | 63:17 98:5 conversations | costs 20:2 31:8 33:20 39:18 | 72:19 84:22 customary |
| conference 8:2 | continue 27:6 | 14:13 | 44:4 56:16 | 32:4 95:6 |
| conferences 22:9 30:11 | continues 56:14 58:6 | conversion 84:18 | 57:2,5 73:13 74:6,11 77:5 | customer 70:3 97:18 |
| 30:14 | 71:21 83:14 | convince 58:7 | 77:11 93:8 | customers 34:5 |
| confidential 1:1 38:4 | continuing 83:15 | convinced 20:15 | could 8:13 17:2,3 24:1 | 37:1,17 39:11 51:2,3 |
| confined 28:14 | contract 34:16 35:2 36:2 | convincing 71:12 | 26:18 30:14 38:18,21 | 52:3,8,15 92:18 97:11 |
| confusing 89:17 | 44:10 45:3 57:21 64:1 | convoluted 21:13 100:14 | 40:1 45:8 61:13,18 | 97:15 cut 54:11 |
| connected 24:12 | 67:7,13,14 68:14 81:15 | coordinating 12:11 | 67:1 69:7 72:2,5 75:1 | cuts 96:14 cutting 27:20 |
| consent 62:3 62:18 | 95:19 contracted | coordination 13:5 | 76:4 77:22 79:3 81:14 | |
| consenting 51:22 | 56:5 contracting | copies 17:16 | 88:2 89:18 | **D** |
| consider 53:6 | 10:4 44:12 56:1 | copy 17:15 54:9 | couldn't 93:19 counsel 54:1 | D 4:2 5:3,3 24:18 41:4,4 |
| considered 53:2 78:21 | contracting/... 55:17 | corporate 6:2 | country 12:10 48:12 62:12 | Dale 73:17 DAN 1:13 2:10 |
| 87:14 | contracts 34:19,22 | corporation 28:10,12 | 83:11 | 4:5 |
| consisted 10:18 | 35:1,4 37:13 37:18,19,21 | correct 21:13 26:13,16 | County 13:9 101:5 | data 70:20 dated 55:11 |
| constant 48:11 | 37:22 44:18 | 43:3 44:8 53:16 66:7 | couple 9:6 41:15 84:11 | 61:1,20 63:13 68:21 |
| constantly 45:21 | | 74:13 80:3 | course 28:2 | 73:17 75:4 77:17 |
| constellation 100:7 | | | | |

Henderson Legal / Spherion
(202) 220-4158

Dan Dragalin, M.D   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   September 17, 2004
New York, NY

6

day 84:7
101:18
deadline 77:20
deal 10:21 28:9
28:10 40:7
dealings 20:19
deals 30:9 35:8
dealt 22:19
debating 87:21
decade 12:2
14:22 27:14
30:18
decades 58:13
58:18
decision 46:2
decisions 12:15
decrease 24:18
26:5,20
33:20 59:21
59:22 65:21
83:9
decreasing
56:7
deductible
73:14
deep 89:8
deeper 73:1
definitely
36:22
definition
31:21 87:21
91:18
defraying
73:13
degree 31:2
35:6
Dekalb 13:9
delay 70:10
delivered 19:4
51:15
demand 81:18
demands 45:18
Denver 10:3
depending

14:12 15:8
64:21 65:15
72:21 98:22
99:2
depends 35:5,7
39:10 48:12
50:13,17
73:8
depose 29:9
deposed 5:15
5:19
deposition
1:13 2:9 8:7
36:21 37:5
98:12 100:21
depositions 7:3
dermatologists
75:10
description
32:17
desire 82:21
83:1
Desk 94:7
deter 80:14
determine 61:5
89:2 94:21
determined
17:1,10
developed 49:8
development
78:5
dialysis 55:17
56:2,6 58:9
did 9:1,15 10:4
10:10,21
11:14 12:16
14:3 15:1
18:4,7,22
20:18 23:21
25:11,15
35:12,16
48:9 53:6
55:13 59:7
59:10 60:2,7

61:6 66:10
69:18 70:9
72:16 78:20
81:12 84:21
didn't 19:2
20:3,5 25:20
40:2 41:9
95:19
difference 11:3
34:9 61:11
differences
96:1
different 26:14
26:14 35:4
37:7 44:14
50:13 60:15
60:16 65:17
70:16 97:1,7
differently
44:16 52:20
difficult 58:7
89:10
difficulties
69:3
dinners 30:15
direct 44:22
direction 60:3
directly 52:12
director 6:2
12:3 13:1,9
18:20 25:19
directors 12:13
26:1
disciplines
98:18,19
disclosed 36:20
discount 23:10
24:3,5,8
33:22 34:10
48:6 50:11
56:10 64:3
64:22 65:1
66:10 72:18
73:1 78:15

79:6,10,11
81:10,12,21
82:9 85:2
96:20
discounted
51:18
discounts
19:13 20:13
21:12,16,22
28:6 34:3
88:13 89:9
95:22 100:13
discover 21:20
discuss 59:10
discussing
42:15
discussion
15:9 20:9
24:10 39:1
40:15 43:14
43:16 49:6
54:21 57:14
74:17 83:3
discussions
14:22 15:2,7
43:1 49:11
49:13 59:7
disease 18:21
dispensed 33:4
disruption
15:11,14
dissatisfaction
15:12,15
DISTRICT 1:2
1:2
disturb 71:7
divide 62:12
divided 65:13
66:14,16
doctors 58:16
doctor's 92:4
document 1:8
4:16,19
17:13,21

18:2,11 19:7
54:2,16,19
67:21 68:2
77:16
documents
8:12 38:5
68:4
does 15:19
21:10 28:10
31:17 32:7
33:1,12,21
35:21 37:13
38:7 39:6,20
40:3 43:5,10
44:10 47:16
49:14 50:12
54:9 64:3
66:10 67:8
75:12 77:19
78:13 79:4
80:5 90:4
95:3,8 96:3
96:20 97:18
100:1
doesn't 28:21
33:3 42:9
79:15 82:14
90:8 93:19
doing 35:12
53:2 64:2
66:6 72:19
77:20 85:6
domiciled 10:2
Don 69:6,14,16
done 25:22
57:4 94:15
96:2 100:6
don't 7:17,21
28:3,9 30:9
31:19 36:15
36:16 38:2,2
38:6 40:7
46:2,3 50:7
59:19 65:20

Dan Dragalin, M.D    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    September 17, 2004
New York, NY

7

| | | | | |
|---|---|---|---|---|
| 77:6,7,14 | 86:8 88:9 | 51:12 55:3 | entitled 4:16 | **EXAMINAT...** |
| 78:22 80:22 | 89:2,22 90:7 | 73:5 87:21 | 17:14,21 | 5:9 84:15 |
| 82:11,12 | 90:15 91:11 | 91:13 | **entity** 18:18 | 99:11 |
| 88:6 93:17 | 93:2 94:22 | **early** 8:1 82:1 | **equipment** | **examined** 5:7 |
| 95:2,11 97:3 | 98:14,14,20 | 98:9 | 30:12 | 41:6 |
| 98:2 | 100:2 | **easier** 37:11 | **especially** | **example** 16:4 |
| **down** 7:6,13 | **drugs** 10:8 | **educational** | 30:16 59:1 | 24:13 27:18 |
| 9:22 19:9 | 12:17 14:5,7 | 8:18 | 69:9 70:1 | 49:4 90:9,21 |
| 39:18 71:9 | 14:11 23:6,9 | **effective** 15:10 | 72:4 | 93:4 |
| **download** | 23:18 24:8 | 44:3 | **ESQ** 3:8,15,21 | **examples** |
| 52:10 | 24:17 28:7 | **effort** 55:18 | **essentially** | 38:18 49:2 |
| **Dr** 4:12 5:11 | 32:2 33:4 | 56:1 63:4 | 11:8 30:9 | **exceed** 57:2 |
| 6:17 8:1,17 | 35:9 39:22 | **egregious** 59:2 | 49:9 51:14 | **except** 10:3,16 |
| 18:1,15 | 40:5,9 43:13 | **either** 52:9 | 51:22 57:20 | 11:2,8 |
| 42:22 55:1 | 47:18,22 | 62:3,5,17 | 73:10 | **exception** |
| 84:5,17 98:8 | 48:22 49:16 | **electronically** | **established** | 85:11 |
| 99:5,13 | 49:17 51:5 | 51:15 96:13 | 63:19 | **excessive** 27:5 |
| **Dragalan** 4:12 | 52:19 53:7 | **else** 18:7 75:8 | **estimate** 20:11 | 51:10 53:12 |
| **Dragalin** 1:13 | 53:14 55:20 | 85:17 91:7 | **et** 6:4 14:2 | 53:13 58:1 |
| 2:10 4:5,16 | 56:13,15,19 | **Emergis** 72:7 | 61:15 73:14 | **exclude** 68:7 |
| 4:19 5:11 | 57:5 64:3 | 75:18 | 97:3 | **excluded** 90:20 |
| 6:17 8:1,17 | 66:10 67:8 | **Emory** 9:3,5 | **even** 16:2 77:3 | **exclusive** 45:17 |
| 17:20 18:1 | 74:11 80:6 | **employee** | **ever** 5:15 | 56:9 |
| 42:22 54:15 | 80:14 84:20 | 34:13 | 13:11,14 | **exclusively** |
| 55:1 84:5,17 | 85:3 87:15 | **employees** | 15:1 21:4 | 13:2 |
| 98:8 99:5,13 | 88:5 92:3,3,5 | 85:16 | 28:7 29:8 | **exclusives** |
| **dramatically** | 92:21 93:8 | **employer** 36:1 | 48:16 51:4 | 45:14,16 |
| 90:9 | 97:16 99:20 | 85:14 | 52:17 57:4 | 46:3 |
| **draw** 25:21 | 100:7,9 | **employers** | 59:7,10 | **Excuse** 6:6 |
| 55:9 73:18 | **duly** 5:6 | 14:2 33:16 | 68:10 70:9 | **executive** 9:10 |
| **drug** 14:17,20 | **during** 12:2 | **end** 20:16 | 78:20 92:10 | 64:8,13 |
| 15:18,20 | 18:17 43:15 | 73:19 | 93:8 95:5 | **exercise** 61:16 |
| 16:3,12 | **dust** 75:7,12,16 | **endocrinolo...** | 98:5 | **exhibit** 4:16,19 |
| 19:12 20:2 | 81:3 | 58:9 | **everybody** | 17:13,13,20 |
| 21:10 24:11 | **D.C** 3:14 | **England** 76:8 | 82:14 | 22:11 23:2 |
| 24:12,13,14 | | 76:11,11 | **everybody's** | 24:2 25:2 |
| 24:19 26:7 | **———— E ————** | 80:18 | 97:10 | 27:1 53:22 |
| 30:13 49:22 | **E** 3:1,1,21 4:2 | **enough** 15:18 | **everything** 7:6 | 54:5,6,15 |
| 50:4,9 53:9 | 4:15 41:2,2 | 15:20 16:1 | 7:13 75:8 | 55:8 61:19 |
| 58:21,22 | 101:1,1 | 47:7 92:8 | **evoke** 59:6 | 63:12 68:19 |
| 59:3 60:1,9 | **each** 7:8 45:20 | **enter** 37:13 | **exact** 11:1 | 75:2 85:20 |
| 70:16,22 | 45:21 47:4 | **entire** 12:2 | **exactly** 20:17 | 85:22 94:1,2 |
| 77:10 79:16 | 64:22 65:14 | 54:1 | 31:21 36:16 | **existence** 78:19 |
| 83:11,21 | 81:2 97:6 | **entirely** 47:4 | 79:11 96:10 | **expectations** |
| | **earlier** 28:5 | | | |

Dan Dragalin, M.D     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     September 17, 2004
New York, NY

8

| | | | | |
|---|---|---|---|---|
| 60:16 | 60:15 63:1 | figure 93:9 | forwarded | 4:10 42:12 |
| expensive | 78:10 83:13 | figures 48:10 | 54:1 | further 41:6 |
| 55:19 56:13 | 87:22 92:8 | 86:8 | foundation | 100:18 |
| 56:17 | 98:15 | finally 63:19 | 19:10 | 101:13 |
| explain 28:16 | fairly 26:5 | financial 37:3 | four 10:12 | future 69:10 |
| 51:13 64:15 | fall 67:9 | financing 29:1 | 11:5 13:5 | 72:5 |
| 67:1 76:15 | familiar 31:7 | find 57:16 70:9 | 56:6 | |
| 96:2 | 31:13,22 | finding 61:10 | Frank 2:2,12 | ──── G ──── |
| explained 68:5 | 32:5 86:17 | fine 8:4 | 5:7 101:7,21 | G 5:3 41:4 |
| expressed | family 12:9 | firm 11:13 | free 28:2 29:17 | gained 22:10 |
| 68:11 | far 19:21 33:9 | 18:19 | 30:11,12,12 | gastroentero... |
| EYES 1:1 | 67:20 | first 16:17 23:4 | 30:14,14 | 75:9 |
| e-mail 54:18 | fast 70:7 | 25:2 26:22 | freshman 30:1 | gave 14:10 |
| 55:10,13,15 | favor 83:8 | 41:17 44:19 | Friday 1:15 | general 20:5 |
| 57:1 58:6 | February 75:4 | 48:11 54:18 | from 6:9 8:12 | 23:7,8,15 |
| 60:20,21 | 77:18 | 55:21 56:18 | 23:9,15,19 | 32:14 38:17 |
| 61:3,19,20 | fee 27:2 34:8 | 56:20 62:8 | 24:22 27:3,6 | 43:20 45:18 |
| 63:11,13 | 34:12 46:14 | 64:7 69:12 | 28:8 36:12 | 46:3,6 47:2 |
| 66:8 68:18 | 46:16,21,22 | 70:20 72:6 | 44:16 52:4 | 47:14,20 |
| 68:21 72:1 | 47:2,3,6,10 | 73:19 75:5 | 52:11,20 | 48:3,6 49:18 |
| 72:14 73:15 | 47:13 48:18 | 75:12 78:3 | 53:11 55:10 | 52:7 55:20 |
| 77:15,17 | 49:14 51:5 | 96:11,11 | 57:12 60:21 | 56:13 57:11 |
| 79:1 | 51:20 62:3 | 97:12 | 61:20 63:13 | 58:22 70:15 |
| e-mails 4:20 | Feller 3:21 6:6 | five 98:1 | 65:18,19 | 77:7 79:9,10 |
| 53:22 54:17 | 6:11,12,16 | flag 71:14,16 | 68:8,21 | 83:17 |
| 74:21 | 35:18 36:4,8 | flat 34:12 | 73:16 75:3 | generally 5:21 |
| | 36:19 37:3,9 | flipped 82:14 | 76:18 77:17 | 6:1 9:18 |
| ──── F ──── | 40:12 42:6,9 | Floor 3:19 | 79:9 80:14 | 50:15 51:15 |
| F 3:15 41:2 | 42:16 67:19 | flow 71:7,19 | 82:19 86:18 | 52:3 74:3,6 |
| 101:1 | 68:5 72:12 | 96:5 | 86:19 90:11 | 76:20 84:1 |
| face-to-face | 76:6,10 | focused 28:20 | 90:14,20 | 93:1 |
| 45:1 | 92:12,16,20 | folks 71:20 | 94:11,16,17 | generate 27:6 |
| facilities 22:14 | fellowships 9:6 | follows 5:8 | 94:18,19 | generic 37:21 |
| 23:8,18 27:4 | felt 51:10 | 17:5 41:7 | 95:3 96:6 | 39:8,9 49:19 |
| 32:21 44:16 | 59:11 | follow-up | 98:1 99:15 | generically |
| fact 27:8 46:10 | Ferrante 55:10 | 99:10 | 99:20 | 43:14 61:11 |
| 47:3 64:4 | 68:21 69:12 | form 22:3 | front 43:17 | geographic |
| 66:21 | few 13:17 | 66:12 90:17 | 86:2 | 32:13,16 |
| factor 65:14 | 27:22 38:18 | formed 91:19 | full 58:10 67:5 | 47:1,4 81:20 |
| 70:14 72:20 | 45:14,15 | former 64:13 | 67:11 | Georgetown |
| factors 61:14 | 95:20 | formula 49:20 | Fulton 13:9 | 9:1 |
| 65:17 81:16 | field 44:13 | 97:20 | function 52:4 | Georgia 8:20 |
| 83:17 | Fifth 2:11 3:19 | formulas 95:12 | fund 28:17 | get 7:9,12 |
| fair 22:21 39:3 | 5:5 | forth 49:11 | FURNISHED | 18:15 24:8 |
| 42:22 56:22 | | | | 31:11 36:9 |

Dan Dragalin, M.D    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    September 17, 2004
New York, NY

9

| | | | | |
|---|---|---|---|---|
| 45:17 50:12 | 74:22 82:10 | 63:16 64:22 | 46:1,1,13 | **header** 68:20 |
| 57:11,18 | 86:18 97:10 | 65:14 69:21 | 47:6,9 48:16 | **heading** 19:8 |
| 58:19 70:20 | **gotten** 55:1 | 70:5 72:8 | 49:8 50:18 | **health** 9:6 |
| 71:1 84:21 | **government** | 73:4 81:9 | 51:2,3 52:8 | 11:20 13:1 |
| 89:10 93:14 | 13:15 19:13 | 86:20,21 | 52:12 53:2 | 29:8,12 76:8 |
| 93:20 94:22 | **grants** 29:17 | 87:15 91:14 | 54:8,10,12 | **healthcare** |
| 95:22 98:19 | **great** 9:17,19 | 91:19 98:5 | 55:1 57:14 | 10:21 11:13 |
| **gets** 42:20 | 9:19 10:2,11 | 99:2 | 57:21 58:12 | 76:12 80:18 |
| **getting** 28:3 | 10:17 25:4 | **halt** 30:22 | 59:7 60:4 | **HealthEOS** |
| 81:2 83:10 | 25:13,17 | **hand** 48:5 | 61:12 62:10 | 28:12 33:6 |
| **give** 7:10 20:11 | 26:2 27:18 | 101:18 | 63:5 66:16 | **hear** 40:2 |
| 23:14 24:14 | 49:4 63:17 | **Handelman** | 67:6 68:9,10 | **heard** 89:4,5 |
| 24:15 32:17 | 63:19 64:8 | 73:17 | 70:7,7,17,18 | **heavily** 19:13 |
| 38:18 41:9 | 64:14,16,19 | **happened** 57:8 | 71:1,4,4,5 | 20:12 21:21 |
| 82:3 84:12 | 65:13,16 | 70:9 | 75:7,21 | **held** 2:10 9:12 |
| 95:4 | 66:8 67:6,15 | **happy** 42:6 | 77:20 79:15 | 13:14 |
| **given** 93:5 | 70:2 89:4,6 | **hard** 28:16 | 80:5,10,10 | **helped** 25:19 |
| **giving** 74:10 | 97:21 99:6 | **has** 18:10 | 81:21 84:6 | 86:21 |
| **go** 6:20 24:1 | **greater** 24:8 | 19:14 20:13 | 84:11 85:16 | **her** 62:13 |
| 38:21 40:12 | **Greg** 40:2 | 21:22 22:19 | 86:2 92:5,12 | **here** 8:5 49:10 |
| 48:3 50:18 | **GREGORY** | 28:7 32:12 | 95:19 96:1,3 | 53:22 56:21 |
| 57:13,15,19 | 3:15 | 32:13 41:17 | 96:22 98:5 | 60:12,20 |
| 60:3 63:9 | **grossly** 27:5 | 51:5 52:17 | 99:5 100:8 | 64:13 70:6 |
| 71:1 73:2,6 | **group** 12:9 | 57:4,8 68:5 | 100:18 | 82:10 84:10 |
| 74:14,19 | 13:2 23:21 | 73:12 84:8 | 101:17 | 84:13 95:5 |
| 77:21 79:2 | 33:6 36:1 | 92:9 93:8 | **haven't** 43:1 | **hereby** 101:9 |
| 89:11 | 60:22 62:2 | 97:6 | 89:4,5,7 | **hereunto** |
| **goal** 39:8,9 | 62:13,17 | **have** 5:15,18 | **having** 5:6 | 101:17 |
| **goes** 73:8,10,11 | 63:6 75:3 | 8:12 9:12 | 26:17 36:16 | **He'll** 31:11 |
| 73:12 96:10 | 98:13,17 | 13:11,14,16 | 41:5 46:7 | **he's** 18:20 78:4 |
| 96:11 | **groups** 62:4 | 14:17 15:1 | **HCPCS** 48:2,5 | 79:7,13 |
| **going** 7:4,5,6 | **guess** 30:20 | 17:17,18 | 52:20 77:22 | **high** 39:16 |
| 7:22 8:9 | 68:19 90:2 | 18:1,4,7,15 | 79:3,4,7,10 | **higher** 80:13 |
| 19:21 23:14 | **guy** 42:1 | 19:18 21:4 | 82:5 85:3 | **HIGHLY** 1:1 |
| 42:17 54:11 | **guys** 35:14 | 24:21 25:4 | 94:8,18 | **him** 19:3 |
| 76:9,19 79:9 | 75:21 | 25:11 27:12 | **he** 18:16,19 | **his** 5:4 18:15 |
| 81:22 89:10 | | 28:19,21 | 19:2 22:5 | 18:17 55:5 |
| 96:18,21 | **H** | 29:8,12,12,21 | 42:3,9 55:22 | 56:2 86:20 |
| 100:9 | | 31:3 33:22 | 56:4,7 64:8 | 100:12 |
| **good** 5:11,12 | **H** 4:15 | 36:14 37:17 | 64:13 68:5 | **HMO** 11:5,6,6 |
| 6:10,11 16:4 | **had** 9:21,22 | 38:7 39:16 | 69:13 78:13 | 13:2 |
| 49:4 70:4 | 11:2 12:7,9 | 42:3,9 43:21 | 79:4,5 100:3 | **HMOs** 12:9,9 |
| **got** 8:20 9:1 | 12:11,12 | 44:5,12 | 100:7 | **hold** 10:10 |
| 23:14 54:10 | 43:1 48:16 | 45:14,15 | **head** 7:11 | **home** 58:9 |
| | 49:11,12 | | | |
| | 53:15 60:16 | | | |

Dan Dragalin, M.D    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    September 17, 2004
New York, NY

10

honestly 22:7
  29:5
hopefully
  54:14 84:9
hospital 13:9
  93:5
hospitals 32:21
  38:15 44:15
  45:2,4 63:8
  80:3,7,15
how 5:18 7:4
  9:12 10:10
  10:13 11:4
  11:17 14:4
  14:16 21:20
  23:17 27:12
  27:15 29:5
  29:21 30:6
  33:21 34:4
  35:16 36:1
  36:12 39:14
  41:17 44:10
  46:4,16 48:9
  50:15 73:7,9
  77:22 78:16
  79:3 82:11
  88:6 91:13
  93:11,14,17
  98:6
However 22:13
hundred 27:21

I
idea 59:11 70:4
  79:16 82:3
  88:3 90:22
identification
  17:21 54:16
if 7:17,20 8:11
  8:13 13:18
  19:7 22:11
  23:2 24:13
  24:17 25:1
  26:22 28:3
  29:11 30:3

30:20 32:1
  37:2,6 39:16
  40:10 41:16
  42:7 43:14
  43:18 44:2
  45:18,18,22
  47:7 49:21
  50:8 53:13
  55:8 61:13
  61:18 63:11
  64:19 67:6
  67:12,14,15
  68:18 72:19
  73:9,15 74:9
  76:19 77:15
  77:21,22
  78:20 79:2
  81:10 84:8
  85:14 87:3
  87:14 90:1
  93:12 95:19
  97:11,15
  100:1,9
III 19:8
Immunizatio...
  16:4
impact 90:10
impediment
  63:2,10
implemented
  83:5
important 7:7
  7:9 39:17
  47:9 92:17
impossible
  35:11
impression
  23:16 41:9
  93:21
incentives
  29:15 30:4
  31:4
include 10:4
  12:16 15:20

33:1 39:20
  47:16
includes 20:21
  80:2
including
  19:21 25:4
  64:10,21
  85:3
income 27:8
increase 46:9
  56:9,10
  59:20 73:8
  80:12
increasing
  79:17
increasingly
  20:15
indirect 46:9
individual
  8:11 18:13
  30:9,10
  37:22 38:1
  63:7 81:15
individually
  47:10
individuals
  28:1
industry 1:5
  21:18 74:1
  86:14,16
  88:7
inflation 83:1
information
  8:11 42:7,10
  42:17 70:16
  71:1 95:1
  96:8
infusion 58:10
initiating
  55:16
initiation 27:2
inject 49:21
input 18:8
installation

25:20 27:17
installed 25:5
installing
  25:12
instances 77:9
instead 10:17
  71:14 72:18
Institute 8:20
institutional
  92:6
insurance 6:3
  9:17 10:1
  15:22 25:3
  33:16
integration
  75:17
intend 89:1,3
intense 30:17
intensify 82:21
intent 63:9
interaction
  45:1
interconnect...
  24:20
interested 87:4
  101:16
interferes
  71:19
intermittently
  69:6
internal 50:14
internally 65:7
internship 9:2
Interplan
  38:20
interpretation
  64:2,4 66:9
  66:11,15
  67:16
interpreting
  67:7,15
into 37:13
  49:18 65:13
  98:1

introduce 71:9
introduces
  71:18
investigating
  57:10
invokes 27:3
involved 13:4
  29:6 33:7
  45:17 69:4
  70:6 81:6
  85:10 93:3
  95:22 98:14
  98:20,22
involves 70:15
IPA 62:2,14,17
isolate 24:11
issue 20:2,4
  50:13 54:9
  60:12 63:18
  70:13,13
  71:21,22
  79:19
issues 6:4
  12:15,16
  13:20,22
  14:3 16:3
  98:15
item 50:9
  57:12 64:21
  70:19,20
  88:12
items 50:8
  67:20
iterative 48:14
its 33:12 39:18
  43:5 44:11
  51:5 81:6
itself 39:10
I'll 7:18 8:7
  18:15,16
  42:6 62:1
  63:16 68:22
  72:1 73:18
  84:8 91:20

Dan Dragalin, M.D   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   September 17, 2004
New York, NY

11

| | | | | |
|---|---|---|---|---|
| 93:2 | 62:1 66:15 | 26:2 27:15 | **largely** 16:22 | **life** 9:17,19,20 |
| **I'm** 6:8 7:4 8:9 | 69:5 70:6 | 27:15,21 | 17:9 26:4 | 10:11,15,16 |
| 22:8 31:13 | 73:7 76:21 | 29:9 30:3 | 75:19 | 10:17 11:4 |
| 31:22 33:8 | 80:22 81:1 | 31:19 32:1 | **larger** 23:10 | 25:4,13,17 |
| 36:8,16 | 84:13 85:9 | 33:5 36:16 | 24:3,5 | 26:2 27:19 |
| 43:19 49:21 | 87:10 88:12 | 36:16 38:2,2 | **largest** 70:3 | 34:13 49:4 |
| 65:11,12 | 89:12,14,17 | 38:6 41:20 | **Larry** 42:2 | 63:18 64:9 |
| 72:13 73:21 | 91:21 92:2 | 50:15,18 | **last** 6:12 17:3 | 64:14,16,19 |
| 79:12 85:14 | 93:2,7 96:19 | 57:1,14 | 25:1,16 55:5 | 65:13,16 |
| 86:4,16 87:9 | **J-code** 4:17 | 58:12,19,20 | 65:21 66:20 | 66:9 67:7 |
| 87:11 88:2 | 17:14,21 | 58:21 59:19 | 75:21 76:2 | 70:2 97:22 |
| 94:12 95:4 | 27:5,9,17 | 59:21 61:14 | 86:6 | **like** 17:12 |
| 95:15 | 49:8 53:7 | 63:8 64:12 | **late** 20:7 30:17 | 24:10 28:3 |
| **I've** 22:19 | 56:19 57:13 | 65:9,20 69:7 | 77:20 91:15 | 30:10 36:1 |
| 31:19 38:1 | 64:6 65:3,6 | 72:2 76:7 | 91:20 | 49:9 53:21 |
| 56:20 94:14 | 67:1 69:2,4 | 77:7,8,14,21 | **later** 36:18 | 54:18 60:19 |
| **i.e** 56:17 | 69:20 70:14 | 78:12,16,20 | 58:6 | 70:21 77:21 |
| | 83:3 84:20 | 78:22 79:2 | **leader** 11:10 | 79:2 87:3 |
| **J** | 85:3,22 94:3 | 80:19 81:2 | 98:17 | 88:19 90:8 |
| **J** 2:2,12 5:7 | **J-codes** 19:6 | 82:11,12,17 | **least** 12:19 | 90:11,20 |
| 23:6 25:5,6 | 27:7 55:11 | 85:6 88:6 | 20:9 23:20 | 98:9,10 |
| 61:4 101:7 | 55:19 56:13 | 93:11,14,17 | 27:14 43:10 | **liked** 70:7 |
| 101:21 | 63:20 64:17 | 93:20 95:2 | 50:20 67:13 | **limit** 46:19 |
| **January** 68:22 | 64:21 66:2,6 | 95:19 96:1 | **leave** 65:4 | **limited** 29:2 |
| **Jersey** 10:18 | 70:1 75:10 | 96:22 97:3,5 | **left** 65:16 | **line** 33:10 50:8 |
| 11:7 | 76:16 78:21 | 97:11,15,18 | 98:13 | 50:9 57:12 |
| **job** 11:8,16 | 79:8,14 | 98:2,18,22 | **legislative** | 64:21,22 |
| 20:19 | 80:20 | **knowing** 87:5 | 30:19,19 | 65:3,4,5 |
| **John** 3:8 6:9 | **J/Q-codes** | **knowledge** | **length** 82:10 | 66:20 67:3 |
| 6:12 7:21 | 19:10 | 18:13 20:18 | **less** 20:1,3 | 70:19,20 |
| 17:14 63:13 | | 22:10 32:10 | 45:11 99:20 | 88:12 |
| **July** 63:13 | **K** | 58:2 60:3 | **let** 7:18,21 37:8 | **lines** 60:8 |
| **jump** 54:12 | **Karen** 61:20 | 76:18 | 63:8 73:21 | 63:20 64:17 |
| **June** 4:17 | 62:8 | **known** 21:16 | 84:17 85:19 | **line-by-line** |
| 17:14,22 | **Katz** 63:18 | **Kodroff** 3:4 | 93:16 94:20 | 51:16 |
| 55:11 61:1 | 64:12 | 6:9 | 98:6 | **listed** 67:21 |
| 61:21 | **keep** 39:18 | | **let's** 24:15 | **listen** 33:14 |
| **just** 6:18 7:18 | **kind** 38:14 | **L** | 46:19 74:15 | **literature** 22:9 |
| 7:21 10:18 | 41:10 92:3 | **L** 5:3 41:4 | **level** 19:8 20:2 | **LITIGATION** |
| 14:21 15:9 | **kinds** 49:13 | **lack** 26:10 | 31:3 80:13 | 1:6 |
| 23:15 24:16 | **knew** 58:17 | 83:19,20,21 | 83:9 | **little** 6:18 |
| 24:19 30:12 | **know** 7:3,18,21 | **large** 12:10 | **levels** 14:14 | 19:14 20:1 |
| 35:7 38:22 | 8:6 14:1,14 | 22:18 24:7 | 59:12 | 20:13 21:22 |
| 39:10 41:8 | 18:18 21:20 | 25:3 33:15 | **LEWIS** 3:11 | 27:3,19 |
| 42:19 48:7 | 23:17 24:4 | 77:10 | | |

Dan Dragalin, M.D     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     September 17, 2004
New York, NY

12

| | | | | |
|---|---|---|---|---|
| 30:22 41:22 | **MAC** 31:14 | 30:8 90:2 | 101:15,16 | 91:17,21,22 |
| 54:12 56:8 | 32:1 | 91:9 | **matters** 5:15 | 93:19 97:9 |
| 71:11 74:22 | **Macoretta** 3:8 | **manufacture...** | **maximum** | 99:14 100:1 |
| 81:9 | 4:7 6:8,9,14 | 29:6,16 | 31:14,19 | **meaning** 43:2 |
| **lives** 31:20 | 6:14,17,21 | 91:11 99:15 | **may** 17:16 | **means** 67:1 |
| **LLP** 3:11 | 8:4 17:2,11 | **manufacture...** | 23:10 24:3 | 70:18 71:3 |
| **location** 47:1,4 | 17:18 22:2 | 16:11 | 33:7 37:7 | **meant** 16:19 |
| **long** 9:12 | 31:11 40:1 | **many** 5:18 | 40:4 54:22 | 16:21 17:7,8 |
| 10:10 11:17 | 54:4,7 66:12 | 29:5 95:18 | 55:16 64:5 | 64:15 78:12 |
| 23:17 27:12 | 84:8,11,16 | **March** 72:8,10 | 66:21 89:15 | **mechanism** |
| 29:21 40:6 | 87:9,13 | 72:12,13 | **maybe** 30:22 | 62:7 |
| 41:17 78:16 | 92:15,19 | 73:18 | 99:9 | **Medicaid** 23:5 |
| 78:19 82:11 | 99:7 100:18 | **Marcy** 3:21 | **MD** 55:7 | 90:20 |
| **longer** 67:9 | **made** 22:5 | 6:12 76:4 | **MDL** 1:5 | **medical** 6:2 |
| 71:12 | 46:7 50:21 | **margin** 15:20 | **me** 5:21 6:6 | 8:22 10:5 |
| **look** 19:7 | 76:15 | 60:9,12,13 | 7:18,21 10:6 | 12:3,13,15 |
| 22:11 23:2 | **Magovac** 75:4 | 61:12,14 | 10:9 23:14 | 13:1,8 18:20 |
| 24:21 25:1 | **main** 53:8 | 74:11 | 24:14,15 | 25:19 26:1 |
| 26:22 48:3 | 71:12 | **margins** 60:17 | 29:11 31:18 | 29:17 30:1 |
| 54:18 57:13 | **maintain** 80:12 | **mark** 17:12 | 32:17 36:19 | 30:11,12 |
| 61:18 68:18 | **major** 34:14 | 53:21 | 37:8 42:3 | 31:4 37:14 |
| 73:15 77:15 | **majority** 52:11 | **market** 3:6 | 55:18 56:12 | 40:6,9,11 |
| 89:1 | 66:17 | 33:12 38:13 | 67:20,21 | 43:8,21 44:6 |
| **looking** 55:8 | **make** 36:11 | 39:3 43:5 | 73:21 79:5 | 50:2 83:1 |
| 56:4,7 74:21 | 37:7 41:8,13 | 45:21 48:14 | 82:3 84:12 | **Medicare** 23:5 |
| 77:3 79:9 | 42:19 46:1 | 65:15 68:15 | 84:17 85:19 | 73:20 74:1 |
| 86:4 | 53:18 | 84:2,2 | 87:11 89:18 | 88:16 |
| **loosely** 92:17 | **makes** 52:14 | **marketing** | 91:21 93:16 | **medicine** 13:4 |
| **looser** 41:22 | 61:3 66:8 | 43:10 | 94:20 95:4 | **member** 64:5 |
| **lose** 44:7 | **making** 56:8 | **marketplace** | 98:6,7 | 66:22 73:12 |
| **loss** 100:4,10 | 59:4 100:8 | 39:10 45:19 | **mean** 14:21 | **members** |
| **lot** 20:4 30:15 | **management** | 48:13 | 15:12,16,21 | 68:12 |
| 30:19 31:1 | 18:21 | **markets** 45:15 | 15:22 16:6 | **mentioned** |
| 82:15 84:3 | **Manhattan** | **marking** 54:4 | 19:19 20:4,8 | 34:1 86:20 |
| 99:1,1 | 11:11 | **marriage** | 22:17 30:9 | **message** 79:12 |
| **lower** 77:21 | **manner** 46:8 | 101:14 | 31:17 32:7 | **met** 42:3 |
| 79:3,4,6 | **manual** 25:8 | **Marty** 63:17 | 35:7 38:4,17 | **methodologies** |
| **lowering** 79:16 | 70:18 71:11 | **MASSACH...** | 51:2 52:4 | 34:2,6 97:1 |
| **lowest** 24:1 | 71:17 | 1:2 | 58:20 59:1 | **methodology** |
| 39:7,8 | **manually** 71:4 | **master's** 9:5 | 63:5 66:2 | 15:11 21:14 |
| **lunch** 8:1 | 71:5 | **match** 49:10 | 68:1 69:18 | 27:18 29:1 |
| 40:16 | **manufacturer** | **Matria** 18:21 | 72:17 79:4 | 34:11 49:9 |
| **lunches** 30:15 | 16:14 19:12 | **matrix** 69:3 | 81:14 82:14 | 49:10 63:21 |
| | 28:8 29:4 | **matter** 101:11 | 87:8,10 89:5 | 64:18 65:7 |
| **M** | | | | |

Dan Dragalin, M.D       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY       September 17, 2004
New York, NY

13

| | | | | |
|---|---|---|---|---|
| 65:10 69:5 | 3:11 | 36:19 37:3,9 | 32:18 36:5 | 38:13 55:18 |
| 69:22 72:19 | **morning** 5:11 | 40:12 42:6,9 | 38:16 81:5 | **nature** 15:6 |
| 91:17 97:5,7 | 5:12 6:10,11 | 42:16 67:19 | **must** 94:8 | 49:5 51:8 |
| 97:10,20 | **Morrisy** 42:2 | 68:5 72:12 | **mutual** 62:3,17 | NE 76:11 |
| 100:15 | **Morrow** 55:6 | 76:6,10 | **my** 7:14 8:8 | **necessarily** |
| **methods** 96:17 | 86:20 | 92:12,16,20 | 9:2 11:16 | 8:10 25:7 |
| **Michael** 55:10 | **most** 15:21 | **Muccino** 62:8 | 17:16 18:13 | 92:5 98:21 |
| 68:21 | 16:11 21:8 | **much** 6:21 | 22:10 23:13 | **necessity** 12:15 |
| **middle** 76:21 | 59:2 68:8 | 14:16 20:9 | 23:13,15 | **need** 7:20 62:5 |
| **might** 7:11 | **mostly** 41:12 | 23:10 24:3 | 25:17 31:20 | 81:19 |
| 8:12 13:16 | 92:2 | 28:15 56:15 | 32:9 50:3,4 | **negotiate** |
| 24:18 29:16 | **move** 6:18 23:2 | 72:22 73:7 | 76:18 84:13 | 22:22 35:13 |
| 30:11 33:5 | 60:19 63:11 | 74:12 77:22 | 85:16,20 | 36:2,12 |
| 36:18 39:21 | 85:5 | 79:3 89:22 | 86:15 87:2 | 47:10 |
| 43:15 60:4 | **moved** 26:3 | 91:15 92:1 | 88:20 89:9 | **negotiated** |
| 93:20 | MP 4:20 17:16 | **MultiPlan** 2:9 | 89:12,20 | 24:19 34:10 |
| **mind** 29:10 | 54:2,16 | 2:11 3:18 5:5 | 90:7,18 91:8 | 36:13 88:11 |
| **minus** 23:6,9 | MPI 64:1 | 8:6,9 9:9 | 95:4 100:17 | **negotiating** |
| 23:19 24:1 | Mr 4:6,7 5:10 | 18:7,10 19:1 | 101:18 | 19:5 |
| 24:16,19 | 6:8,14,17,21 | 19:5 28:7,10 | **myself** 23:21 | **negotiation** |
| 25:5,12 26:3 | 7:1 8:4 17:2 | 32:19 33:3,9 | 74:22 | 82:16 |
| 65:11,18,19 | 17:11,12,18 | 33:12,19 | M-a-c-o-r-e-... | **negotiations** |
| 74:1,3,6 77:5 | 17:19 22:2 | 34:4,8,17 | 6:15 | 31:20 |
| **minute** 74:15 | 31:11 35:20 | 35:12,21 | M-o-r-r-o-w | **negotiators** |
| 84:12 | 36:7,22 37:6 | 36:3,5 37:13 | 55:6 | 62:11 |
| **model** 12:9 | 37:10,12 | 38:7 39:6,17 | M-u-c-c-i-n-o | **nephrologists** |
| 13:2 23:22 | 38:21 39:2 | 41:10,17 | 61:20 | 58:8 |
| **modifications** | 40:1,14 42:8 | 42:16 43:5 | M.D 1:13 4:5 | **network** 4:11 |
| 35:2 97:10 | 42:11,19,21 | 44:7,10 46:5 | 9:1 | 9:11 15:11 |
| **money** 77:22 | 53:21 54:4,6 | 46:13 48:9 | _____ | 15:14 27:20 |
| 79:3 85:7 | 54:7,8,20 | 50:1 51:4 | **N** | 28:14,18 |
| **month** 56:17 | 64:7 66:12 | 52:17 53:6 | N 3:1 4:2 5:3,3 | 32:20,20 |
| **monthly** 16:8 | 68:1 69:12 | 56:18 57:4 | 41:2,2,2,4,4 | 33:13 37:15 |
| 89:22 | 74:19 78:3 | 63:2 66:9,10 | **name** 6:13 | 38:14,15 |
| **months** 9:14 | 78:12 79:1 | 66:14,18 | 18:16,17 | 41:21 42:5 |
| 70:1 82:12 | 84:8,11,16 | 67:18 71:10 | 55:2,5 86:20 | 42:16 44:11 |
| **mop-up** 41:15 | 86:5 87:7,9 | 75:17 78:10 | **named** 42:2 | 45:3,13 46:5 |
| **more** 37:7 44:3 | 87:11,12,13 | 79:20 80:2,5 | **names** 38:17 | 46:11,13 |
| 52:14 53:18 | 90:17 92:15 | 80:17 81:10 | **narrower** | 47:9 50:1 |
| 56:8 60:1 | 92:19 93:13 | 81:21 83:8 | 10:18 | 51:21 52:14 |
| 70:20 80:6 | 99:7,8,12 | 85:10 92:3,9 | **national** 12:3 | 53:18 65:8 |
| 84:3 86:7 | 100:16,18 | 92:13 93:8 | 12:10 25:19 | 72:9,9 76:13 |
| 87:15 90:1 | Ms 6:6,11,16 | 94:21 | 32:20 48:4 | 78:4 80:2 |
| **MORGAN** | 35:18 36:4,8 | **MultiPlan's** | 55:22 56:5 | **networks** 38:8 |
| | | | **nationally** | |

Dan Dragalin, M.D    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    September 17, 2004
New York, NY

14

| | | | | |
|---|---|---|---|---|
| 39:4 49:7 | 50:22 54:10 | 14:12,13 | 12:21 13:7 | 10:2 69:2 |
| 60:5 | 54:22 58:7 | **nurses** 12:12 | 13:11 17:19 | 95:3 |
| **neutral** 73:10 | 60:4,5 61:8 | **NW** 3:13 | 19:7 20:8,11 | **opinion** 66:14 |
| **neutralize** 83:1 | 61:16 63:10 | ——— **O** ——— | 33:12 36:22 | 66:16 |
| **never** 29:10 | 64:3 66:5,6 | **O** 41:2,2,2 | 37:9 41:14 | **opposed** 7:10 |
| 38:1 42:3 | 66:10 67:8 | **object** 66:12 | 42:8,11 54:4 | **options** 87:19 |
| 83:4 94:14 | 67:10,11,14 | 87:7 | 54:7 55:8 | **order** 54:13 |
| **new** 1:14,14 | 69:5 70:22 | **objection** 22:2 | 63:15 85:4 | 56:9 75:1 |
| 2:11,11,14 | 70:22 79:5 | 22:5 90:17 | 85:14 86:1 | **organization** |
| 3:20,20 5:5,5 | 79:13 81:8 | 93:13 | 87:9,13 88:8 | 42:1,4 |
| 10:15,16,18 | 85:10 86:9 | **objective** 16:21 | 88:22 89:13 | **organizations** |
| 11:4,7 71:9 | 86:15,16,22 | 17:8 | 92:20 93:18 | 33:19 |
| 76:8,11,11 | 89:13,14,15 | **obtainable** | 94:5,20 | **organize** 19:3 |
| 80:18 101:3 | 90:1 92:5,13 | 93:22 | 95:13,16 | 84:13 |
| 101:9 | 93:15,22 | **obviously** 7:3 | 97:8 99:4,6 | **other** 7:8 8:12 |
| **next** 69:6 | 95:7 96:10 | 46:2 72:20 | **Once** 92:12 | 11:20 25:22 |
| 73:15 88:21 | 96:21 97:2 | 90:9 100:9 | **oncologist** 27:9 | 29:7,12,15 |
| **nodding** 7:10 | 100:10 | **occasionally** | 49:21 | 32:12 45:20 |
| **none** 81:5 | 101:13 | 95:22 | **oncologists** | 45:21 46:1 |
| 95:11,17 | **Notary** 2:14 | **occupy** 20:6 | 58:8 59:1 | 48:5 49:12 |
| **non-progress** | 5:6 41:5 | **occurred** 6:1 | 75:9 | 76:6,9 81:2 |
| 69:1,20 | 101:8 | **occurs** 26:6 | **one** 18:12,13 | 84:3 87:20 |
| **noon** 8:3 | **note** 62:2 | 29:19 | 24:11,12 | 88:8,8 94:13 |
| **normal** 27:5 | **noted** 5:2 | **October** 75:6 | 25:22 34:7 | 100:9,13 |
| 52:20 | 56:11 | 75:19 | 38:2 39:15 | **others** 66:6 |
| **normally** | **notes** 95:5 | **odds** 45:20 | 44:2 46:1 | 76:1 83:8 |
| 70:21,22 | **nothing** 76:9 | **off** 26:18 38:21 | 47:6 50:9 | 91:6 |
| 95:20 | **notice** 2:12 | 39:1 40:12 | 53:8 60:20 | **our** 18:16 |
| **northeast** 9:16 | 62:4,18 | 40:15 42:14 | 73:21 75:2 | 20:20 23:22 |
| 9:22 25:18 | **notified** 62:5 | 48:6,8,10 | 76:6,7 83:7 | 28:18 36:14 |
| **not** 7:8,16 8:10 | **now** 31:18 82:6 | 51:19 54:11 | 85:14,21 | 37:3 39:15 |
| 11:8 14:15 | 82:18 88:18 | 54:20,21 | 87:19,22 | 44:21,22 |
| 14:16,19 | **number** 6:3 | 58:13,17 | 95:4 97:18 | 46:10,11 |
| 15:17 16:9 | 16:7,20,20,21 | 71:4 74:14 | 98:21 99:8 | 52:9,12,20 |
| 16:19,20 | 16:22 17:7,7 | 74:17 78:15 | 100:10 | 55:22 56:8 |
| 17:6,8,17 | 17:8,9 22:18 | 81:21 | **ones** 59:9 | 58:2,2 62:2 |
| 21:7 22:16 | 30:18 35:1,2 | **office** 80:8 | **one-hour** 19:4 | 62:16 63:6,7 |
| 22:17 24:9 | 46:21 54:2 | 92:4 | **only** 1:1 11:3 | 63:8,9 64:2 |
| 28:10 31:13 | 56:5,8 63:6,6 | **officer** 69:13 | 18:12 24:9 | 67:2,7,13,14 |
| 33:8 35:10 | 63:8 70:1,21 | **officers** 99:1,2 | 45:17 62:20 | 68:3,7 69:22 |
| 36:6 37:4 | 86:8 94:16 | **offices** 2:10 | 75:20 76:6 | 69:22 70:3 |
| 43:14,16,16 | **numbers** 17:15 | **Oh** 76:8 | **operating** | 71:12 79:6 |
| 43:18 47:5 | 54:10 85:20 | **okay** 5:21 6:5 | 69:13 | 81:19 82:21 |
| 48:1,11 | **numerous** | 7:2 8:17 | **operations** | 82:22 92:18 |

| | | | | |
|---|---|---|---|---|
| 95:11,18,21 | 68:19,20 | 64:18 65:9 | 42:15 43:1 | **pharmaceuti...** |
| 96:2 | 73:16 74:22 | 67:5,11,13 | 60:22 80:15 | 10:7 |
| **ourselves** | 75:2 77:16 | 71:9 100:15 | 98:22 | **Pharmacia** |
| 57:19 | 94:1,2 | **payments** | **per** 28:22 | 3:12 |
| **out** 5:13 8:2 | **paid** 41:10 | 36:10 41:13 | 34:13 56:17 | **pharmacies** |
| 11:11 38:12 | 46:7 92:10 | **payor** 14:13 | 64:20 89:21 | 22:14 23:7 |
| 44:13 54:9 | **palatable** 60:1 | 15:2,8 34:3,5 | **percent** 23:19 | 33:1 79:22 |
| 56:15 57:16 | **panel** 28:4 | 34:7,16 | 24:1 27:8,22 | 92:9 |
| 58:22 61:10 | **paragraph** | 35:22 36:5 | 48:8,10 50:2 | **pharmacy** 14:7 |
| 65:3 70:9,19 | 66:20 73:20 | 43:4,11,21 | 50:3 61:15 | 33:4 85:10 |
| 75:1 84:7,9 | **part** 28:18 | 46:7 48:17 | 61:15 65:1 | 85:15 92:22 |
| 93:9 | 37:14 39:9 | 50:12,17 | 65:11,12,18 | **PHCS** 38:19 |
| **outcome** | 43:18 45:13 | 51:3,19 52:3 | 65:19,20 | **Philadelphia** |
| 101:16 | 46:12 48:2 | 52:15 53:15 | 74:7,7,10,12 | 3:7 |
| **outside** 18:10 | 52:5 | 57:12,14 | 76:17 77:3,5 | **phone** 6:7,18 |
| 32:10 36:20 | **particular** 32:2 | 58:13,17 | 79:2,10,11 | 7:22 |
| 71:16 | 48:18 81:20 | 59:8 68:10 | 81:12 82:9 | **physician** |
| **over** 7:8 12:7 | 90:15 | 68:16 71:8 | 82:13,20,20 | 12:16 14:5 |
| 14:14,22 | **parties** 70:5 | 73:3,7 80:11 | 98:2 99:20 | 14:10 27:19 |
| 48:15 81:22 | 101:15 | 92:14 95:18 | 100:4 | 32:11 35:9 |
| 83:2 84:8 | **pass** 96:8 | 96:11,11,14 | **percentage** | 39:21 40:4,8 |
| **overall** 42:4 | **passed** 34:3 | 96:14,21 | 34:9 48:4 | 43:13 47:17 |
| 90:10 | **past** 31:20 | 97:4,6 | 49:19 64:22 | 47:22 48:22 |
| **overcharging** | **patient** 67:11 | **payors** 21:2 | 85:2 88:12 | 49:16 51:5 |
| 59:3 | **pause** 71:20 | 27:7 41:12 | **perception** | 52:18 55:7 |
| **oversight** | **Paxil** 93:4 | 43:7 49:1,12 | 15:18,19 | 64:5 66:21 |
| 83:21 | **pay** 14:15,16 | 50:15 59:16 | **Perrin** 11:11 | 67:2,4,8 74:2 |
| **own** 45:16 49:7 | 23:5 44:5 | 60:2,7,16 | 13:17 14:1 | 84:19 |
| 50:14 52:8 | 53:15 73:9,9 | 79:21 80:10 | 20:22 98:8 | **physicians** |
| 60:5 65:8,14 | 95:20 96:18 | 81:6 92:18 | 99:2 | 14:4,20 |
| 71:13 72:8 | 96:21 97:16 | 96:17,22 | **person** 86:21 | 22:14 23:8 |
| **owned** 13:2 | 98:3 | 97:12 | **personally** | 23:18 27:4 |
| **owner** 69:16 | **payers** 13:22 | **payor's** 50:14 | 94:15 95:7 | 28:2 74:6,10 |
| | 14:4,10 | **pays** 34:8 74:1 | **Pfizer** 3:12 | 84:19 |
| ——————— | 33:15 34:20 | 92:3 96:14 | **pharmaceuti...** | **Physician's** |
| **P** | 35:13 44:5 | 97:4 | 1:4 13:12,19 | 94:7 |
| **P** 3:1,1 95:12 | **paying** 15:17 | **PDR** 94:17 | 13:21 16:10 | **pick** 65:3 93:2 |
| 95:13,13 | 84:19,22 | **pediatric** 9:2 | 16:15 20:5 | **piece** 28:11 |
| **Pacific** 62:10 | 85:1 | **pediatrics** 9:4 | 24:15 28:8 | 29:2 |
| **package** 24:21 | **payment** 15:11 | **penetration** | 28:11,15,17 | **pills** 92:8 |
| 52:5 100:6 | 25:5,12 26:3 | 45:22 | 29:13,16 | **place** 34:1 62:7 |
| **page** 4:4 23:4 | 35:19,19 | **Pennsylvania** | 30:7 32:11 | **places** 84:3,4 |
| 25:2 27:1 | 36:5 51:19 | 3:7,13 10:19 | 33:7 40:8,10 | **plaintiffs** 3:5 |
| 54:19 55:9 | 58:10 63:21 | **people** 8:12 | 64:10 | 6:10 |
| 60:20,21 | | | | |
| 61:19 63:12 | | | | |

Dan Dragalin, M.D     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     September 17, 2004
New York, NY

16

| | | | | |
|---|---|---|---|---|
| **plan** 38:19 | 69:8 72:2,15 | 89:21 90:1,4 | **proceed** 54:22 | **provided** 67:21 |
| 85:4 | 74:14 | 90:6 93:15 | **proceedings** | **provider** 15:12 |
| **plans** 11:20 | **PPO** 12:8,10 | 93:22 94:10 | 101:10,12 | 15:15 24:7 |
| 28:22 29:8 | **practice** 11:10 | 94:11,12,13 | **process** 25:20 | 30:4,8 39:4 |
| 29:12 88:19 | 13:4 98:13 | 94:16,18,22 | 27:7 43:15 | 44:18,19,21 |
| **play** 18:22 | 98:17 | 97:16 100:12 | 48:14 51:13 | 45:18 47:1,5 |
| 25:15 | **practices** 12:14 | **prices** 21:5,7,7 | 51:22 70:18 | 47:7,14,17 |
| **plugged** 76:20 | **practitioner** | 24:12 52:10 | 71:9,17,19 | 48:21 52:13 |
| **plus** 23:8 61:14 | 32:12 | 87:16 88:11 | 78:18 79:12 | 53:9 57:16 |
| 61:15 65:12 | **practitioners** | 88:12 89:2 | 97:16 | 57:20,20 |
| 65:19,20 | 30:13 32:15 | 90:14 91:4,5 | **processes** 25:7 | 71:2,5 76:13 |
| 72:20 73:22 | 32:20,22 | 91:5,9,10 | **Procrit** 55:19 | 76:22 77:4,7 |
| 74:10 75:11 | 38:15 44:15 | 99:14 | 56:12 | 77:13 79:20 |
| 76:16,20,21 | 45:9 46:18 | **pricing** 19:10 | **produce** 69:3 | 80:13 81:18 |
| 77:3 97:21 | 46:20 63:7 | 21:9 25:7 | **produced** 40:7 | 81:19 83:21 |
| 98:2,2 | 80:3 | 26:6,8,11 | **product** 39:7 | 96:6,20 |
| **PMPE** 34:11 | **practitioner's** | 49:8 63:20 | 39:12 | 100:3 |
| 73:9 | 80:7 | 64:17 69:22 | **products** 10:22 | **providers** 10:5 |
| **point** 7:16 19:9 | **preference** | 83:21,22 | 24:21 43:5 | 15:17 26:7 |
| 20:19 22:12 | 68:11 | 95:5 98:14 | **Professional** | 26:14 28:18 |
| 23:3 25:1 | **preliminary** | 98:20 | 2:13 101:8 | 29:17 31:4 |
| 26:22 62:22 | 89:12 | **primarily** 32:1 | **profit** 15:20 | 34:1 36:6 |
| 75:5 86:5 | **prescription** | 32:9,10,11,19 | **program** 28:19 | 37:14 38:1 |
| 89:9 94:3 | 10:8 92:21 | 33:15 | **programs** 23:5 | 38:14,15 |
| **policy** 38:3 | **presentation** | **primary** 28:13 | **progress** 70:8 | 43:7,12,22 |
| **pop** 20:3 | 43:19 | 28:14 33:6,9 | **progressing** | 44:6,11,14 |
| **portion** 28:16 | **president** 9:10 | 49:7 60:5 | 70:7 | 45:12,15,19 |
| 39:20 40:3 | 9:16 10:14 | **principally** | **project** 55:18 | 46:4,13 47:8 |
| 59:20 | 11:5 25:18 | 58:8 | 56:3,12 69:2 | 47:21 49:15 |
| **position** 9:8,13 | 62:9 78:4 | **printed** 54:9 | 69:7,20 70:6 | 51:21 53:11 |
| 10:11 11:18 | **pretty** 28:14 | **prior** 4:11 7:3 | 70:10 | 57:6 58:3,8 |
| 12:6 13:14 | 91:15 92:1 | 42:2 78:9 | **promote** 30:13 | 59:11 60:10 |
| **positions** 29:7 | **prevalent** | 84:18 | **proposal** 61:4 | 68:8,15 |
| 29:11 | 30:16 | **privately** 19:3 | **proposals** | 69:10 72:5 |
| **possibility** | **previously** | **probably** 8:7 | 59:19 | 77:9,10 |
| 56:4,7 | 41:5 42:15 | 45:11 56:14 | **proprietary** | 79:21 80:19 |
| **possible** 33:5 | **price** 1:6 15:3 | 65:17 76:4 | 65:8 | 81:13 83:10 |
| 47:5 100:5 | 16:6,7 19:11 | **problem** 18:18 | **protocol** 50:14 | 89:11,14 |
| 100:11 | 19:11 24:14 | 20:6 71:12 | **protocols** | 96:2 99:19 |
| **potential** 46:9 | 24:19 31:10 | 77:20 | 12:14 | **provider's** |
| 61:5 68:15 | 43:2 58:11 | **procedure** | **provide** 8:13 | 51:17 |
| **potentially** | 58:20 73:22 | 32:16 | 29:16 39:6 | **providing** 60:9 |
| 16:2 39:15 | 86:8,13,17,22 | **procedures** | 39:12 42:6 | **provision** |
| 43:11 56:9 | 87:3,14,22 | 25:22 | 42:17 85:15 | 48:18 68:14 |

Dan Dragalin, M.D     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     September 17, 2004
New York, NY

17

| | | | | |
|---|---|---|---|---|
| **Prudential** 6:2 12:4 13:3 19:22 | **quick** 8:2 **quote** 21:21 22:12 23:4 24:3 25:3 27:2 55:15 58:7 61:4 62:1 63:16 68:22 72:1 73:20 75:5 | **reasons** 53:8 83:7 **rebates** 19:14 20:13 21:12 21:16,22 28:6,7,15,17 29:13 90:8 90:11 100:13 | 69:15 **references** 66:21 **referencing** 79:6 **referring** 8:9 36:4 80:14 **reflects** 16:9,10 | **relationship** 64:10 **relationships** 37:1 44:17 **relatively** 56:17 70:15 **relevant** 37:5 **remain** 69:1 |
| **public** 2:14 5:6 9:5 41:6 101:8 **publication** 90:3 **published** 16:8 22:13 86:9 89:21,21 | | **recall** 81:10 **receive** 59:4 65:1 | **regard** 13:22 37:22 97:1 **region** 9:17,21 10:15,17 62:10 65:14 78:5 97:22 | **remainder** 63:22 64:6 66:22 **remember** 13:18 14:9 18:17 30:20 32:3 49:3 79:11 |
| **pull** 70:19 **pulling** 31:18 **purchasers** 90:7,19 **purchases** 24:7 **purchasing** 98:15 100:2 **purposes** 26:4 62:11 | **R** R 3:1 5:3 41:2 41:4 101:1 **range** 81:11 **ranged** 65:18 65:19 **rare** 35:10,11 **rate** 39:16 50:11 77:11 **rates** 22:22 39:7,9 96:17 | **received** 9:5 28:7 29:13 **recently** 25:4 81:1 **recess** 40:16 74:18 **recommend** 61:6 **recommenda...** 61:8,16 | **regionally** 38:13 **regions** 62:11 65:13 98:1 **Registered** 2:13 101:7 **regulation** 26:10 83:20 | **remembered** 55:2 **repeat** 17:2 88:2 **rephrase** 7:19 **reported** 2:1 10:6,9 101:10 |
| **pursuant** 2:12 **push** 78:2 **pushback** 77:1 **pushed** 70:2 **put** 30:22 71:13 **P.C** 3:4 **p.m** 41:3 100:20 | **rather** 28:22 61:9 **RBRVS** 48:4,5 **Re** 1:4 **reactions** 58:4 59:16 **read** 17:3,5 66:21 | **reconvene** 8:3 **record** 22:5 38:22 39:1,2 40:12,15 42:14,20 54:20,21 55:1 74:15 74:17,20 101:12 | **reimburse** 14:4,20 15:3 33:3 43:7,12 43:21 44:5 80:19 **reimbursed** 28:4 | **reporter** 2:13 7:6,12 17:3,5 101:8 **represent** 90:4 **representative** 8:6 36:14,15 **reprice** 33:4 41:11 50:8 |
| **Q** **quality** 12:14 28:20 **quarterly** 52:11 | **reads** 19:9 23:4 25:2 27:1 62:1 63:16 68:22 **realistic** 86:7 87:15 | **recoup** 77:22 79:3 **recruiting** 44:16 | **reimbursem...** 14:14 16:1 22:22 27:21 32:9 33:7 36:6 59:12 | 50:10 52:13 61:4,6,9,17 65:4,5 67:3 71:6 76:16 92:18,21 |
| **question** 7:17 15:13 22:6 36:17 37:7 **questions** 7:5 7:15 8:8 31:12 41:15 71:2,5 84:6,9 84:12 99:5 99:10 100:17 100:19 | **reality** 19:14 20:14 22:1 **really** 7:7 20:3 20:5 22:7 38:6 48:13 50:17 82:11 **reason** 7:7,20 53:10 85:5 **reasonable** 32:14 | **Red** 94:7,9,19 **reduce** 43:6 44:3 51:17 53:14 100:12 **refer** 75:13 **reference** 24:2 66:8 75:13 78:6,7 94:7 95:2 **referenced** | 59:22 79:16 79:17 80:13 87:18 88:1,4 88:10 95:11 **relate** 14:3 39:21 40:3,4 43:11 **related** 84:20 101:14 **RELATES** 1:8 | 96:13 **repriced** 52:18 57:22 64:1 64:20 67:6 68:9 72:20 **repricing** 27:18 51:12 |

Henderson Legal / Spherion
(202) 220-4158

Dan Dragalin, M.D      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY      September 17, 2004
New York, NY

18

51:22 52:2,9
52:12,21
53:6,14
56:19 61:10
61:12 63:3
65:6 66:1
69:4,22
70:14 71:11
71:13,17
72:18 74:9
75:10 77:3
78:21 83:3,9
83:14 94:4
96:7,8
request 42:20
requested 52:3
require 62:3,6
62:17,20
63:4 79:21
required 82:15
research 63:19
reserves 68:3
residency 9:2,2
resign 28:2
resigned 28:1
respect 45:2
response 27:3
responsibilit...
9:19 10:16
12:5,7
responsibility
10:1 12:11
rest 59:5 65:5
result 15:15
28:1 46:10
resumed 41:4
revenue 27:6
69:8 72:3,15
73:2,6,7
81:18 90:10
100:8
revenues 27:9
Rick 77:17
right 6:19 22:7

50:6 51:1
54:5 61:22
66:7 68:3
76:8 84:21
85:7,11 86:4
86:10 88:1
91:2 96:9,18
97:12 99:17
ripping 58:12
58:17
risk 41:10,11
41:13 44:6
risk-sharing
81:6
role 18:4,22
25:11,15
Ron 63:18
64:12
room 91:1
Roseman 3:4
6:9
Rosenbaum
63:17 64:7
Rowe 60:22
RPR 2:2
101:21
Rubin 69:16
rule 46:3
rules 7:4
run 61:9
runner 43:17

S
S 3:1 4:15 41:2
41:2,2
safe 66:13
said 16:17
42:16 64:16
68:2 69:18
72:14 78:13
81:11 83:7
87:10 91:19
93:20 99:13
sake 48:7
sales 10:3 11:2

11:8 36:14
43:15 64:13
71:20
same 10:15
11:1,1,8
22:12 26:7
31:9 45:11
49:12,19
53:9 73:16
77:19 78:13
83:11 85:1
91:15 95:13
samples 29:18
30:14
sampling 21:9
satellite 13:5
13:10
save 85:7
savings 34:7
61:5 73:4
77:1
say 5:20 15:14
16:13,16,17
16:21 17:9
20:7 22:21
24:16 39:3
40:1 42:22
45:22 48:8
50:2 56:22
57:20 60:7
60:14,15
63:1 66:1,13
73:11 75:11
77:12 78:10
82:1 83:13
87:22 94:2
94:11
saying 43:19
90:12
says 22:12
55:15 56:11
62:16 72:1
73:20 79:1
86:7 94:6

schedule 5:14
46:14 47:2,7
47:11 48:18
49:14
schedules 27:2
46:16,21,22
47:3,13
49:14 51:6
51:21
school 8:19,22
30:2
scope 36:20
se 28:22
second 27:1
38:22 40:13
46:8 53:10
53:22 60:19
60:21 67:19
80:17 94:2,3
95:4
secondary
15:12
secure 23:9,18
secured 70:5
see 37:18 41:16
61:1 63:9
seek 36:11
seeks 35:21
94:21
seems 36:19
67:20
seen 18:1,10,12
70:8 89:7
select 72:21
selected 49:1
59:9 90:19
selective 69:9
72:3,16
selectively
63:20 64:16
65:4,6 66:1,2
66:5
self-funded
14:2 33:16

35:22 41:12
sell 91:5,6,11
100:10
selling 38:8,14
39:4 100:3
seminar 19:4
semi-objective
32:8
send 51:19
55:13 65:2
71:17,18
96:13
sends 96:12
sense 37:8
sentence 73:19
86:6
separate 49:16
79:19 94:6
September
1:15 2:6
101:18
series 4:20
53:22 54:17
services 13:1
32:12 36:6
36:11 47:14
50:5 59:5,14
60:10 68:9
79:18 85:16
set 45:16 55:18
56:12 73:22
74:9 95:12
95:17 101:18
sets 45:19
setting 92:6
settled 75:7
settling 75:13
75:16 81:3
seven 82:12
seventh 23:3
several 27:21
shared 34:7
38:6 73:4
she 42:17

Dan Dragalin, M.D        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY        September 17, 2004
New York, NY

19

| | | | | |
|---|---|---|---|---|
| **She's** 62:9,10 | **some** 7:16 8:8 | **sources** 70:16 | 62:13,16 | 25:7 27:2 |
| **Shield** 11:7 | 25:3 27:20 | 94:7 | **states** 1:2 | 29:17 59:19 |
| **shortly** 8:3 | 31:2,3 34:2 | **Southeastern** | 53:10 75:5 | 93:12 101:12 |
| 84:10 | 43:16 44:21 | 13:1 | 77:18 | **sufficiently** |
| **should** 15:2 | 44:22 45:7 | **speak** 6:18 | **stating** 5:4 | 47:9 |
| 16:16 60:14 | 47:8 48:4 | **specialty** 32:15 | **statistically** | **SUFFOLK** |
| 60:17 75:7 | 50:20 53:11 | 79:22 | 21:7,8 | 101:5 |
| 78:1 79:6 | 57:19 58:11 | **specific** 14:9 | **step** 8:2 | **suggest** 75:6 |
| 80:12 84:9 | 59:11 62:2 | 14:14 15:1 | **steps** 69:6 | **suggested** |
| 94:2,11 | 62:16,20 | 29:4 32:13 | **Steve** 55:16,21 | 80:11 |
| **shouldn't** | 63:18 66:6 | 44:18,19,20 | **still** 31:3 81:3 | **suggestion** |
| 73:11 | 71:20 74:12 | 46:22 49:2 | 83:6 | 76:16 |
| **show** 39:14 | 82:3,10 84:3 | 50:19 51:11 | **stipulation** | **Suite** 3:6 |
| **shows** 57:1 | 84:20 85:5 | 57:7,10 98:1 | 67:4,10 | **suits** 6:4 |
| **showstopper** | 90:14 94:13 | **specifically** | **straight** 48:6 | **supplied** 37:21 |
| 63:10 | 99:18 | 52:18 59:10 | 85:2 | **suppliers** 23:5 |
| **side** 36:14,15 | **somebody** | 79:8 | **Street** 3:6 | **supply** 14:19 |
| 62:2 | 49:22 85:17 | **Spector** 3:4 6:9 | **strike** 98:6 | **supposed** |
| **sign** 35:22 45:4 | **someone** 90:15 | **spell** 6:12 | **students** 30:11 | 75:18 90:5 |
| 45:22 | 90:22 | **spoke** 55:3 | **studies** 57:5 | **sure** 6:14 33:8 |
| **significant** | **something** | **ss** 101:4 | **study** 93:9,12 | 40:14 41:8 |
| 21:8,9 | 36:1 37:4 | **staff** 44:12 | **subject** 17:9 | 42:20 69:5 |
| **signs** 34:16 | 43:17 52:2 | **stage** 20:6 | 55:11 68:3 | 79:13 84:14 |
| **simply** 19:11 | 52:14 54:11 | **standard** 34:19 | 81:14 | **swept** 49:18 |
| 50:8 | 60:7 67:17 | 34:22 35:2 | **subjective** | **sworn** 5:6 41:5 |
| **Simultaneous** | 68:1,15 87:3 | 43:19 45:3 | 16:20,22 | **system** 13:10 |
| 79:8 | 91:7 98:10 | 47:2,3 78:14 | 17:7 | 25:12 26:3 |
| **simultaneou...** | **sometime** | 78:18 82:8 | **submit** 49:22 | 26:12,18 |
| 25:18 79:17 | 18:17 | 82:13 83:20 | 50:8,9 | 48:2 52:9 |
| **since** 23:20 | **sometimes** | 94:17 97:9 | **submits** 19:12 | 83:9 84:20 |
| 30:1 56:20 | 15:22 95:11 | **standpoint** | **submitted** 90:2 | 85:5 96:16 |
| 58:12 70:2 | **somewhere** 8:3 | 44:17 | **subsidiary** | 96:19 |
| 91:13 | 9:7 76:20 | **start** 73:21 | 11:6 28:12 | **systems** 25:5 |
| **single** 24:22 | 82:18 91:1 | 84:17 | 85:12 | |
| **sits** 90:22 | **sooner** 78:2 | **started** 82:13 | **subsidize** | |
| **six** 62:11 65:13 | **sorry** 6:8 65:12 | **starting** 75:3 | 28:17 | **T** |
| 82:12 | 65:12 72:13 | 88:20 | **substantial** | **T** 4:15 41:2 |
| **sixth** 19:9 86:5 | 73:21 87:9 | **State** 2:14 | 26:6 69:8 | 101:1,1 |
| **sizable** 78:1 | 87:11 88:2 | 101:3,9 | 72:3,15 | **take** 7:7,22 |
| **size** 60:12,13 | 94:12 95:15 | **stated** 77:19 | **substantially** | 41:11,13 |
| **slow** 71:8 | **sort** 7:11 11:14 | **statement** | 59:3 | 47:5 51:14 |
| **small** 16:1 | 29:18 32:14 | 19:15 22:15 | **substantiate** | 51:16 70:19 |
| **software** 28:19 | 42:3 45:16 | 23:12 25:9 | 58:2 | 71:4,11,16 |
| **sold** 92:9 100:7 | 46:14 81:6 | 27:10 58:14 | **such** 21:15 | **taken** 40:16 |
| | | | | **taking** 5:13 |
| | | | | 84:7 |

Dan Dragalin, M.D     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     September 17, 2004
New York, NY

20

| | | | | |
|---|---|---|---|---|
| **talk** 5:14 7:8 | 41:6 | 41:16 44:6 | 35:5,6 38:11 | 34:21 36:10 |
| 84:7 | **testifying** 8:5 | 44:20 46:1 | 45:19 46:21 | 38:4 40:11 |
| **talked** 28:5 | **texts** 30:12 | 51:18 61:12 | 47:3 65:21 | 44:19,20 |
| 73:4 81:9 | **than** 70:21 | 61:13 63:22 | 67:3 82:16 | 45:20,20 |
| 83:4 86:5 | 76:5 84:3 | 67:8 71:14 | 82:17,17 | 46:6,11 |
| 91:13,18 | 87:20 88:8 | 74:20 75:8 | 83:19,20,20 | 47:22 49:18 |
| **talking** 7:2 | 99:20 | 78:1 82:11 | 88:11,13,14 | 58:21 59:3 |
| 26:12 46:18 | **thank** 5:13 | 87:16 96:7 | 97:9 100:6 | 67:14 89:14 |
| 79:13 82:5 | 6:16,22 | 96:12,13 | **these** 23:6,9 | 90:19 |
| 88:16 | 17:11,18 | **theoretically** | 34:5,15 38:8 | **they've** 78:16 |
| **talks** 86:6 94:3 | 84:6 99:7 | 16:9,10,18,19 | 54:13 56:14 | 78:19 |
| **task** 7:14 | 100:16 | 17:6 90:5 | 60:9 63:1 | **thing** 7:11 11:1 |
| **team** 19:5 | **their** 15:17,19 | **there** 6:3,19 | 96:18 | 11:2 29:18 |
| **Technology** | 45:16 46:7 | 7:16 9:1,7 | **they** 10:6,9 | 31:9 |
| 8:20 | 49:7 52:8 | 13:19,21 | 18:22 19:2 | **things** 64:9 |
| **teleconference** | 57:16 58:22 | 14:12,13,21 | 24:18 28:3 | 89:4,6 90:8 |
| 19:5 | 59:2,5,13 | 16:3 17:17 | 30:7,8 35:16 | 90:11 92:8 |
| **Telephonically** | 60:5,10 62:6 | 20:8 27:22 | 36:2,11,12 | **think** 7:3,21,22 |
| 3:3 | 63:21 64:2 | 28:11,19 | 37:18,20,20 | 17:16 36:22 |
| **telerecruiting** | 64:10 65:6,7 | 30:18,19 | 38:5,10 | 37:2,6,10 |
| 44:22 | 65:14 68:11 | 31:3 34:22 | 39:14 41:12 | 41:14 54:8 |
| **tell** 5:21 20:16 | 71:13,16 | 35:3,8 37:2 | 41:13 45:22 | 54:10,22 |
| 22:8 29:5,11 | 72:8,9 74:11 | 38:12 42:1 | 49:8,9 50:12 | 66:13 75:11 |
| 31:21 38:4 | 78:18 98:11 | 43:15 44:6 | 51:3,10 | 78:1 82:8 |
| 89:18 96:21 | **them** 7:5 11:15 | 45:3,5,6,8,10 | 56:16 58:12 | 86:5 91:19 |
| 98:7 | 16:12,13 | 45:14 47:2,8 | 58:12,17,19 | 94:14 99:4 |
| **tells** 96:16,19 | 29:14 37:18 | 49:2,12 | 58:19,20,20 | **thinking** 55:19 |
| **tend** 46:22 | 53:19 59:5 | 50:19,20 | 58:21 59:4,6 | 56:12 |
| 56:16 | 59:13 62:20 | 52:7 55:9 | 59:18 60:4 | **third** 61:18 |
| **tenure** 25:17 | 63:8 66:19 | 59:18 62:7 | 60:11 63:4 | 70:3 |
| **term** 8:8 16:5 | 71:15,16,16 | 65:16 66:13 | 64:1 65:2,4,7 | **third-party** |
| 31:7,13,14,17 | 71:17,18 | 66:17 69:7 | 66:5 67:9,12 | 33:15 35:22 |
| 31:22 51:12 | 73:8,10,11 | 72:2,15,20,22 | 67:12 71:15 | 44:4 51:3 |
| 86:13,14,15 | 80:14 84:22 | 76:8 77:8,19 | 72:8 73:3,9,9 | **those** 5:22 12:1 |
| 86:15 92:16 | 85:1 89:3,4,6 | 82:16,17 | 78:14,20 | 14:3 15:6 |
| 95:6 | 89:7,11,15 | 83:17 88:10 | 80:19 83:22 | 16:3 30:3 |
| **terms** 34:15 | 92:10 95:17 | 88:12 94:6,9 | 84:1,1 88:19 | 33:18 34:3 |
| 35:13 36:2 | 95:21 98:3,6 | 98:17,18,19 | 88:22 89:8 | 34:13,19 |
| 36:12 37:19 | **themselves** | 98:21 99:1 | 93:9 95:9,19 | 36:12 37:18 |
| 41:22 45:7,7 | 45:12 | **therefore** 62:4 | 95:20 98:3 | 37:19 43:1,7 |
| 45:10 47:20 | **then** 8:2 9:5 | 67:5,8 | 100:9 | 44:4 45:3,7 |
| 47:21 62:10 | 12:10 16:18 | **there's** 8:11 | **they'll** 24:14 | 45:10 46:16 |
| 89:8 | 20:3 22:21 | 9:6 24:2,10 | **they're** 11:13 | 47:6 48:10 |
| **testified** 5:7 | 23:22 40:11 | 34:6,21 35:1 | 28:3 30:8,10 | 49:15,17 |

Dan Dragalin, M.D       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY       September 17, 2004
New York, NY

21

| | | | | |
|---|---|---|---|---|
| 50:11,16 | today 5:14 | 45:19 47:3 | 93:7 96:4 | upcoming |
| 51:8,17 52:7 | 7:14 98:3 | 53:8 56:6 | 99:17 | 88:13 |
| 53:14 60:16 | together 70:17 | 75:21 76:2 | understanding | us 5:14 19:3 |
| 62:4 71:14 | told 33:6 91:21 | 99:9 | 19:16 80:5 | 29:1 36:20 |
| 71:14,16 | Tom 18:15 | type 30:3 | 87:2 88:18 | 46:1 49:9 |
| 77:9 84:5 | 55:2 86:20 | 44:19 51:3 | 88:20 89:9 | 50:22 51:15 |
| 89:1 99:8 | too 16:3 39:16 | 63:1 81:6 | 89:12,18,20 | 52:4,11,12 |
| 100:16 | 58:5 | types 30:4 32:2 | 90:7,13,18 | 54:1 60:4,6 |
| though 20:17 | took 41:10 | 33:18 35:3 | 91:8,14 | 64:20 71:17 |
| 22:17 77:4 | topic 37:1 | 44:14 50:16 | understood | 73:9,9 77:19 |
| 89:4 | topics 67:22 | typical 58:3 | 19:18 91:22 | 78:13 84:7 |
| thought 21:4 | total 24:21 | typically 34:16 | 99:14,18 | 86:21 95:19 |
| 56:19 69:2 | toward 20:16 | 81:11 | undertaken | 96:12,19,21 |
| 70:4,4 | towards 73:19 | | 93:8 | use 8:7,9 20:18 |
| thoughts 84:13 | Towers 11:11 | ___ U ___ | unheard | 30:13 43:5 |
| three 5:20 9:14 | 13:17 14:1 | U 32:5 95:6,12 | 100:10 | 43:17 58:1 |
| 10:19 11:12 | 20:22 98:7 | 95:13,13,14 | uniform 26:17 | 79:21 82:13 |
| 11:19 13:3 | 99:2 | 95:18,20,21 | unique 30:10 | 94:9 95:5,9 |
| 44:14 47:3 | TPAs 33:15 | ultimately 43:7 | 35:1 47:6 | 95:10,18,21 |
| 56:6 65:17 | tracking 62:7 | 43:12 44:5 | 81:15 | 96:18 |
| 70:15 94:6 | transcript 7:9 | unable 27:7 | unit 94:11,12 | used 22:13,17 |
| 99:9 | 101:12 | unbundle 50:7 | 96:3 98:21 | 22:19 32:1,9 |
| through 4:20 | traveled 20:10 | unbundling | United 1:2 | 32:10 51:12 |
| 9:22 17:16 | treat 50:16 | 97:2 | 53:10 | 65:7,18 |
| 22:8 30:17 | tried 93:9 | uncomfortable | units 70:21 | 78:14 86:14 |
| 34:2 50:1 | tries 67:18 | 69:1,19 | 94:17 | 86:16 87:22 |
| 52:9 54:3,17 | trouble 36:17 | under 19:8 | University 9:1 | 88:4,6,9 94:8 |
| 60:4,5,6 63:5 | true 26:17 | 26:12 31:2 | 9:3 | uses 28:15,16 |
| 85:17 92:9 | 27:13 101:12 | 67:9 84:20 | unless 73:3 | using 39:15 |
| 100:12 | truth 38:4 | 93:21 | 93:4 | 63:21 64:17 |
| throughout 8:7 | try 7:14,18 | undercompe... | unlikely 93:3 | 70:14 76:21 |
| thrown 9:7 | 54:13 57:16 | 59:13 | unsubstantia... | 78:17 82:9 |
| 92:16 | 93:16 94:20 | undergradu... | 16:11 | 87:17 |
| time 5:2,13 | trying 36:8 | 8:19 | until 20:7 75:6 | usual 32:4 |
| 14:1 15:22 | 41:16 43:4 | underpayment | up 6:18 13:20 | 64:20 95:6 |
| 20:19 25:16 | 68:11 76:22 | 59:4 | 13:22 20:3 | usually 22:10 |
| 35:17 37:7 | turn 84:8 | understand | 25:21 28:18 | 35:17 96:12 |
| 45:17 50:4 | 85:19 | 7:17 8:15 | 35:22 43:15 | 100:6 |
| 56:18,20 | turns 7:8 | 16:5 19:6 | 44:3 45:16 | |
| 81:22 82:10 | tutorial 4:17 | 20:12 27:4 | 45:22 59:4 | ___ V ___ |
| 84:7 | 17:14,22 | 41:14 57:21 | 62:12 65:13 | value 76:22 |
| timely 46:8 | 85:22 86:21 | 60:8 84:18 | 75:1 78:2 | variability |
| times 5:18 | 93:21 | 89:8 90:12 | 95:20 98:12 | 26:6,9,11,21 |
| 56:15 | two 5:20 34:13 | 91:21 92:2 | 100:8 | 53:9 60:13 |
| | | 92:15,19 | | 65:22 83:10 |

22

| | | | | |
|---|---|---|---|---|
| 83:15,18 | want 5:20 29:9 | 68:5,7 69:21 | 59:12,16,18 | 67:3 69:18 |
| variation 35:3 | 38:17 39:6 | 73:6,11 | 61:12 63:2 | 72:14 75:6 |
| 35:6,8 45:6 | 41:15 42:7 | 76:18 77:6 | 65:17,17 | 77:9 78:13 |
| 45:10 58:11 | 47:7 67:12 | 78:18 81:18 | 66:5 69:19 | 88:22 94:21 |
| 81:17 | 84:1 85:15 | 82:5,21 | 72:22 73:3 | 98:7,12 |
| variations 82:4 | 87:7 99:9 | 83:19 88:11 | 74:21 77:2,5 | where 23:14 |
| varied 59:18 | wanted 41:8 | 88:17 89:7 | 79:9 82:4,8 | 34:7,12 63:9 |
| 81:22 98:1 | 42:19 93:12 | 89:20 90:5 | 83:8 84:19 | 79:12 94:10 |
| variety 14:21 | Warren 73:16 | 90:18 91:18 | 98:7,13 99:1 | 94:15,22 |
| 34:6 38:11 | Washington | 94:20 95:10 | 99:19 100:9 | 95:2 |
| 64:9 98:18 | 3:14 11:12 | 97:21 98:6 | West 9:17,20 | WHEREOF |
| 98:19 | wasn't 20:9 | 98:12,18 | 10:2,11,17 | 101:17 |
| various 21:2 | 70:6 98:16 | 100:5 | 25:4,13,17 | Whereupon |
| 34:2 61:14 | 98:17,20 | Wells 3:15 4:6 | 27:18 49:4 | 100:20 |
| 96:17,22 | way 7:19 14:21 | 5:10 7:1 | 63:17,19 | whether 14:15 |
| vary 30:4,7,8 | 22:10 41:9 | 17:12,19 | 64:8,14,16,19 | 14:15,19 |
| 81:12 | 44:3 76:9 | 35:20 36:7 | 65:13,16 | 15:2 38:13 |
| vendors 56:6 | 85:1 87:20 | 36:22 37:6 | 66:9 67:6,15 | 65:20 79:5,7 |
| verbal 7:10 | 94:20 96:4 | 37:10,12 | 70:2 97:21 | 79:13 80:6 |
| versus 15:11 | 101:15 | 38:21 39:2 | western 9:19 | which 10:2 |
| 80:7 81:19 | ways 34:14 | 40:14 42:8 | 26:2 78:5 | 13:2 18:21 |
| very 12:10 | web 24:10,20 | 42:11,19,21 | we'll 54:14 | 28:13,13 |
| 21:13 27:3 | 52:10 | 53:21 54:6,8 | we're 7:22 | 45:15 46:9 |
| 27:19,22 | well 8:14 13:4 | 54:20 68:1 | 54:11 60:8 | 61:19 63:12 |
| 29:1 31:22 | 13:16 14:12 | 74:19 86:5 | 66:19 76:22 | 63:12 68:19 |
| 45:14 49:8 | 15:8,21 16:9 | 87:7,11,12 | 81:1 83:6 | 70:18,22 |
| 69:1,19 | 16:15,19 | 90:17 93:13 | 84:22 97:12 | 71:2 73:16 |
| 70:17 89:8 | 17:6 18:12 | 99:8,12 | we've 49:10,12 | 75:18,18 |
| 89:10 100:14 | 18:12 19:2 | 100:16 | 85:1 92:16 | 77:9 85:1,20 |
| vice 9:10 62:9 | 20:1,15 21:6 | went 8:19,22 | whatever | 85:21 90:9 |
| 78:4 | 21:16 24:9 | 22:9 42:14 | 49:19 50:11 | 91:10 97:12 |
| view 66:17 | 25:16 26:20 | were 5:22 6:3 | 65:1 71:15 | white 22:16 |
| violating 67:14 | 27:17 28:9 | 7:2 9:18 | 83:22 84:2 | 73:17 |
| Virginia 9:22 | 28:16 30:7 | 11:17 12:1,5 | 96:7 | who 4:11 6:6 |
| 10:19 | 34:21 35:5 | 13:19,21 | what's 22:4 | 18:14 27:4 |
| visibility 37:17 | 36:7,13 | 14:12,13,21 | 37:19 97:2,2 | 28:18 29:9 |
| Vista 38:19 | 37:20 38:11 | 15:6 16:3 | when 6:1 7:18 | 33:12 38:10 |
| volume 24:6,8 | 40:6 44:12 | 19:22 20:3 | 8:8 14:1 | 41:20 42:3 |
| 24:18 46:10 | 46:6 48:1,2 | 20:21 27:20 | 15:14 16:13 | 55:21 62:8 |
| volumes 77:10 | 49:7,8 57:7 | 27:22 30:18 | 16:17 19:22 | 64:7,9,12,14 |
| | 58:19 59:18 | 42:15 51:8 | 20:12,17,21 | 69:12,14 |
| W | 59:19 60:13 | 51:10 53:12 | 35:21 48:3 | 70:2 72:6 |
| WAC 31:7 | 61:8 63:4,6,7 | 53:13 57:9 | 50:12 64:15 | 78:3 87:9 |
| wait 65:11 | 65:12 66:19 | 58:3,17 | 65:15 66:1 | 99:2 |
| 67:19 75:6 | | | | |

Dan Dragalin, M.D       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY       September 17, 2004
New York, NY

23

whoever 96:6
whole 9:22
wholesale 1:5
  15:3 16:6,7
  19:11 43:2
  58:11
wholesaler
  16:15 17:1
  17:10 21:10
  24:15,22
  31:8 100:2
  100:12
wholesalers
  23:9,19
  64:11 91:6,6
  99:15,21
whom 35:19
why 26:2 33:18
  53:6 58:16
  59:19 61:6
  62:20 76:15
wide 14:21
  35:6 38:11
widely 88:4,6,9
will 7:16,16
  17:15 24:15
  33:14 37:10
  43:18 47:5
  47:10,17
  48:14,21
  50:10 61:13
  63:4,5 75:10
  78:1 84:2
  85:7 88:19
  89:1
willing 36:11
  89:15
Wisconsin
  28:13,14
  85:12
within 66:14
  66:17 101:8
  101:11
within-entitled

101:11
without 87:20
witness 4:4
  6:19 41:4
  42:18 84:14
  99:6 101:17
work 33:21
  44:21,22
  63:5
worked 11:21
  13:11 18:19
working 19:22
works 7:4
  22:21
would 8:14
  14:4 17:12
  20:7 24:4,5,8
  26:20 35:10
  35:11 38:5
  44:6,7 49:9
  50:18 53:14
  53:18,21
  54:18 57:11
  57:12,13,15
  57:18,19
  58:1,1 60:1
  60:19 61:12
  62:4 65:1,2,4
  65:15 70:7
  71:7,8,11
  72:21,22
  73:2,22
  74:10 75:6
  77:21 79:2
  81:16 87:4
  87:16,19
  88:3 90:9
  93:3,11,14
  94:17,18,18
  95:20 96:5,5
  96:6,8 98:19
  100:3,8,11
wouldn't 16:2
write 7:6

writing 62:5
written 22:17

――――――――
        X
――――――――
x 1:4,9 4:2,15

――――――――
        Y
――――――――
yeah 18:20
  26:20 60:11
  64:19 78:14
  88:17 94:14
year 9:14
  25:17 65:21
  72:10 88:21
  97:22
years 10:12,20
  11:6,12,19
  13:3 41:19
  48:15 75:21
  76:2 83:2
year-and-a-h...
  65:16
York 1:14,14
  2:11,12,14
  3:20,20 5:5,5
  10:15,16
  11:4 101:3,9
your 5:13 6:12
  7:2 8:17 9:8
  9:18 12:5
  17:2,15
  19:15 20:19
  20:19 21:18
  29:7,11,12
  37:1,17
  39:11 43:5
  43:20 44:2
  45:13 47:9
  48:17 51:3
  51:20,21
  52:3,14,15
  53:18 54:1
  55:9 59:8
  60:2 68:10
  73:2,18 74:9

80:10,11
84:7,18 85:4
85:12,15
86:11,13
87:21 88:18
89:13,18
90:13,22
91:14,18
92:13 96:9
96:16,17
97:11,15
yourself 88:19
you'll 29:11
you're 7:5 8:5
  23:14 24:22
  26:11 31:18
  36:4 48:13
  54:4 76:19
  85:6 88:16
you've 91:22

――――――――
        Z
――――――――
Zuzenak 78:3
  78:12 79:1
Z-u-z-e-n-a-k
  77:17

――――――――
        $
――――――――
$1,000 56:17

――――――――
        0
――――――――
000001 4:20
  54:2,17
000052 17:16
001 4:16 17:20
002 4:19 54:15
01-CV-1225...
  1:7

――――――――
        1
――――――――
1 17:13 22:11
  23:2 24:2
  25:2 72:8,10
  75:19 85:20
  85:22 94:1,2

1:47 100:20
10 4:17 17:14
  17:22 24:16
  61:15 65:11
  65:12 74:10
  76:21
10% 58:12
  73:22
10:30 2:7
10:33 5:2
10003-1004
  3:20
11:23 40:16
11:30 8:1
1111 3:13
115 2:11 3:19
  5:5
12 60:20
12:09 41:3
13 54:19 55:9
13-state 9:21
1456 1:5
15 23:19 65:20
  76:17 77:3
  79:2 98:2
15% 23:10
  75:11 77:21
16 61:1,21
17 1:15 2:6
  4:17 24:1
17th 101:18
1818 3:6
19103 3:7
1980 12:19
1980s 19:22
  23:21
1984 12:21

――――――――
        2
――――――――
2 54:5,6 55:8
  61:3,19
  63:12 68:19
  75:2,2
20 24:20 61:15
  65:1 74:7

Henderson Legal / Spherion
(202) 220-4158

24

76:21 77:5
99:20 100:4
**20%** 74:3
**20004** 3:14
**2003** 4:17
17:14,22
53:4,7 55:11
61:1,21
63:14
**2004** 1:15 2:6
68:22 73:18
75:4,14
77:18 101:18
**21** 68:22
**24** 61:19 63:13
75:4
**25** 48:8,9 73:18
79:10 81:12
82:9,18,20
**25's** 82:17
**2500** 3:6
**26** 77:18

**3**

**3** 98:9
**30** 24:20 41:19
74:7 77:5
99:20 100:4
**30%** 74:3
**30's** 82:16
**30(b)(6)** 1:13
2:9
**35** 48:8,10
79:11 81:12
82:13,14,18
82:20

**4**

**4** 12:20 55:11
72:12,13
**40** 56:15 74:12
**42** 4:12 68:20
**43** 68:19 74:22

**5**

**5** 4:6 65:18,19
98:2
**5%** 23:6,8 74:1
**50** 27:8
**500** 12:12
**51** 4:20 54:3,17
**52** 85:20
**53** 17:16 85:20
94:1
**54** 4:20

**6**

**6** 77:16
**60** 27:8

**7**

**7th** 3:19
**70** 12:12 50:2,3
**70s** 30:17
**72** 12:9

**8**

**80** 12:13
**80s** 6:3 12:2
20:7,8,16
30:18 91:14
91:15,20
**84** 4:7

**9**

**9** 63:12
**90** 98:9
**90s** 27:14
30:21 82:1
98:9
**92** 98:9
**99** 4:6