Exhibit 41

Page 1

1    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2       IN THE UNITED STATES DISTRICT COURT

3      FOR THE DISTRICT OF MASSACHUSETTS

4    ----------------------------x
In Re: PHARMACEUTICAL         )
5    INDUSTRY AVERAGE WHOLESALE    )
PRICE LITIGATION              )
6    ----------------------------x
THIS DOCUMENT RELATES TO      )
7    ALL ACTIONS                   )
----------------------------x
8

9

10

11

12                    October 6, 2004

13                    12:23 p.m.

14

15        Deposition of CHRISTOPHER EDDY,

16    held at the offices of Morgan, Lewis &

17    Bockius LLP, 101 Park Avenue, New York, New

18    York, pursuant to subpoena, before Cary N.

19    Bigelow, RPR, a Notary Public of the State

20    of New York.

21

22

EXHIBIT

Christopher Eddy                   Highly Confidential- Attorneys' Eyes Only                   October 6, 2004
                                              New York, NY

---

Page 2

```
 1   A P P E A R A N C E S :
 2
 3   HOFFMAN & EDELSON
 4   Attorneys for Plaintiffs
 5        45 West Court Street
 6        Doylestown, Pennsylvania 18901
 7   BY:  ALLAN HOFFMAN, ESQ.
 8        (via telephone)
 9
10   MORGAN, LEWIS & BOCKIUS, LLP
11   Attorneys for Pfizer Inc.
12        1111 Pennsylvania Avenue, N.W.
13        Washington, D.C. 20004
14   BY:  J. CLAYTON EVERETT, JR., ESQ.
15
16   KELLEY DRYE & WARREN LLP
17   Attorneys for Dey, L.P.
18        101 Park Avenue
19        New York, New York 10178
20   BY:  CHRISTINE SCHESSLER, ESQ.
21        (via telephone)
22
```

Page 4

```
 1   ----------------- I N D E X -----------------
 2   WITNESS        EXAMINATION BY        PAGE
 3   CHRISTOPHER EDDY   MR. EVERETT       6, 150
 4                MR. HOFFMAN       134, 152
 5   ----------------- EXHIBITS -----------------
 6   EDDY DEPOSITION                      FOR ID.
 7
 8   Exhibit Eddy 001, two-page    27
 9   list of deposition subjects
10   Exhibit Eddy 002, documents   59
11   bearing production Nos. EMP 0005669
12   through EMP 0005682
13   Exhibit Eddy 003, documents   87
14   bearing production Nos. EMP 0013651
15   through EMP 0013657
16   Exhibit Eddy 004, documents   107
17   bearing production Nos. E 28250
18   through E 28261
19
20
21
22
```

---

Page 3

```
 1   A P P E A R A N C E S :
 2
 3   SHOOK HARDY & BACON LLP
 4   Attorneys for Aventis Pharmaceuticals, Inc.
 5        1200 Main Street
 6        Kansas City, Missouri 64105
 7   BY:  CHRISTINE SCHESSLER, ESQ.
 8        (via telephone)
 9
10   LOUIS L. BENZA, ESQ.
11   Empire Blue Cross Blue Shield
12        15 Metrotech Center, 6th Floor
13        Brooklyn, New York 11201
14
15
16
17
18
19
20
21
22
```

Page 5

```
 1
 2         IT IS HEREBY STIPULATED AND AGREED,
 3   by and between the attorneys for the
 4   respective parties herein, that filing and
 5   sealing be and the same are hereby waived.
 6         IT IS FURTHER STIPULATED AND AGREED
 7   that all objections, except as to the form
 8   of the question, shall be reserved to the
 9   time of the trial.
10         IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized to
13   administer an oath, with the same force and
14   effect as if signed and sworn to before the
15   Court.
16
17
18
19
20
21
22
```

Henderson Legal / Spherion
(202) 220-4158

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                              New York, NY

Page 6

1   C H R I S T O P H E R   E D D Y,   called as a
2      witness, having been duly sworn by a Notary
3      Public, was examined and testified as
4      follows:
5   EXAMINATION BY
6   MR. EVERETT:
7      Q.    Good afternoon, Mr. Eddy.  My name is
8   Clay Everett, I am representing Pfizer, Inc. in
9   the average wholesale price litigation.
10        Would you please state your name and
11   current title for the record.
12      A.    My name is Christopher Eddy, regional
13   manager for provider relations and contracting
14   for the upstate and mid-Hudson region.
15        MR. BENZA:  Before we go any further,
16   I just want to designate at this point the
17   testimony Mr. Eddy gives as highly
18   confidential as permitted by the court's
19   protective order.
20        MR. EVERETT:  Okay.
21      Q.    Mr. Eddy, have you been deposed
22   before?

Page 7

1      A.    Yes, I have.
2      Q.    When?
3      A.    Approximately two weeks ago.
4      Q.    In what context?
5      A.    Regarding the TAP litigation.
6      Q.    What in general was the substance of
7   your testimony in the deposition two weeks ago?
8        MR. BENZA:  Objection.
9        The grounds for the objection is the
10   testimony in the TAP litigation was deemed,
11   it was stipulated as confidential by the
12   parties, by both the plaintiffs and the
13   defendants.
14        MR. EVERETT:  Okay.  And I don't want
15   to get into issues of confidentiality or
16   protective order issues with the TAP
17   litigation.  Obviously, Mr. Eddy will
18   testify today as to his knowledge with
19   regard to the issues in this litigation.
20        MR. BENZA:  Correct.
21      Q.    But we may certainly deal with some
22   issues that were dealt with in the previous

Page 8

1   litigation.
2        Let me ask you this:  What did you do
3   to prepare for your deposition today?
4      A.    I have mainly seen the subpoena and
5   the complaint and I have spoken with my counsel.
6      Q.    When did you speak to your counsel
7   about this deposition?
8      A.    Three, four days ago we talked on it.
9      Q.    For how long did you talk?
10      A.    Approximately an hour.
11      Q.    What did you do to prepare for your
12   deposition in the TAP litigation?
13      A.    Again, I looked at the complaint and
14   subpoena and I spoke with counsel.
15      Q.    Did you speak with the same counsel?
16      A.    I also spoke with another lawyer that
17   was representing us.
18      Q.    Have you spoken to plaintiffs' counsel
19   in the average wholesale price litigation?
20      A.    Plaintiffs in what term, can I ask?
21      Q.    That's a fair question.
22        In the litigation there are plaintiffs

Page 9

1   who are pursuing claims for damages against
2   defendants and the defendants in this case are
3   pharmaceutical manufacturers.
4        The plaintiffs in the average
5   wholesale price litigation are for the most part
6   health and welfare benefit funds and public
7   interest groups and they are represented by a
8   variety of lawyers.
9      A.    As far as I know, I haven't spoken to
10   any counsel representing those parties.
11      Q.    Other than your counsel, have you
12   spoken to anyone to prepare yourself for this
13   deposition?
14      A.    No, I have not.
15      Q.    As you have been deposed before, we
16   probably don't need to go through all of the
17   issues associated with the depositions or the
18   ground rules, but I will just run through them
19   quickly just to be clear.
20        You understand you are under oath
21   today?
22      A.    Yes, I do.

3 (Pages 6 to 9)

Christopher Eddy                     Highly Confidential- Attorneys' Eyes Only                     October 6, 2004
                                                New York, NY

Page 10

1    Q.    You understand everything you say,
2    it's just like as if you were in a courtroom,
3    and everything you say must be true and is
4    subject to potential prosecution for perjury.
5          Because there is a court reporter
6    present today it is important that you answer
7    all my questions orally, the reporter cannot
8    take down nods of the head or shakes of the
9    head.
10   A.    I understand.
11   Q.    It is important you wait until I
12   finish my question before you answer.
13         Will you do that?
14   A.    Yes.
15   Q.    And I will wait until you finish your
16   answer before I ask another question.
17   A.    Thank you.
18   Q.    Let me know if you need to take a
19   break at any time in the deposition.  As long as
20   there is not a question pending, I am happy to
21   do that.
22   A.    Sure.

Page 11

1    Q.    And also let me know if you don't
2    understand the question that I ask.
3    A.    Okay.
4    Q.    Do you understand you are here today
5    to testify on behalf of Empire Blue Cross Blue
6    Shield?
7    A.    Yes, I do.
8    Q.    When I ask you questions and use the
9    term "you" I will be referring to Empire Blue
10   Cross Blue Shield unless I indicate otherwise,
11   all right?
12   A.    Yes.
13   Q.    Other than the deposition you gave in
14   the TAP litigation a couple of weeks ago, have
15   you been deposed at any other time?
16   A.    No, I have not.
17   Q.    Mr. Eddy, would you run through your
18   education for me after high school.
19   A.    I have a two-year degree from State
20   University of New York at Cobleskill, that was
21   obtained in 1987 in computer science.
22         After that, while I was working, I

Page 12

1    went back to school part time and I received a
2    four-year degree in computer information systems
3    from Empire State College.
4    Q.    After you completed your last degree,
5    did you go to work?
6    A.    I was actually working during that
7    time frame.
8    Q.    Where were you working during that
9    time frame?
10   A.    Empire Blue Cross.
11   Q.    What was your position at that time?
12   A.    It would have been in provider
13   relations, I would have been a provider
14   relations coordinator.
15   Q.    What were your duties as a provider
16   relations coordinator?
17   A.    I was responsible to identify
18   providers for recruitment for our provider
19   network.  Once those providers were recruited, I
20   worked with their staffs to educate them on our
21   products and the different guidelines they
22   needed to follow, I worked with them if they had

Page 13

1    any problem resolution.
2    Q.    What do you mean by problem
3    resolution?
4    A.    If they questioned the processing of a
5    claim, the claim denied, they didn't know the
6    reason why, I would assist them with that.
7    Q.    How long did you hold the position as
8    provider relations coordinator?
9    A.    Approximately three years.
10   Q.    That would take us to what date,
11   approximately?
12   A.    Into '96, sometime in 1996.
13   Q.    What position did you assume at that
14   time?
15   A.    At that time I was promoted to a
16   senior provider relations coordinator.
17   Q.    How did your duties vary?
18   A.    I maintained the same responsibilities
19   as the coordinator, I assumed responsibilities
20   to lead seminars for providers in different
21   areas.  In addition to that, I assisted my
22   supervisor at that time and attended meetings on

Henderson Legal / Spherion
(202) 220-4158

Christopher Eddy

Highly Confidential- Attorneys' Eyes Only
New York, NY

October 6, 2004

Page 14

1 her behalf if she wasn't able to.
2     Q.    What sort of meetings would you attend
3 on behalf of your supervisor?
4     A.    Going way back, so I would have to say
5 at the time, most likely it was credentialing,
6 attendance at credentialing meetings, and other
7 than that -- I definitely remember credentialing.
8     Q.    What do you mean by providers in the
9 context of your work as provider relations
10 coordinator?
11     A.    Providers are the physicians that make
12 up our network or allied providers as you would
13 call them, that would be your podiatrists, your
14 physical therapists some medical providers is
15 mainly what we serviced in our department.
16     Q.    During this time period, did you have
17 any duties relating to pharmaceutical products?
18     A.    No, I did not.
19     Q.    How long did you hold the position of
20 senior provider relations coordinator?
21     A.    Approximately seven years.
22     Q.    Until approximately 2003?

Page 15

1     A.    Actually until January of this year,
2 2004.
3     Q.    What position did you assume at that
4 time?
5     A.    At that time I took the position as
6 regional manager for provider relations upstate.
7     Q.    How did your duties change?
8     A.    The biggest change I had at that point
9 was I became responsible for a staff of seven
10 employees and having to work with them and help
11 them out in their areas.
12     Q.    Other than the duties that you had
13 performed as provider relations coordinator,
14 what other duties are performed by the staff of
15 seven employees over whom you now have
16 supervisory responsibility?
17     A.    I have six coordinators.  Of the six,
18 one of them is a senior provider relations
19 coordinator.  They are all responsible for
20 territory in the upstate mid-Hudson region and I
21 have one internal representative which is a
22 provider relations associate.

Page 16

1     Q.    How are the duties of the provider
2 relations associate different than the provider
3 relations coordinators?
4     A.    The associate is actually an internal
5 position, they assist the staff if they have
6 questions or they are working with doctors.  The
7 coordinators travel, on a weekly basis they are
8 outside of the office two or three days a week,
9 so the internal person helps them get their work
10 done.  In essence, that's what the position
11 does.
12     Q.    Do the six provider relations
13 coordinators have duties different than the
14 duties you had as provider relations
15 coordinator?
16     A.    It is pretty much identical.  I mean,
17 as time has changed, we have picked up a little
18 different responsibilities now.
19     Q.    Are you involved at all in contracting
20 with providers?
21     A.    In what terms are you looking at
22 contracting?

Page 17

1     Q.    Any terms at all.
2     A.    Recruiting, that type of contracting,
3 yes, we go out and recruit with the physicians
4 and we would supply them with an agreement if
5 they would like to participate.
6     Q.    What do you do to recruit physicians?
7     A.    Mostly right now the recruitment is
8 based on network need, if we do not have a
9 provider in a particular specialty, or we are
10 mainly getting providers that call us up asking
11 to participate.
12     Q.    How do you determine if you have a
13 network need for a particular type of provider?
14     A.    What we look at to determine the
15 network need is, say you have a particular
16 county and there are no providers participating
17 in a certain specialty and New York State
18 indicates that there are providers available, we
19 will try to identify those providers and see if
20 they are interested in participating with our
21 products.
22     Q.    What do you do to interest providers

Christopher Eddy                Highly Confidential- Attorneys' Eyes Only                October 6, 2004
                                          New York, NY

Page 18

1   in your products?
2     A.   We mainly have a little information
3   that we go out, just telling them the different
4   products that we offer and what would be their
5   responsibilities in our network if they joined
6   those programs and we kind of go out and talk
7   with them about that, listen to what their
8   questions are.
9     Q.   If physicians are interested in
10  joining your network, how do you get them to
11  join?
12     A.   If they are interested we give them an
13  application -- I should say, excuse me, it's an
14  agreement, and a cover sheet and the providers
15  would complete those two documents and return
16  them back to their coordinator.
17     Q.   Do you negotiate with providers about
18  any terms of the agreement that will govern
19  their relationship to Empire?
20     A.   The physician managed care and the PPO
21  agreements are non-negotiable, the wording in
22  those contracts.

Page 19

1     Q.   So Empire uses standard contracts for
2  all of its network providers?
3     A.   Yes.
4     Q.   Are the fees for provider network set
5  out in those contracts?
6     A.   Without actually looking at the
7  contract right now, I do not -- they are not
8  mentioned directly, it just references Empire's
9  managed care fee schedule.
10     Q.   Do you discuss the fees paid to
11  providers with providers when recruiting them to
12  the Empire network?
13     A.   If the provider asks for that
14  information.
15     Q.   In your experience, do providers
16  generally ask for information about the fees
17  that will be paid by Empire?
18     A.   Yes.
19     Q.   Do providers ever ask about fees that
20  will be paid by Empire for drugs dispensed in
21  their offices?
22     A.   We do on occasion get questions.

Page 20

1     Q.   Other than those discussions, do you
2  have any responsibilities other than those --
3     MR. EVERETT:  Strike that.
4     Q.   Other than those discussions with
5  providers in the context of recruiting them to
6  the Empire network, do you have any
7  responsibilities related to pharmaceutical
8  products?
9     A.   No, I do not.
10     Q.   Let's talk about Empire, the corporate
11  entity, a little bit.
12     Empire is a managed care organization;
13  is that correct?
14     MR. BENZA:  Objection to the extent
15    that calls for a legal conclusion.
16     A.   It has a varied, a variable amount of
17  products, some of which are managed care
18  programs.
19     Q.   What types of products does Empire
20  offer?
21     A.   We offer an HMO product or an HMO
22  network, I should say, with products available

Page 21

1   within that network.  One of such products is
2  what we call our direct HMO.
3     Would you like specifics on that or
4  just the names?
5     Q.   Let's run through the names first.
6     A.   Plain HMO, Direct Pay HMO, Child
7  Health Plus and Healthy New York.
8     Q.   Does Empire offer any non-HMO
9  products?
10     A.   I just wanted to add one more to that.
11     There is a senior plan.  I'm sorry, I
12  forgot that one.
13     Go ahead.
14     Q.   Does Empire offer any non-HMO
15  products?
16     A.   Yes, we do.
17     Q.   What are those products?
18     A.   Preferred provider organization, which
19  is a PPO, exclusive provider organization, which
20  is an EPO.
21     Q.   How do the HMO products differ from
22  the PPO products?

Henderson Legal / Spherion
(202) 220-4158

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                    New York, NY

Page 22

1    A.    Usually the HMO network is a smaller
2    subset of physicians that are available for the
3    members to see.  Depending on which product the
4    member has, they have responsibility to get a
5    referral from their primary care physician for
6    any services through a specialist.  Some
7    products do not have referral, do not require
8    referrals.
9    Q.    How does the exclusive provider
10   organization differ from the HMO product?
11   A.    The exclusive provider organization,
12   the member can see any provider in our PPO
13   network, as we call it, any participating
14   provider for coverage services without a
15   referral, they can self-refer.  If they decide
16   to see a doctor or provider that does not
17   participate, the member is going to be
18   responsible for the charges.
19   Q.    Do all of the products offered by
20   Empire Blue Cross and Blue Shield provide
21   coverage for pharmaceutical companies?
22   A.    I can't answer that because I don't

Page 23

1    work on the pharmaceutical side of it, so that
2    would be specific to those groups when they
3    purchase from us.
4    Q.    What do you mean by groups when they
5    purchase from us?
6    A.    Well, most of these products, when you
7    look at them, are usually bought by employer
8    practices, employer groups, and those groups can
9    choose their benefits, those groups decide
10   whether they want pharmacy benefits or not and
11   we have no part of that decision, it's the
12   employer groups.
13   Q.    For those products that do offer
14   pharmacy benefits, are groups that purchase
15   those products able to negotiate for the
16   different copays and coinsurance to be paid by
17   their beneficiaries for those products?
18   A.    I don't work with the groups in
19   selling it, so I couldn't tell you what the
20   groups choose, how they choose it, but the
21   identification card that the member has
22   indicates their copayment amounts if they have a

Page 24

1    benefit available.
2    Q.    Does Empire have standard copays and
3    coinsurance for pharmaceutical products?
4    A.    I couldn't answer that for you.
5    Q.    Geographically, where does Empire
6    operate?
7    A.    We have 28 counties in New York that
8    we operate in as well as operating as Well
9    Choice in New Jersey.
10   Q.    Does Well Choice offer different
11   products than Empire New York?
12   A.    They offer similar products.  There
13   may be a few products that are specific to New
14   York State that they don't offer down there.
15   Q.    What are Empire's competitors?
16   A.    It probably will depend on which area
17   you are looking at.  In my upstate region my
18   competitors are MVP, which is Mohawk Valley
19   Health Plan, as well as Capital District
20   Physicians Health Plan.
21        As you come down here to New York City
22   that changes differently because there are

Page 25

1    different groups down here.  You probably have
2    Oxford, Aetna U.S. Healthcare, GHI.  Those are
3    just some of the competitors.
4    Q.    How do you know those companies are
5    competitors of Empire?
6    A.    They offer products in the same market
7    that we offer products in and via commercials on
8    TV or newspaper articles you see their names.
9    Q.    What are the facets of competition
10   between Empire and those competitors?
11   A.    They are probably -- all of the
12   insurance companies are looking for consumers
13   for their products.
14   Q.    What does Empire do to attract
15   consumers for its products?
16   A.    The best way probably would be able to
17   have competitive prices with premiums.
18   Q.    To offer competitive prices for
19   premiums, is it important for Empire to keep its
20   costs of doing business low?
21   A.    Based on my knowledge, I would say
22   yes, but I don't know for the company as a

Henderson Legal / Spherion
(202) 220-4158

Christopher Eddy | Highly Confidential- Attorneys' Eyes Only<br>New York, NY | October 6, 2004

---

Page 26

1 whole.
2    Q.   Is it important to Empire's
3 competition with its competitors to have a large
4 network of providers available to beneficiaries
5 of Empire?
6    A.   The size of the network isn't always
7 the best to drive that.
8    Q.   Do you believe competition is mainly
9 in terms of the price?
10    A.   It's probably the main part of it.
11    Q.   How is Empire organized internally?
12 Are there different divisions of Empire?
13    A.   Yes, there are.
14    Q.   What division do you work for?
15    A.   I'm in operations.
16    Q.   Other than operations, what other
17 divisions or groups are there?
18    A.   It would be easier if I had an
19 organization chart to show you all that. I am
20 trying to think offhand.
21      Just briefly, there's probably a
22 finance and sales or marketing, I should say.

Page 27

1    Q.   How is the operations group organized?
2    A.   Well, I can only speak for, like, my
3 area of the operations department that I deal
4 with. There is a division that deals
5 specifically with hospitals and then there's a
6 division of us that deals with the provider
7 relations. There could be another few areas
8 pulled into there that I am not involved with,
9 but those are the main two I am dealing with
10 under operations.
11    Q.   In what division is the pharmacy
12 department?
13    A.   Honestly, I don't know that.
14    Q.   Do you have any interaction with the
15 people who work in the pharmacy department?
16    A.   Occasionally I will be at a meeting
17 where they are at for some reason, but that's
18 usually the only points that I have involvement
19 with them.
20    Q.   Mr. Eddy, I am going to hand you
21 what's been marked as Eddy Deposition Exhibit 1.
22    (Exhibit Eddy 001, two-page

Page 28

1 list of deposition subjects, marked for
2 identification, as of this date.)
3    Q.   This is a list of deposition subjects.
4 Just so you know, it's a two-sided document and
5 all of the documents I will give you today are
6 two-sided.
7      Take a minute and take a look at that.
8      Mr. Eddy, have you seen Deposition
9 Exhibit 1 before?
10    A.   Yes, I have.
11    Q.   Do you understand that you are here
12 today to testify regarding some of the subjects
13 that are identified in Deposition Exhibit 1?
14    A.   Yes.
15    Q.   Which subjects are you prepared to
16 testify about today?
17    A.   I can speak specifically regarding
18 questions on the provider side, medical
19 providers.
20    Q.   Are you the person at Empire that's
21 most knowledgeable about the subjects that are
22 identified in Deposition Exhibit 1 on the

Page 29

1 provider side of the business?
2    MR. BENZA: I am going to let him
3 answer but I do want to object to that
4 question.
5      There was discussion, obviously,
6 between counsel and Mr. Eddy was proffered
7 as the witness on these particular topics
8 more than anyone at Empire, in our opinion,
9 would be able to talk on these topics.
10      I will let him answer the question in
11 his opinion, but as I say, that's been a
12 matter of discussion by counsel, both sides,
13 and he has been agreed to as the witness
14 today for this topic.
15    MR. EVERETT: Just so that you
16 understand, we have had some discussions
17 with the counsel that represents Empire, the
18 outside counsel that represents Empire, but
19 we were just given a list of names and there
20 wasn't a specific discussion about
21 particular individuals.
22      I understand you have proffered

Henderson Legal / Spherion<br>(202) 220-4158

Christopher Eddy

Highly Confidential- Attorneys' Eyes Only
New York, NY

October 6, 2004

Page 30

1  Mr. Eddy as a witness to testify about
2  provider relations and I am just trying to
3  explore the extent of his knowledge.
4        MR. BENZA:  That's fine.
5     A.    Based on my 13 years of experience in
6  provider relations, I was asked to do this
7  because of the knowledge that I have.
8     Q.    Mr. Eddy, have you heard of the term
9  "AWP" in reference to pharmaceutical products
10  before?
11    A.    Yes, I have.
12    Q.    What do you understand that term to
13  mean?
14    A.    It's actually the average wholesale
15  price.
16    Q.    To what do you understand average
17  wholesale price to refer?
18    A.    The cost of the drug that's determined
19  by the manufacturer.
20    Q.    What is the basis for your
21  understanding of the term "AWP"?
22    A.    My experience working with provider

Page 31

1  offices.
2     Q.    In what context has your experience in
3  dealing with providers' offices given you some
4  understanding of the meaning of the term "AWP"?
5     A.    I would be asked questions regarding
6  AWP when I was a provider relations coordinator,
7  so during the context of my position I had to
8  gain some knowledge into what the AWP was so I
9  could answer questions to the physician offices.
10    Q.    How did you gain knowledge about AWP?
11    A.    Mainly at that time back then talking
12  to my peers in my department, trying to -- I
13  think at the time back then we had a copy of the
14  drug topics red book in the office and I was
15  able to look up and find information regarding
16  that and then knowledge from talking to provider
17  offices and the physicians in the office.
18    Q.    Did you talk to any of your peers in
19  the pharmacy department of Empire about the
20  meaning of AWP?
21    A.    No, I did not.
22    Q.    You do know who is in the pharmacy

Page 32

1  department at Empire, do you not?
2     A.    I will say more so now than back then,
3  yes.
4     Q.    If you wanted to contact someone in
5  the pharmacy department of Empire, you could do
6  so, could you not?
7     A.    Yes, I could, yes.
8     Q.    In response to a previous question you
9  indicated that you understood AWP to refer to
10  the cost of a drug that is determined by
11  manufacturer.
12        The cost to whom?
13    A.    That they would supply it to the
14  entities purchasing it.
15    Q.    What entities do you understand
16  purchase drugs from manufacturers?
17    A.    Physicians offices can purchase drugs
18  directly or they go through another provider to
19  purchase those drugs.
20    Q.    Other than physicians' offices, what
21  other entities purchase drugs from
22  manufacturers?

Page 33

1     A.    Mainly I deal with physicians' offices
2  because that's where my questions come from.  I
3  don't know of any other option where they
4  purchase those from.
5     Q.    To be clear, did you understand the
6  term "average wholesale price" to refer only to
7  the cost of drugs purchased by physicians'
8  offices?
9     A.    Yes.
10    Q.    To be clear, again, you did not
11  understand the term "AWP" to refer to the cost
12  of drugs purchased by hospitals?
13    A.    I couldn't answer that because I don't
14  have experience working on the hospital side, so
15  I don't know there.
16    Q.    The same question for pharmacies.
17        MR. BENZA:  Could you actually repeat
18  the question?
19    Q.    Did you understand the term "AWP" to
20  refer to the cost that pharmacies paid to
21  acquire drugs?
22    A.    I don't have any experience with the

Henderson Legal / Spherion
(202) 220-4158

Christopher Eddy                  Highly Confidential- Attorneys' Eyes Only                  October 6, 2004
                                  New York, NY

Page 34

1    pharmacy side, so again, I wouldn't have any
2    information there regarding the pharmacies'
3    cost.
4         Q.    Did you believe that all providers
5    purchased pharmaceutical products at the same
6    cost?
7         A.    I had no reason not to believe that.
8    I have always thought they always paid the same
9    price.
10        Q.    To clarify, you believed that all
11   providers paid exactly the same price for
12   pharmaceutical products?
13        A.    Right.  Based on the territories that
14   I handled, the questions that I always saw was
15   always the same.  I don't know if in other
16   geographical regions if that price would change,
17   but I assumed it was the same.
18        Q.    Did you understand that the published
19   AWP to include discounts provided to providers?
20        A.    I did not know of any discounts.
21        MR. HOFFMAN:  Objection.
22        Q.    You can answer the question.

Page 35

1         A.    Sorry.
2              Can you repeat that for me?  I am
3    sorry, I lost my train of thought.
4         Q.    Did you understand the published AWPs
5    to reflect discounts received by providers
6    purchasing pharmaceutical products from
7    manufacturers?
8         MR. HOFFMAN:  Same objection.
9         A.    I did not know of any discounts, I had
10   not heard of any discounts.
11        Q.    Do you know that providers receive
12   educational grants in some cases from
13   pharmaceutical manufacturers?
14        MR. BENZA:  Objection.
15        A.    I don't have any knowledge of that.
16        Q.    Do you know if providers receive free
17   samples from pharmaceutical manufacturers?
18        A.    Based on my knowledge, being in the
19   field, I have seen drug vendors bring in drugs
20   to the doctor's office and leave them with them.
21   I don't know if the office paid for them, if
22   they were free, but I have seen them bring drugs

Page 36

1    into the office.
2         Q.    Has your understanding of the term
3    "AWP" changed at all over time?
4         A.    No.
5         Q.    It is the same today as it's always
6    been?
7         A.    Yes.  It might have been a little more
8    comfortable now with more experience, but it's
9    been the same.
10        Q.    Did your understanding of the term
11   "AWP" affect in any way the activities that you
12   performed on behalf of Empire?
13        A.    No.
14        MR. HOFFMAN:  Objection, vague.
15        Q.    Mr. Eddy, in your position as regional
16   manager of provider relations, if I have the
17   title right -- Mr. Eddy, in your position as
18   regional manager for provider relations, is it
19   important for you to keep up to date on drug
20   pricing issues?
21        A.    No.
22        Q.    Because your job has nothing to do

Page 37

1    with pharmaceutical products; is that correct?
2         MR. BENZA:  Objection to the
3    characterization.
4         A.    We deal with questions, but other than
5    pharmaceutical benefits, you are right, we do
6    not specifically deal with the pharmacy benefit
7    in our position.
8         Q.    Do you play any role in determining
9    the fee schedules for providers in the Empire
10   network?
11        A.    The mechanism that we use to determine
12   fee schedules is confidential with us.  We do --
13   our department will look at CPT codes, which are
14   the current procedural terminology codes, and we
15   do monitor those codes and a fee schedule is
16   based off of Medicare.
17        Q.    What do you do to monitor CPT codes?
18        A.    In the past, when they created our
19   managed care products, they used a percentage of
20   Medicare and they do -- I can't recall when the
21   last one was done, but they do an analysis
22   occasionally to see where our fees compare in

10 (Pages 34 to 37)

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                            New York, NY

Page 38

1 the current fees to make sure we are still
2 competitive.
3     Q.    How do you determine if you are still
4 competitive?
5     A.    Usually that will be determined
6 because we will get a lot of providers calling
7 you because they are not happy with our fee
8 schedule.  That's a major indicator.
9     Q.    What do you mean, they are not happy
10 with your fee schedule?
11     A.    They just contact their coordinators
12 and tell them that what we are possibly paying
13 for an office visit, what we are paying is lower
14 than our competitors and they are not happy that
15 our fees are so low or at that point they would
16 like to them look into that or something.
17     Q.    Does Empire ever adjust its fees in
18 response to that type of competition?
19     A.    Overall there's been one fee schedule
20 normalization over the past, I don't know the
21 exact time frame, but within the last, I would
22 say within three years there was one, and that's

Page 39

1 the last time I remember an update being made to
2 the fee schedule.
3     Q.    How often is the fee schedule updated?
4     A.    Not very often.
5     Q.    Does Empire have a single fee schedule
6 for all of its products?
7     A.    There are separate fee schedules.
8     Q.    Separate fee schedules for what?
9     A.    Based on regions.  You are based on --
10 there is Manhattan, outer boroughs, upstate,
11 mid-Hudson, because Medicare has different
12 regions.
13     Q.    Is there a constant relationship
14 between the Medicare fee schedule and the Empire
15 fee schedules?
16     MR. BENZA:  Objection to the term
17 "constant."
18     A.    I have not been involved in all the
19 normalizations up through, so I couldn't tell
20 you specifically if there has been a constant
21 the whole way through.  This fee schedule was
22 created on the basis of one particular year of

Page 40

1 Medicare.
2     Q.    Which particular year of Medicare?
3     A.    1994.
4     Q.    Are you familiar with the fee schedule
5 for the upper Hudson region of which you are
6 regional manager of provider relations?
7     A.    Yes.
8     Q.    What is the relationship between the
9 prices in the fee schedule, the Empire fee
10 schedule for the upper Hudson region and the
11 Medicare fee schedule?
12     A.    An actual percentage I couldn't give
13 you because over the years Medicare has raised
14 certain codes and decreased certain codes, so
15 when you look at the fee schedule some areas
16 will differ, but the percentage is still there
17 from the basis when you look at the original
18 year when it was created.
19     Q.    What is the percentage difference from
20 the basis year it was originally created?
21     A.    The actual at the time was 125 percent
22 is the percent of 1994 Medicare, RBRVS.

Page 41

1     Q.    How did Empire decide to set its fee
2 schedule at 125 percent originally of the 1994
3 Medicare RBRVS fee schedule?
4     A.    I honestly -- I can't tell you, I
5 don't know, I wasn't involved in the
6 decision-making at that time of the fee
7 schedule, so I don't know the decisions that
8 were made.
9     Q.    Do you know how often the Empire fee
10 schedule has changed since it was originally put
11 in place?
12     A.    At this time there hasn't been a
13 complete fee schedule change.  There has been at
14 least one fee schedule modification in the time
15 frame, and I don't recall the actual time frame
16 for that or the change in what it was.
17     Q.    How was the fee schedule modified?
18     A.    I remember them looking at codes and
19 updating codes because Medicare had increased
20 the codes and from volume of calls from
21 providers in certain areas, and the company went
22 back and looked at those.  I don't specifically

11 (Pages 38 to 41)

Christopher Eddy

Highly Confidential- Attorneys' Eyes Only
New York, NY

October 6, 2004

Page 42

1  remember which codes they were that were the
2  basis of the modification back then.
3      Q.    Individual codes were modified in the
4  course of this modification?
5      A.    Yes.
6      Q.    Do the Empire fee schedules include
7  fees that will be paid for physician-administered
8  drugs?
9      A.    The fee schedules would only cover
10  those CPT codes, so for a CPT code, there is an
11  administration code.  Those administration codes
12  would be covered under the Medicare fee
13  schedule, so our fee schedule would be based on
14  what Medicare was.
15      MR. BENZA:  Do you need to stretch
16  your legs?
17      THE WITNESS:  I will be okay, but in a
18  minute I would like to get up and stretch,
19  that would be good.
20      Q.    We will go just a couple more minutes
21  and then take a break.
22      Are the prices for physician-administered

Page 43

1  drugs as opposed to the administration of those
2  drugs included in the fee schedule?
3      A.    Can you be a little bit more specific
4  on that, what you are --
5      Q.    Are you familiar with J codes?
6      A.    Yes.
7      Q.    Does Empire reimburse physicians for
8  physician-administered drugs based on J codes?
9      A.    The J codes are published off the NDC
10  values and they appear in the drug topics red
11  book.
12      Our reimbursement for drugs is based
13  on the AWP, average wholesale price, it is not
14  based on the Medicare fee schedule.
15      There are certain codes I will say
16  that Medicare puts out for immunizations that
17  our fee schedule is based on Medicare's pricing
18  for the immunizations and they have a CPT code,
19  the price of that, and those J codes that don't
20  have a CPT like you are talking about were based
21  off of AWP.
22      Q.    Where would those AWP-based prices for

Page 44

1  J code drugs that don't have a corresponding CPT
2  code be found?
3      A.    The pricing for those is just -- we
4  utilize the drug topics red book and the price
5  will be in that book right there for the
6  corresponding drug.
7      Q.    Is there a separate fee schedule for
8  those physician-administered drugs?
9      A.    No.  It's based specifically off of
10  the AWP.
11      Q.    Do any of the contracts that Empire
12  has with providers identify the basis for
13  reimbursement for physician-administered drugs
14  where there is no CPT code?
15      A.    Can you give me a little bit more
16  clarification?
17      Q.    Empire reimburses some physicians for
18  physician-administered drugs based on AWP; is
19  that correct?
20      A.    Yes.
21      Q.    Is there any contractual obligation
22  that Empire has with its providers to base its

Page 45

1  reimbursement on that AWP basis?
2      A.    The establishment of the fees is
3  something driven by the company, the company
4  decides the net reimbursement, and as long as I
5  recall in the department it's always been based
6  on AWP.
7      Q.    Let me just clarify a little bit more.
8      Empire produces and publishes a fee
9  schedule that it provides its providers; is that
10  correct?
11      MR. BENZA:  Objection to publishes.
12      A.    We did, at one point we had a
13  published fee schedule of selected codes.  As
14  far as I know, that hasn't been maintained at
15  this time, but if a provider asks for
16  reimbursement, the coordinators would respond to
17  the provider and give them the pricing for the
18  CPT codes.
19      Q.    How do providers know how much they
20  will be reimbursed by the provider for
21  physician-administered drugs?
22      A.    In most cases, the provider will

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                              New York, NY

Page 46

1    usually ask their coordinator or call the
2    coordinator and ask them what our reimbursement
3    is and that would be advised to the provider.
4        Q.    To your knowledge, are those
5    reimbursement terms set out in any contracts
6    between Empire and providers?
7        A.    To my knowledge, the fees, the
8    contracts in the agreements references managed
9    care fee schedule and I do not recall seeing
10   anything specific in that wording to AWP.
11       Q.    And just to be clear, the managed care
12   fee schedule does not include schedules for
13   physician-administered drugs; is that correct?
14       A.    Yes.
15           MR. EVERETT:  Let's take a short
16   break.
17           We will break and reconvene in 10
18   minutes.
19           (Recess taken.)
20   BY MR. EVERETT:
21       Q.    Mr. Eddy, have you heard of a term WAC
22   in reference to pharmaceutical products?

Page 47

1        A.    In just looking through the complaint.
2        Q.    Other than in the complaint?
3        A.    No, I have not.
4        Q.    Mr. Eddy, are you familiar with a term
5    "MAC" in the context of pharmaceutical products?
6        A.    Again, I just saw it, again, in the
7    context of the complaint and I don't have any
8    knowledge other than that.
9        Q.    To your knowledge, does Empire
10   reimburse for any pharmaceutical products based
11   on MAC?
12       A.    I do not know.
13       Q.    At what rate does Empire reimburse
14   providers for physician-administered drugs?
15           MR. BENZA:  Objection to rate.
16       A.    Are you specifically referring to the
17   J codes, as you referenced earlier?
18       Q.    Let's talk about the J codes first.
19           What is the basis for reimbursement of
20   J code physician-administered drugs by Empire?
21       A.    Depending on the product, the
22   reimbursement is set and the basis is the

Page 48

1    average wholesale price.
2        Q.    Does the reimbursement differ by
3    product?
4        A.    Managed care products in the HMO
5    network are being reimbursed at AWP, straight
6    AWP; the products in the PPO network are being
7    reimbursed at AWP plus 30 percent.
8        Q.    Are those the rates used for all
9    physician-administered drugs that are dispensed
10   by physicians to beneficiaries of Empire
11   utilizing the HMO products and PPO products?
12           MR. HOFFMAN:  Objection, vague as to
13   time.
14       A.    Can you be a little bit more specific
15   for me on the question?
16       Q.    Do those rates apply to all
17   physician-administered drugs?
18           MR. HOFFMAN:  Same objection.
19       A.    Yes, they do.
20       Q.    Have those rates changed over time?
21       A.    At one point, and it was probably in
22   the early nineties, I don't know the actual

Page 49

1    date, everything was reimbursed at AWP plus 30
2    percent.
3        Q.    Why was the reimbursement changed for
4    the HMO products?
5        A.    I was not involved with that change,
6    so I don't know the reasoning for the change.
7        Q.    How does Empire determine the amount
8    that it will pay for physician-administered
9    drugs?
10       A.    Empire, since we started, as far as I
11   recall, with the company, has always been the
12   AWP, that's always been the basis for the drugs.
13           As for the percentages that are
14   established, that would have been determined
15   most likely by recommendations of management at
16   that time.
17       Q.    How did management determine the
18   percentage of AWP paid for physician-administered
19   drugs?
20       A.    Since I wasn't involved when they made
21   that change, I couldn't tell you the specifics
22   that they looked at to make the determination of

13 (Pages 46 to 49)

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                              New York, NY

Page 50

1    that.
2        Q.    Who would know the answer to that
3    question?
4        A.    I actually don't -- my boss who was
5    involved with that at the time has passed away,
6    so other than that I don't know who was involved
7    in making that decision, so I don't think I
8    could tell you another person.
9        Q.    What position did your boss hold?
10       A.    She was the director of provider
11   relations in the upstate mid-Hudson region.
12       Q.    Has Empire considered changing the
13   percentage of AWP that it pays for
14   physician-administered drugs?
15           MR. BENZA:  Objection as to time
16       frame.
17           Can you put a time frame on that?
18       Q.    At any time.
19       A.    It has always been based on AWP.  In
20   2003 we went with a program through Specialty Rx
21   Empire started.
22       Q.    Other than the program with Specialty

Page 51

1    Rx, to your knowledge, has Empire ever
2    considered changing the percentage of AWP that
3    it will pay physician-administered drugs?
4        A.    Other than that, I have no knowledge
5    of any.
6        Q.    Have you had any discussions with
7    management about the percentage of AWP that's
8    paid for physician-administered drugs by Empire?
9        A.    No, I have not.
10       Q.    Do you know what factors were
11   considered by management in setting their
12   recommendation to pay for -- pay AWP plus or
13   minus no percentage for HMO products?
14       A.    I do not.
15       Q.    Do you know why Empire uses AWP as a
16   basis for its reimbursement of
17   physician-administered drugs?
18       A.    It's actually published in sources
19   that it's easy for the providers to see what the
20   pricing is, so the published drug topics red
21   book is the one that we use, it is an easy
22   source for providers to obtain pricing.

Page 52

1        Q.    For the providers to obtain pricing?
2        A.    Yes.  The provider offices can
3    purchase the drug topics book and also see what
4    the cost of the drugs are.  Anybody can purchase
5    the book.
6        Q.    Does Empire ever reimburse providers
7    at their billed charges for physician-administered
8    drugs?
9        A.    We would only reimburse at the AWP.
10           I mean, the contract has wording in it
11   for reimbursement of the fee schedule or lesser
12   of, if they ever billed lesser than the AWP.  I
13   have never seen that happen.
14       Q.    Are you familiar with the Empire
15   claims database system?
16       A.    I have a little bit of experience with
17   it, not a lot.
18       Q.    Is there any way to differentiate,
19   when looking at a claim in the Empire claims
20   database, between claims that were paid based on
21   a percentage of AWP and claims that were paid
22   based on billed charges?

Page 53

1        A.    I have actually never looked
2    specifically at that, so to tell you, I don't
3    know, I never looked specifically.
4        Q.    Have you done anything in the past to
5    determine whether Empire is making payments for
6    physician-administered drugs based on billed
7    charges?
8        A.    I have actually no reason to believe
9    that was the case, so I have never done any
10   research.
11       Q.    Are you familiar with the term "usual
12   and customary"?
13       A.    Yes.
14       Q.    What do you understand that term to
15   mean in the context of pharmaceutical products?
16       A.    As it refers to pharmaceutical
17   products, I couldn't answer in that context.  I
18   know from the medical side what it would be.
19       Q.    What do you understand that to be in
20   the medical context?
21       A.    Usually what will happen, if a
22   provider does not participate, they set up,

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                              New York, NY

Page 54

1  there's usual and customary charges that are set
2  up and that's what the providers are reimbursed
3  at, the ratio for reimbursement, and they set it
4  that way because if the providers, first of all,
5  don't participate with the program, the member
6  has got to be responsible for charges, so they
7  look at the claims that way, the usual and
8  customary. It's usually a higher reimbursement
9  for the physician.
10     Q.    How is usual and customary determined?
11     A.    From my experience with that, it is
12  based on billing of claims coming in of
13  providers and the charges that the system sets
14  up, it tracks it and the fees, to my knowledge,
15  that's how it is set up.
16     Q.    To your knowledge, does Empire
17  reimburse physicians ever for
18  physician-administered drugs based on usual and
19  customary charges?
20     A.    I have actually never seen it based on
21  that, so I have no knowledge of that.
22     Q.    Does Empire reimburse physicians

Page 55

1  separately for services provided in the
2  administration of physician-administered drugs?
3     A.    The physician billing the
4  administration code could be reimbursed
5  separately when billed with the drug.
6     Q.    Are you aware of any complaints by
7  providers that the amount paid by Empire for the
8  administration of physician-administered drugs
9  is insufficient to cover the costs associated
10  with administering physician-administered drugs?
11     A.    I -- in the time frame I have been
12  doing this, I do not recall any providers
13  questioning the administration charge that we
14  pay.
15     Q.    Are you aware generally of any such
16  complaints about the amount paid for the
17  administration of physician-administered drugs?
18     A.    Usually, if a provider has a concern,
19  they address it to the coordinators and my staff
20  will bring that to my attention, let me know,
21  and I don't remember anybody specifically saying
22  that.

Page 56

1     Q.    What is the Independent Practice
2  Association?
3     A.    They are also known as an IPA. They
4  are very rare upstate, in my territory, so I
5  don't have a lot of experience in dealing with
6  them or even working with an IPA, usually.
7     Q.    Do you understand what an IPA is?
8     A.    I have heard the terminology before.
9  Since I really haven't dealt with them, I really
10  don't have a very strong understanding of that.
11     Q.    In what context have you heard the
12  terminology?
13     A.    Usually how a group forms or they set
14  themselves up as an IPA, a practice association,
15  and just pretty much how the group is set up is
16  my knowledge of it.
17     Q.    How is an IPA set up?
18     A.    Just from what I have seen, it's
19  usually a group of providers that form a
20  practice together and that's my understanding of
21  an IPA.
22     Q.    What functions does an IPA serve?

Page 57

1     A.    Since I haven't had much experience
2  with them, it is hard for me to tell you what
3  functions they would serve. I really have not
4  had any dealings with them, so I don't get
5  involved in that piece of it.
6     Q.    Do you have a general understanding of
7  that?
8     A.    Well, they probably would hire an
9  administrator to manage their practice and they
10  would probably try to work in the best interests
11  of their practice; I would assume that's what
12  they would be looking to do.
13     Q.    Does an IPA pool the resources of the
14  physicians that belong to it?
15     A.    It probably would be on their best
16  behalf to do that.
17     Q.    Why would physicians want to pool
18  their resources?
19         MR. BENZA: Objection.
20     A.    I would be guessing, because I am not
21  a physician's office, but to see that, they
22  probably -- I would assume they would operate

15 (Pages 54 to 57)

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                              New York, NY

Page 58

1  more smoothly, the company would, the group, the
2  practice would, to pool the resources.
3      Q.   What do you mean, operate more
4  smoothly?
5          MR. BENZA:  Objection.
6      A.   Again, not being in a physician
7  office, it is hard, because I am not seeing it
8  from their eyes how they are doing it.  Usually
9  they could utilize the same people to do
10 billing, the same people to do services in the
11 group, instead of having separate billing
12 practices in each one of the doctors' offices.
13     Q.   Does Empire pay any physicians based
14 on a capitated fee schedule?
15     A.   As far as I know, at this time, we do
16 not pay on a capitated fee schedule, everything
17 is on a straight fee schedule.
18     Q.   Has Empire ever paid physicians based
19 on a capitated fee schedule?
20     A.   I don't recall us ever using a
21 capitated period.
22     Q.   I am handing to you know a document

Page 59

1  marked Eddy Deposition Exhibit 2.  This is a
2  document bearing Bates numbers EMP 5669 through
3  EMP 5682.
4          Take a minute to look through that.
5          (Exhibit Eddy 002, documents
6  bearing production Nos. EMP 0005669 through
7  EMP 0005682, marked for identification, as
8  of this date.)
9          MR. HOFFMAN:  Give me a minute,
10 please.  I am trying to locate that.
11     Q.   Have you had a chance to look through
12 the document?
13     A.   Yes.
14         MR. EVERETT:  Allan, have you found
15 the document?
16         MR. HOFFMAN:  Not yet.  Give me one
17 more minute to see.
18     Q.   Mr. Eddy, what do you understand this
19 document to be?
20     A.   This is the first time I have seen
21 this document.  It's actually something specific
22 to downstate which we don't have upstate, so

Page 60

1  this is something new.  It's an IPA agreement.
2      Q.   Do the terms of agreements by Empire
3  with its providers vary by geographic region?
4      A.   The agreement that a physician signs
5  to participate is the same for all the providers
6  in our service area in New York State.  There's
7  a few minor changes in New Jersey because the
8  department down there makes those changes, so
9  every provider would sign the same agreement.
10     Q.   In your region, the upper Hudson
11 region, Empire has no agreements of the type
12 like Eddy Deposition Exhibit 2?
13     A.   Right now upstate I don't know of any
14 IPAs that are contracted upstate as this is
15 downstate, something specific to this market
16 down here.
17     Q.   Turn, if you will, please, to page EMP
18 5677, page 9 of the document.
19         Look, if you will, please, at the
20 paragraph 7-B.
21         Does this contract indicate that
22 physicians who are members of the IPA that is a

Page 61

1  party to this agreement will be paid by Empire
2  on a capitated basis?
3          MR. BENZA:  Objection.  The document
4  speaks for itself.
5      Q.   You can answer the question.
6      A.   Since I wasn't the author of this, it
7  does mention capitation here, but I don't know
8  the context that they were putting that in when
9  they wrote it, what they were doing with the
10 policy with respect to this specific group.
11     Q.   Does paragraph 7-B indicate that
12 Empire will pay physicians a flat fee?
13     A.   It indicates capitation in that
14 paragraph, it does not indicate a flat fee, but
15 not knowing the specific contracts, I couldn't
16 speak for the specific contract, what the actual
17 that is going on with this group.
18     Q.   You are familiar with the term
19 "capitation," aren't you?
20     A.   Yes.
21     Q.   What do you understand that to be?
22     A.   It is a payment made from the

Highly Confidential- Attorneys' Eyes Only
New York, NY

Page 62
1  insurance company to the group on a per-member
2  per-month basis, the price they are paid on a
3  monthly basis, and that price covers all of the
4  medical care they handle for that patient.
5      Q.   In your understanding in general, the
6  term "capitation," do you believe it covers
7  physician-administered drugs?
8      A.   I honestly do not know if this covers
9  that or not.  It doesn't indicate here, so I
10  couldn't tell you.  I don't know.
11      Q.   I am not asking about this document in
12  particular.
13          In general, do you understand
14  capitation contracts for physician services to
15  include physician-administered drugs?
16      A.   I don't know if it is covered or not.
17      Q.   Other than this contract, are you
18  aware of any other capitation agreements between
19  Empire and physicians?
20          MR. HOFFMAN:  Objection,
21  mischaracterizes the document.
22      A.   At this time, I am not aware of any.

Page 63
1      Q.   Has Empire ever employed a benefits
2  consultant, to your knowledge?
3      A.   I do not recall or remember anything.
4      Q.   What are benefits consultants?
5      A.   I honestly do not know.
6      Q.   Have you ever heard of the term
7  "benefits consultant"?
8      A.   No.
9      Q.   Does Empire have any contracts with
10  hospitals?
11      A.   There is a department that does
12  contract with hospitals.
13      Q.   Does Empire have any contracts with
14  those hospitals through that department?
15      A.   I know they contract with them, so
16  there must be contracts there.  It's not in my
17  area of my department, so I physically have not
18  seen any, but I know they contract with them.
19      Q.   On what basis does Empire reimburse
20  hospitals for drugs administered in the
21  hospital?
22          MR. HOFFMAN:  Objection, lacks

Page 64
1  foundation.
2      MR. EVERETT:  Just for the folks on
3  the phone, I would appreciate it if you
4  allow me to finish the question, please.
5      Q.   Go ahead.
6      A.   I am not involved with the hospitals,
7  so I couldn't tell you, I don't know what their
8  basis is for their contracting in their setting.
9      Q.   Who would know that?
10      A.   That would be the hospital contracting
11  department.
12      Q.   Who within the hospital contracting
13  department?
14      A.   The person that handles it upstate,
15  the director upstate is Barry Brandau.
16      Q.   Is the hospital contracting department
17  divided geographically by region?
18      A.   Yes, it is.
19      Q.   Is there any centralized hospital
20  contracting department?
21      A.   Each region has their own person in
22  charge of the region and they report up to,

Page 65
1  like, their supervisor or vice president that's
2  in charge of the division.
3      Q.   Is there a supervisor or vice
4  president to whom you report?
5      A.   I report to a director of provider
6  relations.
7      Q.   Does the director of provider
8  relations have responsibility for provider
9  relations in all of the regions in which --
10      A.   Yes.
11      Q.   -- Empire -- I would appreciate it if
12  you would wait until I finish the question.
13          Does the director of provider
14  relations have responsibility for provider
15  relations in all of the regions in which Empire
16  does business?
17      A.   Yes, he does.
18      Q.   Who is the director of provider
19  relations?
20      A.   Paul Portsmore.
21      Q.   Do you know how long Mr. Portsmore has
22  worked for Empire?

17 (Pages 62 to 65)

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                              New York, NY

Page 66

1     A.    I do not know the length of time he
2  has been with the company.
3     Q.    How long has Mr. Portsmore held the
4  position of director of provider relations?
5     A.  Between one and two years, a short
6  time.
7     Q.    How do Mr. Portsmore's
8  responsibilities differ from your
9  responsibilities?
10    A.    He would be responsible for managers
11 in all three of our regions and he would report
12 directly to the vice president of our division.
13    Q.    Who is the vice president of your
14 division?
15    A.    Dan McCarthy.
16    Q.    What is the division named?
17    A.    Managed care operations.  It might be
18 changed recently, but that's what I remember.
19    Q.    Do you have meetings with the other
20 regional directors of provider relations?
21    A.    We do on occasion, yes.
22    Q.    How often?

Page 67

1     A.    The last one is probably about a month
2  ago.
3     Q.    Are they held periodically, those
4  meetings?
5     A.    They used to be and then it's changed
6  a little bit recently.
7     Q.    How often did you used to have
8  meetings?
9     A.    We used to have them on a monthly
10 basis.
11    Q.    When did it change?
12    A.    Probably around May.
13    Q.    Now how often are these meetings held?
14    A.    Actually, the one we held the other
15 day is probably the first one we've had since
16 May.
17    Q.    What explains the change?
18    A.    There's just been some changes going
19 on with the division with changes in where
20 people report, just day-to-day activity they
21 have been changing.
22    Q.    What changes?

Page 68

1     A.    They are looking to take the
2  contracting out of provider relations, we are
3  going to deal specifically with provider
4  relations, and then there will be a part of the
5  people that will deal specifically with the
6  contracting piece and that's what's in process
7  right now.
8     Q.    What's the contracting piece?
9     A.    Mainly the contracting piece deals
10 specifically with the hospitals and sometimes
11 they handle large groups through the contracting
12 piece.  They are currently working on that
13 process right now.
14    Q.    Does the contracting piece involve
15 individual negotiations about contracts?
16    A.    As for contracts, we don't negotiate
17 individual contracts, it's the standard contract
18 that everybody utilizes, so contracting would
19 not deal with the agreements, the negotiation of
20 the contract.
21    Q.    What does it deal with exactly?
22    A.    Contracting deals with the larger

Page 69

1  groups that we have or the facility practices in
2  some of our areas where we negotiate with those
3  groups, reimbursement specifically.
4     Q.    And it deals with them in what way?
5     A.    They would work with those groups to
6  set up reimbursement based on CPT codes at a
7  different fee schedule than our providers.
8     Q.    Are separate fee schedules negotiated
9  with particular hospitals?
10         MR. BENZA:  Objection.
11         Hospitals?
12    A.    Hospitals aren't in my area of
13 knowledge, so as for hospitals, I couldn't speak
14 on how they are handled.
15    Q.    You just mentioned that there were
16 negotiations about how to set up reimbursement.
17         To what were you referring?
18    A.    When I stated that a minute ago, I
19 stated with large faculty practices, which are
20 the physician groups or large provider
21 practices.  It is specific to physicians, it has
22 nothing to do with hospitals.

18 (Pages 66 to 69)

Christopher Eddy                Highly Confidential- Attorneys' Eyes Only              October 6, 2004
                                          New York, NY

Page 70

1    Q.   Are separate fee schedules associated
2  with large faculty practices?
3    A.   There have been some occasions when
4  negotiations have been completed with groups.
5    Q.   Have you been involved in any of those
6  negotiations?
7    A.   I have been involved in a few of them
8  upstate.
9    Q.   When was the first such negotiation
10 that you were involved with?
11   A.   I don't recall an actual date.
12 Probably within the last seven years is the
13 first one.
14   Q.   With what large faculty practice did
15 you negotiate a separate reimbursement schedule?
16   A.   We actually did it with a provider's
17 office in a particular county where we had a
18 network need and there were selected procedure
19 codes only, CPT codes.
20   Q.   Why did you negotiate separately with
21 that provider's office?
22   A.   There was a network need that if we

Page 71

1  lost the provider's office we wouldn't have a
2  provider available to treat our patients.
3    Q.   What CPT codes were changed?
4    A.   Specifically, I don't remember the
5  codes.  Most -- the providers most likely
6  identified E&M codes, which are your office
7  visit codes.  Those are usually the high volume
8  codes that they bill.
9    Q.   What type of provider was it?
10   A.   It was a multispecialty group where
11 they had multispecialties.
12   Q.   What were the specialties?
13   A.   They had primary care specialties as
14 well as specialties such as gastro.
15   Q.   Did that negotiation involve any
16 oncologists?
17   A.   I do not recall any oncologists in
18 that group.
19   Q.   Did it involve any rheumatologists?
20   A.   No.
21   Q.   Was there any discussion about
22 physician-administered drugs?

Page 72

1    A.   If a group ever asked regarding
2  physician-administered drugs, as a company we do
3  not negotiate those prices for the
4  physician-administered drugs.
5    Q.   Does Empire negotiate prices for other
6  codes?
7    A.   It would be specific to the codes
8  listed in the current procedural terminology
9  book, the CPT codes would be the only ones that
10 we would negotiate.
11   Q.   Empire does on occasion, they
12 negotiate about CPT codes?
13   A.   The CPT codes are in the current
14 procedural code manual, so yes, those codes upon
15 occasion would be negotiated.
16   Q.   Why does Empire negotiate about those
17 codes and not about physician-administered
18 drugs?
19   A.   In my experience in dealing with the
20 providers' offices I have never had a provider
21 ever question the reimbursement of a drug by
22 Empire, so based on that information, we've

Page 73

1  never had the need and we've always determined
2  that since we haven't had the need, that is
3  something that we never negotiated on.
4    Q.   I thought I understood you previously
5  to say that Empire had a policy of not
6  negotiating about physician-administered drug
7  reimbursement.
8        Is that correct?
9    A.   That is correct.
10       What I said a minute ago, the reason
11 we've never negotiated and we made it the
12 policy, as I stated earlier, is we've never had
13 any complaints back, and based on that, we made
14 the policy and we said we would never negotiate
15 the AWP prices based on that.  I apologize.
16   Q.   In negotiating fee schedules with
17 particular providers, is Empire interested in
18 what its bottom line cost is likely to be?
19       MR. BENZA:  Objection.
20   A.   Usually when we negotiate with the
21 providers' offices, we only know what the
22 negotiation, how it impacts the group.

19 (Pages 70 to 73)

Christopher Eddy                       Highly Confidential- Attorneys' Eyes Only                      October 6, 2004
                                                    New York, NY

Page 74

1        As for the bottom line of the company,
2  we don't compare it to what it does overall to
3  the company, just the group.
4        Q.    How do you analyze the impact of the
5  fee schedule changes on the group?
6        A.    We look at the volume of services they
7  billed in a certain time frame, according to the
8  requests, and kind of look to see what they are
9  looking for and try to come up with a mutual
10 arrangement between both parties.
11       Q.    How does the volume of services play
12 into your analysis?
13       A.    It gives me an idea to see, first of
14 all, what we are going to be reimbursed, but it
15 also gives me an idea of what the groups being
16 reimbursed which, we know they have already done
17 their research on that, too, what they are
18 looking for.
19       Q.    How do you decide whether to accept an
20 offer of a different fee schedule from a
21 provider?
22             MR. BENZA:  Objection.

Page 75

1        A.    Specifically, when a doctor puts
2  something to us in writing, we review the
3  request and we look if there is a network need
4  for the provider or that provider left our
5  network, would we have providers that still
6  maintain our patients, see our patients, and in
7  some areas they are the only providers
8  available, so we need to keep them in our
9  network so we look at their proposal and we work
10 with them and try to come up with something
11 mutually agreeable to both parties and that is
12 presented to my boss with the information to get
13 approval for that.
14       Q.    How do you decide if it's agreeable to
15 Empire?
16       A.    That would be actually once I spoke to
17 the group and we've mutually agreed to
18 something, I would have to present that to my
19 boss to see if that is something that the
20 company would agree upon with the data that I
21 have available and discussion with the doctor's
22 office and the reasonings why we had to

Page 76

1  negotiate.  They look at a lot of different
2  variables and as for their decision, they may
3  come back and ask more questions.  They make the
4  final decision on what I am presenting to them.
5        Q.    What factors do you consider?
6        A.    I consider -- the biggest factor I
7  consider, to me, when I negotiate with the group
8  is the member is if I don't have this doctor,
9  what's going to happen to my patient and their
10 satisfaction with the network, and that's my
11 biggest consideration I look to do a
12 negotiation.
13       Q.    Would you agree to pay any price for a
14 necessary component of your network?
15       A.    No.
16       Q.    How do you decide what price?
17       A.    Usually a doctor's office will always
18 come in high and be willing to negotiate down,
19 and you work it out.  You know they will come in
20 that way, so you try to look at what they are
21 doing, you get a rough idea where they want to
22 go and you work on getting a proposal for them.

Page 77

1        Q.    Have you ever engaged in negotiations,
2  individual negotiations with providers about fee
3  schedules where you failed to reach agreement?
4        A.    I probably had a few small groups that
5  it didn't get that far, it was determined up
6  front that we just weren't going that way and we
7  decided upfront before we got into actual
8  negotiations, so we do get very few requests to
9  do this.
10       Q.    How did you determine that you weren't
11 going to go that way?
12       A.    The volume of members that they saw,
13 the other providers available in their territory
14 where they were close to other providers that
15 could handle the patients and treat them.  There
16 are a lot of factors we look at to make the
17 decision.
18       Q.    Is it correct to say you determined
19 that it wouldn't be worthwhile to pay more to
20 those physicians with whom you didn't reach
21 agreement?
22       A.    No.  I will let you go from there.

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                              New York, NY

Page 78

1      Q.    Why were you unwilling to negotiate a
2  separate fee schedule with some physicians?
3      A.    Some of the providers would not even
4  be willing to talk or negotiate, they he wanted
5  to set a flat amount, which was unrealistic.
6      Q.    Why was that unrealistic?
7      A.    The percentage amount they were
8  looking at was extremely high and I could not
9  justify doing that percentage for them, so
10  straight upfront, when we talked upfront, they
11  said okay and they said this is it, they kind of
12  said it is this amount or nothing, they made it
13  clear to me upfront, so we said no, we can't do
14  that, and so they said, okay, we are going to
15  terminate.
16      Q.    How do you know when you can justify
17  the percentage they were asking?
18      A.    Usually most offices are reasonable
19  and they are fair in the percentages they ask
20  for.  You get an unreasonable office that asks
21  for in excess of 150 percent of Medicare and
22  they are not willing to talk.  To me, that is

Page 79

1  unrealistic to offer a doctor that much money
2  when there are other providers in the same
3  territory that are willing, that still see the
4  patients and they see a higher volume than that
5  physician's office.
6      Q.    You are unwilling to pay a price that
7  is not competitive?
8      MR. BENZA:  Objection to competitive.
9      A.    I don't consider it as a price that's
10  being competitive.  I think it's a price of more
11  of an unrealistic request from an office.
12      Q.    How do you know that the request is
13  unrealistic?
14      A.    Just my experience, just dealing with
15  the requests I have done, just my experience in
16  seeing it and the percentage that people ask for
17  and how the context of the discussion goes.
18      Q.    Are there any competitive dynamics
19  associated with your negotiations with providers
20  for individual fee schedules?
21      MR. BENZA:  Objection.
22      A.    Mainly my discussions for fee

Page 80

1  schedules that we do are based, as I said
2  earlier, are based on the network need and the
3  product.  We would like to keep everybody in our
4  network, but there are times when we can't
5  negotiate with people, it's not realistic.
6      Q.    Because of a network need, do some
7  providers have more leverage in negotiations
8  with Empire?
9      A.    Yes, some providers could have more
10  leverage in those cases.
11      Q.    Is that leverage important to
12  determining the fees that are ultimately paid?
13      MR. BENZA:  Objection.
14      A.    In my experience in dealing with the
15  provider that fits that criteria, they did
16  approach me with something to that extent and
17  they were actually very willing and they
18  negotiated very fair on both parties, they did
19  not use their leverage to strong hand us.
20      Q.    How do you know that it's fair?
21      A.    That's my, just the basis of my
22  knowledge of what I thought they would have

Page 81

1  asked for.
2      Q.    What's your knowledge of what you felt
3  they would ask for?
4      A.    But knowing them being at only
5  provider in a certain region, I would have
6  thought they would have asked for a lot more
7  than they did and a lot higher, knowing they had
8  control of the market and the office actually
9  took the approach of being very fair in their
10  approach and they wanted to make some more
11  money, but they were willing to work to get a
12  mutual arrangement between the two, so based on
13  that information, my experience.
14      Q.    Did Empire pay that provider more than
15  it pays its other providers?
16      MR. BENZA:  Objection.
17      A.    In that particular region, yes, they
18  would be paying that doctor more than other
19  providers.
20      Q.    And the reason for that is that that
21  provider was a necessary component in your
22  network; is that right?

21 (Pages 78 to 81)

Christopher Eddy | Highly Confidential- Attorneys' Eyes Only | October 6, 2004
New York, NY

Page 82

1      A.    Necessary to our network.
2      Q.    In the cases in which you have
3   negotiated separately with providers about fee
4   schedules, were you approached originally by the
5   provider?
6      A.    Usually it's the practice
7   administrator that approaches the insurance
8   company.
9      Q.    But it is not Empire that approaches
10  the providers?
11     A.    No.
12     Q.    Approximately how many separate fee
13  schedules have you negotiated during your tenure
14  with Empire?
15     A.    I know of three that I have negotiated
16  full fee schedules.
17     Q.    What do you mean by full fee
18  schedules?
19     A.    In some cases with some larger faculty
20  practices or practices that we have had, they
21  have done a full fee schedule, which is all the
22  CPT codes, all of the medical codes and CPT

Page 83

1   listing.
2      Q.    In those instances, did you separately
3   negotiate about every CPT code?
4      A.    A percentage was determined and that
5   percentage was applied to all the CPT codes.
6      Q.    Other than those three negotiations
7   you have had about full fee schedules, have you
8   had any other negotiations with providers about
9   particular portions of the fee schedules?
10     A.    Yes, we have.
11     Q.    About how many?
12     A.    Since I am new to my department
13  upstate, I don't have all of the information for
14  my department.  I just know particularly what I
15  did in my territory at the time that I can speak
16  of, and I would say less than 10.
17     Q.    Have any of the negotiations about CPT
18  codes dealt with the codes for the
19  administration of physician-administered drugs?
20     A.    I don't recall that code coming up,
21  but without going back, without remembering each
22  one specifically, I couldn't definitely tell

Page 84

1   you, but I don't remember either of those two
2   specific codes that I can think of on the lists.
3      Q.    In the context of those discussions
4   about particular CPT codes, how did you evaluate
5   the value of the schedule change?
6      A.    Again, I went back and I looked at the
7   providers' claims data to see what they were
8   submitting because they provided me with the
9   particular codes, they gave me the particular
10  codes they were looking for, and I worked with
11  them on the particulars to reach an agreement.
12     Q.    Going back and looking at the
13  providers' claims data, did you try to determine
14  how much more Empire was likely to be required
15  to pay if it renegotiated the fee schedule?
16     A.    Yes, I did.
17     Q.    What did you do to determine that?
18     A.    I would look at the codes that they
19  were specifically requesting and I could see
20  their frequency either from the time frame I was
21  looking at and I could determine what we
22  currently paid and what we paid in the

Page 85

1   negotiation, so I knew exactly what they would
2   be getting.
3          MR. HOFFMAN:  Excuse me, Clay, you are
4      breaking up a little on the phone.  If you
5      could speak up, I would appreciate it.
6          MR. EVERETT:  Sure.
7      Q.    How did you balance those increased
8   costs against the value of the provider in the
9   network?
10         MR. BENZA:  Objection.
11     A.    At the time when I did those
12  negotiations, I was a coordinator or the senior
13  coordinator, I determined my network need and
14  what my network would be like if I lost those
15  providers and what access issues I would have
16  for my providers in those networks, and when I
17  presented that to my boss for approval, I
18  presented that information to her with my
19  information showing that if these providers left
20  the network, this is what would happen to the
21  network as the justification for that.
22     Q.    Did you do any analysis of the

22 (Pages 82 to 85)

Christopher Eddy                Highly Confidential- Attorneys' Eyes Only                October 6, 2004
                                          New York, NY

Page 86

1  competitive effects of having a provider missing
2  from a network?
3         MR. BENZA:  Objection.
4     A.   I never really compared it to my
5  provider network, my competitors' providers.  I
6  only specifically compared it to -- most of the
7  negotiations are done for primary care
8  physicians in areas, and I looked at if I lost
9  that physician, where the patient could go, and
10 if there was nothing available, that's what I
11 based my analysis on.
12    Q.   Were you concerned that if that
13 provider was not included in the network Empire
14 would lose some business?
15    A.   I mean, anytime a provider wants to
16 terminate, you are concerned that a member is
17 going to be upset.  I am not involved in the
18 daily selling of the business, so my concerns
19 are more for the members as an issue, because I
20 always think, in our position, we are provider
21 relations, but we deal with what the members
22 have to access, so my concern is I want to be

Page 87

1  sure the member is happy.  As for driving
2  business, I don't look at that portion of it.
3         MR. BENZA:  Would it be all right to
4     take a couple minutes' break?
5         MR. EVERETT:  That's fine.
6         (Recess taken.)
7  BY MR. EVERETT:
8     Q.   Mr. Eddy, I am handing to you now a
9  document that's been marked as Eddy Deposition
10 Exhibit 3.  It's a document bearing the Bates
11 numbers EMP 13651 through EMP 13656.
12        Take a minute and look at that
13 document.
14        (Exhibit Eddy 003, documents
15     bearing production Nos. EMP 0013651 through
16     EMP 0013657, marked for identification, as
17     of this date.)
18    A.   Okay.
19    Q.   Have you had a chance to look at the
20 document?
21    A.   Yes, I have.
22    Q.   Mr. Eddy, what is the preclinical

Page 88

1  policy committee?
2     A.   It's a committee that makes decisions
3  on medical policy for the company.
4     Q.   Who are members of that committee?
5     A.   Usually the members that make
6  decisions on that are the medical directors in
7  our company and then there is representation on
8  the committee from various departments in the
9  company.
10    Q.   What departments are represented?
11    A.   Our department is represented on it,
12 and I am trying to think what else is.
13        There's somebody from medical policy
14 and different staff members are there, and I
15 can't think of the names of all of the
16 departments, but there are provider services,
17 different areas where they attend the meeting,
18 listen to what's going on.
19    Q.   Who is the representative from your
20 department?
21    A.   Actually, it is Paul Portsmore or
22 myself.

Page 89

1     Q.   How long has this committee been in
2  existence?
3     A.   As for the existence, I don't know
4  when it actually started.  I started attending
5  this year when I was promoted.
6     Q.   Prior to this year, you don't know
7  whether it existed or not?
8     A.   Prior to this year, I didn't know what
9  the status was of the committee.  I assume it's
10 been in place.  I just don't know what they have
11 done, what they have done with that information.
12    Q.   In the time that you have been a
13 member of the preclinical policy committee, has
14 there been discussion about prices paid for
15 physician-administered drugs?
16    A.   This document indicates that
17 information on it and I have attended -- I
18 probably started in March of this year attending
19 the meetings on or off when my boss wasn't
20 available.
21    Q.   Have you attended any meetings where
22 there has been discussion of prices for

23 (Pages 86 to 89)

Page 90

1  physician-administered drugs?
2      A.   I don't recall if I was at this one in
3  particular. Other meetings, I don't recall the
4  information on it, because there are a lot of
5  subjects they usually discuss.
6      Q.   You don't recall if there has been any
7  discussion of physician-administered drugs at
8  meetings that you have attended?
9      A.   That's correct, the meetings that I
10 have attended, I don't recall, and I don't
11 recall if I went to this meeting, actually.
12     Q.   What topics are generally discussed at
13 the meetings of the preclinical policy
14 committee?
15     A.   They will review medical policy for
16 changes based on either requests from physicians
17 by Empire's coverage of services and the medical
18 directors review that information and present
19 those topics.
20     Q.   What do you mean by medical policy?
21     A.   What they do is we have our current
22 medical policy and a doctor may see MS, Medicare

Page 91

1  Services, pay something different than our
2  policy at the time, so the doctor will send in
3  information to our medical directors and they
4  review their information they supply with
5  information from the journals supporting that
6  study and then our medical directors look at
7  that information and make a decision if our
8  policy should be updated or corrected.
9      Q.   Do you include within medical policy
10 decisions about prices?
11     A.   Usually it's straight medical policy
12 at this meeting, and just being at the meeting
13 for a short time frame, that's what I have
14 specifically seen with specific procedures, the
15 policy decisions.
16     Q.   By medical policy, do you include
17 decisions about whether Empire will reimburse at
18 all for a particular medical procedure?
19     A.   They would look at information and
20 some procedures are determined to be
21 experimental and investigational which are not
22 covered, and that's because of how the policy is

Page 92

1  set up for them, and it may affect if they are
2  reimbursed or not.
3      Q.   If you will look down to the second to
4  last paragraph on the first page, the paragraph
5  that begins "Drugs related to oncology," do you
6  see that?
7      A.   Yes.
8      Q.   Have you ever negotiated separate fee
9  schedules with any oncologists?
10     A.   I would have to go back and look at
11 those specific groups that we have full fee
12 schedules to see if there are oncologists in the
13 practices to see if they would be under the full
14 fee schedules.
15     Some of the groups had them and then
16 they have since changed their practice and they
17 no longer have them in their groups.
18     Q.   How would Empire find out about the
19 provider objections to potential changes to
20 Empire's medical policy?
21     A.   Most likely that's from providers
22 writing in to our medical director regarding

Page 93

1  concerns of current programs that are doing,
2  what the company is doing about concerns if they
3  add more to those programs or make changes to
4  those programs.
5      Q.   Are providers ever informed of
6  potential changes in Empire's medical policies?
7      A.   They are only informed once the change
8  has been decided and approved. There's no prior
9  notification of the change.
10     Q.   In this context, do you have any
11 understanding of how Empire came to understand
12 that critical provider objections would be made
13 by oncologists, urologists and rheumatologists
14 for changing the basis for reimbursement for
15 physician-administered drugs?
16     MR. BENZA:  Objection as to the
17 characterization of what the document says.
18     A.   As for the document, I don't know what
19 they have there that they reviewed other than
20 what I have heard from my own providers.
21     Q.   What have you heard from your own
22 providers?

24 (Pages 90 to 93)

Christopher Eddy    Highly Confidential- Attorneys' Eyes Only    October 6, 2004
New York, NY

Page 94

1    A.    I have heard from the group that they
2    were concerned because they buy from a
3    particular vendor or a manufacturer directly and
4    they wanted to continue going to that
5    manufacturer because they were concerned about
6    not getting the appropriate drugs or having
7    their drugs, as they said, stolen in the mail
8    when they were shipped to them, and that's the
9    concerns that I have heard voiced to me from one
10   practice.
11       Q.    When were those concerns voiced?
12       A.    Within the last two to four weeks we
13   had a discussion.
14       Q.    What gave rise to the discussion?
15       A.    The doctors weren't happy with our
16   current program and they wanted to let it be
17   known to their coordinator and then I got
18   involved with that.
19       Q.    What is the current program?
20       A.    Specialty Rx.
21       Q.    Does page EMP 13651 the discussion
22   under injectables refer to the Specialty Rx

Page 95

1    program?
2    A.    The second paragraph, there is a
3    mention of Specialty Rx.
4    Q.    Does the entire discussion talk about
5    Specialty Rx?
6    MR. BENZA:  Objection.  The document
7    speaks for itself.
8    MR. EVERETT:  I am just asking for his
9    interpretation.
10   A.    To me, the notes just indicate what
11   their response is to in that specific paragraph,
12   what they are saying.
13       I mean, as for the context of what he
14   is looking at, the rest of it, I don't know what
15   was said in the discussion in the meeting.
16       Q.    Are the rates that have been
17   negotiated with Specialty Rx reflected in
18   Empire's fee schedules?
19       A.    As far as what I know that Specialty
20   Rx is, there is a list of drugs that correspond
21   to that program and if a patient requires those
22   drugs, the patient or the provider would go

Page 96

1    through Specialty Rx to obtain that drug and
2    that's the only way that I could obtain the
3    drug for our programs is through Specialty Rx.
4    If the drug is not on a Specialty Rx list, the
5    drug would be reimbursed at the AWP price that
6    we have listed.
7    Q.    Is the Specialty Rx price list
8    incorporated in Empire's fee schedules?
9    MR. BENZA:  Objection to incorporated.
10   A.    I just answered that for you in the
11   context that I said, I said the members have to
12   go through Specialty Rx, so if they don't go
13   through Specialty Rx and they buy it elsewhere,
14   they don't use the program, the drug is denied,
15   the doctor can't get payment from the patient
16   because he didn't follow the guidelines of the
17   program.  So however you want to look at that
18   you could say, if they don't utilize Specialty
19   Rx, there is zero payment, there's nothing in
20   the fee schedule.  If they utilize it and get
21   the approvals, it's going to be reimbursed
22   according to those guidelines.

Page 97

1    Q.    Does Empire keep a fee schedule as a
2    separate document?
3    A.    For the drug codes, as I said earlier,
4    it is based off of the AWP and always references
5    AWP, depending on these programs, so it is not
6    specifically in our fee schedule.
7    Q.    If we turn now to the next page,
8    13652, first of all, having looked at this
9    document, does it refresh your recollection at
10   all as to whether you attended this meeting?
11       A.    I still don't recall, looking at it.
12   I mean, I would have to go back and check my
13   calendar for the date just to verify if it was.
14       Q.    Do you recall ever having discussions
15   about non self-injectable drugs that are
16   discussed in this document?
17       A.    I have had discussions about Specialty
18   Rx with people in my staff and different things
19   like that, but as for the specifics of the
20   other, I have not been involved in setting any
21   change of reimbursement as what they are looking
22   at here.

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                              New·York, NY

Page 98

1    Q.    Are reimbursements for
2  physician-administered drugs in the Empire
3  system based on J codes?
4    A.    It does look at the J code, but it
5  also looks at the corresponding NDC code.
6    Q.    Are there multiple NDC codes that
7  correspond to individual J codes?
8    A.    I know there's different dosage
9  amounts under certain drugs.  Offhand, I don't
10  remember.  I would have to look and see if there
11  are separate NDC codes for each dosage amount,
12  but there could be different dosages they use,
13  but I can't remember if there is a separate NDC
14  code for each dosage.
15    Q.    Do AWPs vary based on NDCs?
16    A.    AWPs can vary based on the dosages of
17  the vials, there's different levels it can be.
18    Q.    Are there separate NDCs based on the
19  packager of the drug?
20    A.    I don't know.
21    Q.    How does Empire decide which AWP to
22  use in reimbursing for physician-administered

Page 99

1  drugs that have assigned to them a J code?
2        MR. BENZA:  Objection.
3        MR. HOFFMAN:  Objection.
4        What do you mean by which AWP is used?
5        MR. BENZA:  That is the basis for my
6  objection as well.
7    A.    Can you be more specific or --
8    Q.    Do AWPs vary based on NDCs?
9        MR. BENZA:  Objection.  I don't think
10  that is --
11    A.    I am not well versed in the NDCs,
12  because we usually refer the providers back to
13  the drug topics book when they have questions,
14  so the only time I would specifically go out to
15  look and see if there is a specific code is if
16  somebody questioned a claim and we were
17  specifically looking at it to help them out.
18        Without looking at it there, I can't
19  tell you if there's different levels for that
20  portion of it, the NDC codes, I would
21  specifically·have to look at the system to see.
22  I don't work with them every day, so I don't

Page 100

1  have that knowledge.
2    Q.    You don't know whether AWPs vary based
3  on the NDC code?
4    A.    Right, since I don't work with it
5  every day, I can't tell you that.  If I looked
6  on the system, I might be able to give you an
7  answer.
8    Q.    Is there an AWP published for each NDC
9  code?
10    A.    What I always follow is the drug
11  topics book is whatever is listed in there,
12  there's going to be the drug and the
13  information, that's what it's going to relate
14  to.  That's how we relate that to the provider.
15        I don't get into the specifics of
16  looking up the reimbursement for the pricing of
17  them, to provide that, so I couldn't tell you.
18    Q.    Are the listings in the drug topics
19  book of AWPs listed by NDC?
20        MR. HOFFMAN:  Objection.
21        Are you asking him his understanding
22  or are you asking him·to speak definitively

Page 101

1  on those books?
2        MR. EVERETT:  I am asking for his
3  understanding.
4    A.    My understanding I have is ours is
5  based on an Internet system at work and I can go
6  in and type in a date, either a J code or NDC
7  code and get information when a provider calls
8  me with a question, so my experience in using it
9  is just that system of what I am seeing.  I
10  don't have the actual book to look to see if it
11  is different by other ways.
12    Q.    In the system that Empire uses, you
13  can type in a J code and that will pull up a
14  particular AWP?
15    A.    If the J code is an active code and it
16  can go in, it will pull up the information.  If
17  not, you have to be more specific and indicate
18  the NDC information on it.  It all depends on
19  the particular drugs.
20    Q.    How do you determine the NDC for those
21  products where typing in a J code won't pull up
22  an AWP?

26 (Pages 98 to 101)

Christopher Eddy                 Highly Confidential- Attorneys' Eyes Only                October 6, 2004
                                          New York, NY

Page 102

1    A.    I actually refer that back to the
2    provider's office and ask them to give me a copy
3    of the bill with the NDC code on it. I have no
4    other way to determine that. They give me the
5    actual code to look at and that's what I am
6    following.
7         Q.    On page 13652 the third to last bullet
8    point before committee decisions indicates that
9    therefore most of the claims are currently
10   suspended from AWP pricing.
11        Do you see that?
12   A.    Yes.
13        MR. BENZA: I am sorry, where is that?
14   Okay.
15        Q.    Do you have an understanding of what
16   manual pricing means?
17   A.    Unfortunately, I have never processed
18   claims of Blue Cross, so I can't tell you
19   specifically what they do to process a claim
20   manually, so --
21        Q.    Do you have an understanding generally
22   of what it would mean to manually price claims

Page 103

1    in the Empire system?
2    A.    With this, I mean, just from my own
3    thoughts here now thinking is if there are
4    different doses of it, they would either
5    probably have to contact the provider's office
6    to get more specific information because
7    different dosages could have different
8    reimbursement levels and without having the
9    correct dosage or knowing what that dosage is,
10   they can't pay that claim correctly, so those
11   may kick out to a person to review and either
12   somehow either send the letter back or contact
13   the office for more information.
14        Q.    Why would different dosages have
15   different reimbursement numbers?
16        MR. BENZA: Objection.
17   A.    I honestly couldn't speak to that
18   because I am not a pharmacist or doctor. I have
19   noticed, looking at the codes, there are
20   different levels, but I am not a medical person,
21   so I couldn't tell you the difference of why one
22   pays more on that. I just see the different

Page 104

1    codes out there.
2         Q.    You have noticed that there are
3    different prices or codes for different dosages;
4    is that correct?
5    A.    Yes.
6         Q.    How does Empire decide what dosage to
7    use in determining its reimbursement for
8    physician-administered drugs?
9         MR. BENZA: Objection.
10        MR. HOFFMAN: Objection.
11   Q.    You can answer.
12   A.    Usually, from what I have heard from
13   complaints through my coordinators is the
14   provider has to supply an NDC code in addition
15   to the J code when they send it in and that will
16   point them to the correct payment to be paid.
17        Q.    What is the medical cost forum?
18   A.    I actually have not been involved in
19   that, so I honestly couldn't tell you what they
20   do.
21        Q.    Are you aware that there is a group
22   called the medical cost forum in Empire?

Page 105

1    A.    Yes, I am. I have heard the name.
2         Q.    Do you know generally what they do?
3    A.    I actually -- I know they have
4    meetings, but I don't know the specifics of
5    their meetings, what the decisions are. I have
6    heard the name, I just don't know what they
7    actually do.
8         Q.    Who is involved in the medical cost
9    forum from Empire?
10   A.    Since I haven't been involved, I don't
11   know. I assume that that would be senior
12   management, but I don't know who that would be,
13   who those people would be.
14        Q.    Why do you assume that that would be
15   senior management?
16   A.    Just that, to me, it is above me still
17   that information, and it is not in my knowledge,
18   has not been told to me, so I assume other
19   people higher up are involved in that meeting.
20        MR. BENZA: Don't assume.
21        THE WITNESS: Sorry.
22   Q.    Is anyone from provider relations

27 (Pages 102 to 105)

Christopher Eddy                     Highly Confidential- Attorneys' Eyes Only                     October 6, 2004
                                             New York, NY

| Page 106 | Page 108 |
|---|---|
| 1 involved in the medical cost forum? | 1    A.   I think, as I indicated earlier, I |
| 2    A.   I don't know. | 2 think that was in 2003.  I don't have the actual |
| 3    Q.   You mentioned previously that Empire | 3 time frame. |
| 4 at some point in the late 1990s changed its | 4    Q.   What products are covered by the |
| 5 reimbursement for physician-administered drugs | 5 Specialty Rx contract? |
| 6 to AWP for its HMO products; is that correct? | 6    A.   If I recall correctly, that's the |
| 7    A.   Yes. | 7 managed care products that we offer, but I would |
| 8    Q.   Did Empire receive any complaints from | 8 have to go back and look at the documentation |
| 9 providers when it made that change in pricing | 9 just to make sure, to verify that. |
| 10 physician-administered drugs? | 10    Q.   Does Empire offer any products that |
| 11    A.   It's so long ago that I don't recall, | 11 are not managed care products? |
| 12 I don't recall any complaints that I received or | 12       MR. BENZA:  Asked and answered, |
| 13 heard. | 13    objection. |
| 14    Q.   Did any providers drop out of the | 14    A.   We have some old indemnity products |
| 15 Empire network due to the change in | 15 out there that have been out there forever that |
| 16 reimbursement for physician-administered drugs | 16 are not managed care. |
| 17 in HMO products? | 17    Q.   What is the basis for reimbursement in |
| 18    A.   I don't recall anything at that time, | 18 those products? |
| 19 the providers withdrawing because of that. | 19    A.   Some of the products are sold, I |
| 20    Q.   Mr. Eddy, I am going to hand to you | 20 couldn't tell you.  There is one product in |
| 21 now a document that's been labeled as Eddy | 21 particular upstate called Matrix and that is |
| 22 Deposition Exhibit 4.  This is a document | 22 based on a percentage of Medicare RBRVS. |

| Page 107 | Page 109 |
|---|---|
| 1 bearing the Bates numbers E 28250 through E | 1    Q.   Are there other indemnity products |
| 2 28261. | 2 besides that upstate New York product? |
| 3       Take a minute and look at that | 3    A.   There are probably some other old ones |
| 4 document. | 4 that are small membership numbers, but I don't |
| 5       (Exhibit Eddy 004, documents | 5 recall specifically their names. |
| 6 bearing production Nos. E 28250 through E | 6    Q.   Do you know what the basis for |
| 7 28261, marked for identification, as of this | 7 reimbursement is under those indemnity products? |
| 8 date.) | 8       MR. BENZA:  Objection. |
| 9    Q.   Are you familiar with that document? | 9    A.   I can only speak specifically as to |
| 10    A.   No. | 10 Matrix, what the reimbursement is for that. |
| 11    Q.   Was Empire entered into any contracts | 11    Q.   You don't know what the basis is for |
| 12 with specialty pharmacy providers? | 12 reimbursement of the other indemnity products? |
| 13    A.   The only information on that I know | 13    A.   The other ones have been out there so |
| 14 would be Specialty Rx. | 14 long and are so old, we there probably very few |
| 15    Q.   What is Specialty Rx? | 15 or there isn't anybody on those anymore.  I |
| 16    A.   That's the drug company that I | 16 couldn't tell you what the specifics on those |
| 17 indicated earlier that deals with handling | 17 are anymore, we just don't see them that much. |
| 18 certain drugs for Empire where the member would | 18    Q.   Does the contract with Specialty Rx |
| 19 have to go through that vendor to obtain those | 19 relate to physician-administered drugs? |
| 20 drugs. | 20    A.   The contract with Specialty Rx relates |
| 21    Q.   When did Empire start working with | 21 to a list of drugs that's sent out with their |
| 22 Specialty Rx? | 22 mailing. |

28 (Pages 106 to 109)

Christopher Eddy                Highly Confidential- Attorneys' Eyes Only                October 6, 2004
                                        New York, NY

Page 110

1    Q.    What drugs?
2    A.    I don't know the specifics of what it
3    would have been.  The mailing sent to the
4    providers would have told them specifically
5    which drugs had to be Specialty Rx.
6    Q.    Are all of the drugs that are part of
7    the Specialty Rx list administered by physicians
8    in their offices?
9          MR. BENZA:  Objection.
10   A.    I honestly couldn't tell you that
11   because I don't know where the physician would
12   utilize the drugs, if they utilized them in
13   their office or elsewhere.  I mean, there was
14   information listed on the mailing, but as for
15   the provider treating his patient, that's their
16   decision where he sees the patient.
17   Q.    Are they all physician-administered
18   drugs?
19   A.    Without looking at the names, knowing
20   what they were, I couldn't tell you if they were
21   all physician-administered drugs or not.  I am
22   not a physician so I wouldn't recall all that.

Page 111

1    Q.    Turn to page E 28255 and look at the
2    list that runs from page E 28255 through E
3    28259.
4          Are the drugs listed on those pages
5    the drugs that are part of the Specialty Rx
6    program?
7    A.    I do not know.  Without looking at the
8    two and comparing, I couldn't tell you.
9    Q.    What would you compare them to?
10   A.    I would have to look at the mailing
11   that was sent out to the providers with regard
12   to Specialty Rx to see if they were the same
13   drugs.
14   Q.    You are only familiar with the mailing
15   provided to providers?
16   A.    Yes.  This is not specific to my
17   department, this document.
18   Q.    Which department would have the
19   responsibility for negotiating a contract
20   relating to physician-administered drugs with a
21   specialty pharmacy?
22   A.    This contract here would most likely

Page 112

1    be handled by our pharmacy department.
2    Q.    What changed when Empire began to use
3    Specialty Rx?
4          MR. BENZA:  Objection.
5    A.    I honestly don't know what their
6    reason, their decision was in that change.
7    Q.    I am not asking why they changed.  I
8    am just asking mechanically what changed.
9          MR. BENZA:  Objection.
10         MR. HOFFMAN:  Same objection.
11   A.    I still don't know what they did to
12   that.
13   Q.    You indicated that a mailing was sent
14   out to physicians after Empire entered into a
15   contract with Specialty Rx; is that correct?
16   A.    Yes.
17   Q.    What sort of information did that
18   mailing provide to physicians?
19   A.    It gave them an overview of the
20   Specialty Rx program, a list of drugs, and it
21   also gave them a document that they could fill
22   out to either be faxed in or gave them -- I

Page 113

1    think the protocol was to call in and get
2    approval for those drugs.
3    Q.    What is the Specialty Rx program?
4    A.    It's a program with a vendor that
5    handles providing drugs that have been
6    identified, certain drugs that have been
7    identified, this vendor is the vendor that
8    supplies them to providers or members.
9    Q.    How is that drug provided to the
10   providers or members?
11   A.    Once the provider fills out the form
12   and completes it, based on that information,
13   either the drug is forwarded to the patient or
14   the physician.
15   Q.    Forwarded by --
16   A.    Specialty Rx.
17   Q.    Prior to the time that Empire had the
18   contract with Specialty Rx, were drugs provided
19   to providers or members of Empire's network by a
20   specialty pharmacy?
21         MR. BENZA:  Objection.
22   A.    I do not know of anything in place.  I

                                        29 (Pages 110 to 113)

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                               New York, NY

Page 114

1    don't know if there was because I am not on the
2    pharmacy side to tell if there was something in
3    place, but as far as I know, I don't recall
4    anything other than Specialty Rx.
5        Q.    Do you know why Empire decided to
6    enter into a contract with Specialty Rx?
7        A.    No, I do not.
8        Q.    Did Empire solicit bids from specialty
9    pharmacies other than Specialty Rx before
10   entering into the Specialty Rx contract?
11       A.    I don't know.
12       Q.    Does Specialty Rx provide to providers
13   in Empire's network any supplies other than the
14   actual drugs?
15       A.    I don't know.
16       Q.    Does Specialty Rx provide to Empire
17   any services other than the provision of drugs?
18           MR. BENZA:  Objection.
19       A.    Again, I don't know either.
20       Q.    Does Empire have any preference as to
21   whether drugs are administered in a hospital
22   versus in a physician's offices?

Page 115

1            MR. HOFFMAN:  Objection.
2        A.    I don't know of any preference that
3    they would have.
4        Q.    To your knowledge, is it more
5    expensive to Empire to have drugs dispensed to
6    Empire's members in a hospital than in a
7    physician's office?
8        A.    Since I don't deal with the hospital
9    contracting piece, I don't have any idea what
10   the reimbursement would be there, so I really
11   couldn't tell you if it would be higher or
12   lower.
13       Q.    In your job as regional director of
14   provider relations, do you do anything to try to
15   control Empire's costs of doing business?
16           MR. BENZA:  Objection.
17           MR. HOFFMAN:  Objection.
18       A.    As regional manager for provider
19   contracting, I don't have anything to do with
20   the costs, controlling the costs, I am not
21   involved in any way.
22       Q.    In any of your previous positions were

Page 116

1    you involved in controlling costs?
2        A.    No, I was not.
3        Q.    Did Empire believe that providers were
4    earning a margin on drugs that they dispensed to
5    Empire's beneficiaries?
6            MR. BENZA:  Objection.
7            MR. HOFFMAN:  Objection.
8        A.    I actually don't have any knowledge of
9    that, I couldn't tell you.
10       Q.    Other than the negotiations that you
11   had with individual provider groups about
12   particular changes to the fee schedule, do you
13   have any responsibilities for setting Empire's
14   reimbursement to providers?
15       A.    I don't have any responsibilities with
16   respect to reimbursement.
17       Q.    Do you have any responsibilities
18   associated with the reimbursement to physicians?
19       A.    I may see a recommendation of what
20   they are looking at to present, but I have no --
21   other than seeing what they are looking at, I
22   have no piece of making that recommendation.

Page 117

1        Q.    Who does that?
2        A.    In our department, we are split up,
3    each of us handle different avenues.  One of my
4    peers may be responsible to looking at the fee
5    schedules and making recommendations to
6    management, but I am not involved with that.
7        Q.    By your other peers, you mean the
8    other regional directors?
9        A.    The other regional managers.
10       Q.    In your meetings with the other
11   regional managers, have you discussed the Empire
12   fee schedules?
13       A.    Yes, we have.
14       Q.    Have you discussed Empire's policies
15   for reimbursing physicians?
16       A.    We've mainly discussed the fee
17   schedules concerns that we hear from our
18   provider network, that's what we've discussed.
19       Q.    Is it just a free-ranging discussion
20   of provider complaints?
21           MR. HOFFMAN:  Objection.
22       A.    In most cases, it is regarding, we are

Henderson Legal / Spherion
(202) 220-4158

Christopher Eddy                Highly Confidential- Attorneys' Eyes Only                October 6, 2004
                                          New York, NY

Page 118

1    hearing questions from the providers in our
2    community.  That's pretty much what we base our
3    discussions on, is what we are hearing coming
4    in.
5        Q.    Do you make decisions about
6    reimbursement rates from physicians at those
7    meetings of regional managers?
8        A.    We have not.
9        Q.    Do you make recommendations about
10   reimbursement levels based on the discussions
11   that are held at meetings of regional managers?
12          MR. HOFFMAN:  Objection.
13          Recommendations to whom?  Oral
14   recommendations, written recommendations?
15          MR. EVERETT:  I appreciate that.
16       Q.   You can answer the question.
17       A.    Currently I am not involved with the
18   recommendations, so I have not had an
19   opportunity yet to make a decision like that.
20       Q.    Is that something that would be
21   discussed in the meetings with regional
22   managers?

Page 119

1          MR. BENZA:  Objection.
2        A.    It could be, it could be a topic.
3        Q.    How do you know that it could be a
4    topic?
5        A.    If we have a meeting and one of my
6    counterparts brings that topic up in a meeting,
7    it could be discussed at the meeting, I mean, if
8    they discuss it as an option that might be
9    happening.  Right now we haven't had that
10   discussion, so I am not saying it would never
11   happen, but it is something that could happen.
12       Q.    Do you have agendas for those
13   meetings?
14       A.    We have not.
15       Q.    Does Empire try to figure out
16   providers' costs in setting reimbursement levels
17   for providers?
18          MR. BENZA:  Objection.
19       A.    I haven't been involved in that, so I
20   couldn't tell you if they do that or not.  I
21   mean, other than my negotiations, I haven't been
22   involved in any other piece of that.

Page 120

1        Q.    In your negotiations, do you try to
2    figure out providers' costs in determining
3    whether to offer reimbursement?
4        A.    As I indicated earlier, mainly what we
5    try to figure out is what their current cost is
6    and what the future cost to be of the
7    negotiation for the providers and that's what we
8    do in the process.
9        Q.    What do you do to determine their
10   current costs?
11       A.    We look at their claims volume for a
12   particular period of time and compare that to
13   the current fee schedule and then any change
14   over that reimbursement would be the change the
15   office is requesting that we are looking to
16   negotiate.
17       Q.    By provider costs, I mean the costs
18   that are paid by the provider for overhead, for
19   services, for products --
20       A.    No.
21          MR. BENZA:  Let him ask the question.
22          THE WITNESS:  Sorry.

Page 121

1        Q.    Do you try to figure out those
2    provider costs --
3          MR. EVERETT:  Strike that.
4        Q.    Have you tried to figure out those
5    provider costs in your negotiations with
6    providers about fee schedules?
7        A.    No, we have not.  I wouldn't have
8    knowledge of all the costs, what they are.  We
9    haven't discussed that.
10       Q.    And you are able to reach some
11   agreement with providers without knowing their
12   costs?
13          MR. BENZA:  Objection.
14       A.    So far, in the majority of the cases,
15   as I said earlier, the exceptions we have been
16   able to come up with a mutually-agreed upon
17   price in the negotiation.
18       Q.    And those prices have been agreeable
19   to Empire?
20       A.    Yes, to both parties.
21       Q.    Is Empire a Medicare carrier?
22       A.    In what terms are you looking at as a

Henderson Legal / Spherion
(202) 220-4158

Christopher Eddy    Highly Confidential- Attorneys' Eyes Only    October 6, 2004
New York, NY

Page 122

1  Medicare carrier?
2     Q.    Does Empire administer any Medicare
3  products?
4     A.    We have the senior plan HMO and we
5  also are available as a secondary program that
6  members can pick up in addition to Medicare.
7     Q.    What is the senior plan?
8     A.    The senior plan, it's an HMO program
9  that is offered in, I want to say the lower
10 eight or nine counties around New York City, and
11 those members would choose a primary care
12 physician to manage their care and then they
13 would be able to see any doctor in the HMO
14 network without a referral.  Usually the members
15 would have a copayment on their ID card that
16 they would have to pay the primary care
17 physician.
18    Q.    Is that plan a Medicare Plus Choice
19 plan?
20    A.    I am not familiar with it because it's
21 not in my territory, it's only down here, so
22 since it is not in my territory, I don't look

Page 123

1  through all of the information, so I am not 100
2  percent sure if it is.  Since upstate we can't
3  offer it, I am not versed in the whole program,
4  what it is.
5     Q.    Does Empire have separate negotiations
6  with providers about reimbursement for its
7  senior plan?
8     A.    Senior plan, as far as I know, is
9  reimbursed the same as the other HMO products,
10 there is no different reimbursement.
11    Q.    Does the senior plan cover
12 physician-administered drugs?
13    A.    I don't know the actual benefits of
14 the program, so I really can't give you a
15 definite answer on that.  It's an HMO program,
16 but I don't know the actual benefits on the
17 program.
18    Q.    Does Empire receive circulars from the
19 centers for Medicaid and Medicare services?
20    MR. BENZA:  Objection to circulars.
21    A.    More specific can you tell me?  I am
22 not sure if we do receive those.

Page 124

1     Can you be more specific?
2     Q.    Does Empire receive information from
3  the centers for Medicare and Medicaid services?
4     MR. BENZA:  Objection.
5     A.    Again, I don't know.  There is a
6  specific area that deals with the senior plan in
7  the company, I mean, that deals with managing of
8  the program, so I don't know what they receive,
9  what they get in that aspect of it, so I really
10 can't answer that for you.
11    Q.    Do your duties have anything to do
12 with Medicare?
13    A.    With senior plan, no.  Medicare
14 secondary, sometimes we get those, there's a lot
15 of patients that have secondary Medicare.
16    Q.    What is Medicare secondary?
17    A.    Usually it is a supplemental policy
18 that the member purchases from Empire Blue Cross
19 and they have a deductible to be met, and then
20 what happens is when Medicare does not pay the
21 20 percent, the 20 percent that is not covered
22 rolls over to Empire.  We will then process the

Page 125

1  claim and pay that according to that plan.  We
2  would pay 80 percent, the member has a 20
3  percent responsibility or they could have a
4  deductible.  It is all what their benefit is at
5  that time, what they have met.
6     Q.    If you combine the member's copay and
7  the payments made by Empire as part of this
8  Medicare secondary program, is the full amount
9  of the leftover Medicare payment paid?
10    MR. BENZA:  Objection.
11    MR. HOFFMAN:  Objection.
12    A.    It could vary and that is a hard
13 question to answer, because depending on the
14 service rendered, I mean, is it something that
15 Medicare covers or not, I mean, and the other
16 aspect, when you look at the deductibles, the
17 coinsurance and things, there's a lot of factors
18 in there that it may not add up, so --
19    Q.    For some services Medicare requires
20 beneficiaries to make a 20 percent copayment.
21    Are you aware of that?
22    A.    Yes, I am.

32 (Pages 122 to 125)

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                              New York, NY

Page 126

1     Q.    Does the -- in the cases where
2  Medicare requires the beneficiaries to make a 20
3  percent copayment, does Empire's secondary
4  Medicare coverage apply to pay for any of those
5  copayments?
6          MR. BENZA:  Objection.
7          MR. HOFFMAN:  Objection.
8     A.    The coverage will most likely be based
9  on the member's benefit, the member's contract,
10 and that will depend what gets paid, the
11 particular groups, I mean, whatever their policy
12 is.
13         To answer that, it is not -- I mean,
14 you really can't tell without looking, there
15 isn't a definite answer.
16    Q.    Is the Medicare copay one of the
17 things that's covered by the secondary Medicare
18 policies offered by Empire?
19         MR. BENZA:  Objection.
20    A.    Again, it's a coinsurance for Medicare
21 that crosses over and the member could still be
22 responsible for a portion of that, and without

Page 127

1  seeing a claim, an actual claim process, there
2  is not a definite answer I can tell you yes, it
3  would cover it all the way or not all the way.
4     Q.    I am not asking you if it is covered
5  all the way or not covered all the way, just
6  whether it is in any cases covered at all.
7     A.    That 20 percent coinsurance, when it
8  crosses over, could be covered and paid.  I
9  mean, without seeing the actual patient and that
10 information, what was billed, I couldn't tell
11 you that it's always going to happen that way.
12    Q.    What do you mean by --
13    A.    Something may come over, they may
14 still have a deductible they owe, so we wouldn't
15 make any payment, but the patient would be
16 responsible.  So, I mean, not knowing all of the
17 factors, there is not really a definite answer
18 that I can tell you yes we would pay or Empire
19 wouldn't pay in those cases.
20    Q.    That is not my question.  The question
21 is whether they would ever pay.
22         MR. BENZA:  Objection.

Page 128

1     A.    Again, it's the same thing back again.
2  I really can't give you a definite, a specific.
3     Q.    What are the factors that play into
4  that?
5     A.    If the member's deductible has been
6  met, the policies or services that are being
7  billed.  There are lots of things that come into
8  effect when a claim comes across that may not
9  always -- when you think about it, yes, it may
10 pay, no, it may not pay, and again, it is not
11 getting back -- there are lots of factors that
12 could influence the way, if it could do what you
13 are asking it to do.
14    Q.    Let's assume a situation where the
15 Medicare deductible has been completely paid,
16 the service is covered by Medicare, there is a
17 20 percent copayment.  The member has a policy
18 with Empire for a secondary Medicare coverage.
19         In that circumstance, would Empire pay
20 a portion of the copayment?
21         MR. BENZA:  Objection.
22         MR. HOFFMAN:  Objection.

Page 129

1     A.    Again, it is specific.  We could pay a
2  portion of that, they could be responsible.  I
3  actually don't know without seeing the claim.
4     Q.    Is the secondary Medicare coverage
5  offered by Empire an indemnity program?
6          MR. HOFFMAN:  Objection.
7     A.    It does meet the criteria of an
8  indemnity program because the member, in
9  essence, can see whoever they want to see, they
10 are not restricted for referrals or stuff like
11 that, so technically, you could say yes, it
12 could be considered an indemnity program.
13    Q.    Are the terms of Empire's
14 reimbursement to providers for its secondary
15 Medicare coverage determined by reference to
16 Empire's fee schedules?
17         MR. BENZA:  Objection.
18    A.    Claims for patients with secondary is
19 referenced back to what Medicare approves.  When
20 it rolls across to us, we can pay up to the
21 Medicare approved amount, depending upon the
22 services of the contractors, a lot of factors,

33 (Pages 126 to 129)

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                    New York, NY

Page 130

1    but we look at the Medicare approved amount on
2    our fee schedule.
3        Q.    You indicated that you can pay up to
4    the Medicare amount.
5            In what cases would Empire pay less
6    than the Medicare allotment?
7        A.    If for some reason a claim came across
8    that we did not make any payment, the patient
9    had the responsibility, we, in essence, did not
10   make any payment, the member is paying the
11   difference up to that, so the member is going to
12   get billed by the provider up to that Medicare
13   amount, it is based on what their benefit is
14   with us on the claim, if we pay that amount or
15   not.
16           MR. BENZA:  Could we take five?
17           MR. EVERETT:  Let's go off the record.
18           (Recess taken.)
19   BY MR. EVERETT:
20       Q.    Mr. Eddy, does Empire employ any
21   physicians?
22       A.    We have medical directors on staff.

Page 131

1        Q.    Are there any physicians in the
2    provider contracting division?
3        A.    In what context are you looking, in
4    our department, I mean, or more specific or --
5        Q.    Just whether there are any physicians
6    in the provider contracting department.
7        A.    The only one that I -- there is
8    Dr. Wolinsky who does medical policy, and I
9    don't know where he rates, which department he
10   is actually linked to for you, and then the -- I
11   can't think of what his title is, but there is
12   Dr. Sokolow who is the head of our division.
13   Other than that, I don't know of any other
14   physicians.  I just don't know where
15   Dr. Wolinsky fits in, if he is in another area
16   or what.
17       Q.    Dr. Sokolow is the head of what
18   division?
19       A.    He is in charge of the managed care
20   area, but I don't know what his actual title is.
21       Q.    Did Dr. Sokolow ever have a clinical
22   practice?

Page 132

1            MR. BENZA:  Objection.
2        A.    I don't know.
3        Q.    Do you know if Dr. Wolinsky ever had a
4    clinical practice?
5            MR. BENZA:  Objection.
6        A.    I don't know either.
7            MR. EVERETT:  What is the basis for
8    that objection?
9            MR. BENZA:  You are going to have
10   Dr. Wolinsky here.
11           MR. EVERETT:  That doesn't make the
12   question objectionable to him.
13           MR. BENZA:  Also, you know, lack of
14   foundation.
15           It's okay, he can answer.  I didn't
16   instruct him not to answer.
17       Q.    You testified earlier that you
18   believed AWP referred to the prices paid by
19   providers to purchase drugs from manufacturers;
20   is that correct?
21       A.    I think the word that I probably -- I
22   think I said earlier was AWP is the price that

Page 133

1    the manufacturer sets for the cost of the drug.
2    It's not the price -- it's what the manufacturer
3    sets the price as, I think is what I said.
4        Q.    How is that different from the price
5    that's paid by the provider?
6        A.    The provider has to pay what the
7    manufacturer sets, so depending upon how you
8    look at it, I mean, in my context, I just said
9    what the manufacturer set.  As far as I know,
10   the provider can't say I am only going to pay
11   you this amount of money, they have to pay what
12   the manufacturer says.
13       Q.    Do you believe that there is any
14   difference in terms of percentage between AWP
15   and the prices that providers pay?
16       A.    To me, it should be the same, as far
17   as I know.
18           MR. EVERETT:  Mr. Eddy, I have no
19   further questions for you right now.
20           Are there any questions from any of
21   the other defense counsel on the phone?
22           MS. KILLOREN:  I have nothing.

34 (Pages 130 to 133)

Christopher Eddy                   Highly Confidential- Attorneys' Eyes Only                   October 6, 2004
                                   New York, NY

Page 134

1      MS. SCHLESSLER:  I have nothing.
2      MR. HOFFMAN:  Plaintiffs' counsel will
3  have some questions.
4      If we could, can we take a five-minute
5  break, we will come back?
6      MR. BENZA:  Fine with us.
7      MR. HOFFMAN:  Okay.
8      (Recess taken.)
9  EXAMINATION BY
10 MR. HOFFMAN
11     Q.   Good morning, Mr. Eddy.  I am Allan
12 Hoffman, attorney for the plaintiffs.
13     A.   Good afternoon.
14     Q.   I just had some questions concerning
15 your earlier testimony, some follow-up
16 questions.
17     First, you testified earlier that the
18 original fee schedule that was set up in 1994
19 for Empire was at 125 percent of Medicare.
20     Do you recall that?
21     A.   Yes, I do.
22     Q.   When you said Medicare in that

Page 135

1  context, were you talking about the Medicare
2  part B fee schedule?
3      A.   We base our fee schedule off of
4  Medicare RBRVS.
5      Q.   Can you describe that?
6      A.   Medicare has reimbursement for
7  physicians and they have a relatively based
8  relative value system they use to calculate a
9  reimbursement price and we use that value they
10 calculate as a basis for our fee schedule.
11     Q.   Is that an AWP-based system?
12     A.   I would say it's probably not.  I
13 mean, Medicare comes through some type of -- I
14 don't know what their mechanism is for creating
15 their fee schedule, but most everybody bases
16 their fees in some form or way off of Medicare.
17     Q.   Is it possible Medicare, that the
18 Medicare system is an AWP-based system and you
19 are just not sure?
20     A.   AWP-based, my understanding is that is
21 a price set by the manufacturer.  Medicare sets
22 its price, but I don't know what format they use

Page 136

1  to set that.  I can't speak specifically to how
2  Medicare creates their schedule.
3      Q.   You spoke about contracts that were,
4  that referenced managed care, the managed care
5  fee schedule.
6      Do you recall that?
7      A.   I remember speaking about the managed
8  care contracts, yes.
9      Q.   You had said that it doesn't
10 specifically reference AWP, but it is AWP based
11 in the fee schedule; is that right?
12     MR. EVERETT:  Objection to the form.
13     A.   The managed care agreement references
14 in a section of it the managed care fee schedule
15 as the reimbursement to a provider.  It does not
16 have any mention in that document about AWP at
17 all, it just references straight managed care
18 fee schedule.
19     Q.   But the fee schedule has always been
20 AWP based; is that correct?
21     A.   Yes.  As far as I recall, from when I
22 have been in the department until now, it's

Page 137

1  always been AWP-based, that is correct.
2      Q.   Has it always been the contract that
3  was in place or is there another type of
4  contract that preceded that?
5      A.   Since I have been in the department,
6  it's always been AWP-based.  I don't have any
7  other knowledge that it wasn't based off of
8  that.
9      Q.   And the fact that it references
10 managed care fee schedule, did the contracts
11 before that reference AWP specifically, do you
12 know?
13     A.   I don't recall anything in specific
14 contracts.
15     Q.   The drugs that are purchased through
16 Specialty Rx you spoke about earlier, do you
17 recall that?
18     A.   Yes.
19     Q.   Those drugs are purchased based on an
20 AWP-based formula; isn't that correct?
21     MR. EVERETT:  Objection to form.
22     A.   I don't know the specifics of the

35 (Pages 134 to 137)

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                                    New York, NY

Page 138
1  pricing behind Specialty Rx and how that is set
2  up. I know of the program and the protocols of
3  how the provider or the member have to go about
4  obtaining the drugs, but I don't know
5  specifically the reimbursement methodology
6  beyond that.
7       Q.    Would you look at Exhibit 4, what was
8  marked as Exhibit 4 earlier.
9       A.    Yes.
10      Q.    Turning to Exhibit 1 --
11            MR. EVERETT:  Exhibit 1?
12      Q.    Turn to Exhibit 1 within that
13 contract, the drug addendum.
14      A.    Yes.
15      Q.    Do you see that has ingredient costs,
16 AWP discount.
17      A.    I see that on the document.
18      Q.    Does that refresh your recollection as
19 to whether or not this contract is reimbursed in
20 an AWP-based system?
21      A.    This contract is specific to the
22 pharmacy department, it's not my department, so

Page 139
1  I don't have knowledge of what they did when
2  they wrote that, so I really couldn't tell you
3  the specifics of how that works.
4       Q.    You don't know one way or the other?
5       A.    No.  I would leave that to them to
6  provide that answer.  I don't have the definite
7  answer on that.
8       Q.    Is it your understanding that other
9  than when applying a usual or customary amount
10 that the reimbursement for drugs under the
11 Empire plan's providers are AWP-based?
12      A.    The usual and customary amount I
13 referenced earlier I referenced specifically to
14 providers and medical services.
15            As for the drug services and
16 reimbursement, I am not involved in the actual
17 pricing of those drugs, so I couldn't tell you
18 the usual and customary effect of the drugs,
19 only the provider piece of the business.
20      Q.    How about on the services side?
21      A.    On the services side, for a provider
22 if he is billing for an office visit or another

Page 140
1  service and he is nonparticipating, the fees,
2  the service would be looked at according to the
3  usual and customary fee schedule and reimbursed
4  that way.
5       Q.    When it is not based on usual and
6  customary fee schedule, what is that based on?
7       A.    It's based on if it is a managed care
8  account, it is based on a managed care fee
9  schedule.
10      Q.    Which is AWP-based; is that correct?
11      A.    Yes.
12      Q.    What is Empire seeking to cover when
13 it reimburses physicians based on AWP?
14      A.    Could you clarify that?
15      Q.    I am not sure I understand what you
16 are looking for.
17      Q.    When they set up the system to cover
18 based on AWP, what is it they are seeking to
19 cover for the provider?
20            MR. BENZA:  Objection to it.  It what?
21            MR. HOFFMAN:  I am sorry, who made
22      that objection?

Page 141
1            MR. BENZA:  I did.  You said it, and I
2  am just wondering what the it is that you
3  reference there.
4       Q.    I don't know exactly what I said.
5            What is Empire seeking to cover in
6  reimbursing physicians based on AWP?
7            Do you understand that question?
8       A.    It's my understanding that AWP is the
9  price that the doctor is purchasing the drug
10 for, it's what he is paying for the drug, so my
11 understanding of that is we are reimbursing the
12 provider for what he's spent on the drug.
13      Q.    Okay.
14            Does Empire view its reimbursement
15 rate for physician-administered drugs as an
16 opportunity for manufacturers to mark up the
17 cost of drugs?
18            MR. EVERETT:  Objection.
19      A.    I can't really answer that because I
20 don't really know.  I have always -- I always
21 have thought that the AWP is the actual price,
22 so I don't have any knowledge of that.

36 (Pages 138 to 141)

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                              New York, NY

Page 142

1      Q.    Right.  But my question is, does
2  Empire choose to reimburse drugs -- does it
3  choose its rate for reimbursement with the
4  intention of it being an inflated cost of a drug
5  or inflated AWP?
6          MR. EVERETT:  Objection.
7      A.    I have no knowledge of the inflated
8  AWP, so I really can't answer that.
9      Q.    Let me ask that another way.
10          Is it important for Empire that AWP
11  prices be as accurate as possible?
12          MR. EVERETT:  Objection, foundation.
13      A.    I have always thought the AWP price
14  was the price that was the accurate price.
15      Q.    Right.  Is that important to Empire
16  that it be the accurate price?
17          MR. EVERETT:  Same objection.
18      A.    I would say yes, it would be important
19  if it's the price.
20      Q.    Why is that?
21      A.    Because I want to make sure that I'm
22  reimbursing my providers fairly for a service.

Page 143

1      Q.    Would knowing that a drug's AWP was
2  substantially higher than what the physician is
3  paying for the drug affect the amount Empire
4  would pay to reimburse the physician?
5      A.    I don't know.  I really couldn't
6  answer that.  I mean, everything that I know,
7  all of my knowledge that I have is based on AWP
8  being the actual price, so I have no knowledge
9  to believe that it's not the case.
10      Q.    Is it fair to say that Empire would
11  prefer to use a noninflated AWP benchmark as
12  opposed to an inflated benchmark?
13          MR. EVERETT:  Objection.
14      A.    I am actually not the person who makes
15  that decision, so I don't know.
16      Q.    What's your understanding?
17          MR. EVERETT:  Same objection.
18          I don't know what you mean by
19  inflated.
20      A.    I am still not sure where you are
21  going with the question, so I --
22      Q.    Okay.  My question is a simple one.

Page 144

1          I was just asking whether Empire would
2  prefer a noninflated AWP benchmark as opposed to
3  learning that the AWP is an inflated benchmark
4  and is not tied to prices or an average of
5  prices.
6          MR. EVERETT:  Objection.
7      A.    My only knowledge of the whole topic
8  is what I read in the complaint, so I really
9  can't provide an adequate answer because I have
10  not done any research into that information,
11  even to review it to see if there is an issue
12  there, so I don't feel -- I don't have a
13  decision that I could say, provide you with an
14  answer.
15      Q.    Let me ask you this:  Would Empire be
16  interested in negotiating prices from a
17  benchmark that is as accurate as possible?
18          MR. EVERETT:  Objection.
19          What do you mean by accurate?
20      A.    Could you be more specific?
21      Q.    Well, when you go about setting
22  reimbursement rates and you said that is an

Page 145

1  AWP-based system, isn't it important to Empire
2  that the AWP benchmark be accurate?
3          MR. EVERETT:  Objection.
4      A.    It's my knowledge right now that the
5  AWP system is the accurate number that we're
6  using.  Since I have not done any research or
7  seen any other research, it's hard for me to say
8  another way that it's inaccurate.  I would have
9  to see stuff to know.  Right now I don't know
10  that information.
11      Q.    Right.  You testified earlier that you
12  would want it to be accurate because you would
13  want to know that your reimbursement system was
14  the right amount to be paying providers.
15          MR. EVERETT:  Objection,
16  mischaracterizes his testimony.
17          MR. BENZA:  You can answer his
18  question.
19      Q.    Is that correct?
20      A.    I would like it to be accurate --
21          MR. BENZA:  Really, it's yes or no.
22      A.    Yes, it should be accurate.

37 (Pages 142 to 145)

Page 146

1        MR. BENZA:  That's what he was asking
2    you..
3    Q.    Okay.
4    A.    I want it to be accurate, I mean, I
5    want it to be accurate, but right now, just with
6    what my knowledge is, I have no belief that AWP
7    isn't accurate.  So I don't know that other than
8    what I have seen and heard in the complaint.
9    Q.    I am not asking you what your
10    knowledge is.  I am just asking whether that is
11    an important factor for you and your answer was
12    yes?
13    A.    Yes.
14    Q.    You spoke earlier about certain J code
15    drugs and I just want to clarify for my
16    understanding, did the J code drugs include AWP
17    drug cost and an administration fee?
18    A.    Administration fees can be paid on the
19    drugs.  I couldn't tell you specifically which
20    drugs it is or is not, I mean, that would
21    probably look at policy to see if there were a
22    decision not to allow administration for certain

Page 147

1    drugs, but if it is allowed, we could pay a J
2    code and a corresponding admin fee to the
3    provider.
4    Q.    Is the drug cost itemized in those
5    circumstances?
6    A.    When the provider bills on those
7    claims, he would bill for the drug with the J
8    code and include the NDC and then bill the admin
9    cost additionally.
10    Q.    Okay.  So you would view it to
11    determine what the AWP cost was in that case,
12    separate from the administration fee?
13    A.    Yeah, you would have to go back over a
14    claim and look at a claim and actually see and
15    identify the claims, but they are two different
16    lines, the doctor has to bill separately.
17    Q.    Returning back to the U&C in the
18    medical service environment, would you agree
19    that U&C is not frequently used as a basis for
20    payment in those settings?
21    A.    Yes.
22    Q.    If it is not a U&C basis for payment

Page 148

1    for brand drugs, it would be an AWP-based
2    payment?
3        MR. EVERETT:  Objection.
4    A.    We have a very large provider network,
5    so, yes, it would be paid under the AWP.
6    Q.    Now, you were talking earlier about
7    alternative fee schedules that are negotiated
8    with practices, with provider practices.  You
9    had said you negotiated three that you are aware
10    of alternative full fee schedules and less than
11    10 partial fee schedules.
12        Do you recall that?
13    A.    Yes, I do.
14    Q.    Okay.  And just to put it in
15    perspective, how many provider practice
16    contracts have you negotiated that did not
17    involve alternative fee schedules, can you
18    approximate that?
19    A.    I would probably say overall, I mean,
20    85 -- at least 85 percent to 95 percent of my
21    providers are on standard fee schedules.
22    Q.    Has that always been the case?

Page 149

1    A.    Yes.
2    Q.    The senior plan you referred to, is
3    that also an AWP-based reimbursement for the
4    drugs on that plan?
5    A.    I don't know specifically since I
6    don't deal with it up in my territory, I don't
7    know the specifics of that program.
8    Q.    So you don't know either way?
9    A.    It's an HMO-based program, but I am
10    not a definite, I don't have a definite answer.
11    Q.    Who would know the answer to that?
12    A.    We would probably have to talk to
13    somebody that is in that area.  I mean, I would
14    say -- I would more lean to yes, it is an
15    HMO-based reimbursement, but I am not 100
16    percent sure on that.
17    Q.    Let me ask you one last question.
18        Would Empire want to know if AWPs were
19    inflated?
20        MR. EVERETT:  Objection.
21        MR. BENZA:  That's a yes or no.
22    A.    I would say yes.

38 (Pages 146 to 149)

Christopher Eddy                    Highly Confidential- Attorneys' Eyes Only                    October 6, 2004
                                              New York, NY

Page 150

1     Q.    Why is that?
2     A.    If the pricing was -- if we were
3  paying more than we should have, I would say, as
4  a company, we would want to know that.
5     Q.    Why is that?
6     A.    Because the price that we are going
7  by, the benchmark, the AWP then wouldn't be
8  correct, so that would be something that we
9  would probably want to look into.
10    Q.    Would that knowledge be used in
11 determining reimbursement rates by Empire?
12    A.    It could be.
13          MR. HOFFMAN:  Those are all of the
14    questions that I have.
15          MR. EVERETT:  I just have a couple of
16    questions to clarify a couple of things you
17    just said.
18 BY MR. EVERETT:
19    Q.    Just to be clear, Empire doesn't
20 reimburse for any medical services or procedures
21 based on AWP, does it?
22    A.    No.  The medical services are based on

Page 151

1  our fee schedule.
2     Q.    I know you testified about this
3  previously, but is there a document that is the
4  managed care fee schedule?
5     A.    There is not an actual document.  It's
6  actually, to print every code off you would have
7  huge piles of paper.  It is actually on our
8  system, we have to pull down codes as doctors
9  request them.
10    Q.    Does that system make any direct
11 reference to AWP?
12    A.    When a claim comes in, I don't know
13 how it truly processes on the system, how it
14 gets that price.  It is somehow directed over to
15 the system where the AWPs are housed, but I
16 don't know exactly how that works behind the
17 scenes.
18    Q.    I believe you testified a moment ago
19 that if payments for physician-administered
20 drugs are not made at usual and customary, then
21 they are made at some AWP-based price by Empire;
22 is that correct?

Page 152

1     A.    If the drug, as you stated, comes in
2  from a non-par provider, it looks at the U&C.
3  If it is a par provider, it would pay according
4  to our fee schedules again.  It looks at our fee
5  schedules and then if it is a drug, it would go
6  out to the AWP and process according to that.
7     Q.    If the provider billed Empire less
8  than the AWP-based price that Empire was willing
9  to pay, would Empire pay the billed charge?
10    A.    Yes.
11          MR. EVERETT:  I don't have any other
12    questions.
13          I think we are done.
14 BY MR. HOFFMAN:
15    Q.    Are you aware of an instance where
16 that's occurred?
17    A.    I have not seen an instance where that
18 occurred, but if the providers bill less than
19 our fee schedule, we will pay them as what they
20 bill us.
21    Q.    You are unaware of that ever
22 occurring, though; is that correct?

Page 153

1     A.    I have not seen it occur.
2          MR. HOFFMAN:  Okay.
3          Do you have any further questions,
4    Clay?
5          MR. EVERETT:  No, I don't.
6          MR. BENZA:  Thank you all very much.
7          (Time noted:  4:04 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

39 (Pages 150 to 153)

Christopher Eddy                Highly Confidential- Attorneys' Eyes Only                October 6, 2004
                                         New York, NY

Page 154

```
 1            C E R T I F I C A T E
      STATE OF NEW YORK    )
 1                         : ss.
      COUNTY OF NEW YORK   )
 2
 3            I, CARY N. BIGELOW, RPR, a Notary
 4      Public with in and for the State of New
 5      York, do hereby certify:
 6            That CHRISTOPHER EDDY, the witness
 7      whose testimony is hereinbefore set forth,
 8      was duly sworn by me and that such
 9      testimony given by the witness was taken
10      down stenographically by me and then
11      transcribed.
12            I further certify that I am not
13      related to any of the parties to this
14      action by blood or marriage, and that I am
15      in no way interested in the outcome of this
16      matter.
17            IN WITNESS WHEREOF, I have hereunto
18      set my hand this 6th day of October, 2004.
19
20           _____
21            CARY N. BIGELOW, RPR
22
```

40 (Page 154)